1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Carlos Holguín (Cal. Bar No. 90754)
2   Peter A. Schey (Cal. Bar No. 58232)
3   256 South Occidental Boulevard
    Los Angeles, CA  90057
4   Telephone: (213) 388-8693
5   Facsimile: (213) 386-9484
    Email: crholguin@centerforhumanrights.org
6          pschey@centerforhumanrights.org

7   ORRICK, HERRINGTON & SUTCLIFFE LLP
8   Elena Garcia (Cal. Bar No. 299680)
    egarcia@orrick.com
9   777 South Figueroa Street, Suite 3200
    Los Angeles, CA 90017
10  Telephone:  (213) 629-2020
11

12  *Attorneys for plaintiffs (listing continues on following page)*

13                      UNITED STATES DISTRICT COURT
14          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15

16  JENNY LISETTE FLORES, *et al.*,        )   Case No. CV 85-4544 DMG (AGRx)
                                            )
17          Plaintiffs,                     )   EXHIBITS 12 AND 13 IN SUPPORT OF
                                            )   PLAINTIFFS' MOTION TO ENFORCE
18  - vs -                                  )   [REDACTED VERSION OF DOCUMENT
                                            )   PROPOSED TO BE FILED UNDER SEAL]
19  DANA J. BOENTE, ACTING ATTORNEY         )
    GENERAL OF THE UNITED STATES, *et al.*, )
20                                          )
                                            )
21          Defendants.                     )
                                            )
22  _____       )

23

24

25

26

27

28

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:  (408) 280-2437
Facsimile:   (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

Case 2:85-cv-04544-DMG-AGR Document 201-1 Filed 05/19/16 Page 181 of 290 Page ID #:4366

# Exhibit 12
## Publicly Filed

## DECLARATION OF ROBYN BARNARD, ESQ.

I, Robyn Barnard, Esq., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an associate attorney with Human Rights First's Refugee Representation team, 75 Broad Street, Floor 31, New York, N.Y. 10004. Human Rights First provides *pro bono* representation to asylum seekers through its offices in New York, Washington, D.C., and Houston, Texas, often in conjunction with major law firms. Our organization's clients include many mothers and *Flores* class-member children who fled their countries to seek protection in the United States.

2. I am admitted to practice in New York. My day-to-day practice involves interviewing and assisting indigent asylum seekers in immigration detention and helping them find *pro bono* legal representation. I have represented asylum seekers in the United States for approximately one year and previously assisted asylum seekers in Australia.

3. I provide this declaration to document the conditions that some families currently in immigration detention face, to explain the effects on detained families transferred from one facility to another, and the challenges that transferring families between facilities poses for *pro bono* legal services providers.

## BERKS COUNTY RESIDENTIAL CENTER *PRO BONO* REPRESENTATION PROJECT

4. On August 11, 2015, I toured the Berks County Family Residential Center (the "Berks facility") located in Leesport, Pennsylvania. I was accompanied by lawyers from Human Rights First and Philadelphia law firms, a social worker, and pediatricians. We had the opportunity to speak with approximately sixteen parents and some of their children, in a

1

group setting, about their experiences at the Berks facility. At least some of these families included *Flores* class members.

5. When our group asked the parents how many had *pro bon,* or any type of legal representation, only two knew with certainty that they had a lawyer. One thought that she had a lawyer, but had never spoken with the attorney.

6. On August 19, 2015, Human Rights First published a report documenting our research and findings in relation to the Berks facility. (See Ex. 1.)

7. That report concluded, among other things, that "[d]etention worsens the situation for already vulnerable children and parents." Parents held in family detention appear to suffer from depression and children appear to experience "behavioral regressions, depression, anxiety, and increased aggression toward both parents and other children." (*Id.* at 1.)

8. In response to the seemingly low rate of *pro bono,* or other types of, legal representation of families detained at the Berks facility, Human Rights First partnered with a local Berks County legal service provider, the Pennsylvania Immigrant Resource Center (PIRC); local private attorneys; Philadelphia-based law firms; and Pennsylvania law schools ("*pro bono* representation project") to attempt to provide *pro bono* legal representation for families detained at Berks, many of whom include *Flores* class members. Nevertheless, because of the remote location of this detention center, effective and thorough legal representation for the majority of *Flores* class members and their mothers is very challenging.

9. In early November 2015, Refugee and Immigrant Center for Education and Legal Service (RAICES), CARA Pro Bono Project attorneys,[1] and other attorneys representing detained *Flores* class members informed me that several families had disappeared from the Dilley and Karnes detention centers in Texas. It turned out that the families had been transferred to the Berks facility.

10. Since October 28, 2015, the *pro bono* representation project at the Berks facility has screened at least 51 families, of which 44 were transferred from either the Dilley or the Karnes facilities. At least 31 of these transferred families had been held in the Dilley or Karnes facilities for more than 20 days before they were transferred to the Berks facility; and at least six of those families had been detained in Texas for more than two months before their transfer to Pennsylvania. All of the families who have been transferred to the Berks facility since late October received an initial "negative" fear determination from the asylum office that adjudicated their credible or reasonable fear interviews in Texas.

11. In reviewing approximately 44 "negative" fear interview records for *Flores* class members and their mothers transferred from the two Texas family detention facilities to the Berks facility, I observed evidence of conditions that may prevent accurate assessments of credible fear:

    (a) Inadequate interpretation services;

    (b) lack of an adequate explanation to the class members and mothers regarding the purpose of the interview or review hearing;

---

[1] CARA is a collaborative effort to provide pro bono legal services to families in detention made up of RAICES, the American Immigration Lawyers Association, Catholic Legal Immigration Network, and the American Immigration Council.

3

(c) failure to explain to class members and mothers what it means to be a member of a "social group" (the basis for most denials);

(d) use of form-letter denials that do not explain the individualized basis for the denial, thus precluding effective review by immigration judges or federal courts; and

(e) families represented by counsel in Texas, who had requested review of denials of their credible or reasonable fear interviews before immigration judges, were transferred to Berks before their immigration judge hearings had taken place.

12. Once a transfer takes place, our collective in Pennsylvania must rush to identify newly transferred families, attempt to find volunteers to interview them about their fear of return and the circumstances surrounding their prior fear interviews and review hearings in Texas, and hastily assemble and file requests for re-interview with the Newark Asylum Office before the families are deported. Given the large number of families involved, the remoteness of the Berks facility, and delayed access to detainees' Immigration and Customs Enforcement (ICE) administrative files, effective representation for the majority of detainees is very difficult.

13. I have observed no changes in ICE policies or practices regarding *Flores* class members since the District Court issued its remedial Order on August 12, 2015. The Court ordered that as required by Paragraph 18 of the Settlement, "Defendants, upon taking an accompanied class member into custody, shall make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14 of the Agreement." Review of the administrative files for class members and mothers we have interviewed at Berks, when finally obtained, show no compliance with this part of the Court's Order.

4

14. On February 19, 2016, Human Rights First published summary of medical complaints
made by mothers at Berks, which include the written responses they received from their
ICE deportation officers (DO). (Ex. 3.) One mother wrote:

> My son suffers from a skin disease named ███████████ and since we
> arrived in the United States, it developed itself so much to the point he even has
> symptoms on his genitals. When scratched it bleeds and [the detention center
> health staff] did not give me any medications for it or to calm him down, also his
> behavior has changed, he cries because he does not want to stay here any longer,
> it has already been over four months and I am still here.

In their response, her ICE DO advised her to make an appointment with the medical
staff at Berks, not addressing her concerns that the medical staff had not helped her child
despite visits to the medical department at the detention center. The ICE DO went on to
say, "[y]ou may accept your removal order and arrangements can be made for your
removal from the United States. At this time your custody status remains unchanged."
Another complaint reads:

> My daughter has been having diarrhea for about three weeks now and we went to
> see a doctor but they did not give us any medication not even serum. With every
> passing day her behavior is getting worse and the psychologist just tells me to be
> patient. I need you to give me the adequate medication and that you give me the
> opportunity to take my case outside of here. I am not a criminal. You gave the
> opportunity to other persons that have been deported to leave, why did you not
> give it to me. It has been more than four months that I have been detained.

ICE DOs response: "Thank you! You may disolve [sic] your case at any time and return to your country. Please use the medical department in reference to health related issues."

I declare under penalty of perjury that the above facts are true and correct to the best of my knowledge.

Executed this 9th day of May 2016, in the city of New York, state of NY.

Robyn Barnard, Esq.

Case 2:85-cv-04544-DMG-AGR   Document 201-1   Filed 09/29/16   Page 210 of 290   Page ID
#:4759

# Exhibit 12 Attachment
# Exhibit 3

# Health Concerns at the Berks Family Detention Center

**February, 2016**

In summer 2014 the Obama Administration announced their intention to detain large numbers of asylum-seeking families from Central America as part of a new policy aimed at deterring other families and children from migrating to the United States. The Berks County Residential Center in Pennsylvania, which has been in operation for 15 years, is one of three family immigration detention centers where U.S. Immigration and Customs Enforcement (ICE) detains families. While ICE has presented family detention as a "humane alternative" to preserve family unity during immigration proceedings, a growing body of research shows that detention, even for limited periods of time, is harmful to the health and development of children.

The Pennsylvania Department of Human Services (PA DHS) licensed the Berks County facility as a child residential facility for dependent and delinquent children. However, in October 2015, PA DHS issued a decision that the license, which expires on February 21, 2016, would not be renewed due to the fact that the facility holds asylum-seeking families, as opposed to only children, as the license allowed. The facility has appealed the decision to not renew its license to the Bureau of Hearings Appeals—an administrative body within Pennsylvania's Department of Human Services.

## Mothers at Berks Raise Health Concerns—ICE Suggests Removal in Response

In December 2015, mothers at the Berks facility expressed concern over their prolonged detention and the negative impact it has had on their children's health in written complaints to ICE. Human Rights First obtained copies of seven such complaints which include the written responses they received from their ICE Deportation Officers (DO). We have removed the mothers' names and translated their messages.

Each mother expressed concern for her child's unresolved medical and/or mental health issues. One mother, who had been detained for four months at the time of her complaint, told the ICE DO of her son's skin condition that had spread over his body, leading to continuous scratching and bleeding.

> My son suffers from a skin disease named ████████████ and since we arrived in the United States, it developed itself so much to the point he even has symptoms on his genitals. When scratched it bleeds and [the detention center health staff] did not give me any medications for it or to calm him down, also his behavior has changed, he cries because he does not want to stay here any longer, it has already been over four months and I am still here.

The ICE DO responded that she should make an appointment to see the medical department in the facility, without addressing her concerns that previous visits with health staff were unhelpful. The ICE DO went on to state, "You may accept your removal order and arrangements can be made for your removal from the United States. At this time your custody status remains unchanged."

207

Another mother with a five-year-old daughter issued the following grievance to ICE and received the answer below.

> Mother's request: My daughter has been having diarrhea for about three weeks now and we went to see a doctor but they did not give us any medication not even serum. With every passing day her behavior is getting worse and the psychologist just tells me to be patient. I need you to give me the adequate medication and that you give me the opportunity to take my case outside of here. I am not a criminal. You gave the opportunity to other persons that have been deported to leave, why did you not give it to me. It has been more than four months that I have been detained.

> ICE's response: Thank you! You may disolve [sic] your case at any time and return to your country. Please use the medical department in reference to health related issues.

Other mothers brought up behavioral changes in their children including lack of appetite, difficulty sleeping, increased crying, and feelings of desperation and distress. Some noted the length of time they had already been detained—upwards of four months—and others expressed frustration over having relatives (including, in one case, the child's father) in the United States who would welcome them to stay pending the resolution of their case. All received seemingly uniform responses from ICE either directing them to make an appointment with facility medical staff or suggesting they accept an order of deportation.

These documents demonstrate serious concerns and warranted immediate action from the ICE officers overseeing these families while they are in detention. The ICE DOs' responses exemplify why the Obama Administration's system of family detention is incapable of satisfying basic obligations for the health and well-being of the children and families in their custody.

On February 5, 2016, thirty mothers at the facility wrote an open letter asking for their release. They wrote:

> [Our] children have suffered psychological damage, and many of them have suffered health-wise, because of this confinement, and not to mention the racist abuse and poor treatment from certain members of the staff in this detention center, but especially by the agents of ICE that play and mock our dignity as immigrants. We came here seeking refuge. We came to this country to save our lives and the lives of our children.

## Ongoing Federal Litigation to End Family Detention

On July 24, 2015, the U.S. District Court for the Central District of California ruled in _Flores v. Lynch_ that the federal government had failed to comply with a settlement agreement that sets standards for the detention and release of children in federal immigration custody. In its notice of appeal, the government argued that family detention is "becoming short-term in most cases" and its family detention facilities are "processing centers" where individuals could be interviewed and screened "rather than detained for a prolonged period of time."

The families detained for months on end at Berks stand in stark contradiction to the government's assertion. At present, all of the families at Berks are asylum seekers and the vast majority are mothers from Central America who have been detained for upwards of one month, with one family detained by ICE since August 2015—nearly six months.

## Detention is Harmful to Children's Health

The types of health and behavioral concerns raised by the mothers at Berks are not uncommon to children held in immigration detention. Human

208

Rights First, along with pediatricians and a social worker, spoke with families at Berks in August 2015. The parents—including those who have been detained for two or three weeks—related symptoms of their children's behavioral regressions, depression, anxiety, and increased aggression toward both parents and other children.

Even if the government were able to process families within 20 days—the self-imposed timeline it created in the *Flores* litigation—research has shown that any period in detention can be detrimental to children's health and development. Attorneys, children's rights advocates, and medical professionals have repeatedly called for an end to the detention of families, citing the negative health impacts. Despite ICE reform announcements and subsequent changes at the detention centers, the fact remains that ICE is not suited to care for children and these centers remain instruments of confinement.

On July 24, 2015, the American Academy of Pediatrics wrote a letter to Secretary of Homeland Security Jeh Johnson stating, "We question whether the existing family detention facilities are capable of providing generally recognized standards of medical and mental health care for children." The letter also noted the particular vulnerability of asylum seekers who have already experienced significant trauma, noting that the "detainment of any children and mothers in the existing [family detention] facilities puts them at greater risk for physical and mental health problems and unnecessarily exposes children and mothers to additional psychological trauma."

Attorneys and advocates for the families have also raised privacy and safety concerns with the facility operator and ICE. Since families are typically placed in rooms that accommodate six individuals (often three parent-child dyads), children have been forced to share a room with unrelated adults. They must sleep, dress, and use the restroom with no door or privacy from adults, who may be of the opposite sex, in the same room.

## Recommendations

- The Obama Administration should end its misguided policy of detaining immigrant families. The license to operate the Berks County Residential Center expires on February 21, 2016 and will not be renewed. In light of this clear message from child welfare authorities, the federal government should end family detention once and for all and immediately release the families who are currently detained at Berks. Community-based alternatives to detention programs have proven effective in ensuring appearance for court hearings. Moreover, most families detained at Berks have legal counsel—and government data shows that 98 percent of families who are represented by legal counsel are in compliance with their immigration court obligations.

- Berks County should abandon its appeal to the Pennsylvania Bureau of Hearings and Appeals. Detaining asylum-seeking children and their parents is harmful to their health and well-being. Many local groups have spoken out against Berks County's involvement in family detention and called for the facility's closure.

- The Pennsylvania Department of Human Services should seek an emergency removal of residents, if ICE and Berks County continue to detain families at the Berks County Residential Center after the license expires.■

Case 2:85-cv-04544-DMG-AGR   Document 201-1   Filed 09/09/17   Page 215 of 290   Page ID #:4393

# Addendum

## Redacted Correspondence

---

### Complaint #1

Name: ▮▮▮▮▮▮▮   A#: ▮▮▮▮▮▮▮

Date: December 7, 2015

My son suffers from a skin disease named ▮▮▮▮▮▮▮ and since we arrived in the United States, it developed itself so much to the point he even has symptoms on his genitals. When scratched it bleeds and they did not give me any medications for it or to calm him down, also his behavior has changed, he cries because he does not want to stay here any longer, it has already been over four months and I am still here.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/2015   Staff Member: ▮▮▮▮

If your child is experiencing medical issues please make an appointment to see the medical department here at the facility. Your attorney filed a motion in the Eastern District Court of PA which temporarily stays your removal. You may ask your attorney to withdraw that motion. You may accept your removal order and arrangements can be made to your removal from the United States. At this time your custody status remains unchanged.

---

### Complaint #2

Name: ▮▮▮▮▮   A#: ▮▮▮▮▮

Date: December 7, 2015

My son is 6 years old, he is desperate because of such confinement. It worries me a lot that something bad could happen to him here. He's very hyperactive, aggressive, the desperation has made him this way. He cries a lot because of this despair. I am afraid that something bad will happen to him. I need you to help me and to give me the opportunity to take my case out of here.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15   Staff Member: ▮▮▮▮

If you are experiencing issues related to your safety/ security or well-being at the shelter please report these incidences to county staff. If you are experiencing other issues related to medical/ psychological, please make an appointment to see the medical staff or to speak with a psychologist. At this time your custody status will remain unchanged.

---

### Complaint #3

Name: ▮▮▮▮▮   A#: ▮▮▮▮▮

Date:        December 7, 2015

I need information about my case, we have been here for three months already. My girls do not even want to eat anymore and seeing them like this hurts me. This is why I am asking you to review my case, we want to leave.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15   Staff Member: ▮▮▮▮

Your attorney filed a motion to the Eastern District Court of PA requesting a temporary stay of your removal. If you wish to have your attorney withdraw that motion please do so. If that motion is withdrawn arrangement can be made for your removal from the United States. At this time your custody status remains unchanged.

---

### Complaint #4

Name: ▮▮▮▮▮   A#: ▮▮▮▮▮

Date:December 7, 2015

My daughter has been having diarrhea for about three weeks now and we went to see a doctor but they did not give us any medication not even serum. With every passing day her behavior is getting worse and the psychologist just tells me to be patient. I need you to give me adequate medication and that you give me the opportunity to take my case outside of here. I am not a criminal. You gave the opportunity to other persons that have been deported to leave, why did you not give it to me. It has been more than four months that I have been detained.

Signature: ▮▮▮▮▮

**Response**

Date: 12/8/15   Staff Member: ▮▮▮▮

Thank you! You may dissolve [sic] your case at any time and return to your country. Please use the medical department in reference to health related issues.

**Complaint #5**

Name: ███████ A#: ███████

Date: December 7, 2015

I am worried my two-year-old son is distressed due to so much detention. We have been detained for almost two months. He does not want to eat, he cries a lot during the night. Please, help us.

I am asking you to give me the opportunity to resolve my case outside of the detention center and I would like to have an update on my case as well.

Thank you

Signature: ███████

**Response**

Date: 12/8/15  Staff Member: ███████

Your attorney has filed a motion in the Eastern District Court of PA requesting a temporary stay of your removal. If you wish to have your attorney withdraw that motion please do so. If the motion is withdrawn arrangements can be made for your removal from the United States. At this time your custody status will remain unchanged.

**Complaint #6**

Name: ███████ A#: ███████

Date: December 7, 2015

My case is that my children are desperate and do not want to eat anymore. Just cry and get depressed. I don't know what to do anymore because they want to be with their father. Their father is in Austin and they tell me they want to be with him. Please help me, please give me the opportunity to defend my case out of detention. Please because I want to help my children. Please help me.

Signature: ███████

**Response**

Date: 12/8/15  Staff Member: ███████

Your attorney filed a request for reconsideration with the Newark Asylum office. That request is still pending. You may ask your attorney to withdraw that request, if you wish to do so. If that request is withdrawn arrangements can be made for your removal from the United States. At this time your custody status will remain unchanged.

**Complaint #7**

Name: ███████ A#: ███████

Date: December 7, 2015

My problem is that I don't sleep and I have headaches because I think a lot about my case and my family. My son cries a lot because he does not want to be here. We have been detained for a long time; three months, and we do not want to stay here, I feel badly for my son.

My problem would be solved if you could let me go to be with my family here and if you could review my case because it has been a long time.

Signature: ███████

**Response**

Date: 12/8/15  Staff Member: ███████

If you are experiencing medical issues please see the medical staff here at the facility. Your attorney filed a motion in the Eastern District Court of PA requesting a temporary stay of your removal. If you wish to have your attorney withdraw that motion please do so. If the motion is withdrawn, arrangements can be made for your removal from the United States. At this time your custody status will remain unchanged.



75 Broad Street, 31st Floor, New York, NY 10004
Tel: 212.845.5200  |  Fax: 212.845.5299

805 15th Street, N.W.,#900, Washington, DC 20005
Tel: 202.547.5692  |  Fax: 202.543.5999

1303 San Jacinto Street, 9th Floor
at South Texas College of Law, Houston, TX 77002
Tel: 713.955.1360  |  Fax: 713.955.1359

humanrightsfirst.org

Case 2:85-cv-04544-DMG-AGR Document 201-1 Filed 09/19/16 Page 16 of 290 Page ID #:1396

# Exhibit 13
## Publicly Filed

## DECLARATION OF KAREN S. LUCAS

I, Karen Siciliano Lucas, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am an attorney licensed and admitted to the bar in the State of New York. I am currently the Associate Director of Advocacy at the American Immigration Lawyers Association (AILA).

2. AILA is a national association of more than 14,000 attorneys and law professors who practice and teach immigration law. AILA and the American Immigration Council supported a massive pro bono representation effort at the family detention facility in Artesia, New Mexico, until the closure of that facility in December 2014. AILA is one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA),[1] which facilitates pro bono legal representation to mothers and children held at the family detention center in Dilley, Texas (formally known as the "South Texas Family Residential Center" and hereinafter referred to as "STFRC").

3. In my capacity as Associate Director of Advocacy, I communicate regularly with our partners on the ground as well as former volunteer attorneys to identify systemic challenges faced by mothers and children held in family detention centers, including problems related to access to counsel and conditions of detention. Based on this information, I liaise with government officials in Washington, D.C. in an effort to resolve operational issues and to advocate for better detention policies and practices with the Administration and with Congress.

4. I have observed in this capacity that CARA Pro Bono Project staff and volunteers face substantial hurdles to meaningful representation at Dilley. ICE has consistently frustrated the ability of dedicated lawyers and legal assistants to access their clients and has systematically disregarded the attorney-client relationship.

5. This declaration is submitted for several purposes. First, this declaration provides information regarding a formal complaint filed with the Department of Homeland Security's (DHS) Office of Civil Rights and Civil Liberties (CRCL) and Office of the

---

[1] CARA is a partnership among Catholic Legal Immigration Network, Inc., American Immigration Council, Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

Inspector General (OIG) on September 30, 2015 by AILA, the American Immigration Council, Refugee and Immigrant Center for Education and Legal Services (RAICES), and Catholic Legal Immigration Network, Inc. (CLINIC). The complaint (attached hereto as Exhibit A) documents, with sworn statement by detained mothers, case after case in which ICE employed coercive tactics (including misinformation, intimidation, and denying attorneys access to their clients) to force detained mothers to forfeit their right to pursue bond hearings before immigration judges and instead to accept electronic ankle monitors as a condition of release.

6.  Second, this declaration provides the court with an updated picture of further instances of coercion and interference with counsel that have taken place since the September 30, 2015 CRCL/OIG complaint by summarizing and attaching sworn statements by 12 mothers detained with their children.

7.  Third, this declaration provides information regarding a letter sent to ICE and USCIS by AILA, CLINIC, RAICES, the Council and Human Rights First dated December 24, 2015. The letter (attached hereto as Exhibit Q) describes the rapid deportation strategy DHS has carried out since the deadline this Court set for compliance with its August 21, 2015 Order. Specifically, the letter documents several new practices that DHS instituted since October 23, 2015 that short-circuit due process and place vulnerable, traumatized children and mothers in already flawed expedited removal procedures, leading to the unlawful deportation of families who appear to have legitimate claims for asylum or other protection under U.S. law.

**September 30, 2015 Complaint Regarding Coercion and Interference with Counsel**

8.  I coordinated the effort to file this complaint.  To this end, I read each of the supporting sworn declarations signed by detained mothers. I further spoke directly with the CARA team members who had worked with these mothers to record their statements, as well as with AILA member attorney David Kolko and law student volunteer Katherine Shattuck, who also provided their sworn statements based on their experiences providing *pro bono* legal representation at the STFRC in Dilley, Texas.

9.  The sworn statements upon which the CRCL complaint is based present case after case at the STFRC in which ICE employed coercive tactics (including misinformation,

intimidation, and denying attorneys access to their clients) to force detained *Flores* class members and their mothers to forfeit their right to pursue bond hearings before immigration judges and instead for mothers to accept electronic ankle monitors as a condition of release.

10. Specifically, the complaint documents that ICE has blocked attorneys from accessing their clients during compulsory ICE questioning regarding the terms and conditions of their release. During this questioning, which may take place in the court trailer, an ICE meeting room, at the door of a family's dormitory, or in a children's play area, ICE presents documents for signature that include a waiver of the right to seek a bond hearing before an immigration judge.

11. This denial of access to counsel has enabled ICE to use the following coercive tactics during these meetings:

    a. **Substantially misinforming detained mothers and/or *Flores* class members about the possibility of release on bond**. The cases contained in the attached complaint demonstrate that ICE deportation officers lead mothers to believe that ankle monitors are the only viable option for release. To this end, ICE has misinformed mothers of *Flores* class members both about the length of time they would have to remain in detention in order to seek bond as well as the likely amount of any bond to be set. Further, officers have actively dissuaded mothers from asserting their right to a bond hearing. Nor have we ever seen ICE provide Flores class members with notice of their independent right to bond review hearings before Immigration Judges as required by Paragraph 24A of the Settlement or scheduled class members for custody hearings before Immigration Judges as required by Paragraph 24A of the Settlement.

    b. **Resorting to intimidation and threats**. These tactics include threatening to withhold medical care for children if mothers choose to seek bond hearings instead of accepting ankle monitors and threatening mothers with deportation if they raise concerns about how long the process is taking or inquire about the status of their cases.

    c. **Coercing signatures even when detained mothers do not understand the documents**. The complaint documents that ICE has forced mothers of class members to sign documents they do not understand and to sign documents with

3

215

pre-checked boxes waiving their right to a custody redetermination by an Immigration Judge.

12. By way of background, when mothers and *Flores* class members detained at STFRC receive a positive credible or reasonable fear determination by the Asylum Office, ICE (instead of the Asylum Office) will inform them of that result (contrary to the regulations, which plainly delegate the duty of informing an individual of the results of an interview to the asylum officer, *see* 8 C.F.R. § 208.30(f)). The declarations accompanying the complaint demonstrate that the way in which ICE often informs detained mothers and/or class members of their fear interview result is to call detainees, often in large groups of as many as 30 mothers or more, into a room in the trailer used for immigration court proceedings. In fact, the detainees are specifically told that they must "go to court" ("ir a corte") for this meeting with ICE.

13. As the declarations attest, at these meetings ICE collectively informs the detainees in attendance that they have received a positive fear determination from the Asylum Office. ICE then informs the mothers, sometimes in front of their children, that they are eligible for release. ICE officers sometimes tell the mothers that they can either pursue bond before an immigration judge or be released immediately on an electronic monitoring device shackled to the mother's ankle. At other times, ICE simply tells the detainees that they will be released soon on an ankle monitor, no mention is made of bond, and ICE hands the mothers documents to sign. Little explanation or translation or interpretation of these documents from English into Spanish or the mother's primary language is given.

14. If a mother expresses interest in pursuing bond before an Immigration Judge, ICE routinely tries to dissuade her from doing.

15. ICE further requires the mothers who are present at these meetings to sign documents. Specifically, ICE presents the mothers with the Notice of Custody Determination (I-286) (a redacted example of which is attached to this declaration as Exhibit B), which requires a signature. Mothers have consistently reported to CARA that ICE pre-checked the box on this form that waives their right to an immigration judge custody redetermination hearing (bond hearing). As one mother stated in her declaration attached to the complaint, "I was not given the opportunity to check this box myself, and consequently not allowed to make this decision myself. … [T]he officer made it difficult for me to say no to the ankle monitor." (See CRCL Complaint at p. 6, quoting from declaration of *Lillian.)

4

16. ICE deportation officers also present the mothers with an agreement to accept an ankle shackle (a redacted example of which is attached to this declaration as Exhibit C). This form also requires a signature.

17. Despite repeatedly raising objections to the process with ICE and DHS Headquarters officials, ICE continues to categorically block all attorneys and legal representatives from accompanying their clients to these meetings.

**Further Instances of Coercion and Interference with Counsel**

18. To provide an updated picture of further instances of coercion and interference with counsel that have taken place since the September 30, 2015 CRCL/OIG complaint, sworn declarations from 12 mothers documenting their experiences are summarized below and attached as exhibits. These declarations, which are redacted for confidentiality purposes, describe the following coercive situations that have occurred since September 30:

   a. "**Ana,**" Exhibit D. Ana, a mother detained with a class member, was mocked by an ICE officer when she opted to pursue bond rather than accept an ankle shackle. Ana first found out that she had a positive credible fear determination from her own, non-detained mother (her class member child's grandmother) "because the immigration officers called my mother [in Virginia] and shared this confidential news with her before telling me." When ICE did inform Ana of the positive fear determination later that day, Ana told the officer she wanted to pursue bond. After asking if she had "thought hard enough" about this, the officer "then told me it would make his boss mad to see that I picked a bond." Ana asked if it would affect her case negatively, and the officer said that his "supervisor would be angry." The supervisor then came over and asked what Ana had chosen. Ana explained that the officer said she had chosen bond "because of 'my mommy.' He was doing it in a way that was mocking me. … They kept smiling at me in a mocking manner." Nonetheless, she pursued her bond hearing before an immigration judge, who set a minimal bond of $1,500. She paid the bond and has since been released with her class member child.

   b. "**Dalia,**" Exhibit E. A mother who tried to assert her right to a bond hearing but was manipulated by ICE in an effort to dissuade her from doing so. On November 17, 2015, an ICE officer told Dalia that if she wanted to pursue bond rather than

an ankle monitor, she would have to wait between 80 and 100 days[2] in detention
with her class member child before she could be released. "He told me not to
think about myself but to think about my son who was standing next to me. He
asked my son directly if he wanted to leave the detention center at that moment, to
which my son responded yes, but my son then said that he was with me and he
would be ok with whatever decision I made. The officer then said to me that the
schooling my son is receiving at the detention center is a joke, that it was a lie of a
school." From there, the pressure continued, with the officer trying to persuade
Dalia that the shackle "would be a much better option" than bond. Dalia states in
her declaration: "He said that since he was no longer going to be my deportation
officer that my case was going to take a long time for me to get out of here. The
officer kept saying that he had the power to just make a phone call right then and
there and get me out of here."

c.   **"Luz,"** Exhibit F. Another mother was mocked by an ICE officer when she said
she wanted bond. When going over her documents, Luz states, the ICE officer
saw she checked the box indicating she wanted to pursue a bond hearing. The
officer said "You like the food here?" When she replied yes, the officer said "'oh
I guess that's why you don't want to leave here.' It was obvious that he was
making fun of me," she said. After she finished signing the documents, the officer
taunted her: "'Ok, now we're going to call your family. Oh wait, I forgot you
aren't going to leave.'"

d.   **"Claudia,"** Exhibit G. A mother whose family members in the U.S. faced direct
and intentional pressure from ICE to withdraw their offer to pay her bond, leaving
her instead to take the ankle shackle or remain in custody with her class member
child. When Claudia first spoke with her aunt and uncle in the U.S., they agreed
bond would be a better choice than the ankle shackle for her "because they only
should put that kind of thing on a criminal, and I am not a criminal. I am here
because I am fleeing violent persecution by my ex-partner." Her aunt and uncle
then sent all required supporting documents for bond to her pro bono CARA
Project attorneys at Dilley.  Then, on November 24, Claudia states, "an

---

[2] In the CARA Project's experience, if ICE timely files required documentation with the court, then pursuing an
immigration judge bond would take around 7-10 days.

immigration officer called my uncle [] to confirm his address [and] that he was willing to receive me. I had not yet been told whether I had a positive or a negative credible fear decision, but we were still wanting to request a bond when the decision came if it was positive." On that same day she was given an appointment to go to the court at 3 pm. When Claudia arrived in the court trailer, ICE officers informed Claudia, along with a group of other women, that she had received a positive fear determination. . When Claudia told the officer she would like to pursue a bond hearing, the officers took her and the other women who wanted bond to another room. "Then he asked me if I was sure my family would be able to pay the amount of money that the bond would be set by a judge." The officer then called her uncle on the phone. Claudia states that the officer "told him that it would be expensive and that he would have to pay two bonds, one for me and one for my [class member] daughter. That it could be up to $20,000. They told my uncle I might have to wait three more weeks to get out if I asked for a bond." All of this persuasion paid off for ICE. "The officer managed to convince my uncle that the bond would be too expensive and would take too long, so he decided that I should leave with the ankle monitor. … Since my aunt and uncle will support me and would have to pay the bond, I will go with their decision." The next day, a guard told her to get ready to leave. Claudia had a 1:30 pm meeting scheduled with her lawyers, and when she told ICE she wanted to attend, some of the officers initially told her there was no time. But when she pressed them (this time finding an officer who spoke Spanish), they finally agreed, but told her she had to hurry. They then placed the ankle shackle on her before she went to the meeting. When Claudia and her lawyers spoke with her uncle again, he agreed she should pursue bond, and he cancelled her travel ticket. After CARA Project staff advocated with ICE, they eventually removed the shackle and allowed Claudia to pursue a bond hearing. An immigration judge set a bond of $2,000 for Claudia and her class member daughter to be released, which her family paid.

e.   **"Razida,"** Exhibit H. Another mother whose family members in the U.S. faced direct pressure from ICE *not* to pay bond before she even knew she had a positive credible fear determination. Razida had spoken with her family on December 3,

7

and all agreed that bond would be preferable to an ankle monitor. Then on December 4, Razida's sister told her that ICE had called and said she was about to be released with an ankle monitor, so they should make travel arrangements. Her sister was surprised because she knew Razida wanted to pursue bond.  But ICE told Razida's sister that the bond would take a very long time, and that the maximum amount of time she would be on the ankle monitor would be six months. Razida's sister then told her that, based on her conversation with ICE, she had changed her mind and she now thought it would be better for Razida to leave with an ankle monitor. Razida still did not want to leave with the ankle shackle, and when she spoke with her family later that day, they all reaffirmed that bond would be the best option. At about 8:00 or 8:30 that night, ICE called Razida and about fifteen other mothers to the court building and told them that they had received positive fear decisions. When Razida raised her hand and said she wanted to pursue a bond hearing, the officers then tried to talk her out of that decision, saying she and her class member child would have to stay longer, that bond would cost thousands of dollars, and that her family would have to pay the bond for each person – her daughter and herself. "'Imagine paying $15,000,'" Razida recalls him saying. "He was very insistent that I sign to leave with an ankle monitor," she said in her declaration.  But Razida stuck with her decision and was subsequently released on a $4,000 bond.

f.    **"Johana,"** Exhibit I. Another mother who states that ICE called her friend to arrange for her release on an ankle shackle without first asking her whether she wanted to pursue a bond hearing or accept the ankle shackle – or even advising her that she had received a positive credible fear determination in her case, making her eligible for release.

g.    **"Angelica,"** Exhibit J. Another mother who was told that her that if she wanted bond, it would be set separately for herself and her class member daughter at $10,000 each. Angelica declares: "I was confident about my decision because the CARA Pro Bono Project had already given m[e] information about the bond. I knew that the ICE officer was not telling the truth. I am very concerned about other mothers that are too timid to stand up for themselves." In fact, she relates, that very night, one of the other mothers requested a bond hearing, but the officer

8

did not respond. When the officer began walking out of the room, this mother walked after him but was stopped by the other officers "who told her that she could not change her mind because the officer that assisted her had already left."

h.  **"Talia,"** Exhibit K. A Quiche-speaking mother who did not understand the papers she was being asked to sign to secure her release, which included an agreement to accept an electronic ankle monitor. Talia declares: "I asked 'what are these papers' and the officer said 'they are so you can leave'. I asked if they were for deportation, and he said no. … I was confused because I was scared that I was going to be deported. But when I saw our plane tickets on top of those papers I believed him that they were for my release. They said they weren't doing anything wrong. So I signed the papers. The official did not say anything about an ankle shackle. I had no idea I was signing for an ankle monitor. He just told me to sign for myself and my [class member] daughter."

i.  **"Arelis,"** Exhibit L. A mother who was not properly informed about the possibility of bond before signing her documents. Arelis states that the officer "didn't explain to me the bond option, he only said that I would have to stay detained longer if I opted for the bond, because I would have to file some documents. … When we started going through the release documents the officer told me to mark that I wanted to be released with a shackle without further explaining the differences between the shackle and the bond."

j.  **"Glenis,"** Exhibit M. Another mother who was not informed about her right to a bond hearing before signing away that right. Glenis states that an ICE officer came to her room at 9:30 pm one night, with another woman, and told both of them that they were going to be released. "They gave us a paper and told us to sign it. They told us that the next day we could leave with an ankle shackle. The officials did not tell us that we had any other option or anything. They only told us that we had to sign the paper to get the shackle and leave the next day."

k.  **"Yunis,"** Exhibit O. A mother who was misled about both the likely amount of bond and the nature of the documents she was signing. Yunis states that on November 13, ICE called her into a meeting with 20-25 other women. She wanted to be released on bond. "The officer spoke very fast and I could not understand what he was saying." The officer informed Yunis and the other women that the

9

bond would be very high – "about $20,000 for three people [a mother and two children]." The officer told her "'this is very expensive and your family probably won't be able to pay that.'" "I signed the doc[ument]s because the officer said 'it was only to prove that you were here detained in this center.' … I did not understand that I was signing a document agreeing to leave with the grillete [ankle bracelet]."

l.    **"Maritza,"** Exhibit N. Another mother given misinformation about bond as well as documents with pre-checked boxes waiving her right to a bond hearing. Maritza states that ICE officers told her on December 1 that she would have to wait one month before she and her class member child could leave if she wanted bond. She insisted that she wanted a bond. "They presented me with a document to sign and the box to leave with the shackle was already checked by the officers, so they made me check the other box and put my initials beside it." "I was worried that they were going to pressure me a lot because I have seen them do it to other women." The Notice of Custody Determination that Maritza signed clearly includes boxes that were pre-checked by computer before Maritza signed the documents. (See Exhibit B.)  Despite this pressure to accept an ankle monitor from ICE, Maritza pursued a bond hearing and paid the $1,500 bond set by the immigration judge.

m.    **"Yolanda,"** Exhibit P. Another mother who felt pressured to waive her right to a bond hearing. Yolanda states that at 9:30 pm on December 14, ICE told her and other mothers to go to the children's play area, where ICE officers collectively informed them that they had positive fear determinations and could be released. When Yolanda said she wanted to pursue a bond hearing instead of accepting release on an ankle monitor, the officer told her that the judge could make her pay two bonds: one for herself and one for her class member child. Yolanda felt the pressure: "The officer made me feel like he really wanted me to leave with an ankle shackle. He kept repeating the same thing over and over telling me to sign the papers so I could leave sooner. I didn't understand why he wasn't respecting my decision when I said I didn't want to leave with the shackle and he made me repeat myself three times." Yolanda had to repeatedly insist on her right to a bond hearing before an immigration judge. When she finally had that hearing on

December 22, the immigration judge set a bond of $2,500, and she has since been released.

19. The above supplemental coercion-related declarations point to continuing as well as additional trends:

   a. ICE officers communicating outcomes of detained individuals' confidential credible and reasonable fear interviews to sponsors before notifying the detained individuals and without obtaining their consent.

   b. Officers mocking, degrading, and manipulating mothers and class members into forfeiting their right to a bond redetermination before an immigration judge.

   c. Officers pressuring sponsors not to pay bond and instead to require detained mothers to accept release on an ankle monitor.

   d. Officers misinforming detained mothers that they would have to pay more than one bond, overinflating the likely bond amounts by two or three times the actual likely amount.

   e. Pre-checking the box indicating waiver of bond hearing on forms or pressuring mothers to sign documents they do not understand.

   f. All of the above practices delaying the release of Flores class members and their mothers.

   g. Practices that fail to comply with Paragraph 24A of the settlement which provides that "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."

20. The presence of counsel in the room during ICE's meetings with detained mothers and/or class members about their terms and conditions of release could prevent these due process violations from taking place. *In addition to prohibiting counsel of record (that is, attorneys who have already submitted Form G-28 Notice of Entry of Appearance as Attorney) from attending these meetings, ICE fails even to notify counsel of record when these meetings will take place. ICE also does not serve the mothers' or class members' counsel with copies of documents that their clients signed during meetings with ICE officers regarding the terms and conditions of their release.*

11

223

**December 24, 2015 Letter to ICE and USCIS Regarding Rapid Deportation Strategy Implemented Since *Flores* Order Compliance Deadline**

21. Since the October 23, 2015 deadline set by the Court for the Government to come into compliance with its August 2015 Order, as documented in a letter to ICE and USCIS from AILA, CLINIC, RAICES, the Council and Human Rights First dated December 24, 2015, attached as Exhibit Q, practitioners and advocates in all three family detention facilities have witnessed practices that have entirely short-circuited the *Flores* settlement and class members' right to due process and access to counsel. For example:

   a. USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews. Further, USCIS has adjudicated requests for reconsideration of negative fear determinations based on a heightened standard, which has led to the removal of families with viable claims for protection.

   b. USCIS and ICE have deprived parents and class members of their statutory right to immigration judge review of a second negative fear determination.

   c. USCIS has deprived certain class member children of the opportunity to assert their claims for asylum by refusing to fully consider class members' claims independently of their parents' claims.

   d. ICE has deported represented parents and class member children while their cases are still in progress. In particular, ICE has disregarded pending and scheduled requests for reconsideration by a USCIS asylum officer, pending civil rights complaints, and pending petitions for review to the federal courts.

   e. DHS has transferred represented mothers and class member children away from counsel sometimes without any notice and more recently, without meaningful notice.

22. As the letter documents, these changes have led to the unlawful deportation of many class members and their mothers who appear to possess legitimate claims for asylum or other protection under U.S. law. These problems also illustrate why ICE's use of expedited removal routinely results in violations of both the *Flores* settlement and the due process rights of class members and their mothers.

Executed this 7th day of May, 2016, in Washington DC.


Karen S. Lucas, Esq.

# Attachment to Exhibit 13
# Exhibit D

I, ████████████████████ swear that the following is true and correct to the best of my knowledge:

1. I am writing this declaration to explain how I and other women are being forced to take shackles when we are eligible for and would prefer bonds.

2. I am in immigration detention in Dilley Texas. I have been here for 12 days.

3. This Monday December 7, 2015 I learned that I had passed my credible fear interview. I learned this from talking to my mother because the immigration officers called my mother and shared this confidential news with her before telling me.

4. Later that day, around 5 immigration officers called several women and me to meet to tell us that we had received positive results from our credible fear interviews from the asylum office. One officer announced to our little group that we had all received positive decisions and that each one of us now had to talk to an officer.

5. The male officer I met with gave me paperwork to sign to indicate if I wanted a bond or a shackle. I opted for the bond. After seeing that I chose a bond, the officer asked me several times if I had thought hard enough about this and why didn't I want a shackle. I told him I was sure, that I had talked to my mother about this and we wanted the bond. He then told me that it would make his boss mad to see that I picked a bond. I asked if it would affect my case negative and he said that supervisor would be angry. The supervisor then asked my deportation officer what did she choose. The officer said I was choosing a bond because of "my mommy." He was doing it in a way that was mocking me. The supervisor responded – we already talked to her mom and we know she's choosing a bond. They kept smiling at me in a mocking manner. The officer with me then said "remember it is you who is locked up, not your mom." Then he told me opting for a bond I would be here for 10 more days or more. I refused to sign some of his paperwork because it was all in English. He put the paper down harshly on the desk and asked me if I thought an immigration official would lie. I told him that I had already made the decision and I left.

6. Afterwards, I was afraid that since he said it angered his supervisor that they would start to treat me badly here. I went to talk to a lawyer to tell them about this. The lawyer told me I had a right to a bond.

7. Immigration did not give me a bond. I had to go before an immigration judge and ask for one. The immigration judge gave me a minimum bond of $1500. My family is paying that and I will leave soon.

8. Other women in my sleeping quarters have told me that the officers do not tell them that they have two options after a positive fear finding: (1) bond or (2) shackle. Instead the officers just tell them to sign and put shackles on them. One woman told me that her deportation officer told her that the bond would be $10,000 for her and another $10,000 for her child - $20,000!

9. I believe that this deception and intimidation to take a shackle is unfair. We have a right to a bond and the officer should not be pressuring us into accepting shackles.

Date: December 10, 2015

CERTIFICATION

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to ███████████████ in Spanish.

Helen Lawrence

12/10/2015

Date

Case 2:85-cv-04544-DMG-AGR Document 201-1 Filed 05/19/16 Page 240 of 290 Page ID #:4425

# Attachment to Exhibit 13
# Exhibit E

**Declaration of** ███████████ **A#** ███████

My name is ███████████ I was born in El Salvador on ███████ My son is with me, his name is ███████████ and he is 10 years old. We were detained on November 4, 2015. I crossed the border through McAllen, Texas. We were detained by the McAllen Texas Border Patrol Station.

Yesterday, on November 17, 2015, the deportation officer Ivan Astacio called me to go to court because he wanted to talk to me, he asked me if I was ready to leave since I had received a positive decision after my credible fear interview. He told me that if I wanted to get a bond it would take anywhere between 80 days and 100 days for me to get released. He told me to not think about myself but to think about my son who was standing next to me. He asked my son directly if he wanted to leave the detention center at that moment, to which my son responded yes, but my son then said that he was with me and he would be ok with whatever decision I made. The officer then said to me that the schooling my son is receiving here at the detention center is a joke, that it was a lie of a school. He also kept saying that the bond would be anywhere between $5,000- $10,000 and that the shackle would be a much better option because I would only have to wear it for about 2 months. He also said that I would lose the $5,000 paid for the bond, that it was a lot of money to lose. He said that since he was no longer going to be my deportation officer that my case was going to take a long time for me to get out of here. The officer kept saying that he had the power to just make a phone call right then and get me out of here. He said that he could call my cousin immediately so that my cousin could purchase the airplane tickets and I could be released with the shackle.

There has been about 3 different times when immigration officers tell me the same thing, pressuring me to get the shackle and forget about the bond. Each one of them has told me that it will take between 80-100 days to get released if I decide to get a bond.

I have been very clear multiple times that I want to get a bond and that I am not interested in getting the shackle but the officers keep insisting I should get the shackle.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection:



_____          11/18/2015
Signature                                          Date

I, Jose Alberto Cruz Guadarrama, certify under penalty of perjury that I am fluent in the English and Spanish languages and that I read this document to the affiant in Spanish who verified that its contents are true and accurate.

So sworn this 18 day of November, 2015.

_____
Jose Alberto Cruz Guadarrama

# Attachment to Exhibit 13
# Exhibit F

**Declaration of** ███████████          **A#** ███████████

1. My name is ███████████ **A#** ███████ and I was born in ███████ El Salvador on ███████.
2. I have been detained in the South Texas Family Detention Center since November 18, 2015 with my son ███████████ **A#** ███████.
3. On November 26, 2015, I was called to the play area in the Red Parrot neighborhood with seven or eight other people.
4. There were about four ICE officers present.
5. They told us we had all received positive decisions on our fear interviews.
6. They told us that we would all be leaving with a shackle unless we wanted to go in front of a judge to ask for a bond.
7. I said that I wanted to leave with a bond. I was the only person to do so.
8. They told me that the process would be as long as a month or longer and that the bond was going to be a lot of money.
9. They continued the conversation about what the release with the shackle would look like.
10. Afterwards, an ICE officer called me over to table and told me how to sign the documents. On the area where it says that I want to ask for a bond from a judge, he said, "Oh that's right, you want to leave with a bond. You like the food here?" I responded that yes, I do. He said "oh I guess that's why you don't want to leave here." It was obvious that he was making fun of me from the way that he spoke to me and looked at me.
11. He asked me who had told me to leave with a bond, and I told him it was my family.
12. He repeated that release with a bond was take a long time.
13. After I finished signing all the documents he said "Ok, now we're going to call your family. Oh wait, I forgot you aren't going to leave."
14. He made me feel embarrassed because he spoke loud when he said that I didn't want to leave because of the food, and other women could hear him.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

███████████          11-27-2015

                              Date

I certify that I am proficient in the English and Spanish languages and I accurately and truthfully read the aforementioned in the Spanish language to the client.

_____          11/27/15

Ian Philabaum          Date

244

# Attachment to Exhibit 13
# Exhibit H



**Declaration of** █████████████████████████████████████ (A███████████

1. I, ███████████████████████████████ fled my home country of El Salvador on November 10ᵗʰ
   with my daughter ████████████████████ (DOB █████████) to seek asylum in the United
   States of America. I entered the US on November 21ˢᵗ and was detained. I am currently detained
   at the South Texas Family Residential Center in Dilley, Texas.

2. I understand that if I receive a positive decision I can leave with an ankle monitor or I can ask to
   pay a bond. I had heard from some people that the immigration officials say that the bond is ten
   or fifteen thousand dollars, but the pro bono lawyers say that it is usually less money.

3. On Tuesday of this week I spoke to my brother-in-law, █████████████████ and spoke with
   him about the bond option. He said that my family might be able to get the money together for a
   bond if it were an affordable amount.

4. On Wednesday, December 2ⁿᵈ, I was given a credible fear interview.

5. I spoke with my family again on Thursday December 3ʳᵈ about the bond option and we did not
   have a set decision yet about the money, but we all agreed that it would be better to leave with a
   bond because if I leave with a monitor I will have to spend time going to the immigration office
   and they will be calling me to tell me to go there. It is better if I only have to go to court.

6. I also do not want the monitor because I would have to charge it and it makes noises and I could
   go out and it would be beeping.

7. On Friday, December 4ᵗʰ, I had not yet been given any official decision by immigration agents
   about my credible fear interview.

8. During the day on December 4ᵗʰ I called my brother-in-law's wife, ████ and she told me that ICE
   had called her and said that I was going to be released with an ankle monitor and that she
   should be ready to make travel arrangements for me. She told me she had been surprised that
   they called her to say that, because she knew I wanted to ask for a bond. The officer told her
   that the bond would take a very long time to get and that the maximum amount of time I would
   have a monitor would be six months.

9. I told ████ that I had not told anyone I wanted to leave with an ankle monitor and that ICE had
   not told me any of that and had not given me any decision yet. Then she said that because the
   ICE officer had said it would take a long time to get a bond it is better if I leave with a monitor.

10. I was surprised about what had happened. It is very strange that they call your family members
    without telling you anything or giving you an answer. I was disappointed about maybe having
    to leave with the monitor because I want to leave with a bond.

11. I spoke with my family again on the evening of Friday, December 4ᵗʰ. We spoke about the bond
    and the ankle monitor and reaffirmed that it would be best for me to request a bond.

12. After speaking to my family, around 8:00pm or 8:30pm, some people with red shirts came to
    my room and took me to the court building. There were about 15 other women there.

13. There were officers there, some of them had jackets on that said "police" on the back. There
    were about eight officers.

14. They told us that we all had positive decision. They asked if everyone was going to leave with
    an ankle monitor. I raised my hand and said that I did not want to leave with the monitor and
    that I wanted to ask for a bond. Then the officers said that the people who wanted to leave with

a bond would have to stay longer.

15. Then they met with us individually to sign the documents. I was at a desk in the courtroom with an officer, the other women with different officers in the courtroom.

16. The officer asked me if I was able to pay the bond. He said we could call my family to confirm that they were able to pay a bond. I said that was not necessary because I had already spoken with them and we had agreed to request a bond.

17. He showed me the phone number he had for my family and it was the wrong phone number. I gave him the correct phone number because otherwise they would call the wrong person.

18. He told me that the bond would cost thousands of dollars. He said it could be $8,000, or even $15,000. "Imagine paying $15,000," he said to me. He told me that my family would have to pay one bond for me and another bond for my daughter, that the bond amount was for each person, not both.

19. He told me it could take up to two weeks to be released with a bond.

20. He was very insistent that I sign to leave with the ankle monitor and not request a bond. He told me that if we called my family and they said they were not sure they could pay the bond I would have to sign for the ankle monitor.

21. The officer did not introduce himself when I sat down with him or tell me his name. I looked at his uniform for his name but he had no nametag.

22. I kept my decision to request a bond.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.



12/6/15
Date

I, Alexander Mensing, certify under penalty of perjury that I am fluent in the English and Spanish languages and that I read this document to the affiant in Spanish who verified that its contents are true and accurate.

So sworn this 6th day of December, 2015.

Signature

251

# Attachment to Exhibit 13
# Exhibit I

My name is [redacted] and I am from Honduras. I have been detained since October 29, 2015 with my son, [redacted] I entered the United States and was taken to the Macali station.

I spent 4 nights and 3 days in the ICE holding facility. The holding facility was incredibly cold. I believe I got pneumonia at the holding facility because of how cold it was. Everyone's aluminum blanket was rattling in the air and it felt like my hair was frozen. I wrapped my sweater around my son's head to keep him warm and I only had a t-shirt on.

We received 3 sandwiches every day. It consisted of bread with ham and juice. The ham and bread were frozen. There was enough water, but it was cold. The food was always the same. The children wouldn't eat it because they were all sick.

I did not shower. They didn't have soap, but they had toilet paper and pads. The kids needed soap when they went to bathroom. We were all dirty from having been in the river, but there was no soap with which to wash up. There's a view to the men's area from the women's bathroom – when you sit/stand, the men can see and they are looking. There were no doors on the bathrooms.

We slept on the floor. The lights were left on all night. Some women had to sleep next to the toilet because there was no room. We were stepping on each other because couldn't see with all the aluminum blankets – even stepping on pregnant women.

Everyone was coughing, but nowhere to lodge medical complaint. I believe I contracted pneumonia because of the place.

When the officers wanted us to sign the deportation orders, one of my friends asked for an interpreter so she knew what she was signing and they told her there were no interpreters. Officer [name unknown] told me that he would sign for me if I wouldn't sign, and that they were just going to send me back.

The conditions of the ICE holding facility were very bad. There was no soap, not enough food and people were starving from their journeys. It was so cold and they had to watch the children deal with the cold/hunger.

The officers were telling us all they had to stand up and couldn't lie down. Every time an official came, us had to stand up instead of lying down. White officers treated me well, but the Hispanic officers were the ones who treated me poorly.

Today, November 10, 2015, I spoke with my friend on the phone who indicated that she received a phone call from an ICE officer – Officer Martinez I would be released today at 5pm on the ankle bracelet and to be sure that she buys my tickets. He gave her instructions on how to have the tickets faxed here and she did it. I have never met Officer Martinez, and no one ever told me I was going to be released. Even now, a few hours before I am to be released, no one has come to speak with me about the fact that I will be released with an ankle bracelet.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

_____          11 / 10 / 15
                                          Date

**Interpretation Certification:** I certify that I am proficient in the English and Spanish languages and that the foregoing was read to above signed individual in Spanish.

_Theresa Willer_                          11 / 10 / 15
Signed                                    Date

Case 2:85-cv-04544-DMG-AGR Document 201-1 Filed 09/19/16 Page 258 of 290 Page ID #:4731

# Attachment to Exhibit 13
# Exhibit J

**Coercion Declaration of** ▓▓▓▓▓▓▓▓

I, ▓▓▓▓▓▓▓▓ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1. My name is ▓▓▓▓▓▓▓▓ A# ▓▓▓▓▓ .

2. Currently, I am detained at the South Texas Family Residential Center (STFRC) in Dilley, Texas with my daughter. I have been detained at STFRC since November 28, 2015.

3. On December 9, 2015 around 9:00 pm, two ICE officers came by to my room located in the Brown Bear neighborhood at STFRC. They told me to go straight to the playroom. When I got the playroom there were approximately twelve mothers and six ICE officers. The officers told us that we had all gotten positive determinations in our interviews. They said that we were going to get tired because we had to sign a lot of papers.

4. When I got my turn, the ICE officer required me to sign some documents. I stopped signing the papers and asked him if I was signing for the ankle monitor. I explained to him that I wanted the bond and that my brother was willing to pay it. The officer replied that I had to pay $10,000 for a bond. He specifically said that I had to pay $10,000 for myself and another $10,000.00 for my daughter. I told him that it was fine and that I wanted to go through with it anyways.

5. I was confident about my decision because the CARA Pro Bono Project had already given my information about the bond. I knew that the ICE officer was not telling me the truth. I am very concern about other mothers that are too timid to stand up for themselves.

6. Actually, that night one of the mothers wanted to request a bond. However, the ICE officer dismissed her request. After the ICE officers left the playroom, she went after him. However, she was turned down by the other ICE officers who told her that she could not change her mind because the officer that assisted her had already left.

This affidavit was read to me in Spanish and it is a true statement of what I have said.

▓▓▓▓▓▓▓▓▓▓▓▓

December 10, 2015
Dilley, Texas

I, Ana Camila Colón, certify that I am proficient in the English and Spanish languages and that the foregoing text was read to ▓▓▓▓▓▓▓▓ in Spanish. I further certify that the English translation of the Spanish statement, to the best of my abilities, to be true and accurate.

*Ana Camila Colón*

Ana Camila Colón

255

Case 2:85-cv-04544-DMG-AGR Document 201-1 Filed 09/19/16 Page 264 of 290 Page ID
#:4776

# Attachment to Exhibit 13
# Exhibit K

Declaration of ██████████████ (A# ████████)

I, ████████████████████████ fled Guatemala with my daughter █████████████ (A# ████████) to seek asylum in the United States of America. I was detained by US border patrol agents on October 17, 2015. I am now detained at the South Texas Family Residential Center in Dilley, Texas.

I am from ████████ Guatemala and I speak Quiche. I speak some Spanish but my native language is Quiche. I have a hard time understanding Spanish.

I did not receive an interview with the asylum office because I speak Quiche. On Monday I had a meeting with an official, I am not sure who it was, I think I was in a courthouse. He asked me where I was going after I got out and he called my husband and had him buy my plane ticket.

Two nights ago at around 9 PM 4 ICE officers came to my room looking for me. One of them told me that I had to sign some papers because I was leaving now. They took me to a playroom with 8-9 other women. They said that we have to sign the papers and call our family members and tell them that we could leave now. One of the other women had already signed papers – "la salida" - and she asked ICE why she had to sign more papers. The officer replied that they had to sign the papers in order to leave.

All 9 of the women signed the papers. All of us received the same papers. Some of them have already left. Only one other woman did not speak Spanish well, she spoke Mam. But no one asked what the papers were, and I am not sure why they did not ask. I asked "what are these papers" and the officer said "they are so you can leave". I asked if they were for deportation and they said no.

I was confused because I was scared that I was going to be deported. But when I saw our plane tickets on top of those papers I believed him that they were for my release. They said they weren't doing anything wrong. So I signed the papers. The official did not say anything about an ankle shackle. I had no idea that I was signing for an ankle monitor. He just told me to sign for myself and for my daughter and I did.

I am nervous about having an ankle monitor. I am happy that I am going to be safe and leave here. But I am worried that I will have problems going in stores or that people will judge me because I will have the ankle monitor. I am worried that people will think that I am a criminal.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection:

████████████████

Signature

10/28/2015

Date

257

I, Catalina Restrepo, certify under penalty of perjury that I am fluent in Spanish and English and that I worked with a certified translator to translate the following into Quiche and that the document was read to the affiant in Quiche who verified that its contents are true and accurate.

Catalina Restrepo                                      10/28/2015

Signature                                              Date

Attachment to Exhibit 13
Exhibit M

**DECLARATION OF** ███████████████

My name is ███████████████ Last night at 9:30, ICE officials came into my room. They asked another woman to sit down with me. They told us that we had been granted our release and we could leave the detention center in a few days. They gave us a paper and told us to sign it. They told us that the next day we could leave with an ankle shackle. The officials did not tell us that we had any other option for bond or anything. They only told us that we had to sign the paper to get the shackle and leave the next day.

Signed this 18th of November, 2015

██████████████████

---

I certify that I am proficient in the Engligh and Spanish languages and that the foregoing was read to me in Spanish.

GRACE SCHOENLANK

262

Case 2:85-cv-04544-DMG-AGR  Document 341-1  Filed 09/09/16  Page 263 of 290  Page ID
#:14778

# Attachment to Exhibit 13
# Exhibit N

**Declaration of** ███████ **A#** ████████

1. My name is ████████ **A#** and I am from ████████ El Salvador.

2. My son, ████████ **A#** ████████ and I have been detained in the South Texas Family Detention Center since November 20, 2015.

3. On December 1, 2015 I was called to a meeting in court at 10:00am.

4. I arrived at the court and an officer marked my name on a list in the front room. I went in to another room where there was another woman waiting, and then a third woman arrived.

5. The immigration officers called us up one by one, and when they called my name the two officers told me that I had received a positive decision on my interview. Then they asked me to sign a document so I could leave the following day with the shackle.

6. I told the officers that I didn't want to leave with the shackle, and that I wanted to leave with a bond.

7. The officers told me that if I applied for a bond I would have to wait one month before I could leave.

8. I told the officers that I still wanted to leave with a bond.

9. They presented me with a document to sign and the box to leave with the shackle was already checked by the officers, so they made me check the other box and put my initials beside it.

10. I was worried that they were going to pressure me a lot because I have seen them do it to other women. For example, one time they came to my room and told a Guatemalan woman that the bond was going to be $20,000.

11. I was confident that I wanted to leave with a bond and told the officers just that, and they didn't bother me too much.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

_____ _____12/2/15_____

██████████████ **Date**

I certify that I am proficient in the English and Spanish languages and I accurately and truthfully read the aforementioned in the Spanish language to the client.

_____ _____12/2/15_____

Ian Philabaum **Date**

264

Case 2:85-cv-04544-DMG-AGR Document 204-1 Filed 09/19/16 Page 72 of 290 Page ID #:4730

# Attachment to Exhibit 13
# Exhibit P

**Declaration of** ████████████████████████ **A#** ██████

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

1. My name is ████████████████ **A#** █████████ and I was born in ████████████
   ████████, Honduras on ████████████

2. On or about December 1, 2015 I was detained with my daughter ████████████████ (A# ██████████ by the United States Border Patrol, and on December 2, 2015 I was moved to the South Texas Family Detention Center.

3. On December 11, 2015 I had my credible fear interview in the asylum office.

4. On December 14, 2015 at 9:30pm five ICE officers came to my room and called my name and told me to go to the play room to sign some paperwork.

5. I went to the play room with my daughter and there were two CCA guards and nine other women.

6. The ICE officer told us as a group that we had all received positive decisions on our fear interviews and that we were all being prepared for our release. The officer told us that they had some paperwork for us to sign.

7. The officers started calling us one by one to sign the paperwork. When they called me the officer told me that the papers he wanted me to sign were so I could be released with the ankle shackle. He told me that if I signed right away I could leave on Wednesday, December 16, 2015. I told him that I did not want to leave with the ankle shackle and that I want a bond.

8. The officer told me that the process would be two weeks or more, and that the judge could give me and my daughter separate bonds and they could be from $1,000 to $12,000 each.

9. The officer told me three times to call my family to tell them that the process could be very long and make sure they actually want to pay the bond. I told him that I didn't need to call my family because I had already talked to them and we were confident in our decision to ask for a bond.

10. The officer made me feel like he really wanted me to leave with the ankle shackle. He kept repeating the same thing over and over telling me to sign the papers so I could leave sooner. I didn't understand why he wasn't respecting my decision when I said I didn't want to leave with the shackle and he made me repeat myself three times.

████████████████████                          12/15/2015

                                              **Date**

I certify that I am proficient in the English and Spanish languages and I accurately and truthfully read the aforementioned in the Spanish language to the client.

_Ian Philabaum_ (signature)                   12/15/2015

Ian Philabaum                                 **Date**

Dated: February 8, 2017.

Respectfully submitted,

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael Sorgen

LAW FOUNDATION OF SILICON VALLEY -
LEGAL ADVOCATES FOR CHILDREN &
YOUTH
Jennifer Kelleher Cloyd
Katherine H. Manning
Kyra Kazantzis

Of counsel:

YOUTH LAW CENTER
Virginia Corrigan

/s/__Peter Schey_____
*Attorneys for Plaintiffs*

/ / /

# CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On February 8, 2017, I electronically filed the following document(s):

- EXHIBITS 12 AND 13 IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE [REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*