CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| Plaintiffs, | ) |
| - vs - | ) EXHIBITS 15 AND 18 IN SUPPORT OF |
| | ) PLAINTIFFS' MOTION TO ENFORCE |
| DANA J. BOENTE, ACTING ATTORNEY | ) [REDACTED VERSION OF |
| GENERAL OF THE UNITED STATES, *et al.*, | ) DOCUMENT PROPOSED TO BE |
| | ) FILED UNDER SEAL] |
| Defendants. | ) |
| | ) |

1
2
3

*Plaintiffs' counsel, continued:*

4
5
6
7

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

8
9
10
11
12
13
14
15
16

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:   (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
          kate.manning@lawfoundation.org
          kyrak@lawfoundation.org

17
18

*Of counsel:*

19
20
21
22

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

23
24
25
26
27
28

# Exhibit 15
## Publicly Filed

# DECLARATION OF LINDSAY M. HARRIS

I, Lindsay M. Harris, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed and admitted to the California bar in December 2009. Following a Ninth Circuit clerkship, I represented women and girls fleeing gender-based violence at the Tahirih Justice Center in Falls Church, VA. I also developed and taught a course in Refugee and Asylum Law at George Mason University School of Law. From 2013-2015, I supervised students enrolled in a clinical program at Georgetown University Law Center representing detained and non-detained asylum seekers in immigration court proceedings.

2. I am currently a Legal Fellow with the American Immigration Council ("Council"). The Council is one of four partner organizations that comprise the CARA Family Detention Pro Bono Project (CARA),[1] which provides pro bono representation to mothers and children held at the South Texas Family Residential Center in Dilley, Texas ("Dilley facility"). The Council supports our on-the-ground staff and partners by assisting in identifying and resolving individual and systemic challenges faced by mothers and children in family detention, including problems related to access to counsel and conditions of detention.

3. The CARA Project is currently staffed on the ground in Dilley by two attorneys funded by the Catholic Legal Immigration Network ("CLINIC"), Inc., along with a Project Coordinator and Project Consultant funded by the Council. Each week, the American Immigration Lawyers Association recruits seven to fifteen volunteer attorneys, paralegals, interpreters, and law students to assist our on-the-ground staff from Sunday to Friday. Together, the CARA staff and volunteers see up to 140 mothers on a daily basis and assist in preparing them for, and often representing them in, credible and reasonable fear interviews, bond hearings, and immigration judge reviews of negative credible and reasonable fear determinations, and requests for reinterview as necessary..

4. I previously submitted a declaration in this litigation in August 2015 regarding medical conditions in family detention facilities. I submit this declaration to provide updated information regarding the medical conditions observed by CARA Project staff and volunteers at the Dilley facility and to explain the process of compiling information for the second complaint filed by all

---

[1] The CARA partners are the Catholic Legal Immigration Network, Inc., the American Immigration Council, the Refugee and Immigrant Center for Education and Legal Services, and the American Immigration Lawyers Association.

1

four CARA partners with the Department of Homeland Security's (DHS) Office of Civil Rights and Civil Liberties (CRCL) and the DHS Office of the Inspector General (OIG) on October 6, 2015. This complaint, attached as Exhibit A hereto, concerned the failure of Immigration and Customs Enforcement (ICE) to provide adequate medical care to mothers and children held at the Dilley facility.

5. CARA's work on behalf of mothers and children detained in Texas has consistently revealed that children and their mothers are not receiving adequate medical care. Unfortunately, troubling trends that we documented in our July 30, 2015 complaint, previously submitted to this court, persist. These trends include failure to provide complete information to mothers and their children about medical treatment they receive; wait times of four to eight hours to receive medical attention for time-sensitive medical needs; a lack of appropriate follow up treatment, and the unavailability of specialist care. Our staff and volunteers have also observed additional problems, including: routine requests by medical staff at the facility that mothers sign forms saying that they have refused medical care if they leave the medical clinic temporarily, even after waiting many hours to be seen; failure to treat pre-existing conditions, including anemia, vision problems, chronic pain from gun-shot wounds, and high-blood pressure; and unavailability of doctors, who are not on site or available in the evenings or during lunch.

6. As a result, the CARA Project again determined it was necessary to bring these disturbing trends to the attention of CRCL and OIG. We filed the attached cover letter and complaints with CRCL and OIG on October 6, 2015. For confidentiality reasons, we used pseudonyms in the publicly available version of the complaint. Names and alien numbers were included in the version of the complaint that we sent to CRCL and OIG, which is otherwise identical to the version attached as Exhibit A.

7. The October 6, 2015 complaint compiled individual complaints filed electronically on behalf of eight families with CRCL and OIG between July 31 and September 15, 2015. These complaints are detailed in bullet points in the first two pages of the cover letter to the October 6, 2015 complaint. The names and alien numbers for these individual families were submitted to CRCL and OIG when the complaints were originally filed.

8. The October 6, 2015 complaint also included declarations from fourteen additional mothers each of whom asserted inadequate medical care in some form for themselves or their children. CARA

2

Project staff and volunteers collected these sworn declarations from mothers detained at the Dilley facility between September 16 and October 5, 2015.

9. The trends described in our October 6, 2015 have continued up to and after the October 23, 2015 deadline for the government to comply with the court's August 21, 2015 order.

10. To provide the court with an updated picture of some of the troubling instances of inadequate medical care at the Dilley facility, sworn declarations from thirteen mothers documenting problems they or their children experienced are summarized below and attached as exhibits. These declarations, which are redacted for confidentiality purposes, describe the following situations that occurred prior to the Flores compliance deadline on October 23, 2015:

   a. A ten-year-old child who had a fever for twelve days who repeatedly sought medical care at the Dilley clinic. When his mother took her son a third time for treatment his ear was swollen and the staff person at the clinic advised that he should take ibuprofen and drink more water. The child eventually experienced liquid pus coming out of his ear. When he suffered with the same ailment in El Salvador, doctors successfully treated the ear infection with antibiotics. Ex. A.

   b. A four-year-old child who had to visit the medical clinic at Dilley seven times, with wait times sometimes as long as five hours, for a doctor to prescribe the necessary antibiotics, allergy medication, and eye medicine to treat her sore throat, irritated eyes, cough, and fever. Ex. B.

   c. A child with chronic stomach pain due to a hernia who did not receive any investigation into this condition. His mother informed medical professionals at Dilley about his hernia and the doctor told the mother he would get back to her about the hernia. She received no follow-up information or communication from the medical clinic. Ex. C.

   d. A mother whose allergy medication was confiscated from her when she entered into the custody of Customs and Border Protection. Although she received medication while detained at Dilley, it did not relieve the symptoms manifested on her face, including swelling, redness, and a burning sensation. Ex. D.

   e. A three-year-old girl who fell from the top bunk, temporarily immobilizing an arm and a leg, did not receive any medical attention for three hours. Ex. E.

   f. A mother whose medication for anemia and a kidney condition was taken away when she entered the facility at Dilley. Doctors performed an independent medical examination to

3

verify the diagnosis of these conditions. Eight days later, she had not received any test results or medication for her ongoing symptoms, including a chronic cough that caused pain in her kidney. Ex. F.

g.  A five-year-old boy with cold symptoms who waited from eight o'clock in the morning until three in the afternoon to see a doctor at Dilley and was then told to come back the next day. The following day the boy and his mother again waited for three or four hours, only to be told to drink more water. Ex. J at ¶ 7. The boy's mother had also suffered for five days at Dilley with bleeding from her mouth and nose before receiving medication. *Id.*

h.  A six-year-old boy who went to the doctor at Dilley because he was vomiting and although the doctor said he had a fever, he was only told to drink water and not even given anything to reduce the fever. Ex. L at ¶ 9. His mother reported waiting at least four hours to see a doctor and being told, again, just to have her son drink water. *Id.*

i.  A mother detained at Dilley who reported being sick, with stomach problems, for two days before she was seen by a doctor. She described the medical care as "terrible" and reported many children sick with fevers just told by medical personnel to drink more water. Ex. M at ¶4.

j.  Twin eleven-year-old girls detained at Dilley for a month and a half, and now Berks, whose mother reported that the girls suffered from constant diarrhea, stomachaches, and fevers. The family waited for more than four hours to see the doctor and, after the wait, the doctor gave no medicine to reduce the fevers. Instead, medical personnel advised the girls to drink water that tasted of chlorine. Dec. N at ¶ 8.

11. The following situations arose after the October 23, 2015 deadline to comply with the most recent order in the *Flores* case. These are just a few of the concerning medical situations that have arisen following the deadline, in the month following the deadline, but unfortunately CARA Project staff at Dilley and Karnes continue to see troubling inadequate medical care. We have repeatedly asked ICE Headquarters in DC for a detailed breakdown of the staffing in the detention centers, but have yet to receive a response.

a.  A mother who suffered from severe asthma but was not permitted to keep an inhaler with her in the Dilley facility until after she had experienced several asthma attacks and

received oxygen for three or four hours. She constantly worried that her asthmatic eight-year-old son would experience similar symptoms. Ex. G.

b. A four-year-old boy who suffers from asthma and a kidney condition for which he requires medication every six hours. This child was denied medical care while in the custody of Customs and Border Protection (CBP) prior to being transferred to Dilley and did not receive the necessary medications for his kidney conditions from November 6 to November 11. A doctor told the mother that they would try to get the son to a specialist in San Antonio, but could make no guarantees. Ex. H.

c. A two-year-old boy with a cast on his fractured arm that was due to be removed on November 9, 2015, by a doctor in El Salvador. Although the boy and his mother saw doctors at Dilley a total of five times and repeatedly alerted doctors that the cast should be removed. On one occasion when the mother raised her concern about the cast, a doctor was simply unresponsive. On another occasion, on November 12, a doctor asked when the mother would receive a decision on her immigration case. The mother was made to feel that getting an appointment for her son's cast to be removed was dependent on the results of her credible fear interview. The cast was not removed until November 19, 2015, after attorneys from the CARA Project intervened and brought the case to the attention of ICE officials. Ex. I.

d. A five-year-old boy transferred from Karnes to Berks who was vaccinated for varicella (chicken pox) at the Berks facility, despite being vaccinated as an infant. Ex. K at ¶ 19. He developed chicken pox two days after the vaccination and he and his mother were held in medical isolation for a week. *Id.* The mother describes how her son seems depressed, has stopped playing with other children, has become quiet, wants to go and says that he is in prison. *Id.* at ¶23.

12. We have received little response to the complaints raised with CRCL and OIG regarding medical treatment for immigrant families held in detention. On August 11, 2015, the Office of Inspector General sent a letter in response to our July 30, 2015, complaint, advising that the U.S. Government Accountability Office was "currently reviewing medical care at detention facilities and the results of this review are scheduled to be released in mid-November of this year." Ex. V

5

(OIG August 11, 2015, letter). The OIG letter requested permission to send our July 30 complaint to GAO for their review. On August 28, 2015, we responded to OIG and gave written permission for the complaints to be shared with GAO. *See* Ex. W. As of December 2, 2015, GAO has not issued a report on medical care at detention facilities.[2]

13. At a meeting with CRCL on September 30, 2015, CRCL staff advised that they were looking into the July 30, 2015, medical complaint and were unsure whether they were going to open a complaint.

14. As of May 5, 2016, we have received no response from either OIG or CRCL to the October 6, 2015 complaint we filed regarding inadequate medical care for families detained at the South Texas Family Residential Center in Dilley, Texas.


Executed this 5th day of May, 2016

5·5·2016

Lindsay M. Harris, Esq.
American Immigration Council
1331 G Street NW, Suite 200
Washington DC, 20005
202-507-7511
lharris@immcouncil.org

---

[2] *See* http://www.gao.gov/browse/date/sixmonths (last visited Dec. 2, 2015).

Case 2:85-cv-04544-DMG-AGR   Document 291-2   Filed 05/19/16   Page 20 of 278   Page ID
#:11793

# Attachment to Exhibit 15
# Exhibit B



On September 25th, 2015 and are currently being held at the South Texas Family Residential Center in Dilley, Texas.

On September 28th, the day we arrived in Dilley, my daughter was healthy and was given a medical checkup.

After five days here, on about October 2nd, my daughter began to get sick. Her eyes were irritated, her throat hurt, she had a cough and a fever. I thought, though, that they only did a checkup. I didn't know I could go to the clinic here.

The other women told me I could go to the clinic, but that they would not give me medicine. But I went on October 9th anyways because she had a very high fever. They gave her ice to eat and on her head and gave her a tylenol.

Her fever got worse again later that day so I went back to the clinic. I waited five hours for them to see us, and meanwhile I tried to bring her fever down by dabbing her forehead with a moist towel. By the time a nurse saw her, the fever was a bit lower and they told me that there was nothing wrong with her, but they told me they had given me an appointment.

So on the 10th I waited from noon until 6pm for them to see us. They took her temperature, her pressure and her weight and told me they were not seeing any patients any more so I could come back the next day if I wanted to.

I was very upset, so I didn't go. They came to see me but I didn't go because they had done nothing. I filed a report with a woman with a blue uniform and orange letters to complain about the lack of medical service.

A couple days later someone who I think was an immigration official asked if I had filed the report and recorded the details of what had happened. She told me that if I went to the clinic again and they did not see me I should speak to a supervisor or anyone with a blue uniform.

But my daughter got worse. She had fever every night. It seems like she had an infection in her eyes. Her throat didn't hurt any more but her head hurt and she still had a cough. So I went back on the 13th or 14th and waited for three hours. I told them I was going to leave, and then they saw us. They gave her three days of tylenol.

On Saturday the 17th she had a very bad fever. I took her to the blue clinic at about 1:30pm just as the doctor was leaving and said that she would not be seeing anyone else, that I could go back at 4:30. I took her at about 6pm because she had fever again. They told me that they weren't seeing anyone anymore there and that I should go to a different clinic.

I was fed up so I didn't want to go. An official who had seen my daughter crying in our room saw us and said I should take her to the clinic. He offered to take us to the clinic. They took my ID and said they would see me. I dabbed her forehead with moist towels again and by the time they saw me her temperature was normal, so the nurse didn't give her anything except two small packets of honey for

the cough.

That visit on Saturday October 17th, while we were talking through an interpreter, whose name is Gloria, the interpreter got upset with me and told me only to answer what the nurse asked me. She said what I was saying was not what the nurse was asking me. So I began to answer only yes or no. She said they would make an appointment for me for the next day for a doctor to see my daughter.

Sunday the 18th I went at 10am which was when my appointment was. After twenty or thirty minutes the nurse took her weight, pressure and temperature and then said I had to go to another clinic in order to see a doctor. So I went to the other clinic. But it turned out that there was only a nurse there, not a doctor. I said I needed to see a doctor because I had seen lots of nurses and they all tell me the same thing. The nurse called me in and said only she was there. I was upset at this point and said that they had sent me from clinic to clinic, I had been to all of them, and that if she was going to see me that she do it and if not I was going to go. I am tired of my daughter being sick every night and getting up and needing water and having fever, and that the nurses don't give her anything.

So she asked if we had eaten. It was about noon. I said that not yet, and she asked if my daughter had been eating. I told her she had eaten almost nothing for four days. She said to go have her eat a bit and to come back at 2pm and she would see me.

I went back at 2pm and she saw us. She was very nice and gave my daughter ibuprofen and saline solution. She also made another appointment for me to see a doctor today at 10am.

Today, October 19th, I went to the doctor and gave her an antibiotic, an allergy medicine, an eye medicine and something for her nose.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

_____    10/19/15
                                    Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to me in Spanish.

Abr Mensing                         10/19/15
CARA Volunteer                      Date

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 23 of 273   Page ID
#:4792

# Attachment to Exhibit 15
# Exhibit C

**Declaration of** ███████████ **A#** ███████

- On what I believe was September 30th (though it may not have been that exact day) I went to the doctor because my son was sick with a fever and an infection. Also my son had been told in Guatemala that he had a hernia and some related complications that required an operation, but I did not have the resources to have this done. He has chronic stomach pain and also in other parts of his body, I believe because of this problem.
- I told the doctor about the fever and infection, and also that my son was in need of treatment for a hernia or related issue. The doctor said he would get back to me about the hernia, but that my son did not have a fever and was fine. As his mother it was very obvious to me my son is sick so I told the doctor no that my son is definitely sick and needs help.
- Finally the doctor agreed to give my son medicine, and thank God after taking the medicine for six days the fever and infection are gone.
- However, the doctor never did tell me anything more about the hernia and no one from the medical office has followed up with me about that. I believe that my son at least deserves to have this problem investigated and if the doctor agrees that more treatment is needed my son should be allowed to see a specialist or go to a hospital.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

███████████████████

10/07/2015
Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to ████
██████ in Spanish.

*David Mullins*

David Mullins

10/07/2015
Date

303

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 03/19/16   Page 25 of 273   Page ID
#:4194

# Attachment to Exhibit 15
# Exhibit D

## AFFIDAVIT

My name is ███████████████████████ I am a citizen of El Salvador. I entered the United States on October 12, 2015. My Alien number is ████████ My date of birth is ██████████ I was admitted to the South Texas Family Residential Center on Wednesday, October 14, 2015. At the time I entered the US I had in one of my pockets a little bottle that contained the medication I was using to treat an allergy condition on my face. Soon after entering the US, an Immigration Officer ordered me to take all my personal items and put them inside a plastic bag. At the time, I tried to explain to the Immigration Officers the reasons why I needed to keep using the medication (topical lotion) in order to treat the allergy on my skin. The Immigration Officer dismissed all of my demands, and took away my allergy medication. On Wednesday, October 14th of this year, I explained to a CCA staff that I was having issues with my allergy and that my face was swollen and that I was experiencing burning sensation on my face. The CCA staff referred me to the medical center and I was giving some pink liquid medication to treat my symptoms. The medication that was given to me on 10/14 has not have any effect on me and to this date, I am still experiencing redness and burning sensation on my face. I am in desperate need to retrieve the prescription medication I had on me at the time of entering the US.

CERTIFICATE OF TRANSLATION

I certify that I, MARTHA E. ARISTIZABAL, am proficient in the English and Spanish languages and that the foregoing was read to me in Spanish.

Martha E. ARISTIZABAL

Case 2:85-cv-04544-DMC-AGR   Document 201-2   Filed 05/19/16   Page 27 of 273   Page ID #:11806

# Attachment to Exhibit 15
# Exhibit E

## Medical Affidavit of █████████

I █████████ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1.  My name is █████████ (A# █████ and I was born on █████████ in █████ El Salvador.

2.  Currently, I am detained at the South Texas Family Residential Center in Dilley, Texas with my daughter █████████ (A# █████

3.  On October 8, 2015 around 9:00 p.m., my three years old daughter fell from the top bunk hurting her right arm and leg.

4.  I urged an officer to escort me to the medical facility. I checked in with one of the CCA officers and told him what had happened. He proceeded to tell me to wait while seated.

5.  **I waited for three (3) hours without any type of medical assistance or triage intervention or assessment.**

6.  I was very scared because my daughter was not able to move her arm or leg.

7.  While I was there, another resident wanted to leave because she had been waiting too long because without getting any medical help. I overheard when one of employees informed the lady that if she wanted to leave she had so to sign a document attesting that she refused to get medical assistance.

This affidavit was read to me in Spanish and it is a true statement of what I have said.

I, Ana Camila Colón, certify that I am proficient in the English and Spanish languages and that the foregoing text was read to █████████ in Spanish. I further certify that the English translation of the Spanish statement, to the best of my abilities, to be true and accurate.

*Ana Camila Colón*

Ana Camila Colón

10 /26 /15

307

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 29 of 273   Page ID
#:14902

# Attachment to Exhibit 15
# Exhibit F

# AFFIDAVIT

1. My name is ███████████████████ I am from Honduras. I have one child, ██████ who is with me today ███████ is eight years old. We were first detained by immigration officials in the United States on September 27, 2015.

2. My daughter had a medical exam on the first that that we arrived in Dilley, on Sunday, but they only checked her vision and her cough—they did not do a full medical exam. I did not have a medical exam until Tuesday, two days after I arrived. When I first arrived, I told them about my medical condition, but they took away my medication and made me wait for an exam. They first gave me an appointment for first thing in the morning at 6 a.m. on Monday, but when I got there they told me to come back at 7 p.m. that same day. When I went back, they told me the doctor had left for the day, and that I had to come back at 6 a.m. on Tuesday.

3. My doctor in my country diagnosed me with a serious anemia, and a problem with my right kidney. My right kidney has fallen from it's proper place, closer to my lower back. This means that if I cough a lot or if I move a lot, my kidney hurts me a lot. My doctor in my country had given me medication to protect the kidney from harm and to prevent infection because it is more susceptible to harm.

4. When I first arrived, I had medication with me that my doctor in my home country had prescribed. She had told me that this medication was necessary for my live, and to ensure my wellbeing. When I was detained, they took away my medication, even though I told them that I needed the medication. I was told I needed a medical exam first.

5. During my medical exam, I believe that I was meeting with a doctor. I had to speak with him through a telephone interpreter. I told the doctor about my condition and explained that I needed my medication. I told him that I had documents with me explaining my condition and the medication that I needed, and but the doctor never gave me the opportunity to show him the proof. I was told by the doctor that regardless of the documents, they needed to do their own tests to see if I have the medical condition that I'm claiming, and in order to get the medication that I need. I did not feel like I understood what was going on. They did not explain to me whether they're going to give me the treatment I need, or how long I'd have to wait.

6. It has been eight days since I had the medical exam, and I still don't know the results. Eight days later I still don't have the medication that I need for my serious condition. I feel weak because of my anemia, and my kidney hurts me a lot. I also have a cough, and it hurts my kidney when I cough. I know my body, and I know that I'm not well and I need my medication. I have not gone back to the clinic because they told me that they would let me know when to return.

7. I feel that I haven't received any care here. All I had with the interview, but they haven't actually done anything for my health. I feel bad because I really need this care. It bothers me that I can't have my medication, even when I have the proof of my condition.

I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge and recollection.

10/7/15
date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to me in Spanish.

Lindsey Kaley                    10/7/15
                                 date

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 32 of 278   Page ID
#:14805

# Attachment to Exhibit 15
# Exhibit G

**Medical Affidavit of** ▮▮▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮▮▮▮▮▮▮ declare under penalty of perjury that the following is true to the best of my recollection and knowledge, and that the following statement has been read to me in the Spanish language:

1. My name is ▮▮▮▮▮▮▮▮▮▮ (A# ▮▮▮▮▮ ). I was born on ▮▮▮▮▮ ▮▮ in Honduras.

2. I arrived at the South Texas Family Residential Center on November 6, 2015 along with my two children: ▮▮▮▮▮▮▮ (11 years old) ▮▮▮▮▮▮▮ (8 years old).

3. I have suffered from severe asthma since I was five (5) years old. When I first arrived at this detention center I told the doctor my son and I both suffer from asthma.

4. Since **Saturday,** November 14th I felt sick. At first, I figured I just had a cold. The next day I started to have pain in my chest. Sunday night, around 8:00pm, I went to the clinic for help because I could tell the pain in my chest was a bad sign and I was having difficulty breathing.

5. When I got to the clinic, the nurse asked me why I had waited to come at night because there are no doctors at night. I told her that I was not aware that they didn't have doctors available at night and explained that I was suffering from pain in my chest and am having trouble breathing. The nurse gave me two pills for the pain in my chest. I think they gave me Tylenol.

6. I told the nurse I need an inhaler. I explained to her that this has happened to me before and that I have asthma attack. They told me that they cannot give me the inhaler unless I talk to the doctor. They gave me an appointment to see the doctor on **Monday** November 16th at 2:00 pm.

7. On Monday I came back to the clinic for my appointment at 2:00 pm. The doctor did a check up and asked me questions. I told him that I had asthma and what was happening to me and that I had a lot pain in my throat. He checked my lungs and noticed something was wrong. They took me to a room to put a mask on me to help me breath. After using the mask the doctor came back and prescribed medicine. They let me use the inhaler, but said that I would have to come to the pharmacy to use it. MI would have to come back in

312

the morning and afternoon as I needed it. I insisted that I need it with me because I know my case, but he wouldn't let me keep it with me. He wouldn't give me a reason why.

8. Tuesday and Wednesday I was able to go the clinic to take my medication. However, the pain in my chest never went away and I was still having problems breathing. I told them every time I came to the clinic. Every time I asked to keep the inhaler. They still would not let me keep it.

9. **Wednesday**, November 18th night I was not feeling well. I went to sleep and around 11:30pm I woke up because I couldn't breathe. I ran out of the room to seek help. I went out to the hall way, checked the laundry room and the game room and could not find anyone. I was very desperate since I could not breath. After this, I found an officer that didn't speak Spanish and could not understand that this was an emergency. Finally, another officer came along and took me to the clinic.

10. My children had to stay at the room because they were sleeping. I was very worried because my younger son also suffers from asthma and was sick and was using his inhaler.

11. Once at the clinic, I finally had access to the inhaler.

12. They asked me why I didn't keep the inhaler with me. I told them that I asked to keep it with me but my request had been denied and told that I had to keep it here. They asked me why they wouldn't let me bring the inhaler with me and I said I did not know.

13. After a few minutes in the clinic I think my lungs went into shock and things got worse. I started to turn purple in the face and could not breathe. I couldn't see the people around me. All I could see was the white light. I was taken to the machine to help me breath and someone ran to find oxygen to put in my nose. I was with the oxygen for three (3) or four hours.

14. During these three (3) hours while I was trying to breath I was worried for my children. Every breath I took I took it for them.

15. Once they thought my breathing was more stable they let me leave and finally gave me my inhaler to keep with me. I did not sleep at all that night. I thought I was going to die and all I could think about were my children.  My son has asthma too and I'm petrified if this were to happen to him while we are here.

313

16. On **Thursday**, November 19th, 2015 I went back to the medical facility because I still do not feel good and feel like I am still having problems breathing. To me surprise, there was no record of my respiratory failure that I suffered just the day before.

17. I was not given the attention I need. I still feel like I have not been given the treatment I need and that I will continue to have problems breathing.

18. I have been dealing with my asthma problem since the age of five. I know when my body is in danger of shutting down because I can't breathe. That is what happened to me and I'm afraid it will happen again soon because I still am having problems.

19. In my country when that happens they give me an IV and take x-rays to see there is pneumonia. They also put a nebulizer on my face. They do the nebulizer three times every fifteen minutes. They did none of those things here. They gave me the nebulizer but only once. However, they have not done any x-rays or given me the IV, which I really think I need. I also think that if I was able to keep my inhaler with me that would have helped me, but they would not let me.

I declare under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge and recollection:

_11 / 20 / 2015_

Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to in Spanish.

_11 / 20 / 2015_

Ana Camila Colón

Date

314

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 36 of 273   Page ID #:4809

# Attachment to Exhibit 15
# Exhibit H



**Declaration of ▮▮▮▮ (A# ▮▮▮▮**
**Regarding My Son, ▮▮▮▮   Medical Condition**

I, ▮▮▮▮ (A# ▮▮▮▮ declare under penalty of perjury that the following is true to the best of my recollection and knowledge, and that the following statement has been read to me in the Spanish language:

1. My name is ▮▮▮▮ I was born on ▮▮▮▮ in Honduras.
2. I fled to the United States to seek asylum. After a long and challenging journey, my 4-year-old son, ▮▮▮▮ and I arrived in Texas on November 6, 2015.
3. ▮▮▮▮ has suffered from numerous medical conditions in his young life, one of them is asthma. I made sure to take his asthma medication with me when we fled Honduras, but we lost it when I was carrying ▮▮▮ in the rain on the way here.
4. ▮▮▮▮ also suffers from a dangerous kidney condition. His body makes too much calcium and too little potassium. ▮▮▮▮ had two surgeries back in Honduras. The most recent one was January 28, 2015. ▮▮▮ also must take medication every 6 hours in order for his kidneys to function properly. If he doesn't take medication, he can get very sick. ▮▮▮ will be experience fevers, urinary tract infections, and kidney stones. Because ▮▮▮ body is so small, he cannot pass the kidney stones. In addition to taking medication, ▮▮▮ has to follow a very specialized diet. For example, he cannot eat any foods with food coloring in them or consume milk and dairy products. After ▮▮▮ last surgery, his doctor wanted ▮▮▮ to come in for a follow-up ultrasound to make sure his scars were healing and that the medications were working. ▮▮▮ doctor back home was supposed to see him on November 16, 2015.
5. ▮▮▮ did not have access to a doctor, medical treatment, or medications the entire time we were at the hielera and la perrera. As a result, he has become very sick. While we were held by CBP, my son had trouble breathing, was coughing, stomach pain, and had a fever.
6. When we arrived in Dilley on November 10, 2015, I took ▮▮▮ for medical treatment. They gave him Tylenol and a spray for his asthma, but nothing to treat his kidney condition.
7. Since we've been detained, I've also had trouble with ▮▮▮ diet. He cannot eat many of the foods here, and has little appetite since he has been so sick.
8. Today, I was contacted by the pharmacy here at Dilley, and told to report before closing time at 7pm. I do not know whether they are going to have the medication my son needs, or if they are just giving me the Tylenol that my son also needs to treat his fever.
9. I am very worried about my son. He is so sick right now, and even if he has medication, there's no way for me to ensure that his dietary needs can be met while we are in detention. My son's doctor in Honduras said that ▮▮▮ needs an ultrasound of his kidneys, which we were supposed to receive on by November 16, 2015. I'm afraid he won't be able to receive his ultrasound while we are in detention.

I declare under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge and recollection:

316



_____
11/10/15
Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to

in Spanish.

_____
Sandra Lopez

Date    11/10/15

Case 2:85-cv-04544-DMG-AGR   Document 341-2   Filed 02/09/17   Page 29 of 98   Page ID
#:14811
Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 42 of 278   Page ID
#:4812

# Attachment to Exhibit 15
# Exhibit J

**DECLARATION OF** ██████████████

I, ██████████████████████ swear under the penalties of perjury that the following information is true and correct to the best of my knowledge and belief:

1. My name is ██████████████████████ I was born in El Salvador. I am 33 years old. I am detained at the Berks County Residential Center in Leesport, PA, with my son ██████ ████████████ who is five years old. He was born in El Salvador.

2. My son and I have been detained at Berks County Residential Center for more than twenty days. Before this, I was detained for twenty one days in Dilley, Texas and spent a day each in a Hielera and a Perrera. I have been in detention since October 10, 2015, so it has now been almost two months.

3. I fled El Salvador because members of my family were being threatened by gangs. My nephew, who is only fourteen years old, left the country because a gang was trying to recruit him. Another nephew of mine was beaten because the gang demanded that he give them money and he did not have any. The gang looks for young children to do their work and I am afraid my son will be recruited. They gang regularly meets at a house two doors down from me and are very present in my neighborhood. I am afraid of what will happen if I stay there.

4. When I first arrived in the United States, I was taken to a Hielera, an ice box or freezer in McAllen, Texas. It was crowded, about 60 or 70 people were there, and there were no mattresses or blankets. We slept on the concrete. It was very, very cold. We were given bread and frozen ham sandwiches to eat. The lights were on the entire night, never turned off. There were no windows and only one door which was locked. I did not get much sleep because there was no place to lie down. There were many young babies and children there. One little girl fainted, some children were vomiting. Some children were taken to the doctor, then they were returned. When I arrived, my clothes were wet and muddy from crossing the river. The officer made me take off and turn over the extra pair of pants I was wearing. There was one bathroom for everyone there to use and we were not allowed to shower.

5. I spent one day in the Hielera, before being moved to a Perrera, a warehouse where they hold people. We were given blankets that were like paper. I slept on a mattress but the floor was filthy. There were about twenty people in our small room, and a public bathroom with no privacy.

6. After one day in a Perrera, I was woken up and put on a bus. They did not tell us where we were going. When someone would ask a question about where we were going or what was happening, the officials on the bus would tell us that they didn't know. I thought they were taking me to see my family, who live in Denver.

7. They took us to Dilley, Texas. The experience there was horrible. Two or three days after I arrived, blood started coming from my mouth and nose. I wasn't taken to a doctor. They told me to drink hot water. About a week later, they gave me pills for a sore throat. I was bleeding for five days before I got medicine. At Dilley, I was able to take a shower. I had a

mattress, blanket and pillow. There was more food to eat, but it made a lot of us sick. Me and my son both had diarrhea for most of the time we were there. Eventually, my son got a cold and we went to go see a doctor at the office at Dilley. We waited from 8 in the morning until 3 in the afternoon and then they just told us to come back the next day. We waited for three or four hours the next day and then the doctor just told my son to drink water. We had no food to eat while we waited, so we went hungry all day.

8.  I saw about four different lawyers at Dilley with the CARA Project. They sent a note that said we could request a lawyer and told us to get in touch with them. I went to the office at the center and filled out a request for a lawyer. Some of the other people at the center told me where to go; the staff didn't tell me anything about getting a lawyer. The attorneys were free, so I didn't need to get money to pay for them. I trusted the lawyers, and they helped file a request for re-interview but I didn't get to have one because I was taken from Dilley before it could happen.

9.  Around November 1st, I was taken from Dilley. I didn't know where I was going, I thought they were sending me back to El Salvador. When I asked the officials where they were taking me, they said they couldn't tell me. They took my son's passport and my identification card. I didn't get them back. We left Dilley around 10:30 in the morning. We were taken to a room where they usually do vaccinations, and we were given a sandwich and water. We drove to the airport in a truck with another mother and child. We got on a plane with two agents, it was filled with regular passengers. We were only allowed to have water in the airport and on the plane, but the agents bought pizza. My son was crying because he was hungry, but they didn't have food for him. They never asked if I had a lawyer or what the status of my case was.

10. At Dilley, the consulate for El Salvador came to visit. The woman from the consulate was there to get documents if we had to return to El Salvador.

11. We arrived at the detention facility in Berks County around 3 am. My son and I didn't have anything to eat except for the sandwich they gave us in Texas all day. We were interviewed for about an hour and then we got to eat. They examined us, took blood pressure, and searched our belongings. A few days later, they took blood from my son.

12. When I first got to Berks County I was afraid that I lost my lawyer. They told me that I could contact a lawyer here but I didn't know how to do that.

13. My son has mostly been healthy in Berks but some of the other children have had facial swelling. When he had a fever and a cold, my son was taken to the emergency room. He had an infection in his eye but he hasn't been given medicine yet, we're still waiting for it. Staff members come in at night every fifteen minutes with flashlights. My son sleeps through the night but I don't. My son cries sometimes, he asks why we can't be free, why we're still here. He mostly listens to me but he gets in trouble here and there, he's mischievous.

323

14. When I was in Texas, an Official told me that I had to sign papers or that I was going to be in jail. I didn't know what I was signing and I thought they were deportation papers.

15. I'm scared now because in the middle of the night here, they take people and deport them. I'm afraid every night that I'm going to be taken next.

16. I feel frustrated and worried that all of my time spent getting here will not amount to anything, but I have hope that it'll work out because I am afraid to return to my country.

17. I keep fighting because I have hope. I have hope that my lawyer will present my case well.

18. I have heard your case goes better if you leave the center, and I would like to be with my family so they can help me.

_11/30/15_

DATE



CERTIFICATE OF INTERPRETATION

I, Richard Mullen, certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ██████████ in the Spanish language and that she understood the contents of the Declaration.

_Richard Mullen_

[signature][name]

# Attachment to Exhibit 15
# Exhibit K

**DECLARATION OF** ██████████████

1. I am a thirty two year old woman from El Salvador. I fled my home country with my five-year-old son because we were in danger.

2. I arrived in the U.S. on September 23, 2015. Immigration officials brought me to the hielera, where we were held for two days. The conditions were very bad -- they made my son and I sleep on the floor. The only thing we could cover us with is an aluminum blanket and they treated us badly. The officers were really mean. They yelled at us. When the cleaning crew would come around they made us sleep on the wet floor. Immigration officers screamed at us, "Get up you lazies/crazies."

3. The food was really bad. They gave us juice that gave us acid reflux. They gave us frozen sandwiches. Both kids and adults got sick from the acid.

4. I asked the officers if they could turn down the air conditioning because the kids were getting very chilly, but after I asked they actually made it colder. My five-year-old son was completely desperate. He was shaking and the only thing he had to cover himself was the aluminum blanket. Sometimes the officers yelled to the kids to shut up because the children were crying so loud because of the cold.

5. After two days, officers transferred my son and I to the perrera. They call it that because they put us into rooms that look like kennels. They put us behind bars. They're like prison cells. There are no walls anywhere. There are just bars. Anytime there was a transfer from the hielera to the perrera they took people in the early morning and they would not say anything – we had no idea where we were going.

6. In both the hielera and the perrera, there were no windows. The lights were kept on all the time. After we crossed the river, our clothes were still wet. They wouldn't let us change clothes even though it was very cold. The whole time I was in the hielera I was in wet clothes. My son was dry because I carried him on my back to keep him dry when crossing the river. But there were other kids who were definitely wet. Some of them got sick with a fever and they received no treatment.

7. Also in the hielera and the perrera, the officials had guns and uniforms. My son would say "Oh, we're in prison." He would ask "Why are we detained? Why are we here if we didn't do anything?" I was sad, depressed, down because of what he said. Because I came here, trying to make a better life, I risked my life to leave danger in El Salvador and I thought that I would be free, but I ended up in prison.

326

8. In the perrera they gave us a mattress but still the same aluminum blanket and it was still very cold. They gave us frozen ham sandwiches. Three times a day it was the same thing, a frozen ham sandwich. My son did not eat. We were in the perrera about one day. It was hard to tell because I didn't know if it was day or night because there were no windows and the lights were on all the time.

9. After the perrera, I was taken to the detention center in Karnes, Texas. When they brought us to Karnes, they just gathered together a group of mothers and children and said they were being transferred, I wasn't sure if it was the morning or night but we got to Karnes at 8:00 a.m. on September 26, 2015. It was very difficult in Karnes because the officers did not treat us well. When people lined up for food, they just threw a tray at us. They didn't hand it to us, they would toss it at us.

10. They didn't treat the children well. Sometimes they would yell at them or scold them for playing with things. Guards and officers would say, "don't touch those toys. Don't touch that." For the kids who did not go to school, they would take their toys out of the room and just make them cry. They were just very mean to them.

11. In Karnes, I was given an interview by the asylum officer but I did not have a lawyer during that interview. My family contacted a lawyer. They paid her $2,000. She met with me once and told me she thought I would get a negative result in front of the judge. She was supposed to be with me in front of the judge but she did not show up. I told the judge how my husband had physically abused me in El Salvador and about threats from the gangs. He said he understood but then he agreed with the asylum officer.

12. After I got my negative decision from the judge, I didn't know that I was able to get a lawyer. It wasn't until one of the staff at Karnes told me "you know you can get a lawyer" and gave me the number of RAICES but said "don't tell anyone that I gave you this number." So I contacted the attorneys at RAICES. I met with them many times and they told me they would request another interview. They also told me that if anyone in the prison gave me anything to sign to not sign it, that I already had a lawyer. I trusted the lawyers I worked with at RAICES. They gave me a lot of confidence in them. I thought they would be able to help me.

13. Around October 20, 2015, at 7:00 p.m., ICE officers told me that I was going to be sent to Pennsylvania because they needed more space in Karnes. At 11:00 that night they woke up me and my son and took us out. They told us that we were going to a "home type" place and that there would be a woman there to welcome us. To get transferred here they made me sign papers. They said "if you sign or don't sign it doesn't matter, you'll still be moved there." I was afraid that I was signing my deportation papers. I was scared

327

Case 2:85-cv-04544-DMG-AGR   Document 241-2   Filed 09/09/16   Page 36 of 98   Page ID
#:1819

because a friend of mine from Guatemala had been told to sign deportation papers and she was sent back.

14. On the plane, we were mixed in with men. They gave us no food just the frozen ham sandwiches again. There were men who were handcuffed at the feet and at the wrist. We were really uncomfortable. We didn't know what class of person they were. We worried about what these men could do. Instead of having a relaxing trip, we wondered what would happen. We were worried the whole time. My five-year-old son tried to reassure me that it would be OK, he said, "No mommy, I'm a man, you don't have to worry with me." If we had to go to the bathroom, we had to pass by them. The officials working there told us "don't look. Look forward and you won't have problems."

15. My son is scared of going on trips or traveling so the plane from Texas to Pennsylvania was scary for him. In Mexico, the house we were in was when the Zetas and the Negros gang were forming. ███ had seen that these two gangs were encroaching on the territory because they were facing off. He saw a lot of people with guns. The gangs knew there were immigrants in the house, and they made the owner of the house pay for each head. My son saw everything and he was really scared. He almost never slept the rest of the way to the U.S. I was sorry to have to put him on a plane with more scary men again.

16. I thought that my case was closed, that coming here to Berks would mean deportation.

17. When we got here there were some people waiting for us, doctors, nurses, and caseworkers. I thought, "Oh, we're coming back to the same thing as Karnes." It was a little better in that the food was better but the officials here – some are good, some are bad.

18. I didn't know what was going to happen to my case because my lawyers were in Texas and I did not get to speak to them before I was transferred. My cousin here said he would look into getting me an attorney but there were already attorneys coming here.

19. Since I was here, my son got sick with chicken pox. He already had chicken pox when he was 1-1/2 years old.  They gave him a vaccine for varicella here and two days later he got chicken pox. I told them he'd already had chicken pox in El Salvador but they said some times they can get it a second time.  I think he got the chicken pox from the vaccine because before that he was fine.

20. Because my son was sick, we spent a week in isolation. It was horrible. It was too much; when the staff would deal with us they were all covered in gloves

and a suit, a hat. You could only see their eyes. I got really mad because it was over the top. Mothers feel really bad. My son was not able to leave the room, only me. Even if he had to leave the room, they would have to put a mask on him, he was not able to touch anything. Nothing near kids, he couldn't play with the kids. They would really discriminate. It was painful.

21. They put us in the isolation room, there was a window with a curtain and they would peep in all the time. They would always pass by and sit down and open the curtain and sit and watch. I felt like I had no privacy.  We were locked in there for a week. Afterward, they would have some guy follow us around even when we were outside so my son wouldn't touch any chairs, don't touch wood, don't touch toys.

22. With the chicken pox, the only thing they would do is take my son's temperature. They would give him Tylenol and that was it.

23. Sometimes my son gets depressed. He's always been calm but he's almost just stopped playing with other kids.  He's a lot quieter now since we have been detained. He says he wants to go. He says he's in prison. In the beginning, the officials told the children not to go near him as if something was wrong with him.

24. I did not expect that when I came to the United States my son and I would be put in a detention center. I wish that this never existed.

I, ██████████████████ declare under the penalty of perjury that the above declaration is true to the best of my belief and recollection.

11/13/2015

DATE

██████████████████████████████

### CERTIFICATE OF INTERPRETATION

I, <u>Martha Sandoval Reyna</u> certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ████████████████  n the Spanish language and that she understood the contents of the Declaration.

Martha Sandoval Reyna

Martha Sandoval Reyna

330

# Attachment to Exhibit 15
# Exhibit L

## DECLARATION OF ████████████

I, ████████████ swear under the penalties of perjury that the following information is true
and correct to the best of my knowledge and belief:

1. My name is ████████████ and my A number is ████████. I am 24 years old and
   I was born in Honduras. My son is here with me, he is six years old and he was also born
   in Honduras.

2. I have been detained since September 28, 2015. I was detained in Dilley, Texas for one
   month and then I was transferred to Berks on October 28.

3. I am still afraid of returning to Honduras because there are still death threats against me
   and my family, nothing has changed. I am also afraid for my son because he should have
   the right to live without being threatened and fearing for his life.

4. I entered the US on 28 of September. I don't know where we were, but it was somewhere
   by the river. I was picked up by immigration right away. They took us to the icebox or
   *hielera*.

5. It was a bad experience. They don't treat people well in the icebox. I was there for 2
   days. It was cold, really cold. We had to sleep on a dirty floor. We were given frozen ham
   sandwiches. That is not healthy for children. There were so many children there, even
   little toddlers. The lights were on constantly. There are no windows, no privacy. The
   floor is disgusting. They mistreat people there. They tell us that we're all liars and that we
   should just go home. They took our identification and never gave it back to us.

6. They took us to another place after the icebox, what we called the "dog pound" or the
   *perrera*. We were still incarcerated, like inside of a cage. We didn't have beds, they just
   gave us these cots to sleep on.

7. After that they put us on a bus, which was also freezing. They told us we were going to a
   "family center." We had no idea what was happening.

8. We wanted to go to North Carolina to live with my uncle. He is ready to take us in
   whenever we are released.

9. Instead, they took us to Dilley and put us in detention. At Dilley, we had problems with
   the medical care. My son was vomiting and when we went to the doctor, they said he had
   a fever and that he should just drink water. We had to wait at least four hours to even see
   a doctor, and then they would just tell him to drink water again.

10. While I was at Dilley, I had a lawyer from the CARA Project. When we arrived at Dilley,
    the staff told us that we could submit a request for a lawyer, so I did that and I was

332

assigned to a legal team. It wasn't always the same person. I worked with a few different people. They were free lawyers. We probably met five different times. I shared my personal information with them, and one of the women I really trusted. She said she would help me.

11. After I received my first negative asylum decision, the lawyers tried to help me. We went to court to see a judge, and I explained my fears again. The judge didn't believe me. After my hearing, the lawyers wrote a letter asking the judge to change his mind.

12. One of the immigration officials was always mean to me, I don't know why. If someone got a negative decision, they would tell them to give up and ask us what we were still doing there. They told me to give up and stop fighting my case because I would never win.

13. Before they transferred me to Berks, I told them that I had a lawyer from CARA. The day that they took me to Berks, I had an appointment with my lawyer to call my family in Honduras for the first time, but I didn't get to do that.

14. Immigration came to our bedroom around 1:00 in the morning and told us to pack. I had no idea what was happening. They told us we were going to see "our family." I didn't know what that meant. I had no idea where we were going.

15. We took a bus to the airport, and then we got on the plane. We were with other families, about eleven mothers and their children. We were put on the plane with a lot of men who were in shackles, we didn't know who they were. We had to change planes several times, so by the time we arrived in Berks it was dark outside. They had given us maybe one sandwich in 24 hours. They searched all of our bags and they washed all of our clothes. They inspected our bodies and searched our hair for lice.

16. My son was very sick by this time. He had been sick for weeks. He was having trouble breathing when we got here. We went to the hospital and he had to stay for three days. They prescribed medicine, but it hasn't arrived here yet.

17. When I got to Berks, I had no idea what was going to happen with my lawyers. After I came here, I met a lawyer who gave me her card. She is a great but I have to pay her.

18. A lot of people here are sick. There are two mothers here that have chicken pox, they're in quarantine. There is also a child here who has an infection in his eye that makes his eyes water.

19. Most of the staff here treat us ok, but some treat us like we're going to infect them. They wear gloves when they come in the room and they cross the hallway so they don't have to touch us. They act like we're dirty. At night, we have to leave the door open and they come in every fifteen minutes and shine a flashlight on us.

20. My son doesn't eat much here. He cries a lot because he doesn't want to be in jail. He asks me why others get to leave and we don't. He gets picked on by the other kids so I don't want him to play sometimes and he gets upset. I feel like I have to watch him all the time. I'm so worried that something is going to happen to him.

21. You just feel so terrible to be here. You feel like you must be the worst criminal in the world to be here, or else why would they do this to us. I worry that my son will be traumatized and think there is something wrong with him. He asks why we're in imprisoned all the time. They call it a family care center, but it's a prison. They don't take care of us, they monitor us and make us feel like criminals. Why would you put someone in prison just for being afraid?

22. I am still fighting because I don't want to go back to Honduras, but I think what they are doing to the families is so wrong.

11/19/15

DATE

CERTIFICATE OF INTERPRETATION

I, Caitlin Barry, certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to _____ the Spanish language and that she understood the contents of the Declaration.

334

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 56 of 278   Page ID
#:4826

# Attachment to Exhibit 15
# Exhibit M

DECLARATION OF ██████████████████

1. My name is ████████████████ A █████████ I was born on ████████ in ████████
   ██████ El Salvador. I am detained with my sixteen-year-old daughter, ████████
   ████████ My daughter and I have been detained since August 24, 2015, it has been more
   than three months now.

2. We were encountered by immigration in McAllen, Texas. They took us to the detention
   center at Dilley. They never told us why we were detained, or how long we would be
   there. First they took us to the icebox or the *hielera*, then we came to Dilley and were put
   in prison.

3. My first interview with immigration was on September 25, 2015, one month after I was
   detained. I did not have a lawyer, I was by myself. I never talked to a lawyer or knew
   how to find one. I told them why I was afraid of returning to El Salvador. I received a
   negative decision. After I was interviewed, I was able to find a lawyer when they came to
   the detention center. I talked to the lawyers, and they told me that I would see a judge and
   they could represent me. They worked with CARA Project. There were two lawyers, I
   think their names were Alex and Brian. They worked for free and said I didn't have to
   pay them anything. I liked the lawyers that we had, they were so helpful and they spent
   time explaining what was happening and what to expect. They listened to our story and
   said they would try to help us.

4. In Dilley, the medical care was terrible. I got sick, something in my stomach, and went to
   see the doctor. They made me wait two days because no one was available, then they just
   gave me something to drink. There were so many sick children there, with fevers, and
   they always just tell them to drink water.

5. In the court hearing, the Judge asked me the same questions. The lawyers were not
   allowed to say anything, they could just take notes. The hearing on was on October 5,
   2015. Afterwards, I hoped that I would get a new interview, but it still hasn't happened.

6. We were moved to Berks on October 28, 2015. We were given no notice and ICE
   officials never told us why. We were never even given a phone call to call our lawyers
   and tell them that they we were being transferred. They just put us on a plane. They came
   to our room about 7 at night and told us to pack our things. I hoped they were moving us
   to be closer to our families, but I had no idea what was happening. One lady asked why
   they were moving us, and they told us that we were going to Pennsylvania to wait for the
   judge's decision, and that if we received negative decisions, we would be deported.

7. Two weeks after we arrived in Berks, they took us and put us on a plane. They were
   going to deport us. They woke us up at 3 in the morning. We had no opportunity to call
   our lawyers, they just said we were leaving in thirty minutes. It was me, my daughter and
   another woman and her kids. My daughter tried to ask why we were leaving and they told

336

her to shut up. We packed our things and they took us to an airport. Then they told us we were going back, with no explanation. Apparently a lawyer found out what was happening and had called immigration and stopped it. The other woman was deported. They have taken many families away at 3 in the morning.

8. I am still waiting for my new interview. They haven't told me when it will happen. My lawyers in Texas can't help me anymore. I was able to find a lawyer in Pennsylvania, but I have to pay her. There are no free lawyers at Berks like there are in Texas.

9. I was in Dilley for two months, and now I have almost one month at Berks. There are many families trapped like this.

10. I have a sister in Maryland and cousins and uncles across the US, and my husband is in Dallas. If we are released, we want to join my husband, but we could go live with any of my family. They would all take us in.

11. Last week, they gave us a letter saying they will review our detention on December 18, 2015, which will be almost four months.

11/19/15

DATE

CERTIFICATE OF INTERPRETATION

I, Caitlin Barry_____, certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ███████████ in the Spanish language and that she understood the contents of the Declaration.

Case 2:85-cv-04544-DMG-AGR   Document 341-2   Filed 02/09/17   Page 46 of 98   Page ID
#:14829
Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 59 of 273   Page ID
#:4829

# Attachment to Exhibit 15
# Exhibit N

## DECLARATION OF ▓▓▓▓▓▓▓▓▓▓

I, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ declare under penalty of perjury that the following is true to the best of my recollection and knowledge, and that the following statement has been read to me in the Spanish language:

1. My name is ▓▓▓▓▓▓▓▓▓▓▓▓. My A# is ▓▓▓▓▓▓▓. I am thirty-years-old and I am detained at the Berks County Residenial Center with my twin eleven-year-old daughters, ▓▓▓ and ▓▓▓

2. I have been in the U.S. since September 19, 2015. I know that I am currently detained in Pennsylvania, but this is the fourth place that my daughters and I have been detained.

3. My daughters and I are still afraid of returning to El Salvador. I am especially fearful for my daughters because of their age and because of our contact with gangs in El Salvador. I fear that they may suffer severe physical and sexual violence if returned.

4. We are a devout religious family. I am the daughter of a pastor and a devout Christian.

5. The three of us were apprehended in Texas on September 19, 2015. When immigration appreheneded us they took us to a hielera where we stayed for seven days. The condition in the hielera were cruel for my children. It was as cold as a freezer. It was so cold that the children were crying and turning purple. There was nowhere to lay down. There were only cement benches. The lights were always on. There were no windows. There were a lot of people in this hielera. I would guess more than thirty women and children. Only the very young children received foil blankets. The only food we were given was a small piece of bread and ham. There were no showers. There was one toilet in the room for everyone. There was no privacy. My children suffered.

6. While I was in the hielera, I saw a woman go into labor. They took her out of the hielera to give birth, but then she was immediately returned to the hielera with her newborn. She was not gone long enough to receive any kind of proper treatment. I was under the impression that all they did was clean her and the baby off and returned them to the center.

7. During this time we were taken to a place we called the dog pound, or the "perrera". We called it the dog pound because it was a room with a lot of cages like you were trapping animals. When we were in the dog pound, they gave me a mattress, but they took my children away. I believe it was so that they could shower.

8. An officer then came in and took us to a place they called a family ranch in Dilley, Texas. I was at that center for about a month and a half. At the center there was a lot of sickness. My children suffered from constant diarrhea, stomachaches and fever. We would wait for four hours or more to see and doctor and we still would not receive

339

medicine. Even when my daughters had high fevers they were not given medicine. They were told to drink water. The water was disgusting and tasted like pure chlorine. All me and my children could do was pray.

9. When I was at the family ranch, I was able to meet lawyers and other staff of the CARA Project who were willing to help me for free. I remember their names were Ian and Brian. They were very nice to us. And I wanted a lawyer to help me. I only knew I had a right to a lawyer because I was told by other detainees. The staff refused to talk to me. They also refused to read papers to me that I was given in English. That is why the lawyers were helpful. I would see these lawyers often, more than several times a week. I trusted my lawyers and I told them everything, all of my personal details and everything that I was afraid of for my daughters. These lawyers appeared in court on my behalf.

10. There came a time when I was threatened by an immigration official in the Dilley facility. His name was Officer Mendoza and he was a deportation officer. One day I was called down to court. I assumed that I was going to see the judge. However, when I got there, Mendoza took me into a room. My attorney wasn't there. He put papers in front of me that I could not read because they were in English. He told me that I had to sign some papers for my removal. When I refused, Officer Mendoza became very angry and he threatened to put me in jail and to take my children away. I was scared, so I signed the papers. I did not want to sign for my deportation, but I was afraid that immigration would take my children. I know now that the document was so that they could get a passport to deport me, but my daughters cannot be deported because I fear for their lives and safety.

11. I was then transferred to another detention facility away from my lawyers with no warning. On or about October 31, 2015, I was moved to the Berks County Residential Facility where I am still detained to this day. My daughters and I were taken from the facility at night and put on a plane with other detainees. It was frightening for my daughters to be in front of other male detainees who were shackled and in handcuffs. It did not matter to Immigration officials that I had a lawyer or that I was fighting my case. They still moved me.

12. When my daughters and I got to Berks we again had to go through an admission process. They checked my daughters' bodies again. My daughters were embarrassed because they were for the first time talked to about whether they had sexual intercourse. They made my 11 year old daughters take a pregnancy test.

13. When we were transferred here I was afraid that I had lost my lawyers. I felt like my case was over and that I would have no help. Here in Pennsylvania I heard that there were no lawyers here like in Texas. I was lucky enough to receive information about a lawyer from another detainee. We do not get legal access here in Berks like we did in Texas. The staff will not help up access legal help.

14. I am fighting for my daughters' lives and for their safety. I fight to be strong for them. I try to encourage them to respect others and to be well despite the fact that it kills me to see them trapped in detention. If we were to be released, we could live with family in the United States and continue our case. The father of my daughters is here, and so is my sister and brother in Kansas. That is where we would go and wait for our turn to present our immigration case.

15. My daughters and I are currently in detention with a stay of removal granted by a Federal District Court. Although I have received a negative decision from the Asylum Office, I am supposed to have the right to see a judge to consider that negative decision. From what I understand, Immigration does not want to give me that hearing, even though I was told by the Asylum office that I would have that opportunity.

16. Instead, my daughters and I have been in detention for almost three months. I know my children are depressed and suffering but I will do my best to comfort them, and let them know that one day we will be free.



11/30/2015

DATE

CERTIFICATE OF INTERPRETATION

I, Martha Sandoval-Reyna certify that I am fluent in the Spanish and English languages and that the above DECLARATION, was read to ████████████ n the Spanish language and that she understood the contents of the Declaration.

Martha Sandoval-Reyna

341

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 69 of 273   Page ID #: 4832

# Attachment to Exhibit 15
# Exhibit O



**Declaration of** 

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

1. My name is ▮▮▮▮▮ A# ▮▮▮▮▮ and I was born on ▮▮▮▮▮ in ▮▮▮▮▮ Honduras.
2. My daughter ▮▮▮▮▮ A# ▮▮▮▮▮ and I have been detained in the US since November 14, 2015.
3. My daughter and I arrived at the South Texas Family Detention Center on or around November 17, 2015.
4. Since my daughter and I arrived at the detention center, I have been to the medical clinic about ten times. Every time I go to the clinic, I am always dissatisfied with the medical service my daughter and I receive.
5. On or about November 18, 2015 we went to the medical clinic for our first physical examination. My daughter and I were both sick with cold and a cough, and my daughter had a fever after having spent days in the holding cell at the US-Mexico border. The nurses asked us questions and I told them that my daughter had a fever, but they said it wasn't a fever and didn't give us anything to help our sicknesses.
6. The next time I went was a few days later, because my daughter's fever had gotten worse. The just gave us honey and Vicks VapoRub.
7. We went back to our room and I gave her the Vicks VapoRub but my daughter didn't get any better and she wouldn't stop crying.
8. That same night, in the early morning at 2am, CCA agents came to my room because my daughter wouldn't stop crying. They told me that the other women and children were having trouble sleeping because my daughter was crying so loud. They took me back to the clinic to see what was wrong.
9. One nurse checked my daughter when we got to the clinic and said that she didn't have a fever. The nurse just told me to give my daughter a bath and put wet towels with cold water on her.
10. Two days later the medical clinic called us back to check on my daughter and they said that she was fine other than a small virus that she had. They told me that she just needed to drink more water.
11. On November 29, 2015 my daughter began vomiting. She vomited four times in the early morning.
12. On November 30, 2015 she vomited three times in the early morning.
13. On December 1, 2015 my daughter woke up and vomited three times in the early morning. I called a CCA agent over to see how sick she was. The CCA agent told me to take her to the clinic. I told the CCA agent that I wasn't going to take her to the clinic because they weren't going to help her or give her anything for her sickness.
14. On December 2, 2015 I took her to the clinic. Her stomach was hurting a lot so they gave her a suppository to try to help her have a bowel movement. My daughter left the clinic feeling a little better, but she still had gas in her stomach.
15. On December 3, 2015 my daughter woke up in the early morning and vomited two times. I gave her water and cleaned her and we went back to bed.

16. Later the same day I took my daughter back to the clinic and the looked at her stomach. There was a doctor present and the doctor asked me when the last time my daughter had a bowel movement and I told her it was when she was given a suppository the day before. The doctor then gave my daughter some Pedialyte.

17. My daughter is still constipated and in a lot of pain. She cries all day.

18. There has not been a day in the South Texas Family Detention Center when my daughter hasn't cried extensively.

19. It is so hard to know my daughter is in so much pain and there is hardly anything I can do about it. I feel like no one else really wants to help my daughter and I often cannot help but cry with her.

20. I have been feeling a lot of depression lately because I feel like nobody wants to help me.

21. I have seen the psychologist five times because of my depression.

22. I told the psychologist that I feel incapacitated for my inability to do anything to help my daughter.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

$12/4/15$

Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to ▮▮▮▮▮▮▮▮ in Spanish.

Ian Philabaum

$12/4/15$

Date

344

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 66 of 273   Page ID
#:4835

# Attachment to Exhibit 15
# Exhibit P

**Medical Declaration of** ████████████

I, ████████████ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1. My name is ████████████ (A# ████████ and I was born on ████████████

2. Currently, I am detained at the South Texas Family Residential Center (STFRC) in Dilley, Texas with my daughter. I have been detained at STFRC since November 28, 2015.

3. Last week, around 2:00 am. I went to the STFRC clinic because I felt very sick. I had a bad headache and my ears and stomach hurt. There was no doctor available, so the nurse gave me acetaminophen.

4. The next day I went back to STFRC clinic. When the doctor saw me, he dismissed my symptoms. Even though I insisted I felt very sick, he told me that I was perfectly fine and a healthy person.

5. Two days later, I went back to the STFRC clinic because I was vomiting and my stomach hurt. The nurse told me she could not give me any medication because my medical record reflected that I had previously refused to be checked by the doctor. I told her that that was impossible because I had insisted on my symptoms and the doctor did not check me. The doctor did not even take my vitals.

This affidavit was read to me in Spanish and it is a true statement of what I have said.

████████████████████

████████████

December 10, 2015
Dilley, Texas

I, Ana Camila Colón, certify that I am proficient in the English and Spanish languages and that the foregoing text was read to ████████████ in Spanish. I further certify that the English translation of the Spanish statement, to the best of my abilities, to be true and accurate.

*Ana Camila Colón*

Ana Camila Colón

346

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 65 of 273   Page ID
#:4837

# Attachment to Exhibit 15
# Exhibit Q

**Medical Declaration of** ████████████ (A# ██████)

I, ████████████████ declare under penalty of perjury under the laws of the United States that the following statements are true and correct to the best of my knowledge and recollection:

1. Since December 2, 2015, I have been detained at the South Texas Family Residential Center in Dilley, Texas with my two-year-old daughter ████████████ A# ████████). From that very first day we arrived my daughter was suffering from vomits and diarrhea.

2. On December 3, 2015, around 1:00 am, I took my daughter to the main clinic and told the nurse that my daughter had been choking on her own vomit in the middle of the night. The nurse told me to give my daughter water. She added that there were **no doctors available** and that I had to come back later for an appointment. Around 8:30 am I went back to the main clinic. I was sent from the main clinic to the clinic at the "red bird" neighborhood. From the "red bird", they sent me to the clinic at the "brown bear". From the clinic at the "brown bear", they sent me to the clinic at the "blue butterfly". From the "blue butterfly", they sent me back to the main clinic. **I spent more than four (4) hours being sent from clinic to clinic.** Once we were back at the main clinic, the nurse took her temperature and told me **I had to wait until the following day to see the doctor**.

3. On December 4, 2015 at 9:00 am, I went back to the main clinic for the doctor's appointment. **We waited for four (4) hours without any type of medical assistance or triage intervention or assessment.** Finally, we were called in at 1:00 pm. I told the doctor that my daughter had been choking on her own vomit in the middle of the night. The doctor performed a physical exam. Later, he recommended me to wash the baby's hands and give her water.

4. I still very concerned about my daughter's health because she is still suffering from vomits and diarrhea.

I declare under penalty of perjury under the laws of the United States of America that the above statements are true and correct to the best of my knowledge and recollection:

████████████████                    12/8/15
                                     Date

I certify that I am proficient in the English and Spanish languages and that foregoing was read to ████████████ in Spanish.

_Ana Camila Colón_                   12/8/15
Ana Camila Colón                     Date

348

# Attachment to Exhibit 15
# Exhibit S

**Declaration of**  **A#**

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

1. My name is _____ (A# _____ and I was born on _____ in _____ Guatemala.

2. My daughter, _____ (A# _____ ), and I were picked up by border patrol and taken to the Rio Grande City, TX station.

3. On December 6, 2015 at the "hielera", those that were detained were asked to remove coats and to take everything out of their pockets. When the official saw I had a bag with prescription medicine, shoe laces, hair bands and a poncho, he angrily screamed at me and asked why I had not removed these things earlier, and that we were told at the river to not take anything with us. The contents of the bag were taken from me. I did not ask to keep my medicine, did not challenge the officer for fear that by not following directions I would be immediately returned to Guatemala.

4. The medicine is to treat a medical problem that I have been having for the last two months. The symptoms I was suffering from were intense thirst, frequent urination, dry mouth, headaches and fatigue.

5. My daughter and I arrived at Dilley Detention Center on December 8th, 2015. I was given a physical exam and told the person who did the exam that I had had medicine taken from me. I was not asked what they were prescribed for and there was no more inquiry or mention about the reason for the medicine.

6. On Monday night, December 14, 2015, I started feeling very poorly. I experienced severe chest pain, headache, blurred vision and thirst. I was taken to the clinic at the center, assessed for cardiac trouble which was negative, but her urine came back with very high glucose levels. I was transferred to a local hospital, given insulin and returned to the detention center on Tuesday the 15th in time for my CFI.

7. It wasn't until I got back to the South Texas family detention center that they told me that I have diabetes. I had been detained here for one week without my medicine, even though I had told them I needed it and had this problem. It wasn't until my physical problem was so horrible that they actually listened to me and tried to figure out what was wrong.

8. It worries me that they don't have the capacity to care for all the women and children that they detain here. They should give more attention to these problems because someone could die.

9. I don't understand why I was treated like a criminal and they did not assess the medical problem that I informed them of. If they had just listened to me I would not have had the severe problem that I did. The situation here frightens me because my medical

problem could have ended up worse and I don't know what would have happened with my daughter.

_____          $\frac{12/18/15}{\text{Date}}$

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to ████████████ in Spanish.

_____          $\frac{12/18/15}{\text{Date}}$
Ian Philabaum

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 78 of 278   Page ID
#:4843

# Attachment to Exhibit 15
# Exhibit T

**Declaration of**  **A#**

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge and recollection:

1. My name is _____ (A# _____ and I was born on _____ in _____ Guatemala.

2. My son _____ (A# _____), and I were picked up by United States Border Patrol on December 6, 2015.

3. On December 8, 2015 we were transferred to the South Texas family detention center.

4. When we arrived at the South Texas family detention center my son's health was good but I had some stomach pains.

5. My son was given a physical exam on his first day here, but I was never given a physical exam. I asked the staff working in the central clinic if I could have a medical appointment because I wasn't feeling well. They told me that if it was urgent I had to go to the medical trailer in the "Brown Bear" neighborhood.

6. I went to the medical trailed in the Brown Bear trailer and met with a nurse. I explained the pains in my stomach and she told me she would make an appointment for me to meet with a doctor in the clinic. I was never called back to the clinic for my appointment.

7. On Wednesday, December 16, 2015 my son woke up sick. We already had an appointment that day with the clinic for my son to get his vaccinations, so I decided I would tell the medical staff at that appointment.

8. At the appointment I asked the nurse if she could check my son's eyes, and she told me that she was only supposed to administer the vaccinations, and that I should ask the medical staff at the front desk how to check on his eyes.

9. I went to the front desk and asked for another appointment that same day for my son's eyes. They told me that he could be seen if we went to the clinic in the Brown Bear neighborhood.

10. We went to the Brown Bear clinic and they saw us after a short wait. The nurse gave my son a thorough check up – she checked his lungs, his eyes, his ears. Afterwards she told me that he had a general allergy, and she gave my son a liquid medicine for the allergy and liquid acetaminophen. She gave me a prescription for a pill for the allergy, and more acetaminophen, but I couldn't get it for another 6 hours, and we left in the afternoon.

11. I told the nurse that I thought my son had an eye infection and he needed eye drops to fix the problem. The nurse told me that it was just an allergy like she had said.

12. That night my son's eyes were getting worse and I was really worried. He couldn't sleep and we were up all night because his eyes were so irritated.

13. The next morning I went to the pharmacy to get more medicine. I gave him the medicine for the allergy, but his eyes just kept getting worse. I went back to the pharmacy in the afternoon to get a different medicine that would work actually help my son but they said they could only give me acetaminophen.

14. I haven't gone back to the clinic because they only give my son medicine that doesn't work, and it seems like it actually makes it worse.

15. It makes me so upset to see my son so sick. His eyes are so irritated and every night his eyes are stuck together and I feel so bad because I don't have any resources to help my son. I wish I could take him to the clinic and they would give him medicine that would help him, but they don't.

16. I just wish I was out of this place so I could make sure that my son would get the medical attention he needs.

_____    12/18/15
                      Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to ▮▮▮▮▮▮▮▮▮▮ in Spanish.

_____    12/18/15

Ian Philabaum           Date

356

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 78 of 278   Page ID #:4751

# Attachment to Exhibit 15
# Exhibit U

**Declaration of** ▮▮▮▮▮▮▮▮▮▮▮▮ / A▮▮▮▮▮▮▮

I ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ declare from my personal knowledge and under penalty of perjury that the following is true:

1.  With the help of a lawyer, I have prepared this declaration because my son ▮▮▮▮ ▮▮▮▮▮ A# ▮▮▮▮▮▮▮ was denied critical medical care. My son is only two years old and he is here with me in the South Texas Family Residential Center. We have been here since approximately Friday, December 18th.

2.  I was born on ▮▮▮▮▮▮ in ▮▮▮▮▮ Honduras. I have never committed a crime and I have never been charged with a crime in any part of the world.

3.  I fled Honduras because I was in fear for my life and the life of my son. I had no alternative but to bring my child with me so we could both stay alive. Unfortunately, the journey was long and excruciating. My child and I had to sleep in the cold mountain and traveled on top of a train called "La Bestia"(no inside, but on top of the cargo train cart). My child and I endured freezing temperatures as we had to sleep in the mountains and on top on the train for days, we did not have clothes or blankets to protect us from the inclement weather. We walked during at night for hours under pouring rain. Crossed the river, and we again became wet, which caused the cold to be worse, I feared that we would not make it out alive, I was not feel my arms and legs and my two year old son trembled from the cold. My child was ill, he was unable to breathe, he was wheezing, coughing, and had a burning fever. By the time we were with the immigration authorities of the United States, I told the officers that my child was sick. I desperately tried to get effective medical attention for my child as his condition became worse. In the "hielera" he was given some medication that was completely ineffective and his condition became worse.

4.  A few days after arriving here I went to the clinic to ask for medical services for my son and they only gave me vicks vaporub and a liquid medicine which they said was for allergies that were causing his cough. They gave me that medicine twice a day for a few days, but he did not get better at all.

5.  On 12/30/2015 I was called in to the medical facility so my child could get vaccinated. I waited at the clinic from 8am until 1:30pm for them to see me with my son ill and now he had a fever, which was getting worse. I alerted the medical personnel that my child had a high fever. My child had and continues to have as of the time I signed this declaration, a fever that is extremely high. Despite my pleads for medical assistance for my child, he did not receive any medication or treatment for the fever. I am afraid that my child will have convulsions or brain damage as a result of having such a high fever and not being treated for it.

6.  On the evening of 12/30/2015 I was in the visitation trailer and my son's fever was so bad that the lawyers and I asked a prison employee to take me to the clinic. In the clinic they told me to sit and wait. After five minutes I stood up and told the people at the clinic that my son was very very bad and needed to be seen, and they

1

told me I had to wait. After a few minutes I got up and insisted again that they see my son, whose face was very red and who was not speaking, and he was writhing. Only then did they finally give him medical attention. They checked his temperature, they checked his throat, and then they gave him medicine. They said he had fever and a throat infection. They prescribed him antibiotics and tylenol.

Under penalty of perjury under the laws of the United States of America, I declare that the above statements are true and accurate to the best of my knowledge and recollection.

12-30-15

Date

I certify that I am proficient in the English and Spanish languages and that the foregoing was read to ▓▓▓▓▓▓▓▓ in the Spanish language.

Alexander Mensing

12/31/15

Date

2

359

# Attachment to Exhibit 15
# Exhibit V



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

AUG 1 1 2015

Beth Werlin
American Immigration Council

Karen Lucas
American Immigration Lawyers Association

Michelle Mendez
Catholic Legal Immigration Network, Inc.

Aseem Mehta
Immigrant Justice Corps

Amy Fischer
Refugee and Immigrant Legal and Education Center

Katharina Obser
Women's Refugee Commission

Dear Nongovernmental Organization Representatives:

Thank you for your July 30, 2015, letter requesting that the Office of
Inspector General (OIG) investigate complaints about U.S. Immigration
and Customs Enforcement's (ICE) failure to provide adequate medical
care to mothers and children in family detention facilities in Dilley and
Karnes City, Texas, and Leesport, Pennsylvania.

As you may be aware, the U.S. Government Accountability Office (GAO)
is currently reviewing medical care at detention facilities and the results
of this review are scheduled to be released in mid-November of this year.
GAO is reviewing: (1) the medical care standards the Department of
Homeland Security (DHS) uses at detention facilities; (2) the extent to
which DHS assesses and oversees compliance with medical care
standards at detention facilities; (3) how DHS manages and oversees
medical care costs and expenditures at detention facilities; and (4) how
DHS obtains and addresses any complaints received from detainees or
others regarding medical care in detention facilities. With your
permission, I would like to send the allegations in your complaint to GAO
to help inform their review. Because we coordinate with GAO and try to
avoid duplication of effort, we will not initiate any reviews based on your



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

request at this time. Once the GAO report is issued, we will review it and evaluate whether we should perform additional work in this area. Additionally, we are referring your specific allegations to ICE, with a request that they immediately determine the current condition and status of the individuals to ensure they have received or are receiving proper medical care, if they are still in ICE's custody.

We are also currently conducting a follow-up review of recommendations we made to ICE in our March 2011 report, *Management of Mental Health Cases in Immigration Detention* (OIG-11-62). We are assessing ICE's progress in implementing its proposed actions to address our recommendations and its compliance with relevant mental health standards, protocols, and guidance developed since we issued our report.

We look forward to hearing from you regarding permission to refer these complaints. Should you have any questions, please contact Anne Richards, Assistant Inspector General for Inspections and Evaluations, at (202) 254-4100.

Sincerely,

John Roth
Inspector General

cc: Megan Mack, Officer for Office of Civil Rights and Civil Liberties

Case 2:85-cv-04544-DMG-AGR   Document 201-2   Filed 05/19/16   Page 69 of 278   Page ID #:4853

# Attachment to Exhibit 15
# Exhibit W

August 28, 2015

John Roth
Office of Inspector General
Department of Homeland Security
Washington, DC 20528-0305

      **Re:**    **Investigation of complaints regarding ICE's failure to provide adequate
              medical care in family detention facilities**

Dear Mr. Roth:

We write on behalf of the undersigned organizations to respond to your August 11, 2015, letter
regarding our complaint filed on July 30, 2015, with the Office of Inspector General (OIG). This
complaint discussed ten cases illustrating U.S. Immigration and Customs Enforcement's (ICE)
failure to provide adequate medical care to children and mothers in family detention facilities in
Dilley and Karnes City, Texas, and Leesport, Pennsylvania.

We are aware of U.S. Government Accountability Office's (GAO) broader review of medical
care at detention facilities, which you reference in your August 11 letter.  Pursuant to your
request, we grant you permission to share the allegations in our complaint with GAO to help
inform their review of these critically important and troubling issues. When the forthcoming
GAO report is released, we would be happy to meet with you to share our perspective on the
report and on any new developments regarding medical care in family detention facilities.

We are grateful to you for referring the specific complaints raised by our July 30 complaint to
ICE so that they can immediately determine the current condition and status of the individuals
concerned.

Further, we are pleased to learn that OIG is currently conducting a follow-up review of
recommendations made to ICE in your March 2011 report, *Managing of Mental Health Cases in
Immigration Detention*. We would highlight, for your review, the attached complaint filed by
three of the undersigned organizations on June 30, 2015, on the negative psychological impact of
detention for immigrant children and their mothers. This was originally filed only with the DHS
Office of Civil Rights and Civil Liberties (CRCL), but we hope you will find it useful as you
undertake your follow-up review of mental health issues in immigration detention. We
understand that CRCL forwarded at least two of these cases to you, as of correspondence dated
August 20, 2015 (the two cases were 15-09-ICE-0545 and 15-09-ICE-0544).

Case 2:85-cv-04544-DMG-AGR   Document 201-1   Filed 05/19/16   Page 86 of 273   Page ID
#:4855

We recently filed five additional complaints regarding problems with medical care at the Dilley facility with CRCL, attached here for your review and forwarding to GAO and to ICE. We will continue to document the ongoing, extreme, and often urgent problems in these facilities until the Government ends family detention. Thank you again for your attention to these urgent issues.


Sincerely,

Beth Werlin                                         Aseem Mehta
American Immigration Council                        Immigrant Justice Corps
bwerlin@immcouncil.org                              amehta@justicecorps.org

Karen Lucas                                         Amy Fischer
American Immigration Lawyers Association            Refugee and Immigrant Legal and
klucas@aila.org                                     Education Center
                                                    Amy.fischer@raicestexas.org

Michelle Mendez
Catholic Legal Immigration Network, Inc.            Katharina Obser
mmendez@cliniclegal.org                             Women's Refugee Commission
                                                    katharinao@wrccommission.org


Cc. Megan Mack

# Attachment to Exhibit 15
# Exhibit X

   

October 6, 2015

Megan Mack
Office of Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

John Roth
Office of Inspector General
Department of Homeland Security
Washington, DC 20528

**RE: ICE's Continued Failure to Provide Adequate Medical Care to Mothers and Children Detained at the South Texas Family Residential Center**

Dear Ms. Mack and Mr. Roth:

The undersigned organizations, Catholic Legal Immigration Network, Inc. (CLINIC), American Immigration Council (Council), Refugee and Immigrant Center for Education and Legal Services (RAICES), and American Immigration Lawyers Association (AILA), jointly file the present complaint on behalf of fourteen mothers and their children who received or are still receiving substandard medical care while detained at the South Texas Family Residential Center (STFRC), the family detention facility in Dilley, Texas.

Unfortunately, this complaint highlights the very same problems that we brought to the attention of the Office of Civil Rights and Civil Liberties and the Office of the Inspector General in our previous complaint, filed on July 30, 2015.[1] That complaint was filed on behalf of ten mothers and children who received inadequate medical care at the STFRC, as well as the two other family detention centers in Karnes City, Texas, and Berks County, Pennsylvania. Eight additional complaints, supplementing the original July 30 complaint, were filed with your offices between July 31 and September 15, 2015. Brief summaries of those eight cases, in chronological order of their submission to your office, are provided below:

- A seven-year-old boy who repeatedly sought medical care at the clinic in Dilley, but was repeatedly turned away. When a urine test was finally taken, he was rushed to a hospital in San Antonio where he was kept for five days and diagnosed with juvenile diabetes. Despite his condition, the boy and his mother were returned to the detention facility. When they went to the STFRC clinic for a scheduled follow-up appointment for his

---

[1] On July 30, 2015, the four CARA Pro Bono Project partners, signatories to this complaint, along with Women's Refugee Commission and Immigrant Justice Corps, submitted a complaint regarding ICE's Failure to Provide Adequate Medical Care to Mothers and Children in Family Detention Facilities.

juvenile diabetes, they were told they would be called back because there were too many people in line. They were never called back to the clinic. (*Submitted August 20, 2015*)

- A four-year-old girl who presented at the medical clinic with a fever and a nosebleed. The nurse told the mother that there was only one doctor, who was too busy to see the child because it was not an emergency, but gave her acetaminophen. The child later vomited out the acetaminophen and remained ill. When the mother returned to the clinic, she waited another four hours with her child to see a doctor. (*Submitted August 20, 2015*)

- On the day of her arrival at Dilley, clinic staff examined a twelve-year-old girl identified her as potentially suffering from diabetes. She was promised a follow-up appointment with a specialist that was not scheduled until three months after she and her mother were first detained. On another occasion, she and her mother had to wait five hours to see a doctor for a scheduled appointment at the medical clinic at Dilley. (*Submitted August 21, 2015*)

- A child who lost weight during the more than two months she spent in detention. Her mother sought medical care for her at the clinic three times, but it was not until the child collapsed and the clinic held her overnight that her illness was properly treated. (*Submitted August 25, 2015*)

- A mother who suffered from a chronic condition involving the secretion of pus from her breast experienced pain and discomfort throughout her more than three months in detention at Dilley. During this time, her condition went untreated although she reported it to medical staff on three occasions. (*Submitted August 25, 2015*)

- A two-year-old girl who presented with a virus that a nurse at the clinic said "all of the children here" have. The child developed asthma in the facility, but the mother had to seek medical care on seven separate occasions before a doctor finally diagnosed her and prescribed medication that the toddler has to take twice a day, along with an inhaler, which she is now using four to eight times daily to treat her asthma. (*Submitted August 31, 2015*)

- A mother who waited for seven hours with her three-year-old child to receive pain medication for a migraine. She finally left the clinic without receiving any medication at three in the morning, when she was told she would have to wait another two hours to see a doctor. Later, when her daughter presented with cold-like symptoms, this mother felt it was pointless to return to the medical clinic. *(Submitted September 15, 2015)*

- A registered nurse with ten years of experience was detained at Dilley with her four-year-old child, who contracted a cough and lost eight pounds while detained. When this mother took her child to the clinic, a nurse told her that the child's refusal to eat was normal and that "some days children eat, some days they don't." The nurse informed the mother that no doctor was on site, that she was not authorized to prescribe medication, and that she needed to attend to the long line of other mothers and children waiting. The nurse then advised the mother to have the child drink water and gave her Pedialyte. After this interaction, this mother, an experienced nurse, felt that there was no point in returning to the clinic. (*Submitted September 15, 2015*)

To date, we have received no meaningful response to the ten original complaints submitted to CRCL and OIG or to these eight additional complaints. Nor have we seen any improvement in the quality of medical care in the family detention centers.

The fourteen cases summarized below demonstrate that the level of medical care provided by Immigration and Customs Enforcement (ICE), and its contractor, the Corrections Corporation of America (CCA), in family detention facilities remains woefully inadequate. STFRC holds up to 2,400 children and mothers. At one point in mid-August, the number of detained individuals dropped to around 1,050, but at certain points in September, that number almost doubled. The sworn declarations attached to this complaint from fourteen detained mothers exemplify our concerns about the quality of medical care provided by the clinic currently operating at the STFRC.

The cases summarized in this complaint reflect the continuation of the following disturbing trends identified in our July 30, 2015 complaint:

- Children with fevers and infections or viruses are told to drink more water and, lately, prescribed Vicks Vaporub;
- Mothers and children must often wait between four to eight hours to receive medical attention;
- Lack of follow-up treatment and unavailability of specialist care.

In addition to these three ongoing trends, these cases also reflect the following problems with medical care at STFRC:

- Mothers are routinely asked to sign forms saying that they have refused medical care if they leave the medical clinic, even after waiting many hours to be seen;
- Pre-existing conditions, including anemia, vision problems, chronic pain from gun-shot wounds, and high-blood pressure, are not being treated;
- Doctors are not on site or available in the evening or during lunch.

* * *

**Complainant #1: "Alma."[2]** At six o'clock in the evening of September 20, 2015, suffering from a terrible migraine, Alma sought medical assistance at the clinic with her six-year-old daughter. By ten o'clock that evening, Alma decided that she needed to take her daughter home to sleep. She was unable to see a doctor to get a prescription for pain medication and was forced to sign a release saying that she had refused medical care after her four-hour wait. While she was waiting, Alma witnessed a child convulsing with a fever, who had already been to the medical clinic on two occasions. The mother told Alma that she was afraid her child would die because he was not getting adequate medical attention.

**Complainant #2: "Leonora."** Around September 5, 2015, in the evening, Leonora and her two-year-old son went to the medical clinic because she and her son were both suffering from a cough, a cold, and a fever. The nurse who saw Leonora told her that nurses were not authorized to prescribe medicine and that doctors were not on site at nine o'clock. Leonora and her son returned to the clinic on four more occasions, still sick and in need of care. On one occasion Leonora and her son waited for four hours, but did not get to see a doctor because he was out to lunch. When Leonora sought help for the sixth time, she was given ibuprofen and Vicks Vaporub for her son, who had been vomiting and

---

[2] Pseudonyms are used to protect clients' identities in the publicly submitted version of this complaint, but all the complainants have agreed to share their names and Alien registration numbers with CRCL and OIG. Signed, sworn declarations that include this information are included with this complaint.

unable to eat for days. The doctor and nurses told Leonora that her son's sickness was "normal and just a virus going around" and that if he just "drank more water," he would be fine. Leonora was left with the impression that the medical clinic either does not "have medicine or they just aren't giving it out."

**Complainant #3: "Josefina."** Josefina's twelve-year old daughter, Ariela, received treatment in El Salvador for problems with her vision. The family was forced to flee without Ariela's glasses. Upon arrival at Dilley, Josefina indicated to STFRC staff that her daughter needed glasses. Her daughter underwent eye testing on August 15, after which doctors repeatedly assured Josefina that she would receive glasses. As of September 25, 2015, almost six weeks later, Ariela had not yet received them. In the meantime, she continues to suffer from headaches and has trouble seeing the computer screen at school. Her teacher sent a letter to her mother indicating that Ariela's eyes are tearing up because she cannot see the screen. Josefina is concerned that Ariela's vision will worsen without glasses.

**Complainant #4: "Carolina."** Carolina's three-year-old daughter, Grace, became sick with a fever, diarrhea, vomiting, coughing, and clutched her ear in pain. Carolina took Grace to the medical clinic, where she waited for more than five hours to see a nurse. The nurse examined Grace and said she looked dehydrated and like her eardrum had exploded. After examining Grace, a doctor concluded that she had either a virus or an infection that would go away in two to three weeks. The doctor prescribed Vicks Vaporub. Since that appointment, Grace has lost weight and is still sick. Carolina has not returned to the medical clinic because the doctor made it clear that they would not do anything to help. Still detained as of October 5, she remains very worried about her daughter's health.

**Complainant #5: "Mariana."** Prior to fleeing Honduras, Mariana's four-year-old son, Silas, experienced hair loss and a problem with his right eye. His hair loss has intensified in detention; his right eye is swollen, red, and painful, and tears continuously flow from that eye. On September 14, 2015, Mariana tried to get medical help for her son at Dilley. A doctor at the clinic did a vision test and told Mariana that Silas's problems were probably due to allergies. The doctor indicated further that a specialist would be required to treat Silas's hair loss. Another doctor told Mariana that the problem seemed urgent and that she should take her son to see a specialist immediately after they were released. Silas and his mother have already been detained for three weeks, and he is still not receiving the care that he needs.

**Complainant #6: "Sofia."** Sofia is a twenty-two-year-old mother from Guatemala who has been detained at Dilley since September 3, 2015. About a month before she left Guatemala, Sofia sought medical attention for a urinary infection and a hemorrhaging ulcer in her uterus. The Guatemalan doctor advised Sofia that these symptoms could be an indication of cancer and directed her to return to for a follow-up visit. Sofia was forced to leave Guatemala before her follow-up appointment. When she arrived at Dilley, she told a doctor about her ongoing stomach pain, infection, and possible uterine cancer. The doctor told Sofia that they could not treat her at Dilley, took a urine sample, but did not examine her.[3] Sofia also experienced delays in accessing medical care for her five-year-old daughter, who fell and hurt her lip. Sofia sought medical assistance for her daughter, whose lip was bleeding, around seven o'clock at night, but a doctor did not arrive until midnight. As of October 2, 2015, nearly a month after her arrival at Dilley, Sofia remained detained and did not know whether she has cancer.

---

[3] Although the population at Dilley consists entirely of mothers and children, there was reportedly no gynecologist on staff at STFRC as of September 30, 2015.

**Complainant #7: "Mayra."** Mayra's three-year-old daughter, Aracely, experienced a severe earache, a headache, and knee pain. On September 8, Mayra took her to the clinic, where she was advised that her daughter was "going to be fine" and should drink water. On September 16, Aracely came down with a fever and a cough. This time, after Mayra and Aracely waited for six hours at the clinic, a clinic staff person told them Aracely would be rescheduled for the next day. The next day, after waiting four more hours with a sick three-year-old, Mayra left the clinic because she did not think they would do anything to help her child. To leave, she had to sign a document in English that she did not really understand. Still detained as of October 5, Mayra worries about her daughter's health and has no faith in the medical care at Dilley.

**Complainant #8: "Johanna."** Johanna's four-year-old son, Andres, was diagnosed with anemia when he was an infant. In El Salvador, he received regular medical treatment. Upon arriving at Dilley, sometime on or around August 27, 2015, Johanna told the medical staff that her son needed assistance. As of September 24, 2015, Andres had not received medical care, despite Johanna's repeated efforts to seek help for her son. Andres complains of pain in his head, his lips turn purple, and he shakes from being cold, even in the heat of South Texas. He vomits, is constantly fatigued and does not play with other children.

**Complainant #9: "Melinda."** Melinda is detained at Dilley with her nineteen-month-old and five-year-old children. A few weeks after she arrived at Dilley, Melinda took her children to an appointment at the clinic to be vaccinated. She had to wait five hours to see the nurse. A few days later, Melinda became ill – her body ached, her ears and throat hurt, and she had chills, dizziness, and a fever. She went to the medical clinic with her children, but was not permitted to bring a stroller, in which her baby was sleeping, into the clinic. Though extremely sick, she held the baby in her arms and watched her five-year-old while she waited. When Melinda fairly quickly determined that she was too sick to wait and decided to return to her room to lie down, medical clinic staff made her sign a form saying that she did not want to wait and that she understood that she could not return that night. After she returned to her room, a guard saw that Melinda was still not doing well. The guard said she would send Melinda to the clinic as an emergency. When Melinda returned to the clinic, the guard who had made her sign the form laughed, shook his head, and told her to wait in the room. Melinda waited three hours, only to realize that the guard had not added her to the list of people to be seen. Distraught, Melinda left without getting medical attention. When she raised her treatment at the clinic the next morning with an ICE officer, the officer told her that he would investigate whether she was lying to him and, if so, he did not want to hear from her again.

**Complainant #10: "Heidi."** Heidi is detained at Dilley with her two children.  She did not find out that there was a medical clinic at Dilley until more than a week after she arrived.  On September 7, she took her four-year-old daughter, Lidia, who had a fever of 104 degrees, to the clinic, where she waited five hours to see a doctor. The doctor gave the child ibuprofen. When the fever did not subside, Heidi brought Lidia back to the clinic for the next three days.  Each time, they waited five hours to receive ibuprofen. After this, Heidi decided there was no point in returning, but a friendly guard saw that Lidia was sick and brought them back to the medical clinic. After a five-and-a-half hour wait, the doctor apologized that he did not have any medicine other than ibuprofen to give Lidia. On their sixth visit to the clinic, a doctor finally prescribed a medication to treat Lidia's sore throat. The medication helped, but lost more than four and a half pounds while detained.  According to Heidi: "Last Thursday when we went to the infirmary, they told me that [Lidia] had lost four and a

371

half pounds, but she has lost even more weight since then. Her ribs are visible, and the pants that fit her when she arrived here are so loose they fall down." Subsequently, Heidi's twelve-year-old son was sent home from school because the teacher thought he had conjunctivitis.  Due to the delays she had encountered with Lidia, Heidi was reluctant to seek help at the medical clinic for her son.

**Complainant #11: "Suzanne."** Suzanne is detained at Dilley with her children, ages seven and nine.  Her nine-year-old daughter Emilia suffers from tachycardia, an excessively fast heartbeat. When Suzanne took Emilia to see a doctor on September 28, she experienced a four-hour wait. Because the doctors went to lunch before attending to Emilia, Suzanne missed her scheduled legal appointment and her children missed lunch. When Suzanne asked a nurse if she could leave the clinic to get lunch for her children, the nurse advised that the doctors were on their way.  However, Suzanne and her children then waited another two hours. When a doctor finally arrived, he informed Suzanne that he would refer Emilia to a cardiologist, but Emilia has not yet seen a specialist and to Suzanne's knowledge, as of October 5, no appointment has been scheduled. Emilia continues to experience chest pain. Suzanne also asked about her son's two loose teeth and the doctor told her that it would take a month to see a dentist. Suzanne also has not received the care she herself needs. When she was detained at the border, she was not allowed to take a shower and developed a urinary tract infection. Although she was given medication to treat the infection, her condition has not improved. When Suzanne raised this with a doctor at STFRC on September 25, she was told to drink water and continue taking the medication.

**Complainant #12: "Brenda."** Brenda is detained at STFRC with her five-year-old child. She fled El Salvador because gang members shot her twice in the stomach and back. Following the shooting, she underwent surgery in El Salvador, but continues to suffer pain because of the damage to her ribs and intestines. On September 27, six days after her arrival at Dilley, Brenda saw a doctor. Although she told the doctor about her constant discomfort and intense pain, the doctor did not prescribe any pain medication or advice on pain management. Sometimes when her pain is very intense, Brenda has trouble taking care of her young daughter, who becomes anxious when she sees her mother in pain.

**Complainant #13: "Cristina."** Before fleeing El Salvador, Cristina took a daily medication, Enalapril, to manage her high blood pressure. Six days after her arrival at STFRC, on September 25, Cristina saw a doctor for the first time. Cristina informed the doctor about her condition and her need for medication. The doctor said that she would find out if the medication was available at Dilley and that a nurse would come to check Christina's blood pressure on a daily basis. As of October 2, Cristina had heard nothing about the medication, and no one had checked her blood pressure. When Cristina attempted to go to the clinic to follow up, a guard turned her away, even after she explained her situation, because she did not have an appointment. Cristina has now been without her medication for more than three weeks and is experiencing chronic headaches, constant fatigue, and blurred vision. She has difficulty taking care of her four-year-old daughter in this condition.

**Complainant #14: "Ana."** Ana is detained at STFRC with her thirteen-year-old daughter, Belin, and her six-year-old son, Marcos. Several weeks after they arrived at Dilley, Marcos began experiencing nausea, a sore throat, a fever, and vomiting. When Marcos' fever reached 103, Ana took him to the medical clinic, where he was given a three-day supply of Tylenol. After the three days, however, Marcos' condition did not improve. Ana took him back to the clinic at ten o'clock at

372

night, but no doctor was on site.  After they had waited for three hours, the nurse on duty gave
Marcos a few more Tylenol and told them to come back the next day for an appointment at one
o'clock in the afternoon. That night, Marcos was inconsolable and did not sleep at all. The next day,
Ana and Marcos arrived early for their appointment, but they still had to wait until four o'clock to be
seen. The doctor quickly examined Marcos and determined that he needed to go to hospital. Ana
requested that she be allowed to tell her thirteen-year-old daughter, Belin, that they were leaving for
the hospital, but was denied permission to speak with her child. Desperate to get medical care for her
son, Ana left for the hospital, after the guards assured her that they would notify Belin.
Unfortunately, this never happened.  Left alone at the detention facility with no explanation, Belin
became distressed and concerned about her brother's condition and contacted a family member
outside the detention facility. Only after the family member alerted CARA Project attorneys that
Belin had been left alone was Belin able to speak to her mother and learn of her brother's condition.
Meanwhile, the doctors at the hospital diagnosed Marcos with a virus and treated his symptoms.

***

The fourteen complaints detailed above and in the attached sworn declarations represent only a
sampling of the many stories of inadequate medical care that CARA staff and volunteers have
encountered at STFRC since we filed our July 30, 2015 complaint. Several mothers have declined to
officially share the   problems they have encountered in accessing medical care for fear that it will
negatively impact their immigration cases. The examples contained herein mirror the suffering of
many other families who, like the complainants, lost faith in the medical clinic at the STFRC.

As discussed in our July 30 complaint, CARA staff and volunteers have seen mothers and children
who entered family detention centers with injuries or illnesses that remained untreated throughout the
duration of their detention. Many others have developed ailments while detained.  The fourteen cases
included in this complaint further illustrate that the detention of  children and their mothers can result
in serious and potentially  irreversible damage to their health, development, and well-being.[4]

In addition to investigating the specific cases described above, we urge your offices to conduct a
broader  investigation into the adequacy of the medical care provided at the STFRC, as well as the
other family detention facilities in Karnes City, Texas, and Berks County, Pennsylvania. While this
follow-up complaint focuses solely on cases arising from the STFRC, the troubling practices and low
standard of care at the other family detention facilities have yet to be addressed.

While consistent quality medical care  is imperative for anyone in detention, our organizations do
not believe that improved access to medical care would  sufficiently mitigate the harm caused by
family detention to justify this practice. Accordingly, we advocate that detained children and their
mothers be released to sponsors in the United States or, in the rate case where none are available, to
community-based  support programs that would facilitate access to medical care and other services.
Ultimately, we urge the Administration to end the heinous practice of detaining families.

Thank you for your renewed attention to this urgent matter. We look forward to your prompt
response.

---

[4] A previous complaint, filed by AILA, the Council, and the Women's Refugee Commission on June 30, 2015, raises
serious concerns about the  psychological impact of family detention on mothers and children seeking asylum.

Sincerely,


Lindsay M. Harris
American Immigration Council
lharris@immcouncil.org

Michelle N. Mendez
Catholic Legal Immigration Network,
Inc.
mmendez@cliniclegal.org


Karen S. Lucas
American Immigration Lawyers
Association
klucas@aila.org

Amy Fischer
Refugee and Immigrant Center for
Education and Legal Services
Amy.fischer@raicestexas.org

# Exhibit 18
## Publicly Filed

DECLARATION OF ROBERT DOGGETT

I, Robert Doggett, hereby declare:

1.       I make this declaration based on my own personal knowledge and, if called to testify, I
could and would do so competently as follows:

2.       I have been a licensed Texas attorney since 1990. I hold the position of General Counsel
with Texas RioGrande Legal Aid, Inc. (TRLA).  My office address is 4920 North IH-35, Austin,
Texas, 78751.

3.       I currently represent Grassroots Leadership, Inc., a non-profit organization, and recent
immigrants that have fled Central America that have been detained in a lawsuit for declaratory
judgment against the Texas Department of Family and Protective Services ("DFPS") that is
pending in the Travis County District Court in Austin, Texas.  Originally, the suit challenged the
agency's "emergency" adoption of a regulation allowing for the licensing of family immigration
detention facilities operating in Karnes City ("the Karnes facility") and Dilley, Texas ("the
Dilley facility").  As will be explained further below, once the court invalidated the emergency
rule, DFPS adopted another licensing regulation using normal adoption procedures.
Subsequently, our suit was amended to include claims that the new rule conflicts with Texas law,
and was enacted without statutory authority.  On May 4, 2016, the court issued a temporary
restraining order prohibiting further implementation of the new rule pending a temporary
injunction hearing set for May 13, 2016.

4.       DFPS promulgated the emergency rule through publication on September 18, 2015.  The
rule was promulgated more than a year after family immigration detention began operating at the
Karnes facility in August 2014 and almost a year after family immigration detention began at the
Dilley facility in December 2015.

5.       DFPS explicitly invoked the July 24, 2015 federal district court decision in *Flores v.
Johnson*, CV 85-4544 DM0 (C.D. Cal. July 24, 2015) as its only rationale for emergency action.
Specifically, the agency said that, the "court's ruling *highlights a gap* in the oversight of the
children housed in facilities covered by the settlement agreement. There are two such facilities in
Texas: the South Texas Family Residential Center in Dilley, Texas and the Kames County
Residential Center in Karnes City, Texas. Both are family residential facilities designed for
detention of adults with children. Neither is currently licensed by the Child-Care Licensing
Division of DFPS."  *See* Attachment 1, DFPS Emergency Rule.

6.       While seeking to allow licensing on an emergency basis, DFPS did not take any steps to
bring the facilities into compliance with the state's own Minimum Standards for General
Residential Operations, which are the standards normally in place for childcare facilities
regulated and licensed by DFPS. The emergency regulations specifically exempted the Karnes
and Dilley facilities from several key minimum standards.  The exemptions waived compliance
with minimum standards that: 1) impose a limit on the number of children sharing a bedroom, 2)
provide for adequate space in bedrooms, 3) preclude children from sleeping in the same bedroom

with unrelated adults, and 4) preclude unrelated children of opposite genders from sharing a bedroom.

7.      On September 30, 2015, counsel for Grassroots Leadership, Inc. filed a Petition for Declaratory Judgment, Application for Temporary Restraining Order, and Application for Temporary and Permanent Injunction in the Travis county District Court.  The petition asserted that DFPS had deprived Grassroots Leadership, Inc. of its statutory right to comment on DFPS's vague licensing rule, and its statutory right to require the agency's written responses to all public comments *prior* to implementation of a licensing rule and potential licensing of the facilities.

8.      At the time of the filing of the lawsuit, the Corrections Corporation of America and the GEO Group, Inc., which manage the Dilley facility and the Karnes facility respectively, had filed applications for licensing under the emergency regulation.  There was an imminent risk that DFPS would license the two facilities under the emergency regulations that exempted the facilities from compliance with the minimum standards that govern facilities utilized for housing children.  On October 8, 2015, the parties reached agreement stipulating that DFPS would not proceed with licensing of the Karnes and Dilley facilities until at least October 23, 2015.

9.      A hearing on the temporary injunction request was scheduled for October 23, 2015.  However, DFPS removed the case to federal court on that date, leading to a delay in the temporary injunction hearing in the Travis County District Court.  The United States District Court for the Western District of Texas promptly remanded the case back to the Travis County District Court.  On October 30, 2015, after argument on the petition, the Travis County District Court granted a temporary restraining order halting the implementation of the emergency rule and set a hearing on the request for temporary injunction for November 11, 2015.

10.     An evidentiary hearing on the request for temporary injunction finally took place on November 11, 2015.  I offered legal argument and with approval from the court introduced several documents into evidence, including a petition opposing the licensing of the Karnes and Dilley facilities signed by 140 individuals and organizations.

11.     Among other witnesses, Professor Luis Zayas testified as an expert at the hearing.  Luis Zayas is the Dean of the School of Social Work at the University of Texas at Austin and a well-recognized expert on the impacts of immigration proceedings and detention on migrant youth.  Dean Zayas has visited both the Karnes and Dilley facilities on multiple occasions.  He testified about the conditions in the facilities, describing them as secure and highly restrictive, making them much like jails.  He explained that multiple families are held in single sleeping and living cells together.  He laid out his conclusion that the children held in the family detention facilities, even for relatively short periods of time, suffer negative and long-lasting impacts on their mental health.  He also noted that the facilities do not resemble other childcare facilities, even residential facilities, because they do not have a therapeutic or child welfare purpose but rather serve a law enforcement purpose of immigration detention.  Professor Zayas testified that the facilities are more closely akin to juvenile detention centers but cannot be treated as juvenile detention centers for regulation purposes, because the children held there have not been accused or found to be offenders.  Finally, he concluded that the conditions for children would not be improved if the Karnes and Dilley facilities were licensed under the emergency regulation and its exemptions,

411

because the minimum standards waived under the emergency regulations are critical to protecting child safety and welfare.

12.     On November 20, 2015, Judge Karin Crump of the 250th District Court, Travis County, Texas, granted a temporary injunction of the DFPS emergency regulation.  *See* Attachment 2, Temporary Injunction Decision.  The Court held that Grassroots Leadership, Inc. was entitled to a temporary injunction, because the organization had a "probable right to a declaratory judgment" declaring the emergency regulation invalid on the grounds that there was no basis for the agency's emergency action to regulate the Karnes and Dilley facilities.  The ruling further found that Grassroots Leadership, Inc. would be irreparably harmed without an injunction, because the organization would be deprived of its ability to comment on the agency's regulatory actions before the regulation was enacted and potential licensing took place.

13.     The November 20, 2015 ruling found that the emergency regulation "disregards the fact that [the Karnes and Dilley facilities] have been in operation in Texas for well over a year" and also "removes [the facilities'] obligations to comply with current Texas Minimum Standards for General Residential Operations that pertain to the safety and welfare of children"  (footnote omitted).

14.     Finally, the November 20, 2015 decision concluded that the emergency rule allows for "significantly less oversight" than the existing state standards for child welfare in residential operations and fails to "provide for 'regular and comprehensive' oversight'" of the Karnes and Dilley facilities.  The Travis County District Court issued the temporary injunction to preserve the status quo until a trial could take place on the matter.

15.     Two days after the temporary injunction hearing, on November 13, 2015, DFPS published a proposed non-emergency regulation that would allow for licensing of the Karnes and Dilley facilities.  *See* Attachment 3, Proposed Regulation.  The non-emergency proposed regulation includes the same exemptions from the minimum standards that would otherwise apply in the state of Texas to residential childcare operations.  The exemptions waive compliance with minimum standards that impose a limit on the number of children sharing a bedroom, that provide for adequate space in bedrooms, that preclude children from sleeping in the same bedroom with unrelated adults and preclude unrelated children of opposite genders from sharing a bedroom.  In addition, the non-emergency proposed regulation explicitly declines to address whether the facilities meet other requirements relating to their nature as "secure" or "non-secure" facilities.  Finally, the proposed regulation allows for additional waivers and exemptions from the child welfare standards that are otherwise applicable under state law.

16.     Interested parties were given until December 14, 2015 to offer public comment on the regulation.  On December 9, 2015, a public hearing was held on the proposed permanent regulation.  *See* Attachment 4, Transcript of Public Hearing.  The transcript of the hearing reflects that dozens of speakers testified in opposition to the proposed regulation, alerting the agency to the conditions of detention in the facilities, and informing the agency that the exemptions from the state's own minimal standards would greatly undermine child health and safety for the children detained at Karnes and Dilley.  No public statements were made in favor

of the regulation or licensing of the facilities. Written comments on the regulation were provided by many individuals and organizations, including a number of Texas state legislators, as well.

17.     The period for public comment on the non-emergency proposed regulation allowing for licensing of the Karnes and Dilley facilities closed on December 14, 2015. Under the regular rule-making process, the agency is required to respond to all public comments on the regulation. The agency then will reach a determination as to whether it will implement the regulation.

18.     In the February 26, 2016 edition of the Texas Register, the agency adopted the new version of the regulation with few changes. Specifically, it labeled the facilities "family residential centers," and categorized them as a "general residential operation" (GRO) with the following characteristics:

  a.  The center is operated by or under a contact with United States Immigration and Customs Enforcement;
  b.  The center is operated to enforce federal immigration laws;
  c.  Each child at the center is detained with a parent or other adult family member, who remains with the child at the center; and
  d.  A parent or family member with a child provides the direct care for the child except for specific circumstances when the child is cared for directly by the center or another adult in the custody of the center.

  Title 40, Part 19, Chapter 748, Subchapter A, Rule § 748.7(a) (effective March 1, 2016), published in 41 TEX. REG. 1493-1502 (Feb. 26, 2016). *See* Attachment 5, new regulation.

19.     Notably, the new regulation also states "The department does not oversee requirements that pertain to other law, including whether the facilities are classified as secure or in compliance with any operable settlement agreements or other state or federal restrictions." Rule 748.7(b) (2016).

20.     Similar to the emergency rule that was invalidated by the Court, the new rule also makes some exceptions from the minimum standards the agency normally requires of child-care facilities: the rule waives the limitation of room occupants to four, the limitation on a child sharing a bedroom with an adult, and the limitations on children of the opposite sex sharing a room. Rule 748.7(c) (2016).

21.     One of the plaintiffs in the amended case who is currently being detained has already suffered an assault because of conditions and practices in the facilities that would be legalized by the rule, and that the elimination of these minimum standards interferes with or threatens to interfere with or impair a legal right or privilege of all the individual Plaintiffs and those in the family detention centers.

22.     Plaintiff EGS has been detained with her 12 year old daughter in Karnes County Residential Facility since March 24, 2016. She fled El Salvador after gang members murdered

413

her brother-in-law and raped and robbed her.  The gang members then started stalking her daughter and threatened to rape her too.  After arriving in Texas she says:

> My worst nightmare became a reality when my daughter was sexually assaulted in jail by a woman we were forced to share a room with. My daughter's abuser remains in this detention center and we must see her every day. My daughter is afraid to be without me for even a minute. She currently sleeps in my small bottom bunk bed each night out of fear someone will harm her while she is sleeping.

> Declaration of EGS, May 2, 2016, exhibit from the Second Amended Petition, Grassroots Leadership, Inc., et al. v. Texas DFPS, et al., *see* Attachment 6.

23.     Grassroots Leadership, Inc., joined by four current detainees of one of the detention centers, filed an amended suit against the agency on May 3, 2016.  As explained in the amended petition, DFPS issued its rule in direct contravention of the Texas Legislature's prohibition on confining a child in a secure immigration detention facility, "regardless of whether the facility is publicly or privately operated."  Tex. Fam. Code § 54.011(f).  DFPS's official explanation asserts that § 54.011(f) does not deprive it of authority to issue § 748.7 because DFPS believes that this statute applies only to facilities operated by juvenile justice agencies and not to "federal facilities."

24.     DFPS provides no authority or explanation to support this position, nor does anything in the term "publicly or privately operated" exclude a detention facility operated by a private corporation under contract with ICE.  41 TEX. REG. at 1500-01.  DFPS makes no attempt at all to explain what change in law or facts, if any, could justify DFPS's current view that a child-care license is required of immigration detention facilities under TEX. HUM. RES. CODE § 42.041, when for ten years DFPS had repeatedly asserted that it lacked statutory authority to license these facilities.  41 Tex. Reg. at *passim*.

25.     DFPS recognizes but fails to address serious concerns of how child-care regulation can be consistent with not only parental custody, but also with serious mental health needs at the facilities covered by § 748.7.  *See, e.g.,* 41 TEX. REG. at 1501 (no response to comment about deficient access to psychiatrists and psychologists); *id.* at 1498-99 (mental harm may be inevitable consequence of immigration detention); *id.* at 1500 (DFPS itself claims that it "lacks authority to appoint an independent medical and psychological team to investigate reports of abuse, neglect and exploitation").

26.     DFPS admits that § 748.7 attempts an entirely new branch of child-care licensing in Texas.  41 TEX. REG. at 1497 ("From the outset, DFPS recognized that the character of the FRCs is without an identical counterpart in the current regulatory structure.").

27.     In addition to the conflict with Texas Family Code § 54.011(f), Plaintiffs claim the agency lacks statutory authority to enact the licensing rule because DFPS and its predecessors

have not done so before in some 75 years of child-care licensing (and have claimed that they have no jurisdiction up until now); because child care is not the primary purpose of the facilities, and no specific legislative authorization or historical need for or capacity to conduct child-care licensing of these facilities has been alleged or shown; and because the agency altered the statutory definition of "general residential operation" that appears in TEX. HUM. RES. CODE § 42.002(4) by classifying immigrant detention facilities as "general residential operations" even when they do not provide 24-hour care for children.

28.     On May 4, 2016, the state court conducted a hearing on Plaintiffs' application for a temporary restraining order and at the conclusion of the hearing the judge ordered that the agency desist and refrain from licensing the Dilley facility until further order of the court (the Karnes facility was licensed by the agency on or about May 2, 2016).  *See* Attachment 7.  The court indicated it would take up possible remedies regarding the Karnes facility at the temporary injunction hearing on May 13, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th of May, 2016 at Austin, Texas.

_____
Robert Doggett

415

# Attachment to Exhibit 18
# Attachment 6

DECLARATION [E.G.S. (full named redacted)] **(E.G.S.)**

I, [EGS (full name redacted)], declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.  My name is [E.G.S. (full named redacted)]. I was born on [redacted] in El Salvador. I have been detained at the Kames County Residential facility with my 12 year old daughter, [(full named redacted)] (A.E.S.G.), since around March 24, 2016.

2.  I fled to the United States for protection and safety. Prior to being placed in this jail, the Mara murdered my brother-in-law in El Salvador. The same four members of the Mara then raped me multiple times and robbed and stalked me. My rapists then stalked my daughter and repeatedly threatened to rape her too. They also threatened to kill my husband if I told anyone what they did to me.

3.  In detention in the United States my suffering continues. I do not feel safe or comfortable in this jail because I cannot trust the jailers who want to detain and deport me to look out for my best interests or the best interests of my daughter. I cannot trust the strangers with whom I must cohabitate in jail either because I have experienced great harm at the hands of strangers in the past.

4.  My worst nightmare became a reality when my daughter was sexually assaulted in jail by a woman we were forced to share a room with. My daughter's abuser remains in this detention center and we must see her every day. My daughter is afraid to be without me for even a minute. She currently sleeps in my small bottom bunk bed each night out of fear someone will harm her while she is sleeping.

5.  My daughter and I would like to be released from jail so that we can access the therapy and help we need. Living in detention under the threat of deportation is traumatizing. It reminds me of my experience being watched, followed and raped in El Salvador. We cannot sleep or eat as usual, are hypervigilant, cry and feel depressed. We want to be well and safe and hope other families do no suffer as much as we are currently suffering.

*My Childhood in El Salvador*

6.  I suffered greatly in El Salvador throughout my childhood. My mother had 12 children and I am the fifth youngest of my siblings. My father was an alcoholic and he was extremely violent with my mother, me and my siblings. He was never sexually abusive to me, but one of my older sisters said that he tried to sexually abuse her. Since my mother had so many children, she couldn't care for all of us. As each of my siblings got older, we began working to help care for the younger siblings. My mother never supported us. I think she was depressed. She never gave us any advice or help growing up.

7.  I only went to school for 3 years when I was 7 years old until I was 9 years old. I cannot read or write. I started working as a domestic worker at the age of 10. I worked for many different families and frequently lived within the home of the family I was working for.

8.  Although working as a domestic worker was always tough, one job in particular was the

546

worst. When I was 14 years old I went to live with a family to take care of their children and the house. The family included the mother, father, and two children. My first day on the job, the mother was working her shift as a nurse. The father raped me and told me to leave the house. I went back to my mother's house and told her what had happened, but she did not believe me.

*My Life with My Husband and Children in El Salvador*

9.  When I was 21 years old I married my husband M.M.S.G. Together we had three beautiful children. In addition to A.E.S.G., we also have an 11 year old daughter and a 9 year old son. I love my children greatly.

10. My husband and I lived for two years in Canton Primavera, and then moved to Canton Piedrapacha. We have lived in Piedrapacha with our family in the same house since then. The house belongs to one of my husband's friends in the United States, but he lets us live in the house. My husband has worked in the fields, and I've sold jewelry to try and support our family. We have little money and no assets.

*My Nightmare in El Salvador*

11. The nightmare that lead to my journey to the United States began in January, 2016. Members of the Mara 18 killed my brother-in-law. He was the husband of my sister. He had previously lived in the United States with my sister and their three sons, two of whom were born in the United States. He was deported back to El Salvador last year. One day when my brother-in-law was leaving his house in the early morning to go to work, he was shot and killed in the street.

12. We had a wake for my brother-in-law at his mother's house. In El Salvador, when we have a wake, it's customary for all of the neighbors to join around the house in the patio and on the street. A wake for us is like a party - there's food and drinks and lots of noise. It's custom for the family of the deceased person to offer coffee to all of the neighbors who join to celebrate the life of the person who passed away.

13. I was handing out coffee to neighbors outside around the house. It was dark, around 1:00 a.m. There were four gang members on the edge of the crowd outside near the gate of the house. Suddenly they grabbed me and took me to an area away from the house by a canal. No one saw what happened or heard since there was a lot of noise. The men were known gang members. I had seen them before and had seen their tattoos. The four of them were always together.

14. The men beat me and threw me around between themselves asking who was going to be the first. After they each raped me, they told me I already knew who they were, meaning that I knew they were gang members. They told me not to tell anyone what they had done. The men said that I had already seen what they could do - they had killed my brother-in-law. They said they would kill my husband and rape my daughter if I told anyone what they did to me. They said that my daughter was pretty and they wanted the same from her.

15. The men finally left me there, and I went back to the wake and went to lay down. No one asked me where I had been or what had happened because they thought I was grieving my brother-in-law.

547

16. On January 28th, classes started at school. The same four gang members began to harass my daughter A.E.S.G. They would stand outside of her school. They would tell young boys at school during breaks in the school day to tell A.E.S.G. that "those guys over there say hi." She'd turn around and see the four of them standing there looking at her. This happened every day until we left El Salvador.

17. Later in January, at the very end of the month, those four men robbed me. I was on my way to my house after having been out collecting money from jewelry sales I had made that month. I was planning to go home then to go to the jewelry store to pay off what I had owed from the jewelry I had taken to sell during the month of January. I had $150 dollars with me, which is a large quantity of money in El Salvador. There's an open area near my house, and the four gang members were waiting for me there. They told me to give them the money, and that I already knew what would happen to me if l didn't. I understood that to mean that if l didn't give them the money, they would rape me again.

18. Again, in February, the four men robbed me of my earnings for the month. That time, I had only collected $50. The men knew that at the end of the month I collected money from my sales. They were waiting for me again in the open area nearby my house. Again, they told me if I didn't give them my money, I knew what would happen.

19. They raped me again around March 2nd. Where we live there are only classes in the morning. I was alone at the house while my children were in school and my husband was out working in the fields. Then suddenly the same four men showed up. They came in and shut the door. They told me I knew what was coming and not to make noise or do anything. Each one of them raped me. They didn't say anything else but they laughed.

*My Decision to Come to the United States*

20. The next day I made plans to come to the United States. I asked my husband for permission to leave, and he asked why. I told him that it was so that we could have a better future for our children. My husband does not know that I was raped by the mara or that they threatened to kill him. Even though my husband does not know everything that happened, he was willing to support my decision to come to the U.S.

21. I cannot be safe in El Salvador because the police cannot and will not protect me and the Mara will complete their threats if I seek police protection. The Mara kill police officers and retaliate when someone goes to the police for help. For example, around August of 2015, a woman where I live made a report to the police after she was robbed by the Mara. The police detained the man who robbed her for only a few days, then released him. When he was released, the Mara went to the woman's house to kill her. They mixed up the houses though, and went to the neighbor's house with masks and guns. When the woman found out, she fled to save her life. The mother of my brother-in-law also made a police report about his murder. The police did not investigate his death at all.

22. There is nowhere safe for my daughter and I to live in El Salvador. The Maras is well connected and finds people when they relocate within El Salvador. I've been raped numerous times and cannot bear the thought of the same thing happening to my daughter. My daughter and I left El Salvador in search of protection and safety in the United States in March 2016.

548

*My Nightmare in the United States*

23. When I crossed over the U.S.-Mexico border I felt relief. I had hope that my daughter and I were going to be ok, that we would finally be safe and protected. When immigration officials first saw us they screamed at us. They treated us like criminals and my daughter and I were very afraid.

24. We were taken to an immigration processing station. Many people call it the "hielera", or freezer, because it is very cold there. We were placed in a concrete cell. There were lots of women and children in the cell and we barely had enough room to sit down. We were exhausted, but there were no blankets or beds. The floor was concrete and very cold. There was a toilet in the cell, but there was no door or privacy. It is embarrassing to go to the bathroom when other people can see you. There were no showers. We were cold, tired, hungry and scared.

25. When it was my turn to speak with an immigration officer, he asked me why I came to the United States. I told him because of the economy and because I was raped. He told me that he didn't have anything to do with the problems in my country. When he told me that, I didn't continue to try to talk with him about how I had been raped and my family threatened. It is very intimidating to talk to a man in uniform in a non-confidential space about something so private.

26. My daughter and I were in the hielera for a number of days. We were then transferred to another place that most people call the "perrera", or dog cage. Lastly, we were sent to a jail in Karnes, Texas.

27. Living in Karnes has been very difficult for me and my daughter. We are being held by immigration officials who want to deport us. Although I have never lived in jail before, the feeling I have here – of always being watched, of being controlled, of being forced to do one thing or another – is a feeling I am very familiar with. This is how I felt every day in El Salvador, where I was raped, stalked, robbed and beaten. Life in this place reminds me of the life I fled, the life I am desperate to escape and protect my daughter from.

28. In the beginning of my stay at Karnes my daughter and I were placed in isolation because my daughter was very sick. We were in isolation for four days and could not come out. It was horrible.

29. We were then placed in a room with another family, a mother and a daughter. We were apprehensive to share a room with strangers, but at Karnes, there was no choice. The mother quickly started doing things that made us feel uncomfortable. She told us she liked men and women. She started explaining the sexual things she likes to do to women. She started to touch my daughter on the shoulder and the back, playing with her. Or at least at that time, I thought it was a joke.

30. These jokes continued, and quickly crossed the line. The woman asked me to sleep in her bed. She asked me to pass her my daughter, so she could sleep in her bed. She lifted up her shirt and flashed my daughter. This made us feel so uncomfortable. Neither my daughter nor I could sleep at night. We were afraid the woman's jokes would become reality. My daughter started sleeping in my bed, as she was too afraid to sleep alone.

31. I was fearful something would happen to my daughter. I approached an officer and asked to be [549]

switched to another room. He told me there was nothing he could do. His response was very ugly. It reinforced how unsafe and unprotected I feel in this jail.

32. Wednesday, April 13th, we were all in our room. My daughter said she had to go to the bathroom. While she was in the bathroom, the women opened the bathroom door while she was naked. Scared, my daughter shut the door. The woman opened the door again two times. After, my daughter came back into the room, the woman said vulgarly that my daughter's body had changed and that she had pubic hair. My daughter felt very ashamed.

33. On Saturday, April 16th, my daughter went to our room to shower. Shortly thereafter, the woman also went to our room. I followed a few minutes later. By the time I got to the room, the woman had again opened the bathroom door. My daughter quickly put her clothes on because she was afraid. My daughter told me what had happened. I told our roommate not to open the door again when my daughter was showering. She just smiled.

34. The next day, Sunday April 17th, after the 8PM count of prisoners, we were returning to our room when I saw the woman grab my daughter's private parts. I asked her why she did this. Again, she just smiled. I went directly to report this to an official. I think this would have been prevented, if they had taken my report seriously the first time.

35. My daughter and I were moved to another room. For two nights we were in a room alone. During that time, my daughter slept in her own bed. We were then moved to a room with 8 other people. My daughter started sleeping in my bed again.

36. I helped my daughter fill out a form to report the sexual assault. I have been interviewed in person twice at Karnes by separate officials, and my daughter has been interviewed three times. I am not sure who all these individuals were, but each time my daughter and I explained in detail the incidents, gave information about the woman who hurt my daughter, and answered all of the officials' questions. I also reported the sexual assault by phone to the Department of Family and Protective Services. I have not been contacted again by any of the officials who have interviewed me. I am willing to answer any further questions and help the investigation in any way I can.

37. I hope that at least someone to whom I have reported will take this sexual assault against my daughter seriously, because I don't want this type of abuse to happen again to someone else. Since she was assaulted my daughter has had trouble sleeping and she is not interested in playing ball with the other children here like she used to. She is scared, has lost her appetite, and wants to spend the weekends sleeping. As for me, I also have trouble sleeping and have headaches. But most of all, I am devastated that I brought my daughter to try to escape the sexual abuse that I suffered in El Salvador and with which she was threatened there. Instead, she has suffered what we were fleeing.

*My Desire to Fight My Immigration Case and Be Free*

38. I was ordered deported without a lawyer and without the opportunity to request asylum on March 21, 2016. Although I was granted the opportunity to speak with an Asylum Officer on April 2, 2016 about my fear to return to El Salvador before my deportation was executed, the Asylum Officer did not believe that I can win asylum in the United States. During my interview I told the Asylum Officer about my brother-in-law's murder, being robbed, and the ongoing harassment my daughter experienced from the Mara. I did not talk about being raped because my daughter does not know what happened to me and she was present in the room throughout my interview because

50

she is afraid to leave my side in the jail.

39. After my interview with the Asylum Officer, I started working with *pro bono* attorneys from the CARA Family Detention Pro Bono Project. My lawyers believe I qualify for asylum and should have the opportunity to apply. My lawyers submitted a Request for Reconsideration or Re-interview to the Asylum Office on April 19, 2016. It was denied on April 21, 2016. They filed a complaint with the Office of Civil Rights and Civil Liberties on April 22, 2016 and a Request for Precautionary Measures with the Inter-American Commission on Human Rights on April 27, 2016.

40. My daughter and I are not doing well in detention. We are both sad and we both cry. We feel like criminals. We cannot go anywhere without permission. Guards walk through our bedroom at night every 15 to 30 minutes. This wakes us up and makes us feel afraid. We are rounded up and counted three times a day. We feel like prisoners. We are not the only ones who feel this way. There is another woman here who has been here longer than us. She always cries and her child has stopped eating.

41. I am worried about myself and think I need help. I cannot sleep and feel very on edge. I spend all day thinking about my past and being in jail. I feel trapped and hopeless. I think I need to talk with someone but am scared to talk about my past and present with the people who work here. I know they work for the jail that wants to deport me and my daughter. Everything is bottled up inside of me. I wish I was free so that I could go see a psychologist and have mental health support. I feel so desperate for help that approximately three weeks ago I made a request to see a psychologist here in the jail. I still have not seen a psychologist or received a response.

42. I worry the most about my daughter. She is afraid here. She lives in fear that she will be assaulted again within this place. She cannot sleep and never wants to leave my side. She has made some friends, but they keep coming and going. Some are released. Some are deported. My daughter asks me "When will we go?" "How long will we be here?" "Will we be deported?" I don't know what to tell her.

43. I wish I was free so that I had control over the medical care my daughter and I receive. Getting access to medical care is not easy here. In order to receive medical attention, you need to wait for a long period of time. When my daughter and I got here she was very sick. She had a headache, was very weak, and her bones hurt. We went to request medical attention and waited for someone to assist us for 2 hours. After two hours, my daughter was too weak to continue waiting so I took her back to our room to lay down. The next day we went back. This time we were not attended until midnight, after waiting for four hours.

44. Another reason I wish I was free is so that I could control what I eat and when. I have diabetes. The stress of wondering if or when I will be free again and whether or not I will be deported has not been good for my condition. It is hard to monitor and control my blood sugar.

45. The first thing I would do if I was free is call my husband in El Salvador. I have not been able to speak with my husband or two children since entering the United States. I worry about them and wonder if they are ok. I do not know if the Mara has come after them. I need to hear their voices and to tell them I love them. I also think my husband could help me gather evidence for my immigration case.

46. If I was free I would have the chance to be supported by people who know and love my daughter and I. We could be with our family. They could come with us to immigration court and be a moral support. We would be safe and comfortable with them. We could start, little by little, to recover from all we have gone through.

My name is ███████████ . I was born on ███████ I am currently incarcerated at the Karnes County Residential Center which is located at 409 FM 1144, Karnes City, TX 78118.

I declare under penalty of perjury that all information in the attached document titled, Declaration of ███████████ , is true and correct. This declaration was read to me in Spanish, a language in which I am fluent.

Signed in Karnes County, Texas on May 2, 2016.

X _____
███████████

553

1
2      Dated: February 8, 2017.                    Respectfully submitted,

3                                                   CENTER FOR HUMAN RIGHTS &
                                                    CONSTITUTIONAL LAW
4                                                   Carlos Holguín
5                                                   Peter A. Schey

6                                                   ORRICK, HERRINGTON & SUTCLIFFE LLP
7                                                   Elena García

8                                                   LA RAZA CENTRO LEGAL, INC.
                                                    Michael Sorgen
9
10                                                  LAW FOUNDATION OF SILICON VALLEY -
                                                    LEGAL ADVOCATES FOR CHILDREN &
11                                                  YOUTH
12                                                  Jennifer Kelleher Cloyd
                                                    Katherine H. Manning
13                                                  Kyra Kazantzis

14                                                  Of counsel:
15
16                                                  YOUTH LAW CENTER
                                                    Virginia Corrigan
17
18                                                  /s/__Peter Schey_____
                                                    *Attorneys for Plaintiffs*
19
20
21         / / /
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On February 8, 2017, I electronically filed the following document(s):

- EXHIBITS 15 AND 18 IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE [REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*