1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
2  Peter A. Schey (Cal. Bar No. 58232)
   Carlos Holguín (Cal. Bar No. 90754)
3  256 South Occidental Boulevard
   Los Angeles, CA  90057
4  Telephone: (213) 388-8693
   Facsimile: (213) 386-9484
5  Email: pschey@centerforhumanrights.org
6          crholguin@centerforhumanrights.org
7

8  ORRICK, HERRINGTON & SUTCLIFFE LLP
9  Elena Garcia (Cal. Bar No. 299680)
   egarcia@orrick.com
10 777 South Figueroa Street, Suite 3200
   Los Angeles, CA 90017
11 Telephone:  (213) 629-2020
12

13

14 *Attorneys for plaintiffs (listing continues on following page)*

15                  UNITED STATES DISTRICT COURT
16
                CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
17

18 JENNY LISETTE FLORES, *et al.*,          )   Case No. CV 85-4544 DMG (AGRx)
19                                          )
             Plaintiffs,                    )   PLAINTIFFS' CORRECTED EXHIBIT 9 –
20                                          )   DEPOSITION OF PHILLIP MILLER
                                            )   EXCERPTS
21 - vs -                                   )
                                            )
22 JEFFERSON B. SESSIONS, ATTORNEY          )   Hearing: October 6, 2016
23 GENERAL OF THE UNITED STATES, *et al.,*  )
                                            )
24                                          )
             Defendants.                    )
25 _____  )
26

27 *Plaintiffs' counsel, continued:*

28

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Kyra Kazantzis (Cal. Bar No. 154612)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:    (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        kyrak@lawfoundation.org
        annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES,        )
et al.,                      )
                             )
                             )
             Plaintiffs,     )
VS.                          )  Case No. CV 85-4544 DMG
                             )
                             )
LORETTA E. LYNCH,            )
Attorney General of the      )
United States, et al.,        )
                             )
                             )
             Defendants.     )
--------------------------x

DEPOSITION OF PHILIP MILLER

WASHINGTON, D.C.

SEPTEMBER 28, 2016

1:01 p.m.

Reported by:
Misty Klapper, CRR, RPR, CMR
Job No. 46539

Exhibit 9
1

2

1

2

3

4                          PHILIP MILLER

5                          SEPTEMBER 28, 2016

6                          1:01 p.m.

7

8          Deposition of Philip Miller,

9     held at the Department of Justice,

10    450 5th Street, N.W., Washington,

11    D.C., pursuant to Notice, before

12    Misty Klapper, RPR, CRR, CMR and

13    Notary Public within and for the

14    District of Columbia.

15

16

17

18

19

20

21

22

23

24

25

3

1

2      APPEARANCES:

3      FOR THE PLAINTIFFS:
                   Center for Human Rights & Constitutional L
4                  256 South Occidental Boulevard
                   Los Angeles, California  90057
5                  (213) 388-8693
                   BY:  Peter A. Schey, Esq. (via telephone)
6                       pschey@centerforhumanrights.org

7

8      FOR THE DEFENDANTS:
                   UNITED STATES DEPARTMENT OF JUSTICE
                   District Court Section
9                  P.O. Box 868
                   Ben Franklin Station
10                 Washington, D.C.  20044
                   (202) 307-4693
11                 BY:  William Silvis, Esq.
                        william.silvis@usdoj.gov

12

13     ALSO PRESENT:

14                  Tom Zimmerman

15                  Wendy Wallace

16

17

18

19

20

21

22

23

24

25

4

1

2                          C O N T E N T S

3       WITNESS:                    EXAMINATION BY:     PAGE

4       Philip Miller               Mr. Schey            5

5

6

7

8                           E X H I B I T S

9       NO.:          DESCRIPTION:                      PAGE

10      Exhibit 1    Gurule Declaration                  34

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1

2

3          MS. REPORTER:  Mr. Schey, do

4      you hereby order our services for

5      this deposition and agree to

6      payment?

7          MR. SCHEY:  Yes.

8              P R O C E E D I N G S

9   Whereupon:

10                  PHILIP MILLER,

11              was called for examination, and, after

12   being duly sworn, was examined and testified as

13   follows:

14              EXAMINATION BY COUNSEL FOR

15      PLAINTIFFS

16              BY MR. SCHEY:

17      Q.   If you don't understand any

18   of my questions, would you please let

19   me know that you do not understand my

20   question and I will rephrase it?

21      A.   I will.  Thank you.

22      Q.   And I'm entitled to your best

23   estimation of things.  So if you have

24   an estimate, please give it, but do not

25   guess or speculate.

11

PHILIP MILLER

1

2      Q.   Do you know approximately --

3   before Dilley and Karnes were set up,

4   do you know approximately what

5   percentage of apprehended minors were

6   released because there was no space

7   available, detention space available,

8   for them?

9      A.   I do not know that.

10      Q.   And when -- prior to Karnes

11   and Dilley being set up, when -- when

12   accompanied minors were released, what

13   authority was relied upon by ICE to

14   release those children?

15           MR. SILVIS:  I'll object to

16        the extent you're asking for a

17        legal conclusion.

18           THE WITNESS:  We used our

19        discretionary detention authority

20        under Section 236(a), which also

21        provides opportunity for us to set

22        conditions to include the

23        conditions under which someone

24        could be released.

25           BY MR. SCHEY:

12

PHILIP MILLER

Q.   And what does 236(a) say?
Can you tell us your best recollection?

A.   Well, I'm not an attorney, so
I don't have the law memorized; but
operationally it gives us the authority
to set conditions of either continued
detention or release for cases that are
not mandatory detention.

Q.   Okay.  Weren't -- weren't the
vast majority of those accompanied
minors apprehended close to the border?

A.   I don't have a breakdown in
front of me, nor do I recall the
location of -- of folks where they're
arrested.

Q.   Give us your best estimate.
Isn't it a fact that the great majority
of minors apprehended accompanied by
parents by ICE this year, last year,
the previous two years, five years, ten
years have always been apprehended
along the border?  Isn't that true?

MR. SILVIS:  Object to the
form and foundation.

49

PHILIP MILLER

1

2      settlement agreement requires is

3      legal advice and that he won't be

4      providing what that legal advice

5      was.  And that would be

6      attorney/client privilege.

7              BY MR. SCHEY:

8      Q.   Were -- other than through

9  your meetings with counsel, have -- has

10  anybody provided you with any

11  documentation regarding the

12  requirements of Flores?

13      A.   No, sir.

14      Q.   And when -- when -- when was

15  the most recent time that ICE officers

16  at your detention facilities received

17  any in-person training regarding the

18  options for release under the Flores

19  settlement for minors in your custody?

20          MR. SILVIS:  Object to the

21      form and to the foundation of the

22      question.

23          THE WITNESS:  Every time new

24      detailers arrive at one of the

25      residential centers, they have an

50

PHILIP MILLER

1  intake briefing and instruction

2  on, you know, what they will be

3  required to do while they're at

4  the facility.  And that training

5  is predicated on our operational

6  understanding of the Flores

7  agreement.

8       It's not limited to -- to

9  different sections of it.  It's an

10  overall intake briefing that

11  covers our expectations of our

12  officers while they're on campus.

13       BY MR. SCHEY:

14  Q.   Okay.  I'm going to ask you

15  to try to answer my questions or this

16  deposition will just go on for a lot

17  longer than it needs to.

18       My question was not generally

19  what kind of training you provide to

20  your officers.  My question was very

21  specific.  And most of my questions

22  will be very specific.

23       My question was -- and if you

24  don't know, just state you don't know.

52

PHILIP MILLER

1      question.

2            BY MR. SCHEY:

4      Q.   And if you don't know, just

5      say you don't know.  Don't tell us

6      about they get all kinds of memos all

7      the time.  My question is a very

8      specific question.

9            MR. SILVIS:  Object to the

10     form.

11           THE WITNESS:  I don't know.

12           BY MR. SCHEY:

13     Q.   And are you aware of any time

14     in which ICE agents working at the

15     family detention facilities have

16     received in-person training about the

17     Flores requirements with regards to the

18     options for release of minors in your

19     custody?

20     A.   No, I don't.

21     Q.   Are you aware of any time in

22     which ICE officers working at your

23     family detention facilities have

24     received written instructions or

25     guidance regarding the options for

53

PHILIP MILLER

1

2     release of minors under the Flores

3     settlement?

4          A.   No, sir.

5          Q.   Are you aware of any

6     in-person training provided to your

7     officers at family detention centers --

8     I said in-person training -- regarding

9     Judge Gee's -- and for the Court

10    Reporter, that's G-E-E -- August 2015

11    order in the Flores case?

12         A.   No.

13         Q.   Are you aware of any written

14    instructions or guidance issued to your

15    officers at the family detention

16    centers in writing, instructions or

17    guidance, regarding Judge Gee's August

18    2015 order in the Flores case?

19              MR. SILVIS:  Object to

20         foundation.

21              THE WITNESS:  No, not to the

22         officers.

23              BY MR. SCHEY:

24         Q.   Are you aware of any part of

25    the PALMS -- for the Court Reporter, I

54

PHILIP MILLER

1    believe that's capital -- all capitals

2    P-A-L-M-S -- PALMS Training Module that

3    includes an explanation of the options

4    for release of minors set forth in the

5    Flores settlement?

6         A.   No.

7         Q.   Are you aware of any part of

8    the PALMS Training Module that

9    addresses the meaning of a special

10   needs minor under the Flores

11   settlement?

12             MR. SILVIS:  Object to

13        foundation.

14             THE WITNESS:  No.

15             BY MR. SCHEY:

16        Q.   Are you aware of any training

17   provided in the PALMS Module regarding

18   the definition of a licensed program

19   under the Flores settlements?

20             MR. SILVIS:  Object to

21        foundation.

22             THE WITNESS:  No.

23             BY MR. SCHEY:

24        Q.   Are you aware whether anybody

60

PHILIP MILLER

1    approximately ten options generally

2    involving release to people, that

3    they're then entitled to be offered

4    release to a licensed program?

5            MR. SILVIS:  Object to the

6        form.

7                BY MR. SCHEY:

8        Q.   Are you aware of that or not?

9            MR. SILVIS:  Objection to the

10       form and foundation.

11           THE WITNESS:  No.

12               BY MR. SCHEY:

13       Q.   Was that a no?

14       A.   Yes, my answer was no.

15       Q.   And at the present time, does

16   ICE have any contracts with any

17   licensed programs, other than your

18   detention -- family detention centers,

19   in which you could place accompanied

20   minors?

21           MR. SILVIS:  Objection,

22       foundation.

23           THE WITNESS:  Not placement

24       locations.  We have a family case

61

                    PHILIP MILLER

1

2       management program where we could

3       facilitate community re-engagement

4       generally utilized for folks who

5       are not good candidates for the

6       FRCs.  We will look to place them

7       into the family case management

8       program as an alternative to

9       detention.

10              BY MR. SCHEY:

11      Q.   Okay.  Again, I'm just going

12   to request that you try to focus on my

13   questions and that way we'll just get

14   through your deposition a lot quicker

15   and you can get on with your work and I

16   can get on with my work.

17              My -- my question was a very

18   specific question.  Are you aware of --

19   of any licensed program, other than

20   your family detention centers, your

21   three family detention centers, that

22   ICE has contracted with for the

23   placement of minors in your custody who

24   for one reason or another placement

25   with an individual is not available or

62

                    PHILIP MILLER

1

2    appropriate?

3        A.   No.

4        Q.   Are you aware of whether in

5    the past couple of years ICE has had

6    any such contracts with licensed

7    programs --

8        A.   No.

9        Q.   -- for the placement of

10   minors?

11           MR. SILVIS:  Objection,

12       foundation.

13           THE WITNESS:  No.

14             BY MR. SCHEY:

15       Q.   Okay.  Are you aware of any

16   of the -- any of the requirements in

17   the Flores settlement with reference to

18   how rapidly minors may have the right

19   to be placed with an individual or

20   placed in a licensed program?

21           MR. SILVIS:  Object to the

22       form.

23           THE WITNESS:  Yes.

24             BY MR. SCHEY:

25       Q.   I'm sorry?

71

                        PHILIP MILLER

1

2    accompanying children; is that correct?

3         A.   We have the capability to do

4    it, yes.

5         Q.   And those fathers and mothers

6    at your facility are commingled with --

7    with children detained at that

8    facility; is that correct?

9         A.   Yes.

10        Q.   And does that raise any

11   concerns with you or with the agency?

12             MR. SILVIS:  Object to the

13        form.

14             THE WITNESS:  No.

15               BY MR. SCHEY:

16        Q.   How about at the other two

17   facilities, in Dilley and Karnes, their

18   children are also coming over with

19   unrelated adults; is that correct?

20        A.   Yes.

21        Q.   And does that raise any

22   concern for you or for the agency that

23   you are aware of?

24             MR. SILVIS:  Object to the

25        form.

72

                    PHILIP MILLER

1

2          THE WITNESS:  No.

3              BY MR. SCHEY:

4      Q.   How many -- if you know,

5  approximately what is the mix of

6  fathers versus mothers detained at

7  Dilley?

8      A.   There are no fathers at

9  Dilley.

10     Q.   How about at Karnes?

11     A.   There are no fathers at

12  Karnes.

13     Q.   How about at Berks?

14     A.   There are no fathers at

15  Berks.

16     Q.   And why is it that your

17  agency does not detain fathers who are

18  accompanying their children when

19  apprehended?

20         MR. SILVIS:  Object to

21      foundation.

22         THE WITNESS:  We don't have

23      the capacity to do it at this

24      time.

25             BY MR. SCHEY:

89

PHILIP MILLER

1

2      that same information could not be put

3      into the case comment section of the

4      EARM system?

5              A.   No.

6              Q.   And with regards to the

7      sponsorship person or the sponsor

8      person, if -- if what was involved was

9      a minor, would your officers make

10     inquiry as to the appropriateness of

11     the minor joining that sponsor or

12     living with that sponsor?

13             A.   Sorry, I don't understand

14     your question.

15             Q.   Sure.  You talked about how

16     the officers would make inquiry into

17     the sponsor; is that correct?

18             A.   Yes.

19             Q.   And you mentioned several

20     things they would look into.

21                  If a minor is involved, is

22     one of the issues they look into the

23     appropriateness of the minor living in

24     that home?

25             A.   No.  We defer to the mother.

99

                    PHILIP MILLER

1          Q.   And what are those

2   circumstances -- what are those

3   instructions, excuse me?

4          A.   As I said, when they arrest

5   or encounter a juvenile offender, they

6   should confer with the field office

7   juvenile coordinator.

8          Q.   Okay.  And you previously

9   said a juvenile who has been convicted

10  of an adult crime.  I believe that's

11  what you said.  Is that correct?

12         A.   That was an example of

13  someone who could be placed in adult

14  detention, yes.

15         Q.   Okay.  And my question was,

16  are you aware of any instructions to

17  ICE officers regarding the

18  circumstances in which a minor in your

19  custody may be placed in an ICE

20  detention facility or ICE contracted

21  facility?

22             MR. SILVIS:  Object to the

23         form.

24                 BY MR. SCHEY:

100

PHILIP MILLER

1     Q.   Are you aware of any such

2     instructions and, if so, tell us about

3     those instructions.

4          MR. SILVIS:  Object to the

5          form.

6          BY MR. SCHEY:

7     Q.   I'm not talking about whether

8     they were instructed to contact some

9     juvenile coordinator.

10    A.   Those are the instructions.

11    If you don't like the answer, there's

12    nothing I can do about it, but that's

13    my answer.

14    Q.   Okay.  So my question is, are

15    you aware of any instructions -- aside

16    from contacting a juvenile coordinator,

17    are you aware of any instructions to

18    ICE officers regarding the

19    circumstances in which a minor in ICE

20    custody may be placed in a secure ICE

21    detention facility or ICE contracted

22    facility, any such instructions?

23         MR. SILVIS:  Objection, asked

24         and answered.

101

                        PHILIP MILLER

1

2          THE WITNESS:  No.

3              BY MR. SCHEY:

4      Q.   Are you aware whether or not

5   the Flores settlement requires that

6   when a minor is placed in such a

7   detention facility, a secure detention

8   facility, that facility must have

9   separate accommodations for minors?

10      A.   No.

11      Q.   Are you aware of any

12   instructions that have been issued to

13   ICE officers in writing, and, if so,

14   what instructions, that would help them

15   understand what the term escape risk

16   means under the Flores settlement?

17          MR. SILVIS:  Objection to

18      form.

19          THE WITNESS:  Can you ask

20      your question again?

21              BY MR. SCHEY:

22      Q.   Are you aware of any written

23   instructions issued to ICE officers,

24   and, if so, please identify those

25   instructions, that explains to them

Exhibit 9
21

102

1          PHILIP MILLER

2    what the term escape risk means in the

3    Flores settlement?

4         A.   No.

5         Q.   Are you aware of any

6    in-person training about that?

7         A.   About defining terms from

8    Flores?

9         Q.   Explaining to the officers

10   what the term escape risk means under

11   the Flores settlement, are you aware of

12   any in-person training on that

13   question?

14        A.   No.

15        Q.   Do you recall what the -- or

16   how the term escape risk is -- is

17   defined in -- in the Flores settlement

18   in general?

19        A.   No.

20        Q.   Are you yourself aware of

21   what the term medium secure facility

22   means as set forth in the Flores

23   settlement?

24        A.   No.

25        Q.   Are you aware of what the

103

PHILIP MILLER

1

2     Flores settlement states with regards

3     to the placement of minors in medium

4     secure facilities as an alternative to

5     placement in a secure facility?

6          A.   No.

7          Q.   What is your understanding of

8     the current status of licensing for the

9     facility at Dilley?

10          A.   Current status is that the

11     final adjudication is being held in

12     abeyance by the State of Texas pending

13     the grassroots litigation.

14          Q.   And so at the present time

15     the Dilley facility is not licensed; is

16     that correct?

17          A.   Yes.

18          Q.   How about the same question

19     for the Karnes facility, does that have

20     a current operative license or not?

21          A.   It does have a current

22     operative license.

23          Q.   And when does that license

24     expire?

25          A.   Sometime in October.  I do

Exhibit 9
23

121

                    PHILIP MILLER

1   you know?

2       A.   I believe that was determined

3   by the State of Texas in coordination

4   with the juvenile family resident

5   management unit.

6       Q.   When was that change made to

7   go from 8 persons to 5 people per room?

8       A.   I don't remember the exact

9   date, but it was during the process of

10  obtaining the temporary license.

11      Q.   And the Declaration also

12  states that -- strike that.

13           Has ICE made any effort that

14  you are aware of to determine whether

15  the period of time in which you are

16  detaining these family units prior to

17  their fear interviews is sufficient

18  time to allow for adequate preparation

19  and representation by counsel?

20           MR. SILVIS:  Object to the

21      form.

22           THE WITNESS:  Although I

23      wasn't involved in the

24      conversation, I know that our

122

```
 1              PHILIP MILLER

 2         Chief Counsel Office in San

 3         Antonio, along with USCIS and the

 4         different pro bono providers, met

 5         and came to an agreement of how

 6         long the -- the resident would be

 7         on campus before they would have

 8         their initial interview.

 9              BY MR. SCHEY:

10         Q.   And do you know what they

11    determined?

12         A.   I believe it's 72 hours.

13         Q.   And so you understand there

14    was some agreement with the pro bono

15    attorney groups that 72 hours was

16    sufficient time for them to adequately

17    prepare for legal representation at a

18    fear interview; is that correct?

19         A.   Yes, sir.

20         Q.   And who communicated that to

21    you, if you recall?

22         A.   Our attorneys.

23         Q.   When you say our attorneys,

24    do you mean ICE attorneys or attorneys

25    with the Office of Immigration?
```

135

1                  PHILIP MILLER

2     remember at this time, yes, sir.

3          Q.   And when you said -- the

4     first one you gave was age and then a

5     separate one children under one.

6               Can you explain the criteria

7     of age to us?

8          A.   Sure.  Some families have

9     children that are -- you know -- that

10    are older than 17.  Some families --

11    you know, it's like -- there is no

12    standard definition, at least for us

13    and what comprises a family.  So we

14    have to look, you know, at the age of

15    the children relative to, you know,

16    what's readily available; you know,

17    whether the family unit is comprised of

18    children that are, you know, of

19    majority under the INA or deemed

20    juvenile.

21               So it's a little bit -- you

22    know, we try to keep family units

23    together.  And so we'll look at kind of

24    the totality of the circumstances of --

25    of that individual family unit and does

136

PHILIP MILLER

that individual family unit's profile,

taking into account those six -- and I

believe there's probably others, I

don't have the -- I don't have the

screening tool in front of me -- but

they -- you know -- they try to look at

the totality of the family composition

and whether or not their needs can be

met before we make a determination on

placement.

    Q.  Okay.  I apologize, I'm sure

it's me, but I'm still not quite

understanding what you're saying about

the age.  I know you said if they were

older children.  I think you said older

than 17.

    A.  Right.  If they're over 17 --

like some groups, especially at ports

of entry, present themselves as a

family unit.  They consider themselves

a family unit.  Sometimes in that

family unit they'll say this is my son,

he's 19; this is my daughter, who is

16, but she's a U.S. citizen; this is,

Exhibit 9
27

141

1              PHILIP MILLER

2    16th 2016 the average length of stay

3    was 11.8 days.  And then the next

4    sentence, which is still talking about

5    the same cohorts of 18,706 residents

6    limits the -- the data provided to

7    those who, quote, were released or

8    removed, unquote.  And I assume that

9    means removed from the United States.

10            Do you know why in providing

11   this data ICE did not include people

12   who were not released or not removed?

13            MR. SILVIS:  Object to the

14       form and foundation.

15            BY MR. SCHEY:

16       Q.   In other words, people who --

17   whose credible fear determinations were

18   negative.  Do you have any idea why

19   those were not included in these

20   numbers?

21       A.   Yes.

22       Q.   Maybe you can explain why.

23       A.   Our system of record, the way

24   we count average length of stay, is the

25   difference between when you book into a

Exhibit 9
28

142

                    PHILIP MILLER

1

2   FRC and when you're released.  And

3   released can be, you know, different

4   mechanisms, whether that's released on

5   supervised release, posting a bond,

6   granted release or removed from the

7   United States.

8              For the people who remain on

9   campus, we can't measure how long

10  they -- since they -- you know, between

11  book in and book out because they have

12  yet to book out.  So that's why this

13  Declaration correctly states that we're

14  talking about a population that was,

15  you know, released or removed, because

16  that's the only way our system allows

17  us to count length of stay.

18              BY MR. SCHEY:

19      Q.   Okay.  And would it be fair

20  to say that if we counted people who

21  got a negative fear determination and,

22  therefore, were -- were not released

23  and -- and were not removed as of May

24  16th 2016, then the numbers would

25  change by some unknown margin?  Is that

Exhibit 9
29

143

PHILIP MILLER

1

2  fair to say?

3       A.   I think it would be fair to

4  say that we can't count that which is

5  unknown.

6       Q.   Okay.

7       A.   I can't tell you how long

8  someone has stayed until they're no

9  longer a resident.

10       Q.   I understand, but do you

11  agree with me that these numbers would

12  change if there was some way to count

13  that?

14       A.   I think it's unknown.

15       Q.   Okay.

16       A.   I mean, you know, again, it's

17  difficult for me to -- to say because a

18  lot of people who get a negative fear

19  finding are included in the removals.

20  That's -- you know, we need that

21  determination before we take the

22  removal.

23          So I'm not sure if there's a

24  specific population you're talking

25  about, but, you know, it's hard for us

Exhibit 9
30

151

                    PHILIP MILLER

1       Declaration states in paragraph 15 that

2       ICE review every case no later than 15

3       days or after the family units'

4       apprehension and every 15 days

5       thereafter.

6              Do you see that in paragraph

7       15?

8           A.   Yes, sir.

9           Q.   When -- when I deposed the --

10      the ICE officials in charge of these

11      three detention centers, I was not able

12      to learn what -- what they would do

13      differently at the 15 day mark than at

14      any other time, because they testified

15      we're constantly reviewing every case

16      to see if anything has changed.

17             I'm wondering, can you tell

18      us what the instruction says about this

19      15 days and what it says anybody is

20      supposed to do differently after 15

21      days?

22             MR. SILVIS:  Object to the

23         form.

24             THE WITNESS:  Sure.  The

152

PHILIP MILLER

1
2      original guidance that went out, I

3      believe it was in June of '15, was

4      at the Secretary's direction to,

5      you know, provide the residents

6      with the opportunity to -- to

7      inform ICE of any changes in their

8      circumstance or sponsorship.  And

9      we would do that iteratively

10     throughout their continued

11     detention.

12          Now that families are in

13     detention for a much shorter

14     period of time, I probably would

15     imagine that AFODs, A-F-O-D,

16     assistant field office directors

17     at the facilities had that ongoing

18     dialogue with the residents.

19          The 15-day benchmarks remain

20     in effect.  They notice the

21     residents that their -- you

22     know -- that their case is being

23     reviewed and if they have any

24     additional submissions that they

25     or their counsel would like to

153

PHILIP MILLER

1 have considered.

2       But for many of them if -- if

3    they get to the 15 day point, it's

4    usually only once.  You know, most

5    of these folks that we're talking

6    about are -- you know -- are

7    generally put on supervised

8    release around the 15 day mark, if

9    not shortly thereafter.

10       BY MR. SCHEY:

11    Q.   And was any written

12 instruction issued about what to do

13 differently at the 15 day mark, if you

14 know?

15    A.   I believe there was in -- in

16 June of '15.

17    Q.   But when you say you believe

18 there was, have you seen a written

19 instruction that went out to ICE agents

20 telling them what to do any differently

21 at the 15 day mark?

22    A.   To the best of my

23 recollection, it went to the field

24 office directors, yes.

154

                    PHILIP MILLER

1

2       Q.    And do you know -- have you

3   seen any evidence of field office

4   directors then issued something to

5   their agents about what to do at the 15

6   day mark?

7       A.    That's what they indicated to

8   me.  Yes, they did that.

9       Q.    And my question was, have you

10  seen what they've distributed?

11      A.    No, I have not seen what they

12  distributed.

13      Q.    Okay.  And it's your

14  understanding that every 15 days that a

15  family unit is in custody, that ICE

16  gives them some sort of a written

17  notice telling them that if they have

18  anything new about their custody

19  status, to come and bring that forward

20  to an ICE agent?

21      A.    Yes, that's my understanding.

22      Q.    And have you ever seen one of

23  those documents that is allegedly given

24  to these detainees?

25      A.    I saw it during the creation

155

                    PHILIP MILLER

1

2    of the -- of the document.

3        Q.   Sorry, during the creation of

4    what document?

5        A.   The document that you just

6    referenced, the notice document.

7        Q.   So during its creation you

8    observed a document that ICE agents are

9    supposed to distribute to families

10   every 15 days who have been in custody

11   for more than 15 days; is that your

12   testimony?

13       A.   Yes.

14       Q.   And is there any required

15   reporting, like in the system you

16   mentioned earlier, the data system,

17   that that would be recorded, that these

18   families have been provided this 15-day

19   notice every 15 days?

20           MR. SILVIS:  Object to form.

21           THE WITNESS:  I don't recall

22       requirements.

23           BY MR. SCHEY:

24       Q.   Okay.  Have you seen any

25   reports that would indicate to you that

156

PHILIP MILLER

1    this -- the fact that this is being

2    done is being recorded anywhere?

3        A.   Yes.

4        Q.   Okay.  And what reports have

5    you seen that would indicate that this

6    is being done at the three family

7    detention facilities?

8        A.   I see an aggregate report of

9    either changes in custody

10   determinations or other actions taken.

11       Q.   So you've seen an activity

12   report about custody determinations;

13   but my question was, do you see any

14   report that would indicate that these

15   notices have been distributed every 15

16   days?

17       A.   The distribution of the

18   notices, no, I don't track that.  I

19   track the actions taken based on the

20   case reviews.

21       Q.   And what is this case review?

22   What is it called in the memo, in the

23   instruction memo?

24       A.   I don't recall that.

Exhibit 9
36

165

PHILIP MILLER

1 behalf of minors.

2       Again, we see the decision on

3 how and where children reside to

4 be a decision of the mother.  We

5 work to ensure that the family

6 stays together, both while they're

7 detained and while they're in

8 transit.

9       And so the kind of

10 assessments that you're

11 describing, I think, are being

12 done well by ORR.  At least it's

13 my understanding that ORR does

14 them well.

15       And I think if Congress

16 wanted us to -- to do that and not

17 do a law enforcement mission, we

18 would have been directed to do so.

19            BY MR. SCHEY:

20       Q.   Okay.  But are you aware of

21 anything in the budget approved by

22 Congress -- for your -- you know --

23 your couple billion dollars for

24 detention costs, are you aware of

177

STATE OF _____ )

                                          )  :ss

COUNTY OF _____)




            I, PHILIP MILLER, the

witness herein, having read the foregoing

testimony of the pages of this deposition,

do hereby certify it to be a true and

correct transcript, subject to the

corrections, if any, shown on the attached

page.



                    _____

                              PHILIP MILLER




Sworn and subscribed to before

me, this          day of

                        , 2016.


_____

         Notary Public

178

1

2                           CERTIFICATE OF NOTARY

3          I, MISTY KLAPPER, the officer before whom the

4     foregoing deposition was taken, do hereby certify

5     that the witness whose testimony appears in the

6     foregoing deposition was duly sworn by me; that the

7     testimony of said witness was taken by me in

8     shorthand and thereafter reduced to typewriting by

9     me; that said deposition is a true record of the

10    testimony given by said witness; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this deposition was

13    taken; and, further, that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties hereto, nor financially or otherwise

16    interested in the outcome of this action.

17

18

19                          _____

20                          Misty Klapper
                            Notary Public in and for the
21                          District of Columbia

22

23

24

25

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On March 2, 2017 I electronically filed the following document(s):

- **PLAINTIFFS' CORRECTED EXHIBIT 9 – DEPOSITION OF PHILLIP MILLER EXCERPTS**

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/  *Peter Schey*
*Attorney for Plaintiffs*