FILED

**FOR PUBLICATION**

JUL 05 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| JENNY LISETTE FLORES, | No.   17-55208 |
| Plaintiff-Appellee, | |
| v. | D.C. No. 2:85-cv-04544-DMG-AGR |
| JEFFERSON B. SESSIONS III, Attorney General; THOMAS E. PRICE, M.D., Secretary of Health and Human Services; JOHN KELLY, Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, | OPINION |
| Defendants-Appellants. | |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted April 18, 2017
San Francisco, California

Before:  Reinhardt, Tashima, and Berzon, Circuit Judges.

Opinion by Judge Reinhardt:

In this case we apply the straightforward tools of statutory construction in order to determine what the statutes before us are designed to do and not do. In

performing this task we, of course, start by examining the words of the statutes. We then look to the statutes' clear purpose and intent. Specifically, we ask whether, without even mentioning the subject, the statutes invalidate a key provision of a consent decree to which the government is bound. In the process, we encounter a bureaucratic maze of alphabet agencies and examine how they can work together to carry out their shared and overlapping statutory duties. In the end, however, we arrive at a simple answer to our question. If Congress had intended to terminate the settlement agreement in whole or in part, it would have said so.

## Introduction

On January 28, 1997, the district court approved a settlement between the plaintiff class and the federal government establishing a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." *Flores* Settlement at ¶ 9. The "*Flores* Settlement" sets the minimum standards for the detention, housing, and release of non-citizen juveniles who are detained by the government, and obliges the government to pursue a "general policy favoring release" of such juveniles. *Id*. at ¶ 14. Pursuant to this goal, Paragraph 24A of the Settlement provides that a "minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge." *Id*. at ¶ 24A. The

question before us today is whether, in light of changes to the statutory law, this

provision remains in effect in the case of unaccompanied minors.[1]

Since the government agreed to the *Flores* Settlement, Congress has passed

two statutes addressing the care and custody of unaccompanied, non-citizen

minors.[2] In 2002, Congress enacted the Homeland Security Act (the "HSA"),

which transferred authority over the care and placement of unaccompanied minors

to the Office of Refugee Resettlement of the Department of Health and Human

Services ("ORR"). In 2008, Congress enacted the Trafficking Victims Protection

Reauthorization Act (the "TVPRA"), which paralleled certain aspects of the *Flores*

Settlement and affirmed ORR's responsibility for the care and custody of

unaccompanied minors. The government asserts that these two laws terminated the

bond-hearing requirement of the *Flores* Settlement with respect to unaccompanied

minors. Plaintiffs disagree, and moved to enforce the Settlement and to require that

ORR comply in full with Paragraph 24A. The district court granted plaintiffs'

---

[1] Last year, we held that the *Flores* Settlement applies to both accompanied and unaccompanied minors. *See Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016). In doing so, we explicitly rejected the government's argument that the Settlement's applicability to accompanied minors had been modified by intervening law. *Id.* at 910. We did not, however, answer the question presented here. *Id.*

[2] From here on, we will not repeat "non-citizen" each time we refer to unaccompanied minors. This is a case involving only non-citizens and the fact of non-citizenship is implicit in all our references to minors covered by the *Flores* Settlement.

3

motion, finding that neither the HSA nor the TVPRA terminated any part of the
bond-hearing requirement of the Settlement Agreement. This appeal followed. We
hold that in enacting the HSA and TVPRA, Congress did not terminate Paragraph
24A of the *Flores* Settlement with respect to unaccompanied minors.

Our reading of the statutes is dictated by the ordinary tenets of statutory
construction. By their plain text, neither law explicitly terminates the bond-hearing
requirement for unaccompanied minors. Moreover, the statutory framework
enacted by the HSA and TVPRA does not grant ORR exclusive and autonomous
control over the detention of unaccompanied minors. Rather, the statutes leave
ample room for immigration judges to conduct bond hearings for these children.
Additionally, holding that the HSA and TVPRA do not deny unaccompanied
minors the right to a bond hearing under Paragraph 24A affirms Congress's intent
in passing both laws. These statutes sought to protect a uniquely vulnerable
population: unaccompanied children. In enacting the HSA and TVPRA, Congress
desired to *better* provide for unaccompanied minors. Depriving these children of
their existing right to a bond hearing is incompatible with such an aim.

The bond hearing under Paragraph 24A is a fundamental protection
guaranteed to unaccompanied minors under the *Flores* Settlement. As was true
prior to the HSA and TVPRA, these proceedings do not afford unaccompanied

4

minors the same rights that may be gained through an ordinary bond hearing. Specifically, they do not result in the setting of bail. Even if the immigration judge determines that the form of detention ORR has imposed is improper, the government must still identify a safe and secure placement into which the child can be released. As a result, a favorable finding in a hearing under Paragraph 24A does not entitle minors to release.

However, such a hearing does provide minors with meaningful rights and practical benefits. The hearing is a forum in which a child has the right to be represented by counsel, and to have the merits of his or her detention assessed by an independent immigration judge. The hearing is also an opportunity for counsel to bring forth the reasons for the minor's detention, examine and rebut the government's evidence, and build a record regarding the child's custody. Without such hearings, these children have no meaningful forum in which to challenge ORR's decisions regarding their detention or even to discover why those decisions have been made. There are no procedures available to them that afford them the right to a hearing with counsel, an opportunity to examine adverse evidence, or a forum in which to refute the government's claims regarding the need for their custody.

In the absence of such hearings, these children are held in bureaucratic limbo, left to rely upon the agency's alleged benevolence and opaque decision making. A hearing under Paragraph 24A provides meaningful protections against such perfunctory and ad hoc determinations. For all children in ORR custody, these hearings compel the agency to provide its justifications and specific legal grounds for holding a given minor. The record shows that, in the absence of such hearings, unaccompanied minors, their parents, and their counsel are often given conflicting or confusing information about why a child is being detained. Bond hearings provide the concrete information needed to advocate for a minor's release.

For those minors in secure detention, bond hearings additionally provide an opportunity to contest the basis of such confinement. For example, the TVPRA allows children to be placed in secure detention facilities only if they pose a safety risk to themselves or others, or have committed a criminal offense. These are precisely the determinations made by an immigration judge at a bond hearing.

Providing unaccompanied minors with the right to a hearing under Paragraph 24A therefore ensures that they are not held in secure detention without cause. Finally, bond hearings help to guide ORR in making its placement determinations for unaccompanied minors. By allowing an immigration judge to assess the merits of a child's ongoing detention, bond hearings provide ORR with

6

valuable information that helps the agency determine the appropriate custody of

unaccompanied minors in a fairer and less arbitrary manner.

      As was the case under the *Flores* Settlement prior to the passage of the HSA

and TVPRA, the determinations made at hearings held under Paragraph 24A will

not compel a child's release. Regardless of the outcome of a bond hearing, a minor

may not be released unless the agency charged with his or her care identifies a safe

and appropriate placement. At the time of the Settlement, that responsibility fell to

the former INS; now, under the HSA and TVPRA, it rests with ORR. Thus, since

well before the time the Settlement went into effect, bond hearings have not

controlled the custody of unaccompanied minors. Yet the fact that the rights

afforded by such hearings may be imperfect does not mean that the government

may simply strip them from unaccompanied minors. Indeed, the fact that the

plaintiffs are so vigorously fighting to retain the bond hearings, and the

government so vigorously fighting to abolish them, may offer some indication that

the hearings remain of practical importance. It is in this context that we examine

the two statutes that the government contends terminate this key provision of the

*Flores* Settlement.[3]

## I.

*The* Flores *Settlement*

The *Flores* Settlement arose out of a lawsuit first filed by plaintiffs in the

Central District of California in 1985, challenging the policies of the Immigration

and Naturalization Service (INS) regarding the release of detained minors. In 1997,

the district court approved the current Settlement, which defines a "minor" as "any

person under the age of eighteen (18) years who is detained in the legal custody of

---

[3] We reject the government's procedural arguments that equitable rules of
contract enforcement provide good reason to deny plaintiffs' enforcement motion.
Plaintiffs first received notice from the government that ORR would not comply
with Paragraph 24A in an email from the Department of Justice Office of
Immigration Litigation in November 2015. There was no unreasonable delay by
plaintiffs in bringing their motion to enforce Paragraph 24A of the *Flores*
Settlement in August 2016, nor any representation by plaintiffs that they intended
to accept the government's position. The doctrines of laches, equitable estoppel,
and waiver therefore do not apply.

the INS," *Flores* Settlement at ¶ 4,[4] and the certified class as "[a]ll minors who are detained in the legal custody of the INS," *id.* at ¶ 10. The Settlement favors family reunification, and states the order of preference for persons into whose custody detained minors are to be released, provided that detention is not required to secure their appearance before immigration authorities or to ensure the safety of themselves or others. *Id.* at ¶ 14. The Settlement also addresses the appropriate care of those minors who cannot be immediately released, and who therefore remain in federal custody. *Id.* at ¶ 12A, 19-24. This includes providing such minors with the bond hearing that is the subject of this dispute.

Paragraph 24A of the *Flores* Settlement provides that:

A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor

---

[4] The settlement contemplates that detention may encompass government custody of various degrees of restrictiveness, and appears to equate detention with government custody. *See Flores* Settlement at ¶ 11 ("The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs . . . ."); *id.* at ¶ 14 (distinguishing "detention" from "release" to the custody of designated individuals or entities other than the government). The parties have used the terms "detention" and "custody" throughout the Settlement Agreement and extensively in their briefs and appear to have a mutual understanding as to their meaning. No dispute or disagreement in this regard has been presented to us for resolution. Should any difference as to the meaning of these terms arise in the future, it may be placed before the district court by means of an appropriate motion.

indicates on the Notice of Custody Determination form that he or she refuses such a hearing.[5]

*Id*. at ¶ 24. We discuss the function and purpose of this hearing throughout this opinion.

The *Flores* Settlement was intended as a temporary measure, but in 2001 the parties stipulated that it would remain in effect until "45 days following defendants' publication of final regulations" governing the treatment of detained, minors. It has now been twenty years since the Settlement first went into effect, and the government has not published any such rules or regulations. Thus, pursuant to the 2001 agreement, the Settlement continues to govern those agencies that now carry out the functions of the former INS. It is the position of the government, however, that Paragraph 24A has been terminated as to unaccompanied minors by the statutory changes and no longer remains in effect as to them.

*Statutes Following the* Flores *Settlement*

---

[5] Administrative removal proceedings to determine a non-citizen's right to remain in the United States have been re-designated as "removal" rather than "deportation" under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996). This opinion therefore treats "deportation proceedings" as addressed in the Settlement to be the equivalent of the "removal proceedings" that take place under the current statutory framework.

In the two decades since the *Flores* Settlement was approved, there have been dramatic changes to the bureaucratic landscape of immigration law. Twice, Congress has passed laws directly addressing the care and custody of unaccompanied minors.

In 2002, Congress passed the Homeland Security Act (the "HSA"), Pub. L. No. 107-296, 116 Stat. 2135. The HSA abolished the former INS, and established the Department of Homeland Security (DHS). 6 U.S.C. §§ 111, 251, 291. Most relevant to this case, the Act also transferred a number of the functions relating to the care of unaccompanied minors from the former INS to the Director of the Office of Refugee Resettlement ("ORR") of the Department of Health and Human Services ("HHS").[6] 6 U.S.C. § 279(a), (b)(1)(A), (g)(2). The Act charges ORR with "ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child." *Id*. §

---

[6] The HSA, 6. U.S.C. § 279(g)(2), defines an "unaccompanied alien child" as: a child who-
    (A)   has no lawful immigration status in the United States;
    (B)   has not attained 18 years of age; and
    (C)   with respect to whom -
        (i)   there is no parent or legal guardian in the United States; or
        (ii)   no parent or legal guardian is available to provide care and physical custody.

279(b)(1)(B). To that end, the HSA gives ORR responsibility for "coordinating and implementing the care and placement of unaccompanied alien children," "ensuring that the best interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child," "implementing policies with respect to the care and placement of unaccompanied alien children," and identifying "a sufficient number of qualified individuals, entities, and facilities to house" such children. *Id*. § 279(b)(1). With respect to making placement determinations, the HSA requires that ORR coordinate with certain other agencies, including the Bureau of Border Security and the Bureau of Citizenship and Immigration Services, both part of the Department of Homeland Security. *Id*.§ 279(b)(2).

Additionally the HSA includes a savings clause, which preserves those administrative actions to which the INS was a party. This clause provides that:

> Completed administrative actions of an ageny . . . shall continue in effect according to their terms until amended, modified, superseded, terminated, set aside, or revoked in accordance with law by an officer of the United States or a court of competent jurisdiction, or by operation of law.

6 U.S.C. § 552(a)(1) (incorporated by reference into 6 U.S.C. § 279(f)(2)). The statute goes on to define such "completed administrative actions" as including "orders . . . *agreements*, grants, contracts, certificates, licenses, registrations, and

privileges." *Id*. § 552(a)(2) (emphasis added). The *Flores* Settlement thus remains in effect as an "agreement" preceding the passage of the HSA.

In 2008, Congress again addressed the treatment of unaccompanied minors when it passed the Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232). Like the HSA, the TVPRA gives ORR responsibility for certain aspects of the care and custody of unaccompanied minors. In doing so, the TVPRA "partially codified the [*Flores*] Settlement by creating statutory standards for the treatment of unaccompanied minors." *Flores v. Lynch*, 828 F.3d at 904. Under the TVPRA, the "care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). The Act provides that this authority is to be exercised in a manner consistent with the Homeland Security Act, and incorporates by reference the savings clause included in the HSA. *Id*. (citing 6 U.S.C. § 279).[7] Thus, the TVPRA also preserves the *Flores* Settlement.

---

[7] The government recognizes that the HSA savings clause, 6 U.S.C. § 552(a), and its incorporation in the TVPRA, 8 U.S.C. § 1232(b)(1), "maintained the Agreement in effect as a consent decree."

13

The TVPRA directs that "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours after determining that such child is an unaccompanied alien child." *Id.* § 1232(b)(3). Once a child is placed in ORR custody, the TVPRA states that the agency shall promptly place him in the "least restrictive setting that is in the best interest of the child." *Id*. § 1232(c)(2)(A). In making this placement determination, ORR must consider the child's "danger to self, danger to the community, and risk of flight." *Id*. The TVPRA, like the *Flores* Settlement, provides that if a "suitable family member" or other guardian is not available to take custody of a minor, he may be placed in a specialized juvenile program or facility. *Id.* However, the Act requires that children not be placed in secure facilities "absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id.* This is, significantly, precisely the determination that can best be made in a bond hearing.

Additionally, although the TVPRA grants ORR responsibility for the placement of unaccompanied minors, it does not give the agency exclusive control. Instead, like the HSA, the TVPRA directs ORR to consult with other government actors, and also requires that the agency assist unaccompanied minors in navigating the general immigration system. *Id.* § 1232(a)(1),(c)(1, 4-5). In passing these

14

statutes, then, Congress did not intend to entirely remove unaccompanied minors

from the auspices of authorities outside ORR. Rather, Congress provided for the

welfare of unaccompanied minors by ensuring coordination and cooperation

among diverse governmental agencies. Nonetheless, the government argues that

the HSA and TVPRA terminated Paragraph 24A of the *Flores* Settlement with

respect to the fundamental right it affords to unaccompanied minors.


*Current Detention Practices of ORR*

ORR publishes a guide that describes its policies for determining whether to

detain or release unaccompanied minors. *See* U.S. Department of Health and

Human Services, ORR Guide: Children Entering the United States Unaccompanied

("ORR Guide").[8] These policies are posted on ORR's website but are not

promulgated through any formal agency rule-making process and do not appear to

have any binding effect. Under the policies, the initial decision about whether to

release a minor to a particular sponsor is made by the local federal field specialist.

ORR Guide §§ 2.3.1, 2.7. If the field specialist denies release, the parent or legal

guardian (but not, apparently, any other sponsor) has 30 days to request an appeal

---

[8] The ORR Guide is available at
https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last visited June 27, 2017).

to the Assistant Secretary for Children and Families. *Id.* § 2.7.8. If the parent or guardian requests a hearing, one will be scheduled via teleconference or video conference, at which point the parent or guardian "may explain the reasons why he or she believes the denial was erroneous." *Id.* While the policy states that "[t]he Assistant Secretary will consider the testimony and evidence presented at the hearing," it does not guarantee any right to present evidence. *Id.* Nor does it provide any rules for admissibility, evidentiary burdens, or standards of proof. *Id.* The policy also does not protect the right of the parent or guardian to be represented by counsel at the hearing. *Id.* Perhaps most important, minors—as opposed to parents or guardians—can appeal a detention decision only "[i]f the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community." *Id.* Even if that is the sole reason for detention, the minor's right to appeal is predicated on the parent not having requested an appeal, and detained minors have no apparent right to be present at or participate in—on their own behalf or through counsel—an appeal filed by a parent or guardian. *Id.*

Plaintiffs submit evidence showing that, in practice, ORR currently detains unaccompanied minors for months, and even years, without providing them with any opportunity to be heard before a neutral person with authority to review the

16

basis for the detention. One declaration, for example, is from Hector, who was
detained in California at the age of 15. Although Hector's mother was living in Los
Angeles and repeatedly attempted to get her son released into her custody,[9] Hector
was detained by ORR for 489 days. For most of this time, Hector was held in a
juvenile detention facility in Yolo County, California, an eleven-hour drive from
his home in Los Angeles. Hector describes the Yolo facility as a "real prison,"
where the juvenile detainees were treated "badly, like delinquents." Hector recalled
in his declaration how the guards would "lock us up in the cells every night, to
sleep on benches made out of cement with mattresses," and said that the "entire
time, we live[d] locked up." For the sixteen months that Hector was detained, ORR
never provided him or his attorney with an explanation for his continued secure
detention, gave any indication of when he might be released, or presented him for a
hearing before an immigration judge. In his declaration written while still held at
Yolo, Hector wrote that "I feel desperate . . . [m]y only wish is to leave detention,

---

[9] ORR treats some children whose parents are present in the United States as
"unaccompanied alien children" if the parents are not "available to provide care
and physical custody." 6 U.S.C. § 279(G)(2). *See D.B. v. Cardall*, 826 F.3d 721,
734 (4th Cir. 2016) (affirming the classification of a child as an unaccompanied
minor when his parent was present in the United States and holding that for a
parent to be "available to provide care" for a child, the parent "must be available to
provide what is necessary for the child's health, welfare, maintenance, and
protection"). We express no opinion as to whether the *Cardall* approach comports
with the statute.

live with my mom, and study." On December 16, 2016, Hector finally got his wish.

ORR, without any explanation for the sixteen-month delay, released Hector into

the custody of the person who had been advocating for his freedom all along—his

mother.

The declaration of Byron, another child detained at Yolo, tells a similar

story. Byron entered the United States from El Salvador when he was three years

old, and grew up with his mother in North Carolina. When he was in the sixth

grade, Byron moved to Texas to live with his father. It was there that Byron was

arrested, and spent time in a juvenile detention facility. Yet after Byron completed

his juvenile sentence, he was not released. Instead, he was deemed an

unaccompanied undocumented minor, and transferred to the custody of ORR. ORR

then placed Byron in the Yolo County detention center, moving him across the

country from his home and family. Byron states that, when he arrived at the Yolo

County facility, he was told that if he maintained good behavior he would be

transferred to a group home after 30 days. The 30 days passed, but Byron was not

released.[10] Instead, he was held in a facility with such poor air conditioning that it

_____

[10] Byron's case managers apparently told him that he would not be released
to the group home because he was "too close to turning 18." There is nothing in the
HSA, TVPRA, or the *Flores* Settlement stating that a minor being 17 years old is a
sufficient justification for keeping him in a secure detention facility.

18

was difficult to sleep at night, with flooding toilets and unusable showers, and in which guards threatened him with pepper spray and locked him in his room.

After six weeks in detention, Byron met with an official from ORR. Byron told the official that his mother had been trying to obtain his release into her custody, and the official apparently replied that ORR would approve a home study verifying his mother's competency as his custodian, and that he would be released "within the next few weeks." Byron was, understandably, overjoyed. He called his mother to tell her the good news, and for Mother's Day she flew to California, ready to purchase a return ticket for her son. It was then that Byron was informed that he would not, in fact, be going home. Byron did not receive anything in

writing regarding the denial of his release, and neither he nor his mother was contacted by ORR about its decision.[11]

Byron remained in Yolo until his eighteenth birthday, at which point he was transferred to Immigration and Customs Enforcement (ICE) custody and moved to an adult jail in Yuba County, California. Shortly after his transfer, Byron requested a bond hearing before an immigration judge. The judge concluded that Byron was

---

[11] Byron stated that his roommate at Yolo County had the same experience of being promised, and then denied, release. Byron wrote that after his roommate was told by ORR that he would remain at Yolo, he signed up for voluntary departure because "he felt he couldn't believe anything ORR told him." Byron says that "[t]he only thing that kept me from signing up for voluntary departure after going through everything was my mom. The stress was killing me and I felt like I could not even smile anymore but my mom continued to support me and try to keep me positive. I did not care about my life anymore, but I did not want to ruin hers." This anecdote is supported by the declarations submitted by counsel for detained minors indicating that their clients experience "profound helplessness and despair, to the point where they are prepared to take extreme measures, including opting for voluntary return to countries in which they know their lives and freedom will be in jeopardy, rather than continue to live day after day in ORR's detention facilities never knowing if or when they will be reunited with their families." As one attorney wrote, she feared that her client would "give up, opt to be deported, and take his chances at surviving the horrific violence that awaits him in Guatemala." Such evidence raises the alarming possibility that children who may have legitimate claims to asylum or other forms of relief from removal are being sent back to countries where they face danger, and even death. Left in bureaucratic limbo, without any opportunity to be heard, these children lose hope. Unaccompanied minors today face an impossible choice between what is, in effect, indefinite detention in prison, and agreeing to their own removal and possible persecution.

not a flight risk or a danger to himself or others, and found him eligible for release

on bond. Finally, Byron returned home to live with his mother in North Carolina.

Plaintiffs also offer a declaration by the attorney for William, who was first

apprehended and placed in ORR custody when he was nine years old. William's

counsel states that she began representing the child after he had spent almost a year

in a residential treatment facility. Although William wished to be reunited with his

parents, who lived in Texas, ORR refused to grant his request. William's attorney

states that at no time did ORR provide its reasons for determining that a ten-year-

old child should remain in a detention facility, nor did it grant William or his

parents any hearing with respect to his confinement. It was only after his counsel

brought a motion to terminate removal proceedings on the basis of the child's

incompetency that ORR "suddenly and without explanation released William to his

parents." By the time William returned home, he had spent almost a year and a half

in detention.

## II.

There is no question that the HSA and TVPRA gave new responsibilities to

ORR with respect to the care and custody of unaccompanied minors. The issue

before us, however, is whether these statutory changes terminated the *Flores* Settlement's bond-hearing requirement for such children.

A party seeking to alter the terms of a consent decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Flores v. Lynch*, 828 F.3d at 909 (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992)).[12] "When the basis for modification is a change in law, the moving party must establish that the provision it seeks to modify has become '*impermissible*.'" *Id.* at 909-10 (quoting *Rufo*, 502 U.S. at 383) (emphasis added). Put otherwise, in order to demonstrate that Paragraph 24A no longer applies to unaccompanied minors, the government must establish that compliance with the HSA and TVPRA would directly conflict with the *Flores* Agreement and convert it into an "*instrument of wrong*." *Sys. Fed. No. 91 Ry. Emps. Dep't. v. Wright*, 364 U.S. 642, 647 (1961) (emphasis added); *cf. City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1153-54 (8th Cir. 2013)

---

[12] Notably, the government did not seek to modify the consent decree. Instead, the government contests the ongoing applicability of Paragraph 24A in response to the plaintiffs' motion to enforce. *Cf. Flores v. Lynch*, 828 F.3d at 909 (holding that the district court erred in modifying substantive rights under the agreement in the context of a motion to enforce). However, we give the government the benefit of the doubt by examining this case as if the government had made an affirmative motion to modify the consent decree.

(modifying a consent decree when a change in relevant law made "illegal what the earlier consent decree was designed to enforce").

### a. Statutory Text

In order to determine whether the HSA and TVPRA terminated Paragraph 24A's bond-hearing requirement with respect to unaccompanied minors, we look first to the text of the statutes themselves. They are silent. Nowhere in either statute is there any mention of bond hearings, or of an immigration judge's authority—or lack of authority—to review the custody status of unaccompanied minors.

The government argues that Congress's failure to explicitly provide for bond hearings under the HSA or TVPRA demonstrates that it did not intend unaccompanied minors to receive them. This reading would require the court to construe silence as an affirmative repeal of Paragraph 24A. However, a basic canon of statutory construction requires that we presume Congress does not silently abrogate existing law. The Supreme Court has "frequently cautioned that 'it is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law.'" *NLRB. v. Plasterers' Local Union No. 79, Operative Plasterers' & Cement Masons' Int'l Ass'n, AFL-CIO*, 404 U.S. 116, 129-30 (1971) (alteration omitted) (quoting *Girouard v. United States*, 328 U.S. 61, 69 (1946)).

23

When asked to find that Congress has overruled a binding agreement incorporated into a judicial decree—just as when asked to find that Congress has overruled an earlier statute—we should "avoid the 'treacherous' course of inferring from Congress's silence any affirmative intentions." *United States v. Leddin (In re Mark Anthony Const., Inc.)*, 886 F.2d 1101, 1107 (9th Cir. 1989).[13]

The government's argument asks us to ignore our obligation to interpret statutes with the assumption that "Congress is aware of the legal context in which it is legislating." *Abrego Abrego v. Dow Chem. Co*., 443 F.3d 676, 683-84 (9th Cir. 2006); *see also Miles v. Apex Marine Corp*., 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation"); *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991) ("Congress is, of course, presumed to know existing law pertinent to any new legislation it enacts.") (citing *Native Village of Venetie v. Alaska*, 918 F.2d 797, 803 (9th Cir. 1990)). At the time it

---

[13] The government's argument would also have us conclude that when Congress intends to preserve existing laws or agreements, it must make an explicit statement to that effect when it passes substantively related statutes. Holding that Congress's failure to address bond hearings in the HSA and TVPRA means that it intended to terminate Paragraph 24A (at least in part) would therefore put an unprecedented and unreasonable burden on our legislative branch. Congress need not repeat every provision of a statute or agreement that it is *not* repealing or terminating. Rather, by using broad savings clauses, such as the one found in the HSA and incorporated into the TVPRA, Congress is able to efficiently indicate that it is not seeking to change the status quo sub silentio.

enacted the HSA and TVPRA, Congress was on notice with respect to the government's obligations under the nationwide *Flores* Settlement and resulting consent decree, which had governed the treatment of minors since 1997. Congress therefore had the opportunity to address, and to explicitly modify if it wished to do so, any provisions of the Settlement, including the bond-hearing requirement under Paragraph 24A. Yet, neither statute so much as mentions bond hearings for unaccompanied minors, let alone provides for their elimination.

We are confident that Congress's failure to address bond hearings in the HSA and TVPRA did not occur because Congress lacked the words to do so. Congress could have addressed the ongoing applicability of Paragraph 24A in light of the HSA and TVPRA. It did not do so. We refuse to read into such legislative silence any affirmative intent. Such a statutory omission does not render compliance with the *Flores* Settlement "*impermissible*," *Flores v. Lynch*, 828 F.3d at 910 (emphasis added), nor does holding that ORR must provide bond hearings to unaccompanied minors convert the Settlement into an "*instrument of wrong*," *Wright*, 364 U.S. at 647 (emphasis added). To the contrary, there is no provision of the HSA or TVPRA that would be violated by holding that Paragraph 24A remains in effect in its entirety.

*b. Statutory Framework*

Having concluded that the HSA and TVPRA do not explicitly supersede Paragraph 24A, we turn next to the government's argument that the Acts create a statutory framework that leaves "no room" for bond hearings for unaccompanied minors. This assertion rests on the premise that the breadth of ORR's responsibility over unaccompanied minors effectively precludes immigration judges from having any authority over their detention.

The HSA and TVPRA contain no indication that they are intended to encompass the entire immigration framework for unaccompanied minors, or to shift all related responsibilities to ORR.[14] *See D.B. v. Cardall*, 826 F.3d 721, 731 (4th Cir. 2016) (stating that "[t]he care and custody of [unaccompanied minors] by the government is governed by a legal framework consisting primarily of two statutory provisions—§ 279 of Title 6 and § 1232 of Title 8—*plus* a settlement agreement that is binding on the pertinent federal agencies") (emphasis added). The statutes do not grant ORR exclusive authority over unaccompanied minors for all purposes and in all contexts. Instead, the laws are concerned with ensuring the

---

[14] If this were the case, we expect that the government would have moved to terminate the *Flores* Settlement after the passage of the HSA and TVPRA, as it would have been abridged *in toto* by the intervening laws. It did not, and does not argue here that the Settlement is entirely void, just that the bond hearing provision in Paragraph 24A has been superseded.

welfare of such children. They specifically address ORR's responsibility for their care and placement while in government custody, but not the procedures for determining whether they should remain in such custody.

This focus on care and placement—rather than on detention—is evident from the plain text of both statutes. The HSA grants ORR responsibility for ensuring that "the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child." 6 U.S.C. § 279(b)(1)(A). This concern with the welfare of unaccompanied minors is echoed throughout the rest of the statute, which goes on to repeatedly discuss ORR's responsibility for the *care and placement* of unaccompanied minors, including "making placement determinations," *id.* § 279(b)(1)(C), "implementing policies with respect to the care and placement of unaccompanied alien children," *id.* § 279 (b)(1)(E), and "conducting investigations and inspections of facilities and other entities in which unaccompanied alien children reside," *id.* § 279 (b)(1)(L).

The TVPRA is similarly concerned with ORR's responsibility over ensuring the adequate care of unaccompanied minors. The Act puts ORR in charge of "providing safe and secure placements for children," 8 U.S.C. § 1232(c)(2), and goes on to list a series of considerations governing the prompt "placement" of children in the "least restrictive setting that is in the best interest of the child," *id.* §

27

1232(c)(2)(A). Even the government characterizes the TVPRA as making clear that
it is ORR, not DHS, that is "responsible for all *placement* decisions for
[unaccompanied minors] in government custody." That is certainly an accurate
statement of the TVPRA's effect, but the fact that ORR controls care and custody
decisions does not mean that the agency has sole authority to assess whether a
child should remain detained or in a particular placement. The HSA and TVPRA
address ORR's obligation to provide for the welfare of unaccompanied minors, but
that is not tantamount to giving the agency absolute or exclusive power over their
lives while in government custody.

That the HSA and TVPRA do not grant ORR exclusive authority over
unaccompanied minors is additionally made clear by the statutes' numerous
references to other government actors. Rather than suggesting that the treatment of
unaccompanied minors is governed entirely by ORR, both the HSA and TVPRA
provide instead for a degree of cooperation between ORR and outside agencies.
The HSA, for example, directs ORR to consult with the Bureau of Citizenship and
Immigration Services and the Bureau of Border Security to "ensure that
unaccompanied alien children are likely to appear for all hearings or proceedings in
which they are involved . . . [and] are placed in a setting in which they are not
likely to pose a danger to themselves or others." 6 U.S.C. § 279(b)(2). It also

28

directs ORR to collect and compile "statistical information from the Department of

Justice, the Department of Homeland Security, and the Department of State on

each department's actions relating to unaccompanied alien children." 6 U.S.C. §

279(b)(1)(K). There would be no such data to collect if the agencies had no role to

play with relation to the lives of such children.

The TVPRA likewise requires that the Secretary of HHS consult with DHS

in developing procedures for determining the age of a child, 8 U.S.C. § 1232

(b)(4), establishing policies and programs to ensure that unaccompanied children

are protected from traffickers, § 1232 (a)(1), and providing specialized training to

federal personnel, § 1232(e). *See also* H.R. Rep. No. 110-430, at 57 (2007) (stating

that, in passing the TVPRA, Congress intended to "require[] that HHS take steps to

assist children in complying with immigration orders, assist children in accessing

pro bono representation and, in certain cases involving particularly vulnerable

children, to obtain guardians ad litem"). Contrary to the government's argument

that the HSA and TVPRA removed unaccompanied minors entirely from the

general immigration system, the statutes in fact require a degree of

interdepartmental cooperation. We see no reason why this statutory framework

would not also permit ORR to work with DHS and the Department of Justice in

fulfilling the government's obligation under Paragraph 24A to provide unaccompanied minors with bond hearings.[15]

Indeed, holding that unaccompanied minors in ORR custody must receive bond hearings does not create a novel process for determining the placement or release of such children. Instead, it affirms the framework established by the *Flores* Settlement. Like the HSA and TVPRA, the Settlement addresses concerns regarding the welfare and care of unaccompanied minors. Unlike those statutes, the Settlement explicitly provides such children with the right to a bond hearing. Yet it also states that "nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts." *Flores* Settlement ¶ 11. The bond-hearing requirement does not trump this overarching command.

Mirroring the Settlement, the TVPRA prohibits ORR from releasing an unaccompanied minor from custody unless it has "determin[ed] that the proposed

---

[15] Although the HSA, in dissolving the former INS, transferred most immigration law enforcement functions (including adult detention) to the newly created DHS, it retained adjudicatory authority, including the authority to conduct bond hearings, within the DOJ. Pub. L. No. 107-296, 116 Stat. 2135, 2273-74; *see Hernandez v. Ashcroft*, 345 F.3d 824, 828 n.2 (9th Cir. 2003). Review by a division of the DOJ of detention decisions made by other government agencies is thus a well-established feature of the statutory framework.

custodian is capable of providing for the child's physical and mental well-being." 8

U.S.C. § 1232(c)(3)(A). This safeguard does not render the authority of an

immigration judge to conduct a bond hearing "impermissible." Instead, as was the

case when the *Flores* Settlement first went into effect, it permits a system under

which unaccompanied minors will receive bond hearings, but the decision of the

immigration judge will not be the sole factor in determining whether and to whose

custody they will be released. Immigration judges may assess whether a minor

should remain detained or otherwise in the government's custody, but there must

still be a separate decision with respect to the implementation of the child's

appropriate care and custody.[16]

At the time the *Flores* Settlement was signed, it was the INS that was

charged with ensuring that a child, regardless of a bond determination, was not

---

[16] Two BIA cases decided after the passage of the HSA illustrate what this division of authority looks like in practice. In *In re: Rodriguez-Lopez*, 2004 WL 1398660 (BIA, Mar. 29, 2004), the BIA assessed the appropriateness of the continued detention of an unaccompanied minor, notwithstanding the fact that the child was in the custody of ORR, rather than DHS. Although the BIA noted that, in light of the HSA, the immigration judge was "without authority to make any determination regarding the *placement* of the respondent," it found that the judge had authority to conduct a bond hearing, and to assess whether the minor presented a safety or flight risk. *Id.* at \*2 (emphasis added). In *In Matter of A---*, 2005 Immg. Rptr. LEXIS 54924 (BIA, Sept. 23, 2005), the BIA reversed an immigration judge's order finding no jurisdiction to review ORR's decision to detain a minor, concluding that "an immigration judge retains jurisdiction over the threshold issue of whether an unaccompanied minor should be detained at all." *Id.* at \*1. The BIA stated that, were an immigration judge to determine that an unaccompanied minor should be detained, "then ORR would have exclusive authority over decisions relating to the care and placement of the unaccompanied minor." *Id.* As demonstrated by these two decisions, there is no irreconcilable tension between the command that the care and placement of unaccompanied minors be governed by ORR, and the authority of an immigration judge to conduct a bond hearing for such children. Although the government argues that this analysis is affected by the passage of the TVPRA, that act includes no provision altering immigration judges' authority under the HSA. Instead, the Act "reiterated" the HSA's command "that responsibility for the care and custody" of unaccompanied minors rests with HHS and ORR. *Cardall*, 826 F.3d at 733-34 (internal quotations omitted). We therefore disagree with the government, and with the BIA's recent reversal of its position in *In re A-R*, A 206 755 662 (BIA 2016), that the TVPRA precludes immigration judges from conducting bond hearings for unaccompanied minors in ORR custody.

released to an improper custodian.[17] The only meaningful difference is that today it is ORR, not INS, which is responsible for performing that function. See 8 U.S.C. § 1232(c)(3)(A-C).

The government also asserts that Paragraph 24A is no longer applicable to unaccompanied minors in part because bond hearings would provide "minimal—if any—benefit" to such children. Because the TVPRA prevents ORR from releasing an unaccompanied minor from custody unless the agency has identified a suitable custodian, the government argues that any determination by an immigration judge would have little practical effect. This line of reasoning has minimal—if any—relevance to the instant case.

First, any additional limitations that the HSA and TVPRA might have placed on the effect of an immigration judge's bond-hearing determination do not render such hearings "impermissible" under either statute. A provision of a settlement agreement is not terminated simply because intervening laws might alter its functional impact. Second, even if the government were correct that the determination by an immigration judge would have little practical effect, it would not be excused from nonetheless providing bond hearings. The *Flores* Settlement

---

[17] We additionally note that, even before the *Flores* Settlement, "it has long been the case that the government may not simply send such children 'off into the night.'" *Reno v. Flores*, 507 U.S. 292, 295 (1993).

is the reflection of both parties' bargained-for positions. The process for detaining and releasing unaccompanied minors may result in a complicated set of determinations, but it is the one the government agreed to when it signed the Settlement in 1997. It is not for the government to now claim that the continued enforcement of Paragraph 24A is not, in fact, in plaintiffs' interests.

Third, there is good reason to think that bond hearings would provide significant practical benefits to unaccompanied minors as opposed to the current system. ORR's review process is governed by a manual that is posted with no notice or binding effect on the agency's website.[18] That manual does not guarantee the right to present evidence, does not identify any standard of proof or provide any evidentiary burdens, and does not grant children or custodians the right to be represented by counsel. *See* ORR Guide § 2.7.8. In addition, under the ORR procedure, a detained minor may seek review of a detention decision—rather than relying on his or her parent or legal guardian to do so—only if "the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community." *Id.*

---

[18] This system was characterized in a Senate Report as "setting governmental policy on the fly," and as "inconsistent with the accountability and transparency that should be expected of every administrative agency."

34

Bond hearings, by contrast, allow for representation by counsel, *see* U.S. Department of Justice, Executive Office for Immigration Review, *Immigration Court Practice Manual* § 9.3(e)(ii) (2016), give the minor the right to make an oral statement, *id.* at § 9.3(e)(vi), create an evidentiary record, 8 C.F.R. § 1003.19(b), and may be appealed to the Board of Immigration Appeals, *id.* at § 1003.38. Additionally, the *Flores* Settlement requires that a bond hearing occur unless affirmatively waived, while the ORR review process must be affirmatively invoked. *Compare Flores* Settlement at ¶ 24A *with* ORR Guide § 2.7.8. The experiences of Hector, Byron, and William, discussed above, are a strong indication that ORR's current policies are inadequate and that bond hearings will provide a meaningful benefit to unaccompanied minors, contrary to the government's claim.

As we have previously held, "there is no reason why [the] bureaucratic reorganization" enacted by the HSA and TVPRA "should prohibit the government from adhering to the [*Flores*] Settlement." *Flores v. Lynch*, 828 F.3d at 910. Here, we similarly conclude that the authority granted to ORR does not prevent the government from continuing to fully implement Paragraph 24A. The government remains bound by its bargain in the *Flores* Settlement, regardless of which agency may now be charged with caring for unaccompanied minors. The acronyms have

changed, but the effect remains the same: these children have a right under Paragraph 24A to be heard before an immigration judge.

### c. Congressional Intent

In addition to being the most reasonable reading of the plain text of the laws and the governing statutory framework, construing the HSA and TVPRA so as to provide unaccompanied minors with a bond hearing affirms Congress's intent in passing both laws. The government argues that the legislative history of the HSA and TVPRA shows that the statutes constitute intentional decisions by Congress to give ORR, not immigration judges, full authority over the custody and detention of unaccompanied minors. The government contends that Congress sought such a result because ORR serves an "exclusively child-welfare related function," as opposed to that of DHS. It is correct that, in passing the HSA and TVPRA, Congress sought to improve the welfare of unaccompanied minors. Yet, in claiming that the Acts therefore preclude any bond hearing before an immigration judge, the government ignores the broader intent behind the laws.

The overarching purpose of the HSA and TVPRA was quite clearly to give unaccompanied minors more protection, not less. *See Cardall*, 826 F.3d at 738 (finding that the statutes reflect "Congress's unmistakable desire to protect [the]

36

vulnerable group" of unaccompanied minors). The HSA reflected Congress's
conviction that "[u]naccompanied minors deserve special treatment under our
immigration laws and policies." 148 Cong. Rec. S8180 (daily ed. September 4,
2002). As Senator Edward Kennedy noted, the HSA sought to protect those
children who "have been abandoned, are fleeing persecution, or are escaping
abusive situations at home." *Id*. The Act, Senator Kennedy said, was intended to
provide "comprehensive services to address the special needs of newcomer
children . . . tailored to address the[ir] cultural, linguistic, legal, and developmental
needs." *Id*. Nowhere does the legislative history of the HSA suggest that, in
providing such services, Congress intended to reduce the rights already granted to
unaccompanied minors.

Similarly, in passing the TVPRA, Congress sought to improve the
procedures governing the treatment of unaccompanied minors. The House Report
for the Act states that it was intended to "require[] better care and custody of
unaccompanied alien children to be provided by the Department of Health and
Human Services" and to "improve[] procedures for the placement of
unaccompanied children in safe and secure settings." H.R. Rep. 110-430, at 57
(2007). The Act further sought to "assist children in complying with immigration
orders" and "in accessing pro bono representation." *Id*. As Senator Diane Feinstein

37

stated during the debate over the passage of the TVPRA, the Act represents an

"important step to protecting unaccompanied alien children, the most vulnerable

immigrants," and to fulfilling our nation's "special obligation to ensure that these

children are treated humanely and fairly." 154 Cong. Rec. S10886 (daily ed. Dec.

10, 2008). To deprive unaccompanied minors of an opportunity to contest their

detention before an immigration judge is hardly consistent with such

Congressional intent.

Contrary to the government's assertion that Congress sought to establish a

novel immigration scheme governing the custody of unaccompanied minors, the

HSA and TVPRA in fact affirm the broad goals of the *Flores* Settlement. Like the

Settlement, the HSA and TVPRA emphasize placing children in the least

restrictive environment, and require that the government ensure that they receive

safe and appropriate care.[19] Moreover, we note that providing unaccompanied minors with a bond hearing under Paragraph 24A ensures that they receive the same procedural protections as accompanied minors.[20] As we have previously held, the *Flores* Settlement applies to accompanied and unaccompanied minors alike. *See Flores v. Lynch*, 828 F.3d at 901. There is no indication that, in passing the HSA and TVPRA, Congress intended to distinguish between these categories of children with respect to the rights already afforded to them by the Settlement.

Rather, the HSA and TVPRA were intended to address the unique vulnerability of minors who enter this country unaccompanied, and to improve the treatment of such children while in government custody. There is nothing in the legislative history of either statute to suggest that, in doing so, Congress in fact

---

[19] As the government notes, the TVPRA in certain respects goes beyond the terms of the Flores Agreement. Although the Agreement provides that a minor may be placed in a juvenile detention facility if he or she is an escape risk, *Flores* Agreement at ¶ 21, the TVPRA limits the use of secure custody to a narrower population than the Agreement, stating that secure detention may be used only if a child "poses a danger to self or others or had been charged with having committed a criminal offense." 8 U.S.C. § 1232(c)(2)(A). The fact that the TVPRA limits minors' placement in such facilities is not, however, inconsistent with preserving their right to a bond hearing under Paragraph 24A. Rather, it affirms that Congress intended to better protect unaccompanied minors, an aim also served by allowing immigration judges to conduct bond hearings.

[20] The government does not contest that accompanied minors remain entitled to bond hearings.

sought to strip unaccompanied minors of any extant protections, including their

right to a bond hearing under the *Flores* Settlement.


****

Nothing in the text, structure, or purpose of the HSA or TVPRA renders

continued compliance with Paragraph 24A, as it applies to unaccompanied minors,

"impermissible." *See Flores v. Lynch*, 828 F.3d at 910. Nor does anything in the two

statutes turn the *Flores* Settlement or any part of it into an "instrument of wrong." *See*

*Wright*, 364 U.S. at 647. Not a single word in either statute indicates that Congress

intended to supersede, terminate, or take away any right enjoyed by unaccompanied

minors at the time of the acts' passage. Thus, we hold that the statutes have not

terminated the *Flores* Settlement's bond-hearing requirement for unaccompanied

minors.

We therefore affirm the decision of the district court granting plaintiffs' motion

to enforce Paragraph 24A of the *Flores* Settlement in its entirety.

**AFFIRMED**.