```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                        ---

 4         HONORABLE DOLLY M. GEE, JUDGE PRESIDING

 5                        ---

 6

 7

 8   JENNY L. FLORES,                    )
                                         )
 9                                       )
                                         )
10                  Plaintiff,           )
                                         )No. CV 85-4544DMG
11           VS                          )
                                         )
12   LORETTA E. LYNCH, et al.,           )
                                         )
13                                       )
                    Defendants.          )
14   _____)

15

16         Reporter's Transcript of Proceedings
                 EVIDENTIARY HEARING
17              Los Angeles, California
              MONDAY, JANUARY 30, 2017
18                    9:30 A.M.

19

20

21

22
           ANNE KIELWASSER, CRR, RPR, CSR
23         Federal Official Court Reporter
           350 WEST 1ST Street, Room 4455
24         Los Angeles, California 90012
            Telephone: (213) 894-2969
25          anne.kielwasser@gmail.com
                 AKtranscripts.com
```

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4    Peter Schey
      Francisca Noyes
 5    Center For Human Rights & Constitutional Law
      256 South Occidental Boulevard
 6    Los Angeles, CA 90057
      213-388-8693
 7    Fax: 213-386-9484
      E-mail: Pschey@centerforhumanrights.org
 8

 9
      ON BEHALF OF THE DEFENDANTS:
10
      Sarah B Fabian, USDOJ
11    Carlton F Sheffield
      Colin A Kisor
12    Louisa Slocum
      ^ Dawn Pedeway
13    US Department of Justice
      Civil Division - Office of Immigration Litigation
14    PO Box 868 Ben Franklin Station
      Washington, document 20044
15    202-532-4737
      Fax: 202-616-4975
16    E-mail:  Sarah.b.fabian@usdoj.gov
      E-mail:  Carlton.f.sheffield@usdoj.gov
17    E-mail:  Colin.kisor@usdoj.gov

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1    MONDAY, JANUARY 30, 2017                        9:30 A.M.

 2                              ~ ~ ~

 3                       EVIDENTIARY HEARING

 4                              ~ ~ ~

 5              COURT CLERK:  Calling Item No. 1.  CV 85-4544

 6    Jennie L. Flores versus Loretta E. Lynch, et al.

 7                   Counsel, please state your appearances for

 8    the record.

 9              MR. SCHEY:  Peter Schey, Your Honor, appearing for

10    the plaintiffs.  And with me is attorney Francisca Noyes,

11    N-O-Y-E-S.  She's an associate in my office and is just here

12    to help me today.

13              MS. FABIAN:  Good morning, Your Honor.  Sarah

14    Fabian with the Department of Justice on behalf of the

15    defendants.  I have with me today --

16              THE COURT:  You're going to need to speak into the

17    microphone.

18              MS. FABIAN:  I have with me today Colin Kisor,

19    who's the deputy director at my office, ^ Fred Sheffield

20    who's a trial attorney with my office, ^ Dawn Pedeway, who is

21    a parallel with my office, and Louisa Slocum, who's with the

22    US Customs and Border Protection Office of Chief Counsel.

23              THE COURT:  Good morning.

24                   All right, let me just make something clear

25    about today's hearing.  I indicated in October of 2016 that
```

1   this evidentiary hearing would be limited to

2   cross-examination and redirect examination of witnesses who

3   the parties have designated that they would want to have come

4   testify live.

5           I also gave three months to allow the parties

6   to have deposition testimony taken, which would have allowed

7   them to cross-examine as much as they wish and then to file

8   any supplemental briefing that they have.  That was in an

9   effort to streamline the evidentiary hearing.

10          If you have not designated any witnesses for

11  today's hearing that you wanted to have testify live, then

12  you have waived the right to seek live testimony today.

13          Thus far I have not seen anything on the

14  docket where either side has designated anyone to be

15  testifying live today.  So, it is my assumption that there

16  will not be any live testimony.

17          Is there any comment with regard to that?

18      **MR. SCHEY:**  Plaintiffs understood the Court's

19  orders, and it -- during that three-month period the

20  plaintiffs took all the depositions they wished to take, and

21  defendants, I believe, took all the depositions they wished

22  to take.

23          Plaintiffs have filed the -- pursuant to the

24  Court's detailed order about how to proceed, we have filed

25  the excerpts of -- of those depositions that we felt the

1    Court should consider, and we have seen -- we've seen no need

2    to further cross-examine those people before the Court, and

3    so, we'd want designated people for further

4    cross-examination.

5              **THE COURT:**  Ms. Fabian?

6              **MS. FABIAN:**  Your Honor, I -- and I apologize in

7    advance if the government did misunderstand the Court's

8    order.

9              We objected to the admission of declarations

10   in this case as an admissible hearsay, and that objection had

11   not been ruled on.

12             It was our understanding of the order by

13   designating witnesses would be that -- would be that each

14   side would designate their own witnesses who would appear and

15   would be the witnesses upon each -- with whom -- with -- each

16   party would rely.

17             And that at the hearing, then, each side

18   would have the opportunity to cross-examine those witnesses,

19   if the Court -- we -- we would then continue to object to the

20   declarations being considered; but if the declarations were

21   admitted as the direct testimony in lieu of direct testimony,

22   then we understood that then the opportunity would be just

23   simply cross-examination.

24             Without the opportunity --

25             **THE COURT:**  Well, then, why did you not designate

6

1    anyone that you wished to have come?

2                    There were a 110 declarations filed.  If you

3    think that I was going to have a hearing with a 110 people,

4    dragging them all the way across the country to have

5    testimony here when they already had their direct testimony

6    in declarations, then you were sadly mistaken.

7                    I don't know of any federal court that

8    refuses to accept declarations.

9                    I've reviewed the declarations.  They are not

10   all hearsay.  While some of them have had some admissibility

11   problems, and I will certainly deal with them as evidentiary

12   objections have been raised, and if I rely on that testimony,

13   it's certainly totally absurd to expect that this hearing was

14   going to be -- to have all of plaintiffs' witnesses come to

15   testify live.

16            **MS. FABIAN:**  Your Honor, and I don't believe we

17   would have expected 110 or 106 -- I believe is our count --

18   witnesses to come testify, but it was our position that

19   plaintiffs should have designated which among those 106 they

20   wanted to come testify today and upon whose testimony they

21   wanted to rely.

22                    We designated some number of our witnesses

23   who we wanted to testify today and brought them -- prepared

24   to testify, and they would be available for

25   cross-examination.  That was our understanding of -- of how

```
1    it should go, consistent with any -- any trial where the both
2    parties are designated the witnesses that they're going to
3    rely on for trial.
4              With all due respect to your position, your
5    understanding of our hearsay objections, I think our
6    objection is that the declarations themselves are entirely
7    hearsay in that they're out-of-court statements, and our
8    position has been consistently that these witnesses, the --
9    the testimony in these declarations is really going to turn
10   on your determination of the credibility of those witnesses.
11             We have disputed issues of facts, and the
12   Court will need to decide whether those witnesses are
13   credibly describing their experiences in government custody.
14   And so, it's been our position and it remains our position
15   that to do that, to determine credibility, the Court would
16   need to hear live testimony from those witnesses.
17        THE COURT:  That is a frivolous position.  We
18   regularly have hearings in this court and decide cases based
19   on declarations.
20             I am not going disregard the declarations.
21   And if you have people who are going to be presented as
22   witnesses who have not already presented declarations, I
23   might consider them; but if they have already submitted
24   declarations, then, apparently Mr. Schey does not wish to
25   cross-examine them, and therefore they will nod need to
```

1    testify.

2                    If you have brought them across the country

3    to be here, then you have wasted their time and resources.

4                    I think I made it perfectly clear in my

5    October order and in my order last week that I was going to

6    be having cross-examination or redirect testimony.

7            **MS. FABIAN:**  Understood, Your Honor.  And I

8    reiterate our position then that we do wish to cross-examine

9    plaintiffs' witnesses.  It was our understanding that it

10   would have been plaintiffs' responsibility to bring those

11   witnesses upon whom he wanted to rely.

12           **THE COURT:**  And whom did you designate?

13           **MS. FABIAN:**  We did not designate witnesses.

14           **THE COURT:**  Then you have waived your right to

15   designate any witnesses.

16                    At this late hour we are having the

17   evidentiary hearing.  If you have not designated which

18   plaintiff witnesses you wish to have cross-examined, so you

19   have waived it.

20           **MS. FABIAN:**  I understand that, Your Honor.  And I

21   would just say that it remains our position that it was -- it

22   was plaintiffs' responsibility to designate the witnesses

23   whom they wish to have testify, and that we would have

24   cross-examine those witnesses.

25                    But I understand that that is not the

1    position of the Court.

2              **THE COURT:**  Well, I have made my --

3              I have made the procedures clear.  It is

4    regularly under the Court's rules throughout this district.

5    Court trials are often conducted on the declarations for

6    direct testimony and that the evidentiary or trials occur

7    only with cross-examination and redirect.

8              So, if you disregarded the instructions, then

9    that is to your own peril.

10             **MS. FABIAN:**  Understood, Your Honor.

11             **THE COURT:**  All right.

12             Having set that aside, let me also say that

13   many of the evidentiary objections are blanket objections;

14   and if they are blanket objections, I will treat them with

15   the attention that they deserve, which is not much.

16             **MS. FABIAN:**  Your Honor, I understand.  I'd be

17   happy to walk through the evidentiary objections.  I do

18   acknowledge that we did make blanket objections to the

19   declarations themselves as being out-of-court statements and

20   therefore in a blanket sense being hearsay; so, it is a

21   blanket objection to the admission of those declarations.

22             **THE COURT:**  Well, I have dealt with some of the

23   objections, and I will observe the Rules of Evidence; but to

24   the extent that you have filed blanket objections, I am not

25   going to deal with them on an individual-wide basis.  I am

1    not going to waste the Court's resources parsing through all

2    of the hundreds of declarations and figuring out which of the

3    items you consider to be hearsay or not, because they are

4    simply submitted to us in blanket form.

5                However, when I issue my decision, I will

6    rely only on those pieces of evidence that I think are

7    admissible.

8                **MS. FABIAN:**  Understood, Your Honor.

9                **THE COURT:**  All right.  With regard to the four

10    issues that I identified for today's hearing, I would like to

11    focus counsel's attention in today's hearing on the first

12    two, that is:  *Whether conditions at the US Customs and*

13    *Border Protection facilities violate the Flores Agreement and*

14    *whether the provisions of the Flores Agreement, in particular*

15    *in paragraphs 14 and 19, require defendants to make and*

16    *record efforts to release minors from custody separate from*

17    *the accompanying parent under certain circumstances.*

18                I do have some questions about the other two

19    items, but those are not really going to be much of a factual

20    issue.  So, I'm going to reserve my question as to those for

21    later.

22                I've allocated approximately an hour and a

23    half for today's hearing; and so, each side will have

24    approximately 40 minutes to state -- to make their case as to

25    each of these two items.

1           With regard to the conditions at U.S. Customs

2    and Border Protection facilities, I would like to focus on

3    the Rio Grande sector.

4           **MR. SCHEY:**  Shall I commence?

5           **THE COURT:**  Yes.

6           **MR. SCHEY:**  Thank you.

7           Does it make a difference to the Court if I'm

8    standing up here or sitting here?  I'd do whatever the Court

9    wants.

10          **THE COURT:**  You should stand at the lectern.

11          **MR. SCHEY:**  Got it.

12          **MR. KISOR:**  Your Honor, may I ask a procedural

13   question?

14          **THE COURT:**  Yes.

15          COURT REPORTER:  Can I have your name please.

16          **MR. KISOR:**  It's Colin Kisor, K-I-S-O-R.

17          So, the witnesses from the Customs and Border

18   Protection and Immigration Customs Enforcement that we have,

19   we observed the sign outside that says witnesses may not come

20   into the courtroom.  They're in the attorney waiting room.

21   If they're not going to be able to testify, is it all right

22   if I allowed them to come in and observe the proceedings from

23   the gallery?

24          **THE COURT:**  Yes.  I presume that none of them are

25   people who haven't already submitted their declarations as

```
 1    witnesses.
 2              MR. KISOR:  That's correct.
 3              THE COURT:  And so you do not intend to call any
 4    of them as witnesses on direct.
 5              MR. KISOR:  That is correct.
 6              THE COURT:  All right, then, they may be in the
 7    courtroom.
 8              MR. KISOR:  And, secondly, I note that Mr. Schey
 9    has one of his witnesses here in the courtroom that had
10    submitted a declaration.  May the government use its 40
11    minutes of time or some of thereof to -- to cross-examine
12    that witness that is present in the court today?
13                   I think it might be useful because it might
14    highlight some of the problems with the creation of the
15    declarations, and they would probably only take 15 or 20
16    minutes or so.
17              THE COURT:  All right.  Is there any objections
18    Mr. Schey?  Who is that witness?
19              MR. SCHEY:  His -- his name is Franklin -- umm --
20    he's at -- umm -- Docket No. 201, Exhibit 45.  They would
21    need --
22                   Of course they've not noticed -- they've not
23    requested that he appear.  The only reason I requested he
24    appear is because he lives within a 100 miles of the court,
25    and just out of an abundance of caution, I guess you would
```

```
 1   say, my concern with their argument that some people -- if

 2   they're available, they should be available for further

 3   cross-examination.

 4             They've already cross-examined him.  He's had

 5   his deposition.

 6             Having said all that, sure, if they have a

 7   Spanish interpreter -- he would --

 8             He was deposed, I think, by -- by this

 9   counsel.  So, counsel knows he needs a Spanish interpreter.

10        THE COURT:  Do you have a Spanish interpreter?

11        MR. KISOR:  I do not.

12        THE COURT:  And did you cross-examine him during

13   his deposition testimony?

14        MR. KISOR:  An attorney in my office did, yes,

15   Your Honor.

16        THE COURT:  And did you submit to that deposition

17   testimony relating to this particular witness?

18        MR. KISOR:  I believe that we did.

19        THE COURT:  All right.  So, what would be the

20   purpose of having his live testimony, then?

21        MR. KISOR:  So, there would be two purposes, Your

22   Honor.  One is that you could evaluate his credibility in

23   person in the court; and secondly, his declaration is

24   somewhat representative of the --

25             The process by which his is created is
```

1    somewhat representative of the way that most of these

2    declarations that I've seen have been created, and there are

3    some points that I would like to point out within his

4    particular declaration as to where hearsay, it was elicited

5    where he -- he declared things that could not possibly have

6    been under his personal knowledge under Rule of Evidence 602,

7    and it may just be a representative sample for the Court.

8    And I don't think it would take very much time.

9            THE COURT:  Well, first of all, to the extent that

10   you did not designate him in advance as a witness that you

11   wish to cross-examine today, you've waived it.

12            Secondly, you don't have an interpreter.  So,

13   as a practical matter, we can't have his testimony anyway.

14            And, third, to the extent that you have

15   submitted his cross-examination testimony through his

16   deposition, then it would be duplicative.

17            MR. KISOR:  Thank you, Your Honor.

18            THE COURT:  All right.

19            MR. KISOR:  If I may step out and have the

20   witness -- the people come in.

21            THE COURT:  Yes.

22            MR. KISOR:  Thank you.

23            MR. SCHEY:  Okay.  Good morning, Your Honor.

24            I -- I guess I would like to start with the

25   second question, if I may.  And I -- I -- I'd like to reserve

1    probably at least ten minutes of my time, if not 15.

2                    So, I'm going to try to keep this somewhat

3    brief.  I mean, it's just being a large amount of briefing, I

4    think each side has got to submit about three briefs to the

5    Court, plus all their exhibits, this and that, so, doesn't

6    seem like there's a lot left to be said.

7                    Nevertheless, what -- what I want to focus

8    on, in terms of the -- the first issue, which is kind of the

9    release provisions and -- and where class members is being

10   supposed to be detained issue.

11                   There has been so much briefing on this that

12   I want to just circle back to the -- the foundation.  I want

13   to circle back to where -- where the analysis is supposed to

14   begin, which is ^ with the Goodmans, and -- and I think this

15   Court understands that and it ruled that way in July of '15,

16   August of '15, and again recently in the ORR motion, and

17   that's really just issue about, whatever it was about a week

18   ago.

19                   In all of those the Court makes clear that

20   what's pivotal here is, what does the agreement say, and

21   what's a reasonable interpretation of the agreements, and --

22   and -- I don't think the rules of interpreting that agreement

23   are much different than the rules of statutory construction.

24   There I think California law applies.  It's all the same.

25   You look at the start-out, you look at the plain meaning of

```
1    what the agreement says.  So, that's what I want to take us

2    back to, just given that we spent hundreds of hours of

3    briefing on the cases and this and that.  So, that's what I

4    would like to focus.

5                 So, I'd like to start with paragraph 10,

6    which is the class definition.

7                 So, if we look at paragraph 10, the certified

8    class in this action is defined as follows:  All -- it's --

9    it's so simple.  All minors who are detained in the legal

10   custody of the INS, which we all agree now the Ninth Circuit

11   said:  Oh, these successor agencies -- there is something

12   later in this element that talks about and successor

13   agencies.  So, everybody agrees that even though it says INS,

14   that -- today -- that means Department of Homeland Security.

15                So, what he does not say is that -- is that

16   the class definition is:  All minors who are detained in a

17   legal custody of the INS, except those placed in expedited

18   removal proceedings.  Nor does it say:  Except those

19   defendants' claim is subject to mandatory detention.

20                It simply says that the benefits of this

21   agreement will inure to the benefit of all minors detained to

22   the custody of the defendants.

23                **THE COURT:**  Let me ask you something, Mr. Schey.

24           **MR. SCHEY:**  Yes, please.

25                **THE COURT:**  Are all individuals who are designated
```

```
 1    for expedited removal by definition subject to mandatory
 2    detention?
 3              MR. SCHEY:  They -- actually, Your Honor, not one
 4    of them is subject to mandatory detention in the sense that
 5    the government is statutorily required to place them in
 6    mandatory detention.  They're all subject to mandatory
 7    detention in -- in a different sense, in a sense that
 8    defendants have the discretion to place them into expedited
 9    mandatory detention.
10              And I don't have the citations at my
11    fingerprints and any citation -- anything I talk about that
12    the Court wants a citation to -- I can get it to the Court
13    by -- by later today.  But we have cited starting with a
14    Board of Immigration appeals decision, and the Board of
15    Immigration Appeals of course works for the Attorney
16    General --
17              THE COURT:  Right, I already heard you citing that
18    case.
19              MR. SCHEY:  Yeah.
20              THE COURT:  But, basically, what my understanding
21    is, that the government has the discretion --
22              MR. SCHEY:  It does.
23              THE COURT:  -- and it's a broad discretion.
24              MR. SCHEY:  It is broad.
25              THE COURT:  So -- but my question is, if they
```

1    exercise their discretion to place people into expedited

2    removal proceedings, does that by definition mean that those

3    people have to be in mandatory detention?

4            **MR. SCHEY:**  Not -- not at all, because not --

5    nothing in this --

6            As I read the settlement, nothing in the

7    settlement says:  Defendants shall not take a class member

8    and place that class member in expedited removal proceedings.

9            We -- we could have insisted on -- on that

10    language and -- and we didn't.  And so, nothing --

11            It's a two-step process, place the kid in

12    expedited removal and then figure out their detention.

13            Nothing stops -- and I've never argued in

14    this current motion that anything in the settlement precludes

15    the defendants as they apprehend a minor, which they can do

16    within a hundred miles of the border.  They can -- they can

17    exercise their discretion to place that child in expedited

18    removal.

19            But on the other hand, what the settlement

20    definitely does address, regardless of whether they put a

21    class member into expedited removal, what the settlement

22    does -- and regardless whether they initially detained that

23    minor because the settlement client is -- is aimed at minors

24    who are detained; but having exercised the discretion to

25    place the minor in expedited removal or not, or any kind of

1    detention, the settlement then goes on -- and that's what I

2    was going to get to -- to discuss how you deal with that

3    child's release.

4                    So -- so I think --

5         **THE COURT:** Let me -- let me tell you how I

6    understand your portion, and you can tell me if I'm wrong.

7         **MR. SCHEY:** Sure.

8         **THE COURT:** I think your position is that you are

9    not saying they don't have the discretion to place people

10   into expedited removal --

11        **MR. SCHEY:** Correct.

12        **THE COURT:** -- but that if they do exercise their

13   discretion to do so, that that does not necessarily mean that

14   the minor has to be placed into mandatory detention, but that

15   there has to be an individualized determination based on

16   individualized circumstances as to whether or not that minor

17   is an escape risk.

18        **MR. SCHEY:** Exactly.  Or -- or stated slightly

19   more broadly whether that minor is amenable to release under

20   the Flores settlements, and the point you raised, the escape

21   risk, would certainly be one -- one factor, or dangerousness

22   would certainly be another factor.  So, that's exactly right,

23   but sure, they can.  When -- when --

24                  When we negotiated this settlement, the

25   notion of expedited removal had been discussed in Congress

1   for I think close to two years.  So, the bill, the 1996 law,

2   the IRA, already widely publicized, just like the recent

3   Trump executive orders --

4             This was highly controversial.  For the first

5   time in history this was creating an expedited removal

6   process.

7        **THE COURT:**  So, if I understand the government's

8   position, and when it's their turn, they can correct me if

9   I'm wrong, their position is that -- that expedited removal

10  by definition requires mandatory detention.

11       **MR. SCHEY:**  Well --

12       **THE COURT:**  Do you dispute that that is required

13  as a matter of law?

14       **MR. SCHEY:**  Absolutely, because that's what the

15  Ninth Circuit has said, that's what the Board of Immigration

16  Appeals has said in cases I've cited to you, which the Board

17  of Immigration appeals ruled that at their request.  It was

18  the defendants who went to the board and sought that

19  discretion to say:  Oh, we don't have to detain these people

20  and -- and --

21       **THE COURT:**  So, are there people who are not

22  detained who are in expedited removal?

23       **MR. SCHEY:**  They -- they certainly are.  And they

24  are -- they --

25             Even the government concedes that they

```
 1    have -- they will release -- and they say this in their

 2    depositions over and over again -- that, oh, they will

 3    release a person who's perhaps has posed a credible fear and

 4    if -- if that person is still in expedited removal, they will

 5    release a person who is pregnant, if that person is still in

 6    expedited removal, they will release a family unit if

 7    somebody is sick while they're still in expedited removal.

 8    So, I think the answer is yes.  They do it all the time.

 9                I think the -- even now that the depositions

10    indicate that border patrol, before they turn over a -- a --

11    a detainee to ICE, they make a phone call -- and I've delved

12    into this in some detail in depositions -- they make a phone

13    call to ICE to determine -- and ICE -- they -- they testified

14    ICE --

15                Like in southern Texas, ICE has designated

16    one person that the border patrol calls, and what's the

17    purpose -- before -- before they transfer to ICE, the custody

18    of either delay or -- or -- what's the purpose of that phone

19    call?  To determine if there is bed space for that

20    configuration and that family.

21                So, if the particular kids, or if the kid is

22    of a certain age, or it's boys or girls, and then the advice

23    is, no, there is no bed space, then they release them, border

24    patrol just releases them and tells them to appear at a

25    future date.  So, the answer to your question is yes.
```

1    There's -- there's all kinds of circumstance.

2                   The one circumstance they don't rely upon is

3    the Flores settlement because they -- they have sort of

4    pivoted or segued from their original position in this court.

5                   I mean I -- I -- I --

6                   Let me just go back for this for a second.

7                   You know, for many years, they did -- and --

8    and the Court -- the Court makes note of this in its --

9    probably in its July order, possibly again in its orders,

10   2015 order, but for sure in its July order, the Court makes

11   note that the evidence showed that until they decided to kick

12   in this family, so-called family detention in the summer of

13   2014, they always release people, other than a very small

14   number of people who they detained at ^ birks --

15                  So, this is, what, eight years prior to the

16   law was passed, or much more than that.  Actually, the law

17   was passed in '96 all the way to 2014, about 17 years.

18   They -- they -- they released all these folks, and it was

19   only in 2014 when they decided:  Oh, they'd start detaining

20   these mothers.

21                  Well, then they had to scratch their heads,

22   because they said, well, these mothers, they have

23   accompanying children, how are we going to get around this?

24   How are we going to --

25                  Are we going to detain the children with

UNITED STATES DISTRICT COURT

1    mothers.  And that's when they came up with the theory, the

2    first theory they ran by the Court, they said, well, let's

3    just argue then by class members.  That's how we would get

4    around the problem, because we want to detain the mothers,

5    the mothers have children.  So, let's just argue then our

6    class members.  Well, that went all the way through the

7    courts.

8              And -- and, by the way, that's also the

9    problem with -- with regards to the licensing, and I'll get

10   to that in a minute.  Because they could have set up

11   facilities that would meet the terms of the settlements, and

12   then just say, well, we're going to put the kids in these --

13   the kids -- in facilities -- that meet the terms of the

14   settlement, but they -- they didn't do that as --

15        **THE COURT:**  Just on that note, since we last had a

16   hearing, have there been any licensed facilities?

17        **MR. SCHEY:**  No.  They haven't -- they still have

18   not contracted with a single licensed facility, nor have they

19   contracted with a single licensed facility that's nonsecure,

20   because under paragraph 19, it's supposed to be nonsecure.

21             So now, in fact, now, they -- they were

22   operating with less license than ever before because the

23   Court in Texas, which I just filed last night, I only got it

24   from Texas just a few days ago, but the Court in Texas has

25   made clear --

1            And the Court in Texas discusses this case,

2    has made clear both licenses -- I guess the ^ dily one was

3    enjoined months ago; and according to the declaration of the

4    lawyer in that case, the judge had -- orally also enjoined

5    both months ago, but -- but finally just a few days ago, the

6    judge entered a written order making clear that both of those

7    licenses are -- are -- are enjoined, they -- improperly

8    issued, in part because they -- they're secure facilities.

9            So -- so, going back to the pattern, when

10   they lose in the Ninth Circuit, I mean, we thought at that

11   point:  Fine, now these kids are finally going to at least

12   have the option.

13           I think this Court has recognized, and we

14   certainly recognized, it doesn't mean an automatic release.

15   I mean, it's an option of release.  It's a process.  It's a

16   process where.

17           And it's such a simple process.  They --

18   it's -- it's -- it's -- the government makes it like it's the

19   end of the world for them to do this, but in fact it's -- it

20   probably takes a five-minute conversation with the mother to

21   say, do -- you know, early on, which I'm going to get to why

22   it should be early on, we envisioned a very simple process of

23   saying to the mother, you're detained.  We're going to detain

24   you.  Is there -- do you have any close relative or a friend

25   who you would like to place your child with; and if so, give

```
 1    us their name and phone number, we will be in touch with

 2    them, and we'll get back to you in a couple of days or two or

 3    three days to let you now whether it seems to work.  And

 4    that's it, really.

 5                 I mean, it's really tough, you know, if the

 6    mother says:  No, I want to keep the kid with me, and we

 7    assume in 99 out of 100 cases, that would sort of be the

 8    result.

 9                 And, you know, the Court addressed this, in I

10    think the very first hearing we had in April, I think it was

11    2015.  You got back and looked at that transcript, and the

12    Court was scratching its heard, saying:  Well, what if the

13    mother doesn't want the child to be released, and we made

14    clear at that hearing -- and I'm sure there are mothers have

15    the power to sort of opt the kid out of that -- that benefit.

16                 But when we come back from the Ninth Circuit,

17    and we thought:  Okay, great, they're going to start this

18    process.  There -- there is no reason they couldn't have the

19    border patrol do this from the very get go; but, no, that's

20    when they sort of came up with this new idea, which they had

21    kind of floated earlier -- if you go to the earlier briefs,

22    they -- it's floated there, but it's never a center stage

23    because center stage was their argument that they're not

24    class members, period.

25                 But there was briefing way back then.  There
```

1    was briefing on this notion about:  Is the detention

2    mandatory or is in fact the detention discretionary.  And of

3    course Ninth Circuit also touches on this subject itself,

4    because their argument that all these changes mean the

5    settlement doesn't apply to us anymore or something like

6    that, and the Ninth Circuit said:  Da da da, this is --

7    umm -- if -- if --

8              The Ninth Circuit says:  When this settlement

9    was -- was finally signed and arrived on, this 1996 law was

10   already in place.

11             So, where we are now is not that different

12   from where we were in 2015, except their reason for not

13   applying the settlement is different.  Now their reason is,

14   oh, they're in expedited removal; oh, they're subject to

15   mandatory detention, therefore, in effect, the settlement

16   doesn't apply to them.

17             And the depositions make that absolutely

18   clear.

19             I mean, it's kind of interesting when we

20   first filed this motion that there was a lot of what I would

21   call hemming and hawing on the part of the government about,

22   well, are they kind of enforcing Flores or they're not

23   enforcing Flores.  And it really wasn't -- and I wasn't

24   terribly clear.  I just thinking kids were not being released

25   or given the option to be released.  I mean, the inspection

1    that I did in three facilities -- or four facilities, excuse

2    me, in -- in 2016 --

3            THE COURT:  By the way, how do you respond to the

4    government's position on the advocate witness rule, that you,

5    as counsel, cannot also be a witness?

6            MR. SCHEY:  I guess I'd respond a couple of ways,

7    one is that --

8            THE COURT:  Unless you obtain a waiver, of course.

9            MR. SCHEY:  Yeah, I guess one thing -- and I'm not

10   an expert on this.  So, I'm not in a position to give the

11   Court really incisive analysis.

12               I would say, number one, there are something

13   like, whatever it is, a 100 declarations.  Probably makes

14   very little difference if the Court doesn't consider my

15   declaration.  That will be No. 1.

16               No. 2, my declaration includes matters that

17   were based upon my personal observations.  So, for whatever

18   that's worth.

19               But, I guess, No. 3 -- I mean -- and, again,

20   I'm not an expert on this.  There are so many other issues to

21   research and wrap my brain around, I didn't really focus on

22   this.

23               But, No. 3, we have obligations to monitor;

24   and if we cannot report back to the Court, it seems pretty --

25   seems somewhat -- somewhat strange, you know, if we cannot

```
 1    report to the Court on what we've accomplished in -- in the
 2    monitoring process.
 3                   So, I don't know.  That's -- and they -- they
 4    deposed me.  So, they were -- they were more than welcome to
 5    depose me, and they did deposed me.  They questioned me about
 6    everything that was subject to cross-examination.  So, that's
 7    how I'd respond to that.
 8                   But let me get back to --
 9         THE COURT:  All right, you have -- you have -- you
10    have --
11         MR. SCHEY:  25 minutes.
12         THE COURT:  You have five minutes if you were
13    reversing 15 minutes.
14         MR. SCHEY:  Oh, okay.
15                   Well, let me -- I primarily want to go
16    through this first part because we -- we think it's very
17    important, and of course also as to the border patrol part,
18    but --
19                   So, what is -- what is --
20                   I -- I want to go --
21                   Because the way the -- the settlement
22    instruction -- sometimes it -- it's -- it's not in the neat
23    order that we probably put -- have -- should -- should have
24    put things in.  So, I want to try to put them in, you know,
25    chronological order.
```

1          So, I've already dealt with the class

2    definition, and I've already said nothing in the class

3    definition excludes people who are in expedited removal or

4    excludes people in -- subject to mandatory detention.

5          So, then, really, if you're looking at it

6    from a sequence standpoint, the -- the next important one is

7    Paragraph 18.  And, again, why am I going through this?

8    Because it's the plain meaning where -- when we sat there for

9    months and months, and we worked out this thing, and we came

10   up with words, what do those words mean in -- to -- in -- in

11   plain -- plain English.

12         Paragraph 18 says:  "Upon taking a minor into

13   custody, the INS shall make and record the prompt and

14   continuous efforts on its part where family reunification and

15   the release of the minor pursuant to Paragraph 14 above.

16   Such efforts of family reunification shall continue as long

17   as the minor is in custody."

18         Why do I point the Court to that?  Because it

19   says:  "Upon taking a minor into custody."  It doesn't say

20   two weeks later or a month later, or there are some cases now

21   of kids we took a year to make in determination.

22         I think we just filed a declaration referring

23   to a kid who was in custody at ^ Bergs for over a year, and

24   then was just released recently because her mom was found to

25   have a credible fear, took over a year to get that.

```
 1                   That's not what it says.  It doesn't say
 2      after a credible fear determination, whether that takes five
 3      minutes, five days, 15 days.  They -- they love to tell the
 4      Court:  Oh, on average we've got it down to 15 days, 12 days.
 5      Doesn't matter.  That's not what they bargained for, it's not
 6      what we bargained for.  What we bargained for is:  Upon
 7      taking a minor into custody.
 8                   Now, as a practical matter, I don't think
 9      that has to be the first 30 seconds.  You know, we're --
10      we're willing to understand that it's a practical, realistic
11      world, and maybe that's going to take it a day or two, but it
12      definitely doesn't mean that you can detain the kid for a
13      week or two weeks or a month or 12 months; and -- and it
14      definitely does not say:  Upon the mother deemed determined
15      to have a credible fear, INS shall make and record prompt and
16      continuos -- no.
17                   It says:  Upon taking a minor into custody.
18      And it has no exception for a minor who's in expedited
19      removal.
20                   So, it does not state:  Upon taking a minor
21      into custody, the INS shall make and record prompt and
22      continuous efforts on any part towards family reunification
23      unless defendants place the minor in expedited -- well, it's
24      just not there.
25                   Next.  Paragraph 19, also uses that language.
```

1    It also says:  Upon taking a minor into custody.

2                      Now, let's go to paragraph 14:  Where the INS

3    determines that detention of the minor is not required to

4    secure his or her timely appearance or the -- with -- were to

5    ensure the minors's safety -- I'm slightly paraphrasing, but

6    every word is in the agreements -- the INS shall release a

7    the minor without unnecessary delay in the following order of

8    preference.  And then we all know what the order of

9    preference is.

10                     So, again, no language in there about how

11   this process is to wait until they've done a credible fear

12   interview for the mother, no language in there that says:

13   Oh, don't do this for kids who are in expedited removal, or

14   don't do this for kids who you claim are in mandatory

15   detention.

16                     So, again, the language without unnecessary

17   delay.  If -- if they wanted to say:  Well, but what if we

18   delay because we -- we wanted to give the mother a credible

19   fear interview?  Well, then they should have put that in

20   there.  They didn't put that in here.  It's simply without

21   unnecessary delay.

22                     Now, under paragraph 17, I would just note

23   for the Court that they do have the authority to conduct a

24   suitability assessment, which again would indicate that we

25   didn't think this could all be done in a day or two.

1          I mean, you know, there -- for years, for 17

2    years, this was generally accomplished in five days or less.

3    But they do have the right to do a -- a suitability

4    assessment of the placement.  They don't have to, but

5    paragraph 17 does give them that right.

6          Now, as the Court knows, if a kid, under

7    paragraph 19 -- again, I'll just read it:  In any case in

8    which INS does not release a minor pursuant to paragraph 14,

9    the INS shall remain in -- in legal custody, and then except

10   for kids who are, under paragraph 21 -- which I'll get to in

11   a second -- which is the escape risk -- such minors shall be

12   placed temporarily in a licensed program until release can be

13   effected in correspondence with paragraph 14.

14         It is simply undisputed that they have no

15   contracts with any facilities that are licensed programs, and

16   as the Court knows, when you go to a definition of a licensed

17   program, it says, they're non-secure.  It says that in the

18   agreement, it says that in, I think Exhibit 1, which is the

19   instructions to the officers to implement the agreement, both

20   clearly say it's a non -- nonsecure licensed facility.

21         **THE COURT:**  All right, your time is up, Mr. Schey.

22   You can wrap up.

23         **MR. SCHEY:**  Let -- let me take another four

24   minutes, and then -- and then I'll resume my time on the

25   border patrol business.

1          **THE COURT:**  All right.

2          **MR. SCHEY:**  But I just wanted to get through this,

3     sort of this -- the agreement, which kind of like our little

4     statutory construction argument.

5               So, no facilities available under paragraph

6     19.

7               Now, Paragraph 6 is the one that says that

8     they have to be -- a licensed facility has to be nonsecure.

9               By the way, Paragraph 6 also --

10              I mean this is so the -- the breach is so

11    widespread.  Paragraph 6 also even says that these -- even

12    says geographically where these licensed facilities should be

13    located, because we didn't want them located in extremely

14    isolated areas.

15              So, Paragraph 6 says that they make

16    reasonable efforts to provide placements in a geographical

17    areas and blah blah blah.  Anyway, that's probably not that

18    critical.

19              Paragraph 11 also -- although this begins to

20    become redundant -- paragraph 11 says:  Defendant shall place

21    each minor in the least restrictive setting appropriate.

22              Now, let's just turn to what the Court -- 12A

23    says:  If there is no placement available under 14 and there

24    is no placement available under 19, then they may place --

25    and -- and from reading the -- the minor may be placed in a

```
1    detention facility or a contract facility equipped, having

2    separate accommodation for minors.

3               So, they -- they're not doing that.  That --

4    that's sort of the catch-all.  That's -- that's for kids who

5    are really not going to be replaced or -- or released --

6    because they're a flight risk or they're a danger.

7               So, they haven't done that.  That's paragraph

8    12A.

9               And, again, even for kids placed under 12A,

10   which would theoretically, these kids, they're now detained

11   for weeks, months, and some for years, Subparagraph 3 of --

12   of 12A is interesting, because it says:  Minors placed under

13   this paragraph must be placed in licensed facility under 19

14   as expeditiously as possible.

15              They haven't done that.

16              Now, just before I sit down, let's turn to

17   the -- paragraph 21, which is reasons why they may detain.

18   But, again, if they're going to detain, they're supposed to

19   do it under Subparagraph, they're supposed to do it under

20   12A, and 12A is in facility that has separate accommodations

21   for minors.  And even there they're only supposed to --

22   they're supposed to get them out of there as expeditiously as

23   possible.

24              But let's turn to why they could detain a

25   kid.  So, again, important --
```

```
 1                    Here we spent hours, days, weeks, negotiating

 2       over who they do not have to release, and -- and we came up

 3       with language that's detailed.  It's not like one word, two

 4       words, it's several sentence, and it covers two different

 5       sections; and nowhere in there do we say:  Oh, you don't have

 6       to release if they're in expedited removal.  I mean, how

 7       easy, if the government wanted that, this would have been the

 8       place to it.

 9                    THE COURT:  Your time is up, Mr. Schey.

10                    MR. SCHEY:  Okay.  And so, I'll just say one other

11       thing.  Yes, our position would be, you can consider an

12       escape risk.  It's an individualized determination, it's not

13       some blanket rule.

14                    And the only other thing I would say is this.

15       Where does this gentleman says one of the factors is that the

16       kids are under final order of deportation, I don't believe

17       that these expedited removal orders are orders of final

18       deportation.

19                    No. 1, they can be appealed to an immigration

20       judge.  That's No. 1.  And you cannot deport the kid while

21       they're being appealed to an immigration judge.

22                    And -- and more importantly than that,

23       expedited -- the classes of, quote, deportable aliens is in

24       Section 237 of the Immigration Act.  Under Section 240,

25       immigration judges conduct proceedings to decide the
```

1    deportability of aliens under 237.

2                    That's not what these ICE or -- or -- or

3    border parole agents do when they do an expedited order of

4    removal.  There -- I think it's under 235 -- there they're

5    not deciding deportability, they're deciding whether the

6    alien or the child is inadmissible under Section 212 of the

7    INA.

8                    So, I don't even think that language, yeah,

9    you can look at the escape risk.  I -- I have no question

10   about that.  It says that you have to make an individualized

11   determination.  It's a factor to be considered.  That's what

12   the settlement says.

13                   But when the settlement says one of the

14   factors you can consider is, if the kid is under final order

15   of deportation?  These are not orders of deportations.  These

16   are orders of expedited removal.  They're not even based on

17   the deportation statutes.  They're based on the

18   admissibility.  They're saying:  We busted you.  You're

19   inadmissible.  Why you're inadmissible?  Because you don't

20   have a visa.

21          **THE COURT:**  All right.  Thank you.  All right.

22          **MR. SCHEY:**  So, I'll get to the -- the border

23   patrol stuff --

24          **THE COURT:**  All right, you'll -- you have ten

25   minutes remaining.

```
1            MR. SCHEY:  Okay.  Thank you.

2            THE COURT:  Ms. Fabian?

3            MS. FABIAN:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            MS. FABIAN:  I will start with the border patrol

6    so that I don't run out of time, similarly.

7                 The -- I think largely it is the factual

8    issue.  There is a -- a few points I wanted to make.

9                 First, in -- in the Court's August order,

10   this -- this Court ordered -- did find -- did say that if --

11   if -- if the Court found that if a border patrol station --

12   or border patrol was not complying with the Flores Agreement,

13   that the remedy there, the Court's August order, was that

14   border patrol needed to institute monitoring provisions.

15                We put in some testimony, testimony of Justin

16   ^ Bristow who talks about the -- the updates of the ^ E3DM

17   system, which is the monitoring system used by border patrol

18   that comprehensively monitors the compliance with the Flores

19   Agreement at border patrol station.

20           THE COURT:  How do you address the discrepancies

21   in some of those reports?  How am I to construe situations,

22   for example, where there is either no entry for hours, ten

23   hours in one situation, I guess, and others where there is a

24   frenetic activity, like, within the space of 20 minutes.

25           MS. FABIAN:  Understood, Your Honor.  I -- I would
```

UNITED STATES DISTRICT COURT

```
1    say that the records you have before you are records from

2    individuals who are detained fairly early after the Court's

3    order went into place.  So, compliance with that order began

4    in October.  I think you have records around December.

5                I've spoken to Mr. ^ Bristow.  If he were to

6    testify here today, my accounting is -- and I think Chief

7    Padilla, who's also here today, the chief of the RGB sector,

8    would tell you that.

9                And -- and I think I would just tell you as

10   sort of a matter of general practice when you institute a new

11   policy, a new practice of entering, recording things into a

12   system that there is going to take time for compliance to --

13   to fully be implemented.

14               So, I would say that to some extent -- and I

15   would have to, you know, look at any individual record.

16   There certainly might be reasons why entries weren't made.

17               I think, and Chief Padilla testified at his

18   deposition, it is highly unlikely that -- that in fact a

19   child wouldn't have been fed for 10 hours.  The more likely

20   explanation is that early on, and probably still today on

21   occasion that an agent won't be compliant with entering into

22   the records.

23               The policy is, however, that -- that children

24   are fed every six hours, the snacks are given every three

25   hours, that the overall records would show compliance with
```

```
1    that -- umm --
2              THE COURT:  So, when you see all these
3    declarations that say things like:  We only got a sandwich,
4    which was a piece of bologna, or the bread had ice under it,
5    are you saying they're lying?
6              MS. FABIAN:  Your Honor, I can't -- I can't say.
7    I don't know at what point during their visit --
8              I mean, I don't believe -- I think Chief
9    Padilla would say that it's not border patrol policy or
10   practice to provide kids with a sandwich with ice in it,
11   but --
12             THE COURT:  Right.  I know what the policy is, and
13   the policy is fine.  The problem here is that sometimes
14   what's happening on the ground does not appear to be
15   consistent with policy.
16             Is the E3 detention module something that
17   coincides with the time period during which these declarants
18   experienced what they experienced, or was this implemented
19   after that?
20             MS. FABIAN:  The E3 system has existed for longer
21   than the time period that we're talking about here,
22   consistent with this Court's August order.  Immediately
23   following, border patrol undertook to enhance the E3 system,
24   so that it could provide additional monitoring.  So that your
25   order went into place in -- around October, and at that time
```

```
 1    then E3 -- the enhanced E3 monitoring was in place.

 2                 And as I explained that, I think that you

 3    would -- you would find that then you're rolling out a new

 4    system, a new -- new monitoring procedures for the agents.

 5    There is going to be some time period there where monitoring

 6    is going to come up to speed before agents are always going

 7    to be fully compliant.

 8                 I would say, as far as your question whether

 9    the witnesses are lying, I think that's part of why we would

10    suggest that an assessment of the credibility is important.

11                 I wouldn't certainly as a blanket statement

12    say that individuals are lying, but -- but that -- that goes

13    to the credibility of the witness.  And then to the, I think,

14    the credibility of Chief Padilla in responding and explaining

15    what -- what he oversees his sector and how the practices are

16    -- are sort of overseed [SIC] and ensured to be compliant in

17    his sector.

18                 THE COURT:  Let me ask you something else.  You

19    provided a map of where all of the CVP stations are located.

20    I was able to locate them on the map, but I wasn't able to

21    find the one port of entry that was identified.

22                 Paso Del Norte, is that on the map?

23                 MS. FABIAN:  Your Honor, I don't believe that was

24    on the map.  We -- we were not able to get in --

25                 So, border patrol and ^ OFO are two separate
```

```
 1    divisions of customs and border protection.  We did not have
 2    a map of OFO facility.  So, that is just a --
 3              THE COURT:  Can you tell me generally where that
 4    is?
 5              MS. FABIAN:  El Paso, Texas.
 6              THE COURT:  All right.
 7              MS. FABIAN:  And -- and so I believe --
 8                   I just want to clarify, though, at the
 9    beginning Your Honor had said that you were focusing on the
10    RGB sector.  The OFO, that port of entry would not be
11    considered part of the RGB sector.  The RBG sector -- RGB
12    sector is -- is a border patrol sector that OFO and any ports
13    would be outside of that sector.
14                   So, I -- I'm presuming that -- that Your
15    Honor is focusing on the RGB sector that that's -- when I
16    would say that Chief Padilla's testimony is -- is what would
17    inform the Court as far as --
18              THE COURT:  Yes, I've read his declaration.
19                   Is the Ursula facility a bigger and more
20    modern facility?  Is that why people are transferred there if
21    they have to stay for a longer period of time?
22              MS. FABIAN:  The Ursula facility is a -- it's a --
23    it's a much larger facility.  It also has a lot more
24    resources available to care for children.
25                   It was designed because of the increased
```

UNITED STATES DISTRICT COURT

```
1    numbers of minors in family -- or unaccompanied children and
2    family groups that enter through their RGE sector.  And so
3    it -- it is much larger, and it has much larger shower
4    capabilities.  They have additional food resources.
5              And so, it will ultimately, I think in the
6    near future be in fact the primary place where -- where all
7    minors go through the RGB sector and are able to be processed
8    and held in the facility that has additional resources
9    available for children.
10        THE COURT:  So, is it fair to say that when there
11   is an influx and there are too many people who can be
12   accommodated in the other smaller facilities that they are
13   then transported to Ursula?
14        MS. FABIAN:  That is not -- the -- the current --
15             And, again, I would offer -- the chief -- to
16   better answer these questions, I'll -- I'll give you my best
17   understanding, but I -- but I can't really testify --
18        THE COURT:  That's kind of where I derived my
19   impression, was from reading the declarations.
20        MS. FABIAN:  Understood.
21             So, I -- I would say that the -- the current
22   practice as I understand it is that minors will go through
23   the border patrol station in the Rio Grande Valley sector
24   and -- and as soon as they can be processed at the station,
25   they would be brought to Ursula while awaiting transport onto
```

1    the next location, whether to HHS or to an ICE facility most

2    likely.

3              The -- the goal -- and I believe it's --

4    it's -- my understanding is it would be realized in the near

5    future, is that they'll be able to not have minors go through

6    the stations and the minors will be able to go directly to

7    the Ursula facility and be processed there as well as held

8    there.

9              And so there wouldn't be the -- the process

10   through the border patrol stations.  Of course in a -- in a

11   case of a surge -- any surge influx, there -- there may be --

12   need to be changes to that -- that -- those practices, but

13   the facility was designed -- it -- it -- at the time of the

14   surge in 2014, and certainly reflects border patrol's

15   learning from that experience.

16             **THE COURT:**  On the subject of the percentage of

17   people who are released after they've been placed in custody,

18   I've read your papers where you indicate that by and large

19   about 90 percent are held for 20 days, and that 99 percent

20   are released after 30 days; but according to the plaintiffs,

21   that does not include people who haven't been released at

22   all.  So, how many people are those?

23             **MS. FABIAN:**  Your Honor, I've made a demonstrative

24   for that.  If -- if it would help the Court, I could put it

25   up on the Elmo.

1          **THE COURT:**  Yes, you may.

2          Have you shown a copy to Mr. Schey?

3          **MS. FABIAN:**  It -- it may --

4          (Discussion held off the record.)

5          **MS. FABIAN:**  This chart reflects the numbers that

6    are -- you would find in Mr. Miller's most recent declaration

7    as well.

8          So, if you look at this chart, I -- I sort of

9    designed this to make it a little more easy to digest the

10   information in Mr. Miller's declaration.

11         What this shows is that the top line is

12   the --

13         So, we ran their averages on November 19th,

14   of -- sort of immediately prior to our briefing date for the

15   second supplemental filing.

16         So, that top line will reflect the averages

17   that Your Honor referenced, and those refer to individuals

18   who, as of the date of November 19, were no longer residents

19   at a facility.

20         The bottom line reflects if you run the

21   averages considering both the individuals who had been

22   released and the individuals who remained in ICE custody at

23   the time.

24         So, you'll see that of course the percentages

25   go down slightly because there are individuals who have been

1  held for a longer time, but -- but it's not a significant

2  drop.

3            The 99 percent still reflects overall the

4  majority of individuals who -- who process through and have

5  been released from ICE custody.

6            Does that answer Your Honor's question?

7       **THE COURT:**  So, does the 48,940 figure and the

8  1,950 figure reflect the total universe of people, or does

9  that reflect only the people who have actually been logged in

10 and logged out?

11      **MS. FABIAN:**  I would defer to Mr. Miller.

12      **THE COURT:**  Well, let me read from Mr. Miller's

13 deposition, which is the reason why I'm somewhat purpose

14 perplexed.  It says:  "Our system of record, the way we count

15 average length of stay, is the difference between when you

16 book into FRC and when you're released.

17           "For the people who remain detained, we can't

18 measure how long they, you know, between book-in and book-out

19 because they have yet to book out.

20           "Question:  Okay, and would it be fair to say that

21 if we counted people who were not released, then the numbers

22 would change by some unknown margin?

23           "Answer:  I think it would be fair to say that we

24 can't count that which is unknown.

25           "Question:  Okay.

UNITED STATES DISTRICT COURT

1          "Answer:  I can't tell you how long someone has

2     stayed until they're no longer detained."

3          **MS. FABIAN:**  I -- I think the way I would answer

4     this and maybe make it a little more clear, my understanding,

5     Your Honor, is that if you look at the bottom line, that is,

6     there were 1950 individuals in ICE custody at the family

7     residential centers on the date of November 19.

8               Among those, their average length of the stay

9     as of that date was 14.1 days.

10              That -- that -- of course, some of those

11    individuals may be released the next day who had only been in

12    there for five days at that time, and that would -- they

13    would move into the upper column and -- and effect that

14    number.

15              But as of -- really, those numbers can only

16    be run at a given time and on a certain day and a given

17    snapshot, and so the snapshots that you're seeing there is --

18    those individuals on the bottom row can't be counted in the

19    top row because we -- we can't confirm their -- their total

20    average -- their total stay.

21         **THE COURT:**  So, the bottom row would consist of

22    anyone who is still in detention.

23         **MS. FABIAN:**  On the date of November 19, yes.

24         **THE COURT:**  And that is for all of the facilities

25    throughout the nation?

1          **MS. FABIAN:**  That is for the family residential

2     centers, the three facilities that we've discussed.

3          **THE COURT:**  Okay.

4          **MS. FABIAN:**  I would say that if you look at

5     then -- the -- the declarations of Ms. Hester and Mr. Solinas

6     and perhaps Mr. Reed, you'll see that for -- for some of

7     those individuals who would have been reflected in that

8     bottom number, if you look at the chart attached to their

9     declarations, you'll see that we -- we gave an explanation

10    for those individuals who were in detention on that date, and

11    for some of those you'll see -- and -- and I think, if I'm

12    recalling correctly, for the majority of those, you'll see

13    that we added an additional note around the date of filing

14    that would say that a lot of those were released soon after

15    the date of November 19.

16         **THE COURT:**  Okay.  So, so, if there were 96

17    percent who were detained 30 days or less, just by quick

18    mathematical calculation, that's about 4 percent who were

19    more than 30 percent, that's about 80 people.

20         **MS. FABIAN:**  I -- I'm sorry, Your Honor.  You're

21    going well beyond my math capabilities at this point.

22              I would say that if you look at the

23    declaration of Mr. Reed and see the -- the chart there, that

24    does reflect the individuals who have been in custody for the

25    longest time.  Some of those have of course since that date

1    now been released.  So, it's always going to be a snapshot,

2    but -- and some others may have -- have stayed and, you know,

3    pushed into that longer category.

4              But I think if you looked at -- at Mr. Reed's

5    declaration and see the attachment, that will reflect those

6    individuals who have been there for the longest periods of

7    time on that date.

8         **THE COURT:**  All right.  So, how do you address

9    Mr. Schey's argument under the Flores Agreement, if you look

10   at the plain language, it says that --

11             Well, there are a number of paragraphs that

12   sort of reiterate the concept, but the one that I think says

13   it clearly is -- just one moment, see if I can find it.

14             Paragraph 18.  It says:  "Upon taking a minor

15   into custody, the INS shall make and report the prompt and

16   continuous efforts on its part toward family reunification

17   and the release of the minor pursuant to paragraph 14 above."

18             How do you -- how do you get around that?

19   That just sounds very clear.

20        **MS. FABIAN:**  Your Honor, I think -- I think

21   sometimes the arguments that plaintiffs make and the

22   arguments that the government make sort of pass in the night.

23             And so I -- I'll respond to that by saying, I

24   think our position is that our overall practices are

25   compliant with Paragraph 18 and with the totality of the

1    agreement.

2              Our -- our practice is that --

3              Well, with regard to that particular section,

4    with regard to unaccompanied children, that paragraph is

5    complied with as soon as a child comes into border patrol

6    custody or CVP custody, the children are asked about -- about

7    family members to whom the child could be released.  That

8    information is passed on to HHS, and that process is -- is

9    carried out through the HHS reunification process.

10             **THE COURT:**  What about accompanied minors?

11             **MS. FABIAN:**  So, we're talking about accompanied

12   minors here, and -- and the government's position is that --

13   is the totality that the agreement cannot be used -- that --

14   that the government does not release children separately from

15   their parents.

16             And so I think some -- a little bit we're

17   going back before August, you know, responding to your --

18   Your Honor's order and sort of the practices that instituted

19   both before and after the order are -- are practices that --

20   that we do -- we do not release the minor, so -- so we will

21   acknowledge that boarder patrol is not asking the same

22   questions of minors for the purpose of seeking to release

23   that minor separately from their parent.  Instead, the parent

24   and the minor are placed into proceedings under the INA

25   together, and -- and will be transferred to the ICE facility,

1   and that efforts to release them together will be -- will be

2   undertaken.

3              **THE COURT:**  So, that does seem to be contrary to

4   the language of the agreement.  I understand the government's

5   reasons for why it's doing what it's doing, but why would it

6   not also be simply a matter of asking the mother and the

7   child whether they have someone who is available.

8              Apparently, according to the declarations

9   I've read, those are routine questions that are asked of

10  minors, I presume both accompanied and unaccompanied minors,

11  whether they have any guardians or potential guardians or

12  other people who are available, and then whether or not the

13  mother and the child desire to -- to contemplate that that

14  child should be released.

15             The agreement indicates that the desire of

16  the child should be taken into account.  I suppose that there

17  will be some instances where the mother and the child say no,

18  I don't want to be separated.  But in those instances where

19  that is not the case, why wouldn't you simply comply with the

20  language of the agreement?

21             **MS. FABIAN:**  Your Honor, I think you have to look

22  at the -- the immigration status and the detention status of

23  the child as well as the adult.  The --

24             There is the practice, and I think, the

25  declarations reflect it that -- that the family is asked if

1    they have anyone to whom they wish to provide them support in

2    the United States.

3                   But then -- and that -- that is taken into

4    account when the individual is obtained -- or become in a

5    status where they can released from custody.  That --

6                   As the chart reflects for the majority of

7    individuals that happens very quickly.  They're either found

8    to be eligible for release and released possibly in the

9    support of those individuals, or they're found ineligible for

10   release, they're found to be -- have an executable final

11   order, and they're removed to their -- their home country.

12                  In the other cases, our position is that --

13   that both the child and the parents, for the majority of

14   situations, they're going to share a detention status, and

15   they are subjects to mandatory detention.  And so there is

16   no --

17        **THE COURT:**  So, perhaps you can answer the

18   question that I posed to Mr. Schey, which is, is it your

19   contention that someone who is put into expedited removal

20   proceedings by definition has to be subject to mandatory

21   detention?

22        **MS. FABIAN:**  Absolutely, Your Honor.  That's

23   precisely what the statute says.  It's 8 USC, Section 1225,

24   and, I'm sorry, I can't give you the precise subsection right

25   now, but that is precisely what the statute requires, and the

```
1    exception to that, and -- and -- is there -- and Mr. Schey
2    sort of alluded to this, but there is limited parole
3    authority for those individuals that would allow, I believe,
4    it's for medical reasons and for law enforcement reasons,
5    that ICE could parole individuals who are otherwise subject
6    to mandatory detention into the country.
7                     What I'll say is that, it's our position, and
8    we've argued frequently in our papers, that 8 U.S.C., Section
9    ^ 1252F1 would otherwise prohibit the Court from --
10                    Even if -- even if I sort of accepted the
11   idea that there might be some other discretionary reason that
12   ICE could release an individual in mandatory detention, it's
13   not what the law says.  But even if that were the case, that
14   ^ 1252F1 would prohibit this Court from requiring them to do
15   so on a classwide basis.
16                    And as we -- as we explained that if -- as
17   the Ninth Circuit has found and as this Court has said, that
18   the -- that the INA -- that these provisions of the INA were
19   in place at the time the agreement was signed, then when the
20   agreement said, we know of no -- no provision of law that
21   would -- that would preclude us from -- from signing the
22   agreement, that ^ 1252F1 clearly would preclude us from
23   having entered into agreement that would otherwise on a
24   classwide basis undermine our authority to -- to detain under
25   INA.  That is completely what ^ 1252F1 prohibits.
```

1          **THE COURT:**  Assuming you're correct in that

2     regard, and given Mr. Schey's point that there are many

3     people who are placed into expedited removal who are not yet

4     subject to a final order of removal, that means that they

5     still may be kept in some sort of housing in the interim, you

6     still don't comply with the agreement to the extent that none

7     of these housing facilities are licensed and nonsecure.

8          **MS. FABIAN:**  Your Honor, I would say that the --

9     the -- the agreement --

10         When an individual is in mandatory detention,

11    I -- I dispute that it's not final order, and -- but a

12    removal order is a final order of removal.  The only

13    challenges that can be made -- there's limited challenges.

14    You'll see the -- the Castro proceedings, in the -- in the

15    Third Circuit, sort -- exhibits that there is limited

16    proceedings that could be brought to challenge that there is

17    no review in the immigration courts of the expedited removal

18    order itself.

19         There are provisions where if a credible fear

20    claim is found, an individual could be then placed into 240

21    proceedings; but as -- so long as the person is still subject

22    to the expedited removal order itself, that is an executable

23    final order.

24         There are reasons that -- and there are

25    reasons that it might not be immediately executed to allow

```
1    the person to proceed with those credible fear claims, but it
2    is an executable final order at -- at -- at some point in
3    that credible fear process.  And so, our --
4              Whether the agreement can then otherwise
5    prohibit the detention of individuals subject to those final
6    orders, our position is that it can't.
7              With regard to the licensing question,
8    these -- these -- I would say that -- that is a question of
9    state law, that those issues are being litigated in state
10   law.  I mean, all of these facilities have made efforts to
11   obtain licenses in accordance with state law.
12             If -- if they're unlicensed because state law
13   does not provide a license for those facilities, they are as
14   licensed as they can be under state law.
15             So, I -- I think that -- that would be our
16   position as far as --
17        THE COURT:  I don't understand what that means.
18        MS. FABIAN:  We have sought every license
19   available under state law, and to the extent -- and this -- I
20   mean, we're getting to matters of state law that we haven't
21   briefed so.  But I would say that we sought a license in
22   Texas for the facilities.  If the Texas court has said that
23   there is no license available for these facilities, then we
24   have whatever license which may be no licenses available in
25   the State of Texas.
```

1          But to -- to say that we are required to

2    obtain a license that the State of Texas has said doesn't

3    exist, it sort of puts us in an untenable position.

4          **THE COURT:**  So, are you saying it's an

5    impossibility?

6          **MS. FABIAN:**  I can't say what will happen in the

7    state courts in Texas.  So I think that is an ongoing process

8    that will have to play itself out in the state courts in

9    Texas.

10          I -- I think -- I would go back to --

11          Our position at the outset, though, is to --

12    is that these -- these -- these minors, just -- just like

13    their parents in many of these situations, and nearly all of

14    these situations, they're subjects to either a final order of

15    removal because they have reinstated final order.

16          In those cases, they are -- they do get an

17    analysis of whether they're a flight risk.  If they're a

18    flight risk, they may continue to be detained, or in many

19    cases their final removal order ultimately will be able to be

20    executed.  They can be detained until their final order may

21    be executed.

22          In the cases of individuals subject to

23    mandatory detention under 1225, the minors, just like their

24    parents, are subject to a final order and subject to

25    mandatory removal, and therefore they're -- they are required

```
1   to be detained, and under ^ 12502f1 it simply can't be found

2   on a classwide basis that that would be prohibited by the

3   agreement.

4               I don't know if Your Honor wants to -- to

5   hear anything on the -- on the transfer, the issue of

6   transferring minors.  It was Issue 4 in the Court's order.

7               THE COURT:  No, I don't.  I think that -- I think

8   Mr. Schey will probably acknowledge that there is not much

9   evidence that there is a classwide, nationwide pervasive

10  problem in that regard.  So, I'm not going to focus on that.

11              MS. FABIAN:  Okay.  Unless Your Honor has any

12  other questions --

13              THE COURT:  Yes, I do, actually.  If I -- if I

14  find that there should be some form of monitoring, let's say,

15  as to the Rio Grande Valley sector, the agreement itself has

16  provisions for some sort of monitoring.  Has that ever been

17  in effect since this agreement was signed?

18              MS. FABIAN:  Your Honor, since we last spoke, I've

19  looked into that.  I know you questioned that at our last

20  hearing.  I --

21              It was in place.  It's reflected in the

22  record that it was in place.  I can't find, and my clients

23  haven't been able to find.  Somehow we have lost the

24  institutional knowledge as to those reports and why they

25  stopped.
```

```
 1                  But I agree with the Court, and if the Court

 2       wanted to reinstitute that reporting, I think that we would

 3       be of course willing to comply with --

 4                  THE COURT:  Well, is there such a thing --

 5                  Well, it's obviously not going to be called

 6       an INS juvenile coordinator anymore because there's no INS,

 7       but is there such a person even in the system anymore?

 8                  MS. FABIAN:  ICE does have juvenile coordinators.

 9       I believe CVP also has juvenile coordinators in its

10       facilities.  They may have a different sort of operational

11       purpose than the INS juvenile coordinators, but it is still a

12       position that the agencies keep in order to facilitate this

13       process of housing in the detention of minors.

14                  THE COURT:  But there isn't anyone specifically

15       designated for the Flores Agreement right now.

16                  MS. FABIAN:  Not to my knowledge, Your Honor.  But

17       there would be within the Rio Grande Valley.

18                  THE COURT:  I'm sorry?  There is one?

19                  MS. FABIAN:  I don't believe the position is

20       specifically designated with regard to the Flores Agreement.

21       I -- I -- I understand Your Honor's question to say, is there

22       one person I could point to to say that the juvenile

23       coordinator for the Flores Agreement, I don't believe that's

24       the case.

25                  THE COURT:  So, if I were to reactivate this
```

1    provision, we would have to appoint someone.

2             **MS. FABIAN:**  I -- I would defer that question to

3    -- to Chief Padilla.  I think that he -- he may -- would have

4    a juvenile coordinator within his sector.  Whether that would

5    be the person or whether there would be a separate

6    Flores coordinator, I would have to defer to the client.

7             **THE COURT:**  I see.  All right.

8             All right, if you don't have anything

9    further, then I don't have any other questions for the

10   moment.

11            **MS. FABIAN:**  Thank you, Your Honor.

12            **THE COURT:**  All right.

13            Mr. Schey, you have ten minutes.

14       **MR. SCHEY:**  Thank you.

15            You know on these number -- the -- the

16   question of the numbers -- it's hard -- it's hard to -- to

17   kind, for me to really drill down on that, especially because

18   they submit this supplemental declaration off drive, depose

19   the person and -- all --

20            The first round of numbers, where I deposed a

21   person, and all of a sudden I discovered that they weren't

22   counting people who had not been released.  That -- kind

23   of -- a light went off in my head, I said, wow, that really

24   sort of changes the picture.

25            So, whether that would be true or not now, I

```
1    don't know what numbers they're relying upon.  So, I'm not in
2    a great position to say much about it other than I will say
3    that even if it's 4 percent, for more than whatever they
4    said, I think 20 -- I think they said 30 days, 96 percent
5    were released in 30 days?  Well, 4 percent of the total
6    number of people is 2000 people.  So, that's not
7    insignificant.
8            THE COURT:  No, I think that's 4 percent of 1950
9    or 1850 or whatever the figure was.
10           MR. SCHEY:  Yes, but that number is just looking
11   at a snapshot of the people detained at that moment.
12           If you looked at all the people detained over
13   the previous year, which they said was 48-, close to 50,000,
14   and then if you looked at that whole population, and if you
15   assume it's roughly 4 percent who are being detained for more
16   than 30 days, it comes out to roughly 2,000 people, which
17   makes sense, because one of the three facilities they have
18   is -- is in Pennsylvania, and that is strictly for long-term
19   people.  I mean, the average stay in --
20           They have people who've been detained for
21   more than a year, children who have been detained for more
22   than a year, and the average is certainly months and months
23   and months.  That's not a short-term facility.
24           So, again, it's -- it's hard for us to deal
25   with this because they came up with this at the last minute.
```

1    But what I am saying -- if -- if you look at the total number

2    of people who they -- because that -- that second number they

3    give you is just a snapshot for that moment in time.  But

4    then the -- the other number they give you is -- the 48,000

5    or 49,000, that's the total number apprehended or detained

6    for the -- for the one year from -- I think it was September

7    15 to November 16.

8                    So, you know, if you say, okay, roughly 4

9    percent are being detained more than 30 days, that comes out

10   to roughly 2000.  I mean, that's rough math, but I'll leave

11   it -- I'll leave it at that.

12                   I would -- I would say that --

13                   The government argued:  Oh, these are final

14   and executable orders of removal.  Well, they're not

15   executable.  I mean, the statute says --

16                   The only people we argued about are -- are

17   children with mothers who made a fear claim, right?  If they

18   don't make a fear claim, they -- they're theoretically

19   removed within a matter of days.

20                   So, really, the only people we're talking

21   about are people who make a credible fear claim.  Well, if

22   you make a credible fear claim, you -- you don't have an

23   executable order, even in --

24                   You don't have an order of deportation, which

25   is the language used in that paragraph 21 or whatever was,

```
1    around the escape risk; but even if you did, it's not an

2    executable order any more than an immigration judge's

3    deportation order is an executable order because you can

4    appeal that to the Board of Immigration Appeals.

5              So, for them to say:  Oh, these are some sort

6    of executable order, it's a piece of paper signed by a border

7    patrol agent, is simply not correct.

8              When they say:  Oh, they cannot get a

9    license.  Well, fine, if -- if they --

10             You know why?  If you read that court order

11   that I just filed with the Court, yeah, they cannot get a

12   license because that judge doesn't think kids ought to be

13   detained with unrelated adults, and that judge doesn't think

14   that these kids should be detained in insecure facilities

15   because it doesn't meet Texas licensing requirements.

16             So, I mean, the judge makes parsing reference

17   to Flores.  He -- he -- or she, I don't remember what, if

18   it's a he or she -- but that judge doesn't rely on Flores.

19   They rely on -- but they make parse -- they discuss, like, on

20   page 1 or 2.  It'd be:  Oh, yeah, Flores requires this or

21   that.  He doesn't rely on that.

22             But to me the notion:  Oh, we're in

23   compliance because we cannot get a license.  Well, yeah, you

24   cannot get a license because the -- the type of facility you

25   tried to set up doesn't meet Flores, and apparently it also
```

```
 1    doesn't meet Texas law.  So, for them to say:  Oh, that gets
 2    us out of the this agreement seems absurd, to me anyway.
 3                     With regards to the border patrol conditions,
 4    I mean, the -- the Court is aware --
 5                     They argue:  Oh, well, nothing in the
 6    settlement says we -- we have to give them shower, nothing
 7    says we have to let them sleep; nothing, you know, says we
 8    have to change their clothes if the little kids got soiled
 9    clothes or torn or they're wet because they came across the
10    river.
11                     So, I don't know how much the Court is
12    concerned with that.  All I can say is that paragraph 11 says
13    that:  The INS shall treat all minors in its custody with
14    dignity, respect and a special concern for their particular
15    vulnerability as minors.
16                     And 12A uses similar language.  It says that
17    they'll be kept in safe conditions, sanitary conditions, that
18    are consistent with the INS's concerned for the particular
19    vulnerability of minors.
20                     Then, true, no question, it goes on and does
21    identify three or four things, emergency supplies, adequate
22    temperature control, et cetera.  But --
23                     Drinking water, toilets.
24                     But --
25             THE COURT:  On that subject --
```

1              **MR. SCHEY:**  Yeah.

2              **THE COURT:**  All of the declarations seem to

3    indicate that there are drinking fountains and containers.

4              **MR. SCHEY:**  Containers.

5              **THE COURT:**  -- with water in it.

6                    If the problem is that the water, the tap

7    water there is just not very good are you --

8              **MR. SCHEY:**  I don't expect you to change --

9              **THE COURT:**  Because I noted in some of the

10   declarations, or one of them anyway, that they do have

11   environmental inspections of the water, and that at times the

12   water quality is problematic; and that when that happens, the

13   border patrol pays for portable water to be transported to

14   the check points until the ground water once again satisfies

15   testing.

16             **MR. SCHEY:**  Right, right.  You know, there's big

17   battles and little battles.  I don't think that's something I

18   want this Court to stay up at night about --

19                    I mean, I understand their position.

20                    I actually don't believe that Rio Grande --

21   umm -- umm -- (paused.)

22                    Well, let me just say this.  As I mentioned

23   in sort of the weekend final thing -- umm -- what they don't

24   refute is consistent declarations that say we have to share

25   cups in the places that don't, because some places don't have

```
1    water fountains, some places have water fountains.

2                    What -- what they don't refute are people who

3    say that they -- and numerous, probably 20 declarations that

4    say we had to share cups with other people.

5                    So, I think that piece is -- is -- is --

6    remains undisputed.  I think the showers remains undisputed.

7                    I don't know what this Court wants to do

8    about it.  It's a tough question.  But, you know, I have --

9                    We made some charts, which took somebody in

10   our office hours and days to prepare about every declaration.

11   So, I can look down a column and see how many people

12   complained about showers, and I can see how long was

13   everybody in custody, in border patrol custody.  It's --

14   it's -- it's pretty much --

15                   There isn't a single kid --

16                   And then the other one point --

17                   Sorry to bonus over here, but I wanted the

18   Court to understand.

19                   We have omitted monitoring capacity.  So,

20   they -- they kind of argue:  Oh, he only has a 100

21   declarations, or whatever it is, 60, 70, 80, 100.  Those are

22   declarations based on one visit per facility.

23                   So, when I go to that facility, that border

24   patrol station, and -- and I get to interview 30 people, and

25   29 say:  I've got a -- frozen sandwiches, I've got -- I have
```

1    no soap, I have no towels, I have no showers, I have no

2    change of clothes.  It's not like 29 out of 4,000 or 48,000

3    people that they've arrested during the year, it's 29 out of

4    30 people we're interviewing who happen to be there at that

5    time.

6                    I just want to put that in a context with the

7    Court.  If I had gone out and done this 10 times, we'd have a

8    thousand declarations, you know.  So I -- I just wanted that

9    piece to be clear.

10                   But going back to the conditions.  You know,

11   there on the showers -- they're -- things -- their --

12   their -- their policy that says:  When approaching 48 hours,

13   we'll do our best to give the kid a shower.

14                   If they gave a single one of the kids --

15   they -- let's say we gave a 100 declaration, whatever, 60,

16   70, 80 -- if they gave a single one of those kids a shower,

17   it should be monitored.  They could have told you about it.

18   They could have told me about.

19                   So, I have, whatever, what, 30 kids, 25 kids:

20   Oh, no showers even though I've been there for two or three

21   days.  They don't come back and say:  Oh, here's monitoring

22   reports, the way they do with the food.

23                   And the clean water --

24                   So, the food, the clean water, the

25   temperature, those things they monitor.  But they don't come

```
1    back and say:  Oh, yeah, here is monitoring.  We gave this
2    kid his clothes -- we gave him dry clothes.  Or here is
3    monitoring -- we gave this kid a -- a -- soap and water.
4    Here is monitoring.  We gave this kid a shower.  They -- they
5    don't monitor that.  And -- and the --
6              THE COURT:  Let me ask you a question about the
7    cold.
8              MR. SCHEY:  Yeah.
9              THE COURT:  That seems to be a very prevalent
10   complaint.
11             MR. SCHEY:  Extremely.
12             THE COURT:  And the explanation for why the
13   children are provided only with mylar blankets as the hygiene
14   and the -- the concern about the spread of communicable
15   diseases --
16             MR. SCHEY:  Right.
17             THE COURT:  -- which I can understand.
18                  So, it seems to me that the -- the
19   overarching issue is the temperature.
20             MR. SCHEY:  You know, there is -- I --
21                  I would say what brothers me the most is
22   probably the temperature, and their policy permits them to
23   keep it at 66; which, again, if you're 8-year-old, 10 years
24   old, you know, if you came here from Norway or Sweden, maybe
25   66 would seem like southern California; but when you're
```

```
 1    coming from Central America, and let's say -- now you start
 2    to add some things.
 3              Let's say they keep it at 66.  So, oh, we're
 4    in policy, 66 degrees, no problem.  But let's say you've
 5    crossed the Rio Grande and your clothes are wet and you're
 6    not given a change of clothes, which is -- I understand only
 7    some kids get wet; but, you know, a bunch of kids -- pretty
 8    much all of those kids are coming through the Rio Grande, so
 9    it's not going to be a small minority.  Some kids are -- I
10    don't know -- they're able to stay dry I guess when they
11    cross the river.
12              But then you add that, you know, I think they
13    even admitted in their deposition the average length of time
14    of a person in border patrol stations is 45 hours.  Well,
15    these kids -- that's average, most places they get them out
16    quicker.  Of course Rio Grande, large numbers, is going to be
17    slower.  Whatever.
18              Even if it's, less say, 48 hours.  If you
19    make a kid sleep on a concrete floor for 48 hours and the
20    temperature is 66, yeah that kid is going to be -- his teeth
21    are going to be chattering.
22              So, my big concern would be that, one would
23    be the temperature.  You know, the mylar blanket is fine if
24    they would give two blankets to a kid, I can live with that.
25    But to me a big problem -- two big problems or three.  One is
```

1    the temperature, the second is, in that area, they don't give

2    kids mats to sleep on.  And whereas in El Paso they do, in El

3    Centra --

4              When I got done deposing the chief of El

5    Centra -- I don't know if he's here today -- I said off the

6    record, this guy is amazing.  They're doing great job, had no

7    criticisms.  There was a real humanitarian concern there.

8              And of course I know they can say:  Well,

9    numbers are less, but nothing in the settlement says about

10   the condition says:  Oh, let's -- let's only treat kids with

11   special concern for their vulnerability as wide as -- if the

12   numbers are easy to deal with.  It just doesn't say that.

13             So, I -- I think the lack of mats in -- in

14   that district, which the judge also found as true in the

15   Arizona sectors, that judge has held, it's ridiculous.  And

16   he wasn't just talking about children, he's talking about

17   children and adults, and that's in the order that we -- we --

18   filed review, he said that's ridiculous, you can't have

19   people sleeping on a concrete floor.

20             And then the other -- the -- the other

21   issue --

22        **THE COURT:**  Okay.  You're going to need to wrap

23   up, Mr. Schey.

24        **MR. SCHEY:**  I will.

25             And the other issue that they in no way

1    refute, that they -- we -- I begged them throughout the

2    process from the start to finish which even penetrates those

3    settlement talks.

4                    I -- I have begged them -- and -- in

5    depositions I've requested, I've written to the government --

6    give us any evidence you have on this overcrowding because

7    all the reports that we have talk about severe overcrowding,

8    and that also prevents sleep, because there is -- there is

9    no -- there is literally --

10                   If you look at our declarations, that's --

11   consistently:  I was detained there for two or three days.  I

12   could barely -- my kid could barely sleep.  Or the kids say:

13   I could barely sleep.

14                   They talk about the cold.  They talk about

15   not mats, but they also talk about the cell was so

16   overcrowded, there was no place to lay down even on the

17   concrete floor.

18                   So, they -- they have not responded to any

19   requests to say, just show us any monitoring -- that they

20   don't monitor overcrowding.

21                   Show us any monitoring or start monitoring or

22   show us -- just show us where your policy is, other than to

23   tell us:  Oh, we have a policy, and we certainly don't

24   violate fire codes.

25                   I -- I started initiating a process, which I

1     guess would take year of city -- public interests, public

2     records requests of every county, but they also blew me off.

3     Nobody has really got back to me.  But to try to figure out

4     what are that codes?  What -- what is the capacity in that

5     thing?  But I've asked the government, did -- okay, if you

6     don't monitor it, at least give me the policies that you

7     operate under, and they said no.  Kind of sounds like the new

8     administration.  They said no, it's national security.  It's

9     a security.

10            **THE COURT:**  All right, well, your time is up.

11            **MR. SCHEY:**  So, that's where we are --

12            **THE COURT:**  Let me ask you one question --

13            **MR. SCHEY:**  Yes.

14            **THE COURT:**  -- relating to the pending motion for

15    a stay of the --

16            **MR. SCHEY:**  Of the --

17            **THE COURT:**  -- implementation of my order

18    regarding the bond hearing.

19            **MR. SCHEY:**  Yes.

20            **THE COURT:**  You have not filed a response.  Is it

21    not opposed then?

22            **MR. SCHEY:**  Oh, no, no.  We definitely are going

23    to opposite it.  I thought my cocounsel was going to -- maybe

24    he already has an agreement to get an extra couple of days.

25    I think the plan was to respond by either tonight or by

1    tomorrow.

2              But, yeah, we -- we definitely oppose their

3    application for a stay.  Which we -- we'll set forward the --

4    the arguments.  But we think they can easily do this.  They

5    can do it in front of immigration judges if they want to.

6              The truth is, it can probably be accomplished

7    other ways.  I mean ORR is part of, what, Department of

8    Health and Human Services?  They interface with their LJs all

9    the time, because people have issues about their eligibility

10   for benefits, so they interface with the whole federal

11   government and LJ system.

12             To be honest, we -- I mean --

13        **THE COURT:**  And how many people are affected by --

14             I thought it was a relatively a small number.

15        **MR. SCHEY:**  You know, I -- I don't honestly think

16   that we know precisely the -- the number.  It -- it -- it --

17             In one sense it affects everybody.  It

18   affects thousands, like, 18,000 people per year who

19   apprehended, who are unaccompanied, who are transferred to

20   the custody of ORR because ORR provides none of these kids

21   here.  And so, it -- it -- in one sense, it affects probably

22   about 18,000 kids.

23             Now, we have never said, and even that --

24   that motion, we've kind of -- for the moment we've kind of

25   set aside the question of how promptly should such a hearing

```
1    be provided?

2                    But let's say that they release -- and I

3    don't know what the number is that they release, but let's

4    say they release 90 percent of those kids fairly promptly.

5    So, you wouldn't -- as a practical matter, you wouldn't

6    really need a hearing in front of some sort of impartial ALJ,

7    I honestly don't know the -- the total numbers, but I don't

8    think it's in the thousands.

9                    I mean, I think ORR does a relatively decent

10   job of getting kids out of custody fairly promptly, and at

11   least they're placing kids in some licensed group homes.

12   They have contracts.

13        THE COURT:  Well, I think that was the reason I

14   had the impression that it wasn't a large number because

15   during the oral arguments on the underlying matter --

16        MR. SCHEY:  I -- I agree, yeah, I agree.  I don't

17   think it is large number, because I think most of them --

18                    I think ORR does a relatively good job of

19   placing kids fairly promptly.

20                    So, I don't think we are dealing with a large

21   number of people, and that -- that would -- that they would

22   have to take before some sort of an immigration judge or --

23   or something that was comparable.

24                    I think the numbers on that case are -- are

25   in the low -- you know.
```

1          **THE COURT:**  Well, let me ask Ms. Fabian.

2                Do you have some sort of communication with

3    opposing counsel regarding when their option will be filed?

4          **MS. FABIAN:**  Not to my knowledge; however, I've

5    been out here and traveling last week.  So, my colleague

6    needed to --

7                We did communicate with them before filing,

8    and we're told that they opposed; but to my knowledge, we

9    haven't had an agreement on -- on response time.

10         **THE COURT:**  All right.

11         **MR. SCHEY:**  I think we can give them either today

12   or tomorrow --

13         **THE COURT:**  All right.

14         **MR. SCHEY:**  -- but we definitely oppose it, and we

15   definitely believe the -- the numbers are low, and -- and --

16   and we don't think it would bring the government to a

17   standstill if they took those few kids before a judge.

18               I would just also say in closing that the

19   same is true of these kids in this motion, not one of them

20   has been taken to an immigration judge for -- for -- for a

21   custody redetermination hearing.

22               It's just like the settlement -- once they

23   go:  Oh, expedite removal.  Settlement vanishes.  Every part

24   of the settlement vanishes.  And including the -- the review

25   by an immigration judge.  So, not one --

```
 1                    I mean, every single declaration.

 2                    So, I interviewed --

 3                    When I went to these four facilities, and

 4    maybe -- at each facility I maybe interviewed 15 to 20 kids,

 5    and end up with about 60 to 70, 80 declarations.  Not one of

 6    those kids had been taken to see an immigration judge.

 7                    So, it's the same problem here.  We've got

 8    other problems, but I haven't focused that.

 9              THE COURT:  All right, thank you.

10              MR. SCHEY:  All right, thank you, Your Honor.

11              THE COURT:  All right.  I'm going to set a

12    deadline of tomorrow for plaintiffs to file their

13    opposition to the --

14              MR. SCHEY:  Stay.

15              THE COURT:  -- ex parte --

16              MR. SCHEY:  Sure.

17              THE COURT:  -- motion for a stay.

18              MR. SCHEY:  Sure, sure.

19              THE COURT:  And I'm going to ask counsel to file

20    simultaneous briefs of no more than five pages per side on

21    the subject of whether designation of an individual to

22    expedited removal requires mandatory detention, and whether

23    an expedited removal order is necessarily a final order of

24    removal.

25              MR. SCHEY:  Okay.  You want those tomorrow?
```

1    Wednesday?

2              **THE COURT:**  No, that will be -- that will be due

3    one week from today.

4              **MR. SCHEY:**  Okay.

5              **THE COURT:**  Five pages limit.

6              **MR. SCHEY:**  The second point was what?  Sorry.  I

7    have a short-term --

8              **THE COURT:**  It will be in the minute order.

9              **MR. SCHEY:**  Okay.  Got it.  Thank you.

10             **THE COURT:**  All right.  This matter will stand

11   submitted.

12             COURT CLERK:  This Court is adjourned.

13             (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2    I hereby certify that the foregoing is a true and correct

3    transcript of the stenographically recorded proceedings in

4    the above matter.

5    Fees charged for this transcript, less any circuit fee

6    reduction and/or deposit, are in conformance with the

7    regulations of the judicial conference of the United States.

8

9

10   /S/Anne Kielwasser                    02/09/2017

11   _____       _____
     Anne Kielwasser, CRR, RPR, CSR       Date
     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

'  

**19th** [1] - 44:14
**1ST** [1] - 1:23

## 2

**2** [2] - 27:17, 61:21
**2,000** [1] - 59:17
**20** [6] - 12:16, 37:25, 43:20, 59:5, 64:4, 74:5
**2000** [2] - 59:7, 60:11
**20044** [1] - 2:14
**201** [1] - 12:21
**2014** [4] - 22:14, 22:18, 22:20, 43:15
**2015** [3] - 22:11, 25:12, 26:13
**2016** [2] - 4:1, 27:3
**2017** [2] - 1:17, 3:2
**202-532-4737** [1] - 2:15
**202-616-4975** [1] - 2:15
**21** [3] - 32:11, 34:18, 61:1
**212** [1] - 36:7
**213** [1] - 1:24
**213-386-9484** [1] - 2:7
**213-388-8693** [1] - 2:6
**235** [1] - 36:5
**237** [2] - 35:25, 36:2
**240** [2] - 35:25, 53:21
**25** [2] - 28:12, 65:20
**256** [1] - 2:5
**29** [3] - 65:1, 65:3, 65:4

## 3

**3** [3] - 27:20, 27:24, 34:12
**30** [13] - 1:17, 3:2, 30:10, 43:21, 47:18, 47:20, 59:5, 59:6, 59:17, 60:10, 64:25, 65:5, 65:20
**350** [1] - 1:23

## 4

**4** [7] - 47:19, 56:7, 59:4, 59:6, 59:9, 59:16, 60:9
**4,000** [1] - 65:3
**40** [2] - 10:25, 12:11
**4455** [1] - 3:2
**45** [2] - 12:21, 67:15
**48** [4] - 59:14, 65:13,

67:19, 67:20
**48,000** [2] - 60:5, 65:3
**48,940** [1] - 45:8
**49,000** [1] - 60:6

## 5

**50,000** [1] - 59:14

## 6

**6** [4] - 33:8, 33:10, 33:12, 33:16
**60** [3] - 64:22, 65:16, 74:6
**602** [1] - 14:7
**66** [5] - 66:24, 67:1, 67:4, 67:5, 67:21

## 7

**70** [3] - 64:22, 65:17, 74:6

## 8

**8** [2] - 51:24, 52:9
**8-year-old** [1] - 66:24
**80** [4] - 47:20, 64:22, 65:17, 74:6
**85-4544** [1] - 3:6
**85-4544DMG** [1] - 1:10
**868** [1] - 2:14
**894-2969** [1] - 1:24

## 9

**90** [2] - 43:20, 72:5
**90012** [1] - 1:24
**90057** [1] - 2:6
**96** [2] - 47:17, 59:5
**99** [3] - 25:8, 43:20, 45:4
**9:30** [2] - 1:18, 3:2

## A

**A.M** [1] - 1:18, 3:2
**able** [10] - 11:22, 40:21, 40:25, 42:8, 43:6, 43:7, 55:20, 56:24, 67:11
**absolutely** [3] - 20:15, 26:18, 51:23
**absurd** [2] - 6:14, 62:3
**abundance** [1] - 13:1

**accept** [1] - 6:9
**accepted** [1] - 52:11
**accommodated** [1] - 42:13
**accommodation** [1] - 34:3
**accommodations** [1] - 34:21
**accompanied** [3] - 49:11, 49:12, 50:11
**accompanying** [2] - 10:18, 22:24
**accomplished** [3] - 28:2, 32:3, 71:7
**accordance** [1] - 54:12
**according** [3] - 24:4, 43:21, 50:9
**account** [2] - 50:17, 51:5
**accounting** [1] - 38:7
**acknowledge** [3] - 9:19, 49:22, 56:9
**Act** [1] - 35:25
**action** [1] - 16:9
**activity** [1] - 37:25
**add** [2] - 67:3, 67:13
**added** [1] - 47:14
**additional** [4] - 39:25, 42:5, 42:9, 47:14
**address** [3] - 18:21, 37:21, 48:9
**addressed** [1] - 25:10
**adequate** [1] - 62:22
**adjourned** [1] - 75:13
**administration** [1] - 70:9
**admissibility** [2] - 6:11, 36:19
**admissible** [2] - 5:11, 10:8
**admission** [2] - 5:10, 9:22
**admitted** [2] - 5:22, 67:14
**adult** [1] - 50:24
**adults** [2] - 61:14, 68:18
**advance** [2] - 5:8, 14:11
**advice** [1] - 21:23
**advocate** [1] - 27:5
**affected** [1] - 71:14
**affects** [3] - 71:18, 71:19, 71:22
**age** [1] - 21:23
**agencies** [3] - 16:12, 16:14, 57:13
**agent** [2] - 38:22, 61:8
**agents** [3] - 36:4,

40:5, 40:7
**ago** [5] - 15:19, 23:25, 24:4, 24:6
**agree** [4] - 16:11, 57:2, 72:17
**Agreement** [8] - 10:14, 10:15, 37:13, 37:20, 48:10, 57:16, 57:21, 57:24
**agreement** [25] - 15:21, 15:23, 16:2, 16:22, 32:19, 32:20, 33:4, 49:2, 49:14, 50:5, 50:16, 50:21, 52:20, 52:21, 52:23, 52:24, 53:7, 53:10, 54:5, 56:4, 56:16, 56:18, 62:3, 70:25, 73:10
**agreements** [2] - 15:22, 31:7
**agrees** [1] - 16:14
**aimed** [1] - 18:24
**aKtranscripts.com** [1] - 1:25
**al** [2] - 1:12, 3:7
**alien** [1] - 36:7
**aliens** [2] - 35:24, 36:2
**ALJ** [1] - 72:7
**allocated** [1] - 10:23
**allow** [3] - 4:6, 52:4, 54:1
**allowed** [2] - 4:7, 11:23
**alluded** [1] - 52:3
**amazing** [1] - 68:7
**amenable** [1] - 19:20
**America** [1] - 67:2
**amount** [1] - 15:4
**analysis** [3] - 15:14, 27:12, 55:18
**Angeles** [3] - 1:17, 1:24, 2:6
**Anne** [1] - 76:11
**ANNE** [1] - 1:22
**anne.kielwasser@gmail.com** [1] - 1:25
**Answer** [2] - 45:24, 46:2
**answer** [6] - 21:9, 22:1, 42:17, 45:7, 46:4, 51:18
**anyway** [4] - 14:14, 33:18, 62:3, 63:11
**apologize** [1] - 5:7
**appeal** [1] - 61:5
**appealed** [2] - 35:20, 35:22
**appeals** [2] - 17:15, 20:18

---

'**15** [2] - 15:16, 15:17
'**96** [1] - 22:18

## /

/S/Anne [1] - 76:10

## 0

02/09/2017 - 76:10

## 1

**1** [6] - 3:6, 27:16, 32:19, 35:20, 35:21, 61:21
**1,950** [1] - 45:9
**10** [5] - 16:6, 16:8, 38:20, 65:8, 66:24
**100** [6] - 12:25, 25:8, 27:14, 64:21, 64:22, 65:16
**106** [2] - 6:18, 6:20
**11** [3] - 33:20, 33:21, 62:13
**110** [3] - 6:3, 6:4, 6:18
**12** [2] - 30:5, 30:14
**1225** [2] - 51:24, 55:24
**12502f1** - 56:2
**1252F1** [4] - 52:10, 52:15, 52:23, 53:1
**12A** [7] - 33:23, 34:9, 34:10, 34:13, 34:21, 62:17
**14** [7] - 10:16, 29:16, 31:3, 32:9, 32:14, 33:24, 48:18
**14.1** [1] - 46:10
**15** [7] - 12:16, 15:2, 28:14, 30:4, 30:5, 60:8, 74:5
**16** [1] - 60:8
**17** [4] - 22:18, 31:23, 32:2, 32:6
**18** [4] - 29:8, 29:13, 48:15, 49:1
**18,000** [2] - 71:19, 71:23
**1850** [1] - 59:10
**19** [11] - 10:16, 23:21, 31:1, 32:8, 33:7, 33:25, 34:14, 44:19, 46:8, 46:24, 47:16
**1950** [2] - 46:7, 59:9
**1996** [2] - 20:2, 26:10

Appeals [3] - 17:16, 20:17, 61:5
appear [5] - 5:15, 12:24, 12:25, 21:25, 39:15
appearance [1] - 31:5
appearances [1] - 3:8
appearing [1] - 3:10
application [1] - 71:4
applies [1] - 15:25
apply [2] - 26:6, 26:17
applying [1] - 26:14
appoint [1] - 58:2
apprehend [1] - 18:16
apprehended [2] - 60:6, 71:20
approaching [1] - 65:13
appropriate [1] - 33:22
April [1] - 25:11
area [1] - 68:2
areas [2] - 33:15, 33:18
argue [4] - 23:4, 23:6, 62:6, 64:21
argued [4] - 18:14, 52:9, 60:14, 60:17
argument [5] - 13:2, 25:24, 26:5, 33:5, 48:10
arguments [4] - 48:22, 48:23, 71:5, 72:16
Arizona [1] - 68:16
arrested [1] - 65:4
arrived [1] - 26:10
aside [2] - 9:13, 72:1
assessment [3] - 31:25, 32:5, 40:11
associate [1] - 3:12
assume [2] - 25:8, 59:16
assuming [1] - 53:2
assumption [1] - 4:16
attached [1] - 47:9
attachment [2] - 48:6
attention [2] - 9:16, 10:12
attorney [4] - 3:11, 3:21, 11:21, 13:15
Attorney [1] - 17:16
August [5] - 15:17, 37:10, 37:14, 39:23, 49:18
authority [3] - 31:24, 52:4, 52:25
automatic [1] - 24:15
available [13] - 6:25, 13:3, 33:6, 33:24, 33:25, 41:25, 42:10,

50:8, 50:13, 54:20, 54:24, 54:25
average [8] - 30:5, 45:16, 46:9, 46:21, 59:20, 59:23, 67:14, 67:16
averages [3] - 44:14, 44:17, 44:22
awaiting [1] - 43:1
aware [1] - 62:5

B

barely [3] - 69:13, 69:14
bargained [3] - 30:6, 30:7
based [6] - 7:19, 19:16, 27:18, 36:17, 36:18, 64:23
basis [4] - 10:1, 52:16, 52:25, 56:3
battles [1] - 63:18
become [2] - 33:21, 51:5
bed [2] - 21:20, 21:24
began [1] - 38:4
begged [2] - 69:2, 69:5
begin [1] - 15:15
beginning [1] - 41:10
begins [1] - 33:20
BEHALF [1] - 2:3, 2:9
behalf [1] - 3:15
Ben [1] - 2:14
benefit [2] - 16:22, 25:16
benefits [2] - 16:21, 71:11
Bergs [1] - 29:24
best [2] - 42:17, 65:14
better [1] - 42:17
between [2] - 45:16, 45:19
beyond [1] - 47:22
big [4] - 63:17, 67:23, 68:1
bigger [1] - 41:20
bill [1] - 20:2
birks [1] - 22:15
bit [1] - 49:17
blah [1] - 33:18
blanket [10] - 9:14, 9:15, 9:19, 9:21, 9:22, 9:25, 10:5, 35:14, 40:12, 67:24
blankets [2] - 66:14, 67:25
blew [1] - 70:3

board [1] - 20:19
Board [5] - 17:15, 20:16, 20:17, 61:5
boarder [1] - 49:22
bologna [1] - 39:5
bond [1] - 70:19
bonus [1] - 64:18
book [4] - 45:17, 45:19, 45:20
book-in [1] - 45:19
book-out [1] - 45:19
border [30] - 18:17, 21:11, 21:17, 21:24, 25:20, 28:18, 33:1, 36:4, 36:23, 37:6, 37:12, 37:13, 37:15, 37:18, 37:20, 39:10, 39:24, 41:1, 41:2, 41:13, 42:24, 43:11, 43:15, 49:6, 61:7, 62:4, 63:14, 64:14, 64:24, 67:15
Border [4] - 3:3, 10:14, 11:3, 11:18
bottom [5] - 44:21, 46:6, 46:19, 46:22, 47:9
Boulevard [1] - 2:5
Box [1] - 2:14
boys [1] - 21:23
brain [1] - 27:22
breach [1] - 33:11
bread [1] - 39:5
brief [1] - 15:4
briefed [1] - 54:22
briefing [7] - 4:9, 15:4, 15:12, 16:4, 26:1, 26:2, 44:15
briefs [3] - 15:5, 25:22, 74:21
bring [2] - 8:11, 73:17
Bristow [2] - 37:17, 38:6
broad [2] - 17:24, 17:25
broadly [1] - 19:20
brothers [1] - 66:22
brought [4] - 6:24, 8:3, 43:1, 53:17
bunch [1] - 67:8
business [1] - 33:1
busted [1] - 36:19

C

CA [1] - 2:6
calculation [1] - 47:19
CALIFORNIA [1] - 1:2
California [4] - 1:17,

1:24, 15:25, 67:1
cannot [9] - 27:6, 27:25, 28:1, 35:21, 49:14, 61:9, 61:12, 61:24, 61:25
capabilities [2] - 42:5, 47:22
capacity [2] - 64:20, 70:5
care [1] - 41:25
Carlton [1] - 2:11
carlton.f.sheffield@ usdoj.gov [1] - 2:16
carried [1] - 49:10
case [11] - 5:11, 10:25, 17:19, 24:2, 24:5, 32:8, 43:12, 50:20, 52:14, 57:25, 72:25
cases [9] - 7:19, 16:4, 20:17, 25:8, 29:21, 51:13, 55:17, 55:20, 55:23
Castro [1] - 53:15
catch [1] - 34:5
catch-all [1] - 34:5
category [1] - 48:4
caution [1] - 13:1
cell [1] - 69:16
center [2] - 25:23, 25:24
Center [1] - 2:5
centers [2] - 46:8, 47:3
Centra [2] - 68:4, 68:6
CENTRAL [1] - 1:2
Central [1] - 67:2
certain [3] - 10:18, 21:23, 46:17
certainly [11] - 6:12, 6:14, 19:22, 19:23, 20:24, 24:15, 38:17, 40:12, 43:15, 59:23, 69:24
certified [1] - 16:8
certify [1] - 76:2
cetera [1] - 62:23
challenge [1] - 53:17
challenges [2] - 53:14
change [5] - 45:23, 62:9, 63:9, 65:3, 67:7
changes [2] - 26:5, 43:13, 58:25
charged [1] - 76:5
chart [5] - 44:6, 44:9, 47:9, 47:24, 51:7
charts [1] - 64:10
chattering [1] - 67:22
check [1] - 63:15
Chief [7] - 3:23, 38:7,

38:18, 39:9, 40:15, 41:17, 58:4
chief [3] - 38:8, 42:16, 68:5
child [14] - 18:18, 25:1, 25:14, 36:7, 38:20, 49:6, 49:8, 50:8, 50:14, 50:15, 50:17, 50:18, 50:24, 51:14
child's [1] - 19:4
children [15] - 22:24, 23:1, 23:6, 38:24, 41:25, 42:2, 42:10, 49:5, 49:7, 49:15, 59:22, 60:18, 66:14, 68:17, 68:18
chronological [1] - 29:1
circle [2] - 15:13, 15:14
circuit [1] - 76:5
Circuit [9] - 16:11, 20:16, 24:11, 25:17, 26:4, 26:7, 26:9, 52:18, 53:16
circumstance [2] - 22:2, 22:3
circumstances [2] - 10:18, 19:17
citation [2] - 17:12, 17:13
citations [1] - 17:11
cited [2] - 17:14, 20:17
citing [1] - 17:18
city [1] - 70:2
Civil [1] - 2:13
claim [7] - 16:20, 31:15, 53:21, 60:18, 60:19, 60:22, 60:23
claims [1] - 54:2
clarify [1] - 41:9
class [12] - 15:10, 16:7, 16:9, 16:17, 18:8, 18:9, 18:22, 23:4, 23:7, 25:25, 29:2, 29:3
classes [1] - 35:24
classwide [4] - 52:16, 52:25, 56:3, 56:10
clean [2] - 65:24, 65:25
clear [13] - 3:25, 8:5, 9:4, 15:20, 24:1, 24:3, 24:7, 25:15, 26:19, 26:25, 46:5, 48:20, 65:10
clearly [3] - 32:21, 48:14, 52:23
CLERK [2] - 3:6, 75:13

**client** [2] - 18:24, 58:7
**clients** [1] - 56:23
**close** [3] - 20:2, 24:25, 59:14
**closing** [1] - 73:19
**clothes** [7] - 62:9, 62:10, 65:3, 66:3, 67:6, 67:7
**cocounsel** [1] - 70:24
**codes** [2] - 69:25, 70:5
**coincides** [1] - 39:18
**cold** [2] - 66:8, 69:15
**Colin** [3] - 2:11, 3:19, 11:17
**colin.kisor@usdoj. gov** [1] - 2:17
**colleague** [1] - 73:6
**column** [2] - 46:14, 64:12
**coming** [2] - 67:2, 67:9
**commence** [1] - 11:5
**comment** [1] - 4:18
**communicable** [1] - 66:15
**communicate** [1] - 73:8
**communication** [1] - 73:3
**comparable** [1] - 72:24
**complained** [1] - 64:13
**complaint** [1] - 66:11
**completely** [1] - 53:1
**compliance** [5] - 37:19, 38:4, 38:13, 39:1, 61:24
**compliant** [4] - 38:22, 40:8, 40:17, 49:1
**complied** [1] - 49:6
**comply** [3] - 50:20, 53:7, 57:4
**complying** [1] - 37:13
**comprehensively** [1] - 37:19
**concedes** [1] - 21:1
**concept** [1] - 48:13
**concern** [6] - 13:2, 62:15, 66:15, 67:23, 68:8, 68:12
**concerned** [2] - 62:13, 62:19
**concluded** [1] - 75:14
**concrete** [3] - 67:20, 68:20, 69:18
**condition** [1] - 68:11
**conditions** [6] - 10:13, 11:2, 62:4, 62:18, 65:11

**conduct** [2] - 31:24, 36:1
**conducted** [1] - 9:6
**conference** [1] - 76:7
**configuration** [1] - 21:21
**confirm** [1] - 46:20
**conformance** [1] - 76:6
**Congress** [1] - 20:1
**consider** [6] - 5:2, 7:24, 10:4, 27:15, 35:12, 36:15
**considered** [3] - 5:21, 36:12, 41:12
**considering** [1] - 44:22
**consist** [1] - 46:22
**consistent** [5] - 7:2, 39:16, 39:23, 62:19, 63:25
**consistently** [2] - 7:9, 69:12
**Constitutional** [1] - 2:5
**construction** [2] - 15:24, 33:5
**construe** [1] - 37:22
**containers** [2] - 63:4, 63:5
**contemplate** [1] - 50:14
**contention** [1] - 51:20
**context** [1] - 65:7
**continue** [3] - 5:20, 29:17, 55:19
**continuos** [1] - 30:17
**continuous** [3] - 29:15, 30:23, 48:17
**contract** [1] - 34:2
**contracted** [2] - 23:19, 23:20
**contracts** [2] - 32:16, 72:13
**contrary** [1] - 50:4
**control** [1] - 62:23
**controversial** [1] - 20:5
**conversation** [1] - 24:21
**coordinator** [4] - 57:7, 57:24, 58:5, 58:7
**coordinators** [3] - 57:9, 57:10, 57:12
**copy** [1] - 44:3
**correct** [7] - 12:3, 12:6, 19:12, 20:9, 53:2, 61:8, 76:2
**correctly** [1] - 47:13
**correspondence** [1] -

32:14
**counsel** [5] - 13:10, 27:6, 73:4, 74:20
**Counsel** [2] - 3:8, 3:23
**counsel's** [1] - 10:12
**count** [3] - 6:18, 45:15, 45:25
**counted** [2] - 45:22, 46:19
**counting** [1] - 58:23
**country** [4] - 6:5, 8:3, 51:12, 52:7
**county** [1] - 70:3
**couple** [2] - 25:3, 27:7, 70:25
**course** [12] - 12:23, 17:16, 26:4, 27:9, 28:18, 43:11, 44:25, 46:11, 48:1, 57:4, 67:17, 68:9
**court** [11] - 6:8, 7:8, 7:19, 9:6, 9:20, 12:13, 12:25, 13:24, 22:5, 54:23, 61:11
**COURT** [114] - 1:1, 3:6, 3:17, 3:24, 5:6, 6:1, 7:18, 8:13, 8:15, 9:3, 9:12, 9:23, 10:10, 11:6, 11:11, 11:15, 11:16, 11:25, 12:4, 12:7, 12:18, 13:11, 13:13, 13:17, 13:20, 14:10, 14:19, 14:22, 16:24, 17:1, 17:18, 17:21, 17:24, 18:1, 19:6, 19:9, 19:13, 20:8, 20:13, 20:22, 23:16, 27:4, 27:9, 28:10, 28:13, 32:22, 33:2, 35:10, 36:22, 36:25, 37:3, 37:5, 37:21, 39:3, 39:13, 40:19, 41:4, 41:7, 41:19, 42:11, 42:19, 43:17, 44:2, 45:8, 45:13, 46:22, 46:25, 47:4, 47:17, 48:9, 49:11, 50:4, 51:18, 53:2, 54:18, 55:5, 56:8, 56:14, 57:5, 57:15, 57:19, 58:1, 58:8, 58:13, 59:9, 63:1, 63:3, 63:6, 63:10, 66:7, 66:10, 66:13, 66:18, 68:23, 70:11, 70:13, 70:15, 70:18, 70:21, 71:14, 72:14, 73:2, 73:11, 73:14, 74:10, 74:12, 74:16, 74:18,

74:20, 75:3, 75:6, 75:9, 75:11, 75:13
**Court** [53] - 1:23, 5:2, 5:3, 5:20, 7:13, 7:16, 9:2, 11:8, 11:9, 14:8, 15:6, 15:16, 15:20, 17:13, 22:9, 22:11, 23:3, 23:24, 23:25, 24:2, 24:14, 25:10, 25:13, 27:12, 27:15, 27:25, 28:2, 29:19, 30:5, 31:24, 32:7, 32:17, 33:23, 37:11, 37:12, 41:18, 43:25, 52:10, 52:15, 52:18, 57:2, 61:12, 62:5, 62:12, 63:19, 64:8, 64:19, 65:8, 75:13, 76:11
**Court's** [10] - 4:19, 4:25, 5:8, 9:5, 10:2, 37:10, 37:14, 38:3, 39:23, 56:7
**courtroom** [3] - 11:21, 12:8, 12:10
**courts** [4] - 23:8, 53:18, 55:8, 55:9
**covers** [1] - 35:5
**created** [2] - 14:1, 14:3
**creating** [1] - 20:6
**creation** [1] - 12:15
**credibility** [6] - 7:11, 7:16, 13:23, 40:11, 40:14, 40:15
**credible** [11] - 21:4, 30:1, 30:3, 30:16, 31:12, 31:19, 53:20, 54:2, 54:4, 60:22, 60:23
**credibly** [1] - 7:14
**critical** [1] - 33:19
**criticisms** [1] - 68:8
**cross** [21] - 4:3, 4:8, 5:3, 5:5, 5:19, 5:24, 7:1, 8:1, 8:7, 8:9, 8:19, 8:25, 9:8, 12:12, 13:4, 13:5, 13:13, 14:12, 14:16, 28:7, 67:12
**cross-examination** [9] - 4:3, 5:5, 5:24, 7:1, 8:7, 9:8, 13:4, 14:16, 28:7
**cross-examine** [9] - 4:8, 5:3, 5:19, 8:1, 8:9, 8:25, 12:12, 13:13, 14:12
**cross-examined** [2] - 8:19, 13:5

**crossed** [1] - 67:6
**CRR** [2] - 1:22, 76:11
**CSR** [2] - 1:22, 76:11
**cups** [2] - 64:1, 64:5
**current** [3] - 18:15, 42:15, 42:22
**custody** [30] - 7:14, 10:17, 16:11, 16:18, 16:23, 21:18, 29:14, 29:18, 29:20, 29:24, 30:8, 30:18, 30:22, 31:2, 32:10, 43:18, 44:23, 45:6, 46:7, 47:25, 48:16, 49:7, 51:6, 62:14, 64:14, 71:21, 72:11, 73:22
**Customs** [5] - 3:23, 10:13, 11:2, 11:18, 11:19
**customs** [1] - 41:2
**CV** [2] - 1:10, 3:6
**CVP** [3] - 40:20, 49:7, 57:10

# D

**danger** [1] - 34:7
**dangerousness** [1] - 19:22
**date** [11] - 22:1, 44:15, 44:19, 46:8, 46:10, 46:24, 47:11, 47:14, 47:16, 48:1, 48:8
**Date** [1] - 76:11
**Dawn** [2] - 2:12, 3:21
**days** [24] - 23:25, 24:6, 25:3, 25:4, 30:4, 30:5, 32:3, 35:2, 43:20, 43:21, 46:10, 46:13, 47:18, 59:5, 59:6, 59:17, 60:10, 60:20, 64:11, 65:22, 69:12, 70:25
**deadline** [1] - 74:13
**deal** [5] - 6:12, 10:1, 19:3, 59:25, 68:13
**dealing** [1] - 72:21
**dealt** [2] - 9:23, 29:2
**December** [1] - 38:5
**decent** [1] - 72:10
**decide** [3] - 7:13, 7:19, 36:1
**decided** [2] - 22:12, 22:20
**deciding** [2] - 36:6
**decision** [2] - 10:6, 17:15
**declarants** [1] - 39:18
**declaration** [16] -

12:11, 13:24, 14:5, 24:4, 27:16, 27:17, 29:23, 41:19, 44:7, 44:11, 47:24, 48:6, 58:19, 64:11, 65:16, 74:2

**declarations** [36] - 5:10, 5:21, 6:3, 6:7, 6:9, 6:10, 7:7, 7:10, 7:20, 7:21, 7:23, 7:25, 9:6, 9:20, 9:22, 10:3, 12:1, 12:16, 14:3, 27:14, 39:4, 42:20, 47:6, 47:10, 50:9, 51:1, 63:3, 63:11, 63:25, 64:4, 64:22, 64:23, 65:9, 69:11, 74:6

**declared** [1] - 14:6

**deemed** [1] - 30:15

**defendant** [1] - 33:21

**defendants** [10] - 1:13, 3:16, 4:22, 10:16, 16:23, 17:9, 18:8, 18:16, 20:19, 30:24

**DEFENDANTS** [1] - 2:9

**defendants'** [1] - 16:20

**defer** [3] - 45:12, 58:3, 58:7

**defined** [1] - 16:9

**definitely** [7] - 18:21, 30:13, 30:15, 70:23, 71:3, 73:15, 73:16

**definition** [9] - 16:7, 16:17, 17:2, 18:3, 20:11, 29:3, 29:4, 32:17, 51:21

**degrees** [1] - 67:5

**Del** [1] - 40:23

**delay** [5] - 21:19, 31:8, 31:18, 31:19, 31:22

**delved** [1] - 21:12

**demonstrative** [1] - 43:24

**Department** [4] - 2:13, 3:15, 16:15, 71:8

**deport** [1] - 35:21

**deportability** [2] - 36:2, 36:6

**deportable** [1] - 35:24

**deportation** [6] - 35:17, 35:19, 36:16, 36:18, 60:25, 61:4

**deportations** [1] - 36:16

**depose** [2] - 28:6, 58:19

**deposed** [4] - 13:9, 28:5, 28:6, 58:21

**deposing** [1] - 68:5

**deposit** [1] - 76:6

**deposition** [8] - 4:7, 13:6, 13:14, 13:17, 14:17, 38:19, 45:14, 67:14

**depositions** [8] - 4:21, 4:22, 5:1, 21:3, 21:10, 21:13, 26:18, 69:6

**deputy** [1] - 3:20

**derived** [1] - 42:19

**describing** [1] - 7:14

**deserve** [1] - 9:16

**designate** [7] - 5:15, 6:1, 8:13, 8:14, 8:16, 8:23, 14:11

**designated** [12] - 4:4, 4:11, 4:15, 5:4, 6:20, 6:23, 7:3, 8:18, 17:1, 21:16, 57:16, 57:21

**designating** [1] - 5:14

**designation** [1] - 74:22

**designed** [3] - 42:1, 43:14, 44:10

**desire** [2] - 50:14, 50:16

**detail** [1] - 21:13

**detailed** [2] - 4:25, 35:4

**detain** [9] - 20:20, 23:1, 23:5, 24:24, 30:13, 34:18, 34:19, 34:25, 52:25

**detained** [27] - 15:11, 16:10, 16:17, 16:22, 18:23, 18:25, 20:23, 22:15, 24:24, 34:11, 38:3, 45:18, 46:3, 47:18, 55:19, 55:21, 56:2, 59:12, 59:13, 59:16, 59:21, 59:22, 60:6, 60:10, 61:14, 61:15, 69:12

**detainee** [1] - 21:12

**detaining** [1] - 22:20

**detention** [33] - 16:20, 17:3, 17:5, 17:7, 17:8, 17:10, 18:4, 18:13, 19:2, 19:15, 20:11, 22:13, 26:2, 26:3, 26:16, 29:5, 31:4, 31:16, 34:2, 39:17, 46:23, 47:11, 50:23, 51:15, 51:16, 51:22, 52:7, 52:13, 53:11, 54:6, 55:24,

57:14, 74:23

**determination** [6] - 7:11, 19:16, 29:22, 30:3, 35:13, 36:12

**determine** [3] - 7:16, 21:14, 21:20

**determined** [1] - 30:15

**determines** [1] - 31:4

**difference** [3] - 11:8, 27:15, 45:16

**different** [6] - 15:24, 17:8, 26:12, 26:14, 35:5, 57:11

**digest** [1] - 44:10

**dignity** [1] - 62:15

**dily** [1] - 24:3

**direct** [5] - 5:22, 6:6, 9:7, 12:5

**directly** [1] - 43:7

**director** [1] - 3:20

**discovered** [1] - 58:22

**discrepancies** [1] - 37:21

**discretion** [9] - 17:9, 17:22, 17:24, 18:2, 18:18, 18:25, 19:10, 19:14, 20:20

**discretionary** [2] - 26:3, 52:12

**discuss** [2] - 19:3, 61:20

**discussed** [2] - 20:1, 47:3

**discusses** [1] - 24:2

**Discussion** [1] - 44:5

**diseases** [1] - 66:16

**dispute** [2] - 20:13, 53:12

**disputed** [1] - 7:12

**disregard** [1] - 7:21

**disregarded** [1] - 9:9

**DISTRICT** [2] - 1:1, 1:2

**district** [2] - 9:5, 68:15

**Division** [1] - 2:13

**divisions** [1] - 41:2

**Docket** [1] - 2:21

**docket** [1] - 4:15

**document** [1] - 2:14

**DOLLY** [1] - 1:4

**done** [6] - 31:12, 32:1, 34:8, 34:16, 65:8, 68:5

**down** [6] - 30:5, 34:17, 45:1, 58:18, 64:12, 69:17

**dragging** [1] - 6:5

**drill** [1] - 58:18

**drinking** [1] - 62:24, 63:4

**drive** [1] - 58:19

**drop** [1] - 45:3

**dry** [2] - 66:3, 67:11

**due** [2] - 7:5, 75:3

**duplicative** [1] - 14:17

**during** [6] - 4:20, 13:13, 39:8, 39:18, 65:4, 72:16

## E

**e-mail** [4] - 2:7, 2:16, 2:16, 2:17

**E3** [5] - 39:17, 39:21, 39:24, 40:2

**E3DM** [1] - 37:17

**early** [4] - 24:22, 24:23, 38:3, 38:21

**easily** [1] - 71:5

**easy** [3] - 35:8, 44:10, 68:13

**effect** [3] - 26:16, 46:14, 56:18

**effected** [1] - 32:14

**effort** [1] - 4:10

**efforts** [8] - 10:17, 29:15, 29:17, 30:23, 33:17, 48:17, 50:2, 54:11

**eight** [1] - 22:16

**either** [7] - 4:15, 21:19, 37:23, 51:8, 55:15, 71:1, 73:12

**El** [4] - 41:6, 68:3, 68:5

**element** [1] - 16:13

**elicited** [1] - 14:5

**eligibility** [1] - 71:10

**eligible** [1] - 51:9

**Elmo** [1] - 44:1

**emergency** [1] - 62:22

**end** [2] - 44:20, 74:6

**enforcement** [1] - 52:5

**Enforcement** [1] - 11:19

**enforcing** [2] - 26:23, 26:24

**English** [1] - 29:12

**enhance** [1] - 39:24

**enhanced** [1] - 40:2

**enjoined** [3] - 24:4, 24:5, 24:8

**ensure** [1] - 31:6

**ensured** [1] - 40:17

**enter** [1] - 42:3

**entered** [2] - 24:7, 52:24

**entering** [2] - 38:12, 38:22

**entirely** [1] - 7:7

**entries** [1] - 38:17

**entry** [3] - 37:23, 40:22, 41:11

**environmental** [1] - 63:12

**envisioned** [1] - 24:23

**equipped** [1] - 34:2

**escape** [5] - 19:18, 19:21, 32:12, 35:13, 36:10, 61:2

**especially** [1] - 58:18

**et** [3] - 1:12, 3:7, 62:23

**evaluate** [1] - 13:23

**Evidence** [2] - 9:24, 14:7

**evidence** [4] - 10:7, 22:12, 56:10, 69:7

**evidentiary** [7] - 4:2, 4:10, 6:12, 8:18, 9:7, 9:14, 9:18

**EVIDENTIARY** [2] - 1:16, 3:4

**ex** [1] - 74:16

**exactly** [2] - 19:19, 19:23

**examination** [10] - 4:3, 5:5, 5:24, 7:1, 8:7, 9:8, 13:4, 14:16, 28:7

**examine** [9] - 4:8, 5:3, 5:19, 8:1, 8:9, 8:25, 12:12, 13:13, 14:12

**examined** [2] - 8:19, 13:5

**example** [1] - 37:23

**except** [4] - 16:18, 16:19, 26:13, 32:10

**exception** [2] - 30:19, 52:2

**excerpts** [1] - 5:1

**excludes** [2] - 29:4, 29:5

**excuse** [1] - 27:2

**executable** [9] - 51:11, 53:23, 54:3, 60:15, 60:16, 60:24, 61:3, 61:4, 61:7

**executed** [3] - 54:1, 55:21, 55:22

**executive** [1] - 20:4

**exercise** [3] - 18:2, 18:18, 19:13

**exercised** [1] - 18:25

**Exhibit** [2] - 12:21, 32:19

**exhibits** [2] - 15:6, 53:16

**exist** [1] - 55:4

**existed** [1] - 39:21

**expect** [2] - 6:14, 63:9

**expected** [1] - 6:18

expedite [1] - 73:24
expedited [33] - 16:18, 17:2, 17:9, 18:2, 18:9, 18:13, 18:18, 18:22, 19:1, 19:11, 20:1, 20:6, 20:10, 20:23, 21:5, 21:7, 21:8, 26:15, 29:4, 30:19, 30:24, 31:14, 35:7, 35:18, 35:24, 36:4, 36:17, 51:20, 53:4, 53:18, 53:23, 74:23, 74:24
expeditiously [2] - 34:15, 34:23
experience [1] - 43:16
experienced [2] - 39:19
experiences [1] - 7:14
expert [2] - 27:11, 27:21
explained [2] - 40:3, 52:17
explaining [1] - 40:15
explanation [3] - 38:21, 47:10, 66:13
extent [6] - 9:25, 14:10, 14:15, 38:15, 53:7, 54:20
extra [1] - 70:25
extremely [2] - 33:14, 66:12

**F**

Fabian [5] - 2:10, 3:15, 5:6, 37:3, 73:2
FABIAN [45] - 3:14, 3:19, 5:7, 6:17, 8:8, 8:14, 8:21, 9:11, 9:17, 10:9, 37:4, 37:6, 38:1, 39:7, 39:21, 40:24, 41:6, 41:8, 41:23, 42:15, 42:21, 43:24, 44:4, 44:6, 45:12, 46:4, 46:24, 47:2, 47:5, 47:21, 48:21, 49:12, 50:22, 51:23, 53:9, 54:19, 55:7, 56:12, 56:19, 57:9, 57:17, 57:20, 58:3, 58:12, 73:5
facilitate [1] - 57:13
facilities [23] - 10:14, 11:3, 23:12, 23:14, 23:17, 24:9, 27:2, 32:16, 33:6, 33:13, 42:13, 46:25, 47:3,

53:8, 54:11, 54:14, 54:23, 54:24, 57:11, 59:18, 61:15, 74:4
facility [24] - 23:19, 23:20, 32:21, 33:9, 34:2, 34:14, 34:21, 41:3, 41:20, 41:21, 41:23, 41:24, 42:9, 43:2, 43:8, 43:14, 44:20, 50:1, 59:24, 61:25, 64:23, 64:24, 74:5
fact [5] - 23:22, 24:20, 26:3, 38:19, 42:7
factor [3] - 19:22, 19:23, 36:12
factors [2] - 35:16, 36:15
facts [1] - 7:12
factual [1] - 10:20, 37:8
fair [3] - 42:11, 45:21, 46:14
fairly [4] - 38:3, 72:5, 72:11, 72:20
family [14] - 21:7, 21:21, 22:13, 29:15, 29:17, 30:23, 42:2, 42:3, 46:7, 47:2, 48:17, 49:8, 51:1
far [4] - 4:14, 40:9, 41:18, 54:17
Fax [2] - 2:7, 2:15
fear [13] - 21:4, 30:1, 30:3, 30:16, 31:12, 31:20, 53:20, 54:2, 54:4, 60:18, 60:19, 60:22, 60:23
fed [2] - 38:20, 38:25
federal [2] - 6:8, 71:11
Federal [1] - 1:23
fee [1] - 76:5
fees [1] - 76:5
felt [1] - 5:1
few [4] - 23:25, 24:6, 37:9, 73:18
figure [5] - 18:13, 45:8, 45:9, 59:10, 70:4
figuring [1] - 10:3
file [3] - 4:8, 74:13, 74:20
filed [11] - 4:24, 4:25, 6:3, 9:25, 23:24, 26:21, 29:23, 61:12, 68:19, 70:21, 73:4
filing [3] - 44:16, 47:14, 73:8
final [18] - 35:17, 35:18, 36:15, 51:11,

53:5, 53:12, 53:13, 53:24, 54:3, 54:6, 55:15, 55:16, 55:20, 55:21, 55:25, 60:14, 63:24, 74:24
finally [3] - 24:6, 24:12, 26:10
fine [4] - 24:12, 39:14, 61:10, 67:24
fingerprints [1] - 17:12
finish [1] - 69:3
fire [1] - 69:25
first [11] - 10:12, 14:10, 15:9, 20:5, 23:3, 25:11, 26:21, 28:17, 30:10, 37:10, 58:21
five [8] - 24:21, 28:13, 30:3, 30:4, 32:3, 46:13, 74:21, 75:6
five-minute [1] - 24:21
flight [3] - 34:7, 55:18, 55:19
floated [2] - 25:22, 25:23
floor [3] - 67:20, 68:20, 69:18
Flores [26] - 3:7, 10:14, 10:15, 19:21, 22:4, 26:23, 26:24, 37:13, 37:19, 48:10, 57:16, 57:21, 57:24, 58:7, 61:18, 61:19, 61:21, 62:1
FLORES [1] - 1:8
focus [6] - 10:12, 11:3, 15:8, 16:5, 27:22, 56:11
focused [1] - 74:9
focusing [2] - 41:10, 41:16
folks [1] - 22:19
following [2] - 31:8, 39:24
follows [1] - 16:9
food [3] - 42:5, 65:23, 65:25
foregoing [1] - 76:2
form [2] - 10:5, 56:15
forward [1] - 71:4
foundation [1] - 15:13
fountains [1] - 63:4, 64:2
four [5] - 10:10, 27:2, 32:24, 62:22, 74:4
Francisca [2] - 2:4, 3:11
Franklin [2] - 2:14, 12:20

FRC [1] - 45:17
Fred [1] - 3:20
frenetic [1] - 37:25
frequently [1] - 52:9
friend [1] - 24:25
frivolous [1] - 7:18
front [2] - 71:6, 72:7
frozen [1] - 65:1
fully [2] - 38:14, 40:8
future [3] - 22:1, 42:7, 43:6

**G**

gallery [1] - 11:24
GEE [1] - 1:4
general [1] - 38:11
General [1] - 17:17
generally [2] - 32:3, 41:4
gentleman [1] - 35:16
geographical [1] - 33:17
geographically [1] - 33:13
girls [1] - 21:23
given [7] - 16:3, 27:1, 38:25, 46:17, 53:3, 67:7
goal [1] - 43:4
Goodmans [1] - 15:15
government [16] - 5:8, 7:14, 12:11, 17:6, 17:22, 21:1, 24:19, 26:22, 35:8, 48:23, 49:15, 60:14, 69:6, 70:6, 71:12, 73:17
government's [4] - 20:8, 27:5, 49:13, 50:5
Grande [8] - 11:4, 42:24, 56:16, 57:18, 63:21, 67:6, 67:9, 67:17
great [3] - 25:18, 59:3, 68:7
ground [2] - 39:15, 63:15
group [2] - 72:12
groups [1] - 42:3
guardians [2] - 50:12
guess [9] - 13:1, 14:25, 24:3, 27:7, 27:10, 27:20, 37:24, 67:11, 70:2
guy [1] - 68:7

**H**

half [1] - 10:24
hand [1] - 18:20
happy [1] - 9:18
hard [3] - 58:17, 59:25
hawing [1] - 26:22
head [1] - 58:24
heads [1] - 22:22
Health [1] - 71:9
hear [2] - 7:17, 56:6
heard [2] - 17:18, 25:13
hearing [19] - 4:1, 4:2, 4:10, 4:12, 5:18, 6:4, 6:14, 8:18, 10:11, 10:12, 10:24, 23:17, 25:11, 25:15, 56:21, 70:19, 72:1, 72:7, 73:22
HEARING [2] - 1:16, 3:4
hearings [1] - 7:19
hearsay [7] - 5:11, 6:11, 7:6, 7:8, 9:21, 10:4, 14:5
held [6] - 42:9, 43:8, 43:20, 44:5, 45:2, 68:16
help [2] - 3:13, 43:25
hemming [1] - 26:22
hereby [1] - 76:1
Hester [1] - 47:6
HHS [3] - 43:2, 49:9, 49:10
highlight [1] - 12:15
highly [2] - 20:5, 38:19
history [1] - 20:6
home [1] - 51:12
Homeland [1] - 16:15
homes [1] - 72:12
honest [1] - 71:13
honestly [2] - 71:16, 72:8
Honor [35] - 3:10, 3:14, 5:7, 6:17, 8:8, 8:21, 9:11, 9:17, 10:9, 11:13, 13:16, 13:23, 14:18, 14:24, 17:4, 37:4, 38:1, 39:7, 40:24, 41:10, 41:16, 43:24, 44:18, 46:6, 47:21, 48:21, 50:22, 51:23, 53:9, 56:5, 56:12, 56:19, 57:17, 58:12, 74:11
Honor's [3] - 45:7, 49:19, 57:22

**HONORABLE** [1] - 1:4
**hour** [2] - 8:17, 10:23
**hours** [12] - 16:3, 35:2, 37:23, 37:24, 38:20, 38:25, 39:1, 64:11, 65:13, 67:15, 67:19, 67:20
**housing** [3] - 53:6, 53:8, 57:14
**Human** [2] - 2:5, 71:9
**humanitarian** [1] - 68:8
**hundred** [1] - 18:17
**hundreds** [2] - 10:3, 16:3
**hygiene** [1] - 66:14

## I

**ICE** [15] - 21:12, 21:14, 21:15, 21:16, 21:18, 36:3, 43:2, 44:23, 45:6, 46:7, 50:1, 52:6, 52:13, 57:9
**ice** [2] - 39:5, 39:11
**idea** [2] - 25:21, 52:12
**identified** [2] - 10:11, 40:22
**identify** [1] - 62:22
**immediately** [3] - 39:23, 44:15, 54:1
**Immigration** [8] - 2:13, 11:19, 17:15, 17:16, 20:16, 20:18, 35:25, 61:5
**immigration** [11] - 35:20, 35:22, 36:1, 50:23, 53:18, 61:3, 71:6, 72:23, 73:21, 74:1, 74:7
**impartial** [1] - 72:7
**implement** [1] - 32:20
**implementation** [1] - 70:18
**implemented** [2] - 38:14, 39:19
**important** [4] - 28:18, 29:7, 35:1, 40:11
**importantly** [1] - 35:23
**impossibility** [1] - 55:6
**impression** [2] - 42:20, 72:15
**improperly** [1] - 24:8
**INA** [5] - 36:8, 49:25, 52:19, 53:1
**inadmissible** [3] - 36:7, 36:20
**incisive** [1] - 27:12

**include** [1] - 43:22
**includes** [1] - 27:17
**including** [1] - 73:25
**increased** [1] - 42:1
**indicate** [4] - 21:11, 31:25, 43:19, 63:4
**indicated** [1] - 4:1
**indicates** [1] - 50:16
**individual** [7] - 10:1, 38:16, 51:5, 52:13, 53:11, 53:21, 74:22
**individual-wide** [1] - 10:1
**individualized** [4] - 19:16, 19:17, 35:13, 36:11
**individuals** [21] - 17:1, 38:3, 40:13, 44:18, 44:22, 44:23, 45:1, 45:5, 46:7, 46:12, 46:19, 47:8, 47:11, 47:25, 48:7, 51:8, 51:10, 52:4, 52:6, 54:6, 55:23
**ineligible** [1] - 51:10
**influx** [2] - 42:12, 43:12
**inform** [1] - 41:18
**information** [2] - 44:11, 49:9
**initiating** [1] - 70:1
**INS** [15] - 16:11, 16:14, 16:18, 29:14, 30:16, 30:22, 31:3, 31:7, 32:9, 32:10, 48:16, 57:7, 57:12, 62:14
**INS's** [1] - 62:19
**insecure** [1] - 61:15
**insignificant** [1] - 59:8
**insisted** [1] - 18:10
**inspection** [1] - 27:1
**inspections** [1] - 63:12
**instances** [2] - 50:18, 50:19
**instead** [1] - 49:24
**institute** [2] - 37:15, 38:11
**instituted** [1] - 49:19
**institutional** [1] - 56:25
**instruction** [1] - 28:23
**instructions** [2] - 9:9, 32:20
**intend** [1] - 12:4
**interesting** [2] - 26:20, 34:13
**interests** [1] - 70:2
**interface** [2] - 71:9, 71:11

**interim** [1] - 53:6
**interpretation** [1] - 15:22
**interpreter** [4] - 13:8, 13:10, 13:11, 14:13
**interpreting** [1] - 15:23
**interview** [3] - 31:13, 31:20, 64:25
**interviewed** [2] - 74:3, 74:5
**interviewing** [1] - 65:5
**inure** [1] - 16:22
**IRA** [1] - 20:3
**isolated** [1] - 33:15
**issue** [10] - 10:6, 10:21, 15:9, 15:11, 15:18, 37:9, 56:6, 66:20, 68:22, 69:1
**Issue** [1] - 56:7
**issued** [1] - 24:9
**issues** [5] - 7:12, 10:11, 27:21, 54:10, 71:10
**it'd** [1] - 61:21
**Item** [1] - 3:6
**items** [3] - 10:4, 10:20, 11:1
**itself** [5] - 26:4, 53:19, 53:23, 55:9, 56:16

## J

**JANUARY** [2] - 1:17, 3:2
**Jennie** [1] - 3:7
**JENNY** [1] - 1:8
**job** [3] - 68:7, 72:11, 72:19
**judge** [15] - 24:5, 24:7, 35:21, 35:22, 61:13, 61:14, 61:17, 61:19, 68:15, 68:16, 72:23, 73:18, 73:21, 74:1, 74:7
**JUDGE** [1] - 1:4
**judge's** [1] - 61:3
**judges** [2] - 36:1, 71:6
**judicial** [1] - 76:7
**July** [3] - 15:16, 22:10, 22:11
**Justice** [2] - 2:13, 3:15
**Justin** [1] - 37:16
**juvenile** [6] - 57:7, 57:9, 57:10, 57:12, 57:23, 58:5

## K

**K-I-S-O-R** [1] - 11:17
**keep** [5] - 15:3, 25:7, 57:13, 66:24, 67:4
**kept** [2] - 53:6, 62:18
**kick** [1] - 22:12
**kid** [19] - 18:12, 21:22, 25:7, 25:16, 29:24, 30:13, 32:7, 35:1, 35:21, 36:15, 64:16, 65:14, 66:3, 66:4, 66:5, 67:20, 67:21, 67:25, 69:13
**kids** [39] - 21:22, 23:13, 23:14, 24:12, 26:25, 29:22, 31:14, 31:15, 32:11, 34:5, 34:10, 34:11, 35:17, 39:11, 61:13, 61:15, 62:9, 65:15, 65:17, 65:20, 67:8, 67:9, 67:10, 67:16, 68:3, 68:11, 69:13, 71:21, 71:23, 72:5, 72:11, 72:12, 72:20, 73:18, 73:20, 74:5, 74:7
**Kielwasser** [2] - 76:10, 76:11
**KIELWASSER** [1] - 1:22
**kind** [13] - 15:9, 19:1, 25:22, 26:20, 26:23, 33:4, 42:19, 58:18, 58:23, 64:21, 70:8, 71:25
**kinds** [1] - 22:2
**KISOR** [12] - 11:13, 11:17, 12:3, 12:6, 12:9, 13:12, 13:15, 13:19, 13:22, 14:18, 14:20, 14:23
**Kisor** [3] - 2:11, 3:19, 11:17
**knowledge** [5] - 14:7, 56:25, 57:17, 73:5, 73:9
**knows** [3] - 13:10, 32:7, 32:17

## L

**lack** [1] - 68:14
**language** [12] - 18:11, 31:1, 31:11, 31:13, 31:17, 35:4, 36:9, 48:11, 50:5, 50:21, 61:1, 62:17
**large** [6] - 15:4, 43:19,

67:17, 72:15, 72:18, 72:21
**largely** [1] - 37:8
**larger** [3] - 41:24, 42:4
**last** [7] - 8:6, 23:16, 23:24, 56:19, 56:20, 60:1, 73:6
**late** [1] - 8:17
**law** [17] - 15:25, 20:2, 20:14, 22:17, 26:10, 52:5, 52:14, 52:21, 54:10, 54:11, 54:12, 54:13, 54:15, 54:20, 54:21, 62:2
**Law** [1] - 2:5
**lawyer** [1] - 24:5
**lay** [1] - 69:17
**learning** [1] - 43:16
**least** [5] - 15:2, 24:12, 33:22, 70:7, 72:12
**leave** [2] - 60:11, 60:12
**lectern** [1] - 11:11
**left** [1] - 15:7
**legal** [3] - 16:10, 16:18, 32:10
**length** [3] - 45:16, 46:9, 67:14
**less** [6] - 23:23, 32:3, 47:18, 67:19, 68:10, 76:5
**license** [11] - 23:23, 54:14, 54:19, 54:22, 54:24, 54:25, 55:3, 61:10, 61:13, 61:24, 61:25
**licensed** [13] - 23:17, 23:19, 23:20, 32:13, 32:16, 32:17, 32:21, 33:9, 33:13, 34:14, 53:8, 54:15, 72:12
**licenses** [4] - 24:3, 24:8, 54:12, 54:25
**licensing** [3] - 23:10, 54:8, 61:16
**lieu** [1] - 5:22
**light** [1] - 58:24
**likely** [2] - 38:20, 43:3
**limit** [1] - 75:6
**limited** [4] - 4:2, 52:3, 53:14, 53:16
**line** [4] - 44:12, 44:17, 44:21, 46:6
**literally** [1] - 69:10
**litigated** [1] - 54:10
**Litigation** [1] - 2:13
**live** [9] - 4:5, 4:12, 4:13, 4:16, 4:17, 6:16, 7:17, 13:21, 67:25

**lives** [1] - 12:25
**LJ** [1] - 71:12
**LJs** [1] - 71:9
**locate** [1] - 40:21
**located** [3] - 33:14, 40:20
**location** [1] - 43:2
**logged** [2] - 45:10, 45:11
**long-term** [1] - 59:19
**longest** [2] - 48:1, 48:7
**look** [15] - 16:1, 16:8, 36:10, 38:16, 44:9, 46:6, 47:5, 47:9, 47:23, 48:10, 50:22, 60:2, 64:12, 69:11
**looked** [5] - 25:12, 48:5, 56:20, 59:13, 59:15
**looking** [2] - 29:6, 59:11
**Loretta** [1] - 3:7
**LORETTA** [1] - 1:12
**Los** [3] - 1:17, 1:24, 2:6
**lose** [1] - 24:11
**lost** [1] - 56:24
**Louisa** [2] - 2:12, 3:22
**love** [1] - 30:4
**low** [2] - 73:1, 73:16
**lying** [3] - 39:6, 40:10, 40:13
**Lynch** [1] - 3:7
**LYNCH** [1] - 1:12

## M

**mail** [4] - 2:7, 2:16, 2:16, 2:17
**majority** [4] - 45:5, 47:13, 51:7, 51:14
**mandatory** [21] - 16:20, 17:2, 17:5, 17:7, 17:10, 18:4, 19:15, 20:11, 26:3, 26:16, 29:5, 31:15, 51:16, 51:21, 52:7, 52:13, 53:11, 55:24, 56:1, 74:23
**map** [5] - 40:20, 40:21, 40:23, 40:25, 41:3
**margin** [1] - 45:23
**math** [2] - 47:22, 60:11
**mathematical** [1] - 47:19
**mats** [3] - 68:3, 68:14, 69:16

**matter** [11] - 14:14, 20:14, 30:6, 30:9, 38:11, 50:7, 60:20, 72:6, 72:16, 75:11, 76:4
**matters** [2] - 27:17, 54:21
**mean** [30] - 15:4, 18:3, 19:14, 22:6, 24:11, 24:15, 24:16, 25:6, 26:5, 26:20, 27:1, 27:20, 29:11, 30:13, 32:2, 33:11, 35:7, 39:9, 54:11, 54:21, 59:20, 60:11, 60:16, 61:17, 62:5, 63:20, 71:8, 71:13, 72:10, 74:2
**meaning** [2] - 16:1, 29:9
**means** [3] - 16:15, 53:5, 54:18
**measure** [1] - 45:19
**medical** [1] - 52:5
**meet** [5] - 23:12, 23:14, 61:16, 62:1, 62:2
**member** [3] - 18:8, 18:9, 18:22
**members** [5] - 15:10, 23:4, 23:7, 25:25, 49:8
**mentioned** [1] - 63:23
**microphone** [1] - 3:18
**might** [6] - 7:24, 12:14, 38:17, 52:12, 54:1
**miles** [2] - 12:25, 18:17
**Miller** [1] - 45:12
**Miller's** [3] - 44:7, 44:11, 45:13
**minor** [26] - 18:16, 18:24, 19:1, 19:15, 19:17, 19:20, 29:13, 29:16, 29:18, 29:20, 30:8, 30:18, 30:19, 30:21, 30:24, 31:2, 31:4, 31:8, 32:9, 33:22, 34:1, 48:15, 48:18, 49:21, 49:24, 49:25
**minority** [1] - 67:10
**minors** [26] - 10:17, 16:10, 16:17, 16:22, 18:24, 32:12, 34:3, 34:13, 34:22, 42:2, 42:8, 42:23, 43:6, 43:7, 49:11, 49:13, 49:23, 50:11, 55:13,

55:24, 56:7, 57:14, 62:14, 62:16, 62:20
**minors's** [1] - 31:6
**minute** [4] - 23:11, 24:21, 60:1, 75:9
**minutes** [12] - 10:25, 12:12, 12:17, 15:2, 28:12, 28:13, 28:14, 30:4, 32:25, 37:1, 37:25, 58:14
**mistaken** [1] - 6:7
**misunderstand** [1] - 5:8
**modern** [1] - 41:21
**module** [1] - 39:17
**mom** [1] - 29:25
**moment** [5] - 48:14, 58:11, 59:12, 60:4, 71:25
**MONDAY** [2] - 1:17, 3:2
**monitor** [5] - 27:24, 66:1, 66:6, 69:21, 70:7
**monitored** [1] - 65:18
**monitoring** [17] - 28:3, 37:15, 37:18, 39:25, 40:2, 40:5, 40:6, 56:15, 56:17, 64:20, 65:22, 66:2, 66:4, 66:5, 69:20, 69:22
**monitors** [1] - 37:19
**month** [3] - 4:20, 29:21, 30:14
**months** [10] - 4:6, 24:4, 24:6, 29:10, 30:14, 34:12, 59:23, 59:24
**morning** [5] - 3:14, 3:24, 14:24, 37:4, 37:5
**most** [6] - 14:2, 43:2, 44:7, 66:22, 67:16, 72:18
**mother** [10] - 24:21, 24:24, 25:7, 25:14, 30:15, 31:13, 31:19, 50:7, 50:14, 50:18
**mothers** [7] - 22:21, 22:23, 23:2, 23:5, 23:6, 25:15, 60:18
**motion** [7] - 15:17, 18:15, 26:21, 70:15, 71:25, 73:20, 74:18
**move** [1] - 46:14
**MR** [69] - 3:10, 4:19, 11:5, 11:7, 11:12, 11:13, 11:17, 12:3, 12:6, 12:9, 12:20, 13:12, 13:15, 13:19,

13:22, 14:18, 14:20, 14:23, 14:24, 16:25, 17:4, 17:20, 17:23, 17:25, 18:5, 19:8, 19:12, 19:19, 20:12, 20:15, 20:24, 23:18, 27:7, 27:10, 28:12, 28:15, 32:24, 33:3, 35:11, 36:23, 37:2, 58:15, 59:11, 63:2, 63:5, 63:9, 63:17, 66:9, 66:12, 66:17, 66:21, 68:25, 70:12, 70:14, 70:17, 70:20, 70:23, 71:16, 72:17, 73:12, 73:15, 74:11, 74:15, 74:17, 74:19, 75:1, 75:5, 75:7, 75:10
**MS** [45] - 3:14, 3:19, 5:7, 6:17, 8:8, 8:14, 8:21, 9:11, 9:17, 10:9, 37:4, 37:6, 38:1, 39:7, 39:21, 40:24, 41:6, 41:8, 41:23, 42:15, 42:21, 43:24, 44:4, 44:6, 45:12, 46:4, 46:24, 47:2, 47:5, 47:21, 48:21, 49:12, 50:22, 51:23, 53:9, 54:19, 55:7, 56:12, 56:19, 57:9, 57:17, 57:20, 58:3, 58:12, 73:5
**must** [1] - 34:14
**mylar** [2] - 66:14, 67:24

## N

**N-O-Y-E-S** [1] - 3:12
**name** [3] - 11:16, 12:20, 25:2
**nation** [1] - 47:1
**national** [1] - 70:9
**nationwide** [1] - 56:10
**near** [2] - 42:7, 43:5
**nearly** [1] - 55:14
**neat** [1] - 28:23
**necessarily** [2] - 19:14, 74:24
**need** [9] - 3:17, 5:2, 7:13, 7:17, 8:1, 12:22, 43:13, 68:23, 72:7
**needed** [2] - 37:15, 73:7
**needs** [1] - 13:10
**negotiated** [1] - 19:25

**negotiating** [1] - 35:2
**never** [3] - 18:14, 25:23, 71:24
**nevertheless** [1] - 15:8
**new** [7] - 25:21, 38:11, 38:12, 40:4, 40:5, 70:8
**next** [4] - 29:7, 31:1, 43:2, 46:12
**night** [3] - 23:24, 48:23, 63:19
**Ninth** [8] - 16:11, 20:16, 24:11, 25:17, 26:4, 26:7, 26:9, 52:18
**nobody** [1] - 70:4
**non** [2] - 32:18, 32:21
**non-secure** [1] - 32:18
**none** [3] - 11:25, 53:7, 71:21
**nonsecure** [5] - 23:20, 23:21, 32:21, 33:9, 53:8
**Norte** [1] - 40:23
**Norway** [1] - 66:25
**note** [6] - 12:9, 22:9, 22:12, 23:16, 31:23, 47:14
**noted** [1] - 63:10
**nothing** [9] - 18:6, 18:7, 18:11, 18:14, 29:3, 62:6, 62:7, 62:8, 68:10
**noticed** [1] - 12:23
**notion** [3] - 20:1, 26:2, 61:23
**November** [6] - 44:14, 44:19, 46:8, 46:24, 47:16, 60:8
**nowhere** [1] - 35:6
**Noyes** [2] - 2:4, 3:11
**number** [20] - 6:23, 22:15, 25:2, 27:13, 46:15, 47:9, 48:12, 58:16, 59:7, 59:11, 60:2, 60:3, 60:5, 60:6, 71:15, 71:17, 72:4, 72:15, 72:18, 72:22
**numbers** [13] - 42:2, 44:6, 45:22, 46:16, 58:17, 58:21, 59:2, 67:17, 68:10, 68:13, 72:8, 72:25, 73:16
**numerous** [1] - 64:4

# O

**object** [1] - 5:20
**objected** [1] - 5:10
**objection** [3] - 5:11, 7:7, 9:22
**objections** [10] - 6:13, 7:6, 9:14, 9:15, 9:18, 9:19, 9:24, 9:25, 12:18
**obligations** [1] - 27:24
**observations** [1] - 27:18
**observe** [2] - 9:24, 11:23
**observed** [1] - 11:20
**obtain** [3] - 27:9, 54:12, 55:3
**obtained** [1] - 51:5
**obviously** [1] - 57:6
**occasion** [1] - 38:22
**Occidental** [1] - 2:5
**occur** [1] - 9:7
**October** [4] - 4:1, 8:6, 38:5, 40:1
**OF** [3] - 1:2, 2:3, 2:9
**offer** [1] - 42:16
**Office** [2] - 2:13, 3:23
**office** [6] - 3:12, 3:20, 3:21, 3:22, 13:15, 64:11
**officers** [1] - 32:20
**official** [1] - 76:11
**Official** [1] - 1:23
**OFO** [4] - 41:1, 41:3, 41:11, 41:13
**often** [1] - 9:6
**old** [1] - 66:25
**omitted** [1] - 64:20
**ON** [2] - 2:3, 2:9
**once** [2] - 63:15, 73:23
**one** [39] - 12:10, 13:23, 17:4, 19:22, 21:17, 22:3, 24:3, 27:8, 27:10, 27:13, 29:7, 33:8, 35:4, 35:11, 35:16, 36:14, 37:24, 40:22, 48:13, 48:14, 57:19, 57:23, 59:18, 60:7, 63:11, 64:17, 64:23, 65:15, 65:17, 67:23, 68:1, 70:13, 71:18, 71:22, 73:20, 74:1, 74:6, 75:4
**ongoing** [1] - 55:8
**operate** [1] - 70:8
**operating** [1] - 23:23
**operational** [1] - 57:11

**opportunity** [3] - 5:19, 5:23, 5:25
**oppose** [2] - 71:3, 73:15
**opposed** [2] - 70:22, 73:9
**opposing** [1] - 73:4
**opposite** [1] - 70:24
**opposition** [1] - 74:14
**opt** [1] - 25:16
**option** [4] - 24:13, 24:16, 27:1, 73:4
**oral** [1] - 72:16
**orally** [1] - 24:5
**order** [52] - 4:25, 5:9, 5:13, 8:6, 22:10, 22:11, 24:7, 28:24, 29:1, 31:8, 31:9, 35:17, 36:4, 36:15, 37:10, 37:14, 38:4, 39:23, 40:1, 49:19, 49:20, 51:12, 53:5, 53:12, 53:13, 53:19, 53:23, 53:24, 54:3, 55:15, 55:16, 55:20, 55:25, 56:6, 56:7, 57:13, 60:24, 60:25, 61:3, 61:4, 61:7, 61:11, 68:18, 70:18, 74:24, 75:9
**ordered** [1] - 37:11
**orders** [9] - 4:20, 20:4, 22:10, 35:18, 36:16, 36:17, 54:7, 60:15
**original** [1] - 22:5
**ORR** [6] - 15:17, 71:8, 71:21, 72:10, 72:19
**otherwise** [4] - 52:6, 52:10, 52:24, 54:5
**ought** [1] - 61:13
**out-of-court** [2] - 7:8, 9:20
**outset** [1] - 55:12
**outside** [2] - 11:20, 41:14
**overall** [3] - 39:1, 45:4, 48:25
**overarching** [1] - 66:20
**overcrowded** [1] - 69:15
**overcrowding** [3] - 69:7, 69:8, 69:21
**overseed** [1] - 40:17
**oversees** [1] - 40:16
**own** [2] - 5:15, 9:10

# P

**Padilla** [5] - 38:8, 38:18, 39:10, 40:15, 58:4
**patrol's** [1] - 43:15
**Padilla's** [1] - 41:17
**page** [1] - 61:21
**pages** [2] - 74:21, 75:6
**paper** [1] - 61:7
**papers** [2] - 43:19, 52:9
**Paragraph** [9] - 29:8, 29:13, 29:16, 33:8, 33:10, 33:12, 33:16, 48:15, 49:1
**paragraph** [21] - 16:6, 16:8, 23:21, 31:1, 31:3, 31:23, 32:6, 32:8, 32:9, 32:11, 32:14, 33:6, 33:20, 33:21, 34:8, 34:14, 34:18, 48:18, 49:5, 61:1, 62:13
**paragraphs** [2] - 10:16, 48:12
**parallel** [1] - 3:22
**paraphrasing** [1] - 31:6
**parent** [2] - 10:18, 49:24
**parents** [4] - 49:16, 51:14, 55:14, 55:25
**parole** [3] - 36:4, 52:3, 52:6
**parse** [1] - 61:20
**parsing** [2] - 10:2, 61:17
**part** [1] - 24:9, 26:22, 28:17, 28:18, 29:15, 30:23, 40:10, 41:12, 48:17, 71:8, 73:24
**parte** [1] - 74:16
**particular** [7] - 10:15, 13:18, 14:5, 21:22, 49:4, 62:15, 62:19
**parties** [3] - 4:4, 4:6, 7:3
**party** [1] - 5:17
**Paso** [3] - 40:23, 41:6, 68:3
**pass** [1] - 48:23
**passed** [3] - 22:17, 22:18, 49:9
**patrol** [27] - 21:11, 21:17, 21:25, 25:20, 28:18, 33:1, 36:24, 37:6, 37:12, 37:13, 37:15, 37:18, 37:20, 39:10, 39:24, 41:1,

41:13, 42:24, 43:11, 49:6, 49:22, 61:8, 62:4, 63:14, 64:14, 64:25, 67:15
**patrol's** [1] - 43:15
**pattern** [1] - 24:10
**paused** [1] - 63:22
**pays** [1] - 63:14
**Pedeway** [2] - 2:12, 3:21
**pending** [1] - 70:15
**penetrates** [1] - 69:3
**Pennsylvania** [1] - 59:19
**people** [51] - 5:3, 5:4, 6:4, 7:22, 12:1, 13:2, 14:21, 18:2, 18:4, 19:10, 20:20, 20:22, 22:14, 22:15, 29:4, 29:5, 41:21, 42:12, 43:18, 43:22, 43:23, 45:9, 45:10, 45:18, 45:22, 47:20, 50:13, 53:4, 58:23, 59:7, 59:12, 59:13, 59:17, 59:20, 59:21, 60:3, 60:17, 60:21, 60:22, 64:3, 64:5, 64:12, 64:25, 65:4, 65:5, 68:20, 71:10, 71:14, 71:19, 72:22
**per** [3] - 64:23, 71:19, 74:21
**percent** [13] - 43:20, 45:4, 47:18, 47:19, 47:20, 59:4, 59:5, 59:6, 59:9, 59:16, 60:10, 72:5
**percentage** [1] - 43:17
**percentages** [1] - 44:25
**perfectly** [1] - 8:5
**perhaps** [3] - 21:4, 47:7, 51:18
**peril** [1] - 9:10
**period** [6] - 4:20, 25:25, 39:18, 39:22, 40:6, 41:22
**periods** [1] - 48:7
**permits** [1] - 66:23
**perplexed** [1] - 45:15
**person** [14] - 13:24, 21:4, 21:5, 21:6, 21:17, 53:22, 54:2, 57:8, 57:23, 58:6, 58:20, 58:22, 67:15
**personal** [2] - 14:7, 27:18
**pervasive** [1] - 56:10
**Peter** [2] - 2:4, 3:10

**phone** [4] - 21:12, 21:13, 21:19, 25:2
**picture** [1] - 58:25
**piece** [4] - 39:5, 61:7, 64:6, 65:10
**pieces** [1] - 10:7
**pivotal** [1] - 15:21
**pivoted** [1] - 22:5
**place** [22] - 17:6, 17:9, 18:2, 18:9, 18:12, 18:18, 19:1, 19:10, 25:1, 26:11, 30:24, 33:21, 33:25, 35:9, 38:4, 40:1, 40:2, 42:7, 52:20, 56:22, 56:23, 69:17
**placed** [5] - 16:18, 19:15, 32:13, 34:1, 34:10, 34:13, 34:14, 43:18, 49:25, 53:4, 53:21
**placement** [3] - 32:5, 33:24, 33:25
**placements** [1] - 33:17
**places** [4] - 64:1, 64:2, 67:16
**placing** [2] - 72:12, 72:20
**plain** [5] - 16:1, 29:9, 29:12, 48:11
**plaintiff** [2] - 1:10, 8:19
**PLAINTIFF** [1] - 2:3
**plaintiffs** [8] - 3:11, 4:19, 4:21, 4:24, 6:20, 43:21, 48:22, 74:13
**plaintiffs'** [4] - 6:15, 8:10, 8:11, 8:23
**plan** [1] - 71:1
**play** [1] - 55:9
**plus** [1] - 15:6
**PO** [1] - 2:14
**point** [11] - 14:4, 19:21, 24:12, 29:19, 39:8, 47:22, 53:3, 54:3, 57:23, 64:17, 75:7
**points** [3] - 14:4, 37:9, 63:15
**policies** [1] - 70:7
**policy** [11] - 38:12, 38:24, 39:10, 39:13, 39:14, 39:16, 65:13, 66:23, 67:5, 69:23, 69:24
**population** [1] - 59:15
**port** [2] - 40:22, 41:11
**portable** [1] - 63:14

**portion** [1] - 19:7
**ports** [1] - 41:13
**posed** [2] - 21:4, 51:19
**position** [28] - 6:19, 7:5, 7:9, 7:15, 7:18, 8:9, 8:22, 9:2, 19:9, 20:9, 20:10, 22:5, 27:5, 27:11, 35:12, 48:25, 49:13, 51:13, 52:8, 54:7, 54:17, 55:4, 55:12, 57:13, 57:20, 59:3, 63:20
**possible** [2] - 34:15, 34:24
**possibly** [3] - 14:6, 22:10, 51:9
**potential** [1] - 50:12
**power** [1] - 25:16
**practical** [4] - 14:14, 30:9, 30:11, 72:6
**practice** [6] - 38:11, 38:12, 39:11, 42:23, 49:3, 50:25
**practices** [5] - 40:16, 43:13, 48:25, 49:19, 49:20
**precise** [1] - 51:25
**precisely** [3] - 51:24, 52:1, 71:17
**preclude** [2] - 52:22, 52:23
**precludes** [1] - 18:15
**preference** [2] - 31:9, 31:10
**pregnant** [1] - 21:6
**prepare** [1] - 64:11
**prepared** [1] - 6:24
**present** [1] - 12:13
**presented** [2] - 7:22, 7:23
**PRESIDING** [1] - 1:4
**presume** [2] - 11:25, 50:11
**presuming** [1] - 41:15
**pretty** [3] - 27:25, 64:15, 67:8
**prevalent** [1] - 66:10
**prevents** [1] - 69:9
**previous** [1] - 59:14
**primarily** [1] - 28:16
**primary** [1] - 42:7
**problem** [8] - 23:5, 23:10, 39:14, 56:11, 63:7, 67:5, 68:1, 74:8
**problematic** [1] - 63:13
**problems** [4] - 6:12, 12:15, 68:1, 74:9

**procedural** [1] - 11:13
**procedures** [2] - 9:4, 40:5
**proceed** [2] - 4:25, 54:2
**Proceedings** [2] - 1:16, 75:14
**proceedings** [11] - 11:23, 16:19, 18:3, 18:9, 36:1, 49:25, 51:21, 53:15, 53:17, 53:22, 76:3
**process** [19] - 14:1, 18:12, 20:7, 24:16, 24:17, 24:18, 24:23, 25:19, 28:3, 31:12, 43:10, 45:5, 49:9, 49:10, 54:4, 55:8, 57:14, 69:3, 70:1
**processed** [3] - 42:8, 42:25, 43:8
**program** [2] - 32:13, 32:18
**programs** [1] - 32:16
**prohibit** [3] - 52:10, 52:15, 54:6
**prohibited** [1] - 56:3
**prohibits** [1] - 53:1
**prompt** [4] - 29:14, 30:16, 30:22, 48:16
**promptly** [4] - 72:1, 72:5, 72:11, 72:20
**protection** [1] - 41:2
**Protection** [4] - 3:23, 10:14, 11:3, 11:19
**provide** [5] - 33:17, 39:11, 39:25, 51:2, 54:14
**provided** [3] - 40:20, 66:14, 72:2
**provides** [1] - 71:21
**provision** [2] - 52:21, 58:2
**provisions** [6] - 10:15, 15:10, 37:15, 52:19, 53:20, 56:17
**pschey@ centerforhumanrights .org** [1] - 2:7
**public** [2] - 70:2
**publicized** [1] - 20:3
**purpose** [6] - 13:21, 21:18, 21:19, 45:14, 49:23, 57:12
**purposes** [1] - 13:22
**pursuant** [4] - 4:24, 29:16, 32:9, 48:18
**pushed** [1] - 48:4
**put** [11] - 18:21, 23:13, 28:24, 28:25, 31:20,

31:21, 37:16, 43:25, 51:20, 65:7
**puts** [1] - 55:4

# Q

**quality** [1] - 63:13
**questioned** [2] - 28:6, 56:20
**questions** [6] - 10:19, 42:17, 49:23, 50:10, 56:13, 58:10
**quick** [1] - 47:18
**quicker** [1] - 67:17
**quickly** [1] - 51:8
**quote** [1] - 35:24

# R

**raised** [2] - 6:13, 19:21
**ran** [2] - 23:3, 44:14
**RBG** [1] - 41:12
**reactivate** [1] - 58:1
**read** [7] - 18:7, 32:8, 41:19, 43:19, 45:13, 50:10, 61:11
**reading** [2] - 34:1, 42:20
**real** [1] - 68:8
**realistic** [1] - 30:11
**realized** [1] - 43:5
**really** [17] - 7:10, 10:20, 15:18, 25:5, 25:6, 26:24, 27:12, 27:22, 29:6, 34:6, 42:18, 46:16, 58:18, 58:24, 60:21, 70:4, 72:7
**reason** [7] - 12:24, 25:19, 26:13, 26:14, 45:14, 52:12, 72:14
**reasonable** [2] - 15:22, 33:17
**reasons** [7] - 34:18, 38:17, 50:6, 52:5, 53:25, 54:1
**recalling** [1] - 47:13
**recent** [2] - 20:3, 44:7
**recently** [2] - 15:17, 29:25
**recognized** [2] - 24:14, 24:15
**record** [10] - 3:9, 10:17, 29:14, 30:16, 30:22, 38:16, 44:5, 45:15, 56:23, 68:7
**recorded** [1] - 76:3
**recording** [1] - 38:12

**records** [6] - 38:2, 38:5, 38:23, 39:1, 70:3
**redetermination** [1] - 73:22
**redirect** [3] - 4:3, 8:7, 9:8
**reduction** [1] - 76:6
**redundant** [1] - 33:21
**Reed** [2] - 47:7, 47:24
**Reed's** [1] - 48:5
**refer** [1] - 44:18
**reference** [1] - 61:17
**referenced** [1] - 44:18
**referring** [1] - 29:23
**reflect** [6] - 44:17, 45:9, 45:10, 47:25, 48:6, 51:1
**reflected** [2] - 47:8, 56:22
**reflects** [5] - 43:15, 44:6, 44:21, 45:4, 51:7
**refuses** [1] - 6:9
**refute** [3] - 63:25, 64:3, 69:2
**regard** [9] - 4:18, 10:10, 11:2, 49:4, 49:5, 53:3, 54:8, 56:11, 57:21
**regarding** [2] - 70:19, 73:4
**regardless** [2] - 18:21, 18:23
**regards** [2] - 23:10, 62:4
**regularly** [2] - 7:19, 9:5
**regulations** [1] - 76:7
**reinstated** [1] - 55:16
**reinstitute** [1] - 57:3
**reiterate** [2] - 8:9, 48:13
**relating** [2] - 13:18, 70:15
**relative** [1] - 24:25
**relatively** [3] - 71:15, 72:10, 72:19
**release** [29] - 10:17, 15:10, 19:4, 19:20, 21:2, 21:4, 21:6, 21:7, 21:24, 22:14, 24:15, 24:16, 29:16, 31:7, 32:9, 32:13, 35:3, 35:7, 48:18, 49:15, 49:21, 49:23, 50:2, 51:9, 51:11, 52:13, 72:3, 72:4, 72:5
**released** [22] - 22:19,

25:14, 26:25, 27:1, 29:25, 34:6, 43:18, 43:21, 43:22, 44:23, 45:6, 45:17, 45:22, 46:12, 47:15, 48:2, 49:8, 50:15, 51:6, 51:9, 58:23, 59:6
**releases** [1] - 21:25
**rely** [10] - 5:17, 6:13, 6:22, 7:4, 8:12, 10:7, 22:3, 61:19, 61:20, 61:22
**relying** [1] - 59:2
**remain** [2] - 32:10, 45:18
**remained** [1] - 44:23
**remaining** [1] - 37:1
**remains** [4] - 7:15, 8:22, 64:7
**remedy** [1] - 37:14
**remember** [1] - 61:18
**removal** [39] - 16:19, 17:2, 18:3, 18:9, 18:13, 18:19, 18:22, 19:1, 19:11, 20:1, 20:6, 20:10, 20:23, 21:5, 21:7, 21:8, 26:15, 29:4, 30:20, 31:14, 35:7, 35:18, 36:5, 36:17, 51:20, 53:4, 53:5, 53:13, 53:18, 53:23, 55:16, 55:20, 56:1, 60:15, 73:24, 74:23, 74:24, 74:25
**removed** [2] - 51:12, 60:20
**replaced** [1] - 34:6
**report** [3] - 27:25, 28:2, 48:16
**Reporter** [1] - 1:23, 76:11
**REPORTER** [1] - 11:16
**Reporter's** [1] - 1:16
**reporting** [1] - 57:3
**reports** [4] - 37:22, 56:25, 65:23, 69:8
**representative** [3] - 13:25, 14:2, 14:8
**request** [1] - 20:18
**requested** [2] - 12:24, 69:6
**requests** [2] - 69:20, 70:3
**require** [1] - 10:16
**required** [5] - 17:6, 20:13, 31:4, 55:2, 56:1
**requirements** [1] -

61:16
requires [4] - 20:11, 52:1, 61:21, 74:23
requiring [1] - 52:15
research [1] - 27:22
reserve [2] - 10:21, 15:1
residential [2] - 46:8, 47:2
residents [1] - 44:19
resources [5] - 8:4, 10:2, 41:25, 42:5, 42:9
respect [2] - 7:5, 62:15
respond [5] - 27:4, 27:7, 28:8, 48:24, 71:1
responded [1] - 69:19
responding [2] - 40:15, 49:18
response [2] - 70:21, 73:10
responsibility [2] - 8:11, 8:23
restrictive [1] - 33:22
result [1] - 25:9
resume [1] - 32:25
reunification [5] - 29:15, 29:17, 30:23, 48:17, 49:10
reversing [1] - 28:14
review [3] - 53:18, 68:19, 73:25
reviewed [1] - 6:10
RGB [6] - 38:8, 41:11, 41:12, 41:16, 42:8
RGE [1] - 42:3
ridiculous [2] - 68:16, 68:19
Rights [1] - 2:5
Rio [8] - 11:4, 42:24, 56:16, 57:18, 63:21, 67:6, 67:9, 67:17
risk [9] - 19:18, 19:22, 32:12, 34:7, 35:13, 36:10, 55:18, 55:19, 61:2
river [2] - 62:11, 67:12
rolling [1] - 40:4
Room [1] - 1:23
room [1] - 11:21
rough [1] - 60:11
roughly [4] - 59:16, 59:17, 60:9, 60:11
round [1] - 58:21
routine [1] - 50:10
row [3] - 46:19, 46:20, 46:22
RPR [2] - 1:22, 76:11

Rule [1] - 14:7
rule [2] - 27:5, 35:14
ruled [3] - 5:12, 15:16, 20:18
Rules [1] - 9:24
rules [3] - 9:5, 15:23, 15:24
run [3] - 37:7, 44:21, 46:17

S

sadly [1] - 6:7
safe [1] - 62:18
safety [1] - 31:6
sample [1] - 14:8
sandwich [2] - 39:4, 39:11
sandwiches [1] - 65:1
sanitary [1] - 62:18
Sarah [2] - 2:10, 3:14
sarah.b.fabian@ usdoj.gov [1] - 2:16
sat [1] - 29:9
satisfies [1] - 63:15
Schey [14] - 2:4, 3:10, 7:25, 12:9, 12:19, 16:24, 32:22, 35:10, 44:3, 51:19, 52:2, 56:9, 58:14, 68:24
SCHEY [57] - 3:10, 4:19, 11:5, 11:7, 11:12, 12:20, 14:24, 16:25, 17:4, 17:20, 17:23, 17:25, 18:5, 19:8, 19:12, 19:19, 20:12, 20:15, 20:24, 23:18, 27:7, 27:10, 28:12, 28:15, 32:24, 33:3, 35:11, 36:23, 37:2, 58:15, 59:11, 63:2, 63:5, 63:9, 63:17, 66:9, 66:12, 66:17, 66:21, 68:25, 70:12, 70:14, 70:17, 70:20, 70:23, 71:16, 72:17, 73:12, 73:15, 74:11, 74:15, 74:17, 74:19, 75:1, 75:5, 75:7, 75:10
Schey's [2] - 48:10, 53:3
scratch [1] - 22:22
scratching [1] - 25:13
second [7] - 15:1, 22:7, 32:12, 44:16, 60:3, 68:2, 75:7
secondly [3] - 12:9, 13:24, 14:13

seconds [1] - 30:10
Section [5] - 35:25, 36:7, 51:24, 52:9
section [1] - 49:4
sections [1] - 35:6
sector [16] - 11:4, 38:8, 40:16, 40:18, 41:11, 41:12, 41:13, 41:14, 41:16, 42:3, 42:8, 42:24, 56:16, 58:5
sectors [1] - 68:16
secure [3] - 24:9, 31:5, 32:18
security [2] - 70:9, 70:10
Security [1] - 16:15
see [14] - 39:3, 44:25, 47:7, 47:10, 47:12, 47:13, 47:24, 48:6, 48:14, 53:15, 58:8, 64:12, 64:13, 74:7
seeing [1] - 46:18
seek [1] - 4:13
seeking [1] - 49:23
seem [4] - 15:7, 50:4, 63:3, 67:1
segued [1] - 22:5
sense [7] - 9:21, 17:5, 17:8, 59:18, 71:18, 71:22
sentence [1] - 35:5
separate [5] - 10:17, 34:3, 34:21, 41:1, 58:6
separated [1] - 50:19
separately [2] - 49:15, 49:24
September [1] - 60:7
sequence [1] - 29:7
Services [1] - 71:9
set [6] - 9:13, 23:11, 62:1, 71:4, 72:1, 74:12
setting [1] - 33:22
settlement [23] - 18:7, 18:8, 18:15, 18:20, 18:22, 18:24, 19:2, 19:25, 22:4, 23:15, 26:6, 26:9, 26:14, 26:16, 28:22, 36:13, 36:14, 62:7, 68:10, 69:4, 73:23, 73:24, 73:25
settlements [2] - 19:21, 23:12
several [1] - 35:5
severe [1] - 69:8
shall [12] - 11:5, 18:8, 29:14, 29:17, 30:16,

30:22, 31:7, 32:10, 32:12, 33:21, 48:16, 62:14
share [3] - 51:15, 63:25, 64:5
Sheffield [2] - 2:11, 3:20
short [2] - 59:24, 75:8
short-term [2] - 59:24, 75:8
show [5] - 39:1, 69:20, 69:22, 69:23
showed [1] - 22:12
shower [5] - 42:4, 62:7, 65:14, 65:17, 66:5
showers [5] - 64:7, 64:13, 65:2, 65:12, 65:21
shown [1] - 44:3
shows [1] - 44:12
SIC [1] - 40:17
sick [1] - 21:8
side [6] - 4:15, 5:15, 5:18, 10:24, 15:5, 74:21
sign [1] - 11:20
signed [4] - 26:10, 52:20, 56:18, 61:7
significant [1] - 45:2
signing [1] - 52:22
similar [1] - 62:17
similarly [1] - 37:7
simple [3] - 16:10, 24:18, 24:23
simply [9] - 5:24, 10:5, 16:21, 31:21, 32:15, 50:7, 50:20, 56:2, 61:8
simultaneous [1] - 74:21
single [6] - 23:19, 23:20, 64:16, 65:15, 65:17, 74:2
sit [1] - 34:17
sitting [1] - 11:9
situation [1] - 37:24
situations [4] - 37:22, 51:15, 55:14, 55:15
six [1] - 38:25
sleep [6] - 62:8, 67:20, 68:3, 69:9, 69:13, 69:14
sleeping [1] - 68:20
slightly [3] - 19:19, 31:6, 45:1
Slocum [2] - 2:12, 3:22
slower [1] - 67:18
small [3] - 22:14,

67:10, 71:15
smaller [1] - 42:13
snacks [1] - 38:25
snapshot [4] - 46:18, 48:2, 59:12, 60:4
snapshots [1] - 46:18
so-called [1] - 22:13
soap [2] - 65:2, 66:4
soiled [1] - 62:9
Solinas [1] - 47:6
someone [4] - 46:2, 50:8, 51:20, 58:2
sometimes [3] - 28:23, 39:14, 48:22
somewhat [6] - 13:25, 14:2, 15:3, 28:1, 45:14
soon [4] - 42:25, 47:15, 49:6
sorry [5] - 47:21, 51:25, 57:19, 64:18, 75:7
sort [26] - 22:4, 25:8, 25:16, 25:21, 33:4, 34:5, 38:11, 40:17, 44:9, 44:15, 48:13, 48:23, 49:19, 52:3, 52:11, 53:6, 53:16, 55:4, 56:17, 57:11, 58:25, 61:6, 63:24, 72:7, 72:23, 73:3
sought [3] - 20:19, 54:19, 54:22
sounds [2] - 48:20, 70:8
South [1] - 2:5
southern [2] - 21:16, 67:1
space [3] - 21:20, 21:24, 37:25
Spanish [3] - 13:8, 13:10, 13:11
special [2] - 62:15, 68:12
specifically [2] - 57:15, 57:21
speed [1] - 40:7
spent [2] - 16:3, 35:2
spoken [1] - 38:6
spread [1] - 66:15
stage [2] - 25:23, 25:24
stand [2] - 11:11, 75:11
standing [1] - 11:9
standpoint [1] - 29:7
standstill [1] - 73:18
start [4] - 14:25, 16:1, 16:6, 22:20, 25:18, 37:6, 67:2, 69:3,

69:22
**start-out** [1] - 16:1
**started** [1] - 70:1
**starting** [1] - 17:14
**State** [2] - 55:1, 55:3
**state** [12] - 3:8, 10:25, 30:21, 54:10, 54:12, 54:13, 54:15, 54:20, 54:21, 55:8, 55:9
**statement** [1] - 40:12
**statements** [2] - 7:8, 9:20
**States** [2] - 51:3, 76:7
**STATES** [1] - 1:1
**Station** [1] - 2:14
**station** [5] - 37:12, 37:20, 42:24, 42:25, 64:25
**stations** [4] - 40:20, 43:7, 43:11, 67:15
**status** [4] - 50:23, 51:6, 51:15
**statute** [3] - 51:24, 52:1, 60:16
**statutes** [1] - 36:18
**statutorily** [1] - 17:6
**statutory** [2] - 15:24, 33:5
**stay** [11] - 41:22, 45:16, 46:9, 46:21, 59:20, 63:19, 67:11, 70:16, 71:4, 74:15, 74:18
**stayed** [2] - 46:3, 48:3
**stenographically** [1] - 76:3
**step** [2] - 14:20, 18:12
**still** [11] - 21:5, 21:6, 21:8, 23:18, 38:21, 45:4, 46:23, 53:6, 53:7, 53:22, 57:12
**stopped** [1] - 57:1
**stops** [1] - 18:14
**strange** [1] - 28:1
**streamline** [1] - 4:10
**Street** [1] - 1:23
**strictly** [1] - 59:19
**stuff** [1] - 36:24
**subject** [19] - 16:20, 17:2, 17:5, 17:7, 26:4, 26:15, 28:7, 29:5, 43:17, 51:21, 52:6, 53:5, 53:22, 54:6, 55:23, 55:25, 63:1, 74:22
**subjects** [2] - 51:16, 55:15
**submit** [3] - 13:17, 15:5, 58:19
**submitted** [6] - 7:24,

10:5, 12:1, 12:11, 14:16, 75:12
**Subparagraph** [2] - 34:12, 34:20
**subsection** [1] - 51:25
**successor** [2] - 16:12, 16:13
**sudden** [1] - 58:22
**suggest** [1] - 40:11
**suitability** [2] - 31:25, 32:4
**summer** [1] - 22:13
**supplemental** [3] - 4:9, 44:16, 58:19
**supplies** [1] - 62:22
**support** [2] - 51:2, 51:10
**suppose** [1] - 50:17
**supposed** [7] - 15:11, 15:14, 23:21, 34:19, 34:20, 34:22, 34:23
**surge** [3] - 43:12, 43:15
**Sweden** [1] - 66:25
**system** [9] - 37:18, 38:13, 39:21, 39:24, 40:5, 45:15, 57:8, 71:12

## T

**talks** [3] - 16:13, 37:17, 69:4
**tap** [1] - 63:7
**teeth** [1] - 67:21
**telephone** [1] - 1:24
**temperature** [7] - 62:23, 66:1, 66:20, 66:23, 67:21, 67:24, 68:2
**temporarily** [1] - 32:13
**ten** [4] - 15:2, 36:25, 37:23, 58:14
**term** [3] - 59:19, 59:24, 75:8
**terms** [3] - 15:9, 23:12, 23:14
**terribly** [1] - 26:25
**testified** [2] - 21:14, 38:18
**testify** [12] - 4:5, 4:12, 6:16, 6:19, 6:21, 6:24, 6:25, 8:2, 8:24, 11:22, 38:7, 42:18
**testifying** [1] - 4:16
**testimony** [21] - 4:7, 4:13, 4:17, 5:22, 6:6, 6:13, 6:21, 7:10, 7:17, 8:7, 9:7, 13:14,

13:18, 13:21, 14:14, 14:16, 37:16, 41:17
**testing** [1] - 63:16
**Texas** [14] - 21:16, 23:24, 23:25, 24:2, 41:6, 54:23, 55:1, 55:3, 55:8, 55:10, 61:16, 62:2
**THE** [112] - 2:3, 2:9, 3:17, 3:24, 5:6, 6:1, 7:18, 8:13, 8:15, 9:3, 9:12, 9:23, 10:10, 11:6, 11:11, 11:15, 11:25, 12:4, 12:7, 12:18, 13:11, 13:13, 13:17, 13:20, 14:10, 14:19, 14:22, 16:24, 17:1, 17:18, 17:21, 17:24, 18:1, 19:6, 19:9, 19:13, 20:8, 20:13, 20:22, 23:16, 27:4, 27:9, 28:10, 28:13, 32:22, 33:2, 35:10, 36:22, 36:25, 37:3, 37:5, 37:21, 39:3, 39:13, 40:19, 42:11, 42:19, 43:17, 44:2, 45:8, 45:13, 46:22, 46:25, 47:4, 47:17, 48:9, 49:11, 50:4, 51:18, 53:2, 54:18, 55:5, 56:8, 56:14, 57:5, 57:15, 57:19, 58:1, 58:8, 58:13, 59:9, 63:1, 63:3, 63:6, 63:10, 66:7, 66:10, 66:13, 66:18, 68:23, 70:11, 70:13, 70:15, 70:18, 70:21, 71:14, 72:14, 73:2, 73:11, 73:14, 74:10, 74:12, 74:16, 74:18, 74:20, 75:3, 75:6, 75:9, 75:11
**themselves** [2] - 7:7, 9:20
**theoretically** [2] - 34:11, 60:19
**theory** [2] - 23:2, 23:3
**therefore** [4] - 8:1, 9:21, 26:16, 56:1
**thereof** [1] - 12:12
**they've** [6] - 12:23, 13:5, 31:12, 43:18, 65:4
**thinking** [1] - 26:25
**third** [1] - 14:15
**Third** [1] - 53:16
**thousand** [1] - 65:9

**thousands** [2] - 71:19, 72:9
**three** [12] - 4:6, 4:20, 15:5, 25:4, 27:2, 38:25, 47:3, 59:18, 62:22, 65:21, 68:1, 69:12
**three-month** [1] - 4:20
**throughout** [3] - 9:5, 47:1, 69:2
**timely** [1] - 31:5
**today** [17] - 3:13, 3:16, 3:19, 4:13, 4:16, 6:21, 6:24, 12:13, 14:12, 16:15, 17:14, 38:7, 38:8, 38:21, 68:6, 73:12, 75:4
**today's** [5] - 4:1, 4:12, 10:11, 10:12, 10:24
**together** [2] - 50:1, 50:2
**toilets** [1] - 62:24
**tomorrow** [4] - 71:2, 73:13, 74:13, 75:1
**tonight** [1] - 71:1
**took** [6] - 4:21, 4:22, 29:22, 30:1, 64:10, 73:18
**top** [3] - 44:12, 44:17, 46:20
**torn** [1] - 62:10
**total** [7] - 45:9, 46:20, 46:21, 59:6, 60:2, 60:6, 72:8
**totality** [2] - 49:1, 49:14
**totally** [1] - 6:14
**touch** [1] - 25:2
**touches** [1] - 26:4
**tough** [2] - 25:6, 64:9
**toward** [1] - 48:17
**towards** [1] - 30:23
**towels** [1] - 65:2
**Transcript** [1] - 1:16
**transcript** [3] - 25:12, 76:3, 76:5
**transfer** [2] - 21:18, 56:6
**transferred** [3] - 41:21, 50:1, 71:20
**transferring** [1] - 56:7
**transport** [1] - 43:1
**transported** [2] - 42:14, 63:14
**traveling** [1] - 73:6
**treat** [3] - 9:15, 62:14, 68:11
**trial** [3] - 3:21, 7:2, 7:4
**trials** [2] - 9:6, 9:7
**tried** [1] - 62:1

**true** [5] - 59:1, 62:21, 68:15, 73:20, 76:2
**Trump** [1] - 20:4
**truth** [1] - 71:7
**try** [3] - 15:3, 28:25, 70:4
**turn** [6] - 7:10, 20:9, 21:11, 33:23, 34:17, 34:25
**two** [18] - 10:13, 10:19, 11:1, 13:22, 18:12, 20:2, 25:3, 29:21, 30:12, 30:14, 32:1, 35:4, 35:5, 41:1, 65:21, 67:25, 68:1, 69:12
**two-step** [1] - 18:12
**type** [1] - 61:25

## U

**U.S** [1] - 11:2
**U.S.C** [1] - 52:9
**ultimately** [2] - 42:6, 55:20
**umm** [7] - 12:20, 12:21, 26:8, 39:2, 63:22, 63:24
**unaccompanied** [4] - 42:2, 49:5, 50:11, 71:20
**under** [32] - 9:5, 10:18, 14:7, 19:20, 23:21, 31:23, 32:7, 32:11, 33:6, 33:24, 33:25, 34:10, 34:13, 34:14, 34:20, 35:17, 35:25, 36:2, 36:5, 36:7, 36:15, 39:5, 48:10, 49:25, 52:25, 54:15, 54:20, 55:24, 56:2, 70:8
**underlying** [1] - 72:16
**undermine** [1] - 52:25
**understood** [7] - 4:19, 5:23, 8:8, 9:11, 10:9, 38:1, 42:21
**undertaken** [1] - 50:3
**undertook** [1] - 39:24
**undisputed** [2] - 32:15, 64:7
**unit** [1] - 21:7
**UNITED** [1] - 1:1
**United** [2] - 51:3, 76:7
**universe** [1] - 45:9
**unknown** [2] - 45:23, 45:25
**unless** [3] - 27:9, 30:24, 56:12

**unlicensed** [1] - 54:13
**unlikely** [1] - 38:19
**unnecessary** [3] - 31:8, 31:17, 31:22
**unrelated** [1] - 61:14
**untenable** [1] - 55:4
**up** [17] - 11:9, 23:2, 23:11, 25:21, 29:11, 32:22, 32:23, 35:3, 35:10, 40:7, 44:1, 60:1, 62:1, 63:19, 68:24, 70:11, 74:6
**updates** [1] - 37:17
**upper** [1] - 46:14
**Ursula** [5] - 41:20, 41:23, 42:14, 43:1, 43:8
**US** [3] - 2:13, 3:23, 10:13
**USC** [1] - 51:24
**USDOJ** [1] - 2:10
**useful** [1] - 12:14
**uses** [2] - 31:1, 62:17

**V**

**Valley** [3] - 42:24, 56:16, 57:18
**vanishes** [2] - 73:24, 73:25
**versus** [1] - 3:7
**violate** [2] - 10:14, 69:25
**visa** [1] - 36:21
**visit** [2] - 39:8, 64:23
**vS** [1] - 1:11
**vulnerability** [3] - 62:16, 62:20, 68:12

**W**

**wait** [1] - 31:12
**waiting** [1] - 11:21
**waived** [4] - 4:13, 8:15, 8:20, 14:12
**waiver** [1] - 27:9
**walk** [1] - 9:18
**wants** [4] - 11:10, 17:13, 56:5, 64:8
**Washington** [1] - 2:14
**waste** [1] - 10:2
**wasted** [1] - 8:4
**water** [13] - 62:24, 63:6, 63:7, 63:8, 63:12, 63:13, 63:14, 63:15, 64:2, 65:24, 65:25, 66:4
**ways** [2] - 27:7, 71:8

**Wednesday** [1] - 75:2
**week** [5] - 8:6, 15:18, 30:14, 73:6, 75:4
**weekend** [1] - 63:24
**weeks** [4] - 29:21, 30:14, 34:12, 35:2
**welcome** [1] - 28:5
**WEST** [1] - 1:23
**wet** [3] - 62:10, 67:6, 67:8
**whereas** [1] - 68:3
**who've** [1] - 59:21
**whole** [2] - 59:15, 71:11
**wide** [2] - 10:1, 68:12
**widely** [1] - 20:3
**widespread** [1] - 33:12
**willing** [2] - 30:11, 57:4
**wish** [7] - 4:8, 7:25, 8:9, 8:19, 8:24, 14:12, 51:2
**wished** [3] - 4:21, 4:22, 6:2
**witness** [8] - 12:13, 12:19, 13:18, 14:11, 14:21, 27:5, 27:6, 40:14
**witnesses** [28] - 4:3, 4:11, 5:14, 5:15, 5:16, 5:19, 6:15, 6:19, 6:23, 7:3, 7:9, 7:11, 7:13, 7:17, 7:23, 8:10, 8:12, 8:14, 8:16, 8:19, 8:23, 8:25, 11:18, 11:20, 12:2, 12:5, 12:10, 40:10
**word** [2] - 31:7, 35:4
**words** [3] - 29:11, 35:5
**works** [1] - 17:16
**world** [2] - 24:20, 30:12
**worth** [1] - 27:19
**wow** [1] - 58:24
**wrap** [3] - 27:22, 32:23, 68:23
**written** [2] - 24:7, 69:6

**Y**

**year** [10] - 29:22, 29:24, 30:1, 59:14, 59:22, 59:23, 60:7, 65:4, 70:2, 71:19
**years** [8] - 20:2, 22:8, 22:16, 22:18, 32:2,

32:3, 34:12, 66:24