

# U.S. Customs and Border Protection Juvenile Coordinator Report

Second Report Regarding *Flores v. Lynch*, Case No. CV 85-4544 (C.D. Cal.)
*March 2, 2018*



U.S. Customs and Border Protection

Honorable Dolly M. Gee
U.S. District Court for the Central District of California
350 West 1st St.
Los Angeles, CA 90012
Courtroom 8C, 8th Floor

Dear Judge Gee:

I respectfully submit the second U.S. Customs and Border Protection (CBP) Juvenile Coordinator Report in accordance with Paragraph 28A of the *Flores* Settlement Agreement (Agreement) and this Court's June 27, 2017 and October 18, 2017 Orders.

The attached report details my activities to date as well as planned actions. Taken together, this report provides a picture of the Agency's continued commitment to comply with the Agreement, and monitor that compliance. Since the December 1, 2017 report, I revisted the Rio Grande Valley (RGV) U.S. Border Patrol (USBP) Sector to observe operations at the Central Processing Center-Ursula (CPC-Ursula). I also observed operations at three additional stations in the RGV Sector that were specifically noted in Plantiffs' response to my December 1, 2017 report.  During this timeframe, the Office of Accountability, Management Inspections Division (MID) conducted site visits at seven facilities in the RGV Sector where minors are typically processed including CPC-Ursula.

While this Court's June 27, 2017 Order directs me to monitor activities in the RGV Sector, in recognition of my national mandate, I expanded my oversight and monitoring activities to USBP stations outside RGV Sector and to an Office of Field Operations (OFO) port of entry (POE).  Specifically, a recent increase in the apprehensions of minors prompted my visit to the El Paso USBP Sector and nearby POE. In February 2018, I traveled to four stations in the El Paso Sector and the Paso del Norte POE to observe first-hand how agents and officers respond to minors arriving at the southwest border.

I, along with my team, thoroughly reviewed the Plaintiffs' claims made in their January 8, 2018 response to my first report.  Recognizing that the allegations were made days, even weeks after the Plaintiffs' time in CBP custody, the data team conducted an in-depth analysis of the records for those Plaintiffs held in USBP facilities.  Per policy, the Enforcement Integrated Database e3 Detention Module (e3DM) is used by Border Patrol Agents to record custodial actions for aliens apprehended by USBP.  USBP makes ongoing improvements, modifications and upgrades to e3DM as necessary to allow for better tracking and reporting of *Flores*-related compliance activity.

I, along with my team, have also taken steps to assess the robustness of USBP's data collection and record keeping.  As the official system of record, it is critical that the data contained in e3DM accurately reflects, to the greatest extent operationally feasible, custodial actions provided to minors while in USBP custody.  These actions include

meals or showers provided, welfare checks, and transfer of custody, just to name a few.
My team conducted monthly data spot checks and developed a sampling methodology to
analyze the data associated with minors held in the RGV Sector from August 24, 2017
through January 31, 2018.  Based on my site visits and interviews, MID's recorded
observations, and my team's data analysis efforts, I have concluded the Agency continues
to comply with the Agreement.

I submit this report in good faith as an honest and accurate recording of actions taken for
the period of December 2, 2017 through March 1, 2018.  I plan to submit my next report
to you no later than June 1, 2018 in accordance with your October 18, 2017 Order. I will
continue to provide monthly updates to the Department of Justice attorney of record in
this case through the CBP Office of Chief Counsel.


Respectfully submitted,


Henry A. Moak Jr.
(A) Chief Accountability Officer,
U.S. Customs and Border Protection



**U.S. Customs and Border Protection**

# CBP Juvenile Coordinator Report

## Table of Contents

I.   Introduction ........................................................................................................................ 1

II.  Site Visits .......................................................................................................................... 1

III. e3DM Data Analysis and Results ...................................................................................... 8

   a.   Analysis of the RGV Minor Population ......................................................................... 9

   b.   Analysis of Plaintiffs' Allegations .............................................................................. 12

IV.  Planned Actions and Next Steps ...................................................................................... 17

   a.   Update Training ........................................................................................................... 17

   b.   Message Importance of Data Recordation ................................................................... 17

   c.   Enhance Data Capturing Capabilities ......................................................................... 17

   d.   Conduct Additional Data Analysis .............................................................................. 17

   e.   Visit Facilities Outside of RGV .................................................................................. 18

V.   Conclusion ....................................................................................................................... 18

VI.  Appendix I: List of Acronyms ......................................................................................... 19

# I.  Introduction

The first Juvenile Coordinator Report, dated December 1, 2017, outlined the Agency's
strategic approach to ensuring continued compliance with the Agreement.[1]  From
December 2, 2017 through March 1, 2018, the Juvenile Coordinator oversaw the
Agency's initial implementation phase of this strategy.

The following sections detail the Juvenile Coordinator's activities from December 2,
2017 through March 1, 2018.  Section II describes the Juvenile Coordinator's
observations from his visits to U.S. Customs and Border Protection (CBP) facilities
where minors are routinely held, and the recorded observations from the site visits he
directed the Management Inspections Division (MID) to conduct.[2]  Section III describes
the Juvenile Coordinator's data analysis efforts to monitor and assess how adequately
U.S. Border Patrol (USBP) records its compliance with the Agreement in the Rio Grande
Valley (RGV) Sector.  Together, the site visits and data analysis provide the Juvenile
Coordinator with a more complete picture of how USBP complies with the Agreement.
Finally, Section IV outlines the Juvenile Coordinator's planned activities to enhance
monitoring and reporting capabilities from March 2, 2018 through June 1, 2018.

# II.  Site Visits

Since the December 1, 2017 report, the Juvenile Coordinator returned to RGV Sector,
visited several stations in El Paso Sector, and visited one Office of Field Operations
(OFO) port of entry (POE).  Given the specific concerns raised by the Court in its June
27, 2017 Order, the Juvenile Coordinator continued to focus the majority of his efforts on
the RGV Sector.  The Juvenile Coordinator directed MID to conduct site visits to the
Central Processing Center-Ursula (CPC-Ursula) and stations within RGV Sector where
minors are routinely held.  During these site visits, MID observed facility conditions and
submitted its results to the Juvenile Coordinator.  MID's observations supported the
Juvenile Coordinator's monitoring of these facilities, allowing him to collect more
information to support his conclusions, develop his planned actions, and inform his next
steps.  The following sections detail the Juvenile Coordinator's personal observations
from the field and the results of MID's site visits.

a.  Observations from the Juvenile Coordinator's Site Visits

From February 5, 2018 through February 7, 2018, the Juvenile Coordinator revisted the
RGV Sector, including operations at CPC-Ursula, and visited USBP's El Paso Sector

---

[1] The U.S. Customs and Border Protection (CBP) strategy outlines a comprehensive approach to monitoring and
reporting the Agency's continued commitment to the *Flores* Settlement Agreement.  The strategy centers on three
key areas: policy, execution, and accountability.
[2] For the purposes of this report, "minors" refers both to unaccompanied alien children (UAC), as well as alien
children (those under the age of 18) who are part of a family unit.

(EPT), and OFO's Paso Del Norte POE (PDN). The Juvenile Coordinator selected EPT for two primary reasons: 1) EPT is also located along the southwest border and 2) EPT currently apprehends and holds a higher number of minors as compared to Sectors nationwide.

      *i.    Rio Grande Valley (RGV) Sector Site Visits*

On February 5, 2018, the Juvenile Coordinator returned to the USBP RGV Sector to conduct site visits. The purpose of the trip was to revisit CPC-Ursula and the neighboring USBP stations of Rio Grande City, McAllen, and Weslaco. At each station, the Juvenile Coordinator observed aspects of the facility's operations affecting minors, from initial processing through transfer out of the facility.

Rio Grande City Station (RGC)

The Juvenile Coordinator interviewed the Patrol Agent in Charge (PAIC) and toured the facility. The PAIC informed the Juvenile Coordinator that as a matter of standard procedure, the vast majority of minors apprehended near RGC are directly transferred to CPC-Ursula. While there were no minors on-site at the time of the visit, the Juvenile Coordinator observed the facility and supplies the station had on-site in the event a minor is held there pending transfer. The Juvenile Coordinator observed the conditions of the hold rooms. In each area, there were toilets behind half-walls, sinks, and a five-gallon water dispenser with cups. A cleaning crew was on-site mopping the floors of the hold rooms. The agents on duty confirmed that every shift they checked the temperature of the hold rooms to ensure the rooms were within 66-80 degrees Fahrenheit. The Juvenile Coordinator observed a variety of snacks, juice boxes, and prepared meals (burritos, pizza, hot pockets, and sandwiches) in the food storage area. He observed the storage area had ample sleeping mats, Mylar blankets, car seats, and strollers. The Juvenile Coordinator observed snacks and juice inside station vehicles making them available to minors at any time, including upon apprehension.

Central Processing Center (CPC-Ursula)

From RGC, the Juvenile Coordinator visited CPC-Ursula. He interviewed the PAIC and toured the facility for the second time since his appointment in August 2017. Minors were on-site. The Juvenile Coordinator observed the entrance area where individuals are brought into the facility. In the entrance area, he saw ample snacks, juice, and Mylar blankets. The PAIC informed the Juvenile Coordinator these items are provided to minors upon arrival and before processing. The Juvenile Coordinator observed agents collecting biographical information from minors at initial intake. He also observed agents updating the Enforcement Integrated Database e3 Detention Module (e3DM) to

record USBP custodial actions provided to minors while in USBP custody.[3]  After intake, he observed minors moving freely within designated areas separated by their age, gender, and some by status as an accompanied or unaccompanied minor.  Within these areas, the Juvenile Coordinator observed minors' direct access to blankets, sleeping mats, sinks, and toilets.  A member of the Juvenile Coordinator's team tested a Mylar blanket by wrapping herself in it and confirmed it provided warmth.  The PAIC confirmed that temperatures are checked in hold rooms and the larger holding area once per shift.  The Juvenile Coordinator took notice that the temperature throughout the facility was comfortable.

The Juvenile Coordinator interviewed a nurse practitioner on-site and observed minors awaiting medical screening.  The Juvenile Coordinator learned that a medical screening consists of a medical professional on-site screening an alien for obvious illness or injury. Moreover, the Juvenile Coordinator observed the delivery of the second of three meals of the day, and the agents preparing to distribute the food.  He observed the meals were burritos and they were stored in insulated food carriers to maintain temperature until given to aliens.  He took one of the burritos out of the carrier and confirmed it was warm. The Juvenile Coordinator also saw the assortment of snacks and bottled water available to minors upon their request.  The Juvenile Coordinator observed the shower facility and the hygiene products provided to minors, including towels, deodorant, toothbrushes, and toothpaste.  He also saw a large inventory of clean clothing available for minors to wear, including t-shirts, sweatpants, undergarments, and footwear.  The Juvenile Coordinator saw laundry services were available to minors.  He observed two recently showered minors wearing clothes provided by CPC-Ursula while their personal clothes were laundered.  The Juvenile Coordinator observed the hold rooms were clean.  The PAIC told the Juvenile Coordinator that the facility is cleaned three times a day.  He observed minors watching television while sitting or lying on mats with blankets.  The Juvenile Coordinator observed U.S. Immigration and Customs Enforcement (ICE) on-site and at its designated workspace.  The Juvenile Coordinator also observed a designated area for the diplomatic consuls to meet with their citizens.  There was one foreign consul official sitting at his desk with aliens sitting ready to speak with the consul official.

McAllen Station (MCS)

Following CPC-Ursula, the Juvenile Coordinator visited MCS, where he interviewed the PAIC and toured the station.  Due to the station's close proximity to CPC-Ursula, minors apprehended near MCS are typically transferred to CPC-Ursula.  The Juvenile Coordinator observed a minor being processed and held as arrangements were made for

---

[3] Enforcement Integrated Database e3 Detention Module (e3DM) system is the official system of record through which USBP documents custodial actions related to aliens in USBP holding facilities.  Custodial actions may include, but are not limited to, the provision of food; the provision of a cot/mat or blanket; access to drinking water; access to functioning toilets; access to functioning sinks; and whether hold rooms are clean and maintained within 66-80 degrees Fahrenheit.

the minor's transport to CPC-Ursula. The Juvenile Coordinator observed agents providing a Mylar blanket, crackers, and juice to the minor. He then observed agents record these actions into e3DM. The minor's hold room contained a five-gallon water dispenser with cups, a sink, and a toilet behind a half-wall. An agent demonstrated the infrared laser tool used to check the temperature of the hold rooms during each shift. Using the tool, the agent confirmed that the holding areas were within 66-80 degrees Fahrenheit. The Juvenile Coordinator observed snacks, formula, juice, and meals (hot pockets and sandwiches) for provision to minors in the food storage area. The PAIC confirmed that food was readily available upon a minor's request. The Juvenile Coordinator also observed a storage area containing diapers and toys.

Weslaco Station (WSL)

The Juvenile Coordinator's final visit in RGV Sector was WSL. At WSL, he interviewed the PAIC and toured the station. Like MCS and RGC, minors in WSL are primarily transferred to CPC-Ursula. At the time of the Juvenile Coordinator's visit, he observed family units with minors at WSL. The PAIC informed the Juvenile Coordinator that one of the family units was diagnosed with flu. As such, their transfer to CPC-Ursula was delayed to prevent the spread of flu within CPC-Ursula's open environment, and WSL's enclosed hold rooms were better suited for maintaining a safe environment for others while awaiting custody transfer to ICE. The Juvenile Coordinator observed that the hold rooms contained a five-gallon water dispenser with cups, sinks, and toilets behind a half-wall. The Juvenile Coordinator also observed agents providing sandwiches and juice to the aliens in custody.

> ii.    El Paso (EPT) Sector and Paso Del Norte (PDN) Port of Entry (POE) Site Visits

On February 7, 2018, the Juvenile Coordinator visited three USBP stations (Clint, Santa Teresa, El Paso, and the Paso Del Norte processing area) and one OFO port of entry (Paso Del Norte). The purpose of this trip was to further the Juvenile Coordinator's understanding of the various operational environments outside RGV Sector, and to observe how EPT Sector complies with the Agreement.

Clint Station (CTX)

The Juvenile Coordinator interviewed the PAIC and toured CTX. CTX serves as the primary intake hub for unaccompanied alien children apprehended in EPT. The Juvenile Coordinator observed seven minors on-site. All minors were already processed and awaiting transfer to a Health and Human Services facility. The PAIC informed the Juvenile Coordinator the station has an agreement with a local shelter that allows USBP to bring minors over who require a shower. The Juvenile Coordinator observed hold rooms at the station were clean and contained a toilet, a sink, and a bottle of hand

sanitizer.  Three hold rooms contained minors separated by gender.  Some of the minors
had granola bars that they recently received from the agents as a snack.  Each hold room
had individual bottles of water and a water fountain located at the sink.  A television was
viewable from each hold room.  The agents showed the Juvenile Coordinator where
minors enter the station.  The PAIC informed the Juvenile Coordinator that agents at
CTX regularly take minors to the entrance or parking lot for exercise.  The Juvenile
Coordinator observed a storage area containing clothing, toys, bikes, sports balls, dry
food staples, first aid supplies, and hygiene items (e.g. feminine hygiene products, baby
wipes, and diapers).  The Juvenile Coordinator also observed a freezer stocked with
frozen burritos and a refrigerator stocked with bread and bologna.  There were also
granola bars, raisins, fruit cups, baby formula, and baby food available on-site.  The
PAIC informed the Juvenile Coordinator that, in addition to regular meal times, snacks
were available upon a minor's request.

Santa Teresa Station (STN)

The Juvenile Coordinator interviewed the PAIC and toured STN.  During his visit, there
were three separate family units, including minors, on-site.  The families were in clean
hold rooms with bottled water and hand sanitizer.  The Juvenile Coordinator also
observed male minors in two additional hold rooms, which were clean, had hand
sanitizer, and had drinking water from a water fountain at the sink.  All hold rooms had
cots and some minors were wearing blankets.  The Juvenile Coordinator observed some
minors playing with toys.  The Juvenile Coordinator learned that agents personally
provided these toys for minors.  The Juvenile Coordinator observed food supplies, which
included a freezer with frozen burritos, a refrigerator with bologna and bread, a large box
of granola bars, and baby formula.  One of the minors in custody opened the door of her
hold room and requested bottled water.  The Juvenile Coordinator observed an agent
providing the water immediately to the minor.  The Juvenile Coordinator noticed one of
the minors had a cast on her leg.  The PAIC explained she had been apprehended the
previous night and complained of a hurt ankle.  She was taken to a local hospital where
she was treated for a sprained ankle, received a cast, and returned to STN.  The Juvenile
Coordinator observed an agent using an infrared laser tool to confirm the temperature
was within 66-80 degrees Fahrenheit.

El Paso Station (EPS)

The Juvenile Coordinator interviewed the PAIC and toured EPS.  No minors were present
at EPS at the time of the visit.  The Juvenile Coordinator observed that the hold rooms
were clean and ready for use.  The Juvenile Coordinator observed a clean shower area.
The Juvenile Coordinator observed that the storage area contained a large box of granola
bars, baby formula, and assorted food items present in the event a minor is held at EPS.
The storage area also contained clean clothing, towels, first aid supplies, toothbrushes,
toothpaste, and deodorant.  A television was viewable from each hold room.  Toilets and

drinking water through fountains at each sink were available in every hold room.  The Juvenile Coordinator observed cots were stacked and ready for use.

<u>Paso Del Norte Processing Center (PDT)</u>

The Juvenile Coordinator interviewed the PAIC and toured PDT.  Four family units were on-site at the time of the visit.  The Juvenile Coordinator observed the hold rooms were clean and contained toilets, sinks, and drinking water through fountains at each sink.  The Juvenile Coordinator observed a box of granola bars near the hold rooms and the PAIC confirmed these were available to minors upon request.  The Juvenile Coordinator observed cots in storage ready for distribution.  The Juvenile Coordinator observed some members of family units sitting and laying on cots in the hold room

<u>Paso Del Norte Port of Entry (PDN)</u>

The Juvenile Coordinator's final visit was to OFO's PDN where he interviewed the officer in charge and toured the POE.  The Juvenile Coordinator observed two unaccompanied minors onsite watching a television.  The Juvenile Coordinator was informed the minors were waiting to be transferred out of the POE and would be provided a shower before they were transferred from OFO custody.  An officer informed the Juvenile Coordinator that the POE had converted its staff break room into a hold room for unaccompanied minors.  The hold room was clean, and the minors had access to toilets, sinks, and bottled water.  The Juvenile Coordinator also observed several family units with minors on-site.  He observed the family units were in clean hold rooms with toilets, and drinking water available through fountains at the sink.  Several of the minors who were part of a family unit were playing with dolls.  The Juvenile Coordinator also observed several minors who were part of a family unit laying on cots.  Finally, the Juvenile Coordinator observed a storage area containing clothing for a variety of sizes, cots, towels, blankets, first aid products, toothbrushes, toothpaste, body wash, diapers, baby formula, baby food, granola bars, raisins, and fruit cups.

    *iii.*    *Juvenile Coordinator's Conclusion from Site Visits*

Based upon the Juvenile Coordinator's observations and interviews, the Juvenile Coordinator believes the agents assigned to RGV and EPT Sectors, and the officers assigned to PDN, provided custody to minors in compliance with the Agreement.

    b.  Results of MID Site Visits

MID is a division within the Office of Accountability (OAct) that has expertise conducting detailed, independent reviews of CBP programs, operations, and facilities for purposes of determining compliance with a broad range of laws, regulations, and policy. MID is responsible for conducting inspections throughout CBP that proactively identify

areas of potential vulnerability or conditions that could hinder the successful accomplishment of CBP operational goals. MID provides CBP executive management with timely, objective, and reliable information and analysis concerning the effectiveness, integrity, and performance of CBP programs, operations, and offices. In his position as the Acting Chief Accountability Officer of OAct, the Juvenile Coordinator oversees MID's reviews throughout the Agency. Based on his direct experience working with MID, the Juvenile Coordinator trusts that the observations from MID's site visits are accurate, thorough, and independent from the opinions of the facilities MID observed. The Juvenile Coordinator directed MID to conduct site visits in RGV Sector as part of his strategic approach for monitoring compliance with the Agreement. Before MID's first site visit, the *Flores* Working Group (Working Group) reviewed the Court's June 27, 2017 Order and the requirements of the Agreement.[4] The Working Group created a checklist for MID to use at CPC-Ursula and the stations in the RGV Sector to record whether facilities provided the requirements of the Agreement. The checklist included questions related to access to food and water, temperature at the facility, safe and sanitary conditions, and access to a cot/mat or blanket (including Mylar blankets).[5]

During this reporting period, MID conducted two trips, on January 9-11, 2018 and January 24-26, 2018, to all of the following locations in the RGV Sector where minors are routinely held: Brownsville, CPC-Ursula, Corpus Christi, Falfurrias, Fort Brown, Harlingen, and Kingsville.[6] Because USBP facilities are always operational, MID conducted site visits during various times throughout the day and night. This provided the Juvenile Coordinator with a more complete picture of operations at each facility.

During both trips, minors were present at CPC-Ursula and Brownsville when MID conducted site visits. Minors were present at Harlingen during MID's first site visit and present at Falfurrias during MID's second site visit. At all facilities, MID confirmed the facilities provided access to the following: meals and snacks; drinking water; functioning toilets; and cots/mats or blankets. In the hold rooms where minors were present, MID confirmed facilities were clean, free of pests and rodents, and within the temperature range of 66-80 degrees Fahrenheit. MID observed all facilities provided additional supplies based on operational feasibility (e.g., diapers, formula, clean clothing, and

---

[4] The Juvenile Coordinator hosted the first *Flores* Working Group (Working Group) session in November 2017. The Working Group includes subject matter experts from USBP, OFO, OAct, Office of Chief Counsel (OCC), and Office of Public Affairs (OPA) to discuss CBP's existing monitoring and data collection efforts related to compliance with the Agreement. The Working Group is a mechanism through which the Juvenile Coordinator's planned actions can be discussed.
[5] This checklist specifically asked whether the facility was equipped to provide access to functioning toilets to minors. The version of the checklist MID used during this reporting period did not include a question about whether the facility was equipped to provide access to functioning sinks to minors. The checklist will be reviewed by the Working Group and will be updated to include functioning sinks during the next reporting period. Based on the Juvenile Coordinator's field interviews and review of USBP's system of record, functioning sinks and toilets are recorded by agents once a shift on a per hold room basis. Therefore, the Juvenile Coordinator believes agents continuously monitored whether there were functioning sinks throughout this reporting period.
[6] MID visited all seven facilities during each trip.

towels). MID also learned that each facility had a contingency plan for responding to increased numbers of minors by acquiring additional food and other supplies on an as needed basis. At three stations, MID noted some expired food stored in freezers. Specifically, during both site visits, MID noted that one station had frozen bologna kept past its expiration date. During the second visit, MID noted that one station kept frozen bread and frozen burritos past the expiration dates. Two additional stations kept frozen bread past its expiration dates. Of the stations where MID noted expired food, only one station had a minor on-site. MID visited that station on January 25, 2018 and noted the expiration of frozen bread was January 20, 2018. However, MID noted this station had other unexpired food available for minors. The Juvenile Coordinator reviewed MID's completed checklist and advised USBP of the expired food. On February 21, 2018, USBP Headquarters issued an email titled "*Flores* Compliance Inspections" to USBP Headquarters Law Enforcement Operations Directorate, all USBP juvenile coordinators, and the Juvenile Coordinator for widest dissemination. The email advised agents to monitor and dispose of any expired food, even if frozen, in a timely fashion and never to provide such food to aliens in custody. Based on MID's completed checklist and USBP's follow-up, the Juvenile Coordinator concludes USBP took appropriate action to ensure minors will not receive expired food.

## III.   e3DM Data Analysis and Results

USBP records custodial actions it takes in relation to minors in its custody (custodial records). These custodial records include the provision of food; the provision of a cot/mat or blanket; access to drinking water; access to functioning toilets; access to functioning sinks; and whether hold rooms are clean and maintained within 66-80 degrees Fahrenheit. Maintaining comprehensive custodial records for minors in USBP custody is a critical component in documenting USBP's compliance with the Agreement.

The Juvenile Coordinator and his team conducted an in-depth quantitative analysis of data in USBP's relevant system of record, e3DM, to determine whether the data adequately documented USBP's compliance with the Agreement in the RGV Sector. The purpose of this analysis was two-fold: 1) assess the completeness of the custodial records maintained for minors in the RGV Sector, and 2) use data provided in e3DM coupled with the observations from the Juvenile Coordinator's and MID's site visits to determine whether the data accurately reflected USBP's compliance with the Agreement in the RGV Sector.

The Juvenile Coordinator developed a sampling methodology that is representative of the full population of minors in RGV Sector. Second, the Juvenile Coordinator reviewed the individual custodial records of minors identified in Plaintiffs' January 8, 2018 response to the Juvenile Coordinator's December 1, 2017 report who were in custody in the RGV Sector. The following provides a summary of the Juvenile Coordinator's data analysis efforts.

8

### a. Analysis of the RGV Minor Population

The Juvenile Coordinator reviewed data captured in e3DM related to minors held in RGV Sector since his appointment as the CBP Juvenile Coordinator. The purpose of this review was to provide a baseline statistical analysis regarding the number and percent frequency agents record custodial records in e3DM. Because agents manually record each custodial action into e3DM, the Juvenile Coordinator recognizes there will never be 100 percent recordation. However, based on the Juvenile Coordinator's field interviews and MID's completed checklists, the Juvenile Coordinator believes custody conditions for minors in RGV Sector are consistent with the Agreement, even when recordation is less than 100 percent.

     i.    *Methodology*

For this analysis, the total population represents minors, ages two through 17, in USBP's custody in RGV Sector from August 24, 2017 through January 31, 2018. This timeframe was selected because it reflects the date the Juvenile Coordinator was appointed to this position and it provided the Juvenile Coordinator's team sufficient time to conduct their analysis. To ensure that the subsequent analysis was based on the population's total time in custody (from apprehension through transfer out of USBP custody), minors apprehended prior to August 24, 2017, who remained in custody on that date, were removed from the population pool. Likewise, minors who were apprehended prior to January 31, 2018, but remained in custody on or after February 1, 2018, were also removed from the population pool.[7] After removing those records, 17,352 minors remained.

The Juvenile Coordinator drew a random sample from the 17,352 minors included in the total population. Using a computerized random number generator tool, 646 minors were selected for analysis. The 646 minors were selected based on the individual record number assigned to each minor's e3DM database entry and then by matching that number to the list of numbers selected by the random number generator tool. The resulting sample size of 646 minors provides a 99 percent statistical level of confidence with a five percent margin of error. This statistical methodology is industry standard and ensures the sample selected is unbiased and representative of the 17,352 minors in the total population.

To measure recordation of the specific requirements of the Agreement, the Juvenile Coordinator reviewed custodial records related to food, drinking water, and hold room

---

[7] Excluding those minors who were not apprehended and transferred from USBP custody within the selected timeframe was necessary to ensure all custodial records associated with the minors in the population were included in the analysis. For example, if a minor was apprehended before August 24, 2017 and received a cot/mat or blanket upon arrival at the station, the custodial action would not have been included in the data pull.

conditions, as well as the concerns raised by the Court in its June 27, 2017 Order
pertaining to cots/mats or blankets. These categories are not an all-inclusive list of the
types of recorded actions that can be reported from e3DM.

    ii.    *Results*

Table 1 shows the number and percentage of minors from the sample who were
documented as having access to food, access to drinking water, clean hold rooms, hold
rooms with temperatures within range, functioning toilets, and a cot/mat or blanket.[8]

| Data Category | Number of minors (out of 646) | Percentage |
|---|---|---|
| Recorded as being offered food | 643 | 99.5% |
| Average time between recorded food offered | 4 hours | |
| Recorded as having access to drinking water | 582 | 90.0% |
| Recorded as having clean hold rooms | 642 | 99.4% |
| Recorded as having hold rooms within temperature range of 66-80 degrees Fahrenheit | 642 | 99.4% |
| Recorded as having access to functioning toilets | 597 | 94.4% |
| Recorded as being provided cot/mat or blanket | 353 | 54.6% |

*Table 1: Excerpt of Summary Statistics of Minors Sampled in RGV Sector*

The summary statistics above indicate that the vast majority of the custodial records for
each minor in this sample document access to food (meal and/or snack); drinking water;
clean hold rooms; hold rooms within a temperature range of 66-88 degrees Fahrenheit;
functioning toilets; and a cot/mat or blanket. The summary statistics also indicate that, on
average, agents recorded minors from this sample were offered food every 4 hours.

    iii.    *Analysis*

In the 160-day sample period, USBP agents made approximately 1.5 million individual
data entries for the 17,352 minors in custody in the RGV Sector. For three of the data
categories assessed (offered food, access to clean hold rooms, access to hold rooms with
temperature ranges between 66-80 degrees Fahrenheit), agents recorded access at least 99
percent of the time in e3DM. For access to functioning toilets, agents recorded access
94.4 percent of the time in e3DM. For access to drinking water, agents recorded access
90 percent of the time in e3DM. For cot/mat or blanket provision, agents recorded access
54.6 percent of the time in e3DM.

---

[8] The number and percentage of minors recorded as having access to functioning sinks was not included in the
analysis during this reporting period. For the June 1, 2018 report, the Juvenile Coordinator's team will include this
data point in their subsequent analysis.

The summary statistics show that there is not 100 percent recordation. The Juvenile Coordinator recognizes there may be individual instances where custodial actions were not recorded because they did not occur. However, based on the Juvenile Coordinator's site visits and interviews, as well as MID's completed checklists, he believes that any systemic issues with data recordation are the result of operational demands preventing agents from manually recording these actions. For example, in the data sample, only 54.6 percent of minors in RGV Sector were recorded as being provided a cot/mat or blanket. During the Juvenile Coordinator and MID's visits to RGV; however, they observed that these items were available at every facility they visited. Notably, the majority of the minors in the sample are from CPC-Ursula, where the Juvenile Coordinator learned from the PAIC that a cot/mat or blanket is generally provided upon arrival. During the sampling timeframe, the Juvenile Coordinator also learned that it was not mandatory for USBP agents to record a cot/mat or blanket in e3DM, which may further explain the 54.6 percent result. USBP informed the Juvenile Coordinator that it is in the process of conducting e3DM refresher training and agents are reminded to include this provision when recording custodial actions within the system. The Juvenile Coordinator supports USBP's efforts to improve its recordation of this custodial action and continually improve its methods to monitor its own compliance with the Agreement. The Juvenile Coordinator will continue to monitor recordation of cots/mats or blankets in e3DM to determine whether any additional measures may be appropriate to enhance recordation of this data point. If, after further analysis, the Juvenile Coordinator believes additional actions are necessary, he will engage USBP leadership.

Access to drinking water and functioning toilets were recorded 90.0 percent and 94.4 percent of the time, respectively, for the sample population. Based on the Juvenile Coordinator's site visits and interviews, as well MID's completed checklists; however, the Juvenile Coordinator does not believe 10 percent and 5.6 percent of minors do not have access to drinking water and functioning toilets, respectively, in RGV Sector. In RGV Sector, the Juvenile Coordinator and MID observed that the facilities provided minors with access to functioning toilets and drinking water. The Juvenile Coordinator learned that agents record these data points when drinking water and functioning toilets are present within the physical hold room to which the minor is assigned. If a minor can access drinking water and functioning toilets beyond their assigned hold room, however, this access may not be recorded in e3DM. For example, in some facilities, minors are held in open areas where they have access to drinking water and functioning toilets in an unobstructed adjacent area, but this access may not be recorded. The Juvenile Coordinator will engage USBP leadership to determine the best manner to clarify how these data points are recorded in e3DM.

Overall, the Juvenile Coordinator believes that his and MID's observations provide insight into possible reasons for the gaps in data recordation. As evidenced through this analysis, there is a large amount of data collected for each minor. On average, approximately 75 separate data points are collected for each minor from initial entry into

e3DM to transfer from USBP facilities. As the number of minors in custody grows and the time in USBP short-term holding increases, the amount of data recorded and stored by e3DM grows exponentially. The requirement to both ensure that minors and others in USBP custody receive appropriate treatment while recording all appropriate data points at appropriate time intervals creates a challenge for agents to maintain the data and ensure that records are both timely and complete.

The Juvenile Coordinator recognizes the near-impossible task for agents to achieve 100 percent data recordation in e3DM. The Juvenile Coordinator will engage USBP leadership to explore methods to enhance data recordation. However, even without 100 percent recordation, the Juvenile Coordinator believes the data captured in e3DM coupled with observations from his and MID's site visits confirm USBP's compliance with the Agreement in the RGV Sector.

## b. Analysis of Plaintiffs' Allegations

On January 8, 2018, Plaintiffs' counsel submitted a detailed response to the Juvenile Coordinator's December 1, 2017 report. Plaintiffs' response included 58 declarations from either minors held in CBP custody or their parents. After accounting for duplicate allegations (e.g., situations in which both a minor and a parent submitted a declaration) as well as some data accuracy issues, the team concluded that the declarations contain the allegations of 65 minors held in CBP custody (49 from USBP and 16 from OFO). Of the 49 declarant minors held in USBP custody, 38 declarant minors were held in the RGV Sector and 11 of the minors were held outside RGV Sector.

The Juvenile Coordinator systematically reviewed the custodial records from e3DM of the 49 declarant minors held in USBP custody for this reporting period, and will review the records of the 16 declarant minors held in OFO custody in advance of the June 1, 2018 report. Many of the allegations are repeated throughout the 49 USBP declarations, which center on quality and access to food and water, as well as facility temperature, and facility conditions. The Juvenile Coordinator reviewed all of these allegations in detail, even those that may fall outside the scope of the requirements of the Agreement.

### i.   *Methodology*

For this report, the Juvenile Coordinator selected three of the 38 declarant minors held in RGV Sector, which were representative of the types of allegations made repeatedly in the declarations. This was done by using the declarants' individual e3DM custodial records to show data at the individual level. The Juvenile Coordinator repeated this process for all 49 declarant minors in USBP custody who were included in Plaintiffs' response. Given the Court's June 27, 2017 Order is focused on RGV Sector, the exemplars below are of declarant minors held in RGV Sector.

12

ii.    *Results*

The following case studies illustrate the variety of allegations made and provide examples of CBP's response to such allegations. The Juvenile Coordinator notes that some allegations cannot be refuted because the substance of the allegation does not correspond to data captured in e3DM. Other allegations may be true, but are based on an operational reality that the Juvenile Coordinator believes is consistent with the Agreement. Still other allegations are subjective to the declarant, and to the extent these allegations are true, the Juvenile Coordinator does not believe they are necessarily indicative of a violation. These are all discussed in detail below. In each instance where data was recorded in e3DM, the custodial records were analyzed to determine if USBP met appropriate requirements of the Agreement at the time the complainant was in USBP custody.

Declarant Minor 1

K.C. is an 8 year-old girl from El Salvador who was accompanied by her mother. K.C.'s mother was interviewed by Plaintiffs' counsel on December 7, 2017 while in ICE custody. K.C.'s mother made the following allegations regarding their time at CPC-Ursula: the hold room was overcrowded and cold; K.C. was only provided a Mylar blanket; K.C. was provided juice and a snack instead of water upon arrival; K.C. was not provided enough food and only received sandwiches, "cold" burritos, and apples; K.C. was woken up at night; and the lights remained on 24/7. Additionally, K.C.'s mother alleged that she herself had not received a shower, but it was unclear from the declaration if she was also alleging that K.C. had not received a shower.

The Juvenile Coordinator's team only focused on the allegations as they pertained to K.C., and not her adult mother. According to e3DM records, K.C. was held in custody at CPC-Ursula for approximately 1.75 days, where e3DM records indicate that she was offered five meals (four hot, one cold) and two snacks. The e3DM records indicate she had access to drinking water, functioning toilets and sinks, and was held in a clean and pest-free environment. The records also indicate that the temperature of the rooms in which K.C. was held stayed within the 66-80 degree Fahrenheit range.

Declarant Minor 2

A.T. is a 16-year-old boy from Honduras who was accompanied by his mother. A.T.'s mother was interviewed by Plaintiffs' counsel on December 7, 2017 while in ICE custody. A.T.'s mother made the following allegations regarding their time at CPC-Ursula: the hold room was overcrowded, cold, and dirty; lights remained on 24/7; A.T. and his mother did not have access to a private restroom; A.T. and his mother were held in separate hold rooms; A.T. and his mother were unable to shower and change their clothes for two days after arrival.

13

The Juvenile Coordinator's team only focused on the allegations as they pertained to
A.T., and not his adult mother.  According to e3DM records, A.T. was held in custody at
CPC-Ursula for approximately three days, where he was offered 11 meals (seven hot,
four cold) and five snacks.  A.T. had access to functioning toilets and sinks; a cot/mat or
blanket; and was provided a shower.  The e3DM records show that A.T. was held in a
clean and pest-free environment, and the temperature of the hold rooms in which he was
held stayed within the 66-80 degree Fahrenheit range.

<u>Declarant Minor 3</u>

D.R. is a 16-year-old girl from Honduras who was accompanied by her mother.  D.R. was
interviewed by Plaintiffs' counsel on December 7, 2017 while in ICE custody.  D.R.
made the following allegations regarding her time in CPC-Ursula: the hold room was
overcrowded; she did not have access to a private restroom; she was separated from her
mother, but was allowed to visit; she only showered and brushed her teeth once while in
custody; she was provided spoiled milk; she was only provided a Mylar blanket; the
lights were on 24/7; she was woken up at night; agents yelled and called her lazy; and the
agents did not give her access to a telephone at the facility to make a phone call.

The Juvenile Coordinator's team only focused on the allegations as they pertained to the
declarant minor D.R., and not her adult mother.  According to e3DM records, D.R. was
held in custody at CPC-Ursula for approximately three days where she was offered 13
meals (seven hot, six cold) and two snacks.  The e3DM records indicate that she had
access to functioning toilets and sinks, and a cot/mat or blanket.  The e3DM records
indicate that D.R. was provided a shower, as well as dental hygiene and body-cleansing
products.  The records also indicate that D.R. was held in a clean and pest-free
environment, and the temperature of the hold rooms in which she was held were within
the 66-80 degree Fahrenheit range.

While e3DM records cannot confirm whether D.R. received spoiled milk, MID's
recorded observations did indicate there were some instances where stations stored frozen
food past the expiration date.  As discussed previously, the Juvenile Coordinator advised
USBP of MID's recorded observations and USBP took action to inform the field to
discard any expired food, regardless of how it was stored.  The allegation of spoiled milk
was referred to USBP Headquarters for their review and appropriate action.

    *iii.*    *Analysis*

While this report highlights the specific custodial records of the three declarants, the
Juvenile Coordinator reviewed the custodial records of all 49 declarant minors held in
USBP custody.  The custodial records discussed above were representative of all 38
declarants held in RGV Sector.  The following sections discuss the allegations in greater

14

detail. <u>Analysis of Plaintiffs' Allegations Using Custodial Records, and Juvenile Coordinator and MID's Site Visits</u>

The e3DM records indicate the three Plaintiffs described above were offered regularly scheduled meals and snacks. For example, declarant minor K.C. was offered five meals (four hot, one cold) and two snacks; declarant minor A.T. was offered 11 meals (seven hot, four cold) and five snacks; and declarant minor D.R. was offered 13 meals (seven hot, six cold) and two snacks. Their records are representative of all 38 declarant minors held in RGV custody, as all 38 declarant minors' records indicate regularly scheduled meals throughout their time in custody. The Juvenile Coordinator also interviewed agents at CPC-Ursula during his February site visit, who confirmed that snacks are available upon request to all minors.

Several declarants, including the declarant minors highlighted above, alleged that the hold rooms were dirty. With the volume of individuals moving through USBP custody, the hold rooms will never be spotless. However, as with temperature, agents regularly check and record if hold rooms are clean and pest-free. The Juvenile Coordinator observed cleaning crews on-site while at CPC-Ursula, and was informed that cleaning occurs on a regular schedule each day. The e3DM records indicate that declarant minors K.C., A.T., and D.R. were all held in clean and pest-free areas, which is also representative of all 38 declarant minors' recorded hold room conditions. The three highlighted declarant minors stated they felt cold at CPC-Ursula. While the Juvenile Coordinator cannot dispute whether these declarant minors felt cold, records from e3DM indicate all 38 declarant minors were held in facilities within the temperature range of 66-80 degrees Fahrenheit. This range reflects the CBP standard for hold rooms and accounts for conditions year-round on the northern and southern borders. As referenced earlier, the Juvenile Coordinator observed during his site visits to RGV Sector that agents checked the temperature range and recorded it in e3DM. USBP agents informed the Juvenile Coordinator that hold rooms are checked every shift to ensure the temperature is within this range using laser thermometers. The Juvenile Coordinator also learned that by policy, minors are restricted from being placed in hold rooms outside this temperature range. MID's recorded observations also confirmed that temperatures were within range for each hold room where a minor was on-site at the time of their visit.

Moreover, two of the declarant minors highlighted above, and several other declarants held in RGV Sector, made allegations related to access to showers. During the Juvenile Coordinator site visits, he was informed that, to the extent operationally feasible, efforts are made to provide showers to minors who have been in custody for more than 48 hours. The Juvenile Coordinator observed showers on-site at CPC-Ursula. Additionally, the Juvenile Coordinator observed hygiene products such as toothbrushes, toothpaste, and deodorant at CPC-Ursula. These observations are consistent with the custodial records of the 38 declarants. For example, custodial records from e3DM indicate that declarant minor D.R. was in custody more than 48 hours, and was provided a shower, a body-

15

cleansing product, and a dental hygiene product while at CPC-Ursula. This is representative of the custodial records for the 38 declarants. The custodial records indicate the 38 declarants were provided body-cleansing products in some cases. The custodial records also indicate that of the 38 declarant minors held in RGV, 16 were in custody longer than 48 hours; of the 16, 12 declarant minors' records indicate that they were provided a shower; the remaining four declarant minors' records could not confirm if they were provided a shower.

Of the 38 declarant minors held in RGV, 35 declarant minors' e3DM records indicate that they had access to functioning sinks and toilets while in CBP custody. The remaining three declarant minors' records did not state whether they had access to functioning sinks and toilets, however, the records show they were held in CPC-Ursula, which, as the Juvenile Coordinator observed, provides access to functioning sinks and toilets.

## Plaintiffs' Allegations Related to Operational Realities

The 38 declarants, including the three declarant minors highlighted above, also made allegations concerning use of Mylar blankets, lights on 24/7 in hold rooms, lack of private restrooms, separation from family members, and being woken up at night. The Juvenile Coordinator does not dispute these allegations, but believes these conditions are consistent with the requirements of the Agreement because these conditions exist at USBP facilities for safety and operational needs. For example, Mylar blankets are used as an alternative to cloth blankets for sanitary reasons. Mylar blankets provide warmth and are used as temporary disposable blankets. Moreover, lights must be on throughout facilities at all times so that agents can properly monitor activities within the holding areas, provide appropriate agent safety, and due to the fact that USBP facilities operate at all hours of the day and night. There are no private restrooms in holding areas. Toilets are either placed behind a half-wall or portable toilets with half-doors are provided. This provides minors with privacy and allows agents to appropriately monitor activities within the holding areas. Operational and safety needs also dictate the number and makeup of hold rooms. Families may be separated in holding facilities for a number of reasons, including by age and gender or in situations where the familial relationship between individuals cannot be immediately established. Because USBP operations are 24/7, minors may be woken up for a number of reasons such as, transfer to a different hold room, transfer to new facilities, or to allow time for a meal prior to transfer. Because these conditions exist to ensure the minors' safety, the Juvenile Coordinator believes USBP continues to comply with the Agreement.

## Juvenile Coordinator's Conclusion Regarding Plaintiffs' Allegations

Based on the Juvenile Coordinator's review of the Plaintiffs' allegations and associated custodial records, in addition to his site visits and review of MID's completed checklists,

16

nothing in the Plaintiffs' allegations change the Juvenile Coordinator's conclusion that USBP's actions were consistent with the Agreement.

# IV.   Planned Actions and Next Steps

Continued compliance with the Agreement requires the active participation of the Agency as a whole. The Juvenile Coordinator is committed to building upon the progress outlined above by executing the following actions.

### a. Update Training

The Juvenile Coordinator recognizes the importance of ensuring complete e3DM data entry for all minor records. He supports USBP and OFO's ongoing collaborative efforts to revise training, and will engage their leadership to explore whether additional efforts may be appropriate.

### b. Message Importance of Data Recordation

The Juvenile Coordinator will engage USBP and OFO leadership to emphasize the importance of recording all custodial actions related to minors. Messaging from leadership is important to reinforce the Juvenile Coordinator's findings and to bring awareness to the challenges associated with incomplete data records. Given the volume of data collected for every alien in CBP custody, the Juvenile Coordinator recognizes that it is unrealistic to expect records void of human error or expect 100 percent recordation. However, CBP is committed to maintaining robust custodial records and should continue to emphasize the importance of a high level of recordation.

### c. Enhance Data Capturing Capabilities

The Juvenile Coordinator will engage CBP leadership to determine the best manner to clarify how data is recorded. For instance, it should always be noted when minors have access to functioning toilets and sinks, as well as drinking water, regardless of whether they are located in the physical hold room or are accessed outside the physical hold room. The Juvenile Coordinator will explore how to ensure that any data is better aligned to operational realities and his observations.

### d. Conduct Additional Data Analysis

The Juvenile Coordinator, with the assistance of USBP, OFO, and the Office of Information and Technology (OIT), will continue to review and report on data in CBP's systems of record related to minors in its custody.

17

### e. Visit Facilities Outside of RGV

The Juvenile Coordinator will continue to visit locations beyond RGV Sector in the next reporting period. The Juvenile Coordinator has already conducted site visits to the EPT Sector. Between March 2, 2018 and June 1, 2018, the Juvenile Coordinator plans to visit Yuma (YUM), Tucson (TCA), and El Centro (ELC) Sectors. The Juvenile Coordinator has directed MID to conduct site visits in RGV, YUM, TCA, ELC, and San Diego (SDC) Sectors. The Juvenile Coordinator will also begin to review data from OFO's system of record and will conduct additional site visits to OFO facilities.

# V.   Conclusion

Based on the activities outlined above, the Juvenile Coordinator believes the Agency continues to comply with the Agreement. Between December 2, 2017 and March 1, 2018, the Juvenile Coordinator revisited the RGV Sector; visited the EPT Sector; visited the Paso Del Norte POE; directed MID's site visits to focus on concerns raised by the Court in the June 27, 2017 Order and the requirements of the Agreement; created a methodology for, and conducted data analysis of, e3DM custodial records for data completeness, and monitored *Flores*-related activities across the RGV Sector.

The Juvenile Coordinator recognizes the critical role he plays in ensuring CBP remains in compliance with the Agreement nationwide. Serving as both the Juvenile Coordinator and CBP Chief Accountability Officer uniquely positions the Juvenile Coordinator to emphasize the importance of transparency and accountability within the Agency. The dual roles enable the Juvenile Coordinator to draw upon his vast institutional knowledge of CBP and influence operationally sound solutions to enhance the Agency's ability to monitor and document compliance with the Agreement. The Juvenile Coordinator will continue to leverage these relationships and build upon the progress outlined above to enhance the Agency's monitoring and reporting capabilities.

# VI.  Appendix I: List of Acronyms

| Acronym | Definition |
|---------|------------|
| CBP | U.S. Customs and Border Protection |
| CPC | Centralized Processing Center |
| CTX | Clint Station |
| e3DM | Enforcement Integrated Database e3 Detention Module |
| ELC | El Centro Sector |
| EPS | El Paso Station |
| EPT | El Paso Sector |
| HHS | U.S. Department of Health and Human Services |
| ICE | U.S. Immigration and Customs Enforcement |
| MCS | McAllen Station |
| MID | Management Inspections Division |
| OAct | Office of Accountability |
| OCC | Office of Chief Counsel |
| OFO | Office of Field Operations |
| OIT | Office of Information and Technology |
| OPA | Office of Public Affairs |
| PAIC | Patrol Agent in Charge |
| PDN | Paso Del Norte Port of Entry |
| PDT | Paso Del Norte Processing Center |
| POE | Port of Entry |
| RGC | Rio Grande City Station |
| RGV | Rio Grande Valley |
| SDC | San Diego Sector |
| STN | Santa Teresa Station |
| TCA | Tucson Sector |
| UAC | Unaccompanied Alien Children |
| USBP | U.S. Border Patrol |
| WSL | Weslaco Station |
| YUM | Yuma Sector |