CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
          crholguin@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| | ) |
| Plaintiffs, | ) PLAINTIFFS' RESPONSE TO |
| | ) DEFENDANTS' SECOND JUVENILE |
| - vs - | ) COORDINATORS' REPORTS |
| | ) |
| JEFFERSON B. SESSIONS, ATTORNEY | ) [HON. DOLLY M. GEE] |
| GENERAL OF THE UNITED STATES, *et al.*, | ) |
| | ) Hearing: None |
| Defendants. | ) Time: n/a |
| | ) Room: n/a |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
PUBLIC INTEREST LAW FIRM
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:  (408) 280-2437
Facsimile:   (408) 288-8850
Email: jenniferk@lawfoundation.org
 kate.manning@lawfoundation.org
 annettek@lawfoundation.org

*Of counsel:*

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)
832 Folsom Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 543-3379

1
2

## Table of Contents

I.    INTRODUCTION ....................................................................................1

II.   SECTION BY SECTION RESPONSE TO MONITORS' REPORTS ............5

A.   BORDER PATROL STATION CONDITIONS.........................................5
   1.   ACCESS TO FOOD..........................................................................5
     a.   *June 2017 Order re CBP Food* ................................................5
     b.   *Juvenile Coordinator Report* ................................................6
   2.   ACCESS TO CLEAN DRINKING WATER .......................................7
     a.   *June 2017 Order re Clean Water* ...........................................7
   3.   UNSANITARY CONDITIONS ..........................................................8
     a.   *June 2017 Order re CBP unsanitary conditions* .....................8
     b.   *Juvenile Coordinator Report* ................................................9
   4.   COLD TEMPERATURES ...............................................................10
     a.   *June 2017 Order regarding CBP Cold Temperatures* ...................10
     b.   *Juvenile Coordinator Report* ..............................................10
   5.   SLEEPING CONDITIONS ..............................................................11
     a.   *June 2017 Order regarding CBP sleeping conditions*................11

B.   FAILURE TO PROVIDE ADVISALS ...................................................13
   1.   JUNE 2017 ORDER REGARDING ADVISALS .................................13
   2.   CBP REPORT .............................................................................13
   3.   ICE REPORT ..............................................................................14

C.   EFFORTS TO RELEASE MINORS AND DETENTION IN SECURE, UNLICENSED  FACILITIES ........................................................................15
   1.   FAILURE TO MAKE CONTINUOUS EFFORTS TO RELEASE MINORS .....................15
     a.   *June 2017 Order regarding Required Efforts Aimed at Release of Class Members* .................................................15
     b.   *CBP Report* ..............................................................16
     c.   *ICE Report* ...............................................................17
   2.   HOLDING CLASS MEMBERS IN SECURE, UNLICENSED FACILITIES ..........................21
     a.   *June 2017 Order re secure, unlicensed facilities* ...........................21
     c.   *ICE Reports* ..............................................................21

D.   EXTENDED DETENTION OF CLASS MEMBERS.................................24
   1.   JUNE 2017 ORDER RE EXTENDED DETENTION OF CLASS MEMBERS ........................24
   2.   ICE REPORT ..............................................................................25

III.  E3DM DATA ANALYSIS ....................................................................27

IV.   CONCLUSION......................................................................................30

# **TABLE OF AUTHORITIES**

## **Cases**

*Flores v Sessions*, 862 F.3d 863, 866 (9th Cir. 2017) ........................................................ 1

## **Statutes**

8 U.S.C. § 1182(d)(5) ...........................................................................................passim

8 U.S.C. § 1225(b) ......................................................................................................... 19

## **Other Authorities**

the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVRPA) ...................................................................................................................... 2

## **Regulations**

8 C.F.R. § 212.5(b) ................................................................................................passim

I.     INTRODUCTION

"The 'Flores Settlement' sets the minimum standards for the detention,

housing, and release of non-citizen juveniles who are detained by the government, and

obliges the government to pursue a 'general policy favoring release' of such juveniles."

*Flores v Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). According to Plaintiffs Motion to

Enforce [Doc. #201], Defendants were in breach of the *Flores* Settlement

("Agreement") by, *inter alia*, "(1) continuing to detain class members in deplorable and

unsanitary conditions in CBP facilities (also referred to as 'Border Patrol Stations'); (2)

failing to advise class members of their rights under the Agreement; (3) failing to make

and record ongoing efforts aimed at release or placement of class members; [and] (4)

detaining class members for weeks or months in secure, unlicensed facilities …" [Doc.

#363] Order Re Plaintiff's Motion to Enforce and Appoint a Special Monitor [201,

202], June 27, 2017 ("June 2017 Order") at 1.

The Court granted Plaintiffs' motion on the four claims mentioned above and

ordered Defendants to come into compliance and nominate a Juvenile Coordinator to

monitor compliance and provide reports to the Court. *Id*. at 33-34. This memorandum

responds to the appointed monitors second reports.[1] These reports continue to be

_____

[1] *See* U.S. Customs and Border Protection Juvenile Coordinator Report Regarding
Flores Compliance in the Rio Grande Valley Border Patrol Sector ("CBP Report")
[Doc. #402-1], and Report Of Juvenile Coordinator Deane Doughtery ("ICE Report")
[Doc. # 402-2].

inadequate, incomplete, and lacking in the detail necessary to determine the extent of Defendants' compliance. The reports actually disclose non-compliance at a significant level.

This Administration has made clear in the White House's October 2017 "Immigration Principles and Policies" addressed to Congress exactly what President Trump wants with regards *Flores* class members. One of his core demands is that Congress must "[t]erminate the Flores Settlement Agreement …"[2] The Administration demands that Congress amend current law "to ensure the expeditious return of [unaccompanied minors] and family units." *Id*. In the Administration's mind, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVRPA) and the *Flores* Agreement stand in the way of achieving its goal of "expeditious[ly]" deporting class members.

In light of this Administration's opposition to the *Flores* Settlement, Defendants' failure to adhere to the Court's June 2017 Order, and the newly developing policy and

---

[2] *See* White House, *Immigration Principles and Policies*, issued October 9, 2017, Section B(iii) (White House demand to "[t]erminate the Flores Settlement Agreement (FSA) …") Available at https://www.scribd.com/document/361091383/Read-White-House-immigration-policies-and-principles; The White House insists that "loopholes" "prevent unaccompanied minors that arrive in the country illegally from being removed." *Id*. Rather than "being deported," class members are housed by the Department of Health and Human Services, "at taxpayer expense …" *Id*.

practice of separating apprehended mothers and children,[3] the need for judicial enforcement in this case remains critically important. Based on the monitors' inadequate reports and the previously filed class member declarations, all showing Defendants' non-compliance with this Court's June 2017 Order, in the coming quarter Plaintiffs will gather additional information from class members pursuant to ¶ 32A of the Agreement, conduct site inspections pursuant to ¶ 33, seek copies of instructions issued by Defendants pursuant to ¶ 29A, and seek information regarding compliance pursuant to ¶ 29.

Plaintiffs urge the Court to set a briefing schedule for the parties to address Defendants' compliance and whether permitting discovery would allow the Plaintiffs and the Court to better understand what challenges the Defendants face in achieving compliance. Defendants admit, *inter alia,*

• almost half of all class members are detained for more than 20 days (for how much longer neither the Court nor Class Counsel knows),

---

[3] *See* CourtHouse News, Immigrant Parents Jailed in Texas Fight to Reunite With Kids, November 28, 2017, available at https://www.courthousenews.com/immigrant-parents-jailed-in-texas-fight-to-reunite-with-kids/; Houston Chronicle, *Trump moves to end 'catch and release', prosecuting parents and removing children who cross border, Questionable court policy separates parents, children*, November 25, 2017, available at http://www.houstonchronicle.com/news/houston-texas/houston/article/Trump-moves-to-end-catch-and-release-12383666.php; *see also* New York Times, December 21, 2017*, Trump Administration Considers Separating Families to Combat Illegal Immigration*, available at https://www.nytimes.com/2017/12/21/us/trump-immigrant-families-separate.html?_r=0

PLAINTIFFS' RESPONSE TO SECOND
JUVENILE COORDINATOR REPORTS

3

CV 85-4544-DMG (AGRX)

• in violation of the Agreement two of its three detention facilities are operating without licenses,

• in violation of the Agreement all three detention facilities are effectively secure,

• in violation of the Court's June Order in several facilities children are provided "mats or blankets," rather than sleeping mats *and* blankets, and

• several CBP facilities still do not provide (or at least the report fails to state they provide) hygiene products, soap, or towels.

In addition, with regards release, Defendants still do not appear to be complying with the Agreement's requirement and this Court's June 2017 Order that prompt and continuous efforts be made aimed to the release of class members. Defendant ICE's report talks about releasing some class members under "8 U.S.C. § 1182(d)(5) and 8 C.F.R. § 212.5(b)," ICE Report [Doc. # 402-2] at 8. Those provisions include very limited circumstances in which detainees may be released and their criteria are entirely different from those in the Agreement. The ICE report is however fully consistent with the position Defendants adopted before this Court that they will not undertake prompt and ongoing efforts aimed at release of class members in expedited removal proceedings, the same position they are now arguing in their appeal to the Court of Appeals.

Only by permitting discovery will Class Counsel and the Court ever have a clear understanding of the extent to which Defendants are complying with the

Agreement and this Court's June 2017 Order, the reasons why they are unable or unwilling to comply.

## II.   SECTION BY SECTION RESPONSE TO MONITORS' REPORTS[4]

### A.   BORDER PATROL STATION CONDITIONS

"Since the December l, 2017 report, [CBP Juvenile Coordinator, Henry Moak,] revisited… the Central Processing Center-Ursula (CPC-Ursula)," and, "three additional stations in the RGV Sector that were specifically noted in Plantiffs' [first] response." CBP Report [Doc. #402-1] at 2. Additionally, "the Office of Accountability, Management Inspections Division (MID) conducted site visits at seven facilities in the RGV Sector where minors are typically processed including CPC-Ursula." *Id.·* At each USBP station the Juvenile Coordinator spoke with the Patrol Agent in Charge (PAIC), and although there were minors and their parents present at some locations, the Juvenile Coordinator Report did not indicate that he spoke with any minors or their parents on-site about the current conditions. *Id*. at 6.

### 1.   **Access to Food**

#### a.   **June 2017 Order re CBP Food**

The June 2017 Order concludes that "Defendants failed to provide [class members] with adequate access to food ... Additionally, the food provided must be in

---

[4] For the convenience of the Court, the numbering of sections used in the following discussion matches the numbering in the Court's June 2017 Order.

edible condition (not frozen, expired, or spoiled) and minors must have regular access
to snacks, milk, and juice." June 2017 Order at 8 (internal quotation and citations
omitted). The Court granted Plaintiff's motion to enforce as to the RGV Sector on the
issue of adequate access to food. *Id.* at 10.

b.   **Juvenile Coordinator Report**

The CBP Juvenile Coordinator's report states that he "observed the preparation
for the delivery of the second of three meals of the day, and the agents preparing to
distribute the food. He observed the meals were burritos and they were stored in
insulated food carriers to maintain temperature until given to aliens. He took one of the
burritos out of the carrier and confirmed it was warm. The Juvenile Coordinator also
saw the assortment of snacks and bottled water available to minors upon their request."
CBP Report [Doc. # 402-1] at 7. These observations merely describe what type of food
was observed and that the food was warm. Additionally, the Juvenile Coordinator saw
snacks and water. These observations are identical to observations in his first report.
He provides no evidence or first-hand reports that minors at CPC-Ursula readily
receive adequate food, snacks or water.

Defendants reported several instances of expired food at CBP Stations in the
RGV Sector:

At three stations, MID noted some expired food stored in freezers.

Specifically, during both site visits, MID noted that one station had frozen

bologna kept past its expiration date. During the second visit, MID noted that

one station kept frozen bread and frozen burritos past the expiration dates.

Two additional stations kept frozen bread past its expiration dates

CBP Report at 8. Defendants did circulate an email to CBP stations to address this

issue. On February 21, 2018, *nearly one month after being made aware of several*

*instances of food being kept past it's expiration date,* USBP Headquarters issued an

email "advis[ing] agents to monitor and dispose of any expired food, even if frozen, in a

timely fashion ..." *Id*. Defendants believe that circulating a single email is sufficient to

conclude that USBP has, "ensure[d] minors will not receive expired food." *Id.*

## 2. **Access to Clean Drinking Water**

### a. **June 2017 Order re Clean Water**

"… Defendants have not offered evidence based on records or a witness' personal

knowledge to contradict the specific accounts by Plaintiffs' witnesses of inadequate

water, both in quality and availability, during their CBP-facility detention." June 2017

Order at 12. "Plaintiffs' motion to enforce Paragraph 12A of the Agreement on the

issue of access to clean drinking water is GRANTED**." *Id*. at 33.

### b. **CBP Juvenile Coordinator Report**

The first Juvenile Coordinator Report stated, "The Juvenile Coordinator … saw

… bottled water openly available to minors upon their request." CBP Report [Doc. #

384-1] at 7.This observation was made during a visit to the Ursula CBP station. *Id*."

The second ICE Report uses the same language regarding access to clean drinking water that appeared in its first report filed in December 2017. The report notes that the Rio Grande City Station and Weslaco Station have "five-gallon water dispenser[s] with cups." CBP Report [Doc. # 402-1] at 2. The Coordinator did not verify whether the 5-gallon water dispensers were functioning, full, or clean. At facilities visited by the monitor where class members and their parents were detained, he did not interview them about their access to clean drinking water. While the monitor reports that water was available at some stations, the report does not indicate that drinking water was available to class members at the Rio Grande City Station (RGC).

### 3. **Unsanitary Conditions**

#### a. **June 2017 Order re CBP unsanitary conditions**

"The Agreement certainly makes no mention of the words 'soap,' 'towels,' 'showers,' 'dry clothing,' or 'toothbrushes.' Nevertheless, the Court finds that these hygiene products fall within the rubric of the Agreement's language requiring 'safe and sanitary' conditions and Defendants' own established standards." June 2017 Order, at 13.[5]

"Plaintiffs' motion to enforce Paragraph 12A of the Agreement on the issue of

---

[5] "There is an apparent disconnect between the CBP's standards and class members' experiences, all of whom describe unsanitary conditions with respect to the holding cells and bathroom facilities, and lack of privacy while using the restroom, access to clean bedding, and access to hygiene products (i.e., toothbrushes, soap, towels)." June 2017 Order at 12.

unsanitary conditions is **GRANTED** as to all … CBP stations located within the RGV Sector … [T]he Court also orders compliance monitoring at CPC-Ursula." *Id*. at 33.

b.      **Juvenile Coordinator Report**

In the CBP's first Report, the Juvenile Coordinator reported that he "saw the shower facility and the toiletries provided to minors [at one facility], which included towels, toothbrushes, and toothpaste." CBP Report [Doc. # 384-1] at 7. The second Report contains the exact language. The only indication that CBP facilities are actually providing showers is the Coordinator's observation that he saw "two recently showered minors wearing clothes provided by CPC-Ursula while their personal clothes were laundered." CBP Report [Doc. # 402-1] at 7.[6]

At facilities visited by the monitor where class members and their parents were detained, he did not interview them about the sanitary conditions in the cells where they had been detained following apprehension

While the monitor makes clear that he is aware of what this Court's June 2017 Order requires, and that at the Ursula facility he observed "hygiene products provided

_____

[6] When describing the Clint Station (CTX) the Juvenile Coordinator stated, "The PAIC informed the Juvenile Coordinator the station has an agreement with a local shelter that allows USBP to bring minors over who require a shower." *Id*. at 8. The Juvenile Coordinator does not indicate that he bothered to examine the "agreement" or obtain a copy of the agreement for his files or to share with the Court. Nor does it appear that he inquired into what was taken into consideration to determine when a minor "requires" a shower. *Id*. at 10

to minors, including towels, deodorant, toothbrushes, and toothpaste," *Id*. at 7, his report regarding his observations during visits to the Rio Grande City Station, the Weslaco Station and the McAllen Station makes <u>no</u> mention of the availability of soap, towels, or any other hygiene products for detained children.

4.   **Cold Temperatures**

a.   **June 2017 Order regarding CBP Cold Temperatures**

"Plaintiffs present evidence that recent child detainees experienced extremely cold temperatures at the CBP stations.  Just like the declarants cited in the Court's July 24, 2015 Order, many continue to describe the CBP facilities as hieleras or 'iceboxes.'" June 2017 Order at 15. "Plaintiffs' motion to enforce Paragraph 12A of the Agreement on the issue of temperature control is **GRANTED."** *Id*. at 33.

b.   **Juvenile Coordinator Report**

The Second Juvenile Coordinator Report states that at various facilities, "[t]he agents on duty confirmed that every shift they checked the temperature of the hold rooms to ensure the rooms were within 66-80 degrees Fahrenheit ..." *Id*.at 2 (<u>Rio Grande City Station</u>); *id*. at 7 (Ursula); *id*. at 8 (McAllen).

Defendant's report makes the same claims about "temperature control" that Defendants made in opposition to the motion to enforce compliance of the Agreement, and in their first CBP report filed in December 2017.

The declarations of class members obtained in December 2017 routinely complained about freezing temperatures in CBP facilities. At facilities visited by the monitor where class members and their parents were detained, he did not interview them about the temperatures they had experienced in the cells where detained following apprehension. As we discuss in this memorandum, it also does not appear that several CBP facilities have mats for children to sleep on or dry clothes to provide children whose clothing is soiled or wet from crossing the Rio Grande River. While maintaining a temperature of 66 degrees (within Defendants' guidelines) may be "comfortable" for CBP, it may seem freezing to detained children wearing soiled or wet clothes and forced to sleep on cold concrete floors.

5.    **Sleeping Conditions**

a.    **June 2017 Order regarding CBP sleeping conditions**

"Defendants [evidence] ... does not undercut the credibility of the assertions made by numerous detainees regarding sleeping conditions ..." June 2017 Order at 17. "Plaintiffs' motion to enforce Paragraph 12A of the Agreement on the issue of sleeping conditions is **GRANTED** as to all non-CPC-Ursula CBP stations within the RGV Sector ...." *Id*. at 33.

b.    **Juvenile Coordinator Report**

The First Juvenile Coordinator Report did not provide information on the sleeping conditions of class members. We responded to this absence noting "[t]he CBP monitor ignored his obligation to monitor and report on sleeping conditions of class members in custody in the RGV Sector." P's First Response [Doc. # 391] at 14.

The Juvenile Coordinator states that he is thoroughly familiar with the terms of the Agreement and this Court's June 2017 Order. With regards providing children with sleeping cots or mats, the Second Juvenile Coordinator Report makes clear that at the Ursula facility he "observed minors' direct access to blankets [and] sleeping  mats," and at the Rio Grade City station he observed "ample sleeping mats, Mylar blankets," *Id.* at 2-3.  On the other hand, he does not report observing any sleeping mats or blankets at the McAllen and Weslaco stations. At the McAllen facility he only observer "agents providing a Mylar blanket … to [a] minor …" *Id.* at 8.

From that we assume these facilities have still not obtained mats or blankets for children detained at those stations. Even as to the Ursula and Rio Grande City facilities, the monitor only states he observed "ample" sleeping mats without stating how many mats he observed or the number of children who may be detained overnight at these facilities.

When discussing a checklist the monitor prepared for the Management Inspections Division ("MID") to use when it conducted separate site visits, the check list he prepared included questions relating to the presence of "a cot/mat *or*

blanket (including Mylar blankets …" *Id*., at 11 (emphasis added). He also states that MID's site visits disclosed that CBP facilities provided minors with "cots/mats **or** blankets." *Id*. (emphasis added).

The monitor also reports that Enforcement Integrated Database e3 Detention Module (e3DM) system used as the "official system" of record through which USBP documents actions related to class members in USBP holding facilities, tracks "the provision of a cot/mat *or* blanket …" Id. at 7, fn 3 (emphasis added).

It seems clear from the monitor's report that CBP still does not provide mats or cots for class members to sleep on at various facilities.

B.      FAILURE TO PROVIDE ADVISALS

1.      **June 2017 Order regarding Advisals**

"… Paragraph 24D … requires Defendants to provide class members with three rights advisals: "(a) INS Form I-770, (b) an explanation of right of judicial review… and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to a minor)." June 2017 Order at 18. "Plaintiff's motion to enforce Paragraph 24D with regard to the requirements that Defendants provide class members with a list of legal services and the Notice of Right of Judicial Review (Exhibit 6) is **GRANTED**." *Id*. at 34.

2.      **CBP Report**

Both the First and Second Juvenile Coordinator report do not mention compliance with notice requirements. These advisals should be distributed by CBP after taking class members into custody. Since the Second Juvenile Coordinator Report did not indicate that advisals were distributed by CBP, we are led to believe that CBP continues to be out of compliance with notice requirements.

### 3.    ICE Report

We indicated in Plaintiffs' Response to the first ICE Juvenile Coordinator Report that, "at the Dilley, Karnes and Berks facilities, the monitor reports that all class member files reviewed "showed that the Notice of Advisals [Agreement Exhibit 6] was provided to class members ..." ICE Report [Doc. # 384-2] at 4-5. However, the ICE Report did *not* address the provision of lists of available free legal services required by Paragraph 24D(c) of the Agreement.

In the Second ICE Juvenile Coordinator Report Defendants concede that, "[a]lthough ICE was and is providing a list of free legal service providers to the parents of class members and to the class members who are 14 years old or older, we did not mention that in our last report. This report includes our findings regarding our compliance checks concerning the provision of notice of free legal service providers." Second Report of ICE Juvenile Coordinator, Deane Dougherty [Doc. # 402-2] at 7 ("2nd ICE Report [Doc. # 402-2]).

The Juvenile Coordinator discusses the declarants claiming they did not receive a list of legal service providers and respond: "ICE officers personally serve either the parent of a child under the age of fourteen or the child, if over the age of fourteen, a copy of the local legal service providers at in-processing," ICE Report [Doc. # 402-2] at 7. Defendants provide as evidence three copies of the list of service providers with the names LP, Rigoberto, and Ignacio, possibly declarants. *Id*. at 18-19. This hardly proves that the other three declarants, as well as others detained, have received the list of legal service providers.

C.  EFFORTS TO RELEASE MINORS AND DETENTION IN SECURE, UNLICENSED FACILITIES

1. **Failure to Make Continuous Efforts to Release Minors**
   a.  **June 2017 Order regarding Required Efforts Aimed at Release of Class Members**

"… [T]he Agreement requires ICE to (1) 'release a minor from its custody without unnecessary delay' to a parent, a legal guardian, or other qualified adult custodian, except where the detention of the minor is required 'either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others'; and (2) *'[u]pon taking a minor into custody, . . . [to] make and record prompt and continuous efforts on its part toward family reunification and the*

*release of the minor . . . .'"* June 2017 Order, at 20 (emph. added).[7] Defendants must "make individualized determinations regarding a minor's risk of absconding." *Id*., at 23, citing Agreement ¶ 14.8 "Plaintiffs' motion to enforce Paragraphs 14, 18, 19, and 23 of the Agreement on the issue of whether Defendants are making and recording continuous efforts to release class members or place them in non- secure, licensed facilities in accordance with the Agreement is **GRANTED."** *Id*. at 34.

### b.    CBP Report

The First and Second CBP Report say nothing about compliance with Paragraphs 14, 18, 19, and 23 of the Agreement. Since the Second CBP Juvenile Coordinator Report did not indicate compliance with paragraphs 14, 18, 19, and 23 of the Settlement, we are lead to believe that CBP continues to be completely out of compliance regarding efforts aimed at the release of class members.

---

[7] The Settlement also requires that children *not* released pursuant to Paragraph 14 be placed in a licensed program provided for by ICE. Settlement ¶ 19. To date, ICE does not have a single contract Class Counsel is aware of to place children pursuant to Paragraph 19 of the Settlement. We have repeatedly raised this concern with the Court. *See, e.g*. Doc. #289-2, Plaintiffs' Supplemental Brief in Support of Motion to Enforce Settlement and Appoint a Special Monitor ("Plaintiffs Supp. Brief") at 16.

[8] "To be clear … the Court will order Defendants to comply with the unambiguous charge of the *Flores* Agreement to make individualized determinations regarding a minor's flight risk rather than blanket determinations." June 2017 Order at 25.

### c.   ICE Report

In the First and Second ICE Juvenile Coordinator Reports the Juvenile Coordinator claims that at all ICE facilities (South Texas Dilley, Karnes and Berks), all class member files reviewed "contained a Parole Determination Worksheet with information relating to the individual parole determinations made in each class member's case." ICE Report [Doc. # 384-2] at 3-5; ICE Report [Doc. # 402-2] at 2-6.

In response to the First Juvenile Coordinator's Report we pointed out that

[t]he monitor did not provide copies of the Parole Determination Worksheets she reviewed. Neither the Court nor class counsel has any idea what the Parole Determination Worksheets actually say. All that we know is that the ICE monitor believes that completed Parole Determination Worksheets were "appropriately completed."

P's First Response [Doc. # 391] at 19-20 quoting Doc. # 384-2 at 6.[9]

As we previously pointed out, on its face, the Parole Determination Worksheet captures information inconsistent with the release provisions of the Agreement, and omits factors that must be considered under the Agreement. There is nothing to lead Plaintiffs to believe that the Parole Determination Worksheet captures

---

[9] The report provides no explanation of what the Monitor means by "appropriately completed," nor are copies of any of the "appropriately completed" forms provided for the Court's or Class Counsel's review.

the proper information or utilizes the proper factors, because the Juvenile Coordinator to date has not provided copies of any Parole Determination Worksheets she reviewed.

As she did in her first report, the Juvenile Coordinator again states that she had "verif[ied] compliance by spot-checking the parole worksheet and sponsor identification forms for at least five percent of *Flores* class members." ICE Report [Doc. # 402-2] at 8-9. Other than looking at completed forms she has not shared with Class Counsel or the Court, and finding that ICE's release decisions have always been "appropriate," the Juvenile Coordinator does not provide copies of the "spot-checked" parole worksheets or sponsor identification forms and there is no way to confirm her feeling that ICE is in compliance with the Agreement and this Court's June 2017 Order.

In fact, her report gives every indication Defendants are not in compliance. The monitor reports that "ICE has issued guidance directing the FRCs to evaluate whether, upon initially taking a class member into custody, *the class member is eligible for parole under conditions established by 8 U.S.C. § 1182(d)(5) and 8 C.F.R. § 212.S(b)* . Class members [are] re-evaluated for parole when new, pertinent information is received concerning continued custody." ICE Report [Doc. # 402-2] at 8 (emphasis added). This is precisely the issue litigated in Plaintiffs' motion to enforce. Defendants argued that they were not required to release class

members under the terms of the *Flores* Agreement because Defendants

were placing the vast majority of class members in "expedited removal"

proceedings where they were subject to "mandatory detention" and only

permitted release under the limited parole authority granted in by 8 U.S.C.

§ 1182(d)(5) and 8 C.F.R. § 212.5(b). This Court ruled against Defendants.

Without seeking a stay, Defendants appealed this very issue to the Court of

Appeals where their opening brief makes the same arguments rejected by

this Court.[10]

　　　All of this makes clear that the when the monitor reviews secret

forms not shared with Class Counsel or the Court, and concludes that

hundreds of these forms shows that ICE is in compliance with the

Agreement and this Court's June 2017 Order, *what the monitor really*

---

[10] Defendants, mischaracterizing this Court's order, argue on appeal that this Court erred by ordering Defendants to evaluate class members for release "based only on risk of flight." Appellants' Brief [Case No. 17-56297 Doc. # 6] at 50. Defendants argue that the "vast majority" of the minors in ICE custody "are subject to expedited removal (ER) … [under] 8 U.S.C. § 1225…" *Id.* at 51. And that such class members must "be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* at 51-52, *quoting* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).  This Court rejected Defendants' position holding that the "[a]greement does not contravene the expedited removal statute." June 2017 Order at 23. The text of Agreement paragraphs 14, 18-19 and 21-22, make clear that the Agreement encompasses all minors who are in custody, without qualification as to whether they are accompanied or unaccompanied, or placed in routine or expedited removal proceedings.

*means is that she believes ICE is in compliance with 8 U.S.C. § 1182(d)(5)*

*and 8 C.F.R. § 212.5(b), not the terms of the Agreement or this Court's*

*2017 Order, both of which contain very different obligations and*

*responsibilities than those set out in 8 U.S.C. § 1182(d)(5) and 8 C.F.R. §*

*212.5(b).* The statute and regulation allow release of adults or minors in

highly unusual and extreme situations, versus what this Court and the Court

of Appeals have recognized as the "presumption of release" created in the

*Flores* Agreement.

    At bottom, the chances are close to zero that, on this critical and

central pillar of the Agreement, Defendants will ever come into compliance

with either the terms of the Agreement or this Court's Orders, unless and

until the Court permits Plaintiffs to conduct discovery to clearly show the

ongoing non-compliance, or appoints *independent* monitors not employed

by Defendants who will actually monitor compliance with the Agreement

and this Court's Orders, rather than compliance with Defendants' illegal

policy of detaining children and only releasing them in line with the

restrictive terms of  8 U.S.C. § 1182(d)(5) and 8 C.F.R. § 212.5(b).

2. **Holding class members in secure, unlicensed facilities**

a. **June 2017 Order re secure, unlicensed facilities**

"Defendants do not dispute that the family residential centers continue to be unlicensed." June Order at 28. As this Court has now held twice: "'The fact that the family residential centers cannot be licensed by an appropriate state agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement.'" June 2017 Order at 29, *quoting* July 24, 2015 Order, 212 F. Supp. 3d at 877. "[T]he Court *once again* finds that because the family residential centers are secure, unlicensed facilities, Defendants cannot be deemed in substantial compliance with the Agreement." *Id.* (emphasis added).[11] Plaintiffs' motion that Defendants fail to hold class members in "non- secure, licensed facilities in accordance with the Agreement is **GRANTED.**" *Id.* at 34.

c. **ICE Reports.**

Again showing the absurdity of Defendants' monitoring and the monitor's dedication to ICE's litigation position rather than to the terms of the Agreement or this Court's now two Orders, the ICE monitoring report argues (as Defendants

---

[11] The Agreement provides that "[i]n any case in which the INS does not release a minor pursuant to Paragraph 14, ... [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program . . . ." Agreement ¶ 19. Such placement must happen "as expeditiously as possible." *Id.*

unsuccessfully argued before this Court and now again before the Court of Appeals)

that Karnes and Dilley, and Berks function as "unsecure" facilities:

> Contrary to Plaintiffs' declarations, the fact that class members, who are
> in ICE's legal custody, *are precluded from leaving the FRC and its*
> *grounds does not render the center itself a secured facility* … [C]lass
> members may physically leave an FRC. However, they would be doing so
> without permission but this does not mean the center must be deemed
> physically secure. . . . [T]here will be consequences, *for example re-*
> *arrest*, against those residents who leave the residential

ICE Report [Doc. # 402-2] at 9-10 (emphasis added). The ICE monitor is *not*

impartially monitoring compliance with the plain terms of the Agreement and this

Court's June 2017 Order. She is an advocate for ICE and simply parrots the agency's

arguments already rejected by this Court and that Defendants are now again presenting

to the Court of Appeals.

Any *independent* monitor would inquire into and share with the Court the

various detention facilities' rules (both ICE rules and facility rules) regarding class

members' right to leave the facility, the extent to which leaving without permission is

prevented, what class members are told about the security of the facility, etc. A

dedicated monitor would also interview class members and their mothers to learn what

they understand the rules to be regarding whether the facility is secure or not. The ICE

monitor instead looks into none of this, and simply "reports" (regurgitates) to the Court what Defendants' rejected legal arguments. The monitor doesn't even point out that defendants continue to completely ignore this Court's Order while appealing, despite the fact that they neither sought nor obtained a stay of this Court's Order regarding holding class members in secure facilities.

The Juvenile Coordinator's claims regarding the requirement that class members be held in licensed facilities is even more convoluted than her so-called monitoring of whether they are no longer held in secure facilities. First, she points out that the Berks facility does, at least temporarily, have a license to function. ICE Report [Doc. # 402-2] at 10-11. Rather than honestly reporting that ICE continues to hold the majority of class members in unlicensed facilities at Karns and Dilley, she provides legal arguments that these detention facilities "do not have to be licensed  if the facilities are processing class members as expeditiously as possible." *Id*. at 10. She admits that Dilley and Karns are unlicensed, but says the matter is "under appeal." *Id*. at 12. Neither the Agreement nor this Court's June 2017 Order say Defendants may detain class members for days, weeks or months in unlicensed facilities if the facility's eligibility for a license is "under appeal." Again, the monitor's report does not and is not intended to report on real compliance with the Agreement and this Court's Order. It simply parrots Defendants' unsuccessfully arguments in this Court and its pending arguments on appeal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.   EXTENDED DETENTION OF CLASS MEMBERS

### 1.   June 2017 Order re extended detention of class members

Nothing in the *Flores* Settlement states, explicitly or implicitly, that there is a "20 day average" detention rule regarding compliance with the release provisions of the Agreement.[12] "Paragraphs 12A and 14 of the *Flores* Agreement … require [ ] that Defendants release class members 'without unnecessary delay' to certain adults, or place them in a licensed program …" June 17, 2017 Order at 29. In light of "statistics [the Court examined] … and the fact that use of the expedited removal procedure does not automatically render the Agreement's preference-for-release provision inapplicable, the Court finds Plaintiffs have established Defendants' substantial noncompliance with Paragraphs 12A and 14 of the Flores Agreement ..." *Id*. at 31. Accordingly, "the Court GRANTS Plaintiffs' motion to enforce these paragraphs of the Agreement on the length-of-detention issue." *Id*.

This is yet another area in which Defendants are openly, brazenly, and fearlessly ignoring the Agreement and this Court's several Orders regarding their obligation to make continuous efforts aimed at the release of children starting at the time of

---

[12] As noted above, ¶ 18 provides: "*Upon taking a minor into custody*, the [Defendants] … shall make and record the prompt and continuous efforts … toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts … *shall continue so long as the minor is in custody*." *Id*.  (emphasis added).

PLAINTIFFS' RESPONSE TO SECOND
JUVENILE COORDINATOR REPORTS                      CV 85-4544-DMG (AGRX)

24

apprehension. No amount of "monitoring" by the ICE Juvenile Coordinator will change this. In fact, the ICE monitor simply parrots ICE's arguments this Court has now rejected several times.

**2. ICE Report**

The ICE monitor nowhere explains how she monitored ICE's efforts to comply with the Agreement and this Court's Orders regarding instructions issued to ICE officers, or training they have received, or what precise steps officers take to insure that ongoing efforts are made to secure class members' release, etc. As we discussed above, what the monitor is actually monitoring is ICE's compliance with 8 U.S.C. § 1182(d)(5) and 8 C.F.R. § 212.5(b). ICE Report [Dkt. # 402-2] at 8.

To divert attention away from Defendants refusal to comply with the release provisions of the Agreement, the monitor delves into a morass of statistical numbers dealing with "average" lengths of detention. As we pointed out long ago and this Court recognized, Defendants use of data to show "average" lengths of detention is fairly meaningless because ICE does not take into account those *not released* during any particular counting period. In any event, in this report the ICE monitor provides the following information for all three detention sites:

> In total, there were approximately 5,889 class members detained at ICE 's three FRC during this reporting period … 2,756 of these individuals were

> held in OHS custody for 20 days or more . . . Every Monday I receive a
> weekly report of class members held over 20 days. I review this report
> weekly to ensure there is an explanation for continued detention and
> that I agree with the continued detention in each case.

ICE Report [Doc. # 402-2] at 6. The monitor never explains how much longer than 20 days these 2,756 detained minors spent in Defendants' secure and unlicensed facilities. She never explains how she arrives at an "average" length of stay "of 22.04 days." Defendants "average" is meaningless because they only take into account residents booked and released. *They do not take into account class members not released. See* June 17, 2017 Order at 30 ("What is more, Defendants' length-of-stay statistics only account for individuals already released."). Neither the Court nor the Plaintiffs have been provided with copies of the class members' Parole Determination Worksheets or the "explanation[s] for the continued detention[s]" beyond 20 days reviewed by the monitor, so the Court and Plaintiffs have *no idea* why the majority of class members continue to be detained for longer than 20 days.

The monitor has never provided Class Counsel or the Court copies of the "weekly reports" she gets of class members held over 20 days. Neither Class Counsel nor the Court has the slightest idea why she "agree[s] with the continued detention in each case." *Id*.

This is a program in how to evade monitoring and provide reports based not on the terms of the Agreement or even this Court's Orders, but instead on a framework of Defendants' rejected arguments.

III.  e3DM DATA ANALYSIS

The CBP Juvenile Coordinator offers broad conclusions without providing any of the data or records used to support her analysis. The Juvenile Coordinator has not provided any exhibits or documentation containing examples of minor custodial records, policies on recordation, or documents evidencing the statistical analysis of the e3DM data. Without these records as evidence, neither Class Counsel nor the Court have any idea about the extent to which e3DM is useful at all as a device to monitor compliance with the Agreement and this Court's June 2017 Order.

Defendants acknowledge that their e3DM recordation is insufficient to adequately determine compliance with the Agreement: "The Juvenile Coordinator notes that some allegations cannot be refuted because the substance of the allegation does not correspond to data captured in e3DM." CBP Report [Doc. # 402-1] at 17.

It is unclear what the monitor means when he states that "[o]ther allegations may be true, but are based on an operational reality that the Juvenile Coordinator believes is consistent with the Agreement." *Id*. We have no idea what the monitor means when he refers to "operational reality," nor do we know why he believes true allegations are nevertheless consistent with the Agreement.

While the CBP monitor may theorize why, the fact remains that "only 54.6 percent of minors in RGV Sector were recorded as being provided a cot/mat or blanket." *Id*.at 15. The same holds true for the 10% of detained minors who reportedly had no access to drinking water. *Id*. It is interesting to note that in each instance the monitor strives to come up with reasons why these statistics may be wrong, always exploring ways to explain them to convey that CBP is in compliance with the Agreement and this Court's June 2017 Order. The monitor never offers reasons why the statistics may be wrong in the other direction: Namely slanted toward showing more compliance than is actually occurring. This is what we have come to expect from monitors who are driven by a motive to find compliance, no matter what the facts disclose.

Defendants continued reliance on a recordkeeping system, deemed by the Court and themselves as inadequate, shows their continued reluctance to comply with the Agreement. The monitor nevertheless begrudgingly concedes only "there may be individual instances where custodial actions were not recorded because they did not occur." *Id*. at 15.

The monitor reports that "USBP informed the Juvenile Coordinator that it is in the process of conducting e3DM refresher training ..." *Id*. However the monitor does not report when this training will take place nor does he provide copies of the materials to be used in this training program.

PLAINTIFFS' RESPONSE TO SECOND
JUVENILE COORDINATOR REPORTS

CV 85-4544-DMG (AGRX)

The monitor reports that he conducted "an in-depth quantitative analysis" of data in USBP's relevant system of record, e3DM, to determine whether the data adequately documented USBP's compliance with the Agreement in the RGV Sector. However, the monitor never explains the components of his "in-depth quantitative analysis."

Not having seen the instructions issued to CBP agents about when and how they should access the e3DM database, or having any information about the ease with which an agent may enter data even if the event recorded never took place, or having been informed about any mechanism Defendants have developed to test whether events are being recorded that never took place, it is impossible to determine whether CBP is complying with the Agreement or this Court's June 2017 Order based on the e3DM database.

The evidence that led to the Court's June 2017 Order showed that even with the small sample of declarants whose sworn statements were offered into evidence, there were times that events did not take place but were recorded in the e3DM database as having taken place, and times when events did take place that were never recorded as having taken place. Without far more information than Defendants have made available to Class Counsel and the Court, we are unable to draw any conclusions about the accuracy or inaccuracy of the e3DM as a method to measure Defendants' compliance with the Agreement and this

Court's June 2017 Order. In addition, the e3DM does not even measure several things the Court ordered, including for example, access to both a blanket *and* a mat (as opposed to a blanket *or* a mat), the provision of soap, the provision of towels to dry ones hands or dry off after a shower, the provision of hygiene products like toothbrushes, the provision of dry clothes when a child's clothing is soiled or wet, or the provision of food that is not expired.

In its present form, and given Defendants' failure to provide Class Counsel and the Court with anything more than the CBP monitor's conclusions based upon his review of a sampling of e3DM data, these conclusions cannot be given much weight in assessing compliance with the Agreement and this Court's June 2017 Order.

IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully urge the Court to set a briefing schedule for the parties to address Defendants' non-compliance, how an Order may be structured to achieve compliance with the Agreement and this Court's June 2017 Order, and/or whether permitting discovery by Class Counsel may finally allow disclosure of the information necessary to assess the extent of compliance and the challenges Defendants face if any in achieving compliance.

Dated: March 30, 2018                     Respectfully submitted,

CENTER FOR HUMAN RIGHTS &

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONSTITUTIONAL LAW
Peter A. Schey
Carlos Holguín

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena García

LA RAZA CENTRO LEGAL, INC.
Michael Sorgen

LAW FOUNDATION OF SILICON VALLEY -
LEGAL ADVOCATES FOR CHILDREN & YOUTH
Jennifer Kelleher Cloyd
Katherine H. Manning
Annette Kirkham

/ / /


Of counsel:

YOUTH LAW CENTER
Virginia Corrigan

/s/*Peter Schey*_____
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On March 30, 2018, I electronically filed the following document(s):

• PLAINTIFFS' RESPONSE TO DEFENDANTS' SECOND JUVENILE COORDINATORS' REPORTS

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/*Peter Schey*
*Attorney for Plaintiffs*