CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| Jenny Lisette Flores, *et al.*, | Case No. CV 85-4544-DMG (AGRx) |
|---|---|
| Plaintiffs, | MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE CLASS ACTION SETTLEMENT |
| v. | |
| Jefferson B. Sessions, Attorney General, *et al.*, | Hearing: May 18, 2018 |
| Defendants. | Time:    9:30 a.m. |
| | Room:    1st St. Courthouse Courtroom 8C |

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
          ccwhite@ucdavis.edu

OUTLINE OF CONTENTS

I       INTRODUCTION ................................................................................ 1

II      THE COURT MAY AND SHOULD PRESCRIBE PROCEDURAL
        REMEDIES TO PROTECT THE SETTLEMENT'S SUBSTANTIVE
        PROVISIONS. .................................................................................... 3

III     ORR UNLAWFULLY DENIES CLASS MEMBERS LICENSED
        PLACEMENTS. ................................................................................. 4

        A      Youth have a compelling interest in licensed placement. ................... 4

        B      ORR affords youth neither adequate notice nor opportunity to be
               heard in denying them licensed placements. ....................................... 6

        D      Peremptory step-ups violate ¶¶ 19, 21 and 24B of the Settlement. ..... 10

IV      ORR UNLAWFULLY MEDICATES YOUTH WITHOUT
        PARENTAL AUTHORIZATION. .................................................... 12

        A      ORR regularly compels youth to take psychotropic medications. ..... 12

        B      ORR unlawfully usurps parental rights to make medication
               decisions. .......................................................................................... 14

        C      Psychotropic drugs threaten children with serious, long-term
               injury. ............................................................................................... 15

        D      ORR's disregard for state law safeguards in medicating youth
               violates the Settlement. ................................................................... 16

V       ORR PEREMPTORILY EXTENDS MINORS' DETENTION ON
        SUSPICION THAT AVAILABLE CUSTODIANS MAY BE UNFIT ....... 17

        A      ORR unlawfully demands exceptional abilities in custodians for
               stepped-up youth............................................................................... 18

        B      ORR prolongs children's detention on the specious ground that
               mental health care is elsewhere unavailable. .................................... 21

        C      ORR must give non-dangerous youth a prompt and meaningful
               opportunity to be heard regarding a proposed custodian's fitness. ..... 22

VI      CONCLUSION.................................................................................. 25

TABLE OF AUTHORITIES

**Cases**

*Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016) ........................................ 23

*Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999) ................................................ 4

*EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 925 F.2d 588 (2d Cir. 1991) ................................................................................ 4

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ............................................ 8-9, 18

*Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854, 43 L.Ed.2d 54 (1975) ...................... 3

*Local No. 93, Int'l Ass'n of Firefighters. v. Cleveland*, 478 U.S. 501 (1986) ....... 24-25

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................. 4

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................................. 3-4

*O'Connor v. Donaldson*, 422 U.S. 563 (1975) ......................................................... 24

*Quilloin v. Walcott*, 434 U.S. 246 (1978) ................................................................ 24

*Santos v. Smith*, 260 F. Supp. 3d 598 (W.D. Va. 2017) ........................................... 23

*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) ............................ 11, 24

*Smith v. Sumner*, 994 F.2d 1401 (9th Cir. 1993) ...................................................... 4

*Stone v. City & Cty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992) ........................ 3

*United States v. N.Y.C. Dist. Council of N.Y.C.*, 229 Fed. Appx. 14, 181 L.R.R.M. 3105 (2d Cir. 2007) .......................................................................................... 3

*United States v. Volvo Powertrain Corp.*, 758 F.3d 330 (D.C. Cir. 2014) .................. 3

**Statutes and Regulations**

42 U.S.C. § 622(b)(15)(A) ...................................................................................... 15

6 U.S.C § 279 ......................................................................................................... 1

8 U.S.C. §§ 1101 *et seq.* ....................................................................................... 1

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

Homeland Security Act, Pub. L. 107-296, 116 Stat. 2135 ............................................. 1

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 110 Pub. L. 457, 122 Stat. 5044 ...................................................... 1, 9, 10

Tex. Fam. Code Ann. § 151.001(a)(4), (6) .................................................. 17

Tex. Fam. Code Ann. § 266.004(a), (b) .................................................. 14, 17

Tex. Fam. Code Ann. § 266.0042 .............................................................. 17

Tex. Fam. Code Ann. § 32.001 .................................................................. 17

 **Other Authorities**

ACF Children's Bureau, ACYF-CB-IM-12-03, *Information Memorandum* (Apr. 11, 2012) ......................................................................................... 15

DFPS, CHILD PROTECTIVE SERVICES HANDBOOK §§ 11113.2, 11323 ........................ 17

Government Accountability Office, GAO-12-270T, *Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions* (Dec. 1, 2011) ......................................................................................... 15

ORR, Children Entering the United States Unaccompanied: § 1.3.2, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.3.2 (last rev. Apr. 22, 2016) ................................................. 7

ORR, Children Entering the United States Unaccompanied: § 2.7, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7 (last rev. June 12, 2017) ................................................. 19

# I   INTRODUCTION

On January 28, 1997, the Court approved a class-wide settlement of this action. Exhibit 80, Plaintiffs' Exhibits, filed herewith ("PX"), at 556 ("Settlement"). The agreement sets standards for the detention and release of juveniles detained for alleged civil violations of the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq*.[1] The Settlement binds successors to the Immigration and Naturalization Service ("INS"), including Department of Health and Human Services' Office of Refugee Resettlement ("ORR"), which since 2002 has been responsible for the custody and release of unaccompanied class members.[2]

The Settlement requires ORR to minimize the detention of children and, thereby, the harm detention causes them. In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 110 Pub. L. 457, 122 Stat. 5044, *codified in pertinent part at* 8 U.S.C. § 1232 ("TVPRA"), Congress incorporated this bedrock principle into federal law.

ORR has nonetheless adopted certain policies and practices that prolong children's detention under ever-harsher conditions, creating a continuum of trauma that class members—many of whom arrive in the United States having suffered horrific abuse abroad—are ill-equipped to endure.

---

[1] The Settlement covers "all minors who are detained in the legal custody of the INS," and binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office." Settlement ¶ 1. The Settlement is binding until "45 days following defendants' publication of final regulations implementing this Agreement." Exhibit 3, Plaintiffs' First Set of Exhibits, etc., Feb. 2, 2015 (Dkt. 101), at 54. Defendants have never published such regulations.

[2] In 2002, the Homeland Security Act, Pub. L. 107-296, 116 Stat. 2135 ("HSA"), dissolved the INS and transferred most of its functions to the Department of Homeland Security ("DHS"). Congress directed, however, that the ORR should have authority over unaccompanied minors detained pursuant to the INA. 6 U.S.C § 279. The HSA included savings provisions that continue the Settlement in effect as to the INS's successor agencies. HSA §§ 462(f)(2), 1512(a)(1).

First, ORR "steps up" youth from shelters to medium-secure, secure, and psychiatric facilities without the most rudimentary procedural fairness or transparency. Youth housed in shelters report being awakened in the small hours of the morning and soon thereafter finding themselves confined in juvenile halls or psychiatric facilities. ORR allows youth no administrative procedure—no interview, hearing or administrative appeal—by which they may defend themselves against needless step-up.

Second, ORR routinely administers children psychotropic drugs without lawful authorization. When youth object to taking such medications, ORR compels them. ORR neither requires nor asks for a parent's consent before medicating a child, nor does it seek lawful authority to consent in parents' stead. Instead, ORR or facility staff sign "consent" forms annointing themselves with "authority" to administer psychotropic drugs to confined children.

Finally, the above practices—unlawful in and of themselves—work a further injustice: once ORR steps up a class member, winning release to available custodians becomes exponentially more difficult, and prolonged detention all but certain. According to ORR policy, children who have ever been in a staff-secure or secure facility remain detained until ORR's director or his designee consents to release; such consent is typically many weeks in coming, if it comes at all, and is required even when the step-up was based on "inaccurate, or erroneous information."

Once ORR steps up a youth to a residential treatment center ("RTC"), an RTC doctor must authorize release. In effect, ORR's summarily dispatching a child to a psychiatric facility converts immigration-related custody into indefinite civil commitment, and ORR does so without affording youth the most rudimentary procedural protection.

Such a continuum of trauma would not be inflicted today on any other population. But ORR detains immigrant and refugee children and freely exalts its

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

own administrative convenience to deny basic protections the Settlement confers. It
falls to this Court to remedy a palpable injustice.

**II      THE COURT MAY AND SHOULD PRESCRIBE PROCEDURAL REMEDIES TO
PROTECT THE SETTLEMENT'S SUBSTANTIVE PROVISIONS.**

This Court has affirmed its jurisdiction to enforce the Settlement and set out
the principles for doing so. Order re: Plaintiffs' Motion to Enforce Settlement, July
24, 2015 (Dkt. 177), at 3 ("24A Order"). Those principles remain apposite and need
not be repeated here.

As concerns remedy, the Court has "'inherent power to enforce consent
judgments, beyond the remedial contractual terms agreed upon by the parties
[because] a consent judgment contemplates judicial interests apart from those of the
litigants.'" *United States v. N.Y.C. Dist. Council of N.Y.C.*, 229 Fed. Appx. 14, at *18,
181 L.R.R.M. 3105 (2d Cir. 2007). "Until the parties have 'fulfilled their express
obligations' to comply with a consent decree, 'the court has continuing authority and
discretion—pursuant to its independent, juridical interests—to ensure compliance.'"
*Id.* at *18 n.5 (internal citation omitted, alteration in original); *United States v. Volvo
Powertrain Corp.*, 758 F.3d 330, 343 (D.C. Cir. 2014) ("Where, as here, a consent
decree 'does not specify the consequences of a breach,' the district court has
'equitable discretion' to fashion a remedy for violations of the decree.") (internal
citations omitted).

In *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 & n.20 (9th
Cir. 1992), the Ninth Circuit held that a federal court's authority to remedy violations
of a consent decree are the same as when constitutional violations occur. The
Supreme Court, of course, has often prescribed procedures, independently of the Due
Process Clause, to protect constitutional rights. *E.g.*, *Gerstein v. Pugh*, 420 U.S. 103,
112, 95 S. Ct. 854, 43 L.Ed.2d 54 (1975) ("To implement the *Fourth Amendment's*
protection against unfounded invasions of liberty and privacy," magistrate must
review probable cause for arrest ) (emphasis in original); *Miranda v. Arizona*, 384

1  U.S. 436, 478-79 (1966) (when detained individual is subjected to police questioning,

2  "the privilege against self-incrimination is jeopardized [and] [p]rocedural safeguards

3  must be employed to protect the privilege.").

4  This Court may accordingly prescribe procedures in furtherance of the

5  Settlement's substantive standards. *E.g.*, *EEOC v. Local 580, Int'l Ass'n of Bridge,*

6  *Structural & Ornamental Ironworkers*, 925 F.2d 588, 592 (2d Cir. 1991) (affirming

7  "creation of backpay hearings" to further compliance with consent decree).

8  Constitutional principles of due process are in accord. Because the Government

9  voluntarily entered into the Settlement, the substantive rights it provides are "state-

10  created." *Smith v. Sumner*, 994 F.2d 1401, 1406 (9th Cir. 1993). ORR may not,

11  therefore, deny class members those rights without due process. *Id.*[3] Each of the

12  remedies Plaintiffs seek is justified under the familiar test for determining what

13  process is due. *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

14  The Court should enter a remedial order in the form proposed herewith.

15  **III    ORR** UNLAWFULLY DENIES CLASS MEMBERS LICENSED PLACEMENTS.

16  **A    Youth have a compelling interest in licensed placement.**

17  Settlement ¶ 19 requires ORR to place the general population of class members

18  in non-secure facilities licensed to care for dependent, as opposed to delinquent,

19  minors. ORR may deny youth a licensed placement only under defined

20  circumstances. Settlement ¶ 21.

21

22

23

24

25

26

27

28

---

[3] Other circuits may hold to the contrary, at least as concerns prospective relief. *E.g.*, *Benjamin v. Jacobson*, 172 F.3d 144, 164 (2d Cir. 1999).

At any given time, ORR confines approximately 200 youth in three types of unlicensed facilities:[4] (1) "staff-secure" facilities; (2) RTCs; and (3) juvenile jails.[5] Class members have a clear interest in avoiding step-up to unlicensed facilities.

In contrast to children in licensed placements, children in staff-secure facilities and RTCs typically must wear institutional clothing, are kept under 24-hour surveillance, have limited contact with family, and are summarily disciplined for violations of facility rules. Decl. of Isabella M., Exhibit 10 (PX 61) ¶ 2 ("Isabella M.") (minor under 24-hour surveillance); Decl. of Gloria P., Exhibit 41 (PX 233) ¶ 2 ("Gloria P.") (same); Decl. of John Doe 2, Exhibit 74 (PX 470) ¶ 27 ("If you lose two points in a day, you don't go outside your room."). A children's lawyer describes security at a staff-secure facility as follows:

> The entrance to the area of the building where the UAC children are detained is always locked, and I must press a buzzer and wait for security to allow me to enter. The door is locked from both sides, and so a staff member is also required to unlock the door and let me out . . . Once I have entered the Morrison Facility, I must . . . await staff to open a second locked door before I can enter the hallway leading to the locked room where I meet with [my client]. To my recollection, every door that I have seen be opened at Morrison must be opened by a staff member with a key.

---

[4] A "licensed program" must be "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. . . . All homes and facilities operated by licensed programs . . . [must] be non-secure as required under state law. . . ." Settlement Definition 6. Although staff-secure, RTC, and secure facilities may hold a license of some sort, they are not "licensed placements" as the Settlement defines them. *See* 24A Order at 4 (Yolo juvenile hall "not licensed to care for dependent children.").

[5] ORR currently houses detained youth in three juvenile jails: Yolo County Juvenile Hall in California, and Shenandoah Valley Juvenile Center ("SVJC") and Northern Virginia Juvenile Detention Center ("NoVA") in Virginia. Decl. of Carlos Holguín, Exhibit 87 (PX 648) ¶ 3 ("Holguín").

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

Decl. of Leland Baxter-Neal, Exhibit 5 (PX 32) ¶¶ 9-10; *see also* Decl. of Nicolás C., Exhibit 2 (PX 13, 16-17) ¶¶ 7-8 ("The conditions of Paso are very different from those of the shelter in Kansas City. . . . Everything has a key. . . . I always have to wear a uniform, which makes me feel like a prisoner.").

Conditions in secure facilities are more restrictive and prison-like still. Class member Samuel W. describes them as follows:

> I am suffering a lot being in the Yolo Juvenile Detention Center. It is a jail and I sleep in a locked, small jail cell. I can't leave here and have no freedom at all. We only get one hour of time outside each day. I have to live in a small cell with concrete walls. We have to sleep on hard beds with very thin mattresses.

Decl. of Samuel W., Exhibit 44 (PX 248) ¶ 8 ("Samuel W.").

Youth in secure facilities report being handcuffed, locked in cells, and pepper sprayed. Decl. of Julio Z., Exhibit 64 (PX 420-21) ¶¶ 29, 31 ("Julio Z.") ("I sleep in a locked jail cell. . . . The guards also push us, pepper spray us[.] . . ."); Decl. of John Doe 1, Exhibit 73 (PX 460, 462) ¶¶ 9, 20 ("At Shenandoah, my room had a mattress, a sink, and a toilet . . . I was forced to wear handcuffs on my wrists and shackles on my feet for approximately 10 days in a row."); Decl. of John Doe 3, Exhibit 75 (PX 475) ¶ 12 ("[W]henever I was put in restriction, they took away my mattress and blanket. They took my clothes away about 8 times."); Decl. of D.M., Exhibit 76 (PX 483-84) ¶¶ 16-18 (Children strapped into chairs, and bags placed over their heads; youth thought, "they are going to suffocate me. . .").

**B     ORR affords youth neither adequate notice nor opportunity to be heard in denying them licensed placements.**

Despite their clear interest in licensed placement, ORR regularly steps up youth without giving them notice or the least opportunity to be heard. Class member Roberto F.'s description is fairly typical:

> One day I had a disagreement on the soccer field. A staff member approached me suddenly. I was surprised and without thinking I reacted, but I was accused

6

of beating him. About two days later, suddenly at four in the morning the supervisor came to tell me that they were going to move me to another program. And that is how I arrived at Shenandoah. They gave me no hearing or opportunity to explain my side of the facts.

Decl. of Roberto F., Exhibit 37 (PX 214, 218) ¶ 7 ("Roberto F."); *see also* Decl. of Jaime V., Exhibit 45 (PX 252-53) ¶¶ 11-14 (youth not told where he was going; thought he was being deported); Decl. of Ricardo U., Exhibit 39 (PX 225) ¶ 2 (stepped up minor falsely told he was being stepped down); Gloria P. (PX 233) ¶ 3 (stepped up minor falsely told she was going to another shelter).[6]

And ORR step-ups are *entirely* unilateral. The agency purports to use a "placement tool," into which it enters information about a child. ORR, Children Entering the United States Unaccompanied: § 1.3.2, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.3.2 (last rev. Apr. 22, 2016). The tool generates a "score" and recommends placement: licensed or stepped up. Only ORR supervisory federal field specialists may override the tool's recommendation. *Id.*

Once ORR decides to step up a youth, it sometimes uses a form, "Notice of Placement in a Restrictive Setting," Exhibit 22, PX 114-15, which, to Plaintiffs' knowledge, exists only in English, to explain its reasons for step-up. Most youth report never having seen the form. Samuel W. (PX 248) ¶¶ 2, 7 ("I speak Spanish and only a few words of English. . . . When the government sent me to Yolo Juvenile Detention Center, . . . I don't remember them ever giving me any explanation of my rights in Spanish . . ."); Supp. Decl. of Isabella M., Exhibit 11 (PX 66-67) ¶ 6 (minor never given form notice of placement in restrictive setting); Supp. Decl. of David I., Exhibit 15 (PX 86-87) ¶ 3 (same).

---

[6] ORR's failing to notify children of the basis for step-up also denies notice of their right to judicial review in violation of Settlement ¶ 24C.

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

Even were ORR to issue its form notice consistently, it would do class members little good. Few read English, and ORR allows neither children nor their lawyers to inspect or rebut its evidence or otherwise oppose step-up. Short of going to federal court, children simply have no procdure by which they may contest ORR decisions to deny licensed placement.[7] Decl. of Sofia O., Exhibit 40 (PX 228) ¶ 5 ("Sofia O.") ("I did not have an opportunity to object to the transfer."); Gloria P. (PX 233) ¶ 3 ("I don't remember receiving any document that explained that I had the right to challenge the government's decision to send me to Shiloh."); Decl. of Javier C., Exhibit 30 (PX 170) ¶ 4 ("Javier C.") (same); Decl. of D.M., Exhibit 76 (PX 481) ¶ 5 ("But I never had a chance to dispute this [transfer.]").

This is not exactly what the Ninth Circuit envisioned when it affirmed this Court's order requiring ORR to provide minors bond hearings:

> For those minors in secure detention, bond hearings additionally provide an opportunity to contest the basis of such confinement. For example, the TVPRA allows children to be placed in secure detention facilities only if they pose a safety risk to themselves or others, or have committed a criminal offense. These are precisely the determinations made by an immigration judge at a bond hearing.
>
> Providing unaccompanied minors with the right to a hearing under Paragraph 24A therefore *ensures that they are not held in secure detention without cause*.

---

[7] ORR purports to allow children to request "reconsideration" of placement in a secure or RTC facility, but only *after* they have spent 30 days in one. Exhibit 22, PX 115. Youth who have spent far longer in such facilities report knowing nothing about this or any other means to request step-down. *E.g.*, Gloria P. (PX 233) ¶ 4 (youth detained nearly four months in RTC; "No one has sat down with me and reviewed whether I should be stepped down . . . or told me . . . what I have to do in order to step down."); Decl. of Carlos A. Exhibit 31 (PX 175) ¶ 5 ("Carlos A.") (youth detained three months in juvenile hall; "I don't remember them ever telling me that I could ask for the decision to put me here to be reviewed . . ."); Decl. of Gabriela N., Exhibit 19 (PX 103) ¶ 7 (same; youth detained three months in RTC).

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

*Flores v. Sessions*, 862 F.3d 863, 868 (9th Cir. 2017) (emphasis added).

ORR simply disregards the Ninth Circuit's holding, insisting that it "only applies to the question of dangerousness as it applies to release. An immigration judge's order may be taken under advisement when making a placement decision but is not binding on ORR . . ." Email from T. Biswas, Feb. 23, 2018, Exhibit 70, PX 448.[8]

Nor is class members' suing in federal court a viable remedy. ORR contrives to deny them counsel to challenge step-ups, thus ensuring that indigent, non-English-speaking minors have no meaningful chance to do so.

TVPRA § 235(c)(5) requires ORR to "ensure, to the greatest extent practicable . . . that all unaccompanied alien children who are or have been in the custody of [ORR], and who are not [from contiguous countries], have counsel to represent them in *legal proceedings or matters and protect them from mistreatment.* . . ." (Emphasis added.)

Congress appropriates funds so ORR may provide lawyers to minors in its custody. Between 2009 and 2013, ORR paid the Vera Institute of Justice nearly $40 million to provide legal services. Exhibit 16, Plaintiffs' Exhibits, Aug. 12, 2016 (Dkt. 239-3), at 51. Vera sub-contracts with legal aid programs to represent class members. *Id*. at 7-9.

All this does class members little good in securing their rights under the Settlement:

> Lawyers whom the Vera Institute funds had, and continue to have, [little] latitude in advocating for detained immigrant and refugee children. . . . [D]uring my employment with [Vera-funded] HIAS Pennsylvania I was instructed that I could not assist detained children [to] challenge ORR's release

---

[8] Mr. Biswas issued his email in the case of former class member Santiago H. An immigration judge found Santiago not dangerous and ordered ORR to step him down. Custody Order, Feb. 21, 2018, Exhibit 68, PX 443. ORR simply refused.

or placement decisions, no matter how arbitrary or otherwise unlawful ORR's decisions appeared. I know of no Vera-funded legal services provider who has ever represented a minor in federal court against ORR.

Decl. of Justin Mixon, Exhibit 81 (PX 588) ¶ 9 ("Mixon"); *see also* Affidavit of Lorilei Williams, Exhibit 85 (PX 617) ¶ 19 (ORR "hobbles free legal services providers who undertake to represent detained children."); Decl. of Megan Stuart, July 29, 2016, Exhibit 86 (PX 626-27) ¶¶ 22-24 (same).

As a practical matter, Vera-funded services are the *only* legal help most class members will ever get. Mixon (PX 587) ¶ 8 ("Apart from Vera Institute-funded legal services providers, I know of only a handful of lawyers who are truly versed in the rights of immigrant and refugee minors in ORR custody. In my experience, private practitioners generally lack the resources to pursue federal litigation on behalf of their clients[.] . . .").

ORR's blocking Vera lawyers from helping detained minors challenge step-up ensures that few, if any, class members will ever do so.

### D   Peremptory step-ups violate ¶¶ 19, 21 and 24B of the Settlement.

ORR's policies deny minors licensed placements on grounds neither the Settlement nor the TVPRA authorize.

The Settlement permits unlicensed placement in five circumstances[9]: the minor (1) has committed a violent crime or non-petty delinquent act; (2) threatened violence while in federal custody; (3) is an unusual escape-risk; (4) is so disruptive that secure confinement is necessary to protect the minor or others; or (5) must be protected from smugglers and the like. Settlement ¶ 21.[10]

---

[9] The TVPRA allows ORR only two: *i.e.*, the youth "is a danger to self or others or has been charged with having committed a criminal offense." TVPRA § 235(c)(2)(A).

[10] Even if an exception to licensed placement applies, ORR must house children in the "least restrictive setting" practicable, Settlement ¶ 11, and may not place minors in a

ORR's "Notice of Placement in a Restrictive Setting," Exhibit 22, however, posits seven reasons for secure, four for staff-secure, and four for RTC placement, a *total of 15* grounds for denying class members their right to licensed placement.

Some of these "extras" express little more than vague *suspicion* that a juvenile *might* be dangerous: *e.g.*, "inappropriate sexual behavior," or "[h]av[ing] self-disclosed . . . gang involvement prior to placement in ORR custody that requires further assessement." Paragraph 21, however, allows step-up under specific circumstances, not mere vague suspicion.

There can be no material dispute that ORR in fact dispatches youth to secure facilities precipitiously. In *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), ICE re-arrested several juveniles whom ORR had earlier released, allegedly because they were involved with gangs. *Id*. at 1178. ORR sent the youth to juvenile halls, including Yolo County's. *Id*. at 1199. Yet according to Yolo County Juvenile Hall's Chief Probation Officer, ORR's evidence for sending the minors to his facility was "often insufficient, and . . . the Yolo County Probation Department . . . did not have just cause to detain most of these minors." *Id*. at 1199.

The court preliminarily enjoined ORR to provide re-arrested juveniles bond hearings and to release those whom immigration judges found non-dangerous. *Id*. at 1205-06. Twenty-nine youth received hearings; judges ordered ORR to release twenty-six. Request for Judicial Notice, *Saravia v. Sessions*, No. 18-15114 (9th Cir., March 16, 2018), Exhibit 79 (PX 554-55). All told, ORR had wrongly sent 90 percent to secure facilities.

This Court has ample discretion to require meaningful procedural protection against ORR's wrongfully denying class members their right to licensed placement. It should do so by entering Plaintiffs' proposed order.

---

juvenile hall if "less restrictive alternatives," such as a "medium security facility" or "another licensed program" are available. Settlement ¶ 23.

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

**IV      ORR** UNLAWFULLY MEDICATES YOUTH WITHOUT PARENTAL AUTHORIZATION.

ORR also regularly places youth on multiple psychotropic medications. It often tells children little or nothing about the drugs, nor does the agency obtain parental consent, or the legal equivalent thereof, to medicate children.

There can be no question that psychotropic drugs can seriously and permanently injure children, yet ORR routinely administers such drugs to youth in utter disregard of state laws designed to support children's mental health. Even when a child may truly benefit from psychotropics, both the law and common decency demand that parents decide whether their child should be medicated. Again, ORR prefers to act autocratically, regularly medicating children without consulting their parents, even those readily available to ORR and facility staff.

**A      ORR regularly compels youth to take psychotropic medications.**

ORR regularly places detained children on multiple psychotropic drugs regardless of the child's concerns or wishes.

Sometimes, facility staff will not tell youth what drugs they are being given or why. *See, e.g.*, Julio Z. (PX 418) ¶ 16 ("I never knew exactly what the pills were."); Julio Z. Patient Profile, Exhibit 63 (PX 413) (listing Clonazepam, Divalproex, Duloxetine, Guanfacine, Latuda, Geodon, and Olanzapine); Decl. of David I., Exhibit 14 (PX 81) ¶ 7 ("David I.") ("I take four pills in the morning and about four to six pills in the evening. I don't know what all these pills are for, but I think the one I take at night are for depression and anxiety."); David I. Patient Profile, Exhibit 57 (PX 400) (listing Clonidine, Escitalopram, and Quetiapine); Decl. of Rosa L., Exhibit 17 (PX 95) ¶ 5 ("Rosa L.") ("I take 4 or 5 pills . . . one of the pills is for anxiety. I don't know what the other pills are for."); Rosa L. Patient Profile, Exhibit 58 (PX 402) (listing Aripiprazole, Chlorpromaz, Desmopressin, Escitalopram, Lamotrigine, Lithium, and Trazodone); Javier C. (PX 170) ¶ 5 ("I took nine pills in the morning and seven in the evening. I don't know what medications I was taking . . ."); Decl. of Maricela J., Exhibit 48 (PX 262) ¶ 4 ("Maricela J.") ("I take 4 pills in the morning . . .

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT CV 85-4544-DMG (AGRx)

then I have to take 5 more pills at night. I have not been told why I am required to take all this medication.").

ORR gives class members no choice but to take whatever psychotropic medications it prescribes. Youth report being told that if they refuse drugs they will remain detained, be denied release or privileges, or be physically forced to take them. *See, e.g.*, Julio Z. (PX 417-18) ¶¶ 15, 16 ("The staff threatened to throw me on the ground and force me to take the medication. I also saw staff throw another youth to the ground, pry his mouth open and force him to take the medicine. . . . They told me that if I did not take the medicine I could not leave, that the only way I could get out of Shiloh was if I took the pills."); David I. (PX 82) ¶ 8 ("I have not refused taking the pills because I was told that . . . would make me stay at Shiloh longer . . ."); Rosa L. (PX 95) ¶ 6 ("Sometimes they give me forced injections . . . one or two staff hold my arms and the nurse gives me an injection."); Maricela J. (PX 263) ¶ 8 ("I witnessed staff members forcefully give medication four times . . .two staff members pinned down the girl . . . and a doctor gave her one or two injections . . ."); Isabella M. (PX 62) ¶ 14; Sofia O. (PX 229) ¶ 11.[11]

Nor does ORR allow children who object to being medicated any procedural recourse. *See, e.g.*, Julio Z. (PX 418) ¶ 20 ("I tried to ask [the doctor] why I was being forced to take the medications but he would ignore my questions . . . I wasn't told of any way that I could challenge the decision to be on the medications."); Maricela J. (PX 262) ¶ 5 ("I have complained about receiving too many medications and Dr. Ruiz says it is not within his control . . ."); Javier C. (PX 171) ¶ 10 ("I wanted

---

[11] Youth report that Shiloh staff, in particular, will leave medicated children in common areas until they recover their senses. *See, e.g.*, Javier C. (PX 171) ¶ 8 ("[T]hey would come and give me a shot to tranquilize me. . . . [Then] they left me in the classroom near the wall to sleep."); David I. (PX 83) ¶ 11 ("Two staff grabbed me, and the doctor gave me the injection despite my objection and left me there on the bed.").

1  to stop taking all these medications . . . but . . . they told me that I had to continue
2  because it calmed me.").

3  **B      ORR unlawfully usurps parental rights to make medication**
4  **decisions.**

5       ORR medicates children wholly without regard for their parents' wishes. *See,*
6  *e.g.*, Decl. of Mother of Isabella M., Exhibit 12 (PX 71, 74) ¶ 4 ("Mother of Isabella
7  M.") ("Nobody asked me for my permission to give medications to my daughter,
8  even though the staff at Shiloh has always had my telephone number and address.");
9  Maricela J. (PX 263) ¶ 7 ("I don't think anyone in my family was asked if it was okay
10  for me to take medicine."); David I. (PX 81) ¶ 7 ("As far as I know, ORR did not ask
11  my mother for permission before thay gave me the medication.").

12      ORR or facility staff instead sign forms "consenting" to children's medication,
13  though the forms themselves recognize the consenting authority only of a "Parent,
14  Guardian, or Conservator." *See, e.g.*, Decl. of Carter White, Exhibit 89 (PX 654-55)
15  (Shiloh staff sign consent form, not parent, relatives or potential sponsor); (Isabella
16  M. Medication Forms, Exhibit 59, PX 404-05 (medication forms signed by Shiloh
17  staffer Tabatha Ketner as "Parent, Guardian, or Conservator"); Gabriela N.
18  Medication Form, Exhibit 60, PX 407 (same); Sofia O. Medication Form, Exhibit 61,
19  PX 409 (same); Julio Z. Parental Medical Authorization Form, Exhibit 62, PX 411
20  (medical consent supplied by Yolo Director F. Ray Simmons, not parent or
21  guardian).[12]

22
23
24  _____

25  [12] ORR's forms appear to require its own consent before facilities medicate children,
    but they do not suggest that facilities obtain consent from a child's parent or
26  judicially authorized consenter. *See, e.g.*, ORR Authorization for Medical, Dental,
    and Mental Health Care for Carlos A., Exhibit 88, PX 651-52. As discussed below,
27  Texas law requires such judicial authorization in the absence of parental consent.
28  Tex. Fam. Code Ann. § 266.004(b).

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

### C      Psychotropic drugs threaten children with serious, long-term injury.

Psychotropic medications act on the central nervous system and affect cognition, emotions, and behavior, and serious, long-lasting adverse effects are common. In adults, psychotropic drugs can have serious and sometimes irreversible side effects, including psychosis, seizures, irreversible movement disorders, suicidal ideation, weight gain, and organ damage. Government Accountability Office, GAO-12-270T, *Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions*, 5-6 (Dec. 1, 2011) ("HHS Guidance").

Comparatively little is known about the effects of psychotropic drugs on children and adolescents. ACF Children's Bureau, ACYF-CB-IM-12-03, *Information Memorandum*, 7-8 (Apr. 11, 2012) ("ACF Memorandum"). The FDA has approved only a few such drugs for children, and when these are prescribed, careful oversight and monitoring are essential. HHS Guidance at 4. Giving children *multiple* psychotropic drugs is almost always to be avoided because "[i]ncreasing the number of drugs used concurrently increases the likelihood of adverse reactions and long-term side effects, such as high cholesterol or diabetes . . . " *Id.*

The importance of oversight when giving psychotropic medications to children is well established. Without it, the potential for abuse—including using drugs as "chemical straight-jackets" to control children, rather than to treat actual mental health needs—is unacceptably high. *See* 42 U.S.C. § 622(b)(15)(A) (requiring states to develop "a plan for the ongoing oversight and coordination of health care services for any child in a foster care placement," including "protocols for the appropriate use and monitoring of psychotropic medications."); ACF Memorandum 10-11 ("Strengthened oversight of psychotropic medication use is necessary" as is "close supervision and monitoring . . . [and] careful management and oversight" in administering children psychotropics.).

Not surprisingly, children medicated in ORR custody report negative side effects, including nausea, dizziness, somnolence, depression, and grotesque weight

gain. *See, e.g.*, Julio Z. (PX 418) ¶ 18 ("After taking the medication, I was more tired,
I felt sad and my eyes got teary . . . I began to gain a lot of weight . . . In
approximately 60 days, I gained 45 pounds."); Javier C. (PX 170) ¶ 5 ("The medicine
made me fat. I used to be really skinny."); Maricela J. (PX 262) ¶ 5 ("When I take
medicine, I do not have any mood. . . . I have suffered side effects including
headaches, loss of appetite and nausea."); Mother of Isabella M. (PX 71, 74) ¶ 4
("[T]hey are requiring [my daughter] to take very powerful medications for anxiety. I
have noted that [she] is becoming more nervous, fearful, and she trembles. [She] tells
me that she has fallen several times . . . because the medications were too powerful
and she couldn't walk."); Letter re: Psychotropic Medications, Exhibit 27,
Attachment 10, PX 158 (Yolo psychologist notes child "overmedicated";
recommends drugs be "taper[ed] off").

### D    ORR's disregard for state law safeguards in medicating youth violates the Settlement.

Facilities in which ORR places minors with mental health needs must "meet
those standards . . . set forth in Exhibit 1." Settlement ¶¶ 6, 8.[13] Exhibit 1 requires that
licensed programs "comply with all applicable *state child welfare laws* and
regulations . . . and shall provide or arrange for the following services for each minor
in its care: . . . *appropriate* mental health interventions when necessary. (Emphasis
added). *See also* Letter from James De La Cruz, April 2, 2018, Exhibit 83, PX 598
(acknowledging applicability of Texas law to Shiloh RTC).

In Texas, where Shiloh RTC is located,[14] parents have the right to control a
minor child's medical, dental, and psychological treatment absent a judicial

---

[13] Licensed or not, ORR may place children only in facilities that are "safe" and
"consistent with . . . concern for the particular vulnerability of minors . . ." Settlement
¶ 12A.

[14] Though the most severe medication abuses occur at Shiloh RTC, juveniles at other
ORR facilities are also administered psychotropics. *See, e.g.*, Julio Z. Parental

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

determination of unfitness. Tex. Fam. Code Ann. § 151.001(a)(6). Only rarely does Texas law permit non-parents to authorize a child's medical treatment. Tex. Fam. Code Ann. § 32.001. Even adults with the "actual care, control, and possession of the child" must obtain "written authorization to consent from a person having the right to consent" to treat a minor. Tex. Fam. Code Ann. § 151.001(a)(4).

When the state's Department of Family and Protective Services ("DFPS") acts *in loco parentis*, Texas law requires that it obtain judicial authorization to treat a minor. Tex. Fam. Code Ann. § 266.004(a), (b). DFPS may not unilaterally designate itself or treatment center staff as a child's medical consenter. DFPS, CHILD PROTECTIVE SERVICES HANDBOOK § 11113.2.

Consent to administer psychotropics to dependent youth must be given by someone lawfully authorized to do so, and the consenting party must be informed of risks and alternatives to the proposed medications. Tex. Fam. Code Ann. § 266.0042. The consenter must also be told about non-pharmacological alternatives to psychotropic drugs. CHILD PROTECTIVE SERVICES HANDBOOK, *supra*, § 11323.

Preferring autocracy to due process, ORR does none of this. The Court should order ORR to obtain parental consent, or the lawful equivalent thereof, and to otherwise comply fully with state law when administering psychotropic drugs to detained youth.

## V   ORR PEREMPTORILY EXTENDS MINORS' DETENTION ON SUSPICION THAT AVAILABLE CUSTODIANS MAY BE UNFIT.

Youth may spend weeks, months or even years in ORR custody. Each day, they risk offending staff or violating facility rules, whereupon ORR may summarily step them up.[15] Beyond subjecting them to institutional security and drugging, step-up

---

Medical Authorization Form, Dec. 4, 2016, Exhibit 62, PX 411 (Yolo Institutional Services Director provide medical consent in place of parent/guardian).

[15] At any given time, ORR detains about 40 youth in RTCs, 50 in juvenile halls, and 115 in staff-secure facilities. Holguín (PX 648) ¶ 4. ORR's data do not include the average length of stay for youth placed in these facilities. However, in December

MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1    deals youth an additional blow: once ORR sends a youth to an unlicensed placement,

2    his or her chances of prompt release vanish.

3         Settlement ¶ 14 provides: "Where the INS determines that the detention of the

4    minor is not required either to secure his or her timely appearance before the INS or

5    the immigration court, or to ensure the minor's safety or that of others, the INS shall

6    release a minor from its custody without unnecessary delay . . ."[16] Further grounding

7    ORR's obligation to minimize children's detention, Settlement ¶ 18 provides, "Upon

8    taking a minor into custody, the INS . . . shall make and record the prompt and

9    continuous efforts on its part toward . . . the release of the minor . . ."

10   **A      ORR unlawfully demands exceptional abilities in custodians for**

11   **stepped-up youth.**

12        The Settlement is clear: ORR has three—and only three—reasons to continue

13   youth in detention: (1) dangerousness; (2) flight-risk; and (3) the lack of a custodian

14   who will not harm or neglect them. Settlement ¶ 14.

15        ORR professes not to detain youth as flight-risks. ORR, Interim Guidance on

16   *Flores v. Sessions*, July 18, 2017, Exhibit 8, PX 48 ("Interim Guidance"). And since

17   July 2017, immigration judges have reviewed a child's dangerousness. 24A Order,

18   *aff'd*, *Flores v. Sessions*, *supra*, 862 F.3d 863.

19        ORR continues, however, to detain children indefinitely because it suspects a

20   potential custodian may be unfit, and it does so entirely without timely neutral and

21   _____

22   2017 ORR released just one youth to a custodian from Shenandoah Valley Juvenile

23   Center, one from Yolo Juvenile Hall, and none from Northern Virginia Juvenile
     Detention Center. *Id*. (PX 649) ¶ 5.

24
     Children in RTCs faced similar odds: ORR released one class member from

25   MercyFirst to a custodian during December, and one from Shiloh. *Id*.

26   [16] If a child has more than one potential custodian, ORR must release first to a parent,

27   then to a legal guardian, adult sibling, aunt, uncle, or grandparent, an unrelated adult
     or entity designated by the minor's parent, a juvenile shelter, and finally, if there is no

28   likely alternative to long-term detention, an unrelated adult. Settlement ¶ 14.

MEMORANDUM IN SUPPORT OF MOTION TO
                                                        ENFORCE SETTLEMENT
                                                       CV 85-4544-DMG (AGRx)

1  detached review. *E.g.*, Interim Guidance, PX 48. In reality, ORR extends non-

2  dangerous children's confinement for reasons having little or nothing to do with a

3  custodian's actual propensity to harm or neglect.

4       In June 2017 ORR amended its online "Policy Guide" to provide: "The

5  ORR/FFS elevates release decisions to the ORR Director, or the Director's designee,

6  for any UAC in a secure or staff secure facility, or for any UAC who had previously

7  been in a secure or staff secure facility. The ORR Director or designee makes release

8  decisions for children in these types of facilities." ORR, Children Entering the United

9  States Unaccompanied: § 2.7, *available at* www.acf.hhs.gov/orr/resource/children-

10  entering-the-united-states-unaccompanied-section-2#2.7 (last rev. June 12, 2017).

11       ORR's director must now approve the release of all class members "who are in

12  or were previously placed in a secure or staff-secure facility [even if they] have

13  prevailed in a *Flores* bond hearing on a question of dangerousness . . ." or were

14  stepped up on the weight of "incomplete, *inaccurate or erroneous* information" that

15  the minor was affiliated with a gang. FAQ: ORR DIRECTOR'S RELEASE DECISION, Jan.

16  26, 2018, Exhibit 24, PX 120 (emphasis added). Children, their parents and other

17  available custodians describe a Kafkaesque experience in trying to free a child from

18  ORR detention.

19       Class member Santiago H.'s experience illustrates ORR's refusal to release

20  children from secure detention. In November 2017, ORR confined Santiago at the

21  Shenandoah Valley Juvenile Center ("SVJC"). Case Review, undated, Exhibit 71, at

22  PX 451. SVJC personnel determined that Santiago "does not present any mental

23  health concerns," "gets along well with others," and "does not appear to present a risk

24  to himself or the community at this time." *Id*. at PX 452. SVJC recommended ORR

25  release Santiago to his aunt. *Id*. ORR ignored the findings and recommendation,

26  leaving Santiago in secure confinement for months.

27       In February 2018, Immigration Judge John Bryant held a bond hearing and

28  found Santiago not a danger to the community. The court ordered ORR to step him

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

down to a less secure placement. Custody Order, Feb. 21, 2018, Exhibit 68, PX 443. ORR ignored the order. Email from T. Biswas, Feb. 23, 2018, Exhibit 70, PX 448.

In March Santiago turned 18, and ORR turned him over to ICE. ICE dispatched Santiago to an adult detention facility. Later that month, Immigration Judge Karen Donoso-Stevens ordered Santiago released. Order of the Immigration Judge, March 20, 2018, Exhibit 69, PX 445. Santiago is now free to live with his aunt, which ORR could block *only* because she would harm or neglect him. The only difference: Santiago was now a day older.[17]

In September 2017, ORR placed class member Nicolás C. at the Paso staff-secure facility in Portland, Oregon. According to his mother, ORR prolonged her son's confinement because she had earlier suffered from cancer:

> [Case worker] Erich . . . assured me again and again that the [release] process would not take long, about 30 days at the most. . . . I sent [all the documents he requested] without delay. . . .
>
> However, Erich kept asking me for more and more documents: among them, files from doctors to verify that my cancer would not hinder me from taking care of my son. These . . . caused me great sorrow, and they did not seem necessary to have my son. I believe that a mother has the right to take care of her child even though she is incapacitated, although I am not. It occurred to me that they were looking for an excuse to deny me my son[.] . . .

Decl. of Mother of Nicolás C., Exhibit 1 (PX 3, 7) ("Mother of Nicolás C.") ¶¶ 7-8; *see also* Grandfather of Gabriela N., Exhibit 67 (PX 438) ¶ 9 ("Grandfather of Gabriela N.") (youth detained six months at Shiloh RTC; "I got the impression that the home investigator didn't think I made enough money to be able to support [my granddaughter] and myself."); Decl. of Camila G., Exhibit 55 (PX 393) ¶ 8 ("Camila

---

[17] If Santiago's example provokes a feeling of déjà vu, it is with good reason. *See* 24A Order at 8 (youth spent months in secure ORR detention, only to be released pursuant to immigration judge's order after turning 18 and being transferred to ICE custody).

G.") (youth detained for one year and three months; "My case worker told me that the only reason that I haven't been released to my aunt . . . is because I don't have an official birth certificate[.] . . . My mother died before she could register me for [one].").[18]

## B    ORR prolongs children's detention on the specious ground that mental health care is elsewhere unavailable.

ORR also extends detention of youth summarily placed in RTCs on the theory they cannot get mental health care anywhere else. Notice of Placement in a Restricive Setting, Exhibit 22, PX 114 (grounds for RTC placement include, "ORR has determined that you have a psychiatric or psychological issue that cannot be addressed in an outpatient setting.").[19]

---

[18] Accounts abound of ORR prolonging children's detention for no apparent reason. *E.g.*, Carlos A. (PX 176) ¶ 10 (minor detained four months; "My case manager said the only reason that I haven't been released is that the government is now reviewing my case. They have not told me how long it would take . . ."); Decl. of Miguel B., Exhibit 32 (PX 179) ¶ 5 (youth detained five months; "My mom began trying to get me back . . . Someone came to inspect her house and everything came out well. Neither of us understands why I am still here."); Roberto F. (PX 214, 217) ¶ 6 (youth detained ten months; "[M]y mom moved from Kansas to Texas to be closer to me. . . . They continued to take long making the decision to let me live with her. According to her, the government did a study of the home, and everything went well.").

[19] The evidence suggests that months or years of detention itself brings on the psychological distress for which ORR then medicates children:

> Since last year, when my daughter became a prisoner, I have noticed that she is more and more depressed . . . She tells me that she doesn't want to be in the detention center. When my daughter and I lived together in Honduras, we never had mental problems. . . . In my opinion, detention is affecting [Isabella] a lot, and she would quickly get better if they were to return her to me.

Mother of Isabella M. (PX 70-71, 73-74) ¶ 3; *see also* Grandfather of Gabriela N. (PX 439) ¶¶ 14-15 (granddaughter "did not have any mental health problems. . . . I think that being locked up for several months has made her be more anxious and upset."); Excerpts from ORR File for Victoria R., Exhibit 84, PX 605 ("Separation from family" and "Frustration of lengthy reunification process" are "Major Stressors" for the child).

Since May 2017—some 10 months now—ORR has detained Isabella M. In early October 2017, ORR placed her at the Shiloh RTC, from which it has doggedly refused to release her because "[t]he doctor has said I can't leave until I can control myself. He hasn't told me a time frame for how long it will be before I'm ready." Isabella M. (PX 61) ¶ 3. Isabella M.'s mother corroborates:

> During the summer of last year, a home investigator, Jorge Arango, came twice to evaluate my house. . . . When he finished, he told me that everything was approved . . . Much time went by without any further word . . . I called several times asking when they were going to give me [Isabella] back. They always answered that it depended on the doctor . . .

Mother of Isabella M. (PX 71, 74) ¶ 5; *see also* Decl. of Daniella Q., Exhibit 9 (PX 57) ¶ 3 ("I have been told that the doctor has to say it is alright to release me to my dad."); Decl. of Victoria R., Exhibit 13 (PX 78) ¶ 4 (same); Decl. of Arturo S., Exhibit 21 (PX 110) ¶ 3 (same).

**C        ORR must give non-dangerous youth a prompt and meaningful opportunity to be heard regarding a proposed custodian's fitness.**

Rather than assess custodians' basic fitness, ORR consistently demands extraordinary prowess of stepped-up class members' custodians.[20] The Settlement, however, allows ORR to detain a non-dangerous minor only if it "has reason to believe [an available custodian] may *harm or neglect* the minor . . ." Settlement ¶ 11 (emphasis added).[21]

Even assuming, *arguendo*, the Settlement were to allow ORR to demand exceptional qualifications of custodians for stepped-up youth, it affords no

---

[20] Inasmuch as ORR steps up youth autocratically in the first place, its leveraging step-up to confine youth until and unless a doyen appears is palpable exacerbation.

[21] ORR's prolonging class members' confinement via such policies also violates their right to placement in the least restrictive setting consistent with their best interests, a violation of TVPRA § 235(c)(2)(A).

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1    meaningful chance to be heard on the need for extra qualifications or whether a given

2    custodian possesses them. Again, ORR simply decrees what qualifications a

3    custodian must have and then decides unilaterally whether he or she possesses them.

4    ORR knows that more process than that is surely due.

5         In *Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016), ORR refused to

6    release a youth on the ground he "'require[d] an environment with a high level of

7    supervision and structure,' and it did not 'appear . . . that [his mother's] home [could]

8    provide the structure and supervision necessary[.] . . .'" *Id*. at 480 (internal citation

9    omitted).

10        The minor's mother sued to compel ORR to release her son. *Id*. at 481. The

11   district court initially denied a writ, *id*., but the Fourth Circuit reversed in part and

12   instructed the trial court to decide whether ORR had denied due process. *Id*. Held:

13   "[O]nce ORR decided to withhold RMB from Petitioner's care, ORR 'ha[d] the

14   burden to initiate' proceedings to justify its action. . . . [It] could not simply require

15   Petitioner to change the agency's mind." *Id*. at 486 (internal citations omitted). The

16   court ordered ORR to release the minor immediately, adding that ORR could refer

17   any concerns it may have for the youth's well-being to state juvenile authorities. *Id*. at

18   489.

19        Again in *Santos v. Smith*, 260 F. Supp. 3d 598 (W.D. Va. 2017), ORR refused

20   to release a minor to his mother on the ground that "'he requires an environment with

21   a high level of supervision and structure that [his mother is] unable to provide at this

22   time[.] . . .'" *Id*. at 602. Again, the family sued to compel release. *Id*. at 600. Again,

23   the court held that ORR's refusing release denied due process: "[H]ad better or more

24   process been given (especially as to the delay and the burden being on Ms. Santos to

25   initiate and justify reunification, rather than the default rule being otherwise), the

26   outcome could have been different. . . ." *Id*. at 614.

27        ORR remains undeterred, regularly extending children's confinement because

28   it questions their proposed custodians' fitness while refusing to submit its suspicions

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

to neutral and detached review. *E.g.*, Mother of Nicolás C. (PX 4, 8) ¶ 14 (nobody "has told me anything about my son. I have not been made aware of any procedure by which a mother can oppose the prolonged detention of her child [.] . . ."); Decl. of Sister of Victoria R., Exhibit 65 (PX 426-27, 429-30) ¶ 4 ("They didn't give me any opportunity to explain to them . . . that nothing would happen [to my sister] if they would let me take care of her."); Grandfather of Gabriela N. (PX 439) ¶ 12 ("When I reached out to [my granddaughter's] social worker at Shiloh, she told me that ORR threw out my application [to be her custodian] . . . ORR has never officially told me . . . that my application has been rejected."); Camila G. (PX 394) ¶ 13 (child detained one year and three months; "I don't know what I can do or what the next step can be for me to try and get out of the shelter if ORR does not allow me to live with my aunt . . .").

In *Beltran* and *Santos* the courts held ORR's vetting of custodians lacking in threshhold constitutionality.[22] Here, a consent decree requires ORR to release minors promptly to qualified custodians whether or not release is constitutionally required.

---

[22] ORR may not detain youth "for their own good" without proving that their parents are unfit. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("Due Process Clause would be offended '[if] a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'") (internal citations omitted).

Obviously, ORR detention also impairs children's right to physical liberty. *Saravia*, *supra*, 280 F. Supp. 3d at 1195.

The Settlement expands these rights, entitling class members to release to specified non-parents, including grandparents and adult siblings.

ORR's confining youth until it thinks them mentally fit raises further constitutional concerns. It is hard to distinguish such detention from civil commitment, which, of course, represents a "massive curtailment of liberty," lawful only with due process and proof of dangerousness to others. *O'Connor v. Donaldson,* 422 U.S. 563, 575 (1975) (government may not "confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community").

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1   *Cf. Local No. 93, Int'l Ass'n of Firefighters. v. Cleveland*, 478 U.S. 501, 525 (1986)

2   (consent decree may confer greater relief than could have been obtained at trial).

3        ORR's peremptorily declaring custodians unfit falls short of constitutional

4   minimums, and it can hardly satisfy the Settlement. The Court should order ORR to

5   release non-dangerous class members promptly to available custodians or else submit

6   doubts about their fitness for neutral and detached review.

7   **VI   CONCLUSION**

8        For the foregoing reasons, this Court should grant this motion and enter

9   Plaintiffs' proposed order.[23]

11   Dated: April 16, 2018                    Respectfully submitted,

12                                            CARLOS R. HOLGUÍN, PETER A. SCHEY
13                                            Center for Human Rights &
14                                            Constitutional Law

15                                            LEECIA WELCH
16                                            National Center for Youth Law

17                                            HOLLY COOPER, CARTER WHITE
18                                            U.C. Davis School of Law

19                                            /s/
20                                            Carlos Holguín

21                                            /s/
22                                            Leecia Welch

23                                            /s/
24                                            Holly Cooper

26   [23] Counsel wish to acknowledge the invaluable assistance of U.C. Davis students Gladys Hernandez, Christian Hatchett, and Mayra Sandoval in preparing this brief.

27   Plaintiffs will separately move the Court to award them attorney's fees and costs
28   incurred in the prosecution of this motion.

MEMORANDUM IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)