CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Jefferson B. Sessions, Attorney General, *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG (AGRx)<br><br>EXHIBITS IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT (VOL. 4: EXS. 41-60, PAGES 232-407, PUBLICLY FILED EXHIBITS ONLY)<br><br>Hearing:  May 18, 2018<br>Time:    9:30 a.m.<br>Room:    1st St. Courthouse<br>        Courtroom 8C |

1

*Counsel for Plaintiffs, continued*

2

3

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)

4

Director, Civil Rights Clinic

5

University of California Davis School of Law

6

One Shields Ave. TB 30
Davis, CA 95616

7

Telephone: (530) 754-4833

8

Email: hscooper@ucdavis.edu
        ccwhite@ucdavis.edu

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

I, Carlos Holguín, do hereby declare that true and correct copies of the following documents are attached hereto:

INDEX TO EXHIBITS

| No. | Description | Page(s) |
|---|---|---|
| 1 | Declaration of the Mother of Nicolás C., February 6, 2018 (proposed to be filed partially under seal) | 1-10 |
| 2 | Declaration of Nicolás C., February 4, 2018 (proposed to be filed partially under seal) | 11-19 |
| 3 | Morrison Paso Case Review re: Nicolás C., September 17, 2017 (proposed to be filed partially under seal) | 20-26 |
| 4 | Custody Order of the Immigration Judge re: Nicolás C., December 19, 2017 (proposed to be filed partially under seal) | 27-28 |
| 5 | Declaration of Leland Baxter-Neal, February 6, 2018 (proposed to be filed partially under seal) | 29-34 |
| 6 | Email from Erich Corona re: Nicolás C., January 9, 2018 (proposed to be filed partially under seal) | 35-38 |
| 7 | Declaration of James M. Owens, February 7, 2018 (proposed to be filed partially under seal) | 39-43 |
| 8 | ORR Interim Guidance re: Custody Hearings, July 18, 2017 | 44-55 |
| 9 | Declaration of Daniella Q., February 28, 2018 (proposed to be filed partially under seal) | 56-59 |
| 10 | Declaration of Isabella M., December 1, 2017 (proposed to be filed partially under seal) | 60-63 |
| 11 | Supplemental Declaration of Isabella M., February 28, 2018 (proposed to be filed partially under seal) | 64-68 |
| 12 | Declaration of the Mother of Isabella M., February 28, 2018 (proposed to be filed partially under seal) | 69-75 |
| 13 | Declaration of Victoria R., February 28, 2018 (proposed to be filed partially under seal) | 76-79 |

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

14    Declaration of David I., November 30, 2017 (proposed to be
      filed partially under seal) ................................................................ 80-84

15    Supplemental Declaration of David I., February 28, 2018
      (proposed to be filed partially under seal) ............................................. 85-88

16    Declaration of Eduardo A., March 1, 2018 (proposed to be filed
      partially under seal) .......................................................................... 89-93

17    Declaration of Rosa L., December 1, 2017 (proposed to be filed
      partially under seal) .......................................................................... 94-97

18    Supplemental Declaration of Rosa L., February 28, 2018
      (proposed to be filed partially under seal) ......................................... 98-100

19    Declaration of Gabriela N., December 1, 2017 (proposed to be
      filed partially under seal) .............................................................. 101-104

20    Supplemental Declaration of Gabriela N., February 28, 2018
      (proposed to be filed partially under seal) ....................................... 105-108

21    Declaration of Arturo S., February 28, 2018 (proposed to be
      filed partially under seal) .............................................................. 109-112

22    ORR Form Notice of Placement in a Restrictive Setting,
      February 5, 2018 ........................................................................... 113-115

23    ORR FAQ: July 2017 Bond Hearings for Unaccompanied Alien
      Children (UAC) ............................................................................. 116-118

24    ORR FAQ: ORR Directors Release Decision, January 26, 2018 ..... 119-121

25    Letter from Carlos Holguín to Office of Immigration Litigation,
      December 19, 2017 ......................................................................... 122-129

26    Email from Sarah Fabian re: Flores Meet and Confer
      Discussion, January 12, 2018 .......................................................... 130-131

27    Letter from Leecia Welch to Office of Immigration Litigation
      re: Psychotropic Medications, and Attachments, January 16,
      2018 (proposed to be filed partially under seal) .............................. 132-161

28    Letter from Carlos Holguín to Office of Immigration Litigation,
      February 16, 2018 ........................................................................... 162-164

29   Email from Sarah Fabian re: Flores Meet and Confer
     Discussion, March 2, 2018 ................................................................ 165-168

30   Declaration of Javier C., November 15, 2017 (proposed to be
     filed partially under seal) ................................................................ 169-173

31   Declaration of Carlos A., November 16, 2017 (proposed to be
     filed partially under seal) ................................................................ 174-177

32   Declaration of Miguel B., November 16, 2017 (proposed to be
     filed partially under seal) ................................................................ 178-181

33   Declaration of Luis D., November 15, 2017 (proposed to be
     filed partially under seal) ................................................................ 182-192

34   Declaration of Andrés D., July 11, 2017 (proposed to be filed
     partially under seal) ........................................................................ 193-197

35   Declaration of Jorge E., July 11, 2017 (proposed to be filed
     partially under seal) ........................................................................ 198-205

36   Declaration of Gustavo H., July 11, 2017 (proposed to be filed
     partially under seal) ........................................................................ 206-210

37   Declaration of Roberto F., July 11, 2017 (proposed to be filed
     partially under seal) ........................................................................ 211-220

38   Declaration of Natalia T., November 21, 2017 (proposed to be
     filed partially under seal) ................................................................ 221-223

39   Declaration of Ricardo U., November 21, 2017 (proposed to be
     filed partially under seal) ................................................................ 224-226

40   Declaration of Sofia O., December 1, 2017 (proposed to be
     filed partially under seal) ................................................................ 227-231

41   Declaration of Gloria P., December 1, 2017 (proposed to be
     filed partially under seal) ................................................................ 232-235

42   Declaration of Edwin B., March 1, 2018 (proposed to be filed
     partially under seal) ........................................................................ 236-242

43   Letter from Carlos Holguín to Cynthia Nunes Colbert, et al., re:
     Legal Representation for Specified Class Members, March 12,
     2018 (proposed to be filed partially under seal) ............................ 243-246

44    Declaration of Samuel W., October 26, 2017 (proposed to be
      filed partially under seal) ...................................................... 247-250

45    Declaration of Jaime V., October 26, 2017 (proposed to be filed
      partially under seal) ............................................................ 251-254

46    Declaration of Mateo X., October 26, 2017 (proposed to be
      filed partially under seal) ...................................................... 255-256

47    Declaration of Mario Y., October 26, 2017 (proposed to be filed
      partially under seal) ............................................................ 257-260

48    Declaration of Maricela J., November 30, 2017 (proposed to be
      filed partially under seal) ...................................................... 261-264

49    Declaration of Teresa K., November 30, 2017 (proposed to be
      filed partially under seal) ...................................................... 265-268

50    Declaration of Diego E., January 16, 2018 (proposed to be filed
      partially under seal) ............................................................ 269-273

51    Declaration of Daniel F., March 21, 2018 (proposed to be filed
      partially under seal) ............................................................ 274-278

52    Declaration of Alejandro G., March 21, 2018 (proposed to be
      filed partially under seal) ...................................................... 279-285

53    Transcript of Testimony of James De La Cruz, *Saravia v.
      Sessions*, Case No. 3:17-cv-03615-VC (N.D. Cal. June 29,
      2017), Dkt. No. 28 ............................................................... 286-382

54    Defendant Brent Cardall's Responses to Plaintiff's Request for
      Admission, Set One, *Saravia v. Sessions*, Case No. 3:17-cv-
      03615-VC (N.D. Cal. Sept. 20-21, 2017), Dkt. No. 61-3 ............... 383-390

55    Declaration of Camila G., April 3, 2018 (proposed to be filed
      partially under seal) ............................................................ 391-396

56    Patient Profile – Active Medications of Victoria R., January 9,
      2018 (proposed to be filed partially under seal) .......................... 397-398

57    Patient Profile – Active Medications of David I., November 27,
      2017 (proposed to be filed partially under seal) .......................... 399-400

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

58    Patient Profile – Active Medications of Rosa L., July 31, 2017
      (proposed to be filed partially under seal) ........................................ 401-402

59    Medication Information and Reconciliation and Over-the-
      Counter Medication Release Forms for Isabella M., September
      28-29, 2017 (proposed to be filed partially under seal) .................. 403-405

60    Medication Information and Reconciliation Form for Gabriela
      N., September 7, 2017 (proposed to be filed partially under
      seal) ................................................................................................ 406-407

61    Medication Information and Reconciliation Form for Sofia O.,
      September 18, 2017 (proposed to be filed partially under seal) ....... 408-409

62    Yolo County Juvenile Detention Facility Parental Medical
      Authorization Form for Julio Z., December 14, 2016 (proposed
      to be filed partially under seal) ...................................................... 410-411

63    Patient Profile – Active Medications of Julio Z., December 12,
      2016 (proposed to be filed partially under seal) ............................. 412-413

64    Declaration of Julio Z., November 13, 2017 (proposed to be
      filed partially under seal) .............................................................. 414-424

65    Declaration of Sister of Victoria R., March 13, 2018 (proposed
      to be filed partially under seal) ...................................................... 425-431

66    Declaration of Proposed Sponsor of Victoria R., March 13,
      2018 (proposed to be filed partially under seal) ............................. 432-435

67    Declaration of Grandfather of Gabriela N., March 15, 2018
      (proposed to be filed partially under seal) ...................................... 436-441

68    Custody Order of the Immigration Judge re: Santiago H.,
      February 21, 2018 (proposed to be filed partially under seal) .......... 442-443

69    Order of the Immigration Judge with Respect to Custody re:
      Santiago H., March 20, 2018 (proposed to be filed partially
      under seal) ...................................................................................... 444-446

70    Email from Toby Biswas re: Santiago H. Follow Up, February
      23, 2018 (proposed to be filed partially under seal) ....................... 447-449

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

71     Case Review re: Santiago H., November 29, 2017 (proposed to be filed partially under seal) ........................................................... 450-452

72     ORR Information Memo re: Community Safety Initiative for the Unaccompanied Alien Children Program, August 16, 2017 ...... 453-457

73     Declaration of John Doe 1, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 17, 2018), Dkt. No. 34-1 ......................................... 458-464

74     Declaration of John Doe 2, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 5, 2018), Dkt. No. 34-2 ........................................... 465-471

75     Declaration of John Doe 3, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH (W.D. Va. Jan. 5, 2018), Dkt. No. 34-3 ........................................... 472-478

76     Declaration of D.M, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 2, 2018), Dkt. No. 34-5 ........................................................ 479-484

77     Declaration of R.B., *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 8, 2018), Dkt. No. 34-6 ................................................... 485-490

78     Transcript of Jonathan White, *Saravia v. Sessions*, Case No. 18-15114 (9th Cir. Oct. 27, 2017), Dkt. No. 9-2 ................................... 491-548

79     Exhibit 1 to Appellees' Request for Judicial Notice, *Saravia v. Sessions*, Case No. 18-15114 (9th Cir. March 16, 2018), Dkt. No. 20 ................................................................................... 549-555

80     Stipulated Settlement Agreement, *Flores v. Reno*, Case No. CV 85-4544-RJK(Px) ..................................................................... 556-584

81     Declaration of Justin Mixon, October 19, 2017............................... 585-591

82     Email from Sarah Fabian re: Correspondence re: Legal Representation for Flores Class Members, March 23, 2018............. 592-594

83     Letter from James De La Cruz to Flores Counsel re: Psychotropic Medications, April 2, 2018 (proposed to be filed partially under seal) ..................................................................... 595-601

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

84      Individual Service Plan – Residential Treatment for Victoria R.,
        Shiloh Treatment Center, Inc., December 26, 2017 (proposed to
        be filed partially under seal) ............................................................. 602-606

85      Declaration of Lorelei Alicia Williams, previously filed in this
        case in Docket No. 239-2, August 5, 2016 ...................................... 607-618

86      Declaration of Megan Stuart, previously filed in this case in
        Docket No. 239-2, August 1, 2016 .................................................. 619-646

87      Declaration of Carlos Holguín, April 10, 2018 ............................... 647-649

88      ORR Authorization for Medical, Dental, and Mental Health
        Care for Carlos A., July 31, 2017 (proposed to be filed partially
        under seal)........................................................................................ 650-652

89      Declaration of Carter White, April 14, 2018, attaching Shiloh
        Treatment Center Consent to Medical Care Form........................... 653-655

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of April, 2018, at Santa Clarita, California.

Respectfully submitted,

Carlos Holguín

/s/ Carlos Holguín

# Exhibit 53

Exhibit 53
Page 286

Pages **1 - 95**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
ILSA SARAVIA, AS NEXT FRIEND    )
FOR A.H., A MINOR, AND ON HER   )
OWN BEHALF,                     )
                                )
            Plaintiff,          )
                                )
  VS.                           )       NO. CV 17-03615-VC
                                )
JEFFERSON B. SESSIONS, et al.,  )
                                )
            Defendants.         )
_____)
```

San Francisco, California
Thursday, June 29, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    AMERICAN CIVIL LIBERTIES UNION OF
                    NORTHERN CALIFORNIA, INC.
                    39 Drumm Street
                    San Francisco, CA  94111
            BY:  **WILLIAM S. FREEMAN, ESQUIRE**
                 **JULIA H. MASS, ESQUIRE**

For Defendants:
                    U.S. DEPARTMENT OF JUSTICE
                    Civil Division
                    P.O. Box 868
                    Ben Franklin Station
                    Washington, DC  20044
            BY:  **SARAH B. FABIAN, ESQUIRE**

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

**Exhibit 53**
**Page 287**

<pre>
1                        I N D E X

2    Thursday, June 29, 2017 - Volume 1

3    DEFENDANT'S WITNESSES                        PAGE   VOL.

4    DE LA CRUZ, JAMES
     (SWORN)                                        4     1
5    Direct Examination by Ms. Fabian              4     1
     Cross-Examination by Mr. Freeman             43     1
6    Cross-Examination by Ms. Mass                68     1
     Examination by The Court                     74     1
7                        E X H I B I T S

8    DEFENDANT'S EXHIBITS                  IDEN   EVID   VOL.

9      1                                    13     17     1

10     2                                    24     26     1

11     3                                    28     29     1

12     4                                    34     34     1

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

Exhibit 53
Page 288

| 1 | **Thursday - June 29, 2017**                              **2:04 p.m.** |

2                    **P R O C E E D I N G S**

3                         ---oOo---

4                    **JAMES DE LA CRUZ,**

5    called as a witness for the Defendant, having been duly sworn,

6    testified as follows:

7         **THE COURT:**  The only thing I will say is I'm not sure

8    that microphone works, so if you want to do it from there, you

9    should make sure you speak up.

10        **MS. FABIAN:**  Testing.

11        **THE COURT:**  It is working.

12        **THE CLERK:**  For the record, please state your first

13   and last name.

14        **THE WITNESS:**  My name is James De La Cruz.

15        **THE CLERK:**  Please spell the last name.

16        **THE WITNESS:**  Sure.  James, J-A-M-E-S.  De La Cruz is

17   D-E space L-A space C-R-U-Z.

18        **THE CLERK:**  Thank you.

19                    **DIRECT EXAMINATION**

20   BY MS. FABIAN:

21   **Q.**   Good afternoon, Mr. De La Cruz.  Can you explain to the

22   Court what your position is with HHS?

23   **A.**   Yes, ma'am.  I am the Senior Federal Field Specialist

24   Supervisor.

25   **Q.**   And what are -- generally describe your duties.

**Exhibit 53**
**Page 289**

DE LA CRUZ DIRECT / FABIAN

1    **A.**   My duties are to provide supervision for the other Field

2    Specialists Supervisors in the field, and I also supervise

3    Intakes.

4    **Q.**   What is a Federal Field Specialist?

5    **A.**   A Federal Field Specialist a person who is designated by

6    ORR to work in a specific geographical location and ensure that

7    programs in that geographical location operate within the

8    policies and procedures of the Office of Refugee Resettlement.

9    **Q.**   Where are you located?

10   **A.**   I'm located in Washington, D.C.

11   **Q.**   Are you familiar with the case of A.H.?

12   **A.**   Yes, ma'am, I am.

13   **Q.**   How did you become familiar with that case?

14   **A.**   I became familiar with that case because the day that this

15   case was initially referred to us by DHS, I learned that one of

16   our -- the Field Specialist Supervisors had received a call

17   from Intakes, and Intakes had received information from DHS,

18   and based on our procedures, evaluated that that young person

19   should be in a secure facility.

20       And then what happened later, after that decision was

21   made, after the Intakes --

22       **THE COURT:**  Hold on, before you get there, can you

23   provide a little more detail about -- you said you received

24   information.

25       Who did you receive information from?  Who did they

**Exhibit 53**
**Page 290**

DE LA CRUZ - DIRECT / FABIAN

1    receive the information from?  Can you be a little bit more

2    specific?  Provide a little bit more detail about the

3    information that you got in that conversation with -- I think

4    you said it was another Field Specialist Supervisor.

5            **THE WITNESS:**  Sure.

6        What had happened was we had received a couple of

7    referrals from DHS that were considered secure referrals.  We

8    had noticed that some of these secure referrals were coming

9    from the New York area and that they had been making a sweep of

10   children in that location.

11       So Intakes, as a matter of course, was just keeping me

12   updated and saying, "Hey, we received a couple of referrals."

13           **THE COURT:**  Who and what is Intake?

14           **THE WITNESS:**  Intake specifically is a smaller

15   division within the ORR that works specifically with the

16   Division of Unaccompanied Children Operations.

17       Their specific responsibility is to receive initial

18   referrals from DHS.  What I mean by that is whenever DHS or

19   another federal entity as a matter of fact wants to make a

20   referral of a child into ORR's custody, our Intakes Unit would

21   receive that information and work according to our procedures

22   to find a placement or designated placement for that child.

23           **THE COURT:**  And so the referral for a secure placement

24   came from DHS.  In other words, DHS communicated to ORR that

25   *We're sending you someone and there should be a secure*

**Exhibit 53**
**Page 291**

1   *placement for that person?*

2          **THE WITNESS:** Yes.

3   **BY MS. FABIAN:**

4   **Q.** Is that common, for DHS to make a referral or a

5   custody-level recommendation?

6   **A.** It's -- it would be -- for -- for -- for someone from ICE

7   or a unit from Border Patrol, it could be, because I think

8   someone who has been doing this long enough and they know our

9   operations would know that there is information that we would

10  know about or we would take into consideration for making a

11  placement.

12         So, you know, I don't want to -- it's a matter of

13  semantics where I don't want to say that DHS called and said

14  specifically, *Hey, we want you to put this kid into detention*

15  *or into secure,* but when we received a referral, I do know for

16  a matter of fact that the information they gave us, that this

17  young person had been arrested and that this young person had

18  some pending charges and that this young person had a level of

19  concern that was beyond what we would normally -- the concerns

20  were beyond what we would normally identify for children in a

21  shelter placement.

22  **Q.** Do you rely on DHS's recommendation regarding secure

23  placement?

24  **A.** We rely on the information that they provide us to base

25  our recommendation -- to base our decision.

**Exhibit 53
Page 292**

DE LA CRUZ - DIRECT / FABIAN

1    **Q.**    And you mentioned that the information in this case was

2    related to some arrests.  How did you become aware of the

3    information on which the recommendation was based?

4    **A.**    What happened was we received a couple of referrals, and

5    so we had identified okay, you know, which -- where kids were

6    getting placed.  In the matter of the course of business, when

7    we -- when cases come into us, what we try to do is make sure

8    that we also work with the care providers to make sure that --

9    I'm going to back up a little bit.

10        One of the things that ORR is required to do is to place

11   children in licensed facilities.  All of our licensed

12   facilities are licensed by the state, the particular state

13   where they exist.

14        So what happens is that when we receive children with

15   specific concerns and we place them in a specific provider --

16   could be a mental health facility, it could be a secure

17   facility -- we also make sure that when we do place a child, we

18   make a referral to that particular agency that it's going to be

19   within the guidelines that they have to follow under their

20   license.

21        For instance, we might have a shelter in Texas who might

22   be able to take children under certain circumstances, but we

23   might have a shelter in California that might not be able to

24   take that same child because that shelter in California is not

25   licensed to do -- to take that child.  And it's the same thing

**Exhibit 53**
**Page 293**

1    with secure.

2    **Q.**   Is the decision to place a child in secure governed by ORR

3    policy?

4    **A.**   Yes.

5    **Q.**   And can you -- what is the ORR policy with regard to

6    placing a child into secure custody?

7    **A.**   Generally it's a child who has a level of behavior that's

8    chargeable or has been charged, including an act of violence,

9    including gang-type behavior.

10   **Q.**   How do you, when making an initial secure detainment

11   determination -- how does ORR receive the information it uses

12   to determine if a child meets those initial criteria?

13   **A.**   What happens is when -- when DHS makes a referral to ORR,

14   we receive some general information.  There is also some --

15   some information that -- that's in our referral that DHS fills

16   out that will lead us to believe that we need to ask additional

17   questions.

18        So in the case of a young person of similar age as this

19   case, once we see that, say, for instance, he's been

20   apprehended and there's some charges, there's been some

21   arrests, then what our Intakes office will do, whoever the

22   staff who is assigned that day -- we have a placement tool.

23        What happens is that Intake staff will call the DHS, if --

24   you know, if we don't have sufficient information and we have

25   to ask additional questions, but what they'll do is they'll

Exhibit 53
Page 294

1    call back to that DHS officer and ask specific information.  It

2    could include things like, you know, has the child been

3    arrested, what is he arrested for, what type of crime, is it a

4    crime where there is an act of violence, is it a crime of

5    weapons.

6         And so based on that placement tool, they'll -- they'll

7    rank that -- they'll score that child's background.  And if

8    that child's background falls into a certain score, then that

9    will help us decide whether that child should be referred to

10   secure, whether they should be referred to staff secure or to

11   shelter.  And that's what happened in the case of A.H.

12   **Q.**   When you say *that's what happened*, can you describe what

13   you mean by *that's* --

14   **A.**   What had happened was the Intake staff had scored this

15   young person to be appropriate for secure.

16        **MR. FREEMAN:**  Your Honor, I'm going to note a

17   continuing objection to hearsay.

18        **THE COURT:**  Understood.  I'm going -- everyone is sort

19   of doing this last minute, so I can decide later what I think

20   is appropriate to consider, but I'm going to allow the flow to

21   continue.

22        But on that note, how do you know that that's what

23   happened in this particular case?  What did you do to learn

24   about the process that was -- the decision-making process

25   relating to A.H.?

Exhibit 53
Page 295

1    **THE WITNESS:** Well, what had happened was his attorney

2    on the East Coast reached out. The attorney was looking for a

3    child, and I guess somehow she knew to call me. We do have our

4    names public, you know, as a matter of public -- public

5    information.

6    So I received a call from his attorney saying she was

7    looking for his client, and the understanding was that A.H. had

8    been apprehended by DHS. She wasn't sure why her client was

9    being placed. She stated that she had some concerns.

10   I do recall that she had said that he had, I think, an

11   SIJS case pending, and so I did look into it and I did link her

12   to the field specialist that is in this region and informed her

13   that we had designated placement for A.H. to come to California

14   and also had informed her that based on our information, based

15   on our procedures for placing A.H. into a secure facility,

16   that's where he was going.

17   **THE COURT:** What specific information do you have

18   about the kinds of inquiries the folks at Intake made before --

19   about A.H. in particular, not about generally what they do?

20   **THE WITNESS:** My recollection is they had information

21   that he was referred to ORR. They had -- they had the record

22   and looked into the portals that he had a marijuana charge that

23   was pending, there was a weapons charge unknown. I did notice

24   that. It just said *unknown weapons charge*. And that there was

25   also an intimidation charge that was pending, but I had also

**Exhibit 53**
**Page 296**

1    seen that he was also affiliated or ICE had identified him as

2    being affiliated with the MS-13 in Suffolk County.

3           **MS. FABIAN:** Your Honor --

4           **THE COURT:** Go ahead.

5           **MS. FABIAN:** -- may I confer with opposing counsel? I

6    have an exhibit I want to make sure they don't want to --

7           **THE COURT:** Sure.

8           **MS. FABIAN:** Your Honor, his name appears in the

9    exhibit, which I would need to either redact or submit the

10   document under seal. What would the Court prefer?

11          **THE COURT:** Well, you can -- we can -- you can just

12   use it right now to elicit testimony from the witness without

13   using the name of the -- of the detainee, and then we can --

14          **MS. FABIAN:** I'm happy to then submit it redacted.

15          **THE COURT:** Yes. After the hearing.

16          **MS. FABIAN:** In consultation with opposing counsel.

17          **THE COURT:** Tomorrow or whenever you can submit it

18   under seal.

19          **MS. FABIAN:** Okay. We can consult before we submit it

20   about what you might want to --

21          **MR. FREEMAN:** As long as the name of the -- of our

22   client is appropriately stricken, we have no objection to the

23   introduction.

24          **THE COURT:** Okay.

25          **MR. MASS:** And the A number also.

**Exhibit 53**
**Page 297**

1          **THE COURT:**  The what number?

2          **MR. MASS:**  The A number.

3          **THE COURT:**  Well, I'm going to have you all submit --

4    whatever documents you use here today that I admit, what we'll

5    do is we'll have you meet and confer and submit them jointly

6    with any appropriate redactions.

7          **MS. FABIAN:**  May I approach the witness?

8          **THE COURT:**  Yes.  And you don't need to ask me if you

9    can approach the witness.  You're free to do so.

10         **MS. FABIAN:**  He's not afraid of me, so . . .

11         (Defense Exhibit 1 marked for identification)

12   **BY MS. FABIAN:**

13   **Q.**   Mr. De La Cruz, I have handed you what has been marked as

14   Exhibit 1.  Do you recognize this document?  Have you seen this

15   document before?

16   **A.**   Yes, ma'am.

17   **Q.**   And can you turn to the second -- well, I suppose it's

18   sort of the second page into the first page.

19         What is that document?

20   **A.**   I guess I'm looking at the bottom of the first page.

21   Starting with all the information of the second page -- that

22   information now?

23   **Q.**   Yes.

24   **A.**   What that information is is information that we would have

25   received from the DHS officer who was making the referral of

**Exhibit 53**
**Page 298**

1    A.H. into ORR's care.

2    **Q.**   And who is -- who is Stephanie who is the signatory on

3    the -- first of all, what type of document is this?

4    **A.**   What this is is basically it's a communication to -- I see

5    that that information -- it was an email.  It's a standard

6    communication from Intakes to a number of us in ORR's office,

7    but also to Yolo County staff.  And I'm seeing -- yeah.  That

8    appears to be all of ORR's staff.  I'm seeing if there is any

9    DHS on here.

10        But they're basically Intakes -- that person Stephanie is

11   an Intake Specialist, and she's basically -- what she's doing

12   is giving notice that this young person has been identified

13   into a secure placement, and that secure placement has agreed

14   to accept him into their care.

15   **Q.**   Is this email something -- this type of email something

16   you frequently receive in the course of your business?

17   **A.**   Yes, ma'am.

18   **Q.**   And do you know where the information in the email comes

19   from?

20   **A.**   Yes, ma'am.

21   **Q.**   How do you know that?

22   **A.**   Because this is the same information that's in our portal

23   system.  We have a standard operating procedure with DHS that

24   either CBP or ERO, which is ICE, Immigration Enforcement and

25   Removal -- what they'll do is they'll go into their data

**Exhibit 53**
**Page 299**

DE LA CRUZ - DIRECT / FABIAN

1    system -- well, in this case, it was DHS.

2         The DHS officer went directly into our portals.  They have

3    access to it.  And they entered this information into the

4    Intake's portion of the portals and gave notice to the Intake's

5    team that they had entered that information to make a placement

6    referral to ORR and were waiting for us to gather that

7    information and make a decision.

8    Q.   And is this -- sorry.  Strike that.

9         Do you receive several of these emails in the course of

10   your business?

11   A.   Yes, ma'am.

12   Q.   And you said DHS enters the information directly into the

13   portal?

14   A.   In this specific case, yes, ma'am.  I mean, what I want to

15   be clear about is that some of our federal partners provide us

16   information in different ways.  It all goes into the portals.

17        CBP, they have their own data system, and we work with CBP

18   at the border.  Well, they'll enter information into their own

19   data system, and that information several times a day is pushed

20   into ORR's data system, and in this case, because it's ERO,

21   they would have entered this information directly into the

22   portals.

23   Q.   And is it regular practice for HHS to rely on information

24   entered into the portal by DHS?

25   A.   Yes, ma'am.

Exhibit 53
Page 300

DE LA CRUZ - DIRECT / FABIAN

1    Q.   Is it regular practice for HHS to make the initial custody

2    determination based on the information entered into the portal?

3    A.   Yes.

4    Q.   Does HHS receive additional supporting information

5    regarding the information that's entered into the portal from

6    DHS?

7    A.   Not consistently, ma'am.  In other words, what you're

8    seeing is what we would receive as far as a standard placement.

9    There might be a time where we might receive some information

10   and we might ask to see if they could provide us with

11   additional information.

12        But in this case, I can't say that we did because it was

13   sufficient information there.

14   Q.   Does HHS -- well, strike that.

15        Talking about the initial -- what's the next email, I

16   guess, later in time in this document?

17   A.   What this basically is, this is from -- and to be

18   specific, the email that's -- that's -- that would have been

19   dated Monday, June 12th, 2007 at 2:52 p.m., that's notification

20   from the Yolo staff notifying all parties on this email that

21   the UAC has been accepted into placement at Yolo.  They've

22   agreed to take this child.

23   Q.   Is there any other documentation that's created in the

24   course of determining that a minor should be placed in secure

25   custody?

Exhibit 53
Page 301

DE LA CRUZ - DIRECT / FABIAN

1    **A.**    No.

2    **Q.**    Now, after the initial secure placement --

3              **THE COURT:**  Did you want to move this into evidence?

4              **MS. FABIAN:**  Yes.  Sorry, Your Honor.

5              **THE COURT:**  Any objection?

6              **MR. FREEMAN:**  I do object to the hearsay nature of the

7    document.

8              **THE COURT:**  I think it's admissible because this is --

9    I take this as not being offered to prove that he was an MS-13

10   gang member or that he had this problem at Lincoln Hall Boys'

11   Haven or that he was in fact a self-admitted gang member.

12       I take this to be admissible to show that this is

13   information received from DHS that HHS relied upon in making

14   its determination.

15       Whether it proves to be true or not, we don't know, but

16   it's relevant because it's information that HHS relied on.  And

17   so I think it's admissible for a non-hearsay purpose, and it's

18   admitted.

19             (Defense Exhibit 1 received in evidence)

20             **THE COURT:**  Go ahead.  Sorry.

21             **MS. FABIAN:**  Just to be clear, Your Honor, do you want

22   him to also talk a little bit about the next steps in the

23   process?

24             **THE COURT:**  Yes.  That would be great.

25             **MS. FABIAN:**  Okay.

**Exhibit 53**
**Page 302**

1    Q.    Following the initial decision -- well, after the secure

2    placement was made, how many secure facilities are there in --

3    that ORR utilizes?

4    A.    At this time, two.

5    Q.    And why was Yolo chosen for a placement of A.H.?

6    A.    Because of the -- the charges.  Primarily because of the

7    charges.  Specifically it shows that this young person was

8    arrested for possession of marijuana.  It shows that he was

9    arrested for intimidation pending, and it shows that the --

10   there is also the -- I think I missed something.  The weapons,

11   the intimidation, and marijuana.

12        So to me what stands out about that is that's saying that

13   he was arrested and charged.  I'm not saying in this case that

14   these are just -- the extent of his crime.  We're not making a

15   judgment that these are good or terrible charges or that type

16   of thing.

17        What we're looking at is that because we work with two

18   facilities and two different areas, and like I said earlier, we

19   have to also work with our -- with our facilities based on what

20   they can do as they are licensed.

21        Yolo County is able to take youth -- only take youth who

22   are charged or an obvious threat to the community, whereas

23   Shenandoah has more of an open -- has more of an ability to

24   take children who might not necessarily have been charged.

25        As a matter of course in our business, sometimes we do

Exhibit 53
Page 303

1    receive young -- we do receive minors into our jurisdiction who

2    we believe or who have confessed to having committed murder and

3    those types of things in other countries, but they aren't

4    necessarily charged in the United States.  So we do have to

5    work with a program, for instance, Shenandoah, who does have a

6    little more flexibility to be able to take children who might

7    have engaged in those types of acts.

8         And so when we have a young person who can go into a

9    facility and they can only go when they've actually been

10   arrested or they've been deemed a threat to the community,

11   we're going to have to place with them.

12   **Q.**   When you say *them*, what do you mean?

13   **A.**   We'll have to place with Yolo County.

14   **Q.**   The initial placement into secure custody, can you -- how

15   is that -- what is the next step in that placement decision?

16   **A.**   Well, after the young person is moved from -- well, okay.

17   I'm going to get a little bit to the -- I guess the granular

18   level because --

19   **Q.**   Let's start out just -- I want to focus on this case, on

20   A.H. so -- and so my question was too broad.  That's my fault.

21        For A.H., having been placed into Yolo, what is the next

22   step or what is currently occurring with regard to reviewing

23   his placement decision?

24   **A.**   Okay.  What's happening right now, there should be two

25   things that are happening.  One is the facility should be

**Exhibit 53**
**Page 304**

1    gathering information to determine whether he can be stepped

2    down or whether he should remain in secure.

3        The other thing that should be happening is they should be

4    looking into -- well, they will initiate the -- the -- they'll

5    initiate working with -- making a determination if he can be

6    released to a parent or another responsible adult who's in the

7    United States.

8    **Q.**   And with regard to the decision whether he can be stepped

9    down, what information does ORR look at for that determination?

10   **A.**   They'll -- a number of things.  What they'll do in general

11   is what -- they'll look at his behaviors, they'll see how he is

12   adjusting in a secure facility, they'll be looking at also --

13   they'll do -- they complete an assessment to determine does he

14   have any specialized mental health needs.

15       They'll also look at whether or not he might have been

16   trafficked or could be someone who could -- you know,

17   identified as someone who would be vulnerable to trafficking.

18       The other thing that they'll look at is what his behaviors

19   were like or what has gone on with him prior to coming into

20   ORR's care.

21       Our understanding is that he is charged, and so we will be

22   reaching out to DHS to find out is he being charged, are there

23   any, you know, types of crimes or anything that we should be

24   aware of in making a release decision.

25       And then the other thing that we'll be doing is making

Exhibit 53
Page 305

1    sure that the mom is aware of those things and evaluating

2    where -- if he is charged, is she able to basically ensure that

3    this young person deals with his charges, is part of that

4    process for having been charged.

5        We'll also look at whether or not, you know, the past --

6    since he's been released, we released him once before, now

7    we're being asked to release him again.  We'll look at what's

8    happened, you know, since that release from then until now.

9        Every time we release a child, we do have something called

10   *conditions of release* where we basically ask sponsors to ensure

11   that young people that we release to them continue on with

12   things like education, housing, if there's anything like court,

13   in particular, the immigration court, are they participating in

14   those types of things, and that would be part of our evaluation

15   process.

16   **Q.**   Do you receive information from sources other than DHS in

17   continuing this review?

18   **A.**   We can.  And -- as, you know -- I'll give you an example.

19       We had almost 60,000, you know, children come into our

20   jurisdiction in 2016.  Not all of the youth that we had had

21   issues that might have been relevant, as in this case.

22       So when we do see that children have specialized needs or

23   concerns -- it could be anything.  It could be medical needs.

24   It could be mental health needs.  Our concerns from the past --

25   or familial.  It could be CPS returns.

**Exhibit 53**
**Page 306**

1      If we're going to release that young person back into the
2  community or to the people that were once caring for them, we
3  have to go back and make sure that that person receives the
4  support, is able to basically care for that child.
5  **Q.**   And when you say *we want -- we have to go back and look at*
6  *that,* how does ORR look at that?
7  **A.**   What we would do is in this case, you know, this person
8  was referred to us, you know, as an MS-13 gang member.  As far
9  as we know, he's part of a sweep, so what we could do is go
10 back and reach out to the community, to the law enforcement
11 community.
12     We would also ask the school.  We would gather information
13 from as many resources as we could.  We would ask his mom does
14 she have anyone who could support her recommendation for -- her
15 request for us to release him back into her care, and we would
16 take that information into consideration.
17 **Q.**   Is A.H. also being evaluated by staff at the facility?
18 **A.**   Yes.  He would be evaluated by -- well, a case manager and
19 the clinicians.  For the majority, the clinician.
20     The clinician, again, should have a process in place where
21 they would talk to the -- they would read any kind of
22 behavioral SIRs.  They would take into consideration has he
23 asked to go to a nurse.  They would take into consideration
24 what they experienced in, you know, one-to-one type of therapy.
25     They would also take into consideration information from

**Exhibit 53**
**Page 307**

1   the staff about how he's done with other youth in the program,

2   what he responds to.  They'd also take into consideration, you

3   know, information learned, you know, does he demonstrate

4   gang-type of behavior, non-gang type of behavior, you know, how

5   does he deal with dealing with peers in incidents where there

6   is a conflict, a verbal conflict, physical conflict.

7        And, you know, how can he basically be -- you know, how

8   could someone help him manage his own type of behavior, and

9   those types of things.  There is quite a few things that a

10  clinician would review in making -- evaluating how that young

11  person would do or what he needs.

12  **Q.**   Does A.H. have any behavioral issues that have arisen

13  while he is in Yolo?

14       **MR. FREEMAN:**  Your Honor, I'm going to object to this.

15  It's not necessary to this hearing.  It's potentially

16  prejudicial, and we have not had any opportunity to review

17  this.  I don't see the relevance as to what happened after he

18  was placed in a secure facility.

19       **THE COURT:**  I think it's relevant to the extent you

20  are seeking relief relating to the kind of inquiry they need to

21  conduct now to determine where he should be.

22       I mean, it might not be relevant to relief you are seeking

23  based on the initial decision to send him to Yolo, but to the

24  extent you're seeking relief about what they should do going

25  forward and what kind of inquiry they need to conduct before

**Exhibit 53**
**Page 308**

1   keeping him there, which I think is part of the relief you are

2   seeking, I think it is relevant.

3       You can go ahead and answer the question, but explain how

4   you know also -- know the information.

5           THE WITNESS:  Okay.  I know the information for this

6   specific case or in general?

7           THE COURT:  This specific case.

8           THE WITNESS:  Okay.  For this specific case, I know

9   about it because we know about this TRO.  Basically feel like

10  it's my responsibility to work with Elicia to know why this

11  young person is in our case, what kind of issues might come up,

12  and it's also a part of our responsibility to look at are we

13  actually doing the right thing by keeping this young person in

14  secure right now.

15      So I did look at the SIRs.

16          THE COURT:  What is SIR?

17          THE WITNESS:  Serious Incident Report.

18      So I looked at the Serious Incident Reports myself and I

19  saw that there were basically Serious Incident Reports for this

20  young man.

21          MS. FABIAN:  Your Honor, may -- I don't need to ask.

22  I'm going to hand --

23          THE COURT:  Go ahead.

24          MS. FABIAN:  I'll ask this be marked as Exhibit 2.

25      (Defense Exhibit 2 marked for identification)

Exhibit 53
Page 309

1    BY MS. FABIAN:

2    Q.   What is this document?

3    A.   Ma'am?

4    Q.   I'm sorry.  What is this document?

5    A.   This is -- this is a Serious Incident Report that

6    describes an incident that A.H. was involved in on June 20th,

7    2017.

8    Q.   And how are Serious Incident Reports created?

9    A.   Serious Incident Reports are -- these documents are

10   created when a youth becomes involved into an -- in some kind

11   of incident.  It could be a physical altercation.  It could be

12   verbal.  It could be an allegation against other children,

13   against other staff, basically something -- a concern that is

14   of serious -- that needs to be looked into by the care facility

15   and/or the FFS, and it's documented in our portal system.

16   Q.   And so this paper document -- it reflects information from

17   the portal system; is that correct?

18   A.   Yes, ma'am.

19   Q.   Who enters the information into the portal system?

20   A.   In this case, it would have been the case manager or the

21   clinician.  The portal is -- SIRs can be generated by either a

22   clinician or a case manager or a staff in the facility with the

23   proper clearance to be able to do that.

24   Q.   How does the person who enters the information into the

25   portal -- how are they aware of the information that they're

Exhibit 53
Page 310

DE LA CRUZ DIRECT / FABIAN

1 entering?

2 **A.** They are typically the first -- the person who -- who

3 directly has to engage in intervening in that child's behavior

4 or it might be the person who a child disclosed information to,

5 but it's typically a first-line person who -- who's dealing

6 with that event.

7 **Q.** And is the information entered -- when is the information

8 entered into the portal in relation to the events that the

9 document would reflect?

10 **A.** An SIR is required to be entered within the first hour or

11 so and reported to ORR no less than 24.

12 **MS. FABIAN:** Your Honor, I would like to move the

13 admission of Exhibit 2.

14 **THE COURT:** Any further objection?

15 **MR. FREEMAN:** Objection. It's a multiple hearsay

16 document.

17 **THE COURT:** Okay. Well, again, same thing. I think

18 it's admissible to show what information -- what has been told

19 to ORR which relates to ORR's decision about what to do with

20 the child. So it's admitted for that non-hearsay purpose.

21 (Defense Exhibit 2 received in evidence)

22 **BY MS. FABIAN:**

23 **Q.** And so the Incident Report that I handed you, what -- what

24 behavioral issue does this Incident Report -- sorry. Strike

25 that.

**Exhibit 53**
**Page 311**

1   What does this Incident Report -- what incident does this

2   report reflect?

3   **A.**   What it reflects is that A.H. became engaged into an

4   altercation.

5        **MR. FREEMAN:**  I'm sorry to interrupt, but I do have

6   the same objection as to hearsay.

7        **THE COURT:**  You can say what the -- if you feel it's

8   necessary, you can say what the report says.  I don't think you

9   have any personal knowledge whether it actually happened, and

10  I'm not considering this document for the fact that it actually

11  happened.  I'm considering this document for what it reports.

12       So I'm fine for you to testify about what it reports and

13  what -- how you -- what import you place on that information.

14       **THE WITNESS:**  Okay.

15       What this -- this report basically says is that A.H.

16  became involved in an altercation with another youth.  In the

17  course of dealing with this, the staff needed to physically

18  intervene on the case of A.H. and use some restraints to

19  basically help him de-escalate.

20  **BY MS. FABIAN:**

21  **Q.**   And how would this information be considered in your -- in

22  ORR's overall assessment of a custody decision for A.H.?

23  **A.**   This is one incident.  And so what the field specialist

24  would do -- normally, it's the shelter staff are the ones who

25  deal with this.  And what they would normally do is they would

**Exhibit 53**
**Page 312**

 1   see this is one incident of a particular child's conduct in the

 2   facility.

 3       They should use it objectively which is, you know, this

 4   young person became engaged in a fight.  This is one time.  If

 5   anything came out of this, the concern would be -- is that they

 6   know that this young person might need some help in learning

 7   how to de-escalate himself when he becomes involved in

 8   another -- in a conflict.  And that's what this one particular

 9   document would do.  We wouldn't base any totality of any kind

10   of decision based on one event.

11       **MS. FABIAN:**  I'm going to ask to mark this as Exhibit

12   3.

13       (Defense Exhibit 3 marked for identification)

14   **BY MS. FABIAN:**

15   **Q.**   And is this also a Significant Incident Report?

16   **A.**   Yes, ma'am, it is.

17       **MS. FABIAN:**  I'd like to move the admission of Exhibit

18   3 on the same basis.

19       **MR. FREEMAN:**  Same objection, Your Honor.

20       **THE COURT:**  Admitted on the same basis.

21       **MR. FREEMAN:**  I also should say that we have a

22   continuing objection to the admission of these documents to the

23   extent that they do not black out the name and A number of the

24   petitioner --

25       **THE COURT:**  Well, as I specified earlier, they may not

**Exhibit 53**
**Page 313**

1    be placed into the record until that information is blacked

2    out.

3         MR. FREEMAN:  Thank you.

4         (Defense Exhibit 3 received in evidence)

5    BY MS. FABIAN:

6    Q.  Just briefly, can you describe what this document states?

7    A.  What this document basically states, that this is an

8    incident where he was involved in a verbal altercation as it

9    was reported by staff and that it was an incident of verbal

10   altercation that occurred due to gang affiliations.

11   Q.  And how would this incident report be considered as far as

12   the overall custody determination that ORR is making?

13   A.  Again, this is something that we would take into

14   consideration, not -- among other facts and other information.

15        As I said, he's -- A.H. would be assessed on a number of

16   other issues.  So -- but this is something that the facility

17   would take into consideration, as does he, you know -- he

18   seems -- appears to have some gang affiliation.

19        THE COURT:  Can you show me where in this report is a

20   description of his conduct that suggests gang affiliation?

21        THE WITNESS:  Sure.  I guess somewhere -- I guess I

22   would call it the second page, the third paragraph.  You asked

23   me specifically about gang.  I'm looking on here and I do see

24   the spitting part.

25        THE COURT:  Sorry.  Where?

Exhibit 53
Page 314

```
 1          THE WITNESS:  On, I want to say it's about -- it's

 2   almost on the bottom of the first third portion of the second

 3   page.

 4          THE COURT:  Okay.

 5          THE WITNESS:  It says, "Approximately 1000 hours after

 6   Youth Arnold was secured in his room, youth H.A.M. was also let

 7   out of his room to speak with ORR staff" --

 8          THE COURT:  Hold on, hold on, hold on.  Couple things.

 9       First, I'm still having trouble figuring out where you

10   are -- first, I'm having trouble figuring out where you are,

11   and, second, you've got to go a little slower for the court

12   reporter.

13          THE WITNESS:  Sorry.

14          THE COURT:  Let's see.  Approximately what hours?

15          THE WITNESS:  One thousand.

16          THE COURT:  "At approximately 1000 hours after Youth A

17   was secured in his room"?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.

20          MR. FREEMAN:  I'm sorry.  How many lines from the top

21   or bottom are we talking about?

22          THE COURT:  It looks like it's about 12.

23          MR. FREEMAN:  Okay.  Thank you.

24          THE COURT:  It starts in about the middle of the page,

25   "At approximately a thousand hours."
```

**Exhibit 53**
**Page 315**

1          **MR. FREEMAN:**  We have it.  Thank you, Your Honor.

2          **THE COURT:**  Okay.

3      "After Youth A was secured in his room, youth H.A.M. was

4  also let out."

5      Go ahead and read whatever you want to read, without

6  mentioning anybody's names.

7          **THE WITNESS:**  Okay.  Let me see.

8      "1,000 hours, Youth A was secured in his room with Youth

9  H.A. and also let out of his room to speak with ORR staff.  He

10  approached Room B-13" --

11         **THE COURT:**  A little slower.

12         **THE WITNESS:**  -- "where youth H.A. roam" --

13  "roamed" -- I think it meant to say "roamed."  "And he kicked

14  his door and started yelling at him in Spanish.  At 10:30

15  hours, I noticed nurse" -- "a nurse and advised her of the

16  Youth H.A. had been spit on.  At 10:35 hours, the nurse entered

17  into B-Pod and assessed youth H.A.  A gold medical slip was

18  filled out on behalf of Youth H.A.  Due to Youth" -- I guess,

19  our A.H. -- "spitting on Youth H.A. and deciding to fight,

20  Youth A will receive a hearing."

21      In other words, how I perceive that is that youth -- our

22  youth that we're talking about, A.H., is going to receive a

23  hearing because -- if he's been inciting this fight.

24      "Due to Youth E.H., Youth R inciting Youth A to fight for

25  failure to follow staff instructions" --

**Exhibit 53**
**Page 316**

1      **THE COURT:** What does any of that have to do with

2  gangs?

3      **THE WITNESS:** That's -- it's not clear from the

4  documentation.

5      **THE COURT:** I see there's something a little bit later

6  talking about Youth H.A., who I guess is the person that A.H.

7  got in the fight with?

8      **THE WITNESS:** Right.

9      **THE COURT:** "Once secured, Youth H.A. began kicking

10  his door and yelling 'fuck MS-13' continuously."

11     So that's the one reference to anything gang related that

12  I see.

13     Okay.

14     **THE WITNESS:** All right.

15  **BY MS. FABIAN:**

16  **Q.** I'm not sure where we were exactly.

17     How would this document be considered as part of ORR's

18  overall custody assessment of A.H.?

19  **A.** This is one more incident of a behavior that we -- we

20  would look at to see how he interacts with other youth. The

21  program should be working with him on these types of issues, on

22  how to engage himself when he needs to basically engage other

23  youth.

24     It's a little difficult that there is gang affiliation,

25  but it's still something that the shelter would work with him.

**Exhibit 53**
**Page 317**

1    What I mean on -- what I mean by that is that sometimes in an

2    engagement, you know, kids just have impulse control, and if

3    they just have poor impulse control by nature, then it's

4    getting them to remember hey, if somebody bothers you and

5    upsets you, then this is how you need to handle it and then how

6    you need to basically engage and conduct yourself in working

7    things out.

8         When it's an issue of gang behavior, it's now two issues.

9    It's one -- it's like hey, now you're engaging in an

10   affiliation with a certain group of people which can cause

11   problems.  That's one issue.  But now you have to deal with

12   this second issue of -- is when you do deal with that

13   affiliation and you encounter a group of people, then what's

14   going to happen is you're going to have to be able to control

15   yourself not to get in their fights.

16        So now you have -- instead of just somebody with impulse

17   control, you now have to deal with the other issue of gang

18   affiliation as well, and it becomes a little bit more complex.

19        **MS. FABIAN:**  Your Honor, I have one more -- I just --

20   my aim is not to pile on here.

21        **THE COURT:**  That's fine.

22        **MS. FABIAN:**  It's to get the evidence.  I believe

23   we're at.-

24        **THE COURT:**  This was admitted.  I did say this is

25   admitted on the same basis as the previous one, yes.

**Exhibit 53**
**Page 318**

1      **MS. FABIAN:**  We're at 4.

2          (Defense Exhibit 4 marked for identification)

3  **BY MS. FABIAN:**

4  **Q.**   Is this another Significant Incident Report?

5  **A.**   Yes, ma'am, it is.

6          **MS. FABIAN:**  I'm going to move to admit it on the same

7  basis as the prior two.

8              **THE COURT:**  Any further objection?

9              **MR. FREEMAN:**  Same as before, Your Honor.

10             **THE COURT:**  Okay.  Admitted on the same basis.

11         (Defense Exhibit 4 received in evidence)

12 **BY MS. FABIAN:**

13 **Q.**   Can you briefly describe or state what this report --

14 **A.**   What this basically is is a report is that the youth

15 engaged in disruptive and disrespectful behaviors.

16 **Q.**   And how would this incident report be considered in ORR's

17 overall consideration of whether A.H. should be held in

18 custody?

19 **A.**   What this basically is is an indicator of -- is you have a

20 detention facility, adult staff, who is basically giving a --

21 A.H. some routine instructions not to do something or to do

22 something, and his response was inappropriate by -- by him

23 basically, you know, saying sexual innuendo and inappropriate

24 things to the staff, which is a concern because this is the

25 conduct that you wouldn't typically expect from the average

**Exhibit 53
Page 319**

1    person in any environment.

2    **Q.**   And so how would this behavior -- well, how would this

3    behavior figure into ORR's custody evaluation?

4    **A.**   Well, again, there's two separate issues that we would be

5    evaluating.

6         We would be evaluating whether or not we could -- it would

7    be appropriate to step A.H. down into a less restrictive

8    environment.

9         The other issue is would we -- if the mom or another adult

10   sponsor was to come forward, would we release A.H. to that

11   sponsor.  Would that person be able to basically engage with

12   A.H. to intervene, so -- and in a way that he didn't -- he was

13   able to be safe in a community, in school, and those types of

14   things.

15   **Q.**   When will ORR make its -- its -- I guess it would be the

16   second custody determination -- custody-level determination for

17   A.H.?

18   **A.**   Sure.

19        So not dealing with the issue of whether he should remain

20   in secure, but dealing with the issue of release?

21   **Q.**   No.  Sorry.  I'm not using the right language then.

22        Not dealing with reunification, dealing with the question

23   of level of custody in secure, when will ORR at the latest

24   issue a determination on whether A.H. should remain in secure

25   custody or be stepped down?

**Exhibit 53**
**Page 320**

1    **A.**    On approximately 7 -- July 13th, of 2017.  In other words,

2    30 days after his initial placement into ORR.

3    **Q.**    And on the other side, the reunification determination,

4    what -- where is A.H. in the reunification process?

5    **A.**    The most recent information that I have is that on

6    June 22nd -- well, prior to June 22nd -- now, let me restart

7    this.

8         When A.H. came into our jurisdiction, my understanding is

9    that the care provider reached out to the mother, and with the

10   effort -- with the goal to let her know that he is now in our

11   jurisdiction and where he is.

12        And what they would also do is find out where she lived,

13   find out whether she was interested in becoming a sponsor.  And

14   they would have provided that information to her by sending it

15   to her or working with someone because she could also, you

16   know, download it off of our Internet website.  She would be

17   able to gather that information and also provide whatever

18   documentation is required under the reunification process.

19        My understanding is that it wasn't clear to the program,

20   to the care provider, that she wasn't being responsive to the

21   request, and it's not clear why she stopped being responsive.

22   But my understanding is that on June 22nd, she had stated that

23   she was looking at either still sponsoring herself or locating

24   another sponsor.

25             **MR. FREEMAN:**  Objection.  Move to strike.  Hearsay as

**Exhibit 53
Page 321**

1   to the mother's statement.

2          THE COURT:  Statement of a party opponent.  She's the

3   petitioner.  Why isn't it a statement of a party opponent?

4          MR. FREEMAN:  The hearsay, though -- he didn't hear

5   that statement.  It comes through a third person.

6          THE COURT:  Yeah.  That's right.  Okay.  Granted.

7          THE WITNESS:  Okay.

8          MS. FABIAN:  And, Your Honor, just so you know, I'll

9   ask a follow-up question, I think.  We don't contend at this

10  time that she's not intending to -- we have no position whether

11  she intends to seek reunification or that she's not

12  participating.

13  Q.  But what I'll ask is to your knowledge, has she yet -- has

14  she yet filed a reunification package requesting

15  reunification -- has plaintiff?

16  A.  She's not completed all of the documentation that's

17  required.

18         THE COURT:  Why would she need to do that, having

19  already been -- the child already having been placed with her?

20         THE WITNESS:  Because, one, things change.  People's

21  circumstances change.  I think it's been a year since he's been

22  with those.  But for one, he left and he came back.

23         And this is -- this is now -- we treat this somewhat as a

24  new case because it's not every day -- it does happen for

25  different reasons, but usually when a child comes back to us,

**Exhibit 53**
**Page 322**

1    it's because something has happened in their home, so we would

2    be required to go back and restart the reunification process

3    all over again to ensure that we don't miss out on something

4    that could have happened from the time he was first released to

5    now.

6            THE COURT:  Okay.

7    BY MS. FABIAN:

8    Q.    Does ORR have a separate process in place for an

9    individual who had previously been in custody and been

10   released?

11   A.    It's pretty much the same process, yes.

12           MS. FABIAN:  Your Honor, have we elicited the

13   testimony that the Court needs?  I'm just trying to make sure I

14   have the scope of what we're trying to get out here.

15           THE COURT:  Well, I mean, I'm jumping in and asking

16   questions when I need to, and I'll presumably do that during

17   cross-examination, and we'll see where we are after that.

18           THE WITNESS:  I have to clarify something because it

19   could cause some confusion.

20       When A.H. initially came to us, the process that we used

21   would have likely been, because it's goes -- you know, it was

22   the mom.  What would have happened was -- and if we didn't have

23   any information like we do now, what would have happened is we

24   do the same process.  We gather information.  We gather, you

25   know, the documentation that we normally would for all

Exhibit 53
Page 323

1    releases.

2         But now because it's -- it's -- you know, we have the

3    behavior issues -- if we had known there were behavior issues

4    the first time, we would have considered doing a home study, we

5    would have considered doing post-release services.

6         But, again, now because this is a case where it's a second

7    referral, we have more information, then we would be likely

8    providing additional services to the home study, post-release

9    services.  And post-release would only happen if we did make a

10   decision to release, but more than likely, we would do a home

11   study before we made a release determination of -- either to

12   deny or to approve.

13   **BY MS. FABIAN:**

14   **Q.**   With regard to the determination to place A.H. in secure,

15   you said that a determination would be made on or around

16   July 7th; correct?

17   **A.**   13th.

18   **Q.**   Thirty days after the initial intake?

19   **A.**   Yes, ma'am.

20   **Q.**   Is there -- is that the final decision?  Is there a

21   subsequent review of that --

22   **A.**   No.  We're required to do that every 30 days, and in

23   addition, if he's in our care for 90 days, then a supervisor

24   would review that as well.

25        If at any time he decides that he doesn't agree with our

**Exhibit 53**
**Page 324**

DE LA CRUZ - DIRECT / FABIAN

1    decision, he can make an appeal directly to the ORR director.

2    **Q.**   And is there a timeline for any appeal to the ORR

3    director?

4    **A.**   No.  In other words, how I would say that is, is that it's

5    always continuing.  Let's say, for instance, in the first 30

6    days we make a decision to not step him down, then it starts

7    going into 60 days.  And let's say it gets to 60 days and we

8    decide we still haven't made a determination that we could step

9    him down, then he could make -- he could invoke that request,

10   you know, on day number 100 or 105.

11       So there is no statute -- there is no limitation of when

12   he could ask for that.  Does that make sense?  Yeah.  Okay.

13   **Q.**   With regard to the decision that's still early in the

14   process, but if ORR determines after review that it cannot

15   reunify A.H. with his mother, is there an appeal process for

16   that decision?

17   **A.**   Yes.

18   **Q.**   Can you describe that appeal process?

19   **A.**   Yes.  Generally what can happen is -- and this is a fairly

20   new process.  These have changed a little bit.

21       So if A.H. invoked, I want to say this might be the first

22   time I'm aware that it's being done, but what would happen is

23   if we made a decision to deny, then the mom could basically ask

24   the ORR director for an appeal.  And that -- yeah.  Generally

25   that could happen at any time.

**Exhibit 53**
**Page 325**

1    **Q.**    And how is that appeal conducted?  Sorry.

2         First, how is the denial communicated to A.H. and his

3    mother?

4    **A.**    What would happen is first what happens is once we receive

5    all the documentation -- and in this case, it's likely going to

6    be a home study.  Once we receive that, we would have

7    approximately 30 days to get back to -- to -- to them with the

8    final decision.

9         In the course of that, we do -- in headquarters, we do

10   have somebody that would staff that with other -- like panel

11   the decision, and they would come up with the decision and they

12   would make that recommendation to the ORR director.

13        The ORR director would then take that into consideration

14   and decide whether they should deny it or whether they should

15   go ahead and proceed with the release.

16        If we don't release the child, then what would happen is

17   he would receive notice through the shelter and then the mother

18   would receive notice through the shelter, but she would also

19   receive written documentation and she would also receive

20   information on how to appeal that case.

21   **Q.**    And then you said the first appeal is to the director.

22   How is that appeal conducted?

23   **A.**    Well, he -- he -- my understanding is he would also panel

24   that.  He would ask for additional information.  And he would

25   ask for a panel to also review the case as well and provide

**Exhibit 53
Page 326**

1   their recommendation.

2   **Q.**   Will he issue a decision?

3   **A.**   Yes.  One way or the other.

4   **Q.**   And if the director at this level of appeal denies

5   release, is there a subsequent level of appeal?

6   **A.**   I believe so, yes, ma'am.  There is now.  Again, it's a

7   new procedure, it's a new policy, so I would feel better if I

8   went back and looked up the details on that.

9   **Q.**   Where is that located?

10  **A.**   It would be only in our ORR policies and procedures.

11  **Q.**   Would I be correct to say -- is that the assistant

12  secretary level?

13  **A.**   Yes, ma'am.

14          **MS. FABIAN:**  And I would be happy to point the Court;

15  otherwise, I believe it's in our briefing as to the section.  I

16  won't ask him to have it memorized.

17          **THE COURT:**  That's fine.

18          **MS. FABIAN:**  I have no further questions.

19          **THE COURT:**  Okay.  Why don't we take a five-minute

20  break and then do -- go ahead and proceed -- I assume you want

21  to do some cross-examination?

22          **MR. FREEMAN:**  Yes, Your Honor.  Thank you.

23          **THE COURT:**  Be back in about five minutes.

24                   (Recess taken at 3:09 p.m.)

25                   (Proceedings resumed at 3:20 p.m.)

**Exhibit 53**
**Page 327**

1          **THE COURT:**  Mr. De La Cruz, you can go ahead and have

2    a seat.  Every witness does that.

3          **THE WITNESS:**  I'm not special, I guess.

4          **THE COURT:**  Go ahead.

5          **MR. FREEMAN:**  Your Honor, if I may ask, due to the

6    slightly unusual nature of the proceedings today, when I'm

7    done, if Ms. Mass has a couple of questions, can she ask them?

8          **THE COURT:**  Not a problem.

9          **MR. FREEMAN:**  It's easier than passing me notes.

10                        **CROSS-EXAMINATION**

11   **BY MR. FREEMAN:**

12   **Q.**   Mr. De La Cruz, good afternoon.

13        The first question I have for you is at some point, A.H.

14   went from being in the custody of ICE to being in the custody

15   of ORR.  When exactly did that happen?

16   **A.**   That would have been -- my recollection is that DHS made

17   the referral to ORR on June 12th, and he was intaked physically

18   at the Yolo Center in the afternoon on the 13th, I believe.

19   **Q.**   I'd like to be as precise as I can with the times that

20   things happened.  So when was the intake?

21   **A.**   You know, I'd have to -- I really apologize.  I'd have to

22   look at a record to be able to give you that information.

23   **Q.**   Well, the Exhibit 1 shows an email at 2:50 in the

24   afternoon on June 12th.

25        **MS. FABIAN:**  I took the witness' copy.

**Exhibit 53**
**Page 328**

1          MR. FREEMAN:  I'm happy to give you mine.

2          MS. FABIAN:  I have it.

3          MR. FREEMAN:  Thank you.

4          THE WITNESS:  All right.  Thank you.

5     BY MR. FREEMAN:

6     Q.   Does that help you remember when the intake occurred?

7     A.   Well, the timeline, a little bit, but it's not quite

8     complete.

9     Q.   Do you know when the arrest of A.H. by ICE took place on

10    June the 12th?

11    A.   It would have happened before 2:32.  I want to say, if I

12    recollect, that the apprehension date would have happened

13    around 12:00 or a little bit sooner than that.

14    Q.   So around noon on the 12th?

15    A.   That's my belief, yes, sir.

16    Q.   And when did -- when did your office determine that A.H.

17    should be sent to a secure facility?

18    A.   I'm reviewing this record.

19         On the record that you gave me, on the bottom part of the

20    first page, looking at the date, June 12th, 2017, at

21    2:32:24 p.m -- I'm reviewing this -- that Intakes is

22    notifying -- had received notification from DHS through the

23    portals that a referral had been made.  I want to say that at

24    approximately noon, DHS would have apprehend him, sometime

25    between noon and this time at June 12th.

Exhibit 53
Page 329

DE LA CRUZ CROSS / FREEMAN

1      And I'm reviewing this with incomplete records, but I'm

2 looking at the timeline I would normally look at -- is that

3 between 12o'clock and 2:32, ICE would have entered the

4 information into our portal system and made it known that they

5 were taking that initial step to refer A.H. into ORR's

6 jurisdiction.

7      From what I see here is somewhere in that time, Intakes

8 would have reviewed this information that's on the second page.

9 They would have looked at the information about criminal

10 charges, made the determination, using our policy, that he --

11 that A.H. was appropriate for secure care, and then when I look

12 at this up here, I see the email from Mr. Castaneda at Monday,

13 June 12th, 2017 at 2:52, and they're basically saying that UC

14 has been accepted for placement in the Yolo County.

15      So at that point, we would have communicated to DHS that

16 A.H. has been designated for placement at Yolo County, and we

17 would have given them that notification, and they would have

18 started the transportation piece for transporting him from, I

19 want to say, New York to -- to Yolo County in California.

20 **Q.**   Now, that's 2:52 Eastern time; correct?

21 **A.**   Yes, sir.

22 **Q.**   So within three hours of his arrest, give or take, you've

23 made -- your office has made a determination that he should be

24 sent to a secure facility; correct?

25 **A.**   Yes, sir.

Exhibit 53
Page 330

DE LA CRUZ CROSS / FREEMAN

1          THE COURT:  I'm sorry.  Could I ask one clarification

2     question?

3          So this information on page 2 of Exhibit 1, arrested for

4     intimidation, arrested for possession of an unknown weapon,

5     arrested for possession of marijuana, self-admitted gang

6     member, that is information that DHS entered into your system?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Okay.  And so then ORR employees pull it

9     up on the system, and that is where they get the information?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Okay.  So there wasn't any actual

12     conversation then between somebody from DHS and somebody from

13     ORR?

14          THE WITNESS:  Not that I'm aware of.

15          THE COURT:  Okay.  And in the normal course, there

16     would not have been a conversation between somebody at DHS and

17     somebody at ORR?  There would just be a review by somebody at

18     ORR of the information that DHS input into the system?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Okay.

21          THE WITNESS:  And I'm looking at the information

22     that's here contained in this email, which is information that

23     is sufficient to make a determination.

24          THE COURT:  Got it.

25          And your position is that this -- this information and the

Exhibit 53
Page 331

1    way it's been transmitted to ORR is sufficient to comply with

2    the requirements of the statute?

3             THE WITNESS:  Yes, sir.

4             THE COURT:  Okay.  The 8 U.S.C. Section 1232?  The

5    TVPRA?

6             THE WITNESS:  Yes, sir.

7             THE COURT:  Okay.  Thank you.

8    BY MR. FREEMAN:

9    Q.   So could you explain to me at the bottom of page 1 on

10   Exhibit 1 where it says, "from ACF ORR DUCS Intakes"?

11   A.   Yes, sir.

12   Q.   What is that?

13   A.   That's our Intakes hotline.  ACF -- ORR DUCS -- the

14   division used to be titled Division of Unaccompanied Children

15   Services, and so that email -- the resource box has remained

16   that way for the last 12, 13 years.

17   Q.   But that's -- a human being sends that information to you

18   or is that just generated by a machine?

19   A.   This information would have been sent to us by a person.

20   Q.   And that person is who?

21   A.   From here, from the signature on the second page, a young

22   lady by the name of Stephanie.

23   Q.   Okay.  Now, during the three hours between the arrest --

24   and I'm being generous because you probably got information

25   after the arrest.  But between the arrest and the time he was

Exhibit 53
Page 332

1    determined to be sent off to Yolo, did you or anyone at ORR ask

2    anyone at DHS about the information that they had input?

3    **A.**   I do not have a recollection of that, sir.

4    **Q.**   Okay.  It wouldn't be your typical practice to call up DHS

5    or ICE and say, *Can you tell us more about this arrest or that*

6    *incident*?

7    **A.**   I want to say -- go back to the substance that's here on

8    the second page.  Is -- there is sufficient information for us

9    to be able to make a placement determination.

10   **Q.**   That wasn't my question, sir.

11        Did anybody ask for more detail about the information that

12   was provided to you?

13   **A.**   From DHS, not that I'm aware of sir, no.

14   **Q.**   Now, you now know that some of that information is wrong,

15   don't you?

16   **A.**   I can't say that it is or isn't, sir.

17   **Q.**   Take a look at the 5/25/2017 arrested for possession of an

18   unknown weapon.

19   **A.**   Right.

20   **Q.**   You now know that took place actually not in 2017, but in

21   2016; correct?

22   **A.**   My understanding is I believe that that's accurate.

23   **Q.**   Which is accurate?

24   **A.**   That it could have happened before.  I did see a record

25   somewhere after placement that it was made in 2016.

**Exhibit 53**
**Page 333**

DE LA CRUZ CROSS / FREEMAN

1  **Q.**   Have you looked at the declaration of Daniel Loechner

2  submitted by the defendants in which it says, quote, "According

3  to records provided by local law enforcement, in May 2016, A.H.

4  was arrested by the Amityville, New York Police Department for

5  medicine and possession of a weapon"?

6  **A.**   I don't have that record, sir.

7  **Q.**   I'm happy to hand you my copy.  Please forgive my markings

8  on it.

9  **A.**   Okay.

10  **Q.**   Do you know see that Mr. Loechner contradicts the

11  information that is contained in Exhibit 1?

12  **A.**   This is the first time I've seen it so if I could have a

13  few minutes to review it, would that be okay?

14  **Q.**   Certainly.

15  **A.**   (Witness reviews document.)

16      Okay.  I see it, sir.

17  **Q.**   Yes.  Is it now your understanding that the information

18  about the date of the arrest in Exhibit 1, the arrest for

19  possession of a weapon and intimidation, is wrong?

20  **A.**   I received -- I see that the dates are wrong -- or

21  there's -- what I see is there is two conflicting dates.

22  **Q.**   One of them is sworn under oath; correct?

23  **A.**   Yes.

24  **Q.**   May I?

25  **A.**   Sure.

**Exhibit 53**
**Page 334**

1   **Q.**   Did you or anyone under your supervision at the time --

2   around the time of receiving Exhibit 1 know that that charge

3   from 2016 had been -- was dismissed in contemplation of

4   adjournment in the state of New York, which means there was no

5   finding?

6   **A.**   No.  What I do want to say is -- and I believe -- I do

7   want to say that when the -- when A.H.'s attorney initially

8   contacted me, she basically said, *Hey, I have a concern.*

9   *There's some proceedings that are going on in New York.  I'm*

10  *his attorney, and some of the charges that, you know, ICE is*

11  *picking him up on could be incorrect*, so what I recollect is

12  that -- telling her about our reunification procedures, and

13  that once this young man came into our jurisdiction, we would

14  be gathering more information about him and then we would come

15  to some kind of decision -- we would use that information to

16  come to some kind of a decision.

17  **Q.**   But by that time, by the time you had the conversation

18  with A.H.'s attorney, Stephanie Gibbs, that was 5:00 the

19  following afternoon, Tuesday the 13th; correct?

20  **A.**   Approximately, yes.

21  **Q.**   Now, during the time between when you got notice of the

22  arrest and a decision was made to send A.H. to Yolo -- first of

23  all, it was within the knowledge of DHS that A.H. was

24  represented by an attorney; correct?

25  **A.**   I wouldn't know that.

**Exhibit 53**
**Page 335**

1   **Q.**   Okay.  Well, at the time Ms. Gibbs talked to you the

2   following day, she sent you the forms that showed she had

3   entered an appearance on behalf of A.H.; correct?

4   **A.**   I believe she had.

5   **Q.**   And those forms would be somewhere in the records of the

6   executive office for immigration and review -- somewhere in the

7   immigration system there was information that A.H. was

8   represented by an attorney; correct?

9   **A.**   I would assume so.

10  **Q.**   Was any effort made to reach out to the attorney between

11  the time A.H. was arrested and the time he was sent to Yolo?

12  **A.**   Could you restate the question again?

13  **Q.**   Was any effort made by anybody to reach out to A.H.'s

14  attorney between the time he was arrested and the time he was

15  sent to Yolo?

16  **A.**   I don't have recollection of that --

17         **THE COURT:**  Hold on a second.

18         **MS. FABIAN:**  Objection.  I don't think he has

19  testified that he is aware --

20         **MR. FREEMAN:**  To your knowledge.

21         **MS. FABIAN:**  He doesn't work for DHS.

22         **THE WITNESS:**  Right.  To my knowledge, I wouldn't.

23  **BY MR. FREEMAN:**

24  **Q.**   I'm only seeking your knowledge.

25  **A.**   Sure.

**Exhibit 53**
**Page 336**

1   **Q.**   Are you aware that A.H. repeatedly asked the -- his ICE

2   arresters and the people who had him at the Varick Street

3   facility in New York and elsewhere to speak to an attorney?

4   Were you aware of that?

5   **A.**   No, sir.

6   **Q.**   Presumably you were not aware that those requests were

7   denied; correct?

8   **A.**   Yes, sir.

9   **Q.**   Were you -- was any effort made to reach out to the

10   custodian to whom A.H. had been released under an agreement --

11   in other words, A.H.'s mother -- was any effort made to reach

12   out to her before sending A.H. off to Yolo County?

13   **A.**   I can't speak to DHS, but I can say that any attempts to

14   contact a mother prior to him coming into our jurisdiction -- I

15   do not believe anyone contacted her.

16   **Q.**   I'm talking about prior to the time he was sent to a

17   facility across the country.

18   **A.**   Right.  I have no --

19   **Q.**   Okay.  At the time, ORR had a custody agreement with the

20   mother; correct?

21   **A.**   We had released -- we had previously released A.H. to his

22   mother, right.  That's correct.

23   **Q.**   I misspoke.  It's a sponsor agreement; correct?

24   **A.**   Yes, sir.

25   **Q.**   And is it ORR policy not to contact sponsors before taking

**Exhibit 53**
**Page 337**

DE LA CRUZ - CROSS / FREEMAN

1    their children out of the jurisdiction?

2    A.   We rely on DHS's determination to -- to identify that a

3    child is an unaccompanied child who belongs in federal

4    jurisdiction and that's what we rely on.

5    Q.   So no effort was made to contact the mother?

6    A.   No, sir.

7    Q.   Now, was any effort made to talk to the arresting officer

8    who appears somewhere in all of these records to have said that

9    this young person on arrest admitted to being a gang member --

10   was there any effort made to corroborate information to see

11   whether that was true?

12   A.   Okay.  To my knowledge, no.

13   Q.   Okay.  To this day, has there -- has anyone within the

14   Government, to your knowledge, reached out to the county police

15   or the local police who made this arrest in which it's alleged

16   that A.H. admitted to being a gang member -- has anyone in the

17   Government, to your knowledge, reached out to the arresting

18   officer to ask if that's true?

19   A.   To my knowledge, no.

20   Q.   I'm going to ask you about the marijuana charge as well.

21        Did you have knowledge -- or to your knowledge, did

22   anybody know at the time A.H. was being considered for secure

23   treatment -- secure detention, that the marijuana charge had

24   been dismissed in contemplation of adjournment?

25   A.   No, sir.

**Exhibit 53**
**Page 338**

DE LA CRUZ - CROSS / FREEMAN

1    **Q.**  Did anyone know that the -- that A.H. had been in a

2    supervised work program and that the supervisor in the work

3    program had said he was a very commendable participant in the

4    program?

5    **A.**  No, sir.

6    **Q.**  So basically all you had was some information input by ICE

7    that nobody in your organization really cross-examined; is that

8    correct?

9    **A.**  Yes, sir.

10   **Q.**  Now, you referred to a -- you'd received a bunch of secure

11   referrals because DHS was doing a sweep.  Do you recall that

12   testimony?

13   **A.**  Yes.  And so DHS was telling ORR, *We believe that these*

14   *are people affiliated with gangs and they should be securely*

15   *detained?*

16   **A.**  In not those exact words, but yes, sir.

17   **Q.**  Okay.  Do you have any procedures for reviewing or

18   challenging that recommendation in the three hours between

19   notice of the arrest and the time that you make a decision to

20   send -- to send a youth off to secure detention?

21   **A.**  If we believe that we have complete information, no, sir.

22   **Q.**  Now, the gang piece -- am I correct that the ORR policies

23   were just recently changed -- in fact, on June 12th -- to

24   include gang affiliation as a factor in determining what kind

25   of detention should be ordered?

**Exhibit 53**
**Page 339**

DE LA CRUZ - CROSS / FREEMAN

1    **A.**    Sure.   They were approved and put into effect on that

2    date.

3    **Q.**    So that's the day that A.H. was arrested; correct?

4    **A.**    Yes, sir.

5    **Q.**    To this date, to your knowledge, has anybody been in

6    communication with the mother directly in person about the

7    circumstances of her son's arrest and transfer?

8    **A.**    My understanding is -- my understanding is that the Yolo

9    County facility staff have made contact with the mother.

10   **Q.**    In person or by email or by sending --

11   **A.**    It would have been telephonic.

12   **Q.**    You mentioned, I think at the beginning of your testimony,

13   that Ms. Elicia Smith, who has been sitting here patiently in

14   court all day -- she is the field -- federal field specialist

15   in San Francisco for ORR; correct?

16   **A.**    Yes, sir.

17   **Q.**    So she has jurisdiction over the San Francisco -- over the

18   detention of persons under ORR supervision within this

19   geographic area?

20   **A.**    She's responsible for ensuring that the program follows

21   its policies or ORR's policies and procedures.

22   **Q.**    With respect to A.H. and anyone else within this

23   geographic area; correct?

24   **A.**    Yes, sir.

25   **Q.**    And she would be responsible for detentions that happened

**Exhibit 53**
**Page 340**

1   to occur in the Yolo Center?

2   **A.**   If you could define *responsibility* and *detention*, that

3   would help me answer the question a little bit more directly.

4   **Q.**   Well, why don't you explain what her responsibility is.

5   **A.**   What her responsibilities are, are that when a young

6   person -- well, it's to ensure that children placed under the

7   auspices of the Offices of Refugee Resettlement receive the

8   services required by the Office of Refugee Resettlement, and

9   that the programs that are in her geographical -- geographical

10  location assigned to her follow ORR's policies and procedures

11  in ensuring that those services are provided to any particular

12  child in that geographical location.

13  **Q.**   Okay.  So -- but she's -- she's -- other people report to

14  her, but she's the top person within this geographical location

15  to make sure that that happens?

16  **A.**   Yes.

17  **Q.**   Now, if Stephanie Gibbs had not called you at 5:00 the day

18  after the arrest, what would your normal procedure be for

19  alerting the attorney of an unaccompanied child to the fact

20  that he had been picked up and detained?

21  **A.**   ORR funds legal services in all of the jurisdictions where

22  we have children, so under most circumstances, children come

23  into our jurisdiction and they don't have a legal

24  representative.

25       So normally what would have happened is when a child comes

**Exhibit 53**
**Page 341**

1    into our care, the legal representatives, what they do is they

2    check in every once in a while to see if any new kids have come

3    in, but we also ensure that -- the facility knows that if a

4    child comes in is that we would engage our funded legal

5    representatives to engage with that child to do a screening and

6    a know-your-rights presentation.

7         In some cases, when a child has a legal representative and

8    we find out by happenstance, then sometimes it's our legal rep

9    that will reach out to the attorney because it's questionable

10   whether or not that attorney is still engaged, whether there is

11   anything going on, but if we find out a child -- the child

12   says, *Hey, I have legal representation*, and they identified

13   that they have legal representation, then the facility would

14   reach out to that legal representative.

15   **Q.**   But there's -- what I think I'm understanding is that

16   there's no process within ORR, even when an unaccompanied child

17   has an attorney, in pending immigration court proceedings to

18   find -- affirmatively find that attorney and contact him or

19   her?

20   **A.**   If a child says that he or she has a legal representative,

21   then yes, we would do that.

22   **Q.**   But barring that, what I'm saying is if you just don't

23   know, there's no affirmative outreach, even though the attorney

24   may have information already in the system and notices of

25   representation?

**Exhibit 53**
**Page 342**

1   **A.**   I guess what you're asking me is as part of our screening

2   and our interview, we would ask a child if they have a legal

3   representative?  No, we don't.

4   **Q.**   Now, I want to go to the phone call that you had with

5   A.H.'s attorney, Stephanie Gibbs, at about 5:00 on June 13th.

6   You recall that she -- there was another person on the line, a

7   law professor?

8   **A.**   Yes, sir.

9   **Q.**   Okay.  And do you recall Ms. Gibbs requesting that A.H.

10  not be interviewed by anybody unless she was present or had an

11  opportunity to be present by telephone?

12  **A.**   Yes.  I remember that clearly.

13  **Q.**   And what did you tell her in response to that request?

14  **A.**   Well, we actually had a discussion.  What I will say is

15  when she called, this is an attorney who's reaching out.  She's

16  an appropriate -- she is an attorney who seems to want to

17  engage in the best interests of her client.

18      My response is to, you know, give her and -- try to be as

19  helpful as I can to her.  So she -- she asked us about -- she

20  was on the phone with the law professor, and I can't remember

21  the complete details, but she said -- basically she goes, *Are*

22  *you going to interview my client?*  And I said, *Let me explain*

23  *the process to you.*

24      Because what I -- what I recall having a discussion about

25  is that she was concerned that maybe we would do some kind of

**Exhibit 53**
**Page 343**

1    an interview, sort of like a -- what do you call that?

2    Evidence type of interview like law enforcement.

3            **THE COURT:** Interrogation.

4            **THE WITNESS:** An interrogation.

5        So what I explained to her was that all of our programs

6    are licensed, and they're licensed facilities, and so we

7    require our programs to interview -- do an intake assessment

8    and to interview children to be able to find out things:  are

9    they sick, why are they here, that kind of thing.

10           So what I also recall is sending her our policy for secure

11   placement, and I also sent her a citation in an email that said

12   here is what we -- what the care providers will -- I guess it's

13   a warning for -- not a disclaimer, but basically informing them

14   that they have to be careful about what they tell us in that

15   anything that -- any kind of information could affect their

16   case.

17           So I did provide her with an email about that.  But I did

18   say to her we have to also be able to gather information per

19   our licensing standards and per our -- just to make sure that

20   this young person knows where he is and that kind of thing, and

21   we had a discussion about that.

22   **BY MR. FREEMAN:**

23   **Q.**   Now, he has -- he was interviewed when he arrived at Yolo;

24   correct?

25   **A.**   Yes.

**Exhibit 53**
**Page 344**

1    **Q.**   And his attorney was not present or -- by telephone or in

2    person?

3         **THE COURT:**  You haven't asserted that he had the right

4    to have his attorney present in this discussion, have you?

5         **MR. FREEMAN:**  We have asserted --

6         **THE COURT:**  It's not a claim based on that.

7         **MR. FREEMAN:**  We have asserted in our Complaint his

8    right to counsel in his ongoing proceedings, yes, both in

9    family court and in immigration.

10         **THE COURT:**  Yes.  But not based on asking him

11    questions outside the presence of his attorney when he's in

12    their custody; right?

13         **MR. FREEMAN:**  Well, it's certainly part and parcel of

14    that, Your Honor, and we can amend to make that assertion,

15    but --

16         **THE COURT:**  I'm not sure you need to amend to bother

17    to make a constitutional claim on that.  Of course, you're free

18    to, if you want.

19      I wouldn't dwell too much on asking him questions outside

20    the presence of his attorney.  I would move on, if I were you.

21         **MR. FREEMAN:**  Very good.  Understood, Your Honor.

22    **Q.**   I do want to ask you about some of -- not all of them.

23    One of the SIRs in particular.  I think that was Exhibit 3.

24    That was the one with the long passage of text where we had to

25    search for parts of it that involved our client, A.H.

**Exhibit 53**
**Page 345**

DE LA CRUZ - CROSS / FREEMAN

1    The first page of Exhibit 3 under *Synopsis of Event*, I'll

2    read it:  Quote, "Youth involved in verbal altercation, and it

3    was reported by staff that incident occurred due to gang

4    affiliations," close quote.

5    Do you see that?

6    **A.**   Not in front of me now, but I do want to say I recall

7    that.

8         **MS. FABIAN:**  Here.

9         **MR. FREEMAN:**  I'm sorry.  I didn't realize you didn't

10   have the exhibits.

11        **THE WITNESS:**  Just to save me a little time, could you

12   show me where that is on here?  Or save us a little time?

13   Okay.  Thank you.

14   **BY MR. FREEMAN:**

15   **Q.**   And if it will help you, I'm going to ask you whether you

16   recall stating in your declaration essentially the same thing,

17   that -- paragraph 6, "In the third incident on June 22, A.H.

18   was involved in a verbal altercation and staff reported that

19   the incident occurred due to gang affiliations."

20        Do you recall that being in your declaration?

21   **A.**   Yes.

22   **Q.**   Now, we've looked at this in some detail.  In this entire

23   report, did A.H. say anything about gang affiliations?

24   **A.**   In this document?

25   **Q.**   Yes, correct.

**Exhibit 53**
**Page 346**

DE LA CRUZ CROSS / FREEMAN

1    **A.**   My understanding is he did.

2    **Q.**   Show us where, please.

3    **A.**   "Once secured, youth A.M. began kicking" --

4              **THE COURT:**  Whoa, whoa, whoa.

5              **MR. FREEMAN:**  Five lines from the bottom, Your Honor.

6    **Q.**   You are referring to an alleged statement by youth H.A.M.,

7     who is not our client.  He is someone else; correct?

8    **A.**   Right.

9    **Q.**   So is there anywhere in that report where A.H. said

10   anything about gang affiliations?

11   **A.**   That's correct.

12   **Q.**   And under *Synopsis of Event* at the top, it says it was

13   reported by staff -- it's all passive tense, but who is the

14   staff who reported that?  Is there some way to know that?

15   **A.**   Well, to find out the specifics, the closest we would have

16   is to look at the bottom of page 2, and it has the name of the

17   staff filling out the report.

18   **Q.**   That's Brenda Moreda?

19   **A.**   Correct.

20   **Q.**   But do we know whether Ms. Moreda was the person who

21   reported that the incident occurred due to gang affiliations?

22   **A.**   Not without further investigation.

23   **Q.**   Okay.  Let's talk -- and I'm coming close to wrapping up.

24        Let's talk about the two processes that you've identified

25   going forward, one for the every 30-day step-down process and

**Exhibit 53**
**Page 347**

1   one for the reunification process.

2       Does A.H. have access to the information that's being used

3   by ORR to determine whether he can be stepped down before the

4   determination is made?

5   **A.**   First, A.H. would know why he's in secure placement, and

6   what -- part of -- part of the reason why that's important is

7   because he would -- he would -- the clinician would have to

8   know to make sure that he knows why he's in that facility.

9       Then what would happen is he would also be informed that

10  he is being evaluated on whether he would be stepped down or

11  not.

12      So at some point in those discussions, in those staffings,

13  the staff would have to be up front with him and tell him, *Hey,*

14  *this is the reason why you're here and these are the reasons* --

15  *these are some of the behaviors that have occurred, these are*

16  *some of the concerns that* -- that is if he's not going to get

17  stepped down.

18      They would basically work with him as best as they could

19  to make sure that he knew what the behaviors were, and then

20  what they would also do is they would also try to build some

21  kind of a specialized individual service plan for him to help

22  him understand what kind of behaviors could help him move

23  towards either stepping down and being more successful in his

24  placement.

25      So that information -- they would have to go over with him

**Exhibit 53**
**Page 348**

**DE LA CRUZ CROSS / FREEMAN**

1  what -- how -- how those incidents are basically affecting our

2  decisions because we would be trying to work with him to

3  eventually move toward stepping down.

4  **Q.**   My question was a little bit narrower, sir.

5  **A.**   Sorry.

6  **Q.**   That's okay.

7      Before a decision-maker makes a decision on stepping down,

8  does A.H. get to see the documents that the decision-maker

9  looks at?

10  **A.**   They would -- I wouldn't say that he sees the documents,

11  no, sir.

12  **Q.**   Does he get to look at the SIRs?

13  **A.**   He would be informed about the SIR, yes, sir.

14  **Q.**   Well, the reason I ask the question is because there is

15  some questionable stuff in these SIRs, in my humble opinion.

16      Does he get to take a look at the SIRs?

17  **A.**   No, sir, I don't believe so.

18  **Q.**   Does the attorney get to take a look at the SIR?

19  **A.**   The attorney would get a copy of the SIRs.

20  **Q.**   Does the attorney get a copy of the SIR before the

21  decision is made?

22  **A.**   She could make a request to get that information.

23  **Q.**   Would she get that information before a decision was made?

24  If she made a request today, would she get that information?

25  **A.**   That would go to our records department.  To my knowledge,

**Exhibit 53**
**Page 349**

DE LA CRUZ   CROSS / FREEMAN

1  she would.

2  Q.   Is that a policy or is that just something that you do on

3  the fly?

4  A.   It should be in our policy.

5  Q.   Does the mother get a copy of the information that the

6  decision-maker looks at?

7  A.   She would be informed.

8  Q.   Does she get a copy of the documents, sir?

9  A.   She can make a records request as well.

10 Q.   Same process?

11 A.   Yes, sir.

12 Q.   How quickly are those requests turned around?

13 A.   Well, typically 30 days.  But if an attorney gave his

14 information and said hey, they really need to know this for

15 some particular reason or not, they could work with us and we

16 would expedite that.

17 Q.   But decisions are made every 30 days, aren't they?

18 A.   So let me be clear.  We would inform the attorney and the

19 mother in a timely manner.  I would have to go back and look at

20 our policy to see if there is a specific time that we would

21 inform them of an SIR.  So they could technically receive

22 information within 24 hours.

23      And the other thing that would influence that is the

24 licensing of that program.  I would have to go back and do some

25 research and see if they're required under their license to

Exhibit 53
Page 350

1   have to report that information.

2       So communicating information and searching it and making a

3   receipt -- and receiving it, that information in a written

4   form, are two different things.  So --

5   **Q.**   Did -- I didn't mean to cut you off.  I want to make sure

6   you're done.

7   **A.**   Okay.

8   **Q.**   Does counsel have the right to appear at a hearing before

9   the step-down determination is made?

10  **A.**   Counsel would have the right to have a meeting and be

11  informed, and it wouldn't necessarily be in a hearing.

12  **Q.**   So there is no confrontation of witnesses or any kind of a

13  formal process like we have today?

14  **A.**   Not with the 30-day process.

15  **Q.**   Okay.  What about the reunification process?  Same

16  question.  Does counsel have a right to be -- to actually have

17  a role in that process before a decision is rendered?

18  **A.**   Counsel has the right to be informed.  And they also have

19  a right to be informed of why we're going to make a decision.

20  And we would also think that the -- that the -- that would

21  happen simultaneously with the parent, but they would -- they

22  would be informed of that information.

23  **Q.**   They're informed of the decision after it's made?

24  **A.**   Yes -- well, it just depends on counsel because sometimes

25  counsel -- we've had counsel work with a parent and work with

**Exhibit 53**
**Page 351**

1    the child, and they might participate by sharing information

2    with the care provider.

3       We've had counsel reach out to affiliates for services in

4    certain areas and help the parent go out, and let's say if it's

5    a gang prevention type of program, they could -- they --

6    they're open to helping the parent find resources.  They've

7    done things like that before.

8       So if that's the kind of engagement that we have and the

9    kind of relationship the attorney has with the program and

10   they're not prohibited from having, then what would happen is

11   they would know ahead of time how the outcome is going to be,

12   but I can't say as a matter of course that that's part of our

13   ongoing procedures to do that.

14   **Q.**   Now, in terms of the release process, I think I understood

15   you to say that the mother has to go through a whole lot of

16   process basically to resubmit information to determine whether

17   she's a suitable caretaker?

18   **A.**   That's correct.

19   **Q.**   Sponsor?

20   **A.**   Yes, sir.

21   **Q.**   Now, HHS has already made that determination before;

22   right?

23   **A.**   Right.

24   **Q.**   Do you go back and basically take the information she gave

25   you before and program that in yourself, or does she have to

**Exhibit 53**
**Page 352**

DE LA CRUZ / CROSS / MASS

1   provide it all again?

2   **A.**   She would -- she would be given a new reunification packet

3   and be asked to provide current information.

4   **Q.**   You basically treat it as a new process, don't you?

5   **A.**   Yes.

6           **MR. FREEMAN:**   Ms. Mass does have a couple of

7   questions.

8           Thank you very much, Mr. De La Cruz.

9           **THE WITNESS:**   Sure.

10                          **CROSS-EXAMINATION**

11  **BY MR. MASS:**

12  **Q.**   Good afternoon, Mr. De La Cruz.

13          Just to follow up on a couple questions -- a few

14  questions, you talked about how A.H.'s attorney reached out to

15  you on the 13th and mentioned to you that some of the charges

16  that ICE was relying on to make the arrest were incorrect.

17          Have you taken any steps to look into that since that

18  phone call?

19  **A.**   I've asked Elicia to work with the program to gather

20  information about that.  And that's something that they would

21  do as a standard as well, standard practice.

22  **Q.**   And that's a 30-day time frame to get -- to get all that

23  together and make a decision with it; is that correct?

24  **A.**   Yes.

25  **Q.**   And before ORR made the decision to transfer A.H. to Yolo

**Exhibit 53**
**Page 353**

1    to the secure facility, did anyone from ORR speak to A.H. about

2    the reason that you were making that decision?

3    **A.**    No one would have contacted A.H. prior to him actually

4    physically arriving in ORR's custody.

5    **Q.**    In Yolo County; is that correct?

6    **A.**    Yes, ma'am.

7    **Q.**    And so just -- I know that my co-counsel was trying to pin

8    this down.

9         When do you consider that he actually became in ORR's

10   custody?  Was it when he was admitted into Yolo County?

11   **A.**    When they do an intake, yes, ma'am.

12   **Q.**    But ORR made the decision to send him there before he was

13   in your custody; is that right?

14   **A.**    That's correct.

15   **Q.**    And then you spoke about the basis for the decision to

16   send him to a secure facility being that there were pending

17   charges.

18   **A.**    Correct.

19   **Q.**    And I was wondering what counts as pending for the

20   purposes of that decision.

21   **A.**    What counts as pending is receiving information from DHS

22   that he was arrested, and it's up to the court or the

23   jurisdiction where those offenses would have occurred for them

24   to decide whether to actually charge him with those things.

25   **Q.**    So the fact that he -- at the time we know that you

**Exhibit 53**
**Page 354**

1    didn't -- ORR was not aware that those charges had been

2    resolved at the time that you had the information that they

3    were pending; is that right?

4    A.   Yes, ma'am.

5    Q.   And would it have mattered to ORR that had you known in

6    fact those charges weren't pending but had actually in fact

7    already been terminated?

8    A.   They would have caused us to review that decision.

9    Q.   And if there's an arrest but there's no factual finding of

10   guilt or any kind of admission, does the fact that the arrest

11   is for something serious -- is that enough to put -- was that

12   enough to put A.H. into secure custody?

13   A.   Yes.

14   Q.   You mentioned that your programs are licensed.

15   A.   Yes, ma'am.

16   Q.   Is there a difference between the term *licensed* and the

17   term *secure* for purposes of ORR custody?

18   A.   Yes.  Well, licensed -- licensed is the authority to

19   provide a service; in other words, an entity goes to -- an

20   agency goes to a state entity, licensing entity, and they

21   receive authority to provide a particular service.

22        Secure is a type of service.

23   Q.   And are you familiar with the requirements of the Flores

24   consent decree?

25   A.   For the most part, yes, ma'am.

Exhibit 53
Page 355

1    **Q.**    And under that decree, there is a presumption of releasing

2    minors to their -- to their parents or to a guardian; right?

3    **A.**    That's correct.

4    **Q.**    And people -- and minors who are not released to their

5    parents are supposed to be -- generally supposed to be in

6    nonsecure facilities; is that correct?

7    **A.**    Generally, yes.

8    **Q.**    So under that decree, is it your understanding that ORR's

9    responsible for complying with that settlement agreement also?

10   **A.**    Could you restate the question again?

11   **Q.**    Does ORR aim to comply with the Flores settlement

12   agreement when they make decisions about secure custody?

13   **A.**    Yes.

14   **Q.**    And is it your understanding that secure custody is

15   allowed under that agreement for mere arrests and mere

16   allegations of criminal activity?

17   **A.**    When we placed A.H., we placed him according to our

18   policies, and our policies do allow us to place children who

19   are -- have gang affiliation into secures.  And also crimes --

20   you know, particular chargeable/nonchargeable crimes.

21   **Q.**    But you've also said mere allegations of gang affiliation

22   and mere allegation of criminal activity is enough to place a

23   child in a secure facility; is that right?

24   **A.**    Information that we receive and according to our policy is

25   something that we take into consideration, yes, ma'am.

**Exhibit 53**
**Page 356**

1   **Q.**   And in this case, you really only had allegations of gang

2   affiliation and allegations of criminal charges; is that

3   correct?

4   **A.**   What we received is information that we basically

5   construed as fact, which is that when that determination was

6   made for placement, the information that we provided was that

7   A.H. had been arrested for possession of marijuana.

8       We also received that he was arrested for possession of a

9   weapon, which was pending, and we also received information

10   that he was arrested for gang intimidation, which was pending.

11       And at the time that we received the information, that's

12   not always sufficiently time for us to be able to establish

13   what that means or whether that's fact or not.  What I'm saying

14   is we have to take DHS on what they're providing us, and that's

15   pretty much what we did.

16   **Q.**   Do you have ORR staff based in New York?

17   **A.**   Yes.

18   **Q.**   You mentioned that in the decision to release a child to

19   his or her guardian or to the sponsor, that there's a packet of

20   information that gets put together and that the director makes

21   the decision based on what's in the packet; is that correct?

22   **A.**   For secure children, yes, ma'am.

23   **Q.**   Yes.  And does the child have access to that packet before

24   the decision is made or at any time?

25   **A.**   As a matter of standard operating procedures, the shelter

**Exhibit 53**
**Page 357**

**DE LA CRUZ - CROSS / MASS**

1   does not provide that to them.

2   **Q.**   Okay.  But just -- okay.

3        And does the child's attorney get access to the packet

4   that the ORR director depends on to make his decision before

5   the decision is made?

6   **A.**   That's not an easy yes-or-no question.  Sometimes the

7   attorney fills out the packet with the parent.

8        So I think what you're asking is when we make a release

9   decision, do we have a procedure where we give the attorney a

10  packet of information and we say ahead of time, *We're giving*

11  *this to you; we're telling you ahead of time that we're going*

12  *to make this decision.*  I think that's what you're asking me.

13  Am I correct?

14  **Q.**   I'm asking whether the child or his representatives have

15  any access to the derogatory information that the ORR director

16  relies on to make a decision about custody?

17  **A.**   The child and the parent would know ahead of time what

18  information has been provided.  Do we give them a packet of

19  what the parent has turned in?  No.

20  **Q.**   I'm asking if you would make the same information

21  available to the child and his or her representatives as you

22  make available to the ORR director --

23  **A.**   No.  Okay.

24  **Q.**   Thank you.

25  **A.**   Sure.

**Exhibit 53**
**Page 358**

**DE LA CRUZ - EXAMINATION / COURT**

1  **Q.**   I just want to clarify the record.  Did you testify that

2  it was your understanding that A.H. had been arrested for gang

3  intimidation?

4  **A.**   Yes, ma'am.

5  **Q.**   And that's based on Exhibit 1?  The information that was

6  in the email from Stephanie, the Intake specialist?

7  **A.**   Sure.  The email that is dated -- well, it's two pages,

8  but it's on June 12th, 2017, 2:32.

9  **Q.**   And where is it in this email that it says that he was

10  arrested for gang intimidation?

11  **A.**   Oh, I see what you're saying.  No.  It says -- well, he

12  was arrested for intimidation on 5/25, and he was identified as

13  a member of the MS-13 by Suffolk County.

14  **Q.**   Okay.

15     No further questions.

16       **THE COURT:**  I have a couple follow-up questions.

17              **EXAMINATION OF DE LA CRUZ**

18  **BY BY THE COURT:**

19  **Q.**   So I apologize if you answered this question already, but

20  I just want to get clarification of it.

21     Did ORR know, during this period where it had been

22  referred A.H. and before it decided to send A.H. to Yolo -- did

23  ORR know that it had previously placed A.H. with his mother?

24  **A.**   Yes, sir, I believe so.

25  **Q.**   Okay.  So that information was in the possession of the

**Exhibit 53**
**Page 359**

1  people who decided -- the people at ORR who decided that he

2  needed to go to Yolo?

3  **A.**   Yes, sir.

4  **Q.**   Okay.  But there was no phone call to the mother before

5  making a decision to send him to Yolo?

6  **A.**   From ORR?

7  **Q.**   Yes.

8  **A.**   No, sir.

9  **Q.**   And he was being held, you said, in New York.  He was at

10  an ICE facility in New York?

11  **A.**   That was my understanding and the staff's understanding,

12  yes, sir.

13  **Q.**   Okay.  What were the other facility options that ORR had

14  at the time?  Where are the other places that he could have

15  been sent other than Yolo?

16      I'm not talking about only secure facilities; I'm talking

17  about other facilities.  What would be the next step down in

18  terms of --

19  **A.**   It could have been a staff secure placement.  We have a

20  staff secure in New York.  We also have a -- we have staff

21  secure in New York.  We have one in Chicago.

22  **Q.**   Talk to me about what a staff -- quote, "staff secure,"

23  unquote, is?

24  **A.**   A staff secure program is a program that relies more on

25  staff intervention and pragmatic-type of intervention to be

**Exhibit 53**

**Page 360**

1    able to help direct a youth in their daily activities.  And the

2    difference is that a secure facility would rely more on the

3    physical aspect of being able to help redirect a youth.

4        In other words, if somebody's upset and somebody's

5    hostile, they have it in their ability and their license to be

6    able to escort somebody, have to use more -- have to use

7    restraints, if necessary.  Or to actually place them in a room

8    by themselves and lock the door until they calm down.

9        And so that's what I mean by the physical part.

10       Whereas a staff secure program is a program where, for

11   instance, keeping the kids more busy, having a lower staff

12   ratio where the staff would be there to intervene more quickly

13   and be able to give more individualized attention to that

14   particular child.

15       There would be more emphasis on that type of an

16   intervention.

17   Q.   So is the child detained in that, quote/unquote, "staff

18   secure" facility?  In other words, the child is not permitted

19   to leave that facility?

20   A.   Yes.  In other words, all of our facilities, from my

21   understanding -- historically is that all of our facilities are

22   considered detention, even our shelters.

23   Q.   And the staff secure facility is -- does the child have a

24   roommate?

25   A.   Yes.

Exhibit 53
Page 361

1  **Q.**   One roommate, multiple roommates?

2  **A.**   If -- if -- yes, they could.

3       That's something that we would program in.  All of -- yes.

4  All of our staff secures and our shelters would have that,

5  but --

6  **Q.**   Would have what?

7  **A.**   Well, like, if we have a child who is transgender or we

8  have a child who -- and doesn't feel comfortable or we have a

9  child who maybe engages in more type of, you know, sexually

10 inappropriate type of behaviors, then we would have to, like,

11 not have a roommate for that particular child.

12 **Q.**   Okay.  So there is flexibility at the staff secure

13 programs?

14 **A.**   Yes.

15 **Q.**   And does staff -- is staff armed?

16 **A.**   No.

17 **Q.**   Staff is not armed?

18 **A.**   In a staff secure facility, no.

19 **Q.**   What's the age range of people, children, held in the

20 staff secure facility?

21 **A.**   Typically, it's usually someone who's between 12 to 17.

22 **Q.**   Is it different age ranges for different facilities?

23 **A.**   Yes.  It depends on their license.  An example is there is

24 some shelters who can take, you know, children from 0 to 17.

25 Same thing with foster homes.

**Exhibit 53**
**Page 362**

1    So it just depends on what that program, that particular

2  program, is licensed to be able to work with.

3  **Q.**    And it's not ORR staff, but it's somebody with whom ORR

4  has contracted; is that right?

5  **A.**    Yes.

6  **Q.**    Okay.  So a county facility or a private facility?

7  **A.**    Yes.  Typically the secure facilities -- for instance,

8  Yolo County is a county facility, and I believe Shenandoah in

9  Virginia is as well.

10  **Q.**    What about New York?

11  **A.**    That is a nonprofit agency so they're private.

12  **Q.**    Okay.

13  **A.**    So as an entity, they operate as a private entity, but

14  they're licensed by the state.

15  **Q.**    Okay.  And do you know anything about their criteria for

16  who they will take, who they can take, what type of person they

17  can and can't take or will and won't take?

18  **A.**    Sure.  They would also -- they would be a facility that

19  would take a child who could respond to interventions, to staff

20  interventions, and someone who's basically -- they don't either

21  have any information or any belief that this person would

22  engage in physical violence and that type of thing.  Or someone

23  who might have had that in their background but has made

24  progress in being able to start, you know -- self-regulating

25  when they have to get in some kind of a conflict.

**Exhibit 53**
**Page 363**

1    **Q.**   Okay.  As you sit here today, looking at Exhibit 1 again

2    and the information that the DHS folks -- do you still have

3    that in front of you?

4    **A.**   I do.

5    **Q.**   The information that the DHS folks entered into ORR's

6    system, I want to go through and ask you whether -- which

7    information you now know -- have confirmed as accurate and

8    which information you've confirmed is inaccurate.

9        So the arrest for possession of marijuana -- and it says

10   "in the fifth."  Do you know what "in the fifth" is?

11   **A.**   Let me see.  Well, to me it looks like it's probably part

12   of that particular state's penal code, "in the fifth."

13   **Q.**   Okay.  And it says he was arrested for possession of

14   marijuana.  Have you confirmed now that that is correct, that

15   he was arrested for possession of marijuana?

16   **A.**   What I'd have to do is go back and reference the original

17   affidavit that the gentleman provided to me, and I'd like to

18   reference that again because I do know that the dates are

19   wrong.

20       But now that you're asking me the question, it doesn't say

21   that he wasn't arrested.  It says he was arrested on a

22   different date.

23   **Q.**   Okay.  Which affidavit are you referring to?

24   **A.**   There was one -- I think it was the testimony provided

25   from -- I think his name was Loechner.

**Exhibit 53**
**Page 364**

1    **Q.**    Okay.  Why don't you give him that again.  Okay.

2         So other than Loechner's declaration and your review of

3    this Exhibit 1, you don't have any -- that's the only

4    information you have about whether these -- the items in

5    this -- in this Exhibit 1 are accurate?

6    **A.**    Yes, sir.  That's the only known information that I have.

7    **Q.**    Okay.  All right.  Then I don't think I need to go through

8    it with you.  I just need to know that that's all that has been

9    done to confirm whether this stuff is accurate or inaccurate.

10   **A.**    The only other piece that I don't know has happened is has

11   the program actually reached out and obtained a record from the

12   jurisdiction that originally arrested this young man.

13   **Q.**    When you say *the program*, who are you referring to?

14   **A.**    Yolo County.

15   **Q.**    Is there a reason the people at Yolo County would do that

16   as opposed to somebody from ORR?

17   **A.**    Well, they would do it as our requirement.  In other

18   words, Yolo County -- Yolo County is, I guess, acting under our

19   procedures and our policies.  And one of our requirements would

20   be that they gather information to be able to make a

21   recommendation for release so that we would ask them to do

22   that, and if they weren't able to obtain that, then they would

23   let an FSS or Elicia know and she or her supervisor could reach

24   out to the entity where -- that actually did the arrest,

25   actually conducted the arrest, and ask them if they will

**Exhibit 53**

**Page 365**

1    provide us with the record.

2    **Q.**    Again, so the people at Yolo County are -- the county

3    employees at that facility are expected to understand ORR

4    policies regarding the custody of unaccompanied minors?

5    **A.**    That's correct.

6    **Q.**    And it's Ms. Smith's -- Elicia's responsibility for making

7    sure that those policies regarding the custody of unaccompanied

8    minors are followed by those county officials?

9    **A.**    Yes, sir.

10   **Q.**    Okay.  How common is it that you'll be referred somebody

11   from DHS who you have already placed with family members?  DHS

12   arrests somebody and refers them to you, and they've already

13   been placed with family members.

14       I assume that the most -- by far the most common is

15   somebody who ORR has not come into contact with yet; is that

16   right?

17   **A.**    Yes.  It -- it's happened -- well, first -- I guess one of

18   the other things that we -- we also recognize is the Homeland

19   Security Act and the definition of an *unaccompanied alien*

20   *child*, which is, you know -- you have to be under the age of

21   17 -- I'm sorry -- under the age of 18.  You have to be in the

22   United States without any kind of legal status, and you also

23   have to not be in the accompaniment of your parent or legal

24   guardian or they are otherwise unavailable.

25       So, you know, that -- from time to time we will receive a

**Exhibit 53**
**Page 366**

1    referral from DHS and they will inform us that they have a

2    child who they are having to separate from their parent, and it

3    could be for different reasons.

4        We've had parents who physically are sexually abusing

5    their own child.  We've had incidents where the parent has

6    criminal charges and they're getting detained and so they'll

7    make the referral to us.  Or they'll also make a referral to us

8    and say that the parent is -- is not, you know, coming forward

9    to pick up their child and they've given them notification,

10   which happens sometimes because parents aren't documented and

11   they don't want to get detained themselves.

12       So for us to get a referral for a child and that child is

13   going to be separated from their parent is not uncommon.

14   **Q.**   Okay.

15   **A.**   And I can say, now that you've gotten me thinking about

16   it, it happens almost every other day.

17   **Q.**   Okay.  And what about this type of situation where DHS

18   simply arrests somebody based on a warrant that they are

19   removable and refer them to you?  How often does it turn out

20   that that person has already been placed by you with a family

21   member?

22   **A.**   I'd have to say at this moment, not very -- that I can

23   recall, not frequently.

24   **Q.**   Can you recall any instance in which that's happened?

25   **A.**   Where DHS has made a referral to us and they removed the

**Exhibit 53**
**Page 367**

DE LA CRUZ - EXAMINATION / COURT

1  child from the parent and it's just simply over -- for purposes

2  of immigration?

3  **Q.**   Yes.

4  **A.**   No, because normally there is -- there is some reason for

5  that.

6       You know, when I go -- if I was to go back and look at

7  cases where we received a referral a second time, it's usually

8  because there's something else that's going on.  Again, it's

9  either because the parent is -- there is some kind of abuse

10  issue, there is a neglect issue, there is an abandonment issue,

11  or the child has gotten picked up from local law enforcement

12  and that local law enforcement has basically referred the case

13  over to DHS and DHS has made the determination to -- to ask us

14  to take custody of that child.

15  **Q.**   Okay.  Let me think.  I think that was it.

16       Do you know if DHS had any reason to believe, when DHS

17  referred A.H. to you that -- do you know if DHS had any reason

18  to believe that A.H. had already been placed by you with

19  family?

20  **A.**   Okay.  That's not a simple question so I'm going to have

21  to answer you, okay, to be -- to be forthcoming.

22       When we -- when a child is in our jurisdiction and we

23  release a child to a sponsor, whether it's a -- whether it's --

24  it could be any adult.  It could be a distant family member.

25  It could be someone with a relationship.  It could be the

**Exhibit 53**
**Page 368**

1    mother, the father --

2    **Q.**    Are you thirsty, by the way?

3    **A.**    Sure, I will take some water.

4    **Q.**    You can continue.

5    **A.**    Okay.

6          So whenever we release a child, we notify DHS that the

7    child is being released from us to a particular person.

8          And that's something that we do for all of our cases.  For

9    every single child that we release out of our jurisdiction, we

10   give DHS notification before we do the release and we also give

11   them notification that the child has been released.  Okay?

12         Now -- so when we talk about, you know, do we give --

13   would DHS have been notified, yeah, we would have notified the

14   field office juvenile --

15   **Q.**    What you are going to say is you don't have any reason to

16   believe that the particular ICE agents who picked him up and

17   sent him to you knew of the information that you had previously

18   transmitted to DHS?

19   **A.**    That's correct.

20   **Q.**    Okay.  All right.

21   **A.**    They could have, they might not have, but we also have to

22   look at even if they know, are they making a decision that that

23   parent is unavailable.

24   **Q.**    Right.  Okay.  Okay.

25         Does anybody have anything, very, very briefly, before we

**Exhibit 53**
**Page 369**

 1    finish?

 2              MR. FREEMAN:  No, thank you.

 3              MS. FABIAN:  No, Your Honor.

 4              THE COURT:  You can step down.  Thank you.

 5         All right.  We're going -- we're going to take -- we will

 6    take a five-minute break, and then I'm going to come out and

 7    tell you whether I'm going to rule from the bench or whether I

 8    will take it under submission and issue a ruling like tomorrow

 9    or something like that.

10              MR. FREEMAN:  Thank you.

11                   (Recess taken at 4:28 p.m.)

12              (Proceedings resumed at 4:41 p.m.)

13              THE COURT:  Okay.  In light of the time sensitivity,

14    I'm just going to issue a ruling right now from the bench.

15         First, on the issue of proper respondent, I think it's a

16    close question, and my ruling is without prejudice to the

17    Government asking me to revisit it at a later stage in the

18    litigation, if necessary, but I am concluding that Ms. Smith is

19    the appropriate respondent.

20         As I said earlier, I do not believe that the distinction

21    between immigration habeas cases and other core habeas cases,

22    criminal cases, the *Padilla* case -- I don't believe that

23    distinction is convincing or the reasons for that distinction

24    are convincing.

25         But I do believe that it is appropriate, at least -- and I

Exhibit 53
Page 370

1   believe -- it's a close question, and, like I said, you can ask

2   me to revisit it, but I do believe that it is appropriate to

3   distinguish between situations where the Government is holding

4   someone in its own facility and situations where the Government

5   is holding someone in a contracted-out facility.

6        I also think that in a situation where the Government is

7   holding someone in a facility run by some other entity, some

8   other government entity or some private entity, there are a lot

9   of reasons, as we discussed today, for not having the head of

10  that facility be named the respondent in a habeas case.

11       Moreover, I think the testimony here made clear that in

12  this context, Ms. Smith really is the custodian because

13  Ms. Smith is responsible for how things go with the custody of

14  the child.

15       There are all these ORR policies about the way in which

16  the child is held in custody and the procedures for holding the

17  child in custody, and Ms. Smith is in charge of that, in charge

18  of overseeing that, much like a warden would be in charge of it

19  in a more conventional scenario.

20       Moreover, I became even more convinced this must be the

21  right answer upon hearing that -- basically it appears that

22  every facility that ORR uses is a facility operated by somebody

23  other than ORR, including these private not-for-profit

24  corporations.

25       So it seems like the Government's argument in this case

Exhibit 53
Page 371

1  for who is the proper respondent would stand for the

2  proposition that if somebody's in a nonprofit group home like

3  the one described in New York, the only appropriate respondent

4  in a habeas petition would be the person who works for that

5  nonprofit organization who's in charge of running that group

6  home.

7      And that, it seems, can't be right and particularly when

8  we now have testimony about how it's really ORR officials, the

9  ORR district director, who is responsible for making sure that

10  the ins and outs of custody are handled properly by the people

11  who are under contract with ORR.

12      So that is my conclusion about the proper respondent, and

13  so we're in the right district, and so I won't be, at least at

14  this stage, again without prejudice to the Government making

15  the argument later, if necessary -- I am concluding that we're

16  in the right district, and I won't be transferring the case to

17  the Eastern District of California.

18      With respect to the merits, I think on most of the issues

19  raised by the petitioner, the petitioner has not established a

20  likelihood of success or raised serious questions on the

21  merits.

22      I think also with respect to the access-to-counsel issue

23  and the access-to-courts issue, in addition to not establishing

24  strong likelihood of success on the merits, the petitioner

25  hasn't established irreparable harm because of all the issues

Exhibit 53
Page 372

1    we discussed this morning and early afternoon regarding getting

2    a continuance.

3        However, with respect to one issue and that is -- sorry;

4    give me a second -- that is the issue relating to 8 U.S.C.

5    Section 1232 -- by the way, before I forget, let me hand these

6    exhibits back to Kristen.

7        With respect to the TVPRA, I believe that under the

8    sliding-scale approach that exists in the Ninth Circuit, the

9    petitioner has raised serious questions going to the merits.  I

10   wouldn't say made a strong showing of a likelihood of success,

11   but has raised serious questions going to the merits on whether

12   the TVPRA was violated by not giving adequate consideration to

13   whether A.H. should be placed into custody and placed into a

14   secure facility.

15       I say that with the caveat that -- as I said, I think it's

16   a close issue, even as to this child, but I say it without

17   regard to what the requirements are in the vast, vast majority

18   of cases.  I mean, one of the things that the testimony

19   established here is that this is a highly, highly unusual case.

20       But this is a case in which ORR had already screened the

21   child, screened the mother, made a decision that the child

22   could be placed with the mother, and entered into a contract

23   with the mother regarding the care of the child.

24       In those circumstances and given that ORR knew at the time

25   it received the referral from DHS that it had already engaged

Exhibit 53
Page 373

1 in this screening process, it had an obligation to investigate

2 the information it was receiving from DHS about A.H.

3     Obviously it doesn't need to be reached, but I think it's

4 fair to assume at least that in normal circumstances, ORR might

5 not need to look behind the information it receives from DHS

6 about an unaccompanied minor that DHS has picked up for the

7 first time and that ORR has been referred for the first time

8 and that ORR has never had any contact with before.

9     But in a case like this, ORR had an obligation under the

10 statute, given the information that it had, to do more, to make

11 sure that the child should be in custody and that the child

12 should be in -- that being in a secure facility was the least

13 restrictive setting that is in the best interests of the child.

14     And so I believe that in a Temporary Restraining Order,

15 that violation or possible violation ought to be remedied, and

16 here's what I'm going to order ORR to do:

17     I'm going to require ORR to look much more carefully than

18 it has done up until now into whether it should have taken the

19 child into custody on -- June 12th, was it?

20        **MR. FREEMAN:** Yes, Your Honor.

21        **THE COURT:** And whether it should have -- if it should

22 have taken the child into custody, whether it should have

23 placed the child in a secure facility on June 12th.

24     I'm going to require ORR, number three, to look much more

25 carefully into whether -- even if it was appropriate to take

**Exhibit 53**
**Page 374**

DE LA CRUZ - EXAMINATION / COURT

1    the child into custody on June 12th, whether it remains

2    appropriate under the statute to keep the child in custody, and

3    if so, where.

4         If so, number four, should the child remain in custody in

5    a secure facility.

6         So just to be clear, what I'm asking -- what I'm ordering

7    ORR to go back and look at carefully is, number one, whether it

8    should have retained, on June 12th, the child in custody at

9    all.

10        Number two, whether it should have sent the child to a

11   secure facility.

12        Number three, whether the child should remain in custody

13   today.

14        And number four, if so, whether the child should remain in

15   a secure facility as opposed to, say, the facility in New York

16   that we discussed.

17        I'm going to require ORR to make that determination by

18   July 7th.

19        And among other things -- I mean, it's obviously up to ORR

20   whether it wants to be more thorough than I'm requiring, but at

21   a minimum -- at a minimum -- ORR must conduct a careful check

22   of the accuracy of the information it received from DHS,

23   including obtaining police reports, if possible, and court

24   records, if possible, and including contacting the appropriate

25   local law enforcement officials who might have information

Exhibit 53
Page 375

1   about the child's status as a member or affiliate of MS-13.

2       ORR must give the child an opportunity to be heard in the

3   presence of his attorney and must give his attorney the

4   opportunity to be heard in connection with this decision.

5       ORR must give the attorney access to all the information

6   on which the decision would be based and give her an

7   opportunity to respond to that information before the final

8   decision is made by July 7th.

9       Those are all the requirements that come to mind that I

10  want to impose on ORR in connection with this reconsideration,

11  but I'm willing to hear other suggestions, if anybody wants to

12  make any other suggestions about what ORR should be required to

13  do.

14       **MS. FABIAN:**  Your Honor, one question.

15       And I'm only guessing here if July 7th was based on

16  testimony from my client.  The 30-day process is already under

17  way and sort of --

18       **THE COURT:**  I'm concerned --

19       **MS. FABIAN:**  -- anticipated to close on the 13th, and

20  only because of the holiday next week would ask if perhaps the

21  Court would allow them to complete it --

22       **THE COURT:**  No.  I'm ordering it to be done by

23  July 7th, and I'm very concerned about the adequacy of that

24  process, which is why I included some specific requirements for

25  things that ORR needs to do and things that ORR needs to look

Exhibit 53
Page 376

1  into.

2        **MS. FABIAN:**  Okay.

3     And then I guess I would ask -- and I -- I apologize.  You

4  asked ORR to -- I understand the requirements with what they

5  need to do and the process that that they need to follow.  I

6  think that makes sense.

7     You initially said to review the initial decision and --

8  so that their initial custody determination and then their --

9  make a new determination.  And you said consistent with the

10  statute.

11     Is that consistent with their own policy as they've

12  interpreted the statute, or is there another sort of

13  interpretation of the statute that you're asking them to apply?

14        **THE COURT:**  I don't have in mind any requirement that

15  they make a determination that is different from how they would

16  do it pursuant to their policy, except to the extent that the

17  policy is inconsistent with anything that I just said.  Is that

18  fair?

19        **MS. FABIAN:**  That's helpful, Your Honor.  Thank you.

20        **THE COURT:**  Anything else?

21        **MR. FREEMAN:**  Thank you, Your Honor.

22     Just a logistical question purely, and we understand the

23  order.

24     In terms of opportunity for counsel to have input and

25  respond, I take it that that's something that happens before

**Exhibit 53**
**Page 377**

1    the 7th and that there's a report that needs to be submitted by

2    ORR to this Court and to us by the 7th?

3         THE COURT:  Well, so clearly what is baked into my

4    order that I just announced is that ORR needs to provide the

5    child's attorney with the information that will go into

6    whatever decision they will be making well enough before the

7    7th to give the attorney an opportunity to respond.

8         The child himself, as I said, must be given an opportunity

9    to be heard.

10        You seem to be asking is ORR required to submit a report

11   by the 7th.

12        MR. FREEMAN:  Right.  I'm not trying to be obtuse.

13   I'm just trying to figure out where does this go and who does

14   it get to and when.

15        THE COURT:  I think it's -- it can be that ORR submit

16   a report, it can be that the parties come back for a Status

17   Conference on the Tuesday after -- actually, I don't believe

18   I'm going to be -- where am I going to -- I'm not going to be

19   here.

20        I mean, we could have -- am I going to be here that

21   Friday, the 7th?  We could have a Status Conference on Friday,

22   the 7th, or ORR can provide a written report -- what would

23   be --

24        MS. FABIAN:  I will be in L.A. on the 7th.

25        THE COURT:  We could have a telephonic Status

Exhibit 53
Page 378

```
 1   Conference on the 7th.

 2       Would you rather do that or would you rather submit

 3   something in writing on the 7th?

 4       MS. FABIAN:  I believe if my client is going to issue

 5   a decision, it would make sense for us to at least submit that

 6   to opposing counsel, if not submit it to the Court, and then

 7   follow up with a Status Conference from there so that -- so I

 8   don't believe we would be able to provide that any earlier, and

 9   that way the parties could talk about what we would propose to

10   the Court happen from there.

11       THE COURT:  Okay.  So what does that mean?  Status

12   Conference on Friday?

13       MR. FREEMAN:  Friday afternoon, the 7th?  Friday

14   morning?

15       MS. FABIAN:  I guess what I'm saying is if my client

16   issues something on the 7th, having a Status Conference might

17   be premature on that Friday, only because we'll all sort of

18   review it when it's issued and then perhaps talking after that

19   to determine now that that is there, what do we believe should

20   happen next.

21       THE COURT:  Okay.  I'm somewhat hopeful -- back when I

22   worked for the Government, if I was the litigator in a case

23   like this, I would then be involved in the decision that was

24   going to be issued afterwards.  I'm hopeful that you are going

25   to be involved as well.
```

**Exhibit 53**
**Page 379**

```
 1          MS. FABIAN:  Absolutely, Your Honor.  Because I'm in

 2    court and across the country from my clients on that day and

 3    assuming it is issued that day, that would be the day -- the

 4    earliest I would then be able to discuss that with opposing

 5    counsel.  I think if we're doing that for the first time with

 6    the Court, it may be less productive in terms of seeing where

 7    the parties --

 8          THE COURT:  I assume one of two things is going to

 9    happen:  Your client will make a decision that they're happy

10    with or your client will make a decision that they're not happy

11    with.

12          And if they're not happy with it, presumably they will

13    want to seek further relief here, and if they want to seek

14    further relief here, that -- it's going to take time for them

15    to prepare their submission and all that stuff.  They're not --

16    I assume they're not going to be seeking relief on Friday

17    afternoon.

18          But I think what I would like to do is set a Status

19    Conference for Friday afternoon on the 7th at 3:00.  And if you

20    mutually decide that there is no value in having that Status

21    Conference at that time, you can move to continue it to

22    Wednesday, the 12th.

23          We have Case Management Conferences on Wednesday the 12th

24    that week; right?  Why are you looking so troubled?

25          THE CLERK:  We have four items at 1:30; one item at
```

Exhibit 53
Page 380

1    2:30.

2              THE COURT:  That's not too bad.

3         Why don't we say 2:30 on Friday the 7th, and you can move

4    it, if you want, to 2:30 on Wednesday, the 12th.

5              MS. FABIAN:  That sounds fine.

6              MR. FREEMAN:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              MR. MASS:  And is that going to be in person or

9    telephonic?

10             THE COURT:  I assume telephonic would be better.

11             MS. FABIAN:  It would need to be, yes.

12             MR. MASS:  Okay.  Thank you.

13             THE COURT:  All right.  Thank you.

14                  (Proceedings adjourned at 5:02 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Exhibit 53
Page 381

```
 1

 2

 3                        CERTIFICATE OF REPORTER

 4            I certify that the foregoing is a correct transcript

 5    from the record of proceedings in the above-entitled matter.

 6

 7    DATE:   Monday, July 10, 2017

 8

 9    Pamela A. Batalo

10    _____
      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 53**
**Page 382**

# Exhibit 54

Exhibit 54
Page 383

# EXHIBIT C TO

# DECLARATION OF ASHLEY CORKERY

## [B. Cardall Responses to RFAs]

**Exhibit 54**
**Page 384**

**S.R.E. 182**



1   PHILIP J. POGLEDICH, COUNTY COUNSEL (State Bar No. 197110)
    OFFICE OF THE COUNTY COUNSEL
2   625 Court Street, Room 201
    Woodland, CA 95695
3   Telephone: (530) 666-8172
    Facsimile: (530) 666-8279
4
    Attorneys for Defendant/Respondent BRENT CARDALL,
5   Chief Probation Officer of Yolo County
    In His Official Capacity
6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  LORENZA GOMEZ, as next friend for J.G., a        Case No. 3:17-cv-03615-VC
    minor, and on her own behalf, et al.,
12                                                    DEFENDANT BRENT CARDALL'S
              Petitioners/Plaintiffs on behalf       RESPONSES TO PLAINTIFF'S
13            of themselves individually and         REQUEST FOR ADMISSION, SET ONE
              others similarly situated,
14
        v.
15
    JEFFERSON B. SESSIONS, et al.,
16
              Respondents/Defendants.
17

18

19      PROPOUNDING PARTY:      PETITIONERS/PLAINTIFFS

20      RESPONDING PARTY:       Defendant/Respondent BRENT CARDALL, Chief Probation

21                              Officer of Yolo County, in his official capacity

22      SET NO.:                ONE

23      Defendant/Respondent Brent Cardall ("Defendant") hereby responds to Plaintiffs' Requests

24  for Admission (Set One) as follows.  All capitalized terms set forth below shall have the meaning

25  set forth in the Definitions section of Plaintiffs' Requests for Admission.

26

27

28

_____
            DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSION

**Exhibit 54**                                          **S.R.E. 183**
**Page 385**

<strong>REQUESTS FOR ADMISSION</strong>

**REQUEST FOR ADMISSION NO. 1:**

Admit that prior to August 26, 2017 the federal government sent at least seven UNDOCUMENTED TEENAGERS to YOLO.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 2:**

Admit that prior to August 26, 2017 the federal government failed to provide evidence of alleged gang affiliation with respect to at least seven UNDOCUMENTED TEENAGERS sent to YOLO within 30 days of their arrival at YOLO.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the federal government failed to provide evidence of alleged gang affiliation with respect to A.H. and J.G., the two UNDOCUMENTED TEENAGERS sent to YOLO who are named in the AMENDED COMPLAINT, within 30 days of their arrival at YOLO.

**RESPONSE:**

Defendant admits this request in part and denies it in part, as follows. The federal government provided some information on A.H.'s alleged gang affiliation on July 3, 2017, 20 days after his arrival at YOLO. The information is contained in documents that will be produced concurrently with the service of these responses (Bates Nos. 0762-67). Defendant takes no position as to whether the information provided on July 3, 2017 is sufficient to establish the alleged gang affiliation of A.H.

**REQUEST FOR ADMISSION NO. 4:**

Admit that prior to August 26, 2017 the Yolo County Probation Department could not verify gang affiliations for most of the UNDOCUMENTED TEENAGERS sent to YOLO.

2

1    **RESPONSE:**

2     Admit.

3 **REQUEST FOR ADMISSION NO. 5:**

4     Admit that prior to August 26, 2017 the Yolo County Probation Department reached out to

5 local law enforcement agencies where the UNDOCUMENTED TEENAGERS were first arrested

6 but often found corroboration of gang allegations from these agencies to be lacking or insufficient.

7    **RESPONSE:**

8     Admit.

9 **REQUEST FOR ADMISSION NO. 6:**

10    .  Admit that prior to August 26, 2017 the Yolo County Probation Department concluded it did

11 not have just cause to detain most of the UNDOCUMENTED TEENAGERS sent to YOLO.

12    **RESPONSE:**

13     Admit.  In responding to this Request for Admission, the responding party has interpreted

14 "just cause" in a manner consistent with Section 1.2.4 of the ORR Guide (describing the

15 circumstances under which it is appropriate to place a child in a "Secure Care Facility") available

16 on the internet at the following link: https://www.acf.hhs.gov/orr/resource/children-entering-the-

17 united-states-unaccompanied.

18

19 Dated: September 20, 2017

20                 By                                    

21                      PHILIP J. POGLEDICH
                     County Counsel, County of Yolo
                     Attorneys for Defendant Brent Cardall

22

23

24

25

26

27

28

                                3
DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSION

# EXHIBIT D TO

# DECLARATION OF ASHLEY CORKERY

[B. Cardall Supplemental Responses to RFAs]

**Exhibit 54**
**Page 388**

**S.R.E. 186**



1  PHILIP J. POGLEDICH, COUNTY COUNSEL (State Bar No. 197110)
   OFFICE OF THE COUNTY COUNSEL
2  625 Court Street, Room 201
   Woodland, CA  95695
3  Telephone: (530) 666-8172
   Facsimile: (530) 666-8279
4
   Attorneys for Defendant/Respondent BRENT CARDALL,
5  Chief Probation Officer of Yolo County
   In His Official Capacity
6

7

8                        UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10

11  LORENZA GOMEZ, as next friend for J.G., a      Case No. 3:17-cv-03615-VC
    minor, and on her own behalf, et al.,
12                                                  DEFENDANT BRENT CARDALL'S
              Petitioners/Plaintiffs  on behalf    SUPPLEMENTAL (CORRECTED)
13            of themselves individually and       RESPONSE TO PLAINTIFF'S REQUEST
              others similarly situated,           FOR ADMISSION, SET ONE, REQUEST
14                                                  FOR ADMISSION NO. 3
         v.
15
    JEFFERSON B. SESSIONS, et al.,
16
              Respondents/Defendants.
17

18

19        PROPOUNDING PARTY:    PETITIONERS/PLAINTIFFS

20        RESPONDING PARTY:     Defendant/Respondent BRENT CARDALL, Chief Probation

21                              Officer of Yolo County, in his official capacity

22        SET NO.:              ONE

23        Defendant/Respondent Brent Cardall ("Defendant") hereby supplements and corrects his

24  original response to Plaintiffs' Requests for Admission (Set One), Request for Admission No. 3, as

25  follows.  All capitalized terms set forth below shall have the meaning set forth in the Definitions

26  section of Plaintiffs' Requests for Admission.

27

28

_____
   DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION NO. 3

**Exhibit 54**                **S.R.E. 187**
**Page 389**

1                      **SUPPLEMENTAL (CORRECTED) RESPONSE**

2                      **TO REQUEST FOR ADMISSION NO. 3**

3    **REQUEST FOR ADMISSION NO. 3:**

4         Admit that the federal government failed to provide evidence of alleged gang affiliation with

5    respect to A.H. and J.G., the two UNDOCUMENTED TEENAGERS sent to YOLO who are named

6    in the AMENDED COMPLAINT, within 30 days of their arrival at YOLO.

7           **ORIGINAL RESPONSE:**

8         Defendant admits this request in part and denies it in part, as follows.   The federal

9    government provided some information on A.H.'s alleged gang affiliation on July 3, 2017, 20 days

10   after his arrival at YOLO.   The information is contained in documents that will be produced

11   concurrently with the service of these responses (Bates Nos. 0762-67).  Defendant takes no position

12   as to whether the information provided on July 3, 2017 is sufficient to establish the alleged gang

13   affiliation of A.H.

14           **SUPPLEMENTAL (CORRECTED) RESPONSE:**

15         Defendant admits this request as to J.G.  With respect to A.H., Defendant responds that the

16   federal government provided some information on A.H.'s alleged gang affiliation on July 3, 2017,

17   20 days after his arrival at YOLO.   The information is contained in documents produced

18   concurrently with the service of Defendant's original response to Plaintiff's First Set of Requests

19   for Admission (Bates Nos. 0762-67).  Defendant takes no position as to whether the information

20   provided on July 3, 2017 is sufficient to establish the alleged gang affiliation of A.H.

21

22   Dated: September 21, 2017

23                           By _____

24                              PHILIP J. POGLEDICH

                               County Counsel, County of Yolo

25                                Attorneys for Defendant Brent Cardall

26

27

28

                               2