CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>Jefferson B. Sessions, Attorney General, *et al.*,<br><br>            Defendants. | Case No. CV 85-4544-DMG (AGRx)<br><br>EXHIBITS IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT (VOL. 5: EXS. 61-89, PAGES 408-655, PUBLICLY FILED EXHIBITS ONLY)<br><br>Hearing: May 18, 2018<br>Time:    9:30 a.m.<br>Room:    1st St. Courthouse<br>             Courtroom 8C |

1

*Counsel for Plaintiffs, continued*

2

3

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic

4

CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic

5

University of California Davis School of Law

6

One Shields Ave. TB 30
Davis, CA 95616

7

Telephone: (530) 754-4833

8

Email: hscooper@ucdavis.edu
         ccwhite@ucdavis.edu

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

I, Carlos Holguín, do hereby declare that true and correct copies of the following documents are attached hereto:

INDEX TO EXHIBITS

| No. | Description | Page(s) |
|-----|-------------|---------|
| 1 | Declaration of the Mother of Nicolás C., February 6, 2018 (proposed to be filed partially under seal) ................................................. 1-10 | |
| 2 | Declaration of Nicolás C., February 4, 2018 (proposed to be filed partially under seal) ..................................................... 11-19 | |
| 3 | Morrison Paso Case Review re: Nicolás C., September 17, 2017 (proposed to be filed partially under seal) ................................. 20-26 | |
| 4 | Custody Order of the Immigration Judge re: Nicolás C., December 19, 2017 (proposed to be filed partially under seal)........... 27-28 | |
| 5 | Declaration of Leland Baxter-Neal, February 6, 2018 (proposed to be filed partially under seal) ..................................................... 29-34 | |
| 6 | Email from Erich Corona re: Nicolás C., January 9, 2018 (proposed to be filed partially under seal) ................................. 35-38 | |
| 7 | Declaration of James M. Owens, February 7, 2018 (proposed to be filed partially under seal) .................................................. 39-43 | |
| 8 | ORR Interim Guidance re: Custody Hearings, July 18, 2017 ............. 44-55 | |
| 9 | Declaration of Daniella Q., February 28, 2018 (proposed to be filed partially under seal) ..................................................... 56-59 | |
| 10 | Declaration of Isabella M., December 1, 2017 (proposed to be filed partially under seal) ..................................................... 60-63 | |
| 11 | Supplemental Declaration of Isabella M., February 28, 2018 (proposed to be filed partially under seal) ................................. 64-68 | |
| 12 | Declaration of the Mother of Isabella M., February 28, 2018 (proposed to be filed partially under seal) ................................. 69-75 | |
| 13 | Declaration of Victoria R., February 28, 2018 (proposed to be filed partially under seal) ..................................................... 76-79 | |

iii

14   Declaration of David I., November 30, 2017 (proposed to be
     filed partially under seal) ................................................................ 80-84

15   Supplemental Declaration of David I., February 28, 2018
     (proposed to be filed partially under seal) .............................. 85-88

16   Declaration of Eduardo A., March 1, 2018 (proposed to be filed
     partially under seal) ..................................................................... 89-93

17   Declaration of Rosa L., December 1, 2017 (proposed to be filed
     partially under seal) ..................................................................... 94-97

18   Supplemental Declaration of Rosa L., February 28, 2018
     (proposed to be filed partially under seal) ............................ 98-100

19   Declaration of Gabriela N., December 1, 2017 (proposed to be
     filed partially under seal) ........................................................ 101-104

20   Supplemental Declaration of Gabriela N., February 28, 2018
     (proposed to be filed partially under seal) ........................... 105-108

21   Declaration of Arturo S., February 28, 2018 (proposed to be
     filed partially under seal) ........................................................ 109-112

22   ORR Form Notice of Placement in a Restrictive Setting,
     February 5, 2018 ...................................................................... 113-115

23   ORR FAQ: July 2017 Bond Hearings for Unaccompanied Alien
     Children (UAC) ....................................................................... 116-118

24   ORR FAQ: ORR Directors Release Decision, January 26, 2018 ..... 119-121

25   Letter from Carlos Holguín to Office of Immigration Litigation,
     December 19, 2017 ................................................................... 122-129

26   Email from Sarah Fabian re: Flores Meet and Confer
     Discussion, January 12, 2018 ................................................. 130-131

27   Letter from Leecia Welch to Office of Immigration Litigation
     re: Psychotropic Medications, and Attachments, January 16,
     2018 (proposed to be filed partially under seal) ................... 132-161

28   Letter from Carlos Holguín to Office of Immigration Litigation,
     February 16, 2018 .................................................................... 162-164

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

29   Email from Sarah Fabian re: Flores Meet and Confer
     Discussion, March 2, 2018 ............................................................ 165-168

30   Declaration of Javier C., November 15, 2017 (proposed to be
     filed partially under seal) ............................................................. 169-173

31   Declaration of Carlos A., November 16, 2017 (proposed to be
     filed partially under seal) ............................................................. 174-177

32   Declaration of Miguel B., November 16, 2017 (proposed to be
     filed partially under seal) ............................................................. 178-181

33   Declaration of Luis D., November 15, 2017 (proposed to be
     filed partially under seal) ............................................................. 182-192

34   Declaration of Andrés D., July 11, 2017 (proposed to be filed
     partially under seal) ..................................................................... 193-197

35   Declaration of Jorge E., July 11, 2017 (proposed to be filed
     partially under seal) ..................................................................... 198-205

36   Declaration of Gustavo H., July 11, 2017 (proposed to be filed
     partially under seal) ..................................................................... 206-210

37   Declaration of Roberto F., July 11, 2017 (proposed to be filed
     partially under seal) ..................................................................... 211-220

38   Declaration of Natalia T., November 21, 2017 (proposed to be
     filed partially under seal) ............................................................. 221-223

39   Declaration of Ricardo U., November 21, 2017 (proposed to be
     filed partially under seal) ............................................................. 224-226

40   Declaration of Sofia O., December 1, 2017 (proposed to be
     filed partially under seal) ............................................................. 227-231

41   Declaration of Gloria P., December 1, 2017 (proposed to be
     filed partially under seal) ............................................................. 232-235

42   Declaration of Edwin B., March 1, 2018 (proposed to be filed
     partially under seal) ..................................................................... 236-242

43   Letter from Carlos Holguín to Cynthia Nunes Colbert, *et al.,* re:
     Legal Representation for Specified Class Members, March 12,
     2018 (proposed to be filed partially under seal) ........................... 243-246

44   Declaration of Samuel W., October 26, 2017 (proposed to be filed partially under seal) ................................................................. 247-250

45   Declaration of Jaime V., October 26, 2017 (proposed to be filed partially under seal) ........................................................ 251-254

46   Declaration of Mateo X., October 26, 2017 (proposed to be filed partially under seal) ................................................................. 255-256

47   Declaration of Mario Y., October 26, 2017 (proposed to be filed partially under seal) ........................................................ 257-260

48   Declaration of Maricela J., November 30, 2017 (proposed to be filed partially under seal) ................................................................. 261-264

49   Declaration of Teresa K., November 30, 2017 (proposed to be filed partially under seal) ................................................................. 265-268

50   Declaration of Diego E., January 16, 2018 (proposed to be filed partially under seal) ................................................................. 269-273

51   Declaration of Daniel F., March 21, 2018 (proposed to be filed partially under seal) ................................................................. 274-278

52   Declaration of Alejandro G., March 21, 2018 (proposed to be filed partially under seal) ................................................................. 279-285

53   Transcript of Testimony of James De La Cruz, *Saravia v. Sessions*, Case No. 3:17-cv-03615-VC (N.D. Cal. June 29, 2017), Dkt. No. 28 ................................................................. 286-382

54   Defendant Brent Cardall's Responses to Plaintiff's Request for Admission, Set One, *Saravia v. Sessions*, Case No. 3:17-cv-03615-VC (N.D. Cal. Sept. 20-21, 2017), Dkt. No. 61-3 ................ 383-390

55   Declaration of Camila G., April 3, 2018 (proposed to be filed partially under seal) ................................................................. 391-396

56   Patient Profile – Active Medications of Victoria R., January 9, 2018 (proposed to be filed partially under seal) ............................ 397-398

57   Patient Profile – Active Medications of David I., November 27, 2017 (proposed to be filed partially under seal) ............................... 399-400

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

58    Patient Profile – Active Medications of Rosa L., July 31, 2017
      (proposed to be filed partially under seal) ........................................ 401-402

59    Medication Information and Reconciliation and Over-the-
      Counter Medication Release Forms for Isabella M., September
      28-29, 2017 (proposed to be filed partially under seal) ................... 403-405

60    Medication Information and Reconciliation Form for Gabriela
      N., September 7, 2017 (proposed to be filed partially under
      seal) ..................................................................................................... 406-407

61    Medication Information and Reconciliation Form for Sofia O.,
      September 18, 2017 (proposed to be filed partially under seal) ....... 408-409

62    Yolo County Juvenile Detention Facility Parental Medical
      Authorization Form for Julio Z., December 14, 2016 (proposed
      to be filed partially under seal) ........................................................ 410-411

63    Patient Profile – Active Medications of Julio Z., December 12,
      2016 (proposed to be filed partially under seal) .............................. 412-413

64    Declaration of Julio Z., November 13, 2017 (proposed to be
      filed partially under seal) .................................................................. 414-424

65    Declaration of Sister of Victoria R., March 13, 2018 (proposed
      to be filed partially under seal) ........................................................ 425-431

66    Declaration of Proposed Sponsor of Victoria R., March 13,
      2018 (proposed to be filed partially under seal) .............................. 432-435

67    Declaration of Grandfather of Gabriela N., March 15, 2018
      (proposed to be filed partially under seal) ........................................ 436-441

68    Custody Order of the Immigration Judge re: Santiago H.,
      February 21, 2018 (proposed to be filed partially under seal) .......... 442-443

69    Order of the Immigration Judge with Respect to Custody re:
      Santiago H., March 20, 2018 (proposed to be filed partially
      under seal) .......................................................................................... 444-446

70    Email from Toby Biswas re: Santiago H. Follow Up, February
      23, 2018 (proposed to be filed partially under seal) ........................ 447-449

71    Case Review re: Santiago H., November 29, 2017 (proposed to
      be filed partially under seal) ............................................................ 450-452

72    ORR Information Memo re: Community Safety Initiative for
      the Unaccompanied Alien Children Program, August 16, 2017 ...... 453-457

73    Declaration of John Doe 1, *John Doe 1 v. Shenandoah Valley
      Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH,
      (W.D. Va. Jan. 17, 2018), Dkt. No. 34-1 ........................................ 458-464

74    Declaration of John Doe 2, *John Doe 1 v. Shenandoah Valley
      Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH,
      (W.D. Va. Jan. 5, 2018), Dkt. No. 34-2 .......................................... 465-471

75    Declaration of John Doe 3, *John Doe 1 v. Shenandoah Valley
      Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH
      (W.D. Va. Jan. 5, 2018), Dkt. No. 34-3 .......................................... 472-478

76    Declaration of D.M, *John Doe 1 v. Shenandoah Valley Juvenile
      Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va.
      Jan. 2, 2018), Dkt. No. 34-5 ........................................................... 479-484

77    Declaration of R.B., *John Doe 1 v. Shenandoah Valley Juvenile
      Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va.
      Jan. 8, 2018), Dkt. No. 34-6 ........................................................... 485-490

78    Transcript of Jonathan White, *Saravia v. Sessions*, Case No. 18-
      15114 (9th Cir. Oct. 27, 2017), Dkt. No. 9-2 .................................. 491-548

79    Exhibit 1 to Appellees' Request for Judicial Notice, *Saravia v.
      Sessions*, Case No. 18-15114 (9th Cir. March 16, 2018), Dkt.
      No. 20 ............................................................................................... 549-555

80    Stipulated Settlement Agreement, *Flores v. Reno*, Case No.
      CV 85-4544-RJK(Px) ...................................................................... 556-584

81    Declaration of Justin Mixon, October 19, 2017 ............................. 585-591

82    Email from Sarah Fabian re: Correspondence re: Legal
      Representation for Flores Class Members, March 23, 2018 ............ 592-594

83    Letter from James De La Cruz to Flores Counsel re:
      Psychotropic Medications, April 2, 2018 (proposed to be filed
      partially under seal) ........................................................................ 595-601

viii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

84      Individual Service Plan – Residential Treatment for Victoria R.,
        Shiloh Treatment Center, Inc., December 26, 2017 (proposed to
        be filed partially under seal) ............................................................ 602-606

85      Declaration of Lorelei Alicia Williams, previously filed in this
        case in Docket No. 239-2, August 5, 2016 ...................................... 607-618

86      Declaration of Megan Stuart, previously filed in this case in
        Docket No. 239-2, August 1, 2016 .................................................. 619-646

87      Declaration of Carlos Holguín, April 10, 2018 ............................... 647-649

88      ORR Authorization for Medical, Dental, and Mental Health
        Care for Carlos A., July 31, 2017 (proposed to be filed partially
        under seal).......................................................................................... 650-652

89      Declaration of Carter White, April 14, 2018, attaching Shiloh
        Treatment Center Consent to Medical Care Form ........................... 653-655

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of April, 2018, at Santa Clarita, California.

Respectfully submitted,

Carlos Holguín

/s/ Carlos Holguín

# Exhibit 72

Exhibit 72
Page 453



ADMINISTRATION FOR
# CHILDREN & FAMILIES
330 C Street, S.W., Washington, DC 20201 | **www.acf.hhs.gov**

**Information Memo**

**TO:**       Domestic Policy Council

**FROM:**   Department of Health and Human Services, Administration for Children and
            Families, Office of Refugee Resettlement

**DATE:**    August 16, 2017

**SUBJECT:** Community Safety Initiative for the Unaccompanied Alien Children Program

## ISSUE

This memorandum provides an overview of the Community Safety Initiative being undertaken
by the Office of Refugee Resettlement to address concerns regarding gang involvement by
former unaccompanied alien children.

This memo is for your information only and does not ask you to take any action.

## BACKGROUND

The Office of Refugee Resettlement (ORR) is responsible for receiving in its custody all
unaccompanied alien children (UAC)  referred by the Department of Homeland Security (DHS)
within 72 hours of referral, and providing each child received with care consistent with law.
ORR is required by statute and the *Flores* Settlement Agreement to place each child in the least
restrictive setting consistent with the child's individual requirements and, if possible, identify a
responsible adult, or sponsor, to provide care for the child prior to the UAC's immigration court
proceedings.

In recent months, there has been public and congressional concern with the Mara Salvatrucha, or
MS-13, Central American street gang in American communities, and the involvement in that
gang of some individuals who were previously in the ORR UAC Program. This followed outcry
at murders committed by MS-13 members, particularly in the Suffolk County, Long Island, area,
as well as other U.S. communities including the Washington, D.C., and Houston metropolitan
areas. Rep. Peter King, whose district includes Suffolk County, has raised the issue of the
number of MS-13 members on Long Island who entered the United States as UAC, and on July
28, the President gave a speech about MS-13 in Suffolk County. ORR has actively responded to
this concern with policy and procedural changes aimed at reinforcing community-safety
protections in the program.

Exhibit 72
Page 454



ADMINISTRATION FOR
CHILDREN & FAMILIES

330 C Street, S.W., Washington, DC 20201 | **www.acf.hhs.gov**

UAC who are determined to pose a danger to themselves, to others in communities, or pose a flight risk are placed by ORR in secure or staff secure facilities. Secure facilities are ORR's most restrictive level of care, with staffing and infrastructure comparable to juvenile criminal justice facilities, and are in fact state or local juvenile halls to which ORR has awarded contracts or grants to provide secure UAC custody. Staff secure programs are programs with higher levels of staffing to manage UAC who for reasons of self-harm, disruptive behavior, criminal history, or flight risk are not suitable for residential shelter programs, but do not currently require secure-level care.

## DISCUSSION

The great majority of UAC in ORR custody do not pose a safety risk to the public and are not affiliated with gangs. Many UAC come to the United States to escape violence and gangs in their home communities. On June 9, 2017, ORR reviewed of the UAC in its secure and staff secure facilities. From that review, ORR determined that of the 138 UAC in those facilities on June 9, 35 were voluntarily involved with gangs. Four additional UAC had reported that they had been forced into gang participation. In the context of the nearly 2,400 UAC in ORR custody on that date, this means that gang members were approximately 1.6% of all UAC in care.

However, while the proportion of UAC who have gang affiliation is small, ORR recognizes the importance of planning and programmatic interventions to manage that sub-population in a way that does not compromise the program and does not put American communities at risk.

## Community Safety Initiative

In the current Administration, ORR has initiated a Community Safety Initiative, a comprehensive review of program policies and procedures from the lens of the safety of American communities into which UAC are reunified with sponsors.

As elements of the unfolding Community Safety Initiative, ORR has made a number of policy and procedure changes made to date. These include:

- **No current gang members are eligible for release to a sponsor from the program.** UAC with gang history upon attaining their 18th birthday are transferred to DHS Immigration and Customs Enforcement (ICE) for detention as adults. In some cases, such as Bond Hearings or habeas lawsuits, courts may order UAC released despite ORR decision to retain UAC in care.

- **All UAC identified as having current or past gang affiliation are placed in secure facilities**. There, further assessment occurs to verify the gang affiliation and determine the dangerousness of the UAC. UAC may be stepped down to staff secure or other level of care based on the evaluation in secure settings.

Exhibit 72
Page 455



ADMINISTRATION FOR
CHILDREN & FAMILIES

330 C Street, S.W., Washington, DC 20201 | www.acf.hhs.gov

- **ORR's Deputy Director for Children's Programs and the ORR Director now review and approve releases from secure or staff secure facilities.**

- **ORR is working on a Memorandum of Agreement (MOA) with DHS to improve existing processes of consultation on the suitability of releases from secure and staff secure facilities, and on the suitability of sponsors.** At present, 24 hours prior to release of a UAC from ORR custody, ORR notifies DHS of the sponsor's identity, location, and relationship to the child, and asks for DHS input regarding safety of the release for the child and the community. ORR again notifies DHS 24 hours after the minor's release. In the MOA discussions, ORR and DHS are reviewing how the two departments communicate to strengthen ORR's decision-making on releases of UAC at higher risk of violence or criminal activity in the community where they are placed with a sponsor.

- **ORR instituted a policy of notification to local authorities of release from secure and staff secure facilities.** Another goal of the Community Safety Initiative is increased coordination with and support for local authorities in communities in which UAC are released to sponsors. In July, ORR made a policy change to allow notification of local authorities when UAC from secure and staff secure facilities are released in their communities. ORR is currently working through requirements for implementation of this policy, which it expects to implement in the fall.

- **Programs are adding the GREAT gang prevention program to their curricula.** ORR is also focusing on interventions while minors are in ORR custody designed to help prevent later gang involvement post-release. A specific gang prevention program for youth recommended by the Department of Justice's Office of Juvenile Justice and Delinquency Prevention (OJJDP), the Gang Resistance Education and Training (GREAT) curriculum, is being piloted in facilities. ORR anticipates expansion of the GREAT program to other ORR residential care facilities based on lessons learned from the pilot.

- **Gang prevention resources are being added to post-release services.** ORR is also undertaking to increase the protections against gang involvement by UAC that can be incorporated into safe discharge and post-release services for those UAC who receive post-release services. ORR has partnered with DHS to deliver DHS-provided trainings to ORR's post-release services providers on how to identify MS-13 and other gang colors and signs, as well as whom to notify if providers become aware of gang activity.

- **ORR field staff is integrating with local anti-gang task forces.** Some ORR Federal Field Specialists have begun attending local and regional anti-gang task forces to strengthen partnerships with law enforcement and stay informed about MS-13 and other gang activity in their areas. ORR is actively participating in the interagency gang task force on Long Island, and is in the process of expanding this effort, including current

Exhibit 72
Page 456



ADMINISTRATION FOR
CHILDREN & FAMILIES

330 C Street, S.W., Washington, DC 20201 | **www.acf.hhs.gov**

outreach efforts to Northern Virginia and Texas gang task forces.

- **ORR is in direct contact with Suffolk County, NY, Police Commissioner Sini.** In the case of Suffolk County, New York, the ORR Director has been in personal contact with Suffolk County Police Commissioner Timothy Sini on a number of occasions. ORR has assisted Suffolk County police with their investigation of MS-13 members by providing information on who, among gang suspects identified by local police, have come through the ORR UAC Program. The Suffolk County Commissioner in turn has agreed to inform ORR whether gang involvement began before, during, or after time in ORR care, if that information surfaces during local investigations. ORR is working to inform Suffolk County of releases of UAC into that community. Following the President's speech about MS-13 at Suffolk County police academy on July 28, the Commissioner was quoted in a Fox News report describing response from ORR as "encouraging."

- **ORR is in the process of expanding its secure bed capacity**. At present, ORR has 58 secure beds nationwide, in two juvenile justice facilities: one operated by a regional criminal justice consortium in Virginia, and the other operated by a county in California. Due to increased numbers of domestic apprehensions, particularly from DHS enforcement operations targeting gang members, as well as ORR's new policies regarding initial designation to secure beds of all UAC with past or present gang affiliation, additional secure beds are required. ORR is in the process of obtaining additional secure beds by a new contract mechanism.

Exhibit 72
Page 457

# Exhibit 73

Exhibit 73
Page 458

# **EXHIBIT 1**

Exhibit 73
Page 459

## DECLARATION OF JOHN DOE 1

I, John Doe 1, declare and state the following:

1.  I am 17 years old.  I was born in Tamaulipas, Mexico.

2.  I came to the United States right after I turned 15. I believe it was in August.

3.  I was taken into custody by immigration authorities as soon as I crossed the border.  I was sent to BCFS in San Antonio, Texas, and I stayed there for a few months until I was transferred to Mercy First, a treatment center in New York, for psychological issues.

4.  After a short time in New York, I was transferred to NOVA, a staff secure facility in Virginia.  Then I was sent to Shenandoah.

5.  I was detained at Shenandoah for over a year and a half, from April 2016 to December 2017.

6.  I have been diagnosed with depression and other disorders, and I take medications for them.  I think they increased the dosage of my depression medication when I came to Shenandoah.  At first it made my symptoms worse, and I didn't feel like getting out of bed or doing anything, but then I got used to it.

7.  For most of my time at Shenandoah, I was placed in Alpha Pod.  It is for kids who have misbehaved.

8.  We would get points awarded for good behavior and points taken away for bad behavior.  If you had all of your points at the end of the week, you could buy things like toothpaste and soap.  I regularly got points taken away for things like not wanting to work on the mural in art class, complaining about a headache, or throwing a ball that hit the ceiling in the gym.

9.  At Shenandoah, my room had a mattress, a sink, and a toilet.  There is no wall or divider

1

Exhibit 73
Page 460

in the room, and the staff could see into the rooms through a window in the door. The kids would sometimes put a piece of paper over this window so people couldn't see them using the toilet, but the staff would remove it. One time a staff member stood at my doorway and watched me use the bathroom.

10. While I was at Shenandoah, staff members would make fun of me on a daily basis. They would call me names such as "pendejo" and "onion head," and do things like drop my clean towel on the dirty floor in front of me. They were always trying to provoke me.

11. I once became so frustrated by a staff member's repeated mocking that I pushed the staff member. In response, four staff members shoved me to the floor and piled on top of me, and they began hitting me in my abdomen with their elbows. I had a lot bruises from this.

12. There are American and Latino kids at Shenandoah. The Latino kids are treated differently than the American kids.

13. Staff frequently refused to allow us to watch Spanish shows on the TV in our pods. They would tell us they didn't care what we wanted and didn't care that we were Latino.

14. On one occasion, I got into a fight with one of the American kids after he had taunted me and told me that he "hates Latinos". When staff broke up the fight, I was grabbed and thrown forcefully to the ground, but the other kid was just held by the arms and pulled away. I was then restrained, tied to a chair, and hit several times by staff members while I was tied to the chair. I was left tied to the chair in my room for four hours.

15. They tied me to a chair about five times while I was at Shenandoah. My hands, legs and chest were tied to the chair. On some occasions they put something over my head. It had small holes that I could see out of, but only a little.

16. I was assaulted by Shenandoah staff on many occasions while I was detained there, and

2

several times while I was tied to a chair. On one occasion, I was hit in the face and scratched by a staff member while I was restrained. I developed a black eye and bruising from this.

17. On another occasion, I asked to come inside during gym because I had a headache. Staff suspected, for no apparent reason, that I may have found a piece of glass outside. I was thrown to the ground and searched, and my clothes were shredded. Though they found nothing, staff transferred me to Alpha Pod after this incident.

18. I saw other kids being hit by staff too. I once tried to defend another kid when a staff member was hitting him. As a result, the other kid and I were both stabbed by the staff member with a pen.

19. Another time, a staff member entered my room when I didn't want him to and provoked a fight. The staff member hit me, and I bit the staff member. Thereafter, the staff member beat me, leaving me with bruises on my neck and arms. A supervisor took photographs of my injuries. I have asked for these photos repeatedly, but staff members have never given them to me.

20. After this incident, I was placed in cha-chas (handcuffs). I was forced to wear handcuffs on my wrists and shackles on my feet for approximately 10 days in a row. During this time, the handcuffs were only removed when I was sleeping or eating alone in my room.

21. The handcuffs are very tight, and they often left bruises and cuts on my wrists after they were taken off. I complained about this and showed my injuries to the staff, but they took no action.

22. At Shenandoah, I was also placed on restriction a lot. This happened whenever kids would act out or hit the staff, or if they hurt themselves. When you are restricted, you are largely

3

Exhibit 73
Page 462

in your room and you can't leave.  When you are outside your room, staff place you in handcuffs.  I have been restricted in my room for several days at a time. I was only allowed to leave my room for classes.

23. Soon after I arrived at Shenandoah, I began to hurt myself.  I would cut my wrists with a piece of glass or plastic, whatever I could find.  I would sometimes bang my head against the wall or the floor because I was angry and sad.

24. Staff members saw the scars on my wrists and knew I was hurting myself. They told me they didn't care. Sometimes I would lose points or be placed on restriction for hurting myself.

25. One time I cut myself after I had gotten into a fight with staff. I filled the room with blood. This happened on a Friday, but it wasn't until Monday that they gave me a bandage or medicine for the pain.

26. I had never cut myself before I came to the United States.  I learned this from other kids while I was detained.

27. On August 21, 2017, I tried to kill myself.  I tied part of a curtain around my throat.  Staff found me, and they responded by taking away all of my clothes and placing me on restriction for several days.

28. I was angry that I was at Shenandoah for so long, and I didn't want to be there anymore.  I would throw food down the toilet because I couldn't eat it.  I would feel sick and dizzy.

29. I had the urge to cut myself frequently, and expressed a desire to kill myself.

30. In December 2017, I was transferred back to NOVA.  It's better here.  I don't know how long I will be here or whether I will be transferred back to Shenandoah.

4

31. This statement has been prepared in English but it has been read to me in Spanish by a bilingual interpreter.

32. I declare, under penalty of perjury, that all the information I have provided here is true and correct to the best of my knowledge, and I am aware of the legal consequences of making a false declaration.

Executed this 17th day of January, 2018, in Alexandria, Virginia

_____

John Doe 1

5

# Exhibit 74

Exhibit 74
Page 465

# **EXHIBIT 2**

## DECLARATION OF JOHN DOE 2

I, John Doe 2 :, declare and state the following:

1. I am 16 years old. I was born in Reynosa, Mexico.

2. I came to the United States when I was ten months old. I lived with my mom in Macallen, Texas until I was sixteen. While living in Macallen, I attended school. I was about to finish ninth grade when I was taken into custody by immigration authorities.

3. One day in 2017, I was driving with some friends. The driver of the car was pulled over, and the police searched our car. They asked for identification, and no one had any, so they called immigration.

4. I was then arrested, and taken to a shelter in Harlingen, Texas. I stayed at the shelter in Harlingen for approximately two months.

5. While I was staying at Harlingen, I tried to escape, but I did not succeed. I was then transferred to BCFS, a staff secure facility in San Antonio, Texas.

6. I felt safe at BCFS. I played soccer, was treated well by staff, and enjoyed visits from my family.

7. While I was staying at BCFS, I saw a doctor who told me I had ADHD, depression, and anger management issues. The doctor gave me Prozac, Trazodone, and two other medications, which I was told are used for my mood and concentration.

8. Sometimes I would get in trouble with the staff at BCFS because other kids would pick on me and I would defend myself. I got in verbal fights with other kids a few times, and once I tried to hit a kid. The staff restrained me, and took me to the floor.

9. I was feeling very angry and very sad during this time. I started to harm myself. I cut my wrists.

1

10. Because of my anger, I was taken to see a doctor at a hospital or a rehab place. I stayed there for about twenty days, before I was taken back to BCFS.

11. Shortly after I returned to BCFS, I was transferred to Shenandoah. I had been at BCFS for about three months. I was told I was "going to a better place," but I knew I was being transferred to juvenile.

12. I arrived at Shenandoah on September 30, 2017. I did not see a doctor when I arrived, but my medications came with me. I am still taking them.

13. Soon after I arrived at Shenandoah, I met my case manager, Emily. She told me I had been transferred to Shenandoah because of behavioral issues. She also told me that if I'm good for 30 days, they'll send a request for a transfer.

14. I was assigned to live in Alpha Pod. I was told by staff and other kids that people who behave badly go to Alpha Pod.

15. I feel very sad at Shenandoah. I do not have many privileges. A few months ago I cut myself again, but I haven't done it in a while.

16. I am not allowed outside of the building at all. I have not been outside since I've been here. We have gym class, but it is always indoors.

17. In addition to gym, I take math, science, and art. My favorite class is art. I don't like my other classes. They aren't interesting because they are too easy. The teachers teach things I learned in elementary and middle school. I never took a test here to measure my grade level.

18. Generally, they teach class in Spanish. Sometimes they teach in English. Spanish is my native language, but I understand English very well because I lived most of my life in Texas.

2

19. Some of the staff here are nice, they'll joke around with you. Some are all mean. They

tell you do this, do that. Some of them are bilingual, but a lot of them are not.

20. I often overhear staff members insult me and other kids in English, thinking we cannot

understand them. If you don't know Spanish, they will talk shit. They will say,

"Hispanics, they don't know nothing, they just come to our country," and tell the kids

they're stupid, make fun of them for not understanding English. I was the only one who

understood what they were saying because I am the only federal kid who speaks English.

21. The staff will say things behind the kids' backs, but in a way that the kids can hear them.

I became very frustrated, so I started to tell the other kids what the staff was saying about

them in English. The staff got very mad at me for this and took away my points.

22. I have complained about the staff being racist. I submitted a report and Mr. K, the

director, came to talk to me about it.

23. There are local kids and federals (immigrant kids) at Shenandoah. We don't interact with

the local kids at all but we see them in the hallways and pass by the pods where they live.

They have different privileges and they are treated differently. They can go outside

more, staff is friendlier to them. They get Xboxes in their pods and they have computers

in their classrooms. I have said things to the staff about it, but no changes have been

made. We want to be treated equally, like the locals. They shouldn't look down on us for

not having papers.

24. It feels bad to be here. I get really angry. I'm frustrated about being locked up, and I

miss my family.

25. One time, about one or two months ago, I was mad and I said, "Fuck school and fuck this

place" during class, and the staff removed me from the program. They took me to my

3

room. I told them I didn't want to go, and I was resisting it – I wasn't letting them grab me. They put the handcuffs on me. When I kept resisting, they drew me to the wall and put my face in the wall. Once I was inside my room, they took the handcuffs off. They kept me in my room for four hours and overnight.

26. After that I started to behave bad a lot. I got removed from the program a lot. I was placed on restriction for dumb things, like trying not to go to class, joking around with other kids, or for saying bad words to a teacher.

27. If you lose two points in a day, you don't go outside your room. During the night shift, you don't leave your room. So if you are placed on restriction you're in your room from the time when you are removed from the program, and through the night until the next day.

28. If you are behaving bad, resisting the staff when they try to remove you from the program, they will take everything in your room away – your mattress, blanket, everything. They will also take your clothes. Then they will leave you locked in there for a while. This has happened to me, ad I know it has happened to other kids too.

29. One time I was kept in my room for a day and a half. I had tried to swing at a staff member. I was pushing back, so they called a 1033 for backup. When the other staff came, they put me to the floor. They used force to push me inside my room, and then they put the handcuffs on me.

30. There's this chair, and they brought it outside my room. It has wheels on so it can be moved. They put me in the chair, strapped my arms and legs down, and put something over my face. It's a white thing with small holes in it. You can see and breathe out of it. They told me they were putting it on so I couldn't spit, but I hadn't tried to spit.

4

31. When I was strapped to the chair, they took the handcuffs off and they brought the chair
to another room.  I don't know how long I stayed there, but it was maybe 30 or 40
minutes.  After that I was brought back to my room.  This was during the evening, and I
was kept in my room for the next day and a half, until the morning of the day after.  They
took away my mattress, blanket, and shirt for the first few hours, and then they brought
them back.

32. When I get frustrated sometimes I talk back to staff and insult them, and I get removed
from the program.  When this happens, the staff will sometimes use force to restrain me.
They will grab my hands and put them behind my back so I can't move.  Sometimes they
will use pens to poke me in the ribs, sometimes they grab my jaw with their hands.  They
are bigger than me.  Sometimes there will be three or four of them using force against me
at the same time.

33. The force used by staff has left bruises on my wrists, on my ribs, and on my shoulder.
The doctor here gave me ibuprofen for the pain.

34. I have been good for the past 44 days, and I haven't been removed from the program.
They told me they sent a request for a transfer, and that it generally takes 60-90 days, but
they didn't tell me why.

I declare, under penalty of perjury, that all of the information I have provided here is
correct and complete to the best of my knowledge, and I am aware of the legal consequences of
making a false declaration.

Executed this 5th day of January, 2018, in Staunton, Virginia

John Doe Z

5

# Exhibit 75

Exhibit 75
Page 472

# EXHIBIT 3

## DECLARATION OF   JOHN DOE 3

I,  John Doe 3    , declare and state the following:

1. I am 15 years old. I was born in Honduras.

2. I left Honduras because I was being persecuted by the "18 gang" who threatened to kill me.

3. My girlfriend and I fled to Guatemala and then travelled to Mexico.   My girlfriend wanted to go back to Honduras, but I told her that I couldn't, because the gang was going to kill me.

4. With a friend, I took buses and jumped on trains through Mexico to get to the United States. It took us something like 25 days to get to the US border from Mexico.

5. I was picked up by immigration right after I crossed the border. I was placed at a house in Texas and then moved to a house in San Antonio, where I stayed for about a month. I was then moved to a center called BCFS where I stayed for about two weeks. After that, I was moved to Shenandoah.

6. To get to Shenandoah, they put me on three planes. I kept asking where I was going but they never told me. It took a long time and put me in a bad mood.

7. They said the reason for the moves from place to place was because I was a member of MS-13. I told them I was not part of anything.

8. When we landed at the airport, a grey van was waiting to transport me to Shenandoah. They put cuffs on my hands that were connected to a belt around my waist and put cuffs on my feet. When I asked them why they put us in handcuffs, they said that everyone

1

Exhibit 75
Page 474

who is transported here gets handcuffs. I threw a fit. I asked what was going on and

kicked a chair. They put handcuffs on my hands and legs.

9. At Shenandoah, I was put in restriction for any little thing. I was put in restriction many

times; more than 10. They restrict me when I get angry and send me back to the pod. I

get angry because of the things they do.

10. On one occasion, going to art class, I held the door open so everyone could enter. A staff

member yelled at me for doing this, and I asked him why he was yelling at me and

bringing his anger here. In response, the staff member lunged towards me, and I

crouched down to avoid him. He fell and then restrained me, putting my hands behind my

back and slamming my face into the wall. I maneuvered my way out of the hold and

asked, "what is happening"? Then two staff members slammed my body to the ground

and, when they picked me back up, shoved me against the wall again.

11. After this, they put me in restriction in my room. They took away my mattress and my

blanket and left me only in my boxers. I was left in my room all day without clothes and

it was very cold. I did not get the mattress and blanket back until 9:00 that night. I did

not get my clothes back until the next morning.

12. On another occasion, I moved the TV in the pod so that the light wouldn't hit it and we

could see better. A staff member came over and took a point away from me for that and

put me in restriction. Whenever I was put in restriction, they took away my mattress and

blanket. They took my clothes away about 8 times.

13. About four times when they put me in restriction, staff put cuffs on my hands and my feet

inside my room. The cuffs were very tight and left marks on my wrists. One night in

2

particular I couldn't sleep well because of the pain in my wrists. When I was cuffed, staff also hit me. They came into my room and started hitting me.

14. One time I got angry when staff sent me to my room. I hit the door with my fist and my hand started bleeding. Staff then they put cuffs on me and I was strapped to a chair with a belt. I was just in my boxers. I was there for definitely more than half an hour. I was crying. Staff said that they did it to calm me down. No one did anything for my bleeding hand.

15. Another time I put paper over the window in the door to my room for privacy. A lot of staff came into the room with plastic shields and swarmed over me. A large staff member put all his weight on me. I had scratches and bruises all over my arms.

16. Staff members take away points without telling me. When I ask how many points I have, they tell me 4 to 5 points less than I have. That makes me mad. I ask the supervisor why they do this and say that they are messing up. They don't give me an answer. I think they do things to make me angry so that I will hit them and then charges will be pressed and I will get a longer sentence.

17. Staff take away points for little things. They take away points when I don't want my food and give it to a friend. Some staff take away points when you don't raise your hand.

18. I feel like people here are racist. The American kids are treated differently. For example, an American kid asked for chapstick and got it immediately. I asked for Vaseline for my lips which were chapped and hurting. I got it eventually but not immediately.

19. The pods for the American kids are very different than the pods for the Hispanic youth. Bravo and Echo, the pods for the American youth, have soft chairs, X-boxes all week

3

Exhibit 75
Page 476

and I-pods.  The immigrant youth have steel chairs, no I-pods and have X-boxes one to three times a week.

20. We get special food, like Burger King and pizza, on Tuesdays.  My Honduran friends who arrived this past Saturday did not get the special food on the following Tuesday, but the American kids who also arrived on that Saturday got the special food.

21. Staff is disrespectful to us.  When I asked a friend to ask a staff member why the staff member was taking away so many points, the staff member said to my friend, "tell that Hispanic guy to tell me in English".

22. If something hurts, I can see a doctor.  But I don't get medicine until much later than I ask for it.  I get very strong headaches, that are so bad that they make me cry.  Many times when I ask for medicine I have to wait a long time.  When I had a stomach ache, I did not get medicine until a week after I asked for it.  Then it was pointless.

23. We got six vaccinations at a clinic.  I do not know what the shots were for.  They had us in hand and leg cuffs the entire time we were in public.  People stared at us.

24. I am taking medications for anger and to help me sleep.  I would like calcium and iron supplements but they refused to give them to me.

25. I have been on good behavior for three months.  I should have been stepped down after 30 days of good behavior.  I am upset that I haven't been stepped down.  I will talk to my case manager about that.

4

Exhibit 75
Page 477

26. I want us to be treated as human beings.

This statement has been prepared in English but has been read to me in Spanish by a bilingual interpreter. I declare, under penalty of perjury, that all the information I have provided here is correct and complete to the best of my knowledge. I am aware of the legal consequences of making a false declaration.

Executed this 5 day of January, 2018, in Staunton, Virginia

JOHN DOE 3

5

Exhibit 75
Page 478

# Exhibit 76

Exhibit 76
Page 479

# **EXHIBIT 5**

Exhibit 76
Page 480

### DECLARATION OF D.M.

I, D.M., declare and state the following:

1. I am 20 years old. I currently live in San Antonio, Texas.

2. I was born in Honduras, and I came to the United States when I was 15. I was taken in by immigration authorities when I crossed the border, and then I was in ORR custody for about three years.

3. I arrived at Shenandoah in 2014, around the last week of May. I was at Shiloh Treatment Center before that.

4. At first the people transferring you don't tell you they're going to take you to jail – all they do is tell you you're going to another placement. But then they handcuff you, and put a big heavy bag on your right or left leg. Once you have the handcuffs and the big bag, you know you're going to jail.

5. I was told I was sent to Shenandoah because I was too aggressive, supposedly because I had had physical issues with staff more than three times in one week. But I never had a chance to dispute this, and I was only told the reason for the transfer after I arrived there.

6. When I was at Shenandoah, there was a lock-in (secure) part and a staff secure part of the facility. I was in the lock-in part for 8 months, and then I was stepped down to the staff secure part for about 3 months.

7. The rules at Shenandoah were really strict. There was one hour when you had to read a book. The guards had to see your eyes moving back and forth on the page, and if they didn't, they would put you on restriction in your cell.

8. One day, it was reading time, and there was this kid who was quiet but wasn't looking at his book like he was supposed to. This guard – I forgot his name, but he was a big guy,

1

Exhibit 76
Page 481

he used to be an NFL player – he was really strict and he used to be mean to everyone. He asked the kid why he wasn't looking at his book. The kid responded and said he wasn't causing any trouble or anything. The guard told him to shut up. The kid got up and said, "I'm sorry, sir." And the guard grabbed him by the shirt and pushed him away. Then the kid felt disrespected, so he got mad and he punched the guard. In response, the guard grabbed the kid and tackled him, and slammed him to the floor. The guard put his whole weight on top of him. He had his elbow on the kid's chest and had his other arm pinning the kid down. He took his time calling a 1033 on his radio (for backup). There was a group of us watching this, and we didn't think it was necessary for the guard to treat the situation as he did.

9.  It's easy for the guards to write incident reports – you did this, you did that, you disrespected me – but they never hear the kid's side of the story. My voice was never heard. They never came and talked to us about what was going on inside of us. A kid starts suffering as soon as Border Patrol gets them. They're all scared of being sent back home or being sent to jail.

10. I didn't feel like I belonged there. I never threatened staff members. I wasn't affiliated with a gang in my home country or anywhere else. I was terrified there.

11. There were both federals (immigrant kids) and local American kids at Shenandoah, and there were differences in the way they were treated. The locals were able to have a roommate, while federals have to have cells by themselves. The guards would joke with the local kids about the federals, telling them that the federals were in their cells alone because they raped someone or because they had sexual problems (HIV, stuff like that). I

2

Exhibit 76
Page 482

overheard them talking like this in the gym, and I understood because I was the only one

who spoke English.  The guards are adults, and they were supposed to be there for us.

12. The guards at Shenandoah also put down the federals, calling them wetbacks.  They used

that word because they know it's insulting.  Most of the kids don't even understand

what's being said about them because the staff doesn't speak Spanish.

13. The guards would also mock us by trying to speak Spanish.  They would say "Vamonos!

Vamanos!" with a smirk on their faces.

14. Before I came to Shenandoah, I had been diagnosed with post-traumatic stress disorder,

major depressive disorder, and bipolar disorder.  I didn't meet with a psychologist until

about a month and half after I had arrived there.  I went in with medication from Shiloh,

but I didn't receive any meds until a month and a half in, when I met with the

psychologist.  What did they do with my meds? What did they think, they I didn't need

them in secure?

15. I had a lot of issues there because of my mental disorder.  Whenever I was in crisis – if I

was trying to hurt myself inside my cell, or saying things to someone no one could see –

they would drag me out of my cell and put me in the restraint chair.  All I could see was

them running for the chair.

16. Whenever they used to restrain me and put me in the chair, they would handcuff me.

Strapped me down all the way; from your feet all the way to your chest, you couldn't

really move.  Handcuffs would have been enough.  Once you're strapped down, they

have total control over you.

17. They also put a bag over your head.  It has little holes; you can see through it.  But you

feel suffocated with the bag on.

3

Exhibit 76
Page 483

18. When you're in a crisis, the bag is the least helpful thing – it's scary, you know. And they don't do it in a nice way. They don't explain what they are doing; they just grab the left side of your head and they force it over you. You can't move to resist. The first thing that came to my head when they put it on me was, "They are going to suffocate me. They are going to kill me."

19. They had me in that chair for a good hour, but they don't check the time. They don't check if blood is flowing through your veins. I feel like they should have to do a 20-minute check to make sure it's not too tight, it's not hurting you, or whatever. There is a guard there with you, but they never checked on me.

20. I saw two other cases, besides me, where kids had to be put in the chair. It was when the guards had break up a fight. I never had a fight in that place. I was placed in the chair when I was having a mental crisis.

21. Every time I was in crisis, they put me in the chair. The guards never did anything less extreme than that. They would call for help from a psychologist only after I was strapped down. They would wait for like 45 minutes or an hour to call though.

I declare, under penalty of perjury, that all the information I have provided here is correct and complete to the best of my knowledge, and I am aware of the legal consequences of making a false declaration.

Executed this 2nd day of January, 2018, in San Antonio, Texas

_____

D.M.

4

# Exhibit 77

Exhibit 77
Page 485

# **EXHIBIT 6**

## DECLARATION OF R.B.

I, R.B., declare and state the following:

1. I am 18 years old.  I am currently living in Corpus Christi, Texas, with my mom.

2. I am originally from Guatemala, but I came to the United States with my mom when I was young.

3. When I was 13, I got picked up by immigration authorities.  I had run away from home and I was living in Rio Grande City at the time.

4. I stayed in a sorting facility for one night, and then I was sent to Nueva Esperanza, a staff secure facility in Brownsville, Texas.  From there I was moved to a juvenile facility in Newark, New Jersey.  I stayed there for about two months, but I started losing it.  I was sad because I hadn't seen my mom in a long time.  I had a lot of anger problems, and it was really hard.

5. I told the guards I wanted to hurt myself, and they sent me to Sandy Pines, a hospital in West Palm Beach, Florida.  The guards at Newark told me they were sending me away because I needed help, and they didn't have the right resources there.

6. A few months later, I was sent to Shenandoah because of behavioral problems.  I lit a piece of toilet paper on fire using lead from a pencil.  I burned it in the sink, right under the faucet, and I put it out in a matter of seconds.  I wasn't trying to start something, I was just showing off.  I also got into a fight with my roommate that night.  Two or three days later, they told me I was being transferred.  They didn't tell me where I was going.  I was 14 at the time.

7. I was at Shenandoah for a little over three months.  After being there for two months, I escaped while I was being transported to a doctor's office.  I was so sad, I felt worthless

1

Exhibit 77
Page 487

and I didn't feel like I had anything to live for.  In Shenandoah, they locked me in a room that was 8x10, or maybe 8x16, for 23 hours a day, all by myself.  It's not good for a person to be isolated that long.  I started talking to myself.

8.  I wasn't myself after that.  When I left home I was just a little boy, but being there changed me. I'm not optimistic any more.  Even now, my mom tells me that I changed a lot, that I'm not the same person.  I rarely go out with friends.  I just spend time with my family now.

9.  When I was at Shenandoah, at least once a week, I had to fight – with a guard, another kid, or anybody who wanted to fight me – because I was so angry.  They didn't tell me anything about what was going on with my case or when I was going to leave.  Not knowing anything month after month drove me crazy.

10.  When I got in fights, the guards at Shenandoah would grab my arms and put them behind my back. They would cross my elbows and put pressure on them.  Then they would fold my knees and push me down.  It hurt, so I fought back to relieve the pressure.  I told them, "If you just let me go a little bit, I'll calm down," but they wouldn't do it.

11.  When they couldn't get one of the kids to calm down, the guards would put us in a chair – a safety chair, I don't know what they call it – but they would just put us in there all day.  This happened to me, and I saw it happen to others too.  It was excessive.

12.  At other detention facilities where I had been, the staff would treat us differently when we were angry.  They would tell me to calm down and then slowly let me go, and then they would take me to my room so I could punch a wall or something.  The guards at Shenandoah would say, "calm down, calm down" and I would say "I just got punched in the face, why you want me to calm down?"  And then they would put me in the chair.

2

13. I was put in this chair 4-6 times I guess.  The longest time I was in it was probably half a day, or two shifts. I was really mad that time.  I was young, I had a lot of problems.

14. The chair is painful.  Imagine a little rocking chair with straps for your head, elbows, legs, feet; you could turn your head a little from side to side, but you can barely move it in.  It's a metal chair that has two little wheels in the back, so they can lean it back and transfer it, like a dolly.

15. This is embarrassing, but on one occasion, I had to pee, and they wouldn't let me, so I just went on myself.  I know one or two other kids this happened to as well; they peed on themselves while they were in the chair.

16. One time they put a mask on my face because I spit on the guard when I was strapped down.  I know now that was bad, but you have to understand there was nothing you could do, except move your head back and forth, while you were in the chair.  The mask is like a white veil I guess, or a net for your hair – it has a million little holes in it.  You can see through it and breathe through it.

17. I also got placed on room restriction a lot.  If me and another minor got into a fight, they'd put us on room restriction for 3, 4, 5 days at a time.  When you were on room restriction, when they woke you up at 6 or 7 am, they'd take your mattress away, and wouldn't give it back until room checks at the end of the day.  They would leave you in your room with nothing but a book and a Bible, but no mattress – so you can't sleep, because you would just be laying on the concrete.  I started talking to myself and banging my head against the wall.  I felt like I was going crazy, and I would do anything to get the guard's attention.

3

18. The guards never picked fights with me, but I saw it happen with other kids. They would say things to them and challenge them until the kids got really mad and fought back. Then the kids would push the guard, and then the guard would grab both of the kid's arms and try to force them into a restraint. The guards were twice the size of the kids, who were 13 or 14 years old, but they would use their full weight to push them to the ground.  Sometimes it was two guards doing this to a little kid.

19. Before I was at Shenandoah, I had been diagnosed with ADHD and prescribed medications for it, but that was it.  When I came to Shenandoah, they told me I had bipolar disorder and PTSD.  At first I didn't even take medicine, but they made me think I needed it – sleeping pills, Seroquel, and a bunch of others.  They keep you drugged there.

20. Now I just take melatonin to help me sleep, nothing else.  I don't need any anti-psychotic drugs.

21. I declare, under penalty of perjury, that all the information I have provided here is true and correct to the best of my knowledge, and I am aware of the legal consequences of making a false declaration.

Executed this 8th day of January, 2018, in Corpus Christi, Texas

_____

R.B.

4

Exhibit 77
Page 490

# Exhibit 78

Exhibit 78
Page 491

WHITE - DIRECT EXAMINATION / MURLEY

```
 1                    P R O C E E D I N G S

 2    OCTOBER 27, 2017                              12:56 P.M.

 3                        ---oOo---

 4          THE COURT:  All right.  Ready to call your next

 5    witness?

 6          MS. MURLEY:  Yes, your Honor.  Our next witness is

 7    Jonathan White from ORR.

 8          MS. MASS:  Just a question for the Court.  Would you

 9    prefer that we reserve any objections and present them as

10    Mr. Schenker did?

11          THE COURT:  I think that worked out very well.  Thank

12    you.

13          MS. MASS:  Thank you.

14                    JONATHAN WHITE,

15    called as a witness for the defendants herein, having been duly

16    sworn, testified as follows:

17          THE WITNESS:  Yes, ma'am, I do.

18          THE CLERK:  Please be seated.

19       Please state your name clearly and spell your name for the

20    record.

21          THE WITNESS:  My name is Commander Jonathan White.

22    That's J-O-N-A-T-H-A-N, W-H-I-T-E.

23                    DIRECT EXAMINATION

24    BY MS. MURLEY:

25    Q.   Good afternoon, Mr. White.  Where are you currently
```

1  employed?

2  **A.**   I'm an officer in the United States Public Health Service

3  Commission Corps and I am stationed at the U.S. Department of

4  Health and Human Services, Administration for Children and

5  Families, Office of Refugee Resettlement.

6  **Q.**   And in that, what is your current job title?

7  **A.**   I'm posted as the Deputy Director for Children's Programs.

8  **Q.**   And how long have you been in that position?

9  **A.**   I've only been in that position since the 9th of January,

10  although I have been at the Administration for Children and

11  Families since 2010 and have worked on unaccompanied alien

12  children issues for ACF since 2012.

13  **Q.**   And in your current role, what are your current -- what

14  are your day-to-day duties?

15  **A.**   I'm the senior career, as opposed to political appointee,

16  person for --

17          **THE COURT:**  Can you pull the microphone a little bit

18  farther away --

19          **THE WITNESS:**  Sure.

20          **THE COURT:**  -- from your face?  Thank you.

21          **THE WITNESS:**  Is that better?

22          **THE COURT:**  Great.  Thanks.

23  **A.**   I'm the senior career person for the Unaccompanied Alien

24  Children Program.  I manage the three divisions under that

25  program.

 1      I ensure that the program has sufficient capacity to

 2   respond to the number of UAC referred every day by DHS and that

 3   all of the staff who work in the program have the resources

 4   they need to execute the policies of ORR.

 5   **Q.**   And you mentioned three divisions in that that you manage?

 6   **A.**   Correct.

 7   **Q.**   And what are those?

 8   **A.**   The first is the Division of Unaccompanied Children

 9   Operations, which oversees all of the different grant funded

10   shelter and other programs nationwide.

11      The second is the Division of Health for Unaccompanied

12   Children, which oversees public health and medical services for

13   children in our care.

14      And the third is the Division of Planning and Logistics,

15   which is the emergency management function of the program and

16   plans for surge events.

17   **Q.**   And what qualifications do you have that qualify you for

18   your current job?

19   **A.**   I'm a licensed clinical social worker.  I'm an emergency

20   manager.  And my professional training and background is as an

21   emergency manager specializing in the needs of children.

22      And I have a professional background in trauma informed

23   human services for children and vulnerable populations.

24   **Q.**   Are you familiar with the October 11th, 2017 letter from

25   ORR Director E. Scott Lloyd to the mother of F.E., a plaintiff

1  in this case?

2  **A.**   I am.

3         **MS. MURLEY:**  Your Honor, I have copies of this

4  document.  Part of it was submitted in the record, but not the

5  whole thing.

6         **THE COURT:**  Okay.

7         **MS. MURLEY:**  I don't have a properly redacted

8  version.  I'm going to meet-and-confer with plaintiff's

9  counsel and get that on the record probably Monday.

10         **THE COURT:**  Okay.

11         **MS. MURLEY:**  And it's Defendants' Exhibit 7.

12         **THE COURT:**  Okay.

13      (Defendants' Exhibit 7 marked for identification)

14         **THE COURT:**  So this is everything that accompanied

15  the letter that was to the mother?

16         **MS. MURLEY:**  Yes, your Honor.

17         **MS. MASS:**  Do you have one for yourself?

18         **MS. MURLEY:**  I do.  Give me one second.

19      (Brief pause.)

20  **BY MS. MURLEY**

21  **Q.**   Mr. White, do you recognize this document?

22  **A.**   I do.

23  **Q.**   Is this the letter that was sent to F.E.'s mother by

24  Director Lloyd?

25  **A.**   Yes.  This is the official Letter of Denial that was sent

1  to the mother of the child, who I understand in court we're

2  referring to as F.E., and in our system this would be a Letter

3  of Denial of Category 1 Sponsor.

4  **Q.**   And what is your level of familiarity with that document?

5  **A.**   I was involved in the decision-making process which

6  resulted in the creation of this document and I assisted in the

7  drafting of the document.

8  **Q.**   And what is the information that Director Lloyd would have

9  received in order to make this determination?

10 **A.**   So the determination rests on a range of different sources

11 of information.  These include the school records from the high

12 school that the UAC attended while he was living in the

13 community.  Also, court and police materials produced by --

14 provided to us by Suffolk County Police Department, as well as,

15 of course, the record of his time in care with us since his

16 referral by DHS.

17 **Q.**   And specifically talking about referral, when a UAC such

18 as F.E. is referred to ORR custody from DHS, what is the

19 initial intake process?

20 **A.**   So the initial intake process for any UAC would be that

21 our intakes desk, which is staffed 24/7 365, would be contacted

22 by the referring federal agency.  That's typically Customs and

23 Border Protection or Immigration and Customs Enforcement.  Far

24 more often the former than the latter.

25      The DHS referring agency then provides, typically

WHITE - DIRECT EXAMINATION / MURLEY

 1   electronically, information referring the child to our care.

 2   Intakes receives that information and makes an initial

 3   recommendation as to the appropriate level of care in our

 4   system, which includes determinations about the level of

 5   restrictiveness of the setting.

 6       That decision is -- is reviewed by a federal field

 7   specialist, which is a federal -- a federal official with a

 8   regional responsibility to confirm that in the case of those

 9   placements, such as that that would apply in the case of F.E.,

10   where that initial designation is to a more restrictive level

11   of care than our standard shelter setting.

12   Q.   And so ORR relies initially on information from DHS to

13   make that initial placement?

14   A.   We must rely on the information that we receive in that

15   initial referral.  I think -- I think it's well known in the

16   context of this case that we have a 72-hour statutory time

17   frame during which we must receive the child, but in practice

18   the referral process must be very rapid.  And we do rely on the

19   information provided by the referring agency for initial

20   designation.

21       I'm sure we'll talk about this more, but initial

22   designation is only the first in a series of administrative

23   decisions that ORR makes affecting the appropriate level for

24   the child in care consistent with our legal requirement to have

25   children in the least restrictive setting consistent with their

```
 1   needs and the needs of the program with regard to the safety of
 2   other UAC in care.
 3   Q.   When you say "level of care," what does that mean?
 4   A.   We have a number of different types of residential
 5   facilities --
 6           THE COURT:  And I'll just interrupt and say that I'm
 7   familiar with the different grades of residential facilities
 8   and what they involve, so you can skip that.
 9   BY MS. MURLEY
10   Q.   So in this case, F.E. was placed in an initial -- a secure
11   facility?
12   A.   He was placed in a secure facility at his initial
13   placement based on information that he had a current gang
14   affiliation as provided by DHS and other potential indications
15   of danger.
16           MS. MASS:  Your Honor, I'm sorry to interrupt Ms.
17   Murley, but just in the interests of time, my understanding was
18   that this witness was being brought to testify about the
19   supplemental information that was added just recently and so
20   I -- I don't know what the scope is.
21           THE COURT:  I don't have any objection to testifying
22   to something beyond that, but what I do not want is what
23   occurred on direct examination of the last witness, which is
24   largely a repeat of what's already in the submissions.
25           MS. MURLEY:  Okay.  Understood.
```

1      **THE COURT:**  All I want this to be the testimony

2  adding to the information that's already been placed in the

3  record.

4      **MS. MURLEY:**  Okay.  Thank you, your Honor.  I

5  understand, your Honor.

6  **BY MS. MURLEY**

7  **Q.**   When in this process does ORR begin to identify a suitable

8  sponsor?

9  **A.**   For any UAC, whether they come in as a secure -- the very

10 small percentage that come in with initial designation as

11 secure or UACs at other levels of care, for every UAC the

12 identification of a sponsor begins when they first arrive in

13 our care and is a continuous process throughout the time that

14 they spend in our care; that we identify a viable sponsor and

15 proceed to the case management process for reunification

16 wherever possible.

17 **Q.**   Now, for a UAC that had previously been in ORR's care that

18 had a sponsor fill out that information, why would his previous

19 sponsor have to fill out a second reunification package if that

20 was the identified sponsor?

21 **A.**   Because the information may have changed.  So let me --

22 let me just explain that for a minute.  So consistent --

23      **THE COURT:**  Sorry to interrupt.  Can you ask the

24 question again?  I want to make sure I understood that

25 question.

1    **BY MS. MURLEY**

2    **Q.**   For a UAC in ORR custody, like F.E., who had previously

3    been released from ORR custody, why would a -- his previous

4    sponsor have to fill out a second reunification package?

5    **A.**   So consistent with sort of the challenges of the child

6    welfare work involved in the sponsor case management process,

7    sponsor suitability is not a lifetime situation.  That's not

8    true -- that's true in our program.  It's true in any child

9    welfare context in the country.  Individuals become more or

10   less suitable to provide what in our case is a standard, which

11   is to meet the emotional and financial needs to support the

12   child.  That is a -- that is a variable set of facts.

13       Now, we have some UAC who we've previously reunified where

14   the sponsors come back to us.  We call them re-referrals or

15   second referrals.  In most cases that is not a result of a

16   criminal apprehension, in this case, but that is one of the

17   ways that that can happen.

18       The reason that we are required to go through the

19   reunification process, including the submission of the family

20   reunification application by the sponsor, is because the facts

21   may have changed with regard to suitability.

22       And, in fact, as a general rule, when a UAC comes back to

23   us, something has happened.  Most UAC don't come back to us.

24   But those that do, it's generally because something has

25   happened regarding the suitability of the sponsor.  And in

1  the -- in terms of the child welfare realities of children in

2  the care in the community, much may have changed.

3      Among the things, for example, that we have to reassess

4  are the -- the household composition may have changed.  We do

5  vetting and background check of every adult in the household

6  and it may that be there is a new adult living in the household

7  who was not living in the household a year ago or two years ago

8  or two-and-a-half years ago when we reunified the child.  It

9  may be that the employment circumstances for the adult has

10 changed.  It may be that the adult now is involved in a

11 relationship with -- with someone else who poses a threat to

12 the child.  It may be that the adult has new and problematic

13 behaviors that didn't exist there before.

14     So there are a whole host of reasons that we would not

15 simply re-reunify a child.

16     We do work with sponsors that we've previously reunified a

17 child with to facilitate their getting that application in.

18 And there are certain elements of what they submit that are

19 enduring facts, such as relationship verification.  If we

20 already determined you're the biological mother of a child, we

21 don't need to reinvestigate that biological maternity.

22     But there are many facts which may have changed and we do

23 have to go through the process.

24 **Q.**  How often are -- after the initial placement in your care,

25 are placement decisions made?

 1  **A.**    I'm sorry.  Say it again?

 2  **Q.**    Once a UAC enters your care and say, like, F.E. ends up in

 3  a secure facility, how often are placement decisions made

 4  whether or not that individual needs to be stepped down or

 5  stepped up to different levels of care?

 6  **A.**    Sure.  So for any UAC in our physical custody and care

 7  there is an ongoing process of evaluation about whether

 8  step-down is appropriate, if they are in a restrictive setting

 9  like secure or staff secure.  We are required to do that within

10  30 days and we do that within 30 days.

11       Because due to the policy where we have -- we are now

12  receiving more initial designations to secure on the basis of

13  allegations of gang affiliation, we've determined internally

14  that for those UAC, we really want our internal standard to be

15  faster than the 30 days that's in the policy.  Because if we

16  determine that that child doesn't require secure, that's a long

17  time in secure if they don't need secure.

18       So our internal aspirational goal is to do that as quickly

19  as possible, and we strive to do that in five days.  That's not

20  a policy, but that's our analysis of the fastest, just

21  logistically, that the processes can be done.

22       So for the staff that work on that in our grantee

23  programs, we do strive to complete that evaluation to determine

24  whether they should be stepped down in those initial days

25  following the designation of secure.

WHITE - DIRECT EXAMINATION / MURLEY

1   **Q.**   And is the placement decisions that are ongoing, is that

2   a -- is that separate from the reunification --

3   **A.**   Yes.

4   **Q.**   -- process?

5   **A.**   Yes.  That's a separate decision-making process, although

6   they weigh some of the same factors.

7       So there are multiple sort of decisions that we're talking

8   about here.  The first is the initial designation decision.

9   That's made at the point of intakes.  In that decision we have

10  really generally access to the least information of all of the

11  administrative determinations we're going to make.  We have

12  really in most cases what's in the referral.

13      Then we have for those who are referred to secure, our

14  preliminary evaluation that we try to make within those first

15  few days following placement in secure.  We have more

16  information for that.

17      For any UAC who is in secure, staff secure, we have a

18  30-day review.  It's a recurring 30-day review to determine

19  their current requirements.

20      And then, of course, separate from all of those is the

21  decision regarding release.  That is itself a decision with two

22  different dimensions.  For the vast majority of UAC and care

23  the issue is only the suitability of a sponsor.  For those UAC

24  who are in secure or staff secure settings or have been in

25  secure or staff secure settings, there is a second

1    determination about the safety issues to ensure that their

2    release does not create a community safety hazard.  But that is

3    a separate decision from the decision about levels of care

4    while in our system.

5    **Q.**  As part of the reunification process, does ORR require a

6    home study be done?

7    **A.**  A home study is required in some cases.  There are three

8    triggers for a home study --

9            **THE COURT:**  Sorry.  Let me interrupt again.

10           **THE WITNESS:**  Sorry.

11           **THE COURT:**  If you could keep the microphone away,

12   back from you a little bit?

13           **THE WITNESS:**  Yes, sir.

14   **A.**  Some UAC require a home study as a matter of statutory

15   requirement under TVPRA.  We call those TVPRA mandated.  That,

16   for example, includes UAC who have a disability or UAC who

17   have -- who have experienced human trafficking, or UAC where

18   there is some evidence of significant risk to safety of the

19   child from the parents.

20       There are also UAC who require home study, who are what we

21   call ORR policy mandated.  These are certain populations that

22   we have learned are at greater risk and so although it's not a

23   TVPRA required home study, this includes, for example, UAC who

24   are going to what we call a category three sponsor -- that's an

25   unrelated adult or distant relative -- if that sponsor has ever

1    attempted to sponsor another UAC, because that's a potential

2    trafficking flag.

3         And, third, in some cases we do discretionary home studies

4    where the case manager and others working on the case determine

5    that there are just some concerning elements that would require

6    a home study.

7    **Q.**   And how often does it -- what is the time frame for

8    completing a home study?

9    **A.**   It varies, but it's generally in the weeks.  It really

10   depends, in part, on the backlog awaiting home study based on

11   how many referrals we have received, but a period of weeks is

12   normal.

13   **Q.**   And once a home study is complete, what is the next steps

14   in the reunification process evaluation?

15   **A.**   So when we have the completed FRA, which is the

16   application submitted by the sponsor, have completed a home

17   study, if required, have vetted the sponsors through the

18   appropriate background checks, that would involve a CAN

19   check -- so a check with the states where the sponsor has

20   resided to see if they have any reports of child abuse and

21   neglect -- a public records based background check, and for all

22   by a few sponsors a fingerprint background check.  We conduct

23   an FBI fingerprint background check on every sponsor, except

24   parents, if there are no other red flags.  So all non-parent

25   sponsors and any parent where there is any other red flag, we

 1  would be required to do an FBI fingerprint background check.

 2      When those processes are completed, if we have all of that

 3  information that's required to make that determination, the

 4  case manager, that is an employee of the sheltering facility

 5  where the child is housed, that would make an initial

 6  recommendation of that reunification.  That then goes to a case

 7  coordinator.  That's an employee of a third-party contract that

 8  we have that reviews those.

 9      If it is approved at that level, it then goes to the

10  federal field specialist.  And I can probably go quickly

11  through that because I know all about the role of federal field

12  specialist from Jim De La Cruz.  For those who have not been in

13  secure or staff secure that then is the last hurdle.

14      Under our policy that went in effect on June 12th of this

15  year, for those who have secure and staff secure as part of

16  their history, they then go from that level to me.  It's

17  reviewed at my level and typically we often find at that point

18  that additional information may be required.

19      When I have had a chance to review it, I then brief our

20  Director on it.  And release -- a final approval of a release

21  for a UAC from secure or staff secure requires Director level

22  approval.

23  **Q.**  So I'd like to turn to the decision in front of you --

24          **THE COURT:**  Before we get to that, can I have some

25  follow-up questions?

1          **THE WITNESS:**  Yes, sir.

2          **THE COURT:**  You made reference to re-referrals and

3    you said that -- you identified a few reasons why a re-referral

4    might occur, some change in -- a variety of different potential

5    changes in circumstances.

6          First of all, re-referral, is that a term that you all

7    regularly use in doing your jobs or is that just your way of

8    describing this?

9          **THE WITNESS:**  Yes, your Honor.  That's a term of art

10   that we use.  It's not in policy, but we talk about it

11   informally in the workplace.  We generally talk about

12   re-referrals or second referrals.

13         **THE COURT:**  Okay.  And can you give me a sense of how

14   common it is for there to be re-referrals?

15         **THE WITNESS:**  So I don't have statistics on it.  I

16   would describe it as not uncommon.

17         Certainly, it's a minority case, but it's not uncommon and

18   it is generally the result of some family systems problem.  It

19   most commonly occurs when either the UAC runs away from the

20   sponsors and -- or the sponsors themselves either have domestic

21   legal sort of criminal justice involvements or may -- or may

22   have removal issues, or it happens because through the child

23   welfare system of the state, for example, a sponsor has been

24   involved in abuse of the child.  The child is harmed in some

25   other way.  And then if that child then gets back sort of on

1    DHS's federal radar, then they can be returned to our care.

2         **THE COURT:**  Okay.  So I'm going to ask this question

3    generally and it may be not amenable to a general answer, so

4    please don't hesitate to tell me that.

5         How do these -- how does the potential need for a -- how

6    does the -- how does the re-referral generally come to your

7    attention, or how does the potential need to revisit the

8    sponsorship or the placement typically come to your attention?

9         **THE WITNESS:**  So ORR -- we don't go out and take

10   reunified -- kids that we've reunified back into our care, for

11   example.  In that way we are -- in that way the parallelism for

12   the state child welfare system isn't there.

13        Here is how this would happen.  Intakes, when they

14   received a referral and entered them in would be flagged and

15   say:  Hey, this kid -- looks like this kid has been with us

16   before.  And that would be -- it would be an initial

17   designation, that we would identify it that way through our own

18   administrative process.

19        **THE COURT:**  So the only time that you will be

20   revisiting the placement is if somehow somebody delivers the

21   child to you again?

22        **THE WITNESS:**  Yes, sir.  That's right.  And that

23   would have to be a federal agency and it is almost always

24   either Customs and Border Protection or ICE.

25        **THE COURT:**  Okay.  And so -- so it sounds like from

1   what you're saying -- please correct me if I'm wrong, but

2   putting together what you've said so far, it sounds like what

3   you're saying is that these federal agencies might bring you

4   these kids based on allegations of criminal conduct or gang

5   affiliation or allegations that they have been abused or that

6   they have run away and that the -- and the feds have taken

7   custody of them again, or you mentioned changed circumstances

8   from -- with the -- the adult in the household.  Like, how

9   would that come to ORR's attention?

10          **THE WITNESS:**  So, just so I'm clearer.  Those are the

11   reasons that we -- once those UAC are referred back to us, it's

12   why we go through our whole process again.  I understand that

13   that seems, like, counterintuitive.  Why would you do that?

14   You've already looked at this once.

15       We have to look at it again because these -- we have to

16   look at it again because the facts may have changed.  Plenty of

17   times it -- we re-reunify someone with the same sponsor, but we

18   go back.  We have to go back and do the -- and check on them.

19   It cannot simply be that we go:  Oh, we know who the sponsor is

20   because it's the same one.  It's the same one as in 2014.

21       That was how I understood that question.

22          **THE COURT:**  No, that's helpful.  But in each case

23   it's because the child has been delivered to you again.

24          **THE WITNESS:**  That's right, sir.  We don't get to --

25   we really don't have a say in which kids come to us.  And when

 1   I'm giving sort of the five sentence version of what we do, I

 2   say are two -- the two requirements we have that regards --

 3   that regard intakes in our program is, first, we have to take

 4   all the UAC who are referred to us and we must accept them into

 5   care within 72 hours of referral and place them in a setting

 6   consistent with their needs.

 7        So, yes, they come -- they would come to us as a

 8   consequence of some other federal agency apprehending them

 9   again.

10        What -- the cases sort of in the class that the -- the UAC

11   in the class that are talked about in this case, though, are

12   not the whole universe or even the majority of the universe of

13   re-referrals.  Most re-referrals come to us because ICE may

14   have apprehended a parent or something else may have happened

15   or the UAC has run away and then gets re-apprehended that way.

16        So this Operation Matador environment, that's not in any

17   way sort of the whole universe of re-referrals.

18             THE COURT:  What -- does it ever happen that ORR

19   comes to learn that there may be some problem in the household?

20   So it's not -- not in a situation where the child is delivered

21   to ORR's custody, but just, you know, you've placed a child

22   somewhere and then you later learn that there is a problem in

23   the household that may require the child to be removed from it.

24   I mean, does that ever happen?

25             THE WITNESS:  Yes, sir.  That happens often.  And if

 1    I can sort of explain that process, it may be helpful to you.

 2              THE COURT:  Yes.

 3              THE WITNESS:  So because we have a National Call

 4    Center that every UAC and every sponsor -- every UAC formally

 5    in our care and every sponsor has access to and because -- and

 6    because some UAC also receive post-release services, we do

 7    sometimes have what we call notification of concern.  And this

 8    is we learn after we've reunified a child with a sponsor, that

 9    something dangerous to the child is going on.

10         Depending on the nature of that danger, we then would

11    notify either the Child Protective Services authority that has

12    competent authority for the state where the child lives or ICE,

13    HSI.  So, for example, if we learn that the child is in a

14    trafficking situation, we would notify HSI.  If we learn that

15    the child may be being abused by a parent and more sort of

16    traditional family abuse, physical or sexual family abuse, then

17    we would notify CPS.

18              THE COURT:  And then to the extent you know -- I

19    mean, I assume when you notify a local CPS, they go through

20    whatever normal process they have to evaluate whether there is

21    something that requires removal of the child from the

22    household.

23         What about when you notify HSI of something that may be

24    happening, an allegation of trafficking or, you know, there's,

25    you know, a report that the -- the adult sponsor is engaged in

 1    criminal activity or something like that.  What do you know

 2    about what HSI does then in response to that?

 3          THE WITNESS:  I don't know a great deal about it

 4    because we're not a law enforcement agency, but from some cases

 5    where they do report back to us, you know, they would

 6    investigate that consistent with, you know, any report that

 7    they would get from other sources.

 8          THE COURT:  And so in a situation like that, you will

 9    never reinitiate the assessment of the propriety of the

10    placement?

11          In other words, you only do that when a minor is delivered

12    to your custody, but you -- you won't do a re-initiation of the

13    assessment of the propriety of the placement merely upon being

14    informed -- merely upon receiving a notification of concern?

15          THE WITNESS:  We don't have the legal authority to

16    take UAC back into care unilaterally.  And that's something --

17          THE COURT:  Are you saying that you don't have the

18    authority to reinitiate on your own the, you know, home

19    assessment or the -- revisit the determination that you made

20    previously to place an unaccompanied minor in a particular

21    household based simply on receiving a notification of concern?

22          THE WITNESS:  That's right, sir.  Once -- once we've

23    reunified the child with a sponsor and it is -- this is

24    something that HHS has opined -- had to opine to Congress about

25    often, I will say.  So the position that HHS has always taken

1  is it is our understanding that we do not have the legal

2  authority to go out and take a child into custody ourselves.

3       We do have the authority and the mandated reporter

4  responsibility to advise other entities, state and federal, if

5  we learn of anything that is dangerous to a child we've

6  reunified.  And I take that responsibility very seriously.  But

7  we do not have the authority to take kids back into care on our

8  own and we don't.

9            THE COURT:  And so when you get these notifications

10  of concern, do you ever investigate them or do you kind of pass

11  them on to CPS or HSI?

12            THE WITNESS:  It really depends on the circumstances.

13  There are some circumstances where we might investigate them

14  because they might affect the safety of other UAC in care.

15       But we're not an investigative authority.  We're not a law

16  enforcement agency.  So we might investigate, for example,

17  if -- if we believe that in some way someone had, for example,

18  used fraudulent documents in our system.  We would want to look

19  into that in partnership with OIG and FBI and others to

20  understand are there vulnerabilities in our system?  Did

21  someone make a mistake somewhere?

22            THE COURT:  But I'm trying to see -- I understand the

23  idea that you may not have the authority to go out and take a

24  child after you've placed the child, but what would stop you

25  from -- you know, we're talking about these -- I want to make

 1    sure I get my terminology right -- home studies.

 2            **THE WITNESS:**  Sure.

 3            **THE COURT:**  So it sounds like sometimes you will

 4    place a child with a sponsor without conducting a home study.

 5            **THE WITNESS:**  The majority of cases it's without a

 6    home study.

 7            **THE COURT:**  So let's say, you know, you get this --

 8    you get a notification of concern regarding what might be

 9    happening in the home of a child that you've placed.  What --

10    what would stop you from -- I understand you can't go out --

11    maybe you can't go out and seize the child, but what would stop

12    you from conducting a home study at that point, if you've

13    been -- if you have cause for concern that it may no longer be

14    appropriate for the child to be in that home?  Anything that

15    would stop you from doing that?

16            **THE WITNESS:**  It's something that we don't do because

17    once we have reunified the child, that is the state child

18    welfare authority's -- that's their space to operate.  And if

19    we -- if we -- no, we don't do that.

20        And if someone sort of on my team, for example, were to

21    suggest that as a great idea, I would be very opposed to that

22    idea because I would worry that we would compromise the ability

23    of child welfare authorities in communities, to keep kids safe

24    in the communities.  And that's -- that's their piece of the

25    puzzle.

 1          THE COURT:  Thank you.

 2          THE WITNESS:  Yes, sir.

 3   BY MS. MURLEY

 4   Q.   So back to the decision.  Prior to this decision -- one

 5   second.  Let me get my thoughts.

 6        (Brief pause.)

 7   Q.   What was your role in this decision?

 8   A.   So my role in any secure or staff secure release review is

 9   that I take a -- the information that is provided to me by the

10   federal field supervisor and signed off on by the federal field

11   supervisor's -- excuse me, that's prepared by the federal field

12   specialist and signed off on by the federal field supervisor.

13   That comes to me.  I review all of those documents and look to

14   make recommendation to the Director.

15        Now, in this case, partly following the experience that we

16   had in the prior A.H. case, this F.E. case came during a period

17   of time where we had begun expanding, being more robust in how

18   much we were willing to look into and behind information that

19   we received.

20        So when this case came to me, I determined that we really

21   did not have enough closer-to-the-ground information; that we

22   needed to know more from the community where he had been

23   living.  So I directed --

24          THE COURT:  Could I interrupt real quick?  You're

25   talking about A.H. now?

1        **THE WITNESS:**  Now I'm talking about F.E.

2        **THE COURT:**  Okay.  Sorry.

3    **A.**   I think for -- agency-wise A.H. was for us, among others

4    things, an understanding that -- that we probably needed to

5    intensify our efforts to dig into information having to do with

6    gang affiliation as best we could, given that we're not a law

7    enforcement entity.

8        So I tasked members of my team with ensuring that we had

9    information from SCPD and from the schools to begin to look

10   behind sort of DHS information, to get closer to the ground on

11   that information.

12       I obtained that information and participated in the

13   process of review, including a discussion, a multi-disciplinary

14   discussion by members of our team.  And then I prepared a set

15   of recommendations for the Director and that went up then for

16   his review.  That, in turn, led to his decision, which is

17   represented in this letter.

18   **Q.**   And the final decision was the denial of family

19   reunification?

20   **A.**   That's correct.  It was a denial, that's right.  The

21   denial based on -- based on two factors.

22       The first is that we determined that there was potential

23   danger to the community based on indication of current

24   voluntary gang affiliation, which -- which in our policy is

25   danger by itself.

1     Second, we also determined that at this time the sponsor

2   that he had had before, which was his mother, that she was not

3   a suitable sponsor at this time because there was considerable

4   evidence that despite being informed by school authorities and

5   police authorities, she had been unable to prevent him from

6   associating with gang members.

7     So those two bases inform the decision, first of all, to

8   deny release on the basis of dangerousness; and, second, that

9   at this time this sponsor is not a suitable sponsor.

10  **Q.**   What level of care is F.E. currently in?

11  **A.**   He's currently in our shelter level care, which is our

12  most common level of care and which we do not consider a -- it

13  is not in our spectrum considered a restrictive level of care.

14  **Q.**   So F.E. is in a shelter level care?

15  **A.**   Yes.

16  **Q.**   But the finding is that he -- there is a dangerousness

17  finding in this letter.

18  **A.**   That's right.  And that may sound counterintuitive, but

19  let me explain it.

20    So level of care is based on our standard, our requirement

21  that it is -- we must serve the best interest of the child by

22  -- for every child we have in care, that child has to be in the

23  least restrictive setting consistent with his or her needs, the

24  safety of staff, the safety of other UAC and the safety of the

25  public.

WHITE - DIRECT EXAMINATION / MURLEY

1      And as you know, as we have already discussed, and that's

2  something for those who are in a restrictive level of care,

3  like secure or staff secure, we must re-review essentially

4  monthly.  That is a separate standard from the standard for

5  danger for release.

6      So it is our determination that F.E., on the basis of his

7  behavior, should not be kept at a secure or staff secure level

8  of care because his behavior does not warrant it.  He's not

9  dangerous to -- he has given us no reason to think he's

10  dangerous to staff or to other UAC at those levels of care.

11     However, the evidence does support that at this time in

12  the sponsor household there is -- that is not restrictive

13  enough a setting to prevent him from having involvements with

14  criminal justice authorities and association with gang members.

15     So, yes, he is -- he poses a danger in the community, at

16  least in this setting, but he does not require secure level

17  care.  And I think it would be inappropriate, from a child

18  welfare point of view, to have him at a secure and staff secure

19  level of care given that his behavior is managed effectively at

20  the lower level of care.

21  **Q.**  And this denial letter contains a second finding with

22  regard to suitability?

23  **A.**  Correct.

24  **Q.**  And how is that finding separate from the dangerousness

25  finding?

**A.**  So it's separate.  So the -- the danger finding is based
on -- we have a policy determination that current voluntary
gang affiliation is dangerous and that there were sufficient
indications of current voluntary gang affiliation.

Separate from that is the issue of whether a given sponsor
can meet the set of needs under our sense of what's required
from a sponsor.  And one of those is a sufficiently effective
supervisory and disciplinary environment for a child to prevent
the child from being involved with gangs, to keep the child in
school and attending class, to prevent the child from engaging
in unlawful conduct, including unlawful employment without
legal status.

And in this case at this time his mother has not
demonstrated or provided us with a plan for how she would do
that.  School authorities specifically counseled her on the
danger to this child of his maintaining social relationships
with gang members and subsequent to that there were multiple
law enforcement interactions with him in the presence of gang
members.

She, I think understandably, sought from the records we
have, to engage with police authorities, to ask them to cease
speaking to him as if he were a gang member; but subsequent to
that she still could not still prevent his association with
gang members.

So there are concerns about her supervisory and

1   disciplinary capacity to keep him safe from gang recruitment

2   and illegal involvement.  That is something that -- as I think

3   we tried to make plain here in the letter, if subsequently she

4   can identify to us a coherent plan for how she would prevent

5   him from being involved with gangs, that is something which

6   could lead to a different determination on our part.

7        We don't view her as inherently or permanently unable to

8   perform the duties as sponsor.  She just has thus far not

9   demonstrated her plan sufficiently to protect him from gang

10  involvement.

11  **Q.**   When you talk about gang involvement, you relied largely

12  on the document from the Suffolk County?

13  **A.**   Rely on the school report regarding his disciplinary

14  behavior and the documents provided from Suffolk County.

15          **MS. MURLEY:**  One second, your Honor.

16       (Discussion held off the record between defense

17        counsel.)

18          **MS. MURLEY:**  Just a few more questions.

19  **BY MS. MURLEY**

20  **Q.**   This letter serves as the final agency decision.  Is there

21  a review process of this determination?

22  **A.**   There is.  There are two remedies that he, as the UAC, and

23  his mother, as the parent who would wish to serve as his

24  sponsor, have.

25       First of all, they have the bond hearing process to

1  challenge our determination that he dangerous in front of a

2  third-party reviewer.

3      Within HHS she also has the opportunity -- the two of them

4  have the opportunity to appeal the Director's decision to the

5  Assistant Secretary of ACF, review both danger and suitability.

6      So she has two -- two different remedies that she could

7  pursue.

8  **Q.**  And if after a bond hearing an immigration judge were to

9  find that F.E. was not a danger to the community, what impact

10 would that have on HHS's findings?

11 **A.**  At that point the issue then would become the ability

12 either of the family to identify another sponsor or of the

13 mother to provide us with -- to provide us with evidence or a

14 plan to support that she is able to address the deficiencies in

15 supervision and discipline that result in his gang involvement.

16     And it is not at all uncommon in our system for

17 parentals -- for parent sponsors, what we call category one

18 sponsors, who may be found unsuitable at one point to

19 subsequently be found suitable, particularly if they can

20 address deficiencies that underlie that decision.

21         **MS. MURLEY:**  No further questions, your Honor.

22         **THE COURT:**  Thank you.

23     Looks like we have about 15 minutes before the fire drill.

24 I think we should use those 15 minutes.

25

1                    **CROSS EXAMINATION**

2  **BY MS. MASS**

3  **Q.**  Good afternoon, Mr. White.  My name is Julia Mass.  I'm

4  going to be asking you some questions.

5       Let me just start out by finding out, did you have any

6  direct communications with F.E.'s mother yourself?

7  **A.**  I have not.

8  **Q.**  Okay.  And have you had any direct communications with

9  F.E.?

10 **A.**  I have not.

11 **Q.**  And in terms of your understanding of the school incidents

12 that informed the decision to deny reunification and, also, the

13 police interactions, were you present for any of those

14 incidents or interactions?

15 **A.**  Oh, no.  Definitely not.

16 **Q.**  So your understanding of those is based on documents?

17 **A.**  Yes.

18 **Q.**  Okay.

19        **MS. MASS:**  And so I would just like to lodge an

20 objection to any characterizations of those incidents or at the

21 school or with the police and the mother's response as outside

22 the witness's personal knowledge and as relying on hearsay.

23 **BY MS. MASS**

24 **Q.**  Okay.  Let me ask you a little bit more about your

25 background.  Your a licensed clinical social worker?

 1   **A.**   I am.

 2   **Q.**   Before working with the federal government, did you ever

 3   work in a county children's services or child welfare agency?

 4   **A.**   No.

 5   **Q.**   Or any other kind of child welfare agencies outside of the

 6   federal government?

 7   **A.**   No.

 8   **Q.**   Do you consider ORR a child welfare agency?  You mentioned

 9   it's not a law enforcement agency, but what do you think?  How

10   do you characterize it?

11   **A.**   It's a bizarre thing.  It's very difficult to actually say

12   what the UAC program is with -- except with reference to

13   itself.

14        I will say, however, that we use -- we use the body of

15   social work practice and understanding that comes out primarily

16   of a child welfare system's point of view to implement the

17   requirement to pursue the best interests of the child.

18   **Q.**   Okay.  And the authority of ORR, is that based in the

19   TVPRA, the trafficking victims reauthorization?

20   **A.**   Our authority is based on the Homeland Security Act,

21   TVPRA.  You're quizzing my knowledge of law.  I'm also not an

22   attorney.

23        But, yes, primarily our role is defined by TVPRA, by the

24   Homeland Security Act and, of course, by the terms of the

25   *Flores* Settlement Agreement.

1  Q.   And anything that's in the *Flores* Settlement Agreement, to

2  your understanding, would that also help to define your

3  obligations and what you're authorized to do?

4  A.   Absolutely.

5  Q.   Okay.  So, and under the TVPRA, I think you mentioned that

6  there are follow-up services sometimes when ORR provides

7  release, is that right?

8  A.   Yes.

9  Q.   And so -- and is it also true that there is a statutory

10  process to reunify undocumented immigrants with their --

11  children with their parents?

12  A.   Absolutely.

13  Q.   Okay.  And you mentioned when a child comes into ORR

14  custody after being referred by one of the DHS components, ORR

15  conducts a review of that custody after the initial

16  determination of where to place the person is made.  I'm

17  thinking about the step-down process.

18  A.   Oh, sure.

19  Q.   Okay.

20  A.   Yes.

21  Q.   And who conducts that review?  What staff were involved?

22  A.   That is conducted by staff of the sheltering program that

23  receives the child, as well as federal staff, including the

24  federal field specialist.

25       And typically it may also involve the federal field

1    supervisor, the senior federal field supervisor, and in some

2    cases other members of the team, potentially the senior advisor

3    for child well-being and safety.  It would depend, in part, on

4    the specific circumstances of that UAC's care.

5    **Q.**   Okay.  But, certainly, it would include contracted

6    facilities like the Yolo facility and BFCS in Fairfield?

7    **A.**   It would include employees of those grantees, yes.

8    **Q.**   Okay.  And I just want to back up for a second.

9        I understand there was a policy change that added gang

10   affiliation as one of the considerations for placing a child in

11   secure custody in June of this year, is that correct?

12   **A.**   Gang affiliation had already been a factor.  I would say

13   that the June 12th policy change changed the -- the primary

14   change was that it made that gang affiliation led to a required

15   placement at secure as the initial designation.

16   **Q.**   Okay.  And so part of the review that the facilities would

17   engage in in order to determine the step-down process would

18   also be to look into gang affiliation and those allegations to

19   see if they are correct, is that right?

20   **A.**   Yes.  To the extent they were able, that's right.

21   **Q.**   Okay.  And what standards does ORR use to determine gang

22   affiliation?

23   **A.**   So the -- the sort of domains that would be involved

24   would, first of all, be disclosures by the child.

25       Second, there would be expressions by the child, which

 1  could include also art or other things that they produce.

 2      The -- then it would include available documents and

 3  records from other agencies.

 4  **Q.**  But I'm -- I guess what I mean is what are the criteria

 5  that you would -- what are the indicia of gang membership,

 6  other than just admission of being a gang member, that would

 7  deem a person a gang member in your eyes or in the eyes of ORR?

 8      Is it the same -- for example, I think Mr. Pisciotta

 9  testified about the criteria that DHS uses.  They include

10  things like clothing and association.

11      Are those the same criteria or does ORR have separate

12  criteria or different criteria?

13  **A.**  I think we're looking at sort of the totality of what we

14  know about -- about the child and that would primarily include

15  sort of what they say about themselves, what they express, with

16  whom they associate.

17  **Q.**  Okay.  So I think we were looking at Exhibit 7 from the

18  defendants.  If we could turn to a page here -- it's a large

19  packet, but about five or so pages in there is a letter dated

20  June 14, 2017 with the seal of the U.S. Department of Homeland

21  Security.  Maybe it's more like 10 pages in.

22  **A.**  I found the one.  This is -- it says "Memorandum for Alien

23  File Regarding Gang Affiliation."

24  **Q.**  That's right.  And we'll just be careful not to use any

25  names, but are you familiar with this letter?

1   **A.**   I am familiar with the letter, although in making my

2   recommendation up to the Director, I actually did not include

3   this letter in my decision-making process.

4       This letter, however, I think was the -- this letter

5   really, which represents DHS's determination that the child is

6   a gang member, was very important for the initial designation

7   to secure.  However, this letter did not inform my

8   recommendation to the Director.

9   **Q.**   So did DHS's belief that this youth was a gang member

10  influence your belief that he's a gang member in any way?

11  **A.**   It informed the -- certainly informed the initial

12  designation, but I -- I did not find this letter sufficient by

13  itself to persuade me one way or another.  It didn't seem like

14  sufficiently actionable.

15      For me, what was much more informative was the information

16  from the school and from SCPD.

17  **Q.**   Okay.  Do you know what date ORR received this letter?

18  **A.**   I don't know the date that we received it.

19  **Q.**   Do you have a sense over the last four months whether it

20  was towards the early part of when he was brought into custody

21  versus towards the end or more recently?

22  **A.**   It must have been in hand prior to the -- it must have

23  been in the earlier portion of his time in our care.

24  **Q.**   And then looking at the very last page of the packet that

25  is Exhibit 7, this is a letter dated September 27th to James

 1   De La Cruz from Inspector Michael Romagnoli from the -- looks

 2   like Suffolk County Police Department.

 3        Are you familiar with this letter?

 4   **A.**   Yes.  This one I know.

 5   **Q.**   Did you rely on this letter to make your decision?

 6   **A.**   This letter did partially inform my decision, yes.

 7   **Q.**   Okay.  And do you --

 8             **THE COURT:**  Sorry.  I'm having trouble finding it.

 9   You said the very last page of this packet?

10             **MS. MASS:**  Yes.  Of the Exhibit 7 packet.

11             **THE COURT:**  Not the last page of my packet that was

12   handed up to me.

13        (Whereupon document was tendered to the Court.)

14             **THE COURT:**  That looks like it.  I'll just take a

15   look at this and then give it back to you.

16        Okay.  Go ahead.  Sorry.

17             **MS. MASS:**  Thank you.

18   **BY MS. MASS**

19   **Q.**   Tell us how this influenced your decision or what -- what

20   you relied on here?

21   **A.**   So this represented -- would have been in contrast to

22   anything we had seen before that.  This actually provided

23   details.  And this -- I felt that this helped to establish that

24   there had been association with gang members at moments when

25   the UAC interacted with police.

1    There is a report in here of subject self-admission, but I

2  thought what was most relevant was simply the number of

3  distinct encounters with law enforcement in the presence of

4  gang members.

5  **Q.**   And did you ask for any of the underlying documentation to

6  support the conclusions in this letter?

7  **A.**   We asked for everything that we could get and this is the

8  most that we could get.

9  **Q.**   Okay.

10 **A.**   In part, because we are not a law enforcement agency and

11 law enforcement agencies, federal, local and state, will often

12 not share with us information because we are not sworn law

13 enforcement officials.

14    We are trying to look into things as deeply as we can and

15 deeper than historically we -- we have attempted to, and this

16 is as deep as we can get.

17 **Q.**   Did you ever provide a copy of this letter to F.E. or to

18 his mother so that they could respond to the allegations, the

19 conclusions that are made here?

20 **A.**   Yes.  That's the packet that you're looking at.

21 **Q.**   Ahh.  Before reaching the decision to deny reunification,

22 did you give them an opportunity to respond to this

23 information?

24 **A.**   No.  I did not.

25 **Q.**   Did anyone that you're aware of?

 1    **A.**   I'm not aware that ORR staff provided them with this

 2    letter.  I do not think anyone did.

 3    **Q.**   Do you know if ORR staff spoke to F.E. or his mother about

 4    the concerns that you had that were the basis for denying the

 5    reunification request?

 6    **A.**   I think we had a fair amount of contact through the case

 7    management process with the family that included discussions of

 8    the gang concern and the -- and the legal counsel for the

 9    family made contact with all of us to advocate for his client.

10    **Q.**   Which staff, in particular, spoke to F.E. or his mother

11    about the -- about the gang allegations that were relevant to

12    your decision?

13    **A.**   I don't know.

14    **Q.**   But you did mention that facility staff sometimes played

15    the role of helping to look into the -- those underlying gang

16    allegations, is that correct?

17    **A.**   The primary role that facility staff have is looking at

18    the expressions and behaviors and disclosures of the child

19    client while he or she is in our care.

20         It is less their role to look into underlying documents,

21    although there may be some cases where that happens also,

22    particularly in secure settings, which have -- which have

23    greater access to that kind of information.

24              **THE COURT:**  Let me ask, do you have a rough estimate

25    of how long, how much longer you have?

1    **MS. MASS:**  Oh, maybe 20 minutes.

2         **THE COURT:**  Okay.  I think now is a good time to

3    maybe take a break and get ready for the fire alarm.  I will

4    head back there.  If it is louder --

5         (Interruption in the proceedings.)

6         **THE COURT:**  I will go back there.  If it's a lot

7    louder in here, I'll come get you all and bring you back there,

8    okay?

9         (Brief recess held in the proceedings.)

10        **THE COURT:**  Go ahead.

11        **MS. MASS:**  All right.

12   **BY MS. MASS**

13   **Q.**   Turn back to the last page of Exhibit 7 we were looking

14   at, the September 27th letter from the Suffolk County Police

15   Department.

16        Do you know why this letter was being solicited at the end

17   of September after -- after F.E. had already been in custody

18   for three and a half months?

19   **A.**   Yes.  First of all, that wasn't when it was solicited.

20   That's the date it was received.

21   **Q.**   Okay.

22   **A.**   We had been seeking additional information for some time.

23   **Q.**   For how long?

24   **A.**   Essentially from his -- from his apprehension.

25   **Q.**   So for three and a half months you were waiting for the

 1    Suffolk County Police Department to provide you the evidence to

 2    support the gang allegations which were the basis for you

 3    having him in custody, is that right?

 4    **A.**   We initially requested additional information from DHS.

 5    We then requested additional information from the school and

 6    from SCPD.

 7         This level of information was not, however, necessary for

 8    the decision about his initial designation --

 9         (Interruption in the proceedings.)

10    **A.**   As I mentioned earlier, the issue was the information that

11    we needed to determine whether he posed a danger by virtue of

12    having current gang membership.  That's a release decision.  We

13    did seek that information from a variety of sources.

14         The information we received from DHS was not sufficient.

15    It was not specific enough for us to use.

16    **Q.**   To continue to keep him in custody?

17    **A.**   No.  It wasn't specific enough for us to evaluate either

18    way.

19    **Q.**   All right.

20    **A.**   We couldn't just take and -- this is the document we

21    referred to earlier.  This is the earlier letter.  That was not

22    sufficiently detailed for us to make conclusions from.

23    Therefore, we needed more information.

24         We were following the process established following A.H.;

25    that we not simply rely on what DHS says, but that we attempt

1  to get at the underlying information from local authorities,

2  which we did.

3  **Q.**  Okay.  Looking at the second bullet point here that has --

4  it says:

5       "June 2017, subject self-admitted MS-13

6    association."

7       Are you aware -- there is no day there.  Are you aware

8  that this statement, that F.E. was a self-admitted gang member,

9  had never been disclosed before to Department of Homeland

10 Security or HHS?

11 **A.**  No, I'm not aware that.

12 **Q.**  Are you aware of any records prior to the date of this

13 letter that include that information?

14 **A.**  If we had those records, they would have been in the

15 packet that was sent to the sponsor and, therefore, they would

16 be in this exhibit.  So, no.

17       **THE COURT:**  Could I ask a clarification question on

18 the dialogue you were just having with Ms. Mass?

19       When you said the information you received or the

20 documentation you received from DHS was insufficient to make a

21 determination, which determination are you talking about or

22 which determinations are you talking about?

23       **THE WITNESS:**  It didn't contain any real detail.  It

24 was clear that it referred to things that were known to local

25 authorities.

1    Consistent with what we learned from the A.H. experience,

2    we sought to find out what local authorities knew given that

3    DHS was characterizing what they learned from local

4    authorities.  So we reached out to the school and the court and

5    the police department.

6          THE COURT:  Okay.  And so -- but when you say that it

7    was not sufficient for you to make a determination, were you

8    referring to a determination about what level of care, what

9    level of custody, or determination about whether he should be

10   reunified with his mother or both?

11         THE WITNESS:  Both.

12         THE COURT:  Okay.  Thank you.

13   BY MS. MASS

14   Q.   So just so I'm perfectly clear.  In terms of this letter,

15   I believe it's your testimony so far that you relied on these

16   conclusions without seeing or verifying -- seeing any records

17   to support it or verifying by speaking to any of the Suffolk

18   County police personnel, is that correct?

19   A.   Yes.  We relied upon this information.

20         THE COURT:  Could I ask you another follow-up

21   question?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  This is a follow-up to the answer you

24   just gave to me a second ago.

25         THE WITNESS:  Yes, sir.

1      THE COURT:  You said that based on our experience

2   with A.H., where DHS had been characterizing the information

3   they received from local law enforcement, we determined that we

4   needed to reach out directly to local law enforcement and

5   others to get further detail.

6      Did I -- did I restate your testimony accurately?

7      THE WITNESS:  I think so.  Prior to the A.H. case, we

8   really would have, I think, generally viewed that what came

9   from law enforcement officials at DHS was sufficient for our

10  decisions.  We learned from the A.H. experience that -- that

11  that wasn't sufficient; that there was an expectation that we

12  look behind that.

13      THE COURT:  And can you tell me more about -- when

14  you say, "We learned from the A.H. experience that that wasn't

15  sufficient," can you tell me more about that?  What you mean by

16  that?

17      THE WITNESS:  We were directed in that case to look

18  behind what DHS said and to seek additional information from

19  local authorities.

20      That's challenging for us because we're not a law

21  enforcement authority ourselves.  This is the -- this reflects

22  what it looks like when we look behind those statements.  We --

23      THE COURT:  So -- sorry to interrupt, but so you're

24  not saying, well, we concluded independently that we found

25  something wrong with the information we received from DHS about

 1    A.H.  You're saying we learned that we were required to do

 2    more.

 3         Is that -- is that your -- do I understand you correctly?

 4              **THE WITNESS:**  That's correct, sir.

 5              **THE COURT:**  Okay.  Presumably in response to my

 6    ruling.

 7              **THE WITNESS:**  That's exactly right, sir.

 8              **THE COURT:**  All right.  I just want to make sure I

 9    understood that.

10    **BY MS. MASS**

11    **Q.**   Okay.  And now I have marked as an exhibit an email dated

12    August 4th, 2017.

13         (Plaintiff's Exhibit D marked for identification.)

14    **Q.**   This is Exhibit D.  It's an email from Jose Esquivel.  Are

15    you familiar with Mr. Esquivel?  Do you know who he is?

16    **A.**   I do.

17    **Q.**   Have you ever seen this before, this email?

18    **A.**   If you'll give me just a moment to read it?

19    **Q.**   Sure.

20         (Brief pause.)

21    **A.**   I can't recall whether I've seen this email or some of the

22    subsequent products that it informed.

23    **Q.**   Were you aware that Mr. Esquivel had stated that F.E. had

24    denied any gang affiliation and that his statements were

25    congruent with the facility's experience of having had him in

 1  their care for -- for I can't remember how long, but some weeks
 2  at least?
 3  A.   Yes.  I was aware that that had been part of the
 4  clinician's analysis.
 5  Q.   Okay.  And we have another document, which would be
 6  Exhibit E.
 7       (Plaintiff's Exhibit E marked for identification)
 8  Q.   This is a memo dated September 12, 2017.  It's addressed
 9  to you.  Have you seen this memo before?
10  A.   Sure, yes.  This one I know well.
11  Q.   Okay.  And this is a memo that is from an FFS supervisor
12  and an FFS.  Is that a federal field specialist and a federal
13  field specialist supervisor?
14  A.   That's right.
15  Q.   And are those the ORR officials that were -- have the most
16  kind of authority over this particular child, F.E.?
17  A.   Yes.  What you are seeing here, this memorandum is our
18  internal memorandum that comes up to me in the release review
19  process for secure and staff secure UAC that I discussed
20  earlier.  And this is the one including their recommendation
21  for release.
22  Q.   Yes.  Is there anything you disagree with, other than the
23  recommendation for release, that's in this memo?
24  A.   In terms of disagreement --
25  Q.   Disagreement with the facts presented?

```
 1   A.    I have to -- I have to review it quickly to identify
 2   specific pieces.
 3   Q.    All right.
 4   A.    This document came prior to the receipt of the school and
 5   SCPD documents.  I don't think I'm likely to disagree.  I have
 6   to review it to see if there is specific facts with which I
 7   disagree.  I doubt there are.
 8        It is that -- it does not have the full set of facts that
 9   were available to us by the time that it came through me to the
10   Director.
11   Q.    On the second page in the -- at the bottom of the second
12   paragraph it says:
13              "A note in his school records indicate that F.E.
14         may have been associating with people that, quote, may
15         be gang affiliated."
16        Did you get other school records beyond those that you --
17   came in after September 12th?
18   A.    Sorry.  I'm looking for the passage.  Where is it again?
19   Q.    It's at the second paragraph of Page 2, at the end of the
20   paragraph.
21   A.    I see it now.
22        I don't know whether they had the same school records that
23   I reviewed.  That is in the school records I reviewed.  There
24   is additional material in the school records that are not
25   represented in the memorandum.
```

```
 1        It also important to note that our instruction to FFS is
 2   that they are to elevate -- if they think there is any basis
 3   for release, they are to elevate to me.  In other words, they
 4   are to err on the side of recommending.  Some of the more
 5   difficult decisions about denial happen higher up.
 6   Q.   Okay.  If we could just focus on the question I asked,
 7   which was:  Are you in disagreement with any of the facts that
 8   are presented in the memo?
 9   A.   Let me start from the beginning.
10        (Brief pause.)
11   Q.   Mr. White, I appreciate your diligence, but I think in the
12   interests of time, rather than make you read the whole thing --
13   A.   Steer me to the facts and I'll answer "yes" or "no."
14   Q.   -- I think I will steer you.
15        There was a mention in the memo of some photographs -- oh,
16   shoot.
17   A.   No.  That's also in the second paragraph of Page 2.
18   Q.   That's right.  Do you know what those photos relate to?
19   What that reference is?
20   A.   I do.  Those were photographs that I believe were provided
21   to the program by DHS, which we were able to determine were not
22   him.
23   Q.   Okay.
24   A.   So those did not inform my decision.  We disregarded those
25   photos.
```

WHITE - CROSS EXAMINATION / MASS

```
 1   Q.   Do you have any disagreement with the statement that:

 2             "Since his arrival in ORR custody on June 18th

 3        and in all subsequent placements, F.E. has maintained

 4        good behavior."

 5   A.   I have no reason to disagree with that.  There are no SIRs

 6   to suggest otherwise.  That's why he's in shelter level care.

 7   Q.   Great.  Also, did you read the home study report that was

 8   prepared and is a part of this packet?

 9   A.   Yes.  I read the home study.

10   Q.   Are you aware that the social worker and her supervisor

11   also recommended that F.E. be released to his mother?

12   A.   Yes, absolutely.  And, indeed, if they had not, it would

13   have been unlikely it would have gotten as far as me.

14   Q.   Okay.  And they concluded that the sponsor could provide

15   for him financially.  Yes?

16   A.   Yes.

17   Q.   And that the sponsor had attended all of his criminal

18   court and immigration court hearings?

19   A.   Yes.

20   Q.   And, also, concluded that F.E. feels safe and loved by the

21   sponsor and his siblings?

22   A.   Yes.  I think all the evidence would support that.

23   Q.   Okay.

24   A.   We included that in our own letter, too; that we noted the

25   loving relationship.
```

1    Q.    So it sounds like on the other side of the balance then we

2    had both the field specialist, federal field specialist,

3    federal field specialist supervisor, the director of one of the

4    facilities where F.E. stayed and also the home study all

5    recommending release or generally avowing that F.E. was a good

6    kid who didn't have any gang problems, as far as anyone could

7    tell who had actually talked to him.

8         On the other side of that was, as I understand it, this

9    letter, that's the last page in the packet, and the school

10   records, is that correct?

11   A.    That's correct.

12   Q.    Is there anything else on the other side of it?

13   A.    No, I don't think so.

14   Q.    Okay.  And so looking at the school records -- oh, first

15   of all, you said that the gang allegations, just on their own,

16   are evidence of dangerousness.

17        Is that -- is that why -- am I right in understanding

18   that's why you made -- one of the reasons you made a

19   determination that F.E. should say in ORR custody?

20   A.    Yes.  We have a -- there has been a policy decision made.

21   Q.    Is there any other evidence, other than the conclusions

22   you made about his gang affiliation, that support a finding of

23   dangerousness?

24   A.    There is the pending charge.  However, that did not --

25   while that is a factor, it was not as significant to the

1    discussion as the other factors, but it is a factor.

2    **Q.**   Okay.  And is there any -- when you say a gang

3    affiliation, does ORR distinguish between active gang

4    membership, of the sort that Mr. Pisciotta testified about

5    where a child might be doing work for the gang, versus having

6    merely been on the same street corner or at the same deli and

7    identified as -- in the same vicinity with or hanging out with

8    what were considered known gang members?

9    **A.**   We recognize that gang affiliation is a spectrum.  That's

10   true.  The key issues for us are voluntary versus coerced and

11   present versus past.

12   **Q.**   And what was it that led you to believe that F.E. was

13   voluntary as opposed to coerced?  If you -- I mean, you came to

14   a conclusion that he is a --

15   **A.**   There is no evidence that was produced that it was

16   coerced.  And we have plenty of kids with a history of coerced

17   involvement, especially in home country.

18   **Q.**   Did you ask his mother to address the question of whether

19   she thought he had ever been coerced to be in a gang or did

20   anyone to your knowledge?

21   **A.**   I don't know if others had.  That is generally something

22   that people volunteer on their own.

23        My understanding from what we had from her is she

24   maintained he wasn't involved in a gang.

25   **Q.**   Yeah.  That's consistent with my understanding as well.

1    **A.**   Right.  Exactly.  Yeah.

2    **Q.**   Okay.  And then the other -- the other factor, as I

3    understand it, was that you were concerned about the mother at

4    this time not having a plan for dealing with what you -- your

5    conclusion that F.E. was gang affiliated, is that right?

6    **A.**   We determined that she has not indicated how she would

7    protect him from association with gang members.  After the

8    school specifically counseled her that he was at risk because

9    of his association with gang members and after her own

10   involvement with the police about it, he subsequently continued

11   to have encounters in the presence of gang members.

12   **Q.**   I understand.  Did you -- did anyone from ORR, to your

13   knowledge, ask her whether she spoke to him about -- after the

14   school counseled her?

15   **A.**   I did not.  I don't know what others have.

16   **Q.**   So you don't know if -- she might have, for example,

17   spoken to her son, as recommended by the school, and then

18   learned from him that the friend, who in the school record it

19   says may be gang affiliated, she could have heard from her son

20   that, in fact, he doesn't believe that his friend is gang

21   affiliated.  You have not ruled out that possibility, have you?

22   **A.**   We have not ruled out that possibility.  He had three

23   subsequent encounters, all of who were in the presence of gang

24   members --

25   **Q.**   If you could -- we just only have a little amount of time,

 1  so if you could just stick to the question, that would be
 2  really helpful.
 3      And you mentioned there is a sponsorship agreement -- or,
 4  I guess, it's mentioned in the letter that there is a
 5  sponsorship agreement.  So just -- if you could play this out
 6  with me so I can understand that sponsorship agreement and what
 7  the requirements are.
 8      If she had been counseled by the school that her son was
 9  associated with someone who may be gang affiliated and she did,
10  in fact, speak to him and he told her that, no, that's my
11  friend who you know and who she knew and didn't think was gang
12  affiliated, is it your contention that the sponsor agreement
13  would then require her to nevertheless contact ORR about that?
14      She complied with the school's recommendation that she
15  counsel her son and had done so and determined for herself that
16  she didn't believe that that child was gang affiliated.  She
17  still had a duty to contact ORR?
18  **A.**   A duty on that part of the sponsor agreement would be if,
19  indeed, he had contact with gang members.
20  **Q.**   Okay.  And so she didn't know anything beyond that the
21  school had told her that one of his friends may be gang
22  related, and she had followed up on that, discovered she didn't
23  think that was true.  She wouldn't have a duty under the
24  sponsorship agreement to notify ORR at that point, would she?
25  **A.**   She would for each of the subsequent incidents where he

```
 1   was with gang members.
 2   Q.   If she knew or believed that he was with gang members,
 3   right?
 4   A.   Right.
 5   Q.   That's right.
 6        Okay.  And then finally having determined that she's not a
 7   suitable sponsor, if F.E. were to seek a -- what's been called
 8   a bond hearing, which is kind of a misnomer because there is no
 9   bond involved, but under the Flores case a hearing in front of
10   an immigration judge and the judge were to rule that he wasn't
11   a danger and didn't pose a flight risk, ORR nevertheless
12   wouldn't be able to release him because you don't have a
13   suitable sponsor, is that correct?
14   A.   At that time either a different sponsor could step forward
15   or she could apply articulating a plan to protect him from gang
16   involvement, as we spelled out in our letter.
17   Q.   Okay.
18   A.   Or she could also appeal our Director's decision through
19   the due process channel of the Assistant Secretary specifically
20   on the suitability question.
21   Q.   Yeah.  And also -- just to be clear, it's ORR's policy not
22   to place anyone who is a gang member with a sponsor no matter
23   how qualified the sponsor may be, is that right?
24   A.   It is ORR's policy not to release those who are dangerous,
25   and gang affiliation is an indication of danger.
```

```
 1   Q.   Is it like a per se indication at this point for ORR?  Is
 2   that your policy?  That gang affiliation of the sort that's
 3   listed in this letter from Suffolk County is a per se pretty
 4   much showing of dangerousness for ORR policy purposes?
 5   A.   When you say a per se indication of --
 6   Q.   Well, oh, sorry.  So what I mean is just -- if a law
 7   enforcement agency says that we had three occasions in which we
 8   identified this person as affiliated with gang members or known
 9   gang members, that would be sufficient for ORR policy to
10   conclude that the child is dangerous?
11   A.   If that was persuasive to the Director.
12   Q.   Okay.  Is there any reason that you know of that that
13   wouldn't be persuasive?  I mean, this letter was persuasive,
14   right?
15   A.   Yes.
16   Q.   Is that a "yes"?
17   A.   Yes.
18   Q.   Okay.  All right.  I...
19        (Brief pause.)
20   Q.   And just so we're -- no, I think I've covered it.
21        Thank you.
22             THE COURT:  Any redirect?
23             MS. MURLEY:  Just briefly, your Honor.
24
25
```

WHITE - REDIRECT EXAMINATION / MURLEY

| 1 | **REDIRECT EXAMINATION** |

2  BY MS. MURLEY

3  Q.   I just want to clarify about the DHS information.  What

4  information did you receive from DHS for initial placement for

5  F.E.?

6  A.   For initial placement we have to actually look at the --

7  look at the intakes form that we received.  It included, I

8  believe, a description of him as a gang member and, I believe,

9  a notation of a charge.

10  Q.   And did you try to get more information before the initial

11  placement?

12  A.   No.  We do not get additional information before the

13  initial placement.

14  Q.   And why is that?

15  A.   Because a process requires us to immediately place.

16  Q.   And did DHS provide information later?

17  A.   It provided additional information later.

18  Q.   And what was that?

19  A.   That included the -- the letter, the memorandum of

20  association and there may have been additional documentation.

21  I'm not certain what was provided at what time because we asked

22  them for additional information subsequently.

23  Q.   And did DHS give you the Suffolk County Police Department

24  records?

25  A.   No.  We had to obtain those.

PROCEEDINGS

1    Q.   And would receiving that information faster improve HHS's

2    ability to complete the review process in a shorter time

3    period?

4    A.   It would.

5              MS. MURLEY:  That's all.

6              THE COURT:  All done?  All right.  You can step down.

7    Thank you.

8              THE WITNESS:  These materials, who do I give these

9    to?

10             THE COURT:  You can leave them there.  The lawyers

11   will deal with them.

12             THE WITNESS:  Okay.

13        (Witness excused.)

14             THE COURT:  Okay.  It's 10 minutes to 3:00.  I'm

15   trying to decide whether argument would be more productive now

16   or at a later time.

17        Does anybody have any thoughts about that?

18             MR. SCHENKER:  Your Honor, we would -- plaintiffs

19   would very much like to proceed with argument now.

20        If your Honor has more questions down the road after

21   you've reviewed the papers more, we could come back for

22   specific follow-up.

23        But we feel strongly that -- and the record shows your

24   Honor said you're familiar with the declarations.  We think

25   these children are suffering greatly and the duration of their

# Exhibit 79

Exhibit 79
Page 549

No. 18-15114

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ILSA SARAVIA, et. al.,

*Plaintiffs-Appellees,*

versus

JEFFERSON B. SESSIONS, III,
Attorney General of the United States, et. al.,

*Defendants-Appellants.*

On Appeal From the United States District Court
for the Northern District of California
The Honorable Judge Vince Chhabria
District Court Case No. 3:17-cv-03615-VC

## EXHIBIT 1 TO
## APPELLEES' REQUEST
## FOR JUDICIAL NOTICE

**Exhibit 79**
**Page 550**

1  CHAD A. READLER
   Principal Deputy Assistant Attorney General
2  WILLIAM C. PEACHEY
   Director
3  WILLIAM C. SILVIS
   Assistant Director
4  SARAH B. FABIAN
   Senior Litigation Counsel
5  NICOLE MURLEY
6  Trial Attorney

7  U.S. Department of Justice
8  Office of Immigration Litigation
   District Court Section
9  Box 868, Ben Franklin Station
   Washington, DC 20442
10 Telephone: (202) 532-4824
11 Fax: (202) 616-8962
   E-mail: Sarah.B.Fabian@usdoj.gov
12
13 Attorneys for Defendants

14          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
15             SAN FRANCISCO DIVISION

16 Lorenza Gomez, as next friend for J.G., a        )  Case No.: 3:17-cv-03615
17 minor, and on her own behalf; Ilsa Saravia, as   )
   next friend for A.H., a minor, and on her        )  Notice Attaching Chart of *Saravia* Hearings
18 behalf; and Wilfredo Velasques, as next friend   )  for Class Members
   F.E., a minor, and on his own behalf,            )
19                                                   )
20          Plaintiff/Plaintiff,                     )  Honorable Vince Chhabria
21       vs.                                         )
                                                     )
22 Jefferson B. Sessions III, U.S. Attorney         )
   General, et al.,                                 )
23                                                   )
24          Respondents/Defendants.                  )
                                                     )
25 _____         )

26

Exhibit 79
Page 551

On December 12, 2017, the parties participated in a telephonic status conference with the

Court in the above-captioned case. During that conference, the Court requested that Defendants

provide the Court with information regarding the outcomes of the *Saravia* hearings for existing

class members. To comply with the Court's request, Defendants provide the attached chart.

DATED: December 22, 2017                    Respectfully submitted,

                                            CHAD A. READLER
                                            Principal Deputy Assistant Attorney General

                                            WILLIAM C. PEACHEY
                                            Director

                                            WILLIAM C. SILVIS
                                            Assistant Director

                                  By:  */s/ Sarah B. Fabian*
                                            SARAH B. FABIAN
                                            Senior Litigation Counsel
                                            NICOLE MURLEY
                                            Trial Attorney
                                            Office of Immigration Litigation
                                            Civil Division, U.S. Department of Justice
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, DC 20044
                                            (202) 532-4824
                                            (202) 616-8962 (facsimile)
                                            sarah.b.fabian@usdoj.gov
                                            nicole.murley@usdoj.gov

                                            Attorneys for Defendants

1

Exhibit 79
Page 552

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document and attachment filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

DATED:  December 22, 2017          /s/ Sarah B. Fabian
                                   Sarah B. Fabian
                                   Senior Litigation Counsel
                                   Office of Immigration Litigation
                                   Civil Division, U.S. Department of Justice

2

Exhibit 79
Page 553

| Name of current program | First Name | Last Name | Next Hearing date and time |
|---|---|---|---|
| Released | | | Saravia hearing completed on 12/5. Release ordered. |
| Released | | | Saravia Hearing Completed by NYC Immigration Ct: Ordered Released |
| Released | | | Saravia hearing completed on 12/13. Release ordered. |
| Released | | | Saravia hearing completed on 12/20/17. Release ordered. |
| Released | | | Saravia hearing completed 12/13/17. Re-arrest not warranted, release ordered. |
| Children's Village Staff Secure | | | Saravia hearings held on 11/28, 12/6 in VA, and on 12/13 in Newark. R/S at UACs request to 1/2/18. |
| Aged out on 11/27. Not in ORR custody on date of hearing | | | Saravia Hearing conducted on 11/28 in San Francisco, on 12/13 in Newark. R/S: At UACs request to 1/4/18. |
| Released | | | Saravia hearing held on 11/28 at San Francisco Immigration Ct.: Minor Ordered Released |
| Released | | | Saravia Hearing completed on 12/20. Minor Ordered Released. |
| Released | | | Saravia Hearing Completed on 12/19. Minor ordered released. |
| Yolo County Juvenile Detention | | | Saravia Hearing Completed on 12/19. DHS prevailed. Re-arrest was warranted, UAC did not rebut dangerousness. Minor to be detained |
| BCFS San Antonio Staff Secure | | | Saravia hearing completed on 12/7. IJ Finds no jurisdiction to order change in custody as outlined in Saravia. Minor to be detained. |
| Selma Carson Home | | | Saravia hearing on 11/28 continued to 12/12 at Seattle Immigration Ct: Minor has final order but pending MTR, Saravia hearing continued to 1/9/18, unless motion to reopen is granted prior to that date. |
| Released | | | Saravia hearing 11/28: Ordered Released |
| Released | | | Saravia Hearing 11/29: Ordered Released |
| Released | | | Saravia hearing 11/28: Ordered Released |
| Released | | | Saravia Hearing 12/7: Ordered Released. |

Exhibit 79
Page 554

| | | | |
|---|---|---|---|
| Childrens Village SS | K▮ | C▮ D▮ | Saravia Hearing 12/7. UAC is subject to final order thus re-arrest was warranted. MTR remains pending. |
| Released | A▮ | V▮ | Saravia Hearing held 11/28: Ordered Released |
| Released | D▮ | E▮ | Saravia Hearing Completed on 12/8. Ordered Released. |
| Released | C▮ A▮ | C▮ M▮ | Saravia and Flores hearing held 11/21 at NYC Imm Ct: Prevailed on Flores hearing and D.Ct. ordered release. |
| Released | ▮ V▮ | F▮ M▮ | Saravia hearing 29, 2017, San Francisco Imm Ct: Ordered Released |
| Released | L▮ ▮ | V▮ R▮ | Saravia hearing cancelled: D.Ct. order granting release. |
| Released | E▮ A▮ | R▮ S▮ | Saravia hearing cancelled: Released by ORR pursuant to Flores v. Sessions. |
| Released | ▮ C▮ | A▮ S▮ | Saravia hearing cancelled: D.Ct. order granting release. |
| Released | M▮ ▮ | Z▮ S▮ | Saravia Hearing 11/29: Ordered Released |
| Children's Village Staff Secure | E▮ A▮ | C▮ G▮ | Saravia hearing held 11/28 at NYC Immigration Ct: continued to 12/7 and 12/12 at request of minor's counsel: IJ found DHS meet its burden at 12/12 hearing |
| Ordered Removed. No longer in ORR Custody. | N▮ S▮ | C▮ A▮ | Saravia hearing cancelled |
| Released | ▮ ▮ | G▮ G▮ | Saravia hearing held 11/28 continued to 12/8 at NYC Immigration Court: Ordered Released |
| Released | A▮ W▮ | H▮ S▮ | DHS prevailed in Saravia hearing 11/28 and 12/5 |
| Released | ▮ M▮ | G▮ R▮ | Saravia hearing cancelled: D.Ct. order granting release. |
| Released | ▮ A▮ | V▮ G▮ | Saravia hearing held 11/28 at Houston Immigration Court: transferred to NYC Imm Ct at request of minor hearing held on 12/11: Ordered Released. |
| Released | D▮ A▮ | B▮ -P▮ | Saravia hearing held 11/28: Ordered Released |

**Exhibit 79**
**Page 555**

# Exhibit 80

Exhibit 80
Page 556

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


JENNY LISETTE FLORES, et al, Plaintiffs


v.


JANET RENO, Attorney General of the United States, et al., Defendants


Case No. CV 85-4544-RJK(Px)


STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

Exhibit 80
Page 557

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement (the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

**I DEFINITIONS**

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs. As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office. As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS. This Agreement shall cease to apply to any person who has reached the age of eighteen years. The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult. The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 attached hereto. All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a minor has drug or alcohol problems or is mentally ill. The INS shall make reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended, such as southern California, southeast Texas, southern Florida and the northeast corridor.

Exhibit 80
Page 558

7. The term "special needs minor" shall refer to a minor whose mental and/or physical condition requires special services and treatment by staff. A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places children without special needs, but which provide services and treatment for such special needs.

8. The term "medium security facility" shall refer to a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets those standards set forth in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close supervision but do not need placement in juvenile correctional facilities. It provides 24-hour awake supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff supervision, than a facility operated by a licensed program in order to control problem behavior and to prevent escape. Such a facility may have a secure perimeter but shall not be equipped internally with major restraining construction or procedures typically associated with correctional facilities.

## II SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9. This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement. This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented. The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement. However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts. Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void. However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate. Within 120 days of the final district court approval of this Agreement, the INS shall

Exhibit 80
Page 559

initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation. The final regulations shall not be inconsistent with the terms of this Agreement. Within 30 days of final court approval of this Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles. Those instructions shall include, but may not be limited to, the provisions summarizing the terms of the Agreement attached hereto as Exhibit 2.

### III CLASS DEFINITION

10. The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

### IV STATEMENTS OF GENERAL APPLICABILITY

11. The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

### V PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12. Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours. If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, minors shall be separated from delinquent offenders. Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff. The INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19 (i) within three (3) days, if the minor

Exhibit 80
Page 560

was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except:

> 1. as otherwise provided under Paragraph 13 or Paragraph 21;

> 2. as otherwise required by any court decree or court-approved settlement;

> 3. in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

> 4. where individuals must be transported from remote areas for processing or speak unusual languages such that the INS must locate interpreters in order to complete processing, in which case the INS shall place all such minors pursuant to Paragraph 19 within five (5) business days.

B. For purposes of this Paragraph, the term "emergency" shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C. In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13. If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

**VI GENERAL POLICY FAVORING RELEASE**

Exhibit 80
Page 561

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

**A. a parent;**

**B. a legal guardian;**

**C. an adult relative (brother, sister, aunt, uncle, or grandparent);**

**D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;**

**E. a licensed program willing to accept legal custody; or**

**F. an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.**

15. Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

A. provide for the minor's physical, mental, and financial well-being;

B. ensure the minor's presence at all future proceedings before the INS and the immigration court;

C. notify the INS of any change of address within five (5) days following a move;

D. in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

E. notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F. if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any immigration proceedings pending against the minor.

Exhibit 80
Page 562

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours. For purposes of this Paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian in writing seeks written permission for a transfer, the District Director shall promptly respond to the request.

16. The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15. The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17. A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14. A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor.

18. Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

**VII INS CUSTODY**

19. In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody. Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier. All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20. Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the <u>Commerce Business Daily</u> and/or

Exhibit 80
Page 563

the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21. A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

> A. has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

>> i. Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. This list is not exhaustive.);

>> ii. Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc. This list is not exhaustive.);

> As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

> B. has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

> C. has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc. This list is not exhaustive.);

> D. is an escape-risk; or

> E. must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

Exhibit 80
Page 564

22. The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

> A. the minor is currently under a final order of deportation or exclusion;

> B. the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

> C. the minor has previously absconded or attempted to abscond from INS custody.

23. The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator.

24A. A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

B. Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1. In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C. In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility. With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review. With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

Exhibit 80
Page 565

D. The INS shall promptly provide each minor not released with (a) INS Form I-770; (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services providers compiled pursuant to INS regulation (unless previously given to the minor).

E. Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court. Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

## VIII TRANSPORTATION OF MINORS

25. Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except

      A. when being transported from the place of arrest or apprehension to an INS office, or

      B. where separate transportation would be otherwise impractical.

When transported together pursuant to Clause (B) minors shall be separated from adults. The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26. The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14. The INS may, in its discretion, provide transportation to minors.

## IX TRANSFER OF MINORS

27. Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner. No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

## X MONITORING AND REPORTS

28A. An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date

Exhibit 80
Page 566

record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations. Statistical information will include at least the following: (1) biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the terms of this Agreement. The Coordinator shall file these reports with the court and provide copies to the parties, including the final report referenced in Paragraph 35, so that they can submit comments on the report to the court. In each report, the Coordinator shall state to the court whether or not the INS is in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial compliance, explain the reasons for the lack of compliance. The Coordinator shall continue to report on an annual basis until three years after the court determines that the INS has achieved substantial compliance with the terms of this Agreement.

31. One year after the court's approval of this Agreement, the Defendants may ask the court to determine whether the INS has achieved substantial compliance with the terms of this Agreement.

Exhibit 80
Page 567

**XI ATTORNEY-CLIENT VISITS**

32. A. Plaintiffs' counsel are entitled to attorney-client visits with class members even though they may not have the names of class members who are housed at a particular location. All visits shall occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit any such notice of appearance to representation of the minor in connection with this Agreement. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

B. Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C. Agreements for the placement of minor in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D. Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

**XII FACILITY VISITS**

33. In addition to the attorney-client visits permitted pursuant to Paragraph 32, Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23. Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit. The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff. In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

**XIII TRAINING**

Exhibit 80
Page 568

34. Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance
and training for designated INS employees regarding the terms of this Agreement. The INS shall develop
written and/or audio or video materials for such training. Copies of such written and/or audio or video
training materials shall be made available to Plaintiffs' counsel when such training materials are sent to
the field, or to the extent practicable, prior to that time.

## XIV DISMISSAL

35. After the court has determined that the INS is in substantial compliance with this Agreement and the
Coordinator has filed a final report, the court, without further notice, shall dismiss this action. Until such
dismissal, the court shall retain jurisdiction over this action.

## XV RESERVATION OF RIGHTS

36. Nothing in this agreement shall limit the rights, if any, of individual class members to preserve issues
for judicial review in the appeal of an individual case or for class members to exercise any independent
rights they may otherwise have.

## XVI NOTICE AND DISPUTE RESOLUTION

37. This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement
except for claims brought under Paragraph 24. The parties shall meet telephonically or in person to
discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms
of the Agreement, prior to bringing any individual or class action to enforce this Agreement. Notice of a
claim that defendants have violated the terms of this Agreement shall be served on plaintiffs addressed
to:

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA 90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA 94104

and on Defendants addressed to:

Exhibit 80
Page 569

Michael Johnson

Assistant United States Attorney

300 N. Los Angeles St., Rm. 7516

Los Angeles, CA 90012

Allen Hausman

Office of Immigration Litigation

Civil Division

U.S. Department of Justice

P.O. Box 878, Ben Franklin Station

Washington, DC 20044

## XVII PUBLICITY

38. Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement. The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by the parties, as set forth in Exhibit 5 attached. The parties shall pursue such other public dissemination of information regarding this Agreement as the parties shall agree.

## XVIII ATTORNEYS FEES AND COSTS

39. Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs the total sum of $_____, in full settlement of all attorneys' fees and costs in this case.

## XIX TERMINATION

40. All terms of this Agreement shall terminate the earlier of five years from the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with the Agreement, except the following: the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors.

## XX REPRESENTATIONS AND WARRANTY

41. Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law. Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation. Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation. The undersigned, by their signatures on

Exhibit 80
Page 570

behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.


EXHIBIT 1
Minimum Standards for Licensed Programs

A. Licensed programs shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes and shall provide or arrange for the following services for each minor in its care:

1. Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items.

2. Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

3. An individualized needs assessment which shall include: (a) various initial intake forms; (b) essential data relating to the identification and history of the minor and family; (c) identification of the minors' special needs including any specific problem(s) which appear to require immediate intervention; (d) an educational assessment and plan; (e) an assessment of family relationships and interaction with adults, peers and authority figures; (f) a statement of religious preference and practice; (g) an assessment of the minor's personal goals, strengths and weaknesses; and (h) identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification.

4. Educational services appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program shall provide minors with

Exhibit 80
Page 571

appropriate reading materials in languages other than English for use during the minor's leisure time.

5. Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

6. At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

7. Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present. It is a time when new minors are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational activities, etc. It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

8. Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

9. Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

10. Whenever possible, access to religious services of the minor's choice.

11. Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor.

12. A reasonable right to privacy, which shall include the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

Exhibit 80
Page 572

13. Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the minor.

14. Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a deportation or exclusion hearing before an immigration judge, the right to apply for political asylum or to request voluntary departure in lieu of deportation.

B. Service delivery is to be accomplished in a manner which is sensitive to the age, culture, native language and the complex needs of each minor.

C. Program rules and discipline standards shall be formulated with consideration for the range of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors. Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Any sanctions employed shall not: (1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance.

D. A comprehensive and realistic individual plan for the care of each minor must be developed in accordance with the minor's needs as determined by the individualized need assessment. Individual plans shall be implemented and closely coordinated through an operative case management system.

E. Programs shall develop, maintain and safeguard individual client case records. Agencies and organizations are required to develop a system of accountability which preserves the confidentiality of client information and protects the records from unauthorized use or disclosure.

F. Programs shall maintain adequate records and make regular reports as required by the INS that permit the INS to monitor and enforce this order and other requirements and standards as the INS may determine are in the best interests of the minors.

Exhibit 2
Instructions to Service Officers re:
Processing, Treatment, and Placement of Minors

These instructions are to advise Service officers of INS policy regarding the way in which minors in INS custody are processed, housed and released. These instructions are applicable nationwide and supersede all prior inconsistent instructions regarding minors.

Exhibit 80
Page 573

**(a) Minors.** A minor is a person under the age of eighteen years. However, individuals who have been "emancipated" by a state court or convicted and incarcerated for a criminal offense as an adult are not considered minors. Such individuals must be treated as adults for all purposes, including confinement and release on bond.

Similarly, if a reasonable person would conclude that an individual is an adult despite his claims to be a minor, the INS shall treat such person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require such an individual to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor for all purposes.

**(b) General policy.** The INS treats and shall continued to treat minors with dignity, respect and special concern for their particular vulnerability. INS policy is to place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to ensure the minor's timely appearance and to protect the minor's well-being and that of others. INS officers are not required to release a minor to any person or agency whom they have reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

**(c) Processing.** The INS will expeditiously process minors and will provide them a Form I-770 notice of rights, including the right to a bond redetermination hearing, if applicable.

Following arrest, the INS will hold minors in a facility that is safe and sanitary and that is consistent with the INS's concern for the particular vulnerability of minors. Such facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will separate unaccompanied minors from unrelated adults whenever possible. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.

If the minor cannot be immediately released, and no licensed program (described below) is available to care for him, he should be placed in an INS or INS-contract facility that has separate accommodations for minors, or in a State or county juvenile detention facility that separates minors in INS custody from delinquent offenders. The INS will make every effort to ensure the safety and well-being of juveniles placed in these facilities.

Exhibit 80
Page 574

**(d) Release.** The INS will release minors from its custody without unnecessary delay, unless detention of a juvenile is required to secure her timely appearance or to ensure the minor's safety or that of others. Minors shall be released in the following order of preference, to:

(i) a parent;

(ii) a legal guardian;

(iii) an adult relative (brother, sister, aunt, uncle, or grandparent);

(iv) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other documentation that establishes to the satisfaction of the INS, in its discretion, that the individual designating the individual or entity as the minor's custodian is in fact the minor's parent or guardian;

(v) a state-licensed juvenile shelter, group home, or foster home willing to accept legal custody; or

(vi) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

**(e) Certification of custodian.** Before a minor is released, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

(i) provide for the minor's physical, mental, and financial well-being;

(ii) ensure the minor's presence at all future proceedings before the INS and the immigration court;

(iii) notify the INS of any change of address within five (5) days following a move;

(iv) if the custodian is not a parent or legal guardian, not transfer custody of the minor to another party without the prior written permission of the District Director, except in the event of an emergency;

(v) notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

Exhibit 80
Page 575

(vi) if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any deportation proceedings pending against the minor.

In an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS, but must notify the INS of the transfer as soon as is practicable, and in all cases within 72 hours. Examples of an "emergency" include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian seeks written permission for a transfer, the District Director shall promptly respond to the request.

The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement. However, custody arrangements will not be terminated for minor violations of the custodian's obligation to notify the INS of any change of address within five days following a move.

**(f) Suitability assessment.** An INS officer may require a positive suitability assessment prior to releasing a minor to any individual or program. A suitability assessment may include an investigation of the living conditions in which the minor is to be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. The assessment will also take into consideration the wishes and concerns of the minor.

**(g) Family reunification.** Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, will promptly attempt to reunite the minor with his or her family to permit the release of the minor under Paragraph (d) above. Such efforts at family reunification will continue so long as the minor is in INS or licensed program custody and will be recorded by the INS or the licensed program in which the minor is placed.

**(h) Placement in licensed programs.** A "licensed program" is any program, agency or organization licensed by an appropriate state agency to provide residential group, or foster care services for dependent children, including a program operating group homes, foster homes or facilities for special needs minors. Exhibit 1 of the Flores v. Reno Settlement Agreement describes the standards required of licensed programs. Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space available, or within five days in all other cases, except when:

(i) the minor is an escape risk or delinquent, as defined in Paragraph (l) below;

(ii) a court decree or court-approved settlement requires otherwise;

Exhibit 80
Page 576

(iii) an emergency or influx of minors into the United States prevents compliance, in which case all minors should be placed in licensed programs as expeditiously as possible; or

(iv) where the minor must be transported from remote areas for processing or speaks an unusual language such that a special interpreter is required to process the minor, in which case the minor must be placed in a licensed program within five business days.

**(i) Secure and supervised detention.** A minor may be held in or transferred to a State or county juvenile detention facility or in a secure INS facility or INS-contracted facility having separate accommodations for minors, whenever the District Director or Chief Patrol Agent determines that the minor -

(i) has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, unless the minor's offense is

(a) an isolated offense not within a pattern of criminal activity which did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. ); or

(b) a petty offense, which is not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.);

(ii) has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

(iii) has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.);

(iv) is an escape-risk; or

(v) must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

Exhibit 80
Page 577

"Chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense.

The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

> (a) the minor is currently under a final order of deportation or exclusion;

> (b) the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

> (c) the minor has previously absconded or attempted to abscond from INS custody.

The INS will not place a minor in a State or county juvenile detention facility, secure INS detention facility, or secure INS-contracted facility if less restrictive alternatives are available and appropriate in the circumstances, such as transfer to a medium security facility that provides intensive staff supervision and counseling services or transfer to another licensed program. All determinations to place a minor in a secure facility must be reviewed and approved by the regional Juvenile Coordinator.

**(j) Notice of right to bond redetermination and judicial review of placement.** A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case in which he either affirmatively requests, or fails to request or refuse, such a hearing on the Notice of Custody Determination. A juvenile who is not released or placed in a licensed placement shall be provided (1) a written explanation of the right of judicial review in the form attached, and (2) the list of free legal services providers compiled pursuant to 8 C.F.R. § 292a.

**(k) Transportation and transfer.** Unaccompanied minors should not be transported in vehicles with detained adults except when being transported from the place of arrest or apprehension to an INS office or where separate transportation would be otherwise impractical, in which case minors shall be separated from adults. INS officers shall take all necessary precautions for the protection of minors during transportation with adults.

When a minor is to be released, the INS will assist him or her in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released. The Service may, in its discretion, provide transportation to such minors.

Exhibit 80
Page 578

Whenever a minor is transferred from one placement to another, she shall be transferred with all of her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions must be shipped to the minor in a timely manner. No minor who is represented by counsel should be transferred without advance notice to counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived notice, in which cases notice must be provided to counsel within 24 hours following transfer.

**(l) Periodic reporting.** All INS district offices and Border Patrol stations must report to the Juvenile Coordinator statistical information on minors placed in proceedings who remain in INS custody for longer than 72 hours. Information will include: (a) biographical information, including the minor's name, date of birth, and country of birth, (b) date placed in INS custody, (c) each date placed, removed or released, (d) to whom and where placed, transferred, removed or released, (e) immigration status, and (f) hearing dates. The Juvenile Coordinator must also be informed of the reasons for placing a minor in a medium security facility or detention facility as described in paragraph (i).

**(m) Attorney-client visits by Plaintiffs' counsel.** The INS will permit lawyers for the *Reno v. Flores* plaintiff class to visit minors even though they may not have the names of minors who are housed at a particular location. A list of Plaintiffs' counsel entitled to make attorney-client visits with minors is available from the district Juvenile Coordinator. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law of Los Angeles, California, or the National Center for Youth Law of San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

Visits must occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff must provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit the notice of appearance to representation of the minor in connection with his placement or treatment during INS custody. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

A minor may refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

Exhibit 80
Page 579

**(n) Visits to licensed facilities.** In addition to the attorney-client visits, Plaintiffs' counsel may request access to a licensed program's facility (described in paragraph (h)) or to a medium-security facility or detention facility (described in paragraph (i)) in which a minor has been placed. The district juvenile coordinator will convey the request to the facility's staff and coordinate the visit. The rules and procedures to be followed in connection with such visits are set out in Exhibit 4 of the *Flores v. Reno* Settlement Agreement,, unless Plaintiffs' counsel and the facility's staff agree otherwise. In all visits to any facility, Plaintiffs' counsel and their associated experts must treat minors and staff with courtesy and dignity and must not disrupt the normal functioning of the facility.

EXHIBIT 3
Contingency Plan

In the event of an emergency or influx that prevents the prompt placement of minors in licensed programs with which the Community Relations Service has contracted, INS policy is to make all reasonable efforts to place minors in licensed programs licensed by an appropriate state agency as expeditiously as possible. An emergency is an act or event, such as a natural disaster (e.g. earthquake, fire, hurricane), facility fire, civil disturbance, or medical emergency (e.g. a chicken pox epidemic among a group of minors) that prevents the prompt placement of minors in licensed facilities. An influx is defined as any situation in which there are more than 130 minors in the custody of the INS who are eligible for placement in licensed programs.

1. The Juvenile Coordinator will establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements. These 80 placements would supplement the 130 placements that INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses. The Juvenile Coordinator may consult with child welfare specialists, group home operators, and others in developing the list. The Emergency Placement List will include the facility name; the number of beds at the facility; the name and telephone number of contact persons; the name and telephone number of contact persons for nights, holidays, and weekends if different; any restrictions on minors accepted (e.g. age); and any special services that are available.

2. The Juvenile Coordinator will maintain a list of minors affected by the emergency or influx, including (1) the minor's name, (2) date and country of birth, and (3) date placed in INS custody.

3. Within one business day of the emergency or influx the Juvenile Coordinator, or his or her designee will contact the programs on the Emergency Placement List to determine available placements. As soon as available placements are identified, the Juvenile Coordinator will advise appropriate INS staff of their

Exhibit 80
Page 580

availability. To the extent practicable, the INS will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

4. In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List, the Juvenile Coordinator will work with the Community Relations Service to locate additional placements through licensed programs, county social services departments, and foster family agencies.

5. Each year, the INS will reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs. However, any decision to increase the number of placements available shall be subject to the availability of INS resources. The Juvenile Coordinator shall promptly provide Plaintiffs' counsel with any reevaluation made by INS pursuant to this paragraph.

6. The Juvenile Coordinator shall provide to Plaintiffs' counsel copies of the Emergency Placement List within six months after the court's final approval of the Settlement Agreement.


EXHIBIT 4
Agreement Concerning Facility Visits Under Paragraph 33

The purpose of facility visits under paragraph 33 is to interview class members and staff and to observe conditions at the facility. Visits under paragraph 33 shall be conducted in accordance with the generally applicable policies and procedures of the facility to the extent that those policies and procedures are consistent with this Exhibit.

Visits authorized under paragraph 33 shall be scheduled no less than seven (7) business days in advance. The names, positions, credentials, and professional association (e.g., Center for Human Rights and Constitutional Law) of the visitors will be provided at that time.

All visits with class members shall take place during normal business hours.

No video recording equipment or cameras of any type shall be permitted. Audio recording equipment shall be limited to hand-held tape recorders.

The number of visitors will not exceed six (6) or, in the case of a family foster home, four (4), including interpreters, in any instance. Up to two (2) of the visitors may be non-attorney experts in juvenile justice and/or child welfare.

Exhibit 80
Page 581

No visit will extend beyond three (3) hours per day in length. Visits shall minimize disruption to the routine that minors and staff follow.


Exhibit 5
List of Organizations to Receive Information re: Settlement Agreement

Eric Cohen, Immig. Legal Resource Center, 1663 Mission St. Suite 602, San Francisco, CA 94103

Cecilia Munoz, Nat'l Council Of La Raza, 810 1st St. NE Suite 300, Washington, D.C. 20002

Susan Alva, Immig. & Citiz. Proj Director, Coalition For Humane Immig Rights of LA, 1521 Wilshire Blvd., Los Angeles, CA 90017

Angela Cornell, Albuquerque Border Cities Proj., Box 35895, Albuquerque, NM 87176-5895

Beth Persky, Executive Director, Centro De Asuntos Migratorios, 1446 Front Street, Suite 305, San Diego, CA 92101

Dan, Kesselbrenner, , National Lawyers Guild, National Immigration Project, 14 Beacon St.,#503, Boston, MA 02108

Lynn Marcus , SWRRP, 64 E. Broadway, Tucson, AZ 85701-1720

Maria Jimenez, , American Friends Service Cmte., ILEMP, 3522 Polk Street, Houston, TX 77003-4844

Wendy Young, , U.S. Cath. Conf., 3211 4th St. NE, , Washington, DC, 20017-1194

Miriam Hayward , International Institute Of The East Bay, 297 Lee Street , Oakland, CA 94610

Emily Goldfarb, , Coalition For Immigrant & Refugee Rights, 995 Market Street, Suite 1108 , San Francisco, CA 94103

Jose De La Paz, Director, California Immigrant Workers Association, 515 S. Shatto Place , Los Angeles, CA, 90020

Annie Wilson, LIRS, 390 Park Avenue South, First Asylum Concerns, New York, NY 10016

Stewart Kwoh, Asian Pacific American Legal Center, 1010 S. Flower St., Suite 302, Los Angeles, CA 90015

Warren Leiden, Executive Director, AILA, 1400 Eye St., N.W., Ste. 1200, Washington, DC, 20005

Exhibit 80
Page 582

Frank Sharry, Nat'l Immig Ref & Citiz Forum, 220 I Street N.E., Ste. 220, Washington, D.C. 20002

Reynaldo Guerrero, Executive Director, Center For Immigrant's Rights, 48 St. Marks Place , New York, NY 10003

Charles Wheeler , National Immigration Law Center, 1102 S. Crenshaw Blvd., Suite 101 , Los Angeles, CA 90019

Deborah A. Sanders, Asylum & Ref. Rts Law Project, Washington Lawyers Comm., 1300 19th Street, N.W., Suite 500 , Washington, D.C. 20036

Stanley Mark, Asian American Legal Def.& Ed.Fund, 99 Hudson St, 12th Floor, New York, NY 10013

Sid Mohn, Executive Director, Travelers & Immigrants Aid, 327 S. LaSalle Street, Suite 1500, Chicago, IL, 60604

Bruce Goldstein, Attornet At Law, Farmworker Justice Fund, Inc., 2001 S Street, N.W., Suite 210, Washington, DC 20009

Ninfa Krueger, Director, BARCA, 1701 N. 8th Street, Suite B-28, McAllen, TX 78501

John Goldstein, , Proyecto San Pablo, PO Box 4596,, Yuma, AZ 85364

Valerie Hink, Attorney At Law, Tucson Ecumenical Legal Assistance, P.O. Box 3007 , Tucson, AZ 85702

Pamela Mohr, Executive Director, Alliance For Children's Rights, 3708 Wilshire Blvd. Suite 720, Los Angeles, CA 90010

Pamela Day, Child Welfare League Of America, 440 1st St. N.W., , Washington, DC 20001

Susan Lydon, Esq., Immigrant Legal Resource Center, 1663 Mission St. Ste 602, San Francisco, CA 94103

Patrick Maher, Juvenile Project, Centro De Asuntos Migratorios, 1446 Front Street, # 305, San Diego, CA 92101

Lorena Munoz, Staff Attorney, Legal Aid Foundation of LA-IRO, 1102 Crenshaw Blvd., Los Angeles, CA 90019

Christina Zawisza, Staff Attorney, Legal Services of Greater Miami, 225 N.E. 34th Street, Suite 300, Miami, FL 33137

Exhibit 80
Page 583

Miriam Wright Edelman, Executive Director, Children's Defense Fund, 122 C Street N.W. 4th Floor, Washington, DC 20001

Rogelio Nunez, Executive Director, Proyecto Libertad, 113 N. First St., Harlingen, TX 78550

Exhibit 6
Notice of Right to Judicial Review

"The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may ask a federal judge to review your case. You may call a lawyer to help you do this. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

Exhibit 80
Page 584

# Exhibit 81

Exhibit 81
Page 585

DECLARATION OF JUSTIN MIXON

I, Justin Mixon, declare and say as follows:

1. I execute this declaration in support of plaintiffs' motion for an award of attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(2)(A), at market rates. For the reasons I explain below, I am of the firm opinion that giving aggrieved class members a fair chance of prevailing on their motion to enforce the settlement in *Flores v. Sessions* required counsel with expertise not possessed by most lawyers, nor even members of the immigration bar.

2. I am an attorney admitted to practice in the state of Pennsylvania. Further details regarding my professional qualifications appear in my CV attached hereto.

3. I am currently a private practitioner in Pennsylvania specializing in immigration law. My immigration practice areas include immigration benefits for immigrant and refugee minors, including asylum and removal defense.

4. From April 2014 to June 2017, I served as an attorney with Hebrew Immigrant Aid Society (HIAS) of Pennsylvania. HIAS Pennsylvania is a non-profit, public interest organization that provides legal and supportive services to immigrants, refugees and asylum seekers from all backgrounds in order to assure their fair treatment and full integration into American society. During my tenure, the Vera Institute of Justice funded HIAS Pennsylvania via a master grant from the Office of Refugee Resettlement of the U.S. Department of Health and Human Services to provide free legal services to immigrant and refugee minors in ORR custody. These services consisted primarily of conducting "know your rights" presentations and assisting with applications for affirmative immigration benefits, such as Special Immigrant Juvenile status and asylum.

5. As part of my duties with HIAS, I regularly communicated with other lawyers and advocates for detained immigrant and refugee children and subscribed to the major list serves for practitioners who detained immigrant and refugee children. I thereby became aware of advocacy, including litigation, carried out nationwide, and not only in

Exhibit 81
Page 586

Pennsylvania. Now in private practice, I continue to keep abreast of developments in the law impacting on my representing immigrant and refugee youth.

6. I am familiar with the work and reputation of Carlos Holguín, lead attorney for the *Flores* plaintiffs in their effort to compel ORR to grant juveniles in its custody bond redetermination hearings. In my opinion, Mr. Holguín possesses specialized knowledge regarding the rights of detained immigrant and refugee children, particularly the settlement in *Flores* and the potential for enforcing detained children's rights thereunder via class-wide litigation, that is not generally available. I am of the opinion that Mr. Holguín is among a very few advocates for immigrant children's rights in the country with the knowledge and experience needed to give the *Flores* class a fair chance of prevailing against ORR.

7. In my opinion, successfully enforcing the *Flores* settlement against ORR required specialized knowledge of poorly understood nooks and crannies of immigration law. The *Flores* settlement is now some 20 years old, yet it contains many protections for detained immigrant and refugee children found nowhere else. In other aspects, the *Flores* settlement contains provisions that precede and are now parallel to or analogous with other sources of law, particularly the 2002 Homeland Security Act and the 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act. Understanding how these disparate sources of law potentially intersect to delimit ORR's authority to detain immigrant and refugee children without hearing is not commonplace amongst lawyers generally, nor even among members of the immigration bar.

8. I know relatively few immigration practitioners who specialize in the rights of immigrant and refugee children. Apart from Vera Institute-funded legal services providers, I know of only a handful of lawyers who are truly versed in the rights of immigrant and refugee minors in ORR custody. In my experience, private practitioners generally lack the resources to pursue federal litigation on behalf of their clients, and they therefore typically limit representation to advocacy before the relevant federal administrative agencies: U.S. Citizenship and Immigration Services, U.S. Customs and Immigration Enforcement, and the

-2-

Exhibit 81
Page 587

Executive Office for Immigration Review. (Prior to the Ninth Circuit's affirming detained children's rights to bond hearings, practice before ORR consisted almost exclusively of filling out family reunification packets and supplicating informally on behalf of one's client.)

9. Lawyers whom the Vera Institute funds had, and continue to have, even less latitude in advocating for detained immigrant and refugee children. Although the TVPRA directs HHS to ensure that such children receive representation in "legal matters" to the greatest extent practicable, during my employment with HIAS Pennsylvania I was instructed that I could not assist detained children challenge ORR's release or placement decisions, no matter how arbitrary or otherwise unlawful ORR's decisions appeared. I know of no Vera-funded legal services provider who has ever represented a minor in federal court against ORR.

10. In sum, the members of the bar qualified and available to assist detained immigrant and refugee children seek redress against ORR in federal court are few, and the Vera Institute, at the behest of ORR, blocks the majority of those from representing children aggrieved by ORR's custody and placement decisions in any event. In my opinion, only attorneys with this distinctive mix of knowledge of immigrant and refugee children's rights and the skill and experience to bring federal litigation to enforce those rights could have enforced the *Flores* settlement against ORR. I must therefore conclude that aggrieved *Flores* class members would have had great difficulty retaining qualified counsel to seek class-wide relief against ORR were it not for Mr. Holguín and his colleagues.

11. *A fortiori*, I also believe that no other qualified lawyers could have been found to represent the plaintiff class against ORR at the inflation-adjusted EAJA rate. To begin, few members of the immigration bar regularly engage in federal court litigation; those who do, typically pursue cases on behalf of individual clients; and only a very small number are willing and able to prosecute class actions, or indeed, any federal litigation in which a favorable outcome is not reasonably assured with a minimal investment of time and money.

-3-

Exhibit 81
Page 588

The steep learning curve required to develop adequate expertise in the law impacting *Flores* class members in this case would make finding qualified counsel at the statutory rate all but impossible.

I declare under penalty of perjury that foregoing is true and correct.

Executed this 19th day of October, 2017, at Jenkintown, Pennsylvania.

Justin Mixon

/ / /

-4-

Exhibit 81
Page 589

# Justin Mixon, Esq.
453 Johnson Street, Suite 201A
Jenkintown, PA 19046
(215) 692-2262
justinmixon@mixonlegal.net

---

## EDUCATION

**University of Minnesota Law School**, Minneapolis, MN
J.D. – May 2002, Cum Laude
2002 Law School Public Service Award
Environmental Moot Court Director
National Competition Team Member 2001-2002

**Trinity University**, San Antonio, TX
B.A. in Religion (academic studies), May 1994

## EXPERIENCE

**HIAS Pennsylvania**
Immigrant Youth Staff Attorney, 5/2014 – 6/2017
- Represent youth and young adults in child welfare, custody, asylum, Deferred Action, and U Visa cases.
- Manage and provide information and support for cases with pro bono attorneys at local law firms.
- Conduct presentations and CLE legal seminars to synagogues, law schools, lawyers, and other community groups regarding the humanitarian crisis in Central America and how they can assist immigrant families.
- Collaborate with community and advocacy groups to promote the rights of immigrant families detained at the Berks family detention center and federal government youth shelters.

**Justin Mixon, Esquire**, Jenkintown, PA
Solo Practice Attorney 2012 - present
- Represent clients in immigration, family, and housing cases in court and in administrative hearings.
- Provide legal advice and representation to clients through the Montgomery County Bar Association Legal Access Project.
- Complete transactional matters, such as wills, trusts, rental leases, deeds, and contracts.

**Abington Friends School**, Abington, PA
4th Grade Collaborating Teacher, 8/11 – 6/12
- Design and teach math, literacy, and social studies lessons in two 4th grade classrooms.
- Create and direct engaging classroom learning centers in four core subjects.
- Assistant coach for high school chess and ultimate frisbee teams.

Exhibit 81
Page 590

**Educational Advancement Alliance's Learning Lab**, Philadelphia, PA
Science Teacher 7/10 – 4/11
- Created and taught fun, hands-on science lessons for 4th, 5th and 6th grade students on a mobile science lab bus visiting Philadelphia School District elementary schools.
- Organized professional development science trainings for teachers, including a new program to provide science materials and lessons to teachers.
- Collaborated with other non-profit organizations and the Philadelphia School District to conduct science fairs, summer programs, and other community events.

**Philadelphia School District**, Philadelphia, PA
Third Grade Teacher 7/08 – 6/10 (Laura Carnell Elementary School)
Fifth Grade Teacher 2/08 – 7/08 (William Cramp Elementary School)
- Taught 3rd grade students of diverse backgrounds, using the Literacy, Math, Science, and Social Studies Philadelphia curriculum.
- Designed engaging lessons that require students to learn and demonstrate skills on their own and in groups.

**Justin Mixon, Esquire** - Jenkintown, PA
Solo Practice Attorney 5/06 – 12/07
- Represented clients in employment, contracts, family law, and other cases in court and in administrative hearings.
- Provided free legal advice to dozens of clients through the Montgomery County Bar Association Legal Access Project.

**Legal Aid Bureau, Inc.** – Riverdale, MD
Staff Attorney 7/04 – 5/06
- Represented low-income clients in employment, housing, bankruptcy, and consumer cases in court and in administrative hearings.
- Performed outreach and legal rights presentations for community groups, including Spanish-speaking immigrant communities.

**Equal Justice Works Fellowship - Virginia Justice Center**, Falls Church, VA
Attorney / Equal Justice Works Fellow 9/02 – 7/04
- Organized low-wage immigrant workers to advocate for better working conditions in courts and with police, employers and government agencies.
- Conducted monthly clinics teaching workers how to represent themselves in small claims court and file complaints with state agencies to collect unpaid wages.

**U.S. Peace Corps, Guatemala**
Agricultural Diversification / Community Development Volunteer 10/95 – 1/98
- Provided technical assistance and project facilitation to improve crop production, family nutrition, and group organization in 5 villages with over 25 families.

**Heifer Project International**, Perryville, Arkansas
Educator for the International Learning and Livestock Center 9/94 - 8/95

Exhibit 81
Page 591

# Exhibit 82

Exhibit 82
Page 592

Subject: RE: Correspondence re: legal representation for Flores class members
From: "Fabian, Sarah B (CIV)" <Sarah.B.Fabian@usdoj.gov>
Date: Fri, 23 Mar 2018 22:24:46 +0000
To: "crholguin@centerforhumanrights.org" <crholguin@centerforhumanrights.org>, Paola Midence
<pmidence@catholiccharities.org>, "kchapman@catholiccharities.org" <kchapman@catholiccharities.org>,
"Alsterberg, Cara E. (CIV)" <Cara.E.Alsterberg@usdoj.gov>, "Silvis, William (CIV)" <William.Silvis@usdoj.gov>,
"Murley, Nicole (CIV)" <Nicole.Murley@usdoj.gov>
CC: Leecia Welch <lwelch@youthlaw.org>, Crystal Adams <cadams@youthlaw.org>, Neha Desai
<ndesai@youthlaw.org>, Poonam Juneja <pjuneja@youthlaw.org>, "Holly S Cooper"
<hscooper@ucdavis.edu>, Schey Peter <pschey@centerforhumanrights.org>

Carlos:

This email responds to your March 12, 2018 letter. Your letter requests that "HHS, through its contractor,
the Vera Institute of Justice, and its subcontractor, the St. Frances Cabrini Center for Immigrant Legal
Assistance, provide [five UACs] legal representation in the legal matters enumerated above."

As an initial matter, your request appears to be based on your assertions regarding the requirements of the
TVPRA. Any alleged compliance or non-compliance by Defendants with the TVPRA, enacted in 2009, is not
relevant to the requirements of the *Flores* Settlement Agreement, and thus is outside the scope of your
representation of class members in the *Flores* case.

Moreover, Defendants dispute that the provisions of the *Flores* Settlement Agreement and the TVPRA cited
by you in your letter require that ORR provide representation in the manner requested in your letter.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguin [mailto:crholguin@centerforhumanrights.org]
**Sent:** Monday, March 12, 2018 3:28 PM
**To:** Paola Midence <pmidence@catholiccharities.org>; kchapman@catholiccharities.org; Fabian, Sarah B
(CIV) <sfabian@CIV.USDOJ.GOV>; Alsterberg, Cara E. (CIV) <caalster@CIV.USDOJ.GOV>; Silvis, William (CIV)
<WSilvis@civ.usdoj.gov>
**Cc:** Leecia Welch <lwelch@youthlaw.org>; Crystal Adams <cadams@youthlaw.org>; Neha Desai
<ndesai@youthlaw.org>; Poonam Juneja <pjuneja@youthlaw.org>; Holly S Cooper
<hscooper@ucdavis.edu>; Schey Peter <pschey@centerforhumanrights.org>
**Subject:** Correspondence re: legal representation for Flores class members

Please see attached.

Thank you.

--

Exhibit 82
Page 593

Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org

Exhibit 82
Page 594

# Exhibit 85

Exhibit 85
Page 607

DECLARATION OF LORILEI ALICIA WILLIAMS

I, Lorilei Alicia Williams, declare and say as follows:

1. I am an attorney licensed to practice in the states of Texas and New York. I joined Staten Island Legal Services, part of Legal Services NYC, in January 2016 as the Immigration Unit Director.

2. From September 2012 until April 2014, I worked as a staff attorney in the unaccompanied minors program of the St. Frances Cabrini Center for Immigration Legal Assistance at Catholic Charities of the Archdiocese of Houston-Galveston. In the course of my practice I regularly represented unaccompanied juveniles detained pursuant to the Immigration and Nationality Act (INA) and housed by the Office of Refugee Resettlement of the Department of Health and Human Services (ORR) at the following detention facilities: Southwest Key Conroe, Shiloh, Southwest Key Casa Houston, Southwest Key Mesa, Baptist Children and Family Services Baytown, Catholic Charities St. Michael's, and the Children's Center in Galveston.

3. From May 2014 until January 2016, I worked as a staff attorney in the unaccompanied minors program of Catholic Charities Community Services of the Archdiocese of New York. During this period I regularly represented unaccompanied juveniles detained ORR detained at the following facilities: MercyFirst, the Children's Village, Cayuga Centers, Abbott House, Leake and

Exhibit 85
Page 608

Watts, New York Foundling, the Children's Home of Poughkeepsie, the Children's

Home of Kingston, Lincoln Hall, and Cardinal McClosky, among others.

4.   My representation included assisting detained juveniles contest removal,

seek affirmative immigration benefits such as asylum and special immigrant

juvenile status, as well as seeking their release to parents or other custodians and

advocating for their placement in the least restrictive setting. I have accordingly

had regular occasion to observe, and am intimately familiar with, ORR's policies

and practices, as well as those of United States Immigration and Customs

Enforcement (ICE), toward the detention, release, and treatment of juveniles. I am

also familiar with how those policies and practices have changed over time.

5.   In the Houston area, Southwest Key Mesa was primarily a shelter-level

facility, although it did have staff-secure beds.  Shiloh was primarily a residential

treatment center, although for some time it also had staff-secure beds.  In New

York, the Children's Village was primarily a shelter-level facility with two cottages

dedicated to staff-secure beds.  MercyFirst has both shelter-level beds and

residential treatment center beds.

6.   Children are placed in staff-secure beds if ORR determines that they

require a higher level of supervision than the general population of detained

immigrant and refugee youth.  Staff-secure placement is more restrictive than

shelter placement or placement in transitional foster care.  In all aforementioned

- 2 -

Exhibit 85
Page 609

facilities, I observed that children placed in staff-secure beds oftentimes remained

at staff-secure level for several months.  In a few cases, ORR released such

children to sponsors or transferred them directly to a less secure long-term

placement (such as ORR-funded long-term foster care or the Unaccompanied

Refugee Minors (URM) program).  In most cases, however, ORR required that the

child earn the right to be "stepped-down" from staff-secure level to shelter level

before it would release the child or transfer him or her to a long-term placement.  It

was common to see children detained for six months or longer in staff-secure

placements.

7.  ORR places children at residential treatment centers (RTCs) when it

believes they need psychological or medical intervention.  Most children I worked

with at RTCs suffered from post-traumatic stress disorder.  Many had thoughts of

self-harm or suicide, or had experienced psychotic episodes.  (A few had no

extraordinary psychological needs, but had heightened medical conditions such as

deafness, muteness, autism, or epilepsy.)  Many children suffering from PTSD or

other psychological trauma also had alleged criminal history closely associated

with such trauma.  Similar to staff-secure children, ORR would sometimes release

RTC children directly from RTC, but most often would refuse to release them until

they had first stepped down to a less secure placement.  In both staff-secure and

RTC placements, children suffered greater restrictions on their liberties, such as

- 3 -

Exhibit 85
Page 610

being denied permission to leave the facility to attend school or recreational activities. In my experience, children in staff-secure or RTC placements also reported shelter abuses more frequently, such as excessive use of force when restraining a child, threatening children with removal, and general hostility towards the children.

8. I am informed and believe that the *Flores* settlement and § 235(c)((2) of the 2008 Trafficking Victims Protection Act (TVPRA) require ORR to place detained juveniles in the least restrictive setting that is in the best interests of the child. I am further informed and believe that the *Flores* settlement and the TVPRA require ORR to minimize the detention of juveniles by releasing them to their parents and other reputable custodians except where a particular minor is an extraordinary flight-risk or to ensure his or her safety or the safety of others. I am further informed and believe that the *Flores* settlement guarantees juveniles whom ORR refuses to release notice and a meaningful opportunity to be heard regarding the grounds for continuing to detain them. In my opinion, ORR is clearly in breach of these requirements: ORR is needlessly extending the juveniles' time in detention, placement in staff-secure beds and RTCs, and it affords detained youth little or no opportunity to examine or contest the grounds for continuing to detain them or house them in restrictive settings. The following examples illustrate ORR's policies and practices.

- 4 -

Exhibit 85
Page 611

9. Alan Yair Cruz Mar, a 16-year-old born in Mexico, A 205 907 243, was
detained by Customs and Border Protection (CBP) on August 24, 2015.  Alan's
father is a U.S. citizen who recognized his paternity over Alan and agreed to
provide him with financial support until he turns 18, thereby making Alan a
derivative U.S. citizen effective the date of his birth.  A derivative citizen does not
need to apply for citizenship: he or she is a citizen at birth.  Alan did not know that
he had this claim to citizenship until I met with him and also spoke with his father.

10. On November 6, 2015, I informed ORR and ICE that Alan was a U.S.
citizen and therefore not subject to detention under the INA. ICE's Enforcement
and Removal Operations (ERO) unit terminated removal proceedings against Alan
during the fourth week of November because of his probative claim to U.S.
citizenship and, advised ORR regarding his U.S. citizenship claim. ORR
nevertheless continued to detain him for months without affording him any
meaningful opportunity contest such detention and despite my best efforts to have
him released to his father.

11. In an effort to have Alan released to his father, I reached out multiple
times via telephone and email to David Fink, ORR's Federal Field Specialist (FFS)
supervisor, and James "Jim" de la Cruz, also an FFS supervisor, both out of
Washington, D.C. On multiple occasions, they simply refused to respond to
inquiries regarding why Alan was being detained in lieu of release to his father.  A

- 5 -

Exhibit 85
Page 612

local FFS, Karla Mansilla, instructed me to bring up the question with ORR's legal counsel, but when I asked for their counsel's contact information, she refused to give it to me. (I considered filing a petition for habeas corpus contesting Alan's continued detention, but as explained below, I was then funded by the Vera Institute pursuant to a contract with ORR; both ORR and Vera Institute informally discourage Vera-funded lawyers from taking any legal action against ORR lest they cut off funds entirely for assisting unaccompanied minors.)

12. I successfully had Alan's removal proceedings terminated in immigration court in mid-January 2016, but it took more than a week for ORR to release Alan to his grandmother. At no time did ORR provide Alan, his father, his grandmother, or me any written explanation of its reasons for continuing to detain him. At no time did ORR present Alan for a bond redetermination hearing. At no time did ORR disclose to Alan, his father, his grandmother, or to me the evidence supporting its decision to continue Alan in detention. At no time did ORR grant Alan, his father, or his grandmother a hearing regarding the grounds for continuing to detain Alan. The most ORR could muster was to advise me informally that they did not want release Alan because they were concerned about his father's criminal history.

13. Another of my clients who suffered needless detention was William Alberto Alvarez Argaeta, A 205 298 892, from El Salvador. (William recently

- 6 -

Exhibit 85
Page 613

passed away at the age of 14 in a fishing accident.)  CBP apprehended William on December 26, 2011, when he was nine years old.  ORR first detained William at the IES Harlingen Foster Program, and then at the Children's Center in Galveston, Texas.  On January 4, 2012, ORR transferred him to Shiloh RTC.  William was diagnosed with Attention-Deficit/Hyperactivity Disorder, Combined Type; Posttraumatic Stress Disorder; and, Bipolar I Disorder, with episodes that have been mixed, severe with psychotic features.

14. William's psychological difficulties stemmed from a long and tragic history of sexual abuse in El Salvador.  He had been abandoned by extended family with whom his parents had left him, and for at least a year he lived alone, homeless, and defenseless on the streets of El Salvador; he was eight years old and easy prey for sexual predators.  William's parents eventually managed to find him and arranged to have him brought to Dallas, Texas, where they lived.

15. I began representing William in October 2012. On numerous occasions he was uncooperative and exhibited clear indicia of mental illness. During this initial period of detention, William had no next-friend or child advocate, so I undertook to advocate for release to his parents. Being reunified with his parents was William's only clear wish, and I believed his parents would speak for him during removal proceedings.  ORR refused to release William. As was the case with Alan, the agency refused to provide any written explanation of why a child of

- 7 -

Exhibit 85
Page 614

such tender age and suffering from such trauma needed to be detained for more than a year when his parents were ready, willing and able to care from him and lived only a few hours away. Again, at no time did ORR present William for a bond redetermination hearing. At no time did ORR disclose to William's parents or to me the evidence supporting its decision to continue William in detention. At no time did ORR grant William or his parents any hearing regarding its reasons for continuing to detain their nine year old child.

16. ORR also appears to have done its best to insulate its decisions to continue children in detention from judicial review. When I discussed William's plight with my supervisors at Catholic Charities Houston, I was told explicitly that we could not take legal action against ORR because our Vera Institute funding to help detained children would be at risk. I determined, then, that my only recourse was to attempt to terminate William's removal proceedings on the basis of his incompetency. In January 2013, I submitted a motion to the immigration court. I also reached out to ORR and asked them if William's psychiatrist and clinician would be able to testify in court as to William's competency. I believe an individual hearing date was either for April or June 2013, but I do not recall the exact date. Some time prior to the competency hearing, ORR suddenly and without explanation released William to his parents; he had by that time spent almost a year and a half needlessly detained.

- 8 -

Exhibit 85
Page 615

17. As the foregoing cases illustrate, in practice I have never known ORR to provide any written explanation for its decisions against releasing juveniles from staff-secure or RTC detention. In my experience, ORR affords neither detained juveniles nor their parents or other proposed custodians any transparent, meaningful opportunity to be heard on the matter of children's release, no opportunity to see, explain or rebut whatever evidence ORR believes justifies a child's continued secure confinement, or any effective way to appeal ORR's custody decisions administratively. Although ORR publishes on its website that parents may send a letter to the ACF Assistant Secretary appealing the denial, this is not communicated clearly to the parents or children.  In sum, in denying juveniles' release to their parents or other caregivers, ORR provides—

- no notice of the reasons for housing them in a staff-secure or RTC facility;

- no bond redetermination or other hearing on the reasons for continuing to detain them;

- no written information regarding when or if it will reach a decision on whether to detain or release a child;

- no written information regarding when or if it will "step down" a child from a staff-secure or RTC placement to a non-secure licensed placement;

- 9 -

Exhibit 85
Page 616

- no explanation of the right of judicial review; and

18. Although I am not a mental health professional, I have noted the deleterious effects ORR's opaque and oft-delayed release and step-down decisions have on detained youth. In both Alan's and William's cases, facility staff repeatedly encouraged my clients, their parents, and myself to believe that ORR would release my clients promptly, whereas in truth and fact the agency delayed its decisions for weeks or months, leaving children, their parents, and their lawyer twisting in the wind, awaiting a decision from on high that might or might not be favorable and that would never be explained other than in the barest of conclusory terms. In the face of such extended and faceless uncertainty, detained children—already traumatized by horrific experiences in their countries of origin—have expressed to me feeling profound helplessness and despair, to the point where they are prepared to take extreme measures, including opting for voluntary return to countries in which they know their lives and freedom will be in jeopardy, rather than continue to live day after day in ORR's detention facilities never knowing if or when they will be reunited with their families.

19. Additionally, although ORR boasts of providing free legal services to detained minors, it hobbles free legal service providers who undertake to represent detained children. While working for both Catholic Charities in Houston and in New York, I was funded by ORR to represent detained unaccompanied minors.

- 10 -

Exhibit 85
Page 617

ORR provides such funds pursuant to the TVPRA to the VERA Institute of Justice, which then sub-contracts with nonprofit legal service organizations to provide direct legal services to ORR detainees, among others.

20.  In cases where ORR insisted upon detaining children for unusually long periods of time, pursuing relief in federal court was not an option, so my only recourse was to maintain open communication with shelter staff and ORR personnel in the hopes that a positive long-term stakeholder relationship would work to detained children's benefit.  On more than one occasion, shelter staff and I strategized together on how to persuade ORR to release a child, but these measures were no substitute for a fair and transparent procedure by which detained children and their parents could understand and test the government's case for refusing release.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5 day of August, 2016, at Staten Island, NY.

Rachel W W Granfield
Notary Public, State of New York
No. 02GR6333769
Qualified in Richmond County
My Commission Expires 11-30-19

/// Rachel WW Granfield

Lorilei Alicia Williams

- 11 -

Exhibit 85
Page 618

# Exhibit 86

Exhibit 86
Page 619

### DECLARATION OF MEGAN STUART

I, Megan Stuart, declare and say as follows:

1. I am an attorney licensed to practice in the state of New York. Since 2011, I have been  employed by the Urban Justice Center and work for the Peter Cicchino Youth Project ("PCYP")

2. The Peter Cicchino Youth Project provides free civil and immigration legal services to homeless and incarcerated youth under 25 in New York, with a particular focus on LGBTQ youth. PCYP works to interrupt cycles of poverty and criminalization that prevent homeless and street-involved young people in New York City from living their lives to the fullest. We do so by providing holistic, client-centered legal services and case management. PCYP operates legal clinics in drop-in centers and youth programs where homeless youth congregate to access food, showers, laundry, medical care, social services, and community. To meet the needs of undocumented youth, we have partnerships with service providers and community activists who are able to connect homeless immigrant youth with us.

3. My immigration practice involves representing clients in a wide array of affirmative immigration applications, including Special Immigrant Juvenile Status, U Visas, Asylum, Green Card replacements, adjustment

Exhibit 86
Page 620

of status and naturalization as well as defensive applications for clients in removal proceedings.

4. PCYP clients are a mix of young people who were brought here as children or who fled their home country because of sexual orientation/gender identity-based persecution. Some of these clients have had no contact with immigration, while others are in removal proceedings and homeless.

5. In the course of my practice I have represented unaccompanied juveniles detained pursuant to the Immigration and Nationality Act (INA) and housed by the Department of Health and Human Services' Office of Refugee Resettlement (ORR) at Children's Village, Union County Juvenile Detention Center, Shenandoah, NOVA and Sandy Pines.

6. My representation of these youth includes both advocacy for release from detention and placement in the least restrictive setting possible as well as immigration representation, including applications for various immigration benefits and defense in removal proceedings.

7. Through this work, I have had regular occasion to observe, and am accordingly familiar with, the policies and practices of the ORR and United States Immigration and Customs Enforcement (ICE), toward the detention, release, and treatment of juveniles detained at Children's

- 2 -

Exhibit 86
Page 621

Village and Union County, which I am informed and believe are generally representative of ORR policies and practices nationwide.

8. The Union County facility in New Jersey and NOVA in Virginia, are secure detention facilities for adjudicated juvenile delinquents; to my knowledge, these facilities are neither licensed nor suited to house dependent, non-delinquent minors. The facilities are surrounded by a secure perimeter fence, and ingress and egress take place through sally ports. To my knowledge, juveniles detained at Union County and NOVA are never allowed outside the facility. Schooling takes place inside the locked gates of the facility; visitation is rare and tightly regulated.

9. In sum, juveniles held at the Union County facility live under palpably prison-like conditions, and those placed there by ORR or ICE are treated little differently from the adjudicated delinquents with whom ORR and ICE detainees are wholly commingled and have regular daily contact.

10. I am informed and believe that pursuant to the 2008 Trafficking Victims Protection Act (TVPRA) as well as the 1997 settlement in *Flores v. Lynch*, No. 85-4544 (C.D. Cal.), neither ORR nor ICE is permitted to place minors in secure juvenile facilities unless no less restrictive alternative is available and appropriate under the circumstances.

- 3 -

Exhibit 86
Page 622

11. I am further informed and believe that the *Flores* settlement requires
ORR and ICE to minimize the detention of juveniles by releasing them to
their parents and other reputable custodians except where a particular
minor is an extraordinary flight-risk or to ensure his or her safety or the
safety of others. In light of what I have observed in the abovementioned
facilities, I believe ORR and ICE are clearly in breach of these
requirements.

12. In multiple cases of youth detained in these facilities, I have advised
ORR of the availability of less restrictive placements, including release to
parents, guardians, or other appropriate custodians, yet in my experience
ORR generally ignores such alternatives or rejects them without
providing detained children, their parents or other proposed custodians,
or their counsel a coherent explanation of why it believes release would
be inappropriate, nor does ORR provide any meaningful opportunity to
examine, much less explain or rebut, any evidence it may have to support
having denied children's release. At best, ORR's policies and procedures
for determining whether to release a juvenile are ad hoc and adhere
neither to accepted standards of due process in immigration proceedings
nor to those accepted in the context of child welfare.

- 4 -

Exhibit 86
Page 623

13. In my experience, ORR never provides a child denied release (i) a written explanation for refusing to release the minor from either Union County or Children's Village facility; a bond redetermination hearing before an immigration judge; a Form I-770; an explanation of the child's right to seek judicial review of ORR's release or placement decisions; or a list of free legal services providers. In effect, ORR affords detained juveniles no meaningful opportunity to be heard on the matter of their release, to see or explain any evidence ORR believes justifies their continued secure confinement, or to appeal ORR's custody or placement decisions administratively.

14. Among my clients whose experience is illustrative of the foregoing are E.S., Roberto Montealegre, and Sandra Igihozo.

15. Sandra Igihozo is a now 20- year-old native and citizen of Rwanda and a member of the class protected under the *Flores* settlement, who was previously detained at the Children's Village in New York.

16. Sandra, who had a stable middle-class childhood, fled Rwanda after she was tortured because of her sexual orientation. During her journey to join her family in Canada, Sandra was sexually assaulted.

17. Sandra was taken into custody by CBP in July 2013, and was placed at Children's Village a few days later. She entered ORR care pregnant and

- 5 -

Exhibit 86
Page 624

without family in the United States. In July 2013, ORR determined that Sandra would be detained in lieu of release on bond, recognizance, supervision or parole. In October 2013, I requested that the immigration court review ORR's no-release decision and the $20,000 bond set before her transfer to ORR. In a decision dated October 31, 2013, and affirmed December 19, 2013, the immigration court declined to redetermine bond because she believed that she only had jurisdiction over certain custody determinations made by the Attorney General, and not the Office of Refugee Resettlement. Sandra accordingly remained detained. A true and correct copy of this decision is attached as Exhibit A to this declaration.

18. During the pendency of the Bond redetermination motion, I also made a request on October 2, 2013 for ORR to release Sandra into the custody and care of a licensed youth shelter that had agreed to provide her foster care until her 21st birthday. On October 24, 2013, ORR field specialist Elcy Velez denied this request, advising via email that "ORR has no plans to release Sandra at this time." ORR provided no explanation for its decision, nor did it disclose—much less allow Sandra to explain or rebut—any evidence it may have had to support its decision. A true and correct copy of my request and ORR's denial thereof are attached as Exhibit B to this declaration.

- 6 -

Exhibit 86
Page 625

19. Between October and December 2013, I made several additional requests to ORR for Sandra to be released so that she could enter foster care, all of which were denied without any explanation of the reasons for the decision, the standards employed, or the evidence upon which the decision was based.

20. Sandra remained in ORR custody until January 10, 2014, 20 days before her 18th birthday. I believe the threat of a habeas petition is what motivated ORR and the Attorney General to release Sandra into URM care, though ORR never offered any explanation for reversing its decision to detain Sandra.

21. Despite the stress that months of detention imposed on Sandra and her child, Sandra was eventually able to become a Legal Permanent Resident.

22. In my experience, the Vera-funded legal service providers seem reluctant to aggressively advocate or take legal action when ORR refuses to release a minor or places them in an overly restrictive setting.

23. Although most Vera-funded providers are personally committed to representing immigrant youth with the utmost vigor, the current funding structure deters many from zealously advocating for unaccompanied minors with respect to ORR's often arbitrary detention decisions.

- 7 -

Exhibit 86
Page 626

24. Though I am uniquely situated in terms of capacity and expertise to represent youth in ORR detention, I have been told that because of my advocacy for my clients, Vera-funded providers are not to refer cases to me, or risk losing their funding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of August 2016.

Megan Stuart

- 8 -

Exhibit 86
Page 627

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
26 FEDERAL PLZ 12TH FL.,RM1237
NEW YORK, NY  10278


URBAN JUSTICE CENTER
123 WILLIAM STREET 16TH FL.
NEW YORK, NY  10038

IN THE MATTER OF            FILE A 205-710-232       DATE: Oct 31, 2013
IGIHOZO, SANDRA

___ UNABLE TO FORWARD - NO ADDRESS PROVIDED

___ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE.  THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:   BOARD OF IMMIGRATION APPEALS
                     OFFICE OF THE CLERK
                     5107 Leesburg Pike, Suite 2000
                     FALLS CHURCH, VA  20530


___ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                     IMMIGRATION COURT
                     26 FEDERAL PLZ 12TH FL.,RM1237
                     NEW YORK, NY  10278

___ OTHER: _____
_____

                              _____
                              COURT CLERK
                              IMMIGRATION COURT              FF

   CC: DISTRICT COUNSEL, NYC DISTRICT
       26 FEDERAL PLAZA, ROOM #1130
       NEW YORK, NY,  10278

Ex A1

Exhibit 86
Page 628



**U.S. Department of Justice**

Executive Office for Immigration Review
*Immigration Court*

26 Federal Plaza, 12ᵗʰ Floor Room 1237
New York, New York 10278

File: A205 710 232 - New York

---------------------------------------------x

In the Matter of
IGIHOZO, Sandra                                    In Removal Proceedings
Respondent.

---------------------------------------------x

On behalf of Respondent:                      On behalf of DHS:
Megan Stuart, Staff Attorney                  Fen Lu, Assistant Chief Counsel

### Decision on Motion for Bond Redetermination

The respondent is a seventeen year old, female, who is a native and citizen of Rwanda. She is alleged to have entered the United States upon presentation of a false passport in an assumed name on or about July 13, 2013 at Dulles International Airport. On or about July 29, 2013, she was apprehended by U.S. Border Patrol Agents near the Canadian border. She explained to the agents that she was attempting to enter Canada. She was placed in custody and served with a Notice to Appear on that date. On the following day, she was served with Form I-286, informing her that DHS had made a determination that she be released from custody under bond in the amount of $20,000.[1]

The respondent was previously before Immigration Judge Gabriel C. Videla when, through counsel, she indicated she wished a bond redetermination. Judge Videla instructed counsel to file the motion by October 9, 2013, and the Department to reply by October 17, 2013. The Department did not respond. On October 17, 2013, the matter was assigned to me for consideration. I granted the Department an extension to respond, and they have filed a memorandum in opposition to the respondent's motion. The respondent has replied to that memorandum in opposition.

As more fully described in her pending motion, the respondent was forced to flee Rwanda after she was detained by the police and threatened with death when her sexual orientation

---

[1]The Record of Proceeding does not include Form I-286. However, respondent has supplied a copy of such document (Exhibit C to Reply to DHS Opposition), and the Form I-213 (Exhibit B to Emergency Motion filed by respondent) confirms that such determination was made at the time of her apprehension. Respondent indicated on Form I-286 that she requested a redetermination of this custody decision by an immigration judge.

Exhibit 86
Page 629

(lesbian) was discovered.  Her mother made arrangements with a step-cousin to take the respondent to Canada, where she has family.  Unfortunately, en route to the United States, she was raped by her step-cousin.  In the United States, she sought to escape from him and took a cab to the US-Canadian border where she was apprehended and these proceedings were initiated. [2] The respondent asserts that she is pregnant as a result of the rape by her step-cousin, and is due to deliver a child approximately one month after her 18th birthday.

Respondent is currently housed at Children's Village in Dobbs Ferry, New York.  She asserts that she is not comfortable in that setting, has no educational opportunities there, and most of the children are much younger than she is.  In Rwanda, she had completed most of her high school education and speaks three languages.  She has presented documentation to show that she has been accepted into the Safe Horizon's Streetwork Project, and has offered a "detailed release plan" written by that office's social worker.  However, the Office of Refugee Resettlement ("ORR"), through its Federal Field Specialist, Elcy Valdez, has declined to allow such placement and informed counsel for respondent, as recently as October 24, 2013,  that it has "no plan to release Sandra at this time."

Respondent asserts that the immigration judge has authority to order the release of the respondent.  DHS asserts that it does not.  I have carefully considered the memoranda and evidence, and arguments made by both sides and have concluded that an immigration judge has authority to review the decision of the DHS with respect to determinations relating to bond, but that it has no authority to interfere with the care and custody of the minor child as determined by ORR.

The respondent has offered an unreported decision of the Board of Immigration Appeals to support her position.  That decision is supportive of my conclusion that I continue to have jurisdiction with respect to bond, and could order the $20,000 bond reduced or that she be released on conditional parole, but I can not require the Office of Refugee Resettlement to make any particular determination regarding the placement of the respondent.  The Immigration Judge's authority to determine conditions of custody under 8 C.F.R. 1236.1(d) extends only to certain custody determinations by the Attorney General, not the Office of Refugee Resettlement. I have no authority under the Homeland Security Act of 2002 to order the ORR to provide any particular custody arrangements, or to require them to provide reasons for their custody decisions.  The Director of ORR is charged with "coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status."  6 U.S.C. 279(b)(a)(A).  The Director has jurisdiction to make placement determinations, but that does not strip jurisdiction from the Immigration Judge to determine if custody is warranted in the first place.  Clearly, the overriding consideration in separating the custody decisions made by the Attorney General from those care and custody issues determined

---

[2] The respondent asserts that her baby is due in February (about a month after her 18th birthday).  The respondent claims that she was raped by her step-cousin, Didier, while in Uganda. The time-frame of these events is not clear, although it would seem that respondent became pregnant in approximately May, 2013, nine months prior to her anticipated delivery in February, 2014.

Exhibit 86
Page 630

by ORR highlights the need for the expertise of those charged with the best placement of the child for the best interests of the child.  The ORR has social workers and experts in these issues, whereas an immigration judge does not.  In a hypothetical situation, I might conclude that a seven-year old child should not be detained in custody or be required to post a bond.  However, it would be for ORR to decide where that child should be placed and by whom  the child should be cared for.  While I may feel quite confident, based on the representations of counsel for respondent, that the suggested placement with Safe Horizons appears suitable, apparently ORR does not, and there is no mechanism for me to override their determination as to this child's care and placement.  The care of this very vulnerable child has been determined by ORR to be best served at Children's Village.

Having reached the conclusion that I lack the authority to override that determination, I note that DHS has determined that a $20,000 bond is necessary to ensure the respondent's appearance at hearings.   The immigration judge does have jurisdiction to review that determination.  Unless the DHS wishes to re-evaluate whether such bond, or any bond,  is necessary, a hearing will be set solely for the purpose of considering that bond so that when it is determined that respondent may be placed in another setting, or she is over 18 and no longer subject to the care of ORR, the redetermination of the bond, to which she is entitled, will have been completed.  The issue of the care and custody exercised by ORR will not be part of the hearing and the sole issues will be whether respondent's release would pose a danger to property or persons and whether she is likely to appear at any future proceedings.

ORDER: IT IS ORDERED that the motion for bond redetermination is Granted in part, and Denied in part.

Patricia A. Rohan
Immigration Judge

Dated: _Oct. 31, 2013_

THIS DOCUMENT WAS SERVED
                                    ALIEN/ATTY   TA'S
IN PERSON               ☐  ✓      ☐
VIA US MAIL             ☑          ☑
VIA FEDERAL EXPRESS     ☐          ☐
DATE 10/31/13  BY ___  CLK ___

Exhibit 86
Page 631

**U.S. Department of Justice**
Executive Office for Immigration Review
Office of the Immigration Judge

File A 079 238 898

In the Matter of

Iginozo, Sandra

In Removal Proceedings

**Order of the**
**Immigration Judge**

Supplemented Decision
on Bond Redetermination

I hereby incorporate, in its entirety, my decision of October 31.2013. I do not believe I have authority to order the release or placement of the respondent I would wish that I had such authority, but I do not. The DHS has withdown any bond requirement. It is, in my opinion, for ORR to find an appropriate placement for her as soon as possible given the respondents situation

Date: DEC 19 2013

Place: NYC

_(Signature)_

(Immigration Judge)

2. ALIEN'S COPY

ExA2

Exhibit 86
Page 632

EOIR-23
MAR. 84

**URBAN JUSTICE CENTER** | PETER CICCHINO YOUTH PROJECT

October 2, 2013

The Childrens Village
1 Echo Hills Road
Dobbs Ferry, NY 10522

**Re: Pre 18 Release Plan**
**Sandra Igihozo, A# 205-710-232**

Dear Ms. Valdez, Ms. Claudio, and Ms. Roman,

My name is Gretchen Begley and I am a Case Manager at the Peter Cicchino Youth Project ("PCYP") of the Urban Justice Center. PCYP addresses the legal needs of homeless and street involved youth.  I work with the Urban Justice Center's legal team as a social service provider to help released children transition into the community and towards independence. In order to facilitate this transition, I create and carry out individualized social service and education plans.

This plan is submitted in support of Sandra's pre-18 release from Children's Village.[1] As you know, Sandra is pregnant and has no long-term federal care options which means that she is in grave danger of being discharged into homelessness on her 18th birthday and in her third-trimester of pregnancy. Our primary concern, which I know you share, is that Sandra and her child have access to the best long-term care available so that they both have a change at a safe and supported life. Given this, the best long-term option for Sandra is for her to get into State Foster Care, which requires her release from Children's Village before her 18th birthday. Additionally, given that Sandra's life will undoubtedly get more difficult as her pregnancy advances, a release as soon as possible is in her best interest.

The plan detailed below considers Sandra's: A) future housing, B) education, C) medical care and mental health, D) immigration case, E) need for identification, and F) extracurricular enrichment opportunities.  Each component of this plan has been identified based upon my recent conversations with Sandra, her attorney Megan Stuart, and my experience working with numerous unaccompanied youth in New York City.  This plan has been discussed with Sandra and he has agreed to participate.  I have done my best to incorporate information regarding the programs and social service agencies I have identified for Sandra in order to provide context for the services available to unaccompanied children generally in the New York City area.

My proposed Plan for Sandra is as follows:

---

[1] Although it is certainly in Sandra's best interest to transition to foster care upon release from the Children's Village, I have been working concurrently on a pre/post18 plan for Sandra, so that, in the event Sandra does not transfer to Foster Care, his transition to the community is as smooth as possible.

ExB

Exhibit 86
Page 633

**A. Housing:**

Independent housing opportunities for youth like Sandra in New York City, are funded by the New York Department of Youth and Community Development ("DYCD"). Generally, DYCD housing services include three separate elements: 1) Crisis Shelters, 2) Transitional Independent Living, and 3) Borough-Based Drop-in Centers.

1. Crisis Shelters: Crisis Shelters offer emergency shelter for runaway and homeless youth up to the age of 21.[2] The shelters are the **entry-point** for the DYCD's Runaway and Homeless Youth system. These voluntary, short-term residential programs provide emergency shelter and crisis intervention services aimed at reuniting youth with their families or, if family reunification is not possible, arranging appropriate transitional and long-term placements. In other words, in order for a youth to enter a transitional and long-term housing placement in New York, he or she must first begin in a DYCD "Crisis Shelter", who have the ability to make a referral.

There are three Crisis Shelters in New York City that Sandra is eligible for: Streetworks and the Covenant House. Both programs are tasked with ensuring a youth's transition to long-term placement when other reunification options or placements do not exist. In order to ensure children transition to permanency as quickly as possible, DYCD limits the length of stay for a child in a Crisis Shelter to 30 days, with the possibility of a 30 day extension. Both Streetworks and Covenant House accept children on a first-come first serve basis, however, their intake procedures are different as follows:

   a. Streetworks (209 W. 125th. St., New York, NY 10027, Phone: 212.695.2220)
      i. I have contacted Streetworks about Sandra, and they have agreed to accept her into their crisis shelter. Letter from Streetworks, attached.
      ii. Generally, youth seeking acceptance into the Streetworks program must complete two intake interviews. The youth must come to the shelter from 10am-12pm on Monday, Tuesday, Thursday, or Friday. Streetworks only takes the first four youth who arrive on any given day for intake. It is best to arrive 15 minutes prior to the opening time. If Streetworks has a bed available once a youth completes the intake process, the youth is placed immediately. If however a bed is not available, youth are placed on the waitlist. A youth placed on the waitlist must call Streetworks daily in order to determine if and when a bed is available.

   b. Covenant House (460 W 41st St, New York, NY 10026)
      i. Covenant House will conduct an intake of a youth at any time, day or night. Youth will be placed immediately, if a bed is available. If a bed is not available, youth are referred to adult crisis shelters. Due to Urban

---

[2] Please note that the term "homeless and runaway" youth is broadly defined by the McKinney-Vento Act as a youth who has a primary nighttime residence a publicly or privately operated program, including transitional housing. The definition of homeless, as defined by the federal statute, is so broad that it deems children who are in ORR facilities "homeless" as well as children who are in independent living placements that provide housing to youth for years.

Exhibit 86
Page 634

Justice Center's long-standing relationship with the Covenant House, we frequently communicate directly with Covenant House Legal Director Nancy Downing when a client of ours is expected to arrive for intake. [3] We have already communicated with Nancy Downing about Client's case, and she is prepared to coordinate Client's placement at the Covenant House if and when necessary.

 c. Ali Forney Center ("AFC") (321 W 125th St New York, NY)

  i. AFC offers a scattered-site emergency housing program for LGBTQ youth with sites in Queens and Brooklyn. They offer temporary housing in safe, staff-supervised homelike apartments. LGBTQ youths are able to reside in our emergency housing program for up to six months while we assist them in moving on to more permanent housing. Currently AFC has 4 emergency housing apartments and a total of 49 beds.

Both the Covenant House and Streetworks provide the following services to their residents:

- Crisis Center
- Community Centers
- Street Outreach
- Transitional Housing Program
- Health Services
- Mental Health Services
- Mother & Child Programs
- Regional Training Centers
- Substance Abuse Services
- Vocational Training Institute

2. Transitional Independent Living: Transitional Independent Living (TIL) facilities provide homeless youth between the ages of 16 and 21 with support and shelter as they work to establish an independent life.  As mentioned above, a young person in need of long-term residential services must first visit a <u>Crisis Shelter</u> and obtain a referral to a Transitional Independent Living facilities.  Youth may stay in the Transitional Independent Living facilities for up to 18 months. Services offered at TILs include:

- Educational programs
- Vocational training
- Job placement assistance
- Counseling
- Basic life skills training
  - a. There are three long-term programs specifically designed for pregnant and parenting teens, however to be eligible for the program a youth needs to be referred from one of the Crisis Centers.

---

[3] *See* *http://www.covenanthouse.org/homeless-charity/new-york*

Exhibit 86
Page 635

      i.     Independence Inn mother-child program;
     ii.     Covenant House mother-child program
    iii.     Inwood house

3. Borough-Based Drop-in Centers: Drop-In Centers are located in each of the five boroughs of New York City, one per borough. The Drop-In Centers provide youth up to the age of 24 and their families with essentials like food, clothing and immediate shelter as well as access to counseling, support, and referrals to relevant services. Drop-In Centers are open 6 days a week. Drop-In Centers frequently have close connections to TIL programs, and in limited circumstances, may be able to conduct an intake for possible placement at a partner TIL.

## B. Education:

We would like to enroll Sandra into a traditional high school. We think she would succeed in a traditional educational environment because she is fluent in English and completed all but one month of high school in Rwanda. New York Law guarantees Sandra the right to an education and once she is released, we will take her  the local enrollment center so that she can be immediately placed into a high school.

## C. Medical Care and Mental Health:

Upon release, we will enroll Sandra into Child's Health Plus, New York Sate's low-income insurance plan for youth. Unlike traditional Medicaid, undocumented immigrants are eligible for insurance until they turn 19. We imagine that by the time Sandra is 19, she will have immigration status, thereby becoming eligible for Medicaid.

## D. Immigration Case:

Sandra and her attorney, Megan Stuart, will continue to work together on her immigration applications. Sandra is eligible for the following forms of relief, which she and Megan will peruse. I will escort Sandra to all immigration court appearances, the next of which is on October 17th at 1pm.

      i.     Asylum
           a.    Sandra is prima facie eligible for asylum because she was persecuted in Rwanda because of her sexual orientation. Sandra is working with Megan to develop her asylum application, which will be submitted before Sandra turns 18. Because an asylum application requires Sandra to re-live an extremely traumatic period in her life, it requires several meetings between Sandra and Megan.
     ii.     SIJS
           a.    Sandra is also prima facie eligible for SIJS. Upon release, Sandra and Megan will petition the appropriate family court for a special findings order that they can then submit to USCIS.
    iii.     U-Visa/T-Visa

Exhibit 86
Page 636

    a.   Sadly, Sandra is also eligible for a U  and/or T visa based upon the sexual assault from her relative who was entrusted with her care. Sandra and obtain the necessary certifications either by reporting the crime to law enforcement locally, or thu the family court. This process will be started in the next few weeks. Once the requisite certificates are obtained, Sandra and Megan will meet to write a supporting affidavit and then submit the application ASAP.

## E.  Identification:

We want to ensure Sandra has all needed identification.  Youth under the age of 18 are able to obtain free picture identification at New York Parks and Recreation.   These identifications include membership to all Park and Recreation centers in NYC, and are only free for youth under 18 years of age.  Upon release, we will escort Sandra to obtain this ID. We believe the New York Parks and Recreation I.D. qualifies as a government issued I.D. because it is issued by NYC.  A Parks and Recreation center is located near our offices at 80 Catherine Street.  Sandra need only bring a birth certificate to become a member and obtain an I.D.

## F.  Extracurricular Activities:

In order to ensure Sandra is has access to extracurricular programming and additional supportive services, after her release we will assist Sandra in becoming a member of the Door and Ali Forney Center. The Ali Forney Center is a drop-in space for LGBTQ youth who provides a variety of social services as well as a place for LGBTQQ youth to congregate and socialize. The Door a comprehensive youth empowerment organization.[4] The Door provides a wide range of services to meet the needs of New York City youth aged 12-21, including, but not limited to:

College Advisement & Tutoring
The Talent Search program provides the support and guidance you need to make your way to high school graduation, college and beyond.

Counseling
Counselors are here to listen and help with a range of issues, including anger management, crisis intervention, gender identity, and much more.

Creative Arts
Regularly scheduled, free creative arts classes include a range of performing and visual arts, music and dance.

English Language (ESOL)
The Door offers a flexible schedule of classes for young people who would like to learn English.

Foster Care
If you are in foster care, The Door can provide the additional support you may need to reach your goals.

---

[4] See http://www.door.org/about-door

Exhibit 86
Page 637

GED
The Door offers a variety of programs to help you get your GED and move on to a career, college or a vocational/training program.

Health & Dental Services
The Adolescent Health Center (AHC) offers comprehensive health and dental services to all Door members, regardless of ability to pay.

Jobs & Internships
Jobs & Internships programs give you the chance to explore different career paths and gain skills to help you find the right job and keep it.

Leadership
The Door offers a range of opportunities to learn key leadership skills that will help you in school, work and everyday life.

Legal & Immigration Services
The Legal Services Center provides different kinds of legal counsel, including support for immigrant youth. Services are offered in English, Spanish, Mandarin and French.

LGBTQ
The Door provides a range of programs geared towards Lesbian, Gay, Bisexual, Transgender or Questioning (LGBTQ) members.

Recreation
Games, workshops, and fitness and performance opportunities are offered on a daily basis.

Runaway and Homeless Youth
If you are homeless or have run away from home, The Door can help you find essentials like food, clothing and shelter, as well as help with your specific needs.
Sexual Health & Birth Control
The Adolescent Health Center (AHC) offers a comprehensive list of services to meet your sexual health and birth control needs.

Supportive Housing
In December of 2010, in partnership with Common Ground, The Door opened The Lee, a supportive housing building located on the Lower East Side.  The Lee currently houses 55 young people living in their own apartments, often for the first time.

In sum, Sandra is quickly approaching her 18th birthday and we would like to do as much as possible to ensure that she is best situated for her transition to independent living in the community should he not have access to foster care.  This requires that Sandra attend numerous appointments and we truly appreciate your help in transporting Client so that he can have the best chance possible upon release from the Children's Village.

Exhibit 86
Page 638

I look forward to working with you.  Thank you for your assistance.


Sincerely,


Gretchen Begley, MSW
Case Manager

Exhibit 86
Page 639

# COVENANT HOUSE ⬛ NEW YORK

460 WEST 41ST STREET, NEW YORK, N.Y. 10036 • (212) 613-0300

December 18, 2013

Megan Stuart
Staff Attorney
Peter Cicchino Youth Project
Urban Justice Center
123 William Street, 16th Floor
New York, NY 10038

RE:   Sandra Igihozo (DOB: 01/30/1996)

Dear Attorney Stuart,

This will confirm that Covenant House New York will accept Sandra Igihozo into our Crisis Center Program. We are aware that Sandra is a minor and we will provide for her essential needs during her stay at Covenant House. She will be placed in our Mother/Child program located at 427 West 52nd Street, New York, NY 10019. Covenant House is a crisis intervention center for homeless and runaway youth, under 21 years of age. We provide shelter, food, clothing, as well as a number of services including medical services, counseling services, employment and education services. Caseworkers and a case manager work with each youth to develop a case plan, and to help each youth meet his/her goals with the longer term goal of becoming a self-sufficient adult. If Sandra is in need of services that we do not offer, we will work with her to obtain services through an outside agency.

Please be advised that because we are a licensed Runaway and Homeless Youth Program (licensed by NYS Office of Children and Family Services), we provide all services and must act in accordance with the New York State Runaway and Homeless Youth Act and the relevant Runaway and Homeless Youth Regulations.

Please feel free to contact me should you need any additional information. We look forward to having Sandra Igihozo in our Crisis Center Program, and assisting her in any way possible. Thank you for your kind assistance in this matter.

Sincerely,

Nancy Downing
Director of Advocacy/Legal Services

ExC

Exhibit 86
Page 640



US Department of Health and Human Services                    Sponsor's Agreement to Conditions of Release

# OFFICE OF REFUGEE RESETTLEMENT
## Division of Unaccompanied Children's Services

| Name of Minor: Sandra Igihozo | Minor A #: 205-710-232 |
|---|---|
| Aliases (if any): | FINS #: |
| Name of Sponsor: Covenant House New York/Under 21 | Date: 12/18/13 |

Pursuant to Section 462 of the Homeland Security Act, the Office of Refugee Resettlement (ORR) will place the above-named minor into your care and custody, provided that you, as the minor's custodian, agree to:

- Provide for the physical, mental, and financial well-being of the minor.

- Ensure the minor's presence at all future proceedings before the Department of Homeland Security (DHS)/Immigration and Customs Enforcement (ICE) and the Executive Office for Immigration Review (EOIR).

- Ensure the minor reports for removal from the United States if so ordered.

- Notify DHS/ICE and EOIR within (5) five days of any change of residence.

- Notify DHS/ICE at least (5) five days prior to your own departure from the United States and indicate whether the departure is voluntary, pursuant to a grant of voluntary departure, or an order of removal.

- Notify DHS/ICE if dependency proceedings involving the minor are initiated and also notify the dependency court of any immigration hearings pending against the minor.

- Receive written permission from DHS/ICE if you decide to transfer custody of the minor to another person. Please note that in the case of an emergency (serious illness, destruction of home, etc), you may temporarily transfer physical custody of the minor to another person prior to securing permission from ICE, but you must notify ICE as soon as it becomes practical and no later than (72) seventy-two hours.

- Notify DHS/ICE as it becomes practical and no later than 72 hours of your learning that the minor has disappeared, has been threatened, or has been contacted in any way by an individual or individuals believed to represent an alien smuggling syndicate or organized crime.

**I Understand** that release of the above-named minor from the Office of Refugee Resettlement to my custody does not grant the minor any legal immigration status and that the minor must present himself/herself for immigration court proceedings.

**Check the circle that applies:**

○ I received a copy of the above-named minor's Notice to Appear, DHS Form I-862 (NTA).

● I was not provided a copy of the above-named minor's Notice to Appear, DHS Form I-862 (NTA).

### Sponsor's Agreement to Conditions of Release

I hereby acknowledge that I have read/had explained to me in my own language, and agree to these conditions of release of the above named minor into my custody. I further understand that DHS/ICE may refer the minor to ORR, and ORR may resume custody if I do not comply with the conditions of the release agreed to in this form.

_Nancy J. Downing_ Director of Advocacy/Legal for          12/18/13
Signature of Sponsor                                              Date
Covenant House New York/Under 21, Inc.

Notary Seal:          Subscribed to before me this
18th day of December, 2013.
_Alice Obida_

ALICE OBIDA
Notary Public, State of New York
No. 31-4667734
Qualified in New York County
Commission Expires 8-23-14

Sponsor's Agreement to Conditions of Release, Rev. 3/21/05
ORR R-420
[OMB 0970-0278, valid through 06/30/2008]

Exhibit 86
Page 641



U.S. Department of Health and Human Services

Office of Refugee Resettlement
Sponsor Care Agreement, Rev. 04/30/2012

**OFFICE OF REFUGEE RESETTLEMENT**
**Division of Children's Services**
**SPONSOR CARE AGREEMENT**

| | |
|---|---|
| Name of Minor: Sandra Igihozo | Minor A #: 205-710-232 |
| Aliases (if any): | Minor DOB: 01/30/1996 |
| Name of Sponsor: Covenant House New York / Under 21, Inc | Date: 12/18/13 |

You have applied to the Office of Refugee Resettlement (ORR) to sponsor an unaccompanied alien child in the care and custody of the Federal Government pursuant to the Flores v. Reno Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan. 17, 1997), Section 462 of the Homeland Security Act of 2002 and Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. If your sponsorship application is approved, you will receive an ORR *Verification of Release* form and will enter into a custodial arrangement with the Federal Government in which you agree to comply with the following provisions while the minor is in your care:

- Provide for the physical and mental well-being of the minor, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.

- If you are not the minor's parent or legal guardian, make best efforts to establish legal guardianship with your local court within a reasonable time.

- Attend a legal orientation program provided under the Department of Justice/Executive Office of Immigration Review (EOIR)'s Legal Orientation Program for Custodians (Sponsors), if available where you reside.

- Depending on where the minor's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within five (5) days of any change of address or phone number of the minor, by using an Alien's Change of Address form (Form EOIR-33). In addition if necessary, file a Change of Venue motion on the minor's behalf. The Change of Venue motion must contain information specified by the Immigration Court. Please note that a Change of Venue motion may require the assistance of an attorney. For guidance on the "motion to change venue," see the Immigration Court Practice Manual at http://1.usa.gov/e0H9zL. For immigration case information please contact EOIR's immigration case information system at 1-800-898-7180. Visit EOIR's website for additional information at: http://www.justice.gov/eoir/formslist.htm

- Notify the Department of Homeland Security (DHS)/U.S. Citizenship and Immigration Services) within ten (10) days of any change of address, by filing an Alien's Change of Address Card (AR-11) or electronically, at http://1.usa.gov/Ac5MP

- Ensure the minor's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR. For immigration case information, contact EOIR's case information system at: 1-800-898-7180.

- Ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order. The minor is assigned to a Deportation Officer for removal proceedings.

- Notify local law enforcement or your state or local Child Protective Services if the minor has been or is at risk of being subjected to abuse, abandonment, neglect, or maltreatment or if you learn that the minor has been threatened, has been sexually or physically abused or assaulted, or has disappeared. Notice should be given as soon as it becomes practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.

- Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the minor disappears, has been kidnapped, or runs away. Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the minor's disappearance.

- Notify ICE if the minor is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. Provide notification as soon as possible or no later than 24 hours after becoming aware of this information. You can contact ICE at 1-866-341-2423.

- In the case of an emergency (serious illness, destruction of home, etc), you may temporarily transfer physical custody of the minor to another person who will comply with the terms of this *Sponsor Care Agreement.*

- If you are not the child's parent or legal guardian, in the event you are no longer able and willing to care for the minor and unable to temporarily transfer physical custody, and the minor meets the definition of an unaccompanied alien child, you should notify ORR at 202-401-5709.

- The release of the above-named minor from the Office of Refugee Resettlement to your care does not grant the minor any legal immigration status and the minor must present himself/herself for immigration court proceedings.

Exhibit 86
Page 643



U.S. Department of Health and Human Services

Office of Refugee Resettlement
Letter of Designation for Care of a Minor, 04/30/2012

## OFFICE OF REFUGEE RESETTLEMENT
### Division of Children's Services
### LETTER OF DESIGNATION FOR CARE OF A MINOR

The Office of Refugee Resettlement (ORR) takes custody of unaccompanied alien children ("UAC") referred by a Federal entity pursuant to the Flores v. Reno, Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan. 17, 1997), Section 462 of the Homeland Security Act of 2002, and Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. ORR has authority under the law to transfer custody of a UAC to a sponsor. Your child has been classified as a UAC pursuant to the Homeland Security Act of 2002 §462(g)(2). ORR strongly encourages parents and legal guardians to designate a sponsor for their child.  In the event that you are unavailable to sponsor your child, ORR asks that you designate a sponsor to care for your child (subject to ORR's approval).

I/We are the parent(s) or legal guardian(s) of, _____Sandra Igihozo_____ , born on _01_, _30_,_1996_.
*(name of child)* *(MM/DD/YYYY)*

I/We designate, _Covenant House New York / Under 21, Inc._ , to sponsor our child.
*(name of sponsor)*

**I consent that the above named sponsor may:**

- Have temporary care-giving authority for my child, until such time as my child is returned to my physical custody; or his/her custody status is altered by a Federal, State, or local agency; or changed by a court of law
- Provide for medical, dental, and mental health care for my child
- Provide for my child's physical and mental well-being, including but not limited to providing, food, shelter, and clothing
- Enroll my child in  school
- Temporarily transfer physical custody of my child in the event of an emergency (serious illness, destruction of home, etc.) to another person who will comply with the *Sponsor Care Agreement*.

| Name of parent(s) or legal guardian(s) signing the form | |
|---|---|
| | (1)_____ |
| | (2)_____ |
| If one of the child's biological parents or other legal guardian is unable to consent please check why | ☐ Deceased  ☐Mentally or physically unable to give consent<br><br>☐ Abandoned child  ☐No longer has legal custody of child<br><br>☐ Child's other parent/legal guardian resides in another location *(ORR may send them a separate copy of this form to sign)*  ☐ Other *(ORR may request an explanation)* |
| Address of parent(s) or legal guardian(s) signing the form | |
| Parent(s) or legal guardian(s) signature* | (1)_____ _____(DATE)<br><br>(2)_____ _____(DATE) |

\* Please note that by signing this form you are NOT terminating your parental or guardianship rights to your child. You maintain legal custody over your child pursuant to relevant Federal and State law. ORR encourages you to stay in close contact with your child and the child's sponsor in order to help make decisions for the child's care and for medical, educational, and other service. Please also note that if you do not designate a sponsor, ORR may transfer custody of your child to a sponsor identified by ORR.

## NOTARY SEAL:

Letter of Designation for Care of a Minor, 04/30/2012
ORR UAC/FRP-9
ORR UAC Program Operations Manual 2012

Exhibit 86
Page 644



**Urban Justice Center**
123 William Street, 16th Floor, New York, NY 10038
Tel: (646) 602-5600 • Fax: (212) 533-4598
www.urbanjustice.org

December 9, 2013

Office of Refugee Resettlement
Department of Health and Human Services
370 L'Enfant Promenade, S.W.
Washington, D.C. 20447
*Via email to*:
Elcy Valdez Elcy.Valdez@acf.hhs.gov
David Fink David.Fink@ACF.hhs.gov

Re: IGIHOZO, Sandra
A 205-710-232

Dear Elcy and David:

I am writing today to demand the release of Sandra Igihozo by **Friday December 13, 2013.**

As you are well aware, a pre-18 release will allow Sandra to access state-foster care, which is the only way for Sandra to receive the care and support she needs to successfully transition into motherhood and adulthood. Foster care will ensure that Sandra receives the supportive services she needs to develop healthy coping skills for the traumatic events she suffered in Rwanda; on her journey to safety in the United States and the continued uncertainty that plagues her detention here in New York.

If Sandra is not released before her 18th birthday, she will face one of two brutal futures while she applies for lawful status. Upon her 18th birthday, Sandra will either be taken into ICE custody and placed in adult detention, or released from ORR and discharged into homeless while in her third trimester of pregnancy. The second possibility forces Sandra to survive without access to food, clothing, shelter and medical care. Both of these futures are bleak for both Sandra and her unborn child and place her health and life in imminent risk of harm.

Accordingly, I write to demand that Sandra be released to Covenant House, Streetworks or the Children's Village Sanctuary Program, all state-licensed programs. As outlined in the pre-18 release plan previously submitted, upon release, our social worker will facilitate Sandra's transition into foster care and will provide all other necessary social services. Failure to release Sandra violates the terms of the *Flores* settlement, which states that "[ORR] shall release a minor from its custody without unnecessary delay…"

ExD

*individual rights • social change*

Exhibit 86
Page 645



**Urban Justice Center**
123 William Street, 16th Floor, New York, NY 10038
Tel: (646) 602-5600 • Fax: (212) 533-4598
www.urbanjustice.org

In the alternate, I write to demand that you cease the unlawful detention of Sandra by Friday, December 13th. In our previous conversations, ORR and ICE have taken the position that Sandra is in the sole legal and physical custody of ORR. If this is true, then ORR has no authority to *detain (*rather than *care for*) Sandra. *See* Homeland Security Act § 462(b)(A)-(L), 6 U.S.C.A. § 279(b)(1)(A–L). According to the act, being in DHS custody is a statutory prerequisite for ORR's detention authority over unaccompanied children.

If you have any questions, please do not hesitate to contact me at 646-602-5643 or via email at mstuart@urbanjustice.org.

I look forward to your response,

Megan Stuart
Attorney for Sandra Igihozo

*Cc:*
Toby Biswas Toby.Biswas@ACF.hhs.gov

*individual rights • social change*   Exhibit 86
Page 646

# Exhibit 87

Exhibit 87
Page 647

DECLARATION OF CARLOS HOLGUIN

I,  Carlos Holguín, declare and say as follows:

1.  I am one of two attorneys who currently serve as class counsel for Plaintiffs in *Flores v. Sessions*. I execute this declaration in support of plaintiffs' motion to compel the Office of Refugee Resettlement of the U.S. Department of Health and Human Services to comply with the *Flores* settlement.

2. Pursuant to ¶¶ 28 and 29 of the *Flores* settlement, ORR provides class counsel with monthly statistical reports on class members in its custody.

3. ORR's reports indicate that it currently houses class members in three juvenile jails: Yolo County Juvenile Hall in California, and Shenandoah Valley Juvenile Center ("SVJC") and Northern Virginia Juvenile Detention Center ("NoVA") in Virginia.

4. The statistical reports identify class members released to custodians from the various facilities in which ORR detains class members. From my review of these reports, it appears that at any given time ORR detains about 40 class members in residential treatment centers ("RTC"), about 50 class members in juvenile halls, and about 115 in staff-secure facilities.

/ / /

Exhibit 87
Page 648

5. ORR's data do not include the average length of stay for youth housed in the different types of facilities. However, ORR's statistical report for December 2017, indicates it released one class member to a custodian from Shenandoah Valley Juvenile Center, one to a custodian from Yolo Juvenile Hall, and none to a custodian from Northern Virginia Juvenile Detention Center. According to its December 2017 statistical report, ORR released one class member to a custodian from MercyFirst RTC, and one to a custodian from Shiloh RTC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April, 2018, at Santa Clarita, California.

_____
Carlos Holguin

/ / /

Exhibit 87
Page 649

# Exhibit 89

**Exhibit 89**
**Page 653**

1   I, CARTER WHITE, declare as follows:

2

3   1.      This declaration is based on my personal knowledge.  If called to testify in this

4   case, I would testify competently about these facts.

5   2.      I am the Director of the Civil Rights Clinic at the University of California Davis

6   School of Law.

7   3.      On November 20 and 21, 2017, I visited Shiloh Treatment Center as part of a visit

8   to the facility by *Flores* counsel pursuant to ¶ 32 of the *Flores* Settlement Agreement.

9   4.      Attached to this declaration is a true and correct copy of the Shiloh Treatment

10  Center Consent to Medical Care Form that Shiloh staff gave us during that visit.

11  5.      During that visit, we met with several Shiloh staff members.  They informed us

12  that, for children in ORR custody, these Shiloh Treatment Center Consent to Medical

13  Care Forms are signed by Shiloh staff members as the "Parent, Guardian, or

14  Conservator," and are not signed by the child's parent, family member, or potential

15  sponsor.

16  6.      Under my supervision, UC Davis students have reviewed the files of a significant

17  number of children in ORR custody.  To my knowledge, none of the students have ever

18  found a medical consent form in the file of a child in ORR custody that was signed by the

19  child's parent, family member, or potential sponsor.

20

21  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

22  19th day of April, 2018, at *Richmond*, California.

23

24

25                          CARTER WHITE

26

27

28

1

Exhibit 89
Page 654

Shiloh Treatment Center, Inc.
Admission Packet

*Office of Refugee Resettlement*

## Affidavit Authorizing
Consent to Medical Care
Consent to Administer Prescription Medications
Consent to Administer Non-prescription (OTC) Medications

State of TEXAS

BEFORE ME, the undersigned authority, on this day personally appeared

_____ , who after being duly sworn by me, on his/her oath did say
**Parent, Guardian, or Conservator Name**

I am _____ and I am the _____
       **Parent, Guardian, or Conservator Name**                              **Relationship to Client**

of _____ , who is in the care of Shiloh Treatment Center.
      **Client Name**

If at any time such child or ward of mine should require medical or related care while in the care of Shiloh Treatment Center (Shiloh), I consent to the administration of necessary medical or related care, including any appropriate medications, and authorize any approved representative of Shiloh to give consent to any doctor, emergency medical service, hospital, or other medical facility to provide medical or related care to such child or ward. I further give my permission for Shiloh to administer such medications that may be prescribed or recommended by medical personnel treating my child or ward. I understand that I will be notified about medical care and the prescription of medication.

_____
       **Signature of Parent, Guardian, or Conservator**

**SWORN TO AN SUBSCRIBED** before me, the _____ day of _____ ,20 _____

_____
       **Signature of Notary Public**

_____
       **Printed Name of Notary Public**

Notary Public for: _____
                              **County**

*File in Master Chart*

**Exhibit 89
Page 655**