CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Jefferson B. Sessions, Attorney General, *et al.*, <br><br> Defendants. | Case No. CV 85-4544-DMG (AGRx) <br><br> EXHIBITS IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT (VOL. 1: EXS. 1-20, PAGES 1-108, REDACTED EXHIBITS ONLY) <br><br> Hearing: May 18, 2018 <br> Time: 9:30 a.m. <br> Room: 1st St. Courthouse <br>        Courtroom 8C |

**REDACTED VERSIONS OF DOCUMENTS PROPOSED TO BE FILED UNDER SEAL**

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
         ccwhite@ucdavis.edu

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

I, Carlos Holguín, do hereby declare that true and correct copies of the following documents are attached hereto:

INDEX TO EXHIBITS

| No. | Description | Page(s) |
|---|---|---|
| 1 | Declaration of the Mother of Nicolás C., February 6, 2018 (proposed to be filed partially under seal) | 1-10 |
| 2 | Declaration of Nicolás C., February 4, 2018 (proposed to be filed partially under seal) | 11-19 |
| 3 | Morrison Paso Case Review re: Nicolás C., September 17, 2017 (proposed to be filed partially under seal) | 20-26 |
| 4 | Custody Order of the Immigration Judge re: Nicolás C., December 19, 2017 (proposed to be filed partially under seal) | 27-28 |
| 5 | Declaration of Leland Baxter-Neal, February 6, 2018 (proposed to be filed partially under seal) | 29-34 |
| 6 | Email from Erich Corona re: Nicolás C., January 9, 2018 (proposed to be filed partially under seal) | 35-38 |
| 7 | Declaration of James M. Owens, February 7, 2018 (proposed to be filed partially under seal) | 39-43 |
| 8 | ORR Interim Guidance re: Custody Hearings, July 18, 2017 | 44-55 |
| 9 | Declaration of Daniella Q., February 28, 2018 (proposed to be filed partially under seal) | 56-59 |
| 10 | Declaration of Isabella M., December 1, 2017 (proposed to be filed partially under seal) | 60-63 |
| 11 | Supplemental Declaration of Isabella M., February 28, 2018 (proposed to be filed partially under seal) | 64-68 |
| 12 | Declaration of the Mother of Isabella M., February 28, 2018 (proposed to be filed partially under seal) | 69-75 |
| 13 | Declaration of Victoria R., February 28, 2018 (proposed to be filed partially under seal) | 76-79 |

14   Declaration of David I., November 30, 2017 (proposed to be
     filed partially under seal) .................................................. 80-84

15   Supplemental Declaration of David I., February 28, 2018
     (proposed to be filed partially under seal) ........................... 85-88

16   Declaration of Eduardo A., March 1, 2018 (proposed to be filed
     partially under seal) ........................................................ 89-93

17   Declaration of Rosa L., December 1, 2017 (proposed to be filed
     partially under seal) ........................................................ 94-97

18   Supplemental Declaration of Rosa L., February 28, 2018
     (proposed to be filed partially under seal) ......................... 98-100

19   Declaration of Gabriela N., December 1, 2017 (proposed to be
     filed partially under seal) ................................................ 101-104

20   Supplemental Declaration of Gabriela N., February 28, 2018
     (proposed to be filed partially under seal) ....................... 105-108

21   Declaration of Arturo S., February 28, 2018 (proposed to be
     filed partially under seal) ................................................ 109-112

22   ORR Form Notice of Placement in a Restrictive Setting,
     February 5, 2018 .......................................................... 113-115

23   ORR FAQ: July 2017 Bond Hearings for Unaccompanied Alien
     Children (UAC) ............................................................ 116-118

24   ORR FAQ: ORR Directors Release Decision, January 26, 2018 ..... 119-121

25   Letter from Carlos Holguín to Office of Immigration Litigation,
     December 19, 2017 ....................................................... 122-129

26   Email from Sarah Fabian re: Flores Meet and Confer
     Discussion, January 12, 2018 .......................................... 130-131

27   Letter from Leecia Welch to Office of Immigration Litigation
     re: Psychotropic Medications, and Attachments, January 16,
     2018 (proposed to be filed partially under seal) ............... 132-161

28   Letter from Carlos Holguín to Office of Immigration Litigation,
     February 16, 2018 ......................................................... 162-164

iv

29    Email from Sarah Fabian re: Flores Meet and Confer
      Discussion, March 2, 2018 ............................................................. 165-168

30    Declaration of Javier C., November 15, 2017 (proposed to be
      filed partially under seal) .............................................................. 169-173

31    Declaration of Carlos A., November 16, 2017 (proposed to be
      filed partially under seal) .............................................................. 174-177

32    Declaration of Miguel B., November 16, 2017 (proposed to be
      filed partially under seal) .............................................................. 178-181

33    Declaration of Luis D., November 15, 2017 (proposed to be
      filed partially under seal) .............................................................. 182-192

34    Declaration of Andrés D., July 11, 2017 (proposed to be filed
      partially under seal) ..................................................................... 193-197

35    Declaration of Jorge E., July 11, 2017 (proposed to be filed
      partially under seal) ..................................................................... 198-205

36    Declaration of Gustavo H., July 11, 2017 (proposed to be filed
      partially under seal) ..................................................................... 206-210

37    Declaration of Roberto F., July 11, 2017 (proposed to be filed
      partially under seal) ..................................................................... 211-220

38    Declaration of Natalia T., November 21, 2017 (proposed to be
      filed partially under seal) .............................................................. 221-223

39    Declaration of Ricardo U., November 21, 2017 (proposed to be
      filed partially under seal) .............................................................. 224-226

40    Declaration of Sofia O., December 1, 2017 (proposed to be
      filed partially under seal) .............................................................. 227-231

41    Declaration of Gloria P., December 1, 2017 (proposed to be
      filed partially under seal) .............................................................. 232-235

42    Declaration of Edwin B., March 1, 2018 (proposed to be filed
      partially under seal) ..................................................................... 236-242

43    Letter from Carlos Holguín to Cynthia Nunes Colbert, *et al.,* re:
      Legal Representation for Specified Class Members, March 12,
      2018 (proposed to be filed partially under seal) ............................ 243-246

v

44   Declaration of Samuel W., October 26, 2017 (proposed to be
     filed partially under seal) ........................................................ 247-250

45   Declaration of Jaime V., October 26, 2017 (proposed to be filed
     partially under seal) .................................................................. 251-254

46   Declaration of Mateo X., October 26, 2017 (proposed to be
     filed partially under seal) ........................................................ 255-256

47   Declaration of Mario Y., October 26, 2017 (proposed to be filed
     partially under seal) .................................................................. 257-260

48   Declaration of Maricela J., November 30, 2017 (proposed to be
     filed partially under seal) ........................................................ 261-264

49   Declaration of Teresa K., November 30, 2017 (proposed to be
     filed partially under seal) ........................................................ 265-268

50   Declaration of Diego E., January 16, 2018 (proposed to be filed
     partially under seal) .................................................................. 269-273

51   Declaration of Daniel F., March 21, 2018 (proposed to be filed
     partially under seal) .................................................................. 274-278

52   Declaration of Alejandro G., March 21, 2018 (proposed to be
     filed partially under seal) ........................................................ 279-285

53   Transcript of Testimony of James De La Cruz, *Saravia v.
     Sessions*, Case No. 3:17-cv-03615-VC (N.D. Cal. June 29,
     2017), Dkt. No. 28 .................................................................... 286-382

54   Defendant Brent Cardall's Responses to Plaintiff's Request for
     Admission, Set One, *Saravia v. Sessions*, Case No. 3:17-cv-
     03615-VC (N.D. Cal. Sept. 20-21, 2017), Dkt. No. 61-3 ................ 383-390

55   Declaration of Camila G., April 3, 2018 (proposed to be filed
     partially under seal) .................................................................. 391-396

56   Patient Profile – Active Medications of Victoria R., January 9,
     2018 (proposed to be filed partially under seal) ............................ 397-398

57   Patient Profile – Active Medications of David I., November 27,
     2017 (proposed to be filed partially under seal) ............................ 399-400

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

58   Patient Profile – Active Medications of Rosa L., July 31, 2017
     (proposed to be filed partially under seal) ...................................... 401-402

59   Medication Information and Reconciliation and Over-the-
     Counter Medication Release Forms for Isabella M., September
     28-29, 2017 (proposed to be filed partially under seal).................. 403-405

60   Medication Information and Reconciliation Form for Gabriela
     N., September 7, 2017 (proposed to be filed partially under
     seal)................................................................................................... 406-407

61   Medication Information and Reconciliation Form for Sofia O.,
     September 18, 2017 (proposed to be filed partially under seal) ....... 408-409

62   Yolo County Juvenile Detention Facility Parental Medical
     Authorization Form for Julio Z., December 14, 2016 (proposed
     to be filed partially under seal) ........................................................ 410-411

63   Patient Profile – Active Medications of Julio Z., December 12,
     2016 (proposed to be filed partially under seal) .............................. 412-413

64   Declaration of Julio Z., November 13, 2017 (proposed to be
     filed partially under seal) ................................................................. 414-424

65   Declaration of Sister of Victoria R., March 13, 2018 (proposed
     to be filed partially under seal) ........................................................ 425-431

66   Declaration of Proposed Sponsor of Victoria R., March 13,
     2018 (proposed to be filed partially under seal) .............................. 432-435

67   Declaration of Grandfather of Gabriela N., March 15, 2018
     (proposed to be filed partially under seal) ....................................... 436-441

68   Custody Order of the Immigration Judge re: Santiago H.,
     February 21, 2018 (proposed to be filed partially under seal).......... 442-443

69   Order of the Immigration Judge with Respect to Custody re:
     Santiago H., March 20, 2018 (proposed to be filed partially
     under seal)......................................................................................... 444-446

70   Email from Toby Biswas re: Santiago H. Follow Up, February
     23, 2018 (proposed to be filed partially under seal) ........................ 447-449

71    Case Review re: Santiago H., November 29, 2017 (proposed to be filed partially under seal) ............................................................ 450-452

72    ORR Information Memo re: Community Safety Initiative for the Unaccompanied Alien Children Program, August 16, 2017 ...... 453-457

73    Declaration of John Doe 1, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 17, 2018), Dkt. No. 34-1 ......................................... 458-464

74    Declaration of John Doe 2, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 5, 2018), Dkt. No. 34-2........................................... 465-471

75    Declaration of John Doe 3, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH (W.D. Va. Jan. 5, 2018), Dkt. No. 34-3........................................... 472-478

76    Declaration of D.M, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 2, 2018), Dkt. No. 34-5........................................... 479-484

77    Declaration of R.B., *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 8, 2018), Dkt. No. 34-6........................................... 485-490

78    Transcript of Jonathan White, *Saravia v. Sessions*, Case No. 18-15114 (9th Cir. Oct. 27, 2017), Dkt. No. 9-2................................... 491-548

79    Exhibit 1 to Appellees' Request for Judicial Notice, *Saravia v. Sessions*, Case No. 18-15114 (9th Cir. March 16, 2018), Dkt. No. 20................................................................................ 549-555

80    Stipulated Settlement Agreement, *Flores v. Reno*, Case No. CV 85-4544-RJK(Px) ......................................................... 556-584

81    Declaration of Justin Mixon, October 19, 2017................................ 585-591

82    Email from Sarah Fabian re: Correspondence re: Legal Representation for Flores Class Members, March 23, 2018............. 592-594

83    Letter from James De La Cruz to Flores Counsel re: Psychotropic Medications, April 2, 2018 (proposed to be filed partially under seal) ................................................................. 595-601

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

84    Individual Service Plan – Residential Treatment for Victoria R.,
      Shiloh Treatment Center, Inc., December 26, 2017 (proposed to
      be filed partially under seal) ............................................................. 602-606

85    Declaration of Lorelei Alicia Williams, previously filed in this
      case in Docket No. 239-2, August 5, 2016 ....................................... 607-618

86    Declaration of Megan Stuart, previously filed in this case in
      Docket No. 239-2, August 1, 2016 ................................................... 619-646

87    Declaration of Carlos Holguín, April 10, 2018 ................................ 647-649

88    ORR Authorization for Medical, Dental, and Mental Health
      Care for Carlos A., July 31, 2017 (proposed to be filed partially
      under seal) ......................................................................................... 650-652

89    Declaration of Carter White, April 14, 2018, attaching Shiloh
      Treatment Center Consent to Medical Care Form ............................ 653-655

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of April, 2018, at Santa Clarita, California.

Respectfully submitted,

Carlos Holguín

/s/ Carlos Holguín

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

# Exhibit 1

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 1
Page 1

<u>DECLARACIÓN DE</u> ▮▮▮▮▮▮▮▮▮▮▮▮

Yo, ▮▮▮▮▮▮▮▮▮▮, declaro y digo lo siguiente:

1. Mi nombre es ▮▮▮▮▮▮▮▮. Nací el día ▮▮▮▮▮▮, 1981 in Tezoatlán de Segura
y Luna, en el estado de Oaxaca, México. He estado viviendo en los estados unidos desde 2005 y
actualmente yo vivo en Sebring, Florida.

2. Yo soy la mamá de ▮▮▮▮▮▮▮▮▮▮, quién actualmente se encuentra detenido
por la Oficina de Resentamiento de Refugiados en un centro de detención en Portland, Oregon. Llevo
más de 4 meses cumpliendo con todo lo que me piden para recuperar el custodia de mi hijo.

3. Yo vine a los estados unidos para buscar una vida mejor para mi hijo. ▮▮▮▮▮▮ era
pequeño cuando me mudé a los estados unidos y lo dejé con mis padres y hermanos en México
mientras que yo intentaba establecerme en EE.UU. Yo siempre he mantenido contacto con mi familia y
con mi hijo, con solo una única interrupción. En 2007 me enfermé de cáncer. El doctor me dijo que el
cáncer había expandido en mi cuerpo, era muy avanzado, hasta terminal. Yo estaba internada en un
hospital por casi un año, y se me hizo muy difícil comunicarme con ▮▮▮▮▮▮. Volví a comunicarme
con él en 2008 cuando mi salud empezó a mejorar. Desde entonces mi salud ha mejorado, gracias a
Dios, aunque sigo recibiendo quimioterpia una vez al mes.

4. La primera vez que me di cuenta de que ▮▮▮▮▮▮ había llegado a los Estados Unidos fue
cuando recibí un correo de voz de él, en que me dijo que se encontraba detenido en Kansas City. Esto
fue a setiembre de 2017. Yo no sabía que él hubiera puesto en marcha su plan para venir los Estados
Unidos. Cuando recibí el mensaje me preocupé mucho y hasta que pensé que tal vez fue una broma de
mal gusto. Acaba de pasar el Huracán Irma por Florida, y había muchos problemas con encontrar señal
del celular. Tuve que manejar una hora y media a otro lugar para poder hacer llamadas y recibir
mensajes, pero él no me había precisado dónde la inmigración lo tenía detenido. Llamé a muchos
lugares en los días siguientes tratando de saber algo de ▮▮▮▮▮▮ y su paradero. Me puse mal y muy
desesperada, pues no sabía dónde estaba él ni como comunicarme. Llamé a muchas oficinas del
gobierno, llamé a Inmigración, llamé a ICE, llamé al FBI, y a otras oficinas donde el gobierno tiene preso
a la gente para la deportación, y otros sitios hasta que no sabía dónde pero era de gobierno. En ningún
lado me dieron información.

**Exhibit 1**
**Page 2**

5. En estos días a mediados de septiembre, cuando no sabía dónde estaba mi hijo, recibí una llamada de personas desconocidas que no se identificaron, que me dijeron que tenían a mi hijo y que yo tendría que pagar $1,400 para que me lo devolviera. Me exigieron un depósito $400 en una cuenta del banco y después otro pago de $1,000 cuando me presentara ante ellos para recogerlo a mi hijo. Yo dije que yo quería hablar con mi hijo para saber si de verdad lo tenían y me dijeron que no, entonces yo colgué.

6. Yo no sabía nada más de mi hijo hasta el 19 de septiembre, cuando recibí un mensaje por facebook de Erich Corona, el case manager de mi hijo en Portland. Al principio, tenía dudas si de veras fuera él legítimo. Me acordaba que me habían llamado una vez esos tipos estafadores diciendo que tenían mi hijo. No creí que de veras tenían a mi hijo hasta que pude hablar con él. Entonces sí me dio cuenta que era cierto. Cuando hablé con él, sentí como que me había regresado el alma a mi cuerpo. Había pasado noches sin dormir, buscando y buscando mi hijo sin saber dónde andaba. Una tortura día en día. Hasta que me puse a llorar de la emoción al escuchar su voz.

7. Erich me explicó que iba a mandarme unos formularios para aplicar ser patrocinadora de mi hijo, y me pidió muchos documentos. Desde el principio, me aseguraba una y otra vez que el proceso no iba a tardar mucho, unos 30 días a más tardar. Inmediatamente, me puse a reunir todos los documentos que me pidió Erich, y se los mandé sin demora ninguna. Dentro de una semana le había mandado todos los documentos que pidieron. Cada papel que me pidieron les he mandado de lo más pronto posible.

8. Sin embargo, Erich seguía pidiendome más y más documentos: entre ellos, archivos de médicos para comprobar que mi cancer no me estorbaría cuidar a mi hijo. Estos parecían muy personales, me causaron mucha pena, y no me parecían necesarios para tener mi hijo. Creo que una madre tiene derecho de cuidar a su hijo auque esté incapacidata, aunque yo no lo estoy. Se me ocurrió que estaban buscando una excusa para negarme a mi hijo por estar enferma. Pero yo tengo una hija de cuatro años y nunca la he faltado nada. No obstante, les mandé todos los documentos que me pidieron tan pronto que pude obtenerlos del doctor, A pesar de todo, sigue el gobierno en no entregarme a mi hijo.9. Al contrario, luego me exigieron todas las direcciones donde viví antes. Puse la dirección de un PO Box por una de ellas, porque la había usaba siempre, y de todos modos, tuve que ver con una casa en que viví en 2011 y 2012 y yo no me acordaba el número de la casa. Me dijeron que eso no se hace. Tuve que manejar una hora y media a la casa en sí para conseguir el número.

2

Exhibit 1
Page 3

11. Luego me dijeron que me presentara para que me tomaran huellas digitales, aunque me habían asegurado varias veces que sacarme las huellas no fue necesario. Erich me contactó al principios de diciembre de 2017 para avisarme que tuve cita para el 16 de noviembre para las huellas, pero a él se le había olvidado avisarme. Me dijo que habían puesto una nueva cita para el 8 de enero, y que mi esposo y yo teníamos que ir. Como siempre, con esto también cumplimos, aunque nos costó manejar dos horas y media en llegar al sitio donde sacan las huellas. Unos días después, Erich me llamó para avisarme que el gobierno había perdido las huellas de mi esposo, y que tuvimos que presentarnos otra vez el 2 de febrero para sacar huellas.

12. También me hicieron un chequeo de casa, o sea el "home study." Una señorita llegó a la casa el 13 de diciembre. y pasó como una hora y media. Revisó la casa y todo los cuartos, incluyendo el cuarto de mi hija de 4 años y el cuarto que nosotros habíamos preparado para ███████. Luego me hizo una entrevista, y me hizo muchas preguntas sobre mi situación de inmigración y como había entrado a los Estados Unidos. Me dijo que si me dan a mi hijo y no se presenta él por sus citas en la corte, las inmigración pueden llevar de preso a todos de la casa. Me aseguró la investigadora que en una semana tendrían resultados del "home study" y que para el año nuevo seguramente iban a entregarme a mi hijo. Me puse tan emocionada, hasta que le compré unos regalos de Navidad para mi hijo. Todavía los tengo, aún envueltos con papel de regalo de Navidad. Me da una tisteza profunda cada vez que los veo.

13. Últimamenete, Erich me ha informado que ya iban a trasladar an ███████ a un albergue cercana en Florida, que llegaría mi hijo el 1 o el 2 de febrero, pero ya pasaron las fechas indicadas, y ahora me dicen que aún no tienen donde alojarlo en Florida.

14. Según el abogado de mi hijo, mi hijo se enfermó tanto que lo llevaron al hospital la noche del 30 de enero. Pregunté a respeto con el case manager, y me respondió que lo habían llevado al doctor pero no era nada preocupante. Luego mi hijo me llamó, y me dijo que sentía muy mal, que estaba sangrando de la nariz y que no había comido. Alguien cortó la llamada sin darle tiempo de explicarme más. Nadie de Morrison ni del gobierno me han dado más información sobre la salud de mi hijo, los estudios, resultados o tratamiento médico que le están dando. Nadie me ha comunicado para pedir mi permiso para darle a mi hijo cualquier tratamiento médico o medicación.

15. Desde que supe que el gobierno estaba deteniendo mi hijo, ya hace más de cuatro meses, la única persona del gobierno con quien he hablado ha sido Erich, excepto cuando Erich fue a vacaciones

3

**Exhibit 1**
**Page 4**

yo hablé con otro case manager, Maribel. Aparte de la investigadora de casas, nadie más del gobierno
me ha comunicado para informe sobre mi hijo. No me han avisado de ningún procedimiento por el cuál
una madre puede oponerse a la detención prolongada de su hijo, o que los oficiales migratorios no esás
cumpliendo con sus multiples promesas de entregarle un hijo a una mamá desesperada. Durante meses,
nadie me han dada información clara ni honesta.

16. Han pasado los meses y con cada día que pasa lo pienso menos probable el deseo que
cualquier mamá en mis zapatos esperaría: el momento o el día que su hijo por fin llegue a casa.
Primero le dicen a uno que en unas semanas va a tener su hijo, después, en un mes, y después, en otro
mes—pero nunca cumplen. Con tanta tardanza, yo me he preguntado, ¿En qué estoy equivocando? ¿No
he llenado todos los documento bien? ¿No he enviado cada cosa que me piden? ¿Porque no quieren
liberar a mi hijo? Si están demorando hasta que cumpla mayor de edad para deportarlo, ¿porque no me
lo dicen de una vez? Quiero que al menos me lo permitan ver un día, si solo por un rato, para que valga
la pena que una familia sufre. ▮▮▮▮▮▮▮ no es ningún peligroso para detenerlo por tanto tiempo. Una
madre lo sabe, y el juez de inmigración ya lo decidió. ¿Qué madre no quisiera tener a su hijo en sus
brazos, si solo por un momento?

Declaro bajo protesta de decir la verdad que toda la información que aquí he proporcionado es
correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad. .

Hecho el día __6__ de febrero del año 2018, en Sebring, Florida.



///

4

X

**Exhibit 1**
**Page 5**

**DECLARATION OF** ██████████████████████████

I, ████████████████████, declare and say the following:

1. My name is ██████████████████. I was born on █████████, 1981 in Tezoatlán de Segura y Luna, in the state of Oaxaca, Mexico. I have been living in the United States since 2005 and currently I live in Sebring, Florida.

2. I am the mother of ██████████████████████, who is currently being held by the Office of Refugee Resettlement in a detention center in Portland, Oregon. I have been fulfilling everything they ask me for more than 4 months to recover custody of my son.

3. I came to the United States to find a better life for my son. ████████████ was small when I moved to the United States and left him with my parents and siblings in Mexico while I was trying to establish myself in the United States. I have always maintained contact with my family and my son, with only one interruption. In 2007 I got sick with cancer. The doctor told me that the cancer had expanded in my body, it was very advanced, even terminal. I was admitted to a hospital for almost a year, and it was very difficult for me to communicate with ████████████. I began to communicate with him again in 2008 when my health began to improve. Since then my health has improved, thank God, although I still receive chemotherapy once a month.

4. The first time I realized that ████████████ had arrived in the United States was when I received a voicemail from him, in which he told me he was being held in Kansas City. This was in September of 2017. I did not know that he planned to come to the United States. When I received the message I was very worried and thought maybe it was a joke in bad taste. Hurricane Irma had just passed through Florida, and there were many problems with finding a cell phone signal. I had to drive an hour and a half to another place to make calls and receive messages, but he had not told me where immigration had detained him. I called many places in the following days trying to find out something about ████████████ and his whereabouts. I got sick and very desperate, because I did not know where he was or how to communicate with him. I called many government offices, called immigration, called ICE, other offices where the government holds people in jail for deportation, and other places I did not know where but it was government offices. Nowhere did they give me any information.

5. These days in mid-September, when I did not know where my son was, I received a call from unknown people who did not identify themselves, who told me they had my son, and that I would have to pay $1,400 to get him back. They demanded a $400 deposit in a bank account and then another $1,000 payment when I met with them to pick up my son. I said that I wanted

**Exhibit 1**
**Page 6**

to talk to my son to know if they really had him and they said no, so I hung up.

6. I did not know anything else about my son until September 19, when I received a message on Facebook from Erich Corona, my son's case manager in Portland. At first, I had doubts if it were really legitimate. I remembered that they had called me once those scammers saying they had my son. I did not think they really had my son until I could talk to him. Then I did realize that it was true. When I spoke with him, I felt like my soul had returned to my body. I had spent nights without sleep, searching and searching for my son without knowing where he was. A torture day by day. I started crying from emotion when I heard his voice.

7. Erich explained to me that he was going to send me some forms to apply to be my son's sponsor, and he asked me for many documents. From the beginning, he assured me again and again that the process would not take long, about 30 days at the most. Immediately, I began to gather all the documents that Erich asked me, and I sent them without delay. Within a week I had sent him all the documents they asked for. Every paper they requested I sent as quickly as possible.

8. However, Erich kept asking me for more and more documents: among them, files from doctors to verify that my cancer would not hinder me from taking care of my son. These seemed very personal, they caused me great sorrow, and they did not seem necessary to have my son. I believe that a mother has the right to take care of her child even though she is incapacitated, although I am not. It occurred to me that they were looking for an excuse to deny me my son for being sick. But I have a four-year-old daughter and she has never lacked anything. However, I sent them all the documents they asked for as soon as I could get them from the doctor. In spite of everything, the government has yet to provide my son to me.

9. On the contrary, they then demanded all the addresses where I lived before. I put the address of a PO Box for one of them, because I had always used it, and anyway, it had to do with a house in which I lived in 2011 and 2012 and I did not remember the house number. They told me that that is not how it is done. I had to drive an hour and a half to the house itself to get the house number.

10. Then they told me to show up so they could take my fingerprints, although they had assured me several times that getting my fingerprints was not necessary. Erich contacted me at the beginning of December of 2017 to let me know that I had an appointment for November 16 for the prints, but he had forgotten to let me know. He told me that they had put a new appointment for January 8, and that my husband and I had to go. As always, we also complied with this, although it took us two and a half hours to get to the place where the prints are taken. A few days later, Erich called me to let

**Exhibit 1**
**Page 7**

me know that the government had lost the fingerprints for my husband, and that we had to show up again on February 2 to have prints taken.

11. I was also given a home check, or "home study." A young lady arrived at the house on December 13 and it took like an hour and a half. She checked the house and all the rooms, including my 4-year-old daughter's room and the room we had prepared for ███████. Then she interviewed me, and asked me a lot of questions about my immigration situation and how I had entered the United States. She told me that if they give my son to me and he does not show up for his court dates, immigration can arrest everyone in the house. The investigator assured me that in a week they would have results of the "home study" and that for the New Year they would surely give me my son. I got so excited, I even bought some Christmas presents for my son. I have them, still wrapped with Christmas wrapping paper. They give me a deep sorrow every time I see them.

12. Lastly, Erich informed me that they were going to transfer ███████ to a nearby shelter in Florida, that my son would arrive on February 1 or 2, but the dates have already passed, and now they tell me that they still do not have where to host him in Florida.

13. According to my son's lawyer, my son became so ill that he was taken to the hospital on the night of January 30. I asked the case manager about that situation, and he replied that he had been taken to the doctor but it was not worrisome. Then my son called me, and he told me that he felt very bad, that he was bleeding from his nose and that he had not eaten. Someone cut the call without giving him time to explain more. No one from Morrison or the government has given me more information about my son's health, the studies, results or medical treatment he is receiving. No one has contacted me to ask for my permission to give my son any medical treatment or medication.

14. Ever since I learned that the government detained my son, more than four months ago, the only person from the government I spoke with was Erich, except when Erich went on vacation I spoke with another case manager, Maribel. Apart from the home investigator, no one else from the government has told me anything about my son. I have not been made aware of any procedure by which a mother can oppose the prolonged detention of her child, or that immigration officials are not fulfilling their multiple promises to give a child to a desperate mother. For months, no one has given me clear or honest information.

15. Months have passed and with each passing day I think less likely the dream that any mother in my shoes would wait for: the time or the day that her son finally gets home. First they tell you that in a few weeks you will have your child, then, in a month, and then in another month-but they never fulfill their

**Exhibit 1**
**Page 8**

promises. With such delay, I have asked myself, what am I doing wrong?
Have I not filled all the documents correctly? Have I not sent everything they
ask from me? Why do they not you want to free my son? If you are delaying
release until he reaches the adulthood so he can be deported, why won't they
just say this at once? I want them to at least allow me to see him one day, if
only for a while, so that it's worth it for a family to suffer. ███████ is not
dangerous to be detained for so long. A mother knows that, and the
immigration judge already decided. What mother would not want to have her
son in her arms, if only for a moment?

I declare under perjury to tell the truth and that all the information I have
provided here is correct and complete, I am aware of the legal consequences
of declaring with falsehood before the authority.

Done on February <u>6</u>, 2018, in Sebring, Florida.

                                                    ___/s/___

                                                              ████████

/ / /

**Exhibit 1**
**Page 9**

DECLARATION OF TRANSLATOR

I, Jorge Medina, declare and say as follows:

1. I speak, read and write English and Spanish.

2. On this day I translated the declaration of ▮▮▮▮▮▮▮▮ from Spanish to English. The annexed is a true and accurate translation of said declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___6th___ day of February 2018, at Los Angeles, California.

_____
Jorge Medina

/ / /

Exhibit 1
Page 10

# Exhibit 2

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Exhibit 2
Page 11

**DECLARACIÓN DE** ███████████████████

Yo, ████████ ███████, declaro y digo la siguiente:

1. Yo nací en Oaxaca, México ████████ 2000. Tengo 17 años de edad. Actualmente
me encuentro detenido en un centro de detención en Portland, Oregon llamado Morrison
Paso Staff Secure Program en donde he estado desde septiembre del 2017.

2. Me detuvieron inicialmente en Kansas City los policías a finales de agosto del 2017. El 13
de septiembre me transfirieron a un shelter de la Oficina de Resentamiento de Refugiados
en Kansas City y estuve detenido por aproximadamente 5 días.

3. En el shelter los trabajadores no me dijeron la razón por la cual estaba ahí y tampoco me
dijeron cuanto tiempo iba a estar con ellos. En el shelter yo podía caminar libremente pero
me dijeron que si me iba, que la policía iba a llegar a arrestarme. No habían llaves ni
barras en las puertas o las ventanas en el shelter. Si quería salir afuera del shelter tenía que
ser acompañado por un trabajador. No me acuerdo si me dejaron saber cuáles eran mis
derechos mientras estaba en el shelter. Pero nunca tuve consulta con un abogado en el
shelter.

4. Cuando yo estaba en el shelter, no tuve ningún problema o pelea con otros jóvenes, ni un
incidente o problema de comportamiento. Después de aproximadamente 5 días en el
shelter, los trabajadores me dijeron que iba a ser trasferido y que recogiera todas mis
cosas. Esto pasó el 18 de septiembre del 2017, ese mismo día que me dijeron que iban a
transferir, me pusieron en un avión y me transfirieron a Morrison Paso Staff Secure
Program (Paso) en Portland, Oregon.

5. Antes de que me transfirieran, los trabajadores nunca me dijeron la razón por la cual me
estaban transfiriendo o si podía hacer una disputa acerca de la transferencia. No me
acuerdo haber recibido ninguna notificación en escrito acerca de la transferencia o acerca
de mis derechos para disputar.

6. Cuando llegue a Paso el 18 de septiembre, le pregunte a los trabajadores ahí porque había
sido transferido y ellos me dijeron que era porque había un reporte que un trabajador hizo
en Kansas City.

**Exhibit 2
Page 12**

7.  Las condiciones de Paso son muy diferentes a las del shelter en Kansas City. En Paso todas las puertas están con llave menos las de las recámaras. En el pasillo puedo caminar libremente pero solamente es un pasillo corto. Todo está con llave. Siempre tengo que preguntarle a un trabajador que me abra la puerta para poder moverme dentro de la facilidad. Por ejemplo, si me muevo de mi cuarto a la sala necesito permiso de un trabajador para que me abra la puerta y necesito hasta una llave para poder ir al baño. Cada vez que pasamos de un pasillo a otro pasillo, tenemos que mover el cinturón de nuestra ropa para mostrar que no tenemos nada escondido allí.

8.  En Paso siempre tengo que ocupar un uniforme, que hace sentirme como prisionero. Aquí nos dan un uniforme para ir a la escuela y uno para estar afuera con los demás. La única ropa que tenemos son los dos uniformes, y no nos permiten tener o llevar otra ropa.

9.  En Paso, solo tengo contacto con los trabajadores y otros jóvenes inmigrantes detenido como yo.  Yo comparto un cuarto con otro muchacho. El cuarto tiene dos camas y he compartido el cuarto con varios muchachos. Mis pertenencias están bajo llave y cuando quiero utilizar mis pertenencias tengo que pedir permiso a un trabajador para que le quite llave y ellos siempre revisan lo que estoy sacando. Las otras cosas que tenemos, como lápices y un teléfono que solo funciona para escuchar música, nos las dan los trabajadores y si nos portamos mal, nos las quitan.

10. Todos los días los trabajadores en Paso nos revisan el cuarto mientras estamos en la escuela. Me permiten hablar con mi madre por teléfono solo el lunes, miércoles y viernes. Si quiero hablar con ella en otro día, no me permiten hablar con ella los días que me toca.

11. En Paso, es requerido que vaya a la escuela 5 días a la semana. La escuela está en el mismo edificio solo que en otro pasillo. Si alguien no va a las clases, le quitan privilegios, como poder escuchar música.

12. Desde que llegué a Paso, me reúno con mi consejera una vez por semana por una hora. Bajo la recomendación de la consejera, me dan pastillas para dormir todos los días porque estando encerrado no puedo dormir y quiero tomármelas. En el shelter en Kansas vi una consejera una vez, y no me recomendaron tomar pastillas para dormir.

**Exhibit 2**
**Page 13**

13. He visto al doctor cuatro o cinco veces desde que llegue a Paso. En unas de esas me dieron inyecciones que me dijeron que fueron vacunas. Yo pregunté si era necesario, y me dijeron que no era opcional, y que yo tenía que tenerlas.

14. Pedí una audiencia con el juez para entender la razón por cual estoy detenido. Me representaron en mi audiencia mis abogados, Leland y Jenny, el 19 de diciembre de 2017. Mis abogados me explicaron que el juez determinó que no soy un peligro pero que el gobierno todavía tenía que aprobar a mi madre como mi patrocinadora. Sin embargo, nadie en Paso o ningún otro oficinal del gobierno me explicaron los resultados de mi audiencia.

15. Durante los primeros meses en Paso, no tuve ningún problema, excepto que me hicieron un reporte por haberme marcado con un fierro en mi cuerpo. No recibí ningún castigo por esto. Pero, después de que gané mi audiencia con el juez, y nada cambió, yo empezaba a sentir frustración y fue más difícil no enojarme. Yo siempre hice mucho esfuerzo para hacer todo lo que me decían, y cumplir con todas las reglas, aunque a veces los otros muchachos molestan mucho, pero empezaba a creer que nunca iba a salir. Después de la audiencia con el juez, tuve tres reportes de mi comportamiento. Dos de los otros reportes fueron porque le dije algo a otro muchacho que me estaba molestando, sin embargo yo nunca lo toqué. Tampoco recibí ningún castigo en esas situaciones. El último reporte de que me acuerdo, tuve una pelea verbal con un muchacho y luego él me golpeó. Yo no lo golpeé a él, el staff nos separó y lo sacaron a él de la clase. Los supervisores hablaron conmigo y me quitaron mis privilegios de televisión, juegos y mi música por tres días.

16. Me han dicho información confusa acerca de cuándo me van a liberar. A principios de enero, después de que gané mi audiencia, me dijo la directora de Paso que serían tan siquiera 30 días hasta que me regresaran al shelter o me reunifiquen con mi madre. Más luego, me dijeron que sería al menos 30 días más para que me pudieran bajar de nivel. El lunes el 29 de enero, me dijeron que me podían bajar de nivel el 1 de febrero, pero todavía sigo detenido, ahora por más de cuatro meses. No creo que mi estado de custodia haya sido revisado cada 30 días. No he tenido ninguna reunión con un funcionario del gobierno al respecto.

**Exhibit 2**
**Page 14**

17. Nunca me han dado ningún cargo ni me han declarado culpable de ningún cargo criminal.

18. Nunca he intentado escapar de mi detención desde que estuve en Kansas City.

19. Todo lo que quiero en este momento es ser reunificado con mi madre en Florida. Me han dado muy poca información acerca del proceso de reunificación con mi madre. Erich, un trabajador aquí, solo me dice que van a trasladarme a un shelter en Florida, y que están esperando otra vez las huellas de mi padrastro, pero que supuestamente se perdieron la primera vez. Erich pretende mantenerme informado acerca del proceso para reunificarme con mi mama, pero cada semana me dice lo mismo: que están esperando por las huellas.

Declaro bajo protesta de ley y castigo de perjurio que lo anterior es cierto y correcto.

Hecho el dia ⟨04⟩ de ⟨febrero⟩, del ano 2018, en Portland Oregon.



///

Exhibit 2
Page 15

**DECLARATION BY** █████████████████████

I, ██████████████████████████ declare and say the following:

1. I was born in Oaxaca, Mexico on ████████, 2000. I am 17 years old. I am currently being held in a detention center in Portland, Oregon called Morrison Paso Staff Secure Program where I have been since September 2017.

2. Police officers initially detained me in Kansas City at the end of August 2017. On September 13, I was transferred to a shelter in the Office of Refugee Resettlement in Kansas City and detained for approximately 5 days.

3. In the shelter the workers did not tell me the reason why I was there and they did not tell me how long I would be with them. In the shelter I could walk freely but they told me that if I left, that the police would arrest me. There were no keys or bars on the doors or windows in the shelter. If I wanted to go outside the shelter I had to be accompanied by a worker. I do not remember if they let me know what my rights were while I was in the shelter. But I never had consultation with a lawyer in the shelter.

4. When I was in the shelter, I did not have any problems or fights with other young people, nor had an incident or behavior problem. After about 5 days in the shelter, the workers told me I was going to be transferred and to collect all my things. This happened on September 18, 2017, that same day they told me they were going to transfer, they put me on a plane and transferred me to Morrison Paso Staff Secure Program (Paso) in Portland, Oregon.

5. Before I was transferred, the workers never told me the reason why they were transferring me or if I could make a dispute about the transfer. I do not remember receiving any written notification about the transfer or about my rights to dispute.

6. When I arrived at Paso on September 18, I asked the workers there why had I been transferred and they told me it was because there was a report that a worker made in Kansas City.

7. The conditions of Paso are very different from those of the shelter in Kansas City. In Paso all the doors have keys except those of the bedrooms. In the hallway I can walk freely but it is a short hallway. Everything has a key. I always have to ask a worker to open the door so I can move inside the facility. For example, if I move from my room to the living room, I need a worker's permission to open the door and I need a key to go to the bathroom. Every time we move from one hallway to another hallway, we have to move the belt of our clothes to show that we have nothing hidden there.

**Exhibit 2**
**Page 16**

8. In Paso I always have to wear a uniform, which makes me feel like a prisoner. Here they give us a uniform to go to school and one to be outside with others. The only clothes we have are the two uniforms, and they do not allow us to have or wear other clothes.

9. In Paso, I only have contact with workers and other immigrant youth detained like me. I share a room with another boy. The room has two beds and I have shared the room with several boys. My belongings are locked and when I want to use my belongings I have to ask a worker for permission to remove the key and they always check what I'm taking out. The other things we have, like pencils and a phone that only works to listen to music, are given to us by the workers and if we behave badly, they take them away from us.

10. Every day the Paso workers check the room while we are at school. They allow me to talk to my mother by phone only on Monday, Wednesday and Friday. If I want to talk to her on another day, I'm not allowed to talk to her on the days that I am scheduled.

11. At Paso, you are required to go to school 5 days a week. The school is in the same building only as in another hallway. If someone does not go to the classes, they take away privileges, such as being able to listen to music.

12. Since I arrived in Paso, I meet with my counselor once a week for one hour. Under the recommendation of the counselor, they give me pills to sleep every day because when I am locked up I cannot sleep and I want to take them. At the shelter in Kansas I saw a counselor once, and I was not recommended to take sleeping pills.

13. I have seen the doctor four or five times since I arrived in Paso. In some of those they gave me injections that they told me were vaccines. I asked if it was necessary, and they told me that it was not optional, and that I had to have them.

14. I requested a hearing with the judge to understand the reason why I am being detained. My lawyers, Leland and Jenny, represented me at my hearing on December 19, 2017. My lawyers explained to me that the judge determined that I am not a danger but that the government still had to approve my mother as my sponsor. However, no one in Paso or any other government office explained the results of my hearing.

15. During the first months in Paso, I did not have any problem, except that they made a report for having marked myself with an iron in my body. I did not receive any punishment for this. But, after I won my hearing with the judge, and nothing changed, I started to feel frustrated and it was harder not to get angry. I always made a lot of effort to do everything that was said to me, and to comply with all the rules, although sometimes the other boys bother a lot,

**Exhibit 2**
**Page 17**

but I started to believe that I was never going to leave. After the hearing with the judge, I had three reports of my behavior. Two of the other reports were because I said something to another boy who was bothering me, however I never touched him. I did not receive any punishment in those situations either. The last report that I remember, I had a verbal fight with a boy and then he hit me. I did not hit him, the staff separated us and they took him out of the class. The supervisors talked to me and took away my television privileges, games and my music for three days.

16. They have told me confusing information about when they will release me. In early January, after I won my hearing, the Principal told me that it would not be even 30 days until they returned me to the shelter or reunited me with my mother. Later on, they told me that it would be at least 30 more days so that they could lower me in level. On Monday, January 29, they told me that they could lower me on February 1, but I am still in detention, now for more than four months. I do not think my custody status has been reviewed every 30 days. I have not had any meeting with a government official about it.

17. I have never been charged or convicted of any criminal charges.

18. I have never tried to escape my detention since I was in Kansas City.

19. All I want at this time is to be reunited with my mother in Florida. I have been given very little information about the reunification process with my mother. Erich, a worker here, just tells me that they are going to move me to a shelter in Florida, and that they are waiting again for the fingerprints of my stepfather, but that supposedly they were lost the first time. Erich tries to keep me informed about the process to reunite with my mother, but every week she tells me the same thing: they are waiting for the prints.

I declare under protest of law and punishment of perjury that the above is true and correct.

Done on February 4, of the year 2018, in Portland Oregon.

/// 

**Exhibit 2
Page 18**

DECLARATION OF TRANSLATOR

I, Jorge Medina, declare and say as follows:

1. I speak, read and write English and Spanish.

2. On this day I translated the declaration of ███████████ from Spanish to English. The annexed is a true and accurate translation of said declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __6TH__ day of February 2018, at Los Angeles, California.

_____

Jorge Medina

/ / /

Exhibit 2
Page 19

# Exhibit 3

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 3
Page 20

Detained

███████████

EXHIBIT E                          Morrison Paso Case Review dated September 17, 2017
                                   20170917_Morrison Paso_CaseReviewx

Exhibit 3
Page 21

**Case Review**

| UAC Basic Information | |
|---|---|

**First Name:**

**Last Name:**

**AKA:**

| Status: | ADMITTED | | |
|---|---|---|---|
| Date of Birth: | ████ 2000 | Gender: | M |
| A No.: | | LOS: | 72 |
| Age: | 17 | Current Program: | Morrison Pass |
| Country of Birth: | Mexico | Admitted Date: | ████ 2017 |

(• 30 day Case Review  ○ Discharge  ○ Transfer    Are there any changes?:  • Yes • No

**Previous Placement:**

Minor is a transfer from The Villages Shelter Kansas; minor was stepped-up to current program due to self-disclosed human smuggling/run-risk concerns; First time in ORR care.

**Religious Affiliation:**

Catholic

**Case Manager:**

Erich Corona

**Clinician:**

Brittany Ruas

**Document any new information regarding the UAC not indicated in the UAC Assessment and/or the previous case summary below**

| Medical | |
|---|---|

**List any allergies:**

N/A

**Do you feel unwell?**

○ Yes  • No

**If yes, what are your symptoms?**

N/A

**Additional medical information:**

N/A

**Medical History**

| Condition | Yes/No | Date of Diagnosis/Clarification |
|---|---|---|
| Pregnant | ○ Yes • No | |
| Tuberculosis | ○ Yes • No | |
| Varicella | • Yes ○ No | |
| Measles | ○ Yes • No | |
| Mumps | ○ Yes • No | |
| Rubella | ○ Yes • No | |
| Asthma | ○ Yes • No | |
| Diabetes | ○ Yes • No | |
| Cancer | ○ Yes • No | |
| Cardiac Issues | ○ Yes • No | |
| Sexually Transmitted Disease | ○ Yes • No | |
| Respiratory/Lung Disorder | ○ Yes • No | |
| Physical Disability | ○ Yes • No | |

**Medication History**

| Medication | Dosage | Timeframe | Medical Condition |
|---|---|---|---|
| | | | N/A |
| | | | N/A |
| | | | N/A |
| | | | N/A |
| | | | N/A |

| Legal | |
|---|---|

**Know Your Rights Presentation provided?**  • Yes ○ No

Exhibit 3
Page 22

| | |
|---|---|
| Date: | 9/19/17 |
| Legal screening completed? | ⦿ Yes ○ No |
| Date: | 9/22/17 |
| Any possible legal relief identified? | ○ Yes ⦿ No |
| Specify: | Minor has not been identified for legal relief at this time as of 11.17.17 |

## Mental Health

Provide a short summary of the UAC's current functioning:

19/18/17-Minor continues to attend individual and group counseling weekly. Minor has been able to follow rules and regulations and is redirected easily. Minor expresses feelings and thoughts in session and reports what he needs in regards to his coping skills. Minor has not presented with any harm to self or other thinking. Clinician has no concerns at this time regarding minor and his functioning.

10/29/17-Minor continues to participate in program activities and requirements and follows all rules and regulations. Minor attend individual and group counseling and provides input and discusses feelings. Minor has started family sessions with his sponsor and is willing to discuss his feelings and concerns when needed. Sponsor has been flexible and available for family sessions. Minor has begun to become honest regarding the details of his journey and discussion of his future. Minor reports zero harm to self or other thinking. There are no mental health concerns at this time.

11/17/17-Minor continues to comply with program rules and regulations. Minor has showed appropriate behaviors within the program and a high level of emotional intelligence. Minor has been able to attend outings and show appropriate behavior in the community. Minor continues to report no thoughts of self harm or harm to others. Minor also has participated actively in individual, family and group therapy. Minor appears to remain receptive and compliant with expectations.

## Psychological Evaluation

Date of
Evaluation:
Evaluator:
Axis I:
Axis II:
Axis III:
Axis IV:
Axis V:
Summary of Recommendations:

## Trafficking

**Who planned/organized your journey?**

During initial intake, Minor stated that he and his mother planned the trip to the US. However, during sponsor assessment on 9/27/17, Minor's mother denied paying for minor's journey, as she stated that neither she, nor her parents, were aware that the minor had made the journey on his own accord. CM contacted minor's grandparents in COO on 9/18/17, who reported that they were not aware that the minor had made the journey to the US to see his mother, as they were originally notified by the minor's supervisor at the tortilla shop, who wanted to know if the minor was going to come into work after missing the previous day of work. CM have informed the minor about this discrepancy and he continues to be adamant that his mother paid for his journey ($8,000 USD). Upon further assessment in program, minor disclosed that he saved $600 USD and his friends lent him $500 USD for his journey. Minor stated that he initially did not want to inform the program of his friend's names and stated that they were they ones who arranged for his entire journey, including the arrangements for transport from Arizona to Florida to his mother. Minor stated that his is expected to payback his friends whenever he can have permission to work in the US and stated that there will be no consequences for him nor his family for delaying payment to his friends given his current situation.

**What were you told about the arrangements before the journey?**

Minor reports that the guide did not explain details, he just told minor to get ready to leave around July 30 and to take just few clothes.

**Did the arrangements change during the journey?**     ○ ⦿
                                                          Yes No

**If yes, how?**

Minor reports that everything went as planned during his journey across the border.

**Does your family owe money to anyone for the journey?**     ○ ⦿
                                                               Yes No

**If yes, how much?**

**Whom is the money owed?**

N/A- During initial intake, Minor stated that he and his mother planned the trip to the US. However, during sponsor assessment on 9/27/17, Minor's mother denied paying for minor's journey, as she stated that neither she, nor her parents, were aware that the minor had made the journey on his own accord. CM contacted minor's grandparents in COO on 9/28/17, who reported that they were not aware that the minor had made the journey to the US to see his mother, as they were originally notified by the minor's supervisor at the tortilla shop, who wanted to know if the minor was going to come into work after missing the previous day of work. CM have informed the minor about this discrepancy and he continues to be adamant that his mother paid for his journey ($8,000 USD). Upon further assessment in program, minor disclosed that he saved $600 USD and his friends lent him $600 USD for his journey. Minor stated that he initially did not want to inform the program of his friend's names and stated that they were the ones who arranged for his entire journey, including the arrangements for transport from Arizona to Florida to his mother. Minor stated that his is expected to payback his friends whenever he can have permission to work in the US and stated that there will be no consequences for him nor his family for delaying payment to his friends given his current situation.

**Who is expected to pay?**

Friend(s) in Mexico; $600 USD.

**What do you expect to happen if payment is not made?**

Minor stated that there will be no consequences if payment is delayed.

## Coercion Indicators

**Did anyone threaten your or your family?**     ⦿ ○
                                                 Yes No

Exhibit 3
Page 23

If yes, who made the threats?

Minor has NOT been threatened, however: During sponsor assessment on 9/27/17, sponsor reported that on 9/18/17 around 12PM EST, she was contacted by an unknown number by a person named Eric, who informed her that her son was at safe house somewhere in Arizona with a lady who was caring for him, where he was safe, and was instructed to send her $800 dollars via bank account number [redacted] 0-50-9. Per sponsor, Eric stated that once the minor arrived to Florida via van, she would have to pay an additional $400 dollars in person. Sponsor stated that she did not send any money to the bank account, since she received a phone call on 9/19/17 from Paso Program from Case Manager, who allowed her to speak to her son. Per sponsor, she was relieved to hear her son's voice and was confused as to why the person on the phone was requesting monies, as she reports not being aware that minor had made the journey into the US, without the consent of the family. Furthermore, sponsor reports being apprehensive initially about the authenticity of PASO program as well, until she received an PRP packet in the mail on 9/11/17 and was able to watch the sponsor video (this sponsor was a victim of hurricane Irma and reported connectivity issues in her area during this time.) Sponsor stated that as of 9/18/17, the unknown number contacted her on two other occasions and left two voicemails allegedly threatening her to send the $800 USD, or else "something bad" would happen to her son. As of 9/19/17, the sponsor reports that she stopped using her old cell phone and is currently only using her home phone to communicate with PASO Program. Sponsor reports that she has continued contacting her parents in Mexico since 9/18/17, were her family denies being asked or threatened for any types of monies from anyone regarding the minor's alleged transportation costs. CM Created a Fraud SIR and notified Sebring PD, who instructed CM to notify the sponsor to contact them, if she felt like pressing charges and wanted police to become involved. CM relayed this information to sponsor; sponsor stated that she would speak to her husband first before proceeding, as her family in COO, had not reported any type of harm by the alleged individuals in Arizona.

Were you ever physically harmed?                                                                      ☐ ☒
                                                                                                    Yes No
If yes, how?
n/a

Was anyone around you ever physically harmed?                                                         ☐ ☒
                                                                                                    Yes No
If yes, who?
n/a

Were you ever held against your will?                                                                 ☐ ☒
                                                                                                    Yes No
If yes, where?
n/a

Did anything bad happen to anyone in this situation or anyone else who tried to leave?                ☐ ☒
                                                                                                    Yes No
What happened and to whom?
n/a

Did anyone ever keep/destroy your documents?                                                          ☐ ☒
                                                                                                    Yes No
If yes, who and what?
n/a

Did anyone ever threaten to report you to the police/immigration?                                     ☐ ☒
                                                                                                    Yes No
If yes, who?
n/a

Are you worried anyone might be trying to find you?                                                    ☐ ☒
                                                                                                    Yes No
If yes, who?
n/a

## Debt Bondage/ Labor Trafficking

Did you perform any work or provide any services?                                                     ☒ ☐
                                                                                                    Yes No
If yes, what and where?
Back in COO, minor used to work every day in the fields from Monday to Saturday planting and gathering vegetables, and spreading pesticide on the fields.
Who arranged the work?
Minor found that job through a neighbor who was already working in the fields.
What type of work did you perform?
Minor used to work planting and gathering vegetables, and spreading pesticide on the fields
What was the work schedule?
Every day from Monday to Saturday from 5:00 am -12:00 pm
Did work conditions change over time?
No
Is there a debt?                                                                                      ☐ ☒
                                                                                                    Yes No
If yes, has any debt amount increased?                                                                ☐ ☒
                                                                                                    Yes No
By how much?
When did it increase?
Why did it increase?
n/a

Have you or your family ever been threatened over payment or work for the journey?                    ☐ ☒
                                                                                                    Yes No
If yes, who threatened you and how?
N/A

**Exhibit 3**
**Page 24**

What did you expect would happen if you left the job or stopped working?

Nothing.

Were you ever made to work or do anything you did not want to do?

○ ○
Yes No

Did you receive pay or did someone else keep the pay?

Minor received the payment

Were you paid what was promised when you started working?

yes

Were expenses taken out of the pay?

○ ○
Yes No

If yes what?

N/A

How did you get to the work site?

walking

Where did you live while working?

Minor was living with his maternal grandparents while working on the fields.

**Commercial Sex Indicators**

Did anyone ever ask you to see you naked or in your underwear in exchange for money/anything of value?

○ ○
Yes No

Did anyone ever pay/accept money/anything of value from other people in order to see you naked or in your underwear?

○ ○
Yes No

Did anyone ever ask to take pictures or recording of you naked or engaged in sex acts?

○ ○
Yes No

If so, did they offer you money/anything of value to do this or did they accept money/anything of value from others in order to see these pictures or recordings?

○ ○
Yes No

Did anyone ever ask or expect you to perform sexual acts in exchange for money/anything of value?

○ ○
Yes No

Did anyone ever promise or give money or anything of value to you in exchange for sexual acts?

○ ○
Yes No

Based on the information provided above in the "Trafficking" section, is there a trafficking concern?

○ ○
Yes No

If yes, date of trafficking referral:

| Sponsor Information (List by Priority) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Current Sponsor | Cat (1,2,3) | Sponsor Name | DOB | Address | Phone | Legal Status | Relationship |
| ■ | | | 1981 | | | Without status | Mother |

**Sponsor Risk Assessment Sponsor Risk Assessment**

| | |
|---|---|
| Substance use concerns? | ○ Yes ⦿ No |

If yes, explain:

please reference UAC portal.

| | |
|---|---|
| Domestic violence concerns? | ○ Yes ⦿ No |

If yes, explain:

please reference UAC portal.

| | |
|---|---|
| Child abuse or neglect concerns? | ○ Yes ⦿ No |

If yes, explain:

please reference UAC portal.

| | |
|---|---|
| Mental health issues? | ○ Yes ⦿ No |

If yes, explain:

please reference UAC portal.

| | |
|---|---|
| Does the sponsor have any family support? | ○ Yes ⦿ No |

Specify:

please reference UAC portal.

| | |
|---|---|
| Does the sponsor have any identified special needs? | ○ Yes ⦿ No |

If yes, explain:

please reference UAC portal.

| | |
|---|---|
| Does the sponsor have financial needs? | ○ Yes ⦿ No |

If yes, explain:

please reference UAC portal.

| | |
|---|---|
| Does the sponsor have adequate housing? | ○ Yes ⦿ No |

If yes, explain:

please reference UAC portal.

Are there any concerns with the disciplinary practices/philosophy of sponsor?

please reference UAC portal.

Exhibit 3
Page 25

| Does the sponsor have any criminal history? | ○ Yes ◉ No | | | |
| List any Felony convictions: | | | | |
| please reference UAC portal. | | | | |
| List any Misdemeanor convictions: | | | | |
| please reference UAC portal. | | | | |
| List any Probation/Parole: | | | | |
| please reference UAC portal. | | | | |
| List and describe any disclosed criminal activity: | | | | |
| N/A | | | | |
| History of incarceration: | Crime | Date | Length of Sentence | Location |
| Are there any parent/child relational issues? | ○ Yes ◉ No | | | |
| If yes, explain: | please reference UAC portal. | | | |
| Does the sponsor have an Order of Removal? | ○ Yes ◉ No | | | |
| If yes, date issued: | | | | |
| Has the sponsor sponsored any other UAC in DCS care? | ○ Yes ◉ No | | | |
| Additional sponsor information: | | | | |
| please reference UAC portal. | | | | |
| Sponsor Sponsored UACs: | Name of UAC | A Number | Relationship | Facility sponsored from |

## TVPRA 2008

Based on the most recent trafficking screening, is the child a victim of a severe form of trafficking in persons? (Indicate 'yes' only if ORR has issued a trafficking eligibility letter for UAC.)   ○ Yes ◉ No

Date eligibility letter issued:

Based on the most recent screening for disabilities, does the child have a disability as defined in section 3 of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102(1)?   ○ Yes ◉ No

If yes, specify disability:

n/s

Based on the most recent screening, has the child been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened?   ○ Yes ◉ No

If yes, provide a short summary:

n/s

Based on the sponsor risk assessment, does the sponsor clearly present a risk of abuse, maltreatment, exploitation, or trafficking to the UAC?   ○ Yes ◉ No

If yes, provide a short summary:

n/s

## Recommendations

| Discharge: | ○ Yes ◉ No |
| Sponsor: | ███████ |
| Discharge w/ Post Release: | ○ Yes ◉ No |
| Date of PR referral: | |
| Refer to Home Study | ○ Yes ◉ No |
| Reason for HS referral: | N/A |

## Care Plan

| Reunification: | Program has obtained complete FRP and all supporting documentation;proof of relationship was established via authenticated BC from the Mexican Consul. Sponsor assessment revealed NO safety concerns, as sponsor is familiar with her community and has been very forthcoming in providing information and completing paperwork. Given the CAT1 established relationship and lack of safety concerns, coupled with Clear online background/sex offender checks for sponsor and alt. care provider, the program will not be requiring fingerprints at this time nor CA/N checks. Program is working on conducting family sessions, as clinician and case manager believe that youth has resentment towards his mother, given their 13 year estranged relationship. Minor currently wishes to reunify with his mother and has not disclosed any type of child abuse by sponsor nor caregivers in COO. Program feels that sponsor has been very receptive and forthcoming during family sessions and believe that the sponsor will be able to adequately meet minor's needs. Program submitted for a CAT1 straight release on 10/30/17, Case Coordinator concurred with recommendation on 11/5/17; Pending FFS approval to elevate memo to HQ. Upon doing so, program will then submit a transfer request -preferably to a shelter in FL, where the minor may receive visitations from his mother/sponsor, while he awaits his release decision from ORR. |
| Legal: | Minor was provided with his KYR on :9/19/17 and Legal screening on:9/21/17; Minor has not been identified for any type of legal relief.as of 11/17/17. |
| Mental Health: | Minor will continue to attend weekly and individual counseling with clinician and will present needs and concerns as they arise. Minor and clinician will continue family sessions with sponsor. |

## Certification

Signature:

Brittany Russ, MSW, CSWA Erich Corona, BS

Date:

Exhibit 3
Page 26

# Exhibit 4

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 4
Page 27

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
1220 SW 3RD AVENUE, SUITE 500
PORTLAND, OR  97204

In the Matter of:                          **Case No.:**

                                           **Docket: PORTLAND DETENTION CENTER**

RESPONDENT                                 IN REMOVAL PROCEEDINGS

### CUSTODY ORDER OF THE IMMIGRATION JUDGE

Request having been made for a change in the custody status of the respondent
pursuant to 8 C.F.R. Part 236 and having considered the representations of the
Department of Homeland Security and the respondent, it is HEREBY ORDERED
that:  Not a danger to the community, bond granted
subject to HHS/ORR identifying, evaluating, and
approve an appropriate sponsor.

                                           **RICHARD ZANFARDINO**
                                           Immigration Judge
                                           Date:  Dec 19, 2017

Appeal:  NO APPEAL  (A/I/B)
Appeal Due By:   1-18-18

                    CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)   PERSONAL SERVICE (P)
TO:  [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] Alien's ATT/REP  [M] **HHS/ORR**
DATE:  __12/19/17__  BY: COURT STAFF _____
     Attachments!  [✓] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

Form EOIR 1 - 1T (Custody - REMOVAL)

**Exhibit 4
Page 28**

# Exhibit 5

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 5
Page 29

**METROPOLITAN PUBLIC DEFENDER**
**IMMIGRANT DEFENSE OREGON**
630 SW 5th Ave., Suite 500, Portland Or. 97204
Phone: 503-225-9100

## DECLARATION OF LELAND BAXTER-NEAL

I, Leland Baxter-Neal, declare and say as follows:

1.      I am an attorney in good standing barred to practice in the state of Oregon. My
bar number is 155347. I am employed as a staff attorney at Metropolitan Public Defender, in a
non-profit immigration project called Immigrant Defense Oregon.

2.      In that capacity, myself and co-counsel Jenny Hernandez represented ▉▉▉
▉▉▉▉▉▉▉▉▉▉▉ in his Dec. 19, 2017, "*Flores* bond hearing" pursuant to *Flores v.
Sessions*, 862 F.3d 863 (9th Cir. 2017). ▉▉▉ ▉▉▉ is currently detained by the Office of
Refugee Resettlement (ORR), at a "staff-secure" facility operated by Morrison Child & Family
Services ("Morrison"). We continue to represent ▉▉▉ ▉▉▉ for the purposes of enforcing his
rights under the settlement in *Flores, et al., v. Sessions, et al.*, No. CV 85-4544 DMG (C.D. Cal.)
("the *Flores* settlement") and seeking his release to his mother.

3.      The aforementioned *Flores* bond hearing was held on Dec. 19, 2017, at the
Portland Immigration Court in front of Immigration Judge Richard Zanfardino. In advance of the
Flores bond hearing, ORR counsel Thomas Pabst told me that that ORR would not be arguing at
the bond hearing that ▉▉▉ ▉▉▉ is a flight risk because, when determining whether to
release a minor in ORR custody to a sponsor, ORR does not consider whether that minor is a
flight risk.  ORR counsel affirmed the same in its briefing in advance of the hearing. At the
hearing, ORR counsel told the immigration judge that his argument in support of detaining ▉▉▉
▉▉▉ would be limited only to asserting that ▉▉▉ ▉▉▉ was a danger to the community.
At the conclusion of that hearing, the immigration judge sided with ▉▉▉ ▉▉▉ and ruled that
the he is not a danger to the community.

**Exhibit 5**
**Page 30**

4. As ▮▮▮ counsel, I contacted the staff at Morrison by email to Erich Corona, ▮▮▮ case manager, on Jan. 2, 2018, to inquire as to his custody status. Mr. Corona had previously told me that the staff at Morrison had recommended ▮▮▮ be placed with his mother, who lives in Florida, and that while that request for placement was pending, Morrison staff had also requested ▮▮▮ be "stepped down" to a less restrictive facility in Florida to be closer to his mother. Mr. Corona responded by email the same day that "everything was still pending in terms of ▮▮▮ transfer."

5. I contacted Mr. Corona by email again on Jan. 9, 2018, for an update on ▮▮▮ custody status. Mr. Corona replied, "We are currently working on ▮▮▮ transfer request," and described several factors that had delayed ORR's processing. On Jan. 19, 2018, Ms. Hernandez and I provided a demand letter via email to Scott Lloyd, Director of the Office of Refugee Resettlement, Maria Ivall, the Federal Field Specialist who oversees the staff secure center at Morrison, and Thomas Pabst, ORR counsel. In that letter, we demanded ORR immediately release ▮▮▮ to his mother's care, as ▮▮▮ continuing detention in a staff-secure facility and separation from his mother was in violation of the *Flores* settlement, and ▮▮▮ statutory and constitutional rights. Our office provided ORR until Jan. 29, 2018, to release ▮▮▮ and asserted that, if ▮▮▮ were not released, we would take legal action to enforce his rights.

6. Ms. Ivall replied by email later the same day, Jan. 19, 2018, confirming receipt of the letter and stating that "the case has been elevated to ORR headquarters and we will get back to you." As of this date, our office has not received a reply to our letter.

7. On Jan. 30, 2018, I emailed Ms. Ivall again to inquire as to ▮▮▮ status. Ms. Rodriguez replied by email later the same day as follows:

> "My apologies in advance, unfortunately I am unable to provide you with details of the case. Please feel free to make a formal request to ORR of the UC's file for more detailed information. I am more than happy to explain or discuss the

Exhibit 5
Page 31

process of step down as well as reunification if needed, however I am including ORR's link below for information.

I can tell you that the goal for staff secure UCs is to step down for as long as it is warranted and it is safe to do so. At this time in this particular case, the step down request is in the process of being submitted to ORR for approval. As of yet I am not aware of any approved placements. The care provider will send you a notification when UC has been approved to transfer since they are in charge of informing all stakeholders. They should provide you with the location where this UC is being transferred if/when accepted since you are the representing attorney."

8.    On Feb. 1, 2018, I contacted Mr. Corona at Morrison to confirm if he had any updated information as to ███ ███ custody status. Mr. Corona replied by email on Feb. 2, 2018, that, "Maria's email is the most current information we have on hand. We will notify you when the UC is discharged from our program once he is accepted by a shelter program in FL." Mr. Corona added that, "There is nothing we nor FFS can do at this time to expedite his transfer, we simply have to wait until a program has the capacity to accept him in FL."

9.    The Morrison center where ███ ███ is detained is classified by ORR as "staff-secure." To schedule my visits and phone calls with ███ ███ I must contact the staff at Morrison in advance and request they schedule the call or visit. The entrance to the area of the building where the UAC children are detained is always locked, and I must press a buzzer and wait for security to allow me to enter. The door is locked from both sides, and so a staff member is also required to unlock the door and let me out so that I may leave at the conclusion of my legal visits.

10.   Once I have entered the Morrison facility, I must sign in on a clipboard and note the time and reason for the visit, and then await staff to open a second locked door before I can enter the hallway leading to the locked room where I meet with ███ ███ To my recollection, every door that I have seen be opened at Morrison must be opened by a staff member with a key. When my client concludes his meeting with me, he undergoes a brief visual inspection by security in which he must pull away the waistband of his shorts to show

Exhibit 5
Page 32

that he has nothing concealed before he is allowed through the locked door that leads to the
area where the youth are held. Based on my own direct experience, and conversations with
███ ███████, it is my belief that his movements from place to place are tightly restricted and
closely monitored, and his behavior is subject to strict guidelines and punishment if he does not
comply.

11.     In the two months that Ms. Hernandez and I have represented ███ ███████, I
have visited him in person or spoken with him by phone approximately 10 times. I have had the
opportunity to get to know him and observe his moods and discuss with him his feelings. While
I am not a mental health professional, I am deeply concerned that ███ ███████ continued
detention, paired with inconsistent information from ORR about if and when he will be reunited
with his mother, are causing significant harm to his mental health and wellbeing.

12.     ███ ███████ has repeatedly been given timelines for his release that have then
come and gone.  For as long as I have represented him, he has been told by staff at Morrison
that a request to transfer him to a lower security facility in Florida, to be closer to his mother,
"is pending." Both he and I have been told at different points that his transfer to the lower
security would happen within a matter of weeks, or, more recently, by Feb. 2, but when those
dates come, nothing happens. ███ ███████ has also been told previously that his release to his
mother would happen in 30 days, only to have that date come and go as well.  Following his
bond hearing before an immigration judge, in which he was found not to be a danger to the
community, ███ ███████ has a three minor altercations with other boys at the detention
center, mostly verbal altercations, written up as "Serious Incident Reports," called SIRs.  Both
███ ███████ and I were then told by staff that he would not be transferred out of the facility
until he had at least thirty days without a SIR.

/

/

/

/

**Exhibit 5**
**Page 33**

13.     ▇▇▇▇▇▇▇ very badly wants to be reunited with his mother, and is unhappy being locked in the detention center. He has expressed this directly to me on multiple occasions. Further, I have observed, and he has reported, increasing frustration that, dispute winning his bond hearing now nearly two months ago, he continues to be detained. This frustration appears to be leading to a lack of patience with other students and, at times, a sense of despair about his case. I believe, and he has expressed to me, that the three SIRs following his successful bond hearing were directly related to the negative effects of the continued detention and inconsistent reports about when and if he would be released.

14.     I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

I, Leland Baxter-Neal, certify under penalty of perjury that the foregoing is true and correct. Executed on Feb. 6, 2018.

Leland Baxter-Neal
Oregon Bar No. 155347

Exhibit 5
Page 34

# Exhibit 6

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

Exhibit 6
Page 35

**Leland Baxter-Neal**

| | |
|---|---|
| **From:** | Erich Corona <Erich.Corona@morrisonkids.org> |
| **Sent:** | Tuesday, January 09, 2018 11:48 AM |
| **To:** | Leland Baxter-Neal |
| **Cc:** | Jenny Hernandez; Brittany Russ; Jessica Mena; Kenneth Ramirez; Maribel Reyes |
| **Subject:** | RE: ██████████ |

**Importance:** High

Good morning Leland,

We are currently working on his transfer request. Please keep in mind that ORR is now getting back from VACA mode and will resume its normal operations. Furthermore, this minor was initially submitted for release on 10/30/17, however, due to some technical issues, ORR was not able to look at this case until 11/21/17.

When a the covering FFS reviewed this case on 11/21/17, the covering FFS requested a discretional HS. The Positive HS results were received on 12/27/17.

Furthermore, we have been experiencing technical issues with the UAC portal for the past couple of weeks, which as prevented us from creating the transfer online.

I am currently working on the transfer request, now that the minor's mother has attended her fingerprint appointment and her CA/N checks have been initiated (Items which needed to be initiated before UC could be transferred due to discretional HS recommendation).

We will notify you once FFS approves his transfer; thank you for continuing to advocacy for this youth.

Saludos,



**Erich Corona** | Case Manager
11035 NE Sandy Blvd. | Portland, OR 97220
(503) 258-4623(d) | (503) 896-1158(c)

Check out our website: **Morrisonkids.org**



Disclaimer: Information contained in this message and or attachments is intended only for the recipient(s) named above and may contain confidential and or privileged material. If you are not the intended recipient, any disclosure, copying, distribution or action taken on it is prohibited. If you believe you have received this email in error, please contact the sender, delete this email and destroy all copies.

**From:** Leland Baxter-Neal [mailto:lbaxterneal@mpdlaw.com]
**Sent:** Tuesday, January 9, 2018 11:37 AM
**To:** Erich Corona <Erich.Corona@morrisonkids.org>
**Cc:** Jenny Hernandez <jhernandez@mpdlaw.com>; Brittany Russ <Brittany.Russ@morrisonkids.org>; Jessica Mena <Jessica.Mena@morrisonkids.org>; Kenneth Ramirez <Kenneth.Ramirez@morrisonkids.org>; Maribel Reyes <Maribel.Reyes@morrisonkids.org>
**Subject:** RE: ██████████

Hi Erich,

**Exhibit 6**
**Page 36**

I just wanted to follow up and check in on ▮▮▮▮▮ transfer.  Has he been formally stepped down yet and transferred to Florida, or is it still pending?

If it is still pending, is it currently pending at the stage of the field supervisor approving him to be stepped down, or has it been approved but is pending with the Florida shelter having everything ready to receive him?

Please update us with any details regarding the delay in stepping him down.

Thanks!

Leland

---

**From:** Erich Corona [mailto:Erich.Corona@morrisonkids.org]
**Sent:** Tuesday, January 02, 2018 3:32 PM
**To:** Leland Baxter-Neal
**Cc:** Jenny Hernandez; Brittany Russ; Jessica Mena; Kenneth Ramirez; Maribel Reyes
**Subject:** RE: ▮▮▮▮▮
**Importance:** High

Hello Leland,

Hope you had a good new year as well!
Everything is still pending in terms of ▮▮ transfer.
We will keep you posted before it is approved so that you may provide legal counsel over the phone.
We will provide the new program's info once he is accepted into another program.

Saludos,



**Erich Corona** | Case Manager
11035 NE Sandy Blvd.  |  Portland,OR 97220
(503) 258-4623(d)|(503) 896-1158(c)

Check out our website: Morrisonkids.org



Disclaimer: Information contained in this message and or attachments is intended only for the recipient(s) named above and may contain confidential and or privileged material. If you are not the intended recipient, any disclosure, copying, distribution or action taken on it is prohibited. If you believe you have received this email in error, please contact the sender, delete this email and destroy all copies.

---

**From:** Leland Baxter-Neal [mailto:lbaxterneal@mpdlaw.com]
**Sent:** Tuesday, January 2, 2018 10:46 AM
**To:** Erich Corona <Erich.Corona@morrisonkids.org>
**Cc:** Jenny Hernandez <jhernandez@mpdlaw.com>
**Subject:** ▮▮▮▮▮

Hi Erich,

Happy new year! I wanted to check in and see how things are going with ▮▮▮▮▮ and his step down to Florida.  If he hasn't been stepped down, are things on track and do you know when he might be transferred? And if he has been transferred, can we get the name and location of the facility and a point of contact there from you?

**Exhibit 6**
**Page 37**

Thanks! Hope you enjoyed the holidays.

Cheers,


Leland Baxter-Neal

Attorney | Immigrant Defense Oregon
Metropolitan Public Defender
630 SW Fifth Ave., Suite 500
Portland, OR 97204
503.225.9100

**Exhibit 6**
**Page 38**

# Exhibit 7

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

Exhibit 7
Page 39

## DECLARATION OF JAMES M. OWENS

I, James M. Owens, declare and say as follows:

1.     All facts stated herein are of my own personal knowledge, and if sworn I could competently testify thereto.

2.     I am an attorney licensed to practice law in the State of California.  I am a Retired Assistant County Counsel from Los Angeles County.  I retired in March of 2014.  For the last 15 years of county service, I managed the Dependency Division in Los Angeles County.  The Dependency Division handles child abuse and neglect cases for the Los Angeles County Department of Children and Family Services.  We had 120 attorneys handling approximately 25,000 dependency cases and appeals.   The attorneys staffed 20 courts and would routinely handle over 1,000 matters each court day.  I am very familiar with laws and time lines relating to children detained by and placed in custody of California child welfare agencies.

3.     In preparation for this declaration, I have reviewed a time line provided to me by Attorney Carlos Holguin.  I have been asked to analyze the time frames and circumstances of the child ▓▓▓ detention based upon federal and state laws applicable to the detention of dependent children and timelines child protection agencies typically follow when placing children with a non-offending parent after they have been removed from an unfit home.  I am not familiar with federal immigration laws or how dependency law may be applicable to the instant case.

4.     I am informed and believe that the ▓▓▓, has been detained in a non-licensed facility since September 18, 2017.   I am also informed and believe that the child's mother is an appropriate custodian and is willing to provide care and supervision for the child.  I am informed that there was a home study conducted on the mother's home on or about October 30, 2017.  The home study recommended release to the child's mother.  The results of the home study were received December 27, 2017.

5.     Child welfare is state managed and federally funded.  Many of the state laws designed to expedite placement of children are mandated by the federal funding statute commonly called the Adoptions and Safe Families Act.  The requisite components of all state

<u>1</u>

Declaration of James M. Owens

**Exhibit 7**
**Page 40**

1    plans are contained at 42 USC section 671. Pursuant to this statute, child welfare agencies are

2    required to place children with appropriate parents quickly.  Prior to detaining children from

3    their parents, the agency is required to provide "reasonable efforts" to prevent or eliminate the

4    need to remove the child from a parent.  *See* 42 U.S.C. § 671(a)(15).  This is codified in

5    California law at Welfare and Institutions Code section 309, which provides that the social

6    worker shall "immediately release the child to the custody of the child's parent" unless the child

7    has no parent willing to provide care, social worker believes that the child's detention is a matter

8    of immediate and urgent necessity for the protection of the child, the parent, guardian or

9    custodian is a flight risk, the child has left a placement in which he or she was placed by the

10   juvenile court, the parent or person having legal custody has voluntarily surrendered physical

11   custody.

12        6.        The time frames for dependency hearings are very quick.  If the social worker

13   decides to detain a child.  The social worker must file a petition with the court within 48 hours of

14   the child's detention.  *See* Welfare and Institutions Code sections 313.  A hearing is scheduled on

15   the next court day after the petition is filed with the court.  *See* Welfare and Institutions Code

16   section 315. The judge considers the grounds for detention.  If there are no legal grounds for

17   detention, the court shall order the release of the child from custody.  *See* Welfare and

18   Institutions Code section 319(b).

19        7.        Were state child welfare agencies involved, the instant case would have presented

20   issues involving the Interstate Compact on the placement of children as it involved a home study

21   conducted in Florida. This may have delayed placement were this a California child dependency

22   case as the local agency would be dependent on a Florida agency to complete the home study.

23   Even so, the statute contemplates a state conducting a home study for another state pursuant to

24   the Interstate Compact will complete the home study in 60 days.  *See* Cal. Fam. Code section

25   7901.1. When another state requests Los Angeles County to perform a home study under the

26   Interstate Compact, Los Angeles would take all steps to complete the home study within the time

27   period contained in Family Code section 7901.1.  When Los Angeles County receives a

28   completed home study from another state approving placement with a parent, Los Angeles would

2

---

**Declaration of James M. Owens**

**Exhibit 7**
**Page 41**

take all steps to effectuate an immediate placement with that parent. The Adoption and Safe Families Act requires all states receiving federal funds to have "orderly and timely interstate placement of children" 42 United Sates Code section 671(25). The federal law further requires that the receiving state conduct and complete the home assessment within 60 days.  42 United Sates Code section 671(26).

8.     If the state placing a child is not requesting supervision by the receiving state, however, the Interstate Compact would not be applicable to a placement with a parent. In these circumstances, the child welfare agencies may handle such placements without the delays associated with coordinating interstate placement with the receiving state. In Los Angeles County, these placements are often effectuated before the 48-hour time for the filing of the petition expires.

9.     I am advised that ORR may be continuing ▮▮▮▮▮ in federal custody because no one in his mother's household is a licensed driver. In my experience, the lack of access to a motor vehicle would not justify the continued detention of a health teen age child.  If transportation was necessary, the child welfare agency would typically provide public transportation vouchers to the family to provide transportation for the child.

10.     The goal of child welfare is to place children is safe, nurturing environments in a timely fashion. The Adoption and Safe Act requires placements foster families, relatives and other nonparents to meet licensing standards required of foster placements. These include criminal history checks on prospective care providers.  42 United States Code sections 671(19) and 671(20).

11.     Continued detention in a non-licensed placement is very problematic in circumstances where the child could be placed with a parent who has no history of abuse, neglect, or unfitness, nor any legal impediment to receiving custody. Childhood is short, and children should receive parenting in a nurturing, permanent relationship. Too frequently children are placed in institutional settings where their day to day care is provided by a series of adult caretakers who lack any permanent connection to the children they care for. In these

3

Exhibit 7
Page 42

circumstances, the dependency system makes every attempt to promptly place the child in a
permanent nurturing relationship, preferable with a parent or relative.

12.     In my experience, all involved in the dependency system would take every effort
to expedite placement with a child with a parent who could provide a safe and stable home.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 7th day of February 2018, in Long Beach, California.


James M. Owens

Exhibit 7
Page 43

# Exhibit 9

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 9
Page 56

1    I, ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊, declare as follows:

2

3    1.    This declaration is based on my personal knowledge. If called to testify in this
4    case, I would testify competently about these facts.

5    2.    I am 15 years old. My brother and I came to the United States from Honduras in
6    October 2017. My brother, who is 14 years old, was allowed to go and live with our dad
7    in Miami. I was taken to a shelter called International Education Services (IES), and then
8    I spent time at a hospital because I was told I had anxiety and depression. After leaving
9    the hospital, I returned to IES. I was given medication at IES, but I didn't think it was
10   helpful. I was told that I needed help, and that things would be better if I went to Shiloh
11   Residential Treatment Center (RTC). I have been detained at Shiloh for approximately
12   three months.

13   3.    I want to live with my dad, who has lived in the United States for approximately
14   12-13 years. My dad has applied to be my sponsor. He completed all the reunification
15   requirements a long time ago. He has gotten fingerprinted, and his home study went
16   well. I have been told that the doctor has to say it is alright to release me to my dad. This
17   week, I was told that I would be released to my dad in two weeks.

18   4.    I take multiple medications three times a day: in the morning, at noon, and at night.
19   I am told that these medications are supposed to help me with depression, anxiety,
20   sleeping, and to make me feel better. The staff tell me I need to take the medications for
21   my own good. No one has given me a diagnosis.

22   5.    No one has told me that I am dangerous. No one has told me that they are worried
23   that I will run away. I don't have any problems. I haven't gotten into any fights. No one
24   has given me a document that explains why I am still detained at Shiloh. I don't think I
25   would feel as sad or anxious if I were living with my dad.

26   6.    I have never been to court. No one has given me the opportunity to go to court or
27   speak with a judge.

28   7.    I really want to be with my dad.

Exhibit 9
Page 57

1

2   I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

3   __28th__ day of February, 2018, at ___Manvel___, Texas.

4



Exhibit 9
Page 58

1

CERTIFICATE OF TRANSLATION

2     I, _San Juana Castillo_, hereby certify that I am proficient in both

3   Spanish and English, and that I accurately translated the foregoing statement and read it

4   back to _____ in its entirety in Spanish on __February 28, 2018__ .

5

6                                              _____

7                                              San Juana Castillo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 9
Page 59

# Exhibit 10

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 10
Page 60

I, █████████████████████, declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.     I am 16 years old.  I am from Honduras.  I am currently being held in ORR custody detained at the Shiloh Residential Treatment Center.  I have been here for about two months.  Shiloh is a locked facility with 24-hour surveillance and monitoring.  The children are detained here and no one is free to leave.

3.     My mom lives in Houston and comes to see me when she can, but she has to complete a lot of requirements before I can live with her.  I talk to my mom about two times a week.  They have already checked my mom's house and she passed the home study.  I was told that my case is finished and once the doctor says I'm ready, I can be released.  The doctor has said I can't leave until I can control myself.  He hasn't told me a time frame for how long it will be before I'm ready.

4.     I was taken into immigration custody in Texas about six months ago in May 2017.

5.     My dad was assassinated with 16 gunshots in front of me at age 5.  I was also raped when I was 5.  It was so traumatic that since that time I suffer from extreme anxiety.  I also have epilepsy and asthma.

6.     I still dream though.  I one day I dream of being a pilot and flying.  I don't want to fail my mom.  I know that one day I will realize my dreams.

7.     I was first detained in Southwest Key, a shelter facility.  I suffered an anxiety attack there and was sent to this psychiatric facility called the "Shiloh."  My heart beats very fast and hands sweat when I have an anxiety attack.  I think the anxiety would be better if I was with my mother.

8.     I don't remember ever being told or reading that I could appeal or challenge the government's decision to put me into this treatment facility, or that I could go to court about it.

9.    I have never had a thirty-day review while I've been at Shiloh to review my custody classification since I have been here.  No one has formally sat down with me and reviewed whether I should be stepped down to a lower level of security or told me how I'm doing here or what I have to do in order to step down.

10.    I was supposed to have a court date on November 8th but it was cancelled.

11.    A lawyer named "Juana" comes to our facility once a month, but not sure what the progress is on my immigration case or my release. I really want a lawyer who can help me.

12.    At Shiloh, I am given seven pills every day. In the morning, I take 4 pills and then 3 in the evening. The medicine is supposed to help with epilepsy and anxiety.  The doctor has changed my pills a couple of times.  The medicine makes me feel dizzy and sometimes makes it hard to concentrate. I have no appetite.

13.    I talk to a therapist two times a week.

14.    I have seen another youth get an injection that he didn't want. A staff member had to grab him first and then give him the injection.

15.    I don't like to be around other kids because of my anxiety.  I smile with a fake smile so everyone thinks I'm ok.

16.    Sometimes I have no desire to do anything. I try and keep a diary of my days.

17.    I just want to be with my mother.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 1st day of December, 2017, at Manvel, Texas.



CERTIFICATE OF TRANSLATION

2

**Exhibit 10
Page 62**

1  My name is Karina Marquez and I swear that I am fluent in both the English and Spanish
2  languages and I translated the foregoing declaration from English to Spanish to the best
3  of my abilities.

4

5  Dated: December 1st 2017

6                                                    Karina Marquez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Exhibit 10
Page 63

# Exhibit 11

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 11
Page 64**

DECLARACIÓN DE ████████

Yo, ██████████, declaro y digo lo siguiente:

1. Hago la presente para actualizar la declaración que hice el 1 de diciembre del año pasado.

2. Todavía me encuentro detenida en Shiloh RTC. No tengo idea de cuando me van a liberar para que pueda vivir con mi mamá.

3. Pienso que me sentiría mejor vivir con mi mamá, y que la detención prolongada e sin fin me está causando más ansiedad y depresión. Ultimamente, el médico me informó que no tengo epilepsia, y de hecho no he sufido ningún ataque desde hace tres o cuatro meses.

4. Todavía no tengo abogado que de veras me ayude en cuanto mi caso de inmigración o regresame a mi mamá.

5. Nadie me ha avisado que tengo derecho a una audiencia ante un juez de inmigración para decidir si estoy peligrosa o un riesgo de fugarme, y hasta la fecha no he tenido tal audiencia.

Exhibit 11
Page 65

6. El abogado Carlos Holguín me mostró un formulario que se titula "Notice of Placement in Restrictive Setting." Es la primera y única vez que he visto tal formulario.

Declaro bajo protesta de decir la verdad que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día 28 de febrero del año 2018, en Manville, Texas.



/ / /

**Exhibit 11**
**Page 66**

DECLARATION OF ███████████

I, ███████████ declare and say the following:

1.  I do this to update the statement I made on December 1 of last year.

2.  I am still detained in Shiloh RTC. I have no idea when they are going to free me so I can live with my mom.

3.  I think I would feel better living with my mother, and that prolonged and endless detention is causing me more anxiety and depression. Lately, the doctor informed me that I do not have epilepsy, and in fact I have not suffered any attack for three or four months.

4.  I still do not have a lawyer who will really help me with my immigration case or return me to my mother.

5.  No one has advised me that I am entitled to a hearing before an immigration judge to decide if I am dangerous or at risk to flee, and to date I have not had such a hearing.

6.  Attorney Carlos Holguin showed me a form entitled "Notice of Placement in Restrictive Setting." It is the first and only time I've seen such a form.


I declare under protest to tell the truth that all the information that I have provided here is correct and complete, aware of the legal consequences of declaring with falsehood before the authority.

Done on February 28 of the year 2018, in Manville, Texas.


_____

██████████

/// 

**Exhibit 11**
**Page 67**

## DECLARATION OF TRANSLATOR

I, Jorge Medina, declare and say as follows:

1. I speak, read and write English and Spanish.

2. On this day I translated the declaration of ▮▮▮▮▮▮▮ from Spanish to English.

The annexed is a true and accurate translation of said declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of March 2018, at Los Angeles, California.

_____
Jorge Medina

/ / /

Exhibit 11
Page 68

# Exhibit 12

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 12
Page 69**

DECLARACIÓN DE █████████████

Yo, ███████████████, declaro y digo lo siguiente:

1. Yo soy la madre de ██████████████, que actualmente se encuentra
detenida en Shiloh RTC. Hago la presente para apoyar a mi hijo salir de la detención y
venir a vivir conmigo. Si me llaman de testigo, afirmo que pudiera jurar de
conocimiento personal a lo siguiente.

2. Actualmente vivo en un apartamento en Kemah, Texas, que queda a unos 45
minutes en coche de Shiloh. Me permiten hablar con █████ dos veces por semana, por
unos 20 cada llamada. Cada otra semana voy a Manvel para visitar a mi hija █████. Me
gustaría ir con más frecuencia, pero no hay servicio de autobus de Houston a Shiloh. La
parada de autobus mas cercana a Shiloh es a 12 millas, y yo no puedo caminar tanto.
Asi que, me cobra un Uber o un Taxi unos $80 para llevarme a Shiloh. Me dar pesar,
pero no gano lo suficiente para ir a ver a mi hija más de una vez cada dos semanas.

3. Desde mayo del año pasado, cuando se cayo presa mi hija, he notado que se ve
cada vez más y más deprimida, y llora demasiado ella. Me dice que ya quiere estar allí
en el centro de detención. Cuando vivíamos juntas mi hija y yo en Honduras, nunca
tuvimos problemas mentales. En 2015 se le pegó el primer ataque de epilepsia, peera
aparte de esto, █████ siempre fue una hija normal, nunca tiró ni un plato ni nada. Se
reía, jugaba, lloraba normal como una niña en su niñez, en fin, una niñez sana y normal.

**Exhibit 12**
**Page 70**

Opino yo que la detención le está afectando mucho a ██████, y que se mejoraría rapido si me la regresarían a su mamá.

   4. Tengo entendido que la obligan a ██████ tomar medicamentos muy fuertes para la ansiedad. He notado que ██████ se pone más nerviosa, tiene miedo, y tiembla. ██████ me dice que varias veces se ha caido, y se lastimó la cabeza y los brazos, hasta quedarse en silla de ruedas, porque los medicamentos eran demasiados fuertes y no podía caminar. Se ha quejado de lo medicamentos al staff, como le da miedo estar en medio de la gente. Nadie me pidieron perimso para dar medicamentos a mi hija, aunque el staff de Shiloh siempre ha tenido mi numero de telefono y dirreción.

   5. En el verano del año pasado, el investigator de casas, Jorge Arango, llegó dos veces para evaluar mi casa. Paso como o 45 minutes cada vez. Me hizo muchas preguntas, y grabó él mis respuestas en su celular.  Al terminar, me dijo que todo estaba aprobado, y que para el siguiente semana iba llegar su reporte dando la aprobación que todo estaba bueno. Pasé mucho tiempo sin escuchar más de las posibilidades de tener a mi hija. Me pusé desesperada, y le llamé varias veces preguntando que cuando me iban a entregarme a ██████ Siempre me contestaron que dependía del médico, que ██████ tendría que pasar dos semanas sin ataque epileptica o de ansiedad. No entiendo porque sigue detenida porque ya tiene ██████ más de tres meses sin ningún ataque.

**Exhibit 12**
**Page 71**

Declaro bajo protesta de decir la verdad que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día 28 de febrero del año 2018, en Kemah, Texas.



/ / /

**Exhibit 12**
**Page 72**

D**ECLARATION OF** ████████████████

I, ██████████████████, declare and say as follows:

1. I am the mother of ████████████████ who is currently detained at Shiloh RTC. I execute the present declaration to support my daughter's release from detention so she can come live with me. If I am called to testify, I affirm that I could swear to the following from personal knowledge.

2. I am now living in an apartment in Kemah, Texas, which is located about 45 minutes by car from Shiloh. I am allowed to talk with ██████ twice per week, for about 20 minutes each call. Every other week I go to Manvel to visit my daughter, ██████ I would like to go more often, but there is no bus service from Houston to Shiloh. The closest bus stop to Shiloh is 12 miles away, and I cannot walk that much. So I have to pay an Uber or a taxi about $80 to take me to Shiloh. Regrettably, I do not earn enough to go see my daughter more than once every two weeks.

3. Since last year, when my daughter became a prisoner, I have noticed that she is more and more depressed, and she cries too often. She tells me that she doesn't want to be in the detention center. When my daughter and I lived together in Honduras, we never had mental problems. In 2015 she had her first epileptic seizure, but apart from that, ██████ was always a normal daughter, never throwing a plate or anything. She laughed, played and cried like a normal young girl, in short, her childhood was healthy

**Exhibit 12**
**Page 73**

and normal. In my opinion, detention is affecting ███ a lot, and she would quickly get better if they were to return her to her me.

4. I understand they are requiring ███ to take very powerful medications for anxiety. I have noted that ███ is becoming more nervous, fearful, and she trembles. ███ tells me that she has fallen several times and has injured her head and arms, to the point that she ended up in a wheelchair, because the medications were too powerful and she couldn't walk. She has complained about the medications to the staff, that they make her afraid of people. Nobody asked me for permission to give medications to my daughter, even though the staff at Shiloh has always had my telephone number and address.

5. During the summer of last year, a home investigator, Jorge Arango, came twice to evaluate my house. He spent about 45 minutes here each time. He asked me many questions and recorded my answers on his cell phone. When he finished, he told me that everything was approved, and that the following week they would receive his report saying that everything was fine. Much time went by without any further word about the possibility of getting my daughter back. I became desperate, and I called several times asking when they were going to give me ███ back. They always answered that it depended on the doctor, that ███ would have to go two weeks without an epileptic or anxiety attack. I don't understand why she is still being detained because ███ has now gone more than three months without an attack.

-2-

**Exhibit 12**
**Page 74**

I declare that all the information I have provided here is correct and complete, being aware of under my duty to tell the truth and the legal consequences of perjury.

Done this 28th day of February, 2018, at Kemah, Texas.


/s/ _____

███████████

/ / /

* * * * *

DECLARATION OF TRANSLATOR

I, Carlos Holguín, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing declaration of █████████ from Spanish into English.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of March, 2018, at Santa Clarita, California.


_____

Carlos Holguín

-3-

**Exhibit 12**
**Page 75**

# Exhibit 13

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 13
Page 76**

1 I, ███████████████████████, declare as follows:

2

3 1.    This declaration is based on my personal knowledge. If called to testify in this
4 case, I would testify competently about these facts.

5 2.    I am 15 years old. My immigration file number is ████████. I came to the
6 United States by myself in June 2017. I was taken to Southwest Key Casa Antigua, and I
7 was there for about six months. Then I was sent to Shiloh, where I have been detained
8 for approximately three months. They told me they sent me to Shiloh because I had
9 anxiety and depression, and because Southwest Key was overcrowded. I did not want to
10 go to Shiloh, but I was told that it was for my own well-being.

11 3.    My dad lives in the United States but he does not want to be my sponsor because
12 we don't speak very often. We have never met; I only know him from photographs. I
13 want to live with my sister in Pennsylvania, and she wants me to live with her. She is 33
14 years old and applied to be my sponsor in June 2017. In late October 2017, the
15 government denied my sister's application to be my sponsor, and I don't know why. I am
16 confused because when I was at Southwest Key, I was told there might have been a
17 problem with my sister's fingerprinting process. At Shiloh, I have been told she was
18 denied because of the home study. I am not allowed to speak with my sister anymore
19 because she was denied. After my sister was denied, my uncle applied to be my sponsor.
20 He lives with multiple people in an apartment, and not everyone was willing to get
21 fingerprinted. I don't believe he was allowed to continue with his sponsor application.
22 Now, a family friend is applying to be my sponsor. I do not want to stay at Shiloh or a
23 shelter. I will probably try to live in long-term foster care if my family friend is not
24 approved to be my sponsor. One of the main reasons I am sad is because my sister was
25 rejected, and I don't know when I'll be able to be released.

26 4.    I take multiple medications: five to six medications in the morning, and five to six
27 medications at night. I have been told that some of these medications are vitamins, and

28

**Exhibit 13**
**Page 77**

1   some are supposed to help me with depression and anxiety.  I have been told that I cannot

2   be released until the doctor says it is alright for me to be released.

3   5.     No one has told me that I am dangerous, and no one has told me that they are

4   worried that I will run away.  I have not gotten into any fights or said any bad words.  I

5   just want to live with my sister in Pennsylvania.

6

7   I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

8   <u>28th</u> day of February, 2018, at   <u>Manvel</u>  , Texas.

Exhibit 13
Page 78

1

CERTIFICATE OF TRANSLATION

2        I, _SAN JUANA CASTILLO_, hereby certify that I am proficient in both

3   Spanish and English, and that I accurately translated the foregoing statement and read it

4   back to [redacted] in its entirety in Spanish on _February 28, 2018_ .

5

6                              _San Juana Castillo_ (signature)

7                              San Juana Castillo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 13
Page 79

# Exhibit 14

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 14
Page 80**

1  I, ███████████████████████ declare as follows:

2

3  1.      This declaration is based on my personal knowledge.  If called to testify in this

4  case, I would testify competently about these facts.

5  2.      I am 13 years old. I am from El Salvador. I am currently being held in ORR

6  custody in the Shiloh Residential Treatment Facility.

7  3.      I was taken into the Office of Refugee Resettlement ("ORR") custody in about

8  August of 2017. I was held at a Southwest Key shelter in Texas for about two months.

9  4.      I was verbally told about my transfer to Shiloh Residential Treatment Facility

10 approximately one day before my transfer. I was also told that I was going to a place that

11 was better for me, but no one explained why they thought it was better. I did not receive

12 any papers that explained why I was transferred to Shiloh. I did not want to leave the

13 Southwest Key shelter, but I was told that the government had already made a decision. I

14 don't remember receiving any document that explained that I had the right to challenge

15 the government's decision to send me to Shiloh. If I had, I would have challenged the

16 decision.

17 5.      I have spent approximately one month and half at the Shiloh Residential Treatment

18 Center. During this time, I have not been told about, and I have not received a 30-day

19 review.

20 6.      In the three months I have been living in the U.S., I have not had a court hearing.

21 No one has told me who my attorney is or when I will be going to court.

22 7.      I take pills every morning and night. I take four pills in the morning and about four

23 to six pills in the evening. I don't know what all the pills are for, but I think the ones I

24 take at night are for depression and anxiety.  When I have asked about the additional

25 medication, I have been told that the pills are vitamins. I am also told that the pills are

26 recommended by my doctor. As far as I know, ORR did not ask my mother for

27 permission before they gave me the medication.

28

8.      I do not want to take the pills because I don't think they help me and they make me sleepy. I have not refused taking the pills because I was told that the doctor will see that I refused the medication and that would make my stay at Shiloh longer because it would make it harder for the doctor to release me.

9.      I don't feel safe here because the staff are mainly men and because sometimes the staff scream at me.  I feel afraid all the time.  My father was abusive and I was bullied a lot by other boys in the past, so it is hard for me to be around men all day long.  I have asked to spend less time around men, but I have been told that it is not possible.

10.     My worst experience at Shiloh Residential Treatment Center occurred at the end of October 2017. I gathered things inside a bag and I tried to escape from the center. The Shiloh staff stopped me before I could escape. They told me to not try to escape because if I did, I would be sent to jail. The Shiloh staff then told me to go to my room. They called a supervisor. The staff pulled my arms behind my back. Eventually I was taken to my room. Once inside my room I tried to open the window. The supervisor saw me do this, and in response, he violently threw me against the door. I felt faint. At some point the supervisor placed me against the wall, but the top of my head touched the wall, so from my head to my back, my body was in a backwards C-shape. The supervisor pushed me against the wall with all of his weight and this caused my neck to compress. This made me feel like I was choking and it was hard for me to breathe. I told the supervisor to stop because I couldn't breathe. All I could hear the supervisor say was "No stop." I don't remember for how long I was held in this painful position, but it was a long time. I briefly fainted. As I recovered consciousness a staff person violently threw me on my bed and this caused my head to bang against the wall. I did not receive medical attention to my head. The doctor checked for fractures in my arms but I did not have fractures. I had purple bruises on my arms.

11.     After the doctor came, the supervisor told me I was going to get a medication injection to calm me down. Before they gave me the injection, I was feeling dizzy and was still having a hard time breathing. I was in a lot of pain with bruises all over, and I

**Exhibit 14
Page 82**

1  did not want the injection. Two staff grabbed me, and the doctor gave me the injection
2  despite my objection and left me there on the bed.

3  12.  I miss my mother, and I really want to be reunited with her. My mother lives in
4  Los Angeles, and is in the process of trying to reunify with me. My sister and my niece
5  were reunited with my mother recently, and I want to be with them, too. I think my
6  mother is doing a home study. I want to be sent to a shelter in California so that I can be
7  closer to her. I hope to soon reunify with her, but I have not been told how long it will
8  take. I haven't seen her in three months, and it is very hard for me not to know when I
9  will be able to see her again.

10

11  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
12  30th day of November, 2017, at Manvel, Texas.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

Exhibit 14
Page 83

1  CERTIFICATE OF TRANSLATION

2      I certify that I am fluent in the Spanish and English languages and that I truthfully

3  and accurately translated the above declaration from English to Spanish from ▮▮▮▮

4  ▮▮▮▮▮▮▮▮ before he signed the declaration.

5

6  Dated: November 30, 2017

7                            Maria Jose Martinez Campos

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 14**
**Page 84**

# Exhibit 15

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 15
Page 85**

DECLARACIÓN DE ▮▮▮▮▮

Yo, ▮▮▮▮▮▮ declaro y digo lo siguiente:

1. Hago la presente para actualizar la declaración que hice el 21 de noviembre del año pasado.

2. Todavía me encuentro detenido en Shiloh RTC, pero me ha informado mi trabajadora social que el médico ya me dio de alta y que es posible que me van a liberar esta semana o la otra.

3. El abogado Carlos Holguín me mostró un formulario que se titula "Notice of Placement in Restrictive Setting." Es la primera y única vez que he visto tal formulario.

Declaro bajo protesta de decir la verdad que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día 28 de febrero del año 2018, en Manville, Texas.



/ / /

Exhibit 15
Page 86

DECLARATION OF ███████████████

I, ███████████, declare and say the following:

1. I make the present to update the statement I made on November 21 of last year.

2. I am still detained in Shiloh RTC, but my social worker has informed me that the doctor has already discharged me and that it is possible that they will release me this week or the next.

3. Attorney Carlos Holguin showed me a form entitled "Notice of Placement in Restrictive Setting." It's the first and only time I've seen such a form.


I declare under protest to tell the truth that all the information that I have provided here is correct and complete, aware of the legal consequences of declaring with falsehood before the authority.

Done on February 28 of the year 2018, in Manville, Texas.


_____

███████████

/// 

**Exhibit 15**
**Page 87**

### DECLARATION OF TRANSLATOR

I, Jorge Medina, declare and say as follows:

1. I speak, read and write English and Spanish.

2. On this day I translated the declaration of ███████████ from Spanish to English.

The annexed is a true and accurate translation of said declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___6ᵗʰ___ day of March 2018, at Los Angeles, California.


_____
Jorge Medina

/ / /

**Exhibit 15**
**Page 88**

# Exhibit 16

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 16
Page 89**

1   I, ███████████████████ declare as follows:

2

3   1.      This declaration is based on my personal knowledge. If called to testify in this
4   case, I would testify competently about these facts.

5   2.      I am 17 years old. I came by myself to the United States from Honduras in
6   January 2017. I have been detained at four different ORR facilities; I am currently
7   detained at Southwest Key Mesa in Houston, Texas.

8   3.      When I first arrived at the border, I was taken to a shelter in Miami, Florida, where
9   I stayed for 10-11 days. While there, I spoke to a clinician and told her that I came to the
10  United States to escape gangs. The clinician asked me if I was in gang, and I got really
11  quiet and didn't say anything. She told me that if I told her information, such as that I
12  was in a gang, then I might be able to be with my family more quickly. Once I heard her
13  say that, I started saying all kinds of things, that I was in a gang, even though that wasn't
14  true, because was she said made me think doing so would help me be with my family.
15  Now, looking back, I feel like I made a mistake because after I told her all this, I was
16  transferred to Shenandoah.

17  4.      On the day I was transferred to Shenandoah, I was excited at first because I
18  thought that I was going to be taken to live with my family in Houston. But then I
19  realized that the flight I was on was taking longer than I expected, and then I was placed
20  in shackles and taken to Shenandoah. The staff at Shenandoah never physically harmed
21  me, but I saw them physically drag other kids to their bedrooms. If kids were suicidal,
22  staff would take the kids' mattresses and all of their clothes, saying they did it for their
23  protection. The staff told all the kids that if the kids were fighting, the staff had the
24  authority to force them to the ground and put their knees on the back of the kids' necks.

25  5.      At Shenandoah, I met with a psychiatrist, who concluded that I was not a danger to
26  society. I was told that the psychiatrist's report would help me reunite with my uncle in
27  Houston. Because the report was positive, I was transferred to staff secure at Children's
28  Village.

1

Exhibit 16
Page 90

6.     When I was at Children's Village, my uncle—who lives with my grandpa and grandma in Houston—applied to be my sponsor. They all submitted their fingerprints and paperwork in February 2017 and had their home study in August 2017, which went well. I was told that there was a problem when my grandma submitted her fingerprints, but it looked like maybe there was a way to work around the problem. I have never met my uncle or grandparents, and I was told that instead of being released to live with them, I should transfer to Southwest Key Mesa (Mesa) so I could get to know them better. They didn't tell me how long I would have to wait at Mesa before I would be released to live with them. Initially, I was excited to come to Mesa because I thought that I would be able to live with my family soon. But when I arrived at Mesa in October 2017, I was told that my uncle's and grandparents' fingerprints had expired, and they had to start the process all over again. My uncle and grandparents completed the fingerprints again, but around the end of November or the beginning of December 2017 Mr. Dino, the Federal Field Specialist at Mesa, denied their application because of the problem related to my grandma's fingerprints. I asked what the problem was with my grandma, but no one would tell me. They told me Mr. Dino was the only person who could explain. I pleaded with my case worker to ask Mr. Dino to give my uncle and grandparents another chance so that I could get to know my grandparents, but Mr. Dino said no. Mr. Dino will not let me talk to my uncle or my grandparents, and I don't know why. I have asked to speak with Mr. Dino many times, but he always refuses to speak with me.

7.     Now, I am trying to live with my dad, who lives in Atlanta, Georgia. On February 16, 2018, my dad confirmed that he had completed his fingerprints, but I was told that the staff hasn't received them yet because Mesa has problems connecting to the internet. My dad is still waiting for the government to complete the home study, but I have not been told when that will happen. The staff tell me that it may take three to four more months before I will know whether I can live with my dad.

8.     Mr. Dino says that I cannot be in shelter at Mesa because I told the clinician at the shelter in Miami that I had been in a gang, even though that wasn't true. No one has told

Exhibit 16
Page 91

1  me that they are worried that I will run away from the facility.  Some of the kids here
2  have threatened to hurt me, and I don't feel safe.  I want to tell my Young Center
3  advocate about these threats, but Mesa staff will not let me talk to her. She has tried to
4  call me multiple times, but the staff don't let us talk.  The last time I spoke to her was
5  February 4, 2018.  I don't want the other kids to hurt me, and I don't want to get in fights
6  with them.  I am religious and read the bible, and I prefer to keep to myself.  I haven't
7  gotten into trouble throughout my time in ORR custody.
8  9.     I have been in ORR custody for one year and two months.  I really want to live
9  with my dad.  I know I would feel safer if I were living with him.

11  I declare under penalty of perjury that the foregoing is true and correct. Executed on this
12  _____ day of _____, 2018, at _____, Texas.

1

CERTIFICATE OF TRANSLATION

2      I, _San Juana Castillo_, hereby certify that I am proficient in both

3  Spanish and English, and that I accurately translated the foregoing statement and read it

4  back to _____ in its entirety in Spanish on _March 1, 2018_ .

5

6

7                                San Juana Castillo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 16
Page 93

# Exhibit 17

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Exhibit 17
Page 94

I, ███████████████████████████ declare as follows:

1.     This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2.     I am 16 years old. I am from Mexico. I came to the United States when I was twelve or thirteen years old with my father. He was detained when we arrived and I was sent to BCFS. I am currently being held in ORR custody in the Shiloh Residential Treatment Facility.

3.     I am not sure, but I think I came to Shiloh Residential Treatment Facility in June 2017. They told me I had to come here because I had tried to hurt myself.

4.     I think I have spent approximately five months at the Shiloh Residential Treatment Center.

5.     At Shiloh I have to take pills in the morning, afternoon, and night. I take 4 or 5 pills in the morning, 1 pill in afternoon, and 1 pill at night. In the morning, one of the pills is for anxiety. I don't know what the other pills are for. I don't like taking the medicine because it makes me sleepy and dizzy. But, if I don't take the pills, they will give me a report and I will have to stay at Shiloh longer. I do not know if they have talked to anyone in my family about the medications.

6.     Sometimes they give me forced injections. The last time was a few weeks ago. I have been given injections many times. When I get upset, one or two staff hold my arms and the nurse gives me an injection. I think the injection has trazedone and Benadryl, but I am not sure. The injection makes me tired.

7.     They told me that if I am good, I can have a phone call with my family. I haven't talked to my family in a long time. I really want to talk to them.

8.      I miss my Dad and want to live with him.  He lives in Arkansas. I think my
grandmother is in Texas.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
1st day of December, 2017, at Manvel, Texas.

1

CERTIFICATE OF TRANSLATION

2      I certify that I am fluent in the Spanish and English languages and that I truthfully

3  and accurately translated the above declaration from English to Spanish.

4

5  Dated: December 1, 2017

6

7      _____

8                 Karina Marquez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**Exhibit 17**
**Page 97**

# Exhibit 18

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 18
Page 98**

I, ███████████████████████ declare as follows:

1.    This declaration is based on my personal knowledge. I execute this declaration to update the declaration made on December 1, 2017. If called to testify in this case, I would testify competently about these facts.

2.    I am 16 years old. I am still detained at Shiloh Residential Treatment Center.

3.    I have not been given the opportunity to tell a judge that I am not dangerous and that I have not tried to run away.

4.    I have received a form from my case worker that explains why I am still detained at Shiloh. My case worker tells me I am here because the doctor says I have to be here.

5.    My father is a U.S. citizen. I want to live with him. My grandma is my father's mother. She lives in Del Rio, Texas. I am sad because I have not been able to speak with my father or my grandmother for a long time. The staff won't let me talk to them because when I've talked to them in the past, I get sad that the government won't let me live with them. I think I would feel better if I lived with my father or grandma.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of February, 2018, at ___Manvel___. Texas.

███████████████████████

Exhibit 18
Page 99

1

CERTIFICATE OF TRANSLATION

2      I, ___San Juana Castillo___ hereby certify that I am proficient in both

3   Spanish and English, and that I accurately translated the foregoing statement and read it

4   back to [redacted] in its entirety in Spanish on _February 28, 2018_ .

5

6                              _San Juana Castillo_

7                              San Juana Castillo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 18
Page 100

# Exhibit 19

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 19**
**Page 101**

I, ███████████████████████, declare as follows:

1.     This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2.     I came to the USA fleeing sexual violence and child abuse. In El Salvador, I suffered a lot and was in and out of shelters throughout my childhood. I experienced some very horrible violence at a young age, and I haven't really told my story until now. I was gang raped when I was 15 years old. The rapists told me not to tell anyone or they would kill me. My biological dad is deceased, and my mom was involved with a man who was abusive to me, and I did not feel safe at home. My older sister is paralyzed –she suffered horrible abuse and can no longer speak or walk. I also have two little brothers. I decided to leave my country for safety and opportunity in the United States.

3.     I am 16 years old. I am currently being held in ORR custody detained at the Shiloh Residential Treatment Center. I arrived here on September 7, 2017. Shiloh is a locked facility with 24-hour surveillance and monitoring. The children are detained here and no one is free to leave.

4.     I was taken into immigration custody in Texas about eleven months ago in January 2017. I was first detained at Southwest Key, a shelter, but then I became increasingly stressed, because I felt like I was going to be detained forever. I just want to live in Oakland, California with my grandpa—I don't want to be detained. My grandfather is in the beginning of process of sponsoring me.

5.     One time a staff member began yelling at me at Southwest Keys and I broke a mirror. The staff accused me of trying to hurt myself and sent me to a psychiatric hospital. Then a psychologist recommended that I come here to Shiloh because there is more one-on-one attention here.

6.     I don't remember ever being told or reading that I could appeal or challenge the government's decision to put me into this treatment facility, or that I could go to court about it.

7.     I have never had a thirty-day review to review my custody classification since I
have been here.  No one has formally sat down with me and reviewed whether I should
be stepped down to a lower level of security or told me how I'm doing here or what I
have to do in order to step down.

8.     I have had about three court hearings. My attorney is Paola, I think I met with her
recently but I don't remember.

9.     At Shiloh, I am given three pills every day. In the morning I take one pill, I don't
know what it is. In the evening, I take Prozac and Melatonin.  The staff checks our
mouths to make sure that we have taken our medicine.  I don't think that my family was
asked before giving me medicine. My understanding is that the government makes those
decisions.

10.    I think I would get a "report" if I didn't take my medicine.  Getting a report
impacts your privileges and delays when you can get released.

11.    The staff hold down and inject youth who aren't able to calm down.

12.    I am only allowed two 15-minute calls per week. The calls have no privacy.
Sometimes I talk to my mother and sometimes I talk to my grandfather.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
first day of December 2017, at Manvel, Texas.

1
2
3                          CERTIFICATE OF TRANSLATION
4   My name is Karina Marquez and I swear that I am fluent in both the English and Spanish
5   languages and I translated the foregoing declaration from English to Spanish to the best
6   of my abilities.
7
8   Dated: December 1, 2017                    _____
9                                                    Karina Marquez
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 19
Page 104

# Exhibit 20

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 20
Page 105**

DECLARACIÓN DE ███████████

Yo, ███████████ declaro y digo lo siguiente:

1. Hago la presente para actualizar la declaración que hice el 21 de noviembre del año pasado.

2. Todavía me encuentro detenida en Shiloh RTC. No tengo idea de cuando me van a liberar para que pueda vivir con mi abuelo en Oakland, California.

3. Pienso que la detención prolongada me provoca más ansiedad y desesperación. Solo puedo hablar con mi mamá y con mi abuelo una vez por semana por 15 minutos con cada uno. No estar con la familia es muy difícil para mi, y creo para todo menor de edad detenido.

4. Nadie me ha avisado que tengo derecho a una audiencia ante un juez de inmigración para decidir si estoy peligrosa o un riesgo de fugarme, y hasta la fecha no he tenido tal audiencia.

Declaro bajo protesta de decir la verdad que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día 28 de febrero del año 2018, en Manville, Texas.



/ / /

**Exhibit 20**
**Page 106**

DECLARATION OF ████████████

I, ████████████, declare and say the following:

1. I make the present to update the statement I made on November 21 of last year.

2. I am still detained in Shiloh RTC. I have no idea when they will release me so I can live with my grandfather in Oakland, California.

3. I think prolonged detention causes me more anxiety and despair. I can only talk to my mother and my grandfather once a week for 15 minutes with each one. Not being with family is very difficult for me, and I believe for all underage detainees.

4. No one has advised me that I have the right to a hearing before an immigration judge to decide if I am dangerous or at risk of fleeing, and to date I have not had such a hearing.


I declare under protest to tell the truth that all the information that I have provided here is correct and complete, aware of the legal consequences of declaring with falsehood before the authority.

Done on February 28 of the year 2018, in Manville, Texas.

_____

████████████

/// 

**Exhibit 20**
**Page 107**

## DECLARATION OF TRANSLATOR

I, Jorge Medina, declare and say as follows:

1. I speak, read and write English and Spanish.

2. On this day I translated the declaration of █████████ from Spanish to English.

The annexed is a true and accurate translation of said declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __6th__ day of March 2018, at Los Angeles, California.

Jorge Medina

/ / /

**Exhibit 20**
**Page 108**