CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
         pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>Jefferson B. Sessions, Attorney General, *et al*.,<br><br>　　　　Defendants. | Case No. CV 85-4544-DMG (AGRx)<br><br>EXHIBITS IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT (VOL. 3: EXS. 31-40, PAGES 174-231, REDACTED EXHIBITS ONLY)<br><br>Hearing:　May 18, 2018<br>Time:　　9:30 a.m.<br>Room:　　1st St. Courthouse<br>　　　　　Courtroom 8C |

## REDACTED VERSIONS OF DOCUMENTS PROPOSED TO BE FILED UNDER SEAL

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
        ccwhite@ucdavis.edu

I, Carlos Holguín, do hereby declare that true and correct copies of the following documents are attached hereto:

INDEX TO EXHIBITS

| No. | Description | Page(s) |
|---|---|---|
| 1 | Declaration of the Mother of Nicolás C., February 6, 2018 (proposed to be filed partially under seal) | 1-10 |
| 2 | Declaration of Nicolás C., February 4, 2018 (proposed to be filed partially under seal) | 11-19 |
| 3 | Morrison Paso Case Review re: Nicolás C., September 17, 2017 (proposed to be filed partially under seal) | 20-26 |
| 4 | Custody Order of the Immigration Judge re: Nicolás C., December 19, 2017 (proposed to be filed partially under seal) | 27-28 |
| 5 | Declaration of Leland Baxter-Neal, February 6, 2018 (proposed to be filed partially under seal) | 29-34 |
| 6 | Email from Erich Corona re: Nicolás C., January 9, 2018 (proposed to be filed partially under seal) | 35-38 |
| 7 | Declaration of James M. Owens, February 7, 2018 (proposed to be filed partially under seal) | 39-43 |
| 8 | ORR Interim Guidance re: Custody Hearings, July 18, 2017 | 44-55 |
| 9 | Declaration of Daniella Q., February 28, 2018 (proposed to be filed partially under seal) | 56-59 |
| 10 | Declaration of Isabella M., December 1, 2017 (proposed to be filed partially under seal) | 60-63 |
| 11 | Supplemental Declaration of Isabella M., February 28, 2018 (proposed to be filed partially under seal) | 64-68 |
| 12 | Declaration of the Mother of Isabella M., February 28, 2018 (proposed to be filed partially under seal) | 69-75 |
| 13 | Declaration of Victoria R., February 28, 2018 (proposed to be filed partially under seal) | 76-79 |

14    Declaration of David I., November 30, 2017 (proposed to be
      filed partially under seal) ............................................................ 80-84

15    Supplemental Declaration of David I., February 28, 2018
      (proposed to be filed partially under seal) ............................... 85-88

16    Declaration of Eduardo A., March 1, 2018 (proposed to be filed
      partially under seal) ................................................................... 89-93

17    Declaration of Rosa L., December 1, 2017 (proposed to be filed
      partially under seal) ................................................................... 94-97

18    Supplemental Declaration of Rosa L., February 28, 2018
      (proposed to be filed partially under seal) ............................. 98-100

19    Declaration of Gabriela N., December 1, 2017 (proposed to be
      filed partially under seal) ....................................................... 101-104

20    Supplemental Declaration of Gabriela N., February 28, 2018
      (proposed to be filed partially under seal) ............................ 105-108

21    Declaration of Arturo S., February 28, 2018 (proposed to be
      filed partially under seal) ....................................................... 109-112

22    ORR Form Notice of Placement in a Restrictive Setting,
      February 5, 2018 ..................................................................... 113-115

23    ORR FAQ: July 2017 Bond Hearings for Unaccompanied Alien
      Children (UAC) ....................................................................... 116-118

24    ORR FAQ: ORR Directors Release Decision, January 26, 2018 ..... 119-121

25    Letter from Carlos Holguín to Office of Immigration Litigation,
      December 19, 2017 .................................................................. 122-129

26    Email from Sarah Fabian re: Flores Meet and Confer
      Discussion, January 12, 2018 ................................................. 130-131

27    Letter from Leecia Welch to Office of Immigration Litigation
      re: Psychotropic Medications, and Attachments, January 16,
      2018 (proposed to be filed partially under seal) .............. 132-161

28    Letter from Carlos Holguín to Office of Immigration Litigation,
      February 16, 2018 ................................................................... 162-164

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

29    Email from Sarah Fabian re: Flores Meet and Confer
      Discussion, March 2, 2018 ............................................................ 165-168

30    Declaration of Javier C., November 15, 2017 (proposed to be
      filed partially under seal) ............................................................. 169-173

31    Declaration of Carlos A., November 16, 2017 (proposed to be
      filed partially under seal) ............................................................. 174-177

32    Declaration of Miguel B., November 16, 2017 (proposed to be
      filed partially under seal) ............................................................. 178-181

33    Declaration of Luis D., November 15, 2017 (proposed to be
      filed partially under seal) ............................................................. 182-192

34    Declaration of Andrés D., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................... 193-197

35    Declaration of Jorge E., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................... 198-205

36    Declaration of Gustavo H., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................... 206-210

37    Declaration of Roberto F., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................... 211-220

38    Declaration of Natalia T., November 21, 2017 (proposed to be
      filed partially under seal) ............................................................. 221-223

39    Declaration of Ricardo U., November 21, 2017 (proposed to be
      filed partially under seal) ............................................................. 224-226

40    Declaration of Sofia O., December 1, 2017 (proposed to be
      filed partially under seal) ............................................................. 227-231

41    Declaration of Gloria P., December 1, 2017 (proposed to be
      filed partially under seal) ............................................................. 232-235

42    Declaration of Edwin B., March 1, 2018 (proposed to be filed
      partially under seal) .................................................................... 236-242

43    Letter from Carlos Holguín to Cynthia Nunes Colbert, *et al.,* re:
      Legal Representation for Specified Class Members, March 12,
      2018 (proposed to be filed partially under seal) ............................ 243-246

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

44    Declaration of Samuel W., October 26, 2017 (proposed to be
      filed partially under seal) ................................................................. 247-250

45    Declaration of Jaime V., October 26, 2017 (proposed to be filed
      partially under seal) ........................................................................ 251-254

46    Declaration of Mateo X., October 26, 2017 (proposed to be
      filed partially under seal) ................................................................. 255-256

47    Declaration of Mario Y., October 26, 2017 (proposed to be filed
      partially under seal) ........................................................................ 257-260

48    Declaration of Maricela J., November 30, 2017 (proposed to be
      filed partially under seal) ................................................................. 261-264

49    Declaration of Teresa K., November 30, 2017 (proposed to be
      filed partially under seal) ................................................................. 265-268

50    Declaration of Diego E., January 16, 2018 (proposed to be filed
      partially under seal) ........................................................................ 269-273

51    Declaration of Daniel F., March 21, 2018 (proposed to be filed
      partially under seal) ........................................................................ 274-278

52    Declaration of Alejandro G., March 21, 2018 (proposed to be
      filed partially under seal) ................................................................. 279-285

53    Transcript of Testimony of James De La Cruz, *Saravia v.
      Sessions*, Case No. 3:17-cv-03615-VC (N.D. Cal. June 29,
      2017), Dkt. No. 28 ............................................................................ 286-382

54    Defendant Brent Cardall's Responses to Plaintiff's Request for
      Admission, Set One, *Saravia v. Sessions*, Case No. 3:17-cv-
      03615-VC (N.D. Cal. Sept. 20-21, 2017), Dkt. No. 61-3 ................ 383-390

55    Declaration of Camila G., April 3, 2018 (proposed to be filed
      partially under seal) ........................................................................ 391-396

56    Patient Profile – Active Medications of Victoria R., January 9,
      2018 (proposed to be filed partially under seal) ............................. 397-398

57    Patient Profile – Active Medications of David I., November 27,
      2017 (proposed to be filed partially under seal) ............................. 399-400

58      Patient Profile – Active Medications of Rosa L., July 31, 2017
        (proposed to be filed partially under seal) ....................................... 401-402

59      Medication Information and Reconciliation and Over-the-
        Counter Medication Release Forms for Isabella M., September
        28-29, 2017 (proposed to be filed partially under seal)................... 403-405

60      Medication Information and Reconciliation Form for Gabriela
        N., September 7, 2017 (proposed to be filed partially under
        seal)..................................................................................................... 406-407

61      Medication Information and Reconciliation Form for Sofia O.,
        September 18, 2017 (proposed to be filed partially under seal) ....... 408-409

62      Yolo County Juvenile Detention Facility Parental Medical
        Authorization Form for Julio Z., December 14, 2016 (proposed
        to be filed partially under seal) ........................................................ 410-411

63      Patient Profile – Active Medications of Julio Z., December 12,
        2016 (proposed to be filed partially under seal) ............................... 412-413

64      Declaration of Julio Z., November 13, 2017 (proposed to be
        filed partially under seal) .................................................................. 414-424

65      Declaration of Sister of Victoria R., March 13, 2018 (proposed
        to be filed partially under seal) ......................................................... 425-431

66      Declaration of Proposed Sponsor of Victoria R., March 13,
        2018 (proposed to be filed partially under seal) ............................... 432-435

67      Declaration of Grandfather of Gabriela N., March 15, 2018
        (proposed to be filed partially under seal) ........................................ 436-441

68      Custody Order of the Immigration Judge re: Santiago H.,
        February 21, 2018 (proposed to be filed partially under seal).......... 442-443

69      Order of the Immigration Judge with Respect to Custody re:
        Santiago H., March 20, 2018 (proposed to be filed partially
        under seal)........................................................................................... 444-446

70      Email from Toby Biswas re: Santiago H. Follow Up, February
        23, 2018 (proposed to be filed partially under seal) ........................ 447-449

71    Case Review re: Santiago H., November 29, 2017 (proposed to
      be filed partially under seal) ................................................................ 450-452

72    ORR Information Memo re: Community Safety Initiative for
      the Unaccompanied Alien Children Program, August 16, 2017 ...... 453-457

73    Declaration of John Doe 1, *John Doe 1 v. Shenandoah Valley
      Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH,
      (W.D. Va. Jan. 17, 2018), Dkt. No. 34-1 ........................................... 458-464

74    Declaration of John Doe 2, *John Doe 1 v. Shenandoah Valley
      Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH,
      (W.D. Va. Jan. 5, 2018), Dkt. No. 34-2 ............................................. 465-471

75    Declaration of John Doe 3, *John Doe 1 v. Shenandoah Valley
      Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH
      (W.D. Va. Jan. 5, 2018), Dkt. No. 34-3 ............................................. 472-478

76    Declaration of D.M, *John Doe 1 v. Shenandoah Valley Juvenile
      Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va.
      Jan. 2, 2018), Dkt. No. 34-5 ............................................................... 479-484

77    Declaration of R.B., *John Doe 1 v. Shenandoah Valley Juvenile
      Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va.
      Jan. 8, 2018), Dkt. No. 34-6 ............................................................... 485-490

78    Transcript of Jonathan White, *Saravia v. Sessions*, Case No. 18-
      15114 (9th Cir. Oct. 27, 2017), Dkt. No. 9-2 .................................... 491-548

79    Exhibit 1 to Appellees' Request for Judicial Notice, *Saravia v.
      Sessions*, Case No. 18-15114 (9th Cir. March 16, 2018), Dkt.
      No. 20 .................................................................................................... 549-555

80    Stipulated Settlement Agreement, *Flores v. Reno*, Case No.
      CV 85-4544-RJK(Px) ......................................................................... 556-584

81    Declaration of Justin Mixon, October 19, 2017................................ 585-591

82    Email from Sarah Fabian re: Correspondence re: Legal
      Representation for Flores Class Members, March 23, 2018............. 592-594

83    Letter from James De La Cruz to Flores Counsel re:
      Psychotropic Medications, April 2, 2018 (proposed to be filed
      partially under seal) ............................................................................ 595-601

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

84    Individual Service Plan – Residential Treatment for Victoria R., Shiloh Treatment Center, Inc., December 26, 2017 (proposed to be filed partially under seal) ............................................................... 602-606

85    Declaration of Lorelei Alicia Williams, previously filed in this case in Docket No. 239-2, August 5, 2016 ....................................... 607-618

86    Declaration of Megan Stuart, previously filed in this case in Docket No. 239-2, August 1, 2016 ..................................... 619-646

87    Declaration of Carlos Holguín, April 10, 2018 ................................. 647-649

88    ORR Authorization for Medical, Dental, and Mental Health Care for Carlos A., July 31, 2017 (proposed to be filed partially under seal)........................................................................... 650-652

89    Declaration of Carter White, April 14, 2018, attaching Shiloh Treatment Center Consent to Medical Care Form............................ 653-655

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Executed on this 14th day of April, 2018, at Santa Clarita, California.

4                                    Respectfully submitted,

5                                    Carlos Holguín

6                                     /s/ Carlos Holguín

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 31

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 31**
**Page 174**

I, █████████████████████  declare as follows:

1.    This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2.    I am 17 years old. I am from El Salvador. I have been in the United States since March 2016. I am currently in immigration detention in the custody of ORR at Children's Village Staff Secure Facility in Dobbs Ferry, New York.

3.    When I first came to the United States, I was taken into immigration custody and held in a shelter in ORR custody in Texas. I was there for about 27 days. ORR determined that my mother was a suitable sponsor for me and I was released to her custody at that time.

4.    After I was released from ORR custody, I lived with my mother on Long Island. On July 28, 2017, I was on my way to work when I was taken into custody by immigration officials, who told me that they were detaining me for being in the United States illegally. They took me to an ICE facility in Central Islip and then they moved me to the Shenandoah Juvenile Detention Center the next day.

5.    When I arrived at Shenandoah, the detention center officials told me that I was taken back into custody because the government thought that I was in a gang. I don't remember anyone ever telling me why I was taken to Shenandoah instead of being placed in another facility that was less like a jail. I don't remember them ever telling me that I could ask for the decision to put me there to be reviewed or that I could challenge it before a judge.

6.    I did not like being at Shenandoah. Some of the staff members would discriminate against the immigrant children, and they acted like we were bothering them when we wanted to talk to them.

7.    They told me at Shenandoah that if I behaved well there for at least a month, then they would move me to a lower level of security. I never got any write ups in the time that I was there.

1

Exhibit 31
Page 175

8.     They moved me to the Children's Village Staff Secure Facility on August 23, 2017. At Children's Village, I am on the green level for my behavior, which is the best level that you can be on.

9.     I had a bond hearing on October 31 and November 14. At the bond hearing, I found out for the first time why the government was accusing me of being in a gang. They said that my school had gotten a tip that I was in a gang. They also said that they thought that I had put gang related pictures on my Facebook page, but what they showed was just a picture of a clown and it wasn't gang related at all. After the immigration judge listened to the evidence, the judge determined that I am not a flight risk and that I am not a danger, and he said that I should be released. At the hearing on November 14, the immigration judge also administratively closed my immigration case.

10.     My mother has been approved again to be my sponsor. My case manager said that the only reason that I haven't been released is that the government is now reviewing my case. They have not told me how long it would take for the government to finish that review; they just said that the government would take their time to review the case carefully.

11.     While they are reviewing my case, I am still detained. I do not like being at Children's Village Staff Secure. They don't let me see a doctor when I ask to see one; instead, when I have asked to see one, the staff tells me that I am fine and that it isn't necessary to see the doctor.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 16th day of November, 2017, at Dobbs Ferry, New York.

**Exhibit 31**
**Page 176**

1

## CERTIFICATE OF TRANSLATION

2

I, Paige Austin, hereby certify that I am proficient in both Spanish and English, and

3

that I accurately translated the foregoing statement and read it back to ▮▮▮▮▮▮▮

4

▮▮▮▮▮▮▮ in its entirety in Spanish on November 16, 2017.

5

6

7

Paige Austin

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Exhibit 31
Page 177

# Exhibit 32

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 32
Page 178**

1   I, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , declare as follows:

2   1.      This declaration is based on my personal knowledge.  If called to testify in this

3   case, I would testify competently about these facts.

4   2.      I am 16 years old. I came to the U.S. in 2016. When I got here, imigration detained

5   for about 25 days at a shelter in Texas and then I was released me to my mother, who

6   lives in Central Islip, New York. I lived with her for about eight months. I did not have

7   any problems with the police: I was never arrested. I went to school. Once I suspended

8   for a week after another student hit me. My mouth was bleeding. I didn't touch him but

9   we both got suspended.

10  3.      One day about five months ago, shortly before the end of the school year, I was

11  walking home from school. I bent to pick something up in the street and then two men in

12  regular clothes stopped me and handcuffed me. They took me somewhere for about two

13  hours. They asked me questions but they spoke a lot in English and I didn't understand

14  very well. The only information I gave them was basic things like my address. Then they

15  brought me to Children's Village. I don't know if the men who stopped me were police

16  or immigration.

17  4.      When I first got to Children's Village, I was in staff secure for around a month.

18  They quickly stepped me down to the shelter. I have not had any discipline or reports for

19  bad behavior since I got here.

20  5.      My mom began trying to get me back again as soon as they detained me. I know

21  she has done a lot of paperwork and she gave her fingerprints. Someone came to inspect

22  her house and everything came out well. Neither of us understands why I am still here.

23  No one has explained what is wrong or why the process is so slow. Immigration released

24  me to my mother before and nothing has changed.

25  6.      I had a lawyer in my family court case before I was detained; she was helping me

26  apply for Special Immigrant Juvenile Status. When I was detained, she spoke to the

27  agents. They told her I said when they questioned me that I was in a gang. But I never

28  said that. Most of their questioning was in English; the only information I gave them

1

**Exhibit 32**
**Page 179**

1  were basic things like my address. I would never have said that because I am not in a

2  gang. I have never been arrested in any country or involved with a gang.

3  7.      My social worker at Children's Village also told my mother that I was here

4  because someone accused me of being in a gang. But I have never been in a gang.

5  8.      I am not happy here. I miss my mother. I want to be with her.

6

7  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

8  16 day of NOV, 2017, at Dobb's Ferry, New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

Exhibit 32
Page 180

1

## CERTIFICATE OF TRANSLATION

2    I, Paige Austin, hereby certify that I am proficient in both Spanish and English, and

3  that I accurately translated the foregoing statement and read it back to ███████████

4  ██████████    in its entirety in Spanish on November 16, 2017.

5

6

7                              Paige Austin

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**Exhibit 32**
**Page 181**

# Exhibit 33

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 33
Page 182**

DECLARACIÓN DE ███████████████

Yo, ██████████████████, declaro y digo lo siguiente:

1. Tengo 17 años de edad. Faltan seis meses para cumplir los 18 años. Soy de

Honduras. Actualmente me encuentro detenido en MercyFirst RTC, en Nueva York.

Tengo once meses detenido aquí. No me han dicho cuánto tiempo más voy a estar

detenido.

2. Vine a los EE.UU. para escaspar de las pandillas en Honduras, que asesinaron

a mi mejor amigo. Lo mataron para mandarme a mi un mensaje, que me iban a hacer lo

mismo si no me uniera con la pandilla. También a mi me golpearon con un bate en la

cabeza. Me quedé sin consiencia en la casa de mi abuela. La herida que sufrí me ha

causado problemas con mi capacidad mental. Vino solo a los EE.UU. con la idea de

reunirme con mi mamá, que actualmente vive en Nebraska. En mi país nunca tuve

problemas con la policía. La mara me obligó dejar mis estudios porque me andaban

buscando a la salida del colegio. Solo logré llegar al qinto grado cuando tuve que

abandonar a mis estudios.

3. Pasando por México me asaltaron tres veces. Presencié la violación de una

mujer y la matanza por machete de un compañero de camino. Por suerte, logré llegar a

los EE.UU., y por el febrero de 2015, entré por la frontera con Texas, México. Caminé

dos noches, y llegué hasta Houston, yo creo, cuando me caí preso por la Inmigración.

Me llevaron a la hielera, pasé un día allá, y luego un día en la perrera, y luego a un

**Exhibit 33**
**Page 183**

shelter en Manhattan que se llamaba Luther King, o algo así. Me quedé dos noches allí, y luego me mandaron a un hospital. Yo quería suicidarme allí por las muchas cosas que me habían pasado. No es que intenté suicidarme, sino que les conté al staff que tenía ganas de hacerlo.

4. Me quedé 15 días en el hospital. Y cuando me sentí algo mejor, me mandaron al "staff-secure" en Shiloh, Texas. Me quedé en Shiloh entre 2-3 meses. Pienso que Shiloh, aunque no sea de máxima seguridad, es el peor lugar que he conocido desde que me caí preso por la Inmigración. La trabajadora del caso allá no hacía nada, nunca me proporcionó información sobre el progreso de mi caso, ni cuanto tiempo iba a quedarme detenido, ni cuando me dejarían salir con mi mamá. Me permitían hablar con mi mamá por teléfono solamente una vez por semana, con límite de diez minutos la llamada. Me sentí desesperado y deprimido por mi situación.

5. Un día en la escuela, un staff me empujó la silla con el pie, y yo me caí al suelo. Me levanté y sin pensarlo le pegé a él. Luego tres del estaff me agarraron, y me tumbaron al suelo. A poco rato logré calmarme, y me dejaron quedarme en la aula con el profesor el resto del día. Esta noche, regresé al mi cuarto para dormir. Por las cuatro de la madrugada, me despertaron el estaff y me dijeron que me iban a trasladar para otro lugar. No me dieron ninguna explicacíon del porque me iban a trasladar, ni me dieron la menor oportunidad de explicarles porque le había pegado al estaff.

Exhibit 33
Page 184

6. Me llevaron a NOVA, una instalación de máxima seguridad en Virginia. Me quedé en NOVA por tres o cuatro meses. Ahí me encerraron en un cuarto de seguridad, donde no había nada más que un banco de concreto con colchón delgadito para acostarse, un inodoro de metal, y un lavamanos de metal. La puerta tenía un crystal pequeño, pero el cuarto ningúna ventana más. Me quedé encerredo con llave todas las noches, y a veces todo el día. No había televisor ni libros ni nada mas que hacer más que quedarme dormido. Usabamos ropa de preso. A veces me platicaban que si me porté bien me iban a dar más privilegios. Hice todo lo posible para portarme bien, y logré hacerlo para que me trasladaran a un lugar de menos seguridad.

7. Luego me mandaron a MercyFirst por primera vez, donde me quedé por cuatro o seis meses. Como a un mes y medio, mi trabajdora del caso me informó que el estudio de la casa de mi mamá había salido positivo. Me sentí alegre porque creía que me iban a dejar salir con mi mamá, pero no fue así. No me dieron ninguna explicación de porque no me dejaron salir con mi mamá, pero me quedé detenido.

8. Un día estaba platicando con mi clinician, y le platiqué de un accidente que había sucedido en Honduras. Un amigo y yo andaba en moto, y el chofer de un carro iba al sentido contrario. Para evitar un choque con nostotros, el chofer dió una vuelta para un barranco, y se voltió el carro y el chofer murió. Me imagino que el clinician sacara la conclusión de que nosotros habíamos provocado el accidente para matar al chofer, pero no fué así. Ni modo, como a una semana me llegaron el estaff y me

Exhibit 33
Page 185

obligaron acompañar a dos hombres para otro lugar, y solo me dijeron que me iban a explicar porque en el camino. En el camino ellos me dijeron que iba yo para California, pero no me avisaran que iba para máxima seguridad, ni porque me habían sacado de MercyFirst.

9. Llegue a Yolo Juvenile el mismo día. Me encerraron ahí dos meses y medio. Yolo es un juvenile de máxima seguridad. Allí nosotros los detenidos por la inmigración vivíamos con los norteamericanos encerrados por delinquencia. Un día hubo un pleito entre uno de ellos y uno detenido por la inmigración. Como yo apenas había llegado, no sabía nada de la regla. Empezó el estaff a gritar "code blue," y como yo no entendí que hacer, que es tirarse al suelo, me echaron espray de pimiento en los ojos. Y como me quema.

10. Como a los dos meses me informó me trabajador de caso que la investigación del accidente en Honduras había salido positiva, y que me iban a regresar a MercyFirst. En Yolo, nunca me dijeron  nada sobre las posibilidades de ir con mi mamá, aparte de avisarme que necesitaba yo más tratamiento. Tardó otras dos semanas hasta que me mandaron de vuelta a MercyFirst.

11. En MercyFirst existe un systema de comportamiento. Nos dicen que si llegamos al nivel más alto, que es el nivel de anaranjado, nos bajan al shelter, y de allí podemos salir a la familia. Yo tenía el anaranjado por dos meses, pero no me bajaron al shelter. Por tanto tiempo encerrado sin resultados, me frustré, y quebré una silla y una

Exhibit 33
Page 186

ventana. Ya llevo cuatro meses tratando de recuperme el anranjado, y precisamente ayer me dijeron que me van a bajar al shelter. Espero que después de un mes más en el shelter me van a dejar salir con mi mamá.

Declaro bajo protesta de decir la verdad que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día \_15\_ de noviembre del año 2017, en Syosset, Virginia.



///

**Exhibit 33**
**Page 187**

DECLARATION OF ██████████████████████

I, ████████████████████ declare and say the following:

1. I am 17 years old. I have six months left to turn 18. I'm from Honduras. I am currently detained at MercyFirst RTC, in New York. I have been detained here for eleven months. They have not told me how much longer I will be detained.

2. I came to the United States to escape from the gangs in Honduras, who murdered my best friend. They killed him to send me a message, that they would do the same to me if I did not join the gang. They also beat me with a bat on the head. I ran lost consciousness in my grandmother's house. The wound I suffered has caused problems with my mental capacity. I came alone to the United States with the idea of meeting with my mom, who currently lives in Nebraska. In my country I never had problems with the police. The gang forced me to leave my studies because they were looking for me after school. I only managed to reach the fifth grade when I had to abandon my studies.

3. Passing through Mexico, I was assaulted three times. I witnessed the rape of a woman and the machete slaughter of a road companion. Luckily, I made it to the United States, and by February 2015, I came through the border between Texas and Mexico. I walked two nights, and I got to Houston, I think, when I was detained by Immigration. They took me to "la hielera," I spent a day there, and then one day in "la perrera," and then to a shelter in Manhattan called Luther King, or something like that. I stayed two nights there, and then they sent me to a hospital. I wanted to commit suicide there because of the many things that had happened to me. It is not that I tried to kill myself, but that I told the staff that I wanted to do it.

4. I stayed 15 days in the hospital. And when I felt somewhat better, they sent me to "staff-secure"

**Exhibit 33
Page 188**

in Shiloh, Texas. I stayed in Shiloh between 2-3 months. I think that Shiloh, although it is not maximum security, is the worst place I have known since I was detained by Immigration. The case worker there did nothing, never gave me information about the progress of my case, or how long I was going to be detained, or when they would release me to my mother. I was allowed to speak with my mother by phone only once a week, with a limit of ten minutes per call. I felt desperate and depressed about my situation.

5. One day at school, a staff pushed my chair with their foot, and I fell to the ground. I got up and without thinking I hit him. Then three of the staff grabbed me, and they knocked me to the ground. After a while I managed to calm down, and they let me stay in the classroom with the teacher for the rest of the day. That night, I return to my room to sleep. At four o'clock in the morning, I was awakened by the staff and they told me that they were going to move me to another place. They did not give me any explanation of why they were going to move me, nor did they give me any opportunity to explain why I had hit the staff.

6. I was taken to NOVA, a maximum-security facility in Virginia. I stayed at NOVA for three or four months. There they locked me in a secure room, where there was nothing but a concrete bench with a thin mattress to lie down on, a metal toilet, and a metal sink. The door had a small window, but the room had no other windows. I was locked up every night, and sometimes all day. There was no television or books or anything else to do but to fall asleep. We used prisoner clothes. Sometimes they told me that if I behave well they would give me more privileges. I did everything possible to be good, and I managed to do it so that I could move to a place with less security.

7. Then they sent me to MercyFirst for the first time, where I stayed for four or six months. About a month and a half in, my caseworker informed me that the study of my mother's house had turned out positive. I felt happy because I thought they were going to let me go with my mom, but it was

**Exhibit 33**
**Page 189**

not like that. They did not give me any explanation of why they did not let me leave with my

mother, but I remained detained.

8. One day I was talking with my clinician, and I told him about an accident that had happened in

Honduras. A friend and I were on a motorcycle, and the driver of a car was driving in the wrong

direction. To avoid a collision with us, the driver took a turn towards a ravine, and the car turned

and the driver died. I imagine that the clinician drew the conclusion that we had caused the accident

to kill the driver, but it was not so. Either way, about a week after staff came to me and they forced

me to accompany two men to another place, and they only told me that they were going to explain

why on the way. On the way they told me that I was going to California, but they did not tell me I

was going to a maximum security, or why they had taken me out of MercyFirst.

9. I arrived at Yolo Juvenile the same day. They locked me there for two and a half months. Yolo is

a maximum-security juvenile facility. There immigration detainees lived with Americans locked up

for delinquency. One day there was fight between one of the Americans and an immigration

detainee. Since I had barely arrived, I did not know about the rules. Staff began to yell "code blue,"

and since I did not understand what to do, which is to throw myself to the ground, they put pepper

spray in my eyes. And how it burns me.

10. About two months later, my caseworker informed me that the accident investigation in

Honduras had turned out positive, and that they were going to return me to MercyFirst. In Yolo,

they never told me anything about the possibilities of going with my mother, apart from telling me

that I needed more treatment. It took another two weeks until they sent me back to MercyFirst.

11. In MercyFirst there is a behavioral system. They tell us that if we reach the highest level, which

is the level orange, they lower us to a shelter, and from there we can be released to our family. I had

**Exhibit 33
Page 190**

the orange level for two months, but they did not take me down to a shelter. Being locked up

without results for so long, I got frustrated, and broke a chair and a window. I've been trying to

recover the orange level for four months, and just yesterday they told me they're going to take me

down to a shelter. I hope that after a month more in the shelter they will let me go out with my

mother.

I declare under protest to tell the truth that all the information I have provided here is correct and

complete, aware of the legal consequences to declare with falsehood before the authority.

        Done on November 15, 2017, in Syosset, Virginia.


                                        _____


/// 

**Exhibit 33
Page 191**

## DECLARATION OF TRANSLATOR

I, Jorge Medina, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing declaration of ███████████████

███████ from Spanish into English.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of April, 2018, at Los Angeles, California.

Jorge Medina

Exhibit 33
Page 192

# Exhibit 34

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 34**
**Page 193**

### Declaration of ████████

I, ████████, declare and state the following:

1. I am 15 years old. I first arrived in the United States in December 2016.

2. I was initially placed in New Hope, a shelter located in Brownsville, Texas, where I stayed for approximately one month.

3. In early January 2017, I was transferred to Nueva Esperanza, a staff secure facility, also in Brownsville. My understanding was that I was transferred because of serious incident reports, one of which included an incident during which I had made a fist while looking in the general direction of a staff member. The staff member had interpreted this gesture as a threat. One of the other incidents included an occasion in which I had said that I wanted to escape from the facility.

4. I was transferred to the Shenandoah Valley Juvenile Center in March 2017.

5. At Shenandoah, we are locked up all the time. We are locked in our rooms for approximately 14 hours per day. At mealtimes, we are locked in our rooms until the food is ready to eat, and then sent to our rooms again right after we eat.

6. While I am locked in my room, there is nothing to do except read a book.

7. While we are in the common areas in our pods, there is nothing to do except play cards. Some of the game sets are incomplete, and we are not allowed to use them without permission from the staff.

8. We are allowed outside of our pods for recreation for just one hour per day. Aside from recreation and classes, we spend the majority of our time

**Exhibit 34**
**Page 194**

locked in our pods.

9.  The classes that we attend here are not very stimulating or interesting. I can finish my work very quickly, because I have already learned most of what they were teaching us, so I would read my book instead.

10. The teachers were unhappy about this because they thought I was a bad influence on the other kids.  They told me they were going to take my books away.  This made me very upset, because books are the only thing that I have, and I asked them not to.  But teachers made a complaint to the facility and a new rule was instituted that we were no longer allowed to bring books with us to class.

11. After this rule had been instituted, I was stopped by a staff member when I left for classes in the morning and told that I could not bring my book with me to class. I got upset and refused to leave the book.

12. I was told that if I did not leave my book, I would be locked in my room for 15 minutes. I resisted this as well and I began raising my voice, because I did not want to be locked in my room for any longer.

13. I was then restrained by three staff members and shoved into my room, and handcuffs were placed on my wrists. They were very tight and left marks on my wrists. They removed the mattress from my bed and shoved my face into the concrete where the mattress had been. While I was still in the handcuffs, they pushed against my back and legs to hold me there. When they picked me back up, my face was flushed and red.

**Exhibit 34**
**Page 195**

14. The staff members then took the handcuffs off of my wrists and locked me in my room. They took everything away, including my mattress, hairbrush, and my book. I was locked in my room for 8 hours before I was allowed to leave.

15. There is so little to do here that I often feel sad and angry, and I cry a lot.

16. I once ate shampoo because I was sad.  We are no longer allowed to have shampoo in our rooms anymore.

17. I have been prescribed medications to help me sleep and to control my impulses. I had no need for medications before I came to Shenandoah.

18. Since arriving at Shenandoah, I have felt very sad, listless, and frustrated by the extreme limitations placed on me here. Out of a deep sense of desperation, I have engaged in self-harm.  I have scratched and cut my arms and wrists with whatever items I can find, including my fingernails, hairbrush, toothpaste, and pieces of plastic. I had never engaged in this behavior before I came to Shenandoah.

19. This statement has been prepared in English but it has been read to me in Spanish by a bilingual interpreter.

Executed this 11th day of July, 2017, in Staunton, Virginia

**Exhibit 34**
**Page 196**

DECLARATION OF TRANSLATOR

I, Evelyn Nunez, declare and say as follows:

    1. I am fluent in English and Spanish.

    2. On July 11, 2017, I translated the foregoing to the declarant, who affirmed that he understood the contents thereof prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April, 2018, at Washington, D.C.

Exhibit 34
Page 197

# Exhibit 35

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 35**
**Page 198**

DECLARACIÓN DE ███████

Yo, ███████, declaro y digo lo siguiente:

1. Tengo 16 años de edad. Actualmente me encuentro detenido en Shenandoah Valley Juvenile Hall, in Staunton, Virginia. Tengo más de ocho meses detenido en Shenandoah, y no tengo idea de cuánto tiempo más vaya a pasar aquí.

2. Mis padres me mandaron a los EE.UU. para protegerme contra los criminales que dominan a todo el mundo en mi país, El Salvador. En septiembre de 2016, entré a los EE.UU. por la frontera de México con Texas. Poco después, me entregué a la Patrulla Fronteriza. Me llevaron a lo que se llama "la hielera," porque allí meten a los detenidos en celdas donde hace muchísimo frío. Pasé una noche allí, y luego me trasladaron para otra hielera a unos 15 minutos de la primera. Pasé dos noches en la segunda hielera.

3. Luego me trasladaron a una casa hogar que se llama Jóvenes Para Mañana, o algo así, traduciéndolo de inglés, en el estado de Virginia, como a una hora de donde me encuentro detenido actualmente. Pasé aproximadamente un mes en la casa hogar. Nunca tuve problemas con el personal, ni con los demás jóvenes detenidos, y el lugar fue bastante cómodo y agradable. Hasta el día me llamaron para hablar con una psicóloga.

4. La psicóloga no habló bien el español, y no había interprete. Me preguntó ella de mi vida en El Salvador y de mi familia. Le conté que había muchas presiones para unirme con pandilla en El Salvador, y que mi hermano ya andaba con ellos, y que la

Exhibit 35
Page 199

policía lo andaba buscando por asesinato. La psicóloga me entendió mal, y se equivocó que yo había matado a alguien, pero no fue así. De hecho en El Salvador fui estudiante, y nunca me metí con pandilla. Mi mamá trabajaba en un banco de las 5:00 de la madrugada hasta las 5:30 de la tarde, y no pudo controlar la mala influencia de mi hermano. Ella y mi papá tomaron la decisión de que yo viniera a los EE.UU., para alejarme de la pandilla.

5. Inmediatamente después de esa platica con la psicóloga, en el mismo día, me mandaron para Shenandoah. No me dieron ninguna explicación de por qué me trasladaron. No más me dijeron que yo ya no podía quedarme en un lugar de baja seguridad. Me metieron en un carro con un señor que me aseguró que Shenandoah iba a ser mejor lugar que la casa hogar, pero no salió así.

6. En Shenandoah nos tratan como criminales. Las instalaciones son de tipo cárcel. Dormimos encerrados con llave todas la noches. No nos llevan al parque, al cine, ni a ningún lugar normal. El los dormitorios solo hay una plataforma de concreto, en que dormimos con colchón pequeño, y un inodoro de metal. En cambio, en la casa hogar estábamos como en casa. Nos llevaba al parque, y al cine, y otros lugares todos los viernes. Todo fue mucho más saludable y agradable ahí. Si me hubieron dado una oportunidad de explicar lo que le conté a la psicóloga, de que todo eso de las pandillas trata de mi hermano, y no de mí, a lo mejor estaría todavía en la casa hogar en vez de Shenandoah.

-2-

**Exhibit 35**
**Page 200**

7. Tampoco tengo idea de cuantos meses más vaya a estar yo encerrado. Durante más de ocho meses en Shenandoah, no he tenido ninguna audiencia para decidir si merezco regresar a la casa hogar u otro lugar donde te dan más libertad. Solo me vienen a decir de vez en cuando que si mi porto bien la casa hogar tal vez me acepte de nuevo, que ellos de la casa hogar tienen la palabra.

8. Los primeros cuatro meses en Shenandoah me porté bien, igual como me porté en la casa hogar. Más luego, después de pasar tanto tiempo encerrado como criminal, empecé a tener problemas con el staff y los demás jóvenes detenidos. Ahora por primera vez tomo medicamento para los nervios y para dormir. Es imposible no sentirse uno desesperado, después de pasar tanto tiempo en un lugar como Shenandoah. Normalmente yo soy tranquilo. No me gustan los conflictos ni la violencia. Pero la cárcel cambia a uno, si quieres sobrevivir.

Declaro bajo protesta de decir la verdad que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día __11__ de julio del año 2017, en Staunton, Virginia.



///

**Exhibit 35**
**Page 201**

**DECLARATION OF** ███████████

I, █████████, declare and say the following:

1. I am 16 years old. I am currently being held at Shenandoah Valley Juvenile Hall in Staunton, Virginia. I have been detained for more than eight months in Shenandoah, and I have no idea how much longer I will be here.

2. My parents sent me to the United States to protect me against the criminals who dominate every person in my country, El Salvador. In September 2016, I entered the United States at the border of Mexico and Texas. Shortly afterward, I turned myself over to the Border Patrol. They took me to what is called "la hielera," (the freezer) because there they put the detainees in cells where it is very cold. I spent one night there, and then they moved me to another "hielera" about 15 minutes from the first. I spent two nights in the second "hielera."

3. I was then transferred to a shelter that was called "Jovenes Para Manana," or something like that, translating it in English, in the state of Virginia, about an hour from where I am currently detained. I spent about a month in the shelter. I never had problems with the staff, nor with the other young people being detained, and the place was quite comfortable and pleasant. Until the day I was called to speak with a psychologist.

4. The psychologist did not speak Spanish well, and there was no interpreter. She asked about my life in El Salvador and my family. I told her that there was a lot of pressure to join the gang in El Salvador, and that my brother was already with them, and that the police

-1-

Exhibit 35
Page 202

were looking for him due to a murder. The psychologist misunderstood me, and wrongly

thought that I had killed someone, but it was not so. In fact, I was a student in El Salvador,

and I never involved with gangs. My mom worked in a bank from 5:00 in the morning until

5:30 in the afternoon, and could not control the bad influences over my brother. She and my

dad made the decision that I should come to the United States to get away from the gang.

5. Immediately after that talk with the psychologist, on the same day, I was sent to

Shenandoah. I was not given any explanation as to why I was moved. I was only told that I

could no longer stay in a place of low security. I was put in a car with a gentleman that

assured me that Shenandoah was going to be a better place than the shelter, but it did not go

that way.

6. At Shenandoah they treat us like criminals. The facilities are jail-type. We slept

locked up every night. They do not take us to the park, to the movies, or to any normal place.

In the bedrooms there is only one concrete platform, in which we sleep on a small mattress,

and a metal toilet. However, in the shelter we were at home. They took us to the park, and to

the movies, and other places every Friday. Everything was much healthier and more pleasant

there. If I had been given the opportunity to explain what I told the psychologist, that all this

gang discussion was about my brother and not me, maybe I would still be in the shelter

instead of Shenandoah.

7. I also have no idea how many more months I will be locked up. For more than eight

months at Shenandoah, I have not had a hearing to decide if I deserve to return to the shelter

**Exhibit 35
Page 203**

or another place where they give you more freedom. They only come to me to say from time to time that if I behave well the shelter may perhaps accept me again, that the people at the shelter can make that call.

8. The first four months in Shenandoah I behaved well, just as I did in the shelter. But then, after spending so much time locked up like a criminal, I began to have problems with the staff and the other young people detained. Now, for the first time, I take prescription medication for anxiety and to be able to sleep. It's impossible not to feel hopeless, after spending so much time in a place like Shenandoah. Usually I'm quiet. I do not like conflict or violence. But the jail changes you if you want to survive.

I declare under protest to tell the truth that all the information I have provided here is correct and complete, and I am aware of the legal consequences of falsely declaring before the authority.

July 11, 2017 in Staunton, Virginia.

**Exhibit 35**
**Page 204**

DECLARATION OF TRANSLATOR

I, Jorge Medina, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing declaration of ▮▮▮▮▮▮▮ from Spanish into English.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of July, 2017, at Los Angeles, California.

_____
Jorge Medina

**Exhibit 35**
**Page 205**

# Exhibit 36

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 36
Page 206**

## Declaration of ███████████

I, ████████████████ declare and state the following:

1. I am 16 years old.  I first arrived in the United States in June 2016.

2. After I was detained near the Mexican border, I was initially placed in Homestead, a shelter in Miami.  I stayed there for approximately three weeks.

3. About a month later, I was transferred to a staff secure facility in Texas.  My understanding was that I was transferred for drawing gang symbols in a bathroom at the shelter.  Although I had not drawn the gang symbols, I had provided the pencils that the youths who drew them had used.  I took responsibility for drawing the symbols because I did not want to have trouble with those kids later, as they were all bigger than me.

4. I stayed at the staff secure facility for almost two months.  I was then transferred to NOVA, a facility in Alexandria, Virginia that I believed was a jail.  I understood that I had been transferred there primarily because staff had seen a video in which I was making gang symbols while I was talking to another staff from El Salvador.  I am not a member of a gang, but we had been discussing how the gangs had treated us in El Salvador.  I was never given an opportunity to explain this before I was transferred.

5. When NOVA closed, I was transferred to Shenandoah Valley Juvenile Center.  I was not told that I was being transferred to a secure facility for any reason other than the fact that NOVA was closing.  I had not had any behavioral problems at NOVA during the three weeks prior to the transfer.

6. I have been detained at Shenandoah since December 2016.

**Exhibit 36**
**Page 207**

7.  I had been told by my case manager that if I was good for 30 days, I could be transferred to another, less-secure facility.

8.  I had good behavior for the first two months that I was at Shenandoah. I did not get involved in any fights with other kids or staff.

9.  After 30 days had passed with no behavioral issues and no mention of a transfer, I was surprised.  After 60 days had passed with still no word on a possible transfer, I became extremely frustrated.

10. Since I had arrived at Shenandoah, I had spent most of my time in Charlie and Delta Pods, but some of the kids in those pods had tried to pick fights with me.  I asked to be transferred to Alpha Pod because it seemed to me that the kids in that pod had gotten involved in fewer fights. I did not realize at the time that Alpha Pod was where kids with behavioral problems were usually placed.

11. Shortly after I was placed in Alpha Pod, I was pressured by another youth to become involved in a fight with staff.  He told me that if I did not participate, he would have me beat up. Because of his threats, I became involved in a fight in the gym with several of the kids from Alpha Pod and several staff members. After this incident, I was locked in my room for two days and placed in handcuffs for 10 days.

12. A few weeks after this incident, I was approached by another group of youths and urged to initiate a fight with a staff member, and I agreed.

**Exhibit 36**
**Page 208**

13. I became involved in these fights out of both fear for what would happen to
    me if I did not do so and disappointment that my good behavior had not
    resulted in a transfer.

14. I have not had any other incidents with staff since those two incidents, but I
    have been involved in a few fights with other residents.

15. I have had good behavior for the past 39 days, but I have not received any
    information about a possible transfer or review of my case.

16. This statement has been prepared in English but it has been read to me in
    Spanish by a bilingual interpreter.

Executed this 11th day of July, 2017, in Staunton, Virginia



**Exhibit 36**
**Page 209**

DECLARATION OF TRANSLATOR

I, Evelyn Nunez, declare and say as follows:

    1. I am fluent in English and Spanish.

    2. On July 11, 2017, I translated the foregoing to the declarant, who affirmed that he understood the contents thereof prior to signing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April, 2018, at Washington, D.C.

Exhibit 36
Page 210

# Exhibit 37

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 37**
**Page 211**

DECLARACIÓN DE ████████████

Yo, ████████████, declaro y digo lo siguiente:

1. Tengo 17 años de edad. Faltan cuatro meses para cumplir los 18 años. Soy de Honduras. Actualmente me encuentro detenido en Shenandoah Valley Juvenile Hall, en Virginia. Tengo más o menos seis semanas detenido aquí. No me han dicho cuánto tiempo más voy a estar detenido.

2. Vine a los EE.UU. para salvarme la vida de los maras y sicarios en Honduras. También porque una mujer mayor me estaba acosando allí, y para estar con mi mamá, que actualmente vive en Texas. En mi país nunca tuve problemas con la policía. La mara me obligaron dejar mis estudios porque me andaban buscando en el colegio para meterme con ellos. Así que no me quedo ninguna opción más que abandonar a mi país.

3. El 22 de agosto de 2016, entré a los EE.UU. por la frontera con Reynosa, México. Había caminado solito como 16 horas por campo seco, enfermo de sed y de hambre, cuando me arrestó la Patrulla Fronteriza. Me metieron bien feo en una troca grandota y larga, y me llevaron a la instalación de la inmigración, donde me quedé unos dos días. Luego me trasladaron a lo que llamamos "la hielera." Éramos como 20 personas metidos en un solo cuarto, estábamos bien apretados. Me quedé allá como tres días. No había ni campo suficiente para acostarnos, ni colchón ni nada. Los niños chiquitos, padecía del frio, hasta que me quité mi camisa para prestársela a un niño

Exhibit 37
Page 212

aguantando el frío. Luego me mandaron a la perrera. Pasé como dos días allí, y luego me llevaron para IES Casa Norma Linda, en Brownsville, Texas.

4. Nos trataban bien en Norma Linda. Solamente tuve un problema allí, con otro joven detenido. Él era homosexual, y empezó a sentirme incómodo. Le reporté con mi consejera. Le dije que no quería problemas con él ni con nadie. Creo que ella lo tomó a mal, que yo quería pegarle al joven o algo. Como una semana después, me trasladaron a Southwest Key, staff secure, en Brownsville, Texas. Estaba en escuela en Norma Linda un día, cuando de repente me llegaron y me dijeron, "████, ya te vas. Alista tus cosas." Yo pensaba que iba a ir con mi mamá, pero me informaron en el carro que iba a otro albergue. Yo les estaba preguntando porque. Me contestaron que yo no podía estar en esa programa porque yo tenía muchos reportes. Yo les pregunté, ¿Que reportes? porque nunca me avisaron que hubo reportes en mi contra. No me dieron más explicación, ni oportunidad to defenderme. Me puse a llorar frustrado, porque no lo pensé justo que me trasladaran así de repente.

5. En Southwest Key la vida estaba más complicada. El personal nos gritaba con groserías, nos insultaban, llamándonos "putos," o "apúrense culeros." Un estaf de allá le regaló una pluma a unos de los compañeros para que se le pusiera tatuaje. Allí también presencié como agarraban a los menores con brutalidad, tumbándolos al suelo. Yo logré evitar ese maltrato por cuidarme mucho.

-2-

Exhibit 37
Page 213

6. Pasé aproximadamente cuatro meses en Southwest Key. Como al segundo mes, mi mamá se mudó de Kansas a Texas para estar más cerca de mí. Encontró una casa, que se dice que es muy bonita, para recibirme. Siguieron tardando en tomar la decisión de dejarme salir a vivir con ella. Según ella, el gobierno le hizo un estudio de casa, y todo marchó bien.

7. Como en febrero de año presente, me trasladaron a BCFS, otra staff secure en California, donde me quedé hasta octubre, más o menos. En California me regañaban de vez en cuando por usar malas palabras, y por otras cosas pequeñas, pero nunca me avisaron que iban a trasladar por mal comportamiento. Un día tuve un desacuerdo en la cancha de fútbol. Un personal de estaf me acercó de repente. Me sorprendió y sin pensar me reaccioné, pero me acusaron de pegarle. A unos dos días, de repente a las cuatro de la mañana vino el supervisor para decirme que me iban a trasladar a otro programa. Y así llegue a Shenandoah. No me dieron ninguna audiencia ni oportunidad de explicar mi lado de los hechos. No me dieron otra alternativa más de aceptar el traslado a alta seguridad.

8. Shenandoah es cárcel, aunque el personal nos hablan mejor que en Southwest Key. Sin embargo, la vida aquí es muy difícil. Usamos uniformes de preso que huelen mal y que me causan una picazón de alergia. A veces se dificulta un poco no meterse en problemas con los compañeros. No hay mucho que hacer, y uno pasa mucho tiempo aburrido. Normalmente, pasamos casi 13 horas y 45 minutos encerrados con llave en

Exhibit 37
Page 214

nuestros cuartos, y aún más si hay problemas con el comportamiento. Estamos
divididos en como cinco o seis pods, con límite de 10 jóvenes por pod. Nos castigan por
lo que hacen los jóvenes de otro pod, y eso no considero justo. Hay cuatro estaf por pod
que nos cuidan: dos en la mañana y dos en la tarde. De los cuatro que nos cuidan a
nosotros, casi siempre solamente uno, el que trabaja las mañanas, habla español. Así
que es muy fácil que hay mal entendimientos entre los jóvenes detenidos y el estaf.

9. Hasta la fecha he tenido no más una audiencia ante un juez de inmigración, en
Texas. Me explicó el juez mis derechos y que me iban a dar otra corte, y que si no
llegaba con un abogado la orden de deportación sería más probable. Como a los dos o
tres semanas después de llegar en Shenandoah, platiqué con abogada por primera vez
desde que estoy encerrado. Ni en Texas ni en California me dieron abogado. Llegaban
abogados para charlas de nuestros de derechos, pero ninguno para representarme.

Declaro bajo protesta de decir la verdad que toda la información que aquí he
proporcionado es correcta y completa, consciente de las consecuencias legales de
declarar con falsedad ante la autoridad.

Hecho el día __11__ de julio del año 2017, en Staunton, Virginia.



/ / /

-4-

Exhibit 37
Page 215

**DECLARATION OF** ██████████████████

I, ████████████████, declare and say the following:

1. I am 17 years old. It's four months until I turn 18. I'm from Honduras. I am currently being held at Shenandoah Valley Juvenile Hall in Virginia. I have been detained here for six weeks or so. I have not been told how much longer I will be detained.

2. I came to the United States to save my life from the "maras" and assassins in Honduras. Also because an older woman was harassing me there, and to be with my mom, who currently lives in Texas. In my country I never had problems with the police. The "mara" forced me to leave my studies because they were looking for me at school to get me to join them. So I have no choice but to leave my country.

3. On August 22, 2016, I entered the United States by the border with Reynosa, Mexico. I had walked alone for 16 hours on a dry field, thirsty and hungry, when I was arrested by the Border Patrol. They put me very roughly inside in a big and long truck, and they took me to the immigration facility, where I stayed for about two days. Then they moved me to what we call "la hielera" (the freezer). We were like 20 people in one room, we were packed tight. I stayed there for about three days. There was not enough room for us to lie down, no mattresses or anything. There were small children were enduring in the cold, until I took off my shirt to lend it to a young boy. Then they sent me to "la perrera" (the dog kennel). I spent two days there, and then they took me to IES House Norma Linda in Brownsville, Texas.

**Exhibit 37**
**Page 216**

4. They treated us well in Norma Linda. I only had one problem there, with another young man being detained. He was homosexual, and I began to feel uncomfortable. I reported him to my counselor. I told the counselor I did not want problems with him or anyone. I think she took it the wrong way, that I wanted to hit the young man or something. About a week later, I was transferred to Southwest Key, staff secure, in Brownsville, Texas. I was at school in Norma Linda one day, when they suddenly came to me and said, "█████ you're leaving. Pack your things." I thought I was going to go with my mom, but I was informed in the car that I was going to another shelter. I was asking them why. They answered that I could not be in that program because I had too many reports. I asked them, "what reports?" because I was never warned that there were reports against me. They gave me no more explanation or opportunity to defend myself. I started to cry because I was frustrated and also because I did not think it was right that I was suddenly moved.

5. Life in Southwest Key was more complicated. The staff shouted at us with insults, insulting us, calling us "putos," or "apurense culeros." A staff there gave a pen to one of my partners to get a tattoo. There, too, I watched as they grabbed the minors brutally, throwing them to the ground. I managed to avoid that abuse by taking great care of myself.

6. I spent approximately four months at Southwest Key. Around the second month, my mom moved from Kansas to Texas to be closer to me. She found a house, which is said to be very nice, to receive me. They continued to take long making the decision to let me live with her. According to her, the government did a study of the home, and everything went well.

**Exhibit 37**
**Page 217**

7. Around February of this year, I was transferred to BCFS, another secure staff in California, where I stayed until October, more or less. In California I was scolded from time to time for using bad words, and for other small things, but I never was I warned that they were going to move me because of bad behavior. One day I had a disagreement on the soccer field. A staff member approached me suddenly. I was surprised and without thinking I reacted, but I was accused of beating him. About two days later, suddenly at four in the morning the supervisor came to tell me that they were going to move me to another program. And that is how I arrived at Shenandoah. They gave me no hearing or opportunity to explain my side of the facts. I was given no alternative but to accept the transfer to high security.

8. Shenandoah is a jail, though the staff speak to us better than in Southwest Key. However, life here is very difficult. We wear prison uniforms that smell bad and cause me an allergic itch. Sometimes it becomes a little difficult not to get in trouble with our cellmates. There is not much to do, and one spends a lot of time bored. Normally, we spend almost 13 hours and 45 minutes locked in our rooms, and even longer if there are problems with the behavior. We are divided into five or six pods, with a limit of 10 young people per pod. They punish us for what young people do in another pod, and that's not fair. There are four staff that can take care of us: two in the morning and two in the afternoon. Of the four who take care of us, almost always only one, who works the morning, speaks Spanish. So it is very easy that there are misunderstandings among the young people and the staff.

9. To date, I have had only one hearing before an immigration judge, in Texas. The judge

-3-

**Exhibit 37**
**Page 218**

explained to me my rights and that they were going to give me another court date, and that if I did not arrive with a lawyer the deportation order would be more likely. After two or three weeks from arriving in Shenandoah, I spoke to a lawyer for the first time since I've been locked up. Neither Texas nor California gave me a lawyer. Lawyers came to talk about our rights, but none to represent me.

I declare under protest to tell the truth that all the information I have provided here is correct and complete, I am aware of the legal consequences of declaring falsehoods before the authority.

July 11, 2017, Staunton, Virginia.

**Exhibit 37**
**Page 219**

**Translator Declaration**

I, <u>Jorge Medina</u>, hereby declare that I am fluent in English and Spanish.

I hereby certify that I have translated the attached document and to the best of my

knowledge, the attached document is a true, accurate and complete translation of

████████████████ declaration.

Date: <u>July 14, 2017</u>

Signature of translator

Printed Name of translator

Jorge Medina

**Exhibit 37
Page 220**

# Exhibit 38

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 38**
**Page 221**

I, ███████████████████████████, declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.     I was born in Honduras in 2001. My alien # is ████████. I arrived to the United States with my 31 year old sister. We were both detained by customs and I was placed in Casa Norma Linda in Brownsville, Texas. I asked to stay with my sister, but they did not let me. They separated me from her and I have not been able to see her since I have been in custody. From Casa Norma Linda, I was transferred to the Shiloh Regional Treatment Center in Manvel, Texas ("Shiloh"). I was transferred to Shiloh in September 2017.

Witnessed Force Medication

3.     Here in Shiloh, I saw girl receive an injection by force. Her name is ████████████. One time I saw the staff members pin her down and give her an injection in her arm. After receiving the injection, she appeared sedated.

Medication Compliance

4.     I take medication here in the facility. I take 2 pill in the morning and 3 pills at night. I was told by staff members that if I take my medication, Dr. Ruiz would release me and I would be placed on a foster care list. I am not eligible for foster care unless I take my medication and Dr. Ruiz releases me. Dr. Ruiz is the psychiatrist who works here.

PREA Phone

5.     I do not know what a Prison Rape Elimination Act (PREA) phone is or where it is located. The staff have never informed about how to access this phone or how to file a complaint. They did not give me this information upon arrival.

Shared Living Space with non-ORR Detainees

6.     I am currently sharing a room with an "American girl" named ███. She is not one of the girls in ORR custody. We share a room together. She has been in the room with me

1

Exhibit 38
Page 222

1  for about a week. There is another American girl here as well. Her name is ███. She also

2  lives in the home with me, but in a separate room. She has been in Shiloh for about a

3  year.

4

5  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

6  _21_ day of November, 2017, at Manvel, Texas.

7

8

9

10

11     I certify that I am fluent in the Spanish and English languages and that I truthfully

12  and accurately translated the above declaration from English to Spanish for ███

13  ███ before she signed the declaration.

14

15  Dated: November _21____, 2017

16

17

18  Mayra Sandoval

19

20

21

22

23

24

25

26

27

28

2

**Exhibit 38**
**Page 223**

# Exhibit 39

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 39**
**Page 224**

Declaration of █████████████

I, █████████████████ declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.     I was born in Guatemala in 2000. My alien # is ████████████ I speak a Guatemalan dialect called Ixil and Spanish. I have been in the custody of the United States Office of Refugee Resettlement (ORR) since August 15, 2016. I was detained at Southwest Key in El Paso, Texas before being transferred to Shiloh. I have been detained at the Shiloh Regional Treatment Center in Manvel, Texas, since July 5, 2017. Shiloh is a locked facility, and none of the people who live here are free to leave. Before being transferred to Shiloh, I was not told that I was being sent to a treatment facility. The case manager at El Paso told me that I was being sent to a foster home.

Vision Issues

3.     Before August 2015 I lived in Guatemala. I cannot see things that are far away. When I lived in Guatemala I wore glasses that helped me see long distances. Since I have been detained by ORR, I have not had any glasses. The eye doctors have told me I do not need glasses and that I have allergies. The doctors prescribed me eye drops. When I used the eye drops, they caused me pain, burning, and kept me from being able to sleep.

PREA and Telephone Access

4.     I do not know where the Prison Rape Elimination Act (PREA) telephone is located in this facility. I have never heard of a PREA phone or where I can go to file a complaint against anyone in this facility. Also, I am not allowed to talk to my family in private. My conversations are supervised by staff members.

False Report by Staff

5.     When I was at Southwest Key in El Paso, a case worker made a false report about me to my father in Guatemala. She told my father that I had painted gang graffiti on a wall, and that I had been fighting with other detainees. Both of these reports were false.

//

1

Exhibit 39
Page 225

<u>Breach of Confidentiality by My Lawyer</u>

6.    When I was in El Paso I told my lawyer something in confidence about what had happened to me in Guatemala. The lawyer told this information to both my case worker and counselor without my consent or approval.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 21 day of November, 2017, at Manvel, Texas.

████████████████████████████████████████

    I certify that I am fluent in the Spanish and English languages and that I truthfully and accurately translated the above declaration from English to Spanish for ████████

████████ before he signed the declaration.

Dated: November ___21___, 2017

_Mayra Sandoval_
Mayra Sandoval

2

**Exhibit 39
Page 226**

# Exhibit 40

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 40**
**Page 227**

1 | I, ███████████████████████████████, declare as follows:

2

3 | 1.    This declaration is based on my personal knowledge.  If called to testify in this

4 | case, I would testify competently about these facts.

5 | 2.    I am 17 years old. I am from Honduras. I came to the United States because my

6 | father was abusive for many years and there were fights at school that made me afraid.  I

7 | am currently being held in ORR custody in the Shiloh Residential Treatment Facility, in

8 | Texas.

9 | 3.    I was taken into the custody of the Office of Refugee Resettlement ("ORR") in the

10 | summer of 2017. I was held at a shelter that was somewhere near Washington, D.C.

11 | 4.    My potential sponsor is my mother. While I was at the shelter I received news that

12 | my mother received a negative recommendation because she did not have a job and did

13 | not understand my mental health. I felt frustrated and sad because I felt like I would

14 | never leave the immigration center and like I would never reunite with my mother. I

15 | wanted to cry by myself so I stood near a window. The staff panicked and claimed that I

16 | was trying to jump out the window. The staff then grabbed and four people held me

17 | down. Each person held me down by one of my extremities, one on each thigh and one

18 | on each arm. As the staff held me down I struggled against the staff. I tried bite a woman

19 | that was holding my arm, but it was only to try to get the staff off of me.

20 | 5.    I was transferred to Shiloh Residential Treatment Center ("Shiloh") in September

21 | 2017.  The staff at the shelter told me that I was being transferred because the

22 | reunification process with my mother would be faster and easier at the next center. This

23 | was not true. The process to reunify with my mother has still been taking a long time. I

24 | was not told why I was transferred and I did not have an opportunity to object to the

25 | transfer.

26 | 6.    Since I came to Shiloh, I have not had a 30-day review.

27

28

---

1

**Exhibit 40**
**Page 228**

7.    I have been to court one time since I came to the United States. I think there was an attorney there representing all the kids, but I do not remember speaking to an attorney about my case.

8.    At Shiloh, I take six pills in the morning and four pills in the night. One pill in the morning is Prozac, and I am told the other five are vitamins. I am told the four pills I take at night are vitamins. I do not know if my mother gave her permission for me to take the pills.

9.    I have told staff that I do not want to take the medication, but they have told me that I need it and that I will get a report if I do not take it. A report means I would have to stay at Shiloh for thirty more days. I have seen other kids getting reports and having to stay at Shiloh longer because of the reports.

10.    I have been seeing Dr. Ruiz one time a week about my medications. Dr. Ruiz has told me that I am now in a lower level. I do not know what this means. On Tuesday, he said that he "released me." He said that I have gotten better and that there is no reason for me to stay here. He said that I have not got any reports, but that if I was to get a report I would need to stay.

11.    While at Shiloh, I have seen other kids get forced injections. I am not sure how many times. I have seen a girl named ███████ get a forced injection because she was not controlling herself. Two people had to hold her down while she got the injection. She then sat in a chair and fell asleep for about an hour and a half.

12.    Kids at Shiloh are also forced to take a strong medication during the day that makes them fall asleep. I have seen this happen probably three times to a girl named ███████ who came here recently. One time around 11 a.m., we were outside playing and two girls got into a fight and called each other names. I tried to help stop the fight by grabbing one of the girls to take her away. The staff told me not to touch her or I would get a report, which means I would have to stay at Shiloh for 30 more days. The staff then came and got behind the other girl to keep them from fighting. Then, they took ███████ away and gave her a strong pill. I saw her later and she looked weird and dizzy, like she

**Exhibit 40**
**Page 229**

1  was about to fall asleep.  She then came inside and put her head on the desk and fell

2  asleep for about three hours.  When she woke up, she told me she had a headache.

3  13.    At Shiloh, there is a lack of privacy. The doors to our rooms always have to stay

4  open, including at night when we go to sleep. A staff person sits all night in the hallway

5  and monitors us through our open doors. In addition, whenever I speak over the telephone

6  a case manager is always present and the telephone is always on speaker.

7  14.    I am also under constant surveillance. My room has a camera. There are cameras in

8  the hallway of the house where I sleep and in the cafeteria.

9  15.    I do not know where the Prison Rape Elimination Act (PREA) telephone is located

10 in this facility.

11 16.    I was recently told that my case was submitted to the government and that we are

12 waiting on a response. My mother now has a job and understands my mental health. I

13 miss my mother and younger brother so much, and I just want to be with them. It's been

14 five years since I have been without them.  I do not want to be locked up in here.  I would

15 be much happier if I could be with them.

16

17

18 I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

19 1st day of December, 2017, at Manvel, Texas.

20

21  

22

23

24

25

26

27

28

3

Exhibit 40
Page 230

CERTIFICATE OF TRANSLATION

I certify that I am fluent in the Spanish and English languages and that I truthfully and accurately translated the above declaration from English to Spanish before she signed the declaration.

Dated: December 1, 2017

_____

Karina Marquez