CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
          pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>Jefferson B. Sessions, Attorney General, *et al.*,<br><br>                Defendants. | Case No. CV 85-4544-DMG (AGRx)<br><br>EXHIBITS IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT (VOL. 5: EXS. 61-89, PAGES 408-655, REDACTED EXHIBITS ONLY)<br><br>Hearing:   May 18, 2018<br>Time:      9:30 a.m.<br>Room:      1st St. Courthouse<br>               Courtroom 8C |

**REDACTED VERSIONS OF DOCUMENTS PROPOSED TO BE FILED UNDER SEAL**

1

*Counsel for Plaintiffs, continued*

2

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
        ccwhite@ucdavis.edu

ii

1  I, Carlos Holguín, do hereby declare that true and correct copies of the following

2  documents are attached hereto:

3                          INDEX TO EXHIBITS

4
5  <u>No.</u>    <u>Description</u>                                                      <u>Page(s)</u>

6  1    Declaration of the Mother of Nicolás C., February 6, 2018
       (proposed to be filed partially under seal) ............................... 1-10
7
8  2    Declaration of Nicolás C., February 4, 2018 (proposed to be
       filed partially under seal) ..................................................... 11-19
9
10  3   Morrison Paso Case Review re: Nicolás C., September 17, 2017
       (proposed to be filed partially under seal) ............................ 20-26
11
12  4   Custody Order of the Immigration Judge re: Nicolás C.,
       December 19, 2017 (proposed to be filed partially under seal)........... 27-28
13
14  5   Declaration of Leland Baxter-Neal, February 6, 2018 (proposed
       to be filed partially under seal) ............................................. 29-34
15
16  6   Email from Erich Corona re: Nicolás C., January 9, 2018
       (proposed to be filed partially under seal) ............................ 35-38
17
18  7   Declaration of James M. Owens, February 7, 2018 (proposed to
       be filed partially under seal) ................................................. 39-43
19
    8   ORR Interim Guidance re: Custody Hearings, July 18, 2017 ............. 44-55
20
21  9   Declaration of Daniella Q., February 28, 2018 (proposed to be
       filed partially under seal) ..................................................... 56-59
22
    10  Declaration of Isabella M., December 1, 2017 (proposed to be
23     filed partially under seal) ..................................................... 60-63
24
    11  Supplemental Declaration of Isabella M., February 28, 2018
25     (proposed to be filed partially under seal) ............................ 64-68
26  12  Declaration of the Mother of Isabella M., February 28, 2018
       (proposed to be filed partially under seal) ............................ 69-75
27
28  13  Declaration of Victoria R., February 28, 2018 (proposed to be
       filed partially under seal) ..................................................... 76-79

EXHIBITS IN SUPPORT OF MOTION TO
                                         ENFORCE SETTLEMENT
                                         CV 85-4544-DMG (AGRx)

14   Declaration of David I., November 30, 2017 (proposed to be
     filed partially under seal) ................................................................. 80-84

15   Supplemental Declaration of David I., February 28, 2018
     (proposed to be filed partially under seal) ............................................ 85-88

16   Declaration of Eduardo A., March 1, 2018 (proposed to be filed
     partially under seal) ................................................................. 89-93

17   Declaration of Rosa L., December 1, 2017 (proposed to be filed
     partially under seal) ................................................................. 94-97

18   Supplemental Declaration of Rosa L., February 28, 2018
     (proposed to be filed partially under seal) ........................................ 98-100

19   Declaration of Gabriela N., December 1, 2017 (proposed to be
     filed partially under seal) ........................................................... 101-104

20   Supplemental Declaration of Gabriela N., February 28, 2018
     (proposed to be filed partially under seal) ........................................ 105-108

21   Declaration of Arturo S., February 28, 2018 (proposed to be
     filed partially under seal) ........................................................... 109-112

22   ORR Form Notice of Placement in a Restrictive Setting,
     February 5, 2018 ................................................................... 113-115

23   ORR FAQ: July 2017 Bond Hearings for Unaccompanied Alien
     Children (UAC) ................................................................... 116-118

24   ORR FAQ: ORR Directors Release Decision, January 26, 2018 ..... 119-121

25   Letter from Carlos Holguín to Office of Immigration Litigation,
     December 19, 2017 ................................................................... 122-129

26   Email from Sarah Fabian re: Flores Meet and Confer
     Discussion, January 12, 2018 .......................................................... 130-131

27   Letter from Leecia Welch to Office of Immigration Litigation
     re: Psychotropic Medications, and Attachments, January 16,
     2018 (proposed to be filed partially under seal) .............................. 132-161

28   Letter from Carlos Holguín to Office of Immigration Litigation,
     February 16, 2018 ................................................................... 162-164

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

29    Email from Sarah Fabian re: Flores Meet and Confer
      Discussion, March 2, 2018 ............................................................ 165-168

30    Declaration of Javier C., November 15, 2017 (proposed to be
      filed partially under seal) .......................................................... 169-173

31    Declaration of Carlos A., November 16, 2017 (proposed to be
      filed partially under seal) .......................................................... 174-177

32    Declaration of Miguel B., November 16, 2017 (proposed to be
      filed partially under seal) .......................................................... 178-181

33    Declaration of Luis D., November 15, 2017 (proposed to be
      filed partially under seal) .......................................................... 182-192

34    Declaration of Andrés D., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................. 193-197

35    Declaration of Jorge E., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................. 198-205

36    Declaration of Gustavo H., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................. 206-210

37    Declaration of Roberto F., July 11, 2017 (proposed to be filed
      partially under seal) .................................................................. 211-220

38    Declaration of Natalia T., November 21, 2017 (proposed to be
      filed partially under seal) .......................................................... 221-223

39    Declaration of Ricardo U., November 21, 2017 (proposed to be
      filed partially under seal) .......................................................... 224-226

40    Declaration of Sofia O., December 1, 2017 (proposed to be
      filed partially under seal) .......................................................... 227-231

41    Declaration of Gloria P., December 1, 2017 (proposed to be
      filed partially under seal) .......................................................... 232-235

42    Declaration of Edwin B., March 1, 2018 (proposed to be filed
      partially under seal) .................................................................. 236-242

43    Letter from Carlos Holguín to Cynthia Nunes Colbert, et al., re:
      Legal Representation for Specified Class Members, March 12,
      2018 (proposed to be filed partially under seal) .......................... 243-246

v

44    Declaration of Samuel W., October 26, 2017 (proposed to be
      filed partially under seal) ...................................................................247-250

45    Declaration of Jaime V., October 26, 2017 (proposed to be filed
      partially under seal) .........................................................................251-254

46    Declaration of Mateo X., October 26, 2017 (proposed to be
      filed partially under seal) ...................................................................255-256

47    Declaration of Mario Y., October 26, 2017 (proposed to be filed
      partially under seal) .........................................................................257-260

48    Declaration of Maricela J., November 30, 2017 (proposed to be
      filed partially under seal) ...................................................................261-264

49    Declaration of Teresa K., November 30, 2017 (proposed to be
      filed partially under seal) ...................................................................265-268

50    Declaration of Diego E., January 16, 2018 (proposed to be filed
      partially under seal) .........................................................................269-273

51    Declaration of Daniel F., March 21, 2018 (proposed to be filed
      partially under seal) .........................................................................274-278

52    Declaration of Alejandro G., March 21, 2018 (proposed to be
      filed partially under seal) ...................................................................279-285

53    Transcript of Testimony of James De La Cruz, *Saravia v.
      Sessions*, Case No. 3:17-cv-03615-VC (N.D. Cal. June 29,
      2017), Dkt. No. 28 ............................................................................286-382

54    Defendant Brent Cardall's Responses to Plaintiff's Request for
      Admission, Set One, *Saravia v. Sessions*, Case No. 3:17-cv-
      03615-VC (N.D. Cal. Sept. 20-21, 2017), Dkt. No. 61-3 ................383-390

55    Declaration of Camila G., April 3, 2018 (proposed to be filed
      partially under seal) .........................................................................391-396

56    Patient Profile – Active Medications of Victoria R., January 9,
      2018 (proposed to be filed partially under seal) ............................397-398

57    Patient Profile – Active Medications of David I., November 27,
      2017 (proposed to be filed partially under seal) .............................399-400

58    Patient Profile – Active Medications of Rosa L., July 31, 2017
      (proposed to be filed partially under seal) ........................................ 401-402

59    Medication Information and Reconciliation and Over-the-
      Counter Medication Release Forms for Isabella M., September
      28-29, 2017 (proposed to be filed partially under seal).................. 403-405

60    Medication Information and Reconciliation Form for Gabriela
      N., September 7, 2017 (proposed to be filed partially under
      seal)................................................................................................ 406-407

61    Medication Information and Reconciliation Form for Sofia O.,
      September 18, 2017 (proposed to be filed partially under seal) ....... 408-409

62    Yolo County Juvenile Detention Facility Parental Medical
      Authorization Form for Julio Z., December 14, 2016 (proposed
      to be filed partially under seal) ....................................................... 410-411

63    Patient Profile – Active Medications of Julio Z., December 12,
      2016 (proposed to be filed partially under seal) .............................. 412-413

64    Declaration of Julio Z., November 13, 2017 (proposed to be
      filed partially under seal) ................................................................ 414-424

65    Declaration of Sister of Victoria R., March 13, 2018 (proposed
      to be filed partially under seal) ....................................................... 425-431

66    Declaration of Proposed Sponsor of Victoria R., March 13,
      2018 (proposed to be filed partially under seal) .............................. 432-435

67    Declaration of Grandfather of Gabriela N., March 15, 2018
      (proposed to be filed partially under seal) ....................................... 436-441

68    Custody Order of the Immigration Judge re: Santiago H.,
      February 21, 2018 (proposed to be filed partially under seal).......... 442-443

69    Order of the Immigration Judge with Respect to Custody re:
      Santiago H., March 20, 2018 (proposed to be filed partially
      under seal)........................................................................................ 444-446

70    Email from Toby Biswas re: Santiago H. Follow Up, February
      23, 2018 (proposed to be filed partially under seal) ........................ 447-449

vii

71   Case Review re: Santiago H., November 29, 2017 (proposed to be filed partially under seal) ............................................................ 450-452

72   ORR Information Memo re: Community Safety Initiative for the Unaccompanied Alien Children Program, August 16, 2017 ...... 453-457

73   Declaration of John Doe 1, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 17, 2018), Dkt. No. 34-1 .......................................... 458-464

74   Declaration of John Doe 2, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 5, 2018), Dkt. No. 34-2 ............................................ 465-471

75   Declaration of John Doe 3, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH (W.D. Va. Jan. 5, 2018), Dkt. No. 34-3 ............................................ 472-478

76   Declaration of D.M, *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 2, 2018), Dkt. No. 34-5 ............................................................ 479-484

77   Declaration of R.B., *John Doe 1 v. Shenandoah Valley Juvenile Ctr. Comm'n*, Case No. 5:17-cv-00097-EKD-JCH, (W.D. Va. Jan. 8, 2018), Dkt. No. 34-6 ............................................................ 485-490

78   Transcript of Jonathan White, *Saravia v. Sessions*, Case No. 18-15114 (9th Cir. Oct. 27, 2017), Dkt. No. 9-2 .................................... 491-548

79   Exhibit 1 to Appellees' Request for Judicial Notice, *Saravia v. Sessions*, Case No. 18-15114 (9th Cir. March 16, 2018), Dkt. No. 20 ........................................................................................ 549-555

80   Stipulated Settlement Agreement, *Flores v. Reno*, Case No. CV 85-4544-RJK(Px) ................................................................. 556-584

81   Declaration of Justin Mixon, October 19, 2017 ................................ 585-591

82   Email from Sarah Fabian re: Correspondence re: Legal Representation for Flores Class Members, March 23, 2018 ............ 592-594

83   Letter from James De La Cruz to Flores Counsel re: Psychotropic Medications, April 2, 2018 (proposed to be filed partially under seal) .................................................................... 595-601

viii

84      Individual Service Plan – Residential Treatment for Victoria R., Shiloh Treatment Center, Inc., December 26, 2017 (proposed to be filed partially under seal) ................................................................ 602-606

85      Declaration of Lorelei Alicia Williams, previously filed in this case in Docket No. 239-2, August 5, 2016 ...................................... 607-618

86      Declaration of Megan Stuart, previously filed in this case in Docket No. 239-2, August 1, 2016 ................................................... 619-646

87      Declaration of Carlos Holguín, April 10, 2018 ................................ 647-649

88      ORR Authorization for Medical, Dental, and Mental Health Care for Carlos A., July 31, 2017 (proposed to be filed partially under seal)............................................................................................ 650-652

89      Declaration of Carter White, April 14, 2018, attaching Shiloh Treatment Center Consent to Medical Care Form........................... 653-655

EXHIBITS IN SUPPORT OF MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1

2

I declare under penalty of perjury that the foregoing is true and correct.

3

Executed on this 14th day of April, 2018, at Santa Clarita, California.

4

Respectfully submitted,

5

Carlos Holguín

6

/s/ Carlos Holguín

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 61

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 61**
**Page 408**

Shiloh Treatment Center, Inc.                                                          *Office of Refugee Resettlement*
Admission Packet

## Medication Information and Reconciliation
Include all medication the client is currently prescribed.

Client Name                    Date of Completion  9-18-17          Form Completed By  Tabatha Ketner RN

Source of Medication Information:    ☒Pharmacy Label        ☐Parent or Client        ☒Physician Prescription
*Check All That Apply*               ☒Discharge Summary/Records From Transferring Facility    Facility: _____
                                     ☐Other: _____

| Medication at Admission | | | | | | | | | | For Use by Clinic Staff | | |
| Name of Medication | Dose | Frequency | Route | Prescriber | Date Prescribed | Target Symptoms | Last Dose Date | Last Dose Time | Quantity Provided at Admit | Quantity Received at Admit | Order on Admit | Change on Admit | Discontinue on Admit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hydroxyzine HCL | (PRN) 25mg | q4hr | PO | Koshes | 9-1-17 | anxiety | unk | unk | 188 | 188 | | | |
| Fluoxetine HCL | 20mg | daily | PO | Koshes | 9-1-17 | depression | 9/18 | Am | 13 | 13 | Y | N | N |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Tabatha Ketner RN                                                9-18-17
**Parent, Guardian, or Conservator**                              **Date**

**For Use by Clinic Staff**
Review of Medication Conducted By:  Sherri Pitts          Date:  9-18-17   Time:  3:00pm
Physician Approving Medication:   ☐Rafael Guerrero, MD   ☐Victor Oderinde, MD   ☒Javier Ruiz, MD   ☐Vernon Walling, MD
Change in Medication: _____

Rev. 09/10                    *Copy to Medical Chart and Copy Completed Form to Pharmacy*                    R-1

**Exhibit 61**
**Page 409**

# Exhibit 62

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 62**
**Page 410**

## YOLO COUNTY JUVENILE DETENTION FACILITY
## PARENTAL MEDICAL AUTHORIZATION

**DATE OF BOOKING:**   12.14.16                                          **TIME OF BOOKING:**   1525 Hours

| | AGE | BIRTH DATE | GENDER | ETHNICITY | ALIEN NUMBER |
|---|---|---|---|---|---|
| ███ | 16 | ██/2000 | M | Guatemala | ████ |
| **MINOR'S NAME** | | | | | |

**PARENT'S NAME:**   F. Ray Simmons, Institutional Services Director, Guardian        **SOCIAL SECURITY #:**   Not Applicable

**WORK PHONE:**   (530) 406-4706   **HOME PHONE:**   Not Applicable   **CELLULAR PHONE:**   (530) 383-4518

**NAME AND NUMBER OF INSURANCE CARRIER:**   Office of Refugee Resettlement / Div of Unaccompanied Children's Services (ORR/DUCS), Washington, DC

**MEDICAL STATUS:**   ☒ NO   ☐ YES   **POE NUMBER:**   N/A

**DATES OF IMMUNIZATION TO CHILDHOOD DISEASES:**

**POLIO** _____   **DPT** _____   **MMR** _____   **TETANUS BOOSTER** _____

I, *F. RAY SIMMONS, INSTITUTIONAL SERVICES DIRECTOR FOR YOLO COUNTY AND* GUARDIAN FOR THE ABOVE NAMED MINOR, GIVE MY PERMISSION FOR THIS CHILD TO BE EXAMINED, IMMUNIZED, OR TO RECEIVE ANY ROUTINE MEDICAL OR DENTAL CARE RECOMMENDED AND PROVIDED BY A LICENSED PHYSICIAN, NURSE PRACTITIONER OR PHYSICIAN'S ASSISTANT UNDER THE SUPERVISION OF A LICENSED PHYSICIAN, PSYCHIATRIST OR DENTIST DURING THE TIME THIS CHILD IS IN CUSTODY AT THE YOLO COUNTY JUVENILE DETENTION FACILITY. I UNDERSTAND THAT EVERY EFFORT WILL BE MADE TO CONTACT ME IF ANYTHING OTHER THAN ROUTINE TREATMENT BECOMES NECESSARY. I UNDERSTAND THAT I AM PERSONALLY RESPONSIBLE FOR ALL MEDICAL EXPENSES INCURRED BY THIS CHILD WHILE IN CUSTODY. I UNDERSTAND THAT I MAY ARRANGE FOR THIS CHILD TO BE SEEN BY A PRIVATE PHYSICIAN OR DENTIST.

| | | |
|---|---|---|
| 1. | **MEDICATIONS:** | *Depakote ER 500mgs-3500 mgs*<br>*Klonopin 2mgs*<br>*Cogentin 1mg*<br>*Duloxetine 60mg*<br>*Guanfacine 1mg – 3mg*<br>*Latuda 80mgs* |
| 2. | **SPECIAL MEDICAL NEEDS:** | None |
| 3. | **PAST MEDICAL OR PSYCHOLOGICAL CONDITIONS:** | |
| 4. | **ALLERGY INFORMATION:** | NKDA |

**AUTHORIZATION TO PASS OUT TYLENOL (ACETAMINOPHEN)**   **DATE AND TIME:**   12.14.16 @1720

**TYPE OF MEDICAL CONSENT RECEIVED**   ☐ **TELEPHONE CONSENT**   **DATE/TIME** _____
                                       ☒ **WRITTEN CONSENT**   **DATE/TIME**   12.14.16 @1720

WRITTEN MEDICAL CONSENT MUST BE OBTAINED UPON THE FIRST VISIT OF THE PARENT OR GUARDIAN TO THE JUVENILE DETENTION FACILITY OR PROBATION DEPARTMENT. THE WRITTEN CONSENT SUPERSEDES THE VERBAL CONSENT.

| | |
|---|---|
| **DETENTION OFFICER RECEIVING TELEPHONE CONSENT:** | |
| **PARENT'S/GUARDIAN'S SIGNATURE CONSENT:** | *F Ray Simmons by p* 12.15.2016 |
| **SIGNATURE CONSENT WITNESS (DETENTION OFFICER):** | |

JH604 PARENTAL MEDICAL AUTHORIZATION
WHITE - MEDICAL STAFF / PINK - MINOR'S FILE

**Exhibit 62**
**Page 411**

# Exhibit 63

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 63
Page 412**

12/12/2016

## Patient Profile - Active Medications

Client: _____                    Teaching Home: 58-A

Physician: JAVIER RUIZ-NAZARIO, MD

Allergies:

| Rx # | Medication | | Instructions | Start Date |
|---|---|---|---|---|
| | | | *** Psychotropic Medications *** | |
| 53713 | BENZTROPINE | TAB 1MG | TAKE 1 TABLET BY MOUTH DAILY at 9:00 PM | 07/05/2016 |
| 54435 | CLONAZEPAM | TAB 2MG | TAKE 1 TABLET BY MOUTH TWICE A DAY at 7:45 AM and 9:00 PM | 12/12/2016 |
| 54434 | DIVALPROEX | TAB 500MG ER | TAKE 1 TABLET BY MOUTH TWICE A DAY at 7:45 AM and 9:00 PM | 12/12/2016 |
| 53974 | DULOXETINE | CAP 60MG | TAKE 1 CAPSULE BY MOUTH DAILY at 7:45 AM | 09/14/2016 |
| 54427 | GUANFACINE | TAB 2MG ER | TAKE 1 TABLET BY MOUTH DAILY at 7:45 AM | 12/06/2016 |
| 54384 | LATUDA | TAB 120MG | TAKE 1 TABLET BY MOUTH DAILY FOR 4 DAYS THEN INC at 9:00 PM | 11/29/2016 |
| 54385 | LATUDA | TAB 40MG | TAKE 1 TABLET BY MOUTH DAILY (TAKE ALONG WITH 160MG AFTER BEING ON 120MG 4 DAYS) at 9:00 PM | 11/29/2016 |
| | | | *** PRN Psychotropic Medications *** | |
| 53580 | GEODON | INJ 20MG | INJECT 20MG INTRAMUSCULARLY EVERY 8 HOURS AS NEEDED FOR AGGRESSIVE BEHAVIOR | 06/02/2016 |
| 53997 | OLANZAPINE | INJ 10MG | INJECT 10MG INTRAMUSCULARLY EVERY 6 HOURS AS NEEDED SEVERE AGITATION, PHSICAL AGRESSION | 09/20/2016 |
| 53998 | OLANZAPINE | TAB 10MG ODT | DISSOLVE 1 TABLET BY MOUTH EVERY 6 HOURS AS NEEDED FOR AGITATION AND AGGRESSION | 09/20/2016 |
| | | | *** Non-Psychotropic Medications *** | |
| 54399 | MEAL REPLACEMENT SHAKE | | GIVE 1 SHAKE 3 TIMES DAILY (OFFER TO REPLACE A MEAL) at 7:45 AM, 12:00 PM and 6:00 PM | 11/30/2016 |

12/13/16

**Exhibit 63**
**Page 413**

# Exhibit 64

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 64**
**Page 414**

1  I, ████████████████████████████ declare as follows:

2

3  1.    This declaration is based on my personal knowledge.  If called to testify in this

4  case, I would testify competently about these facts.

5  2.    My name is ████████████████████ and I was born on ████████ 2000 in

6  Agua Blanca, Jutiapa, Guatemala. I speak Spanish and am unable to fluently speak, or

7  read English. I began my journey to the United States around January 6, 2016 to escape

8  child abuse, forced child labor, and forced recruitment from gangs in Guatemala. I was

9  only 15 years old when I began my journey. My father severely beat me from the time

10 that I was a young child, and I wanted to find safety, hope, and a new life in the United

11 States.  The journey up through Mexico took about 10 days. I traveled on buses all the

12 way to the U.S. border. I was scared, but I hoped to seek safety and a better life in the

13 U.S.

14 3.    On January 16, 2016, the U.S. Border Patrol apprehended me as I crossed the Rio

15 Grande along the Texas border. I spent one night in the custody of Border Patrol (CBP).

16 The following day, the Office of Refugee Resettlement ("ORR") picked me up in

17 Houston, Texas. I was detained in a place called "Southwest Key," which is located in

18 Houston, Texas.

19 4.    I have been in custody for almost two years. During that time I have been forced to

20 take medication that I do not want to take, handcuffed, and experienced long delays in the

21 reunification process.

22 **Southwest Key**

23 5.    I spent approximately 6 months at Southwest Key. This was the first time in my

24 life I was ever detained. It was a completely new experience. I felt so desperate to get out.

25 I could not sleep at night because I thought about getting out, and I thought about my

26 family and how they were doing. After approximately 1 month of detention, I spoke with

27 my brother and told him that I was going to ask for deportation because I was desperate

28 to get out of detention. My brother told me to stay strong and that the process is not easy

1

**Exhibit 64
Page 415**

1  to get out of detention. I took my brother's advice to heart. I decided to stay and fight for
2  my case.

3  6.     On ▇▇▇▇ 2016, I had my birthday in the detention center. It was very sad to be
4  alone. Some of my family called me from Guatemala and sang to me for my birthday. I
5  wanted so bad to cry but the Southwest Key staff was watching me on the phone and I
6  tried to hold back my tears.

7  7.     Around May 2016, a counselor informed me that my mother was seriously sick
8  back in Guatemala. Because my mom has cholesterol and heart problems I believed that
9  my mom suffered a heart attack. In reaction to the news, I fainted and had a breakdown,
10 to the point where I urinated on myself. I became conscious at a hospital and did not have
11 any idea how I got there. At the hospital, a staff person from Southwest Key told me that
12 my reaction to my mom's illness was not normal. When she said my reaction was not
13 normal I felt confused. I was worried about my mom. I asked her to not tell my mom
14 about my hospitalization because I was afraid that the news would worsen my mother's
15 illness. Someone told my mom that I was hospitalized and I talked with her over the
16 phone. My mom cried during our phone call.

17 8.     A Southwest Key staff member stayed with me at the hospital day and night. The
18 Southwest Key staff member translated for the doctor. Unfortunately, I do not recall what
19 the doctor told me. I felt scared and confused because I did not understand what was
20 happening to me. I spent approximately one week at the hospital, which was located in
21 Texas. My blood pressure was checked and I was connected to an IV drip - which I was
22 told contained a saline solution. I recall seeing the hospital staff inject substances into the
23 IV drip but I didn't know what they were.

24 9.     I was placed in a wheelchair and transferred to another location by ambulance. A
25 Southwest Key staff member was with me and I asked them why I was being transferred
26 but the person told me they didn't know why I was being transferred. There were
27 American children and I saw many with cuts on their wrists. I was sad because this was

28

**Exhibit 64
Page 416**

1    the first time I was detained and surrounded by strangers. I missed my family. I usually

2    sat on the sofa and listened to the radio. I could not tell if it was night or day.

3    10.    I asked the staff at the psychiatry center why I was moved there, but they did not

4    give me an answer. Instead they told me that I was at a psychiatry hospital. My case

5    manager, Pedro, informed me that I would return to Southwest Key. Instead, I was taken

6    to Shiloh in the city of Manvel, in Texas. I later learned that Shiloh is a residential

7    treatment center.

8    **Shiloh**

9    11.    I hated being at Shiloh, it was an awful place. I wanted to return to Southwest Key.

10    Instead, I remained at Shiloh for approximately 6 months and there I became more

11    depressed and anxious. I was forced to take medication that I did not want to take. The

12    staff was very aggressive. On one of the most awful occasions, they threw me down to

13    the ground, held me down for approximately 30 minutes, and injured my elbow.

14    12.    When I arrived at Shiloh I was told to sign a document. No one explained the

15    document and I did not understand what I signed.

16    13.    Shiloh was different from Southwest Key, because it seemed like it was just kids

17    who were being medicated. It included houses for males and females. Each house had 4

18    rooms; each room had approximately 8 beds. All the children at Shiloh received

19    medication. All of us were angry because the staff forced us to take medication.

20    14.    We were told that the medication consisted of vitamins and that we had to take

21    them in order to grow. Staff said that we would not develop normally if we did not take

22    them.

23    15.    In my case, I was forced to take medication twice a day – in the morning and in the

24    afternoon. Most days I received 4 pills and sometimes more. The staff threatened to

25    throw me on the ground and force me to take the medication. I also saw staff throw

26    another youth to the ground, pry his mouth open and force him to take the medicine.

27    16.    They told me that if I did not take the medicine I could not leave, that the only way

28    I could get out of Shiloh was if I took the pills. I only took the medication because I

3

**Exhibit 64
Page 417**

1  wanted to leave the facility. I understood them to mean that I may be detained there
2  forever if I didn't obey them. I never knew exactly what the pills were and was only told
3  they were "vitamins" but I was sure this was not true.

4  17.     My throat hurt from the daily intake of pills. On one occasion, I refused to take the
5  daily dose of medication. That day, the staff forced my mouth open to get me to take the
6  medication. On other occasions, the staff indicated that if I did not take the medication,
7  they would force my mouth open like they did that time. I felt like I had no one to help
8  me and no option but to take the daily medication.

9  18.     After taking the medication, I was more tired, I felt sad and my eyes got teary. I
10 thought more about my family and I felt alone. I felt depressed and stressed.  I began to
11 gain a lot of weight. At the beginning of my stay in Shiloh, I weighed 140 pounds. In
12 approximately 60 days, I gained 45 pounds. I noticed that my shirts were tighter. In an
13 attempt to lose weight, I ran frequently. However, that did not help and it is my belief that
14 the medication I was being given caused my drastic weight gain.

15 19.     I talked to a clinician at Shiloh about my feelings of sadness but she did not help.
16 When I asked her why I was being forced to take the medication, she said that she could
17 not answer my questions because she was not a doctor.

18 20.     About once a week a doctor came to Shiloh.  I tried to ask him why I was being
19 forced to take the medications but he would ignore my questions ask to move on to the
20 next youth he needed to meet with. I wasn't told of any way that I could challenge the
21 decision to be on the medications. As far as I know, no judge or anyone else ever
22 reviewed the decision to have me on the medications.

23 21.     Even outside of forcing us to take medication, the staff at Shiloh was very
24 aggressive.  For example, there was one staff person in particular who forcibly denied us
25 access to water.  There was water located in the living room and the staff person would
26 not allow us to go there; he said we had to stay up front where we could be seen.  If we
27 attempted to leave the area to go and get water, the staff person pushed us.

28

22.     On one occasion, I was inside my room and I wanted water. The water was located outside my room so I asked a staff member if I could go get some water but he said no. I attempted to leave my room three times. Each time he pushed me back inside my room. The third time I held my ground and in response he grabbed me, threw me on the ground, and held me down. While he held me down another staff member came and he put his foot on my face. When the first staff member threw me on the ground I scrapped my elbow very badly and bled a lot. The staff members called a nurse so that she could inject me, because according to them, I needed to calm down. The nurse arrived thirty minutes later and during that time I was held down.  After she injected me, I didn't receive treatment for my elbow. After I was injected I went to the bathroom. A staff member pushed the bathroom door open and as I quickly pulled my pants up I hit my elbow on the door. This aggravated my injury. The injury on my elbow left a scar, and whenever I see it, the scar reminds me of this incident.

23.     Another example of the aggressiveness of the staff members occurred when a phone call I had with my parents went over my allotted time. I think the phone call went over my allotted time for about 3 minutes. A staff member told me to hang up the phone. The staff member grabbed the phone so roughly that the phone broke.

24.     I even saw a staff member once push a 12-year-old so hard that the plaster on the walls cracked. That happened on the last day that the 12-year-old was at Shiloh. I washed a power drink bottle and used it to hold water. The 12-year-old was asking for water so I gave him my bottle.

25.     In addition, the Shiloh staff used crude and offensive language when they addressed me and the other children. The staff said to us "fuck you bitch." The staff told me that they would marry my mother and have sexual relations with her. One of these occasions occurred when I found out my mother was ill. I became angry because of the emotions I was feeling from my mother's illness and confronted the staff.

**Exhibit 64**
**Page 419**

26.     I had many concerns and complaints against staff at Shiloh but I was not aware of a mechanism, such as a confidential locked box, at Shiloh for us to file complaints against the staff.

**Yolo**

27.     I arrived at the Yolo County Juvenile Detention Center in December 2016 and have been detained here ever since. It has been 11 months of misery. My experience at Yolo County Detention Center is even worse than Shiloh. Yolo County Detention is a juvenile jail where we are kept in cells, forced to wear uniforms and treated like criminals. The detention center makes me feel like an animal.

28.     The conditions at the detention center are terrible. The food is bad and it is not uncommon to find hair in the food. When we take showers, the water runs too hot and burns us. If we run out of toilet paper and request more, the staff frequently ignores us or takes a couple of hours to give us the toilet paper. If we request medication for headaches, or other injuries, we are ignored.

29.     I sleep in a locked jail cell. The beds are thin mattresses on top of a block of cement and we don't get pillows. I have a make-shift pillow that I make out of my sweaters or other clothes. When I am sitting at the tables in the common areas I am required to ask permission before I can stand up.

30.     We are allowed outside to see the sun one hour per day, in the morning from approximately 8:00 a.m. to 9:00 a.m. The teachers arrive around 12:15 p.m. School is then in session until approximately 3:00 p.m. Then we spend about half an hour in our rooms until dinner. There is a recess that is supposed to occur at 6:15 p.m, however, frequently the recess is pushed until 7:30 p.m. or 8:00 p.m. The guards rob us of our recess time.

31.     The guards also push us, pepper spray us, and place the handcuffs excessively tight – to the point that wrist injuries frequently occur. If we do not want to go into our rooms, the guards push us into our rooms. I asked the guards why they use pepper spray and I was told that it is for their protection. Although the guards have not used pepper spray on

**Exhibit 64
Page 420**

1  me, the other children that experienced it tell me that they would rather die than
2  experience the burning in their eyes. I live in constant fear that I will be pepper sprayed,
3  especially because I saw the severe effect it has on other children at the detention center.

4  32.    On three different occasions, the guards handcuffed me. My hands were
5  handcuffed behind my back. The guards pushed me down without the opportunity to
6  break my fall. On one occasion, I asked for water. I stretched my leg and the guard
7  pushed me. I banged my head on my way down to the ground. On a different occasion
8  the guards injured my elbow and then handcuffed me despite my injury. I have a scar
9  from this incident and whenever I see it, the scar reminds me of the incident.

10  33.    I and the other children are given $25 per week to place phone calls. I use my
11  allotted money to speak with my brother and my mother. The phone calls are extremely
12  important to me because I derive my strength from my family. I want to eventually work
13  and help my mom.

14  34.    When I speak with my brother on the phone I feel comfortable telling him about
15  my detention conditions. Usually I can only call my brother at 8:00 p.m., however,
16  because my brother is in New York, that is 11:00 p.m. for my brother. I feel bad when I
17  call my brother at 8:00 p.m. because my brother wakes up early to go to work. I asked the
18  guards if I can call my brother at an earlier time, but the guards have not accommodated
19  me.

20  35.    In contrast, when I speak with my mother I am both happy and sad. I am happy to
21  speak with her because my mother raised me and so I feel more trust with her. I feel sad
22  because I miss her. I do not tell her about my detention conditions. I lie to my mother and
23  tell her that everything is okay because I do not want to worry her. My mother always
24  cries and tells me that she does not believe me. I want to work and in turn help my
25  mother. My dream is to study and become an attorney. I want to help children that are
26  also in juvenile detention.

27  36.    In ████ 2017, I turned 17 years of age. It was my second birthday that I celebrated
28  while in detention. I mentioned in passing my birthday to a friend that is also detained

**Exhibit 64
Page 421**

1  with me. My friend remembered my birthday and told the teacher. To celebrate my
2  birthday my teacher then brought pizza for everyone. I received two slices of pizza and
3  everyone else received one slice of pizza. I thanked my teacher, especially because not
4  everyone would do something like this for me. I was also happy because I had not had
5  pizza in a long time. Although the pizza and celebration was nice, it was still hard for me
6  to have another birthday away from my family.

7  37.    The guards frequently yell "cover" which indicates to the rest of us that we have to
8  get on the ground face down with our hands on our heads. The number of times the
9  guards yell "cover" varies on each day, and there were times when the guards yelled
10  "cover" twice in one day.

11  38.    One "cover" incident occurred in the last week of August 2017. The guards also
12  use the chokehold on one of the children. The other children and I laid on the floor face
13  down. We complained, but we could not do much because we feared the use of pepper
14  spray. The guards stated that the use of the chokehold was to keep the child calm.

15  39.    I witnessed another scary "cover" incident that occurred in first week of September
16  2017. A child was getting books when the guard asked the child to go to his room. The
17  incident escalated to the point that the child received injuries on his elbow and on one of
18  his eyes. The rest of us heard the screams of the child. This incident contributed to my
19  fear and the feeling that I will also be thrown down and that the guards will use force
20  against me.

21  **Court Process**

22  40.    Throughout the 6 months that I spent at Southwest Key, I never saw a judge. I was
23  not permitted to attend the one hearing I did have, scheduled for May 23, 2016, because I
24  was hospitalized after my counselor informed me that my mom was seriously ill. My
25  hearing was then rescheduled for approximately 3 months later. Although I entered into
26  ORR custody in January 2016, it was not until August 2016 – after approximately seven
27  months of detention passed – that I first saw an immigration judge.

28

41.     Although I told the Yolo County Juvenile Detention Center staff that I wanted to see a judge, it was not until after I spent approximately 3 months at the detention center that I appeared before an Immigration Judge in San Francisco. So, since the Border Patrol apprehended me in January 2016, I appeared before an Immigration Judge a handful of times.

42.     While I have been detained at Yolo County Juvenile detention center, the ORR has not provided me with the opportunity to review my detention classifications every 30 days as provided by law and they have not allowed my lawyer to participate. At the beginning of my detention, I went two months without a report. I speak with my ORR case manager about why I am here, but I have never gone to a more formal proceeding regarding my detention classification. I have never been told why I am here, had a chance to present any evidence on why I should not be here, or been given any notice of any classification review. Any 30-day review afforded on the basis of Flores Settlement or law has not and is not provided in any way, shape, or form to me.

43.     In total, my detention constitutes approximately 1 year and 11 months. During that time: I appeared before an Immigration Judge a handful of times, I had 3 attorneys, I celebrated two birthdays and one Christmas away from my family.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 13 day of November, 2017, at Woodland, California.

Exhibit 64
Page 423

CERTIFICATE OF TRANSLATION

I, Gladys Hernandez, certify that I am fluent in the Spanish and English languages and

hereby certify that the above information is a true, complete and accurate translation of

████████████████████ Declaration.

Dated: 11/13/2017

_Gladys H_

Gladys Hernandez

Exhibit 64
Page 424

# Exhibit 65

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 65
Page 425**

DECLARACIÓN DE ████████████████

Yo, ███████████████ declaro y digo lo siguiente:

1. Yo soy la hermana de ████████████████ Tengo 29 años de edad.

Vivíamos juntas ██████ y yo en Honduras por los primeros 11 años de su vida. Como soy mayor

de ██████ de unos 15 años, ██████ siempre me ha considerado como segunda madre. Nuestra

mamá murió en enero del año pasado, y el papá de ██████ dejó de verla cuando estaba

pequeña. Yo soy la única familiar que tiene ██████ en los Estados Unidos.

2. A principios de agosto de 2017, me enteré que la inmigración la tenía a ██████

detenida en un albergue en McAllen, Texas, que se llama la Casa Antigua. Inmediatamente

después de saber que la habían detenida a mi hermana, me comuniqué con la inmigración para

pedir el custodio de ██████. Me mandaron unos formularios. Los rellené y se los regresé a la

inmigración dentro de tres días de recibirlos. En una semana más me dieron cita para sacar

huellas digitales en Philadelphia, cerca de donde vivo yo durante los últimos cinco años. El 25 y

el 27 de septiembre llegó una investigadora de casas, una mujer joven, de unos 27 años. Estuvo

ella como una hora y media en mi casa el 25, y unas dos horas el día 27. Me hizo ella muchas

preguntas, revisó toda la casa: baño, cocina, recámaras, todo. Tomó fotos de mí y de la casa.

Me dijo que todo estaba bien, que tenía una casa amplia, y con buena ubicación con escuela

para ██████. A la semana, me llamó para decirme que había salido positivo el estudio de casa.

██████ todavía estaba en el albergue Casa Antigua.

4. A fin de cuentas, se me rehusaron el custodio de ██████. El primero de noviembre de

2017, me llamó Daniel, el supervisor de la Casa Antigua. Me informó que como tenía mi hija,

Marta, 10 años de edad, un caso abierto de abuso infantil, y que me acusan de no protegerla de

Exhibit 65
Page 426

mi ex-pareja, que no sería yo una custodia adecuada para ███. No me dieron ninguna

oportunidad de explicarles que la persona que golpeó a mi hija ya no vivía conmigo o que como

resultado del caso de mi hija, aprendí ser mejor madre y que nada pasaría a ███ si me la

permiten cuidar. No me dieron ninguna opción ni nada.

5. Actualmente ███ está detenida en Shiloh RTC, Texas, donde la mandaron como en

diciembre de año pasado. Cuando ███ estaba en la Casa Antigua nos comunicábamos por

teléfono dos días por semana. Pero no me han permitido hablar con ███ desde que la

mandaron a Shiloh. Una persona de Shiloh le informó a mi hermana en Honduras que no me

iban a permitir llamadas telefónicas con ███ porque mi hija Marta tiene el caso abierto,

pero a mí nadie de Shiloh ni del gobierno me ha dicho nada.

6. Cuando nos permitían comunicarnos, noté que ███ andaba más y más triste y

deprimida a causa de la detención prolongada. Me expresó una desesperación con su condición

de presa. Tengo entendido que la mandaron a ███ para Shiloh porque tras meses de

detención necesitaba atención psicológica. En Honduras ███ había presenciado el asesinato

de nuestro hermano, y es verdad que sufrió un golpe fuerte en ese entonces. Sin embargo, en

Honduras ███ seguía siendo una muchacha tranquila, aunque muy alejada de las personas.

Como a las 13 años, empezó ███ a asistir a la iglesia con su mamá, y se puso mejor y más

abierta, hasta que murió nuestra mamá, y entonces se cayó mucho en la depresión.

7. ███ abandonó a Honduras para México como en marzo del año pasado. No me

dijo nada, hasta que alguien me llamó para informe que habían secuestrado a ███ en

Guerrero, y exigiéndome mil dólares para no matarla a mi hermana y para moverla para

Monterrey, México. Yo no tenía tanto dinero, y tuve que pedir ayuda de la iglesia. Ellos de la

-2-

Exhibit 65
Page 427

iglesia me ayudaron, y logré mandarles el dinero a los secuestradores. Luego me exigieron más

dinero para entregármela a la frontera con McAllen, y otra vez la iglesia me ayudó en juntar el

dinero.

8. En enero, poco después que me habían negado el custodio de ███████, Oscar, el

ayudante del pastor de mi iglesia, se ofreció como custodio para █████. Todavía no han

tomado la decisión, y resulta que █████ sigue detenida en Shiloh sin poder comunicarse

conmigo. Obviamente, █████ ha sufrido demasiado, y solo deseo que el gobierno la libere

pronto y que por fin tenga mi hermana una vida saludable y normal.

Declaro bajo protesta de decir la verdad y pena de perjurio que toda la información que

aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de

declarar con falsedad ante la autoridad.

Hecho el día _____ de mazo del año 2018, en Philadelphia, Pennsylvania.

███████████████

/ / /

-3-

**Exhibit 65**
**Page 428**

DECLARATION OF ████████████████

I, ████████████████████, declare and say as follows:

1. I am ████████████████████████ sister. I am 29 years old. ████████ and I lived together in Honduras during the first 11 years of her life. Inasmuch as I am some 15 years older than ████████, ████████ has always thought of me as a second mother. Our mother died in January of last year, and ████████ father stopped seeing her when she was small. I am the only family ████████ has in the United States.

2. In early August of 2017, I learned that Immigration was detaining ████████ in a shelter in McAllen, Texas, called Casa Antigua. Immediately after I learned that they had detained my sister, I contacted Immigration to ask for ████████ custody. They sent me some forms. I filled those out and returned them to Immigration with three days of receipt. A week later, they gave me an appointment to take fingerprints in Philadelphia, near to where I've lived for the past five years. A home investigator, a young woman about 27 years old, came to my home on the 25 and 27 of September. She was here about an hour and a half on the 25th, and about two hours on the 27th. She asked me many questions, inspected the whole house: bathroom, kitchen, bedrooms, everything. She took photographs of me and my home. She told me that everything was fine, that I had ample house, with a good location with school for ████████. A week later, the investigator called me to say that everything on the home study had come out positively. ████████ was then still at the Casa Antigua shelter.

4. In the end, they refused me ████████ custody. The first of November of 2017, Daniel, the supervisor at Casa Antigua called me. He informed me that because my daughter, Marta, who is 10 years old, had an open child-abuse case, and that they were accusing me of not protecting her from my ex-boyfriend, that I would not be an adequate custodian for ████████. They didn't give me any

**Exhibit 65**
**Page 429**

opportunity to explain to them that the person who hit my daughter no longer lived with me or that as a result of my daughter's case I had learned to be a better mother and that nothing would happen to ███ if they would let me take care of her. They gave me no option or anything.

5. ████ is now detained at Shiloh RTC, in Texas, where the sent her around December of last year. When ████ was at Casa Antigua we spoke over the telephone twice a week. But they haven't allowed me to talk to ████ since they sent her to Shiloh. Someone from Shiloh told my sister in Honduras that they weren't going to permit me telephone calls with ████ because my daughter Marta had an open case, but nobody from Shiloh or the government has told me anything.

6. When they did allow us to talk, I noted that ████ was more and more sad and depressed because of the prolonged detention. She told me she felt desperate over being a prisoner. I understand that they sent ████ to Shiloh because after months of detention she needed psychological care. In Honduras ████ had witnessed our brother's murder, and it is true that she suffered a strong blow at that time. Nonetheless, in Honduras ████ remained a calm girl, although very distant from others. When she was about 13, ████ started attending church with our mother, and she got better and more open, until our mother died, and then she suffered from much depression.

7. ████ left Honduras for Mexico in about March of last year. She didn't tell me anything, until someone called me to say they had kidnapped ████ in Guerrero, and demanded one thousand dollars in order not to kill my sister and to move her to Monterrey, Mexico. I didn't have that much money, and I had to ask for help at my church. The people from the church helped me, and I managed to send the kidnappers the money. The later demanded more money in order to send ████ to the border near McAllen, and again, the church helped me gather up the money.

8. In January, a little time after they had refused me ███████ custody, Oscar, the assistant pastor of my church, offered himself as custodian for ██████. They still haven't made a decision, and as a result ██████ is still detained at Shiloh without the ability to communicate with me. Obviously, ██████ has suffered too much, and I only wish the government would free her soon and that my sister would at last have a healthy and normal life.

I declare under duty to tell the truth and penalty of perjury that all the information that I have provided here is correct and complete, being aware of the legal consequences of declaring falsely before the authorities.

Done this ____ day of March, 2018, in Philadelphia, Pennsylvania.

_____/s/_____
████████████████████████

\* \* \* \* \*

DECLARATION OF TRANSLATOR

I, Carlos Holguín, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing declaration of ████████████ from Spanish into English.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of March, 2018, at Santa Clarita, California.



_____
Carlos Holguín

-3-

**Exhibit 65**
**Page 431**

# Exhibit 66

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 66**
**Page 432**

DECLARACIÓN DE ███████████████

Yo, ████████████████ declaro y digo lo siguiente:

1. Yo soy ciudadano de los Estados Unidos. Soy participante y ayudante del pastor de la iglesia Seventh Day Adventist, donde también participa ███████████ la hermana de ███████████ . Tengo 50 años de edad.

2. Vivo con mi esposa y con mi hija, de 17 años, en Philadelphia. Trabajo como terapista en el departamento de psicología en la clínica de salud mental del condado en Philadelphia. Cuento con entrada adecuada para toda necesidades de ██████ . Tengo una casa con tres recamaras, y contamos con una recámara libre para ██████ . Ni a mi esposa ni a mi jamás nos han arrestado, ni hemos tenido problemas con la policía nunca.

3. En enero del año presente, poco después de que el gobierno se había rehusado a ██████ cuidar a su hermana, inicié el proceso de pedir el custodio de ██████ . Nos presentamos mi esposa y yo en Philadelphia el 2 de marzo para tomar huellas digitales. El viernes pasado, el 9 de marzo, tuve una entrevista telefónica con una trabajadora social. Me hizo ella muchas preguntas, desde que entré a los Estados Unidos hasta la presente. Al terminar la entrevista, me informó ella que todo parecía bien, y que el único problema que pueda existir es que no conocemos a ██████ Yo le comenté que me parecía extraño, porque nadie en los Estados Unidos, aparte de su hermana, conoce a ██████ . No me dio ninguna idea de cuando harían una decisión en cuanto el custodio de ██████ .

Declaro bajo protesta de decir la verdad y pena de perjurio que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día 13 de mazo del año 2018, en Philadelphia, Pennsylvania.

Exhibit 66
Page 433

DECLARATION OF ███████████████

I, ███████████████ declare and say as follows:

1. I am a citizen of the United States. I am member of and assistant to the pastor of the Seventh Day Adventist church, where ███████████, the sister of ███████████, is also a member. I am 50 years old.

2. I live with my wife and my daughter, 17 years old, in Philadelphia. I work as a therapist in the psychology department of a mental health clinic in the county of Philadelphia. My income is sufficient to cover all of ██████ needs. I have a house with three bedrooms, and we have an empty bedroom from ██████. Neither my wife nor I have ever been arrested, nor have we ever had problems with the police.

3. In January of this year, a little after the government had refused to let ██████ take care of her sister, I initiated the process of asking for ███████ custody. My wife and I went to Philadelphia on March 2 to take fingerprints. Last Friday, March 9, I had a telephonic interview with a social worker. She asked me many questions covering when I first entered the United States to the present. When the interview was over, she informed me that everything looked fine, but that that only problem that might exist is that we don't know ██████. I commented to her that this seemed strange, because nobody in the United States, apart from her sister, knows ██████. She didn't give me any idea about when they would make a decision regarding ███████ custody.

I declare under duty to tell the truth and penalty of perjury that all the information that I have provided here is correct and complete, being aware of the legal consequences of declaring falsely before the authorities.

Done this 13th day of March, 2018, in Philadelphia, Pennsylvania.

_____/s/_____
███████████████

**Exhibit 66**
**Page 434**

\* \* \* \* \*

DECLARATION OF TRANSLATOR

I, Carlos Holguín, declare and say as follows:

1. I am fluent in English and Spanish.

2. On this day, I translated the foregoing declaration of ████████████ from Spanish into English.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of March, 2018, at Santa Clarita, California.

_____
Carlos Holguín

-2-

**Exhibit 66**
**Page 435**

# Exhibit 67

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 67**
**Page 436**

1   I, ███████████████, declare as follows:

2

3   1.      This declaration is based on my personal knowledge.  If called to testify in this

4   case, I would testify competently about these facts.

5   2.      I am the grandfather of ████████████████, who is currently

6   detained at Shiloh Residential Treatment Center.

7   3.      I am currently living in a duplex apartment in Oakland, California. I live in the

8   apartment by myself and have two bedrooms. I work every day as a food vendor.

9   4.      I want to be ██████ sponsor because she is my granddaughter and I am her

10  grandfather. We have a very close relationship. I spent a lot of time with ██████ when

11  we both lived in El Salvador. I came to the United States when she was five years old,

12  and have helped to financially support ██████ and her mother ever since. I think I

13  would be a good sponsor for ██████ because I want to take care of her and am able to

14  do so.

15  5.      I have talked with ██████ mom about applying to be ██████ sponsor. She

16  is very supportive of me being ██████ sponsor because I am her grandfather and

17  would take good care of her.

18  6.      I talk to ██████ on the phone for 15 minutes every Friday. I tell her that I hope I

19  will see her soon, that she should behave herself, and not to despair or get upset. She is

20  always happy to talk to me on the phone. Because Texas is very far away from

21  California, I have not been able to go and visit ██████ in person. However, sometimes

22  ██████ social worker helps to set up video calls so that I can see ██████ when we

23  talk.

24  7.      I have never been arrested or charged with a crime in the United States. I have

25  lived here since 2004. When I lived in El Salvador, I was wrongfully arrested by the

26  police and spent two years in jail. I had gone to a house with some friends without

27  knowing that there was a person inside the house who was being held hostage. While we

28  were inside, the police surrounded the house and arrested everyone inside.  Even though I

1

**Exhibit 67**
**Page 437**

explained that I had just gotten there and had nothing to do with the kidnapping, the
police still arrested me. I waited in jail while my lawyer gathered evidence to support my
release. After two years, I appeared in front of a judge and he let me go. I was never
convicted of any crime. My lawyer obtained a "carta de libertad" and I was released.

8.      I don't remember exactly when I initially applied to be ▊▊▊▊ sponsor. In the
fall of 2017 I tried to submit my fingerprints. However, ORR told me that I needed to
submit documentation (the "carta de libertad") from El Salvador that explained my time
in prison. I requested the documentation from El Salvador, and it arrived one month and
eight days later. I immediately submitted it to ORR, and ORR told me to go and get my
fingerprints taken again. I submitted my second set of fingerprints in January 2018. After
I submitted my second set of fingerprints, ORR sent me a lot of information and
scheduled a home study visit.

9.      In February 2018, a home investigator came to my house to conduct a home study.
She asked me a lot of questions and had me fill out a lot of paperwork. I don't think that
the home study went very well, mainly because the home investigator asked me a lot of
detailed questions about finances that I wasn't sure how to answer. I got the impression
that the home investigator didn't think I made enough money to be able to support
▊▊▊▊ and myself. I know I don't make a lot of money, but I make enough to take
care of ▊▊▊▊ She is my granddaughter, and everything I have I will give to her.

10.     The home investigator also asked if I would make ▊▊▊▊ go to school. I support
▊▊▊▊ going to school and getting an education. If she comes to live with me I will
take her to school and I will bring her home from school. I will help her with what she
needs.

11.     When I asked the home investigator what was going to happen after the home
study, she said that I was required to complete an orientation before ▊▊▊▊ could be
released. The home investigator didn't give me any information about how to complete
the orientation. I contacted ORR to ask for orientation information and completed the

2

**Exhibit 67
Page 438**

1  orientation last month. I have not heard anything from ORR since then. I have never

2  received the results of the home study.

3  12.    When I reached out to ███████ social worker at Shiloh, she told me that ORR

4  threw out my application and that they are going to transfer ██████ somewhere else.

5  ORR has never officially told me that they are looking at other sponsors or that my

6  application has been rejected.

7  13.    I believe that I would be the best sponsor for ██████ ██████ has uncles and

8  aunts from her father's side of the family who live in Los Angeles. ██████ father

9  died when she was very young. These uncles and aunts have not spoken with ██████

10 since her father died and do not want to take care of her. I do not think that they would be

11 good sponsors for ██████.

12 14.    ██████ did not take any medications when she lived in El Salvador, and she did

13 not have any mental health problems. Before the home investigator came to do the home

14 study, ██████ social worker texted me to ask if I could afford to buy certain

15 medications if ██████ was released to my care. She said that it would be my

16 responsibility to buy them for her and make sure that she took them. The medications

17 were "Adderall, 20 mg" and "Prozac, 20 mg." ██████ counselor told me that

18 ██████ has to take the medications, otherwise she gets agitated.

19 15.    Up until last week (March 9, 2018), I had never heard ██████ get agitated during

20 any of our weekly phone conversations. I think that being locked up for several months

21 has made her be more anxious and upset. The last time that we talked, she told me that

22 she was starting to feel desperate. I told her not to lose hope and that we are just waiting

23 to see what the government says about me.

24 16.    I have not been contacted by ORR to give permission for ██████ to be given

25 medication.

26

27

28

1  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
2  15th day of March, 2018, at Oakland, California.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 67
Page 440

CERTIFICATE OF TRANSLATION

My name is Rebecca Gudeman and I swear that I am fluent in both the English and Spanish languages and I translated the foregoing declaration from English to Spanish to the best of my abilities.

Dated: March 15th 2018

_____

Rebecca Gudeman

Exhibit 67
Page 441

# Exhibit 68

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 68
Page 442**

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
1901 SOUTH BELL STREET, SUITE 200
ARLINGTON, VA 22202

IN THE MATTER OF:                          FILE: ███████

                              Docket:  ARLINGTON, VA

RESPONDENT                    IN REMOVAL PROCEEDINGS

**CUSTODY ORDER OF THE IMMIGRATION JUDGE**

Request having been made for a change in the custody status of the respondent pursuant to 8 C.F.R.
236.1(c) and having considered the representations of the Department of Health and Human
Services/ORR and the respondent, it is HEREBY ORDERED that:

_____   No Action _____

_____   ORDERED No Jurisdiction _____

_____   ORDERED that the request for a change in custody status be denied.

_____   ORDERED that the request be granted and that respondent be

        released from custody under bond of $_____

✓   OTHER  *R is to "stepped down" to a
less Restrictive Facility as Rec
by the staff
Report At His Facility*

                              JOHN M. BRYANT
                              Immigration Judge          2/Feb/18
*Report At His ___ Facility*                Date:

Appeal: WAIVED / RESERVED  (A / H / B)
Appeal Due By: _____  *② R is not a danger to the
community)*

              CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY: MAIL (M)  PERSONAL SERVICE (P)  FAX (F)
TO:  [ ] ALIEN   [ **P** ] ALIEN c/o Custodial Officer   [ **P** ] Alien's ATT/REP  [ **P** ]/HHS/ORR
DATE: 2/21/18                      BY: COURT STAFF
   Attachments:  [  ] EOIR-33   [  ] EOIR-28   [  ] Legal Services List   [ X ] Other

**Exhibit 68**
**Page 443**

# Exhibit 69

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 69**
**Page 444**

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
ARLINGTON, VA

FILE: ███████████

IN THE MATTER OF:

██████████████████████

RESPONDENT

IN REMOVAL PROCEEDINGS


ORDER OF THE IMMIGRATION JUDGE
WITH RESPECT TO CUSTODY


Request having been made for a change in the custody status of
respondent pursuant to 8 CFR 236.1(c), and full consideration
having been given to the representations of the Department of
Homeland Security and the respondent, it is hereby

_____   ORDERED that the request for a change in custody status be
         denied.

___✓___   ORDERED that the request be granted and that respondent be:

_____   released from custody on his own recognizance

___✓___   released from custody under bond of $ 1,500 _____

_____   OTHER _____


Copy of this decision has been served on the respondent and the
Department of Homeland Security.

APPEAL:  waived -- reserved

ARLINGTON -- ARLINGTON DETAINED LOCATION

Date:  Mar 20, 2018

                              _____
                                   KAREN DONOSO-STEVENS
                                   Immigration Judge

                                                          XS

Exhibit 69
Page 445

NOTICE OF HEARING IN REMOVAL PROCEEDINGS
IMMIGRATION COURT
1901 S. BELL STREET, SUITE 200
ARLINGTON, VA  22202

RE: ███████████   ███████████
FILE: ███████████   ███████████                    DATE:  Mar 20, 2018

TO:
      ███████████   ███████████
      DHS/ICE/FARMVILLE
      P.O BOX N
      FARMVILLE, VA  23901

     Please take notice that the above captioned case has been scheduled for a
VIDEO hearing before the Immigration Judge on Apr 11, 2018 at 08:30 A.M..
The alien will be present via tele/video.  All other parties and witnesses
should report to:

            1901 S. BELL STREET, 4th FLOOR, COURTROOM 15
            ARLINGTON, VA  22202

     You may be represented in these proceedings, at no expense to the
Government, by an attorney or other individual who is accredited to represent
persons before an Immigration Judge.  Your hearing date has not been scheduled
earlier than 10 days from the date of service of the Notice to Appear in order
to permit you the opportunity to obtain an attorney or representative.  If you
wish to be represented, your attorney or representative must appear at the
hearing prepared to proceed.  You can request an earlier hearing in writing.
     Failure to appear at your hearing except for exceptional circumstances
may result in one or more of the following actions:  (1) You may be taken into
custody by the Department of Homeland Security and held for further
action. OR (2) Your hearing may be held in your absence under section 240(b)(5)
of the Immigration and Nationality Act.  An order of removal will be entered
against you if the Department of Homeland Security established by clear,
unequivocal and convincing evidence that you or your attorney have been
provided this notice and you are removable.
     IN THE EVENT YOU ARE RELEASED FROM CUSTODY, WITHIN FIVE DAYS OF YOUR
RELEASE, YOU MUST PROVIDE TO THIS IMMIGRATION COURT A WRITTEN NOTICE/EOIR-33
OF THE ADDRESS AND TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING
THESE PROCEEDINGS.  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES,
WILL BE SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE
CONSIDERED SUFFICIENT NOTICE TO YOU AND THESE PROCEEDINGS CAN GO FORWARD IN
YOUR ABSENCE.
     A list of free legal service providers has been given to you.  For
information regarding the status of your case, call toll free 1-800-898-7180 or
240-314-1500.
_____
                      CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)    PERSONAL SERVICE (P)
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN's ATT/REP  [ ] DHS
DATE: _____ BY:  COURT STAFF _____
     Attachments:  [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other
_____
                                                                  VW

**Exhibit 69**
**Page 446**

# Exhibit 70

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 70**
**Page 447**

**Becky Wolozin**

| | |
|---|---|
| **From:** | Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov> |
| **Sent:** | Friday, February 23, 2018 5:59 PM |
| **To:** | Becky Wolozin |
| **Cc:** | Rachel Nadas; Mansilla, Jessie (ACF) |
| **Subject:** | FW: ▮▮▮▮ Follow Up |

Ms. Wolozin:

Please be aware that the *Flores v. Sessions* decision only applies to the question of dangerousness as it applies to release. An immigration judge's order may be taken under advisement when making a placement decision but is not binding on ORR as it would be on the issue of release. See, ORR Policy Guide, section 2.9 Bond Hearings for Unaccompanied Children:

> "….ORR also takes into consideration the immigration judge's decision in the bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement.[12]"

For a more thorough legal analysis of this issue please review Section IV of ORR's Pre-Hearing Brief in this case.

At this time ORR does not plan to change ▮▮▮▮ placement.

Thank you,

Toby


Toby R. M. Biswas, ESQ.
Unaccompanied Alien Children Policy Supervisor

U.S. Department of Health and Human Services
Administration for Children and Families
Office of Refugee Resettlement
Office of the Director – Division of Policy and Procedures

(202) 205-4440 (O)
(301) 356-5470 (C)
(202) 401-1022 (F)


**From:** Becky Wolozin [mailto:becky@justice4all.org]
**Sent:** Friday, February 23, 2018 5:31 PM
**To:** Mansilla, Jessie (ACF) <Jessie.Mansilla@acf.hhs.gov>
**Cc:** Rachel Nadas <rnadas@justice4all.org>
**Subject:** ▮▮▮▮ Follow Up

Hi Ms. Mansilla,

**Exhibit 70**
**Page 448**

I left you a couple of messages following up on a case regarding a child,             , in Shenandoah Valley Juvenile Center who recently won his Flores bond hearing. The judge determined he was not a danger to the community, thus invalidating any authority to hold him in a secure setting. I am cc'ing my colleague, Rachel Nadas, who will be following up about             s prompt step down next week while I am out of town. Please keep us informed about any development in his transfer to a less secure setting.

Thank you,

Becky Wolozin
Attorney
Immigrant Advocacy Program
Legal Aid Justice Center
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Ph: (703) 720-5606
Cell: (571) 373-0518
Fax: (703) 778-3454
becky@justice4all.org

Exhibit 70
Page 449

# Exhibit 71

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 71**
**Page 450**

**Case Review**

## UAC Basic Information

**First Name:**
███████

**Last Name:**
██████

**AKA:**

**Status:** ADMITTED

**Date of Birth:** ██/2000          **Gender:** M

**A No.:** ████████          **LOS:** 68

**Age:** 17          **Current Program:** Shenandoah Valley Juvenile Center

**Country of Birth:** Guatemala          **Admitted Date:** 11/29/2017

○ 30 day Case Review  ○ Discharge  ○ Transfer          Are there any changes?:  ○ Yes  ● No

**Previous Placement:**
SWK Montezuma 11/20/17 to 11/29/17

**Religious Affiliation:**
None

**Case Manager:**
Emily Twigg

**Clinician:**
Melissa Cook

**Document any new information regarding the UAC not indicated in the UAC Assessment and/or the previous case summary below**

## Medical

**List any allergies:**
UC does not report any allergies.

**Do you feel unwell?**
○ Yes  ● No

**If yes, what are your symptoms?**
N/A

**Additional medical information:**
UC was seen by Dr. Shapcott for an initial medical assessment on 11/30/17. No concerns were raised during this intake. UC received all necessary medical checks at SWK Montezuma. Immunizations received on 11/22/17. HIV testing completed on 11/22/17, results negative.

**Medical History**

| Condition | Yes/NO | Date of Diagnosis/Clarification |
|---|---|---|
| Pregnant | ○ Yes ● No | |
| Tuberculosis | ● Yes ○ No | Positive TB test. UC will not receive LTBI treatment since he will age out before treatment can be completed. |
| Varicella | ○ Yes ● No | |
| Measles | ○ Yes ● No | |
| Mumps | ○ Yes ● No | |
| Rubella | ○ Yes ● No | |
| Asthma | ○ Yes ● No | |
| Diabetes | ○ Yes ● No | |
| Cancer | ○ Yes ● No | |
| Cardiac Issues | ○ Yes ● No | |
| Sexually Transmitted Disease | ○ Yes ● No | |
| Respiratory/Lung Disorder | ○ Yes ● No | |
| Physical Disability | ○ Yes ● No | |

**Medication History**

| Medication | Dosage | Timeframe | Medical Condition |
|---|---|---|---|
| | | | |

## Legal

**Know Your Rights Presentation provided?**  ● Yes  ○ No

**Date:** 12/01/2017

**Legal screening completed?**  ● Yes  ○ No

**Date:** 12/01/2017

Exhibit 71
Page 451

| Any possible legal relief identified? | ○ Yes ◉ No |
|---|---|
| Specify: | Pending further legal consults to determine legal eligibility. |

## Mental Health

Provide a short summary of the UAC's current functioning:

No SIRs this period.

MENTAL HEALTH UPDATE 12/29/18: Minor has been doing well.  He is quiet and observant. He is slowly becoming more relaxed and participates in school and activities with a relish for learning. He recently participated in a school play where he sang songs in English. UC did very well and was proud of his accomplishments but shy for praise. UC stated he has not done anything like this since childhood. Youth continues to present as stable and well balanced. He does not present with any mental health concerns. He gets along well with others and is respectful to his peers and staff.

SIR: UC recanted previous disclosure of gang involvement. UC reported that he was told to say these things to have a better chance at winning a legal case to stay in the United States.

Mental Health Update 1/29/18
Minor continues to do well. He has exemplary behavior. Minor is beginning to show signs of stress and anxiety over his age out. He openly processes this with clinician and clings to hope and positivity as best he can. Minor battles cultural and language barriers on a daily basis. He is aware of this and is beginning to ask more questions and clarify when he does not understand something. This is compared to his early days at SVJC when he agreed with everything and nodded his head in agreement when he did not understand things due to language barriers. Minor works hard in school and is an exemplary young man who responds maturely to harassment or being picked on by peers.
Minor was given a psychological evaluation by Dr. Gustavo Rife. There are no concerns and the minor is not considered a risk after a full evaluation was completed.
Clinician highly recommends that the minor be stepped down as his behavior does not merit secure and his psychological evaluation does not consider him a risk to self or community .

## Psychological Evaluation

| Date of Evaluation: | 1/4/2000 |
|---|---|
| Evaluator: | Dr. Gustavo Rife |
| Axis I: | |
| Axis II: | |
| Axis III: | |
| Axis IV: | |
| Axis V: | |
| Summary of Recommendations: | |

The following Diagnostic Impression,  Summary and Recommendations is taken from the Psychological Evavoation by Dr. Gustavo Rife

"DIAGNOSTIC IMPRESSION
The clinical interview did not find indications of any mental health problems at this time. ███ did not exhibit any antisocial or violent traits, instead was cooperative in his interviewer. It is my opinion within a reasonable degree of psychological certainty that the profile of symptoms present does not meet criteria for any DSM-5diagnosis at this time.
CONCLUDING SUMMARY AND RECOMMENDATIONS
████████ is 17-year-old, Hispanic, male, from Guatemala. Came to the U.S. to find work and, possibly, get an education. ███ acknowledged lying to Immigration Officers about past association with gangs and committing crimes in his country, and he appeared sincerely remorseful and truthful about such false statements. ███ is not at risk to harm others or engage in criminal behavior in the community. He is hoping to reunify with his aunt, ███ who lives in █████ Tennessee, before he ages out on ██████ 2018.
In terms of his functioning, ███ does not present with significant mental health problems that might be of concern at this time. He may, or may not have, a problem with alcohol; however, his drinking does not appear significant as stated during the clinical interview. ███ scored in the Below Average Range of intelligence on a nonverbal intelligence measure. His IQ of 82 fell in the 12th percentile, indicating that he is performing better than 12% of his same-aged peers. ███ 's scores may be somewhat restricted given his personal background, upbringing, language limitations in Spanish. ███ appears to be functioning pretty well given and there is no reason to suspect that he has any specific mental health problem at this time. Given the results of this psychological evaluation, the following recommendations are made:
Placement and Risk:███ will benefit from reunification with his aunt in ██████. He will need some initially transitional supportive services to help him transition into the U.S. culture and to assist with acculturation.
███ does not appear to present a risk to himself or the community at this time."

## Trafficking

**Who planned/organized your journey?**

UC planned his own journey.

**What were you told about the arrangements before the journey?**

His aunt lent him some money.

**Did the arrangements change during the journey?**                                    ○ ◉
                                                                                       Yes No

**If yes, how?**

**Does your family owe money to anyone for the journey?**                               ○ ◉
                                                                                       Yes No

**If yes, how much?**

**Whom is the money owed?**

**Who is expected to pay?**

**What do you expect to happen if payment is not made?**

### Coercion Indicators

**Did anyone threaten your or your family?**                                            ○ ◉
                                                                                       Yes No

**If yes, who made the threats?**

**Exhibit 71**
**Page 452**

# Exhibit 83

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 83
Page 595



ADMINISTRATION FOR
# CHILDREN & FAMILIES
330 C Street, S.W., Washington, DC 20201 | www.acf.hhs.gov

April 2, 2018

*Via email*

Re: *Flores*, et. al., v. *Sessions*, et al., No. CV 8504544 DMG (C.D. Cal.)


Dear *Flores* Counsel:


We have reviewed your letter dated January 16, 2018 regarding the administration of psychotropic medications to unaccompanied alien children (UAC) in the custody of the Office of Refugee Resettlement (ORR) and placed at the Shiloh Residential Treatment Center (Shiloh RTC or Shiloh), including the specific cases that you highlighted (████████████████████ and ████████████████), with ORR. This letter responds to the concerns expressed therein.

## Shiloh Residential Treatment Center

Shiloh RTC is a residential treatment center in Manvel, Texas that cares for children, including UAC in ORR's custody, with a very high level of needs, such as significant mental health problems or violent histories, which require specialized treatment and services. The facility has 44 beds in total, of which 32 are designated for UAC in ORR's custody. As of the date of today's letter, 26 UAC placed by ORR are being housed at Shiloh RTC, which has 4 staff members for every child placed there. Shiloh RTC's program is physically organized in a group of cottages and has a central building where a school is located. Notably, Shiloh RTC is <u>not</u> operated by DayStar Treatment Center (DayStar), which is mentioned in your letter. As of February 2011, Daystar is no longer in operation, and even when it was still in business the licensure of Daystar was completely separate from that of Shiloh.

## Compliance with Texas State Licensing Standards & ORR Monitoring Visits

Shiloh RTC's operations are monitored closely during regular (announced and unannounced) licensing visits and inspections by the State of Texas each year. A licensing visit can cover any topic addressed in the governing Texas Department of Family and Protective Services (TDFPS) Licensing Division's Minimum Standards for General Residential Operations, including most saliently, policy, procedures, and practices concerning the use of psychotropic medication.[1]  Shiloh RTC is required to

---

[1] *See generally* TDFPS' Minimum Standards for General Residential Operations, available at https://www.dfps.state.tx.us/Child_Care/documents/Standards_and_Regulations/748_GRO.pdf (last visited

**Exhibit 83**
**Page 596**

follow strictly any recommendations for corrective action from Texas' licensure process concerning the care of UAC and other children who reside and receive treatment services there.[2]  To ORR's knowledge, Texas state licensing officials have not reported any concerns regarding Shiloh RTC's compliance with state guidelines concerning the administration of psychotropic medications to UAC in ORR's custody.

In addition to complying with mandated state licensing requirements in Texas, Shiloh is also accredited by the Joint Commission on the Accreditation of Hospitals and Organizations (JCAHO), the world recognized leader in the accreditation of health care organizations.  Shiloh's JCAHO accreditation was just renewed for another three-year period in January 2018.  By adhering to JCAHO's heightened national standards, which address in relevant part the administration and use of psychotropic medication, Shiloh exceeds Texas state minimum licensing standards.  Consistent with JCAHO's standard MM.01.01.05, Shiloh RTC developed formal monitoring processes, as well as specific written policies and procedures to monitor the use of psychotropic medications.  These policies and procedures address the following issues, among others:  guidelines for the prescription of emergency psychotropic medication; the use of multiple psychotropic agents in the same class; the use of high-dose pharmacotherapy; the prevention, identification, and management of side effects from the use of psychotropic medication, including tardive dyskinesia.

Further, it is Shiloh's policy that, in addition to monthly reviews of all their medication orders, on at least a quarterly basis, the board certified child and adolescent psychiatrists who contract with Shiloh to provide psychiatric care for UAC (and other residents) review current prescriptions of psychotropic medications using the best practice guidelines set forth in Texas' *Psychotropic Medication Utilization Parameters for Children and Youth in Foster Care*.[3]  Consistent with these guidelines, Shiloh policy requires that psychiatrists treating UAC strive to use no more than four psychotropic medications concurrently, attempt a mono-therapy regimen for identified target symptoms before prescribing a multiple-therapy regimen, and avoid high-dose pharmacotherapy.  The justification for any deviation from these standards must be clearly documented.  Peer reviews may also be conducted to review a multiple-therapy regimen.

Over and above Shiloh's compliance with Texas State licensing and national JCAHO accreditation requirements, and the facility's own policies and procedures, ORR conducts routine Federal monitoring visits and medical reviews, and regularly participates in various treatment meetings concerning UAC placed at Shiloh.  Specifically, biannual Federal monitoring visits are conducted by ORR's Division of Children's Services (DUCS) Monitoring Team, which includes monitoring of

---

March 8, 2018), at page 161 (use of psychotropic medication).  These standards require that Texas state licensed residential facilities comply with Texas Administrative Code Chapter 748, Title 40, Social Services and Assistance, Part 19, Department of Family and Protective Services, Division 7, Use of Psychotropic Medication.
[2] *See* Minimum Standards for General Residential Operations, at page v (Introduction).
[3] *See* Psychotropic Medication Utilization Parameters for Children and Youth in Foster Care (5th Version) (March 2016), available at https://www.dfps.state.tx.us/Child_Protection/Medical_Services/ documents/reports/2016-03_Psychotropic_Medication_Utilization_Parameters_for_Foster_Children.pdf.  The Medication Tables therein were updated in July 2016.  This guidance was developed by the Texas Department of Family and Protective Services and the University of Texas at Austin College of Pharmacy with review and input provided by:  the Federation of Texas Psychiatry, Texas Pediatric Society, Texas Academy of Family Physicians, the Texas Medical Association, and Rutgers University-Center for Education and Research on Mental Health Therapeutics.

**Exhibit 83
Page 597**

Shiloh's procedures for documenting medication use and medical treatment of UAC.  ORR's medical team from headquarters has likewise participated in quarterly conference calls regarding residential treatment centers, and has visited Shiloh, in order to monitor the provision of medical care to UAC by reviewing medical procedures and auditing charts.  Shiloh also provides a spreadsheet for each UAC placed there which ORR uploads into its patient portal and includes all medications whether prescription, non-prescription or emergency PRN ("as needed"), as well as information about when medications are started or stopped and why, and increases/decreases/adjustments to medications. Additionally, the assigned ORR Federal Field Specialist (FFS), who is trained as a clinical social worker, often participates in weekly treatment team meetings at Shiloh where issues concerning medications such as a child's refusal to take medication may be discussed.   During periodic medical reviews, the FFS will participate in clinical discussions with the attending psychiatrist and registered nurse for particularly complex cases.  The FFS also conducts monthly meetings with Shiloh staff and local General Dynamics Information and Technology (GDIT) Case Coordinators (contracted case management staff who provide recommendations on transfers and release) to discuss specific UAC cases at Shiloh which may include a discussion of UAC's medical treatment and the prescription of medication.     Finally, the FFS also conducts quarterly meetings with stakeholders to include ORR headquarter medical staff and the Senior Advisor for Child Well-being and Safety.  Among other topics, these quarterly meetings involve a general review by medical doctors of medical treatment and services provided to UAC, including the prescription of psychotropic medications.[4]

**Informed Consent & UAC Assent**

Shiloh RTC follows applicable Texas state law concerning informed consent pertaining to the prescription of psychotropic medications to children in state residential treatment facilities.  *See* Texas Administrative Code § 748.2253 (use of psychotropic medication).  Under these procedures, if a UAC has a viable sponsor, Shiloh's policy is to inform the sponsor about any changes in medications prescribed for a particular child, including starting a new medication or increasing the dose of a current medication.  Shiloh's policy specifies that informed consent must include an explanation of the following:  benefits; risks; side effects; medical consequences of refusing the medication or recommendation for the medication; and contact information for the prescribing physician. However, there are emergency situations in which psychiatrists may prescribe psychotropic medications to UAC without such consent or court authorization when their extreme psychiatric symptoms render them a danger to themselves or others.  *See* Texas Family Code § 266.009.

**Specific Cases:** ▮▮▮▮▮▮▮▮▮▮ **and** ▮▮▮▮▮▮▮▮▮▮



Turning to the two individual cases mentioned in your letter --▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ –we discuss the specific concerns you highlighted with ORR below.   Notably, neither of these cases raised any issues regarding the prescription of psychotropic medication with the Texas state licensing authorities or the JCAHO accreditation process.   Rather, both UAC, who exhibited serious mental health symptoms while at Shiloh, were prescribed psychotropic medication in compliance with Texas state law and Shiloh's policies and procedures.

---

[4] ORR does not, however, employ child and adolescent psychiatrists who would have the training to scrutinize the specific medications prescribed by Shiloh experts.

**Exhibit 83**
**Page 598**

█████████████████████████

████ was admitted to Shiloh in March 2016 following a psychiatric hospitalization that resulted from his expression of suicidal ideation (jumping from a window of a multi-story building) and threats. He also has a history of severe trauma and has been attacked by gang members, which reportedly put him into a coma for two days and may have resulted in a traumatic brain injury. In the past (2014), ████ says that he actually attempted suicide and shot himself in the head. While placed at Shiloh, he engaged in physically aggressive behavior towards his peers and staff which was unprovoked, and sexually inappropriate behavior with female staff at Shiloh.

████ was prescribed medication by a board-certified child and adolescent psychiatrist who contracted with Shiloh in order to treat his extreme aggressiveness, as well as posttraumatic stress disorder (PTSD) and terrifying nightmares, paranoia, labile mood, and anxiety/depression. Notably, one of the documented goals of family therapy with ████ and his sponsor/mother, which was scheduled for two 45 minute sessions per month, was to understand ████ mental health diagnoses, symptoms, and needs. A goal for ████ mother in therapy was to learn about the psychotropic medication that he was prescribed by his assigned psychiatrist at Shiloh. Further, ████ Service Plan at Shiloh RTC specified that the minor was to be provided medication education in order to ensure that he understood what medications he was prescribed and why. Per this plan, during one medication administration daily, ████ was to be asked to name his medications and state why they were prescribed to him.

Following his discharge from Shiloh RTC on 4/12/2016, ████ was transferred directly to NOVA secure facility in order to stabilize his increasingly aggressive and defiant behavior, such as attacking a vulnerable peer and stabbing a staff member with a pencil – incidents which necessitated the administration of PRN psychotropic medication consistent with Texas law in order to calm ████ down. He was not transferred to Yolo secure until more than five months later on 9/25/2016 and spent several months (from June to September 2016) in the interim placed at Mercy RTC in New York. Psychiatric records from NOVA (where ████ was placed from April to June 2016), including a neuropsychological evaluation performed on 5/9/2016 by an independent psychiatrist, indicate that, at the time, although he was initially uncomfortable with the idea of taking medication, ████ believed his medication regimen to be working to improve his emotional state and he wanted to keep taking the same medications. Upon his discharge from NOVA on 6/6/2016, psychiatric records from that facility likewise reflect a recommendation that ████ continue to take his prescribed psychotropic medications. When he arrived at Mercy RTC the next day (6/7/2016), the psychiatrist's progress notes state that he agreed to continue to take his medications. While at Mercy RTC, ████ experienced suicidal ideation and engaged in self harm, actively hallucinated, as well as disclosed intrusive PTSD related memories from his harrowing trip to the United States, which necessitated an increase in the dosage of certain medications, and switching other medications.

Following his subsequent placement at Yolo secure in late September 2016, medication logs show that ████ assigned psychiatrist gradually added prescriptions to try new psychotropic medications and reduced the dosage for or eliminated others that ████ had already been taking. It was not until later in November 2016 at Yolo that ████ expressed that he did not want to take most of his medications (with the exception of medications for nightmares and sleeping) because he no

**Exhibit 83
Page 599**

longer needed them.  During a weekly therapy session at Yolo on 11/10/2016 just two days after
stopping certain medications psychotropic medications, however, ███ reported to a mental health
clinician that he was experiencing more nightmares, sadness, loneliness, and thoughts of harming
himself by cutting.  Notably, psychiatric records from Mercy RTC where ███ was readmitted in
December 2016 show that ███ was prescribed additional psychotropic medications with his
consent in order to better stabilize his mood and prevent psychosis, as well as lessen his exhibition of
aggressive behavior.

███████████

        When he was transferred to Shiloh RTC in June 2016 on an emergency basis, ███ exhibited
several severe mental health symptoms such as psychosis, paranoia, and hyper-suspiciousness. ███
came to Shiloh not long after an acute psychiatric hospitalization in late April 2016 and had a history
of bizarre catatonic and seizure-like behavior, and depression. While previously hospitalized, ███ had
urinated on himself and attempted to shower with his clothes on.   He arrived at Shiloh with several
psychotropic medications which had been previously prescribed to him at SW Key Mesa, a staff-
secure shelter where he had exhibited oppositional and defiant behaviors, aggression, homicidal
threats, and runaway behavior.  While placed at Shiloh, ███ engaged in physically and verbally
aggressive behavior towards staff and peers, self-injurious behaviors/self-mutilation, as well as
inappropriate sexualized behavior; in total he obtained 26 Special Incident Reports (SIRS) while at
Shiloh for this behavior.

        The board-certified psychiatrist who was assigned to ███ at Shiloh gradually made changes to
███ diagnoses based on his observations of him at Shiloh, and changed his medication regimen
accordingly.  As is permitted by Texas law, ███ also sometimes needed emergency PRN
psychotropic medications at Shiloh in order to curb his highly aggressive behavior, and protect him
and other minors at the facility.  On at least one occasion, ███ *asked* for such medication in order to
help control his extremely volatile mood.  Each new medication or dosage change was carefully
documented and explained to ███ who never refused to take the medication prescribed and was
compliant with his regimen at Shiloh, although he did refuse further medical evaluation later after
being transferred to Yolo secure.  ███ also agreed to allow his therapist at Shiloh to inform his
sponsor mother about his diagnoses and the medications that he was prescribed.   The therapist spoke
to the mother and provided her with psycho-education about ███ mental illness, and she agreed to
take the minor to a psychiatrist in the community to continue his medication if he were released to her
upon his discharge from Shiloh.

        The treating psychiatrist at Shiloh did document side effects that ███ experienced such as
weight gain and made further gradual medication changes in order to alleviate such side effects while
continuing to treat his serious mental health symptoms effectively.  ███ severe psychiatric
symptoms such as psychotic behavior improved incrementally throughout his stay at Shiloh and the
psychiatrist made different adjustments to his medication regimen up until the time of his discharge to
Yolo secure in December 2016.  ███ medical records also indicate that he had been successfully
treated for pneumonia in the past but that, contrary to your letter, testing did not actually confirm that
he had a history of encephalitis.  A brain MRI and EEG given to ███ because of prior reports of
"seizure-like activity" were also negative.

**Exhibit 83
Page 600**

Of note is that records from Yolo secure indicate that ███████ physical and verbal aggression with peers and staff persisted after his transfer to that facility in December 2016, and he regularly engaged in disruptive and defiant behavior there. He also expressed suicidal ideation and exhibited sexually inappropriate behavior. In fact, although the assigned consulting psychiatrist's progress note from 1/5/17 indicated improvement in how ██████ felt with a reduction in his medications and stated he reported that he was calm and cooperative with Yolo staff, a psychological evaluation of ██████ from March 2017 which details 18 separate SIRS that ██████ received since his arrival at Yolo secure which spanned the months of December 2016 through February 2017 seems to suggest otherwise. In that evaluation, the independent licensed clinical psychologist who performed the psychological testing and reviewed various historical medical, psychiatric, and other records concluded that ██████ moderate violence risk would likely decrease if he continued to participate in mental health treatment, including taking prescribed psychotropic medications.

Finally, we note that the cases you cite are older cases from 2016. There is no evidence that the cases are representative of a widespread problem with the medication practices that exist at facilities where ORR places UAC.

Sincerely,

James S. De La Cruz

Senior Federal Field Specialist Supervisor

Office of Office Refugee Resettlement, Division of Children's Services

Exhibit 83
Page 601

# Exhibit 84

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 84
Page 602**

## Individual Service Plan – Residential Treatment
Shiloh Treatment Center, Inc.

Client's Name: ████████████████        Case #: ████████

DOB: ████03        Age: **14**        Gender: **Female**        Race: **Hispanic**

Language: **Spanish**        Nationality: **Honduras**        Alien Number: ████████

DOA: **12-05-17**                                   Date of Service Plan: **12-26-17**

Estimated Length of Stay: **30 days**              ISP Review Interval: **28 days**

Client Placed at Shiloh by: **Office of Refugee Resettlement Department of
Unaccompanied Children**

ORR Program Type: **Subacute**

Completed by: **Erika Slater, BCBA; Juana Medina; Josephine Avila, MA, LPA**

---

**Allergies:**           Drug: Ibuprofen
                         Food: Spicy food, fish, sour cream

**Safety Precautions:**  ████████ was referred to Shiloh Treatment Center for a 30-day psychiatric
                         evaluation following: anxiety with panic attacks and fainting spells.

**Safety Plan:**         Due to her current mental and emotional functioning, the least restrictive
                         environment necessary to care for her needs is in a highly structured
                         residential subacute treatment setting. She should initially have trained
                         staff to provide one-on-one supervision to monitor her as her mood
                         stabilizes.

**Level of Supervision:**   Highest: 1:1
                            Lowest: Close Proximity

**Child-care Services:**

| | | |
|---|---|---|
| Assigned Teaching Home | Daily | Woodhouse |
| Medication Administration | Daily | Lena Broussard, Art Portillo and all staff |
| Medication Education | Daily | Lena Broussard, Art Portillo and all staff |
| Educational Services* | Weekdays | Shiloh School – Reach Campus
George Littleton |
| Social Skills Training | Daily | Lena Broussard, Art Portillo and all staff |
| Recreation and Leisure | Daily | Chesley Sharp, Doug Manning, Alyn Aluotto,
Lena Broussard, Art Portillo and all staff |
| Community Recreation and Leisure | Monthly | Doug Manning, Alyn Aluotto, Lena Broussard,
Art Portillo and all staff |
| Life Skills Training | Daily | Lena Broussard, Art Portillo and all staff |

Revised 11/05/15        *Place Original in Individual Service Plan and Copy to Travel Folder and Medical Chart*

**Exhibit 84
Page 603**

**Service Plan**
Shiloh Treatment Center, Inc.

Client: █████████████████
Case #: ██████████
Date: **12-26-17**

| | | |
|---|---|---|
| Vocational Education | Weekdays | George Littleton |
| Acculturation Services | Weekdays | George Littleton |
| Preparation for Independent Living | Weekdays | George Littleton |
| Sexual Health Education | Monthly | Julie Schultz, LMSW |
| Religious Services | Weekly | Elisandro Sanabria |
| Family Communication | Bi-weekly | Juana Medina, Josephine Avila, MA, LPA |

**Treatment Services:**

| | | |
|---|---|---|
| Medical/Nursing Services | Ongoing | Tabatha Ketner, RN and Angelina Farella, MD |
| Psychotropic Medication Monitoring | Monthly | Javier Ruiz, MD |
| Safety Contract | As Needed | Claudia, Josephine Avila, MA, LPA, Juana Medina, Doug Manning, Alyn Aluotto |
| Behavioral Programming | Continuous | Lena Broussard, Art Portillo and all staff |
| Counseling: Individual | Weekly | Josephine Avila, MA, LPA |
| Counseling: Family | (Frequency) | Josephine Avila, MA, LPA |
| Counseling: Group | Weekly | Ana Grant, LPC-I |
| Case Coordination | Daily | Juana Medina, Josephine Avila, MA, LPA, Micaela Vergara, MSW, LCSW, Marjorie Victor, Nidia Murray |
| Discharge Planning | Ongoing | Juana Medina, Josephine Avila, MA, LPA, Micaela Vergara, MSW, LCSW, Marjorie Victor, Nidia Murray |

**Additional Services and Community Service Providers:**

| | | |
|---|---|---|
| Prescription Medications | Monthly/As needed | First Choice Pharmacy |
| General Dental Care | 90 days/Bi-Annually As needed | Marvin Rodrigue, DDS |
| Guardianship | Ongoing | Office of Refugee Resettlement Micaela Vergara, MSW, LCSW Federal Field Specialist 2900 Louisiana Street Houston, TX 77006 (202) 450-8917 |
| Third Party Case Monitor | Ongoing | NIDIA MURRAY Case Coordinator Nidia Murray |
| Citizenship Status | Ongoing | Undocumented |
| Legal Representation | Ongoing | Cabrini Center |
| Immigration Status | Current | In removal proceedings |
| Sponsor | Ongoing | No viable sponsor |
| Sponsor Language | | Spanish |
| Reunification Status | ☒ No Sponsor Available | Note: _____ |
| | ☐ Searching for Viable Sponsor | Note: _____ |
| | ☐ Sponsor Identified | Note: _____ |
| | ☐ FRP in Process | Note: _____ |
| | ☐ FRP Completed | Note: _____ |
| | ☐ Home Study Requested | Note: _____ |

**Exhibit 84**
**Page 604**

**Service Plan**
Shiloh Treatment Center, Inc.

Client: ███████████████
Case #: ████████
Date: **12-26-17**

☐ Home Study in Progress            Note: _____
☐ Home Study Completed             Note: _____
☐ Release Decision Pending          Note: _____
☐ Negative Release Recommendation   Note: _____
☐ Positive Release Recommendation   Note: _____
☐ Post-Release Services Requested   Note: _____
☐ Post-Release Services Provider Accepted UC   Note: _____

## Present Level of Functioning

Intellectual Functioning:  When compared to others at her age level, ████████ Compresion de Lenguaje, Expresion oral, and Lectura skills are limited (Level 3). Her Escritura skills are very limited (Level 2). Her Habilidad para escuchar skills are negligible (Level 1).

Overall, when compared to others at her age level, ████████ Amplia habilidad en espanol is limited (Level 3). Her Lectura-Escritura skills are limited (Level 3). Her Proficiencia de lenguaje aplicado (the ability to apply listening, speaking, reading, writing, and comprehension abilities in Spanish) is very limited (Level 2). ████████ Lenguage oral skills are very limited (Level 2).

Developmental Functioning:  Unknown, but there is little reason to suspect that there were any developmental delays or other issues with delivery or pregnancy.

## Strengths and Weaknesses

Major Stressors:  Separation from family.
Frustration with lengthy reunification process.
Experiences panic attacks and fainting spells.

Major Strengths:  Has family in the US.
Good academic experience.
Resilient, insightful, and goal oriented.

Skills:  Domestic skills.
Good academic experience.
Good social skills.

Deficits/Barriers to Treatment:  No viable sponsor
Death of her mother
Poor coping skills

## Triggers of Problematic Behaviors:
When she worries due to bad news about her case; when someone is yelling or raising their voices

## Client's Preferred De-Escalation Methods:
Deep breathing; coloring; drawing

**Exhibit 84**
**Page 605**

**Service Plan**
Shiloh Treatment Center, Inc.

Client: ███████████████
Case #: ████████
Date:  **12-26-17**

**Cultural Identity Needs and Acculturation Issues:**
None identified.

**Assessments to be Completed:**
30-Day Treatment Summary due 01-04-18 by Douglas Plaeger, MA, LPC.

**Exhibit 84**
**Page 606**

# Exhibit 88

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**Exhibit 88**
**Page 650**



U.S. Department of Health and Human Services

Office of Refugee Resettlement
Authorization for Medical, Dental, and Mental Health Care, Rev. 11/01/2011

## OFFICE OF REFUGEE RESETTLEMENT
### Division of Children's Services
### AUTHORIZATION FOR MEDICAL, DENTAL, AND MENTAL HEALTH CARE

The Department of Health and Human Service (HHS), Office of Refugee Resettlement (ORR), Division of Children's Services (DCS) is responsible for coordinating and implementing the care and custody of the following minor pursuant to section 462 of the Homeland Security Act of 2002 (6 U.S.C. §279):

| | | | |
|---|---|---|---|
| Minor's Name: | ▓▓▓▓▓▓ | Alien Number: | ▓▓▓▓▓ |
| Date of Birth: | ▓▓ 2000 | Nationality: | El Salvador |

ORR hereby Authorizes , hereinafter "care provider," to arrange medical, dental, and mental health care for said minor under the following terms and conditions:

care provider :    Shenandoah Valley Juvenile Center

### 1. Licensing and Reimbursement

•All medical, dental, or mental health services for the minor will be by a State licensed provider.

•The licensed medical, dental, or mental health provider must be willing to accept the Medicare reimbursement rate, payment on a fee for service basis, or to provide services for no fee.

### 2. Authorization and Notification

•The care provider shall secure authorization from ORR before consenting to any non-emergency medical, dental or medical health services; except for initial medical screening.

•The care provider shall consent to the provision of emergency treatment recommended by a licensed medical, dental, or mental health provider. The care provider shall notify ORR of the emergency immediately following treatment if possible, or within 24 hours after the initial incident.

•Significant surgical or medical procedures require heightened ORR involvement. Please refer to ORR instructions and procedures on medical services requiring heightened ORR involvement in these special cases.

•Minors have the right to be tested for HIV or other sexually transmitted diseases; the care provider shall ensure the minor receives the test(s) as requested.

•The care provider is authorized to dispense over-the-counter medications and prescription

Exhibit 88
Page 651



**U.S. Department of Health and Human Services**

**Office of Refugee Resettlement**
Authorization for Medical, Dental, and Mental Health Care, Rev. 11/01/2011

### 3. Medical and Dental Exams/Screenings

•Minors in care shall receive a medical exam within 48 hours of placement in a care provider program, unless the minor obtained a medical exam within one calendar year and while under the care of another ORR-funded care provider.

•Minors in care shall also receive an initial dental examination within 90 days of placement, but no sooner than their 30th day in the custody of ORR.

### 4. Immunizations

•The care provider shall ensure that all minors in care receive necessary immunizations.

•Females 10 years or older must undergo a quantitative blood pregnancy test, with the minor's consent, before being administered any immunization.

### 5. Medical, Dental, and Mental Health Records/Confidentiality

•Care providers shall (1) obtain copies of all screenings, exams, or testing performed on a minor in care, signed by the licensed health care professional, (2) provide copies to ORR, when requested, and (3) ensure that medical records are maintained in the minor's file.

•All records maintained by the care provider in reference to the minor's health care are the property of ORR. Care providers may not release health information about the minor to any individual or organization without prior express authorization of ORR, except in the following instances: to the minor's educational program or medical, mental health, dental, and other service providers to the extent that the information is needed for the minor's education, recreation, social development.

| | | |
|---|---|---|
| _____  care manager | 07/31/2017 | (540) 886-0729 x.118 |
| Signature - Authorized Representative of Care Provider | Date | Telephone Number |
| _____ | 07/31/2017 | 202-401-5709 |
| Signature - Official Representative | Date | Telephone Number |

**Office of Refugee Resettlement**
**Administration for Children and Families**

1. "Immunizations and Pregnancy Testing." April 2, 2008. http://www.acf.hhs.gov/programs/orr/programs/ORRPolicy420R.pdf

**Exhibit 88**
**Page 652**