CHAD A. READLER
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
     P.O. Box 868, Ben Franklin Station
     Washington, D.C. 20044
     Tel:  (202) 532-4824
     Fax:  (202) 305-7000
     Email:  sarah.b.fabian@usdoj.gov

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544 |
| Plaintiffs, | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT** |
| v. | |
| LORETTA E. LYNCH, Attorney General of the United States; *et al.,* | Hearing Date:  June 29, 2018 |
| Defendants. | Time: 10:00am |
| | Dept: 350 West 1st Street, Los Angeles, CA, 90012, Courtroom 8C, 8th Floor |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   RELEVANT BACKGROUND .............................................................. 1

    A.   Relevant Provisions of the *Flores* Settlement Agreement ........................... 1

    B.   Trafficking Victims Protections Reauthorization Act of 2008 .................... 2

III.  ARGUMENT ....................................................................................... 4

    A.   This Court Cannot Impose Procedural remedies on HHS ........................... 4

    B.   The Court Should Deny Plaintiffs' Motion Because
        Plaintiffs Have Not Established That Defendants Are
        Violating the *Flores* Agreement ................................................................. 6

        i.   ORR's Use of Residential Treatment, Staff-Secure, And
            Secure Facilities is Consistent with the Requirements of the *Flores*
            Agreement ............................................................................. 6

            1.   Residential Treatment Facilities are Licensed Facilities Under
               the Agreement ....................................................................... 6

            2.   Staff-Secure Facilities Are Medium Security Facilities Under
               The Agreement, And ORR uses These Facilities
               in a Manner That is Consistent With the Agreement's
               Terms ...................................................................................... 8

            3.   ORR's Use of Secure Facilities is Consistent with the Terms
               of the Agreement ................................................................... 9

            4.   The TVPRA Governs ORR's Use of Secure
               Facilities ............................................................................. 11

            5.   Plaintiffs Are Asking the Court to Order Review Procedures
               for ORR Placement Decisions That Plainly Go Beyond What
               Was Agreed to by the Parties ............................................... 12

        ii.  ORR's Medication Practices Comply with the *Flores* Agreement .. 13

iii.   ORR's Practices Regarding the Release of Class Members Do Not
Violate the *Flores* Agreement ........................................................ 18

1.   ORR Separates Its Dangerousness Determinations From Its
Determinations Regarding The Suitability Of A Proposed
Sponsor……………………………………………………..18

2.   ORR's Suitability Determinations of Potential Sponsors
Comply with the Agreement ................................................. 19

3.   HHS Has Exclusive Responsibility for Suitability
Determinations Under the TVPRAs ..................................... 24

IV.   CONCLUSION ....................................................................................... 26

## **CASES**

*Abrego Abrego v. The Dow Chemical Co.*,
    443 F.3d 676 (9th Cir. 2006) .................................................................. 11

*Bailey v. Roob*,
    567 F.3d 930 (7th Cir. 2009) .................................................................... 4

*Beltran v. Cardall*,
    222 F. Supp. 3d 476 (E.D. Va. 2016) ...................................................... 19

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) ................................................................................ 11

*City of Las Vegas v. Clark County*,
    755 F.2d 697 (9th Cir. 1985) .................................................................... 4

*Flores v. Sessions*,
    862 F.3d 863 (9th Cir. 2017) ...........................................................*passim*

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ................................................................ 13

*Kelly v. Wengler*,
    822 F.3d 1085 (9th Cir. 2016) .................................................................. 4

*L.V.M. v Lloyd*
    Case No. 1:18-cv-1453 (S.D.N.Y. filed Feb. 16, 2018) ........................ 12

*Reno v Flores*,
    507 U.S 292 (1993) ............................................................................. 5, 6

*Santos v. Smith*,
    260 F. Supp. 3d 598 (W.D. Va. 2017) .................................................. 19,

*Saravia v. Sessions*,
    280 F. Supp. 3d 1168 (N.D. Cal. 2017) ............................................ 10, 11

*Smith v. Sumner*,
    994 F.2d 1401 (9th Cir. 1993) ............................................................. 5, 6

iii

*United States v. Armour & Co.*,
   402 U.S. 673 (1971) .................................................................. 5, 13

*United States v. Asarco Inc.*,
   430 F.3d 972 (9th Cir. 2005) .................................................... 5, 13

*United States v. LeCoe*,
   936 F.2d 398 (9th Cir. 1991) ......................................................... 11

*United States v. N.Y.C. Dist. Council of N.Y.C.*,
   229 F. App'x 14 (2d Cir. 2007) ...................................................... 4

## <u>UNITED STATES STATUTES</u>

8 U.S.C. § 1232(b)(1) ........................................................................ 3

8 U.S.C. § 1232(c)(2)(A) ............................................................... 3, 11

8 U.S.C. § 1232(c)(3) ........................................................................ 3

8 U.S.C. § 1232(c)(3)(A) ................................................... 3, 18, 24, 25

8 U.S.C. § 1232(c)(3)(B) .............................................................. 3, 25

8 U.S.C. § 1232(c)(4) ........................................................................ 3

8 U.S.C. § 1232(c)(5) ...................................................................... 13

## <u>LEGISLATIVE MATERIALS</u>

H.R. Rep. 110-430(I) (2007) ........................................................... 12

## <u>TEXAS STATE STATUTES</u>

Tex. Fam. Code § 266.009 ............................................................... 17

## <u>TEXAS ADMINISTRATIVE CODE</u>

26 Tex. Admin. Code § 748.2253 ............................................. 15, 16, 17

## I.      INTRODUCTION

Plaintiffs return to this Court with a motion to enforce the 1997 *Flores* Settlement Agreement  ("*Flores* Agreement" or "Agreement"), this time asking the Court to enforce and/or order measures never agreed to by the parties, and that are found nowhere within the four corners of the Agreement. Moreover, Plaintiffs ignore Section 235 of the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457 § 235, 122 Stat. 5044, 5074-5082 (Dec. 23, 2008) (codified at 8 U.S.C. § 1232), and further ignore provisions of the Agreement itself that conflict with their allegations of breach. For all of these reasons, and because Plaintiffs fail in any event to meet their burden to show that the U.S. Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR") is not complying with the *Flores* Agreement, Plaintiffs' Motion to Enforce Class Settlement Action, ECF No. 409 ("Motion") should be denied.

## II.      RELEVANT BACKGROUND

### A.      Relevant Provisions of The *Flores* Settlement Agreement

The *Flores* Agreement addresses the procedures and practices that the parties agreed should govern the former Immigration and Naturalization Service's ("INS") discretionary decisions to release or detain these unaccompanied minors, and to whom they should or may be released. *See* Agreement ¶¶ 14-18 (describing the general framework for release of unaccompanied minors from INS custody and the procedures and priorities for release). The "general policy favoring release" provision of the Agreement provides the order of preference for the persons into whose custody these unaccompanied minors should be released. *Id.* ¶ 14. The Agreement further provides that before releasing a minor, the INS may require a "positive suitability assessment[.]"*Id.* ¶ 17. This assessment "may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive,

1

verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor." *Id.*

The Agreement also addresses what to do in a situation where a minor cannot be released and must remain in the custody of the INS. *See Id.* ¶¶ 19-24. In such a situation, the Agreement requires that the minor be placed in a licensed facility. *Id.* ¶ 19. In certain situations where a minor has committed certain crimes, or otherwise been determined to be a danger or an escape risk, the Agreement further allows that he or she "may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors . . . ." *Id.* ¶¶ 21-22. A secure facility should not be used, however, if there is a less restrictive alternative such as a medium-security facility or another licensed program that is "available and appropriate in the circumstances . . . ." *Id.* ¶ 23. The Agreement requires that ORR provide minors with a bond hearing unless waived by the minor. *Id.* ¶ 24A. It also provides that a minor may challenge his or her placement in a particular type of facility "in any United States District Court with jurisdiction and venue over the matter . . . . ." *Id.* ¶ 24B, that the Court is limited to "entering an order solely affecting the individual claims of the minor bringing the action, *id.* and that the "standard of review for the INS's exercise of its discretion for placement decisions shall be the abuse of discretion standard of review." *Id.* ¶ 24C. Finally, "[i]n order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility." *Id.* ¶ 24B.

### B.  Trafficking Victims Protection Reauthorization Act of 2008

The TVPRA was signed into law on December 23, 2008. The TVPRA requires that "the care and custody of all unaccompanied alien children, including responsibility

2

for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). The TVPRA made clear that HHS is responsible for all placement decisions for unaccompanied alien children ("UAC") in its custody, and provides guidelines for the reunification of UAC by HHS, including dictating the requirements for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(c)(3). The TVPRA also requires that UAC may not be:

> placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

8 U.S.C. § 1232(c)(3)(A). In some instances, HHS must conduct a home study for certain UAC before placing the UAC with a proposed custodian. 8 U.S.C. § 1232(c)(3)(B). In the event that the proposed custodian is found to be a suitable custodian to whom an unaccompanied child may be released, the potential custodian must complete a legal orientation presentation addressing their responsibility to ensure the juvenile's appearance at all immigration proceedings, and to protect the child from mistreatment, exploitation, and trafficking. *See* 8 U.S.C. § 1232(c)(4).

The TVPRA further requires that UAC who remain in HHS custody must be "promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(a). It delegates to the Secretary of HHS the authority to make such placement decisions, considering "danger to self, danger to the community, and risk of flight." *Id.* The statute explicitly provides that "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id.* For children placed in a secure facility, the statute also explicitly delegated to the Secretary of HHS the authority to create "procedures" for determining if a less restrictive environment for custody would be

suitable. Specifically, secure placements "shall be reviewed, at a minimum, on a monthly basis, in accordance with procedures prescribed by the Secretary, to determine if such placement remains warranted." *Id.*

### III.   ARGUMENT

#### A.   This Court Should Not Impose Procedural Remedies On ORR.

Plaintiffs incorrectly contend that this Court can impose procedural remedies on ORR. However, the case law relied upon by Plaintiffs establishes no such rule, and none of those cases provides for such procedural remedies in the context of a motion to enforce a settlement agreement. In fact, such coercive remedies designed to ensure future compliance with the Agreement based on the Court's inherent powers to enforce the Agreement and its own orders are available only in the context of a civil contempt proceeding, and not through a motion to enforce the Agreement such as the one filed by Plaintiffs here. *See Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016) (discussing how court-ordered remedies designed to ensure compliance with a settlement agreement, and to cure breach, are properly considered under civil contempt standards). Moreover, to establish that such remedies are required, Plaintiffs must bear the burden of proof of showing a violation by clear and convincing evidence. *See Bailey v. Roob*, 567 F.3d 930, 934-35 (7th Cir. 2009) ("The parties agree that this circuit's case law requires the party seeking sanctions to demonstrate that the opposing party is in violation of a court order by clear and convincing evidence."); *see also United States v. N.Y.C. Dist. Council of N.Y.C.*, 229 F. App'x 14, 18 (2d Cir. 2007).

Plaintiffs' argument on this point also is problematic because Plaintiffs conflate the notion of the Court's power to order procedural remedies with the predicate requirement that consent decrees must be interpreted using general contract principles. *See City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) ("A consent

decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles."); *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) ("[C]ourts treat consent decrees as contracts for enforcement purposes."). Like a contract, a consent decree "must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." *Asarco*, 430 F.3d at 980; *see also United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."). Under these principles, the first question for the Court must be whether ORR is in breach of the plain terms of the Agreement itself. Only if such breach is found can the Court then consider whether any remedy is required for that breach.

Plaintiffs nonetheless ask this Court to read into the *Flores* Agreement certain procedural requirements that are contained nowhere within the Agreement itself, and then to find ORR in breach of the Agreement for failing to follow those allegedly-required procedures and order those same procedures as a remedy for the breach. *See* Motion at 6-10, 22-25. Plaintiffs' only support for this approach is their contention that *Smith v. Sumner*, 994 F.2d 1401 (9th Cir. 1993), stands for the proposition that rights contained in the Agreement are "state-created" and therefore "ORR may not, therefore, deny class members those rights without due process." Motion at 4.

*Smith* is inapplicable here because its holding is limited and establishes only that, in the context of state prison litigation, a consent decree entered into by a state may confer upon a state prisoner a liberty interest under the Fourteenth Amendment. 994 F.2d at 1406. It does not appear that the holding of *Smith* has ever been applied in the context of a federal consent decree, nor is there any basis to expand that holding in such a manner here, particularly because the custody of UAC by HHS is substantially distinguishable from state criminal detention. *See Reno,* 507 U.S at 302 (Custody of unaccompanied

children is not "in the sense of shackles, chains, or barred cells . . . . Nor even in the sense of a right to come and go at will, since . . . juveniles, unlike adults, are always in some form of custody.") (citation omitted).

Moreover, *Smith* was not decided in the context of an enforcement motion, but rather the Court was evaluating the propriety of a jury instruction in an action under Section 1983. In that context, the question before the Court was whether a consent decree had created a liberty interest for the plaintiff such that the denial of that interest without due process was a constitutional violation that could form the basis for his Section 1983 claim. 994 F.2d at 1405. Nothing in *Smith* goes so far as to establish that, in the context of an enforcement motion, a consent decree properly may be read to incorporate procedural due process terms that are not otherwise contained within the Agreement, or that failure to provide such process would constitute a breach of the Agreement.

     **B.**    **The Court Should Deny Plaintiffs' Motion Because Plaintiffs Have Not Established That Defendants Are Violating The *Flores* Agreement.**

        *i.*   *ORR's Use of Residential Treatment, Staff-Secure, And Secure Facilities Is Consistent With The Requirements Of The Flores Agreement.*

            *1.*  *Residential Treatment Facilities Are Licensed Facilities Under The Agreement.*

Plaintiffs argue that ORR violates the *Flores* Agreement by placing class members into "unlicensed" facilities without notice or the opportunity to be heard regarding that placement. The *Flores* Agreement defines "licensed programs" as follows:

The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors.  A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 attached hereto.  All homes and facilities operated by licensed programs, including facilities for special

needs minors, shall be non-secure as required under state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, e.g., cases in which a minor has drug or alcohol problems or is mentally ill.

*Flores* Agreement ¶ 6. A "special needs minor" is "a minor whose mental and/or physical condition requires special services and treatment by staff." *Id.* ¶ 7. As described in the Declaration of Jallyn Sualog, ORR's Acting Deputy Director and the Director of Children's Services, ("Sualog Decl."), May 25, 2018, attached hereto as Exhibit A, ORR's residential treatment centers ("RTCs") serve special needs minors, and therefore qualify as licensed facilities under the terms of the *Flores* Agreement, even though they may provide a slightly more restrictive setting than traditional shelter facilities. Specifically, ORR defines an RTC as a:

> sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services and interventions. Residential treatment centers provide highly customized care and services to individuals following either a community based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. ORR uses a RTC at the recommendation of a psychiatrist or psychologist or with ORR Treatment Authorization Request (TAR) approval for an unaccompanied alien child who poses a danger to self or others and does not require inpatient hospitalization.

Sualog Decl. ¶ 7 (citing ORR Guide, Guide to Terms). Restrictions at RTCs are in accordance with state law, and are necessary to ensure the protections of the special needs minors placed into those facilities. Sualog Decl. ¶ 9. Accordingly, Plaintiffs are incorrect that the use of RTCs denies any class member a licensed placement, and their motion should therefore be denied.

2. *Staff-Secure Facilities Are Medium Security Facilities Under
The Agreement, And ORR Uses These Facilities In A Manner
That Is Consistent With The Agreement's Terms.*

ORR's staff-secure facilities are medium security facilities as defined by the

Agreement. The Agreement defines a "medium secure facility" as follows:

> The term "medium security facility" shall refer to a facility that is operated
> by a program, agency or organization licensed by an appropriate State
> agency and that meets those standards set forth in Exhibit 1 attached hereto.
> A medium security facility is designed for minors who require close
> supervision but do not need placement in juvenile correctional facilities.  It
> provides 24-hour awake supervision, custody, care, and treatment.  It
> maintains stricter security measures, such as intensive staff supervision,
> than a facility operated by a licensed program in order to control problem
> behavior and to prevent escape.  Such a facility may have a secure
> perimeter but shall not be equipped internally with major restraining
> construction or procedures typically associated with correctional facilities.

*Flores* Agreement ¶ 8.

Staff-secure facilities are licensed in the manner required by the *Flores*

Agreement. *See* Sualog Decl. ¶¶ 4 & 6. Staff-secure facilities are "designed for minors

who require close supervision but do not need placement in juvenile correctional

facilities." *Flores* Agreement ¶ 8; Sualog Decl. ¶ 5. They "provide[] 24-hour awake

supervision, custody, care, and treatment." *Flores* Agreement ¶ 8; Sualog Decl. ¶ 5. Staff-

secure facilities "maintain[] stricter security measures, such as intensive staff supervision,

than a facility operated by a licensed program in order to control problem behavior and to

prevent escape." *Flores* Agreement ¶ 8; Sualog Decl. ¶ 5. Finally, staff-secure facilities

"have a secure perimeter but [are not] equipped internally with major restraining

construction or procedures typically associated with correctional facilities." *Flores*

Agreement ¶ 8; Sualog Decl. ¶ 5. The *Flores* Agreement prefers the use of staff-secure

facilities over secure facilities where "appropriate in the circumstances," *Flores*

Agreement ¶ 23, and requires that "Defendants shall provide minors not placed in

8

licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility." *Id.* ¶ 24.C. ORR provides such notice. *See* Sualog Decl. ¶ 11. Plaintiffs point to nowhere in the *Flores* Agreement that requires notice and an opportunity to be heard regarding such placements, as they contend should be required. This Court should not read these additional requirements into the *Flores* Agreement.

Plaintiffs also are incorrect in their assertion that ORR's Notice of Placement in a Restrictive Setting ("Notice") establishes that ORR is not complying with the *Flores* Agreement with regard to placement of UAC into staff secure facilities. *See* Motion at 10-11. The reasons provided in the Notice show that a placement in a medium secure or staff secure facility is "appropriate in the circumstances" as is required by Paragraph 23 of the Agreement. *See* Sualog Decl. ¶ 11. For UAC placed in such a staff secure facility, the Notice indicates that those UAC require close supervision but do not require placement in a secure care provider facility. *Id.* Plaintiffs have provided no other reason to find that ORR is placing minors into staff-secure facilities in a manner that fails to comply with the Agreement. Thus Plaintiffs have provided no basis to find that ORR's use of staff-secure facilities violates the *Flores* Agreement, and their motion should be denied.

### 3. *ORR's Use Of Secure Facilities Is Consistent With The Terms Of The Agreement.*

Paragraph 21 of the *Flores* Agreement describes circumstances under which minors may be held in or transferred to secure facilities (e.g., juvenile detention facilities) that are not licensed programs within the meaning of the Agreement (although they are licensed by the State in which they are located). Per the Agreement, a minor may be placed in such a secure facility when it is determined that the minor "has been charged

with, is chargeable,[1] or has been convicted of a [non-isolated or petty] crime, or is the subject of delinquency proceedings." *Flores* Agreement, ¶ 21. A minor's secure placement also is permissible under the Agreement where it may be shown that the minor: "has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;" "has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others . . . ;" "is an escape-risk;" or "must be held in a secure facility for his or her own safety, such as when INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees." *Id.*

The reasons provided in ORR's Notice regarding secure placement satisfy the specific criteria set forth in Paragraph 21 of the Agreement. *See* Sualog Decl. ¶ 11. In particular, for UAC placed in a secure provider facility, the Notice clearly indicates several circumstances that demonstrate that those UAC pose a danger to self or others or have been charged with having committed a criminal offense. *Id.* Moreover, as discussed above with regard to staff-secure facilities, the *Flores* Agreement requires that ORR provide this Notice, but does not provide for the type of "notice and opportunity to be heard" that Plaintiffs are asking this Court to read into the Agreement. Thus, Plaintiffs have not shown that ORR is in breach of the Agreement with regard to its use of secure facilities.[2]

---

[1] As used in Paragraph 21 of the *Flores* Agreement, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense.
[2] Plaintiffs' discussion of *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), also provides no basis to find that ORR is in violation of the *Flores* Agreement. The Court in *Saravia* was looking at the due process rights of minors who had previously been released from ORR custody with regard to their re-arrest by U.S. Immigration and Customs Enforcement ("ICE"), and the *Saravia* hearings that result from that Court's

### 4.   *The TVPRA Governs ORR's Use Of Secure Facilities.*

In any event, there is good reason for the Court to find that with regard to secure facilities, it is the TVPRA and not the *Flores* Agreement that governs ORR. Plaintiffs' Motion, however, entirely fails to acknowledge that the TVPRA plainly establishes the situations under which UAC may be placed into a secure facility, and further establishes review procedures for such placements. *See* 8 U.S.C. § 1232(c)(2)(A) ("A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense. The placement of a child in a secure facility shall be reviewed, at a minimum, on a monthly basis, in accordance with procedures prescribed by the Secretary, to determine if such placement remains warranted."). Based on the plain language of the TVPRA, it can reasonably be found that the TVPRA, and not the *Flores* Agreement, governs the processes by which ORR places UAC into secure facilities and reviews those placements.

It is clear that Congress intended the procedures of the TVPRA to govern this process. When Congress enacted the TVPRA, it knew the currently-existing law and procedures governing the placement of UAC into secure facilities. *See, e.g.,Flores v. Sessions*, 862 F.3d 863, 875 (9th Cir. 2017) (noting the Court's obligation to interpret statutes with the assumption that Congress is aware of the legal context in which it is legislating); *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 683-84 (9th Cir. 2006) ("Faced with statutory silence on the burden issue, we presume that Congress is aware of the legal context in which it is legislating.") (citing Cannon *v. Univ. of Chi.*, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law . . . ."); *United States v. LeCoe*, 936

---

preliminary injunction order look at the question of whether ICE had sufficient evidence of changed circumstances related to danger at the time of arrest to take those minors back into ICE custody. *Id.* at 1197.

F.2d 398, 403 (9th Cir. 1991) ("Congress is, of course, presumed to know existing law pertinent to any new legislation it enacts."). Further, Congress stated that in enacting the TVPRA it intended to "improve[] procedures for the placement of unaccompanied children in safe and secure settings." *See* H.R. REP. 110-430(I); 154 Cong. Rec. H10888-01. Where Congress modified the provisions of the Agreement through the TVPRA by squarely addressing the issue of secure placements for UAC and providing the permissible bases for such placements as well as a procedure by which ORR conducts regular reviews of that placement, then it can be concluded that the TVPRA governs such placements. *See Flores* 862 F.3d at 865 (noting that in enacting the TVPRA "Congress . . . had the opportunity to address, and to explicitly modify if it wished to do so, any provisions of the Settlement[.]"). To the extent Plaintiffs wish to challenge the sufficiency or constitutionality of the process and procedures provided by Congress in the TVPRA, and implemented by ORR, they should do so in separate litigation,[3] and not through a motion to enforce the *Flores* Agreement.

> 5. *Plaintiffs Are Asking The Court To Order Review Procedures For ORR Placement Decisions That Plainly Go Beyond What Was Agreed To By The Parties.*

The *Flores* Agreement makes clear the parties' agreement regarding the proper avenue for review of ORR's placement decisions. Specifically, the parties agreed that "Any minor who disagrees with the INS's determination to place that minor in a particular type of facility . . .  may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination . . . ." *Flores* Agreement ¶ 24.B. As explained above and in the attached Declaration of Jallyn Sualog, ORR provides notice in accordance with Paragraph 24.C in

---

[3] This issue has been raised in litigation currently pending in the U.S. District Court for the Southern District of New York. *See L.V.M. v. Lloyd*, Case No. 1:18-cv-01453 (S.D.N.Y.).

order to permit such judicial review. *See* Sualog Decl. ¶ 11. Plaintiffs nonetheless ask this Court to ignore the plain language of the Agreement because, they contend, "suing in federal court" is not "a viable remedy." Motion at 9. This argument ignores the important requirement that a settlement agreement should be construed according to its plain terms. *Asarco*, 430 F.3d at 980; *Armour*, 402 U.S. at 681.

Plaintiffs cannot ask this Court to find the Government in breach of the *Flores* Agreement, and to order the Government to comply with procedural requirements that are found nowhere within the four corners of the *Flores* Agreement, simply on the basis that they now believe that the review procedures they agreed to are no longer "a viable remedy." To the extent that Plaintiffs contend that this review is not "viable" because UAC do not have sufficient access to counsel to pursue these remedies, Plaintiffs point to nothing in the Agreement that suggests that the parties' agreement to these terms was based on any requirement that the Government would provide such counsel, or that such agreement was contingent on access to counsel in any way.[4] If Plaintiffs wish to change the terms of the *Flores* Agreement they must do so by filing a motion to amend the Agreement, and not through a motion to enforce. For the purpose of the instant Motion, the Court should find that ORR complies with the *Flores* Agreement with regard to its use of residential treatment, staff-secure, and secure facilities. Thus there is no basis to find that ORR is in breach of the Agreement and Plaintiffs' motion should be denied.

ii.   *ORR's Medication Practices Comply With The Flores Agreement.*

The *Flores* Agreement requires that "Licensed programs shall comply with all applicable state child welfare laws and regulations[,]" and that as part of this requirement, ORR:

---

[4] The TVPRA likewise contains no requirement that ORR provide counsel to UAC in the manner suggested by Plaintiffs. *See* 8 U.S.C. § 1232(c)(5); *see also J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016).

13

shall provide or arrange for the following services for each minor in its care:

***

2. Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

*Flores* Agreement, Exhibit 1, ¶ A.2. Plaintiffs allege that ORR fails to comply with this provision of the Agreement in its provision of psychotropic medications to some class members. However, there is good reason for this Court to conclude that ORR's provision of such medications complies fully with "all applicable state child welfare laws and regulations" and therefore is in compliance with the *Flores* Agreement.

To start, to the extent Plaintiffs appear to ask this Court to independently determine what provision of psychotropic medication is "appropriate", this Court should decline to do so. As evidenced by the terms of the Agreement, the parties agreed that the provision of "appropriate" medical care falls under the requirement that such care be provided in accordance with "all applicable state child welfare laws and regulations[.]" *Flores* Agreement, Exhibit 1, ¶ A.2. Thus, it should be concluded that the parties intended that what is "appropriate" in this context should be determined by looking at what "applicable state child welfare laws and regulations" require. This is particularly true where, as here, the Agreement contains no additional specific language to guide the Court in evaluating what the parties meant with regard to the "appropriate" provision of medications in this context. To find otherwise would open the door for this Court to evaluate any number of details of the services required under *Flores* Agreement, Exhibit 1, ¶ A, such as the meanings of "proper physical care and maintenance," ¶ A.1, or

14

"educational services appropriate to the minor's level of development, and communication skills," ¶ A.4. This Court should decline to make such in depth evaluation of the Agreement's requirements, particularly in an area such as medical care where there exist "applicable state child welfare laws and regulations" against which to measure ORR's compliance.

This Court further should not conduct its own evaluation into what "applicable state welfare laws and regulations" require with regard to the prescription of psychotropic medications to UAC in ORR custody, as Plaintiffs appear to invite the Court to do. Rather the Court should rely on the State's own evaluation of whether the provision of these medications at ORR facilities complies with these requirements. Nothing in the Agreement requires this Court to independently evaluate such compliance, and the applicable state authorities are in a better position than this Court to make such a determination.

Notably, as explained in the attached declaration of Jalyn Sualog, the operations of Shiloh Residential Treatment Center ("Shiloh RTC" or "Shiloh"), which "cares for children, including UAC in ORR's custody, with a very high level of mental health needs and/or violent histories who require specialized treatment and services" are monitored closely by the State of Texas for compliance with its state child welfare laws through regular announced and unannounced licensing visits each year.[5] *See* Sualog Decl. ¶ 13.

---

[5] In particular, "Shiloh's operations are governed by the Texas Department of Family and Protective Services (TDFPS) Licensing Division's Minimum Standards for General Residential Operations, which include policy, procedures, and practices concerning the use of psychotropic medication." Sualog Decl. ¶ 14; *see generally* TDFPS' Minimum Standards for General Residential Operations, available at https://www.dfps.state.tx.ug/Child_Care/documents/Standards_and_Regulations/748_GRO.pdf (last visited May 25, 2018) (use of psychotropic medications). "These standards specifically require that Texas state licensed residential facilities comply with state regulations concerning the use of psychotropic medication by children which are now found at Texas Administrative Code Chapter 748, Title 26, Health and Human Services,

Similar to Shiloh RTC in Texas, other state licensing authorities similarly monitor ORR facilities in other states. Sualog Decl. ¶ 13. Given this extensive level of oversight by the states where ORR places UAC, this Court can—and should—reasonably rely on the conclusions of those state licensing authorities with regard to whether ORR is complying with "applicable state welfare laws and regulations" at ORR residential treatment (or other) facilities.

Finally, Plaintiffs have not established that the provision of psychotropic medications at Shiloh violates "applicable state welfare laws and regulations" and therefore have not shown that ORR is in violation of the *Flores* Agreement.[6] Per Texas law, "Shiloh RTC must follow any recommendations for corrective action from Texas' licensure process concerning the care of UAC and other children who reside and receive treatment services there." Sualog Decl. ¶ 16. ORR is not aware of any reported concerns by the State of Texas about Shiloh's compliance with Texas state guidelines concerning the administration of psychotropic medications to UAC in ORR's custody. *Id.* Notably, Shiloh also follows Texas state best practice guidelines for the administration of psychotropic medication to children in foster care.[7] Sualog Decl. ¶ 17. Consistent with these guidelines, the board certified child and adolescent psychiatrists who treat UAC at Shiloh "strive to use no more than four psychotropic medications concurrently, attempt a mono-therapy regimen for identified target symptoms before prescribing a multiple-therapy regimen, and avoid high-dose pharmacotherapy." *Id.* In addition, "ORR also

---

Part 1, Health and Human Services Commission, Subchapter L (Medication), Division 7, Use of Psychotropic Medication."  Sualog Decl. ¶ 14.

[6] Plaintiffs summarily allege that other ORR facilities also are in violation of the *Flores* Agreement with regard to the provisions of psychotropic medications, but provide no specific evidence of such violations.

[7] *See* Texas' Psychotropic Medication Utilization Parameters for Children and Youth in Foster Care (5th Version) (March 2016), available at https://www.dfps.state.tx.us/Child_Protection?Medical?Services/documents/reports/2016-03_Psychotropic_Medication_Utilization_Parameters_for_Foster_Children.pdf.

conducts routine Federal monitoring visits and medical reviews, and regularly
participates in various treatment meetings concerning UAC placed at Shiloh RTC." *Id.* ¶
18.

Shiloh's Texas state license also mandates that it comply with applicable Texas
state laws concerning informed consent with regard to the prescription of psychotropic
medications to children in state residential treatment facilities. Sualog Decl. ¶ 15; 26 Tex.
Admin. Code § 748.2253 (use of psychotropic medication). Consistent with Texas law,
"if a UAC has a viable sponsor, Shiloh informs the sponsor about any changes in
medications prescribed for the child, including starting a new medication or increasing
the dose of a current medication." Sualog Decl. ¶ 15.[8] However, Texas law permits
psychiatrists to prescribe psychotropic medications to UAC at Shiloh on an emergency
basis without such consent or court authorization when their extreme psychiatric
symptoms render them a danger to themselves or others. *Id.*; Tex. Fam. Code § 266.009.
The State of Texas has expressed no concern with the consent procedures applied by
Shiloh, nor has it provided any opinion or other basis on which it could be concluded that
these procedures violate state law. *Id.* at ¶ 16.

Plaintiffs fail to establish that ORR's administration of psychotropic medication at
Shiloh RTC or any other facility where ORR places UAC violates "applicable state
welfare laws and regulations," and therefore have provided no basis to find that ORR is
in violation of the *Flores* Agreement. Accordingly, Plaintiffs' motion should be denied.

---

[8] Shiloh RTC explains the following to potential sponsors: benefits; risks; side effects;
medical consequences of refusing the medication or recommendation for the medication;
and contact information for the prescribing physician.  Sualog Decl. ¶ 15.

### iii. *ORR's Practices Regarding The Release Of Class Members Do Not Violate The Flores Agreement.*

#### 1. *ORR Separates Its Dangerousness Determinations From Its Determinations Regarding The Suitability Of A Proposed Sponsor.*

On July 5, 2017, the Ninth Circuit upheld this Court's decision requiring that ORR provide minors in its custody with bond hearings under Paragraph 24.A of the *Flores* Agreement. *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017). In its ruling, the Ninth Circuit explicitly recognized that "[i]mmigration judges may assess whether a minor should remain detained or otherwise in the government's custody, but there must still be a separate decision with respect to the implementation of the child's appropriate care and custody." *Id.* at 878 (also recognizing the requirement in the TVPRA, 8 U.S.C. §1232(c)(3)(A), that ORR must make a suitability determination regarding a proposed custodian before releasing UAC). Thus, the Court's decision effectively created a system by which two determinations must be made before a minor can be released: (1) a dangerousness determination; and (2) a determination regarding the suitability of the proposed custodian.

Since that time, all UAC in ORR custody may receive a *Flores* hearing before an immigration judge to determine whether ORR may keep them in custody on the basis of dangerousness. *See* Sualog Decl. ¶ 22 (citing ORR Guide § 2.9). ORR also has implemented a separate review procedure by which the release determination for any UAC who has been previously housed in staff-secure or secure ORR facilities is reviewed by the Director of ORR for a final determination regarding dangerousness prior to release. *Id.* (citing ORR Guide § 2.7). However, the Director does not conduct such a review if an immigration judge has already determined that the UAC is not dangerous.

18

*Id.*[9] Thus, contrary to Plaintiffs' assertion, Motion at 19, ORR does not consider dangerousness as part of its suitability analysis.[10] *Id.* ¶ 21.

### 2. *ORR's Suitability Determinations Of Potential Sponsors Comply With The Agreement.*

Plaintiffs ask this Court to find that ORR may deny release to a sponsor only under the very limited language of Paragraph 11 of the Agreement. Yet Plaintiffs inexplicably fail to acknowledge the requirements of Paragraph 17 of the Agreement, which explicitly governs ORR's suitability determinations. Notably, the language of Paragraph 17 provides broad and permissive authority for ORR to conduct suitability determinations, providing that ORR "may" conduct a suitability analysis before release, and allowing that such analyses "may" include certain components, but not foreclosing the consideration of additional factors as well. The only required consideration by ORR in Paragraph 17 is "the wishes and concerns of the minor." The only other requirement that the Agreement then imposes on ORR in making release determinations is that such determinations be made "without unnecessary delay." *Flores* Agreement ¶ 14. Read as a whole, it should then be concluded that ORR complies with the Agreement in making suitability determinations so long as the factors ORR looks at in making those

---

[9] "The ORR Director previously did review such cases, but would not deny release based on dangerousness where an immigration judge had found that the UAC was not dangerous. This policy was recently changed to clarify that no review by the ORR Director would be conducted in such circumstances." Sualog Decl. ¶ 22.

[10] *Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016), and *Santos v. Smith*, 260 F. Supp. 3d 598 (W.D. Va. 2017), are therefore inapplicable to this case. Both of those cases evaluated the constitutionality of the procedures applied by ORR—a question that is not at issue here—before the Ninth Circuit's decision in *Flores*, when there was no separation of issues of suitability and dangerousness in ORR's analysis, and no opportunity for a UAC to have dangerousness determined by an immigration judge. Because those cases addressed a different legal issue and an entirely different release procedure than those at issue before this Court, those cases are inapplicable here.

determinations—factors which the Agreement leaves to the broad discretion of ORR—do not result in "unnecessary" delay of the release process.

Plaintiffs have made no showing that ORR violates the Agreement in this regard. Statistics make clear that the average length of stay in ORR custody remains fairly low, and that there has been no "unnecessary" increase in those numbers. *See* Sualog Decl. ¶¶ 30-31 (showing the average length of care in fiscal years (FYs) 2015, 2016, 2017, and 2018 were 37, 40, 51 and 57 days respectively; these numbers includes UAC in all types of ORR shelters including long-term foster care, which tends to have a long length of care because minors are placed in these facilities precisely because they do not have a viable sponsor in the United States and do not have an option for release). ORR also has found that length of care for UAC who are or were in secure or staff-secure care has not increased (254 days for population examined as of February 1, 2016, 238 days as of February 1, 2017, and 213 days as of February 1, 2018). *Id.* at ¶¶ 42, 44, 26. In addition, the percentage of those who have had long stays of nine months or more has decreased. *Id.* at ¶ 48.

One explanation for the slight increase in the overall numbers is that the make-up of sponsors changed from FY2016 to FY2018, with the percentage of "Category 1" sponsors (parents or legal guardians) decreasing over this time period, *id.* at ¶¶ 32-36, while the number of "Category 2" sponsors (immediate relatives, such as brothers, sisters, aunts, uncles, grandparents or first cousins) increased from 36% in FY 2016, to 41% in FY 2017, to 47% in FY 2018, *id.*, and Category 3 sponsors (distant or unverified relatives or unrelated adults) also increased from 9% in FY 16, to 10% in FY 17, to 11% in FY 18, *id.*[11]

---

[11] For release to Category 1 sponsors, length of care increased from: 27 days in FY2016, to 33 days in FY2017, to 36 days in FY2018. For Category 2, the increase is 42, 52, and 55 days, and, for Category 3, the variation is from 75 days, to 84 days, to 82 days, over the same time periods. *Id.* at ¶¶ 38-40.

Additionally, ORR put in place more robust suitability provisions after an investigation from the Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs. *Id.* at ¶ 23. That investigation resulted from an incident in which UAC were released to traffickers, after both parents and the UAC identified them in affidavits as family friends. *Id.* The traffickers, however, were not friends, and instead forced the UAC to live in substandard conditions and work 12 hours a day, 6-7 days per week, on an egg farm. *Id.* In response, ORR expanded its provision of post-release services to UACs released from its custody, and in March 2016 required that for TVPRA-mandated home studies, and other cases where a home study is conducted, post-release services providers must be in place, prior to discharge. *Id.* at ¶¶ 24-25. This referral can lengthen the time spent in care, because the post-release services must be in place, and there may be wait lists for such services. *Id.* In addition, ORR mandated home studies for additional categories of children, and allowed home studies for other children. *Id.* Home studies increased proportionate to UAC census, with 5.6% of UAC receiving home studies in FY2015, 5.98% in FY2016, and 7.77% in FY 2017. *Id.* ORR also has enhanced its background checks. *Id.* at ¶ 26. In April 2016, it clarified criteria for background checks, enhancing sex offender registry checks for adult household members living with sponsors. *Id.* In March 2015, ORR added child abuse and neglect checks for category 3 sponsors. *Id.*

All of these enhancements are necessary, even where they may result in some delay in release. ORR must fully assess a sponsor (even a parent) before making a release determination because ORR lacks the authority to reassume care if the sponsor abuses or neglects a child after a UAC has been released from ORR custody. *Id.* at ¶ 20. In that respect, ORR is very different from a domestic child welfare organization, which typically retains such authority post-placement. *Id.* Because these review procedures

create no unnecessary delay in the release of class members, the Court should find that
ORR is not in violation of the Agreement.

The cases of the individuals to whom Plaintiffs point in their Motion also do not
establish that ORR is not in compliance with the *Flores* Agreement. To the contrary, in
the cases of these individuals the steps taken by ORR have all been necessary to ensure
the suitability of the proposed custodian before the minor is released.

For example, records for Santiago H.[12] show that the ORR grantee shelter required
additional time to ensure the suitability of his proposed sponsor, an aunt. Shelter case
management notes show that "birth certificates for the sponsor, minor and all family
members do not prove relationship between the sponsor and the minor." The sponsor first
said that she was the sister of UAC's father. "CM [case manager] explained that
comparing the birth certificates of the sponsor and UAC's father both parents were
different.  Indicating that they were not siblings. The sponsor then reported that her father
is the brother of UAC's father. CM then explained when she compared the birth
certificates of the sponsor's father and UAC's father that neither of the parent's names
were the same." *See* Santiago H. Case Management Notes at 8 (proposed to be filed
under seal as Exhibit B). Fingerprint results for the aunt also showed that the aunt had
sponsored another UAC in 2016, yet she could not provide contact information for this
prior UAC, nor could she provide documentation for him, even after "multiple attempts"
made by the case manager. *Id* at 17. The case manager also recommended a home study
due to "discrepancies regarding the sponsor's partner and whether or not he was living in
the home." *Id.* at 15. Thus, notwithstanding Santiago's exceptional behavior that is
reflected in the Case Management Notes, ORR was justified in taking additional time

---

[12] Defendants use the pseudonyms used by Plaintiffs in their Motion.

22

conducting its suitability analysis in order to ensure Santiago's safe release from ORR custody.[13]

Case files from other minors mentioned in Plaintiffs' Motion similarly show that ORR shelters work diligently to ensure appropriate release of minors. In some cases home studies or additional background checks required additional time. *See e.g.* Nicholas C. Release Request (proposed to be filed under seal as Exhibit C) (discretionary home study ordered on November 21, 2017; child abuse and neglect checks ordered, as well as fingerprint checks for sponsor and alternative care provider; alternate care provider's fingerprints forwarded February 6, 2018, and Nicholas C. released on February 8, 2018.). In other cases, questions arose about the sponsor during the evaluation process. *See e.g.* Gabriela N. Transfer Request and Case Review (proposed to be filed under seal as Exhibits D and E) (home study worker provided a negative recommendation for grandfather on February 15, 2018, and case manager discontinued working with him due to "past criminal history, not providing documentation in a timely manner, and not being able to properly care for the minor"). Still other cases show sponsors who were not able to prove their relationship with the minor they were seeking to sponsor. *See e.g.* Camila G. Case Review of 4-10-18 (proposed to be filed under seal as Exhibit F) (Original sponsor was a cousin; when great aunt identified as a sponsor, there were no valid birth certificates, and shelter worked repeatedly with consulate to try to ensure relationship); *see also* Arturo S. Case Review (proposed to be filed under seal as Exhibit G) (Birth certificate did not check out and DNA test showed sponsor was not the father). In other cases a sponsor, even a parent, determined that he or she did not wish to take sponsorship

---

[13] While it may be the case that once transferred to ICE custody Santiago was able to be released on bond, this is a function of law that provides no insight into the "necessity" of ORR's efforts to determine suitability. ICE bond hearings evaluate only the questions of flight risk and dangerousness, and say nothing about the suitability of home to which Santiago, now no longer a minor under the law, has been released.

of a child. *See e.g.* Roberto F. Case Management Notes at 16 (proposed to be filed under seal as Exhibit H) (mother became worried when she learned Roberto was seeking a bond hearing and said she wanted him to gain legal status while detained, as she was unsure she could pay for legal representation); *see also* Victoria R. Case Review at 9 (proposed to be filed under seal as Exhibit I) (father did not want to act as sponsor; sister's child abuse/neglect check had substantiated findings).

All of these cases demonstrate that far from being unnecessary, suitability procedures—such as background checks and home studies—are a useful tool to uncover situations that demonstrate a potential risk to a UAC which must be resolved before the UAC can be released. To the extent Plaintiffs ask this Court to eliminate or scale back this process, they are asking this Court to eliminate processes that are, in fact, necessary for the protection of UAC in ORR custody, the elimination of which would create a risk that UAC would be released from ORR custody to sponsors that are not suitable to care for them. Plaintiffs simply have not met their burden to show that ORR's suitability procedures are "unnecessary," and therefore have not shown that ORR is not complying with the Agreement's requirements. Accordingly Plaintiffs' Motion should be denied.

### 3. HHS Has Exclusive Responsibility For Suitability Determinations Under The TVPRA.

Even where a UAC has been determined not to be dangerous, and thus is eligible for release, ORR still must conduct a review of the suitability of a proposed sponsor for that UAC. *Flores*, 862 F.3d at 878. In so ruling, the Ninth Circuit recognized that this analysis is required by the TVPRA, 8 U.S.C. §1232(c)(3)(A). *Id.* However, while dicta suggests that the Court believed that the TVPRA suitability requirements "mirror[]" those in the *Flores* Agreement, the Court was incorrect in this regard. In fact, the TVPRA did not adopt the same language of the *Flores* Agreement with regard to the requirements for a suitability analysis, giving good reason to find that Congress intended the requirements

of the TVPRA to govern this process. *Compare Flores* Agreement ¶ 17 ("A suitability
assessment may include such components as an investigation of the living conditions in
which the minor would be placed and the standard of care he would receive, verification
of identity and employment of the individuals offering support, interviews of members of
the household, and a home visit. Any such assessment should also take into consideration
the wishes and concerns of the minor."), *with* 8 U.S.C. § 1232(c)(3)(A) ("[A] an
unaccompanied alien child may not be placed with a person or entity unless the Secretary
of Health and Human Services makes a determination that the proposed custodian is
capable of providing for the child's physical and mental well-being. Such determination
shall, at a minimum, include verification of the custodian's identity and relationship to
the child, if any, as well as an independent finding that the individual has not engaged in
any activity that would indicate a potential risk to the child."), and 8 U.S.C. §
1232(c)(3)(B) ("Before placing the child with an individual, the Secretary of Health and
Human Services shall determine whether a home study is first necessary."). While there
is some overlap between the requirements, Congress plainly did not adopt the existing
language and requirements of the *Flores* Agreement, but rather provided a modified
standard to be applied by ORR under the TVPRA. This gives good reason for this Court
to find that the TVPRA was intended to—and does—govern ORR's suitability
determinations, and that a motion to enforce under the *Flores* agreement is not the proper
avenue for relief related to these determinations. *See Flores* 862 F.3d at 865 (noting that
in enacting the TVPRA "Congress . . . had the opportunity to address, and to explicitly
modify if it wished to do so, any provisions of the Settlement[.]"). Should Plaintiffs wish
to challenge ORR's compliance with the provisions of the TVPRA in this regard, they
should be required to do so in a separate action, and not in a motion to enforce the *Flores*
Agreement.

## IV.    **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

DATED:        May 25, 2018                    Respectfully submitted,


                                              CHAD A. READLER
                                              Acting Assistant Attorney General
                                              Civil Division

                                              WILLIAM C. PEACHEY
                                              Director, District Court Section
                                              Office of Immigration Litigation

                                              WILLIAM C. SILVIS
                                              Assistant Director, District Court Section
                                              Office of Immigration Litigation

                                              */s/ Sarah B. Fabian*
                                              SARAH B. FABIAN
                                              Senior Litigation Counsel
                                              Office of Immigration Litigation
                                              District Court Section
                                              P.O. Box 868, Ben Franklin Station
                                              Washington, D.C. 20044
                                              Tel: (202) 532-4824
                                              Fax: (202) 305-7000
                                              Email: sarah.b.fabian@usdoj.gov

                                              *Attorneys for Defendants*

26

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2018, I served the foregoing pleading on all

counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants