

# U.S. Customs and Border Protection Juvenile Coordinator Report

Third Report Regarding *Flores v. Lynch,* Case No.CV 85-4544 (C.D. Cal.)

*June 1, 2018*



Honorable Dolly M. Gee
U.S. District Court for the Central District of California
350 West 1st St.
Los Angeles, CA 90012
Courtroom 8C, 8th Floor

Dear Judge Gee:

I respectfully submit the third U.S. Customs and Border Protection (CBP) Juvenile Coordinator Report in accordance with Paragraph 28A of the *Flores* Settlement Agreement (Agreement) and this Court's June 27, 2017, October 18, 2017, and March 12, 2018 Orders.

As the CBP Juvenile Coordinator, I understand the important role I play to monitor and report on the Agency's compliance with the Agreement.  I welcome the opportunity to discuss the extensive efforts CBP has taken to ensure all minors in CBP custody are treated with dignity, respect, and special concern for their particular vulnerability as minors.

I have reviewed the Plaintiffs' Response to my March 2, 2018 report.  I acknowledge Plaintiffs' concerns related to the potential disconnect between my observations and minors' experiences, and related to ensuring the reliability of the data collected in CBP's systems of record.  To address these concerns and to build upon my previous monitoring efforts, I spoke with minors either with their parents, or just with a minor's parents, where the parents volunteered to share their experiences with me at each CBP facility I visited.  Following my site visits, I reviewed the associated custodial records of each minor to determine whether the data collected aligned with each minor's actual experience and my personal observations on-site.  I also interviewed agents and officers regarding the internal controls in place to ensure custodial records are as thorough and complete as operationally feasible.  In total, I conducted eight unannounced site visits, exceeding the minimum number ordered by this Court on March 12, 2018, interviewed 38 minors who were in U.S. Border Patrol or Office of Field Operations' custody at the time of my site visits, and directed the Office of Accountability, Management Inspections Division (MID) to observe operations at 47 CBP facilities along the southwest border during this reporting period.  Based on my personal observations and MID's recorded observations at CBP facilities along the southwest border, on-site interviews of minors and/or their parents, and subsequent review of minors' custodial records, I conclude CBP continues to comply with the Agreement.

I submit this report in good faith as an honest and true recording of actions taken for the period of March 2, 2018 through May 31, 2018, which is accurate as of the time of its submission.  I will continue to fully execute my responsibilities as the CBP Juvenile Coordinator.

Respectfully submitted,

Henry A. Moak, Jr.
(A) Chief Accountability Officer,
U.S. Customs and Border Protection



# CBP Juvenile Coordinator Report

## Table of Contents

I.   Introduction ................................................................................................ 1

II.  Monitoring Activities .................................................................................. 2

  A.  Juvenile Coordinator's Site Visits ....................................................... 2

  B.  Management Inspection Division's Site Visits ..................................... 27

  C.  Juvenile Coordinator's Conclusion ...................................................... 34

III. Conclusion ................................................................................................. 36

Appendixes ...................................................................................................... 38

a.   Appendix 1: List of Acronyms ............................................................. 38

b.   Appendix 2: Juvenile Coordinator Minor Interviews- Introductory Statements ........ 39

# I.  Introduction

This is the third U.S. Customs and Border Protection (CBP) Juvenile Coordinator Report in accordance with Paragraph 28A of the *Flores* Settlement Agreement (Agreement) and this Court's June 27, 2017, October 18, 2017, and March 12, 2018 Orders.

- The Court's June 27, 2017 Order states that, "The Juvenile Coordinator will monitor compliance with those terms of the *Flores* Agreement, which this Court has found must be enforced and shall report directly to the Court regarding the status of Defendants' compliance."
- The Court's October 18, 2017 Order "…sets forth the following deadlines for the Juvenile Coordinators to file their respective compliance reports…":  December 1, 2017; March 2, 2018; and June 1, 2018.
- The Court's March 12, 2018 Order directs the CBP Juvenile Coordinator "…to conduct at least two inspections without providing advance notice to the facility that he plans to visit," and further stipulates that, "The results of those inspections shall be incorporated into the Juvenile Coordinator's June 1, 2018 report."

My monitoring and reporting processes are firmly rooted in the clear direction provided by the Court in the three aforementioned orders.  Since my appointment as the CBP Juvenile Coordinator on August 24, 2017, I have built upon existing efforts to develop and execute a comprehensive process for monitoring and reporting Agency compliance with the Agreement.  With each reporting period, I have enhanced my monitoring and reporting processes based on best practices identified in the previous reporting period.

In this report, I outline my extensive activities to monitor compliance with the Agreement from March 2 through May 31, 2018.[1]  The first section outlines my findings from my eight unannounced site visits, where I observed approximately 750 minors in CBP custody.[2]  Here, I describe the results of my inspections and share the information provided to me by 38 minors (or their parents on their behalf) who agreed to speak with me about their experience in CBP custody.  I believe this group of minors and their custodial records is representative of the approximately 750 minors I observed along the southwest border.  I reviewed the custodial records of each of the 38 minors interviewed to assess the completeness of the data captured by CBP and, as described herein, identified instances where the minors' experiences and custodial records differed.  Most

---

[1] Although the Court's June 27, 2017 Order applied only to the Rio Grande Valley Border Patrol Sector, I have expanded the scope of my activities beyond the Rio Grande Valley Sector, reflecting my nationwide responsibilities. Therefore, this report discusses my activities to monitor compliance at facilities in several locations both in and outside of the Rio Grande Valley Border Patrol Sector.

[2] For the purpose of this report, "minors" refers to both unaccompanied alien children (UAC), as well as children (those under the age of 18) who are part of a family unit.

commonly, these discrepancies were the result of agents or officers not recording custodial actions that minors and/or parents confirmed took place, like providing blankets and mats, clean clothing, or toothbrushes.  Overall, my interviews with minors and/or their parents, site visits, and review of custodial records demonstrate that CBP understands its obligations under the Agreement and complies with these obligations.  The second section describes the results of the Office of Accountability (OAct), Management Inspections Division's (MID) observations at 47 CBP facilities along the southwest border where minors are routinely held.  Where applicable, I identify areas for improvement.

# II.   Monitoring Activities

During this reporting period, I conducted eight unannounced site visits and directed MID to visit 47 CBP facilities and advise me of their findings.  The following section describes each of the facilities visited and our results.

## A. Juvenile Coordinator's Site Visits

On March 12, 2018, the Court ordered me to conduct at least two unannounced site visits, and to incorporate my findings into this report.  In order to capture how each CBP facility typically executes its responsibilities under the Agreement, and in compliance with the March 12, 2018 Order, I did not provide any of the facilities with advanced notice of my visits.  Moreover, before the first visit, I did not inform the U.S. Border Patrol (USBP) or the Office of Field Operations (OFO) juvenile coordinators, or others with those offices, that I would be conducting unannounced visits.

What I learned during the unannounced visits confirmed that agents and officers in the field execute their responsibilities professionally and in a manner consistent with the Agreement.

### i.   *Methodology*

From April 9 through April 19, 2018, I visited two CBP Ports of Entry (POEs), Miami International Airport and San Ysidro Land POE, and six USBP facilities, Clint Station, Santa Teresa Station, the Central Processing Center-Ursula (CPC-Ursula), Ajo Station, Yuma Station, and Chula Vista Station.[3]

These locations were selected in recognition of my national responsibility to monitor all facilities where minors are held in CBP custody, and this Court's June 27, 2017 Order specifically directing me to monitor compliance in the Rio Grande Valley Border Patrol

---

[3] Clint and Santa Teresa Station are located in the El Paso Border Patrol Sector.  CPC-Ursula is located in the Rio Grande Valley Sector.  Ajo Station is located in the Tucson Sector.  Yuma Station and Chula Vista Station are located in the Yuma and San Diego Sectors, respectively.

Sector.  I selected Miami International Airport and San Ysidro Land POE because OFO historical data indicated these ports receive a high volume of passenger and/or pedestrian traffic, increasing the likelihood that minors would be on-site during my visits.  At the time of my visit, minors were only on-site at the San Ysidro Land POE.  I did not know in advance of my visit whether minors would or would not be on-site while I was present.

The USBP locations were selected based on data related to the number of minors apprehended in each Sector and station from February 1 through March 15, 2018, and in the case of Clint Station, information I received while I was conducting an unannounced site visit at a nearby station in the Sector.  The highest number of minor apprehensions during this time-period was recorded in the Rio Grande Valley Sector.  Generally, the Rio Grande Valley Sector stations reporting the highest number of apprehensions transfer all minors apprehended directly to CPC-Ursula.  Yuma Sector and Tucson Sector recorded the next highest number of minors apprehended, and as such, I traveled to the stations with the highest number of minor apprehensions in each sector, Yuma and Ajo Stations, respectively.  San Diego Sector had the fourth highest number of minors apprehended during the February 1 through March 15, 2018 time-period, with Chula Vista Station recording the highest number of minor apprehensions within the Sector.  I also returned to Santa Teresa and Clint Stations in the El Paso Sector during this reporting period to compare my findings from my previous announced visit to those from my previous unannounced visit.  In my March 2, 2018 report, I indicated that I planned to visit Yuma, Tucson, and El Centro Sectors during this reporting period.  I did not visit any USBP facilities in the El Centro Sector during this reporting period.  In light of this Court's June 27, 2017 and March 12, 2018 Orders, and my review of USBP minor apprehension data, I determined that visiting CBP facilities in Rio Grande Valley, El Paso, Tucson, Yuma, and San Diego Sectors would provide a more complete snapshot of USBP facilities where the majority of minors are held.  At the time of my visits, minors were on-site at all USBP locations, except Santa Teresa Station in El Paso Sector.  I did not know in advance of any of my visits whether minors would or would not be on-site while I was present.

During this reporting period, I continued the process described in my March 2, 2018 report for each site visit, which included interviewing agents and officers and inspecting the facilities.  To provide a more complete picture of whether and how CBP complies with the Agreement, I also decided to interview minors and/or their parent(s) or legal guardian(s) who agreed to voluntarily speak with me about their experience in CBP custody.  When I first arrived at a facility where minors were on-site, I informed the Patrol Agent in Charge (PAIC), Watch Commander, or Chief of my intent to interview minors and/or their parents who agreed to speak with me.  I also requested a list of all minors currently in custody at that location, including their Alien-number (A-number), age, status as accompanied or unaccompanied, start-date of custody (sometimes referred to as book-in) and the hold room(s) in which they were held during their time at the facility.  I collected this information for crosschecking the custodial records against the first-hand experiences of the minors interviewed and my personal observations.

At each facility where minors were present, a plain-clothes agent or officer assisted with Spanish translation. These agents and officers were generally assigned to field intelligence units, and as such, were familiar with conducting interviews. When I arrived at each site, I requested plain-clothes agents and officers assist me to make the entire process as non-intimidating as possible. It was important to me that minors and their parent(s)/legal guardians felt comfortable to speak freely about their experience. At Clint Station, the first location I visited where minors were present, the plain-clothes agent that assisted me during the interviews translated my introductory statement into Spanish.[4] This statement explained, among other factors, my role, my purpose for conducting the interviews, and that their decision to participate in an interview was voluntary and would not affect any immigration processing or disposition. At Clint Station and at all the locations thereafter, the plain-clothes agent or officer read the statement in Spanish to unaccompanied minors of an age able to comprehend the statement (generally, 14 years old or older), and to accompanied minors and their parent(s)/legal guardian(s).[5] I generally limited my interviews of unaccompanied minors to those who were 14 years old or older because that is typically the age where CBP has determined minors are able to comprehend and sign the immigration forms in their A-file. After reading the statement, the agent or officer gave the minors and/or their parent(s) or legal guardian(s) time to decide whether they wanted to speak with me. The agent or officer then reiterated that these interviews were voluntary and would have no impact on any immigration processing or disposition before asking if anyone agreed to speak with me. If minors and/or their parent(s) or legal guardian(s) agreed to speak with me, we conducted the interviews in the most open and accessible location available in the facility. In facilities where the only available space was an interview room, we left the door open throughout the entire interview and arranged chairs in a semi-circle to facilitate discussion. This was done to remove the appearance of a formal interview and to put the minors and/or their parent(s) or legal guardian(s) at ease. The plain-clothes agent or officer was present during the interview to assist with translation where necessary.

The interviews were conversational and the questions were open-ended, to the extent possible, to allow the minor and/or their parent(s) or legal guardian(s) to freely discuss their experience in CBP custody. Because the interviews were conversational, the minors and/or their parent(s) or legal guardian(s) did not always speak to each requirement of the Agreement in detail. Throughout the entire process, it was important that all minors and/or their parent(s) or legal guardian(s) understood they could choose not to answer any question or stop the interview at any time. Once I finished the interview, I reviewed the A-files of those minors whose processing was complete. If the minor was still being processed, I did not review the A-file because the A-file had not been completed.

---

[4] Please see Appendix 2 for the English and Spanish translation of the introductory statement.
[5] During all of my interviews of minors who were accompanied, the minors were accompanied by their father or mother (not a legal guardian).

With the exception of completed A-files, I did not review any other records associated with the minors I interviewed until after I returned to Headquarters.  I did not review the data captured in USBP and OFO's systems of record while I was on-site.  Instead, on April 23, 2018, after I completed all site visits, I provided USBP and OFO with the name, A-number, location, age, book-in date, date interviewed and any other identifying information made available to me during the interviews for each minor I interviewed. USBP and OFO then provided me with each minor's custodial records on April 26, 2018 and May 7, 2018, respectively.[6]  Reviewing the custodial records after the site visits provided me with a more complete picture of each minor's time in custody, from book-in to book-out.  Because the custodial records included custodial actions recorded from book-in to book-out, I could review the data entered that corresponded to the period of time I was on-site to confirm whether the records aligned with my observations and information gathered during the interviews.  This review mirrored the analysis conducted in my March report where I performed an in-depth review of the custodial records associated with all minors who submitted declarations with Plaintiffs' January 8, 2018 response.  In that response, Plaintiffs provided declarations from interviews of minors after they were transferred from CBP custody.  For this report, I had the opportunity to speak with minors and/or their parents while they were still in CBP custody.  I was able to crosscheck the custodial records against my personal observations and minors' experiences conveyed to me while I was on-site.  I believe this site visit methodology, which now includes interviews, provides a more comprehensive picture of Agency compliance.

   ii. *Observations and Results*

This section outlines my findings, and where applicable, includes details of my interviews with minors and/or their parent(s).  When discussing the locations where minors and/or their parents were interviewed, I incorporate data from the minors' custodial records that I reviewed after my visit, and, if available at the time of my visit, the minors' A-File.

   a. U.S. Border Patrol Facilities

<u>Santa Teresa Station</u>

On April 10, 2018, I returned to the El Paso Border Patrol Sector.  My first unannounced visit was to Santa Teresa Station at 10:00 AM.  There, I interviewed the PAIC and toured

---

[6] For this report, "custodial record" is used to describe the data collected in USBP's Enforcement Integrated e3 Detention Module (e3DM) and OFO's Secured Integrated Government Mainframe Access (SIGMA) for each of the minors I interviewed.  Custodial actions, like meals provided and confirmation that a minor's hold room is within the appropriate temperature range, are typically recorded in each office's relevant system of record, e3DM and SIGMA respectively.  The custodial records are separate from the A-files, which I only reviewed on-site if they were complete at the time of my visit.

the facility.  There were no minors on-site when I arrived.  I was informed that two minors had been in custody earlier that morning, but had since been transferred to Clint Station to await transfer to the U.S. Department of Health and Human Services (HHS).  I toured the hold room where minors are typically held while in custody.  The hold room had a toilet and sink behind a half-wall for privacy.  There was also a half-gallon water dispenser with cups, in addition to the water fountain in the room.  Cloth and disposable blankets were available for minors to use.  I was informed that cots or mats are not currently provided at this station because Santa Teresa Station generally processes minors as expeditiously as possible (as required by the Agreement) and transfers them to Clint Station, where cots are available.  The PAIC explained that Clint Station is less than 50 miles from Santa Teresa, so the close proximity makes this a feasible option.  However, as reflected in my interview below with the minor identified as F.P., minors sometimes spend the night in Santa Teresa before they are transferred to Clint Station or to another facility for various reasons, including because the minor is being processed overnight.

I also observed the food and supplies currently on-hand and available when minors are on-site.  There were frozen burritos, granola bars, infant formula, baby food, Pedialyte, and juice.  All these items were within the expiration date.  The PAIC informed me that agents check expiration dates monthly to ensure no food that could be provided to minors has expired.  Toiletries, including toothbrushes, toothpaste, floss, deodorant, and feminine hygiene products, were available.  I also observed several items for infants and toddlers, including bottles, diapers, pull-ups, and diaper cream.  Clean clothes and shoes were also available in various sizes.

The PAIC informed me that agents check the hold rooms each shift to ensure the temperature is within the appropriate 66-80 degree Fahrenheit range (appropriate range), and that the toilets and sinks are functioning properly.  The PAIC also informed me that Santa Teresa Station shares cleaning services with a nearby POE, so cleaning crews are on-site three times a week or more, as-needed.

Based on my personal observations, Santa Teresa Station is equipped to comply with the Agreement when minors are on-site.[7]  I therefore conclude Santa Teresa Station continues to comply with the Agreement.

<u>Clint Station</u>

On April 10, 2018, I also visited Clint Station because agents at Santa Teresa informed me minors were on-site there.  The PAIC at Santa Teresa informed me he would not inform Clint Station that I was on my way to the station.  I arrived at Clint Station

---

[7] The fact that Santa Teresa Station provides blankets, but not cots or mats, to minors on-site does not, in my opinion, mean that the station is out of compliance with the Agreement.  Specifically, as explained in my March 2, 2018 report, MID's checklist for determining compliance looks for whether a minor is provided access to a cot/mat or blanket.  I support and share this determination by the *Flores* Working Group.

approximately one hour later, and the PAIC at Clint Station informed me he did not have advanced notice of my visit.  When I arrived at Clint Station at 12:45 PM, there were 10 unaccompanied minors on-site.  The minors were in two different hold rooms, separated by gender.  I was informed that all minors on-site were 16 or 17 years old.  In each hold room, there were functioning sinks, functioning toilets, and functioning water fountains at the sinks that provided potable water.[8]  The toilets and sinks were behind a half wall for privacy.  A five-gallon water container and cups were also in each hold room.  I observed that each minor also had an individual water bottle and a granola bar, which had been provided prior to my arrival.  In each hold room, I observed a cot and cloth blanket for each minor.  There was also a television for each hold room; a soccer game was playing on the television in the males' hold room.  I checked the temperature of both hold rooms, which measured 75 degrees Fahrenheit.[9]  The PAIC informed me the hold rooms are professionally cleaned daily and they have an agreement with a nearby facility to provide minors with showers.[10]

At the station, I observed the food and other supplies available for agents to provide to minors.  There were frozen burritos, ramen noodles, oatmeal, granola bars, juice boxes, baby food, and formula available.  All were within the expiration date.  The PAIC also informed me that hot meals, which I understand are provided by food service contractors, are brought to the facility twice a day.  Toiletries, including toothbrushes, toothpaste, mouthwash, body wipes, body soap, deodorant, and feminine hygiene products were available.  I also observed several items for infants and toddlers, including bottles, diapers, and pull-ups.  Clean clothes and shoes were also available in various sizes.  The station had laundry facilities and detergent on-site.

When I arrived at Clint Station, I informed the PAIC of my intent to interview minors and explained the process.  The PAIC provided me with a list of all minors on-site.  A plain-clothes agent assisted me by reading the introductory statement in Spanish to all of the minors.  The plain-clothes agent also assisted with translation during the interviews.  In total, I interviewed three minors at Clint Station.

Minor G.E. was an unaccompanied 17-year-old male from Honduras.  G.E. stated the agents were "good people" because the agents spoke to him respectfully and were not aggressive when he was apprehended on April 9, 2018 at 5:30 PM.  At the time of the

---

[8] At Clint Station, and at all CBP facilities I visited where minors were on-site, I confirmed that each hold room where minors were held had functioning sinks, toilets, and water fountains.  For each hold room where minors were held, I flushed the toilets and turned on the water in each sink and water fountain.

[9] To check the temperature of the hold rooms at Clint Station, I used the station's infrared thermometer.  Throughout this report, I provide the temperature of the hold rooms at the various CBP facilities I visited.  At each facility where minors were present, I used that facility's infrared thermometer to measure the temperature.

[10] I followed up with USBP Headquarters after my visit to learn more about the agreement Clint Station has in place to ensure minors have access to showers, even though this is not an express obligation under the Agreement, except in limited circumstances.  The particular facility is called Southwest Key Programs and is a private organization contracted by HHS to provide for UACs.

interview, he had been in custody for approximately 20 hours. G.E. explained that he was first taken to a different station for processing. There, G.E. ate a burrito, granola bar, and juice. G.E. then stated that he was transported to Clint Station after a couple hours. G.E.'s custodial records show that, after his apprehension, he was taken to Paso Del Norte Processing Center at 5:42 PM on April 9, 2018 and provided a burrito, granola bar, and juice. Just as G.E. described, his custodial records indicate that he left Paso Del Norte Processing Center on April 9, 2018 at 9:10 PM and arrived at Clint Station an hour later. The custodial records show G.E. was provided a burrito, granola bar, and juice upon arrival at Clint Station. During the interview, G.E. stated he had access to functioning toilets and functioning sinks, and drinking water. The custodial records also indicate that his hold room provided access to functioning toilets, functioning sinks, and drinking water. G.E. also stated that the temperature was comfortable. G.E. stated he had a cot and blanket at Clint Station. While receipt of these items is not recorded in his custodial record, I observed cots and blankets in the hold rooms at the station. While G.E. noted the lights remained on throughout the night, G.E. stated he was able to sleep. G.E.'s custodial records indicate he was asleep when the agents checked on him twice throughout the night. According to the custodial records, G.E. received breakfast, lunch, and dinner on April 10, 2018, G.E. slept overnight, and received breakfast before his transfer to HHS on April 11, 2018. I checked the temperature of G.E.'s hold room and it measured 75 degrees Fahrenheit. The custodial records show that the temperature was within range throughout the entire time G.E. was in CBP custody. After the interview, I reviewed G.E.'s A-file, which contained the signed I-770 form, list of free legal services, and fax receipt showing the Honduran consulate was informed of his custody. The A-file and custodial records also indicate G.E. watched the UAC video.[11]

Minor F.P. was an unaccompanied 16-year-old male from Honduras. F.P. explained, and his custodial records indicate, that he was apprehended and taken to Santa Teresa Station, where he arrived at 11:06 PM on April 9, 2018. At the time of the interview, he had been in custody for approximately 14 hours. F.P. stated he received a burrito, cookie, and juice at Santa Teresa Station, and "it was good." As F.P. explained, and custodial records show, F.P. was held overnight while Santa Teresa Station completed processing, and was given a meal in the morning before he was transferred to Clint Station at 9:19 AM. Custodial records show F.P. arrived at Clint Station approximately an hour and half later. While F.P. did not receive a cot or mat at Santa Teresa Station, he explained that he was given a blanket there and slept overnight. F.P.'s custodial records do not reflect his receipt of a cot or blanket at Clint Station; however, I observed F.P. had a blanket and cot at the time of my visit. Based on the custodial records, F.P. received another meal before the interview. The custodial records indicate, and F.P. confirmed, that he had access to

---

[11] The Know What to Expect videos, are two videos that explain what to expect in custody in easy to understand language appropriate for UACs, as well as accompanied minors   While these videos were made specifically for UACs, I understand accompanied minors are often shown these videos as well. When minors view these two videos, USBP records it as "UAC video" shown in its system of record.  For this report, I follow USBP's nomenclature to reflect what I saw in each minor's custodial records.

drinking water, functioning toilets and functioning sinks. I checked the temperature of F.P.'s hold room and it measured 75 degrees Fahrenheit. The custodial records indicate the hold room was maintained within the appropriate range the entire time F.P. was in custody. F.P. told me that the agents at both stations treated him well, and explained the facility was "peaceful," albeit a bit boring, and "no one yells at you." According to the custodial records, F.P. received two additional meals on April 10, slept during the night, and received breakfast the morning of April 11 before his transfer to HHS. After the interview, I reviewed F.P.'s A-file, which contained the signed I-770 form, list of free legal services, and fax receipt showing the Honduran consulate was informed of his custody. The A-file and custodial records also indicate F.P. watched the UAC video.

Minor E.A. was an unaccompanied 17-year-old male from Honduras. E.A. told me he was apprehended on April 10, and taken to a different station first before he was transferred to Clint Station. The custodial records show that E.A. was apprehended and arrived at Paso Del Norte Processing Center at 7:15 AM for processing, and was then transported to Clint Station, where he arrived at 1:06 PM. At the time of the interview, he had been in custody for approximately six hours. E.A. stated he received a burrito and cookie at the first station, and then a burrito, cookie, and juice after arriving at Clint Station. Food provided at Paso Del Norte Processing Center was not recorded; however, the meal E.A. received after arriving at Clint Station was recorded. E.A. stated he did not "like" the burrito. The custodial records show, and E.A. confirmed, that he had access to drinking water, and functioning toilets and sinks. E.A. stated the temperature of his hold room was "normal." I checked the temperature of E.A.'s hold room and it measured 75 degrees Fahrenheit. The custodial records indicate that the temperature of the hold room was maintained within the appropriate range while E.A. was in custody. According to the custodial records, E.A. received dinner, slept during the night, and received breakfast on April 11 before his transfer to HHS. After the interview, I reviewed E.A.'s A-file, which contained the signed I-770 form, list of free legal services, and fax receipt showing the Honduran consulate was informed of his custody. The A-file and custodial records also indicate E.A. watched the UAC video.

Based on my interviews, my review of the custodial records, and my personal observations, I conclude that Clint Station continues to comply with the Agreement. I observed and heard from the minors directly that, as required by the Agreement, they received access to food and potable water, and were held under safe and sanitary conditions in hold rooms maintained at an appropriate temperature and with functioning toilets and functioning sinks. I also observed and heard from minors that, in general, they received cots and blankets. I recognize that the entry of certain data points in the relevant system of record can be improved, whether or not the entry of such data points is required by the Agreement. For example, receipt of blankets and mats, as well as meals provided at Paso Del Norte Processing Center, were not recorded in the custodial records I reviewed. I observed each minor in Clint Station had a blanket and mat while I was on-site and minor E.A. told me he received food while at Paso Del Norte Processing Center.

9

I continue to believe more consistent data entry is important to document the Agency's compliance with the Agreement. Since my last report, USBP has increased their agent data entry training, and I will continue to work with USBP leadership to emphasize robust record keeping in the field. I have already met with USBP leadership to discuss the importance of recording custodial actions, and they share my opinion that it is important to document their agents' efforts to comply with the Agreement.

Central Processing Center-Ursula

On April 16, 2018 at 9:15 AM, I arrived unannounced at CPC-Ursula in McAllen, Texas. There were 470 minors on-site, ranging in age from less than one to 17 years old. Minors were in various hold rooms depending on their age, gender, and status as accompanied or unaccompanied. In each hold room, there were portable toilets with a half door for privacy and functioning sinks with soap and paper towels. Each hold room also had mats available for the minors, and I observed minors using Mylar blankets. There was bottled water, juice, milk, and apples in the individual hold rooms. Five-gallon water containers with cups were also available in each hold room. I drank water from several of the five-gallon water containers freely accessible to minors in various hold rooms and found it to be potable and clean. I also observed several televisions throughout the facility to provide entertainment for the minors. When I first arrived, I saw several minors watching a movie. Given CPC-Ursula's open layout, the hold rooms allow air to flow between them. Therefore, I stood in the center of the facility to check the temperature using one of CPC-Ursula's infrared thermometers. The temperature of CPC-Ursula measured 72.5 degrees Fahrenheit. When I checked the temperature in various locations throughout the entire area where minors are held, it measured within the appropriate range. Any difference in temperature at the center of the facility versus the perimeter was nominal.

I also observed the facility's food and supplies available for agents to provide to minors. The PAIC informed me that food service contractors bring meals to the facility. I observed the food service contractors bringing lunch inside the facility in large warmers to ensure the hot food remained hot. Furthermore, I saw an assortment of snacks and drinks, including apples, baby formula, baby cereal, Pedialyte, juice, and other snacks. All food items were within the expiration date. The PAIC showed me the non-refrigerated food items, which were organized by expiration date to ensure that minors do not receive expired food. Toiletries, including body wipes, feminine hygiene products, toothbrushes, toothpaste, shampoo, soap, and wash cloths, were available. I also observed several items for infants and toddlers, including bottles, diapers and pull-ups, diaper cream, diaper wipes, baby powder, and baby lotion. Clean clothes and shoes were also available in various sizes, and I observed minors wearing these items. CPC-Ursula has its own laundry facility on-site and it was in use at the time of my visit. There were approximately 500 mats in the storage area, in addition to the mats already in the holding area.

When I arrived, I informed the PAIC of my intent to interview minors and/or parent(s) or legal guardian(s) and explained the process. The PAIC provided me with a list of all minors on-site. A plain-clothes agent assisted me by reading the introductory statement in Spanish in the various hold rooms. Officials from the Guatemalan consulate were also on-site. I spoke to the officials and explained my role and purpose for interviewing minors and/or parents/legal guardian(s). The officials also remarked that CPC-Ursula did a good job of providing age-appropriate care to minors in custody. The officials were meeting with their citizens during the same time I conducted interviews. During the officials' meetings, they explained to their citizens that I was on-site and asked if anyone would be willing to speak with me. The consular officials referred several of the minors and parents I ultimately interviewed to me.

The plain-clothes agent translated all interviews, which were conducted in Spanish. The interviews took place on the holding room floor, where various consular officials also speak to their citizens. In total, I interviewed 13 minors at CPC-Ursula.

First, I interviewed a group of five male minors. Minor C.G. was a 16-year-old unaccompanied male from Guatemala, who was apprehended and taken directly to CPC-Ursula on April 14, arriving at 9:07 PM; at the time of the interview, he had been in custody for approximately one day and 12 hours. Minor J.A. was a 14-year-old unaccompanied male from Guatemala, who was apprehended and taken directly to CPC-Ursula on April 15, arriving at 1:54 PM; at the time of the interview, he had been in custody for approximately 20 hours. Minor C.S. was a 16-year-old unaccompanied male from Guatemala who was apprehended and taken directly to CPC-Ursula on April 15, arriving at 5:03 PM; at the time of the interview, he had been in custody for approximately 17 hours. B.X. was a 13-year-old unaccompanied male from Guatemala, who was apprehended and taken directly to CPC-Ursula on April 15, arriving at 9:17 PM; at the time of the interview, he had been in custody for approximately 12 hours.[12] Minor J.C. was a 17-year-old unaccompanied male from Guatemala who was apprehended and taken directly to CPC-Ursula on April 15, arriving at 9:17 PM; at the time of the interview, he had been in custody for approximately 12 hours. During the interview, the minors informed me they received clean clothes after arrival so that their clothes could be washed. The custodial records do not show that they were provided clean clothes.[13] All of the minors were wearing their own clothes again at the time of the interview. The

---

[12] B.X. was the only unaccompanied minor under 14 years old that I interviewed. B.X. was in the same hold room as J.A. and the other three minors were in an adjoining hold room. B.X. came to the area where I was conducting interviews with the other four minors. Because B.X. was 13 years old and I believed he understood the purpose of the interviews and statement read to him, I decided to interview him with the rest of the group of minors.

[13] USBP provides clean clothes and/or laundry services to minors whenever operationally feasible. USBP updated its e3DM in order to record the provision of clean clothes as a data point; however, this is not a mandatory field that agents must record. In my opinion, while this data point is helpful to thoroughly document the various custodial actions agents perform for minors, the absence of recording when clean clothes are provided does not impact my ultimate conclusion that CPC-Ursula is in compliance with the Agreement.

custodial records indicate that all five minors were in custody for less than 48 hours and were given breakfast, lunch, dinner, and snacks throughout their time in custody. As discussed above, I checked the temperature of the facility during my visit, and it measured 72.5 degrees Fahrenheit. The custodial records indicate the temperature of the hold rooms for each of these minors was within the appropriate range throughout their time in custody. The records also show the minors had access to drinking water, functioning toilets, and functioning sinks. At the time of the interview, all five minors stated they had taken a shower, which is also recorded in their custodial records. All five minors also told me they had brushed their teeth, but the custodial records do not show they received a dental hygiene kit. All five minors also informed me that they received a blanket and mat. The custodial records of J.A. indicate that he was provided a mat and blanket, but that receipt of a mat and blanket was not recorded for the other minors. After the interview, I reviewed C.G. and J.A.'s A-files, which showed they received the I-770 forms, list of free legal service providers, and notification to their respective consulates. Agents indicated that C.G. and J.A. received these documents, but refused to sign them. B.X., J.C., and C.S. were not yet processed at the time of the interview, and therefore, A-files were not ready for me to review. The custodial records indicate all five minors watched the UAC video.

Next, I interviewed three unaccompanied siblings from Honduras. The brothers, both J.A., were 14 and 16 years old, and the sister, Y.A., was 17 years old. The siblings were apprehended and brought directly to CPC-Ursula, arriving at approximately 8:00 PM on April 14. At the time of the interview, they had been in custody for approximately one day and 14 hours. The siblings informed me that after they arrived, they showered, brushed their teeth and hair, and were given clean clothes while their clothes were washed. The custodial records indicate that they were provided showers at 10:30 AM the morning after they arrived at CPC-Ursula. However, the custodial records do not show that the siblings received dental hygiene kits or were provided clean clothes. They were all wearing their own clothes at the time of the interview. The siblings explained they had access to functioning toilets and functioning sinks in their hold rooms, as well as access to drinking water, and the custodial records confirm this. I checked the temperature and it measured 72.5 degrees Fahrenheit. The custodial records indicate the temperature of the hold rooms for each sibling was maintained within the appropriate range throughout their time in custody. The siblings also confirmed they received a mat and blanket at CPC-Ursula, and that they were able to sleep. The custodial records of Y.A. indicate that she was provided a mat and blanket, but that receipt of a mat and blanket was not recorded for the brothers. When asked about the temperature, the siblings stated they felt cold, but the blankets helped keep them warm. The siblings also stated they had called a family member while at CPC-Ursula and had spoken to a consular official over the phone. The custodial records indicate that the siblings were in custody for a total of one day and 23 hours, during which time they all received breakfast, lunch, dinner, and snacks each day. After the interview, I reviewed the three minors' A-files, which showed that each of the minors received the I-770 forms, list of free legal

service providers, and notification to their consulate.  An agent indicated in their files that the minors received these documents, but refused to sign them.  The custodial records indicate that all three minors watched the UAC video.

I also interviewed a father and his 16-year-old son, E.J.  E.J and his father are from Honduras.  E.J. and his father were apprehended on April 13, 2018, and brought to CPC-Ursula at 1:59 PM.  At the time of the interview, they had been in custody for approximately two days 20 hours.  E.J. and his father stated they were taken to McAllen Station for processing after arriving at CPC-Ursula and returned to CPC-Ursula after processing.  The father explained that he and his son were held in different rooms, but that they had spoken to each other on April 15.  E.J. informed me that since his arrival at CPC-Ursula, he had showered and brushed his teeth.  The custodial records indicate that E.J. was provided a shower, a body cleansing product, and dental hygiene product. During the interview, E.J. stated that he had received meals during his time at both CPC-Ursula and McAllen Station.  E.J. specifically mentioned eating a sandwich and juice at McAllen Station that "was good" and an apple and breakfast burrito at CPC-Ursula.  E.J. did not indicate that those were the only meals he received; these were just meals he mentioned to me during the interview.  The custodial records indicate that, during his entire time in custody, which spanned three days and 22 hours, E.J received breakfast, lunch, dinner and snacks each day.  When asked about the quality of food, E.J. stated, "It's good."  E.J. also explained that he had received clean clothes to wear while his were being washed.  E.J. was wearing his own clothes again at the time of the interview.  E.J.'s custodial records show that he received clean clothing.  E.J. explained to me that everyone in his hold room had a mat, and that the mats are located inside the hold room so that anyone can grab one.  E.J.'s custodial records also show receipt of a mat and blanket.  Moreover, E.J. stated he had access to functioning toilets and functioning sinks in his hold room, and that drinking water was freely available.  The custodial records also show E.J. had access to drinking water, functioning toilets, and functioning sinks.  While E.J. stated he thought the temperature was cold, he did confirm that the blanket helped keep him warm.  I checked the temperature and it measured 72.5 degrees Fahrenheit. The custodial records indicate the temperature of E.J.'s hold room was maintained within the appropriate range throughout his time in custody.  E.J. informed me that he has been able to sleep while in custody.  After the interview, I reviewed E.J.'s A-file, which showed he received the I-770 forms, list for free legal service providers, and notification to his consulate.  The agents indicated in his file that he received these documents, but refused to sign them.  The custodial records indicate that E.J. watched the UAC video.

The Guatemalan consular officials referred two mothers to me.  One mother had two daughters, minors Y.T. and B.T., who were four and five years old, respectively.  The other mother had a son and daughter, minors D.M. and J.M., who were one and three years old respectively.  The minors drank juice while their mothers spoke with me.  Y.T., B.T., and their mother were apprehended on April 12, 2018 and brought to CPC-Ursula at 8:50 PM.  At the time of the interview, they had been in custody for approximately three

days and 13 hours.  Y.T. and B.T.'s mother stated that after they arrived, they received cookies and juice.  Y.T. and B.T.'s mother also confirmed they received body wipes, had brushed their teeth, and showered.  Y.T. and B.T.'s custodial records indicate they were provided showers, clean clothes, body cleansing products, and dental hygiene products. Y.T. and B.T.'s mother stated it was cold at night, but they received blankets and mats, which helped her children, sleep.  Y.T. and B.T.'s custodial records indicate they each received a blanket and mat, and that the temperature of Y.T. and B.T.'s hold room was maintained within the appropriate range throughout their time in custody.  I checked the temperature of the hold room and confirmed it was 72.5 degrees Fahrenheit.  The custodial records indicate that Y.T. and B.T. were in custody for a total of four days and 21 hours, during which time they received breakfast, lunch, and dinner and snacks every day.  The custodial records also indicate they had access to drinking water, functioning toilets, and functioning sinks throughout their entire time in custody.  Because Y.T. and B.T. were under 14 years of age and accompanied, I did not review their A-Files.  It is my understanding the parent or legal guardian of accompanied minors under 14 years old would receive the relevant immigration forms on the minors' behalf.  The custodial records indicate that Y.T. and B.T. were shown the UAC video.

D.M., J.M., and their mother were apprehended on April 15, 2018 and brought to CPC-Ursula at 5:27 PM; at the time of the interview, they had been in custody for approximately 16 hours.  D.M. and J.M.'s mother stated they received sandwiches, cookies, and milk.  The mother told me the milk was "bad" and the "children did not like it."  When I asked her what she meant by "bad," the mother explained the milk was different from what they are used to.  D.M. and J.M.'s mother stated she could get milk, water, and apples for her children at any time.  D.M. and J.M.'s mother stated that the minors did not receive showers and were provided body wipes; however, the custodial records show the minors were provided showers the morning of April 16.  D.M. and J.M.'s mother also stated they were given a blanket and mat.  The custodial records of D.M. and J.M. do not have receipt of a blanket and mat recorded.  In total, the custodial records indicate D.M. and J.M. were in custody for a one day and 21 hours, during which time they received breakfast, lunch, dinner and snacks throughout each day.  The custodial records indicate that the temperature of D.M. and J.M.'s hold rooms were maintained within the appropriate range throughout their time in custody and that they had access to drinking water, functioning toilets, and functioning sinks.  When I checked the temperature of the facility, it measured 72.5 degrees Fahrenheit.  Because D.M. and J.M. were under 14 years of age, I understand that their mother would have received their immigration forms on their behalf.  The custodial records indicate that D.M. and J.M. watched the UAC video.

Based on my interviews, review of A-files when available, and later review of custodial records, as well as my personal observations, I conclude that CPC-Ursula continues to comply with the Agreement.  I recognize the importance of thorough record keeping and will continue to emphasize this to the field.  There were instances where minors and/or

their parents confirmed receipt of various hygiene products or mats and blankets, but it was not included in the custodial records.  Conversely, there was one instance where custodial records indicate two siblings received showers, but the mother stated they had not.  Whether or not the Agreement requires the recordation of such items, I conclude that more consistent data entry will continue to help the Agency document its compliance with the Agreement.  Given the large number of minors processed at CPC-Ursula each day and the large number of data points agents are required to input each day, I understand there will never be 100 percent recordation.  However, CBP is committed to ensuring their efforts are accurately reflected in the custodial records and I will continue to work with leadership to emphasize the importance of complete custodial records.

Ajo Station

On April 17, 2018 at 1:00 PM, I arrived unannounced at Ajo Station.  There were 17 minors on-site, who had each arrived at the station the previous day with an accompanying family member.  The minors ranged in age from two to 17 years old.  I informed the PAIC of my intent to interview any minors and/or parents or legal guardians who volunteered.  A plain-clothes agent read the introductory statement to the minors and parents in Spanish.  After the statement was read, some of the men stated, "everything is ok" and that the agents "have been nice to us," but no one wished to speak with me.

The two hold rooms where minors were held had functioning toilets, functioning sinks, and water fountains with potable water.  I also observed bottled water available for the minors to drink.  The toilets and sinks were behind a half-wall for privacy.  I measured the temperature of the hold rooms, which were 74 degrees Fahrenheit and 74.3 degrees Fahrenheit, respectively.  There were mats and Mylar blankets in the hold rooms available for minors to use.  The PAIC informed me there were over 100 mats available at the station.  While shower facilities are not available on-site, the PAIC informed me agents allow minors to use a separate hold room to wash up in private.[14]

I also observed the station's food and supplies available for agents to provide to minors.  There were burritos (and a warmer), crackers, juice, baby food, frozen children's meals, and bottled water.  All food items were within the expiration date.  Toiletries, including pre-pasted toothbrushes, body wipes, and feminine hygiene products, were available.  I also observed several items for infants and toddlers, including bottles, diapers, and diaper cream.  Clean clothes and shoes were also available in various sizes.

---

[14] I followed up with USBP Headquarters after my visit to learn more.  USBP Headquarters, in consultation with the Tucson Sector, informed me agents allow one family unit (parent and child(ren)) in the room to wash up and allow parents to assist their children.  UACs use the room, one at a time, to wash up.  I was informed that the video monitoring system is still recording while individuals are in the hold room, but agents do not project images from that hold room on the central monitor screen while it is in use.

Based on the hold room conditions, and the food and supplies available on-site, I
conclude that Ajo Station is holding minors consistent with the terms of the Agreement.

Yuma Station

On April 18, 2018, I arrived unannounced at Yuma Station at 10:00 AM.  There were 110
minors on-site, ranging in age from less than one year old to 17 years old.  Minors were
in seven different hold rooms depending on their age, gender, and status as accompanied
or unaccompanied.  Each hold room had functioning sinks, and functioning toilets behind
a half wall for privacy.  Each hold room had a functioning water fountain with potable
water.  I checked the temperature in each hold room; all rooms measured between 73.5
degrees Fahrenheit and 76.8 degrees Fahrenheit.  The mean temperature was 74.9 degrees
Fahrenheit.  There were also three mobile shower units on-site, which the PAIC informed
me that minors generally had access to within 48 hours of book-in and/or before transfer
out of the facility.

I also observed Yuma Station's food and supplies available for agents to provide to
minors.  There were ramen noodles, protein bars, raisins, canned pasta, juice, milk, baby
food, and formula, all within the expiration dates.  Toiletries, including feminine hygiene
products, packaged shower kits with a wet and dry cloth, toothbrush/toothpaste kits,
mouthwash, body wash, brushes, and combs, were available.  I also observed several
items for infants and toddlers, including bottles, baby wipes, pacifiers, and diaper cream.
I observed Mylar blankets and mats in the storage area.  Clean clothes and shoes were
also available in various sizes.  The PAIC informed me the holding rooms are generally
cleaned twice a day by contractors.

When I arrived, I informed the PAIC of my intent to interview minors and/or their
parents or legal guardians, and explained the process.  A plain-clothes agent assisted me
in reading the introductory statement to the minors and/or their parents in Spanish.  The
statement was read to all seven rooms where minors were held.  The plain-clothes agent
assisted me by translating the interviews as well.  The interviews were conducted in an
interview room near the hold rooms because that was the only available room for our use.
The door of the interview room remained open for all interviews and the chairs were
arranged in a semi-circle to facilitate discussion.  Because I was using an interview room,
I reiterated that these interviews were voluntary and had no impact on any immigration
processing or disposition.  In total, I interviewed 12 minors at Yuma Station.

Minor F.R. was a 16-year-old unaccompanied male from Guatemala.  F.R. explained, and
the custodial records indicate, that he was apprehended the night before.  The custodial
records show that F.R. arrived at Yuma Station on April 18 at 12:15 AM.  At the time of
the interview, he had been in custody for approximately 11 hours.  F.R. told me the
apprehending agent was "nice, friendly, and didn't disrespect anyone."  F.R. stated that,

when he was brought to the station, he received soup, crackers, and juice. [15]  F.R. did tell
me the soup was not warm, but stated the crackers and juice "were fine."  The custodial
records indicate that F.R. received a meal at 1:11 AM.  The custodial records also
indicate that F.R. received an energy bar at 3:21 AM.  F.R. did not tell me that he
received the energy bar, but he did state that he received breakfast.  The custodial records
indicate that F.R. received breakfast at 6:34 AM.  F.R. stated that he had slept on the
floor the night before with a blanket.  The custodial records do not have receipt of a
blanket or mat recorded.  F.R. stated the hold room was "a little cold," but the blanket
helped keep him warm.  The custodial records indicate that F.R.'s hold room was
maintained within the appropriate temperature range the entire time he was in custody.
The temperature of F.R.'s hold room measured 74.1 degrees Fahrenheit when I checked.
F.R. confirmed, and the custodial records show, that the hold room had functioning
toilets, functioning sinks, and functioning water fountains.  F.R. mentioned it was
difficult to wash his hands because the water turns off quickly after the button is pushed.
The custodial records indicate F.R. was provided a body-cleansing product.  After the
interview, I reviewed F.R's A-file, which showed he received and signed the I-770 forms,
list for free legal service providers, and notification to his consulate.  The custodial
records indicate that F.R. watched the UAC video.

I also interviewed the father of an 11-month-old son, J.Z., from Honduras.  The father
informed me that he and J.Z. were apprehended on April 15.  The custodial records
indicate that J.Z. and his father arrived at Yuma Station on April 15 at 6:44 PM; at the
time of the interview, they had been in custody for approximately two days and 16 hours.
The father stated that J.Z. had only a blanket the first night, but has had a mat since April
16.  The custodial records do not have receipt of a blanket or mat recorded.  The father
informed me that, during his time in custody, he had requested and received food,
diapers, baby wipes, and diaper cream for his son.  The custodial records indicate that
J.Z. was provided a body-cleansing product on April 16 and provided a shower on April
17.  The father stated that the hold room temperature is relatively stable, but is
"sometimes cold" and at other times, it is comfortable.  When I checked the temperature
of J.Z.'s hold room, it measured 76.4 degrees Fahrenheit.  Overall, the father stated he
had been treated well, but would like cloth blankets for his son instead of Mylar.  J.Z.
was not processed at the time of the interview and therefore did not have an assigned A-
number or A-file to review.  The custodial records indicate that J.Z. was shown the UAC
video, but given his age and status as an accompanied minor, this was not necessary.

I interviewed a father, son, and daughter from Guatemala.  The son, W.Z. was 16 years
old and the daughter, C.Z., was 14 years old.  The father stated, and custodial records
indicate, that the family was apprehended on April 16 and arrived at Yuma Station at
approximately 5:20 PM.  At the time of the interview, they had been in custody for

---

[15] Throughout the interviews, the minors and/or their parents referred to ramen noodles as soup.  Yuma Station
provides ramen noodles as a hot meal.

approximately one day and 17 hours.  The father stated they had only received soup for their meals.  The son and daughter stated they had also received juice and crackers as snacks.  The custodial records indicate that W.Z. and C.Z. received hot meals for breakfast, lunch, and dinner; the records specify the minors received soup for dinner each night.  The custodial records also indicate the minors received snacks during their time in custody.  The daughter stated she was wet when she first arrived, but that she fell asleep before receiving dry clothes.  During the interview, the son stated he had not slept.  Both the son and daughter stated they received blankets upon arrival, but not mats.  The custodial records do not have receipt of a blanket or mat recorded for either minor.  Both the son and daughter stated the temperature was "a little cold," but the blankets helped "a little."  When I checked, the temperature of the son's hold room was 74.1 degrees Fahrenheit, and the daughter's hold room was 74.2 degrees Fahrenheit.  The custodial records indicate both minors' hold rooms were maintained within the appropriate range the entire time they were in custody.  The daughter also stated that she requested and received feminine hygiene products.  I observed agents providing feminine hygiene products to the female minors' hold room, where C.Z. was placed.  Additionally, the custodial records indicate that W.Z. and C.Z. were provided body-cleansing products.  Both minors told me their hold rooms provided functioning toilets, functioning sinks, and functioning water fountains.  Custodial records confirmed this.  The father expressed concern that the water from the fountain may not be potable.  I confirmed that the water was potable and went back to the hold room with the son.  I drank the water from the fountain and confirmed that it was clean.  Overall, the father stated that the station was calm and they were "better off than in [their] home country."  W.Z. and C.Z. were not processed at the time of the interview and therefore did not have an assigned A-file to review.

I interviewed a mother and her two sons from Guatemala.  The oldest son, Y.M., was 15 years old and the younger son, F.M., was five years old.  The mother explained, and the custodial records indicate that they were apprehended and taken to Yuma Station around 5:30 PM on April 16.  At the time of the interview, they had been in custody for approximately one day and 17 hours.  The family stated, and the custodial records indicate, that the sons received soup, crackers, and juice within a couple of hours of their arrival at the station.  The mother and oldest son stated they had received regular meals while in custody, estimating at least six meals between arrival and our interview.  All of these meals were recorded in each minors' records.  The custodial records indicate the two sons were in the same hold room the entire time in custody; however, during the time I was on-site, I observed the youngest son in a hold room with his mother and the older son in a hold room with other male minors.  The family stated, and the custodial records indicate, that their hold rooms had functioning toilets, functioning sinks, and functioning water fountains.  This was confirmed for both the hold room assigned to the oldest son in the custodial records and the one I observed him in during my time on-site.  The custodial records indicate that F.M. and Y.M. were provided body-cleansing products.  The family did note that cups were not available in their hold room.  The hold rooms had functioning

water fountains at the time of my visit so I do not believe cups were required.  I drank water directly from the water fountain in Y.M.'s hold room.  The mother and oldest son stated the temperature of their hold rooms were comfortable.  The mother explained sometimes the room would get warmer, but then cool off again.  I measured the temperature of the hold rooms that each son was in at the time of my visit.  F.M.'s hold room measured 74.5 degrees Fahrenheit and Y.M.'s hold room measured 74.1 degrees Fahrenheit.  The custodial records indicate the temperature of each son's hold room was maintained within the appropriate range the entire time they were in custody.  The sons stated that they had slept a little, and that they currently had access to a blanket and mat.  The custodial records do not have receipt of a blanket or mat recorded.  Y.M. and F.M. were not processed at the time of the interview, and therefore did not have assigned A-numbers or A-files to review.

R.M. was a 14-year-old male from Guatemala who was apprehended with his father on April 17 and arrived at Yuma Station at 8:24 AM.  At the time of the interview, they had been in custody for approximately one day and two hours.  R.M. stated, and the custodial records indicate, that at the time of the interview, he had received three meals, crackers, and juice since he arrived at the station.  The custodial records also indicate that R.M. received his fourth meal after the interview.  I observed him receive this meal.  R.M. stated he slept overnight and received a blanket and mat.  The custodial records do not show receipt of a blanket or mat.  R.M. explained that he would prefer the temperature to be warmer in his hold room.  When I checked the temperature of the hold room, it measured 76.4 degrees Fahrenheit.  The custodial records show, and R.M. confirmed, that his hold room had functioning toilets, functioning sinks, and a functioning water fountain.  R.M. stated he would like a toothbrush.  I observed toothbrushes with toothpaste were among the supplies available to minors, but R.M's custodial records do not indicate whether he received one.  The custodial records indicate that R.M. was provided a body-cleansing product on April 17 and provided a shower on April 21.  R.M. was not processed at the time of the interview and therefore did not have an assigned A-number or A-file to review.

M.H. was a 17-year-old female from Guatemala who was apprehended with her father on April 17 and arrived at Yuma Station at 8:38 AM.  At the time of the interview, they had been in custody for approximately one day and two hours.  M.H. stated, and the custodial records indicate, that she received her first meal at 12:30 PM and then received another meal later in the evening.  Custodial records also indicate that M.H. received two meals in between 12:30 PM and her evening meal, although M.H. did not indicate that she received these.  M.H. also stated that, at the time of the interview, she had received crackers and juice between meals.  The custodial records indicate that M.H. received snacks between meals throughout her entire time in custody.  M.H. stated she had a blanket and mat, and had slept sporadically because there were "a lot" of people in the room with her.  The custodial records do not show receipt of a mat or blanket.  M.H. stated she was not cold in her hold room because she was wearing her sweatshirt.  When I

19

checked the temperature in her hold room, it measured 74.2 degrees Fahrenheit. M.H. stated her hold room had functioning toilets and functioning sinks. M.H. did not specifically mention the water fountain, but custodial records show the water fountain was functioning the entire time she was in the hold room. Custodial records indicate that M.H. received a body-cleansing product, but, during the interview, she did not indicate that she had received body wipes. I observed body wipes at the station. M.H. stated that feminine hygiene products were available, and that she could ask for more as needed. M.H. was not processed at the time of the interview and therefore did not have an assigned A-number or A-file to review.

M.P. was a seven-year-old female from Guatemala who was apprehended with her father on April 18 and taken to Yuma Station at 6:44 AM. At the time of the interview, they had been in custody for approximately four hours. The father stated that he and his daughter were apprehended early that morning and were "thankful" that they had been well received so far. The father stated, and the custodial records confirm, that M.P. had received two meals since they arrived. The father and daughter stated that they slept the morning they arrived. The father and daughter stated that they had not been provided a mat, but they had received a blanket. The custodial records for M.P. do not show receipt of a blanket or mat. The daughter indicated that the toilets, sink, and water fountain in the hold room had been functioning since she arrived. The custodial records indicate the toilets and sink were functioning the entire time the daughter was in custody. The custodial records indicate there were approximately two hours on April 19, after our interview, when the water fountain was not functioning. Moreover, the custodial records indicate that M.P. was provided a body-cleansing product on April 18 and provided a shower on April 21. M.P. stated the hold room was cold and she would prefer it warmer; however, she said the blanket helped "a little" to keep her warm. I checked the temperature of M.P.'s hold room, and it measured 76.8 degrees Fahrenheit. M.P. was not processed at the time of the interview and therefore did not have an assigned A-number or A-file to review.

Y.P. was a seven-year-old female from Guatemala who was apprehended with her mother and arrived at Yuma Station on April 17 at 11:45 AM. At the time of the interview, they were in custody for approximately 23 hours. The mother stated that the apprehending "agents were nice." The mother stated, and custodial records indicate, that they were taken directly to Yuma Station after apprehension. The custodial records indicate, and the mother confirmed, that Y.P. received a meal, juice, and crackers after they arrived. The custodial records also show that Y.P. received dinner and a snack later in the evening, and that Y.P. received a meal at 1:11 AM, an energy bar at 3:21 AM, and breakfast at 6:34 AM on April 18. The mother did not name all of these meals during the interview, but she stated they had been fed about three times a day since they arrived at Yuma Station on April 17. The mother stated that her daughter had slept at the station, and while Y.P. did not receive a blanket or mat immediately, she currently had both a blanket and mat. The custodial records do not show receipt of a blanket or mat. The

mother stated the temperature of the hold room was "fine." I checked the temperature of the hold room, and it measured 74.5 degrees Fahrenheit. The mother stated she would like a toothbrush, but "everything else has been fine." I observed toothbrushes with toothpaste available at the station, but the custodial records do not indicate whether Y.P. received one. The custodial records indicate that Y.P. was provided a body-cleansing product on April 17 and provided a shower on April 20. Y.P. was not processed at the time of the interview and therefore did not have an assigned A-number or A-file to review.

B.X. was a four-year-old female from Guatemala who was apprehended with her mother on April 18, and arrived at Yuma Station at 6:32 AM. At the time of the interview, they had been in custody for approximately four hours. The custodial records indicate, and the mother confirmed, that B.X. received a meal upon arrival, and then crackers and juice approximately three and a half hours later. The mother stated that her daughter had slept after arriving at the station, but did not receive a blanket or mat immediately after arrival. The mother informed me that B.X. currently had a blanket and mat in the hold room. The custodial records do not show receipt of a blanket or mat. The custodial records indicate, and the mother confirmed, that there were functioning toilets and functioning sinks in the hold room. The mother stated they did not have drinking water, but I confirmed the water fountain was working while I was on-site. The custodial records indicate there were approximately two hours on April 19, after my interview, when the water fountain was not functioning. The mother stated that the hold room temperature was "normal," and the custodial records indicate the temperature was within range throughout the entire time they were in custody. I checked the temperature of the hold room while on-site, and it measured 76.8 degrees Fahrenheit. The custodial records indicate that B.X. was provided a body-cleansing product on April 18 and provided a shower on April 21. The day after the interview, on April 19, the custodial records indicate B.X. was provided ibuprofen and antibiotics. B.X. was not processed at the time of the interview and therefore did not have an assigned A-number or A-file to review.

J.C. was a four-year-old male from Guatemala who was apprehended with his father on April 18 and arrived at Yuma Station at 6:03 AM. At the time of the interview, they had been in custody for approximately four hours. The father stated that there were no issues with his son. The custodial records show, and the father confirmed, that J.C. received a meal, crackers, and juice after they arrived. The custodial records show that J.C. received lunch after the interview. I observed J.C. receive this meal. During the interview, the father stated that J.C. had not received a blanket or mat yet, and that he found the hold room to be cold. I checked the temperature of the hold room, and it measured 76.4 degrees Fahrenheit. The father stated, and the custodial records show, that the toilets were functioning. The father was unsure how to use the sink and water fountain. After the interview, I accompanied the father and son back to the hold room to show them how to use the sink and water fountain. I drank water from the fountain and it was clean. The custodial records indicate that J.C. was provided a body-cleansing product on April 18

and provided a shower on April 21.  J.C. was not processed at the time of the interview and therefore did not have an assigned A-number or A-file to review.

Based on my interviews with the minors and/or their parents, personal observations, and subsequent review of the custodial records, I conclude that Yuma Station is compliant with the Agreement.  At the time of my visit, Yuma Station was holding a large number of individuals (both minors and adults), and I observed agents working quickly and professionally to process minors in their custody.  Many of the minors and parents reflected on the agents' professionalism and respect.  My observations and interviews confirm that minors were provided regular meals, had access to functioning toilets, functioning sinks, functioning water fountains, and were held in rooms in which the temperature was maintained within the appropriate range.  During the interviews, two fathers expressed they was unsure how to use the water fountain.  After the fathers told me this I went to two of the hold rooms where the minors and parents were held and showed them how to use the water fountain.  I then drank the water and confirmed it was clean.  The custodial records indicate that after my visit there was a two-hour period where the water fountain in one of the hold rooms was not functioning; however, it is my understanding that the water fountain was repaired and is currently operational.

Given the large number of individuals in holding at the time of my visit, I believe the custodial records reflect a rigorous effort to maintain complete and accurate custodial records.  However, some data was consistently missing from custodial records and one minor's hold room was mislabeled in the custodial records.  Whether or not the Agreement requires recordation of certain data points that were not recorded, I believe that more consistent data entry will continue to help the Agency document its compliance with the Agreement.  I have met with USBP leadership and they share this opinion.  Recognizing that increases in the number of minors in custody at any given time could create additional challenges, I intend to engage USBP leadership to ensure that Yuma Station has the resources and contingency plans in place to meet all the requirements outlined in the Agreement, in the event that even more minors are held in its custody.  Overall, minors confirmed, and the custodial records generally indicate, that minors had access to food, drinking water, functioning toilets and sinks, and were held in hold rooms that were maintained within the appropriate temperature range.  Therefore, I conclude that Yuma Station is compliant with the Agreement.

Chula Vista Station

On April 19, 2018 at 8:30 AM, I arrived unannounced at Chula Vista Station in San Diego, California.  There were four accompanied minors on-site, who were transferred to ICE custody while I was there.  I informed the PAIC of my intent to interview any minors and/or parents or legal guardians who volunteered.  A plain-clothes agent read the introductory statement to the minors and parents in Spanish.  No one wished to speak to me.

The minors on-site were in one hold room with their parents or legal guardians. The hold room had functioning toilets, functioning sinks, and a water fountain with potable water. The toilets and sinks were behind a half wall for privacy. The hold room had adequate bunk beds with mats and Mylar blankets for the number of minors and accompanying family members in the hold room. I checked the temperature of the hold room, which measured 70.1 degrees Fahrenheit. The PAIC informed me that minors shower at the barracks on-site, in a separate building. The PAIC informed me minors take showers daily, or as requested.

I also observed the station's food and supplies available for agents to provide to minors. There were frozen burritos, adult cereal and toddler cereal, ramen noodles, crackers, Pedialyte, and infant formula. All food items were within the expiration date. Toiletries, including toothbrush swabs and feminine hygiene products, were available. I also observed several items for infants and toddlers, including bottles, diapers, and baby wipes. Clean clothes and shoes were available in various sizes.

Based on the hold room condition, and the food and supplies available on-site, I conclude that Chula Vista Station is holding minors consistent with the terms of the Agreement.

> b.   Office of Field Operations Facilities

<u>Miami International Airport</u>

On April 9, 2018, I arrived at Miami International Airport unannounced. There, I interviewed the Chief and toured the two terminals where minors are generally held. There were no minors on-site when I arrived. I toured the areas where minors are typically held while in custody. The hold rooms each had a toilet and sink behind a half-wall for privacy. There was also bottled water in addition to the water fountain in the hold room. Pillows, mats, Mylar blankets, and cots were available for minors to use.

I also observed the food and supplies currently on-hand and available when minors are on-site. There were microwavable meals, fruit cups, tuna packets, rice, baby food, and baby formula. All these items were within the expiration date. The Chief informed me that food is made available at all times to minors. Toiletries, including soap, shampoo, baby wipes, baby powder, diapers and feminine hygiene products were available. I also observed showers were on-site at one of the terminals.

At the time of my visit, the on-site temperature monitor was broken; however, the hold room thermostats were all functional. The officer informed me that officers check the hold rooms each shift to ensure the temperature is within the 66-80 degree Fahrenheit range, and that the toilets and sinks are functioning properly.

Based on my personal observations, Miami International Airport is equipped to comply with the Agreement when minors are on-site. When I spoke to the Chief and officers escorting me throughout the facility, they were knowledgeable about the Agreement and understood the requirements. Therefore, I conclude that Miami International Airport continues to comply with the Agreement.

<u>San Ysidro Land Port of Entry</u>

On April 19, 2018 at 10:45 AM, I arrived unannounced at San Ysidro Land POE. There were 139 minors on-site, ranging in age from less than one to 17 years old. Minors were in various hold rooms depending on their age, gender, and status as accompanied or unaccompanied. In each hold room, there were functioning sinks and functioning toilets behind a half wall for privacy. Each hold room had a functioning water fountain with potable water, as well as a five-gallon beverage container filled with water. I checked the temperature in each hold room. All rooms measured between 65.1 degrees Fahrenheit and 76.5 degrees Fahrenheit; the mean temperature was 70 degrees Fahrenheit. There were no minors present in the hold room that measured 65.1 degrees Fahrenheit at the time of my check. I informed an officer on-site that the temperature was out of range. The minors held in that hold room were eating lunch in the cafeteria at that time. I did not re-check the temperature after minors returned to that hold room.

I also observed the facility's food and supplies available for officers to provide to minors. There was juice, milk, sandwiches, carrots, celery, mac-and-cheese, animal crackers, goldfish crackers, fruit snacks, baby food, and baby formula. All food items were within the expiration date. Toiletries, including feminine hygiene products, as well as items for infants and toddlers, like bottles, diapers, and baby wipes were available on-site. I also observed mats, wool blankets, and Mylar blankets on-site and available for minors to use. Shower facilities were also on-site for minors.

The San Ysidro Land POE is unique compared to the other facilities I observed during this reporting period because this facility has a cafeteria for individuals in custody to eat their meals. This provides an opportunity for older children who may not be in the same hold room as their parent or legal guardian, for various reasons including age and gender, to eat their meals together. When I was on-site, I observed three groups of minors and families eating lunch, which consisted of a sandwich, celery and carrots, animal crackers, and juice.

When I arrived, I informed the Chief and Watch Commander of my intent to interview any minors and/or parents or legal guardians and explained the process. The Watch Commander provided me with a list of all minors on-site. A plain-clothes officer assisted me by reading the introductory statement to the three groups of minors and families eating lunch, and assisted with translation during the interviews. After each group received their lunch, the assisting plain-clothes officer read the statement and asked

whether any minors and/or their parents wanted to voluntarily speak with me.  In total, I interviewed 10 minors at San Ysidro Land POE.  The interviews were conducted in an interview room near the cafeteria because that was the only space available for our use.  The door of the interview room remained open for all interviews and the chairs were arranged in a semi-circle to facilitate discussion.  Because I was using an interview room, I reiterated that these interviews were voluntary and had no impact on any immigration processing or disposition.

I interviewed two siblings from Mexico who were accompanied by their mother.  Minor M.R. was a 17-year-old female who was with her one-year-old brother, J.G.  They arrived at San Ysidro POE on April 18, 2018 at 8:55 PM.  At the time of the interview, they had been in custody for approximately 14 hours.  The mother informed me the officers have been "nice" and that she and her children have been treated well.  The mother explained that she and her children received something to eat and drink when they first arrived.  The mother stated that she and her daughter had received four meals and some snacks since they arrived, and that officers had provided formula and diapers for her son upon her request.  The mother told me her children had not been hungry since they arrived at the facility.  The mother also stated they received blankets and mats once they were placed in the hold room.  The mother explained she finds the temperature cold, but the blankets help.  The mother stated that both children have been able to sleep in the hold room.  Moreover, the mother confirmed that the hold room had functioning toilets, functioning sinks, and drinking water available.  The custodial records indicate the family was provided their first meal at 2:04 AM on April 19.  They were then provided breakfast, lunch, dinner, and snacks every day they were in custody, as well as drinking water.  The custodial records indicate that the family was held together in one hold room, which was clean and maintained within the appropriate temperature range.  The custodial records do not confirm if the hold room provided access to a toilet or sink.  The custodial records do not have receipt of a blanket or mat recorded for the siblings.  The custodial records indicate that M.R. and J.G. were offered a shower on April 21 at 4:54 A.M., but both declined.

I interviewed two brothers from Mexico who were accompanied by their mother.  Minor J.G.A. was a 14-year-old male who was with his 10-year-old brother, J.G.  They arrived at San Ysidro POE on April 18, 2018 at 6:06 PM.  At the time of the interview, they had been in custody for approximately 17 hours.  The mother informed me that they were nervous when they first arrived, but that "officers have been nice and that helps."  The sons stated that they had received regular meals since they arrived, and they had each received a blanket and mat.  While the sons stated the hold room was "a little cold," they also confirmed that the blankets help keep them warm.  They also told me they had been able to sleep while in custody.  The sons stated their hold room had functioning toilets, functioning sinks, and access to drinking water.  The custodial records indicate that the brothers were initially held in the same hold room, that J.G. was taken to a different hold room temporarily from 7:31 PM to 8:42 PM, and that he was then brought to the same

hold room as his brother again. The custodial records show the brothers' first meal was at 9:18 PM. They were provided another meal at 2:24 AM, when J.G. was again placed in a different hold room, and the records indicate the brothers remained in different hold rooms for the rest of their time in custody. The custodial records indicate the brothers were provided breakfast, lunch, dinner, and snacks every day they were in custody, and had access to drinking water. The custodial records indicate their hold rooms were clean and maintained within the appropriate temperature range. The custodial records do not have receipt of a blanket or mat recorded for the brothers. The custodial records do not confirm if their hold rooms provided access to a toilet or sink. J.G.A.'s custodial records indicate he was given medication on April 19 at 2:28 PM. Both brothers' records indicate they were offered showers on the morning of April 21 and the morning of April 22; J.G.'s custodial records indicate he declined the showers.

I interviewed three brothers from Honduras who were accompanied by their mother. Y.L. was a 14-year-old male, A.L. was a 12-year-old male, and J.S. was a three-year-old male. They arrived at San Ysidro POE on April 18, 2018 at 8:08 PM. At the time of the interview, they had been in custody for approximately 15 hours. The mother explained that they have had a "good experience" at the facility because "they know the officers are helping them." The mother and older sons stated they had received food after arrival and regular meals thereafter. They also told me they had received blankets and mats, and they all had been able to sleep at the facility. The mother and older sons stated their hold rooms had functioning toilets, functioning sinks, and water for them to drink. They also told me the temperature of the hold rooms was "comfortable." The custodial records indicate that the three brothers were initially in the same hold room until 9:44 PM, at which point Y.L. and A.L. were placed in a different hold room than J.S. A.L. was with his older brother Y.L. until April 19, 4:33 PM, when he was then placed in the same hold room as his younger brother J.S. and their mother. The custodial records indicate that the two younger brothers remained together for the rest of their time in custody, while Y.L. was held separately from them. The custodial records indicate that the brothers were provided their first meal at 2:26 AM on April 19. They were then provided breakfast, lunch, dinner, and snacks every day they were in custody, and had access to drinking water. The custodial records indicate that the brothers' hold rooms were clean and maintained within the appropriate temperature range. The custodial records do not have receipt of a blanket or mat recorded for the brothers. The custodial records do not indicate whether the brothers' hold rooms provided access to a toilet or sink. The brothers' records indicate they were offered showers on the morning of April 21 and the morning of April 22; A.L. and J.S.'s custodial records indicate they declined the showers.

Lastly, I interviewed three siblings from Mexico who were accompanied by their mother. J.Z.A. was a 17-year-old male, J.Z. was a 14-year-old male, and S.M. was a three-year-old female. According to the custodial records, the family arrived at San Ysidro POE on April 18, 2018 at 6:33 PM. At the time of the interview, they had been in custody for approximately 17 hours. The mother and sons informed me they had received food upon

arrival and that they had received regular meals thereafter. They also told me they had received blankets and mats, and they all had been able to sleep while in the facility. The mother and sons stated their hold rooms have functioning toilets, functioning sinks, and water for them to drink. The sons informed me that the temperature was "fine." The mother told me she thought it was cold, but that the blanket helped keep her daughter warm. The mother also told me the officers have treated her family well and "taken care of [the family's] needs." The custodial records indicate that the brothers were held together in a different hold room than their sister, who was held with her mother. The custodial records indicate that the siblings were provided their first meal at 9:18 PM. They were then provided breakfast, lunch, dinner, and snacks every day they were in custody, and that they had access to drinking water. The custodial records indicate that the siblings' hold rooms were clean and maintained within the appropriate temperature range. The custodial records do not have receipt of a blanket or mat recorded for the siblings. The custodial records do not indicate whether the siblings' hold rooms provided access to a toilet or sink. The brothers' records indicate they were provided showers on the morning of April 21 and the morning of April 22; S.M.'s custodial records indicate she declined the showers on those dates.

Based on my interviews with the minors and/or their parents, personal observations, and subsequent review of the custodial records, I conclude that San Ysidro Land POE is compliant with the Agreement. The families that I spoke to at San Ysidro all shared that the officers had treated them well and were professional. My observations and interviews confirm that at the time of my site visits, minors were provided regular meals, access to water, functioning toilets, functioning sinks, and functioning water fountains. Absent one hold room, which minors were not in at the time I checked the temperature, the hold rooms were all within the appropriate range at the time of my visit. The custodial records indicate the temperature was maintained within the appropriate range the entire time each minor was in custody. The custodial records at San Ysidro Land POE do not indicate whether any of the minors I interviewed received a blanket and mat, or indicate whether or not the hold rooms had functioning toilets and functioning sinks. However, based on my observations and interviews, the minors had access to blankets, mats, functioning toilets, and functioning sinks, even if it was not recorded. I will engage OFO leadership to discuss the importance of more consistent data entry. I continue to believe that more consistent data entry is important to document the Agency's compliance, but I do not believe a failure to record these items indicates non-compliance at San Ysidro Land POE. Therefore, I conclude San Ysidro continues to comply with the Agreement.

## B. Management Inspection Division's Site Visits

In my capacity as the acting CBP Chief Accountability Officer (CAO), I oversee all activities within OAct. As discussed in my March 2, 2018 report, MID is one of the divisions within OAct, and provides CBP executive management with analysis concerning the effectiveness, integrity, and performance of CBP programs, operations,

and offices.  MID acts independently and proactively to identify potential issues of
vulnerability and works with leadership to develop corrective action plans to strengthen
oversight of Agency operations.  MID also conducts site visits to CBP facilities for
purposes of determining compliance with the requirements of the Agreement, and reports
the results of these site visits to me.  I rely on these site visits to CBP facilities to inform
me of CBP's compliance with the Agreement at various facilities around the country.  I
trust that the observations from MID's site visits are accurate, thorough, and independent
from the opinions of USBP and OFO.

       i.  *Methodology*

In the March 2, 2018 report, I indicated that MID would revisit the facilities it had
previously inspected in the Rio Grande Valley Sector, as well as facilities outside this
Sector.  The *Flores* Working Group created a MID checklist to record whether conditions
at CBP facilities meet the requirements of the Agreement, which includes questions
related to whether the facility is equipped to provide access to food and water,
temperature at the facility, safe and sanitary conditions, and access to a cot/mat or blanket
(including Mylar blankets).  Prior to MID's site visits during this reporting period, the
MID checklist was updated to include minors' access to functioning toilets, functioning
sinks, and a station/POE point of contact (POC) on-site who MID is able to contact
immediately if MID observes any issues at the facilities, such as expired food, non-
functioning toilets or sinks, temperatures out of range, or pests/rodents.

When MID arrived at each CBP facility they notified the PAIC or supervisory officer of
their intent to walk through the facility to observe conditions related to the Agreement.
MID records their observations on the checklist, and then submits the checklists to me.
Generally, an agent or officer will accompany MID throughout the facility, but the
observations recorded are MID's own.  MID's observations center on whether the
facilities are equipped to provide access to food and water, temperature at the facility,
safe and sanitary conditions, and access to a cot/mat or blanket (including Mylar
blankets).  Therefore, even when minors are not on-site, or when MID does not directly
observe minors provided meals and snacks, it is able to confirm that the facility has these
items available and is able to provide these items as necessary.

During this reporting period, MID conducted three trips to CBP facilities along the
southwest border, which occurred on March 12-14, April 2-4, and May 1-3, 2018.  MID
conducted site visits to USBP locations in the following sectors:  Rio Grande Valley, San
Diego, Yuma, El Centro and Tucson.  MID conducted site visits to OFO locations in the
following field offices:  Laredo, San Diego, and Tucson.  The site visits were conducted
at locations during various times throughout the day and night in order to provide me
with a complete picture of operations at each facility.  USBP and OFO had notice that
MID would be traveling to the facilities visited and the dates of the trips, but they were

not informed of the exact time when MID would be on-site.  In total, MID conducted 47
site visits during these three trips, covering 27 USBP facilities and 20 OFO facilities.

ii. *Observations and Results*

This section outlines MID's findings based on their observations, which are recorded on
the completed checklists from all site visits, and where applicable, includes corrective
actions taken by the USBP or OFO facilities following the site visits.

a. U.S. Border Patrol Facilities

Rio Grande Valley Sector

MID conducted site visits in the Rio Grande Valley Sector on March 12-14, 2018 to the
following locations where minors are routinely held: Brownsville Station, CPC-Ursula,
Corpus Christi Station, Falfurrias Station, Fort Brown Station, Harlingen Station, and
Kingsville Station.

Minors were on-site at CPC-Ursula and Fort Brown Station during MID's site visits.
MID conducted its site visit of CPC-Ursula at 2:00 PM, during which time MID observed
minors being served snacks.  At all facilities, MID confirmed that facilities were
equipped to provide access to the following, even if minors were not on-site or MID did
not directly observe minors at the time of the site visit: meals and snacks; drinking water;
functioning toilets; functioning sinks; and cots/mats or blankets.  In the hold rooms where
minors were present, MID confirmed that the rooms were clean, free of pests and rodents,
and within the temperature range of 66-80 degrees Fahrenheit.  MID observed that all
facilities provided additional supplies for minors, such as diapers, formula, clean
clothing, and towels.  Falfurrias Station and CPC-Ursula each have shower facilities on-
site.

San Diego Sector

MID conducted site visits in the San Diego Sector on April 2-4, 2018 to the following
locations: Boulevard Station, Brown Field Station, Campo Pine Valley Station, Chula
Vista Station, El Cajon Processing Center, El Cajon Station, Imperial Beach Station,
Newton-Azrak Station, and San Clemente Station.

Minors were on-site at Brown Field Station, Chula Vista Station, Imperial Beach Station,
and San Clemente Station during MID's site visits.  MID observed minors being fed
meals at Brown Field Station, meals and snacks at Imperial Beach Station, and snacks at
San Clemente Station.  At all facilities, MID confirmed that facilities were equipped to
provide access to the following, even if minors were not on-site or MID did not directly
observe minors at the time of the site visit: meals and snacks; drinking water; functioning

29

toilets; functioning sinks; and cots/mats or blankets.  In the hold rooms where minors
were present, MID confirmed that the rooms were clean, free of pests and rodents and
within the temperature range of 66-80 degrees Fahrenheit.  MID observed all facilities
provided additional supplies for minors, such as diapers, baby wipes, clean clothing, and
towels.  MID reported that Chula Vista Station has shower facilities on-site.

Yuma Sector

MID conducted site visits in the Yuma Sector on April 2-4, 2018 to the following
locations: Yuma Station, Blythe Station, and Wellton Station.

Minors were on-site at Yuma Station during MID's site visit.  MID also observed data
entry training occurring on-site at Yuma Station.  I later learned this training occurred on
April 3 through April 5, 2018, during which time USBP Headquarters personnel trained
Yuma agents on the use of USBP's system of record and reinforced the importance of
recording custodial actions in a timely manner.  At all facilities, MID confirmed that
facilities were equipped to provide access to the following, even if minors were not on-
site or MID did not directly observe minors at the time of the site visit: meals and snacks;
drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  In the
hold rooms where minors were present, MID confirmed that the temperature was within
the 66-80 degrees Fahrenheit range.  MID observed all facilities provided additional
supplies for minors, such as baby bottles, diapers, clean clothing, and towels.

At Yuma Station, MID observed fruit flies in the sink area of one of the hold rooms.
MID informed the supervisory agent in charge of the pests.  MID observed the agent
killed most of the fruit flies in the sink while MID was on-site.  MID reported this finding
to me on April 13, 2018.  It is my understanding that a contract exterminator treated the
processing area, which includes hold rooms, following MID's visit.  When I was at Yuma
Station on April 18, 2018, I did not observe fruit flies in any hold rooms.

El Centro Sector

MID conducted site visits in the El Centro Sector on April 2-4, 2018 to the following
locations: Indio Station, Calexico Station, and El Centro Station.

Minors were on-site at Calexico and El Centro Stations during MID's site visits.  MID
observed minors being served snacks at El Centro Station.  At all facilities, MID
confirmed that facilities were equipped to provide access to the following, even if minors
were not on-site or MID did not directly observe minors at the time of the site visit: meals
and snacks; drinking water; functioning toilets; functioning sinks; and cots/mats or
blankets.  In the hold rooms where minors were present, MID confirmed that rooms were
clean, free of pests and rodents, and within the temperature range of 66-80 degrees

Fahrenheit.  MID observed all facilities provided additional supplies for minors, such as diapers, formula, clean clothing, and towels.

At Indio Station, where minors were not present, MID observed expired food in the food storage area.  MID informed the supervisory agent in charge of the expired food.  MID reported this finding to me on April 13, 2018.  I advised USBP of MID's finding.  USBP informed me the expired food was disposed of and replenished with new stock.  USBP also informed me that, at this time, all items in stock at Indio Station currently have a minimum expiration date of January 2019.  Moving forward, El Centro Sector will deploy more conspicuous labeling and signage to ensure all stock is rotated and pulled properly.

Tucson Sector

MID conducted site visits in the Tucson Sector on May 1-3, 2018 to the following locations: Casa Grande Station, Tucson Coordination Center, Brian A. Terry Station, Nogales Station, and Douglas Station.

Minors were on-site at the Tucson Coordination Center during MID's site visits.  At all facilities, MID confirmed that facilities were equipped to provide access to the following, even if minors were not on-site or MID did not directly observe minors at the time of the site visit: meals; drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  All facilities, except the Tucson Coordination Center, were equipped to provide snacks to minors.  In the hold rooms where minors were present, MID confirmed that the rooms were clean, free of pests and rodents, and within the temperature range of 66-80 degrees Fahrenheit.  MID observed all facilities provided additional supplies for minors, such as baby bottles, diapers, clean clothing, and towels.  MID reported Casa Grande Station, Tucson Coordination Center, Douglas, and Nogales Station each have shower facilities on-site.

Based on MID's site visits to the Rio Grande Valley, San Diego, Yuma, El Centro, and Tucson Sectors, I conclude the USBP facilities MID visited continue to comply with the Agreement.  MID immediately alerted the agents on-site of the expired food at Indio Station and fruit flies at Yuma Station.  In my opinion, this does not necessarily mean the stations were out of compliance with the Agreement.  During my site visit to Yuma Station, I did not observe any pests in the hold rooms.  Additionally, as discussed above, agents quickly addressed these isolated incidents.  In Indio Station, no minors were even on-site at the time MID identified the expired food.  Likewise, the fact that Tucson Coordination Center was not equipped to provide snacks to minors at the time of MID's visit, does not, in my opinion, mean the facility was out of compliance with the Agreement.  As MID confirmed, that facility was equipped to provide minors with hot meals and the food on-site was within the expiration date.  Therefore, I conclude USBP facilities continue to comply with the Agreement.

      b.   Office of Field Operations Facilities

<u>Laredo Field Office</u>

MID conducted site visits in the Laredo Field Office on March 12-14, 2018 to the following locations: Brownsville POE, Del Rio POE, Eagle Pass POE, Hidalgo POE, Laredo POE, Progreso POE, and Roma POE.

Minors were on-site at Eagle Pass POE, Laredo POE, and Roma POE during MID's site visits.  At all facilities, MID confirmed that facilities were equipped to provide access to the following, even if minors were not on-site or MID did not directly observe minors at the time of the site visit: meals and snacks; drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  At Hidalgo POE, Laredo POE, Progreso POE, and Roma POE, the officers informed MID that hot meals are provided by local restaurants.  In the hold rooms where minors were present, MID confirmed that the rooms were clean, free of pests and rodents, and within the temperature range of 66-80 degrees Fahrenheit.  MID observed that all facilities provided additional supplies for minors, such as diapers, formula, clean clothing, and towels.

<u>San Diego Field Office</u>

MID conducted site visits in the San Diego Field Office on April 2-4, 2018 to the following locations: San Diego Airport, Otay Mesa POE, San Ysidro POE, Tecate POE, Calexico East POE, Calexico West POE, and Andrade POE.

Minors were on-site at Otay Mesa POE, Tecate POE, and Calexico West POE during MID's site visits.  At all facilities, MID confirmed that facilities were equipped to provide access to the following, even if minors were not on-site or MID did not directly observe minors at the time of the site visit: meals and snacks; drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  In the hold rooms where minors were present, MID confirmed that the rooms were clean, free of pests and rodents, and within the temperature range of 66-80 degrees Fahrenheit.  MID observed that all facilities provided additional supplies for minors, such as diapers, formula, clean clothing, and towels.  San Diego Airport, San Ysidro POE, and Tecate POE have shower facilities on-site.

MID observed expired food at the Calexico West POE, and promptly informed the supervisory officer.  The day after MID's site visits, the Chief of Staff of Calexico West and East POEs informed MID that corrective actions had been taken to remove all food products in question from food storage areas, refrigerators, and freezers, and that officers are actively reevaluating the overall methodology for food storage.  The Calexico Chief of Staff also noted that following MID's visit, a mini-fridge designated for detainee food was installed in Calexico East, to be monitored by officers at all shifts to ensure that all

food stored is within expiration dates.  Additionally, a new shelving unit was installed in Calexico East to store linens, supplies, and hygiene packs for all detainees.

Expired juice bottles were observed in Andrade POE, where there were no minors on-site.  MID informed the supervisory officers of the expired juice; the officer informed MID that he would dispose the expired juice.  The POC noted they keep small amounts of juice on hand, but officers are ready to obtain more from a local store nearby, within an hour.

Tucson Field Office

MID conducted the first site visit in the Tucson Field Office to the San Luis POE on April 3, 2018, during the same trip as the site visits to the Yuma Sector, due to San Luis POE's close proximity to the Yuma Sector.  Minors were on-site at San Luis POE during MID's site visit.  At all San Luis POE, MID confirmed that the POE was equipped to provide access to the following, even if minors were not on-site or MID did not directly observe minors at the time of the site visit: meals and snacks; drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  In the hold rooms where minors were present, MID confirmed that the rooms were clean, free of pests and rodents, and within the temperature range of 66-80 degrees Fahrenheit.  MID observed the facility provided additional supplies for minors, such as diapers, formula, clean clothing, and towels.

Expired food and formula were observed at San Luis POE.  MID informed the supervisory officer of the expired food and formula; the food and formula were promptly disposed while MID was still onsite.

MID continued site visits in the Tucson Field Office on May 1-3, 2018, to the following locations: Tucson Airport, Naco POE, Nogales POE, Sasabe POE, and Douglas POE.

Minors were on-site at Nogales POE during MID's site visits.  At all facilities, MID confirmed that the facilities provided access to the following: meals; drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  All facilities except the Tucson Airport were equipped to provide snacks to minors.  In the hold rooms where minors were present, MID confirmed that the rooms were clean, free of pests and rodents, and within the temperature range of 66-80 degrees Fahrenheit.  MID observed the facilities provided additional supplies for minors, such as diapers, formula, clean clothing, and towels.  MID also reported Tucson Airport, Nogales POE, Naco POE, and Sasabe POE each have shower facilities on-site.

Based on MID's site visits to facilities within the Laredo, San Diego, and Tucson Field Offices, I conclude the OFO facilities MID visited continue to comply with the Agreement.  MID immediately alerted the officers on-site of the expired food at Calexico

West POE, Andrade POE, and San Luis POE.  It is my understanding that these isolated instances were quickly addressed.  The Chief of Staff of Calexico POE even followed up with MID the next day to advise that all expired food had been disposed of and immediate actions were taken to ensure food is not stored past its expiration date.  Furthermore, the fact that Tucson Airport was not equipped to provide snacks to minors at the time of MID's visit, does not, in my opinion, mean the facility is out of compliance with the Agreement.  MID confirmed that Tucson Airport was equipped to provide meals to minors if any were on-site.  At the time of MID's site visit, minors were not on-site.  Therefore, I conclude the OFO facilities MID visited continue to comply with the Agreement.

## C. Juvenile Coordinator's Conclusion

Based on my site visits, interviews with 38 minors, review of the associated custodial records, and when available, A-files, as well as the results of MID's 47 visits, I conclude that CBP continues to comply with the Agreement.  During the interviews, minors and/or their parents confirmed that, in general, minors received meals and snacks; had access to drinking water, functioning toilets, and functioning sinks; and were held in rooms that were maintained at an appropriate temperature.  Except for one hold room, which was less than one degree Fahrenheit below the appropriate temperature range and did not have any minors currently in the room, I confirmed that the temperature of the hold rooms were within the appropriate range during each of my site visits.  The facilities I observed were safe and sanitary, and where MID observed isolated cases of pests or expired food, there was immediate follow-up.  An exterminator treated the facility at Yuma Station, and I did not observe any pests when I was on-site later in the month.  Moreover, Indio Station promptly discarded any expired food items, and El Centro Sector has informed me of additional efforts to monitor the expiration dates of its food stock.  As discussed above, in certain instances where MID observed expired food, minors were not even on-site.  Additionally, as resources permitted, I observed laundry services, showers, toiletries, clean clothing, and entertainment provided to minors.  MID also made note of laundry services, showers, toiletries, and clean clothing observed at various facilities visited.  During the interviews, some minors and/or their parents also stated agents and officers were professional and respectful while executing their duties.

During the interviews, some minors and/or their parents expressed dislike of food served, were unsure how to use the water fountain or if the water was potable, and stated they felt the hold rooms were cold.  In the cases where minors and/or their parents mentioned they did not like the food, the food was different from what they were used to, or they would have liked more variety, there were no allegations the food they received was spoiled or expired.  Moreover, during the interviews in Yuma Station, if a minor and/or parent told me they were unsure how to use the water fountain or questioned if it were safe to drink, after the interviews I returned to their hold rooms to demonstrate how the water fountain worked and drank the water myself.  I can confirm that the water fountains worked and the water tasted clean.  As discussed above, the custodial records indicate the water

fountain in one hold room was not functioning for approximately two hours; however, it was promptly addressed and functional within two hours. Finally, in regard to the temperature of the hold rooms, some minors and/or parents told me they found it cold. Except for one room where minors were not present at the time, the rooms were all within a range of 66 to 80 degrees Fahrenheit at the time that I checked the temperature, with an overall average of 72.8 degrees Fahrenheit. Temperature is a personal preference, and many of the minors and or parents I spoke to were not used to air conditioning. While I cannot ensure that all CBP facilities maintain a temperature that is comfortable for every single individual in custody, I will continue to monitor the temperature of CBP facilities to ensure minors' hold rooms continue to be maintained within 66 to 80 degrees Fahrenheit, and that minors have access to blankets. For the most part, my observations, review of custodial records, and minor interviews confirm that the temperature is maintained within range and minors have access to blankets and mats. The minors and/or their parents stated during the interviews that blankets generally helped keep them warm when they felt cold.

My site visits, interviews, and review of custodial records and A-files, as well as MID's site visits, highlighted two areas where improvements can be made: (1) ensuring processes are in place to prevent storing food past its expiration date; and (2) more consistent data entry for custodial records. Both OFO and USBP have already taken steps to ensure that no one receives expired food. On May 14, 2018, OFO Headquarters communicated by e-mail to all 20 Field Offices to closely monitor the expiration dates of perishable items provided to minors and adults in CBP custody, including food products and hygiene items. This monitoring includes the checking of the expiration dates of products in the storage rooms; if any products are expired, officers should properly dispose of the items and should not provide any expired items to individuals in custody. Similarly, USBP Headquarters Law Enforcement Operations Directorate issued an email on February 21, 2018, and again on May 17, 2018, to all USBP juvenile coordinators. This email advised agents to monitor and dispose of any expired food in a timely fashion and to never provide such food to anyone in CBP custody. CBP is committed to ensuring that no one in its custody is provided food past the expiration date and will re-emphasize this to the field to ensure proper food storage processes are in place to routinely check for lapsed expiration dates.

OFO and USBP have also taken steps to promote more consistent data entry for their respective systems of record, which in my opinion; will allow the Agency to better document its compliance with the Agreement. For example, OFO continually communicates musters to field offices regarding the proper use of its computer systems. On May 8, 2018, OFO updated its system of record and issued memorandum and a muster on the proper use of the system updates. Both the memorandum and muster included a statement on accountability to ensure that data entries are completed timely and accurately. Likewise, USBP strives to ensure the data is entered into the system in a timely and accurate manner. While MID was on-site in Yuma Station, agents were

taking a data-entry training.  It is my understanding that USBP Headquarters conducts
data-entry training in the field on a continuous basis.  I have spoken with USBP
leadership about the need to continue data entry training and promote robust record
keeping so that the custodial records reflect the dedicated efforts of the agents in the field,
and I intend to meet with OFO leadership as well.  While I did observe some
discrepancies between the custodial records and what minors reported to me or I
observed directly, the majority of the instances reflect a failure to record, not execute, as
confirmed by my interviews, personal observations, and MID's observations.  I recognize
that 100 percent recordation is unrealistic given the large volume of data collected for
both minors and adults.  For example, of the 38 minors I interviewed in CBP custody,
there were approximately 8,000 custodial actions captured.

Ultimately, this does not change my conclusion that the Agency continues to comply with
the Agreement.  My observations, interviews with minors, review of custodial records,
and when available, A-files, as well as MID's site visits, confirmed that overall, minors
were provided access to food and water, functioning toilets and sinks, and held in hold
rooms that were maintained within the appropriate range.  When issues were identified
on-site, like MID's findings of expired food or pests, the CBP facilities quickly resolved
these issues.  Moreover, my observations and interviews with minors revealed that when
there are discrepancies in the custodial records, it generally reflects inconsistent data
entry.  Overall, it appears custodial actions are performed more often than are recorded,
which does not change my opinion that CBP continues to comply with the Agreement.
Whether or not the Agreement requires improvements in these areas, I conclude
processes to check food expiration dates and more consistent data entry will help the
Agency demonstrate its own compliance with the Agreement.

# III.   Conclusion

Based on my extensive monitoring activities during this reporting period, I conclude that
CBP continues to comply with the Agreement.  From March 2, 2018 through May 31,
2018, I developed a site visit process that included interviewing minors; I conducted eight
unannounced site visits to USBP and OFO facilities where minors were held; I
interviewed 38 minors (or parents on the minors' behalf) who agreed to voluntarily share
their experience in CBP custody with me and reviewed the 38 minors' custodial records;
and I directed MID to conduct site visits at 47 CBP facilities on the southwest border and
advise me of their findings.  Taken together, these activities provide me with a sufficient
basis to conclude that the Agency is holding minors in a manner that is consistent with
the Agreement.

While this is the last report I am currently required to submit per this Court's June 27,
2017 and October 18, 2017 Orders, I will continue to execute my responsibilities as the
Juvenile Coordinator, and engage with CBP leadership to identify any actions I deem
necessary to ensure ongoing compliance with the Agreement.  The dual role of Juvenile

Coordinator and CAO provides me with the institutional capacity to promote transparency and develop operationally sound measures to achieve this goal.  Unless otherwise directed, I will continue to leverage my unique experience to build upon the progress outlined above and enhance the Agency's monitoring and reporting capabilities.

# Appendixes

## a. Appendix 1: List of Acronyms

| Acronym | Definition |
|---------|------------|
| **A-number** | Alien Number |
| **CAO** | Chief Accountability Officer |
| **CBP** | U.S. Customs and Border Protection |
| **CPC** | Centralized Processing Center |
| **e3DM** | Enforcement Integrated Database e3 Detention Module |
| **HHS** | U.S. Department of Health and Human Services |
| **MID** | Management Inspections Division |
| **OAct** | Office of Accountability |
| **OFO** | Office of Field Operations |
| **PAIC** | Patrol Agent in Charge |
| **POC** | Point of Contact |
| **SIGMA** | Secure Integrated Government Mainframe Access |
| **UAC** | Unaccompanied Alien Child(ren) |
| **USBP** | U.S. Border Patrol |

# b. Appendix 2: Juvenile Coordinator Minor Interviews- Introductory Statements

**English Version**

Henry Moak is the U.S. Customs and Border Protection Juvenile Coordinator. As the Juvenile Coordinator, his job is to monitor all U.S. Customs and Border Protection facilities where minors are held to ensure each facility is operating according to the terms of the *Flores* Settlement Agreement. The *Flores* Settlement Agreement describes conditions that must be met for all minors held in U.S. Customs and Border Protection custody.

Mr. Moak is here to monitor operations at [name of facility]. He will interview the [agents or officers] and inspect the facility. As part of his visit to [name of facility], he would also like to interview minors and/or accompanying family members or legal guardians to learn about your experience at [name of facility]. This interview is voluntary and is not required for any purpose. This interview, if you choose to participate, will have no impact on any immigration processing or your immigration disposition. If you decide to participate, you may decide at any point to stop the interview or decline to answer any question. A family member, legal guardian, or consular official to the extent one is available, may also be present for the interview. If you wish to have a consular official present during the interview, and one is not presently available, you may decline to be interviewed or the Juvenile Coordinator may decide not to interview you. If you require a translator for the interview, please request one, and CBP will provide one if you are interviewed. You may choose to stop the interview at any time, and you may decline to answer any questions that you do not wish to answer.

These interviews will be conducted for the purpose of understanding your experience at [name of facility] and will assist Mr. Moak in monitoring compliance with the *Flores* Settlement Agreement. The interviews Mr. Moak conducts today at [name of facility], and at other U.S. Customs and Border Protection facilities he visits, will be compiled and discussed in a report documenting U.S. Customs and Border Protection's compliance with the *Flores* Settlement Agreement, to submit to the court overseeing this case.

If you would like to speak with Mr. Moak about your experience at [name of facility] please let the [agents or officers] know and he will meet with you shortly.

**Spanish Version**

Henry Moak es el coordinador de juveniles para la Protección Aduanera y
Fronteriza de Los Estados Unidos.  Como el coordinador de juveniles su trabajo es
supervisar instalaciones donde los menores están detenidos para asegurar que cada
instalación está operando de acuerdo a los términos del acuerdo de solución
Flores.  El acuerdo de solución Flores describe las condiciones que deben
cumplirse para todos los menores detenidos bajo la custodia de la Protección
Aduanera y Fronteriza de Los Estados Unidos.

El Señor Moak esta aquí para supervisar las operaciones en [facility].  El
entrevistara a los agentes e inspeccionara las instalaciones como parte de su visita
a [facility].  También le gustaría entrevistar a menores de edad y familiares y
tutores legales para conocer su experiencia en [facility].  Esta entrevista es
voluntaria y no es necesaria para cualquier propósito.  Esta entrevista si deseas
participar no tendrá impacto en ningún procedimiento de inmigración o tu
disposición migratoria.  Si decides participar, en cualquier momento puedes
decidir parar la entrevista o negar contestar preguntas.  Cualquier familiar o tutor
legal o consulado  si hay uno disponible también puede estar presente para la
entrevista.  Si deseas tener un oficial de consulado presente durante la entrevista y
no hay uno disponible, puedes negar la entrevista o el coordinador de juveniles
puede decidir no entrevistarte.  Si requieres un traductor para la entrevista, por
favor solicite uno y le proveeremos uno si lo entrevistan.  Pueden parar la
entrevista en cualquier momento y negar contestar cualquier pregunta que no
quiera contestar.

 Estas entrevistas se llevaran a cabo con el fin de entender su experiencia en
[facility] y le ayudaran a Mr. Moak en el seguimiento de cumplimiento con el
acuerdo de solución Flores.  Estas entrevistas de hoy en [facility] y en otras
instalaciones serán recompiladas y discutidas en un reporte documentando por la
Protección Aduanera y Fronteriza de Los Estados Unidos en cumplimiento con el
acuerdo de solución Flores para someter a la corte sobre este caso.

Si usted desea hablar con Mr. Moak sobre su experiencia en [facility] por favor
avise a los agentes y el los entrevistara.