CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        cadams@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores, *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>Jefferson B. Sessions, Attorney General, *et al.*,<br><br>            Defendants. | Case No. CV 85-4544-DMG (AGRx)<br><br>REPLY TO OPPOSITION TO MOTION TO ENFORCE CLASS ACTION SETTLEMENT<br><br>Hearing:  June 29, 2018<br>Time:      10:00 a.m.<br>Room:     1st St. Courthouse<br>            Courtroom 8C |

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
          ccwhite@ucdavis.edu

OUTLINE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   THE COURT MAY GRANT THE RELIEF PLAINTIFFS REQUEST WITHOUT
      HOLDING DEFENDANTS IN CIVIL CONTEMPT. ...................................... 1

III.  ORR PEREMPTORILY DENIES NON-DANGEROUS YOUTH LICENSED
      PLACEMENT.......................................................................................... 3

      A.    ORR's interning special needs minors in RTCs does not convert
            them into "licensed placements." .......................................... 4

      B.    ORR unquestionably sends non-dangerous class members to staff-
            secure facilities and juvenile halls. ....................................... 6

IV.   THIS COURT, AND NOT A STATE LICENSING AGENCY, IS CHARGED WITH
      ENSURING COMPLIANCE WITH A FEDERAL CONSENT DECREE. ............ 7

      A.    The Settlement nowhere commits children's protection against
            unlawful medicating to the unfettered discretion of licensing
            inspectors. ............................................................................... 7

      B.    ORR's notifying "viable sponsors" of changes to children's
            medications falls far short of complying with the Settlement. ........... 10

      C.    ORR's medicating class members for months on end cannot
            possibly be dismissed as a response to an emergency. ...................... 12

V.    GRANTING YOUTH A TIMELY AND MEANINGFUL OPPORTUNITY TO BE
      HEARD ON A CUSTODIAN'S FITNESS HELPS PROTECT THEM FROM HARM OR
      NEGLECT. ............................................................................................. 12

      A.    ORR admits to policies that irrationally prolong class members'
            detention. .............................................................................. 13

            1.    Extended detention so ORR's director may approve release... 14

            2.    Detaining class members until RTC staff approve release. ..... 15

            3.    Detaining children until post-release services are in place. ..... 16

      B.    ORR's prolonging class members' detention because it is
            purportedly powerless to retrieve them from unfit custodians is
            irrational................................................................................. 18

VI.   THE TVPRA REINFORCES NON-DANGEROUS CLASS MEMBERS' RIGHTS
      UNDER THE SETTLEMENT TO TRANSPARENCY AND FAIRNESS IN STEP-UPS
      AND DETERMINATIONS OF CUSTODIANS' FITNESS. ........................... 19

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

VII.   PLAINTIFFS' PROPOSED REMEDIAL ORDER IS PRACTICABLE AND EQUITABLE. ................................................................................ 21

     A.   ORR should refer custodians' fitness to competent state authorities if it declares them unfit or fails to decide fitness within thirty days. ............................................................................... 21

     B.   ORR should submit step-ups for review by immigration judges. ...... 23

     C.   ORR should obtain the informed written consent of a parent or other close relative, or else a court order, before administering children psychotropic medications. ................................................ 24

VIII.   CONCLUSION ................................................................................. 25

TABLE OF AUTHORITIES

**Cases**

*Baird v. State*, 398 S.W.3d 220 (Tex. Crim. App. 2013) ................................. 9

*Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016) ....................... 20, 21, 22, 23

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ............................................... 20

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ................................................. *passim*

*In re Gault*, 387 U.S. 1 (1967) ...................................................................... 23

*M.B. v. Corsi*, No. 2:17-cv-04102-NKL, 2018 U.S. Dist. LEXIS 3232
   (W.D. Mo. Jan. 8, 2018) ......................................................................... 24

*M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015) ................................... 7-8

*Maldonado v. Lloyd*, 2018 U.S. Dist. LEXIS 75902 (S.D.N.Y. 2018) ........... 20, 21, 22

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) ........................................ 9

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................................................... 21

*O'Connor v. Donaldson*, 422 U.S. 563 (1975) .............................................. 23

*Parham v. J. R.*, 442 U.S. 584 (1979) ........................................................... 24

*People v. Cornett*, 53 Cal. 4th 1261 (2012) .................................................. 9

*Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992) ........................... 9

*Santos v. Smith*, 260 F. Supp. 3d 598 (W.D. Va. 2017) ............................... 20, 21, 22

*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) ....................... 6, 18

*Smith v. Sumner*, 994 F.2d 1401 (9th Cir. 1993) .......................................... 2, 22

*Stone v. City & Cty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992) .......... 2

*United States v. N.Y.C. Dist. Council of N.Y.C.*, 229 F. App'x. 14 (2d
   Cir. 2007) ............................................................................................... 9

*In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015) ..................................................................................... 9

*Washington v. Harper*, 494 U.S. 210 (1990) ............................................. 24

**Statutes**

8 U.S.C. § 1232(c)(3)(B) ........................................................................... 17

Cal. Welf. & Inst. Code § 369.5(a)(1) ......................................................... 7

Cal. Welf. & Inst. Code § 739.5(a)(1) ......................................................... 7

Prison Litigation Reform Act, 18 U.S.C. § 3626 ....................................... 3

Tex. Admin. Code § 748.2001 ................................................................... 11

Tex. Admin. Code § 748.2253(a) .........................................................10-11

Tex. Admin. Code § 748.2253(c) .............................................................. 11

Tex. Fam. Code § 266.009(a) .................................................................... 12

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, § 235, 110 Pub. L. 457, 122 Stat. 5044 ............................... 3

**Other Authorities**

Cal. Rule of Court 5.640 ............................................................................. 7

DFPS's Minimum Standards for General Residential Operations, *available at* www.dfps.state.tx.us/child_care/ child_care_standards_and_regulations ..................................................... 11

*Federal Agency's Shelter Oversight Raises Questions*, Houston Chronicle, Dec. 19, 2014, *available at* https://www.houstonchronicle.com/news/article/Federal-agency-s-shelter-oversight-raises-5969617.php (last visited June 11, 2018) ......................... 8

Judicial Council of California, Mandatory Forms JV-220, JV-220(A), JV-220(B) .............................................................................................. 7

REPLY TO OPPOSITION TO MOTION TO ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

ORR, Children Entering the United States Unaccompanied: § 1.4.6, www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.4.6 (last rev. Jan. 27, 2015) ........................................ 5

ORR, Children Entering the United States Unaccompanied: § 2.7, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7 (last rev. June 12, 2017) ................. 14

ORR, Children Entering the United States Unaccompanied: § 6.2.2, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-6#6.2.2 (last rev. Sept. 11, 2017) .............................................................................................. 16-17

*The State Foster Care System Has a License to Be Terrible at Licensing*, THE HOUSTON PRESS, May 6, 2016, *available at* www.houstonpress.com/news/the-state-foster-care-system-has-a-license-to-be-terrible-at-licensing-8375852 (last visited June 12, 2018) .............................................................................................. 8

Tex. Psychotropic Med. Utilization Parameters for Children & Youth in Foster Care (5th Version) (Mar. 2016), https://www.dfps.state.tx.us/Child_Protection/Medical_Services/documents/reports/2016-03_Psychotropic_Medication_Utilization_Parameters_for_Foster_Children.pdf ............................................................... 11

## I.     INTRODUCTION

Defendants contest none of the dispositive facts: ORR (1) dispatches non-dangerous children and youth to unlicensed facilities without notice or opportunity to be heard; (2) forces class members to take psychotropic medications without parental consent or court order; and (3) detains non-dangerous youth indefinitely without hearing because it thinks them psychologically unwell or suspects their parents or other custodians are or may be unfit. Defendants offer no valid reason the Court should not grant the instant motion and issue the remedial order Plaintiffs propose.

The Court need not hold Defendants in contempt to prescribe procedural remedies for substantive violations of the Settlement, but may do so upon a preponderance of the evidence. Nothing requires this Court to condone ORR's flouting state law restrictions on giving psychotropic drugs to children merely because Texas licensing authorities may be amenable to doing so.

Enjoining ORR against denying class members licensed placements contrary to *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017), should give little pause. If ORR thinks a class member too dangerous for a licensed placement, it should submit its evidence to an immigration judge. Awakening youth in the small hours of the morning and transferring them to juvenile lock-ups without notice or opportunity to be heard breaks faith with both law and common decency.

Lastly, it will be seen that ORR's refusal to release non-dangerous children so it may engage in extreme vetting of their parents or other relatives is wholly irrational. Defendants admit as much, conceding that several of ORR's vetting practices have no empirical foundation, but are rather self-serving hedges against political reproach.

## II.     THE COURT MAY GRANT THE RELIEF PLAINTIFFS REQUEST WITHOUT HOLDING DEFENDANTS IN CIVIL CONTEMPT.

Defendants argue that this Court may not require procedures to protect class members' substantive settlement rights unless it holds ORR in civil contempt. Defs.'

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-RJK(Px)

Resp. in Opp. to Pls.' Mot. to Enforce Settlement, at 4 ("Opp."). This Court has
rejected that argument before:

> As Defendants put it, "because Plaintiffs' motion to enforce the Agreement
> amounts to a request for civil sanctions against Defendants, . . . the Court
> should require Plaintiffs to establish any violation of the Agreement under the
> clear and convincing standard." . . .
>
> The Court disagrees. Plaintiffs make no attempt to hold Defendants in civil
> contempt. . . . Plaintiffs' motion asserts breach of contract and seeks
> enforcement of the Agreement.

Order re Pls.' Mot. to Enforce, June 27, 2017 (Dkt. 363), at 3.

The Court held Defendants in breach, and although the Settlement does not
expressly require it, ordered Defendants' juvenile coordinator to "monitor compliance
with those terms of the *Flores* Agreement, which this Court has found must be
enforced and . . . report directly to the Court regarding the status of Defendants'
compliance." *Id.* at 33; *see also* Order re Resp. to Order to Show Cause, Aug. 21,
2015 (Dkt. 189), at 15 (requiring Defendants to disclose class statistics monthly,
rather than semi-annually).

Defendants next argue that Plaintiffs ask the Court to read procedural
requirements into the Settlement "and then to find ORR in breach . . . for failing to
follow . . ." those procedures. Opp. at 5. That is not Plaintiffs' position. Instead,
Plaintiffs assert that when the government enters into a settlement that creates
*substantive* rights, courts may protect those rights by procedural remedy. Mem. in
Support of Mot. to Enforce (Dkt. 409-1), at 3-4 ("Pls.' Br."), *citing, inter alia*, *Smith
v. Sumner*, 994 F.2d 1401, 1406 (9th Cir. 1993); *Stone v. City & Cty. of San
Francisco*, 968 F.2d 850, 861 & n.20 (9th Cir. 1992).

Defendants argue that *Smith* is "limited" to "state prison litigation . . .," Opp. at
5, in other words, that prisoners are uniquely entitled to procedural remedies to

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1   protect their substantive rights under a consent decree. Defendants point to nothing in

2   *Smith* to support that proposition, and there is none.[1]

3          Answering Plaintiffs' specific claims, Defendants argue that the Settlement

4   does not itself create procedural protections against wrongful step-up or detention,

5   and that Plaintiffs must seek relief "in separate litigation . . . ." Opp. at 12, 25.

6   Though a hollow distraction, Plaintiffs will file a supplemental complaint obviating

7   Defendants' objection. The Court should grant Plaintiffs the relief they seek

8   regardless.

9   **III.    ORR PEREMPTORILY DENIES NON-DANGEROUS YOUTH LICENSED PLACEMENT.**

10          Defendants nowhere deny that ORR dispatches class members to Residential

11   Treatment Centers ("RTCs"), staff-secure facilities, and juvenile halls without

12   affording them the least opportunity to be heard.

13          Numerous youth report being awakened in the small hours and shipped off to

14   secure placements with no advance notice. When dazed children ask where they are

15   being taken, ORR staff often dissemble, saying they are going somewhere "better" or

16   closer to parents and family. *See, e.g.*, Decl. of Ricardo U., Exhibit 39 (PX 225) ¶ 2

17   (stepped up minor falsely told he was being stepped down); Decl. of Gloria P.,

18   Exhibit 41 (PX 233) ¶ 3 (stepped up minor falsely told she was going to another

19   shelter).

20          Nor do Defendants deny the profound consequences of step-up: children

21   transferred to RTCs and juvenile halls are medicated involuntarily and without

22   parents' consent. Those sent to staff-secure facilities or juvenile halls endure harsh

23   restrictions on their lives and liberty; their right to prompt release to available

24   custodians vanishes.

25   _____

26   [1] Congress has limited prisoners' legal recourse, *see* Prison Litigation Reform Act, 18
     U.S.C. § 3626, even as it has repeatedly enhanced protections for children and youth,
27   including class members herein, *see* William Wilberforce Trafficking Victims
     Protection Reauthorization Act of 2008, § 235, 110 Pub. L. 457, 122 Stat. 5044.
28

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1    Defendants deny none of this. Instead, they argue that RTCs are licensed

2   shelters and that ORR's dispatching children to such psychiatric facilities is therefore

3   immaterial. Second, they assert there is no evidence that ORR sends youth to staff-

4   secure facilities or juvenile halls contrary to the Settlement. Lastly, they argue that

5   the TVPRA supersedes the agreement anyway, and the Settlement accordingly

6   affords class members no protection against improper placement or ORR

7   peremptorily finding their parents or other prospective custodians unfit. Defendants'

8   arguments are meritless.

9    **A.    ORR's interning special needs minors in RTCs does not convert them**

10       **into "licensed placements."**

11    RTCs are woefully different from licensed juvenile shelters and foster homes.

12   The uncontroverted evidence reveals RTCs are locked psychiatric facilities in which

13   ORR detains children until a facility doctor declares them "well." The uncontested

14   evidence further shows that ORR involuntarily medicates youth in RTCs without

15   parental consent or court order, often forcing multiple psychotropic drugs on youth

16   that cause them unhealthy weight gain, depression, extreme anxiety, and acute

17   listlessness, among other pernicious side effects. *See, e.g.*, Decl. of Julio Z., Exhibit

18   64 (PX 418) ¶ 18 ("After taking the medication, I was more tired, I felt sad and my

19   eyes got teary . . . I began to gain a lot of weight . . . In approximately 60 days, I

20   gained 45 pounds."); Decl. of Javier C., Exhibit 30 (PX 170) ¶ 5 ("The medicine

21   made me fat. I used to be really skinny."); Decl. of Maricela J., Exhibit 48 (PX 262)

22   ¶ 5 ("When I take medicine, I do not have any mood. . . . I have suffered side effects

23   including headaches, loss of appetite and nausea."); Decl. of Mother of Isabella M.,

24   Exhibit 12 (PX 71, 74) ¶ 4 ("[T]hey are requiring [my daughter] to take very

25   powerful medications for anxiety. I have noted that [she] is becoming more nervous,

26   fearful, and she trembles. [She] tells me that she has fallen several times . . . because

27   the medications were too powerful and she couldn't walk."); Letter re: Psychotropic

28

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1   Medications, Exhibit 27, Attachment 10, PX 158 (Yolo psychiatrist notes child

2   "overmedicated"; recommends drugs be "taper[ed] off").

3       Defendants contest none of this, but rather argue that because the Settlement

4   allows ORR to house class members with "special needs" in licensed facilities, RTCs

5   are "licensed placements." Opp. at 7. That is a palpable non sequitur. Settlement

6   Paragraph 7 defines a "special needs minor" as one "whose mental and/or physical

7   condition requires special services and treatment by staff." Exhibit 80, PX 556. The

8   agreement requires ORR to "place such minors, whenever possible, in licensed

9   programs in which the INS places children without special needs, . . . ." *Id.* The

10  agreement thus requires ORR to house children with special needs with the general

11  population of class members whenever possible. RTCs, however, house *only* youth

12  "who [have] a psychiatric or psychological issue . . ." ORR, Children Entering the

13  United States Unaccompanied: § 1.4.6, *available at*

14  www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-

15  section-1#1.4.6 (last rev. Jan. 27, 2015).

16      Further, Settlement Paragraph 6 allows licensed facilities, including those

17  housing special needs minors, to "maintain [only the] level of security . . . necessary

18  for the protection of a minor or others. . . ." Security in RTCs clearly exceeds this

19  standard. *See* Julio Z. (PX 418) ¶ 21 (minor in RTC not permitted to leave his room

20  to get water); Decl. of Gabriela N., Exhibit 19 (PX 102) ¶ 3 (minor describes RTC as

21  locked facility with 24-hour surveillance and monitoring). Such facilities are in no

22  sense "non-secure." ORR's "Notice of Placement in a Restrictive Setting" concedes

23  as much, characterizing RTCs as "a restrictive setting . . . ." Exhibit 22, PX 114-15.

24      Finally, a licensed facility must have a dependent care license *and* meet the

25  standards set out in Settlement Exhibit 1, which requires, *inter alia*, that facilities

26  afford children privacy, including a private space, and allow them to wear their own

27  clothing and talk privately on the phone. Exhibit 80, PX 558, 571 ¶ 6 & Ex. 1.

28  Children in RTCs enjoy none of these rights. *See, e.g.*, Maricela J. (PX 264) ¶ 15

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1   (minor not allowed to call her family); Gabriela N. (PX 102) ¶ 3 (minor under 24-

2   hour surveillance and monitoring); Julio Z. (PX 417) ¶ 13 (minor sleeping in an

3   eight-person room).

4          Defendants neither produce their RTCs' licenses nor identify the state laws

5   they contend authorize the restrictions RTCs place on children's lives and liberty.

6   The evidence demonstrates that youth are profoundly injured when ORR summarily

7   sends them to RTCs. RTCs bear scant resemblance to a licensed shelter.

8          **B.    ORR unquestionably sends non-dangerous class members to staff-**

9                  **secure facilities and juvenile halls.**

10         Defendants next argue that ORR steps up class members only as the Settlement

11  permits. Opp. at 10. The uncontroverted evidence proves the contrary. ORR has

12  clearly dispatched numerous youth to juvenile halls upon bare accusation of gang-

13  involvement; immigration judges promptly ordered most of these youth released.

14  *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1178-79, 1181, 1199, 1202-3, 1205 (N.D.

15  Cal. 2017); Request for Judicial Notice, *Saravia v. Sessions*, No. 18-15114 (9th Cir.,

16  Mar. 16, 2018), Exhibit 79 (PX 554-55); *see, e.g.*, Decl. of Carlos A., Exhibit 31 (PX

17  174) ¶¶ 5, 9. Defendants' attempt to naysay the relevance of *Saravia* is unavailing.

18  That the *Saravia* plaintiffs had been re-arrested is immaterial. What matters is that

19  ORR summarily declared them too dangerous for licensed placement, yet

20  immigration judges promptly found the vast majority not dangerous.

21         Nor is there any dispute that ORR continues class members who were *not*

22  rearrested in unlicensed placements despite immigration judges finding them not

23  dangerous. *See, e.g.*, Custody Order, Feb. 21, 2018, Exhibit 68, PX 443; Email from

24  T. Biswas, Feb. 23, 2018, Exhibit 70, PX 448. Defendants nowhere contest that such

25  placements directly violate the Ninth Circuit's holding that an immigration judge

26  finding a class member not dangerous "ensures that they are not held in secure

27  detention without cause." *Flores v. Sessions*, 862 F.3d at 868.

28

6

**IV.  THIS COURT, AND NOT A STATE LICENSING AGENCY, IS CHARGED WITH ENSURING COMPLIANCE WITH A FEDERAL CONSENT DECREE.**

In their opening brief, Plaintiffs established that: (1) ORR routinely forces class members to take multiple psychotropic drugs; (2) minors suffer debilitating side effects from such drugs; (3) ORR regularly medicates children and youth for months without a parent's consent or court order; (4) the Settlement requires ORR to comply with state laws regulating the administration of psychotropics to juveniles; and (5) state law requires a court to authorize ORR's medicating minors if a parent does not. Pls.' Br. at 12-17. Defendants deny none of this.[2] Instead, Defendants argue that the Court should let state licensing agencies decide whether ORR's medicating class members is lawful. Opp. at 15. It should not.

**A.  The Settlement nowhere commits children's protection against unlawful medicating to the unfettered discretion of licensing inspectors.**

Nothing in the Settlement suggests that children's protection against psychotropic drugging turns on a state licensing body's oversight, or more accurately, the lack thereof.[3] To the contrary, Settlement Paragraph 37 reserves jurisdiction in

---

[2] Nor is Plaintiffs' evidence limited to class members ORR detains in Texas alone. Pls.' Br. at 16, n.14 (Julio Z. Parental Medical Authorization Form, Dec. 14, 2016, Exhibit 62, PX 411 (Yolo County Juvenile Hall official "consent" to medicating class member).

Like Texas, California generally requires that a juvenile court authorize the administration of psychotropic medication to dependent children. Cal. Welf. & Inst. Code §§ 369.5(a)(1), 739.5(a)(1); *see also* Cal. Rule of Court 5.640; Judicial Council of California, Mandatory Forms JV-220, JV-220(A), JV-220(B) (requiring that a court be informed fully of the potential consequences of psychotropics prior to authorizing their administration to dependent minors).

[3] In *M.D. v. Abbott*, the court held that Texas Department of Family and Protective Services ("DFPS") was "failing its licensing and inspecting duties." 152 F. Supp. 3d 684, 802 (S.D. Tex. 2015). The court noted that DFPS had closed only "one facility

1   this Court to redress class-wide violations. Exhibit 80, PX 569 ¶ 37 ("This paragraph

2   provides for the enforcement, in this District Court, of the provisions of this

3   Agreement except for claims brought under Paragraph 24.").

4          Nor does a facility having a license foreclose ORR breaching the Settlement. In

5   addition to requiring that facilities be licensed, the Settlement posits numerous

6   requirements that ORR must observe. *See, e.g.*, Exhibit 80, PX 571 ¶ A ("*Licensed*

7   programs shall comply with all applicable state child welfare laws . . . ." (emphasis

8   added)).

9   _____

10  in the past five years, but it is a story of horror rather than optimism regarding
    enforcement." *Id.* at 803.

11
12          The Daystar facility in Manvel, Texas had a capacity of 141 children. Between
            1993 and 2002, three teenagers died at Daystar from asphyxiation due to
13          physical restraints. In most cases, the children were hog-tied. Beyond these
            deaths, there were reports of sexual abuse and staff making developmentally
14          disabled girls fight for snacks. Numerous stakeholders, including the district
            attorney, spoke out against Daystar, *but the facility kept its license*. In
15          November 2010, a fourth child died in what was ruled a homicide by
            asphyxiation due to physical restraints. *Daystar's license was still not revoked*
16          until January 2011. DFPS allowed this facility—that was responsible for four
            deaths, numerous allegations of sexual abuse, and unthinkable treatment of
17          developmentally disabled children—to operate for 17 years.
18
19  *Id.* at 803 (emphasis added). *See also The State Foster Care System Has a License to
20  Be Terrible at Licensing*, The Houston Press, May 6, 2016, *available at*
    www.houstonpress.com/news/the-state-foster-care-system-has-a-license-to-be-
21  terrible-at-licensing-8375852 (last visited June 12, 2018) (DFPS "rarely if ever
22  seriously sanctions residential treatment centers and group homes that make money
    off warehousing children").
23
24  According to news reports, Daystar was owned by Clay Dean Hill, who now owns
    the Shiloh RTC. *Federal Agency's Shelter Oversight Raises Questions*, Houston
25  Chronicle, Dec. 19, 2014, *available at*
    https://www.houstonchronicle.com/news/article/Federal-agency-s-shelter-oversight-
26  raises-5969617.php (last visited June 11, 2018). Although ORR states that "Shiloh
    RTC is not operated by DayStar Treatment Center," Letter from James De La Cruz,
27  Apr. 2, 2018, Exhibit 83, PX 596, it never denies that their owner is one and the
28  same.

8

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1      Implicit in Defendants' argument is that licensing is good enough. That, of

2 course, would reduce the Settlement's other requirements for proper placements to

3 surplusage. Defendants offer no reason to drain those requirements of independent

4 force. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("canon against

5 surplusage is strongest when an interpretation would render superfluous another part

6 of the same statutory scheme").

7      In any event, the Settlement is an order of the Court, and as such, a consent

8 decree. *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 378 (1992). This Court

9 accordingly has an independent interest in ensuring Defendants comply with the

10 decree. *United States v. N.Y.C. Dist. Council of N.Y.C.*, 229 F. App'x. 14, at *18 n.5

11 (2d Cir. 2007).

12      Defendants offer no reason the Court should abdicate its role. Plaintiffs are not

13 "ask[ing] this Court to independently determine what provision of psychotropic

14 medication is 'appropriate.'. . . ." Opp. at 14. They ask only that the Court decide

15 whether ORR is complying with the simple text of statutes and regulations.

16      Federal courts routinely interpret and apply state statutes and regulations. *See,*

17 *e.g.*, *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 746 (9th Cir.

18 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). Like most

19 jurisdictions, Texas and California courts determine the plain meaning of statutes by

20 construing their literal text according to the rules of grammar and common usage,

21 *Baird v. State*, 398 S.W.3d 220, 228 (Tex. Crim. App. 2013); *People v. Cornett*, 53

22 Cal. 4th 1261, 1265 (2012), a task wholly familiar to this Court, *see, e.g.*, Order re

23 Pls.' Mot. To Enforce Settlement of Class Action and Defs.' Mot. to Amend

24 Settlement Agreement, July 24, 2015 (Dkt. 177), at 3 (applying California's "plain

25 language" canon to construe the Settlement).

26

27

28

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

ORR routinely medicates class members without parental consent or court order.[4] Deciding whether ORR thereby breaches the Settlement requires expertise in neither medicine nor licensing. It requires only an ability to discern the plain meaning of statutes and regulations, which this Court is fully competent to do.

**B.     ORR's notifying "viable sponsors" of changes to children's medications falls far short of complying with the Settlement.**

Defendants next invite the Court to condone ORR medicating children because ORR purports to inform "viable sponsor[s]" about changes in medications it is already giving children. Opp. at 17. Such advisals do not come close to satisfying state law or, *a fortiori*, the Settlement.[5]

---

[4] Although Defendants argue that Shiloh is "monitored closely" by licensing authorities, Opp. at 15, they produce no evidence that DFPS has ever affirmatively approved ORR medicating children without parental consent or court authorization. The best Defendants can manage is that ORR is "not aware of any reported concerns." *Id.* at 16. That hardly overcomes the evidence of record that ORR is medicating children without parental consent or court authorization, a plain violation of state law.

[5] The evidence shows that ORR regularly fails to tell parents it is changing their children's medications. Mother of Isabella M. (PX 71, 74) ¶ 4; Maricela J. (PX 263) ¶ 7; Decl. of David I., Exhibit 14 (PX 81) ¶ 7. If ORR sees fit to keep parents in the dark, it is not apparent whom ORR considers "viable sponsor[s]."

Even if ORR were to explain the "benefits; risks; side effects; medical consequences of refusing the medication or recommendation for the medication; and contact information for the prescribing physician," Opp. at 17, it would fail to comply with Texas law, which requires far more, including —

"(1) The child's diagnosis; (2) The nature of the child's mental illness or condition; (3) An explanation of the purpose of the medication; (4) A description of the benefits expected; (5) A description of any accompanying discomforts and risks, including those which could result from long-term use of the medication, and possible side effects, including side effects that are known to frequently occur in persons, side effects to which the child may be predisposed, and the nature and possible occurrence of irreversible symptoms; (6) A statement of whether the medication is habituating in nature; (7) Alternative interventions to the use of psychotropic medication that have been attempted and that have been unsuccessful; (8) Other alternative treatments or

10

1    Texas requires "General Residential Operations" such as Shiloh to "obtain a

2    written, signed, and dated *consent*, specific to the psychotropic medication to be

3    administered, from the person legally authorized to give medical consent . . ." Tex.

4    Admin. Code § 748.2001 (emphasis added).[6] Defendants nowhere refute Plaintiffs'

5    showing that ORR fails to obtain such consent. Decl. of Carter White, Exhibit 89 (PX

6    654-55) (dozens of class member files reviewed; none contains a consent form signed

7    by a parent, family member, or potential sponsor).

8    In sum, ORR gives children no choice but to take whatever psychotropic

9    medications it prescribes, and it does so in blatant disregard of parental prerogative

10   and state law; Defendants never truly contend otherwise.

11

12

13   _____

14   procedures to the use of the psychotropic medication; (9) Risks and benefits of
     the alternative treatments or procedures; (10) Risks and benefits of not

15   receiving or undergoing a treatment or procedure; (11) An explanation that the
     person legally authorized to give medical consent may ask questions about the

16   child's response to the medication, and may review your daily records on
     request; and (12) An explanation that the person legally authorized to give

17   medical consent may *withdraw consent and request the medication be
     discontinued at any time*.

18

19   Tex. Admin. Code § 748.2253(a) (emphasis added); *see also* Tex. Psychotropic Med.

20   Utilization Parameters for Children & Youth in Foster Care 4 (5th Version) (Mar.
     2016), https://www.dfps.state.tx.us/Child_Protection/Medical_Services/documents/re

21   ports/2016-

22   03_Psychotropic_Medication_Utilization_Parameters_for_Foster_Children.pdf
     (Texas best practice guidelines mandating informed consent be obtained from the

23   appropriate party, and specifying elements of informed consent). A person legally

24   authorized to consent must acknowledge receipt of the foregoing information and a
     copy of the signed acknowledgment must be included in a child's file. Tex. Admin.

25   Code § 748.2253(c).

26   [6] Defendants concede that Shiloh must comply with DFPS's Minimum Standards for

27   General Residential Operations, including Chapter 748, *available at*
     www.dfps.state.tx.us/child_care/child_care_standards_and_regulations. Opp. at 15,

28   n.5.

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

**C.**   **ORR's medicating class members for months on end cannot possibly be dismissed as a response to an emergency.**

Defendants lastly note that ORR dispensing with parental and court authorization for medicating children is permissible in emergencies. However, ORR administering class members psychotropics for brief periods to control acute psychotic episodes is not here at issue. *See, e.g.*, Decl. of Isabella M., Exhibit 10 (PX 62) ¶ 12; Mother of Isabella M. (PX 71, 74) ¶ 5 (class member Isabella M. medicated for 10 months).[7]

Though Defendants would distend this exception to cover ORR medicating children for months on end for "anxiety" or "depression," *see, e.g.*, Decl. of David I., Exhibit 14 (PX 81) ¶ 7 ("I take four pills in the morning and about four to six pills in the evening. I don't know what all these pills are for, but I think the ones I take at night are for depression and anxiety."), such prolonged drugging can hardly be considered a valid response to a psychiatric emergency.

**V.   GRANTING YOUTH A TIMELY AND MEANINGFUL OPPORTUNITY TO BE HEARD ON A CUSTODIAN'S FITNESS HELPS PROTECT THEM FROM HARM OR NEGLECT.**

Defendants next suggest that allowing children an opportunity to be heard regarding the fitness of their parents and other available custodians would impair ORR's evaluating custodians, a notion bordering on the frivolous.

The Settlement requires ORR to "make and record the prompt and continuous efforts on its part toward . . . the release of the minor . . ." and to "release a minor from its custody without unnecessary delay . . ." when a suitable custodian appears. Exhibit 80, PX 562-63 ¶¶ 14, 18.

---

[7] Texas permits physicians to medicate dependent children without parental consent or judicial authorization only in acute psychiatric emergencies: that is, when "it is *immediately* necessary to provide medical care . . . to prevent the *imminent* probability of death or substantial bodily harm to the child or others." Tex. Fam. Code § 266.009(a) (emphasis added).

REPLY TO OPPOSITION TO MOTION TO ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

The question is not whether ORR may evaluate proposed custodians, but whether it is free to extend children's detention indefinitely without affording an opportunity to be heard regarding available custodians' fitness. The decree requires *balance*. Ceding ORR carte blanche to vet class members' custodians ad nauseam would reduce the Settlement's "general policy favoring release" and Paragraphs 14 and 18, to nullities.

Allowing children a chance to be heard could not possibly impair ORR's screening custodians. To the contrary, not only are disreputable candidates less likely to appear in formal proceedings, but testing a custodian's fitness before a detached arbiter could only improve the vetting process.

Defendants never defend the dearth of transparency, timeliness, and fairness in ORR's denying or delaying children's release to available custodians. Instead, they argue that extreme vetting is good because ORR cannot take children back into custody if they are abused; and further, that the TVPRA supersedes the Settlement such that Plaintiffs have no settlement right to prompt release. Neither of Defendants' arguments has any merit.

## A.   ORR admits to policies that irrationally prolong class members' detention.

Defendants never dispute that ORR delays or denies class members' release from RTCs until facility medical staff certify they are "well." Nor do Defendants deny that ORR: (1) unilaterally prescribes what requirements parents and other proposed custodians must meet to receive a child; and (2) unilaterally declares whether class members' parents or other prospective custodians meet the qualifications it sets. Neither of these practices squares with the Settlement.

In their opening brief, Plaintiffs described the experiences of numerous children and youth whose detention ORR has prolonged via extreme vetting of their parents and other available custodians. Pls.' Br. at 19-21. Defendants contest the details with respect to a few class members, but that should give little pause. The

REPLY TO OPPOSITION TO MOTION TO ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1   purpose of giving youth an opportunity to be heard is to resolve differences with

2   ORR, but with transparency, reliability, and fairness. Whether or not its treatment of

3   individual children is excusable, ORR *admits* to arbitrary[8] policies that protract non-

4   dangerous class members' detention in violation of the Settlement.

5             **1.**       **Extended detention so ORR's director may approve release.**

6          In their opening brief, Plaintiffs showed that ORR detains youth whom it has

7   *ever* placed in a staff-secure or secure facility until its director approves release. Pls.'

8   Br. at 18-19. ORR applies this policy even if it knows step-up was predicated on

9   "incomplete, *inaccurate or erroneous* information . . ." and even if an immigration

10  judge finds a youth not dangerous. FAQ: ORR DIRECTOR'S RELEASE DECISION, Jan.

11  26, 2018, Exhibit 24, PX 120. The evidence shows that this policy protracts

12  children's detention for weeks or months.

13         Defendants do not dispute that ORR may detain non-dangerous youth only if

14  all available custodians are unfit. They also concede the director's approval has

15  nothing to do with custodians' fitness. Opp. at 18; Decl. of Jallyn N. Sualog, Dkt.

16  425-1 ¶ 22 ("Sualog").

17         Defendants do offer that ORR has "clarif[ied]" its policy so as to dispense with

18  the director's approval if an immigration judge finds a class member not dangerous.

19  Opp. at 19 n.9. But even if true,[9] ORR is still clearly extending non-dangerous

20  children's detention for the sake of its director's approval.

21  _____

22  [8] ORR admits it adopted these policies "*without impact analysis or other data-based*

23  *evaluations*," Sualog ¶ 23 (emphasis added), but rather as a concession to political
criticism, *id.*

24  [9] Defendants fail to report that ORR's online policy manual requiring director

25  approval reads *exactly* as it has since June 2017. ORR, Children Entering the United
States Unaccompanied: § 2.7, *available at* www.acf.hhs.gov/orr/resource/children-

26  entering-the-united-states-unaccompanied-section-2#2.7 (last rev. June 12, 2017).

27  Defendants also fail to produce any document that actually supersedes ORR's
January 2018 FAQ, in which ORR states unequivocally that its director must approve

28  the release of all youth "who are in or were previously placed in a secure or staff-

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1    Settlement Paragraph 24A requires Defendants to provide all class members a

2    bond hearing, *regardless of the type of facility in which ORR places them*, unless they

3    affirmatively waive a hearing. ORR is accordingly obliged to let immigration judges

4    review whether youth are dangerous. Order re Pls.' Mot. to Enforce, Jan. 20, 2017

5    (Dkt. 318), at 6 ("24A Order").

6    Compelled to comply with Paragraph 24A in July 2017, Defendants asked that

7    ORR notify only youth in staff-secure or secure facilities of their right to a bond

8    hearing. Defendants represented that ORR does not place dangerous youth in shelters;

9    immigration judges reviewing whether such a youth is dangerous would therefore be

10   pointless. Letter from Sarah Fabian, Sept. 12, 2017, Exhibit 90, PX 658 ("UAC in

11   non-secure shelter care are unlikely to benefit from a hearing as ORR likely would

12   concede to an immigration judge that such UAC are not a danger and may be released

13   upon the determination of a suitable sponsor."). ORR therefore protracts the detention

14   of non-dangerous youth—those whom it has stepped *down* to shelters—until its

15   director approves release. That is clearly *not* release without unnecessary delay.

16   In sum, ORR must release non-dangerous children to reputable custodians

17   promptly, and there is no material dispute that its director-approval policy protracts

18   the detention of non-dangerous class members. ORR thereby breaches Settlement

19   Paragraphs 14 and 18.

20   ## 2.    Detaining class members until RTC staff approve release.

21   Defendants nowhere deny that ORR refuses to release non-dangerous class

22   members it has placed in RTCs until a facility doctor certifies them "well." Pls.' Br.

23   at 21-22, *citing, inter alia*, Isabella M. (PX 61) ¶ 3 (class member interned and

24   medicated without parental consent for 10 months awaiting doctor's approval).

25

26

27   secure facility [even if they] have *prevailed in a* Flores *bond hearing on a question of*

28   *dangerousness . . .*" Exhibit 24, PX 120 (emphasis added).

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1   Here ORR's policy is all but indistinguishable from indefinite civil

2   commitment, yet ORR adheres to none of the substantive standards or procedural

3   protections that courts have held are required when the government seeks to confine

4   children to psychiatric facilities.

5   The Settlement nowhere permits ORR to civilly commit class members. If a

6   non-dangerous class member has a reputable custodian, ORR must release the class

7   member. ORR indefinitely detaining class members it thinks have mental health

8   issues is an egregious violation of the Settlement.

9   **3.   Detaining children until post-release services are in place.**

10   Defendants also confess a policy, previously unknown to Plaintiffs, that is yet

11   another systematic breach of the Settlement: ORR refuses to release class members to

12   qualified custodians who have *passed* home studies until "post-release services" are

13   in place. Opp. at 21.

14   Implicit in this policy is that it is "necessary" for a child to remain in federal

15   custody rather than spend a single day with a parent or other custodian before ORR

16   gives *the custodian* these services:

17   •   Help with improving "parenting" skills.

18   •   Help "ensur[ing] the UAC's attendance at all immigration court

19       proceedings . . . ."

20   •   Information "about the benefits of obtaining legal guardianship of the

21       child."

22   •   Help with "accessing relevant legal service resources . . . ."

23   •   Help arranging "school enrollment . . ." for a released youth.

24   •   Help getting "medical insurance for the UAC and . . . locating medical

25       providers . . . ."

26   •   Information about "relevant mental health resources and referrals for the

27       UAC."

28   •   Information about "resources and referrals for family counseling . . . ."

16

- Help with "address[ing] any substance abuse-related needs of the UAC . . . ."

- "[I]nformation about gang prevention programs . . . ."

ORR, Children Entering the United States Unaccompanied: § 6.2.2, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-6#6.2.2 (last rev. Sept. 11, 2017).[10]

In exceptional cases, having some of the above services in place could be worth a child spending a short amount of extra time locked away from parents and family. But ORR admits that it extends children's detention whenever it studies a custodian's home and not because an individual child actually *needs* specific post-release services.

That is patently irrational. A home study focuses on the proposed *custodian*'s fitness, not whether a given youth has any actual need for legal guardianship or other post-release services. If ORR wishes to extend class members' detention for the sake of post-release services, it should persuade a neutral decision maker that a child actually needs them.

In sum, ORR's policies dramatically extend stepped-up class members' confinement. ORR admits that a youth whom it summarily dispatches to a staff-secure or secure facility will be detained more than *four and one half times* longer than other youth will be. Sualog ¶¶ 30, 44. ORR admits that about one in five youth it

---

[10]  ORR asserts it "is unable to release a TVPRA or home study case without post-release services in place." Sualog ¶ 24.

The TVPRA, however, requires ORR to "conduct follow-up services, during the pendency of removal proceedings, on children for whom a home study was conducted . . ." 8 U.S.C. § 1232(c)(3)(B). The statute nowhere demands that follow-up services commence instantly upon a child's release.

ORR knows as much. Section 1232(c)(3)(B) has been law since 2008, yet ORR did not begin detaining children for the sake of post-release services until 2016. Sualog ¶ 24.

1   steps up spends *a year or more* in custody, *id.* ¶ 45, and that it has even detained one

2   youth for nearly *four* years now, *id.* ¶ 47. That ORR could confine a youth without

3   trial for so long is simply astonishing.

**B.    ORR's prolonging class members' detention because it is purportedly powerless to retrieve them from unfit custodians is irrational.**

6       Tacitly conceding that its policies do indeed subject proposed custodians to

7   "extreme vetting," Defendants argue such screening is warranted "because ORR

8   lacks the authority to resume care if the sponsor abuses or neglects a child." Opp. at

9   21. Defendants' argument is specious.

10      Settlement Paragraph 16 provides: "The INS may terminate the custody

11  arrangements and assume legal custody of any minor whose custodian fails to comply

12  with the agreement required under Paragraph 15." Paragraph 15 requires, *inter alia*,

13  that a custodian agree to "provide for the minor's physical, mental, and financial

14  well-being . . . ." Defendants have not shied away in the past from re-arresting class

15  members. *Saravia*, 280 F. Supp. 3d at 1177-79, 1202-03.

16      Even assuming, *arguendo*, ORR were helpless to protect former detainees

17  itself, such youth would be no worse off than other children, including U.S. citizens.

18      For 15 years James Owens supervised 120 lawyers handling child abuse and

19  neglect cases in Los Angeles. He declares:

20          Although Los Angeles County has a large population of undocumented

21          children and youth, I am aware of no instance in which [the Department of

22          Children and Family Services] refused to protect a child because she or he

23          lacked lawful immigration status or had previously been in federal immigration

24          custody.

25  Decl. of James Owens, June 12, 2018, Exhibit 91 (PX 666) ¶ 8 ("Owens").

26      Nothing stops ORR from reporting post-release abuse or neglect of former

27  detainees to child protection agencies. Given the many declarations in which youth

28  describe the hardships of ORR detention, it should surprise no one if class members

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1   would prefer a true child protection agency's help over another term "deterring"

2   unauthorized immigration.

3   **VI.    THE TVPRA REINFORCES NON-DANGEROUS CLASS MEMBERS' RIGHTS UNDER**

4   **THE SETTLEMENT TO TRANSPARENCY AND FAIRNESS IN STEP-UPS AND**

5   **DETERMINATIONS OF CUSTODIANS' FITNESS.**

6   Defendants lastly argue that the TVPRA supersedes the Settlement's placement

7   and release provisions. Opp. at 24. Though they nowhere acknowledge it, this

8   argument has already been rejected by this Court and the Ninth Circuit.

9   The Court may recall that ORR's defense against allowing children bond

10  hearings was that the TVPRA supersedes the Settlement, devolving to ORR exclusive

11  authority to decide whether a youth is too dangerous to release. This Court disagreed:

12  Defendants argue that the TVPRA's provisions involving review of potential

13  custodians are "inconsistent with the scheme proposed by Plaintiffs in which

14  an immigration judge could order [an unaccompanied alien child] released

15  even where HHS has determined that no suitable custodian is available to take

16  custody of the [child]." Opp. at 16. Not so. If the initial proposed custodian is

17  unfit to care for the unaccompanied child under the TVPRA, *Defendants*

18  *should follow Paragraph 14 of the* Flores *Agreement,* which outlines an order

19  of preference for the minor's release, in order to effectuate the least restrictive

20  form of detention.

21  24A Order at 6 n.5 (emphasis added); *see also id*. at 7 (Settlement "poses no

22  irreconcilable conflict with the TVPRA's safety and *placement* provisions."

23  (emphasis added)).

24  Affirming, the Ninth Circuit observed that the TVPRA requires "prompt

25  'placement' of children in the 'least restrictive setting that is in the best interest of the

26  child,'" and "[m]irror[s] the Settlement" in requiring ORR to take care that class

27  members not be placed with unfit custodians. *Flores v. Sessions*, 862 F.3d at 876,

28  878. The court emphasized ORR's continuing to adhere to the Settlement was

19

1 consistent with the TVPRA's goal of *improving* the Government's treatment of class

2 members:[11]

3    Like the Settlement, the HSA and TVPRA emphasize placing children in the

4    least restrictive environment, and require that the government ensure that they

5    receive safe and appropriate care. . . .

6    [T]he HSA and TVPRA were intended . . . to improve the treatment of such

7    children while in government custody. There is nothing in the legislative

8    history of either statute to suggest that, in doing so, Congress in fact sought to

9    strip unaccompanied minors of any extant protections . . .

10 *Id*. at 880-81.

11    Defendants make no effort to establish that the TVPRA "directly conflict[s]"

12 with the Settlement, or that allowing children to be heard on a custodian's fitness

13 would convert the agreement into "an instrument of wrong." *Id*. at 874. The TVPRA

14 has been law since 2008, yet Defendants have never moved to relieve ORR from the

15 decree's placement, release, or custodian vetting provisions. Defendants must comply

16 with those provisions until they carry the burden of showing a direct conflict with the

17 TVPRA. *Flores v. Lynch*, 828 F.3d 898, 909-10 (9th Cir. 2016).

18

19

20 [11] This Court's 24A Order and the Ninth Circuit's affirmance thereof similarly

21 *improved* class members' legal circumstances. Defendants' attempt to distinguish

*Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016), and *Santos v. Smith*, 260 F.

22 Supp. 3d 598 (W.D. Va. 2017), is therefore perplexing.

23 As Plaintiffs have explained, both *Beltran* and *Santos* enjoined ORR's refusal to

24 release children because it thought their parents unfit. Defendants nevertheless

suggest that because these cases pre-date the Ninth Circuit's decision in this case,

25 class members deserve less relief than the petitioners in those cases won. Opp. at 19

26 n.10. That makes no sense.

27 In all events, in May 2018 yet another federal court overturned ORR's refusal to

release a child on the grounds that his mother was unfit. *Maldonado v. Lloyd*, 2018

28 U.S. Dist. LEXIS 75902, at *18-29 (S.D.N.Y. 2018).

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

VII.   **PLAINTIFFS' PROPOSED REMEDIAL ORDER IS PRACTICABLE AND EQUITABLE.**

In *Beltran*, *Santos*, and *Maldonado*, courts applied the test set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), and held ORR's process for assessing parents' fitness—or rather the lack thereof—inadequate. *Beltran*, 222 F. Supp. 3d at 482-89, *Santos*, 260 F. Supp. 3d at 611-15, and *Maldonado*, 2018 U.S. Dist. LEXIS 75902, at *18-29.

Under *Mathews*, courts determine what process is due by weighing these factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Applying this test to the facts at bar, it is clear that ORR is unlawfully abridging Plaintiffs' rights: (1) to prompt release to parents and other enumerated custodians; (2) to licensed placements; and (3) to be free from the unnecessary and unwanted administration of psychotropic medications.

### A.   ORR should refer custodians' fitness to competent state authorities if it declares them unfit or fails to decide fitness within thirty days.

In *Beltran*, *Santos*, and *Maldonado,* the courts found the petitioners' private interests substantial. *Beltran*, 222 F. Supp. 3d at 482 (minor's "right to his mother's care . . . is 'deserving of the greatest solicitude'"); *Santos*, 260 F. Supp. 3d at 612 ("[T]he private interests implicated here include both the right to family unification and O.G.L.S.'s right to liberty."); *Maldonado*, 2018 U.S. Dist. LEXIS 75902, at *27 (ORR's "actions have 'encroached' upon EHE's right to family integrity 'considerably.'").

To the extent ORR withholds custody of class members from their parents, the private interests at stake here are identical to those identified in *Beltran*, *Santos*, and *Maldonado*.

1    Class members' interest in prompt release to grandparents, adult siblings, and

2  other available custodians designated in Settlement Paragraph 14 is key to ensuring

3  that they are placed in the least restrictive setting appropriate under the

4  circumstances. That both the Settlement and the TVPRA enshrine the right to least

5  restrictive placement dispels any doubt that this right is substantial as well.[12]

6    The courts in *Beltran*, *Santos*, and *Maldonado* next found that ORR's

7  procedures create an unacceptable risk of erroneous deprivation and that better

8  procedures would substantially reduce this risk. *Beltran*, 222 F. Supp. 3d at 488

9  ("deficient procedures employed by ORR created a significant risk that Petitioner and

10 RMB would be erroneously deprived of their right to family integrity"); *Santos*, 260

11 F. Supp. 3d at 612 ("more fulsome process, with correction of some of the

12 deficiencies alleged by petitioners, would considerably lessen the risk of an erroneous

13 deprivation"); *Maldonado*, 2018 U.S. Dist. LEXIS 75902, at *25-27 (same).

14    The evidence before this Court shows that ORR persists in the many

15 procedural shortcomings those decisions identify, and this Court should likewise hold

16 that ORR's dearth of transparency and fairness in vetting class members' custodians

17 an unacceptable risk of erroneous deprivation.

18    Finally, none of the three courts could identify any substantial governmental

19 interest in ORR refusing to afford fairer procedure. *Beltran*, 222 F. Supp. 3d at 489

20 (providing adversarial hearing would not "impose the catastrophic administrative

21 burden Respondents fear."); *Santos*, 260 F. Supp. 3d at 610, 616 ("respondents have

22 not identified . . . what burden it would impose on ORR to provide more process");

23 *Maldonado*, 2018 U.S. Dist. LEXIS 75902, at *27 ("As in *Santos*, Respondents here

24 fail to 'identif[y] what burden it would impose on ORR to provide more process to

25 [EHE] (or children like him)'").

26

27 ───────────────

[12] As Plaintiffs have explained, Defendants may not abridge class members'

28 substantive rights under the Settlement without due process. *Smith*, 994 F.2d at 1406.

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1    Rather than prescribe additional procedures, the courts in *Beltran*, *Santos*, and

2  *Maldonado* ordered ORR to release the petitioning juveniles. As one explained,

3    The Court will not undertake to design additional procedures for ORR to

4    follow in this case. The Court is neither competent to do so, nor inclined to

5    encroach upon an area of the law traditionally reserved to state courts. . . . The

6    Court will therefore . . . require that RMB be released to Petitioner's care and

7    custody. Should Respondents believe Petitioner to be unable to care for RMB,

8    or that RMB presents a risk to himself or others, they may refer the matter to

9    appropriate state and local authorities.

10  *Beltran*, 222 F. Supp. 3d at 489.

11    Here, the evidence shows that in FY2015 class members spent an average of 37

12  days in ORR custody. Sualog ¶ 30. Though that figure has increased to 57 days in

13  FY2018, ORR concedes that much of the increase is due to policies the agency

14  adopted "without impact analyses or other data-based evaluations," *id.* ¶ 23, but

15  rather as a concession to political criticism, *id.*

16    State child protection agencies typically require that home studies be

17  completed in about one week and a parent's fitness determined within thirty days.

18  Owens (PX 666-67) ¶ 9.

19    If ORR declares a proposed custodian unfit, or fails to decide a custodian's

20  fitness within 30 days, it should refer the matter to state authorities so that they may

21  commence their process without extending class members' confinement even more.

22    **B.    ORR should submit step-ups for review by immigration judges.**

23    As for ORR denying class members licensed placements, much the same

24  applies with respect to each of the *Mathews* factors. Interning children indefinitely in

25  a juvenile hall or psychiatric facility without hearing has long offended due process.

26  *In re Gault*, 387 U.S. 1, 27-31 (1967); *O'Connor v. Donaldson,* 422 U.S. 563, 575

27  (1975) (government may not "confine those who are mentally ill merely to ensure

28  them a living standard superior to that they enjoy in the private community").

1   And here an appropriate remedy is clear. In *Flores v. Sessions*, the Ninth

2   Circuit held, "Providing unaccompanied minors with the right to a hearing under

3   Paragraph 24A therefore ensures that they are not held in secure detention without

4   cause." 862 F.3d at 868.

5   The Court should accordingly order ORR to advise class members of its

6   reasons and evidence for denying a licensed placement before the youth is stepped

7   up. Absent exigency, ORR should present a class member's dangerousness for

8   determination by an immigration judge before step-up. ORR should be enjoined

9   against denying class members a licensed placement contrary to an immigration

10   judge's finding that the youth is not one described in Settlement Paragraph 21 as

11   subject to unlicensed placement.

12   **C.**   **ORR should obtain the informed written consent of a parent or other**

13   **close relative, or else a court order, before administering children**

14   **psychotropic medications.**

15   ORR should be enjoined to comply fully with state law if it wishes to

16   administer class members psychotropic medications, and should be required to obtain

17   appropriate consent for such medications, as required by the Settlement and the

18   *Mathews* standard. Class members have a substantial liberty interest in being free

19   from the unwanted and unnecessary administration of psychotropic medication. *See,*

20   *e.g.*, *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J. R.*, 442 U.S. 584,

21   600 (1979); *M.B. v. Corsi*, No. 2:17-cv-04102-NKL, 2018 U.S. Dist. LEXIS 3232, at

22   *37 (W.D. Mo. Jan. 8, 2018) ("Plaintiffs have a substantial liberty interest in avoiding

23   the unnecessary administration of medical treatment."). Administering psychotropic

24   medication to children without first obtaining informed consent creates a substantial

25   risk of erroneous deprivation of this right. *See, e.g.*, *M.B.*, 2018 U.S. Dist. LEXIS

26   3232, at *38-43.

27   Except in the case of acute psychiatric emergency, ORR should, at a minimum,

28   obtain a parent's informed consent prior to giving a child specific medications. If no

24

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)

1  parent is available, ORR should be enjoined to obtain the informed voluntary consent
2  of another adult family member identified in Settlement Paragraph 14D, or else a
3  court order authorizing it to administer specific psychotropic medications.

4  **VIII. CONCLUSION**

5      For the foregoing reasons, this Court should grant this motion and enter
6  Plaintiffs' proposed order.

8  Dated: June 15, 2018                        Respectfully submitted,

9                                              CARLOS R. HOLGUÍN
10                                             PETER A. SCHEY
                                               Center for Human Rights &
11                                             Constitutional Law

12                                             LEECIA WELCH
13                                             NEHA DESAI
                                               POONAM JUNEJA
14                                             CRYSTAL ADAMS
                                               National Center for Youth Law
15

16                                             HOLLY COOPER
                                               CARTER WHITE
17                                             U.C. Davis School of Law

18

19                                             /s/
20                                             Carlos Holguín

21                                             /s/
22                                             Leecia Welch

23

24                                             /s/
25                                             Holly Cooper

26

27

28

REPLY TO OPPOSITION TO MOTION TO
ENFORCE SETTLEMENT
CV 85-4544-DMG (AGRx)