CHAD A. READLER
Acting Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
COLIN KISOR
Deputy Director
SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFERSON B. SESSIONS III,<br>Attorney General of the<br>United States; *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR RELIEF FROM THE FLORES SETTLEMENT AGREEMENT** |

## I.   INTRODUCTION

When the U.S. Department of Homeland Security ("DHS") apprehends a family with minor children illegally entering the United States outside a port of entry, it traditionally has three options to choose from:  (1) keep the family together by placing the family members at an appropriate residential facility during the pendency of their immigration proceedings; (2) separate the family by detaining the parents and transferring the children to U.S. Health and Human Services ("HHS") custody; or (3) provide the family with a Notice to Appear for removal proceedings, release the family members from custody into the interior of the United States, and accept the now-common reality that families frequently fail to appear at the required proceedings, thus remaining illegally in the United States.

Only the first option accomplishes the dual goals of enforcing federal law and keeping families together.  Accordingly, in 2015 the Government came to this Court to explain the importance of family detention to both enforcing the immigration laws while avoiding family separation.  *See* Defendants' Motion to Modify Settlement Agreement, ECF 120 (Feb. 27, 2015).  Unfortunately, however, this Court's construction of the Flores Settlement Agreement eliminates the practical availability of family detention across the nation, thus creating a powerful incentive for aliens to enter this country with children in violation of our criminal and immigration laws and without a valid claim to be admitted to the United

States, as the Government previously explained.  *See* Declaration of Tae D. Johnson, ECF 120-1 at 2 ¶ 7 (Feb. 27, 2015).

Under current law and legal rulings, including this Court's, it is not possible for the U.S. government to detain families together during the pendency of their immigration proceedings.  It cannot be done.  One reason those families "decide to make the dangerous journey to illegally enter the United States is that *they expect to be released from custody.*"  *Id.* (emphasis added).  Following the July 2015 ruling, there was a 3 to 5-fold increase in the number of illegal family border crossings. This surge is not a mere coincidence, it is the direct result of the message sent to those seeking illegal entry: we will not detain and deport you.

These realities have precipitated a destabilizing migratory crisis:  tens of thousands of families are embarking on the dangerous journey to the United States, often through smuggling arrangements, and then crossing the border illegally in violation of our federal criminal law.  And as the Government has previously stated, once these families are released into the interior, a vast segment fail to appear at their immigration hearings.  *See* Declaration of Thomas Homan, ECF 184-1, at 14 ¶ 30 (Aug. 6, 2015) (in 2014-2015, out of 41,297 cases involving families, 11,976 had already resulted in *in abstentia* removal orders).  This entire journey and ultimate crossing puts children and families at risk, and violates

criminal laws enacted by Congress to protect the border.  Those illegal crossings must stop.

Since 2015, the number of families illegally crossing the southwest border has increased markedly, well beyond the high levels that led to the Government's request for modification in 2015.  Undeniably the limitation on the option of detaining families together and the marked increase of families illegally crossing the border are linked.  Illegal family crossings and apprehensions that were in the range of 1,000 to 3,000 per month in early 2015 dramatically increased to a range of 5,000 to 9,000 per month in the months after July 2015, when this Court ruled to prevent the Government from detaining families together.[1]

In the absence of congressional action addressing border security and immigration, the President has directed the Executive Branch to take three immediate steps to ameliorate the crisis.  First, the President has directed the Secretary of Homeland Security to retain custody of family units through any criminal improper entry or immigration proceedings, to the extent permitted by law.  Executive Order, Affording Congress an Opportunity to Address Family Separation §§ 1, 3, 2018 WL 3046068 (June 20, 2018).[2]  Second, the President has

---

[1] *See* https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016.
[2] Available at https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.

directed the Department of Justice to promptly seek relief from this Court from the provisions of the Flores Settlement Agreement that "would permit the Secretary [of Homeland Security] . . . to detain alien families together through the pendency of criminal proceedings for improper entry or any removal or other immigration proceedings." *Id.* § 3(e). And the President has directed federal agencies to marshal resources to support family custody and to speed up the resolution time for immigration cases involving family units by "prioritiz[ing] the adjudication of cases involving detained families." *Id*. §§ 3(c), 3(d), 4.

This crisis at the border regarding illegal family crossings mandates that the Government take action. Accordingly, we ask for immediate interim relief from this Court that would permit family detention during immigration proceedings. This Court should provide limited emergency relief in two respects. *First*, the Court should provide a limited exemption from its construction of the Flores Settlement Agreement's release provisions so that ICE may detain alien minors who have arrived with their parent or legal guardian together in ICE family residential facilities. *Second*, the Court should determine that the Agreement's state licensure requirement does not apply to ICE family residential facilities. These changes are justified by several material changes in circumstances—chief among them the ongoing and worsening influx of families unlawfully entering the United States at the southwest border.

The Government requests that this Court provide a prompt hearing relating to its request. The government has moved expeditiously here given the President's direction, but is prepared to supplement this request with further factual information in advance of that hearing or at a time requested by the Court, including updating information submitted in connection with the Government's 2015 request relating to the circumstances at ICE family residential centers. The Government is also open to promptly discussing other options with Plaintiffs and the Court that will permit families to be kept together at residential facilities during the time needed to complete immigration processing. This Court, given its ongoing exercise of jurisdiction over the Flores Settlement Agreement, has the authority and responsibility to resolve these growing concerns by immediately permitting family detention.

## II.    BACKGROUND

In 2015, the Government filed a motion to modify the Flores Settlement Agreement in order to exclude accompanied minors from the Agreement and permit use of ICE family residential centers during immigration proceedings, which would have allowed the Government to exercise this option to keep families together to the greatest extent possible during removal proceedings. *See* Defendants' Motion to Modify Settlement Agreement, ECF 120 (Feb. 27, 2015). In that filing, the Government explained that a "practice of general release

encourages parents to subject their children to this dangerous journey in order to avoid their own detention" and puts "unrelated children at increased risk of trafficking by smugglers who bring them across the border in an attempt to avoid detention by representing themselves as a family unit."  Declaration of Tae D. Johnson, ECF 120-1 at 5 ¶ 11 (Feb. 27, 2015).

In 2015, the Government apprised this Court that a result of not amending the Flores Settlement Agreement could be the separation of families.  The Government explained that DHS required "additional, family-appropriate immigration detention capacity to hold families apprehended at the border, *without requiring separation of parents from their children*."  Defendants' Opposition to Motion to Enforce, ECF 121 at 1 (Feb. 27, 2015) (emphasis added).  The Government further explained that Plaintiffs' opposition to family detention units—based on an agreement that arose out of litigation that was limited to *unaccompanied* children—"threatens family unity and ignores the significant growth in the number of children . . . apprehended while unlawfully crossing the southwest border" with and without parents.  *Id*. at 2.  The Government urged against an application of the Flores Settlement Agreement that would "mak[e] it impossible for ICE to house families at ICE family residential centers, and to *instead require ICE to separate accompanied children from their parents or legal guardians*."  *Id*. at 17 (emphasis added).

6

This Court denied that motion in July 2015, Order, ECF 177 (July 24, 2015), and the Ninth Circuit affirmed that denial on July 6, 2016, holding that this Court had not abused its discretion. *Flores v. Lynch*, 828 F.3d 898, 909-10 (9th Cir. 2016). In so ruling, the Ninth Circuit concluded that the Government's request "to exempt an entire category of migrants from the Settlement" was not "a 'suitably tailored' response to the change in circumstances." *Id*. at 910. The Ninth Circuit acknowledged, however, that "relaxing certain requirements" might be appropriate where a showing of changed circumstances has been made. *Id*. And in the face of the Government's warning that family separation could result from this Court's decision, the Ninth Circuit specifically envisioned separating parents from their children under the terms of the Agreement – releasing the children while maintaining detention of their parents. *Flores*, 828 F.3d at 908-09; *see* Appellants Ninth Circuit Brief at 61, No. 15-56434 (Jan. 15, 2016).

The circumstances created by this application of the Agreement have become untenable. After a significant reduction in family units crossing the border in FY 2015 when the Government was holding families together, *see* ECF 184-1 at 8 ¶ 17, family crossings away from legal ports of entry nearly doubled in FY 2016, as measured by apprehensions. Such apprehensions have only increased annually since that time, except for a brief drop at the start of 2017—including an increase this year that, when projected to cover the full year, represents a 17% increase over

the illegal family entries in 2017 and a 30% increase in illegal family entries in 2014, the year that prompted the Government's prior filing with this Court. And the increase in family entries over FY 2015 is 123%, from 39,838 in FY 2015 to a number that, when projected to cover the full year, is 88,670 for FY 2018.[3] The year-to-year data follows:

**SW Border Family Apprehensions:**

| <u>Fiscal Year</u> | <u>Family Apprehensions</u> |
|---|---|
| 2012 | 11,116 |
| 2013 | 14,885 |
| 2014 | 68,445 |
| 2015 | 39,838 |
| 2016 | 77,674 |
| 2017 | 75,622 |
| 2018 (8 months) | 59,113 (12 month projection: 88,670).[4] |

The month-to-month figures show the sharp rise in family border crossings during 2015—from a figure in the range of 1,600 to 4,000 before this Court's July

---

[3] The simple projection is based on the assumption that illegal crossers for the remaining four months will arrive at the same rate as in the prior eight months, a projection that does not account for seasonal variations.

[4] *See* https://www.cbp.gov/newsroom/stats/sw-border-migration (2018); https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017 (2017); https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016 (2012-2016). In addition, 34,650 family units who presented at ports of entry on the southwest border this fiscal year were determined to be inadmissible. *Id.*

8

2015 decision, to a figure ranging from 5,000 to nearly 9,000 in the months after the decision:[5]

| Jan | Feb | Mar | Apr | May | June | July | Aug | Sep | Oct | Nov | Dec |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1622 | 2041 | 2782 | 3087 | 3861 | 4042 | 4503 | 5159 | 5273 | 6025 | 6471 | 8973 |

## III.   APPLICABLE LEGAL STANDARDS

The Government invokes Federal Rule of Civil Procedure 60(b)(5) and 60(b)(6) in support of its request to modify the Flores Settlement Agreement.

### A.   Federal Rule of Civil Procedure 60(b)(5)

Under Federal Rule of Civil Procedure 60(b)(5), the Court may relieve a party from "a final judgment, order, or proceeding [if] applying [the prior action] prospectively is no longer equitable." Fed. R. Civ. Proc. 60(b)(5); *see Frew ex. rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004); *McGrath v. Potash*, 199 F.2d 166, 167-68 (D.C. Cir. 1952).  The party seeking relief "bears the burden of establishing that a significant change in circumstances warrants revision of the decree."  *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383 (1992).  That burden may be met by showing "a significant change either in factual conditions or in law."  *Id.* at 384; *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[T]he passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts,

---

[5] *See* https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016.

9

and new policy insights—that warrant reexamination of the original judgment.").

A motion under this section must be brought "within a reasonable time." Fed. R. Civ. Proc. 60(c)(1).

The Flores Settlement Agreement is an example of what the Supreme Court has termed "institutional reform litigation." *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 380). A district court's ability to modify a decree in response to changed circumstances is heightened in institutional reform litigation. *Rufo*, 502 U.S. at 380. "Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Id.* And "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Id.* at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

## B.    Federal Rule of Civil Procedure 60(b)(6)

Federal Rule of Civil Procedure 60(b)(6) allows a Court to relieve a party from "a final judgment, order, or proceeding for . . . any other reason that justifies relief." Fed. R. Civ. Proc. 60(b)(6). The rule generally is "used sparingly as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). The frustration of

performance of a settlement agreement may provide reason to grant a motion under this Rule. *Stratman v. Babbitt*, 42 F.3d 1402, 1994 WL 681071, at *4 (9th Cir. Dec. 5, 1994). A motion under this section must be brought "within a reasonable time." *Alpine*, 984 F.2d at 1049 (quoting *In re Pacific Far East Lines, Inc.*, 889 F.2d 242, 249 (9th Cir. 1989)).

## IV.   ARGUMENT

This Court should provide limited emergency relief to enable the Government to keep alien families together. *First*, the Court should provide a limited exemption from its interpretation of the Flores Settlement Agreement's release provisions so that U.S. Customs and Immigration Enforcement (ICE) may detain alien minors who have arrived with their parent or legal guardian together in ICE family residential facilities. *Second*, the Court should exempt ICE family residential facilities from the Agreement's state licensure requirement. These changes are justified by several material changes in circumstances—including the worsening influx of families unlawfully entering the United States at the southwest border.

The Government does not, at this time, ask to be relieved from the Agreement's substantive requirements on the conditions of detention in these facilities. And it does not, at this time, ask to be relieved from any other provision of the Flores Settlement Agreement that otherwise affects accompanied (or

unaccompanied) minors.  Instead, in this motion, the Government asks for limited

relief that would promote an important, widely shared goal that has spanned

administrations:  keeping families together while effectively carrying out removal

proceedings required by immigration law.

This Court has clear authority to grant these exemptions.  It should exercise

that authority to help keep families together.  The Government seeks this

emergency relief on an *ex parte* basis, to enable the Government both to maintain a

secure southwest border while also avoiding family separations.

**A.      Significant Changes in Circumstances—Including the Ongoing,
Worsening Influx of Family Units on the Southwest Border—
Show that this Court Should Modify the Flores Settlement
Agreement.**

This Court should modify the Flores Settlement Agreement in light of

"significant change[s] in circumstances."  *Rufo*, 502 U.S. at 383 (modification of a

consent decree is appropriate when "a significant change in circumstances warrants

revision of the decree").  This changed-circumstances standard is met where there

have been "changes in circumstances that were beyond the defendants' control and

were not contemplated by the court or the parties when the decree was entered."

*Id.* at 380-81 (discussing *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d

1114, 1119-21 (3d Cir. 1979)).  Several significant changes satisfy these standards.

*First*, since the Agreement was entered, the number of persons illegally crossing the border in family units has dramatically increased and has materially changed from what the parties or Court could reasonably have contemplated.  That increase has consisted in significant measure of children who are accompanied by their parents.  Although the Ninth Circuit previously found that the parties "expressly anticipated an influx" when the Agreement was signed, *Flores*, 828 F.3d at 909, nothing suggests that the parties anticipated that this increase would consist largely of children who were accompanied by their parents.  Indeed, the Agreement arose from litigation solely about *unaccompanied* minors.  A modification is warranted to account for the important, widely shared interest in keeping families together.

The current situation is untenable.  As the Government explained in 2015, aliens cross the border illegally relying on promises from traffickers that "they will not be detained but instead will be released."  Declaration of Tae D. Johnson, ECF 120-1 at 2 ¶ 7.  (Feb. 27, 2015).  Such an incentive structure increases the chances that an alien without a valid claim for relief in the United States will be able to remain here illegally or during lengthy removal proceedings.  As the Government explained in 2015, "detaining these individuals dispels such expectations, and deters others from unlawfully coming to the United States."  *Id*. at 4 ¶ 8..  Moreover, many of these aliens are smuggled for "significant fees" and those

13

"payments are then used by cartels to fund additional illicit and dangerous

activities in the United States and Mexico." *Id*. ¶ 9.   The more constrained DHS's

ability to detain families together during the period necessary to promptly conduct

immigration proceedings, the more likely it is that families will attempt illegal

border crossing.  As the Government explained in 2015, a "practice of general

release encourages parents to subject their children to this dangerous journey in

order to avoid their own detention" and puts "unrelated children at increased risk

of trafficking by smugglers who bring them across the border in an attempt to

avoid detention by representing themselves as a family unit." *Id*. at 5 ¶ 11.

*Second*, neither the parties nor the Court anticipated that, when the

Government first began applying the Agreement to accompanied minors, as

required by this Court's order, that shift in practice would lead to the current

situation that incentivizes a dangerous journey by family units with young

children, risky illegal entry attempts by families with children, and trafficking of

families through Mexico in a manner contrary to the intent of asylum treaties.  As

explained above, the number of family units crossing the border illegally has

increased dramatically since the Government sought relief in 2015—by 30% since

the 2014 influx that led the Government to seek relief from this Court.  Without the

option to keep families together during the pendency of removal proceedings, the

Government must choose between acquiescing to and incentivizing illegal

immigration by releasing all family groups, or detaining the parents but separating

the family (as a result of the Agreement, as interpreted).  These are precisely the

sorts of changes that warrant "relax[ation] [of] certain requirements" of the

Agreement.  *Flores*, 828 F.3d at 910.

*Third*, class-action litigation has been filed challenging the legality of family

separation.  In one case, the plaintiffs seek class-wide relief requiring DHS to

discontinue family separation.  *See Ms. L. v. U.S. Immigration and Customs

Enforcement*, Motion, No. 18-428, ECF No. 48-1, at 26 (S.D. Cal.); *see also

Mejia-Mejia v. ICE*, No. 18-1445, Complaint ¶ 4 (D.D.C. filed June 19, 2018) ("If,

however, the government feels compelled to continue detaining these parents and

young children, it should at a minimum detain them together in one of its

immigration family detention centers").  Yet in declining the Government's

previous request to amend the Flores Settlement Agreement, the Ninth Circuit held

that family separation is permissible under the Agreement, and reversed this

Court's holding that the Agreement required the release of both the parents and

children to maintain family unity.  *See Flores*, 828 F.3d at 910 (Flores Settlement

Agreement "provides no affirmative release rights for parents").  It cannot be the

case—nor is it consistent with immigration law—that the Government's only

option, when facing a crisis of illegal border crossings, is simply to permit such

illegality by releasing all aliens after apprehension with full knowledge that later

voluntary appearance for removal proceedings is increasingly rare.  This point was true when the Government made it in 2015, and it remains true today.

*Finally*, the President has identified this issue as a significant problem warranting focused attention throughout the Executive Branch.  *See* Executive Order, Affording Congress an Opportunity to Address Family Separation (June 20, 2018).  In doing so, he has directed significant resources to provide adequate facilities where families can be together, and the prioritization of their immigration proceedings to minimize the amount of detention.  *Id.* § 4 (the "Attorney General shall, to the extent practicable, prioritize the adjudication of cases involving detained families").  Those efforts justify renewed consideration of family custody under the Flores Settlement Agreement.

## B.   Two Narrow Modifications to the Flores Settlement Agreement Are Warranted to Address the Significant Changes in Circumstances.

Given the circumstances set forth above, two "tailored" modifications to the Agreement are warranted at this time.  *Rufo*, 502 U.S. at 383 (once the moving party has established that modification is warranted, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance").

*First*, the Court should provide the Government an exemption from Paragraph 14 of the Agreement so that children may be placed in ICE custody with

their parent or guardian, rather than be released to another individual or placed into HHS custody.  *See* Flores Agreement ¶ 14 (requiring INS to "release a minor from its custody" in certain circumstances).  So long as paragraph 14 of the Agreement is applied as written to accompanied children, ICE is required to separate parents or guardians from their children in situations where the law requires detention or ICE or an immigration judge determines that a parent or guardian should be detained to prevent flight or danger to the community during removal proceedings.  Exempting ICE family residential centers from this requirement on the limited basis proposed by the Government will permit DHS to more effectively prevent large numbers of alien families from illegally entering the United States through the southwest border, while also allowing families to stay together in specially designed facilities during their criminal and removal proceedings.

*Second*, the Court should provide an exemption for ICE family residential centers from the licensing provisions of the Agreement.  Those provisions require that minors "be placed temporarily in a licensed program."  Agreement ¶ 19; Exhibit 1 (laying out the minimum standards for conditions in facilities holding minors).  A "licensed program" is one "that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children."  Agreement ¶ 6.  This exemption is necessary because of ongoing and unresolved disputes over the ability of States to license these types of facilities that

house both adults and children.  Exemption from this requirement is tailored to address the immediate influx with which the Government is currently dealing, while providing time for ongoing efforts in Congress to address these issues.  And the Government does not now object to the requirement that ICE family residential facilities would continue to meet the standards laid out in Exhibit 1 to the Agreement.

These are narrow, targeted requests aimed at addressing a specific and growing problem.  Notably, while the Government continues to believe that it was incorrect to hold that the Flores Settlement Agreement applies to accompanied minors, the Government does not seek here to "exempt an entire category of migrants from the Settlement."  *Flores*, 828 F.3d at 910.  Rather, at this time, the Government seeks only to permit family detention under the Agreement given the ongoing severe influx of family units at the border.[6]  The Government does not seek through this motion to exempt accompanied minors—or any other group— from all of the settlement provisions.  The two requested exemptions are the sort of "relax[ation] [of] certain requirements" of the Agreement that the Ninth Circuit

---

[6] The Government continues to disagree that the Flores Settlement Agreement covers accompanied minors and with other aspects of this Court's rulings interpreting the Agreement, and preserves its arguments in the event of further review .

invited the Government to seek.  *Id.*  Relaxing these requirements would permit family units to be kept together in appropriate facilities.

The equities and human considerations strongly support this narrow relief. Family detention during the pendency of removal proceedings has been a continuing goal of DHS for a considerable time, and across administrations.  DHS has viewed this authority as critical to addressing the growing influx of family units illegally crossing the southwest border.  The inability to employ this option creates a continued incentive for parents to bring their children on the dangerous journey to the United States and to enter the country illegally, rather than at ports of entry.  Entering illegally provides two opportunities to remain in the United States for a family with no valid asylum claim—either if the family evades detection entirely or if the family is caught and then released, the family unit disappears.  Proposed legislation in Congress seeks to address the issues created by the limitations that the Agreement, as it has been interpreted, places on the Government's ability to use ICE family residential centers.  This process is fluid, but the emergency currently existing on the southwest border requires immediate action.  This Court can take such action to help address this urgent problem.

*        *        *

The Government is prepared to make a more thorough showing, if necessary, in support of this request to amend the Flores Settlement Agreement.

The Government respectfully requests a prompt hearing on its request for

immediate relief, together with any additional proceedings the Court believes

appropriate.

## V.    CONCLUSION

For the above reasons, the Government respectfully asks this Court to grant

limited emergency relief that would:  (1) exempt DHS from the Flores Settlement

Agreement's release provisions so that ICE may detain alien minors who have

arrived with their parent or legal guardian together in ICE family residential

facilities; and (2) exempt ICE family residential facilities from the Agreement's

state licensure requirement.  The Government is not asking to be relieved from the

substantive language of the Agreement on the conditions of detention in these

facilities.  The Government asks for immediate relief, along with a schedule to

allow the parties to more fully address the issues raised by this request.


DATED:      June 21, 2018              Respectfully submitted,


                                       CHAD A. READLER
                                       Acting Assistant Attorney General

                                       /s/ August E. Flentje
                                       AUGUST E. FLENTJE
                                       Special Counsel to the Assistant Attorney
                                       General
                                       Civil Division

20

WILLIAM C. PEACHEY
Director
COLIN KISOR
Deputy Director

/s/ Jeffrey S. Robins
JEFFREY S. ROBINS
Assistant Director

SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962


*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2018, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ August E. Flentje
August E. Flentje
Attorney for Defendants