Amy P. Lally (SBN 198555)
alally@sidley.com
Ellyce R. Cooper (SBN 204453)
ecooper@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595-9500
Facsimile: +1 310 595-9501

Mark Rosenbaum (SBN 59940)
mrosenbaum@publiccounsel.org
Judy London (SBN 149431)
jlondon@publiccounsel.org
Talia Inlender (SBN 253796)
tinlender@publiccounsel.org
Alisa Hartz (SBN 285141)
ahartz@publiccounsel.org
Lucero Chavez (SBN 273531)
lchavez@publiccounsel.org
Elizabeth Hadaway (SBN 308800)
ehadaway@publiccounsel.org
Malhar Shah (SBN 318588)
mshah@publiccounsel.org
Deena Tumeh (SBN 318573)
dtumeh@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: +1 213 385-2977
Facsimile: +1 213 385-9089

*Attorneys for Plaintiff-Intervenors*
*Additional counsel on next page*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES; et al., | Case No.  CV 85-4544-DMG |
| Plaintiffs, | **NOTICE OF LODGING OF COMPLAINT IN INTERVENTION** |
| v. | **Filed concurrently with** |
| JEFFERSON B. SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES; KIRSTJEN NIELSEN, SECRETARY OF HOMELAND SECURITY; U.S. | **NOTICE OF MOTION AND MOTION TO INTERVENE AS PLAINTIFFS** |

| | | |
|---|---|---|
| 1 | DEPARTMENT OF HOMELAND SECURITY, AND ITS SUBORDINATE ENTITIES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION, | Date:    July 27, 2018 |
| 2 | | Time:    9:30 a.m. |
| 3 | | Judge:   Hon. Dolly M. Gee |
| 4 | | Courtroom: 8C, Los Angeles Courthouse |
| 5 | Defendants. | |
| 6 | Ms. J.P., Ms. J.O., Ms. R.M., and DOES 1-10, | |
| 7 | Plaintiff-Intervenors. | |

8

9   Carter G. Phillips*
cphillips@sidley.com
10  Jennifer J. Clark*
jennifer.clark@sidley.com
11  SIDLEY AUSTIN LLP
1501 K Street, N.W.
12  Washington, D.C. 20005
Telephone: +1 202 736-8000
13  Facsimile: +1 202 736-8711
14

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
Part-time Lecturer in Law
USC Gould School of Law**
University of Southern California
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: +1 213 675-5957

15

16  Michael Andolina*
mandolina@sidley.com
17  Timothy Payne*
tpayne@sidley.com
18  Kevin Fee*
kfee@sidley.com
19  SIDLEY AUSTIN LLP
One South Dearborn
20  Chicago, IL 60603
Telephone: +1 312 853-7000
21  Facsimile: +1 312 853-7036
22

Luis Cortes Romero (SBN 310852)
lcortes@ia-lc.com
Alma L. David (SBN 257676)
adavid@ia-lc.com
IMMIGRANT ADVOCACY &
LITIGATION CENTER, PLLC
19309 68th Avenue South, Suite R-102
Kent, WA 98032
Telephone: +1 253 872-4730
Facsimile: +1 253 237-1591

23

24  Sean A. Commons (SBN 217603)
scommons@sidley.com
25  SIDLEY AUSTIN LLP
555 West Fifth Street
26  Los Angeles, CA 90013
Telephone: +1 213 896-6000
27  Facsimile: +1 213 896-6600
28

NOTICE OF LODGING OF COMPLAINT IN INTERVENTION

*Application for admission pro hac vice to be submitted

** Institution listed for identification purposes only

1       PLEASE TAKE NOTICE that Plaintiffs-Intervenors lodge herewith the

2   attached Complaint in Intervention.

3

4   Dated:  June 25, 2018                          Respectfully Submitted,

5                                                  /s/  Amy P. Lally
    MARK ROSENBAUM (CABN 59940)                    Amy P. Lally (CABN 198555)
6   mrosenbaum@publiccounsel.org                   alally@sidley.com
    Judy London (SBN 149431)                       Ellyce R. Cooper (CABN 204453)
7   jlondon@publiccounsel.org                      ecooper@sidley.com
    Talia Inlender (SBN 253796)                    SIDLEY AUSTIN LLP
8   tinlender@publiccounsel.org                    1999 Avenue of the Stars, 17th Floor
    Alisa Hartz (SBN 285141)                       Los Angeles, CA 90067
9   ahartz@publiccounsel.org                       Telephone: +1 310 595-9662
    Lucero Chavez (SBN 273531)                     Facsimile: +1 310 595-9501
10  lchavez@publiccounsel.org
    Elizabeth Hadaway (SBN 308800)                 Carter G. Phillips*
11  ehadaway@publiccounsel.org                     cphillips@sidley.com
    Malhar Shah (SBN 318588)                       Jennifer J. Clark*
12  mshah@publiccounsel.org                        jennifer.clark@sidley.com
    Deena Tumeh (SBN 318573)                       SIDLEY AUSTIN LLP
13  dtumeh@publiccounsel.org                       1501 K Street, N.W.
    PUBLIC COUNSEL                                 Washington, D.C. 20005
14  610 S. Ardmore Avenue                          Telephone: +1 202 736-8270
    Los Angeles, CA 90005                          Facsimile: +1 202 736-8711
15  Telephone: +1 213 385-2977
    Facsimile: +1 213 385-9089                     Michael Andolina*
16                                                 mandolina@sidley.com
                                                   Timothy Payne*
17  Mark E. Haddad (SBN 205945)                    tpayne@sidley.com
    markhadd@usc.edu                               Kevin Fee*
18  Part-time Lecturer in Law, USC Gould           kfee@sidley.com
    School of Law**                                SIDLEY AUSTIN LLP
19  University of Southern California              One South Dearborn
    699 Exposition Blvd.                           Chicago, IL 60603
20  Los Angeles, CA 90089                          Telephone: +1 312 853-7000
    Telephone: +1 213 675-5957                     Facsimile: +1 312 853-7036
21
    Luis Cortes Romero (SBN 310852)                Sean A. Commons (CABN 217603)
22  lcores@ia-lc.com                               scommons@sidley.com
    Alma L. David (SBN 257676)                     SIDLEY AUSTIN LLP
23  adavid@ia-lc.com                               555 West Fifth Street
    Immigrant Advocacy & Litigation                Los Angeles, CA 90013
24  Center, PLLC                                   Telephone: +1 213 896-6000
    19309 68th Ave South R-102                     Facsimile: +1 213 896-6600
25  Kent, WA 98032
    Telephone: +1 253 872-4730
26  Facsimile: +1 253 237-1591

27

28

*Application for admission pro hac vice to be submitted

** Institution listed for identification purposes only

Amy P. Lally (SBN 198555)
alally@sidley.com
Ellyce R. Cooper (SBN 204453)
ecooper@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595-9500
Facsimile: +1 310 595-9501

Mark Rosenbaum (SBN 59940)
mrosenbaum@publiccounsel.org
Judy London (SBN 149431)
jlondon@publiccounsel.org
Talia Inlender (SBN 253796)
tinlender@publiccounsel.org
Alisa Hartz (SBN 285141)
ahartz@publiccounsel.org
Lucero Chavez (SBN 273531)
lchavez@publiccounsel.org
Elizabeth Hadaway (SBN 308800)
ehadaway@publiccounsel.org
Malhar Shah (SBN 318588)
mshah@publiccounsel.org
Deena Tumeh (SBN 318573)
dtumeh@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: +1 213 385-2977
Facsimile: +1 213 385-9089

*Attorneys for Plaintiff-Intervenors*
*Additional counsel on next page*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES; et al., | Case No.  CV 85-4544-DMG |
| Plaintiffs, | **[PROPOSED] COMPLAINT IN INTERVENTION** |
| v. | |
| JEFFERSON B. SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES; KIRSTJEN NIELSEN, SECRETARY OF | |

HOMELAND SECURITY; U.S.
DEPARTMENT OF HOMELAND
SECURITY, AND ITS SUBORDINATE
ENTITIES; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; U.S.
CUSTOMS AND BORDER
PROTECTION,

              Defendants.

Ms. J.P., Ms. J.O., Ms. R.M., and DOES 1-
10,

              Plaintiff-Intervenors.

Carter G. Phillips*
cphillips@sidley.com
Jennifer J. Clark*
jennifer.clark@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736-8000
Facsimile: +1 202 736-8711

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
Part-time Lecturer in Law
USC Gould School of Law**
University of Southern California
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: +1 213 675-5957

Michael Andolina*
mandolina@sidley.com
Timothy Payne*
tpayne@sidley.com
Kevin Fee*
kfee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: +1 312 853-7000
Facsimile: +1 312 853-7036

Luis Cortes Romero (SBN 310852)
lcortes@ia-lc.com
Alma L. David (SBN 257676)
adavid@ia-lc.com
IMMIGRANT ADVOCACY &
LITIGATION CENTER, PLLC
19309 68th Avenue South, Suite R-102
Kent, WA 98032
Telephone: +1 253 872-4730
Facsimile: +1 253 237-1591

Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013

Telephone: +1 213 896-6000
Facsimile: +1 213 896-6600

*Application for admission pro hac vice to be submitted

** Institution listed for identification purposes only

1

**INTRODUCTION**

2      1.      This complaint challenges the federal government's extraordinary,

3 deliberate, and needless policies of separating immigrant parents from their children,

4 holding each in prolonged detention with no access to one another, and denying them

5 access to the mental health services that they now desperately need to address the

6 consequences of such cruel separation.

7      2.      Plaintiff-Intervenors are three mothers currently being held in detention

8 by the federal government.  Each came to the United States with a child under the age

9 of 18, fleeing from persecution in her native country, and seeking asylum here as

10 permitted under the laws of the United States.

11      3.      Defendants are each charged with the faithful execution of the laws of the

12 United States.  Nonetheless, Defendants adopted the family separation policy with the

13 deliberate objective of defying these laws and deterring families from Central

14 America from seeking asylum.  The policy is a component of Defendants' racially-

15 motivated effort to stem immigration from non-European countries.

16      4.      Defendants implemented their policy with chaos and cruelty.  They

17 subjected mothers already fleeing violence and persecution in their home countries to

18 one of the most brutal traumas: forced separation from their children.  Parents and

19 children were torn away from each other with little explanation.  Guards, perhaps to

20 inure themselves to the horror they were inflicting, mocked children and parents for

21 their tears.  Parents received little or no information about their children's

22 whereabouts or well-being, and no explanation as to whether or when they would see

23 their children again.

24      5.      Defendants' family separation policy inflicted affirmative harm on

25 parents and their children.  Experts agree that forcible separation of children from

26 their parents is a traumatic event that can have both immediate and long-term

27 psychological consequences.

28

[PROPOSED] COMPLAINT IN INTERVENTION

6.    Defendants' policy was also unnecessary.  In the past, the federal government found alternatives to family separation, including the release of parents and children.  Defendants' policy of family separation during detention was thus a new and gratuitous injury inflicted solely to terrify immigrant parents and children, deter other refugees from seeking asylum, and extract political concessions.  Executive Order No. 13841, which summarily and prospectively terminates the family separation policy, confirms that the policy of separating parents and children was not required by law.

7.    While Defendants may no longer be separating the family members of newly arriving asylum seekers, they continue to separately detain the parents of more than 2,000 children.  This ongoing policy of separate detention subjects parents and children to continuing trauma and exacerbates the harm and cruelty of the initial separation.

8.    This policy is wholly unnecessary.  In those cases where release on recognizance is insufficient, there are many effective programs to ensure attendance at court hearings and other proceedings.  For instance, under the Family Case Management Program, the government had released asylum-seeking parents and children together.  In this program, which costs far less than detention, immigrants appeared for their removal hearings over 99% of the time.  Despite its success in achieving the government's compliance goals, the program was eliminated in June 2017.

9.    Defendants now contend that their only option is to obtain relief from the *Flores* Settlement sufficient to detain asylum-seeking parents and children indefinitely in substandard unlicensed detention centers.  That is unacceptable.  Plaintiff-Intervenors have already suffered from Defendants' failure to prepare for their last policy shift.  Defendants cannot use this crisis of their own making to justify shunting the parents and children they have traumatized into hastily-provided and legally-inadequate facilities.  One deplorable policy cannot be remedied with another.

10.     Instead, what is needed is parental participation in fashioning and implementing the remedies that the *Flores* Settlement requires to ensure that Plaintiff-Intervenors' children receive the full services they need.  Plaintiffs are bringing this complaint as one in intervention because their participation is essential to protecting their own parental and family rights, and because the interdependent nature of the harm imposed on parent and child by prolonged family separation counsels for a coordinated enforcement response from the *Flores* Court.  For the mental health services that their children can receive under the *Flores* Settlement to be effective, Plaintiff-Intervenors must be available to their children's therapists and reunited with their children outside of detention.

11.     Plaintiff-Intervenors have their own rights, as parents, to vindicate in response to the harm of family separation.  These include a right to release in order to care for and direct the upbringing of their children to ameliorate the trauma caused to both parent and child by the government's deliberate separation.  As the Ninth Circuit has made clear, under the *Flores* Settlement alone, minor children cannot obtain parental release, in significant part because their parents did not participate in the litigation.  *Flores v. Lynch*, 828 F.3d 898, 909 & n. 4 (9th Cir. 2016).  By intervening, Plaintiff-Intervenors will directly present their right to release, and enable the Court to provide a complete and coordinated response to family separation that addresses the harm that Defendants' family separation policy inflicted both on Plaintiff-Intervenors and on their children.

**Plaintiff-Intervenor Ms. J.P.[1]**

12.     Plaintiff-Intervenor Ms. J. P. ("Ms. P") is the 37-year-old mother of 16-year-old L.P. Ms. P is currently being detained in the custody of U.S. Immigration and Customs Enforcement at the James A. Musick Facility in Irvine, California.  Her

---

[1] *See* Declaration of Judy London ("London Decl."); Declaration of Lucero Chavez ("Chavez Decl.").

daughter, L.P. is currently being held at Casa Phoenix, a Southwest Key Programs, Inc., facility in Phoenix, Arizona.

13.     Ms. P entered the United States with her daughter near San Luis, Arizona, on or around May 17, 2018, after having fled Guatemala in fear for her life. Ms. P sought to escape death threats from a former partner who had sexually abused and beaten Ms. P.  Ms. P and L.P. were detained by U.S. Customs and Border Protection ("CBP") officers shortly after crossing the border.  Ms. P's native language is a Mayan dialect that is rarely spoken in the United States.  She cannot speak or understand English, and understands very little Spanish.  As a result, Ms. P was not able communicate with the CBP officers who detained her and L.P.

14.     Upon their detention, CBP officials placed Ms. P and L.P. in a cold, windowless room alongside other detainees.  There were no beds, showers, or private toilets, and the lights were on twenty-four hours a day.  Ms. P and L.P. were fed nothing but lukewarm soup for three or four days.  L.P. recalls witnessing other children forcibly taken from their parents, and seeing a mother being physically restrained by guards as her son was taken away.  Guards at the facility taunted mothers, saying:  "If you're such a good mother why would you bring your child here."

15.     Ms. P and L.P. were not told if or when they would be released.  L.P. was questioned without her mother and given papers to sign in English, which she does not speak or read.  On or around May 20, 2018, officers came in and took L.P. away from Ms. P.  L.P. fainted in terror when she realized what was happening, causing injury to her mouth that left her face swollen for several days.  Ms. P was not told or able to understand why her daughter was being taken, where she was going, or if or when she would see her daughter again.

16.     On June 1, 2018, with the assistance of a fellow detainee, Ms. P submitted a request to U.S. Immigration and Customs Enforcement ("ICE") seeking information on her daughter's whereabouts.  Ms. P can neither read nor write and was

not able to understand the written response that she received several days later which, in any event, contained only her daughter's location and not a telephone number or other way to reach her daughter.  Ms. P had no contact with her daughter until June 22, 2018, when, after 30 hours of advocacy by her attorney, she was allowed to speak with L.P. by phone.  Until then, Ms. P feared that she would never see or speak to her daughter again.  She still fears that she faces certain death if she is forced to return to Guatemala, and remains worried that she will be deported and separated from her daughter.  Ms. P believes that she has been to court, but does not understand the purpose for or substance of the court hearings that she attended.

17.    L.P. says that she has felt isolated during this period.  She has been kept hundreds of miles from her mother, and her only regular contact is with a counselor whom she sees once a week.  She feels depressed, hopeless, and confused by her detention and separation.  She cannot speak about her mother or the experience of separation without crying.  She dreams of her mother and prays to be reunited with her.

**Plaintiff-Intervenor Ms. J.O.[2]**

18.    Plaintiff-Intervenor Ms. J.O. ("Ms. O") is the mother of 16-year-old T.B.  Ms. O and her daughter fled their native Honduras in fear for their lives after gangs directly threatened their family.  Ms. O and T.B. entered the United States near Granjeno, Texas, on or around May 18, 2018.  Ms. O and her daughter encountered a CBP officer that day, and claimed fear of returning to Honduras.  Ms. O was told that she was to be charged with illegal entry in violation of 8 U.S.C. 1325(a)(1).  CBP explained that Ms. O would be transferred to another facility for these proceedings, but reunited with her daughter thereafter.  When she protested regarding the separation, a CBP officer said to Ms. O, "You can thank Trump."  Ms. O was detained away from her daughter while in CBP custody.

---

[2] *See* Declaration of Luis Cortes ("Cortes Decl.").

19.     On or about May 21, 2018, Ms. O was transferred out of the CBP facility where she had been held.  She was moved to the SeaTac Federal Prison in SeaTac, Washington, and subsequently transferred to the Northwest Detention Center in Tacoma, Washington.  Ms. O has not seen her daughter since approximately May 21, 2018.  Ms. O's daughter, T.B. is currently being detained in Southwest Key Programs, Inc.—Casa Antigua in San Benito, Texas.

**Plaintiff-Intervenor Ms. R.M.[3]**

20.     Plaintiff-Intervenor Ms. R. M. ("Ms. M") and her 15-year-old daughter, S.Q., fled El Salvador in fear of Ms. M's husband, a former military officer, who had severely beaten them both and threatened their lives.  On or around May 18, 2018, Ms. M and her daughter, 15-year-old S.Q., entered the United States near Hidalgo, Texas.  Ms. M and her daughter encountered a CBP officer the same day, and claimed fear of returning to their country of origin.

21.     Ms. M and her daughter were immediately detained.  Ms. M was told that she was being charged with illegal entry into the United States pursuant to 8 U.S.C. 1325(a)(1).  Ms. M and her daughter were informed that Ms. M was to be transferred to another facility for criminal prosecution, and that they would be reunited after the proceedings were over.  Upon hearing this, Ms. M's daughter began to cry.  A CBP officer mocked her daughter's crying.

22.     Ms. M was detained on the opposite side of the facility from her daughter, from where she could hear her daughter crying.  Ms. M recalls that CBP officers at the CBP facility in Texas would throw water and crackers on the floor for detained women.  When Ms. M reached her hand to obtain crackers, an officer made a comment suggesting that she was asking for "five-star treatment" and then threw the crackers on the floor.

---

[3] *See id.*

23.     Within several days of her detention, Ms. M was prosecuted on federal criminal charges and transferred to the SeaTac Federal Prison in SeaTac, Washington. She was later moved to the Northwest Detention Center in Tacoma, Washington, where she remains.  Ms. M's daughter is currently being detained in Southwest Key Programs, Inc.—Casa Antigua in San Benito, Texas.

**Plaintiff-Intervenors DOES 1-10**

24.     Plaintiff-Intervenors Does 1-10 are parents of minor children who are being detained by U.S. immigration officials after entering into the United States by crossing the southern border.  Upon information and belief, Plaintiff-Intervenors Does 1-10 have been separated from their minor children, who are being held in detention facilities apart from their parents by U.S. immigration officials.

**Defendants**

25.     Defendant Jefferson B. Sessions is the Attorney General of the United States.  In this capacity, Defendant Sessions is responsible for setting policy related to the enforcement of immigration laws in the United States, including the policy of family separation.

26.     Defendant Kirstjen Nielsen is the Secretary of the Department of Homeland Security.  In this capacity, Defendant Nielsen is responsible for the administration of immigration laws in the United States.  Defendant Nielsen has ultimate responsibility for each of the agencies within DHS, and for all DHS policies and procedures.

27.     Defendant U.S. Department of Homeland Security ("DHS") is responsible for enforcing the immigration laws of the United States.

28.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is the agency of DHS responsible for administering immigration laws in the United States, including overseeing immigration detention.

29.     Defendant U.S. Customs and Border Protection ("CBP") is an agency of DHS responsible for the processing and detaining of noncitizens who are apprehended near the United States border.

## JURISDICTION AND VENUE

30.     This is an action in intervention in the above-captioned matter filed by Plaintiff Jenny Lisette Flores.  This Court has had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

31.     Sovereign immunity does not bar claims against federal officials seeking solely to prevent future violations of federal law (rather than monetary relief).  *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697-99 & nn.18-19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183-84 (1938).

32.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(e)(1) because at least one plaintiff resides in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

33.     This Complaint in Intervention is submitted pursuant to order of this Court, if the Court grants Plaintiff-Intervenors' Motion for Intervention pursuant to Fed. R. Civ. P. 24, filed herewith.

34.     This Complaint incorporates and adopts as its own all allegations alleged by Plaintiff Flores to the extent any of Plaintiff Flores's allegations are relevant to the allegations of the Plaintiff-Intervenors.

## THE NEED TO INTERVENE

35.     Plaintiff-Intervenors satisfy the Fed. R. Civ. P. 24(a)(1) standard for intervention as a matter of right for the reasons stated in their motion to intervene:  (1) Plaintiff-Intervenors' request is timely; (2) Plaintiff-Intervenors have a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede

their ability to protect Plaintiff-Intervenors' interest; and (4) the existing parties may not adequately represent Plaintiff-Intervenors' interest.

36.     Alternatively, Plaintiff-Intervenors satisfy the Fed. R. Civ. P. 24(b)(1)(B): (1) the Plaintiff-Intervenors' claims share common questions of law or fact with the main action; (2) Plaintiff-Intervenors' motion is timely; and (3) the court has jurisdiction over Plaintiff-Intervenors' claims.

## STATUTORY AND LEGAL FRAMEWORK

### U.S. Law Permits Families to Seek Asylum upon Arrival

37.     The laws of the United States permit non-citizens on American soil to seek asylum regardless of how, or where, or with whom they arrive at the border. They establish that "[a]ny alien" who arrives in the United States, "whether or not at a designated port of arrival" may apply for asylum "irrespective of such alien's status." 8 U.S.C. § 1158.

38.     Statutes that govern the process for seeking asylum in the United States have their roots in the refugee crisis that followed World War II.  They incorporate concepts from international law (*see, e.g.*, 8 U.S.C. § 101(a)(42) (incorporating the definition of "refugee" from the United Nations Convention Relating to the Status of Refugees)), and provide a process for individuals who fear persecution in their native countries to seek protection in the United States (*see, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212 § 201(b), 94 Stat. 102 (1980)).

39.     The United States does not limit the right to seek asylum to those who cross into the country at a port of entry.  Those apprehended for the first time crossing into the United States outside a port of entry may be subject to expedited removal, a process under which an individual may be removed from the United States without a full hearing before an immigration judge.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).  But there are safeguards to protect those seeking asylum in that context.  If an individual "indicates either an intention to apply for asylum . . . or a fear of persecution,"

9

immigration officers must refer the individual "for an interview by an asylum officer" to evaluate whether the individual has a credible fear of persecution if returned to their country.  8 U.S.C. § 1225(b)(1)(A)(ii).

40.     If an asylum officer concludes that there is a "significant possibility" the individual can prove eligibility for asylum, the asylum seeker receives a positive credible fear determination and is placed into regular removal proceedings.  During those regular removal proceedings, the putative refugee may submit an asylum application, obtain a hearing before an immigration judge, and appeal an adverse decision through the Board of Immigration Appeals and the federal courts.  8 U.S.C. § 1225 (b)(1)(B)(ii); 8 C.F.R. §§ 235.6(a)(1)(ii), (iii).

41.     An asylum seeker may also be placed directly into regular removal proceedings with issuance of a Notice to Appear for a future hearing date.  *See* 8 U.S.C. §§ 1225(b)(2), 1229(a)(1), 1229a.

42.     No law requires the prolonged detention of asylum seekers throughout this process and no law requires the prolonged separation of families either.

### The *Flores* Settlement Sets Standards for Housing Detained Children

43.     When the government detains children, it must comply with the *Flores* Settlement, regardless of whether the children arrive unaccompanied or with their families.  *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016).

44.     The *Flores* Settlement implements a "general policy favoring release" of minors.  Settlement ¶¶ 14-18.  It also requires the government to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs."  *Id*. ¶ 11.  Children should generally be released within five days to one of the following recipients, in order of preference:  a parent, a legal guardian, an adult relative, an adult designated by a parent or legal guardian, or, if no such individuals are available, a licensed program willing to accept legal custody.  *Id*. ¶¶ 12, 14.  In the event of an "emergency" or an "influx" of minors into the country, the government is required to place minors "as expeditiously as possible."  *Id*. ¶ 12.C.  The *Flores* court

found that up to 20 days may be as expeditious as possible for the government under extenuating circumstances, a time frame that has been widely reported in the press.

45.     The government must "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor," and "[s]uch efforts at family reunification shall continue so long as the minor is in [the government's] custody."  Settlement ¶ 18.

46.     When the government transfers a detained minor to any person or entity other than a parent, guardian, adult relative, or a parent or guardian's designee, such person or entity is required to be "licensed by an appropriate state agency to provide residential, group, or foster care services for dependent children."  Settlement ¶ 6. Any such licensed person or entity to which the government transfers a minor is required to meet certain additional standards, as described in Exhibit 1 of the *Flores* Settlement.

47.     Among other services, licensed programs must provide "appropriate mental health interventions when necessary," "identification of the minor's special needs including any specific problem(s) which require immediate intervention," "[a]t least one (1) individual counseling session per week conducted by trained social work staff," "[g]roup counseling," and "[v]isitation and contact with family members (regardless of their immigration status)."  Settlement, Exhibit 1.

48.     The government is required by the *Flores* Settlement to "treat minors with dignity, respect, and special concern for their particular vulnerability." Settlement, Exhibit 2.  The government is further required to "hold minors in a facility that is safe and sanitary and that is consistent with . . . the particular vulnerability of minors."  *Id.*  Any such facility in which minors are held by the government following arrest must provide for "contact with family members who were arrested with the minor."  *Id.*

**Alternatives to Detention and the Family Case Management Program**

49.     On June 21, 2018, the government requested relief from the *Flores* Settlement so as to permit it to detain minors who are arrested with their parents indefinitely through the pendency of their immigration proceedings, in facilities unlicensed by any state authority. *Flores v. Sessions*, No. 85-cv-04544, Dkt. 435 (C.D. Ca. Jun. 21, 2018).  The government's motion suggests that alternatives to detention are unworkable in part because there is a risk that released individuals will not attend their immigration proceedings. *Id.*

50.     To the contrary, several different alternatives to detention have been available to asylum seekers in the United States.  For example, in recent years community supported models have proven particularly effective and economical.  For some migrants, release on recognizance is sufficient to ensure that they attend court hearings and other proceedings. [4]

51.     Beginning on January 21, 2016, the Family Case Management Program ("FCMP") was offered as an "alternative to detention . . . initiative that use[d] qualified case managers to promote participant compliance with their immigration obligations."[5] The program used a wrap-around services model for immigrant families whom ICE recommended for placement after determining they were "non-dangerous"

---

[4] *See, e.g.*, *Report of the DHS Advisory Committee on Family Residential Centers*, DHS (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf ("For many families, release on recognizance with information about rights and responsibilities and referrals to legal services and psycho-social supports is sufficient to ensure compliance with immigration proceedings.").

[5] *Fact Sheet: Stakeholder Referrals to the ICE/ERO Family Case Management Program*, U.S. I.C.E, *available at* http://www.ilw.com/immigrationdaily/news/2016,0111-ICE.pdf.

[PROPOSED] COMPLAINT IN INTERVENTION

and "low-flight-risk families."[6]  The cost was reported to be $36 per family each day compared to $319 per bed per day in a family detention center.[7]

52.    The FCMP was designed, but not limited, to serve victims of domestic violence or sexual abuse, pregnant women, nursing mothers, and families with physical and/or mental illness. The FCMP operated in five cities across the United States: Baltimore, Chicago, Los Angeles, Miami, and New York.  The program allowed families for whom detention in ICE centers or more traditional alternative programs would exacerbate their trauma or illness to exit detention into the community while they moved through their immigration proceedings. The program facilitated access to holistic community-based services tailored to each family's needs, including:[8]

- Orientation and education for participants about their legal rights and responsibilities;
- Individualized family service plans;
- Assistance in accessing low-cost or pro bono legal assistance for housing, education, and medical/mental health providers (if needed);
- Assistance with transportation logistics;
- Tracking and monitoring of immigration obligations; and
- Safe repatriation and reintegration planning (where applicable).

---

[6] Loiselle, Mary F., *GEO Care's New Family Case Management Program*," GEO World, at 3 (2016), *available at* https://www.geogroup.com/userfiles/1de79aa6-2ff2-4615-a997-7869142237bd.pdf.

[7] Elise Foley & Jennifer Bendery, *This Alternative To Detaining Immigrant Families Works.  Trump Just Won't Use It.*, HUFFINGTON POST (June 22, 2018), *available at* https://www.huffingtonpost.com/entry/trump-family-detention-alternative_us_5b2d4731e4b0321a01d1002e.

[8] *Fact Sheet: Stakeholder Referrals to the ICE/ERO Family Case Management Program*, U.S. I.C.E, *available at* http://www.ilw.com/immigrationdaily/news/2016,0111-ICE.pdf; Loiselle, Mary F., *GEO Care's New Family Case Management Program*," GEO World, at 3 (2016), *available at* https://www.geogroup.com/userfiles/1de79aa6-2ff2-4615-a997-7869142237bd.pdf.

[PROPOSED] COMPLAINT IN INTERVENTION

The FCMP was launched on January 21, 2016, and proved within its first year of operation to be a more effective alternative to other more restrictive alternatives traditionally utilized.  It was a step forward in procuring dignity for immigrant families, and it satisfied ICE's primary goal of ensuring compliance with participants' immigration obligations—99% for ICE check-ins and appointments, and 100% for attendance at court hearings.[9]

53.     Despite its success in terms of the government's stated compliance priorities, the program was closed in June 2017.

## THE NEEDLESS AND INHERENTLY CRUEL POLICY OF FAMILY SEPARATION INFLICTED IRREPARABLE HARM

### "Zero Tolerance" Family Separation Policy Rationalized as Deterrent

54.     On May 7, 2018, Attorney General Jeff Sessions announced a "zero-tolerance" policy of forced family separation to deter migrants from crossing the southern border of the United States.  Sessions said, "If you cross this border unlawfully, then we will prosecute you.  It's that simple. . . .  If you are smuggling a child, then we will prosecute you and that child will be separated from you. . . ."

55.     The family separation policy was by no means limited to "smugglers." In the first month of the policy, more than 2,300 children were separated from their parents while crossing the border.[10]  Some children were as young as 18 months old, and more than 100 children were younger than four years old.[11]  These children have been sent to shelters and other temporary housing, overseen by the U.S. Department of Health and Human Services ("HHS"), across the United States.  The children are often

---

[9] *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted).* DHS Office of Inspector General, at 5 (OIG-18-22) (Nov. 30, 2017).

[10] Sarah Almukhtar, et al., *How Trump's Policy Changed Separated Migrant Children From Their Parents*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/interactive/2018/06/20/us/border-children-separation.html.

[11] Caitlin Dickerson, *Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border*, N.Y. TIMES (Apr. 20, 2018), https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.

[PROPOSED] COMPLAINT IN INTERVENTION

housed hundreds of miles away from their parents.  There are an estimated 100 shelters in 17 states, including Arizona, California, Connecticut, Florida, Illinois, Kansas, Maryland, Massachusetts, Michigan, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Washington.[12]  Of course, separation of a mere mile between a child and parent is a terrifying situation for both when there is no certainty of where the parent or child is being kept and no guarantee that the two ever will be reunited.

56.    Defendants have mischaracterized family separation as necessary to enforce the law.  But DHS expressly contemplated using family separation to deter migration from Central America into the United States at least a year before the "zero tolerance" policy was adopted.[13]  In March 2017, then DHS Secretary Kelly confirmed that family separation was under consideration as a means to deter migration across the southern border.  After experts and members of Congress strongly opposed the idea, DHS Secretary Kelly testified in April 2017 that DHS would not "routinely" separate children from their families at the border, except under extenuating circumstances.[14]  Nevertheless, non-profit organizations observed a trend of family separation at the border with Mexico and complained to DHS and urged it to clarify its policies.

---

[12] Sarah Almukhtar et al., *Where Migrant Children Are Being Held Across the U.S.*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/interactive/2018/06/21/us/where-are-the-border-children.html.

[13] *Kelly: DHS is considering separating undocumented children from their parents at the border*, CNN (March 6, 2017), https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.

[14] *See, e.g.*, Stein, Fernando et al., *AAP Statement Opposing Separation of Mothers and Children at the Border*, AMERICAN ACADEMY OF PEDIATRICS (March 4, 2017), *available at* https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx; *Letter to Secretary Kelly Opposing Plan to Separate Migrant Families at the Border*, ALIANZA AMERICAS ET AL. (March 22, 2017), *available at* https://www.womensrefugeecommission.org/rights/gbv/resources/1460-family-separation-sign-on-letter; Testimony before Congress in the Senate Homeland Security and Governmental Affairs Committee hearing titled, "Improving Border Security and Public Safety" (April 5, 2017); *Kelly says DHS won't separate families at the border*, CNN (March 29, 2017) http://www.cnn.com/2017/03/29/politics/border-families-separation-kelly/index.html.

57.     On May 11, 2018, White House Chief of Staff John Kelly confirmed that the policy was put in place to deter other migrants, specifically Central Americans, from coming to the United States.  In his words, "a big name of the game is deterrence."[15]

### Separated Families Held Hostage to Exact Political Concessions

58.     As the horrors of family separation reached the media, President Trump insisted that he would not change the policy unless lawmakers agreed to his immigration reform demands.[16]  He asserted that if lawmakers had passed the aggressive anti-immigration legislation he wanted, the policy would be unnecessary.[17]  He urged Congress to crack down on asylum seekers, reduce visas, and spend $25 billion on a border wall.[18]

59.     President Trump also contended that the solution to the emerging humanitarian crisis that he had created was for Democrats to give in to his political demands.[19]  On June 15, 2018, he tweeted, "The Democrats are forcing the breakup of families at the Border with their horrible and cruel legislative agenda.  Any

---

[15] *Transcript: White House Chief of Staff John Kelly's Interview with NPR,* NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[16] Michael Scherer & Josh Dawsey, *Trump cites as a negotiating tool his policy of separating immigrant children from their parents,* WASH. POST (June 15, 2018), https://www.washingtonpost.com/amphtml/politics/trump-cites-as-a-negotiating-tool-his-policy-of-separating-immigrant-children-from-their-parents/2018/06/15/ade82b80-70b3-11e8-bf86-a2351b5ece99_story.html?utm_term=.8d0d24db87ef&__twitter_impression=true&noredirect=on.

[17] Michael D. Shear et al., *G.O.P. Moves to End Trump's Family Separation Policy, but Can't Agree How,* N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/politics/trump-immigration-children-separated-families.html.

[18] *Id.*

[19] Linda Qiu, *Fact-Checking the Trump Administration's Case for Child Separation at the Border,* N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/fact-check-trump-child-separation.html.

---

[PROPOSED] COMPLAINT IN INTERVENTION

1    Immigration Bill MUST HAVE full funding for the Wall, end Catch & Release, Visa

2    Lottery and Chain, and go to Merit Based Immigration.  Go for it!  WIN!"[20]

3         60.    Despite his administration's previous characterization of the family

4    separation policy as a means to deter future immigration, President Trump also

5    advanced the fiction that existing federal law already compelled family separation.

6    On June 19, 2018, he said, "[W]e have to get the Democrats to go ahead and work

7    with us.  Because as a result of Democrat-supported loopholes in our federal laws,

8    most illegal immigrant families and minors from Central America who arrive

9    unlawfully at the border cannot be detained together or removed together, only

10   released.  These are crippling loopholes that cause family separation, which we don't

11   want."[21]

12        61.    As children and parents suffered the consequences of being torn apart

13   with no certainty that they would ever see each other again, President Trump used

14   their suffering as a bargaining chip in his political negotiations to advance his broader

15   anti-immigrant agenda.

16   **The Trauma of Family Separation**

17        62.    President Trump's heartless political tactics have caused very serious

18   traumatic harm to separated families.  The consensus among leading experts on

19   trauma is that tearing children from their parents inflicts severe complex trauma on

20   both children and parents alike that can never be fully remedied.[22]  As Senior Vice

21   Dean and Professor of Mental Health at University of Southern California Dr.

---

22,23   [20] Donald J. Trump (@realDonaldTrump), TWITTER (June 15, 2018),
https://twitter.com/realDonaldTrump/status/1007671131841671169.

24,25   [21] *Remarks by President Trump at the National Federation of Independent Businesses 75th Anniversary Celebration*, WHITE HOUSE (June 19, 2018),
https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-federation-independent-businesses-75th-anniversary-celebration/.

26,27,28   [22] Declaration of Kenneth Berrick, John Sprinson, Jill Duerr Berrick & Kevin Campbell, ¶ 10, 12 (hereinafter "Berrick Decl."); Declaration of Dylan Gee, ¶ 5 (hereinafter "Gee Decl."); Declaration of Jose Hidalgo, ¶ 12, 13 (hereinafter "Hidalgo Decl"); Declaration of Bruce Perry, ¶ 21 (hereinafter "Perry Decl."); Declaration of Marleen Wong, ¶ 19 (hereinafter "Wong Decl."); Declaration of Luis Zayas, ¶ 12, 14.

Marleen Wong explains, trauma is the body's neurobiological stress response to experiencing or witnessing an event involving life-threatening circumstances or threat of serious injury that causes him or her to feel intense fear, helplessness, or horror.[23] Complex trauma describes multiple, repeated, persistent, or prolonged exposure to trauma such that the body's stress response impacts the development and functioning of the brain.[24]  Left untreated, such trauma causes immediate and long-lasting physical and psychological harm, especially in children, whose still-developing bodies and brains are ill equipped to cope with traumatic stress. [25]

### Trauma Experienced by Children

63.   Recent media reports offer but a hint at the on-going suffering caused by forced family separation.  Recently, an audio recording from inside a U.S. Customs and Border Protection facility captured the voices of ten Central American children separated from their parents.  The children, as young as four, can be heard crying out desperately for their parents.  They repeatedly scream "Mami" and "Papa," many crying so hard it sounds like they can barely breathe.  Above the heart wrenching weeping and crying is the voice of a Border Patrol agent who jokes: "Well, we have an orchestra here.  What's missing is a conductor."[26]

64.   A pediatrician visiting the Texas detention facility known as "the Ursula" reported seeing somewhere between 20 and 30 ten-year-old boys caged in by a chain link fence crying and sobbing for their mothers—some of them reaching out through

---

[23] Declaration of Marleen Wong, ¶ 12 (hereinafter "Wong Decl.").

[24] *Id.*

[25] Berrick Decl.¶ 15; Gee Decl. ¶ 5, 8, 9; Hidalgo Decl. ¶ 12; Perry Decl. ¶ 21; Wong. Decl.  ¶ 20 ("Prolonged exposure to such stress has a debilitating effect on children even after the particular traumatic event is over.") .

[26] Ginger Thompson, *Listen to Children Who've Just Been Separated From Their Parents and the Border*, PROPUBLICA (June 18, 2018), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.

[PROPOSED] COMPLAINT IN INTERVENTION

the fence as they screamed.  Their mothers, who were in identical cages about fifty feet away, could only look on, unable to help or console them.[27]

65.     Upon separation, children experience acute psychological distress.[28] According to founder and Chief Executive Office of Seneca Family of Agencies Kenneth Berrick, Professor at the University of California, Berkeley School of Social Welfare Dr. Jill Duerr Berrick, founder of the Center for Family Finding and Youth Connectedness Kevin Campbell, and Clinical Director of Seneca Family of Agencies Dr. John Sprinson, such trauma may be particularly severe when the separation is sudden or forcible.[29]  During the moment of separation, a child can experience "severe neurobiological stress causing the child to feel intense fear, helplessness, or horror."[30] "Immediate reactions include obvious emotional suffering in the form of inconsolable crying, desperate efforts to pursue or search for the parent and anger."[31]  Instructor of Psychiatry at the Harvard Medical School and Massachusetts General Hospital Dr. Jose Hidalgo notes these effects may be exacerbated by the additional trauma caused when witnessing a parent's reaction to separation.[32]

66.     In the immediate aftermath of separation, children are likely to continue to suffer from "extraordinary stress and pain."[33]  They may show signs of regression, reverting to crying and bed-wetting, or suffer the loss of other important

---

[27] Sady Doyle, *Child Trauma Can't Be Undone With an Executive Order*, ELLE MAGAZINE (June 21, 2018), https://www.elle.com/culture/career-politics/a21748590/child-trauma-cant-be-undone-with-an-executive-order/.

[28] Hidalgo Decl. ¶ 8.

[29] Berrick Decl. ¶ 10 ("When the separation is sudden, unpredictable, or in a strange environment with no other familiar adult figures present then the response is likely to be extreme."); Hidalgo Decl. ¶ 8; Wong Decl. ¶ 19.

[30] Wong Decl. ¶ 19.

[31] Berrick Decl. ¶ 11.

[32] Hidalgo Decl. ¶ 8.

[33] Zayas Decl. ¶ 11; *see also* Gee Decl. ¶ 5 ("The immediate psychological consequences of exposure to traumatic events involving caregivers include, but are not limited to, anxiety, distress, despair, and terror for both the child and the parent."); Perry Decl. ¶ 21; Wong Decl. ¶ 20.

developmental milestones.[34]  Separated children are also likely to exhibit a variety of negative behaviors from aggressiveness to withdrawal.[35]

67.   The longer the parent and child are separated, the greater the harms the child experiences.[36]  Decades of public health research demonstrate that the child-parent bond is a crucial factor in healthy child development.[37]  The absence of interaction between parent and child "acts as a 'double whammy' for healthy development: not only does the brain not receive the positive stimulation it needs, but the body's stress response is activated, flooding the developing brain with potentially harmful stress hormones."[38]  Moreover, separation disrupts and severely damages the relationship between a child and their parent.[39]

68.   Assistant Professor of Psychology at Yale University Dr. Dylan Gee writes that "For a child who has been separated from their parent at the border, their body and brain are being shaped to anticipate danger and prepare for the worst."[40]  As

---

[34] Doyle, *supra* note 27; *see also* Joint Decl. ¶ 11.

[35] Berrick Decl. ¶ 11; Wong Decl. ¶¶ 18, 20.

[36] Hidalgo Decl. ¶ 11; Jessica Henderson Daniel, PhD, *Statement of APA President Regarding Executive Order Rescinding Immigrant Family Separation Policy*, AM. PSYCHOLOGICAL ASS'N (June 20, 2018), http://www.apa.org/news/press/releases/2018/06/family-separation-policy.aspx.

[37] Karen Dineed Wagner, MD, PhD, *President's Statement on Separating Children From Families*, AMER. ACAD. OF CHILD AND ADOLESCENT PSYCHIATRY, https://www.aacap.org/AACAP/ Press/Press_Releases/2018/Statement-on-Separating-Children-from-Families.aspx ("Parental support is an essential and proven protective factor that substantially reduces risk for adverse health and developmental outcomes for children."); "Separating Parents and Children at US Border is Inhumane and Sets the Stage for a Public Health Crisis," AM. PUBLIC HEALTH ASS'N (June 15, 2018), https://www.apha.org/news-and-media/news-releases/apha-news-releases/2018/parent-child-separation ("Decades of public health research have shown that family structure, stability and environment are key social determinants of a child's and a community's health.").

[38] *Serve and Return*, HARVARD UNIVERSITY CENTER ON THE DEVELOPING CHILD, https://developingchild.harvard.edu/science/key-concepts/serve-and-return/ (last visited June 24, 2018); *see also* Berrick Decl. ¶ 15

[39] Berrick Decl. ¶¶ 11, 12.

[40] Dylan Gee, *I study kids who were separated from their parents.  The trauma could change their brains forever*, VOX (June 20, 2018), https://www.vox.com/firstperson/2018/6/20/1748 2698 /tender-age-family-separation-border-immigrants-children.

[PROPOSED] COMPLAINT IN INTERVENTION

detailed by substantial research conducted by Adjunct Professor in the Department of Psychiatry and Behavioral Sciences at the Feinberg School of Medicine at Northwestern University Dr. Bruce Perry, stress hormones induce a state of hypervigilance that alters a child's cognition and emotion and causes chronic problems with how that child responds to stress over a lifetime.[41]  Such alterations increase the risk of  "psychological and physical health problems," including "fundamental changes in brain function," which may "manifest[] as a loss of capacity to regulate intense emotions, to cope with future stress and to regulate fear reactions to reminders of traumatic events," and may in turn cause "other effects such as depression, substance abuse, problems forming relationships, and other behavioral problems."[42]

69.     Separation is not the only source of trauma migrant children will face upon arrival at the border.  After separation, children are likely to be held in detention centers, where even a short length of stay is known to cause traumatic effects.[43] According to Dr. Luis Zayas, Dean of Steve Hicks School of Social Work and

---

[41] *Id.*; *see also* Perry Decl. ¶¶ 4, 13 ("[T]rauma, neglect, and maltreatment during childhood have profound effects on physical, emotional, behavioral, and cognitive development.  Some of the most important consequences of developmental adversity are the result of abnormal development and functioning of the brain's stress response systems."); ¶ 21 ("[T]raumatic stress alters the developing brain.  It can increase risk for a host of emotional and behavioral problems, including antisocial behavior, attention problems, acting out, aggressive or violent behaviors, lack of trust, and other counterproductive coping mechanisms."); Berrick Decl. ¶¶ 13, 16; Gee Decl. ¶¶ 5, 8.

[42] Hidalgo Decl. ¶ 12; Gee, *supra* note 40 ("A child whose brain is constantly scanning the environment for danger will undoubtedly have difficulty paying attention in class or interacting with peers on the playground.  Some children will internalize their feelings and appear numb; others will respond by acting out.  In the long run, the cascade of consequences places individuals who have experienced early trauma at risk for academic or occupational failure, substance abuse, and health problems such as heart disease and diabetes."); Doyle, *supra* note 27, ("'Long-term, these individuals who have traumatic reactions are at heightened risk of virtually every  medical problem,' says Dr. Judith Cohen, Medical Director of the Center for Traumatic Stress. 'Neurologic to cardiac to pulmonary to reproductive problems . . . just go down the body and virtually every part is affected.'").

[43] Council on Community Pediatrics, *Policy Statement—Detention of Immigrant Children*, AMERICAN ACADEMY OF PEDIATRICS (March 2017), http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483; *see also* Zayas Decl. ¶¶ 11, 15.

---

21

Professor of Psychiatry at Dell Medical School at the University of Texas, Austin, both "[s]cience and clinical practice show that [] children being held in detention with or without their parents are undergoing extraordinary stress and pain."[44]

70.     Reports concerning unaccompanied immigrant children detained in the United States found high rates of mental health disorders like anxiety, depression, posttraumatic stress disorder, and suicidal ideation, as well other behavioral problems that do not necessarily disappear upon release.[45]  Experts concur that any period of detention, even if brief, can cause psychological trauma and induce long term mental and medical health risks in children.[46]  According to the American Academy of Pediatrics, "there is no evidence indicating that any time in detention is safe for children."[47]

71.     Indeed, separation and detention are likely to be only some of many traumatic experiences already suffered by a migrant child.  The families arriving daily at this nation's borders are likely to be fleeing endemic levels of crime, violence, and victimization in their home countries.[48]  They are likely to have been victims of violence, both in their homes and communities.[49]  On top of that, migrant children and their families are likely to have endured a harrowing journey across thousands of miles without adequate food, water, or protection.[50]  To be suddenly separated from

---

[44] *Id.*

[45] Council on Community Pediatrics, *supra* note 43.

[46] *Id.* ¶ 11, 15-19.

[47] Council on Community Pediatrics, *supra* note 43.

[48] Adriana Beltrán, *Fleeing Violence in Central America*, WOLA: COMMENTARY (Feb. 21, 2017), https://www.wola.org/analysis/people-leaving-central-americas-northern-triangle/ ("In [] Guatemala and Honduras, homicide levels have decreased overall, but both remain among the world's most violent countries not at war."); ("Extortion is widespread, with small businesses, the public transportation sector, and poor neighborhoods being the most heavily hit. . . .  Failure to pay can result in harassment, violence, or death."); *id.* ("Honduras and Guatemala are some of the most dangerous countries to be a woman, with female homicide rates among the highest in the world.").

[49] *Id.*

[50] *NAPNAP Statement Opposing the Border Separation of Children and Parents*, NAT'L ASS'N OF PEDIATRIC NURSE PRACTITIONERS (June 11, 2018),

[PROPOSED] COMPLAINT IN INTERVENTION

one or both parents compounds trauma upon trauma.[51]  Exposure to multiple traumatic events results in even higher risks for the multitude of mental and medical problems described above.[52]

### Trauma Experience by Parents

72.     Parents experience trauma due to forcible separation from their children as well.[53]  Drs. Gee and Hidalgo expect that parents who experience their children being taken away from them will suffer acute psychological distress that manifests in physical and mental symptoms of anxiety, depression, suicidal ideation, loss of appetite, and loss of sleep.[54]  "The traumatic nature of separation from the child is likely to be exacerbated when parents are not provided with information about their child's location or condition, or when parents do not have access to information in their native language . . . ."[55]

73.     Parents also face traumatic effects from detention, which compounds the trauma of being forcibly separated from their children.  Studies reveal that detained adult asylum seekers "suffered from musculoskeletal, gastrointestinal, respiratory, and neurologic symptoms,"[56] as well as anxiety, depression, posttraumatic stress disorder, and self-harming behavior.[57]

---

https://www.napnap.org/napnap-statement-opposing-border-separation-children-and-parents.

[51] Tammy Bean, PhD, et al., *Comparing Psychological Distress, Traumatic Stress Reactions, and Experiences of Unaccompanied Refugee Minors with Experiences of Adolescents Accompanied by Parents*, 195 J. NERVOUS MENTAL DISEASE, 288, 288 (2007); *see also* Hidalgo Decl. ¶ 10; Zayas Decl. ¶ 8.

[52] Gee, *supra* note 40.

[53] Hidalgo Decl. ¶ 13; Gee Decl. ¶ 6.

[54] *Id.*

[55] Gee Decl. ¶ 6; see also Hidalgo Decl. ¶ 17 ("The uncertainty of not knowing where separated loved ones are and how to get them back is traumatizing in itself and also needs to stop.").

[56] Council on Community Pediatrics, *supra* note 43 (citing Deans AK, et al., *Use of Royal Darwin Hospital emergency department by immigration detainees in 2011*, 199 Med J Aust. 776-778 (2013), *available at* https://www.mja.com.au/system/files/issues/199_11_161213/dea10447_fm.pdf).

[57] *Id.*

74.     Parents, like their children must also cope with the events that prompted their migration in the first place, as well as the stressors and trauma experienced on the way.[58]  As with their children, such experiences are only compounded by subsequent detention and separation from their families.[59]

**Family Separation is Motivated by Racial Animus**

75.     The family separation policy was adopted as part of an anti-immigration agenda motivated by racial animus.  On the first day of his presidential campaign, then Candidate Trump categorically labeled Mexican immigrants as criminals and rapists: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with [them]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[60]

76.     Three years later, when John Kelly discussed the family separation policy, he echoed similar sentiments about the categorical undesirability of migrants from Central America.  "[T]hey're also not people that would easily assimilate into the United States into our modern society.  They're overwhelmingly rural people in the countries they come from—fourth, fifth, sixth grade educations are kind of the norm. They don't speak English, obviously that's a big thing.  They don't speak English. They don't integrate well, they don't have skills."[61]

77.     The Trump Administration has consistently demonstrated a pattern of pursuing immigration policies motivated by racial animus toward non-European

---

[58] Gee Decl. ¶ 7; Zayas Decl. ¶ 8.

[59] Id.

[60] *Donald Trump Announces a Presidential Bid*, WASH. POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.0b727c71c4c8.

[61] *Transcript: White House Chief of Staff John Kelly's Interview with NPR,* NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

immigrants.  For example, in or around June 2017, in a meeting with Secretary of State Rex Tillerson and then-DHS Secretary John Kelly, Trump reportedly said of the 15,000 Haitians admitted to the United States, they "all have AIDS."[62]  At this same meeting, the President, after learning that 40,000 people had entered the United States from Nigeria, reportedly stated that they would never "go back to their huts" in Africa.[63]

78.     On or about January 11, 2018, several lawmakers gathered with the President in the Oval Office of the White House to discuss a bipartisan immigration proposal.  President Trump grew frustrated when the conversation turned to protections for foreign nationals from certain Central American and African countries.  "Why," the President asked, "are we having all these people from shithole countries come here?"[64]  Trump asked, "Why do we need more Haitians?"  He insisted that lawmakers "[t]ake them out" of any potential immigration deal.[65]  Instead, he expressed a preference for immigrants from countries like Norway, which is overwhelmingly white, or from Asian countries, which he felt would help the United States economically.[66]

79.     Senator Dick Durbin, who was present at the January 11, 2018, meeting in the Oval Office, characterized the President's "shithole" comments as "clearly

---

[62] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. TIMES (Dec. 23, 2017), https://nyti.ms/2DEQLyv.

[63] *Id.*

[64] Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, WASH. POST (Jan 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[65] *Id.*

[66] *Id.* Despite the President's openness to the financial benefits of Asian immigrants, his Administration has targeted Asian refugees for deportation.  Agnes Constante, *As Cambodian deportations resume, community looks for ways to cope*, NBC NEWS (April 20, 2018), https://www.nbcnews.com/news/asian-america/deportation-cambodian-refugees-u-s-devastates-community-n867096.

[PROPOSED] COMPLAINT IN INTERVENTION

racial," "hate-filled," and "vile."[67]  Senator Durbin reportedly warned the President
that exclusion of immigrants based on those grounds would be "an obvious racial
decision."[68]

80.     Similarly vile sentiments motivate the administration's policies on family
separation.  Not only are these policies being used to attempt to deter asylum seekers
and other migrants from certain countries, they are also dehumanizing and inhumane.
In fact, President Trump explicitly stated on May 16, 2018, "These aren't people.
These are animals." [69]

81.     On June 19, 2018, he again asserted that migrant parents crossing the
border with their children "could be murderers and thieves and so much else."[70]  He
also argued that his political opponents "don't care about crime and want illegal
immigrants, no matter how bad they may be, to pour into and infest our Country, like
MS-13."[71]  He refers to migrants, including asylum seekers, as people who "invade
our Country" and who should not receive the process due to them under United States
and international law: "When somebody comes in, we must immediately, with no
Judges or Court Cases, bring them back from where they came."[72]

---

[67] Carl Hulse, *Inside the Oval Office Immigration Meeting that Left a Senator
Stunned*, N.Y. TIMES (Jan. 19, 2018), https://nyti.ms/2DiqhlM.

[68] *Id.*

[69] Julie H. Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*,
N.Y. TIMES (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-
undocumented-immigrants-animals.html.

[70] Philip Rucker, Josh Dawsey & Seung Kim, *Trump defiant as crisis grows over
family separation at the border*, WASH. POST (June 19, 2018),
https://www.washingtonpost.com/politics/trump-defiant-as-crisis-grows-over-family-
separation-at-the-border/2018/06/18/210c78ca-730f-11e8-805c-
4b67019fcfe4_story.html?utm_term=.1d4d5ae8f8b7.

[71] Donald Trump (@realDonaldTrump), TWITTER (June 19, 2018),
https://twitter.com/realdonaldtrump/status/1009071403918864385 (emphasis added).

[72] John Bacon, *Trump wants to send undocumented immigrants back without
hearings*, USA TODAY (June 24, 2018),
https://www.usatoday.com/story/news/nation/2018/06/24/immigrant-children-trump-
warns-undocumented-immigrants-invade-us/728949002/.

82.     These categorical insults expose the racial animus motivating recent policies.  Other explanations have proven false and pretextual.  Secretary Nielsen argued that the policy was necessary due to a marked increase in the number of adults arriving at the border with children and fraudulently claiming to be a family unit.  In last five months, however, less than 1 percent of families apprehended at the border fraudulently claimed to be a family unit.[73]  Trump also claimed that 80 percent of migrants who are released never show up for their immigration hearings and disappear into the country.  Federal data, however, reveals that most do appear at their court hearings.[74]

83.     Research also suggests that deterrence policies have little effect on reducing illegal immigration.[75]  Indeed, even a forced separation policy would not deter many Central American migrants from traveling to the United States because they are asylum seekers whose lives are in danger; the alternative of staying in their own countries is even worse.[76]  Many migrants simply have no choice but to escape the violence of their home countries.

### Family Separation Is Exposed As Needless Cruelty

84.     As news about the impact of family separation spread, it shocked the public conscience.  Thousands of people across the country protested the cruel and

---

[73] Linda Qiu, *Fact-Checking the Trump Administration's Case for Child Separation at the Border*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/fact-check-trump-child-separation.html.

[74] Noah Bierman, et al., *Trump orders end to his family separation policy at the border, but relief could be temporary*, N.Y. TIMES (June 20, 2018), http://www.latimes.com/politics/la-na-pol-trump-immigration-20180620-story.html.

[75] Anna Oltman, *Does separating families at the border discourage immigration? Here's what the research says*, WASH. POST (May 31, 2018), https://www.washingtonpost.com/news/monkey-cage/wp/2018/05/31/does-separating-families-at-the-border-discourage-immigration-heres-what-the-research-says/?utm_term=.58063f1056b9.

[76] Julie Turkewitz & Jose A. Del Real, *Why Are Parents Bringing Their Children on Treacherous Treks to the U.S. Border?*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/us/immigration-border-children.html.

[PROPOSED] COMPLAINT IN INTERVENTION

inhumane policy of forcible separation.[77]  Major health organizations, political figures and the business community voiced their outrage.

85.    America's medical and public health communities unanimously decried the practice of separating families.[78]  The American Academy of Pediatrics said that the "[s]eparation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for safety of the child at the hand of parent."[79] The American Academy of Child and Adolescent Psychiatry stated that "[s]eparating these children from their families in times of stress creates unnecessary and high-risk trauma at the very time they need care and support the most."  The National Academies of Sciences, Engineering and Medicine said that "[p]arents' impact on their children's well-being may never be greater than during the earliest year of life, when a child's brain is developing rapidly and when nearly all of her or his experiences are shaped by parents and the family environment."

86.    In an open letter to Attorney General Sessions and Secretary Nielsen, the Attorneys General in 21 states called for the Trump Administration to end the zero-tolerance policy.[80]  The Attorneys General called the policy "inhumane" and "contrary

---

[77] Tim Argango & Kalya Cockrel, *Marches Across the U.S. Protest Separation of Migrant Families*, N.Y. TIMES (June 14, 2018), https://www.nytimes.com/2018/06/14/us/protest-marches-family-separation.html.

[78] Melissa Healy, *'Children must not be abused for political purposes': What health groups say about family separation*, L.A. TIMES (June 20, 2018), http://www.latimes.com/science/sciencenow/la-sci-sn-family-separation-medical-groups-20180620-story.html.

[79] Julie M. Linton et al., *Detention of Immigrant Children*, THE AMERICAN ACADEMY OF PEDIATRICS (March 2017), http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483; *U.S. Rights Chief: Migrant Family Separations "Unconscionable,"* CBS NEWS (June 18, 2018) (Dr. Colleen A. Kraft, President of the American Academy of Pediatrics, say that separating children from their parents by force is a "form of child abuse"), https://www.cbsnews.com/news/trump-policy-migrant-family-separation-parents-children-unconscionable-un-says/.

[80] Hector H. Balderas, *Open Letter to the Honorable Jeff Sessions and the Honorable Kirstjen Nielsen*, STATE OF NEW MEXICO OFFICE OF THE ATTORNEY GENERAL (June 19, 2018), https://ag.ny.gov/sites/default/files/ag_ltr_to_ag_sessions_sec._nielsen_re_family_separation_6.19.181.pdf (joined by the Attorney Generals of California, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Maine, Maryland,

to American values," and characterized the policy as raising serious due process and equal protection concerns.  The letter concluded, "Put simply, the deliberate separation of children and their parents who seek lawful asylum in America is wrong."

87.     All four living former first ladies also joined the chorus of critics.[81] Laura Bush compared the situation to Japanese Interment.[82]  She called the policy "cruel" and "immoral," and noted that such treatment inflicts serious trauma.[83] Michelle Obama and Hillary Clinton both supported Bush's article; Clinton called the situation a "humanitarian crisis" and noted that "every human being with a sense of compassion and decency, should be outraged."[84]  Rosalynn Carter called the policy "disgraceful and a shame to our country."[85]

88.     Several airlines also condemned the separation policy and said that they would not allow the federal government to use their flights to transport separated children.  American Airlines said that it has "no desire to be associated with separating families, or worse, to profit from it."[86]  Southwest Airlines asked that "anyone" involved with the separation policy not fly with them.[87]

_____

Massachusetts, Minnesota, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington).

[81] Stephanie Ebbs, *All 5 first ladies speak out against family-separation immigration policy*, ABC NEWS (June 18, 2018), https://abcnews.go.com/Politics/ladies-speak-family-separation-immigration-policy/story?id=55986862.

[82] Laura Bush, *Laura Bush: Separating children from their parents at the border 'breaks my heart'*, WASH. POST (June 17, 2018), https://www.washingtonpost.com/opinions/laura-bush-separating-children-from-their-parents-at-the-border-breaks-my-heart/2018/06/17/f2df517a-7287-11e8-9780-b1dd6a09b549_story.html?noredirect=on&utm_term=.d43b5a479ab6.

[83] *Id.*

[84] Stephanie Ebbs, *All 5 first ladies speak out against family-separation immigration policy*, ABC NEWS (June 18, 2018), https://abcnews.go.com/Politics/ladies-speak-family-separation-immigration-policy/story?id=55986862.

[85] *Id.*

[86] Richard Fausset, *Airlines Ask Government Not to Use Their Flights to Carry Children Separated at the Border*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/airlines-transport-immigrant-children.html.

[87] *Id.*

[PROPOSED] COMPLAINT IN INTERVENTION

89.     The U.S. Chamber of Commerce and the Business Roundtable also condemned forcibly separating children from their parents.  The Business Roundtable called it "cruel and contrary to American values," and the U.S. Chamber of Commerce's top official said that "this is not who we are, and it must end now."[88]

90.     Governors from at least eight states announced that they would withhold or recall National Guard troops from efforts to secure the border in response to the separation policy.[89]  North Carolina Governor Roy Cooper said that the "cruel policy of tearing children away from their parents requires a strong response" and that he was pulling his state's troops from the border.[90]  Massachusetts Governor Charlie Baker called the policy "cruel and inhumane."[91]

91.     Republican Senator Orrin G. Hatch (UT) said that the separation policy was "not American."[92]  Senator Rob Portman (OH) said that policy runs "counter to our values."[93]

92.     In addition, 75 former United States Attorneys also called on Sessions to end the family separation policy.  The open letter stated that Session's "Zero Tolerance policy has resulted in the unnecessary trauma and suffering of innocent children."  The letter went on to say that "[u]nder [the] policy, families and children are greeted with unexpected cruelty at the doorstep of the United States, instead of with relief or asylum in the greatest country in the world."[94]

[88] Michael D. Shear et al., *G.O.P. Moves to End Trump's Family Separation Policy, but Can't Agree How*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/politics/trump-immigration-children-separated-families.html.

[89] Matthew Haag & Jess Bidgood, *Governors Refuse to Send National Guard to Border, Citing Child Separation Practice*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/national-guard-trump-children-immigration.html.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Bipartisan Group of Former United States Attorneys Call on Sessions to End Family Separation*, MEDIUM (June 18, 2018),

[PROPOSED] COMPLAINT IN INTERVENTION

93.     Faced with national revulsion at family separation and legislative refusal to accede to his political demands as the price of ending the policy, President Trump abruptly changed course.

94.     On June 20, 2018, President Trump issued an executive order entitled "Affording Congress an Opportunity to Address Family Separation" ("Executive Order").[95]  The Executive Order continued the policy of initiating criminal proceedings for all who cross the border illegally and called for indefinite detention of families, including children covered by the *Flores* Settlement, in camps and makeshift detention centers.[96]

95.     President Trump's Executive Order did not and could not end the trauma of family separation.  Most families still have not been reunited.  Parents still do not know where their children are and, like Plaintiff-Intervenors, are not able to care for them or even speak with them.  Traumatized children remain in deplorable detention conditions. Some may be lost in the system.  Detention centers "are often unable to locate the parent of separated children because the children arrive without proper records."[97] Once a child arrives at a detention center, "there is no firm process in place to determine whether they have been separated from someone who was legitimately their parent, or for reuniting parents and children who had been mistakenly separated."[98]

96.     Critically, the Executive Order failed to provide any remediation for the trauma and devastation unnecessarily inflicted by the government on the children and

https://medium.com/@formerusattorneys/bipartisan-group-of-former-united-states-attorneys-call-on-sessions-to-end-child-detention-e129ae0df0cf.

[95] Executive Order, *Affording Congress an Opportunity to Address Family Separation*, WHITE HOUSE (June 20, 2018), https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.

[96] *Id.*

[97] Caitlin Dickerson, *Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border*, N.Y. TIMES (Apr. 20, 2018), https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.

[98] *Id.*

parents whom it separated.  To mitigate the negative effects of the trauma suffered, separated families must be immediately reunited and provided with access to intensive trauma treatment services outside of the traumatizing environment of detention.[99] Without these remedies, the deleterious impact of forcible separation is debilitating and causes life-long harm.[100]

**Parents and Children Forcibly Separated By the Government Are Subject to Severe, Ongoing Trauma**

97.     Plaintiff-Intervenors and their children have experienced and continue to experience severe, complex trauma as a result of their forced separation.  This trauma is evident in the emotional response to this separation that each has displayed.  Ms. O cried throughout her visits with her attorney and had difficulty speaking about her separation from her daughter.[101]  Ms. M also broke down in tears during her attorney's visit, explaining that she wants to be reunited with her daughter.[102]  Ms. P's daughter was so traumatized by her forced separation from her mother that she fainted and was injured in the process.[103]  Ms. P herself displays a "palpable" level of distress, helplessness, and panic over the whereabouts of her child.[104]  Adding to each Plaintiff-Intervenor's trauma is the fact that each escaped from violent circumstances in her home country.[105]

---

[99] Gee Decl. ¶ 14 ("Following reunification, children and parents require immediate, intensive clinical intervention to support healing following trauma exposure."); Zayas Decl. ¶ 12 ("The psychological wounds of detention and family separation will last a lifetime. It will take social work, psychiatric, psychological and counseling services to start and see through the repairs.").

[100] Wong Decl. ¶ 21 ("Without such trauma treatment programs, the effect of the forcible separation on these children will be debilitating and will cause them life-long harm.").

[101] Cortes Decl. ¶ 15.

[102] *Id*. ¶ 11.

[103] Chavez Decl. ¶ 15.

[104] London Decl. ¶ 14.

[105] Cortes Decl. ¶¶ 7, 12; London Decl. ¶ 6.

[PROPOSED] COMPLAINT IN INTERVENTION

98.     In what appears to be a willful disregard for the trauma they have and continue to endure, immigration officers responsible for carrying out the detentions have treated each of the Plaintiff-Intervenors with remarkable cruelty.  Ms. P and her daughter were held in deplorable conditions for three days before their forced separation.[106]  Officers made no efforts to help Ms. P communicate with her daughter until counsel became involved, despite her obvious distress.[107]  In an act particularly symbolic of the subhuman way that detainees are treated, a CBP officer threw crackers on the floor to force Ms. M pick them up, rather than simply handing them to her.[108]  These actions inevitably exacerbate the trauma for the Plaintiff-Intervenors, and may be designed intentionally to do so.

99.     In order to limit the damage inflicted by forced separation, families must be immediately reunited.[109]  Due to the trauma experienced by both parents and children, such reunions will require intensive support and a therapeutic environment.[110]

100.     Reunification is necessary, but not sufficient, to address the trauma intentionally inflicted upon these families by the federal government.  In addition to immediate family reunification, separated children require immediate trauma-informed interventions,[111] central to which is the involvement of parents.[112]  Because the quality of parent interactions with their child is important to the child's recovery, parents must receive their own trauma-specific services, both to address their own

---

[106] Chavez Decl. ¶¶ 10-12.

[107] London Decl. ¶ 12.

[108] Cortes Decl. ¶ 10.

[109] *Id.* ¶ 14; Hidalgo Decl. ¶ 14; Wong Decl. ¶ 21.

[110] Benedict Carey, *Reuniting and Detaining Migrant Families Pose New Mental Health Risks*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/health/migrant-families-immigration-detention.html ("At the individual level, many of the parents torn from their children will not have easy reunions, experts said."); *see also* Joint Decl. ¶ 12.

[111] Hidalgo Decl. ¶ 14; Perry Decl. ¶ 22; Wong Decl. ¶ 21.

[112] Perry Decl. ¶ 23.

[PROPOSED] COMPLAINT IN INTERVENTION

trauma as well as to learn how best to support their child through his or her trauma.[113] Such interventions require the following key components: (1) external and internal safety; and (2) development of quality relationships.[114]

101.   External safety is addressed through the creation of a safe environment that stops the infliction of trauma.[115]  This requires, among other things, that members of separated families be provided with accurate information about their whereabouts and the process of reunification; access to reliable means to maintain consistent contact; and access to appropriate advocacy and social supports.[116]  It also requires family reunification and implementation of a trauma intervention plan outside of any detention facility.[117]  Institutional conditions of detention facilities do not provide children with a nurturing environment conducive to recovery.[118]

102.   Developing a sense of internal safety requires interventions focused on assisting children to develop coping skills and the capacity to regulate emotions.[119] Such interventions are intended to help restore proper brain function.[120]

103.   The last component—development of healthy relationships— acknowledges the crucial role that familial bonds play in child development.[121]

---

[113] *Id*. ¶ 23 ("It is also critical for any adult caregivers (including parents) themselves to be regulated in order to effectively interact with a traumatized child. When the caregivers themselves have been exposed to traumatic stress—such as the stress of detention and of having their children forcibly removed from their care with no or little communication—they also need trauma-specific services, both to treat their own primary trauma and to effectively support their traumatized child.").

[114] Hidalgo Decl. ¶ 14.

[115] *Id*. ¶ 15.

[116] *Id*. ¶ 16.

[117] *Id*. ¶ 15; Perry Decl. ¶ 23.

[118] Hidalgo Decl. ¶ 15.

[119] *Id*. ¶ 19.

[120] *Id*.

[121] *Id*. ¶ 22; Perry Decl. ¶ 23

[PROPOSED] COMPLAINT IN INTERVENTION

Parents must play an important role in their children's recovery and parental presence through reunification is a critical support.[122]

104.   "The longer such interventions are delayed, the greater the negative cumulative effects the acute neurophysiological, neuroendocrine, and neuropsychological response will have on these children and their parents."[123] Experts must have immediate access to the traumatized children and their parents in order to assess their needs and begin to provide appropriate trauma intervention.[124]

### Reunification Must Occur Outside Detention

105.   After the trauma Plaintiff-Intervenors suffered, reunification in detention is inadequate and potentially dangerous.  An environment like a detention center can prevent and even undermine trauma intervention.[125]  "Therapeutic work while in a setting or circumstance where there is continuing distress, threat, uncertainty and unpredictability can undermine, or even make impossible, meaningful therapeutic progress."[126]

106.   Indeed, continuing to detain these families will only exacerbate the trauma suffered by forced separation.  Even prior to the adoption of the policy, humans rights groups and other children's advocates reviewing detention center conditions reported "prisonlike conditions; inconsistent access to quality medical, dental, or mental health care; and lack of appropriate developmental or educational opportunities."[127]  Conditions included "forcing children to sleep on cement floors

---

[122] Hidalgo Decl. ¶¶ 16, 22; Joint Decl. ¶ 21.

[123] Perry Decl. ¶ 22.

[124] Hidalgo Decl. ¶ 24.

[125] *Id*. ¶16 ("Facilities with a law enforcement orientation do not have the training or expertise to manage the complex needs of trauma survivors.").

[126] Perry Decl. ¶ 22.

[127] Council on Community Pediatrics, *Policy Statement—Detention of Immigrant Children*, AMERICAN ACADEMY OF PEDIATRICS (March 2017), http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

open toilets, constant light exposure, insufficient food and water, no bathing facilities, and extremely cold temperatures."[128]

107.   Data from Texas Health and Human Services Commission and the Department of Family and Protective Services shows that numerous of the centers where children are being sent pursuant to this policy "have been cited by state child care facility regulators for dozens of violations in recent years," some of which have been for serious issues.[129]

108.   Such centers have also been the subject of "fire-code violations, lawsuits claiming abuse, and complaints from employees alleging wrongful termination and unpaid wages."[130]

109.   At family detention centers, former detainees reported a dozen or more people sharing a single cell, guards ordering that toddlers not be allowed to crawl, and toys barred from living quarters.[131]   A 2014 evaluation of children at family detention centers found that "children regressed to bed wetting.  A 9-year-old-girl sought to return to breast feeding.  Children clung to their mothers legs, fearful of letting them out of sight.  Many had night terrors, were depressed or acted out."[132]

---

[128] Colleen Kraft, *AAP Statement on Executive Order on Family Separation*, AMERICAN ACADEMY OF PEDIATRICS (June 20, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/pages/AAP-Statement-on-Executive-Order-on-Family-Separation.aspx.

[129] Manny Fernandez, *Inside the Former Walmart That Is Now A Shelter for Almost 1,500 Migrant Children*, N.Y. TIMES (June 14, 2018), https://www.nytimes.com/2018/06/14/us/family-separation-migrant-children-detention.html.

[130] Manny Fernandez and Katie Benner, *The Billion-Dollar Business of Operating Shelters for Migrant Children*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/migrant-shelters-border-crossing.html.

[131] Sonia Nazario, *There's a Better, Cheaper Way to Handle Immigration*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/opinion/children-detention-trump-executive-order.html.

[132] *Id.*

[PROPOSED] COMPLAINT IN INTERVENTION

110.   Guards at family detention centers have been accused of sexual assault, abusive treatment, and neglect.[133]

### The Effect of the Family Separation Policy

111.   The government's family separation policy has exacerbated the deficiencies of the facilities, resulting in increasingly unsafe conditions as detention centers are unable to appropriately care for the number of children being detained. The government was utterly unprepared to properly care for scores of infants and toddlers because the practice is unheard of in modern times.  Michelle Brane, director of migrant rights at the Women's Refugee Commission, said, "There is no model for how you house tons of little children in cots institutionally in our country.  We don't do orphanages, our child welfare has recognized that is an inappropriate setting for little children."[134]

112.   In a former Walmart Supercenter that currently serves as a detention center for approximately 1,500 immigrant boys, cots are being added to already overcrowded rooms, and the "facility has obtained a waiver from the state to expand its capacity."[135]

113.   Meanwhile, hundreds of adult detainees have been sent temporarily to federal prisons.[136]

114.   Furthermore, on Thursday, June 14, 2018, the Department of Health and Humans Services "announced that temporary tent housing would be set up near the

---

[133] *Id.*; Manny Fernandez and Katie Benner, *The Billion-Dollar Business of Operating Shelters for Migrant Children*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/migrant-shelters-border-crossing.html.

[134] Garance Burke & Martha Mendoza, *Toddlers Separated from Parents at the Border Are Being Detained in 'Tender Age' Shelters*, TIME (June 20, 2018), http://time.com/5316764/toddler-immigrants-tender-age-shelters/.

[135] Manny Fernandez, *Inside the Former Walmart That Is Now A Shelter for Almost 1,500 Migrant Children*, N.Y. TIMES (June 14, 2018), https://www.nytimes.com/2018/06/14/us/family-separation-migrant-children-detention.html.

[136] *Id.*

37

border station in Tornillo, Tex., to house up to 360 youths," despite the expectation that temperatures at the site would exceed 100 degrees.[137]  As of June 21, 2018, this tent facility remained open, and was at full capacity of 360 children.[138]  The government reportedly has considered establishing additional tent cities on Army and Air Force bases.[139]

115.   While the government has released photos of young boys being held at detention centers, no images are available of young girls.  In light of the previous allegations and investigations of sexual assault at detention facilities, this has raised concerns about the treatment of girls and young women.[140]

**"Tender Age" Facilities**

116.   Conditions in detention centers are especially poor for younger children, particularly those of "tender age," defined as 12 years old or younger.  Current estimates put the number of children under 12 being held at "tender age" shelters at more than 2,300 – many being toddlers and infants.  As of April 2018, reportedly more than 100 children under age four were separated from their parents at the border.[141]  Homeland Security officials were unable to "provide information about the age cutoff below which they would decline to take a child."[142]

---

[137] *Id.*

[138] Michael D. Shear, Helene Cooper, Katie Benner, *U.S. Prepares Housing Up to 20,000 Migrants on Military Bases*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/politics/trump-immigration-border-family-separation.html.

[139] Manny Fernandez, *Inside the Former Walmart That Is Now A Shelter for Almost 1,500 Migrant Children*, N.Y. TIMES (June 14, 2018), https://www.nytimes.com/2018/06/14/us/family-separation-migrant-children-detention.html.

[140] Maya Rhodan, *Here Are the Facts About Donald Trump's Family Separation Policy*, TIME (June 20, 2018), http://time.com/5314769/family-separation-policy-donald-trump/.

[141] Julie Hirschfeld Davis, *Separated at the Border From Their Parents:  In Six Weeks, 1,995 Children*, N.Y. TIMES (June 15, 2018), https://www.nytimes.com/2018/06/15/us/politics/trump-immigration-separation-border.html.

[142] *Id.*

[PROPOSED] COMPLAINT IN INTERVENTION

117.   These "tender age" children are being sent to their own shelters, three of which were family detention centers that were hurriedly updated to care for younger children that were separated from their parents.[143]  A fourth facility is planned for Houston to "house up to 240 children in a warehouse previously used for people displaced by Hurricane Harvey."[144]

118.   Lawyers and health care professionals who have visited the "tender age" shelters "described play rooms of crying preschool-age children in crisis."[145] Elizabeth Frankel, associate director of the Young Center for Immigrant Children's Rights, said that her colleagues have been given the responsibility for caring for a number of infants.[146]  She described children in crisis, crying uncontrollably, having panic attacks, not sleeping, wetting the bed, and regressing to the point that they can no longer talk.[147]  Other children are too young to speak, and therefore staff members have been unable to determine where or who their parents are.[148]

119.   Nothing in the Executive Order provides for a comprehensive and independent investigation by independent and qualified mental health professionals into the circumstances under which Plaintiff-Intervenors and other asylum-seeking parents were separated from their children or into the conditions in which their children are being held.  Absent relief from this Court, Plaintiff-Intervenors, even if

---

[143] Caitlin Dickerson and Manny Fernandez, *What's Behind the 'Tender Age' Shelters Opening for Young Migrants*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/tender-age-shelters-family-separation-immigration.html.

[144] Garance Burke and Martha Mendoza, *Toddlers Separated from Parents at the Border Are Being Detained in 'Tender Age' Shelters*, TIME (June 20, 2018), http://time.com/5316764/toddler-immigrants-tender-age-shelters/.

[145] *Id.*

[146] Caitlin Dickerson and Manny Fernandez, *What's Behind the 'Tender Age' Shelters Opening for Young Migrants*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/tender-age-shelters-family-separation-immigration.html.

[147] *Id.*

[148] *Id.*

---

[PROPOSED] COMPLAINT IN INTERVENTION

eventually reunited with their children, will have no way adequately to determine and

respond to the conditions under which their children were detained.

**A System in Utter Chaos and Confusion: Difficulties in Reunification**

120.   Because the Executive Order was a surprise to many, further chaos

ensued.  Agencies carrying out the policy received no advanced notice about the major

changes.  And one official who works for ICE said that an internal email about the

Executive Order arrived "literally at the same time that it was breaking on CNN."[149]

Such an abrupt change of course has left federal agencies scrambling with little

guidance on how to proceed.[150]

121.   Notably, the Executive Order failed to mention what would happen to the

2,300 children who had been separated from their parents.  There is no reliable plan in

place yet to reunite families.  On the day the Executive Order was issued, a

spokesman for HHS initially said that the government would not try to reunite

separated families, but later backtracked, saying that "it is still very early, and we are

awaiting further guidance on the matter."[151]  Anthony Enriquez, director of the

unaccompanied minors program for Catholic Charities, explained, "There is no system

whatsoever to track these family separations, no efforts systemically to reunite these

families.  There is no supervisor, there is no database saying, 'child here, parent

there,' so they can come back together."[152]  While HHS insists that it "is working with

---

[149] Caitlin Dickerson, *On Family Separation, Federal Workers Often Agonized Over Enforcement*, N.Y. TIMES (June 23, 2018), https://www.nytimes.com/2018/06/23/us/migrant-children-federal-agency-border.html.

[150] Michelle Goldberg, *They Really Don't Care About Migrant Families*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/opinion/trump-family-separation-melania-jacket.html.

[151] Charlie Savage, *Explaining Trump's Executive Order on Family Separation*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/politics/family-separation-executive-order.html.

[152] Liz Robbins, *Hundreds of Separated Children Have Quietly Been Sent to New York*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/nyregion/children-separated-border-new-york.html.

[PROPOSED] COMPLAINT IN INTERVENTION

agency partners to foster communications and work towards reuniting every minor and every parent or guardian via well-established reunification processes," very little details have been released about how HHS will go about reuniting families and what the timeline is for reunification.[153]

122.   Indeed, even after the Executive Order was signed, many parents still have not been able to speak with their children or know where their children are being held.  Parents report repeatedly calling the government-established hotline number, but nobody answers or no information is provided.  Compounding the difficulties, detained parents do not have a phone number where agencies may call them back.[154] As a result, parents and children have no idea if and when they will see each other again.  One separated parent said, "I feel like I am going to die.  I feel powerless."[155]

123.   Out of pure desperation, some parents have agreed to give up their asylum claims in the hopes of seeing their children again.  Knowing how desperate separated parents are, the government has taken advantage of their fears and vulnerability by encouraging parents to sign voluntary deportation orders in exchange for the return of their children.  One Honduran detainee agreed to abandon his asylum case and signed voluntary deportation forms in the hopes of seeing his 6-year-old daughter again.[156]

### Indefinite Detention of Children and Families is Inhumane

---

[153] *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification*, DEPT. OF HOMELAND SECURITY (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

[154] Jennifer Jett & Mihir Zaveri, *More Than 500 Migrant Children Reunited with Adults, Government Says*, N.Y. TIMES (June 24, 2018), https://www.nytimes.com/2018/06/24/us/migrant-children-reunited.html.

[155] Jack Healy, *Migrant Parents Wait and Hope for Their Children: 'I Feel Like I'm Going to Die'*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/immigrant-children-separating-families.html.

[156] Jay Root & Shannon Najmabadi, *Kids in exchange for deportation: Detained migrants say they were told they could get kids back on way out of U.S.*, TEXAS TRIBUNE (June 24, 2018), kids-exchange-deportation-migrants-claim-they-were-promised-they-could.

124.   The government's proposal to incarcerate families in substandard facilities indefinitely while they are in immigration proceedings is unacceptable. There are significant psychological and health costs for detained parents and children even if they are detained together.[157]

125.   The American Academy of Pediatrics ("AAP") stated that "continuing to maintain the 'zero tolerance' policy will put more children in detention facilities, an environment [that] is no place for a child, even if they are accompanied by their families."[158]   AAP explained, "Studies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression and posttraumatic stress disorder.  Conditions in U.S. detention facilities, which include forcing children to sleep on cement floors, open toilets, constant light exposure, insufficient food and water, no bathing facilities, and extremely cold temperatures, are traumatizing for children.  No child should ever have to endure these conditions."[159]

126.   There are also serious logistical obstacles to family detention at the moment.  There are only two centers where families can remain together, but their combined capacity is just 2,700 people.[160]   The Department of Defense has since been charged with finding space on military bases to house up to 20,000 children—

---

[157] Benedict Carey, *Reuniting and Detaining Migrant Families Pose New Mental Heath Risks*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/health/migrant-families-immigration-detention.html.

[158] Colleen Kraft, *AAP Statement on Executive Order of Family Separation*, AMERICAN ACADEMY OF PEDIATRICS (June 20, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/pages/AAP-Statement-on-Executive-Order-on-Family-Separation.aspx.

[159] *Id.*

[160] Miriam Jordan, *How and Why 'Zero Tolerance' Is Splitting Up Immigrant Families*, N.Y. TIMES (May 12, 2018), https://www.nytimes.com/2018/05/12/us/immigrants-family-separation.html.

42

although amidst all the chaos, it is unclear whether these detention facilities will also house parents.[161]

127.   Customs and Border Protection officials have also voiced concerns that agents cannot refer all migrants for criminal prosecution because the Department of Justice (DOJ) and other law enforcement agencies do not have the resources to process each case.  Specifically, officials expressed concern that there are not enough prosecutors and judges to handle all of the proceedings and not enough space available to detain families.[162]

128.   But indefinite detention of families is not the only option.  AAP endorses community-based case management as an alternative solution to compliance with government requirements.[163]  A family case management program, such as the one the Trump administration arbitrarily terminated in June 2017, would allow families seeking asylum to be released and monitored by caseworkers while their immigration court cases proceed, and would produce full compliance with court-ordered hearings at a fraction of the cost of detention.[164]

129.   Defendants cannot credibly insist that they need relief from the *Flores* Settlement when such proven and economically efficient alternatives are available.

---

[161] Michael D. Shear, et al., *U.S. Prepares to House Up to 20,000 Migrants on Military Bases*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/politics/trump-immigration-border-family-separation.html.

[162] Michael D. Shear, et al., *In Tense Meeting, Trump Officials Debate How to Process Migrant Families*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/us/politics/donald-trump-immigration-midterms.html.

[163] *Id.*

[164] Sonia Nazario, *There's a Better, Cheaper Way to Handle Immigration*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/opinion/children-detention-trump-executive-order.html.

# CLAIMS FOR RELIEF

## FIRST CLAIM

### Violation of Substantive Due Process

130.   Plaintiff-Intervenors reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

131.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

132.   The Due Process Clause applies to all persons on United States soil and thus applies to Plaintiff-Intervenors and their children.  *Zadvydas v. Davis*, 533 U.S. 678 (2001).

133.   The guarantee against the deprivation of liberty without due process bars the government from infringing on certain fundamental liberty interests.  The continued separation and confinement of Plaintiff-Intervenors and their children violates those rights in several respects.

134.   Plaintiff-Intervenors and their children have a liberty interest under the Due Process Clause in remaining together as a family and a right to be protected against the government's arbitrary destruction of the integrity of their families.  *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745 (1982); *Moore v. E. Cleveland*, 431 U.S. 494 (1977); *Meyer v. Nebraska*, 262 U.S. 390 (1923).  The continued separation of Plaintiff-Intervenors from their children, without any determination that Plaintiff-Intervenors were unfit or present a danger to their children, plainly violates that right.

135.   Plaintiff-Intervenors' separation and the resulting trauma occurred while Plaintiff-Intervenors and their children were in the custody of the United States Department of Homeland Security.  Once Defendants detained Plaintiff-Intervenors and their children, the Defendants incurred a duty not to gratuitously inflict emotional and psychological harm and a duty to provide for their safety and general well-being. *See DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189 (1989).

136.   By forcibly separating Plaintiff-Intervenors from their children and keeping them apart, Defendants have inflicted and will continue to inflict upon Plaintiff-Intervenors extraordinary harm that they would not have otherwise have faced.  During Plaintiff-Intervenors' confinement and since the time Defendants arbitrarily separated Plaintiff-Intervenors from their children, Plaintiff-Intervenors have not received the intensive family mental health care services that they need on an ongoing basis—including for a period following their release from detention—as a result of Defendants' intentional infliction of emotional and psychological harm.

137.   Plaintiff-Intervenors further have the right to freedom from arbitrary detention.  The Due Process Clause permits confinement only when it serves a valid government purpose.  Absent a valid purpose, such confinement arbitrarily denies a person their liberty and is therefore unconstitutional.

138.   Plaintiff-Intervenors' continued detention and separation from their children, serves no valid governmental purpose.  Plaintiff-Intervenors and their children are seeking asylum in this country.  Before the Defendants adopted their extraordinarily cruel family separation policy, the federal government had kept asylum-seeking families together during the review process and had released minors from detention with their parents in accordance with the terms of the *Flores* Settlement.  Under the Family Case Management Program, the government had previously released asylum-seeking parents and children together and achieved an over 99-percent compliance rate with court appearances.

139.   Nor is there any legitimate government interest in continuing to detain Plaintiff-Intervenors and their children once they are reunited.  Defendants have gratuitously inflicted emotional and psychological harm on Plaintiff-Intervenors during their already unnecessary detention by forcibly separating them from their children.  To continue to detain Plaintiff-Intervenors, even with their children, would only serve to arbitrarily exacerbate their trauma without serving any legitimate government interest.

140.   The separation of Plaintiff-Intervenors from their children and their continued detention is arbitrary and shocks the conscience.  Defendants forcibly separated Plaintiff-Intervenors from their children without explanation or basis in fact, which deliberately induced severe trauma to both parent and child.  Defendants did so despite clear warnings, including from numerous professionals and organizations such as the American Academy of Pediatrics, that their actions were tantamount to child abuse and could result in long-term adverse mental health consequences.

141.   Defendants intentionally took these actions pursuant to a policy of detention and family separation that lacked any legitimate basis.  Subjecting parents and their minor children to the cruel practice of separating families for the purposes of deterring other legitimate asylum seekers, and to use their profound suffering as a political bargaining chip, clearly violates due process.

142.   Plaintiff-Intervenors and their children have suffered and will continue to suffer irreparable injury from the unnecessary prolonged detention and the arbitrary and cruel separation of their families and their continued and prolonged detention.

## SECOND CLAIM

## Violation of Procedural Due Process

143.   Plaintiff-Intervenors reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

144.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

145.   The Due Process Clause applies to all persons on United States soil and thus applies to Plaintiff-Intervenors and their children. *Zadvydas v. Davis*, 533 U.S. 678 (2001).

146.   The separation of Plaintiff-Intervenors from their children violates procedural due process because it was undertaken without any hearing or finding of

any facts that could justify a presumption that Plaintiff-Intervenors were not the parents of their accompanying children or otherwise fit to serve as their guardian.

147.   The continuing detention of Plaintiff-Intervenors also violates procedural due process because no bail hearing has been held and no finding has been made by an impartial adjudicator that Plaintiff-Intervenors present either a risk of flight or a threat to the safety of the community that could not be mitigated by readily available terms and conditions of release and supervision.

## THIRD CLAIM

### Violation of the Equal Protection Guarantee of the Due Process Clause of the Fifth Amendment

148.   Plaintiff-Intervenors reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

149.   The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

150.   Defendants' decisions to end the Family Case Management Program, to adopt a "Zero Tolerance" program for families from Central America arriving at the southern border seeking asylum, and to isolate children in detention facilities separate from their parents, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, and/or national origin and, in particular, reflect bias against immigrants perceived to come from non-white, non-European countries.

151.   Plaintiff-Intervenors have suffered and continue to suffer irreparable injury resulting from the end of the Family Case Management Program, the separation

and continued detention of asylum-seeking parents and children, and the denial of adequate, remedial, family medical and mental-health services in a non-detention setting.

## **PRAYER FOR RELIEF**

Plaintiff-Intervenors ask this Court to grant the following relief:

1.     Order the immediate reunification of Plaintiff-Intervenors with their children;

2.     Preliminarily and permanently enjoin Defendants from separating Plaintiff-Intervenors from their children;

3.     Preliminarily and permanently enjoin Defendants from detaining Plaintiff-Intervenors with their children;

4.     Declare the policy of separately detaining parents from their children unlawful;

5.     Declare the policy of detaining parents of unaccompanied minors unlawful;

6.     Order an immediate and comprehensive on-site investigation, by qualified mental health professionals, of the circumstances under which Plaintiff-Intervenors' children were separated from Plaintiff-Intervenors and have been and are being held;

7.     Order Defendants to provide trauma-informed remedial medical and mental health services appropriate to address the trauma of separation and child detention to Plaintiff-Intervenors and to Plaintiff-Intervenors' children;

8.     Order Defendants to immediately cease detaining Plaintiff-Intervenors;

9.     Order Defendants to immediately release Plaintiff-Intervenors along with their children to ensure these families obtain effective trauma-informed remedial medical and mental health services outside detention;

[PROPOSED] COMPLAINT IN INTERVENTION

10.     Enjoin Defendants from removing Plaintiff-Intervenors from the United States of America until they are reunited with their children, in the event that they are not permitted to remain in the country;

11.     Require Defendants to pay reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and on any other basis justified under law; and

12.     Grant any other and further relief that this Court may deem fit and proper.

Dated:  June 25, 2018                          Respectfully Submitted,

MARK ROSENBAUM (CABN 59940)          /s/ DRAFT
mrosenbaum@publiccounsel.org         Amy P. Lally (CABN 198555)
Judy London (SBN 149431)             alally@sidley.com
jlondon@publiccounsel.org            Ellyce R. Cooper (CABN 204453)
Talia Inlender (SBN 253796)          ecooper@sidley.com
tinlender@publiccounsel.org          SIDLEY AUSTIN LLP
Alisa Hartz (SBN 285141)             1999 Avenue of the Stars, 17th Floor
ahartz@publiccounsel.org             Los Angeles, CA 90067
Lucero Chavez (SBN 273531)           Telephone: +1 310 595-9662
lchavez@publiccounsel.org            Facsimile: +1 310 595-9501
Elizabeth Hadaway (SBN 308800)
ehadaway@publiccounsel.org           Carter G. Phillips*
Malhar Shah (SBN 318588)             cphillips@sidley.com
mshah@publiccounsel.org              Jennifer J. Clark*
Deena Tumeh (SBN 318573)             jennifer.clark@sidley.com
dtumeh@publiccounsel.org             SIDLEY AUSTIN LLP
PUBLIC COUNSEL                       1501 K Street, N.W.
610 S. Ardmore Avenue                Washington, D.C. 20005
Los Angeles, CA 90005                Telephone: +1 202 736-8270
Telephone: +1 213 385-2977          Facsimile: +1 202 736-8711
Facsimile: +1 213 385-9089
                                     Michael Andolina*
Mark E. Haddad (SBN 205945)          mandolina@sidley.com
markhadd@usc.edu                     Timothy Payne*
Part-time Lecturer in Law, USC Gould tpayne@sidley.com
School of Law**                      Kevin Fee*
University of Southern California    kfee@sidley.com
699 Exposition Blvd.                 SIDLEY AUSTIN LLP
Los Angeles, CA 90089                One South Dearborn
Telephone: +1 213 675-5957          Chicago, IL 60603
                                     Telephone: +1 312 853-7000
Luis Cortes Romero (SBN 310852)      Facsimile: +1 312 853-7036
lcores@ia-lc.com
                                     Sean A. Commons (CABN 217603)
                                     scommons@sidley.com
                                     SIDLEY AUSTIN LLP
                                     555 West Fifth Street

49

Alma L. David (SBN 257676)
adavid@ia-lc.com
Immigrant Advocacy & Litigation
Center, PLLC
19309 68th Ave South R-102
Kent, WA 98032
Telephone: +1 253 872-4730
Facsimile: +1 253 237-1591

Los Angeles, CA 90013
Telephone: +1 213 896-6000
Facsimile: +1 213 896-6600

*Application for admission pro hac vice to be submitted

** Institution listed for identification purposes only

[PROPOSED] COMPLAINT IN INTERVENTION