# DECLARATION OF JUDY LONDON

1. I, Judy London, make this declaration based on my own personal knowledge, and if called as a witness, I could and would testify to the following matters:

2. I am an attorney licensed to practice law in the State of California. I am the director of the Immigrants' Rights Project at Public Counsel in Los Angeles, California. I have been an immigration attorney for 24 years.

3. I represent J.P. in this lawsuit, and I conducted two interviews with her. J.P. is from Guatemala. She and her sixteen-year-old daughter L.P. traveled to the United States together, but an ICE officer separated them on or around May 21, 2018. She had no knowledge of her teenage daughter's whereabouts until I met with her on June 21, and did not speak with her daughter until June 22, after I advocated for the contact. In fact, until I met with her, no one had ever explained to her in a language she could understand what had happened to her daughter. Despite her obvious terror and inability to comprehend what was happening around her, no one made sure she had and understood information about how she could contact her daughter. To the contrary, the guards insisted she needed no help and could on her own use phones to reach her daughter.

4. I first met J.P. at the Musick Detention Facility on June 21, 2018. She is a tiny woman – perhaps five feet and appears very thin. She looked withdrawn, distraught and terrified. I conducted my first interview with J.P. in Spanish, but I quickly learned that she speaks the Mayan dialect Q'eqchi' and understands very little Spanish and no English. Nor does J.P. know how to read or write, because she never went to school.

5. My second interview with J.P. was more comprehensive because I spoke to her through a Q'eqchi' interpreter. The interpreter was on the telephone and was a professional interpreter through a private translation service. A relative in the United States had offered to serve as an interpreter over the phone, but the detention facility refused my request to call him to interpret. J.P. was far more animated once she could communicate through a language she completely understood. She had not been able to

communicate effectively with anyone since she had been detained, because no one in the facility spoke her language. This was extremely stressful on J.P., who was already in a stressful situation.

6. J.P. explained to me that she had left Guatemala because her ex-partner beat her, sexually abused her, and threatened to kill her. She has three children, an eighteen-year-old son, a sixteen-year-old daughter L.P., and a twelve-year-old son. J.P. never went to the police in Guatemala because her ex-partner threatened to kill her if she talked to anyone about his abuse. She is terrified of him.

7. J.P. and her daughter L.P. left their home to escape her ex-partner's violence and threats and traveled to the United States. They were apprehended by ICE on May 17, 2018, and taken to a "cold room," a chilly holding cell, where there was no food for several days other than soup. They had to stay in the "cold room" and could not leave, and no one explained to J.P. what was happening.

8. After several days, ICE officials took L.P. away from J.P. The officials did not ask J.P. what language she spoke (or if they did she did not understand the question), and did not tell her why they were separating her from her child. Teenage L.P. was so scared when she was being taken from her mother that she fell to the ground and fainted. ICE officials did not give J.P. any written information about how to locate her daughter after the separation. J.P. was terrified of what would happen to L.P. She thought they would never see each other again.

9. When I met her, J.P. had had no news whatsoever of her minor daughter between about May 20 and June 21 and feared she would never see her again. On June 1, 2018, J.P. did succeed in obtaining help from another detainee who wrote on her behalf a request form to ICE asking where L.P. was. J.P. got a response dated June 4, containing her daughter's location only, but she is illiterate and no one ever even tried to explain it to her, so she didn't know what it said until June 21, 2018, when I explained it to her. She was incredibly relieved to learn that there was information about her daughter's location, but she still seemed very worried and asked repeatedly how she

could speak with her daughter. I had to tell her that the paper provided a location only and no phone number.

10. On June 22, 2018, the day after I first visited her, J.P. was given another form; this time, it did have a phone number for her to contact L.P. On that day, while I was meeting with J.P., the guard advised me that J.P. had a scheduled phone call with her daughter. J.P. had no prior understanding that ICE had arranged this call and was surprised and anxious. The ICE officer handed the phone to J.P. Her eyes immediately filled with tears as she heard her daughter's voice for the first time in a month, and initially she could hardly speak. I could hear L.P. sobbing on the other side of the phone line, and I could see tears fill J.P.'s eyes.

11. After the call, J.P. told me how happy she was to finally hear L.P.'s voice. She said she was "content" for the first time since L.P. was taken from her. She told me that she had feared she would never talk to or see her again. Still, she remained very worried that she would be deported and separated from her daughter when she returned to immigration court.

12. I was stunned by the number of barriers and the indifference of the multiple officials I asked to facilitate a simple task to put my client out of her state of terror: a simple phone call. Securing an opportunity for J.P. to call her daughter required navigating a complex system and around 30 hours of advocacy by me, an experienced attorney. While ICE finally facilitated a phone call the afternoon of June 22, I do not think this ever would have happened had I not been retained by J.P. and been available to remain in Irvine for the following 30 hours to advocate on her behalf.

13. J.P. has had two court dates since being taken into custody in the United States. She did not recall anyone at either court appearance asking if she had any children or if they had been separated from her. She was too scared to ask them anything about L.P. All she understood them to tell her was to come back with a lawyer.

14. While I was at the detention facility, I learned that J.P. is far from the only mother there who was separated from her child and is being detained. I met with another mother already under threat of being deported without her child. I learned that many

women at the facility had been separated from their children, and that although there were telephone numbers posted in the living areas for detainees to call to locate their children, the numbers proved useless. The level of stress and despair shared by J.P. and a second woman I interviewed was palpable; detention is always stressful, but these women were in a state of helplessness, despair and panic about the whereabouts and well-being of their children.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 25, 2018, at Los Angeles, California

Judy London