# ATTACHMENT 1

MICHAEL N. FEUER, SBN 111529
  *City Attorney*
JAMES P. CLARK, SBN 64780
LEELA A. KAPUR, SBN 125548
VALERIE L. FLORES, SBN 138572
MICHAEL DUNDAS, SBN 226930
200 North Main St., City Hall East Suite 800
Los Angeles, California 90012
mike.dundas@lacity.org
Telephone: (213) 978-8130
Facsimile: (213) 978-8312


*Attorneys for Amicus Curiae City of Los Angeles*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | Case No.        2:85-cv-4544-DMG |
| Plaintiffs, | **[PROPOSED] BRIEF OF CITY OF LOS ANGELES, CITY OF CHICAGO, CITY OF NEW YORK, AND CITY AND COUNTY OF SAN FRANCISCO AS AMICI CURIAE IN OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR RELIEF FROM THE FLORES SETTLEMENT** |
| v. | |
| JEFFERSON B. SESSIONS III, Attorney General of the United States, *et al.*, | |
| Defendants. | |

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................ii

STATEMENT OF INTEREST.............................................................1

ARGUMENT.....................................................................................5

I.    DEFENDANTS ARE UNABLE TO MEET THE BURDEN OF SHOWING THERE HAS BEEN A SIGNIFICANT CHANGE IN CIRCUMSTANCES AT THE SOUTHWEST BORDER TO WARRANT REVISION OF THE SETTLEMENT. ............................................................5

II.   THE STATE LICENSING REQUIREMENT IN THE EXISTING SETTLEMENT IS CRITICAL TO ENSURING THE HEALTH AND SAFETY OF THE PLAINTIFF CHILDREN. ......................................................................7

CONCLUSION....................................................................................10

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Flores v. Lynch*,
   828 F.3d 898 (9th Cir. 2016) .................................................................. 6

*Horne v. Flores*,
   557 U.S. 433 (2009) ............................................................................... 5

*Ms. L. v. U.S. Immigration & Customs Enf't*,
   No. 18-cv-0428 (DMS) (MDD), 2018 U.S. Dist. LEXIS
   107365 (S.D. Cal. June 26, 2018) ......................................................... 9

*Rufo v. Inmates of the Suffolk County Jail*,
   502 U.S. 367 (1992) ........................................................................ 5, 6, 7

*Souza v. Sessions*,
   No. 1:18-cv-04412 (MSS) ECF Dkt. # 23
   (N.D. Ill. June 28, 2018) ....................................................................... 3

*Troxel v. Granville*,
   530 U.S. 57 (2000) ................................................................................. 9

## OTHER AUTHORITIES

Bermudez, Esmeralda, Children separated from
parents arrive in L.A., but frustrated community gets
few answers, L.A. Times (June 21, 2018) ............................................ 8

City of Los Angeles Personnel Data ..................................................... 1

Goodman, David J., (*Now Hiring: Under De Blasio,
New York's Government Grows to Record Level*), N.Y.
Times (Oct. 11, 2016) ........................................................................... 3

King, Miriam, Ruggles, Steven, and Warren, J. Robert, 2016 Current Population Survey by the American Immigration Council, using IPUMS-CPS. Sarah Flood, *Integrated Public Use Microdata Series, Current Population Survey: Version 5.0* [dataset] (Minneapolis, MN: University of Minnesota, 2017) ........................................ 1

Moreno, Barry, *Children of Ellis Island*, Arcadia Publishing (2005) ......................................................... 4

New York City Mayor's Office of Immigrant Affairs, State of our Immigrant City: Annual Report March 2018 ........................................................................ 3

Robbins, Liz, (*Hundreds of separated children have quietly been sent to New York*), N.Y. Times (June 20, 2018) ........................................................................ 8

Statement by Homer Venters, MD, Physicians for Human Rights Director of Programs, on June 21, 2018 .................... 10

U.S Department of Health and Human Services, Office of Refugee Resettlement - Unaccompanied Children Released to Sponsors by County FY16 ............................... 2, 4

U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates ........................................... *passim*

U.S. Census Bureau, Detailed Languages Spoken at Home and Ability to Speak English for the Population 5 Years and Older: 2009-2013 ................................... 1

U.S. Customs and Border Protection (CBP) statistical report titled: United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016 ........................... 6

U.S. Department of Health and Human Services, Office of Refugee Resettlement - Unaccompanied Children Released to Sponsors by County FY17, Updated: May 25, 2018 ........................................................................ 4

U.S. Department of Homeland Security OIG Report
(OIG-18-67), ICE's Inspections and Monitoring of
Detention Facilities Do Not Lead to Sustained
Compliance or Systemic Improvements (June 26, 2018)
.............................................................................................. 9

U.S. Department of State, 2018 Trafficking in Persons
Report (June 28, 2018) ....................................................... 10

U.S. Department of State, Bureau of Population,
Refugees and Migration, Office of Admissions –
Refugee Processing Center (State Department Refugee
Data) ................................................................................ 1, 3

# STATEMENT OF INTEREST

The City of Los Angeles, City of Chicago, City of New York and City and County of San Francisco respectfully submit this proposed brief, as *amici curiae*, in opposition to Defendants' *ex parte* application for relief from the *Flores* settlement agreement.

This litigation is of utmost importance to *amici*. At least 1.5 million Los Angeles residents are themselves immigrants.[1] Nearly 900,000 of those, 22% of the city's entire population, were born either in Mexico or Central America.[2] The City of Los Angeles is home to residents from more than 135 foreign countries, and 185 languages are spoken here.[3] Some 40.2% of business owners in Los Angeles are immigrants.[4] And the City, itself, employs approximately 10,000 foreign-born workers in its various offices and departments.[5]

The city's economic and cultural success derives directly from its openness to welcoming diversity. In 2016, approximately 2,322 refugees were resettled in the Los Angeles area,[6] and 3517 unaccompanied minors being held by the U.S. Department of Health & Human Services Office of Refugee Resettlement (ORR) were released to sponsors in and

---

[1] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates (2012-2016 ACS Data).

[2] *Id.*

[3] *Id.*; U.S. Census Bureau, Detailed Languages Spoken at Home and Ability to Speak English for the Population 5 Years and Older: 2009-2013.

[4] Analysis of data from the 2016 Current Population Survey by the American Immigration Council, using IPUMS-CPS. Sarah Flood, King, Miriam, Ruggles, Steven, and Warren, J. Robert, *Integrated Public Use Microdata Series, Current Population Survey: Version 5.0* [dataset] (Minneapolis, MN: University of Minnesota, 2017).

[5] City of Los Angeles analysis of personnel data.

[6] U.S. Department of State, Bureau of Population, Refugees and Migration, Office of Admissions – Refugee Processing Center (State Department Refugee Data), *available at* ireports.wrapsnet.org.

around Los Angeles.[7]

Chicago is likewise heavily dependent on the contributions of individuals from countries most affected by the *Flores* settlement agreement. Some 560,000 of Chicago's approximately 2.7 million residents are immigrants. More than one half of those immigrants (291,487, or approximately 11% of Chicago's population) were born in Central America, Mexico, or South America.[8] Approximately 1.32 million people are employed in Chicago. Of those, 185,836, or approximately 14% of Chicago's workforce, were born in Central America, Mexico, or South America.[9]

In addition, like Los Angeles, Chicago welcomes and resettles a large number of refugees: in 2016, approximately 2,091 refugees resettled in the Chicago area,[10] and in 2016, 256 unaccompanied minors were placed by ORR in and around Chicago.[11] This includes refugees directly impacted by the federal government's policy of separating immigrant parents and children at the southwest border. Just yesterday, a federal district court judge in Chicago entered a preliminary injunction directing government officials to immediately release a nine-year-old boy who had been placed with a social services agency in Chicago to his mother, who had not seen him since they were separated at the border in late May. The court held that their continued separation likely violated their due process rights and subjected them to

---

[7] U.S Department of Health and Human Services, Office of Refugee Resettlement - Unaccompanied Children Released to Sponsors by County FY16, Updated: January 26, 2017. (FY16 ORR Report). Retrieved from: https://www.acf.hhs.gov/orr/resource/unaccompanied-children-released-to-sponsors-by-county-fy16

[8] 2012-2016 ACS Data, *supra,* fn. 1.

[9] *Id.*

[10] State Department Refugee Data, *supra,* fn. 6.

[11] FY16 ORR Report, *supra,* fn. 7.

irreparable harm.[12]

The population of New York City is 8.4 million people as of 2016.[13] New York City is home to over 3.1 million foreign-born New Yorkers, about 37% of the City's population.[14]  Of those immigrants, over 300,000 people, or about 4% of the city's total population, were born either in Mexico or Central America.[15]  New York City has residents from more than 150 foreign countries.[16]  Over 150 languages are spoken in New York City[17] and approximately 49% of New Yorkers speak a language other than English at home.[18]

Approximately 4.3 million people are in the labor force in New York City; of those, 46% are foreign-born immigrants.[19]  New York City itself employs 287,000 people,[20] 33% of them foreign-born.[21] And 52% of New York City's business owners are immigrants.[22]

More than 2,000 refugees have been resettled in New York City since 2010.[23]  However, since President Trump entered office, on average, New York City has received about half the number of refugees

---

[12] Souza v. Sessions, No. 1:18-cv-04412 (MSS) ECF Dkt. # 23 (N.D. Ill. June 28, 2018).

[13] 2012-2016 ACS Data, *supra,* fn. 1.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] NEW YORK CITY MAYOR'S OFFICE OF IMMIGRANT AFFAIRS, STATE OF OUR IMMIGRANT CITY: ANNUAL REPORT MARCH 2018, at *13. Retrieved from: https://www1.nyc.gov/assets/immigrants/downloads/pdf/moia_annual_report_2018_final.pdf

[18] 2012-2016 ACS Data, *supra,* fn. 1.

[19] *Id.*

[20] Goodman, David J., *Now Hiring: Under De Blasio, New York's Government Grows to Record Level*, N.Y. Times (Oct. 11, 2016), Retrieved from: https://www.nytimes.com/2016/10/12/nyregion/bill-de-blasio-government-jobs.html

[21] 2012-2016 ACS Data, *supra,* fn. 1.

[22] *Id.*

[23] State Department Refugee Data, *supra,* fn. 6.

per month compared to the last year of the Obama administration, from about 29 refugees placed in New York City per month in 2016 to about 15 per month during Trump's administration, for a total of 241 refugees placed in New York City from January 2017 to June 26, 2018.[24] In federal fiscal year 2017, 1,400 unaccompanied minors being held by ORR were released to sponsors in New York City.[25]

The City and County of San Francisco, with a total population of 850,282, has some 296,849 immigrant residents.  Of those, 46,220 (more than 5% of the entire population) were born in either Mexico or Central America.  In addition, San Francisco has 10,600 Hispanic/Latino owned business.  Those businesses generated $1,583,562,000 in sales, receipts, or value of shipments and they employed 8,748 people.  Specifically addressing the need for ongoing support of Plaintiffs, San Francisco welcomed 253 unaccompanied minors placed with sponsors by ORR in 2016 and another 230 unaccompanied minors in 2017.[26]

Of course, *amici* simply echo our nation's centuries-old practice of welcoming migrant children.  Since its inception, the United States has served as an adopted home for generations of migrant children. Welcoming and protecting young immigrants is part and parcel of our DNA.  For example, more than one million children passed through Ellis Island in its 62 years as an immigration station.[27]  However immigrants came to our country, those who arrived here as children have certainly helped to build the foundation of our economic prosperity, military

---

[24] *Id.*

[25] U.S Department of Health and Human Services, Office of Refugee Resettlement - Unaccompanied Children Released to Sponsors by County FY17, Updated: May 25, 2018 (FY17 ORR Report). Retrieved from: https://www.acf.hhs.gov/orr/resource/unaccompanied-children-released-to-sponsors-by-county-fy17

[26] FY16 ORR Report, *supra,* fn. 7; FY17 ORR Report, *supra,* fn. 25.

[27] Moreno, Barry, *Children of Ellis Island*, Arcadia Publishing (2005).

security, cultural artistry, and civic society.  *Amici* therefore look to a
new generation of child migrants, especially those traveling here to
escape harm and persecution, to help lead our financial and cultural
success into the future.  For the following reasons, a*mici* assert that
Defendants' *ex parte* application should be denied.

## ARGUMENT

I.   DEFENDANTS ARE UNABLE TO MEET THE BURDEN OF
     SHOWING THERE HAS BEEN A SIGNIFICANT CHANGE IN
     CIRCUMSTANCES AT THE SOUTHWEST BORDER TO
     WARRANT REVISION OF THE SETTLEMENT.

As Defendants note in their application, a court may only relieve a
party from "a final judgment, order, or proceeding" if that party
established that "a significant change in circumstances warrants
revision of the decree." Fed. R. Civ. Proc. 60(b)(5); *Rufo v. Inmates of the
Suffolk County Jail*, 502 U.S. 367, 383 (1992); see also *Horne v. Flores*,
557 U.S. 433, 447 (2009).  As set forth by the United States Supreme
Court, this test is met where there are "changes in circumstances that
were beyond the defendants' control and were not contemplated by the
court or the parties when the decree was entered."  *Rufo,* at 380-81.

Defendants have not met that burden.  This Court's action in
response to Defendants' 2015 motion to modify the *Flores* agreement
provides guidance here.  At that time, Defendants argued that a
modification to the agreement was required since the United States was
experiencing a "surge" in unauthorized family units entering the United
States in 2014.  Defendants argued that this increase in the
apprehension of family units, as distinguished from apprehensions of
unaccompanied minors, was not anticipated when the parties entered

into the *Flores* agreement.[28]

Statistics show that in 2012 and 2013, the two years prior to the "surge" that was the impetus for Defendants' 2015 motion, United States Border Patrol apprehended a yearly average of 12,986 people arriving in family units.[29]  In 2014, however, Border Patrol apprehended 68,445 family unit members, a **427%** increase in family unit apprehensions over the preceding year-over-year average.  *Id.*  After considering the impact of the "surge," this Court denied Defendants' motion, and the Ninth Circuit affirmed, holding that the *Flores* agreement "expressly anticipated an influx" could occur.  *Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016).

With the present *ex parte* application, Defendants are once again trying to claim that a "surge" in family units crossing the southwest border has created a change sufficient to meet the standard set forth in *Rufo*.  But, even taking Defendants' own qualified interpretation[30] of recent family unit apprehension statistics, one can see that there has been no "significant change in circumstances."  Defendants are

---

[28] *See* Defendants' Motion to Modify Settlement Agreement, ECF Dkt. # 120 (Feb. 27, 2015).

[29] U.S. Customs and Border Protection (CBP) statistical report titled: *United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016*. Retrieved from: https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016

[30] *Amici* use the word "qualified" because Defendants' motion states they are estimating 88,670 apprehensions of family unit members in 2018, a number "projected" off the monthly average of family unit apprehensions to date in 2018 and "based on the assumption that illegal crossers for the remaining four months will arrive at the same rate as in the prior eight months, a projection that does not account for seasonal variations." Defendants' *Ex Parte* Application to Modify Settlement Agreement (Application), ECF Dkt. # 435-1 at *8 (June 21, 2018).  The "projected" number should not be considered reliable because it fails to reflect the seasonal fluctuations in migration patterns (*i.e.* the 2018 CBP statistical year ends on September 30, 2018 and crossings historically drop in the coming summer months when temperatures spike at the southwest border.).

estimating there will be 88,670 apprehensions of family unit members in 2018.  Taking this one year of data alone, Defendants' assert "a 30% increase" in family entries over the 2014 apprehensions.  But this increase is significantly smaller than the 427% "surge" relied upon in Defendants' 2015 motion, which this Court found unconvincing.  And, if one averages out the four years of reported family apprehensions since that prior ruling – including Defendants' qualified 2018 count – one would find a yearly average of 70,451 apprehensions from 2015 through and including 2018, which is a de minimis increase over the 68,445 apprehensions in 2014 that this Court found to be insufficient under the *Rufo* test.

## II.   THE STATE LICENSING REQUIREMENT IN THE EXISTING SETTLEMENT IS CRITICAL TO ENSURING THE HEALTH AND SAFETY OF THE PLAINTIFF CHILDREN.

*Amici* are acutely focused on Defendants' attempt to modify the settlement to eliminate the state licensing requirement.  Notably, paragraph 6 of the *Flores* settlement defines "licensed program" as "any program, agency or organization that is licensed by an appropriate state agency," and Exhibit 1 of the settlement requires that licensed programs "comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes."

The City of Los Angeles, through the Los Angeles City Attorney's Office, prosecutes violations of child welfare laws and health and safety codes in the State of California.  So does the City and County of San Francisco and the City of New York.  Cases are referred to these offices for prosecution by the State of California's and New York's licensing agencies.  *Amici* have a strong interest, therefore, in the continued licensed regulation of Defendants' child welfare programs, especially

considering that media reports estimate that hundreds of children recently separated from their families by Defendants' are being held in and around *amici's* jurisdictions.[31]

Defendants assert in their application to the Court that they will continue to comply with the requirements set forth in Exhibit 1 of the settlement. *See* Application at *18 (stating "the Government does not now object to the requirement that [Immigration and Customs Enforcement (ICE)] family residential facilities would continue to meet the standards laid out in Exhibit 1 to the Agreement"). Defendants are, therefore, conceding they will continue to comply with state law, as Exhibit 1 requires, but they want to be relieved of any oversight provided by the state licensure.

Licensing is a critical check on the adequacy and competence of the organizations running the facilities holding these migrant children. The very purpose of state licensing is to ensure a minimum standard of quality in a service field that is incredibly complex with the potential to inflict extreme harm upon an already vulnerable youth population. The only discernible purpose of the government's requested change is to evade the crucial layer of oversight and accountability provided by the settlement agreement's state licensure requirement.

But Defendants present no evidence that state licensing is unavailable or even impracticable, nor do they propose any alternative to state licensure that would help ensure accountability of the agencies

---

[31] *See* Robbins, Liz, *Hundreds of separated children have quietly been sent to New York,* N.Y. Times (June 20, 2018). Retrieved from: https://www.nytimes.com/2018/06/20/nyregion/children-separated-border-new-york.html; Bermudez, Esmeralda, *Children separated from parents arrive in L.A., but frustrated community gets few answers,* L.A. Times (June 21, 2018). Retrieved from: http://www.latimes.com/local/california/la-me-ln-separated-kids-la-20180620-story.html

running the facilities.  To the contrary, a report released just this week by the Office of the Inspector General (OIG) at the Department of Homeland Security shows that ICE, for example, should not be self-monitoring.  Specifically, the OIG determined that ICE's privately-contracted inspection firms and its own self-monitoring via ICE's Office of Detention Oversight do not result in sustained compliance with detention standards and practices, nor do they promote systemic improvements or comprehensive corrections of deficiencies.[32]

The state licensing requirement is all the more critical now that Judge Dana M. Sabraw has issued an order requiring the federal government to reunite the separated children with their parents, many of whom are in Defendants' custody.[33]  Removing the licensing requirement at this critical moment of reunification could create serious consequences for the health and wellbeing of the children.  In his ruling, Judge Sabraw recognized the "constitutional liberty interest 'of parents in the care, custody, and control of their children[,]' which 'is perhaps the oldest of the fundamental liberty interests recognized by' the Supreme Court." *Id.* at *35 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

*Amici's* interest in seeing the state licensing requirements be properly applied and enforced within our respective jurisdictions has its foundation in that same fundamental liberty interest in protecting the care and custody of all children.

---

[32] U.S. Department of Homeland Security OIG Report (OIG-18-67), *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (June 26, 2018). Retrieved from: https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf

[33] *Ms. L. v. U.S. Immigration & Customs Enf't*, No. 18-cv-0428 (DMS) (MDD), 2018 U.S. Dist. LEXIS 107365 (S.D. Cal. June 26, 2018).

# CONCLUSION

For these reasons, *amici* respectfully request this Court to deny Defendants' *ex parte* application for relief from the *Flores* settlement agreement.

As Physicians for Human Rights stated last week, "without state licensure, there would be no guarantee of adherence to existing minimum standards, which are designed to protect children and families. In practice, such a modification would legalize ad hoc detention sites, including tent cities on military bases. Families should be placed in community-based settings while their proceedings are pending, and no detention facility should ever be exempt from state licensing requirements."[34]

Ironically, just yesterday, the United States Department of State echoed the statement by Physicians for Human Rights in the department's 2018 Trafficking in Persons Report.[35]  The report, which was officially released on June 28, 2018, states in the context of criticizing foreign government practices of child institutionalization that, "[r]emoval of a child from the family should only be considered as a temporary, last resort. Studies have found that both private and government-run residential institutions for children, or places such as orphanages and psychiatric wards that do not offer a family-based setting, cannot replicate the emotional companionship and attention found in family environments that are prerequisites to healthy cognitive

---

[34] Statement by Homer Venters, MD, Physicians for Human Rights Director of Programs, on June 21, 2018. Retrieved from: http://physiciansforhumanrights.org/press/press-releases/legal-protections-for-immigrant-children.html

[35] U.S. Department of State, *2018 Trafficking in Persons Report* (June 28, 2018). Retrieved from: https://www.state.gov/documents/organization/282798.pdf

1    development."[36]

2    Dated:        June 29, 2018                Respectfully submitted,

3                                              By: */s/    Michael Dundas*

4                                              MICHAEL N. FEUER
5                                                 *City Attorney*
                                               James P. Clark
6                                              Leela Kapur
                                               Valerie Flores
7                                              Michael Dundas
                                               200 North Main Street,
8                                              City Hall East Suite 800
                                               Los Angeles, CA 90012

9                                              *Attorneys for Amicus Curiae*
10                                             *City of Los Angeles, California*

11

12                                             EDWARD N. SISKEL
                                                  *Corporation Counsel*
13                                             30 N. LaSalle Street, Suite 800
                                               Chicago, IL 60602

14                                             *Attorney for Amicus Curiae*
15                                             *City of Chicago, Illinois*

16

17                                             ZACHARY W. CARTER
                                                  *Corporation Counsel*
18                                             100 Church Street
                                               New York, NY 10007

19                                             *Attorney for Amicus Curiae*
20                                             *City of New York, New York*

21

22                                             DENNIS J. HERRERA
                                                  *City Attorney*
23                                             City Hall Room 234
                                               One Dr. Carlton B. Goodlett Pl.
24                                             San Francisco, CA 94102

25                                             *Attorney for Amicus Curiae*
                                               *City and County of San Francisco,*
26                                             *California*

27

28
    _____
    [36] *Id.*

                                    11