UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 1 of 32 |
|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings:  IN CHAMBERS - ORDER RE PLAINTIFFS' MOTION TO ENFORCE
CLASS ACTION SETTLEMENT [409]**

**I.
INTRODUCTION**

On April 16, 2018, Plaintiffs filed a motion to enforce the *Flores* Settlement Agreement. [Doc. # 409.]  In particular, Plaintiffs claim that the Office of Refugee Resettlement ("ORR") has breached the *Flores* Agreement by implementing policies and/or practices that fall within three general categories:  (1) placing Class Members[1] in Residential Treatment Centers ("RTCs"), staff-secure facilities, and secure facilities; (2) administering psychotropic drugs to Class Members without first obtaining a court order or the informed consent of a person authorized by state law to approve such decisions; and (3) unnecessarily prolonging Class Members' detention in ORR facilities.[2]  *See* Mot. to Enforce at 9–30 [Doc. # 409-1].[3]

To redress these alleged breaches, Plaintiffs request certain procedural remedies, many of which are not explicitly provided in the *Flores* Agreement (*e.g.*, notice and an opportunity to be heard before a transfer from a non-secure facility to an RTC).  *See* Proposed Order at 1–5 [Doc.

---

[1] The Class is defined as "[a]ll minors who are detained in the legal custody of [Defendants]."  *See Flores* Agreement at ¶ 10 [Doc. # 101].

[2] ORR is generally responsible for "the care and custody of all unaccompanied alien children" ("UACs").  *See* 8 U.S.C. § 1232(b)(1); ORR Guide to Children Entering the United States Unaccompanied ("ORR Guide"), Introduction, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. June 21, 2017).  A UAC is a child who has:  (1) no lawful immigration status, (2) not reached the age of 18, and (3) "no parent or legal guardian in the United States; or . . . no parent or legal guardian in the United States . . . available to provide [for the child's] care and physical custody."  *See* 6 U.S.C. 279(g)(2); 8 U.S.C. § 1232(g).  The parties agree that the Class Members in ORR's custody are UACs.  *See* Mot. to Enforce at 6 ("The Settlement binds . . . ORR[,] . . . which since 2002 has been responsible for the custody and release of unaccompanied class members.") [Doc. # 409-1].

[3] All page references herein are to page numbers inserted by the CM/ECF system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 2 of 32 |
|---|---|---|---|

# 422-1].  Defendants contend that they have not violated the *Flores* Agreement, and claim that the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") supersedes certain aspects of the *Flores* Agreement's placement and suitability provisions.  *See* Opp'n re Mot. to Enforce at 9–31 [Doc. # 425].  The motion has been fully briefed.  [Doc. ## 425, 434.]  Both sides apparently fail to comprehend this Court's role in these  proceedings. Plaintiffs seek extracontractual remedies for alleged constitutional violations in the context of a motion to enforce the consent decree, whereas Defendants urge the Court to abdicate its responsibility to redress violations of the Agreement's explicit terms.  It is therefore unsurprising that the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to enforce.

## II.
## LEGAL STANDARD

The Court incorporates the legal standard articulated in Part II of its June 27, 2017 Order and need not repeat it here.  *See* Order re Pls.' Mot. to Enforce & Appoint a Special Monitor at 2–4 [Doc. # 363].

## III.
## DISCUSSION

Before discussing Defendants' alleged breaches of the *Flores* Agreement, the Court must first address the scope of its authority to enforce that Agreement and whether the TVPRA supersedes any of its provisions.

## A.     The Court's Remedial Powers for Breach of Contract

Plaintiffs seek certain procedural remedies that are not set forth in the *Flores* Agreement, including an order requiring ORR to:  provide notice and an opportunity to be heard by an immigration judge *before* a Class Member may be transferred to an RTC, staff-secure facility, or secure facility;[4] obtain a court order or informed written consent prior to the administration of

---

[4] Paragraph 24C provides that "Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility," but the provision does not require this notice to be provided in advance of the transfer to those facilities.  *See Flores* Agreement at ¶ 24C [Doc. # 101].  Paragraph 27 also provides that if a minor is represented by counsel, then the minor's attorney must generally be given "advance notice" of the transfer.  *See id.* at ¶ 27.  Neither provision requires advance written notice to be provided to minors who are not represented by counsel.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
| --- | --- | --- | --- |

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 3 of 32 |
| --- | --- | --- | --- |

psychotropic drugs to a Class Member;[5] and release a Class Member to a proposed sponsor or refer the proposed sponsor's suitability determination to a state juvenile authority within 30 days of receiving a complete family reunification packet.[6]  *See* Plaintiffs' Proposed Order at 3–5 [Doc. # 422-1].  Plaintiffs contend that this Court has the authority to provide them such relief in the context of the instant motion to enforce.  *See* Mot. to Enforce at 8–9.  The Court concludes that, on this motion to enforce, Plaintiffs are entitled to only such relief as is explicitly or implicitly authorized by the *Flores* Agreement.

"Without question courts treat consent decrees as contracts for enforcement purposes." *See United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005).  "[A] motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract."  *See Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989).  In contrast, a contempt motion seeks relief that "*coerces* compliance with a court order . . . ."  *See Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016) (emphasis added).   The former merely requires a showing that the preponderance of the evidence establishes that a breach occurred, *see O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) ("[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." (internal quotation marks omitted) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)); *Buss v. Superior Court of L.A. Cty.*, 16 Cal. 4th 35, 54 (1997) (contract causes of action are subject to the preponderance standard), whereas the latter utilizes the "clear and convincing evidence" standard.  *See Labor/Community Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009).

Notwithstanding these distinctions between enforcement and contempt motions, Plaintiffs insist that they need only satisfy the preponderance standard to obtain the extracontractual procedural relief that they seek.  *See* Reply at 8 ("The Court need not hold Defendants in contempt to prescribe procedural remedies for substantive violations of the Settlement, but may

---

[5] As discussed *infra* Part III.D, Texas's child welfare laws and regulations limit Defendants' authority to administer psychotropic drugs to Class Members detained at Shiloh RTC, and the *Flores* Agreement requires Defendants to adhere to such state laws.  *See Flores* Agreement, Ex. 1 at ¶ A (requiring licensed programs to "comply with all applicable state child welfare laws and regulations") [Doc. # 101].  Therefore, the Court will afford such procedural protections to Class Members housed at Shiloh RTC.

[6] ORR defines the term "sponsor" as "an individual (in the majority of cases a parent or other relative) or entity to which ORR releases an unaccompanied alien child out of Federal custody."  *See* ORR Guide, Guide to Terms, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. June 21, 2017).  For the purposes of clarity and consistency, this Order uses the term "sponsor" instead of "custodian."

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
| --- | --- | --- | --- |

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 4 of 32 |
| --- | --- | --- | --- |

do so upon a preponderance of the evidence."). Yet, none of the authorities upon which they rely supports this proposition.

Several of the cases Plaintiffs cite arose in the context of civil contempt proceedings. *See Stone v. City & Cty. of S.F.*, 968 F.2d 850, 852 (9th Cir. 1992) (appeal of a contempt order for failure to comply with a consent decree); *E.E.O.C. v. Local 580, Int'l Ass'n of Bridge Structural & Ornamental Ironworkers*, 925 F.2d 588, 595 (2d Cir. 1991) ("In civil contempt cases, a court has discretion to fashion sanctions which are necessary to coerce compliance with its orders, and remedies which 'compensate complainant for losses sustained.'" (quoting *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443 (1986))); *United States v. N.Y.C. Dist. Council of N.Y.C.*, 229 Fed. App'x 14, 17 (2d Cir. 2007) ("A contempt order is a 'potent weapon,' that is inappropriate if 'there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" (quoting *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967); *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).

Although *United States v. Volvo Powertrain Corp.*, 758 F.3d 330 (D.C. Cir. 2014), was not decided in the context of a contempt motion, that case is sharply distinguishable from the instant matter. There, the D.C. Circuit upheld a district court's imposition of monetary sanctions for violations of a consent decree even though the decree did not provide any remedies for the type of breach at issue (*i.e.*, the defendant's affiliate sought EPA certification of nonroad compression-ignition engines that did not meet certain emissions standards). *See id.* at 333–34, 343–45. *Volvo* is inapposite for two reasons: (1) the defendant waived the argument that the plaintiff needed to satisfy the clear and convincing standard to obtain these sanctions; and (2) the relief was relatively limited and akin to a traditional contract remedy. *See id.* at 337–39, 344–45. *Volvo* does not establish that the Court's authority to enforce the *Flores* Agreement extends so far as to create an entirely new procedural framework protecting Class Members' underlying contractual rights. *Cf. Stone*, 968 F.2d at 861 (contempt case in which the Ninth Circuit stated that, "[i]n employing their broad equitable powers, federal courts should 'exercise the least possible power adequate to the end proposed'" (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)).[7]

---

[7] Plaintiffs point out that this Court ordered Defendants' juvenile coordinator to submit quarterly written reports directly to the Court and to disclose class statistics to Plaintiffs' counsel on a *monthly* (as opposed to semi-annual) basis, even though the *Flores* Agreement does not impose those requirements. *See* Reply at 9 (citing June 27, 2017 Order at 33 [Doc. # 363]; Order re Resp. to Order to Show Cause at 15 [Doc. # 189]); Order Setting Deadlines for Compliance Reports (requiring the Juvenile Coordinators to submit reports to the Court every 3–4 months) [Doc. # 380]; *see also Flores* Agreement at ¶¶ 29–30 (requiring Defendants to disclose class statistics to Plaintiffs' counsel on only a semi-annual basis, and providing that "the INS Juvenile Coordinator" shall report to the Court on only an annual basis) [Doc. # 101]. Such measures flow from the contract and fall within the scope of the Court's existing powers to monitor compliance with the *Flores* Agreement, and the parties interposed no objections

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 5 of 32 |
|---|---|---|---|

Plaintiffs further argue that the *Flores* Agreement creates substantive rights that are protected by the Due Process Clause. *See* Mot. to Enforce at 8–9. According to Plaintiffs, "[c]onstitutional principles of due process" require the imposition of more robust procedural protections to mitigate the risk of erroneous deprivation of Class Members' substantive rights. *See* Reply at 28–32. Plaintiffs rely principally on *Smith v. Sumner*, 994 F.2d 1401 (9th Cir. 1993), *Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016), *Santos v. Smith*, 260 F. Supp. 3d 598 (W.D. Va. 2017), and *Maldonado v. Lloyd*, No. 18 Civ. 3089 (JFK), 2018 WL 2089348 (S.D.N.Y. May 5, 2018), for that proposition. *See* Mot. to Enforce at 8–9; Reply at 8–10, 28–30. Whatever the merits of this claim, it has no place in a motion to enforce the consent decree. The vindication of a constitutional right is not coterminous with the enforcement of a contractual provision. *See Adams*, 876 F.2d at 709. *Sumner*, *Beltran*, *Santos*, and *Maldonado* do not compel a contrary conclusion.[8] *See Sumner*, 994 F.2d at 1402, 1404–07 (state prisoner filed suit under 42 U.S.C. section 1983 for a violation of his due process rights); *Beltran*, 222 F. Supp. 3d at 479, 481–82, 489–90 (district court granted habeas relief because the respondents detained the child in violation of the Due Process Clause); *Santos*, 260 F. Supp. 3d at 600 (same); *Maldonado*, 2018 WL 2089348 at *1, *7–10 (same).

Plaintiffs also contend that although Paragraph 24B allows a minor to obtain judicial review of his or her placement in a particular type of facility, *see Flores* Agreement at ¶ 24B [Doc. # 101], that option is not a "viable remedy." *See* Mot. to Enforce at 14–15. Plaintiffs explain that the TVPRA requires ORR to "ensure, to the greatest extent practicable . . . that all unaccompanied minor children [in ORR's custody], and who are not [from contiguous countries] have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." *See* 8 U.S.C. § 1232(c)(5). They present evidence showing that ORR has contracted with the Vera Institute of Justice to provide legal aid programs to Class Members, *see* Mot. to Enforce at 14 (citing [Doc. # 239-3 at 51 (excerpt from Vera contract)]), and allege that ORR has instructed Vera-funded attorneys not to challenge ORR's placement decisions. *See id.* at 15 (citing Mixon Decl. at ¶ 9, Pls.' Ex. 81 [Doc. 409-5]; Williams Decl. at ¶ 19, Pls.' Ex. 85 [Doc. # 409-5]; Stuart Decl. at ¶¶ 22–24, Pls.' Ex. 86 [Doc. # 409-5]). Yet, Defendants correctly point out that "nothing in the Agreement . . . suggests that the parties' agreement to these terms was based on any requirement that [Defendants] would provide

---

to these modest remedial measures. The procedural remedies that Plaintiffs request do not have these characteristics.

[8] For that same reason, Plaintiffs' citations to *Gerstein v. Pugh*, 420 U.S. 103 (1975), *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Mathews v. Eldridge*, 424 U.S. 319 (1976), are inapposite. *See* Mot. to Enforce at 8–9.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 6 of 32 |
|---|---|---|---|

such counsel, or that such agreement was contingent on access to counsel in any way." *See* Opp'n re Mot. to Enforce at 18. Thus, this practice does not breach the *Flores* Agreement.[9]

Despite the fact that the Court cannot afford Plaintiffs much of the extracontractual relief they seek, the Court does have the authority to determine whether Defendants have breached the Agreement by, *inter alia*, failing to adhere to "all applicable state child welfare laws and regulations." *See Flores* Agreement, Ex. 1 at ¶ A [Doc. # 101]. The remainder of this Order addresses that question.

**B.** **The TVPRA Did Not Supersede the *Flores* Agreement's Placement and Suitability Provisions**

Defendants argue that the TVPRA superseded provisions of the *Flores* Agreement that govern ORR's placement of a UAC in a secure facility and the review procedures for such placements.[10] *See* Opp'n re Mot. to Enforce at 16–17. Defendants further contend that the TVPRA conferred upon ORR the exclusive authority to determine the suitability of a proposed sponsor, thereby superseding the portion of the *Flores* Agreement's provision that allows ORR to conduct "[a] positive suitability assessment . . . prior to release to any [proposed sponsor] . . . ." *See id.* at 29–30; *Flores* Agreement at ¶ 17 [Doc. # 101]. As a result, Defendants claim that Plaintiffs cannot challenge ORR's placement and suitability procedures in a motion to enforce the *Flores* Agreement. *See id.* at 16, 30. These arguments are meritless. Moreover, if these arguments have a familiar ring, it is because the Court previously rejected Defendants' similar argument in a slightly different context relating to enforcement of Paragraph 24A of the Agreement. *See* Court's January 20, 2017 Order at 5–8 [Doc. # 318]; *Flores v. Sessions*, 862

---

[9] Plaintiffs suggest the Ninth Circuit has already held that ORR must allow immigration judges to determine whether Class Members may be placed in secure facilities. *See* Mot. to Enforce at 13–14; Reply at 13. Although the Ninth Circuit concluded that "bond hearings help to guide ORR in making its placement determinations for unaccompanied minors," the panel did not hold that Paragraph 24A's bond hearing requirement governs ORR's placement decisions. *See Flores v. Sessions*, 862 F.3d 863, 868 (9th Cir. 2017). In fact, the court observed that "[i]mmigration judges may assess whether a minor *should remain detained* or otherwise in the government's custody, but there must still be a *separate decision* with respect to the implementation of the child's appropriate care and custody." *See id.* at 878 (emphasis added).

[10] Although Defendants do not identify which portions of the Agreement have been superseded by the TVPRA's provisions governing secure facilities, it appears that Defendants claim that Paragraphs 21, 22, 23, 24B, 24C, and 24D are no longer operable. These Paragraphs articulate and define the criteria for placement in a "detention facility" and permit judicial review of such decisions. *See Flores* Agreement at ¶¶ 21–23, 24B–24D [Doc. # 101].

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | | Date | July 30, 2018 |
|---|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | | Page | 7 of 32 |
|---|---|---|---|---|

F.3d 863, 865, 874–81 (9th Cir. 2017) (affirming this Court's conclusion that the TVPRA does not supersede Paragraph 24A).

The TVPRA provides that "[a] child shall not be placed in a secure facility *absent a determination* that the child poses a danger to self or others or has been charged with having committed a criminal offense.  The placement of a child in a secure facility shall be reviewed, at a minimum, on a monthly basis, in accordance with the procedures prescribed by the Secretary [of the Department of Health and Human Services], to determine if such placement remains warranted."  *See* 8 U.S.C. § 1232(c)(2) (emphasis added).  Admittedly, Section 1232(c)(2) does not restate verbatim Paragraph 21's criteria for detaining Class Members in a secure facility.[11] *See infra* Part III.C.2.  In particular, Paragraph 21 limits the categories of conduct that may justify such detention, *see Flores* Agreement at ¶ 21A, and specifies the circumstances under which Defendants may place a Class Member in a secure facility due to the danger posed by that minor.  *See e.g.*, *id.* at ¶ 21B (providing that a Class Member may be detained if he or she "has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in [Defendants'] legal custody or while in the presence of an . . . officer [of Defendants]").  Assuming without deciding that Section 1232(c)(2)'s placement criteria are broader in some respects than those provided in Paragraph 21, that would not establish that "compliance with the . . . TVPRA would *directly conflict* with the *Flores* Agreement" such that the former supersedes the latter.  *See Flores*, 862 F.3d at 874 (emphasis added).  Section 1232(c)(2) identifies circumstances that are *necessary* for placement of a UAC in a secure facility, whereas Paragraph 21 delineates conditions that *permit* such detention.  Defendant has not shown that Paragraph 21 does anything other than complement Section 1232(c)(2).

Moreover, ORR's statutory obligation to review its placement decision every month is in no way inconsistent with the *Flores* Agreement's notice and judicial review provisions.[12] *See*

---

[11] Paragraph 21 uses the terms "detention facility" and "secure facility" interchangeably.  *See Flores* Agreement at ¶ 21 [Doc. # 101].

[12] Defendants cite certain excerpts of the TVPRA's legislative history to support the rather uncontroversial proposition that Congress intended the TVPRA to "improv[e] procedures for the placement of unaccompanied children in safe and secure settings."  *See* Opp'n re Mot. to Enforce at 17 (internal quotation marks omitted) (quoting H.R. Rep. No. 110-430(I), at 57 (2007)) (citing 154 Cong Rec. H108888 (daily ed. Dec. 10, 2008)).  Because Defendants have not identified any ambiguity in the TVPRA, the Court need not examine the legislative history of the statute.  *See Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 816 (9th Cir. 2004) ("Canons of statutory construction dictate that if the language of the statute is clear, we look no further than that language in determining the statute's meaning.  Therefore, we look[] to legislative history only if the statute is unclear." (alteration in original) (quoting *Ore. Nat. Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir. 1996)).  In any event, even if

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 8 of 32 |
|---|---|---|---|

*Flores* Agreement at ¶¶ 24B–D [Doc. # 101].  Additionally, Paragraph 23's bar on transferring a minor to a secure facility "if there are less restrictive alternatives that are available and appropriate in the circumstances" is consistent with the TVPRA's command that UACs "be promptly placed in the least restrictive setting that is in the best interest of the child."  *See Flores* Agreement at ¶ 23 [Doc. # 101]; 8 U.S.C. § 1232(c)(2)(A).

Defendants also claim that the TVPRA supplants Paragraph 17 of the *Flores* Agreement. *See* Opp'n re Mot. to Enforce at 29–30.  Section 1232(c)(3)(A) provides in pertinent part that:

> [A UAC] may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed [sponsor] is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum, include verification of the [sponsor's] identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the [UAC].

*See* 8 U.S.C. § 1232(c)(3)(A).  Further, Section 1232(c)(3)(B) provides that, "[b]efore placing the [UAC] with an individual, the Secretary of Health and Human Services shall determine whether a home study is first necessary."  8 U.S.C. § 1232(c)(3)(B).

Likewise, Paragraph 17 of the Agreement allows Defendants to require a "positive suitability assessment . . . prior to the release to any individual or program pursuant to Paragraph 14."  *See Flores* Agreement at ¶ 17.  Such an assessment may include "an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity, and employment of the individuals offering support, interviews of members of the household, and a home visit."  *See id.*  The Agreement requires that "[a]ny such assessment . . . take into consideration the wishes and concerns of the minor."  *See id.*  Paragraph 15A provides that every proposed sponsor must execute an agreement to, *inter alia*, "provide for the minor's physical, mental, and financial well-being." *See id.* at ¶ 15A.

Both the TVPRA and the *Flores* Agreement allow ORR to determine a proposed sponsor's suitability by (among other things) verifying that person's identity, determining

---

Congress intended to improve ORR's placement procedures, that intention is not inconsistent with the *Flores* Agreement's limitations on the agency's authority to place UACs in secure facilities.  *See Flores*, 862 F.3d at 880 ("The overarching purpose of the . . . TVPRA was quite clearly to give unaccompanied minors more protection, not less.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 9 of 32 |
|---|---|---|---|

whether that individual would provide for a Class Member's physical and mental well-being, and conducting home visits/studies. Indeed, the Ninth Circuit noted that the TVPRA's suitability requirements mirror their counterparts in the Agreement. *See Flores*, 862 F.3d at 878. It follows that the TVPRA does not directly conflict with Paragraphs 15A and 17 of the Agreement.

In sum, the Court concludes that the TVPRA did not supersede the placement and suitability provisions of the *Flores* Agreement because the two can be easily reconciled and Congress did not explicitly abrogate Class Members' rights under the Agreement. *See Flores*, 862 F.3d at 875 ("[A] basic canon of statutory construction requires that we presume Congress does not silently abrogate existing law."). Therefore, a motion to enforce is an appropriate means by which Plaintiffs can challenge alleged violations of those aspects of the Agreement.

**C.    ORR's Placement of Class Members in Staff-Secure Facilities, Secure Facilities, and RTCs**

ORR places UACs in several types of facilities, including shelter-type facilities, staff-secure facilities, secure facilities, and RTCs. *See* Sualog Revised Decl. at ¶¶ 1–3, 5, 7 (declaration from the Deputy Director of ORR, who is also the Director of Children's Services) [Doc. # 466-1]. ORR defines a shelter-type facility as "a residential care facility in which all programs are administered on-site in the least restrictive setting." *See id.* at ¶ 5. In contrast, staff-secure facilities "maintain stricter security measures than shelter care, such as a higher staff to UAC ratio for supervision and a secure perimeter with a 'no climb' fence." *Id.* ORR claims that staff-secure facilities have "a more shelter, home-like setting than secure detention, and do not have locked pods or cell units." *Id.* ORR asserts that in Texas, Washington, Florida, New York, and Arizona, staff-secure facilities and non-secure shelters both have the same state licenses. *See id.* at ¶ 6. On the other hand, California has different licenses for these two types of facilities. *Id.* Defendants contend that staff-secure facilities are "medium security" facilities for the purposes of the *Flores* Agreement. *See* Opp'n re Mot. to Enforce at 13–14; *see also Flores* Agreement at ¶ 8 (defining a "medium security facility" as, *inter alia*, a "facility [that] is designed for minors who require close supervision but do not need placement in juvenile correctional facilities") [Doc. # 101].

ORR concedes that "[s]ecure facilities are the most restrictive level of care." Sualog Revised Decl. at ¶ 5 [Doc. # 466-1]. ORR defines secure facilities as "licensed juvenile detention centers" comprised of "physically secure structures" that are staffed with personnel who are "able to control violent behavior[.]" *See id.* These facilities fall within the scope of the definition of secure facilities provided in Paragraph 21 of the *Flores* Agreement. *See* Opp'n re Mot. to Enforce at 14–15; *see also Flores* Agreement at ¶ 21 (providing that, under certain

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 10 of 32 |
|---|---|---|---|

circumstances, "[a] minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors") [Doc. # 101].  ORR's secure facilities include three juvenile jails: Yolo County Juvenile Hall in California, Shenandoah Valley Juvenile Center in Virginia, and Northern Virginia Juvenile Detention Facility in Virginia.  *See* Holguín Decl. at ¶¶ 2–3, Pls.' Ex. 87 [Doc. # 409-5].

Finally, ORR defines an RTC as:

a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services and interventions.  [RTCs] provide highly customized care and services to individuals following either a community based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence.  ORR uses a[n] RTC at the recommendation of a psychiatrist or psychologist [or with ORR Treatment Authorization Request (TAR) approval] for [a UAC] who poses a danger to self or others and does not require inpatient hospitalization.

Sualog Revised Decl. at ¶ 7 (quoting ORR Guide, Guide to Terms, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. June 21, 2017)) (internal quotation marks omitted) [Doc. # 466-1].[13]  Although this definition of "RTC" suggests that placement therein occurs only after a licensed psychiatrist or psychologist determines that a UAC "poses a danger to self or others," ORR's "Notice of Placement in a Restrictive Setting" shows that a UAC may be placed in an RTC under other circumstances.  Specifically, the form provides in pertinent part:

---

[13] Sualog's declaration omitted the "or with ORR Treatment Authorization Request (TAR) approval" language that is bracketed into the block quotation, which does appear in the ORR Guide.  *Compare* Sualog Decl. at ¶ 7 [Doc. # 466-1], *with* ORR Guide, Guide to Terms, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. June 21, 2017).  The parties have not provided a definition of a "TAR."  In any event, it appears that a TAR must be completed by a licensed psychologist or psychiatrist before ORR transfers a UAC to an RTC.  *See* Sualog Revised Decl. at ¶ 8 ("ORR will consider transferring [a] UAC to an RTC if 'a licensed psychologist or psychiatrist has indicated[']" that certain conditions have been satisfied) (quoting ORR Guide at § 1.4.6, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. Jan. 27, 2015)) [Doc. # 466-1].

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | | Date | July 30, 2018 |
|---|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | | Page | 11 of 32 |
|---|---|---|---|---|

**Residential Treatment Center:** ORR has determined that you have a psychiatric or psychological issue that cannot be addressed in an outpatient setting. A licensed psychologist or psychiatrist has indicated that you:
☐ Have not shown reasonable progress in the alleviation of your mental health symptoms after a significant period of time in outpatient treatment;
☐ Demonstrate behavior that is a result of your underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting;
☐ Require therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent you from independent participation in the daily schedule of activities; *and/or*,
☐ Present a continued and real risk of harm to self, others, or the community, despite the implementation of short-term interventions.

ORR Form Notice of Placement in a Restrictive Setting ("Notice of Placement"), Feb. 5, 2018, Pls.' Ex. 22 at 12 (emphasis added) [Doc. # 409-3]. Defendants argue that, for the purposes of the *Flores* Agreement, RTCs constitute licensed programs that serve special needs minors. *See* Opp'n re Mot. to Enforce at 11–12.

Plaintiffs contend that RTCs violate the *Flores* Agreement because they do not comport with its definition of "licensed programs." *See* Reply at 11–13. They also contend that Defendants have violated the *Flores* Agreement by placing Class Members in RTCs, staff-secure facilities, and secure facilities without adequate notice or an opportunity to be heard, and that the criteria for such placements do not comport with the *Flores* Agreement. *See* Mot. to Enforce at 11–16. The Court addresses each of these arguments *seriatim*.[14]

**1.    Shiloh RTC Does Not Satisfy the *Flores* Agreement's Requirements for "Licensed Programs"**

Paragraph 19 of the Agreement provides that as a general rule, if a Class Member is not released, he or she "shall be placed temporarily in a licensed program until such time as a release can be effected in accordance with Paragraph 14 . . . or until the minor's immigration

---

[14] Plaintiffs complain in passing that "children in staff-secure facilities . . . typically must wear institutional clothing, are kept under 24-hour surveillance, have limited contact with family, and are summarily disciplined for violations of facility rules," and that "[y]outh in secure facilities report being handcuffed, locked in cells, and pepper sprayed." *See* Mot. to Enforce at 10–11. It appears that Plaintiffs make these generalized assertions to support their position that "[y]outh have a compelling interest in licensed placement" such that they possess a due process right to pre-placement notice and an opportunity to be heard. *See id.* (emphasis omitted). They do not argue that the conditions of those facilities otherwise violate the *Flores* Agreement, nor do they identify which provisions of the Agreement have been violated by these practices.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 12 of 32 |
|---|---|---|---|

proceedings are concluded, whichever occurs earlier." *See Flores* Agreement at ¶ 19 [Doc. # 101]. A licensed program is defined in pertinent part as:

> [A]ny program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 attached hereto. All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required by state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a minor has drug or alcohol problems or is mentally ill.

*Id.* at ¶ 6. A "special needs minor" is in turn defined as:

> [A] minor whose mental and/or physical condition requires special services and treatment by staff. A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment as a result of neglect or abuse. [Defendants] shall assess minors to determine if they have special needs and, if so, shall place such minors, whenever possible, in licensed programs in which [Defendants] place[] children without special needs, but which provide services and treatment for such special needs.

*Id.* at ¶ 7.

Plaintiffs contend that RTCs do not adhere to the *Flores* Agreement's requirements for licensed programs because RTCs employ a level of security that exceeds that which is "necessary for the protection of a minor or others . . . ." *See* Reply at 12 (quoting *Flores* Agreement at ¶ 6). They further claim that RTCs violate the Agreement because they separate special needs minors from the general population of Class Members. *See id.* Additionally, Plaintiffs argue that RTCs do not afford Class Members the privacy rights identified in Exhibit 1 of the Agreement. *See id.* at 12–13.[15]

---

[15] Plaintiffs further contend that "Defendants neither produce their RTCs' licenses nor identify the state laws they contend authorize the restrictions RTCs place on children's lives and liberty." Reply at 13. Yet, *Plaintiffs* bear the burden of proving that RTCs violate the *Flores* Agreement by virtue of their purported failure to adhere to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | | Date | July 30, 2018 |
|---|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 13 of 32 |
|---|---|---|---|

Plaintiffs have shown that the level of security at Shiloh RTC in Manvel, Texas violates the *Flores* Agreement because it is a locked facility with 24-hour surveillance and monitoring. *See* Isabella M. Decl. at ¶ 2, Pls.' Ex. 10 [Doc. # 421-1]; Gloria P. Decl. at ¶ 2, Pls.' Ex. 41 [Doc. # 421-4]; Gabriela N. Decl. at ¶ 3, Pls.' Ex. 19 [Doc. # 421-1].[16]  Although it is possible that a Class Member who has been placed in an RTC possesses "a psychiatric or a psychological issue that cannot be addressed in an outpatient setting," *see* Notice of Placement, Pls.' Ex. 22 at 12 [Doc. # 409-3], that does not necessarily mean that the aforementioned measures must be undertaken in order to protect the minor or others.  *See Flores* Agreement at ¶ 6 [Doc. # 101]. Plaintiffs also present evidence showing that Shiloh RTC's staff engages in practices that are not necessary for the protection of minors or others.  For example, Julio Z. attests that a staff member at Shiloh RTC often refused to allow Julio and other Class Members to leave their living quarters to obtain drinking water.  *See* Julio Z. Dec. at ¶¶ 21–22, Pls.' Ex. 64 [Doc. # 421-5].  On one occasion, after that individual repeatedly denied Julio's request to get water, Julio nonetheless insisted upon leaving his room for that purpose.  *See id.* at ¶ 22.  The staff member responded by throwing Julio to the ground, injuring Julio's elbow.  *See id.*

On the other hand, if a Class Member has been placed in Shiloh RTC because a licensed psychologist or psychiatrist found that he or she "[p]resent[s] a continued or real risk of harm to self, others, or the community," *see* Notice of Placement, Pls.' Ex. 22 at 12 [Doc. # 409-3], then 24-hour surveillance and monitoring may be the "level of security . . . which is necessary for the protection of [that] minor or others."  *See Flores* Agreement at ¶ 6 [Doc. # 101].  If so, then that level of security falls within the scope of the proviso included in the Agreement's definition of licensed programs.  *See id.* ("All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; *provided, however*, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances . . . ." (emphasis added)); *see also Proviso*, Black's Law Dictionary (10th ed. 2014) ("[i]n drafting, a [proviso is a] provision that begins with the words provided that and supplies a condition, *exception*, or addition" (emphasis added)).  Moreover, because ORR policy does not allow a Class Member to be transferred to an RTC unless "ORR has determined that [he or she has] a psychiatric or psychological issue that cannot be addressed in an outpatient setting,"

---

applicable state laws.  *See Buss*, 16 Cal. 4th at 54 (a party asserting a breach of contract claim must satisfy the preponderance of the evidence standard).  Moreover, Plaintiffs do not argue that Defendants refused to provide them such information upon their request.  *See Flores* Agreement at ¶ 29 (providing that "Plaintiffs' counsel shall have an opportunity to submit questions . . . with regard to the implementation of this Agreement . . . .") [Doc. # 101].

[16] On this record, it is unclear whether other RTCs also utilize 24-hour surveillance and monitoring.

CIVIL MINUTES—GENERAL                    Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 14 of 32 |
|---|---|---|---|

*see* Notice of Placement, Pls.' Ex. 22 at 12 [Doc. # 409-3]; Sualog Revised Decl. at ¶ 8 [Doc. # 466-1], placement in an RTC does not necessarily run afoul of the *Flores* Agreement's requirement that special needs minors be housed with other children "*whenever possible.*" *See Flores* Agreement at ¶ 7 (emphasis added) [Doc. # 101].

With regard to Class Members' privacy rights, Plaintiffs claim that Shiloh RTC does not provide sufficient "private space" to comply with Exhibit 1 to the Agreement because Julio Z. slept in an 8-person room at the facility. *See* Reply at 12–13 (citing Julio Z. Dec. at ¶ 13, Pls.' Ex. 64 [Doc. # 421-5]). Exhibit 1 does not require, however, that each Class Member have his or her own living quarters. Instead, it requires that ORR provide "a private space . . . for the storage of personal belongings." *See Flores* Agreement, Ex. 1 at ¶ A12 [Doc. # 1]. On the other hand, Class Members in RTCs are entitled to "talk privately on the phone, as permitted by the house rules and regulations. *See id.* There is evidence that several Class Members have not been allowed to have any private telephone calls at Shiloh RTC. *See* Gabriela N. Decl. at ¶ 12, Pls.' Ex. 19 ("I am only allowed two 15-minute calls per week. The calls have no privacy.") [Doc. # 421-1]; Maricela J. Decl. at ¶ 15, Pls.' Ex. 48 (strongly suggesting that Shiloh RTC staff have refused to allowed Maricela to speak with her family on the telephone). Thus, Defendants have violated that privacy right contemplated in the Agreement.[17]

Accordingly, the Court **ORDERS** Defendants to transfer all Class Members out of Shiloh RTC unless a licensed psychologist or psychiatrist has determined or determines that a particular Class Member poses a risk of harm to self or others. *See* Flores Agreement, ¶ 6 ("a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others . . . ."). Class Members who do not fall within that exception shall be placed "in the least restrictive setting appropriate to [each Class Member's] age and special needs, provided that such setting is consistent with [Defendants'] interests to ensure the [Class Member's] timely appearance before [Defendants] and the immigration courts and to protect the [Class Member's] well-being and that of others." *See Flores* Agreement at ¶ 11 [Doc. # 101]. Defendants are further **ORDERED** to cease employing at Shiloh RTC any security measures that are not necessary for the protection of minors or others, such as the denial of access to drinking water. Additionally, the Court **ORDERS** Defendants to permit Class Members at Shiloh RTC to "talk privately on the phone, as permitted by the house rules and regulations." *See Flores* Agreement, Ex. 1 at ¶ A12 [Doc. # 101].

---

[17] Plaintiffs also argue that Class Members in RTCs are not allowed to wear their own clothing. *See* Reply at 12–13; *see also Flores* Agreement, Ex. 1 at ¶ A12 (providing that a Class Member shall be allowed to "wear his or her own clothes, when available") [Doc. # 101]. Plaintiffs have not directed the Court to any evidence substantiating that claim.

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | | Date | July 30, 2018 |
| --- | --- | --- | --- | --- |

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | | Page | 15 of 32 |
| --- | --- | --- | --- | --- |

2.      **Adequate Notice and an Opportunity to Be Heard and Criteria for
Placing Class Members in Secure Facilities**

Plaintiffs complain that ORR transfers Class Members to staff-secure facilities, secure facilities, and RTCs without adequate notice or an opportunity to be heard. *See* Mot. to Enforce at 11–15. With regard to the latter contention, Plaintiffs point out that ORR's policies indicate that the agency unilaterally determines whether to transfer a Class Member to such facilities using a "placement tool" that takes into account the minor's characteristics (*e.g.*, criminal history). *See id.* at 12 (citing ORR Guide at § 1.3.2, *available at* https://www.acf.hhs.gov/orr/res ource/children-entering-the-united-states-unaccompanied (last rev. Apr. 22, 2016)). ORR relies upon the score generated from the placement tool "unless ORR Intakes Team . . . in consultation with other ORR staff" decides to override the score for that particular case. *See* ORR Guide at § 1.3.2, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. Apr. 22, 2016). This procedure does not violate the *Flores* Agreement because there is no contractual entitlement to a pre-placement hearing. Rather, Class Members may challenge placement decisions in federal court *after* the agency has already made them. *See Flores* Agreement at ¶ 24B ("Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may seek judicial review . . . .").

Further, Plaintiffs seek an order requiring Defendants to provide "written and oral notice in a language [the Class Member] understand[s] of the reasons for such transfer and disclose . . . the evidence ORR contends justify the transfer . . . at least 10 days *in advance* of the date ORR proposes to effect the [Class Member's] physical transfer." *See* Proposed Order at 3 (emphasis added) [Doc. # 422-1]. The *Flores* Agreement requires ORR to provide advance notice of transfer only if an attorney represents the particular Class Member. *See Flores* Agreement at ¶ 27 ("No minor who is represented by counsel shall be transferred without advance notice to such counsel . . . .") [Doc. # 101]. Plaintiffs have not pointed to any evidence showing that Defendants violated this provision of the Agreement.

Conversely, Paragraph 24C of the *Flores* Agreement does provide that, "[i]n order to permit judicial review of Defendants' placement decisions as provided in [the] Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility." *See Flores* Agreement at ¶ 24C [Doc. # 101]. Therefore, ORR is required to provide each Class Member with written notice of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 16 of 32 |
|---|---|---|---|

the reasons for placing him or her in a staff-secure facility, a secure facility, or an RTC to enable judicial review of that decision.[18]

ORR concedes that its "Notice of Placement" form is intended to serve as this written "notice of reasons." *See* Sualog Revised Decl. at ¶ 11 ("The reasons provided in ORR's Notice of Placement in a Restrictive Setting . . . provide notice of the reasons for housing the minors in such facilities and enable judicial review in a Federal court of such decisions by ORR.") [Doc. # 466-1]. The *Flores* Agreement does not state with particularity *when* ORR must provide such notice to the Class Member. Under California law, "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed." *See* Cal. Civ. Code § 1657. Because the parties have not explained why a more clearly defined standard would be appropriate under the circumstances, the Court construes Paragraph 24C as requiring notice within a reasonable time after ORR renders its placement decision.[19]

Plaintiffs present evidence that multiple Class Members have been detained in secure or medium security facilities for weeks (and sometimes months) without receiving a written notice of reasons for the transfer. *See, e.g.*, Samuel W. Decl. at ¶¶ 2–7, Pls.' Ex. 44 (Samuel has been at a Yolo Juvenile Detention Center for nearly a month and has not received "a written notice about why [ORR] . . . transferr[ed] [him] there") [Doc. # 421-4]; Isabella M. Suppl. Decl. at ¶¶ 1–6, Pls.' Ex. 11 (Isabella has been detained at Shiloh RTC for at least three months and has not received a Notice of Placement form) [Doc. # 421-1]; David I. Suppl. Decl. at ¶¶ 1–3, Pls.' Ex. 15 (David has been at Shiloh RTC for at least three months and has not received a Notice of

---

[18] Shiloh RTC may comport with the Agreement's definition of a "licensed program" to the extent that a psychologist or a psychiatrist has determined that a Class Member placed therein is a danger to himself/herself or others. *See supra* Part III.C.1. Nonetheless, Shiloh RTC is also a "medium security facility" because "[i]t provides 24-hour awake supervision, custody, care and treatment." *See id.*; *Flores* Agreement at § 8 [Doc. # 101]. Further, the Notice of Placement form concedes that an RTC is a "restrictive setting." *See* Notice of Placement, Pls.' Ex. 22 at 12 [Doc. # 409-3]. Given that Paragraph 24C's express purpose is to permit judicial review of a decision to place a minor in a detention or medium security facility, *see Flores* Agreement at § 24C, the transfer of a Class Member to an RTC triggers ORR's obligation to provide a notice of reasons for the placement, notwithstanding the fact that an RTC may technically satisfy the definition of a licensed program under certain circumstances. Further, the Court interprets Paragraph 24C as requiring a *written* "notice of reasons" for the transfer because Paragraph 24C is intended to facilitate judicial review of such decisions.

[19] The *Flores* Agreement certainly does not prohibit ORR from providing Class Members with notice of its placement decisions *before* they go into effect. Nonetheless, the terms of the Agreement do not require that ORR provide pre-placement notice unless a Class Member is represented by counsel. *See Flores* Agreement at ¶ 37 [Doc. # 101]. Because Paragraph 24B does not require ORR to obtain court approval before placing a Class Member in a particular facility, post-placement notice is not *per se* unreasonable under California Civil Code section 1657.

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 17 of 32 |
|---|---|---|---|

Placement form) [Doc. # 421-1]; Gloria P. Decl. at ¶¶ 3–4, Pls.' Ex. 41 (Gloria has been in Shiloh RTC for four months, and does not recall receiving any document explaining the right to challenge ORR's placement decision) [Doc. # 421-4]; Carlos A. Decl. at ¶¶ 2, 4–5, 8–9, Pls.' Ex. 31 (Carlos was in Shenandoah Valley Juvenile Center for nearly a month, and does not recall being informed that he could challenge the placement decision) [Doc. # 421-3].[20]  Detaining a Class Member in a restrictive setting for three or four months without informing the minor of the reasons for placement amounts to a failure to provide written notice within a reasonable time. Furthermore, Plaintiffs believe that the form "exists only in English," *see* Mot. to Enforce at 12, a notion that Defendants do not dispute.  *See* Opp'n re Motion to Enforce 9–10 (arguing instead that the Notice of Placement otherwise satisfies the Agreement).  Since the purpose of the notice of reasons is to permit judicial review, the *Flores* Agreement impliedly requires ORR to provide notice in a language that the Class Member can understand.  *See, e.g.*, Carlos A. Decl. at ¶ 2 ("I speak Spanish and only a few words of English.") [Doc. # 421-4].  Therefore, Defendants have breached the *Flores* Agreement by failing to provide these Class Members with a notice of reasons in a language that they can understand within a reasonable period of time.

Additionally, Plaintiffs argue that the Notice of Placement form indicates that ORR transfers Class Members to secure facilities on grounds that are not authorized by the *Flores* Agreement.  *See* Mot. to Enforce at 10–11.  Paragraph 21 provides that a Class Member may be placed in a secure facility if one of the following five conditions has been met:

A. [The Class Member] has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

i.  Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples:  breaking and entering, vandalism, DUI, etc.  This list is not exhaustive.);

ii.  Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples:  shoplifting, joy riding, disturbing the peace, etc.  This list is not exhaustive.);

---

[20] Given that ORR's Notice of Placement form states that a Class Member may seek reconsideration of ORR's placement decision or file suit in federal court to challenge the decision, it can readily be inferred that Gloria P., Carlos A., and Gabriela N. did not receive this form.  *See* Notice of Placement, Pls.' Ex. 22 at 12–13 [Doc. # 409-3].

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | | Date | July 30, 2018 |
|---|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 18 of 32 |
|---|---|---|---|

> As used in this paragraph, "chargeable" means that the INS has probable
> cause to believe that the individual has committed a specified offense;
>
> B.  [The Class Member] has committed, or has made credible threats to
> commit, a violent or malicious act (whether directed at himself or others)
> while in [Defendants'] legal custody or while in the presence of an . . .
> officer [of Defendants];
>
> C.  [The Class Member] has engaged, while in a licensed program, in conduct
> that has proven to be unacceptably disruptive of the normal functioning of
> the licensed program in which he or she has been placed and removal is
> necessary to ensure the welfare of the minor or others, as determined by
> the staff of the licensed program (Examples:  drug or alcohol abuse,
> stealing, fighting, intimidation of others, etc.  This list is not exhaustive.);
>
> D.  [The Class Member] is an escape-risk; or
>
> E.  [The Class Member] must be held in a secure facility for his or her own
> safety, such as when [Defendants have] reason to believe that a smuggler
> would abduct or coerce a particular minor to secure payment of smuggling
> fees.

*See Flores* Agreement at ¶ 21 [Doc. # 101].

On the other hand, ORR's Notice of Placement form provides that a Class Member may
be placed in a secure facility if:

> ORR has determined that [the Class Member] pose[s] a danger to self or others; or
> ha[s] been charged with having committed a criminal offense.  ORR considered
> that [the Class Member]:
> □ [Is] charged with, *may be chargeable*, or ha[s] been convicted of a crime; or [is]
> the subject of delinquency proceedings, ha[s] been adjudicated delinquent, or [is]
> chargeable with a delinquent act;
> □ Ha[s] committed, or ha[s] made credible threats to commit a violent or
> malicious act while in ORR custody;
> □ Ha[s] committed, threatened to commit, or engaged in serious, self-harming
> behavior that poses a danger to self while in ORR custody;
> □ Ha[s] engaged in conduct that has proven to be disruptive of the normal
> functioning of a staff secure facility in which [the Class Member] [was] placed
> such that transfer may be necessary to ensure [the Class Member's] welfare or the
> welfare of others;
> □ *Ha[s] reported gang involvement or display[ed] gang affiliation while in care;*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 19 of 32 |
|---|---|---|---|

☐ *Ha[s] self-disclosed* violent criminal history or *gang involvement prior to placement in ORR custody that requires further assessment;* and/or
☐ Ha[s] a history of or display[ed] sexual predatory behavior, or other inappropriate sexual behavior.

*See* Notice of Placement, Pls.' Ex. 22 at 12 (footnote omitted) (emphasis added) [Doc. # 409-3].[21]

Paragraph 21 of the Agreement does not authorize the italicized criteria shown above. A Class Member may be placed in a secure facility if he or she "is chargeable" with a crime, not if he "may be chargeable" with one. *See Flores* Agreement at ¶ 21A [Doc. # 101]. For instance, a Class Member's gang membership does not necessarily establish that he or she is chargeable with a delinquent act or offense, or that any of the other criteria of Paragraph 21 have been satisfied. On the other hand, to the extent the italicized criteria contribute to Defendants' probable cause determination that a Class Member has engaged in a pattern or practice of criminal conduct or committed a violent crime, then Paragraph 21 explicitly authorizes detention of that Class Member in a secure facility. Therefore, Defendants have breached the *Flores* Agreement insofar as ORR has placed Class Members in secure facilities *solely* on the basis of one or more of the italicized portions of the Notice of Placement form and absent probable cause to believe that the individual has committed a specified offense.[22]

Accordingly, the Court **ORDERS** Defendants to comply with Paragraph 24C by providing each Class Member with a written notice of reasons for placing him or her in a secure facility, staff-secure facility, or an RTC within a reasonable time of ORR's placement decision. Any such notice of reasons shall be in a language that the Class Member understands. Further, pursuant to Paragraph 21, the Court **ORDERS** Defendants to remove from a secure facility any

---

[21] The first checkbox is accompanied by a footnote that clarifies that Paragraph 21's "isolated" and "petty" offenses are excluded from the scope of that criterion. *See* Notice of Placement, Pls.' Ex. 22 at 12 [Doc. # 409-3].

[22] Plaintiffs claim that *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), indicates that "ORR in fact dispatches youth to secure facilities precipitously." *See* Mot. to Enforce at 16. In *Saravia*, ORR released certain Class Members from custody who were later rearrested and placed in secure facilities. *See Saravia*, 280 F. Supp. 3d at 1177–81. The district court ordered ORR to provide Class Members with hearings before immigration judges and to release those found to be non-dangerous. *See Saravia*, at 1205–06. Ultimately, immigration judges ordered the release of the vast majority of the Class Members who received bond hearings. *See* Request for Judicial Notice, *Saravia v. Sessions*, No. 18-15114 (9th Cir. Mar. 16, 2018), Pls.' Ex. 79 at 112–13 (chart showing which Class Members were ultimately released) [Doc. # 409-5]. It appears that Plaintiffs raise this argument merely to support their position that the Court should order procedural remedies that are not prescribed in the *Flores* Agreement. *See* Mot. to Enforce at 16; Reply at 13. The Court has already rejected that request in the context of a motion to enforce. *See supra* Part III.A.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
| --- | --- | --- | --- |

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 20 of 32 |
| --- | --- | --- | --- |

Class Member who was placed or whose placement has been maintained there *solely* because: the Class Member "may be chargeable" (as opposed to "is chargeable") with an offense; the Class Member reported gang involvement or displayed gang affiliation while in care and Defendants lack probable cause to believe that the individual committed any other specified offense; and/or the Class Member self-disclosed gang involvement prior to placement in ORR custody that does not give rise to probable cause to believe that the individual has committed a specified offense.  All such Class Members shall be placed "in the least restrictive setting appropriate to [each Class Member's] age and special needs, provided that such setting is consistent with [Defendants'] interests to ensure the [Class Member's] timely appearance before [Defendants] and the immigration courts and to protect the [Class Member's] well-being and that of others."  *See Flores* Agreement at ¶ 11 [Doc. # 101].

**D.      ORR's Administration of Psychotropic Medication to Class Members**

Plaintiffs point out that Exhibit 1 to the Agreement requires licensed programs to "comply with all applicable state child welfare laws and regulations," *see Flores* Agreement, Ex. 1 at ¶ A [Doc. # 101], and claim that ORR has violated Texas law by forcing Class Members at Shiloh RTC to take psychotropic medication without first obtaining a court order or the informed written consent of a person authorized by state law to provide such consent.[23]  *See* Mot. to Enforce at 21–22.  Defendants concede that "Shiloh RTC's operations *are governed by* the Texas Department of Family and Protective Services (TDFPS) Licensing Division's Minimum Standards for General Residential Operations, which include polic[ies], procedures, and practices concerning the use of psychotropic medication."  *See* Sualog Revised Decl. at ¶ 14 (emphasis added) (citing Tex. Admin. Code §§ 748.2253–61) [Doc. # 466-1].  Defendants further concede that Shiloh RTC must comply with Texas state law "concerning informed consent pertaining to the prescription of psychotropic medications to children in state residential treatment facilities." *See id.* at ¶ 15.

---

[23] Plaintiffs also claim that ORR violated state law by administering psychotropic drugs to Julio Z. at Yolo County Juvenile Detention Center without first obtaining a court order or consent from a person authorized to do so. *See* Reply at 14 n.2.  Plaintiffs support that assertion with a Parental Medical Authorization form wherein an ORR Institutional Services Director authorized the administration of multiple psychotropic drugs, including Depakote. *See* Pls.' Ex. 62 [Doc. # 421-5].  The authorities upon which Plaintiffs rely, however, apply to a child who has been "adjudged a dependent child of the court," *see* Cal. Welf. & Ins. Code § 369.5(a)(1), or "adjudged a ward of the court."  *See id.* § 739.5(a)(1); *see also* Cal. R. of Ct. 5.640(b)–(c)(1) (implementing California Welfare and Institutions Code sections 369.5 and 739.5, and identifying forms used to obtain court authorization for administering psychotropic medication).  It is unclear whether Julio Z. fell into either of those categories while he was detained at Yolo County Juvenile Detention Center.  Therefore, the Court cannot conclude on this record that ORR's practices violate California law.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | | Date | July 30, 2018 |
|---|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | | Page | 21 of 32 |
|---|---|---|---|---|

Texas's regulations provide that "General Residential Operations" must obtain "written, signed, and dated consent, specific to the psychotropic medication to be administered, from the person legally authorized to give medical consent before administering a new psychotropic medication to a child." *See* Tex. Admin. Code § 748.2001(b). The regulations further state that, prior to obtaining this written consent, the prescribing health care professional must provide the "person legally authorized to give medical consent" with a very detailed disclosure regarding the administration of the psychotropic drug and this disclosure must be in writing or orally conveyed and documented thereafter. *See* Tex. Admin. Code § 748.2253(a). This disclosure must include, *inter alia*, the side effects of the medication, the "[r]isks and benefits of the alternative treatments or procedures," and "[a]n explanation that the person legally authorized to give medical consent may withdraw consent and request the medication be discontinued at any time." *See id.* § 748.2253(a)(1)–(12). A copy of the signed written consent form must be filed in the child's record. *See id.* § 748.2253(c).

For the purposes of these regulations, a "[p]erson legally authorized to provide consent" is defined as a "person legally authorized to give consent by the Texas Family Code or a person authorized by [a] court[.]" *See* Tex. Admin. Code § 748.43(47). Under the Texas Family Code, parents have the right to consent to medical, psychiatric, or psychological treatment, *see* Tex. Fam. Code § 151.001(a)(6), and other adult relatives of the child have the right to consent to such treatment if the parent(s) cannot be contacted and has/have not given actual notice of a contrary intent. *See* Tex. Fam. Code § 32.001(a)(1)–(3).[24] The Texas Family Code also allows other adults to consent to such treatment if: (1) the parent(s) cannot be contacted, (2) the parent(s) has/have not given actual notice of a contrary intent, and (3) the adults seeking to authorize the treatment (a) have "actual care, control, and possession of [the] child" and "written authorization to consent from a person having the right to consent" or (b) are "responsible for the actual care, control, and possession of [the] child under the jurisdiction of a juvenile court or committed by a juvenile court to the care of an agency of the state or county[.]" *See id.* § 32.001(a)(5), (a)(7).

Plaintiffs present evidence showing that on numerous occasions, ORR staff at Shiloh RTC signed forms purportedly authorizing the administration of psychotropic medication to Class Members. *See* White Decl. at ¶ 5, Pls.' Ex. 89 (Shiloh RTC staff admitted to White that they—and not parents, family members, or potential sponsors—signed Consent to Medical Care Forms for Class Members) [Doc. # 409-5]; Isabella M. Medication Form, Pls.' Ex. 59 (indicating

---

[24] Although Texas Family Code section 32.001(a) provides that these non-parents may consent to "medical, dental, psychological, and surgical treatment of a child[,]" (*i.e.*, the adjective "psychiatric" is missing from this list), Plaintiffs do not argue that such persons are not authorized to consent to the administration of psychotropic medication.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | | Date | July 30, 2018 |
|---|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | | Page | 22 of 32 |
|---|---|---|---|---|

that Isabella M. was prescribed multiple psychotropic medications upon admission at Shiloh RTC, including topiramate; signed by RN Tabatha Ketner as a "Parent, Guardian, or Conservator") [Doc. # 421-4]; Gabriela N. Medication Form, Pls.' Ex. 60 (indicating that Gabriela N. was prescribed fluoxetine upon admission at Shiloh RTC; signed by Ketner as a "Parent, Guardian, or Conservator") [Doc. # 421-4]; Sofia O. Medication Form, Pls.' Ex. 61 (indicating that Sofia O. had been prescribed various psychotropic medications including hydroxyzine HCL; signed by Ketner as a "Parent, Guardian, or Conservator") [Doc. # 421-5].

Plaintiffs also point to other evidence indicating that ORR administered psychotropic drugs to Class Members at Shiloh RTC without securing parental consent. *See* Decl. of Mother of Isabella M. at ¶ 4, Pls.' Ex. 12 ("Nobody asked me for permission to give medications to my daughter, even though the staff at Shiloh has always had my telephone number and address.") [Doc. # 421-1]; Maricela J. Dec. at ¶¶ 4–7, Pls.' Ex. 48 (upon arriving at Shiloh RTC, staff gave her new medication that she believes has caused her nausea and other side effects; Maricela J. does not believe that she or anyone in her family gave permission for her to take the medication) [Doc. # 421-4]; David I. Decl. at ¶ 7, Pls.' Ex. 14 (David takes pills every morning and night and, as "far as [he] know[s], ORR did not ask [his] mother for permission before [ORR] gave [him] the medication") [Doc. # 421-1]; David I. Patient Profile—Active Medications, Pls.' Ex. 57 (showing David was prescribed several psychotropic medications, including escitalopram) [Doc. # 421-4]. Moreover, it appears that Shiloh RTC officials attempt to secure informed written consent to administer psychotropic medications only if the Class Member "has a viable sponsor[,]" and that these officials do not inform prospective sponsors that they have the right to withdraw their written consent. *See* Sualog Revised Decl. at ¶ 15 ("It is my understanding that, *if a UAC has a viable sponsor*, it is Shiloh's policy to inform the sponsor about any changes in medications prescribed for the child, including starting a new medication or increasing the dose of a current medication. Shiloh's policy is to explain the following: benefits; risks; side effects; medical consequences of refusing the medication or recommendation for the medication; and contact information for the prescribing physician." (emphasis added)) [Doc. # 466-1]. This evidence establishes that Defendants have violated Texas state child welfare laws and regulations by administering psychotropic medications to Class Members at Shiloh without first: (1) providing the disclosure required by 26 Texas Administrative Code section 748.2253 to a "person legally authorized to give medical consent[,]" and (2) securing the informed written consent of "person legally authorized to give consent by the Texas Family Code or a person authorized by [a] court[.]" *See* Tex. Admin. Code §§ 748.43(47), 748.2001(b); *see also* Tex. Fam. Code § 266.004 (procedures for obtaining a court order authorizing medical care for a child in foster care).

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 23 of 32 |
|---|---|---|---|

Defendants nonetheless insist that "ORR is not aware of any reported concerns by the State of Texas about Shiloh's compliance with Texas state guidelines concerning the administration of psychotropic medications to [Class Members] in ORR's custody." *See* Opp'n re Mot. to Enforce at 20–21 (citing Sualog Decl. at ¶ 16 [Doc. # 425-1]). Defendants argue that this Court should "reasonably rely on the conclusions" of state licensing authorities such as TDFPS because of their "extensive level of oversight" over ORR's operations. *See id.* Although a state agency's findings are relevant to whether Defendants have complied with applicable state child welfare laws and regulations, the Court cannot simply defer to the *absence* of any negative findings on the part of the agency, especially in the face of evidence affirmatively showing violations of such laws and regulations. To hold otherwise would be an abdication of this Court's responsibility under Paragraph 37 to enforce the *Flores* Agreement.

Defendants also suggest (but do not explicitly argue) that their administration of psychotropic medications to Class Members at Shiloh RTC does not violate Texas law because psychiatrists supposedly provided these drugs on "an emergency basis without . . . consent or court authorization when their extreme psychiatric symptoms render[ed] them a danger to themselves or others." *See* Opp'n re Mot. to Enforce at 22 (citing Sualog Decl. at ¶ 15 [Doc. # 425-1]; Tex. Fam. Code § 266.009). Texas law does permit Shiloh RTC to administer psychotropic medications "in an emergency during which it is *immediately* necessary to provide medical care to the foster child to prevent the *imminent* probability of death or substantial bodily harm to the child or others." *See* Tex. Fam. Code § 266.009(a) (emphasis added); *see also* 26 Tex. Admin. Code § 748.2257(a) (clarifying that Texas Family Code section 266.009(a) applies to General Residential Operations). Defendants do not identify, however, which (if any) Class Members housed at Shiloh RTC were allegedly provided psychotropic medications on an emergency basis, even though Texas law requires them to retain "[t]he physician's statement regarding the emergency and the prescription . . . ." *See* Opp'n re Mot. to Enforce at 22; 26 Tex. Admin. Code § 748.2257(c). Furthermore, the declarations of several Class Members indicate that ORR officials have *consistently* given them psychotropic drugs without legal authorization. *See* Isabella M. Decl. at ¶ 12, Pls.' Ex. 10 ("At Shiloh, I am given seven pills *every day*." (emphasis added)) [Doc. # 421-1]; David I. Decl. at ¶ 7, Pls.' Ex. 14 ("I take pills *every morning and night*." (emphasis added)) [Doc. # 421-1]. ORR could not have possibly administered psychiatric medication to those Class Members on an "emergency basis" every day.

For the reasons discussed in this section, the Court finds that Defendants have breached Paragraphs 6 and 9 and Exhibit 1 of the *Flores* Agreement in the course of administering psychotropic medications at Shiloh RTC. The Court **ORDERS** Defendants to comply with *all* Texas child welfare laws and regulations governing the administration of psychotropic drugs to Class Members at Shiloh RTC. Most importantly, Defendants shall do the following before

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 24 of 32 |
|---|---|---|---|

administering *any* psychotropic medication to a Class Member at Shiloh RTC: (1) provide the disclosure required by 26 Texas Administrative Code section 748.2253 to a "person legally authorized to give medical consent" as that term is defined in 26 Texas Administrative Code section 748.43(47), and (2) obtain the written consent of that person in accordance with 26 Texas Administrative Code sections 748.2001 and 748.2253. If Defendants are not able to obtain such informed written consent, then they may not administer the psychotropic medication to the Class Member unless they obtain a court order authorizing them to do so under Texas law or there is an "emergency" as that term is defined in Texas Family Code section 266.009 and 26 Texas Administrative Code section 748.2257. If Defendants administer psychotropic medication on an emergency basis, then Defendants shall adhere to all of the notification and documentation requirements imposed by Texas Family Code section 266.009 and 26 Texas Administrative Code section 748.2257.

**E.      ORR's Policies and Practices Regarding the Release of Class Members to Sponsors**

Plaintiffs challenge several ORR policies and practices concerning the release of Class Members to proposed sponsors on the ground that they violate Paragraphs 14 and 18's requirement that Class Members be released "without unnecessary delay[.]"[25]      *See Flores* Agreement at ¶¶ 14, 18 [Doc. # 101]. First, Plaintiffs argue that ORR breaches these provisions by unilaterally prescribing requirements for proposed sponsors that amount to "extreme vetting" and by continuing to detain Class Members in RTCs on the ground that they have psychiatric or psychological issues that cannot be addressed in an outpatient setting. *See* Mot. to Enforce at 23–27; Reply re Mot. to Enforce at 20–23.      Second, Plaintiffs claim that ORR needlessly conditions the release of Class Members who have *ever* been placed in staff-secure or secure facilities on the approval of the agency's Director. *See* Reply re Mot. to Enforce at 21–22. Third, Plaintiffs challenge ORR's policy of delaying the release of Class Members until certain post-release services are in place. *See id.* at 23–26.      The Court addresses each of these arguments in turn.[26]

---

[25] Plaintiffs also argue that the *Flores* Agreement "allows ORR to detain a non-dangerous minor only if it 'has reason to believe [an available sponsor] may *harm or neglect* the minor . . . .'" *See* Mot. to Enforce at 27 (emphasis in original) (quoting *Flores* Agreement at ¶ 11 [Doc. # 101]). Notwithstanding Plaintiffs' argument to the contrary, the wording of Paragraph 11 is not quite so cabined. Rather, it states that "[n]othing [in the *Flores* Agreement] shall require [Defendants] to release a minor to any person or agency whom [Defendants have] reason to believe may harm or neglect the minor or fail to present him or her before [Defendants] or the immigration courts when requested to do so." *See Flores* Agreement at ¶ 11 [Doc. # 101].

[26] Defendants offer certain statistics relating to UACs' "length of care" in ORR custody in order to show that the agency does not unnecessarily delay their release. *See* Sualog Revised Decl. at ¶¶ 27–48 [Doc. # 466-1]. For instance, the average length of care in fiscal years 2015, 2016, 2017, and 2018 were 37 days, 40 days, 51 days,

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 25 of 32 |
|---|---|---|---|

    **1.    ORR's Alleged "Extreme Vetting" and Its Purported Prolonged Detention of Class Members in RTCs**

ORR does not violate the *Flores* Agreement merely because it unilaterally determines the suitability criteria for potential sponsors. Because Paragraph 17 provides a non-exhaustive list of considerations relevant to ORR's "positive suitability" assessments, it impliedly gives ORR the authority to prescribe additional factors. *See Flores* Agreement at ¶ 17 (listing "components" that a suitability assessment "may include") [Doc. # 101]. Of course, ORR's adoption of certain criteria may violate the *Flores* Agreement's other provisions.

Plaintiffs claim that the experiences of certain Class Members demonstrate that ORR "demands exceptional abilities" in sponsors, which unnecessarily delays their detention. *See* Mot. to Enforce at 23–26. Defendants contest whether ORR unnecessarily delayed the release of seven of the Class Members—*i.e.*, Santiago H., Nicolàs C., Gabriela N., Camila G., Arturo S., Roberto F., and Victoria R. *See* Opp'n re Mot. to Enforce at 27–29. Although the evidence on this point is not entirely clear, it is arguable that ORR delayed releasing or refused to release these seven Class Members because the agency had legitimate suitability concerns or the proposed sponsors withdrew their requests.[27] Some of these delays may have been caused by

---

and 57 days. *See id.* at ¶ 30. Defendants also speculate that the increases in the average length of detention from fiscal year 2016 to fiscal year 2018 may be attributed to the decrease in the proportion of parents and guardians as opposed to other sponsors who apparently require more thorough vetting. *See* Opp'n re Mot. to Enforce at 25 (citing Sualog Decl. at ¶¶ 32–36 [Doc. # 425-1]). In the abstract, however, this data is unhelpful because it is unclear how ORR's policies and practices have affected each UAC's length of stay.

    [27] *Compare* Santiago H.'s Case Review, Pls.' Ex. 71 at 74–75 (in undated case notes, a psychologist recommended that Santiago H. be released to his aunt) [Doc. # 421-5], *with* Santiago H. Case Mgmt. Notes at 8, 15, 17, Defs.' Ex. B (indicating that ORR spent time verifying the proposed sponsor's relationship to Santiago H., determining whether to conduct a home study, and ascertaining whether the proposed sponsor had custody of another UAC) [Doc. # 429-1]. *Compare* Decl. of Mother of Nicolàs C. at ¶¶ 3, 7–8, Pls.' Ex. 1 (stating that ORR asked for a doctor to verify that Nicolàs C.'s mother's cancer would not hinder her from caring for her son) [Doc. # 421-1], *with* Nicolàs C. Case Notes at 2, Defs.' Ex. C (indicating that ORR may have delayed Nicolàs C.'s release to conduct a home study and to fingerprint his proposed sponsor) [Doc. # 429-2]. *Compare* Grandfather of Gabriela N. Decl. at ¶ 9, Pls.' Ex. 67 ("I got the impression that the home investigator didn't think I made enough money to be able to support [Gabriela N.] and myself.") [Doc. # 421-5], *with* Gabriela N. Case Notes, Defs.' Ex. D at 9–10 [Doc. # 429-3] & Defs.' Ex. E at 1–2 [Doc. # 429-4] (noting that Gabriela N. had been diagnosed with several psychiatric conditions, including suicidal ideation, and denying her Grandfather's request in part because a home study revealed he could not address her "specific needs"). *Compare* Camila G. Decl. at ¶ 8, Pls.' Ex. 55 ("My case worker told me that the only reason that I haven't been released to my aunt . . . is because I don't have an official birth certificate from El Salvador. My mother died before she could register me for an official birth certificate.") [Doc. # 421-4], *with* Camila G. Case Notes at 5–6, Defs.' Ex. F (noting that ORR coordinated with the El Salvadorian consulate to obtain a birth certificate for Camila G. to confirm her aunt's relationship to her) [Doc. # 429-5]. *Compare* Arturo S.

---

| **CIVIL MINUTES—GENERAL** |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 26 of 32 |
|---|---|---|---|

ORR's policy changes in 2015 and 2016 to conduct home studies that are not expressly required by the TVPRA, expand sex offender registry checks to cover all adult household members living with sponsors, and conduct child abuse and neglect checks for category 3 sponsors (*i.e.*, unverified relatives or unrelated adults). *See* Sualog Revised Decl. at ¶¶ 25–26, 32 [Doc. # 466-1]. Although ORR admits that it implemented these changes without first conducting "impact analyses or other data-based evaluations," *see id.* at ¶ 23, the Court cannot find on this evidentiary record that these measures *per se* "unnecessary delay" the release of Class Members. *See Flores* Agreement at ¶¶ 14, 18 [Doc. # 101]. In fact, they appear to be reasonably calculated to protect Class Members from "harm or neglect" and to ensure that they have an adequate "standard of care."[28] *See Flores* Agreement at ¶¶ 11, 17 [Doc. # 101].

In any event, Plaintiffs do not request an order releasing these seven Class Members or any of the other Class Members identified in their motion, *see* Proposed Order at 3–5 [Doc. # 422-1], nor is it clear that any of said Class Members are still in ORR custody. *See, e.g.*, Mot. to Enforce at 24–25 (claiming that Santiago H. has reached the age of majority and has been released). Rather, Plaintiffs make this argument to support their request for an order requiring ORR to do the following within 30 days of receiving a complete family reunification packet: release the Class Member to the proposed sponsor or refer the matter to state juvenile authorities. *See* Reply re Mot. to Enforce at 20–21 ("Defendants contest the details with respect to a few class members, but that should give little pause. The purpose of giving youth an opportunity to be heard is to resolve differences with ORR, but with transparency, reliability, and fairness.").

---

Decl. at ¶ 3, Pls.' Ex. 21 ("I have been told that the doctor has to say it is alright to release me to my dad.") [Doc. # 421-2], *with* Arturo S. Case Notes at 2, 7–8, Defs.' Ex. G (indicating that Arturo's release was delayed in part because a DNA test indicated that the proposed sponsor was not his biological father, and because ORR sought a doctor's recommendation for the release; Arturo has been diagnosed with several psychiatric conditions including posttraumatic stress disorder) [Doc. # 429-6]. *Compare* Roberto F. Decl. at ¶ 6, Pls.' Ex. 37 ("[M]y mom moved from Kansas to Texas to be closer to me. She found a house, which is said to be very nice, to receive me. They continued to take long making the decision to let me live with her. According to her, the government did a study of the home, and everything went well.") [Doc. # 421-3], *with* Roberto F. Case Management Notes at 16, Defs.' Ex. H (noting that Roberto's mother indicated that she wanted him to obtain legal status while he is detained because she was unsure whether she could pay for legal representation while he was in her custody) [Doc. # 429-7]. *Compare* Victoria R. Decl. at ¶ 4, Pls.' Ex. 13 ("I have been told that I cannot be released until the doctor says it is alright for me to be released.") [Doc. # 421-1], *with* Victoria R. Case Notes at 9–10, Defs.' Ex. I (suggesting that the delay in releasing Victoria is at least partially because her father did not want to be a sponsor and ORR suspected Victoria's sister of child abuse and neglect) [Doc. # 427-8].

[28] Plaintiffs claim that ORR made these changes "as a concession to political criticism." *See* Reply re Mot. to Enforce at 21. Defendants explain that ORR revised its policies in response to a Senate Subcommittee report that "there were systemic deficiencies in ORR's UAC placement process and that ORR needed to improve oversight and regularize its procedures" regarding releases of UACs. *See* Sualog Revised Decl. at ¶ 23 [Doc. # 466-1].

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 27 of 32 |
|---|---|---|---|

The Court has already rejected this request because no such procedural requirement appears in the *Flores* Agreement.  *See supra* Part III.A.  Nonetheless, to the extent Plaintiffs claim that particular policies or practices breach the Agreement, the Court shall consider such arguments.

Plaintiffs also challenge ORR's policy of refusing to release a Class Member from an RTC unless a staff doctor has recommended that course of action.  *See* Mot. to Enforce at 26–27 (citing Isabella M. Decl. at ¶ 4, Pls.' Ex. 10 [Doc. # 421-1]; Decl. of Mother of Isabella M. at ¶ 5, Pls.' Ex. 12 [Doc. # 421-1]; Daniella Q. Decl. at ¶ 3, Pls.' Ex. 19 [Doc. # 421-1]; Victoria R. Decl. at ¶ 4, Pls.' Ex. 13 [Doc. # 421-1]; Arturo S. Decl. at ¶ 3, Pls.' Ex. 21 [Doc. # 421-2]).  Placement in an RTC, however, requires a finding that the Class Member "has a psychiatric or psychological issue *that cannot be addressed in an outpatient setting*."  *See* ORR Guide at § 1.4.6, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. Jan. 27, 2015) (emphasis added).  By definition, "the standard of care [a Class Member] would receive" outside of a facility that provides *inpatient* psychiatric or psychological treatment would be inadequate for that Class Member's needs.  *See Flores* Agreement at ¶ 17 [Doc. # 101].  To the extent that a particular Class Member challenges that placement determination, he or she may seek judicial review of the decision in accordance with Paragraph 24B.  *See supra* Part III.A.  Detaining a Class Member in an RTC on the basis of this policy of physician approval, however, is not necessarily a violation of the *Flores* Agreement.

## 2.     Conditioning Release on the Approval of the Director

Prior to June 29, 2018, Section 2.7 of the ORR Guide provided in relevant part:

The ORR/[Federal Field Specialist] elevates release decisions to the ORR Director, or the Director's designee, for any UAC in a secure or staff secure facility, or for any UAC who had previously been in a secure or staff secure facility.  The ORR Director or designee makes release decisions for children in these types of facilities.

*See* ORR Guide at § 2.7, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7 (last rev. June 12, 2017) [https://web.archive.org/web/20180209024712/https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2].

Similarly, before July 3, 2018, ORR's Frequently Asked Questions ("FAQ") regarding the ORR Director's release decisions indicated that if the UAC had previously been placed into a secure or staff-secure facility "based on incomplete, inaccurate or erroneous information" (*e.g.*,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 28 of 32 |
|---|---|---|---|

"an erroneous report that the child was affiliated with a gang"), such a case had to be elevated to the ORR Director for his (or his designee's) approval. *See* ORR FAQ: ORR Director's Release Decision, Pls.' Ex. 24 [Doc. # 409-3]. The FAQ also stated that if UAC was previously placed in a secure or staff-secure facility and prevailed in *Flores* bond hearing on a question of dangerousness, the release decision would still be elevated to the ORR Director, although he supposedly would not deny the release request based solely on the UAC's dangerousness.[29] *See id.*

Notwithstanding these portions of the ORR Guide and the FAQ, the Deputy Director asserts "there is no ORR Director review of releases if an Immigration Judge in a *Flores* Custody Redetermination hearing determines a UAC is not a danger to the community, and ORR does not appeal the decision." *See* Sualog Revised Decl. at ¶ 22 [Doc. # 466-1]. The Deputy Director concedes, however, that "ORR has . . . implemented a separate review procedure by which the release determination for any UAC who *has been previously housed* in staff-secure or secure ORR facilities is reviewed by the Director of ORR prior to release." *See id.* (emphasis added).

Defense Counsel admitted in a letter to Plaintiffs' attorneys that "UAC in non-secure shelter care are unlikely to benefit from a [bond] hearing as ORR *likely would concede* to an immigration judge that such UAC are not a danger and may be released upon the determination of a suitable sponsor." *See* Sept. 12, 2017 Letter from Sarah Fabian at 4, Pls.' Ex. 90 (emphasis added) [Doc. # 434-1]. Given that Class Members who were previously (but are no longer) in secure or staff-secure facilities are no more dangerous than others who have been placed in less restrictive settings, there is no apparent justification for subjecting such Class Members to an extra layer of review that would inevitably prolong their detention (*i.e.*, requiring the ORR Director or his designee's approval, rather than merely the approval of ORR personnel who typically handle such decisions). *See* Opp'n to Mot. to Enforce at 23 (conceding that there is "a system by which two determinations must be made before a minor can be released: (1) a dangerousness determination; and (2) a determination regarding the suitability of a proposed [sponsor]."). The same is true for Class Members who prevail on their *Flores* bond hearings or are placed into secure or staff-secure facilities "based on incomplete, inaccurate or erroneous

---

[29] On June 29, 2018, ORR removed the aforesaid language from Section 2.7 of the ORR Guide, apparently in response to Plaintiffs' challenge thereto. *See* ORR Guide at § 2.7, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7 (last rev. June 29, 2018). It also appears that on July 3, 2018, ORR removed from its website the portions of the FAQ that are discussed above. *See* Unaccompanied Alien Children Frequently Asked Questions, ORR, https://www.acf.hhs.gov/orr/unaccompanied-children-frequently-asked-questions (last rev. July 3, 2018).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 29 of 32 |
|---|---|---|---|

information[.]"[30]  *See* ORR FAQ:  ORR Director's Release Decision, Pls.' Ex. 24 [Doc. # 409-3].  Thus, to the extent that ORR still requires the ORR Director or his designee to approve the release of any Class Member who was previously placed in a secure or staff-secure facility but was later transferred to a less restrictive setting, the agency violates the *Flores* Agreement by unnecessarily delaying the release of that Class Member.  *See Flores* Agreement at ¶¶ 14, 18 [Doc. # 101].

The Court therefore **ORDERS** Defendants to cease requiring ORR Director or designee approval prior to release of Class Members who:  (1) were previously placed in secure or staff-secure facilities but have since been transferred to less restrictive settings; (2) prevailed on their *Flores* bond hearings; and/or (3) were placed in secure or staff-secure facilities based on incomplete, inaccurate, or erroneous information.

### 3.     Requiring Post-Release Services to Be in Place Prior to Release

ORR's Deputy Director attests that "[i]n March 2016, ORR required that UAC[s] who fall into the mandatory categories in the TVPRA and other cases where a home study is conducted . . . have a post-release services provider in place, *prior to discharge*."  *See* Sualog Revised Decl. at ¶ 24 (emphasis added) [Doc. # 466-1].  Yet, she cryptically (and quite inconsistently) states that "[f]or non-TVPRA cases, post-release services may begin after release."  *See id.*  She also concedes that "[t]his referral [for post-release services] can sometimes lengthen the time some UAC[s] spend in care" because "there are waitlists for . . . post-release services."  *See id.*  According to the ORR Guide, the sponsors must be provided no fewer than nine different post release service areas (and, in some instances, more service areas are required), including information about child abuse, neglect, separation, grief and loss, and how these issues affect children; relevant mental health resources and referrals; monitoring and assistance in facilitating the sponsor's plan to ensure the UAC's attendance at all immigration court proceedings and compliance with DHS requirements; assistance in accessing relevant legal resources; and information about gang prevention programs in the sponsor's community.  *See* ORR Guide at § 6.2.2, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last rev. Sept. 11, 2017).

The Court concludes that ORR's *blanket* rule requiring that post-release services are in place before releasing a Class Member to a sponsor for whom home study services were conducted violates Paragraph 14 and 18's bar on unnecessarily delaying the release of Class Members.  *See* Owens Decl. at ¶¶ 1, 5 (retired Los Angeles assistant county counsel, who attests

---

[30] Plaintiffs do not explicitly challenge this policy's application to Class Members who are currently housed in secure or staff-secure facilities and have not obtained favorable *Flores* bond determinations.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | | Date | July 30, 2018 |
|---|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | | Page | 30 of 32 |
|---|---|---|---|---|

that in his experience, "having [post-release] services in place is generally not a precondition to release in a child dependency case") [Doc. 434-2]. Neither the TVPRA nor the *Flores* Agreement require the adoption of this rule.[31] Moreover, the Deputy Director's declaration strongly suggests that this policy applies even if a home study resulted in a positive suitability assessment. *See* Sualog Revised Decl. at ¶¶ 24–25 [Doc. # 466-1]. Furthermore, Defendants' assertion that "ORR lacks the authority to reassume care if the sponsor abuses or neglects a child after a UAC has been released from [its] custody" does not support this policy. *See id.* at ¶ 20. The *Flores* Agreement explicitly confers upon Defendants the authority to "terminate the custody arrangements and assume legal custody of any minor" whose sponsor fails to "provide for the minor's physical, mental, and financial well-being." *See Flores* Agreement at ¶¶ 15A, 16 [Doc. # 101].

Accordingly, the Court **ORDERS** Defendants to cease uniformly requiring post-release services to be in place *before* the release of a Class Member to a sponsor. Such detention shall be permitted if and only if ORR conducts an individualized assessment and determines that, given the particularized needs of the Class Member, the sponsor would not be a suitable custodian if such post-release services were not in place prior to release. *See id.* at ¶ 17. Otherwise, the continued detention of a Class Member pursuant to this blanket policy amounts to unnecessary delay. *See id.* at ¶¶ 14, 18.

**IV.
CONCLUSION**

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to enforce the *Flores* Agreement as follows:

1. Pursuant to Paragraphs 6, 7, 8, and 19 of the *Flores* Agreement, the Court **ORDERS** Defendants to transfer all Class Members out of Shiloh RTC unless a licensed psychologist or psychiatrist has determined or determines that a particular Class Member poses a risk of harm to self or others. Class Members who do not fall within that exception shall be placed "in the least restrictive setting appropriate to [each Class Member's] age and special needs, provided that such setting is consistent with [Defendants'] interests to ensure the [Class Member's] timely appearance before [Defendants] and the immigration courts and to protect the [Class Member's] well-

---

[31] The TVPRA provides in pertinent part that ORR "shall conduct follow-up services, *during the pendency of removal proceedings*, on children for whom a home study was conducted and is authorized to conduct follow-up services in cases involving children with mental health or other needs who could benefit from ongoing assistance from a social welfare agency." *See* 8 U.S.C. § 1232(c)(3)(B) (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 31 of 32 |
|---|---|---|---|

being and that of others." *See Flores* Agreement at ¶ 11 [Doc. # 101]. The parties shall meet and confer to determine a reasonable time frame in which such transfers can be effectuated and the procedures ORR shall undertake to ensure that these transfers do not disrupt the continuity of care and the health of each Class Member. To the extent the parties reach agreement on any procedures that differ from those that appear in their consent decree, they shall submit a stipulation and proposed order as to any amendments **by August 10, 2018**;

2. Pursuant to Paragraphs 6, 7, 8, and 19, and Exhibit 1 of the Agreement, the Court **ORDERS** Defendants to: (a) cease employing at Shiloh RTC any security measures that are not necessary for the protection of minors or others, including the denial of access to drinking water; and (b) permit Class Members at Shiloh RTC to "talk privately on the phone, as permitted by the house rules and regulations[.]" *See Flores* Agreement, Ex. 1 at ¶ A12;

3. The Court **ORDERS** Defendants to comply with Paragraph 24C by providing each Class Member with a written notice of reasons for placing the minor in a secure facility, staff-secure facility, or an RTC within a reasonable time either before or after ORR's placement decision. Any such notice shall be in a language that the Class Member understands;

4. Pursuant to Paragraph 21, the Court **ORDERS** Defendants to remove from a secure facility any Class Member who was placed or whose placement has been maintained there *solely* because: the Class Member "may be chargeable" (as opposed to "is chargeable") with an offense; the Class Member reported gang involvement or displayed gang affiliation while in care and Defendants lack probable cause to believe that the individual committed any other specified offense; and/or the Class Member self-disclosed gang involvement prior to placement in ORR custody that does not give rise to probable cause to believe that the individual has committed a specified offense. All such Class Members shall be placed "in the least restrictive setting appropriate to [each Class Member's] age and special needs, provided that such setting is consistent with [Defendants'] interests to ensure the [Class Member's] timely appearance before [Defendants] and the immigration courts and to protect the [Class Member's] well-being and that of others." *See* Flores Agreement at ¶ 11;

5. In accordance with Paragraphs 6 and 9 and Exhibit 1 of the Agreement, the Court **ORDERS** Defendants to comply with *all* Texas child welfare laws and regulations governing the administration of psychotropic medications to Class Members at Shiloh

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 30, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 32 of 32 |
|---|---|---|---|

RTC.  Most importantly, Defendants shall do the following *before* administering *any* psychotropic medication to Class Members at Shiloh RTC:  (1) provide the disclosure required by 26 Texas Administrative Code section 748.2253 to a "person legally authorized to give medical consent" as that term is defined under 26 Texas Administrative Code section 748.43(47), and (2) obtain the informed written consent of that person in accordance with 26 Texas Administrative Code sections 748.2001 and 748.2253.  If Defendants are not able to obtain such informed written consent, then they may not administer the psychotropic medication to the Class Member unless they obtain a court order authorizing them to do so under Texas law or there is an "emergency" as that term is defined in Texas Family Code section 266.009 and 26 Texas Administrative Code section 748.2257.  If Defendants administer psychotropic medication on an emergency basis, then they shall adhere to all of the notification and documentation requirements imposed by Texas Family Code section 266.009 and 26 Texas Administrative Code section 748.2257;

6. Pursuant to Paragraphs 14 and 18, the Court **ORDERS** Defendants to cease requiring ORR Director or designee approval prior to release of Class Members who:  (1)  were previously placed in secure or staff-secure facilities but have since been transferred to less restrictive settings; (2) prevailed on their *Flores* bond hearings; and/or (3) were placed in secure or staff-secure facilities based on incomplete, inaccurate, or erroneous information;

7. In accordance with Paragraphs 14 and 18, the Court **ORDERS** Defendants to cease its blanket policy of requiring that post-release services are in place prior to the release of a Class Member to a sponsor for whom home study services were conducted.  Such detention shall be permitted if ORR conducts an individualized assessment and determines that, given the particularized needs of the Class Member, the sponsor would not be a suitable custodian if such post-release services were not in place prior to release.  *See Flores* Agreement at ¶ 17; and

8. The motion to enforce is otherwise **DENIED**.[32]

**IT IS SO ORDERED**.

---

[32] The parties may meet and confer regarding the logistics of implementing any aspect of this Order.  If they reach agreement on any procedures that differ from those that appear in their consent decree or this Order, they shall submit a stipulation and proposed order as to any amendments **by August 10, 2018** or such other date as the parties may agree.