CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
PETER A. SCHEY (Cal. Bar No. 58232)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        cadams@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JEFFERSON B. SESSIONS, Attorney General, *et al.*, <br><br> Defendants. | No. CV 85-4544-DMG (AGRx) <br><br> OPPOSITION TO MOTION TO MODIFY ORDER APPOINTING SPECIAL MASTER/INDEPENDENT MONITOR <br><br> Hearing:  Nov. 9, 2018 <br> Time:  10:00 am. <br> Room:  1st St. Courtroom 8C |

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
          ccwhite@ucdavis.edu

OPPOSITION TO MOTION TO MODIFY ORDER
APPOINTING INDEPENDENT MONITOR
CV 85-4544-DMG (AGRx)

OUTLINE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    THE EVIDENCE SHOWS ORR IN CONTEMPT OF THE COURT'S JULY 30
       ORDER AND OTHERWISE IN BREACH OF THE SETTLEMENT. ...............................2

       A.    ORR continues to violate the July 30 order in its treatment of class
             members at Shiloh RTC. .................................................................2

       B.    ORR continues to deny children licensed placement without
             adequate reason or notice. ..............................................................7

             1.    Secure placement without adequate notice. ..............................7

             2.    Unlicensed placement without lawful reason. ...........................7

       C.    ORR continues to unnecessarily prolong class members'
             detention. ......................................................................................10

             1.    ORR's fingerprinting policies and practices unnecessarily
                   protract class members' detention. ........................................10

III.   ORR HAS OBSTRUCTED PLAINTIFFS' EFFORTS TO DETERMINE WHETHER IT
       IS COMPLYING WITH THE COURT'S JULY 30 ORDER AND IS OTHERWISE IN
       BREACH OF THE SETTLEMENT. ...................................................................13

       A.    ORR's limiting Plaintiffs' experts' access to detained children
             lacks a rational basis and appears aimed at shielding ORR's
             mistreatment of class members from meaningful scrutiny. ...............13

       B.    ORR's invasive background checks of Plaintiffs' mental health
             and other experts aim to deter effective monitoring of the July 30
             order and the Settlement in general. ...............................................16

IV.    INDEPENDENT MONITORING OF ORR'S COMPLIANCE WITH THE COURT'S
       JULY 30 ORDER IS NOT A SANCTION AND COULD IMPOSE NO APPRECIABLE
       OPERATIONAL BURDEN ON ORR. ...............................................................18

V.     CONCLUSION ......................................................................................20

1

TABLE OF AUTHORITIES

2

3

**Cases**

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017)..................................................13

4
*Hook v. State of Arizona*, 120 F.3d 921 (9th Cir. 1997).........................................18

5
*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982)...................................................18

*J.E.C.M et al. v. Lloyd et al.,* 18-cv-903 (E.D. Va. 2018)....................................11

6
*Organization for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536 (9th Cir.

7
   1987)................................................................................................................ 18

*Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982) ...................................18

8
*S.E.V. v. Lloyd, et al.*, 18-cv-4555 (S.D.N.Y. Oct. 5, 2018)................................11

9
*Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881 (9th Cir. 2005)....................19

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)............................................18

10

**Statutes and Regulations**

11

Paperwork Reduction Act, 44 U.S.C. § 3501 .......................................................18

12
Fed. R. Civ. Proc. 53(a)(1)(C)..............................................................................18

**Other**

13

CNN, *ICE arrested undocumented immigrants who came forward to take in*

14
   *undocumented children*, September 20, 2018.....................................................12

15
Dallas News, *Feds admit it's slow-going reuniting immigrant children at tent city*
   *with families*, Oct. 12, 2018,............................................................................. 9

16
New York Times, *Detention of Migrant Children Has Skyrocketed to Highest Levels*

17
   *Ever*, Sept. 12, 2018.......................................................................................... 8

New York Times, *The Government is Moving Migrant Children to a Texas Tent City.*

18
   *Here's What's Behind It*, October 1, 2018.......................................................... 8

19
ORR Policy Guide, § 2.6.2, FINGERPRINTS.........................................................11

U.S. Department of Health and Human Services, *Unaccompanied Alien Children*

20
   *sheltered at Tornillo LPOE, Tornillo, Texas*, October 12, 2018 ......................... 8

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

Defendants urge the Court to remove its July 30, 2018, order (ECF 470) ("July 30 order") from the purview of the independent monitor's reference (ECF 494) on the ground such oversight is a "sanction" that conflicts with the Settlement and that ORR does not deserve in any event. The Court should deny Defendants' motion.

As will be seen, the uncontroverted record demonstrates that ORR did not timely comply with the July 30 order and is almost certainly not complying with it now. Children detained at the Shiloh Residential Treatment Center ("Shiloh RTC") and elsewhere report that ORR continues to administer them psychotropic drugs without informed parental consent or court order, continues to place them at Shiloh without competently determining they pose a risk of harm to themselves or others, and continues to deny them private telephone conversations.

The evidence also shows that ORR continues to place class members in secure detention without giving children written notice in a language they understand of the reasons for secure placement. Further, ORR is now detaining some 1,500 class members for months in unlicensed "tent cities" where they are experience security, conditions, and treatment wholly incompatible with the Settlement's guarantee of placement in licensed, non-secure dependent care facilities.

The record further shows that ORR has adopted a number of policies and practices—particularly regarding fingerprinting of proposed sponsors—that needlessly protract children's detention. In essence, ORR seems to reason that if it may not distend children's confinement for howsoever long as its director may take to approve their release, it may accomplish the same result by imposing ever-increasing and needless demands for fingerprinting, while doing little or nothing to enable sponsors to comply with those onerous requirements.

It will also be seen that ORR is increasingly committed to hobbling Plaintiffs' ability to monitor its compliance with the July 30 order and the Settlement, including prohibiting Plaintiffs' mental health experts from "engaging in a mental health

OPPOSITION TO MOTION TO MODIFY ORDER
APPOINTING INDEPENDENT MONITOR
CV 85-4544-DMG (AGRx)

evaluation" of detained children and insisting that any expert accompanying Plaintiffs' counsel execute an "all-encompassing" waiver of their right to privacy in information about their "character, general reputation, personal characteristics, and/or mode of living."

Lastly, there is simply no legal support for Defendants' notion that monitoring is a "sanction" the Court may not impose without doing violence to the Settlement itself. As the Court's order of reference indicates, ORR's violations of the July 30 order and the Settlement itself are not likely to end anytime soon; a monitor could well prove indispensable to the Court's adjudicating these violations efficiently while it attends to the many other matters on its busy docket.

II.    THE EVIDENCE SHOWS ORR IN CONTEMPT OF THE COURT'S JULY 30 ORDER AND OTHERWISE IN BREACH OF THE SETTLEMENT.

**A.    ORR continues to violate the July 30 order in its treatment of class members at Shiloh RTC.**

In July 30 order, the Court enjoined ORR against administering psychotropic drugs to children detained at the Shiloh RTC unless it first obtains informed parental consent or a court order authorizing it to do so. The Court further ordered ORR to remove all class members from Shiloh RTC unless a licensed psychologist or psychiatrist determines that a particular child poses a risk of harm to self or others.

On August 23, 2018, Plaintiffs' counsel, accompanied by psychiatrist Amy Cohen, M.D., visited the Shiloh facility and interviewed staff and children detained there. Declaration of Amy Cohen, M.D., August 26, 2018, Exhibit 7 ("Cohen I").

According to Dr. Cohen, Douglas Plaeger, Shiloh's Program Director, stated that someone from the Public Health Service had spent two days during the week of August 13, 2018, reviewing case files for Shiloh's then-current detainees, but had actually only spoken to about three children only. *Id.* ¶ 8. Mr. Plaeger further stated that ORR had not informed Shiloh of the results of this "file review," and Shiloh had

1    accordingly transferred *no* child to another facility because of ORR's risk-of-harm

2    determinations. *Id*.

3         As regards psychotropics, Mr. Plaeger reported that Shiloh continued to

4    recognize ORR as wielding full authority to authorize Shiloh to administer children

5    medications on a non-emergent basis without parental consent or court authorization.

6    *Id*. at ¶ 9. Class members corroborated Mr. Plaeger's admissions:

7         [One child] confirmed that since July 30, 2018, no one has interviewed him to

8         assess whether he poses a danger to himself or others. He further confirmed

9         that he continues to take Lexapro and that as far as he knows, no one from

10        Shiloh or ORR has asked [his adult family members] for permission to

11        continue giving him psychotropic medication.

12        All of the other children I assessed at Shiloh reported much the same: (i) no

13        one has spoken with them to assess whether they pose a risk of harm to

14        themselves or others; and (ii) Shiloh continues to administer psychotropic

15        medications without parental consent or court order.

16   *Id*. ¶¶ 10-11.[1]

17        As for removing class members from Shiloh who pose no risk of harm, ORR

18   did not complete its "file review" risk-determinations until about September 6, 2018.

19   Email from S. Fabian, September 7, 2018, Exhibit 12; Declaration of Carlos Holguín,

20   October 19, 2018, Exhibit 3 ¶ 7 ("Holguín"). Of the 13 children's files ORR purports

21   to have evaluated, it ended up transferring only one to another facility. *Id*.[2]

22   _____

23   [1] As far as Plaintiffs can determine, ORR did not actually tell Shiloh to stop

24   medicating children without parental consent or court order until September 13, 2018,
     nearly a month and a half after this Court's order. *See* Letter from ACF to Shiloh

25   RTC, September 13, 2018, Exhibit 11.

26   [2] According to ORR's report, it also released one class member to a sponsor, even as

27   it continued to house another three children at Shiloh whose release it had approved,
     seemingly despite their posing no risk of harm. Holguín ¶ 7.

28

OPPOSITION TO MOTION TO MODIFY ORDER
APPOINTING INDEPENDENT MONITOR
CV 85-4544-DMG (AGRx)

1    The utility of independent monitoring of ORR's risk determinations is

2  manifest. ORR has refused to disclose (i) the identity or qualifications of the

3  individual who "determined" that the children remaining at Shiloh as of September 6

4  pose a risk of harm; (ii) the methodology or metric it used to determine such risk; and

5  (iii) the reports, if any, ORR prepared of its file-review risk assessments. Email from

6  S. Fabian, October 19, 2018, Exhibit 25.

7    There is good reason to question whether ORR's risk determinations

8  adequately ensure that class members are placed at Shiloh only as the July 30 order

9  and the Settlement permit:

10    Nor, in my opinion, has ORR has evaluated Lucas—or any of the other twenty-

11    four children at Shiloh—carefully enough to conclude that any of them pose a

12    risk of harm to themselves or others. My extensive review of the records of

13    Lucas and another child have suggested that no standardized metric whatsoever

14    is used to evaluate actual risk to self. Rather, the mere admission of suicidal

15    thoughts have been sufficient to precipitate significantly elevated supervision

16    and transfer to a higher level of care, often—as in Lucas's case—to the

17    detriment of these children. . . .

18    In my opinion, ORR's treatment of Lucas and other children at Shiloh RTC

19    continues to fall far short of both accepted mental health care standards and the

20    "risk of harm" and informed consent standards set out in the Court's order of

21    July 30.

22  Cohen I ¶ 7, 15.

23    Nor does it appear that ORR's complying with the July 30 order has improved

24  since.  On October 17, and 18, 2018, Plaintiffs' counsel again interviewed class

25  members detained at Shiloh. Child after child reported that the Court's order has had

26  little impact on ORR's placing children at Shiloh or on the treatment they experience

27  there.

28

4

Filed herewith as Exhibits 18-24 are the declarations of class members now detained at Shiloh, some three and one-half months after the July 30 order. Their declarations attest as follows:

1) ORR appears[3] still to administer psychotropic medications to children without their families' consent or court order. Declaration of C., October 18, 2018, Exhibit 18 ¶ 9 (class member administered psychotropic medication; "As far as I know, my mom has not given permission for me to take the medication."); Declaration of F., October 18, 2018, Exhibit 20 ¶ 7 (same; class member administered "about seven medications at night . . ."); Declaration of M., October 18, 2018, Exhibit 21 ¶ 10 (same; "Sometimes, I feel like I've been give twenty pills in one day."); Declaration of M., October 18, 2018, Exhibit 22 ¶¶ 8-9 (same; "The drugs make me feel really tired and sluggish. . . . Sometimes I have stomach pain and a lot of headaches. . . . No one from Shiloh has asked permission from my mother or my aunt to give me the medications."); Declaration of N., October 18, 2018, Exhibit 23 ¶ 6 (medication "makes me feel tired and unmotivated. As far as I know, my mom has not given permission for me to take the medication.").[4]

---

[3] Plaintiffs have not had time to obtain ORR's files for the declarants whose accounts are set out in Exhibits 18-24, and they cannot therefore exclude all possibility that ORR may have obtained informed parental consent or court order allowing Shiloh to medicate class members.

For its part, ORR has refused to provide Plaintiffs with copies of any consent or court order it may have obtained. *See* Letter from C. Holguín to S. Fabian, August 10, 2018, Exhibit 1; Email from S. Fabian, October 19, 2019, Exhibit 26. Such secretiveness underscores the need to retain compliance with the July 30 order in the independent monitor's duties.

[4] At the July 27, 2018, hearing on Plaintiffs' motion to enforce, the Court indicated that ORR should consider its order regarding medicating children at Shiloh RTC a bellwether for medicating children detained at other facilities.

Nonetheless, ORR continues to administer psychotropic medications to children held in facilities other than Shiloh without parental consent or court order. *See* Exhibits 30,

1         2) ORR places children at Shiloh without competently evaluating whether they

2    are risks to themselves or others. *See, e.g.,* Declaration of C., October 18, 2018,

3    Exhibit 18  ¶ 10 ("Since July 30, 2018, I do not remember receiving a psychiatric

4    evaluation to determine whether I am dangerous."); Declaration of E., October 18,

5    2018, Exhibit 19 ¶ 10 (same); Declaration of F., October 18, 2018, Exhibit 20 ¶ 8

6    (same); Declaration of M., October 18, 2018, Exhibit 21 ¶ 11 (same); Declaration of

7    M., October 18, 2018, Exhibit 22 ¶ 10 (same); Declaration of N., October 18, 2018,

8    Exhibit 23 ¶ 8 (same).

9         3) Shiloh continues to monitor class members' telephone calls with their family

10   members. Declaration of C., October 18, 2018, Exhibit 18 ¶ 6 (child speaks to mother

11   "twice a week and we are very close. These phone calls are not in private; my case

12   manager is always in the room. I would prefer to talk to my mom privately because

13   there are lots of things that I would like to tell her but don't want my case manager to

14   overhear."); Declaration of E., October 18, 2018, Exhibit 19 ¶ 9 (same); Declaration

15   of F., Exhibit 20 ¶ 4 (same); Declaration of M., Exhibit 21 ¶ 6 (same); Declaration of

16   M., October 18, 2018, Exhibit 22 ¶ 7 (same); Declaration of Y., October 18, 2018,

17   Exhibit 24 ¶ 8 (same); Declaration of N., October 18, 2018, Exhibit 23 ¶ 5 (same; "I

18   don't think any kids here are having private phone conversations.").

19

20

21

22

---

23   32, 33, 36, 38 and 39 (forms authorization Yolo County Juvenile Hall to medicate

24   children without parental consent or court order); *see also* Declaration of G.A.L.R.,
     September 9, 2018, Exhibit 17 ¶ 10 ("I take multiple medications. I think they are for

25   sleep and anger. I do not know the names of the medications. I do not believe that my
     father knows about the medications I am on."); Declaration of E.A.X.C., October 8,

26   2018, Exhibit 33 ("I am given medication to help me sleep here at Yolo. I do not have

27   any family in the U.S., and no one has contacted my family for permission to give me
     medication.").

28

**B.     ORR continues to deny children licensed placement without adequate reason or notice.**

The July 30 order bars ORR from placing children in secure, unlicensed facilities except as ¶ 21 of the Settlement allows. Order at 31. It also requires ORR to give detained children written notice in a language they understand of the reasons it has placed them in a secure facility. The available evidence shows ORR is failing to comply with this directive as well.

1.     Secure placement without adequate notice.

The evidence before the Court shows that ORR continues to confine class members at secure facilities such as Yolo County Juvenile Hall without providing them notice of its reasons for doing so in a language they understand, a violation of ¶ 24C of the Settlement and this Court's July 30 order. *See* Notice of Placement in Restrictive Setting re: B., August 16, 2018, Exhibit 29; Declaration of B., October 18, 2018, Exhibit 28 ("I did not understand what I was signing. I do not read, write, or understand English and the document was never presented or read to me in a language that I understand.").

2.     Unlicensed placement without lawful reason.

ORR's forms also indicate that it continues to place class members at Yolo for no ascertainable reason at all, much less one the July 30 order permits. *E.g.*, Notice of Placement in Restrictive Setting re: D., August 29, 2018, Exhibit 35 (indicating secure placement because class member had been "previously placed at Yolo Secure . . ." pending "reassess[ment] to determine if appropriately placed."). And it increasingly clear that ORR is placing children in secure, unlicensed facilities on an unprecedented scale.

In June 2018, ORR constructed a "tent city" near the Tornillo Port of Entry in Texas ("Tornillo"). Originally described as a "temporary facility" capable of holding 400 children, Tornillo is now expected to remain open until at least the end of this year and has been expanded to hold up to 3,800 children. The New York Times,

1   *Migrant Children Moved Under Cover of Darkness to a Texas Tent City*, Sept. 30,
2   2018, *available at* www.nytimes.com/2018/09/30/us/migrant-children-tent-city-
3   texas.html (last visited October 19, 2018).

4         According to Defendants' "fact sheet" on Tornillo, ORR is now confining
5   some 1,500 children at the Tornillo detention camp. U.S. Department of Health and
6   Human Services, *Unaccompanied Alien Children sheltered at Tornillo LPOE,*
7   *Tornillo, Texas*, October 12, 2018, Exhibit 13 ("Fact Sheet"); *see also*, New York
8   Times, *Detention of Migrant Children Has Skyrocketed to Highest Levels Ever*, Sept.
9   12, 2018, *available at* www.nytimes.com/2018/09/12/us/migrant-children-
10  detention.html (last visited October 17, 2018).

11        Defendants' fact sheet verifies that children at ORR's tent city "do not
12  integrate into the local community," "do not attend local schools," and "remain under
13  the supervision of shelter staff at all times." Fact Sheet at 2. Nowhere does the fact
14  sheet assert that the detention camp is state-licensed to care for dependent children, as
15  the Settlement requires; news reports indicate it is not. *See, e.g.,* New York Times,
16  *The Government is Moving Migrant Children to a Texas Tent City. Here's What's*
17  *Behind It*, October 1, 2018, *available at* www.nytimes.com/2018/10/01/us/migrant-
18  children-tent-city-camp-texas.html (last visited October 17, 2018) ("The shelters are
19  licensed and monitored by state child welfare agencies that impose requirements on
20  staff hiring and training, as well as education and safety. . . . Conversely, the tent city
21  is considered an 'emergency shelter' and is thus unregulated, except for a loose set of
22  guidelines crafted by the Department of Health and Human Services, which oversees
23  it.").

24        Nor is it clear that ORR may house children at the Tornillo detention camp on
25  grounds of "emergency" or "influx" as the Settlement defines them. *See* Settlement ¶
26  12B. To the contrary, ORR's own data confirm that the agency simply does not

27
28

OPPOSITION TO MOTION TO MODIFY ORDER
APPOINTING INDEPENDENT MONITOR
CV 85-4544-DMG (AGRx)

transfer children from Tornillo to properly licensed facilities "as expeditiously as
possible," a prima facie violation of Settlement ¶ 12(3).[5]

ORR's monthly statistical reports reveal that as of September 13, 2018, ORR
was detaining approximately 1,067 children at the Tornillo camp. Holguín ¶ 4. Of
these, 46 children had been at Tornillo since June, 45 since July, and 493 since
August. *Id*. ORR accordingly detained scores of children at Tornillo for prolonged
periods without transferring them to licensed placements. Indeed, ORR's fact sheet
indicates that the agency does not place children at Tornillo as an initial response to
an influx or emergency at all, but instead removes them from licensed placements in
order to send them to the unlicensed tent city. Fact Sheet at 1 ("UAC spend on
average 25 days at Tornillo. Most all are about to be released to a suitable sponsor.").

There is no telling how many more children ORR has "temporarily" confined
at Tornillo for protracted periods as of this writing. Leah Chavla, lawyer and policy
advisor with the Women's Refugee Commission, recently visited the detention camp.
Facility operators told her that "many of youth there were those that were awaiting
results of fingerprints of their prospective sponsors." Declaration of Leah Chavla,
October 18, 2018, Exhibit 14. They also reported that there were "over 150 children
[there] who were classified as "Category 4": namely, children with no viable family

---

[5] ORR's reports indicate that the percentage of children at Tornillo ORR releases to
family has dropped significantly from June to August of 2018. *Id*. HHS claims that
"logistical challenges" have slowed reunifications. Dallas News, *Feds admit it's
slow-going reuniting immigrant children at tent city with families*, Oct. 12, 2018,
*available at* www.dallasnews.com/news/immigration/2018/10/12/feds-admit-slow-
going-reuniting-immigrant-children-tent-city-families (last visited October 19, 2018).

As discussed *post*, however, there is good reason to believe that ORR's ever-more
extreme vetting of detained children's parents and other available custodians is
needlessly prolonging class members' detention, thereby contributing to the "influx"
or "emergency" ORR cites as justification for its using Tornillo and other irregular
detention camps. *Id*. (reporting that delays in completing fingerprint and background
checks in turn delay children's release for months).

1   member in the United States to receive them. Children with no viable sponsor

2   typically remain in custody for extended periods and are accordingly most in need of

3   prompt placement in properly licensed facilities. *Id.* Since her visit, Chavla has

4   learned from service providers that ORR has detained children at Tornillo for

5   "several months." *Id.*

6          Plaintiffs' counsel has notified ORR that they intend to interview class

7   members at the Tornillo detention camp on October 25 and 26, 2018. Should they

8   confirm the foregoing, Plaintiffs would be obliged to seek relief from this Court

9   enjoining ORR's violations of the Settlement's licensed placement requirement.

10  Defendants will almost certainly dispute some or all of the evidence bearing on this

11  issue. Including ORR facilities in the independent monitor's portfolio would

12  accordingly further judicial economy.

13      **C.    ORR continues to unnecessarily prolong class members' detention.**

14         This Court's order of July 30 enjoined ORR from pursuing certain policies and

15  practices that unnecessarily extend class members' detention. *E.g.*, July 30 Order at

16  32 (enjoining blanket policy of requiring that post-release services be in place prior to

17  the release of a class member to a sponsor for whom home study was conducted). The

18  evidence indicates that ORR continues to pursue policies and practices that protract

19  children's detention unnecessarily. An independent monitor would prove helpful to

20  the Court's adjudicating whether these  policies and practices accord with the

21  Settlement.

22         1.    ORR's fingerprinting policies and practices unnecessarily protract

23               class members' detention.

24         In June of 2018, ORR, without going through the formal rulemaking process,

25  prescribed substantially more burdensome fingerprinting requirements on class

26  members' parents and other available custodians. Previously, proposed sponsors and

27  their adult household members only had to provide fingerprints in relatively limited

28  circumstances: *e.g.,* when there was a documented risk to the safety of the child,

OPPOSITION TO MOTION TO MODIFY ORDER
APPOINTING INDEPENDENT MONITOR
CV 85-4544-DMG (AGRx)

when a particular child was "especially vulnerable," or when ORR had studied the proposed sponsor's home. ORR Policy Guide, § 2.6.2, FINGERPRINTS, *available at* https://web.archive.org/web/20180209024712/https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited October 19, 2018).

ORR's current policy, however, requires that all potential sponsors, as well as all members of their households, undergo fingerprinting. ORR Policy Guide, § 2.6.2, FINGERPRINTS, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited October 19, 2018) ("All individuals seeking to sponsor a UAC and adults in their household are subject to fingerprinting requirements. . . Revised 6/7/18.").

Though fingerprinting is not in and of itself objectionable, ORR's failure to increase the number or capacity of its vendors to accommodate the vastly increased workload its current fingerprinting policy creates, is.

Merely scheduling a fingerprinting appointment now takes months. *See generally,* Second Amended Complaint at 17, *J.E.C.M et al. v. Lloyd et al.,* 18-cv-903 (E.D. Va. 2018) (". . . appointments are being scheduled as far as one or two months out"). Once sponsors submit to fingerprinting, they must typically wait additional months for results. Fingerprinting delays now extend the time class members spend in ORR custody by months. *See, S.E.V. v. Lloyd, et al.*, 18-cv-4555 (S.D.N.Y. Oct. 5, 2018) (finding that "S.E.V.'s release has apparently been delayed by a new ORR policy requiring parents to be fingerprinted . . . ."); Declaration of Leah Chavla, Exhibit 14 ¶ 4 ("I know that since the summer, there have been significant delays in fingerprinting . . . "); Declaration of C., October 18, 2018, Exhibit 18 ¶ 7 ("[My mom] submitted her fingerprints in early July, as did my aunt and uncle who live with her. . . . After all these months, we're still waiting for the federal agent to approve my mom's fingerprints."); Declaration of M., October 18, 2018, Exhibit 22 ¶ 6 ("My aunt applied to be my sponsor back in July. My case worker said that her home study,

1  applications, and finger prints were good, and we are only waiting on finger prints to

2  clear for my twenty-three-year-old cousin who is to act as my backup caregiver. They

3  told me the fingerprints would only take 15 days, but that time has now passed.");

4  Declaration of W, October 17, 2018, Exhibit 25 ¶ 12-13 ("Around 45 days ago, my

5  father submitted his fingerprints. We have not gotten back any results. . . . Today the

6  social worker told me that she is going to pressure the government to process my

7  father's fingerprints because that is the only thing holding me from being reunited

8  with my father.").

9      Defendants have also embarked on a policy and practice aimed at discouraging

10 parents and other potential custodians from seeking custody of detained children at

11 all. In a profound and disturbing departure from prior policy and practice, ORR now

12 sends fingerprints and extensive personal information of all would-be sponsors and

13 their adult household members to ICE.

14     In April of 2018, ORR, ICE, and CBP executed a Memorandum of Agreement

15 whereby ORR sends sponsors' fingerprints and other personal information to DHS.

16 Memorandum of Agreement, April 13, 2018, § 5(B), Exhibit 8 ("ORR will provide

17 ICE with the name, date of birth, address, fingerprints . . . and any available

18 identification documents or biographic information regarding the potential sponsor

19 and all adult members of the potential sponsor's household").

20     Although Defendants' nominally justify this on grounds of child safety, on

21 September 18, 2018, an ICE official admitted that since ORR began sharing

22 sponsors' information, it had apprehended at least 41 sponsors and their family and

23 household members. CNN, *ICE arrested undocumented immigrants who came*

24 *forward to take in undocumented children*, September 20, 2018, *available at*

25 www.cnn.com/2018/09/20/politics/ice-arrested-immigrants-sponsor-

26 children/index.html (last visited October 19, 2018).

27     In fact, ORR's sharing potential sponsors' fingerprints with ICE is wholly

28 unnecessary to ensure child safety. *See* Declaration of Cecilia Saco, July 14, 2018,

Exhibit 9 ¶ 7 (Los Angeles County Department of Children and Family Services submits fingerprints "to three data bases: California Department of Justice ("DOJ"), FBI and California CACI (Child Abuse Central Index). . . . To the best of my knowledge, DCFS does not share live scan information with ICE except pursuant to court order.").

Obviously, when the threat of arrest and removal succeeds in deterring parents and other potential custodians from coming forward, children suffer longer and longer periods in ORR detention, a result wholly inimical to their welfare and ORR's statutory obligation to care for children, not turn them into a tool of law enforcement. *See generally Flores v. Sessions*, 862 F.3d 863, 876 (9th Cir. 2017) ("focus on care and placement—rather than on detention—is evident from the plain text" of the Homeland Security Act and the Trafficking Victims Protection Act).

Unless Defendants' information-sharing furthers child safety or securing a child's appearance, doing so violates the Settlement's requirement of expeditious release. A special master would assist the Court in determining Defendants' policy and practice in fact protect children, or merely injure them even more.

III.   ORR HAS OBSTRUCTED PLAINTIFFS' EFFORTS TO DETERMINE WHETHER IT IS COMPLYING WITH THE COURT'S JULY 30 ORDER AND IS OTHERWISE IN BREACH OF THE SETTLEMENT.

**A.     ORR's limiting Plaintiffs' experts' access to detained children lacks a rational basis and appears aimed at shielding ORR's mistreatment of class members from meaningful scrutiny.**

Paragraph 32 of the Settlement requires ORR to allow class counsel confidential attorney-client interviews with detained class members "in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question." As far as Plaintiffs know, no ORR facility has a written policy or procedure against lawyers' having experts, including mental health

1  professionals, assist them interview detained clients. *See, e.g.*, St. Michael's Home

2  for Children, Procedure: Attorney of Record, July 7, 2017, Exhibit 10-2.

3      Nonetheless, on July 11, 2018, ORR refused to permit Plaintiffs' consulting

4  mental health expert, Dr. Amy Cohen, to interview class members at the Shiloh RTC.

5  Email from S. Fabian, July 11, 2018, Exhibit 10. When Plaintiffs' counsel insisted on

6  reviewing Shiloh's generally applicable policies and procedures relating to attorney-

7  client visits, Defendants forwarded the document filed herewith as Exhibit 10-1.

8      Shiloh's written policy nowhere bars attorneys' consulting experts from

9  participating in meetings with detained clients; indeed, the policy ORR provided does

10  not appear to address attorney-client visits at all, suggesting that Shiloh RTC may in

11  fact have *no* policy regarding attorney-client visits, itself a likely violation of the

12  Settlement. Settlement ¶ 32C ("Agreements for the placement of minor in non-INS

13  facilities shall permit attorney-client visits, including by class counsel in this case.").

14      After vigorous objection by class counsel, ORR relented and allowed Dr.

15  Cohen access to Shiloh detainees. Subsequently, however, ORR pronounced a

16  blanket policy barring Plaintiffs' mental health experts from attending confidential

17  attorney-client meetings:

18      ORR's position is that the participation of mental health experts in attorney-

19      client visits under Paragraph 32 is not mandated by the settlement agreement.

20      Further, ORR's child welfare experts are concerned that for minors who

21      already have access to trauma-informed, individual and group mental health

22      services . . . introduction of another unfamiliar mental health professional

23      during attorney-client visits who ask the children to repeat their stories is not

24      consistent with trauma-informed practice and child welfare principles.

25      Therefore, going forward, ORR . . . will not permit such participation.

26  Email from S. Fabian, October 10, 2018, included in Exhibit 4.

27      ORR's barring Plaintiffs' counsel's experts from participating in attorney-

28  client meetings is utterly devoid of any rational basis:

14

1   |   In my professional opinion, ORR's blocking detained children from speaking
2   |   with plaintiffs' mental health experts is not only unwarranted by any specific
3   |   data or professional literature, but in fact represents the potentially dangerous
4   |   removal of a layer of protection for children under ORR custody. . . .
5   |   In Psychiatry, as in all other areas of patient care, the expert second opinion is
6   |   the gold standard by which current therapies are evaluated: the thoroughness of
7   |   assessment, the accuracy of diagnosis, the efficacy of treatment. This is
8   |   especially important for those with histories of trauma, where presentation is
9   |   inconsistent, misdiagnosis common, and treatment complex and often
10  |   ineffective, if not downright harmful. The notion that it is dangerous or
11  |   counterproductive to conduct interviews with children suffering trauma to
12  |   obtain a second opinion is not borne out by the literature nor by my years of
13  |   experience. . . .

Declaration of Dr. Amy Cohen, October 18, 2018, Exhibit 6 ¶¶ 7-8 ("Cohen II").

ORR's limiting mental health professionals' access to detained children appears aimed less at protecting children than it does concealing violations of the Settlement and this Court's orders. The Court's including ORR facilities in the Special Master's mandate would do much to ensure that such violations do not go unnoticed.[6]

---

[6] Perhaps sensing the untenability of its position, ORR Yesterday partially backpedaled from its blanket exclusion of mental health experts. *See* Email from S. Fabian, October 18, 2018, Exhibit 26.

The agency, however chastened, continues to insist that it will not permit Plaintiffs' experts to "engag[e] in a mental health evaluation . . ." of detained children. *Id*.

15

**B.     ORR's invasive background checks of Plaintiffs' mental health and other experts aim to deter effective monitoring of the July 30 order and the Settlement in general.**

ORR's efforts to evade scrutiny of its compliance with the Settlement and this Court's order go further still: the agency now insists that Plaintiffs' consulting experts and interpreters execute the "Background Check Consent Form," Exhibit 5-1, several days before speaking with detained children. Again, ORR's demand is nowhere to be found in the Settlement, nor is it all rationally related to any legitimate concern for child welfare.

To the contrary, like this Court's order appointing an independent monitor, ECF 494 at 16, the Settlement nowhere requires that Plaintiffs give ORR any advance notice that they will conduct attorney-client meetings at a particular detention facility. *See* Settlement ¶ 32. Obviously, ORR's completing a background check, even one far less invasive than that their form contemplates, takes time and cannot be accomplished unless Plaintiffs give notice well in advance of visiting any ORR detention facility. ORR, therefore, has no authority to demand that Plaintiffs' experts submit to background checks at all.

Plaintiffs' counsel have nonetheless extended ORR the courtesy of notifying it in advance of monitoring visits and providing their experts' names and driver's license numbers. Until recently, that has been good enough. Holguín ¶ 6. ORR's present background checks, however, are so distended and invasive of privacy as to amount to a "poison pill" aimed at deterring qualified experts from stepping forward to assist in evaluating ORR's treatment of children detained in an ever expanding network of juvenile detention centers.

ORR's form, entitled "Consent to Pre-Visit Background Check," authorizes it to obtain a "'consumer report' which may include information about your character, general reputation, personal characteristics, and/or mode of living." Exhibit 5-1. By signing the form, a volunteer expert or translator cedes ORR authority to obtain "all-

encompassing" personal information, including "information regarding your credit history, criminal history, social security verification, motor vehicle records, verification of your education or employment history, or other background checks." That ORR's demands are grossly and unnecessarily invasive of personal privacy cannot be gainsaid:

> During the course of my professional duties, I have been permitted access to numerous juvenile institutions; I have never been required to consent to the broad disclosure of personal information ORR's form demands. It is my personal and professional opinion that requiring consent to ORR's collecting such information is unnecessary and a strong deterrent to mental health professionals' assisting class counsel in monitoring ORR's compliance with court orders and the *Flores* settlement, particularly those of us who devote our time *pro bono publico*. In my opinion, ORR's demanding mental health practitioners to broadly renounce their rights to personal privacy aims more to shield it from unwanted scrutiny than to serve any legitimate concern for child welfare.

Cohen II ¶ 15.

The Court's including ORR facilities within the independent monitor's duties would ensure that meaningful scrutiny of ORR's compliance with the July 30 order and the Settlement will not be defeated for want of experts and translators willing to surrender their personal privacy in order to help detained children.[7]

---

[7] ORR's demand for vast amounts of personal information also appears to violate the Paperwork Reduction Act, 44 U.S.C. § 3501 (requiring federal agencies to get OMB approval any time they demand personal information from ten or more individuals).

IV.   INDEPENDENT MONITORING OF ORR'S COMPLIANCE WITH THE COURT'S JULY 30 ORDER IS NOT A SANCTION AND COULD IMPOSE NO APPRECIABLE OPERATIONAL BURDEN ON ORR.

The Court should also deny ORR's motion because it mischaracterizes the appointment of a special master/independent monitor as a "sanction."

The function of a special master is to assist the Court with matters that "cannot be effectively and timely addressed by an available district judge or magistrate judge[.]" Fed. R. Civ. Proc. 53(a)(1)(C). Courts have appointed special masters "[b]ecause of the complexity of litigation and problems associated with compliance with the district court order." *Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982); *see also Organization for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542 (9th Cir. 1987) (the "prospect of numerous, time-consuming hearings concerning noncompliance with the injunction" constitutes "exceptional condition" warranting reference to special master); *Hook v. State of Arizona*, 120 F.3d 921, 926 (9th Cir. 1997).[8]

---

[8] ORR's attempt to distinguish *Hook* and *United States v. Suquamish Indian Tribe*, 901 F.2d 772 (9th Cir. 1990), is unavailing.

ORR argues that these cases approve the appointment of special masters to oversee injunctions, whereas the instant appointment involves oversight of a consent decree. The short answer to Defendants' point is that the prospective provisions of a consent decree *are* an injunction. *See Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir. 1982); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).

In all events, ¶ 32 of the Settlement authorizes Plaintiffs' to appoint third parties to assist them in monitoring ORR's treatment of class members. The July 30 order directs ORR to comply with the Settlement; ¶ 32, *a fortiori*, authorizes Plaintiffs to appoint a third party to monitor the July 30 order as well.

The Court's appointing a monitor is therefore, not qualitatively different from what the Settlement itself authorizes. The order of reference does grant the special master greater access to class members and information, but that, of course, is an entirely

OPPOSITION TO MOTION TO MODIFY ORDER
APPOINTING INDEPENDENT MONITOR
CV 85-4544-DMG (AGRx)

A special master's authority is limited by the order of appointment, but typically includes authority to compel, take, and record evidence. Fed. R. Civ. Proc. 53(c)(1)(A)-(C). They may be authorized to impose non-contempt sanctions, but may only recommend contempt to a judge. Fed. R. Civ. Proc. 53(c)(2). Inasmuch as a special master may be authorized to impose non-contempt sanctions, merely appointing a master could hardly itself be a sanction. *Cf. Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) ("when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions."). This Court's assigning a special master to assist it is no more a "sanction" than was its having assigned a judge to hear this case in the first instance.

---

reasonable and necessary measure if the Court is to address the violations of the July 30 order and the Settlement it will surely be called upon to adjudicate.

Finally, were ORR's instant objection valid, it would also preclude the Court's having appointed an independent monitor to oversee DHS's compliance with its order of June 27, 2017 (ECF 363) as well.

19

V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to modify its order appointing a special master/independent monitor.

Dated: October 19, 2018.

Respectfully submitted,

CARLOS R. HOLGUÍN
PETER A. SCHEY
Center for Human Rights &
Constitutional Law

LEECIA WELCH
NEHA DESAI
CRYSTAL ADAMS
National Center for Youth Law

HOLLY COOPER
CARTER WHITE
U.C. Davis School of Law

/s/ *Carlos Holguín*

Carlos Holguín
*One of the Attorneys for Plaintiffs*

OPPOSITION TO MOTION TO MODIFY ORDER
APPOINTING INDEPENDENT MONITOR
CV 85-4544-DMG (AGRx)