# Exhibit 1

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone:  (213) 388-8693 Facsimile:  (213) 386-9484
www.centerforhumanrights.org

August 10, 2018

William C. Silvis
Sarah B. Fabian
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

*Via email*

Re: *Flores*, et al., *v. Sessions,* et al.*,* No. CV 85-4544-DMG (C.D. Cal.).

Dear Counsel:

Plaintiffs have now extended multiple offers to meet and confer regarding ORR's implementing the Court's order of July 30, 2018 (ECF No. 470), but to no avail. ORR has now had eleven days to comply with the Court's order, and Plaintiffs accordingly expect ORR will forthwith implement the order strictly according to its terms.

Plaintiffs remain willing to meet and confer, but would not be in a position to modify or waive any provision of the Court's order or of the *Flores* Settlement without first having had an opportunity to review the facts relevant to determining whether any such modification or waiver would be consistent with class members' best interests. We think ORR's sharing such information is inherent in the Court's comments encouraging the parties to meet and confer.

Pursuant to the Court's order, ¶ 29 of the *Flores* Settlement, the Freedom of Information Act, 28 U.S.C. § 552, and the Department of Health and Human Service's regulations governing access to public records, 45 C.F.R. §§ 5.1 *et seq.*, Plaintiffs request copies of all instructions, memoranda, or policies ORR has issued to bring itself into compliance with the District Court's order of July 30, 2018. This request includes, but is not limited to, the following:

> 1) Memoranda and instructions reflecting ORR's efforts to comply with the Court's order that it "transfer all Class Members out of Shiloh RTC unless a licensed psychologist or psychiatrist has determined or determines that a particular Class Member poses a risk of harm to self or others."

> 2) A list of all class members detained at Shiloh whom ORR has evaluated for risk of harm, the date of each such evaluation, the name and qualifications of the person(s) who performed each evaluation, a summary of the results of each evaluation, and a copy of any report generated as a result of each evaluation.

Sarah Fabian, *et al.*
August 10, 2018
Page 2 of 4

3) A list of class members ORR has transferred out of Shiloh as a result of an evaluation finding that the class member does not pose a risk of harm, including the date of each such class member's actual transfer and identifying the facility to which he or she was transferred.

4) Copies of all licenses issued to Shiloh RTC by the State of Texas or any of its subordinate entities.

5) Copies of all reports and evaluations generated as a result of each inspection by the State of Texas, any of its subordinate entities, or any accrediting agency of Shiloh RTC between January 1, 2014 and the present.

6) Copies of Shiloh RTC's written policies and procedures regarding the prescription, administration, monitoring, and use of psychotropic medications.

7) Copies of the ORR Division of Children's Services (DUCS) Monitoring Team's policies and procedures and any federal monitoring visits conducted by ORR's Division of Children's Services (DUCS) Monitoring Team or any other ORR monitoring team at Shiloh RTC.

8) A list of all class members detained at Shiloh RTC who have been given psychotropic medications on or after August 1, 2018, identifying the medications and their dosage, the name and relationship to the class member of the person consenting to the administration of such medicating, a copy of any notice given the consenting party aimed at informing his or her consent as required by state law, and a copy of the signed consent itself.

9) A list of all class members detained at facilities other than Shiloh RTC who have been given psychotropic medications on or after August 1, 2018, identifying the medications, their dosage and dates given, the name and relationship to the class member of the person consenting to the administration of such medications, a copy of any notice given such consenting party aimed at informing his or her consent as required by state law, and a copy of the signed consent itself.

10) A description of each security measure at Shiloh RTC that ORR discontinued on or after July 31, 2018, on the ground they are not necessary for the protection of minors or others, listing the date on which each such security measure was discontinued and attaching copies of all instructions, changes to Shiloh's operations manual, and other writings reflecting their discontinuation.

11) Copies of all instructions, changes to Shiloh's operations manual, and other writings describing Shiloh's policies on providing class members access to drinking water and private telephone use, including all writings reflecting Shiloh's efforts and practices to ensure staff comply with those policies.

12) Copies of each ORR policy, practice, and form, including instructions for its use, issued on or after July 31, 2018, for notifying class members of ORR's reasons for placing them in a secure facility, staff-secure facility, or RTC.

13) A list of all class members housed in a secure facility on or after July 31, 2018, listing each of the grounds ORR placed him or her in a secure facility, and providing the date, if any, on which ORR transferred the class member out of the secure facility pursuant to the Court's order of July 30, 2018.

14) A copy of the notice given each class member housed in a secure facility, staff-secure facility, or RTC on or after August 1, 2018, notifying him or her of ORR's reasons for placement in a secure facility, staff-secure facility, or RTC.

15) All writings generated on or after July 31, 2018, reflecting ORR's efforts to comply with Texas child welfare laws and regulations governing the administration of psychotropic medications to class members at Shiloh RTC, including, but not limited to, copies of all disclosures required by 26 Texas Administrative Code § 748.2253 and court orders authorizing Shiloh to administer psychotropic medication to class members.

16) All memoranda and instructions instructing ORR personnel and contractors to "cease requiring ORR Director or designee approval prior to release of Class Members who: (1) were previously placed in secure or staff-secure facilities but have since been transferred to less restrictive settings; (2) prevailed on their *Flores* bond hearings; and/or (3) were placed in secure or staff-secure facilities based on incomplete, inaccurate, or erroneous information.

17) A list of all class members whose release ORR had submitted to and remained pending before its director or designee for approval on or before July 31, 2018.

18) A list of all class members whose release ORR had submitted to its director or designee for approval released without such approval as a result of the Court's order of July 30, 2018, and providing the date of each such child's release.

19) All memoranda and instructions instructing ORR personnel and contractors to cease requiring that all post-release services be in place prior to releasing class members and/or guiding such persons on conducting an individualized assessment of class members particularized need for particular post-release services.

Apart from the information described in ¶¶ 4, 5, and 7 above, we request ORR produce the information specified herein by the close of business on Tuesday, August 14, 2018. Plaintiffs will be prepared to meet and confer 48 hours following receipt.

As to the information described in ¶¶ 4, 5, and 7, we request that information no later than Monday, August 20, 2018.

Should ORR be amenable to having an outside mental health expert evaluate class members
detained at Shiloh to determine whether they pose a risk of harm to self or others, Plaintiffs
propose that such evaluations be done by Amy Cohen, M.D., and such additional experts as Dr.
Cohen may designate to work under her supervision. Dr. Cohen's qualifications are fully set
forth in her attached CV.

Should defendants wish clarification regarding the foregoing, I may be reached at the above
address and telephone number, or via email to crholguin@centerforhumanrights.org.

Sincerely,

Carlos Holguín
One of the attorneys for plaintiffs

ccs:    Holly Cooper, Esq.
        Leecia Welch, Esq.
        Peter A. Schey, Esq.

# Exhibit 2

# Intentionally Omitted

# Exhibit 3

DECLARATION OF CARLOS HOLGUIN

I, Carlos Holguín, declare and say as follows:

1.   I am one of two attorneys who currently serve as class counsel for Plaintiffs in *Flores v. Sessions*. I execute this declaration in support of Plaintiffs' motion to oppose the Office of Refugee Resettlement of the U.S. Department of Health and Human Services' ex parte application for partial reconsideration of the order appointing the Special Master/Independent Monitor.

2.   Pursuant to ¶¶ 28 and 29 of the *Flores* settlement, ORR provides class counsel with monthly statistical reports on class members in its custody.

3.   The monthly statistical reports identify class members in the various facilities in which ORR detains class members. ORR's data do not include the average length of stay for youth housed in the facilities.

4.   The monthly statistical reports reflect that as of September 13, 2018, there were approximately 1,067 class members detained at the Tornillo Port of Entry ("Tornillo"). From my review of the reports, of these 1,067 class members: 46 class members had been detained at Tornillo since June (admitted between June 14, 2018 and June 30, 2018); 45 class members had been detained at Tornillo since July (admitted between July 3, 2018 and July 14, 2018); 493 class members had been detained at Tornillo since August (admitted between August 14, 2018 and August 31, 2018); 429 class members were admitted in September (between September 1, 2018 and September 9, 2018), and 54 class members were "en route" to Tornillo on September 13, 2018. These statistics show that 91 class members have been detained at Tornillo for over three months, since at least July 14, 2018.

5.   The monthly statistical reports also reflect that the percentage of children at Tornillo that ORR is releasing to sponsors dropped significantly from June to August.

6.   Although the *Flores* settlement nowhere requires it, Plaintiffs' counsel have extended ORR the courtesy of notifying it of monitoring visits. Plaintiffs have customarily provided ORR accompanying experts' names and driver's license numbers.

Declaration of Carlos Holguin

1

Until recently, ORR did not refuse accompanying experts access to detained class members on the grounds that they were security risks or had failed to provide sufficient information to demonstrate they were not security risks.

7.   On September 7, 2018, Plaintiffs' counsel received a spreadsheet containing the names of class members then detained at Shiloh RTC and indicating whether ORR had determined they were risks to themselves or others. Of the 13 children ORR purports to have evaluated, it transferred only one to another facility. ORR also released one class member to a sponsor, but continued to house another three children at Shiloh whose release it had approved despite their posing no risk of harm.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of October, 2018, at Santa Clarita, California.

_____

Carlos Holguín

# Exhibit 4

| | |
|---|---|
| From: | **Fabian, Sarah B (CIV)** Sarah.B.Fabian@usdoj.gov |
| Subject: | RE: Flores Monitoring |
| Date: | October 16, 2018 at 9:21 AM |
| To: | Peter Schey pschey@centerforhumanrights.org |
| Cc: | Carlos Holguín crholguin@centerforhumanrights.org, Chapman Noam chapmannoam@centerforhumanrights.org, Flentje, August (CIV) August.Flentje@usdoj.gov |

Peter:

As I mentioned yesterday, I provided you with the dates you requested last Friday.

As I also explained, Defendants' position regarding the participation of mental health experts remains the same as stated in my emails, and will apply to the upcoming visits.

I note that there are visits to 4 locations that are scheduled for visits this week, but for which we have not received any information from you regarding participants. Two of those visits are scheduled to happen tomorrow. If you intend to go forward with those visits then we need to receive participant information immediately, and even so there may be a delay at this point given the need for the facilities to review the information you provide. Please let me know immediately if you intend to go forward with the following visits this week, and if so provide the requested information for all participants.

- · SW Key El Presidente, 10/17 and 10/18 (also scheduled for 10/23 and 24)
- · His House, 10/17 and 10/18
- · SW Key San Diego, 10/18 and 10/19
- · Heartland Guadalupe, 10/18 and 10/19

Best,
Sarah


Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Monday, October 15, 2018 1:01 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Flores Monitoring

Dear Sarah,

We will proceed with the planned site visits and continue to wait for dates we have requested. Please promptly provide availability of the locations/dates Plaintiffs long ago requested. Defendants' delays make effective and efficient monitoring extremely difficult.

Defendants are asserting a position regarding child welfare experts' ability to participate in class member interviews that is a clear breach of ¶ 32 of the Settlement. For any facility at which any facility will not permit a child welfare expert to accompany plaintiffs' counsel, please timely (so we may arrange travel and experts' time) provide the facility's rules showing that it routinely denies access to child  welfare experts assisting counsel, and also provide an individualized statement for each minor Defendants refuse to allow to meet with Flores counsel accompanied by a child welfare expert prepared by a facility mental health specialist attesting that, as Defendants' claim, that "introduction of another unfamiliar mental health professional during [an] attorney-client visit[ ] who ask the children to repeat their stories is not consistent with trauma-informed practice and child welfare principles." Defendants seem to be under the impression that Plaintiffs' experts intend to treat class members. They do not. They have in the past in numerous visits to many facilities holding class members participated as Plaintiffs' experts to evaluate class members' treatment and whether it comports with state child welfare standards and, *a fortiori*, the *Flores* settlement.

Until now, Plaintiffs have provided advance notice of visits to Defendants' facilities as a matter of courtesy, and not because the Settlement requires it. We are willing to continue providing such notice in most instances to the extent consistent with our clients' best interests, but are prepared to discontinue doing so if any agency holding class members is intent on obstructing access to interviews with class members.

We have requested but still not received copies of the licenses for each facility Plaintiffs will be visiting. Can these be forwarded to us immediately? They were requested some time ago and we would assume are readily available to Defendants and could easily be forwarded to Plaintiffs.

Plaintiffs and interviewed class members also remain deeply concerned that all the facilities Plaintiffs last visited appear to be secure in violation of the settlement, class members do not have adequate communication with parents, relatives or other decision-makers, delays from ORR custody remain unreasonable, obtaining fingerprints from parents and relatives seeking to be unified with class members that will be shared with ICE serves no legitimate purpose under the settlement and is obviously discouraging such adult relatives from seeking the release of class members, parents, relatives and minors are not being informed of other options for release under the settlement, and accompanying parents are not being fully informed of their children's Flores rights or the parents right to change their mind about whether to have their child remain with them or be released.

Finally, as we have discussed, Plaintiffs wish to meet and confer regarding Defendants' proposed regulations intended to abrogate portions of the Flores settlement the Administration has repeatedly and publicly criticized as constituting a "loophole" in the law and encouraging undocumented migration, both assertions Plaintiffs believe are untrue. The Court may or may not provide guidance on this issue shortly but Plaintiffs wish to commence a meet and confer on this subject within the next two to  three business days.

Unless these matters can be promptly discussed and resolved, Plaintiffs' will move to hold Defendants in breach of the Settlement and for appropriate remedies, including monetary sanctions. Regarding Defendants' recent effort to block child welfare experts from accompanying class counsel, Plaintiffs will seek expedited resolution of this issue by the Court unless the parties can reach a prompt resolution.

You may reach me at 323-251-3223 to discuss the matters outlined above.

Thank you.

Peter A. Schey
President
Center for Human Rights and Constitutional Law

On Wed, Oct 10, 2018 at 2:04 PM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

> Peter:
>
> Defendants agree that under the terms of Paragraph 33, during the course of the facility tour which will last no more than three hours, the tour participants may interview staff and any class members who are present during the tour. However, Defendants note that this provision does not provide for separate, private, individualized interviews. Moreover, as these are not attorney-client interviews, Defendants believe that attorneys for Defendants as well as staff from ORR and facility staff have the right to be present at any such interviews.
>
> Best,
> Sarah
>
> Sarah B. Fabian
> Senior Litigation Counsel
> Office of Immigration Litigation – District Court Section
> (202) 532-4824
>
> **From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
> **Sent:** Wednesday, October 10, 2018 3:58 PM
> **To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
> **Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
> **Subject:** Re: Flores Monitoring
>
> Sarah,
>
> Regarding your email message of today (copy below), please make Defendants, including ORR, aware that under xhibit 4 of the Agreement, "The purpose of facility visits under paragraph 33 is to interview class members and staff ..." Under Paragraph 33 Plaintiffs' counsel and "associated experts" may join facility visits. Please advise whether this is going to be a problem going forward.
>
> Peter A. Schey
> President
> Center for Human Rights and Constitutional Law
>
> On Wed, Oct 10, 2018 at 12:19 PM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:
>
>> Peter:
>>
>> *Flores* counsel is entitled to attorney-client visits with class members pursuant to Paragraph 32 of the settlement agreement, and ORR has taken affirmative steps to help facilitate the many visits that you have requested at various facilities throughout the month of October.  Moreover, under Paragraph 33 of the agreement, as Plaintiffs' counsel, you may also request to visit and tour a facility along with a child welfare expert of your choice if desired – ORR has likewise assisted in coordinating such visits with a number of facilities at your request.
>>
>> However, in advance of your upcoming visits, ORR wants to make clear that ORR's position is that the participation of mental health experts in attorney-client visits under Paragraph 32 is not mandated by the settlement agreement. Further, ORR's child welfare experts are concerned that for minors who already have access to trauma-informed, individual and group mental health services, as well as psychiatric services when needed, consistent with Exhibit 1 to the settlement agreement, introduction of another unfamiliar mental health professional during attorney-client visits who ask the children to repeat their stories is not consistent with trauma-informed practice and child welfare principles. Therefore, going forward, ORR objects to the participation of mental health experts in the attorney-client visits, and will not permit such participation. Such individuals are welcome to join attorneys, however, during tours of facilities under Paragraph 33 to learn more about the care providers and their programming.
>>
>> Also I am attaching the background check form mentioned in my emails below that must be provided for each visitor.
>>
>> Best,
>> Sarah
>>
>> Sarah B. Fabian
>> Senior Litigation Counsel
>> Office of Immigration Litigation – District Court Section
>> (202) 532-4824
>>
>> **From:** Fabian, Sarah B (CIV)
>> **Sent:** Tuesday, October 09, 2018 2:15 PM
>> **To:** 'Peter Schey' <pschey@centerforhumanrights.org>
>> **Cc:** 'Carlos Holguín' <crholguin@centerforhumanrights.org>; 'Chapman Noam' <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
>> **Subject:** RE: Flores Monitoring
>>
>> Please see the below information about the availability of space for interviews at each facility:

| Program | # of private interviews conducted at one time |
|---|---|
| BCFS Baytown | 3 |
| Southwest Key Casa Montezuma | 3 |
| His House | 4 |
| Southwest Key Nueva Esperanza | 2 |
| Homestead | 4 |

| Southwest Key Conroe | 2 |
| Lincoln Hall Boys Haven | 2 |
| Southwest Key Canutillo | 6 |
| Heartland Guadalupe | 4 |
| Childrens Village Shelter | 20 |
| BCFS Chavaneaux | 2 |
| BCFS Raymondville | 2 |
| Southwest Key San Diego | 2 |
| Southwest Key El Presidente | 3 |
| Southwest Key Combes | 3 |

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Fabian, Sarah B (CIV)
**Sent:** Thursday, October 04, 2018 5:57 PM
**To:** Peter Schey <pschey@centerforhumanrights.org>
**Cc:** Carlos Holguin <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** RE: Flores Monitoring

Peter:

·   We are identifying dates for your requested visit to Tornillo and will get back to you early next week. Please be aware that the facility likely will not be able to arrange for visits on 4 consecutive days because this will interfere too significantly with the operations of the facility. You should expect that the dates offered will be broken up into no more than two days at a time.

·   Relatedly, as I noted when I sent the previous chart, the days offered by the facilities were offered with the expectation that you would request no more than 2 consecutive days. Where you have requested more than 2 consecutive days we are checking with the facilities to see if that can be accommodated, and if not we will get back to you with alternative dates. Likewise, where you have asked the facilities to provide additional dates please expect that those will not be consecutive with the two days that you have already selected. I will get back to you regarding these dates early next week as well.

·   Defendants agree to provide you with the best estimate for each facility as to how many interviews could be conducted at one time, the street address for the facility, and a POC for each visit who will likely be a DOJ attorney who can assist you in coordinating with the facility. I will provide you with that information when I receive it from each facility, likely next week some time.

·   Defendants agree to post notice of your visit in advance of the visit. Please provide a copy of the notice you would like posted in both English and Spanish. Defendants will also provide you with a list of residents at the facility that includes the information required by the Agreement, and if possible, will do so in advance of the visit.

·   As with previous visits, Defendants request that you comply with the following:

**7 days in advance of any visit to an ORR facility, ORR requests that you send in a single email:**

1.   Full list of visitors and a description of each visitor's role (that is, attorney, medical professional, interpreter, etc.)

2.   Copies of Photo ID documents (e.g., driver's license, passport)

3.   For attorneys, a bar card

4.   For any non-attorney professional experts, evidence of current professional licensure

5.   Explicit consent to ORR performing background checks (for both attorneys and non-attorneys) (see attached form to be provided by each participant)

Please note that if individuals are added to the list after this email is send, it is not guaranteed that they will be accommodated by the facility.

Let me know if you have any questions, otherwise I will follow up with you next week.

Thanks,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Thursday, October 04, 2018 1:30 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Flores Monitoring

**Subject:** Flores Monitoring

Dear Sarah,

Please see below regarding Plaintiffs' planned monitoring efforts for this month:

**Additional Location for Site Visit and Class Member Interviews**

As we discussed with you on Monday and Tuesday this week, in addition to the facilities we identified in our email on 9/11/18, we also wish to conduct a site visit and 4 consecutive days of class member interviews at the tent city in Tornillo, TX identified in the 9/30 NY Times article available through this link. Please let us know by COB Friday these week of 4 consecutive days on which Plaintiffs may conduct class member interview and a site inspection perhaps on the 2nd or 3rd day of the visit. We want to conduct this inspection in the period between 2 and 4 weeks from now.

**Information Needed to Coordinate Monitoring Efforts**

As we discussed over the phone, Plaintiffs need additional information in order to efficiently facilitate monitoring visits. These include the following for each facility:

- The capacity to accommodate class member interviews (how many interviews can be conducted at one time so they take place at least 10-15 feet apart if in a common area). This information is needed immediately so Plaintiffs can begin planning visits to the facilities Plaintiffs identified almost a month ago. Please provide this information by COB tomorrow, October 4, 2018.
- The current street addresses where the site visits/interviews will take place
- A  POC at each facility for monitoring teams to coordinate with directl

  Please also advise whether defendants

-  agree to post a notice about the visits 10 days prior to each visit
- will provide Plaintiffs with a list of the class members present at each facility about a week prior to each visit, hopefully with the type of data Defendants normally share with Plaintiffs on a monthly basis and that is available  to all facility managers.
- will identify class members who were separated from a parent but have not yet been reunited with the parent.
- prior to each visit will provide Plaintiffs with a copy of the facility's state issued license.

**Additional Dates for Identified Site Visits/Class Member Interviews**

Several of the options you provided for Plaintiffs to conduct class member interviews and site visits occur less than one week from today. In light of the time available to coordinate the logistics of these visits, we think it is highly unlikely that we will be able to efficiently arrange site visits on any of the days identified during the week of October 8th. Therefore, please advise us promptly, within one business day, if at all possible, of two additional days for each facility that Plaintiffs may conduct interviews with class members any time after October 15th.

Based on the options you sent us yesterday, we have indicated in the chart below dates we would like to conduct monitoring and instances where more dates need to be identified.

| *Facility* | *Location* | *Pop.* | *Selected Dates* | Comments |
|---|---|---|---|---|
| Homestead | Homestead, FL | 1345 | Tu, 10/23; We, 10/24 | Plaintiffs require 4 days to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key El Presidente | Brownsville, TX | 363 | Tu, 10/23; We, 10/24 | Plaintiffs require 3-4 days to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key Nueva Esperanza | Brownsville, TX | 276 | Tu, 10/23; We, 10/24; Th, 10/25; Fr, 10/26 | |
| BCFS Baytown | Baytown, TX | 207 | We, 10/24; Th, 10/25 | Plaintiffs require 3-4 dates to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key Casa Montezuma | Channelview, TX | 203 | Mo, 10/29; Tu, 10/30; We, 10/31 | |
| Southwest Key Conroe | Conroe, TX | 199 | Mo, 10/22; Tu, 10/23 | |
| Lincoln Hall Boys Haven | Lincolndale, NY | 183 | Mo, 10/29; Tu, 10/30 | |
| Childrens Village Shelter | Dobbs Ferry, NY | 167 | We, 10/24; Th, 10/25 | |
| His House | Miami Gardens, FL | 125 | We, 10/17; Th, 10/18 | |
| Southwest Key San Diego | San Diego, CA | 89 | Th, 10/18; Fr, 10/19 | |
| Southwest Key Canutillo | Canutillo, TX | 87 | Tu, 10/30; We, 10/31 | |
| BCFS Chavaneaux | San Antonio, TX | 78 | We, 10/24; Th, 10/25 | |
| Southwest Key Combes | Harlingen, TX | 78 | Tu, 10/23; We, 10/24 | |
| BCFS Raymondville | Raymondville, TX | 49 | Tu, 10/23; We, 10/24 | |
| Heartland Guadalupe | Chicago, IL | 47 | Th, 10/18; Fr, 10/19 | |

Please let us know if you have any questions.

Thank you.

Best,
Peter Schey

14

# Exhibit 5

| | |
|---|---|
| **From:** | **Fabian, Sarah B (CIV)** Sarah.B.Fabian@usdoj.gov |
| **Subject:** | RE: Flores Monitoring |
| **Date:** | October 16, 2018 at 2:11 PM |
| **To:** | Peter Schey pschey@centerforhumanrights.org |
| **Cc:** | Carlos Holguín crholguin@centerforhumanrights.org, Chapman Noam chapmannoam@centerforhumanrights.org, Flentje, August (CIV) August.Flentje@usdoj.gov, Cooper Holly S (hscooper@ucdavis.edu) hscooper@ucdavis.edu |

Peter:

I have asked ORR to cancel the four visits scheduled for this week and I will let you know when they are able to reschedule those visits. Please confirm ASAP if you intend to cancel the numerous visits that are scheduled for next week as well. If you do not intend to cancel those visits please send participant information immediately.

ORR's position regarding the participation of mental health experts in the upcoming visits has remained the same since last week as explained in my emails. If you would like to meet and confer regarding that position I can do so tomorrow or Thursday as needed, however I do not expect Defendants' position on this point to change.

Regarding the background check form, that was first provided to you by email on July 21 and this is the first objection you have raised to the form. ORR is willing to waive use of the form for individuals who work for the organizations that serve as class counsel for the Flores agreement. However, ORR needs to be able to conduct background checks for individuals who are not associated with those organizations given the problems the government has experienced in the past with individuals you have recruited for these visits who have misrepresented their identities and intentions with regard to participation in these visits. If you have specific objections to the form we are happy to try to address them, but we would ask you to please send your specific concerns immediately so that we can address them and still allow ORR the opportunity to conduct the necessary background checks prior to next week's visits. Please identify your specific concerns no later than noon Pacific tomorrow.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Tuesday, October 16, 2018 3:39 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Flores Monitoring

Dear Sarah,

In light of the delays in getting the visits for this week scheduled and disputes regarding (1) whether the facilities we have planned visits to have existing written policies that exclude attorneys from being accompanied by child welfare experts (Para 32 interviews), (2) restrictions ORR now seeks to impose on child welfare experts interviewing class members under Parea. 33, and (3) the form ORR wants all monitors to sign granting access to personal data unrelated to participation inn  visits as a monitor,  Plaintiffs wish to reschedule the visits scheduled for as soon after this week as possible. We again request that the parties meet and confer telephonically to work out the issues identified in this and my previous email. I am free tomorrow after 11:30 AM Pacific Time and all day Thursday to meet and confer. Please let me know Defendants' position should we move ex parte for an Order permitting child welfare experts to interview class members under Paragraphs 32 and/or 33, and limiting the scope of information sought by ORR from monitors to something similar to what ICE historically requested.

Thank you.

Peter A. Schey
President
Center for Human Rights and Constitutional Law

On Tue, Oct 16, 2018 at 9:21 AM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Peter:

As I mentioned yesterday, I provided you with the dates you requested last Friday.

As I also explained, Defendants' position regarding the participation of mental health experts remains the same as stated in my emails, and will apply to the upcoming visits.

I note that there are visits to 4 locations that are scheduled for visits this week, but for which we have not received any information from you regarding participants. Two of those visits are scheduled to happen tomorrow. If you intend to go forward with those visits then we need to receive participant information immediately, and even so there may be a delay at this point given the need for the facilities to review the information you provide. Please let me know immediately if you intend to go forward with the following visits this week, and if so provide the requested information for all participants.

· SW Key El Presidente, 10/17 and 10/18 (also scheduled for 10/23 and 24)

· His House, 10/17 and 10/18

· SW Key San Diego, 10/18 and 10/19

· Heartland Guadalupe, 10/18 and 10/19

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Monday, October 15, 2018 1:01 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Flores Monitoring

Dear Sarah,

We will proceed with the planned site visits and continue to wait for dates we have requested. Please promptly provide availability of the locations/dates Plaintiffs long ago requested. Defendants' delays make effective and efficient monitoring extremely difficult.

Defendants are asserting a position regarding child welfare experts' ability to participate in class member interviews that is a clear breach of the Settlement. For any facility at which any facility will not permit a child welfare expert to accompany plaintiffs' counsel, please timely (so we may arrange travel and experts' time) provide the facility's rules showing that it routinely denies access to child welfare experts assisting counsel, and also provide an individualized statement for each minor Defendants refuse to allow to meet with Flores counsel accompanied by a child welfare expert prepared by a facility mental health specialist attesting that, as Defendants' claim, that "introduction of another unfamiliar mental health professional during [an] attorney-client visit[ ] who ask the children to repeat their stories is not consistent with trauma-informed practice and child welfare principles." Defendants seem to be under the impression that Plaintiffs' experts intend to treat class members. They do not. They have in the past in numerous visits to many facilities holding class members participated as Plaintiffs' experts to evaluate class members' treatment and whether it comports with state child welfare standards and, *a fortiori*, the *Flores* settlement.

Until now, Plaintiffs have provided advance notice of visits to Defendants' facilities as a matter of courtesy, and not because the Settlement requires it. We are willing to continue providing such notice in most instances to the extent consistent with our clients' best interests, but are prepared to discontinue doing so if any agency holding class members is intent on obstructing access to interviews with class members.

We have requested but still not received copies of the licenses for each facility Plaintiffs will be visiting. Can these be forwarded to us immediately? They were requested some time ago and we would assume are readily available to Defendants and could easily be forwarded to Plaintiffs.

Plaintiffs and interviewed class members also remain deeply concerned that all the facilities Plaintiffs last visited appear to be secure in violation of the settlement, class members do not have adequate communication with parents, relatives or other decision-makers, delays from ORR custody remain unreasonable, obtaining fingerprints from parents and relatives seeking to be united with class members that will be shared with ICE serves no legitimate purpose under the settlement and is obviously discouraging such adult relatives from seeking the release of class members, parents, relatives and minors are not being informed of other options for release under the settlement, and accompanying parents are not being fully informed of their children's Flores rights or the parents right to change their mind about whether to have their child remain with them or be released.

Finally, as we have discussed, Plaintiffs wish to meet and confer regarding Defendants' proposed regulations intended to abrogate portions of the Flores settlement the Administration has repeatedly and publicly criticized as constituting a "loophole" in the law and encouraging undocumented migration, both assertions Plaintiffs believe are untrue. The Court may or may not provide guidance on this issue shortly but Plaintiffs wish to commence a meet and confer on this subject within the next two to three business days.

Unless these matters can be promptly discussed and resolved, Plaintiffs' will move to hold Defendants in breach of the Settlement and for appropriate remedies, including monetary sanctions. Regarding Defendants' recent effort to block child welfare experts from accompanying class counsel, Plaintiffs will seek expedited resolution of this issue by the Court unless the parties can reach a prompt resolution.

You may reach me at 323-251-3223 to discuss the matters outlined above.

Thank you.

Peter A. Schey
President
Center for Human Rights and Constitutional Law


On Wed, Oct 10, 2018 at 2:04 PM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Peter:

Defendants agree that under the terms of Paragraph 33, during the course of the facility tour which will last no more than three hours, the tour participants may interview staff and any class members who are present during the tour. However, Defendants note that this provision does not provide for separate, private, individualized interviews. Moreover, as these are not attorney-client interviews, Defendants believe that attorneys for Defendants as well as staff from ORR and facility staff have the right to be present at any such interviews.

Best,
Sarah


Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Wednesday, October 10, 2018 3:58 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Flores Monitoring

Sarah,

Regarding your email message of today (copy below), please make Defendants, including ORR, aware that under xhibit 4 of the Agreement, "The purpose of facility visits under paragraph 33 is to interview class members and staff ..." Under Paragraph 33 Plaintiffs' counsel and "associated experts" may join facility visits. Please advise whether this is going to be a problem going forward.

Peter A. Schey
President
Center for Human Rights and Constitutional Law

On Wed, Oct 10, 2018 at 12:19 PM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Peter:

*Flores* counsel is entitled to attorney-client visits with class members pursuant to Paragraph 32 of the settlement agreement, and ORR has taken affirmative steps to help facilitate the many visits that you have requested at various facilities throughout the month of October.  Moreover, under Paragraph 33 of the agreement, as Plaintiffs' counsel, you may also request to visit and tour a facility along with a child welfare expert of your choice if desired – ORR has likewise assisted in coordinating such visits with a number of facilities at your request.

However, in advance of your upcoming visits, ORR wants to make clear that ORR's position is that the participation of mental health experts in attorney-client visits under Paragraph 32 is not mandated by the settlement agreement. Further, ORR's child welfare experts are concerned that for minors who already have access to trauma-informed, individual and group mental health services, as well as psychiatric services when needed, consistent with Exhibit 1 to the settlement agreement, introduction of another unfamiliar mental health professional during attorney-client visits who ask the children to repeat their stories is not consistent with trauma-informed practice and child welfare principles. Therefore, going forward, ORR objects to the participation of mental health experts in the attorney-client visits, and will not permit such participation. Such individuals are welcome to join attorneys, however, during tours of facilities under Paragraph 33 to learn more about the care providers and their programming.

Also I am attaching the background check form mentioned in my emails below that must be provided for each visitor.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Fabian, Sarah B (CIV)
**Sent:** Tuesday, October 09, 2018 2:15 PM
**To:** 'Peter Schey' <pschey@centerforhumanrights.org>
**Cc:** 'Carlos Holguin' <crholguin@centerforhumanrights.org>; 'Chapman Noam' <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** RE: Flores Monitoring

Please see the below information about the availability of space for interviews at each facility:

| Program | # of private interviews conducted at one time |
| --- | --- |
| BCFS Baytown | 3 |
| Southwest Key Casa Montezuma | 3 |
| His House | 4 |
| Southwest Key Nueva Esperanza | 2 |
| Homestead | 4 |
| Southwest Key Conroe | 2 |
| Lincoln Hall Boys Haven | 2 |
| Southwest Key Canutillo | 6 |
| Heartland Guadalupe | 4 |
| Childrens Village Shelter | 20 |
| BCFS Chavaneaux | 2 |
| BCFS Raymondville | 2 |
| Southwest Key San Diego | 2 |
| Southwest Key El Presidente | 3 |
| Southwest Key Combes | 3 |

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Fabian, Sarah B (CIV)
**Sent:** Thursday, October 04, 2018 5:57 PM
**To:** Peter Schey <pschey@centerforhumanrights.org>
**Cc:** Carlos Holguin <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** RE: Flores Monitoring

Peter:

·    We are identifying dates for your requested visit to Tornillo and will get back to you early next week. Please be aware that the facility likely will not be able to arrange for visits on 4 consecutive days because this will interfere too significantly with the operations of the facility. You should expect that the dates offered will be broken up into no more than two days at a time.

·   Relatedly, as I noted when I sent the previous chart, the days offered by the facilities were offered with the expectation that you would request no more than 2 consecutive days. Where you have requested more than 2 consecutive days we are checking with the facilities to see if that can be accommodated, and if not we will get back to you with alternative dates. Likewise, where you have asked the facilities to provide additional dates please expect that those will not be consecutive with the two days that you have already selected. I will get back to you regarding these dates early next week as well.

·   Defendants agree to provide you with the best estimate for each facility as to how many interviews could be conducted at one time, the street address for the facility, and a POC for each visit who will likely be a DOJ attorney who can assist you in coordinating with the facility. I will provide you with that information when I receive it from each facility, likely next week some time.

·   Defendants agree to post notice of your visit in advance of the visit. Please provide a copy of the notice you would like posted in both English and Spanish. Defendants will also provide you with a list of residents at the facility that includes the information required by the Agreement, and if possible, will do so in advance of the visit.

·   As with previous visits, Defendants request that you comply with the following:

**7 days in advance of any visit to an ORR facility, ORR requests that you send in a single email:**

1.   Full list of visitors and a description of each visitor's role (that is, attorney, medical professional, interpreter, etc.)

2.   Copies of Photo ID documents (e.g., driver's license, passport)

3.   For attorneys, a bar card

4.   For any non-attorney professional experts, evidence of current professional licensure

5.   Explicit consent to ORR performing background checks (for both attorneys and non-attorneys) (see attached form to be provided by each participant)

Please note that if individuals are added to the list after this email is send, it is not guaranteed that they will be accommodated by the facility.

Let me know if you have any questions, otherwise I will follow up with you next week.

Thanks,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Thursday, October 04, 2018 1:30 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Flores Monitoring

Dear Sarah,

Please see below regarding Plaintiffs' planned monitoring efforts for this month:

**Additional Location for Site Visit and Class Member Interviews**
As we discussed with you on Monday and Tuesday this week, in addition to the facilities we identified in our email on 9/11/18, we also wish to conduct a site visit and 4 consecutive days of class member interviews at the tent city in Tornillo, TX identified in the 9/30 NY Times article available through this link. Please let us know by COB Friday this week of 4 consecutive days on which Plaintiffs may conduct class member interview and a site inspection perhaps on the 2nd or 3rd day of the visit. We want to conduct this inspection in the period between 2 and 4 weeks from now.

**Information Needed to Coordinate Monitoring Efforts**
As we discussed over the phone, Plaintiffs need additional information in order to efficiently facilitate monitoring visits. These include the following for each facility:

- The capacity to accommodate class member interviews (how many interviews can be conducted at one time so they take place at least 10-15 feet apart if in a common area). This information is needed immediately so Plaintiffs can begin planning visits to the facilities Plaintiffs identified almost a month ago. Please provide this information by COB tomorrow, October 4, 2018.
- The current street addresses where the site visits/interviews will take place
- A  POC at each facility for monitoring teams to coordinate with directl

    Please also advise whether defendants

- agree to post a notice about the visits 10 days prior to each visit
- will provide Plaintiffs with a list of the class members present at each facility about a week prior to each visit, hopefully with the type of data Defendants normally share with Plaintiffs on a monthly basis and that is available  to all facility managers.
- will identify class members who were separated from a parent but have not yet been reunited with the parent.
- prior to each visit will provide Plaintiffs with a copy of the facility's state issued license.

**Additional Dates for Identified Site Visits/Class Member Interviews**
Several of the options you provided for Plaintiffs to conduct class member interviews and site visits occur less than one week from today. In light of the time available to coordinate the logistics of these visits, we think it is highly unlikely that we will be able to efficiently arrange site visits on any of the days

identified during the week of October 8th. Therefore, please advise us promptly, within one business day, if at all possible, of two additional days for each facility that Plaintiffs may conduct interviews with class members any time after October 15th.

Based on the options you sent us yesterday, we have indicated in the chart below dates we would like to conduct monitoring and instances where more dates need to be identified.

| Facility | Location | Pop. | Selected Dates | Comments |
|---|---|---|---|---|
| Homestead | Homestead, FL | 1345 | Tu, 10/23; We, 10/24 | Plaintiffs require 4 days to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key El Presidente | Brownsville, TX | 363 | Tu, 10/23; We, 10/24 | Plaintiffs require 3-4 days to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key Nueva Esperanza | Brownsville, TX | 276 | Tu, 10/23; We, 10/24; Th, 10/25; Fr, 10/26 | |
| BCFS Baytown | Baytown, TX | 207 | We, 10/24; Th, 10/25 | Plaintiffs require 3-4 dates to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key Casa Montezuma | Channelview, TX | 203 | Mo, 10/29; Tu, 10/30; We, 10/31 | |
| Southwest Key Conroe | Conroe, TX | 199 | Mo, 10/22; Tu, 10/23 | |
| Lincoln Hall Boys Haven | Lincolndale, NY | 183 | Mo, 10/29; Tu, 10/30 | |
| Childrens Village Shelter | Dobbs Ferry, NY | 167 | We, 10/24; Th, 10/25 | |
| His House | Miami Gardens, FL | 125 | We, 10/17; Th, 10/18 | |
| Southwest Key San Diego | San Diego, CA | 89 | Th, 10/18; Fr, 10/19 | |
| Southwest Key Canutillo | Canutillo, TX | 87 | Tu, 10/30; We, 10/31 | |
| BCFS Chavaneaux | San Antonio, TX | 78 | We, 10/24; Th, 10/25 | |
| Southwest Key Combes | Harlingen, TX | 78 | Tu, 10/23; We, 10/24 | |
| BCFS Raymondville | Raymondville, TX | 49 | Tu, 10/23; We, 10/24 | |
| Heartland Guadalupe | Chicago, IL | 47 | Th, 10/18; Fr, 10/19 | |

Please let us know if you have any questions.

Thank you.

Best,
Peter Schey

# Exhibit 5-1



ADMINISTRATION FOR
**CHILDREN & FAMILIES**
Office of Refugee Resettlement | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

## CONSENT TO PRE-VISIT BACKGROUND CHECK

Disclosure

The Office of Refugee Resettlement ("ORR") may obtain information about you from a third party consumer reporting agency in order to conduct a background check before your visit to an ORR facility housing unaccompanied alien minors. Thus, you may be the subject of a "consumer report" which may include information about your character, general reputation, personal characteristics, and/or mode of living.

These reports may contain information regarding your credit history, criminal history, social security verification, motor vehicle records, verification of your education or employment history, or other background checks.

You have the right, upon written request made within a reasonable time, to request whether a consumer report has been run about you and to request a copy of your report. The scope of this disclosure is all-encompassing, however, allowing ORR to obtain from any outside organization all manner of consumer reports to the extent permitted by law.

Authorization

I hereby consent to the Office of Refugee Resettlement ("ORR"), or its grantee, investigating or verifying my background, as a safety measure before I visit an ORR facility housing unaccompanied alien minors.

For this purpose, I authorize ORR, or its grantee, to obtain "consumer reports" and/or "investigative consumer reports."

I authorize any law enforcement agency, administrator, state or federal agency, institution, school or university (public or private), information service bureau, employer, or insurance company to furnish any and all background information requested by ORR, an ORR grantee, or a third party consumer reporting agency.

Signature: _____
Printed Name: _____
Date: _____


Contact Information

Phone: _____
Email: _____

21

**Page 29**

# Exhibit 6

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org
          pschey@ centerforhumanrights.org

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
          ndesai@youthlaw.org
          pjuneja@youthlaw.org
          cadams@youthlaw.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | Case No. CV 85-4544-DMG (AGRx) |
| Plaintiffs, | DECLARATION OF AMY COHEN, M.D. |
| v. | Hearing: November 9, 2018 |
| JEFFERSON B. SESSIONS, Attorney General, *et al.*, | Time: 10:00 a.m.<br>Room: 1st St. Courtroom 8C |
| Defendants. | |

23

1

2

3

*Counsel for Plaintiffs, continued*

4

HOLLY S. COOPER (CAL. BAR NO. 197626)
Co-Director, Immigration Law Clinic

5

CARTER C. WHITE (CAL. BAR NO. 164149)

6

Director, Civil Rights Clinic
University of California Davis School of Law

7

One Shields Ave. TB 30

8

Davis, CA 95616
Telephone: (530) 752-5440

9

Email: hscooper@ucdavis.edu

10

ccwhite@ucdavis.edu

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

I, Amy Cohen, M.D., declare and say as follows:

1. My name is Amy Cohen MD.  I am a child, adolescent and adult psychiatrist with over 30 years of experience treating trauma in highly vulnerable populations in the inner city of Boston and Los Angeles, in Appalachia, in South Sudan and at Juvenile Hall. This declaration represents my professional opinion regarding ORR's barring independent mental health professionals assisting counsel for the *Flores* class from interviews with children in ORR custody.

2. I graduated with honors from the University of Pennsylvania School of Medicine where I received the award for excellence in psychiatry. I completed my internship, adult residency and child fellowship at Harvard. My expert second opinion on complex psychiatric cases has been sought by hundreds of clinicians over my years of work. I have taught trauma diagnosis and treatment to psychiatry, psychology and nurse practitioner supervisees. I  have published two articles on the impact and treatment of trauma in the population of asylum-seeking children from Central America as well as a pamphlet on the recognition and treatment of trauma in the respite setting. Owing to my clinical expertise in trauma, I was asked to join the Executive Steering Committee for the Youth Reinvestment Fund of the California State and Community Board of Corrections.

3. Over the past several months I have worked pro bono with *Flores* counsel as a medical expert in child psychiatry and specifically in the diagnosis and treatment of trauma. In that capacity I have been asked to assess whether the mental

3

health treatment provided to children in ORR custody meets professional standards of child psychiatric and trauma care.  To that end and informed by my experience interviewing and treating traumatized children I have conducted in-depth interviews of 13 children and evaluated thousands of pages of documents representing records of care from four separate ORR-contracted facilities owned and managed by three separate entities. I have prepared two detailed reports and several sworn declarations setting forth findings and recommendations from this work.

4. On October 10, 2018, Carlos Holguin, lead counsel for the *Flores* class, forwarded to me an email from Sarah Fabian, Senior Litigation Counsel for ORR. Ms. Fabian therein advised that ORR will no longer permit mental health experts to participate in confidential meetings between *Flores* counsel and detained children. In explaining ORR's position, Ms. Fabian stated that ORR provides children in its custody with "trauma-informed individual and group mental health services" and believes that children's speaking with a clinician accompanying counsel would be harmful to them. She further asserts that unnamed "child welfare experts" opine that children's speaking with plaintiffs' mental health experts "is not consistent with trauma-informed practice and child welfare principles."

5. In my professional opinion, ORR's blocking detained children from speaking with plaintiffs' mental health experts is not only unwarranted by any specific data or professional literature, but in fact represents the potentially dangerous removal of a layer of protection for children under ORR custody. Only

4

through the direct interviews with children is it possible to assess whether or not children ORR has placed at Shiloh RTC, for example, pose a significant risk of harm to themselves or others.

6. Ms. Fabian's email offers no evidence that detained children have been made to participate in meetings with me, or any other of plaintiffs' mental health experts, against their will. She offers no evidence that any child has in any way been harmed as a result of such meetings. I know of no literature that would in any way support ORR's contention that visits such as these contravene professional practice standards or are at all harmful to children suffering from trauma. In practice, the children I have seen often report feeling better after our visits and wishing I could return to speak with them again.

7. In Psychiatry, as in all other areas of patient care, the expert second opinion is the gold standard by which current therapies are evaluated: the thoroughness of assessment, the accuracy of diagnosis, the efficacy of treatment. This is especially important for those with histories of trauma, where presentation is inconsistent, misdiagnosis common, and treatment complex and often ineffective, if not downright harmful. The notion that it is dangerous or counterproductive to conduct interviews with children suffering trauma to obtain a second opinion is not borne out by the literature nor by my years of experience. Quite the contrary. Reputable mental health providers uniformly seek second opinions because they are often immensely helpful to the treatment of traumatized children and their families.

5

And while no child should be subjected to random examination by those who do not have the knowledge or experience to manage such interviews with expertise and sensitivity, the additional participation by trauma experts is often experienced by child and adult patients as itself therapeutic.

8. During my professional interviews with children in ORR custody - as would be the case with any clinician experienced in working with such children - all interviews were entirely voluntary and conducted in a child-centered manner informed by an understanding of the vulnerability and trigger points of such a population. At no time did children ask to end an interview with me, and I am aware of no subsequent reports of distress by interviewed children.

9. ORR's contention that children in ORR custody are receiving "trauma-informed treatment" suggests that the mental health services it provides for detained children are driven by special expertise in the area of trauma. I did not find this to be the case. First, the designation "trauma-informed" has no standardized meaning in psychiatry and is generally considered throughout the field to be misappropriated by many programs and individuals. Those utilizing such a designation need not prove any competency or even training in the area of trauma diagnosis or treatment to any reputable professional body.

10. After my examination of records from ORR facilities and interviews with children, it is my professional opinion that much of the mental health treatment detained children receive not only fails to meet any reasonable standard of care in

6

the assessment, diagnosis or treatment of childhood trauma, but in some cases has significantly worsened post-trauma conditions and prognosis for these children.

11. In addition, independent, direct interviews with detained children are often necessary to ascertain whether or not a facility is in compliance with court orders or the *Flores* settlement.  For example, the court's order of July 30, 2018, mandated that children not determined to represent a risk to themselves or others be transferred to a less restrictive setting than that prevailing at the Shiloh RTC.

12. Determining risk of harm should be made utilizing a professionally recognized metric following the direct interview of a child. During my visit to Shiloh RTC in August of this year, its clinical director reported that ORR had sent an "expert" to the facility to determine the risk of harm presented by each child detained at Shiloh RTC. According to the clinical director at Shiloh, ORR's mental health expert interviewed no more than three children in the course of determining that nearly all presented risks of harm. Shiloh's director identified no standardized metric ORR's expert had used in making this determination, and there are substantial reasons to question the validity of those determinations. During the course of visiting Shiloh in August, my structured interviews of 12 detained children revealed that only one of the twelve was verifiably dangerous to herself or others. Further, it was also only through the mechanism of direct interviews that I was able to ascertain that children were not being given the opportunity or

7

information to give or withhold consent for medication and that many felt coerced to take medication which they did not like or wish to take.

13. I find ORR's professed concern for potential compounding of trauma puzzling for another reason. According to recent press reports, some of the largest ORR detention contractors have failed to adequately vet their front-line childcare providers, resulting in alarming reports of severe child abuse, abuse so pervasive that Arizona has reportedly threatened to revoke the licenses of 13 ORR shelters located in that state. In addition, reports of late night awakening and removal from their shelter beds of unsuspecting children in order to keep them from protesting transport to the tent city in Tornillo have become frequent. If verified, these reports establish that ORR is causing children trauma far more severe than any they could possibly experience as a result of speaking with an independent mental health professional. For those of us with close knowledge of the impact of trauma on the minds, brains and bodies of growing children, these policies and practices have raised considerable alarm.

14. Plaintiffs' counsel has also provided me with a copy of a form ORR is reportedly now demanding that lawyers and their experts execute before they will be allowed access to detained children. The form, entitled "Consent to Pre-Visit Background Check," authorizes ORR to obtain a "'consumer report' which may include information about your character, general reputation, personal characteristics, and/or mode of living." By signing the form, an individual

8

1

2

3   authorizes ORR to obtain "all-encompassing" personal information, including

4   "information regarding your credit history, criminal history, social security

5   verification, motor vehicle records, verification of your education or employment

6   history, or other background checks."

7

8       15. During the course of my professional duties, I have been permitted access

9   to numerous juvenile institutions; I have never been required to consent to the broad

10  disclosure of personal information ORR's form demands. It is my personal and

11  professional opinion that requiring consent to ORR's collecting such information is

12  unnecessary and a strong deterrent to mental health professionals' assisting class

13

14  counsel in monitoring ORR's compliance with court orders and the *Flores*

15  settlement, particularly those of us who devote our time *pro bono publico*. In my

16

17  opinion, ORR's demanding mental health practitioners to broadly renounce their

18  rights to personal privacy aims more to shield it from unwanted scrutiny than to

19  serve any legitimate concern for child welfare.

20

21      16. In sum, the independent participation of expert clinicians in the

22  examination of these children and their care offers those with oversight

23  responsibility the information they require to protect the health and safety of

24

25  children in ORR detention. It is my professional opinion that to remove or deter

26  such protection would leave these vulnerable children more exposed and

27  endangered.

28

9

1

2

3          I declare under penalty of perjury that the foregoing is true and correct.

4          Executed on this 18th day of October, 2018, at Los Angeles, California.

5

6

7                                              _____
                                               Amy Cohen, M.D.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 7

CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

*Listing continues on next page*
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LUCAS R., *et al.*, | Case No. CV 2:18-CV-05741 |
| Plaintiffs, | DECLARATION OF DR. AMY COHEN, M.D., IN SUPPORT OF EX PARTE APPLICATION TO RECONSIDER CONTINUANCE OF LUCAS R. MOTION FOR PRELIMINARY INJUNCTION. |
| v. | |
| ALEX AZAR, Secretary of U.S. Department of Health and Human Services; *et al.*, | Hearing:   None |
| Defendants. | |

35

1
2
3

*Counsel for Plaintiffs, continued*

4    HOLLY S. COOPER (Cal. Bar No. 197626)
     Co-Director, Immigration Law Clinic
5    CARTER C. WHITE (Cal. Bar No. 164149)
6    Director, Civil Rights Clinic
     University of California Davis School of Law
7    One Shields Ave. TB 30
8    Davis, CA 95616
     Telephone: (530) 754-4833
9    Email: hscooper@ucdavis.edu
10          ccwhite@ucdavis.edu

11   LEECIA WELCH (Cal. Bar No. 208741)
12   NEHA DESAI (Cal. RLSA Bar No. 803161)
     POONAM JUNEJA (Cal. Bar No. 300848)
13   National Center for Youth Law
14   405 14th Street, 15th Floor
     Oakland, CA 94612
15   Telephone: (510) 835-8098
16   Email: lwelch@youthlaw.org
            ndesai@youthlaw.org
17          pjuneja@youthlaw.org

18   CRYSTAL ADAMS (Cal. Bar No. 308638)
19   National Center for Youth Law
     1313 L St. NW, Suite 130
20   Washington, DC 20005
21   Telephone: (202) 868-4785
     Email: cadams@youthlaw.org
22
23
24
25
26
27
28

2

I, Dr. Amy Cohen, M.D., declare and say as follows:

1. I have previously submitted a declaration attesting to my qualifications and experience. *See* ECF 39-7. I have also submitted a supplemental declaration in which I updated my assessment of the mental health of Plaintiff Lucas R. following a telephone interview with him on August 16, 2018. *See* ECF 55-1.

2. On August 23 and 24, 2018 I visited Shiloh Treatment Center ("Shiloh RTC") in Manvel, Texas, at the request of counsel for the plaintiff children in *Flores v. Sessions*. The purposes of the visit were two: (i) to assess whether *Flores* class members housed at Shiloh RTC following the Court's order of July 30, 2018, pose a risk of harm to themselves or others; and (ii) to evaluate the mental health of Lucas R. Over the course of two days I assessed ten of the twenty-five children in residence there, including Lucas R., whom I assessed during the morning of August 23, 2018.

3. In the late afternoon of August 23, 2018, I was advised that the Court had postponed hearing on Lucas's motion for an order requiring his immediate placement with his sister, Madelyn R., from August 31, 2018, to September 21, 2018. I execute this declaration in support of Lucas's request that the Court reconsider postponing the hearing on his motion such that his request for reunification with his sister may be heard on the originally scheduled date of August 31, 2018. As explained below, it is my professional opinion that unless the Court acts promptly to remove Lucas from Shiloh and reunite him with his family, the ongoing decline detention is causing in his psychological well-being may very well prove catastrophic.

4. As described in my original evaluation (ECF 39-7), Lucas has suffered from post-traumatic stress disorder owing to physical abuse he suffered at the hand of his aunt, uncle, cousins and brother in Guatemala. ORR detention has significantly worsened his PTSD symptoms and caused him to develop Adjustment Disorder with Anxiety and Depressed Mood.  As a consequence, his feelings of anger, mistrust, isolation, and despondency associated with both diagnoses have intensified. In short,

8

Case 2:85-cv-04544-DMG-AGR   Document 501-1   Filed 10/19/18   Page 39 of 116   Page ID
#:24865
Case 2:18-cv-05741-DMG-PLA   Document 64-1   Filed 08/27/18   Page 4 of 7   Page ID #:2801

Lucas's deterioration was—and is—entirely iatrogenic: that is, a consequence of prolonged detention, family separation, and improper mental health "treatment" ORR has given him, all of which are making Lucas sicker.

5. In my professional opinion, Lucas does not and will not pose a danger to others. In arriving at this opinion I utilized the Columbia-Suicide Severity Rating Scale ("C-SSRI"). [As Lucas had never been deemed a risk to others, it was unnecessary to engage him in a more formal screening process for this]. The C-SSRI is the single most widely accepted, well-researched tool for assessing actual "danger to self" in both children and adults. While many patients experience suicidal thoughts, the C-SSRI enables the clinician to determine when those thoughts rise to "intent": a level of actual dangerousness requiring referral for a higher level of care or supervision. Children and adults with histories of severe trauma often experience repeated and transient "suicidal ideation" which does not rise to that level of intent..

6. This evaluation also engendered my professional opinion that at the present time Lucas does not pose a danger to himself, but that failing to end his confinement and separation from his family may soon cause him to pose a risk of harm to himself, the very condition that ostensibly justifies Lucas's confinement at Shiloh RTC. Lucas's suicidal thoughts have been vague and have not been accompanied by the "intent" or "plan" which would raise them to a level of dangerousness. These thoughts are nearly always precipitated by identifiable events or circumstances: the frequency of his ideation has increased during his time in custody and he is able to identify that feelings that he will never get out of Shiloh and rejoin his family will often lead to a vague wish to die. He is also able to state that each disappointing event - the rejection of his sister as sponsor, the cessation of his phone calls with her - has intensified his experience of isolation and hopelessness and that this, in turn, has increased the frequency of his suicidal ideation. By my evaluation, Lucas does not represent a risk to himself at this time. However, as his protracted separation from

4

his family and his consequent hopelessness continues, he is at increasing danger of crossing that line from thought to intent.

7. Nor, in my opinion, has ORR has evaluated Lucas—or any of the other twenty-four children at Shiloh—carefully enough to conclude that any of them pose a risk of harm to themselves or others. My extensive review of the records of Lucas and another child have suggested that no standardized metric whatsoever is used to evaluate actual risk to self.  Rather, the mere admission of suicidal thoughts have been sufficient to precipitate significantly elevated supervision and transfer to a higher level of care, often - as in Lucas's case - to the detriment of these children. For some, this has meant that they learn to keep such thoughts to themselves, increasing their isolation and preventing them from receiving the appropriate treatment for such a symptom.

8. Upon being admitted to the Shiloh RTC on August 23, 2018, *Flores* counsel and I met with Douglas Plaeger, who identified himself as Shiloh's Program Director. Mr. Plaeger stated that someone from the Public Health Service had spent two days during the week of August 13, 2018, reviewing case files for Shiloh's current detainees, but had only spoken to about three children. Mr. Plaeger further stated that ORR has not informed Shiloh of the results of this file review, and Shiloh had accordingly transferred no child to another facility based on ORR's having determined that they do not pose a risk of harm to themselves or others.

9. Mr. Plaeger further stated that Shiloh continues to deem ORR the custodian or guardian of children detained at Shiloh and that ORR continues to have full authority to authorize Shiloh to administer children psychotropic medications on a non-emergent basis without parental consent or court authorization.

10. Lucas confirmed that since July 30, 2018, no one has interviewed him to assess whether he poses a danger to himself or others. He further confirmed that he continues to take Lexapro and that as far as he knows, no one from Shiloh or ORR

has asked Madelyn or any other adult family member for permission to continue giving him psychotropic medication.

11. All of the other children I assessed at Shiloh reported much the same: (i) no one has spoken with them to assess whether they pose a risk of harm to themsevles or others; and (ii) Shiloh continues to administer psychotropic medications without parental consent or court order.

12. In an effort to form an opinion on whether the medications Shiloh continues to administer children are safe and effective, I requested Mr. Plaeger provide me with a medication list for each child whom I interviewed and who provided formal consent that I receive this information. Initially, Mr. Plaeger indicated he had no objection to doing so, but later refused to share medication lists, purportedly pursuant to instructions from ORR.

13. From his attorneys and myself, Lucas has been aware that the hearing to address his status has been scheduled for August 31st. This beacon has gotten him through weeks of misery. Just as his trust in his attorneys and myself has represented a counterweight to the alienation and isolation that Lucas feels toward the staff at Shiloh, so too his court date has served as the singular hope in what has felt like an increasingly hopeless existence.

14. On Friday, August 24, 2018, attorney Carlos Holguín and I met with Lucas to tell him about the Court's having postponed the hearing on his request to be reunited with his family. Children suffering from PTSD often struggle to internalize psychological distress as a means to keep from losing control of overwhelming emotions. I carefully observed Lucas's reaction to the news that he may have to spend an additional four weeks in confinement away from his family. He became notably withdrawn and quiet, turning inward, shutting down, putting his earbuds back in his ears.  Unlike in our other interviews he was unable to speak directly of the feelings generated by this news, suggesting that these feelings were too overwhelming to

6

address directly.  His body language - a shrug and pulling back from the table - suggested that this news had left him feeling more hopeless, less trustful in the system which might allow him relief - perhaps even in those of us he's counted on to help him - more isolated.  These are all factors which increase his risk of deterioration into a dangerous state.

15. In my opinion, ORR's treatment of Lucas and other children at Shiloh RTC continues to fall far short of both accepted mental health care standards and the "risk of harm" and informed consent standards set out in the Court's order of July 30. These failures create an unreasonable risk that Lucas will suffer serious harm should he remain in ORR detention for an additional four weeks. No child—especially one suffering from PTSD—is impervious to the destructive effects of institutionalization and separation from family. I believe that ongoing residence at Shiloh and separation from the family could well push Lucas, like any such youth, to an experience of isolation and hopelessness wholly inimical to his long-term well-being.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this __26__ day of August, 2018, at Los Angeles, California.

Dr. Amy Cohen, M.D.

41

# Exhibit 8

MEMORANDUM OF AGREEMENT
AMONG
THE OFFICE OF REFUGEE RESETTLEMENT
OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT AND
U.S. CUSTOMS AND BORDER PROTECTION
OF THE U.S. DEPARTMENT OF HOMELAND SECURITY
REGARDING
CONSULTATION AND INFORMATION SHARING
IN UNACCOMPANIED ALIEN CHILDREN MATTERS

I.   **Parties**

The Parties to this Memorandum of Agreement (MOA) are the Office of Refugee
Resettlement (ORR) in the Administration for Children and Families of the U.S. Department
of Health and Human Services (HHS), and U.S. Immigration and Customs Enforcement
(ICE) and U.S. Customs and Border Protection (CBP) of the U.S. Department of Homeland
Security (DHS) (collectively "the Parties").

II.  **Purpose**

The purpose of this MOA is to set forth the expectations of the Parties and implement
processes for the Parties to share information about unaccompanied alien children (UACs) at
the time of referral from ICE or CBP to ORR; while in the care and custody of ORR,
including in the vetting of potential sponsors and adult members of potential sponsors'
households; and upon release from ORR care and custody. This MOA sets forth a process by
which DHS will provide HHS with information necessary to conduct suitability assessments
for sponsors from appropriate federal, state, and local law enforcement and immigration
databases, as required by law. Such information includes information to which HHS would
otherwise not have access and without which suitability assessments are incomplete. The
Parties recognize such information-sharing as a top priority requiring special attention to
ensure that the transfer, placement, and release of UACs are safe for the UACs and the
communities into which they are released.

This MOA does not address all necessary coordination between the Parties, nor is that the
intent of this document. It is not a substitute for, nor does it supersede or revise, the Parties'
responsibilities under the Memorandum of Agreement between the Department of Homeland
Security and the Department of Health and Human Services Regarding Unaccompanied
Alien Children, executed on February 22, 2016, which established a framework for
interagency coordination.

1

III.  **Authorities**

This MOA is authorized under, and entered into consistent with, the following provisions of law:

A.  Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 102(b), 462, 116 Stat. 2135, 2142, 2202 (codified at 6 U.S.C. §§ 112(b), 279);

B.  William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 235, 122 Stat. 5044, 5077-79 (codified in principal part at 8 U.S.C. § 1232);

C.  Privacy Act of 1974, as amended, 5 U.S.C. § 552a;

D.  Immigration and Nationality Act of 1952, as amended, §§ 103(a), 287 (codified at 8 U.S.C. §§ 1103(a), 1357); and

E.  Tariff Act of 1930, as amended, § 589 (codified at 19 U.S.C. § 1589a).

IV.  **HHS and DHS Responsibilities Upon Initial Referral**

A.  **Initial Referral and Transfer**

1.  At the time of initial referral, the DHS component (ICE or CBP) referring the UAC to HHS (specifically, ORR) will electronically transfer the following information about the UAC, to the extent such information is known and can be gathered in an operationally reasonable manner, to ORR through the UAC Portal or by some other appropriate method:

   a.  Basic biographical data (e.g., name, date of birth, country of birth, potential sponsor information);
   b.  Situational factors (e.g., health, pregnancy, travel companions);
   c.  Human trafficking indicators; and
   d.  Known criminal or behavioral issues, including arrests, criminal charges and convictions, immigration history, gang affiliation or suspected gang affiliation, and violence or behavioral concerns.

2.  To ensure ORR has available information and supporting documentation to make an informed placement decision, the apprehending DHS component (ICE or CBP) will normally include in the Transfer Packet:

   a.  Copies of all identity documents;
   b.  DHS Form I-213, Record of Deportable/Inadmissible Alien;
   c.  DHS Form I-216, Record of Persons and Property Transferred;
   d.  DHS Form I-217, Information for Travel Document or Passport;

2

    e.  DHS Form I-770, Notice of Rights and Request for Disposition;

    f.  DHS Form I-862, Notice to Appear or other charging document;

    g.  CBP Form 93, Unaccompanied Alien Child Screening Addendum (trafficking information), if conducted;

    h.  Other applicable DHS, ICE, or CBP forms, if applicable, such as DHS Form I-200, Warrant for Arrest of Alien; and

    i.  Copies of any publicly available federal, state, or local criminal records in the possession of the apprehending DHS component (ICE or CBP) at the time of transfer and appropriate available documentation describing any gang, immigration, criminal, or other activity that may affect placement.

3.  As expeditiously as possible, but no later than 24 hours after receiving notification from ICE or CBP of a UAC needing placement at an ORR facility, ORR will send a notification email notifying both ICE and CBP of the placement location. At a minimum, the message will include:

    a.  Identifying information of the UAC at issue;

    b.  Facility name and location; and

    c.  Facility point of contact (name and telephone number).

## B. ORR Care

1.  While UAC are in ORR care, ORR will notify ICE or CBP of the following situations, as expeditiously as possible, but no later than 48 hours after the occurrence:

    a.  Unauthorized absences. The ORR-funded care provider will contact the ICE Enforcement and Removal Operations (ERO) Field Office Juvenile Coordinator (FOJC) by telephone and provide notice by email.

    b.  Arrest of a UAC in ORR custody. The ORR-funded care provider will contact the FOJC by telephone and provide notice by email.

    c.  Death of a UAC. ORR headquarters will immediately notify, by telephone, ICE ERO.

    d.  Alleged or suspected fraud, human smuggling, human trafficking, drug trafficking, weapons trafficking, or gang-related activity. ORR will notify the ICE Homeland Security Investigations Tip Line by email and, for human trafficking specifically (either by or of a UAC), ORR will also email the ICE Human Trafficking Help Desk.

    e.  Abuse of a UAC in ICE or CBP custody. If ORR becomes aware of allegations of abuse of a UAC while he or she was in ICE or CBP custody, ORR will notify the appropriate DHS component (ICE or CBP) as required under ORR policy.

    f.  Violence by a UAC while in ORR care. ORR will notify the FOJC of incidents of physical violence or assault by a UAC in its care, including incidents between a UAC and facility staff.

3

      g.  Change in level of care. ORR will provide notice by email to the FOJC of any step up/step down to or from secure care for the UAC.

2.  ORR will provide to the FOJC copies of all age-determination findings concluding that an individual is 18 years of age or over, as soon as possible from the time of such determination.

3.  If ICE or CBP becomes aware of any criminal information (e.g., information regarding gang affiliation) that it did not have at the time of initial referral and transfer, ICE or CBP will notify ORR as expeditiously as practicable after becoming aware of the information (using their best efforts to provide such notification within 48 hours), and provide supporting documentation, to aid in ORR's consideration of whether transfer of the UAC may be necessary.

4.  To the extent permitted by law, and consistent with policy, DHS will report to ORR the results of any investigations (including investigations commenced following ORR's notification under Section IV(B)(1) of this MOA) they conduct that would be relevant to ORR's determinations concerning UAC care and placement. Such information will be provided as expeditiously as possible, and normally within 96 hours of such information becoming available.

## V.   HHS and DHS Responsibilities Prior to ORR Release of a UAC to a Sponsor

### A. HHS's Responsibilities

1.  Pursuant to 8 U.S.C. § 1232(c)(3)(A), HHS must make a determination that a proposed sponsor is capable of providing for the child's physical and mental well-being. Such determination includes verification of the proposed sponsor's identity and relationship, as well as a finding that the proposed sponsor has not engaged in any activity that would indicate a potential risk to the child. In all placement determinations, HHS must ensure, among other things, that the UAC is likely to appear for all hearings or proceedings in which they are involved, is protected from smugglers and traffickers, and is placed in a setting where the UAC will not pose a danger to himself or others. 6 U.S.C. § 279(b)(2). In order to fulfill its statutory duty under 8 U.S.C. § 1232(c)(3)(A) and to ensure that all proposed placements meet the standards set forth in 6 U.S.C. § 279, ORR will take the following steps:

      a.  Prior to any release of a UAC from ORR care and custody to any sponsor, ORR will request from ICE information about all potential sponsors and adult members of potential sponsors' households, in order to aid HHS in determining the suitability of a potential sponsor. Such information includes the citizenship, immigration status, criminal history, and immigration history (to the extent consistent with the Privacy Act of 1974). ORR will advise the potential sponsor that this process is a required step in the UAC placement process.

4

**B.** ORR will provide ICE with the name, date of birth, address, fingerprints (in a format and transmitted as prescribed by ICE from time to time), and any available identification documents or biographic information regarding the potential sponsor and all adult members of the potential sponsor's household. ICE will then provide ORR with the summary criminal and immigration history of the potential sponsor and all adult members of the potential sponsor's household to the extent available to ICE, consistent with the applicable confidentiality provisions of the Immigration and Nationality Act (INA). ORR will use the criminal and immigration history information provided by ICE in ORR's individualized determination of sponsorship eligibility.

1.  ICE will ascertain only criminal and immigration history information. ORR will remain responsible for searching various databases including public records, Sex Offender Registry, National (FBI) Criminal History, Child Abuse and Neglect, State Criminal History Repository, and local police records for all potential sponsors.

**C. DHS's Responsibilities**

1.  Upon notice from an ORR-funded care provider that a potential sponsor or adult member of a potential sponsors' household requires screening for criminal and immigration histories and that ORR has received proper authorization from the potential sponsor or adult household members, ICE will conduct the initial screening. At a minimum, the review will include:

    a.  A biographic criminal check of the national databases;
    b.  A biographic check for wants and warrants; and
    c.  An immigration status check of the immigration databases.

2.  ICE will run the fingerprints of the potential sponsor and/or adult household member and review the response received for any criminal activity.

3.  ICE will provide the relevant criminal and immigration history information (consistent with the applicable confidentiality provisions of the INA) on the potential sponsor and adult household members within 72 hours, excluding weekends and holidays, after ORR requests the information and provides ICE with the necessary background information on the potential sponsor or adult member of the potential sponsors' household.

**VI.   Severability**

Nothing in this Agreement is intended to conflict with current law or regulation or the directives of DHS, CBP, ICE, HHS, or ORR. If a term of this MOA is inconsistent with such authority, then that term shall be invalid, but the remaining terms and conditions of this agreement shall remain in full force and effect.

5

**VII.    Disputes**

Disagreements between the Parties arising under or related to this MOA will be resolved by consultation.  Attempts to resolve disputes will occur first at the lowest level possible.  Any issues left unresolved after due consultation may be raised to the appropriate levels in the Parties, or if necessary, DHS and HHS.

**VIII.   Funding**

Each Party intends to bear its own costs in relation to this MOA.  Expenditures are subject to the Parties' budgetary resources and availability of funds pursuant to applicable laws and regulations.  The Parties expressly acknowledge that this MOA in no way implies that funding is to be made available for such expenditures and does not obligate the Parties to expend any funds.  Nothing in this MOA is intended to or shall be construed to require the obligation, appropriation, or expenditure of any money from the U.S. Treasury in violation of the Antideficiency Act, 31 U.S.C. §§ 1341-1519.

**IX.     No Private Rights**

This MOA is an agreement between the Parties and is not intended to, does not, and should not be construed to create any right or benefit, substantive or procedural, enforceable at law or in equity by any party in any administrative, civil, or criminal matter, against the United States, or any of its agencies, officers, or employees.  This MOA does not and is not intended to place any limitations on the otherwise lawful enforcement or litigative prerogatives of the Parties.

**X.      Effective Date, Modification, and Termination**

This MOA will take effect thirty (30) days after signature by the Parties and will remain in effect until revised or revoked in writing by mutual agreement of the Parties, or terminated without cause by any Party upon thirty (30) days advance notice in writing of intent to terminate.


Approved by:



_____          04/13/18
Kevin K. McAleenan                                Date
Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security


6

Thomas D. Homan
Deputy Director and Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

APR 1 3 2018
Date

Steven Wagner
Acting Assistant Secretary for Children and Families
U.S. Department of Health and Human Services

04-13-18
Date

Scott Lloyd
Director
Office of Refugee Resettlement
Administration for Children and Families
U.S. Department of Health and Human Services

4/13/18
Date

7

# Exhibit 9

## [Provisionally Filed Under Seal]

**DECLARATION OF CECILIA SACO IN SUPPORT OF ▮▮▮▮▮▮ DENIAL TO SPONSOR ▮▮▮**
**▮▮▮ BY ORR**

I, Cecilia Saco, declare as follows:

1.  I write this declaration in support of ▮▮▮▮▮ regarding her denial by ORR to sponsor
    her brother ▮▮▮▮▮ I make all of the statements herein of my personal
    knowledge, except as to those matters based on information and belief, which I believe
    to be true. I believe the statements herein to be true and if called to testify as a witness
    thereto, could do so competently under oath.

2.  I am a retired Supervising Social Worker with Los Angeles County Department of
    Children and Family Services' (DCFS) Special Immigrant Status (SIS) Unit. I was a Los
    Angeles County employee for 32 years and 5 months. I was a Supervising Children's
    Social Worker for the past 28 years and have extensive experience working with abused
    and neglected children. I have a Master degree in Social Work and I have received
    training on Intervention in Child Maltreatment & Domestic Violence from UCLA's School
    of Public Policy & Social Research, Department of Social Welfare.  Also, I have extensive
    child welfare and immigration experience working with undocumented immigrant
    children and families. I have managed a specialized unit within DCFS responsible for the
    filing of over 3000 Special Immigrant Juvenile Status (SIJS) applications with USCIS on
    behalf of DCFS undocumented immigrant dependent children. I was also the designated
    U Visa Certifier for DCFS for the period of 2008-2018.

3.  During my tenure with DCFS, I investigated hundreds of reports of child abuse and
    neglect. Such investigations typically included evaluating children's relatives and their
    homes in an effort to determine whether a child could be safely placed with family,
    rather than in taxpayer-funded foster or group homes.

4.  I am a native Spanish-speaker; I am bicultural as well, and I was accordingly tasked with
    investigating many monolingual Spanish-speaking families. As part of my duties with
    DCFS, I also had occasion to discuss child protection practices with colleagues from
    other states and counties; I believe DCFS's policies and practices with respect to
    evaluating the suitability of family members to care for children to be fairly typical of
    child welfare practices nationwide.

5.  I have been asked to give an opinion regarding the suitability of ▮▮▮▮▮ and
    ▮▮▮▮▮ to care for their brother, ▮▮▮▮▮, whom I understand has
    currently been detained by the Office of Refugee Resettlement ("ORR") at the Shiloh
    Residential Treatment Center in Texas. I have reviewed ORR's files for ▮▮▮ and its

home study of ███. These were provided by Carlos Holguín, one of the lawyers for the plaintiffs in *Flores v. Sessions*. On July 9, 2018, I visited the home of ████ and ████, ████, in Los Angeles, California. I spoke with ████ and ████ at length, and following standard DCFS practices and standards, evaluated their suitability to serve as custodians for ████.

6. ORR's file indicates that it denied ████ custody of her brother because of two concerns: First, that her roommate's brother, who was present at the time ORR's investigator visited the home, failed to appear for fingerprinting; and second, that ████ was unlikely to address ████'s mental health needs following release.

7. With respect to the first of ORR's concerns, when any adult applies with DCFS to become a resource family, he/she and all adult members of the household complete the same paperwork to live scan (fingerprint). Applicants don't have to have documented immigration status, but they do need appropriate ID to live scan (*matricula consular* or passport in the case of undocumented people). DCFS sends the live scan paperwork to three data bases: California Department of Justice ("DOJ"), FBI and California CACI (Child Abuse Central Index). When the applicant reports he/she has lived out of state, DCFS also checks the appropriate out-of-state CACI. To the best of my knowledge, DCFS does not share live scan information with ICE except pursuant to court order. It is my understanding that California DOJ sometimes shares information with ICE on a case-by-case basis, but that ICE needs a court order to access California DOJ records.

8. ████ assured me that her roommate's brother does not live in the home. She stated that she told ORR's investigator, Brenda, the same. During my visit, the roommate's brother was not present, nor did I observe anything in the home to indicate that he in fact lives there. I explained to ████ that if I had a reason to suspect that an adult male was residing in the home and would not appear for fingerprinting, I would need a letter from his actual landlord verifying that he was living elsewhere. ████ readily agreed to get such a letter, or similar proof.

9. I then asked ████ if ORR's investigator had been similarly open to the family's clearing up questions about her roommate's brother's residence. ████ reported that ORR had given her no chance to change its belief that her roommate's brother lived in ████'s home.

10. I next discussed with ████ and ████ whether they were open to seeking mental health services for ████. ████ initially assured me that ████ is not "crazy" and does not need mental health care. In my experience, ████'s equating mental health concerns with psychosis is fairly typical in Latin America, where cultural attitudes and limited education engender a reluctance to seek help for common mental health conditions

such as anxiety and depression. I explained that many people who are not "crazy" nonetheless have mental health problems that should be treated, and that they should be open to the possibility that ███ too, may such have such mental health needs. ███ and ███████ indicated they understood and agreed to have ███ treated for any mental health issues he may have following release. I also asked ███ if anyone from ORR had discussed ██████'s mental health with her. She said no one had.

11. ███ also related that ORR had given her nothing in writing explaining its reasons for refusing to release ██████ to her, and that as far as she knew, she had no right to a hearing, administrative appeal, or other procedure by which the family might seek to change ORR's decision. In my opinion, ORR's denying █████████'s custody failed to meet accepted child welfare standards in several particulars.

12. First, standard child welfare practice requires that families receive a detailed, written explanation of why they are being denied custody of a dependent minor. This gives the family guidance about how to cure any problems the child welfare investigator uncovers during a home evaluation. Unless a family member has committed major crimes such as murder, rape or sex-related offenses, child endangerment, willful cruelty, or similarly irremediable safety-risk, standard child welfare practice is to encourage families to make any needed changes to reduce or eliminate concerns. This reflects the consensus among child welfare professionals that it is better to place children with their families whenever it is safe to do so.

13. Second, in county child welfare systems, social workers assess the caregivers' home, the caregivers' ability to care and provide for the child, and the caregiver's background check; finally they make recommendations. Our reports are reviewed by State legal counsel after which families are entitled to contest and rebut social workers' findings and recommendations. According to █████, however, ORR gave her no opportunity to appeal or otherwise contest ORR's decision to deny her ██████'s custody. I know of no child protection agency that is similarly empowered to issue final, unreviewable decisions regarding the suitability of family members to care for dependent children.

14. Third, ORR should have explained to the family that not all persons with mental health needs are psychotic, and that there is no shame in getting help for mental health problems. As noted, I often had to explain this to our Spanish-speaking families; I did not always succeed in convincing them, but in my experience the majority of families do understand this explanation when given a chance, and they thereafter follow through with seeing to it that a child receives needed mental health treatment. In the case of ████████, if ██████ was to be released to her, she assured me her willingness to look for mental health resources in her community, educate herself about the possible issues concerning her brother ██████, and to get the appropriate services for him, before a crisis may arise. In my opinion, if given the opportunity, █████ and █████████ would not

neglect ▮▮▮▮ mental health needs.

15. If I was still working for DCFS, as long as I was presented with proof that the roommate's brother lives in a different residence, and I had the commitment of ▮▮ and ▮▮▮▮ to seek mental health services for ▮▮▮ I would release ▮▮▮ to his siblings. I would also continue to support the family after the release with the appropriate community resources to secure a permanent home for ▮▮▮.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct.

Executed at Los Angeles, California on:

_04/14/18_

Date

Cecilia Saco

# Exhibit 10



**From:** **Carlos Holguín** crholguin@centerforhumanrights.org 📎
**Subject:** Fwd: Correspondence re: Flores class member interviews at Shiloh RTC, St. Michael's
**Date:** October 19, 2018 at 6:34 AM
**To:**

---

**From:** "Fabian, Sarah B (CIV)" <Sarah.B.Fabian@usdoj.gov>
**Subject:** **RE: Correspondence re: Flores class member interviews at Shiloh RTC, St. Michael's**
**Date:** July 11, 2018 at 2:44:01 PM PDT
**To:** "crholguin@centerforhumanrights.org" <crholguin@centerforhumanrights.org>
**Cc:** "Alsterberg, Cara E. (CIV)" <Cara.E.Alsterberg@usdoj.gov>, "Silvis, William (CIV)" <William.Silvis@usdoj.gov>, "Flentje, August (CIV)" <August.Flentje@usdoj.gov>, Adams Crystal <cadams@youthlaw.org>, "acohen8919@mac.com" <acohen8919@mac.com>, Neha Desai <ndesai@youthlaw.org>, Schey Peter <pschey@centerforhumanrights.org>

Carlos:

The procedures are attached. I reiterate that there is absolutely no basis to find that these visits would be authorized under Paragraph 33 of the Agreement, as those visits are plainly limited to attorney-client access. Even if Defendants were to agree that the visits you are requesting for non-attorney professionals might be authorized under Paragraph 34 the Agreement as your colleague Mr. Schey has argued, which we do not, even under any reading of that Paragraph of the Agreement, Plaintiffs would be obligated to provide 7 days-notice of that visit and to follow these "generally applicable policies and procedures of the facility." I understand St. Michaels has been able to make arrangements to allow a visit to occur at that facility this week. I am still awaiting word whether Shiloh is able to do so as well, but in the meantime would urge you to consider bringing your request in accordance with the facility policies so that it may be considered as quickly as possible.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguin [mailto:crholguin@centerforhumanrights.org]
**Sent:** Wednesday, July 11, 2018 3:34 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Alsterberg, Cara E. (CIV) <caalster@CIV.USDOJ.GOV>; Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>; Adams Crystal <cadams@youthlaw.org>; acohen8919@mac.com; Neha Desai <ndesai@youthlaw.org>; Schey Peter <pschey@centerforhumanrights.org>
**Subject:** Re: Correspondence re: Flores class member interviews at Shiloh RTC, St. Michael's

Sarah,

Please have Shiloh and St. Michael forward us their written "normal policies and procedures" regarding the participation of experts in attorney-client meetings by 3:00 pm pacific time today.

Thank you.

--
Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org
--
CONFIDENTIALITY NOTICE: This communication, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and legally privileged information. Any unauthorized interception, review, use, distribution, or disclosure not authorized by the intended recipient(s) is prohibited and may violate applicable laws, including the Electronic Communications Privacy Act of 1986, Pub. L. 99-508, 100 Stat. 1848, *codified at* 18 U.S.C. §§ 2510 *et seq.* If you are not the intended recipient, please contact the sender and destroy all copies of the original communication.

Fabian, Sarah B (CIV) wrote:

> Carlos:
>
> This is Defendants' final word as to what is required under the Agreement with regard to non-attorney visitors. I have reached out to the facility to find out if this visit is something that could be arranged under the facility's normal policies and procedures either today or in the near future. I will let you know as soon as I hear back on that question.
>
> Best,
> Sarah
>
> Sarah B. Fabian
> Senior Litigation Counsel
> Office of Immigration Litigation – District Court Section
> (202) 532-4824

**From:** Carlos Holguin [mailto:crholguin@centerforhumanrights.org]
**Sent:** Wednesday, July 11, 2018 3:01 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Alsterberg, Cara E. (CIV) <caalster@CIV.USDOJ.GOV>; Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>; Adams Crystal <cadams@youthlaw.org>; acohen8919@mac.com; Neha Desai <ndesai@youthlaw.org>; Schey Peter <pschey@centerforhumanrights.org>
**Subject:** Re: Correspondence re: Flores class member interviews at Shiloh RTC, St. Michael's

RYO, St. Michaers

Mr. Flentje,

Is this is Defendants' final word? If so, please advise, and I will proceed to contact Judge Gee's chambers.

Thank you.

--
Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org
--

Fabian, Sarah B (CIV) wrote:

> Carlos:

> Your request for attorney-client visits, improperly dated, was sent only two days before your requested visit. The responses you are getting from me and from the facility are not inconsistent – if visits are not cleared sufficiently in advance then it may be difficult for the facility, operationally, to make the necessary arrangements for those visits including getting any necessary approvals and clearing visitors for access. Nonetheless, as I understand it, facility staff attempted to make provisions for this attorney-client visit despite the lack of notice from you.

> As you are aware, visits under Paragraph 32 are provided in accordance with the regular practices and procedures of the facility. For many facilities where class members are held, notice and the ability to make the necessary arrangements is part of the regular operations of the facilities, and your disregarding that is a breach of your obligations under the Agreement. Defendants have worked with you to arrange hundreds of interviews at numerous facilities over the last several weeks, and in order for us to continue to do so it is imperative that Plaintiffs hold up your end of the Agreement as well by providing us with sufficient notice so that the visits can be arranged without disrupting the operations of these facilities.

> Moreover, you are reminded that Paragraph 32 permits

58

Moreover, you are reminded that Paragraph 32 permits attorney-client visits only. Nothing in that provision allows for visits from non-attorney professionals. If you wish to arrange such visits you would need to make those arrangements with the facility who may or may not allow them in accordance with their policies. If you believe that the Agreement in fact contains authority providing for such visits please explain the basis for your belief.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguin [mailto:crholguin@centerforhumanrights.org]
**Sent:** Wednesday, July 11, 2018 12:39 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Alsterberg, Cara E. (CIV) <caalster@CIV.USDOJ.GOV>; Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>; Adams Crystal<cadams@youthlaw.org>; acohen8919@mac.com; Neha Desai <ndesai@youthlaw.org>; Schey Peter <pschey@centerforhumanrights.org>
**Subject:** Re: Correspondence re: Flores class member interviews at Shiloh RTC, St. Michael's

Dear Sarah,

I am advised that Shiloh staff is denying Plaintiffs' counsel access to *Flores* class members on the ground that ORR's Federal Field Specialist has not approved access. Apparently, this has nothing to do with any logistical limitations at the facility itself, which was the sole objection you raised to today's monitoring visit.

I am advised that facility staff have been unable to reach you via telephone notwithstanding that you were on notice that Plaintiffs counsel would appear today at the Shiloh facility.

Though it should go without saying, Defendants are in clear and present breach ¶ 32 of the Settlement. Until now, Plaintiffs have provided advance notice of visits to ORR facilities as a matter of courtesy, and not because the Settlement requires it. We are willing to continue providing such notice to the extent consistent with our clients' best interests, but are prepared to discontinue doing so if ORR is going to obstruct access on grounds as

insubstantial as those presently being asserted.

I urge ORR cure this breach by allowing Plaintiffs' counsel access to class members at Shiloh without further delay. Its failing to do so will result in Plaintiffs' moving to hold ORR in breach of the Settlement and for appropriate remedies, including monetary sanctions and an order making explicit that Plaintiffs need give ORR no notice prior to future monitoring visits.

You may reach me at 661-270-0912 to discuss this if you wish.

--
Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
213.386.9484 (fax)
http://www.centerforhumanrights.org
--



Attorney of
Record...re.doc



HR2_Profession
alStaff...KP.doc

60

# Exhibit 10-1

2.   PROFESSIONAL STAFF PRIVILEGES

### 2.1.   Professional Staff Privileges

2.1.1.   Policies and procedures specify the types of professionals who need clinical privileges and treatment functions which are considered privileges.  Clinical privileges are granted to:

- all individuals permitted by law and by Shiloh to provide client care services without supervision or direction
- staff providing treatment or diagnostic services to Shiloh clients or the evaluation of such services and to staff providing facility administration
- other individuals who are determined by the COW and the board to be subject to the process for granting clinical privileges

### 2.2.   Delineation of Privileges

2.2.1.   The COW delineates the organization's clinical privileges, defines the qualifications necessary to be eligible for privileges and determines the levels of practice and supervision.

2.2.2.   The clinical privileges and criteria document is approved by the board before adoption as the basis of granting privileges.

2.2.3.   As the COW determines that revisions are necessary to the clinical privileges and criteria document, the proposed revisions are submitted to the board for approval.

2.2.4.   The clinical privileges and criteria as a whole are reviewed at least once every two years during the COW policy review process.

2.2.5.   The COW determines the basis for appointment, re-appointment or revision of clinical privileges.

### 2.3.   Applying for Privileges and Renewal of Privileges

2.3.1.   Any one seeking privileges, or the renewal of privileges, to treat or work with Shiloh clients must gain them through the process described below.  Privileges are assigned by the credentials review process.

2.3.2.   Applicants for privileges must participate in the process whereby the COW determines each applicant's eligibility for privileges.

2.3.3.   The COW uses the requirements for eligibility specified in the clinical privileges and criteria documents, to judge an applicant's eligibility based on criteria for qualifications, clinical performance and ethical practice.

2.3.4.   An individual seeking privileges or revision of privileges must have on file for the COW's review the certain documents.

2.3.5.   Verification of the supporting documentation regarding education, work experience, training, licensure certification, or registration is required and must include:

- current proof of licensure or certification if applicable
- diplomas or transcripts from colleges, universities or training institutes
- certificates reflecting additional training
- resume or vita of applicable work experience

2.3.6.   Upon verification of relevant information contained in the application package, the package is submitted to the Shiloh CEO for an appointment recommendation.  After indicating the recommendation on the application form, the CEO forwards the application package to the COW for the credentials review process.

2.3.7.   Evidence of an applicant's current competence is considered when reviewing his/her application.  Competence is verified by the following:

- peer recommendations
- results of monitoring and evaluation of care through QI and supervisory reports, if any

2.3.8.   Individuals applying for privileges indicate on the signed application that they have read and agree to be bound by Shiloh Policies and Procedures.

2.3.9.   Each member of the professional staff is reviewed for reappointment to the COW and renewal or revision of clinical privileges every two years.

2.3.10.  An individual seeking renewal of privileges or revision of privileges must have on file for the COW's review the following documentation:

- up-to-date proof of licensure and certification
- performance evaluation for the current year, if applicable
- written recommendations from professional peers

## 2.4.   Granting Privileges to Unlicensed and Uncertified Staff

2.4.1.   The COW delineates the qualifications, status, clinical duties and responsibilities of staff who provide client care services with supervision and direction but who are eligible for the granting of specific clinical privileges.

2.4.2.   The COW specifies the categories of staff who may qualify for specific clinical privileges.

2.4.3.   During the credentials review process, the COW considers each individual staff for specific privileges based on demonstrated competence, education, experience and peer recommendation.

**2.5.   Credentials Review Process**

2.5.1.   The COW's credentials review process calls for the COW to review applications for appointment, reappointment of staff privileges at Shiloh and to assure that clinical privileges are specific to the practitioner and the care the practitioner provides within Shiloh.  Candidates are verified through a primary source.

2.5.2.   Each practitioner is individually considered by the COW for the specific treatment modalities and services he will be authorized to provide.

2.5.3.   The client-care services that a staff is authorized to provide may be limited by the COW during the credentials review even though the staff may meet the required criteria for performing the service.

**2.6.   Decisions on Privileges**

2.6.1.   Decisions to grant privileges will follow the following process:

2.6.1.1.   Using the COW-approved delineation of clinical privileges and criteria the COW will consider the following information in their decision-making process:

- the educational requirements of the position or of the procedure being privileged
- the licensing or certification requirements of the position or of the procedure being privileged
- the experience required for the position or of the procedure being privileged

2.6.1.2.   The current competence demonstrated in the position or in the procedure being privileged by the individual applying for privileges or membership in the COW as demonstrated by:

- peer recommendations
- supervisor evaluations
- client care review
- evidence of on-going training and education
- information from monitoring, evaluation and quality improvement reports

2.6.1.3.   Re-appointment to the professional staff and renewal or revision of privileges is also dependent upon the following:

- compliance with the COW policies on professional ethics as evidenced by the absence of any validated reports of ethical misconduct
- compliance with all policies and procedures established by the COW and board as evidenced by the absence of substantiated reports of noncompliance

2.6.1.4.   After reviewing the application for privileges and COW membership, the COW makes a recommendation to the board, that the application be approved, not approved, or deferred.

2.6.1.5.   The board decides within 30 days of the receipt of a recommendation from the COW whether to approve, not approve, or defer approval of privileges.  Clinical privileges are granted by the board, but are initiated by through the COW application and credentials review process.

2.6.1.6.   If all parties in the approval process decide to defer, the applicant must wait six months before re-initiating the application process.

## 2.7.   Emergency and Temporary Privileges

2.7.1.   The COW has procedures for granting emergency and temporary privileges on a time-limited basis.

2.7.2.   Application for full appointment and privileges must be made during this temporary period.

2.7.3.   Emergency or temporary appointments occur to fill critical job vacancies, or to initiate new programs.

### 2.8.    Appeals Process

2.8.1.   Staff members may have the opportunity for due process and appeal of adverse recommendations regarding their reappointment, restrictions, revocation, or denial of clinical privileges.

2.8.2.   An individual dissatisfied with the outcome of his application for professional privileges or with corrective actions may appeal the decision.

2.8.3.   All appeals must be in writing and must be submitted to the COW within 30 days of the date the individual was notified of the decision.

2.8.4.   Written appeals must state a specific reason the individual believes the decision was incorrect.

2.8.5.   A hearing is scheduled for the individual to present his case in person to the appeal board.

2.8.6.   An appeal board, made up of a member of the board, the CEO and one member of the COW hear the appeal and recommend action to the board.  Decisions of the board are final.

2.8.7.   The CEO is responsible for a written report of the hearing and the board's decision; this report becomes part of the staff's personnel record and the records of the COW and board.

### 2.9.    Clinical Privileges of the Professional Staff

The clinical privileges of the professional staff are as follows:

| Discipline | Privilege |
|---|---|
| Physician | Medical diagnosis and treatment |
| | Psychiatry and psychiatric testing |
| | General psychotherapy |
| Nursing | General nursing care and treatment |
| Psychology | General psychotherapy |
| | Individual Therapy |
| | Group psychotherapy |
| | Family therapy |
| | Individual counseling with an MR population |
| | Behavior therapy |

Shiloh Treatment Center, Inc.
*Human Resources*

Psychological testing
    Psychosocial Evaluation
    Intelligence testing
    Achievement Testing
    Personality Testing
    Social adaptation
    Neuropsychological
Admission Assessment
Discharge Summary
Client care monitoring

<u>Counselors and Clinical Social Workers</u>

    General psychotherapy
    Individual Therapy
    Group psychotherapy
    Family therapy
    Individual counseling with an MR population
    Behavior therapy
    Psychosocial Evaluation
Admission Assessment
Discharge Summary

<u>Education</u>
Academic instruction
Diagnostic assessment
    Academic ability
    Developmental level
Individual Education Plan development
Behavior management

<u>Speech Therapy</u>
Speech and language evaluation
Speech and language therapy
Communication training

<u>Treatment Director</u>
<u>Shift Supervisor</u>
Behavior management
Client care monitoring
Therapeutic hold
Placement on suicide precaution
Removal from suicide precaution
Placement on runaway precaution
Removal from runaway precaution
Special restrictions
Safety precautions
Visitation and passes
Medication monitoring
First Aid
CPR

Shiloh Treatment Center, Inc.
*Human Resources*

Direct Care Staff                    Behavior management
                                     Client care monitoring
                                     Therapeutic hold
                                     Special restrictions
                                     Safety precautions
                                     Visitation and passes
                                     Medication monitoring
                                     First Aid
                                     CPR

# Exhibit 10-2



| **Catholic Charities**<br>**Archdiocese of Galveston-Houston**<br><br>***Applies to: St. Michael's Home for Children*** | **Procedure:**<br>**Attorney of Record**<br><br><br>**Effective:  07/7/2015** |
|---|---|

### _Procedure_

It is procedure for St. Michael's Home for Children to communicate with attorney of records for clients in care. It is procedure for SMHC to follow Catholic Charities and ORR policy regarding attorney of records. In particular, staff shall not make judgments or recommendations about a child's possible immigration relief.

**Working with Cabrini Center Attorneys**

All children in care are to have access to legal service providers and the case management department is the main contact for that provider. It is noted that ORR has instructed care provider facilities to engage with and allow VERA contracted attorneys and legal caseworkers on property to provide Know Your Rights Presentations and legal intakes. These sessions may be conducted on site at SMHC.

St. Michael's Home for Children as part of Catholic Charities of the Archdiocese of Galveston Houston works closely with the other department of the agency St. Frances of Cabrini Legal Center, who have a VERA contract.

All Cabrini staff including attorneys and legal case workers have background checks per agency Zero Tolerance Policy 2.b.ii. The Case Management department collaborates with this program staff in regards to the immigration docket, as well as legal paperwork such as change of address information.

All Cabrini staff members must let SMHC they are coming to the property. It is noted that case management would then inform all needed parties. All Cabrini Staff members must be able to show a Catholic Charities badge.

**Private Attorneys**

Clients or family members of clients are able to hire a private attorney for a client in care. Case Managers must inform all clients and sponsors that Cabrini Center provides a Know Your Rights presentation and legal assistance for no charge. Case Managers cannot give legal advice or counsel about hiring, firing, or choosing a private attorney. All clients must be informed that they are not required to use the attorney recommended by their parents or by the individual who brought them to the United States. Furthermore, a child may terminate the services of his/her attorney if he/she believes that the attorney does not have his/her best interests in mind.  St. Michael's Home for Children staff must request a signed G-28 authorizing representation prior to responding to questions from an outside caller claiming to be his/her attorney. The G-28 must be signed by the child, child's parent or legal guardian.

Any family member or attorney indicating that a private attorney has been hired must be able to have a signed G-28 upon request as well as answer if it has been filed with the immigration court. Case Managers must work with Cabrini Center Supervisors/attorney to confirm status of attorney and note any concerns. If the G-28, EOIR-27 or EOIR-28 is signed by anyone other than the child, parent or legal guardian - or if it is unsigned - do not allow contact and alert the ORR. If the child's signature appears on the G-28, EOIR-27 or

EOIR-28, make sure the child acknowledges that he/she signed the document and that this person is his/her attorney.

Private attorneys once verified may speak with their client by phone or visit them in the main building location. They must provide a picture ID and G-28. No client visits may occur on site at shelter locations without ORR FFS or PO prior approval.

In general, SMHC staff may ask questions or discuss basic information about a child with the attorney (after attorney provides a copy of a signed G-28, EOIR-27 or EOIR-28). Care providers may also apprise attorneys of reunification efforts or difficulties and coordinate with the attorney the prompt submission of documentation from the sponsor. Care providers will refer attorneys' inquiries that require government action or review to the FFS and copy the Case Coordinator.

Licensed psychologists, physicians and other professionals may also aid attorneys with assessments, evaluations, expert witnessing and other areas of representation. Attorneys are required to obtain written permission from the ORR Project Officer prior to having these professionals meet with the child. The child shall be notified before the meeting and the professionals working at the attorney's or accredited representative's request may have access to the child only with the child's permission. The ORR cannot fund such evaluations solely for the purpose of assisting a child's immigration case.

**Other Topics**
Any attorney that requests client information from a client's case file, must be redirected to ORR for the process of requesting a record formally. SMHC staff cannot release information about the UAC to the child's attorney of record or any other party without prior authorization from the ORR

Unlimited telephone access shall be permitted for calls to attorneys who have provided the care providers with Notice of Attorney Representation (Forms EOIR-27, EOIR-28 or G-28) signed by the child or child's parents/legal guardian.

The telephone numbers or names of VOLAG caseworkers should also not be divulged to attorneys or potential sponsors.

# Exhibit 11

**ADMINISTRATION FOR**

# CHILDREN & FAMILIES

Office of Refugee Resettlement | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

September 13, 2018

Dr. Luis A. Valdes
Administrator
3926 Bahler Ave.
Manvel, TX 77578

Dear Dr. Valdes:

I am writing as a follow-up to my September 5th email regarding the administration of psychotropic medications to minors in ORR custody at Shiloh.  ORR seeks to clarify further what is required of Shiloh as a federal ORR grantee for compliance with the recent *Flores* Enforcement Court Order.

As you know, that Order interprets Texas law governing informed consent. While ORR has sought further guidance from the State Attorney General's Office on the application of Texas law to the unique context of unaccompanied alien children (UAC) in ORR federal custody and may disseminate future policy directives accordingly, compliance with the terms of the *Flores* Order as ORR is interpreting them is needed now.

## Texas Law Requirements Regarding Informed Consent (Per the *Flores* Order)

Unless and until otherwise directed by ORR, Shiloh should be following the same policies and procedures that the facility adheres to in obtaining informed consent for administration of psychotropic medications to its domestic population of children in foster care consistent with Texas law. **ORR reiterates its requests for copies of any such policies or procedures currently in effect.**

### Written, Signed, Dated Consent

- Shiloh must obtain written, signed and dated consent from a person legally authorized to give medical consent.  *See* Tex. Admin. Code §§ 748.43(47), 748.2001(b).
  - The written consent must be kept in the minor's case file.
- Consent must be specific to *each* psychotropic medication to be administered, as well as for medication changes.

<u>Person legally authorized to give medical consent "("Medical Consenter")</u>

- Parent(s)
  - o Have the right to consent to medical, psychiatric, or psychological treatment. *See* Tex. Fam. Code § 151.001(a)(6).
  - o All attempts (successful or unsuccessful) to reach a minor's parent(s) must be clearly documented in the minor's case file.
- Close Adult Relatives
  - o Examples include (but are not limited to): grandparents, aunts, and uncles.
  - o If the minor's parent(s) cannot be contacted and has/have not given actual notice of a contrary intent, a close adult relative of the minor may consent to the administration of psychotropic medications.
  - o A potential sponsor may or may not be considered a "close relative."

- Court Order - without consent from a parent or close adult relative, a Texas state court order is necessary to appoint a Medical Consenter. Tex. Fam. Code § 266.004 (procedures for obtaining a court order authorizing medical care for a child in Texas state foster care).
  - o Please let us know immediately if Shiloh encounters any difficulty in obtaining such a Texas state court order for the appointment of a Medical Consenter for a UAC as is required by the current interpretation of the *Flores* Order.  ORR recognizes the possibility that Texas state courts may be resistant to exercising jurisdiction over UAC in federal custody.

- Until ORR otherwise directs, an ORR/Federal Field Specialist (FFS) may <u>NOT</u> sign a consent form without a Texas state court order appointing the FFS as the Medical Consenter for the minor.
  - o As noted ORR has sought a legal opinion from the Texas Attorney General to be certain of the State's own interpretation of informed consent requirements in the unique context of minors in federal custody with ORR.
  - o ORR is evaluating, with the state of Texas as well, whether children in the care and custody of HHS are analogous to those under the jurisdiction of the State of Texas or a county within the state such that an ORR/FFS *could* consent when a parent or close relative is unable to do so.
  - o In the interim, however, until ORR receives the Texas opinion, ORR reads the Court Order such that consent for administering psychotropic medication to a UAC focuses on parental informed consent, and then consent from other adult relatives, in keeping with Texas state law. If Shiloh cannot obtain such approval, then a Texas state court order must be sought for the appointment of a Medical Consenter to consent to the administration of psychotropic medications.  Again, please inform ORR immediately if Shiloh encounters any resistance from Texas state courts to providing such a court order.

**Detailed Disclosure Prior to Obtaining Written Consent**

Prior to obtaining written consent, the prescribing health care professional must provide the
"person legally authorized to give medical consent" with a very detailed disclosure in writing (or
orally if documented thereafter). *See* Tex. Admin. Code § 748.2253(a)&(c). The disclosure must
include:

- The child's diagnosis
- The nature of the child's mental illness or condition
- An explanation of the purpose of the medication
- A description of the benefits expected
- Side effects of the medication
- A statement of whether the medication is habituating in nature
- Risks and benefits of the alternative treatments or procedures
- Risks and benefits of not receiving or undergoing a treatment or procedure
- An explanation that the personal legally authorized to give medical consent may ask
  questions about the child's response to the medication, and may review Shiloh's daily
  records on request
- An explanation that medical consent may be withdrawn and that a request may be made
  that the medication be discontinued at any time.
- A copy of the written consent form must be filed in the minor's case file.

**Emergency Medication**

Texas law does allow Shiloh to administer psychotropic medications to UAC without consent or
court authorization "in an emergency during which it is *immediately* necessary to provide
medical care to the child to prevent the *imminent* probability of death or substantial bodily harm
to the child or others." *See* Tex. Fam. Code § 266.009(a) (emphasis added); 26 Tex. Admin.
Code § 748.2257(c).

If Shiloh administers psychotropic medication to a minor in ORR custody on an emergency
basis, the physician must document the emergency and the prescription in the minor's case file.

**Required Documentation of Compliance with the *Flores* Order and Texas Law**

- Shiloh must make every effort to achieve compliance with the *Flores* Order and Texas
  law as expeditiously as possible as to each minor currently in ORR custody and placed at
  Shiloh as well as any minor to be placed at the facility in the future. However, Shiloh
  must take care to ensure that, in the interim as compliance is being achieved, minors on a
  present regimen of psychotropic medication(s) continue to be provided appropriate

Administration for Children and Families  |  **Office of Refugee Resettlement**  |  www.acf.hhs.gov/programs/orr

3

psychiatric care consistent with all applicable medical/psychiatric practice standards under state law.

- A detailed log must be kept in the minor's case file of the following:
    - o All attempts to reach a parent or close relative for consent
    - o Written, signed consent once obtained for each new medication prescribed to a minor, and medication changes
    - o Documentation that the required detailed disclosures (see above) have been provided to the person giving medical consent.
    - o Documentation of any emergency medication provided and the reasons why.

Please respond in writing to this email to inform ORR of the specific steps that Shiloh has taken or is taking to ensure swift compliance with the *Flores* Order and Texas law.

Thank you for your attention to this very important matter and your anticipated cooperation in facilitating Shiloh's compliance.

Sincerely,



UAC Policy Supervisor

# Exhibit 12

From: **Fabian, Sarah B (CIV)** Sarah.B.Fabian@usdoj.gov 📎
Subject: [Not Virus Scanned] [Not Virus Scanned] RE: Correspondence requesting meet/confer in re: contempt
Date: September 7, 2018 at 3:41 PM
To: Carlos Holguín crholguin@centerforhumanrights.org
Cc: Silvis, William (CIV) William.Silvis@usdoj.gov, Holly S Cooper hscooper@ucdavis.edu, Leecia Welch lwelch@youthlaw.org,
Peter Schey pschey@centerforhumanrights.org, Flentje, August (CIV) August.Flentje@usdoj.gov

SF

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure
you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure
you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Carlos:

Please see the attached in response to two of your inquiries. I am still waiting for more
information regarding the medication issue and will follow up with you on that on
Monday.

Thank you,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguín [mailto:crholguin@centerforhumanrights.org]
**Sent:** Thursday, September 06, 2018 9:04 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; Holly S Cooper
<hscooper@ucdavis.edu>; Leecia Welch <lwelch@youthlaw.org>; Peter Schey
<pschey@centerforhumanrights.org>; Flentje, August (CIV)
<AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Correspondence requesting meet/confer in re: contempt

Please see attachments.

Attachments available until Oct 6, 2018

Thank you.

—
Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
(213) 388-8693 x.309 (v)
(213) 290-1642 (direct)
(213) 386.9484 (fax)
http://www.centerforhumanrights.org
--

On Sep 4, 2018, at 3:10 PM, Fabian, Sarah B (CIV)
<Sarah.B.Fabian@usdoj.gov> wrote:

Carlos:

I am available tomorrow (Wednesday) afternoon to discuss your letter.
Please let me know if there is a time that works for you after 3pm Eastern.

Also, please see the attached spreadsheet reflecting decisions regarding
step downs from secure care. I inadvertently missed sending this
spreadsheet to you on August 24 when it was sent to me by my clients, so
all information therein is accurate as of that date.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguín [mailto:crholguin@centerforhumanrights.org]
**Sent:** Friday, August 31, 2018 7:20 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>; Silvis, William
(CIV) <WSilvis@civ.usdoj.gov>
**Cc:** Holly S Cooper <hscooper@ucdavis.edu>; Leecia Welch
<lwelch@youthlaw.org>; Peter Schey
<pschey@centerforhumanrights.org>
**Subject:** Correspondence requesting meet/confer in re: contemp

Please see attached.

Thank you.

Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
(213) 290-1642 (direct)
213.386.9484 (fax)
http://www.centerforhumanrights.org
<Copy of Copy of Secure cases 8.24.18- production.xlsx>

| Click to Download | Click to Download |
|---|---|
| 2dLetterRe7-30OrderCompliance090618.pdf | Shiloh G28s.zip |
| 93 KB | 39.8 MB |

# Exhibit 13

For Immediate Release
October 12, 2018

Contact:  ACF Press Office
202-401-9215
media@acf.hhs.gov

## FACT SHEET

**U.S. Department of Health and Human Services**
**Unaccompanied Alien Children sheltered at Tornillo LPOE, Tornillo, Texas**

The U.S. Department of Health and Human Services (HHS) has established a temporary shelter for unaccompanied alien children (UAC) at U.S. Customs and Border Protection (CBP) Tornillo, Texas Land Port of Entry (LPOE).

The temporary shelter established at Tornillo has 3800 beds for UAC, 1400 of those beds are on reserve status.  Continuation of operation of the Tornillo temporary shelter is a necessary and prudent step to ensure that HHS has the capacity to provide appropriate care for UAC while a suitable sponsor is identified and the Border Patrol can continue its vital national security mission to prevent illegal migration, trafficking, and protect the borders of the United States.

The need for the continuation of the temporary operation at Tornillo is based on the number of UAC in ORR care who crossed the border alone without their parent or legal guardian.  Family separations that resulted from the Zero Tolerance Policy which ended on June 20, 2018 are not driving this need. No children that were a part of the family separations are at the Tornillo facility.

All UAC sheltered at the Tornillo LPOE site are in the custody of HHS and all of the care and services is being provided by entities under grant or contract to HHS's Administration for Children and Families (ACF).

HHS operates a  network of just over 100 shelters in 17 states and has a proven track record of accountability and transparency for program operations, as well as being a good neighbor in the communities where shelters are located.  Currently, the average length of care for UAC in the program is approximately 59 days.  The overwhelming majority of UAC are released to suitable sponsors who are family members within the United States (U.S.) to await immigration hearings.

The task of assigning each child to the most appropriate shelter is complex and done with great care.  As of today there are approximately 1,500 UAC residing at Tornillo.  All are age 13 to 17.  Approximately 80 percent are male and 20 percent are female.   UAC spend on average 25 days at Tornillo.   Most all are about to be released to a suitable sponsor.

UAC receive the following at Tornillo: an individual bed; care and supervision; case management; counseling; access to legal services; medical care; three meals a day and snacks; recreation; soccer; basketball; movies; arts and crafts; board games; televised sports events; religious services; an on-site barber; and private showers, minors in the program receive

79

For Immediate Release                                   Contact:  ACF Press Office
October 12, 2018                                                       202-401-9215
                                                                          media@acf.hhs.gov

educational services from teachers under the oversite of an experienced senior public school administrator using textbooks and workbooks.

UAC residing in HHS shelters do not integrate into the local community.  UAC do not attend local schools.  They remain under the supervision of shelter staff at all times. A lease agreement with GSA is providing HHS temporary use of the site.  HHS will assume full responsibility for the facility during its use, including wear and tear on the grounds.

**Security of the unaccompanied alien children:**
While using space at the Tornillo LPOE site to temporarily shelter UAC, HHS assumes full security responsibility for the UAC.  HHS has on-site security 24 hours per day, seven days per week.  The children have on average a supervision ratio of no more than one adult for every eight children, 24 hours per day.  This ratio does not include the additional security, medical, case management, education, recreation and operations personnel hired by HHS grantees/contractors to work with the UAC.

**Health of the unaccompanied alien children:**
UAC receive an initial screening for visible and obvious health issues when they first arrive at Border Patrol facilities.  Children must be considered "fit to travel" before they are moved from the border patrol station to an HHS-funded facility.

UAC are medically screened and vaccinated within 48 hours of arriving at a HHS facility.  The initial screening includes a general health assessment, including a mental health screening and a review of vaccination history.  If a vaccination record is not located or a child is not up-to-date, the child receives all vaccinations recommended by the Centers for Disease Control and Prevention (CDC).  Some health conditions may manifest after the UAC was transferred to a temporary facility.  If a health issue arises while in our care, the UAC will receive prompt attention and the appropriate medical care will be provided.

**About unaccompanied alien children:**
By law, the U.S. Department of Health and Human Services (HHS) has custody of and must provide care for each unaccompanied alien child referred to its care, defined as a child who has no lawful immigration  status in the United States; has not attained 18 years of age; and, with respect to whom, there is no parent or  legal guardian in the United States, or no parent or legal guardian in the United States available to provide care and physical custody. *See* 6 U.S.C. § 279(g)(2).  HHS plays no role in the apprehension or initial detention of unaccompanied alien children (UAC) prior to their referral to HHS custody.

UAC are referred to ORR by another federal agency, usually the Department of Homeland Security.  Most children are placed into ORR care because they were apprehended by immigration authorities while trying to cross the border; others are referred after coming to the attention of immigration authorities at  some point after crossing the border.  UAC are

80

For Immediate Release                                    Contact:  ACF Press Office
October 12, 2018                                                    202-401-9215
                                                                   media@acf.hhs.gov

transferred to the care and custody of HHS until they are released to a suitable sponsor,
usually a relative, while their immigration cases are adjudicated.  The children come primarily
from Guatemala, Honduras, and El Salvador.

**Donation guidelines:**
Members of the public have expressed interest in donating or volunteering to help
unaccompanied alien children. However, there are several voluntary, community, faith-based,
or international organizations assisting unaccompanied children. You can find resources and
contacts in your state at the following on-line address:

https://www.acf.hhs.gov/orr/state-programs-annual-overview

81

# Exhibit 14

I, LEAH J. CHAVLA, declare as follows:

1.      This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.      I have been an international human rights lawyer since 2013.  Currently, I am a Policy Advisor for the Migrant Rights and Justice division of the Women's Refugee Commission (WRC).  My work at WRC is focused on children in the custody of the Office of Refugee Resettlement (ORR).

3.      On September 24, 2018 I visited the "emergency influx" facility in Tornillo, Texas housing children in ORR custody. My visit to Tornillo was part of a stakeholder tour, which included advocates and service providers.

4.      During our tour of Tornillo, I was told by Kevin Dinnin of Baptist Child and Family Services (BCFS), the contracting organization running the Tornillo facility, that many of the youth there were those that were awaiting results of fingerprints of their prospective sponsors.  My understanding is that children, who were classified as potentially having a Category 1 (parent or legal guardian) or Category 2 (other close family member) sponsor, were being placed at Tornillo since they were the ones who usually have the least time left in custody.  However, I know that since the summer, there have been significant delays in fingerprinting, such that children who are awaiting fingerprinting results, may still be in custody for several months.  On our tour, staff at Tornillo told us that the average length of stay for children housed there was approximately 20 days, and that this figure does not include the time that the children have spent in permanent ORR shelters prior to being transferred to Tornillo. I have subsequently heard from several service providers that the length of stay at Tornillo has increased to closer to 30 days, and that there are children at Tornillo who have been there for several months.

5.      Further, on the day of my visit, there were hundreds of children there who were not far along in their reunification process, including over 150 children who were classified

1

as "Category 4" meaning that they had no viable sponsors.  Based on my experience

working on policy and programmatic advocacy on behalf of children in ORR custody,

Category 4 children are the ones who are in custody for the longest periods of time.

6.      None of the children at Tornillo were receiving schooling or regular mental health

care, among other benefits to which they would be entitled if they were placed in a

licensed shelter.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

18 of October, 2018, in Washington, D.C.


LEAH J. CHAVLA

# Exhibit 15

## [Provisionally Filed Under Seal]

1   I, ████████████████████████████, declare as follows:

2

3   1.      This declaration is based on my personal knowledge.  If called to testify in this
4   case, I would testify competently about these facts.

5   2.      I am 17 years old.  My alien registration number is ████████████. I am currently
6   being held in ORR custody detained at the Yolo County Juvenile Detention Center. This
7   is a jail. The children are detained here and no one is free to leave.

8   3.      I have been detained in this facility since August 25, 2018. This is the first time I
9   have ever been in immigration custody.

10  4.      Before being detained here, I was being held in a county jail in Charlotte, North
11  Carolina. I was falsely accused of several criminal charges. After approximately three
12  months, all of the charges were dropped, but I was kept in county custody for an
13  additional four days, and then I was transferred to immigration custody.  I have never
14  before in my life been accused of any criminal conduct.

15  5.      I have never had any gang involvement, I have never displayed any gang
16  affiliation, and I have never given anyone here at Yolo or anywhere else any reason to
17  believe I have any gang involvement or affiliation. From what I understand about the
18  ORR detention system, to the extent I should be held in custody at all, the most
19  appropriate placement for me would be in a shelter, and not in a secure or staff-secure
20  facility.

21  6.      On Tuesday of this week, I witnessed two other youth fighting, and I reported this
22  to one of the guards. Instead of taking this report, the guard threatened me, saying "you
23  do not have any rights here. We can do whatever we want with you." He told me to stay
24  quiet and not to make this report.

25  7.      Since I have been held here at Yolo, I have witnessed guards physically abusing
26  the youths detained here. I have seen them use pepper spray three times on other youth
27  and each time it was unnecessary as the people were already in handcuffs with their hand

28

1

1 behind their backs. Guards also unnecessarily place their knees on the heads of youth
2 who are lying on the ground.

3 8.      I am not permitted to have any private telephone conversations here at Yolo. My
4 social worker told me that I am not allowed to have private telephone calls because she
5 suspects that I would talk to people about gang activity. I have only been allowed to call
6 one person in North Carolina while I have been here. I have been denied access to the
7 telephone numbers of other individuals in North Carolina who might agree to serve as
8 sponsors for me; those numbers are on my cell phone and I have been denied access to it
9 and to the information on that phone).

10 9.      The food here at Yolo is very bad. When I arrived here almost a month ago I
11 weighed about 180 pounds, and now I weight 158 because I cannot eat most of the food
12 we are given. The food is often frozen and inedible. The vegetables are cold and lacking
13 in flavor. We are also prohibited from sharing food with other detainees; if we were to do
14 so we would be punished.

15 10.     The water in the showers here is much too hot and burns your skin, and there is no
16 way to regulate the water temperature in the shower.

17 11.     About two weeks ago, a group of us met with another social worker and raised the
18 issue of the fact that the soccer equipment here needs to be replaced. She told us that we
19 should not be requesting this, and like to other guards have said, "you don't have any
20 rights here."

21 12.     I have I declare under penalty of perjury that the foregoing is true and correct.
22 Executed on this 2 1ˢᵗ day of September, 2018, at Woodland, California.

23

24

25

26

27                         CERTIFICATE OF TRANSLATION

28

---

2

1  My name is _Suyapa Lainez_ and I swear that I am fluent in both the English and

2  Spanish languages and I translated the foregoing declaration from English to Spanish to

3  the best of my abilities.

4

5  Dated: September 21, 2018

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# Exhibit 16

## [Provisionally Filed Under Seal]

I, ██████████ █ █████ declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2. I am 17 years old. My alien number is ████████. I am currently being held in ORR custody at the Yolo County Juvenile Detention Center.

<u>Notification</u>

3. I was apprehended by authorities in Texas after crossing the U.S. border. The immigration authorities there kept me for four days before transferring me to a shelter called BCC in Maryland; no one gave me any advanced notice about this transfer.

4. After two weeks in the BCC shelter, I tried to escape by running through an open door but I was caught when I encountered an electrified fence. The next day early I was transferred to the NOVA center in northern Virginia.

5. I was never told why I was being sent to NOVA. I do not remember being given any notice or explanation by the immigration authorities, I guess it was because I tried to escape.

6. I stayed in NOVA for about a month. I went to school about four hours a day, and we were only ever allowed to go outside for about one or two hours per week. The amount of time we were allowed to be outside depended on our behavior. While there, I remember that one day I was playing with another kid. We were both taking our shoes off and throwing them in the air. On occasion, one of our shoes landed on one of the guards. We tried to explain that we did not intend to hit him but he was so angry that he did not listen. Because of this, the guards tried to put me in a green jacket which is used to restrict our movement. I resisted because I was just playing and was not trying to hit

1

him with the shoes. This is the only reason that I can think of for why I was transferred to Yolo.

7.   No one ever explained to me why I was leaving NOVA. I was not given any notice that I was leaving, or any explanation as to why. I just remember that the next day after the shoe incident the guards woke me up at 3:00 am and told me that everything was ready for me to go.

8.   Now I have been told that I am being moved from Yolo, and they told me they are moving me on Tuesday, October 9th. I don't know why.

Unnecessary Punishment

9.   Three days after I arrived at Yolo, I was told to "cover" but I was never explained what "cover" meant. Because I didn't hit the ground, the guards sprayed pepper spray into my eyes. It was so painful that I passed out. I don't know if this was because of the pain or the spray but the only thing that I remember is that I woke up in the hospital.

10. On one occasion I had a problem with a kid here in Yolo. The guard took me away to a room after one kid threw food at me and I reacted. After that, while playing soccer, the same kid started giving me strange looks. The guard again took me to a room but this time asked me to give him my clothes. I did what he asked because I know how the guards are here but I asked if they would give me a blanket. They said they would, but instead they gave me the green jacket. I remember that that night was very cold. The people here do not care if you need something, because that night I asked for a blanket and they ignored me, knowing that it is cold and that they do not regulate the temperature.

Medication Compliance

11. I am given medication to help me sleep here at Yolo. I do not have any family in the

    U.S., and no one has contacted my family for permission to give me medication.

Conditions

12. Here in Yolo, I cannot shower because the water is so hot that it is making my hair fall

    out.

13. The food here tastes bad, the only thing that I eat is fruit because the rest does not have

    any flavor. I have lost weight since being in Yolo because I can't eat the food.

14. No one here speaks Q'eqchí. To make me understood I have to speak Spanish and that

    make me feel uncomfortable because my Spanish is not my first language.

15. I cannot stand it here in Yolo, I have been detained for like a year but I am afraid for my

    life if I am sent back to my home country.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this _8_

day of October, 2018, at Woodland, California.


███████████████████████

████████ ██ ███


CERTIFICATE OF TRANSLATION

My name is _Emily Child_ and I swear that I am fluent in both the English and

Spanish languages and I translated the foregoing declaration from English to Spanish to

the best of my abilities.


Dated: October _8_ , 2018          _Emily Child_


3

# Exhibit 17

## [Provisionally Filed Under Seal]

I, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, declare as follows:

1.     This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2.     I am 17 years old. I am from Guatemala City. I entered the United States on January 4, 2018 with my brother ▮▮▮▮▮

3.     My brother and I were taken into immigration custody at Southwest Key in Phoenix, Arizona. We were there for 25 days.

4.     We were released to our father in Greenbelt, Maryland. I remained with my father for four months but unfortunately, I was arrested and sent to Children's Village staff secure in New York.

5.     When I was at Children's Village, I missed my family all the time.

6.     I took a medication at Children's Village to help me sleep. I don't think my father was told about the medication I was on.

7.     I had some trouble at Children's Village and so I was sent to Yolo.

**Yolo**

8.     I have been at Yolo for three months. I hate it here. The staff have abused me many times. In fact, the staff have put me in handcuffs and thrown me onto the ground more about ten times. On one specific occasion, I didn't want to go into my room so four staff members threw me to the ground and then they bent my arms, and it hurt a lot. They handcuffed me and threw me into my cell and then removed the handcuffs once I was in a cell.

9.     Another time, I covered the window slit with a piece of paper and then staff got really angry. Four or five staff members put on extra gear including protective vest and a helmet, forced themselves into my room and then beat me. They injured my right shoulder, it was bleeding and painful. I couldn't move my shoulder at all for two days. I also had bruises all over my shoulders and legs.

1

10. I take multiple medications. I think they are for sleep and anger. I do not know the name of the medications. I do not believe that my father knows about the medications I am on.

11. When I talk to my father on the phone, I am in an open space not a private room.

12. The water in the showers is scalding hot. Its burns my skin. The staff say that they can't change the temperature.

13. I desperately want to get out of here. I want to be back with my father and brother. I miss them all the time.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 21 day of 9 , 2018, at Woodland California.

2

1                      CERTIFICATE OF TRANSLATION

2         I, _Karen  Pedraza._____, hereby certify that I am proficient in both

3 Spanish and English, and that I accurately translated the foregoing statement and read it

4 back to               in its entirety in Spanish on September 21, 2018.

                                     _____

7                               Karen Pedraza

3

# Exhibit 18

## [Provisionally Filed Under Seal]

1   I, █████████████████████, declare as follows:

2

3   1.     This declaration is based on my personal knowledge. If called to testify in this
4   case, I would testify competently about these facts.

5   2.     I am 15 years old. I came to the United States from Honduras in May 2018.
6   When I arrived at the border, I was taken to the Southwest Key Casa Antigua shelter,
7   where I was detained for about two months.

8   3.     At the shelter, I thought a lot about traumatic events from my childhood. I began
9   experiencing a lot of anxiety and couldn't control how I felt. It became so
10  overwhelming, and I started having thoughts about hurting others.

11  4.     One day, as I was getting ready for my P.E. class, the staff told me to change my
12  clothes because I was going on an outing. I was confused because I didn't have any
13  appointments scheduled for that day. The staff told me that I was going to be transferred
14  to a new facility. I had no prior notice of the transfer and neither did my family. I didn't
15  know anything about the new placement except that the staff said that the placement
16  would be "better," and my mom would be able to visit me. Once I arrived at Shiloh, I
17  realized that the staff had lied. Shiloh is not a good place, and my mom has not been able
18  to visit me here because she lives in Maryland.

19  5.     I have been at Shiloh since July, and I don't know when I'll be allowed to leave.

20  6.     I want to live with my mom. She applied to be my sponsor when I was detained at
21  the shelter. We usually speak on the phone twice a week and we are very close. These
22  phone calls are not in private; my case manager is always in the room. I would prefer to
23  talk to my mom privately because there are lots of things that I would like to tell her but
24  don't want my case manager to overhear.

25  7.     As far as I know, my mom has done everything the government has asked her to.
26  She completed a home study and received a positive recommendation. She submitted her
27  fingerprints in early July, as did my aunt and uncle who live with her. My mom's

28

1

fingerprints showed an error through the immigration records system. After all these months, we're still waiting for the federal agent to approve my mom's fingerprints.

8.    The doctor just approved my release. When I first arrived at Shiloh, I was told that I would not be approved for release unless I was no longer sad. The doctor told me that I needed to smile and talk to the other girls here – then he'd know that I was feeling better.

9.    I take three medications at night. One is for insomnia, one is for depression, and the other is for allergies. As far as I know, my mom has not given permission for me to take the medication.

10.    Since July 30, 2018, I do not remember receiving a psychiatric evaluation to determine whether I am dangerous.

11.    I liked the shelter better than Shiloh. Here, the staff play favorites – if they don't like you, they don't talk to you or include you in group activities. One time, one of the staff members was playing a card game with some of the other girls. I asked to join them, and the staff member said that I wasn't invited. That kind of rejection happens all the time here. One time, the staff hurt my feelings so badly, that I just started crying; I tried not to but I couldn't help it – tears just started pouring down my face.

12.    I am ready to live with my mom right now. I'm so miserable here. I often look at a picture of my mom and I get very emotional. I miss her so much. I know I would be happier and healthier if I lived with her.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of October, 2018, at _____ Manvel _____, Texas.

1

CERTIFICATE OF TRANSLATION

2

3    I, ___Lexie Villa_____, hereby certify that I am proficient in both

4    Spanish and English, and that I accurately translated the foregoing statement and read it

5    back to [redacted] in its entirety in Spanish on __October 18, 2018__.

6

7

8                                        Lexie Villa

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# Exhibit 19

## [Provisionally Filed Under Seal]

DECLARATION OF ███████████████

I, ███████████████████, declare as follows:

1.    This is based on my personal knowledge. If called to testify in this case, I would testify competently about the following.

2.    I am seventeen years old. I came to the United States on September 10, 2017. My father passed away years ago. My mom lives in Guatemala. She beat me, and I felt that no one loved me there, and also because it is very dangerous in Guatemala, I decided to come to the United States.

3.    I am currently detained at Shiloh RTC, where I arrived about six months ago. Before arriving here, I spent about nine months in two shelters in Arizona.

4.    My Uncle ███████ has applied to be my sponsor. I would like to live with him. They have already visited his house, and everything went well. His finger prints have also cleared, which has allowed him to visit me in person. My case manager tells me that they are waiting on a check of some kind to make sure that he is not on a registry relating to abuse of children, and then I will be able to live with him. I have heard from my case manager and other children here that this additional registry check is causing many children's releases to be delayed.

5.    When I was detained for many months at the Casa Phoenix shelter, my uncle tried to call the shelter staff and apply to be my sponsor. But the staff would not answer his calls, and I was not allowed to call him.

6.    For a while, the shelter told me that they were going to send me to a foster family. But then a girl living at the shelter falsely stated that I said inappropriate things, and after that they told me that they weren't going to send me to a foster family anymore.

7.    When they gave me that false report, I felt very depressed because I had already been confined for so long and I tried to kill myself. After that, they sent me to the Campbell shelter for about a week. They told me I was there because it was a smaller

1

place and I would have more attention. While at the Campbell shelter, they started giving me medication.  Soon after I arrived, they told me I was being sent to another shelter and then to a foster family.  They woke me up at 3 a.m., and two staff members flew with me to Shiloh. They never told me where I was going or why.

8.     For about three months, the staff at Shiloh were giving me four medications a day: one for anxiety, another for depression, and two for sleep. Now I am taking two medications at night: one for anxiety and another that I don't know.  Until two weeks ago, no one from Shiloh or the shelters had asked permission from my mother or anyone else from my family to give me the medications. My mom told me that the staff recently asked her during a phone call if she was okay with me taking the medications.

9.     At Shiloh, I am able to use the phone to call my family, but the calls are not private. My case manager is always in the room. I would prefer if I could talk privately with my family.

10.     As of July 30, 2018, no one has interviewed me to assess whether I am a danger to myself or others. The truth is that I have never felt like I wanted to hurt anyone else. When I feel very disappointed, for example, when I get very bad news, I only think of hurting myself. But, it has been six months since I have tried to harm myself. Sometimes I feel sad because I'm still here at Shiloh, but other than that, I have been fine.  I get along well with the other girls at Shiloh.

11.     Until last Tuesday, I was here because the doctor would not approve me to be released.  But last week, the doctor told me that I do not have to be here and that he would release me if everything was final with my sponsor.  We have just been waiting on the response from the government on the child abuse registry check.

1  12.     For me, what I want to do is to get out of here and be with my family. I already
2  feel good, just tired from being detained for so long. I want to learn English and study to
3  be a police officer, and earn enough to get my mother out of her house in Guatemala
4  because my uncle hits her.

5

6  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
7  18th day of October, 2018, at Manvel, Texas.

8
9

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

1                         CERTIFICATE OF TRANSLATION

2

3        I, KARINA MARQUEZ , hereby certify that I am proficient in both

4   Spanish and English, and that I accurately translated the foregoing statement and read it

5   back to ████████████████ in its entirety in Spanish on 10·18·18 .

6

7

8                             Karina Marquez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# Exhibit 20

## [Provisionally Filed Under Seal]

1   I, ████████████████   declare as follows:

2

3   1.      This declaration is based on my personal knowledge.  If called to testify in this

4   case, I would testify competently about these facts.

5   2.      I am 17 years old.  I came to the United States from Guatemala in January 2018.

6   When I arrived at the border, I was taken to the Southwest Key Lighthouse shelter in

7   Phoenix, Arizona, where I was detained for about six months.

8   3.      At the shelter, I was having a lot of bad dreams.  The bad dreams kept coming, and

9   they didn't get better.  One day, the staff at the shelter said that they were taking me to a

10  new place in Texas.  I didn't want to leave, but the staff told me that I had to go.  The

11  staff woke me up around 3:00am and took me to Shiloh.  I have been at Shiloh since

12  June, and I have no idea when I'll be allowed to leave.

13  4.      I want to live with my uncle.  My mom wants me to live with him too.  He lives in

14  Florida and applied to be my sponsor once I arrived at Shiloh.  We usually speak on the

15  phone twice a week and we get along really well.  These phone calls are not in private;

16  my case manager is always in the room.

17  5.      As far as I know, my uncle has done everything the government has asked him to.

18  Recently, I've been devastated because my case manager told me that my uncle's

19  reunification application was denied.  Apparently, the government doesn't think my uncle

20  speaks Spanish well enough, and they're worried that, once I'm released, he won't be

21  able to explain things properly to doctors on my behalf.  I think the government's view of

22  my uncle's Spanish skills is the only obstacle preventing me from living with him.  I

23  don't understand because, even though my uncle primarily speaks in a dialect, he has told

24  me that he speaks Spanish well.

25  6.      When I arrived at Shiloh, my case manager told me that the doctor had to approve

26  my release.  The doctor says that he won't approve my release until I start behaving

27  better.  I have been struggling to improve my behavior because I've been so upset about

28  my uncle's application.

1

7.     I take multiple medications: about seven medications at night and two medications in the morning. I think one of the medications is for my mind, and another one is supposed to help me sleep better. I don't what the other medications are for. I think I took some of the same medications at the Southwest Key shelter too. As far as I know, my uncle and mom have not given permission for me to take the medication.

8.     Since July 30, 2018, I do not remember receiving a psychiatric evaluation to determine whether I am at risk of harming myself or others.

9.     I liked the shelter much more than Shiloh. I could talk to everyone at the shelter, and I could go outside more often. There were more activities; for example, I could take classes to learn English. At Shiloh, I don't learn anything. I was happier at the shelter.

10.    I am ready to live with my uncle right now. I'm so miserable here. I know I would be happier and healthier if I lived with him.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of October, 2018, at _____Manvel_____, Texas.

1

CERTIFICATE OF TRANSLATION

2

3        I, __Lexie Villa_____, hereby certify that I am proficient in both

4   Spanish and English, and that I accurately translated the foregoing statement and read it

5   back to ████████████_____ in its entirety in Spanish on __10/18/18_____.

6

7                                   _Lexie U. Villa_____

8                                        Lexie Villa

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# Exhibit 21

## [Provisionally Filed Under Seal]

1  I,                          , declare as follows:

2

3  1.     This declaration is based on my personal knowledge.  If called to testify in this
4  case, I would testify competently about these facts.

5  2.     I am 9 years old.  My grandma and I came to the United States from Guatemala in
6  April 2018.  When we arrived at the border, I was separated from my grandma, and I was
7  taken to the Southwest Key El Presidente shelter in Brownsville, Texas, where I was
8  detained for about two months.

9  3.     At the shelter, the staff were really strict.  Certain things staff members did really
10  bothered me, and I began to act out.  I would throw things at the staff.  When I started
11  misbehaving, the staff would grab me so hard that I couldn't breathe.  Each time the staff
12  grabbed me, I was in more and more pain.

13  4.     One night, the staff told me to get in the car because we were going to go look at
14  the stars outside.  It was really late at night, and I was tired and fell asleep.  When I woke
15  up, I was furious because I realized that they had lied to me.  They had taken me to
16  Shiloh and left all my personal belongings behind at the shelter.  No one had told me that
17  I would be transferring to a new facility.  I had no prior notice of the transfer and neither
18  did my family.

19  5.     I have been at Shiloh since July, and I have no idea when I'll be allowed to leave.

20  6.     I want to live with my uncle.  He lives in Houston and applied to be my sponsor
21  once I arrived at the other shelter.  We usually speak on the phone twice a week and we
22  get along really well.  These phone calls are not in private; my case manager is always in
23  the room.

24  7.     My grandma, aunt, and cousins live with my uncle too.  They've all come to visit
25  me here many times.

26  8.     As far as I know, my uncle has done everything the government has asked him to.
27  He completed a home study and received a positive recommendation.

28

1

9.      I am still waiting for the doctor to approve my release.  I've been told that I behave
badly, and I won't be allowed to live with uncle until I improve my behavior.

10.     I take multiple medications in the morning, afternoon, and night.  I don't know
what they're for or how many I take.  Sometimes, I feel like I've been given twenty pills
in one day.  As far as I know, my uncle and other family members have not given
permission for me to take the medication.

11.     Since July 30, 2018, I do not remember receiving a psychiatric evaluation to
determine whether I am at risk of harming myself or others.

12.     I miss the field trips we used to take at the shelter.  I enjoyed getting out into the
community.  At Shiloh, we only take trips to the store.

13.     I am ready to live with my uncle right now.  I'm so unhappy here.  I know I would
be happier and healthier if I lived with him.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
18th day of _October_, 2018, at ____Manvel____, Texas.

2

1    CERTIFICATE OF TRANSLATION

2

3    I, ___Lexie Villa_____, hereby certify that I am proficient in both

4    Spanish and English, and that I accurately translated the foregoing statement and read it

5    back to ▮▮▮▮▮▮▮▮▮▮ in its entirety in Spanish on __October 18, 2018__.

6

7    _Lexie V. Villa_____

8                        Lexie Villa

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3