# Exhibit 22

## [Provisionally Filed Under Seal]

1       DECLARATION OF ████████████████

2

3    I, ███████████, declare as follows:

4

5    1.     This is based on my personal knowledge.  If called to testify in this case, I would
6    testify competently about the following.

7    2.     I am seventeen years old.  I came to the United States about a year ago from
8    Honduras.

9    3.     I am currently detained at Shiloh RTC, where I have lived for about five months.
10   Before arriving here, I spent about seven months in a shelter in Arizona.

11   4.     For about my first six months at the shelter, I was doing okay.  But, as time wore
12   on, I got more and more depressed about being detained and not knowing when I would
13   be released, and I began cutting myself.

14   5.     The staff at the shelter sent me to a hospital two times for cutting.  After the second
15   time, they told me that they were going to send me to another place because they couldn't
16   give me the attention that I needed at the shelter.  They woke me up at 4 a.m., and flew
17   me to Shiloh.  I didn't want to come because I was scared of going to a new place.

18   6.     At first Shiloh was not good at all.  But, it got better when my aunt who lives in
19   Houston was cleared to visit me.  My aunt applied to be my sponsor back in July.  My
20   case worker said that her home study, application, and finger prints were good, and we
21   are only waiting on finger prints to clear for my twenty-three-year-old cousin who is to
22   act as my backup caregiver.  They told me the finger prints would only take 15 days, but
23   that time has now passed.

24   7.     I talk to my aunt once a week.  I enjoy talking to her, but am not allowed to speak
25   to her in private.  My case manager is always in the room.  Nobody here has private calls.

26   8.     At Shiloh they give me three medications in the morning: Zoloft and two others
27   they haven't explained, and four medications in the night: melatonin and three others they
28   haven't explained to me.  I see the doctor every two weeks.  He tells me the drugs I need

1

to take, but doesn't explain why. The drugs make me feel really tired and sluggish. I
have trouble concentrating in class. Sometimes I have stomach pain and a lot of
headaches. Sometimes I feel numb on one side of my body. I tell the doctor about these
problems, and he says it is all normal.

9.      I would prefer not to be on any type of medications, but I just take whatever pills
they give me because if not, they will report me. If you get reports, you stay longer
because it is considered being disobedient of the rules. No one from Shiloh has asked
permission from my mother or my aunt to give me the medications.

10.     As of July 30, 2018, no one has interviewed me to assess whether I am a danger to
myself or others. It is really hard to be here not knowing when I will get to live with my
aunt. A month ago, I became really sad about how long I have been detained and cut
myself to try to relieve the pain. But, it has been over a month since I have felt the need
to do that.

11.     I usually see the doctor every two weeks. Last Tuesday, the doctor said that he
was putting me down a level and that when my cousin's finger prints came in, he was
going to approve my release. Previously he would not approve release because he said
my case wasn't ready. He said I still needed to follow the rules and behave. I'm not sure
if he will really approve my release because sometimes they say one thing and do
another.

2

12.     I have been living here so long, sometimes I just feel desperate. I really want to be with my family. I know it will make me feel better. I also want to graduate and go on to college. I want to be an attorney someday.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of October, 2018, at Manvel, Texas.

3

<div align="center">CERTIFICATE OF TRANSLATION</div>

I, _Karina Marquez_ , hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to Melissa Portillo Pavon in its entirety in Spanish on October 18, 2018.

_____

Karina Marquez

4

# Exhibit 23

# [Provisionally Filed Under Seal]

I, ██████████████████ , declare as follows:

1.     This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2.     I am 17 years old. I came to the United States from Guatemala over a year ago. When I arrived at the border, I was taken to a Southwest Key shelter in Brownsville, Texas, where I was detained for about seven months. I have now been living at Shiloh for seven months.

3.     One day, the staff at the Southwest Key shelter said that they were taking me to a new place in Texas because I was hurting myself. I was sad because I didn't want to leave. I had friends in Southwest Key, and I had gotten used to being there. The staff told me that I had to leave because they could not help me. One morning, the staff woke me up around 3:00 a.m. and took me to Shiloh. They had not told me the night before that I would be leaving that morning.

4.     I want to live with my mom. She lives in Indiana and applied to be my sponsor when I was detained in the shelter. My mom has done everything the government has asked her to do. She has had two home studies, and has received a positive recommendation both times. I guess the first home study expired. My case manager has told me that they are waiting on the fingerprints for my twenty-year-old brother to clear because he lives with my mother. It has been a month since they had the fingerprinting done. I am not sure why they didn't do my brother's fingerprints sooner.

5.     I speak on the phone twice a week with my mom. These phone calls are not in private; my case manager is in the room. My case manager doesn't give me the choice to speak to my mom in private, which I would prefer. I don't think any kids here are having private phone conversations.

6.     At Shiloh, I take three medications in the morning, one at noon, and three at night. One in the morning is for anxiety and one at night is to help me sleep, but I don't know what the others are for. I have been told that the medications are supposed to help me,

1

but I don't remember why. My stomach hurts almost every day. I don't know if it is related to the medication. I also think the medication makes me feel tired and unmotivated. As far as I know, my mom has not given permission for me to take the medication. If I were able to live with my mom and not have to take the medications any more, I wouldn't take them.

7.     I used to see the psychiatrist, █████, every week, but now I see him once a month. A couple weeks ago, the doctor told me that I was dropping to a lower level and that I was ready to be released. The doctor has told me that as soon as my brother's fingerprints clear, he will give his permission for me to leave. But I don't know when my brother's fingerprints will be ready. I know that many other youth are also here because they are waiting on fingerprints.

8.     Since July 30, 2018, I have not received a psychiatric evaluation to determine whether I am a risk to myself or others. I do not believe I am either. It has been a long time since I felt like I wanted to hurt myself, and more than two months since I cut myself.

9.     I am ready to live with my mom right now. I miss her very much, and I know I would be happier and healthier if I lived with her. I love school, and look forward to studying a lot. I would like to be a doctor. I want to help my mom so that she doesn't have to work so hard.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of October, 2018, at Manvel, Texas.



2

CERTIFICATE OF TRANSLATION

I, KARINA MARQUEZ , hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to ▮▮▮▮▮▮▮▮ in its entirety in Spanish on 10·18·18 .

Karina Marquez

3

# Exhibit 24

## [Provisionally Filed Under Seal]

DECLARATION OF ██████████████████████████

I, ███████████████████████, declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.     I am 16 years old.  I came to the United States from El Salvador about three years ago.  When I arrived at the border, I was taken to live at a shelter in Brownsville for pregnant minors, where I was detained for about two months. I had my baby there. I then went to live with my aunt in Virginia when my baby was three weeks old. I lived with my aunt for about three years.

3.     One day, I was helping a friend clean up and move from his house.  In the middle of the night, police officers came to the house. The police pointed their guns at us; sat us down; and took our pictures. They asked my name and where I lived, and then took me in for questioning.  They then took me to the hospital for blood tests.  After that, they took me to Shenandoah, which is like a jail.  We had cells with beds made out of cement and metal toilets inside. I was detained at Shenandoah for seven months. They told me I had to stay there because they thought I was part of a criminal group, and they needed to investigate.  They never gave me anything in writing saying why I was at Shenandoah. After seven months, they released me to Shiloh because they didn't find I had done anything wrong. They said everything was fine. I tried to call the detective about the investigation, but she never answered.

4.     One morning they woke me up at 5 a.m., and told me that I was going to Shiloh. My worker told me that I was going to Shiloh because they accepted me first and the other shelters would not accept youth coming from Shenandoah.  This was the only reason they gave.  They never told me it was a residential treatment center for youth with mental health needs.  I have now been at Shiloh for three months.

1

5.      For the first few months at Shiloh, I was seeing the doctor every other week. He would ask me how I was doing, but I didn't want to tell him because if you say you are feeling said they will keep you here longer. The doctor is making me take medication for anxiety at night, but I don't know why. I also take medication in the morning, but I don't know what some of it is for. I have never had problems with anxiety. The doctor has told me that they are working on another placement for me, but no one has told me when I will be able to leave.

6.      My aunt in Houston started the process to be my sponsor. The problem is that the government is making my aunt fix her birth certificate from El Salvador because one letter in her middle name is spelled incorrectly: it says " ██████ " instead of " ██████ ". This spelling does not match the spelling on my aunt's mom's birth certificate, and so they are telling her she needs to get an attorney to get it fixed. They will not let her move forward with a home study or finger printing until she gets this birth certificate spelling fixed. They won't even let me talk to my aunt on the phone because of this.

7.      My aunt in Virginia is willing to sponsor me, but I have been waiting on the government for over a month to let me know if they will let her.

8.      I am allowed to talk to my Dad and my aunt in Virginia on the phone, but the calls are not private. A case manager is always in the room.

9.      I would like to live with my son. I miss him so much. He just turned two. Last month, he sang "Happy Birthday" to me on the phone, and it made me so happy. I hope we can be together soon.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of October, 2018, at Manvel, Texas.



CERTIFICATE OF TRANSLATION

I, Karina Marquez, hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to ████████ ████████████ in its entirety in Spanish on October 18, 2018.

Karina Marquez

3

# Exhibit 25

From: **Fabian, Sarah B (CIV)** Sarah.B.Fabian@usdoj.gov
Subject: RE: Correspondence requesting meet/confer in re: contempt
Date: October 19, 2018 at 10:57 AM
To: Carlos Holguín crholguin@centerforhumanrights.org
Cc: **Silvis, William (CIV)** William.Silvis@usdoj.gov, **Holly S Cooper** hscooper@ucdavis.edu, **Leecia Welch** lwelch@youthlaw.org, **Peter Schey** pschey@centerforhumanrights.org, **Flentje, August (CIV)** August.Flentje@usdoj.gov

Carlos:

I am not sure what August 31 letter you are referencing. I provided you a letter dated September 13 regarding the administration of psychotropic drugs at Shiloh – is that the one you are asking about? If you are referencing something else please send me a copy of what you are asking about.

Regarding the remainder of your emails, as we have discussed multiple times, the July 30 Order does not require Defendants to provide you with the information you are requesting. Nonetheless, as you are aware, Defendants have provided you with several pieces of information regarding their implementation of, and compliance with, the Court's order. Defendants do not intend to provide you with additional information at this time.

Best,
Sarah


Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguín [mailto:crholguin@centerforhumanrights.org]
**Sent:** Tuesday, October 16, 2018 4:27 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; Holly S Cooper <hscooper@ucdavis.edu>; Leecia Welch <lwelch@youthlaw.org>; Peter Schey <pschey@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Correspondence requesting meet/confer in re: contempt

Sarah,

Please advise if ORR continues to adhere to the policy set out in its letter to Shiloh of August 31, 2018, regarding the administration of psychotropic drugs to *Flores* class members.

If it is not, please provide a statement of the policy it is now following and any legal opinion ORR contends authorizes its current policy.

In addition, please advise whether Defendants remain unwilling to provide the following, much of which Plaintiffs requested by letter dated August 10, 2018:

The name and qualifications of the person(s) who evaluated class members detained at Shiloh from August 1, 2018 to the present for risk of harm and a copy of any written report generated as a result of each evaluation.

A list of all class members detained at Shiloh RTC since August 1, 2018, who have been given psychotropic medications, identifying the medications, their dosage and dates given, the name and relationship to the class member of the person consenting to the administration of such medications, a copy of any notice given such consenting party aimed at informing his or her consent as required by state law, and a copy of the signed consent itself.

A list of all class members detained at facilities other than Shiloh RTC who have been given psychotropic medications on or after August 1, 2018, identifying the medications, their dosage and dates given, the name and relationship to the class member of the person consenting to the administration of such medications, a copy of any notice given such consenting party aimed at informing his or her consent as required by state law, and a copy of the signed consent itself.

Copies of each ORR policy, practice, and form, including instructions for its use, issued on or after August 1, 2018, for notifying class members of ORR's reasons for placing them in a secure facility, staff-secure facility, or RTC.

A list setting forth the the names of all class members housed in a secure facility on or after July 31, 2018, indicating each of the specific grounds ORR placed him or her in a secure facility and a copy of the notice, if any, given to each such class member notifying him or her of the reasons for placement in a secure facility.

Copies of memoranda and instructions directing ORR personnel and contractors to "cease requiring ORR Director or designee approval prior to release of Class Members who: (1) were previously placed in secure or staff-secure facilities but have since been transferred to less restrictive settings; (2) prevailed on their *Flores* bond hearings; and/or (3) were placed in secure or staff-secure facilities based on incomplete, inaccurate, or erroneous information.


Thank you.

—
Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
(213) 388-8693 x.309 (v)
(213) 290-1642 (direct)
(213) 386.9484 (fax)
http://www.centerforhumanrights.org
--
CONFIDENTIALITY NOTICE: This communication, including any attachments, is for the
sole use of the intended recipient(s) and may contain confidential and legally

sole use of the intended recipient(s) and may contain confidential and legally privileged information. Any unauthorized interception, review, use, distribution, or disclosure not authorized by the intended recipient(s) is prohibited and may violate applicable laws, including the Electronic Communications Privacy Act of 1986, Pub. L. 99-508, 100 Stat. 1848, codified at 18 U.S.C. §§ 2510 et seq. If you are not the intended recipient, please contact the sender and destroy all copies of the original communication.

On Sep 11, 2018, at 1:55 PM, Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Carlos:

ORR is still looking into the issue related to the provision of psychotropic medication. As we discussed on the phone, shortly after Judge Gee issued her order, ORR sought a legal opinion from the Texas Attorney General to be certain of the State's own interpretation of informed consent requirements in the unique context of minors in federal custody with ORR. As Judge Gee stated in her order:

> For the purposes of these regulations, a "[p]erson legally authorized to provide consent" is defined as a "person legally authorized to give consent by the Texas Family Code or a person authorized by [a] court[.]" See Tex. Admin. Code § 748.43(47). Under the Texas Family Code, parents have the right to consent to medical, psychiatric, or psychological treatment, see Tex. Fam. Code § 151.001(a)(6), and other adult relatives of the child have the right to consent to such treatment if the parent(s) cannot be contacted and has/have not given actual notice of a contrary intent. See Tex. Fam. Code § 32.001(a)(1)–(3).24 The Texas Family Code also allows other adults to consent to such treatment if: (1) the parent(s) cannot be contacted, (2) the parent(s) has/have not given actual notice of a contrary intent, and (3) the adults seeking to authorize the treatment (a) have "actual care, control, and possession of [the] child" and "written authorization to consent from a person having the right to consent" or (b) are "responsible for the actual care, control, and possession of [the] child under the jurisdiction of a juvenile court or committed by a juvenile court to the care of an agency of the state or county[.]" See id. § 32.001(a)(5), (a)(7).

As you know, children in ORR custody are under the care and custody of the Department of Health and Human Services. 8 U.S.C. 1232(b).  ORR is evaluating, with the state of Texas as well, whether children in the care and custody of HHS are analogous to those under the jurisdiction of a state or county.

In the interim, however, until it has received the Texas opinion, ORR intends to read Judge Gee's order such that consent for administering psychotropic medication to a UAC focuses on parental informed consent, and then

medication to a UAC focuses on parental informed consent, and then
consent from other adult relatives, in keeping with Texas state law. If Shiloh
cannot obtain such approval, then a Texas state court order will be sought to
administer psychotropic medications.

ORR recently sent an email clarifying its position to Shiloh (on September 5)
and also intends to take additional steps to make sure that this position is
more effectively communicated not only to Shiloh, but also to other ORR
facilities in Texas. Once any such communication is finalized and sent, ORR
will be able to share it with you. ORR expects to send the communication by
the end of this week.

Please let me know if you have additional questions about this issue.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Fabian, Sarah B (CIV)
**Sent:** Monday, September 10, 2018 7:22 PM
**To:** 'Carlos Holguín' <crholguin@centerforhumanrights.org>
**Cc:** Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; 'Holly S Cooper'
<hscooper@ucdavis.edu>; 'Leecia Welch' <lwelch@youthlaw.org>; 'Peter
Schey' <pschey@centerforhumanrights.org>; Flentje, August (CIV)
<AFlentje@CIV.USDOJ.GOV>
**Subject:** RE: Correspondence requesting meet/confer in re: contempt

Hi Carlos:

My apologies. Due to the holiday I was not able to get a response on the
medication issue today, but I expect to have more for you tomorrow.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Fabian, Sarah B (CIV)
**Sent:** Friday, September 07, 2018 6:41 PM
**To:** Carlos Holguín <crholguin@centerforhumanrights.org>
**Cc:** Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; Holly S Cooper
<hscooper@ucdavis.edu>; Leecia Welch <lwelch@youthlaw.org>; Peter
Schey <pschey@centerforhumanrights.org>; Flentje, August (CIV)

<AFlentje@CIV.USDOJ.GOV>
**Subject:** RE: Correspondence requesting meet/confer in re: contempt

Carlos:

Please see the attached in response to two of your inquiries. I am still waiting for more information regarding the medication issue and will follow up with you on that on Monday.

Thank you,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguín [mailto:crholguin@centerforhumanrights.org]
**Sent:** Thursday, September 06, 2018 9:04 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Silvis, William (CIV) <WSilvis@civ.usdoj.gov>; Holly S Cooper <hscooper@ucdavis.edu>; Leecia Welch <lwelch@youthlaw.org>; Peter Schey <pschey@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Correspondence requesting meet/confer in re: contempt

Attachments available until Oct 6, 2018                Please see attachments.

Thank you.

—
Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
(213) 388-8693 x.309 (v)
(213) 290-1642 (direct)
(213) 386.9484 (fax)
http://www.centerforhumanrights.org
--

> On Sep 4, 2018, at 3:10 PM, Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:
>
> Carlos:
>
> I am available tomorrow (Wednesday) afternoon to discuss your

letter. Please let me know if there is a time that works for you after 3pm Eastern.

Also, please see the attached spreadsheet reflecting decisions regarding step downs from secure care. I inadvertently missed sending this spreadsheet to you on August 24 when it was sent to me by my clients, so all information therein is accurate as of that date.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Carlos Holguín
[mailto:crholguin@centerforhumanrights.org]
**Sent:** Friday, August 31, 2018 7:20 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>; Silvis, William (CIV) <WSilvis@civ.usdoj.gov>
**Cc:** Holly S Cooper <hscooper@ucdavis.edu>; Leecia Welch <lwelch@youthlaw.org>; Peter Schey <pschey@centerforhumanrights.org>
**Subject:** Correspondence requesting meet/confer in re: contemp

Please see attached.

Thank you.


Carlos Holguín
General Counsel
Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, California 90057
213.388-8693 x.309 (v)
(213) 290-1642 (direct)
213.386.9484 (fax)
http://www.centerforhumanrights.org
<Copy of Copy of Secure cases 8.24.18- production.xlsx>

Click to Download
2dLetterRe7-30OrderCompliance090618.pdf
93 KB

Click to Download
Shiloh G28s.zip

# Exhibit 26

| | |
|---|---|
| **From:** | **Fabian, Sarah B (CIV)** Sarah.B.Fabian@usdoj.gov |
| **Subject:** | RE: Flores Monitoring |
| **Date:** | October 18, 2018 at 1:30 PM |
| **To:** | Peter Schey pschey@centerforhumanrights.org |
| **Cc:** | Carlos Holguin crholguin@centerforhumanrights.org, Chapman Noam chapmannoam@centerforhumanrights.org, Flentje, August (CIV) August.Flentje@usdoj.gov, Cooper Holly S (hscooper@ucdavis.edu) hscooper@ucdavis.edu |

Peter:

Although we received no information from you regarding your concerns with the form, I spoke with my clients and going forward ORR will accept a bar card or other proof of licensure for attorney participants. Thus, the background form is necessary only for non-attorney participants.

Additionally, in order to resolve the issue regarding the participation of mental health experts in attorney-client visits, ORR is willing to allow such participation so long as the minor assents to it in writing in a manner that acknowledges that the mental health expert is not offering treatment, or engaging in a mental health evaluation, only assisting the attorney in monitoring compliance with Flores settlement and the provision of appropriate mental health services (per Exhibit 1). ORR is developing a form that the child can sign for that purpose, and will provide you a copy of it once it is finalized.

Please let me know if these resolve these issues for Plaintiffs, or please let me know if you have additional concerns.

Also, I would appreciate it if you would do us the courtesy of at least initially confirming whether you plan to conduct the remaining seven visits next week about which we have not yet heard anything from you. Defendants and counsel have worked hard to make arrangements so that these visits can run smoothly, and  have already incurred costs having to cancel travel for your last minute cancellations this week. If we need to cancel additional visits we need to know as soon as possible to avoid similar costs going forward.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Fabian, Sarah B (CIV)
**Sent:** Wednesday, October 17, 2018 3:07 PM
**To:** 'Peter Schey' <pschey@centerforhumanrights.org>
**Cc:** 'Carlos Holguin' <crholguin@centerforhumanrights.org>; 'Chapman Noam' <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>; Cooper Holly S (hscooper@ucdavis.edu) <hscooper@ucdavis.edu>
**Subject:** RE: Flores Monitoring

Peter:

Here are rescheduled dates for two of the four visits that you canceled this week. I will send rescheduled dates for the other two when I receive them.

· His House: 11/2 and 11/5
· Heartland Guadalupe: 11/14 and 15

I need to know immediately whether you intend to go forward with the TEN visits that are scheduled for next week. And if so I need to receive participant information for those visits ASAP. If I do not receive confirmation and participant information by COB Friday I may need to cancel the visits for next week.

According to my records the ten locations scheduled for next week (some also have dates in other weeks but the below chart only includes dates for next week) are:

| _Facility_ | _Selected Dates_ |
|---|---|
| Homestead | Tu, 10/23; We, 10/24 |
| Southwest Key El Presidente | Tu, 10/23; We, 10/24 |
| Southwest Key Nueva Esperanza | Tu, 10/23; We, 10/24; Th, 10/25; Fr, 10/26 |
| BCFS Baytown | Tu, 10/23; We, 10/24; Th, 10/25; Fr, 10/26 |
| Southwest Key Conroe | Mo, 10/22; Tu, 10/23 |
| Childrens Village Shelter | We, 10/24; Th, 10/25 |
| BCFS Chavaneaux | We, 10/24; Th, 10/25 |
| Southwest Key Combes | Tu, 10/23; We, 10/24 |
| BCFS Raymondville | Tu, 10/23; We, 10/24 |
| Tornillo | Th, 10/25; Fr, 10/26 |

Also, I have not received from you any information regarding your concerns with the background check form. As I noted, we are willing to discuss and try to address your concerns so that these visits can go forward, but we need you to provide us with that information so that we can do so. Please send that information immediately.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

---

**From:** Fabian, Sarah B (CIV)
**Sent:** Tuesday, October 16, 2018 5:11 PM
**To:** Peter Schey pschey@centerforhumanrights.org

**144**

**To:** Peter Schey <pschey@centerforhumanrights.org>
**Cc:** Carlos Holguin <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>; Cooper Holly S (hscooper@ucdavis.edu) <hscooper@ucdavis.edu>
**Subject:** RE: Flores Monitoring

Peter:

I have asked ORR to cancel the four visits scheduled for this week and I will let you know when they are able to rescheduled those visits. Please confirm ASAP if you intend to cancel the numerous visits that are scheduled for next week as well. If you do not intend to cancel those visits please send participant information immediately.

ORR's position regarding the participation of mental health experts in the upcoming visits has remained the same since last week as explained in my emails. If you would like to meet and confer regarding that position I can do so tomorrow or Thursday as needed, however I do not expect Defendants' position on this point to change.

Regarding the background check form, that was first provided to you by email on July 21 and this is the first objection you have raised to the form. ORR is willing to waive use of the form for individuals who work for the organizations that serve as class counsel for the Flores agreement. However, ORR needs to be able to conduct background checks for individuals who are not associated with those organizations given the problems the government has experienced in the past with individuals you have recruited for these visits who have misrepresented their identities and intentions with regard to participation in these visits. If you have specific objections to the form we are happy to try to address them, but we would ask you to please send your specific concerns immediately so that we can address them and still allow ORR the opportunity to conduct the necessary background checks prior to next week's visits. Please identify your specific concerns no later than noon Pacific tomorrow.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Tuesday, October 16, 2018 3:39 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguin <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Flores Monitoring

Dear Sarah,

In light of the delays in getting the visits for this week scheduled and disputes regarding (1) whether the facilities we have planned visits to have existing written policies that exclude attorneys from being accompanied by child welfare experts (Para 32 interviews), (2) restrictions ORR now seeks to impose on child welfare experts interviewing class members under Parea. 33, and (3) the form ORR wants all monitors to sign including granting access to personal data unrelated to participation inn visits as a monitor, Plaintiffs wish to reschedule the visits scheduled for as soon after this week as possible. We again request that the parties meet and confer telephonically to work out the issues identified in this and my previous email. I am free tomorrow after 11:30 AM Pacific Time and all day Thursday to meet and confer. Please let me know Defendants' position should we move ex parte for an Order permitting child welfare experts to interview class members under Paragraphs 32 and/or 33, and limiting the scope of information sought by ORR from monitors to something similar to what ICE historically requested.

Thank you.

Peter A. Schey
President
Center for Human Rights and Constitutional Law

On Tue, Oct 16, 2018 at 9:21 AM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Peter:

As I mentioned yesterday, I provided you with the dates you requested last Friday.

As I also explained, Defendants' position regarding the participation of mental health experts remains the same as stated in my emails, and will apply to the upcoming visits.

I note that there are visits to 4 locations that are scheduled for visits this week, but for which we have not received any information from you regarding participants. Two of those visits are scheduled to happen tomorrow. If you intend to go forward with those visits then we need to receive participant information immediately, and even so there may be a delay at this point given the need for the facilities to review the information you provide. Please let me know immediately if you intend to go forward with the following visits this week, and if so provide the requested information for all participants:

· SW Key El Presidente, 10/17 and 10/18 (also scheduled for 10/23 and 24)

· His House, 10/17 and 10/18

· SW Key San Diego, 10/18 and 10/19

· Heartland Guadalupe, 10/18 and 10/19

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel

Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Monday, October 15, 2018 1:01 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Flores Monitoring

Dear Sarah,

We will proceed with the planned site visits and continue to wait for dates we have requested. Please promptly provide availability of the locations/dates Plaintiffs long ago requested. Defendants' delays make effective and efficient monitoring extremely difficult.

Defendants are asserting a position regarding child welfare experts' ability to participate in class member interviews that is a clear breach of ¶ 32 of the Settlement. For any facility at which any facility will not permit a child welfare expert to accompany plaintiffs' counsel, please timely (so we may arrange travel and experts' time) provide the facility's rules showing that it routinely denies access to child welfare experts assisting counsel, and also provide an individualized statement for each minor Defendants refuse to allow to meet with Flores counsel accompanied by a child welfare expert prepared by a facility mental health specialist attesting that, as Defendants' claim, that "introduction of another unfamiliar mental health professional during [an] attorney-client visit[ ] who ask the children to repeat their stories is not consistent with trauma-informed practice and child welfare principles." Defendants seem to be under the impression that Plaintiffs' experts intend to treat class members. They do not. They have in the past in numerous visits to many facilities holding class members participated as Plaintiffs' experts to evaluate class members' treatment and whether it comports with state child welfare standards and, *a fortiori,* the *Flores* settlement.

Until now, Plaintiffs have provided advance notice of visits to Defendants' facilities as a matter of courtesy, and not because the Settlement requires it. We are willing to continue providing such notice in most instances to the extent consistent with our clients' best interests, but are prepared to discontinue doing so if any agency holding class members is intent on obstructing access to interviews with class members.

We have requested but still not received copies of the licenses for each facility Plaintiffs will be visiting. Can these be forwarded to us immediately? They were requested some time ago and we would assume are readily available to Defendants and could easily be forwarded to Plaintiffs.

Plaintiffs and interviewed class members also remain deeply concerned that all the facilities Plaintiffs last visited appear to be secure in violation of the settlement, class members do not have adequate communication with parents, relatives or other decision-makers, delays from ORR custody remain unreasonable, obtaining fingerprints from parents and relatives seeking to be unified with class members that will be shared with ICE serves no legitimate purpose under the settlement and is obviously discouraging such adult relatives from seeking the release of class members, parents, relatives and minors are not being informed of other options for release under the settlement, and accompanying parents are not being fully informed of their children's Flores rights or the parents right to change their mind about whether to have their child remain with them or be released.

Finally, as we have discussed, Plaintiffs wish to meet and confer regarding Defendants' proposed regulations intended to abrogate portions of the Flores settlement the Administration has repeatedly and publicly criticized as constituting a "loophole" in the law and encouraging undocumented migration, both assertions Plaintiffs believe are untrue. The Court may or may not provide guidance on this issue shortly but Plaintiffs wish to commence a meet and confer on this subject within the next two to three business days.

Unless these matters can be promptly discussed and resolved, Plaintiffs' will move to hold Defendants in breach of the Settlement and for appropriate remedies, including monetary sanctions. Regarding Defendants' recent effort to block child welfare experts from accompanying class counsel, Plaintiffs will seek expedited resolution of this issue by the Court unless the parties can reach a prompt resolution.

You may reach me at 323-251-3223 to discuss the matters outlined above.

Thank you.

Peter A. Schey
President
Center for Human Rights and Constitutional Law

On Wed, Oct 10, 2018 at 2:04 PM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Peter:

Defendants agree that under the terms of Paragraph 33, during the course of the facility tour which will last no more than three hours, the tour participants may interview staff and any class members who are present during the tour. However, Defendants note that this provision does not provide for separate, private, individualized interviews. Moreover, as these are not attorney-client interviews, Defendants believe that attorneys for Defendants as well as staff from ORR and facility staff have the right to be present at any such interviews.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Wednesday, October 10, 2018 3:58 PM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Re: Flores Monitoring

Sarah,

Regarding your email message of today (copy below), please make Defendants, including ORR, aware that under xhibit 4 of the Agreement, "The purpose of facility visits under paragraph 33 is to interview class members and staff ..." Under Paragraph 33 Plaintiffs' counsel and "associated experts" may join facility

visits. Please advise whether this is going to be a problem going forward.

Peter A. Schey
President
Center for Human Rights and Constitutional Law

On Wed, Oct 10, 2018 at 12:19 PM Fabian, Sarah B (CIV) <Sarah.B.Fabian@usdoj.gov> wrote:

Peter:

*Flores* counsel is entitled to attorney-client visits with class members pursuant to Paragraph 32 of the settlement agreement, and ORR has taken affirmative steps to help facilitate the many visits that you have requested at various facilities throughout the month of October.  Moreover, under Paragraph 33 of the agreement, as Plaintiffs' counsel, you may also request to visit and tour a facility along with a child welfare expert of your choice if desired – ORR has likewise assisted in coordinating such visits with a number of facilities at your request.

However, in advance of your upcoming visits, ORR wants to make clear that ORR's position is that the participation of mental health experts in attorney-client visits under Paragraph 32 is not mandated by the settlement agreement. Further, ORR's child welfare experts are concerned that for minors who already have access to trauma-informed, individual and group mental health services, as well as psychiatric services when needed, consistent with Exhibit 1 to the settlement agreement, introduction of another unfamiliar mental health professional during attorney-client visits who ask the children to repeat their stories is not consistent with trauma-informed practice and child welfare principles. Therefore, going forward, ORR objects to the participation of mental health experts in the attorney-client visits, and will not permit such participation. Such individuals are welcome to join attorneys, however, during tours of facilities under Paragraph 33 to learn more about the care providers and their programming.

Also I am attaching the background check form mentioned in my emails below that must be provided for each visitor.

Best,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Fabian, Sarah B (CIV)
**Sent:** Tuesday, October 09, 2018 2:15 PM
**To:** 'Peter Schey' <pschey@centerforhumanrights.org>
**Cc:** 'Carlos Holguin' <crholguin@centerforhumanrights.org>; 'Chapman Noam' <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** RE: Flores Monitoring

Please see the below information about the availability of space for interviews at each facility:

| Program | # of private interviews conducted at one time |
|---|---|
| BCFS Baytown | 3 |
| Southwest Key Casa Montezuma | 3 |
| His House | 4 |
| Southwest Key Nueva Esperanza | 2 |
| Homestead | 4 |
| Southwest Key Conroe | 2 |
| Lincoln Hall Boys Haven | 2 |
| Southwest Key Canutillo | 6 |
| Heartland Guadalupe | 4 |
| Childrens Village Shelter | 20 |
| BCFS Chavaneaux | 2 |
| BCFS Raymondville | 2 |
| Southwest Key San Diego | 2 |
| Southwest Key El Presidente | 3 |
| Southwest Key Combes | 3 |

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Fabian, Sarah B (CIV)
**Sent:** Thursday, October 04, 2018 5:57 PM
**To:** Peter Schey <pschey@centerforhumanrights.org>
**Cc:** Carlos Holguin <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** RE: Flores Monitoring

Peter:

·    We are identifying dates for your requested visit to Tornillo and will get back to you early next week. Please be aware that the facility likely will not be able to arrange for visits on 4 consecutive days because this will interfere too significantly with the operations of the facility. You should expect that the dates offered will be broken up into no more than two days at a time.

·    Relatedly, as I noted when I sent the previous chart, the days offered by the facilities were offered with the expectation that you would request no more than 2 consecutive days. Where you have requested more than 2 consecutive days we are checking with the facilities to see if that can be

more than 2 consecutive days. Where you have requested more than 2 consecutive days we are checking with the facilities to see what can be accommodated, and if not we will get back to you with alternative dates. Likewise, where you have asked the facilities to provide additional dates please expect that those will not be consecutive with the two days that you have already selected. I will get back to you regarding these dates early next week as well.

· Defendants agree to provide you with the best estimate for each facility as to how many interviews could be conducted at one time, the street address for the facility, and a POC for each visit who will likely be a DOJ attorney who can assist you in coordinating with the facility. I will provide you with that information when I receive it from each facility, likely next week some time.

· Defendants agree to post notice of your visit in advance of the visit. Please provide a copy of the notice you would like posted in both English and Spanish. Defendants will also provide you with a list of residents at the facility that includes the information required by the Agreement, and if possible, will do so in advance of the visit.

· As with previous visits, Defendants request that you comply with the following:

**7 days in advance of any visit to an ORR facility, ORR requests that you send in a single email:**

1. Full list of visitors and a description of each visitor's role (that is, attorney, medical professional, interpreter, etc.)

2. Copies of Photo ID documents (e.g., driver's license, passport)

3. For attorneys, a bar card

4. For any non-attorney professional experts, evidence of current professional licensure

5. Explicit consent to ORR performing background checks (for both attorneys and non-attorneys) (see attached form to be provided by each participant)

Please note that if individuals are added to the list after this email is send, it is not guaranteed that they will be accommodated by the facility.

Let me know if you have any questions, otherwise I will follow up with you next week.

Thanks,
Sarah

Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
(202) 532-4824

**From:** Peter Schey [mailto:pschey@centerforhumanrights.org]
**Sent:** Thursday, October 04, 2018 1:30 AM
**To:** Fabian, Sarah B (CIV) <sfabian@CIV.USDOJ.GOV>
**Cc:** Carlos Holguín <crholguin@centerforhumanrights.org>; Chapman Noam <chapmannoam@centerforhumanrights.org>; Flentje, August (CIV) <AFlentje@CIV.USDOJ.GOV>
**Subject:** Flores Monitoring

Dear Sarah,

Please see below regarding Plaintiffs' planned monitoring efforts for this month:

**Additional Location for Site Visit and Class Member Interviews**
As we discussed with you on Monday and Tuesday this week, in addition to the facilities we identified in our email on 9/11/18, we also wish to conduct a site visit and 4 consecutive days of class member interviews at the tent city in Tornillo, TX identified in the 9/30 NY Times article available through this link. Please let us know by COB Friday this week of 4 consecutive days on which Plaintiffs may conduct class member interview and a site inspection perhaps on the 2nd or 3rd day of the visit. We want to conduct this inspection in the period between 2 and 4 weeks from now.

**Information Needed to Coordinate Monitoring Efforts**
As we discussed over the phone, Plaintiffs need additional information in order to efficiently facilitate monitoring visits. These include the following for each facility:

- The capacity to accommodate class member interviews (how many interviews can be conducted at one time so they take place at least 10-15 feet apart if in a common area). This information is needed immediately so Plaintiffs can begin planning visits to the facilities Plaintiffs identified almost a month ago. Please provide this information by COB tomorrow, October 4, 2018.
- The current street addresses where the site visits/interviews will take place
- A POC at each facility for monitoring teams to coordinate with directtl

  Please also advise whether defendants

- agree to post a notice about the visits 10 days prior to each visit
- will provide Plaintiffs with a list of the class members present at each facility about a week prior to each visit, hopefully with the type of data Defendants normally share with Plaintiffs on a monthly basis and that is available  to all facility managers.
- will identify class members who were separated from a parent but have not yet been reunited with the parent.
- prior to each visit will provide Plaintiffs with a copy of the facility's state issued license.

**Additional Dates for Identified Site Visits/Class Member Interviews**
Several of the options you provided for Plaintiffs to conduct class member interviews and site visits occur less than one week from today. In light of the time available to coordinate the logistics of these visits, we think it is highly unlikely that we will be able to efficiently arrange site visits on any of the days identified during the week of October 8th. Therefore, please advise us promptly, within one business day, if at all possible, of two additional days for each facility that Plaintiffs may conduct interviews with class members any time after October 15th.

Based on the options you sent us yesterday, we have indicated in the chart below dates we would like to conduct monitoring and instances where more dates need to be identified.

| Facility | Location | Pop. | Selected Dates | Comments |
|---|---|---|---|---|
| Homestead | Homestead, FL | 1345 | Tu, 10/23; We, 10/24 | Plaintiffs require 4 days to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key El Presidente | Brownsville, TX | 363 | Tu, 10/23; We, 10/24 | Plaintiffs require 3-4 days to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key Nueva Esperanza | Brownsville, TX | 276 | Tu, 10/23; We, 10/24; Th, 10/25; Fr, 10/26 | |
| BCFS Baytown | Baytown, TX | 207 | We, 10/24; Th, 10/25 | Plaintiffs require 3-4 dates to interview class members at this facility. Please provide 2 additional consecutive dates after Oct. 15 |
| Southwest Key Casa Montezuma | Channelview, TX | 203 | Mo, 10/29; Tu, 10/30; We, 10/31 | |
| Southwest Key Conroe | Conroe, TX | 199 | Mo, 10/22; Tu, 10/23 | |
| Lincoln Hall Boys Haven | Lincolndale, NY | 183 | Mo, 10/29; Tu, 10/30 | |
| Childrens Village Shelter | Dobbs Ferry, NY | 167 | We, 10/24; Th, 10/25 | |
| His House | Miami Gardens, FL | 125 | We, 10/17; Th, 10/18 | |
| Southwest Key San Diego | San Diego, CA | 89 | Th, 10/18; Fr, 10/19 | |
| Southwest Key Canutillo | Canutillo, TX | 87 | Tu, 10/30; We, 10/31 | |
| BCFS Chavaneaux | San Antonio, TX | 78 | We, 10/24; Th, 10/25 | |
| Southwest Key Combes | Harlingen, TX | 78 | Tu, 10/23; We, 10/24 | |
| BCFS Raymondville | Raymondville, TX | 49 | Tu, 10/23; We, 10/24 | |
| Heartland Guadalupe | Chicago, IL | 47 | Th, 10/18; Fr, 10/19 | |

Please let us know if you have any questions.

Thank you.

Best,
Peter Schey

Page 149

# Exhibit 27

## [Provisionally Filed Under Seal]

1    I,                          , declare as follows:

2

3    1.     This declaration is based on my personal knowledge. If called to testify in this
4    case, I would testify competently about these facts.

5    2.     I am 15 years old, and I will turn 16 next month. My alien registration number is
6            . I am currently being detained in ORR custody at the Yolo County
7    Juvenile Detention Center in Woodland, California ("Yolo"). Yolo is a jail. The children
8    are detained here and no one is free to leave.

9    3.     I have been in immigration custody since March 13, 2018. This is the first time I
10   have ever been in immigration custody. Before being held in Yolo, I was detained for a
11   time in a Southwest Key facility in El Paso, Texas, and at a staff-secure facility near
12   Brownsville, Texas.

13                              Attempts at Reunification

14   4.     Since I have been in detention, my family members have been trying to get me out
15   here. From what I understand, I should have been released already but ORR officials
16   keep asking for additional documentation and delaying the process. My aunt in Virginia
17   has agreed to serve as my sponsor. I am sad and worried because of the delays and I do
18   not know if I will ever get out of here.

19                                   Medication

20   5.     When I was in the Southwest Key facility in Texas, a doctor there gave me nine
21   shots. I was told these were vaccinations. Here at Yolo, on September 19, 2018, I was
22   given five more injections. I was only told that they were necessary and I was not given
23   any further explanation. To my knowledge, neither my aunt nor any other responsible
24   adult gave permission for me to receive any of these injections.

25                               Conditions at Yolo

26   6.     It is really hard to take a shower here at Yolo. The water is so hot that it can burn
27   your skin. A couple of day ago a staff member stayed overnight and they could not take a
28   shower because the water temperature was too hot.

1

Unnecessary punishment

7.    Last week, here at Yolo I witnessed three guards holding and using pepper spray against another youth. This was unnecessary and excessive because the youth was already under the control of two guards when the third guard sprayed pepper spray in the youth's face.

8.    The guards routinely search us by twisting the left hand and arm and then making us lift the leg on that side while they frisk us. On September 18, 2018 I complained to a guard because he was bending my hand and arm too hard and it was inflicting pain. I said, "stop doing that so hard, you are treating me like an animal." The guard told me that this was how they had been trained.

9.    The social worker Castaneda was nearby and  witnessed this interaction. The social worker then took me alone to another room and tried to bend my arm the same way that the guard had done, explaining to me that this was the way that they were trained. I asked the social worker to stop because he was hurting my arm the way the guard had done before. The youth that are more well behaved are housed on the upper tier of our pod, so that the guards have more ready access to the youth who have behavior problems. Castaneda threatened me that if I did not behave myself he was going to have me moved from the upper tier to the lower one.

10.    One of the methods of disciplining us is to make us wear different colored shorts. If you behave well you wear a yellow shirt. If you misbehave you can be assigned a gray or purple shirt. As a punishment for my having complained about the guard's physical treatment of me, I was stepped down two colors and not allowed to have Cheetos in snack time. I was also sent to sleep one hour early. In the report on the incident, the officer lied and falsely stated that I had kept a closed fist during the search when in truth I opened my hand and did not keep my fist closed.

//

//

//

2

11.    I declare under penalty of perjury that the foregoing is true and correct.  Executed
on this 21 day of September, 2018, at Woodland, California.

3

1

## CERTIFICATE OF TRANSLATION

2       My name is Jonathan Mulligan and I swear that I am fluent in both the English

3 and Spanish languages and I translated the foregoing declaration from English to

4 Spanish to the best of my abilities.

5

6 Dated: September 21 , 2018

7                                     Jonathan Mulligan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# Exhibit 28

## [Provisionally Filed Under Seal]

I, ███████████████████████ , declare as follows:

1. I have reviewed the document called Notice of Placement in a Restrictive Setting dated August 12, 2018.
2. The signature on the notice is my signature, but I did not understand what I was signing.
3. I do not read, write, or speak English and the document was never presented or read to me in a language that I understand.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 18,2018 at Woodland, California.

████████████████  ————— _____

I KAREN PEDRAZA, hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to ███████████████████
SOSA in its entirety in Spanish on October 18, 2018.

_____ . _____Karen____Pedraza._____

# Exhibit 29

## [Provisionally Filed Under Seal]



**Notice of Placement
in a Restrictive Setting**
Office of Refugee Resettlement

You are in the custody of the Office of Refugee Resettlement (ORR), and have been placed in a restrictive setting – a secure or staff secure facility, or a Residential Treatment Center (RTC). The reason you have been placed in a restrictive setting is listed below.

If you have any questions about this placement, please discuss them with your case manager, your attorney, or an ORR-funded legal service provider.

| UAC Name | Alien Number | Country of Birth | Date of Birth | Gender |
|---|---|---|---|---|
| | | Honduras | | Male |
| **Name of Care Provider Facility** | | | **Type of Facility** | |
| Southwest Key Nueva Esperanza Staff Secure | | | Staff Secure | |

**Secure Care:** ORR has determined that you pose a danger to self or others; or have been charged with having committed a criminal offense. ORR considered that you:

☐ Are charged with, may be chargeable, or have been convicted of a crime; or are the subject of delinquency proceedings, have been adjudicated delinquent, or are chargeable with a delinquent act[1];

☐ Have committed, or have made credible threats to commit a violent or malicious act while in ORR custody;

☐ Have committed, threatened to commit, or engaged in serious, self-harming behavior that poses a danger to self while in ORR custody;

☐ Have engaged in conduct that has proven to be disruptive of the normal functioning of a staff secure facility in which you were placed such that transfer may be necessary to ensure your welfare or the welfare of others;

☐ Have reported gang involvement or display gang affiliation while in care;

☐ Have self-disclosed violent criminal history or gang involvement prior to placement in ORR custody that requires further assessment; and/or,

☐ Have a history of or display sexual predatory behavior, or have inappropriate sexual behavior.

**Staff Secure Care:** ORR has determined that you require close supervision, but do not require placement in a secure care provider facility. ORR considered that you:

☐ Have been disruptive to the normal functioning of a shelter care facility such that transfer is necessary to ensure the welfare of others;

☒ Are an escape risk;

☐ Have non-violent criminal or delinquent history not warranting placement in a secure care provider facility, such as isolated or petty offenses; or,

☐ Could be stepped down from a secure facility.

**Residential Treatment Center:** ORR has determined that you have a psychiatric or psychological issue that cannot be addressed in an outpatient setting. A licensed psychologist or psychiatrist has indicated that you:

☐ Have not shown reasonable progress in the alleviation of your mental health symptoms after a significant period of time in outpatient treatment;

☐ Demonstrate behavior that is a result of your underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting;

☐ Require therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent you from independent participation in the daily schedule of activities; and/or,

☐ Present a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions.

[1] Excluding: isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon (e.g., trespassing and entering, vandalism, DUI, etc.); or petty offenses which are not considered grounds for a stricter means of detention in any case (e.g., shoplifting, joy riding, disturbing the peace, status offenses).

**Notice of Placement in a Restrictive Setting**

Summary of placement decision or case review:

Minor was placed at Southwest Key Processing Center Staff Secure for absconding from Southwest Key Casita Del Valle during a church outing. No criminal activity was reported in current or previous placement. Please note the following is noted in the intakes tab "Requesting SECURE facility placement. Minor escaped from SWK shelter in El Paso, Texas on Sunday June 3, 2018. Minor was apprehended by Border Patrol Agents in the El Paso station's Area of Responsibility on June 11, 2018". At the moment a staff secure setting is appropriate for the minor. The minor will be re-evaluated in the next 30 days for consideration for a step-down to a less restrictive setting.

Update 07/13/2018: The minor's 30 day Notice of Placement was staffed with the Program, FFS, Servando Barrera and Case Coordinator, Christopher Chavez on 07/12/2018 and it was noted that staff secure placement is appropriate for the minor at the moment. Upon arrival the minor was placed on run-risk restriction due to the minor presenting an escape risk. On 06/24/2018 the minor was removed from run-risk restriction due to no longer presenting an escape risk. However, minor is still on a 30 day outing restriction. The outing restriction will end on 07/24/2018 if the minor no longer presents any run-risk behavior. The minor's Notice of Placement will be re-evaluated in the next 30 days.

Update 08/12/2018: The minor's 60day Notice of Placement was staffed with the Program, FFS, Servando Barrera and Case Coordinator, Christopher Chavez on 08/09/2018 and it was noted that staff secure placement is appropriate for the minor at the moment. Minor has not completed 30 days of good behavior. Minor has not been able to attend any outings due to receiving Loss of Privileges for behavior issues. The minor's Notice of Placement will be re-evaluated in the next 30 days.

ORR will review your placement, at a minimum, every 30 days to determine whether your placement in a restrictive level of care is still necessary. If you remain in a secure facility or RTC after 30 days, you may request that the ORR Director reconsider your placement. For more information on this process, please ask your case manager.

If you believe you have not been properly placed or that you have been treated improperly you may also ask a Federal District Court to review your case. You may call a lawyer to assist you.

**UAC's acknowledgement of receipt:**

_____                    8/12/18

UAC's Signature                              Date

# Exhibit 30

## [Provisionally Filed Under Seal]



**U.S. Department of Health and Human Services**

<div align="right">

Office of Refugee Resettlement
Authorization for Medical, Dental, and Mental Health Care, Rev. 11/01/2011

</div>

<div align="center">

**OFFICE OF REFUGEE RESETTLEMENT**
**Division of Children's Services**
**AUTHORIZATION FOR MEDICAL, DENTAL, AND MENTAL HEALTH CARE**

</div>

The Department of Health and Human Service (HHS), Office of Refugee Resettlement (ORR), Division of Children's Services (DCS) is responsible for coordinating and implementing the care and custody of the following minor pursuant to section 462 of the Homeland Security Act of 2002 (6 U.S.C. §279):

| | | | |
|---|---|---|---|
| Minor's Name: | ███████████ | Alien Number: | ███████████ |
| Date of Birth: | ███████████ | Nationality: | Honduras |

ORR hereby Authorizes , hereinafter "care provider," to arrange medical, dental, and mental health care for said minor under the following terms and conditions:

care provider :    Yolo County Juvenile Detention

**1. Licensing and Reimbursement**

•All medical, dental, or mental health services for the minor will be by a State licensed provider.

•The licensed medical, dental, or mental health provider must be willing to accept the Medicare reimbursement rate, payment on a fee for service basis, or to provide services for no fee.

**2. Authorization and Notification**

•The care provider shall secure authorization from ORR before consenting to any non-emergency medical, dental or medical health services; except for initial medical screening.

•The care provider shall consent to the provision of emergency treatment recommended by a licensed medical, dental, or mental health provider. The care provider shall notify ORR of the emergency immediately following treatment if possible, or within 24 hours after the initial incident.

•Significant surgical or medical procedures require heightened ORR involvement. Please refer to ORR instructions and procedures on medical services requiring heightened ORR involvement in these special cases.

•Minors have the right to be tested for HIV or other sexually transmitted diseases; the care provider shall ensure the minor receives the test(s) as requested.

•The care provider is authorized to dispense over-the-counter medications and prescription

**3. Medical and Dental Exams/Screenings**

•Minors in care shall receive a medical exam within 48 hours of placement in a care provider program, unless the minor obtained a medical exam within one calendar year and while under the care of another ORR-funded care provider.

•Minors in care shall also receive an initial dental examination within 90 days of placement, but no sooner than their 30th day in the custody of ORR.

4. Immunizations

•The care provider shall ensure that all minors in care receive necessary immunizations.

•Females 10 years or older must undergo a quantitative blood pregnancy test, with the minor's consent, before being administered any immunization.

5. Medical, Dental, and Mental Health Records/Confidentiality

•Care providers shall (1) obtain copies of all screenings, exams, or testing performed on a minor in care, signed by the licensed health care professional, (2) provide copies to ORR, when requested, and (3) ensure that medical records are maintained in the minor's file.

•All records maintained by the care provider in reference to the minor's health care are the property of ORR. Care providers may not release health information about the minor to any individual or organization without prior express authorization of ORR, except in the following instances: to the minor's educational program or medical, mental health, dental, and other service providers to the extent that the information is needed for the minor's education, recreation, social development,

| [signature] | 09/01/2018 | 530/406-5317. |
|---|---|---|
| Signature - Authorized Representative of Care Provider | Date | Telephone Number |
| [signature] | 09/01/2018 | 202-401-5709 |
| Signature - Official Representative | Date | Telephone Number |

**Office of Refugee Resettlement**
**Administration for Children and Families**

1. "Immunizations and Pregnancy Testing," April 2, 2008. http://www.acf.hhs.gov/programs/orr/programs/ORRPolicy4208.pdf

# Exhibit 31

## [Provisionally Filed Under Seal]

1. I, ▋▋▋▋▋, of legal age, with place of residence at 1161 Sharon Lane in the city of Harrisonburg state of Virginia declare the following;

2. I am the aunt of ▋▋▋▋▋, my brother ▋▋▋▋▋ was the father of ▋▋. Approximately in the year 2007 my brother was assassinated and since then we have assumed the economic responsibility of ▋▋▋▋▋.

3. Approximately in the month of March I heard rumors from my sister that ▋▋ had crossed the border, I was also notified that he had been detained by the immigration authorities.

4. The first time that someone contacted me on behalf of ▋▋ was when he was in the first detention center "Southwest Key Casa del valle". The person that contacted me from that place was the case worker named Emy. She mailed me some forms and requested I take a digital fingerprint exam. Among other things she also requested a birth certificate and place of residence. To her I, more than anything, sent her those documents through Whatsapp, through fax, and a few times also through postal mail.

5. Emy at the beginning was telling me that they were not rushing on ▋▋ case because I was not answering my cell phone and that if ▋▋ case did not advance and came to a halt I was at fault for not answering the phone. I explained to her that if that had happened it was not because I was not willing to help but rather it was because the hours in which she was calling me I was usually working, aside from that I did not know that they needed me to support ▋▋ in this. At first it was my understanding that it was my sister who was sponsoring him, after speaking about this with the caseworker my sister and I talked.

6. My sister commented that she had abandoned the case since they told her many things that discouraged her among those being negative comments about ▋▋.

7. Emy also requested a DNA test through my mom. She considered it to be of much importance to know if there was really any blood relationship with ▋▋ for the reason that ▋▋ last name appears to be different than ours.

1

8. This whole reunification process started with me around the months of April and May 2018.

9. Both case workers had assured me on many occasions that everything was ready but they always asked for something more. This process is very stressful since one never knows when it will end, I sometimes doubt that they will really hand ▆ over to me.

10. I feel that the excuses they give me and ▆ are absurd, with the first case worker, she told me that the only thing that remained was the DNA exam and that with it everything was ready, that the only other thing left would be to buy the ticket for the trip. She then gave me the excuse that it was the government that put these obstacles. She also asked me if I had the money for the DNA test, I asked her how much it cost, she answered me saying she did not know but would investigate. After all this she never gave me an answer. Many weeks passed and I feel that ▆ became frustrated with waiting so much, one day after many weeks had passed with no news the caseworker contacted me and said that it was the government that was not putting a date for these tests. I remember on one occasion ▆ had commented to me that the caseworker had told him to sign his deportation since he did not have anybody to watch out for him, I recall telling ▆ to not sign anything since he had us.

11. The second case worker was named Aimy, she contacted me when ▆ was at the second detention center "Southwest Key"

12. I think that this second case worker was kind, since she contacted me to restart the reunification process again. Once more I provided fingerprints and provided responses to the envelope full of documents that was sent for me to sign, I mailed this documents through the postal mail. As I have mentioned this process seems to have no end, since I have once again started mailing those documents to the case worker. Aimy requested photographs with ▆ mom, she also asked me for the call records and the economic records proving that I was sending money for the care of ▆, I felt this was very strange because she also asked me for access to my Western Union account.

2

13. This case worker also asked me for access to both my mail and call records. I felt that they were investigating me too much and the saddest part was that at the end of all this, she told me that because ▮▮▮ had behaved badly they were not going to give me. She also told me that she had not wanted to tell me earlier everything that was happening with ▮▮▮ at the center because she liked him very much. The weird thing about all of this was that according to this case worker, he only needed a week to be delivered to me.

14. The last case worker is named Monica Moncada, she is from the center where he currently is "YOLO"

15. This lady has contacted me more than anything through phone calls, but she always comes up with things telling me that they can't give me ▮▮▮, first it was because my migratory status is uncertain since I have TPS, then she asked me for a co-sponsor, I sent her the name and information of this to her. Apart from this she asked me again for information that I had already sent to the past case workers. Currently she is telling me that the only thing missing is the study of the house, which I have been waiting on for a long time, she only lets me know that it is the government that is putting these obstacles.

16. I declare this under the penalty of perjury and I testify that the foregoing is true and correct.

17. This declaration was realized on the month of October on the 17 of the year 2018, in the city of Harrisonburg, state of Virginia.

3

1

CERTIFICATE OF TRANSLATION

2   My name is Cassie Tadeo Godina and I swear that I am fluent in both the English and

3   Spanish languages and I translated the foregoing declaration from English to Spanish to

4   the best of my abilities.

5

6   Dated: October 18, 2018

7                           CASSIE TADEO GODINA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

1

2  1.    Yo, ▮▮▮▮▮▮ mayor de edad, con lugar de domicilio en 1161 Sharon

3  Lane en la cuidad de Harrisonburg estado de Virginia declaro lo siguiente;

4  2.    Yo soy la tia de ▮▮▮▮▮▮ , mi hermano ▮▮▮▮▮▮ era

5  el padre de ▮▮ . Aproximadamente en el año 2007 mi hermano fue asesinado y desde

6  entonce nosotros hemos asumiendo la responsabilidad economica de ▮▮▮▮▮▮

7  ▮▮ .

8  3.    Aproximadamente en el mes de Marzo yo escuche rumores de parte de mi hermana

9  que ▮▮ habia cruzado la frontera, tambien me notificaron que este habia sido

10  detenido por las autoridades migratorias.

11  4.    La primera vez que alguien me contacto en nombre de ▮▮ fue cuando el

12  estaba en el primer centro de detencion "Southwest Key Casa del valle". La persona que

13  me contacto de ese lugar como trabajadora del caso se llamaba Emy. Esta me envio unas

14  formas y me solicito el examen de huellas digitales. Entre otras cosas tambien me solicito

15  la partida de nacimiento, lugar de domicilio. A ella yo mas que todo yo le enviaba los

16  documentos a traves del Whatsaapp por medio de Fax, algunas veces tambien por correo

17  postal.

18  5.    Emy al principio me decia que ellos no se apresuraron con el caso de ▮▮ .

19  porque yo no contestaba el telefono celular y que si el caso de ▮▮ no avanzaba y se

20  habia detenido, era porque yo tenia la culpa, por no contestar el telefono. Yo a ella le

21  explique, que si eso habia pasado no era porque yo no estaba dispuesta a ayudar, si no

22  mas bien era porque a las horas en las que ella me llamaba  usualmente yo estaba

23  trabajando aparte, yo no sabia que me necesitaban para apoyar en esto a ▮▮ . Al

24  principio yo tenia entendido que era mi hermana la que lo patrocinaria, despues de hablar

25  sobre esto con la trabajadora yo y mi hermana hablamos.

26  6.    Mi hermana me comento que ella habia abandonado el caso ya que le decian

27  muchas cosas que la desalientaban entre esa cosas comentarios negativos de ▮▮

28

1

7.     Emy tambien solicito la prueba de ADN a traves de mi mama. Ella consideron que era de mucha importancia saber si realmente habia algun parentezco sanguineo con ███████ por la razon de que en el apellido de ███████ aparese uno diferente al nuestro.

8.     Todo este proceso de reunificacion comenzo con mi persona alrededor de los meses Abril y Mayo 2018.

9.     Ambas tabajadoras del caso me habian asegurado en muchas ocasiones que todo estaba listo pero siempre pedian algo mas. Este proceso es muy estresante ya que uno nunca sabe cuando termina, habeses dudo que ellos realmente me entregaran a ██████.

10.     Siento que las excusas que me dan a mi y a ██████ son absurdas, con la primera trabajadora de caso, ella me dijo que solo faltaba el examen de ADN y que con eso to estaba listo, que lo unico faltante seria la comprar del boleto de viaje. Esta luego me salio con la excusa que era el gobierno el ponia las trabas. Esta tambien me pregunto si tenia el dinero para el examen de ADN, yo le pregunte a esta que cuanto costaba, y ella me contesto que no sabia que iba a investigar.  A todo esto ella nunca mas me volvio a dar una respuesta pasaron muchas semanas y siento  que ██████ se desespero de tanta espera, un dia despues de muchas semanas sin novedad la trabajadora me contacto y dijo que era el gobierno el que no ponia fecha para estos examenes. Recuerdo que en una occasion, ██████ me comento que la trabajadora le dijo a el que firmara su deportacion ya que el no tenia a nadie que viera por el, recuerdo que yo le dije a ██████ que no firmara nada ya que el nos tenia a nosotros.

11.     La segunda rabajadora del caso se llamaba Aimy, esta me contacto cuando ██████ estaba en el Segundo centro de detencion "Southwest key"

12.     Pienso que esta segunda trabajadora fue amable, ya que me contacto para reiniciar el proceso reunificacion nuevamente. Una vez mas, yo volvi a presentar huella y proveer respuesta a un sobre con mucha documentacion que me envio para firmar, yo envie esta documentacion a traves de correo postal. Como ya mensione este proceso parese no tener fin, ya que una vez mas comence a enviar los documentos a la trabajadora del case. Aimy

2

1   me solito fotografias con la mama de ███, tambien me pidio el record de las llamadas
2   y registro economicos comprobando que yo enviaba dinero para el cuidado de ███, yo
3   lo senti esto muy extraño porque tambien me pidio tener acceso a mi cuenta de Wester
4   Union.

5   13.     Esta trabajadora a la vez me pidio acceso a mi correos, mis registros de llamadas.
6   Yo sentia que me estaban investigando demasiado y los mas triste fue que al final de todo
7   esto, ella me dejo que porque ███ se habia portado mal no me iban a dar. Esta
8   tambien me dijo que ella no habia querido decirme antes todo lo que estaba pasando con
9   ███ en el centro por que ella lo queria mucho. Lo raro de todo esto, era que segun esta
10  trabajadora de caso, a el solo hacia falta una semana para entregarmelo.

11  14.     La aultima trabajadora de caso se llama Monica Moncada, esta es del centro en el
12  que el esta acutalmente "YOLO"

13  15.     Esta muchacha se ha contactado conmigo mas que todo por medio de llamadas
14  telfonicas, pero esta siempre me sale con cosas deciendome que no me pueden dar a
15  ███ primero que porque mi estatus migratorio es dudoso ya que yo tengo TPS, luego
16  que me pidio un co- patrocinador, le envie el nombre y los datos de este a ella. Aparte de
17  todo esto me pidio de nuevo la informcaion que ya le habia enviado a las muchachas
18  anteriores. Actualmente lo que ella me dice que solo falta el studio de casa el cual llevo
19  esperando desde hace mucho, ella solo me sabe decir que es el govierno el que esta
20  poniendo trabas.

21  16.     Yo declaro esto bajo la penalidad de perjurio y testifico que lo anterior es
22          verdadero y correcto.

23  17. Este declacion fue realizada en el mes de Octubre el dia 17 del año 2018, en la
24          ciudad de Harrisonburg, estado de Virginia.

25
26
27
28

3

# Exhibit 32

## [Provisionally Filed Under Seal]





## CONSENT FOR MEDICATIONS

1. The nature of my mental condition has been explained to me by the doctor.

2. I have been informed that medication is a helpful form of mental health treatment, that there is a reasonable expectation I may benefit from prescribed medication, but there is no guarantee of improvement.

3. The doctor told me that there are five major groups of medications used for serious mental problems and that the medication(s) I take will be from the group(s) checked below:

   ☐ Major Tranquilizers (Neuroleptics)
   ☐ Lithium
   ☐ Anti-depressants
   ☐ Anti-anxiety Agents
   ☐ Stimulants (in children, for treatment of hyperactivity)

4. The probable side effects commonly known to occur with the drugs being prescribed have been discussed with me. I understand that if I want to know more about my medications I can ask for further information.

5. If the doctor prescribed a major tranquilizer (neuroleptic), he/she discussed with me tardive dyskinesia, an additional side effect which may cause involuntary movement of the face or mouth, hands and feet if the medication is taken beyond 3 months. This side effect may be potentially irreversible and may appear after the medication has been discontinued.

6. I understand that the use of alcohol and/or other medications while taking the prescribed medications may increase the severity of the side effects described to me.

7. I have been informed of my right to accept or refuse medications, and what, if any, reasonable alternatives are available.

8. I understand that this consent may be withdrawn at any time by stating such intention to any member of the treatment staff.

*I acknowledge that I have read and understand the above and agree to accept the medications prescribed for me.*

_____     _____
SIGNATURE OF PATIENT                                              SIGNATURE OF PHYSICIAN

                                                                                    8/22/18
_____     _____
PARENT/GUARDIAN/CONSERVATOR                                   DATE

*I have discussed this form and its contents and the proposed medication with patient.*

   ☐ He/she understands the nature and effects of the medication and consents to taking such medication but does not wish to sign this form.

   ☐ He/she understands the nature and effects of the medication and refuses to take such medication.

_____     _____
DATE                                                                    SIGNATURE OF PHYSICIAN

*The patient whose name appears on this form has stated to me that he/she wishes to withdraw consent for the use of this medication*

_____     _____
DATE                                        SIGNATURE OF PHYSICIAN OR MEMBER OF THE TREATING STAFF

Medications (optional)_____

CFMG-CFM

# Exhibit 33

## [Provisionally Filed Under Seal]



## CONSENT FOR MEDICATIONS

1. The nature of my mental condition has been explained to me by the doctor.

2. I have been informed that medication is a helpful form of mental health treatment, that there is a reasonable expectation I may benefit from prescribed medication, but there is no guarantee of improvement.

3. The doctor told me that there are five major groups of medications used for serious mental problems and that the medication(s) I take will be from the group(s) checked below:

   ☐ Major Tranquilizers (Neuroleptics)
   ☐ Lithium
   ☐ Anti-depressants
   ☑ Anti-anxiety Agents  *Xanax*
   ☐ Stimulants (in children, for treatment of hyperactivity)

4. The probable side effects commonly known to occur with the drugs being prescribed have been discussed with me. I understand that if I want to know more about my medications I can ask for further information.

5. If the doctor prescribed a major tranquilizer (neuroleptic), he/she discussed with me tardive dyskinesia, an additional side effect which may cause involuntary movement of the face or mouth, hands and feet if the medication is taken beyond 3 months. This side effect may be potentially irreversible and may appear after the medication has been discontinued.

6. I understand that the use of alcohol and/or other medications while taking the prescribed medications may increase the severity of the side effects described to me.

7. I have been informed of my right to accept or refuse medications, and what, if any, reasonable alternatives are available.

8. I understand that this consent may be withdrawn at any time by stating such intention to any member of the treatment staff.

*I acknowledge that I have read and understand the above and agree to accept the medications prescribed for me.*



_____                          SIGNATURE OF PHYSICIAN
SIGNATURE OF PATIENT                                                          8/15/18
                                                                                       DATE
_____
PARENT/GUARDIAN/CONSERVATOR

*I have discussed this form and its contents and the proposed medication with patient.*

☐ He/she understands the nature and effects of the medication and consents to taking such medication but does not wish to sign this form.

☐ He/she understands the nature and effects of the medication and refuses to take such medication.

_____                          _____
DATE                                                            SIGNATURE OF PHYSICIAN

*The patient whose name appears on this form has stated to me that he/she wishes to withdraw consent for the use of this medication*

_____                          _____
DATE                                                            SIGNATURE OF PHYSICIAN OR MEMBER OF THE TREATING STAFF

Medications (optional) _____

CFMG-CFM

# Exhibit 34

## [Provisionally Filed Under Seal]

I, ████████████████, declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2. I am 17 years old. My alien number is ████████. I am currently being held in ORR custody at the Yolo County Juvenile Detention Center in Woodland, California.

### Notification and Medication

3. I came to the United States from El Salvador, crossing the Texas border on February 5, 2018.

4. I was apprehended by officers and kept detained in a prison for 5 days in Texas. I do not remember much about the cell that I was kept in but I remember the I was alone in one cell.

5. I was first taken to Holy Family in Pennsylvania. When I was in Holy Family, I got in a verbal fight with another kid. The other kid approached me and showed me his fist, which made me fear that he was going to hit me. In response I did not punch back, but I pushed him away from me. The head of the center called the police, and when the police came they were waiting for me to capture me and take me away.

6. The police took me to the psychiatric hospital to evaluate my behavior. My father was never informed that I was being taken to the hospital.

7. I was in the psychiatric hospital for nine days, without being able to call my father to tell him where I was. The hospital took blood tests from me, and also tried to make me take pills every day, sometimes putting them in my mouth directly. They did not explain what the pills were for. I did not want to take the pills so I hid them in my mouth. Since my father was never told I was in the hospital, he did not know about the medication that the hospital staff tried to force me to take.

8. I was taken from the hospital to Yolo on March 5. I was not told where I was going—I was only told that I was being moved to a juvenile jail. I was then given a document that

1

said I was being transferred to Yolo for behavioral issues. I was given a short time to read and sign this document. My father was not told where I was being taken.

9. I was put on a flight with other strangers, who looked like tourists. I could not talk to them; I was intimidated and embarrassed to be on the flight.

### Delay in Sponsorship Approval

10. My father first started the sponsorship process when I was in Holy Family. After I was hospitalized and I was moved to Yolo, my father restarted the sponsorship process.

11. At Yolo, the social worker has requested more information from my father.

12. Around 45 days ago, my father submitted his fingerprints. We have not gotten back any results back. The social worker keeps telling me that the government is being slow, that I need to be patient, and that my father should be approved shortly.

13. Today the social worker told me that she is going to pressure the government to process my father's fingerprints because that is the only thing holding me from being reunited with my father.

14. While I have been here at Yolo, I have tried to be on my best behavior. It has been hard staying patient while I have been told I will be released any day, and yet I have been kept here for eight months.

### Unnecessary Punishment

15. Within the first two weeks of my being at Yolo, I was pepper sprayed. Some other kids and I got frustrated when the guard refused to give us chips, and started throwing our milk around. The guard got angry and told us to cover. We did not obey the guard because we did not understand why we were being told to cover just for playing around. One of the other kids kept throwing milk again, and that is when the guard pepper sprayed me right in my face.

16. After the guard sprayed me, he took me into a corner and forced me to kneel. The pepper spray hurt so bad that I stood up and tried to find water to wash off the spray. The guards handcuffed me and took me outside, leaving me and other kids outside in the

2

**Page 177**

hot sun for around 15 minutes without giving us water to wash off the spray. It was so painful that I rubbed my face in the grass to try and get the spray off. After this the doctor and nurse helped me and asked the guards to take me to showers. As further punishment, I was not allowed to go outside at all the next day.

17. In class, the teacher did not speak Spanish and we had a hard time understanding him. One day we kept asking him questions trying to understand him, but he would not explain better what he was saying. Everyone in the classroom became upset and rebelled, standing up from their desks. The teacher called in the staff, which used a big can of pepper spray because they could not control the group.

18. About two months after I was taken to Yolo, I tried to stay out of trouble, and I stayed on my best behavior. I stayed on my best behavior for three months but was frustrated that I was never stepped down. This frustration has made me act out a few times since, but in the past two months again I have been behaving well again. It is so hard to behave well when I know I have no reason to stay here.

19. Yesterday I was feeling unwell in the afternoon and did not feel that I could eat the lunch they gave me. The staff deducted me a point just because I did not eat the lunch. Eventually I was able to talk with the supervisor, who was understanding, and said that he would make sure I got the point back.

Medication

20. Yesterday I was given four vaccination shots. The staff told me that I must get the shots in order to leave Yolo. They tell me I need to get three more shots. I do not know if my father was told about this, or if he gave Yolo permission.

Conditions

21. The food here is awful, especially the lunch. They do not give us much to drink besides water and milk every day. Water and milk.

3

1           22. The water is so hot ("esa agua puta de aqui quema todo"). There is one shower that we

2               all wait for, that only has one water stream. We all want to use that shower because it

3               burns us less.

4           23. Since July, workers at Yolo have kept telling me that I will be leaving soon, and to be

5               patient. They have told me this so often that I have stopped believing them.

6     I declare under penalty of perjury that the foregoing is true and correct. Executed on this ⎣7

7     day of October, 2018, at Woodland, California.

8

9

10

11

12                           CERTIFICATE OF TRANSLATION

13     My name is Suyapa Lainez and I swear that I am fluent in both the English and Spanish languages and I

14     translated the foregoing declaration from English to Spanish to the best of my abilities.

15

16     Dated: October ⎣7, 2018

17                              Suyapa Lainez

18

19

20

21

22

23

24

25

26

27

28

4