# EXHIBIT 2

7.   MEDICAL AND DENTAL SERVICES

**7.1.   Medical Department**

7.1.1.   Medical director

7.1.1.1.   Shiloh appoints a member of the contracted psychiatric staff as the medical director.

7.1.1.2.   The medical director:

- approves all high-risk admissions
- supervises all medical department staff
- monitors:
  - client care
  - documentation
  - compliance with standards, regulations and facility policies
  - psychiatrist caseloads
- participates as a member of COW when available
- approves prescription formulary and the list of non-prescription medications available to clients
- approves all contracted outside healthcare providers

7.1.2.   Physician

7.1.2.1.   Psychiatrist

7.1.2.1.1.   Shiloh contracts with multiple board certified psychiatrists to provide psychiatric care for each assigned client.

7.1.2.1.2.   Each psychiatrist is assigned a group of clients for psychiatric treatment and monitoring to include at least the following:

- psychiatric assessment and diagnosis
- treatment with medication as indicated
- monitoring of:
  - target symptoms
  - effectiveness of medication
  - possible side effects
- order and review of laboratory results as indicated
- participation as a member of each assigned client's IDT
- compliance with guidelines for parameters of care
- referrals for additional or specialized care as indicated

7.1.2.1.3.   Each psychiatrist may be asked to assess additional clients, other than those from his assigned caseload, as needed.

7.1.2.1.4.   Each psychiatrist is required to be available by phone for consultation when not on campus.

7.1.2.1.4.1.   When a psychiatrist is unavailable for consultation, he designates another Shiloh psychiatrist or qualified colleague to respond to phone consultations.

7.1.2.2.   General physician

7.1.2.2.1.   Shiloh contracts with a general care physician to evaluate, treat and manage the non-psychiatric health needs of all residential clients.

7.1.2.2.2.   The physician assesses, monitors and treats the health of all residents including:

- physical health assessment
  o upon admission if copy not provided by hospital or previous placement that indicates assessment was completed within the last six months
  o annual assessment
- order and review of laboratory results as indicated
- treatment of illness and injuries
- referral to outside physicians for specialized services

7.1.2.2.3.   The physician is required to be available by phone for consultation when not on campus.

7.1.2.2.3.1.   When the physician is unavailable for consultation, he designates another Shiloh physician or qualified colleague to respond to phone consultations.

7.1.3.   Director of nursing

7.1.3.1.   The director of nursing:

- assigns duties to nursing staff, licensed vocational nurses, paramedics and support staff
- supervises all nursing staff, licensed vocational nurses, paramedics and medical support staff
- monitors:
  o client care
  o documentation
  o compliance with standards, regulations and facility policies
  o infection control status and compliance

- - maintains compliance with requirements of the TDHS Children's Vaccine Program
- participates as a member of the COW
- performs all functions as a member of the nursing staff

### 7.1.4.   Nursing staff

7.1.4.1.   Shiloh employs one or more registered nurses to provide nursing services for all clients.

7.1.4.2.   Each member of the nursing staff:

- coordinates client medical care
  - schedules medical appointments
  - contacts parents regarding medical needs
  - monitors client health and mental status
  - assesses and treats client illness and injury
  - ensures medical care and records comply with standards, regulations and policies
  - participates as a member of the client's IDT
  - enters treatment, medication, medication changes, physician orders, medical needs, psychiatric diagnoses into clinic database
- assists physicians
  - schedules and coordinates clinics
  - prepares clients' charts for clinics
  - collects and reports relevant information about clients to physicians
  - ensures clinical documentation complies with standards, regulations and policies
  - implements physicians' orders
  - monitors immunization records and facilitates administration of needed vaccinations
- notifies parents about medication changes as a designee for the physician
  - obtains informed consent for medication changes
- collects samples for ordered laboratory testing
- assesses and treats staff illness and injury as appropriate to facility demands

7.1.4.3.   The nursing staff schedules all client appointments with outside practitioners including the following:

- appointments scheduled as directed by a physician or nurse
- follow-up appointments recommended by an outside practitioner

- regularly scheduled appointments

7.1.4.4.  The nursing staff coordinates all client appointments scheduled with outside practitioners including:

- entering appointment in the clinic database
- notifying the shift supervisor of pending appointments
- preparing documentation for the outside practitioner
- processing documentation following an appointment

7.1.5.  Licensed Vocational Nurses (LVN) and Paramedics

7.1.5.1.  An LVN or paramedic is available for physical and psychiatric emergencies during non-business hours.

7.1.5.2.  The LVN and paramedic enters any provided treatment into clinic database.

7.1.5.3.  The LVN or paramedic may be assigned additional support duties by the director of nursing.

7.1.5.4.  Paramedic

7.1.5.4.1.  A paramedic can only perform protocols written and approved by the medical director.

7.1.6.  Medical support staff

7.1.6.1.  Medical support staff may include the LVN or paramedic when staffing levels are low.

7.1.6.2.  The medical support staff maintains client medical charts and the clinic database including the following tasks:

- filing all medical documents
- creating charts for new clients within three days of admission
- disassembling charts of discharged clients within seven days following discharge and forwarding them to the Shiloh office for long-term storage
- assisting medical staff prepare charts for clinics
- entering client data into clinic database
- performing additional duties as assigned

## 7.2.  Non-Psychiatric Medical Services

7.2.1.   Physician services

7.2.1.1.   Contracted physician

7.2.1.1.1.   The physician provides the following services for residential clients:

- admission examination (physical assessment)
- medical care for:
  - injury
  - illness
  - pain
- ongoing maintenance of medical health
- annual physical exams

7.2.1.1.2.   When not on campus, the nurse may contact the physician about a client with presenting symptoms for consultation and verbal orders, if indicated.

7.2.1.2.   Clinic sessions

7.2.1.2.1. The contracted physician conducts on campus clinic sessions each month as scheduled.

7.2.1.2.2. For each scheduled clinic session, the nursing staff:

- identify clients with need for evaluation and maintain a list of identified clients until the next scheduled clinic
- prepare client charts for the physician
  - collect information about the nature of the client's complaint
- notify the shift supervisor of clients to be examined
- assist the physician during examinations
- implement the physician's orders
  - transcribe physician's orders
  - fax orders to pharmacy
  - schedule ordered laboratory tests
  - notify medical support staff of any appointments to be scheduled with an outside practitioner
  - notify shift supervisor and direct care staff of any special orders prescribed by physician
- enter treatment and orders into clinic database
  - details of treatment provided
  - medications started, changed or discontinued

        ○  all new medical conditions entered into "Treatment Plan" section

7.2.1.3.   Physical assessment

7.2.1.3.1. Residential clients

7.2.1.3.1.1.  The contracted physician conducts a complete medical history and physical assessment for each residential and subacute client within 30 days of admission.

7.2.1.3.1.2.  The medical history and physical assessment includes the following screenings and system reviews:
- medical history
  - allergies and reactions
  - medications
  - medical conditions
  - communicable diseases
  - TB results
  - past illnesses
  - past injuries
- vital signs
- cardiac health
  - review of electrocardiogram
- review of systems
- physical examination
- nutrition screening
- physical activity
- hearing
- vision
- substance abuse
- menstruation
- elimination
- sleep
- developmental progress
- behavioral and mental health concerns
- behavioral
- immunizations
- oral health
- lab results

7.2.1.3.1.2.1. If the client provides documentation of a physical assessment within the last six months, an admission physical assessment is not required.

7.2.1.3.1.2.1.1.  If a previous physical assessment is accepted in lieu of conducting another physical assessment, the physician notes:

- a review of the client's current medical records
- any changes to the client's physical health

7.2.1.3.1.2.1.2.  If any changes noted prompts any of the screening process triggers, a new medical history physical assessment is completed.

7.2.1.3.1.2.1.3.  The attending psychiatrist may request a new medical history and physical assessment as warranted.

7.2.1.3.1.3.  The contracted physician conducts a physical assessment annually for each residential client.

7.2.1.3.1.4.  The following screenings are performed annually in conjunction with the physical assessment and recorded on the Annual Screening form:

- hearing screening
- vision screening
- TB skin test
- electrocardiogram (EKG)
- laboratory tests
  - CBC
  - lipid panel
  - complete metabolic panel (CBC)
  - THS
  - drug serum level, if indicated

7.2.1.3.1.4.1.  The results of the annual screenings are entered into the clinic database.

7.2.1.3.2. Day treatment clients

7.2.1.3.2.1.  A physical assessment completed within the last 12 months is requested upon admission.

7.2.1.3.2.2.  If the client has not completed a physical assessment within the past 12 months, a request is made to the parent to schedule and complete a physical assessment

with the client's primary care physician within 30 days from admission.

7.2.1.3.2.3.   If the parent is non-compliant with the request for the completion of a current physical assessment, the status of the client's placement is reviewed by the medical director and the program director.

7.2.1.4.   Documentation

7.2.1.4.1. Each examination is documented by the treating physician including:

- date of examination
- procedure(s) completed
- result of treatment
- follow-up treatment recommended, if any
- appointments scheduled, if any
- refusal to accept medical treatment, if applicable
- signature of treatment provider and date of signature
- date, time and circumstances of any precipitating incident, if applicable

7.2.2.   Nursing services

7.2.2.1.   Admission (Residential and Day Treatment)

7.2.2.1.1.   A member of the nursing staff conducts an assessment of the client's mental status and general physical systems within the first 3 hours of admission.

7.2.2.1.1.1.   The (Nursing) Admission Assessment includes review and documentation of the following information via review of medical records and physical assessment of the client:

- Allergies
- Vital statistics
- Height and weight
- Current DSM diagnosis
- Current medication(s)
- Assessments
  - level of consciousness
  - affect
  - suicidal ideation
  - homicidal ideation
  - thought content

- o menstrual cycle
- o eye, ear, nose, and throat
- o cardiac and respiratory
- o skin
- o pain
- o gastrointestinal
- o prosthetic devices
- Comments and summary of review

7.2.2.1.2.   The assessment results are entered into the clinic database.

7.2.2.1.3.   The Admission Assessment is filed in the client's medical chart.

7.2.3.   Dietary services

7.2.3.1.   Shiloh will utilize a community-based registered dietician to provide:

- dietary consultation to clients as indicated
- dietary planning
- monitoring of nutritional value of food services program

7.2.3.2.   If indicated through one of the following means, a client may be referred to the dietician for consultation and possible dietary planning:

- BMI at admission
- monthly monitoring of BMI
- monitoring of lipid levels
- physician or nurse referral

7.2.3.3.   The nursing staff ensures that the dietary plan is followed by the client and direct care staff.

## 7.3.   Pathology and Laboratory Services

7.3.1.   Laboratory services provider

7.3.1.1.   Shiloh contracts with a laboratory that meets the applicable federal regulations for clinical laboratories.

7.3.1.1.1.   The contracted laboratory maintains evidence of compliance with applicable federal regulations for clinical laboratories.

7.3.1.1.2.    The contracted laboratory submits annual documentation of accreditation to Shiloh.

7.3.2.    Ordering laboratory services

7.3.2.1.    A licensed physician orders laboratory services.

7.3.2.2.    Laboratory services are ordered for a client by a Shiloh physician for the following reasons:

- upon admission for baseline screening
- for a current illness or injury
- for diagnostic purposes
- for monitoring drug levels as indicated
- when illegal drug use is suspected
- when a client pregnancy is suspected
- annually to monitor client health

7.3.3.    Collecting specimens

7.3.3.1.    Shiloh maintains a CLIA license for the following waived testing performed on site:

- throat culture
- blood glucose testing
- urine drug screen

7.3.3.2.    The nursing staff communicates to the shift supervisor or designee any client who requires food and/or medication to be held prior to collection of blood or urine.

7.3.3.3.    A member of the medical staff:

- collects the sample
- completes the laboratory requisition form
- labels all specimens
- contacts the laboratory services provider for pick-up
- ensures each specimen is stored properly and available for pick-up

7.3.4.    Analyzing results

7.3.4.1.    Results are retrieved from the laboratory website by the nursing within 24 hours or as soon as possible for STAT orders.

      7.3.4.1.1.   Results are collected within 24 hours from the time results are available for tests that take longer than 24 hours to complete.

7.3.4.2.   The nursing staff enters the results of each test into the clinic database.

7.3.4.3.   If the results are within acceptable limits, the hard copy results are placed in the ordering physician's box to be reviewed by the physician at the next clinic.

7.3.4.4.   All results are reviewed by both the client's assigned psychiatrist and Shiloh general physician.

      7.3.4.4.1.   The physician initials and dates the laboratory results form to indicate he has reviewed the results.

7.3.4.5.   Critical results

      7.3.4.5.1.   Critical results are reported to the ordering physician immediately by the nursing staff.

         7.3.4.5.1.1.   If the ordering physician is unavailable, the on-call physician is notified of the critical results.

      7.3.4.5.2.   Notification of critical results is documented in the clinic database by the nurse and the corresponding Progress Note is placed in the client's Medical Chart.

      7.3.4.5.3.   The physician receiving the report may issue an order in response to the critical lab result.

7.3.4.6.   Upon review by the general physician, the physician may provide recommendations for psychotropic medication changes to the client's assigned psychiatrist, but only the psychiatrist may order changes to the client's psychotropic medication regimen.

7.3.4.7.   Any physician may order a consultation with an outside provider in response to abnormal results.

7.3.4.8.   Any client with an elevated lipid panel is referred to the dietician for a consult as ordered by the physician.

7.3.5.   Screening and monitoring

7.3.5.1.   Each client receives an annual screening of at least the following tests:

- CBC
- lipid panel
- complete metabolic panel
- TSH
- drug serum level, if indicated

7.3.5.2.   When a medication that requires a drug level for monitoring is increased, a blood serum level is collected within two weeks of the increase.

7.3.5.3.   For any client with an elevated lipid panel an order for a repeat lab within six months is generated.

## 7.4.   Screening

7.4.1.   Admission

7.4.1.1.   Each client receives the following screenings at admission:

- (Nursing) Admission Assessment (see 7.2.2.1)
- vision screening
- hearing screening
- electrocardiogram
- review of immunizations
- TB skin test
- admission lab tests

7.4.1.2.   Day treatment clients

7.4.1.2.1.   Day treatment clients who present with abnormal or undesired results during the screening process, may be required to complete a physical assessment with his primary care physician to alleviate medical concerns and remain in placement.

7.4.1.2.2.   Screening results and the physical assessment will be reviewed by the medical director and discussed with program director to determine risk associated with continued placement.

7.4.2.   Hearing screening

7.4.2.1.   Hearing screening is conducted with the use of an EroScan device.

7.4.2.2.   Each client is screened for possible hearing loss upon admission and annually thereafter.

7.4.2.3.   A trained member of the medical staff conducts the screening.

7.4.2.4.   The results of the screening are provided by the EroScan device and entered into the clinic database by the medical staff performing the screening.

7.4.2.5.   The results printed from the EroScan are attached to the Annual Screening form and filed in the client's medical chart.

7.4.2.6.   If a possible deficit is identified, the client is referred to an audiologist for further assessment and recommendations.

7.4.2.7.   The medical support staff schedules an appointment with an audiologist for the client.

7.4.2.8.   The nursing staff implements all recommendations by the audiologist.

7.4.2.9.   The nursing staff notifies the client's direct care staff of the client's deficit and any accommodations or special care needed.

7.4.3.   Vision screening

7.4.3.1.   Vision screening is conducted using a Snellen Chart.

7.4.3.2.   Each client is screened for a possible vision deficit upon admission and annually thereafter.

7.4.3.3.   A trained member of the medical staff conducts the screening.

7.4.3.4.   If a client has a current prescription for glasses or contacts, the client wears the visual correction aid during the screening.

7.4.3.5.   The results of the screening are documented on the Annual Screening form by the medical staff conducting the screening and filed in the client's medical chart.

7.4.3.6.   If a result of 20/40 or greater is determined for either eye, the client is referred to a vision specialist for further assessment and recommendations.

7.4.3.7.   The medical support staff schedules an appointment with a vision specialist for the client.

7.4.3.8.   All recommendations by the vision specialist are implemented by the nursing staff.

7.4.3.9.   The nursing staff notifies the client's direct care staff of the client's deficit and any accommodations or special care needed.

7.4.4.   TB skin test

7.4.4.1.   Each client receives a TB skin test upon admission.

7.4.3.2.1.   A client is not required to receive a TB skin test upon admission if the parent or guardian provides written proof of a TB skin test conducted within the last 12 months.

7.4.3.3.   A licensed member of the medical staff administers the TB skin test within 24 hours.

7.4.3.4.   A licensed member of the medical staff evaluates the TB skin test with 48 hours of administration.

7.4.3.5.   The results of the screening are documented on the Annual Screening form by the medical staff conducting the screening and filed in the client's medical chart.

7.4.3.6.   ORR Client Procedures (Non-Interfacility Transfers)

7.4.3.6.1.   ORR client less than 5 years should be screened with a PPD or IGRA.

7.4.3.5.1.1.   PPD is preferred in this age group.

7.4.3.5.2.   ORR clients between 5–14 years should be screened with a PPD or IGRA.

7.4.3.5.3.   ORR clients 15 years and older are screened with a chest x-ray and one of the following:

7.4.3.5.5.6.   PPD/Tuberculin skin test (TST)

7.4.3.5.5.6.   TB blood test (Interferon-Gamma Release Assay [IGRA])

o   QuantiFERON®-TB Gold In-Tube test (QFT-GIT)

o   T-SPOT®.TB test (T-Spot)

7.4.3.5.4.   For chest x-rays in children 5–17 years, a PA view only is satisfactory.

7.4.3.5.5.   If the chest radiograph is positive, the Shiloh physician manages the client's treatment to prevent additional exposure to clients and staff and ensure compliance with treatment is maintained as outlined in the Communicable Diseases section of the Infection Control chapter.

7.4.3.5.5.6.   The Brazoria County Health Department TB Control Unit is notified in a timely manner.

7.4.4.   Electrocardiogram (EKG)

7.4.4.1.   An electrocardiogram (EKG) is conducted using the Eclipse 850 Electrocardiograph following the review and initialing by the attending physician.

7.4.4.2.   Each client is screened for a possible cardiac abnormality:

- upon admission
- annually
- as indicated

7.4.4.3.   The results of the EKG are entered into the clinic database and the report generated by the electrocardiograph are filed in the client's medical chart.

7.4.4.4.   If the results indicate a possible cardiac abnormality, the client receives an echocardiogram as soon as possible.

7.4.4.4.1.   If the results of the echocardiogram do not indicate any cardiac abnormality, no further treatment is required.

7.4.4.4.2.   If the results of the echocardiogram confirm a possible cardiac abnormality, the client is not admitted and referred for further cardiac evaluation.

7.4.4.5.   If the cardiac abnormality is confirmed for a current Shiloh client during a routine screening or an ordered screening, the client is scheduled for evaluation by a cardiologist as soon as possible.

7.4.4.6.   If a current client is found to have a cardiac abnormality upon evaluation by a cardiologist, the medical director determines if continued placement is appropriate.

7.4.5.   Vital signs

7.4.5.1.   Each client's vital signs are evaluated upon admission and monthly thereafter.

7.4.5.2.   The paramedic obtains monthly vital signs including:

- blood pressure
- pulse
- respiration
- temperature

7.4.5.3.   The results are entered into the clinic database by the medical staff conducting the screening.

7.4.5.4.   Each client's latest vital signs are reported on his monthly Psychiatric Progress Note and reviewed by his assigned psychiatrist during the monthly medication monitoring visit.

7.4.6.   Height and weight

7.4.6.1.   Each client's height and weight are measured upon admission and BMI calculated.

7.4.6.2.   Weight measurement is recorded at each client's psychiatric monitoring visit.

7.4.6.3.   Height measurement is recorded monthly.

7.4.6.4.   The results are entered into the clinic database by the medical staff.

7.4.6.5.   If the client's BMI indicates he is overweight, the client is referred to a dietician for assessment.

7.4.6.5.1.   The client is monitored for possible signs of metabolic syndrome associated with weight gain as a side effect of his medication.

## 7.5.   Immunizations

7.5.1.   A record of immunization is collected for each client at admission.

    7.5.1.1.   Documentation of a client's immunization may include:

- the original record
- a photo copy or facsimile of the original record
- an official immunization record generated from a state or local health authority
- a record received from school officials, including a record from another state

    7.5.1.2.   The client's immunization must include the following documentation:

- client's name
- client's date of birth
- number of doses and vaccine type
- date client received the vaccine
- a signature or rubber stamp from the healthcare professional who administered the vaccine

7.5.2.   Following admission, the nursing staff determines if a client has received all required immunizations per the client's age.

    7.5.2.1.   If the client is deficient on any required immunizations, the general care physician will order the necessary immunizations to fulfill the requirements.

7.5.3.   The nursing staff monitors each client's immunization status and ensures the client receives all required immunizations as the client ages.

7.5.4.   Immunizations for residential clients are maintained in the Texas Vaccines for Children online database.

7.5.5.   The most current copy of the client's immunization record is filed in the Medical Chart.

7.5.6.   Day treatment clients

    7.5.6.1.   Immunizations records are requested upon admission.

    7.5.6.2.   If a current immunization is not provided upon admission, the parent is advised to provide a copy within 30 days.

    7.5.6.3.   The medical staff may also search for a current immunization record in the Texas Vaccines for Children online database.

7.5.6.4.   If a current immunization record has not been obtained within 30 days, the school principal or designee will contact the client's local school district to inquire about a current copy.

7.5.6.5.   If a current immunization record cannot be obtained, the medical director and program director will be notified.

7.5.6.5.1. The medical director and program director will determine how to proceed the client's current placement.

7.5.6.6.   Immunizations

7.5.6.6.1. The parent is required to maintain current immunizations for the client.

7.5.6.6.2. If a client is need of immunization, the parent will be notified to make an appointment with the client's primary care provider or local health clinic.

## 7.6.   Protective and Supportive Devices

7.6.1.   Protective devices

7.6.1.1.   A protective device may be used to protect a client from voluntary self-injurious behavior or to permit wounds to heal.

7.6.1.2.   A protective device does not prohibit a client's mobility.

7.6.1.3.   The use of a protective device is ordered by a licensed physician for a specific client.

7.6.1.3.1.   The order indicates the circumstances under which the protective device may be used.

7.6.1.3.2.   The licensed physician may write a PRN order for use of the protective device.

7.6.1.3.3.   The physician reviews the PRN order for the protective device at least every 90 days.

7.6.1.4.   The protective device may not be used as:

- punishment
- retribution or retaliation

- a means to get a client to comply
- a convenience for staff
- a substitute for effective treatment or habilitation

7.6.1.5.   Each use of the protective device is documented on the client's Daily Progress Note.

7.6.1.6.   The use of the protective device is documented in the client's Individual Service Plan.

7.6.1.7.   The use of the protective device is reviewed during the client's IDT Staffing.

7.6.1.7.1.   The review is documented on the Service Plan Review form.

7.6.1.7.2.   The review and documentation includes:

- clinical justification for continued use of the protective device
- ways to reduce the need for the protective device

7.6.2.   Supportive devices

7.6.2.1.   A supportive device may be used:

- to support a client's posture
- to assist a client who cannot obtain or maintain normal physical functioning to improve mobility and independent functioning
- as an adjunct to proper care and treatment

7.6.2.2.   The purpose of the support device is not to restrict the client's movement.

7.6.2.3.   The use of a supportive device is ordered by a licensed physician for a specific client.

7.6.2.3.1.   The order indicates the circumstances under which the protective device may be used.

7.6.2.3.2.   The licensed physician may write a PRN order for the use of the supportive device.

7.6.2.3.3.   The physician reviews the PRN order for the supportive device at least every 90 days.

7.6.2.4.    A supportive device that includes tying, depriving, or limiting the use of a client's hands or feet is prohibited.

7.6.2.5.    A supportive device may not be used as:

- a substitute for appropriate nursing care
- punishment
- retribution or retaliation
- a means to get a client to comply
- a convenience for staff
- a substitute for effective treatment or habilitation

7.6.2.6.    If the supportive device is not ordered for assisting the client with sleep or safety during sleep, the device is removed during rest periods.

7.6.2.7.    Each use of the supportive device is documented on the client's Daily Progress Note.

7.6.2.8.    The use of the supportive device is documented in the client's Individual Service Plan.

7.6.2.9.    The use of the supportive device is reviewed during the client's service plan review staffing.

7.6.2.9.1.    The review is documented on the Service Plan Review form.

7.6.2.9.2.    The review and documentation includes:

- clinical justification for continued use of the supportive device
- ways to reduce the need for the supportive device

## 7.7.    Psychiatric Services

7.7.1.    Psychiatric services

7.7.1.1.    Shiloh ensures that each client is evaluated and monitored regularly by a board certified psychiatrist.

7.7.1.2.    All clients admitted to residential or subacute treatment are required to receive psychiatric monitoring by a Shiloh psychiatrist.

7.7.1.3.   Clients admitted to the day treatment program may use an outside psychiatrist for psychiatric monitoring if approved by the medical director and treatment director.

7.7.1.4.   A client with a history of physical aggression, assault, and suicide attempts is required to receive psychiatric services by a Shiloh psychiatrist.

7.7.1.5.   The assigned psychiatrist may discontinue treatment if a client's psychotropic medications are altered by an outside physician or a client is non-compliant with treatment.

7.7.2.   Psychiatric assessment

7.7.2.1.   Upon admission of a new client, a Shiloh psychiatrist reviews and approves all medications currently prescribed to the client prior to administration to the client.

7.7.2.1.1.   Preliminary changes may be made to the client medication regimen if indicated.

7.7.2.2.   Each client is assessed in person by a Shiloh psychiatrist within 7 days of admission.

7.7.2.3.   The psychiatrist completes the Initial Psychiatric Assessment form, provides a complete DSM-IV diagnosis, and establishes a plan for psychiatric treatment.

7.7.2.4.   The complete DSM-IV diagnosis provided by the psychiatrist serves as the definitive mental health diagnosis for the client.

7.7.2.5.   The psychiatrist assesses the client's specific target symptoms related to DSM-IV diagnostic criteria for management by psychotropic medication.

7.7.3.   Psychiatric monitoring

7.7.3.1.   Each client is regularly evaluated by his assigned psychiatrist according to the following schedule:

| Level of Care | Schedule |
| --- | --- |
| Subacute | Weekly/Bi-weekly |
| Residential | Monthly |
| Day Treatment | Monthly |

7.7.3.2.   A client may be monitored more frequently as indicated by his symptoms.

7.7.3.3.   The nursing director or designee assigns clients to the psychiatrists scheduled clinic.

7.7.3.4.   The psychiatrist completes a Psychiatric Progress Note for each regular monitoring visit.

7.7.3.5.   Quarterly, the client's assigned psychiatrist reviews the client's current psychotropic medications using the best practice guidelines *Psychotropic Medication Utilization Parameters for Foster Children* developed by the Texas Department of State Health Services.

7.7.4.   Psychiatric emergency

7.7.4.1.   Hospitalization

7.7.4.1.1.   A client may be transferred to a psychiatric hospital in the event of a serious psychiatric incident or an increase in severity of psychiatric symptoms for a higher level of care and psychiatric stabilization.

7.7.4.1.2.   The treatment director or medical staff contacts the medical director regarding the client's status.

7.7.4.1.3.   The medical director or attending psychiatrist determines if transfer to a psychiatric hospital is warranted.

7.7.4.1.4.   The nursing staff coordinates the transfer with the psychiatric hospital.

7.7.4.2.   Psychotropic PRN medication

7.7.4.2.1.   For the purposes of client safety and to assist with the alleviation of distressing psychiatric symptoms, a psychiatrist may order PRN psychotropic medication.

7.7.4.2.1.1.   A client may request a psychotropic PRN medication if experiencing indicated symptoms.

7.7.4.2.1.2.   A client may be offered a psychotropic PRN if the indicated symptoms are observed by staff.

7.7.4.2.2.   Only a licensed medical staff may administer a psychotropic PRN to include:

- only the medication prescribed in the order(s) is administered
- the symptoms indicated in the order are observed or reported by the client

7.7.4.2.3.   The administration of a psychotropic PRN medication is recorded in the clinic database by the licensed medical staff administering the medication.

- time of the administration
- the symptoms observed that warrant immediate psychiatric treatment
- the client's response to the psychotropic PRN
- a review of the client's vitals immediately following the emergency medication

7.7.4.3.   Emergency medication

7.7.4.3.1.   General guidelines

7.7.4.3.1.1.   According to DFPS Minimum Standards, an emergency medication is considered a form of emergency behavior intervention.

7.7.4.3.1.2.   Emergency psychotropic medication may be prescribed for use by a client for extreme psychiatric symptoms that result in an emergency situation.

7.7.4.3.1.3.   Emergency medication may only be used in an emergency situation to reduce severe psychiatric symptoms by modifying a client's behavior when attempted de-escalation techniques have proven to be ineffective and it is necessary to intervene to prevent:

- imminent probable death or substantial bodily harm because the client attempts or continually threatens to commit suicide or substantial bodily harm
- imminent physical harm to another person because of the client's overt acts including attempts to harm others through:
  - aggressive acts by the client
  - serious incidents of shoving or grabbing others over their objections

7.7.4.3.2.     Written orders

7.7.4.3.2.1.   A written order by a licensed psychiatrist is required prior to the use of emergency medication.

7.7.4.3.2.2.   The written order must include:

- a statement that emergency medication may be used in an emergency situation
- specific medication(s) to be administered
- a complete description of the behaviors and circumstances under which emergency medication can be used
- instructions for observation or heightened observation of the client following the administration of emergency medication
- the prescribing physician's consideration of any potential medical and/or psychiatric contraindications for the client
- clinical justification for the use of emergency medication
- instructions on how to administer the medication

7.7.4.3.2.3.   A written order may include orders for the use of emergency medication as warranted by evaluated symptoms.

7.7.4.3.2.4.   Emergency medication may be administered in conjunction with the use of a therapeutic hold.

7.7.4.3.2.4.1. The written order for emergency medication must specifically allow for the combination and provide clinical justification for the use of emergency medication with a therapeutic hold.

7.7.4.3.3.     If a written order is not currently part of the client's psychiatric treatment plan, the nurse should contact the attending psychiatrist prior to administration of an emergency medication.

7.7.4.3.3.1.   If the attending psychiatrist is unresponsive or unavailable, the nurse may contact another credentialed Shiloh psychiatrist for an order.

7.7.4.3.3.2.   A written copy of the order must be entered into the client record upon review by the ordering physician following next visit to Shiloh, including:

- date of order
- time of order
- physician's signature

7.7.4.3.4.   Following emergency medication

7.7.4.3.4.1.   After the administration of emergency medication staff should closely monitor the client to ensure the safety of the client and others for a minimum of 15 minutes.

7.7.4.3.4.2.   Staff must take appropriate action to help the client return to normal activities.

7.7.4.3.4.2.1. Staff should provide the client with an appropriate transition and offer the client an opportunity to return to regular activities.

7.7.4.3.4.2.2. The staff does not have to return the client to previous activities or engage in current activities if participation is not in the best interest of the client or the clients in the group.

7.7.4.3.4.3.   If the client does not return to previous or current activities, staff must attempt to engage the client in an alternative routine activity.

7.7.4.3.5.   Debriefing

7.7.4.3.5.1.   Client debriefing

7.7.4.3.5.1.1. Within 48 hours after the administration, staff should provide the client with an opportunity to privately discuss:

- the situation that lead to the need for emergency medication
- the staff's reaction to the situation

7.7.4.3.5.1.2. The goal of the discussion is to allow the client and staff to discuss:

- the client's behavior and circumstances that lead to the administration of emergency medication
- strategies attempted before the administration of emergency medication
- the client's reaction to those strategies
- the client's reaction to the emergency medication
- how the staff can assist the client in regaining self-control in the future to avoid emergency medication
- what the client can do to regain control in the future to avoid the use of emergency medication

7.7.4.3.5.1.3. Staff must make a reasonable effort to debrief with other clients who witnessed the incident.

7.7.4.3.5.2.   Staff debriefing

7.7.4.3.5.2.1. After the emergency situation has stabilized, staff involved in the administration of emergency medication should debrief each other concerning the incident.

7.7.4.3.6.   Documentation

7.7.4.3.6.1.   The administration of emergency medication must be documented as soon as possible but no later than 24 hours after the administration of the emergency medication.

7.7.4.3.6.2.   Documentation by the administering licensed medical staff is entered into the clinic database as soon as possible to include the following information:

- Time of the administration
- The symptoms observed that warrant immediate psychiatric treatment
- Offer of an oral medication prior to the use of an injectable
- The client's response to the emergency medication
- A review of the client's vitals immediately following the emergency medication, if possible
- A follow-up review of the client's current status and vitals within an hour following the administration of an emergency medication

7.7.4.3.6.3.   Documentation of the administration of emergency medication is completed by the direct care service unit, direct care staff or shift supervisor, on an Emergency Medication Report.

7.7.4.3.7.   Supervisory interview

7.7.4.3.7.1.   The shift supervisor or designee reviews the administration of the emergency medication with the client within 24 hours of administration of the emergency medication.

7.7.4.3.7.2.   The interview is documented on the back of the Emergency Medication Report in the designated area.

7.7.4.3.8.   Medical review

7.7.4.3.8.1.   The medical director or designee reviews the completed Emergency Medication Report within 72 hours of the completion of the supervisory interview.

7.7.4.3.9.   Tracking

7.7.4.3.9.1.   The completed Emergency Medication Report is forwarded to the Shiloh office for tracking.

7.7.4.3.9.2.   Information is collected from the Emergency Medication Report and entered into the Medication Data Database.

7.7.4.3.10.   Triggered review

7.7.4.3.10.1. A service plan review is triggered for a client when the client is administered emergency medication three or more times within a 30 day period.

7.7.4.3.10.2. The service plan review must occur no later than 30 days following the third emergency medication administered.

7.7.4.3.10.3. The full service planning team must participate in the service plan review and include at least the following participants:

- the client's assigned counselor
- a registered nurse
- the client's service director
- a shift supervisor

7.7.4.3.10.4. The following must be documented on the Service Plan Review form:

- a review of the client's current Individual Service Plan
- a review of records of all emergency behavior interventions
- a review of any potential medical or psychiatric reason for not using emergency medication on the client including any medical and/or psychiatric contraindications specific to the client
- alternatives to manage the client's behavior and strategies to assist the client with managing his own behavior
- a written plan for reducing the need for emergency medication
- assessment of current psychotropic medication and possible need for change to control psychiatric symptoms

7.7.4.3.10.5. If a client receives four triggered reviews within a 90-day period, the client must be examined by a psychiatrist or other licensed professional service provider.

7.7.4.3.10.6. The licensed provider will make recommendations the use of emergency medication and document the recommendations on the Service Plan Review form or a professional Progress Note.

## 7.8. Medication

### 7.8.1. Prescription medication

#### 7.8.1.1. Prescribing medication

##### 7.8.1.1.1. The following information is contained in the client's medical chart and available to any Shiloh physician who prescribes medication:

- age
- gender
- diagnosis
- symptoms
- allergies
- sensitivities

- height, weight and BMI
- substance abuse history
- current medications

7.8.1.1.2.   The following information is provided to any outpatient provider as needed for treatment of the client:

- name
- age (date of birth)
- gender
- allergies and sensitivities
- diagnosis
- current symptoms
- current medication
- additional information as needed for type of treatment to be provided

7.8.1.1.3.   Medication Orders

7.8.1.1.3.1.   Medication orders must be from authorized prescribers, licensed to practice in the State of Texas.

7.8.1.1.3.2.   Medication orders that contain abbreviations and symbols are carried out only if the abbreviations and symbols are on the standard legend and not indicated on the list of prohibited abbreviations.

7.8.1.1.3.3.   Once a stop order (discontinue order) has been issued for a medication, a new order is required to restart the medication.

7.8.1.1.3.4.   The attending psychiatrist is responsible for monthly review of each assigned client's medication orders.

7.8.1.1.3.5.   The list of current medications a client receives may include:

- Psychotropic medication
- PRN psychotropic medication
- Emergency psychotropic medication
- Non-psychotropic medication
- Prescribed over-the-counter medication

7.8.1.1.3.6.   Physician/nurse's orders for approved over the counter medications will include the following:

- the over the counter generic name or, if ordered, the medication brand name
- the frequency of administration
- the dosage level
- the route of administration
- the physician's name and signature

7.8.1.1.4.     Telephone orders/Verbal orders

7.8.1.1.4.1.   Telephone orders/verbal orders from the physician are limited to the following situations when the physician is not available on campus, but the medical condition is not serious enough to require emergency medical care:

- The medication is needed immediately to treat a known recurring illness, infection or medical condition.
- A medication currently in use is proving ineffective, and a different one is needed immediately to control seizures or other medically serious condition.
- The symptoms of an illness are clearly indicative of a medical condition requiring treatment but not of a nature requiring emergency care.

7.8.1.1.4.2.   The nurse or pharmacist will take telephone orders from the physician.

7.8.1.1.4.3.   Telephone orders/verbal orders will be received and written into the client records only by nursing staff.

7.8.1.1.4.4.   All telephone orders/verbal orders will be documented and will include:

- date and time the order was given
- name of the physician or dentist,
- signature of the approved staff person taking the order.

7.8.1.1.4.5.   The physician ordering the medication will sign telephone orders for medication upon his next visit.

7.8.1.1.5.     Informed consent

7.8.1.1.5.1.   Informed consent is obtained from the client's parent/guardian for all medication changes that include starting a new medication or changing a current medication.

      7.8.1.1.5.2.   Informed consent includes an explanation of the following:

- benefits
- risks
- side effects
- medical consequences of refusing the medication or recommendation for the medication
- name and number for prescribing physician, if desired

7.8.2.   High-risk medication

   7.8.2.1.   A list of high-risk medication is maintained at the on-site clinic.

   7.8.2.2.   The list is reviewed and updated annually by the medical director.

7.8.3.   Prohibited abbreviations

   7.8.3.1.   A list of prohibited abbreviations is maintained at the on-site clinic.

   7.8.3.2.   Written orders can not contain prohibited abbreviations.

   7.8.3.3.   The list of prohibited abbreviations is reviewed and updated annually by the medical director.

7.8.4.   Look-alike/Sound-alike medication

   7.8.4.1.   A list of look-alike/sound-alike medications is maintained at the on-site clinic.

   7.8.4.2.   Orders containing look-alike/sound-alike are reviewed with extra care to ensure medication names are not mixed up.

   7.8.4.3.   The list of look-alike/sounds-alike medications is reviewed and updated annually by the medical director.

7.8.5.   Psychotropic medication

   7.8.5.1.   Guidelines for use

      7.8.5.1.1.   Use the least amount of medication required to address psychiatric symptoms as based on data obtained by:

- review of psychiatric history
- observation of behavior
- behavioral rating scales
- reporting by client
- reporting by parent

- reporting by other IDT members

7.8.5.1.2.   Do not prescribe psychotropic medication to a child under the age of four.

7.8.5.1.3.   Before prescribing a psychotropic medication, evaluate the medications:

- known efficacy
- benefit-to-risk ratio
- consistency with DSM-IV diagnosis and target symptoms

7.8.5.1.4.   Identify and define the following for each prescribed psychotropic medication:

- intended use of psychotropic medication
- target symptoms
- treatment goals

7.8.5.1.5.   Start a new psychotropic medication with the lowest possible dose and titrate carefully as indicated.

7.8.5.1.6.   Conduct a documented review and monitoring of the client at least monthly including the following:

- height
- weight
- blood pressure
- any relevant physical findings
- laboratory testing as indicated
- response to medication
  - efficacy
  - presence of side effects
  - absence of side effects
  - possible toxicity
  - EPS, if indicated

- benefit-to-risk ratio
- mental status
- review of current diagnosis
- impression
- progress toward defined treatment goals

7.8.5.1.7.   Conduct a documented review and monitor more frequently as indicated by:

- length of stay

- increase in severity of symptoms
- recommendation by attending psychiatrist

7.8.5.1.8.   Complete a review of the guidelines set forth by the State of Texas in the Psychotropic Medication Utilization Parameters for Foster children at least quarterly.

7.8.5.1.9.   Prescribe psychotropic medication within normal dosage range as recommended by the manufacturer.

    7.8.5.1.9.1.   If dosage exceeds the indicated range, the prescribing physician must provide documented rationale.

7.8.5.1.10.   If target symptoms do not appear to be improving with prescribed medication after an appropriate length of time, reassess the client's medication regimen and make changes as indicated.

7.8.5.1.11.   Before adding an additional psychotropic medication, assess the client for:

- adequate adherence to prescribed medication schedule
- accuracy of diagnosis
- influence of psychosocial stressors
- occurrence of comorbid disorders such as:

  - substance abuse
  - possible medical condition

7.8.5.1.12.   Strive to use no more than four psychotropic medications.

7.8.5.1.13.   Attempt a mono-therapy regimen for identified target symptoms before prescribing a multiple-therapy regimen.

7.8.5.1.14.   Consider reducing or possibly discontinuing a psychotropic medication prescribed for the primary target symptom of aggression if the client meets the following criteria:

- the target symptom is aggression secondary to a non-psychiatric diagnosis (e.g. Conduct Disorder, Oppositional Defiant Disorder, Intermittent Explosive Disorder)
- the aggression has been in remission for at least six months

7.8.5.1.15.   If psychotropic medication is discontinued, evaluate the need to restart medication at least every six months.

7.8.5.2.    Monitoring children for adverse effects of antipsychotics

7.8.5.2.1.    The following guidelines are used for monitoring the risks associated with the of antipsychotic medications:

| Assessments | Frequency |
|---|---|
| Personality and family history | Admission and annually thereafter |
| Lifestyle monitoring | Every monitoring visit |
| Height, weight, BMI, and percentile or z score | Every monitoring visit |
| Somnolence and sedation | Every monitoring visit |
| Sexual symptoms and signs | Admission, titration, and every 3 months thereafter |
| Blood pressure and pulse | Admission, titration, and every 6 months thereafter |
| FBS, lipids (+/- insulin) | Admission, 3 months, and every 6 months thereafter |
| LFT's | Admission, 3 months, and every 6 months thereafter |
| EPS, akathesia | Admission, titration, 3 months and then annually |
| Dyskinesia and tardive dyskinesia | Admission, 3 months, and annually thereafter |
| Lytes, CBC, renal function | Admission and annually (unless on Clozaril) |
| Prolactin | Only if symptomatic |
| EKG | If on Ziprasidone, during titration, and at maximum dose |

*Source:  Dr. Correll via Dr. Javier Ruiz 04/13/11*

7.8.5.3.    Multiple psychotropic medications

7.8.5.3.1.    If unable to adhere to the guideline of four or less psychotropic medications, documentation of justification for use is required.

7.8.5.3.2.    If unable to adhere to mono-therapy regimen for a class of psychotropic medication, documentation of justification for use is required.

7.8.5.3.3.    The following are considered applicable multiple-therapy regimens:

- two or more antidepressants
- two or more antipsychotics
- two or more stimulants

- three or more mood stabilizers

7.8.5.3.4.    If indicated, a peer review is conducted to review a multiple-therapy regimen.

7.8.5.3.4.1.    A peer review includes the following by a consulting psychiatrist:

- review of entire medication regimen
- review of the client's
  - behavior
  - psychiatric symptoms
  - diagnosis
- recommendations

7.8.5.3.4.2.    The attending psychiatrist must address all recommendations by the consulting psychiatrist.

7.8.5.3.4.3.    If the medication regimen does not change to meet the guidelines for use, a peer review is conducted quarterly thereafter or until the medication regimen no longer warrants a peer review.

7.8.5.4.    High-dose pharmacotherapy

7.8.5.4.1.    If unable to adhere to the guideline of dosage recommendations by the manufacturer, documentation of justification for use is required.

7.8.5.4.2.    The attending psychiatrist will monitor the client closely for adverse reactions resulting from high-dose pharmacotherapy.

7.8.5.5.    EPS and tardive dyskinesia

7.8.5.5.1.    For clients prescribed medications where EPS is indicated as a possible side effect, the AIMS test is used to monitor possible EPS in order to prevent tardive dyskinesia.

7.8.5.5.2.    An informal AIMS evaluation is conducted at each medical review.

7.8.5.5.3.    If indicated, a formal AIMS evaluation is conducted using a corresponding AIMS questionnaire.

7.8.5.5.4.    If symptoms of EPS are present, the client is treated to alleviate the symptoms.

7.8.5.6.    Psychotropic PRN medication

7.8.5.6.1.    For the purposes of client safety and to assist with the alleviation of distressing psychiatric symptoms, a psychiatrist may order PRN psychotropic medication.

7.8.5.6.2.    Only a licensed medical staff may administer a psychotropic PRN to include:

7.8.5.6.3.    Direct care staff do not have access to psychotropic PRN medication.

7.8.5.6.4.    Psychotropic PRN medication inventory is stored in the locked treatment room.

7.8.5.6.4.1.    Psychotropic PRN medication is ordered and restocked by the clinic staff.

7.8.5.6.4.2.    An accurate inventory is kept for the stock of emergency medication.

7.8.5.6.4.3.    All doses removed for administration to a client are recorded on the PRN Log located in the emergency medication storage area.

7.8.5.6.5.    The attending psychiatrist must review PRN orders for symptom management at least every 90 days.

7.8.5.6.6.    After six months, if symptoms improve, psychiatrist should evaluate further need for a PRN order.

7.8.6.    Medication administration

7.8.6.1.    Medication administration procedures are maintained in the Medication Administration Guidelines and Training Manual.

7.8.6.2.    Medication Administration Training

7.8.6.2.1.    Medication administration training is taught by a registered nurse.

7.8.6.2.2.    Once a staff completes the Medication Administration Training, the staff is allowed to access the client medications.

7.8.6.2.2.1.    The staff is allowed to administer medication.

7.8.6.3.    A list of primary and secondary medication administrators is posted in the medication closet in each teaching home.

7.8.6.3.1.　The list is updated by medication coordinator.

7.8.6.3.2.　The list also includes staff prohibited from administering medication as part of the risk management program.

7.8.6.4.　The Medication Administration Guidelines and Training Manual is reviewed every five years or as needed when procedural changes are implemented.

7.8.6.5.　The Medication Administration Guidelines and Training Manual contains procedures about:

- medication administration
- medication storage
- medication management
- mediation refills
- outside medications

7.8.6.6.　Medication disposal

7.8.6.6.1.　Unused, discontinued, and expired medications are returned to the clinic for destruction.

7.8.6.6.1.1.　Unused, discontinued, and expired are stored in a locked box, in the locked treatment room.

7.8.6.6.1.2.　Only the medication coordinator has the key to medication stored for destructions.

7.8.6.6.1.3.　All destroyed medications are catalogued prior to destruction to provide record of their chain of custody as part of the diversion program.

7.8.6.6.2.　The facility contracts with medication destruction agency that destroys medication in a safe manner in accordance with state licensing standards.

7.8.6.7.　Outside medications

7.8.6.7.1.　Outside medication includes any medication not provided directly to Shiloh clients by a pharmacy including the following:

- medication brought by client at admission
- medication brought for administration to the client by the client or a parent including, but not limited to, the following:

        o  non-prescription (OTC) medications
        o  vitamins and supplements
        o  prescription medication
        o  refill of the client's current medication

7.8.6.7.2.     All outside medication is sent to the nurse or pharmacy tech (medication coordinator) for review.

    7.8.6.7.2.1.     Medication brought for the client at admission is taken to a nurse for verification and approval before delivery to the client's assigned teaching home.

    7.8.6.7.2.2.     Medication brought by a parent or client is taken to a nurse or pharmacy tech (medication coordinator) by staff for approval and verification before being administered to the client.

    7.8.6.7.2.3.     If an outside medication requires immediate approval during non-business hours, the on duty LVN or paramedic will verify and approve the medication.

7.8.6.7.3.     Outside medication are verified and approved by a nurse or pharmacy tech (medication coordinator) as follows:

- inspect medication for integrity
- verify medication is the medication named on package using the drug book
- verify directions against current orders approved by physician
  - if directions on the label do not match current directions, correct directions on the label
- for a new medication:
  - review the potential for drug interactions with current medication(s)
  - if appropriate, contact the client's assigned physician for approval
- if approved, initial label or package to indicate verification and approval
- catalog the medication including:
  - date approved
  - quantity approved
  - person who brought medication
- if necessary:
  - complete a corresponding Prescription Medication Record
  - send to the medication coordinator for packaging and corresponding paperwork

7.8.6.7.4.   If verification and approval is completed by a LVN or paramedic, all of the above steps are completed with the addition of the following:

- notify the on-call nurse for approval
  - nurse will determine if the client's physician should be contacted for approval

7.8.6.7.5.   If the outside medication is not approved, a nurse will notify the client and/or parent and return the medication to the client's parent.

7.8.7.   Adverse reaction

7.8.7.1.   Staff receive training in the identification of a medication reaction as part of the medication administration training curriculum.

7.8.7.2.   Reporting allergic and adverse reactions

7.8.7.2.1.   All suspected adverse reactions are reported immediately to the shift supervisor.

7.8.7.2.2.   The shift supervisor will immediately contact the nurse.

7.8.7.2.3.   If a client is in severe distress, follow emergency medical procedures.

7.8.7.2.4.   An adverse reaction is recorded on a Medication Incident Report.

7.8.7.2.5.   The prescribing physician or other on-call physician is notified of any suspected or known adverse or allergic reaction.

7.8.7.2.6.   Routine assessment of possible side effect is conducted during the monthly psychiatric monitoring visit.

7.8.7.3.   Toxicity and overdose

7.8.7.3.1.   Serum drug levels are monitored as indicted to prevent toxicity from medications known to have the potential to become toxic.

7.8.7.3.2.   If overdose is suspected or reported by the client, notify the shift supervisor immediately.

7.8.7.3.3.   The shift supervisor will immediately contact the nurse or paramedic.

7.8.7.3.4.   If a client is in severe distress, follow emergency medical procedures.

7.8.7.3.5.   The prescribing physician or other on-call physician is notified of any suspected or known overdose.

7.8.8.   Medication errors

7.8.8.1.   Tracking errors

7.8.8.1.1.   The medication coordinator conducts regular counts of each client's medications to determine if medications were given correctly.

7.8.8.1.2.   In the event that the counts do not match, it is assumed an error has occurred.

7.8.8.1.3.   The number of errors are counted monthly and divided by the total doses administered monthly.

7.8.8.1.4.   The following types of errors are counted and monitored:

- Missed doses
- Late doses
- Wrong doses

7.8.8.2.   Reporting errors

7.8.8.2.1.   Errors are reported to medical staff upon discovery.

7.8.8.2.2.   Medication errors are aggregated quarterly and provided to the COW during staff meetings.

7.8.8.2.3.   The medical director reviews medication error data.

7.8.8.3.   Documenting errors

7.8.8.3.1.   Errors are recorded on the Medication Incident Report.

7.8.8.3.1.1.   The staff responsible for the error is required to sign the Medication Incident Report.

7.8.8.3.2.   Data is collected from the Medication Incidents Reports and entered into a spreadsheet maintained by the medication coordinator.

7.8.8.4.   Client refusal

7.8.8.4.1.   Client refusals are recorded on the Medication Incident Report.

7.8.9.   Non-prescription medications

7.8.9.1.   Approved OTC medication

7.8.9.1.1.   A list of Approved OTC Medications is posted in all medication dispensing areas.

7.8.9.1.2.   A list of Approved OTC Medications is posted in all medication administration areas.

7.8.9.1.3.   The list of Approved OTC Medications is reviewed and updated annually by the medical director or designee.

7.8.9.2.   Administration of OTC medication

7.8.9.2.1.   Approval must be obtained from a nurse prior to the administration of OTC medication.

7.8.9.2.2.   All OTC medications not listed on the Approved OTC Medications list require an order from a nurse or physician before they are dispensed or administered.

7.8.9.2.3.   A client may only receive items approved by the parent or guardian on the Over-the-Counter (OTC) Medication Release form.

7.8.9.2.3.1.   OTC medications not approved on the form require informed consent by the parent or guardian.

7.8.10.   Sample medications

7.8.10.1.   Shiloh has discontinued the use of sample medication.

7.8.11.   Investigational medications

7.8.11.1.   Shiloh does not allow the prescribing of investigational medications to clients.

7.8.12.   Emergency medication supply

7.8.12.1.   The supply of emergency medications is stored in a double locked area.

7.8.12.2.   Access is limited to authorized medical staff.

7.8.12.3.  An accurate inventory is kept for the stock of emergency medication.

7.8.12.4.  All doses removed for administration to a client are recorded on the PRN Log located in the emergency medication storage area.

## 7.9.    Injury, Illness and Seizure

7.9.1.    Illness/injury reports

7.9.1.1.  Injury/illness reports are completed by the direct care staff as needed following daily health checks.

7.9.1.2.  Direct care staff are required to hand in injury/illness reports to nursing staff for follow-up.

7.9.2.    Client injury

7.9.2.1.  Any injury to clients are documented by direct care staff, reported to shift supervisor, and referred to the nurse or paramedic for assessment and treatment.

7.9.3.    Client illness

7.9.3.1.  Client illness is documented by direct care staff and reported to the nurses for assessment, treatment, and physician follow-up.

7.9.4.    Client seizure

7.9.4.1.  All seizures are documented on the designated form which records duration, type, time, and characteristics and immediately reported to the shift supervisor.

7.9.4.2.  The designated seizure form is given to the nursing staff for review and referred to a physician.

7.9.4.3.  Physicians are responsible for requesting a follow-up with a neurological specialist.

7.9.5.    Hypertension and hypotension

7.9.5.1.  Symptoms of hypertension or hypotension are referred to a physician for treatment or referral to a specialist.

7.9.5.2.   The nurse or paramedic is responsible for training direct care staff to adequately monitor symptoms by recording blood pressure at a frequency determined by the nurses or physician.

7.9.6.   Emergency medical services

7.9.6.1.   In the event of a life threatening emergency, staff dial 911 for the local EMS.

7.9.6.2.   After contacting the local EMS, staff notify the shift supervisor of the emergency.

7.9.6.3.   In the event of a non-life threatening emergency, staff notify the shift supervisor immediately.

7.9.6.4.   The shift supervisor contacts the nursing staff or paramedic for how to proceed.

7.9.6.5.   The nursing staff or paramedic may:

- assess the situation
- provide treatment
- contact the Shiloh physician
- refer the client to a local emergency room or urgent care center
- contact 911 for the local EMS

7.9.6.6.   If the client is referred to a local emergency room or urgent care center, the nurse or paramedic provides the staff with current medical information necessary to obtain treatment.

7.9.6.7.   The shift supervisor arranges transportation of the client to a local emergency room or urgent care center.

7.9.6.8.   A Serious Incident Report is completed for any client with a critical injury or illness that requires emergency medical treatment from an outside medical professional or hospitalization including a:

- dislocated fracture or broken bone
- concussion
- laceration requiring stitches
- second or third degree burn
- damage to internal organs
- admission to the hospital overnight or longer

7.9.6.9.   The service director, shift supervisor or designee notifies the client's parent or guardian of the medical emergency as soon as possible.

7.9.6.10.  The service director, shift supervisor or designee notifies TDFPS licensing via the abuse hotline as soon as possible but no later than 24 hours after the incident.

7.9.6.11.  All documentation of treatment from the outside medical professional is provided to nursing staff upon return to Shiloh.

## 7.10.  Dental Services

7.10.1.  Dentist services

7.10.1.1.  Dental services are provided by community providers at an offsite office.

7.10.1.2.  Dental services are scheduled and provided for residential clients whose length of stay is greater than 30 days.

7.10.1.3.  Clients receive dental care at least every a six months for a checkup, cleaning and any necessary referral.

7.10.1.4.  Upon admission, medical office staff will determine the date of the last dental checkup and schedule accordingly.

7.10.1.4.1.   If the client has no record of examination within the past 6 months, a dental exam and cleaning is scheduled with the first 30 days of placement and completed within 90 days from the date of admission.

## 7.11.  Medical Equipment

7.11.1.  Shiloh maintains the following medical equipment according to the manufacturer's recommendations:

- EKG
- De-fibrillator (multiple sites)
- Ero-Scan
- Scales
- Centrifuge

## 7.12.  Medical Records

7.12.1.  A medical chart is created for each client within seven days of admission.

7.12.2.  The following admission documents are copied for the medical chart and sent to the medical coordinator at admission and included the indicated information:

- Client Information Sheet
- Enrollment Information
  - name
  - age
  - gender
  - height
  - weight
- Emergency Information
- Agreement for Placement
- Authorization to Release/Obtain Protected Health Information (as appropriate)
- ORIGINAL Affidavit Authorizing Consent to Medical Care/ Consent to Administer Prescription Medications/ Consent to Administer Non-prescription (OTC) Medications
- Procedure for Medical and Medication Notification
- Medical Reimbursement Information
- Financial Agreement
- Agreement for Assessment/ Vision and Hearing Screening
- Medical History
  - allergies
  - sensitivities
- Medication Information and Reconciliation
- Over-the-Counter (OTC) Medication Release form
- Initial Staff Briefing and Preliminary Service Plan
  - diagnosis and conditions
  - current medications
  - allergies
- Psychosocial History
  - substance abuse history
- Records from parent and/or transferring facility

7.12.3.  Client medical documents are filed weekly or more often if indicated.

7.12.4.  All records of medical treatment are filed in the client's medical chart.

7.12.4.1.  All records from Shiloh medical and psychiatric treatment providers are filed in the client's medical chart.

7.12.4.1.1.  Treatment records entered in to the Clinic Database that do not have a supporting hard copy record are printed, signed by the treatment provider, and filed in the client's medical record.

7.12.4.2.  All records from outside medical treatment providers are filed in the client's medical chart.

7.12.5.  A copy of the Individual Service Plan is filed in the client's medical chart.

7.12.5.1.  A copy of all Service Plan Reviews is filed in the client's medical chart.

7.12.5.2.  All treatment records entered into the clinic database must have a corresponding paper record in the client's medical chart.