MICHAEL N. FEUER, SBN 111529
*City Attorney*
JAMES P. CLARK, SBN 64780
LEELA A. KAPUR, SBN 125548
VALERIE L. FLORES, SBN 138572
MICHAEL DUNDAS, SBN 226930
200 North Main St., City Hall East Suite 800
Los Angeles, California 90012
mike.dundas@lacity.org
Telephone: (213) 978-8130
Facsimile: (213) 978-8312

*Attorneys for Amicus Curiae City of Los Angeles*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES, *et al.*,

　　　　　　Plaintiffs,

v.

JEFFERSON B. SESSIONS III,
Attorney General of the
United States, *et al.*,

　　　　　　Defendants.

Case No. 2:85-cv-4544-DMG (AGRx)

**[PROPOSED] BRIEF OF 18 CITIES AND COUNTIES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................................................ii

STATEMENT OF INTEREST .................................................................... 1

ARGUMENT .............................................................................................. 6

I. THE RULES ABOLISH THE STATE LICENSING REQUIREMENT, THEREBY ENDANGERING THE HEALTH AND SAFETY OF CHILDREN........................................ 9

 a. State Licensing Provides Critical Oversight. ........................ 10

 b. ICE-Run Facilities Have a History of Poor Conditions and Compliance Issues. .......................................................... 12

 c. Eliminating the Requirement that Children be Housed in State-Licensed Facilities Will Result in Longer Detention in Secure Facilities, Thereby Increasing the Ill Effects on Children. ................................. 16

II. THE RULES CURTAIL OR ELIMINATE ESSENTIAL PROCEDURAL PROTECTIONS GUARANTEED BY THE FSA. ............................................................................................ 17

 a. The Rules Deprive UACs of Their Right to be Heard at Bond Hearings. ................................................................ 17

 b. The Rules Limit Options for Release from Federal Custody.................................................................................. 20

CONCLUSION .......................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Citizens for a Better Environment v. Gorsuch*,
   718 F.2d 1117 (D.C. Cir. 1983) ............................................................. 8

*Ferrell v. Pierce*,
   560 F. Supp. 1344 (N.D. Ill. 1983) ......................................................... 8

*Flores v. Johnson*,
   212 F. Supp.3d 864 (C.D. Cal. 2015) ................................................... 11

*Flores v. Lynch*,
   828 F.3d 898 (9th Cir. 2016) ................................................ 1, 7, 11, 19

*Flores v. Lynch*,
   212 F. Supp.3d 907, 914 (C.D. Cal. 2015) ....................................... 7, 10

*Flores v. Reno*,
   Stipulation and Order, Case No. 2:85-cv-04544-DMG
   (AGRx), Dkt. No. 13 (C.D. Cal., Dec. 12, 2001) ................................... 8

*Flores v. Sessions*,
   862 F.3d 863 (9th Cir. 2017) ................................................... 18, 19, 20

*Flores v. Sessions*,
   Order Denying Defendants' "*Ex Parte* Application for
   Limited Relief from Settlement Agreement," Case No.
   2:85-cv-04544-DMG-AGR, Dkt. No. 455 at 3-4 (C.D. Cal.
   July 9, 2018) .................................................................................... 8, 19

*Souza v. Sessions*,
   No. 1:18-cv-04412 (MSS) ECF Dkt. # 23 (N.D. Ill. June 28,
   2018) .................................................................................................... 22

1
2
3

# STATUTES

8 U.S.C. § 1225(B)(iii)(IV) ............................................................ 22

18 NYCRR Article 3 ...................................................................... 10

225 ILC §10/1 ............................................................................... 18

California Health & Safety Code § 1500 ................................... 10

Chicago Municipal Code § 4-76-010 .......................................... 2

Los Angeles Municipal Code § 57.105.3.9.2.1 ........................... 2

Los Angeles Municipal Code § 57.105.6.24 ............................... 2

NY CLS Social Services § 378 (1) .............................................. 10

NY CLS Social Services § 379 (1) .............................................. 10

# <u>RULES & REGULATIONS</u>

22 CCR § 84000 ........................................................................... 10

22 CCR § 89244 ........................................................................... 10

22 CCR §§ 89254-89255 ............................................................. 10

Proposed Rule 8 CFR § 212(5)(b)(3) .......................................... 23

Proposed Rule 8 CFR § 236.3(b)(5) ........................................... 9

Proposed Rule 8 CFR § 236.3(b)(8-9) ........................................ 9

Proposed Rule 8 CFR § 236.3(j) .................................................. 22

Proposed Rule 45 CFR § 410.302 .............................................. 21

Proposed Rule 45 CFR § 410.402 .............................................. 17

Proposed Rule 45 CFR § 410.810 ........................................................ 18

83 FR 45486 (Sept. 7, 2018) ............................................................... 1

## OTHER AUTHORITIES

American Pediatric Association, *et al.*, July 24, 2018 Letter to
Congress ................................................................................................. 13

Cities for Action & Lumos Foundation, "On the Frontlines of
the Family Separation Crisis," Sep. 2018 .............................................. 4

Human Rights First, "Family Detention: Still happening,
Still Damaging," October 2015 ...................................................... 12, 16

Julie M. Linton, Marsha Griffin, Alan J. Shapiro, "Detention
of Immigrant Children," American Academy of Pediatrics,
March 2017 ........................................................................................... 13

October 2016 Report of the ICE Advisory Committee on
Family Residential Centers ................................................................. 17

Office of Inspector General "ICE's Inspections and
Monitoring of Detention Facilities Do Not Lead to Sustained
Compliance or Systemic Improvements," OIG-18-67 (June 26,
2018) ..................................................................................................... 15

Office of Inspector General "Management Alert - Issues
Requiring Action at the Adelanto ICE Processing Center in
Adelanto, California," OIG-18-86 (September 27, 2018) ...................... 13

Scott Allen, Pamela McPherson, Letter to Chairman Grassley
and Vice Chairman Wyden, July 17, 2018 .............................. 13, 14, 15

## STATEMENT OF INTEREST

The City of Chicago, City of Los Angeles and City of New York, together with the City and County of San Francisco, Los Angeles County Santa Clara County, and the Cities of Austin, Boston, Cambridge, Columbus (OH), Houston, New Haven, Oakland, Philadelphia, Providence, San Jose, Seattle, and Somerville respectfully submit this brief, as *amici curiae*, in support of Plaintiffs' Motion to Enforce Settlement.

On September 7, 2018, the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS") (collectively, the "Departments") proposed rules "to amend regulations relating to the apprehension, processing, care, custody, and release of alien juveniles" ("Rules") in a Notice of Proposed Rule Making ("NPRM") published in the Federal Register.  83 Fed. Reg. 45486 (Sept. 7, 2018).

The Rules are an impermissible and troubling attempt to use the rulemaking process to flout court-mandated safeguards for the detention of immigrant children in federal custody as set forth in the *Flores* Settlement Agreement ("FSA").  Instead of being consistent with the terms of the FSA, the Rules dispense wholesale with its most critical protections, in favor of a new detention policy for which the Departments identify no justification.

*Amici* have significant interest in and grave concerns with the Rules because they would result in longer detentions and lower standards of care for immigrant children, thus increasing the well-documented risks of such detention and impeding *amici*'s ability to serve properly the needs of their immigrant residents.  Specifically, the Rules impact three primary interests of *amici:*  (1) ensuring the health and wellbeing of immigrant children through state and local licensing of

housing facilities; (2) providing essential resources to immigrant children to address the harms of detention; and (3) providing immigrant children with access to legal representation throughout their immigration proceedings.

*First*, the Rules attempt to undo the FSA's requirement that minimum standards of care be met for children while in detention or in the custody of HHS's Office of Refugee Resettlement ("ORR"), including being housed in state-licensed facilities. *Amici* have an acute interest in protecting the FSA's state licensing requirement. Many *amici,* like the City of Los Angeles, Los Angeles County, the City of New York and the City and County of San Francisco all prosecute violations of child welfare laws and health and safety codes in their respective jurisdictions. Cases are routinely referred to these offices for prosecution by the State of California's and the State of New York's licensing agencies. And in addition to enforcing state laws, some *amici* have local ordinances requiring state-licensed facilities to abide by local fire, building, and other safety codes that ensure the safety not only of the children, but also of the staff and first responders.

For example, Chicago's and Los Angeles's municipal codes subject state-licensed child care institutions to additional oversight, inspections, and penalties beyond those provided for by the State of Illinois and State of California, respectively. *See* Chicago Mun. Code § 4-76-010 *et seq.*; Los Angeles Mun. Code § 57.105.3.9.2.1, 57.105.6.24. These state licensing schemes and local laws reflect *amici's* interests in ensuring protection for immigrant children – protections that will not necessarily exist for children housed in federally-"licensed" facilities.

*Second*, because the Rules will result in the detention of immigrant children for longer periods of time than the FSA permits, and in

facilities that do not meet the minimum standards of the FSA, the Rules in turn are likely to require *amici* to dedicate resources to address the harms to immigrant youth caused by that longer detention, including trauma, in order to support the health and vitality of immigrant youth as they are integrated into communities after release.

New York City's response to the needs of separated immigrant children held in federal custody in New York City provides an example of how local governments have stepped in to support the well-being of immigrant youth in their jurisdictions who have confronted traumatic circumstances. In the wake of the "family separation crisis" in the summer of 2018, New York City engaged in a multi-pronged response to: (1) help ORR meet the medical needs of the approximately 300 separated immigrant children sent to ORR-contracted facilities in New York City, many of whom were suffering from trauma as a result of having been separated from their family; and (2) streamline access to city services for these children, as well as for their family, sponsors, ORR foster care parents, and the non-profit provider staff caring for them.

New York City delivered workshops to staff at ORR facilities to help ORR staff recognize and support immigrant children impacted by trauma. And when the population of separated children exhibited pressing physical and mental health needs that exceeded the treatment capabilities of the ORR-contacted agencies, New York City set up an expedited referral hotline to link children to emergency and outpatient psychiatric care, provided a bilingual child and adolescent psychiatrist to collaborate on-site with ORR mental health clinicians, trained mental health clinicians from the ORR facilities in trauma skills groups for young children, and contracted with the health insurance company

covering the children at the ORR-contracted agencies to ensure that insurance issues would not impede access to medical care.  New York City also provided trainings on trauma-related care to ORR foster care parents and ORR-contracted agency staff caring for immigrant children.

Similarly, over the summer of 2018, the City of Los Angeles and Los Angeles County, which was a destination for many reunited families, convened regional stakeholders, including a range of local service providers, to coordinate assistance to separated and reunited families in Southern California.  Through its Office of Immigrant Affairs ("OIA"), the County of Los Angeles reunited and supported children and their parents who were living in the County and who were impacted by the family separation crisis.  An OIA liaison was assigned to each family impacted by the federal government's policy and worked with those families to connect them with available County and non-County social, health, consumer, and legal services.  The County has continued to support reunified families, including by providing medical services including health assessments and immunizations, and mental health services.

Both the County and the City of Los Angeles also provided the impacted families with enrollment assistance in education, aid from legal service providers, and connections to a range of social, work, education, and family support services, including English classes, food distribution, employment support, and benefit screenings.[1]

*Third*, the Rules eliminate the right to bond redetermination hearings and prolong detention times.  This will undoubtedly interfere with immigrant children's ability to receive adequate access to counsel,

---

[1] Cities for Action & Lumos Foundation, "On the Frontlines of the Family Separation Crisis," Sep. 2018, p. 18, available at https://perma.cc/DAW3-FNMV.

1  and *amici's* ability to provide such counsel.

2      *Amici* have a strong interest in ensuring legal representation to

3  their immigrant residents, especially immigrant children.  In line with

4  this interest, several *amici* fund legal representation for immigrants in

5  their jurisdictions.  For example, Chicago provides funding to the

6  National Immigrant Justice Center ("NIJC"), including to NIJC's

7  Asylum Project, to help immigrant residents receive the legal services

8  they need.  In 2017, Chicago approved two contracts totaling $1.8

9  million to fund legal aid for immigrants through 2018, and will add to

10  this figure in 2019.

11      New York City, likewise, has made substantial investments in

12  legal services for its immigrant residents, totaling more than $40 million

13  for 2019.  This includes $4.1 million earmarked for: (1) increasing

14  capacity for legal defense in deportation proceedings for immigrant

15  youth; (2) increasing funding for social work and case management

16  resources to address the acute needs of these children; and (3) providing

17  legal risk assessment and screening services to immigrants, including

18  family members, seeking to be sponsors of unaccompanied minors

19  ("UACs"), thus facilitating their release from ORR facilities.  In addition,

20  New York City has pioneered innovative models for immigrant legal

21  representation, such as the New York Immigrant Family Unity Project,

22  which provides free, high-quality legal representation to detained

23  immigrants facing deportation, and the Immigration Children Advocates

24  Relief Effort, serving UACs.

25      In 2017, the City of Los Angeles, Los Angeles County, and two

26  foundations created the LA Justice Fund, a $10 million public-private

27  partnership that funds organizations providing immigration legal

28  services.  The LA Justice Fund was expanded in 2018 to provide legal

representation to children who were separated from their families and who are detained or housed in Los Angeles as well as their respective parents or sponsors.  Further, Los Angeles County engaged the American Academy of Pediatrics ("AAP") to train pediatricians to conduct trauma assessments and write medical reports necessary for children and parents' legal relief cases.  More recently, the County, in conjunction with AAP and legal services providers throughout Southern California began organizing a November 2018 training summit to explore ways that doctors and lawyers can more closely collaborate to protect the rights of separated immigrant children and their families.

Many other *amici* also provide legal aid funds or support services to their immigrant communities.  *See*, *e.g.*, Santa Clara County (dedicated Office of Immigrant Relations providing community and legal services to immigrants and immigrant children).

Because the Rules strip away critical procedural protections guaranteed by the FSA, the Rules impede access by immigrant children to crucial legal services and undermine *amici*'s investments in these services.

With these interests at stake, and for the following reasons, *amici* assert that Plaintiff's Motion to Enforce Settlement should be granted.

## ARGUMENT

The FSA provides critical protections for children in immigrant detention. Rather than implement those protections, the proposed Rules strip them away. The FSA was thoughtfully crafted over many years of litigation and negotiation between the federal government and a class of immigrant children apprehended at the United States border and detained by the Immigration and Naturalization Service ("INS").  On January 28, 1997, the parties entered into the FSA, which "sets out

nationwide policy for the detention, release, and treatment of children in the custody of the INS [now DHS and HHS]."  FSA, ¶ 9 (C.D. Cal. Jan. 28, 1997).  The FSA announced a "General Policy Favoring Release," *id.*, VI and ¶ 14, and requires that the government place children "in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and immigration courts and to protect the minor's well-being and that of others," *id.*, ¶ 11.  Thus, the FSA strives to protect the welfare of immigrant children at the highest level possible, while still ensuring the government's legitimate enforcement needs are met.

The FSA imposes minimum standards for all children held in detention or in ORR custody, regardless of whether the children entered the United States with their families or as UACs.  *See Flores v. Lynch*, 828 F.3d 898, 906-08 (9th Cir. 2016).  Specifically, it requires that children be housed in non-secure, state-licensed facilities and be provided adequate access to medical care, counseling, language services, and legal representation.  *See* FSA, Ex. 1.  Immigration and Customs Enforcement ("ICE") must transfer children apprehended at the border (and to whom release was denied) to non-secure state-licensed facilities within five days, or "as expeditiously as possible if there is an influx[.]" *Id.*, ¶ 12A.  In 2015, this Court held that, in the case of an influx, up to 20 days would be considered a reasonable delay.  *See Flores v. Lynch*, 212 F. Supp.3d 907, 914 (C.D. Cal. 2015), *aff'd in part and rev'd in part on other grounds by*, 828 F.3d 898 (9th Cir. 2016).

The FSA, as a document, was intended to be a temporary measure, but its principles of child health and welfare were intended to be permanent.  In 2001, the parties stipulated that the FSA would remain

in place until "45 days following defendants' publication of final regulations" governing the treatment of detained children.  *See Flores v. Reno*, Stipulation and Order, Case No. 2:85-cv-04544-DMG (AGRx), Dkt. No. 13 (C.D. Cal., Dec. 12, 2001).  Any such regulations, however, "shall not be inconsistent with the terms" of the FSA.  FSA, ¶ 9.  Thus, while the Departments have now proposed "final regulations," the FSA remains in effect until regulations consistent with the terms the FSA, are implemented.

Having had their attempts to amend or terminate the FSA rebuffed by the courts,[2] the Departments now improperly attempt to circumvent the guarantees of the FSA through the rulemaking process. Although the Rules profess to "adopt in regulations provisions that parallel the relevant and substantive terms of the FSA, consistent with [federal statutes], with some modifications … to reflect intervening statutory and operational changes while still providing similar substantive protections and standards," NPRM at 45486, in practice, the Rules directly undermine the protections for vulnerable children at the heart of the FSA.

---

[2] For example, earlier this year, this Court rejected Defendants' request for "limited" relief from the FSA's state licensing requirements, holding that Defendants' request, if allowed, would constitute a "fundamental and material breach of the parties' Agreement."  *Flores v. Sessions*, Order Denying Defendants' "*Ex Parte* Application for Limited Relief from Settlement Agreement," Case No. 2:85-cv-04544-DMG-AGR, Dkt. No. 455 at 3-4 (C.D. Cal. July 9, 2018)("July 9 Order").  As detailed below, this is only the most recent example of the courts having rejected Defendants' efforts to circumvent the FSA.  Unable to find a court willing to sanction such efforts, the Departments now engage in a transparent effort to end-run the binding terms of the FSA through administrative rulemaking.  This is unlawful.  *See, e.g., Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1124-29 (D.C. Cir. 1983) (EPA could not use rulemaking to avoid settlement agreement with environmental group where regulations contained less stringent criteria for regulating toxic waste discharge than settlement agreement); *Ferrell v. Pierce*, 560 F. Supp. 1344, 1364-70 (N.D. Ill. 1983) (HUD prohibited from implementing proposed regulations where they conflicted with settlement agreement regarding mortgages).

[PROPOSED] BRIEF OF 18 CITIES AND COUNTIES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT

I.    THE RULES ABOLISH THE STATE LICENSING
      REQUIREMENT, THEREBY ENDANGERING THE HEALTH
      AND SAFETY OF CHILDREN.

One of most consequential features of the Rules is the elimination of the FSA's requirement that detained children must be held in non-secure state-licensed facilities during the pendency of their immigration proceedings.  Under the FSA, children apprehended by border patrol officials, and not otherwise eligible for release, may only be transferred to "licensed programs."  FSA, ¶ 19.  A "licensed program" is "any program, agency or organization that is licensed by an appropriate state agency," *id.*, ¶ 6, and it "must comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes." *Id.*, Ex. 1.

The Rules abandon this critical requirement, providing instead that, where no state-licensed programs are available, DHS, through ICE, may house children with their families in its own family detention centers exempt from state licensing requirements.  *See* Proposed Rule 8 CFR § 236.3(b)(8-9).  These ICE facilities will be considered "licensed" if DHS "employs an outside entity to ensure that the facility complies with family residential standards established by ICE."  NPRM at 45497.  Proposed Rule 8 CFR § 236.3(b)(5) also includes an "out" for noncompliance:  DHS would have the authority to delay or suspend services such as meals, snacks, or counseling, due to "emergency" situations (such as a natural disaster, facility fire, civil disturbance, or medical concerns).  Thus, DHS has already anticipated and provided cover for falling short of its own minimum standards of care.

In sum, the Rules allow ICE to set its own standards of care for its own facilities, avoid oversight from independent state regulators, and

rely on unnamed "outside entities" to inspect the facilities and ensure compliance.  This is woefully inadequate to ensure the health and welfare of vulnerable children and is contrary to the FSA's requirement that any Rules promulgated to address the detention of immigrant children be consistent with its terms.  *See* FSA ¶ 9.

a. State Licensing Provides Critical Oversight.

State licensing provides critical oversight of child welfare programs, ensuring that their operations provide minimum standards of care for the health and safety of immigrant children.  *See, e.g., Flores v. Johnson*, 212 F. Supp.3d 864, 879 (C.D. Cal. 2015) (licensing provision provides "essential protection of regular and comprehensive oversight by an independent child welfare agency").

Most *amici* are located in States that have licensing regulations that, among other things, detail standards of care, require regular inspections, and grant local entities the authority to address vigorously noncompliance through such measures as prosecution of violations, imposing fines, corrective action plans, suspending licenses for programs, or suspending the ability for a program to house children. *See*, *e.g.*, 225 ILCS 10/1 *et seq.* (Illinois Child Care Act regulating facilities housing children); Cal. Health & Safety Code § 1500 *et seq.*; 22 CCR § 84000 *et seq.* (regulations governing group homes in California); 22 CCR §§ 89254-89255 (setting forth various penalties for non-compliance in California); NY CLS Soc Serv § 379(1).

In addition, many States already supervise and license programs that provide care to parents with their children, such as mother/child foster care and domestic violence shelters for families.  *See*, *e.g.*, 22 CCR § 89244 (discussing authority of licensing agency to inspect and evaluate foster homes and interview children placed in such homes in California);

NY CLS Soc Serv § 378(5); 18 NYCRR Art. 3.

Defendants have previously tried to evade the FSA's state licensing requirement and to house children in unregulated ICE facilities, but courts have rebuffed such efforts, finding them to be material breaches of the FSA. *See, e.g., Flores v. Johnson*, 212 F. Supp.3d at 877-80 (defendants materially breached FSA by failing to house unreleased minors in non-secure, state-licensed facilities); July 9 Order at 3-4 ("Defendants now seek to hold children in indefinite detention in unlicensed facilities, which would constitute a fundamental and material breach of the parties' Agreement."). Defendants have also been unsuccessful in their attempts to modify the FSA to allow such federal custody because there are no changed circumstances or operational shifts justifying modification. *See Flores v. Lynch*, 828 F.3d at 910 (affirming denial of motion to amend FSA to allow ICE to house children in unlicensed facilities); July 9 Order at 7.

Undeterred, DHS now seeks to codify what the courts have repeatedly found to be a material breach of the FSA. In an effort to overcome these court rulings, DHS states that the Rules are different from the previous attempts to avoid the state licensing requirement because they "create[] an affirmative proposal of a federal-licensing scheme," which, it claims, has not previously been considered by a court. NPRM at 45492. In other words, DHS argues that merely by designating the ICE facilities "licensed programs," they are suddenly equivalent to (and thus consistent with) the FSA's state-licensing requirement. That cannot be so. The Rules do not provide any detail regarding the licensing scheme contemplated for these facilities. Without that information, it is impossible to determine whether the federal licensed facilities would adequately protect the children who

1  would be housed there.

2        More fundamentally, the Rules lack the accountability of state and

3  local licensing that is central to the FSA: state regulations and local

4  codes provide consequences such as fines, penalties, and license

5  suspension or revocation on noncompliance.  Although the Rules do not

6  provide detail regarding the contemplated oversight of the ICE-run

7  facilities, it is likely that such oversight will be less stringent than state

8  and local licensing.  Without this accountability, the federal facilities

9  will lack incentive to ensure that even regular inspection and minimal

10  standards are met.

11        b.  ICE-Run Facilities Have a History of Poor Conditions and
12             Compliance Issues.

13        *Amici*'s concerns about the conditions at the ICE-run federally-

14  licensed facilities contemplated by the Rules are well founded.  ICE-run

15  detention facilities historically and routinely provide substandard care

16  to children and adults, failing to meet even their own minimum

17  standards of care.  *See*, *e.g.*, human rights *first*, "Family Detention:  Still

18  happening, Still Damaging," October 2015, ("human rights *first* Report")

19  (discussing reports of substandard care at family detention centers

20  including Karnes, Dilley, and Berks).[3]  Pediatric and mental health

21  advocates who visited ICE family detention centers in 2015 and 2016

22  found "discrepancies between the standards outlined by ICE and the

23  actual services provided, including inadequate or inappropriate

24  immunizations, delayed medical care, inadequate education services,

25  and limited mental health services."  Julie M. Linton, Marsha Griffin,

26  Alan J. Shapiro, "Detention of Immigrant Children," American Academy

27

28  [3] Available at: https://perma.cc/JAZ7-ZG5K

[PROPOSED] BRIEF OF 18 CITIES AND COUNTIES AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT

of Pediatrics, March 2017 at 8 ("AAP Report").[4]

Two of DHS's own medical and psychiatric experts, so alarmed by
the conditions and risks to the children's well-being, wrote to the Senate
Whistleblowing Caucus to voice their concerns.  *See* Scott Allen, Pamela
McPherson, Letter to Chairman Grassley and Vice Chairman Wyden,
July 17, 2018.[5]  After conducting ten investigations over four years at
ICE family detention facilities, Doctors Allen and McPherson concluded
that children housed in ICE family detention centers are at "high risk of
harm," due to serious compliance issues such as lack of timely access to
medical care, lack of sufficient medical staffing, inadequate trauma care
and counseling, and inadequate access to language services.  *Id.* at 4; *see
also* American Pediatric Association, *et al.*, July 24, 2018 Letter to
Congress (letter submitted by 14 medical and mental health associations
seeking congressional oversight of DHS-run facilities and stressing that
"conditions in DHS facilities, which include open toilets, constant light
exposure, insufficient food and water, no bathing facilities, extremely
cold temperatures, and forcing children to sleep on cement floors, are
traumatizing for children").[6]

Just last month, an especially troubling DHS Inspector General
report on an ICE-run adult detention facility revealed astonishingly
substandard and harmful conditions.  *See* Office of Inspector General
"Management Alert - Issues Requiring Action at the Adelanto ICE
Processing Center in Adelanto, California," OIG-18-86 (September 27,
2018).[7]  The report was the result of an unannounced inspection of the
adult Adelanto ICE Processing Center conducted in May and identified

[4] Available at: https://perma.cc/9HGG-HFRH
[5] Available at: https://perma.cc/2S6H-QNJX
[6] Available at: https://perma.cc/PQM2-V5L2
[7] Available at: https://perma.cc/PL8E-ZV36

1  "serious violations" of ICE's national detention standards, representing

2  "significant threats to the safety, rights, and health of detainees."  *Id.* at

3  2.

4  One such violation was the presence of "nooses" (*e.g.*, braided bed

5  sheets), which are prohibited, in 15 of the 20 cells they visited.  *Id.* at 2-

6  3.  The inspectors determined that ICE "has not taken seriously the

7  recurring problem," exhibiting "a disregard for detainee health and

8  safety," as these "nooses" have often been used in suicides or attempted

9  suicides.  *Id.* at 4.  The inspectors also found that detainees were often

10  placed prematurely in segregation without the required disciplinary

11  hearing or findings and, once there, were being improperly handcuffed,

12  shackled, and deprived of communication assistance.  *Id.* at 5-7.  Finally,

13  the report detailed numerous failures by ICE to ensure that the

14  detainees receive timely and necessary medical and dental care,

15  resulting in tooth loss and exacerbated health conditions, and in some

16  instances contributing to detainee death.  *Id.* at 7-8.  The report

17  concluded that "although this form of civil custody should be non-

18  punitive, some of the center conditions and detainee treatment we

19  identified during our visit and outlined in this management alert are

20  similar to those one may see in criminal custody."  *Id.* at 9.  This report

21  exposes the very real and ongoing failures of ICE to maintain its

22  standards for ICE adult facilities; the risk of lasting harm to vulnerable

23  children resulting from such substandard levels of care at family

24  detention centers would be vastly greater than the risk to adults.

25  The Rules further exacerbate the health risks posed by ICE-run

26  detention facilities by leaving compliance in the hands of an

27  "independent entity;" *i.e.*, for-profit, third-party contractors.  This

28  compliance system has already proven to be woefully inadequate.  In a

1  June 2018 report, inspectors from DHS's Office of Inspector General
2  found that Nakamoto, the third-party contractor frequently used by ICE
3  to conduct inspections at adult detention facilities, did not always
4  examine actual conditions, was not consistently thorough, and
5  frequently failed to identify compliance deficiencies.  *See* Office of
6  Inspector General "ICE's Inspections and Monitoring of Detention
7  Facilities Do Not Lead to Sustained Compliance or Systemic
8  Improvements," OIG-18-67 (June 26, 2018).[8]

9      Indeed, the report found that, in some instances, Nakamoto even
10 misrepresented results in their reports to ICE.  *Id.* at 9.  ICE employees
11 reported that the Nakamoto inspections "breeze by the standards," and
12 were "very, very, very difficult to fail."  *Id.*  The report further found that
13 ICE does not "ensure adequate oversight or systemic improvements in
14 detention conditions; certain deficiencies remain unaddressed for years."
15 *Id.* at 4-5 (*i.e.* problems identified in 2006 still persisted in 2017).

16     The Rules embrace and adopt this subpar inspection regime.  They
17 do not set forth any details, much less requirements, about how the
18 contracts to third parties will be awarded, how the contractors will be
19 vetted, how often the facilities will be inspected, what the inspection
20 process will entail, or how deficiencies will be addressed and corrected.
21 Without such details, *amici* are left with little more than the
22 Departments' assurances that the new federal licensing scheme will
23 meet the rigorous state-licensing standards set forth in the FSA.  Given
24 the well-documented shortcomings of oversight and compliance in ICE-
25 run detention facilities, such assurances ring hollow.

26

27

28

---

[8] Available at: https://perma.cc/K57T-LV9N

c. Eliminating the Requirement that Children be Housed in
State-Licensed Facilities Will Result in Longer Detention in
Secure Facilities, Thereby Increasing the Ill Effects on
Children.

If implemented, the Rules would permit DHS to hold children and
their families in secure, detention-like settings indefinitely (rather than
the 20-day limit currently in place), because ICE facilities would be
deemed "licensed" by ICE. As a result, the risk of harm to the physical
and mental health of these children would greatly increase. It is well-
documented that any amount of detention can be harmful to vulnerable
children. The recent AAP Report analyzed first-hand accounts from
children, doctors, and parents, as well as qualitative studies, and
concluded that even short-term detention could produce long-term
negative physical and emotional symptoms among detained children.
*See* AAP Report at 10 ( "[R]eports about detained unaccompanied
immigrant children in the United States found high rates of
posttraumatic stress disorder, anxiety, depression, suicidal ideation, and
other behavioral problems."); *see also* human rights *first* Report at 1
(research from pediatricians, physicians and social workers who visited
family detention centers "confirms that detention of less than two weeks
is associated with negative health outcomes and potential long-term
health and developmental consequences").

DHS's own advisory committee, formed to advise ICE and DHS on
how to improve family detention, itself warned of the risks posed by
detention of children. See October 2016 Report of the ICE Advisory
Committee on Family Residential Centers ("[D]etention is generally
neither appropriate nor necessary for families…. [D]etention or the
separation of families for purposes of immigration enforcement or

management are never in the best interest of children.").[9]

And the Rules' purported requirements regarding medical care do nothing to assuage these health concerns.   See Proposed Rule, 45 CFR § 410.402.  Indeed, the onus appears to be on the licensed facility to set its own standard of "appropriate" or "routine" medical care. Outside of immunizations, there is no reference to national standards or clinical guidelines, and the directive to administer "prescribed medications" is rendered meaningless without comprehensive rules establishing the preventative care, testing, and medical services that must be provided to detained children. Nor are there any requirements that children suspected or diagnosed with a disease of public health concern be reported to local health officials, as is required by state and local laws—once again ensuring that these facilities remain unchecked.

## II.    THE RULES CURTAIL OR ELIMINATE ESSENTIAL PROCEDURAL PROTECTIONS GUARANTEED BY THE FSA.

The Rules also strip away a number of key substantive and procedural safeguards required by the FSA.  The Rules eliminate UACs' rights to be heard in bond redetermination hearings and impose new requirements on sponsors.  They also pave the way for extended periods of detention for immigrant children, undermining the central purpose animating the FSA – to protect immigrant children's welfare by limiting their time in detention as much as possible.  Finally, the Rules will significantly impede children's access to crucial legal services.

### a.  The Rules Deprive UACs of Their Right to be Heard at Bond Hearings.

Under the FSA, UACs in deportation proceedings "shall be afforded a bond redetermination hearing before an immigration judge in

---

[9] Available at: https://perma.cc/QZ3Y-5KL4

every case, unless the minor indicates . . . that he or she refuses such a hearing." FSA, ¶ 24(A). This hearing allows UACs an opportunity to challenge ORR's initial determination that they are not entitled to release because they pose a flight risk or a danger to the community, as well as to challenge whether they will be placed in a secure versus non-secure facility. *See id.*, ¶ 24(B). The Rules replace the procedure for redetermination hearings with a new administrative process, whereby a UAC is only afforded such a hearing if she affirmatively requests one, and any such redetermination is made not by an immigration judge, but by a hearing officer "employed by HHS." Proposed Rule, 45 CFR § 410.810. By placing the onus on UACs – who lack familiarity with their rights and the immigration process in general – to request a redetermination hearing, the Rules will inevitably lead to fewer children receiving such hearings and, therefore, to prolonged detention.[10]

Bond redetermination hearings provide a vital check against unnecessary, or overly-restrictive detentions of UACs. And such hearings grant invaluable protections to UACs even if they do not ultimately result in release: they allow for representation by counsel, an opportunity for the UAC to make an oral statement, and the creation of an evidentiary record, and the right of appeal. *Flores v. Sessions*, 862 F.3d 863, 879 (9th Cir. 2017). Further, such hearings "compel the agency to provide its justifications and legal grounds for holding a given minor." *Id.* at 867. Without such hearings, "these children have no meaningful forum in which to challenge ORR's decisions regarding their detention or even to discover why those decisions have been made." *Id.* Bond redetermination hearings, therefore, provide an independent,

---

[10] The Rules also further narrow the scope of the hearings, should they occur, by prohibiting review of the UAC's level of custody. Proposed Rule, 45 CFR § 410.810(h).

transparent process through which the government must account for its decisions affecting this vulnerable population.

To support the proposed elimination of this right, the Departments rely on the very same arguments that the Ninth Circuit rejected in *Flores v. Sessions*. Citing to the 2002 Homeland Security Act ("HSA"), and the 2008 William Wilberforce Trafficking Victims Protection Act ("TVPRA"), the Rules assert that the two statutes supersede the FSA and no longer authorize, much less require, bond redetermination hearings before an immigration judge. NPRM at 45509. The Departments contend that because Congress failed to explicitly provide for bond hearings in the two laws, and because the breadth of ORR's responsibility over UACs effectively precludes immigration judges in the Department of Justice from having any authority over UAC detention, the bond hearing requirement is no longer legally valid. *Id.* at 45509-10.

The Departments' position, like the attempt to circumvent the state licensing requirement, has already been rejected by the Ninth Circuit, which held that "in enacting the HSA and TVPRA, Congress did not terminate Paragraph 24(A) (the bond hearing requirement) of the *Flores* Settlement with respect to unaccompanied minors." *Sessions*, 862 F.3d at 867. As the court reasoned, because the "overarching purpose of the HSA and TVPRA was quite clearly to give unaccompanied minors more protection, not less," *id.* at 880, "[d]epriving these children of their existing right to a bond hearing is incompatible with such an aim." *Id.* at 874. Examining the text of each statute and the statutory framework as a whole, the court held that the HSA and TVPRA neither explicitly supersede the FSA's bond hearing requirement nor create a framework incompatible with such hearings. *Id.* at 875, 880.

The Departments' only response to the Ninth Circuit's ruling is that the case was wrongly decided.  See NPRM at 45509.  Whatever the Departments' view of the merits of that decision, it remains governing law.

The Departments also attempt to justify the Rules' elimination of the FSA's bond redetermination procedure by arguing that it is "more sensible for the same agency (HHS) charged with responsibility for custody and care of UACs also to conduct the hearings envisioned by the FSA." *Id.* at 45509.  Such a position, however, directly conflicts with a UAC's right under the FSA "to have the merits of [her] detention assessed by an independent immigration judge." *Sessions*, 862 F.3d at 880.  It is also far from sensible—rather than provide an independent arbiter to assess HHS's bond determinations, the Rules make HHS both jailer and judge.  Finally, under the system set forth in the Rules, appeals would go directly to the Assistant Secretary for the Administration of Children and Families, instead of being heard by judges on the Board of Immigration Appeals, who possess far more institutional knowledge of the issues and are better suited to assess bond redetermination decisions.

      b. <u>The Rules Limit Options for Release from Federal Custody.</u>

The Rules further conflict with the essence of the FSA by significantly curtailing to whom, and when, a minor who has been approved for release by DHS and HHS may *actually* be released.  Under the FSA, potential sponsors must undergo a rigorous vetting process that requires, among other things, that they execute an Affidavit of Support agreeing to provide for the minor's well-being and ensure appearance of the minor at all future immigration proceedings; in addition, potential sponsors may be required to submit to a "positive

suitability assessment," which includes investigations into the custodian's living conditions, identification, and employment.  FSA, ¶ 15.

The Rules go further and place additional vetting procedures on potential sponsors, adding to the suitability assessment a required "fingerprint-based background and criminal records check," not just for the sponsor, but also for any "adult residents of the prospective sponsor's household."  Proposed Rule, 45 CFR § 410.302.  The addition of the requirement of fingerprint-based criminal background checks on all adult household residents is suspect in light of this Administration's aggressive immigration enforcement efforts.  This information will necessarily be shared with ICE, who may then actively use the information from sponsors and their households for purposes beyond those contemplated by the FSA, such as for raids, arrests, and other enforcement actions.  *Amici* assert that these additional vetting requirements will unduly delay release and possibly deter safe, stable, and responsible custodians from coming forward to sponsor detained children.  Not only do the expanded fingerprint-based background checks not serve their identified purpose, this measure will be harmful to *amici*'s immigrant residents.

A recent example out of Chicago shines a light on how the Rules' new processes will cause emotional harm to the immigrant children and unnecessary detention.  In that instance, it took an order from a federal district court judge to prompt federal officials to release a nine-year-old boy who had been placed with a social services agency in Chicago to his mother, who had not seen him for weeks since they were separated at the border in late May.  Federal officials had refused to reunite the mother and child until adults living with the mother produced

background information and consented to be fingerprinted.  The court rejected any need for delay, holding that the continued separation likely violated the mother and son's due process rights and subjected them to irreparable harm.  *Souza v. Sessions*, No. 1:18-cv-04412 (MSS) ECF Dkt. # 23 (N.D. Ill. June 28, 2018).

The Rules also restrict to whom DHS may release children beyond what the FSA contemplates.  Under the FSA, minors may be released from either DHS or HHS custody to, in preferred order:  (1) a parent, (2) a legal guardian, (3) an adult relative (brother, sister, aunt, uncle, or grandparent), or (4) an adult individual or entity designated by the parent or legal guardian who provides sufficient documentary sworn evidence of capability of care to the satisfaction of officers.  FSA, ¶ 14. Under the Rules, however, children in DHS custody may only be released to a parent or legal guardian not in detention.  *See* Proposed Rule, 8 CFR § 236.3(j).  This change would curb the ability of a minor to be released to a relative, rather than remain in prolonged and unregulated family detention, should the family prefer.  This change, is therefore "inconsistent with the terms" of the FSA.  *See* FSA, ¶ 9. Moreover, given the already rigorous suitability tests for sponsors, there is no simply no justification for removing adult relatives from the list of approved custodians.

Finally, the Rules conflict with the FSA's procedural protections for asylum-seekers.  Children seeking asylum are placed in expedited removal proceedings, which means they are subject to mandatory detention unless or until they can show a credible fear of persecution in their home countries.  8 U.S.C. § 1225(B)(iii)(IV).  Under the FSA, DHS has the discretion to release children seeking asylum based on a case-by-case determination that includes not only medical necessity or law

enforcement needs (the two exceptions that apply to adults), but also "urgent humanitarian reasons" or "significant public benefit."  FSA, ¶ 14.  The Rules would remove these additional bases for release and provide that the same strict parole standards that apply to adults are also applied to minors in expedited removal proceedings.  *See* Proposed Rule, 8 CFR § 212(5)(b)(3)  The Rules provide no explanation for eliminating DHS's authority to consider unique circumstances that may arise for children seeking asylum.

## CONCLUSION

Instead of being consistent with the terms of the FSA, as required, the Rules dispense wholesale with its most critical protections, in favor of a new detention policy for which Defendants identify no supportable justification.  The Rules impermissibly conflict with the express terms and the underlying purpose of the FSA – to protect the health and wellbeing of immigrant children.  In particular, the Rules allow Defendants to hold immigrant children in substandard, detention-like facilities for unnecessary periods of time, without any oversight or accountability, and deprive them of essential procedural protections. For these reasons, *amici* respectfully request this Court to grant Plaintiffs' Motion to Enforce Settlement.

| | |
|---|---|
| Dated:    November 7, 2018 | Respectfully submitted,<br><br>By:*/s/   Michael Dundas*<br><br>Michael N. Feuer<br>*City Attorney*<br>James P. Clark<br>Leela Kapur<br>Valerie Flores<br>Michael Dundas<br>200 North Main Street,<br>City Hall East Suite 800<br>Los Angeles, CA 90012<br><br>*Attorneys for Amicus Curiae*<br>*City of Los Angeles, California* |
| Edward N. Siskel<br>*Corporation Counsel*<br>Jane Elinor Notz<br>Rebecca Hirsch<br>30 N. LaSalle Street, Suite 800<br>Chicago, IL 60602<br><br>*Attorneys for Amicus Curiae*<br>*City of Chicago, Illinois* | Zachary W. Carter<br>*Corporation Counsel*<br>100 Church Street<br>New York, NY 10007<br><br>*Attorney for Amicus Curiae*<br>*City of New York, New York* |
| Dennis J. Herrera<br>*City Attorney*<br>City Hall Room 234<br>One Dr. Carlton B. Goodlett Pl.<br>San Francisco, CA 94102<br><br>*Attorney for Amicus Curiae*<br>*City and County of San Francisco, California* | Margaret L. Carter<br>O'Melveny & Myers LLP<br>400 S. Hope Street<br>Los Angeles, CA 90071<br><br>*Attorney for Amicus Curiae*<br>*Los Angeles County, California* |
| James R. Williams<br>*County Counsel*<br>70 West Hedding St., 9th Fl.<br>San Jose, CA 95110-1770<br><br>*Attorney for Amicus Curiae*<br>*County of Santa Clara, California* | Anne L. Morgan<br>*City Attorney*<br>PO Box 1546<br>Austin, TX 78767<br><br>*Attorney for Amicus Curiae*<br>*City of Austin, Texas* |
| Eugene O'Flaherty<br>*Corporation Counsel*<br>One City Hall Square, Rm. 615<br>Boston, MA 02201<br><br>*Attorney for Amicus Curiae*<br>*City of Boston, Massachusetts* | Nancy E. Glowa<br>*City Solicitor*<br>795 Massachusetts Avenue<br>Cambridge, MA  02139<br><br>*Attorney for Amicus Curiae*<br>*City of Cambridge, Massachusetts* |

| | |
|---|---|
| Zach Klein<br>*City Attorney*<br>77 N. Front St – 4th Floor<br>Columbus, OH 43215<br><br>*Attorney for Amicus Curiae*<br>*City of Columbus, Ohio* | Ronald C. Lewis<br>*City Attorney*<br>900 Bagby, 4th Floor<br>Houston, Texas 77002<br><br>*Attorney for Amicus Curiae*<br>*City of Houston, Texas* |
| John Rose, Jr.<br>*Corporation Counsel*<br>165 Church Street, 4th Flr.<br>New Haven, CT 06510<br><br>*Attorney for Amicus Curiae*<br>*City of New Haven,*<br>*Connecticut* | Barbara J. Parker<br>*City Attorney*<br>One Frank H. Ogawa Plaza, 6th Flr.<br>Oakland, California 94612<br><br>*Attorney for Amicus Curiae*<br>*City of Oakland, California* |
| Marcel S. Pratt<br>*City Solicitor*<br>City of Philadelphia Law Department<br>1515 Arch Street, 17th Floor<br>Philadelphia, PA 19102<br><br>*Attorney for Amicus Curiae*<br>*City of Philadelphia,*<br>*Pennsylvania* | Jeffrey Dana<br>*City Solicitor*<br>444 Westminster Street, Suite 220<br>Providence, RI 02903<br><br>*Attorney for Amicus Curiae*<br>*City of Providence,*<br>*Rhode Island* |
| Richard Doyle<br>*City Attorney*<br>Office of the City Attorney<br>200 E. Santa Clara Street, 16th Flr.<br>San Jose California 95113-1905<br><br>*Attorney for Amicus Curiae*<br>*City of San Jose, California* | Peter S. Holmes<br>*City Attorney*<br>701 Fifth Avenue, Suite 2050<br>Seattle, WA 98104-7097<br><br>*Attorney for Amicus Curiae*<br>*City of Seattle, Washington* |
| Francis X. Wright, Jr.<br>*City Solicitor*<br>93 Highland Avenue<br>Somerville, MA 02143<br><br>*Attorney for Amicus Curiae*<br>*City of Somerville,*<br>*Massachusetts* | |

[PROPOSED] BRIEF OF 18 CITIES AND COUNTIES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT