ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

*Special Master / Independent Monitor*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | CASE NO. CV 85-4544 |
| Plaintiffs, | **NOTICE OF FILING OF FIRST REPORT OF THE SPECIAL MASTER / INDEPENDENT MONITOR** |
| v. | |
| WILLIAM P. BARR, Attorney General of the United States, *et al.*, | |
| Defendants. | |

On October 5, 2018, the Court ordered the appointment of Andrea Sheridan Ordin as Special Master/Independent Monitor ("Monitor") and ordered the Monitor to file formal Reports and Recommendations to the Court. In accordance with the Court's Order, the Monitor submits the attached First Report of the Special Master/Independent Monitor for the Court's consideration.

DATED:   March 6, 2019

Respectfully Submitted,

Andrea Sheridan Ordin
STRUMWASSER & WOOCHER LLP

By _____
Andrea Sheridan Ordin

*Special Master / Independent Monitor*

2

**CERTIFICATE OF SERVICE**

Case No. CV 85-4544

I am a citizen of the United States. My business address is 10940 Wilshire Boulevard, Suite 2000, Los Angeles, California 90024. I am over the age of 18 years, and not a party to the within action.

I hereby certify that on March 6, 2019, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Eastern District of California by using the CM/ECF system:

**NOTICE OF FILING OF FIRST REPORT OF THE SPECIAL MASTER / INDEPENDENT MONITOR.**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on March 6, 2019, at Los Angeles, California.

Lauren S. Guerena

# Attachment

In the United States District Court

Central District of California – Western Division


JENNY LISETTE FLORES, *et al.*, Plaintiffs,

v.

WILLIAM P. BARR, etc., *et al.*, Defendants.


Case No. CV 85-4544-DMG (AGRx)

Hon. Dolly M. Gee, United States District Judge


# First Report and Recommendation

# Of the Special Master/Independent Monitor


Andrea Sheridan Ordin
Special Master/Independent Monitor
Strumwasser & Woocher LLP
1094 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
(310) 576-1233

TABLE OF CONTENTS

1.   INTRODUCTION ................................................................................................. 1

2.   RELEVANT DUTIES OF THE MONITOR ...................................................... 3

3.   *FLORES* SETTLEMENT AGREEMENT ......................................................... 6

4.   ACTIVITY OF MONITOR OCTOBER 15, 2018 – JANUARY 31, 2019 ............. 9

5.   DISCUSSION OF CLAIMS OF BREACHES ................................................ 14

   A.   CBP Facilities ............................................................................................ 14

   i.   Issues ......................................................................................................... 14

   ii.   Monitor's Investigation ........................................................................ 14

   iii.   Deaths of two minors in December 2018 .......................................... 23

   B.   ICE Facilities .............................................................................................. 30

   i.   Issues ......................................................................................................... 30

   ii.   Monitor's Investigation ........................................................................ 31

   C.   ORR Facilities ............................................................................................ 36

   i.   Issues ......................................................................................................... 36

   ii.   Monitor's Investigation ........................................................................ 37

6.   DISCUSSION OF WHETHER DEFENDANTS' RESPONSES TO PLAINTIFFS'

DECLARATIONS HAVE REBUTTED PLAINTIFFS' EVIDENCE ............................... 43

## 1. INTRODUCTION

On October 5, 2018, this Court appointed Andrea Sheridan Ordin Special
Master/Independent Monitor ("Monitor") with her duties to commence on
October 17, 2018. In 2017, the Court had previously appointed Henry A.
Moak, Jr. from the U.S. Customs and Border Protection ("CBP") and Deane
Dougherty from Immigration and Customs Enforcement ("ICE") to serve in
the role of Juvenile Coordinator for their respective agencies. Based in part
upon continuing conflicting information from the Parties, numerous
declarations from class members and relatives indicating non-compliance
with the Court's June 27, 2017 Order, and the additional finding that the
Office of Refugee Resettlement ("ORR") had also breached the *Flores*
Settlement Agreement in multiple respects, the Court ruled:

> "Because of the complexity of the *Flores* Agreement, the Court's finding
> of non-compliance, and ongoing  disputes between the Parties relating
> to the implementation of the *Flores* Agreement, the Court finds that the
> appointment of a Special Master and Independent Monitor is
> warranted."

At the Status Conference on October 15, 2018 designed to introduce the
Parties and the Monitor, the Court expressed appreciation for the
contributions of the Juvenile Coordinators and their continued participation,

and then left the bench to allow Counsel for the Parties, the Juvenile Coordinators, and the Monitor to discuss among themselves their respective approaches in the coming year in order to comply with the Judge's Orders. The 2017 Order alone cites more than 15 categories of breaches primarily directed to facilities within the jurisdiction of CBP and ICE.  The 2018 Order focuses on breaches in three general categories in facilities primarily under the jurisdiction of ORR: (1) placing class members in residential treatment centers, staff-secure facilities, and secure facilities; (2) administering psychotropic drugs to class members without a court order or the informed consent of an authorized person under state law focusing specifically on the Residential Treatment Center known as Shiloh; and (3) unnecessarily prolonging class members' detention in ORR facilities.

This first Report principally describes the issues being addressed, the tours of facilities intended to familiarize the Monitor with conditions in the Rio Grande Valley ("RGV") sector, and the Monitor's preliminary observations while touring the facilities and questioning staff and detained minors.  In the second Report and Recommendations, the Monitor expects to analyze the government internal data documenting compliance or non-compliance with the Court's orders. Subsequent Reports also will detail results of interviews with class members, government staff and experts. In the subsequent Reports

and Recommendations, the Monitor expects to be able to draw definitive conclusions and to offer concrete recommendations.

## 2. RELEVANT DUTIES OF THE MONITOR

The entirety of the Order places significant responsibilities on the Monitor, including but not limited to:

- Monitor compliance with the Court's June 27, 2017 and July 30, 2018 Orders, and other Court orders issued during the Term ("the Court's Orders");

- Meet with the Parties and their counsel and receive and/or hear evidence and legal arguments on issues pertaining to compliance with the Court's Orders;

- Make findings of fact and prepare formal Reports and Recommendations to the Court regarding achievement of the goals of monitoring and substantial compliance with the Court's Orders;

- Conduct such investigation, interviews, and site visits as are necessary to achieve the goals of monitoring or aid in the preparation of Reports and Recommendations;

- Direct the Parties to produce such information or documents as the Monitor deems relevant to achieve the goals of monitoring or to prepare Reports and Recommendations;

- Resolve such disputes as may arise between the Parties regarding the implementation of the Court's Orders, including this Order;

- Preside over and facilitate mediations and/or settlement negotiations between the Parties as to any issues pertaining to the implementation of the Court's Orders; and

- Advise and update the Court on the status of Defendants' compliance with the Court's Orders.

In addition to the Court's broad general instructions above, Paragraph D (1) (a) contains a specific requirement to evaluate the competing evidentiary claims of the Parties in their opposing papers preceding appointment of the Monitor. That evaluation is set out beginning at page 40.

The Court further contemplated that during the course of the Monitor's work, additional, unenumerated matters might arise. The Court specifically instructed that: "During the course of her monitoring duties, if the Monitor discovers potential breaches of the *Flores* Agreement that are beyond the scope of the June 27, 2017, July 27, 2018, or July 30, 2018 Orders, she shall bring them to the Court's and the Parties' attention."

Two such unenumerated items arose in the course of the current period:

- The Tornillo temporary emergency facility for unaccompanied alien children ("UAC") was reported in national and local media to have violated the *Flores* orders in several aspects. Announcements of closure of Tornillo, and the eventual closure, led to the Monitor cancelling a planned visit to that facility, and no remedial measures will now be recommended specifically for that facility. Evidence of past practices and events at Tornillo will, of course, be fully taken into account as relevant.

- In December, two children died in CBP custody, again raising concerns about possible violations of the *Flores* Agreement. As contemplated in the Court's orders, the Monitor is bringing to the attention of the Court and the Parties the publicly-available facts and pending actions by CBP in regard to the two deaths.

The Order contemplates regular Reports and Recommendations to the Court, with the first Report due in draft to the Parties one month before the Final Report is filed with the Court.  By agreement among the Parties, Court, and Monitor, the first Report is due to the Court on March 6, 2019.

As also contemplated by the Order, the Monitor received detailed written comments during the week of February 18, 2019, from counsel for the Plaintiffs, counsel for Defendants, CPB, ICE and ORR, as well as the Juvenile

Coordinators[1] for CPB and ICE. The comments received were helpful and many of suggestions have been incorporated or addressed in this First Report.

## 3. *FLORES* SETTLEMENT AGREEMENT

The Court and the Parties are well aware of the provisions of the Agreement. The Settlement Agreement in *Flores v. Reno*, CV 85-4544-RJK (Px), was filed in l997 after the litigation had been pending for nine years and had been heard by the United States Supreme Court. *See Reno v. Flores* (1993) 507 U.S. 292, 113 S. Ct. 1439, 123 L.Ed.2d 1. The Settlement Agreement is 23 pages, and attaches Exhibits, including Instructions to Services Officers re: Processing, Treatment and Placement of Minors. These provisions in this contract between the INS and class members have resulted in scores of legal disputes and the filing of tens of thousands of pages in multiple federal cases. The core provisions, which over the years have been incorporated in one form or another in policy memoranda first by the then Immigration and Naturalization Service, and now by the Department of Homeland Security

---

[1] During the period of this Report, a new Juvenile Coordinator has been appointed for ORR and the Monitor will be conducting joint tours and interviews with the Juvenile Coordinator in March, at Homestead, Florida.

("DHS") and Department of Health and Human Services ("HHS")[2], Office of Refugee Resettlement, include:

- The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interest to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others.

- Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. In the event of an emergency or influx of

---

[2] Responsibilities of the former Immigration and Naturalization Service were transitioned to DHS and HHS by the Homeland Security Act of 2002, Pub.L. 107–296, 116 Stat. 2135.

minors into the United States, the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible.

- The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs. Nothing requires INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so. See 8 USC §1232(c)(3)(A).

- Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety[3] or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:
    o A parent;
    o A legal guardian;
    o An adult relative (brother, sister, aunt, uncle, or grandparent); an adult individual or entity designated by the parent or legal

---

[3] See ¶17, which outlines the possibility of performing a suitability assessment, including the wishes and concerns of the minor.

guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

- o A licensed program willing to accept legal custody; or

- o An adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

## 4. ACTIVITY OF MONITOR OCTOBER 15, 2018 – JANUARY 31, 2019

After the October 17, 2018, effective date of appointment, the Monitor focused initially on investigating and mediating disputes relating to Defendants' compliance or non-compliance with the June 27, 2017 Order Re Plaintiffs' Motion to Enforce and Appoint a Special Monitor [Doc. #363] and July 30, 2018 Order re Plaintiffs' Motion to Enforce Class Action Settlement [Doc. #470].

In order to understand more fully the context of many disputes continuing over enforcement of the provisions of the two referenced Orders and the

*Flores* Agreement, the Monitor undertook a variety of visits to facilities under the jurisdiction of CBP in the Rio Grande Valley.  The Monitor also visited certain ORR and ICE facilities in Texas outside of the Rio Grande Valley.

October 30, 2018:   Tour with counsel for the Parties and presentations by CBP personnel at McAllen Border Patrol Station and Processing Center ("CPC Ursula"), conversations with Consulate of Guatemala representatives on-site, and observation of CBP enforcement activities at the border. The Monitor, with lawyers for Plaintiffs and Defendants, accompanied CBP officers on patrol, and accompanied the officers as they apprehended family units who presented themselves at the United States-Mexico Border.

November 26, 27, 28, 2018: Tours and interviews with counsel for the Parties at ICE Karnes County Family Residential Center, located in Karnes County, Texas, and South Texas Family Residential Center, located in Dilley, Texas.

December 4, 2018: First Tour and interviews at Shiloh Residential Treatment Center in Manvel, Texas, with counsel for the Parties and Plaintiffs' expert psychiatrist, Dr. Amy Cohen.

December 5, 2018: Tour of Catholic Charities Houston Shelter and Southwest Key Casa Montezuma.

January 14, 15, 2019: Second Tour of Shiloh, to moderate mediation meeting among Drs. Luis Valdes, Javier Ruiz, and Amy Cohen, and interviews and review of patient files.

January 21, 22, 2019: Unannounced inspection of the McAllen Border Patrol Station and CPC Ursula with Border Patrol Juvenile Coordinator Henry A. Moak, Jr. and his team.

In addition, the Monitor reviewed CBP, ICE, and ORR data documenting their management of the various facilities, including:

- McAllen Border Patrol Station, CPC Ursula, patrol locations for apprehension of immigrant aliens

- Shiloh Residential Treatment Center

- Shelters in Houston, including Catholic Charities Houston Shelter, Southwest Key Casa Montezuma

- Residential Family Center, Dilley

- Residential Family Center, Karnes

In connection with her review of CBP data, the Monitor met with a representative of CBP for a day-long review of the practices and procedures for acquisition, management, and reporting of the data maintained in the e3DM system maintained by CBP to track detainees. Separately, the Monitor

reviewed materials regarding the data portal employed by ORR and observed its usage by ORR personnel.

The Monitor also reviewed multiple letters from Plaintiffs' counsel addressing alleged potential breaches and new issues and reviewed Defendants' counsel's responses.  Specifically, the Monitor has reviewed Plaintiffs' January 7, 2019, letter outlining categories of documents deemed essential to determining compliance. The Monitor has received multiple CBP, ICE, and ORR documents required by the Order Appointing the Monitor and will provide analysis of those documents and documents to be received in future reports.

The Monitor continued her research, which included:

- More than 200 declarations filed by the Parties in 2017 and 2018.

- Literature on medical treatment of minors, including literature provided by the American Academy of Pediatrics.

- Texas law and regulations relating to children in confinement, and requirements for administering medical treatment and medication.

- Relevant federal district court and Ninth Circuit cases related to the detention of UAC's and family units.

- Office of Refugee Resettlement Policies: Children Entering the United States Unaccompanied.

- Conditions at Tornillo.

Given the scope of the Monitor's responsibilities over the year of monitoring, there are significant powers and duties that the Monitor has not yet addressed or exercised.  With the exception of the Monitor's involvement in mediating the critical disagreements over the prescribing of psychotropic drugs at Shiloh, the Monitor has not yet met with the Parties and their counsel to receive and/or hear evidence and legal arguments on issues pertaining to compliance with the Court's orders.

It is the Monitor's hope that as the Monitor develops sufficient data and other firsthand accounts from detainees and others related to compliance, the Parties will be able to effectively utilize the Dispute Resolution process contemplated by the Order Appointing the Monitor.

## 5. DISCUSSION OF CLAIMS OF BREACHES

### A. CBP Facilities

#### i.   Issues

Relying on the Court's June 27, 2017 Order Re Plaintiffs' Motion to Enforce and Appoint a Special Monitor [Doc. # 363], the Monitor focused first on four categories of allegations with respect to CBP: access to food, safe and sanitary conditions, ambient temperature (cold temperatures), and sleeping conditions. The Monitor did not focus, for this Report, on advisal of rights when minor was in CBP custody.

#### ii.   Monitor's Investigation

##### (1) First Site Visit to McAllen Border Patrol Station

On October 31, 2018, the Monitor, accompanied by counsel for Plaintiffs and Defendants, and the CBP Juvenile Monitor, toured both the McAllen Border Patrol Station ("MCS") and CPC Ursula during the morning.  The MCS was observed to be severely overcrowded.

The RGV Sector Detention Dashboard is an internal report created for leadership, which documents the numbers of adult and juvenile detainees in each of the facilities on a daily basis.

### *Census for MCS*

The Monitor reviewed the Dashboard for October 31, 2018, the day of the tour. The Dashboard reflects that there were ███ juveniles in custody yet to be processed in cells and ███ adults in custody, for a total of ███ juveniles and adults in MCS.  The design capacity for the total cells in MCS is ███, and the largest individual cell capacity is ███. One of the cells was observed to have approximately 60 mothers and children.

The Dashboard documents an average time in custody for that day as 16 hours, but does not differentiate between adult and juvenile detention times in the facility.   The Dashboard does report how many detainees (again without differentiation of juveniles) were kept at the facility more than 72 hours.   None were reported.

The Monitor also reviewed the Dashboard for MCS for October 30, 2018, which documented a total of ███ detainees, including ███ juveniles, and the Dashboard for November 1, 2018, which documented ███ detainees, including ███ juveniles.  The average reported time in custody for October 30, 2018 was 13 hours and the average reported time in custody for November 1,

2018 was 20 hours. The Dashboard reports that one detainee was in custody

for more than 20 hours on October 30, 2018, and none on November 1, 2018.[4]

### *Safe, Sanitary Conditions, Access to Food*

The cells, each bounded by concrete walls, were originally constructed for

adult male detainees and contain no furnishings except for benches to sit on.

Each cell has one or more toilets, at least one sink, and access to water. The

Monitor did not walk into the cells, but observed that due to the crowded

conditions, the cells did not provide adequate privacy for personal hygiene or

use of toilets.

The Monitor observed the distribution of snacks and provision of water. At

this initial tour, no measurement was made of ambient temperature in the

cells, but the Monitor did observe that the common areas were cold and that

the minors in detention cells appeared to be uncomfortably cold and wrapped

themselves in single mylar blankets while sitting, standing, or lying on the

concrete floor. During this limited tour, floors and walls appeared to be clean

and swept. The Monitor observed that many minors were lying on the floor

---

[4] The Monitor has noted that the e3DM Dashboard printouts that have thus
far been provided (and other reports provided by ORR and ICE) usually show
means (average days), occasionally medians (50th percentile), and
occasionally a report of more extreme values. The data provided are useful
but not fully sufficient for the present purposes, and the Monitor will be
addressing additional data requirements for future reports.

wrapped in the mylar blankets and appeared to be sleeping at mid-day. There
are no floor mats provided for sleeping at this facility.

>    (2) *First site visit to Rio Grande Valley Centralized Processing
>    Center*

The CPC Ursula is designed to accommodate large numbers of adults and
minors, both accompanied and unaccompanied. The design capacity for CPC
Ursula, built in 2014, is ███ individuals. The large open space is divided into
pods surrounded by chain link fences on all four sides.

The Monitor observed CPC Ursula in the morning and returned in the evening
of October 31, 2018. In the morning, CPC Ursula appeared overcrowded, but
returning in the evening, the Monitor observed that the numbers of juveniles
had decreased dramatically. The Dashboard for October 31 documents a total
of ███ detainees, including ███ juveniles. The average time in custody (not
differentiated between adults and juveniles) was 71 hours, and 544 detainees
were in custody for more than 72 hours, 767 were in custody for less than 72
hours.

The CPC Ursula felt warmer than MCS in the morning but appeared still to be
uncomfortable for the detainees. In the evening, the Monitor interviewed a
group of juvenile girls who were awaiting transfer to ORR. Some of the girls

said that they were cold, but one girl said she was less uncomfortable than she had been at MCS.

The Monitor observed that evening approximately 50 minors standing in line for crackers and an apple after the evening meal. The Monitor spoke to a group of juvenile boys, who were also awaiting transfer to ORR. When asked about their previous meal, two expressed appreciation and three others responded that they were still hungry. They were reminded by one of the touring officials that they could have snacks, and one of the boys said he was aware of that. Each boy was asked how long he had been in CPC Ursula. Most said one to two days, but one boy said he had been there for at least a week.

(3)Second Site Visit to McAllen Border Patrol Station and CPC Ursula[5]

On January 21, 2019, the Monitor, accompanied by the CBP Juvenile Coordinator, made an unannounced evening visit to MCS. Juvenile Coordinator Moak was accompanied by a team of three contractors who assisted him with inspecting the amenities and compliance. Arriving at the facility at approximately 8:30 P.M., the group was left standing outside for

---

[5] The Monitor notes that this visit took place during the December 22, 2018-January 25, 2019 government shutdown. We were told that supervising personnel had been required to purchase food and other necessities for the detainees in the absence of personnel and contractors who had been furloughed.

more than 15 minutes while the personnel inside verified the group's identity. Listed below are some of the impressions and data collected by both the Monitor and the Juvenile Coordinator's team on both the evening of January 21, 2019, at MCS and mid-morning and afternoon of January 22, 2019, at CBP Ursula.

### *Temperatures of a reasonably comfortable range*

The low temperature was still the most consistent complaint at MCS. CBP policy specifies an acceptable temperature range of 66 to 80 degrees Fahrenheit. The Juvenile Coordinator used on-site measuring equipment and got readings in the six cells containing juveniles of 64.7 to 69.8 degrees; the room with the 64.7 reading was the only one below the 66-degree minimum of the CBP standards. To the Monitor, wearing a turtle neck top, jacket, and slacks, the temperature was below a comfortable level, although within the 66-80 minimum and maximum of CBP standards.

### *Safe and Sanitary Conditions*

All cells at McAllen Border Station had functioning toilets. Five of the six sinks were functioning well, and one was functioning poorly. All sinks were without soap. All cells were observed to be clean and pest-free. Cups were available for drinking.

### *Access to food*

On January 22, 2019, the Monitor and the Juvenile Coordinator arrived at CPC
Ursula and observed delivery and distribution of food, which is prepared off-
site by contractors. A meal is typically a burrito with a fruit or a bologna
sandwich with juice.  The minors are asked to exit cells, and line up outside
the cell to receive food and to be counted for attendance. The food appeared
to be the same amount and variety for adults and boys and girls. For the next
Report, the Monitor will report more fully on the adequacy and access to food.

The Monitor also examined the food in the refrigerator at CPC Ursula, which
appeared to be fully stocked and organized by date to facilitate distribution
before expiration.

Also on January 22, 2019, the Monitor observed the Juvenile Coordinator and
his team conducting interviews with two mothers with their minor children
at CPC Ursula and a group of unaccompanied juvenile males.  The interviews
covered the *Flores* standards in detail, and detailed notes of the team will be
included in full in the Juvenile Coordinator's report.  The ICE Transport
Program manager was on site and assisted with translation of the interviews.
The Monitor elicited comments on various issues. One mother stated that her
children had been offered three meals a day and snacks, but one of her
children will not eat the food and spits up the milk. Two unaccompanied male

juveniles who were interviewed complained about the burritos for breakfast
and said that they were still hungry. The Monitor explained that snacks were
available, which they acknowledged.

### *Hygiene*

In summary, except for one adult, the interviewees at CPC Ursula all related
that they had showered and were wearing either their own clean clothes or
clean clothes they had been given.

### *Sleeping Conditions*

All interviewees had received a mat and mylar blanket upon arrival at CPC
Ursula. The lights are on at CPC Ursula all 24 hours, but the mothers
interviewed said their children were able to sleep during the night hours at
CPC Ursula. In a separate interview, an older unaccompanied juvenile male
said he had not slept much since his arrival. When asked about the officers
checking on their well-being, one of the juvenile males said that he was kicked
in the leg by someone he called "an officer" to wake him up. The Juvenile
Coordinator reported the allegation to a supervising Border Patrol officer.

### *Access to Medical Treatment*

The Monitor met on January 21, 2019, with medical personnel who were on
duty at MCS and reviewed the current policy for medical assessment and

treatment of the minors. The medical personnel included an EMT and a nursing staff member. Such personnel are on duty 24 hours, seven days a week. All minors have an initial screening when they first arrive at the station. The nurse practitioner explained the new policy, issued by Commissioner Kevin McAleenan in December 2018, which requires a second medical assessment when the minors arrive at CPC Ursula. The nurse practitioner also explained the use and availability of nearby hospitals and urgent care clinics. The Monitor also reviewed with the staff the prescription policy. On January 22, 2019, the Juvenile Coordinator and the Monitor observed the office of the CPC Ursula medical personnel who were seeing detainees, but did not then conduct interviews.

### *Census for MCS*

The Dashboard for MCS indicates 294 detainees in custody, including 74 juveniles, on January 21, 2019. On January 22, the Dashboard indicates 225 detainees in custody, including 32 juveniles. The average time in custody was 24 hours on January 21 and 32 hours on January 22.

### *Census for CPC Ursula*

The Dashboard for CPC Ursula for January 22, 2019, indicates a total of 1,569 detainees, including 655 juveniles. The average time in custody for all detainees was 65 hours. The Dashboard also indicates that 847 detainees

were in custody less than 72 hours, and 722 detainees were in custody more than 72 hours.

### iii.    Deaths of two minors in December 2018

Upon receipt of the press reports of the December 2018 deaths of two minors in CBP custody, the Monitor collected the publicly available information from CBP, which is related below. The Monitor is advised that the Department of Homeland Security, Office of the Inspector General ("DHS 016") opened an investigation on December 24, 2018. As noted on page 22, the Monitor is also advised that the Commissioner of CBP has revised medical screening procedures in order to add a second medical assessment of each arriving minor.

The Monitor will await further instructions from the Court, if any, before any additional inquiries are made.

### (1) Jakelin Caal Maquin

Information made available by CBP:

- On December 6, 2018 at 9:15 P.M., a seven-year-old female child from Guatemala was apprehended with her father approximately a half mile west of the Antelope Wells Port of Entry at the Bounds Forward

Operating Base ("Bounds FOB"). There were four Border Patrol Agents on scene at the time.

- Upon apprehension, the Border Patrol Agent conducted an initial screening, which consists of an interview and observation of the detainee to identify any health or safety problems to ensure that they receive necessary medical care. The initial screening revealed no evidence of health issues.

- She and her father were held inside the Sally Port of the Antelope Wells Port of Entry and had access to food, water and restrooms, while waiting for transport.

- At 10:00 P.M., an MCI Transport Bus left the Lordsburg Border Patrol Station route to the Bounds FOB. Lordsburg Border Patrol Station is approximately 94 miles away from the FOB Bounds, and the trip takes between two to three hours.

- Around 12:20 AM on December 7, the MCI Transport Bus transported the first group of UAC to the Lordsburg Border Patrol Station.

- The MCI Transport Bus returned at 4:00 AM to the Bounds FOB. At 4:30 AM, the second group, including the child and her father was loaded onto the MCI Transport Bus. Just prior to departure, at 5:00 AM, the father advised the agent that the child was sick and vomiting while on the bus.

- At this time, the Agents notified the Lordsburg Border Patrol Station to prepare to receive the child and provide emergency medical care.

- Shortly before 6:30 AM, the bus arrived at the Sally Port of the Lordsburg Border Patrol Station and the father advised that the child was not breathing. A Border Patrol Emergency Medical Technician began to provide medical care and revived the child twice. It was determined at this time that she had a temperature of 105.7 degrees.

- Hidalgo County EMS arrived and began providing care at 6:40 AM. A decision was made to transport to the nearest trauma center, Providence Children's Hospital in El Paso, Texas.

- Air Ambulance departed LOB with the child at 7:45 AM, she arrived at
  the Providence Children's Hospital in El Paso at 8:50 AM and received
  additional emergency medical care.

- Her father was transported by CBP via a government vehicle to the
  hospital.

- At 11:00 AM on December 7, LOB was notified the juvenile went into
  cardiac arrest again and was subsequently revived. She was breathing
  by machine and diagnosed with liver failure.

- She died at 12:35 AM on December 8.

### (2) Felipe Alonzo-Gomez

Information made available by CBP (times indicated to be local, Mountain
Standard Time):

- On December 18, at approximately 1300 hours, eight year-old Felipe
  Alonzo-Gomez was apprehended with his father at 3.29 miles west of
  the Paso Del Norte Port of Entry in El Paso, Texas.

- On December 18, at approximately 1639 hours, the father and child were transferred to the PDT processing center.

- While detained at PDT, the child and his father were provided hot food, snacks, juice, and water, and the agents logged six welfare checks.

- On December 20, at 1200 hours, the child and his father were transferred to El Paso Border Patrol Station ("EPS").

- From December 20 to December 22, the child and his father were provided with showers, food, juice, and water, and the agents logged 17 welfare checks.

- On December 22, at approximately 2317 hours, U.S. Border Patrol transferred the child and father to the Alamogordo Border Patrol Station ("ALA") to finalize processing. The child and his father were transferred because of capacity levels at the El Paso Station.

- On December 23, at approximately 0108 hours, the child and his father arrived at the Alamogordo Station.

- o Upon arrival, the child and his father were provided with personal hygiene products and meals, and they received several welfare checks.

- On December 24, at about 0539 hours, a placement request for the child and his father was e-mailed to ICE's Enforcement and Removal Operations's family placement inbox.

- On December 24, at approximately 0900 hours, a processing agent noticed that the child was coughing and appeared to have glossy eyes.

- On December 24, at approximately 0930 hours, based on the agents' observations, the child and his father were transferred to GCRMC with possible influenza symptoms.

- On December 24, at about 1130 hours, hospital staff conducted several tests on the child for strep throat.

- On December 24, at about 1320 hours, the child was evaluated for release and found to have a 103 degree fever and was held for continued observation.

- On December 24, at about 1450 hours, the child was released from the ER with a prescription for amoxicillin and ibuprofen.

- The child and his father were transported to temporary holding at the Highway 70 checkpoint. While at the checkpoint, the child and his father were offered and accepted a hot meal.

- At about 1700, agents provided the child with a dose of the prescribed medication as ordered by the medical staff and agents conducted several welfare checks that evening.

- On December 24 at 1900 hours, the child appeared to be nauseous and vomited. Agents were aware of this and helped clean up the vomit.

  - His father declined further medical assistance as the child had been feeling better.

- On December 24, at about 2200 hours, the child appeared lethargic and nauseous again.

- o   As no EMT was on-duty, agents made the decision to return the
      child and his father to the hospital. During transportation to the
      hospital the boy began to vomit and he lost consciousness.

- At 2307 hours, radio traffic indicated that the agent had arrived at the
  hospital where he was met by hospital staff.

  - o   The staff were unable to revive the child and pronounced him
        deceased at 2348 hours on December 24, 2018.

- The Guatemala Consulate was contacted at 0740 hours on December
  25, 2018. The father is currently detained at the Alamogordo Station
  pending transfer to ICE Enforcement and Removal Operations ("ERO").
  He has spoken to his spouse in Guatemala and the Guatemala
  Consulate.

## B.  ICE Facilities

### i.   Issues

Pursuant to the Court's June 27, 2017 Order Re Plaintiffs' Motion to Enforce
and Appoint a Special Monitor [Doc. # 363], the Monitor is focusing on two

categories of allegations with respect to ICE: secure, unlicensed facilities and releasing minors without unnecessary delay or within 20 days of detention.

With respect to unnecessary delay/20-days requirement, the ICE Juvenile Coordinator has provided the Monitor with helpful material from the ERO Custody Management Division Enforcement Integrated Database ("EID"). Although the Monitor has not yet personally reviewed the files of minors who have experienced delay in excess of 20 days, the Coordinator advises that common reasons that unaccompanied children remain in custody over 20 days are the following:

- Parents not claiming fear of return to their country of citizenship when apprehended but subsequently asserting the claim;
- Sponsor delay in providing a transportation plan to transfer the minor to the sponsor; or
- Delays in ICE receiving from the U.S. Citizenship and Immigration Services ("CIS") the determination on the claimed fear of return.

ii.   **Monitor's Investigation**

*(1) South Texas Family Residential Center (Dilley)*

The large Dilley facility was constructed in 2015 for families detained by ICE and is maintained by CoreCivic by contract. It consists of almost 55 acres of

Page 31

grounds and was designed to accommodate up to 2,400 people. The facility is still not officially licensed by the State of Texas, but it is still subject to unannounced inspections and standards of licensed facilities. The Monitor is told that State inspections of Dilley occurred 3 times in 2016, 3 times in 2017, and 2 times in 2018. The Monitor will be examining copies of those inspections later in March. The case cited by the Court in the 2017 order [Doc. # 363], *Grassroots Leadership, Inc. v. Texas Department of Family and Protective Services*, No. D-1-GN-15-004336, slip op., Travis Cty. Dist. Court (Dec. 16, 2016), has been reversed. *See Texas Department of Family and Protective Services v. Grassroots Leadership, Inc.*, (Tex. App., Nov. 28, 2018, No. 03-18-00261-CV) 2018 WL 6187433. The Texas Court of Appeals set aside on standing grounds the order prohibiting Texas from issuing childcare licenses to the Dilley and Karnes residential centers.

The Monitor toured the Dilley facility with the ICE Juvenile Coordinator, staff, and lawyers for Plaintiffs and Defendants on November 26, 2018.

The Monitor observed that since the families are not free to leave the facility without staff accompaniment, it is defined as a secure facility. Individual family members can move freely throughout the large, open facility to playrooms, snack areas, libraries, exercise rooms, and outdoor athletic fields. Residents in each of the six- to eight-person bedrooms have access to cable television.

Dilley was constructed specifically within the framework of ICE's detention standards, focused on the needs of family groups. There is a school on-site, operated by a contractor with 18 years of experience nationwide, staffed by bilingual, state-certified teachers. Parents have access to English as a Second Language and other adult education programs. Volunteers for the Dilley Pro Bono Initiative have designated offices to consult with clients seven days a week. Dilley has medical facilities, including a dental office, on premises. A subcontractor, ICE Health Service Corp., provides 24-hour medical services.

Residents can receive visitors seven days a week, from 8 A.M. to 8 P.M. Recreation resources include a soccer field, volleyball and basketball courts, board games, and toys. There is a large library, a small computer lab with internet access and email services, and residents have access to a beauty shop. Residents may keep and wear their own clothes, and non-institutional, brightly-colored clothing is available. The facility's cafeteria serves three meals a day, seven days a week.

The average length of stay for Dilley during January 2018 was 19.8 days. As of December 18, 2018, the average length of stay was 11.6 days. The 2018 average was 14.6 days.[6]

---

[6] The ICE Juvenile Coordinator has provided the Monitor information regarding ICE's computation of these averages. She advises that minors who

Page 33

(2)   *Karnes County Residential Center*

The Karnes County Residential Center, located in Karnes City, Texas, has a

capacity of 830 residents, including 580 children younger than 18. Karnes

originally housed female head-of-household family units since the beginning

of August 2014, but since July of 2018 Karnes has transitioned to male-head-

of-household units with male children only.

As noted above, the recent appellate decision in the *Grassroots Leadership*

case (see p. 32) has removed the bar to state licensure for Karnes, but the

facility does not presently hold a state license. As with Dilley, it is subject to

unannounced inspection and standards of licensed facilities. The Monitor is

told inspections of Karnes occurred once in 2015, 2 times in 2016, 2 times in

2017, 2 times in 2018, and once in 2019. The Monitor will receive copies of

those inspections.

The Monitor toured the Karnes facility with the ICE Juvenile Coordinator, her

staff, and lawyers for Plaintiffs and Defendants on November 27, 2018.

Again, as with Dilley, since the families are not free to leave the facility

without staff accompaniment, it is defined as a secure facility. The families

---

have not yet been reunited with their parents in accordance with the *Ms. L v.
ICE* order have been excluded from the *Flores* timeframe. The Monitor expects
to obtain additional information regarding these averages and numbers for
minors whose stays have exceeded certain thresholds.

have free movement within the facility and grounds. The Karnes Pro Bono Project ("RAICES") is provided a designated area to consult with clients, and visitations are permitted seven days a week.

According to the Resident's Handbook provided to the Monitor, the personal areas are searched once a day to detect contraband, maintain sanitary standards, and eliminate fire and safety hazards. Rules of Behavior and Discipline are given to all adults. Staff conducts an adult and child census three times a day.

Non-institutional clothing is provided. There is a law library and a leisure library. Recreation facilities include an outdoor basketball court, an indoor gymnasium, and a playscape for children. The Monitor toured the medical and dental facilities and cafeteria, and observed an interactive religious service with approximately 40-50 male adults in attendance. Residents may maintain personal attire for daily wear. Individual washing machines are available throughout the living areas. The eight person bedrooms are fitted with cable television.

The average length of stay for minors at Karnes during January 2018 was 15.4 days. During December 2018, the average length of stay was 10.1 days. The 2018 average was 11.8 days. Length of stay was determined by ERO Custody Management by calculating the time between Apprehension Date and either

Book-out date or the end of month for those who remained in custody.[7] On occasion, where there are data quality issues on the apprehension date, the initial Book-in date was substituted.

## C.  ORR Facilities

### i.    Issues

Pursuant to the Court's Order Re Plaintiffs' Motion To Enforce Class Action Settlement [Doc. # 470], the focus of the Monitor's investigation concerns three categories of issues.  The first category is the assignment of UACs to ORR staff-secure facilities or secure facilities, with particular attention to whether the UAC is given timely written notice of the reasons for placing a UAC in a secure facility, staff-secure facility, or RTC. The second category concerns the administration of psychotropic medication to class members without the informed written consent by a person authorized by state law or a court order. This latter issue is particularly pressing in the context of the Shiloh Residential Treatment Center, also described by Shiloh personnel as a subacute hospital with a residential program[8].  The Monitor will address the

---

[7] The Monitor has questions about the aggregation of booked-out minors and those still in custody and expects to receive additional information about this and other data.

[8] The Order specifically applies to Shiloh, but the issue is so entwined with the delivery of psychotropic drugs in all shelters, that the Monitor will address the medical delivery of drugs in ORR shelters in a future report.

issues particular to Shiloh below (see p. 40 et seq.). The third category

concerns the time UACs are in the custody of ORR and whether all expeditious

steps have been taken to place the UACs in a non-institutional setting.

### ii.    Monitor's Investigation

On December 3, 2018, the Monitor toured two of the more than 100 shelter

facilities for which ORR contracts, the Catholic Charities Houston Shelter and

the Southwest Key Casa Montezuma Shelter.

The Monitor does not yet have the data necessary to determine the duration

of minors' stays at these two facilities, but the ORR data for fiscal year 2018

reflects that of the 55,136 total placements nationally, 35,249 (86%) were

released, 896 (2%) were removed, and the overall length of care averaged 60

days. Nationally, the data for the first three months of the 2019 fiscal year

(the U.S. federal government's fiscal year begins October 1) reflect total

placements of 18,137, of which 12,953 were released (90%), 256 (2%)

removals, and a significant increase in overall average length of care, to 89

days. The RGV-specific numbers will be included when they are received.

### (1) Catholic Charities Houston

The Monitor visited the Catholic Charities Houston Shelter on December 4, 2018, with the staff of ORR and counsel for Defendants.[9] The shelter is in an attractive home in a residential neighborhood, designed to care for young women and their infants. At the time of the visit, there was one infant in the childcare room being cared for by a staff member. All of the women were at school during the visit except one who was in the hospital about to deliver.

It appeared that the young women were free to come and go unimpeded. We could not interview any of the young women who were in class to determine whether they were having any difficulty coming and going as they wished. The facility holds a license from the state.

### (2) Southwest Key Casa Montezuma

The Monitor visited Southwest Key Casa Montezuma on the same day, December 4, 2018, accompanied by staff of ORR and counsel for Defendants.

Southwest Key Casa Montezuma is a modified hospital in a residential area and operates as a General Residence Operation. It is a large facility with a capacity for 800 unaccompanied children. The Monitor observed bedrooms,

---

[9] Plaintiffs' counsel were given the opportunity to participate in the visits to the Catholic Charities and Southwest Key Casa Montezuma facilities but declined. They did join the visit to Shiloh, as noted below.

bunk beds, dresser drawers, and often an attached bathroom. The male UACs are on a separate floor from the females. No personal items were observed in the bedrooms, either on the beds or on the dresser. The facility is surrounded by security for persons coming and going. The facility is locked and secure, with personnel regulating entry and exit of visitors and staff and minors accompanied by staff. The outdoor area for exercise is small and surrounded by a chain-link fence. The Monitor observed school classes, which appeared to be of reasonable size and engaged in appropriate teaching activities. The monitor examined the cafeteria at mealtime, seeing male and female minors eating at the same time, with talk and laughter among the minors. The food looked appetizing. The walls of the cafeteria and general halls were decorated with bright colors, signs announcing events and reporting inappropriate conduct, and student artwork.

The Monitor observed the medical facilities and met with administrative personnel. In walking through the facility, the Monitor observed mental health professionals in their offices and teachers conducting classes. The Monitor was told that all of the relevant staff held state licenses and that the facility itself was licensed.

Family members are able to visit the minors, and the Monitor observed a bank of telephones available for private conversations with family, friends, and potential sponsors.

In response to questions, administrative staff recognized that there had been increased delay in obtaining sponsors, which the Monitor understands to be attributable, at least in part, to the current government policy regarding the need for fingerprints. But staff said that, in addition, they were sometimes being told that the fingerprints for household members of a prospective sponsor had expired, delaying placement until fingerprinting could be repeated. There also appeared to be increased investigation of sponsors and of the extended family of the potential sponsor.

In January of 2019, subsequent to the December 4th tour, the Monitor was informed that on December 18, 2018, ORR policy had been changed by an Operational Directive in an attempt to increase the speed of investigation of sponsors and extended families, and decrease the length of care described during our tour. Among other things, ORR revised ORR fingerprint policy to extend the time period in which fingerprints remain valid. The Monitor will be reviewing the impact of this change in policy and provide results in the next Report.

### (3) Shiloh Residential Treatment Center

The Monitor attended the first tour and interviews at Shiloh with counsel for the Parties and ORR personnel. The Unaccompanied Minor's Program at Shiloh Treatment Center is a residential treatment program in a rural and

Page 40

isolated environment that serves children and adolescents ages 3 – 18 years old with behavioral and emotional problems resulting from a mental health diagnosis. Shiloh operates 24 hours a day, 7 days a week. Shiloh is currently licensed for 44 beds by the Texas Department of Family and Protective Services, accredited by the Joint Commission, and approved as a non-public school by the Texas Education Agency.

The Court specifically directed that Shiloh provide facilities where minors may have private telephone conversations. The Monitor and attendees examined the office with the cubicle equipped with seating and the telephone used by the minors. Since the Court's Order, the formerly solid door to the telephone cubicle has been altered to include a window, so that minors can now close the door and speak without being overheard by a staff member in the office.

The Monitor observed the residences of the minors. The interiors contain bedrooms with bunk beds, bedroom furniture, private bathrooms, and a common living room, dining room and kitchen. The exteriors of the residences are equipped with visible security on doors and windows. The Monitor also observed a class in session and staff and boys in the athletic yard.

At the conclusion of the tour, the Monitor met in a conference room with ORR personnel, counsel, management of Shiloh, and the expert psychiatrist for Plaintiffs to discuss in general the role of ORR and its contractors caring for UACs, and specifically the current compliance by Shiloh with the Court's Order after July 30, 2018. The conversation focused primarily on informed consent for administration of psychotropic medications, ensuring that minors were held in the least restrictive environment, and that minors should be expeditiously released or "stepped down" to a less restrictive environment. The lawyers and Shiloh staff concluded the meeting with a brief question and answer session.

Days later, at a subsequent meet and confer with counsel, at the suggestion of the Monitor, it was agreed that the Program Administrator, Shiloh Psychiatrist, and Plaintiffs' expert witness should meet in person or through Skype to further discuss disputed issues, without their lawyers present, with the hope that the medical professionals could develop a medical protocol consistent with best practices and the Order. It was decided that the Monitor would attend as moderator.

The Monitor attended the meeting of the doctors at Shiloh on January 14, and observed their thoughtful and far-ranging attempt to develop a common protocol.

At the conclusion of the meeting, the doctors agreed to share their impressions with the lawyers for ORR and the Plaintiffs.  The Monitor has been informed that after hearing from the doctors, the lawyers for ORR and the Plaintiffs have met and conferred in January and February. Each side has proposed language to settle the dispute.  The Monitor will report on the results in the next Report.

## 6. DISCUSSION OF WHETHER DEFENDANTS' RESPONSES TO PLAINTIFFS' DECLARATIONS HAVE REBUTTED PLAINTIFFS' EVIDENCE

Paragraph D(1)(a) of the Order Appointing the Monitor requires her to include in the First Report and Recommendation a discussion of "Defendants' responses to the declarations Plaintiffs filed on July 19, 2018 [Doc. ## 475 to 475-7] and Plaintiffs' reply hereto [Doc. ## 481 and 481-1], and opine on the extent (if any) to which Defendants have rebutted Plaintiffs' evidence."[10]

---

[10] Defendants' filing contains separate replies from ICE Juvenile Coordinator Deane Dougherty [Doc. # 475-1] and USBP Juvenile Coordinator Henry A. Moak, Jr. [Doc. # 475-2 to 475-7]. The ICE reply addresses Plaintiffs' Memorandum Re Status Conference and Response to Third Government Monitors' Reports [Doc. ## 457 to 457-1], dated July 13, 2018, and does not purport to address Plaintiffs' July 19, 2018 declarations, to which this paragraph of the Order refers. Therefore, the Monitor focuses here on Mr. Moak's response to the allegations against CBP in Plaintiffs' July 19, 2018 filing.

In his response (Letter from Henry A. Moak, Jr. to Hon. Dolly M. Gee, Aug. 6, 2018) [Doc. #475-1] ("Moak Ltr."), Mr. Moak describes how he had CBP activity logs and amenity reports retrieved for all of the declarations pertaining to the RGV Sector, of which he was able to obtain documentation regarding 18 of the declarants; he attaches those documents to his response. Mr. Moak then presents his conclusions from this review. The Monitor has reviewed his response and compared the 18 declarations to the records proffered by Mr. Moak. Obviously this is a limited subset from which to draw any broad conclusions about rebuttal of Plaintiffs' evidentiary showings, but that is of lesser concern than the limited evidentiary support CBP can draw from the 18 files that were examined.

Mr. Moak's file review demonstrates that the full breadth of the allegations in Plaintiffs' declarations are not fully addressed in the file. Overall, "the custodial records indicate many of the minors were provided some or all of these amenities." (Moak Ltr., at 2.) The review is restricted to "allegations related to personal hygiene products, access to showers, food availability, or other amenities offered" (*id.*), and acknowledges that some of the declarants' allegations "cannot be resolved based solely on the attached RGV records," in part because some of the issues (e.g., ambient temperatures) pertain to declarants' subjective experiences (*id.* at 3). And Mr. Moak acknowledges

"particularly concerning" allegations of agent or officer misconduct, which
have been referred to CBP's Office of Professional Responsibility. (*Id.*)

Mr. Moak compares the allegations of two declarations with the records
proffered with his response, which "illustrate how many of the 18
declarations I reviewed contain allegations that are inconsistent with the
actual data collected by CBP during the minors' time in custody." (*Id.* at 2.)
The Monitor has compared the declarations with the CBP data provided. The
comparison reveals that the limited scope of the data maintained, the
inherently subjective nature of some of the complaints, and the limited
conclusions Mr. Moak was able to reach cannot provide sufficient evidentiary
refutation of the declarations.

To illustrate, Mr. Moak's first example regards Keylin M, whose declaration is
Plaintiffs' Exhibit 6. The following table itemizes the allegations, shows
Mr. Moak's responses, and describes how the Monitor finds that the two
relate.

| Allegation (Plaintiffs' Exhibit 6) | CBP Response (Moak Ltr., p. 2) | Monitor's Observations |
|---|---|---|
| Room cold, shivering, miserable cold. (¶¶ 4, 10) | No response with respect to Keylin in particular, but CBP maintains that, except as noted, temperature was maintained between 60 and 80 degrees F. | Numerous declarations allege (and Monitor observed) that rooms felt cold, minors were unaccustomed to air conditioning, many were lightly dressed. |
| Given food frozen (¶¶ 5, 13, 20) Food smelled bad (¶¶ 13, 20) | "[C]ustodial records show 22 meals were accepted, one meal was rejected, and seven snacks were offered during the minor's time in custody." | Monitor confirms that e3DM records show minor "accepted" 22 meals (plus snacks) and refused 1. Whether minor found them edible (i.e., actually ate) is not clear. Several of Plaintiffs' declarants made the same allegation regarding undefrosted food. |
| Separated from Mother, limited opportunity to talk (¶¶ 6-7, 19) | No response | |
| Female guards abusive (¶¶ 8-9) | Allegations are particularly concerning. Referred to OPR. | |
| Guards did not allow them to keep blankets when leaving facility. (¶¶ 11, 12) | No response | Allegation appears to regard being permitted to keep blankets when transferred between facilities, rather than being denied blankets. |

| Allegation<br>(Plaintiffs' Exhibit 6) | CBP Response<br>(Moak Ltr., p. 2) | Monitor's Observations |
|---|---|---|
| Had no toothpaste, toothbrush at "Dog House" (¶ 14) | "KM received . . . a dental hygiene product, . . ." | Records show she received these items at "RGV", the first facility to which she was taken. Declaration says she did not have toothpaste, toothbrush "the entire time I was at the Dog House," which appears to refer to the second facility ("BRP" in the records), where she was taken on her fifth day in custody. So it appears she did not take what she was given at "RGV" with her to "BRP", where she was not given new dental hygiene items. |
| Bathrooms "dirty and disgusting, toilets overflowing" (¶ 15) | No response. | |
| Was not allowed to shower or change for 5 days (¶ 16) | "Custodial records indicate that KM received … two showers during her time in custody." | Minor was in custody for 8 days at time of declaration. |
| Not given any food, water when moved after 4 days (¶ 18) | "[C]ustodial records show 22 meals were accepted, one meal was rejected, and seven snacks were offered during the minor's time in custody." | This allegation appears to refer to 5th day in custody, when she was transferred from "RGV" to "BRP". E3DM records indicate meals were received. No records regarding water. |

The material Mr. Moak has provided is by no means irrelevant to the issues before the Court. In the Monitor's view, this exercise has shown that while the e3DM data definitely has a significant role to play in examining some of the allegations that have been made, rebuttal of the full range of issues requires evidence outside the e3DM materials, at least as it is presently designed, and may require, for example, reconsideration of the standards and criteria CBP has adopted.

At this point the Parties have moved beyond the allegations of the 2018 filings. The Monitor has seen some progress on a number of the issues that have thus far eluded resolution. If, after the current efforts run their course, some issues remain unresolved, the Parties can address them with new evidence from both sides.