CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | | |
|---|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) | Case CV 85-4544 DMG-AGRx |
| | ) | |
| Plaintiffs, | ) | EXHIBITS IN SUPPORT OF |
| | ) | PLAINTIFFS' MOTION TO |
| - vs - | ) | ENFORCE THE SETTLEMENT |
| | ) | AGREEMENT**[REDACTED** |
| WILLIAM BARR, ATTORNEY | ) | **VERSION OF DOCUMENT** |
| GENERAL | ) | **PROPOSED TO BE FILED** |
| OF THE UNITED STATES, *et al.*, | ) | **UNDER SEAL]** VOL. 1 OF 5 |
| | ) | |
| Defendants. | ) | [HON. DOLLY M. GEE] |

///

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone:  (408) 280-2437
Facsimile:   (408) 288-8850
Email: jenniferk@lawfoundation.org
          kate.manning@lawfoundation.org
          annettek@lawfoundation.org

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (Cal. Bar No. 208741)
Neha Desai (Cal. RLSA Bar No. 803161)
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
          ndesai@youthlaw.org

U.C. DAVIS SCHOOL OF LAW
Holly S. Cooper (Cal. Bar No. 197626)
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

PLAINTIFFS' MOTION TO ENFORCE CV 85-4544-DMG(AGRX)

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Of counsel:*

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)
832 Folsom Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 543-3379

1

# **INDEX OF EXHIBITS**

2    VOL. 1

3    1.  Declaration of Peter Schey                                          1

4    2.  Declaration of Hope Frye                                            8

5    3.  Excerpts of Flores Class Member Declarations                       15

6    4.  Office of Refugee Resettlement Unaccompanied Minors Policies       43

7    5.  N.E. Wang, Emergency Medicine and Pediatrics at Stanford,

8        Stanford Human Rights in Trauma Mental Health Program,

9        *2018 Individual Program Report: Homestead* (April 11, 2019)      52

10   6.  Declaration of Dr. Marsha Griffin                                  67

11   7.  Declaration of Dr. Ryan Matlow                                     84

12   8.  The New England Journal of Medicine, Reducing

13       Protections for Noncitizen Children — Exacerbating

14       Harm and Trauma (November 21, 2018)                              104

     9.  Omitted

16   VOL. 2

17   10. Deposition of K██████████, ORR Federal

18       Field Specialist, *Lucas R v. Azar*                              108

19   VOL. 3

20   11. Declaration of E████L██████████                                  337

21   12. Declaration of J████Q██████                                      341

22   13. Declaration of M████D████████████████                            346

23   14. Declaration of Y████M████████                                    351

24   15. Declaration of C████M██████████                                  355

25   16. Declaration of C████████A████████████                            359

26   17. Declaration of D████O██████████                                  363

27   18. Declaration of E████G████████████                                366

28   <small>Plaintiffs' Motion to Enforce Cv 85-4544-DMG(AGRX)</small>

19. Declaration of H███████Z███████████████ 369

20. Declaration of J███████M█████████████ 373

21. Declaration of J███████A███████████████ 377

22. Declaration of K███████M█████████████ 380

23. Declaration of K████████D█████████ 384

24. Declaration of M███████G█████████ 388

25. Declaration of M███████Y███████████████ 392

26. Declaration of M███████A██████████████ 395

27. Declaration of M████████G██████████ 398

28. Declaration of N███████G████████████████ 401

29. Declaration of N███████J█████████████ 404

30. Declaration of D███████A██████████ 408

31. Declaration of O████████D█████████ 412

32. Declaration of S███████D████████ 415

33. Declaration of S████████G█████████ 418

34. Declaration of C████████A█████████████████ 422

<u>VOL. 4</u>

35. Declaration of D██████L█████████ 426

36. Declaration of E███████A██████ 430

37. Declaration of E███Y██████████████ 433

38. Declaration of Y███████M████████████████ 437

39. Declaration of G███████M█████████ 440

40. Declaration of M███J██████ 444

41. Declaration of N██████R█████████████████████ 448

42. Declaration of M███████Y████████████████ 453

43. Declaration of N███████C██████ 457

44. Declaration of O████████D█████████ 461

45. Declaration of Y███████A███████████████ 465

46. Declaration of M███████A██████                                      469

47. Declaration of A███████H█████                                      473

48. Declaration of J██████N██████████                                  476

49. Declaration of H██████S█████████                                   479

50. Declaration of E██████I███████████                                 485

51. Declaration of G██████N█████████████████                           489

52. Declaration of D██████A█████████                                   492

53. Declaration of S███████N█████                                      496

54. Declaration of D███████J███████████                                500

55. Declaration of H██████M██████████████                             505

56. Declaration of B███████M███████████                                509

57. Declaration of C██████G████████████                                513

58. Declaration of N███████P████████████                               517

59. Declaration of D██████H███████████                                 521

VOL. 5

60. Declaration of E██████G██████                                      525

61. Declaration of A███████A████████████████                          529

62. Declaration of A███████B██████                                     532

63. Declaration of L██████M███████████████                             536

64. Declaration of N██████E█████████████                               539

65. Declaration of J███████A█████████████                              543

66. Declaration of J█████████D██████████████                           547

67. Declaration of J███████P████                                       550

68. Declaration of I███████P██████████                                 553

69. Declaration of J██████J████████████                                557

70. Declaration of E██████J███████                                     560

71. Declaration of K██████D████████                                    564

72. Declaration of J█████████N███████████                              567

73. Declaration of R█████A██████████     571

74. Declaration of E██████E█████████     575

75. Declaration of R██F████████████     578

76. Declaration of M█████N█████████     581

77. Declaration of M█████U████     585

78. Declaration of A██████E████████████     589

79. Declaration of D█████N█████████     593

80. Declaration of Z████P████████████     598

81. Declaration of C███████A██████████     602

82. Declaration of M███████I█████     606

83. Declaration of H████P████     609

84. Declaration of A███S██████████     612

85. Declaration of A████████Q██████     616

86. Declaration of K████M█████████     620

/ / /

Exhibit 1

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544 DMG (AGRx) |
| | ) |
| Plaintiffs, | ) DECLARATION OF PETER SCHEY IN |
| | ) SUPPORT OF PLAINTIFFS' MOTION TO |
| - vs - | ) ENFORCE SETTLEMENT AGREEMENT RE |
| | ) RELEASE FROM UNLICENSED AND |
| JEFFERSON B. SESSIONS, ATTORNEY | ) SECURE "EMERGENCY INFLUX |
| GENERAL OF THE UNITED STATES, *et al.*, | ) FACILITIES" |
| | ) |
| Defendants. | ) [HON. DOLLY M. GEE] |
| | ) |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone:   (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        annettek@lawfoundation.org

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (Cal. Bar No. 208741)
Neha Desai (Cal. RLSA Bar No. 803161)
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
        ndesai@youthlaw.org

U.C. DAVIS SCHOOL OF LAW
Holly S. Cooper (Cal. Bar No. 197626)
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

*Of counsel:*

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)

832 Folsom Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 543-3379

I, Peter Schey, do hereby declare that the following is true and correct.

1.  I am a class counsel in *Flores v. Sessions*. My responsibilities as class counsel include ongoing monitoring of Defendants' compliance with the terms of the Settlement Agreement reached in this matter.

2.  In furtherance of this responsibility, I coordinate site visits by volunteer attorneys to ORR facilities throughout the nation, including visits to Homestead Emergency Influx Facility in November 2018 and March 2019. Each attorney volunteer is vetted to ascertain they are a member in good standing of their respective state bars.

3.  The site visits were led by attorney Hope Frye, whose declaration is concurrently filed in support of this Motion to Enforce the Settlement. Ms. Frye has led numerous visits to ORR facilities under the auspices of the *Flores* Settlement Agreement. I provided materials and training for Plaintiffs' monitors on interviewing class members, recording class members' statements, drafting class member declarations, and reviewing with and interpreting declarations for class members.

4.  Attorneys conducting the site visits were able to briefly interview staff at Homestead and make personal observations of the circumstances at Homestead.

5.  In November 2018, class counsel Carlos Holguin, deposed Homestead Influx Facility Program Coordinator, Bernadine Leslie Wood, and ORR Federal Field Specialist Karen Husted. True and correct copies of Ms. Wood's and Ms. Husted's deposition transcripts are beingfiled herewith as Exhibits 9 and 10.

6.  Defendants provide data to class counsel on a monthly basis, as required by the Settlement Agreement. In order to meaningfully analyze this data, pursuant to a confidentiality agreement, I have provided this data to Stanford University

researchers led by Dr. Nancy Ewen Wang. A copy of their analysis as to length of

detention is filed herewith as Exhibit 5.

7. Plaintiffs have met and conferred with Defendants regarding this motion. Plaintiffs

believe the issues raised are not within the current jurisdiction of the Special

Master, but nevertheless (i) provided her with a copy of Plaintiffs' meet and confer

correspondence provided the Defendants on December 31, 2018

I declare under penalty of perjury that the foregoing facts are true and

correct. Executed this 30th day of May, 2019, in Los Angeles, CA.

_____

*Attorneys for Plaintiffs*

CV 85-4544-DMG (AGRX)

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On May 31, 2019, I electronically filed the following document(s):

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/Peter Schey
*Attorney for Plaintiffs*

1

Exhibit 2

## Declaration of Hope M. Frye

I, Hope M. Frye, declare that the following is true and complete to the best of my knowledge:

l. My name is Hope Frye. I am an immigration attorney licensed to practice law by the Supreme Court of Ohio, registration number 0025018. I am past president of the American Immigration Lawyers Association, former chair of the board for the Center for Human Rights and Constitutional Law, and currently serve as executive director of Project Lifeline.

2. I regularly lead teams of attorneys and doctors to monitor compliance by Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and the Office of Refugee Resettlement ("ORR") with the settlement in *Flores v. Barr*. We visit facilities where these agencies hold unaccompanied children and families with children.

3. Between March 25-28, I led a *Flores* visit to an ORR facility for unaccompanied children located on the Homestead Job Corps facility site, adjacent to the Homestead Air Base in Homestead, Florida ("Homestead"). This shelter is operated by Comprehensive Health Services (a Caliburn Company).

4. This *Flores* team was comprised of highly skilled lawyers and doctors who regularly interact with traumatized immigrant children in the course of their work. The majority have been on more than one *Flores* monitoring visit, including to ORR's Tornillo and Casa Padre facilities The team included Michael Bochenek and Clara Long (Human Rights Watch); Kennji Kizuka (Human Rights First); Theresa Lee (KIND); Elora Mukherjee (Columbia Law School); Beth Lyon (Cornell Law School); Inez Fraenkel; Natasha Quiroga (Lawyers Committee for Civil Rights); Dr. Ewen Wang (Professor of Emergency Medicine – Pediatrics, Stanford University Medical School), and Dr. Ryan Matlow (Director of Community Research Programs for Stanford's Early Life Stress and Pediatric Anxiety Program, Stanford University Medical School).

5. L███, W███ Health and Human Services (HHS) Lead Program Coordinator and manager of Homestead, greeted us, led the facility tour, and answered questions during a meeting following the tour.  Her senior management team is J███ M███Program Coordinator, who also accompanied us on the tour, and V███, B███, Director of Quality Control. According to Ms. W███, Homestead has 3,321 employees covering three shifts.

6. Ms. W███ stated that HHS contracts separately for all services necessary to run Homestead, including security, commissary, and maintenance, that training for staff is provided by General Dynamics Information Technology and that some transportation is provided by GEO Group. W███ stated that she does not supervise any of these contractors.

7. According to Ms. W███ there were 2,026 children ages 13-17 held at Homestead, including 480 children who arrived during our visit. Forty percent of the children are 17. W███ advised that Homestead's capacity was then 2,142 but is being increased to accommodate 2,350 children. She stated that the staff-to-child ratio is 1:12. Of the 8,000 or so children held at Homestead over

the past year, W███ advised that only 55 had been sent there after being placed at other ORR facilities, the rest having come directly from the border.

8. In all but name, Homestead is a secure facility. The perimeter is surrounded by an 8' chain link fence with a privacy covering. Entrance and exits are blocked by fences and gates staffed by security personnel. The gates are closed, opened only upon producing proper credentials. Children understand that they are not free to leave and have been told that they will be arrested by local police and ICE and deported, if they do. Even talking about leaving is thought to be a violation of the rules for which children believe they will be stepped-up to a more restrictive facility.

9. According to W███, Homestead does not hold a license to care for dependent children, or indeed, any other state license. She stated that licensure is unnecessary because Homestead is on federal property. However, she reported that local police have been called and responded to incidents at the shelter. She also said she would expect city of Homestead firefighters to provide services should there be a fire at the ORR facility.

10. I observed Homestead to be markedly stark, almost entirely devoid of foliage, and memorable for a drab, institutional quality. The noise level inside every building we entered (education, cafeteria, multi-purpose area and so forth) was disturbingly high. The buildings, including the cafeteria, medical unit and dormitories were unclean, and many areas smelled strongly of mildew.

11. The facility is divided into "campuses" – the South Side (holding 13-16-year-olds) and the North Side (holding 17-year-olds).  On the South Side, four large dilapidated concrete buildings are used as dormitories. On the exterior of one of these buildings is a sign that says: "Column contains lead paint. Contact Safety Officer before working on the column."  Among an auditorium, cafeteria, and administrative building, are three large tents. One tent houses the education area; another is for orientation and large gatherings, and a third has showers and toilets.

12. The dormitories on the South side each sleep 434 children, 12 to a room, in bunk beds. The rooms are small and have few windows. Each room has a shared toilet and shower. Children keep their few belongings in a plastic box under each bed. The rooms are barren with doors removed. A staff member sits in the entryway to monitor the children at night.

13. On the North Side, 144 seventeen-year-old boys sleep in bunk beds in a cavernous room that appears to have been an airplane hangar. The beds are close together and the blankets worn. The far interior wall has an enormous and very loud built-in fan that runs constantly. The children who sleep closest to the fan (a distance of maybe 12-15 feet) are given an extra blanket to pull over their heads in order to contend with the noise and the constant draft the fan creates. W███ claims that ear plugs are available upon request but that no child has ever asked for them. She also claims that the boys enjoy this sleeping arrangement, because it "feels like a slumber party." Children we interviewed universally disagreed with Wood and denied being offered ear plugs.

14. The communal bathroom for this enormous sleeping area is accessed through a single door located in the back of the room and down a hallway. It's a large room with showers, three to a stall, a number of portable toilets, and a deep smell of mildew from the carpet. According to the medical experts on our monitoring team, the unsanitary condition of the bathroom area and the incessant and deafening noise of the fan are clear health hazards.

15. The layout of this immense communal sleeping area and the secluded location of the bathroom make it difficult, if not impossible, for Homestead staff to ensure children's safety. While we were told that there are 30 security cameras at Homestead, there are none in the sleeping areas. Moreover, during our tour of the operations center, we observed no one watching or even facing the security camera monitors.

16. Children at Homestead have access to two dirt fields used for soccer and a small basketball area. We were told the fields are being re-sodded. The recreation areas appeared wholly insufficient to accommodate the exercise needs of the hundreds of children being held at Homestead.

17. I asked to see where children were kept in solitary confinement. We were taken to a small windowless room tucked in the corner of the medical building. The room had four beds and nothing more. W█████ said that children were put there when they turned 18 to await transfer to an ICE facility by Geo (contracted transportation). She claimed that because of her "good relationship with ICE" most youth are picked up the same day and that, in any event, none remain in solitary confinement for more than two days. Although there is no bathroom, █████, said the children are not allowed outside the room. She claimed to have no choice but to segregate the 18-years-olds from the other children in this way. She also claimed that no minors are ever held in this room or in any other solitary condition.

18. W████ told us that the facility's rules are clearly explained to detained children, and that positive reinforcement is used to manage behavior that violates these rules. She stated that children who violate the rules are sent to a "better choices" group that helps them identify behavioral triggers and "redirect" behavior. She stated that children are issued reports only to encourage them to redirect impermissible behavior.

19. Every child interviewed expressed fear and anxiety around the enforcement of shelter rules. They had been told during orientation that any violation of the rules would result in a 10-30-day extension of detention. Some children believed that if they violated a rule their social worker would stop work on reuniting them with parents and other family members for an extended period of time. They all believed that rule violations would affect their immigration cases, potentially resulting in deportation. Although children expressed concern that they did not know all the rules, those they uniformly reported knowing included 1. no touching (even of a sibling or when saying goodbye to a friend who is leaving the shelter); 2. failing to finish showering within 5 minutes; 3. no looking at or talking to a member of the opposite sex; and 4. not finishing their food.  Children uniformly reported that enforcement of Homestead's rules was severe, and that they feared the repercussions of any infraction.

20. Upon admission to Homestead, children have a medical screening and are given vaccinations at the on-site medical clinic. The clinic operates 24/7 and has rooms for overnight stays for children with diseases such as the flu, conjunctivitis and upper respiratory problems. Children are supposed to report illness to a Youth Counselor, who is supposed to take them to the clinic within one hour. However, several children reported extensive delays, up to several days,  in being taken to the clinic, despite repeated requests for medical attention.

21. We met briefly with K███████ O████ a licensed clinician whose title is "Parental Sex Abuse Compliance Manager," and A█████ G████████, also a licensed clinician, who manages the other clinicians who are not licensed. Lead clinicians must be licensed while others with related degrees can practice under a licensed clinician's supervision.

22. O█████ told us that within 72 hours of arriving at Homestead, children have a bio/psych/social risk assessment to determine placement. Before being cleared for stay at Homestead, clinicians tell children about the "zero tolerance policy" for touching and/or verbal disrespect and the grievance procedure.

23. O█████ further advised that children determined to have psychiatric needs are taken to Larkin Community Hospital in South Florida for evaluation. Children may be treated as outpatients or admitted to the hospital, and some children have been send to Larkin multiple times and stayed there for lengthy periods. Larkin staff may prescribe Homestead detainees medications, which are administered at Homestead's medical unit. O█████ claimed that written parental consent is obtained for the administration of psychotropic medications on a Homestead-specific form. She reported that the signed form is uploaded onto the ORR portal and the original destroyed. On the day we met with the clinicians, two children were being discharged from Larkin and nine children were being given psychotropic drugs.

24. Among the children we interviewed at Homestead was D██████████████████ (A number ████████), who reported having attempted suicide, hearing the voice of her grandfather, and other signs of psychiatric illness. She had been hospitalized three times for a total of three months. She was taking three psychotropic drugs and required her own 1:1 monitor.

25. Employees told us that Homestead has an "eyes on at all times" policy which requires them to have the children they are responsible for always in the line of sight. As a result, children never have any privacy.

26. W███ told us that children are transferred to licensed shelters only if they have special needs. She did not elaborate on what constitutes a special need. During our visit, we encountered children who are required to be placed in a licensed ORR facility under  ORR rules including those who spoke indigenous languages and were not fluent in Spanish and M█████ who is blind.(See ¶ 32)

27. Children had not been given a list of lawyers nor advise of their *Flores*. Although children expressed a desire for legal representation, none had a lawyer nor did they know how to contact one.

28. Although W█████ said that visitors are allowed, children did not know this. Additionally, Homestead has extensive rules governing outside visits the import of which discourages visitation.The only actual outside contact are phone calls.

29. After interviewing class members it was clear without a doubt that the staff at Homestead do not provide class members with adequate time to speak with their families or provide adequate privacy when on the telephone. L█████ W█████Homestead program director, and all class members, stated telephone time was limited to two ten minute phone calls per week. Class members must request, and have been denied, additional telephone time even if they have an unusual circumstance such as death of an immediate family member.

30. We observed Homestead's school to be rather makeshift: a tent divided into mostly small rooms. The interior walls do not reach the ceiling, and the noise generated by some 2,000 children who fill in 52 classrooms in the tent creates a din. Teachers use headsets with microphones so that students may hear instruction over the constant noise. We observed approximately 36-48 children per class with one teacher. We were told that teachers work every day. We observed an unstructured and disorganized environment not suitable for nor conducive to learning.

31. According to Ms. W████, Homestead organizes it staff into 25-30 teams made up of case workers, clinicians and case aids. She stated that caseworkers for approximately 17% of the children detained at Homestead operate remotely, communicating with children by Skype. For their part, numerous children we interviewed reported that their caseworkers changed so often they never knew who is in charge of reuniting them with the families or other proposed custodians, and that recommendations for their release had been delayed because replacement case workers had to learn about their cases. During our visit, there were eight vacancies for case worker positions. One case worker was non-Spanish speaking. W████ said the average length of time a child stays at Homestead is 62 days, down from an average of 89 days during the period ORR demanded fingerprints from all adults living in a proposed sponsor's household.

32.  We interviewed M█████ A█████ [█████████████] an indigenous 14-year-old Guatemalan boy who has been detained since December 6, 2018.  Miguel is  4'9', 66 pound, legally blind and whose first language is Acateco. The paternity of M█████s father was confirmed on December 12, 2018, and he was being processed as a sponsor.

33. We had serious concerns about the length of M████s detention, placement at Homestead, lack of suitable education, medical and psychological care and other issues including safety. During the March 28 site inspection, I asked W████ why M████ had not been released. Twice she stated that they were waiting for a $5,000 pair of glasses and that M████ would be released once the glasses were received. She admitted she had no idea when that might happen.

34. On April 3 I received a copy of M████s ORR file. The file contained an Abuse/Neglect in ORR Care Event Report ID █████ of physical abuse by another child. According to the report, on March 27, █████, was hit in the stomach by another child. He had been the victim of repeated assaults by children, including being hit in the groin. █████, knew or should have known about

this assault when I asked about M████'s release. I intervened on April 4. Within hours, plans were made to release M████ to his father the following day.

35. In a subsequent conversation with Sarah Fabian and A████ M██████████, ORR Juvenile Coordinator, I was told that M████s release was delayed waiting for his father to complete modifications required following a home study. The glasses that had been ordered were being mailed.

36. M████s was not the only inappropriate placement we encountered. Of the 13 indigenous children we saw, five were not fluent enough in Spanish to be interviewed. They spoke Mam, Q'eqchi, and K'iche. According to Wood, no one working at Homestead speaks any indigenous language.

I, Hope M. Frye, declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 25 day of May 2019, at Tiburon, California.

Hope M. Frye

Exhibit 3

# Excerpts of Declarations from Minors at Homestead Influx Facility

## Table of Contents

1. Delays in Release ....................................................................... 1

2. Facility is Secure ....................................................................... 13

3. Limited Telephone Access to Parents and Relatives ...................................... 16

4. Not Being Advised of *Flores* Rights .................................................. 20

5. Harsh Conditions/Harm ................................................................. 21

   Prison-like Rules .................................................................. 21

   No Contact/Touching Allowed ........................................................ 23

   Exposure to Traumatic Behaviors .................................................... 24

   Separated from Family/Siblings ..................................................... 24

   Inability to communicate in native language......................................... 25

# 1. Delays in Release

M██ D██████████ ██████████████ is a 14-year-old national of Honduras. M███ was apprehended in Texas in May 2018, was taken to an unknown detention center for three to five days, and was eventually transferred to Homestead in Miami, Florida. Maria had been detained at Homestead for 58 days when her declaration was taken. "My counselor told me that I had a few options for my current situation-that I could be returned to Honduras to rejoin my father, or that I could be sent to the home of family members. I told her that I wanted to go to my cousin M████ home in New Jersey. Since then, my cousin M████ has been trying to get the government to release me to him. I was told by my case worker that the delay in my release has been due to the fact that my cousin M████ lives by himself and they can't release me to him alone so M████ needs my Aunt G████ D████ to move in with him so they can release me to both of them. My understanding is that they are preparing all of the documentation so I could be released to them….To this day, I have no idea when I will be released to the care of my cousin Marcos and my aunt G████ in New Jersey." Declaration of M███ D██████ ███████████████, Ex. 13 ¶¶ 13-14, 19.

K██████ D██████████ is a 17-year-old national of Guatemala. He came with his father and was immediately apprehended upon crossing the border at Mexicali, CA on May 24, 2018. He was then transported overnight to another facility. From there, he was taken to another house where he remained overnight. The next morning, the official put him an airplane to the Homestead facility at which he currently resides in Miami.  He had been at the Homestead facility for 67 days when his declaration was taken. "[I]t has been over three weeks since my case manager told me I was going to be released to my uncle and it has not happened yet. Last week, my case manager said that while my uncle had already been approved to be my sponsor, they did not know what was going to happen to me right now because my case is stopped right now." Declaration of K██████ D██████, Ex. 23 ¶¶ 7, 9-11.

O██████ D████████████ ██ is a 16-year-old Guatemalan national. He came to the U.S. border with his father, and arrived at the El Paso, Texas port of entry. He and his father were taken to a detention facility. He was then transported via airplane to the Homestead facility in Miami. "To this day, I still don't know what is going to happen to me as I have not spoken to my case manager for over two weeks. I don't understand why I am not given any information as to what is going to happen to me." Declaration of O██████ D████████████████ dated 8/1/18, Ex. 31 ¶ 10-11.

Over two months later, O████'s release had still not been processed when he declared, "My case was not started until 90 days after I arrived here in Homestead. The reason for this was that it was believed that I would be reunited with my father, and as such it was not necessary to start working on my case. Once my father had been deported back to Guatemala, the immigration officials realized that I would not be reunited with him....It is my understanding that my cousin, J███ █████████ is willing to care for me and I might be released to his care. It is my understanding that my cousin sent in his fingerprints to the government in August 2018, which is a requirement for me to be released to him. I do not understand what the delay is, why I have not been released to my cousin or if I will be released to him in the future. No one at Homestead has explained this process to me." Declaration of O████ D█████████ dated 10/24/18, Ex. 44 ¶ 9,10.

D████ A██████ is a 17-year-old national of Guatemala. D███ and his father were apprehended in Texas on May 22, 2018. D████ was separated from his father and detained for one day in West Texas Detention Facility in Sierra Blanca, Texas. He was subsequently transferred to Homestead in Miami, Florida. He had been detained for 70 days when his declaration was taken. "Twenty days ago, I informed my case manager that I was willing to leave the U.S. voluntarily. But I was told, you have to speak with the legal department. They are the ones who told me the process for me to return home will not be quick and I may be in Homestead, Florida for an undisclosed amount time. It's hard for me to understand what is preventing me from joining my family. Declaration of D███ A█████████, Ex. 30 ¶ 10.

D███ L████████ is a 17-year-old national of Guatemala. As soon as he arrived, he was taken to a facility with large tents, where he was separated from his father. Diego had been at the Homestead facility for 151 days, as of the date of his declaration. "I have an uncle M████ M██████████ in Miami who is able to take me in. They have the paperwork but I don't know exactly when or what the next steps are. [E]ighty-five days after I arrived here they completed the finger printing part of the background check. They have been telling me for over a month that they need to wait for other people to leave first before it will be my turn." Declaration of D███ L█████████, Ex. 35 ¶¶ 8-9.

J███ Q█████ is an 18-year-old national of Guatemala. J███ was apprehended with her father by CBP immediately after crossing the border and was subsequently held in a tent for five days before being transferred to Homestead in Miami, Florida, on May 30, 2018. She had been detained for approximately 68 days when her declaration was taken. "I have an uncle who lives in New Jersey. His name is C████ Q█████████ and he is my father's oldest brother. My uncle has also said he would like me to come live with him. I would like to go and live with him....I have told my social worker that I want to live with my uncle C████, and my social worker told

2

me to be patient....No one has explained other options for leaving this facility. They just tell me to be patient. I don't know anyone here who has gotten to leave and be with their family." Declaration of J███ Q███████, Ex. 12 ¶ 6.

██████ G████████████████ is a 16-year-old national of El Salvador. For his safety, he and his father came to the U.S. and surrendered at the border near San Diego, California. E███ was removed to the facility in Homestead, Florida, and had been there for 140 days at the time of the declaration. "I have been here at Homestead since June 3, 2018, and...a social worker told me that I would soon be able to leave Homestead. When time passed and I was not allowed to leave. I was told by someone who works at Homestead that I would be reunited with my father on June 25 or 26. Since then, I have not been told when I would be able to leave Homestead. And I have not been provided with an update on the status of any efforts to reunite me with my father, or to allow me to live with my uncle in California in more than three weeks." Declaration of E████ G████████████ dated 8/1/18, Ex. 18 ¶ 6.

When E███ was interviewed again, over two months later, he declared, "I have been here for 140 days. I have a caseworker, and she told me that she is working on getting paperwork in order so that I can be released to my uncle. I do not understand exactly why I am still at the Homestead facility. My case worker then told me that she is going to try to release me to my uncle. My uncle's fingerprints came in over a week ago. I was told that I would be released after the fingerprints were received, but I am still waiting." Declaration of E████ G████████████ █████ dated 10/23/18, Ex. 36 ¶¶ 3, 4.

██████ L████████████████ is a 16-year-old national of Guatemala. E███ was apprehended by immigration services on or about April 24, 2018 and separated from her father. On April 27, 2018, she was flown to Homestead, Florida. She had been detained approximately 180 days when her declaration was taken. "At the interview with my social worker and counselor, I was asked if I had any family members in the United States and I told them that I had an aunt - D███ G███ - in Florida. A whole month went by and I was finally able to speak to my aunt D███ who said she would help me and that she would take care of me. When my aunt D████ spoke to my social worker, she was told by the social worker that since I did not know my aunt in person, they couldn't release me to her because she was not blood-related. I was then asked by my social worker if I had any other family members in the United States and I told them about my aunt A████ D█████, also married to another of my mother's brothers who is now deceased....[She] was also told she could not care for me because we are not blood-related." Declaration of E████ L████████████ dated 7/31/18, Ex. 11 ¶¶ 7-8.

██████ L████████████ was interviewed again in October, and declared, "I have my cousin A████ (S█████....They told me that I cannot be and stay with him because he is a minor and single. I told the social worker to help me return to Guatemala because I do not have anybody

3

here. The social worker sent some papers to my dad a month ago to sign so they can return me to Guatemala. I want to go back to Guatemala, I have been here six months already. They did not tell me when they are going to deport me." ████████ ███ L████████████ ████████ ¶ 16.

████ G██████████████ is a 13-year-old national of Honduras. He left Honduras with his father on May 15, 2018 and crossed the border at McAllen, Texas, before being immediately apprehended by U.S. Border Patrol. He was separated from his father and then they were both taken to a facility referred to as "La Perrera." He was then flown to the Homestead Facility on June 20, 2018, and had been there for 50 days when his declaration was taken. "I was told by my case manager that they first need to make sure that my aunt is really my family member before they can send me to her. I was told that my aunt must get her fingerprints done and then the government will decide if I could go with her. To this day, I still don't know when will I be sent to my aunt's home. I am desperate right now and really want to leave this place and be home with my loved ones." Declaration of N███ G████████████, Ex. 28 ¶ 8, 9.

████ M████████████████ is a 13-year-old national of Guatemala. He entered the U.S. in Texas and was caught by border patrol. Y████ was put onto an airplane full of kids and taken to the CBP facility in Homestead, Florida. He had been detained for 140 days at the time of his declaration. "All I was told in the two months I've been here is that the government is waiting for my fingerprints....I'd like to be released to my aunt because I could study and work." Declaration of Y███ M████████████ dated 7/31/18, Ex. 14 ¶ 6.

Three months later, he was again interviewed at Homestead, and declared, "It is my understanding that my uncle, S████ Ca███, is willing to take care of me if I am released to his care. It is my understanding that not only my uncle, but also his wife, must submit their fingerprints before I can be released to my uncle. I am told that my uncle and his wife submitted their fingerprints at the same time. For reasons that I do not understand, my uncle's fingerprints have been received and processed by the government, but my aunt's fingerprints have not." Declaration of Y███ M████████████ dated 10/24/18, Ex. 38 ¶ 7.

C████ M██████████ is a sixteen-year-old national of Guatemala. He and his father were apprehended after crossing the border in Texas on June 10, 2018. He was taken to a detention center for three days, then to a cage inside a tent for two days, then to Homestead on June 16, 2018. He had been at Homestead for 46 days when his declaration was taken. "I would like to leave here to be with my uncle, J██ A████████████████, who lives in Atlanta. My social worker told me that they are waiting to receive digital fingerprints. However, I spoke to my uncle and he said he sent in his fingerprints 30 days ago. I haven't been able to get information from my social worker for 20 days, because my old social worker left and when I called the new social worker, she didn't answer. My parents gave permission, and my social



worker spoke with my mother and she gave permission to the social worker to release me to my uncle." Declaration of C███ M███████████, Ex. 15 ¶ 6.

C███ A████████████████ is a 17-year-old national of Guatemala. C███ was detained at the Homestead Facility in Homestead, Florida. After 40 days at the Homestead Facility, he was transported to Texas supposedly to reunify with his father, but his father was not there. After five days, he was sent back to Homestead. where he had been for approximately 132 days total at the time of his declaration. "On July 22, 2018, after 40 days of being in Homestead, they told me to pack my things because I was being transferred to see my sponsor....Instead they took me on a plane to BCFS Texas Harlingen, a detention for children in Texas....I have told the counselor and social worker at the center that I want to be released to A███ G█████. No one has confirmed to me that this will happen or when. My mom sent a power of attorney and my sponsor gave her fingerprints." Declaration of C███ A██████████████ dated 8/1/18, Ex. 16 ¶¶ 4, 6.

Cr███ was still in Homestead when he was interviewed again in October. He declared, "After 40 days at the Homestead Facility, I was told I would be transported to Texas because my father was there. I have been at the Homestead Facility for approximately 132 days in total." Declaration of C█████ A██████████████ dated 10/24/18, Ex. 34 ¶ 6.

M███ Y████████████ is a 17-year-old national of Honduras. She was apprehended after crossing the border near El Paso, Texas on or about May 23, 2018. She was held at a facility near El Paso for a day and a half, then taken by bus to another facility for two days, after which she was transferred to Homestead on May 27, 2018. She had been detained 65 days when her declaration was taken. "I have an adult cousin who lives in Michigan legally, O██ B████, to whom I would like to be released. He has applied for permission for me to live with him. According to the first case worker assigned to me, O██'s paperwork was all in order. But my current case worker (my third since coming to Homestead) recently told me that the fingerprints were not in the system." Declaration of M████ Y██████████████, Ex. 25 ¶ 4.

█████ J███ is a 16-year-old Guatemalan national. He came to the U.S. with his father and he presented himself at the border and was detained. After four days he was flown to Florida. He had been at Homestead for approximately 138 days when his declaration was taken. "Nobody here has explained to me why I have not been released …" Declaration of M████ J███, Ex. 40 ¶¶ 5, 6, 11.

G███████ M████ is a 16-year-old national from El Salvador. After crossing a river, G████ and her family were apprehended. After being held at both the "ice box" and "la perrera," she

was transported to Homestead, Florida. "It is my understanding that my grandmother submitted her fingerprints back in July, but I am not allowed to be placed with her yet. These issues have not been explained to me by anyone at the Homestead facility." Declaration of G████ M████, Ex. 39 ¶ 13.

E██ Y████████████ is a 16-year-old Honduran national. He was apprehended after walking across the border. E██ was taken to a facility for seven days before being transferred to Homestead. "[My case manager] explained to me a little about the process for me to live with my uncle but I don't know how long it will take. My uncles have all completed all the paperwork and submitted their fingerprints. My uncles have both submitted their fingerprints but only one has come back so far. I feel I cannot get enough information about my situation, my status and how I can leave here." Declaration of E██ Y████████████, Ex. 37 ¶ 7-8.

N██████ R████████████ Velasquez is a 15-year-old national of Guatemala. was apprehended immediately after he crossed the border with his father into Arizona. N███ had been detained at the Homestead facility for about 70 days when his declaration was taken. "I have several family members here in the U.S. to whom I could be released. I am not sure why I haven't been released to N████. I've been told that it's because the government is waiting for my birth certificate, but I have been told that my certificate has arrived. Now, my social worker has told me that we are waiting for my aunt's fingerprints to arrive but I don't know why it's taking so long. I have had four different social workers since I've been here, and they all tell me different things about what's happening with my release, which is confusing." Declaration of N██████ R████████████, Ex. 41 ¶ 7.

N████ J████████████████████████ presented herself at a border checkpoint in Texas on or about June 5, 2018, along with her father, step-mother, and three-month-old sister. N████ was separated from her family and was sent from border patrol custody in Texas to Homestead in Miami, Florida. She was sent back once to Texas and then returned to Homestead without explanation. She had been detained for approximately 140 days when her declaration was taken. "I arrived in Homestead on June 13, 2018…. I am told that I may be released to my aunt. It is my understanding that my aunt must submit her fingerprints for analysis before I can be released to her care. My aunt submitted her fingerprints at least three months ago, but I have not yet been released to her. I have been told that my father will need to provide a letter allowing me to be released to my aunt." Declaration of N████ J████████████████████████ ¶ 6, 9.



Z████ P███████████████z is a 15-year-old native of El Salvador. She crossed the border
near McAllen, Texas, and was detained and transferred to "the dog kennel." She was
subsequently taken to Homestead, where she declared, "I haven't met with my social worker, but
I really want to in order to start the process of being released to be with my grandfather in
Maryland who is a legal resident of the U.S." Declaration of Z███ P█████████████z, Ex.
80 ██ ¶ 1,5.

R██ F████████████████ is a 15-year-old native of El Salvador. He arrived in the United
States and was apprehended 45 minutes later. He was separated from his family and spent three
days in la hielera before being transferred to Homestead. "My mom lives in San Francisco and
will be my sponsor.  I talk to her twice a week for five minutes because that's all they permit us.
She has already submitted all of the paperwork to be my sponsor, including her fingerprints.
Nobody here talked to me to explain this process…." Declaration of R██ F████████████
██████ Ex. 75 ¶ 1,2,5.

B████ M████████████ is a 16-year-old native of Guatemala. She crossed the border,
turned herself into border patrol, and was taken to the "dog kennel" for five days. In early
November she was flown to Homestead and has been detained there ever since. "I'm still here
because they won't approve a sponsor for me. First, we tried to get my uncle approved as a
sponsor. He is the only family I have in the U.S. He's only 25 but very responsible. He lives in
Tennessee. I had to wait two months to get his fingerprints approved. Finally, they said I
couldn't go live with him because he lives with friends and because I didn't have any photos of
me and him together. When they denied my uncle's sponsorship, an older neighbor, a friend of
the family who now also lives in Tennessee also said she would sponsor me. But they said
because she's not family I can't go live with her." Declaration of B████ M████████████
Ex. 56 ██ ¶ 1,3,4,5.

M████ A█████ is a 13-year-old national of Guatemala. After crossing the border, M████
spent the night in immigration custody before being transferred to Homestead where he had been
for about three months at the time this declaration was taken. "I am hoping to be released to my
father, who lives in Alabama. I am not sure exactly what else needs to happen before I can live
with my father, but a social worker said that I might be transferred in 20 days or less."
Declaration of M████ A████████ Ex. 46  ¶¶ 1, 2.

E██████ E███████████████████ is a 17-year-old national of El Salvador. He entered the
United States near McAllen, Texas and was taken into CBP custody for two days before being
transferred to Homestead, where he declared: "My case is getting delayed because I had some

trouble with the sponsorship process. The person who was initially going to be my sponsor was the former wife of one of my uncles. However, my former social worker said that since my uncle is no longer with that wife, that woman is no longer considered to be my family and so cannot be my sponsor….My mom's cousin, who lives in Delaware, offered to be my new sponsor and so she is going through the paperwork and is now waiting to submit her fingerprints. I really hope it is soon because I want to leave here." Declaration of E███ E██████████ ██████, Ex. 74 ¶¶ 1,2, 4.

J██████A██████████████ is an 18-year-old national from Guatemala. After crossing the border she spent six days in immigration detention. The first two days she was detained in the hielera and was transferred to another place with cages before being transferred to Homestead. "I have a brother in California who is willing to care for me. I'm not sure when I will be sent to live with him. I haven't heard anything about what the steps are in the process to allow me to live with him. I hear that because I am about to turn 18, they have to work more quickly to get me out soon. I don't know what will happen with my case if I turn 18 before I am able to leave here and join my brother." Declaration of J███████A██████████████, Ex. 65 ¶¶1, 3, 4, 5, 8.

H████P██ is a 15-year-old national of Guatemala. After crossing the border he turned himself into border patrol and was detained in a warehouse for three days. He had been in Homestead for nine days at the time this declaration was taken. "I haven't had a meeting with my social worker yet. I think he was going to talk to my mother and then call me for a meeting but he hasn't done that yet. I am anxious to see him so that I can start the process to be released to my mother who lives in California." Declaration of H████P███Ex. 83 ¶¶ 1, 2, 3, 4.

H████M██████████████ is a 17-year-old national of Guatemala. He was apprehended by immigration agents and taken to a cell for one day, transferred to another cell, and finally transferred to Homestead where he had been detained for three months at the time of his declaration. "I have a cousin who lives here in Florida who can take care of me. I know he has done his fingerprints, so we are just waiting to hear whether the government agrees to let me stay with him. I have not heard anything about my case or whether there is anything else I can do to make sure I can go stay with my cousin." Declaration of H████M██████████████, Ex. 55 ¶¶ 1, 5, 10.

H████S██████████ is a 16-year-old national of Guatemala. After crossing the border immigration agents took him into custody and placed them in a cell for two days. He was taken to San Diego, California where he was placed on a plane and transferred to Homestead. "My mother lives in Tennessee and is willing to care for me. I understand that she has an appointment

8

for her fingerprints next week, on Monday. Then she will sign something, and that's when I will be able to live with her—unless I have a report, which means I would spend more time here. Luckily I don't have a report. I'm not sure how long the process will take, but I hear that it might be another two weeks or maybe a month before I can live with her." Declaration of H███ S███████, Ex. 49 ¶¶ 1,3,7,12.

C███ G████████ is a 16-year-old national of El Salvador. C███ was taken into custody and placed in a cell for four days. After that he was taken to Homestead where he had been for about a month at the time this declaration was taken. "I want to be released to M███ Y██████. Even though my family is close with M███ and his wife, the detention center will not let me go to them. I want to be released to M███, and I gave all his information to my case worker, but she told me he can't be my sponsor. She gave me three reasons why they won't release me. She said I can't go to the family my mother wants me to live with because M███ and I don't have the same last name, M███ doesn't send me money, and M███ and his wife are not family because my sister and her boyfriend are not married." Declaration of C█ G████████ Ex. 57 ¶¶ 1, 6, 9, 11.

A█████B██ is a 13-year-old national of El Salvador. She crossed the border and was taken to a facility in Texas for two days, after which she was transferred to Homestead. "The hardest part about being here is waiting and having to be patient. I know it's a process, but I want to go live with my mom in Atlanta. My social worker and my counselor say my mom already sent her fingerprints and that they did a home study." Declaration of A███B████, Ex. 62 ¶¶ 1, 3, 6.

N██E███████████ is a 15-year-old national of Colombia. After crossing the border she was immediately apprehended and taken into custody. She was first taken to la hielera for three days, transferred to la perrera for one day, and last taken to Homestead where she has been for eleven days at the time her declaration was taken. "I do not know when I will be permitted to leave. My mother has sent in all the paperwork necessary for my release, but no one has given me any information on when I can leave. Not even my social worker has given me this information. My mother has not received a fingerprinting appointment yet. My mother and I do not know when she will be scheduled to give her fingerprints." Declaration of N██E███ █████████, Ex. 64 ¶¶ 1, 2, 3, 4, 6.

A██████Q█████ is a 15-year-old national of Guatemala. She traveled to the United States by herself and was apprehended by border patrol officers. She was placed in la hielera for one night and then transferred to la perrera for three days. On February 25, 2019, officers then brought her to Homestead where she had been when she delcared: "I do not know when I can leave. No one

9

has given me this information. My aunt J████ has a fingerprinting appointment on May 10, 2019. My aunt and I do not understand why the fingerprinting appointment is such a long time away. I do not know how to speed up the process that will let me get out of here." Declaration of A████Q████, Ex. 85  ¶¶ 1, 3, 4, 5.

K███M█████████ is a 17-year-old national of Honduras. K███ crossed the border, walked for hours, and was found by border patrol officers. She was first taken to la hielera, was transferred to la perrera, and then transferred to Homestead, where her declaration was taken. "I do not know when I can leave. No one has given me this information. My mother has submitted all the paperwork necessary for me to leave. My social worker has received these documents. But no one has talked with me or my mother about fingerprints. A friend of mine here said that my mother must give her fingerprints. But neither my mom nor I have any information about how my mom can give fingerprints. I do not know how to accelerate the process that will get me out of here." Declaration of K████M█████, Ex. 86 ¶¶ 1, 3, 4, 5.

M████U████ is a 17-year-old national of Guatemala. M████ crossed the border and was taken to la hielera for six days, after which he was taken to Homestead. He had been in Homestead for approximately one month when his declaration was taken. "I do not know when I can leave. I have been told that the only thing that is missing from my case is my uncle's fingerprints. I do not know if my uncle has received a fingerprinting appointment yet. I do not know how to speed up the process that will let me get out of here. My uncle also does not know." Declaration of M████U████, Ex. 77 ¶¶ 1, 3, 4, 6.

E███I█████████ is a 16-year-old national of El Salvador. After walking for an hour, he was taken by immigration officers to la hielera. After four days there, he was brought to Homestead. He declared, "my uncle must submit fingerprints. My uncle and I wait eagerly every day for his fingerprinting appointment. But he has not received an appointment over the past eight days. To me, this feels like a long delay. I have asked my social worker why it is taking so long for a fingerprinting appointment. The social worker told me that it might be weeks longer of delays." Declaration of E███I█████, Ex. 50 ¶¶ 1, 3, 5.

D███J███████████ is a 16-year-old national of Honduras. D████ crossed the border and was taken into immigration custody. He was taken to la perrera for four days and then taken to Homestead, where he had been since March when he made this declaration: "I do not know when I can leave this place. I want to get out of here as soon as possible. I have spoken with a social worker two times about how I can leave. I understand that before I am released, my aunt's fingerprints need to be taken and the government must verify that she is actually my aunt.

I do not know when my aunt will receive the fingerprinting appointment. My aunt also does not know this." Declaration of D████ J███████ ██████, Ex. 54 ¶¶ 1, 2, 3, 4, 6.

C███ A███████████ is a 13-year-old national of Guatemala. Upon entering the U.S., C██ was taken into custody and separated from his aunt and cousin. He was taken to la hielera for four days before being taken to Homestead. "I do not know when I am going to leave from the detention center in Homestead. My mother is trying to help me leave, but we do not know when I will be released. I have not received any information on when I will be reunited with my mom. I don't know what I can do to speed up the process. Neither does my mom." Declaration of C███ A██████ ██████, Ex. 81 ¶¶ 1, 3, 4, 5, 7.

E███ G██████ is an 18-year-old national of Guatemala. After crossing the border, he and his sister spent five days in la perrera and then were transferred to Homestead, where he had been for a month when he made this declaration. "My social worker and my counselor both said I have almost been approved for release and the only thing that's missing is an interview with my mom's landlord in New York. My mom said she has been calling my social worker frantically to try to get through to give her the phone number of her landlord. But my social worker is not picking up." Declaration of E███ G██████, Ex. 60 ¶¶ 1, 3, 4, 6.

S██████ N████ is a 16-year-old national of Guatemala. He travelled to the United States and found immigration officers 15 minutes after crossing the border. He was taken to la hielera for about 30 hours, transferred to la perrera, and then transferred to Homestead, where he had been for 38 days at the time this declaration was taken. "I arrived with six other kids. All of them have already left. I want to leave too. I feel bad that I am still here and bored. I don't understand why my case to leave is delayed." Declaration of S██████ N████, Ex. 53 ¶¶ 1, 3, 4, 5, 10.

M████ N████████████ is a 14-year-old national of Guatemala. He crossed a narrow river and then was apprehended by immigration officials. He was transferred to la hielera for three days and then transferred to Homestead, where he had been for 26 days at the time his declaration was taken. "I am waiting to be released to my brother. My brother sent the papers but they haven't arrived to immigration yet, so I don't have an appointment for the fingerprints." Declaration of M████ N██████████████, Ex. 76 ¶¶ 1, 3, 4, 10.

L████ M████████████ is a 15-year-old national of Guatemala. He travelled to the U.S. with family members and was taken to hielera almost immediately after crossing the border. At the time his declaration was taken he had been in Homestead for two weeks. "I hope that I can leave soon. My father lives in New Jersey and is going to receive my brother, my niece and me.

He says that he has to move to another apartment before we can leave here." Declaration of L███ M██████████████, Ex. 63 ¶¶ 1, 2, 3, 8.

K███ D███████████ is a 15-year-old national of Honduras. He crossed into the United States and was taken to la hielera, transferred to la perrera, and then to Homestead. He had been at Homestead for 20 days at the time his declaration was taken. "My cousin lives in Los Angeles, California. She says she will receive me there and already did her fingerprints so that I can live with her." Declaration of K███ D████████, Ex. 71 ¶¶ 1, 3, 4, 5, 8.

J███ J████████████ is a 17-year-old national of Honduras. He was initially taken to la perrera for three days before being transferred to Homestead, where he had been for over 21 days when his declaration was taken. "My cousin went to do his fingerprints on Thursday last week so that he can receive me, but I am still waiting for the results." Declaration of J███ J████ ██████████, Ex. 69 ¶¶ 1, 2, 3, 5.

I███ P██████████ is a 16-year-old national of El Salvador. She was apprehended with her nieces after crossing the border. She spent two nights in la perrera before being brought to Homestead, where she had been for 17 days at the time her declaration was taken. "I don't understand what is happening with my sister. She lives in New York and is going to receive the three of us. But it seems like my nieces are going to leave without me and that my sister doesn't have to do fingerprints for them. She had an appointment to do fingerprints for the three of us on in April. I don't understand why my sister does not have to do fingerprints for me." Declaration of I███ P██████, Ex. 68 ¶¶ 1, 2, 3, 4, 9.

G███ N████████████████ is a 17-year-old national of Guatemala. He crossed the border and was taken to la perrera for two days. After that, he was transferred by airplane to Homestead. "My case worker worked with [my sponsor] to submit paperwork and to get fingerprinted. I would talk to him on the phone and he would tell me that everything was going well, but one week ago, my case worker told me that he had been rejected as my sponsor, since he was not a 'blood relative,' which I thought he was. I was devastated by the news and had a very difficult week. I felt anxious and sad, and hopeless. Fortunately, today, I was told that my mother had located her brother J████ E████████████████████████, who is applying to be my sponsor. We believe that he will be approved, but the process is starting all over again. I have been at Homestead for 53 days." Declaration of G███ N████████████████████████, Ex. 51 ¶¶ 1, 3, 5, 8.

E███ J█████████ is a 17-year-old national of Guatemala. Immigration officials detained him a few minutes after he crossed the border. He was taken to la hielera for about 10 hours before being transferred to la perrera for two days. He was then taken to Homestead, where had been for almost two months when he made his declaration. "My aunt in Mississippi is going to receive me when I leave the shelter. But the problem is that my first social worker did not advance my case. My aunt sent the documents the social worker asked for but when my social worker changed the new social worker asked for the same documents again that my aunt had already sent. So I think that the first social worker did nothing with the documents my aunt sent. My aunt did an interview with my new social worker this week and now has to go do her fingerprints." Declaration of E██ J█████████, Ex. 70 ¶¶1, 2, 3, 7.

D███ A████████ is a 14-year-old national of El Salvador. He crossed a bridge into the U.S. and was placed in la perrera. After that, he was transferred to Homestead where he had been detained for 164 days at the time of his declaration. "My mother is in Maryland. She would like to take me. I want to be with my mother and I want them to let me go. The government staff called her last Monday. I had an appointment for March 20, but it was cancelled. It's been more than a month. It's taking forever. I don't know why it's taking so long." Declaration of D██ A████████, Ex. 52 ¶¶ 1, 2, 4.

B███ M█████████ declared, "I've been here in Homestead for almost five months. I'm still here because they won't approve a sponsor for me. First, we tried to get my uncle approved as a sponsor. He is the only family I have in the U.S. He's only 25 but very responsible. He lives in Tennessee. I had to wait two months to get his fingerprints approved. Finally, they said I couldn't go live with him because he lives with friends and because I didn't have any photos of me and him together. When they denied my uncle's sponsorship, an older neighbor, a friend of the family who now also lives in Tennessee also said she would sponsor me. But they said because she's not family I can't go live with her. Now I don't know what to do. I think I'm going to ask for a voluntary departure to be sent back to Guatemala. If I ask to be sent back, my social worker told me that I'll still have to wait four to six months here. It's such a long time and I've already been here for five months." Declaration of B██ M█████████ █████, Ex. 56, ¶¶ 4-6.

## 2. Facility is Secure

N███ P█████████ is a 13-year-old national of Guatemala. She was taken into custody by border patrol for about a day, taken to another facility for two days, and then to Homestead.

"We are not allowed to leave Homestead. We must be with a YC (a Youth Counselor) who watches us all the time." Declaration of N███ P██████████████, Ex. 58 ¶¶ 1, 4, 8.

D███ N██████████████ is a 13-year-old national of Honduras. D███ was taken into custody by border patrol officers and separated from her uncle and cousin. She was put in la hielera for four days and then placed on a plane and brought to Homestead. "Children like me are not allowed to leave this detention center. We must be with a YC (a Youth Counselor) at all times here. The YCs watch us at all times and make sure that we never try to leave. The YCs have told us that if a child tries to leave, the police or other officials will come looking for us. It is just not possible for a child to leave when he wants to go." Declaration of D███ N██████████████, Ex. 79 ¶¶ 1, 3, 4, 5, 9.

A███ E██████████████ is a 13-year-old national of El Salvador. She was taken to la perrera for two days and then to Homestead. "We are not allowed to leave. We must be with a YC (a Youth Counselor) who watch us all the time." Declaration of A███ E██████████████ ██████, Ex. 78 ¶¶ 7.

"The Homestead facility is very secure. We are not allowed to go off grounds except with special permission and we must ask in advance. I have not gotten to leave at all. The people in charge have said that if you leave without permission, they will file a report against us. The doors are always locked. We also have 'YCs' – that's what they're called. They accompany us for meals and tell us what we can do. They change throughout the day. We can't even go to the bathroom without a YC accompanying us." Declaration of J███ Q██████, Ex. 12 ¶ 7.

"I am not allowed to leave when I want to. While the doors are not locked, there is security all over the facility. Declaration of Y███ M██████████████ dated 7/31/18, Ex. 14 ¶ 8.

"[W]e must ask for permission to go to the restroom and are watched as we enter and exit the bathroom. I think that if I tried to go outside of the facility's walls, it would be seen as me trying to escape and I would be sent back to Guatemala….We are not able to walk around the facility freely or without being directly supervised. My actions, and the actions of the other children at the facility, are watched and monitored at all times." Declaration of Y███ M██████████████ ██████ dated 10/24/18, Ex. 38 ¶¶ 8, 9.

"The adults here have told us if we try to escape, we will be sent to a place with more laws where it would be harder to escape. However, it is already hard to escape. There are gates and walls that

surround this place. You can only leave the buildings in a group, with permission, to do recreations in the yard. However, you aren't allowed to go outside the walls. You have to ask permission from the supervisors with the red hats to go get water, and you have to get permission from the YCs to use the bathroom." Declaration of C███ M█████████████████, Ex. 15 ¶ 7.

"I am not allowed to leave by myself, somebody has to be always with me. I cannot walk away without permission. If I leave, they can get me and take me to a jail, if I escape." ████████████ ██████L████████████████████████ ¶ 15.

"We walk around in lines from our rooms to school and we are not allowed to leave. We cannot walk anywhere alone and we are not allowed to run. It would be a big problem if I tried to leave." Declaration of D███ L████████████, Ex. 35 ¶ 7.

I am not allowed to leave by myself, because there are cameras around and if they see me alone, they give me a report. The doors are locked….I know of another boy who tried to leave and was given a report and he was sent to another shelter. [I]f I want to leave by myself I cannot, I have to ask first but the supervisor told us we cannot wander by ourselves.  Declaration of M███ J███ Ex. 40 ¶ 7.

"We cannot leave this facility. They have told us that we cannot leave." Declaration of E██ Y████████████, Ex. 37 ¶ 19.

"There are guards at all time." Declaration of N███ R███████████████████, Ex. 41 ¶ 8.

"If I were caught trying to walk outside of the facility, I would be moved to a different facility. I have seen other children at this facility who tried to escape. They were caught, returned to the facility and then moved somewhere else a few days later." Declaration of E████ G█████████ ████████ dated 10/23/18, Ex. 36 ¶ 8.

"If I tried to walk outside, they would say I am trying to escape and I might get in trouble." Declaration of G█████ M██████, Ex. 39 ¶ 14.

15

"I know of some other children at Homestead who have tried to leave the facility. They were caught and sent to a jail....We are not able to walk around the facility freely or without being directly supervised. My actions, and the actions of the other children at the facility, are watched and monitored at all times." Declaration of O███████D████████████ dated 10/24/18, Ex. 44 ¶¶ 12, 13.

"If I ever attempted to leave the facility, it will be viewed as me trying to escape. If I tried to leave the facility, I would be deported back to Guatemala, where my life is in danger. . . .We are not able to walk around the facility freely or without being directly supervised. For example, if I need to use the bathroom, I have to ask permission and be accompanied to the bathroom." Declaration of ████████J████████████████ ¶¶ 11, 12, 14.

"This facility is secured and I cannot freely walk without [being] escorted by an adult." Declaration of M███D██████████████████, Ex. 13 ¶ 16.

# 3. Limited Telephone Access to Parents and Relatives

M███A██████████████████ is a 15-year-old national of Honduras. M████ and his brother were apprehended on July 27, 2018, and taken to an unspecified facility. On July 30, 2018 he and his brother arrived at the detention center in Homestead, Florida. He had been detained for five days total and at the Homestead detention center for three days when his declaration was taken. "Since being here I have talked to my father one time for 10 minutes. I had to share the 10 minutes with my brother Jose." Declaration of M███A█████████████, Ex. 26 ¶ 7.

S███G████████████ is a 17-year-old Honduran national. She spent one day an an unknown location close to the border, then was moved to a second unknown location for two days. She was then moved to third unknown location that people called "la hielera" that reminded her "of cages where you keep chickens." She was transferred to Homestead on May 22, 2018. "I am only given two phone calls a week, each for 10 minutes. One time I was still talking to my mom and went a bit over and I was told I had to hang up. I wish I had more time, sometimes even 15 or 20 minutes." Declaration of S███G██████████████, Ex. 33 ¶ 16.

16

D████ H████████████ is a 17-year-old national of Honduras. He spent four days in an immigration cell before being transferred to Homestead, where he had been for 114 days at the time this declaration was taken. "We get phone calls twice a week. My days are Mondays and Wednesdays. After Wednesday, I have to wait until the following Monday, which is hard. I use the calls to call my mother, and I only get to speak to her for five minutes at a time. Five minutes is not enough." Declaration of D███ H█████████████a, Ex. 59 ¶¶ 1, 2, 6.

J████ N███████████ is a sixteen-year-old national from Nicaragua. After traveling through Mexico, J████ was apprehended by immigration agents and taken to la perrera, where he remained for eight days. After that he was transferred to Homestead, where he had been for 38 days at the time this declaration was taken. "I speak to my mother twice a week by phone for 10 minutes each. Twenty minutes per week is not enough time and I would like more time to speak with her." Declaration of J███ N████████████ Ex. 48 ¶¶ 1, 6, 9.

"We are only allowed to talk to our families by phone twice a week, for 10 minutes. I speak for five minutes with my mother, and five minutes with my uncle. If I had more time, I could ask my mother how she is, and tell her what's happening here. I wish I could talk to her more to get support. I feel bad not being able to talk to my uncle. I would like to ask him if he knows what's happening with my case, and to know how he's doing, but there isn't time." Declaration of C██████ M████████████, Ex. 15 ¶ 10.

"I am able to speak to my father twice per week, for 10-minute increments. Every time that I speak to my father, a case worker for the government is present and listening to what I say." Declaration of Y████ M████████████ dated 10/24/18, Ex. 38 ¶¶ 5,6.

"Sometimes I have to use one of the two weekly calls to call my sponsor….If I talk longer than 10 minutes I am sometimes told my time is over. I wish I could talk to my parents for longer, 10 minutes is too little." Declaration of C████ A████████████ dated 8/1/18, Ex. 16 ¶ 10.

"I have to split my 10 minutes of call time to have five minutes with my mother and five minutes with P████ A███. My mother tells me she is very worried about me. I worry about my mother because she is ill and sometimes she is too sick to take my call. The staff here time our calls and sometimes my mom keeps talking and I have to tell her that time is up …. It is very hard. I would like to talk to my mom more." Declaration of C█████ A████████████████████ Ex. 34 ¶ 9.

"Since I have been at the Miami center, I have talked to my father twice per week for about four minutes each time and the remaining six minutes I use it to call my cousin and my aunt to find out what is going on with my case." Declaration of M███ D███████████████████████████, Ex. 13 ¶ 18.

"I have been able to call my family twice per week, for about 10 minutes. However, there have been times where I am not permitted to speak more than five minutes or sometimes I am rushed to hang up because they need to take me back to my room or because the case manager needs the phone." Declaration of K███ D████████, Ex. 23 ¶ 12.

███Every time I talk to [my dad], my social worker is present, always." ████████████████ L███████████████████████████ ¶ 8.

"I talk to my father twice a week sometimes for five and sometimes for 10 minutes. We talk about patience and he asks for updates about my situation and what is going on with my uncle. Sometimes the case manager is with him when I make my call. I miss my dad." Declaration of D███ L█████████████, Ex. 35 ¶ 12.

"I cannot talk to my mother as often as I want because they only give us 20 minutes a week to talk on the phone. If I want to talk five minutes every day I cannot do it, it has to be the 10 minutes at a time. I do not think it is enough time, I would like to talk to my mom in Guatemala more often. I talk with her about how I am doing, how are they doing. I do not tell her if I need something here (like toothbrush and toothpaste) because I do not want her to worry. She gives me advice to be good and do not get in trouble. I think I need more time to talk to her. I do not talk to my father often because immigration is listening to the conversation and he is detained." Declaration of M█████ J███ Ex. 40 ¶ 10.

"I speak to my parents two times a week. We are allowed 10 minutes twice a week. I don't have enough time to talk to my parents." Declaration of E███ Y████████████████, Ex. 37 ¶ 5.

"I am only allowed to speak to my family twice a week for 10 minutes. I'm not allowed to call two different people for five minutes at a time - just one call each time." Declaration of N████ R████████████████████████, Ex. 41 ¶ 11.

"I am allotted 10 minutes two times per week to speak to my family. The time has to be divided among my family members. For example, I talk to my mother for five minutes, I only have five minutes left to talk to my father." Declaration of E███ G████████████ dated 10/23/18, Ex. 36 ¶ 5.

"I am able to speak to my father twice per week, for 10-minute increments. Every time that I speak to my father, a case worker for the government is present and listening to what I say." Declaration of O████ D████████ dated 10/24/18, Ex. 44 ¶ 8.

"I'm only allowed to talk to my mom for five minutes and my grandpa for five minutes. That's not really enough time to say more than a quick hello and make sure she's okay." Declaration of Z██ P██████████████, Ex. 80 ¶6.

"I talk to [my mother] twice a week for five minutes because that's all they permit us." Declaration of R██ F███████████, Ex. 75 ¶ 4.

"I get two days a week for ten minutes each to call people and since I called them yesterday, I can't make another call today. It's disappointing because I can't even access the phone to talk to my mom today on my birthday. Nobody has sung happy birthday to me today." Declaration of E██████ E████████████, Ex. 74 ¶ 5.

"We are allowed phone calls two times a week. We can use the phone calls to call relatives in our home countries if we want. I had my call yesterday, so I was able to call my parents in Guatemala for five minutes and my brother in California for five minutes. That is a very short time…." Declaration of J█████ A████████, Ex. 65 ¶ 10.

"I'm supposed to get phone calls twice a week, on Mondays and Wednesdays. Today is Tuesday, and the last time I was able to make a call was last week, on Wednesday. The staff never called me to make my calls yesterday, even though I asked them. They said I would get called, but I never was. The calls are for 10 minutes. It would be good to have more time." Declaration of H████ M████████████████ Ex. 55 ¶ ¶ 7, 8.

"Now I can only talk to my mom for five minutes twice a week and my aunt for five minutes twice a week." Declaration of A███ B███, Ex. 62 ¶ 8.

"Since arriving here, I have been able to talk with mom twice per week, but my calls are limited to 10 minutes." Declaration of N███ E██████████████████, Ex. 64 ¶ 11.

"Since arriving here, I have been able to talk with my family twice per week, but my calls are limited to 10 minutes. It is not sufficient time. I wish I had more time for phone calls." Declaration of K███ M██████████, Ex. 86 ¶ 11.

"I am allowed to call my family two times each week, with a time limit of 10 minutes per call. This is not sufficient time for me to talk with my family. I wish I had more time to talk with my family." Declaration of D████ J████████████, Ex. 54 ¶ 7.

"At times my phone calls are limited to five minutes.  At other times my phone calls are limited to 10 minutes.  How much time I am allotted depends on which YC is supervising my calls." Declaration of D███ N██████████, Ex. 79 ¶ 11.

"I am able to call my mother twice a week but only for 10 minutes.  I wish that my phone calls with my mother could be longer.  I do not know why I cannot speak with my mother for a longer period of time." Declaration of A█████ E█████████████████, Ex. 78 ¶ 11.

"We have 10 minutes each time [to call our families]. You cannot ask for more time. They say its only 10 minutes for calls." Declaration of M████ N██████████████, Ex. 76  ¶ 8.

"We can make calls two times per week to our families. We only get 10 minutes. But the social worker is usual at my side when I make calls. I would prefer to speak with my family in private. It is not easy to talk to my family when the social worker is sitting with me." Declaration of L█████ M███████████████████, Ex. 63  ¶ 6.

# 4. Not Being Advised of *Flores* Rights

"I do not know anything about the *Flores* settlement agreement. No one here has given me information about my release options under *Flores*." Declaration of A████████Q██████, Ex. 85 ¶ 7.

20

"I do not know anything about the *Flores* settlement agreement. No one here has given me information about my release options under *Flores*." Declaration of K███M███████, Ex. 86 ¶ 8.

"I do not know anything about the *Flores* settlement agreement.  No one here has given me information about my release options under *Flores*." Declaration of M███U████, Ex. 77 ¶ 6.

"I do not know anything about the *Flores* settlement agreement.  No one here has given me information about my release options under *Flores*." Declaration of E███ I████████, Ex. 50 ¶ 8.

"I do not know anything about the Flores settlement agreement.  No one here has given me information about my release options under Flores." Declaration of D███ J████████, Ex. 54 ¶ 6.

"I do not know anything about the *Flores* settlement agreement.  No one here has given me information about my release options under *Flores*." Declaration of A███ E██████, Ex. 78 ¶ 12.

# 5. Harsh Conditions/Harm

## Prison-like Rules

J████ D██████████, is a 13-year-old native of El Salvador. "I've been held here at the Homestead immigration detention center for children since March 7. When I first came here, they gave us an orientation and told us that we had to follow the rules: no touching, five minutes for taking a showers, 15 minutes to eat, no lending clothes, no taking any food into the bunk room, no sitting on anyone else's bed. If we don't follow the rules or pay attention to the youth counselors they said, we would get a report. If you get a report, you'll end up spending more time here." Declaration of J████ D███████████, Ex. 66, ¶¶ 1-3.

"There are many rules here. You can't share food. You can't hug or touch anyone. At night when we return to the dormitories, we have only five minutes to bathe. The youth counselors and

supervisors say we cannot leave the facility and that we have to go around in a group." Declaration of M█████ N██████████████, Ex. 76, ¶ 6.

"There are many rules. It is hard to remember all of the rules. You shouldn't fight. You have to obey the youth counselors. You have to respect the girls and should not look at them when they pass by. You cannot touch other people. If you have to go to the bathroom, someone has look after you and go with you to the bathroom." Declaration of S█████ N██████, Ex. 53, ¶ 7.

A████ S██████████████ is a 15-year-old national of Guatemala. She was apprehended by immigration agents about 30 minutes after crossing the border. She spent three days in hielera and one day in perrera before being transferred to Homestead on March 18. She declared, "[w]e only get 5 minutes to shower but I would like more time because I have long hair." Declaration of A█████ S████████████, Ex. 84 ¶ 7.

"You can only shower for five minutes, which does not feel like enough time to properly clean my body." Declaration of D█████ J████████████████, Ex. 54 ¶ 10.

"The YCs explained the rules to me when I arrived. If we want to go to the bathroom, we have to be accompanied by a YC. We have to be accompanied everywhere we go. We can't use bad words. We have to walk in line when we go anywhere." Declaration of J████████ A██████████████, Ex. 65, ¶ **6**.

"When I arrived, the staff here told me the rules:...We have to walk in line. We can't touch anybody else. If we break the rules, we will get a report. The staff say that if we get a report, they will send it to the judge who decides whether we will stay in this country." Declaration of H████ M██████████████ Ex. 55, ¶ 6.

"The YCs, the name for the staff members who supervise us, tell us what the rules are. The rules are things like not touching other people, whether another kid or a YC; don't go anywhere unless accompanied by a YC; don't wear earrings or have visible tattoos; don't fight; no more than five minutes in the shower; don't disrespect anybody. If we break a rule, we get a report. Getting a report means we will spend more time here. The YCs tell us this themselves, and I have heard them say this directly to groups of us many times." Declaration of H████ S████████████, Ex. 49, ¶ 11.

22

"We used to get up at 8 AM here, but now we get up at 5 AM." Declaration of D████ A███ ████████, Ex. 52 ¶ 5.

"You must wear the clothes assigned to you.  You can't share clothes with a friend.  You can't write on your clothes.  You can't decorate your clothes.  You must keep your clothes clean.  You must eat your food in the place where you receive it.  If you receive food in the cafeteria, you must eat it there.  If you receive food in a classroom, you must eat it there.  You cannot bring food from one place to another.  You can't sit with a friend on their bed to have a conversation.  When you're in your dormitory, you must be in your own bed." Declaration of K████ M████ ████████, Ex. 86 ¶ 9.

## No Contact/Touching Allowed

"The rules here say that we cannot touch each other. We cannot touch each other on the hand or touch another girl's hair. It's really hard. Sometimes something good will happen and my niece will say to me, "give me a hug!" but I have to say "no" because we are not allowed to touch. There are cameras here watching us." Declaration of I████ P████████████, Ex. 68, ¶ 6.

"They said that you can't touch anyone....If you break the rules, they will write a report and the staff at the orientation said that the report will delay your case." Declaration of E████ E████ ████████████, Ex. 74 ¶. 3.

"The rules here are that you can't touch anyone. Sometimes when your friend is crying because they can't stand being here any longer you want to be able to give them a hug. But you can't because it's against the rules." Declaration of A████ B████, Ex. 62 ¶ 6.

"There are many rules.  You can't give a friend a hug.  You cannot give anyone a handshake, not even your teacher or a YC (Youth Counselor).  You can't ever touch anyone.  You can't blow a kiss to someone."  Declaration of N███ E████████████████, Ex. 64 ¶ 9.

"There are many rules here.  You cannot give a friend a hug.  You cannot give anyone, not even your teachers, a handshake." Declaration of A████ Q██████, Ex. 85 ¶ 9.

"You can't give a friend a hug.  You cannot give anyone a handshake, not even your teacher or a YC (Youth Counselor).  You can't ever touch anyone.  You can't blow a kiss to someone." Declaration of K████ M████████████, Ex. 86 ¶ 9.

23

"There are many rules here. You cannot hug a friend or touch anyone." Declaration of E█████ I████████████, Ex. 50 ¶ 10.

"Children here also cannot touch each other. I cannot give anyone a hug. I need to be comforted, but there is no way for that to happen here." Declaration of N███P███████ ██████, Ex. 58 ¶ 8.

"The rules of the center do not permit children to give each other a hug or touch each other in any way." Declaration of A█████ E██████████████████, Ex. 78 ¶ 7.

## Exposure to Traumatic Behaviors

"Sometimes it's really hard having to stay here. A couple of girls since I've been here have been cutting themselves. That's why we're not allowed to bring pens or pencils into our bedrooms. We're only allowed to have clothes and a few other things like a toothbrush and a hairbrush." Declaration of B█████M███████████, Ex. 56, ¶ 7.

A█████ H██████ crossed the border and was taken to a place where they held children, women, and people who were asking not to be deported. After two days he was transported to Homestead. "Sometimes things are tense here with the other kids because no one wants to be here and some can't stand it anymore. Some kids have words with each other and try to start problems." Declaration of A█████ H████████, Ex. 47 ¶ 6.

"Other children here are also very sad. They cry a lot. Some children do not have anyone to receive them in the United States. They do not know whether they can ever leave from here. These children are suffering the most. Much of the time they are crying and crying. They do not have energy, they do not have hope, they do not want to talk with anyone, and they are not motivated to play. One of my friends has no one to receive him in the United States. When he is in his room, he just cries and cries." Declaration of D█████J████████████████, Ex. 54 ¶ 9.

## Separated from Family/Siblings

J████████████, born ███████████, traveled to the United States with his 17-year-old sister L████ in early March. Before being transferred to Homestead, "for four days in a jail near the border. I could see my sister through the wires, but I wasn't allowed to speak to her. If you tried to speak

24

to anyone outside of your cage, they yelled at you." In Homestead, "My sister is in another part of the facility. They told me that I could see her once a week on Fridays. When I talk with her, she says she's desperate to get out of here." J████ P██. Ex. 67 ¶ 5.

"My brother and I are in separate dormitories. There are 12 kids in all in my dormitory, and the same in my brother's. Because he's in another dormitory, we can only see each other when we make phone calls to our relatives or sometimes during lunch. We are allowed to eat lunch together two or three times a week. I don't know why we are separated, because I think some of the other kids in my room are about his age. One is about 13, I think. For me, it would be better if we were together, or at least if we could spend more time together." Declaration of H████ S████████, Ex. 49 ¶ 9.

## Inability to communicate in native language.

M████ I████ born in Quiché, Guatemala, spent two days in the "dog kennel, a place where a lot of kids were held in big cages....I am 16 years old. I speak a little Spanish and Quiché. I speak Quiché best....I talk on the phone with my father and my sister twice a week. There's no one here I can speak Quiché with. I hope I can go live with my sister soon. I feel so alone here." Declaration of M████ I████, Ex. 82 ¶ 1, 4.

"In my dormitory, Golf 8, there are about fourteen girls, but none of them speak Quiche. There are children here who speak Quiche, but none of the teachers and none of the YCs (Youth Counselors) speak Quiche. The teachers and the YCs always speak in Spanish and English." Declaration of A████ Q████, Ex. 85 ¶ 8.

"I can speak Mam and Spanish. I have not met any staff here who can speak Mam. But there are some children here who cannot even speak Spanish. I saw one boy who cannot speak Spanish. He is always sitting alone with his head down. He cannot communicate with anyone. He looks very sad." Declaration of M███N█████████, Ex. 76 ¶ 9.

Exhibit 4

May 21, 2019

# Office of Refugee Resettlement Policies Relating to Unaccompanied Minors

**ORR Children Entering the United States Unaccompanied: Guide to Terms, Section 1.7**

Source: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.7

### 1.7 Placement and Operations During an Influx

As noted in subsection 1.3.5, ORR may experience periods of **influx** in which the number of unaccompanied alien children coming into the United States exceeds the standard capabilities of ORR to process them timely and to shelter them with existing resources.

During an influx, ORR may not have sufficient bed space available within its licensed care provider network to place unaccompanied alien children. In this situation, ORR arranges for **Influx Care Facilities** to meet the need.

An Influx Care Facility is a type of care provider facility that is opened to provide temporary emergency shelter and services for UAC during an influx or emergency. Because of the temporary and emergency nature of Influx Care Facilities, they may not be licensed or may be exempted from licensing requirements by State and local licensing agencies. Influx Care Facilities may also be opened on Federal properties, in which case, the facility would not be subject to State or local licensing standards.

Certain Influx Care Facilities may require a 72-hour medical waiting period prior to receiving unaccompanied alien children. Therefore, ORR may also activate **HHS Processing Centers (HPC)** to initially screen and vaccinate children prior to their placement in Influx Care Facilities. Unaccompanied alien children remain in an HPC until they are medically cleared for movement to and placement in an Influx Care Facility. During an influx, ORR also uses HPCs to more efficiently handle the transfer of unaccompanied alien children from DHS border patrol custody into HHS custody.

HPCs must provide the services as described in subsection 1.7.5 and 1.7.6. **Standard ORR facilities** that are designated as HPCs or as Influx Care Facilities are required to meet the same standards applicable to all ORR State-licensed programs.

**ORR's Children Entering the United States Unaccompanied: Guide to Terms**

Source: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Influx

**Definition of "Influx" and "Influx Care Facility"**

**Influx** – An increase in the number of unaccompanied alien children that exceeds the standard capabilities of responsible Federal departments and agencies to process and transport them timely and/or to shelter them with existing resources.

**Influx Care Facility** – A type of care provider facility that is opened to provide temporary emergency shelter and services for unaccompanied alien children during an influx or emergency. Influx care facilities may be opened on Federally owned or leased properties, in which case, the facility would not be subject to State or local licensing standards; or, at facilities otherwise exempted by the State licensing authority.

**2.5 ORR Policies on Requesting Background Checks of Sponsors**

Source: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2

In order to ensure the safety of an unaccompanied alien child and consistent with the statutory requirements under the TVPRA of 2008, ORR requires a background check of all potential sponsors and household members. The background check takes place as soon as the potential sponsor and adult household members have completed the Authorization for Release of Information form, submitted fingerprints (when applicable), and provided a copy of a valid government issued photo identification. ORR transmits the fingerprints to the Department of Homeland Security to perform criminal and immigration status checks on ORR's behalf.  DHS then submits the results to ORR.

ORR also conducts additional background checks without going through DHS.  Depending on the circumstances, these checks may involve background checks on criminal history (including through the FBI) and child abuse/neglect checks (CA/N)

Adult care givers identified in a sponsor care plan also require background checks, as provided in the chart at section 2.5.1.

## 2.5.1 Criteria for Background Checks

Source: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2

All potential sponsors and some adult household members undergo a background check for criminal history and immigration status using fingerprints.  These checks are conducted by the Department of Homeland Security on behalf of ORR and DHS then submits the results to ORR.

In addition, ORR independently conducts background checks without going through DHS. This independent background check process varies, depending in part on the relationship of the potential sponsor to the unaccompanied alien child:

- Parents and legal guardians (Category 1)
- Other immediate adult relatives, such as brother, sister, aunt, uncle, grandparent or first cousin (Category 2)
- Distant relatives and unrelated adults (Category 3)

As a part of this independent background check process, all potential sponsors and adult household members must undergo a public records check and sex offender registry check.

The following indicates the **minimum** requirements for the process for sponsors. ORR may require additional checks, verifications, or procedures for sponsors in any category if there are any unresolved issues or questions related to the well-being of the child.

The following table lists the types of background checks performed, and explains when they are performed, based on the potential sponsor's relationship to the unaccompanied alien child and other release considerations. The chart identifies when DHS performs the check on ORR's behalf. (See also Section 2.7.4, listing findings barring release).

| Type of Background Check | Purpose | Persons Checked | When Performed |
|---|---|---|---|
| Public Records Check | Identifies arrests or convictions of sponsors, adult household members, or others. If a check reveals a criminal record or safety issue, it will be used to evaluate the sponsor's ability to provide for a child's physical and | Potential Sponsors in Categories 1-3.<br><br>Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |

| | mental well-being. | | |
|---|---|---|---|
| Sex Offender Registry Check, conducted through the U.S. Department of Justice National Sex Offender Public Website | Identifies sponsors and others that have been adjudicated as sex offenders through a national search and, if available, a local public registry search. | Potential Sponsors in Categories 1-3.<br><br>Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |
| Immigration Status Check conducted by the Department of Homeland Security using fingerprints | Provides information about immigration court actions and immigration statuses, including information about orders of removal. The information is also used to determine whether a sponsor care plan is required for release (see Section 2.7.6). | Potential Sponsors in Categories 1-3. | In all cases. |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study. |
| National (FBI) Criminal History Check, based on digital fingerprints or digitized paper prints | Determines whether a sponsor or adult household member (as applicable) has a criminal history, has been convicted of a sex crime, or has been convicted of other crimes that compromise the sponsor's ability to care for a child. | Potential Sponsors in Categories 1-3. | In all cases. |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study |
| DHS criminal history check, based on digital fingerprints or digitized paper prints. | Determines whether a sponsor or adult household member (as applicable) has a criminal history, including: biographic criminal check of the national databases, a biographical check for wants and warrants. | Potential Sponsor in Categories 1-3. | In all cases. |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home |

| | | | study. |
|---|---|---|---|
| Child Abuse and Neglect (CA/N) Check, obtained on a state by state basis as no national CA/N check repository exists | Checks all localities in which the sponsor or household member has resided in the past 5 years. | Potential Sponsors in Categories 1-2. | In cases that require a home study, and cases where a special concern is identified. |
| | | Potential Sponsors in Category 3. | In all cases. |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In any case where a sponsor is required to undergo a CA/N check. |
| State Criminal History Repository Check and/or Local Police Check | Assists in locating police or arrest records, or other criminal offense details, as needed. | Potential Sponsors in Categories 1-3. Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | Used on a case-by-case basis when there is an unresolved criminal arrest or issue that is still in process. |

### 2.5.2 Results of Background Checks on Release Decisions

As an entity providing for the health and well-being of children and youth, ORR uses the results from background checks to determine whether release to a potential sponsor is safe. A potential sponsor may be denied a release request, based on the results of a background check, and a release decision may remain undecided until ORR obtains the results of a potential sponsor's criminal history, immigration background checks, or child abuse and neglect reports.

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the  DOJ to investigate criminal history through the National Criminal Information Center.

### Criminal History

In the event that a background check of a potential sponsor or, if applicable, adult household member, reveals criminal history or a safety risk, the care provider and ORR evaluate this information and request the potential sponsor to provide any additional  information that may demonstrate the potential sponsor's ability to provide for the child's physical and mental well-being.

If release is not barred by Section 2.7.4, the decision to release a child or youth to a sponsor in these circumstances is based on all the following considerations:

- The severity of the criminal and/or child abuse/neglect history;
- The length of time that has passed since the criminal act or child abuse/neglect allegation occurred;
- The relationship of the potential sponsor and other adult household members to the child or youth; and
- The evidence, if any, of rehabilitation since the criminal act or child abuse/neglect allegation occurred.

In cases where the proposed sponsor or other adult household member has been charged with, but not convicted of, a crime, ORR may postpone a final release decision until the legal issue is resolved.

If the sponsor has an outstanding order of removal, or a pending order of removal that is related to an underlying criminal act, the decision to release a child or youth to a sponsor in these circumstances is based on the considerations described above.

## Sponsor Immigration Status

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR uses status information to determine whether a sponsor care plan is necessary in the event the sponsor is required to leave the United States. (See Section **2.6 Effect of Sponsor Immigration Status on Release of Unaccompanied Alien Children**)

## Summary Table of Results of Background Checks and Next Steps

The following table shows procedures following the results of background checks.

| Background Check Results | Next Steps |
|---|---|
| No arrest record; check completed | Proceed with release decision-making process. See Section **2.7 Recommendations and Decisions on Release**. |
| Criminal arrest record and/or substantiated adverse child welfare findings; check completed | Determine whether release is barred. See Section 2.7.4 Deny Release Request. If release is not barred, elevate safety issues for third party review. For any findings that could affect safe release, care provider and/or ORR will obtain additional documents to determine current situation (e.g. sponsor is on probation, criminal charges are resolved, etc.). Final release decision shall take into account the criminal records and all other relevant information that is available. |
| Immigration status concern (e.g. out of status, no legal | Review FBI record and DHS report, and/or Department of |

| status, prior order of removal, or no immigration record for non-citizen) | Justice/Executive Office of Immigration Review's case status hotline for information related to possible unresolved immigration issues. |
|---|---|
| Pending results; check not complete | ORR/FFS will provide instructions to care provider |

## 2.2.4 Required Documents for Submission with the Application for Release

Source: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2

In addition to completing and signing the Family Reunification Application (FRA) and the Authorization for Release of Information, potential sponsors must provide documentation of identity, address, and relationship to the child they seek to sponsor.**3** Potential sponsors must also submit documentation verifying the identity of the children they seek to sponsor, and evidence verifying the identity of all adults residing with the sponsor and all adult care givers identified in a sponsor care plan. In addition to their use as evidence of the foregoing, all documentation submitted under this section is used as part of the overall sponsor assessment process. See **Section 2.4 Sponsor Assessment Criteria and Home Studies.** As a result, ORR may in its discretion require potential sponsors to submit additional documentation beyond the minimums specified below.

### Proof of Child's Identity
The potential sponsor or child's family must provide the unaccompanied alien child's birth certificate or a legible copy of the child's birth certificate.

### 2.2.5 Legal Orientation Program for Custodians
All potential sponsors of children and youth under the care of ORR should attend a presentation provided by the Legal Orientation Program for Custodians (LOPC). The purpose of this program is to inform potential sponsors of their responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of 2008. The program also provides information about possible free legal counsel (pro bono legal services) for the youth or child during the immigration court process.

The Office of Legal Access Programs (OLAP), within the Executive Office for Immigration Review (EOIR) at the U.S. Department of Justice, manages the LOPC and contracts with legal service organizations around the country to provide LOPC services to potential sponsors in their local communities or in

metropolitan areas served by the program. EOIR is the entity in the federal
government that is also responsible for adjudicating immigration cases by fairly,
expeditiously, and uniformly interpreting and administering the nation's
immigration laws.

The unaccompanied alien child's **case manager** is responsible for informing
potential sponsors about all procedures related to the child's case--including
attendance at an LOPC presentation. The Family Reunification Packet (FRP)
that goes to each potential sponsor includes an *Authorization for Release of
Information* that the sponsor must sign before the case manager may schedule
an appointment for LOPC services. All potential sponsors should submit
the *Authorization for Release of Information* immediately and prior to submitting
the complete FRP to ensure timely scheduling of their LOPC session.
Upon receipt of the *Authorization*, the case manager schedules an appointment
for a potential sponsor to attend a presentation with one of the LOPC providers
around the country. Alternatively, the case manager contacts the **LOPC
National Call Center at (888) 996-3848** and arranges for the Call Center to
schedule an LOPC appointment for the potential sponsor or mail an LOPC
Information Packet to the sponsor.
When evaluating family members and other potential sponsors, ORR considers
whether they have attended an LOPC presentation.  Attendance at an LOPC
presentation is a factor in the release assessment.

## 2.4 Sponsor Assessment Criteria and Home Studies

Source: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-
states-unaccompanied-section-2

As noted in the **Section 2.2 Application for Safe and Timely Release of an
Unaccompanied Alien Child from ORR Care**, the application process for
release of an unaccompanied alien child involves a number of steps, including
background checks (see **Section 2.5 ORR Policies on Requesting
Background Checks**) and submission of the application by the sponsor. This
section describes the criteria ORR uses to assess each potential sponsor's ability
to provide for the physical and mental well-being of the unaccompanied alien
child, and the role of home studies in the process.
The sponsor assessment reviews a sponsor's strengths, resources, risk factors
and special concerns within the context of the unaccompanied alien child's
needs, strengths, risk factors, and relationship to the sponsor. ORR also
determines whether to conduct a home study, as required by the law or as
necessary to ensure the welfare of the child

### 2.4.1 Assessment Criteria

ORR considers the following factors when evaluating family members and other potential sponsors:

- The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.
- The sponsor's motivation for wanting to sponsor the child or youth.
- The unaccompanied alien child's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian has designated a sponsor).
- The child or youth's views on the release and whether he or she wants to be released to the individual.
- The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.
- The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.
- The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's attendance at a Legal Orientation Program for Custodians (LOPC) presentation. See section 2.2.5.
- The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.
- The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.
- The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such  as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

Exhibit 5

# Stanford
# MEDICINE | Emergency Medicine

Peter Schey
*Flores* Class Counsel
Center for Human Rights and Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057

May 29, 2019

*Re:*    Data Analysis, *Flores v. Barr,* Case No. 85-CV-04544-DMG

Dear Mr. Schey,

At your request as Class Counsel in the above-referenced case, and pursuant to a confidentiality agreement entered into between your office and staff and Dr. N. Ewen Wang, MD,  I have analyzed monthly data from January 2018 to April 2019 provided to you by the Department of Justice (DOJ) and Department of Homeland Security (DHS) pursuant to the *Flores* Settlement.

Qualifications

I am a Professor in Emergency Medicine and Pediatrics (by courtesy), Associate Director of Pediatric Emergency Medicine and Director of our section in Social Emergency Medicine at Stanford University School of Medicine.  My scholarly expertise is in health services research with a focus on Social Emergency Medicine, or the intersection of vulnerable populations with the Health Care system.  I am additionally affiliate faculty in the Human Rights in Trauma Mental Health program at Stanford.  My team has over 10 years of experience using national and statewide datasets to analyze population-wide access to specialty care and health outcomes. We have been funded by the National Institute of Health, as well as by various external and internal grants.

Length of Detentions at Homestead and ORR-facilities

As you requested, we have provided two separate analytical reports, the first focusing on the detention of Flores Class Members at the Homestead Influx Center


**Stanford**
**M E D I C I N E** | Emergency Medicine

and the second focusing on ORR-wide custody of detained Class Members. We provide an overview of the Class Members' detention data regarding gender, age,

country of origin.  We also provide length of detention of Class Members as a function of age, data regarding class members who "age out" while in custody as a function of the length of detention prior to aging out.

The results of these analyses are attached to this letter.

<u>Additional Data Required to Analyze Effective Prompt and Continuous Efforts to Release</u>

Having reviewed the terms of the settlement and carefully analyzed the data that the government is currently providing to Class Counsel, we believe it is urgently important for the relevant agencies to provide additional data points in order to assess compliance with specific provisions of the settlement.

In particular, it does not appear that ORR or Homestead collects or records quantifiable data that would permit ORR, the Special Master, or Class Counsel to monitor Homestead's success or failure in making and recording efforts aimed at the prompt release of minors, as required by Paragraph 18 of the Settlement. ("Upon taking a minor into custody, [Defendants], or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in [Defendants'] custody." Settlement ¶ 18.) For example, data regarding date, time, and location of apprehension and initial booking by CBP are not provided in ORR reports.  Additionally, there are crucial data quality and validation issues including distinctly different class members recorded with the same A-number.

Analyzing this data is likely the most accurate, cost-effective, and effective way to monitor compliance with the Settlement. The size of the class, the widespread dispersal of the class members, the large number of facilities, and the security measures taken to detain the class, all combine to make occasional visual inspections a far less accurate and effective means to assess compliance with this provision, than reports that can be prepared based upon contemporaneous agency records of the entire class.

# Stanford
## M E D I C I N E | Emergency Medicine

My team – pediatric and health services experts with a sincere interest in the health, safety, and well-being of detained children – have created a data infrastructure that is able to assist in dynamic and effective monitoring of compliance with the terms of the Settlement.

Recent major increases in the volume of detained class members, the known effects of stress and detention on the physical and mental health of children, as well as the deaths of class members in custody of the relevant agencies makes this compliance an urgent health issue. We are available to assist in recommending what data should be made available, how it should be recorded and methods of analysis.

Sincerely,

_____

Dr. N. Ewen Wang, M.D.
Professor Emergency Medicine
Professor Pediatrics (by courtesy)
Associate Director Pediatric Emergency Medicine
Director Section in Social Emergency Medicine
ewen@stanford.edu
(650) 723-0757

## Facility Report for Flores v. Barr Class Counsel: Homestead

Analysis of Class Members Held at the Homestead ORR Facility          May 24, 2019

### Executive Summary

This report summarizes Department of Justice Office of Refugee Resettlement (DOJ ORR) data provided to Flores v. Barr Class Counsel for Class Members held in the custody of ORR at the Homestead facility at any point from January 2018 to April 2019. The focus is on detention characteristics of the 10,125 Class Members whose DOJ records clearly indicate their age, date of placement into ORR custody, detention duration, and, when applicable, release from ORR custody.

We conclude that the monthly volume of Class Members held at Homestead has more than doubled since June 2018. Additionally, only 1615 (16% of 10,125) Class Members were released from ORR custody within 20 days. Notably, there were 1828 (18%) Class Members detained more than 90 days, 1593 (16%) detained from 61-90 days, 3318 (33%) from 31-60 days, and 1771 (17%) from 21-30 days.

### Volume

There were a total of 10,125 Class Members held in ORR custody at Homestead from January 1, 2018 through April 30, 2019.  We attempt to account for the constant influx and efflux of Class Members. Table 1 demonstrates that there were 3 (0.003% of 10,125) Class Members already in ORR custody as of December 31, 2017 who were eventually held at Homestead. During 2018, 4753 (46.9%) Class Members who were placed in custody by ORR were held at Homestead. To date in 2019, 5369 (53%) Class Members were placed in custody by ORR and were held at Homestead.

Table 1. Overview of the volume of Class Members held in ORR Custody at Homestead, by year of placement and release.

|  | Grand Total | Released in 2018 | Released in 2019 | Still in ORR Custody on 30APR2019 |
|---|---|---|---|---|
| Grand Total | 10,125 (100.0%) | 3,089 (30.5%) | 4,483 (44.3%) | 2,553 (25.2%) |
| In ORR Custody as of 31DEC2017 | 3 (0.0%) | 3 (0.0%) |  |  |
| Placed into ORR Custody in 2018 | 4,753 (46.9%) | 3,086 (30.5%) | 1,512 (14.9%) | 155 (1.5%) |
| Placed into ORR Custody in 2019, to date | 5,369 (53.0%) |  | 2,971 (29.3%) | 2,398 (23.7%) |

### Demographics

Figure 1. Basic demographics of Class Members held in ORR Custody at Homestead.



Gender

Female
3,087 (30.5%)

Male
7,038 (69.5%)

Age

11 to 13 years
549 (5.4%)

14 to 17 years
9,575 (94.6%)

Country of Origin

Other
174 (1.7%)

Mexico
113 (1.1%)

El Salvador
1,463 (14.4%)

Honduras
2,770 (27.4%)

Guatemala
5,605 (55.4%)

# Homestead: Monthly Volume Trends of Class Members in Detention

Homestead began holding Class Members in ORR custody in March 2018. From June 2018 through December 2018 the average number of Class Members held in detention at Homestead each month was 1,515.

The number of Class Members held in detention at Homestead more than doubled from 1,570 in June 2018 to 3,234 in March 2019 and continued to increase in April 2019 to a maximum for the reporting period of 3,728 Class Members. (Figure 2)

Figure 2. Class Members held in custody by ORR at Homestead by month. Shading indicates length of detention to date.  9,906 Class Members in view.



## Homestead: Length of Detention

Overall, the median length of detention in ORR custody for Class Members held at Homestead was 43 days (Inter Quartile Range (IQR) 25-75).

Few Class Members were in ORR custody 20 days or less (1615, 16% of 10,125). The largest number of Class Members, 3318 (32.8%), remained in ORR custody 31-60 days; the second largest number of Class Members, 1771 (17.5%), remained in ORR custody 21-30 days.  (Table 2). Length of detention distributions were similar across age groups. (Figure 3)

**Table 2.** Overall detention characteristics of Class Members held at Homestead, grouped by age at time of placement into ORR Custody.

|  | Grand Total | 6 to 10 years | 11 to 13 years | 14 to 17 years |
|---|---|---|---|---|
| Number of Class Members | 10,125 (100.0%) | 1 (0.0%) | 549 (5.4%) | 9,575 (94.6%) |
| Released | 7,633 (75.4%) |  | 442 (80.5%) | 7,191 (75.1%) |
| Still in ORR Custody on 30APR2019 | 2,492 (24.6%) | 1 (100.0%) | 107 (19.5%) | 2,384 (24.9%) |
| Length of Detention >20 days | 8,510 (84.0%) | 1 (100.0%) | 443 (80.7%) | 8,066 (84.2%) |
| Length of Detention <=20 days | 1,615 (16.0%) |  | 106 (19.3%) | 1,509 (15.8%) |
| Detention in days, median (IQR) | 43 (25-75) | 32 (32-32) | 40 (23-74) | 43 (25-75) |
|  |  |  |  |  |
| 1-20 days | 1,615 (16.0%) |  | 106 (19.3%) | 1,509 (15.8%) |
| 21-30 days | 1,771 (17.5%) |  | 112 (20.4%) | 1,659 (17.3%) |
| 31-60 days | 3,318 (32.8%) | 1 (100.0%) | 149 (27.1%) | 3,168 (33.1%) |
| 61-90 days | 1,593 (15.7%) |  | 95 (17.3%) | 1,498 (15.6%) |
| 91-120 days | 862 (8.5%) |  | 39 (7.1%) | 823 (8.6%) |
| 121-150 days | 402 (4.0%) |  | 19 (3.5%) | 383 (4.0%) |
| 151-180 days | 263 (2.6%) |  | 11 (2.0%) | 252 (2.6%) |
| 6-<12 months | 295 (2.9%) |  | 18 (3.3%) | 277 (2.9%) |
| 12-<18 months | 6 (0.1%) |  |  | 6 (0.1%) |

**Figure 3.** Distribution of length of detention for Class Members held at Homestead, grouped by age; a different visualization of Table 2 information. The 6-10 years individual is not shown.



# Homestead: Transfer & Release Characteristics

Most Class Members at Homestead began their detention in ORR Custody at Homestead. The majority (8,841, 87.3% of 10,125) also remained in ORR Custody at Homestead until release, while 7% were transferred to BCFS Tornillo (Tables 3 & 4)

At the end of the reporting period, 69.5% of Class Member had been Reunified with a sponsor. Most of these had a sponsor in Florida, Texas, or California. (Figures 4 & 5)  Of those Reunified, 2,013 (28.6% of 7,037) had been held in ORR Custody for 61-120 days, longer than most other types of releases. (Table 5)

**Table 3**. Top 10 facilities where Class Members at Homestead are <u>first</u> held in ORR Custody

| First Program Name | |
|---|---|
| Grand Total | 10,125 (100.0%) |
| Homestead | 10,067 (99.4%) |
| His House | 17 (0.2%) |
| Southwest Key Casa Quetzal | 10 (0.1%) |
| Catholic Charities Boystown | 7 (0.1%) |
| Southwest Key Campbell | 6 (0.1%) |
| BCFS San Antonio | 3 (0.0%) |
| Southwest Key Casita Del Valle | 3 (0.0%) |
| Southwest Key Glendale | 3 (0.0%) |
| Southwest Key Sol | 3 (0.0%) |
| Southwest Key Casa Blanca | 2 (0.0%) |

**Table 4**. Top 10 facilities where Class Members at Homestead are <u>last</u> held in ORR Custody

| Last Program Name | |
|---|---|
| Grand Total | 10,125 (100.0%) |
| Homestead | 8,841 (87.3%) |
| BCFS Tornillo | 707 (7.0%) |
| His House | 134 (1.3%) |
| Catholic Charities Boystown | 77 (0.8%) |
| Southwest Key Casa Padre | 61 (0.6%) |
| BCFS Harlingen | 51 (0.5%) |
| Southwest Key Nueva Esperanza | 22 (0.2%) |
| Heartland Intl Childrens RC | 15 (0.1%) |
| Southwest Key Rio Grande | 14 (0.1%) |
| Southwest Key Casa Montezuma | 13 (0.1%) |



**Figure 4.** Release classification of Class Members at Homestead.

Other
502 (5.0%)

Aged Out
114 (1.1%)

Not Released
2,453 (24.2%)

Reunified
7,037 (69.5%)



**Figure 5.** Top 10 states of sponsors of Reunified Class Members at Homestead.

FL  894 (12.5%)
TX  804 (11.2%)
CA  516 (7.2%)
NY  427 (6.0%)
MD
NJ
VA  266 (3.7%)
GA  248 (3.5%)
TN
NC

% of Class Members

**Table 5**. Lengths of detention in ORR Custody by release classification, for Class Members at Homestead

| Length of Detention | Grand Total | Reunified | Not Released | Other | US Departure | Aged Out |
|---|---|---|---|---|---|---|
| | 10,125 (100.0%) | 7,037 (69.5%) | 2,453 (24.2%) | 502 (5.0%) | 19 (0.2%) | 114 (1.1%) |
| 1-20 days | 1,615 (16.0%) | 716 (10.2%) | 849 (34.6%) | 32 (6.4%) | | 18 (15.8%) |
| 21-30 days | 1,771 (17.5%) | 1,278 (18.2%) | 457 (18.6%) | 27 (5.4%) | | 9 (7.9%) |
| 31-60 days | 3,318 (32.8%) | 2,283 (32.4%) | 765 (31.2%) | 245 (48.8%) | | 25 (21.9%) |
| 61-90 days | 1,593 (15.7%) | 1,263 (17.9%) | 158 (6.4%) | 156 (31.1%) | 2 (10.5%) | 14 (12.3%) |
| 91-120 days | 862 (8.5%) | 750 (10.7%) | 73 (3.0%) | 25 (5.0%) | 1 (5.3%) | 13 (11.4%) |
| 121-150 days | 402 (4.0%) | 350 (5.0%) | 29 (1.2%) | 3 (0.6%) | 3 (15.8%) | 17 (14.9%) |
| 151-180 days | 263 (2.6%) | 200 (2.8%) | 49 (2.0%) | 4 (0.8%) | 3 (15.8%) | 7 (6.1%) |
| 6-<12 months | 295 (2.9%) | 197 (2.8%) | 67 (2.7%) | 10 (2.0%) | 10 (52.6%) | 11 (9.6%) |
| 12-<18 months | 6 (0.1%) | | 6 (0.2%) | | | |

# Homestead: Turning 18 While in ORR Custody

During the reporting period, there were 3,555 17-year-old Class Members released from ORR custody who were held at Homestead. Most (96.8% of 3,555) were released prior to their 18th birthday and their release status is noted as 'Other Status' below. (Table 6)

The remaining 112 (3.2%) had a release status of 'Aged Out', which indicates they were released on the date of their 18th birthday. A larger percentage of Class Members in the 'Aged Out' group (31.3% of 112) were held in custody by ORR for more than 120 days compared to those released before they turned 18 (11.2% of 3,443). Trends related to monthly detention by release status are shown in Figure 6.

**Table 6.** Length of detention for 17-year-old Class Members held at Homestead and released from ORR Custody

| Length of Detention | Grand Total | Aged Out | Other Status (released before 18th bday) |
|---|---|---|---|
| | 3,555 (100.0%) | 112 (3.2%) | 3,443 (96.8%) |
| 1-20 days | 312 (8.8%) | 17 (15.2%) | 295 (8.6%) |
| 21-30 days | 543 (15.4%) | 8 (7.1%) | 535 (15.6%) |
| 31-60 days | 1,178 (33.3%) | 25 (22.3%) | 1,153 (33.7%) |
| 61-90 days | 682 (19.5%) | 14 (12.5%) | 668 (19.5%) |
| 91-120 days | 398 (11.3%) | 13 (11.6%) | 385 (11.3%) |
| 121-150 days | 192 (5.4%) | 17 (15.2%) | 175 (5.1%) |
| 151-180 days | 104 (2.9%) | 7 (6.3%) | 97 (2.8%) |
| 6-<12 months | 125 (3.5%) | 11 (9.8%) | 114 (3.3%) |

**Figure 6.** Monthly trends of release of 17-years-old Class Members held in custody by ORR at Homestead, grouped by type of release. Vertical axis indicates percent of Class Members calculated within release type. Shading indicates length of detention.



## Homestead: Data Processing

1. Data shown are from DOJ files provided for months November 2017 through April 2019.

2. There are approximately 3400 more Class Members (~4% of all ORR records for this period, not just records of the Homestead facility) excluded from this analysis because their DOJ records were ambiguous due to duplicated, inconsistent, or missing data.

3. There are 336 individuals recorded in the DOJ files who were older than 18 at time of admittance into ORR Custody. They are not included in this analysis of Flores Class Members.

4.  Length of detention is calculated as the elapsed days from date of placement into the custody of ORR  to date of release. If there is no release information, the Class Member is assumed still in the custody of ORR  at the end of April 2019, and the length of detention is calculated as the elapsed days from date of placement until 5/15/2019, the date of the census for the latest file provided by the DOJ. The date of placement and last day in detention are included as days in detention.

5. Monthly trends of detained Class Members are the sums of all distinct Class Members held in the custody of ORR  each month. These will differ from average daily census numbers provided by DOJ. Instead our numbers indicate how many Class Members the ORR system detains and is responsible for each month.

# Report for Flores v. Barr Class Counsel

Analysis of Class Members Held at All ORR Facilities                    May 24, 2019

---

## Executive Summary

This report summarizes Department of Justice Office of Refugee Resettlement (DOJ ORR) data provided to Flores v. Barr Class Counsel for Class Members held in the custody of ORR at any point during January 2018 to April 2019. The focus is on detention characteristics of the 85,205 Class Members whose DOJ records clearly indicate their age, date of placement into ORR custody, detention duration, and, when applicable, release from ORR custody.

We conclude that the monthly volume of Class Members held in the custody of ORR has nearly doubled during the reporting period. Additionally, only 11,899 (14% of 85,205) Class Members were released from ORR custody within 20 days. Notably, there were 17,789 (21%) Class Members detained more than 90 days, 14,837 (17%) detained from 61-90 days, 28,690 (34%) from 31-60 days, and 11,990 (14%) from 21-30 days.

## Volume

There were a total of 85,205 Class Members held in the custody of ORR from January 1, 2018 through April 30, 2019.  We attempt to account for the constant influx and efflux of Class Members. Table 1 demonstrates that there were 7,564 (8.9% of 85,205) Class Members already in ORR custody as of December 31, 2017, 51,191 (60.1%) were placed into ORR custody during 2018, and 26,450 (31%) were placed into ORR custody during the first four months of 2019.

Table 1. Overview of the volume of Class Members held in ORR Custody, by year of placement and release.

|  | Grand Total | Released in 2018 | Released in 2019 | Still in ORR Custody on 30APR2019 |
|---|---|---|---|---|
| Grand Total | 85,205 (100.0%) | 45,961 (53.9%) | 26,623 (31.2%) | 12,621 (14.8%) |
| In ORR Custody as of 31DEC2017 | 7,564 (8.9%) | 7,181 (8.4%) | 154 (0.2%) | 229 (0.3%) |
| Placed into ORR Custody in 2018 | 51,191 (60.1%) | 38,780 (45.5%) | 10,949 (12.9%) | 1,462 (1.7%) |
| Placed into ORR Custody in 2019, to date | 26,450 (31.0%) |  | 15,520 (18.2%) | 10,930 (12.8%) |

## Demographics

Figure 1. Basic demographics of Class Members held in ORR Custody.



**Gender**
- Female 25.9K (30.4%)
- Male 59.3K (69.6%)

**Age**
- 0 to 5 years 2.5K (2.9%)
- 6 to 10 years 6.0K (7.1%)
- 11 to 13 years 7.9K (9.3%)
- 14 to 17 years 68.8K (80.7%)

**Country of Origin**
- Other 3.5K (4.1%)
- Mexico 2.2K (2.6%)
- El Salvador 11.3K (13.2%)
- Honduras 23.8K (27.9%)
- Guatemala 44.5K (52.2%)

## All Facilities: Monthly Volume Trends of Class Members in Detention

The number of Class Members held in custody by ORR each month nearly doubled during the reporting period. February 2018 saw the fewest number of Class Members held in custody by ORR, 10,566; the maximum of 20,285 was recorded in April 2019. (Figure 2)

The number of Class Members held in custody by ORR for more than 3 months tripled, from 1,782 in January 2018 to 5,472 in October 2018, and remained at this level through December 2018.

Figure 2. Class Members in ORR Custody by month. Shading indicates length of custody to date; 85,205 Class Members in view.

## All Facilities: Length of Detention

Overall, the median length of detention in ORR custody was 48 days (Inter Quartile Range (IQR) 28-81).

Few Class Members were in ORR custody 20 days or less (11,899, 14% of 85,205). The largest number of Class Members, 28,690 (33.7%), remained in ORR custody 31-60 days; the second largest number of Class Members, 14,837 (17.4%), remained in ORR custody 61-90 days.  (Table 2)

Length of detention distributions were similar across age groups. (Figure 3)

**Table 2.** Overall detention characteristics grouped by age at time of placement into ORR Custody.

|  | Grand Total | 0 to 5 years | 6 to 10 years | 11 to 13 years | 14 to 17 years |
|---|---|---|---|---|---|
| Number of Class Members | 85,205 (100.0%) | 2,508 (2.9%) | 6,016 (7.1%) | 7,919 (9.3%) | 68,762 (80.7%) |
| Released | 72,816 (85.5%) | 2,117 (84.4%) | 5,228 (86.9%) | 6,882 (86.9%) | 58,589 (85.2%) |
| Still in ORR Custody on 30APR2019 | 12,389 (14.5%) | 391 (15.6%) | 788 (13.1%) | 1,037 (13.1%) | 10,173 (14.8%) |
| Length of Detention >20 days | 73,306 (86.0%) | 2,146 (85.6%) | 4,900 (81.4%) | 6,450 (81.4%) | 59,810 (87.0%) |
| Length of Detention <=20 days | 11,899 (14.0%) | 362 (14.4%) | 1,116 (18.6%) | 1,469 (18.6%) | 8,952 (13.0%) |
| Detention in days, median (IQR) | 48 (28-81) | 49 (28-84) | 45 (24-74) | 43 (24-73) | 49 (29-83) |
| 1-20 days | 11,899 (14.0%) | 362 (14.4%) | 1,116 (18.6%) | 1,469 (18.6%) | 8,952 (13.0%) |
| 21-30 days | 11,990 (14.1%) | 340 (13.6%) | 886 (14.7%) | 1,270 (16.0%) | 9,494 (13.8%) |
| 31-60 days | 28,690 (33.7%) | 820 (32.7%) | 1,900 (31.6%) | 2,537 (32.0%) | 23,433 (34.1%) |
| 61-90 days | 14,837 (17.4%) | 438 (17.5%) | 1,083 (18.0%) | 1,293 (16.3%) | 12,023 (17.5%) |
| 91-120 days | 7,164 (8.4%) | 196 (7.8%) | 432 (7.2%) | 571 (7.2%) | 5,965 (8.7%) |
| 121-150 days | 3,895 (4.6%) | 139 (5.5%) | 262 (4.4%) | 291 (3.7%) | 3,203 (4.7%) |
| 151-180 days | 2,249 (2.6%) | 82 (3.3%) | 133 (2.2%) | 172 (2.2%) | 1,862 (2.7%) |
| 6-<12 months | 3,615 (4.2%) | 106 (4.2%) | 176 (2.9%) | 255 (3.2%) | 3,078 (4.5%) |
| 12-<18 months | 604 (0.7%) | 15 (0.6%) | 15 (0.2%) | 31 (0.4%) | 543 (0.8%) |
| 18-<24 months | 182 (0.2%) | 7 (0.3%) | 6 (0.1%) | 16 (0.2%) | 153 (0.2%) |
| 24+ months | 80 (0.1%) | 3 (0.1%) | 7 (0.1%) | 14 (0.2%) | 56 (0.1%) |

**Figure 3.** Distribution of length of detention grouped by age; a different visualization of Table 2 information.



# All Facilities: Turning 18 While in ORR Custody

During the reporting period, there were 30,355 17-year-old Class Members released from ORR custody. Most (91.7% of 30,355) were released prior to their 18th birthday and their release status is noted as 'Other Status' below. (Table 3)

The remaining 2,533 (8.3%) had a release status of 'Aged Out', which indicates they were released on the date of their 18th birthday. A larger percentage of Class Members in the 'Aged Out' group (14.7% of 2,533) were held in custody by ORR for more than 6 months compared to those released before they turned 18 (5.6% of 30,355). Trends related to monthly detention by release status are shown in Figure 4.

**Table 3.** Length of detention for 17-year-old Class Members released from ORR Custody

| Length of Detention | Grand Total | Aged Out | Other Status (released before 18th bday) |
|---|---|---|---|
| | 30,355 (100.0%) | 2,533 (8.3%) | 27,822 (91.7%) |
| 1-20 days | 3,095 (10.3%) | 657 (26.2%) | 2,438 (8.8%) |
| 21-30 days | 3,806 (12.6%) | 237 (9.4%) | 3,569 (12.9%) |
| 31-60 days | 10,100 (33.5%) | 481 (19.2%) | 9,619 (34.8%) |
| 61-90 days | 5,699 (18.9%) | 324 (12.9%) | 5,375 (19.4%) |
| 91-120 days | 3,019 (10.0%) | 188 (7.5%) | 2,831 (10.2%) |
| 121-150 days | 1,617 (5.4%) | 154 (6.1%) | 1,463 (5.3%) |
| 151-180 days | 925 (3.1%) | 97 (3.9%) | 828 (3.0%) |
| 6-<12 months | 1,593 (5.3%) | 288 (11.5%) | 1,305 (4.7%) |
| 12-<18 months | 267 (0.9%) | 72 (2.9%) | 195 (0.7%) |
| 18-<24 months | 47 (0.2%) | 11 (0.4%) | 36 (0.1%) |
| 24+ months | 20 (0.1%) | 2 (0.1%) | 18 (0.1%) |

**Figure 4.** Monthly trends of release of 17-years-old Class Members held in custody by ORR, grouped by type of release. Vertical axis indicates percent of Class Members calculated within release type. Shading indicates length of detention.



## All Facilities: Data Processing

1. Data shown are from DOJ files provided for months November 2017 through April 2019.

2. There are approximately 3400 more Class Members (~4% of all records) excluded from this analysis because their DOJ records were ambiguous due to duplicated, inconsistent, or missing data.

3. There are 336 individuals recorded in the DOJ files who were older than 18 at time of admittance into ORR Custody. They are not included in this analysis of Flores Class Members.

4. Length of detention is calculated as the elapsed days from date of placement into the custody of ORR to date of release. If there is no release information, the Class Member is assumed still in the custody of ORR at the end of April 2019, and the length of detention is calculated as the elapsed days from date of placement until 5/15/2019, the date of the census for the latest file provided by the DOJ. The date of placement and last day in detention are included as days in detention.

5. Monthly trends of detained Class Members are the sums of all distinct Class Members held in the custody of ORR each month. These will differ from average daily census numbers provided by DOJ. Instead our numbers indicate how many Class Members the ORR system detains and is responsible for each month.

Exhibit 6

I, Marsha Rae Griffin, MD, make the following statement based on my personal knowledge and declare that the following is true.

1.  I am a Professor of Pediatrics at the University of Texas Rio Grande Valley (UTRGV) School of Medicine. Since 2007, I have been the Director of Community for Children, an elective program for medical students and residents, which studies the effects of immigration enforcement on a border community, its children and on those children held in detention.

2.  Over the last ten years, I have toured multiple ORR facilities, CBP Processing Centers, Adult Detention Centers and Family Detention Centers.  I visited ORR facilities in Texas and Arizona, including facilities for "tender age children." In May 2018, I toured and consulted with attorneys serving detainees at the family detention center in Dilley, Texas. Most recently, in late October 2018, I accompanied Flores attorneys to Tornillo to inspect the facility and interview the children held there.

3.  I serve as Co-Chair of the American Academy of Pediatrics (AAP) Immigrant Health Special Interest Group. I co-authored the AAP's 2017 Policy Statement on the Detention of Immigrant Children which outlines the harmful effects of detention on children and advocates against the separation of children from their parents. I attached a copy of this report and commend it to you as a foundational and comprehensive discussion and analysis of the harms suffered by children held in immigration detention.  I am a designated spokesperson for the AAP on the effects of immigration enforcement on children.

4.  It is never in the best interest of a child to be detained.  With or without a parent, no time in detention is safe for a child. The harm lies in the nature of detention itself in

which a child is rendered powerless, subjected to indefinite detention with no effective control over any decisions, including the length of their detention. Both tender age children's and adolescents' health are negatively affected by detention. Adolescents have difficulty understanding and accepting the terms of detention and the uncertainty regarding their release.  At a crucial time in their development, when normally they are learning the skills of independence and coping on their own, all control is taken from them.  At a time when all adolescents need privacy, they are given none.

5. Over the last few years, I and my colleagues at the American Academy of Pediatrics have received frequent requests from probono immigration attorneys seeking our advice regarding the deteriorating physical and mental health of their detained juvenile clients.  So many in fact, that in 2018, physicians and attorneys joined together to create the Medical Review for Immigrants.  I am the Medical Director of this program. There are now over 200 volunteer physicians willing to review a child's medical chart, if a child's immigration attorney contacts us.  Understanding the gravity and urgency of many of these cases, the physicians commit to review the records within 24-48 hours and respond to the attorneys' request, because many times the child's life hangs in the balance.  Many of these cases involve the inappropriate use of psychotropic medications.

6. In December 2018, as Medical Director of Medical Review for Immigrants, I referred a case of prolonged detention and over-medication of an adolescent to an expert in Developmental-Behavioral Pediatrician for his review of the medical record for the attorneys. In my last communication with the physician in February 2019, he called the boy's treatment, "egregious".

7.  In March 2019, I received a request for assistance from a professor of counseling, who had been allowed to visit a child held in an inpatient behavioral treatment center in South Texas. The counselor has a PhD in counseling and serves as a child advocate for this child. She was deeply disturbed that he was slurring his words and drooling, when she met him. He had recounted a story of forced injection of medication by the staff at the treatment center. I referred the case to a probono legal team for their review and possible representation of the child. This level of medical abuse deserves investigation.

8.  In October 2018, I accompanied Flores attorneys conducting interviews with children held at Tornillo. All the children I interviewed had been in Tornillo for over two months, one for over four months. Many had already spent months in another ORR facility prior to their transfer to Tornillo. Some children interviewed had been detained for over nine months. Prior to being transported to Tornillo, all the children interviewed by the group were told that their cases would move quickly, once they got to Tornillo and that they would be with their families very soon. This proved untrue across the board. All asked why their cases were taking so long. Children sought help getting released and displayed despair at not knowing when and if they would be released. Many feared that they would never be released.

9.  A sixteen-year-old girl said that many girls would cry themselves to sleep at night without anyone to comfort them. The "chaperones" that stayed in the tents during the night did nothing to help. She went on to say, "I don't cry anymore. I am no longer angry. I am no longer sad. I am nothing." To any pediatrician, this statement would be considered a red flag that she is a suicide-risk. Other children expressed similar sentiments. Prolonged, uncertain detention of previously traumatized children is the

causative factor in these children's deteriorating mental and physical health and will have long-term health consequences.

10. Earlier that day, the Director of the Tornillo facility told us that Tornillo was not required to have mental health providers and that it was unnecessary, because the children were all stable and did not have any emotional issues. He stated that the staff "kept an eye on the children" and they would be able to tell just by looking at a child, if he or she had a problem. After interviewing the children and witnessing the severe mental and emotional distress of the children, we asked for another meeting with the Director and detailed our concerns with particularity. He expressed surprise and said that if these children were having emotional problems they needed to be "transferred out" so they could obtain proper mental evaluation and treatment. Having personally reviewed dozens of cases for probono attorneys of emotionally distressed children who had been committed to inpatient psychiatric facilities and forcibly administered injectable psychotropic medications or given multiple combinations of psychotropic medications, I expressed great concern that transferring these children would only exacerbate the problem and could potentially cause further long-term mental and physical damage to the child.  The mental distress of these children could be effectively treated by promptly uniting them with their families.

11. Children detained even for short periods experience significant negative physical and emotional symptoms. They exhibit developmental delays and poor psychological adjustment, affecting functioning in school and in social interactions including with family. My observations and experience are consistent with qualitative reports about detained unaccompanied immigrant children which find high rates of posttraumatic

stress disorder, anxiety, depression, suicidal ideation, and other behavioral problems. Even brief detention can cause psychological trauma and induce long-term mental health risks for children. It is incontrovertible that both short-term and long-term damage to the child is exacerbated by the uncertainty they experience around the length of detention and their lack of understanding as to why they are not being released.

12. Most children in ORR facilities believe that any feelings shared with "clinicians" ("mental health" providers) who may be available to talk with them will be shared with DHS, so they say nothing. If a child does report emotional problems, he/she is at risk of placement in a staff- secure or a residental treatment facility and given psychotropic drugs which amounts to chemical restraint. The child is then labeled "unstable" which will delay release, or in some incidences, deny it all together.

13. Although many of the ORR facilities I have visited provide entertainment and recreational activities, the fact remains that these facilities operate as detention facilities. Like a prison, no child is allowed to leave the premises on their own. These facilities are often surrounded by high fences and locked gates. No child is allowed to wander on their own. Each child is constantly monitored, and the staff is strict in maintaining an 8:1 ratio of children to chaperone. There is inconsistent access to quality medical, dental, or mental health care, and a lack of appropriate developmental or educational opportunities. Detention of children in these conditions leads to regressive behavioral changes in children, including decreased eating, sleep disturbances, clinginess, withdrawal, aggression, and eventually self-injurious behavior.

14. In April of 2018, at an ORR facility in Raymondville, Texas, holding "tender age children," I, along with other pediatricians, saw a 5-year-old girl who was being

"guarded" for trying to run away and biting anyone who came near her. She was

allowed outdoor play time limited to a small courtyard.  Two chaperones were assigned

to watch her.  It was clear to us that her behavior was an age appropriate expression of

acute distress and fear. The staff was untrained to recognize this and to manage it

appropriately. In all detention facilities holding children including those with infants

and toddlers, staff are admonished to not touch a child unnecessarily - to not hug a

child. Nor are children allowed to give loving touch to another child, not even their

siblings.

15. None of the ORR facilities that I have toured in the last ten years have been "shelters".

They are all secure. Children cannot leave on their own. If they do, they are considered

runaways and a flight risk which will cause them to be housed in a more restrictive

environment including those that are known to administer drugs as a form of chemical

restraint. Children are told that this will be a black mark in their immigration file and

will prolong their time in detention and that they will be punished for this. Almost all

facilities are surrounded by high fencing and locked gates. I asked one of the children

interviewed at Tornillo, if they were free to come and go outside the confines of the

detention center. She looked at me in disbelief and shook her head no. She stated that

the children at the facility know that they would be punished or deported, if they left the

facility.

16. Another cause of the children's sense of hopelessness and isolation is the lack of

meaningful communication with their families. They are only allowed to talk to their

family twice a week for 10 minutes each time. If the child's family is not available at

the time the child is allowed to call, he/she must wait until the next time perhaps days

later. Moreover, these are not confidential calls. Due to ORR rules that the child must be monitored by a chaperone at all times, these conversations are overheard by the ORR staff. The "phone rooms" that I have seen are small with several chairs and phones close together. Children have no privacy. The primary and sometimes the only source of information the child has about release comes from the sponsor, so children are forced to choose between talking with that person or with their family in their home country. This is an untenable situation contributing to the feelings the children have of isolation, loneliness and helplessness. They need to have time to express their feelings to their families and to receive guidance about their detention, release and court cases.

17. Given the restrictions on phone calls, the children have virtually no opportunity to contact a probono immigration attorney.  Although they are given a form with a list of attorneys and their phone numbers, the form is in English and none of the children speak or read English.  Besides, this form is locked up in the child's file at the ORR facility. The children have no access to this list of attorneys, nor proscribed time to try to contact an attorney.

18. It is never in the best interest of the child to be held in immigration detention. In my opinion, the government is causing irrevocable mental and physical harm to every immigrant child held in immigration detention. The longer the child is held the greater the harm. We are further damaging children already traumatized by events at home and during their perilous journey here. We are not providing safe haven. Instead, we are participating in child abuse and neglect.


Respectfully submitted on this day *May 30* at *2019* .

Marsha R. Griffin, MD FAAP

**CURRICULUM VITAE**

**Marsha R. Griffin, MD, FAAP**
**University of Texas Rio Grande Valley School of Medicine**
**Department of Pediatrics**
**2102 Treasure Hills Blvd, Harlingen, Texas 78550**
**marsha.griffin@utrgv.edu**
**956-296-1537 (office); 956-832-8255 (cell)**

---

## EDUCATION

| | | |
|---|---|---|
| M.D. | University of Texas Health Science Center at San Antonio (UTHSCSA) School of Medicine, San Antonio, TX | May 2003 |
| | United Theological Seminary, graduate studies in Social Justice Issues New Brighton, MN | 1995–1998 |
| B.A. | University of Texas Pan American, Psychology/Biology Edinburg, TX | May 1976 |
| | Southwestern University, Pre-Med/Biology Georgetown, TX | 1969-1970 |
| | Texas Woman's University, Communication Denton, TX | 1968-1969 |

## RESIDENCY TRAINING

| | | |
|---|---|---|
| Pediatric Resident | University of Texas Health Science Center at San Antonio San Antonio, TX | 2005-2006 |
| Pediatric Resident | Baylor College of Medicine Houston, TX | 2004-2005 |
| Pediatric Internship | Baylor College of Medicine Houston, TX | 2003-2004 |

## CURRENT ACADEMIC APPOINTMENTS

| | | |
|---|---|---|
| Professor | Department of Pediatrics University of Texas Rio Grande Valley School of Medicine | 2016-present |
| Director | Division of Child and Family Health Department of Pediatrics University of Texas Rio Grande Valley School of Medicine | 2016-present |
| Director | *Community for Children: At the Border and Beyond* International Elective in Community Pediatrics, Department of Pediatrics University of Texas Rio Grande Valley School of Medicine University of Texas Health Science Center at San Antonio Regional Academic Health Center | 2006-present<br>2006-2016 |
| Adjunct Associate Professor | Department of Pediatrics University of Texas Health Science Center at San Antonio Regional Academic Health Center | 2013-2016 |
| Clinical Assistant Professor | Department of Pediatrics University of Texas Health Science Center at San Antonio Regional Academic Health Center | 2006–2013 |

1

| Adjunct Doctoral Faculty | Department of Counseling, Leadership, Adult Education, and School Psychology in the College of Education, Texas State University | 2015-present |
|---|---|---|

## PREVIOUS NON-ACADEMIC APPOINTMENTS

| Founder and President | Focus Foundation, Inc. Santa Fe, NM | 1989-1998 |
|---|---|---|

*Details:*  Founded the non-profit, Focus Foundation, Inc., to produce documentary films highlighting social justice issues affecting children's abilities to reach their full potential and to give children and youth a voice in creating the future.

| Documentaries | *Summer's Story:  The Truth and Trauma of Date Rape* | 1992 – Santa Fe, NM |
|---|---|---|

Summer's Story was the personal story of a young college woman, who was raped her first month in college, of her healing and her advice to other college students.  This film was distributed to major universities across the nation and was chosen by the State of Minnesota to be the lead piece in their Against Violence Campaign.

| | *In Our Hands* | 1993 – Santa Fe, NM |
|---|---|---|

*In Our Hands* was a documentary celebrating the lives, visions, and art of young deaf artists from five State Deaf Schools across the Southwest.  Focus Foundation edited the film, which was distributed to all State Deaf Schools in the United States.

| | *Voices of Our Children* | 1995 – Ojibway country |
|---|---|---|

*Voices of Our Children* was commissioned by the Minnesota Juvenile Justice Committee to document the successes of Ojibway-based programs for their children growing up on five Ojibway reservations in Minnesota and southern Canada. The children and youth on the reservations shared their challenges, their heartaches and their visions for the future of all Native American living on reservations.

| | *Augsburg Peace and Justice Program* | *1997- Minneapolis, MN* |
|---|---|---|

This film was commissioned by Augsburg College and documented the impact of the Center for Global Education and Experience on students at Augsburg College.  The Center's programming explores peace and social justice through community engagement.

| Director of Housing Services | Central Community Housing Trust, (CCHT) now Aeon Minneapolis, MN | 1994-1998 |
|---|---|---|

*Details:*  Responsible for fostering community partnerships within the neighborhoods served by CCHT developing social services for the residents of CCHT housing, which included over 800 units of affordable housing in downtown Minneapolis.  Organized and facilitated services in the inner city for formerly homeless, former addicts and alcoholics, Somalian refugees, and street children.

| General Pediatrician | Brownsville Community Health Center (BCHC) | 2006-2016 |
|---|---|---|
| Chief of Pediatrics | Brownsville, TX | 2011-2016 |

*Details:* Responsible for the fiscal management, procurement of supplies, and oversight of all medical staff (including four pediatricians, nurse practioner, physician assistant, and eight certified medical assistants). Provided both outpatient and inpatient care for children in the Lower Rio Grande Valley of Texas, one of the most medically underserved regions of the United States. Approximately 70% of the children in the BCHC clinic are indigent patients.  Another 30% receive Medicaid or SCHIP. Approximately 90% of my patients' parents speak only Spanish. Appointed as medical director for BCHC Campus Care Clinic in April 2010, serving the indigent students in the local independent school district. Prior to appointment as Chief of Pediatrics in 2011, served as a general pediatrician on the staff of BCHC, beginning in 2006. In 2011, created the "These Bones Won't Heal:  The Fracture Fund" and solicited funds to provide on-going funding for indigent patients to cover the cost of orthopedic care for simple fractures. Resigned as Chief of Pediatrics in 2014 to devote time to special projects focusing on immigration and advocacy for human rights.

| Co-Founder & | MedicoLegal Partnership for Children/RioGrande Valley (MLPC) | 2007-2016 |
|---|---|---|
| Medical Director | Brownsville Community Health Center/Texas RioGrande Legal Aid, Brownsville, TX | |

*Details:*  Initiated and organized the development of the first two operational medical-legal partnerships (MLP) in Texas, located in San Antonio and Brownsville. As Medical Director of MedicoLegal Partnership for Children – Rio Grande Valley. Maintain the partnership between Brownsville Community Health Center and Texas RioGrande Legal Aid, Inc. and promote MLP among all the physicians and staff of the clinic. Participate in MLP activities on the state and national level, including service to the medical

2

advisory committee for the National Center for Medical Legal Partnership.  MedicoLegal Partnership for Children – Rio Grande Valley was awarded the White House Champion of Change Award in 2011.

## TEACHING

Director                              Community for Children: At the Border and Beyond                    09/2006-present
UTRGV School of Medicine
*Details:*  Created a 4-week elective rotation for medical students and residents from across the country, designed as the core international health and community pediatrics curriculum for the Department of Pediatrics focused on the border of Mexico and Texas, UTHSCSA.  The curriculum has eight primary objectives:  rights of the child; social determinants of disease and health; clinical care in resource-poor regions; the impact of poverty, violence and immigration; advocacy; cultural humility; fostering a culture of compassion among physicians and professional development.  The CfC curriculum is addressed through didactics, community outreach, advocacy projects, tailored Spanish-language classes, guided reflection and individual development counseling. The rotation is offered two times per year with an average of 16 students and residents annually. Working with the community-based organizations, the students and residents expand the organizations' outreach, research and advocacy within the local community creating positive change.  CfC has trained 118 medical students, residents and fellows, from major academic medical schools from across the US, Canada and Israel, since its inception.  The Community for Children program is now under the auspices of UTRGV School of Medicine,

Professor of Pediatrics                Third-Year Pediatric Didactics                      07/2018-present
UTRGV School of Pediatrics
Details:  Provided syllabus, NMBE style questions, didactic instruction on Common Acute Pediatric Illnesses and Human Rights and Advocacy for third-year medical students on pediatric rotations.  Training 50+ MSIII's per academic year.

Professor of Pediatrics                Medicine, Behavior and Society                      09/2017-present
UTRGV School of Medicine
*Details:*  Provided syllabus, USMLE style question and presentation on social determinants of health:  *Access to Care:  Critical Access.*

Professor of Pediatrics                Mind, Brain and Behavior                            09/2017-2018
UTRGV School of Medicine
*Details:* Facilitated problem-based learning classes with MSII's for the Mind, Brain and Behavior Module, which is a module combining Neurology, Psychiatry and Neurosciences.

Clinical Adjunct Associate Professor   Third-Year Pediatric Clerkship                     09/2006-2016
UTHSCSA/RAHC
*Details:*  Hands-on and didactic instruction for pediatric third- year medical students in pediatric patient care issues. Train three to four students each academic semester.

## RECENT HONORS

2018 Council on Community Pediatrics Outstanding Service in Advocacy Award, American Academy of Pediatrics Annual Leadership Forum, March 2019, Chicago, IL.
2018 Health Policy Hero.  National Center on Health Policy. To be awarded May 2019.  Washington, DC.
2018 American Academy of Pediatrics (AAP) Clifford G. Grulee Award. Considered to be one of the greatest honors the Academy can bestow upon one of its Fellows for service to children and to the Academy and its programs.
2015 American Academy of Pediatrics (AAP) Special Achievement Award for organizing medical care for Central American immigrant families on the Texas/Mexico border during the surge of 2014.
2015 Texas Pediatric Society's Central American Refugee Humanitarian Award
2014 Migrant Health Network – 30 "Clinicians Making a Difference" – Presented to clinicians from the U.S. and abroad who have dedicated their lives to migrant health and the migrating poor
2012 American Academy of Pediatrics Local Heroes Award – Presented at the AAP Annual Meeting, New Orleans
2011 White House Initiative – Champions of Change – Awarded to Brownsville Community Health Center/Texas RioGrande Legal Aid for Medical-Legal Partnership

## RECENT GRANTS

American Academy of Pediatrics Disaster Funding - $40,000                              01/01/2019-12/31/2019
Funding to support Clinical Efforts at the Catholic Charities Rio Grande Valley Humanitarian Respite Center

3

Details:  Joint project between UTRGV School of Medicine, Stanford University, Texas Children's Hospital/Baylor College of Medicine and Catholic Charities of the Rio Grande Valley.  Texas Pediatric Society fiduciary.  Funds to purchase medical supplies and over-the-counter medications for the Humanitarian Respite Clinic.

Anonymous Donor - $50,000                                                                              01/01/2019-12/31/2019
Program funding from foundation to sponsor Interviewing Immigrant Children in Detention: Developing Training Modules for Attorneys and Other Professionals
Details:  Joint project between UTRGV Department of Pediatrics and Stanford University School of Medicine Department of Pediatrics to develop training modules in best practice models in interviewing children, who have been previously traumatized and are currently in U.S. governmental custody. These training modules are an effort to avoid re-traumatizing these children, while still obtaining needed documentation of the conditions within the detention facilities where children are held. The modules and evaluation results will be distributed nationally.

Proctor and Gamble - $9,960                                                                              01/01/17-12/31/17
Community for Children – A Program for Physicians-in-Training Developing Leaders Capable of Creating Positive Systemic Change
Details: Co-authored grant to support leadership development for medical trainees participating in Community for Children (CforC). The grant will fund travel of nine medical students and residents to present their advocacy work at national conferences. In addition, one outstanding fellow will receive intensive mentoring from CforC faculty, accompanying them to national meetings addressing human rights issues, enabling this fellow to dialogue with the highest levels of American Academy of Pediatrics' leadership. Information about Community for Children is available at www.communityforchildren.org.

American Academy of Pediatrics/CATCH Implementation Grant - $12,000                          04/2013-03/2014
Details: Co-authored grant and was one of 13 proposals of 108 applications funded. Grant was to implement "Bikes for Tikes" a monthly health promotion program supervising bicycle rides along the City of Brownsville's new Hike & Bike trails, designed for children (6-12 yrs) and their families. Funds were used to purchase bicycles & helmets and healthy snacks for the project.  This program was eventually integrated into the City's recreation department. Helmets were given to all participant children.

American Academy of Pediatrics- Mentorship and Technical Assistance Grant; $1,855             11/2010-11/2011
Details: Co-authored grant to obtain funds to support participation of professional meeting facilitator/evaluator at the inaugural meeting of Texas Medical Legal Partnerships.

American Academy of Pediatrics, 2007 CATCH Residency Training Funds; $10,000                   03/2007-01/2009
Details:  Co-Principal Investigator for development, implementation, and evaluation of curriculum for Community for Children International Elective.

## PENDING GRANTS

Project Title: **South Texas Center for Biomedical Research on Hispanic Health**
Williams-Blangero, Contact PI, Griffin M, Core Co-Leader on Community Engagement
Direct: 13,864,876, Indirect: $6,307,969, Total $20,182,845
Submitted, Scored 30, Pending Council Review

Project Title:  **Humanitarian Respite Clinic at the Catholic Charities of the Rio Grande Humanitarian Respite Center** in McAllen, TX,
UNICEF USA & Silicon Valley Foundations ongoing solicitations
Griffin Principal Investigator
Direct Costs: $2,500,000
Details:  Providing healthcare services and ongoing case management for the recently released asylum seeking families from Central America, released and approved by the Department of Homeland Security to travel north to family or sponsors and to remain in this country pending immigration hearings. This is a partnership between Catholic Charities of the Rio Grande, UTRGV School of Medicine, Texas Children's Hospital/Baylor College of Medicine and Stanford University School of Medicine.

## SELECT COMMUNITY/ACADEMIC PRESENTATIONS

**Griffin M,** (2018 February) *Providing Trauma-Informed Care to Immigrant Patients.* Presentation to Clinical Pastoral Education Interns, Valley Baptist Medical Center, Harlingen, TX.

**Griffin M,** (2018 August) Invited Speaker, *An Update on Immigration on the Border: Trauma in Immigrant Children.* Brownsville Independent School District School Nurses, Brownsville, TX.

4

Rosenberg J, Sudanagunta S, *Griffin M,* (September 2018) *Food Security in Colonias of Hidalgo County, Texas: A Needs Assessment Analysis.* Poster Presentation at UTRGV Second Annual Research Symposium, Edinburg, TX.

*Griffin M,* (2018 September) *Access to Care:  What Does This Mean?* UTRGV Mind, Behavior and Society Module. Edinburg, TX.

*Griffin M,* (October 2018) Invited Speaker, *Immigration as seen from the Border: Impact on Health.* UTRGV AMA Chapter of Medical Students. Edinburg TX.

*Griffin M,* (2018 December) Invited Speaker. *Immigration as a Social Determinant of Health Along the Border.*  UTRGV Area Health Education Program Office's Continuing Education Seminars, "Healthcare Challenges Along the Border." Brownsville, TX.

*Griffin M, Advocacy in Pediatrics.*  UTRGV MSIII Didactic Sessions, (2018August, October, December) (2019 February, April). Edinburg TX.

Gomez, Y, *Griffin M, Acute Illnesses in Pediatrics.*  UTRGV MSIII Didactic Sessions, (2018 September, November) Edinburg, TX.

*Griffin M,* Berry L.  *Acute Illnesses in Pediatrics.*  UTRGV MSIII Didactic Sessions, (2019 March, May) Edinburg, TX.

*Griffin M.* (2019 May) Invited Speaker. *Stories from the Immigration Frontlines: Why It Should Matter to Us All.*   UTRGV Neuroscience Research Seminar Series. Edinburg, TX.

*Griffin M.* (2019 May) Invited Speaker for Preventive Medicine Residents.  *Immigration as Seen from the Border:  Stories from the Frontlines.* Edinburg TX.

*Griffin M.* (2019-2020) Invited to assist with development of Global Health Tract for OB/Gyn Residents with focus on the Border.

*Griffin M,* Tapia B.  (2019 Summer) UTRGV SoM Summer Course: Immigration Status as a Social Determinant of Health.  Design of Curriculum.

*Griffin M.*  (2019-2020 Academic Year) UTRGV SoM Pediatric MSIV Elective:  Community for Children. Design of Curriculum.


## SELECT PRESENTATIONS

*Griffin M,* (2019 April) Invited Plenary Speaker. *Advocating for Immigrant Children:  Perspectives from the Border.* American Academy of Pediatrics Legislative Conference.  Washington, DC.

*Griffin M,* Son M. (2019 March) Invited Grand Rounds Speaker.  *The Rights of a Child as Viewed through a Global Lens: Stories from the Frontlines.* Children's Mercy Hospital, Kansas City, KS.

*Griffin M,* Son M.  (2019 March) Invited Speakers.  *Ethical Considerations in Caring for the Global Child.*  Bioethics Center, Children's Mercy Hospital, Kansas City, KS.

*Griffin M,* (2019 March) Invited Grand Rounds Speaker.  *Immigration as seen from the Border: Stories from the Frontlines.* INOVA Fairfax Hospital for Children. Fairfax, VA.

*Griffin M* (2019 March) Invited Guest Speaker, *On Call on the Border:  Coordinating Children's Care.*  DC, Virginia, and Maryland Chapters of the American Academy of Pediatrics Spring Dinner and Symposium. Catholic University, Washington, DC.

*Griffin M,* (2019 March) Invited Leonard P. Rome CATCH Visiting Professor and Grand Rounds Speaker.  *Coming to a Neighborhood Near You: Immigration Frontlines.* Meetings with community and school leaders regarding authentic engagement. Meeting with hospital administrators on the rights of a child and needed national health policy to protect immigrant children.  Meeting with faculty regarding curriculum design to promote resilience in physicians-in-training. Children's National Medical Center. Washington, DC.

*Griffin M,* (2019 March) Invited Grand Rounds Speaker.  *Immigration as seen from the Border: Stories from the Frontlines.* The University of Texas at Austin Dell School of Medicine. Austin, TX.

*Griffin M,* (2019 March) Invited Key Panelist, *Migration and displaced children: current issues and potential solution.* Coalition of Centres in Global Child Health, American Academy of Pediatrics, and the International Pediatric Association at the 10th Annual

Consortium of Universities of Global Health conference this Satellite Session will focus on health and nutrition issues among migrant children around the world.  Chicago, IL.

**Griffin M,** (2018 November) Invited Speaker.  *Immigration as seen from the Border: The Urgent Need for a Network.* TEACH TX Collaborative Conference, Houston, TX.

**Griffin M,** (2018 October) Invited Speaker.  *Immigration as seen from the Border: Stories from the Frontlines.* Yale Immigrant Health Initiative.  Zoom Webinar.  New Haven, CN.

**Griffin M,** (2018 October) Invited Guest Panelist, *Immigration Crisis: Impact on Families and Children's Health,* Association of Schools and Programs of Public Health Webinar:  Academic Public Health and the Family Immigration Crisis.

**Griffin M,** (2018 October) Invited Key Panelist, Massachusetts General Hospital for Children's 2018 Summit for Pediatric Global Health, Boston, MA.

**Griffin M,** (2018 October) Invited Speaker.  *Immigration as seen from the Border: Stories from the Frontlines.* Massachusetts General Hospital/Harvard School of Medicine Grand Rounds. Boston, MA.

**Griffin M,** (2018 April) Invited Speaker. *Trauma in Immigrant and Refugee Children.*  Invited speaker, American Academy of Pediatrics Trauma-Informed Pediatric Provider Course, Houston, TX.

**Griffin M,** (2018 March) Invited Speaker.  Unique *Healthcare Challenges in Immigrant and Refugee Children.*  Invited speaker, American Academy of Pediatrics Advocacy Lecture for The Society of Pediatric Anesthesia, Pediatric Anesthesiology 2018 Conference., Phoenix, AZ.

**Griffin M,** (2017 November) *Immigrant and Refugee Children on the Border.* Invited speaker, 14th Annual Conference on Forensic Sciences: Child Abuse and Neglect, South Padre Island, TX.

Edwards K, **Griffin M,** Vandermeer R, (2017 October) *Caring for Immigrant Children:  Opportunities and Challenges.* Invited speaker, Texas Pediatric Society Annual Meeting, Plano, TX.

**Griffin M,** (2017 July) *Immigrant and Refugee Children: Supporting Their Health and Development.* Pediatric Grand Rounds Presentation, Baylor College of Medicine Texas Children's Hospital, Houston, TX.

Fabreau G, **Griffin M,** Kimball SL, Marlin RP, Rashid M, Scales D, Shah SK, (2017 June) *Advocating for Change and Responding to Political Shifts: Policy Implications of the Recent Canadian and U.S. Elections.* North American Refugee Health Conference, Toronto, Canada.

**Griffin M,** Linton JM, (2017 May) Immigrant Children Seeking Safe Haven – Stop the Detention of Children and Families.*  Invited speaker. Presentation at the National Hispanic Medical Association 21st Annual Conference, Washington D.C.

**Griffin M,** (2017 March) *Undocumented Immigrant Children: Supporting their Health and Development.*  Grand Rounds Presentation, University of Texas Health Science Center at San Antonio, San Antonio, TX.

**Griffin M,** (2016 October) *Undocumented Immigrant Children: Supporting Their Health and Development.*  Invited speaker. Presidential Plenary Presentation at the American Academy of Pediatrics Annual Conference, San Francisco, CA.

**Griffin, M**., (2015 March) *Immigration and the Militarization of the Texas/Mexico border: It's effect on the health of children and families.* Invited speaker. Presentation to medical students from Stritch School of Medicine Loyola University Chicago, Chicago, IL.

**Griffin, M.,** (2015 March*) Immigration and the Militarization of the Texas/Mexico border: A Violation of Human Rights.*  Invited speaker. Presentation to law students from Loyola University Chicago School of Law, Brownsville, TX.

**Griffin, M.**, (2015 March) *Children's Lives on the Border: The Effect of Chronic Stress on Children in our School: A Resource Guide for Texas School Nurse Organization*. Presentation to Texas School Nurse Organization Region One, Edinburg, TX.

**Griffin, M**., Seifert, M., Son, M, Livingston, J., & Fisch, S. (2015 October). *Children's Lives on the Texas/Mexico Border: A Pediatrician-led Community Response to Toxic Stress.*  Poster presentation at AAP Annual Conference, Washington, DC.

6

Livingston, J., **Griffin, M.**, Brooks, A., Monserrat, C., & Son, M. (2014 October). *Transforming privilege in marginal spaces: Teaching medical students on the Texas/Mexico border.* Paper presented at the XI International Transformative Learning Conference, Teachers College, Columbia University, New York City.

**Griffin, M**., & Seifert, M. (2014 February). *Children's lives on the border: Strategic doing.* Summit meeting and workshops for 50 representatives from community-based organizations, legal institutions, schools, universities, churches, and synagogue, UTHSCSA Regional Academic Health Center/Community for Children, Harlingen Cultural Arts Center, Harlingen, TX.

Livingston, J., **Griffin, M**., Monserrat, C., & Coryell, J. (2013 November). *Preparing compassionate leaders: A novel approach in medical education.* Paper presented at American Association for Adult and Continuing Education, Lexington, KY.

**Griffin, M.**, Son, M., Livingston, J., & Monserrat, C. (2012 October). Advocacy for children's health and social justice on the Texas/Mexico border. Poster presented at the AAP Annual Meeting, New Orleans, LA.

**Griffin, M.** (2012 February). *Social justice and medicine: Opportunities and challenges along the border.* Invited speaker. Presentation to the National Board of Directors, Migrant Health Promotion, February 2012, Weslaco, TX.

**Griffin, M**. (2012 January). *Roots of advocacy: Call to service among the poor.* Invited speaker. Presentation to Union Theological Seminary graduate students, Brownsville, TX.

**Griffin, M**. (2011 October). *Top five things a woman needs to know about health care.* Panel discussion including female physicians and lawyers about important legal issues impacting women and family health care, Regional Academic Health Center, UTHSCSA, Harlingen, TX.

**Griffin, M**., Livingston, J., Cass, A., Gutnik, L., & Stroik, J. (2011 July). *Community-based advocacy training: Strategies and tools for preparing pediatricians to meet the future.* Poster presentation at AAP Future of Pediatrics Conference, Chicago, IL.

**Griffin, M**., Son, M., Fisch, S., Livingston, J., Monserrat, C., & Seifert, M. (2009 February). *Community for Children: At the border and beyond.* Workshop presentation at the AAP Future of Pediatrics Conference, Anaheim, CA.


## SELECTED PUBLICATIONS

Rosenberg J, Sudanagunta S, **Griffin M.** (2019 January) Correlation Between Immigration-Related Fear and Food Insecurity Among Households in Colonias of Hidalgo County, Texas. *Journal of Applied Research on Children: Informing Policy for Children at Risk. pending publication.*

Swamy P, Griffin MR, (2018 December) Supporting Our Immigrant Children. *American Professional Society on the Abuse of Children (APSAC) Advisor.* Volume 30: Issue 4.

Swamy P, Russell EA, Mandalakas AM, **Griffin MR,** Migrating Children: The Need for Comprehensive Integrated Health Prevention Measures. *Current Tropical Medicine Reports.* First Online: 16 April 2018.

Linton JM, Kennedy E, Shapiro AJ, **Griffin M,** Unaccompanied Children Seeking Safe Haven: Providing Care and Supporting Well-being of a Vulnerable Population. *Children & Youth Services Review*, available online March 26, 2018, DOI information: 10.1016/j.childyouth.2018.03.043.pending print publication.

Livingston JM, **Griffin M,** Developing professional identities and fostering resilience in medical students and residents: Transformative learning on the Texas-Mexico border. In T. Carter, C. Boden-McGill, & K. Peno (Eds.), *Transformative learning in professional contexts: Building resilient professional identities for work-based practice*. Charlotte, NC: Information Age Publishing, pending publication.

Linton JM, **Griffin M**, Shapiro AJ, AAP COUNCIL ON COMMUNITY PEDIATRICS. Detention of Immigrant Children. *Pediatrics.* 2017; 139(5): e20170483.

Linton JM, **Griffin M**, Shapiro AJ. AAP policy says no child should be in detention centers or separated from parents. *AAP News*, March 13, 2017.

**Griffin M,** Linton JM. Crossing into a deeper understanding of care for immigrant patients. *AAP Voices Blog.* August 22, 2016.

Livingston, J., **Griffin, M**., Brooks, A., Son, M., Monserrat, C (2014). Transforming privilege in marginal spaces: Teaching medical students on the Texas-Mexico Border.  In A. Nicolaides, & D. Holt (Eds.), *Spaces of transformation and transformation of spaces: Proceedings from the XI International Conference on Transformative Learning*, Teacher's College, Columbia University, New York City, (pp. 347-354). Athens, GA: University of Georgia.

**Griffin M**., Son, M., & Shapleigh, E. (2014). Children's lives on the border. *Pediatrics*, *133*(5), e1118-e1120.

### RECENT SERVICE -Medical

| | |
|---|---|
| Board Member and President, Community for Children, Incorporated | 2015-present |
| Board Member and Chair, Migrant Clinician Network | 2016-present |
| Member, Medical Advisory Committee, National Center for Medical Legal Partnership | 2010-2011 |
| Member, American Academy of Pediatrics (AAP) | 2003-present |
|     Member, AAP Council on Community Pediatrics | 2010-present |
|     Member, AAP Special Interest Group on International Medicine | 2010-present |
|     Member, AAP Special Interest Group on Immigrant Child Health | 2014-present |
|     Co-Chair, AAP Special Interest Group on Immigrant Child Health | 2015-present |
| Member, Texas Pediatric Society (TPS) | 2006-present |
|     Member, TPS Committee on Mental Health | 2017-present |
|     Member, TPS Community Health Advocacy/CATCH/School Health Committee | 2017-present |
| Invited Member, Texas Advocacy TEACH Collaborative, Coalition of Texas Pediatric Residency Programs focused on training Pediatric Residents across the state to advocate for positive change for children. | 2017-present |

**Fluent in English, Proficient in Spanish**

8

Exhibit 7

**<u>Declaration of Dr. Ryan Matlow</u>**

I, Ryan Matlow, declare that the follow is based on my personal experience and is true and accurate:

I am a practicing licensed psychologist and a Clinical Assistant Professor in the Department of Psychiatry and Behavioral Sciences at the Stanford University School of Medicine. In this position, I serve as the Director of Community Programs for Stanford's Early Life Stress and Pediatric Anxiety Program. I am also a faculty member in the Stanford Human Rights and Trauma Mental Health Program. My clinical and research efforts and experiences focus on understanding and addressing the impact of stress, trauma, and adversity in children, families, and communities.

I provide clinical service and training in trauma-focused psychological evaluation and therapy for children and families. I have worked extensively with immigrant children and families from Mexico, Central America, and South America. I am fluent in Spanish. I developed and implemented clinical interventions specifically tailored to address immigration-related trauma including experiences of family separation in this population.

I collaborate extensively with attorneys and legal professionals to provide consultation on the consequences of child trauma exposure and human rights abuses to inform transitional justice and judicial processes. In this work, and in other consultation efforts, I have prepared and submitted expert reports, statements, and declarations documenting the expected impact of trauma, abuse, and victimization relevant to specific cases in local, federal, and international courts. A copy of my curriculum vitae is attached here to provide further information about my professional experiences.

From July 11- 13, 2018, I accompanied a Flores team visiting Casa Padre, a secure ORR detention shelter run by Southwest Key in Brownsville, Texas. In November 2018, with a Flores team, I visited Tornillo, a BCFS influx detention facility outside El Paso, Texas. Again, in March 2019, I visited Homestead Temporary Shelter for Unaccompanied Children. The purpose of my visits was to assess the mental health and physical wellness of the children detained at these facilities.

During my visits to Casa Padre, Tornillo and Homestead, I toured the facilities, observed children in the milieu, spoke with representative agency staff, and met with detained children to conduct interviews about their experiences while in custody. I met with children individually and in small group settings.

My observations showed clear ongoing psychological harm directly attributable to detention and separation practices. The harms inherent in the detention of children are compounded by the separation from and lack of communication with any external source of support including parents, guardians and loved ones.

While these ORR facilities differ, the fundamental conditions of detention are the same. Children are held in congregant care in secured, locked, and restricted environments with thousands of other unfamiliar children across a variety of ages. Casa Padre had 1400 boys from 10-17 years old and Tornillo had about 2000 children from ages 13-17 (20% of whom were girls), and Homestead had about 2000 children from ages 13-17, split evenly between boys and girls.  The children come from different countries and cultures. Some children who speak indigenous languages had no one to talk with. At Casa Padre and Homestead children who spoke the same indigenous language were intentionally separated from each other.

Children have no freedom for mobility, personal choice, or privacy.  At all three locations children are escorted everywhere.  At Casa Padre, children are supervised in groups of 8 and at Homestead in groups of 12. Children reported they must move in groups to go anywhere. For example, at Casa Padre multiple children reported that seven others must need to go to the bathroom before a mandatory escort will be provided.

These environments, which are highly structured and institutionalized, fail to provide for many of the children's basic needs. For example, children have no access to supplemental food outside of regimented meal times. Children interviewed at Casa Padre reported being hungry. Children at Tornillo did not have a school program despite lengthy periods of detention. Children at Homestead report taking a shower longer than 5 minutes is a violation of the rules for which they can receive disciplinary action. At all places, children did not have adequate recreation time either outdoors or indoors.

At Tornillo they did not have access to books, computers and other educational material. At Casa Padre, the younger children (ages 10-12) did not have access to age-appropriate recreation and play materials.

At Homestead, children are threatened that they will receive reports that will result in prolonged detention and/or deportation if they break facility rules, such as touching other kids, taking more than 5 minutes to shower, or not eating their meals.  Children report that the food is terrible and always the same thing; some children force-feed themselves so as not to violate the rules. Children report that the schedules and routines frequently change, which is a source of confusion, frustration and anxiety. A number of children reported being woken up at 6 a.m, but not having any activity until 8 a.m.

According to Homestead management, children are only allowed 10 minutes of telephone time twice a week which is their only contact outside the facility. Children, however, tend to report receiving just 5-7 minutes of phone time with family twice a week which they universally said was entirely insufficient to communicate with family members and access appropriate support resources. Children demonstrated clear distress around the limited opportunities and strict cut-offs for outside communication.

Children are effectively held on lockdown. At Casa Padre, only certain staff have the keys that are necessary to go places within the building and to exit it. During our site visit, the deputy head of the facility could not open the door leading to the outside "recreation" area. She had to call two other staff members, one at a time, before they could open the door. At both facilities children express incredulity when asked if they could leave on their own. At Tornillo some children believed they would be shot if they tried to leave. Homestead is surrounded by a high fence with guards posted at locked gates.

Children are frequently threatened both directly and indirectly that they and/or their family members' immigration cases would be negatively impacted (including deportation) if they violate facility rules. Since the expressed policies, rules, and protections for children in these facilities were inconsistently enforced, a child would have little if any certainty what might be considered an infraction at any given moment. Children are led to believe that even small infractions will go in their court record and be considered in determining deportability. Additional threats for attempting to leave the facility include arrest and imprisonment by local police and a guarantee of deportation. Children are afraid to voice any desire to leave for fear of retaliation.

At Homestead especially, all children experience anxiety and fear around the rules and the threats used to coerce compliance. I met with one 15-year-old Guatemalan (indigenous) boy who had been separated from his father by CBP at the border in January 2019.  He demonstrated pervasive anxiety and preoccupation about his father's well-being and had only spoken with his father (who is still in custody) one time since their separation.  He was clearly depressed and presented symptoms including concentration difficulty, somatic complaints, sadness, loss of appetite and sleep problems — all these symptoms onset following his separation and detention, and which were a marked change in his functioning prior to leaving Guatemala.  Another child reported that he and his dorm-mates often cry at night out of sadness and desperation for their situation. He described his observations of other boys becoming increasingly hopeless and shut-down (especially those that do not have sponsors).  This child also does not participate in sports due to religious beliefs and therefore has no opportunities for recreation. He had requested opportunities to practice and learn music but had not been allowed to.

 Children reported being bullied and harassed by their peers which was regularly unaddressed by facility staff.  Children had poor knowledge and information about multiple aspects of their situation. They were not meaningfully informed of their legal rights including the right to an attorney and how to access an attorney. They were frequently unaware of the whereabouts or well-being of family members, especially those held concurrently in ICE custody.

Children had no idea about how long they would be held and were unaware of the necessary steps for their release.  In all cases, they were being held in custody for periods of time that extended well beyond what they had been told, for reasons that were unknown or unclear to the child.

Children at Casa Padre had grossly inadequate health care and little meaningful access to mental health resources. Multiple children reported medical ailments that were unaddressed for lengthy periods after being reported to staff. In general, facility staff was not qualified and lacked capacity to provide adequate medical, mental health, or education services to the children, especially children functioning within the context of intense distress related to their past and current experiences of adversity and trauma including family separation.  At Tornillo there was no mental health care. The head of the facility said that ORR did not want mental health care provided.  Many children expressed mistrust of facility staff, including medical and mental health providers (when present).

In all three settings children are deprived of opportunities for activities, materials, and interpersonal interactions that are typical of child development and that promote healthy physical, emotional, and behavioral development.

The conditions observed during these site visits are consistent with those that create trauma and that commonly result in post-traumatic stress and long-lasting functional impairment. The likelihood that a life event experienced by an individual is traumatic and will result in post-traumatic stress and other debilitating conditions is significantly heightened when the individual: (1) has limited sense of control, autonomy, or personal agency over what is happening to him/her; (2) has limited knowledge about his/her circumstances or expected outcomes; (3) perceives a lack of predictability, consistency, or security in his/her environment; (4) has limited access to social and family supports and/or protective resources; (5) experiences fear, helplessness, or horror; and (6) perceives constant and pervasive threat of danger in his/her environment.

These are the precise conditions that I observed and were reported by children at Casa Padre, Tornillo, and Homestead.

Children held at these ORR shelters displayed the signs and symptoms of acute distress that are expected in reaction to ongoing trauma.  In interviews, children were sad, tearful, and despondent. They expressed despair and hopelessness at not being able to be with and communicate with their families and for not knowing when and how they would be released.  Overall, they demonstrated emotional flatness, numbing, and avoidance of thoughts and feelings related to their experience, as well as intrusive thoughts and memories (including nightmares) of their past and ongoing traumas. These are core symptoms of posttraumatic stress disorder (PTSD).  The psychological symptoms of anxiety, depression, and PTSD, and the related manifestations, were found to be frequent and pervasive within the population, occurring multiple times a day, nearly every day, thereby meeting clinical significance for psychological disturbance.

The acute forms of distress and functional impairment that were observed during site visits are expected to have a lasting and pervasive impact on the children detained.  Trauma exposure – especially when experienced in childhood – is associated with increased risk for long-term psychological dysfunction and psychiatric disorders, including problems with emotions, behaviors, mood, learning, substance abuse, and interpersonal relationships.

These problems and functional difficulties stem from the impact of traumatic stress on children's development, where trauma exposure literally changes the structure and functioning of children's brains and biological systems and, in particular, the stress response system. This has lasting implications for physical health and immune functioning. These trauma-related neurobiological alterations can be extremely difficult to reverse, as maladaptive neural pathways

and related behavioral responses become engrained over the course of development.  The result is a profound and pervasive long-term impact on health outcomes that correspond with leading causes of death, early mortality, lost productivity, and high costs of care.

Furthermore, the combination of deprivation and threat that is encountered in the institutionalized setting of childcare detention impairs the development of executive functioning, self-regulation, and adaptive living skills that are critical for future academic achievement, vocational performance, independent living, and interpersonal functioning.

Both the short- and long-term consequences of childhood exposure to trauma and adversity such as forced detention and family separation are well-established and firmly documented in the scientific literature.  Specific studies with immigrant children and families have empirically demonstrated outcomes consistent with those described above and have documented the negative impact of child detention and family separation on psychological well-being, physical health, family functioning, and economic and community stability.

Research has shown that increased duration of exposure to traumatic stress – in this case, increased length of detention in these secure facilities with no meaningful communication with family – corresponds with a more pervasive impact on child development and a more profound and long-lasting impairment in psychological functioning.  My clinical experiences with children previously or concurrently held in immigration detention demonstrate findings and outcomes that are consistent with the research literature.

By subjecting the population of immigrant children to the traumas of detention, denial of safety and family separation, the government is causing an increase in the prevalence, risk, and severity of mental health, physical health, and social problems for the children, their families and society at large.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of May 2019.

Ryan Matlow, PhD  - CA Licensed Psychologist (Lic.# PSY27178)

# *RYAN B. MATLOW, Ph.D.*

Early Life Stress and Pediatric Anxiety Program
Department of Psychiatry and Behavioral Sciences
Stanford University School of Medicine
1520 Page Mill Rd., Mail Code 5265
Palo Alto, CA 94305
Office: 650-724-8113
Email: rmatlow@stanford.edu

**California Licensed Psychologist:** PSY 27178

## EDUCATION and TRAINING

**2013-2014**    **Postdoctoral Fellowship, University of California, San Francisco**
San Francisco General Hospital Child and Adolescent Services
Multicultural Clinical Training Program *(APA accredited)*

**2012-2013**    **Predoctoral Clinical Psychology Internship, University of California, San Francisco**
San Francisco General Hospital Child and Adolescent Services
Multicultural Clinical Training Program *(APA accredited)*

**2008-2013**    **Ph.D., Child Clinical Psychology, University of Denver**
Specialization:  Developmental Cognitive Neuroscience
Doctoral Thesis: *Attentional processes associated with victimization history and posttraumatic symptomatology in women exposed to intimate partner abuse*

**2005-2008**    **M.A., Psychology (Psychological Research), San Francisco State University**
Master's Thesis: *Time course of attentional bias in anxiety: Converging evidence of reaction time and eye movement measures*

**1999-2003**    **B.S., Cognitive Science**, **University of California, San Diego**
Specialization:  Neuroscience
Minor:  Spanish Language Studies

## HONORS and AWARDS

**2018**    Lucile Packard Foundation for Children's Health Project Grant
**2018**    Stanford Department of Psychiatry and Behavioral Sciences Small Grant
**2017**    Stanford Center for Clinical and Translational Research and Education Spectrum Pilot Grant for Population Health Sciences
**2013-2014**    Pritzker Foundation Maryon Stone Postdoctoral Fellowship
**2011-2012**    University of Denver Arts, Humanities, and Social Sciences Dissertation Fellowship
**2011**    University of Denver Graduate Student Professional Development Grant
**2009-2011**    University of Denver Graduate Affairs Committee Award for Research and Travel
**2009-2011**    University of Denver Graduate School of the Four Faculties Travel Grant
**2009**    International Society for the Study of Trauma and Dissociation David Caul Research Grant
**2009**    International Society for Traumatic Stress Studies Student Research Grant

*Ryan Matlow – Curriculum Vitae*                                                                                 *2*

---

## FACULTY EXPERIENCE

---

**2016- current**  *Clinical Assistant Professor*
**Department of Psychiatry and Behavioral Sciences**
**Stanford University School of Medicine**

**2014- 2016**  *Instructor*
**Department of Psychiatry and Behavioral Sciences**
**Stanford University School of Medicine**

---

## CLINICAL EXPERIENCE

---

**2017-current**  *Clinical Psychologist*
**Child Anxiety Outpatient Clinic**
**Lucile Packard Children's Hospital** (Stanford, CA)

**2015-current**  *Clinical Psychologist*
**Integrated Behavioral Health Services Program**
**Ravenswood Family Health Center** (East Palo Alto, CA)

**2012-2014**  *Postdoctoral Fellow, Predoctoral Intern*
**Multicultural Clinical Training Program** (APA Accredited)
**Healthy Environments and Response to Trauma in Schools (HEARTS) Program**
**San Francisco General Hospital Child and Adolescent Services**
**Department of Psychiatry, University of California San Francisco** (San Francisco, CA)

**2010-2012**  *Group Therapy Co-lead*
**Healthy Adolescent Relationship Project**
**Department of Psychology, University of Denver** (Denver, CO)

**2009-2012**  *Doctoral Clinical Trainee*
**Center for Child and Family Psychology**
**Department of Psychology, University of Denver** (Denver, CO)

**2011-2012**  *Doctoral Clinical Trainee*
**Family Therapy Clinic**
**Department of Psychology, University of Denver** (Denver, CO)

**2010-2011**  *Clinical Trainee (practicum)*
**Child Trauma Program**
**Kempe Center for Prevention and Treatment of Child Abuse and Neglect, University of Colorado** (Denver, CO)

**2009-2010**  *Doctoral Clinical Trainee*
**Developmental Neuropsychology and Learning Disability Clinic**
**Department of Psychology, University of Denver** (Denver, CO)

*Ryan Matlow – Curriculum Vitae*                                                              3

---

## RESEARCH EXPERIENCE

**2014- current**   *Director of Community Research Programs*
**Early Life Stress and Pediatric Anxiety Program**
**Department of Psychiatry and Behavioral Sciences**
**Lucile Packard Children's Hospital at Stanford University School of Medicine**

**2014- current**   *Faculty affiliate*
**Human Rights in Trauma Mental Health Program**
**Department of Psychiatry and Behavioral Sciences**
**WSD Handa Center for Human Rights and International Justice**
**Stanford University**

**2008-2013**   *Graduate Research Assistant*
**Traumatic Stress Studies Group**
**Department of Psychology, University of Denver**

**2007-2008**   *Research Coordinator*
**San Francisco Treatment Research Center**
**Department of Psychiatry, University of California San Francisco**

**2006-2008**   *Research Assistant*
**Child Trauma Research Project**
**Department of Psychiatry, University of California San Francisco**

**2006-2008**   *Graduate Research Assistant*
**Motivation and Emotion Research Laboratory**
**Department of Psychology, San Francisco State University**

---

## PEER REVIEWED PUBLICATIONS

Liu, N., Basile, A., **Matlow, R. B.**, Reiss, A. L., & Carrion, V. G. (under review). Ventrolateral prefrontal cortical activation to fearful faces in children with generalized anxiety disorder: A functional near-infrared spectroscopy (fNIRS) study.

**Matlow, R. B.**, Alvarez, V., Cortez, C., Rettger, J. P., Reicherter, D., & Carrion, V. G. (in preparation). Addressing mental health needs in community settings: Development and implementation of wellness programs.

**Matlow R. B.** & Reicherter, D. (2018, November 21).  Reducing protections for Noncitizen children – Exacerbating harm and trauma.  *New England Journal of Medicine.* doi: 10.1056/NEJMp1814340

**Matlow, R. B.**, & DePrince, A. P. (2015). The impact of appraisals and context on readiness to leave relationships following intimate partner abuse.  *Violence Against Women, 21,* 1043-1064. doi: 10.1177/1077801215590668

Prochaska, J. J., Fromont, S. C., Wa, C., **Matlow, R. B.**, Ramo, D. E., & Hall, S. M. (2013).  Tobacco use and its treatment among young people in mental health settings: A qualitative analysis.  *Nicotine and Tobacco Research, 15,* 1427-1435. doi: 10.1093/ntr/nts343

**Matlow, R. B.,** & DePrince. A. P. (2013).  The influence of victimization history on PTSD symptom expression in women exposed to intimate partner violence. *Psychological Trauma: Theory, Research, Practice, & Policy, 5, 241-250.* doi: 10.1037/a0027655

**Matlow, R. B.,** Gard, D. E., & Berg, D. J. (2012). Difficulty disengaging from threat in anxiety: Initial evidence for delayed response execution. *Journal of Experimental Psychopathology, 3,* 455-469.

---

## BOOK CHAPTERS AND OTHER PUBLICATIONS

---

**Matlow, R.B.** (2019).  General principles of psychotherapy for youth exposed to traumatic stress.  In V. Carrion (Ed.), *Assessing and Treating Youth Exposed to Traumatic Stress.* American Psychiatric Association Publishing, Inc.: Washington, DC.

**Matlow, R.B.,** & Carrion, V.G. (2018). Caring for students with mental health issues: Stress and trauma.  In L. Roberts (Ed.), *University Student Mental Health: A Guide for Psychiatrists, Psychologists, and Leaders Serving Higher Education.* American Psychiatric Association Publishing, Inc.: Washington, DC.

Reicherter, D., Reed, D., Williamson, R., & **Matlow, R**. (2016). Creating lab reports on psychological outcomes of political violence in human rights criminal cases: The Human Rights in Trauma Mental Health Laboratory at Stanford University. In B. van Schaack & D. Reicherter (Eds.), *Cambodia's Hidden Scars: Trauma Psychology and the Extraordinary Chambers in the Courts of Cambodia, 2nd Edition* (268-276). Phnom Penh, Cambodia: Documentation Center of Cambodia.

**Matlow, R. B.,** & Romero, M. B. (2016).  Addressing trauma and attachment in Latino immigrant youth and their families. *StressPoints: A Quarterly eNewsletter of the International Society for Traumatic Stress Studies.* http://sherwood-istss.informz.net/admin31/content/template.asp?sid=47180&brandid=4463&uid=1019024656&mi=5308153&mfqid=24888590&ptid=0&ps=47180

---

## CONSULTATION AND EXPERT REPORTS

---

**Matlow, R. B.,** Carrion, V. G., Reicherter, D., Wang, N. E., & Wise, P. (2018).  *Suporting the Mental Health of Migrant Children: Consulting Lawyers in Interviewing Children for the Flores Settlement.*  Consultant's report on guidelines and recommendations for training attorneys and paralegals in interviewing children Center for Human Rights and Consitutional Law in the case of *Flores vs. Sessions.* Stanford, CA.

**Matlow, R. B.,** Wang, N. E., Williamson, J., Wise, P., & Young, D. (2018).  *Mental Health and Wellness of Children Detained by United States Immigration and Customs Enforcement and Kept Separated from their Families.*  Expert report produced for the Center for Human Rights and Consitutional Law in the case of *Flores vs. Sessions.* Brownsville, TX.

**Matlow, R. B.,** Kletter, H., Wilson, H., Hamilton, M., Lugo, A., Reicherter, D., & Carrion, V. G. (2018). *Statement on the Impact of Parent-Child Separation on Parents' Ability to Effectively Participate in Asylum Proceedings.*  Expert statement prepared for Kids in Need of Defense (KIND) for use as pro se materials in asylum proceedings.

Reicherter, D. & **Matlow, R. B.** (2018).  *Mental Health Outcomes of Rape, Mass Rape, and other Forms of Sexual Violence and Forced Marriage and Forced Pregnancy.* Expert report produced by the Human Rights and Trauma Mental Health Program for the case of the International Criminal Court Prosecutor v. Dominic

*Ryan Matlow – Curriculum Vitae*                                                                                   5

Ongwen. Stanford, CA.

Brunner, J., Joseff, K., **Matlow, R.B.**, Rahter, J., Reicherter, Dr., & Van Schaack, B. (2017).  *Mental Health Consequences Following Release from Long-Term Solitary Confinement in California.*  Consultative report produced by the Human Rights and Trauma Mental Health Program for the Center for Constitutional Rights in the case of *Ashker v. The Governor of California.*

Reicherter, D., **Matlow, R. B.,** Reed, D. E., Gray, G., & Van Schaack, B. (2016). *The Mental Health Outcomes of Rape, Mass Rape, and other Sexual Violence.*  Expert report produced by the Human Rights and Trauma Mental Health Program for the case of the International Criminal Court Prosecutor v. Jean Pierre Bemba Gombo. Stanford, CA.

## SELECTED CONFERENCE PRESENTATIONS

Espil, F.M, **Matlow, R.B.,** Goldman Rosas, L., Lara, J.E., Litke, S.G., Latu, M.K., & Carrion, V. (2018).  *Implementing evidence-based mental health care in East Palo Alto Schools.*  Poster presentation at the 16th Annual Stanford Center for Population Health Sciences Community Health Symposium, Stanford, CA.

**Matlow, R.B.** (2017, November). *Addressing the complex experience of traumatic stress for Latino immigrants in the current political climate.*  Symposium presentation at the 33rd Annual Meeting for the International Society of Truamatic Stress Studies, Chicago, IL.

Altamirano, O., Bradley, T., Basile, A., Espil, F., **Matlow, R.**, & Carrion, V. (2017, November).  *Sex moderates the association between stress response and locus of control.* Poster presentation at the 33rd Annual Meeting for the International Society of Truamatic Stress Studies, Chicago, IL.

Nuñez, A., Bradley, T., Basile, A., Espil, F., **Matlow, R.**, & Carrion, V. (2017, November).  *The relative impact of locus of control and interpersonal relationships on involuntary stress responses, anxiety, and depression in high adversity child population.*  Symposium presentation at the 33rd Annual Meeting for the International Society of Truamatic Stress Studies, Chicago, IL.

Maldonado, Y., Fuentes Afflick, E., Flores, G., & **Matlow, R.** (2017, May).  *Health and Mental Health Issues of Children in Immigrant Families.*  Panel presentation at Stanford Child Health and Immigration Conference. Stanford, CA.

**Matlow, R.** (2017, February).  *Complex Trauma in Childhood: Implications for Criminal Justice.* Invited lecture at the 2017 California Attorneys for Criminal Justice Capital Case Defense Seminar. San Diego, CA.

Trent, L., Basile, A., **Matlow, R.**, Reichert, E., Read, K., & Carrion, V. (2016, October). *Implementing Evidence-Based Assessment in Routine Clinical Care: Outcomes and Future Directions.* Poster presentation at the annual meeting of the Association for Behavioral and Cognitive Therapies (ABCT), New York, NY.

**Matlow, R.B.**, Alvarez, V., Cortez, C., Rettger, J.P., Reicherter, D., & Carrion, V.G. (2016, May).  *Addressing Mental Health Needs in Community Settings: Development and Implementation of Wellness Programs.* Poster presentation at the 14th International Conference for Community Campus Partnerships for Health (CCPH), New Orleans, LA.

Bradley, T.B., **Matlow, R.**, & Carrion, V. (2015, November). *A school-based yoga and mindfulness curriculum to promote student health and wellness: program implementation and a neuroscientific evaluation.* Poster presentation at Advancing School Mental Health Conference, New Orleans, LA.

**Matlow, R. B.,** Shirk, S. R., & DePrince, A. P. (2012, November).  *Examining the overlap between trauma exposure and bipolar disorder.*  Presentation at the 28th Annual Meeting of the International Society for Traumatic Stress Studies, Los Angeles, CA.

**Matlow, R. B.** & DePrince, A. P. (2011, November). *The impact of appraisal processes on readiness to leave an abusive relationship.*  Presentation at the 27th Annual Meeting of the International Society for Traumatic Stress Studies, Baltimore, MD.

**Matlow, R. B.** & DePrince, A. P. (2010, November). *Factors influencing readiness to change in female victims of domestic violence.*  Presentation at the 44th Annual Meeting of the Association for Behavioral and Cognitive Therapies, San Francisco, CA.

**Matlow, R. B.** & DePrince, A. P. (2009, November). *The influence of victimization history on symptom expression.*  Poster presentation at the 25th Annual Meeting of the International Society for Traumatic Stress Studies, Atlanta, GA.

**Matlow, R. B.,** Gard, D. E., Berg, D. J., Krausova, M., & Jones, R. (2008, October).  *Difficulty disengaging from affective stimuli in anxiety: Converging evidence of reaction time and eye movement.*  Poster presentation at the 48th Annual meeting of the Society for Psychophysiological Research, Austin, TX.

**Matlow, R.B.,** Gard, D., Lima, M., Bergstrom, J., Krausova, R., & Rao, S. (2007, November).  *Attention bias in chronic pain patients: Difficulty disengaging from negative stimuli.*  Poster presentation at the 41st Annual Association for Behavioral and Cognitive Therapies Convention, Philadelphia, PA.

**Matlow, R.,** Ghosh Ippen, C., & Lieberman, A. (2007, August).  *Ethnic differences in women's expression of PTSD and related symptoms.*  Poster presentation at the 115th Annual American Psychological Association Convention, San Francisco, CA.

**Matlow, R.** & Gard, D. (2007, May).  *The role of attention, fear, anxiety, and trauma in a chronic pain population.*  Poster presentation at the San Francisco State University Graduate Research Showcase, San Francisco, CA.

## SELECTED LECTURES, TRAININGS, and DIDACTIC PRESENTATIONS

Kletter, H., & **Matlow, R.** (2018, September).  Cue Centered Therapy.  Invited training for staff at the University of California San Francisco Child and Adolescent Services staff and trainees from the Multicultural Clinical Training Program.  University of California San Francisco.  San Francisco, CA.

**Matlow, R.** (2018, September).  *Impact of Family Separation on Child Mental Health and Development.*  Invited presentation at the conference for Humanitarian Crisis at the Border – Family Separation and Detention: Challenges and Responses.  University of Texas El Paso.  El Paso, TX.

**Matlow, R.** (2018, March). *Youth Trauma Treatment* and *Trauma and Systems.*  Invited two-part didactic training for interns and trainees at the Community Health Awareness Council.  Mountain View, CA.

**Matlow, R.,** & Bradley, T., (2018, February).  *Learning to Thrive: Fostering Resilience and Healthy Development to Overcome Adversity and Trauma.*  Invited presentation to the Santa Clara County School Boards Association.  San Jose, CA.

*Ryan Matlow – Curriculum Vitae*                                                                      7

Kletter, H., & **Matlow, R.B.** (2017, October).  *Impact of Domestic Violence on Youth.*  Invited presentation at the 9th Annual Ob/Gyn Domestic Violence Forum, Department of Obstetrics and Gynecology, Santa Clara Valley Medical Center, San Jose, CA.

**Matlow, R.** (2017, May).  *Defining and Understanding Stress and Trauma in the Community.*  Invited presentation at the One East Palo Alto's 10th Annual Family Awareness Night.  East Palo Alto, CA.

**Matlow, R.** (2017, March). *The Neurodevelopmental Impact of Child Traumatic Stress.*  Invited presentation for staff at The Primary School. East Palo Alto, CA.

**Matlow, R.,** & Kletter, H. (2017, January). *Stanford Cue Centered Therapy: Training for Behavioral Healthcare Service Providers.*  Hosted training for community partners of the Early Life Stress and Pediatric Anxiety Program, Palo Alto, CA.

**Matlow, R.** (2016, October).  *The Neuroscience of Stress and Trauma: Impact and Interventions.*  Invited presentation at the Los Altos High School Science, Technology, Engineering, and Mathematics Weeks, Los Altos, CA.

**Matlow, R.** (2016, October).  *The Neurodevelopmental Impact of Traumatic Stress: A Context for Promoting Health and Justice.*  Invited presentation at the Habeus Corpus Resource Center Fall Conference 2016 on Understanding, Investigating, and Presenting Trauma in Your Case, San Francisco, CA.

**Matlow, R.,** & Kletter, H. (2016, September). *Stanford Cue Centered Therapy.*  Invited training for Ponce Health Sciences University Child and Adolescent Psychiatry Program, Ponce, PR.

Kletter, H., & **Matlow, R.** (2016, September). *Stanford Cue Centered Treatment Protocol.*  Invited training at Stanford Youth Solutions, Sacramento, CA.

**Matlow, R.** (2016, July).  *Responding to Stress and Trauma in Youth: Taking Care of Yourself and Your Community while Taking Care of Others.*  Invited training for team leaders and administrative staff at City Year San Jose/Silicon Valley, San Jose, CA.

Kletter, H., & **Matlow, R.** (2016, May). *Stanford Cue Centered Treatment Protocol.*  Invited training at the Center for Youth Wellness, San Francisco, CA.

**Matlow, R.** (2016, January).  *Community-level approaches for addressing traumatic stress.*  Invited lecture at Stanford University School of Medicine Department of Psychiatry and Behavioral Sciences Grand Rounds, Stanford, CA.

**Matlow, R.** (2015, August).  *Trauma-informed approaches for managing challenging behaviors.*  Invited workshop training for staff at the Boys and Girls Club of Silicon Valley, San Jose, CA.

Wilson, H., **Matlow, R.**, Kessler, M., & Lembke, A. (2015, May).  *Teen mental health and your family: Practical information and insights.*  Panel presentation at Health Matters: Stanford Medicine Community Day, Stanford, CA.

**Matlow, R. B.** & Kletter, H. (2015, April).  *Developing trauma-informed systems of care.*  Invited workshop at Center for Youth Wellness / Bayview Children's Health Center, San Francisco, CA.

**Matlow, R. B.,** & Rettger, J. P. (2014, November).  *Developing trauma-informed practice to support student health and healing.*  Presentation at Northern California Safe and Health Schools Conference, Berkeley, CA.

**Matlow, R. B.** & Dorado, J. (2014, April). *Transforming trauma: Building safe and supportive trauma-informed systems of care.* Presentation at the 20th Annual Northern California Child Sexual Abuse Awareness Conference, Davis, CA.

**Matlow, R. B.** & Farahmand, F. (2014, May). *The impact of stress and trauma on the developing child and classroom-based strategies to support students in need.* Professional development training for Leap Arts in Education program, San Francisco, CA.

---

### TEACHING and SUPERVISION EXPERIENCE

---

**2014-current**    **Department of Psychiatry and Behavioral Sciences, Stanford University School of Medicine**
*Director of Community Programs:* Early Life Stress and Pediatric Anxiety Program
Clinical Mentorship, Supervision, and Consultation
Clinical Research Supervision
Research Mentorship, Consultation, and Education

**2008**             **Department of Psychology, University of Denver**
*Graduate Teaching Assistant:* Research Methods

**2006-2007**        **Psychology Department, San Francisco State University**
*Graduate Teaching Assistant*: Introduction to Behavioral Statistics

**Clinical Research Supervision**
*John Rettger, Ph.D.,* Clinical Research Coordinator 2 (2014 – current)
*Travis Bradley, M.P.P.,* Clinical Research Coordinator 2 (2014 – current)
*Robert Borah, B.A.,* Lab Manager/Associate Clinical Research Coordinator (2017 – current)
*Alejandro Nuñez, B.A.,* Assistant Clinical Research Coordinator (2016 – current)
*Jannet Lara, B.A.,* Assistant Clinical Research Coordinator (2016 – current)
*Yamilka Alsina, M.D.,* Assistant Clinical Research Coordinator (2017 – current)
*Tyler Harvey, B.A.,* Assistant Clinical Research Coordinator (2017 – current)
*Laila Soudi, M.Sc.,* Assistant Clinical Research Coordinator (2017 – 2018)
*Alex Basile, B.S.,* Lab Manager/Administrative Services Administrator (2014 – 2017)
*Lindsay Trent, Ph.D.,* Postdoctoral Scholar (2014 – 2017)
*Jairo Vélez, B.A.,* Clinical Research Coordinator 1 (2015 – 2017)
*Olivia Altamirano, B.A.,* Assistant Clinical Research Coordinator (2016 – 2017)
*Katherine España, B.A.,* Clinical Research Coordinator 1 (2014 – 2016)
*Sophia Schoenberg, B.S.,* Assistant Clinical Research Coordinator (2015 – 2016)

**Doctoral Dissertation Committee Membership**
*Kristina Mendez*, Ph.D. candidate, Palo Alto University (proposed December, 2017)
      Doctoral Thesis: *Culturally Adapted Yoga for Newcomer Immigrant Adolescents*

**Clinical Mentorship and Consultation**
*Veronica Alvarez, MSW,* Wellness Educator/Clinical Research Coordinator 2 (2014-current)
*Cristina Cortez, MFT,* Wellness Educator/Clinical Research Coordinator 2 (2015-current)
*Cynthia Yee, MFTi,* Wellness Educator/Clinical Research Coordinator 2 (2017-current)
*Mele Latu,* One East Palo Alto Behavioral Health Advisory Group Ambassador Team Coordinator (2016 – current)
*Viliami Young,* One East Palo Alto Behavioral Health Advisory Group Ambassador Team (2017 – current)

*Ryan Matlow – Curriculum Vitae*                                                                                              9

*Abel Velasquez,* One East Palo Alto Behavioral Health Advisory Group Ambassador Team (2017 – current)
*Carlos Jalpa,* One East Palo Alto Behavioral Health Advisory Group Ambassador Team (2017 – current)
*Ligia Hernandez,* One East Palo Alto Behavioral Health Advisory Group Ambassador Team (2017 – current)

**Visiting Scholars**
*Susanna Cruylles, M.D.,* International Visiting Scholar, Principe de Asturias Hospital, National Health System,
     Spain (2015, 2018)
*Sophie Borst, Ph.D.,* International Visiting Scholar, Curium/LUMC, Netherlands (2014-2015)

**Research Mentorship, Consultation, and Education**
*Audrey Ho, M.S.,* Post-baccalaureate Intern (2018 – current)
*Alina Liao, M.B.A./M.A.* (Education), Stanford Graduate School of Business (2016 – current)
*Ashley Edwards, M.B.A./M.A.* (Education), Stanford Graduate School of Business (2016 – current)
*Jonathan Lee, M.D., M.B.A.,* Medical Resident, Stanford University School of Medicine (2015 – current)
*Kristina Mendez, B.A.,* Psychology Doctoral Student, Palo Alto University (2015 – current)
*Tyler Harvey,* Undergraduate Summer Intern, St. Olaf University (2015 – 2016)
*Alan Huang,* High School Intern, Palo Alto High School (2015 – 2016)
*Matheson Kuo,* High School Summer Intern, Castilleja School (2015)
*Iyahna Smith,* Undergraduate Summer Intern, Howard University (2015)
*Michelle Douglas,* Undergraduate Summer Intern, Boston College (2015)
*Rachel Sivek, B.S.,* Medical Student Clerkship, George Washington University (2015)
*Lara Tully, M.D.,* Child Psychiatry Fellow, Stanford University School of Medicine (2015)
*Thomas Ford,* Undergraduate Intern, Stanford University (2015)

---

**COMMITTEE and SERVICE EXPERIENCE**

---

**2017-current**     **Community Health Awareness Council (CHAC) Board of Directors**
                     *Community Representative*

**2015-current**     **Youth Empowerment and Strategies for Success Collaborative, One East Palo Alto**
                     **Neighborhood Improvement Initiative**
                     *Participant/collaborator; Focus Area Workgroup co-lead*

**2015-current**     **MindRight Youth Mental Health Text Messaging Services**
                     *Clinical Advisor*

**2014**             **Administrative Space-sharing Committee for San Francisco General Hospital Division of**
                     **Infant, Child, and Adolescent Psychiatry, University of California San Francisco**
                     *Committee member representing Child and Adolescent Services*

**2012-current**     **Journal of Psychiatric Research**
                     **International Society for Traumatic Stress Studies Annual Meeting**
                     **Journal of Traumatic Stress**
                     **Journal of Interpersonal Violence**
                     **Psychological Trauma: Theory, Research, Practice, and Policy**
                     *Peer Reviewer for journal article and conference submissions*

**2010-2012**        **Committee for the Development of a Campus Climate Survey, Center for Multicultural**
                     **Excellence, University of Denver**
                     *Survey Co-author*

**2009-2012**    **Multicultural Research Group, Department of Psychology, University of Denver**
*Coordinator, Student Member*

**2010-2011**    **Diversity Committee and Central Committee, Department of Psychology Graduate Student Admissions, University of Denver**
*Student Member, Child Clinical Psychology Program*

---

## CLINICAL TRAINING AND CERTIFICATION

**Cue Centered Therapy for Youth Experiencing Posttraumatic Symptoms,** *Therapist and Trainer*
**Practicewise, LLC Managing and Adapting Practice (MAP),** *Certified Therapist and Instructor*
**Trauma-Focused Cognitive Behavioral Therapy,** *Certified Therapist*

---

## PROFESSIONAL MEMBERSHIP

**2007, current**   American Psychological Association
**2016-current**   Community Campus Partnerships for Health
**2009-current**   International Society for Traumatic Stress Studies
**2007, 2010-11**   Association for Behavioral and Cognitive Therapies
**2008**        Society for Psychophysiological Research

---

## LANGUAGE FLUENCY

**English**
**Spanish**

Exhibit 8

*The* NEW ENGLAND JOURNAL *of* MEDICINE

# Perspective

## Reducing Protections for Noncitizen Children — Exacerbating Harm and Trauma

Ryan Matlow, Ph.D., and Daryn Reicherter, M.D.

On June 26, 2018, a federal judge ordered the Trump administration to reunite families that it had separated at the U.S.–Mexico border. As of mid-October, however, an analysis by the American Civil Liberties Union showed that 245 children were still in government custody. About half those children remained in the United States when their parents were deported and were not seeking reunification; the other half were still waiting to be reunited with their parents.[1] Meanwhile, the total number of undocumented immigrant children in U.S. government custody has reached unprecedented levels (more than 14,000 as of mid-November), and President Donald Trump continues to crack down on immigrant families seeking asylum.

As part of the ongoing effort to deter immigrants from attempting to enter the United States, the Departments of Homeland Security (DHS) and Health and Human Services (HHS) have released a proposal (DHS Docket No. ICEB-2018-0002) to establish new regulations to replace the existing standards of care for noncitizen children. The current standards were established by the 1997 Flores Settlement Agreement, which resulted from a class action lawsuit filed against the government in response to the mistreatment of immigrant children in U.S. custody. Although the proposed regulations mirror much of the language in the Flores Settlement Agreement, the new proposal includes provisions that would permit the detention of noncitizen children and their families for indefinite periods in facilities without appropriate and independent monitoring. According to the proposal, the goal of the regulations is to reduce operational difficulties stemming from state licensing requirements for housing children and families who are undergoing immigration proceedings.

We believe that this proposal presents a grave and urgent risk to the health and well-being of noncitizen children and their families and would have important negative consequences for the United States. Children and families are already being harmed because of the effects of separation, detention, and the failure to provide appropriate oversight and ensure safety for those in government custody and care. In addition, children and families seeking asylum and refuge are negatively affected by deterrence efforts that result in denial of basic human rights and access to resources such as appropriate medical care. We fear that

overturning the Flores Settlement Agreement would allow these harms to continue and might even exacerbate them.

One of the stated aims of the HHS Administration for Children and Families is to "address the needs, strengths and abilities of vulnerable populations," including refugees and immigrants. But the proposed regulations would ultimately result in the traumatization of children and families in the custody and care of the administration's Office of Refugee Resettlement and the U.S. government.

Our concerns stem from the clear understanding in the medical and mental health communities that the indefinite detention of children and families is a form of trauma and is likely to cause lasting psychological harm. Detention is harmful to individual and family well-being and can have adverse effects on the functioning of children and families.[2] Children and families in detention often experience pervasive emotional distress — including sadness, despair, worry, and frustration — as well as physical restriction and poor health, social impairment, and spiritual despair. Children and families are stripped of their autonomy and right to self-determination and are left with little or no information about the possibility of or timeline for release; this lack of personal control and agency exacerbates their trauma. What's more, although state-licensed facilities are currently required to provide educational services to children in their care (with standards for student-to-teacher ratios, for example), the removal of state licensing requirements would eliminate these standards.

We know that exposure to chronic stress, adversity, and trauma in childhood affects the development of neurologic and biologic systems.[3] Children's expected neurobiologic adaptations to separation from caregivers and to the conditions of detention will prove problematic in the context of society at large. The removal of the protective buffer of a supportive caregiver — because of both separation and the expected consequences of detention on family caregiving practices — could have detrimental effects on child development. Children may learn, for example, that they cannot rely on the presence of a trusted adult to ensure safety and emotional regulation; resulting short-term behavioral and psychological coping responses are likely to create problems in future family, community, and educational contexts. It is firmly established that childhood trauma is associated with an increased risk for psychological dysfunction, including severe and impairing psychiatric disorders, ranging from mood and anxiety disorders to substance abuse and personality disorders. Furthermore, the profound, long-term negative physical and mental health outcomes associated with childhood exposure to trauma and adversity include most leading causes of death, early mortality, lost productivity, and high costs of care.[4] Exposing noncitizen children and families to additional trauma is therefore likely to increase the burden on the U.S. health care system.

There is also a real risk that families detained in government custody will be exposed to life-threatening circumstances. Previous research and policy analysis has revealed that DHS "facilities do not meet the basic standards for the care of children in residential settings,"[2] and there have been multiple cases of noncitizen children who were gravely harmed or experienced trauma while in DHS custody, even when facilities were purportedly operating under the standards of the Flores Settlement Agreement.[2,5] Children have reportedly been harmed by the failure to provide appropriate care and monitoring, including harm from serious delays in access to necessary medical intervention, exposure to physical and sexual assault; and the administration of psychotropic drugs for the purposes of managing challenging behavior. Despite evidence of ongoing abuses and violations of existing standards, the proposed regulations would loosen oversight over detention conditions, permitting a form of self-licensing and eliminating state, local, and attorney inspections. Given the less rigorous standards and monitoring that would be established under the new regulations, such harms are likely to continue and to proliferate.

We believe that there are several alternatives to the proposed regulations that could minimize risks for noncitizen children and families. First, we suggest that DHS and HHS adhere to guidelines established by the Substance Abuse and Mental Health Services Administration for key principles of a trauma-informed approach in behavioral health service sectors, which include safety; trustworthiness and transparency; peer support; collaboration and mutuality; empowerment, voice, and choice; and sensitivity to cultural, historical, and gender issues. Second, we recommend that the current standards established by the Flores Settlement Agreement be upheld, rigorously enforced, and strengthened. Third, we believe that the Trump administration could address the influx of noncitizen children and families in ways that

2

would not exacerbate their long-term trauma, such as discontinuing family-detention and family-separation practices under all but the most extreme circumstances, providing families with options for housing in "least restrictive" settings, and providing access to appropriate health and educational services for children (see box).

The U.S. government has a duty to protect children in its custody and care, rather than to punish, criminalize, and further traumatize people seeking refuge and asylum. The scientific literature has documented the damage that will almost surely be caused by indefinite and unregulated detention. We believe that the government should not be complicit in the traumatization of noncitizen children and families by engaging in indefinite detention, not only because of the human-rights violations inherent in this practice, but also because of the high costs that would be imposed on our health care systems and the potential damage to the international reputation of the United States that would result.

Health professionals have an immediate opportunity to relay concerns about the harms associated with recent and proposed changes to U.S. immigration policy by means of policy advocacy and engagement with legislative representatives. From our training and professional experiences, we have an understanding of the effects of exposure to traumatic stress during childhood, and we can testify to the related costs and consequences for families, communities, and systems of care.

Disclosure forms provided by the author are available at NEJM.org.

From the Department of Psychiatry and Behavioral Sciences, Stanford University School of Medicine, Stanford, CA.

This article was published on November 21, 2018, at NEJM.org.

**1.** American Civil Liberties Union. Family separation: by the numbers. October 2018 (https://www.aclu.org/issues/immigrants -rights/immigrants-rights-and-detention/ family-separation).
**2.** Linton JM, Griffin M, Shapiro AJ. Detention of immigrant children. Pediatrics 2017; 139(5):e20170483.
**3.** Shonkoff JP, Garner AS. The lifelong effects of early childhood adversity and toxic stress. Pediatrics 2012;129(1):e232-e246.
**4.** Felitti VJ, Anda RF, Nordenberg D, et al. Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults: the Adverse Childhood Experiences (ACE) Study. Am J Prev Med 1998;14:245-58.
**5.** American Civil Liberties Union Border Rights, University of Chicago Law School International Human Rights Clinic. Neglect and abuse of unaccompanied immigrant children by U.S. customs and border protection. May 2018 (https://www.aclusandiego .org/civil-rights-civil-liberties/).

**DOI: 10.1056/NEJMp1814340**
*Copyright © 2018 Massachusetts Medical Society.*

---

**Recommended Approaches for Receiving Noncitizen Children and Families.**

Discontinue family-detention and family-separation practices, except in extreme cases of danger or risk identified by means of individualized assessment by objective third-party observers.

House families together in community settings or in "least restrictive" environments, providing families with options and agency in determining their residential placement during the course of ongoing immigration proceedings.

Provide access to age-appropriate educational services, in accordance with national education standards, oversight, and monitoring.

Allocate resources to provide culturally sensitive, trauma-informed case management, health care, and prevention and treatment services for mental health.

Provide a humane response to asylum-seeking children and families in accordance with U.S., international, and humanitarian law.

# CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On this date, May 31, 2019, I electronically filed the following document(s):

- EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT [**REDACTED VERSION OF DOCUMENTS PROPOSED TO BE FILED UNDER SEAL**] VOL. 1 OF 5

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/Peter Schey
*Attorney for Plaintiffs*

CV 85-4544-DMG (AGRX)