1

2   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Peter A. Schey (Cal. Bar No. 58232)
3   Carlos Holguín (Cal. Bar No. 90754)
    256 South Occidental Boulevard
4   Los Angeles, CA  90057
    Telephone: (213) 388-8693
5   Facsimile: (213) 386-9484
6   Email: pschey@centerforhumanrights.org
            crholguin@centerforhumanrights.org
7

8   ORRICK, HERRINGTON & SUTCLIFFE LLP
9   Elena Garcia (Cal. Bar No. 299680)
    egarcia@orrick.com
10  777 South Figueroa Street, Suite 3200
    Los Angeles, CA 90017
11  Telephone:  (213) 629-2020

12
13  *Attorneys for plaintiffs (listing continues on following page)*

14                    UNITED STATES DISTRICT COURT

15          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16
    JENNY LISETTE FLORES, *et al.*,     )    Case CV 85-4544 DMG-AGRx
17                                      )
                    Plaintiffs,         )    EXHIBITS IN SUPPORT OF
18                                      )    PLAINTIFFS' MOTION TO
                                        )    ENFORCE THE SETTLEMENT
19          - vs -                      )    AGREEMENT **[REDACTED
                                        )    VERSION OF DOCUMENT
20                                      )    PROPOSED TO BE FILED
    WILLIAM BARR, ATTORNEY             )    UNDER SEAL]** VOL. 2 OF 5
21  GENERAL                             )
    OF THE UNITED STATES, *et al.*,     )
22                                      )
                                        )
23                  Defendants.         )    [HON. DOLLY M. GEE]
                    ─────────────────   ─
24

25  / / /

26

27

28

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone:  (408) 280-2437
Facsimile:   (408) 288-8850
Email: jenniferk@lawfoundation.org
         kate.manning@lawfoundation.org
         annettek@lawfoundation.org

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (Cal. Bar No. 208741)
Neha Desai (Cal. RLSA Bar No. 803161)
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
         ndesai@youthlaw.org

U.C. DAVIS SCHOOL OF LAW
Holly S. Cooper (Cal. Bar No. 197626)
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

*Of counsel:*

YOUTH LAW CENTER
Virginia Corrigan (Cal. Bar No. 292035)
832 Folsom Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 543-3379

1

## **INDEX OF EXHIBITS**

2   <u>VOL. 1</u>

3   1. Declaration of Peter Schey   1

4   2. Declaration of Hope Frye   8

5   3. Excerpts of Flores Class Member Declarations   15

6   4. Office of Refugee Resettlement Unaccompanied Minors Policies   43

7   5. N.E. Wang, Emergency Medicine and Pediatrics at Stanford,

8       Stanford Human Rights in Trauma Mental Health Program,

9       *2018 Individual Program Report: Homestead* (April 11, 2019)   52

10   6. Declaration of Dr. Marsha Griffin   67

11   7. Declaration of Dr. Ryan Matlow   84

12   8. The New England Journal of Medicine, Reducing

13       Protections for Noncitizen Children — Exacerbating

14       Harm and Trauma (November 21, 2018)   104

   9. Omitted

16   <u>VOL. 2</u>

17   10. Deposition of K▇▇▇▇, ORR Federal

18       Field Specialist, *Lucas R v. Azar*   108

19   <u>VOL. 3</u>

20   11. Declaration of E▇▇▇L▇▇▇   337

21   12. Declaration of J▇▇▇Q▇▇▇   341

22   13. Declaration of M▇▇▇D▇▇▇   346

23   14. Declaration of Y▇▇▇M▇▇▇   351

24   15. Declaration of C▇▇▇M▇▇▇   355

25   16. Declaration of C▇▇▇A▇▇▇   359

26   17. Declaration of D▇▇▇O▇▇▇   363

27   18. Declaration of E▇▇▇G▇▇▇   366

28

19. Declaration of H████Z███████████████                369

20. Declaration of J██████M████████████████             373

21. Declaration of J████A██████████████████             377

22. Declaration of K████M██████████████                 380

23. Declaration of K██████D██████████                    384

24. Declaration of M████G██████████                     388

25. Declaration of M██████Y████████████████             392

26. Declaration of M████A██████████████                 395

27. Declaration of M████G████████████                    398

28. Declaration of N████G████████████████               401

29. Declaration of N██████J███████████                  404

30. Declaration of D████A██████████████                 408

31. Declaration of O██████D█████████████████            412

32. Declaration of S████D██████████                     415

33. Declaration of S██████G██████████████               418

34. Declaration of C██████A████████████████████         422

VOL. 4

35. Declaration of D████L██████████████                 426

36. Declaration of E██████A████████                     430

37. Declaration of E██Y████████████████                 433

38. Declaration of Y████M████████████████               437

39. Declaration of G██████M██████████                   440

40. Declaration of M███J██████                          444

41. Declaration of N████R█████████████████████████      448

42. Declaration of M██████Y█████████████████            453

43. Declaration of N████C████████                       457

44. Declaration of O██████D████████████                 461

45. Declaration of Y████A████████████████               465

46. Declaration of M█████A██████ ........................................... 469

47. Declaration of A█████H██████ ........................................... 473

48. Declaration of J█████N███████ .......................................... 476

49. Declaration of H█████S███████ .......................................... 479

50. Declaration of E█████I██████████ ....................................... 485

51. Declaration of G█████N████████████ .................................... 489

52. Declaration of D█████A████████ ......................................... 492

53. Declaration of S██████████N████ ........................................ 496

54. Declaration of D█████J██████████ ....................................... 500

55. Declaration of H█████M█████████████ ................................... 505

56. Declaration of B█████M███████████ ..................................... 509

57. Declaration of C█████G███████████ ..................................... 513

58. Declaration of N█████P███████████ ..................................... 517

59. Declaration of D█████H███████████ ..................................... 521

VOL. 5

60. Declaration of E█████G██████ ........................................... 525

61. Declaration of A█████A██████████████ .................................. 529

62. Declaration of A█████B█████ ............................................ 532

63. Declaration of L█████M███████████████ ................................ 536

64. Declaration of N█████E██████████████ .................................. 539

65. Declaration of J████████A█████████ ..................................... 543

66. Declaration of J█████D███████████████ ................................. 547

67. Declaration of J█████P█████ ............................................. 550

68. Declaration of I█████P██████████ ....................................... 553

69. Declaration of J████J████████████ ...................................... 557

70. Declaration of E████J███████ ........................................... 560

71. Declaration of K█████D██████████ ...................................... 564

72. Declaration of J████████N████████████ ................................. 567

73. Declaration of R███A███████████   571

74. Declaration of E████████E██████   575

75. Declaration of R██F█████████████   578

76. Declaration of M███N█████████      581

77. Declaration of M████U████          585

78. Declaration of A██████E█████████    589

79. Declaration of D████N██████████     593

80. Declaration of Z████P████████████   598

81. Declaration of C█████A████████████  602

82. Declaration of M███████I██          606

83. Declaration of H████P███            609

84. Declaration of A████S█████████      612

85. Declaration of A██████████Q████     616

86. Declaration of K████M██████         620

/ / /

Exhibit 10

Page 1

1                UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                    WESTERN DIVISION
3
              CASE NO. 2:18-CV-05741-DMG-PLA
4
5     LUCAS R., et al.,
6                    Plaintiffs,
7     vs.
8     ALEX AZAR, Secretary of U.S.
      Department of Health and Human
9     Services; et al.,
10                   Defendants.
      _____
11
12
                        DEPOSITION OF
13
                     ███████████████
14
15
16          DATE TAKEN:    Thursday, April 25, 2019
            TIME:          9:34 a.m. - 3:25 p.m.
17          PLACE:         2 South Biscayne Boulevard
                           Suite 3100
18                         Miami, Florida  33131
19
20
21        Taken on behalf of the Plaintiffs before
22    ██████████████████, Shorthand Reporter and Notary Public in
23    and for the State of Florida at Large, pursuant to
24    Notice of Taking Deposition in the above cause.
25

Page 2

APPEARANCES

On behalf of the Plaintiffs:
            CENTER FOR HUMAN RIGHTS &
            CONSTITUTIONAL LAW
            256 S. Occidental Boulevard
            Los Angeles, California  90057
            BY:  CARLOS R. HOLGUIN, ESQUIRE
                  E-mail: crholguin@centerforhumanrights.org

On behalf of the United States:
            U.S. DEPARTMENT OF JUSTICE
            Civil Division
            Ben Franklin Station
            P.O.  Box 878
            Washington, DC 20044-0878
            BY:  YAMILETH G. DAVILA, ESQUIRE
                  E-mail:  yamileth.g.davila@usdoj.gov
                  BENJAMIN M. MOSS, ESQUIRE
                  E-mail:  benjamin.m.moss2@usdoj.gov

On Behalf of HHS:

            U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
            OFFICE OF THE GENERAL COUNSEL
            1301 Young Street
            Suite 1138
            Dallas, Texas  75202
            BY:  LISA STEELE, ESQUIRE
                  E-mail:  lisa.steele@hhs.gov

On behalf of E. Scott Lloyd:
            OFFICE OF U.S. ATTORNEY
            Civil Division
            300 North Los Angeles Street
            Suite 7516
            Los Angeles, California  90012
            BY:  DAVID E. PINCHAS, ESQUIRE
                  (Present telephonically)

Page 3

1                                    APPEARANCES
2                                    (continued)
3
      Also Present:
4
                        ███████████████
5
6
7                              - - - - - -
8
9
                              I N D E X
10
11    DEPOSITION OF ████████████████              PAGE NO.
12    Direct Examination by Mr. Holguin              4
      Cross-Examination by Ms. Davila              181
13    Witness Signature Page                       187
      Errata Sheet                                 188
14    Certificate of Oath of Witness               189
      Certificate of Reporter                      190
15    Letter to Witness Re: Reading                191
16
17
18
19
20
21
22
23
24
25

Page 4

1          THE COURT REPORTER:  Please raise your right

2      hand to be sworn.

3          Do you solemnly swear or affirm that the

4      testimony you are about to give will be the truth,

5      the whole truth, and nothing but the truth?

6          THE WITNESS:  Yes.

7  Thereupon:

8                    ███████████

9  was called as a witness and, having been first duly

10  sworn, was examined and testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. HOLGUIN:

13      Q.   Good morning, ██████████.  You are aware this

14  is a deposition and the basic process that is going to

15  happen here today.  Have you had your deposition taken

16  before?

17      A.   No.

18      Q.   Okay.  Well, in essence, what is going to be

19  happening is that I will be asking you questions.  The

20  court reporter will be recording your answers.  You are

21  under oath, as you know now.  If at any time you feel

22  tired, unable to answer, want to take a break, just let

23  us know and we can do that.

24          The reporter is only able to transcribe audio,

25  verbal responses.  So rather than shake the head yes or

Page 5

1   no, if you could answer "yes" or "no," that would be

2   appreciated.

3         A.    Yes.

4         Q.    Also, the reporter can only record one person

5   at a time.  So we will try to do our best to speak

6   separately.

7             Is there any reason today -- are you taking

8   any medications, are there any problems that you might

9   have in recalling or testifying, answering truthfully?

10        A.    No.   No.

11        Q.    At the end of the deposition, the reporter

12  will transcribe the proceedings.  You will have a chance

13  to look at the testimony and make corrections to your

14  testimony.  You should know that if you do make changes,

15  the plaintiffs would have the right to comment on the

16  changes that you do make.  So please try to be as

17  accurate as possible during your testimony today.

18            Now, at the conclusion of the deposition, your

19  attorneys and the attorneys for the plaintiffs may agree

20  that you can sign the booklet containing your testimony

21  in the presence of any notary public, as opposed to

22  before the court reporter here today.  We will talk

23  about that a little bit later with your lawyers.  If we

24  agree to do that, it will be on the understanding and

25  your promise that you will read the deposition

Page 6

1    transcript, correct it, if necessary, and sign it in the

2    presence of a notary public and then return it to the

3    office in which you received it.  Are there any

4    questions about that?

5         A.    No.

6         Q.    Could you please state and spell your full

7    name for the record.

8         A.    ████████████████████████

9              MS. DAVILA:  Before we delve into the

10             substantive questioning, we would like to preserve

11             our objections that we discussed earlier.

12             MR. HOLGUIN:  Sure.

13             MS. DAVILA:  Counsel for the government and

14             plaintiffs have discussed earlier the presence of

15             Dr. Cohen this morning at this deposition.  It is

16             the government's understanding that Dr. Cohen has

17             not signed a protective order in this matter.  We

18             are also informed by counsel that Dr. Cohen may be

19             a witness in this matter, but we are not informed

20             that she is at this point identified as a

21             Rule 26(a) witness or as an expert witness in this

22             case.  Accordingly, the government would like to

23             preserve on the record our objection to her

24             presence here today because pursuant to the court's

25             order of 11-2-2018, and that's at ECF Number 126,

1          plaintiffs may not proceed on any cause of action

2          seeking to enforce the Flores Agreement.  Thank

3          you.

4     BY MR. HOLGUIN:

5          Q.      ████████████  can you please explain or describe

6     for us your current position with the Department of

7     Health & Human Services.  Well, that assumes a fact not

8     in evidence, but please go ahead.

9          A.    I am a federal field specialist.

10         Q.    For what federal agency?

11         A.    Office of Refugee Resettlement.

12         Q.    And that's within the Department of Health &

13    Human Services, correct?

14         A.    Yes.

15         Q.    And how long have you been in that position?

16         A.    A little over four years.

17         Q.    Now, what area geographic area, region, do you

18    work in?

19         A.    Miami, Florida.

20         Q.    And does that cover the entire city or does it

21    cover a county?  What is the geographic extent of your

22    work?

23         A.    Currently?

24         Q.    Yes.

25         A.    Homestead.

1      Q.   How many facilities do you oversee at

2   Homestead?

3           MS. DAVILA:  Objection.  Vague.

4   BY MR. HOLGUIN:

5      Q.   Do you oversee any facilities in which

6   children are held for immigration violations at

7   Homestead?

8      A.   Can you repeat that?

9      Q.   Well, you are familiar with the Homestead

10   facility in which ORR places children who are facing

11   removal proceedings or other immigration-type

12   proceedings, correct?

13      A.   Yes.

14      Q.   What is that facility called?  What is its

15   full name?

16      A.   Homestead Influx Shelter.  You used the term

17   "oversee."  I don't oversee the program.

18      Q.   Then how do you describe your duties with

19   respect to the Homestead Influx Shelter?

20      A.   I review the releases when they are submitted.

21      Q.   These are decisions to release children to

22   their parents or other proposed custodians?

23      A.   Correct.

24      Q.   Do you ever actually go to the Homestead

25   facility?

1      A.   I have been to the Homestead facility, but I
2  go rarely to the Homestead facility.
3      Q.   About how many times per year would you say
4  you go to Homestead?
5      A.   Are you speaking about this contract year or
6  previous contract years?
7      Q.   Let's talk about this contract year.
8      A.   How many times have I been to Homestead
9  physically?  Maybe four or five times.
10      Q.   In the past year, 12 months?
11      A.   I wouldn't know a number to tell you.  Not
12  very often.  I don't go very often at this point.
13      Q.   Are you aware of any other employee of Office
14  of Refugee Resettlement who visits Homestead more
15  regularly than you do?
16      A.   Yes.
17      Q.   Who would that be?
18      A.   At this time, my supervisor, ████████████
19      Q.   How do you spell this person's name, ████?
20      A.   ████████████████
21      Q.   What is ██████████████ title, job title?
22      A.   Federal field specialist supervisor.
23      Q.   So your understanding is that ██████████ does
24  go to the Homestead facility with some regularity?
25      A.   At this point, recently, yes.

1       Q.   Now, is it also ███████████ obligation to

2   look at conditions and treatment that children

3   experience at the Homestead facility?

4       A.   I can't speak of her responsibilities.  I am

5   not quite sure what her responsibilities are.

6       Q.   Now, when you go to Homestead, what is your

7   objective in going there?

8       A.   My objective is, I facilitate the releases.

9   So I have been there in the past where I have sat in a

10  staffing of the case managers and leads.  No, not case

11  managers.  Excuse me.  The leads, really.  But my focus

12  and my emphasis and my position right now is to deal

13  with the releases when they come in.  So the back end of

14  the cases.

15      Q.   When you reference "the leads," what does that

16  mean?  What are the leads?

17      A.   I was speaking of the lead case managers

18  employed by CHSI.

19      Q.   How many lead case managers are at the

20  Homestead facility?

21      A.   I don't know the number.  I have nothing to do

22  with their human resources.  I don't know the numbers of

23  leads that they have at this point.

24      Q.   How many lead case managers have you found

25  there when you have been to Homestead?

Page 11

1     A.   I think I might have met with six, seven of

2  them, maybe eight.

3     Q.   Is there anyone else who currently performs

4  duties similar to yours?  In other words, making

5  decisions about whether children should be released?

6     A.   Currently, yes.

7     Q.   How many other people are doing this?

8     A.   One other person.

9     Q.   What is that person's name?

10    A.   ███████████ .

11    Q.   Approximately how many release decisions do

12  you make, say, per week?

13    A.   I make approximately between 20 and 40 a day.

14    Q.   20 to 40 per day?

15    A.   28 to 40 a day, I would say, is more accurate.

16    Q.   Approximately how long do you spend on each

17  decision, making each decision?

18    A.   It varies from case to case.

19    Q.   Now, is it the case that the actual gathering

20  of information about proposed sponsors or custodians,

21  the gathering of information is performed by employees

22  at Homestead?

23    A.   Correct.

24    Q.   And could you give us the full name of the

25  company or corporation that actually owns and operates

Page 12

1   Homestead?

2       A.   I believe it is Comprehensive Health, maybe

3   Services, Incorporated.  I am not 100 percent on that.

4       Q.   And their current contract, when did that

5   begin?

6       A.   I can't tell you.  I don't work in the

7   contracts.  I have nothing to do with their contracts.

8   It was a part of Homestead when the children were

9   placed.  I can't tell you that.

10      Q.   Have you ever seen their contract?

11      A.   No.

12      Q.   So you don't know what it might say?

13      A.   No, no.

14      Q.   If you could explain, generally, how is it

15  that the caseworkers investigate proposed sponsors and

16  how that process goes from beginning to end where you

17  made a decision as to whether they should be released or

18  not.

19      A.   I can't speak of how they got the information

20  in every case because I am not physically there to know

21  that or watch them do the case.  If you would like me to

22  speak in general terms, what my experience has been on

23  that end, I can try to answer the question.  But it's

24  their processes, they run their shelter, and I can't

25  really answer that.  They have to follow the ORR

Page 13

1   policies.

2        Q.   If you could just describe, generally, your

3   understanding of how the process proceeds, that would be

4   appreciated.

5        A.   And you're speaking of the process with the

6   sponsors, correct?

7        Q.   Yes.

8        A.   So the case manager would normally contact the

9   sponsor and begin an FRP, which is Family Reunification

10  Package.  I'm sorry about the acronyms.  They contact

11  the sponsor.  They complete an assessment of the

12  sponsor.  They also have to give documentation that's

13  located in the Family Reunification Package.  In some

14  cases, the sponsor needs to be fingerprinted.  That

15  needs to be done.  In some cases, there is a CA/N, which

16  is for the abuse and it's required in some cases.  They

17  are constantly speaking to the sponsors and assessing.

18  That's what I would say about that.  And collecting the

19  documents that are required for the release.

20       Q.   Now, you referenced an ORR manual or document

21  that directs the case managers in how to go about

22  gathering this information; is this correct?

23       A.   Yes.

24       Q.   What is that document called?

25       A.   Well, there are two documents that you can

Page 14

1   reference.  There is the MAP, which is a more detailed

2   explanation of forms and procedures, and there is ORR

3   policies.  Both of them are free to look at on the

4   website.

5       Q.   Now, when you say "MAP," are you speaking in

6   the generic sense of a map or --

7       A.   A manual.  I am speaking of a manual, the

8   process.

9       Q.   So when you say "MAP," is that an acronym as

10  well?

11      A.   Yes.  Don't ask me what it stands for.  I

12  think it's one "P," but it could also be two.  I'm

13  sorry.

14      Q.   Between the MAP and the policies that appear

15  on ORR's website, those are the instructions that the

16  caseworkers follow in investigating and evaluating

17  proposed sponsors?

18          MS. DAVILA:  Objection.  Mischaracterizes

19      testimony.

20  BY MR. HOLGUIN:

21      Q.   If I have mischaracterized your testimony,

22  could you please correct it?

23      A.   Well, I said I am not sure of their internal

24  processes.  It's a general process, how to and what is

25  required for a sponsor.  However, they are assessing the

Page 15

1    sponsor as well.  So it's not everything in terms of

2    flatly looking at that policy.

3        Q.   From ORR's perspective, these two sources are

4    the instructions that the case managers are supposed to

5    follow, that ORR insists they follow in investigating

6    proposed sponsors?

7            MS. DAVILA:  Can you read back that question.

8            (Thereupon, the requested portion of the record

9    was read by the Court Reporter.)

10           MS. DAVILA:  Objection.  Mischaracterizes

11       testimony.

12   BY MR. HOLGUIN:

13       Q.   You can answer.

14       A.   The policy and procedure is part of the

15   necessity of exploring and assessing the sponsors.  It's

16   case by case.  That is the best way I would summarize

17   that answer.

18       Q.   Well, in addition to Homestead, ORR does place

19   children in a number of other facilities around the

20   country; is that correct?

21       A.   Yes.

22       Q.   Would each one of those facilities have their

23   own internal procedures for evaluating proposed

24   sponsors?

25       A.   I would say every program runs their program

Page 16

1    the way that they run their program.  They have to make

2    sure that they follow the ORR policies.  However, they

3    are independent shelters, I imagine, that you are

4    speaking of.  So I am sure there are internal processes

5    as well that I would not be privy to.

6         Q.   But there is a minimum level of investigation

7    that ORR insists all shelters follow; is that correct?

8         A.   Following the policies and procedures, yes.

9         Q.   Now, from the standpoint of those minimum ORR

10   policies that every shelter must follow, are those

11   contained in the MAP and the ORR online policy manual or

12   are they also contained in some other source?

13        A.   They are in the MAP and the ORR policies and

14   procedures.

15        Q.   Do they appear in any other source?

16        A.   Not to my knowledge.

17        Q.   Do you receive a file from the case managers

18   when the case is being referred to you for a decision as

19   to whether someone should be released or not?

20        A.   Are you speaking of a physical file or an

21   electronic file?

22        Q.   Either one.

23        A.   There is an electronic file.

24        Q.   And what system do they use to transfer to you

25   the electronic file?

Page 17

1       A.   I would not know their system.

2       Q.   How do you receive it?  Is it an e-mail?

3       A.   I receive it on the UAC portal, as well as an

4   e-mail that the recommendation is in.  The

5   recommendation e-mail does not come to me from CHSI.

6       Q.   Where do you get the recommendation e-mail

7   from?

8       A.   From a third-party reviewer.

9       Q.   Is that third-party reviewer also called a

10  case coordinator?

11      A.   Yes.

12      Q.   Who employs the case coordinator?

13      A.   GDIT.  General Dynamics -- I don't know the

14  rest of it.

15      Q.   How many people at General Dynamics, or GDIT,

16  do you interface with in a particular week?

17      A.   I can't answer that.  They use a pool of

18  people.  I don't know.  I honestly don't know.

19      Q.   Do you know any of their names?

20      A.   Yes.

21      Q.   For example, could you give us two or three?

22      A.   ███████████████████████████████, and

23  ███████████████

24      Q.   How do you distinguish the role of a case

25  coordinator from a case manager who works at Homestead?

Page 18

1        A.    Are you asking how I personally determine

2    or --

3        Q.    To your knowledge, what are the differences in

4    their tasks?  How are they similar?  How are they

5    different?

6        A.    A third-party reviewer is an extra set of eyes

7    on the case to assist with a recommendation.  The case

8    manager is the one presenting the case to the third

9    party who then, in turn, presents it to the FFS.

10       Q.    Do the case coordinators conduct any

11   investigation themselves?  Do they speak to the parents?

12   Do they speak to the children?

13       A.    They have spoken to children before.  I am not

14   quite sure if they speak to parents.  You would have to

15   ask GDIT that.

16       Q.    What about with respect to the case managers?

17   Do they make recommendations with respect to release as

18   well?

19       A.    Yes.

20       Q.    So the process is, if I can summarize this,

21   and correct me if I am wrong, that the case managers

22   gather the information that is required by their own

23   internal policies, as well as the MAP and the ORR online

24   policies.  They then make a recommendation as to whether

25   a child should be released to a proposed sponsor.  That

1   goes to the case coordinator, who then puts an extra set

2   of eyes on the process.  The case coordinator will then

3   forward a recommendation to you, and then you make the

4   final decision.

5          MS. DAVILA:  Objection.  Vague.  Objection.

6      Compound.  Objection.  Mischaracterizes testimony.

7   BY MR. HOLGUIN:

8      Q.   You can correct me in anything I have said if

9   it's wrong, please.

10     A.   The case manager sends the recommendation to

11  the case coordinator.  They staff the cases as well with

12  case coordinators.  Then they, in turn, send the

13  recommendation to the FFS.

14     Q.   And the FFS, in the cases you handle, would be

15  yourself, correct?

16     A.    In the cases that I have, it would go to me.

17  But the releases, just to clarify, go into a central

18  box, the Homestead FFS box, so that if there is coverage

19  or if ██████ or any other FFS is assisting, they could

20  go to anyone.  They are not preassigned to the FFS.

21     Q.   Now, in making your decisions about whether to

22  release or not, are the standards you follow in the MAP

23  and the ORR policy online policies as well?

24     A.   For the most part, yes.

25     Q.   That takes care of "for the most part."  What

Page 20

1    about the remainder?  What standards do you follow?

2        A.   I have to assess the case as well to ensure as

3    safe of a release as I can make it.  So the FFSs do look

4    at the cases for that purpose as well.

5        Q.   I am trying to understand.  These other

6    criteria that you apply, the ones that don't appear in

7    the MAP or the ORR online policies, those criteria are

8    specific to the individual FFS?

9        A.   No.  I think you misunderstood what I was

10   attempting to say.  No.

11          We follow the policies and procedures in

12   making release determinations.  However, I just want to

13   stress to you that we are dealing with lives of children

14   and there are variations in cases.

15       Q.   Do you mean that there are variations in cases

16   that present factors that are not covered in the MAP or

17   the ORR online materials?

18       A.   There could possibly be a case.  I am not able

19   to reference that for you right now.  As I said, it's on

20   a case-by-case basis.  We do follow the guidelines set

21   out by ORR as well as any other guidance we have

22   received.

23       Q.   Now, other guidance you have received, what

24   form would that guidance arrive in?

25       A.   If I have a difficult case that could be a

Page 21

1    little blurred in some way, I would staff it with my

2    supervisor.

3        Q.   Consult with a supervisor?

4        A.   Yes.

5        Q.   Are you aware of any written material that

6    your supervisor has access to that you do not have

7    access to?

8        A.   No, sir.

9        Q.   Is it fair to say that you exercise some

10   judgment in making these decisions, either in a case

11   where you decided on your own or where you consult with

12   a supervisor?

13       A.   In some instances.

14       Q.   In the times that you have been to Homestead,

15   have you had occasion to talk with any of the children?

16       A.   I have spoken to three children.

17       Q.   Is this during the past year?  What is the

18   period of time?

19       A.   This contract year, I am not sure if it -- I

20   believe it could have been right before Christmas.

21       Q.   What was the purpose in speaking with them?

22       A.   With the children?

23       Q.   Yes.

24       A.   I just wanted to make sure they were doing

25   okay.

Page 22

1      Q.   Apart from speaking to those three children,

2  do you have any role in monitoring or assessing the

3  treatment or conditions the children experience at

4  Homestead?

5      A.   No, sir.  My function in Homestead is strictly

6  on releases and transfers.  I have, due to the volume --

7  and I am not sure if you have been to Homestead or if

8  you are aware of the volume of Homestead.  You cannot do

9  both functions.  So I have been delegated to do the

10  release end of it.  So no, I don't monitor them at all.

11      Q.   Now, when you receive a release packet through

12  the portal, does the information you receive indicate,

13  for example, how long a child has been detained?

14      A.   The information on the portal can tell me how

15  long a child has been there.  When you open the portal,

16  it will tell you the length of stay.  So yes, I can see

17  the length of stay.

18      Q.   Is that one of the factors you take into

19  consideration when you decide whether to release or not?

20      A.   The length of time that the child has been in

21  care?  No.

22      Q.   Does the portal indicate any kind of

23  assessment as to the child's psychological state at

24  Homestead?

25      A.   The clinicians assessments.  There is ongoing

Page 23

1   assessments.  If they seek other professional

2   evaluations, that would be -- the report would be

3   uploaded in the portal.

4       Q.   Is that something you review in deciding

5   whether to release or not?

6       A.   Yes.  However, it is not necessarily to

7   release or not.  It is to look at whether that child

8   needs post-release services, follow-up services.  And in

9   some cases, if that child met criteria for TVPRA, the

10  Trafficking Victims Protection Reauthorization Act, the

11  TVPRA home study.  So that's where those assessments

12  come into play.

13      Q.   With respect to post-release services, or

14  TVPRA benefits, but not with respect to the release

15  decision --

16      A.   Well, it is part of the release decision.  If

17  there is a home study -- if they meet criteria for a

18  home study, I would recommend a home study.  If they met

19  criteria for post release, I would recommend post

20  release.

21      Q.   I see.  Let me just ask it more generally.

22  What is the fundamental thing you are looking for, the

23  most important factor in your mind when you decide

24  whether to release or to continue a child in custody?

25      A.   Safety.

Page 24

1      Q.   Safety.  And this means safety following
2    release, correct?
3      A.   If I am looking at the releases, it would be
4    in conjunction with the safe release outside of the
5    shelter, correct.
6      Q.   Now, are you aware of any statistics or
7    studies that ORR has done about the incidents of abuse
8    or neglect following release from ORR custody?
9      A.   No, sir.
10     Q.   So you don't know whether it happens
11   10 percent of the time, 5 percent of the time, 1 percent
12   of the time?
13     A.   No.
14     Q.   Do you have any insight as to any individual
15   cases where children have actually been abused and
16   neglected following release from ORR custody?
17     A.   "Aware of," meaning I have heard of or I have
18   personal knowledge of?
19     Q.   You have personal knowledge of.  Let's start
20   with that.
21     A.   I don't have personal knowledge.  I don't
22   follow the children once they are released.  I have
23   heard of that, but I don't have, myself, personal
24   experience.
25     Q.   How many cases have you heard of now?

1        A.    Probably -- maybe three to five.

2        Q.    Over how long a period would that be?

3        A.    I believe since I have been in FFS.  If a

4   child is back in custody, that is normally how I would

5   see that.

6        Q.    So that would be four years, I believe you

7   said?

8        A.    Yes.

9        Q.    So between three and five --

10       A.    Cases.

11       Q.    -- cases in over four years?

12       A.    Fair to say.

13       Q.    Are you aware of cases of abuse or neglect of

14   children in ORR custody by staff in the facility, by

15   other detainees?

16       A.    Yes.

17       Q.    About how many of those do you know of?

18       A.    Can you clarify what you are talking about in

19   terms of abuse so I can answer your question?

20       Q.    Comparable to the abuse or neglect of the

21   three to five cases that you have heard of when children

22   are released.  Comparable to that.

23       A.    Well, I am talking about abandonment and

24   neglect in the majority of the ones I have heard of, so

25   I would say no to that.  Physical abuse, I would say no.

Page 26

1    I have seen not physical abuse, I would say, but I have

2    read SIRs that weren't appropriate behaviors.

3         Q.    And what sorts of behaviors have you taken

4    note of?

5         A.    Staff sees inappropriate behavior.

6         Q.    Inappropriate how?  Inappropriate touching,

7    inappropriate sexual conduct?

8         A.    Inappropriate.  I have seen inappropriate

9    sexual conduct and inappropriate conduct in general.

10   SIRs, not personally observed.  Reading SIRs.

11        Q.    But it's not your responsibility to verify the

12   veracity of whatever the allegation might be?

13        A.    No, sir.

14        Q.    Whose job is that?

15        A.    I am not quite sure whose job that is.

16   Homestead is a unique place.  There is the COR team

17   there who oversees contracts and what is going on in the

18   shelter.  I don't know exactly who is responsible.

19   Again, my role in Homestead is limited to releases and

20   to the transfers in some instances.

21        Q.    Your tenure with ORR entirely, not as an FFS,

22   but with ORR, how long have you been with ORR?

23        A.    I started as a contractor, working for USCCB

24   as a case coordinator.  We were called field

25   specialists.  I was there in 2004 and 2005.  Then I was

Page 27

1    a director of Children's Village, Boys Town.  I was the

2    program director from 2006 to 2014.  Then I went to

3    Neighbor to Family, which was on an urgent and

4    compelling grant, and I worked there until I started

5    with ORR.

6         Q.   So in total, you have worked with ORR for

7    about 14 years either as a contractor or as an employee?

8         A.   That's about right.  Math is not my forte.

9         Q.   Now, based on your knowledge of how ORR

10   functions, you don't know right now who is responsible

11   for investigating allegations of abuse or neglect within

12   the Homestead facility; is that correct?

13              MS. DAVILA:  Objection.  Asked and answered.

14              THE WITNESS:  There are mandated reporters,

15         like every other shelter, so they have to report

16         any instance.  So you have DCF investigating.

17         Sometimes it could be sent to the local police

18         department.

19   BY MR. HOLGUIN:

20        Q.   But internally within ORR, you are not aware

21   of anyone who is in charge of investigating reports of

22   abuse or neglect in the Homestead shelter?

23              MS. DAVILA:  Objection.  Asked and answered.

24         Objection.  Cumulative.  Objection.

25         Mischaracterizes testimony.

Page 28

1            THE WITNESS:  ORR has a section that deals

2        with abuse allegations in the sense that there is a

3        section, and they review those SIRs.  But I can't

4        tell you the workings of who is actually

5        investigating.  I know that the SIRs, the sexual

6        abuse ones, are elevated to a unit that explores

7        what goes on in that.

8    BY MR. HOLGUIN:

9        Q.   Do you know the name of that unit?

10       A.   I don't know the name of the unit.

11       Q.   Do you know where it is located?

12       A.   I don't know if it is -- I don't believe it is

13   in Miami, but I am not quite sure where their offices

14   are.

15       Q.   Have you ever met anyone who worked in that

16   unit?

17       A.   I have met people that work within the

18   allegations of abuse from ORR.  They provided training

19   at Homestead and that's how I met them.  But other than

20   that, no.

21       Q.   Did you attend the training?

22       A.   I did.

23       Q.   Based on what you know of it, if someone at

24   Homestead receives an SIR -- and this is called a

25   Serious Incident Report.  That is an acronym for Serious

Page 29

1   Incident Report; is that correct?

2        A.   Yes.

3        Q.   So if someone at Homestead forwards a Serious

4   Incident Report, who do they send it to within ORR?

5        A.   They send it to intake, to a hotline.  It

6   depends on what the SIR is.  There is a chain of where

7   it goes to.  But all SIRs are forwarded to the intake,

8   and we get a copy of them in the FFS box.  The COR team,

9   which is primarily project officers for Homestead, they

10  receive it as well.  And again, if it is something that

11  OIG needs to know or HHS needs to know, it depends on

12  the incident.

13       Q.   The procedures that are applied to different

14  types of incidents, are those written down anywhere?

15       A.   Yes.

16       Q.   What is the name of the document or the

17  manual?

18       A.   It is in the policies and procedures.

19       Q.   Is that in the online manual?

20       A.   Yes.

21       Q.   Now, project officers, what is their role?

22       A.   In Homestead?

23       Q.   Yes.

24       A.   I can't speak on their role.  They are the

25  ones that deal with the contractual issues and the

Page 30

1    running of the program.

2         Q.   If we could speak a little bit about your

3    background.  You gave us some information about where

4    you worked before you came to become a federal field

5    specialist at ORR.  What is your educational background?

6         A.   I have my master's degree in social work and I

7    am a licensed clinical social worker.

8         Q.   When did you receive your -- is it an MSW?

9         A.   Yes.

10        Q.   When did you receive that?

11        A.   I believe in '97.

12        Q.   And your LCSW?

13        A.   I received it in March of last year.

14        Q.   How long have you been involved in social work

15   in general?

16        A.   Since 1984.

17        Q.   Have you ever worked for a child protective

18   services agency?

19        A.   No.

20        Q.   So your work history since 1984 has been in

21   running shelters?

22        A.   No.  I worked in a boys' home in New York and

23   we had children who were not or did not have the

24   parental -- for the most part, parental -- anybody to go

25   to, in a sense.  I worked with that same agency working

Page 31

1    with children that were in the juvenile justice system.

2    We had a group home.  So we would take the kids from the

3    juvenile facility to the group home, low risk children.

4    Criminal risk, I am talking about.  I did that.  I

5    worked in a psychiatric hospital as a psychiatric social

6    worker.  I worked at the school board as a trust

7    counselor.  I worked at the public defender's office as

8    a forensic social worker.

9        Q.   Have you ever conducted, personally, child

10   abuse investigations?

11       A.   I have not.  I have phoned them in several

12   times.  But no, I have not personally conducted them.

13       Q.   Have you had occasion to place children in

14   foster homes as part of your work prior to coming to

15   ORR?

16       A.   Not in foster homes, per se.  When I worked as

17   a social worker in New York, we had one occasion that

18   the child could not return to the facility, but they

19   went to another relative.  I mean, not the facility; to

20   the mother.  They went to another relative, to a

21   grandmother.

22       Q.   Were you involved in evaluating the

23   grandmother as a suitable custodian?

24       A.   No.  DCF did.  Well, not DCF in New York.  It

25   is called something different.

Page 32

1          Q.    This would be the New York child protective
2     services agency?
3          A.    That would have conducted the assessment of
4     whether the grandmother was suitable?  Yes.
5          Q.    So then, essentially, before coming to ORR,
6     you did not have occasion to evaluate the suitability of
7     proposed custodians; is that correct?
8          A.    I wouldn't say -- evaluate in terms of
9     removal, no, which is what I thought you were asking in
10    the last question.  I was not the person that would do
11    the assessment for removal of a child, but I would
12    assess the situation.  Particularly in New York, I did
13    home visits and was required to send reports to the
14    child welfare agency.
15         Q.    So approximately how many home visits do you
16    think you have performed?
17         A.    I would do three a week.
18         Q.    And for how many weeks did you do that?
19         A.    For a two-year period.  Almost a two-year
20    period.
21         Q.    Now, how does your experience in doing those
22    home visits compare to your ability to evaluate children
23    under your current procedures?
24         A.    Very different.  It's a completely different
25    situation.

Page 33

1      Q.   So when you were doing home visits, you would

2   actually go to the home.  What was your process when you

3   would arrive at a potential home?

4      A.   The goal was to try to reunify the child with

5   the parents.

6      Q.   And the goal that you are pursuing now in

7   evaluating these releases, making these release

8   decisions, is that goal the same or is it any different?

9      A.   No.  The goal is to safely -- I am going to

10  use that term over and over again because that is what

11  we try to do.  Safely reunify the child with family in

12  the United States.

13     Q.   But in terms of what you used to do when you

14  were conducting home visits and what you do now, what is

15  the major difference?

16     A.   I am not visiting the home.

17     Q.   So you make the decision based upon paper, the

18  data that is transmitted to you through the portal,

19  correct?

20     A.   Largely, yes.

21     Q.   What other sources of information do you use,

22  apart from what is recorded in the portal, to make a

23  decision whether to release or not?

24     A.   Again, I staff the cases when I feel that I

25  need to, so I would get some feedback from either the

Page 34

1   case coordinator, sometimes the lead case manager,

2   sometimes the assistant program director, and sometimes

3   my direct supervisor.

4        Q.   And all of those sources will provide you with

5   information or is it recommendations?

6        A.   Recommendations.  However, the case manager or

7   the lead will provide more information if requested.

8   They would speak to the sponsor to clarify for me.

9        Q.   From time to time, you will request additional

10  information from the case manager, lead case manager, to

11  help you make a decision?

12            MS. DAVILA:  Objection.  Mischaracterizes

13       testimony.

14  BY MR. HOLGUIN:

15       Q.   Is that correct?

16       A.   If I understand what you are asking me, at

17  times have I requested additional information on a

18  case --

19       Q.   Yes.

20       A.   -- to a lead case manager or case manager?

21       Q.   Yes.

22       A.   That's correct.

23       Q.   Now, turning to home studies, in what

24  percentage of cases, the cases you have decided, do you

25  estimate home studies have been performed?

Page 35

1      A.   I don't want to guess on that.  You know, the

2   volume of Homestead is huge.  I don't know the

3   percentage offhand.  It is a little difficult to answer

4   accurately.

5      Q.   I understand.  I am just looking for an

6   estimate.

7           MS. DAVILA:  Objection.  Asked and answered.

8           THE WITNESS:  A low amount.  It is not that

9       high of an amount.  Again, and I don't do all the

10      release decisions.  I do have somebody else working

11      on them.  I really don't feel comfortable answering

12      that with a number or a range.  It's low.  It's

13      low.

14   BY MR. HOLGUIN:

15      Q.   Let's just talk about the release decisions

16   you made yesterday.  That was between 28 to 40; is that

17   correct?

18      A.   No.  I was not working the whole day

19   yesterday.  I did 18, if you would like a number.

20      Q.   When was the last day you worked a whole day?

21      A.   The day before that.

22      Q.   All right.  Then let's talk about that day.

23   Were there about 28 to 40 decisions --

24      A.   There were 39.

25      Q.   There were 39.  All right.  And in how many of

Page 36

1    those cases was a home study conducted?

2        A.   When you say "a home study conducted," are you

3    referring to my recommendation that a home study be done

4    or are you asking me about the home studies that came

5    back and the child submitted for release at the point of

6    having the home study?  I am not sure.

7        Q.   Let's start with the first number that you

8    recommended a home study be done.

9        A.   Yesterday.  You are asking about yesterday?

10       Q.   The day before yesterday.

11       A.   The day before yesterday.  I don't think I

12   recommended any home studies the day before yesterday.

13       Q.   And then of the home studies that had been

14   completed when you were working these cases, how many

15   cases had completed home studies?

16       A.   One.

17       Q.   Who is it that actually performs the home

18   studies for ORR or children in Homestead?

19       A.   For ORR, there are contracted agencies

20   throughout the nation that do home study assessments.

21       Q.   Do you know approximately how many of those

22   agencies there are?

23       A.   I don't.

24       Q.   Of the cases you worked the day before

25   yesterday, do you recall the names of any of the

Page 37

1    agencies that performed home studies?

2         A.   I honestly don't.

3         Q.   Are you aware of what qualifications are

4    required of the individuals who perform home studies for

5    ORR?

6         A.   I don't.  That is contractual.  There is a

7    project officer that is in charge of home studies.  So

8    no, I don't have any -- I am not privy to that

9    information.

10        Q.   As a person who has experience in this, have

11   you become aware of differences in the quality of the

12   work produced by different individuals who perform home

13   studies?

14        A.   I have not noticed a difference in home

15   studies, no.

16        Q.   Are you aware of what standards the

17   individuals who perform home studies are required to

18   follow in conducting a home study?

19             MS. DAVILA:  Objection.  Asked and answered.

20        Objection.  Cumulative.  Objection.

21        Mischaracterizes prior testimony.

22             THE WITNESS:  As I stated before, I have

23        nothing to do with the contract of the home study

24        providers.  So no, that is outside of my realm.

25   BY MR. HOLGUIN:

Page 38

1       Q.   Have you ever had concerns about the quality

2   of the home studies that you are receiving?

3            MS. DAVILA:  Objection.  Asked and answered.

4            THE WITNESS:  No.

5   BY MR. HOLGUIN:

6       Q.   Do you know approximately how long a home

7   study takes to be completed?

8       A.   It's typically -- from the point that they

9   find a provider to go and I cannot give you a firm

10  answer because some of the kids live -- the sponsors

11  live in remote areas, which could take longer to get a

12  staff member out there to do the home study.  But from

13  the point that they accept the home study, the home

14  study provider has ten days to provide the report from

15  the point that it's assigned.

16      Q.   Is there any maximum amount of time from

17  within which the home study must be sent out?

18      A.   When you say "sent out," I am not quite

19  sure --

20      Q.   Assigned to someone?

21      A.   Assigned to a provider?  I am not familiar

22  with that process.

23      Q.   So it's ten days from the time that it is

24  assigned to a provider?

25      A.   Correct.

Page 39

1      Q.   But there is no maximum amount of time from --
2 well, let me back up.  Who makes the decision as to
3 whether a home study is required?
4      A.   The ultimate decision?  That's the FFS.
5      Q.   So in the cases that you handle, that is your
6 decision, correct?
7      A.   Ultimately, yes.
8      Q.   What about initially?
9      A.   When you say "initially," are you talking
10 about whether they are recommending a home study?  It
11 follows the same procedure as outlined prior, which is
12 case manager, to case coordinator, to FFS.
13      Q.    Is it correct to say that no home study will
14 be done unless you approve it?
15           MS. DAVILA:  Objection.  Mischaracterizes
16      prior testimony.  Objection.  Assumes facts not in
17      evidence.
18           THE WITNESS:  No.  You can't characterize it
19      in that way because my supervisor would say,
20      ███████    I looked at this case and it's a home
21      study." You know, ORR can do that.
22 BY MR. HOLGUIN:
23      Q.   So what is the first person who would
24 recommend a home study?
25      A.   The case manager of the program.

Page 40

1      Q.   How quickly after a child comes under the

2   jurisdiction of a case manager is that recommendation

3   made?

4      A.   That is a general question that depends on the

5   case.  Again, it's case by case.  Maybe a child does not

6   disclose it in the beginning.  Maybe a child discloses

7   something later down the line.  It depends.  There is no

8   finite answer to that.

9      Q.   In a typical case, when does the first

10  recommendation that anyone makes about a home study come

11  in?

12          MS. DAVILA:  Objection.  Asked and answered.

13      Objection.  Mischaracterizes prior testimony.

14          THE WITNESS:  Again, I can't give you a solid

15      answer to that because it's case by case.  If it is

16      a home study, there are issues with the case,

17      whether it's an issue with the child or his

18      sponsor.  So I can't give you that number because

19      it varies.

20  BY MR. HOLGUIN:

21      Q.   Now, when you say there is an issue with a

22  child that would trigger a home study, what sorts of

23  issues are those?

24      A.   They would meet TVPRA criteria.

25      Q.   What are those?

Page 41

1      A.   So if a child was abused by caregivers,

2   abandoned, if the child has severe issues that would

3   meet ADA requirements, sexual abuse perpetrator as a

4   caregiver.  So under ADA, there is a lot of things that

5   could trigger a home study.  TVPRA would trigger a home

6   study.  And then there are discretionary home studies,

7   which could mean that if a sponsor had a record that was

8   a little iffy and we were concerned about the safety, we

9   might go that way.  Same with the TVPRA.  It's safety as

10  well as issues.

11     Q.   Thank you.  Are you aware of what standards

12  ORR requires the case managers to follow in terms of

13  prompt and continuous efforts to reunify children with

14  their families?

15     A.   I am not sure I understand the question that

16  you are asking.

17     Q.   Have you ever heard that phrase before,

18  "prompt and continuous efforts" to reunify or to release

19  children?

20     A.   With the case managers, it's an ongoing

21  process.  So that should be an ongoing process.

22     Q.   But my question is:  Have you ever heard that

23  phrase, prompt and continuous efforts to release?

24     A.   I have heard of timely safe releases, which is

25  how we kind of state it.

Page 42

1     Q.   All right.  So in terms of timely, what is

2   your understanding as to what that means?

3     A.   Are you talking my personal opinion?  My

4   experience?  Are you talking --

5     Q.   Your understanding.  Your personal

6   understanding as to what timely means in terms of

7   release.

8     A.   That means the case managers have been doing

9   their job.

10     Q.   Are there any objective time limits on any of

11   this, doing one's job as a case manager, that within a

12   certain time period something must be accomplished?

13     A.   Well, there are suggested timelines.  They

14   hope to get the Family Reunification Package to the

15   sponsor in 24 hours.  So there are different timelines.

16   But there is also a lot of variables that come into

17   play.  Again, it's case by case.  We are working with

18   live human beings.  There are certain guidelines that

19   they follow in terms of getting this document out.  But

20   understandably, some of the sponsors may not read or

21   write.  It may take longer to get documents back from

22   sponsors.  A lot of the issues in terms of the time is

23   out of the control of the case manager as well.

24     Q.   Now, when you say that there are guidelines

25   for when certain tasks are to be accomplished, where are

Page 43

1    those written, if they are?

2         A.    I believe they are in the policy and I do

3    believe they are in the MAP.

4         Q.    Other than the delivery of a family

5    reunification application to the sponsor within

6    24 hours, are you able to recall right now any other

7    guidelines on timing?

8         A.    No.  There are goals they want.  You know, we

9    are looking to Category 1, 2, 3.  Obviously, there are

10   different documents that are required the further away

11   you go from the parent as a sponsor.  So they are

12   supposed to set up the fingerprints.  I don't recall the

13   time that they have to do that.  They are supposed to

14   set up a CA/N check, if necessary.  They are supposed to

15   set that up with the fingerprints so they go

16   hand in hand.  But specific, no.  As I said, the goal is

17   the safe timely release, but there are a lot of

18   variables that come into play.

19        Q.    During the course of your duties, in reviewing

20   the information you received through the portal, have

21   you had occasion to notice that certain case managers

22   were not meeting the guidelines for prompt processing of

23   the children's release?

24             MS. DAVILA:  Objection.  Vague.

25   BY MR. HOLGUIN:

Page 44

1      Q.   For example, if they took longer than 24 hours

2   to get the family reunification application to the

3   proposed sponsor.

4      A.   Yes.

5      Q.   And what is your process when you notice that?

6      A.   Well, bear in mind that when I notice it, it's

7   at the back end of the case because I do releases.  So I

8   am not looking at the cases prior to the submission.

9   Once they are submitted and I look at the case, I send

10  them an e-mail that says, "What was the delay?  Why was

11  there a delay in this case?"  I have had occasion to ask

12  them those questions.

13     Q.   At Homestead, approximately what percentage of

14  cases do you find that the case managers or the other

15  personnel at Homestead have failed to meet the

16  guidelines, in your judgment, for prompt processing?

17          MS. DAVILA:   Objection.   Mischaracterizes

18      prior testimony.

19          THE WITNESS:   I don't know if I would term

20      fail to follow the timelines in some of the cases

21      because of the fact that, as I said, a lot of the

22      processing of the cases does depend on how good

23      your sponsor is and how diligent the sponsor is in

24      returning the paperwork and following up with the

25      fingerprints, if they are required.

Page 45

```
1          So there are issues where I may send an e-mail
2       asking about the length of stay, per se, and I will
3       get back an answer from them and a timeline from
4       them of why.  Not every case is the fault of the
5       case manager.  Are there some?  Absolutely.
6   BY MR. HOLGUIN:
7       Q.   Sitting here today, can you recall any
8   particular cases where the case managers were dilatory,
9   in your judgment?
10      A.   If you are speaking about a specific case, I
11  don't know a specific case.  Again, the volume I deal
12  with is rather high.  Have I seen cases recently that I
13  thought were delayed?  Yes.
14      Q.   But you cannot recall the name of any
15  particular case?
16      A.   No, no.
17      Q.   Do you recall the last time you saw one?
18      A.   I probably saw some yesterday.  I probably saw
19  one the day before.  I can't recall specifics, again.
20      Q.   You tend to see them with some frequency; is
21  that correct?
22      A.   There is frequency.  But again, some of the
23  issues have been mitigated due to issues beyond the
24  control of the case manager.
25      Q.   I am only referring to those that, in your
```

Page 46

1    judgment, are within the control of the case manager.

2        A.   I have seen some.

3        Q.   All right.  How many detained children does

4    each case manager at Homestead assist?

5        A.   The ratio at Homestead, I am not sure what

6    they follow.

7        Q.   To your knowledge, does ORR require any

8    minimum or maximum ratio of case worker to children at

9    Homestead?

10       A.   In the shelters, I can speak of ratio, having

11   run one for eight years.  But Homestead is a different

12   contract, and I am not privy to the contract so I can't

13   answer that.

14       Q.   In the shelters that you are familiar with,

15   other than Homestead, what was the ratio, typical ratio,

16   of those places?

17       A.   Are you speaking about case manager ratio in

18   particular?

19       Q.   Yes.

20       A.   One to eight.

21       Q.   Had you ever been advised by caseworkers at

22   Homestead that they simply have too many children to

23   process or manage?

24       A.   Yes.

25       Q.   How often have you heard that?

Page 47

1      A.   The times that I would staff cases, I have
2   heard that.  You are talking about this contract,
3   correct?  Not the one before.
4      Q.   This contract.
5      A.   Several times I have heard that, and they have
6   written that.
7      Q.   And they have written it?
8      A.   Yes.
9      Q.   In writing that, do they say, you know, I have
10   got this many cases and it's just too many?
11      A.   They don't state it like that in writing, to
12   my knowledge.  But they would say that the cases were
13   recently transferred and things along those lines, that
14   they had a lot of cases.
15      Q.   Too many for them to handle?
16      A.   They never said the words "too many for them
17   to handle."
18      Q.   But is it your understanding that they believe
19   that they are being overworked?
20          MS. DAVILA:  Objection.  Mischaracterizes
21       testimony.
22          THE WITNESS:  From issues that I have heard
23       from them, some of them do believe that.
24   BY MR. HOLGUIN:
25      Q.   Do you recall the name of the last individual

```
 1   who issued one of these kinds of reports?

 2        A.   No.

 3        Q.   Or any individual?

 4        A.   No.  I don't know specific names.  If I heard

 5   it in a meeting, it was in a meeting where there were

 6   some case managers and some lead case managers.  Some of

 7   them would voice that they felt overwhelmed.

 8        Q.   I believe you testified earlier that you had

 9   seen some of these reports in writing.

10        A.   Well, I would see the transfer of the child.

11   They would never specifically put "I am overworked" in

12   writing.

13        Q.   The transfer of the child, what does that --

14        A.   Meaning a case manager left, so the child was

15   moved to a different case manager.

16        Q.   Are you aware of the rate of turnover of case

17   managers at Homestead?

18        A.   I am not aware of the rate.  I don't deal with

19   human resources.  My experience is that it's high.

20        Q.   Now, when you say "high," you're comparing it

21   to what your experience is in other shelters, correct?

22        A.   Yes.

23        Q.   So in other shelters, what is the rate of

24   turnover that you recall?

25        A.   It is lower.  But you need to take into
```

Page 49

1    account that Homestead is an influx shelter.  So an

2    employee of Homestead understands that it could ramp up

3    and down, and it is not permanent.  So the turnover is

4    higher in an influx shelter for that reason.  They may

5    take it, and then they get a more permanent job.  You

6    can't blame them for wanting a more permanent position.

7         Q.   In what other ways, testifying here today,

8    come to mind that Homestead differs from the other

9    shelters you have worked in or with, apart from the rate

10   of turnover in case managers?  What else comes to mind?

11        A.   In what sense are you referring to?

12        Q.   Well, in terms of the experience that a child

13   would have at Homestead versus the other shelters you

14   have worked in.

15            MS. DAVILA:  Objection.  Vague.

16            THE WITNESS:  My answer to you is that

17        Homestead has many more children than these other

18        shelters.  Catholic Charities' Boys Town, for

19        example, which is a shelter where I was the

20        director, we had 81 kids.  So you can't look at the

21        experience of a shelter where there are 81 kids

22        versus 2,300.  It is a very different experience.

23   BY MR. HOLGUIN:

24        Q.   Is the larger shelter you worked with, other

25   than Homestead, this particular shelter with 81

Page 50

1    children?

2         A.   Yes.  And I covered His House, which at the

3    time was up to 123.  I have not covered any facility

4    higher than that.

5         Q.   Can you speak to the turnover rate of case

6    managers at His House?

7         A.   I can't speak to that because I only covered

8    His House on occasion.  So I don't know the turnover

9    because I am not that familiar with the staff.

10        Q.   What about the other shelter that you

11   referenced with approximately 80 children?

12             MS. DAVILA:  Objection.  Vague.

13             THE WITNESS:  You are referring to Boys Town,

14        I take it?

15   BY MR. HOLGUIN:

16        Q.   Boys Town, yes.

17        A.   They don't have a high turnover rate.

18        Q.   Do you recall how many case managers they had

19   there?

20        A.   Not by number.  If there are 81 kids, they are

21   at a ratio of one to eight.

22        Q.   So perhaps ten?

23        A.   Yes.  They stay pretty close to ratio.

24        Q.   In the course of a year, how many of those

25   approximate ten case managers would be changed?

Page 51

1        A.    Maybe two, maybe one.

2             MR. HOLGUIN:  Let's take a five-minute break.

3        Is that acceptable?

4             MS. DAVILA:  Yes, that's fine.

5             MR. HOLGUIN:  Thank you.

6             (Recess taken in the proceedings from 10:41

7        a.m. to 10:51 a.m., after which the following

8        proceedings were had:)

9             MR. HOLGUIN:  Back on the record.

10       BY MR. HOLGUIN:

11            Q.    The times you have been at Homestead,

12       approximately how much time do you spend there?

13            A.    Four to six hours.

14            Q.    Were you provided a tour of the facility when

15       you were there on any of the occasions you have been

16       there?

17            A.    On the first contract, when they first opened,

18       I was.  On the second contract, I didn't -- I went on --

19       I think I did go on a tour, but it wasn't for me, the

20       tour.  I think there was a visit, and I think I

21       accompanied.

22            Q.    It was a group of people?

23            A.    Yes.

24            Q.    So you are familiar with the basic physical

25       plant?

Page 52

1        A.    Yes.

2        Q.    Did you have occasion to observe children

3   moving through the facility?

4        A.    No.   I mean, I have seen them outside.

5   Technically, the procedure of moving from one building

6   to another, no.

7        Q.    Did you have occasion to observe, for example,

8   a line of children moving from one place to another?

9        A.    Yes.

10       Q.    And I assume that to gain entry of the

11  facility, you went through a certain process; is that

12  right?

13       A.    Yes.

14       Q.    Identifying yourself?

15       A.    Yes.

16       Q.    Did you have occasion to notice that there

17  were gates and there is a perimeter fence around

18  Homestead?

19       A.    Yes.

20       Q.    Now, in your experience with prior shelters,

21  is the level of security at Homestead comparable,

22  greater than or less than, to what you would normally

23  experience or expect at a shelter?

24            MS. DAVILA:   Objection.   Mischaracterizes

25       prior testimony.

Page 53

1          THE WITNESS:  I can speak of the only shelter

2      that I really visited, which is His House and Boys

3      Town.  His House has a gatehouse.  You cannot get

4      in without going through -- there is one way in,

5      one way out.  There is a guard gate.  So it is

6      similar, I would say.  It's much smaller.  Again,

7      you're dealing with 2,300 children versus 123

8      children.

9          So His House does have a guardhouse.  There is

10      only one way in and one way out.  Boys Town does

11      have a perimeter fence.  They have to go through

12      and buzz in and it's pretty secure in that sense.

13      You can't just walk into the building.  A staff

14      member has to physically bring somebody in.  So I

15      would say it's similar.

16  BY MR. HOLGUIN:

17      Q.   In terms of licensing, were Boys Town and

18  His House licensed by the state in which they were

19  located as dependent care shelters?

20      A.   They are licensed under the shelter care

21  requirement or under Department of Children and

22  Families.  I think they changed them to a

23  group-home-type of setting.  But yes, they are licensed

24  by the state of Florida, if that is your question.

25      Q.   And both facilities you are referencing are in

Page 54

1    the state of Florida?

2          A.    Yes.

3          Q.    Now, are you aware of whether Homestead has a

4    license?

5          A.    I have not physically seen or noticed if they

6    had a license, but I believe that they are not licensed.

7          Q.    Now, you have characterized Homestead as an

8    influx facility, correct?

9          A.    Yes.

10         Q.    Are there other influx facilities that ORR

11   operates or places children?

12         A.    Are you speaking currently or in the past?

13         Q.    Currently.

14         A.    No.  Homestead is the only current one, to my

15   knowledge.

16         Q.    And to your knowledge, is the Homestead

17   facility, the population there, expected to grow or to

18   shrink or stay the same?

19         A.    Homestead will rev up and rev down, depending

20   on the census.  It's census driven, which is why it is

21   an influx shelter.  It can rev up, I believe, and it can

22   ramp down depending on population, children coming over.

23         Q.    You aware of any plans to either expand or

24   shrink the capacity at Homestead?

25         A.    Currently?

1          Q.    Yes.

2          A.    I believe they are expanding.  I can't tell

3     you a number.  I am not in that planning process.  I

4     don't really know.  I have heard rumors of expansion,

5     but I honestly don't know.

6          Q.    Are you familiar with how ORR decides to send

7     a child to an influx facility like Homestead as opposed

8     to any other facility?

9          A.    At intake, when they receive information when

10    a child is picked up, they will not send a child that is

11    under the age of 13 to Homestead.  They try not to send

12    pregnant minors.  It happens on occasion because the

13    girls didn't know they were pregnant.  They screen for

14    gang involvement before they send to an influx shelter.

15    So an influx shelter's population would meet the same

16    criteria as a shelter would in terms of the children

17    that intakes -- delegates to Homestead and other

18    shelters.

19         Q.    So then as a practical matter, how is it that

20    a child who is not a gang member and who is not pregnant

21    ends up at Homestead versus another shelter?

22         A.    I think it's availability.  I don't think

23    there is any other issue than availability of beds.

24         Q.    Are you aware of any policy whereby children

25    initially placed at Homestead are stepped down or

Page 56

1    transferred to another shelter?

2        A.   A policy, per se, or do we transfer children

3    that have been placed at Homestead to other shelters?  I

4    am not quite sure.

5        Q.   Let's start with policy.  Are you aware of any

6    policy that says, you know, after so much time at

7    Homestead, we are going to transfer a child to another

8    facility?

9            MS. DAVILA:  Objection.  Vague.

10           THE WITNESS:  I would say I am aware in the

11       first opening of Homestead, but I believe what I

12       was instructed was that it depends on the capacity

13       nationwide, specifically.

14   BY MR. HOLGUIN:

15       Q.   Is it your understanding that if there is a

16   bed available at another facility, a shelter, that a

17   child is eligible to be transferred out of Homestead to

18   that facility because there is a bed available?

19           MS. DAVILA:  Objection.  Misstates prior

20       testimony.

21           THE WITNESS:  I wouldn't say that because,

22       obviously, intakes are the ones that send the

23       children places.  Yes, a child could be

24       transferred, but you're looking at availability.  A

25       lot goes into whether or not a child can be

Page 57

1        transferred.  It's not all dictated by that.

2              When we were running on 85 to 90 percent

3        capacity, there was nowhere to put the kids.  The

4        minute a child left, the beds were taken in other

5        facilities.  So I don't know how to answer your

6        question.

7    BY MR. HOLGUIN:

8        Q.   You reference other factors, in addition to

9    availability.  What other factors come to mind?

10       A.   For a transfer of a child?

11       Q.   Yes.

12       A.   We have to look at if the needs of the child

13   are better met elsewhere.  We have children that may

14   need a smaller environment.  They can't work within a

15   large shelter.  There is a lot of varying reasons of why

16   a child is transferred, and not all of them are

17   length-of-stay driven.  Some are, but not all of them

18   are.

19       Q.   When you say "length-of-stay driven," are you

20   referring to simply the number of days or weeks or

21   months the child has been there --

22       A.   Yes.

23       Q.   -- or are you referring to the impact of the

24   length of detention on the child's --

25       A.   Both.

Page 58

1        Q.    Both.  So how is it that ORR becomes aware

2   that detention has become so lengthy that a child should

3   be transferred out of Homestead?

4        A.    I don't use the term "detention."  It's a

5   shelter.  It is not a detention facility.  I want to

6   make that clear.  That's how I understand the verbiage

7   as a social worker.

8           Now, when do they become aware?  You can

9   become aware of it when the shelter provides

10  length-of-stay reports.

11       Q.    But that just gives a raw number of days or

12  weeks that a child has been at Homestead, correct?

13           MS. DAVILA:  Objection.  Assumes facts not in

14       evidence.  Objection.  Foundation.

15           THE WITNESS:  The length-of-stay report has

16       other data on it, where the case is at and the

17       progression of the case, which is also taken into

18       consideration.

19  BY MR. HOLGUIN:

20       Q.    Who makes the decision as to whether a child

21  should be transferred out of Homestead to another

22  shelter?

23       A.    The ultimate decision?  The FFSs are the ones

24  that approve it.  Again, it's myself and ███████ at this

25  point.  Until October, ██████████████ was an FFS at

Page 59

1    Homestead.  He was promoted, but he and I worked

2    together at Homestead.  Sometimes my supervisor will

3    say,  ███████  I need you to look at this case.  Let's

4    move this child."  She is staffing.  Sometimes the CFS,

5    the contracted field specialist who is staffing cases at

6    Homestead, will send an e-mail saying, "Hey, we need to

7    move on this child," for whatever reason it is.  So I

8    guess that is the way I can answer your question.

9         Q.   So then you personally, have you had occasion

10   to decide whether a child should be moved out of

11   Homestead to another facility?

12        A.   Yes.

13        Q.   How often does that happen?

14        A.   It varies, as well.  You mean that I am the

15   one that initiates and says, "Let's transfer this kid"?

16        Q.   Well, let's just talk about the number of

17   times you were involved in any capacity in a transfer

18   decision.

19        A.   I am involved in quite a few of them.

20        Q.   The day before yesterday, for example, did you

21   have occasion to consider or be involved in any transfer

22   decisions?

23        A.   I was involved with one, yes.

24        Q.   What was the circumstance there?

25        A.   The child had a brother in long-term foster

Page 60

1   care in New York.  I was trying to -- she had only been

2   in Homestead for eight days, but I was trying to get her

3   to New York to be closer to her brother.

4        Q.   As far as initiating consideration of

5   transfers, who does that?

6        A.   It could be anyone from the case coordinator,

7   to the case manager, to the lead case manager, to the

8   program administer, to the CFS.  A lot of different

9   people make recommendations.

10       Q.   Is there a maximum amount of time ORR allows a

11  child to be housed at Homestead?

12       A.   Currently not.  I was instructed if the

13  population census nationwide is 85 percent or higher,

14  then no.

15       Q.   So even though there is 15 percent of bed

16  capacity available in other facilities, there is still

17  no limit on the amount of time a child can be

18  ███████████

19       A.   Not to my knowledge.

20       Q.   -- at Homestead?

21       A.   Not to my knowledge.

22       Q.   I think you already answered this, but I just

23  want to make sure.  No limit, for example, on 200 days

24  that a child can be detained at Homestead?

25       A.   Again, it's case by case.  I can't recall or I

Page 61

1  don't know what case you are talking about.  I don't

2  know the particulars in the case, so it is very

3  difficult for me to answer your question.

4      Q.   Are you aware of any plans that ORR currently

5  has to close Homestead?

6      A.   I am not aware of a plan in place, but I am

7  sure that once the numbers dwindle to where they don't

8  need Homestead, they will close Homestead.  The influx

9  shelter is there if needed.

10     Q.   Are you aware of how ORR defines an influx?

11     A.   No.  I don't know, per se.  I would presume it

12  is based on capacity.  If you have 300 children waiting

13  at the border daily and there is nowhere to place them,

14  you use an influx shelter.  I mean, I think it's driven

15  by the census.

16     Q.   You were involved with ORR in 2012; is that

17  correct?

18     A.   As a program director at Children's Village

19  Boys Town, not as a federal employee.

20     Q.   But at that time, you were aware that there

21  was at least some reports of an influx that resulted in

22  the opening of temporary shelters, for example, at

23  Lackland Air Force Base?

24     A.   Yes.

25     Q.   You were aware of that?

Page 62

1      A.   Yes.

2      Q.   Were you aware of how long that facility

3  remained opened?

4      A.   No.

5      Q.   But you did become aware that it was closed,

6  correct?

7      A.   Yes.

8      Q.   What is your understanding of the

9  qualifications, minimum qualifications, necessary to do

10  your job as a federal field specialist in charge of

11  release?

12      A.   I believe the minimum is -- I don't really

13  know what the minimum is.  I think that I have read that

14  it was a bachelor's degree and X number of experience in

15  the field.

16      Q.   What about the case coordinators?  Are you

17  aware of the minimum qualifications to become a case

18  coordinator?

19      A.   I am not.  I was one.  It wasn't called case

20  coordinator and it was under a different contract.  The

21  case coordinators I am most familiar with at Homestead

22  all have master's degrees.

23      Q.   So you were an employee of GDIT?

24      A.   No.  Never.  USCCB.

25      Q.   You are talking about the U.S. Conference of

Page 63

1    Catholic Bishops?

2        A.   Yes.

3        Q.   At some point in time, the USCCB functioned or

4    provided case coordinators?  In other words, they were

5    doing what GDIT does now, correct?

6            MS. DAVILA:  Objection.  Vague.

7            THE WITNESS:  USCCB had a contract with ORR,

8        as well as LIRS.  It was the two agencies that

9        dealt with the case coordination.  It was called

10       field coordination then, contract.  There were two

11       agencies.

12   BY MR. HOLGUIN:

13       Q.   Is that the same function that now GDIT has

14   taken over?

15       A.   It was a bit different.

16       Q.   How was it different?

17       A.   It differed in the sense that, in my position,

18   we covered an RTC.  I was the person doing the case

19   management, so I was the person speaking to the sponsors

20   and I was the person getting the FRP, which is a little

21   different.  They don't do that currently.  I was the one

22   that had to write referrals for foster care, if it was

23   warranted.  That was one facility, which was Tampa Bay.

24   So it was a little different because it was a little

25   more intense back then in terms of the responsibility.

Page 64

1      Q.   Is it fair to say that your role as a case

2   coordinator for --

3      A.   Field coordinator.

4      Q.   -- a field coordinator was more hands-on than

5   the functions of the case coordinators under GDIT?

6           MS. DAVILA:  Objection.  Mischaracterizes

7        prior testimony.

8           THE WITNESS:  I would say that is an unfair

9        assessment in the sense that the numbers were much

10       lower.  In the facility that we covered, the census

11       was lower.  So they are covering more territory

12       because there are more programs now and the census

13       is higher.  So yes, I was more hands-on than they

14       are currently.

15   BY MR. HOLGUIN:

16       Q.   Where are the GDIT case coordinators

17   physically located?  Do you know?

18       A.   The ones that I provided the names for are in

19   Miami.

20       Q.   Do they ever go to Homestead, to your

21   knowledge?

22       A.   Yes, they do.

23       Q.   Do they go there regularly?

24       A.   I believe they do, but I am not 100 percent

25   sure.

Page 65

1      Q.   Do you know whether they interact with or
2   interview children when they go?
3      A.   I can tell you that they have.  I can't tell
4   you when or how recent that was.  I can tell you that
5   they have.
6      Q.   But you can't tell me how frequently they do
7   that?
8      A.   I cannot tell you that.  I am not physically
9   there, so I really don't know the answer.
10     Q.   When you get information from the case
11   coordinators, does that come through the portal as well?
12     A.   The majority of the information.  They also
13   send an e-mail that they have reviewed the case so that
14   I know that the case is ready.
15     Q.   What types of information do they enter into
16   the portal?
17     A.   Into the portal, the only information they
18   enter is on the release request document.
19     Q.   On the release request document, what specific
20   information do they add, the case coordinators?
21     A.   Typically, their recommendation of the case
22   and sometimes a little brief of why, particularly if
23   they don't necessarily agree with the case manager.
24     Q.   In the circumstances where they do agree with
25   the case manager, is it typically the case that they

Page 66

1    will just say that we agree?

2         A.   Some of them write more than others.  I don't

3    think they ever just write "I agree," but some of them

4    write a little more than others, I would say.

5         Q.   Do the case coordinators have any role in

6    ordering home studies?

7         A.   They recommend home studies.

8         Q.   And the decision to perform one is yours and

9    your supervisor's, your office, correct?

10        A.   Yes.

11        Q.   Do you have occasion to speak on the telephone

12   with any of the case coordinators?

13        A.   Yes.

14        Q.   About how often does that happen?  In how many

15   cases?

16             MS. DAVILA:  Objection.  Compound.

17             THE WITNESS:  I can't give you a number of

18        cases.  It is typically when there is a complex

19        case.  I would say I speak to them probably weekly,

20        if I was going to make a guesstimate to you.  I

21        would speak to the case coordinators -- not the

22        pool case coordinators, but the case coordinators

23        that are staffing the cases with the case managers.

24   BY MR. HOLGUIN:

25        Q.   What is the difference between a pool case

Page 67

1    coordinator and the staff case coordinator?

2         A.   The case coordinators that are staffing the

3    cases enter their staffing notes into their system so

4    that others can see.  Because, again, you are dealing

5    with a high volume, they have a pool of other case

6    coordinators in other regions that actually do their

7    recommendations for them.  They read the case notes that

8    the others provide and make their recommendations.

9         Q.   So the case coordinator's recommendation with

10   respect to any given child might be made by someone

11   outside of Miami?

12        A.   Yes.  Yes.

13        Q.   You refer to these as pool case coordinators?

14        A.   Yes.

15        Q.   Approximately what percentage of the

16   recommendations come from the pool versus the --

17        A.   Almost all of them.

18        Q.   Almost all come from the pool?

19        A.   Yes.

20        Q.   Are you aware of their actual physical

21   location geographically?

22        A.   They are all over.

23        Q.   To your knowledge, have any of the pool case

24   coordinators ever come to Homestead or talked with any

25   kids?

Page 68

1          A.    Not to my knowledge.

2          Q.    When you were working at U.S. Conference of

3     Catholic Bishops as the prior -- the predecessor to the

4     current case coordinators, those were nonprofit

5     organizations, correct?

6          A.    Yes.

7          Q.    Are you aware of whether GDIT is a nonprofit?

8          A.    I honestly don't know.

9          Q.    How long, if you know, has GDIT been

10    functioning as a case coordinator?

11         A.    I am not sure of the date that they started,

12    but I was working at Boys Town as the program director

13    and they were already installed.  I mean, I left case

14    coordination in 2006 before I joined Catholic Charities,

15    Boys Town.  So probably a year or two after that that

16    they received the contract.  A year after I left USCCB

17    they had the contract, I believe, for a year more with

18    LIRS.

19              Then after that, LIRS got the contract solely

20    and USCCB did not.  Then it went from LIRS to GDIT.  But

21    I am not sure on the dates, to be honest with you.  It

22    didn't really have anything to do with me at that point.

23         Q.    Would approximately 2008 --

24         A.    I would say maybe 2009, 2010 maybe.  I recall

25    that USCCB, when I left, they still had the contract.

Page 69

1    Then after that contract period was over, LIRS got the

2    full contract.  Then after LIRS, they gave it to GDIT.

3    I was not working for ORR at the time, so I can't really

4    give you the specifics.

5        Q.   Now, the case coordinators, what information

6    are they provided when they make their recommendation,

7    the same information you receive from the case managers?

8        A.   No.  They typically have a little bit more.

9    They have the staffing notes.  They use a system called

10   OneNote, which we don't have access to.  The case

11   coordinators that are local do the staffing with the

12   various case managers and case management teams.  On the

13   more complex cases, they take notes.  I am not privy to

14   the notes.

15            They may tell me, "Hey, we staffed this case

16   today."  I get phone calls from them, but I am not privy

17   to that.  The pool case coordinators are able to view

18   the notes that the other case coordinators write.

19       Q.   So there is a separate system that GDIT

20   maintains where they record data around children that

21   you are not able to access?

22            MS. DAVILA:  Objection.  Mischaracterizes

23        prior testimony.

24            THE WITNESS:  I am not saying data, per se,

25        but I am saying notes of staffings that they have

Page 70

1        held.

2    BY MR. HOLGUIN:

3        Q.   What is an example of a note of staffing?   I

4    am having trouble understanding what they have access to

5    that you don't.

6        A.   They are physically there to report.  I don't

7    know if it's telephonically or physically with all of

8    them, but they staff the cases.  So on a more complex

9    case, they may write a note of what is going on with the

10   case so that the case manager can record it just so that

11   the other case coordinator will have that piece when

12   they review it.

13       Q.   Do you know of any reason why you are not

14   permitted to access that information?

15       A.   It is on their internal system.  It is their

16   own system.  They will elevate a case, though.  If they

17   are staffing a case and there is an issue, they will

18   elevate the case to us.

19       Q.   What does it mean to elevate a case to you?

20       A.   They will either call or send an e-mail

21   letting us know that they staffed this case and there

22   were some concerns with the case.

23       Q.   To your knowledge, are those concerns about a

24   particular case that is shared with the children who are

25   being considered for release?

Page 71

1      A.    I don't know the answer to that.  The case

2   managers meet with the child weekly and they review the

3   progression of the case.  To some extent, I am sure it

4   is, but I am not there.  I don't know.  I can't really

5   answer with certainty.

6      Q.    Are the case managers privy to the

7   information, all the information that the case

8   coordinators have?

9      A.    Are you speaking of their internal notes on

10   their system?

11      Q.    Yes.

12      A.    No, they are not privy to those.

13      Q.    As a matter of course, then, there is

14   information that only the case coordinators have; is

15   that correct?

16      A.    The information that they have in their

17   staffing notes comes from the case managers.  So I am

18   not quite sure that I would characterize it as they

19   don't have access to it.  Because it is solely based on

20   the staffing of the case with the case manager.  I am

21   not sure if it's any information that the case managers

22   wouldn't already have.

23      Q.    So then everything that the case

24   coordinators have -- all the information the case

25   coordinators have comes from the case managers; is that

Page 72

1    correct?

2         A.   And the lead case managers, yes, and the

3    clinicians.

4         Q.   But there is some information that comes from

5    those sources that is not entered into the portal?

6         A.   Possibly.  You are asking me, and I don't have

7    access to it so I don't know.  I don't know if they are

8    putting all of the information on the release request.

9    I honestly don't know the answer to that.

10        Q.   What about the parents and other proposed

11   sponsors for the children?  Are they privy to the

12   information that the case coordinators have?

13        A.   I am not sure I understand in what sense you

14   are speaking.

15        Q.   Do the proposed sponsors receive any summary

16   or the actual information, a copy of the information

17   that the case coordinators are using to make a

18   recommendation?

19        A.   No.

20        Q.   Did they ever receive a copy of the case

21   manager's information, the information case managers

22   have collected, to make a recommendation regarding

23   release?

24        A.   No.

25        Q.   Did the parents or other proposed sponsors

Page 73

1    ever receive a copy of the information you used to base

2    a decision to release or not?

3        A.   They receive information in terms of

4    vaccinees, follow-up.  They receive information -- if

5    the case is denied, they send notification to them that

6    it's denied, unless it is a parent.  Then that

7    notification comes from headquarters of ORR.

8             But do they receive my notes?  No.  Do they

9    receive the case notes?  No.  The case coordinator

10   notes?  No.  But they are provided with information

11   concerning any follow-up, the vaccinees, that type of

12   information.

13       Q.   What is the principal reason for declining to

14   release the child to a proposed sponsor?

15            MS. DAVILA:  Objection.  Vague.

16            THE WITNESS:  I don't quite -- you are

17        talking -- there are a lot of different reasons on

18        why, and they are primarily based on safety.

19   BY MR. HOLGUIN:

20       Q.   Is it fair to say that the primary reason

21   could be summed up as you don't believe the proposed

22   custodian is a fit caregiver for a child?

23            MS. DAVILA:  Objection.  Mischaracterizes

24        prior testimony.  Objection.  Foundation.

25            THE WITNESS:  I wouldn't term it "fit."  I

Page 74

1           would term it that there are issues that involve

2           safety.  Due to the safety issues, then we would

3           have to deny a sponsor or staff denies a sponsor.

4           We don't take it lightly.  It is not done often.

5      BY MR. HOLGUIN:

6           Q.   That it would be an unsafe placement for the

7      child to release them?

8           A.   Correct.

9           Q.   In terms of what is safe, are there any

10     guidelines that ORR has as to --

11          A.   Yes.

12          Q.   Are those in the MAP and the ORR online

13     policy?

14          A.   They are in the ORR policies.  You can find

15     where it says reasons for denial.

16          Q.   Are you aware of any sort of reasons that will

17     automatically disqualify a house or a placement as being

18     unsafe?

19          A.   Yes.

20          Q.   What are those?

21          A.   There are certain criminal offenses that are

22     all listed on the policy that would disqualify a

23     household.  Not necessarily the parental household, but

24     the Category 2 and 3 household.  There is definitely a

25     list of those.  On a Category 3, if there is no proof of

1  a prior relationship, and I am talking about Category 3

2  non-related sponsors, then we would deny that because,

3  obviously, we have to look at the possibility of

4  trafficking when you're dealing with an unrelated

5  sponsor.  So there is criteria that has to be met, and

6  it's very -- there could be a home study for some reason

7  that came back negative that we would have to look at

8  too in terms of whether that is a safe release or not.

9       Q.   But that is not an automatic disqualification?

10      A.   No.

11      Q.   Whereas the lack of a prior relationship in a

12  Category 3 sponsor --

13      A.   Unrelated.

14      Q.   -- is an automatic disqualifier?

15      A.   Well, if you can't prove there was a

16  relationship, yes.  And I am talking about unrelated

17  Category 3, not necessarily a related Category 3.  If

18  there is no proof, if they don't know anything about

19  each other, they found somebody to sponsor that is

20  unknown to the child and the family, it's a denial.

21      Q.   It is an automatic denial, correct?

22      A.   Yes.

23      Q.   Having worked in child welfare before coming

24  to ORR, was it your experience that state child

25  protective agencies would place children in foster

Page 76

1    homes?

2         A.   Yes.

3         Q.   In your experience, were those foster

4    parents -- did they uniformly have preexisting

5    relationships with the children they received?

6         A.   No.

7         Q.   Did you ever consider that was a problem that

8    would create an unsafe environment for those children?

9         A.   I have never qualified a foster parent, so I

10   don't feel I am qualified to answer your question.

11        Q.   In general, you are aware that when an adult

12   applies to be a foster parent, there is basically an

13   evaluation of their qualifications, correct?

14             MS. DAVILA:  Objection.  Calls for

15        speculation.

16             THE WITNESS:  Again, that is not my area of

17        expertise.  I have never qualified or disqualified

18        a foster parent.

19   BY MR. HOLGUIN:

20        Q.   Have you ever qualified or disqualified any

21   adult who has sought the custody of a child prior to

22   coming to ORR?  In other words, your work before coming

23   to ORR, did you have occasion to place children with

24   other adults, other than their parent?

25             MS. DAVILA:  Objection.  Vague.  Objection.

Page 77

1       Compound.

2               THE WITNESS:  In my work in New York, I assume

3       that is what you were referring to.  I did not

4       place; the child welfare agency placed.  I did not

5       qualify or disqualify the adults.  I made a

6       recommendation from a home visit, but it was not my

7       decision to place or not to place a child.

8    BY MR. HOLGUIN:

9       Q.   To your recollection, did you automatically

10   recommend against placing a child with an unrelated

11   adult for lack of a preexisting relationship?

12              MS. DAVILA:  Objection.  Asked and answered.

13      Objection.  Mischaracterizes prior testimony.

14              THE WITNESS:  Again, I did not make the

15      referrals to foster care from that agency, so I

16      can't answer that question.  I don't know.

17   BY MR. HOLGUIN:

18      Q.   I am referring to your recommendations.

19              MS. DAVILA:  Objection.  I am going to make a

20      standing objection to this line of questioning.

21              THE WITNESS:  You're also asking me questions

22      from 20 years ago or so.  You are asking me a

23      difficult question in terms of telling you.

24              I can tell you that when I was at the program

25      in New York, there was only one case that I did

Page 78

1          make a recommendation not to return to the parent

2          following a home visit.  That child went to a

3          grandmother.  So that child didn't go to a

4          stranger.  I can't tell you about that because I

5          have not dealt with that.

6     BY MR. HOLGUIN:

7          Q.   In developing that rule, that ORR will not

8     release a child to an unrelated adult unless there is a

9     preexisting relationship, are you aware of any studies

10    that ORR consulted in providing that?

11              MS. DAVILA:  Objection.  Mischaracterizes

12         prior testimony.

13              THE WITNESS:  I want to clarify that I'm

14         stating that there was no preexisting with the

15         family or the child.

16    BY MR. HOLGUIN:

17         Q.   Correct.

18         A.   Am I aware of studies?  No, I am not.

19         Q.   Are you aware of any incidents in which --

20    well, are you aware of any incidents in which ORR

21    released a child to an unrelated adult and there was

22    abuse or neglect?

23         A.   I am not familiar with the case, but I am

24    familiar with a case that we sent for home study because

25    of that fact; that the relationship was rather vague,

1   the home study worker determined that the person ran a

2   restaurant and had other people in her home with beds

3   all over the floor, no food in the house.

4        Q.   That was an individual investigation, correct?

5             MS. DAVILA:  Objection.  Counsel has

6        interrupted the witness.

7             Did you finish your answer?

8             THE WITNESS:  No.

9             MS. DAVILA:  Please allow the witness to

10       finish her answer.

11   BY MR. HOLGUIN:

12       Q.   Please finish.

13       A.   What I am telling you is that unlike some of

14   the other populations that I have worked with, we have

15   children that could possibly be trafficked.  So when you

16   are looking at preestablished relationships, you are

17   really concerned with possible trafficking, which brings

18   a different level to safety.

19             The concern is there for that purpose.  We are

20   talking about safety.  And have I seen that?  Yes, I

21   have.  I have in the case I just described, and I am

22   sure I could find others to discuss with you.  After the

23   fact, I don't have any knowledge.

24       Q.   Is it your understanding that U.S. citizen

25   children are not trafficked?

Page 80

1       A.   No.   That is not what I am saying.

2       Q.   U.S. citizen children may be trafficked as

3   well, correct?

4       A.   Yes.

5       Q.   And the children that ORR has may be

6   trafficked?

7       A.   Yes.

8       Q.   Does ORR place children with foster families?

9       A.   Yes.

10       Q.   Is that term long-term foster care?

11       A.   There are two terms.  There is transitional

12   foster care and long-term foster care.

13       Q.   Now, how do those differ?

14       A.   Transitional is typically for tender aged

15   children or parenting teens, so they are not in a large

16   shelter while their reunification is going on.

17   Long-term foster cares are children without a viable

18   sponsor who meet criteria for some sort of legal relief.

19       Q.   All right.  Now, approximately how many

20   children does ORR place per year in long-term foster

21   care?

22       A.   I don't oversee any long-term foster care

23   programs.  I don't know the numbers.

24       Q.   Are you involved at all in placing children in

25   long-term foster care?

Page 81

1          A.   We don't place them at Homestead.  If a child
2     has no viable sponsor and could possibly have a legal
3     case, we send them to the local shelters.
4          Q.   And here in Miami, what are the local
5     shelters?
6          A.   His House and Boys Town.
7          Q.   So they are transferred from Homestead to the
8     local shelters, and then the local shelters would manage
9     the placement --
10         A.   The process.
11         Q.   The process of placing them in long-term
12    foster care?
13         A.   Yes.  Yes.
14         Q.   How are the families or foster parents that
15    receive children in the long-term foster care program
16    selected?
17         A.   I can't answer that.
18         Q.   Do they have preexisting relationships with
19    the children who come into ORR custody?
20              MS. DAVILA:  Objection.  Speculation.
21         Objection.  Mischaracterizes prior testimony.
22         Objection.  Foundation.
23              THE WITNESS:  Not to my knowledge.  Again, I
24         don't work in foster care.  I can't really, truly,
25         answer your question.

Page 82

1    BY MR. HOLGUIN:

2        Q.   Are you aware of any child protective

3    services, agency, state or local level, that also

4    pursues a policy, blanket policy, of denying release to

5    unrelated adults who lack a prior existing relationship

6    with a child?

7            MS. DAVILA:   Objection.   Mischaracterizes

8        prior testimony.

9            THE WITNESS:   Not to my knowledge.   I work

10       with a specific population.

11   BY MR. HOLGUIN:

12       Q.   In addition to that blanket policy, and the

13   ones involving -- would you characterize them as serious

14   criminal convictions or background that are

15   disqualifiers?

16       A.   Yes.

17       Q.   In addition to those two, can you think of any

18   others that automatically disqualify someone from

19   receiving a child from ORR custody?

20       A.   Well, the criminal is a big one.   As I said to

21   you, if the house is not safe.   Let's say, they do a

22   home study and it comes back negative for reasons that

23   is safety driven, then it could be safety.   It is always

24   about -- the bottom line is always safety.

25       Q.   Now, in terms of safety, is it a safety

Page 83

```
 1   concern if a child's proposed sponsor does not have a
 2   separate room for the child?
 3        A.   Not necessarily.
 4        Q.   So that shouldn't disqualify?
 5        A.   That is not --
 6             MS. DAVILA:  Objection.  Mischaracterizes
 7        prior testimony.
 8             THE WITNESS:  It's case by case.  I don't know
 9        what situation the child is going to.  But not
10        necessarily.  Would that be the only factor?  No.
11   BY MR. HOLGUIN:
12        Q.   But the lack of a private bedroom for a child
13   is a factor that you would consider in determining
14   whether a placement is safe, correct?
15        A.   Not necessarily.  Again, it's case by case.
16        Q.   Is the lack of a private bedroom relevant to
17   the decision as to whether a placement is safe?
18        A.   No.  But we would look to make sure that there
19   was a bed for the child, their own bed, as well as a
20   place to store belongings.
21        Q.   What about the availability of a licensed
22   driver in the household?  Is that a factor contributing
23   to the safety determination?
24        A.   No.  No.
25        Q.   Are you aware of what criteria the case
```

Page 84

1   coordinators apply in making their recommendations?

2         A.   They would have to use policy and procedures.

3   I am not quite sure of their internal workings.  You

4   need to ask somebody from GDIT that question.  I don't

5   know.

6         Q.   In terms of your decision-making, do you give

7   any greater or lesser weight to the recommendation of

8   the case manager over the case coordinator?

9         A.   I would say no.  I review them.  I don't

10  always agree with the case coordinator and I don't

11  always agree with the case manager.  Sometimes there are

12  cases I agree with neither one of them.  So I would say

13  no.

14        Q.   Now, in the cases where you disagree with both

15  case manager and case coordinator -- let's talk about

16  the last one you can recall.  What was their

17  recommendation where you disagreed?

18        A.   They wanted to deny a sponsor.

19        Q.   And you felt they should be released?

20        A.   Yes.

21        Q.   What was the cause of your disagreement with

22  the case manager?

23        A.   The case manager wanted to release.  That one

24  was a case coordinator that I didn't agree with.

25        Q.   I see.  Let's start there.  Why did the case

Page 85

1   coordinator disagree with the case manager?  Do you

2   recall?

3       A.   Because they misread the Serious Incident

4   Reports.

5       Q.   What was their interpretation of the Serious

6   Incident Report?

7       A.   That the child had seven incident reports or

8   six, I am not quite sure now; that he was a perpetrator

9   and he was misbehaving.  But he was not the perpetrator.

10  They didn't understand that when they read the SIRs.

11      Q.   So the case coordinator recommended denial of

12  release because the child had misbehaved in ORR custody?

13      A.   The child had issues, they thought.

14      Q.   Issues in terms of behavior?

15      A.   Yes.

16      Q.   But they were wrong?

17      A.   In my opinion, after I read the incident

18  reports myself, yes.  In my opinion.

19      Q.   What role does a child's behavior during ORR

20  custody play in your decision to release or not release?

21      A.   The behavior itself, as long as it's safe and

22  they are not unstable, if they have an incident report,

23  I might ask for post-release services or I might ask for

24  a discretionary home study to make sure that the sponsor

25  could handle whatever serious behaviors.  But it would

Page 86

1   have to rise, to me, to the extent of serious behaviors.

2         We are working with adolescent children.  So

3   some behaviors that others may deem as unacceptable are

4   common in a place where there is adolescent children.

5         Q.   In your experience, does children's behavior

6   change if they are in a location such as Homestead

7   versus with a family living --

8         A.   Very possible.

9               MS. DAVILA:  Objection.  Vague.  Objection.

10        Calls for speculation.

11              THE WITNESS:  It is possible.

12   BY MR. HOLGUIN:

13        Q.   Do you think it is common?

14              MS. DAVILA:  Objection.  Vague.  Objection.

15        Calls for speculation.

16              THE WITNESS:  I don't know if it's common.  I

17        would say it is possible.

18   BY MR. HOLGUIN:

19        Q.   In your experience, does children's behavior

20   change over time with the length of time they remain in

21   a facility such as Homestead?

22        A.   Possible.  It's possible.

23        Q.   Are you familiar with any studies that have

24   evaluated the consequences of long-term placement in an

25   institution such as Homestead and what that does to them

Page 87

1    in terms of their behavior and psychological well-being?

2              MS. DAVILA:  Objection.  Vague.

3              THE WITNESS:  Have I read any studies about

4         that?  No.

5    BY MR. HOLGUIN:

6         Q.   Have you seen any instruction from ORR, your

7    superiors, in which federal field specialists are told

8    to take into account changes in behavior that take place

9    over time in a particular child during ORR custody?

10             MS. DAVILA:  Objection.  Vague.

11             THE WITNESS:  I can say that the goal is to

12        release a child as soon as possible, timely and

13        safe releases.  Clinically, I am sure, in my

14        experience, that the behavior does change.

15             You know, the child didn't come to the United

16        States to live in a shelter.  The child came to the

17        United States to go somewhere.  But again, it is a

18        case-by-case issue.  The experiences in a shelter

19        differ from child to child.  I am not quite sure of

20        the scope of how to answer your question fully.

21   BY MR. HOLGUIN:

22        Q.   When you get the case submitted to you and you

23   are evaluating the child's behavior, do you take into

24   account the length of time a child has been in custody,

25   in a place like Homestead, in evaluating the seriousness

Page 88

1    of their behavior?

2         A.   Yes.

3              MS. DAVILA:  Objection.  Compound.  Objection.

4         Vague.

5    BY MR. HOLGUIN:

6         Q.   How do you account for that?

7         A.   When I am assessing for release, I am looking

8    at the child as a whole.  So you're looking at various

9    factors in relation to release.  The release -- mainly,

10   what I would look at where behavior is concerned is more

11   of a post-release-type service to make sure that

12   somebody can help the family if they need additional

13   resources once the child is released.  I would not say

14   that that holds up the release unless the child is

15   actively wanting to hurt themselves or others. Then it

16   becomes a safety issue.  So that's how I would answer

17   that.

18        Q.   Has it been your impression, with respect to

19   any child, that the reason that they want to harm

20   themselves is because of the effects of prolonged

21   detention?

22             MS. DAVILA:  Objection.  States facts not in

23        evidence.  Objection.  Mischaracterizes prior

24        testimony.

25             MR. PINCHAS:  I would like to add an objection

Page 89

1          for improper opinion.  Improper expert opinion.

2               THE WITNESS:  Can you repeat the question?

3          I'm sorry.

4               MR. HOLGUIN:  Could you please read back the

5          question.

6               (Thereupon, the requested portion of the record

7     was read by the Court Reporter.)

8               MS. DAVILA:  Same objections.

9               THE WITNESS:  I can't speak for every child.

10         Again, it is more speculative if I answer because I

11         am not physically there and I am not the one

12         assessing the child for suicidal thoughts or

13         suicidal gestures.  So I don't know.  I am more

14         comfortable saying I don't know.

15    BY MR. HOLGUIN:

16         Q.   Is it fair to say that your decision -- you

17    are dependent on the information you get from the case

18    manager and the case coordinator in evaluating a child's

19    behavior?

20               MS. DAVILA:  Objection.  Mischaracterizes

21         prior testimony.

22               THE WITNESS:  I would say that I also take

23         into account the clinician's recommendations and if

24         there is any recommendation if the child has been

25         evaluated by an outside psychiatrist or

Page 90

1          psychologist.  So I wouldn't say that it is in

2          just -- information is not just from the case

3          manager and the case coordinator.  There are also

4          clinicians that work with the facility that do

5          assess the children.  Yes, I do read the assessment

6          and take that into account.

7     BY MR. HOLGUIN:

8          Q.   What is your understanding of the number of

9     clinicians who work at Homestead?

10         A.   That is contractual.  I don't know the answer

11    to that.

12         Q.   How many different clinician reports have you

13    read?

14         A.   Several.  I don't know the number.  I don't

15    know the ratio that they have.  I can't speak on those.

16         Q.   Do you know how often they see children?

17         A.   They see children at least once a week for a

18    session and they do a group session with the children on

19    a weekly basis as well.

20         Q.   Do you know what qualifications the clinicians

21    have?

22         A.   I don't know exactly.  They do have master's

23    degrees.  There are licensed clinicians at the program.

24         Q.   Have you had occasion to see clinician reports

25    that predict self-harm following release, a child will

Page 91

1    harm him or herself following release?

2        A.   Not to my knowledge.

3        Q.   In the clinician reports you have seen, what

4    sorts of information have caused you to decline release?

5        A.   I have not declined a release, again, unless

6    it was a safety concern or the sponsor was a safety

7    concern or the child was not a stable child.  You know,

8    if they needed to be stabilized.  They had maybe a

9    possibility of -- you know, if they met criteria to be

10   hospitalized.  If they were a danger to self or others.

11           I don't deny a child because of mental health,

12   if that is the question, which I am not quite sure it

13   was.

14       Q.   So you are aware of cases of children at

15   Homestead who have been determined to be unstable in

16   this way?

17           MS. DAVILA:  Objection.  Vague.

18   BY MR. HOLGUIN:

19       Q.   So unstable that they need hospitalization,

20   for example?

21       A.   Yes.

22       Q.   How often does that happen?

23       A.   Not often, I wouldn't say.  Again, you are

24   asking me questions that are while the case is going on

25   and my knowledge of the cases when they are ready for

Page 92

1   release.  So I don't feel that I could answer that in

2   all honesty.

3        Q.   Well, when you have gotten the case submitted

4   to you, you have had occasion to see clinician reports

5   saying this child is unstable?

6        A.   Not at the point that they submit the case.

7        Q.   In other words, what you are saying is that in

8   the past they were unstable?

9        A.   They could have been.

10       Q.   How does past instability impact their

11  eligibility for release or the safety of their placement

12  outside of ORR custody?

13       A.   It does not necessarily affect it.  Again, if

14  you are looking at whether a home study is recommended

15  or not, if you have a child who is psychotic, a child

16  that has severe mental illness, then they would have a

17  home study.  If not, if they didn't rise to that

18  occasion, we may recommend PRS.  Post-relief services

19  would not -- that's not release deniable.  It's a

20  recommendation, as is a home study.

21            I think your question to me is a little

22  confusing in that sense.

23       Q.   Are you aware of children who are continued at

24  Homestead after being hospitalized for psychosis?

25       A.   If there was no bed in any other facility --

Page 93

1  well, no.  After they were hospitalized, meaning they

2  are stable and returned to the facility stable?  Then

3  yes.  The answer is yes.

4       Q.   Is it the case that a child can continue at

5  Homestead after a psychotic episode, provided someone

6  says that they have been stabilized?

7       A.   If the child is stable and the recommendation

8  at the time from the treating psychiatrist is that the

9  child can remain in a shelter setting and there is no

10  bed to transfer the child, then yes, a child goes back

11  to Homestead.

12       Q.   Now, when there is a child who has a psychotic

13  breakdown at Homestead, what is the process?  What

14  happens?

15       A.   What happens in what?  What process are you

16  referring to?

17       Q.   Do they send them to a hospital?

18            MR. PINCHAS:  Objection.  Incomplete

19       hypothetical.

20            THE WITNESS:  If you're telling me if a

21       child --

22            MS. DAVILA:  Objection.  Vague.

23  BY MR. HOLGUIN:

24       Q.   Let me rephrase it.

25            When it's determined that a child needs to be

Page 94

1   hospitalized for psychiatric reasons, where are they

2   sent?  Which hospital?

3          MR. PINCHAS:  Objection.  Incomplete

4      hypothetical.

5   BY MR. HOLGUIN:

6      Q.   Which hospital?  Do you know?

7      A.   They are utilizing Larkin Hospital.

8      Q.   Larkin Hospital?

9      A.   Yes.

10     Q.   Is that L-A-R-K-I-N?

11     A.   Yes.

12     Q.   Where is that located?

13     A.   South Miami.

14     Q.   Is it a public hospital or a private hospital?

15     A.   To my knowledge, it is a private hospital.

16     Q.   And ORR keeps records of children who have

17  been sent to Larkin?  Does ORR keep records of children

18  who have been sent to Larkin?

19     A.   I am not sure what you mean by "keep records."

20     Q.   To your knowledge, does Larkin treat children

21  from Homestead who have been sent there from Homestead

22  free of charge?

23     A.   Not to my knowledge.

24     Q.   When I refer to records, records of payments

25  to Larkin for its having treated children in ORR

Page 95

1    custody?

2         A.   There is a medical unit that is not within

3    ORR, but they deal with the medical insurance.  It's a

4    TAR they have to submit.  So Larkin would have Homestead

5    submit the TAR for them.  If they need additional time,

6    they have to do that.

7              In that sense, I don't know if that is a

8    record.  Are they aware of -- the contractor that deals

9    with the insurance is aware of it.

10        Q.   You said TAR.  Is that an acronym, T-A-R?

11        A.   Yes.

12        Q.   Do you know what that stands for?

13        A.   It's treatment authorization, I believe.

14        Q.   Is ORR advised either in advance or shortly

15   after a child has been sent to Larkin from Homestead?

16        A.   The program, CHSI, would submit a request to

17   the medical that they are -- that the child was

18   hospitalized.  They would also do an incident report.

19   CHSI is supposed to complete an incident report within

20   four hours of the hospitalization.

21        Q.   In terms of the medical care for the children

22   at Homestead, does ORR pay for that on a -- let's talk

23   about medical care that cannot be provided on site.  For

24   example, hospitalization like we are talking about here.

25   I think you mentioned that there was something about an

Page 96

1   insurance company or --

2        A.   The children are --

3             MS. DAVILA:  Objection.  Vague.  Objection.

4        Calls for speculation.  Objection.  Foundation.

5             THE WITNESS:  I don't deal with the medical

6        authorizations at all.  Again, my purpose is the

7        releases.  So you are asking me to give an opinion

8        on something that I feel is a little out of my area

9        of work.

10            But yes, there is an insurance system that

11       insures the children.  Who they are?  I honestly

12       don't know.  That is not anything I deal with.  I

13       don't submit the TAR.  I don't do anything with

14       insurance.  I am not the one to answer your

15       question on that line.

16  BY MR. HOLGUIN:

17       Q.   Okay.  Fair enough.  Thank you.

18            In terms of home studies and when they are

19  first recommended, at what point after a child arrives

20  at Homestead is the first point at which a home study

21  might be recommended?

22            MS. DAVILA:  Objection.  Asked and answered.

23       Objection.  Cumulative.

24            THE WITNESS:  We discussed that exact question

25       prior to the break.  As I told you, it varies case

Page 97

1          to case.  I can't give you an answer on that one.

2          I know that was one of the questions we discussed.

3          I can't.

4     BY MR. HOLGUIN:

5          Q.   In terms of the earliest case, the quickest

6     that you have seen a home study recommendation come in,

7     what would that be?

8          A.   If there was an incident report where a child

9     reported that they were abused by a caregiver and it's

10    very early on when they report it, it might be requested

11    very early on because the knowledge is there.  It would

12    rise to criteria of the TVPRA criteria.  So it varies,

13    again.  I will say it varies.

14          You can have a child come into a facility and

15    say nothing in the beginning because they are not

16    comfortable.  And then you can have a child that is

17    disclosing issues ten days into their stay.  So again,

18    it's case by case, depending on the information that is

19    available at the time.

20          Q.   Let's take a hypothetical where a child comes

21    into the country and discloses to Border Patrol that I

22    have an aunt living in the United States, and then the

23    child comes into ORR custody.  What is the quickest that

24    you would expect a home recommendation to come in on

25    such a case?

Page 98

1          MS. DAVILA:  Objection.  Vague.  Objection.

2      Calls for speculation.

3          THE WITNESS:  Again, I don't deal with the

4      intake part of it.  However, if intake provides a

5      phone number of a relative, which often they do,

6      the shelter typically calls the relative, even

7      before the child is placed, to try to get the ball

8      rolling.  But again, I am not in that part of the

9      case process.  I am at the end.

10  BY MR. HOLGUIN:

11      Q.   Do home studies get scheduled before the case

12  arrives to you?

13      A.   The whole case may not be completed when the

14  home study is requested.  The case does not have to have

15  all the documentation when the home study is requested.

16  So I am the last -- the FFS is the last person that

17  approves the home study, but it could be anywhere in the

18  process of the case.

19      Q.   Do you approve the performance of the home

20  study before the case is submitted to you?

21      A.   When you say "submitted," what are you

22  referring to?  Submitted for a home study

23  recommendation?  I mean, what do you mean by submitted?

24      Q.   How are cases submitted to you?

25          MS. DAVILA:  Objection.  Vague.

Page 99

1   BY MR. HOLGUIN:

2       Q.   Do they come to you without a recommendation

3   for release sometimes?

4       A.   No.

5       Q.   So by the time they get to you, there is

6   always a recommendation as to whether there should be a

7   release?

8       A.   Yes.

9       Q.   I guess the problem I am having is that I am

10  trying to understand how someone could recommend release

11  or continued custody in a circumstance where they also

12  think the home study might be necessary.  I am just

13  trying to get to that, as to the timing of that, how it

14  works.

15          MS. DAVILA:  Objection.  Vague.  Objection.

16      That is not a question.  Would you like to

17      rephrase?

18          MR. HOLGUIN:  I am trying to explain to the

19      witness the source of my confusion.  Rather than

20      wasting a lot of time in trying to formulate a

21      question that she is going to be able to understand

22      on its own, I am trying to give context to it.

23      Well, if I have to, I have to.

24  BY MR. HOLGUIN:

25      Q.   Do you receive recommendations or requests to

Page 100

1    conduct home studies before there is a recommendation

2    regarding release?

3        A.    Yes.

4        Q.    Under what circumstances does that happen?

5        A.    It is always before there is a recommendation

6    of release.  They are recommending a home study.

7        Q.    So the case managers will recommend a home

8    study without recommending release?

9        A.    It is two different things that you are

10   talking about.

11       Q.    So sometimes you get cases that come to you

12   just for the decision about home study, correct?

13       A.    Yes.

14       Q.    Now I understand.  When a home study comes

15   back negative, is that information shared with the

16   proposed custodian?

17       A.    If it's a denial, it is shared.  If there are

18   issues that the proposed sponsor can mitigate that the

19   home study -- the reason for the denial, then yes, the

20   case manager will speak to them about what we can

21   mitigate from that.  So a negative home study would not

22   necessarily mean a denial.

23       Q.    I am referring to the home study that comes

24   back negative, whether or not it results in an actual or

25   final denial.  Just a home study that comes back with a

Page 101

1    negative recommendation, does the proposed custodian

2    receive a copy of the home study?

3                MS. DAVILA:  Objection.  Vague.  Objection.

4          Asked and answered.  Objection.  Cumulative.

5                THE WITNESS:  Not to my knowledge.

6    BY MR. HOLGUIN:

7          Q.   Do you know why not?

8          A.   In Child Welfare, if there was a report, a DCF

9    report, I don't believe that in that they give them

10   reports, per se.  In the negative home study, we don't

11   give them the physical home study.  However, the

12   findings are discussed with the sponsor, again, with the

13   hope that you could mitigate some of the negative

14   aspects of a home study.

15         Q.   Who determines whether those negative aspects

16   have been mitigated?

17         A.   It varies.  Sometimes we will ask for an

18   addendum to the home study.  Sometimes we will request

19   photos to make sure that the changes in the home are

20   made.  It depends why the home study was negative.

21         Q.   My question is:  Who is it that decides

22   whether the concerns in the home study have been

23   satisfactorily resolved since a minor may be released?

24         A.   It goes back to the case manager, who

25   recommends it back to the case coordinator, who

Page 102

1   recommends it back to the FFS.

2        Q.   In circumstances where the case manager

3   determines that the concerns have not been mitigated,

4   what opportunity, if any, does the proposed sponsor have

5   to contest that determination?

6        A.   They are able to contest any -- if it results

7   in a denial of the case, they could request a denial.  I

8   mean, they could request an appeal to the denial.

9        Q.   To whom do they appeal?

10       A.   They appeal to ORR headquarters.

11       Q.   Is it your understanding that any custodian or

12   proposed custodian who has been denied custody of a

13   child has that right to appeal?

14       A.   I believe I am speaking -- I know that the

15   parents have the right to appeal.  A parental denial is

16   very different from a denial of any other category of

17   sponsor.

18            I know that in the case of a Cat 3 sponsor

19   that was denied, they appealed it to my supervisor, not

20   headquarters.  So anybody other than the parents, they

21   can request that somebody else look at the case.

22       Q.   They can request that someone else within ORR

23   look at the case?

24       A.   Exactly.

25       Q.   Now, you were talking about state and local

Page 103

1     child welfare agencies in which I believe you said that

2     you don't believe that they share the results of home

3     studies with proposed custodians.

4          A.   I am stating that I am working in the

5     capacity -- because you asked me questions about my

6     other job.  We never provided reports to any family

7     members.

8          Q.   In those circumstances, in those cases, is it

9     your recollection that parents and other relatives and

10    proposed custodians had a right to a hearing?

11         A.   I believe so.

12         Q.   And they would go in front of a juvenile court

13    judge or a dependency court judge?

14         A.   You are talking 20-plus years ago.  I had one

15    case that I didn't recommend a parent.  And in the case

16    that I didn't recommend the parent, she did not care

17    about the recommendation.  She didn't really want the

18    child anyway.

19         Q.   Are you aware of any state or local agency

20    that has the right to deny the release of a child

21    without providing a hearing?

22         A.   I believe you are talking apples and oranges.

23    We are looking at children that were in the custody of

24    that family member versus ORR where the children are

25    coming in and they were not in the custody of that

Page 104

1    individual.  I believe there is a little bit of a

2    difference between that.

3         Q.    That is not always the case, is it?

4              MR. PINCHAS:  Objection.  Calls for a legal

5         conclusion.

6    BY MR. HOLGUIN:

7         Q.    We all read the newspaper reports about

8    children being separated from their parents and other

9    family members at the border.

10             MS. DAVILA:  Objection.

11   BY MR. HOLGUIN:

12        Q.    Did none of those children come into ORR

13   custody, to your knowledge?

14             MS. DAVILA:  Objection.  Calls for

15        speculation.  Objection.  Foundation.  Objection.

16        Asked and answered.

17             THE WITNESS:  That is not what you were asking

18        me about, separations at the border.  I don't

19        believe that is what I understood your question in

20        the beginning to be.  I believe you were asking me

21        about hearings.

22             As I stated, there is a process for the

23        sponsors, if they don't agree with the denial that

24        they go through.  Now, whether it is a Cat 1 -- as

25        I said, it's a different process.  I am not quite

1     sure how the 2s and 3s go about that, but I have

2     had a case that was a denial that bumped it up past

3     my supervisor to look at the case.  So that is all

4     I can honestly tell you about that process.  It is

5     not a process I am involved in.  I don't do

6     anything -- if I deny a case, I am done with that

7     case.  I don't know how to answer you honestly on

8     that.

9  BY MR. HOLGUIN:

10    Q.   Do you recall in that case that was bumped up

11 to your supervisor, was the proposed sponsor permitted

12 to come in and interview with the --

13         MS. DAVILA:  Objection.  Calls for

14    speculation.

15         THE WITNESS:  I am not quite sure what they

16    did.  I know a letter was written, and that is

17    about the extent of what I know.

18 BY MR. HOLGUIN:

19    Q.   Going back to your comment about apples and

20 oranges, because I believe the distinction you were

21 trying to make was that children in ORR custody are

22 different from children in state and local child

23 protective jurisdictions because those children are the

24 ones that state and local agencies deal with are being

25 taken from their parents; is that correct?

Page 106

1          MS. DAVILA:  Objection.  Misstates prior

2      testimony.  Objection.  Vague.

3          THE WITNESS:  The population is different, is

4      what my point truly is.  You're dealing with,

5      number one, two different systems and differing

6      populations.

7  BY MR. HOLGUIN:

8      Q.   All right.  When we're talking about

9  populations, we are talking about a generalization.

10 Would you concede that there are members of the ORR --

11 the population of children in ORR custody who have been

12 separated from their parents?

13         MS. DAVILA:  Objection.  Vague.  Objection.

14     Calls for a legal conclusion.

15         THE WITNESS:  Am I aware of cases --

16         MR. PINCHAS:  Wait.  Wait.  Assumes facts not

17     in evidence.

18 BY MR. HOLGUIN:

19     Q.   Are you aware of any children in ORR custody

20 that were separated from their parents at the border?

21         MS. DAVILA:  Objection.  Vague.

22 BY MR. HOLGUIN:

23     Q.   You can answer.

24     A.   Yes.

25     Q.   So then in those cases, at the very least, the

Page 107

1   situation is not so much different than those in which

2   the state or local child protection agency is trying to

3   remove a child from their parent.  Is there any

4   difference?

5            MR. PINCHAS:  Objection.  Argumentative.

6            MS. DAVILA:  Objection.  Calls for

7       speculation.  Objection.  Foundation.

8            THE WITNESS:  I don't know every child taken

9       from their families.  I don't work within that

10      system and have not for 20-plus years.  I don't

11      feel I can answer that.

12  BY MR. HOLGUIN:

13      Q.   Are you aware of the average length of time it

14  takes for a case manager to submit a case to you for a

15  decision with respect to release?

16      A.   I believe we discussed that answer previously.

17  Again, that is case by case.

18      Q.   But is there an average?  Do you monitor about

19  how long the case managers are taking to send you cases

20  for --

21      A.   Again --

22           MS. DAVILA:  Objection.  Asked and answered.

23      Objection.  Cumulative.

24           THE WITNESS:  It's case by case.  I am looking

25      at the cases on the back end.  I am not sure how to

Page 108

1      answer your question.

2  BY MR. HOLGUIN:

3      Q.   Let me ask you this:  Does ORR track or

4  accumulate statistics on how long case managers are

5  taking to submit cases for release with the FFSs?

6      A.   I believe they look at that.  I don't know if

7  they are tracking it per case manager or per program.

8      Q.   Where would those statistics be stored?  Do

9  you know?

10     A.   I don't know.  That is an administrative

11 issue.

12     Q.   Do you have the name of the administrative

13 unit that would --

14          MS. DAVILA:  Objection.

15          Did you finish your answer?

16          THE WITNESS:  I was just saying that it's

17     not -- I mean, I don't have that data personally,

18     so I am not sure how to answer your question of

19     where it is located.

20 BY MR. HOLGUIN:

21     Q.   Do you know the name of the unit within or the

22 entity within ORR that would track that?

23     A.   I don't.

24     Q.   To your recollection, you have never seen

25 anything come from your superior expressing any concern

Page 109

1    about the amount of time case managers have taken to

2    submit cases to you for a decision on release?

3            MS. DAVILA:  Objection.  Vague.

4            THE WITNESS:  I have received instruction that

5        is more vague.  I have not seen where it was listed

6        per case manager.  I have seen where -- you know,

7        length of stay is a concern always.  The philosophy

8        is timely and safe releases.  So length of stay is

9        always a problem.

10           Again, as I stated before, it's case by case

11       and there are variables.  Have I received data that

12       X case manager is taking longer than Y?  I have not

13       seen that personally.

14   BY MR. HOLGUIN:

15       Q.   Are you familiar with statistics on the

16   average length of stay in ORR custody?

17       A.   I believe they send out an e-mail that may

18   have that information on it, but I don't -- it is not

19   something that I work on.  So perhaps there has been.  I

20   mean, I don't know.  I know that the programs and their

21   quarterlies and other reporting may put their average

22   length of stay.

23       Q.   So you are not aware whether the average

24   length of stay has increased or decreased over the past,

25   say, three years?

1          MS. DAVILA:  Objection.  Mischaracterizes
2      prior testimony.
3  BY MR. HOLGUIN:
4      Q.   Are you aware of that?
5          MS. DAVILA:  Objection.  Vague.
6          THE WITNESS:  Have I seen periods where the
7      length of stay was down versus higher?  Is that the
8      question?  In three years' period?
9  BY MR. HOLGUIN:
10     Q.   Over the past three years, have you noticed
11 any trend in the length of stay, whether decreasing or
12 increasing?
13     A.   The only trend that I am speaking of is the
14 cases that I see.  I think there is a trend that the
15 number of length -- the length of stay has gone down.
16     Q.   How would you identify the document or the
17 report -- what is the form in which you've received that
18 information?
19     A.   I just told you that in my experience of
20 reviewing the cases, I have noticed that the length of
21 stay has gone down.
22     Q.   But these are the cases of the Homestead
23 children that you have had?
24     A.   Yes.
25     Q.   Agency-wide, ORR-wide, you are not privy to

Page 111

1    any of the --

2         A.   They send out information on length of stay.

3    I can't cite it for you at the moment.  They send out

4    length of stay averages in an e-mail form, but I can't

5    cite that for you.

6         Q.   All right.  Thank you.

7              In terms of the legal assistance available to

8    children at Homestead, what legal assistance is

9    available to them, to your knowledge?

10             MS. DAVILA:  Objection.  Foundation.

11             THE WITNESS:  You are asking me more of a

12        contractual issue that is not what I work with.  I

13        know that they receive -- that VERA has a contract

14        with ORR and I know that the local provider for the

15        children in the Miami area is Americans for

16        Immigrant Justice, AIJ.

17   BY MR. HOLGUIN:

18        Q.   Do you have any estimate as to how many

19   children at Homestead are being represented by lawyers

20   with the Americans for Immigrant Justice?  Do you know

21   how many children AIJ represents?

22             MS. DAVILA:  Objection.  Vague.  Objection

23        compound.

24             Which organization are you asking about?

25   BY MR. HOLGUIN:

Page 112

1     Q.    I'm asking about AIJ.

2     A.    When you say "represent," are you talking that

3 have submitted a G-28 and are representing a child or

4 are you talking about a legal screening and

5 know-your-rights presentation?

6     Q.    A submission of a G-28.

7     A.    Not that many.  I don't know the number.  I

8 don't deal with that.  I don't deal with that end of it.

9     Q.    Are you aware of children at Homestead

10 represented by lawyers, apart from AIJ staff attorneys?

11    A.    If you are asking me if I have ever known that

12 a child has been represented outside of AIJ, I have seen

13 that.

14    Q.    Has any lawyer who has been representing a

15 child at Homestead ever submitted evidence to you or

16 argument to you in favor of releasing their clients from

17 ORR custody?

18    A.    To me directly?  No.  Not that I am aware of.

19    Q.    Does ORR decline to release children because

20 they believe they may be flight risks after release?

21    A.    I think you have to ask have I ever denied a

22 release for a future flight risk.  Is that what you are

23 asking?  I have personally not.

24    Q.    Is flight risk one of the criteria that FFSs

25 are supposed to take into account in determining whether

Page 113

1    to release a child from ORR custody?

2         A.   I honestly don't understand.  When you say

3    "flight risk," what are --

4         Q.   Likelihood to abscond.  They will not appear

5    for removal hearings or for removal, should they be

6    ordered removed?

7         A.   But how are you expecting -- what do you mean?

8    I don't understand.  It's like if I am predicting the

9    future.

10        Q.   Well, yes.

11        A.   I am not psychic.  I don't know how to answer

12   your question.

13        Q.   It's a prediction of future behavior,

14   certainly.  So predicting whether a particular placement

15   is going to be safe or not, you would concede that,

16   would you not --

17             MS. DAVILA:  Objection.  Vague.

18   BY MR. HOLGUIN:

19        Q.   When you are determining whether to release a

20   child and you determine that it is unsafe, the

21   determination predicts future behavior, future events.

22   Is that correct?

23        A.   That is incorrect.

24        Q.   How so?  If a child is currently in ORR

25   custody and you are saying that a placement outside of

Page 114

1    ORR custody is going to be unsafe, by definition, it

2    must mean it's going to be unsafe in the future.

3             MS. DAVILA:  Objection.  Vague.  Objection.

4         Misrepresents prior testimony.

5             MR. PINCHAS:  Objection.  Argumentative.

6         Counsel is testifying.

7             THE WITNESS:  When we look at factors for

8         safety, it is not an objective prediction.  There

9         has to be an issue that is identified.  Whether the

10        sponsor has serious criminal behavior -- I mean,

11        there are issues that you look at.  It is not

12        necessarily that I am predicting that a child --

13        something will happen or a child will abscond.  We

14        don't know.  I mean, the likelihood of a child not

15        going to court -- I think there is a likelihood

16        with any child who is undocumented, you know, to

17        not go to court.  So I don't think I would use that

18        as a determining factor because how would I know

19        that?

20            I am not quite sure where you are expecting me

21        to answer because looking at objective data versus

22        I am psychic and looking at the future are very

23        different in my eyes.  So I would not use data that

24        is just what I predict versus here is history for

25        you.  Here is your history that you are looking at.

1           Here is criminal history.  Here is whatever history

2           you are looking at.

3                So I think that when you are looking at it, it

4           is not looking at a predictor in that sense.  You

5           are looking at data that is objective data to show

6           what has gone on in the house versus, oh, I don't

7           think this kid is going to show up in court so I am

8           not going to release the kid to the sponsor.

9                Have I sent children to sponsors who have

10          removal orders?  Yes.  Is the likelihood that they

11          go to court?  Who knows.  So there are different

12          issues there.  It is not one little answer that I

13          can squeeze into a box for you.

14     BY MR. HOLGUIN:

15          Q.   If we are going to base it on past behavior,

16     say, a child has attempted to escape three or four

17     times, would that be taken into account in your

18     determination as to whether to release or not?

19                MS. DAVILA:  Objection.  Vague.  Objection.

20          Asked and answered.  Objection.  Cumulative.

21                THE WITNESS:  Would I look at that and say,

22          "Oh, I can't release the child because he wants to

23          leave Homestead"?  No.  I may think that they might

24          need additional services, but I don't think I would

25          deny a release for a child that is wanting or has

Page 116

1      voiced or has attempted to run.

2           If they had attempted to run -- I mean,

3      sometimes there is a reason.  They will tell you a

4      reason.  It does not necessarily mean that this

5      child is going to do it again.  I mean, it is case

6      by case when you are dealing with human lives.

7      There is no piece of paper that I can say, "Here

8      you go."  It depends on the kid and the case and

9      the circumstances.

10  BY MR. HOLGUIN:

11      Q.   So if I understand correctly, then, when you

12  say there may be reasons that a child has run or

13  attempted to run, what kind of reasons do you have in

14  mind?

15      A.   This is opinion, obviously.  This is not

16  factual, what I am saying here.  In the case of a child

17  that may not understand how the process is moving along

18  and they get very antsy, that could happen.  And then

19  someone sits with the child and explains here is where

20  we are at in your case, blah, blah, blah.  That may calm

21  the child down.  I mean, there are a lot of reasons.

22           Can we take a break?

23           MR. HOLGUIN:  Yes, of course.

24           We can go off the record.

25           (Luncheon recess taken in the proceedings from

Page 117

1   12:20 p.m. to 1:18 p.m., after which the following

2   proceedings were had:)

3               MR. HOLGUIN:  David, go ahead.

4               MR. PINCHAS:  Yes.  I just want to say that it

5           seems that you are a very thoughtful witness.  It's

6           just that since I am not there, if you could just

7           give me a few seconds before you answer so I can

8           make an objection.  Okay?

9               THE WITNESS:  Yes.

10              MR. HOLGUIN:  Are we ready?  We will continue

11          the deposition.

12              MS. DAVILA:  We're ready.

13  BY MR. HOLGUIN:

14      Q.    ██████████ , speaking of fingerprints, what is

15  ORR's current policy on requiring fingerprints from

16  proposed sponsors or the members of their household?

17      A.    The current policy is that we are not

18  fingerprinting the parents at this point, unless there

19  is cause to feel the need to fingerprint, and also not

20  household members.  However, with home studies, the

21  fingerprints are -- they get fingerprinted with home

22  studies.

23      Q.    To clarify, when a home study is performed,

24  there are fingerprints required of everyone in -- all

25  adult members in the household or every member of the

Page 118

1    household?

2         A.   Adult members of the household.  If it's a

3    parent, the parent, at that point, is required.

4         Q.   Absent a home study, fingerprinting of a

5    parent is not required?

6         A.   Unless there is a concern that would elevate

7    that you would want to print.

8         Q.   What about adult members of the parents'

9    household, are they fingerprinted?

10        A.   They are not fingerprinted.  But again, if

11   there is reason to believe there could be issues, they

12   may be requested to print.

13        Q.   Is that a change from policy that existed in

14   the recent past?

15        A.   Yes.

16        Q.   When did the policy change?

17        A.   I can't tell you the exact date.  I believe it

18   occurred in March.

19        Q.   What was the policy prior to March?  March of

20   2019, by the way?

21        A.   I believe so.

22        Q.   Or 2018?

23        A.   No.  It was this year.  The policy was that

24   the parents were being fingerprinted and adult household

25   members were being fingerprinted.

Page 119

1        Q.    So as recently as last month, all members of

2    the --

3        A.    I think it was -- I am not giving you the

4    exact date because, honestly, I don't remember.  It was

5    before March.  So maybe January.  It was definitely

6    before March.  Sorry.

7        Q.    Why was the policy changed?

8        A.    You would have to ask the people that make

9    policy.  I am not one that makes policy.  I don't know.

10       Q.    In your judgment, has the change in policy

11   impaired child safety?

12       A.    I don't know how to answer that question.

13       Q.    In your judgment, does fingerprinting -- well,

14   let's back up.  Now, how are fingerprints actually

15   collected by ORR when they are required?

16       A.    The sponsors go to either a digital site,

17   which can be in shelters.  There is a list of digital

18   sites.  They try to do them where the sponsor is or who

19   is getting fingerprinted won't be concerned.  Obviously,

20   if you are asking someone who is not documented to go

21   get fingerprinted at your local police station, that is

22   going to be an issue.  So they have fingerprint sites.

23   Some people don't live near fingerprint sites, so they

24   get the fingerprint cards to do.

25       Q.    So the list of fingerprint sites, is that

Page 120

1    published anywhere?

2         A.   I am not sure if it is published anywhere.  I

3    have a list.  The programs have a list.  They generally

4    provide the sponsor with the location closest to where

5    they reside.

6         Q.   Your list covers the country or does it just

7    cover Miami?

8         A.   Nationwide.

9         Q.   Do you have any estimate as to how many sites

10   are listed on the list that you have?

11        A.   No.  I don't deal with the fingerprint sites

12   either.  So no, there is no need for me to know that

13   information.

14        Q.   But one of your concerns in making a release

15   decision is whether the fingerprinting has been

16   accomplished; is that correct?

17        A.   If it is a required fingerprint, then that

18   would be correct.

19        Q.   Do you have any estimate as to how long it

20   takes from the time that the proposed sponsor submits

21   fingerprints to the time the results come back?

22        A.   I have no idea.

23        Q.   Do you know what databases the fingerprints

24   are checked against?

25        A.   I believe that they are checked against FBI.

Page 121

1    I am not sure.  I don't want to -- I am not sure.  I

2    would be speculating.

3         Q.   Have you become aware that there are

4    substantial delays in receiving fingerprint results?

5              MS. DAVILA:  Objection.  Vague.  Objection

6         foundation.

7    BY MR. HOLGUIN:

8         Q.   Let me ask it more specifically.

9              Do you know how long it takes from the time of

10   submission of the fingerprints to the time when ORR gets

11   results back?

12        A.   I don't know the answer to that.

13        Q.   When are fingerprints requested?  Do you know

14   that?  I mean the timing, not under the circumstances.

15   When in the process in a case where fingerprints are

16   going to be required are the proposed sponsors directed

17   to submit fingerprints?

18             MS. DAVILA:  Objection.  Vague.

19             THE WITNESS:  They tell the sponsor about the

20        fingerprinting when they make contact with the

21        sponsor.  So early on, unless -- again, it's case

22        by case.  So unless there is an issue where we find

23        a home study to be necessary, then, you know, maybe

24        not right away because we didn't know the situation

25        would require a home study.

Page 122

1   BY MR. HOLGUIN:

2       Q.   I see.   In addition to yourself, how many

3   other ORR personnel are involved with managing the

4   treatment conditions or release of children housed at

5   Homestead?

6           MS. DAVILA:   Objection.   Vague.

7           THE WITNESS:   Are you speaking of treatment

8       conditions or releases?   You lumped them together

9       so I am not quite sure of your question.

10  BY MR. HOLGUIN:

11      Q.   We can separate them.   With respect to

12  release, how many ORR personnel are involved in

13  determining whether children should be released from

14  Homestead?

15          MS. DAVILA:   Objection.   Asked and answered.

16      Objection.   Cumulative.

17          THE WITNESS:   As I said, there is another FFS

18      that works with me.   We also have a supervisor.   We

19      work as a team.   Sometimes there could be other

20      coverage of Homestead from an outside FFS.   If I am

21      on vacation, if we need extra help, we've had help

22      before.

23  BY MR. HOLGUIN:

24      Q.   Now, you mentioned that there were other

25  shelters in the Miami area to which children from

Page 123

1    Homestead are sometimes transferred.  What are the names

2    of those shelters?

3         A.    His House and Catholic Charities, Boys Town.

4         Q.    So the two that you used to work for; is that

5    right?

6         A.    I never worked for His House.  I said I

7    covered His House as an FFS.

8         Q.    My apologies.

9         A.    I did work at Boys Town, yes.

10        Q.    Are you in charge or do you participate also

11   in release decisions for children housed at those two

12   shelters or either one of them?

13        A.    Not currently.  I have covered them in the

14   past.  But no, I haven't since I have been at Homestead.

15        Q.    So who covers releases now from the other two

16   shelters, Boys Town and --

17        A.    Another FFS.

18        Q.    And that person's name is?

19        A.    ███████████.

20        Q.    Does ███████████ also work with children from

21   Homestead, children detained at Homestead?

22        A.    She has covered Homestead in the past, but not

23   typically.

24        Q.    In terms of monitoring conditions and

25   treatment while children are at Homestead, how many ORR

Page 124

1    personnel are involved in that?

2         A.   I am not involved in that.  As I told you, I

3    deal with releases.  I know that there is a COR team.  I

4    am not sure how many people are in that team.  I know

5    that my supervisor does look at that.  I mean, there is

6    a wide range of people, I imagine.  There is a COR team.

7    Again, I don't know how many people are on that.  There

8    is another team that deals with -- the DIPEL (phonetic)

9    team kind of deals with, I guess, if there is an

10   evacuation need or something along those lines.  I am

11   not involved in that area of the shelter.

12        DIPEL is an acronym.  I don't know what it --

13        MS. DAVILA:  A disaster?

14        THE WITNESS:  Yes.  In case there is a

15      hurricane.

16   BY MR. HOLGUIN:

17        Q.   Speaking of the COR team, are the members of

18   that team housed in -- are they in Miami too?

19        A.   No, they are not.

20        Q.   Do you know where they are located?

21        A.   I imagine they are in D.C., but I am not sure

22   if they are all in D.C.  I am not quite sure.

23        Q.   Are you aware of anybody who is in Miami who

24   regularly participates in monitoring the treatment that

25   children experience at Homestead?

Page 125

1        A.    I would say my supervisor is the one who would

2   know that information.

3        Q.    Now, your offices are here in Miami, correct?

4        A.    I don't have an office, but yes, I am situated

5   in Miami.  I work remotely.

6        Q.    I see.  Does ORR have an office here in Miami?

7        A.    There is an office that we use in Homestead.

8   But no, we don't have an office in Miami.

9        Q.    I believe you testified earlier that on

10  occasion the children will be transferred out of

11  Homestead into one of the two Miami shelters prior to

12  being transferred to a long-term foster care placement.

13  Is that right?

14             MS. DAVILA:  Objection.  Mischaracterizes

15       testimony.  Objection.  Vague.

16  BY MR. HOLGUIN:

17       Q.    Is that the case?  A child goes from Homestead

18  to one of the shelters before being sent to long-term

19  foster care?

20       A.    Yes.

21       Q.    Is it a policy that a child may not go

22  directly to long-term foster care from Homestead?

23       A.    There is not a policy.  The long-term foster

24  care tends to take quite some time.  When we are

25  referring to long-term foster care, typically, the

Page 126

1   attorney that is supplying the good faith letter would

2   like the child to remain in the Miami area.  So we

3   transfer them to one of the local shelters.

4        Q.   You referred to this letter as a good faith --

5   I am sorry.  How was that called?

6        A.   Good faith letter.

7        Q.   Good faith letter.  What does that letter

8   convey?

9        A.   It is a legal letter from the attorneys,

10  basically, that the child could have relief, some sort

11  of legal relief.

12       Q.   And they need that in order to get into

13  long-term foster care?

14       A.   Yes.

15       Q.   And is it required that an attorney prepare

16  that?

17       A.   Yes.

18       Q.   So in terms of children at Homestead, is it

19  correct that the attorneys from Americans for Immigrant

20  Justice are the ones that typically submit those

21  letters?

22       A.   Yes.

23       Q.   Have you ever had an occasion where an

24  attorney not affiliated with Americans for Immigrant

25  Justice has submitted a good faith letter on behalf of a

Page 127

1    child detained at Homestead?

2         A.   Not that I recall.  Again, the volume is high.

3    There could be.  Not that I am able to recall.

4         Q.   When you assumed your position as an FFS, were

5    you required to attend training that ORR put on?

6         A.   Yes.

7         Q.   What did that consist of?

8         A.   There was training -- there were different

9    trainings.  So we had HR training, different trainings

10   in D.C.  I trained hands-on with my supervisor as well.

11        Q.   In training hands-on with your supervisor,

12   where, physically, did that take place?

13        A.   At one of the facilities.

14        Q.   Do you recall the facility?

15        A.   I believe it could have been Boys Town, I

16   believe.

17        Q.   Now, have you had occasion to take notice of

18   children detained at Homestead who have physical

19   disabilities?

20        A.   Yes.  Personally seeing them, no.  Reading

21   about them when they are submitted, yes.

22        Q.   What sort of physical disabilities did you

23   take note of?

24        A.   We had children that had heart difficulties

25   that required surgery.  They have had children with eye

Page 128

1    issues, some that needed surgery.  Along those lines.

2        Q.   What about disabilities in terms of limbs,

3    being able to walk, being able to have use of arms and

4    legs?

5        A.   We have had one recently that had some

6    mobility issues due to -- I believe it was feet and

7    fingers, but I am not 100 percent sure on that.

8        Q.   To your knowledge, is Homestead able to

9    accommodate children with those kinds of disabilities?

10            MS. DAVILA:  Objection.  Calls for

11        speculation.  Objection.  Foundation.  Objection.

12        Vague.

13            MR. PINCHAS:  Objection.  Calls for a legal

14        conclusion.

15   BY MR. HOLGUIN:

16        Q.   You can answer.

17        A.   This would be an opinion of mine.  My opinion

18   is they are better able to handle medical kids because

19   they have a medical department, which the shelters do

20   not have.  Do they stay there with medical conditions

21   if there is an issue that they don't have to be moved

22   for that?  It's on a case-by-case basis.

23            In my opinion, because they have a doctor on

24   staff and nurses, they are better equipped to deal with

25   medical issues, in my opinion.

Page 129

1      Q.   How about mobility issues?

2           MS. DAVILA:  Same objections as before.  Also

3      calls for expert testimony and impermissible lay

4      opinion.

5           THE WITNESS:  This is opinion.  It's not

6      factual as well.  I think they are just as equipped

7      because of the fact that it is one story.  There

8      are not steps involved.  Some of the shelters -- in

9      His House, you have to step up into the cottages.

10     Boys Town is flat for the boys, but the girls have

11     an upstairs.  So in some cases, I would say it's

12     better equipped because they are on one floor.

13  BY MR. HOLGUIN:

14     Q.   Have you had occasion to actually look at the

15  buildings in which the children sleep at Homestead?

16          MS. DAVILA:  Let the record reflect that

17  ████████████  has written a note and provided it to

18     counsel.

19          You may answer the question.

20          THE WITNESS:  Yes.

21  BY MR. HOLGUIN:

22     Q.   So then you observed that there is more than

23  one floor to those dorms, correct?

24     A.   There are dorms where there is a second floor

25  and there are dorms -- there is enough bed space in the

Page 130

1    flat area, plus they have a medical area.  So that is

2    why I answered as I did.

3         Q.   So your recollection is that the dorms at

4    Homestead have two floors?

5         A.   I said that I believe there is one building

6    that has a second floor.  I am not sure if there is a

7    second building that has a second floor where the

8    children sleep.  They also have a ground floor.  There

9    are no steps to get into the ground floor, which is what

10   I had stated.

11        Q.   Okay.  Now, is there any periodic review of

12   children's placement at Homestead, whether they should

13   be placed there or somewhere else on a periodic basis, a

14   fixed schedule?

15        A.   That I participate in?  No.

16        Q.   Or that you know of.

17        A.   I know that sometimes I will receive a message

18   from the medical department saying that this child needs

19   to be transferred for medical reasons.  But I am not

20   aware of periodic reviews of that.

21        Q.   Are you aware of any list of free legal

22   services that is provided to children at Homestead?

23        A.   I don't participate in the intake process with

24   the children, but they are required to provide that

25   information to the children.

Page 131

1      Q.   But you personally have never seen such a

2   list?

3      A.   I have seen --

4           MS. DAVILA:  Objection.  Misstates testimony.

5   BY MR. HOLGUIN:

6      Q.   It's a question.

7      A.   I have seen the list before, yes.

8      Q.   How long ago?

9      A.   I really don't know the answer to that.

10     Q.   To your knowledge, are your duties as an FFS

11  typical of what FFSs do in general?

12          MR. PINCHAS:  Objection.  Lacks foundation.

13          MS. DAVILA:  Objection.  Vague.

14          You may answer the question.

15          THE WITNESS:  Yes.

16  BY MR. HOLGUIN:

17     Q.   Now, going up your chain of command, you have

18  a supervisor.  What is the chain of command as it goes

19  up from there?

20     A.   My supervisor also has a supervisor.

21     Q.   And is that person here in Miami?

22     A.   No.

23     Q.   So that person works where?

24     A.   Washington.

25     Q.   And then above that individual?

1      A.   I am not quite sure of the hierarchy of who

2  his direct supervisor is.  But is it somebody in Miami?

3  No.

4      Q.   Do you know the name of the person in

5  Washington who supervises your supervisor?

6      A.   Yes.

7      Q.   Could you please provide it?

8      A.   ███████████████

9      Q.   Who is it within Office of Refugee

10  Resettlement who is responsible for liaison with General

11  Dynamics Information Technology?

12          MS. DAVILA:  Objection.  Foundation.

13          THE WITNESS:  I am not sure what the question

14      is.  A liaison?  They have a project officer, as

15      every contract does.  So I am not quite sure how

16      you are -- what you are trying to ask me.

17  BY MR. HOLGUIN:

18      Q.   Well, who within the government oversees the

19  work of General Dynamics Information Technology, if

20  anyone?

21      A.   I would be speculating that it would be --

22  that they would have a project officer that would be in

23  charge of the contract.  I am not 100 percent.  I don't

24  deal with contracts or monitoring.  That is well above

25  what I do in my position.

Page 133

1      Q.   Now, I believe you mentioned earlier that you

2   had involvement with the transfer of children from

3   Homestead to an RTC; is that correct?

4      A.   Yes.

5      Q.   And an RTC stands for residential treatment,

6   center; is that correct?

7      A.   Yes.

8      Q.   What residential treatment center were you

9   involved in in the course of this transfer decision?

10      A.   I believe that we sent one child to Shiloh,

11   and I believe we sent one child to an out-of-network

12   facility, Acadia.  I believe the name was Acadia.  I am

13   not 100 percent sure.

14      Q.   Now, when you say "an out-of-network

15   facility," what does that mean?

16      A.   It means a facility that is not under contract

17   with ORR.

18      Q.   Do you know how many of those exist right now?

19      A.   I do not.  I refer to one.  I don't know how

20   many exist.

21      Q.   Do you know of any others, other than the one

22   you just mentioned?

23           MS. DAVILA:  Objection.  Asked and answered.

24           THE WITNESS:  I don't.

25   BY MR. HOLGUIN:

Page 134

1       Q.   Do you know the criteria for sending a child

2    to an out-of-network facility?

3       A.   Well, typically, the criteria, there is no

4    capacity within network or the in-network program will

5    not accept the child for whatever reason that would be,

6    and the child meets RTC criteria per the treating

7    psychiatrist.

8       Q.   So are all of the out-of-network facilities

9    residential treatment centers?

10      A.   I don't believe so.  I have not used an

11   out-of-network except one time for one child, so I can't

12   speak to that.  People could be using out of network

13   that I am unaware of.  I can tell you my experience was

14   one program.

15      Q.   In your experience, why was the child sent to

16   an out-of-network placement in that one instance?

17      A.   I believe there was no capacity at the

18   in-network one, and I believe the other program would

19   not accept the child.

20      Q.   So in-network residential treatment centers in

21   existence right now are -- how many of them are there,

22   if you know?

23      A.   I believe, two.

24      Q.   Would that be Shiloh and MercyFirst?

25      A.   Yes.

Page 135

1      Q.   Have you had occasion to send children to

2   either of those facilities, other than the one instance

3   that you mentioned?

4      A.   I believe I only had one child accepted by

5   Shiloh that I have sent.  I am not quite sure -- I might

6   have sent a child to MercyFirst in the last contract.  I

7   don't believe I have in this contract year.  So I am not

8   sure.  I am not quite sure.

9           Again, the volume, if you're looking at the

10  volume, it is very hard for me to answer.

11     Q.   What are the criteria that you know of

12  pursuant to which an RTC may refuse to accept the child?

13     A.   I am not sure of the criteria that they use

14  because that is not a program I oversee, nor am I privy

15  to their contract.  They have denied children that they

16  did not feel was a fit for the population that they were

17  serving at the time.  But specifics, I don't know.  They

18  just say "yes" or "no".  That is what I see.

19     Q.   Do you know how long Homestead has been in

20  operation?

21     A.   On this contract or the contract before?

22     Q.   In operation as an ORR facility.

23     A.   I think they came on in 2016, I want to say.

24  I want to say.  It could be off, but I believe it was

25  2016.  I believe.  Maybe '15, but I believe '16.

Page 136

1      Q.   Is it your understanding that Homestead is

2   located on a military base?

3      A.   To my understanding, it is on a job corps

4   site, not a military base.

5      Q.   Job corps site.  Do you have any knowledge as

6   to why it was located on a job corps site?

7      A.   Availability, I believe.

8      Q.   Do you know what the cost is to detain a child

9   per day at Homestead?

10     A.   I don't know.  I don't deal with contracts.  I

11  have no knowledge of what they -- what the per diem rate

12  for a child at Homestead is.

13     Q.   Are children who are placed at Homestead given

14  any notice of the reason they are being placed there?

15     A.   I don't know what intake gives them or does

16  not give them, so I honestly don't know.

17     Q.   In terms of transferring children out of

18  Homestead to some other placement, is there any written

19  policy that you know of?

20     A.   There is criteria in policy that will tell you

21  the difference between the programs and the level of

22  care.  They would have to meet criteria if you are

23  looking at different programs that are not

24  shelter-to-shelter.  There is criteria and policy that

25  dictates what would constitute a transfer to a different

Page 137

1   level of care.

2        Q.   What different levels of care does ORR have?

3        A.   Shelter, staff secure, secure, RTC, and

4   long-term foster care.  And transitional foster care,

5   but that is not a transfer that we do.

6        Q.   Specifically with respect to Homestead, are

7   there any written criteria you know of about when

8   children should be transferred out of Homestead to

9   another shelter?

10       A.   Well, we look at different factors in

11   determining that.  A child who we know would be extended

12   stay if they chose voluntary departure or a child that

13   is going to long-term foster care because those

14   processes are long, we would try to transfer them to a

15   permanent shelter.

16            As far as different level of care, again, that

17   is criteria based.  So that would require that they met

18   criteria to be placed in a different level of care.

19       Q.   I am referring specifically to transfers to

20   shelters.  Transfers out of Homestead to a shelter.  Are

21   there any criteria written down for when that might

22   happen?

23       A.   Well, as I stated before, there is criteria

24   time-wise when the percentage in the shelter, to my

25   knowledge, is under 85 percent versus above.  But I am

Page 138

1    telling you what I have been told.

2         Q.   Do you have any knowledge as to how much it

3    costs to perform a home study?

4         A.   No, sir.  I have never been involved in the

5    home study process and I don't deal with contracts in my

6    position at all either.  So no, I don't know.

7         Q.   Is it the case that persons who are required

8    to be fingerprinted may have to appear more than once

9    because of the length of time that has transpired

10   between the first fingerprinting and the release

11   decision?

12        A.   Has that occurred?  Yes.  Because the

13   fingerprints are only valid a certain length of time.

14   So that has happened.  It is very rare, but it has

15   happened.

16        Q.   How long are fingerprints valid for?

17        A.   I believe it is -- I believe it is now four or

18   six months.  I can't even remember right now.

19        Q.   Do you know why they are considered to be

20   valid for only a fixed period?

21        A.   Well, obviously, if you are looking at a home

22   study and safety issues, you're looking at, hopefully,

23   nothing has happened since the last fingerprinting.

24        Q.   Well, there is a difference -- even after the

25   period, whatever it may be, has expired, what is the

Page 139

1    impediment to rechecking the same fingerprints against

2    the databases?  Rechecking the same fingerprints?

3              MS. DAVILA:  Objection.  Vague.

4              THE WITNESS:  You would have to ask the

5          fingerprint people that handle the fingerprints.  I

6          don't know what that is.  I don't partake in the

7          fingerprinting process or the -- when we get it, we

8          just get results.  So I don't know the answer to

9          that.

10   BY MR. HOLGUIN:

11        Q.   But who determines whether the results are

12   based upon stale fingerprints?

13        A.   It is just the date.  It is not a question of

14   who determines that.  It was just a date.  They are

15   taken out of our system after a certain amount of time,

16   so I would not even be able to check them after a

17   certain amount of time.

18        Q.   So as far as you would know, then, they had

19   never been fingerprinted.  Would that be fair to say?

20             MS. DAVILA:  Objection.  Misstates testimony.

21             THE WITNESS:  I don't know if I would know or

22         not.  I may not know because by the time it gets to

23         me, which is the back end, I am looking at what is

24         going on, you know, with the fingerprints.  If the

25         fingerprints are gone from our system, I have no

Page 140

1          way of knowing that they took them and that they

2          were processed, if it's out of our system.

3     BY MR. HOLGUIN:

4          Q.   Do you know the name of the unit or people who

5     are in charge of fingerprinting for ORR?

6          A.   I believe it is PSC.  I know you will ask me

7     the acronym, which I can't tell you.  It's PSC.

8          Q.   To your knowledge, is that a private company

9     or is that a unit within the federal government?

10         A.   I believe that it's a unit within the federal

11    government, but I am not 100 percent on that.

12         Q.   Okay.  Now, in reviewing cases presented to

13    you from children at Homestead, is there an indication

14    amongst the clinician notes or elsewhere whether the

15    child has been prescribed psychotropics?

16         A.   Yes.

17         Q.   What is your best estimate as to the number of

18    cases you have seen where a child has been prescribed

19    psychotropics?

20         A.   I would say it is a low percentage.  I can't

21    give you a number.  Again, I also split the Homestead

22    duties.  You're looking at whatever I am looking at.  I

23    would say it's a low percentage of kids.

24         Q.   When you say "low," is that below 5, below 2,

25    below 10?

Page 141

1           MS. DAVILA:  Objection.  Calls for

2       speculation.

3           THE WITNESS:  It is speculation, but I'll

4       answer.  I would say maybe 2 percent, maybe 3

5       percent.  It's small.  It is not a large amount of

6       kids.

7   BY MR. HOLGUIN:

8       Q.   What is your understanding as to who has

9   prescribed those medications for the children?

10      A.   The psychiatrist is the only one that I am

11  aware of that prescribes the medication to the children.

12      Q.   And is that the psychiatrist at the hospital

13  that we were talking about earlier, Larkin?

14      A.   There, or I know that they take the children

15  to their outpatient clinic.  So it would be a

16  psychiatrist.

17      Q.   Their outpatient clinic?  Who is --

18      A.   Larkin.

19      Q.   So it's either Larkin Hospital or the Larkin

20  outpatient clinic?

21      A.   For the most part.  Occasionally, a child may

22  go elsewhere, depending, you know, if there is no room.

23      Q.   Is it your understanding that ORR is the one

24  who agrees that the child should be on the

25  psychotropics?

Page 142

1          MS. DAVILA:  Objection.

2          MR. HOLGUIN:  Yes, that was bad.  Let me

3      rephrase.

4  BY MR. HOLGUIN:

5      Q.   Who consents to the administration of the

6  psychotropic medications to the children --

7          MS. DAVILA:  Objection.  Foundation.

8  BY MR. HOLGUIN:

9      Q.   -- detained at Homestead?

10     A.   It is my understanding procedurally that they

11  consult with the parents.  The child can always say no.

12  They are under ORR care; however, they do speak to the

13  parents, and the child can say no.  I have seen that

14  happen before.

15     Q.   So is the parent required to sign a consent

16  form for the administration of psychotropics?

17     A.   My belief is -- and I don't deal with that

18  aspect.  I have seen the forms that they are signing.  I

19  have not seen them the whole time I have been at

20  Homestead, but more recently, yes.  I was told by one of

21  the lead clinicians that they call the family, even from

22  the hospital, so that if they have a question about the

23  medication, the doctor can answer it.  So I know that

24  they were doing verbal consent as well.

25     Q.   Have you taken note of any written policy that

Page 143

1    ORR has on the administration of psychotropic
2    medications?
3         A.   It's evolving, the medication consents.  We
4    are using a form at Homestead and have been for a little
5    bit of time.  I am not quite sure when that started.  So
6    I would say yes.  But prior, it was very vague.  I know
7    that they were doing verbal consent with the parents.
8              Bear in mind, some of these parents are in
9    very, very remote areas where it is very difficult to
10   obtain information.
11        Q.   Do you ever have occasion to try to contact
12   one of these parents on your own?
13        A.   No, I have not.  Again, I get the case at the
14   back end.  Anything that has been done, has already been
15   done by the time it gets to me.  It is for release
16   decision.
17        Q.   Yes.  But you did mention that you had spoken
18   to three children at Homestead.
19        A.   I did, actually, speak to three children at
20   Homestead.
21        Q.   What language did they speak?
22        A.   Spanish.
23        Q.   And did you communicate with them in Spanish?
24        A.   I did.  And I am not fluent, but I am pretty
25   good.  I had with me the CFS, who was completely

Page 144

1    bilingual.

2         Q.   Who translated for you?

3         A.   Yes.

4         Q.   If you wanted to speak with a Spanish-speaking

5    parent, whether in the United States or elsewhere, would

6    you be in a position to be able to do that?

7         A.   I would not feel comfortable doing that in

8    terms of asking for consent for medication.  I

9    understand Spanish and I speak Spanish, but my Spanish

10   is limited to items that I am used to speaking about.

11   So I would not -- I would not want to be the one to do

12   that because I would want to make sure that they

13   understood completely.  So no is the answer.

14        Q.   Very well.  In making the release decisions

15   for a child whose parent is abroad, what weight do you

16   give the parents -- what, if any, weight do you give the

17   parents instructions as to who the child should be

18   placed with?

19        A.   Completely.  The children have to have a

20   letter of designation from the parents.  We would not

21   release to somebody that is not designated for the

22   child.  Now, does that mean I am going to automatically

23   release to the sponsor they designate?  Not necessarily,

24   if there were issues that I talked about previously that

25   deal with safety.  But would we send a child somewhere

Page 145

1    where the parent is saying no or we don't have that

2    letter?  No.

3         Q.   What about in the circumstance where the

4    parent says, "I would like my child to live with this

5    person"?  What weight is that given?

6         A.   Again, in terms of, we would -- that is who we

7    would explore, obviously, unless the child said, "No, I

8    don't want to go to this person.  I don't know this

9    person."  So we would explore the person, always, who

10   the parent says.  But does that necessarily mean we

11   release to that person?  It does not.

12        Q.   Are the parents' wishes taken into account?

13             MS. DAVILA:  Objection.  Asked and answered.

14             THE WITNESS:  I believe I answered that.  That

15        is who we would explore, is the sponsors.

16   BY MR. HOLGUIN:

17        Q.   So it would function to cause you to consider

18   a particular individual, correct?  If the parent said,

19   "I would like my child released to this person, my

20   sister," for example, you would then begin to evaluate

21   the sister?

22             MS. DAVILA:  Objection.  Vague.  Objection.

23        Compound.

24   BY MR. HOLGUIN:

25        Q.   Is that correct?

Page 146

1      A.   The program would begin to assess that sponsor

2  and make a recommendation.

3      Q.   Now, in the circumstance where a child arrives

4  and reports having more than one potential sponsor,

5  there is a hierarchy, is that correct, in terms of

6  closeness of family relationship?  In other words, you

7  will consider parents first, more distant relatives

8  second, and so forth?  Is that correct?

9          MS. DAVILA:  Objection.  Vague.  Objection.

10      Compound.

11          THE WITNESS:  Yes.  In most cases, we would

12      want to get somebody in the family first before you

13      would look outside the family.

14  BY MR. HOLGUIN:

15      Q.   And so in Category 1, which you referenced

16  earlier, those are parents and guardians; is that right?

17      A.   Parents and legal guardians.

18      Q.   And Category 2?

19      A.   Is close family.  So uncle, aunt, first

20  cousin, grandparents.

21      Q.   And in Category 3?

22      A.   Other cousins that are not first cousins.  And

23  obviously there is -- or relatives that are distant

24  relatives, but you can still prove it with the birth

25  certificates.  Or as I stated before, there are some

Page 147

1    unrelated sponsors.

2         Q.    In Category 3?

3         A.    In Category 3.

4         Q.    And then in Category 4?

5         A.    That means no sponsor.

6         Q.    I see.  So when I ask about hierarchy,

7    assuming all other things are equal, you would release

8    to Category 1, someone in Category 1, before you would

9    release to someone in Category 2; is that correct?

10             MS. DAVILA:  Objection.  Misstates prior

11        testimony.

12             THE WITNESS:  Yes.  You said if everything is

13        okay.  Yes.

14   BY MR. HOLGUIN:

15        Q.    Yes.  Now, when a child reports that he or she

16   has more than one potential sponsor, what is the policy

17   of ORR in terms of simultaneous evaluation or serial

18   evaluation?  In other words, will ORR evaluate both

19   potential custodians at the same time or do you want to

20   wait for one to be rejected before going to the next?

21        A.    No.  We stress that they should do concurrent

22   sponsorship when it is not, like, a parent.  Because you

23   never know what is going to happen or if somebody is

24   going to drop out.  So yes, we are all for concurrent

25   sponsors.

Page 148

1     Q.   Concurrently evaluating sponsors?

2     A.   Yes.

3     Q.   Returning a little bit to the topic of

4 children's behavior at Homestead, have reports come to

5 your attention that children are being told that by

6 behaving badly at Homestead their detention will be

7 extended?

8         MS. DAVILA:  Objection.  Vague.  Objection.

9       Argumentative.  Objection.  Compound.  Objection.

10      Mischaracterizes prior testimony.  Objection.

11      Speculative.

12        THE WITNESS:  I am not quite sure.  Are you

13      talking about a youth care worker saying this or a

14      case manager or anyone at Homestead?

15 BY MR. HOLGUIN:

16     Q.   Anyone in authority at Homestead.

17        MS. DAVILA:  Same objections.

18        THE WITNESS:  To my knowledge, I have not

19      heard that.  It could happen.  I have not heard

20      that.

21 BY MR. HOLGUIN:

22     Q.   If it is told to them, it would be inaccurate;

23 is that correct?

24        MS. DAVILA:  Same objection as before.

25        THE WITNESS:  Yes.

Page 149

1    BY MR. HOLGUIN:

2         Q.    What is the consequence to a child who

3    misbehaves at Homestead?

4              MS. DAVILA:  Objection.  Vague.

5              THE WITNESS:  When you say "misbehaves," what

6         are you speaking of?  There is obviously degrees.

7         There are degrees.  If it's a child that could harm

8         somebody else or themselves, obviously that is a

9         different perspective.  If it's a child that maybe

10        used foul language -- I mean, there are so many

11        different scenarios that we could discuss that I am

12        not quite sure how to respond to what you are

13        saying.

14   BY MR. HOLGUIN:

15        Q.    Well, what is the range of disciplinary

16   consequences that people at Homestead have at their

17   disposal when there is misbehavior?

18             MS. DAVILA:  Objection.  Vague.  Objection.

19        Calls for speculation.

20             THE WITNESS:  Again, as somebody who deals

21        with releases, I don't know what they utilize in

22        terms of negative.  Does it affect a release?  Not

23        unless it's something that maybe requires a home

24        study.  But again, there are a million different

25        scenarios you are looking at.  And being not the

Page 150

1        person there and monitoring the program in that

2        aspect, I don't know.

3    BY MR. HOLGUIN:

4        Q.    But you have had occasion to read SIRs?

5        A.    Yes.

6        Q.    And do the SIRs indicate the discipline that

7    has been administered for the violation that is reported

8    in the SIR?

9        A.    I believe they do an addendum to the SIR.

10   Which I don't always get and don't usually see until the

11   end.  In the initial SIR, no, I don't see where that

12   is -- where I would see that.

13       Q.    But it might appear in an addenda?

14       A.    It could appear.  I am not saying it does or

15   it does not.  I don't know.

16             When you talk about discipline, I am not quite

17   sure what you mean by that.

18       Q.    Well, there is misbehavior and then there is a

19   consequence for that, presumably, so the misbehavior

20   does not recur.  So I am wondering what it is that ORR

21   or the personnel at Homestead do to a child who

22   misbehaves.

23             MS. DAVILA:  Objection.  Compound.  Objection.

24       Vague.  Objection.  Confusing.  Counsel is mixing

25       misbehavior and behavioral issues.

Page 151

1    BY MR. HOLGUIN:

2         Q.   Misbehavior.  Let's just settle on that.

3         A.   What would fall into the category of

4    misbehavior that you are asking me to discuss?

5         Q.   Let's talk about disrespecting staff members,

6    for example.

7         A.   All I have seen that they have done, and this

8    is not -- this is speculation, meaning after the fact.

9    What I have seen is that they have met with a clinician

10   to discuss that.

11        Q.   Are you aware of anything beyond that?  For

12   example, isolation.  For example, loss of privileges, to

13   watch television or participate in recreation or

14   anything of that nature as a consequence of a child

15   misbehaving at Homestead.

16             MS. DAVILA:  Objection.  Asked and answered.

17        Objection.  Cumulative.

18             THE WITNESS:  Yes.

19   BY MR. HOLGUIN:

20        Q.   When a child is subject to that sort of

21   discipline at Homestead, what is the procedure for

22   determining what discipline should be applied?

23        A.   That, you would be better served asking

24   someone who is not the person that just reviews the

25   files.  I don't know the answer to that.

Page 152

```
 1        Q.   When a child has a grievance or a complaint
 2   about their treatment at Homestead, how would he or she
 3   make that complaint or grievance known to ORR?
 4        A.   I believe Homestead -- well, I have seen that
 5   Homestead has a grievance procedure.  I have seen a
 6   report that was generated by CHSI with the grievances on
 7   them.
 8        Q.   So is it your understanding that those kinds
 9   of reports come in periodically to ORR?
10        A.   I don't --
11             MS. DAVILA:  Objection.  Counsel is
12        testifying.  Summary reports is not in the witness'
13        testimony.
14             MR. HOLGUIN:  I thought I backed away from
15        that term.
16   BY MR. HOLGUIN:
17        Q.   The report that you mentioned, where there is
18   a list of children and -- is that correct?  It is a list
19   of children that have submitted grievances or
20   complaints?
21        A.   I honestly don't review it.  I believe it is a
22   report.  I don't know how often they submit it.  It goes
23   to the COR team.  I believe it lists the grievances that
24   the children have.  I am not sure of the period of time.
25   It is not something that I would look at.  I know I have
```

Page 153

1    seen it.

2         Q.   All right.  That's fair.

3              Does ORR review or approve -- let's start with

4    review.  Does ORR review rules regarding detainee

5    behavior or children's behavior at Homestead before they

6    are implemented?

7         A.   That is contractual, the contractual part of

8    the contract.  I don't know that.  I would imagine it

9    would be in part of their grant submission, but I don't

10   know.

11        Q.   Are you aware that a child touching another

12   child at Homestead is considered a violation of the

13   facility rules?

14             MS. DAVILA:  Objection.  Vague.

15             THE WITNESS:  I would imagine it is a

16        violation of the rules, but I am speculating.

17   BY MR. HOLGUIN:

18        Q.   In the shelter you worked at previously, were

19   children precluded from touching one another?

20        A.   Yes.

21        Q.   At all times?

22        A.   When you say "touching," do you mean -- I know

23   it's on the record.  If somebody taps somebody on the

24   arm, or are you talking about touching an area that --

25             MS. DAVILA:  Let the record reflect the

Page 154

1          witness has tapped herself on the arm and then

2          referred to the upper torso.

3     BY MR. HOLGUIN:

4          Q.   I am talking about any physical contact.

5          A.   When I was at Boys Town, we did not want any

6     physical contact because it could be misconstrued and,

7     obviously, turned into something that it did not need to

8     turn into necessarily.  So we did not want the children

9     touching each other, no.

10          Q.   Was it considered an infraction if they shook

11     hands or --

12          A.   Are you speaking to Boys Town when I was the

13     director?

14          Q.   Yes.

15          A.   No.

16          Q.   Did you say that there were girls also at Boys

17     Town?

18          A.   Yes.

19          Q.   Would one girl's brushing another girl's hair

20     be considered prohibited contact at Boys Town?

21          A.   We would ask them not to do that, so they

22     would be stopped.  But would it generate anything

23     behavioral for the child?  No.

24               We are talking about Boys Town, though,

25     remember.  And then we are also talking about prior to

Page 155

1    2014.

2          Q.   Yes.

3               Are children permitted writing implements,

4    writing instruments, pens or pencils, in their rooms at

5    Homestead?

6          A.   You are talking about programmatic things,

7    which, again, deal with releases?

8          Q.   Yes.

9          A.   I would speculate that they can't, but I don't

10   know.

11         Q.   At Boys Town, were children permitted writing

12   implements in their rooms?

13         A.   No.

14         Q.   What would be the consequence if a child at

15   Boys Town were discovered with a writing implement in a

16   room?

17         A.   Just take the writing instrument away.  It

18   wasn't really a -- I mean, keep it in context of what

19   the child is doing.  We did that because they were

20   writing on furniture all the time.  So that was the

21   reason for the no pens and pencils in the rooms.  But

22   did you get a punishment for that?  No.

23         Q.   To your knowledge, are children at Homestead

24   permitted to listen to music?

25         A.   I honestly don't know the answer to that.

Page 156

1          Q.    What about at Boys Town?

2          A.    Most of them had MP3 players, so yes.  Back

3    in -- I said MP3 player, so it was a while ago.

4          Q.    The children at Homestead, are they permitted

5    to wear hats?

6          A.    I believe so, but I am not -- I am not quite

7    sure.  I believe they are allowed.

8          Q.    At Boys Town, were the children permitted to

9    wear hats?

10         A.    Yes.

11         Q.    At Boys Town, were children permitted to have

12   trips outside of the facility?

13         A.    Yes.

14         Q.    Are you aware whether children at Homestead

15   are permitted to leave the facility for trips?

16         A.    I have not seen them on a trip or heard of

17   them on a trip.  I don't know.  I have not seen that

18   they have.

19         Q.    In terms of meals and nutrition, was it the

20   policy at Boys Town to vary the menu?

21         A.    Yes.  However, in Boys Town we had to have all

22   menus approved by a dietician.  There were five cycles

23   of menus that we had that were approved by dieticians.

24   So we were very limited in the flavors and the salt

25   content because there was a dietician.  So yes and no to

Page 157

1    that question.

2         Q.    Are you aware of what sorts of variations in

3    menus children have at Homestead?

4         A.    Again, I am not there.  That is a programmatic

5    issue.  I wouldn't have any need to know about the menus

6    or the food.  It is not within the release scope that I

7    am assigned currently.

8         Q.    At Boys Town, how long were children permitted

9    to bathe?

10        A.    We didn't time them.  But again, you're

11   looking at 2,300 kids versus 81 children.  So there is a

12   difference.

13        Q.    At Boys Town, how long were children permitted

14   to eat a meal?

15        A.    We didn't have a set time for them.  They

16   finished when they finished.  You try to have a schedule

17   somewhat, but nobody sits there and says, "Oh, it's

18   5:30.  Get out."  No, you don't do that either.  Not at

19   Boys Town when I was there.

20        Q.    Would you have any information that would

21   suggest that a child was being less than forthcoming if

22   he or she said that we are allowed 15 minutes to eat

23   meals at Homestead?

24             MS. DAVILA:  Objection.  Vague.  Objection.

25        Foundation.  Objection.  Calls for speculation.

Page 158

1             MR. PINCHAS:  Excuse me.  Court reporter,

2        could you please read back the question.

3             (Thereupon, the requested portion of the record

4    was read by the Court Reporter.)

5             THE WITNESS:  I wouldn't know that.  That

6        wouldn't be something -- again, my focus at

7        Homestead is very -- it's releases.  I wouldn't

8        know that.  I wouldn't know if it happened or

9        didn't happen.  I am not there.  I have not

10        observed meals.  I really can't answer that

11        truthfully.

12   BY MR. HOLGUIN:

13        Q.    Fair enough.  In terms of access to

14   telephones, do you have any information at all about

15   what access the children have at Homestead to

16   telephones?

17        A.    I can tell you that they are supposed to be

18   able to call the families.  There is a phone that they

19   can report abuse.  There is a hotline phone that is just

20   for that.  I don't know about the calls in.  I don't

21   know how that works in Homestead.  Again, I am not

22   there.  That is not what I deal with.

23             I could tell you how the shelter that I worked

24   at, when I worked there, did the telephones.  But that's

25   different.

Page 159

1      Q.   Have you, as an FFS, had occasion to prohibit

2   telephone calls between children at Homestead and

3   particular adults?

4      A.   Personally as an FFS?  No.

5      Q.   If Homestead were to prohibit a telephone call

6   between a detained child and a particular individual,

7   that would have been their decision and not ORR's?

8           MS. DAVILA:  Objection.  Calls for

9           speculation.

10  BY MR. HOLGUIN:

11     Q.   Does ORR, to your knowledge, have any role in

12  choosing which people children can have telephone calls

13  with?

14          MS. DAVILA:  Objection.  Calls for

15          speculation.

16          THE WITNESS:  To the extent that they are

17          supposed to be able to identify who the person is.

18          They can't just say, "Hey, I want to call

19          305-7100."  The program is supposed to verify to

20          make sure it is a safe call.  That is all I can say

21          to that.  But me, no, I don't know of that.

22  BY MR. HOLGUIN:

23     Q.   Or anyone else within ORR?

24     A.   Except that they are supposed to ID the

25  people.  They need to know who they are calling.

Page 160

1        Q.    So would you characterize that as ORR's

2   policy?

3               MS. DAVILA:   Objection.  Vague.  Objection.

4        Mischaracterizes prior testimony.

5               THE WITNESS:   There is policy on telephone

6        calls.

7   BY MR. HOLGUIN:

8        Q.    Is that written policy?

9        A.    Yes.

10       Q.    What is your understanding of the education

11  that children receive at Homestead?

12       A.    My understanding is -- again, I am not there.

13  I have never watched a classroom in progress.  My

14  understanding is that they go to school and that they

15  have qualified teachers teaching the classes.  That is

16  my understanding.

17       Q.    Are you aware of any noise standards that

18  prevail during classroom instruction at Homestead?

19       A.    No.  That would not be my release issue.

20       Q.    What about waking and going to sleep?  Do you

21  have any information about what time children are

22  awakened at Homestead?

23       A.    No.  I don't know that.  Again, the scope of

24  my function at Homestead is releases.  So no, I don't

25  know that.

Page 161

1      Q.   So you have the same answer for what time

2   children go to sleep?

3      A.   Exact answer.

4      Q.   Do you know what the minimum qualifications

5   for case managers are at Homestead?

6      A.   I am going to tell you what I believe.  In

7   policy, it tells you the minimum qualifications for the

8   positions, case manager being one of them.  Since I

9   don't deal with personnel, I am not 100 percent -- I

10   don't read that often.  I can refer to it, but I don't

11   read it and keep it in my head since I don't hire

12   anymore.

13        What I can tell you from my experience is at

14   Boys Town they have to have a bachelor's degree.

15      Q.   Currently, what sort of background checks, if

16   you know, are case managers subjected to at Homestead?

17        MS. DAVILA:  Objection.  Calls for

18        speculation.

19        THE WITNESS:  Again, policy and programmatic

20        stuff with Homestead, I am unaware.  However, I

21        believe they would follow the same as a shelter

22        would, which would require fingerprinting, local

23        checks, and DCF checks.  I would imagine, but I am

24        speculating.

25   BY MR. HOLGUIN:

Page 162

1      Q.   Would the same answer apply to other personnel

2   at Homestead?

3           MS. DAVILA:   Same objection.

4           THE WITNESS:   Same answer.

5   BY MR. HOLGUIN:

6      Q.   Is it your understanding that all case

7   managers at Homestead work on-site at the facility?

8      A.   No.

9      Q.   So what percentage of the case managers are

10   actually there?

11      A.   I am not sure of the breakdown.  I do know

12   that they utilize remote.  I don't know the breakdown,

13   to be honest with you.

14      Q.   In your experience at Boys Town, were remote

15   case managers used?

16      A.   No.

17      Q.   What about counselors at Homestead?  Are those

18   all on-site or are they also remote?

19      A.   I believe there are some remote.

20      Q.   At the function of a counselor as opposed to a

21   case manager, what does the counselor do?

22      A.   Clinical intervention, counseling, I would

23   say.

24      Q.   Do you know how many of the counselors are

25   remote versus on-site?

Page 163

1        A.    I honestly don't.

2        Q.    When you get a case submitted to you and you

3    are reviewing the evaluations, does it indicate whether

4    the evaluation was performed remotely or on-site?

5        A.    It does not.

6        Q.    Is there any policy with respect to keeping

7    children at Homestead who are monolingual in an

8    indigenous language?

9            MS. DAVILA:  Objection.  Vague.

10           THE WITNESS:  Recently, there has been a

11       directive about that, but not before.  More

12       recently.

13   BY MR. HOLGUIN:

14       Q.    What does the directive say?

15       A.    We were told to transfer the children.

16       Q.    Have you ever had occasion to transfer

17   monolingual indigenous-language-speakers out of

18   Homestead?

19       A.    Yes.

20       Q.    Where are they sent to?

21       A.    To local or -- to shelters.

22       Q.    Why is that?

23       A.    I was not told the reason for the directive.

24   But if I were to speculate, I would think because they

25   are more used to handling and they have more resources

Page 164

1   for the children who speak the dialect, versus

2   Homestead.  That would be speculation, however.

3       Q.   Do you know the number of pediatricians on

4   staff at Homestead?

5       A.   I am not aware of pediatricians.  I honestly

6   don't know.  I know there is a medical director who is a

7   doctor.  I am not aware of his credentials.  I don't

8   really deal with that aspect.

9       Q.   Do you know the ratio of therapists to

10  detainees at Homestead?

11      A.   I don't know the ratios at Homestead.  I know

12  the ratios in a shelter.

13      Q.   Well, what are the ratios at a shelter?

14      A.   Are you speaking like a Boys Town or His House

15  shelter?

16      Q.   Yes.

17      A.   One to twelve.

18      Q.   Is there any measurement of the efficacy or

19  the results of counseling sessions in which the children

20  at Homestead participate?

21      A.   I would say they have leads who review that.

22  They have lead clinicians, APDs, assistant program

23  directors, program director.

24      Q.   But you have never seen any evaluation of the

25  efficacy of counseling or therapy at Homestead; is that

Page 165

1  correct?

2      A.   That is correct.

3      Q.   Do you have occasion to review reports of

4  detention or family-separation-induced stress among

5  children at Homestead?

6      A.   Specifically?

7      Q.   Yes.

8      A.   I am not sure if it's specific.  I mean, I

9  have seen where it could be mentioned.  I am not sure

10  how clinical it was.  But yes, I am sure it is

11  mentioned.

12      Q.   Do you recall any particular case, sitting

13  here today, in which you reviewed a report that said

14  there is detention-induced distress with respect to a

15  particular minor?

16          MS. DAVILA:  Objection.

17          THE WITNESS:  I can't recall.

18  BY MR. HOLGUIN:

19      Q.   Are you aware of any child who has sued ORR

20  for the treatment he or she has experienced at

21  Homestead?

22      A.   Me personally?  No.

23      Q.   What about any child who has sued ORR for

24  declining to release him or her?

25      A.   I am not aware of the cases, no.

Page 166

```
 1        Q.   Do you know how many lawyers Americans for
 2   Immigrant Justice have at Homestead?
 3        A.   No.
 4        Q.   Or have, period?
 5        A.   No.  I don't deal with their contract.  Again,
 6   I am not on-site to do that.  I deal with releases.
 7             MR. HOLGUIN:  Why don't we take a break.  I
 8        think we are pretty much coming to the end.
 9             (Recess taken in the proceedings from 2:36 p.m.
10   to 2:51 p.m., after which the following proceedings were
11   had:)
12             MR. HOLGUIN:  Back on the record.
13   BY MR. HOLGUIN:
14        Q.   ███████████, have you had any occasion where a
15   lawyer from Americans for Immigrant Justice has
16   presented you with evidence in support of a client's
17   release?
18        A.   Not release, but where they have sent a good
19   faith letter.  I wouldn't say evidence.  I don't recall
20   ever reading anything as evidence for release.  But a
21   good faith letter for foster care, yes.
22        Q.   Has any Americans for Immigrant Justice lawyer
23   ever presented evidence in support of transferring a
24   child, a client, out of Homestead to another facility?
25        A.   Yes.
```

Page 167

1       Q.   Outside of the long-term foster care?

2       A.   They have sent a request to transfer a child

3  locally when the child has requested voluntary departure

4  and/or when a child is going to be referred to long-term

5  foster care due to the long process that those entail.

6       Q.   Do you recall seeing evidence from an

7  Americans for Immigrant Justice lawyer under any other

8  circumstance supporting a transfer out of Homestead?

9       A.   I don't.  That does not mean it didn't happen.

10  I can't recall an instance like that.

11       Q.   What about good faith letters from private

12  lawyers for children held at Homestead?  Have you ever

13  received one of those?

14       A.   I don't think I have.

15       Q.   Have you ever gotten a letter or any other

16  evidence from a private lawyer supporting the child's

17  release from Homestead?

18       A.   I believe I have seen a letter where someone

19  was requesting the release of a child, yes.  I think --

20  I believe there was one instance of a private attorney.

21  I don't recall exactly what it entailed, but I do recall

22  seeing an e-mail to that effect.

23       Q.   An e-mail.  Okay.  Anything else other than an

24  e-mail?

25       A.   Not that I am aware of.

Page 168

1      Q.   What about a letter or any evidence from a

2   private lawyer encouraging ORR to transfer a child out

3   of Homestead?

4      A.   Could be.  I don't recall, to be honest with

5   you.

6      Q.   You don't recall seeing any such --

7      A.   It could be.  I don't recall that offhand.

8           The Homestead mailbox gets several hundred

9   e-mails in a day.  I am not sure.  I mean, it could have

10  been sent and I didn't see it or I wasn't around or

11  somebody else saw it.  I don't know.  I can speak to

12  what I recall, which is no.

13     Q.   So you have a Homestead e-mail box?

14     A.   Yes.

15     Q.   What goes in there, anything that has to do

16  with Homestead?

17     A.   Yes.

18     Q.   But other people, other FFSs, have access to

19  that or just yourself?

20     A.   Other FFS have access to that.

21     Q.   It's just kind of a common mailbox?

22     A.   It is a central box for Homestead.  It's for

23  coverage purposes.

24     Q.   I believe you mentioned that you work

25  remotely; is that correct?

Page 169

1     A.   Yes.

2     Q.   Where are you based?

3     A.   ███████████

4     Q.   ███████████

5     A.   Yes.

6     Q.   How far is that from Homestead?

7     A.   It is a good hour-plus in traffic.  Something

8  along those lines, yes.

9     Q.   Are the other FFSs also -- do they also work

10  remotely?

11     A.   Yes.  My supervisor is at Homestead much more

12  frequency.  But ████████who is the other FFS, does not

13  reside in Florida.

14     Q.   Where does ██████ reside?

15     A.   Chicago.  She was here, though, for two weeks

16  not long ago.

17     Q.   Apart from Shiloh, have you ever had occasion

18  to transfer a child to a shelter outside of Miami?

19     A.   Shiloh is an RTC.

20     Q.   RTC.  Sorry.

21     A.   Outside of Miami, I said Acadia.  I believe

22  the last contract I sent one or two children to

23  MercyFirst.

24     Q.   Acadia is the out-of-network facility you

25  mentioned?

Page 170

1      A.    Yes.   I don't know where it's located.   They

2   have several locations.   I don't quite know where

3   exactly.

4      Q.    Now, in terms of stepping up children or

5   transferring children to medium secure or secure

6   facilities, have you ever had occasion to do that?

7      A.    Yes.

8          MS. DAVILA:   Objection.   Vague.

9   BY MR. HOLGUIN:

10     Q.    How would you describe a medium secure

11  facility or staff secure facility?   I believe that's

12  what everyone calls them.

13     A.    We call it staff secure facility.   I would say

14  that that's a facility that is able to handle a child

15  with a little more challenging needs than what a shelter

16  can handle, and not as secure as a staff secure.   I mean

17  as a secure.   Excuse me.

18          Sorry.   The music is throwing me off a bit.

19  My bad.

20     Q.    All right.   If I asked this, I apologize.   I

21  am trying to -- what I would like to know is if you have

22  had occasion to transfer children from Homestead to

23  staff secure facilities.

24     A.    Yes.

25     Q.    How often?

Page 171

1        A.    Not very often.

2        Q.    Over the past year, approximately how many

3   times?

4        A.    I don't even -- I mean, I would be absolutely

5   guessing.  Maybe five, six, seven.  Along those lines.

6   I wouldn't say -- I mean, it could be more and it could

7   be less.  I don't have -- I don't keep a number.

8        Q.    It's not a hundred?

9        A.    No, no.

10        Q.    So how do you make that decision to transfer a

11   child to a staff secure facility?

12        A.    If there is a child typically that has had a

13   number of behavioral SIRs or something that is a little

14   serious that cannot be contained in the shelter or they

15   have attempted to elope, physically attempted to elope,

16   what I would do is staff that case with my supervisor,

17   who would then make the determination of a step-up or

18   not to step up.

19        Q.    When you say "elope," do you mean to go off

20   and get married?

21        A.    No.  Elope, escape.

22        Q.    Escape.  Okay.  Sorry.

23        A.    They are not of age.  We don't marry them in

24   care.

25        Q.    I thought somehow they were determined to get

Page 172

1    married.

2         A.    No.

3         Q.    But you are involved in the decision to step

4    up the child to a staff secure facility?

5         A.    It's myself or whatever FFS is covering, so

6    yes.  But all of them, no.  Probably not.  But yes.

7         Q.    Are there written criteria for who is stepped

8    up to a staff secure facility that ORR has?

9         A.    There is criteria for a step-up, yes, in

10   policy.

11        Q.    In terms of process, where does the initial

12   recommendation for step-up originate?

13        A.    Typically, it originates with the

14   administrators of the program.  CHSI will say -- they

15   will typically send an e-mail to ask us if we could

16   consider a child for step-up.

17        Q.    So then what is your procedure when you

18   receive that kind of an e-mail?

19        A.    I typically read the file, and particularly

20   the SIRs, to see what behaviors they are reporting.

21   Then I will staff what I receive from them as well as

22   the SIR and any other information in the file with my

23   supervisor.

24        Q.    When you say "staff," do you mean you provide

25   that information to the supervisor?

Page 173

1     A.   Yes.  I discuss that information with the

2   supervisor.

3     Q.   Is it your practice to meet with the child

4   during that process of deciding whether to step up?

5     A.   I don't meet with the child, typically.

6     Q.   Is the child told the reasons for the step-up?

7     A.   I can attest that the program is supposed to

8   tell the child the reasons for the step-up.  I am not

9   there physically.  I can't tell you with certainty, but

10  they are supposed to be doing that, yes.

11    Q.   But you don't know for a fact whether they do

12  it or not.

13    A.   They usually notate that they do, so I can say

14  that.  You should ask a CHSI employee more than me about

15  that.

16    Q.   Is the child provided with evidence of the

17  infractions that are being used to justify the step-up?

18         MS. DAVILA:  Objection.  Calls for

19         speculation.

20         THE WITNESS:  I don't know if they physically

21         hand the child something.  I don't know how they

22         process that, to be honest with you.

23  BY MR. HOLGUIN:

24    Q.   Are the facilities required to have an

25  interview with the child to allow the child to explain

Page 174

1    his or her behavior before they recommend a step-up?

2         A.    What I have seen is that the clinician meets

3    with the child when there is a behavioral issue and they

4    will usually put an addendum to the SIR as to, you know,

5    what the child said and what is going on.

6         Q.    Have you had occasion to step up children to

7    secure facilities?

8         A.    Yes.

9         Q.    And is the process the same?

10        A.    It's a little bit different, in that the

11   criteria is different.  Obviously, there has to be a lot

12   more going on if you are stepping up to secure.  Because

13   that's -- you know, we try to stay within the least

14   restrictive environment for the child.  So a step-up to

15   secure has to be -- there has to be a reason.  Now, have

16   I stepped up?  Yes.

17        Q.    In terms of the process, receiving an e-mail

18   from the current placement, your gathering the file and

19   consulting with your supervisor, is that process all the

20   same?

21        A.    Basically, yes.

22        Q.    So would it be fair to say that the criteria

23   for a step-up to a secure is different from the criteria

24   for a step-up to staff secure, but the process is

25   essentially the same?

Page 175

1        A.   Essentially the same, but different criteria.

2        Q.   Now, once a child has been stepped up to

3   either a staff secure or secure, do you have any role in

4   stepping down the child?

5        A.   I don't.  Once they are released from

6   Homestead, no.  They do have reviews on the children.

7        Q.   But you don't?

8        A.   I do not, no.  I am not part of that at all.

9   That is the facility where they are transferred.

10        Q.   Approximately how many children have been

11   transferred out of Homestead, to your knowledge, during

12   the past month to a staff secure or secure facility?

13        A.   Well, are you asking me about a staff secure

14   or a secure?  Obviously, they are different.

15        Q.   Let's take the staff secure first.

16        A.    In the last month, I was on vacation for the

17   majority of March, so I don't know what -- I was gone

18   almost three weeks.  So March you can't ask me about

19   because I wasn't there.

20        Q.   How about February?

21        A.   Well, I am not sure when they happen.  We have

22   very few, maybe two or three.  I honestly don't know.

23   Secure, I can tell you within a month how many there

24   were.

25        Q.   Okay.

Page 176

1         A.   One.   That is why it's easy, plus the case is

2    much more serious, too, in terms of placement.   So yes,

3    one to secure.

4         Q.   Do you know whether any of the children that

5    you can recall being transferred to staff secure or

6    secure were represented by counsel?

7              MS. DAVILA:   Objection.   Vague.   Objection.

8         Compound.

9              THE WITNESS:   I don't know if there were G-28s

10        there in place.   I honestly don't know.

11   BY MR. HOLGUIN:

12        Q.   So you don't recall seeing any child with a

13   G-28 who was then sent to staff secure?

14        A.   I didn't necessarily look for it either, so I

15   don't know.   To my knowledge, I don't know.

16        Q.   Okay.   Why wouldn't you look for it?

17        A.   Why?   Because it wouldn't be anything that I

18   would look at, normally.   If they had it -- if the child

19   needs to be stepped up, the program is the one that

20   provides the notice if there is a G-28 that the child is

21   being moved.

22        Q.   In the cases you handled of transfers to staff

23   secure, have you ever had to deal with a child's lawyer?

24        A.   I have not personally dealt with the attorney,

25   no.

Page 177

1    Q.   Would the same answer apply with respect to
2    children sent to secure facilities?
3    A.   I didn't deal with an attorney on that either.
4    Q.   Never have dealt with an attorney in that
5    circumstance?
6    A.   The majority of the children do not have G-28s
7    on file.  They are represented through -- to AIJ as
8    friends of the court.  So there is no G-28.  They do
9    know-your-rights and a screening.
10   Q.   So your understanding is that when AIJ appears
11   as a friend of court, that is the extent of the service?
12        MS. DAVILA:  Objection.  Calls for
13        speculation.
14        THE WITNESS:  That is my understanding, but I
15        am not an attorney.  I am a social worker.
16   BY MR. HOLGUIN:
17   Q.   Okay.  What would you estimate is the average
18   amount of time you spend per case when you're
19   considering release?
20   A.   It depends how long the child has been in
21   care.  Because, obviously, a child that has been in care
22   seven days does not have as many documents for me to
23   look at as a child that has been in there 60 days.  So
24   yes, do I work after five o'clock every night to do
25   that?  Yes.

Page 178

1        Q.    What time, typically, do you stop working?

2        A.    About 11.

3        Q.    About 11 at night?

4        A.    Yes, 11 at night.

5        Q.    And what time do you start?

6        A.    At 8, 8:30.  That's why I don't do much more

7    than releases.

8        Q.    I see.  Are you provided with aging reports,

9    reports that identify children who have been at

10   Homestead for longer than particular periods, say one

11   month, three months, six months?

12              MS. DAVILA:  Would you repeat that question?

13              (Thereupon, the requested portion of the record

14   was read by the Court Reporter.)

15              MS. DAVILA:  Objection.  Vague.

16              I just want to note for the record that there

17       is a marathon that started this afternoon, sometime

18       later in the afternoon.  At this point, the music

19       is very loud.  We will try to all speak up and get

20       through it, but I wanted to note that for the

21       record.

22              THE WITNESS:  More recently, Homestead has

23       been doing length-of-stay reports.  So yes, I do

24       see them.  But I am not staffing the cases, so

25       people that are staffing are more attuned to

Page 179

1           exactly what is on that list more than I would need
2           to refer to it.
3      BY MR. HOLGUIN:
4           Q.   So again, when you refer to staffing, you are
5      referring to people who are receiving the files or the
6      information about a case?
7                MS. DAVILA:  Objection.  Mischaracterizes
8           testimony.
9                MR. HOLGUIN:  I may have.
10               THE WITNESS:  No.  I am talking about the CFS
11          on-site that is staffing cases with the leads and
12          some of the case managers, as well as the CCs who
13          staff the cases.
14     BY MR. HOLGUIN:
15          Q.   So the first acronym you mentioned was --
16          A.   CFS, contract field specialist.
17          Q.   And who does the contract field specialist
18     work for?
19          A.   GDIT.
20          Q.   And the second acronym you mentioned was CC?
21          A.   Case coordinators.
22          Q.   Was there a third one?
23          A.   I didn't mention a third one.
24          Q.   Oh, good.
25               So those are the people who are concerned with

Page 180

1    these reports that indicate how long certain children

2    have been detained; is that correct?  Did I

3    misunderstand?

4         A.   No.  I am just waiting to see -- I am trying

5    to --

6              MS. DAVILA:  Objection.  Vague.

7              THE WITNESS:  They are more attuned to that

8         report because they are there to staff the cases to

9         try to avoid the length of stay.  So they are very

10        focused on those reports, whereas to me, I, again,

11        deal with the case once the release is submitted.

12        So that is the difference in who really deals with

13        that report and why.

14             The CFS, the staffing and my supervisor who is

15        also on-site, they are very much attuned to that

16        list because they are asking what is going on in

17        these cases.

18   BY MR. HOLGUIN:

19        Q.   All right.  But you have seen the list

20   personally, have you?

21        A.   I have seen the lists, yes.

22        Q.   What do you recall seeing on the list?

23        A.   I just saw a breakdown for a Category 1 child,

24   and I think that they are looking at or they are

25   reporting -- the last one I saw, I think, was a 30-day

Page 181

1    in care report.

2              So what I saw -- again, it is not a report

3    that I focus on because I do the releases, but I saw

4    that it kind of says the child's name, how long they

5    have been in care, what category, and where they are at

6    in the process or what is holding the case up.

7         Q.   Does it indicate their ages?  Do you recall?

8         A.   I am not sure if there is a category for age,

9    to be honest with you.  I looked at the report.  That's

10   not a document that I use for what I do, which is the

11   releases.  But I know they exist.

12             MR. HOLGUIN:  I think that's all I have.

13             MS. DAVILA:  The government has a few

14        questions.  Would you like to take a break at this

15        point?

16             MR. HOLGUIN:  If you like.  We can.  It's up

17        to you.

18             MS. DAVILA:  Are you fine?

19             THE WITNESS:  I am fine.

20             MS. DAVILA:  We will go forward then.

21                      CROSS-EXAMINATION

22   BY MS. DAVILA:

23        Q.   Thank you very much for your testimony today.

24   We appreciate all your work and effort, and dealing with

25   the music outside that started this afternoon.  We

Page 182

1   appreciate that.

2          During your testimony, you referred to "influx

3   facility."  What is an influx facility?

4      A.   My understanding of an influx facility is a

5   facility that has the capacity to go up in capacity and

6   to go down.  So the specific time frame varies.  So it

7   is not a permanent shelter, meaning that the other

8   shelters have grant cycles and they get allotted X

9   amount of beds.  For influx, it can vary, and vary very

10  quickly.  It can ramp up, ramp down.

11     Q.   Are you finished answering?

12     A.   Yes.

13     Q.   Is Boys Town an influx facility?

14     A.   No.

15     Q.   Is His Place an influx facility?

16     A.   His House.

17     Q.   I'm sorry.  His House.

18     A.   No.

19     Q.   Is it an influx facility?

20     A.   No.

21     Q.   Is Homestead an influx facility?

22     A.   Yes.

23     Q.   How do you know?

24     A.   It is called Homestead Influx Facility.  I

25  have been there through different cycles where they have

Page 183

1    closed down, opened back up, ramp up, ramp down.  It's

2    dictated upon the number of children that are coming

3    into the country.  The numbers dictate it.

4         Q.    You mentioned the medical unit at Homestead;

5    is that correct?

6         A.    Yes.

7         Q.    To your knowledge, who staffs the medical unit

8    at Homestead?

9         A.    I believe -- and again, I don't work in the

10   contract area or in personnel.  I believe, it's CHSI.

11        Q.    Have you met any of the employees of CHSI who

12   work in the medical unit?

13        A.    I met the doctor in charge, on occasion.

14        Q.    Do you know the doctor's name?

15        A.    Dr. Patterson.  It's Chip Patterson, but his

16   real name is, like, Relford.  I know because I have

17   tried to e-mail him under Chip and nothing came up.

18        Q.    To your knowledge, does Dr. Patterson

19   prescribe psychotropic medications?

20        A.    To my knowledge, he does not.

21        Q.    To your knowledge, has anyone at Homestead

22   prescribed psychotropic medication?

23        A.    To my knowledge, no one is credentialed to do

24   that, no.

25             MS. DAVILA:  The government has no further

Page 184

1    questions.

2           MR. PINCHAS:  No questions from me.

3           MR. HOLGUIN:  I have nothing further.

4           Could we stipulate to having her sign the

5    transcript in front of any notary?

6           MS. DAVILA:  The errata will be provided to

7    us, and then 30 days later a signature before a

8    notary?

9           MR. HOLGUIN:  Yes.

10          MS. DAVILA:  Is that workable for you?

11          THE WITNESS:  That's fine.

12          MS. DAVILA:  Yes, that's fine.

13          Does that work for you?

14          MS. STEELE:  Yes.

15          MR. PINCHAS:  I have never seen a requirement

16   that it be signed before a notary.  Where does that

17   come from?

18          MR. HOLGUIN:  Well, as far as we're concerned,

19   if there is agreement that it can be signed under

20   penalty of perjury and used as though it had been

21   signed in front of the court reporter, it does not

22   matter whether it is in front of a notary or not.

23          MS. DAVILA:  I am not aware of the requirement

24   either, but I am fine either way.  The witness has

25   already sworn that her testimony is accurate.

Page 185

1           MR. HOLGUIN:  Then let's just have her sign.

2           MS. DAVILA:  That's fine.

3           MR. HOLGUIN:  If everyone is fine with that

4      being equivalent to having her sign in front of the

5      court reporter, then we're good.

6           MS. DAVILA:  Does that work for future

7      witnesses, and so forth?

8           MR. MOSS:  We can take it on a case-by-case

9      basis.  At least for this witness, we're fine.

10          MS. DAVILA:  Is there anything else we need to

11     cover on the record?

12          MR. HOLGUIN:  We said 30 days for the witness

13     to sign, correct?

14          MS. DAVILA:  Right.

15          MR. PINCHAS:  30 days from when?

16          MS. DAVILA:  From when we receive a copy,

17     right?

18          MR. HOLGUIN:  Right.  Is that acceptable?

19     From when you receive a copy, 30 days to sign?

20          MS. DAVILA:  That works for me.  Does it work

21     for you?

22          MR. MOSS:  Yes.

23          MR. HOLGUIN:  And if it's not signed within

24     that period, it can be used as though it were

25     signed?

Page 186

1          MS. DAVILA:  Yes, but we will let you know if

2      there are no changes.  That may be the reason for

3      no signature.

4          MR. HOLGUIN:  Even without changes, the

5      deposition ought to be signed at some point.  Is

6      that acceptable?  30 days --

7          MS. DAVILA:  After receipt.

8          MR. HOLGUIN:  After receipt.  Okay.

9          MS. DAVILA:  So we can forego the notary?

10         MR. HOLGUIN:  That's fine.

11         MS. DAVILA:  Record is closed.

12

13

14         (Thereupon, the taking of the deposition was

15     concluded at 3:25 p.m.  Signature and formalities were

16     not waived.)

17

18

19

20

21

22

23

24

25

Page 187

1    RE:        LUCAS R., et al. vs. ALEX AZAR, et al.
     DEPO OF:   ███████████
2    TAKEN:     THURSDAY, APRIL 25, 2019
3
                              EXCEPT FOR ANY CORRECTIONS
4                             MADE ON THE ERRATA SHEET BY
                              ME, I CERTIFY THIS IS A TRUE
5                             AND ACCURATE TRANSCRIPT.
                              FURTHER DEPONENT SAYETH NOT.
6
7                             _____,
                              ██████████████████
8
9    STATE OF FLORIDA         )
                              )  SS:
10   COUNTY OF _____     )
11
             Sworn and subscribed to before me this _____
12   day of _____, 20___.
     PERSONALLY KNOWN_____OR ID._____
13
14
                              _____
15                            Notary Public in and for
                              the State of Florida at
16                            Large.
17   My commission expires:
18
19
20
21
22
23
24
25

Page 188

```
 1                         ERRATA SHEET
 2    IN RE:          LUCAS R., et al. vs. ALEX AZAR, et al.
      DEPOSITION OF: ████████████
 3    TAKEN:          THURSDAY, APRIL 25, 2019
      JOB: 3267670
 4    DO NOT WRITE ON TRANSCRIPT - ENTER ANY CHANGES HERE
 5    Page #    Line #     Change              Reason
 6    _____/_____/_____/_____
 7    _____/_____/_____/_____
 8    _____/_____/_____/_____
 9    _____/_____/_____/_____
10    _____/_____/_____/_____
11    _____/_____/_____/_____
12    _____/_____/_____/_____
13    _____/_____/_____/_____
14    _____/_____/_____/_____
15    _____/_____/_____/_____
16    _____/_____/_____/_____
17    _____/_____/_____/_____
18    _____/_____/_____/_____
19    _____/_____/_____/_____
20    _____/_____/_____/_____
21    State of Florida:
      County of_____:
22
      Under penalties of perjury, I declare that I have read
23    my deposition transcript, and it is true and correct
      subject to any changes in form or substance entered
24    here.
      _____         _____
25    DATE                ████████████████████
```

```
1              CERTIFICATE OF OATH OF WITNESS
2    STATE  OF  FLORIDA    )
     COUNTY OF MIAMI-DADE )
3
4
5          I, ████████████, Court Reporter and Notary
6    Public in and for the State of Florida at Large, certify
7    that the witness,████████████, personally appeared
8    before me on April 25, 2019 and was duly sworn by me.
9
10   Signed this 1st day of May, 2019.
11
12
13
14
15
                   _____
16                 ████████████████  Court Reporter
17                 Notary Public - State of Florida
18                 Commission No. FF 977791
19                 Expires May 16, 2020.
20
21
22
23
24
25
```

Page 190

1                    CERTIFICATE OF REPORTER

2

3    STATE  OF  FLORIDA    )

     COUNTY OF MIAMI-DADE )

4

5            I, ███████████, Court Reporter, do hereby

6    certify that I was authorized to and did

7    stenographically report the deposition of ███████████

8    that a review of the transcript was not waived; and that

9    the foregoing transcript, pages 1 through 186, is a true

10   and complete record of my stenographic notes.

11           I FURTHER CERTIFY that I am not a relative,

12   employee, attorney or counsel of any of the parties, nor

13   am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16           Dated this 1st day of May, 2019.

17

18

19

20

     _____

21   ███████████, Court Reporter

22

23

24

25

Page 191

```
 1              Veritext Legal Solutions
             One Biscayne Tower, Suite 2250
 2             Two South Biscayne Boulevard
                Miami, Florida  33131
 3                  (305) 376-8800
 4    May 1, 2019
 5    ████████████████
      c/o Yamileth G. Davila, Esquire
 6    U.S. Department of Justice, Civil Division
      Ben Franklin Station
 7    P.O.  Box 878
      Washington, DC 20044-0878
 8    benjamin.m.moss2@usdoj.gov
 9    Re:     Lucas R., et al. vs. Alex Azar, et al.
      Depo of:  ████████████████
10    Taken:  Thursday, April 25, 2019
      Read and sign by:  June 3, 2019
11
      Dear ████████████████
12
           This letter is to advise you that the transcript of
13    the deposition listed above is completed and is
      available at this time for your reading and signing.
14
           Please call the above number to make an appointment
15    to come to the Veritext office closest to you to read
      and sign the transcript.  Our office hours are from 8:30
16    a.m. to 4:30 p.m., Monday through Friday.
17         In the event other arrangements are made, please
      send us a list of any and all corrections, signed and
18    notarized, noting page and line numbers and the reason
      for such changes, so we can furnish all counsel with a
19    copy of same.  If the reading and signing has not been
      completed prior to the referenced date, we shall assume
20    that you have waived the reading and signing of the
      deposition transcript.  Your prompt attention to this
21    matter is appreciated.
22              Sincerely,
23         _____
24         ████████████████, Court Reporter
25
```

**&**

**&** 2:4,15 7:7,12

**0**

**05741** 1:3

**1**

**1** 24:11 43:9 104:24
  146:15 147:8,8
  180:23 190:9 191:4
**10** 24:11 140:25
**100** 12:3 64:24
  128:7 132:23
  133:13 140:11
  161:9
**10:51** 51:7
**11** 178:2,3,4
**11-2-2018** 6:25
**1138** 2:17
**12** 9:10
**123** 50:3 53:7
**126** 6:25
**12680** 189:15
  190:20
**12:20** 117:1
**13** 55:11
**1301** 2:16
**14** 27:7
**15** 60:15 135:25
  157:22
**16** 135:25 189:19
**18** 35:19
**181** 3:12
**186** 190:9
**187** 3:13
**188** 3:13
**189** 3:14
**190** 3:14
**191** 3:15
**1984** 30:16,20
**1:18** 117:1

**1st** 189:10 190:16

**2**

**2** 1:17 43:9 74:24
  140:24 141:4
  146:18 147:9
**2,300** 49:22 53:7
  157:11
**20** 11:13,14 77:22
  103:14 107:10
  187:12
**200** 60:23
**2004** 26:25
**20044-0878** 2:11
  191:7
**2005** 26:25
**2006** 27:2 68:14
**2008** 68:23
**2009** 68:24
**2010** 68:24
**2012** 61:16
**2014** 27:2 155:1
**2016** 135:23,25
**2018** 118:22
**2019** 1:16 118:20
  187:2 188:3 189:8
  189:10 190:16
  191:4,10,10
**2020** 189:19
**2250** 191:1
**24** 42:15 43:6 44:1
**25** 1:16 187:2 188:3
  189:8 191:10
**256** 2:5
**26** 6:21
**28** 11:15 35:16,23
  112:3,6 176:13,20
  177:8
**28s** 176:9 177:6
**2:18** 1:3
**2:36** 166:9

**2:51** 166:10
**2s** 105:1

**3**

**3** 43:9 74:24,25
  75:1,12,17,17
  102:18 141:4
  146:21 147:2,3
  191:10
**30** 180:25 184:7
  185:12,15,19 186:6
**300** 2:22 61:12
**305** 191:3
**305-7100** 159:19
**3100** 1:17
**3267670** 188:3
**33131** 1:18 191:2
**376-8800** 191:3
**39** 35:24,25
**3:25** 1:16 186:15
**3s** 105:1

**4**

**4** 3:12 147:4
**40** 11:13,14,15
  35:16,23
**4:30** 191:16

**5**

**5** 24:11 140:24
**5:30** 157:18

**6**

**60** 177:23

**7**

**7516** 2:22
**75202** 2:17

**8**

**8** 178:6
**80** 50:11
**81** 49:20,21,25
  50:20 157:11

**85** 57:2 60:13
  137:25
**878** 2:10 191:7

**9**

**90** 57:2
**90012** 2:23
**90057** 2:5
**97** 30:11
**977791** 189:18
**9:34** 1:16

**a**

**a.m.** 1:16 51:7,7
  191:16
**abandoned** 41:2
**abandonment**
  25:23
**ability** 32:22
**able** 4:24 20:18
  43:6 69:17,21
  99:21 102:6 127:3
  128:3,3,8,18
  139:16 144:6
  158:18 159:17
  170:14
**abroad** 144:15
**abscond** 113:4
  114:13
**absent** 118:4
**absolutely** 45:5
  171:4
**abuse** 13:16 24:7
  25:13,19,20,25
  26:1 27:11,22 28:2
  28:6,18 31:10 41:3
  78:22 158:19
**abused** 24:15 41:1
  97:9
**acadia** 133:12,12
  169:21,24

[accept - appear]                                                    Page 193

accept  38:13 134:5
  134:19 135:12
acceptable  51:3
  185:18 186:6
accepted  135:4
access  21:6,7 69:10
  69:21 70:4,14
  71:19 72:7 158:13
  158:15 168:18,20
accommodate
  128:9
accompanied  51:21
accomplished
  42:12,25 120:16
account  49:1 87:8
  87:24 88:6 89:23
  90:6 112:25 115:17
  145:12
accumulate  108:4
accurate  5:17
  11:15 184:25 187:5
accurately  35:4
acronym  14:9
  28:25 95:10 124:12
  140:7 179:15,20
acronyms  13:10
act  23:10
action  7:1 190:14
  190:15
actively  88:15
actual  11:19 67:20
  72:16 100:24
ada  41:3,4
add  65:20 88:25
addenda  150:13
addendum  101:18
  150:9 174:4
addition  15:18 57:8
  82:12,17 122:2
additional  34:9,17
  88:12 95:5 115:24

administer  60:8
administered  150:7
administration
  142:5,16 143:1
administrative
  108:10,12
administrators
  172:14
adolescent  86:2,4
adult  76:11,21
  77:11 78:8,21
  117:25 118:2,8,24
adults  76:24 77:5
  82:5 159:3
advance  95:14
advise  191:12
advised  46:21
  95:14
affect  92:13 149:22
affiliated  126:24
affirm  4:3
afternoon  178:17
  178:18 181:25
age  55:11 171:23
  181:8
aged  80:14
agencies  36:19,22
  37:1 63:8,11 75:25
  103:1 105:24
agency  7:10 30:18
  30:25 32:2,14 77:4
  77:15 82:3 103:19
  107:2 110:25
ages  181:7
aging  178:8
ago  77:22 103:14
  131:8 156:3 169:16
agree  5:19,24 65:23
  65:24 66:1,3 84:10
  84:11,12,24 104:23

agreement  7:2
  184:19
agrees  141:24
ahead  7:8 117:3
ahlberg  58:25
aij  111:16,21 112:1
  112:10,12 177:7,10
air  61:23
al  1:5,9 187:1,1
  188:2,2 191:9,9
alejandra  17:22
alex  1:8 187:1
  188:2 191:9
allegation  26:12
allegations  27:11
  28:2,18
allotted  182:8
allow  79:9 173:25
allowed  156:7
  157:22
allows  60:10
americans  111:15
  111:20 126:19,24
  166:1,15,22 167:7
amount  35:8,9
  38:16 39:1 60:10
  60:17 109:1 139:15
  139:17 141:5
  177:18 182:9
amy  3:4
angeles  2:5,22,23
answer  4:22 5:1
  12:23,25 15:13,17
  17:17 25:19 35:3
  38:10 40:8,15 45:3
  46:13 49:16 57:5
  59:8 61:3 65:9 71:1
  71:5 72:9 76:10
  77:16 79:7,10
  81:17,25 87:20
  88:16 89:10 90:10

92:1 93:3 96:14
  97:1 105:7 106:23
  107:11,16 108:1,15
  108:18 113:11
  114:21 115:12
  117:7 119:12
  121:12 128:16
  129:19 131:9,14
  135:10 139:8 141:4
  142:23 144:13
  151:25 155:25
  158:10 161:1,3
  162:1,4 177:1
answered  27:13,23
  35:7 37:19 38:3
  40:12 60:22 77:12
  96:22 101:4 104:16
  107:22 115:20
  122:15 130:2
  133:23 145:13,14
  151:16
answering  5:9
  35:11 182:11
answers  4:20
antsy  116:18
anybody  30:24
  102:20 124:23
anymore  161:12
anyway  103:18
apart  22:1 33:22
  49:9 112:10 169:17
apds  164:22
apologies  123:8
apologize  170:20
appeal  102:8,9,10
  102:13,15
appealed  102:19
appear  14:14 16:15
  20:6 113:4 138:8
  150:13,14

**appearances**  2:1
3:1
**appeared**  189:7
**appears**  177:10
**apples**  103:22
105:19
**application**  43:5
44:2
**applied**  29:13
151:22
**applies**  76:12
**apply**  20:6 84:1
162:1 177:1
**appointment**
191:14
**appreciate**  181:24
182:1
**appreciated**  5:2
13:4 191:21
**appropriate**  26:2
**approve**  39:14
58:24 98:19 153:3
**approved**  156:22
156:23
**approves**  98:17
**approximate**  50:25
**approximately**
11:11,13,16 32:15
36:21 38:6 44:13
50:11 51:12 67:15
68:23 80:19 171:2
175:10
**april**  1:16 187:2
188:3 189:8 191:10
**area**  7:17,17 76:16
96:8 111:15 122:25
124:11 126:2 130:1
130:1 153:24
183:10
**areas**  38:11 143:9

**argument**  112:16
**argumentative**
107:5 114:5 148:9
**arm**  153:24 154:1
**arms**  128:3
**arrangements**
191:17
**arrive**  20:24 33:3
**arrives**  96:19 98:12
146:3
**asked**  27:13,23
35:7 37:19 38:3
40:12 77:12 96:22
101:4 103:5 104:16
107:22 115:20
122:15 133:23
145:13 151:16
170:20
**asking**  4:19 18:1
32:9 34:16 36:4,9
41:16 45:2 72:6
77:21,22 91:24
96:7 104:17,20
111:11,24 112:1,11
112:23 119:20
144:8 151:4,23
175:13 180:16
**aspect**  142:18
150:2 164:8
**aspects**  101:14,15
**assess**  20:2 32:12
90:5 146:1
**assessing**  13:17
14:25 15:15 22:2
88:7 89:12
**assessment**  13:11
22:23 32:3,11 64:9
90:5
**assessments**  22:25
23:1,11 36:20

**assigned**  38:15,20
38:21,24 157:7
**assist**  18:7 46:4
**assistance**  111:7,8
**assistant**  34:2
164:22
**assisting**  19:19
**assume**  52:10 77:2
191:19
**assumed**  127:4
**assumes**  7:7 39:16
58:13 106:16
**assuming**  147:7
**attempted**  115:16
116:1,2,13 171:15
171:15
**attempting**  20:10
**attend**  28:21 127:5
**attention**  148:5
191:20
**attest**  173:7
**attorney**  2:21
126:1,15,24 167:20
176:24 177:3,4,15
190:12,14
**attorneys**  5:19,19
112:10 126:9,19
**attuned**  178:25
180:7,15
**audio**  4:24
**aunt**  97:22 146:19
**authority**  148:16
**authorization**
95:13
**authorizations**
96:6
**authorized**  190:6
**automatic**  75:9,14
75:21
**automatically**
74:17 77:9 82:18

144:22
**availability**  55:22
55:23 56:24 57:9
83:21 136:7
**available**  56:16,18
60:16 97:19 111:7
111:9 191:13
**average**  107:13,18
109:16,21,23
177:17
**averages**  111:4
**avoid**  180:9
**awakened**  160:22
**aware**  4:13 9:13
21:5 22:8 24:6,17
25:13 27:20 37:3
37:11,16 41:11
48:16,18 54:3,23
55:24 56:5,10 58:1
58:8,9 61:4,6,10,20
61:25 62:2,5,17
67:20 68:7 74:16
76:11 78:9,18,19
78:20 82:2 83:25
91:14 92:23 95:8,9
103:19 106:15,19
107:13 109:23
110:4 112:9,18
121:3 124:23
130:20,21 141:11
151:11 153:11
156:14 157:2
160:17 164:5,7
165:19,25 167:25
184:23
**azar**  1:8 187:1
188:2 191:9

**b**

**bachelor's**  62:14
161:14

**back** 10:13 15:7 25:4 36:5 39:2 42:21 44:7 45:3 51:9 63:25 75:7 82:22 89:4 93:10 100:15,24,25 101:24,25 102:1 105:19 107:25 119:14 120:21 121:11 139:23 143:14 156:2 158:2 166:12 183:1
**backed** 152:14
**background** 30:3,5 82:14 161:15
**bad** 142:2 170:19
**badly** 148:6
**ball** 98:7
**base** 61:23 73:1 115:15 136:2,4
**based** 27:9 28:23 33:17 61:12 71:19 73:18 137:17 139:12 169:2
**basic** 4:14 51:24
**basically** 76:12 126:10 174:21
**basis** 20:20 90:19 128:22 130:13 185:9
**bathe** 157:9
**bay** 63:23
**bear** 44:6 143:8
**bed** 56:16,18 60:15 83:19,19 92:25 93:10 129:25
**bedroom** 83:12,16
**beds** 55:23 57:4 79:2 182:9
**beginning** 12:16 40:6 97:15 104:20

**behalf** 1:21 2:3,8 2:14,20 126:25
**behaving** 148:6
**behavior** 26:5 85:14,19,21 86:5 86:19 87:1,8,14,23 88:1,10 89:19 113:13,21 114:10 115:15 148:4 153:5 153:5 174:1
**behavioral** 150:25 154:23 171:13 174:3
**behaviors** 26:2,3 85:25 86:1,3 172:20
**beings** 42:18
**belief** 142:17
**believe** 12:2 21:20 25:3,6 28:12 30:11 43:2,3 47:18,23 48:8 54:6,21 55:2 56:11 62:12 64:24 68:17 73:21 95:13 101:9 102:14 103:1 103:2,11,22 104:1 104:19,20 105:20 107:16 108:6 109:17 112:20 118:11,17,21 120:25 125:9 127:15,16 128:6 130:5 133:1,10,11 133:12 134:10,17 134:18,23 135:4,7 135:24,25,25 136:7 138:17,17 140:6,10 145:14 150:9 152:4 152:21,23 156:6,7 161:6,21 162:19 167:18,20 168:24

169:21 170:11 183:9,10
**belongings** 83:20
**ben** 2:10 191:6
**benefits** 23:14
**benjamin** 2:12
**benjamin.m.moss2** 2:13 191:8
**best** 5:5 15:16 140:17
**better** 57:13 128:18 128:24 129:12 151:23
**beyond** 45:23 151:11
**big** 82:20
**bilingual** 144:1
**birth** 146:24
**biscayne** 1:17 191:1,2
**bishops** 63:1 68:3
**bit** 5:23 30:2 63:15 69:8 104:1 143:5 148:3 170:18 174:10
**blah** 116:20,20,20
**blame** 49:6
**blanket** 82:4,12
**blurred** 21:1
**board** 31:6
**booklet** 5:20
**border** 61:13 97:21 104:9,18 106:20
**bottom** 82:24
**boulevard** 1:17 2:5 191:2
**box** 2:10 19:18,18 29:8 115:13 168:13 168:22 191:7
**boys** 27:1 30:22 49:18 50:13,16

53:2,10,17 61:19 68:12,15 81:6 123:3,9,16 127:15 129:10,10 154:5,12 154:16,20,24 155:11,15 156:1,8 156:11,20,21 157:8 157:13,19 161:14 162:14 164:14 182:13
**break** 4:22 51:2 96:25 116:22 166:7 181:14
**breakdown** 93:13 162:11,12 180:23
**brief** 65:22
**bring** 53:14
**brings** 79:17
**brother** 59:25 60:3
**brushing** 154:19
**building** 52:5 53:13 130:5,7
**buildings** 129:15
**bumped** 105:2,10
**buzz** 53:12

**c**

**c** 191:5
**ca** 13:15 43:14
**california** 1:1 2:5 2:23
**call** 70:20 142:21 158:18 159:5,18,20 170:13 191:14
**called** 4:9 8:14 13:24 17:9 26:24 28:24 31:25 62:19 63:9 69:9 126:5 182:24
**calling** 159:25
**calls** 69:16 76:14 86:10,15 96:4 98:2

98:6 104:4,14
105:13 106:14
107:6 128:10,13
129:3 141:1 149:19
157:25 158:20
159:2,8,12,14
160:6 161:17
170:12 173:18
177:12

**calm** 116:20
**capacity** 54:24
56:12 57:3 59:17
60:16 61:12 103:5
134:4,17 182:5,5
**cards** 119:24
**care** 19:25 22:21
53:19,20 60:1
63:22 77:15 80:10
80:12,12,21,22,25
81:12,15,24 95:21
95:23 103:16
125:12,19,22,24,25
126:13 136:22
137:1,2,4,4,13,16
137:18 142:12
148:13 166:21
167:1,5 171:24
177:21,21 181:1,5
**caregiver** 41:4
73:22 97:9
**caregivers** 41:1
**cares** 80:17
**carlos** 2:6
**case** 1:3 6:22 10:10
10:10,17,19,24
11:18,18,19 12:20
12:21 13:8,21 15:4
15:16,16 16:17,18
17:10,12,24,25
18:7,7,8,10,16,21
19:1,2,10,11,12

20:2,18,20,20,25
21:10 26:24 34:1,1
34:6,10,10,18,20
34:20 39:12,12,20
39:25 40:2,5,5,5,9
40:15,15,16 41:12
41:20 42:8,11,17
42:17,23 43:21
44:7,9,11,14 45:4,5
45:8,10,11,15,24
46:1,4,8,17 48:6,6
48:14,15,16 49:10
50:5,18,25 58:16
58:17 59:3 60:6,7,7
60:25,25 61:1,2
62:16,17,19,21
63:4,9,18 64:1,5,16
65:10,13,14,20,21
65:23,25,25 66:5
66:12,19,21,22,22
66:23,25 67:1,2,5,7
67:9,13,23 68:4,10
68:13 69:5,7,10,12
69:12,15,17,18
70:9,10,10,11,16
70:17,18,19,21,22
70:24 71:1,3,6,7,14
71:17,20,20,21,23
71:24,25 72:2,12
72:17,20,21 73:5,9
73:9 77:25 78:23
78:24 79:21 81:3
83:8,8,15,15,25
84:8,8,10,11,15,15
84:22,23,24,25
85:1,11 87:18,18
87:22 89:17,18
90:2,3 91:24 92:3,6
93:4 96:25 97:1,5
97:18,18,25 98:9
98:11,13,14,18,20

100:7,20 101:24,25
102:2,7,18,21,23
103:15,15 104:3
105:2,3,6,7,10
107:14,14,17,17,19
107:24,24 108:4,7
109:1,6,10,10,12
116:5,6,8,16,20
121:15,21,22
124:14 125:17
128:22,22 138:7
143:13 148:14
161:5,8,16 162:6,9
162:15,21 163:2
165:12 171:16
176:1 177:18 179:6
179:12,21 180:11
181:6 185:8,8
**cases** 10:14 13:14
13:15,16 19:11,14
19:16 20:4,14,15
23:9 24:15,25
25:10,11,13,21
33:24 34:24,24
36:1,14,15,24 39:5
44:8,14,20,22 45:8
45:12 47:1,10,12
47:14 59:5 66:15
66:18,23 67:3
69:13 70:8 84:12
84:14 91:14,25
98:24 100:11 103:8
106:15,25 107:19
107:25 108:5 109:2
110:14,20,22
129:11 140:12,18
146:11 165:25
176:22 178:24
179:11,13 180:8,17
**caseworkers** 12:15
14:16 46:21

**cat** 102:18 104:24
**category** 43:9
74:24,25 75:1,12
75:17,17 102:16
146:15,18,21 147:2
147:3,4,8,8,9 151:3
180:23 181:5,8
**catholic** 49:18 63:1
68:3,14 123:3
**cause** 1:24 7:1
84:21 117:19
145:17
**caused** 91:4
**cc** 179:20
**ccs** 179:12
**census** 54:20,20
60:13 61:15 64:10
64:12
**center** 2:4 133:6,8
**centerforhumanri...**
2:6
**centers** 134:9,20
**central** 1:1 19:17
168:22
**certain** 42:12,18,25
43:21 52:11 74:21
138:13 139:15,17
180:1
**certainly** 113:14
**certainty** 71:5
173:9
**certificate** 3:14,14
189:1 190:1
**certificates** 146:25
**certify** 187:4 189:6
190:6,11
**cfs** 59:4 60:8
143:25 179:10,16
180:14
**chain** 29:6 131:17
131:18

**challenging** 170:15
**chance** 5:12
**change** 86:6,20
  87:14 118:13,16
  119:10 188:5
**changed** 50:25
  53:22 119:7
**changes** 5:14,16
  87:8 101:19 186:2
  186:4 188:4,23
  191:18
**characterize** 39:18
  71:18 82:13 160:1
**characterized** 54:7
**charge** 27:21 37:7
  62:10 94:22 123:10
  132:23 140:5
  183:13
**charities** 49:18
  68:14 123:3
**check** 43:14 139:16
**checked** 120:24,25
**checks** 161:15,23
  161:23
**chicago** 169:15
**child** 18:25 22:13
  22:15,20 23:7,9,24
  25:4 30:17 31:9,18
  32:1,11,14 33:4,11
  36:5 40:1,5,6,17,22
  41:1,2 48:10,13,14
  49:12 55:7,10,10
  55:20 56:7,17,23
  56:25 57:4,10,12
  57:16,21 58:2,12
  58:20 59:4,7,10,25
  60:11,17,24 67:10
  71:2 73:14,22 74:7
  75:20,23,24 76:21
  77:4,7,10 78:2,3,8
  78:15,21 81:1 82:2

82:6,19 83:2,9,12
83:19 85:7,12,13
87:9,12,15,16,19
87:19,24 88:8,13
88:14,19 89:9,12
89:24 90:25 91:7,7
91:11 92:5,15,15
93:4,7,9,10,10,12
93:21,25 95:15,17
96:19 97:8,14,16
97:20,23 98:7
101:8 102:13 103:1
103:18,20 105:22
107:2,3,8 112:3,12
112:15 113:1,20,24
114:12,13,14,16
115:16,22,25 116:5
116:12,16,19,21
119:11 125:17,21
126:2,10 127:1
130:18 133:10,11
134:1,5,6,11,15,19
135:4,6,12 136:8
136:12 137:11,12
140:15,18 141:21
141:24 142:11,13
144:15,17,22,25
145:4,7,19 146:3
147:15 149:2,7,9
150:21 151:14,20
152:1 153:11,12
154:23 155:14,19
157:21 159:6
165:19,23 166:24
167:2,3,4,19 168:2
169:18 170:14
171:11,12 172:4,16
173:3,5,6,8,16,21
173:25,25 174:3,5
174:14 175:2,4
176:12,18,20

177:20,21,23
180:23
**child's** 22:23 57:24
  83:1 85:19 87:23
  89:18 167:16
  176:23 181:4
**children** 8:6,10,21
  10:2 11:5 12:8
  15:19 18:12,13
  20:13 21:15,16,22
  22:1,3 24:15,22
  25:14,21 30:23
  31:1,3,13 32:22
  36:18 41:13,19
  46:3,8,22 49:17
  50:1,11 52:2,8 53:7
  53:8,21 54:11,22
  55:16,24 56:2,23
  57:13 61:12 65:2
  69:20 70:24 72:11
  75:25 76:5,8,23
  79:15,25 80:2,5,8
  80:15,17,20,24
  81:15,19 86:2,4
  90:5,16,17,18
  91:14 92:23 94:16
  94:17,20,25 95:21
  96:2,11 103:23,24
  104:8,12 105:21,22
  105:23 106:11,19
  110:23 111:8,15,19
  111:21 112:9,19
  115:9 122:4,13,25
  123:11,20,21,25
  124:25 125:10
  126:18 127:18,24
  127:25 128:9
  129:15 130:8,22,24
  130:25 133:2 135:1
  135:15 136:13,17
  137:8 140:13 141:9

141:11,14 142:6
143:18,19 144:19
148:5 152:18,19,24
153:19 154:8 155:3
155:11,23 156:4,8
156:11,14 157:3,8
157:11,13 158:15
159:2,12 160:11,21
161:2 163:7,15
164:1,19 165:5
167:12 169:22
170:4,5,22 174:6
175:6,10 176:4
177:2,6 178:9
180:1 183:2
**children's** 27:1
  43:23 61:18 86:5
  86:19 130:12 148:4
  153:5
**chip** 183:15,17
**choosing** 159:12
**chose** 137:12
**christmas** 21:20
**chsi** 10:18 17:5
  95:16,19 152:6
  172:14 173:14
  183:10,11
**circumstance**
  59:24 99:11 145:3
  146:3 167:8 177:5
**circumstances**
  65:24 100:4 102:2
  103:8 116:9 121:14
**cite** 111:3,5
**citizen** 79:24 80:2
**city** 7:20
**civil** 2:9,21 191:6
**clarify** 19:17 25:18
  34:8 78:13 117:23
**classes** 160:15

[classroom - continuous]                                                    Page 198

classroom  160:13
  160:18
clear  58:6
client  166:24
client's  166:16
clients  112:16
clinic  141:15,17,20
clinical  30:7 162:22
  165:10
clinically  87:13
clinician  90:12,24
  91:3 92:4 140:14
  151:9 174:2
clinician's  89:23
clinicians  22:25
  72:3 90:4,9,20,23
  142:21 164:22
close  50:23 61:5,8
  146:19
closed  62:5 183:1
  186:11
closeness  146:6
closer  60:3
closest  120:4
  191:15
  ▮▮▮▮▮  3:4 6:15,16
  6:18 129:17
collected  72:22
  119:15
collecting  13:18
come  10:13 17:5
  23:12 40:10 42:16
  43:18 49:8 57:9
  65:11 67:16,18,24
  81:19 87:15 97:6
  97:14,24 99:2
  100:11 104:12
  105:12 108:25
  120:21 148:4 152:9
  184:17 191:15

comes  40:1 49:10
  71:17,25 72:4 73:7
  82:22 97:20,23
  100:14,23,25
comfortable  35:11
  89:14 97:16 144:7
coming  31:14 32:5
  54:22 75:23 76:22
  76:22 103:25 166:8
  183:2
command  131:17
  131:18
comment  5:15
  105:19
commission  187:17
  189:18
common  86:4,13
  86:16 168:21
communicate
  143:23
company  11:25
  96:1 140:8
comparable  25:20
  25:22 52:21
compare  32:22
comparing  48:20
compelling  27:4
complaint  152:1,3
complaints  152:20
complete  13:11
  95:19 190:10
completed  36:14,15
  38:7 98:13 191:13
  191:19
completely  32:24
  143:25 144:13,19
complex  66:18
  69:13 70:8
compound  19:6
  66:16 77:1 88:3
  111:23 145:23

146:10 148:9
  150:23 176:8
comprehensive
  12:2
concede  106:10
  113:15
concern  79:19 83:1
  91:6,7 108:25
  109:7 118:6
concerned  41:8
  79:17 88:10 119:19
  179:25 184:18
concerning  73:11
concerns  38:1
  70:22,23 101:22
  102:3 120:14
concluded  186:15
conclusion  5:18
  104:5 106:14
  128:14
concurrent  147:21
  147:24
concurrently  148:1
conditions  10:2
  22:3 122:4,8
  123:24 128:20
conduct  18:10 26:7
  26:9,9 100:1
conducted  31:9,12
  32:3 36:1,2
conducting  33:14
  37:18
conference  62:25
  68:2
confusing  92:22
  150:24
confusion  99:19
conjunction  24:4
connected  190:14
consent  142:15,24
  143:7 144:8

consents  142:5
  143:3
consequence  149:2
  150:19 151:14
  155:14
consequences
  86:24 149:16
consider  59:21
  76:7 83:13 145:17
  146:7 172:16
consideration
  22:19 58:18 60:4
considered  70:25
  138:19 153:12
  154:10,20
considering  177:19
consist  127:7
constantly  13:17
constitute  136:25
constitutional  2:4
consult  21:3,11
  142:11
consulted  78:10
consulting  174:19
contact  13:8,10
  121:20 143:11
  154:4,6,20
contained  16:11,12
  171:14
containing  5:20
content  156:25
contest  102:5,6
context  99:22
  155:18
continue  23:24
  93:4 117:10
continued  3:2
  92:23 99:11
continuous  41:13
  41:18,23

[contract - custody]                                                                 Page 199

**contract** 9:5,6,7
12:4,10 21:19
37:23 46:12,12
47:2,4 51:17,18
62:20 63:7,10
68:16,17,19,25
69:1,2 111:13
132:15,23 133:16
135:6,7,15,21,21
153:8 166:5 169:22
179:16,17 183:10
**contracted** 36:19
59:5
**contractor** 26:23
27:7 95:8
**contracts** 12:7,7
26:17 132:24
136:10 138:5
**contractual** 29:25
37:6 90:10 111:12
153:7,7
**contributing** 83:22
**control** 42:23 45:24
46:1
**convey** 126:8
**convictions** 82:14
**coordination** 63:9
63:10 68:14
**coordinator** 17:10
17:12,25 19:1,2,11
26:24 34:1 39:12
60:6 62:18,20 64:2
64:3,4 67:1,1 68:10
70:11 73:9 84:8,10
84:15,24 85:1,11
89:18 90:3 101:25
**coordinator's** 67:9
**coordinators** 18:10
19:12 62:16,21
63:4 64:5,16 65:11
65:20 66:5,12,21

66:22,22 67:2,6,13
67:24 68:4 69:5,11
69:17,18 71:8,14
71:24,25 72:12,17
84:1 179:21
**copy** 29:8 72:16,20
73:1 101:2 185:16
185:19 191:19
**cor** 26:16 29:8
124:3,6,17 152:23
**corporation** 11:25
**corps** 136:3,5,6
**correct** 6:1 7:13
8:12,23 11:23 13:6
13:22 14:22 15:20
16:7 18:21 19:8,15
24:2,5 27:12 29:1
32:7 33:19 34:15
34:22 35:17 38:25
39:6,13 45:21 47:3
48:21 54:8 58:12
61:17 62:6 63:5
66:9 68:5 71:15
72:1 74:8 75:21
76:13 78:17 79:4
80:3 83:14 100:12
105:25 113:22
120:16,18 125:3
126:19 129:23
133:3,6 145:18,25
146:5,8 147:9
148:23 152:18
165:1,2 168:25
180:2 183:5 185:13
188:23
**corrections** 5:13
187:3 191:17
**correctly** 116:11
**cost** 136:8
**costs** 138:3

**cottages** 129:9
**counsel** 2:16 6:13
6:18 79:5 114:6
129:18 150:24
152:11 176:6
190:12,14 191:18
**counseling** 162:22
164:19,25
**counselor** 31:7
162:20,21
**counselors** 162:17
162:24
**country** 15:20
97:21 120:6 183:3
**county** 7:21 187:10
188:21 189:2 190:3
**course** 43:19 50:24
71:13 116:23 133:9
**court** 1:1 4:1,20
5:22 15:9 89:7
103:12,13 114:15
114:17 115:7,11
158:1,4 177:8,11
178:14 184:21
185:5 189:5,16
190:5,21 191:24
**court's** 6:24
**cousin** 146:20
**cousins** 146:22,22
**cover** 7:20,21 120:7
185:11
**coverage** 19:18
122:20 168:23
**covered** 20:16 50:2
50:3,7 63:18 64:10
123:7,13,22
**covering** 64:11
172:5
**covers** 120:6
123:15

**create** 76:8
**credentialed**
183:23
**credentials** 164:7
**crholguin** 2:6
**criminal** 31:4 74:21
82:14,20 114:10
115:1
**criteria** 20:6,7 23:9
23:17,19 40:24
55:16 75:5 80:18
83:25 91:9 97:12
97:12 112:24 134:1
134:3,6 135:11,13
136:20,22,24 137:7
137:17,18,21,23
172:7,9 174:11,22
174:23 175:1
**cross** 3:12 181:21
**cruz** 132:8
**cumulative** 27:24
37:20 96:23 101:4
107:23 115:20
122:16 151:17
**current** 7:6 12:4
32:23 54:14 68:4
117:15,17 174:18
**currently** 7:23 11:3
11:6 54:12,13,25
60:12 61:4 63:21
64:14 113:24
123:13 157:7
161:15
**custodian** 31:23
73:22 100:16 101:1
102:11,12
**custodians** 8:22
11:20 32:7 103:3
103:10 147:19
**custody** 23:24 24:8
24:16 25:4,14

76:21 81:19 82:19
85:12,20 87:9,24
92:12 95:1 97:23
99:11 102:12
103:23,25 104:13
105:21 106:11,19
109:16 112:17
113:1,25 114:1
**cv** 1:3
**cycles** 156:22 182:8
182:25

**d**

**d** 3:9 6:8
**d.c.** 124:21,22
127:10
**dade** 189:2 190:3
**daily** 61:13
**dallas** 2:17
**danger** 91:10
**data** 33:18 58:16
69:20,24 108:17
109:11 114:21,23
115:5,5
**databases** 120:23
139:2
**date** 1:16 68:11
118:17 119:4
139:13,14 188:25
191:19
**dated** 190:16
**dates** 68:21
**david** 2:23 117:3
**davila** 2:11 3:12
6:9,13 8:3 14:18
15:7,10 19:5 27:13
27:23 34:12 35:7
37:19 38:3 39:15
40:12 43:24 44:17
47:20 49:15 50:12
51:4 52:24 56:9,19
58:13 63:6 64:6

66:16 69:22 73:15
73:23 76:14,25
77:12,19 78:11
79:5,9 81:20 82:7
83:6 86:9,14 87:2
87:10 88:3,22 89:8
89:20 91:17 93:22
96:3,22 98:1,25
99:15 101:3 104:10
104:14 105:13
106:1,13,21 107:6
107:22 108:14
109:3 110:1,5
111:10,22 113:17
114:3 115:19
117:12 121:5,18
122:6,15 124:13
125:14 128:10
129:2,16 131:4,13
132:12 133:23
139:3,20 141:1
142:1,7 145:13,22
146:9 147:10 148:8
148:17,24 149:4,18
150:23 151:16
152:11 153:14,25
157:24 159:8,14
160:3 161:17 162:3
163:9 165:16 170:8
173:18 176:7
177:12 178:12,15
179:7 180:6 181:13
181:18,20,22
183:25 184:6,10,12
184:23 185:2,6,10
185:14,16,20 186:1
186:7,9,11 191:5
**day** 11:13,14,15
35:18,20,20,21,22
36:10,11,12,24
45:19 59:20 136:9

168:9 180:25
187:12 189:10
190:16
**days** 38:14,23
57:20 58:11 60:2
60:23 97:17 177:22
177:23 184:7
185:12,15,19 186:6
**dc** 2:11 191:7
**dcf** 27:16 31:24,24
101:8 161:23
**de** 132:8
**deal** 10:12 29:25
45:11 48:18 95:3
96:5,12 98:3
105:24 112:8,8
120:11 124:3
128:24 132:24
136:10 138:5
142:17 144:25
155:7 158:22 161:9
164:8 166:5,6
176:23 177:3
180:11
**dealing** 20:13 53:7
67:4 75:4 106:4
116:6 181:24
**deals** 28:1 95:8
124:8,9 149:20
180:12
**dealt** 63:9 78:5
176:24 177:4
**dear** 191:11
**decide** 22:19 23:23
59:10
**decided** 21:11
34:24
**decides** 55:6
101:21
**deciding** 23:4
173:4

**decision** 11:17,17
12:17 16:18 19:4
23:15,16 33:17,23
34:11 39:2,4,6
58:20,23 59:18
66:8 73:2 77:7
83:17 84:6 85:20
89:16 100:12
107:15 109:2
120:15 133:9
138:11 143:16
159:7 171:10 172:3
**decisions** 8:21 11:5
11:11 19:21 21:10
33:8 35:10,15,23
59:22 123:11
144:14
**declare** 188:22
**decline** 91:4 112:19
**declined** 91:5
**declining** 73:13
165:24
**decreased** 109:24
**decreasing** 110:11
**deem** 86:3
**defendants** 1:10
**defender's** 31:7
**defines** 61:10
**definitely** 74:24
119:5
**definition** 114:1
**degree** 30:6 62:14
161:14
**degrees** 62:22
90:23 149:6,7
**delay** 44:10,11
**delayed** 45:13
**delays** 121:4
**delegated** 22:9
**delegates** 55:17

**delivery** 43:4
**delve** 6:9
**deniable** 92:19
**denial** 74:15 75:20
  75:21 85:11 100:17
  100:19,22,25 102:7
  102:7,8,15,16
  104:23 105:2
**denied** 73:5,6
  102:12,19 112:21
  135:15
**denies** 74:3
**deny** 74:3 75:2
  84:18 91:11 103:20
  105:6 115:25
**denying** 82:4
**department** 1:8 2:9
  2:15 7:6,12 27:18
  53:21 128:19
  130:18 191:6
**departure** 137:12
  167:3
**depend** 44:22
**dependency** 103:13
**dependent** 53:19
  89:17
**depending** 54:19
  54:22 97:18 141:22
**depends** 29:6,11
  40:4,7 56:12
  101:20 116:8
  177:20
**depo** 187:1 191:9
**deponent** 187:5
**deposition** 1:12,24
  3:11 4:14,15 5:11
  5:18,25 6:15
  117:11 186:5,14
  188:2,23 190:7
  191:13,20

**describe** 7:5 8:18
  13:2 170:10
**described** 79:21
**designate** 144:23
**designated** 144:21
**designation** 144:20
**detailed** 14:1
**detain** 136:8
**detained** 22:13
  46:3 60:18,24
  123:21 127:1,18
  142:9 159:6 180:2
**detainee** 153:4
**detainees** 25:15
  164:10
**detention** 57:24
  58:2,4,5 88:21
  148:6 165:4,14
**determination**
  83:23 102:5 113:21
  115:18 171:17
**determinations**
  20:12
**determine** 18:1
  113:20
**determined** 79:1
  91:15 93:25 171:25
**determines** 101:15
  102:3 139:11,14
**determining** 83:13
  112:25 113:19
  114:18 122:13
  137:11 151:22
**developing** 78:7
**devito** 17:22
**dialect** 164:1
**dictate** 183:3
**dictated** 57:1 183:2
**dictates** 136:25
**diem** 136:11

**dietician** 156:22,25
**dieticians** 156:23
**differ** 80:13 87:19
**differed** 63:17
**difference** 33:15
  37:14 66:25 104:2
  107:4 136:21
  138:24 157:12
  180:12
**differences** 18:3
  37:11
**different** 18:5
  29:13 31:25 32:24
  32:24 33:8 37:12
  42:15 43:10 46:11
  48:15 49:22 60:8
  62:20 63:15,16,21
  63:24 73:17 79:18
  90:12 100:9 102:16
  104:25 105:22
  106:3,5 107:1
  114:23 115:11
  127:8,9 136:23,25
  137:2,10,16,18
  149:9,11,24 158:25
  174:10,11,23 175:1
  175:14 182:25
**differing** 106:5
**differs** 49:8
**difficult** 20:25 35:3
  61:3 77:23 143:9
**difficulties** 127:24
**digital** 119:16,17
**dilatory** 45:8
**diligent** 44:23
**dipel** 124:8,12
**direct** 3:12 4:11
  34:3 132:2
**directed** 121:16
**directive** 163:11,14
  163:23

**directly** 112:18
  125:22
**director** 27:1,2
  34:2 49:20 61:18
  68:12 154:13 164:6
  164:23
**directors** 164:23
**directs** 13:21
**disabilities** 127:19
  127:22 128:2,9
**disagree** 84:14 85:1
**disagreed** 84:17
**disagreement**
  84:21
**disaster** 124:13
**disciplinary** 149:15
**discipline** 150:6,16
  151:21,22
**disclose** 40:6
**discloses** 40:6
  97:21
**disclosing** 97:17
**discovered** 155:15
**discretionary** 41:6
  85:24
**discuss** 79:22
  149:11 151:4,10
  173:1
**discussed** 6:11,14
  96:24 97:2 101:12
  107:16
**disposal** 149:17
**disqualification**
  75:9
**disqualified** 76:17
  76:20
**disqualifier** 75:14
**disqualifiers** 82:15
**disqualify** 74:17,22
  77:5 82:18 83:4

**disrespecting** 151:5
**distant** 146:7,23
**distinction** 105:20
**distinguish** 17:24
**distress** 165:14
**district** 1:1,1
**division** 1:2 2:9,21
  191:6
**dmg** 1:3
**doctor** 128:23
  142:23 164:7
  183:13
**doctor's** 183:14
**document** 13:20,24
  29:16 42:19 65:18
  65:19 110:16
  181:10
**documentation**
  13:12 98:15
**documented**
  119:20
**documents** 13:19
  13:25 42:21 43:10
  177:22
**doing** 11:7 21:24
  32:21 33:1 42:8,11
  63:5,18 142:24
  143:7 144:7 155:19
  173:10 178:23
**dorms** 129:23,24
  129:25 130:3
**dr** 3:4 6:15,16,18
  129:17 183:15,18
**driven** 54:20 57:17
  57:19 61:14 82:23
**driver** 83:22
**drop** 147:24
**due** 22:6 45:23 74:2
  128:6 167:5
**duly** 4:9 189:8

**duties** 8:18 11:4
  43:19 131:10
  140:22
**dwindle** 61:7
**dynamics** 17:13,15
  132:11,19

**e**

**e** 2:6,12,13,18,20
  2:23 3:9 6:8,8 17:2
  17:4,5,6 44:10 45:1
  59:6 65:13 70:20
  109:17 111:4
  167:22,23,24 168:9
  168:13 172:15,18
  174:17 183:17
**earlier** 6:11,14 48:8
  125:9 133:1 141:13
  146:16
**earliest** 97:5
**early** 97:10,11
  121:21
**easy** 176:1
**eat** 157:14,22
**ecf** 6:25
**education** 160:10
**educational** 30:5
**effect** 167:22
**effects** 88:20
**efficacy** 164:18,25
**effort** 181:24
**efforts** 41:13,18,23
**eight** 11:2 46:11,20
  50:21 60:2
**either** 16:22 21:10
  27:7 33:25 54:23
  70:20 95:14 119:16
  120:12 123:12
  135:2 138:6 141:19
  157:18 175:3
  176:14 177:3
  184:24,24

**electronic** 16:21,23
  16:25
**elevate** 70:16,18,19
  118:6
**elevated** 28:6
**eligibility** 92:11
**eligible** 56:17
**elope** 171:15,15,19
  171:21
**emphasis** 10:12
**employed** 10:18
**employee** 9:13 27:7
  49:2 61:19 62:23
  173:14 190:12,13
**employees** 11:21
  183:11
**employs** 17:12
**encouraging** 168:2
**ends** 55:21
**enforce** 7:2
**ensure** 20:2
**entail** 167:5
**entailed** 167:21
**enter** 65:15,18 67:3
  188:4
**entered** 72:5
  188:23
**entire** 7:20
**entirely** 26:21
**entity** 108:22
**entry** 52:10
**environment** 57:14
  76:8 174:14
**episode** 93:5
**equal** 147:7
**equipped** 128:24
  129:6,12
**equivalent** 185:4
**errata** 3:13 184:6
  187:4 188:1

**escape** 115:16
  171:21,22
**esquire** 2:6,11,12
  2:18,23 191:5
**essence** 4:18
**essentially** 32:5
  174:25 175:1
**estimate** 34:25 35:6
  111:18 120:9,19
  140:17 177:17
**et** 1:5,9 187:1,1
  188:2,2 191:9,9
**evacuation** 124:10
**evaluate** 32:6,8,22
  145:20 147:18
**evaluated** 86:24
  89:25
**evaluating** 14:16
  15:23 31:22 33:7
  87:23,25 89:18
  148:1
**evaluation** 76:13
  147:17,18 163:4
  164:24
**evaluations** 23:2
  163:3
**event** 191:17
**events** 113:21
**evidence** 7:8 39:17
  58:14 88:23 106:17
  112:15 166:16,19
  166:20,23 167:6,16
  168:1 173:16
**evolving** 143:3
**exact** 96:24 118:17
  119:4 161:3
**exactly** 26:18 90:22
  102:24 167:21
  170:3 179:1
**examination** 3:12
  3:12 4:11 181:21

[examined - file]                                                     Page 203

examined 4:10
example 17:21
  22:13 44:1 49:19
  52:7 59:20 60:23
  61:22 70:3 91:20
  95:24 145:20 151:6
  151:12,12
excuse 10:11 158:1
  170:17
exercise 21:9
exist 133:18,20
  181:11
existed 118:13
existence 134:21
existing 82:5
expand 54:23
expanding 55:2
expansion 55:4
expect 52:23 97:24
expected 54:17
expecting 113:7
  114:20
experience 10:3
  12:22 22:3 24:24
  32:21 37:10 42:4
  48:19,21 49:12,21
  49:22 52:20,23
  62:14 75:24 76:3
  86:5,19 87:14
  110:19 124:25
  134:13,15 161:13
  162:14
experienced 165:20
experiences 87:18
expert 6:21 89:1
  129:3
expertise 76:17
expired 138:25
expires 187:17
  189:19

explain 7:5 12:14
  99:18 173:25
explains 116:19
explanation 14:2
explore 145:7,9,15
explores 28:6
exploring 15:15
expressing 108:25
extended 137:11
  148:7
extent 7:21 71:3
  86:1 105:17 159:16
  177:11
extra 18:6 19:1
  122:21
eye 127:25
eyes 18:6 19:2
  114:23

f

facilitate 10:8
facilities 8:1,5
  15:19,22 53:25
  54:10 57:5 60:16
  127:13 134:8 135:2
  170:6,23 173:24
  174:7 177:2
facility 8:10,14,25
  9:1,2,24 10:3,20
  25:14 27:12 31:3
  31:18,19 50:3
  51:14 52:3,11 54:8
  54:17 55:7,8 56:8
  56:16,18 58:5
  59:11 62:2 63:23
  64:10 86:21 90:4
  92:25 93:2 97:14
  127:14 133:12,15
  133:16 134:2
  135:22 153:13
  156:12,15 162:7
  166:24 169:24

170:11,11,13,14
  171:11 172:4,8
  175:9,12 182:3,3,4
  182:5,13,15,19,21
  182:24
facing 8:10
fact 7:7 44:21
  78:25 79:23 129:7
  151:8 173:11
factor 23:23 83:10
  83:13,22 114:18
factors 20:16 22:18
  57:8,9 88:9 114:7
  137:10
facts 39:16 58:13
  88:22 106:16
factual 116:16
  129:6
fail 44:20
failed 44:15
fair 21:9 25:12 64:1
  73:20 89:16 96:17
  139:19 153:2
  158:13 174:22
faith 126:1,4,6,7,25
  166:19,21 167:11
fall 151:3
familiar 8:9 38:21
  46:14 50:9 51:24
  55:6 62:21 78:23
  78:24 86:23 109:15
families 41:14
  53:22 80:8 81:14
  107:9 158:18
family 13:9,13 27:3
  33:11 42:14 43:4
  44:2 75:20 78:15
  86:7 88:12 103:6
  103:24 104:9
  142:21 146:6,12,13
  146:19 165:4

fanny 1:22 189:5
  189:16 190:5,21
  191:24
far 60:4 137:16
  139:18 169:6
  184:18
fault 45:4
favor 112:16
fbi 120:25
february 175:20
federal 7:9,10 9:22
  30:4 61:19 62:10
  87:7 140:9,10
feedback 33:25
feel 4:21 33:24
  35:11 76:10 92:1
  96:8 107:11 117:19
  135:16 144:7
feet 128:6
felt 48:7 84:19
fence 52:17 53:11
ff 189:18
ffs 18:9 19:13,14,18
  19:19,20 20:8 25:3
  26:21 29:8 39:4,12
  58:25 98:16 102:1
  122:17,20 123:7,17
  127:4 131:10 159:1
  159:4 168:20
  169:12 172:5
ffss 20:3 58:23
  108:5 112:24
  131:11 168:18
  169:9
field 7:9 9:22 26:24
  30:4 59:5 62:10,15
  63:10 64:3,4 87:7
  179:16,17
file 16:17,20,21,23
  16:25 172:19,22
  174:18 177:7

**[files - gates]**  Page 204

**files**  151:25 179:5
**final**  19:4 100:25
**financially**  190:15
**find**  38:9 44:14
  74:14 79:22 121:22
**findings**  101:12
**fine**  51:4 181:18,19
  184:11,12,24 185:2
  185:3,9 186:10
**fingerprint**  117:19
  119:22,23,24,25
  120:11,17 121:4
  139:5
**fingerprinted**
  13:14 117:21 118:9
  118:10,24,25
  119:19,21 138:8
  139:19
**fingerprinting**
  117:18 118:4
  119:13 120:15
  121:20 138:10,23
  139:7 140:5 161:22
**fingerprints**  43:12
  43:15 44:25 117:14
  117:15,21,24
  119:14 120:21,23
  121:10,13,15,17
  138:13,16 139:1,2
  139:5,12,24,25
**fingers**  128:7
**finish**  79:7,10,12
  108:15
**finished**  157:16,16
  182:11
**finite**  40:8
**firm**  38:9
**first**  4:9 36:7 39:23
  40:9 51:17,17
  56:11 96:19,20
  138:10 146:7,12,19

**146:22 175:15
  179:15
**fit**  73:22,25 135:16
**five**  9:9 25:1,9,21
  51:2 156:22 171:5
  177:24
**fixed**  130:14
  138:20
**flat**  129:10 130:1
**flatly**  15:2
**flavors**  156:24
**flight**  112:20,22,24
  113:3
**floor**  79:3 129:12
  129:23,24 130:6,7
  130:8,9
**floors**  130:4
**flores**  7:2
**florida**  1:18,23
  7:19 53:24 54:1
  169:13 187:9,15
  188:21 189:2,6,17
  190:3 191:2
**fluent**  143:24
**focus**  10:11 158:6
  181:3
**focused**  180:10
**follow**  12:25 14:16
  15:5,5 16:2,7,10
  19:22 20:1,11,20
  23:8 24:22 37:18
  41:12 42:19 44:20
  46:6 73:4,11
  161:21
**following**  16:8 24:1
  24:8,16 44:24 51:7
  78:2 90:25 91:1
  117:1 166:10
**follows**  4:10 39:11
**food**  79:3 157:6

**force**  61:23
**forego**  186:9
**foregoing**  190:9
**forensic**  31:8
**form**  20:24 110:17
  111:4 142:16 143:4
  188:23
**formalities**  186:15
**forms**  14:2 142:18
**formulate**  99:20
**forte**  27:8
**forth**  146:8 185:7
**forthcoming**
  157:21
**forward**  19:3
  181:20
**forwarded**  29:7
**forwards**  29:3
**foster**  31:14,16
  59:25 63:22 75:25
  76:3,9,12,18 77:15
  80:8,10,12,12,17
  80:20,22,25 81:12
  81:14,15,24 125:12
  125:19,22,23,25
  126:13 137:4,4,13
  166:21 167:1,5
**foul**  149:10
**found**  10:24 75:19
**foundation**  58:14
  73:24 81:22 96:4
  104:15 107:7
  111:10 121:6
  128:11 131:12
  132:12 142:7
  157:25
**four**  7:16 9:9 25:6
  25:11 51:13 95:20
  115:16 138:17
**frame**  182:6

**franklin**  2:10 191:6
**free**  14:3 94:22
  130:21
**frequency**  45:20,22
  169:12
**frequently**  65:6
**friday**  191:16
**friend**  177:11
**friends**  177:8
**front**  103:12 184:5
  184:21,22 185:4
**frp**  13:9 63:20
**full**  6:6 8:15 11:24
  69:2
**fully**  87:20
**function**  22:5 63:13
  145:17 160:24
  162:20
**functioned**  63:3
**functioning**  68:10
**functions**  22:9
  27:10 64:5
**fundamental**  23:22
**furnish**  191:18
**furniture**  155:20
**further**  43:10
  183:25 184:3 187:5
  190:11
**future**  112:22
  113:9,13,21,21
  114:2,22 185:6

**g**

**g**  2:11 112:3,6
  176:9,13,20 177:6
  177:8 191:5
**gain**  52:10
**gang**  55:14,20
**gate**  53:5
**gatehouse**  53:3
**gates**  52:17

gather 18:22
gathering 11:19,21
  13:22 174:18
gdit 17:13,15 18:15
  62:23 63:5,13 64:5
  64:16 68:7,9,20
  69:2,19 84:4
  179:19
general 2:16 12:22
  14:24 17:13,15
  26:9 30:15 40:4
  76:11 131:11
  132:10,19
generalization
  106:9
generally 12:14
  13:2 23:21 120:3
generate 154:22
generated 152:6
generic 14:6
geographic 7:17,21
geographically
  67:21
gestures 89:13
getting 42:19 63:20
  119:19
girl's 154:19,19
girls 55:13 129:10
  154:16
give 4:4 11:24
  13:12 17:21 38:9
  40:14,18 66:17
  69:4 84:6 96:7 97:1
  99:22 101:9,11
  117:7 136:16
  140:21 144:16,16
given 67:10 136:13
  145:5
gives 58:11 136:15
giving 119:3

go 7:8 8:24 9:2,4,12
  9:24 10:6 13:21
  19:16,17,20 30:24
  33:2 38:9 41:9
  43:11,15 51:19
  53:11 64:20,23
  65:2 78:3 87:17
  103:12 104:24
  105:1 114:17
  115:11 116:8,24
  117:3 119:16,20
  125:21 141:22
  145:8 160:14 161:2
  171:19 181:20
  182:5,6
goal 33:4,6,8,9
  43:16 87:11
goals 43:8
goes 12:16 19:1
  28:7 29:7 56:25
  93:10 101:24
  125:17 131:18
  152:22 168:15
going 4:14,18 10:7
  26:17 33:9 53:4
  56:7 66:20 70:9
  77:19 80:16 83:9
  91:24 99:21 105:19
  113:15 114:1,2,15
  115:7,8,15 116:5
  119:22 121:16
  131:17 137:13
  139:24 144:22
  147:20,23,24
  160:20 161:6 167:4
  174:5,12 180:16
gonzalez 11:10
good 4:13 44:22
  126:1,4,6,7,25
  143:25 166:18,21
  167:11 169:7

179:24 185:5
gotten 92:3 167:15
government 6:13
  6:22 132:18 140:9
  140:11 181:13
  183:25
government's 6:16
grandmother
  31:21,23 32:4 78:3
grandparents
  146:20
grant 27:4 153:9
  182:8
greater 52:22 84:7
grievance 152:1,3,5
grievances 152:6
  152:19,23
ground 130:8,9
group 31:2,3 51:22
  53:23 90:18
grow 54:17
guard 53:5
guardhouse 53:9
guardians 146:16
  146:17
guess 35:1 59:8
  99:9 124:9
guessing 171:5
guesstimate 66:20
guidance 20:21,23
  20:24
guidelines 20:20
  42:18,24 43:7,22
  44:16 74:10

**h**

h 6:8
hair 154:19
hand 4:2 43:16,16
  173:21
handle 19:14 39:5
  47:15,17 85:25

128:18 139:5
  170:14,16
handled 176:22
handling 163:25
hands 64:4,13
  127:10,11 154:11
happen 4:15 59:13
  66:14 91:22 100:4
  114:13 116:18
  137:22 142:14
  147:23 148:19
  158:9 167:9 175:21
happened 138:14
  138:15,23 158:8
happening 4:19
happens 24:10
  55:12 93:14,15
hard 135:10
harm 88:19 90:25
  91:1 149:7
hats 156:5,9
head 4:25 161:11
headquarters 73:7
  102:10,20
health 1:8 2:15 7:7
  7:12 12:2 91:11
heard 24:17,23,25
  25:21,24 41:17,22
  41:24 46:25 47:2,5
  47:22 48:4 55:4
  148:19,19 156:16
hearing 103:10,21
hearings 104:21
  113:5
heart 127:24
held 8:6 70:1
  167:12
help 34:11 88:12
  122:21,21
hey 59:6 69:15
  159:18

**hhs**   2:14 29:11
**hhs.gov**   2:18
**hierarchy**   132:1
   146:5 147:6
**high**   35:9 45:12
   48:19,20 50:17
   67:5 127:2
**higher**   49:4 50:4
   60:13 64:13 110:7
**hilda**   17:22
**hire**   161:11
**history**   30:20
   114:24,25 115:1,1
**holding**   181:6
**holds**   88:14
**holguin**   2:6 3:12
   4:12 6:12 7:4 8:4
   14:20 15:12 19:7
   27:19 28:8 34:14
   35:14 37:25 38:5
   39:22 40:20 43:25
   45:6 47:24 49:23
   50:15 51:2,5,9,10
   53:16 56:14 57:7
   58:19 63:12 64:15
   66:24 70:2 73:19
   74:5 76:19 77:8,17
   78:6,16 79:11 82:1
   82:11 83:11 86:12
   86:18 87:5,21 88:5
   89:4,15 90:7 91:18
   93:23 94:5 96:16
   97:4 98:10 99:1,18
   99:24 101:6 104:6
   104:11 105:9,18
   106:7,18,22 107:12
   108:2,20 109:14
   110:3,9 111:17,25
   113:18 115:14
   116:10,23 117:3,10
   117:13 121:7 122:1

122:10,23 124:16
125:16 128:15
129:13,21 131:5,16
132:17 133:25
139:10 140:3 141:7
142:2,4,8 145:16
145:24 146:14
147:14 148:15,21
149:1,14 150:3
151:1,19 152:14,16
153:17 154:3
158:12 159:10,22
160:7 161:25 162:5
163:13 165:18
166:7,12,13 170:9
173:23 176:11
177:16 179:3,9,14
180:18 181:12,16
184:3,9,18 185:1,3
185:12,18,23 186:4
186:8,10
**home**   23:11,17,18
   23:18 30:22 31:2,3
   32:13,15,22 33:1,2
   33:3,14,16 34:23
   34:25 36:1,2,3,4,6
   36:8,12,13,15,17
   36:20 37:1,4,7,12
   37:14,17,18,23
   38:2,6,12,13,13,17
   39:3,10,13,20,24
   40:10,16,22 41:5,5
   41:6 53:23 66:6,7
   75:6 77:6 78:2,24
   79:1,2 82:22 85:24
   92:14,17,20 96:18
   96:20 97:6,24
   98:11,14,15,17,19
   98:22 99:12 100:1
   100:6,7,12,14,19
   100:21,23,25 101:2

101:10,11,14,18,19
101:20,22 103:2
117:20,21,23 118:4
121:23,25 138:3,5
138:21 149:23
**homes**   31:14,16
   76:1
**homestead**   7:25 8:2
   8:7,9,16,19,24 9:1
   9:2,4,8,14,24 10:3
   10:6,20,25 11:22
   12:1,8 15:18 17:25
   19:18 21:14 22:4,5
   22:7,8,24 26:16,19
   27:12,22 28:19,24
   29:3,9,22 35:2
   36:18 44:13,15
   46:4,5,9,11,15,22
   48:17 49:1,2,8,13
   49:17,25 51:11
   52:18,21 54:3,7,14
   54:16,19,24 55:7
   55:11,17,21,25
   56:3,7,11,17 58:3
   58:12,21 59:1,2,6
   59:11 60:2,11,20
   60:24 61:5,8,8
   62:21 64:20 67:24
   81:1,7 86:6,21,25
   87:25 90:9 91:15
   92:24 93:5,11,13
   94:21,21 95:4,15
   95:22 96:20 110:22
   111:8,19 112:9,15
   115:23 122:5,14,20
   123:1,14,21,21,22
   123:25 124:25
   125:7,11,17,22
   126:18 127:1,18
   128:8 129:15 130:4
   130:12,22 133:3

135:19 136:1,9,12
136:13,18 137:6,8
137:20 140:13,21
142:9,20 143:4,18
143:20 148:4,6,14
148:16 149:3,16
150:21 151:15,21
152:2,4,5 153:5,12
155:5,23 156:4,14
157:3,23 158:7,15
158:21 159:2,5
160:11,18,22,24
161:5,16,20 162:2
162:7,17 163:7,18
164:2,4,10,11,20
164:25 165:5,21
166:2,24 167:8,12
167:17 168:3,8,13
168:16,22 169:6,11
170:22 175:6,11
178:10,22 182:21
182:24 183:4,8,21
**honest**   68:21
   162:13 168:4
   173:22 181:9
**honestly**   17:18 37:2
   55:5 68:8 72:9
   96:11 105:4,7
   113:2 119:4 136:16
   152:21 155:25
   163:1 164:5 175:22
   176:10
**honesty**   92:2
**hope**   42:14 101:13
**hopefully**   138:22
**hospital**   31:5 93:17
   94:2,6,7,8,14,14,15
   141:12,19 142:22
**hospitalization**
   91:19 95:20,24

**hospitalized**  91:10
92:24 93:1 94:1
95:18
**hotline**  29:5 158:19
**hour**  169:7
**hours**  42:15 43:6
44:1 51:13 95:20
191:15
**house**  50:2,6,8 53:2
53:3,9,18 74:17
79:3 81:6 82:21
115:6 123:3,6,7
129:9 164:14
182:16,17
**housed**  60:11 122:4
123:11 124:18
**household**  74:23,23
74:24 83:22 117:16
117:20,25 118:1,2
118:9,24
**hr**  127:9
**huge**  35:2
**human**  1:8 2:4,15
7:7,13 10:22 42:18
48:19 116:6
**hundred**  168:7
171:8
**hurricane**  124:15
**hurt**  88:15
████████1:13 3:11
4:8,13 6:8 7:5
117:14 166:14
187:1,7 188:2,25
189:7 190:7 191:5
191:9,11
**hypothetical**  93:19
94:4 97:20

**i**

**idea**  120:22
**identified**  6:20
114:9

**identify**  110:16
159:17 178:9
**identifying**  52:14
**iffy**  41:8
**illness**  92:16
**imagine**  16:3 124:6
124:21 153:8,15
161:23
**immigrant**  111:16
111:20 126:19,24
166:2,15,22 167:7
**immigration**  8:6,11
**impact**  57:23 92:10
**impaired**  119:11
**impediment**  139:1
**impermissible**
129:3
**implement**  155:15
**implemented**  153:6
**implements**  155:3
155:12
**important**  23:23
**impression**  88:18
**improper**  89:1,1
**inaccurate**  148:22
**inappropriate**  26:5
26:6,6,7,8,8,9
**incident**  28:25 29:1
29:4,12 85:3,6,7,17
85:22 95:18,19
97:8
**incidents**  24:7
29:14 78:19,20
**incomplete**  93:18
94:3
**incorporated**  12:3
**incorrect**  113:23
**increased**  109:24
**increasing**  110:12
**independent**  16:3

**indicate**  22:12,22
150:6 163:3 180:1
181:7
**indication**  140:13
**indigenous**  163:8
163:17
**individual**  20:8
24:14 47:25 48:3
79:4 104:1 131:25
145:18 159:6
**individuals**  37:4,12
37:17
**induced**  165:4,14
**influx**  8:16,19 49:1
49:4 54:8,10,21
55:7,14,15 61:8,10
61:14,21 182:2,3,4
182:9,13,15,19,21
182:24
**information**  11:20
11:21 12:19 13:22
18:22 22:12,14
30:3 33:21 34:5,7
34:10,17 37:9
43:20 55:9 65:10
65:12,15,17,20
69:5,7 70:14 71:7,7
71:14,16,21,24
72:4,8,12,16,16,21
72:21 73:1,3,4,10
73:12 89:17 90:2
91:4 97:18 100:15
109:18 110:18
111:2 120:13 125:2
130:25 132:11,19
143:10 157:20
158:14 160:21
172:22,25 173:1
179:6
**informed**  6:18,19

**infraction**  154:10
**infractions**  173:17
**initial**  150:11
172:11
**initially**  39:8,9
55:25
**initiates**  59:15
**initiating**  60:4
**insight**  24:14
**insists**  15:5 16:7
**instability**  92:10
**installed**  68:13
**instance**  27:16
134:16 135:2
167:10,20
**instances**  21:13
26:20
**institution**  86:25
**instructed**  56:12
60:12
**instruction**  87:6
109:4 160:18
**instructions**  14:15
15:4 144:17
**instrument**  155:17
**instruments**  155:4
**insurance**  95:3,9
96:1,10,14
**insures**  96:11
**intake**  29:5,7 55:9
98:4,4 130:23
136:15
**intakes**  55:17 56:22
**intense**  63:25
**interact**  65:1
**interested**  190:15
**interface**  17:16
**internal**  14:23
15:23 16:4 18:23
70:15 71:9 84:3

**internally**  27:20
**interpretation**  85:5
**interrupted**  79:6
**intervention**
   162:22
**interview**  65:2
   105:12 173:25
**investigate**  12:15
**investigating**  14:16
   15:5 27:11,16,21
   28:5
**investigation**  16:6
   18:11 79:4
**investigations**
   31:10
**involve**  74:1
**involved**  30:14
   31:22 59:17,19,21
   59:23 61:16 80:24
   105:5 122:3,12
   124:1,2,11 129:8
   133:9 138:4 172:3
**involvement**  55:14
   133:2
**involving**  82:13
**isolation**  151:12
**issue**  40:17,21
   55:23 70:17 87:18
   88:16 108:11
   111:12 114:9
   119:22 121:22
   128:21 157:5
   160:19 174:3
**issued**  48:1
**issues**  29:25 40:16
   40:23 41:2,10
   42:22 45:1,23,23
   47:22 74:1,2 85:13
   85:14 97:17 100:18
   114:11 115:12
   118:11 128:1,6,25

129:1 138:22
144:24 150:25
**items**  144:10

**j**

████ 132:8
**january**  119:5
██ 58:25
██ 9:18,19
**job**  9:21 26:14,15
   42:9,11 49:5 62:10
   103:6 136:3,5,6
   188:3
**joined**  68:14
**judge**  103:13,13
**judgment**  21:10
   44:16 45:9 46:1
   119:10,13
**june**  191:10
**jurisdiction**  40:2
**jurisdictions**
   105:23
**justice**  2:9 31:1
   111:16,20 126:20
   126:25 166:2,15,22
   167:7 191:6
**justify**  173:17
**juvenile**  31:1,3
   103:12

**k**

**k**  6:8 94:10
**karen**  1:13 3:11 4:8
   6:8 39:20 59:3
   187:1,7 188:2,25
   189:7 190:7 191:5
   191:9
**keep**  94:17,19
   155:18 161:11
   171:7
**keeping**  163:6

**keeps**  94:16
**kerbel**  1:22 189:5
   189:16 190:5,21
   191:24
**kid**  59:15 115:7,8
   116:8
**kids**  31:2 38:10
   49:20,21 50:20
   57:3 67:25 128:18
   140:23 141:6
   157:11
**kind**  22:22 41:25
   116:13 124:9
   168:21 172:18
   181:4
**kinds**  48:1 128:9
   152:8
**know**  4:21,23 5:14
   9:11 10:21,22
   12:12,20 17:1,13
   17:18,18,19 24:10
   25:17 26:18 27:10
   28:5,9,10,11,12,23
   29:11,11 35:1,2
   36:21 38:6 39:21
   43:8 44:19 45:11
   47:9 48:4 50:8 55:4
   55:5,13 56:6 57:5
   61:1,2,11 62:13
   64:17 65:1,9,14
   68:8,9 70:7,13,21
   71:1,4 72:7,7,9
   75:18 77:16 80:23
   83:8 84:5 86:16
   87:15 89:13,14
   90:10,14,15,16,20
   90:22 91:7,9 94:6
   95:7,12 96:12 97:2
   101:7 102:14,18
   105:7,16,17 107:8
   108:6,9,10,21

109:6,20,20 111:13
111:14,20 112:5,7
113:11 114:14,16
114:18 119:9,12
120:12,23 121:9,12
121:13,23,24 124:3
124:4,7,12,20
125:2 130:16,17
131:9 132:4 133:18
133:19,21 134:1,22
135:11,17,19 136:8
136:10,15,16,19
137:7,11 138:6,19
139:6,8,18,21,21
139:22,24 140:4,6
141:14,22 142:23
143:6 145:8 147:23
149:21 150:2,15
151:25 152:22,25
153:8,10,22 155:10
155:25 156:17
157:5 158:5,8,8,20
158:21 159:21,25
160:23,25 161:4,16
162:11,12,24 164:3
164:6,6,9,11,11
166:1 168:11 170:1
170:2,21 173:11,20
173:21 174:4,13
175:17,22 176:4,9
176:10,15,15 177:9
181:11 182:23
183:14,16 186:1
**knowing**  140:1
**knowledge**  16:16
   18:3 24:18,19,21
   27:9 46:7 47:12
   54:15,16 60:19,21
   64:21 67:23 68:1
   70:23 79:23 81:23
   82:9 91:2,25 94:15

94:20,23 97:11
101:5 104:13 111:9
128:8 131:10 136:5
136:11 137:25
138:2 140:8 148:18
155:23 159:11
175:11 176:15
183:7,18,20,21,23
**known**   112:11
152:3 187:12
**knows**   115:11

**l**

**l**   9:20 94:10
**la**   132:8
**lack**   75:11 77:11
82:5 83:12,16
**lackland**   61:23
**lacks**   131:12
**language**   143:21
149:10 163:8,17
**large**   1:23 57:15
80:15 141:5 187:16
189:6
**largely**   33:20
**larger**   49:24
**larkin**   94:7,8,17,18
94:20,25 95:4,15
141:13,18,19,19
**law**   2:4
**lawyer**   112:14
166:15,22 167:7,16
168:2 176:23
**lawyers**   5:23
111:19 112:10
166:1 167:12
**lay**   129:3
**lcsw**   30:12
**lead**   10:17,19,24
34:1,7,10,20 48:6
60:7 72:2 142:21
164:22

**leads**   10:10,11,15
10:16,23 164:21
179:11
**leave**   115:23
156:15
**left**   48:14 57:4
68:13,16,25
**legal**   80:18 81:2
104:4 106:14 111:7
111:8 112:4 126:9
126:11 128:13
130:21 146:17
191:1
**legs**   128:4
**length**   22:16,17,20
45:2 57:17,19,24
58:10,15 86:20
87:24 107:13 109:7
109:8,16,22,24
110:7,11,15,15,20
111:2,4 138:9,13
178:23 180:9
**lengthy**   58:2
**lesser**   84:7
**letter**   3:15 105:16
126:1,4,6,7,7,9,25
144:20 145:2
166:19,21 167:15
167:18 168:1
191:12
**letters**   126:21
167:11
**letting**   70:21
**level**   16:6 52:21
79:18 82:3 136:21
137:1,16,18
**levels**   137:2
**liaison**   132:10,14
**license**   54:4,6
**licensed**   30:7 53:18
53:20,23 54:6

83:21 90:23
**licensing**   53:17
**lightly**   74:4
**likelihood**   113:4
114:14,15 115:10
**limbs**   128:2
**limit**   60:17,23
**limited**   26:19
144:10 156:24
**limits**   42:10
**line**   40:7 52:8 77:20
82:24 96:15 188:5
191:18
**lines**   47:13 124:10
128:1 169:8 171:5
**lirs**   63:8 68:18,19
68:20 69:1,2
**lisa**   2:18
**lisa.steele**   2:18
**list**   74:25 119:17,25
120:3,3,6,10
130:21 131:2,7
152:18,18 179:1
180:16,19,22
191:17
**listed**   74:22 109:5
120:10 191:13
**listen**   155:24
**lists**   152:23 180:21
**little**   5:23 7:16 21:1
30:2 35:3 41:8
63:20,24,24 65:22
66:4 69:8 92:21
96:8 104:1 115:12
143:4 148:3 170:15
171:13 174:10
**live**   38:10,11 42:18
87:16 119:23 145:4
**lives**   20:13 116:6
**living**   86:7 97:22

**lloyd**   2:20
**local**   27:17 69:11
81:3,4,8,8 82:3
102:25 103:19
105:22,24 107:2
111:14 119:21
126:3 161:22
163:21
**locally**   167:3
**located**   13:13 28:11
53:19 64:17 94:12
108:19 124:20
136:2,6 170:1
**location**   67:21 86:6
120:4
**locations**   170:2
**long**   7:15 11:16
22:13,15 25:2
26:22 30:14 38:6
59:25 62:2 68:9
80:10,12,17,20,22
80:25 81:11,15
85:21 86:24 107:19
108:4 120:19 121:9
125:12,18,22,23,25
126:13 131:8
135:19 137:4,13,14
138:16 157:8,13
167:1,4,5 169:16
177:20 180:1 181:4
**longer**   38:11 42:21
44:1 109:12 178:10
**look**   5:13 10:2 14:3
20:3 23:7 44:9
49:20 57:12 59:3
75:3,7 83:18 88:10
102:21,23 105:3
108:6 114:7,11
115:21 124:5
129:14 137:10
146:13 152:25

[look - mental]                                                     Page 210

176:14,16,18
177:23
**looked** 39:20 181:9
**looking** 15:2 23:22
24:3 35:5 43:9 44:8
56:24 79:16 88:7,8
92:14 103:23
107:24 114:21,22
114:25 115:2,3,4,5
135:9 136:23
138:21,22 139:23
140:22,22 149:25
157:11 180:24
**los** 2:5,22,23
**loss** 151:12
**lot** 41:4 42:16,22
43:17 44:21 47:14
56:25 57:15 60:8
73:17 99:20 116:21
174:11
**loud** 178:19
**low** 31:3 35:8,12,13
140:20,23,24
**lower** 48:25 64:10
64:11
**lucas** 1:5 187:1
188:2 191:9
**lumped** 122:8
**luncheon** 116:25

**m**

**m** 2:12
**magdalia** 123:19
**mail** 2:6,12,13,18
17:2,4,5,6 44:10
45:1 59:6 65:13
70:20 109:17 111:4
167:22,23,24
168:13 172:15,18
174:17 183:17
**mailbox** 168:8,21

**mails** 168:9
**maintains** 69:20
**major** 33:15
**majority** 25:24
65:12 175:17 177:6
**making** 11:4,17
19:21 20:12 21:10
33:7 84:1,6 120:14
144:14
**manage** 46:23 81:8
**management** 63:19
69:12
**manager** 13:8
17:25 18:8 19:10
34:1,6,10,10,20,20
39:12,25 40:2
42:11,23 45:5,24
46:1,4,17 48:14,15
60:7,7 65:23,25
70:10 71:20 84:8
84:11,15,22,23
85:1 89:18 90:3
100:20 101:24
102:2 107:14 108:7
109:6,12 148:14
161:8 162:21
**manager's** 72:21
**managers** 10:10,11
10:17,19,24 13:21
15:4 16:17 18:16
18:21 41:12,20
42:8 43:21 44:14
45:8 48:6,6,17
49:10 50:6,18,25
66:23 69:7,12 71:2
71:6,17,21,25 72:2
72:21 100:7 107:19
108:4 109:1 161:5
161:16 162:7,9,15
179:12

**managing** 122:3
**mandated** 27:14
**manual** 13:20 14:7
14:7 16:11 29:17
29:19
**map** 14:1,5,6,9,14
16:1,1,13 18:23
19:22 20:7,16 43:3
74:12
**marathon** 178:17
**march** 30:13
118:18,19,19 119:5
119:6 175:17,18
**marie** 17:22
**married** 171:20
172:1
**marry** 171:23
█████ 17:23
**master's** 30:6 62:22
90:22
**material** 21:5
**materials** 20:17
**math** 27:8
**matter** 6:17,19
55:19 71:13 184:22
191:21
**maximum** 38:16
39:1 46:8 60:10
**meal** 157:14
**meals** 156:19
157:23 158:10
**mean** 10:16 20:15
31:19 41:7 52:4
59:14 61:14 68:13
70:19 94:19 98:23
98:23 100:22 102:8
108:17 109:20
113:7 114:2,10,14
116:2,4,5,21
121:14 124:5
133:15 144:22

145:10 149:10
150:17 153:22
155:18 165:8 167:9
168:9 170:16 171:4
171:6,19 172:24
**meaning** 24:17
48:14 93:1 151:8
182:7
**means** 24:1 42:2,6
42:8 133:16 147:5
**measurement**
164:18
**medical** 95:2,3,17
95:21,23 96:5
128:18,19,20,25
130:1,18,19 164:6
183:4,7,12
**medication** 141:11
142:23 143:3 144:8
183:22
**medications** 5:8
141:9 142:6 143:2
183:19
**medium** 170:5,10
**meet** 23:17 40:24
41:3 44:15 55:15
71:2 80:18 136:22
173:3,5
**meeting** 43:22 48:5
48:5
**meets** 134:6 174:2
**member** 38:12
53:14 55:20 103:24
117:25
**members** 103:7
104:9 106:10
117:16,20,25 118:2
118:8,25 119:1
124:17 151:5
**mental** 91:11 92:16

**mention** 143:17 179:23
**mentioned** 95:25 122:24 133:1,22 135:3 152:17 165:9 165:11 168:24 169:25 179:15,20 183:4
**menu** 156:20
**menus** 156:22,23 157:3,5
**mercyfirst** 134:24 135:6 169:23
**message** 130:17
**met** 11:1 23:9,18 28:15,17,19 57:13 75:5 91:9 137:17 151:9 183:11,13
**miami** 1:18 7:19 28:13 64:19 67:11 81:4 94:13 111:15 120:7 122:25 124:18,23 125:3,5 125:6,8,11 126:2 131:21 132:2 169:3 169:4,18,21 189:2 190:3 191:2
**military** 136:2,4
**million** 149:24
**mind** 23:23 44:6 49:8,10 57:9 116:14 143:8
**mine** 128:17
**minimum** 16:6,9 46:8 62:9,12,13,17 161:4,7
**minor** 101:23 165:15
**minors** 55:12
**minute** 51:2 57:4

**minutes** 157:22
**misbehaved** 85:12
**misbehaves** 149:3,5 150:22
**misbehaving** 85:9 151:15
**misbehavior** 149:17 150:18,19 150:25 151:2,4
**mischaracterized** 14:21
**mischaracterizes** 14:18 15:10 19:6 27:25 34:12 37:21 39:15 40:13 44:17 47:20 52:24 64:6 69:22 73:23 77:13 78:11 81:21 82:7 83:6 88:23 89:20 110:1 125:14 148:10 160:4 179:7
**misconstrued** 154:6
**misread** 85:3
**misrepresents** 114:4
**misstates** 56:19 106:1 131:4 139:20 147:10
**misunderstand** 180:3
**misunderstood** 20:9
**mitigate** 100:18,21 101:13
**mitigated** 45:23 101:16 102:3
**mixing** 150:24
**mobility** 128:6 129:1

**moment** 111:3
**monday** 191:16
██████ 11:10 19:19 58:24 169:12,14
**monitor** 22:10 107:18
**monitoring** 22:2 123:24 124:24 132:24 150:1
**monolingual** 163:7 163:17
**month** 119:1 175:12,16,23 178:11
**months** 9:10 57:21 138:18 178:11,11
**morning** 4:13 6:15
**moss** 2:12 185:8,22
**mother** 31:20
**move** 59:4,7
**moved** 48:15 59:10 128:21 176:21
**moving** 52:3,5,8 116:17
**mp3** 156:2,3
**msw** 30:8
**music** 155:24 170:18 178:18 181:25

**n**

**n** 3:9 6:8 13:15 43:14 94:10
**name** 6:7 8:15 9:19 11:9,24 28:9,10 29:16 45:14 47:25 108:12,21 123:18 132:4 133:12 140:4 181:4 183:14,16
**names** 17:19 36:25 48:4 64:18 123:1

**nation** 36:20
**nationwide** 56:13 60:13 120:8
**nature** 151:14
**near** 119:23
**necessarily** 23:6 65:23 74:23 75:17 83:3,10,15 92:13 100:22 114:12 116:4 144:23 145:10 154:8 176:14
**necessary** 6:1 43:14 62:9 99:12 121:23
**necessity** 15:15
**need** 33:25 48:25 57:14 59:3,6 61:8 84:4 88:12 91:19 95:5 115:24 117:19 120:12 122:21 124:10 126:12 154:7 157:5 159:25 179:1 185:10
**needed** 61:9 91:8 128:1
**needs** 13:14,15 23:8 29:11,11 57:12 93:25 130:18 170:15 176:19
**negative** 75:7 82:22 100:15,21,24 101:1 101:10,13,15,20 149:22
**neglect** 24:8 25:13 25:20,24 27:11,22 78:22
**neglected** 24:16
**neighbor** 27:3
**neither** 84:12

**network** 133:11,14
134:2,4,4,8,11,12
134:16,18,20
169:24
**never** 47:16 48:11
62:24 76:9,17
103:6 108:24 123:6
131:1 138:4 139:19
147:23 160:13
164:24 177:4
184:15
**new** 30:22 31:17,24
32:1,12 60:1,3 77:2
77:25
**newspaper** 104:7
**night** 177:24 178:3
178:4
**noise** 160:17
**non** 75:2
**nonprofit** 68:4,7
**normally** 13:8 25:4
52:22 176:18
**north** 2:22
**notarized** 191:18
**notary** 1:22 5:21
6:2 184:5,8,16,22
186:9 187:15 189:5
189:17
**notate** 173:13
**note** 26:4 70:3,9
127:23 129:17
142:25 178:16,20
**notes** 67:3,7 69:9
69:13,14,18,25
71:9,17 73:8,9,10
140:14 190:10
**notice** 1:24 43:21
44:5,6 52:16
127:17 136:14
176:20

**noticed** 37:14 54:5
110:10,20
**notification** 73:5,7
**noting** 191:18
**number** 6:25 9:11
10:21 15:19 35:12
35:19 36:7 40:18
50:20 55:3 57:20
58:11 59:16 62:14
66:17 90:8,14 98:5
106:5 110:15 112:7
140:17,21 164:3
171:7,13 183:2
191:14
**numbers** 10:22
61:7 64:9 80:23
183:3 191:18
**nurses** 128:24
**nutrition** 156:19

**o**

**o** 9:20,20 191:5
**o'clock** 177:24
**oath** 3:14 4:21
189:1
**objection** 6:23 8:3
14:18 15:10 19:5,5
19:6 27:13,23,24
27:24 34:12 35:7
37:19,20,20 38:3
39:15,16 40:12,13
43:24 44:17 47:20
49:15 50:12 52:24
56:9,19 58:13,14
63:6 64:6 66:16
69:22 73:15,23,24
76:14,25,25 77:12
77:13,19,20 78:11
79:5 81:20,21,22
82:7 83:6 86:9,9,14
86:14 87:2,10 88:3
88:3,22,23,25

89:20 91:17 93:18
93:22 94:3 96:3,3,4
96:22,23 98:1,1,25
99:15,15 101:3,3,4
104:4,10,14,15,15
105:13 106:1,2,13
106:13,21 107:5,6
107:7,22,23 108:14
109:3 110:1,5
111:10,22,22
113:17 114:3,3,5
115:19,19,20 117:8
121:5,5,18 122:6
122:15,16 125:14
125:15 128:10,11
128:11,13 131:4,12
131:13 132:12
133:23 139:3,20
141:1 142:1,7
145:13,22,22 146:9
146:9 147:10 148:8
148:8,9,9,10,24
149:4,18,18 150:23
150:23,24 151:16
151:17 152:11
153:14 157:24,24
157:25 159:8,14
160:3,3 161:17
162:3 163:9 165:16
170:8 173:18 176:7
176:7 177:12
178:15 179:7 180:6
**objections** 6:11
89:8 129:2 148:17
**objective** 10:7,8
42:10 114:8,21
115:5
**obligation** 10:1
**observe** 52:2,7
**observed** 26:10
129:22 158:10

**obtain** 143:10
**obviously** 43:9
56:22 75:3 116:15
119:19 138:21
145:7 146:23 149:6
149:8 154:7 174:11
175:14 177:21
**occasion** 21:15
31:13,17 32:6
43:21 44:11 50:8
52:2,7,16 55:12
59:9,21 66:11
76:23 90:24 92:4
92:18 125:10
126:23 127:17
129:14 135:1
143:11 150:4 159:1
163:16 165:3
166:14 169:17
170:6,22 174:6
183:13
**occasionally**
141:21
**occasions** 51:15
**occidental** 2:5
**occurred** 118:18
138:12
**october** 58:25
**offenses** 74:21
**offhand** 35:3 168:7
**office** 2:16,21 6:3
7:11 9:13 31:7 66:9
125:4,6,7,8 132:9
191:15,15
**officer** 37:7 132:14
132:22
**officers** 29:9,21
**offices** 28:13 125:3
**oh** 115:6,22 157:17
179:24

**oig**  29:11
**okay**  4:18 21:25
96:17 117:8 130:11
140:12 147:13
167:23 171:22
175:25 176:16
177:17 186:8
**once**  24:22 44:9
61:7 88:13 90:17
138:8 175:2,5
180:11
**one's**  42:11
**onenote**  69:10
**ones**  20:6 25:24
28:6 29:25 56:22
58:23 64:18 82:13
105:24 126:20
**ongoing**  22:25
41:20,21
**online**  16:11 18:23
19:23 20:7,17
29:19 74:12
**open**  22:15
**opened**  51:17 62:3
183:1
**opening**  56:11
61:22
**operates**  11:25
54:11
**operation**  135:20
135:22
**opinion**  42:3 85:17
85:18 89:1,1 96:7
116:15 128:17,17
128:23,25 129:4,5
**opportunity**  102:4
**opposed**  5:21 55:7
162:20
**oranges**  103:22
105:20

**order**  6:17,25
126:12
**ordered**  113:6
**ordering**  66:6
**orders**  115:10
**organization**
111:24
**organizations**  68:5
**originate**  172:12
**originates**  172:13
**orr**  8:10 12:25
13:20 14:2 15:5,18
16:2,7,9,11,13
18:23 19:23 20:7
20:17,21 24:7,8,16
25:14 26:21,22,22
27:5,6,9,20 28:1,18
29:4 30:5 31:15
32:5 36:18,19 37:5
39:21 41:12 46:7
54:10 55:6 58:1
60:10 61:4,10,16
63:7 69:3 73:7
74:10,12,14 75:24
76:22,23 78:7,10
78:20 80:5,8,20
81:19 82:19 85:12
85:19 87:6,9 92:12
94:16,17,25 95:3
95:14,22 97:23
102:10,22 103:24
104:12 105:21
106:10,11,19 108:3
108:22 109:16
110:25 111:14
112:17,19 113:1,24
114:1 119:15
121:10 122:3,12
123:25 125:6 127:5
133:17 135:22
137:2 140:5 141:23

142:12 143:1
147:17,18 150:20
152:3,9 153:3,4
159:11,23 165:19
165:23 168:2 172:8
**orr's**  14:15 15:3
117:15 159:7 160:1
**ought**  186:5
**outlined**  39:11
**outpatient**  141:15
141:17,20
**outside**  24:4 37:24
52:4 67:11 89:25
92:12 112:12
113:25 122:20
146:13 156:12
167:1 169:18,21
181:25
**overseas**  132:18
**oversee**  8:1,5,17,17
80:22 135:14
**oversees**  26:17
**overwhelmed**  48:7
**overworked**  47:19
48:11
**owns**  11:25

**p**

**p**  14:12
**p.m.**  1:16 117:1,1
166:9,10 186:15
191:16
**p.o.**  2:10 191:7
**package**  13:10,13
42:14
**packet**  22:11
**page**  3:11,13 188:5
191:18
**pages**  190:9
**paper**  33:17 116:7
**paperwork**  44:24

**parent**  43:11 73:6
76:9,12,18,24 78:1
103:15,16 107:3
118:3,3,5 142:15
144:5,15 145:1,4
145:10,18 147:22
**parental**  30:24,24
74:23 102:15
**parenting**  80:15
**parents**  8:22 18:11
18:14 33:5 72:10
72:25 76:4 81:14
102:15,20 103:9
104:8 105:25
106:12,20 117:18
118:8,24 142:11,13
143:7,8,12 144:16
144:17,20 145:12
146:7,16,17
**part**  12:8 15:14
19:24,25 23:16
30:24 31:14 98:4,8
141:21 153:7,9
175:8
**partake**  139:6
**participate**  123:10
130:15,23 151:13
164:20
**participates**  124:24
**particular**  17:16
45:8,15 46:18
49:25 70:24 87:9
113:14 145:18
159:3,6 165:12,15
178:10
**particularly**  32:12
65:22 172:19
**particulars**  61:2
**parties**  190:12,13
**party**  17:8,9 18:6,9

patrol  97:21
patterson  183:15
   183:15,18
pay  95:22
payments  94:24
pediatricians  164:3
   164:5
pedro  17:23
penalties  188:22
penalty  184:20
pencils  155:4,21
pens  155:4,21
people  11:7 17:15
   17:18 28:17 51:22
   60:9 79:2 119:8,23
   124:4,6,7 134:12
   139:5 140:4 149:16
   159:12,25 168:18
   178:25 179:5,25
percent  12:3 24:11
   24:11,11 57:2
   60:13,15 64:24
   128:7 132:23
   133:13 137:25
   140:11 141:4,5
   161:9
percentage  34:24
   35:3 44:13 67:15
   137:24 140:20,23
   162:9
perform  37:4,12,17
   66:8 138:3
performance  98:19
performed  11:21
   32:16 34:25 37:1
   117:23 163:4
performs  11:3
   36:17
perimeter  52:17
   53:11

period  21:18 25:2
   32:19,20 42:12
   69:1 110:8 138:20
   138:25 152:24
   166:4 185:24
periodic  130:11,13
   130:20
periodically  152:9
periods  110:6
   178:10
perjury  184:20
   188:22
permanent  49:3,5
   49:6 137:15 182:7
permitted  70:14
   105:11 155:3,11,24
   156:4,8,11,15
   157:8,13
perpetrator  41:3
   85:8,9
person  5:4 11:8
   32:10 37:10 39:23
   63:18,19,20 79:1
   98:16 131:21,23
   132:4 145:5,8,9,9
   145:11,19 150:1
   151:24 159:17
person's  9:19 11:9
   123:18
personal  24:18,19
   24:21,23 42:3,5
personally  18:1
   26:10 31:9,12 59:9
   108:17 109:13
   112:23 127:20
   131:1 159:4 165:22
   176:24 180:20
   187:12 189:7
personnel  44:15
   122:3,12 124:1
   150:21 161:9 162:1

183:10
persons  138:7
perspective  15:3
   149:9
philosophy  109:7
phone  69:16 98:5
   158:18,19
phoned  31:11
phonetic  124:8
photos  101:19
phrase  41:17,23
physical  16:20
   25:25 26:1 51:24
   67:20 101:11
   127:18,22 154:4,6
physically  9:9
   12:20 53:14 54:5
   64:17 65:8 70:6,7
   89:11 127:12
   171:15 173:9,20
picked  55:10
piece  70:11 116:7
pinchas  2:23 88:25
   93:18 94:3 104:4
   106:16 107:5 114:5
   117:4 128:13
   131:12 158:1 184:2
   184:15 185:15
pla  1:3
place  1:17 15:18
   26:16 31:13 52:8
   61:6,13 75:25
   76:23 77:4,7,7 80:8
   80:20 81:1 83:20
   86:4 87:8,25
   127:12 176:10
   182:15
placed  12:9 55:25
   56:3 77:4 98:7
   130:13 136:13,14
   137:18 144:18

placement  74:6,17
   81:9 83:14,17
   86:24 92:11 113:14
   113:25 125:12
   130:12 134:16
   136:18 174:18
   176:2
places  8:10 46:16
   54:11 56:23
placing  77:10
   80:24 81:11
plaintiffs  1:6,21 2:3
   5:15,19 6:14 7:1
plan  61:6
planning  55:3
plans  54:23 61:4
plant  51:25
play  23:12 42:17
   43:18 85:20
player  156:3
players  156:2
please  4:1 5:16 6:6
   7:5,8 14:22 19:9
   79:9,12 89:4 132:7
   158:2 191:14,17
plus  103:14 107:10
   130:1 169:7 176:1
point  6:20 9:12,25
   10:23 36:5 38:8,13
   38:15 58:25 63:3
   68:22 92:6 96:19
   96:20 106:4 117:18
   118:3 178:18
   181:15 186:5
police  27:17 119:21
policies  1:3 14:3
   14:14 16:2,8,10,13
   18:23,24 19:23
   20:7,11 29:18
   74:14

[policy - program]

**policy** 15:2,14
16:11 19:23 43:2
55:24 56:2,5,6
74:13,22 82:4,4,12
84:2 117:15,17
118:13,16,19,23
119:7,9,9,10
125:21,23 136:19
136:20,24 142:25
147:16 156:20
160:2,5,8 161:7,19
163:6 172:10
**pool** 17:17 66:22,25
67:5,13,16,18,23
69:17
**population** 54:17
54:22 55:15 60:13
82:10 106:3,11
135:16
**populations** 79:14
106:6,9
**portal** 17:3 22:12
22:14,15,22 23:3
33:18,22 43:20
65:11,16,17 72:5
**portion** 15:8 89:6
158:3 178:13
**position** 7:6,15
10:12 49:6 63:17
127:4 132:25 138:6
144:6
**positions** 161:8
**possibility** 75:3
91:9
**possible** 5:17 79:17
86:8,11,17,22,22
87:12
**possibly** 20:18 72:6
79:15 81:2
**post** 23:8,13,19,19
85:23 88:11 92:18

**potential** 33:3
146:4 147:16,19
**practical** 55:19
**practice** 173:3
**preassigned** 19:20
**precluded** 153:19
**predecessor** 68:3
**predict** 90:25
114:24
**predicting** 113:8
113:14 114:12
**prediction** 113:13
114:8
**predictor** 115:4
**predicts** 113:21
**preestablished**
79:16
**preexisting** 76:4
77:11 78:9,14
81:18
**pregnant** 55:12,13
55:20
**prepare** 126:15
**prescribe** 183:19
**prescribed** 140:15
140:18 141:9
183:22
**prescribes** 141:11
**presence** 5:21 6:2
6:14,24
**present** 2:24 3:3
20:16
**presentation** 112:5
**presented** 140:12
166:16,23
**presenting** 18:8
**presents** 18:9
**preserve** 6:10,23
**presumably** 150:19
**presume** 61:11

**pretty** 50:23 53:12
143:24 166:8
**prevail** 160:18
**previous** 9:6
**previously** 107:16
144:24 153:18
**primarily** 29:9
73:18
**primary** 73:20
**principal** 73:13
**print** 118:7,12
**prior** 31:14 37:21
39:11,16 40:13
44:8,18 52:20,25
56:19 64:7 68:3
69:23 73:24 75:1
75:11 76:21 77:13
78:12 81:21 82:5,8
83:7 88:23 89:21
96:25 106:1 110:2
114:4 118:19
125:11 143:6
147:10 148:10
154:25 160:4
191:19
**private** 83:12,16
94:14,15 140:8
167:11,16,20 168:2
**privileges** 151:12
**privy** 16:5 37:8
46:12 69:13,16
71:6,12 72:11
110:25 135:14
**probably** 25:1
45:18,18 66:19
68:15 172:6
**problem** 76:7 99:9
109:9
**problems** 5:8
**procedurally**
142:10

**procedure** 15:14
39:11 52:5 151:21
152:5 172:17
**procedures** 14:2
15:23 16:8,14
20:11 29:13,18
32:23 84:2
**proceed** 7:1
**proceedings** 5:12
8:11,12 51:6,8
116:25 117:2 166:9
166:10
**proceeds** 13:3
**process** 4:14 12:16
13:3,5 14:8,24
18:20 19:2 33:2
38:22 41:21,21
44:5 46:23 52:11
55:3 81:10,11
93:13,15 98:9,18
104:22,25 105:4,5
116:17 121:15
130:23 138:5 139:7
167:5 172:11 173:4
173:22 174:9,17,19
174:24 181:6
**processed** 140:2
**processes** 12:24
14:24 16:4 137:14
**processing** 43:22
44:16,22
**produced** 37:12
**professional** 23:1
**program** 8:17
15:25,25 16:1 27:2
30:1 34:2 39:25
60:8 61:18 68:12
77:24 81:15 90:23
95:16 108:7 134:4
134:14,18 135:14
146:1 150:1 159:19

164:22,23 172:14
173:7 176:19
**programmatic**
155:6 157:4 161:19
**programs** 64:12
80:23 109:20 120:3
136:21,23
**progress** 160:13
**progression** 58:17
71:3
**prohibit** 159:1,5
**prohibited** 154:20
**project** 29:9,21
37:7 132:14,22
**prolonged** 88:20
**promise** 5:25
**promoted** 59:1
**prompt** 41:13,18
41:23 43:22 44:16
191:20
**proof** 74:25 75:18
**proposed** 8:22
11:20 12:15 14:17
15:6,23 18:25 32:7
44:3 72:10,15,25
73:14,21 83:1
100:16,18 101:1
102:4,12 103:3,10
105:11 117:16
120:20 121:16
**protection** 23:10
107:2
**protective** 6:17
30:17 32:1 75:25
82:2 105:23
**prove** 75:15 146:24
**provide** 34:4,7
38:14 67:8 120:4
130:24 132:7
172:24

**provided** 28:18
51:14 63:4 64:18
69:6 73:10 93:5
95:23 103:6 129:17
130:22 173:16
178:8 184:6
**provider** 38:9,14
38:21,24 111:14
**providers** 37:24
**provides** 58:9 98:4
176:20
**providing** 78:10
103:21
**prs** 92:18
**psc** 140:6,7
**psychiatric** 31:5,5
94:1
**psychiatrist** 89:25
93:8 134:7 141:10
141:12,16
**psychic** 113:11
114:22
**psychological**
22:23 87:1
**psychologist** 90:1
**psychosis** 92:24
**psychotic** 92:15
93:5,12
**psychotropic** 142:6
143:1 183:19,22
**psychotropics**
140:15,19 141:25
142:16
**public** 1:22 5:21
6:2 31:7 94:14
187:15 189:6,17
**published** 120:1,2
**punishment** 155:22
**purpose** 20:4 21:21
79:19 96:6

**purposes** 168:23
**pursuant** 1:23 6:24
135:12
**pursues** 82:4
**pursuing** 33:6
**put** 48:11 57:3
109:21 127:5 174:4
**puts** 19:1
**putting** 72:8

**q**

**qualifications** 37:3
62:9,9,17 76:13
90:20 161:4,7
**qualified** 76:9,10
76:17,20 160:15
**qualify** 77:5
**quality** 37:11 38:1
**quarterlies** 109:21
**question** 12:23
15:7 25:19 32:10
40:4 41:15,22
53:24 57:6 59:8
61:3 76:10 77:16
77:23 81:25 84:4
87:20 89:2,5 91:12
92:21 96:15,24
99:16,21 101:21
104:19 108:1,18
110:8 113:12
119:12 122:9
129:19 131:6,14
132:13 139:13
142:22 157:1 158:2
178:12
**questioning** 6:10
77:20
**questions** 4:19 6:4
44:12 77:21 91:24
97:2 103:5 181:14
184:1,2

**quickest** 97:5,23
**quickly** 40:1
182:10
**quite** 10:5 18:14
26:15 28:13 38:18
56:4 59:19 71:18
73:16 84:3 85:8
87:19 91:12 104:25
105:15 114:20
122:9 124:22
125:24 132:1,15
135:5,8 143:5
148:12 149:12
150:16 156:6 170:2

**r**

**r** 1:5,22 2:6 6:8
9:20 94:10 95:10
187:1 188:2 189:5
189:16 190:5,21
191:9,24
**raise** 4:1
**ramp** 49:2 54:22
182:10,10 183:1,1
**ran** 79:1
**range** 35:12 124:6
149:15
**rare** 138:14
**rarely** 9:2
**rate** 48:16,18,23
49:9 50:5,17
136:11
**ratio** 46:5,8,10,15
46:15,17 50:21,23
90:15 164:9
**ratios** 164:11,12,13
**raw** 58:11
**read** 5:25 15:7,9
26:2 42:20 62:13
67:7 85:10,17 87:3
89:4,7 90:5,13
104:7 150:4 158:2

**[read - release]**

158:4 161:10,11
172:19 178:14
188:22 191:10,15
**reading**   3:15 26:10
127:20 166:20
191:13,19,20
**ready**   65:14 91:25
117:10,12
**real**   183:16
**really**   10:11 12:25
35:11 53:2 55:4
62:12 65:9 68:22
69:3 71:4 79:17
81:24 103:17 131:9
155:18 158:10
164:8 180:12
**realm**   37:24
**reason**   5:7 49:4
59:7 70:13 73:13
73:20 75:6 88:19
100:19 116:3,4
118:11 134:5
136:14 155:21
163:23 174:15
186:2 188:5 191:18
**reasons**   57:15
73:17 74:15,16
82:22 94:1 116:12
116:13,21 130:19
173:6,8
**reauthorization**
23:10
**recall**   36:25 43:6
43:12 45:7,14,17
45:19 47:25 48:24
50:18 60:25 68:24
84:16 85:2 105:10
127:2,3,14 165:12
165:17 166:19
167:6,10,21,21
168:4,6,7,12 176:5

176:12 180:22
181:7
**recalling**   5:9
**receipt**   186:7,8
**receive**   16:17 17:2
17:3 22:11,12
29:10 30:8,10 55:9
69:7 72:15,20 73:1
73:3,4,8,9 81:15
99:25 101:2 111:13
130:17 160:11
172:18,21 185:16
185:19
**received**   6:3 20:22
20:23 30:13 43:20
68:16 76:5 109:4
109:11 110:17
167:13
**receives**   28:24
**receiving**   38:2
82:19 121:4 174:17
179:5
**recess**   51:6 116:25
166:9
**rechecking**   139:1,2
**recollection**   77:9
103:9 108:24 130:3
**recommend**   23:18
23:19 39:24 66:7
77:10 92:18 99:10
100:7 103:15,16
174:1
**recommendation**
17:4,5,6 18:7,24
19:3,10,13 36:3
40:2,10 65:21 67:9
69:6 72:18,22 77:6
78:1 84:7,17 89:24
92:20 93:7 97:6,24
98:23 99:2,6 100:1
100:5 101:1 103:17

146:2 172:12
**recommendations**
18:17 34:5,6 60:9
67:7,8,16 77:18
84:1 89:23 99:25
**recommended**   36:8
36:12 85:11 92:14
96:19,21
**recommending**
39:10 100:6,8
**recommends**
101:25 102:1
**record**   5:4 6:7,23
15:8 41:7 51:9
69:20 70:10 89:6
95:8 116:24 129:16
153:23,25 158:3
166:12 178:13,16
178:21 185:11
186:11 190:10
**recorded**   33:22
**recording**   4:20
**records**   94:16,17
94:19,24,24
**recreation**   151:13
**recur**   150:20
**refer**   67:13 94:24
133:19 161:10
179:2,4
**reference**   10:15
14:1 20:19 57:8
**referenced**   13:20
50:11 146:15
191:19
**referencing**   53:25
**referrals**   63:22
77:15
**referred**   16:18
126:4 154:2 167:4
182:2

**referring**   36:3
45:25 49:11 50:13
57:20,23 77:3,18
93:16 98:22 100:23
125:25 137:19
179:5
**reflect**   129:16
153:25
**refugee**   7:11 9:14
132:9
**refuse**   135:12
**regarding**   72:22
100:2 153:4
**region**   7:17
**regions**   67:6
**regularity**   9:24
**regularly**   9:15
64:23 124:24
**rejected**   147:20
**related**   75:2,17
**relation**   88:9
**relationship**   75:1
75:11,16 77:11
78:9,25 82:5 146:6
**relationships**   76:5
79:16 81:18
**relative**   31:19,20
98:5,6 190:11,13
**relatives**   103:9
146:7,23,24
**release**   8:21 11:11
13:19 18:17 19:22
20:3,12 22:10,11
22:19 23:5,7,8,13
23:14,16,19,20,24
24:2,4,8,16 33:7,23
35:10,15 36:5
41:18,23 42:7
43:17,23 62:11
65:18,19 70:25
72:8,23 73:2,14

74:7 75:8 78:8 82:4
84:23 85:12,20,20
85:23 87:12 88:7,9
88:9,11,14 90:25
91:1,4,5 92:1,11,19
99:3,7,10 100:2,6,8
103:20 107:15
108:5 109:2 112:19
112:20,22 113:1,19
115:8,18,22,25
120:14 122:4,12
123:11 138:10
143:15 144:14,21
144:23 145:11
147:7,9 149:22
157:6 160:19
165:24 166:17,18
166:20 167:17,19
177:19 180:11
**released**  11:5 12:17
16:19 18:25 24:22
25:22 78:21 84:19
88:13 101:23
122:13 145:19
175:5
**releases**  8:20 10:8
10:13 19:17 22:6
24:3 26:19 33:7
41:24 44:7 87:13
96:7 109:8 122:8
123:15 124:3
149:21 155:7 158:7
160:24 166:6 178:7
181:3,11
**releasing**  112:16
**relevant**  83:16
**relford**  183:16
**relief**  80:18 92:18
126:10,11
**remain**  86:20 93:9
126:2

**remainder**  20:1
**remained**  62:3
**remember**  119:4
138:18 154:25
**remote**  38:11 143:9
162:12,14,18,19,25
**remotely**  125:5
163:4 168:25
169:10
**removal**  8:11 32:9
32:11 113:5,5
115:10
**remove**  107:3
**removed**  113:6
**repeat**  8:8 89:2
178:12
**rephrase**  93:24
99:17 142:3
**report**  23:2 27:15
28:25 29:1,4 38:14
58:15 70:6 85:6,22
95:18,19 97:8,10
101:8,9 110:17
152:6,17,22 158:19
165:13 180:8,13
181:1,2,9 190:7
**reported**  97:9
150:7
**reporter**  1:22 3:14
4:1,20,24 5:4,11,22
15:9 89:7 158:1,4
178:14 184:21
185:5 189:5,16
190:1,5,21 191:24
**reporters**  27:14
**reporting**  109:21
172:20 180:25
**reports**  27:21
32:13 48:1,9 58:10
61:21 85:4,7,18
90:12,24 91:3 92:4

101:10 103:6 104:7
146:4 147:15 148:4
152:9,12 165:3
178:8,9,23 180:1
180:10
**represent**  112:2
**represented**  111:19
112:10,12 176:6
177:7
**representing**  112:3
112:14
**represents**  111:21
**request**  34:9 65:18
65:19 72:8 95:16
101:18 102:7,8,21
102:22 167:2
**requested**  15:8
34:7,17 89:6 97:10
98:14,15 118:12
121:13 158:3 167:3
178:13
**requesting**  167:19
**requests**  99:25
**require**  46:7
121:25 137:17
161:22
**required**  13:16,19
14:25 18:22 32:13
37:4,17 39:3 43:10
44:25 117:24 118:3
118:5 119:15
120:17 121:16
126:15 127:5,25
130:24 138:7
142:15 173:24
**requirement**  53:21
184:15,23
**requirements**  41:3
**requires**  41:12
149:23

**requiring**  117:15
**resettlement**  7:11
9:14 132:10
**reside**  120:5 169:13
169:14
**residential**  133:5,8
134:9,20
**resolved**  101:23
**resources**  10:22
48:19 88:13 163:25
**respect**  8:19 18:16
18:17 23:13,14
67:10 88:18 107:15
122:11 137:6 163:6
165:14 177:1
**respond**  149:12
**responses**  4:25
**responsibilities**
10:4,5
**responsibility**
26:11 63:25
**responsible**  26:18
27:10 132:10
**rest**  17:14
**restaurant**  79:2
**restrictive**  174:14
**resulted**  61:21
**results**  100:24
102:6 103:2 120:21
121:4,11 139:8,11
164:19
**return**  6:2 31:18
78:1
**returned**  93:2
**returning**  44:24
148:3
**reunification**  13:9
13:13 42:14 43:5
44:2 80:16
**reunify**  33:4,11
41:13,18

**rev** 54:19,19,21
**review** 8:20 23:4
  28:3 70:12 71:2
  84:9 130:11 152:21
  153:3,4,4 164:21
  165:3 190:8
**reviewed** 65:13
  165:13
**reviewer** 17:8,9
  18:6
**reviewing** 43:19
  110:20 140:12
  163:3
**reviews** 130:20
  151:24 175:6
**right** 4:1 5:15
  10:12 20:19 21:20
  27:8,10 35:22,25
  42:1 43:6 46:3
  52:12 80:19 102:13
  102:15 103:10,20
  106:8 111:6 121:24
  123:5 125:13
  133:18 134:21
  138:18 146:16
  153:2 170:20
  180:19 185:14,17
  185:18
**rights** 2:4 112:5
  177:9
**rise** 86:1 92:17
  97:12
**risk** 31:3,4 112:22
  112:24 113:3
**risks** 112:20
**role** 17:24 22:2
  26:19 29:21,24
  64:1 66:5 85:19
  159:11 175:3
**rolling** 98:8

**room** 83:2 141:22
  155:16
**rooms** 155:4,12,21
**rtc** 63:18 133:3,5
  134:6 135:12 137:3
  169:19,20
**rule** 6:21 78:7
**rules** 153:4,13,16
**rumors** 55:4
**run** 12:24 16:1
  46:11 116:1,2,12
  116:13
**running** 30:1,21
  57:2
**runs** 15:25

**s**

**s** 2:5 6:8
**safe** 20:3 24:4
  41:24 43:17 74:9
  75:8 82:21 83:14
  83:17 85:21 87:13
  109:8 113:15
  159:20
**safely** 33:9,11
**safety** 23:25 24:1,1
  41:8,9 73:18 74:2,2
  79:18,20 82:23,23
  82:24,25,25 83:23
  88:16 91:6,6 92:11
  114:8 119:11
  138:22 144:25
**salt** 156:24
**sat** 10:9
**satisfactorily**
  101:23
**saw** 45:17,18,18
  168:11 180:23,25
  181:2,3
**sayeth** 187:5
**saying** 59:6 69:24
  69:25 80:1 89:14

92:5,7 108:16
  113:25 116:16
  130:18 145:1
  148:13 149:13
  150:14
**says** 44:10 56:6
  59:15 74:15 93:6
  145:4,10 157:17
  181:4
**scenarios** 149:11
  149:25
**schedule** 130:14
  157:16
**scheduled** 98:11
**school** 31:6 160:14
**scope** 87:20 157:6
  160:23
**scott** 2:20
**screen** 55:13
**screening** 112:4
  177:9
**se** 31:16 45:2 56:2
  61:11 69:24 101:10
**second** 51:18
  129:24 130:6,7,7
  146:8 179:20
**seconds** 117:7
**secretary** 1:8
**section** 28:1,3
**secure** 53:12 137:3
  137:3 170:5,5,10
  170:11,13,16,16,17
  170:23 171:11
  172:4,8 174:7,12
  174:15,23,24 175:3
  175:3,12,13,14,14
  175:15,23 176:3,5
  176:6,13,23 177:2
**security** 52:21
**see** 22:16 23:21
  25:5 45:20 48:10

67:4 84:25 90:16
  90:17,24 92:4
  110:14 122:2 125:6
  135:18 147:6
  150:10,11,12
  168:10 172:20
  178:8,24 180:4
**seeing** 127:20
  167:6,22 168:6
  176:12 180:22
**seek** 23:1
**seeking** 7:2
**seen** 12:10 26:1,8
  45:12 46:2 48:9
  52:4 54:5 79:20
  87:6 91:3 97:6
  108:24 109:5,6,13
  110:6 112:12 131:1
  131:3,7 140:18
  142:13,18,19 151:7
  151:9 152:4,5
  153:1 156:16,17
  164:24 165:9
  167:18 174:2
  180:19,21 184:15
**sees** 26:5
**selected** 81:16
**self** 90:25 91:10
**send** 19:12 29:4,5
  32:13 44:9 45:1
  55:6,10,11,14
  56:22 59:6 65:13
  70:20 73:5 81:3
  93:17 107:19
  109:17 111:2,3
  135:1 144:25
  172:15 191:17
**sending** 134:1
**sends** 19:10
**sense** 14:6 28:2
  30:25 49:11 53:12

**[sense - sources]**

Page 220

63:17 64:9 72:13
92:22 95:7 115:4
**sent**  27:17 38:17,18
78:24 94:2,17,18
94:21 95:15 115:9
125:18 133:10,11
134:15 135:5,6
163:20 166:18
167:2 168:10
169:22 176:13
177:2
**separate**  69:19
83:2 122:11
**separated**  104:8
106:12,20
**separately**  5:6
**separation**  165:4
**separations**  104:18
**serial**  147:17
**serious**  28:25,25
29:3 82:13 85:3,5
85:25 86:1 114:10
171:14 176:2
**seriousness**  87:25
**served**  151:23
**service**  88:11
177:11
**services**  1:9 2:15
7:7,13 12:3 23:8,8
23:13 30:18 32:2
82:3 85:23 92:18
115:24 130:22
**serving**  135:17
**session**  90:18,18
**sessions**  164:19
**set**  18:6 19:1 20:20
43:12,14,15 157:15
**setting**  53:23 93:9
**settle**  151:2
**seven**  11:1 85:7
171:5 177:22

**severe**  41:2 92:16
**sexual**  26:7,9 28:5
41:3
**shake**  4:25
**share**  103:2
**shared**  70:24
100:15,17
**sheet**  3:13 187:4
188:1
**shelter**  8:16,19
12:24 16:10 24:5
26:18 27:15,22
49:1,4,19,21,24,25
50:10 52:23 53:1
53:20 54:21 55:14
55:16,21 56:1,16
57:15 58:5,9,22
61:9,14 80:16
87:16,18 93:9 98:6
124:11 136:24,24
137:3,9,15,20,24
153:18 158:23
161:21 164:12,13
164:15 169:18
170:15 171:14
182:7
**shelter's**  55:15
**shelters**  16:3,7
30:21 46:10,14
48:21,23 49:9,13
49:18 52:20 53:19
55:18 56:3 61:22
81:3,5,8,8 119:17
122:25 123:2,12,16
125:11,18 126:3
128:19 129:8
137:20 163:21
182:8
**shiloh**  133:10
134:24 135:5
169:17,19

**shook**  154:10
**shores**  169:3,4
**shorthand**  1:22
**shortly**  95:14
**show**  115:5,7
**shrink**  54:18,24
**sign**  5:20 6:1
142:15 184:4 185:1
185:4,13,19 191:10
191:15
**signature**  3:13
184:7 186:3,15
189:15 190:20
**signed**  6:17 184:16
184:19,21 185:23
185:25 186:5
189:10 191:17
**signing**  142:18
191:13,19,20
**similar**  11:4 18:4
53:6,15
**simply**  46:22 57:20
**simultaneous**
147:17
**sincerely**  191:22
**sir**  21:8 22:5 24:9
26:13 28:24 29:6
138:4 150:8,9,11
172:22 174:4
**sirs**  26:2,10,10 28:3
28:5 29:7 85:10
150:4,6 171:13
172:20
**sister**  145:20,21
**site**  95:23 119:16
136:4,5,6 162:7,18
162:25 163:4 166:6
179:11 180:15
**sites**  119:18,22,23
119:25 120:9,11

**sits**  116:19 157:17
**sitting**  45:7 165:12
**situated**  125:4
**situation**  32:12,25
83:9 107:1 121:24
**six**  11:1 51:13 85:8
138:18 171:5
178:11
**sleep**  129:15 130:8
160:20 161:2
**small**  141:5
**smaller**  53:6 57:14
**social**  30:6,7,14
31:5,8,17 58:7
177:15
**solely**  68:19 71:19
**solemnly**  4:3
**solid**  40:14
**solutions**  191:1
**somebody**  35:10
53:14 75:19 84:4
88:12 102:21 132:2
144:21 146:12
147:23 149:8,20
153:23,23 168:11
**somewhat**  157:17
**soon**  87:12
**sorry**  13:10 14:13
89:3 119:6 126:5
169:20 170:18
171:22 182:17
**sort**  74:16 80:18
126:10 127:22
151:20 161:15
**sorts**  26:3 40:22
91:4 157:2
**sought**  76:21
**source**  16:12,15
99:19
**sources**  15:3 33:21
34:4 72:5

**[south - step]**

**south** 1:17 94:13
  191:2
**space** 129:25
**spanish** 143:22,23
  144:4,9,9,9
**speak** 5:5 10:4
  12:19,22 18:11,12
  18:14 29:24 30:2
  34:8 46:10 50:5,7
  53:1 66:11,19,21
  89:9 90:15 100:20
  134:12 142:12
  143:19,21 144:4,9
  164:1 168:11
  178:19
**speakers** 163:17
**speaking** 9:5 10:17
  13:5,17 14:5,7 16:4
  16:20 21:21 22:1
  45:10 46:17 54:12
  63:19 71:9 72:14
  102:14 110:13
  117:14 122:7
  124:17 144:4,10
  149:6 154:12
  164:14
**specialist** 7:9 9:22
  30:5 59:5 62:10
  179:16,17
**specialists** 26:25
  87:7
**specific** 20:8 43:16
  45:10,11 48:4
  65:19 82:10 165:8
  182:6
**specifically** 48:11
  56:13 121:8 137:6
  137:19 165:6
**specifics** 45:19 69:4
  135:17

**speculate** 155:9
  163:24
**speculating** 121:2
  132:21 153:16
  161:24
**speculation** 76:15
  81:20 86:10,15
  96:4 98:2 104:15
  105:14 107:7
  128:11 141:2,3
  149:19 151:8
  157:25 159:9,15
  161:18 164:2
  173:19 177:13
**speculative** 89:10
  148:11
**spell** 6:6 9:19
**spend** 11:16 51:12
  177:18
**split** 140:21
**spoken** 18:13 21:16
  143:17
**sponsor** 13:9,11,12
  13:14 14:25 15:1
  18:25 34:8 40:18
  41:7 42:15 43:5,11
  44:3,23,23 73:14
  74:3,3 75:5,12,19
  80:18 81:2 83:1
  84:18 85:24 91:6
  100:18 101:12
  102:4,17,18 105:11
  114:10 115:8
  119:18 120:4,20
  121:19,21 144:23
  146:1,4 147:5,16
**sponsors** 11:20
  12:15 13:6,17
  14:17 15:6,15,24
  38:10 42:20,22
  63:19 72:11,15,25

75:2 104:23 115:9
  117:16 119:16
  121:16 145:15
  147:1,25 148:1
**sponsorship** 147:22
**squeeze** 115:13
**ss** 187:9
**stabilized** 91:8 93:6
**stable** 91:7 93:2,2,7
**staff** 19:11 21:1
  25:14 26:5 33:24
  38:12 47:1 50:9
  53:13 67:1 70:8
  74:3 112:10 128:24
  137:3 151:5 164:4
  170:11,13,16,23
  171:11,16 172:4,8
  172:21,24 174:24
  175:3,12,13,15
  176:5,13,22 179:13
  180:8
**staffed** 69:15 70:21
**staffing** 10:10 59:4
  59:5 66:23 67:2,3
  69:9,11 70:3,17
  71:17,20 178:24,25
  179:4,11 180:14
**staffings** 69:25
**staffs** 183:7
**stale** 139:12
**standards** 19:22
  20:1 37:16 41:11
  160:17
**standing** 77:20
**standpoint** 16:9
**stands** 14:11 95:12
  133:5
**start** 24:19 36:7
  56:5 84:25 153:3
  178:5

**started** 26:23 27:4
  68:11 143:5 178:17
  181:25
**state** 1:23 6:6 22:23
  41:25 47:11 53:18
  53:24 54:1 75:24
  82:3 102:25 103:19
  105:22,24 107:2
  187:9,15 188:21
  189:2,6,17 190:3
**stated** 37:22 104:22
  109:10 130:10
  137:23 146:25
**states** 1:1 2:8 33:12
  87:16,17 88:22
  97:22 144:5
**stating** 78:14 103:4
**station** 2:10 119:21
  191:6
**statistics** 24:6
  108:4,8 109:15
**stay** 22:16,17 45:2
  50:23 54:18 57:17
  57:19 58:10,15
  97:17 109:7,8,16
  109:22,24 110:7,11
  110:15,21 111:2,4
  128:20 137:12
  174:13 178:23
  180:9
**steele** 2:18 184:14
**stenographic**
  190:10
**stenographically**
  190:7
**step** 129:9 171:17
  171:18 172:3,9,12
  172:16 173:4,6,8
  173:17 174:1,6,14
  174:23,24

**[stepped - takes]**

stepped  55:25
172:7 174:16 175:2
176:19
stepping  170:4
174:12 175:4
steps  129:8 130:9
stipulate  184:4
stop  178:1
stopped  154:22
store  83:20
stored  108:8
story  129:7
stranger  78:4
street  2:16,22
stress  20:13 147:21
165:4
strictly  22:5
studies  24:7 34:23
34:25 36:4,12,13
36:15,18 37:1,4,7
37:13,15,17 38:2
41:6 66:6,7 78:9,18
86:23 87:3 96:18
98:11 100:1 103:3
117:20,22
study  23:11,17,18
23:18 36:1,2,3,6,8
36:20 37:18,23
38:7,12,13,14,17
39:3,10,13,21,24
40:10,16,22 41:5,6
75:6 78:24 79:1
82:22 85:24 92:14
92:17,20 96:20
97:6 98:14,15,17
98:20,22 99:12
100:6,8,12,14,19
100:21,23,25 101:2
101:10,11,14,18,20
101:22 117:23
118:4 121:23,25

138:3,5,22 149:24
stuff  161:20
suarez  17:22
subject  151:20
188:23
subjected  161:16
submission  44:8
112:6 121:10 153:9
submit  92:6 95:4,5
95:16 96:13 107:14
108:5 109:2 121:17
126:20 152:22
submits  120:20
submitted  8:20
36:5 44:9 87:22
92:3 98:20,21,22
98:23,24 112:3,15
126:25 127:21
152:19 163:2
180:11
subscribed  187:11
substance  188:23
substantial  121:4
substantive  6:10
sued  165:19,23
suggest  157:21
suggested  42:13
suicidal  89:12,13
suitability  32:6
suitable  31:23 32:4
suite  1:17 2:17,22
191:1
summarize  15:16
18:20
summary  72:15
152:12
summed  73:21
superior  108:25
superiors  87:7
supervises  132:5

supervisor  9:18,22
21:2,3,6,12 34:3
39:19 59:2 102:19
105:3,11 122:18
124:5 125:1 127:10
127:11 131:18,20
131:20 132:2,5
169:11 171:16
172:23,25 173:2
174:19 180:14
supervisor's  66:9
supplying  126:1
support  166:16,23
supporting  167:8
167:16
supposed  15:4
43:12,13,14 95:19
112:25 158:17
159:17,19,24 173:7
173:10
sure  6:12 10:5
14:23 16:2,4 18:14
21:19,24 22:7
26:15 28:13 36:6
38:19 41:15 46:5
56:4 60:23 61:7
64:25 68:11,21
71:3,18,21 72:13
79:22 83:18 84:3
85:8,24 87:13,19
88:11 91:12 94:19
101:19 105:1,15
107:25 108:18
114:20 120:2 121:1
121:1 122:9 124:4
124:21,22 128:7
130:6 132:1,13,15
133:13 135:5,8,8
135:13 143:5
144:12 148:12
149:12 150:17

152:24 156:7
159:20 162:11
165:8,9,10 168:9
175:21 181:8
surgery  127:25
128:1
swear  4:3
sworn  4:2,10
184:25 187:11
189:8
system  16:24 17:1
31:1 67:3 69:9,19
70:15,16 71:10
96:10 107:10
139:15,25 140:2
systems  106:5

**t**

t  6:8 95:10
take  4:22 22:18
31:2 38:11 42:21
48:25 49:5 50:14
51:2 69:13 74:4
87:8,8,23 89:22
90:6 97:20 112:25
116:22 125:24
127:12,17,23
141:14 155:17
166:7 175:15
181:14 185:8
taken  1:16,21 4:15
26:3 51:6 57:4
58:17 63:14 105:25
107:8 109:1 115:17
116:25 139:15
142:25 145:12
166:9 187:2 188:3
191:10
takes  19:25 38:7
107:14 120:20
121:9

**talk** 5:22 9:7 21:15
  35:15,22 59:16
  84:15 95:22 150:16
  151:5
**talked** 67:24
  144:24
**talking** 25:18,23
  31:4 39:9 42:3,4
  47:2 61:1 62:25
  73:17 75:1,16
  79:20 95:24 100:10
  102:25 103:14,22
  106:8,9 112:2,4
  141:13 148:13
  153:24 154:4,24,25
  155:6 179:10
**tampa** 63:23
**tapped** 154:1
**taps** 153:23
**tar** 95:4,5,10 96:13
**tasks** 18:4 42:25
**teachers** 160:15
**teaching** 160:15
**team** 26:16 29:8
  122:19 124:3,4,6,8
  124:9,17,18 152:23
**teams** 69:12
**technically** 52:5
**technology** 132:11
  132:19
**teens** 80:15
**telephone** 66:11
  159:2,5,12 160:5
**telephones** 158:14
  158:16,24
**telephonically** 2:24
  70:7
**television** 151:13
**tell** 9:11 12:6,9
  22:14,16 28:4 55:2
  65:3,3,4,6,8 69:15

77:24 78:4 105:4
  116:3 118:17
  121:19 134:13
  136:20 140:7
  158:17,23 161:6,13
  173:8,9 175:23
**telling** 77:23 79:13
  93:20 138:1
**tells** 161:7
**temporary** 61:22
**ten** 38:14,23 50:22
  50:25 97:17
**tend** 45:20
**tender** 80:14
**tends** 125:24
**tenure** 26:21
**term** 8:16 33:10
  44:19 58:4 59:25
  73:25 74:1 80:10
  80:10,12,17,20,22
  80:25 81:11,15
  86:24 125:12,18,22
  125:23,25 126:13
  137:4,13 152:15
  167:1,4
**terms** 12:22 15:1
  25:19 32:8 33:13
  41:12 42:1,6,19,22
  49:12 53:17 55:16
  63:25 73:3 74:9
  75:8 77:23 80:11
  82:25 84:6 85:14
  87:1 95:21 96:18
  97:5 111:7 123:24
  126:18 128:2
  136:17 144:8 145:6
  146:5 147:17
  149:22 156:19
  158:13 170:4
  172:11 174:17
  176:2

**territory** 64:11
**testified** 4:10 48:8
  125:9
**testifying** 5:9 49:7
  114:6 152:12
**testimony** 4:4 5:13
  5:14,17,20 14:19
  14:21 15:11 19:6
  27:25 34:13 37:21
  39:16 40:13 44:18
  47:21 52:25 56:20
  64:7 69:23 73:24
  77:13 78:12 81:21
  82:8 83:7 88:24
  89:21 106:2 110:2
  114:4 125:15 129:3
  131:4 139:20
  147:11 148:10
  152:13 160:4 179:8
  181:23 182:2
  184:25
**texas** 2:17
**thank** 7:2 41:11
  51:5 96:17 111:6
  181:23
**therapists** 164:9
**therapy** 164:25
**thing** 23:22
**things** 41:4 47:13
  100:9 147:7 155:6
**think** 11:1 14:12
  20:9 32:16 36:11
  51:19,20,20 53:22
  55:22,22 60:22
  61:14 62:13 66:3
  82:17 86:13 92:21
  95:25 99:12 110:14
  112:21 114:15,17
  115:3,7,23,24
  119:3 129:6 135:23
  163:24 166:8

167:14,19 180:24
  180:25 181:12
**third** 17:8,9 18:6,8
  179:22,23
**thought** 32:9 45:13
  85:13 152:14
  171:25
**thoughtful** 117:5
**thoughts** 89:12
**three** 17:21 21:16
  22:1 25:1,9,21
  32:17 109:25 110:8
  110:10 115:16
  143:18,19 175:18
  175:22 178:11
**throwing** 170:18
**thursday** 1:16
  187:2 188:3 191:10
**time** 1:16 4:21 5:5
  9:18 21:18 22:20
  24:11,11,12 34:9,9
  38:16,23 39:1
  42:10,12,22 43:13
  45:17 50:3 51:12
  56:6 60:10,17
  61:20 63:3 69:3
  86:20,20 87:9,24
  93:8 95:5 97:19
  99:5,20 107:13
  109:1 120:20,21
  121:9,10 125:24
  134:11 135:17
  137:24 138:9,13
  139:15,17,22
  142:19 143:5,15
  147:19 152:24
  155:20 157:10,15
  160:21 161:1
  177:18 178:1,5
  182:6 191:13

timeline 45:3
timelines 42:13,15
 44:20
timely 41:24 42:1,6
 43:17 87:12 109:8
times 9:3,8,9 21:14
 31:12 34:17 47:1,5
 51:11 59:17 115:17
 153:21 171:3
timing 43:7 99:13
 121:14
tired 4:22
title 9:21,21
today 4:15 5:7,17
 5:22 6:24 45:7 49:7
 69:16 165:13
 181:23
told 87:7 96:25
 110:19 124:2 138:1
 142:20 148:5,22
 163:15,23 173:6
topic 148:3
torso 154:2
total 27:6
touching 26:6
 153:11,19,22,24
 154:9
tour 51:14,19,20
tower 191:1
town 27:1 49:18
 50:13,16 53:3,10
 53:17 61:19 68:12
 68:15 81:6 123:3,9
 123:16 127:15
 129:10 154:5,12,17
 154:20,24 155:11
 155:15 156:1,8,11
 156:20,21 157:8,13
 157:19 161:14
 162:14 164:14
 182:13

track 108:3,22
tracking 108:7
traffic 169:7
trafficked 79:15,25
 80:2,6
trafficking 23:10
 75:4 79:17
trained 127:10
training 28:18,21
 127:5,8,9,11
trainings 127:9,9
transcribe 4:24
 5:12
transcript 6:1
 184:5 187:5 188:4
 188:23 190:8,9
 191:12,15,20
transfer 16:24
 48:10,13 56:2,7
 57:10 59:15,17,21
 93:10 126:3 133:2
 133:9 136:25 137:5
 137:14 163:15,16
 167:2,8 168:2
 169:18 170:22
 171:10
transferred 47:13
 56:1,17,24 57:1,16
 58:3,21 81:7 123:1
 125:10,12 130:19
 137:8 175:9,11
 176:5
transferring
 136:17 166:23
 170:5
transfers 22:6
 26:20 60:5 137:19
 137:20 176:22
transitional 80:11
 80:14 137:4

translated 144:2
transmitted 33:18
transpired 138:9
treat 94:20
treated 94:25
treating 93:8 134:6
treatment 10:2
 22:3 95:13 122:4,7
 123:25 124:24
 133:5,8 134:9,20
 152:2 165:20
trend 110:11,13,14
tried 183:17
trigger 40:22 41:5
 41:5
trip 156:16,17
trips 156:12,15
trouble 70:4
true 187:4 188:23
 190:9
truly 81:24 106:4
trust 31:6
truth 4:4,5,5
truthfully 5:9
 158:11
try 5:5,16 12:23
 33:4,11 55:11 98:7
 119:18 137:14
 143:11 157:16
 174:13 178:19
 180:9
trying 20:5 60:1,2
 99:10,13,18,20,22
 105:21 107:2
 132:16 170:21
 180:4
turn 18:9 19:12
 154:8
turned 154:7
turning 34:23

turnover 48:16,24
 49:3,10 50:5,8,17
tvpra 23:9,11,14
 40:24 41:5,9 97:12
twelve 164:17
two 13:25 14:12
 15:3 17:21 32:19
 32:19 51:1 63:8,10
 68:15 80:11 82:17
 100:9 106:5 123:4
 123:11,15 125:11
 130:4 134:23
 169:15,22 175:22
 191:2
type 8:11 53:23
 73:11 88:11
types 29:14 65:15
typical 40:9 46:15
 131:11
typically 38:8
 65:21,25 66:18
 69:8 80:14 98:6
 123:23 125:25
 126:20 134:3
 171:12 172:13,15
 172:19 173:5 178:1

**u**

u 6:8
u.s. 1:8 2:9,15,21
 62:25 68:2 79:24
 80:2 191:6
uac 17:3
ultimate 39:4 58:23
ultimately 39:7
unable 4:22
unacceptable 86:3
unaware 134:13
 161:20
uncle 146:19
understand 20:5
 34:16 35:5 41:15

58:6 72:13 85:10
99:10,21 100:14
113:2,8 116:11,17
144:9
**understandably**
42:20
**understanding**
5:24 6:16 9:23 13:3
42:2,5,6 47:18
56:15 62:8 70:4
79:24 90:8 102:11
136:1,3 141:8,23
142:10 152:8
160:10,12,14,16
162:6 177:10,14
182:4
**understands** 49:2
**understood** 104:19
144:13
**undocumented**
114:16
**unfair** 64:8
**uniformly** 76:4
**unique** 26:16
**unit** 28:6,9,10,16
95:2 108:13,21
140:4,9,10 183:4,7
183:12
**united** 1:1 2:8
33:12 87:15,17
97:22 144:5
**unknown** 75:20
**unrelated** 75:4,13
75:16 77:10 78:8
78:21 82:5 147:1
**unsafe** 74:6,18 76:8
113:20 114:1,2
**unstable** 85:22
91:15,19 92:5,8
**uploaded** 23:3

**upper** 154:2
**upstairs** 129:11
**urgent** 27:3
**usccb** 26:23 62:24
63:3,7 68:16,20,25
**usdoj.gov** 2:12,13
191:8
**use** 16:24 17:17
33:10,21 58:4
61:14 69:9 84:2
114:17,23 125:7
128:3 135:13
181:10
**usually** 150:10
173:13 174:4
**utilize** 149:21
162:12
**utilizing** 94:7

**v**

**v** 9:20,20
**vacation** 122:21
175:16
**vaccinees** 73:4,11
**vague** 8:3 19:5
43:24 49:15 50:12
56:9 63:6 73:15
76:25 78:25 86:9
86:14 87:2,10 88:4
91:17 93:22 96:3
98:1,25 99:15
101:3 106:2,13,21
109:3,5 110:5
111:22 113:17
114:3 115:19 121:5
121:18 122:6
125:15 128:12
131:13 139:3 143:6
145:22 146:9 148:8
149:4,18 150:24
153:14 157:24
160:3 163:9 170:8

176:7 178:15 180:6
**valid** 138:13,16,20
**variables** 42:16
43:18 109:11
**variations** 20:14,15
157:2
**varies** 11:18 40:19
59:14 96:25 97:12
97:13 101:17 182:6
**various** 69:12 88:8
**vary** 156:20 182:9
182:9
**varying** 57:15
██████ 123:19,20
**vera** 111:13
**veracity** 26:12
**verbal** 4:25 142:24
143:7
**verbiage** 58:6
**verify** 26:11 159:19
**veritext** 191:1,15
**versus** 49:13,22
53:7 55:21 67:16
86:7 103:24 110:7
114:21,24 115:6
137:25 157:11
162:25 164:1
**viable** 80:17 81:2
**victims** 23:10
**view** 69:17
**village** 27:1 61:18
**violation** 150:7
153:12,16
**violations** 8:6
**visit** 51:20 77:6
78:2
**visited** 53:2
**visiting** 33:16
**visits** 9:14 32:13,15
32:22 33:1,14

**voice** 48:7
**voiced** 116:1
**volovar** 9:18,23
**volovar's** 9:21 10:1
**volume** 22:6,8 35:2
45:11 67:5 127:2
135:9,10
**voluntary** 137:12
167:3
**vs** 1:7 187:1 188:2
191:9

**w**

**wait** 106:16,16
147:20
**waiting** 61:12
180:4
**waived** 186:16
190:8 191:20
**waking** 160:20
**walk** 53:13 128:3
**want** 4:22 20:12
35:1 43:8 58:5
60:23 78:13 88:19
103:17 117:4 118:7
121:1 135:23,24
144:11,12 145:8
146:12 147:19
154:5,8 159:18
178:16
**wanted** 21:24
84:18,23 144:4
178:20
**wanting** 49:6 88:15
115:25
**wants** 115:22
**warranted** 63:23
**washington** 2:11
131:24 132:5 191:7
**wasting** 99:20
**watch** 12:21 151:13

**watched** 160:13
**way** 15:16 16:1
21:1 39:19 41:9
53:4,5,10,10 59:8
91:16 118:20 140:1
184:24
**ways** 49:7
**we've** 122:21
**wear** 156:5,9
**website** 14:4,15
**week** 11:12 17:16
32:17 90:17
**weekly** 66:19 71:2
90:19
**weeks** 32:18 57:20
58:12 169:15
175:18
**weight** 84:7 144:15
144:16 145:5
**welfare** 32:14
75:23 77:4 101:8
103:1
**went** 27:2 31:19,20
51:18 52:11 68:20
78:2
**western** 1:2
**wide** 110:25,25
124:6
**wise** 137:24
**wishes** 145:12
**witness** 3:13,14,15
4:6,9 6:19,21,21
27:14 28:1 35:8
37:22 38:4 39:18
40:14 44:19 47:22
49:16 50:13 53:1
56:10,21 58:15
63:7 64:8 66:17
69:24 73:16,25
76:16 77:2,14,21
78:13 79:6,8,9

81:23 82:9 83:8
86:11,16 87:3,11
89:2,9,22 93:20
96:5,24 98:3 99:19
101:5 104:17
105:15 106:3,15
107:8,24 108:16
109:4 110:6 111:11
114:7 115:21 117:5
117:9 121:19 122:7
122:17 124:14
129:5,20 131:15
132:13 133:24
139:4,21 141:3
145:14 146:11
147:12 148:12,18
148:25 149:5,20
151:18 152:12
153:15 154:1 158:5
159:16 160:5
161:19 162:4
163:10 165:17
173:20 176:9
177:14 178:22
179:10 180:7
181:19 184:11,24
185:9,12 189:1,7
**witnesses** 185:7
**wondering** 150:20
**words** 11:4 47:16
63:4 76:22 92:7
146:6 147:18
**work** 7:18,22 12:6
28:17 30:6,14,20
31:14 37:12 57:14
76:22 77:2 81:24
82:9 90:4,9 96:9
107:9 109:19
111:12 122:19
123:4,9,20 125:5
132:19 162:7

168:24 169:9
177:24 179:18
181:24 183:9,12
184:13 185:6,20
**workable** 184:10
**worked** 27:4,6
28:15 30:4,17,22
30:25 31:5,6,7,16
35:20 36:24 49:9
49:14,24 59:1
75:23 79:14 123:6
153:18 158:23,24
**worker** 30:7 31:6,8
31:17 46:8 58:7
79:1 148:13 177:15
**working** 26:23
30:25 35:10,18
36:14 42:17 68:2
68:12 69:3 86:2
103:4 178:1
**workings** 28:4 84:3
**works** 17:25 99:14
122:18 131:23
158:21 185:20
**write** 42:21 63:22
66:2,3,4 69:18 70:9
188:4
**writing** 47:9,11
48:9,12 155:3,4,11
155:15,17,20
**written** 21:5 29:14
43:1 47:6,7 105:16
129:17 136:18
137:7,21 142:25
160:8 172:7
**wrong** 18:21 19:9
85:16

**x**

**x** 3:9 62:14 109:12
182:8

**y**

**y** 109:12
**yamileth** 2:11
191:5
**yamileth.g.davila**
2:12
**year** 9:3,5,7,10
21:17,19 30:13
32:19,19 50:24
68:15,16,17 80:20
118:23 135:7 171:2
**years** 7:16 9:6 25:6
25:11 27:7 46:11
77:22 103:14
107:10 109:25
110:8,10
**yesterday** 35:16,19
36:9,9,10,11,12,25
45:18 59:20
**york** 30:22 31:17
31:24 32:1,12 60:1
60:3 77:2,25
**young** 2:16
**youth** 148:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On this date, May 31, 2019, I electronically filed the following document(s):

- EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT [**REDACTED VERSION OF DOCUMENTS PROPOSED TO BE FILED UNDER SEAL**] VOL. 2 OF 5

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/Peter Schey
*Attorney for Plaintiffs*

1

CV 85-4544-DMG (AGRX)