CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elena Garcia (Cal. Bar No. 299680)
egarcia@orrick.com
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | | |
|---|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) | Case CV 85-4544 DMG-AGRx |
| | ) | |
| Plaintiffs, | ) | CORRECTED POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| - vs - | ) | MOTION TO ENFORCE |
| | ) | SETTLEMENT AGREEMENT |
| WILLIAM BARR, ATTORNEY | ) | [REDACTED VERSION TO BE FILED |
| GENERAL | ) | UNDER SEAL] |
| OF THE UNITED STATES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | [HON. DOLLY M. GEE] |

*Plaintiffs' counsel, continued:*

LA RAZA CENTRO LEGAL, INC.
Michael S. Sorgen (Cal. Bar No. 43107)
474 Valencia Street, #295

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone:  (408) 280-2437
Facsimile:    (408) 288-8850
Email: jenniferk@lawfoundation.org
        kate.manning@lawfoundation.org
        annettek@lawfoundation.org

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (Cal. Bar No. 208741)
Neha Desai (Cal. RLSA Bar No. 803161)
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
        ndesai@youthlaw.org

U.C. DAVIS SCHOOL OF LAW
Holly S. Cooper (Cal. Bar No. 197626)
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

ii

Table of Contents

I.    INTRODUCTION ................................................................. 1

II.   STATEMENT OF FACTS ....................................................... 2

III.  THIS COURT HAS JURISDICTION TO ENFORCE THE
SETTLEMENT .......................................................................... 6

IV.   ARGUMENT ...................................................................... 8

ORR'S PROLONGED CONFINEMENT OF CHILDREN AT
HOMESTEAD, A SECURE, UNLICENSED FACILITY, BREACHES
THE SETTLEMENT. ................................................................. 8

   1.   Class members have been detained at Homestead for prolonged
   periods of time. ................................................................10

   2.   Homestead is a secure facility. ........................................14

   3.   Class members are harmed by lengthy detention at Homestead. .......17

   4.   Defendants have illegally delayed the release of minors at Homestead
   by sharing sponsors' immigration status with the Immigration and
   Customs Enforcement and arresting sponsors who sought the release of
   minors. ............................................................................22

   5.   Defendants have taken other steps inconsistent with the Settlement
   that cause unnecessary delays in the release of minors from Homestead. 24

III.  CONCLUSION ....................................................................27

///

# Table of Authorities

## Cases

*Badie v. Bank of Am.*, 67 Cal. App. 4th 779 Cal. Rptr. 2d 273 (1998).............. 7

*Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 10 Cal. Rptr. 2d 538 (1998)........................................................................................................ 7

*Dacanay v. Mendoza*, 573 F.2d 1075 (9th Cir. 1978) ..................................... 6

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994) ................................................................................. 6

*Rouser v. White*, 825 F.3d 1076 (9th Cir. 2016)............................................. 7

*Thompson v. Enomoto*, 915 F.2d 1383 (9th Cir. 1990)................................... 7

*Wells Benz, Inc. v. U.S. for Use of Mercury Elec. Co.*, 333 F.2d 89 (9th Cir. 1964)............................................................................................................ 7

## Other Authorities

*2018 Individual Program Report: Homestead* (April 11, 2019)....................... 5

Cal. Civ. Code § 1636 ................................................................................... 7

Consolidated Appropriations Act, 2019, § 224(a), Pub.L. 116-6 (Feb. 15, 2019) ......................................................................................................................25

Memorandum of Agreement from the Office of Refugee Resettlement, U.S. Immigration and Customs Enforcement, and the U.S. Customs and Border Protection (June 2018)..................................................................................24

ORR Rule 2.2.4 .............................................................................................28

ORR Rule 2.4.1 .............................................................................................28

ORR Rule 2.5.2 .............................................................................................24

*Policy Options to Respond to Border Surge of Illegal Immigration*, Department
of Homeland Security and the Department of Justice (Dec. 16, 2017)........24

The New England Journal of Medicine, Reducing Protections for Noncitizen
Children — Exacerbating Harm and Trauma (November 21, 2018)............18

*/ / /*

## I.     INTRODUCTION

On January 28, 1997, this Court approved a class-wide settlement of this case setting minimum national standards for the detention, treatment, and prompt release of accompanied and unaccompanied minors detained by federal immigration authorities. *Flores* Settlement Agreement [Doc. #101] ("Settlement").

The Settlement requires that Defendants make and record *prompt* and continuous efforts aimed at the release of class members to sponsors identified in the Settlement. Settlement ¶ 14. If prompt release is not possible, Defendants are required to *expeditiously* place class members in non-secure facilities licensed for the care of dependent children. Settlement ¶ 19.

The evidence filed with this motion shows that the U.S. Department of Health and Human Services' Office of Refugee Resettlement ("ORR"), which detains all unaccompanied minors commencing seventy-two hours after apprehension, has adopted policies and practices in violation of the Settlement by detaining as many as 2,350 unaccompanied minors in an unlicensed and secure military-style camp in Homestead, Florida ("Homestead"), while routinely failing to expeditiously transfer minors to licensed facilities if not promptly released to sponsors.[1]

---

[1] Pursuant to Local Rule 7-3, Plaintiffs have met and conferred with Defendants regarding this motion. Plaintiffs believe the issues raised are not within the

Plaintiffs seek an Order requiring that Defendants release class members or transfer them to a licensed facility within fourteen (14) days of placement in Homestead.

II.   **STATEMENT OF FACTS**

In February 2018, ORR opened a mass detention facility for unaccompanied minors in Homestead.[2] Homestead is not licensed by the state of Florida and is therefore not regulated by state child welfare and foster care authorities.[3] Defendants plan to expand Homestead so it will detain as many as 3,200 class members. U.S. Dep't Health & Human Servs., *Fact Sheet: Unaccompanied Alien Children sheltered at Homestead Job Corps Site,*

current jurisdiction of the Special Master but nevertheless informed the Special Master and Defendants that Plaintiffs are prepared to have the Special Master serve as a mediator regarding the claims in this motion. On June 10\ 2019\ upon Stipulation [Doc. #552]\ the Court Ordered the Motion to Enforce be set for mediation with the Monitor. [Doc. #553]..

2 Homestead is operated by the for-profit corporation Comprehensive Health Services, Inc. ("CHS"). In February 2018, Defendants awarded CHS a $31 million contract to oversee the Homestead detention camp.In April 2019, Defendants awarded CHS a no-bid contract worth more than $341 million to expand Homestead. *See* Washington Post, *Lawmakers ask watchdog to probe migrant teen camp's contract* (May 14, 2019), available at https://www.apnews.com/.

3 The federal government has granted Homestead a "waiver" allowing Homestead employees to bypass Florida's child abuse and neglect background check system, which would be a requirement of state-licensed facility employees. CBS News, Graham Kates (Jan. 11, 2019\, *Facility for migrant children extends offer letters on the spot amid rapid expansion,* available at https://www.cbsnews.com/news/homestead-florida-nations-largest-facility-for-migrant-children-extends-offer-letters-on-the-spot-amid-rapid-expansion/ (last checked May 28, 2019).

*Homestead, Florida*, April 1, 2019.[4] According to Defendants, the average daily cost to detain a child at Homestead is about $775. The Defendants' unlawful detention of children at Homestead is costing about $1.2 million a day.[5] Far from moving to end the mass incarceration of immigrant children, Defendants are in the process of opening additional unlicensed, secure facilities that may warehouse family units and unaccompanied minors.[6]

Homestead is defined by Defendants as a "Temporary Influx Care Facility."[7] ORR states that "[b]ecause of the temporary and emergency nature of Influx Care Facilities, they may not be licensed or may be exempted from licensing requirements by State and local licensing agencies. Influx Care Facilities may also be opened on Federal properties, in which case, the facility

_____

4 Available at https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-Sheltered-at-Homestead.pdf. (last checked May 29, 2019)

5 NPR, John Burnett (February 17, 2019), *Inside the Largest and Most Controversial Shelter for Migrant Children in the U.S.*, available at https://www.npr.org/2019/02/13/694138106/inside-the-largest-and-most-controversial-shelter-for-migrant-children-in-the-u- ("The average daily cost to care for a child at an influx facility is about $775 a day, according to Evelyn Stauffer, press secretary at the U.S. Department of Health and Human Services. With nearly 1,600 children at Homestead, that puts the burn rate at over $1.2 million a day.") (last checked May 28, 2019).

6 New York Times, *Two New Tent Cities Will Be Built in Texas to Hold Migrants* (April 17, 2019), available at https://www.nytimes.com/2019/04/17/us/mcaleenan-migrants-border-texas.html (last checked May 28, 2019).

7 U.S. Dep't Health & Human Servs., *Fact Sheet: Unaccompanied Alien Children sheltered at Homestead Job Corps Site, Homestead, Florida*, May 10, 2019, available at https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-Sheltered-at-Homestead.pdf.

would not be subject to State or local licensing standards."[8] Defendants use of

Homestead reveals the Government's intentional disregard of the binding

provisions of the Settlement which do not permit unaccompanied minors to be

detained in unlicensed facilities merely because they are on Federal properties.

According to ORR, during an influx it "may not have sufficient bed space

available within its licensed care provider network to place unaccompanied alien

children. In this situation, ORR arranges for Influx Care Facilities to meet the

need." *Id*. Defendants deem bed space insufficient within its licensed care

provider network when 85% of the available beds are occupied by class

members.[9] When that occurs, class members meeting certain criteria are

transferred to Homestead rather than a licensed facility.[10] For about half the cost

of detaining minors at Homestead, Defendants could place minors in facilities

licensed for the care of dependent children.

---

8 *See* ORR Children Entering the United States Unaccompanied: Guide to
Terms, Section 1.7, available at https://www.acf.hhs.gov/orr/resource/children-
entering-the-united-states-unaccompanied-section-1#1.7. (current as of May 19,
2019).

9 Ex. 9, Deposition of ▮▮▮▮ ▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("▮▮▮▮
Depo."), at 60:12-14.

10 The ORR criteria for transfer to an Influx Facility include the minor being
between 13-17 years of age; speaks either English or Spanish; has no known
behavioral or medical issues; has no known special needs; is not be a danger to
self or others; does not have a criminal history; is not a perpetrator or victim of
smuggling or trafficking activities; is not part of a sibling group with a sibling(s)
age 12 years or younger; and is not pregnant or parenting. *Id*. ¶ 1.7.2.

4

There is "currently no[ ]" maximum amount of time ORR allows a child
to be housed at Homestead. ▮▮▮ Depo. at 60:10-21.

Even when bed space does become available at an ORR licensed facility,
minors detained at Homestead are unlikely to be transferred from Homestead to
a licensed facility with bed space.[11]

At Homestead, children are housed in prison-like conditions and
unnecessarily incarcerated for up to several months without being determined to
be flight risks or a danger to themselves or others. Once detained at Homestead,
the majority of class members are not expeditiously transferred to one of
Defendants' licensed facilities. *See* Ex. 5, N.E. Wang, Emergency Medicine and
Pediatrics at Stanford,  Stanford Human Rights in Trauma Mental Health
Program, *2018 Individual Program Report: Homestead* (April 11, 2019) ("NE
Wang Report") at 4, Transfer and Discharge.[12] Instead, class members remain at
Homestead until they are eventually released to a sponsor, or are deported, or
turn eighteen and "age out" and are transferred to an ICE detention facility for
deportation. *Id.*

---

11 Ex.10, ▮▮▮ Depo., at 57:2-4 ("When we were running on 85 to 90 percent
capacity, there was nowhere to put the kids. The minute a child left [a licensed
facility], the beds were taken" by minors not at Homestead).

12 Defendants provide data to class counsel on a monthly basis, as required by
the Settlement Agreement. In order to meaningfully analyze this data, pursuant
to a confidentiality agreement, class counsel provided this data to Stanford
University researchers led by Dr. Nancy Ewen Wang. Ex. 1, Schey Dec. ¶ 6. A
copy of their analysis as to length of detention is filed herewith as Exhibit 5.

Consistent with the terms of the Settlement, Plaintiffs seek an Order requiring that within 20 days of arrival at an influx facility, Defendants either release unaccompanied minors to their sponsors, or transfer them to licensed shelters in compliance with the terms of the *Flores* Settlement.[13]

## III.   THIS COURT HAS JURISDICTION TO ENFORCE THE SETTLEMENT

This Court has the inherent power to enforce the terms of the Settlement because the Settlement "provides for the enforcement, in this District Court, of the provisions of this Agreement ..." *See* Settlement, ¶ 37.[14]

---

13 The Trump Administration has expressed strong opposition to the rights the Settlement extends to class members. *See, e,g.,* Executive Order Affording Congress an Opportunity to Address Family Separation, 83 Fed. Reg. 29435, 29435 (June 25, 2018) ("The Attorney General shall promptly file a request with the U.S. District Court for the Central District of California to modify the Settlement Agreement in *Flores v. Sessions* ... [to] permit the Secretary ... to detain alien families together throughout the pendency of criminal proceedings ... or other immigration proceedings"); President Trump Sends a Letter on Border Security to Congress (Jan. 4, 2019) ("The most pressing legal changes are as follows: Terminate the Flores Settlement ..."), available at https://www.whitehouse.gov/articles/president-trump-sends-letter-border-security/; Newsweek, Jessica Kwong, *Donald Trump Derides 'Judge Flores' for Reno v. Flores Immigration Case Actually Named for Migrant Teen Jenny Lisette Flores* (April 5, 2019) ("The Flores decision is a disaster ... A disaster, and we're working on that"), available at https://www.newsweek.com/donald-trump-derides-judge-flores-settlement-actually-named-after-1387928 (last checked May 29, 2019).

14 *See also* In Chambers Order re Plaintiffs' Motion to Enforce Settlement of Class Action and Defendants Motion to Amend Settlement Agreement [Doc. # 177] ("July 24, 2015 Order") at 3, *citing Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978)

Moreover, the Settlement is a consent decree. "Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts use contract principles, specifically the contract law of the situs state. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990).[15]

"Like terms in a contract, distinct provisions of consent decrees are independent obligations, each of which must be satisfied before there can be a finding of substantial compliance." *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016). "Substantial compliance" means more than "taking significant steps toward compliance" with a consent decree. *Id.* at 1082. In California, "a party is deemed to have substantially complied with an obligation only where any deviation is 'unintentional and so minor or trivial as not substantially to defeat the object which the parties intend to accomplish.'" *Id.* (quoting *Wells Benz, Inc. v. U.S. for Use of Mercury Elec. Co.*, 333 F.2d 89, 92 (9th Cir. 1964) (citation and some quotation marks omitted)).[16]

---

15 Under California law, a court must interpret a contract with the goal of giving effect to the mutual intention of the parties as it existed at the time of contracting. Cal. Civ. Code § 1636. Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798, 79 Cal. Rptr. 2d 273 (1998). Where the contract is clear, the plain language of the contract governs. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538 (1998).

16 "This standard doesn't require perfection … Deviations are permitted so long as they don't defeat the object of the decree." *Id.* (citation omitted). In this case, Defendants use of Homestead to detain thousands of unaccompanied minors completely defeats the object of the Settlement.

## IV.  ARGUMENT

### ORR'S PROLONGED CONFINEMENT OF CHILDREN AT HOMESTEAD, A SECURE, UNLICENSED FACILITY, BREACHES THE SETTLEMENT.

Regardless of whether there is an "influx" as ORR may define that term, the Settlement does not authorize Defendants to detain class members for prolonged periods in unlicensed facilities.[17]  Rather, even during an influx, the Settlement requires ORR to promptly release minors to sponsors identified in Paragraph 14, or if release is not possible, to expeditiously place children in non-secure, licensed facilities. The Settlement provides the following: "In any case in which [Defendants] do[ ] not release a minor pursuant to Paragraph 14 … such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 … or until the minor's immigration proceedings are concluded …" Settlement ¶ 19. "[A]ll minors [shall be placed in licensed facilities] pursuant to Paragraph 19 as expeditiously as possible." Id. ¶ 12.A.[3]

---

17 The Settlement defines an "influx" as existing when more than 130 minors in Defendants' custody are eligible for placement in a licensed program under Paragraph 19. Settlement ¶ 12.B. It is undisputed that almost since the Settlement was reached, an influx has existed. Significantly, the only difference in the Settlement's requirements that are modified in an influx is that rather than placing minors in a licensed placement within three to five days of apprehension (Settlement ¶12.A), the minor must be placed in a licensed program "as expeditiously as possible …" Settlement ¶ 12.A.3 ("in the event of an emergency or influx of minors into the United States, in which case the [Defendants] shall place all minors [in licensed facilities] pursuant to Paragraph 19 as expeditiously as possible").

The term "licensed program" refers to "any program, agency or organization that is *licensed by an appropriate State agency* to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 …" *Id.* ¶ 6 (emphasis added).[18]

As this Court has recognized, "The purpose of the licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency." July 24, 2015 Order at 14. State child welfare licensing standards are designed to ensure that all child care programs meet minimum requirements to protect the health and well-being of

---

18 Exhibit 1 to the Settlement sets forth the requirements for a licensed facility, including an educational assessment and plan (Paragraph A.3(d)), educational services including science, social studies, math, reading, writing and physical education Mondays through Fridays (Paragraph A.4), identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification (Paragraph A.3(h)), individual counseling once a week (Paragraph A.6), group counseling twice a week (Paragraph A.7), visitation and contact with family members (Paragraph A.11), family reunification services and assistance inn obtaining legal guardianship when necessary for the release of the minor (Paragraph A.13), and development of a comprehensive individual plan for the care of each detained minor (Paragraph D). Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living. Paragraph C. ORR programs "shall maintain adequate records and make regular reports as required by the [ORR] that permit the [ORR] to monitor and enforce this order and other requirements and standards … [and that] are in the best interests of the minors." Paragraph F.

children.[19] In contrast to the comprehensive requirements of state child welfare

licensure, ORR's requirements for its "Influx Care Facilities" are limited to

"basic standards of care" that ignore well-established standards for the care of

dependent minors.[20]

1.     **Class members have been detained at Homestead for prolonged periods of time.**

Monthly class member detention reports provided by Defendants to Class

Counsel show that the number of class members in custody at Homestead has

increased dramatically throughout 2018 and 2019. *See* Ex. 5, N.E. Wang Report

at 1. The population has grown significantly: 423 children in April 2018, 1,570

---

19 For example, licensing standards in the state of Florida include detailed
requirements regarding staff training and credentials, child/caregiver ratios,
supervision, food preparation, sanitation, transportation, emergency
preparedness, and sleeping requirements, among many others. *See* Fla. Dep't
Children & Families, *Child Care Facility Handbook* (October 2017), available at
http://www.dcf.state.fl.us/programs/childcare/docs/handbook/Facility%20Handb
ook.pdf.  Florida regulations provide substantial protection for the safety and
security of minors in licensed facilities. *See also* Florida Administrative
Regulations § 65C-14.018 Community Interaction ("The facility shall … assure
that resident children are allowed to become a part of the community"); § 65C-
14.044 Placement Agreement ("The facility shall have a written agreement with
the child, parent, guardian, the department or the licensed child placing agency
which describes the … frequency of contact with the child's family …"); § 65C-
14.042 Orientation ("The facility shall have written policies that encourage and
support … telephone calls, and other forms of communication with parents …").
20 *See* Office of Refugee Resettlement, *ORR Guide: Children Entering the
United States Unaccompanied, 1.7.6. HPC and Influx Care Facility Services*
(last updated Mar. 21, 2016), available at
https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-
unaccompanied-section-1#1.7.

10

children in June 2018, 3,234 children in March 2019, and 3,728 children in May 2019. *Id.*

Class members' length of detention at Homestead is far from "temporary." Data provided by Defendants shows that as the number of class members in custody at Homestead has increased, the length of detention of class members at Homestead has increased as well. *See* Exhibit 5, N.E. Wang Report at 2. In May 2018, 585 class members were released from Homestead within 20 days, while by December 2018, even though there were about 600 additional class members at Homestead, the number released within 20 days dropped to 262. *Id.* at Figure 1.[21]

Per Defendants' monthly detention reports, as of April 30, 2019 -

- 868 class members had been incarcerated at Homestead for 21-30 days,

- 943 class members had been incarcerated at Homestead for 31-60 days,

- 171 class members had been incarcerated at Homestead for 61-90 days.

Ex 5, N.E. Wang Report, Homestead Report, at Figure 2. [22]

---

21 *See also* KQED, *Wait Times for Migrant Children in U.S. Custody Spiked in Recent Years, Records Show* (May 11, 2019) ("In the 2015 fiscal year, officials with the Office of Refugee Resettlement, the agency tasked with caring for unaccompanied minors, released children to sponsors within an average of 34 days. But in the first half of this fiscal year, that average jumped to 77 days."), available at https://www.kqed.org/news/11746399/thousands-of-unaccompanied-migrant-kids-held-u-s-custody.

22 Data shows that Homestead population has more than doubled since June 2018. Additionally, only 1615 (16% of 10,125) class members were released from ORR custody within 20 days. Notably, there were 1,828 (18%) Class Members detained more than 90 days, 1593 (16%) detained from 61-90 days,

11

On February 13, 2019, HHS reported that the "average" length of stay for class members detained at Homestead was 67 days.[23] *Many children are detained at Homestead for even longer periods of time. See, e.g.*, Declaration of N█ J█████ Ex. 29, ¶ 6 (detained at Homestead for 140 days when her declaration was taken); Declaration of D█ A█████ █ Ex. 52, ¶ 29 (164 days).[24]

Monthly data provided by Defendants to Class Counsel does not show class members detained at Homestead being transferred to ORR's licensed programs regardless of bed space at those facilities. Nor is it clear why Defendants must maintain 15% bed capacity at their licensed facilities while thousands of class members are held at a secure unlicensed facility.[25]

---

3318 (33%) from 31-60 days, and 1771 (17%) from 21-30 days. Ex. 5 Homestead Report, at p. 1.

23 U.S. Dep't Health & Human Servs., *Fact Sheet: Unaccompanied Alien Children sheltered at Homestead Job Corps Site, Homestead, Florida*, Feb. 13, 2019, available at https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-Sheltered-at-Homestead.pdf (last checked May 29, 2019). Plaintiffs have previously pointed out that using "averages" regarding minors' length of detention may be misleading both because averages are easily subject to manipulation (*e.g.* by taking an unusual action with a portion of the population being assessed), and more importantly an "average" fails to disclose how many class members were detained for 30-40 days, 40-60 days, 60-90 days, etc.

24 Class member N█████████ D█ is a Guatemalan national who presented herself at a border checkpoint in Texas on or about June 5, 2018, along with her father, step-mother, and three-month-old sister. Nancy was separated from her family and had been detained for approximately ***140 days*** when her declaration was taken. Ex. 29 Declaration of N█ J███, ¶¶ 11,12,14. Class member D█ A████ █ is a fourteen-year-old national of El Salvador detained for about ***164 days*** when he executed his declaration. "My mother is in Maryland. She would like to take me. I want to be with my mother and I want them to let me go …" Declaration of D█ A████ █, Ex. 52 ¶¶ 1, 2, 4.

25 Dr. Wang's report points out the importance for the relevant agencies "to

Defendants may argue, as they did when defending their use of unlicensed ICE facilities, that the licensing issue is "a question of state law" and state licensing requirements essentially cannot be applied to ORR's influx centers. *See* Hearing Tr. dated Jan. 30, 2017, at 54. Even if Defendants "made efforts to obtain [a] license[ ] in accordance with state law," or if Homestead is "unlicensed because state law does not provide a license" for this type of facility, "this reasoning [would be] a mere reprise of Defendants' well-worn argument against Plaintiffs' February 2, 2015 Motion to Enforce—which the Court rejected—that the licensing provision in the *Flores* Agreement cannot be interpreted to apply to family residential centers, in part because there are no state licensing processes available for Defendants' specific facilities." June 27, 2017 Order at 28 [Doc. # 363].[26]

As the Court previously stated with regards ICE detention facilities, "[t]he fact that the family residential centers cannot be licensed by an appropriate state

_____

provide additional data points in order to assess compliance with specific provisions of the settlement. In particular, it does not appear that ORR or Homestead collects or records quantifiable data that would permit ORR, the Special Master, or Class Counsel to monitor Homestead's success or failure in making and recording efforts aimed at the prompt release of minors, as required by Paragraph 18 of the Settlement … For example, data regarding date, time, and location of apprehension and initial booking by CBP are not provided in ORR reports. Additionally, there are crucial data quality and validation issues including distinctly different class members recorded with the same A-number." Ex. 5 at 2.

26 *See also* July 24, 2015 Order, 212 F. Supp. 3d at 877–78 (discussing Defendants' argument and concluding that "Defendants are required to provide children who are not released temporary placement in a licensed program").

agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement." July 24, 2015 Order, 212 F. Supp. 3d at 877.

It also makes no difference whether Defendants provide amenities at Homestead, such as "meals, medical and dental services, recreational opportunities, and education for school-age children." *Id.* at 13. Even "[a]ssuming the conditions are acceptable or ... outstanding, however, Defendants cannot be in substantial compliance with the Agreement because the facilities are secure and non-licensed." *Id.* at 14.

Defendants' lengthy detention of class members at Homestead does not satisfy the Settlement's unambiguous mandate to place children Defendants do not promptly release in "a program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children."  Settlement ¶ 6.

## 2. Homestead is a secure facility.

Even if the Court were to disregard the conditions in, and the unlicensed status of, Homestead, the facility is secure,[27] "which violates the Agreement's

---

27 Interviews with class members at Homestead, a site inspection by Plaintiffs' counsel, depositions of Homestead staff, and numerous public reports all confirm that Homestead is a fully secure facility. *See, e.g.*, Exhibit 2, Declaration of Hope Frye ("Frye Dec.") ¶ 8 ("[T]he perimeter [is] surrounded by an 8' chain link fence with a privacy covering. Entrance and exits are blocked by fences and gates staffed by security personnel. The gates are closed, opened

14

requirement that '[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . .'" July 24, 2015, Order at 15, *quoting* Settlement ¶ 23. Homestead's facility administrator has "acknowledged that the facility is surrounded by a tall covered fence and monitored by a large team of patrolling private security contractors."[28]

C|M|, a sixteen-year-old national of Guatemala apprehended with his father on June 10, 2018, had been at Homestead for forty-six days when his declaration was taken. Ex. 15, Declaration of C|M| ¶ 5. He declares: "I can't leave this facility. People who try to escape are always caught, and my friends tell me that if you are caught, you get sent to another place....There are gates and walls that surround this place ... [Y]ou have to get permission from the YCs [youth counselors] to use the bathroom." *Id.* ¶ 7.

Class member J|Q| had been detained for approximately 68 days when her declaration was taken. She declares: "The Homestead facility is very secure. We are not allowed to go off grounds except with special permission and we must ask in advance. I have not gotten to leave at all. The people in charge have said

---

only upon producing proper credentials. Children understand that they are not free to leave and have been told that they will be arrested by local police and ICE and deported, if they do. Even talking about leaving is thought to be a violation of the rules, for which children believe they will be stepped-up to a more restrictive facility.").

28 Graham Kates, *Nation's largest holding facility for migrant children expands again*, CBS News (April 4, 2019), available at https://www.cbsnews.com/news/homestead-nations-largest-holding-facility-for-migrant-children-expands-again/ (last checked May 28, 2019)

15

that if you leave without permission, they will file a report against us. The doors are always locked.   ... We can't even go to the bathroom without a YC accompanying us." Ex. 12, Declaration of J▇Q▇, ¶ 7.[29]

As the Ninth Circuit has acknowledged, "[t]he [Flores] Settlement creates a presumption in favor of releasing minors and *requires* placement of those not released in licensed, *non-secure* facilities that meet certain standards." *Flores*, 828 F.3d at 901 (emphasis added).

Because Homestead is a secure, unlicensed facility, and the provisions requiring that minors be placed in licensed non-secure facilities as expeditiously as possible are material terms in the Settlement, Defendants cannot be deemed in substantial compliance with the Settlement.[30]

---

29 D▇ N▇ ▇▇▇▇, a thirteen-year-old national of Honduras incarcerated at Homestead, declares: "Children like me are not allowed to leave this detention center ... The YCs [youth counselors] have told us that if a child tries to leave, the police or other officials will come looking for us.  It is just not possible for a child to leave ..." Ex. 79 ¶ 9. *See also* Exhibit 3 at 14 includes numerous additional excerpts of declarations evidencing that Homestead is a secure facility.

30 The Settlement limits the circumstances in which class members may be detained in "secure" facilities. Settlement ¶¶ 21-22. Minors who are an "escape-risk" may be detained in "secure" facilities. *Id.* ¶ 22. The Settlement requires a fact-specific, *individualized* assessment whether there is "a serious risk that the minor will attempt to escape from custody." Settlement ¶ 22. Factors to consider include "whether: ... the minor is currently under a final order of deportation or exclusion; the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation; [or] the minor has previously absconded or attempted to abscond

16

**3.      Class members are harmed by lengthy detention at Homestead.**

The Settlement provides that "[f]ollowing arrest, the [Defendants] shall hold minors in facilities … that are consistent with the [Defendants'] concern for the particular vulnerability of minors …" Settlement ¶ 12. Detention in Homestead is entirely inconsistent with a concern for class members' particular vulnerability as minors.

This Court has already addressed the harms minors experience when subject to secure confinement which "can inflict long-lasting psychological, developmental, and physical harm on children regardless of other conditions." Order of July 24, 2015 [Doc. 177] at 15 (citing Plaintiffs' First Set, Exh. 24 (Declaration of Luis H. Zayas ("Zayas Decl.")) ¶¶ 1-6.) Plaintiffs' evidence has shown that prolonged detention in a secure facility causes children "to suffer[ ] emotional and other harms as a result of being detained." *Id.*

Doctors Ryan Matlow, Ph.D., and Daryn Reicherter, M.D., have written that prolonged detention of class members may "ultimately result in the traumatization of children … in the custody and care of the administration's Office of Refugee Resettlement." Ex. 8, The New England Journal of Medicine, Reducing Protections for Noncitizen Children — Exacerbating Harm and Trauma (November 21, 2018) at 2. "Our concerns stem from the clear

from INS custody." *Id.* Minors who are a danger or have been convicted of certain crimes may also be detained in a "secure" facility. *Id.* ¶ 21.

17

understanding in the medical and mental health communities that the indefinite detention of children … is a form of trauma and is likely to cause lasting psychological harm." *Id.*[31]

Dr. Matlow, a licensed psychologist and a Clinical Assistant Professor in the Department of Psychiatry and Behavioral Sciences at the Stanford University School of Medicine, visited Homestead in March 2019. Ex. 7 at 2. He observed "clear ongoing psychological harm directly attributable to" Defendants' detaining unaccompanied minors in Homestead. *Id.* at 2.  Conditions he observed were "consistent with those that create trauma and that commonly result in post-traumatic stress and long-lasting functional impairment." *Id.* at 6.[32] Exposure to a traumatic experience like detention at Homestead is

> associated with increased risk for long-term psychological dysfunction
> and psychiatric disorders, including problems with emotions, behaviors,
> mood, learning, substance abuse, and interpersonal relationships…. These
> problems and functional difficulties stem from the impact of traumatic

---

31 "It is firmly established that childhood trauma is associated with an increased risk for psychological dysfunction, including severe and impairing psychiatric disorders, ranging from mood and anxiety disorders to substance abuse and personality disorders." *Id.*

32 In his interviews with class members, Dr. Matlow observed "the signs and symptoms of acute distress that are expected in reaction to ongoing trauma" including "despair and hopelessness," "emotional flatness, numbing, and avoidance of thoughts and feelings related to their experience, as well as intrusive thoughts and memories (including nightmares) of their past and ongoing traumas." *Id.* at 6-7.

stress on children's development, where trauma exposure literally changes the structure and functioning of children's brains and biological systems and, in particular, the stress response system. This has lasting implications for physical health and immune functioning….

*Id.* These consequences are "well-established and firmly documented in the scientific literature …" *Id.* at 8.[33]

The conditions prevailing at Homestead exacerbate the harms of class members' prolonged detention in the facility. Declarations signed by numerous class members at Homestead show the facility is surrounded by secure fencing, a large number of "security" guards patrol the facility,[34] and children are subjected to a litany of restrictive rules and are always being watched.

Class member J█ D██, a thirteen-year-old from El Salvador declared, "When I first came here, they gave us an orientation and told us that we had to follow the rules: no touching, five minutes for taking a showers, fifteen minutes to eat, no lending clothes, no taking any food into the bunk room, no sitting on anyone else's bed. If we don't follow the rules or pay attention to the youth counselors they said, we would get a report. If you get a report, you'll end up spending more time here." Ex. 66, Declaration of J█ D██, ¶¶ 1-3.

---

33 *See also* Ex. 6, Declaration of Dr. Marsha Rae Griffin ¶ 9 ("Prolonged, uncertain detention of previously traumatized children is the causative factor in these children's deteriorating mental and physical health and will have long-term health consequences.")
34 *See* Exhibit 2, Frye Dec., ¶ 8.

19

Class member J█ A██ explained "[t]he YCs explained the rules to me when I arrived. If we want to go to the bathroom, we have to be accompanied by a YC. We have to be accompanied everywhere we go. We can't use bad words. We have to walk in line when we go anywhere." Ex. 65, Declaration of J██ L█, ¶ 6.[35]

Children must be accompanied by guards even to use a bathroom.[36] Children are forbidden to touch one another.[37] Children are limited to a maximum of two telephone calls a week of ten minutes each to communicate

---

[35] See also, e.g., Ex. 55, Declaration of H█ M██, ¶ 6 ("When I arrived, the staff here told me the rules: . . .We have to walk in line. We can't touch anybody else. If we break the rules, we will get a report. The staff say that if we get a report, they will send it to the judge who decides whether we will stay in this country.").

[36] Ex. 12, Declaration of J█ Q██, ¶ 7 ("The doors are always locked. We also have 'YCs' – that's what they're called. They accompany us for meals and tell us what we can do. They change throughout the day. We can't even go to the bathroom without a YC accompanying us."); Ex. 14, Declaration of Y█ M███ dated 10/24/18, ¶¶ 8, 9 ("[W]e must ask for permission to go to the restroom and are watched as we enter and exit the bathroom….My actions, and the actions of the other children at the facility, are watched and monitored at all times."); Ex. 15 ¶ 7, Declaration of C█ M██ ("You can only leave the buildings in a group, with permission, to do recreations in the yard….You have to ask permission from the supervisors with the red hats to go get water, and you have to get permission from the YCs to use the bathroom.").

[37] Ex. 62, Declaration of A█ B██, ¶ 6 ("The rules here are that you can't touch anyone. Sometimes when your friend is crying because they can't stand being here any longer you want to be able to give them a hug. But you can't because it's against the rules."); Ex. 68, Declaration of I█ P██, ¶ 6 ("The rules here say that we cannot touch each other. We cannot touch each other on the hand … Sometimes something good will happen and my niece will say to me, "give me a hug!" but I have to say "no" because we are not allowed to touch. There are cameras here watching us"); Ex. 58, Declaration of N█ P██, ¶ 8 ("Children here also cannot touch each other.  I cannot give anyone a hug. I need to be comforted, but there is no way for that to happen here.").

20

with parents or relatives.[38] Children who do not speak Spanish are without any ability to communicate with staff or other children.[39]

Monitoring at Homestead disclosed that "[e]very child interviewed expressed fear and anxiety around the enforcement of shelter rules." Exhibit 2, Frye Dec, ¶ 19.

Defendants' prolonged detention of class members at Homestead not only is in violation of Settlement paragraphs 6, 12.A.3, 14, 18, and 19, it also causes class members to suffer unnecessary and potentially long-lasting harm, in violation of Defendant's obligation to treat children in a manner "consistent with ... the particular vulnerability of minors ..." Settlement ¶ 12. Dr. Matlow reports observing "clear ongoing psychological harm" that was "directly attributable" to

___

[38] *See* Exhibit 2, Frye Dec. ¶ 29 ("After interviewing class members it was clear without a doubt that the staff at Homestead do not provide class members with adequate time to speak with their families or provide adequate privacy when on the telephone...Telephone time was limited to two ten minute phone calls per week. Class members must request, and have been denied, additional telephone time even if they have an unusual circumstance such as death of an immediate family member."); *see also* Ex. 33, Declaration of S▌G▌▌ ▌▌▌▌, ¶ 16 ("I am only given two phone calls a week, each for 10 minutes. One time I was still talking to my mom and went a bit over and I was told I had to hang up. I wish I had more time, sometimes even 15 or 20 minutes."); Ex. 80, Declaration of Z▌P▌ , ¶ 6 ("I'm only allowed to talk to my mom for 5 minutes and my grandpa for five minutes. That's not really enough time to say more than a quick hello and make sure she's okay."); Ex. 74, Declaration of E▌E▌▌, ¶ 5 ("I get two days a week for ten minutes each to call people and since I called them yesterday, I can't make another call today. It's disappointing because I can't even access the phone to talk to my mom today on my birthday. Nobody has sung happy birthday to me today.").
39 *See, e.g.*, Ex. 3, Excerpts of Declarations at p. 26.

Defendants' detaining and treatment of unaccompanied minors in Homestead. Ex. 7 at 2. That harm can be avoided if the Government complies with the terms of the Settlement and within fourteen days transfers minors to licensed facilities if they cannot be released to a parent or sponsor.

**4.      Defendants have illegally delayed the release of minors at Homestead by sharing sponsors' immigration status with the Immigration and Customs Enforcement and arresting sponsors who sought the release of minors.**

The Settlement provides that Defendants may conduct a "positive suitability assessment … prior to release to any individual or program pursuant to Paragraph 14." Settlement ¶ 17.[40]

Among the policies responsible for increasing the length of detention of minors at Homestead is an ORR/ICE/CBP policy providing: "ORR will provide ICE with the name, date of birth, address, fingerprints . . . and any available identification documents or biographic information regarding the potential sponsor and all adult members of the potential sponsor's household."[41] This policy was published as ORR Rule 2.5:

---

[40] A suitability assessment "may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit." *Id.* Any such assessment "should also take into consideration the wishes and concerns of the minor." *Id.*

[41] Memorandum of Agreement from the Office of Refugee Resettlement, U.S. Immigration and Customs Enforcement, and the U.S. Customs and Border Protection (June 2018) ,available at: https://www.texasmonthly.com/wp-content/uploads/2018/06/Read-the-Memo-of-Agreement.pdf.

22

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the DOJ to investigate criminal history through the National Criminal Information Center.

ORR Rule 2.5.2. Results of Background Checks on Release Decisions.[42]

As intended, ORR's sharing sponsor information with ICE resulted in the arrest of numerous potential sponsors and deters others, adding to the unreasonable length of time class members are detained in a prison-like camp at Homestead.[43]

However, on February 15, 2019, the 116th Congress passed an Appropriations Bill meant to curb Defendants arrests and deterrence of sponsors:

---

[42] A memorandum released by Oregon Senator Jeff Merkley revealed the intent of the policy to conduct background checks on sponsors of minors and subsequently place them into removal proceedings: "This [policy] would [allegedly] result in a deterrent impact on 'sponsors' who may be involved with smuggling children into the United States." *Policy Options to Respond to Border Surge of Illegal Immigration*, Department of Homeland Security and the Department of Justice (Dec. 16, 2017), available at: http://liblog.law.stanford.edu/ wp-content/uploads/2019/01/DRAFT-Policy.Options.to_.Respond.to_. Border.Surge_.of_.Illegal.Immigration-memo-Dec.2017.pdf.

[43] *See* Geneva Sands, CNN Politics (December 10, 2018), *ICE arrested 170 potential sponsors of unaccompanied migrant children*, available at https://www.cnn.com/2018/12/10/politics/ice-potential-sponsors-arrests/index.html.

SEC. 224. (a) None of the funds provided by this Act … may be used by

the Secretary of Homeland Security to place in detention, remove, refer

for a decision whether to initiate removal proceedings, or initiate removal

proceedings against a sponsor, potential sponsor, or member of a

household of a sponsor or potential sponsor of an unaccompanied alien

child … based on information shared by the Secretary of Health and

Human Services.

Consolidated Appropriations Act, 2019, § 224(a), Pub.L. 116-6 (Feb. 15,

2019).[44]

To date, ORR's published policy of sharing sponsors' fingerprint

information with ICE remains unchanged. ORR's policy contravenes federal

law, violates the Settlement's limited terms regarding the assessment of sponsors

set forth in Paragraph 17, discourages sponsors from coming forward, and very

likely contributes to the delay in releasing class members from Homestead to

sponsors under Paragraph 14 of the Settlement.

**5.      Defendants have taken other steps inconsistent with the Settlement
that cause unnecessary delays in the release of minors from
Homestead.**

---

[44] Section 224(b) provides exceptions if a background check of a sponsor,
potential sponsor, or member of a household of a sponsor or potential sponsor
reveals felonies involving child abuse, sexual violence, child pornography, or
child trafficking.

The Settlement provides: "Upon taking a minor into custody, [Defendants], or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in [Defendants'] custody." Settlement ¶ 18.[45]

Interviews with class members at Homestead appear to confirm that class members' length of detention is lengthened because Defendants are not making or recording prompt and continuous efforts to reunify minors with sponsors under Paragraph 14.[46]

Defendants' failure to provide adequate case management at Homestead is another factor that impedes the prompt release of minors. Class members declare they are often unable to promptly and continuously access their social workers at

---

[45] It does not appear that Defendants require Homestead to record quantifiable data that would permit ORR, the Special Master, or class counsel to monitor Homestead's success or failure in making and recording efforts aimed at the prompt release of minors under Paragraph 14 or their placement in a licensed facility under Paragraphs 12.A.3 and 19. Ex. 5 NE Wang Report (Cover letter).

[46] *See* Declaration of D███ ███, Ex. 52 ¶¶ 1, 2, 4 ("My mother is in Maryland. She would like to take me. I want to be with my mother and I want them to let me go … It's taking forever. I don't know why it's taking so long."); Declaration of N██ J███ Ex. 29 ¶¶ 11,12,14 (Class member separated from father, step-mother, and sister at the border and detained at Homestead for 140 days at the time her declaration was taken). *See also* Exhibit 3, Plaintiffs' Excerpts of Declarations, at 2-14 for excerpts from numerous class member declarations regarding unreasonable delays in release from Homestead.

Homestead.[47]  This testimony is confirmed by the deposition testimony of Homestead staff.[48]

ORR also delays release by requiring that "[t]he potential sponsor or child's family must provide the unaccompanied alien child's birth certificate or a legible copy of the child's birth certificate." ORR Rule 2.2.4 Proof of Child's Identity. Paragraphs 15 and 17 of the Settlement Agreement set forth what is required for release from custody, neither of which requires a sponsor to produce a birth certificate for the minor in custody.[49]

These broad and vague criteria, coupled with ORR's sharing of sponsor's fingerprints with ICE, required attendance at a presentation with one of ORR's

---

47 A█ A█ ██ is a fourteen-year-old native of Honduras who has been detained at Homestead since December 3, 2018. He declared "I talk with my social worker by a face call on a computer since she is not located here. I believe she is in Texas someplace. Many kids do not have social workers located here. It would be easier if I could talk to my social worker in person. Sometimes, there are problems with the Internet and I have to cut my call short or not talk to her at all, and have to return another time. This has happened to me twice already." Declaration of A█ A█ █, Ex. 61 ¶ 5.
48 Ex. 10, ██████ Depo., at 46:21–47:6, 48:6-7 ("Q: Have you ever been advised by caseworkers at Homestead that they simply have too many children to process or manage? A: Yes. Several times I have heard that, and they have written that….[S]ome case managers and some lead case managers…would voice that they felt overwhelmed.").
49 ORR also requires that a minor's potential sponsor "attend a presentation with one of the LOPC [Legal Orientation Program for Custodians] providers around the country." ORR Rule 2.2.5. *See also* ORR Rule 2.4.1 (requires "the sponsor's attendance at a Legal Orientation Program for Custodians (LOPC) presentation.") Neither Paragraphs 15 nor 17 of the Settlement Agreement require a sponsor to attend a Legal Orientation Program for Custodians scheduled at ORR's convenience.

Legal Orientation Program for Custodians, and demand for copies of minors' birth certificates, are inconsistent with Settlement's terms which permit a suitability assessment of sponsors that can be accomplished so that minors may be reasonably promptly released to available sponsors under Paragraph 14.[50]

## III.   CONCLUSION

At bottom, Defendants' policy and practice of detaining class members at Homestead, a secure, unlicensed prison-like facility, for lengthy periods of time violates the Settlement. As this Court held in its Order of July 24, 2015 [Doc. # 177], the Settlement requires that in any case in which the Defendants do not release a minor pursuant to Paragraph 14, except as provided in Paragraphs 12 or 21, "such minor shall be placed temporarily in a licensed program . . . ." *Id.* at 12, *quoting* Agreement ¶ 19. The Agreement further requires that '[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . . ." (*Id.* ¶ 23.) Thus, "according to the language of the Agreement, Defendants must house children who are not released in a non-

---

50 Despite the limited nature of Defendants' suitability assessment under the terms of the Settlement, ORR's policy permits denial of placement with a sponsor based upon vague factors such as "[t]he linguistic and cultural background of the child or youth and the sponsor," "[t]he sponsor's motivation for wanting to sponsor the child or youth," "[t]he sponsor's strengths," and "[t]he unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns ..." ORR Rule 2.4.1. These vague standards almost insure that Defendants' release decisions will be *ad hoc* and lacking in uniformity.

secure facility that is licensed by an appropriate state agency to care for dependent children." July 24, 2015, Order at 12.

For all of the reasons stated above, Plaintiffs respectfully request that the Court find that Plaintiffs have satisfied their burden of establishing Defendants' substantial non-compliance with the Settlement, grant Plaintiffs' motion to enforce, and –

1. Order that ORR promptly make and record continuous efforts aimed at the release of class members to available sponsors under Paragraph 14;

2. Order that, within 14 days of arrival to an influx facility, class members must be released to a sponsor or transferred to a licensed shelter in compliance with the *Flores* Settlement Agreement.

3. Order that Defendants comply with the Consolidated Appropriations Act, 2019 §224(a), Pub.L. 116-6, and cease expending funds provided by the Act or any other Act, to place in detention, remove, refer for a decision whether to initiate removal proceedings against a sponsor, potential sponsor, or member of a houseful of a sponsor or potential sponsor of an unaccompanied child based on information about the sponsor shared with ICE by the Secretary of Health and Human Services;

4. Grant such other relief as Plaintiffs may seek and the Court deems just;

1        5. Grant Plaintiffs their reasonable fees and costs incurred in bringing this

2 motion to enforce.

3

4 Dated: June 14, 2019                    Respectfully submitted,

5                                        CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW

6                                        Peter A. Schey

7                                        Carlos Holguín

8                                        ORRICK, HERRINGTON & SUTCLIFFE LLP

9                                        Elena García

10                                        LA RAZA CENTRO LEGAL, INC.

11                                        Michael Sorgen

12                                        LAW FOUNDATION OF SILICON VALLEY - LEGAL ADVOCATES FOR CHILDREN & YOUTH

13

14                                        Jennifer Kelleher Cloyd

15                                        Katherine H. Manning
                                       Annette Kirkham

16                                        NATIONAL CENTER FOR YOUTH LAW

17                                        Leecia Welch

18                                        Neha Desai

19                                        U.C. DAVIS SCHOOL OF LAW

20                                        Holly Cooper

21

22                                     /s/  Peter Schey

23                                     *Peter Schey*
                                    *Attorneys for Plaintiffs*

24

25

26

27

28                                            29

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On this date, June 14, 2019, I electronically filed the following document(s):

CORRECTED POINTS AND AUTHORITIES in support of MOTION TO ENFORCE SETTLEMENT AGREEMENT [REDACTED VERSION TO BE FILED UNDER SEAL]

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/Peter Schey
*Attorney for Plaintiffs*

1

CV 85-4544-DMG (AGRX)