# EXHIBIT 21

I, Genevieve Grabman, declare as follows:

1. This declaration is based on my personal knowledge, except as to those matters based on information and belief, which I believe to be true. If called to testify in this case, I would testify competently about these facts.

2. My name is Genevieve Grabman. I am an attorney licensed to practice law by the bars of the State of New York and the District of Columbia. While at Georgetown University Law Center, I completed my clinical studies in refugee and asylum law. I graduated law school in 2003, and since that time, I have provided thousands of hours of pro bono legal assistance to refugees and migrants through programs with the American Bar Association (ABA), the District of Columbia Bar Association, the Maryland Bar Association, Catholic Charities, AYUDA, and other similar organizations. I further have volunteered with the Center for Human Rights and Constitutional Law for a year, during which time I have interviewed and created declarations for unaccompanied minors and their sponsors.

3. In addition to being an attorney, I am also a public health professional focusing on maternal, infant, and reproductive health. In 1995, I worked in the Yadkin County, North Carolina Health Department on mother and baby health issues of Mexican migrant farmworkers. While a Peace Corps Volunteer in the Kyrgyz Republic, I was trained as a lactation consultant by the USAID/BASICS Project in 1996. I earned my master's degree in public health from Johns Hopkins University in 2001. I have served as a staff member or consultant at numerous public health organizations, including African Mothers Health Initiative, the United Nations Children's Fund (UNICEF), the World Health Organization (WHO), and Physicians for Reproductive Health. I have consulted for the ABA's detained migrant health program and recently conducted a maternal and infant health monitoring trip to Malawi, Africa. I do not represent the views of any of my current or previous employers in this declaration and instead speak from my cumulative years of professional experience as both a lawyer and public health official.

4. On June 12, 2019, I visited the Ursula Border Processing Center in McAllen, Texas. I visited with 10 detained minor children during that time and observed the visits of several other detained minors.

Ursula Border Processing Center (BPC)

5. Ursula is an unmarked Customs and Border Patrol facility that is surrounded by a brown fence and secluded from the highway. The population detained at Ursula is composed of many unaccompanied minors, some of whom have their own minor children.

6. The staff at Ursula treated visiting attorneys very professionally; however, the Border Patrol officers did not permit me to view the living or sleeping quarters of the detained minors. I met with detained children in an office space loaned to me by the officers. I noted the Ursula offices were very cold, with the air conditioning set very low. When speaking with the detained children, I wore both a sweater and suit jacket over my clothes.

7. My interviews with detainees at Ursula BPC made evident that the facility has failed to meet the public health needs of the population detained there. Unmet public health needs include those of maternal health, infant health, and infectious disease control. Failure to maintain adequate standards of public health at Ursula risks the lives of the children at the facility. I met the following six Ursula child detainees, whose examples demonstrate the dire individual results of scant attention to public health standards.

Interviews of Minors

8. I interviewed K.B.A.J, age 17, who had been in Border Patrol custody with her infant for eight days. I observed that K.B.A.J. was very thin, confined to a wheelchair, and appeared to be in a great deal of pain. K.B.A.J. had given birth to a premature baby by emergency caesarian section in Mexico. K.B.A.J. was gravely harmed during this

surgery and reported to me being in severe pain on one side of her body since her C-section. She reported shooting, sharp pain from her waist through her right buttock and leg to her foot. K.B.A.J. had difficulty walking due to her post-surgical pain, and she had to remain seated in her wheelchair. Because she always was seated, she reported to me that her buttocks were sore and red and that she was developing a pressure wound on one buttock. K.B.A.J.'s pain prevented her from eating much; she said she was nauseated from the pain. She tried to drink water regularly so that she could produce breastmilk to feed her newborn baby. However, she noted with concern that her breastmilk seemed thin and watery because, she thought, of the very little she was eating. A Border Patrol official told K.B.A.J. that she could not leave Ursula until she could walk. Therefore, I spent an hour helping K.B.A.J. to walk by instructing her to put her weight on the leg and foot that functioned for her. After an hour of practice, K.B.A.J. was exhausted from the effort and her pain. She collapsed into her wheelchair and fell into a deep sleep. Based on my years of work with postpartum women, I know that K.B.A.J. is urgently in need of medical assistance. Her ability to walk will be permanently compromised if her post-surgical injury is not assessed and ameliorated.

9.   As concerning as is K.B.A.J.'s condition, the condition of K.B.A.J.'s premature newborn is even more dire. The baby, K.E.A., was born prematurely by emergency C-section in early May 2019 in Mexico. At the time of our meeting, K.E.A. had been in Border Patrol custody with her mother for eight days. The baby is small, weak, and listless. During the five hours we were together, the baby did not cry. She slept most of the time and had to be roused to nurse. When she did nurse, she did not nurse for long periods, although K.B.A.J. conscientiously tried to breastfeed her. The baby was swaddled in a dirty towel. The day prior, the Border Patrol permitted K.B.A.J. to wash her baby for the first time since their arrival in detention. However, a Border Patrol official confiscated the sweatshirt K.B.A.J. had wrapped around her baby. K.B.A.J. told me that her baby was shaking and trembling with cold and could not maintain her temperature. She begged the Border Patrol guard for something to wrap the baby in, and

Case 2:85-cv-04544-DMG-AGR   Document 572-8   Filed 06/26/19   Page 5 of 6   Page ID #:29470

she was given a dirty towel. Because the towel was dirty and matted, it too was not adequate to maintain the baby's warmth. Babies who are premature, underweight, and have trouble maintaining their temperature are diagnosed as failing to thrive. These infants are hospitalized in a neonatal intensive care unit (NICU) so their temperature and breastmilk intake can be monitored and so their considerable risk of infection can be controlled. Failing to thrive infants are at extreme jeopardy of death. Based on my professional experience and my personal experience as the mother of two premature infants, one of whom failed to thrive and was consequently hospitalized in a NICU for five weeks, I know that this baby needs immediate, urgent medical care.

10.  I spoke at length with a pregnant 17-year old girl, M.G.F.B., who has been detained with her two-year-old son, A.A.J.F. , for 20 days at Ursula. M.G.F.B. will celebrate her 18th birthday in late June. She is eight months pregnant with a due date at the beginning of July, but she has not received any prenatal or other medical care during her time at Ursula. Her toddler son, A.A.J.F., tested positive for influenza and was briefly separated from the general Ursula detainee population because of his flu infection. Yet M.G.F.B. was not tested or vaccinated for the flu. Influenza can be fatal for pregnant women and their fetuses. The Ursula Border Patrol guards have made both pregnant mother and toddler sleep on the cold floor without a mattress or blanket, causing the mother back and hip pain. M.G.F.B. also reported to me that the Ursula guards lock the bathroom and prevent her from using the toilet, despite her need to urinate frequently at this advanced stage of pregnancy. Based on my professional experience in maternal health care and my personal experience as a birth mother of three children, I know M.G.F.B. requires urgent prenatal care to determine whether she and her fetus are infected with influenza, if her pregnancy is proceeding normally, and when she could be expected to give birth. I also know that a Border Patrol facility crowded with people sick with influenza is not a safe place to give birth and could pose a fatal infection risk to a newborn.

11. In another case I observed at Ursula, I saw a 16-year-old aunt, E.T.P.E., and her two-year-old niece, M.A.R.E. Although the mother of the baby, and E.T.P.E.'s sister, is in the United States and is desirous to sponsor these children, E.T.P.E. and M.A.R.E had been detained together at Ursula for 16 days when I met them. Both teen and baby appeared to be infected with influenza: they had fevers, were congested, had running noses, and had deep, rattling coughs. Others housed with them had been tested and confirmed as positive for flu. I am concerned that baby M.A.R.E. has developed pneumonia in addition to the flu. The baby's breathing was rapid and shallow. She was listless, with her eyes rolling back into her head. She could not eat or drink. She did not cry. She did not respond to the volunteer attorneys during the hours she spent with us. She was hot to the touch, as was her aunt, E.T.P.E. Based on my work in public health with women and young children, and based on my education in epidemiology and infectious disease, I know that immediate medical attention must be given to E.T.P.E. and M.A.R.E. because pneumonia can rapidly kill those with influenza.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of June 2019 in Washington, District of Columbia.

*Genevieve Grabman*
Genevieve Grabman