# EXHIBIT 63

# DECLARATION OF ELORA MUKHERJEE, ESQ.

I, Elora Mukherjee, Esq., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

**Background**

1. I am the Jerome L. Greene Clinical Professor of Law and Director of the Immigrants' Rights Clinic at Columbia Law School.

2. I am admitted to practice law in New York and New Jersey. I was admitted to the New Jersey bar in 2005 and the New York bar in 2006.

3. My teaching and practice focus on representing indigent asylum seekers and children seeking Special Immigrant Juvenile Status. I have been representing clients who are immigrants, including those in immigration proceedings, for more than sixteen years. I first represented immigrants seeking asylum as a law student in a clinical program in January 2003.

**My Work Related To *Flores* from January 2007 to March 2019**

4. I started investigating and working on *Flores* issues in January 2007. At the time, I was the Marvin M. Karpatkin Legal Fellow at the American Civil Liberties Union (ACLU). From January 2007 until my ACLU fellowship ended in September 2007, I worked with a legal team to investigate conditions at the T. Don Hutto Family Detention Facility in Taylor, Texas; represent children and families detained there; litigate numerous *Flores* violations at the facility; and settle the case.

5. More recently, I have participated in inspections of federal immigration detention facilities and interviews with detained immigrant children pursuant to Paragraph 32 of the *Flores* Settlement. In July 2018, I interviewed children detained at Casa Padre in Brownsville, Texas, and I participated in a tour and inspection of that facility. In March 2019, I interviewed children detained in Homestead, Florida. Following both of those site visits, I was concerned about numerous *Flores* violations. I conveyed my concerns to the plaintiffs' legal team on the *Flores* case but I did not speak with any journalists about my findings.

**My Experiences at the CBP Facility in Clint, Texas in June 2019**

6. From June 17 to 19, 2019, I personally met with and interviewed fifteen children detained at the U.S. Customs and Border Protection (CBP) facility in Clint, Texas. I observed additional children who were being interviewed by my colleagues as part of our *Flores* inspection.

7. The children whom I personally met with ranged in age from five months to seventeen years old. These children were detained in CBP custody for days and up to nearly a month.

8. Never before in my life have I witnessed, heard of, or smelled such degradation and inhumane treatment of children in federal immigration custody.

9. I saw and smelled children who were dirty. I saw children who wore clothing that was visibly stained with dirt, nasal mucus, and breastmilk. None of the children I interviewed reported having access to soap to wash their hands. Some had not showered or bathed since crossing the border. Nearly all were wearing the same clothing that they had on when they crossed the border into the United States. All reported that they did not have access to clean clothing. Some children had not brushed their teeth at all since crossing the border. No child was offered an opportunity to brush their teeth every day.

10. Because of the lack of access to basic hygiene, a number of the children smelled terrible. When I interview children in detention centers, I typically try to sit near them, in an effort to build rapport and trust as we discuss sensitive and traumatic issues. I tried my best to sit near all the children I interviewed in Clint. Multiple children had a strong stench emanating from them because they were dirty and had not showered.

11. Children reported being hungry. By my third day of interviewing children at Clint, I could not stand by doing nothing for hungry children any longer. I offered three children bananas and oranges. The children ate them rapidly. After I interviewed these three children, I checked in with a guard to ensure that they could eat lunch, since each child had reported being hungry nearly each day at Clint and waking at night with hunger pangs. The guard took the children away, then returned with them very quickly. When the kids entered the conference room, I asked whether they had eaten. Given how little time had passed since they left the room, I was incredulous when they each said yes. The guard confirmed, "They ate, they were really hungry."

12. Children appeared to be traumatized. They consistently cried and some wept in their interviews with me. One six-year old boy did not seem able to verbalize responses to most of my questions. He could not even tell me his name. I learned from guards and CBP counsel that this little boy did not have any family members detained with him at Clint. I spent nearly an hour with this child, first trying to interview him and then just letting him sit on my lap while I rubbed his back. He wept almost inconsolably for most of the time. At one point, I started tearing up as well. CBP counsel saw us together, and I later pleaded to have this child be appropriately cared for. In all my years of representing immigrants, I have teared up in front of government counsel only once before. Eventually a CBP officer came with a bag of lollipops and gave this child a lollipop as an incentive to bring him back to his cell.

13. Children expressed fear of the guards at Clint. One fifteen-year old girl I spoke with was too scared to have her name associated with the declaration that she wanted to share with this Court. She explained that she was scared of retaliation and harm by the guards if they learned her identity. She then cried. Other children reported that, despite their hunger, they were too scared to ask guards for more food.

14. Children appeared to be sick. They had nasal mucus dripping out of their noses. Given the absence of tissues in the facility, many children wiped their noses on their clothing, hands, and arms. Some children did not bother to wipe their noses at all, so had nasal mucus dripping down their faces. Children were coughing. On June 17, I met with a two-year old girl and her teenage mom. The two-year old child appeared listless, without any energy, and simply lay in her mother's arms and eventually fell asleep. She appeared ill.

15. On June 18, 2019, I repeatedly asked CBP guards for access to interview children who were quarantined. I was extremely concerned about the sick children detained there, a number of whom I learned had influenza. When I first asked a CBP guard for access to the quarantine, I was immediately told no. I then explained that I would be happy to sign waivers to address any liability concerns that government officials might have. I was again told no. I then asked for the opportunity to speak with children by telephone. Again, I was told no. I explained to the CBP officer that the children in the quarantine were welcome to use my cell phone for interviews. The CBP guard again said no, and I asked her to please discuss my request with CBP counsel. Reluctantly, the officer agreed to do so. Eventually our team was permitted to conduct three telephone interviews of children in the quarantine on June 18, 2019; these children were 16 and 17 years old. It is my understanding that during these interviews, a guard hovered near the children, perhaps within earshot. No one from our team was able to interview the tender age children in the quarantine on July 18, 2019. It was not possible to interview them by phone given their young ages and our sensitive questions. On the morning of June 19, 2019, I asked CBP counsel for access to the quarantined children. I explained that we simply could not conduct phone interviews with very young children in the quarantine. I further agreed that if I were permitted to interview children in the quarantine, I would leave the facility immediately to limit potential virus exposure to others. Several of my colleagues agreed to abide by the same conditions in order to interview quarantined children. Our requests were denied.

16. During my three days at Clint, I witnessed CBP officers dressed in full uniforms with hand guns at their waists. One day, I witnessed a CBP officer wearing a face mask. Another CBP officer told me, "A lot of officers are getting the flu and colds."

17. I met with and interviewed children who were separated from their loved ones at the border. Children told me that they had been separated from their grandmother. One child told me that she had been separated from her 20-year old sister. Early on the morning of June 18, 2019, my colleague Chapman Noam learned, from a source outside the detention center, that a child detained at Clint had been separated from his mother at the border. That morning, we promptly alerted CBP counsel about this separation and requested that the child be reunited with his mother as quickly as possible. In that conversation, CBP counsel informed us that the government had no way to identify the mother's whereabouts. Several hours later, CBP counsel informed us that the government had identified the mother's whereabouts and that she had been released from detention. CBP counsel further informed us that this child was to be reunited with his mother the following day on June 19, 2019. While Chapman Noam and I were

3

261

Exhibit 63

interviewing this child—a teenager—on the afternoon of June 18, 2019, I asked Chapman if we should share the news that the government had located his mother and that they would be reunited the following day. Chapman was understandably cautious; he did not want to give this teenager false hopes or false information. Chapman then left the interview room to speak with CBP counsel and double check on the government's reunification plan. When Chapman returned, he had secured another verbal confirmation from CBP counsel that the reunification would take place the following day. We shared the wonderful news with this teenager and requested that CBP permit him to make a phone call to his mother, with whom he had not spoken since their separation at the border more than two weeks ago. CBP allowed that phone call, and the teenager's posture and demeanor transformed; he was incredibly relieved and joyful to speak with his mother. For more than two weeks, he had not known if his mother was safe or alive. But the anticipated reunification did not take place on June 19, 2019. When we arrived at the facility on June 20, 2019, we learned that this teenager remained detained at Clint.

18. When my colleagues and I arrived at the Clint facility on the morning of June 18, 2019, CBP counsel stated that between 350 and 360 children were detained at the facility. She further stated that the facility was designed to hold more than 100 people. Neither the CBP counsel nor the CBP officers present offered any information or explanation about how Clint was handling the extra children detained there.

19. On the morning of June 19, 2019, CBP counsel stated that 100 children had been moved out of Clint. On the morning of June 20, 2019, CBP counsel stated that an additional 100 children had been moved out of Clint.

20. Each morning, CBP counsel gave my colleagues and me a list of children who were supposedly detained at Clint that day. We quickly learned that these lists did not accurately reflect who was detained at the facility. As a result, when we asked to interview numerous children each day, we were informed by CBP officers that the requested children were not at Clint or that they were in quarantine and therefore unavailable to meet with us. For our team, the process of learning that a child was no longer detained at Clint was time consuming. When we asked to interview a child, a CBP officer or multiple CBP officers went to look for that child in the cells and cages. Some time later, the officer or officers would return to inform us that the child was no longer detained at Clint or that the child was in the quarantine. We then had to review the list of children once more, request a different child for an interview, and repeat the entire process once again. As a result of the inaccuracy of the daily lists and inability to access the quarantined children, our *Flores* team lost critical time that we should have spent interviewing detained children. I made multiple requests to CBP counsel for accurate, up-to-date lists of children. My colleagues did the same. But we did not receive such lists.

21. Other seemingly inexplicable delays prevented us from interviewing children while we were at Clint. For example, on the afternoon of June 18, 2019, our team had notified the government of multiple children we wanted to interview the following morning at 8:30 a.m. We respectfully requested that these children be brought to us as promptly as

4

21. (cont.) possible on June 19, 2019. But by 9:15 a.m. that morning, only one of these children had been brought to us for an interview. We were informed that the other children had been released. We quickly requested additional children to interview. But I did not have the opportunity to meet with a child until after 10 a.m. that morning.

22. With the exception of the instance described in paragraph 17 above, I did not observe any efforts by government officials at Clint to reunite children with their family members. As I learned from the children about their prolonged stays in CBP custody, I became increasingly concerned about their well-being. On June 20, 2019, I asked CBP counsel if children could be released from Clint directly to their parents, legal guardians, or family members in light of their prolonged times in detention. CBP counsel replied, "I do not know."

23. On June 20, 2019, I asked CBP counsel if there are any counselors or social workers at Clint. CBP counsel replied, "I do not know."

24. On June 18, 2019, I observed as my colleague Warren Binford demanded that our *Flores* team be permitted to tour the Clint facility. CBP counsel emphatically denied that request.

25. On June 20, 2019, I observed as my colleague Kathleen O'Gorman asked CBP counsel if CBP would consider accepting donations of basic hygiene items and age-appropriate items, such as books and teddy bears, for children detained at Clint. CBP counsel flatly refused.

26. I am frustrated by the systemic interference with access to counsel at Clint. In prisons across the country, attorneys can initiate free, confidential legal calls with their clients simply by contacting prison officials. I cannot do this at the detention center in Clint. I am left worrying about the well-being of the children with whom I met. I wish I could call them to ask how they are doing and help secure their releases.

Executed on this 26th day of June, 2019, in New York, New York

_____
Elora Mukherjee, Esq.
Jerome L. Greene Clinical Professor of Law
Director, Immigrants' Rights Clinic
Columbia Law School
435 West 116th Street
New York, NY 10027