# EXHIBIT 69

I, W. Warren H. Binford, declare as follows:

1.   This declaration is based on my personal knowledge, except as to those matters based on information and belief, which I believe to be true. If called to testify in this case, I would testify competently about these facts.

Qualifications

2.   I am a Professor of Law and Director of the Clinical Law Program at Willamette University College of Law. I have a BA, *summa cum laude* with distinction, and a Master's degree in Early Childhood Education from Boston University and a J.D. from Harvard Law School. I am currently licensed as an early childhood teacher in the Commonwealth of Massachusetts and previously administered a licensed infant and toddler center in California. I have experience teaching in a preschool, as well as in several classrooms in disadvantaged communities in first grade (Massachusetts), "Year One" (London), and 7th, 8th, and 9th grades in South-Central Los Angeles.  Among other responsibilities, I teach the Child and Family Advocacy Clinic at Willamette, which provides support and advocacy to children and families in conflict. I have served as a volunteer attorney in *Flores v. Barr* since 2017 and have visited numerous child detention centers to conduct site visits and interview children.

3.   From June 17 to 20, 2019, I participated in interviews of Flores class members at the Clint Border Patrol Facility in Clint, Texas.

4.   When we first arrived, we were provided a roster of children being kept at the facility as of June 17, 2019. The roster listed 351 children. Of these children, 102 were listed between the ages of 0 and 12 years of age.

5.   The chief agent at the facility, Matt Harris, advised us that this facility had a previous maximum occupancy of 104 persons, but that a recent expansion had increased capacity to 600 persons. We requested a tour of the facility but our request was denied.

6.   In reviewing the roster on Monday, June 17, 2019, our team noticed that there appeared to be several child mothers and their infants at the Clint Border Patrol facility.

7.   We immediately asked the Border Patrol to bring us (1) the child mothers and their infants as well as (2) the youngest children and (3) the children who had been there the longest. Border Patrol employees questioned our decision to interview the youngest children and explained that they would need their caregivers to come with them, which we assured them was fine. After this initial request, we requested children from these categories by name.

8.   When the children arrived, they were visibly dirty. In the four days I was there, I saw the bodily fluids on their clothing that appeared to include breast milk, urine, mucous, and saliva. There were many other stains I could not identify. Some of the children had odors and others had visible rashes. Many showed visible signs of illness including coughs, congestion, fever, and lethargy.

9.   One four-year-old was especially dirty and had scalp skin flakes visible on her hair, which was so matted on the back of her head that I feared that her hair might have to be cut off. I spoke to a Border Patrol employee and asked him to please ensure she was given a bath and that her hair was shampooed and brushed out. The next day I asked if that had been done and was assured that it had been. I asked a Border Patrol employee to bring me the little girl and when she arrived, she was just as dirty and her hair was just as matted as the previous day. I spoke to a Border Patrol representative about the fact that she clearly hadn't been given a bath and her hair had not been shampooed and detangled and they assured me that they had taken care of it and that it was clearly documented in their recordkeeping. The little girl was non-verbal, so I asked another girl from the same cell why the Border Patrol is saying the four-year-old was given a bath when she clearly had not been. The older child told me that the Border Patrol came to give the four-year-old a shower, but she did not want to and the seven- or eight-year-old who was taking care of her was unable to persuade her. Apparently, the Border Patrol marked her down as having been given a shower even though it was visibly obvious that she had not and a child in the same cell confirmed that she had not.

10. In the first two days alone, June 17 and 18, we were denied access to ten children who were quarantined. Seven of the children were between the ages of zero and nine years of age according to the roster we were provided. We repeatedly requested to meet with the quarantined children and to see the conditions in which they were being kept and the medical care, but our requests were denied. Eventually, they allowed us to interview by telephone three of the older children who were quarantined, including one child mother who was quarantined with her 2 year old daughter. We prepared declarations of those three children describing the conditions in which they were kept, but they would only allow two of the children to sign the declarations and not the child mother.

11. Multiple of the children we interviewed described the same three meals a day. Essentially, it was instant oatmeal, a cookie, and a pouch of Kool Aid for breakfast; instant soup, a cookie, and another pouch of Kool Aid for lunch; and a frozen burrito in plastic wrap, a cookie, and another pouch of Kool Aid for dinner. Most children described the Kool Aid as "juice." However, we requested meals to be brought to the children when interviews were lengthy and I personally observed that the "juice" they were given three times a day was, in fact, "Kool Aid." As described in the declarations, they were not fed any fruit, vegetables, milk, or any healthy and nutritious foods for the entire time they were kept at this facility.

12. During the four days, our team was at this facility, I repeatedly saw children crying, some inconsolably, and falling asleep in the conference room during their interviews.

13. On June 20, 2019, there was no running water in the main building and so I had to be escorted across the facility to use the bathroom in another structure.

14. During interviews, I witnessed children trying to take care of younger children repeatedly. In fact, one of the girls I interviewed was holding a non-verbal, dirty and ill-kempt, but beautiful four-year-old girl in her arms during our interview when an eight-year-old girl was crying inconsolably. The older girl asked if the eight-year-old could come over to her, and explained that she was taking care of both children. The caregiver

was only 14 years old, and for the rest of the interview held and tried to comfort both of the little girls. The eight-year-old curled up in the older girl's arms in a semi-fetal position.

15. Another girl brought in a two-year-old boy she was taking care of. The boy was not wearing diapers. When I asked her about it, she shrugged and then a short while later, the boy urinated all over himself, his pants, and the conference room chair.

I swear under penalty of perjury the above is true and accurate.

W. Warren H. Binford

June 26, 2019.