

# U.S. Customs and Border Protection Juvenile Coordinator Report

*Flores v. Barr*, Case No. CV 85-4544 (C.D. Cal.)
*July 1, 2019*



Honorable Dolly M. Gee
U.S. District Court for the Central District of California
350 West 1st St.
Los Angeles, CA 90012
Courtroom 8C, 8th Floor

Dear Judge Gee:

I respectfully submit my annual U.S. Customs and Border Protection (CBP) Juvenile Coordinator Report
in accordance with Paragraph 28A of the *Flores* Settlement Agreement (FSA) and this Court's June 27,
2017 and July 27, 2018 Orders.

The United States is facing a border security and humanitarian crisis, and CBP is at the epicenter.
Although this crisis continues to present significant operational challenges, CBP has not been dissuaded
or distracted from delivering an extraordinary humanitarian response, which I have observed first hand
during my tenure as the CBP Juvenile Coordinator. The majority of my report reflects the conditions on
the ground as I saw them at the time of my unannounced site visits. My year-long findings through
interviews and observations reflects CBP's substantial compliance with the FSA.

From June 1, 2018 to May 30, 2019, I conducted 12 unannounced site visits and directed the Office of
Accountability, Management Inspections Division (MID) to conduct an additional 32 site visits to CBP
facilities across the southwest border and to advise me of their findings. On site, I interviewed 63 minors
and/or their parents and reviewed the minors' completed A-files. After my site visits, I also reviewed
each minors' custodial records to compare the data collected with the information gleaned from my
interviews and my observations. Throughout this reporting period, I also assisted the Special
Master/Independent Monitor in obtaining records and data for reporting, as well as facilitating specific
CBP engagements and conversations with CBP's senior leadership. I welcome the Special Master's
counsel, guidance, and continued engagement.

As CBP confronts the surge of unaccompanied children and families across the southwest border, the
Agency has continued to respond timely to address critical and immediate needs. In the course of my site
visits, and from MID's recorded observations, I learned about the significant steps CBP has taken to
provide appropriate care for the unprecedented levels of children in its custody. These actions included
expanded medical care, the creation of temporary processing facilities, and the leveraging of DHS and
interagency resources and personnel.

I share the Agency's commitment to the health and safety of all minors in CBP custody, and my protocols
for site visits and review of policies will continue to evolve based upon existing conditions. I submit this
report in good faith as an honest and true recording of actions taken during this period of time.

Respectfully submitted,

Henry A. Moak, Jr.
Chief Accountability Officer
U.S. Customs and Border Protection



# CBP Juvenile Coordinator Report

## Table of Contents

I.   Introduction ................................................................................................................. 1

II.   Significant Events ........................................................................................................ 2

III.   Monitoring Activities ................................................................................................. 4

   A.   Juvenile Coordinator's Site Visits ...................................................................... 5

   B.   Management Inspection Division's Site Visits .................................................. 61

   C.   Key Insights and Takeaways .............................................................................. 68

IV.   Conclusion ................................................................................................................. 71

Appendix: List of Acronyms ........................................................................................... 73

# I.  Introduction

This is the first annual, and fourth overall, United States (U.S.) Customs and Border Protection (CBP) Juvenile Coordinator Report submitted in accordance with Paragraph 28A of the *Flores* Settlement Agreement (FSA) and this Court's June 27, 2017 and July 27, 2018 Orders.

This report documents my activities between June 1, 2018 through May 30, 2019 to monitor and report on CBP's compliance with the FSA.  I recognize that this Court's June 27, 2017 Order applies only to the Rio Grande Valley (RGV) Border Patrol Sector. As the CBP Juvenile Coordinator, however, I have the responsibility to monitor compliance nationwide.  In light of my nationwide mandate, this report discusses my findings across the Southwest Border, at facilities both in and outside the RGV Sector during this reporting period.  I did not visit any CBP facilities on the Northern border because my monitoring efforts were focused on the areas where the overwhelming majority of minors are held in CBP custody. [1]

The first section provides an overview of the significant steps CBP took during this reporting period to respond to the on-going humanitarian crisis and provide adequate care to minors in its custody.  These actions relate to medical care, temporary holding facilities, and leveraging resources, holding space, and personnel across the U.S. Department of Homeland Security (DHS) and our interagency partners to respond to critical and immediate needs.  My site visits and MID's observations further highlight how CBP has responded to the humanitarian crisis at the station and port-level.  This section also outlines my coordination with the Special Master/Independent Monitor (Monitor).

The second section outlines my findings from my 12 unannounced site visits, where I observed approximately 2,157 minors in CBP custody.  I describe the results of my inspections and my discussions with agents, officers, and on-duty medical professionals. I also describe the information shared with me during my interviews with 63 minors (or their parents on their behalf) who agreed to speak with me about their experience in CBP custody.  While on site, I also reviewed the completed Alien files (A-files) of the minors I interviewed.  I later reviewed the custodial records of each of the minors interviewed to crosswalk each minor's experience with my personal observations and the data collected. I believe these interviews, and my subsequent review of custodial records, are representative of the approximate 2,157 minors I observed across the Southwest Border. This section also describes the results of the Office of Accountability (OAct), Management Inspections Division's (MID) observations at 32 site visits across the Southwest Border, which gave me additional insight into how CBP facilities provide for

---

[1] For the purposes of this report, "minors" refers to both unaccompanied alien children (UAC), as well as alien children (those under the age of 18) who are part of a family unit (i.e., accompanied by a parent).

1

minors in custody.  My description of CBP facilities and operations is based on my monitoring activities during this reporting period, and I incorporate only the facts observed at the time of our 44 site visits.

In the last section, I reflect on the combined findings from the 44 site visits conducted by myself and MID, my discussions with on-site CBP personnel and medical professionals, interviews with minors and/or their parents, and my review of the minors' custodial records and completed A-files.  My findings relate only to the facts observed during this reporting period.  CBP continues to face unprecedented levels of unaccompanied alien children (UAC) and family migration, and as a result, the Agency's response continues to evolve to meet critical and immediate needs.  Overall, I believe CBP understands its obligations under the FSA and continues to utilize all available resources to ensure that the Agency substantially complies with these obligations.

# II.   Significant Events

During this reporting period, there were a number of significant decisions made at the Department and Agency-level and implemented across CBP with regard to the care and custody of minors.  This section highlights these activities broadly.  My site visits and MID's recorded observations further illustrate how these changes affected CBP facilities on a station or port-level.  Additionally, this reporting period also overlaps with the appointment and activities of the Monitor.  I outline my ongoing coordination with the Monitor in this section as well.  I acknowledge that as this reporting period ends, CBP continues to experience a surge of minors in its custody.  For example, the number of UACs and families CBP encountered across the Southwest Border in May 2019 is 210 percent greater than the UACs and families encountered in May 2018.[2]  Although this report does not incorporate any actions taken subsequent to the end date of this report, I have continued to monitor ongoing developments and share the Agency's commitment to ensure all minors in CBP custody receive appropriate treatment consistent with the FSA.

<u>Medical Care</u>

The recent historic influx of migrants in CBP custody has led to an increase in medical issues that the Agency must confront.  Unquestionably, the deaths of Darlyn Cristabel Cordova-Valle, Jakelin Caal Maquín, Felipe Gómez Alonzo, Juan de León Gutiérrez, Wilmer Josué Ramírez Vásquez, and Carlos Hernandez Vásquez are tragic losses.  I believe CBP is taking extraordinary measures, beyond the terms of the FSA, to respond as best it can to not only the surge of minors in its custody, but also to the increased medical issues this latest surge has brought with it.

---

[2] The data referenced in this section compares CBP's southwest border migration FY2019 statistics to its FY2018 statistics.  *See, Southwest Border Migrations FY 2019*, U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited July 1, 2019).

On December 25, 2018, the CBP Commissioner directed same-day secondary medical checks for all minors in CBP custody by contract medical professionals or U.S. Border Patrol (USBP) agents and CBP officers trained as emergency medical technicians (EMTs) or paramedics.  The Commissioner subsequently issued an additional directive on January 28, 2019 to guide CBP's deployment of enhanced medical evaluations for individuals in CBP custody along the Southwest Border.  Furthermore, CBP requested and received medical support from the U.S. Coast Guard (USCG) and the U.S. Public Health Service (USPHS) Commissioned Corps.  These teams initially deployed to the Yuma, Tucson, and El Paso Sectors and increased the Agency's ability to perform medical checks for minors in custody.  CBP also expanded the use of contracted medical personnel to perform medical screening and triage in areas across the Southwest Border where the Agency experienced the highest volume of UAC and family unit apprehensions.  With an eye toward preventive measures, CBP coordinated with the Centers for Disease Control and Prevention to gather data on infectious diseases among migrants in custody and develop recommendations for possible additional CBP action. While on site visits during this reporting period, I observed medical contract professionals, USCG, and USPHS deployed throughout RGV, El Paso, Yuma, and El Centro Sectors.  Although dedicated medical professionals were not deployed to San Diego Sector at the time of my visit, CBP's own EMTs or paramedics on-duty, as well as CBP's Border Patrol Search, Trauma, and Rescue Unit (BORSTAR), provided medical response capabilities and support as required.

Personnel

In March 2019, the DHS Secretary issued a Department-wide call for DHS employees to volunteer to provide support to CBP and U.S. Immigration and Customs Enforcement (ICE) operations across the Southwest Border.  CBP temporarily re-assigned CBP officers from Ports of Entry (POE) nationwide to Border Patrol Sectors.  CBP also increased the number of temporary details of Border Patrol agents from Northern and Coastal Border Sectors to those along the Southwest Border.  In addition, CBP temporarily assigned non-law enforcement mission support personnel to augment staffing and operations at critical over-capacity stations and sectors.  During this reporting period, I observed the volunteer force and re-assigned agents and officers at Yuma Station, Paso Del Norte Processing Center, El Centro Station, Brown Field Station, and Imperial Beach Station.

Facilities and Holding Capacity

In an effort to streamline operations and reduce time in custody, CBP is taking steps to establish a Centralized Processing Center (CPC) in the El Paso Sector.  The El Paso CPC will provide a centralized location for processing of migrants, transferring UACs to U.S. Health and Human Services (HHS), releasing from custody or transferring families to ICE, and will facilitate consistent medical assessments.  The El Paso CPC is modeled, in

3

part, after the CPC established in the RGV Sector (CPC-Ursula).  Additionally, in May
2019, CBP began transporting families by bus and aircraft from some of USBP's severely
overcrowded processing facilities to less-crowded stations along the Southwest Border.
During this reporting period, I observed soft-sided facilities and converted structures used
to alleviate crowding in El Paso Sector and Yuma Station.  I also learned that Yuma
Station bused families to nearby stations, and interviewed families at Brown Field Station
that had been apprehended in RGV Sector and flown to San Diego Sector.

Coordination with the Monitor

On October 5, 2018, this Court appointed the Monitor to oversee CBP's compliance with
the FSA in USBP's RGV Sector.  On October 15, 2018, I appeared in Chambers for a
status conference with the Monitor and the ICE Juvenile Coordinator, during which time
we discussed how to comply with the Court's Orders.  I accompanied the Monitor, with
the Plaintiffs and Government attorneys, to McAllen Station and CPC-Ursula on October
31, 2018.  The tour included presentations by CBP personnel, conversations with the
Consulate of Guatemala representatives on site, and insight into how CBP provides for
the health and safety of minors in its custody.  On November 14, 2018, a USBP
representative met with the Monitor in Los Angeles, California to conduct a
demonstration of the Enforcement Integrated e3 Detention Module (e3DM), USBP's
relevant system of record, and discuss data collected related to minors.  The Monitor and
I returned to the RGV Sector on January 21, 2019, during the government shutdown, to
conduct unannounced site visits to McAllen Station and CPC-Ursula.  While the
government was shutdown, CBP recalled me to ensure my monitoring activities were not
interrupted.  My findings from these site visits are described in detail in the following
section.  Finally, on April 9, 2019, the Monitor met with the CBP Chief Operating
Officer and Senior Official Performing the Functions and Duties of the Commissioner,
the Executive Assistant Commissioner of Enterprise Services, and USBP's policy and
data specialists.  Throughout this reporting period, I also facilitated various requests for
data and information, and I will continue to work closely with the Monitor, as she
requires.

# III.   Monitoring Activities

During this reporting period, I conducted 12 unannounced site visits and directed MID to
conduct an additional 32 site visits and to advise me of their findings.  The following
section describes each of the facilities visited and my findings.  It is important to note that
the description of CBP facilities and operations in this section only incorporates what was
observed at that particular time.  The ongoing surge, particularly the more recent influx of
minors in May and June of this year, continues to impact operations and CBP's response
to this humanitarian crisis continues to evolve.

## A. Juvenile Coordinator's Site Visits

On March 12, 2018, the Court ordered me to conduct at least two unannounced site visits and to incorporate my findings into my June 1, 2018 report. For this reporting period, I continued to conduct unannounced site visits in order to demonstrate how CBP typically executes its responsibilities under the FSA. My unannounced site visits continue to reaffirm that the agents and officers in the field executed their duties professionally and in a manner consistent with the FSA.

### i. *Methodology*

From June 1, 2018 through May 30, 2019, I visited nine USBP facilities: McAllen Station, CPC-Ursula, Yuma Station, El Paso Station, Paso Del Norte Processing Center, Clint Station, El Centro Station, Brown Field Station, and Imperial Beach Station. The USBP facilities are located in the RGV, El Paso, Yuma, and San Diego Sectors. I also visited two CBP POEs: Paso Del Norte POE and San Ysidro POE, which are within Office of Field Operation's (OFO) El Paso and San Diego Field Office areas of responsibility.

I selected these locations based on this Court's June 27, 2017 Order specifically directing me to monitor compliance in USBP's RGV Sector, and my national responsibility to monitor CBP facilities where minors are in custody. When selecting locations, I relied on CBP data related to UACs, families, and the total number of apprehended or inadmissible individuals in USBP and OFO custody. Based on the data, as well as my own CBP knowledge and experience, I selected locations where I believed minors would be on site at the time of my arrival. During this reporting period, minors were on site at each location I visited.

For the OFO site visits, I selected Paso Del Norte POE and San Ysidro POE because OFO historical data indicated these ports receive a high volume of passenger and/or pedestrian traffic, increasing the likelihood that minors would be on site during my visits.

For the USBP site visits, I selected locations both in and out of the RGV Sector. For the RGV Sector site visits with the Monitor in January, I chose to return to McAllen Station and CPC-Ursula. Historically, the stations in the RGV Sector that reported the highest number of apprehensions transferred minors directly to CPC-Ursula. Given McAllen Station's proximity to CPC-Ursula, and the large number of minors in custody there during our October 2018 trip, I chose to return to McAllen Station as well.

Throughout this reporting period, Yuma Sector consistently reported high numbers of UACs and families in custody, which is why I visited Yuma Station in January 2019, the station within Yuma Sector that typically held the most minors. Following my visit, I noticed that Yuma Sector experienced even larger numbers of UACs and families in

custody than in January.  This increase led me to return to Yuma Station in May to observe how the station responded to this high volume.  Before my May site visits, I also learned that CBP was flying family units from the RGV Sector to the San Diego Sector to alleviate crowding in the RGV Sector facilities.  It was important for me to conduct site visits in San Diego Sector to observe how the Sector was responding to this new process and to hear directly from families about their experience.  I selected Brown Field Station and Imperial Station because those stations had the largest numbers of minors on site when I arrived in San Diego.  I also visited El Centro Station during my May 2019 site visits.  This is because I learned, while on site at Yuma Station, that minors were being transferred to El Centro Station to alleviate the processing and capacity strain Yuma Station was experiencing at that time.

Moreover, during this reporting period, El Paso Sector experienced significant increases in apprehensions.  In March 2019, CBP reported a 434 percent increase in apprehensions this fiscal year in El Paso Sector alone.  I also learned that a majority of those apprehensions were families and UACs arriving in large groups.  In light of these facts, I traveled to El Paso Sector to conduct site visits in April 2019.

For this reporting period, I continued the site visit process described in my June 1, 2018 report, which included inspecting the facilities, speaking with agents and officers, and conducting interviews with minors or parents who volunteered to speak with me.  When I arrived at each facility, I described my monitoring process to the Patrol Agent in Charge (PAIC)/Deputy Patrol Agent in Charge (DPAIC) or Watch Commander, and requested a list of all minors in custody at that location.  The list, referred to throughout this report as a "roll call," identified each minor's Alien-number (A-number), age, status as accompanied or unaccompanied, and which hold room the minor was assigned at the time of my visit.  Using this list, I identified the hold rooms where minors were present, and I inspected each hold room to ensure there were functioning toilets, sinks, and access to potable water.  To confirm whether the toilets and sinks were functioning, I flushed every toilet and ran the water for all sinks and fountains.  I also took the temperature of the hold room with a temperature gauge provided by the facility to ensure the room was within the CBP-established acceptable range of 66.0 to 80.0 degrees Fahrenheit.  Moreover, I visually inspected the cleanliness of the room.  I noted whether bedding items, such as blankets, mats, or cots, were being used inside the hold rooms and whether such items were available at the facility.  In addition to the hold rooms, I toured other areas of the facility like the sally port where minors arrived and entered the facility, and the processing area, where minors completed paperwork.  If there was a medical treatment room on site, I typically spoke with the medical professional(s) to understand the facility's medical capabilities.  Moreover, I observed the food and supplies available for minors.  I learned about each facility's processes surrounding preparing and distributing meals and snacks.  I inspected the food storage areas, and I checked the expiration dates on food items.  During my inspections, I also observed the facility's hygiene items, like

personal grooming products and extra clothing, and noted if shower or laundry facilities were available on site.

After inspecting the facilities, I requested an agent or officer to assist me in translating interviews with minors and/or parents who volunteered to speak with me about their experience in CBP custody. When possible, I requested that plain-clothes agents or officers translate for me. It was important to me that minors and/or their parents felt comfortable to speak freely about their experience. In previous visits, the agent or officer assisting with translation read a formal introductory statement explaining the intent of my interviews. I noticed this statement provided a significant amount of information and often came across as too formal and scripted. In an effort to make the interviews more conversational and for me to be more approachable, I asked the agent or officer assisting me to highlight the key points explaining my role and my purpose for conducting the interviews. The agent or officer also emphasized that these interviews were voluntary and that the interviews would not affect any immigration processing or disposition. The plain-clothes agent or officer communicated these points in Spanish to UACs and to accompanied minors and their parents. The agent or officer gave the minors and parents time to decide if they wanted to volunteer, and I typically reiterated these points before beginning the interview. In general, I limited my interviews with UACs to minors ages 14 and older because that is usually the age where CBP has determined minors are able to comprehend and sign the immigration forms in their A-file.

For each interview, my primary goal was to ensure that the minors and parents who volunteered felt comfortable sharing their experiences. I conducted the interviews in an open and accessible location. In facilities where the only available space was an interview room, I left the door open throughout the entire interview and arranged chairs in a semi-circle to facilitate discussion. This was done to remove the appearance of a formal interview and to put the minors and/or their parents at ease. Throughout the entire process, it was important that all minors and/or their parents understood they could choose not to answer any question or stop the interview at any time. The plain-clothes agent or officer was present during the interview to assist with translation.

The interviews were conversational and the questions were open-ended, to the extent possible, to encourage the volunteers to freely discuss their experience in CBP custody. Because the interviews were conversational, the minors and/or their parents did not always speak to each requirement of the FSA in detail. After the interviews, I reviewed the A-files of those minors whose processing had been completed. If the minor was still being processed, I did not review the A-file because the A-file had not been completed. With the exception of completed A-files, I did not review any other records associated with the minors I interviewed until after I returned to CBP Headquarters.

After I returned to CBP Headquarters, I provided USBP and OFO with the minor's name, A-number, facility, and date of the interview. USBP and OFO then provided me with

7

each minor's custodial records.  For this report, "custodial record" is used to describe the data collected in USBP's e3DM and OFO's Secured Integrated Government Mainframe Access (SIGMA).  Custodial actions, like meals provided and confirmation that a minor's hold room is within the acceptable temperature range, are typically recorded in each office's relevant system of record, e3DM and SIGMA, respectively.  The custodial records are separate from the A-files.  I did not review the data captured in USBP and OFO's systems of record while I was on site.

Reviewing the custodial records after the site visits provided me with a more complete picture of each minor's time in CBP custody, from start-date to end-date (often referred to as book-in and book-out).  Because the custodial records included custodial actions recorded for the minor's entire time in custody, I could review the data entered that corresponded to the period of time I was on site to confirm whether the records aligned with my observations and information gathered during the interviews.  I believe this site visit methodology provides a comprehensive picture of Agency compliance.

ii.  *Observations and Results*

This section outlines my findings, and where applicable, includes details of my interviews with minors and/or their parent(s).  For each interview, I incorporated data from the minors' custodial records that I reviewed after my visit, and, if available at the time of my visit, the minors' A-File.

a.  U.S. Border Patrol Facilities

<u>McAllen Station</u>

On January 21, 2019 at 9:30 PM, I arrived unannounced at McAllen Station.  The Monitor accompanied me to observe the facility and my site visit process.  There, I inspected the facility, and interviewed the PAIC and the on-site medical professional.  I did not interview minors during this site visit because we arrived late in the evening and we did not want to disrupt minors who were trying to sleep.  At the time of our visit, there were 43 minors on site.[3]

The minors on site were in six different hold rooms, based on various factors including their age, gender, and status as accompanied or unaccompanied.  The PAIC informed me that hold rooms are cleaned once or twice each shift.  Each hold room contained a functioning toilet and a functioning sink with a water fountain that provided potable water.  The toilets and sinks were behind a half wall for privacy.  Cups were available in

---

[3] For each of my site visits, I reported the number of minors on site.  This count comes from the roll call I received at the beginning of each site visit, which reflects the minors in custody at the time the report was pulled.  The count reported here is different from the numbers provided in the Monitor's report for McAllen Station and CPC-Ursula because the Monitor's number did not reflect the in-custody numbers for the exact time of the site visit.

the hold rooms for drinking.  During the inspection, I observed one of the sinks was functioning poorly.  I alerted the PAIC who submitted a work order requesting maintenance on the sink immediately.

The temperature of the hold rooms measured between 64.7 and 69.8 degrees Fahrenheit. Only one hold room measured below the appropriate temperature range; the mean temperature was 68.3 degrees Fahrenheit.  After the site visit, I reviewed the custodial records for the hold room measuring 64.7 degrees and found that the room measured within the appropriate range when measured again that night at 11:05 PM.  The PAIC acknowledged that the most common complaint they receive is that hold rooms are "too cold."  I observed minors using Mylar blankets.  The PAIC informed me that the station's hold rooms and capacity did not accommodate mats or cots, and that cloth blankets presented health and sanitation challenges.

In the sally port, I observed a lice treatment area, drinking water, and portable toilets. The PAIC explained that minors were screened for lice, scabies, chicken pox, and other ailments when they first arrive.  The medical professional on duty conducted this screening in the sally port.  The PAIC informed me that a physician assistant or nurse practitioner is on site at all times.  The PAIC explained that after the initial medical screening minors were brought inside to complete processing, and UACs were shown the "What to Expect" video.[4]

Inside the station, I observed a medical treatment room, which had over-the-counter medications that the medical professional on duty may administer.  The nurse practitioner explained that the on-duty physician assistant or nurse practitioner could prescribe certain medications, including blood pressure or seizure medication.  The nurse practitioner confirmed that any controlled substances were kept in a locked safe and that all medications administered were documented.  Furthermore, she stated that flu tests could be performed on site for individuals who presented flu-like symptoms.

The nurse practitioner informed me that an additional health screening form for UACs had been created and implemented a few months prior to assist in gathering basic identifying information and potential immediate medical or mental health needs the minor may have.  Although this form was for UACs only, the nurse practitioner explained that medical professionals were available to provide further medical care for accompanied minors, if required.  The medical professional explained that color-coded wristbands were utilized to distinguish particular medical needs, such as an adult or minor with a prescription.

---

[4] The Know What to Expect videos, are two videos that explain what to expect in custody in easy to understand language appropriate for UACs, as well as accompanied minors.  While these videos were made specifically for UACs, I understand accompanied minors are often shown these videos as well.  When minors view these two videos, USBP records it as "UAC video" shown in its system of record.  For this report, I follow USBP's nomenclature to reflect what I saw in each minor's custodial records.

I also observed the station's food and supplies available for agents to provide to minors. There were crackers, bread, frozen burritos, baby formula, and juice.  All food items were within the expiration date.  While on site, I observed agents making and distributing bologna sandwiches.  The PAIC informed me that food was prepared on site and distributed four times a day.  The PAIC explained that frozen burritos were typically served as a hot meal, and that crackers and juice were available to minors upon request. The PAIC also explained that welfare checks often occurred simultaneously as agents entered each room to distribute food.  I observed feminine hygiene products, diapers, baby wipes, and baby formula were all easily accessible in the processing area.  There was also clean clothing in various sizes available for minors.  The PAIC informed me that the clothing typically came from USBP's nearby facility, CPC-Ursula.

Based on my personal observations, and interviews with the PAIC and nurse practitioner, I believe McAllen Station continued to comply with the FSA.  I measured one hold room below the appropriate temperature; however, I observed Mylar blankets were available for minors to use for warmth.  The temperature of the hold room was within the appropriate range when checked again less than two hours after I measured it.  Moreover, the fact that the station provided blankets, but not cots or mats to minors does not, in my opinion, mean that the station was out of compliance with the FSA.  As explained in my March 2018 report, MID's checklist for monitoring compliance included whether a minor is provided access to a cot/mat or blanket.  I support and share this determination made by the *Flores* Working Group.  Finally, the PAIC immediately submitted a work order when alerted to the poorly functioning sink.  This further demonstrates that when issues arise, there are systems in place to respond and remedy the situation.  Therefore, I concluded that McAllen Station continued to comply with the FSA.

<u>Centralized Processing Center- Ursula (CPC-Ursula)</u>

On January 22, 2019 at 11:00 AM, I arrived unannounced at CPC-Ursula.  The Monitor accompanied me on this site visit as well.  There, we inspected the facility and interviewed agents.  We also interviewed minors and/or their parents, and subsequently reviewed several of the minors' A-files.  At the time of our visit, there were 589 minors on site.

CPC-Ursula was divided into two sections.  The first side was dedicated to intake and processing.  The processing side of the facility had hold rooms on either side, and computer stations were grouped in the center to facilitate on-site and virtual processing. The DPAIC informed me that minors were brought to the processing side of the facility while paperwork was started.  The DPAIC explained that minors were given water bottles and a meal when they entered the processing side.

I observed minors in five hold rooms on the processing side of the facility, grouped together by various factors including age, sex, and status as accompanied or unaccompanied.  All five hold rooms provided access to functioning toilets, functioning sinks, and potable water.  I observed Mylar blankets were available and being used.  The DPAIC informed me that mats were not available on this side of the facility.  He informed me that minors typically spent less than six hours on this side of the facility; however, initial processing times may vary for several reasons, including spikes in apprehensions.  The temperature of the hold rooms measured between 65.6 and 69.8 degrees Fahrenheit; the mean temperature was 68.6 degrees Fahrenheit.  The DPAIC informed me that after initial processing was completed, UACs and families were transferred to the other side of the facility.

The non-processing side of the facility was grouped into four color-coded pods, where minors were assigned based on various factors including age, sex, and status as accompanied or unaccompanied.  At the time of my visit, I observed minors in all four pods.  There were televisions playing a movie or the UAC video in several pods.  The DPAIC also informed me that phone calls for UACs were generally unlimited, and in practice, the agents at CPC-Ursula typically provided UACs with the opportunity to make a phone call each evening around 5:00 PM.

Each pod had multiple hold rooms with continuous access to a common restroom area.  The restrooms consisted of portable toilets and portable sinks.  At the time of my visit, I observed a lack of toilet paper in many of the portable toilets, and three of the four pods did not have access to functioning sinks.  Soap was available in the pod with the functioning sinks.  When I raised this concern to the DPAIC, he informed me that a contractor serviced the portable toilets and sinks once a day, but that he had been frustrated with the contractor's underperformance.  I advised USBP Headquarters of the situation; however, I understand USBP Headquarters deferred to the Sector for overseeing its own contract services.  I will continue to monitor this situation and engage the Sector on whether additional action is necessary.  Cups and jugs of clean water were available in all pods for drinking, and diapers and feminine hygiene products were available in the pods where female minors or families were assigned.  I observed Mylar blankets and mats were available and being used.  The open layout of this side of the facility allowed for airflow between the pods, and as such, the temperatures recorded in each pod fluctuated slightly and were all within the appropriate range.  The temperature of the hold rooms ranged from 70.4 to 75.0 degrees Fahrenheit.  The mean hold room temperature of the non-processing side was 72.1 degrees Fahrenheit.

On the processing side, the DPAIC showed me the sally port where minors arrived and an initial medical screening was conducted.  The intake and medical screening process mirrored the process described at McAllen Station.  The DPAIC informed me that all minors received an initial medical screening upon arrival and an additional medical screening prior to transfer from CBP custody.  The DPAIC explained individuals arrived

via the sally port where they were screened for lice, scabies, chicken pox, and other ailments.  The DPAIC stated lice and scabies were treated on site, whereas chicken pox cases were referred to the local hospital, and minors were isolated during treatment.  The DPAIC added that medical professionals conducted flu testing on site, and any individuals with the flu were isolated during treatment to prevent spreading the illness.  Like McAllen Station, the medical professionals at CPC-Ursula completed an additional health screening form for UACs to gather basic identifying information and potential immediate medical or mental health needs.  The DPAIC informed me that the health screening form was included in the UACs' A-files before transfer from CBP custody.

I also observed the facility's food and supplies available for agents to provide to minors.  The DPAIC informed me that meals were prepared offsite by a contractor.  The food service contractor delivered and distributed these meals three times a day.  The DPAIC explained that before each meal, agents told the contractor how many servings were needed, plus a little extra.  I observed the contractor on site distributing the lunch meal, which consisted of a warm burrito, chips, apple, and bottled water.  The DPAIC stated that typically, breakfast and lunch were hot meals, dinner was a sandwich with fruit, and a snack was provided in the evening.  In the food storage area, I observed bologna, bread, cookies, crackers, juice, and baby formula, all within the expiration date.  The food storage area was clean, and there was a system in place with signage to ensure that food was distributed according to expiration date.  Toiletries, including deodorant, pre-pasted toothbrushes, body wash, body wipes, feminine hygiene products, and hair ties were available.  I also observed several items for infants and toddlers, including diapers, baby wipes, and baby bottles.  Clean clothes and shoes were available in a variety of sizes, and I observed minors wearing these items.  CPC-Ursula also had laundry and shower facilities available on site.

When I arrived, I informed the DPAIC of my intent to interview minors and/or their parents.  Based on the roll call provided, I identified which hold rooms contained minors in order to solicit volunteers.  The ICE National Juvenile Coordinator, Transport Program Manager was on site during our visit and assisted with translation for each interview.  As explained in the methodology section above, this was the first site where our translator did not read the entire introductory statement verbatim.  Instead, based on the advice of the Monitor and in an effort to facilitate an informal and open conversation, our translator explained to the minors and parents that I was to conduct voluntary interviews about their experience in CBP custody.  The translator made it clear that these interviews would have no impact on any immigration proceedings or their immigration disposition.  Officials from the Guatemalan consulate were also present and explained to their citizens that I was seeking volunteers for interviews.  Two mothers volunteered for an interview after speaking with the Guatemalan officials.

The interviews took place on the non-processing side of the facility, in an open area where various consular officials speak to their citizens.  In total, I interviewed eight minors at CPC-Ursula.

I conducted the first interview in a group, with three female minors and the adult sister of one of the minors.  The three minors interviewed were C.A.O., A.M.M., and A.D.L.  At the time of the interview, custodial records indicated C.A.O., A.M.M., and A.D.L. had been in custody for 10 hours, 105 hours, and 90 hours, respectively.

C.A.O. was a 15-year-old female from El Salvador who arrived with her adult sister and father.  C.A.O.'s custodial records indicated the family was apprehended and taken to CPC-Ursula on January 22, 2019 at 1:00 AM.  C.A.O.'s sister accompanied her during my interview.  C.A.O. and her sister were not in the same hold room as their father, but C.A.O. told me she had been able to speak with her father while they were in custody.  It is my understanding that CPC-Ursula may hold older minors separate from their parents to avoid the minor being held with unrelated adults of the opposite sex.  This appeared to be the case here since 15-year-old C.A.O. and her adult sister were together, while their father was in a separate hold room.  The custodial records note it was operationally infeasible to hold C.A.O. with her father.  Although it was not documented in the custodial records, C.A.O. told me she had showered and was currently wearing clean clothes provided by the facility while her clothes were washed.  After processing, C.A.O. told me that she received a mat and blanket, which is also shown in her custodial records.  C.A.O. said that she was able to sleep; however, she said she was woken up during regular welfare checks or to eat.  C.A.O. informed me that she was given food and water when she arrived, and her custodial records indicated she was provided a hot meal.  C.A.O. confirmed that she had access to drinking water at all times and could freely use the bathroom and sink to wash her hands.  She stated that soap was available, but it sometimes ran out.  C.A.O. also stated that the facility temperature was "fine."  C.A.O.'s custodial records indicated she received a medical screening after arrival and another prior to her departure.  C.A.O. stated she had not received a list of legal services providers while completing her paperwork.  I could not confirm this, as I did not review C.A.O.'s A-file because it was still being compiled.  It is possible a list of legal services providers had not been provided yet due to her early status in processing.  The custodial records indicated that C.A.O. was transferred to another station within the Sector, before she was transferred back to CPC-Ursula where the custodial records indicated she was provided clean clothes and medically screened prior to being transferred from CBP custody.  The records indicated all hold rooms in CPC-Ursula were within the appropriate temperature range; however, it is not clear which hold room C.A.O. was in while completing processing at the other station.  Likewise, the custodial records indicated C.A.O. received at least three meals per day while at CPC-Ursula, but there was one day at the other station where only two meals were documented.  She was transferred from CBP custody 75 hours after my interview.

13

A.M.M. was a 15-year-old female from Guatemala who arrived with her father. The custodial records indicated A.M.M. and her father were apprehended on January 18, 2019 at 1:34 AM and taken to CPC-Ursula. Like C.A.O.'s father, A.M.M.'s father was also being held in a separate hold room at the time of my visit, and like C.A.O., A.M.M. also stated that she was able to speak to her father. I believe A.M.M. and her father were in different hold rooms to ensure she was not in a hold room with unrelated adult males. At the time of my interview, A.M.M. was wearing her own clothes, which had been washed since she arrived at the facility. A.M.M. also informed me that she received a blanket and mat after she moved from the processing side of the facility to the non-processing side; and provision of bedding was documented in the custodial records. She told me that she has been able to sleep at the facility, and that the temperature in the facility was "fine." The custodial records indicated A.M.M. was provided a meal upon arrival, and received a medical screening after arriving and before she was transferred out of CBP custody. Like C.A.O., A.M.M.'s custodial records also indicated she was transferred to another station within the Sector to complete processing, before she was transferred back to CPC-Ursula. A.M.M. told me that she had access to food, drinking water, functioning toilets, and functioning sinks throughout her time in custody. The custodial records also documented that she was provided at least three meals per day throughout her time in custody. The records also indicated that all hold rooms in CPC-Ursula were within the appropriate temperature range; however, like C.A.O., it is not clear which hold room A.M.M. was in while completing processing at the other station. A.M.M. stated she had not received a list of legal services providers while completing paperwork. I did not review A.M.M's A-file because it was still being compiled, thus I could not confirm if she received a list of legal services providers. Records indicated A.M.M. was transferred out of CBP custody three hours after my interview.

A.D.L. was a 15-year-old female from Guatemala who arrived with her mother. The custodial records indicated A.D.L. and her mother were apprehended on January 18, 2019 at 5:10 PM. At the time of my interview, A.D.L. was wearing her own clothes, which had been washed and returned to her. A.D.L. also informed me she had showered since arriving at the facility, which was documented in the custodial records. A.D.L. informed me she was provided a blanket and mat after initial processing, and that she had been able to sleep. Custodial records indicated she was provided a meal upon arrival, and received frequent meals and snacks throughout her time in custody. A.D.L. confirmed that she had access to food, drinking water, functioning toilets, and functioning sinks throughout her time at CPC-Ursula. The custodial records also indicated the hold room was maintained within the appropriate temperature, and A.D.L. informed me that the temperature was "fine." A.D.L. stated she had not received a list of legal services providers while completing her paperwork. After the interview, I reviewed A.D.L.'s A-file in its current-state. The A-file contained the completed I-770 form. At the time of my review, the A-file did not include a list of legal services providers or record of a medical screening. I asked the agents preparing files, and I was told the record of medical screening and the list of legal services providers would be included in A.D.L.'s

A-file before transfer from CBP custody. The ICE Juvenile Coordinator also confirmed to me that a medical screening was conducted before families were transferred into ICE custody. Custodial records indicated she was transferred from CBP custody 20 hours after my interview.

Next, I interviewed two mothers with their children who volunteered to speak with me after meeting with the Guatemalan consulate officials. The first mother had one child, B.A.S., and the second mother had two children, H.E.M. and J.M.M. At the time of the interview, custodial records indicated B.A.S. had been in custody for 91 hours, and H.E.M. and J.M.M. had been in custody for 61 hours.

B.A.S. was a seven-year-old male from Guatemala who was apprehended with his mother on January 18, 2019 at 4:30 PM, according to the custodial records. The mother informed me that she and her son were given water immediately after apprehension and were fed after they arrived at the facility. The custodial records indicated a snack and cold meal were provided after arrival. The mother also informed me that she and her son completed a medical screening when they first arrived at the facility, which is documented in B.A.S.'s custodial records. The mother told us, and the custodial records confirmed, her son received three meals and a snack each day throughout their time in custody. She stated that her son did not like the food, but that he ate it. The mother explained that she and her son received blankets while on the processing side of the facility and that they received a blanket and a mat when they moved to non-processing side. The custodial records documented provision of bedding. The mother stated that her son had been able to sleep overnight at the facility. At the time of the interview, both the mother and son were wearing their own clothes. The mother explained that their clothes were washed and returned to them. She also stated that they had showered and brushed their teeth since arriving at the facility. B.A.S.'s custodial records indicated he showered on January 21, but do not include receipt of a dental hygiene product. The mother indicated she had not had an opportunity to use the phone. Similar to C.A.O. and A.M.M., custodial records indicated B.A.S. was transferred to a nearby station within the Sector before returning to CPC-Ursula. The records also indicated B.A.S. received a second medical screening prior to being transferred out of CBP custody. Custodial records indicated B.A.S.'s hold room was maintained within the appropriate temperature range throughout his time in custody at CPC-Ursula; however, the custodial records did not indicate which hold room B.A.S. was in while he and his mother were being processed at the other facility. After the interview, I reviewed B.A.S.'s A-file in its current-state. The completed I-770 form was included. At the time I reviewed the A-file, it did not contain a list of legal services providers or confirmation a medical screening occurred. Like A.D.L., I was informed the list of legal services providers and record of medical screening would be included in B.A.S.'s A-file prior to transfer from CBP custody. Custodial records indicated B.A.S was transferred from CBP custody 20 hours after my interview.

15

H.E.M. was a five-year-old female from Guatemala who was apprehended with her one-year-old brother, J.M.M., and their mother on January 19, 2019 at 10:30 PM according to custodial records.  The mother explained that her family was brought directly to CPC-Ursula.  Both children's custodial records indicated they received a medical screening, and a meal upon arrival.  The mother stated, and custodial records confirmed, that throughout their time at the facility, her children received three meals each day and snacks.  The mother also stated they had access to drinking water throughout their time in custody.  The mother stated her daughter did not like the meals provided, but that her daughter was eating the apples and snacks, as well as drinking juice.  She also told me that there was milk for her son.  The mother stated that she could get food, drinks, and diapers for her children whenever she needed.  The mother stated that it was cold on the processing side of the facility, but while there, she and her children received blankets.  After initial processing was completed, the mother stated that she and her children were moved to the non-processing side, where they received a blanket and mat.  The custodial records indicated the hold rooms were maintained within the appropriate temperature range throughout their time in custody.  The mother also informed me that she and her children had not showered or brushed their teeth since they arrived at the facility; however, she said that she and her children had been given body wipes.  The mother told me that she had not had a chance to call her husband, who lives in the United States.  After my interview, I observed the family with an official from the Guatemalan consulate and the mother was on the phone.  Prior to being transferred from CBP custody, custodial records indicated each child received a second medical screening.  After the interview, I did not review H.E.M. and J.M.M.'s A-files because the files had not been completed yet.  The custodial records showed the family was transferred out of CBP custody 38 hours after my interview.

The last minors I interviewed were two male UACs from Honduras.  J.R.G. was 15-years-old, and according to his custodial records he was apprehended on January 22, 2019 at 12:20 AM.  D.O.Z. was 17-years-old, and according to his custodial records he was apprehended on January 21, 2019 at 4:30 PM.  At the time of the interview, the custodial records indicated J.R.G. and D.O.Z. had been in custody for 11 hours and 19 hours, respectively.  Both minors stated the agents treated them well when they were apprehended and they were given water before being taken to CPC-Ursula.  After arriving at CPC-Ursula, both minors stated, and the custodial records documented, they completed a medical screening.  J.R.G. told me he informed the medical professional he was carsick, and the medical professional gave him something to settle his stomach.  Custodial records indicated both minors also received a second medical screening before their transfer to HHS the following day.  Both minors also stated they were given a sandwich and juice after arriving at the facility, and said they were given a burrito in the morning for breakfast; the custodial records documented that a hot and cold meal were provided during those times.  The minors said they did not like the burrito.  They also indicated that they were still hungry.  I informed them that they could ask for food, and that snacks were available.  Custodial records confirmed both minors had at least three

meals per day throughout their time in custody.  The minors told me they had access to
drinking water throughout their time at the facility.  Both minors indicated that it was
colder on the processing side of the facility, and stated they did not receive blankets.
Once they were finished with initial processing and moved to the other side of the
facility, both minors indicated that it was warmer and that mats and blankets were
provided.  Both minors' custodial records documented the provision of bedding and
indicated the hold rooms were maintained within the appropriate temperature range
throughout the minors' time in custody.  J.R.G. told me that he had not slept much since
his arrival at the facility.  D.O.Z. stated he had slept some since his arrival at the facility,
but that an "officer" kicked him in the leg to wake him up.  D.O.Z. did not elaborate on
the circumstances surrounding this incident.  Based on my understanding of how minors
are supervised at CPC-Ursula, I believe "officer" referred to a contract guard since they
are tasked with direct supervision of the minors on the non-processing side of the facility.
I advised USBP of this claim, and it was referred to CBP's Office of Professional
Responsibility (OPR) for an investigation.  During the interview, both minors were
wearing clean clothes provided at the facility.  The minors explained that their clothes
were being washed, and they had showered and brushed their teeth since arriving.
Although custodial records did not confirm this prior to my interview, they showed that
both D.O.Z. and J.R.G. were provided clean clothes and body wipes prior to leaving the
facility.  Both minors stated they had not received a list of legal services providers while
completing their paperwork, nor had they had an opportunity to call a family member.
J.R.G.'s custodial records indicated he used the telephone and made contact with a
relative or friend after he arrived at the facility and both minors' custodial records
indicated they called and made contact with a family member or friend after my interview
at 7:00 PM.  After the interview, I reviewed J.R.G. and D.O.Z.'s A-files.  The A-files
contained the completed I-770 form and a list of legal services providers.  Both A-files
contained documentation that a medical screening was performed.  The completed UAC
health forms were not included in the A-file at the time I reviewed them.  An agent
informed me that the UAC health form is included in the file before any UAC is
transferred from CBP custody.  Both minors' custodial records indicated they viewed the
UAC video.  After the interview, records indicated J.R.G. and D.O.Z. were transferred to
ORR 22 hours and 24 hours after my interview, respectively.

Based on my interviews, review of A-files when available, and later review of custodial
records, as well as my personal observations, I concluded that CPC-Ursula continued to
comply with the FSA.  In my interviews, there were several instances where a parent or
minor indicated they felt cold, or specifically mentioned it was cooler on the processing
side of the facility.  One hold room dipped below the appropriate range at the time of my
visit.  Typically, however, as described in the interviews, custodial records, and my own
observations, minors were provided Mylar blankets while on the processing side of the
facility, which could be used for warmth.  Additionally, three of the pods did not provide
access to functioning sinks.  I was informed the contractor was responsible for filling up
the portable sinks with water, which I observed happening at a different location.  At the

17

time of my visit, the sinks had run out of water.  With such a large population, I understand the portable sinks may run out of water before the contractor returns to service them; however, I will engage the Sector to determine whether additional steps should be taken regarding contract services.  Despite the lower temperature in one hold room and the lapse in access to functioning sinks, I still believe CPC-Ursula complied with the FSA because these were temporary occurrences that can be addressed and mitigated.

I also recognize that complete and thorough custodial records were important.  Whether or not the FSA requires the recordation of all hygiene products and other items provided, I continue to believe more consistent data entry will help the Agency document its compliance.  For example, both D.O.Z. and J.R.G. informed me that they had brushed their teeth and showered prior to my interview, but custodial records did not document the provision of a dental hygiene product or shower.  Given the volume of minors moving through this facility daily and the large number of data points associated with each individual minor, I recognize there will never be 100 percent recordation.  However, I believe it is important to continue exploring how to capture agents' diligent efforts more fully.

With regard to D.O.Z.'s statement that an "officer" kicked him in the leg to wake him up, I cannot confirm or refute this account.  In my experience, I have not personally observed contract guards or agents kicking a minor or otherwise mistreating minors in any way.  The allegation was referred to OPR for an investigation.  I will work with the relevant offices to ensure requirements are met and reaffirm to contract guards and agents the absolute importance of professionalism in all interactions with individuals in CBP custody.

Yuma Station (First Trip)

On January 23, 2019 at 1:45 PM, I arrived unannounced at Yuma Station.  There, I inspected the facility, and spoke with agents and the on-site medical professional.  I also interviewed several minors and/or their parents, and reviewed those minors' completed A-files.  At the time of my visit, there were 266 minors on site.

Minors were in seven different hold rooms depending on their age, sex, and status as accompanied or unaccompanied.  I observed Mylar blankets, as well as mats in the various hold rooms.  The UAC video was playing in one of the hold rooms.  Each hold room had at least one functioning toilet and functioning sink with a water fountain providing potable water.  The toilets and sinks were behind a half wall for privacy.  Two hold rooms had malfunctioning sinks and one hold room had a malfunctioning toilet.  The PAIC immediately submitted work orders requesting maintenance on the sinks and toilet.  In addition, I observed water on the floor near one toilet, and the PAIC explained maintenance had fixed a malfunctioning toilet earlier that day but the area had not been

18

cleaned yet.  The PAIC reported that contractors clean hold rooms twice a day.  It appeared to me that given the high volume of individuals in custody, maintaining the hold rooms' cleanliness was challenging, particularly for the rooms where diapers and feminine hygiene products were being continuously discarded.  The temperature of each hold room was within the appropriate range; all rooms measured between 71.8 and 77.5 degrees Fahrenheit.  The mean temperature was 75.0 degrees Fahrenheit.  There were three portable shower units on site, each of which had a functional shower and sink.  The PAIC informed me that minors were generally offered a shower every 48 hours and/or before they were transferred out of CBP custody.

I observed the sally port where initial medical screenings were conducted, as well as the medical treatment room inside the station.  The PAIC informed me that a medical professional was on site at all times.  The PAIC explained individuals arrived via the sally port where a medical professional screened them for lice, scabies, chicken pox, and other ailments.  The PAIC explained that lice and scabies were treated on site, as well as flu testing and appropriate treatment.  The PAIC explained that if individuals were found to have the flu, they were isolated during treatment to prevent the illness from spreading.  The PAIC informed me that chicken pox cases were referred to the local hospital.  The PAIC also informed me that snacks and water were distributed during the initial arrival process, and I observed an outdoor heater in the sally port.  While I was on site, I observed a father ask an agent to see a medical professional for his child who had a "fever," and the agent promptly escorted the father and son to the medical treatment room.

I also observed Yuma Station's food and supplies available for agents to provide to minors.  The PAIC informed me that the station had an arrangement with a local McDonalds to provide three hot meals each day.  An employee picked up the food and transported it back to the station using insulated bags to retain heat.  The PAIC explained that these meals were distributed around 6:00 AM, 12:00 PM, and 6:00 PM daily, and an additional meal of ramen noodles was provided around midnight.  The PAIC also informed me that snacks and juice were provided to minors four times each day.  I observed four carts that were equipped with snacks, personal hygiene items, and a large pump bottle of hand sanitizer to facilitate distribution of these supplies and make them more accessible to the individuals in custody.  The PAIC also explained that welfare checks occurred simultaneously with the provision of meals and snacks as agents entered each room to distribute food.

The pantry on site was organized by expiration date, with crackers, cookies, juice boxes, ramen noodles, Chef Boyardee, and various types of baby formula.  All food items were within the expiration date.  Powdered milk products from a bulk box were pre-portioned into individual servings and labeled with an expiration date.  The PAIC informed me that this takes more time, but that it was sanitary and ensured that formula and powdered milk products were not wasted.  Personal hygiene and infant care items were available on site,

including diapers in various sizes, baby wipes, pacifiers, body wash, cloth baby blankets, body wipes, pre-pasted toothbrushes, and feminine hygiene products. Clothing and shoes were also available in various sizes, and the PAIC explained these items were provided as necessary, for example, when individuals arrived in wet clothing or prior to transfer from CBP custody. In addition to the on-site pantry, the PAIC informed me that a warehouse close to the station stored additional food and personal hygiene items.

When I arrived, I informed the PAIC of my intent to interview minors and/or their parents. Based on the roll call provided, I identified which hold rooms contained minors in order to solicit volunteers. A plain-clothes agent assisted me with translation. Moving from one hold room to the next, the agent explained to the minors and parents that I was conducting voluntary interviews about their experience in CBP custody. The interviews took place in an interview room near the hold room. The door of the interview room remained open for all interviews and the chairs were arranged in a semicircle to facilitate discussion. Cognizant that I was in an interview room, I reiterated to the minors and parents that my interviews were for the sole purpose of learning about their experiences in CBP custody. In total, I interviewed four minors with their parents and one UAC.

A.R.A. was a four-year-old male from Guatemala who, according to his custodial records, was apprehended with his mother on January 21, 2019 at 8:00 PM. At the time of the interview, the custodial records indicated A.R.A. and his mother had been in custody for approximately 42 hours. A.R.A.'s mother informed me that she and her son were apprehended on January 21 and that the apprehending agent treated them well. She explained that she and her son were transported to Yuma Station, where they waited outside at first. The custodial records indicated a medical screening was conducted upon arrival, which I understand occurs in the sally port (outside of the station itself). The mother told me that after arriving, A.R.A. was given a hamburger, and the custodial records documented that a hot meal was provided. The mother stated that her son did not like chewing and preferred soups and liquids. She told me that she asked for milk, but there was only formula available, which he drank a little. Since then, she said she has been breaking the hamburger into smaller pieces, which helps. I told her that it was important A.R.A. was eating and that she could ask for soup. [5] During the interview, an agent prepared soup for them and I observed A.R.A. eating it. The custodial records specifically indicated that A.R.A. received soup for the fourth meal after my interview. The mother told me they did not have blankets and were sleeping on the bench. I observed an agent provide blankets to them after the interview. The mother also told me the temperature of the station was fine, and that they had access to drinking water as well as functioning toilets and sinks throughout their time in custody. A.R.A.'s custodial records indicated that his hold room was within the temperature range, and that he had functioning toilets, sinks, and access to drinking water throughout his time in custody. I

---

[5] Throughout the interviews, the minors and/or their parents referred to ramen noodles as soup. Yuma Station provides ramen noodles as a hot meal.

asked if there was anything else I should know about their time here, and the mother explained it was difficult to keep the hold rooms clean because there were not any trash bins in the rooms to discard trash or feminine hygiene products, which I observed and advised the PAIC of as well.  The custodial records indicated A.R.A. was offered four meals a day until transferred from CBP custody 17 hours after my interview.  The custodial records also indicated that A.R.A. received body wipes twice while in custody.  After the interview, I reviewed A.R.A.'s A-file, which included the I-770 form and indicated a medical screening was conducted.

D.E.M. was a one-year-old female from Guatemala who was apprehended with her mother on January 21, 2019 at 8:50 PM.  At the time of the interview, custodial records indicated D.E.M. had been in custody for approximately 41 hours.  D.E.M.'s mother told me that she and her daughter were apprehended on the night of January 21, and that they received food and blankets upon arrival at Yuma Station.  The mother stated they received food twice a day since arriving; though, the custodial records indicated D.E.M. accepted eight meals between arriving at the station and my interview.  The mother told me her child did not eat the hamburgers or crackers provided, and was drinking water, juice, and milk (it was not clear whether milk referred to formula or milk).  I asked whether the mother had asked for something else for the child to eat.  She told me she knew soup was available, but that she had not asked.  I reiterated that it was important to ensure D.E.M. was eating, and I let her know she could ask for the food or formula she needed for her child.  D.E.M.'s custodial records indicated she was offered a hot meal upon arrival to Yuma Station, and subsequently was offered at least three meals per day.  The mother confirmed that their hold room had functioning toilets and sinks, and that they had access to drinking water throughout their time in custody.  She also told me that the temperature of the hold room was "normal" and "not cold."  Custodial records confirmed D.E.M. had access to functioning toilets and sinks, and that the hold room was within the acceptable temperature range throughout D.E.M.'s time in custody.  The mother explained that D.E.M. had been bored during their time in custody because there were many people sharing the hold room; which I understood her to mean her daughter was getting restless staying in the same room with limited space to play.  Custodial records indicated D.E.M. received body wipes three times during her time in custody, and was transferred from CBP custody 41 hours after my interview.  I did not review D.E.M.'s A-file after the interview because it had not been completed yet.

O.J.P. was a 16-year-old unaccompanied male from Guatemala who was apprehended on January 21, 2019 at 6:25 PM.  At the time of the interview, custodial records indicated O.J.P. had been in custody for approximately 43 hours.  O.J.P. explained that he was apprehended and brought to Yuma Station on January 20, though the custodial records indicated this took place the following night.  O.J.P. told me that after arriving he was given food and juice, and called his father.  Custodial records indicated he was medically screened and viewed the UAC video upon arrival.  O.J.P. said that he had been eating, but had not wanted to eat lately because he was feeling nervous since other minors he

arrived with had been transferred out of CBP custody.  I explained to O.J.P. that it takes time to find placements for everyone and one placement may be available sooner than another may.  O.J.P. told me he had been drinking water and juice throughout his time in custody.  Custodial records indicated he was offered four meals each day he was in custody.  O.J.P. told me that he had been able to sleep while at the station and that he was given a mat.  He told me that he was not given a blanket; however, I observed that pieces of Mylar blanket had been used to tie his shoes.  O.J.P. informed me that the temperature was cold in the morning and evenings, but that it was currently fine.  He was wearing his jacket, and confirmed it helped keep him warm.  The custodial records showed the temperature of the hold room was within the appropriate range throughout his time in custody.  O.J.P. also told me that he has had access to functioning toilets and sinks throughout his time at custody.  During my visit, his hold room was the one identified with a clogged toilet.  His custodial records noted this, and noted the toilet was cleared and functioning 20 minutes later.  Throughout the remainder of his time in custody, custodial records indicated he had access to functioning toilets and sinks.  O.J.P. told me that he received body wipes, but had not showered since arriving at the station.  His custodial records documented the provision of body wipes prior to this interview.  After the interview, I reviewed O.J.P.'s A-file, which included the I-770 form and record of medical screening.  The custodial records indicated O.J.P. was transferred to ORR 14 hours after my interview.

J.M.S. was a two-year-old male from Guatemala who was apprehended with his father on January 23, 2019 at 4:55 AM.  At the time of the interview, custodial records indicated J.M.S. had been in custody for approximately nine hours.  J.M.S.'s father explained he and his son had been apprehended around 4:00 AM the morning of the interview and were taken to Yuma Station.  The father stated the apprehending agents were respectful.  He stated that after arriving at the station he felt he wasn't getting a lot of information about what was happening and agents gave him short answers; he added there were a lot of people and he understood why the agents responded that way.  The father stated his son was given food, but that his son did not eat the burger and instead drank water and juice.  The father said he told this to an agent and the agent suggested trying to feed the bread and meat separately.  The father told me someone else in the hold room had soup and shared that with his son.  I told the father to make sure that he asked for food his son would eat.  The custodial records showed that J.M.S. was offered at least three meals per day throughout his time in custody.  The father told me that his and his son's hold room had a functioning toilet and sink, and custodial records confirmed.  I observed the father holding a Mylar blanket during the interview.  The custodial records indicated J.M.S. was provided body wipes twice throughout his time in custody.  The custodial records showed J.M.S. was transferred from CBP custody 41 hours after my interview.  I did not review J.M.S.'s A-file after the interview because processing had not been completed yet.

M.A.M. was a 17-year-old male who was apprehended with his father on January 22, 2019 at 11:20 PM.  At the time of the interview, custodial records indicated he had been

in custody for approximately 14 hours.  The father and son explained they were
apprehended and taken to Yuma Station on January 22, adding that they were well
received by the apprehending agents.  They told me that they were transported to the
station and were outside for about 20 minutes, which I understood to mean they were
going through initial intake procedures in the sally port.  The father and son said they
were given juice and crackers upon arrival, and that they had since had three meals.
Custodial records confirmed a hot meal was provided upon arrival, as well as a medical
screening.  The father and son told me that their hold room had functioning toilets and
sinks; adding that one of the toilets had been clogged, but it was fixed and currently
worked.  This was the hold room where I observed water on the floor by the toilet and the
PAIC informed me maintenance had fixed the toilet before I arrived on site.  The father
and son said that the temperature of the station was fine, but that it was cold outside.
They told me that they had blankets, and had been able to sleep.  The custodial records
indicated that M.A.M. was transferred to a nearby station within the Sector the next
morning after my interview, where the records documented he received a medical
screening and hot meal before he was transferred out of CBP custody.  The custodial
records confirmed M.A.M. was provided at least three meals a day throughout his entire
time in custody, and that his hold rooms were maintained within the appropriate range.
The custodial records also documented body wipes were provided three times.  I did not
review M.A.M.'s A-file while on site because it had not been completed yet.  M.A.M.
remained in CBP custody for 34 hours after my interview.

Based on my interviews, review of A-files when available, and later review of custodial
records, as well as my personal observations, I believe Yuma Station continued to
comply with the FSA.  Of note, there were isolated incidents of malfunctioning sinks and
a malfunctioning toilet.  However, these incidents were acknowledged by the PAIC
during my site visit, and work orders were submitted while I was on site.  During the
inspection, the PAIC told me a toilet was fixed just prior to my arrival on site, and during
the interviews, one of the parents even mentioned that the malfunctioning toilet had been
fixed and was currently working.  In two interviews, I heard minors did not initially have
access to a blanket; however, in at least one case, I observed an agent give the individuals
blankets after the interview.  Another parent mentioned that there were not any trashcans
in the hold rooms, which made it difficult to keep clean.  At the time of my visit, I
observed that discarded diapers and feminine hygiene products had not been removed
from some hold rooms.  The PAIC informed me that the spaces are professionally
cleaned twice each day, at which times I presume these items and other waste is
discarded.  Finally, the list of legal services providers was not included in the two A-files
that I reviewed.  In both cases, the minors remained in CBP custody for an additional 17
and 14 hours after my interviews, and I do not know whether any additional items were
reviewed and included in their A-files after my visit.  I will engage USBP to ensure the
list of legal services providers continues to be distributed to minors in CBP custody.
Overall, I believe Yuma Station complied with the FSA.

El Paso Station

On April 24, 2019 at 11:30AM, I arrived at El Paso Station to conduct an unannounced
visit.  There, I inspected the facility, and interviewed the PAIC and the on-site medical
professional.  I did not interview minors at this location.  At the time of my visit, there
were 32 minors on site according to the roll call printed upon arrival.

Minors were in six different hold rooms depending on their age, sex, and status as
accompanied and unaccompanied.  All of the hold rooms had functioning toilets.  The
toilets and sinks were behind a half wall for privacy.  Four hold rooms had functioning
sinks with a water fountain providing potable water.  The sinks in the other two hold
rooms were functioning poorly.  The PAIC informed me agents would submit work
orders to repair the malfunctioning sinks.  The PAIC also distributed water bottles to the
individuals in those hold rooms since the malfunctioning sink affected the water
fountains.  I observed minors using Mylar blankets in the various hold rooms.  The PAIC
informed me that mats were unavailable at the time of my visit because the hold rooms
and capacity could not accommodate mats.  The temperature of each hold room was
within the appropriate range; all rooms measured between 71.5 and 76.0 degrees
Fahrenheit.  The mean temperature was 73.7 degrees Fahrenheit.  There was a mobile
shower facility parked outside with four functioning showers.  The PAIC informed me
that that every effort was made to provide showers for minors every 72-hours as
operationally feasible.  I observed a professional cleaning crew on site during my visit.
The PAIC informed me that the hold rooms and showers were cleaned twice a day.

I observed the sally port where initial medical screenings were conducted, as well as the
medical treatment room inside the station.  The PAIC informed me that medical
professionals were on site at all times.  At the time of my visit, the USCG was
performing medical services.  The USCG flight surgeon on-duty explained that medical
professionals screened all individuals in CBP custody for lice, scabies, chicken pox, and
other ailments when individuals first arrived at the station.  The USCG flight surgeon
explained, and I observed, minors received a bracelet that indicated they were medically
screened.  In the medical treatment room, I observed over-the-counter medications.  The
USCG flight surgeon explained that the medical professional on-duty could administer
these medications, and could write, fill, and administer prescriptions as necessary.  The
PAIC informed me that after the initial medical screening was completed, minors were
brought inside.  In addition to the USCG, the USPHS Commissioned Corps was on site.

I also observed El Paso Station's food and supplies available for agents to provide to
minors.  The PAIC explained that food was prepared on site; meals were distributed three
times a day and snacks twice a day.  The PAIC informed me that frozen burritos were
typically served as a hot meal twice a day (breakfast and dinner), and a sandwich was

24

served as a cold meal at lunchtime.  I observed fruit cups, baby food, baby formula, juice boxes, granola bars, frozen burritos, milk, ramen noodles, animal crackers, raisins, and sandwiches; all within the expiration date.  The PAIC explained that welfare checks occurred simultaneously as agents distributed food.  Toiletries, including all-in-one shower soap, baby wash, pre-pasted toothbrushes, and clean towels were available.  I also observed that feminine hygiene products, diapers, baby wipes, and baby formula were all available upon request.  The station also had clean clothing in various sizes available for minors.  I observed OFO personnel on site assisting with the care and custody responsibilities.

Based on my personal observations, and interviews with the PAIC and USCG flight surgeon, I believe that El Paso Station continued to comply with the FSA.  When issues with the sinks were noted, water bottles were distributed to ensure minors were able to drink water during this time, and the PAIC informed me a work order would be submitted.

Paso Del Norte Processing Center

On April 24, 2019 at 3:15 PM, I arrived at Paso Del Norte Processing Center to conduct an unannounced visit.  There, I inspected the facility, and spoke with the PAIC and on-site medical professional.  I did not interview minors during this site visit.  At the time of my visit, Paso Del Norte Processing Center functioned as a preliminary intake hub before UACs or families were transferred to alternate locations for the remainder of their time in CBP custody.  The PAIC explained that, at the time of our visit, UACs and some families were typically transferred to nearby Clint Station.  However, time in custody at this site could vary depending on available capacity elsewhere.  At the time of my visit, the roll call indicated there were 46 minors on site.  The PAIC informed me there were fewer minors on site than the roll call indicated because minors had been transferred to other facilities, but e3DM had not yet been updated to showed the minors were booked-out.  The PAIC also informed me that CBP officers were temporarily re-assigned to support this facility, which helped with processing the high numbers of individuals in custody.

UACs were placed in hold rooms inside the station, and families were held in the soft-sided facility outside.  The two hold rooms inside the station were within the appropriate temperature range, measuring 69.2 and 70.7 degrees Fahrenheit.  The hold rooms did not have toilets or sinks in the room, but there were gender-specific bathrooms in the processing area that were accessible.  Both bathrooms were clean and had a functioning toilet and sink with soap.  The PAIC explained the minors also used the water fountain in the processing area for drinking as it was near the bathrooms and provided an unlimited source of cold drinking water.  Mylar blankets were available and being used inside the hold room.  In the soft-sided facility, the temperature registered outside the appropriate range at 89.6 degrees Fahrenheit, but occupants inside the structure were using Mylar blankets and the occupants stated the temperature was not an issue.  There were portable

25

toilets and portable sinks available outside.  Cups and jugs of clean water were available
for drinking.

I also observed the intake area, where minors received an initial medical screening, and
the medical treatment room inside the station.  The PAIC informed me there were
medical professionals on site at all times.  The PAIC informed me that all minors
received an initial medical screening upon arrival and an additional medical screening
prior to transfer from CBP custody.  The medical professional on site explained that the
screening consisted of checking for any current symptoms, medication, or illnesses,
including checking exposed skin and hair for rashes or injuries.  He noted that UACs
received special attention, including moving UACs to the front of the line and placing an
emphasis on mental health.  The PAIC informed me that the health screening forms were
included in UAC's A-files before they were transferred to HHS.  The PAIC explained
that lice and scabies were treated on site.  Flu testing was also conducted on site, and any
individuals found to have the flu were isolated during treatment to prevent spreading the
illness.  Over-the-counter medications were available on site, and a local pharmacy was
able to make prescription deliveries.

I also observed Paso Del Norte's food and supplies available for agents to provide to
minors.  The food storage area was clean, and there was a system in place with signage to
ensure that food was distributed according to expiration date.  There were granola bars,
juice boxes, fruit cups, sandwiches, and frozen burritos, which were all within the
expiration date.  I observed leftover sandwiches from two days prior had been removed
from the refrigerator.  The PAIC stated the contractor who prepared the sandwiches had
not removed these.  I was told by the PAIC that these items would be discarded and not
served.  The PAIC explained that minors did not typically receive hygiene items at this
station, given their short time in custody at this location.

Based on my observations and discussions with the PAIC and medical professional, I
believe Paso Del Norte continued to comply with the FSA.  Although the temperature of
the soft-sided facility measured 89.6 degrees Fahrenheit, occupants told me the
temperature was fine.  I observed an industrial fan available to circulate air.  Given the
high volume of individuals being moved through the station at any given time, the agents
had not had the chance to update the records at the time of my visit; however, the PAIC
indicated e3DM would be updated accordingly.  Therefore, I believe the Paso Del Norte
Processing Center complied with the FSA.

Clint Station

On April 25, 2019 at 12:10PM, I arrived unannounced at Clint Station.  There, I
inspected the facility, and spoke with the PAIC and on-site medical professional.  I also
interviewed minors and/or their parents, and subsequently reviewed several of the

26

minors' A-files.  At the time of our visit, there were 291 minors on site, according to the roll call pulled upon my arrival.

The PAIC informed me that the station created additional holding space to accommodate the consistently high number of minors in custody.  The PAIC explained, and I observed, that the hold rooms inside the station were used for the female UACs and younger male UACs; the covered sally port was converted into a holding area for the older male UACs; and an existing standalone warehouse structure was converted to hold families.

Inside the station, the doors to the hold rooms were unlocked and ajar.  I observed several minors freely exiting the hold rooms to go to the processing area where a five-gallon water jug and cups sat atop a table.  The hold rooms had a combination of bunkbeds, mats, and cloth blankets, though not everyone had a bed or mat.  Each hold room had at least one functioning toilet and sink with a water fountain providing potable water placed behind a half wall for privacy.  I observed a movie playing on a TV mounted in one of the hold rooms.  All hold rooms were within the appropriate range; all rooms measured between 71.0 and 73.5 degrees Fahrenheit.  The mean temperature was 72.0 degrees Fahrenheit.

In the holding area for the older male UACs, bunkbeds lined up across the back of the sally port and mats were stacked up in a corner available for the minors to use throughout the day and night.  I observed cloth blankets were also being used.  Many of the minors sat on their bunks or laid on the floor in front of the TV, which had a movie playing.  Portable sinks and toilets, as well as hand sanitizer, were positioned outside the sally port and the minors could freely access them.  The temperature measured 77.0 degrees Fahrenheit.

There was also a basketball hoop and three basketballs outside set up for the UACs.  When I first arrived, I observed younger females outside playing basketball.  The PAIC also told me that agents had started a "world cup" soccer tournament with some of the minors and they played in the evenings.

In addition to UACs, families were also transferred to Clint Station after apprehension during the time of my visit.  The family holding area was located in a separate standalone warehouse structure that had been converted into additional holding space.  The structure was divided into two pods for female and male head of households.  Each pod had bunkbeds, mats, and cloth blankets.  The pods were open and allowed access to the portable toilets and sinks positioned outside.  Industrial fans were positioned in the family holding area to circulate air and regulate the temperature.  The two pods measured 77.0 degrees Fahrenheit and 80.0 degrees Fahrenheit, respectively.  I observed a soccer ball available for minors in the outside area.

I observed the medical treatment room located inside the station and spoke with the contract nurse practitioner on-duty. The nurse practitioner informed me that medical professionals were on site at all times. She explained that all minors received a health screening when they arrived and before transfer, and that they must be medically cleared before transport. The nurse practitioner informed me that the on-duty medical professional could write prescriptions and administer over-the-counter medications. She also stated that flu testing could be performed on site, as needed. I observed one of the medical professionals administering lice treatments for several minors. The nurse practitioner remarked that the medical professionals at Clint Station emphasized hydration to ensure minors drank enough fluids. Adding, they also encouraged the minors to play outside to get fresh air, but not during peak hours when it gets "too hot."

I also observed Clint Station's food and supplies available for agents to provide to minors. The food storage area was clean and organized. There was pudding, instant oatmeal, Nutri-Grain bars, frozen burritos, baby food, baby formula, Pedialyte, and juice boxes; all within the expiration date. I observed, and informed the PAIC, that ramen noodles were past the best-by date; however, they were not expired. The PAIC informed me that food was prepared on site and meals were provided three times a day. The PAIC explained that typical meals consisted of instant oatmeal, granola bar, and juice; soup, granola bar, and juice; or, a burrito, pudding, and juice. While on site, I observed USCG personnel preparing and distributing lunch to the UACs. Room by room, the minors lined up and went down the table where there was a water jug with cups, juice boxes, and granola bars. At the end of the table, the USCG personnel handed each minor a burrito before the minor went back to the hold room. The water jug, cups, and juice boxes remained on the table in between meal times.

There were two portable shower units on site, each of which had a functional shower and sink. There was soap, shampoo, body wipes, razors, shave gel, sunscreen, and towels available for minors to use when showering. I observed clean clothing in a variety of sizes available for minors. Feminine hygiene products, diapers (in various sizes), baby wipes, and baby formula were all easily accessible, both inside for UACs and in the family holding area. There was a washer and dryer on site, which the PAIC explained was used to wash towels, and minors' clothes, if necessary. Mylar and cloth blankets were used at this location and the PAIC informed me that the cloth blankets were sent off site to be cleaned.

When I arrived, I informed the PAIC of my intent to interview minors and/or their parents. An agent assisted me with translation. The agent explained to the minors and parents that I was conducting voluntary interviews about their experience in CBP custody. The translator made it clear that these interviews would have no impact on any immigration proceedings or their immigration disposition. The interviews with UACs took place in the open on the hold room floor, where we arranged chairs in a semi-circle.

The interviews with parents also took place in the open, inside the family holding area. There, we sat at one of the tables used for processing. In total, I interviewed eight UACs and the parents of three minors.

My first interview was with two UAC females, M.T.R. and G.B.R. M.T.R. was a 16-year-old from Guatemala, and was apprehended on April 22, 2019 at 10:32 AM. G.B.R. was a 14-year-old from El Salvador, and was apprehended on April 11, 2019 at 6:00 PM. At the time of the interview, custodial records indicated M.T.R. and G.B.R. were in custody for 74 hours and 330 hours, respectively.

M.T.R. explained she was apprehended and taken to another location first, which custodial records identified as El Paso Station. There, M.T.R. stated she was outside for approximately three hours while agents collected biographical information. She then told me she went inside and was given food before going back outside. M.T.R. told me the room where she was held was initially cold and the blanket provided did not help. M.T.R. stated she spent one day at the first location before being transported to Clint Station. Her custodial records indicated she was taken to El Paso Station the morning of April 22 and then transferred to Clint Station that night, arriving around 1:30 AM on April 23. Although not documented in custodial records, M.T.R. confirmed she saw a nurse upon arrival. She told me she was not feeling well at that time, but did not need medicine. She also stated she was feeling better now. M.T.R. told me the agents were "nice and respectful." M.T.R. confirmed she had access to functioning toilets and sinks in her hold room, but it was not documented in her custodial records because her hold room at Clint Station was not identified. M.T.R. stated she had not showered since arriving; custodial records indicated M.T.R. was asleep when a shower was offered. M.T.R. also told me she received three meals a day, she had enough to drink, and that she knew she could ask for food or items she needed. I observed the UACs at Clint Station receive lunch while I was on site, and M.T.R.'s custodial records documented this hot meal. Her records indicated she received another meal that evening, and the following day she received a meal in the morning and at noon before she was transferred to HHS approximately an hour later. M.T.R. was transferred to HHS custody on April 26; approximately 25 hours after my site visit. Custodial records indicated she was shown the UAC video at Clint Station. After my interview, I reviewed M.T.R.'s A-file, which included the I-770 form, record of medical screening, and list of legal services providers.

Like, M.T.R., G.B.R. explained she was apprehended and brought to a different facility first where she stayed there "a little while." Custodial records indicated she was taken to El Paso Station the night of April 11 before she was transferred to Clint Station, arriving early the morning of April 12. G.B.R. told me the temperature at El Paso Station was cold, but the temperature was "normal" at Clint Station. G.B.R.'s custodial records indicated her hold room at El Paso Station was within the appropriate temperature range, but the custodial records did not track G.B.R.'s hold room conditions at Clint Station. G.B.R. informed me that while she was at Clint Station, she saw the on-site medical

professional and was taken to the hospital (which contributed to her extended time in CBP custody).  G.B.R. did not elaborate further on her hospital visit, but said she returned to Clint Station after her time at the hospital.  G.B.R.'s custodial records documented her temporary book-out to the hospital, on April 12 at approximately 7:00 PM.  Custodial records documented G.B.R. returned to Clint Station on April 21 at approximately 11:00 AM.  Custodial actions were not recorded from temporary hospital book-out until her book-in at Clint Station approximately nine days later.[6]  G.B.R. told me that after leaving for the hospital another UAC took her unoccupied bed, therefore when she returned she did not immediately have a bed to use.  During that time, she told me she slept on the floor.  G.B.R. stated she liked the food, and received three meals a day.  According to custodial records, she received two additional meals after my interview, and accepted three meals the following day prior to her transfer to HHS that evening.  She also said she had access to a functioning toilet and sink throughout her time at Clint Station, and custodial records indicated she showered and watched the UAC video there as well.  According to the custodial records, G.B.R. was transferred to HHS the following evening, 30 hours after my interview.  After the interview, I reviewed G.B.R's A-file, which included the I-770 form, record of medical screening, and list of legal services providers.  G.B.R.'s A-file also included the hospital discharge and prescription paperwork.

Next, I interviewed two sisters from Honduras who were apprehended on April 21, 2019 at 10:22 PM.  M.R.L. was 11 years old and C.R.L. was seven years old.  At the time of my interview, custodial records indicated the sisters had been in custody for approximately 86 hours.  The sisters informed me they were apprehended with their grandmother.  However, the sisters were processed as UACs, and according to custodial records were transferred from El Paso Station to Clint Station.  Under the Trafficking Victims Protection Reauthorization Act (TVPRA), HHS must conduct all other reunifications with relatives other than a parent.  The sisters informed me they arrived at Clint Station on Sunday night, and the next day they spoke to their mother in the U.S. The sisters told me they were given blankets and that they were able to sleep while at the station.  They told me they slept on the benches in the hold room for the first four days before they had cots.  The sisters stated there were more females in their hold room before, and after those minors left, the sisters took the previously occupied cots.  The sisters told me they had been able to play outside, and they typically played basketball. The sisters told me they had not showered or brushed their teeth since arriving at Clint Station.  Custodial records indicated showers were offered twice while in custody, but the sisters were asleep both times.  The sisters confirmed there were on-site medical

---

[6] It is my understanding that custodial records do not capture custodial actions, like meals provided or access to functioning toilets and sinks, while minors are in the hospital.  Instead, the custodial records typically indicate that a minor was transported to and from the hospital, and documenting custodial actions resumes once the minor is back at a CBP facility.  This is because custodial actions represent actions taken while minors are in a CBP facility and under CBP supervision.  Once a minor is in the hospital, attending medical professionals make all decisions related to treatment and care.

professionals who they could go to with any health concerns.  Custodial records indicated
C.R.L. completed a medical screening upon arrival at El Paso Station, but the medical
screening was not documented in M.R.L.'s custodial records.  The younger sister told me
she wanted to speak with the nurse on site during my interview, at which time the nurse
took both sisters to the medical treatment room.  Shortly after, I observed the sisters
calling their mother before returning to their hold room.  Custodial records indicated both
sisters were shown the UAC video while at Clint Station.  Throughout their time in
custody, the records indicated the sisters were offered three meals per day, until their last
day at Clint Station.  On that day, custodial records indicated the sisters received two
meals before they were transferred to HHS custody at approximately 1:00 PM.  The
sisters were transferred to HHS 25 hours after my site visit.  After the interview, I
reviewed M.R.L. and C.R.L.'s A-files.  Both files contained the I-770 form, record of
medical screening, and list of legal services providers.

My next interviews were with V.R.L. and D.M.G.  V.R.L. was an 11-year-old female
UAC from Guatemala who was apprehended on April 20, 2019 at 8:36 PM.  D.M.G. was
a 15-year-old female UAC from Guatemala who was also apprehended on April 20, 2019
at 8:36 PM.  At the time of the interview, custodial records indicated both minors were in
CBP custody for 112 hours.  During the interview, the minors shared they were
apprehended at night and taken to a different CBP location first.  Custodial records
indicated they were taken to Paso Del Norte Processing Center.  The minors remarked
they finally felt safe after being taken into custody, and that the agents were nice.  One of
the minors added that the apprehending agent was "really cool."  At the first location, the
minors stated they received juice upon arrival and they provided biographical
information.  Shortly after, the minors stated they were transferred to Clint Station.

D.M.G. and V.R.L. told me they received three meals a day and snacks, adding that soup
was their favorite meal at Clint Station.  D.M.G. and V.R.L. also told me they could
freely leave their hold room to get water from the five-gallon water jug in the processing
area.  They told me the toilets and sinks were working in their hold room.  The custodial
records did not indicate which hold rooms D.M.G. and V.R.L. were in, and therefore the
custodial records did not track their hold room conditions such as access to functioning
toilets and sinks.  D.M.G. and V.R.L. told me they showered one time since arriving at
the station.  Both minors stated they had blankets throughout their time in custody, and
they were able to sleep.  Finally, D.M.G. and V.R.L. told me they could go outside every
day to play, adding they and some of the other UACs like to sit outside and talk by the
water jug instead of participating.  While I was on site, I observed all the UACs receive
lunch, and both D.M.G. and V.R.L.'s custodial records documented this hot
meal.  Custodial records indicated both minors received another meal that evening and
three meals the following day.  According to the custodial records, V.R.L. was
transferred to HHS custody shortly after the third meal was provided on April
26. D.M.G.'s custodial records indicated she remained at Clint Station overnight, and
received three additional meals throughout the day before she was transferred to HHS

custody on April 27.  The custodial records also indicated both minors were shown the
UAC video at Clint Station.  According to the custodial records, V.R.L. and D.M.G. were
transferred to HHS 30 hours and 55 hours after my site visit.  After the interview, I
reviewed V.R.L. and D.M.G.'s A-files.  Both files contained the I-770 form, record of
medical screening, and list of legal services providers.

G.L.D. was a 17-year-old female UAC from Honduras who was apprehended on April
15, 2019 at 10:10 AM.  M.A.G. was a 14-year-old female UAC from Guatemala who was
also apprehended on April 15 at 10:10 AM.  At the time of the interview, both minors
were in custody for 242 hours.  According to the custodial records, both minors were
apprehended on the same day and were transferred to Clint Station at the same time on
April 16.  M.A.G. told me she was apprehended and brought directly to Clint Station;
however, the custodial records indicated she was initially taken to El Paso Station before
she was transferred to Clint Station that same night.  M.A.G. told me the intake process
included providing biographical information, a medical screening, and that she spoke to
her mother in the U.S.  M.A.G. stated she did not have anything to eat or drink until the
following morning at Clint Station.  M.A.G.'s custodial records indicated she was asleep
during her first night when food was offered.  The records indicated she received
oatmeal, cookies, and juice for breakfast the next morning.  M.A.G. told me she received
three meals each day and drinking water was available whenever she wanted it.  M.A.G.
informed me she did not like the food and she was still hungry, adding she once asked for
more food but did not receive it.  After hearing this, the agent assisting me with
translation gave M.A.G. a snack.  While I was on site, I observed all the UACs receive
lunch, and both G.L.D. and M.A.G.'s custodial records documented this hot
meal.  Custodial records indicated both UACs received another meal that evening, and
three meals per day for the remainder of their time in custody at Clint Station.  Custodial
records indicated both UACS were transferred to HHS custody on April 27 shortly after
they received their third meal of the day.

G.L.D. listened while M.A.G. spoke with me.  During the interview, G.L.D. added she
had been able to sleep "a little bit," and that she had a blanket throughout her time at
Clint Station.  G.L.D. told me she had slept on the floor for the first three nights until a
cot was available, and that she slept on the cot ever since.  G.L.D. also told me the station
was "very cold."  At the time of my visit, all UAC hold rooms inside the station
measured between 71.0 and 73.5 degrees Fahrenheit.  The custodial records indicated
both minors received showers prior to the interview, but G.L.D. stated she had not
showered or brushed her teeth since arriving at Clint Station.  Although both minors'
custodial records identified their hold room at Clint Station, the records did not document
hold room conditions at regular intervals throughout the minors' entire time at the station.
For the periods of time when the hold rooms' conditions are documented, the records
indicated both minors had access to functioning toilets, sinks, and the temperature was
within the acceptable range.  Both minors were transferred to HHS 55 hours after I talked
with them.  After the interview, I reviewed M.A.G. and G.L.D.'s A-files.  Both files

contained the I-770 form, record of medical screening, and list of legal services
providers.

M.O.B. was an eight-year-old female from Guatemala who was apprehended with her
mother on April 24, 2019 at 8:25 AM.  Custodial records indicated M.O.B. was in
custody for 28 hours at the time of my interview.  M.O.B. was sleeping on a mat with a
blanket at the time of my interview with her mother.  The mother told me that after she
and her daughter were apprehended, they were taken to another station first and stayed at
that location for less than an hour before being transferred to Clint Station.  Custodial
records only documented M.O.B.'s time at Clint Station.  At the first location, the mother
explained they received a sandwich and cookie, and changed into clean clothes.  Upon
arriving at Clint Station, the mother told me she and her daughter received burritos and
juice.  She also stated they had a blanket and mat, as well as access to functioning toilets
and sinks throughout their time in custody.  The mother and custodial records confirmed
her daughter received a medical screening after arriving.  The mother explained to me
that M.O.B.'s lip was swollen and the medical professional provided a cream that
reduced the swelling.  M.O.B. was transferred from CBP custody 17 hours after my site
visit.  After the interview, I reviewed M.O.B.'s A-file, which included the I-770 form and
record of health screening.

The last interview I conducted was with a mother who was with her husband and two
children, F.M.C. and D.M.C.  F.M.C. was a five-year-old male, who was sleeping at the
time of the interview, and D.M.C. was a one-year-old male.  The brothers were from El
Salvador and apprehended with their parents on April 18, 2019 at 8:47 PM.  At the time
of the interview, custodial records indicated both children had been in custody for 159
hours.  The mother explained, and custodial records confirmed, that her family was taken
directly to Clint Station after apprehension.  During intake, the mother confirmed her
sons were given juice and cookies.  She told me the family received three meals a day
and had access to drinking water.  The custodial records confirmed the brothers continued
to be offered meals three times a day throughout the remainder of their time in
custody.  The mother said her sons had enough food to eat, including food for the
youngest son.  She also confirmed other items for her youngest son were available, like
diapers, and stated the temperature of the facility was "good."  The mother told me her
sons were given the opportunity to shower, but that she did not accept the
offer.  Custodial records indicated both sons were provided body wipes prior to my
interview.  She also stated that her sons were able to go outside to play, but they were
getting antsy.  She explained her family was going to be transferred from CBP custody
the day after they were apprehended, but one of her sons was sick.  As a result, he had not
been medically cleared to leave.  The mother stated that her son was given medication
and his last dose was scheduled for the following day.  She was hopeful he would be
medically cleared at that time.  The custodial records indicated the brothers were
transferred from CBP custody 17 hours after my site visit.  After the interview, I

reviewed the brothers' A-files, which included the completed I-770 form and record of
health screening.

Based on my personal observations and interviews, I believe Clint Station continued to
comply with the FSA. There were instances where minors informed me they did not
have immediate access to a cot. My interviews and observations indicated minors
generally had access to a blanket, even in situations where a cot was not immediately
available. Additionally, some minors indicated they had not showered or brushed their
teeth while in custody. I observed the shower facilities and saw hygiene items were
available. The PAIC indicated showers and other hygiene items were provided, as
operationally feasible. In certain cases, custodial records revealed that showers were
offered, but it occurred when the minor was asleep. One minor also informed me she did
not receive additional food when she asked for it. In my experience, minors were
generally provided additional food upon request. However, I understand there may be
times when agents are not immediately able to provide additional food or snacks. At a
minimum, I believe each minor received three meals per day, as confirmed by the minors
interviewed and my discussions with the PAIC. I observed ramen noodles that were past
the best-by date; however, this did not indicate that the food was expired. Finally, there
were certain inconsistencies noted in the custodial records. Of note, many of the
custodial records I reviewed from this location did not identify which hold room a minor
was assigned to throughout their time in CBP custody. Without the hold rooms
documented, I was unable to confirm from the custodial records that minors had access to
functioning toilets, sinks, drinking water, or whether the hold rooms were maintained
within the appropriate temperature range. Based on my observations and interviews, I
believe minors had access to these items, and that the hold rooms were generally
maintained within the appropriate temperature range. Additionally, there was an instance
when the custodial records did not document a minor's medical screening, but I saw it in
the minor's A-file. I continue to believe that thorough and complete recordkeeping is
important in order to demonstrate the Agency's compliance with the FSA. Finally, I did
not observe lists of legal services providers in the accompanied minors' A-files. I will
engage USBP to ensure all minors receive the list of legal services providers. Given the
capacity and operational constraints, I believe agents were doing everything within their
capacity to create safe and sanitary spaces for all minors, including areas for minors to
play outside and move about freely. Therefore, I believe Clint Station continued to
comply with the FSA.

Yuma Station (Second Trip)

On May 28, 2019 at 5:00 PM, I arrived at Yuma Station to conduct an unannounced visit.
There, I inspected the facility, and spoke with the PAIC and on-site medical professional.
At the time of my visit, there were 525 minors on site, which was a 97.4% increase in the
minor population compared to my trip in January. I did not interview minors during this

trip.  Instead, my visit focused on how Yuma Station responded to the increased number
of minors in its custody and how it maintained compliance with the FSA.

Given the consistently high numbers of individuals in custody at Yuma Station,
additional spaces were created to facilitate intake and increase holding capacity.  Minors
were located in the newly created overflow area, a converted warehouse structure divided
into two pods, and five hold rooms inside the station.  The PAIC also informed me that in
addition to the new spaces created, the station also transferred some families to nearby
stations to complete processing.

An overflow area of the sally port was created for individuals arriving at the station.  In
the overflow section, there were multiple temporary pop-up shelters with top coverage
and industrial fans circulating the air.  I observed individuals using mats, and saw five-
gallon water jugs with cups available for drinking.  Individuals, including minors, in this
area could freely access portable toilets and sinks with soap.  I observed contractors
servicing the restrooms.  The contractor informed me that the restrooms were serviced
twice daily by emptying and cleaning the toilets, providing toilet paper, filling the
portable sinks with water, and replacing the soap.  I also observed contractors who
emptied trashcans and swept the area.  The PAIC informed me that this area was not for
longer-term holding, and that generally, individuals would spend a few hours here until
further processing could be completed inside.

A warehouse structure, separate from the main station, was converted into two additional
hold rooms to increase overall capacity.  The PAIC informed me the conversion was
executed approximately two weeks prior to my visit.  The building doors were half-open
for ventilation.  In addition, the PAIC informed me that the structure's air conditioning
and fans mounted inside on the walls were installed as part of the conversion.  Inside,
there were two pods, each with portable toilets and sinks with soap.  The portable sinks in
one pod did not have water.  I observed contractors who serviced the portable toilets and
sinks in the overflow area, and the PAIC alerted them to the issues identified in the
warehouse.  I understood that the contractors would address these issues while they were
on site.  Both pods had five-gallon jugs of water and cups for drinking.  I observed Mylar
blankets and mats being used in both pods as well.  Both pods were within the
appropriate temperature range, measuring 76.0 degrees Fahrenheit and 77.4 degrees
Fahrenheit.

Inside the station, there were five hold rooms with minors.  All of these hold rooms
provided access to functioning sinks, functioning toilets, and potable water.  The toilets
and sinks were behind a half wall for privacy.  Two of the hold rooms had a sink that was
functioning poorly; work orders were submitted requesting maintenance.  Those hold
rooms still had at least one functioning sink available.  There were five-gallon jugs of
water with cups also available for drinking.  I observed mats and Mylar blankets used in

35

the hold rooms.  All hold rooms were within the appropriate temperature range, measuring between 72.3 degrees Fahrenheit and 80.0 degrees Fahrenheit.  The mean temperature was 76.3 degrees Fahrenheit.

There were two medical treatment rooms on site; one was inside the station and the other was located in the converted warehouse structure.  The PAIC informed me that there was one physician assistant and four additional medical personnel on duty at all times.  The medical professionals conducted the initial medical screening, checking for scabies, lice, or other ailments.  The on-duty physician assistant explained the medical screening included taking each minor's temperature.  The physician assistant explained that Yuma Station could administer flu tests.  The medical professionals had common over-the-counter medications on site, including Pedialyte, Motrin, Tylenol, Imodium, and Tums, as well as starter doses for some prescription medications.  The physician assistant confirmed that these medications were stored in a safe.  Full prescriptions were filled off site.  I observed posters throughout the station illustrating various warning signs of child illness.  The PAIC explained that the Sector created these posters.

I also observed Yuma Station's food and supplies available to minors.  Just as I described in January, individuals received four meals a day.  Previously, Yuma Station had arranged with the local McDonald's to provide three meals a day.  The PAIC explained that McDonalds was unable to keep up with the current demand, so the station now used Taco Bell to order food as well.  At the time of my visit, McDonald's provided one meal each day, and Taco Bell provided two meals each day.  The DHS volunteers, National Guard, or support staff picked up the McDonald's food each day; and Taco Bell delivered the meals directly to the station.  A fourth meal, typically ramen noodles, was prepared on site and provided in the evenings.  Just as I observed and learned in January, carts were used to provide a variety of snacks, drinks, and personal hygiene items.  The carts also had a large pump bottle of hand sanitizer for minors to use throughout the day when other items were distributed.  I observed a snack cart in the sally port with crackers, juice, diapers, baby food, formula, feminine hygiene products, Mylar blankets, five-gallon water jug, cups, gloves, and shoes.  In the storage room, there were individual servings of formula, bottles, baby food, crackers, ramen noodles, and juice.  All food items were within the expiration date.

Personal hygiene and infant care items were also available on site, including body wipes, all-in-one shower soap, pre-pasted toothbrushes, feminine hygiene products, bottles, pacifiers, and baby swaddles.  Clothing and shoes in various sizes were also available.  I observed individuals wearing brightly colored clothing, and the PAIC informed me that clothing was provided in the course of their scabies treatment.  A portable shower unit, with three shower stalls with functioning showers and sinks, was also on site.

Based on my personal observations, and discussions with the PAIC and on-site physician assistant, I believe Yuma Station continued to comply with the FSA. Although I observed two malfunctioning sinks in the hold rooms, and one portable sink without water in the converted warehouse, action was taken to remedy these issues. Contractors were already on site servicing the portable toilets and sinks, and I believe any outages in access was minimal based on the regularly scheduled maintenance each day. Additionally, work orders were submitted to fix the malfunctioning sinks inside the hold room, and the other sink(s) were still functioning. As such, I believe Yuma Station complied with the FSA.

El Centro Station

On May 29, 2019 at 1:55 PM, I arrived unannounced at El Centro Station. There, I inspected the facility, and spoke with the PAIC and on-site medical professional. I also interviewed minors and/or their parents, and reviewed several of the minors' A-files. At the time of my visit, there were 106 minors on site.

Minors were in five different hold rooms depending on their age, sex, and status as accompanied and unaccompanied. All of the hold rooms had functioning toilets and sinks with potable water. The toilets and sinks were behind a half wall for privacy. I observed an agent distributing cups to all hold rooms for drinking. Minors were using blankets in all hold rooms, and I observed mats in four of the hold rooms. The temperature of each hold room was within the appropriate range; all rooms measured between 74.0 degrees Fahrenheit and 75.3 degrees Fahrenheit. The mean temperature was 74.8 degrees Fahrenheit. In the processing area, where supervisors continually passed through, there were thermostats depicting the temperature of each hold room so that agents could monitor and control the temperature. Of note, the temperature set on the thermostat in a room and the actual temperature of the room varied by a few degrees in many instances. This highlighted the challenges in regulating the temperature when variables, such as the number of people in the room, change frequently. The PAIC informed me that a professional cleaning crew came at least once a day to clean the hold rooms and facilities. I also observed the area where UACs were shown the UAC video, which the PAIC informed me, is typically shown within two hours of the minors' arrival. There was also a telephone in this area, which the PAIC informed me was for the UACs to make phone calls.

The PAIC informed me there was a medical professional on site at all times, and at the time of my visit, HHS medical professionals were supporting this station. The on-duty HHS medical professional explained that a medical professional checked vitals and screened all minors in custody for lice, scabies, and other ailments upon arrival at the station. In the medical treatment room, I observed over-the-counter medications that the medical professional could administer. The medical professional informed me that medical professionals could also write, fill, and administer prescriptions as necessary.

The PAIC explained that agents transported minors to a nearby hospital if medical needs
surpassed the station's capabilities.

I also observed El Centro Station's food and supplies available for minors.  The PAIC
informed me that food is prepared on site, and meals were distributed four times a day
and snacks distributed three times a day.  The PAIC also explained that typically minors
received a snack after arriving at the station.  I observed a feeding schedule poster
displayed in the processing center outlining the types of food to be provided and the
times for such provision.  The PAIC informed me that frozen burritos cooked in ovens
were provided as a hot meal, and that toddler and baby food was provided for age-
appropriate meals when necessary.  The PAIC informed me that wipes were available for
minors to use prior to eating.  Meal distribution and welfare checks were completed
simultaneously at scheduled intervals.  I observed frozen burritos, juice boxes, crackers,
baby formula, powdered milk, toddler food, and saltines.  There were also baby bottles.
All observed food and drink were within the expiration date.

There was a single shower unit positioned in the sally port.  The PAIC informed me that
showers were available to minors, and typically provided every 48 hours.  I observed
hygiene items, including all-in-one shower soap, lice treatment shampoo, pre-pasted
toothbrushes, lotion, body wipes, and large paper towels.  I also observed feminine
hygiene products, diapers, baby wipes, baby formula, and bottles, which the PAIC
informed me, were all available upon request.  Clean clothing in a variety of sizes was
available for minors who needed to replace clothing items.

When I arrived, I informed the PAIC of my intent to interview minors and/or their
parents.  An agent assisted me with translation.  The agent explained to the minors and
parents that I was conducting voluntary interviews about their experience in CBP
custody.  The agent made it clear these interviews had no impact on any immigration
proceedings or their immigration disposition.  The interviews took place in an open
interview room, and chairs were arranged in a semi-circle to facilitate conversation.  In
total, I interviewed two UACs and the parents of two minors.

My first interview was conducted with two male UACs.  J.L.R. was a 17-year-old from
Guatemala who was apprehended on May 24, 2019 at 10:15 PM.  D.O.V. was a 15-year-
old male from Honduras who was apprehended on May 23, 2019 at 11:50 PM.  At the
time of the interview, custodial records indicated J.L.R. and D.O.V. had been in custody
for 112 hours and 134 hours, respectively.

During my interview, D.O.V. explained, and custodial records confirmed, that he was
apprehended and taken directly to El Centro Station on May 24, 2019 in the early
morning.  Upon arrival, D.O.V. informed me that he was asked whether he was hungry
and thirsty, and he was given something to eat and juice to drink, which is also depicted
in his custodial records.  He informed me throughout his time in custody, he received

regular meals, and personnel sometimes would distribute extra servings after all minors were fed. Custodial records confirmed he continued to receive three meals per day for the remainder of his time in custody at El Centro Station. D.O.V. informed me that he had been able to "sleep plenty" at the facility, had access to a mat and blanket, and that the temperature was "pretty good." D.O.V. also told me he showered and brushed his teeth three times since arriving. Custodial records confirmed he showered at this frequency, but did not document receipt of a dental hygiene product. D.O.V. confirmed that a medical professional conducted a health screening after he arrived at the station; however, this was not documented in his custodial records. D.O.V. also stated he had spoken to his cousin living in the U.S. after arriving at the station. The custodial records indicated he viewed the UAC video. Throughout his entire time in custody, custodial records indicated he had access to functioning sinks and toilets, and his room was within the appropriate temperature range. D.O.V. remained in custody for an additional 17 hours after my site visit and before he was transferred to HHS. After the interview, I reviewed D.O.V.'s A-file, which included the I-770 form, record of health screening, and list of legal services providers.

J.L.R. informed me that he was also apprehended and taken directly to El Centro Station on Friday, May 24, 2019. J.L.R. explained that as soon he arrived, a medical professional conducted a health screening; however, this was not documented in his custodial records. J.L.R. stated he called and spoke to his uncle during processing. J.L.R. informed me he was given a burrito to eat within a few hours of his arrival and he received regular meals and snacks thereafter. Custodial records confirmed he was provided something to eat upon arrival, and then regular meals thereafter. J.L.R. elaborated by stating snacks were typically distributed every three or four hours, and if there were leftovers during meal times, minors received extra servings. J.L.R. informed me that he has was able to sleep at the facility, and he had access to a blanket and mat; provision of bedding was not recorded in the custodial records. J.L.R. explained to me that during the day, he and the other minors in his hold room sat on the benches, and at night, they laid the mats across the floor of the hold room to sleep. J.L.R. informed me that a professional crew cleaned the hold rooms regularly and that he had access to drinking water. J.L.R. added that agents checked to see if there is water and toilet paper every shift. Custodial records confirmed that he had access to functioning toilets and sinks, and that his hold room was within the acceptable temperature range. J.L.R. also stated that since arriving at the facility, he had showered and brushed his teeth three times; custodial records documented three showers provided, but did not document that a dental hygiene product was provided. J.L.R. explained that an agent had a list of minors who needed to shower and the minors were taken to the shower one at a time. The PAIC explained to me that this list identified the minors who were approaching, or were over 48 hours in custody, and would be provided a shower as operationally feasible. The custodial records indicated J.L.R. viewed the UAC video. J.L.R. was transferred to HHS 17 hours after my site visit. After the interview, I reviewed J.L.R.'s A-file, which included the I-770 form and record of medical screening.

My next interview was with a father and his daughter.  The minor interviewed, E.R.R.,
was a 15-year-old from Guatemala who was apprehended on May 28, 2019 at 11:05 AM.
At the time of my interview, custodial records indicated E.R.R. had been in custody for
27 hours.  During my interview, E.R.R.'s father explained they were apprehended and
taken to Yuma Station on May 28, 2019, and then transported via bus to El Centro
Station the following day.  Custodial records indicated that they were held at Yuma
Station for 12 hours.  At the time of my interview, the father and daughter had been in
custody at El Centro Station for approximately two hours.  E.R.R.'s father remarked that
he "felt protected" when he and his daughter were apprehended.  The custodial records
indicated E.R.R. completed a medical screening upon arrival in Yuma.  Upon arrival in
El Centro Station, E.R.R.'s father informed me that his daughter was given a burrito to
eat and juice to drink.  Custodial records showed she received three meals per day
throughout her entire time in custody.  E.R.R. informed me that she has access to a
blanket and that it helps with the cold "a little."  The custodial records did not document
provision of bedding, but indicated the hold room was within the appropriate range
throughout E.R.R's time in custody.  She stated she was able to sleep while at the station.
She also informed me that the toilet and sink in her hold room functioned properly, and
custodial records confirmed this continued for the remainder of her time in custody.
Custodial records indicated E.R.R. showered and was transferred from CBP custody 47
hours after my interview.  I did not review E.R.R.'s A-file because it was not completed
at the time of my site visit.

My final interview was with a mother and her daughter.  The minor, F.R.C., was a 15-
year-old from Guatemala.  F.R.C. was apprehended on May 28, 2019 at 11:05 AM.  At
the time of the interview, custodial records indicated F.R.C. had been in custody for 27
hours.  During my interview, I learned that Spanish was not the mother and daughter's
native language and as a result, the agent was unable to translate some of the responses.
However, I believe the mother and daughter generally understood my questions and
answered accordingly.

Like E.R.R. and her father, F.R.C.'s mother explained she and her daughter were also
apprehended on May 28 and taken to Yuma Station.  She told me they were transferred
via bus from Yuma Station to El Centro Station the following day.  F.R.C.'s mother
stated that upon arrival in Yuma Station, someone asked how the mother and daughter
were feeling, and F.R.C.'s mother said that both she and daughter were feeling "fine."
Custodial records confirmed F.R.C. received a medical screening at Yuma Station.  The
mother informed me, and the custodial records confirmed F.R.C. received a meal upon
arrival at Yuma Station.  The custodial records also indicated F.R.C. received a hot meal
prior to leaving Yuma Station.  Upon arrival in El Centro Station, the mother informed
me that F.R.C. was given a meal to eat and juice to drink.  The custodial records
indicated she was offered three meals a day during her entire time in custody.  F.R.C.'s
mother informed me her daughter had access to a blanket and clean drinking water.  She

also informed me that the toilet and sink in their hold room functioned properly, and records indicated this continued for the remainder of her time in custody. Custodial records indicated that F.R.C. took a shower at El Centro Station after my interview. F.R.C. was transferred from CBP custody 47 hours after my interview. I did not review F.R.C.'s A-file because it was not complete at the time of my site visit.

Based on my observations, and discussions with the PAIC and medical professional, as well as interviews with minors and/or parents, I believe El Centro Station continued to comply with the FSA. Interestingly, El Centro Station had individual thermostats for each hold room that allowed agents to monitor and adjust temperatures to maintain the appropriate range. Regarding custodial records, I identified some instances where the custodial records did not fully document all custodial actions provided. For example, minors informed me that they received a medical screening and I also saw the completed medical form in one of the minors' A-files, but it was not documented in the custodial records. There was another instance where a minor stated he brushed his teeth three times, but provision of dental hygiene products were not recorded. Whether or not the FSA requires recordation, I believe thorough recordkeeping is important to demonstrate the diligent efforts of agents and to provide an accurate and complete snapshot of a minor's time in custody. Therefore, I believe El Centro Station complied with the FSA.

Brown Field Station

On May 30, 2019 at 11:25 AM, I arrived unannounced at Brown Field Station. There, I inspected the facility and spoke with the PAIC. I also interviewed minors and/or their parents, and reviewed several of the minors' A-files. At the time of my visit, there were 105 minors on site.

The PAIC informed me that starting two weeks earlier, Brown Field Station received families from the RGV Sector to alleviate the number of individuals held and processed there. The PAIC explained to me that at the time of my visit, this practice continued and Brown Field Station received approximately 130 individuals from the RGV Sector, three to four times a week. At the time of my site visit, the PAIC informed me that Brown Field Station was operating as the central hub for families. For the families transferred to Brown Field Station from RGV Sector, the PAIC explained that RGV Sector started processing the families and Brown Field Station completed processing. The PAIC also informed me that within the San Diego Sector, Imperial Beach typically held UACs; I visited Imperial Beach Station next. Moreover, the PAIC informed me the station currently had two DHS volunteers and temporary duty agents from other stations as part of DHS and CBP's surge support efforts.

There were minors in six different hold rooms. All hold rooms had functioning toilets, and five of the hold rooms had fully functioning sinks with potable water. A sink in one of the hold rooms was functioning poorly, and the PAIC informed me agents would

41

submit a work order requesting maintenance, and distribute water bottles in the interim. The toilets and sinks were behind a half wall for privacy. I observed Mylar blankets being used in the various hold rooms. Some of the hold rooms had mats, and the PAIC informed me that additional mats were distributed at night. I observed mats were available in the processing area. I also observed a cartoon playing for the minors in one of the hold rooms. There was a professional cleaning crew on site, and the PAIC informed me that professionals cleaned the hold rooms once a day. All hold rooms were within the appropriate temperature range, measuring between 68.0 degrees Fahrenheit and 73.5 degrees Fahrenheit. The mean temperature was 70.0 degrees Fahrenheit.

The PAIC explained that Brown Field Station did not currently have contract medical professionals on site, and that agents performed the health screenings. If additional medical attention was required, an on-duty agent certified as an EMT would be called, or minors would be transported directly to the hospital. The PAIC also explained that BORSTAR provided additional medical response capabilities and support as required. The PAIC confirmed that for minors flown from RGV Sector, they received the initial medical screening in RGV from medical professionals on site, with a second medical check by agents after minors arrived at Brown Field Station.

I also observed Brown Field Station's food and supplies available for agents to provide to minors. The PAIC informed me that food was prepared on site, and that the DHS volunteers assisted with feeding. The PAIC also informed me that snacks and juice were typically provided upon arrival. I observed frozen burritos, which the PAIC informed me were prepared in the oven. Additional items in the food storage area included juice, crackers, baby food, shelf stable organic milk, oatmeal, cereal, macaroni and cheese, ramen noodles, Pedialyte, infant formula, and baby cereal. All food items were within the expiration date. I also observed a cart with crackers, milk, juice, napkins, baby wipes, diapers, and toilet paper, which the PAIC stated was used to distribute items to minors. After telling the PAIC that some stations included hand sanitizer on the cart for individuals to use when snacks were distributed, the PAIC indicated this was a good idea and immediately placed hand sanitizer on the cart as well. Later, I observed personnel distributing snacks and supplies, with hand sanitizer on the cart. I observed clothing and sandals available in various sizes, as well as infant care items such as bottles, pacifiers, baby wipes, and diapers. There were body wipes, dental hygiene products, and feminine hygiene products available upon request.

When I arrived, I informed the PAIC of my intent to interview minors and/or their parents. An agent assisted me with translation. The agent explained to the minors and parents that I was conducting voluntary interviews about their experience in CBP custody. The agent made it clear that these interviews would have no impact on any immigration proceedings or their immigration disposition. The interviews took place in an open area on the hold room floor, where I arranged chairs in a semi-circle. In total, I interviewed four minors and their parents.

W.O.G. was a 15-year-old male from Honduras who was apprehended with his mother and adult sister in Texas on May 24, 2019 at 8:00 PM.  At the time of the interview, custodial records indicated W.O.G. had been in custody for 135 hours.  The family members explained they were taken to a station in Texas and provided juice and sandwiches upon arrival.  The custodial records indicated the family was taken to McAllen Station and confirmed they were provided a meal upon arrival.  W.O.G. confirmed that he had access to a blanket, mat, and drinking water at the first station.  His mother stated that the Texas station was "a little warmer" than Brown Field Station.  W.O.G. stated that the temperature of the Brown Field Station was "normal."  At the time of my interview, W.O.G.'s hold room measured 79.5 degrees Fahrenheit.  W.O.G. confirmed he received a medical screening in Texas, but it was not documented in his custodial records.  After three days, the family explained they were flown to California and taken to Brown Field Station.  Custodial records indicated the family spent 31 hours at McAllen Station, and another 24 hours at the temporary soft-sided facility in Donna, Texas (Donna) before they were transported to Brown Field Station.  The family indicated they received their first meal at Brown Field Station seven to eight hours after arriving at the station.  Custodial records indicated they were provided a hot meal of burritos, juice, and cookies four hours after arrival.  W.O.G. explained, and custodial records confirmed, he received three meals and snacks each day at Brown Field Station.  W.O.G. informed me his hold room had functioning sinks and toilets, and he had access to a blanket and mat.  Custodial records for both McAllen Station and Brown Field Station confirmed W.O.G.'s access to functioning sinks and toilets, and that the temperature of his hold rooms were within the appropriate range for the entirety of his time at those locations.  The custodial records did not indicate which hold W.O.G. was in at the temporary soft-sided facility in Donna, and therefore the custodial records did not track his hold room conditions while there.  W.O.G. told me that he had not showered at Brown Field Station, but that he had been given body wipes two times since his arrival, which was documented in the custodial records.  Custodial records showed W.O.G. was transferred from CBP custody 30 hours after my interview.  I did not review W.O.G.'s A-file because it had not been completed.

Next, I interviewed a mother and her two sons from Guatemala.  J.V.R. was 14 years old and A.V.R. was 10 years old.  The family was apprehended on May 23, 2019 at 9:30 PM.  At the time of the interview, the family had been in custody for 158 hours.  The family informed me they were apprehended in Texas and taken to a station and processing center before they were flown to California on May 26.  Custodial records showed the minors were first taken to McAllen Station and then to Donna before they were flown to Brown Field Station.  When I interviewed the family, they had been at Brown Field Station for 91 hours.  After arriving at McAllen Station, the family explained they were given sandwiches, water, and juice.  Custodial records confirmed they received a meal upon arrival.  The mother stated they did not have blankets or mats at McAllen Station, where they stayed overnight.  The mother stated McAllen Station felt cold.  After approximately

43

a day and a half, the mother explained she and her sons were transferred to Donna where
they had blankets and mats.  Custodial records documented the family was at McAllen
Station for approximately 28 hours before they were transferred.  At Donna, the mother
explained she and her sons showered, brushed their teeth, and were given clean clothes to
wear while their clothes were washed.  At the time of the interview, the family was
wearing their own clothes, which were washed and returned to them at Donna.  The
mother confirmed her sons received a medical screening in Texas.  She shared that her
youngest son was feeling sick and she gestured to his nose.  She stated that the medical
staff on site "took care of him."  Custodial records did not maintain this level of detail,
but did confirm both sons were medically screened at McAllen Station.  Since arriving at
Brown Field Station, the mother confirmed that her sons had received three meals a day
and snacks between meals.  According to the custodial records, the sons continued to
receive three meals a day throughout the remainder of their time in custody.  The mother
confirmed her sons had been able to sleep, and had access to blankets and mats.  She also
stated, and the custodial records documented, that her sons had access to functioning
toilets, functioning sinks, and body wipes.  A.V.R.'s records indicated there was one day
when there was at least one non-functioning toilet in his room at Brown Field Station, but
the custodial records indicated it was fixed by the end of the day.  The records did not
specify if one or all of the toilets were non-functioning at that time.  I observed the room
where A.V.R. was held at the time this issue was noted, and the hold room had three
toilets.  I believe that the records were only referencing one of the three toilets.  The
records indicated the brothers were transferred from CBP custody 52 hours after my site
visit.  After the interview, I reviewed the brothers' completed A-files and confirmed each
file contained the I-770 form, record of medical screening, and list of legal services
providers.

My last interview at Brown Field Station was with a father and his 13-year-old son from
Honduras.  C.D.G. and his father were apprehended in Texas on May 25, 2019 at 2:45
PM and flown to California on May 27.  At the time of the interview, custodial records
indicated the family had been in custody for 117 hours, with 68 hours of that time spent
at Brown Field Station.  Similar to other families interviewed, custodial records indicated
C.D.G. was at McAllen Station for 28 hours, and was transferred to Donna before being
transported to Brown Field Station.  The father stated they were taken to the Texas station
around 2:00 PM and were given something to eat around 1:00 AM; thereafter, they
received meals three times a day.  Custodial records indicated the father and son were
booked into McAllen Station at 4:00 PM on May 25, and provided sandwiches and juice
around 8:00 PM that evening.  The father stated he and his son did not have access to a
blanket or mat at the station in Texas, but that they had access to those items at Brown
Field Station.  The father also said they did not have "direct access" to a bathroom, and
did not have the opportunity to shower or brush their teeth in Texas.  After checking the
custodial records, the room C.D.G. was held in McAllen Station indicated he had access
to functioning toilets and sinks.  The custodial records did not indicate which room
C.D.G. was in at Donna.  Records confirmed he had access to functioning toilets and

sinks throughout his time at Brown Field Station.  The father stated that both the station in Texas and Brown Field Station felt cold.  According to the custodial records, the temperature of the McAllen Station and Brown Field Station hold rooms were within the appropriate range throughout their time in custody.  I measured the temperature of the family's hold room while on site, and it was 70.5 degrees Fahrenheit.  Upon arriving at Brown Field Station, the father informed me they received three meals a day and snacks between meals.  The custodial records also documented that C.D.G. received three meals each day throughout his time in custody at Brown Field Station.  The father and custodial records confirmed that C.D.G. received a health screening upon arrival in McAllen Station and no issues were identified.  However, during the interview, the father stated that his son was feeling sick and that he informed an agent approximately an hour ago while being processed.  The agent helping with translation asked the father to point out which agent he told, but the father did not identify an agent.  The PAIC told me the station would request medical assistance, either from an EMT on shift or from BORSTAR, to check on C.D.G. and any other children whose parents had informed them their children were not feeling well.  C.D.G. and his father were being processed under the Migrant Protection Protocols (MPP), meaning they were to stay in Mexico to wait until their court hearing in the U.S.  C.D.G.'s custodial records indicated he was booked-out of CBP custody 23 hours after my interview.  I did not review C.D.G.'s A-file, but saw that the MPP packet being prepared included a list of legal services providers.

Based on my observations, discussions with agents, interviews with minors and/or their parents, and review of available A-files, I believe Brown Field Station continued to comply with the FSA.  Of note, there was one sink functioning poorly; however, the PAIC submitted a work order and informed me water bottles would be distributed to ensure uninterrupted access to drinking water.  Although Brown Field Station did not currently have medical professionals on site, there were processes in place to ensure that all minors received emergency medical care as required.  Brown Field Station leveraged on-duty EMTs and BORSTAR to provide medical support, and if medical attention was required beyond these capabilities, agents transported minors to the hospital.  Therefore, I believe Brown Field Station complied with the FSA.

<u>Imperial Beach Station</u>

On May 30, 2019 at 2:45 PM, I arrived unannounced at Imperial Beach Station.  There, I inspected the facility and spoke with the PAIC.  I also interviewed minors and/or their parents, and reviewed several of the minors' A-files.  At the time of my visit, there were 68 minors on site.  The PAIC at Brown Field Station informed me that UACs apprehended in the Sector were transported to Imperial Beach at the time of my visit.  In addition to UACs apprehended in the Sector, Imperial Beach Station also held families apprehended in the Sector at the time of my visit.

45

Minors were in five hold rooms based on various factors including age, sex, and status as accompanied or unaccompanied. All hold rooms had functioning toilets and sinks with potable water behind a half wall for privacy. Three of the hold rooms also had five-gallon jugs of water with cups for drinking. I observed minors using Mylar blankets and mats in the various hold rooms. I also observed paper and colored markers available in the hold room for UACs. The door to the UACs' hold room remained open. One of the hold rooms had a working telephone for calls, which the PAIC informed me was typically used for speaking with consulate officials. The PAIC informed me that a professional crew cleaned the hold rooms and facilities twice a day. Two of the hold rooms were outside the appropriate temperature range, measuring 63.0 degrees and 64.0 degrees Fahrenheit. The temperature of the five hold rooms measured between 63.0 and 73.2 degrees Fahrenheit; the mean temperature was 68.2 degrees Fahrenheit.

Like Brown Field Station, the PAIC at Imperial Beach Station informed me that the station did not currently have medical professionals on site; however, the PAIC explained that medical professionals from the same contractor used in Texas were tentatively scheduled to deploy this summer. At the time of my visit, agents conducted a medical screening when minors arrived at the station. The PAIC informed me that Imperial Beach Station leveraged the on-duty agents who were certified EMTs as well as BORSTAR to provide medical support. If medical attention was required beyond those capabilities, agents transported minors to the nearby hospital. I observed over-the-counter medications and first aid items, including eye drops, Band-Aids, hydrogen peroxide, Day-Quil, Neosporin, and anti-itch cream in the supply room. The PAIC informed me that agents did not administer over-the-counter medications unless a medical professional had prescribed it.

I also observed Imperial Beach Station's food and supplies available for agents to provide to minors. The PAIC informed me that meals were prepared on site, and that snacks and meals were distributed four times a day. The PAIC also informed me that minors typically received a snack upon arrival, and that meal distribution and welfare checks were completed simultaneously. The PAIC explained that the station had DHS volunteers on site who assisted with food preparation. The PAIC informed me that frozen burritos were heated in ovens, and provided to minors as a hot meal. Toddler and baby food were available and provided when appropriate. I observed frozen burritos, juice boxes, ramen noodles, baby formula, baby food, baby cereal, cereal, crackers, and powdered milk. All observed food and drink were within the expiration date; however, the ramen noodles were past the best-by date, and I alerted the PAIC.

I observed clothing in various sizes available for minors, as well as feminine hygiene products, diapers, baby wipes, baby formula, bottles, and pacifiers, which the PAIC informed me were all available upon request. Although Imperial Beach Station did not have shower facilities on site, I observed body wipes and dental hygiene products were available. The PAIC informed me there was an empty hold room reserved for individuals

to use the body wipes in private and that dental hygiene products were typically provided
at the same time as the body wipes.  The PAIC also informed me that minors were
sometimes transported to a nearby station to shower; however, this was not always
operationally feasible.

When I arrived, I informed the PAIC of my intent to interview minors and/or their
parents.  An agent assisted me with translation.  The agent explained to the minors and
parents that I was conducting voluntary interviews about their experience in CBP
custody.  The agent made it clear that these interviews would have no impact on any
immigration proceedings or their immigration disposition.  One interview took place in
the hold room and the other took place outside of the hold room in the processing area.
In total, I interviewed the parents of two minors.

The first interview was with a father and his four-year-old daughter, C.A.L., from
Guatemala who were apprehended on May 29, 2019 around 9:00 PM.  I conducted the
interview in their hold room because his daughter was asleep using a mat and blanket.  At
the time of the interview, C.A.L. and her father had been in custody for 17 hours.  The
father informed me, and the custodial records confirmed, that he and his daughter were
apprehended and brought directly to Imperial Beach Station the night of May 29.  The
father stated his daughter received juice, crackers, and a medical screening after arriving,
as documented in the custodial records.  The records also indicated C.A.L. received a
burrito the night they arrived.  The father informed me they received mats and blankets,
and that his daughter slept overnight.  The father showed me additional snacks and juice
that had been provided, and stated they had eaten a burrito today.  The custodial records
documented that C.A.L. received three meals and snacks between meals throughout her
entire time in custody.  During the inspection, I noted that the temperature of their hold
room was 64.0 degrees Fahrenheit.  Custodial records also indicated the temperature in
C.A.L.'s hold room was out of range the previous night.  I asked the father about the
temperature, and he responded that it was "fine," elaborating that it was "cool and not too
hot."  Records showed that the temperature was within the appropriate range later that
evening.  C.A.L. was transferred out of CBP custody 18 hours after my interview.  I did
not review C.A.L.'s A-file because it had not been completed yet.

I also interviewed a mother with her two-year-old son, J.C.R., from Guatemala.  At the
time of the interview, J.C.R. and his mother had been in custody for 25 hours.  The
mother explained that she first arrived on April 1, 2019 at a different station and was
transferred to Mexico to wait for her court date, which she informed me was on May 15,
2019.  Custodial records indicated the family was taken to El Centro Station in April.
The mother told me she did not want to wait in Mexico and crossed back into the U.S.
The custodial records indicated that she was apprehended and taken to Imperial Beach
Station on the morning of May 29, 2019.  The mother told me, and custodial records
confirmed, that J.C.R. received a snack when he arrived at Imperial Beach Station, and
that he received four meals since, including burritos, juice, and crackers.  The mother also

informed me, and the custodial records confirmed, J.C.R. received a medical screening after arriving at Imperial Beach Station. The mother explained that J.C.R. had a cold and fever, but was feeling better. The mother also informed me that they had blankets and mats, and access to drinking water, functioning sinks, and functioning toilets. When asked about the temperature of the facility, the mother told me it was "a little cold," but the "blankets help". Custodial records confirmed J.C.R. received a blanket at Imperial Beach Station. At the time of my site visit, J.C.R.'s hold room measured 69.8 degrees Fahrenheit. The custodial records also indicated J.C.R. received a dental hygiene product and body wipes once before my interview, and twice after. J.C.R. was transferred from CBP custody 72 hours after my site visit.

After the interview, I reviewed J.C.R.'s completed A-file. The file contained the I-770 form and list of legal services providers. The A-file also indicated the mother was informed of the MPP process, which provided for the mother and son to stay in Mexico until their court date. Given the mother's statement that her son had been sick with a cold and fever, I fully reviewed the health information captured in J.C.R.'s A-file. The file contained J.C.R.'s health screening form from his initial intake on April 1 and a subsequent patient form completed on May 29 after arriving at Imperial Beach Station. The May 29 form captured the health complaint as having a cough and cold for two days. J.C.R.'s vitals were recorded, and at the time of the assessment, J.C.R.'s temperature was 97.0 degrees Fahrenheit. The form indicated there was "no significant medical issue."

Based on my observations and interviews, I believe Imperial Beach Station continued to comply with the FSA. There were two rooms outside the appropriate temperature range, and I informed the PAIC while on site. I observed Mylar blankets were available, and the father in one of the hold rooms out of range stated the temperature was "fine." Moreover, I observed ramen noodles that were past the best-by date; however, this does not indicate that the food was expired. While shower facilities were not available on site, the agents at Imperial Beach Station created a private area where minors could clean themselves using body wipes. When operationally feasible, minors were transported to a nearby station with shower facilities. Finally, Imperial Beach Station utilized on-duty EMTs and BORSTAR, as well as transported minors to the hospital to ensure minors received emergency medical care as appropriate. The PAIC also informed me contract medical professionals would be deployed to the station in the near-term, which would enhance the station's on-site medical capabilities. Therefore, I believe Brown Field Station complied with the FSA.

b.   Office of Field Operations Facilities

Paso Del Norte POE

On July 19, 2018 at 8:30 AM, I conducted an unannounced visit to the Paso Del Norte
POE in El Paso, Texas.  There, I inspected the facility and interviewed agents, minors
and/or their parents.  At the time of my visit, there were 23 minors on site.

I arrived for an unannounced visit on the same day that MID conducted their planned site
visit.  I recognized that even though the facility was not aware of my visit, they did know
that *Flores*-related site visits by MID would be conducted on this day.  In my opinion,
this does not invalidate my observations or the information I gathered from the interviews
because I heard directly from minors and/or their parents.  Their experiences would not
be impacted by whether officers at the POE were advised of MID's visit.  MID does not
conduct interviews with minors nor engage with minors and/or their parents when they
conduct their site visits.  For that reason, I combined my observations with the recorded
observations MID submitted to me for this facility.

The Watch Commander explained that the UACs were separated from other detainee
populations.  At the time of my visit, the UACs were in an open room, which was
previously a CBP employee break room.  In the UAC room, I observed the UACs sitting
at tables coloring pages torn from a coloring book, and some, including the older males,
were wearing paper hats they decorated earlier in the day.  The minors told me one of the
males showed the group how to create the hats by folding the paper in a specific way.
There was a movie playing in the background, and I observed 15 cots and mats, with
blankets, stacked along the wall.  During the interview, the UACs informed me that they
unstack the cots each night before bed.  I measured the temperature of the UAC hold
room and it measured 75 degrees Fahrenheit.

In a separate processing area, I observed the hold rooms for families and adults.  The
family units were separated in different rooms based on whether the child arrived with his
or her mother or father.  I observed water bottles and snacks in the hold room for the
families.  I checked the temperature of all the hold rooms where minors were present.
One hold room measured 74.0 degrees Fahrenheit and the other hold room measured 75.0
degrees Fahrenheit.  In the processing area I also observed other items available to
minors, including clean clothing in various sizes, toothbrushes/toothpaste, shampoo, and
deodorant.  I also observed items for infants, including diapers, bottles, and baby food.
All minors at the POE had access to functioning toilets, sinks, and potable water.

When I arrived at the POE, I informed the Watch Commander of my intent to interview
minors and/or parents.  Three plain-clothes intelligence officers assisted me with
translation throughout my interviews; however, no more than two intelligence officers
assisted me with translation during a single interview.  Unless otherwise stated below, the
interviews were conducted in a conference room outside of the processing area or hold

rooms.  As described in the June 1, 2018 report, the plain-clothes agents read an
introductory statement that explained, among other factors, my role, my purpose for
conducting the interviews, and that the minor or parent's decision to participate in an
interview was voluntary and would not affect any immigration processing or disposition.[7]
In total, I interviewed nine UACs and 11 accompanied minors with their parents.

The first interview I conducted was with all nine UACs on site.  Collectively, the group
talked to me about their experience in custody so far.  A couple UACs indicated there
was some confusion or miscommunication when they first presented at the POE.  For
example, one UAC said he was unsure of where he was supposed to go and felt offended
when one officer asked why he was following him.  That UAC stated that another officer
explained the process to him and the interactions with officers had been positive since.
Two other UACs stated they arrived in the vehicle lane and the line officer handcuffed
them while they were outside.  One of the UACs felt the officer seemed upset, while the
other UAC thought the officer was "ok."  The two UACs said the handcuffs were
removed once they were brought inside.  Overall, the UACs told me that they ate soup
and burritos, and could get snacks whenever they wanted.  Two UACs stated they asked
for drinks, but were told it was late and they did not receive drinks.  It was not clear if
this was during the initial interactions or once it had been determined they were
inadmissible and moved to the UAC hold room.  A few of the UACs expressed they felt
embarrassed asking for more food, but I told them it was important for them to ask to
ensure they ate enough.  The UACs told me they had cots and blankets that they used
each night.  A couple of the UACs shared they were not sleeping well because they were
not used to the environment, but that they felt safe.  Some of the UACs felt that the
temperature of the facility was cold, while others felt the temperature was fine.  At the
time of the interviews, the UAC hold room measured 75.0 degrees Fahrenheit.  The
UACs told me they were provided clean clothes, and most indicated that they had
showered.  Another UAC shared that the group brushed their teeth in the morning when
they woke up and again before going to bed.  The UACs confirmed they had access to
bathrooms, explaining that it was in a separate area from their hold room so it required an
escort.  Therefore, the UACs told me the entire group took bathroom breaks throughout
the day.  There were a couple UACs who told me they asked to go to the bathroom at
other times and were told to wait; one stated he waited an hour.  I asked the Watch
Commander about this and she explained there were times when only one officer
supervised the UACs.  In those instances, another officer is called to ensure the group of
UACs are supervised while the other officer escorted the UAC to the bathroom.  The
Watch Commander stated this was done as expeditiously as possible.  The UACs told me
that they went outside twice each day and played soccer or football.  They also said they
watched TV in the hold room.  Many of the UACs indicated that while in custody they
had called and spoken with a family member.  After the interview, I reviewed eight of the

---

[7] This was the first CBP facility that I visited after submitting my June 1, 2018 report.  At this time, the translators
read the prepared statement verbatim to solicit volunteers.  For the reasons explained in the methodology section, I
discontinued the practice of reading the statement verbatim for subsequent site visits.

UACs A-files; one of the UACs was transferred to HHS custody while I was on site.  All
A-files contained the I-770 form and list of legal services providers.  This site visit was
conducted before the more recent emphasis on expanded medical care, and as such, I did
not observe or learn about the medical capabilities of the POE or examine the A-files to
determine whether medical screenings were provided.

According to the UACs' custodial records, each UAC was offered at least three meals per
day.  Three of the UACs' custodial records indicated that a second serving of food was
provided after some of the meals.  All of the UACs' custodial records indicated they were
offered at least one shower throughout their time in custody, were provided bedding,
were able to play outside multiple times throughout their time in CBP custody, and that
their hold room was maintained within the appropriate temperature range.  Eight of the
nine UACs' custodial records indicated the UACs brushed their teeth at least once.  All
nine of the UACs' custodial records indicated those minors had multiple opportunities to
use the telephone.  Four of the UACs' custodial records indicated they were provided
clean clothing.

In addition to the UACs, I also interviewed accompanied minors and their parents.  I
conducted the next interview in the hold room with two mothers and their children who
were playing together.  The mothers explained that the children were cousins, and that
they all arrived at the POE together the previous day, July 18, 2018.  Both families were
from Mexico.  L.Z.M. was a one-year-old male.  The brothers, L.F.M. and J.F.M., were
10 and four years old respectively.  At the time of the interview, custodial records
indicated the cousins had been in custody for approximately 13 hours.

The mothers told me they met an officer on the bridge, and told the officer they were
applying for asylum.  The officer then led the mothers and their children to another area
where they made their asylum claim.  The mothers stated the officers they encountered
during this initial process were respectful and treated them well.  Once they completed
this initial process, the mothers told me they were offered something to eat and drink.
L.Z.M.'s mother told me that she and her son were initially placed in a different hold
room from L.F.M., J.F.M., and their mother.  She told me she asked an officer if she
could be moved to their hold room since they are related, and the officer moved them.
L.Z.M.'s custodial records documented this movement, showing L.Z.M. was placed in
one hold room before he was moved to the same room as his cousins the same night they
arrived.  The mothers told me their children had eaten two times since arriving and that
they were offered another meal but declined it because they were not hungry.  The
mother of the youngest male, L.Z.M. told me her son did not like the soup and that it hurt
his stomach.  She said the food did not appear "bad," but that it was different from what
her son was used to.  The mother told me officers brought the child cookies, crackers, and
juice since he was not eating the soup.  She also stated that her son was allergic to milk so
he did not drink that either.  The cousins' custodial records documented they were
offered three or more meals each day, and the youngest two children's records showed

51

baby food and milk were also offered.  The mother told me she asked and received
medicine for the son's stomach.  The mothers confirmed that they and their children have
had access to a functioning toilet and sink throughout their time in custody, and the
mother of the youngest confirmed that she had diapers for her son and knew she could
ask for more if she needed it.  The mothers told me they all received blankets and mats
the first night they were here, and that their children had slept.  Both mothers stated that
the temperature of the facility was fine.  Each child's custodial records indicated they
were provided bedding, access to sink and toilets, and that the temperature of the hold
room was maintained within the appropriate range throughout their time in custody.  Near
the end of their time in CBP custody, all three minors were booked-out of the Paso Del
Norte POE for four hours, and then checked back into the Paso Del Norte POE for
another five hours before being transferred to ICE custody.  The three minors were
transferred to ICE 96 hours after my interview.  I did not reviewed the L.Z.M., L.F.M., or
J.F.M.'s A-files because the files had not been completed yet.

Next, I interviewed three mothers with their children in their hold room.  A.R.A. was a
six-year-old female from El Salvador, A.A.P. was a one-year-old female from Brazil, and
M.S.M. was a two-year-old male from Honduras.  At the time of the interview, custodial
records indicated A.R.A., A.A.P., and M.S.M. were in custody for 47 hours, 35 hours,
and 80 hours, respectively.  One of the mothers was concerned she would be separated
from her child because she said she was told they would be separated when she first
presented at the bridge.  She stated she had been with her child the whole time in custody.
The officer assisting me with translation explained to her that she would not be separated
from her child because she arrived at a POE.  Another mother told me that she was
separated from her cousin and nephew who she arrived with.  The mother told me her
cousin and nephew were both minors, and as such, they would have been processed as
UACs.  Under the TVPRA, HHS must conduct all other reunifications with relatives
other than a parent.  The mothers stated their children had slept a little, and were given
mats and blankets upon arrival.  The custodial records for all three minors showed
bedding was provided.  The mothers stated that their children did not want to eat the soup
that was served every day.  The mother of A.A.P. stated her daughter did not like the
milk because it was different from what she was used to, and said she was giving her
daughter formula and cookies.  The custodial records indicated the children received at
least three meals per day.  At the time of my interview, the mothers stated their children
had not been able to shower, but one of the mothers told me she requested a toothbrush
and received it.  The mothers told me that their hold room was very cold and the children
were sick as a result.  All three children's hold room measured at 65.4 degrees Fahrenheit
at one point during custody, but the custodial records indicated the temperature was
maintained with the appropriate range every other time it was checked.  At the time of
my site visit, the hold room measured 75.0 degrees Fahrenheit.  Custodial records also
indicated all minors had access to functioning toilets and sinks.  During the interview,
one of the mothers told me she previously asked for medicine for her child because he
had a fever.  After hearing this during the course of my interview, an officer took the

child's temperature, which measured 98.1 degrees Fahrenheit.  A.A.P.'s custodial records indicated quite a bit of movement between the POEs; however, this was not discussed during my interview.  According to the custodial records, A.A.P. was initially taken to the Santa Teresa POE for two hours, transferred to the Paso Del Norte POE for 10 hours, transferred back into the Santa Teresa POE for 11 hours, and then transferred back to the Paso Del Norte POE until she was transferred to ICE custody.  At all of the POEs, A.A.P.'s records indicated she had access to functioning toilets, sinks, and absent one time, her hold room was maintained within the appropriate temperature range.  I reviewed all three children's A-files, which contained the I-770 form and list of legal services providers.  A.R.A., A.A.P., and M.S.M. remained in custody after my interview for 28 hours, 27 hours, and 27 hours, respectively.

My next interview was with a father and son.  K.V.C. was a 13-year-old male from Guatemala who arrived at the POE with his father on July 16, 2018.  At the time of the interview, custodial records indicated K.V.C. had been in custody for approximately 57 hours.  K.V.C.'s father explained he and his son arrived on the evening of July 16.  Upon arrival, the father told me his son received water and soup, and subsequently they received three meals each day with water bottles.  While the custodial records did not indicate that K.V.C. received a meal when he first arrived like his father told me, the custodial records indicated he was offered meals three times a day and received juice three times.  While snacks were available, the father stated his son did not like the snack and was not eating it.  The father also stated he and his son were given a mat the first night they were at the POE and they had been able to sleep at the facility.  Custodial records documented K.V.C. received bedding, but it was logged after their first night in custody.  The father told me that their hold room had functioning sinks with soap and a functioning toilet.  Custodial records confirmed K.V.C. had access to functioning sinks and toilets during his time in custody.  The custodial records showed K.V.C.'s hold room dipped slightly below the appropriate range, measuring 65.4 degrees the day before my interview.  K.V.C.'s father told me that the temperature in their hold room was "normal." At the time of the interview, the father told me they had not showered or brushed their teeth.  K.V.C's records indicated he was transferred to ICE custody 28 hours after my interview.  Although the father stated during my interview that he had not received a list of legal services providers, I observed K.V.C.'s A-file contained a list of legal services providers and saw that it was signed by the father.  The A-file also contained the I-770 form.

I also interviewed a mother, father, and their two children.  E.M.S. and K.S.R. were siblings who arrived at the POE on July 17, 2018 with their parents.  The family was from Mexico.  The daughter, E.M.S., was six years old and the son, K.S.R., was one year old.  At the time of the interview, custodial records indicated the family had been in custody for 45 hours.

The parents told me they arrived at the POE on the morning of July 17, 2018. They told me that they were treated well and were given something to eat and drink when they arrived. The parents explained that the mother had been in the same hold room with her two children the entire time they have been in custody and that the father is in a separate hold room with other adult males. They expressed they wished it was possible to spend more time all together while in the facility. The mother told me the children were sleeping, and they had blankets and mats the entire time they were in custody. The custodial records indicated, and the mother confirmed, that bedding was provided. The family said they have received meals three times each day, adding that the food is good, but that they would have liked more variety. The mother told me she asked for more food between meals for her daughter and that she received it. According to the custodial records, both children were offered at least three meals per day, and the records indicated that baby food and milk were also offered during meal times for the youngest son. The mother told me she brushes her children's teeth after meals. The parents stated that drinking water is accessible and they were offered water bottles every couple of hours. The family also confirmed they had access to a functioning toilet and sink. The children's hold room measured 65.4 degrees Fahrenheit at one point during custody, but the custodial records indicated the temperature was maintained with the appropriate range every other time it was checked. At the time of the interview, the children's hold room measured 75.0 degrees Fahrenheit. The parents told me the temperature of the facility was fine, adding it was what they were accustomed to in their own home. Similar to L.Z.M., L.F.M., and J.F.M., custodial records indicated K.S.R. and E.M.S. were booked-out for four hours prior to being booked back into the Paso Del Norte POE, and then transferred to ICE. The family remained in custody for 96 hours after my interview. I did not review the minors' A-files because the files had not been completed at the time of my visit.

J.O.J. was a seven-year-old male from Guatemala who arrived at the POE on July 17, 2018 with his father. At the time of my interview, custodial records indicated J.O.J. had been in custody for approximately 40 hours. The father stated he and his son arrived on the morning of July 17, and had been treated well by the officers. The father confirmed his son received juice, water, and three meals each day. However, he said his son was getting tired of eating the soup so the son was not eating all of it and was still hungry. The custodial records indicated J.O.J. was offered at least three meals per day. The father also stated that there was a sink with soap in the hold room, but that he and his son had not showered or brushed their teeth, adding there was not a lot of privacy. Custodial records indicated the son had access to functioning toilets and sinks during his time in custody. The father told me his son was able to sleep since they arrived and that they received blankets and mats; the provision of bedding was included in J.O.J.'s custodial records. The father also stated the hold room was cold, but the blanket helped for warmth. J.O.J.'s hold room measured at 65.4 degrees Fahrenheit at one point during custody, but the custodial records indicated the temperature was maintained within the appropriate range every other time it was checked. At the time of the interview, J.O.J.'s

hold room measured 75.0 degrees Fahrenheit.  J.O.J. remained in CBP custody for 28
hours after my site visit.  After the interview, I reviewed J.O.J.'s A-file, which contained
the I-770 form.  I asked the officer who brought me the A-files why this minor did not
have the list of legal services providers.  The officer explained that an agent from ICE
was currently on site and working on that minor's ICE paperwork, which would include a
copy of the signed list of legal services providers.  This list was most likely with the ICE
agent.  The officer said she would confirm the list of legal services providers was with
the ICE agent when she returned the A-files, and if not, she would ensure the minor
received this list.

J.R.R. was a 16-year-old male from Guatemala who arrived at the POE with his father on
July 17, 2018.  At the time of the interview, custodial records indicated J.R.R. had been
in custody for approximately 50 hours.  The father and son told me they arrived on
Tuesday morning and were together throughout their time in custody.  They stated the
first officer they encountered treated them well.  They said that after they arrived, they
were given water first and then soup.  The father and son told me they received water
bottles and soup three times each day, and could drink water from the fountain in their
hold room.  J.R.R.'s custodial records indicated he received at least three meals a day
throughout his time in custody.  The father and son told me that they had not showered or
brushed their teeth since arriving, but that they could use the sink to wash up.  They told
me they were able to sleep, and they had blankets and mats.  The custodial records also
showed that bedding was provided.  The father and son told me the temperature of the
facility was fine.  According to the custodial records, J.R.R.'s hold room measured at
65.4 degrees Fahrenheit at one point during custody, but the custodial records indicated
the temperature was maintained with the appropriate range every other time it was
checked.  At the time of the interview, the hold room measured 75.0 degrees Fahrenheit.
The father and son also told me the bathroom was in the hold room so there was not a lot
of privacy.  Custodial records indicated J.R.R. had access to functioning toilets and sinks
during his time in custody.  Overall, J.R.R. and his father indicated that their time in
custody was "good" and that they were "ok."  J.R.R remained in custody for 28 hours
after my interview.  I did not review J.R.R.'s A-file because it had not been completed
yet.

Based on my interviews and observations, I believe that the Paso Del Norte POE
continued to comply with the FSA.  Several of the interviews touched on restrooms.
There were minors who stated they had to wait to use the bathroom because the
restrooms were not located in their hold room, and there were two fathers and sons who
stated there was limited privacy in their hold rooms because the toilets and sinks were
located in the hold rooms.  As I understand it, the situations described were due to safety
considerations.  For the UACs, officers must ensure there is someone to escort the minor
to the restroom and there is someone to supervise the remaining UACs.  For accompanied
minors, the toilets and sinks were behind a half wall, which provided privacy and ensured
clear sight lines for safety and supervision.  Moreover, I found that certain food or items

were provided to minors, but not recorded.  Whether or not recordation of all of these items is required under the FSA, I continue to believe thorough recordkeeping is important and will continue to engage OFO on this topic.  Finally, some minors and/or their parents stated they did not like the food provided or indicated they would like more variety.  None of the parents or minors indicated that the food was inedible, or expired.  Therefore, I believe that the Paso Del Norte POE complied with the FSA.

San Ysidro POE

On January 24, 2019 at 11:30AM, I arrived unannounced at the San Ysidro POE.  There, I inspected the facility, spoke with officers and an on-site medical professional, interviewed minors and/or their parents, and reviewed several minors' A-files.  At the time of my visit, there were 52 minors on site.

Minors were located in six hold rooms based on various factors, including age, sex, and status as accompanied or unaccompanied.  All hold rooms provided access to functioning toilets and sinks with potable water.  The toilets and sinks were behind a half wall for privacy.  Five-gallon water jugs and cups were also available in all hold rooms.  A movie was playing on the TV in four of the hold rooms.  I observed infant care items, including diapers, baby wipes, formula, and powdered milk were available in some of the hold rooms.  The baby formula in one of the hold rooms was running low, and upon inspection, the officer immediately provided more.  The temperature in all of the hold rooms was within the appropriate range, measuring between 68.7 and 72.6 degrees Fahrenheit.  The mean temperature was 71.0 degrees Fahrenheit.  I observed Mylar or cloth blankets and mats were used in all hold rooms with minors.

I observed the intake and processing areas, as well as the medical treatment room.  There were also two water coolers with cups, and two restrooms with functioning toilets and sinks in the processing area.  There were gloves, disinfecting spray, surgical masks, tissues, Mylar blankets, cloth blankets, and feminine hygiene products in the intake area, and the processing area had items available to take as needed, including fruit snacks, animal crackers, powdered milk, baby formula, diapers, baby bottles, and diaper cream.

The Watch Commander informed me that a physician assistant was on site for 12 hours each day.  If there was a medical issue beyond the site's capabilities or during the time when a physician assistant is not on site, the officers transported the minor to the hospital.  The physician assistant explained that upon arrival, minors received an initial medical screening for lice, scabies, chicken pox, and other ailments, which was conducted in the intake area.  The physician assistant explained that lice and scabies were treated on site, and that the medical professional could administer strep tests if necessary.  The Watch Commander confirmed that individuals with contagious illnesses were quarantined.  In the medical treatment room, there were various over-the-counter medications observed

within expiration date, including Tylenol, Benadryl, Pepto Bismol, ibuprofen, aspirin, and Imodium, which the medical professional can administer. The physician assistant on-duty could prescribe and administer other prescription medications, and there was a pharmacy nearby that could typically fill the required prescription the same day. The physician assistant explained that individuals with prescription needs were given a bracelet indicating medication needed and the frequency. In the cafeteria, individuals with these bracelets, adults or minors, showed the bracelet to staff when receiving their meal to also obtain their prescription medication. I learned this method was used because many prescriptions should be taken with food.

I also observed the food and supplies available for officers to provide to minors. As discussed in my June 2018 report, this facility was unique because it served meals in a dining hall with cafeteria-style seating. The kitchen was separated from the dining hall, with a large open counter for officers to distribute food. A large pump bottle of hand sanitizer and sanitizing wipes were on the counter. I observed individuals line up at the counter to receive meals and sit at the various tables. A professional cleaning crew was on site cleaning the hold rooms while the occupants were in the dining hall. The Watch Commander informed me that minors typically received a meal upon arrival and four meals daily; adding that receipt of these meals were entered into SIGMA on the computer located in the kitchen. The watch commander explained that meals were served at 6:00 AM, 10:00 AM, 5:00 PM, and 11:00 PM. Typically, burritos were served for breakfast, sandwiches for lunch, and hamburgers or chicken nuggets for dinner. The last meal of the day varied. The Watch Commander explained that hot food was prepared offsite by a contractor and delivered to the facility, and that ramen noodles and macaroni and cheese were the only foods cooked on site. The Watch Commander added that meals accommodated varying diets, including vegetarian or vegan, and that snacks were available upon request. I observed food organized to ensure the items with the closest expiration date were used first. The walk-in fridge had juice, milk, and leftover sandwiches; labeled and within expiration date. Dry foods included cereal cups, ramen noodles, fruit snacks, macaroni and cheese cups, and goldfish. All food was within the expiration date.

There was a shower facility with multiple stalls and laundry facilities available on site. There was all-in-one soap, deodorants, feminine hygiene products, large paper towels, and dental hygiene products available. The Watch Commander informed me that minors were typically offered showers every 48 hours.

When I arrived, I informed the Watch Commander of my intent to interview minors and/or their parents. An officer assisted me with translation. The officer explained to the minors and parents that I was conducting voluntary interviews about their experience in CBP custody. The officer made it clear that these interviews would have no impact on any immigration proceedings or their immigration disposition. The interviews took place

in an open interview room, and chairs were arranged in a semi-circle to facilitate conversation.  In total, I interviewed one UAC and the parents of eight accompanied minors.

First, I interviewed a mother and her three-year-old son, D.V.S., from Mexico.  The mother and son arrived at the San Ysidro POE on January 22, 2019.  At the time of the interview, custodial records indicated D.V.S. had been in custody for approximately 37 hours.  The mother told me she and her son were treated well when they presented at the POE.  She told me her son was given chicken nuggets and water after arriving, and they were then taken to the hold room.  The mother told me she and her son have had three meals a day and that they have had access to water, juice, and snacks throughout their time in custody.  The custodial records confirmed meals and snacks were regularly provided; documenting meals were provided three times the first day the family arrived, four times the next, and three times the following day before the family was transferred to ICE.  The mother also told me she asked for milk for her son and received it.  She told me that D.V.S. had slept, and explained they only had a blanket the first night, but at the time of the interview, they had both a blanket and mat.  The mother told me that it was difficult to shower her three-year-old son, so she had been using body wipes instead.  Custodial records indicated D.V.S. was offered a shower once a day during their time in custody.  The custodial records also indicated the hold room was cleaned twice a day, and the temperature was maintained within the appropriate range throughout D.V.S.'s time in custody.  The minor was transferred from CBP custody 30 hours after my interview.  I did not review D.V.S.'s A-file because it had not been completed yet.

Next, I interviewed a mother and her three children from Mexico: Y.Q.P. was a 10-year-old female, E.Q.P. was a six-year-old female, and J.Q.P. was a four-year-old male.  The family arrived at the POE on January 23, 2019.  At the time of the interview, custodial records indicated the siblings were in custody for approximately 22 hours.  The mother explained that the family had arrived the day before, on January 23, and the officer at the POE treated the family well.  The mother stated the family was given food and juice when they arrived and they had two meals prior to my interview.  The custodial records indicated the siblings received three meals on their first full day in custody, and four meals the following two days before they were transferred to ICE custody.  The mother stated the hold room had functioning toilets and sinks.  According to the custodial records, each child was offered a shower twice while in custody; both times were after my interview.  The mother also told me her family received mats and blankets, and that her children had been able to sleep.  The records indicated the hold room maintained a temperature within the appropriate range, and was cleaned twice per day while the children were in custody.  The children remained in CBP custody for 58 hours after my interview.  I did not review the children's A-files after the interview because processing had not been completed.

I also interviewed a mother and her two children from El Salvador.  K.A.B. was a 14-year-old female and P.A.B. was a 17-year-old male.  The family arrived at the POE on January 22, 2019.  At the time of the interview, custodial records indicated the family had been in custody for approximately 46 hours.  The mother stated her children received a sandwich upon arrival, and subsequently received four meals a day.  She added that she and her daughter see and eat with P.A.B. during meal times; P.A.B. was in a separate hold room with older male minors and not with his mother and sister.  According to the custodial records, both children received four meals on the day of my interview and received three meals the following day before they were transferred to ICE custody.  The records showed the children were transferred before the fourth meal was provided.  The custodial records also indicated that minors held in a different hold room from their family member, like P.A.B., were provided an opportunity to see their family members at least twice a day.  During the interview, P.A.B.'s mother stated she saw him during meal times each day.  The mother stated that her family received blankets and mats when they arrived, and the siblings told me they were able to sleep.  The family confirmed they had access to drinking water, as well as functioning toilets and sinks since their arrival.  The family also told me they had showered and brushed their teeth once since arriving.  The custodial records indicated that K.A.B. had showered one time before my interview, but the record did not indicate that P.A.B. had showered.  According to the custodial records, both siblings were offered showers prior to being transferred from CBP custody.  Furthermore, the custodial records indicated that the siblings' hold rooms were cleaned two times each day, and that the temperature of the hold rooms were within the appropriate range throughout their time in custody.  K.A.B. and P.A.B. were transferred 30 hours after my interview.  After the interview, I reviewed K.A.B. and P.A.B.'s A-files, which included the I-770 form, record of medical screening, and list of legal services providers.

My next interview was with a mother and her daughter from El Salvador.  The daughter, N.G.E., was less than a year old.  The mother and daughter arrived at the POE on January 23, 2019.  At the time of the interview, N.G.E. had been in custody for approximately 22 hours.  The mother told me she and her daughter presented at the POE on January 23, and felt protected by the officer.  The mother told me that since arriving, she had everything she needed for her child, including diapers and formula.  I emphasized to her that she should ask for what she needs for her child, and she asked for more baby food during the interview.  After the interview, I observed the officer escort the mother and child to the cafeteria.  According to the custodial records, N.G.E. was offered food at least three times per day throughout her time in custody, and the records indicated food was offered four times a day for each full day in custody.  Custodial records showed N.G.E. was offered a shower three of the four days in custody (including before the interview).  The mother also stated that the temperature of the POE was normal and "good for the baby."  The custodial records indicated the hold room was maintained within the appropriate temperature range, specifically noting measurements recorded between 69.0 to 72.0 degrees Fahrenheit.  The mother informed me she and her child were given blankets and

mats, and that N.G.E. had slept.  The custodial records indicated that the hold room was
cleaned approximately twice each day throughout N.G.E.'s time in custody.  N.G.E
remained in custody for an additional 82 hours after my interview.  I did not review
N.G.E.'s A-file because it had not been completed yet.

M.T.D. was a nine-year-old male from Venezuela who arrived at the POE on January 22,
2019 with his father.  At the time of the interview, custodial records indicated the father
and son had been in custody for approximately 37 hours.  The father explained that he
and his son arrived at the POE on January 22.  He told me that his son received water and
juice upon arrival, and his son had had regular meals since.  The custodial records
indicated that M.T.D. was offered at least three meals each day, specifically indicating
meals were offered three times the first full day in custody, four times the following day,
and two times before he was transferred to ICE custody.  The father stated that they
received blankets and mats, and that his son had been able to sleep.  He also told me they
had access to drinking water, as well as functioning toilets and sinks throughout their
time in custody.  The records indicated that M.T.D.'s hold room was maintained within
the appropriate range throughout his time in custody, specifically recording temperatures
between 67.0 and 71.0 degrees Fahrenheit.  The father stated he and his son had not
showered since arriving at the POE.  Custodial records showed the son was offered a
shower on his third, and last, day in CBP custody, after the interview.  The custodial
records also showed that M.T.D.'s hold room was cleaned twice a day while he was in
CBP custody.  M.T.D. remained in custody for 30 hours after my interview.  I did not
review M.T.D.'s A-file after the interview because it had not been completed yet.

The last interview I conducted at the POE was with J.B.B.  J.B.B. was a 16-year-old male
UAC from Honduras.  J.B.B. arrived at the POE on January 23, 2019.  At the time of the
interview, custodial records indicated J.B.B. was in custody for approximately 16 hours.
J.B.B. told me when he arrived he was given something to eat, and received regular
meals since.  According to the custodial records, J.B.B. received one meal after he
arrived, four meals the next day, which was also the day of my interview, and one meal
the following day before he was transferred to HHS custody.  He told me he received a
blanket and mat, and that he was able to sleep.  J.B.B. also informed me he had access to
drinking water, as well as access to functioning toilets and sinks.  J.B.B. stated the
temperature of the POE was normal.  The custodial records showed that J.B.B.'s hold
room was within the appropriate temperature range throughout his time in custody,
specifically noting measurements between 67.0 and 71.0 degrees Fahrenheit.
Furthermore, the custodial records indicated his hold room was cleaned three times in the
36 hours he was in custody.  The records indicated he was offered a shower before my
interview, but this did not come up during my interview.  The custodial records also
indicated he was offered another shower prior to being transferred to HHS.  J.B.B. told
me he felt nervous when he first arrived, but that felt better after he spoke to his family.
J.B.B. remained in custody for another 20 hours after my interview.  After the interview,

I reviewed J.B.B.'s A-file, which included the I-770 form, record of medical screening, and list of legal services providers.

Based on my observations, discussions with the Watch Commander and on-duty medical professional, interviews with minors and/or parents, and review of completed A-files and custodial records, I believe the San Ysidro POE continued to comply with the FSA. There were a few inconsistencies in the custodial records, like a minor informing me he showered, but it was not documented.  While I continue to believe thorough recordkeeping is important to demonstrate the custodial actions occurring daily, these inconsistences do not affect my overall conclusion that the San Ysidro POE complied with the FSA.

## B. Management Inspection Division's Site Visits

During this reporting period, MID continued to conduct site visits to CBP facilities for the purposes of monitoring compliance with the FSA.  In my current position as Chief Accountability Officer (CAO), I oversee MID's multifaceted services and activities, which provide CBP senior leadership with diagnostic tools to measure the overall health of the organization and to identify operational and procedural vulnerabilities.  MID works independently and proactively to assess the effectiveness, integrity, and performance of CBP programs, operations, and offices.  Given MID's expertise, I trust that the observations from MID's site visits are accurate, thorough, and independent from the opinions of USBP and OFO.

i.  *Methodology*

For each site visit, MID utilized a checklist created by the *Flores* Working Group to observe CBP facilities and report their findings to me.  The checklist included questions related to whether the facility is equipped to provide access to food and water, the temperature at the facility, safe and sanitary conditions, and access to a cot/mat or blanket (including Mylar blankets).  The checklist also included a facility point of contact (POC) who MID could contact immediately if MID observed any issues, such as expired food, non-functioning toilets or sink, or temperatures out of range.  Typically, the POC accompanied MID throughout their site visit, which ensured immediate feedback if any issues were identified.

As discussed in the June 2018 report, when MID arrived at a CBP facility, they notified the PAIC or supervisory officer of their intent to walk through the facility and observe conditions related to the FSA.  MID recorded their observations on the checklist, and submitted it to me after each visit.  Although an agent or officer typically accompanied MID throughout the facility, the observations recorded were MID's own.  Because MID's observations focused on whether a facility was equipped to provide access to the FSA requirements, MID confirmed the availability of items, such as food and snacks, even if

minors were not on site at the time of the visit or MID did not directly observe minors receiving such items.

During this reporting period, MID conducted four trips to CBP facilities across the Southwest Border on July 16-19, 2018, April 2-5, 2019, April 15-18, 2019, and May 21-22, 2019.  Just as I did for my site visits, I relied on CBP data related to UACs, families, and the total number of apprehended or inadmissible individuals in USBP and OFO custody to inform my selections for MID's travel.  Based on the available data, as well as my CBP knowledge and experience, I narrowed my focus to specific areas where the majority of minors were in custody and considered the geographic proximity of certain locations to maximize MID's time on the ground.  I also identified sites that I was not visiting personally, but still wanted to ensure I had insight into current operations.  This was particularly true for the stations in the RGV sector, and even more so, as the number of minors in CBP custody began to increase dramatically this spring.  With these considerations guiding me, I directed MID to conduct 32 site visits within the RGV, El Centro, El Paso, Laredo, Tucson, and Yuma Sectors, and within all four Southwest Field Offices' area of responsibility.  Of note, MID conducted site visits in the El Paso region during July 2018 and April 2019, in response to the large increase in the number of minors on site at the facilities within that region.  I notified USBP and OFO of MID's travel schedule.  I do not believe this advanced notice affected what MID observed on site or the conclusions I made based on their findings.

### ii.  *Observations and Results*

In total, MID conducted 32 site visits, covering 20 USBP facilities and 11 OFO facilities; visiting one location in OFO twice.  The following sections outline MID's findings, which were recorded using the checklist, and where applicable, includes corrective actions taken by USBP or OFO facilities.  The following findings are based on MID's observations at the time of their site visit, and do not necessarily reflect the current conditions on the ground beyond the end date of this report.

### a.  U.S. Border Patrol Facilities

Rio Grande Valley Sector

MID conducted site visits in the RGV Sector on April 2-5, 2019 to the following locations: Brownsville Station, CPC-Ursula, Falfurrias Station, Fort Brown Station, Harlingen Station, McAllen Station, Rio Grande City Station, and Weslaco Station.

Minors were on site at each location visited.  MID confirmed that each facility visited was equipped to provide access to the following: meals and snacks (all within the expiration date); drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  In the hold rooms where minors were present, MID confirmed that the rooms

were clean, free of pests and rodents, and within the temperature range of 66.0 to 80.0 degrees Fahrenheit. The temperatures recorded ranged from 70.3 to 76.5 degrees Fahrenheit, resulting in an average temperature of 74.0 degrees Fahrenheit. MID observed that all facilities provided additional supplies for minors, such as baby bottles, baby diapers, diaper cream, baby diaper wipes, baby formula, bug spray, car seats, either body wipes or soap and shampoo, cups, crutches, feminine hygiene products, flip flops, hand sanitizer, juice, milk, and paper towels. CPC-Ursula had shower facilities on site.

During their site visit to CPC-Ursula, MID observed contract personnel on site to provide additional support related to the care of infants or young minors in custody. At CPC-Ursula, MID was informed the National Guard had assisted with organizing supplies and amenities, as well as assisting with various other functions due to the surge in apprehension numbers. MID reported that at that time of their site visit, the National Guard support did not interact with or have direct contact with individuals in custody. MID also noted that Rio Grande City Station added two new mobile air conditioning units to assist in cooling the station facilities due to the high influx of individuals in that station's custody.

El Centro Sector

MID conducted a site visit to Calexico Station in El Centro Sector on May 20, 2019.

Minors were on site at Calexico Station during MID's visit. MID confirmed the station was equipped to provide access to the following: meals and snacks (all within the expiration date); drinking water; functioning toilets; functioning sinks; and cots/mats or blankets. Minors were in one hold room on site, which MID confirmed was clean, free of pests and rodents, and within the temperature range of 66.0 to 80.0 degrees Fahrenheit. The hold room measured 72.2 degrees Fahrenheit. MID observed the station provided additional supplies for minors, such as baby bottles, diapers, diaper cream, diaper wipes, baby food and formula, body wipes, feminine hygiene products, hand sanitizer, juice, soap, and paper towels.

El Paso Sector

MID conducted site visits in the El Paso Sector on July 19, 2018 and April 15-17, 2019 at the following locations: Clint Station, El Paso Station, Paso Del Norte Processing Center, and Santa Teresa Station.

On July 19, 2018, MID visited Paso Del Norte Processing Center and observed minors on site. MID confirmed that the facility was equipped to provide access to the following: meals and snacks (all within the expiration date); drinking water; functioning toilets; functioning sinks; and cots/mats or blankets. In the hold rooms where minors were present, MID confirmed that the rooms were clean, free of pests and rodents, and within

the temperature range of 66.0 to 80.0 degrees Fahrenheit.  The temperatures recorded
ranged from 71.0 to 76.0 degrees Fahrenheit, resulting in an average temperature of 73.4
degrees Fahrenheit.  MID observed the station provided additional supplies for minors,
such as baby bottles, diapers, baby wipes, formula, feminine hygiene products, clothing
in various sizes, toothbrushes/toothpaste, shampoo (lice and regular), juice, and
Pedialyte.

On the April 15- 17, 2019, MID visited Clint Station, El Paso Station, Paso Del Norte
Processing Center, and Santa Teresa Station.  Minors were on site at each location
visited.  MID confirmed the stations were equipped to provide access to the following:
meals and snacks; drinking water; functioning toilets; functioning sinks; and cots/mats or
blankets.  MID observed burritos labeled "Saturday" during their site visit to Paso Del
Norte Processing Center on April 16.  The escort confirmed the burritos were expired and
discarded them in the trash.  MID observed all other food items at Paso Del Norte
Processing Center were within the expiration date.  All food items at Clint Station, El
Paso Station, and Santa Teresa Station were within the expiration date.  In the hold rooms
where minors were present, MID confirmed that the rooms were clean, and free of pests
and rodents.  The temperatures recorded ranged from 63.0 to 84.0 degrees Fahrenheit,
resulting in an average temperature of 74.2 degrees Fahrenheit.  MID observed all
facilities had additional supplies available for minors, such as baby bottles, diapers, baby
wipes, baby formula, feminine hygiene products, juice, and Pedialyte.  MID observed
shower facilities were available at El Paso Station.

Paso Del Norte Processing Center, Santa Teresa Station, and El Paso Station were the
only locations where hold rooms were recorded outside of the temperature range of 66.0-
80.0 degrees Fahrenheit.  At Paso Del Norte Processing Center, AC units and fans were
being utilized in areas where the temperature was 81.4 and 80.6 degrees Fahrenheit.  At
Santa Teresa Station, there were three soft-sided facilities where MID recorded the
temperature as 63.1, 63.0, and 63.6 degrees Fahrenheit.  MID was informed that a cold
front came through the area, which lowered the temperatures in the soft-sided facilities at
the time of MID's site visit.  To address the sudden drop in temperatures, MID observed
heaters and blankets were utilized.  At El Paso Station, MID recorded the temperature as
82.0 and 84.0 degrees Fahrenheit in both of the station's soft-sided facilities.  MID noted
that both soft-sided facilities were utilizing air conditioning units and fans.  Personnel at
all three sites were informed of the out of range temperatures.

Finally, MID noted at the time of the visit, there had been 466 minors at the Paso Del
Norte Processing Center between 6:00 am and 3:00 pm that day.  MID observed that
during this time, was little to no space for cots/mats to be used given their current
capacity.

Laredo Sector

MID conducted site visits in the Laredo Sector on July 18, 2018 at the following
locations: Laredo South Station and Laredo West Station.

Minors were not on site at either location at the time of MID's visit.  MID confirmed that
both stations were equipped to provide access to the following: meals and snacks (all
within the expiration date); drinking water; functioning toilets; functioning sinks; and
cots/mats or blankets.  MID observed that both stations had additional supplies available
for minors, such as baby bottles, sippy cups, diapers, diaper cream, diaper wipes, baby
powder, baby food, baby formula, juice, clothing in various sizes, and feminine hygiene
products.  The Laredo West Station also had shower facilities on site for minors.

Tucson Sector

MID conducted site visits in the Tucson Sector on May 21-22, 2019 at the following
locations: Ajo Station, Casa Grande Station, and Tucson Coordination Center.

Minors were on site at all locations during MID's inspection.  MID confirmed that each
facility visited was equipped to provide access to the following: meals and snacks;
drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  MID
observed minors provided snacks at each location.  In the hold rooms where minors were
present, MID confirmed that the rooms were clean, free of pests and rodents, and within
the temperature range of 66.0 to 80.0 degrees Fahrenheit.  The temperatures recorded
ranged from 70.1 to 74.5 degrees Fahrenheit, resulting in an average temperature of 72.8
degrees Fahrenheit.  MID observed that all facilities provided additional supplies for
minors, such as baby bottles, diapers, baby wipes, diaper cream, body wipes, juice,
toothbrushes/toothpaste, feminine hygiene products, soap, and hand sanitizer.  Tucson
Coordination Center had shower facilities on site.

Yuma Sector

MID conducted a site visit in the Yuma Sector on May 21, 2019 at Yuma Station.

Minors were on site at the time of MID's visit.  MID confirmed the station was equipped
to provide access to the following: meals and snacks (all within the expiration date);
drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  In the
hold rooms where minors were present, MID confirmed the rooms were clean, free of
pests and rodents, and within the temperature range of 66.0 to 80.0 degrees Fahrenheit.
The temperatures recorded ranged from 71.6 to 78.5 degrees Fahrenheit; the average
temperature was 75.5 degrees Fahrenheit.  MID observed the facility provided additional
supplies for minors, such as baby bottles, diapers, diaper cream, baby wipes, body wipes,
deodorant, hand sanitizer, clothing items in various sizes, feminine hygiene products,

juice, milk, and toothbrushes/toothpaste.  MID observed shower facilities on site, and observed minors provided meals and snacks during their visit.

Based on MID's observations for USBP facilities within the Rio Grande Valley, El Paso, Yuma, Tucson, San Diego, El Centro, and Laredo Sectors,  I believe these locations continued to comply with the FSA.  Where there were issues identified, agents responded promptly and there were options available to mitigate intermittent temperature fluctuations.  During MID's April site visits, temperatures were recorded outside the appropriate range at Paso Del Norte Processing Center, Santa Teresa Station, and El Paso Station.  MID alerted agents on site, and noted all of these sites had either fans or air conditioning units to lower the temperature or heaters to raise the temperature level so that it would reach the appropriate temperature range.  At Santa Teresa Station where MID recorded the temperature below the temperature range, MID observed blankets were also provided.  Moreover, agents promptly discarded the expired burritos at Paso Del Norte Processing Center during MID's April trip.  Of note, MID observed contracted personnel at CPC-Ursula providing care for infants and young minors in custody.  Rio Grande City Station reacted to the increase of apprehensions by investing in new AC units to cool the facility.  These actions further support my conclusion that the USBP facilities MID inspected continued to comply with the FSA.

> b.   Office of Field Operations Facilities

El Paso Field Office

MID conducted site visits within the El Paso Field Office area of responsibility on July 19, 2018 and April 16, 2019.  Both times, MID visited the Paso Del Norte POE.

Minors were on site during both of MID's visits.  During both of MID's site visits, MID confirmed the facility was equipped to provide access to the following: meals and snacks (all within the expiration date); drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  In the hold rooms where minors were present during both site visits, MID confirmed the rooms were clean, free of pests and rodents, and within the temperature range of 66.0 to 80.0 degrees Fahrenheit.  On July 19, MID recorded the temperature of all minors' hold rooms was between 74.0 and 75.0 degrees Fahrenheit.  On April 16, there was one hold room with minors, and MID recorded the temperature as 75.6 degrees Fahrenheit.  During both site visits, MID observed the facility provided additional supplies for minors, such as baby bottles, diapers, baby powder, baby formula, baby food, juice, toothbrushes/toothpaste, deodorant, feminine hygiene products, and soap.  Shower facilities were available on site during both of MID's visits.  On April 16, MID observed minors provided meals, and noted the POE had excellent labeling and signage throughout the facility, specifically related to food storage.

<u>Laredo Field Office</u>

MID conducted site visits within the Laredo Field Office area of responsibility on July
17, 2019 at the following locations: Eagle Pass POE and Roma POE.  On April 3-5,
2019, MID returned to the Laredo Field Office area of responsibility to conduct site visits
at the following locations: Brownsville POE, Hidalgo POE, and Rio Grande City POE.

On July 17, 2018, MID conducted site visits at the Eagle Pass POE and Roma POE.
Minors were on site at the Eagle Pass POE only.  MID confirmed that both facilities
visited were equipped to provide access to the following: meals and snacks (all within the
expiration date); drinking water; functioning toilets; functioning sinks; and cots/mats or
blankets.  Minors were in two hold rooms at Eagle Pass POE, and MID confirmed the
rooms were clean, free of pests and rodents, and within the temperature range of 66.0 to
80.0 degrees Fahrenheit.  The temperature measured 79.0 degrees Fahrenheit in both
rooms.  MID observed both of the POEs provided additional supplies for minors, such as
diapers, baby wipes, bottles, clothing in various sizes, toothbrushes/toothpaste, and
mouthwash.

During the April 3-5, 2019 site visits, MID visited the Brownsville POE, Hidalgo POE,
and Rio Grande City POE.  Minors were on site at each location.  MID confirmed all
three facilities visited were equipped to provide access to the following: meals and snacks
(all within the expiration date); drinking water; functioning toilets; functioning sinks; and
cots/mats or blankets.  In the hold rooms where minors were present at all locations, MID
confirmed the rooms were clean, free of pests and rodents, and within the temperature
range of 66.0 to 80.0 degrees Fahrenheit.  The hold room temperatures ranged from 74.5
to 79.0 degrees Fahrenheit, with an average temperature of 75.9 degrees Fahrenheit.
MID observed all three of the POEs provided additional supplies for minors, such as
diapers, baby wipes, baby food, feminine hygiene products, mouthwash, and milk.  MID
observed shower facilities were available for minors to use at all three POEs.  MID also
observed minors provided snacks at the Brownsville POE.  Of note, MID observed the
Hidalgo POE had a contract medical facility on site.  MID also learned that the Hidalgo
POE had an internal audit team that conducted inventories of current and new supplies
and amenities every two weeks when a new supply order was placed.

<u>San Diego Field Office</u>

MID conducted site visits within the San Diego Field Office area of responsibility on
May 20-21, 2019 at the following locations: Andrade POE, Calexico East POE, and
Calexico West POE.

Minors were on site at the Calexico West POE only.  MID confirmed all three facilities
visited were equipped to provide access to the following: meals and snacks (all within the
expiration date); drinking water; functioning toilets; functioning sinks; and cots/mats or

blankets.  In the hold room where minors were present at the Calexico West POE, MID confirmed the room was clean, free of pests and rodents, and within the temperature range of 66.0 to 80.0 degrees Fahrenheit.  The temperature of the hold room measured 76.1 degrees Fahrenheit.  MID noted there was one non-functioning sink in the hold room, but the other two sinks were functioning.  MID learned that in general, minors encountered at the Calexico East POE were transferred directly to the Calexico West POE, a 20-minute drive away.  At the Calexico West and Andrade POEs, MID observed both facilities provided supplies for minors, such as diapers, baby formula, milk, bottles, feminine hygiene products, and toothbrushes/toothpaste.  MID observed both POEs had shower facilities on site.

<u>Tucson Field Office</u>

MID conducted a site visit in the Tucson Field Office on May 21-22, 2019 at the following locations: Nogales POE and San Luis POE.

Minors were on site at both of the POEs during MID's site visits.  MID confirmed both of the POEs were equipped to provide access to the following: meals and snacks (all within the expiration date); drinking water; functioning toilets; functioning sinks; and cots/mats or blankets.  In the hold rooms where minors were present at both locations, MID confirmed the rooms were clean, free of pests and rodents, and within the temperature range of 66.0 to 80.0 degrees Fahrenheit.  The temperatures recorded ranged from 68.0 to 74.8 degrees Fahrenheit, resulting in an average temperature of 72.3 degrees Fahrenheit.  MID observed both of the POEs provided additional supplies for minors, such as diapers, wipes, baby formula, bottles, feminine hygiene products, deodorant, and toothbrushes/toothpaste.  MID observed minors provided meals and snacks at both locations, and noted both locations had shower facilities available for minors.

Based on MID's site visits to the POEs within all four Southwest Border Field Office areas of responsibility, I concluded the OFO facilities MID visited continued to comply with the FSA.  Of note, MID observed one malfunctioning sink at the Calexico West POE, but the other two sinks in the hold room were accessible and functioning.  Therefore, I concluded the OFO facilities MID visited continued to comply with the FSA.

## C. Key Insights and Takeaways

Based on my 12 site visits, interviews with 63 minors and/or their parents, review of each minor's custodial records and A-file (if completed), as well as MID's observations from 32 site visits, I concluded that CBP substantially complied with the FSA.

During this reporting period, I observed, and my interviews confirmed, that in general, minors received regular meals and snacks; had access to drinking water, functioning toilets, and functioning sinks; were held in rooms with adequate temperature control and

68

ventilation; and had access to emergency medical assistance if needed.  Overall, I observed, and MID reported, that the facilities visited were safe and sanitary.

When issues were identified, systems were in place to remedy or mitigate the issues in a timely manner.  For example, when I identified poorly functioning toilets or sinks during my visits, work orders were submitted requesting maintenance, or the issue was mitigated by other means, including distributing water bottles or providing access to other functioning toilets and sinks.  During one of my interviews, I even heard from a parent that a toilet was not functioning and had been fixed prior to my visit.  In the two instances where the malfunctioning sinks also affected access to drinking water, I observed agents either provided an alternative source for drinking water or informed me that agents would do so.  Despite regular service by contractors, I observed portable sinks without water at CPC-Ursula and Yuma Station.  Given the high volume of individuals in custody at these locations, I understand there could be times when the water in portable sinks runs out before contractors arrive to replenish the reserve.  Importantly, portable sinks were not used for drinking.  When portable sinks ran out of water, minors still had access to potable water for drinking.  In the facilities with portable sinks, I also typically observed five-gallon jugs of water with cups readily available.  My site visits and MID's findings also revealed CBP facilities generally had a system in place to ensure all food items were prepared and distributed within the expiration date.  Both MID and I observed food labeled past the expiration date in Paso Del Norte Processing Center.  MID observed the PAIC discard the expired burritos, and the PAIC informed me these items would be discarded and not served.

Additionally, there were several instances of hold rooms outside the appropriate temperature range, with some measuring below 66.0 degrees Fahrenheit and others measuring above 80.0 degrees Fahrenheit.  Most commonly, the temperatures outside the range were recorded in the soft-sided facilities, which were positioned to fulfill an immediate and critical need for increased holding capacity.  In many of these staging and holding areas, air conditioning units or industrial fans were being used to circulate the air.  At Santa Teresa Station, MID recorded temperatures below 66.0 degrees Fahrenheit in the soft-sided facilities due to a cold weather front that lowered temperatures in the area.  There, MID reported that heaters were used and blankets were provided for additional warmth.  Inside the facilities, there were also isolated incidents of hold rooms falling below the appropriate temperature range.

Some subjective factors existed beyond the scope of the FSA requirements.  For example, some minors and parents told me they thought the temperature was cold and they did not like the type of food provided.  Other minors and parents, who were exposed to the same temperatures and served the same food, stated the temperature and food were fine.  Collectively, I have found that most of the minors and parents I interviewed stated they did not have air conditioning in their homes.  When I asked why minors did not like certain foods, I often heard the food was different from what they were used to.  I

emphasize these points because CBP cannot accommodate each individual's temperature and food preferences. However, CBP will continue to hold itself to objective standards, and if or when the Agency falls short, it will act swiftly to remedy the situation. I was particularly interested in El Centro Station's approach to monitoring the temperature of individual hold rooms and I believe, as operationally feasible, this could be identified as a best practice.

Access to a mat or cot was also a challenge at certain CBP facilities. Typically, minors had access to Mylar blankets for warmth, and where space and capacity allowed, cots or mats were provided. However, space sometimes was limited due to capacity, making the use of mats or cots unfeasible. Alternatively, there were times when there was not enough space for each minor to have his or her own mat or cot. In some facilities, I observed mats were lined across the hold room to cover the floor for many minors to use, or for example, at Clint Station there were times when minors informed me they did not have a cot until another minor in their hold room was transferred from CBP custody. To the extent that operational capacity allows, CBP should ensure minors have access to a blanket as well as a cot or mat. However, the fact that some minors may not have access to a mat or cot does not, in my opinion, mean that the facility is out of compliance with the FSA. MID's checklist for monitoring compliance, created by the *Flores* Working Group, looked for whether a minor was provided access to a cot/mat or blanket. I support and share this determination by the *Flores* Working Group.

Furthermore, whether or not recordation of all custodial actions completed is required under the FSA, I continue to believe that thorough recordkeeping is important to document the Agency's compliance and the dedicated efforts of agents and officers. I recognize; however, that 100 percent recordation is unrealistic, given the large volume of data collected for each minor, coupled with the historic influx of minors in custody. Where discrepancies existed, I found it was most commonly because agents or officers did not record custodial actions. For example, there several instances where minors' custodial records did not document an initial medical screening, but the same minors and parents informed me it happened and I saw the records of health screening in their A-files. In many of these same locations, I spoke to the medical professionals on site and learned about the medical checks implemented. The top priority must be executing custodial actions, like medically screening all minors in custody. My observations, interviews with minors and their parents, as well as discussions with agents, officers, and medical personnel on site, convinced me these custodial actions take place. I believe the next step is documenting these custodial actions to reflect each minors' time in custody more completely.

Finally, with regard to one minor's statement that an "officer" kicked him in the leg to wake him up, I did not observe this incident and I cannot confirm or refute this account. During my site visits, I did not observe agents, officers, or contract guards mistreating minors in any way, and no one else reported a similar incident to me during my other

interviews across the Southwest Border.  After hearing this allegation, I advised USBP and the allegation was referred to OPR for investigation.

Ultimately, this does not change my conclusion that the Agency continued to comply with the FSA.  In general, minors received regular meals and snacks; had access to drinking water, functioning toilets, and functioning sinks; were held in rooms with adequate temperature control and ventilation; and had access to emergency medical assistance if needed.  When issues were identified, action was taken to remedy or mitigate the effect of these challenges.  Moreover, based on my observations and interviews, it appeared custodial actions were performed more often than recorded. While CBP should strive for more robust recordkeeping, those inconsistencies do not change my opinion that CBP substantially complied with the FSA.

During this reporting period, CBP took significant measures to ensure appropriate treatment for minors in its custody.  I observed medical contract professionals, USCG, and USPHS deployed to RGV, El Paso, Yuma, and El Centro Sectors.  I observed the DHS volunteer force and re-assigned agents and officers at Yuma Station, Paso Del Norte Processing Center, El Centro Station, Brown Field Station, and Imperial Beach Station supporting processing and logistical requirements.  I also observed coordinated efforts to increase holding capacity and alleviate crowding through soft-sided facilities, converted buildings, and transportation to less crowded facilities.

Therefore, based on my site visits, interviews with 63 minors and/or their parents, review of each minor's custodial records and A-file (if completed), as well as MID's findings from an additional 32 site visits, I concluded CBP substantially complied with the FSA.

## IV.   Conclusion

As of May 30, 2019, more than 675,000 aliens were apprehended or encountered at the Southwest Border this fiscal year.[8]  Total apprehensions on the Southwest Border by USBP reached 593,507, which exceeds the highest fiscal year total for annual apprehensions over the last seven years by 24 percent.  Of the total apprehensions made this fiscal year, UACs and family units represented 66 percent of all Southwest Border apprehensions.  In the month of May alone, UACs and family units represented 72 percent of all Southwest Border apprehensions.

CBP is at the forefront of this border security and humanitarian crisis, and these statistics illustrate the magnitude of the situation we face across the Southwest Border.  In March 2019, CBP reported that each day nearly 40 percent of agents on the Southwest Border

---

[8] The data referenced in this section is from the May 2019 migration statistics released by CBP on June 5, 2019.  At the time of writing this report, May 2019 is the last full month for which this data has been compiled and released. *See, Southwest Border Migrations FY 2019*, U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited July 1, 2019).

were diverted away from the Agency's border security mission to care for, transport, and process family units and UACs.  CBP has also temporarily re-assigned additional personnel from across the U.S. to the Southwest Border, including CBP officers from POEs, which affects the facilitation of legitimate trade and travel.

While CBP is the largest agency in the immigration process, it is only the first step and processing migrants is only a fraction of the CBP mission, though one we take extremely seriously.  In response to the unprecedented levels of UAC and family units in our custody, CBP has deployed all available resources to mitigate the crisis and prioritize the health and safety of minors.  I have seen first-hand how the Agency is facing this challenge head-on to provide appropriate care for the minors in its custody, by expanding medical care, creating temporary facilities, and leveraging resources from across DHS as well as our interagency partners.

From June 1, 2018 through May 30, 2019, I conducted 12 unannounced site visits to CBP facilities where minors were held, interviewed 63 minors and/or their parents, reviewed those 63 minors' custodial records, and directed MID to conduct 32 site visits at CBP facilities across the Southwest Border and advise me of their findings.  Taken together, these activities provide me with a sufficient basis to conclude CBP held minors in a manner that is consistent with the FSA.

# Appendix: List of Acronyms

| Acronym | Definition |
| --- | --- |
| A-file | Alien File |
| A-number | Alien Number |
| BORSTAR | Border Patrol Search, Trauma, and Rescue Unit |
| CAO | Chief Accountability Officer |
| CBP | U.S. Customs and Border Protection |
| CPC | Centralized Processing Center |
| DHS | U.S. Department of Homeland Security |
| DPAIC | Deputy Patrol Agent in Charge |
| e3DM | Enforcement Integrated Database e3 Detention Module |
| EMT | Emergency Medical Technicians |
| FSA | *Flores* Settlement Agreement |
| HHS | U.S. Department of Health and Human Services |
| ICE | U.S. Immigration and Customs Enforcement |
| MID | Management Inspections Division |
| MPP | Migrant Protection Protocols |
| OAct | Office of Accountability |
| OFO | Office of Field Operations |
| OPR | Office of Professional Responsibility |
| ORR | U.S. Health and Human Services, Office of Refugee Resettlement |
| POE | Port of Entry |
| PAIC | Patrol Agent in Charge |
| POC | Point of Contact |
| RGV | Rio Grande Valley |
| SIGMA | Secure Integrated Government Mainframe Access |
| TVPRA | Trafficking Victims Protection Reauthorization Act |
| UAC | Unaccompanied Alien Child(ren) |
| U.S. | United States |
| USCG | U.S. Coast Guard |
| USBP | U.S. Border Patrol |
| USPHS | U.S. Public Health Service |