JOSEPH H. HUNT
Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel, District Court Section
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

JENNY LISETTE FLORES; *et al.*,

Plaintiffs,

v.

WILLIAM P. BARR, Attorney General of the United States; *et al.*,

Defendants.

Case No. CV 85-4544

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT**

Hearing Date: None Set
Time:
Dept:

**TABLE OF CONTENTS**

I. INTRODUCTION……………………………………………………..……1

II. LEGAL BACKGROUND…………………………………………..……2

A. Relevant Provisions of the *Flores* Settlement Agreement……..……..2

B. Trafficking Victims Protection Reauthorization Act of 2008..……….4

III. FACTUAL BACKGROUND…………………………………..………...5

A. The Homestead Facility……………………………………..………...5

B. ORR Releases Minors From Homestead Expeditiously……………..10

C. ORR Has Plans To Increase Capacity in Licensed Facilities…..……15

IV. ARGUMENT

A. The Use Of Influx Facilities Is Permitted By The Agreement………18

B. The Agreement Does Not Require That ORR Transfer UACs From Homestead To A Licensed Facility On An Arbitrary Timeline……………………………..……………………..22

C. ORR Complies With The Agreement Because It Releases UACs From Homestead To Sponsors As Expeditiously As Possible………………………………………………...25

V. CONCLUSION…………………………………………………………34

## II. INTRODUCTION

Plaintiffs return to this Court with another motion to enforce the 1997 *Flores* Settlement Agreement ("*Flores* Agreement" or "Agreement"). This time, Plaintiffs challenge the conditions and release procedures at the U.S. Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR"), Homestead facility, which is an influx facility that is used by ORR to house UACs in order to avoid a backup up of minors in the custody of U.S. Customs and Border Protection ("CBP") when ORR has exceeded its capacity to house minors at existing licensed facilities. Plaintiffs' motion should be denied because Plaintiffs have failed to establish that ORR's use of the Homestead facility violates the Agreement.

ORR has more than complied with its obligation to have available 210 licensed beds in the event of an influx, and in fact ORR is in the process of bringing on line approximately 20,000 licensed beds for that purpose. ORR's use of Homestead to provide for the safe housing of minors until ORR can expeditiously release them to sponsors is entirely consistent with its obligations. Notably, Plaintiffs provide no viable alternatives for ORR to deal with an unprecedented influx of UACs such as the one that occurred over the last few months on the southwest border. Plaintiffs' only proposed solution—a first in, first out policy after 20 days of custody—is based on entirely inapplicable rulings by this Court, and would cause more harm than benefit to the minors affected because they would be required to transfer facilities after they had made connections to other children and staff at the facility, and because it would delay their release by interfering with the ongoing efforts of their case manager at Homestead. Where, as here, Plaintiffs have not identified any violation of the terms of the Agreement, and have not presented any solution that is in keeping with the requirements of the Agreement or even that would

provide any benefit to any class member, this Court should deny Plaintiffs' motion to enforce.

## III. LEGAL BACKGROUND

### A. Relevant Provisions of The *Flores* Settlement Agreement

The *Flores* Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [former Immigration and Naturalization Service's ("INS").]" Agreement ¶ 9. It requires that following apprehension, a minor should be transferred to a "licensed program" within three days, except in the case of an "influx" in which case such transfer must occur "as expeditiously as possible[.]" *Id.* ¶¶ 12.A, 19. "If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility." *Id.* ¶ 12.A. In such a circumstance, "[e]very effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff." *Id.*

An "influx" is defined as "those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement." *Id.* ¶ 12.B. To be able to respond to an influx, the Agreement requires that the government "establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements. These 80 placements would supplement the 130 placements that the INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses."

*Id.* at Exhibit 3. "In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List," then the government is obligated to "locate additional placements through licensed programs, county social services departments, and foster family agencies." *Id.* Each year, the government must "reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs. However, any decision to increase the number of placements available shall be subject to the availability of [agency] resources." *Id.*

The Agreement also governs the release of unaccompanied minors, and to whom they should or may be released. *See* Agreement ¶¶ 14-18 (describing the general framework for release of unaccompanied minors from INS custody and the procedures and priorities for release). The Agreement allows for continued custody where the government "determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others." *Id.* ¶ 14. Otherwise, the Agreement contains a "general policy favoring release," and provides the order of preference for the persons into whose custody these unaccompanied minors should be released. *Id.* ¶ 14. The Agreement further provides that before releasing a minor, the INS may require a "positive suitability assessment[.]"*Id.* ¶ 17. This assessment "may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor." *Id.*

**B. Trafficking Victims Protection Reauthorization Act of 2008**

The TVPRA was signed into law on December 23, 2008. The TVPRA requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). It further requires that, "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3).

The TVPRA also made clear that HHS is responsible for all placement decisions for unaccompanied alien children ("UAC") in its custody, and provides guidelines for the reunification of UAC by HHS, including dictating the requirements for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(c)(3). The TVPRA also requires that UAC may not be:

> placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

8 U.S.C. § 1232(c)(3)(A). In some instances, HHS must conduct a home study for certain UAC before placing the UAC with a proposed custodian. 8 U.S.C. § 1232(c)(3)(B). In the event that the proposed custodian is found to be a suitable custodian to whom an unaccompanied child may be released, HHS must ensure that the potential custodian completes a legal orientation presentation addressing their responsibility to ensure the juvenile's appearance at all immigration proceedings,

and to protect the child from mistreatment, exploitation, and trafficking. *See* 8 U.S.C. § 1232(c)(4). The TVPRA further requires that UAC who remain in HHS custody must be "promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(a). It delegates to the Secretary of HHS the authority to make such placement decisions, considering "danger to self, danger to the community, and risk of flight." *Id.*

## IV. FACTUAL BACKGROUND

### A. The Homestead Facility

Through June 30, 2019, DHS has referred over 58,500 UAC to ORR this fiscal year (FY), an increase of over 57 percent from FY 2018. Declaration of Jallyn Sualog ("Sualog Decl."), ¶ 28. In May 2019, ORR received over 9,000 referrals – one of the highest monthly totals in the history of the UAC program. *Id.* Due to these unprecedented numbers, ORR is preparing for the need for high bed capacity to continue. *Id.*

Opening up influx shelters such as Homestead allows ORR to receive children after permanent licensed bed capacity has been nearly exhausted, reducing the risk of a back-up of unaccompanied children at the southern border. *Id.* ¶ 38. For example, in May 2019, given the high volume of referrals of UAC to ORR's care, total operational capacity system-wide was about 97 percent full. *Id*. The Homestead Job Corps facility, was activated in February 2018 to provide temporary shelter beds for UAC care by HHS. *Id.* ¶ 29. This activation was done to ensure that ORR is able to meet its responsibility, by law, to provide shelter for UACs referred to its care by DHS. *Id.*

Children at Homestead live in hard-side dormitories, have access to dining halls, educational classrooms, indoor and outdoor recreational spaces and fields, and on-site medical facilities. *Id.* ¶ 30. Homestead employs 4,500 trained professionals

who are committed to the physical and mental welfare of the children placed there. *Id.* Homestead has a medical staff of more than 160 medical professionals and provides access to emergency and hospital facilities. *Id.* ¶ 31. Children arriving at Homestead receive a medical examination and vaccinations within twelve hours. *Id.*[1] Homestead children also receive six hours of educational instruction a day, including English as a second language, math, and science. *Id.* ¶ 32. UACs at Homestead receive three meals a day, with an option for two snacks as well, are provided new clothing and a hygiene kit, and have a dormitory bunkbed. *Id.*

HHS arranges for the security of UACs placed at Homestead. *Id.* ¶ 33. Contractors and the Federal Protective Service (FPS) provide on-site security 24 hours a day, seven days a week in order to ensure the safety and well-being of UACs. *Id.* A fence also surrounds the facility, and its front doors are locked. *Id.* These measures are to protect UACs from threats from the public, as the facility is the site of frequent protests and threats. As a secondary matter, the measures prevent escape. *Id.* Homestead is distinct from a secure juvenile detention facility within the meaning of Paragraph 21 of the Agreement. *Id.* It has no locked cell pods, no bars, no restrictive housing, and no housing of dangerous minors. *Id.*

With large numbers of children, Homestead does need to ensure that youth care workers have "line of sight" monitoring of all children in order to keep them

---

[1] Some of Plaintiffs' declarations show apparent misunderstandings of the medical care they received at Homestead. *See e.g.*, Pls' Exh. 24 at ¶ 10 ("In the beginning of July, I was segregated, isolated, and kept alone in an empty room for 24 hours a day for 8 consecutive days.). However, the case file shows that M.G.L., in July, presented to the clinic complaining of fevers, general aches, and pains, and that as a result, the facility doctor recommended isolation. J.G.L. Medical, Defs' Exh. 1; *see also* Pls' Exh. 25 ("I have had to see the doctor at Homestead three different times. The doctor has given me medicine, but did not seek my parents' permission or consent first."). However, the minor in that declaration received cepacol, robitussin, ibuprofen, and azithromycin. M.Y.R.R. Medical Records, Defs' Exh. 2.

safe and free from abuse of any kind. *Id.* ¶ 34.[2] Of necessity, children must sometimes stand in line, and they have set times for meals. *Id.* Children receive 8 minutes to shower, and showers are permitted every day. *Id.* The no touch policy does not apply to siblings, and many children in ORR custody have suffered a traumatic journey and may not wish to be touched by those they do not know well. *Id.* When ORR learned about just a few workers informing children that their release could be jeopardized for failure to comply with such rules, the program immediately took corrective action. *Id.* Telephone time for UACs at Homestead is in line with ORR Policy at all shelter facilities. *Id.*[3] Children also can talk to their attorneys at any time, and the Prison Rape Elimination Act (PREA) hotline is available at all times. *Id.*[4]

---

[2] *See* Defs' Exh. 3 (Pls. Exh. 78, [A.E.V.L.]) (minor declared that UACs are not allowed to leave Homestead and must be with a Youth Counselor who watches them all the time; case file indicates that UAC's sponsor expressed during a family phone session that she did not want the UAC to be unattended in order to ensure the safety of the child).

[3] *See* Def. Exh. 4 (Pls. Exh. 59, [D.G.H.M.]) (minor declared that he was only permitted to speak to his mother for five minutes at a time, but phone records indicate that he spoke with his mother for 10 minutes or longer on at least two occasions).

[4] A number of Plaintiffs' declarations make assertions about policies and practices at Homestead that do not align with records in the case file. *See, e.g.,* J.Q.P, Pl's Exh 12. (declared that he was not given a list of lawyers, and staff told him there are no lawyers at Homestead, but the case file shows a "Know Your Rights" presentation on June 8, 2018 and a legal screening completed June 11, 2018. J.Q.P. Defs' Exh. 5); H.Z.E.R., Pl's Exh. 19 (files show a Know Your Rights screening and a legal screening, H.Z.E.R. Case Review, Defs' Exh. 6); *Compare* Pl's Exh. 48, ¶¶ 12-13 ("I have not spoken to my social worker in 2 weeks . . . I also have not spoken to my counselor in 10 days." "I do not know how to make a complaint") *with* J.N.B. Case Review Notes, Defs' Exh. 7 (showing a Know Your Rights presentation on February 28, 2019 and a legal screening on March 4, 2019, and that a Ms. Hernandez had interacted with J.N.B. just one day prior to his declaration); *Compare* Pl's Exh. 79, ¶7 ("I do not know anything about the *Flores* settlement agreement. No one here has given me information about my release options under *Flores*) *with* D.N.M.A. Case Review, Defs' Exh.8 (showing he received a Know Your Rights presentation on 3/4/2019 and 3/5/201); *compare* Pls. Exh. 50, [E.I.G.M.] (declared that he did not "know anything about the Flores settlement agreement," that "no one here has given me information about my release options under Flores"; and he did "not know how to apply for asylum"), with Defs' Exh. 28 (case file shows that he received an orientation upon admission to the program and a Know Your Rights presentation which covered such topics, and that he had access to regular counseling); Defs' Exh.

All UAC placed at the Homestead influx care facility are in the custody of HHS. *Id.* ¶ 37. Care and services for the children are provided by non-governmental organizations funded by HHS. *Id.* Homestead operates as a temporary influx care facility on federal property and is therefore not required to obtain a license from the State of Florida. *Id.* However, Homestead's federal contracts subject the facility to the majority of the same requirements that apply to state-licensed residential facilities. *Id.*[5] In addition, Homestead is subject to all applicable federal regulations and ORR policies and procedures, which in some instances even surpass Florida's requirements (e.g., medical screening and the provision of medical care to youth, reporting of abuse/grievances, and provision of culturally appropriate food). *Id.* All staff at Homestead have undergone FBI fingerprint background checks which provide information to ensure child safety. *Id.* [6]

---

9 (Pls. Exh. 54, [D.J.A.D.]) (declared that he was not informed about the Flores settlement agreement, his release options, or his asylum rights; case file indicates, however, that he received his orientation and Know Your Rights presentation when he entered Homestead); Defs' Exh.10 (Pls. Exh. 81, [C.A.A.M.]) (declared that he did not know anything about the Flores settlement agreement and that he did not have a lawyer, and that no one gave him information about his release options under Flores; his case file indicates that he received an orientation when he entered Homestead, and a Know Your Rights presentation, where he would have been provided this information); Defs' Exh. 3 (Pls. Exh. 78, [A.E.V.L.]) (minor declared that no one had given her any information about her release options under Flores; her case file indicates that she was given the Know Your Rights presentation, which included information about bond hearings).

[5] The Homestead influx facility contract meets or exceeds Florida state licensing regulations with respect to requirements for provision of medical services, child needs assessment, education, recreation, meals, snacks and hygiene supplies requirements, counseling services and family contact. *See* Sualog Decl., ¶ 37 n.9.

[6] Case files reflect that children expressed positive views of their time at Homestead. *See* H.Z.E.R. clinical notes, Defs' Exh.6 (Pl's Exh. 19) ("UAC expressed gratitude for assistance received at Homestead Shelter, stating she feels very blessed, and fortunate to be in U.S. with the opportunity to be reunified with her family. . . . She stated she is eating and sleeping well. UAC has been getting along well with peers and has no current conflicts."); K.M.P.R. Case Review Notes, Defs' Exh 11 ("UAC continues to adapt to our program and reports feeling grateful to not only be here, but also having the opportunity to learn English."); M.Y.R.R. Clinical Progress Notes, Defs' Exh. 2 ("UAC stated she feels comfortable and grateful for all the help she has received since she arrived."); B.M.S.C. Clinical Progress Note, Defs' Exh. 12 ("[T]he UAC is well adjusted to life at

ORR maintains strict standards for who may be placed in or transferred to Homestead, including that the UAC:

- Be between 13-17 years of age
- Speak either English or Spanish
- Have no known behavioral or medical issues, including contagious diseases or health issues requiring immediate evaluation or medical treatment by a healthcare provider
- Have no known special needs (mental health or identified disabilities)
- Not be a danger to self or others
- Not have a criminal history (i.e., not charged with having committed a criminal offense)
- Not be involved as a perpetrator or victim of smuggling or trafficking activities
- Not be subject to a pending age determination
- Not be part of a sibling group with a sibling(s) age 12 years or younger
- Not be pregnant or parenting
- Be medically cleared and vaccinated as required by the Influx Care Facility (for instance, if the Influx Care Facility is on a Department of Defense site):
  - Have completed the Medical Checklist for Influx Transfers
  - Have no known medical issues, including contagious diseases or health issues requiring additional evaluation, treatment, or monitoring by a healthcare provider
- Be able to be discharged from ORR expeditiously
- Not be involved in an active State licensing, law enforcement, or Prison Rape Elimination Act (PREA) investigation
- Not be turning 18 years old within 30 days of the transfer
- Not be scheduled to be discharged in 3 days or less
- Not have a pending Home Study
- Not have a current set docket date in immigration court or State/family court (juvenile included); not have a pending adjustment of legal status; not have an attorney of record

---

the shelter, has expressed feeling safe and comfortable in her room assignment. The UAC consistently demonstrated an ability to adjust to new environments.”).

*See id.*; *see also* ORR Guide, Section 1.7.2 & 1.7.3. Additionally, children whose potential sponsor is no longer viable and who have no viable sponsor (i.e., a Category 4 UAC) are placed on a priority list for transfer to a licensed ORR care provider shelter. Sualog Decl. ¶ 41. Children with various special medical, mental health or other special needs UACs who may be initially placed or transferred to Homestead in error are also placed on a priority list to be transferred to an appropriate licensed facility. *Id.* These placement policies were specifically determined to facilitate expeditious release of children placed at Homestead. *Id.*

**B. <u>ORR Releases Minors From Homestead Expeditiously</u>**

On July 30, 2019, there were 457 UACs, ages 13-17, residing at Homestead. This number changes on a daily basis as children are referred to HHS, mostly by DHS, and others are released to an appropriate sponsor. *Id.* ¶ 40.

Homestead operations are designed to facilitate the safe release of UAC to suitable sponsors as expeditiously as possible. *Id.* ¶ 42. Homestead employs case managers as well as other senior managers comprising a case management team that works closely with ORR federal staff on-site and independent contractors in order to ensure that children are safely and quickly discharged to family members and other appropriate sponsors. *Id.* Each week, case management teams closely review lists of children who have been in care for 45 or more days, and 75 or more days, and discuss how to address any ongoing barriers to their release. *Id.* Homestead also has put in place special teams to assist with expediting the safe release of Category 1 children being released to suitable sponsors who are parents or legal guardians, and children who are aging out of ORR care at age 18 within a 60-day time period. *Id.*

ORR makes every effort to release children expeditiously directly from Homestead rather than transferring them to a licensed facility after a set period of

time, because it is ORR's belief that being transferred to new facilities just as they are to be released, and after they have already developed positive connections with staff and other children in the Homestead facility, would be harmful to the child. *Id.* ¶ 43. A child's case manager – who likely has developed a relationship with the minor and his or her sponsor – would lose control of the reunification case, and the case would move to a new case manager who has not developed such a relationship, likely slowing the release process. *Id.*

In the past seven months, ORR has issued several operational directives to its staff and care provider network to facilitate improved discharge rates of UACs from its facilities while maintaining safety measures for each UAC. The directives concern changes made to ORR's sponsor background check policies under a Memorandum of Agreement ("MOA") signed in April 2018 by ORR, U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). *See id*. ¶ 12, Exhibit A. Pursuant to the April 2018 MOA, effective June 2018, ORR required all prospective sponsors and all adult household members to provide fingerprints. *Id.* ¶ 14.

In the months subsequent to issuing the MOA, as part of a continuing review of the program and operations, including review of an increased median length of care for UACs in grantee facilities, on December 18, 2018, ORR modified its fingerprint policies-and by extension the MOA-with respect to household members. *Id.* ¶ 15, Exhibit B. Subsequent to issuing the December 18, 2018 Operational Directive, adult household members would not uniformly submit fingerprints. *Id.* ¶ 15. Fingerprints would still be required if a public records check revealed potentially disqualifying factors under ORR policy; there was a documented risk to the safety of the UAC; the child was especially vulnerable; or the case was referred for a home

study. *Id.* Under the Directive, all potential sponsors would still be required to undergo fingerprinting. *Id.*

On March 23, 2019, ORR issued a second operational directive, again modifying its implementation of the MOA. *See id.* ¶ 16, Exhibit C. Specifically, under the March 23, 2019 Operational Directive, Category 1 sponsors would no longer submit fingerprints unless a public records check revealed possible disqualifying information; there was a documented risk to the safety of the child; the child was especially vulnerable; or the case was being referred for a home study. Under the directive, ORR would no longer require confirmation of adult household member immigration status. *Id.* The issuance of the March 23, 2019 Operational Directive essentially brought the policies regarding who must submit fingerprints to the policy positions in place immediately prior to the MOA. *Id.*

On June 10, 2019, ORR issued a third operational directive. *See id.* ¶ 17, Exhibit D. This directive revised ORR policy to no longer require verification of immigration status information prior to releasing UACs to sponsors. *Id.* ORR determined that official immigration status results from ICE were not necessary for its purposes, and that relying on ICE to provide this information added unnecessary delays to the release process. *Id.* ORR uses status information only to determine whether to require prospective sponsors to identify alternative caregivers, who would assume their responsibilities in the event the sponsor suddenly becomes unavailable to care for the child. *Id.* ORR determined that it could achieve this purpose safely while re-implementing its pre-MOA practice of relying on prospective sponsors to self-report their status information. *Id.* Under the directive, if the sponsor refuses to provide status information, ORR presumes the sponsor has no status. *Id.* The directive also requires care providers to inform subjects of fingerprint background checks that DHS may not target a subject for immigration

enforcement purposes using information from the ORR background check process, unless the subject of the check has been charged or convicted of a felony, other crime, or has certain associations (e.g., gang affiliation).[7] *Id.*

On June 18, 2019, ORR issued its most recent operational directive, which made two changes to its release policies. *See id.* ¶ 18, Exhibit E. First, ORR divided Category 2 sponsors into two subgroups, 2A and 2B,[8] which resulted in treating adult siblings and grandparents (as well as aunts/uncles and first cousins who previously served as the UAC's primary caregiver) in the same manner as Category 1 sponsors for purposes of fingerprint background checks (i.e., requiring fingerprints only where a public records check reveals possible disqualifying factors under ORR Guide section 2.7.4; there is a documented risk to the safety of the child; the child is especially vulnerable; or the case is being referred for a home study). *Id.* Category 2B sponsors continue to have fingerprint background checks as a rule. *Id.*

ORR expects that further guidance will be forthcoming regarding length of stay at influx care facilities, and such guidance will be shared publicly. *Id.* ¶ 19.

The four operational directives have helped to significantly reduce the median length of care for UAC, even while the number of overall referrals of UACs to ORR

---

[7] At the time of the operational directive, Congress imposed restrictions on DHS using such background check information for immigration enforcement actions. Congress wrote the prohibition in the DHS budget appropriation, which is in effect through September 30, 2019. *See* Consolidated Appropriations Act, 2019. Pub. L. 116-6, Division A, Title II, §224.

[8] Category 2A includes: An immediate relative--a brother; sister; grandparent **or** other close relatives (aunt, uncle, first cousin) who previously served as the UAC's primary caregiver. (This includes biological relatives, relatives through legal marriage, and half-siblings). Category 2B includes: An immediate relative-- including an aunt, uncle, or first cousin who was not previously the UAC's primary caregiver. (This includes biological relatives, relatives through legal marriage, and half-siblings). *See* ORR Guide, section 2.2.1, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2.1

in fiscal year 2019 are on track to exceed previous records. *Id.* ¶ 20. Notably, at the end of November 2018, the average overall length of care across all ORR care provider facilities was 93 days; in January 2019, after the first operational directive, it was 77 days; and in June 2019 it dropped further to 45 days. For Category 1 children, the average length of care in June 2019 for the entire ORR network was even lower at 30 days. *Id.* Children who are placed at the ORR Homestead influx facility are discharged at an even faster rate than children in the regular ORR network. *Id.* ¶ 21. As of May 2019, when the instant Motion to Enforce was filed, the average length of care for children discharged from Homestead was 35 days. *Id.* For Category 1 children, the length of care was just 23 days. *Id.*

Congress has provided recent guidance on how ORR should operate with respect to both influxes and three of the above-cited Operational Directives by passing the bipartisan Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Pub. L. 116-26. *Id.* ¶ 23. That law prohibits the use of funds to reverse "changes in procedures made by operational directives issued to providers by [ORR] on December 18, 2018, March 23, 2019, and June 10, 2019," except where the Secretary determines a change is necessary to prevent a UAC from being placed in danger, and where the Secretary provides a written justification to Congress and the HHS Office of the Inspector General at least 15 days in advance of its implementation. *Id.* (quoting Pub. L. 116-26 at § 403).

The appropriations law also contains a number of provisions for influx facilities. *Id.* ¶ 24. An influx facility may only be used when "necessary on a temporary basis due to an influx . . . or an emergency." *Id.* (quoting Pub. L. 116-26 at § 404). Influx facilities in place for more than six consecutive months – except where waivers are granted – must meet all of the requirements for licensed

placements in Exhibit 1 of the *Flores* Settlement Agreement that the HHS Secretary determines are applicable to non-State-licensed facilities. *Id.* Influx facilities must also have staffing ratios of one youth care worker for every 8 children during waking hours and one (1) on-duty Youth Care Worker for every sixteen (16) children or youth during sleeping hours, and clinician ratios to children (including mental health providers) as required in grantee cooperative agreements. *Id.*

The appropriations law also further mandates that ORR monitoring requirements apply to influx facilities as "set forth in section 5.5 of its Policies and Procedures Guide as of May 15, 2019." *Id.* ¶ 25 (quoting Pub. L. 116-26 at § 404). The law requires that "for an unlicensed facility in operation for more than three consecutive months, ORR shall conduct a minimum of one comprehensive monitoring visit during the first three months of operation, with quarterly monitoring visits thereafter." *Id.* Sixty days after an influx facility is operational and monthly thereafter, the HHS Secretary must provide a report to the Committees on Appropriations of the House of Representatives and the Senate that details the total number of children in care at each influx facility, average length of stay and length of care, and for any child that has been at the facility for more than 60 days, their length of stay and reason for delay in release. *Id.* ¶ 26 (discussing Pub. L. 116-26 at § 504).

**C. <u>ORR Has Plans To Increase Capacity In Licensed Facilities</u>**

In fiscal year 2019, to date, ORR has already broken its previous record number of yearly referrals, and has generally operated at over 90% of its capacity. Sualog Decl. ¶ 44. If such rates continue, in order to meet current and future rates of referrals, ORR will require a significant increase in its bed capacity, from its current capacity of approximately 15,700 beds, which includes approximately 3,800 influx beds, to approximately up to 20,000 permanent capacity beds. *Id.*

ORR can increase its bed capacity in two main ways: adding permanent, state-licensed facilities, and opening temporary "influx" facilities, which are not licensed.[9] *Id.* ¶ 45. Once opened, state-licensed facilities operate as part of ORR's care provider network subject to cooperative agreements, which typically may be renewed every two years. *Id.* ¶ 47. Licensed facilities must meet both ORR and state-licensing requirements, and are subject to routine monitoring from both federal and state officials. *Id.* Although ORR attempts to place UACs in licensed facilities, influx facilities are vital for ORR to maintain the operational flexibility necessary to accommodate sudden surges of UAC referrals, and avoid backups of UACs at the border. *Id.* ¶ 48. In cases such as natural disasters, emergencies, or sudden surges of UACs, where ORR must quickly increase bed capacity, it activates influx facilities. *Id.* These facilities remain in "warm" status when not in use, operating with a minimal staff sufficient to maintain the physical plant, and sufficient to allow quick activation when beds are needed. *Id.* Though not state-licensed, influx facilities must meet all ORR standards. *Id.* The Homestead Influx Facility is required to meet the minimum standards of care described in the Flores Settlement Agreement and the ORR Guide. Further, as noted above ORR policy is detailed regarding who may be placed in an influx facility. *Id.*

Opening a permanent, licensed care provider facility requires a significant amount of time and preparation. *Id.* ¶ 46. ORR must issue a funding opportunity announcement ("FOA") and select a grantee – usually based upon competitive applications process and review by an independent panel of child welfare experts. *Id.* The grantee must then prepare the site of the facility to meet both ORR and state requirements, and obtain a license. *Id.* Even after ORR grants an award, preparations

[9] *See* ORR Guide, section 1.7, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.7.

for the licensing process typically take a minimum of 90 to 180 days. *Id.* Note that permanent facilities are licensed to provide care and custody for specific demographics of children. *Id.* For example, ORR has specific facilities that are state-licensed to provide care and custody to tender age children, and others specifically licensed to provide care and custody to pregnant UACs, or UACs with babies. *Id.* As a result, placing a UAC within the ORR care provider network requires identifying not just any available bed, but rather an available bed that is licensed to meet the needs of that particular UAC. *Id.*

ORR's goal is to main up to 20,000 total permanent capacity beds. *Id.* ¶ 49. To achieve this goal, this fiscal year ORR has issued two FOAs for state-licensed facilities, with the expectation of adding approximately 4,100 new permanent shelter beds. *Id.* ORR plans to issue a third set of FOAs later this summer (in August) related to the renewal of current facilities, and will continue to issue FOAs until it has a sufficient number of beds for its needs. *Id.* A team of ORR project officers is responsible for processing FOAs. An independent panel reviews and scores each application. ORR uses the results of panel reviews to determine which application is awarded a grant. *Id.* Reflecting the urgency of ORR's need for more permanent licensed bed space, the team has not only posted FOAs online, as is typical, but they have also engaged in outreach to other agencies and non-governmental associations to solicit referrals from child welfare organizations who may serve as grantees. *Id.* ORR is also conducting a nationwide search for a suitable site for additional influx capacity. *Id.* ¶ 50. A dedicated team of public health officers at ORR, who are emergency management experts, have inspected over 100 sites, working with other government agencies to identify facilities that can serve as influx facilities. *Id.*

Notwithstanding its efforts, ORR faces challenges to adding capacity to ORR's licensed care provider network. *Id.* ¶ 51. For example, local communities

may decline to provide sought-after licenses for ORR facilities. *Id.* Additionally, if ORR wants to increase bed space for a specific population, such as tender age or pregnant UACs, the program must rely upon receiving a relevant application—even if there is an immediate need for more of such beds. *Id.* To address these and other challenges, ORR frequently engages local and state governments to educate them about the UAC program. *Id.* It also seeks to cooperate with other government agencies and child welfare organizations, including child welfare accreditation organizations, in order to expand its search for potential grantees. *Id.*

## V. ARGUMENT

### A. The Use Of Influx Facilities Is Permitted By The Agreement

Homestead is an "influx" facility that necessarily exists to provide ORR with additional capacity for housing minors when the numbers of UACs transferred to its custody by DHS exceed its capacity in licensed shelter facilities. Sualog Decl.¶¶ 38 & 48. ORR is making ongoing and continuous efforts to bring online additional capacity in licensed shelter facilities, but until that process can be finalized ORR's only option is to use unlicensed influx facilities such as Homestead. *Id.* ¶ ¶ 44-51.

As discussed extensively above, conditions at Homestead comply with the Agreement despite the fact that the facility does not have a state license. Homestead's federal contracts subject the facility to the majority of requirements that apply to state-licensed residential facilities. *Id.* ¶ 37. In addition, Homestead is subject to all applicable federal regulations and ORR policies and procedures, which in some instances even surpass Florida's requirements (e.g., medical screening and the provision of medical care to youth, reporting of abuse/grievances, and provision of culturally appropriate food). *Id.*

Plaintiffs are incorrect in their assertion that Homestead is a "secure" facility as that term is used in the Agreement. A "secure" facility under the Agreement is a term of art. It requires the facility to meet the standards of Paragraph 21, which allows dangerous minors to be placed in a "State or county juvenile detention facility or a secure INS detention facility or INS contracted facility, having separate accommodations for minors." ORR maintains two secure juvenile detention facilities in its network: Shenandoah Valley Juvenile Center and Yolo County Juvenile Hall, and currently approximately 16 UACs reside in these facilities. Sualog Decl. ¶ 6. Homestead is not a secure juvenile detention facility. Indeed, it is nothing like a juvenile detention facility (e.g., no locked cell pods, no bars, no restrictive housing, and no housing of dangerous minors). *Id.* ¶ 33. Plaintiffs fail to make any allegation that Homestead is akin to juvenile detention. Homestead also does not house the children enumerated in ¶ 21 who would be housed in a secure facility; to the contrary, ORR's standards for placing children in any influx care facility require that the minor not have been charged with or committed any crimes. *See* §§ 1.7.2. and 1.7.3 of the ORR Policy Guide.

Plaintiffs' assertion that Homestead is "secure" relies on assertions of security based on a layperson's use of the word "secure." Given the context of ¶ 21, it is clear that the parties intended the use of "secure" as a term of art and not as a layperson would use the term. Plaintiffs would have the Court believe that the characteristics they allege (locked front doors, close supervision by child care workers, time limits for showers and telephone calls, standing in line, set times for meals, and rules about children touching other children) make Homestead a juvenile detention center under paragraph 21 of the FSA, but that is hardly the case. It is common sense to expect that the conditions that Plaintiffs describe—to the extent that their descriptions are

accurate—are found in facilities that do not rise to the level of juvenile detention.[10] Defendants note that children stand in line in schools, and assert that time limits on showers or telephone calls do not make a facility akin to juvenile detention. Moreover, close supervision and clear rules guard against abuse in a facility that contains a large number of minors who do not know each other well, who are separated from family members, and who may have suffered from trauma before coming to Homestead.[11] Plaintiffs also fail to acknowledge that ORR is prohibited from releasing children on their own recognizance. 6 U.S.C. § 279(b)(2)(B). And finally, the mere fact that Homestead is surrounded by a fence and has in place policies designed to ensure safety does not transform it into a juvenile-detention facility or a "secure" facility within the meaning of the Agreement.

Defendants further note that the Agreement itself clearly distinguishes between influxes and emergencies on the one hand, and secure facilities on the other. Paragraph 12 of the Agreement delineates exceptions to immediate placement in a licensed facility. Emergency or influx is a specific, separately-listed, exception (3) to the placement requirement. Secure detention under Paragraph 21 is its own numbered exception, as well, and is listed as exception (1). Thus, the settlement agreement not only anticipates influx-care facilities, but places them in a distinct category of their own. They are neither licensed facilities under the Agreement, nor are they "secure" facilities under Paragraph 21. Having negotiated such a distinction

---

[10] Indeed, one alleged characteristic cited by Plaintiffs – children being told that there will be consequences for running away – is in fact reflective of a provision of the Agreement to which Plaintiffs explicitly agreed. Specifically, the Agreement makes clear that a minor being an "escape risk," makes him or her eligible for transfer to a juvenile detention center. Agreement ¶ 21.

[11] Plaintiffs at their footnote 5 cite to a Florida "Child Care Facility Handbook;" however, such handbook does not appear to apply to residential operations in Florida. *See* § 1.1. of the handbook, defining "child care" as "the care, protection, and supervision of a child, for a period of less than 24 hours a day on a regular basis, which supplements parental care, enrichment, and health supervision for the child, in accordance with his or her individual needs, and for which a payment, fee, or grant is made for care."

in the Agreement, Plaintiffs now seek to abrogate it and ask the Court to consider Homestead secure under Paragraph 21 based only on assertions grounded in a layman's understanding of the term. This is improper.

The current number of minors available for placement into a licensed facility greatly exceeds the 130 necessary to trigger the influx provisions of the Agreement. While Plaintiffs appear to complain about the fact that Homestead is unlicensed, they entirely fail to acknowledge that ORR's available licensed beds and efforts to open still more licensed facilities more than comply with what the parties agreed was necessary under the Agreement in the event of an influx. The intent of the parties in that regard may be determined by review of Exhibit 3 to the Agreement.

Exhibit 3 makes clear that the parties never expected that the government would be dealing with the numbers of minors available for placement into its facilities as it is facing today. In fact, the parties anticipated that the maximum number of minors available for placement, even in an influx, was unlikely to exceed 210. *See* Agreement, Exhibit 3 (requiring that the government "establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements. These 80 placements would supplement the 130 placements that the INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses."). The parties then further agreed that in the event that the number of children available for placement exceeded 210, then the government is obligated to "locate additional placements through licensed programs, county social services departments, and foster family agencies." *Id.* Beyond that, each year, the government must "reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number

of minors eligible for placement in licensed programs. However, any decision to increase the number of placements available shall be subject to the availability of [agency] resources." *Id.*

As described above, ORR does reevaluate its needs for regular licensed placements, and is working to open and maintain approximately 20,000 licensed beds throughout its network of facilities in the coming months. ORR's efforts to do so far exceed its obligations under Exhibit 3 of the Agreement to maintain access to 210 licensed beds. Notably, the advent of the TVPRA means that ORR is absolutely required to take unto custody UACs who are transferred to it from DHS, and further imposes requirements on ORR before it can release those minors to sponsors. 8 U.S.C. § 1232. Thus, ORR has absolutely no flexibility in its need to be able to house minors who are transferred to its custody, even when it runs out of licensed beds where those UACs can be housed. Nothing in the Agreement can or should be read to prohibit ORR from meeting that need by "locat[ing] additional beds" that "meet all standards applicable to juvenile placements the INS normally uses" as it has done with the Homestead facility. Agreement, Exhibit 3. Where ORR does not have the licensed beds to meet demand—despite vastly exceeding its obligation to maintain 210 licensed beds under the Agreement—and where it has shown it is earnestly working to obtain such beds, ORR's use of the Homestead facility to house minors should be found to be in substantial compliance with the Agreement.

**B. The Agreement Does Not Require That ORR Transfer UACs From Homestead To A Licensed Facility On An Arbitrary Timeline**

It should be noted that Plaintiffs appear to concede the necessity of influx shelters, as they offer no viable alternative for ORR to comply with its obligations under the TVPRA while dealing with the unexpected transfer of an unprecedented

numbers of UACs to its custody in a manner that exceeds its available licensed capacity. However, Plaintiffs then assert that in order to comply with the Agreement ORR should apply a policy of transferring minors who are housed at Homestead into licensed facilities at an arbitrary time period, without regard for the potential damage such transfers could do to the minors themselves, and to ORR's efforts to release them expeditiously to a sponsor. *See* Motion at 28, ¶ 2.

To start, Plaintiffs arbitrarily ask this Court to apply to Homestead the same twenty-day standard for judging the timeliness of release that the Court applied in 2015 with regard to ICE family residential centers. However, the Court's August 2015 order was based on an entirely distinct set of facts and circumstances that applied to accompanied minors, whose release was premised on the timing of their credible fear proceedings. *See* ECF No. 189 at 10. Those facts are wholly inapplicable to the case as hand, where the release of minors from Homestead depends on ORR's ability to locate and evaluate the suitability of potential sponsors. The Court should decline to apply this inapplicable 20-day standard to its determinations of what the Agreement might require with regard to the release of UACs from Homestead.

Moreover, in the vast majority of cases, transferring a UAC from Homestead to a licensed facility after the child has been at Homestead for 20 days would be more harmful than beneficial to the child. *Id.* ¶ 43. As of May 2019, when the instant Motion to Enforce was filed, the average length of care for children discharged from Homestead was 35 days. *Id.* ¶ 21. For Category 1 children, the length of care was just 23 days. *Id.* Thus, in a significant number of cases transferring a child at the 20-day mark would cause him or her to be transferred from one facility to another just as his or her release to a sponsor was being finalized. Being transferred to new facilities just as they are to be released, and after they have already developed

positive connections with staff and other children in the Homestead facility, would be harmful to children. *Id.* ¶ 43. Moreover, a child's case manager – who likely has developed a relationship with the minor and his or her sponsor – would lose control of the reunification case, and the case would move to a new case manager who has not developed such a relationship, likely slowing the release process. *Id.*

As discussed more fully below, rather than focusing on transferring UACs from Homestead into other facilities, it is ORR's primary goal to release UACs from Homestead to sponsors as expeditiously as possible. To that end, ORR has specifically limited the categories of UACs who may be placed at Homestead, so that UACs who might be more difficult to place with sponsors are not housed there. *See id.* ¶ 41 (citing ORR Guide, Section 1.7.2 & 1.7.3). ORR does at times transfer certain UACs to other facilities from Homestead, but using criteria that are tied to the needs of the UACs, and not to an arbitrary deadline imposed by Plaintiffs. Thus, children who ORR initially believed could be placed with a sponsor, but who are determined to no longer have any viable sponsor available, are placed on a priority list for transfer to a licensed ORR care provider shelter. *Id.* Likewise, UACs with various medical, mental health or other special needs who may initially be placed at or transferred to Homestead in error are placed on a priority list to be transferred to an appropriate licensed facility as soon as such placements become available. *Id.* This practice ensures that while expeditious release to a sponsor is the priority, children who cannot be released expeditiously to a sponsor will be transferred out of Homestead and into a licensed facility. It also balances the need for expeditious release with ORR's obligation to ensure the safety of UACs upon release, and considers the reality of the needs of UACs in ORR custody in making release and transfer decisions. The Court should therefore find that it does not violate the Agreement, and should decline to adopt Plaintiffs' arbitrary proposal.

### C. ORR Complies With The Agreement Because It Releases UACs From Homestead To Sponsors As Expeditiously As Possible

Ultimately, Plaintiffs' Motion should be denied because it is incorrect in its assertion that ORR is not expeditiously releasing UACs from Homestead. This Court has already interpreted the Agreement to read "as expeditiously as possible," to rely on good faith and due diligence by Defendants. *Flores v. Lynch*, 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016). Here, ORR has exercised such good faith and due diligence, and has taken the necessary steps to ensure that UACs at Homestead are released to sponsors in a manner that is expeditious, while also ensuring the safety of UACs with their sponsors upon release.

Plaintiffs have submitted a number of declarations which they argue support the view that ORR fails to take sufficient steps to release UACs expeditiously from care at Homestead. The case files for many of these declarants, however, tell a different story of the various efforts made by ORR to release children to suitable sponsors as quickly as possible. For instance, several minors were reunified with parents or other relative sponsors shortly after providing their declarations. *See* Defs' Exh. 3 (Pls. Exh. 56, [J.A.P.L.]) (minor was reunified with his brother after only 9 days, the day before he turned 18); Defs' Exh. 14 (Pls. Exh. 49, [H.S.C.])(minor was reunified with his mother within three weeks); Defs' Exh. 10 (Pls. Exh 81, [C.A.A.M.]) (minor was released to the custody of his mother after less than a month); Defs' Exh. 15 (Pls. Exh. 53, [S.N.N.]) (minor was released to the custody of his uncle within about five weeks of his arrival at Homestead); Defs' Exh. 16 (Pls. Exh. 76, [M.N.T.E.]) (minor was released to the custody of his brother within about five weeks); Defs' Exh. 17 (Pls. Exh [J.J.G.A.]) (ORR expedited fingerprinting process for minor's sponsor (cousin) so that he would be released before aging out

of care, and minor was released a few days after submitting his declaration); Defs' Exh. 9 (Pls. Exh 54, [D.J.A.D.]) (minor was released to the custody of his uncle after being at Homestead about six weeks); Defs' Exh. 11 (Pls' Exh. 22 [K.M.P.R.]) (declarant stated that she was "told that the government would let us know by July 26, 2018, whether I would be released to her. But that day passed, and I haven't heard anything," but records reflect that case manager sent documents to distant cousin on 5/25/2018, just one day after admission, and K.M.P.R. released less than one week after her declaration, on August 7, 2018); Defs' Exh. 18 (Pls' Exh. 63 [L.M.C.N.]) (less than a week after the child's declaration Homestead discharged the minor, and he was in care less than a month, from 3/14/2019 to 4/6/2019); Defs' Exh. 19 (Pl's Exh. 68 [I.P.F.D.]) (Discharged less than a month after entry: entered Homestead 3/11/2019 and discharged 4-6-2019); Defs' Exh. 20 (Pl's Exh. 73 [R.A.F.S.]) (shows minor who feared he would be at Homestead 15 more days was discharged three days after the declaration, on 3/28/2019, and about a month after entering Homestead on 2/22/2019); Defs' Exh. 21 (Pl's Exh. 84 [A.S.F.O]) (Minor who expressed fear that if "we get a report, I will have to stay at Homestead for 25 more days" released shortly after the date of declaration, on 4/16/2019 and less than a month after entering Homestead on 3/18/2019).

In other cases, somewhat longer lengths of stay at Homestead and delays in the release process were explained by potential sponsors' lack of follow through in submitting necessary documentation, repeated difficulties in the identification of a suitable sponsor, and/or the need for a TVPRA-mandated home study where a minor disclosed past abuse. *See* Defs' Exh. 22 (Pls. Exh. 52, [D.A.C.]) (minor's mother needed to provide second proof of address after moving, and a second alternative caregiver had to be approved after the first one (his grandmother), had to return to their home country for medical treatment; minor disclosed past physical abuse which

necessitated a TVPRA home study; minor was released from Homestead to his mother just two days after he signed his declaration); Defs' Exh. 23 (Pls. Exh. 74, [E.E.M.R.]) (minor's release was delayed because it took about a month for his family to identify a viable sponsor, and then that sponsor did not attend her fingerprinting appointment; once his family identified another potential sponsor, he was reunified with that individual within less than a month); Defs' Exh. 24 (Pls. Exh. 55, [H.M.A.L.]) (minor's release was delayed because the first sponsor his family identified (a pastor) did not provide necessary information and fell out of communication with ORR; his second potential sponsor, a cousin, could not provide proof of relationship; once his family identified a third sponsor, ORR reunified him within about six weeks); Defs' Exh. 25 (Pls. Exh. 64, [N.E.A.M.]) (minor declared that her mother had submitted all the necessary paperwork at the time of her declaration; the case file indicates, however, that the mother had not submitted proof of address or proof of income at that time, and that once the paperwork was actually received, the minor was released three days later); Defs' Exh. 26 (Pls. Exh. 51, [G.N.H.P.]) (minor's release was delayed because his first potential sponsor decided not to move forward and his second potential sponsor could not prove their relationship; once a third potential sponsor was identified, minor was released to within five weeks); Defs' Exh. 27 (Pls. Exh. 85, [A.Q.N.]) (delays in release were caused because her sponsor (uncle) had no form of identification and had to get an ID from the Guatemalan consulate before proceeding); Defs' Exh. 28 (Pls. Exh. 50, [E.I.G.M.]) (release process was delayed somewhat as the sponsor collected required documents, including documents from his country of origin); Defs' Exh. 29 (Pls. Exh. 57, [C.G.C.A.]) (declared that he was not able to be released to potential sponsor because they don't share the same last name, the sponsor does not send him

money and because of a lack of a family relationship; the case file indicates that the potential sponsor denied knowing the minor); Defs' Exh. 30 (Pls. Exh. 47, [A.S.H.S.]) (declared that he was told by his case manager that he needed photos documenting his relationship with his uncle in order to be released to his custody; however, case file records indicate that he was not released to initial sponsor because of domestic violence charges against him); Defs' Exh. 31 (Pls. Exh. 27, [M.G.P.T.]) (minor's case manager was eventually able to locate a sponsor for him after many delays cause by his lack of relationship to initial candidates for sponsorship); Defs' Exh. 32 (Pls' Exh. 23, [K.D.L.]) ("About eight days after arriving to Miami, I was finally taken to meet my case manager and counselor," but notes show that three days after arrival the minor met with a clinical counselor, with weekly visits planned thereafter; as of 8/9/2018, proof of address was still pending from the sponsor); Defs' Exh. 33 (Pl's Exh. 71 [K.D.G.C.]) (Sponsor presented with misdemeanor DUI offense and court documents were needed, which took five weeks for receipt).

Also impacting the release of certain minors from Homestead was a physical disability or a psychiatric illness, which ORR needed to take into account in safely releasing them to an appropriate sponsor. For example, before M.A.J., who was discovered to be legally blind due to a severe vision impairment, could be released to his father, a home study revealed that safety interventions to protect him were needed in the home. Defs' Exh. 34 (Pls. Exh. 46, [M.A.J.]).[12] Notably, M.A.J. had

[12] Contrary to M.A.J.'s declaration, *see* Pl's Exh. 46, it was not Plaintiffs' intervention that led to M.A.J.'s release; rather, they happened to inquire about the status of his release at about the same time that his father documented that he had made needed repairs to make his home safe for M.A.J. Defs' Exh. 34. Moreover, despite claims in his declaration that he was the victim of repeated assaults by other children at Homestead, his case file revealed only one incident of another child hitting him and suggesting that the particular child had hit him before, and there were no other indications that he was unhappy or uncomfortable in ORR custody. *Id.*

his first doctor's appointment of his life while in ORR custody at Homestead, and ORR ensured that he received the proper special glasses and assistive devices necessary for his disability after releasing him to his father. *Id.* Another child, D.M.H., who was mentioned in the Frye Decl., Pls. Exh. 1, at ¶ 24, showed signs of psychiatric illness only after having been placed at Homestead and thus needed to be stabilized with appropriate mental health treatment before she could be released to her mother safely with post-release services. Defs' Exh. 35 [D.M.H.].

Additionally, some child declarants also alleged that they did not regularly meet with their case managers or social workers at Homestead and were unaware of the status of their sponsorship process, whereas the case file information did not support such allegations. Defs' Exh. 36 (Pls. Exh.80, [Z.P.M.C.]) (declared that she had not yet met with a case manager after a week at Homestead but case file shows the case manager met with her two days after her arrival); Defs' Exh. 37 (Pls. Exh. 75, [R.F.S.O]) (declared that his mother submitted all the paperwork to be his sponsor but that no one at Homestead explained the process to him; his case file shows that the case manager met with him three times before he submitted his declaration who explained the reunification process to him); Defs' Exh. 38 (Pls. Exh. 83, [H.A.P.C.]) (declared that he had not had a meeting with his social worker yet and he had been at Homestead for 9 days; his case file shows that four days after his arrival, he met with his case manager who explained the requirements for reunification, and on that same day, his case manager spoke to his sponsor and sent the family reunification packet); Defs' Exh. 24 (Pls. Exh. 55, [H.M.A.L]) (declared that he had not heard anything about his case, but his case file indicates that his case manager met with him to discuss his reunification status just a few days before he signed the declaration); Defs' Exh. 24 (Pls. Exh. 86, [K.S.M.B.]) (declared that she

was never informed about when she might be released, but the case file shows that she received an orientation, counseling, and a Know Your Rights presentations within days of arrival; and that her case manager explained the reunification process to her mother within a week of her arrival); Defs' Exh. 40 (Pls. Exh. 77, [M.U.L.]) (minor expressed confusion about delays, but, his case file shows the case manager discussed the reunification process a few days after his arrival); Defs' Exh. 28 (Pls. Exh. 50, [E.I.G.M]) (minor declared that he was unable to speak with a social worker who could work on his release for 15 days after his placement at Homestead; his case file indicates that he had his first face-to-face contact with a case manager two days after his arrival); Defs' Exh. 9 (Pls. Exh. 54, [D.J.A.D.]) (declared that he had spoken with a social worker two times about how he could leave Homestead; this case management schedule was consistent with standard ORR practice, and with D.JA.D.'s Individual Service Plan; D.J.A.D. also had the opportunity to speak with a clinician); Defs' Exh. 31 (Pls. Exh. 27, [M.G.P.T.]) (minor declared that at the time of his declaration his case had not been "opened" and that he does not know when he will be released to his cousin's care or where he will be sent next; case file records, however, indicate that his case manager met with him five times prior to assist in the location of a sponsor). In one case, ORR took steps to ensure that the minor could establish rapport with his father who had already been living in the United States for 13 years before his child arrived, prior to releasing the minor to the father. Defs' Exh. 41 (Pls. Exh. 26, [M.A.G.M.]) (although minor declared that he had talked to his father just once since arriving at Homestead, case records reflect that multiple family counseling sessions were held to help the minor to develop a relationship with his father).

Plaintiffs' Motion also ignores the steps that have been taken by ORR to decrease its release times even in advance of Plaintiffs' filing.[13] As discussed above, at the time of Plaintiffs' filing, ORR had already issued two operational directives designed to reduce the time that UACs spend in ORR custody, and that specifically address claims contained in Plaintiffs' Motion. Sualog Decl. ¶¶ 15-16. Moreover, soon after Plaintiffs' filing, Defendants issued two additional operational directives for this purpose. *Id.* ¶¶ 17-18. Notably, Plaintiffs made no mention of the effects of any of these directives in their Motion. Moreover, Plaintiffs finally lodged their Motion on the record on June 28, 2019, after all of these operational directives were already in place, but made no effort to address these significant changes or the effect that these changes have on their claims.[14]

In fact, the four operational directives have helped to significantly reduce the median length of care for UAC, even while the number of overall referrals of UAC

---

[13] A number of Plaintiffs' declarations reflect delays associated with increased volumes of fingerprinting, despite the fact that these delays have now been ameliorated by the operational directives. *See e.g.*, Pl's Exh. 28 ("I was told by my case manager that my aunt must get her finger prints done); Exh. 37 ("My uncles have completed all the paperwork and submitted their fingerprints. My uncles have both submitted the finger prints but only one has come back so far."); Exh. 38 ("It is my understanding that not only my uncle, but also his wife, must submit their fingerprints before I can be released to my uncle. I am told that my uncle and his wife submitted their fingerprints at the same time. For reasons that I do not understand, my uncle's fingerprints have been received and processed by the government, but my aunt's fingerprints have not."); Exh. 41, ¶7 ("Now, my social worker has told me that we are waiting for my aunt's fingerprints to arrive . . . .").

[14] Plaintiffs appear to contend that asking DHS to process prints at all is a violation of the Agreement, but Plaintiffs provide no support for this assertion. In fact, relying on another agency to help HHS process prints, or share database information about sponsors, in and of itself, does not violate the settlement agreement, and can help ORR access information about potential sponsors more quickly. Moreover, 8 USC § 1232(c)(3)(C) specifically directs DHS to "provide information" to ORR from "appropriate Federal, State, and local law enforcement and immigration databases," that is "necessary to conduct suitability assessments." It also should be noted that at the time the Motion was filed, Congress had already passed section 224 of the DHS Appropriations Act, which restricted DHS from using appropriated funds for bringing immigration enforcement actions against sponsors and potential sponsors based on information shared by ORR.

to ORR in fiscal year 2019 are on track to exceed previous records. *Id.* ¶ 20. At the end of November 2018, the median length of care was 93 days; in January 2019, after the first operational directive, it was 77 days; and in May 2019 it dropped further to 45 days. For Category 1 children, the average length of care in June 2019 for the entire ORR network was even lower at 30 days. *Id.* Notably, children who are placed at the ORR Homestead influx facility are discharged at an even faster rate than children in the regular ORR network. *Id.* ¶ 21. As of May 2019, when the instant Motion to Enforce was filed, the average length of care for children discharged from Homestead was 35 days. *Id.* For Category 1 children, the length of care was just 23 days. *Id.*[15]

Moreover, to the extent that Plaintiffs appear to be challenging the suitability criteria maintained by ORR to ensure the safety of UACs upon release, Plaintiffs are ignoring this Court's own guidance on that topic. As recently as July 30 of last year, the Court found that "ORR does not violate the *Flores* Agreement merely because it unilaterally determines the suitability criteria for potential sponsors. Because Paragraph 17 provides a non-exhaustive list of considerations relevant to ORR's 'positive suitability' assessments, it impliedly gives ORR the authority to prescribe additional factors." *Flores v. Sessions*, No. 85-4544 DMG (C.D.Cal. Jul.30, 2018) at 25. The Court further found that ORR policies on release "appear to be reasonably

[15] In complaining of prolonged custody at Homestead, Plaintiffs rely on many declarations that were obtained more than a year ago (*see* Plaintiffs' Exhs. 11-34), and that involved children separated from parents and legal guardians pursuant to the now-repealed zero tolerance policy. These cases involved considerations (such as receiving consent from the separated parent as to whether the child should be released to another sponsor, reunified with the separated parent in family residential centers, or reunified with the separated parent for purposes of removal) that caused delays that are unique to those cases. *See e.g.*, Plaintiffs' Exhs. 11, 13-20, 22-23, 25, 27-29, 31-45 (separated from father); 30 (separated from father and seeking voluntary departure). Such declarations should not be treated by the Court as representative of the universe of minors in custody at Homestead.

calculated to protect Class Members from 'harm or neglect' and to ensure that they have an adequate 'standard of care.'" *Id.* at 26.[16] Plaintiffs have provided no basis for the Court to find otherwise here, and therefore there is good reason for the Court to deny Plaintiffs' motion.

///

///

///

---

[16] Plaintiffs complain that ORR's practice of obtaining a birth certificate for a UAC prior to release causes unnecessary delay in release, but provide no examples of any actual delays resulting from this process. ORR is not aware of any situations where obtaining the birth certificate for a UAC has delayed release. ORR relies on the birth certificate to verify the identity of the UAC as well as to determine the relationship to the potential sponsor. *See* 8 U.S.C. § 1232(c)(3)(A) (requiring ORR to determine relationship between the sponsor and the UAC). Indeed, ORR's understanding is that Northern Triangle countries have made obtaining the birth certificate from the consulate or Embassy a straightforward process. Likewise, Plaintiffs complain about ORR's requirement that sponsors attend a legal orientation program prior to release of UACs to their custody, but Plaintiffs ignore the fact that requiring attendance at such a program is a specific provision of the TVPRA. *See* 8 U.S.C. § 1232(c)(4) ("The Secretary of Health and Human Services shall cooperate with the Executive Office for Immigration Review to ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by the Executive Office for Immigration Review. At a minimum, such presentations shall address the custodian's responsibility to attempt to ensure the child's appearance at all immigration proceedings and to protect the child from mistreatment, exploitation, and trafficking.").

## VI. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

DATED: August 2, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2019, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants