UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jenny Lisette Flores., *et al.*, <br><br>        Plaintiffs, <br><br>    v. <br><br> William Barr, Attorney General of the United States, *et al.*, <br><br>        Defendants. | Case No. CV 85-4544-DMG-AGRx <br><br> District Judge Dolly M. Gee |

# DECLARATION OF JALLYN SUALOG, DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT

I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.    I am the Deputy Director of the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS"). As the Deputy Director of ORR, I have responsibility for the oversight of the Unaccompanied Alien Children ("UAC") program, including operations, planning and logistics, medical services, and monitoring. I have held the position of Deputy Director since June 2018. I was previously the Director of Unaccompanied Children Operations since September 2013. I have worked at ORR since February 2007. I have a Masters of Arts in Clinical Psychology. Before joining ORR, I worked as a mental health professional and managed child welfare and social services programs for Hawaii's largest non-profit organization.

2.    I am submitting this declaration in response to Plaintiffs' Motion to Enforce Settlement Agreement filed May 31, 2019, ECF 547-2, and corrected June 28, 2019, ECF 578, in order to describe the care children receive during their placement at the Homestead Influx Facility ("Homestead"), as well the significant efforts undertaken by ORR to

maintain and improve the rate of safe and timely discharges of minors from its care at Homestead, and to add licensed and influx capacity to its care provider network.

**ORR's Role:  Care and Custody of UACs, and Safe Release to Suitable Sponsors**

3. The Homeland Security Act of 2002 ("HSA"), *see* 6 U.S.C. § 279, transferred the responsibility for the care and custody for UACs from the former Immigration and Naturalization Service ("INS") to ORR.

4. Notably, ORR does not apprehend alien children prior to their referral to ORR custody, and is not a law enforcement agency. Instead, by law, ORR funds care for each UAC referred to ORR legal custody by another federal department, usually the Department of Homeland Security ("DHS"), until the UAC may be safely released to a suitable sponsor.

5. The care and custody provided by ORR-funded care providers is informed by child welfare principles. ORR currently funds a network of 168 grantee care provider facilities/programs in 23 states. ORR maintains an intakes team whose task it is to assign each child -- including those who are of tender age (under age 12), are a part of sibling groups, or have special needs -- to the most appropriate shelter. The goal of the ORR UAC program is to ensure there is sufficient space to accept referrals of children as quickly as possible, and then to place them in the least restrictive setting that is in their best interests, subject to considerations of danger to self and danger to others.

6. ORR maintains two secure juvenile detention facilities in its network: Shenandoah Valley Juvenile Center and Yolo County Juvenile Hall, and currently, approximately 16 UACs reside in such facilities.

7. ORR policy is for UACs to receive an initial medical exam ("IME") and initial vaccinations within 48 hours of arriving at an HHS-funded care provider. The IME includes a general physical, including a psychosocial risk screening, mental health screening and a review of vaccination history. If a vaccination record is not located or a child is not up-to-date, the child receives all vaccinations recommended by the Centers for Disease Control

and Prevention ("CDC").[1] Some health conditions may manifest after a UAC is transferred to an HHS-funded care provider. If a health issue arises, the UAC will receive prompt attention and medical care is provided.

8. The overwhelming majority of UACs are released from ORR care to suitable sponsors who are family members within the United States to await immigration hearings. UACs remain in the care and custody of ORR until they can safely be released to a suitable sponsor.

9. To this end of a safe and timely release of UACs to suitable sponsors, ORR maintains detailed Policies governing its care provider grantees. The ORR Policy Guide ("ORR Guide") is available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied. Section 2 of the ORR Guide sets forth policies and procedures for the safe and timely release of UACs from ORR care.

10. Informed by child welfare principles, ORR makes the final decision regarding release of UACs to sponsors. Under the HSA, ORR may not release a child "upon their own recognizance." 6 U.S.C. § 279(b)(2)(B). Also, the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") does not permit ORR to release a child to any person "unless [ORR] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," which must include "at a minimum . . . an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A). That independent finding may include, and in some cases must include, a home study – an assessment of the proposed home into which the child would be released – prior to releasing a child to a sponsor.[2] As required by the TVPRA, ORR must always balance an expeditious release against ensuring that the program protects the UACs in its care from "traffickers and other

---

[1] *See, e.g.,* ORR Guide, Children Entering the United States Unaccompanied, Section 3.4 (Medical Services), available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

[2] *See, e.g.,* ORR Guide, Children Entering the United States Unaccompanied, Section 2.4.2 (Home Study Requirement), available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

persons seeking to victimize or otherwise engage such children in the criminal, harmful, or exploitative activity." 8 U.S.C. § 1232(c)(1).

11. Unlike domestic analogues such as state foster care systems, ORR has no authority over UACs once it releases them. ORR, therefore, is in a different posture in its release decisions as compared to a foster care agency.[3] Once ORR releases a UAC to the custody of a sponsor, its legal authority over the child ceases. After release, ORR has limited ability to monitor the welfare of children, and no ability, for example, to enter a home and take a child back into its custody if the child is in danger.[4] As a result, it is imperative that ORR minimize risks to child safety when making release decisions.

**Recent ORR Policy Changes and Operational Directives**

12. In the past seven months, ORR has issued several operational directives to its staff and care provider network to facilitate improved discharge rates of UACs from its facilities while maintaining safety measures for each UAC. The directives concern changes made to ORR's sponsor background check policies under a Memorandum of Agreement ("MOA") signed in April 2018 by ORR, U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). *See* Exhibit A.

13. ORR's fingerprinting policies have varied over the life of the program. Immediately prior to the MOA, ORR uniformly required fingerprints for all sponsors, other than Category 1 (parent or legal guardian) sponsors. For such Category 1 sponsors, ORR required fingerprints if there was a documented risk to the safety of the UAC, the UAC was especially vulnerable, or the case was referred for a home study. ORR also required

---

[3] ORR considers several factors when assessing potential sponsors for UACs. *See, e.g.,* ORR Guide, Children Entering the United States Unaccompanied, Section 2.4.1, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

[4] ORR funds post-release services ("PRS") for certain children, conducts a follow-up phone call with the sponsors 30 days after release, and operates a National Call Center ("NCC") that children or sponsors may contact to report concerns or request referrals to services. However, post-release services are voluntary on the part of the sponsor. *See* ORR Guide, Section 2.7.2. Further, even if ORR became aware of serious concerns regarding a released child through PRS, the 30-day follow-up call, or the NCC, it is not authorized to take direct action such as removing a child from a dangerous situation and bringing him or her back into custody. It can, however, refer the case to state child welfare authorities.

fingerprints for household members of the potential sponsor, in the conditions enumerated above (that is, a documented risk to safety, if the UAC was especially vulnerable, or if the case was referred for home study), but did not uniformly require fingerprints from sponsors' household members.

14. Pursuant to the April 2018 MOA, effective June 2018, ORR required all prospective sponsors and all adult household members to provide fingerprints.

15. In the months subsequent to issuing the MOA, as part of a continuing review of program and operations, including review of an increased median length of care for UACs in grantee facilities, on December 18, 2018, ORR modified its fingerprint policies—and by extension the MOA—with respect to household members. *See* Exhibit B. Subsequent to issuing the December 18, 2018 Operational Directive, adult household members would not uniformly submit fingerprints. Fingerprints would still be required if a public records check revealed potentially disqualifying factors under ORR policy; there was a documented risk to the safety of the UAC; the child was especially vulnerable; or the case was referred for a home study. Under the directive, all potential sponsors would still be required to undergo fingerprinting.

16. On March 23, 2019, ORR issued a second operational directive, again modifying implementation of the MOA. *See* Exhibit C. Specifically, under the March 23, 2019 Operational Directive, Category 1 sponsors would no longer submit fingerprints unless a public records check revealed possible disqualifying information; there was a documented risk to the safety of the child; the child was especially vulnerable; or the case was being referred for a home study. Under the directive, ORR also would no longer require confirmation of adult household member immigration status.  The issuance of the March 23, 2019 Operational Directive essentially brought the policies regarding who must submit fingerprints to the policy positions in place immediately prior to the MOA.

17. On June 10, 2019, ORR issued a third operational directive. *See* Exhibit D. This directive revised ORR policy to no longer require verification of immigration status information prior to releasing UACs to sponsors. ORR determined that official immigration

status results from ICE were not necessary for its purposes, and that relying on ICE to provide this information added unnecessary delays to the release process. ORR uses status information only to determine whether to require prospective sponsors to identify alternative caregivers, who would assume their responsibilities in the event the sponsor suddenly becomes unavailable to care for the child. ORR determined that it could achieve this purpose safely while re-implementing its pre-MOA practice of relying on prospective sponsors to self-report their status information. Under the directive, if the sponsor refuses to provide status information, ORR presumes the sponsor has no status. The directive also requires care providers to inform subjects of fingerprint background checks that, pursuant to current appropriations requirements, DHS may not target a subject for immigration enforcement purposes using information from the ORR background check process, unless the subject of the check has been charged or convicted of a felony, other crime, or has certain associations (e.g., gang affiliation).[5]

18. In addition, on June 18, 2019, ORR issued its most recent operational directive, which made two changes to its release policies. *See* Exhibit E. First, ORR divided Category 2 sponsors into two subgroups, 2A and 2B,[6] which resulted in treating adult siblings and grandparents (as well as aunts/uncles and first cousins who previously served as the UAC's primary caregiver) in the same manner as Category 1 sponsors for purposes of fingerprint background checks (i.e., requiring fingerprints only where a public records check reveals possible disqualifying factors under ORR Guide section 2.7.4; there is a documented risk to the safety of the child; the child is especially vulnerable; or the case is being referred for

---

[5] At the time of the operational directive, Congress imposed restrictions on DHS using such background check information for immigration enforcement actions. Congress wrote the prohibition in the DHS budget appropriation, which is in effect through September 30, 2019. *See* Consolidated Appropriations Act, 2019. Pub. L. 116-6, Division A, Title II, §224.

[6] Category 2A includes: An immediate relative--a brother; sister; grandparent **or** other close relatives (aunt, uncle, first cousin) who previously served as the UAC's primary caregiver. (This includes biological relatives, relatives through legal marriage, and half-siblings).
Category 2B includes: An immediate relative-- including an aunt, uncle, or first cousin who was not previously the UAC's primary caregiver. (This includes biological relatives, relatives through legal marriage, and half-siblings).
*See* ORR Guide, section 2.2.1, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2.1

a home study). Category 2B sponsors continue to have fingerprint background checks as a rule.

19.     Finally, ORR expects that further guidance will be forthcoming regarding a general rule which limits a UAC's stay in any influx care facility to a 90-day length of care and such guidance will be shared publicly.

**Improved Discharge Rates and Reduced Length of Care**

20.     The four operational directives have helped to significantly reduce the median length of care for UACs, even while the number of overall referrals of UACs to ORR in fiscal year 2019 are on track to exceed previous records. Notably, at the end of November 2018, the average overall length of care across all ORR care provider facilities was 93 days; in January 2019, after the first operational directive, it was 77 days; and in June 2019 it dropped further to 45 days. For Category 1 children, the average length of care in June 2019 for the entire ORR network was even lower at 30 days.

21.     Children who are placed at the ORR Homestead influx facility are discharged at an even faster rate than children in the regular ORR network. As of May 2019, when the instant Motion to Enforce was filed, the average length of care for children discharged from Homestead was 35 days. For Category 1 children, the length of care was just 23 days.

22.     ORR's operational directives have promoted these improvements while still prioritizing safety by applying standards consistent with pre-MOA policies.

**Recent Emergency Congressional Appropriations Law**

23.     Congress has provided recent guidance on how ORR should operate with respect to both influxes and three of the above-cited Operational Directives by passing the bipartisan Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Pub. L. 116-26 (July 1, 2019).  That law prohibits the use of funds to reverse "changes in procedures made by operational directives issued to providers by [ORR] on December 18, 2018, March 23, 2019, and June

10, 2019," except where the Secretary determines a change is necessary to prevent a UAC from being placed in danger, and where the Secretary provides a written justification to Congress and the HHS Office of the Inspector General at least 15 days in advance of its implementation. *Id.* at § 403.

24. The appropriations law also contains a number of provisions for influx facilities, notably at sections 404 through 406. An influx facility may only be used when "necessary on a temporary basis due to an influx . . . or an emergency." *Id.* at § 404. Influx facilities in place for more than six consecutive months – except where waivers are granted – must meet all of the requirements for licensed placements in Exhibit 1 of the *Flores* Settlement Agreement that the HHS Secretary determines are applicable to non-State-licensed facilities. *Id.* Influx facilities must also have staffing ratios of one youth care worker for every 8 children during waking hours and one (1) on-duty Youth Care Worker for every sixteen (16) children or youth during sleeping hours, and clinician ratios to children (including mental health providers) as required in grantee cooperative agreements. *Id.*

25. The appropriations law also mandates that ORR monitoring requirements apply to influx facilities as "set forth in section 5.5 of its Policies and Procedures Guide as of May 15, 2019." *Id.* at § 404. Further, the law requires that "for an unlicensed facility in operation for more than three consecutive months, ORR shall conduct a minimum of one comprehensive monitoring visit during the first three months of operation, with quarterly monitoring visits thereafter." *Id.*

26. Sixty days after an influx facility is operational and monthly thereafter, the HHS Secretary must provide a report to the Committees on Appropriations of the House of Representatives and the Senate that details the total number of children in care at each influx facility, average length of stay and length of care, and for any child that has been at the facility for more than 60 days, their length of stay and reason for delay in release. *Id.* at § 504.

27.     Finally, recent correspondence from the Speaker of the House has stated that HHS should ensure that "no children remain longer than 90 days in influx shelters."[7]

**Homestead Influx Facility**

28.     Due to the crisis on the southern border, in fiscal year 2019, ORR faced a dramatic spike in referrals of UACs. Through June 30, 2019, DHS referred over 58,500 UACs to ORR this fiscal year ("FY"), an increase of over 57 percent compared to the number of referrals received over the same time period in FY 2018. In May 2019, ORR received over 9,000 referrals – one of the highest monthly totals in the history of the UAC program. If these numbers continue, this fiscal year ORR will care for the largest number of UACs in the program's history. Based on the anticipated growth pattern in referrals of UACs from DHS to ORR, ORR is preparing for the need for high bed capacity to continue.

29.     The Homestead Job Corps facility, in particular, was activated to provide temporary shelter beds for UAC care by HHS in February 2018. It was previously vacant and had not been in operation as a Job Corps center since August 2015. This activation was done to ensure that ORR is able to meet its responsibility, by law, to provide shelter for UACs referred to its care by DHS.

30.     Children at Homestead live in hard-side dormitories, have access to dining halls, educational classrooms, indoor and outdoor recreational spaces and fields, and on-site medical facilities.  Homestead employs 4,500 trained professionals who are committed to the physical and mental welfare of the children placed there.

31.     Homestead has a medical staff of more than 160 medical professionals and provides access to emergency and hospital facilities. Children arriving at Homestead receive a medical examination and vaccinations within twelve hours. For many, this is the first time they have ever been examined by a physician.

---

[7] https://www.speaker.gov/newsroom/7219-2.

32. Homestead children also receive six hours of educational instruction a day, including English as a second language, math, and science. UACs at Homestead receive three meals a day, with an option for two snacks as well, are provided new clothing and a hygiene kit, and have a dormitory bunkbed.

33. HHS arranges for the security of UACs placed at Homestead. Contractors and the Federal Protective Service (FPS) provide on-site security 24 hours a day, seven days a week in order to ensure the safety and well-being of UACs. A fence also surrounds the facility, and its front doors are locked. These measures are to protect UACs from threats from the public, as the facility is the site of frequent protests and threats. As a secondary matter, the measures prevent escape. Homestead is distinct from a secure juvenile detention facility within the meaning of Paragraph 21 of the *Flores* Settlement Agreement. It has no locked cell pods, no bars, no restrictive housing, and no housing of dangerous minors.

34. With large numbers of children, Homestead does need to ensure that youth care workers have "line of sight" monitoring of all children in order to keep them safe and free from abuse of any kind. Of necessity, children must sometimes stand in line, and they have set times for meals. Children do receive 8 minutes to shower, and showers are permitted every day. The no touch policy does not apply to siblings, and many children in ORR custody have suffered a traumatic journey and may not wish to be touched by those they do not know well. When ORR learned about just a few workers informing children that their release could jeopardized for failure to comply with such rules, the program immediately took corrective action. Telephone time for UACs is in line with ORR Policy which is consistent with the Flores Settlement Agreement. Children can talk to their attorneys at any time, and the Prison Rape Elimination Act (PREA) hotline is available at all times.

35. During the prior Administration, ORR also sheltered over 8,500 UACs at Homestead from June 2016 to April 2017, at which time influx operations ended at the facility. In February 2018, state and local community leaders were notified about the re-

activation of the Homestead site. ORR began to shelter UACs at Homestead in March 2018, and continues to operate it as a temporary influx care facility.[8]

36. ORR awarded the initial contract with Homestead on a competitive basis. ORR awarded the current contract, to continue operations from April 2019 forward, on a sole source basis, to ensure continuity of operations.

37. All UACs placed at the Homestead influx care facility are in the legal custody of HHS. Care and services for the children are provided by non-governmental organizations funded by HHS. Homestead operates as a temporary influx care facility on federal property and is therefore not required to obtain a license from the State of Florida. However, Homestead's federal contracts subject the facility to the majority of the same requirements that apply to state-licensed residential facilities.[9] In addition, Homestead is subject to all applicable federal regulations and ORR policies and procedures, which in some instances surpass Florida's requirements (e.g., medical screening and the provision of medical care to youth, reporting of abuse/grievances, and provision of culturally appropriate food). All staff at Homestead have undergone FBI fingerprint background checks which provide information to ensure child safety. However, because child abuse/neglect ("CA/N") checks may only be performed by the State, ORR was dependent upon the State to conduct such checks and could not obtain agreement as such – thus requiring a waiver for CA/N checks of Homestead employees.

38. Importantly, opening up influx shelters such as Homestead allows ORR to receive children after permanent licensed bed capacity has been nearly exhausted, reducing the risk of a back-up of unaccompanied children at the southern border. For example, in May 2019, given the high volume of referrals of UACs to ORR's care, total operational capacity system-wide was about 97 percent full.

---

[8] *See* ORR Guide, Section 1.7 (Placement Operations During An Influx), available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.7.

[9] The Homestead influx facility contract meets or exceeds Florida state licensing regulations with respect to requirements for provision of medical services, child needs assessment, education, recreation, meals, snacks and hygiene supplies requirements, counseling services and family contact.

39. Since opening at the end of March 2018, over 14,300 UACs were placed at Homestead, and more than 11,700 have been discharged to a suitable sponsor.

40. On July 30, 2019, there were 457 UACs, ages 13-17, residing at Homestead. This number changes on a daily basis as children are referred mostly by DHS and others are released to an appropriate sponsor. As of July 3, 2019, ORR stopped placement at Homestead.

41. ORR maintains strict standards for who may be placed at Homestead, including that the UACs:

- Be between 13-17 years of age
- Speak either English or Spanish
- Have no known behavioral or medical issues, including contagious diseases or health issues requiring immediate evaluation or medical treatment by a healthcare provider
- Have no known special needs (mental health or identified disabilities)
- Not be a danger to self or others
- Not have a criminal history (i.e., not charged with having committed a criminal offense)
- Not be involved as a perpetrator or victim of smuggling or trafficking activities

*See* ORR Guide, Section 1.7.2 & 1.7.3. Additionally, children whose potential sponsor is no longer viable and who have no viable sponsor (i.e., a Category 4 UAC) are placed on a priority list for transfer to a licensed ORR care provider shelter. Children with various special medical, mental health or other special needs UACs who may be initially placed at or transferred to Homestead in error are also placed on a priority list to be transferred to an appropriate licensed facility. These placement policies were specifically determined to facilitate expeditious release of children placed at Homestead.

42. Homestead operations are also designed to facilitate the safe release of UACs to suitable sponsors as expeditiously as possible. Homestead employs case managers as well as other senior managers comprising a case management team that works closely with ORR federal staff on-site and independent contractors in order to ensure that children are safely

and quickly discharged to family members and other appropriate sponsors. Each week, case management teams review lists generated daily of children who have been in care for 45 or more days, and 75 or more days, and discuss how to address any ongoing barriers to their release. Homestead also has put in place special teams to assist with expediting the safe release of Category 1 children being released to suitable sponsors who are parents or legal guardians, and children who are aging out of ORR care at age 18 within a 60-day time period.

43.    In contrast, based on my child welfare expertise and experience with the UAC program, it is my belief that Plaintiffs' proposal of requiring that "within 20 days of arrival at an influx facility, Defendants either release unaccompanied minors to their sponsors, or transfer them to licensed shelters," would actually be harmful to children, and contrary to their best interests.  Based on the average length of care for the month of June 2019, Plaintiffs' proposal would result in children being transferred to new facilities just as they are to be released, and after they have already developed positive connections with staff and other children in the facility—especially for Category 1 and 2 releases. In June, the average length of care was 30 days for UACs with Category 1 sponsors, and 44 days for category 2.  While the average length of care for UAC in Category 3 was 88 days, such children may have transitioned – from at one point being Category 1 or 2, to then Category 3. A child's case manager – who likely has developed a relationship with the minor and his or her sponsor – would lose control of the reunification case, and the case would move to a new case manager who has not developed such a relationship, likely slowing the release process.

**ORR's Efforts to Add Permanent Licensed and Influx Bed Capacity**

44.    In fiscal year 2019, to date, ORR has already broken its previous record number of yearly referrals, and has generally operated at over 90% of its capacity. If such rates continue, in order to meet current and future rates of referrals, ORR will require a significant increase in its bed capacity, from its current capacity of approximately 15,700

beds, which includes approximately 3,800 influx beds, to approximately up to 20,000 permanent capacity beds.

45.     ORR can increase its bed capacity in two main ways: adding permanent, state-licensed facilities, and opening temporary "influx" facilities, which are not licensed.[10]

46.     Opening a permanent, licensed care provider facility requires a significant amount of time and preparation. ORR must issue a funding opportunity announcement ("FOA") and select a grantee – usually based upon competitive applications process and review by an independent panel of child welfare experts.  The grantee must then prepare the site of the facility to meet both ORR and state requirements, and obtain a license. Even after ORR grants an award, preparations for the licensing process typically take a minimum of 90 to 180 days. Note that permanent facilities are licensed to provide care and custody for specific demographics of children. For example, ORR has specific facilities that are state-licensed to provide care and custody to tender age children, and others specifically licensed to provide care and custody to pregnant UACs, or UACs with babies. As a result, placing a UAC within the ORR care provider network requires identifying not just any available bed, but rather an available bed that is licensed to meet the needs of that particular UAC.

47.     Once opened, state-licensed facilities operate as part of ORR's care provider network subject to cooperative agreements, which typically may be renewed every three years. Licensed facilities must meet both ORR and state-licensing requirements, and are subject to routine monitoring from both federal and state officials.

48.     Although ORR attempts to place UACs in licensed facilities, influx facilities are vital for ORR to maintain the operational flexibility necessary to accommodate sudden surges of UACs referrals, and avoid backups of UACs at the border. In cases such as natural disasters, emergencies, or sudden surges of UACs, where ORR must quickly increase bed capacity, it activates influx facilities. These facilities may remain in "warm" status when not in use, operating with a minimal staff sufficient to maintain the physical plant, and

---

[10] *See* ORR Guide, section 1.7, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.7.

sufficient to allow quick activation when beds are needed. Though not state-licensed, influx facilities must meet all ORR standards. The Homestead Influx Facility is required to meet the minimum standards of care described in the Flores Settlement Agreement and the ORR Guide. Further, as noted above, ORR policy is detailed regarding who may be placed in an influx facility.

49. ORR's goal is to maintain up to 20,000 total permanent capacity beds. To achieve this goal, this fiscal year ORR has issued two FOAs for state-licensed facilities, with the expectation of adding approximately 4,100 new permanent shelter beds. ORR plans to issue a third set of FOAs later this summer (in August) related to the renewal of current facilities, and will continue to issue FOAs until it has a sufficient number of beds for its needs. A team of ORR project officers is responsible for processing FOAs. An independent panel reviews and scores each application. ORR uses the results of panel reviews to determine which application is awarded a grant. Reflecting the urgency of ORR's need for more permanent licensed bed space, the team has not only posted FOAs online, as is typical, but they have also engaged in outreach to other agencies and non-governmental associations to ensure that child welfare organizations are made aware and submit an application to serve as grantees.

50. ORR is also conducting a nationwide search for a suitable site for additional influx capacity. A dedicated team of public health officers at ORR, who are emergency management experts, have inspected over 100 sites, working with other government agencies to identify facilities that can serve as influx facilities.

51. Notwithstanding these efforts, ORR faces challenges to adding capacity to ORR's licensed care provider network. For example, local communities may decline to provide sought-after licenses for ORR facilities. Additionally, if ORR wants to increase bed space for a specific population, such as tender age or pregnant UACs, the program must rely upon receiving a relevant application—even if there is an immediate need for more such beds. To address these and other challenges, ORR frequently engages local and state governments to educate them about the UAC program. As noted, it also seeks to cooperate

with other government agencies and child welfare organizations, including child welfare accreditation organizations, in order to expand its search for potential grantees.

Executed on August 2, 2019.

_____

Jallyn Sualog