# Defendants' Exhibit 1

# Exhibit 2

# Declaration of Hope M. Frye

I, Hope M. Frye, declare that the following is true and complete to the best of my knowledge:

l. My name is Hope Frye. I am an immigration attorney licensed to practice law by the Supreme Court of Ohio, registration number 0025018. I am past president of the American Immigration Lawyers Association, former chair of the board for the Center for Human Rights and Constitutional Law, and currently serve as executive director of Project Lifeline.

2. I regularly lead teams of attorneys and doctors to monitor compliance by Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and the Office of Refugee Resettlement ("ORR") with the settlement in *Flores v. Barr*. We visit facilities where these agencies hold unaccompanied children and families with children.

3. Between March 25-28, I led a *Flores* visit to an ORR facility for unaccompanied children located on the Homestead Job Corps facility site, adjacent to the Homestead Air Base in Homestead, Florida ("Homestead"). This shelter is operated by Comprehensive Health Services (a Caliburn Company).

4. This *Flores* team was comprised of highly skilled lawyers and doctors who regularly interact with traumatized immigrant children in the course of their work. The majority have been on more than one *Flores* monitoring visit, including to ORR's Tornillo and Casa Padre facilities The team included Michael Bochenek and Clara Long (Human Rights Watch); Kennji Kizuka (Human Rights First); Theresa Lee (KIND); Elora Mukherjee (Columbia Law School); Beth Lyon (Cornell Law School); Inez Fraenkel; Natasha Quiroga (Lawyers Committee for Civil Rights); Dr. Ewen Wang (Professor of Emergency Medicine – Pediatrics, Stanford University Medical School), and Dr. Ryan Matlow (Director of Community Research Programs for Stanford's Early Life Stress and Pediatric Anxiety Program, Stanford University Medical School).

5. L███, W███ Health and Human Services (HHS) Lead Program Coordinator and manager of Homestead, greeted us, led the facility tour, and answered questions during a meeting following the tour. Her senior management team is J███ M███ Program Coordinator, who also accompanied us on the tour, and V███ B███, Director of Quality Control. According to Ms. W███, Homestead has 3,321 employees covering three shifts.

6. Ms. W███ stated that HHS contracts separately for all services necessary to run Homestead, including security, commissary, and maintenance, that training for staff is provided by General Dynamics Information Technology and that some transportation is provided by GEO Group. W███ stated that she does not supervise any of these contractors.

7. According to Ms. W███ there were 2,026 children ages 13-17 held at Homestead, including 480 children who arrived during our visit. Forty percent of the children are 17. W███ advised that Homestead's capacity was then 2,142 but is being increased to accommodate 2,350 children. She stated that the staff-to-child ratio is 1:12. Of the 8,000 or so children held at Homestead over

Page 2

the past year, W[___], advised that only 55 had been sent there after being placed at other ORR facilities, the rest having come directly from the border.

8. In all but name, Homestead is a secure facility. The perimeter is surrounded by an 8' chain link fence with a privacy covering. Entrance and exits are blocked by fences and gates staffed by security personnel. The gates are closed, opened only upon producing proper credentials. Children understand that they are not free to leave and have been told that they will be arrested by local police and ICE and deported, if they do. Even talking about leaving is thought to be a violation of the rules for which children believe they will be stepped-up to a more restrictive facility.

9. According to W[___], Homestead does not hold a license to care for dependent children, or indeed, any other state license. She stated that licensure is unnecessary because Homestead is on federal property. However, she reported that local police have been called and responded to incidents at the shelter. She also said she would expect city of Homestead firefighters to provide services should there be a fire at the ORR facility.

10. I observed Homestead to be markedly stark, almost entirely devoid of foliage, and memorable for a drab, institutional quality. The noise level inside every building we entered (education, cafeteria, multi-purpose area and so forth) was disturbingly high. The buildings, including the cafeteria, medical unit and dormitories were unclean, and many areas smelled strongly of mildew.

11. The facility is divided into "campuses" – the South Side (holding 13-16-year-olds) and the North Side (holding 17-year-olds). On the South Side, four large dilapidated concrete buildings are used as dormitories. On the exterior of one of these buildings is a sign that says: "Column contains lead paint. Contact Safety Officer before working on the column." Among an auditorium, cafeteria, and administrative building, are three large tents. One tent houses the education area; another is for orientation and large gatherings, and a third has showers and toilets.

12. The dormitories on the South side each sleep 434 children, 12 to a room, in bunk beds. The rooms are small and have few windows. Each room has a shared toilet and shower. Children keep their few belongings in a plastic box under each bed. The rooms are barren with doors removed. A staff member sits in the entryway to monitor the children at night.

13. On the North Side, 144 seventeen-year-old boys sleep in bunk beds in a cavernous room that appears to have been an airplane hangar. The beds are close together and the blankets worn. The far interior wall has an enormous and very loud built-in fan that runs constantly. The children who sleep closest to the fan (a distance of maybe 12-15 feet) are given an extra blanket to pull over their heads in order to contend with the noise and the constant draft the fan creates. W[___]. claims that ear plugs are available upon request but that no child has ever asked for them. She also claims that the boys enjoy this sleeping arrangement, because it "feels like a slumber party." Children we interviewed universally disagreed with Wood and denied being offered ear plugs.

14. The communal bathroom for this enormous sleeping area is accessed through a single door located in the back of the room and down a hallway. It's a large room with showers, three to a stall, a number of portable toilets, and a deep smell of mildew from the carpet. According to the medical experts on our monitoring team, the unsanitary condition of the bathroom area and the incessant and deafening noise of the fan are clear health hazards.

15. The layout of this immense communal sleeping area and the secluded location of the bathroom make it difficult, if not impossible, for Homestead staff to ensure children's safety. While we were told that there are 30 security cameras at Homestead, there are none in the sleeping areas. Moreover, during our tour of the operations center, we observed no one watching or even facing the security camera monitors.

16. Children at Homestead have access to two dirt fields used for soccer and a small basketball area. We were told the fields are being re-sodded. The recreation areas appeared wholly insufficient to accommodate the exercise needs of the hundreds of children being held at Homestead.

17. I asked to see where children were kept in solitary confinement. We were taken to a small windowless room tucked in the corner of the medical building. The room had four beds and nothing more. W___ said that children were put there when they turned 18 to await transfer to an ICE facility by Geo (contracted transportation). She claimed that because of her "good relationship with ICE" most youth are picked up the same day and that, in any event, none remain in solitary confinement for more than two days. Although there is no bathroom, ___ said the children are not allowed outside the room. She claimed to have no choice but to segregate the 18-years-olds from the other children in this way. She also claimed that no minors are ever held in this room or in any other solitary condition.

18. W___ told us that the facility's rules are clearly explained to detained children, and that positive reinforcement is used to manage behavior that violates these rules. She stated that children who violate the rules are sent to a "better choices" group that helps them identify behavioral triggers and "redirect" behavior. She stated that children are issued reports only to encourage them to redirect impermissible behavior.

19. Every child interviewed expressed fear and anxiety around the enforcement of shelter rules. They had been told during orientation that any violation of the rules would result in a 10-30-day extension of detention. Some children believed that if they violated a rule their social worker would stop work on reuniting them with parents and other family members for an extended period of time. They all believed that rule violations would affect their immigration cases, potentially resulting in deportation. Although children expressed concern that they did not know all the rules, those they uniformly reported knowing included 1. no touching (even of a sibling or when saying goodbye to a friend who is leaving the shelter); 2. failing to finish showering within 5 minutes; 3. no looking at or talking to a member of the opposite sex; and 4. not finishing their food. Children uniformly reported that enforcement of Homestead's rules was severe, and that they feared the repercussions of any infraction.

20. Upon admission to Homestead, children have a medical screening and are given vaccinations at the on-site medical clinic. The clinic operates 24/7 and has rooms for overnight stays for children with diseases such as the flu, conjunctivitis and upper respiratory problems. Children are supposed to report illness to a Youth Counselor, who is supposed to take them to the clinic within one hour. However, several children reported extensive delays, up to several days, in being taken to the clinic, despite repeated requests for medical attention.

21. We met briefly with K██████ O████, a licensed clinician whose title is "Parental Sex Abuse Compliance Manager," and A█████ G██████, also a licensed clinician, who manages the other clinicians who are not licensed. Lead clinicians must be licensed while others with related degrees can practice under a licensed clinician's supervision.

22. O████ told us that within 72 hours of arriving at Homestead, children have a bio/psych/social risk assessment to determine placement. Before being cleared for stay at Homestead, clinicians tell children about the "zero tolerance policy" for touching and/or verbal disrespect and the grievance procedure.

23. O████ further advised that children determined to have psychiatric needs are taken to Larkin Community Hospital in South Florida for evaluation. Children may be treated as outpatients or admitted to the hospital, and some children have been send to Larkin multiple times and stayed there for lengthy periods. Larkin staff may prescribe Homestead detainees medications, which are administered at Homestead's medical unit. O████ claimed that written parental consent is obtained for the administration of psychotropic medications on a Homestead-specific form. She reported that the signed form is uploaded onto the ORR portal and the original destroyed. On the day we met with the clinicians, two children were being discharged from Larkin and nine children were being given psychotropic drugs.

24. Among the children we interviewed at Homestead was D████████████████ (A number ████████), who reported having attempted suicide, hearing the voice of her grandfather, and other signs of psychiatric illness. She had been hospitalized three times for a total of three months. She was taking three psychotropic drugs and required her own 1:1 monitor.

25. Employees told us that Homestead has an "eyes on at all times" policy which requires them to have the children they are responsible for always in the line of sight. As a result, children never have any privacy.

26. W████ told us that children are transferred to licensed shelters only if they have special needs. She did not elaborate on what constitutes a special need. During our visit, we encountered children who are required to be placed in a licensed ORR facility under ORR rules including those who spoke indigenous languages and were not fluent in Spanish and M████ who is blind.(See ¶ 32)

27. Children had not been given a list of lawyers nor advise of their *Flores*. Although children expressed a desire for legal representation, none had a lawyer nor did they know how to contact one.

28. Although W____ said that visitors are allowed, children did not know this. Additionally, Homestead has extensive rules governing outside visits the import of which discourages visitation. The only actual outside contact are phone calls.

29. After interviewing class members it was clear without a doubt that the staff at Homestead do not provide class members with adequate time to speak with their families or provide adequate privacy when on the telephone. L____, W____ Homestead program director, and all class members, stated telephone time was limited to two ten minute phone calls per week. Class members must request, and have been denied, additional telephone time even if they have an unusual circumstance such as death of an immediate family member.

30. We observed Homestead's school to be rather makeshift: a tent divided into mostly small rooms. The interior walls do not reach the ceiling, and the noise generated by some 2,000 children who fill in 52 classrooms in the tent creates a din. Teachers use headsets with microphones so that students may hear instruction over the constant noise. We observed approximately 36-48 children per class with one teacher. We were told that teachers work every day. We observed an unstructured and disorganized environment not suitable for nor conducive to learning.

31. According to Ms. W____, Homestead organizes it staff into 25-30 teams made up of case workers, clinicians and case aids. She stated that caseworkers for approximately 17% of the children detained at Homestead operate remotely, communicating with children by Skype. For their part, numerous children we interviewed reported that their caseworkers changed so often they never knew who is in charge of reuniting them with the families or other proposed custodians, and that recommendations for their release had been delayed because replacement case workers had to learn about their cases. During our visit, there were eight vacancies for case worker positions. One case worker was non-Spanish speaking. W____ said the average length of time a child stays at Homestead is 62 days, down from an average of 89 days during the period ORR demanded fingerprints from all adults living in a proposed sponsor's household.

32. We interviewed M____ A____ _____, an indigenous 14-year-old Guatemalan boy who has been detained since December 6, 2018. Miguel is 4'9", 66 pound, legally blind and whose first language is Acateco. The paternity of M____'s father was confirmed on December 12, 2018, and he was being processed as a sponsor.

33. We had serious concerns about the length of M____'s detention, placement at Homestead, lack of suitable education, medical and psychological care and other issues including safety. During the March 28 site inspection, I asked W____ why M____ had not been released. Twice she stated that they were waiting for a $5,000 pair of glasses and that M____ would be released once the glasses were received. She admitted she had no idea when that might happen.

34. On April 3 I received a copy of M____'s ORR file. The file contained an Abuse/Neglect in ORR Care Event Report ID _____ of physical abuse by another child. According to the report, on March 27, _____ was hit in the stomach by another child. He had been the victim of repeated assaults by children, including being hit in the groin. _____ knew or should have known about

this assault when I asked about M████'s release. I intervened on April 4. Within hours, plans were made to release M████ to his father the following day.

35. In a subsequent conversation with Sarah Fabian and A████ M████████, ORR Juvenile Coordinator, I was told that M████'s release was delayed waiting for his father to complete modifications required following a home study. The glasses that had been ordered were being mailed.

36. M████'s was not the only inappropriate placement we encountered. Of the 13 indigenous children we saw, five were not fluent enough in Spanish to be interviewed. They spoke Mam, Q'eqchi, and K'iche. According to Wood, no one working at Homestead speaks any indigenous language.

I, Hope M. Frye, declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 25 day of May 2019, at Tiburon, California.

_____
Hope M. Frye