

**RECEIVED**
CLERK, U.S. DISTRICT COURT

8/15/2019

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CR_____ DEPUTY

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| JENNY LISETTE FLORES, et al., *Plaintiffs-Appellees*, <br><br> v. <br><br> WILLIAM P. BARR, Attorney General; KEVIN K. McALEENAN, Acting Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION, *Defendants-Appellants.* | No. 17-56297 <br><br> D.C. No. 2:85-cv-04544-DMG-AGR <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted June 18, 2019
San Francisco, California

Filed August 15, 2019

Before:  A. Wallace Tashima, William A. Fletcher,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

### Immigration / Juvenile Detention

The panel dismissed for lack of jurisdiction an appeal brought by the Department of Homeland Security and its component agencies of the district court's June 2017 order granting in part the motion of a plaintiff class to enforce a 1997 Settlement Agreement with the government which set a nationwide policy for the detention, release, and treatment of minors detained in Immigration and Naturalization Service custody.

In 1997, the United States entered into a settlement with a class of minors subject to detention by U.S. immigration authorities. The Settlement Agreement, incorporated into a consent decree, requires immigration agencies to hold such minors in their custody "in facilities that are safe and sanitary." The Agreement also requires the government to treat these "minors in its custody with dignity, respect, and special concern for their particular vulnerability as minors."

Plaintiffs filed a motion in district court to enforce the Agreement. The district court found that the government was violating the Agreement by detaining minors in unsanitary and unsafe conditions at Border Patrol stations. These findings were based on evidence that minors in U.S. Customs and Border Protection custody were held in conditions that deprived them of sleep and did not provide adequate access to food, clean water, and basic hygiene

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

items. The court also found that the government was
violating the Agreement by failing to consider minors for
release as specified in the Agreement and by detaining
minors in detention facilities not licensed for the care of
minors. The district court ordered "enforced" various
paragraphs of the Agreement and also directed the
government to appoint an internal "Juvenile Coordinator,"
as contemplated by the Agreement, to monitor the
government's compliance with the Agreement and report to
the court.

The parties agreed that this court has jurisdiction over the
appeal of this post-judgment order only if it modified the
Agreement.

The government argued that the district court's order did
modify the Agreement by requiring the government to
provide specific hygiene items and adequate sleeping
accommodations not explicitly listed in the text of the
Agreement. The panel held that the district court's order did
not modify the Agreement, but instead interpreted the
Agreement's requirement that minors be held in "safe and
sanitary" conditions "consistent with the [government's]
concern for the particular vulnerability of minors."

The government also argued that the district court
modified the Agreement by concluding that it requires the
government to consider releasing class members subject to
expedited removal. The government contended that this
interpretation of the Agreement was inconsistent with the
Immigration and Nationality Act and related regulations—
primarily with the expedited removal provisions, which
provide that noncitizens in expedited removal proceedings
"shall be detained for further consideration of the[ir]
application[s] for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).

The panel held that, rather than modifying the Agreement, the district court appropriately interpreted it as consistent with both the INA and this court's prior interpretation of the Agreement.

Regarding the government's argument that the district court erred in concluding that the Agreement prohibits the government from detaining minors in secure, unlicensed family detention centers, the panel noted that the district court addressed this issue directly in its earlier July 2015 order, and that although the government appealed that order, it did not on appeal challenge the district court's holding on this issue.  The panel concluded that this issue belatedly raised in this appeal was not properly before the court.

Because the panel concluded that the district court's order did not modify the Agreement, it dismissed the appeal.

## COUNSEL

Sarah Fabian (argued), Senior Litigation Counsel; William C. Silvis, Assistant Director, District Court Section; William C. Peachey, Director, District Court Section; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Peter Anthony Schey (argued) and Carlos R. Holguin, Center for Human Rights and Constitutional Law, Los Angeles, California; Elena Garcia, Orrick Herrington & Sutcliffe LLP, Los Angeles, California; Michael S. Sorgen, La Raza Centro Legal Inc., San Francisco, California; Jennifer Kelleher Cloyd, Katherine H. Manning, and Annette Kirkham, The Law Foundation of Silicon Valley

Legal Advocates for Children and Youth Public Interest Law
Firm, San Jose, California; for Plaintiff-Appellee.

## OPINION

BERZON, Circuit Judge:

In 1997, the United States entered into a settlement with
a class of minors subject to detention by U.S. immigration
authorities ("Plaintiffs"). The settlement agreement,
incorporated into a consent decree, requires immigration
agencies to hold such minors in their custody "in facilities
that are safe and sanitary." *Flores* Agreement ("the
Agreement") at ¶ 12A. The Agreement also requires the
government to treat these "minors in its custody with dignity,
respect, and special concern for their particular vulnerability
as minors." *Id.* at ¶ 11.

This appeal began as a motion by the Plaintiffs to enforce
the Agreement. The district court found that the government
was violating the Agreement by detaining minors in
unsanitary and unsafe conditions at Border Patrol stations.
These findings were based on evidence that minors in U.S.
Customs and Border Protection custody were held in
conditions that deprived them of sleep and did not provide
adequate access to food, clean water, and basic hygiene
items. The court also found that the government was
violating the Agreement by failing to consider minors for
release as specified in the Agreement and by detaining
minors in detention facilities not licensed for the care of
minors. The district court ordered "enforced" various
paragraphs of the Agreement and also directed the
government to appoint an internal "Juvenile Coordinator,"
as contemplated by the Agreement, to monitor the

government's compliance with the Agreement and report to
the court.

The parties agree that this court has jurisdiction over the
appeal of this post-judgment order only if it modified the
Agreement. The government argues that the district court's
order did modify the Agreement by requiring the
government to provide specific hygiene items and adequate
sleeping accommodations not explicitly listed in the text of
the Agreement. We disagree. The district court's order does
not modify the Agreement. Instead, it interprets the
Agreement's requirement that minors be held in "safe and
sanitary" conditions "consistent with the [government's]
concern for the particular vulnerability of minors." *See*
Agreement at ¶ 12A. The government also argues that the
district court's order modifies the Agreement in other
respects, but those arguments likewise lack merit. As the
district court's order did not modify the Agreement we
dismiss the appeal.

## I

## A

This case stems from a 1985 lawsuit filed on behalf of a
class of minors detained by U.S. immigration authorities.
After considerable litigation, the parties negotiated the
Agreement; it was entered by the district court as a consent
decree in January 1997. The Agreement remains in effect
today.[1] The Agreement "sets out nationwide policy for the

---

[1] The Agreement included a specified termination date, but in 2001
the parties stipulated to extend the Agreement until "45 days following
defendants' publication of final regulations implementing this
Agreement." The government has issued proposed regulations but the
regulations have not been made final. *See* Apprehension, Processing,

detention, release, and treatment of minors in the custody of the INS." *Id.* at ¶ 9.[2] It requires the government to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." *Id.* at ¶ 11. The Agreement's provisions "create[] a presumption in favor of releasing minors and require[] placement of those not released in licensed, non-secure facilities that meet certain standards." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016).

Under paragraph 12A of the Agreement, "[f]ollowing arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." The Agreement continues: "Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to

---

Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45,486 (proposed Sept. 7, 2018) (to be codified at 8 C.F.R. §§ 212, 236; 45 C.F.R. § 410); *see also Apprehension, Processing, Care, and Custody of Alien Minors*, Regulations.gov, https://www.regulations .gov/docket?D=ICEB-2018-0002 (last visited Aug. 6, 2019).

[2] Although the Agreement's terms refer to "INS," the Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security and the Department of Health and Human Services. *See Flores v. Sessions*, 862 F.3d 863, 870 (9th Cir. 2017).

protect minors from others, and contact with family members who were arrested with the minor."

Within a few days of initial detention—three days if a suitable detention facility "is located and has space available" or five days "in all other cases"—the government ordinarily must choose between two options for placement of minors.[3] The first, and preferable, option, discussed in paragraph 14 of the Agreement, is releasing the minor to a parent, legal guardian, adult relative, or another "capable and willing" designated adult. Alternatively, under paragraph 19, the minor may be placed in a facility "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children." Licensed facilities must be "non-secure as required under state law."

Finally, paragraph 28A provides that "[a]n INS Juvenile Coordinator . . . shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours."

---

[3] Paragraph 21 of the Agreement provides a third option— placement in a secure juvenile detention facility—in limited circumstances, such as where the minor has been charged with a crime. Although the Agreement contemplates secure detention for minors that are "an escape-risk," the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") limits the use of secure custody, stating that "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." 8 U.S.C. § 1232(c)(2)(A); *see also Flores v. Sessions*, 862 F.3d at 881 n.19.

**B**

In May 2016, the plaintiffs filed a motion to enforce the Agreement. The plaintiffs alleged that despite earlier such motions and resulting orders enforcing the Agreement, the government continued to violate it by detaining class members in unsafe and unsanitary conditions at Border Patrol stations and by detaining minors in secure, unlicensed facilities. The plaintiffs requested that the district court address these violations by appointing an independent monitor.

In June 2017, after an evidentiary hearing, the district court granted in part plaintiffs' motion to enforce. In its order ("the Order"), the court found that the government was violating the Agreement's express requirements to provide adequate access to appropriate food and water and "adequate temperature controls at a reasonable and comfortable range." The court further found that although the Agreement "makes no mention of the words 'soap,' 'towels,' 'showers,' 'dry clothing,' or 'toothbrushes,' . . . these hygiene products fall within the rubric of the Agreement's language requiring 'safe and sanitary' conditions." Certain Border Patrol stations, the district court found, were violating paragraph 12A of the Agreement by failing to provide such sanitary necessities.

The district court also determined that although "the word 'sleep' does not appear in the Agreement, . . . whether Defendants have set up conditions that allow class members to sleep in the [Border Patrol] facilities is relevant to the issue of whether they have acted in a manner that is consistent with 'the INS's concern for the particular vulnerability of minors' as well as the Agreement's 'safe and sanitary' requirement." Citing evidence that many minors in Border Patrol custody are forced to sleep on concrete floors,

with no bedding aside from pieces of thin polyester foil, and
are subjected to cold temperatures, serious overcrowding,
and constant lighting, the district court found that the
government was violating the Agreement at certain Border
Patrol stations by holding children in facilities that deprived
them of adequate sleep.

The court also found that the government was failing to
make and record ongoing efforts aimed at releasing or
placing class members in violation of paragraph 14 of the
Agreement, and was detaining class members in secure,
unlicensed facilities in violation of paragraph 19.

The district court declined, however, to appoint an
independent monitor as the plaintiffs had requested. Instead,
it directed the government to identify an internal "Juvenile
Coordinator" in accordance with paragraph 28A of the
Agreement. The court instructed that the Juvenile
Coordinator, once appointed, "will monitor compliance with
those terms of the *Flores* Agreement, which this Court has
found must be enforced and shall report directly to the Court
regarding the status of Defendants' compliance."[4]

## II

## A

This court has appellate jurisdiction over interlocutory
district court orders "granting, continuing, modifying,
refusing or dissolving injunctions, or refusing to dissolve or

---

[4] A Special Master has since been appointed. *See* Order Appointing
Special Master/Independent Monitor, *Flores v. Barr*, No. 2:85-cv-4544
(Order) (C.D. Cal. Oct. 5, 2018) (ECF No. 494). Neither the appointment
of the Special Master nor the Special Master's enforcement activities is
the subject of this appeal.

modify injunctions." 28 U.S.C. § 1292(a)(1). The parties agree that the district court's Order did not grant, continue, refuse, dissolve, or refuse to dissolve an injunction. The only possible basis for appellate jurisdiction therefore depends on whether the Order "modif[ied]" the Agreement. *See Thompson v. Enomoto*, 815 F.2d 1323, 1327 (9th Cir. 1987) (appointment of a special master cannot be appealed under § 1292(a)(1) unless "the interlocutory order appointing a special master 'modifies' the consent decree"); *see also Bogard v. Wright*, 159 F.3d 1060, 1064–65 (7th Cir. 1998) (dismissing for lack of jurisdiction an appeal of an order that enforced but did not modify a consent decree, and discussing the "appellate remedy" available to each party under section 1292(a)(1) with respect to orders after a final judgement).

The text of the district court's opinion in this case interpreted the existing Agreement; its operative provisions, which appear at the end of the Order, granted enforcement of various provisions of the Agreement. The conclusion of the Order reads, for example, "Plaintiffs' motion to enforce Paragraph 12A of the Agreement on the issue of unsanitary conditions is GRANTED . . ." The Order's operative provisions do not require the government to take any specific action other than to propose a Juvenile Coordinator for appointment.[5]

The government does not challenge the appointment of a Juvenile Coordinator, as that appointment is expressly

---

[5] In contrast, the district court's July 2015 order, over which this court exercised appellate jurisdiction, *see Flores v. Lynch*, 828 F.3d at 905, did direct the government to take specific actions, *see id.* at 908 ("To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph 15, a class member's accompanying parent shall be released with the class member . . . .").

provided for in the Agreement. Rather, the government argues that we have jurisdiction to review other parts of the district court's Order because they modified the *Flores* Agreement.

Specifically, the government contends that, by interpreting paragraph 12A in the body of its opinion to require that Border Patrol stations provide the most basic human necessities—accommodations that allow for adequate sleep, essential hygiene items, and adequate, clean food and water—the district court modified the Agreement's requirement that minors be held in "safe and sanitary" conditions that comport with the "special concern for the particular vulnerability of minors." We emphatically disagree.

The government first suggests that the key phrases in paragraph 12A—"safe and sanitary" and "special concern for the particular vulnerability of minors"—add nothing to the enumerated specific requirements found in the next sentence of the Agreement (requiring "access to toilets and sinks, drinking water and food as appropriate," and so on). The government's brief maintains that as the enumerated conditions said nothing about, for example, allowing the children in government custody to sleep or to wash themselves with soap, reading the "safe and sanitary" requirement to cover those requirements is a modification of the Agreement rather than an interpretation of it.

That cramped understanding of paragraph 12A is untenable. Construing the Agreement as requiring only the particular conditions specifically enumerated renders both the "safe and sanitary" and the "particular vulnerability of minors" phrases wholly superfluous. We cannot accept that the parties to the Agreement included gratuitous standards that have no practical impact. "Courts interpreting the

language of contracts 'should give effect to every provision,' and 'an interpretation which renders part of the instrument to be surplusage should be avoided.'" *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003) (quoting *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 12 (Ct. App. 1989)); *see also* Restatement (Second) of Contracts § 203 (Am. Law Inst. 1981). We conclude that paragraph 12A's provisions that facilities be "safe and sanitary and . . . consistent with the INS's concern for the particular vulnerability of minors" do have independent force and can be interpreted and enforced without thereby modifying the Agreement.

The government also argues that the phrase "safe and sanitary" is so vague that either it cannot be enforced, *see* Oral Argument at 33:57–34:09, *Flores v. Barr*, No. 17-56297 (9th Cir. Jun. 18, 2019), https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000015907, or it leaves "the specifics of compliance [with paragraph 12A] up to" the government. Not so.

The district court's interpretation of the Agreement is consistent with the ordinary meaning of the language of paragraph 12A, which does provide a standard sufficiently clear to be enforced. The court found, among other things, that minors (1) were "not receiving hot, edible, or a sufficient number of meals during a given day," (2) "had no adequate access to clean drinking water," (3) experienced "unsanitary conditions with respect to the holding cells and bathroom facilities," (4) lacked "access to clean bedding, and access to hygiene products (i.e., toothbrushes, soap, towels)," and (5) endured "sleep deprivation" as a result of "cold temperatures, overcrowding, lack of proper bedding (i.e., blankets, mats), [and] constant lighting." After so finding, the district court concluded that these conditions fall short of

paragraph 12A's requirement that facilities be "safe and sanitary," especially given "the particular vulnerability of minors." Those determinations reflect a commonsense understanding of what the quoted language requires. Assuring that children eat enough edible food, drink clean water, are housed in hygienic facilities with sanitary bathrooms, have soap and toothpaste, and are not sleep-deprived are without doubt essential to the children's safety.[6] The district court properly construed the Agreement as requiring such conditions rather than allowing the government to decide whether to provide them.

Moreover, contrary to the government's assertions, the district court did not incorporate into the Agreement a particular set of standards, Customs and Border Protection's "National Standards on Transport, Escort, Detention, and Search" (or "TEDS"), with respect to food during detention. We doubt that the TEDS requirements—that minors "be offered a snack upon arrival and a meal at least every six hours thereafter," have food that is "in edible condition (not frozen, expired, or spoiled)," and "have regular access to snacks, milk, and juice,"—extend beyond what paragraph 12A requires. But in any event, in context, the district court referred to TEDS not to interpret the Agreement as incorporating the TEDS standards specifically, but to confirm that the government's inattention to ensuring that children were being adequately fed was egregious, as the government was not even complying with its own standards.

---

[6] We note that, as the district court properly understood, assuring "safe and sanitary" conditions includes protecting children from developing short- or long-term illnesses as well as protecting them from accidental or intentional injury.

In short, the district court's explanation of its enforcement of paragraph 12A regarding the conditions at Border Patrol stations concerned only requirements unarguably within the terms of the Agreement. As a result, the portion of the court's order enforcing paragraph 12A did not constitute an "[i]nterlocutory order[] . . . modifying [an] injunction[], or refusing to . . . modify [an] injunction[]." 28 U.S.C. § 1292(a)(1). We therefore lack jurisdiction over this claim.[7]

## B

The government next argues that the district court modified the Agreement by concluding that it requires the government to consider releasing class members subject to expedited removal. The government contends that this interpretation of the Agreement is inconsistent with the Immigration and Nationality Act (INA) and related regulations—primarily with the expedited removal provisions, which provide that noncitizens in expedited removal proceedings "shall be detained for further consideration of the[ir] application[s] for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).

The Agreement "creates a presumption in favor of releasing minors." *Flores v. Lynch*, 828 F.3d at 901; *accord Flores v. Sessions*, 862 F.3d at 866. That presumption is fully consistent with the Act's expedited removal provisions.

To begin, not all noncitizens eligible to be placed in expedited removal proceedings are in fact placed in such

---

[7] As we lack jurisdiction, we do not reach the government's evidentiary objections regarding the record considered by the district court.

proceedings. The government has discretion to place noncitizens in standard removal proceedings even if the expedited removal statute could be applied to them. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 521–22 (B.I.A. 2011). In other words, the government may place minors into standard, nonexpedited removal proceedings and thus comply with the Agreement by avoiding any mandatory detention allegedly required for expedited removal.

Further, expedited removal does *not* require mandatory detention for minors. The INA provides that, even for noncitizens in expedited removal, "the Attorney General may . . . in his discretion parole into the United States temporarily" any noncitizen applying for admission "under such conditions as he may prescribe." 8 U.S.C. § 1182(d)(5)(A). The government has promulgated two regulations that pertain to parole into the United States of noncitizens in expedited removal proceedings. One provides that such noncitizens "shall be detained pending determination and removal, except that parole of such alien . . . may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii). A second provides that all noncitizens subject to removal—specifically including, by cross-reference, those in expedited removal[8]—may be paroled "on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,' provided the [noncitizens]

---

[8] Section 212.5(b) addresses the parole of aliens "who have been or are detained in accordance with § 235.3(b) or (c) of this chapter." 8 C.F.R. § 212.5(b). Section 235.3(b) provides for expedited removal. *Id.* § 235.3.

present neither a security risk nor a risk of absconding." *Id.* § 212.5(b). Among the groups eligible for parole under this regulation are "[a]liens who are defined as juveniles in § 236.3(a) of this chapter," who may be paroled under "the guidelines set forth in § 236.3(a) of this chapter and paragraphs (b)(3)(i) through (iii) of this section." *Id.* § 212.5(b)(3).

Both regulations expressly cover noncitizens in expedited removal proceedings; nothing in section 235.3(b) negates section 212.5(b). The more specific regulatory provision providing an exception for minors governs, not the general expedited removal provisions. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1015–16 (9th Cir. 2017) (applying the interpretive canon that "the specific governs over the general" to regulations).

The upshot is that the government's own regulations contemplate that minors in expedited removal proceedings may be considered for release, just as the Agreement requires. Rather than modifying the Agreement, the district court appropriately interpreted it as consistent with both the INA and our prior interpretation of the Agreement. We therefore lack jurisdiction over this claim.[9]

---

[9] For the first time on appeal, the government contends that the district court's conclusion that the government must consider whether to release minors to potential custodians other than a parent or legal guardian conflicts with a provision of the TVPRA, 8 U.S.C. § 1232(b)(3). We decline to address this statutory defense in this appeal, as the government did not raise it before the district court. *See Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004).

## C

Finally, the government argues that the district court erred in concluding that the Agreement prohibits the government from detaining minors in secure, unlicensed family detention centers. The district court addressed this issue directly in its July 2015 order. Although the government appealed that order, it did not on appeal challenge the district court's holding on this issue. *See Flores v. Lynch*, 828 F.3d at 901. "[A] party cannot offer up successively different legal or factual theories that could have been presented in a prior request for review." *Sec. Inv'r Prot. Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996). The issue belatedly raised in this appeal is not properly before us.

## III

We dismiss the appeal for lack of jurisdiction.

**DISMISSED**.



 **regulations.gov**
Your Voice in Federal Decision-Making

Home   Help ▼   Resources ▼   Contact Us

Advanced Search

📁 **Apprehension, Processing, Care, and Custody of Alien Minors**

**Docket Folder Summary**   🗊 View all documents and comments in this Docket

**Docket ID:** ICEB-2018-0002   **Agency:** Immigration and Customs Enforcement Bureau (ICEB)
**Parent Agency:** Department of Homeland Security (DHS)

**Summary:**

In 1985, a class-action suit challenged the policies of the former Immigration and Naturalization Service (INS) relating to the detention, processing, and release of alien children; the case eventually reached the U.S. Supreme Court. The Court upheld the constitutionality of the challenged INS regulations on their face and remanded the case for further proceedings consistent with its opinion. In January 1997, the parties reached a comprehensive settlement agreement, referred to as the Flores Settlement Agreement (FSA). The FSA was to terminate five years after the date of final court approval; however, the termination provisions were modified in 2001, such that the FSA does not terminate until 45 days after publication of regulations implementing the agreement.

Since 1997, intervening statutory changes, including passage of the Homeland Security Act (HSA) and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), have significantly changed the applicability of certain provisions of the FSA. The rule would codify the relevant and substantive terms of the FSA and enable the U.S. Government to seek termination of the FSA and litigation concerning its enforcement. Through this rule, DHS, HHS, and DOJ will create a pathway to ensure the humane detention of family units while satisfying the goals of the FSA. The rule will also implement related provisions of the TVPRA.

**RIN:** 1653-AA75   **Impacts and Effects:** None   **CFR Citation:** 8 CFR 236,8 CFR 208
**Priority:** Other Significant

less...

– View Less UA and Regulatory Plan Information and Docket Details

### UA and Regulatory Plan Information ⓘ

**Publication Period:** Spring 2019
**Agenda Stage of Rulemaking:** Final Rule
**Major Rule:** No
**Legal Authorities:** 8 U.S.C. 1103, 8 U.S.C. 1182, 8 U.S.C. 1225 to 1227, 8 U.S.C. 1362
**Legal Deadlines:** None
**Government Levels Affected:** No

**Federalism Implications:** No
**Unfunded Mandates:** No
**Requires Regulatory Flexibility Analysis:** Business, Organizations
**Small Entities Affected:** No
**International Impacts:** No
**Energy Effects:** No
**Included in Regulatory Plan:** No

### Timetable

| Action | Date | FR Citation |
|---|---|---|
| NPRM | 09/07/2018 | 83 FR 45486 |
| NPRM Comment Period End | 11/06/2018 | |
| Final Action | 09/00/2019 | |

### Docket Details ⓘ

**Related RINs:** None
**Related Dockets:** HHS-OS-2018-0023
**Type:** Rulemaking

### Primary Documents   View All (1)

PR   **Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children**   Comment Period Closed
Nov 06, 2018 11:59 PM ET
**Proposed Rule**   Posted: 09/07/2018   ID: ICEB-2018-0002-0001

---

📋 **Sign up for Email Alerts**

**100,073**
Comments Received *

🐦 Tweet   📘 Share   ✉ Email

**Regulatory Timeline**

📁 Pre Rule

📁 Proposed Rule

⚖ Final Rule
Current Stage

**Agency Contact**

Mark Lawyer
*Chief, Regulations*
*USICE*

mark.lawyer@ice.dhs.gov
202 732-5683

500 12th Street SW, Mail Stop 5006
Washington, DC 20536

*This count refers to the total comment/submissions received on this *docket,* as of 11:59 PM yesterday. Note: Agencies review all submissions, however some agencies may choose to redact, or withhold, certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. This can result in discrepancies between this count and those displayed when conducting searches on the Public Submission document type. For specific information about an agency's public submission policy, refer to its website or the Federal Register document.

cited as Flores v. Barr, No. 17-56297 archived on August 12, 2019

## Supporting Documents    View All  (1)

**SR**   1997 Flores Settlement Agreement as amended

**Supporting & Related Material**    **Posted:** 09/13/2018          Comments Not Accepted
**ID:** ICEB-2018-0002-1151

## Comments    View All  (98,208)

*I oppose the governments proposal to wipe away the Flores Settlement Agreement, which protects the welfare of migrant children in U.S. government custody, and..."*

View Comment    **Posted:** 04/20/2019    **ID:** ICEB-2018-0002-73773

*From: sarahp1934@everyactioncustom.comOn Behalf OfSarah Tiers Sent: Wednesday, October 31, 2018 11:59:23 PM (UTC-05:00) Eastern Time (US & Canada) To: ICE..."*

View Comment    **Posted:** 04/20/2019    **ID:** ICEB-2018-0002-77167

*From: James and Judith Landau Sent: Tuesday, November 6, 2018 9:31:13 PM (UTC-05:00) Eastern Time (US & Canada) To: ICE Regulations Subject: Defend Flores. DHS..."*

View Comment    **Posted:** 04/20/2019    **ID:** ICEB-2018-0002-97161

*From: Cameron Pride Sent: Monday, November 5, 2018 4:05:30 PM (UTC-05:00) Eastern Time (US & Canada) To: ICE Regulations Subject: Regarding DHS Docket No. ICEB..."*

View Comment    **Posted:** 04/20/2019    **ID:** ICEB-2018-0002-87422

*From: steven rule Sent: Wednesday, October 31, 2018 11:59:45 PM (UTC-05:00) Eastern Time (US & Canada) To: ICE Regulations Subject: Please Withdraw DHS Docket..."*

View Comment    **Posted:** 04/20/2019    **ID:** ICEB-2018-0002-77168

cited in Flores v. Barr, No. 17-56297 archived on August 12, 2019

| Home | About Us | Resources | Help | Connect With |
|---|---|---|---|---|
| Search | Rulemaking Program | Site Data | How to use Regulations.gov | |
| Advanced Search | Media Toolkit | Regulatory Agenda | FAQs | |
| Browse By Category | Agencies | Agency Reports Required by Statute | Glossary | |
| Learn | Awards & Recognition | API Overview | | ✉ Contact Us |
| | Enhancements & Fixes | Developers | | Privacy and Security Notice |
| | | | | User Notice |
| | | | | Accessibility Statement |

Partner Sites ⬈    | We the People | Federal Register | Reginfo | Congress.gov | USA.gov | E-Gov

*Participate Today!*

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 212 and 236**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Part 410**

[DHS Docket No. ICEB–2018–0002]

RIN 1653–AA75, 0970–AC42

## Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children

**AGENCY:** U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS); U.S. Citizenship and Immigration Services (USCIS), DHS; U.S. Customs and Border Protection (CBP), DHS; Office of Refugee Resettlement (ORR), Administration for Children and Families (ACF), U.S. Department of Health and Human Services (HHS).

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The U.S. Department of Homeland Security (DHS) and the Department of Health and Human Services (HHS) ("the Departments") propose to amend regulations relating to the apprehension, processing, care, custody, and release of alien juveniles. In 1985, plaintiffs in a class action lawsuit, Flores v. Reno, challenged the policies of the legacy Immigration and Naturalization Service (INS) relating to the detention, processing, and release of alien juveniles. The parties reached a settlement agreement, referred to as the *Flores* Settlement Agreement (FSA). The FSA, as modified in 2001, provides that it will terminate forty-five days after publication of final regulations implementing the agreement. The rule would adopt in regulations provisions that parallel the relevant and substantive terms of the FSA, consistent with the HSA and TVPRA, with some modifications discussed further below to reflect intervening statutory and operational changes while still providing similar substantive protections and standards. It therefore would terminate the FSA. The rule would satisfy the basic purpose of the FSA in ensuring that all juveniles in the government's custody are treated with dignity, respect, and special concern for their particular vulnerability as minors, while doing so in a manner that is workable in light of subsequent changes. The rule would also implement closely related provisions of the HSA and TVPRA.

Most prominently, the rule would create an alternative to the existing licensed program requirement for family residential centers, so that ICE may use appropriate facilities to detain family units together during their immigration proceedings, consistent with applicable law.

**DATES:** Written comments and related material must be submitted on or before November 6, 2018.

**ADDRESSES:** You may submit comments on the entirety of this proposed rule package identified by DHS Docket No. ICEB–2018–0002, by any *one* of the following methods:

• *Federal eRulemaking Portal (preferred): https://www.regulations.gov.* Follow the website instructions for submitting comments.

• *Email: ICE.Regulations@ ice.dhs.gov.* Include DHS Docket No. ICEB–2018–0002 in the subject line of the message.

• *Mail:* Debbie Seguin, Assistant Director, Office of Policy, U.S. Immigration and Customs Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536. To ensure proper handling, include DHS Docket No. ICEB–2018–0002 in your correspondence. Mail must be postmarked by the comment submission deadline.

• *Hand Delivery/Courier:* Visitor Entrance, U.S. Immigration and Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536.

*Instructions:* All comments submitted outside of the Federal eRulemaking Portal must include the docket number for this rulemaking. All comments received may be posted without change to the Federal eRulemaking Portal at *https://www.regulations.gov,* including any personal or commercial information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket:* For access to the docket to read background documents or comments received, go to *https:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Debbie Seguin, Assistant Director, Office of Policy, U.S. Immigration and Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536. Telephone 202–732–6960 (not a toll-free number).

*For HHS:* Division of Policy, Office of the Director, Office of Refugee Resettlement, Administration for Children and Families, by email at *UACPolicy@acf.hhs.gov.* Do not email comments on the proposed rule to this address. Office of Refugee Resettlement, 330 C Street SW, Washington, DC 20201. Telephone 202–401–9246.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
  A. Submitting Comments
  B. Viewing Comments and Documents
  C. Privacy Act
II. Table of Abbreviations
III. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Costs and Benefits
IV. Background and Purpose
  A. History
  B. Authority
  1. Statutory and Regulatory Authority
  2. *Flores* Settlement Agreement Implementation
  3. Recent Court Orders
  C. Basis and Purpose of Regulatory Action
  1. Need for Regulations Implementing the Relevant and Substantive Terms of the FSA
  2. Purpose of the Regulations
V. Discussion of Elements of the Proposed Rule
  A. DHS Regulations
  B. HHS Regulations
VI. Statutory and Regulatory Requirements
  A. Executive Orders 12866 and 13563: Regulatory Review
  B. Regulatory Flexibility Act
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Unfunded Mandates Reform Act of 1995
  E. Congressional Review Act
  F. Paperwork Reduction Act
  G. Executive Order 13132: Federalism
  H. Executive Order 12988: Civil Justice Reform
  I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  J. National Environmental Policy Act (NEPA)
  K. Executive Order 12630: Governmental Actions and Interference With Constitutionally Protected Property Rights
  L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  M. National Technology Transfer and Advancement Act
  N. Family Assessment
VII. List of Subjects and Regulatory Amendments

## I. Public Participation

We encourage all interested parties to participate in this rulemaking by submitting written comments, views, and data on all aspects of this proposed rule. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this proposed rule. All comments received will be posted, without change, to *https://*

*www.regulations.gov* as part of the public record and will include any personal or commercial information you provide.

*A. Submitting Comments*

All comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to the Departments will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change. If you submit comments, please indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation. As this rule is being promulgated by two Departments, it is especially helpful if your comment, and each relevant part of that comment, indicates a specific section to which it applies, or at a minimum each specific Department or Departments to which it is addressed. In this way, the comment may be better understood and distributed to the appropriate Department for response. You may submit your comments and materials online or by mail, but please use only one of these means. If you submit a comment online via *https://www.regulations.gov*, it will be considered received when it is received at the Docket Management Facility.

*Instructions:* To submit your comments online, go to *https://www.regulations.gov*, and insert ''ICEB–2018–0002'' in the ''Search'' box. Click on the ''Comment Now!'' box and input your comment in the text box provided. Click the ''Continue'' box, and if you are satisfied with your comment, follow the prompts to submit it. If you submit your comments by mail, you must include DHS Docket No. ICEB–2018–0002, and submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic scanning and filing. If you submit comments by mail and would like to know that they reached the facility, please enclose a stamped, self-addressed postcard or envelope.

Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov*, and will include any personal or commercial information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal or commercial information that you provide in any voluntary public comment submission you make to the

Departments. The Departments may withhold information provided in comments from public viewing that is determined may impact the privacy of an individual or is offensive. For additional information, please read the ''Privacy and Security Notice'' that is available via the link in the footer of *https://www.regulations.gov*.

We will consider all comments and materials received during the comment period and may change this rule based on your comments.

**Note:** The Departments will only consider comments timely submitted to the docket for this rulemaking. In light of the period of time that has elapsed since the 1998 DOJ proposed rule on this topic, the Departments have established a new docket for this rulemaking. Comments submitted to the Departments on this topic prior to opening of the docket for this proposed rule will *not* be incorporated into the docket for this rulemaking; commenters should resubmit those comments, with necessary updates, as appropriate.

*B. Viewing Comments and Documents*

*Docket:* To view comments, as well as documents mentioned in this preamble as being available in the docket, go to *https://www.regulations.gov* and insert ''ICEB–2018–0002'' in the ''Search'' box. Click on the ''Open Docket Folder,'' and you can click on ''View Comment'' or ''View All'' under the ''Comments'' section of the page. Individuals without internet access can make alternate arrangements for viewing comments and documents related to this rulemaking by contacting ICE through the **FOR FURTHER INFORMATION CONTACT** section above. *You may also sign up for email alerts on the online docket to be notified when comments are posted or a final rule is published.*

*C. Privacy Act*

As stated in the Submitting Comments section above, please be aware that anyone can search the electronic form of comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.).

**II. Table of Abbreviations**

ACF—Administration for Children and Families
BPA—U.S. Border Patrol Agent
CBP—U.S. Customs and Border Protection
CBPO—U.S. Customs and Border Protection Officer
DHS—U.S. Department of Homeland Security
DOJ—U.S. Department of Justice
EOIR—Executive Office for Immigration Review

FRC—Family Residential Center
FSA—*Flores* Settlement Agreement
HHS—U.S. Department of Health and Human Services
HSA—Homeland Security Act of 2002
ICE—U.S. Immigration and Customs Enforcement
IIRIRA—Illegal Immigration Reform and Immigrant Responsibility Act of 1996
INA—Immigration and Nationality Act
INS—Immigration and Naturalization Service
JFRMU—Juvenile and Family Residential Management Unit
OFO—U.S. Customs and Border Protection, Office of Field Operations
OMB—Office of Management and Budget
ORR—Office of Refugee Resettlement, U.S. Department of Health and Human Services
TVPRA—William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UAC(s)—Unaccompanied Alien Child(ren)
USCIS—U.S. Citizenship and Immigration Services
USBP—U.S. Border Patrol, U.S. Customs and Border Protection

**III. Executive Summary**

*A. Purpose of the Regulatory Action*

This rulemaking would implement the relevant and substantive terms of the *Flores* Settlement Agreement (FSA), with such limited changes as are necessary to implement closely-related provisions of the Homeland Security Act of 2002 (HSA), Public Law 107–296, sec. 462, 116 Stat. 2135, 2202, and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110–457, title II, subtitle D, 122 Stat. 5044. The proposed regulations would take account of certain changed circumstances, ensure that the regulations accomplish a sound and proper implementation of governing federal statutes, and set forth a sustainable operational model of immigration enforcement. For example, one operational shift under the FSA has been the extension of the agreement to apply to accompanied minors, *i.e.,* juveniles who arrive at the border with their parents or legal guardians. That has created a series of operational difficulties, most notably with respect to a state-licensing requirement for a family residential center (FRC) in which such parents/legal guardians and children may be placed during immigration proceedings. Additionally, changes to the operational environment since 1997, as well as the enactment of the HSA and the TVPRA, have rendered some of the substantive terms of the FSA outdated, similarly making compliance with the HSA, the TVPRA, other immigration laws, and the FSA problematic without some modification of the literal text of the FSA. These provisions are designed, however, so that they still implement the substantive

and underlying purpose of the FSA, by ensuring that juveniles are provided materially identical protections as under the FSA itself. Therefore, the Departments are proposing these regulations to allow the public to comment on our proposed framework for compliance with the FSA, consistent with current law.

From a practical perspective, one of the most important changes from the literal text of the FSA would be the licensing requirement that applies to programs in which minors may be detained during immigration proceedings. Under the FSA, such facilities must be licensed "by an appropriate State agency . . . for dependent children." FSA paragraph 6. That requirement is sensible for unaccompanied alien children, because all States have licensing schemes for the housing of unaccompanied juveniles who are by definition "dependent children," and accordingly the rule would not change that requirement for those juveniles. But the need for the license to come specifically from a "state agency" (rather than a federal agency) is problematic now that the FSA has been held to apply to accompanied minors, including those held at FRCs, because States generally do not have licensing schemes for facilities to hold minors who are together with their parents or legal guardians, and therefore are by definition not "dependent children." The application of the FSA's requirement for "state" licensing to accompanied minors can effectively require DHS to release minors from detention in a non-state-licensed facility even if the parent/legal guardian and child would otherwise continue to be detained together during their removal proceedings, consistent with applicable law. The rule here would eliminate that barrier to the continued use of FRCs, by creating an alternative federal licensing scheme for such facilities. The goal is to provide materially identical assurances about the conditions of such facilities, and thus to implement the underlying purpose of the FSA's licensing requirement, and in turn to allow families to remain together during their immigration proceedings.

### B. Legal Authority

The Secretary of Homeland Security derives her authority to promulgate these proposed regulatory amendments primarily from the Immigration and Nationality Act (INA or Act), as amended, 8 U.S.C. 1101 *et seq.* The Secretary may "establish such regulations" as she deems necessary for carrying out her authorities under the INA. INA sec. 103(a)(3), 8 U.S.C.

1103(a)(3). In addition, section 462 of the HSA and section 235 of the TVPRA prescribe substantive requirements and procedural safeguards to be implemented by DHS and HHS with respect to unaccompanied alien children (UACs). There have also been a series of court decisions arising out of the FSA. *See, e.g., Flores* v. *Sessions,* 862 F.3d 863 (9th Cir. 2017); *Flores* v. *Lynch,* 828 F.3d 898 (9th Cir. 2016); *Flores* v. *Sessions,* No. 2:85–cv–04544 (C.D. Cal. June 27, 2017).

Section 462 of the HSA also transferred to the Office of Refugee Resettlement (ORR) Director "functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization." 6 U.S.C. 279(a). The ORR Director may, for purposes of performing a function transferred by this section, "exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function" immediately before the transfer of the program. 6 U.S.C. 279(f)(1).

Consistent with provisions in the HSA, the TVPRA places the responsibility for the care and custody of UACs who are not eligible to be repatriated to a contiguous country with the Secretary of Health and Human Services.[1] Prior to the transfer of the program, the Commissioner of Immigration and Naturalization, through a delegation from the Attorney General, had authority "to establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of this Act." INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3) (2002); 8 CFR 2.1 (2002). In accordance with the relevant savings and transfer provisions of the HSA, *see* 6 U.S.C. 279, 552, 557; *see also* 8 U.S.C. 1232(b)(1), the ORR Director now possesses the authority to promulgate regulations concerning ORR's administration of its responsibilities under the HSA and TVPRA, and the FSA at paragraph 40, as well, specifically envisions promulgation of such regulations.

### C. Costs and Benefits

This proposed rule would implement the FSA by putting in regulatory form measures that materially parallel its standards and protections, and also by

codifying the current requirements for complying with the FSA, the HSA, and TVPRA. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) encounter minors and UACs in different manners. CBP generally encounters UACs and minors at the border. In Fiscal Year (FY) 2017, CBP apprehended 113,920 juveniles.[2] Generally, ICE encounters minors either upon transfer from CBP to a family residential center (FRC), or during interior enforcement actions. In FY 2017, 37,825 family members were booked into ICE's three FRCs, 20,606 of whom were minors. ICE generally encounters UACs when it transports UACs who are transferred out of CBP custody to ORR custody, as well as during interior enforcement actions.

The Departments consider their current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA to be the baseline for the analysis of costs and benefits. DHS already incurs the costs for these operations; therefore, they are not costs of this proposed rule. A primary source of new costs for the proposed rule would be a result of the proposed alternative licensing process, which would allow ICE to continue detaining some minors along with their accompanying parent or legal guardian in FRCs. ICE also is proposing changes to its current practice for parole determinations to align them with applicable statutory and regulatory authority, which may result in fewer minors or their accompanying parent or legal guardian released on parole. These changes may increase variable annual FRC costs paid by ICE. While DHS acknowledges that this rule may result in additional or longer detention for certain minors, DHS is unsure how many individuals will be detained at FRCs after this rule is effective or for how much longer individuals may be detained because there are so many other variables to consider. Therefore, DHS is unable to provide a quantified estimate of any increased FRC costs. DHS is also unable to provide an estimate of the cost of any increased detention on the individuals being detained. HHS does not anticipate significant new costs associated with this rule, although it will assume some costs from the Department of Justice related to hearings for UACs, with potential associated start-up costs.

---

[1] Some UACs from contiguous countries may be permitted to withdraw their application for admission and be repatriated. These UACs are not referred to HHS. 8 U.S.C. 1232(a)(2).

[2] Throughout this Notice of Proposed Rulemaking, the Departments generally use the term "juvenile" to refer to any alien under the age of 18. For further explanation, see below for discussion of the terms "juvenile," "minor," and "unaccompanied alien child (UAC)."

Retrieved from Flores v. USA on August 2019

The primary benefit of the proposed rule would be to implement the FSA in regulations, and in turn to terminate the agreement as contemplated by the FSA itself. The result would be to provide for the sound administration of the detention and custody of alien minors and UACs to be carried out fully, pursuant to the INA, HSA, TVPRA, and existing regulations issued by the Departments responsible for administering those statutes, rather than partially carried out via a decades-old settlement agreement. The rule would ensure that applicable regulations reflect the Departments' current operations with respect to minors and UACs in accordance with the relevant and substantive terms of the FSA and the TVPRA, as well as the INA. Further, by modifying the literal text of the FSA in limited cases to reflect and respond to intervening statutory and operational changes, DHS will ensure that it retains discretion to detain families, as appropriate and pursuant to its statutory and regulatory authorities, to meet its enforcement needs, but while still providing similar protections to minors. HHS was not an original party to the FSA and instead inherited administration of some of its provisions. The proposed rule similarly benefit HHS as it clearly delineates ORR's responsibilities from that of other Federal partners. Additionally, the proposed implementation of the FSA's substantive provisions, specifically the minimum standards for licensed facilities and the release process, would provide clear standards for the program's network of state licensed facilities.

## IV. Background and Purpose

### A. History

Prior to the enactment of the HSA, the Attorney General and the legacy INS had the primary authority to administer and enforce the immigration laws. In the period leading up to the *Flores* litigation in the mid-1980s, the general nationwide INS policy, based on regulations promulgated in 1963 and the Juvenile Justice and Delinquency Prevention Act of 1974, was that alien juveniles could petition an immigration judge for release from INS custody if an order of deportation was not final. *See Reno* v. *Flores*, 507 U.S. 292, 324–25 (1993). In 1984, the Western Region of the INS implemented a different release policy for juveniles, and the INS later adopted that policy nationwide. Under that policy, juveniles could only be released to a parent or a legal guardian. The rationale for the policy was two-fold: (1) To protect the juvenile's

welfare and safety, and (2) to shield the INS from possible legal liability. The policy allowed alien juveniles to be released to other adults only in unusual and extraordinary cases at the discretion of the District Director or Chief Patrol Agent. *See Flores* v. *Meese*, 942 F.2d 1352 (9th Cir. 1991) (en banc).

On July 11, 1985, four alien juveniles filed a class action lawsuit in the U.S. District Court for the Central District of California, *Flores* v. *Meese*, No. 85–4544 (C.D. Cal. filed July 11, 1985). The case "ar[ose] out of the INS's efforts to deal with the growing number of alien children entering the United States by themselves or without their parents (unaccompanied alien minors)." *Flores* v. *Meese*, 934 F.2d 991, 993 (9th Cir. 1990). The class was defined to consist of "all persons under the age of eighteen (18) years who have been, are, or will be arrested and detained pursuant to 8 U.S.C. 1252 by the INS within the INS' Western Region and who have been, are, or will be denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them." *Id.* at 994.). The *Flores* litigation challenged "(a) the [INS] policy to condition juveniles' release on bail on their parents' or legal guardians' surrendering to INS agents for interrogation and deportation; (b) the procedures employed by the INS in imposing a condition on juveniles' bail that their parents' or legal guardians' [sic] surrender to INS agents for interrogation and deportation; and (c) the conditions maintained by the INS in facilities where juveniles are incarcerated." *See Flores* Compl. paragraph 1. The plaintiffs claimed that the INS's release and bond practices and policies violated, among other things, the INA, the Administrative Procedure Act, and the Due Process Clause and Equal Protection Guarantee under the Fifth Amendment. *See id.* paragraphs 66–69.

Prior to a ruling on any of the issues, on November 30, 1987, the parties entered into a Memorandum of Understanding (MOU) on the conditions of detention. The MOU stated that minors in INS custody for more than 72 hours following arrest would be housed in facilities that met or exceeded the standards set forth in the April 29, 1987, U.S. Department of Justice Notice of Funding in the **Federal Register** and in the document "Alien Minors Shelter Care Program—Description and Requirements." *See* Notice of Availability of Funding for Cooperative Agreements; Shelter Care and Other Related Services to Alien Minors, 52 FR 15569, 15570 (Apr. 29, 1987). The Notice provided that eligible grant

applicants for the funding described in the Notice included organizations that were "appropriately licensed or can expeditiously meet applicable state licensing requirements for the provision of shelter care, foster care, group care and other related services to dependent children . . . ." *Id.*

At approximately the same time that the MOU was executed, the INS published a proposed rule on the Detention and Release of Juveniles to amend 8 CFR parts 212 and 242. *See* 52 FR 38245 (Oct. 15, 1987). The stated purpose of the rule was "to codify the [INS] policy regarding detention and release of juvenile aliens and to provide a single policy for juveniles in both deportation and exclusion proceedings." The INS issued a final rule in May 1988. 53 FR 17449 (May 17, 1988). The rule provided for release to a parent, guardian, or other relative, and discretionary release to other adults. *See* 53 FR at 17451. It also provided that when adults are in detention, INS would consider release of the adult and parent. *Id.*

On May 24, 1988, the district court where the original *Flores* case was filed held that the recently codified INS regulation, 8 CFR 242.24 (1988), governing the release of detained alien minors, violated substantive due process, and ordered modifications to the regulation. The district court also held that INS release and bond procedures for detained minors in deportation proceedings fell short of the requirements of procedural due process, and therefore ordered the INS "forthwith" to provide to any minor in custody an "administrative hearing to determine probable cause for his arrest and the need for any restrictions placed upon his release." *Flores* v. *Meese*, 934 F.2d 991, 993 (9th Cir. 1990) (quoting the district court). The INS appealed, and the Ninth Circuit reversed the district court's holdings that the INS exceeded its statutory authority in promulgating 8 CFR 242.24 and that the regulation violated substantive due process. The Ninth Circuit also reversed the district court's procedural due process holding, identified the legal standard that the district court should have applied, and remanded the issue for the district court to further explore the issue. *Id.* at 1013. On rehearing en banc, however, the Ninth Circuit vacated the original panel's opinion, affirmed the district court's holding, and held that INS's regulation was invalid because the regulation violated the alien child's due process and habeas corpus rights, and detention where the alien child was otherwise eligible for release on bond or recognizance to a custodian

served no legitimate purpose of the INS. *Flores* v. *Meese,* 942 F.2d 1352 (9th Cir. 1991) (en banc) (''The district court correctly held that the blanket detention policy is unlawful. The district court's order appropriately requires children to be released to a responsible adult where no relative or legal guardian is available, and mandates a hearing before an immigration judge for the determination of the terms and conditions of release.'').

The INS appealed, and in 1993, the U.S. Supreme Court rejected Plaintiffs' facial challenge to the constitutionality of the INS's regulation concerning the care of alien juveniles. *Reno* v. *Flores,* 507 U.S. 292 (1993). The Supreme Court held that the regulations did not violate any substantive or procedural due process rights or equal protection principles. *Id.* at 306, 309. According to the Court, the regulations did not exceed the scope of the Attorney General's discretion under the INA to continue custody over arrested aliens, because the challenged regulations rationally pursued the lawful purpose of protecting the welfare of such juveniles. *Id.* at 315.

The regulations promulgated in 1988 have remained in effect since publication, but were moved to 8 CFR 236.3 in 1997. *See* 62 FR 10312, 10360 (Mar. 6, 1997). They were amended in 2002 when the authority to decide issues concerning the detention and release of juveniles was moved to the Director of the Office of Juvenile Affairs from the District Directors and Chief Patrol Agents. *See* 67 FR 39255, 39258 (June 7, 2002).

The Supreme Court decision in *Reno* v. *Flores* only resolved one of the issues in the case. The district court approved the FSA on January 28, 1997. In 1998, the INS published a proposed rule having a basis in the substantive terms of the FSA, entitled Processing, Detention, and Release of Juveniles. *See* 63 FR 39759 (July 24, 1998). In 2001 the parties added a stipulation in the FSA, which terminates the FSA ''45 days following defendants' publication of final regulations implementing t[he] Agreement.'' Stipulated Settlement Agreement paragraph 40 [hereinafter FSA], *Flores* v. *Reno,* No. CV 85–4544– RJK(Px) (C.D. Cal. Dec. 7, 2001). In January 2002, the INS reopened the comment period on the 1998 proposed rule, 67 FR 1670 (Jan. 14, 2002), but the rulemaking was ultimately abandoned. The U.S. District Court for the Central District of California has continued to rule on various motions filed in the case and oversee enforcement of the MOU and later the FSA.

Whereas only one Department was involved in the creation of the FSA,

three Departments now implement the FSA's substantive terms. After the 2001 Stipulation, Congress enacted the HSA and the TVPRA, both of which impact the treatment of alien juveniles. Among other changes, the HSA created DHS and, along with the TVPRA, transferred the functions under the immigration laws with respect to the care and then custody of UACs referred by other Federal agencies to HHS ORR. The TVPRA also further regulated the Departments' respective roles with respect to UACs. *See* 6 U.S.C. 111(a), 279; 8 U.S.C. 1232(b)(1).

To summarize those roles under the current statutory framework: DHS apprehends, provides care and custody for, transfers, and removes alien minors; DHS apprehends, transfers, and removes UACs; and ORR provides for care and custody of UACs who are in federal custody (other than those permitted to withdraw their application for admission) referred to ORR by other Departments. DHS and HHS are therefore now proposing to issue regulations implementing the relevant and substantive terms of the FSA, consistent with the HSA and TVPRA, and in turn to terminate the FSA.

### B. Authority

#### 1. Statutory and Regulatory Authority

a. Immigration and Nationality Act and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

The INA, as amended, provides the primary authority for DHS to detain certain aliens for violations of the immigration laws. Congress expanded legacy INS's detention authority in IIRIRA, Public Law 104–208, 110 Stat. 3009. In that legislation, Congress amended the INA by providing that certain aliens were subject to either mandatory or discretionary detention by the INS. This authorization flowed to DHS after the reorganization under the HSA. Specifically, DHS's authority to detain certain aliens comes from sections 235, 236, and 241 of the INA, 8 U.S.C. 1225, 1226, and 1231. Section 235 of the INA, 8 U.S.C. 1225, provides that applicants for admission to the United States, including those subject to expedited removal, shall be detained during their removal proceedings, although such aliens may be released on parole in limited circumstances, consistent with the statutory standard set forth in 8 U.S.C. 1182(d)(5) and standards set forth in the regulations. Section 236 of the INA, 8 U.S.C. 1226, provides the authority to arrest and detain an alien pending a decision on whether the alien is to be removed from the United States, and section 241, 8

U.S.C. 1231, authorizes the detention of aliens during the period following the issuance of a final order of removal. Other provisions of the INA also mandate detention of certain classes of individuals, such as criminal aliens.

b. Homeland Security Act of 2002

As noted, the HSA, Public Law 107– 296, 116 Stat. 2135, transferred most of the functions of the INS from DOJ to the newly-created DHS. DHS and its various components are responsible for border security, interior immigration enforcement, and immigration benefits adjudication, among other duties. DOJ's EOIR retained its pre-existing functions relating to the immigration and naturalization of aliens, including conducting removal proceedings and adjudicating defensive filings of asylum claims.

The functions regarding care of UACs were transferred from the INS to ORR. The HSA states ORR shall be responsible to coordinate and implement the care and placement of UACs who are in Federal custody by reason of their immigration status. ORR was also tasked with identifying a sufficient number of qualified individuals, entities, and facilities to house UACs, and with ensuring that the interests of the child are considered in decisions and actions relating to his or her care and custody.

c. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008

Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110–457, Title II, Subtitle D, 122 Stat. 5044 (codified in principal part at 8 U.S.C. 1232), then stated that consistent with the HSA, and except as otherwise provided with respect to certain UAC from contiguous countries (*see* 8 U.S.C. 1232(a)), the care and custody of all UAC, including responsibility for their detention, where appropriate, shall be the responsibility of HHS. The TVPRA, among other things, requires federal agencies to notify HHS within 48 hours of apprehending or discovering a UAC, or receiving a claim or having suspicion that an alien in their custody is an unaccompanied minor under 18 years of age. 8 U.S.C. 1232(b)(2). The TVPRA further requires that, absent exceptional circumstances, any federal agency transfer a UAC to the care and custody of HHS within 72 hours of determining that an alien in its custody is a UAC. 8 U.S.C. 1232(b)(3).

The Secretary of HHS delegated the authority under the TVPRA to the

Assistant Secretary for Children and Families, 74 FR 14564 (2009), who in turn delegated the authority to the ORR Director, 74 FR 1232 (2009).

2. *Flores* Settlement Agreement Implementation

As discussed above, in 1996 the U.S. Government and *Flores* plaintiffs entered into the FSA to resolve nationwide the ongoing litigation concerning the INS's detention regulations for alien minors. The FSA was executed on behalf of the Government on September 16, 1996. The U.S. District Court for the Central District of California approved the FSA on January 28, 1997. The FSA became effective upon its approval by the district court, and provided for continued oversight by that court.

Paragraph 9 of the FSA explains its purpose: To establish a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." Paragraph 4 defines a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS," but the definition excludes minors who have been emancipated or incarcerated due to a criminal conviction as an adult. The FSA established procedures and conditions for processing, transportation, and detention following apprehension, and set forth the procedures and practices that the parties agreed should govern the INS's discretionary decisions to release or detain minors and to whom they should or may be released.

The FSA was originally set to expire within five years, but on December 7, 2001, the Parties agreed to a termination date of "45 days following defendants' publication of final regulations implementing this Agreement." A copy of the FSA and the 2001 Stipulation is available in the docket for this rulemaking. The primary purpose of the regulations is to "implement[] the Agreement," and in turn to terminate the FSA.

3. Recent Court Orders
a. Motion To Enforce I

On January 26, 2004, Plaintiffs filed their first motion to enforce the agreement, alleging, among other things, that CBP and ICE: (1) Regularly failed to release class members [3] to caregivers other than parents when parents refuse to appear; (2) routinely failed to place detained class members in the least restrictive setting; (3) failed to provide

class members adequate education and mental health services, and (4) exposed class members to dangerous and unhealthy conditions. Ultimately, after a lengthy discovery process in which the government provided Plaintiffs numerous documents related to the government's compliance with the FSA, Plaintiffs filed a Notice of Withdrawal of Motion to Enforce Settlement on November 14, 2005. The court dismissed the matter on May 10, 2006.

b. Motion To Enforce II

On February 2, 2015, Plaintiffs filed a second motion to enforce the agreement, alleging that CBP and ICE were in violation of the FSA because: (1) ICE's supposed no-release policy—*i.e.,* an alleged policy of detaining all female-headed families, including children, for as long as it takes to determine whether they are entitled to remain in the United States—violated the FSA; (2) ICE's routine confinement of class members in secure, unlicensed facilities breached the Agreement; and (3) CBP exposed class members to harsh and substandard conditions, in violation of the Agreement.

On July 24, 2015, the district court granted Plaintiffs' second motion to enforce and denied Defendant DHS's contemporaneous motion to modify the agreement. *Flores* v. *Johnson,* 212 F. Supp. 3d 864 (C.D. Cal. 2015). The court found: (1) The FSA applied to all alien minors in government custody, including those accompanied by their parents or legal guardians; (2) ICE's blanket no-release policy with respect to minors accompanied by their mothers was a material breach of the FSA; (3) the FSA requires Defendant DHS to release minors with their accompanying parent or legal guardian unless this would create a significant flight risk or a safety risk; (4) DHS housing minors in secure and non-licensed FRCs violated the FSA; and (5) CBP violated the FSA by holding minors and UACs in facilities that were not safe and sanitary. *Id.*

On August 21, 2015, the court denied the Government's motion to reconsider and issued a subsequent remedial order for DHS to implement six remedies. *Flores* v. *Lynch,* 212 F. Supp. 3d 907 (C.D. Cal. 2015). In the decision, the court clarified that, as provided in FSA paragraph 12(A), in the event of an emergency or influx, DHS need not transfer minors to a "licensed program" pursuant to the 3- and 5-day requirements of paragraph 12(A), but must transfer such minors "as expeditiously as possible." In the decision, the court referenced the Government's assertion that DHS, on average, would detain minors who are

not UACs for 20 days—the general length of time required to complete credible and reasonable fear processing at that time for aliens in expedited removal. The court agreed that if 20 days was "as fast as [the Government] . . . can possibly go," the Government's practice of holding accompanied minors in its FRCs, even if not "licensed" and "non-secure" per FSA paragraph 19, may be within the parameters of FSA paragraph 12(A). *Id.* at 914. In a decision issued on July 6, 2016, the Ninth Circuit agreed with the district court that during an emergency or influx, minors must be transferred "as expeditiously as possible" to a non-secure, licensed facility. *Flores* v. *Lynch,* 828 F.3d. 898, 902–03 (9th Cir. 2016). The Ninth Circuit affirmed the district court's holding that the FSA "unambiguously" applies to all alien minors and UACs in government custody [4] and concluded the district court did not abuse its discretion in denying the Government's motion to modify the FSA. The Ninth Circuit, however, reversed the district court's determination that the FSA required the release of accompanying parents. *Id.*

c. Motion To Enforce III

On May 17, 2016, plaintiffs filed a third motion to enforce the agreement, claiming that DHS continued to violate the agreement by: (1) Holding class members in CBP facilities that did not meet the requirements of the FSA; (2) failing to advise class members of their rights under the FSA; (3) making no efforts to release or reunify class members with family members; (4) holding class members routinely with unrelated adults; (5) detaining class members for weeks or months in secure, unlicensed facilities in violation of the FSA; and (6) interfering with class members' right to counsel. The Government filed a response on June 3, 2016.

On June 27, 2017, the district court issued an opinion concluding that ICE had not complied with the FSA because it had failed to advise class members of their rights under the FSA, failed to make continuous efforts to release class

---

[3] In this context, "class members" means minors (as defined in the FSA), including both UACs and accompanied minors.

[4] DHS continues to maintain that the terms of the FSA were intended to apply only to those alien children who were unaccompanied. In its brief opposing the Plaintiffs' Motion to Enforce II, DHS pointed out that the FSA was entered into for the purpose of settling a lawsuit challenging the constitutionality of the Government's policies, practices, and regulations regarding the detention and release of unaccompanied minors. *See* Def.'s Resp. in Opp'n to Mot. To Enforce Settlement of Class Action at 11, *Flores* v. *Lynch,* 212 F. Supp. 3d 907 (C.D. Cal. 2015) (No. CV 58–4544). This proposed rule, however, covers both accompanied and unaccompanied minors.

members, and failed to release class members as required by FSA paragraphs 12(A) and 14. The Court also found that FRCs were unlicensed and secure. *Flores* v. *Sessions,* No. 2:85–cv–04544 (C.D. Cal. June 27, 2017). The district court, however, rejected the claims that ICE had impermissibly detained class members with unrelated adults and interfered with class members' right to counsel.

The district court also concluded that CBP acted in violation of the FSA in the Rio Grande Valley Border Patrol Sector. The court pointed to allegations that CBP failed to provide class members adequate access to food and water, detained class members in conditions that were not safe and sanitary, and failed to keep the temperature of the holding cells within a reasonable range. The court ordered the appointment of a Juvenile Coordinator for ICE and CBP, responsible for monitoring the agencies' compliance with the Agreement. The Government's appeal of that decision remains pending. *See Flores* v. *Sessions,* No. 17–56297 (9th Cir.) (docketed Aug. 28, 2017). On July 27, 2018, the district court ordered the appointment of an independent monitor to oversee compliance with the June 27, 2017 Order.

### d. Motion To Enforce IV

On August 12, 2016, Plaintiffs filed a fourth motion to enforce the agreement, claiming that ORR violated the agreement by failing to provide UACs in ORR custody with a bond redetermination hearing by an immigration judge. The Government argued that the HSA and the TVPRA effectively superseded the FSA's bond-hearing requirement with respect to UACs, that only HHS could determine the suitability of a sponsor (thus determining release), and that immigration judges lacked jurisdiction over UACs in ORR custody. The district court agreed that only HHS could determine the suitability of a sponsor, but disagreed that subsequent laws fully superseded the FSA.

On January 20, 2017, the court found that HHS breached the FSA by denying UACs the right to a bond hearing as provided for in the FSA. *Flores* v. *Lynch,* No. 2:85–cv–04544, 2017 WL 6049373 (C.D. Cal. Jan. 20, 2017). The Government appealed to the Ninth Circuit. On July 5, 2017, the Ninth Circuit affirmed the district court's ruling. The Ninth Circuit reasoned that if Congress had intended to terminate the settlement agreement in whole or in part through passage of the HSA or TVPRA, it would have said so specifically. *Flores* v. *Sessions,* 862 F.3d 863 (9th Cir. 2017). The Government did not seek further review of this decision.

### e. Motion To Enforce V

On April 16, 2018, Plaintiffs filed a fifth motion to enforce the agreement, claiming ORR unlawfully denied class members licensed placements, unlawfully medicated youth without parental authorization, and peremptorily extended minors' detention on suspicion that available custodians may be unfit. On July 30, 2018, the district court issued an Order. *Flores* v. *Sessions,* 2:85–cv–04544– DMG–AGR (ECF No. 470, Jul. 30, 2018).[5] The Order discussed the Shiloh Residential Treatment Center and placement therein, as well as informed consent for psychotropic drugs in such Center; placement in secure facilities; notice of placement in secure and staff-secure facilities; Director-level review of children previously placed in secure or staff-secure facilities and other issues. Readers should refer to the full Order for details.

### f. Motion for Relief

On June 21, 2018, in accordance with the President's June 20, 2018, Executive Order ''Affording Congress an Opportunity to Address Family Separation,'' the Government sought limited emergency relief from two provisions of the FSA—the release provision of Paragraph 14, as well as the licensing requirements of Paragraph 19. This relief was sought in order to permit DHS to detain alien family units together for the pendency of their immigration proceedings. The court denied this motion on July 9, 2018.

This Motion to Modify sought relief consistent with this proposed rule, although this rule includes some affirmative proposals (like the federal-licensing regime) that were not at issue in that motion. For example, as discussed below, by creating a federal licensing scheme for FRCs, the proposed rule would eliminate a barrier to keeping family units in detention during their immigration proceedings, consistent with all applicable law while still providing similar substantive protections to minors.[6]

### C. Basis and Purpose of Regulatory Action

### 1. Need for Regulations Implementing the Relevant and Substantive Terms of the FSA

Under the requirements of the FSA, when DHS apprehends an alien parent or legal guardian with his or her child(ren) either illegally entering the United States between the ports of entry or found inadmissible at a port of entry, it has, following initiation of removal proceedings, three primary options for purposes of immigration custody: (1) Parole all family members into the United States; (2) detain the parent(s) or legal guardian(s) and either release the juvenile to another parent or legal guardian or transfer them to HHS to be treated as an UAC; or (3) detain the family unit together by placing them at an appropriate FRC during their immigration proceedings. The practical implications of the FSA, including the lack of state licensing for FRCs, have effectively prevented the Government from using the third option for more than a limited period of time. This rule would, when finalized, eliminate that barrier and allow for the full range of options at each stage of proceedings.

On June 20, 2018, the President issued Executive Order 13841 specifying that ''[i]t is . . . the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources.'' E.O. 13841 sec. 1, 83 FR 29435. The President further provided that the Secretary of Homeland Security (Secretary), shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any . . . immigration proceedings involving their members.'' *Id.* sec. 3. The President further directed agency components to make available additional facilities for housing families. *Id.* sec. 3(c), (d). And the President provided that the Attorney General ''shall, to the extent practicable, prioritize the adjudication of cases involving detained families.'' *Id.* sec. 4.

There are several advantages to maintaining family unity during immigration proceedings. Those include the interest in the child being with and under the considerate care of the parent, the strong interest parents have in caring for their children, the guidance parents can provide to children during immigration proceedings and the manner in which keeping families together facilitates communications among family members, the consolidation of the family members'

---

[5] The Department of Justice has not yet decided whether to appeal the July 30 order.

[6] At the time of the publication of this proposed rule, the issue of family separation and reunification is the subject of litigation in multiple jurisdictions. This proposed rule is not intended to directly address matters related to that litigation. A significant purpose of the proposed rule with regard to accompanied minors is to allow decisions regarding the detention of families to be made together as a unit, under a single legal regime, and without having a disparate legal regime applicable to the parent versus the child.

Cited in Flores v. Barr (9th Cir.), decided on August 15, 2019

removal proceedings, and to facilitate the physical removal of a family together as a unit if immigration relief is unavailable. But the practical implications of the FSA, and in particular the lack of state licensing for FRCs and the release requirements for minors, have effectively prevented the Government from using family detention for more than a limited period of time, and in turn often led to the release of families. That combination of factors may create a powerful incentive for adults to bring juveniles on the dangerous journey to the United States and then put them in further danger by illegally crossing the United States border—in the hope, whether correct or not, that having a juvenile will result in an immediate release into the United States. At the same time, the second choice—that of separating family members so the adult may be held in detention pending immigration proceedings—is to be avoided when possible, and has generated significant litigation. *See Ms. L* v. *ICE,* No. 18–428 (S.D. Cal.).

This rule serves to clear the way for the sensible use of family residential centers when it is lawful and appropriate. In particular, it would create a federal licensing process to resolve the current problem caused by a state-licensing requirement that is ill-suited to family detention, and it would allow for compatible treatment of a family unit in immigration custody or proceedings by eliminating barriers to that compatibility imposed by the FSA. Further, it would eliminate the disparate legal regime that currently applies to decisions to detain a family unit, with one regime applying to the minor (the FSA, including the state-licensing requirement and release provisions under FSA paragraph 14) and another regime applying to the parent (the existing statutes and regulations governing release on bond or parole under the relevant circumstances). That disparate regime creates problems for maintaining family unity while also enforcing the immigration laws. Instead, the proposed rule would ensure that a single regime applies to the family unit, namely, the existing statutes and regulations governing release on bond or parole.

This rule would allow for detention at FRCs for the pendency of immigration proceedings (subject to all applicable statutes and regulations governing their detention or release) in order to permit families to be detained together and parents not be separated from their children. It is important that family detention be a viable option not only for the numerous benefits that family unity

provides for both the family and the administration of the INA, but also due to the significant and ongoing influx of adults who have made the choice to enter the United States illegally with juveniles or make the dangerous overland journey to the border with juveniles, a practice that puts juveniles at significant risk of harm. The expectation that adults with juveniles will remain in the United States outside of immigration detention may incentivize these risky practices.

In the summer of 2014, an unprecedented number of family units from Central America illegally entered or were found inadmissible to the United States. In Fiscal Year 2013, the total number of family units apprehended entering the United States illegally on the Southwest Border was 14,855. By Fiscal Year 2014, that figure had increased to 68,445. *See https:// www.cbp.gov/sites/default/files/assets/ documents/2017-Dec/BP%20Total %20Monthly%20Family%20Units %20by%20Sector%2C%20FY13- FY17.pdf.*

TABLE 1—FAMILY UNIT APPREHEN-SIONS AT THE SOUTHWEST BORDER BY FISCAL YEAR [7]

| Fiscal Year | Family unit apprehensions at the Southwest Border |
| --- | --- |
| 2013 | 14,855 |
| 2014 | 68,445 |
| 2015 | 39,838 |
| 2016 | 77,674 |
| 2017 | 75,622 |
| 2018 * | 77,802 |

*Partial year data for FY 2018; does not include August and September.

Prior to 2014, the only option available to the Government for the large majority of family units entering the United States was the first option described above—*i.e.,* to issue the family a Notice to Appear and release the alien family to temporarily remain in the United States pending their removal proceedings. Thus, when an unprecedented number of families decided to undertake the dangerous journey to the United States in 2014, DHS officials faced an urgent humanitarian situation. DHS encountered numerous alien families and juveniles who were hungry, thirsty,

exhausted, scared, vulnerable, and at times in need of medical attention, with some also having been beaten, starved, sexually assaulted or worse during their journey to the United States.

DHS mounted a multi-pronged response to this situation. As one part of this response, DHS placed families at existing FRCs and oversaw the construction of appropriate facilities to detain family units together, in a safe and humane environment, during the pendency of their immigration proceedings, which typically involved expedited removal. Although it is difficult to definitively prove a causal link given the many factors that influence migration, DHS's assessment is that this change helped stem the border crisis, as it correlated with a significant drop in family migration: Family unit apprehensions on the Southwest Border dropped from 68,445 in Fiscal Year 2014 to 39,838 in Fiscal Year 2015.

Although the border crisis prompted DHS to hold family units together, DHS quickly faced legal challenges asserting that the FSA applied to accompanied minors and that family detention did not comply with the provisions of the FSA. In July 2015, a federal court rejected the Government's interpretation of the FSA to permit family residential centers, and declined to modify the FSA to allow DHS to address this significant influx of family units crossing the border and permit family detention. *See Flores* v. *Lynch,* 828 F.3d 898, 909–10 (9th Cir. 2016). The Government had explained to the court that doing so would "mak[e] it impossible for ICE to house families at ICE [FRCs], and to instead require ICE to separate accompanied children from their parents or legal guardians." *Flores* v. *Lynch,* No. 85–4544, Defendants' Opposition to Motion to Enforce, ECF 121 at 17 (C.D. Cal. Feb. 27, 2015).

When the FSA was found to apply to accompanied minors—an interpretation with which the Government continues to disagree—the agencies faced new practical problems. The FSA requires DHS to transfer minors to a non-secure, licensed facility "as expeditiously as possible," and further provides that a "licensed" facility is one that is "licensed by a State agency." FSA paragraphs 6, 12(A). That prompted significant and ongoing litigation regarding the ability to obtain state licensing of FRCs, as many States did not have, and have not succeeded in putting in place, licensing schemes governing facilities that hold family units together. That litigation severely limited the ability to maintain detention of families together. Again, although it

---

[7] *See https://www.cbp.gov/sites/default/files/ assets/documents/2017-Dec/BP%20Total %20Monthly%20Family%20Units%20by% 20Sector%2C%20FY13-FY17.pdf* (last visited August 17, 2018) *See also https://www.cbp.gov/ newsroom/stats/sw-border-migration* (last visited August 17, 2018).

**45494** Federal Register / Vol. 83, No. 174 / Friday, September 7, 2018 / Proposed Rules

is difficult to definitively prove the causal link, DHS's assessment is that the link is real, as those limitations correlated with a sharp increase in family migration: The number of family unit apprehensions by CBP again spiked—from 39,838 in Fiscal Year 2015 to the highest level ever, 77,674 in Fiscal Year 2016. The number of such apprehensions along the Southwest Border has continued to rise, and has now reached 77,802 in Fiscal Year 2018, with two months remaining in the fiscal year and a rate of nearly 10,000 per month for the past four months. *See Southwest Border Migration 2018, https://www.cbp.gov/newsroom/stats/ sw-border-migration.*

As long as the licensing must come from a state specifically (rather than from the federal government), DHS's ability to effectively use family detention is limited. A federal program (especially immigration enforcement) that the Constitution and Congress commit to federal discretion should not depend on state licensing, particularly when a well-established state licensing scheme does not already exist. In order to avoid separating family units, DHS needs to release adult family members in cases where detention would otherwise be mandatory and DHS determines parole is not appropriate, or in cases where DHS and/or immigration courts believe detention of the parent is needed to ensure appearance at future removal proceedings or to prevent danger to the community.[8] Because of ongoing litigation concerning state licensure for FRCs, ICE rarely is able to hold family units for longer than approximately 20 days. The result is that many families are released in the interior of the United States. While statistics specific to family units have not been compiled, the reality is that a significant number of aliens who are not in detention either fail to appear at the required proceedings or never actually seek asylum relief, thus remaining illegally in the United States. *See*

*https://www.justice.gov/eoir/file/ 1083096/download* (in FY 2018 to date, 26 percent of case completions for individual case completions are in absentia orders, and 53 percent of case completions for unaccompanied minors are in absentia orders).

As described above, there have been several important changes in law and circumstance since FSA was executed: (1) A significantly changed agency structure addressing the care and custody of juveniles, including the development of FRCs that provide appropriate treatment for minors while allowing them to be held together with their families; (2) a new statutory framework that governs the treatment of UACs; (3) significant increases in the number of families and UACs crossing the border since 1997, thus affecting immigration enforcement priorities and national security; and (4) further recognition of the importance of keeping families together during immigration proceedings when appropriate and the legal and practical implications of not providing uniform proceedings for family units in these circumstances. The agencies have thus determined that it is necessary to put into place regulations that comply with the relevant and substantive terms of the FSA regarding the conditions for custodial settings for minors, but, through federal licensing, will provide the flexibility necessary to protect the public safety and enforce the immigration laws given current challenges that did not exist when the FSA was executed. This proposed rule will provide DHS with the option of keeping families who must or should be detained together at appropriately licensed FRCs for the time needed to complete immigration proceedings, subject to the sound implementation of existing statutes and regulations governing release on parole or bond.

2. Purpose of the Regulations

The primary purpose of this action is to promulgate regulations that would ultimately lead to the termination of the FSA, as provided for in FSA paragraph 40. This proposed rule would implement the relevant and substantive terms of the FSA and provisions of the HSA and TVPRA where they necessarily intersect with the FSA's provisions. The rule would also make some modifications to the literal text of the FSA, but while providing similar substantive protections to juveniles. For example, the rule would allow for detention of families together in federally-licensed programs (rather than facilities licensed specifically by a state). States generally do not have licensing schemes for family residential

centers. Thus, the literal text of the FSA currently imposes a limitation on DHS's ability to detain family units together in a FRC during their immigration proceedings, consistent with applicable law. The federal licensing scheme in turn would provide similar substantive protections regarding the conditions of such facilities, and thus implement the underlying purpose of the state-licensing requirement.

This rule is proposed under the FSA's guiding principle that the Government treats, and shall continue to treat, all juveniles in its custody with dignity, respect, and special concern for their particular vulnerability as minors.

The current DHS regulations on the detention and release of aliens under the age of 18 found at 8 CFR 236.3 have not been substantively updated since their promulgation in 1988.[9] DHS therefore proposes to revise 8 CFR 236.3 to promulgate the relevant and substantive terms of the FSA as regulations. In addition, there are currently no HHS regulations on this topic. HHS proposes a new 45 CFR part 410 for the same reason.

As noted, the proposed regulations would implement the relevant and substantive terms of the FSA and related statutory provisions. Separate from the FSA, DHS has over time developed various policies and other sub-regulatory documents that address issues related to DHS custody of minor aliens and UACs.[10] In considering these proposed regulations, DHS reviewed such policies, and determined that the proposed regulations are compatible with them. Current policies on the detention, apprehension, and transportation of minors and UACs generally would not, therefore, need to be altered to bring them into conformity with the proposed rule. This rule is not, however, intended to displace or otherwise codify such policies and procedures.

Finally, this proposed rule excludes those provisions of the FSA that are

---

[8] Current parole regulations address parole, including for juveniles in custody as well as parole for aliens subject to expedited removal. *See* 8 CFR 212.5(b)(3) (parole for juveniles); 8 CFR 235.3(b)(2)(iii), (b)(4)(ii) (limiting parole for those in expedited removal proceedings). While DHS proposes amendments to section 212.5(b) as a part of this regulation, this regulation is not intended to address or alter the standards contained in sections 212.5(b) or 235.3(b). To the extent that paragraph 14 of the FSA has been interpreted to require application of the juvenile parole regulation to release during expedited removal proceedings, *see Flores* v. *Sessions,* Order at 23–27 (June 27, 2017), this regulation is intended to permit detention in FRCs in lieu of release (except where parole is appropriate under 8 CFR 235.3(b)(2)(iii) or (b)(4)(ii)) in order to avoid the need to separate or release families in these circumstances.

[9] *See* Detention and Release of Juveniles, 53 FR 17449 (May 17, 1998). When published as a final rule, the provisions applying to the detention and release of juveniles were originally placed in 8 CFR 242.24. After Congress passed IIRIRA, the former INS published a final rule updating several immigration-related provisions of the CFR and moved these provisions from section 242.24 of Title 8 to § 236.3. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum proceedings, 62 FR 10312 (Mar. 6, 1997).

[10] *See, e.g.,* ICE, Family Residential Standards, *https://www.ice.gov/detention-standards/family-residential* (last visited May 1, 2018); CBP, National Standards on Transport, Escort, Detention, and Search (Oct. 2015), *https://www.cbp.gov/sites/ default/files/assets/documents/2017-Sep/ CBP%20TEDS%20Policy%20Oct2015.pdf* (last visited May 1, 2018).

relevant solely by virtue of the FSA's existence as a settlement agreement. For instance, the FSA contains a number of special provisions that relate specifically to class counsel and the supervising court with respect to the Departments' compliance with the FSA. Following termination of the FSA, such provisions will no longer be necessary, because compliance with the published regulations will replace compliance with the settlement agreement. As a result, they are not included in this proposed rule.[11]

## V. Discussion of Elements of the Proposed Rule

As stated above, the purpose of this rule is to terminate the FSA by to promulgating regulations that implement it, with minor modifications to reflect changes in governing law and the operational realities on the ground. These proposed regulations, therefore, largely replicate the language of the FSA for publication in the Code of Federal Regulations. The Departments propose some modifications to the literal text of the FSA, however, to ensure the Government continues to comply with the underlying goals of the FSA in a legal and operational environment that has significantly changed since the FSA was signed over 20 years ago.

The Departments have different responsibilities vis-à-vis implementation of the FSA, and so each Department's proposed regulatory text seeks to address these various responsibilities. DHS's proposed regulations seek to establish procedures for the apprehension, processing, care, custody, and release of alien minors, consistent with its obligations under the FSA. While the following sections explain why the proposed regulations do not adopt the literal text of the FSA in certain circumstances, one notable change is the proposal for an alternative licensing process that would allow FRCs to be considered ''licensed programs'' under FSA paragraph 6, and thus suitable for the detention of non-UAC minors, along with their accompanying parents or legal guardians, for longer periods of time than they are currently used. DHS proposes these changes to allow the Department to fully and consistently apply the law to all aliens who are subject to detention, so that

aliens do not have the opportunity to abscond from DHS custody simply because they were encountered with children.

HHS's proposed regulations seek to establish procedures for the processing, care, custody, and release of certain UACs that by law are subject to the care and custody of ORR.

### A. DHS Regulations

DHS proposes to make edits to current section 212.5 primarily to ensure that the terminology used in that section is consistent with the language used in the additional proposed amendments codifying the FSA, explained below. DHS proposes to remove the term ''juvenile'' from 8 CFR 212.5(b) and replace it with ''minor in DHS custody,'' as the proposed amendments to 8 CFR 236.3 remove the term ''juvenile,'' from its definitions section.

DHS also proposes to remove the words ''relative,'' ''brother,'' ''sister,'' ''aunt,'' ''uncle,'' ''or grandparent,'' and replace these terms with ''parent or legal guardian.'' Given that, pursuant to the HSA and TVPRA, DHS does not have the legal authority to release a juvenile in its custody to anyone other than a parent or legal guardian,[12] allowing these terms to remain in the regulatory text improperly implies that DHS will engage in an activity not authorized by statute, i.e., releasing a minor on parole into the custody of someone other than a parent or legal guardian. Further, DHS is proposing to remove paragraph (b)(3)(iii) in its entirety due to the same constraints on its legal authority to release minors to individuals who are not parents or legal guardians. DHS is also proposing to replace the term ''Director, Deportation and Removal,'' with ''Executive Assistant Director, Enforcement and Removal Operations,'' to reflect the current title of the position used within DHS.

DHS is also proposing to remove the cross-reference to section 235.3(b) as it currently appears in section 212.5(b), to eliminate an ambiguity and to codify its longstanding understanding of how certain provisions in section 235.3(b) relating to parole of aliens in expedited removal proceedings apply to minors. In particular, eliminating that cross reference would make it clear that the provisions in section 235.3(b) governing parole of an aliens in expedited removal apply to all such aliens, and not merely adults. The current cross-reference to section 235.3(b) is confusing, however, because it suggests that the more flexible standard in section 212.5(b)

might override those provisions when a minor is in expedited removal. DHS disagrees with that interpretation of its current regulations, which, among other things, is in tension with the text of the relevant statutory provision. See 8 U.S.C. 1225(b)(1)(B)(iii)(IV) (''Any alien subject to [expedited removal] shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.''). DHS is accordingly amending section 212.5(b) to codify its understanding and to eliminate the ambiguity and any potential tension with the statute. This change is discussed more fully below.'' DHS proposes to revise its current regulations on the detention and release of minor aliens by replacing section 236.3 in its entirety. Proposed paragraph 236.3(a)(1) codifies the FSA's general policy statement, found in paragraph 11 of the FSA, that minors and UACs in DHS custody shall be treated with dignity, respect, and special concern for their particular vulnerability.

Current section 236.3 on the ''Detention and release of juveniles'' is silent with respect to whether its provisions apply to aliens detained under mandatory or discretionary legal authorities. This distinction is often meaningful in immigration law because the authority under which aliens are detained may dictate which regulations apply to those detained aliens. However, the FSA does not distinguish the applicability of its provisions as between aliens held under mandatory or discretionary legal authorities. Proposed § 236.3(a)(2), therefore, provides that the provisions of the section apply equally to those minors who are subject to mandatory detention as those subject to discretionary detention, to the extent authorized by law.

### Proposed 8 CFR 236.3(b)—Definitions

The current regulations at section 236.3(a) contain a single definition of the term ''juvenile,'' which is defined as any alien under the age of 18. The FSA does not use the term ''juvenile,'' but it contains several other terms of art that must be defined in DHS regulations to parallel the terms of the agreement. This proposed rule, therefore, removes the term ''juvenile'' from the definitions in section 236.3 and adds several other definitions that are either explicitly written into the FSA or are necessary to understanding the FSA's provisions, given the changes in law that have occurred since the FSA's signing.

*Minor and UAC.* Proposed § 236.3 removes the definition of ''juvenile,'' because the term, defined as any alien under the age of 18, is too broad to be

---

[11] For instance, paragraphs 32(A), (B), and (D), and 33 of the FSA grants *Flores* class counsel special access to covered minors and to certain facilities that hold such minors; it is unnecessary to codify these provisions in regulation. Similarly, paragraphs 29 to 31 include special reporting requirements with respect to class counsel and the supervising court; reporting to these entities would be unnecessary following termination of the FSA.

[12] See further explanation *infra* under discussion of proposed 236.3(g), including note 20.

a useful definition for the purposes of this proposed rule. Instead, proposed § 236.3(b) replaces the term "juvenile" with two definitions: "minor," as it is defined in the FSA, and unaccompanied alien child (UAC), as it is defined in 6 U.S.C. 279(g)(2). The distinction between these two groups of juveniles became legally relevant for DHS's actions because the TVPRA authorizes only ORR to be responsible for the care and custody of UACs. *See* 6 U.S.C. 279(b)(1); 8 U.S.C. 1232(b)(1).

The definitions of minor and UAC are not mutually exclusive, because although most UACs will also meet the definition of minor, some will not. For instance, an alien juvenile who has been legally emancipated does not meet the definition of a minor as set out in the FSA, so the provisions of this proposed rule would not apply to that juvenile. The definition of UAC, however, does not exclude emancipated juveniles. Thus, if an immigration officer encounters any alien juvenile (regardless of whether such juvenile has been emancipated) who has no lawful immigration status, has not attained 18 years of age, and has no parent or legal guardian present in the United States or no parent or legal guardian is available to provide care and physical custody for that juvenile, the juvenile meets the definition of a UAC, and the immigration officer must transfer the juvenile to HHS as set forth under this rule. While the proposed rule does not include a definition of juvenile, this preamble uses the term juvenile to mean any alien under the age of 18.

*Emergency and Influx.* The FSA also includes definitions of "emergency" and "influx," to explain the circumstances under which the FSA permits the Government more than three or five days to transfer juveniles to licensed programs. The proposed rule would add definitions of both "emergency" and "influx" to the regulations in the definitions section at 236.3(b), capturing the relevant and substantive terms of paragraph 12(B) of the FSA. The proposed definition of emergency largely tracks the existing text of the FSA, except that it reflects DHS's recognition that emergencies may not only delay placement of minors, but could also delay compliance with other provisions of this proposed rule, or excuse noncompliance on a temporary basis. For example, access to a snack or meal may be delayed if a minor is being transported from a facility in the path of a major hurricane to another facility in a safer location and that transportation happens during a time when the minor would have access to a snack or meal. Once at a safe location or the emergency

otherwise abates, the schedule would return to normal for those minors. Under current procedures, the disruption of the scheduled items due to the emergency, and the cause of the delay, would be noted in the applicable system of records for those minors who were impacted.

The impact, severity, and timing of a given emergency situation dictate the operational feasibility of providing certain items to minors, and thus the regulations cannot contain every possible reality DHS will face. Thus, the definition of "emergency" is flexible and designed to cover a wide range of possible emergencies.

The FSA defines an influx as a situation where legacy "INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement." Accordingly, as proposed, DHS would adopt this definition of "influx" without change, except to reflect the transfer of responsibilities from legacy INS to DHS and ORR, and to reflect that DHS maintains custody of minors, as defined in this section, and, for the short period pending their transfer to ORR, UACs.

However, DHS regularly has more than 130 minors and UACs in custody who are eligible for placement in a licensed program, and for years has been operating at the current FSA definition of "influx." DHS nonetheless believes that this defined term continues to be useful in the context in which it is used. As reflected in the discussion of proposed § 236.3(e) below, the main implication of the threshold for an "influx" is that in general, under the FSA, DHS is required to transfer non-UAC minors to licensed facilities "as expeditiously as possible" rather than within either a 3- or a 5-day timeframe, because DHS is currently operating under an influx. Notably, the FSA's transfer timeframes no longer control for DHS operations with respect to UACs—the TVPRA requires that UACs be transferred out of DHS custody within 72 hours of determining that the alien is a UAC, absent exceptional circumstances. As a result, although the number of UACs in custody could impact whether DHS is operating under an "influx," the transfer of UACs to ORR remains governed by the requirements of the TVPRA at all times. Given current operational realities, the "as expeditiously as possible" timeframe contained in the FSA remains appropriate and consistent with DHS's goal to expeditiously transfer minors who are not UACs. DHS also notes that even under this standard, *i.e.,* even in

current "influx" conditions, CBP generally transfers minors who are not UACs out of its facilities within 3 to 5 days.

DHS nonetheless welcomes public comment on whether it would be appropriate to revise the definition of influx to better reflect current operational realities. For instance, DHS could define an influx as a situation in which DHS determines that significantly more minors or UACs are awaiting transfer than facility space is available to accommodate them, which prevents or delays timely transport or placement of minors or impacts other conditions provided by the regulations. This definition may effectively codify the relevant and substantive terms of the FSA in today's context. It would also allow for flexibility across the national operations of DHS, without imposing a hard numerical trigger for when the definition of "influx" applies. Under this option, DHS would not be operating under an "influx" as a steady state, as the FSA's definition of influx currently requires; instead, an influx would only exist when there is a significant number of minors or UACs compared to available bed space in licensed facilities, and that the surrounding circumstances prevent or delay the timely transport or placement of minors or impact other conditions provided by the regulations. A single factor alone would not trigger such a provision.

*Licensed Facility and Non-Secure.* Paragraph 6 of the FSA defines "licensed program" as a program, agency, or organization that is "licensed by a State agency to provide residential, group, or foster care services for dependent children." Under paragraph 6, a "licensed program" as used in the agreement must generally be "non-secure," except in certain cases for special needs minors. The proposed rule in section 236.3(b)(9) & (b)(11) includes definitions of "licensed facility" and "non-secure" to conform as closely as possible to the terms of the FSA. The proposed rule would add definitions of "licensed facility" and "non-secure" to conform as closely as possible to the terms and purpose of the FSA while responding to operational realities of ICE's temporary detention of minors. To parallel the provisions of FSA paragraph 6, DHS is proposing that facilities that temporarily detain minors obtain licensing where appropriate licenses are available from a state, county, or municipality in which the facility is located.

However, most states do not offer licensing for facilities like these FRCs, *i.e.,* locations that house minors together with their parents or legal guardians. And those states that have previously offered licensing for FRCs have had their licensing schemes challenged (and in at least one case invalidated) through

Retrieved from the Federal Register Aug. 26, 2019

litigation.[13] That has imposed a barrier to the continued use of FRCs: It is difficult to continue to detain a family in a state-licensed facility, so continued application of a state-licensing requirement can effectively require DHS to release children (but not their parents) from the FRC. The proposed rule would eliminate that barrier to the continued use of FRCs by creating an alternative federal licensing scheme for such detention. The goal is to provide materially identical assurances about the conditions of confinement at that facility, and thus to implement the underlying purpose of the FSA's licensing requirement. It would in turn allow decisions regarding the detention of families to be made together as a unit, under a single legal regime (the background rules regarding detention and release), rather than under two different regimes (one applicable to the parent and another to the child).

Specifically, DHS proposes that if no such licensing scheme is available in a given jurisdiction, a facility will be considered licensed if DHS employs an outside entity to ensure that the facility complies with family residential standards established by ICE. This alternative licensing process is being proposed to enable DHS to house minors together with their parents or legal guardians in FRCs, subject to appropriate standards and oversight, even in jurisdictions in which an applicable licensing regime is unavailable. By providing an alternative to state licensure where such licensure is unavailable, DHS would appropriately preserve its ability to detain minors together with their parents or legal guardians throughout the removal process, if DHS decides, consistent with the standards in the proposed rule and applicable statutes and regulations, that it is necessary or appropriate to maintain custody for more than a brief period. Moreover, the alternative federal licensing scheme would provide effectively the same substantive protections that the state-licensing requirement exists to provide, and accordingly fulfill the underlying purpose of the state-licensing requirement under the FSA. And by requiring DHS to hire an auditor to ensure compliance with ICE's detention

standards, DHS's alternative licensing process would mirror analogous state licensure processes for detention centers and achieve the goals of state licensure by providing third-party oversight of a facility's compliance with an established set of standards.

Finally, while the FSA uses the term "non-secure," as a part of the definition of a licensed program, the FSA does not define this term. The proposed rule provides a definition of non-secure to provide clarity on the use of this term in the immigration detention context. Like the availability of a license for FRCs, the definition of a non-secure facility may vary by state or locality. Accordingly, DHS proposes that a facility will be deemed non-secure if it meets its state's or locality's definition, but if no such definition is provided by the state or locality, the proposed rule provides that a facility will be deemed non-secure if it meets an alternative definition derived from Pennsylvania's definition of secure care.[14]

*Other definitions.* The FSA also contains definitions of the terms "special needs minor" and "escape-risk," which DHS proposes to adopt.[15] DHS does not propose to adopt the FSA's term "medium security facility" because DHS does not maintain any medium security facilities for the temporary detention of minors, and the definition is now unnecessary. The proposed rule does, however, add definitions of the terms "custody," "family unit," and "family residential center" because the enactment of the TVPRA and current DHS detention practices require the use of these terms to accurately describe the requirements and processes necessary in the apprehension, processing, care, and custody of alien juveniles.

Proposed 8 CFR 236.3(c)—Age Determination

Determining the age of an alien is not discussed in the current regulations, but is essential for DHS to apply the

appropriate provisions of the FSA and the TVPRA to an alien in its custody. Paragraph 13 of the FSA provides a "reasonable person" standard for determining whether a detained alien is an adult or a minor. Paragraph 13 also allows medical or dental examinations by a medical professional, or other appropriate procedures, for purposes of age verification. Proposed 8 CFR 236.3(c) would incorporate the FSA's "reasonable person" standard and the FSA's standards with respect to medical and dental examinations, and would also be consistent with the TVPRA's standards for determining whether an alien is under or over the age of 18. The proposed rule would add that age determinations must be based on the totality of the evidence and circumstances.

Proposed 8 CFR 236.3(d)—Determining Whether an Alien Is a UAC

The current regulations make no distinction between UACs and other minors. While no distinction is included in the language of the FSA, such a distinction is made necessary by the HSA and TVPRA, as explained above. Accordingly, proposed 8 CFR 236.3(d) would explain when DHS makes a determination whether an alien juvenile is a UAC. Under the proposed rule, immigration officers will make a determination of whether an alien meets the definition of a UAC each time they encounter the alien. Therefore, even though an alien may have been previously determined to be a UAC, the alien may no longer meet the statutory definition of a UAC if the alien reaches the age of 18, acquires legal status, or if a parent or legal guardian is available in the United States to provide care and physical custody. The proposed paragraph also highlights that, once an alien no longer meets the definition of a UAC, the legal protections afforded only to UACs under the law cease to apply.

Proposed 8 CFR 236.3(e)—Transfer of Minors Who Are Not UACs From One Facility to Another

This section of the proposed rule would address the FSA's requirement that minors and UACs are transferred to and placed in "licensed programs." Paragraph 12(A) of the FSA requires DHS to place in a licensed program those minors who are not released. As mentioned above, the FSA defines a licensed program as a program, agency, or organization that is "licensed by a State agency to provide residential, group, or foster care services for dependent children." Facilities operated by licensed programs must be non-

---

[13] *See, e.g., Grassroots Leadership, Inc.* v. *Tex. Dep't of Family and Protective Servs.,* No. D–1–GN–15–004336 (Tex. Dist. Ct. amended final judgment Dec. 2, 2016) (finding regulatory scheme for FRCs invalid); *Commonwealth of Pa., Dep't of Human Servs.,* Adjudication and Order, Pa. Dep't of Human Servs., Bureau of Hearings and Appeals, BHA Docket No. 061–16–0003 (Apr. 20, 2017) (ordering the Pennsylvania Department of Human Services to rescind its revocation of the license for Berks).

[14] *See* Pa. Code 3800.5 (describing "secure care" as that which is provided in a 24-hour living setting for delinquent children from which "voluntary egress" is prohibited from the building through internal or exterior locks or from the premises through secure, perimeter fencing). DHS chose to use Pennsylvania's definition as a starting point for this proposed definition because of the three family residential centers (FRCs) currently in operation, the facility located in Berks County, PA, is the longest operating of the FRCs.

[15] The FSA's definition of "escape-risk" allows consideration of, *inter alia,* whether "the minor has previously absconded or attempted to abscond from INS custody." This proposed rule would specifically identify absconding from any federal *or* state custody as a relevant factor, not just the custody of INS or its successor agencies. This change is consistent with the FSA, which provides only a non-exhaustive list of considerations.

secure, unless it is appropriate to house such minors in secure detention facilities. Currently, the only non-secure facilities in which ICE detains minors who are not UACs are the FRCs.[16] When appropriate, ICE places minors in FRCs together with their parents or legal guardians until ICE can release the minor.

As discussed above in connection with the proposed definition of "licensed facility" in proposed § 236.3(b)(9), this proposed rule would create an alternative system of regulating facilities, in lieu of state licensure. This system would allow ICE to make decisions regarding the detention of families together as a unit, under the applicable legal standard, while fulfilling the goals of state licensure by ensuring independent oversight of FRCs.

FSA paragraph 12(A) provides that legacy "INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19 [*i.e.*, a licensed program] . . . within three (3) days, if the minor was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except" in certain circumstances, including "in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible." As noted in the discussion above regarding the FSA's definition of "influx," DHS has continuously been dealing with an "influx" of minors, as that term is defined in the FSA. Accordingly, the proposed transfer provision in section 236.3(e) would make "as expeditiously as possible" the default for transferring minors who are not UACs to a licensed facility, but notes that if an emergency or influx, as defined in the regulations, does not exist, the FSA's "default" 3- and 5-day timeframes apply.

The revised order of the text (*i.e.*, making clear that in general the "as expeditiously as possible" standard applies, except where an emergency or influx does not exist) is consistent with the goal of DHS operational offices to transfer all minors who are not UACs as expeditiously as possible, given operational realities. This proposed amendment adds clarity, but does not change the timeframes that have applied with respect to non-UAC minors for two decades under the FSA.

This provision would not retain two additional exceptions to the 3-day transfer timeframe. First, the exception at Paragraph 12(A)(2), requiring transfer in the timeline provided by "any court decree or court-approved settlement," is not needed, as a court order would govern in any event. Second, the exception at paragraph 12(A)(4) of the FSA, allowing transfer within 5 days instead of 3 days in cases involving transport from remote areas or where an alien speaks an "unusual" language that requires the Government to locate an interpreter, is not included. DHS has matured its operations such that these factors no longer materially delay transfer.

Proposed § 236.3(e) would apply only to the transfer of non-UAC minors to licensed facilities because, following passage of the TVPRA, DHS transfers to ORR UACs who are not able to withdraw their application for admission in accordance with that Act. *See* 8 U.S.C. 1232(a)–(b). Therefore, the timeline of the transfer of UACs from DHS to HHS is governed exclusively by the TVPRA.

Finally, under the proposed rule, as under FSA paragraph 12(c), DHS would continue to maintain a written plan describing the reasonable efforts it will take to place all minors who are not UACs as expeditiously as possible pursuant to FSA paragraph 12(C). (This would include placement in a federally-licensed FRC.) CBP and ICE have maintained such a plan through internal guidance for law enforcement operations.

### Proposed 8 CFR 236.3(f)—Transfer of UACs From DHS to ORR

The current regulations also do not address the transfer of UACs from DHS to ORR care and custody under the TVPRA. The FSA is also silent on this topic because the FSA does not distinguish between minors and UACs. Given the passage of the TVPRA and its specific requirements related to the transfer of UACs, the proposed regulations at section 236.3(f) track the TVPRA requirements. Specifically, the proposed regulations at section 236.3(f) prescribe procedures for transferring UACs to the care and custody of ORR within 72 hours (absent exceptional circumstances) of determining that an alien is a UAC. *See* section 235(b)(3) of the TVPRA, 8 U.S.C. 1232(b)(3). Section 236.3(f) would also reflect the general requirement under section 235(b)(2) (8 U.S.C. 1232(b)(2)) that DHS notify ORR within 48 hours that an apprehended individual is a UAC. While these timelines differ from those provided in the FSA, and differ from those

applicable to minors who are not UACs, as described in paragraph 236.3(e), these timelines implement DHS's specific requirements applicable to UACs, as provided in the TVPRA.

Pursuant to the FSA, UACs, like accompanied minors, must be transferred to a licensed program within the 3- and 5-day timeframes provided by Paragraph 12(A), or, in an emergency or influx, "as expeditiously as possible." The TVPRA timeline for the transfer of UACs to HHS does not address the requirements of Paragraph 12(A) with respect to the transfer of UACs to licensed programs. However, HHS now has the authority to provide care and custody of UACs referred to it, and thus, HHS ensures that a referred UAC is placed in an appropriate licensed program, when required under the TVPRA and the FSA. *See* 8 U.S.C. 1232(c)(2)(A) (requiring HHS to "promptly" place UACs "in the least restrictive setting that is in the best interest of the child"). Accordingly, HHS has addressed this requirement in its proposed rule. In this rule, DHS addresses only the transfer of UACs to HHS, which is governed exclusively by the TVPRA.

The current regulations do not speak to the necessary conditions during the transfer of UACs between DHS and HHS facilities, although such conditions are addressed by paragraph 25 of the FSA. Consistent with paragraph 25 of the FSA, the proposed regulations stipulate that UACs will not be transported with unrelated detained adults except upon initial apprehension when being transferred to a DHS facility, or if separate transportation is impractical or unavailable.[17] In such cases, precautions will be taken to ensure the safety, security, and well-being of the UAC.

For the safety and security of UACs and whenever operationally feasible, ICE and CBP currently make every attempt to transport and hold UACs separately from unrelated adults. As an example, CBP's U.S. Border Patrol (USBP) strives to transport UACs and unrelated adults in separate vehicles. However, given the various environments in which USBP operates, such as remote desert locations, separate transportation for UACs from place of apprehension to a USBP station is not always feasible or practical. In these cases, USBP strives to transport the UAC in a manner where she or he can be monitored. There are numerous

---

[16] The *Flores* district court has held that ICE FRCs are secure; the Government has appealed that decision. *See Flores* v. *Sessions*, No. 2:85–cv–04544 (C.D. Cal. June 27, 2017), *appeal pending*, No. 17–56297 (9th Cir.) (docketed Aug. 28, 2017).

[17] The FSA includes "impractical" but not "unavailable." DHS considers the addition of "or unavailable" to be a clarification of the current standard, and not a substantive change.

factors that dictate the way in which a UAC will be transported with unrelated adults. However, at a minimum CBP always assesses the mental capacity, age, and gender of the UAC to ensure that the most safe and secure setting is available.

Proposed 8 CFR 236.3(g)—DHS Procedures in the Apprehension and Processing of Minors or UACs

Current section 236.3(g) provides that each juvenile apprehended in the immediate vicinity of the border who permanently resides in Mexico or Canada shall be informed, prior to the presentation of the voluntary departure form or being allowed to withdraw his or her application for admission, that he or she may make a telephone call to a parent, close relative, a friend, or organization on the free legal services list. The current regulation also provides that if the juvenile does not reside in Mexico or Canada, that juvenile must in fact communicate with a parent, adult relative, friend, or with an organization found on the free legal services list prior to presentation of the voluntary departure form.

In addition, the current regulations at 8 CFR 236.3(h) provide for alien juveniles to be given a Form I–770 Notice of Rights and Disposition, which will be read and explained to the juvenile in a language the juvenile understands if he or she is less than 14 years of age. This paragraph further provides that, in the event that a juvenile who has requested a hearing pursuant to the Form I–770 subsequently decides to accept voluntary departure or is allowed to withdraw his or her application for admission, a new Form I–770 shall be given to, and signed by the juvenile.

The former INS promulgated much of 8 CFR 236.3 to implement the U.S. District Court for the Central District of California's order in *Perez-Funez* v. *Dist. Dir., INS*, 619 F. Supp. 656 (C.D. Cal. 1985), which required INS to afford certain procedural safeguards to unaccompanied juveniles who are taken into immigration custody prior to permitting voluntary departure. *See* 53 FR 17449 (May 17, 1988).

Paragraph 12(A) of the FSA provides that whenever the Government takes a minor or UAC into custody, it shall expeditiously process the minor or UAC and shall provide the minor or UAC with a notice of rights, including the right to a bond redetermination hearing, if applicable. Under paragraph 24(D) of the FSA, DHS promptly provides all non-UAC minors who are not released with a Form I–770, an explanation of the right of judicial review, and a list of

free legal services. The proposed rule's section 236.3(g) would retain the provisions related to the presentation of the Form I–770, explanation of the right of judicial review, and the list of free legal services, as set out in current regulations and the FSA.

The proposed regulations at 8 CFR 236.3(g)(1) would change the regulatory text to reflect current operations, but also preserve the intent of these regulations and FSA paragraphs 12(A) and 24(D), and would continue to comply with *Perez-Funez*. Specifically, proposed § 236.3(g)(1)(i) would update the requirements related to the Form I–770 to reflect Paragraph 12(A) and current operational realities. It also would make minor clarifications to the current regulatory language by adding that the Form I–770 can be provided in a language "and manner" the minor or UAC understands. FSA Paragraph 12(A) requires that *all* minors in DHS custody, even those who request to withdraw their application for admission or request voluntary departure (which includes voluntary departure, as described at 8 CFR 240.25(a), sometimes referred to as a "voluntary return"), will be provided with a notice of rights.

Pursuant to the requirements of the current regulations and FSA Paragraph 12(A), CBP currently provides an I–770 to each minor or UAC during processing. If, after processing, CBP determines that a minor or UAC who was processed for a voluntary departure or a withdrawal of his or her application for admission is no longer amenable to such a disposition because, for instance, the minor or UAC is no longer eligible for voluntary departure, CBP will re-process the minor or UAC for a more appropriate disposition, such as the issuance of a Notice to Appear before an immigration judge. When the minor or UAC is reprocessed, the minor or UAC is issued a new I–770, or the original one is updated accordingly. By issuing a new I–770, or updating the original one, CBP ensures that, in situations in which it is appropriate to change a minor or UAC's immigration disposition, the minor or UAC continues to remain aware of his or her rights. In addition, CBP generally provides a minor or UAC who is being processed for a Notice to Appear with the list of free legal service providers.

Proposed 8 CFR 236.3(g) would provide that minors or UACs who enter DHS custody will be provided an I–770 that will include a statement that the minor or UAC may make a telephone call to a parent, close relative, or friend. The proposed rule would specifically address the list of free legal service providers at proposed § 236.3(g)(1)(iii),

which would apply to every minor who is not a UAC who is transferred to or remains in a DHS detention facility.

In addition, pursuant to the TVPRA, DHS currently screens all UACs from contiguous countries to determine whether such a UAC may be permitted to withdraw his or her application for admission. As part of this screening, the UAC is provided with an I–770 Notice of Rights. UACs from non-contiguous countries are not permitted to withdraw their application for admission, but are similarly provided with the I–770 Notice of Rights. These TVPRA requirements similarly ensure that the due process concerns identified by the court in *Perez-Funez* are adequately addressed.

Proposed § 236.3(g)(1)(i) also does not include the requirement in current section 8 CFR 236.3(g) that a juvenile who does not reside in Mexico or Canada must in fact communicate with a parent, adult relative, friend, or with an organization found on the free legal services list prior to presentation of the voluntary departure form. However, the passage of the TVPRA has made this requirement no longer necessary. Specifically, pursuant to the TVPRA, only UACs who reside permanently in Mexico or Canada are permitted to withdraw their application for admission. 8 U.S.C. 1232(a)(2). Additionally, any minor who is not a UAC, but who is accompanied by a parent or legal guardian who is permitted to voluntarily depart the United States or withdraw his or her application for admission as a member of a family unit would, in general, be undertaking such action along with his or her accompanying parent or legal guardian. Therefore, the minor would, by default, have an opportunity to communicate with his or her parent or legal guardian at that time.

Proposed § 236.3(g)(1)(i) relates only to situations in which DHS processes a minor or UAC. Thus, it does not address situations in which a minor or UAC is in immigration proceedings before an immigration judge. For example, this regulation does not address a situation in which a minor or UAC has been granted voluntary departure by an immigration judge, but then subsequently requests to proceed to a hearing. In such a situation, DHS envisions that, consistent with current practice, the immigration judge would provide the minor or UAC with an appropriate advisal of rights.

Similarly, proposed §§ 236.3(g)(1)(ii) and (g)(1)(iii) would reflect the requirements in Paragraph 24(D) of the FSA related to the provision of the notice of judicial review and the notice

Jenny Flores UAC
May Augusto UAC
Specifically
or UAC

of free legal service providers. Specifically, proposed § 236.3(g)(1)(ii) would provide that every minor who is not a UAC who remains in or is transferred to a DHS detention facility will be provided with the Notice of Right to Seek Judicial Review, as is provided in FSA Paragraph 24(D) and Exhibit 6. Similarly, proposed § 236.3(g)(1)(iii) would provide that such minors will be provided with the list of free legal service providers, as provided in FSA Paragraph 24(D).

Proposed § 236.3(g)(2) discusses DHS's custodial care of a minor or UAC immediately following apprehension. Therefore, this paragraph applies, in general, to the time that a minor or UAC remains in a CBP facility prior to being transferred to ICE or to HHS. This paragraph parallels the requirements of FSA paragraphs 11 and 12(A). For instance, paragraph (g)(2), like the FSA, would require that minors and UACs shall be held in the least restrictive setting appropriate to the minor or UAC's age and special needs, provided that such setting is consistent with the need to protect the minor or UAC's well-being and that of others, as well as with any other laws, regulations, or legal requirements. The proposed rule would also include a cross-reference to DHS's regulations at 6 CFR 115.114, dealing specifically with sexual abuse and assault prevention for juvenile and family detainees in DHS's short-term holding facilities.

Proposed paragraph (g)(2), like the FSA, would require that minors and UACs be housed in facilities that are safe and sanitary, and that the facilities provide access to toilets and sinks, drinking water and food as appropriate, access to emergency medical assistance as needed, and adequate temperature and ventilation.

Consistent with FSA paragraphs 11 and 12(A), proposed paragraph (g)(2)(i) provides for contact between a minor or UAC and family members arrested with the minor or UAC. Following arrest of a minor or UAC and accompanying family members, CBP transports all individuals to a CBP facility for processing. During the time that the family group spends at the facility, CBP provides contact between the minor or UAC and all accompanying family members, absent concerns about the safety of the minor or UAC. This paragraph, therefore, addresses only the issue of contact between family members while they remain in CBP custody. The proposed rule is more detailed than FSA Paragraph 12(A), insofar as it states, consistent with FSA paragraph 11, that the safety and well-being of the minor or UAC and

operational feasibility are relevant considerations when allowing such contact. This is consistent with FSA paragraph 11, which requires that the setting of a juvenile's detention or holding be consistent with a range of factors, including the need to protect the juvenile's well-being or that of others. It is also consistent with DHS's regulations on the prevention of sexual abuse and assault in its facilities. *See* 6 CFR 115.14, 115.114.

DHS's use of the term "operationally feasible" in this paragraph does not mean "possible," but is intended to indicate that there may be limited short-term circumstances in which, while a minor or UAC remains together with family members in the same CBP facility, providing such contact would place an undue burden on agency operations. For instance, if a family member arrested with a minor or UAC requires short-term, immediate medical attention, CBP may be required to temporarily limit contact between that family member and the minor or UAC, in order to provide appropriate medical treatment. Or, CBP may have a legitimate law enforcement reason to temporarily limit contact between a minor or UAC and accompanying family members, such as when CBP decides it is in the minor or UAC's best interest to interview all family members separately. However, CBP will provide contact with family members arrested with the minor or UAC, and/or will hold accompanied minors in the same hold rooms as their accompanying family members, if doing so is consistent with the minor or UAC's safety and well-being and does not place an undue burden on agency operations.

Similarly, the proposed regulations would contain the same limit as the FSA on the amount of time UACs can be housed with an unrelated adult (no more than 24 hours), but the proposed regulations would explicitly allow DHS to depart from this standard in emergencies or other exigent circumstances, to the extent consistent with 6 CFR 115.14(b) and 115.114(b). For example, it may be necessary to house UACs with unrelated adults for more than 24 hours during a weather-related disaster such as hurricanes in southern Texas, or if an outbreak of a communicable disease such as scabies or chicken pox at a facility requires the temporary commingling of the detainee population. Appropriate consideration is given to age, mental condition, physical condition, and other factors when placing UACs into space with unrelated adults.

Where a juvenile is apprehended with his or her parent or legal guardian, the

current regulations indicate that such parent or legal guardian may swear out an affidavit designating a person to whom the juvenile may be released. 8 CFR 236.3(b)(3). Since the passage of the TVPRA, however, DHS no longer has the authority to release a juvenile to someone who is not a parent or legal guardian, so this provision must be amended.[18] If a parent or legal guardian is unavailable to provide care and physical custody for an alien under the age of 18, and the alien has no lawful status in the United States, the alien meets the definition of a UAC. 6 U.S.C. 279(g). Under section 235(b)(3) of the TVPRA (8 U.S.C. 1232(b)(3)), DHS must transfer UACs to HHS custody within 72 hours of determining that a juvenile is a UAC, absent exceptional circumstances. Thus, a parent or legal guardian must be available for a minor without lawful status in DHS custody for DHS to release that minor. The proposed rule would therefore remove the current regulatory language at 8 CFR 236.3(b)(3) authorizing a parent or legal guardian to swear an affidavit authorizing the release of the minor to anyone who is not also a parent or legal guardian.

*Proposed 8 CFR 236.3(h)—Detention of Family Units*

DHS's policy, consistent with E.O. 13841, is to maintain family unity, including by detaining families together where appropriate and consistent with law and available resources. The current regulations, however, do not address the detention of non-UAC minors together with their parents or legal guardians as "family units" while in the custody of DHS. Similarly, while the FSA considers that juveniles may be initially held with related family members, the FSA does not address whether the Government may continue to hold minors together with their parents or legal guardians after transfer to a "licensed program." The proposed regulations in the new section 236.3(h) would set out requirements that must be met for a family to be detained together in an FRC. Per the definitions in proposed paragraph (b), and in accordance with the TVPRA, only minors, not UACs, would be held in DHS custody at an FRC.

The intention of this proposed paragraph is to clarify that DHS may, pursuant to its existing legal authorities, *see, e.g.,* INA sec. 235(b), (b)(1)(B), (b)(1)(B)(iii)(I); 236; 241(a), detain

---

[18] Pursuant to the requirements of the HSA and TVPRA, only HHS has the authority to release a minor to a non-parent or legal guardian, through the process of finding a sponsor for a UAC. *See* 8 U.S.C. 1232.

members of a family unit together. Nothing in this proposed rule impacts DHS's existing detention authority. Because the current regulations do not address detaining non-UAC minors together with their parents or legal guardians as family units, the current regulations also do not explicitly consider what may happen when DHS continues to detain a parent or legal guardian, but could otherwise release a non-UAC minor. Current immigration law describes several situations in which an individual alien may not be released from detention, regardless of whether that alien is part of a family unit. *See, e.g.,* INA sec. 235(b), (b)(1)(B), (b)(1)(B)(iii)(IV); 241(a).

If the parent or legal guardian of a family unit is subject to mandatory detention, but the non-UAC minor of the family unit is otherwise eligible for release, DHS must continue to detain the parent or legal guardian, consistent with applicable law and policy.

Proposed 8 CFR 236.3(i)—Detention of Minors Who Are Not UACs in DHS Custody

The current regulations contain one short paragraph about juvenile detention, stating that DHS may detain a juvenile if such detention is ''necessary, for such interim period of time as is required to locate suitable placement for the juvenile'' either with a parent, legal guardian, adult relative, or other suitable custodian or custodial facility. 8 CFR 236.3(d). As explained several times throughout this preamble, the FSA contains significant detail about requirements for DHS to detain juveniles, including a list of requirements for conditions of detention in the FSA's Exhibit 1. The proposed regulations at section 236.3(i) would completely replace the current regulations at section 236.3(d) with respect to the detention of minors who are not UACs.

The current regulations require that juveniles who are detained by DHS be housed in detention facilities that have separate accommodations for juveniles. *See* 8 CFR 236.3(d). In addition, 6 CFR 115.14, first promulgated in 2014, provides that minors are detained in the least restrictive setting appropriate for the minor's age and needs. That regulation tracks FSA paragraph 11. Accordingly, this proposed rule would cross-reference that regulation and expand on it. Additionally, the proposed regulations would make clear that minors are placed temporarily in a licensed facility, as defined in paragraph (b) of proposed § 236.3, until release can be effectuated as described in proposed § 236.3(j).

The proposed regulations at § 236.3(i)(1) would provide, like paragraph 21 of the FSA, that minors who are not UACs must be transferred to state or county juvenile detention facilities, a secure DHS detention facility, or a DHS-contracted facility having separate accommodations for minors if they meet certain criteria. A non-UAC minor may be placed in one of these facilities because the minor is charged with, is chargeable with, or convicted of a crime or has been charged with, is chargeable with, is the subject to delinquency proceedings or has been adjudicated as delinquent. There is an exception for petty offenses, and another exception for when the offense is isolated, not within a pattern or practice of criminal activity, does not involve violence against a person, and does not involve the use or carrying of a weapon. DHS has retained these exceptions in the proposed rule, but has reworded them in the affirmative for clarity. Rather than explain when DHS *would not use* secure detention (such as the exception to secure detention for petty offenses in paragraph 21(A)(ii) of the FSA), the proposed rule would more clearly explain when DHS *would use* secure detention. As a consequence of these changes, there may be some isolated, non-violent offenses that, although not ''petty'' as defined in paragraph 21(A)(ii) of the FSA, are insufficient cause to place a minor in secure detention. These clarifications are consistent with DHS's current practice, and are consistent with the intent underlying FSA paragraph 21.

Also included in the FSA's list of reasons to house a minor in a secure facility are committing, or making credible threats to commit, a violent or malicious act while in custody or while in the presence of an immigration officer; engaging, while in a licensed facility, in certain conduct that is unacceptably disruptive of the normal functioning of the licensed facility; being an escape risk; or for the minor's own security. DHS chose not to include in the proposed regulatory text the specific examples of behavior or offenses that could result in the secure detention of a minor, as they appear in FSA paragraph 21, because the examples are non-exhaustive and imprecise. For instance, examples listed in paragraph 21 of what may be considered nonviolent, isolated offenses (*e.g.,* breaking and entering, vandalism, or driving under the influence) may be classified as violent offenses in some states. Including these examples as part of codified regulatory text may

inadvertently lead to more confusion than clarity.

Under proposed § 236.3(i)(2), consistent with FSA paragraph 23, DHS would place a minor in a less restrictive alternative if such an alternative is available and appropriate in the circumstances, even if the provisions of section 236.3(i)(1) apply. Finally, as provided under paragraph 6 of the FSA, proposed § 236.3(i)(3) would provide that, unless a secure facility is appropriate pursuant to proposed § 236.3(i)(1) and (2), DHS facilities used for the detention of minors would be non-secure facilities. This proposed paragraph, like FSA paragraph 32(C), provides that agreements for the placement of minors in non-INS facilities shall permit attorney-client visits. Proposed § 236.3(i)(2) explains that the secure facilities used by DHS to detain non-UAC minors will also permit attorney-client visits pursuant to applicable facility rules and regulations.

Proposed § 236.3(i)(3) sets forth concepts also articulated in FSA paragraphs 12, 14, and 19, that unless a detention in a secure facility is otherwise required, facilities used for the detention of minors shall be non-secure.

Proposed § 236.3(i)(4) would set out the standards for ''licensed programs,'' as in paragraphs 6 and 19 of the FSA. While the proposed rule would not define ''licensed program,'' DHS proposes that all non-secure facilities used for the detention of non-UAC minors would abide by these standards. These standards mirror the requirements of Exhibit 1 of the FSA and the current ICE Family Residential Standards. In addition, the standards in proposed paragraph (i)(4) would serve as a baseline of what would be required of a facility audited by a third-party when licensing by the state, county, or municipality is otherwise unavailable, pursuant to proposed paragraph (b)(9) of this section. At a minimum, these standards must include, but are not limited to, proper physical care, including living accommodations, food, clothing, routine medical and dental care, family planning services, emergency care (including a screening for infectious disease) within 48 hours of admission, a needs assessment including both educational and special needs assessments, educational services including instruction in the English language, appropriate foreign language reading materials for leisure time reading, recreation and leisure time activities, mental health services, group counseling, orientation including legal assistance that is available, access to religious services of the minor's choice,

visitation and contact with family members, a reasonable right to privacy of the minor, and legal and family reunification services. Finally, these standards, like FSA paragraph 32(C), require that agreements for placement of minors in non-INS facilities shall permit attorney-client visits. Proposed paragraph 236.3(i)(4) makes clear that DHS permits attorney-client visits pursuant to applicable facility rules and regulations in all licensed, non-secure facilities in which DHS places non-UAC minors.

Related to the requirements placed on facilities used for the detention of minors, but not included in the Exhibit 1 standards, is the requirement found at FSA paragraph 19. FSA paragraph 19 permits "licensed programs" to transfer temporary physical custody of minors prior to securing permission from the Government in the event of an emergency, provided that they notify the Government as soon as practicable, but in all cases within 8 hours. Proposed paragraph 236.3(i)(5) does the same, although applies it to "licensed, non-secure facilities," instead of "licensed programs," for reasons explained above.

### Proposed 8 CFR 236.3(j)—Release of Minors From DHS Custody

The current regulations at § 236.3(b) address the release of juveniles when a determination is made that such juveniles may be released on bond, parole, or on their own recognizance. Provided detention of a juvenile is not required to secure the juvenile's appearance before DHS or the immigration court, and is not necessary to ensure the juvenile's safety or that of others, the current regulations allow a juvenile to be released to a parent, legal guardian, or an adult relative who is not currently in immigration detention. Current paragraph (b) goes on to state that if the parent, legal guardian, or relative is located at a place far from the current location of the juvenile, the relative can secure the release of the juvenile at the closest DHS office to that relative. The issue of transportation of the juvenile to the relative once release is secured is not discussed in the current regulation.

FSA paragraph 14 requires DHS to release a minor without unnecessary delay when DHS determines that the detention of the minor is not required either to secure timely appearance before DHS or an immigration judge, or to ensure the minor's safety or that of others. FSA paragraph 14 also provides a list of custodians to whom a minor may be released: A parent; legal guardian; adult relative (brother, sister,

aunt, uncle, or grandparent); an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being; a licensed program; or an adult individual or entity seeking custody when it appears that no other likely alternative to long term detention is available and family reunification is not a reasonable possibility. FSA paragraph 26 states that the Government shall assist in making transportation arrangements to the office nearest the location of the person or facility to whom a minor is to be released pursuant to paragraph 14. Despite the language of the current regulations and the FSA, pursuant to the TVPRA and the HSA, DHS does not have the authority to release a minor to anyone other than HHS or a parent or legal guardian. Therefore, in order to comply with both paragraph 14 and the TVPRA, DHS may be required, in some situations, to transfer a child to HHS when it is necessary to continue to detain a parent or legal guardian. DHS typically has discretion under existing authorities to simultaneously parole the child and the parent or legal guardian, which would remain unchanged.[19]

The proposed regulation at § 236.3(j) would amend the approach laid out in current § 236.3(b), and make it consistent with the requirements of the TVPRA and the HSA (enacted after the regulation was originally promulgated), and executive orders, as well as with the current operational environment, which has also changed since the provision's original promulgation. With the exception of removing the list of individuals to whom a minor may be released, as described above, the rule largely incorporates the text of paragraph 14. However, the proposed rule would align the FSA paragraph 14 standards with existing statutes and regulations, and thus permit DHS to exercise its existing discretionary authorities governing release.

Aliens, including minors in family units, who are subject to expedited removal and who have not been found to have a credible fear or are still pending a credible fear determination are subject to mandatory detention. 8 U.S.C. 1225(b)(1)(B)(iii)(IV). DHS, however, retains the discretion to release such aliens on parole, based on

a case-by-case determination that parole is for an "urgent humanitarian need or significant public benefit." *Id.* 1182(d)(5)(A). Pursuant to the regulations, aliens who are in expedited removal proceedings and are pending a credible fear determination or who have been found not to have such fear, release on parole can only satisfy this standard when there is a medical necessity or a law enforcement need. 8 CFR 235.3(b)(4)(ii), (b)(2)(iii). Nothing indicates that, by entering into the FSA, the Government intended to subvert the intent of Congress with regard to the detention of minors in family units, allowing for their release into the United States simply based on consideration of those factors listed in paragraph 14 of the FSA.[20]

The intended effect of the draft rule is to change current practice and the text of FSA paragraph 14 to affirm that parole is within the discretion of DHS as intended by statute. For example, minors in expedited removal will be subject to the heightened standard in the 8 CFR 235.3(b). As indicated above, DHS is proposing to remove the reference to 8 CFR 235.3(b) in section 212.5(b) to make clear that the parole standard that applies to those in expedited removal is found in section 235.3 and not 212.5. Moreover, DHS will not make universal parole determinations for all minors placed into FRCs.

For individuals not in expedited removal proceedings, parole is available subject to the generally applicable parole regulation. *See* 8 CFR 212.5(b); *see also* 62 FR 10312, 10320 (1997). For those aliens in expedited removal who are found to have a credible fear and referred for proceeding under section 240 of the INA, parole, bond, or release on recognizance or other conditions are available, depending on the particular circumstances of the alien's entry.

Aliens who are eligible for release on bond, or release on their own recognizance or other conditions, the availability of such release depends on whether the alien can establish he or she is not a flight risk or a danger to the community. *Matter of Patel,* 15 I&N Dec.

---

[19] This rule would delete a reference to such discretion at current 8 CFR 236.3(b)(2), but such reference is unnecessary to ensure DHS discretion to effect simultaneous release. For instance, in the expedited removal context, DHS may parole the parent or legal guardian pursuant to the standards at 8 CFR part 235. And other parole standards are contained at 8 CFR 212.5. There are also other tools available to effect simultaneous release, such as bond.

[20] The U.S. District Court for the Central District of California has rejected this argument, but in doing so, it did not consider the regulatory provisions at 8 CFR 235.3. *Flores* v. *Sessions,* No. 2:85–cv–04544, at 25 n.18 (C.D. Cal. June 27, 2017). That decision requires that ICE must ignore Congress's plain intent with regard to the availability of parole for aliens in expedited removal proceedings and in some instances must consider parole for individuals subject to final orders of removal. The appeal from this decision is currently pending before the U.S. Court of Appeals for the Ninth Circuit. *See Flores* v. *Sessions,* No. 17–56297 (9th Cir.) (docketed Aug. 28, 2017).

666 (BIA 1976). Paragraph 14 similarly states that DHS makes a determination that detention of a minor is not "required to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others." FSA paragraph 14. Both the FSA and custody standards applicable to aliens eligible for release on bond or on recognizance have a preference for release if an alien makes the requisite showing that they are not a flight risk or a danger to the community. *Id.; see also Matter of Patel.* 15 I&N Dec at 666. ("An alien generally is not and should not be detained or required to post bond except on a finding that he is a threat to the national security, or that he is a poor bail risk."). This is the same standard used under paragraph 14 of the FSA; thus the text in proposed paragraph (j) would not reflect a substantive change in the initial custody determinations made by DHS for those minors eligible for such determinations.

Once it is determined that the applicable statutes and regulations permit release, proposed § 236.3(j) would permit release of a minor only to a parent or legal guardian who is available to provide care and custody, in accordance with the TVPRA, using the same factors for determining whether release is appropriate as are contained in paragraph 14. Included in the relevant factors would typically be consideration of whether detention is "required either to secure [the] ... or timely appearance before [DHS] or the immigration court, or to ensure the minor's safety or that of others." DHS also considers family unity when evaluating whether release of a minor is appropriate. This approach is consistent with the President's June 20, 2018, Executive Order 13841, "Affording Congress an Opportunity to Address Family Separation," which identifies a policy of "maintain[ing] family unity, including by detaining alien families together where appropriate and consistent with law and available resources." [21] Moreover, in most cases, the parent is in the best position to represent the minor's rights and wishes and can help the minor to prepare his or her case. It is also more expedient for the family, if the cases are interrelated, to have a single proceeding adjudicated in the same location, by the same adjudicator.

When determining whether an individual is a parent or legal guardian, DHS would use all available evidence, such as birth certificates or other available documentation, to ensure the

parental relationship or legal guardianship is bona fide. If the relationship cannot be established, the juvenile would be treated as a UAC and would be transferred into HHS custody. If the relationship is established, but the parent or legal guardian lives far away, the proposed regulations use the FSA paragraph 26 language, stating that DHS shall assist with making arrangements for transportation and maintains the discretion to actually provide transportation to the DHS office nearest the parent or legal guardian.

Finally, the proposed rule would not include provisions parallel to the requirements in paragraphs 15 or 16 related to release from custody. These requirements have been superseded in part by the TVPRA, under which DHS cannot release a juvenile to anyone other than a parent or legal guardian. Further, parents have no affirmative right of release under the provisions of the FSA. Therefore, if DHS determines that the accompanying parent should be detained, releasing a minor under these circumstances would be either a release to a parent who is not currently in detention, or, in all other cases, a transfer to HHS custody, rather than a release from custody as envisioned under the FSA. In addition, the requirements of paragraphs 15 and 16, which are primarily for the Government's benefit, are not currently implemented.

### Proposed 8 CFR 236.3(k)—Procedures Upon Transfer

Current 8 CFR 236.3 does not set out any procedures to specifically govern the transfer of minors. FSA paragraph 27 provides that a minor who is transferred from a placement in one "licensed program" to another shall be transferred with his/her possessions and legal papers, unless the possessions exceed the amount permitted by carriers, in which case the possessions will be shipped to the minor in a timely manner. The proposed regulations at § 236.3(k) include the same requirement for the transfer of possessions when a minor who is not a UAC is transferred between licensed, non-secure facilities. While DHS understands paragraph 27 of the FSA to, in practice, refer to transfer between ICE facilities (the only DHS facilities that qualify as "placements" in "licensed programs," under the meaning of the FSA), minors are generally transferred with their possessions if they are moving between CBP facilities, or from a CBP facility to an ICE facility.

Paragraph 27 of the FSA also provides that no minor represented by counsel shall be transferred without advance

notice to such counsel except in unusual and compelling circumstances. The proposed regulations also provide that if a minor or UAC is represented by counsel, notice to counsel will be provided prior to any transfer of a minor or UAC from one ICE placement to another, or from an ICE placement to an ORR placement, unless unusual and compelling reasons, such as safety or escape-risk, exist, in which case counsel will receive notification within 24 hours of transfer.

### Proposed 8 CFR 236.3(l)—Notice to Parent of Refusal of Release or Application for Relief

The current regulations provide that if a parent of a detained juvenile can be located, and is otherwise suitable to receive custody of the juvenile, and the juvenile indicates a refusal to be released to his or her parent, the parent(s) shall be notified of the juvenile's refusal to be released to the parent(s), and the parent(s) shall be afforded the opportunity to present their views before a custody determination is made (§ 236.3(e)). Similarly, the current regulations provide that if a juvenile seeks release from detention, voluntary departure, parole, or any form of relief from removal, where it appears that the grant of such relief may effectively terminate some interest inherent in the parent-child relationship and/or the juvenile's rights and interests are adverse to those of the parent, and the parent is presently residing in the United States, the parent shall be given notice of the juvenile's application for relief, and shall be afforded an opportunity to present his or her views and assert his or her interest before a determination is made as to the merits of the request for relief (§ 236.3(f)). In both instances, the parents are given an opportunity to present their views to the district director, Director of the Office of Juvenile Affairs, or an immigration judge.

The FSA does not discuss any necessary notification to parents of a juvenile's refusal to be released to a parent or a juvenile's application for relief from removal. DHS has reviewed the current regulatory provision and is proposing amendments to this paragraph to maintain the goals of this type of notification while reflecting the current distribution of responsibilities vis-à-vis juveniles between DHS components and DOJ EOIR. The language of the current and proposed regulation appropriately protects parental rights while balancing a juvenile's potential desire to take an action adverse to the wishes of his/her parent.

---

[21] E.O. 13841 (June 20, 2018), 83 FR 29435.

Used on August 19, 2019 — Flores v. Reno

Given the current legal environment and operational practices, ICE and CBP would seldom, if ever, be responsible for providing any type of parental notification as required by 236.3(e) or (f). For instance, if a minor seeks release from ICE detention, ICE would only be required to notify that minor's parent if the parent is presently residing in the United States and the minor's release would terminate some interest inherent in the parent-child relationship. Yet even in this scenario, because DHS cannot release a minor to anyone other than a parent or legal guardian as discussed above, it seems unlikely that such release would ''terminate some interest inherent in the parent-child relationship'' as described in current § 236.3(f). In practice, USCIS and EOIR are the entities most likely to be required to provide parental notification due to a potential termination of an interest inherent in the parent-child relationship, because USCIS adjudicators and EOIR immigration judges more frequently grant relief from removal that could impact a parent-child relationship. The proposed DHS regulations at 236.3(l) would remove language authorizing parents to present their views to immigration judges if their child refuses to be released into their custody, because currently immigration judges do not set conditions of release, and therefore do not decide to whom a minor or UAC will be released. However, the change does not prevent parents from presenting their views to DHS. Refusal of release is primarily an issue that affects DHS and HHS, rather than DOJ. In addition, certain types of requests listed in proposed 236.3(l) (*i.e.,* parole) would be addressed to DHS alone, and an immigration judge would not have jurisdiction over such requests.

The proposed changes to current sections 236(e) and (f) (in proposed § 236.3(l)) would clarify the actual scope of DHS's regulations, but would not represent a change in practice. The proposed rule would maintain parents' right to be notified and present their views to DHS (but not an immigration judge) if a minor or UAC in DHS custody refuses to be released to that parent, if a grant of relief might terminate some parent-child relationship interests, or where the child's interests are adverse to those of the parent.

In addition, the proposed rule would not affect the EOIR notice requirement currently contained in 8 CFR 1236.3(f) for applications for relief.

## Proposed 8 CFR 236.3(m)—Bond Hearings

The current regulations make no provision for bond hearings by immigration judges for minors as FSA paragraph 24(A) has been interpreted to require. Paragraph 24(A), states that a minor in ''deportation proceedings'' shall be afforded a bond redetermination unless he or she refuses such a determination. The proposed regulations at § 236.3(m) provide for review of DHS bond determinations by immigration judges to the extent permitted by 8 CFR 1003.19, but only for those minors: (1) Who are in removal proceedings under INA section 240, 8 U.S.C. 1229a; and (2) who are in DHS custody. Those minors who are not in section 240 proceedings are ineligible to seek review by an immigration judge of their DHS custody determination.

DHS proposes this paragraph to provide for bond hearings as under FSA paragraph 24(A), while updating the language to be consistent with developments in immigration law since the FSA was signed, including the TVPRA. FSA paragraph 24(A) refers to minors in ''deportation proceedings.'' The term ''deportation proceedings,'' however, is no longer used in immigration law due to the enactment of IIRIRA in 1996. Prior to IIRIRA's enactment the INS conducted two types of proceedings for aliens: ''exclusion'' proceedings and ''deportation'' proceedings. Section 304 of IIRIRA, however, changed the types of proceedings available to aliens under the INA, and what were previously known as ''deportation'' proceedings became ''removal'' proceedings. *See* INA sec. 240, 8 U.S.C. 1229a. IIRIRA also amended INA section 235 to provide for expedited removal proceedings for certain applicants for admission who would have previously been subject to ''exclusion'' proceedings. *See* INA sec. 235(b), 8 U.S.C. 1225(b). Thus, DHS has proposed to update this language. Additionally, the proposed rule would clarify that this provision applies only to minors in DHS custody, in accordance with the TVPRA.

## Proposed 8 CFR 236.3(n)—Retaking Custody of a Previously Released Minor

The current regulations have no provisions for reassuming custody of previously released minors if they become an escape-risk, become a danger to the community, or are issued a final order of removal after being released. The proposed regulations at § 236.3(n) would provide for this scenario. The regulations also explain that DHS may take a minor into custody if there is no

longer a parent or legal guardian available to care for the minor, at which point the minor will be treated as a UAC and DHS will transfer him or her to HHS.

## Proposed 8 CFR 236.3(o)—Monitoring

The current regulations at § 236.3(c) describe the duties of the Juvenile Coordinator, including the responsibility of locating suitable placements for juveniles. Paragraph 28(A) of the FSA also includes a provision for a Juvenile Coordinator, but places more reporting and monitoring obligations on the Coordinator than currently exist in the regulations. The proposed regulations eliminate the requirement in the current regulations that the Juvenile Coordinator locate a suitable placement for minors, as these duties are generally exercised by immigration officers and other employees at DHS. Section 236.3(o), however, is being proposed to provide for monitoring, as under paragraph 28(A) of the FSA, by proposing two Juvenile Coordinators—one for ICE and one for CBP—and charges each with monitoring statistics about UACs and minors who remain in DHS custody for longer than 72 hours. The statistical information may include, but would not be limited to, biographical information, dates of custody, placement, transfers, removals, or releases from custody. This information does not include immigration status or hearing dates, as referenced in FSA paragraph 28(A), because the import of this data for monitoring purposes is not immediately apparent. The plain language meaning of ''immigration status'' of particular aliens in DHS custody is not relevant to monitoring compliance with detention or holding condition requirements. It is only relevant to whether DHS is able to detain an individual. It is unclear what other meaning of the term ''immigration status'' could be relevant to monitoring compliance with these regulations. The hearing dates for aliens in DHS custody, which are not set by DHS and are frequently subject to change, are also not directly relevant to the monitoring of the conditions of detention for a minor alien. The juvenile coordinators may collect such data, if appropriate. The juvenile coordinators may also review additional data points should they deem it appropriate given operational changes and other considerations.

*B. HHS Regulations*

Proposed 45 CFR Part 410, Subpart A—Care and Placement of Unaccompanied Alien Children

This subpart states the purpose of this regulation and the general principles behind it, and sets standards for the care and placement of UACs as discussed below. ORR uses the term "placement" to refer to assigning UACs to facilities that ORR operates or arranges through a grant or contract, or assigning them to ORR-funded foster care. ORR uses the term "release" to refer to the release of UACs from ORR custody into the custody of an approved sponsor.

Proposed 45 CFR 410.100—Scope of This Part

Section 410.100 discusses what is covered under this part. Specifically, it states that this part covers the care, custody, and placement of UACs pursuant to section 462 of the HSA and section 235 of the TVPRA, and in light of the FSA. The proposed rule would make clear that the purpose of this rule is not to govern or describe the entire program, nor is it to implement either the HSA or the TVPRA in their entirety. Rather, the purpose of this rule is to implement the relevant and substantive terms of the FSA, and this rulemaking will apply provisions of the HSA and TVPRA only where such authorities would supersede or alter an FSA provision.

Proposed 45 CFR 410.101—Definitions

Section 410.101 states the definitions that apply to this part. Notably, the definition of UAC is from the HSA. *See* 6 U.S.C. 279(g)(2); 8 U.S.C. 1232(g). The regulation uses the term "staff secure facility" in the same sense as the FSA uses the term "medium security facility." "Shelter" includes facilities defined as "licensed facilities" under the FSA, and also includes staff secure facilities, *i.e.,* medium security facilities as defined by the FSA. Other types of shelters might also be licensed, such as long term and transitional foster care facilities. The FSA does not define "secure facility," but this regulation proposes a definition consistent with the provisions of the FSA applying to secure facilities. These facilities may be a state or county juvenile detention facility or another form of secure ORR detention facility (such as a Residential Treatment Center), or a facility with an ORR contract or cooperative agreement having separate accommodations for minors. The definition uses the term "cooperative agreement," as ORR uses cooperative agreements for the majority of its shelters, pursuant to 8 U.S.C.

1232(i). The definition recognizes that under the FSA, a secure facility does not need to meet the licensed facility provisions that would apply to other shelters.

Section 410.101 defines unaccompanied alien child according to the definition set forth in the HSA. It, as well as the TVPRA, only gives ORR authority to provide care and custody of individuals who meet that definition. The statutes, however, do not set forth a process for determining whether an individual meets the definition of a UAC. Similar to proposed 8 CFR 236.3(d), § 410.101 would make clear that ORR's determination of whether a particular person is a UAC is an ongoing determination that may change based on the facts available to ORR.

Proposed 45 CFR 410.102—ORR Care and Placement of Unaccompanied Alien Children

Section 410.102 specifies the children for whom ORR provides care, custody, and placement. The regulation specifies that DHS handles immigration benefits and enforcement. The INS entered into the FSA prior to the enactment of the HSA and TVPRA, which transferred the care, and then custody, of the majority of UACs to ORR. The HSA recognizes that ORR does not have responsibility for adjudicating benefit determinations under the INA. This part recognizes the general principles of the FSA that while in custody, UACs shall be treated with dignity, respect, and special concern for their particular vulnerability.

Proposed 45 CFR Part 410, Subpart B—Determining the Placement of an Unaccompanied Alien Child

Proposed 45 CFR 410.200—Purpose of This Subpart

As stated in § 410.200, this subpart sets forth factors that ORR considers when placing UACs.

Proposed 45 CFR 410.201—Considerations Generally Applicable to the Placement of an Unaccompanied Alien Child

Section 410.201 addresses the considerations that generally apply to the placement of UAC. The provision generally parallels the FSA requirements. The provision notes that ORR makes reasonable efforts to provide placements in the geographic areas where DHS apprehends the majority of UACs. ORR complies with this provision, as ORR maintains the highest number of UAC beds in the state of Texas where most UACs are currently apprehended.

Proposed 45 CFR 410.202—Placement of an Unaccompanied Alien Child in a Licensed Program

Section 410.202 states that ORR places a UAC into a licensed program promptly after a UAC is referred to ORR legal custody, except in certain enumerated circumstances. *See* 8 U.S.C.1232(c)(2)(A). The FSA also recognizes circumstances where a UAC is not promptly, or is not at all, placed in a licensed program. These circumstances include emergencies or an influx as defined in § 410.101 (in which case the UAC shall be placed in a licensed program as expeditiously as possible); where the UAC meets the criteria for placement in a secure facility; and as otherwise required by any court decree or court-approved settlement. Like the DHS portion of this proposed rule, proposed § 410.202 does not include the exception, which appears at paragraph 12(A)(4) of the FSA, that allows transfer within 5 days instead of 3 days in cases involving transport from remote areas or where an alien speaks an "unusual" language that requires the Government to locate an interpreter. As noted above, DHS has matured its operations such that these factors no longer materially delay transfer.

Proposed 45 CFR 410.203—Criteria for Placing an Unaccompanied Alien Child in a Secure Facility

Section 410.203 sets forth criteria for placing UACs in secure facilities. This part is consistent with the FSA criteria, except that under the TVPRA, "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." 8 U.S.C. 1232(c)(2)(A). With respect to these regulations, therefore, the TVPRA removes the factor of being an escape risk, which is permissible grounds under the FSA, as a ground upon which ORR may place a UAC in a secure facility.

In addition, HHS chose not to include in the proposed regulatory text the specific examples of behavior or offenses that could result in the secure detention of a UAC, as they appear in paragraph 21 of the FSA, because the examples are non-exhaustive and imprecise. For instance, examples listed in paragraph 21 of what may be considered nonviolent, isolated offenses (*e.g.,* breaking and entering, vandalism, or driving under the influence) could be violent offenses in certain circumstances depending upon the actions accompanying them. In

addition, state law may classify these offenses as violent. Including these examples as part of codified regulatory text may inadvertently lead to more confusion rather than clarity, and eliminate the ability to make case-by-case determinations of the violence associated with a particular act.

Under the proposed regulations, a UAC may be placed in a secure facility if ORR determines that the UAC:

• Has been charged with, is chargeable, or has been convicted of a crime; or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; and where ORR assesses that the crimes or delinquent acts were not:

○ Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon; or

○ petty offenses, which are not considered grounds for a stricter means of detention in any case.

''Chargeable'' means that ORR has probable cause to believe that the UAC has committed a specified offense.

• While in DHS or ORR's custody or while in the presence of an immigration officer, has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself/herself or others.) *Note:* that because the FSA states that such acts would have occurred ''while in INS custody'' or ''in the presence of an INS officer,'' we propose that such activities in either DHS or HHS custody or in the presence of an ''immigration officer'' would be evaluated.

• Has engaged while in a licensed program in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which the UAC is placed such that transfer is necessary to ensure the welfare of the UAC or others, as determined by the staff of the licensed program.

In addition, ORR proposes the following as warranting placement in a secure facility, even though the FSA does not specifically mention such criteria.

• First, if a UAC engages in unacceptably disruptive behavior that interferes with the normal functioning of a ''staff secure'' shelter, then the UAC may be transferred to secure facility. As written, the FSA looks only to such disruptive behavior when it occurs in a ''licensed'' facility—which under the FSA does not include in its definition staff-secure facilities—even though the vast majority of such facilities receive the same licenses as non-secure shelters.

However, under this rule, UACs could be immediately transferred to a secure facility for disruptive behavior in a non-secure shelter, without the means to evaluate further disruption in a staff secure setting. In addition, allowing for evaluation while in staff-secure care allows HHS to protect the other children residing within such shelter; it allows HHS to move one UAC who is disrupting the operations of the staff secure facility and transfer him or her to a more restrictive level of care.

• Second, the proposed rule adds to the list of behaviors that may be considered unacceptably disruptive. Examples provided in the FSA at paragraph 21 are: Drug or alcohol abuse, stealing, fighting, intimidation of others, etc. The agreement specifically says that the list is not exhaustive. Therefore, we propose to add to this list ''displays sexual predatory behavior.''

• Finally, in keeping with the July 30 Order in *Flores* v. *Sessions,* the proposed rule states that placement in a secure RTC may not occur unless a licensed psychologist or psychiatrist determines that the UAC poses a risk of harm to self or others.

Section 410.203 also sets forth review and approval of the decision to place a UAC in a secure facility consistent with the FSA. The FSA states that the determination to place a minor in a secure facility shall be reviewed and approved by the ''regional juvenile coordinator.'' This proposed rule uses the term ''Federal Field Specialist,'' as this is the official closest to such juvenile coordinator for ORR. (*Note:* Although not covered in this proposed rule, ORR also recognizes that the TVPRA at 8 U.S.C. 1232(c)(2)(A) delegates to the Secretary of HHS the requirement for prescribing procedures governing agency review, on a monthly basis, of secure placements. ORR directs readers to sections 1.4.2. and 1.4.7 of the ORR Policy Guide (available at: *https:// www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied*) for these procedurals under the TVPRA.)

Proposed 45 CFR 410.204—Considerations When Determining Whether an Unaccompanied Alien Child is an Escape Risk

Section 410.204 describes the considerations ORR takes into account when determining whether a UAC is an escape risk. This part is consistent with how the term ''escape risk'' is used in the FSA. The TVPRA removes the factor of being an escape risk as a ground upon which ORR may place a UAC in a secure facility, even though it constitutes permissible grounds under

the FSA. The factor of escape risk, however, is still relevant to the evaluation of transfers between ORR facilities under the FSA as being an escape risk might cause a UAC to be stepped up from a non-secure level of care to a staff secure level of care where there is a higher staff-UAC ratio and a secure perimeter at the facility. Notably, an escape risk differs from a ''risk of flight,'' which is a term of art used in immigration law regarding an alien's risk of not appearing for his or her immigration proceedings.

Proposed 45 CFR 410.205—Applicability of Section 410.203 for Placement in a Secure Facility

Section 410.205 provides that ORR does not place a UAC in a secure facility pursuant to § 410.203 if less restrictive alternatives, such as a staff secure facility or another licensed program, are available and appropriate in the circumstances.

Proposed 45 CFR 410.206—Information for Unaccompanied Alien Children Concerning the Reasons for His or Her Placement in a Secure or Staff Secure Facility

Section 410.206 specifies that, within a reasonable period of time, ORR provides each UAC placed in or transferred to a secure or staff secure facility with a notice of the reasons for the placement in a language the UAC understands.

Proposed 45 CFR 410.207—Custody of an Unaccompanied Alien Child Placed Pursuant to This Subpart

Section 410.207 specifies who has custody of a UAC under subpart B of these rules. The regulation specifies that upon release to an approved sponsor, a UAC is no longer in the custody of ORR. ORR would continue to have ongoing monitoring responsibilities under the HSA and TVPRA, but would not be the legal or physical custodian. *See, e.g.,* 6 U.S.C. 279(b)(1)(L); 8 U.S.C. 1232(c)(3)(B). This interpretation accords with ORR's longstanding interpretation, as well as provisions of the FSA (*see e.g.,* paragraphs 15 through 17, discussing ''release'' from custody). This provision recognizes that once a UAC is released, he or she is outside the custody of HHS and ORR.

Proposed 45 CFR 410.208—Special Needs Minors

Section 410.208 describes ORR's policy regarding placement of a special needs minor. Note that an RTC may be considered a secure level of care and is discussed in section 410.203 of this Part.

**Proposed 45 CFR 410.209—Procedures During an Emergency or Influx**

Section 410.209 describes the procedures ORR follows during an emergency or influx. The FSA defines "emergency" and "influx." HHS proposes to incorporate those definitions into its regulations with minor changes, consistent with the definitions in proposed 8 CFR 236.3. In addition, the FSA states that in the case of an emergency or influx of minors into the United States, UACs [22] should be placed in a licensed program as "expeditiously as possible."

However, as DHS does, ORR also proposes a written plan describing the reasonable efforts it will take to place all UACs as expeditiously as possible into a licensed shelter when there is an influx or emergency consistent with proposed 410.209.

**Proposed 45 CFR 410 Subpart C, Releasing an Unaccompanied Alien Child From ORR Custody**

**Proposed 45 CFR 410.300—Purpose of This Subpart**

As described in § 410.300, the purpose of this subpart is to address the policies and procedures used to release a UAC from ORR custody to an approved sponsor.

**Proposed 45 CFR 410.301—Sponsors to Whom ORR Releases an Unaccompanied Alien Child**

As specified in 410.301, ORR releases a UAC to a sponsor without unnecessary delay when ORR determines that continued ORR custody of the UAC is not required either to secure the UAC's timely appearance before DHS or the immigration courts, or to ensure the UAC's safety or the safety of others.

Section 410.301 also contains the list of individuals (and entities) to whom ORR releases a UAC. ORR refers to the individuals and entities in this list as "sponsors," regardless of their specific relationship with the UAC. The list follows the order of preference set out in the FSA.

**Proposed 45 CFR 410.302—Sponsor Suitability Assessment Process Requirements Leading to Release of an Unaccompanied Alien Child From ORR Custody to a Sponsor**

Section 410.302 outlines the process requirements leading to release of a

UAC from ORR custody to a sponsor (also referred to as "custodian"). The FSA at paragraph 17 allows ORR the discretion to require a suitability assessment prior to release. Likewise, the TVPRA provides that ORR may not release a UAC to a potential sponsor unless ORR makes a determination that the proposed custodian is "capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. 1232(c)(3)(A). As such, this proposed rule requires a background check, including at least a verification of identity for potential sponsors in all circumstances.

Like the FSA, the proposed rule also allows for the suitability assessment to include an investigation of the living conditions in which the UAC would be placed and the standard of care he or she would receive, interviews of household members, a home visit, and follow-up visits after release. Furthermore, where the TVPRA requires a home study, as specified in 8 U.S.C. 1232(c)(3)(B), the proposed regulations acknowledge such requirement.

The FSA says that the proposed sponsor must agree to the conditions of release by signing a custodial affidavit (Form I–134) and release agreement. However, the Form I–134 is a DHS form, and ORR does not use such form. Therefore, this proposed rule would have the sponsor sign an affirmation of abiding by the sponsor care agreement, which is the historical agreement and accompanying form ORR has used so that the sponsor acknowledges his or her responsibilities.

For many years the suitability assessment has involved prospective sponsors and household members to be fingerprinted and for background checks to be run on their biometric and biographical data to ensure that release of a UAC to prospective sponsors would be safe. Fingerprinting of potential sponsors and household members is consistent with child welfare provisions. For example, all states require background checks for prospective foster care and adoptive parents, and kinship caregivers typically must meet most of these same requirements. *See* "Background Checks for Prospective Foster, Adoptive, and Kinship Caregivers," available at: *https://www.childwelfare.gov/pubPDFs/background.pdf#page=2&view=Who needs background checks* (last visited

Aug. 4, 2018). As of the time of the publication of the report, in 48 states, all adults residing in the home also were subject to background checks. A criminal records check for adult sponsors and other household members will check the individual's name in State, local or Federal law enforcement agencies' records, including databases of records for any history of criminal convictions. And, nearly all states require a check of national criminal records. *See also* 42 U.S.C. 671(a)(20) (providing that states receiving federal funding for foster care and adoption assistance provide "procedures for criminal records checks, including fingerprint-based checks of national crime information databases (as defined in section 534(e)(3)(A) 1 of title 28), for any prospective foster or adoptive parent before the foster or adoptive parent may be finally approved for placement of a child . . . .") In many, if not most cases, as well, while a sponsor may be a biological parent, the child arrived unaccompanied, and may not have lived with the parent for much or a significant portion of his or her childhood.[19]

Section 410.302(e) lists the conditions and principles of release.

ORR also invites public comment on whether to set forth in the final rule ORR's general policies concerning the following:

• Requirements for home studies (see 8 U.S.C. 1232(c)(3)(B) for statutory requirements for a home study);

• Denial of release to a prospective sponsor, criteria for such denial, and appeal; and

• Post-release services requirements. *Note:* in accordance with the *Flores* v. *Sessions* July 30, 2018 Court order, ORR states in the preamble that it will not have a blanket policy of requiring post-release services to be scheduled prior to release—for those UACs who required a home study—but will evaluate such situations on case-by-case basis, based on the particularized needs of the UAC as well as the evaluation of the sponsor, and whether the suitability of the sponsor may depend upon having post-release services in place prior to any release. Because this statement reflects an interpretation of what may constitute an "unnecessary" delay of release, it is not necessary to include the policy on post-release services being in place, discussed above, explicitly in the regulation text, as the requirement for release without "unnecessary delay" is already included in the substantive rule.

Current policies are set forth in the UAC Policy Guide available at *https://www.acf.hhs.gov/orr/resource/children-*

22 While the text of the FSA only uses the term "minors," HHS has interpreted this term to include UACs, who may or may not meet the definition of "minor" in the FSA, given the subsequent enactment of the TVPRA, and the fact that HHS does not have custody of juveniles who are not UACs.

entering-the-united-states-unaccompanied at: §§ 2.4 through 2.7.

Proposed 45 CFR 410 Subpart D—What Standards Must Licensed Programs Meet?

Proposed 45 CFR 410.400—Purpose of This Subpart

As stated at § 410.400, this subpart covers the standards that licensed programs must meet in keeping with the FSA, as set out in the principles of the FSA, including the general principles of the settlement agreement of treating all minors in custody with dignity, respect, and special concern for their particular vulnerability.

Proposed 45 CFR 410.401—Applicability of This Subpart

Section 410.401 states that the subpart applies to all licensed programs.

Proposed 45 CFR 410.402—Minimum Standards Applicable to Licensed Programs

Section 410.402 reflects the minimum standards of care listed in Exhibit 1 of the FSA. ORR expects licensed programs to easily meet those minimum standards and, in addition, to strive to provide additional care and services to the UACs in their care. The requirements of 410.402 are consistent with the *Flores* v. *Sessions* Court Order of July 30, 2018, as they require that licensed programs comply with applicable state child welfare laws and regulations, and that UACs be permitted to "talk privately on the phone, as permitted by the house rules and regulations."

Proposed 45 CFR 410.403—Ensuring That Licensed Programs are Providing Services as Required by These Regulations

Section 410.403 describes how ORR ensures that licensed programs are providing services as required by these regulations. As stated in this section, to ensure that licensed programs continually meet the minimum standards and are consistent in their provision of services, ORR monitors compliance with these rules. The FSA does not contain standards for how often monitoring shall occur, and this regulation does not propose to do so. At present, ORR provides further information on such monitoring in section 5.5 of the ORR Policy Guide (available at: *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-5#5.5*).

Proposed 45 CFR 410 Subpart E—Provisions for Transportation of an Unaccompanied Alien Child

This subpart concerns the safe transportation of a UAC while he or she is in ORR's custody.

Proposed 45 CFR 410.500—Purpose of This Subpart

Section 410.500 describes how transportation is conducted for a UAC in ORR's custody. The FSA has two provisions that govern transportation specifically, which are incorporated in this proposed rule at § 410.501. First, a UAC cannot be transported with unrelated detained adults. Second, ORR assists in making transportation arrangements when ORR plans to release a UAC under the sponsor suitability provisions, and ORR may, in its discretion, provide transportation to a UAC.

Proposed 45 CFR 410 Subpart F, Transfer of an Unaccompanied Alien Child

This subpart sets forth the provisions for transferring a UAC between HHS facilities. In some cases, ORR may need to change the placement of a UAC. This may occur for a variety of reasons, including a lack of detailed information at the time of apprehension, a change in the availability of licensed placements, or a change in the UAC's behavior, mental health situation, or immigration case.

Proposed 45 CFR 410.600—Principles Applicable to Transfer of an Unaccompanied Alien Child

Section 410.600 sets out the principles that apply to the transfer of a UAC between HHS facilities. The transfer of a UAC under the FSA concerns mainly two issues: (1) That a UAC is transferred with all his or her possessions and legal papers, and (2) that the UAC's attorney, if the UAC has one, is notified prior to a transfer, with some exceptions. This rule adopts the FSA provisions concerning transfer of a UAC.

Proposed 45 CFR 410 Subpart G—Age Determinations

This subpart concerns age determinations for UACs.

Proposed 45 CFR 410.700—Conducting Age Determinations

Section 410.700 incorporates both the provisions of the TVPRA, 8 U.S.C. 1232(b)(4), and the requirements of the FSA, in setting forth standards for age determinations. These take into account multiple forms of evidence, including the non-exclusive use of radiographs,

and may involve medical, dental, or other appropriate procedures to verify age.

Proposed 45 CFR 410.701—Treatment of an Individual Who Appears To Be an Adult

Section 410.701 also accords with the FSA and the TVPRA, and states that if the procedures of § 410.700 would result in a reasonable person concluding that an individual is an adult, despite his or her claim to be a minor, ORR must treat such person as an adult for all purposes. As with 410.700, ORR may take into account multiple forms of evidence, including the non-exclusive use of radiographs, and may require such an individual to submit to a medical or dental examination conducted by a medical professional or other appropriate procedures to verify age.

Proposed 45 CFR 410 Subpart H, Unaccompanied Alien Children's Objections to ORR Determinations

This subpart concerns objections of a UAC to ORR placement.

Proposed 45 CFR 410.800–801—Procedures

While the FSA at Paragraph 24(B) and 24(C) contains procedures for judicial review of a UAC's placement in shelter (including in secure or staff-secure), and a standard of review, the agreement is clear that a reviewing federal district court must have both "jurisdiction and venue." Also, once these regulations are finalized and the FSA is terminated, it would be even clearer that any review by judicial action must occur under a statute where the government has waived sovereign immunity, such as the Administrative Procedure Act. Therefore, we are not proposing regulations for most of paragraphs 24(B) and 24(C) of the FSA, although we do propose that all UACs will continue to receive a notice stating as follows:

"ORR usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may call a lawyer to seek assistance. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

The proposed rule also contains a requirement parallel to that of the FSA that when UACs are placed in a more restrictive level of care, such as a secure or staff secure facility, they receive a notice—within a reasonable period of time—explaining the reasons for housing them in the more restrictive

level of care. In addition, the proposed rule is consistent with the July 30, 2018 order of the *Flores* court by stating that the notice must be in a language the UAC understands.

Finally, consistent with the FSA, the proposed provision requires that ORR promptly provide each UAC not released with a list of free legal services providers compiled by ORR and that is provided to UAC as part of a Legal Resource Guide for UAC (unless previously given to the UAC).

Proposed 45 CFR 410.810 "810 Hearings"

The proposed rule makes no provision for immigration judges employed by the DOJ to conduct bond redetermination hearings for UACs under paragraph 24(A) of the FSA. It is not clear statutory authority for DOJ to conduct such hearings still exists, and indeed DOJ argued in the Ninth Circuit that it does not. In the HSA, Congress assigned responsibility for the "care and placement" of UACs to HHS's ORR, and specifically barred ORR from requiring "that a bond be posted for [a UAC] who is released to a qualified sponsor." 6 U.S.C. 279(b)(1)(A), (4). In the TVPRA, Congress reaffirmed HHS's responsibility for the custody and placement of UACs. 8 U.S.C. 1232(b)(1), (c). The TVPRA also imposed detailed requirements governing ORR's release of UACs to proposed custodians— including, for example, a provision authorizing ORR to consider a UAC's dangerousness and risk of flight in making placement decisions. 8 U.S.C. 1232(c)(2)(A). Congress thus appears to have vested HHS, not DOJ, with control over the custody and release of UACs, and to have deliberately omitted any role for immigration judges in this area.

In *Flores* v. *Sessions,* the U.S. Court of Appeals for the Ninth Circuit nonetheless concluded that neither the HSA nor the TVPRA superseded the FSA's bond-hearing provision. 862 F.3d at 881. But the court did not identify any affirmative statutory authority for immigration judges employed by DOJ to conduct the bond hearings for UACs required by paragraph 24(A) of the FSA. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n* v. *FCC,* 476 U.S. 355, 374 (1986). HHS, however, as the legal custodian of UACs who are in federal custody, clearly has the authority to conduct the hearings envisioned by the FSA and in accordance with the court's ruling in *Flores* v. *Sessions.* It also is more sensible, as a policy matter, for the same agency (HHS) charged with responsibility for custody and care of

UACs also to conduct the hearings envisioned by the FSA.

This rule in turn proposes HHS regulations to afford the same type of hearing paragraph 24(A) calls for, and to recognize the transfer of responsibility of care and custody of UAC from the former INS to HHS ORR. Specifically, rather than providing for DOJ-employed immigration judges to preside over these hearings, this rule includes provisions whereby HHS would create an independent hearing officer process that would be guided by the immigration judge bond hearing process currently in place for UACs under the FSA. The basic idea would be to provide essentially the same substantive protections, but through a neutral adjudicator at HHS rather than DOJ.

This proposed rule implements the FSA's substantive protections, and responds to the HSA and TVPRA and the transfer of responsibility for UACs, when they are in government custody, to HHS. The reasonable method of reconciling paragraph 24(A) of the FSA with the HSA and TVPRA, is for the Secretary of HHS to appoint an independent hearing officer or officers who would conduct the hearings envisioned by the FSA for those UAC who qualify for such review.

Under this proposal, the Secretary would appoint independent hearing officers to determine whether a UAC, if released, would present a danger to community (or flight risk). The hearing officer would not have the authority to release a UAC, as the *Flores* court has already recognized that Paragraph 24(A) of the FSA does not permit a determination over the suitability of a sponsor. Specifically, in reviewing this issue, the Ninth Circuit explained "as was the case when the *Flores* Settlement first went into effect, [a bond hearing] permits a system under which unaccompanied minors will receive bond hearings, but the decision of the immigration judge will not be the sole factor in determining whether and to whose custody they will be released. Immigration judges may assess whether a minor should remain detained or otherwise in the government's custody, but there must still be a separate decision with respect to the implementation of the child's appropriate care and custody." *Flores,* 862 F.3d at 878. Similarly, the district court stated: "To be sure, the TVPRA addresses the safety and secure placement of unaccompanied children . . . . But identifying appropriate custodians and facilities for an unaccompanied child is not the same as answering the threshold question of whether the child should be detained in

the first place—that is for an immigration judge at a bond hearing to decide . . . . Assuming an immigration judge reduces a child's bond, or decides he or she presents no flight risk or danger such that he needs to remain in HHS/ORR custody, HHS can still exercise its coordination and placement duties under the TVPRA." *Flores* v. *Lynch,* No. CV 85–4544 DMG at 6 (C.D. Cal. Jan. 20, 2017).

Thus, the hearing officer would decide only the issues presented by paragraph 24(A) of the FSA—whether the UAC would present a danger to the community or a risk of flight (that is, not appearing for his or her immigration hearing) if released. For the majority of children in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. For these children, a hearing is not necessary or even beneficial, and would simply be a misuse of limited government resources. However, for some children placed in secure facilities, the hearing may assist them in ultimately being released from ORR custody in the event a suitable sponsor is or becomes available.

As is the case now, under section 2.9 of the ORR Policy Guide (available at: *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.9*), the hearing officer's decision that the UAC is not a danger to the community will supersede an ORR determination on that question. While currently, immigration judge decisions on such issues may be appealed to the Board of Immigration Appeals (BIA), HHS does not have a two-tier administrative appellate system that mirrors the immigration judge-BIA hierarchy. To provide similar protections without such a rigid hierarchy, this proposed rule would allow appeal to the Assistant Secretary of ACF (if the appeal is received by the Assistant Secretary within 30 days of the original hearing officer decision). The Assistant Secretary would review factual determinations using a clearly erroneous standard, and review legal determinations on a *de novo* basis. In such cases, where ORR appeals to the Assistant Secretary of ACF, there would be no stay of the hearing officer's decision unless the Assistant Secretary finds, within 5 business days of the hearing officer decision, that a failure to stay the decision would result in a significant danger to the community presented by the UAC. The written stay decision would be based on clear behaviors of the UAC while in care, and/or documented criminal or juvenile behavior records from the UAC.

Otherwise, a hearing officer's decision that a UAC would not be dangerous (or a flight risk) if released, would mean that as soon as ORR determined a suitable sponsor (or if ORR has done so already) it must release in accordance with its ordinary procedures on release.

Under current *Flores* hearing rules, and in accordance with the *Flores* district court's order analogizing *Flores* hearings to bond hearings for adults, immigration judges apply the standard of *Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006).[23] Thus, the burden is on the UAC to demonstrate that he or she would not be a danger to the community (or flight risk) if released. However, due to the unique vulnerabilities of children and subsequent enactment of the TVPRA, we request comments on whether the burden of proof should be on ORR to demonstrate that the UAC would be a danger or flight risk if released. As is the case currently, the standard would be a ''preponderance'' of the evidence.

ORR also would take into consideration the hearing officer's decision on a UAC's level of danger when assessing the UAC's placement and conditions of placement, but the hearing officer would not have the authority to order a particular placement for a UAC.

Requests for a hearing under this section (an ''810 hearing'') could be made by the child in ORR care, by a legal representative of the child, or by parents/legal guardians on their child's behalf. These parties could submit a written request for the 810 hearing to the care provider using the ORR form (*See* https://www.acf.hhs.gov/sites/default/files/orr/request_for_a_flores_bond_hearing_01_03_2018e.pdf (last visited Aug. 12, 2018)), or through a separate written request that provides the information requested in the form. ORR would provide a notice of the right to request the 810 hearing to UACs in secure and staff secure facilities. ORR also expects that the hearing officer would create a process for UACs or their representatives to directly request a hearing to determine danger (or flight risk). During the 810 hearing, the UAC could choose to be represented by a person of his or her choosing, at no cost to the government. The UAC could present oral and written evidence to the hearing officer and could appear by video or teleconference. ORR could also choose to present evidence either in writing, or by appearing in person, or by video or teleconference.

Because the 810 hearing process would be unique to ORR and HHS, if a UAC turns 18 years old during the pendency of the hearing, the deliberations would have no effect on DHS detention (if any).

If the hearing officer determines that the UAC would be a danger to the community (or a flight risk) if released, the decision would be final unless the UAC later demonstrates a material change in circumstances to support a second request for a hearing. Similarly, because ORR may not have yet located a suitable sponsor at the time a hearing officer issues a decision, ORR may find that circumstances have changed by the time a sponsor is found such that the original hearing officer decision should no longer apply. Therefore, the proposed regulation states that ORR may request the hearing officer to make a new determination if at least one month has passed since the original decision, and ORR can show that a material change in circumstances means the UAC should no longer be released due to danger (or flight risk).

HHS invites public comment on whether the hearing officers for the 810 hearings should be employed by the Departmental Appeals Board, either as Administrative Law Judges or hearing officers, or whether HHS would create a separate office for hearings, similar to the Office of Hearings in the Centers for Medicare & Medicaid Services. *See* https://www.cms.gov/About-CMS/Agency-Information/CMSLeadership/Office_OHI.html.

Furthermore, while the FSA contains procedures for judicial review of a UAC's placement in a secure or staff-secure shelter, and a standard of review, once these regulations are finalized and the FSA is vacated, any review by judicial actions would occur in accordance with the Administrative Procedure Act and any other applicable Federal statute. Therefore, we are not proposing regulations for most of paragraphs 24(B) and 24(C) of the FSA.

## VI. Statutory and Regulatory Requirements

The Departments have considered numerous statutes and executive orders related to rulemaking. The following sections summarize our analyses based on a number of these statutes and executive orders.

### A. Executive Orders 12866 and 13563: Regulatory Review

Executive Orders 12866 (''Regulatory Planning and Review'') and 13563 (''Improving Regulation and Regulatory Review'') direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. OMB has designated this rule a significant regulatory action, although not an economically significant regulatory action, under Executive Order 12866. Accordingly, OMB has reviewed this regulation.

### (1) Background and Purpose of the Proposed Rule

These proposed regulations aim to terminate the FSA. They would codify current requirements of the FSA and court orders enforcing terms of the FSA, as well as relevant provisions of the HSA and TVPRA. The Federal government's care of minors and UACs has complied with the FSA and related court orders for over 20 years, and complies with the HSA and TVPRA.

The proposed rule applies to minors and UACs encountered by DHS, and in some cases, their families. CBP and ICE encounter minors and UACs in different manners. CBP generally encounters minors and UACs at the border. Generally, ICE encounters minors either upon transfer from CBP to an FRC, or during interior enforcement actions. ICE generally encounters UACs when they are transferred from CBP custody to ORR custody, as well as during interior enforcement actions.

#### CBP

CBP's facilities at Border Patrol stations and ports of entry (POEs) are processing centers, designed for the temporary holding of individuals. CBP facilities are designed to meet the primary mission of CBP, which is to facilitate legitimate travel and trade. CBP's facilities are not designed, nor are there services in place, to accommodate large numbers of minors and UACs waiting for transfer to ICE or ORR, even for the limited period for which CBP is generally expected to have custody of minors and UACs, generally 72 hours or less. All minors and UACs in CBP facilities are provided access to safe and sanitary facilities; functioning toilets and sinks; food; drinking water; emergency medical assistance, as appropriate; and adequate temperature control and ventilation. To ensure their safety and well-being, UACs in CBP facilities are supervised and are generally segregated from unrelated

---

[23] The *Flores* District Court specifically cited the law of 8 U.S.C. 1226 and 8 CFR 1003.19, 1236.1(d). *See Flores* v. *Sessions*, 2:85–cv–04544, *supra* at 2, 6.

adults; older, unrelated UACs are generally segregated by gender.

CBP has apprehended or encountered 61,610 minors accompanied by their parent(s) or legal guardian(s) (defined as a "family unit"), and 55,090 UACs on average annually for the last three fiscal years. In Fiscal Year 2017, CBP apprehended or encountered approximately 105,000 aliens as part of a family unit. Table 2 shows the annual number of accompanied minors (that is, minors accompanied by their parent(s) or legal guardian(s)) and UACs CBP has apprehended or encountered in Fiscal Years (FYs) 2010 through 2017.

TABLE 2—U.S. CUSTOMS AND BORDER PROTECTION ACCOMPANIED MINORS AND UNACCOMPANIED ALIEN CHILDREN NATIONWIDE APPREHENSIONS AND ENCOUNTERS FY 2010–FY 2017

| Fiscal year | Accompanied minors | UACs | Total |
|---|---|---|---|
| 2010 | 22,937 | 19,234 | 42,171 |
| 2011 | 13,966 | 17,802 | 31,768 |
| 2012 | 13,314 | 27,031 | 40,345 |
| 2013 | 17,581 | 41,865 | 59,446 |
| 2014 | 55,644 | 73,421 | 129,065 |
| 2015 | 45,403 | 44,910 | 90,313 |
| 2016 | 74,798 | 71,067 | 145,865 |
| 2017 | 64,628 | 49,292 | 113,920 |

CBP makes a case by case determination as to whether an alien is a UAC based upon the information and evidence available at the time of encounter. When making this determination, CBP refers to section 462(g)(2) of the HSA, which defines a UAC as a child who— (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

Once CBP determines that an alien is a UAC, CBP must process the UAC consistent with the provisions of the TVPRA, which requires the transfer of a UAC who is not statutorily eligible to withdraw his or her application for admission into the custody of ORR within 72 hours of determining that the juvenile meets the definition of a UAC, except in exceptional circumstances.

If, upon apprehension or encounter, CBP determines that an alien is a minor who is part of a family unit, the family unit is processed accordingly and transferred out of CBP custody. If appropriate, the family unit may be transferred to an ICE FRC. If the FSA were not in place, CBP would still make a determination of whether an alien was a UAC or part of a family unit upon encountering an alien, in order to determine appropriate removal proceedings pursuant to the TVPRA.

ICE

When ICE encounters a juvenile during an interior enforcement action, ICE performs an interview to determine the juvenile's nationality, immigration status, and age. Pursuant to the TVPRA, an alien who has been encountered and has no lawful immigration status in the United States, has not attained 18 years of age, and has no parent or legal guardian in the United States available to provide care and physical custody will be classified as a UAC. The number of juvenile arrests made by ICE is significantly smaller than CBP across all fiscal years as shown in Table 3. An individual would have to be arrested to be booked into an FRC.

TABLE 3—FY 14–FY 17 JUVENILE BOOK-INS WITH ICE AS ARRESTING AGENCY

| Fiscal year | Book-ins of accompanied minors | UAC Book-ins |
|---|---|---|
| 2014 | 3 | 285 |
| 2015 | 8 | 200 |
| 2016 | 108 | 164 |
| 2017 | 123 | 292 |

Once ICE determines that an alien is a UAC, ICE must process the UAC consistent with the provisions of the TVPRA, which requires the transfer of a UAC into the custody of ORR within 72 hours of determining that the juvenile meets the definition of a UAC, except in exceptional circumstances.

At the time that the FSA was agreed to in 1997, INS generally did not detain alien family units. Instead, family units apprehended or encountered at the border were generally released. When a decision was made to detain an adult family member, the other family members were generally separated from that adult. However, beginning in 2001, in an effort to maintain family unity, INS began opening FRCs to accommodate families who were seeking asylum but whose cases had been drawn out. INS initially opened what today is the Berks Family Residential Center (Berks) in Berks, Pennsylvania, in 2001. ICE also operated the T. Don Hutto medium-security facility in Taylor, Texas as an FRC from 2006 to 2009. In response to the influx of UACs and family units in 2014 in the Rio Grande Valley, ICE opened family residential centers in Artesia, New Mexico in June of 2014; Karnes County, Texas in July of 2014; and Dilley, Texas in December of 2014. The Artesia facility, which was intended as a temporary facility while more permanent facilities were contracted for and established, was closed on December 31, 2014.

The South Texas Family Residential Center in Dilley, Texas (Dilley) has 2,400 beds, Berks has 96 beds, and the

Karnes County Residential Center in Karnes County, Texas (Karnes) has 830 beds. The capacity of the three FRCs provide for a total of 3,326 beds. As a practical matter, given varying family sizes and compositions, and housing standards, not every available bed will be filled at any given time, and the facilities may still be considered to be at capacity even if every available bed is not filled. ICE did not maintain a consistent system of records of FRC intakes until July 2014. Since 2015, there has been an annual average of 31,458 intakes of adults and minors at the FRCs. The count of FRC intakes from July 2014 through FY 2017 is shown in Table 4.

### TABLE 4—FAMILY RESIDENTIAL CENTER (FRC) INTAKES FY 2014–FY 2017

| Fiscal year | FRC intakes | FRC adult intakes | FRC minor intakes |
|---|---|---|---|
| Q4 2014 * ........................................................................ | 1,589 | 711 | 878 |
| 2015 ................................................................................ | 13,206 | 5,964 | 7,242 |
| 2016 ................................................................................ | 43,342 | 19,452 | 23,890 |
| 2017 ................................................................................ | 37,825 | 17,219 | 20,606 |

* 2014 only includes the fourth quarter of FY 2014: July, August, and September.

As previously discussed, due to court decisions in 2015 and 2017, DHS ordinarily uses its FRCs for the detention of non-UAC minors and their accompanying parent(s) or legal guardian(s) for periods of up to approximately 20 days. Since 2016, the average number of days from the book-in date to the release date at all FRCs for both minors and adults has been less than 15 days. Table 5 shows the average number of days from book-in date to release date at FRCs for FY 2014 through FY 2017, based on releases by fiscal year. Data on releases are available for all four quarters of FY 2014.

### TABLE 5—AVERAGE NUMBER OF DAYS FROM BOOK-IN DATE TO RELEASE DATE AT FAMILY RESIDENTIAL CENTERS FY 2014–FY 2017

| Fiscal year | Average number of days | Average days for minors (<18 years old) | Average days for adults (≥18 years old) |
|---|---|---|---|
| 2014 ................................................................................ | 47.4 | 46.7 | 48.4 |
| 2015 ................................................................................ | 43.5 | 43.1 | 44.0 |
| 2016 ................................................................................ | 13.6 | 13.6 | 13.6 |
| 2017 ................................................................................ | 14.2 | 14.2 | 14.1 |

Table 6 shows the reasons for the release of adults and minors from FRCs in FY 2017. As it indicates, the large majority of such individuals were released on an order of their own recognizance or paroled.

### TABLE 6—FY 2017 REASONS FOR RELEASE

[Adults and minors]

| Reason for release | Percent |
|---|---|
| Order of Recognizance ........ | 76.9 |
| Paroled ................................. | 21.3 |
| Order of Supervision ............ | 1.7 |
| Bonded Out .......................... | 0.1 |
| Prosecutorial Discretion ........ | <0.0 |

Table 7 shows the number of adults and minors removed from the United States from FRCs since FY 2014. Removals include returns. Returns include Voluntary Departures (including Voluntary Returns)[24] and Withdrawals Under Docket Control.

### TABLE 7—REMOVALS FROM FRCs FY 2014–FY 2017

[Adults and minors]

| Fiscal year | Removals |
|---|---|
| Q4 2014 * .............................. | 390 |
| 2015 ...................................... | 430 |
| 2016 ...................................... | 724 |
| 2017 ...................................... | 977 |

* 2014 only includes the fourth quarter of FY 2014: July, August, and September.

The FSA does not impose requirements on secure facilities used for the detention of juveniles. Juveniles may be placed in secure facilities if they meet the criteria listed in paragraph 21 of the FSA.

#### HHS

The proposed rule also applies to UACs who have been transferred to HHS care. Upon referral, HHS promptly places UACs in the least restrictive setting that is in the best interests of the child, taking into consideration danger to self, danger to the community, and risk of flight. HHS takes into consideration the unique nature of each child's situation and incorporates child welfare principles when making placement and release decisions that are in the best interest of the child.

HHS places UACs in a network of over 100 shelters in 17 states. For its first nine years at HHS, fewer than 8,000 UACs were served annually in this program. Since FY 2012, this number has jumped dramatically, with a total of 13,625 children referred to HHS by the end of FY 2012. Between FY 2012 and FY 2018—Year To Date (YTD) (June), HHS has received a total of 267,354 UACs.

### TABLE 8—UAC REFERRALS TO HHS FY 2008–FY 2017

| Fiscal year | Referrals |
|---|---|
| 2008 ...................................... | 6,658 |
| 2009 ...................................... | 6,089 |
| 2010 ...................................... | 7,383 |
| 2011 ...................................... | 6,560 |
| 2012 ...................................... | 13,625 |
| 2013 ...................................... | 24,668 |
| 2014 ...................................... | 57,496 |
| 2015 ...................................... | 33,726 |

[24] For the purposes of this table, Voluntary Return refers to the DHS grant of permission for an alien to depart the United States, while Voluntary Departure refers to the immigration judge's grant of permission for an alien to depart the United States.

TABLE 8—UAC REFERRALS TO HHS
FY 2008–FY 2017—Continued

| Fiscal year | Referrals |
|---|---|
| 2016 ...................................... | 59,170 |
| 2017 ...................................... | 40,810 |

For FY 2018—YTD (June) the average length of stay (the time a child is in custody from the time of admission to the time of discharge) for UACs in the program is approximately 50 days. In FY 2018—June '18 the average length of care (the time a child has been in custody, since the time of admission) for UACs in ORR care is approximately 58 days. The overwhelming majority, over 90 percent, of UACs are released to suitable sponsors who are family members within the United States. UACs that are not released to a sponsor typically: Age out or receive an order of removal and are transferred to DHS; are granted voluntary departure and likewise transferred to DHS for removal; or, obtain immigration legal relief and are no longer eligible for placement in ORR's UAC program.

TABLE 9—PERCENTAGE OF UACs BY
DISCHARGE TYPE FY 18

[Through June 30th]

| Discharge type | Percentage of UACs |
|---|---|
| Age Out ................................. | 2.5 |
| Age Redetermination .............. | 2.3 |
| Immigration Relief Granted .. | 0.2 |
| Local Law Enforcement ........ | 0.0 |
| Ordered Removed ................. | 0.2 |
| Other ..................................... | 0.3 |
| Runaway from Facility .......... | 0.4 |
| Runaway on Field Trip ......... | 0.1 |
| Reunified (Individual Sponsor) ................................... | 90.0 |
| Reunified (Program/Facility) | 1.3 |
| Voluntary Departure ............. | 1.9 |
| Total ................................. | 100.0 |

(2) Baseline of Current Costs

In order to properly evaluate the benefits and costs of regulations, agencies must evaluate the costs and benefits against a baseline. OMB Circular A–4 defines the "no action" baseline as "the best assessment of the way the world would look absent the proposed action." The Departments consider their current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA to be the baseline for this analysis, from which they estimate the costs and benefits of the proposed rule. The baseline encompasses the FSA that was approved by the court on January 28, 1997. It also encompasses the 2002 HSA

legislation transferring the responsibility for the care and custody of UACs, including some of the material terms of the FSA, to ORR, as well as the substantive terms of the 2008 TVPRA. Finally, it includes the July 6, 2016 decision of the Ninth Circuit affirming the district court's finding that the FSA "unambiguously" applies to both accompanied and unaccompanied minors, and that such minors shall not be detained in unlicensed and secure facilities that do not meet the requirements of the FSA. *See Flores* v. *Lynch,* 828 F.3d 898 (9th Cir. 2016). The section below discusses some examples of the current cost for the Departments' operations and procedures under the baseline. Because the costs described below are already being incurred, they are not costs of this rule.

DHS

CBP incurs costs to comply with the FSA, including those related to facility configurations, custodial requirements, and compliance monitoring. To comply with the terms of the FSA, for example, CBP reallocates space in its facilities to allow for separate holding areas for families and/or UACs. Pursuant to the FSA, CBP provides minors and UACs access to food; drinking water; functioning toilets and sinks; adequate temperature and ventilation; emergency medical care, if needed; and safe and sanitary facilities, which impose costs on CBP. Related costs include, for example, the purchase of food; bottled water; first aid kits; blankets, mats, or cots; and age-appropriate transport and bedding. To ensure compliance with the FSA, CBP has added fields in its electronic systems of records, so that CBP officers and Border Patrol agents can continuously record the conditions of the hold rooms and all custodial activities related to each minor or UAC, such as medical care provided, welfare checks conducted, and any separation from accompanying family members.

CBP has experienced other baseline costs from its national and field office Juvenile Coordinators. Under current practice, the national CBP Juvenile Coordinator oversees agency compliance with applicable law and policy related to the treatment of minors and UACs in CBP custody. The national CBP Juvenile Coordinator monitors CBP facilities and processes through site visits and review of juvenile custodial records. Along with the national CBP Juvenile Coordinator role, CBP has field office and sector Juvenile Coordinators who are responsible for managing all policies on the processing of juveniles within CBP facilities, coordinating within CBP and across DHS components

to ensure the expeditious placement and transport of juveniles placed into removal proceedings by CBP, and informing CBP operational offices of any policy updates related to the processing of juveniles (*e.g.,* through correspondence, training presentations). Moreover, CBP's Juvenile Coordinators serve as internal and external agency liaisons for all juvenile processing matters.

CBP's baseline costs also include the use of translation services, including contracts for telephonic interpretation services.

ICE also incurs facility costs to comply with the FSA. The costs of operation and maintenance of the ICE FRCs for FY 2015–2017 are listed in Table 10, provided by the ICE Office of Acquisition Management. The costs account for the implementation of the FSA requirements, including the cost for the facility operators to abide by all relevant state standards. Two of the FRCs are operated by private contractors, while one is operated by a local government, under contract with ICE. These are the amounts that have been paid to private contractors or to the local government to include beds, guards, health care, and education.

TABLE 10—CURRENT COSTS FOR
FRCs

| Fiscal year | FRC costs |
|---|---|
| 2015 ...................................... | $323,264,774 |
| 2016 ...................................... | 312,202,420 |
| 2017 ...................................... | 231,915,415 |

The FRC costs are fixed-price agreements with variable costs added on a monthly basis. Overall, the fixed-price agreements are not dependent on the number of detainees present or length of stay, with some exceptions. At Berks, the contract includes a per-person fee charged in addition to the monthly fixed rate. At two of the FRCs, Berks and Karnes, education is provided per the standards of a licensed program set forth in the FSA, at a per-student, per-day cost. Since FRCs are currently at limited available capacity and the configuration of limited available capacity varies from day to day across all FRCs, the number of children and adults vary at Berks day to day and the number of children at Karnes vary day to day. Thus, these costs charged to ICE vary from month to month.

In addition to the above example of current costs to operate the FRCs, or the baseline cost, DHS (particularly CBP and ICE) incurs costs to process, transfer, and provide transportation of minors and UACs from the point of

apprehension to DHS facilities; from the point of apprehension or from a DHS facility to HHS facilities; between facilities; for the purposes of release; or for all other circumstances, in compliance with the FSA, HSA, and TVPRA.

The baseline costs also include bond hearing for minors and family units who are eligible for such hearings. When a minor or family unit seeks a bond, ICE officers must review the request and evaluate the individuals' eligibility as well as, where appropriate, set the initial bond amount. Further, should the minor or family unit seek a bond redetermination hearing before an immigration judge, ICE must transport or otherwise arrange for the individuals to appear before the immigration court.

ICE's baseline costs also include the use of translation services, including contracts for telephonic interpretation services.

ICE also incurs baseline costs related to its Juvenile and Family Residential Management Unit (JFRMU), which was created in 2007. JFRMU manages ICE's policies affecting alien juveniles and families. The role of ICE's Juvenile Coordinator is within JFRMU and is not a collateral duty. JFRMU consists of specialized federal staff, as well as contract subject matter experts in the fields of child psychology, child development, education, medicine, and conditions of confinement. JFRMU establishes policies on the management of family custody, UACs pending transfer to the ORR, and UACs applying for Special Immigrant Juvenile specific consent. JFRMU continues to pursue uniform operations throughout its program through implementation of family residential standards. These standards are continually reviewed and revised as needed to ensure the safety and welfare of families awaiting an

immigration decision while housed in a family residential facility. DHS conducts an inspection of each FRC at least annually to confirm that the facility is in compliance with ICE Family Residential Standards.

The baseline costs include the monitoring of FSA compliance and reporting to the court. Since 2007, JFRMU has submitted *Flores* Reports annually, bi-annually, or monthly for submission to the court through DOJ.

### HHS

HHS' baseline costs were $1.4 billion in FY 2017. HHS funds private non-profit and for-profit agencies to provide shelter, counseling, medical care, legal services, and other support services to UACs in custody. Funding levels for non-profit organizations totaled $912,963,474 in FY 2017. Funding levels for for-profit agencies totaled $141,509,819 in FY 2017. Program funded facilities receive grants or contracts to provide shelter, including therapeutic care, foster care, shelter with increased staff supervision, and secure detention care. The majority of program costs (approximately 80 percent) are for bed capacity care. Other services for UACs, such as medical care, background checks, and family reunification services, make up approximately 15 percent of the budget. In addition, some funding is provided for limited post-release services to certain UACs. Administrative expenses to carry out the program total approximately five percent of the budget.

In FY 2016, HHS total approved funding for the UAC program was $743,538,991, with $224,665,994 going to influx programming. In FY 2017, the total funding was $912,963,474, with $141,509,819 for influx.

These are examples of the types of costs the Departments incur under

current operations, and are not a result of this rule.

### (3) Costs

This rulemaking would implement the relevant and substantive terms of the FSA, with limited changes necessary to implement closely related provisions of the HSA and TVPRA, and to ensure that the regulations set forth a sustainable operational model of immigration enforcement. This section assesses the cost of proposed changes to the current operational environment.

The primary source of new costs for the proposed rule would be as a result of the proposed alternative licensing process, changes to ICE parole determination practices to align them with applicable statutory and regulatory authority, and the costs of shifting hearings from DOJ to HHS. The proposed alternative license for FRCs and changes to parole determination practices may result in additional or longer detention for certain minors, but DHS is unable to estimate the costs of this to the Government or to the individuals being detained because we are not sure how many individuals will be detained at FRCs after this rule is effective or for how much longer individuals may be detained because there are so many other variables to consider. The Departments seek comment on how these costs might be reasonably estimated, given the uncertainties.

Table 11 shows the proposed changes to the DHS current operational status compared to the FSA. It contains a preliminary, high-level overview of how the proposed rule would change DHS's current operations, for purposes of the economic analysis. The table does not provide a comprehensive description of all proposed provisions and their basis and purpose.

### TABLE 11—FSA AND DHS CURRENT OPERATIONAL STATUS

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 1, 2, 3 ................ | "Party, "plaintiff" and "class member" definitions. | N/A .................... | None. (*Note:* These definitions are only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, the definitions would no longer be relevant. As a result, the proposed rule does not include these definitions.) |
| 4 ...................... | "Minor" definition .......................... | 236.3(b)(1) ....... | None. |
| 5 ...................... | "Emancipated minor" definition .... | 236.3(b)(1)(i) .... | None. |
| 6 ...................... | "Licensed program" definition ...... | 236.3(b)(9) ........ | FSA defines a "licensed program" as one licensed by an appropriate State agency. DHS would not define "licensed program," but instead would define a "licensed facility" as an ICE detention facility that is licensed by the state, county, or municipality in which it is located. DHS would also add an alternative licensing scheme for family residential centers (FRCs), if the state, county, or municipality where the facility is located does not have a licensing scheme for such facilities. |

TABLE 11—FSA AND DHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 6+ Exhibit 1 ........ | Exhibit 1, standards of a licensed program. | 236.3(i)(4) .......... | DHS provides requirements that licensed facilities must meet. *(Note:* Compared with Exhibit 1, these requirements contain a slightly broadened educational services description to capture current operations and added that program design should be appropriate for length of stay (see (i)(4)(iv)); amended "family reunification services" provision to more appropriately offer communication with adult relatives in the U.S. and internationally, since DHS only has custody of accompanied minors so reunification is unnecessary (see proposed 236.3(i)(4)(iii)(H)).) |
| 7 ...................... | "Special needs minor" definition and standard. | 236.3(b)(2) ........ | None. |
| 8 ...................... | "Medium security facility" definition. | N/A .................... | None. (*Note:* DHS only has secure or non-secure facilities, so a definition of "medium security facility" is unnecessary. As a result, the proposed rule lacks such a definition, even though the FSA contains one.) |
| 9 ...................... | Scope of Settlement Agreement, Effective Date, and Publication. | N/A .................... | None. (*Note:* This provision imposes a series of deadlines that passed years ago, and/or do not impose obligations on the parties that continue following termination of the FSA. As a result, the proposed rule does not include this provision.) |
| 10 ...................... | Class Definition ............................ | N/A .................... | None. (*Note:* Provision is specific to the litigation and is not a relevant or substantive term of the FSA, and is not included in the rule.) |
| 11 ...................... | Place each detained minor in least restrictive setting appropriate for age and special needs. No requirement to release to any person who may harm or neglect the minor or fail to present minor before the immigration court. | 236.3(g)(2)(i), (i), (j)(4). | None. (*Note:* 236.3(j) tracks FSA paragraph 14, which is consistent with FSA paragraph 11 but uses different terms.) |
| 11 ...................... | The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. | 236.3(a)(1) ........ | None. |
| 12(A) ................... | Expeditiously process the minor .. | 236.3(e), (f), & (g)(2)(i). | None. (*Note:* The proposed rule reflects the fact that the TVPRA (rather than the FSA) governs the processing and transfer of UACs. The proposed rule also makes clear that generally, unless an emergency or influx ceases to exist, the transfer timelines associated with an emergency or influx continue to apply for non-UAC minors.) |
| 12(A) ................... | Shall provide the minor with notice of rights. | 236.3(g)(1)(i) ..... | None. |
| 12(A) ................... | Facilities must be safe and sanitary including toilets and sinks, water and food, medical assistance for emergencies, temperature control and ventilation, adequate supervision to protect minor from others. | 236.3(g)(2)(i) ..... | None |
| 12(A) ................... | Contact with family members who were arrested with the minor. | 236.3(g)(2)(i) ..... | None. (*Note:* The proposed rule contains a slightly different standard than appears in the FSA. The proposed rule provides for contact with family members apprehended with both minors and UACs. Additionally, the proposed rule invokes operational feasibility and consideration of the safety or well-being of the minor or UAC in facilitating contact. The FSA generally prioritizes the safety and well-being of the minor and that of others, but does not include these provisos.) |
| 12(A) ................... | Segregate unaccompanied minors from unrelated adults, unless not immediately possible (in which case an unaccompanied minor may not be held with an unrelated adult for more than 24 hours). | 236.3(g)(2)(i) ..... | None. (*Note:* The proposed rule would allow UACs to be held with unrelated adults for no more than 24 hours except in cases of emergency or other exigent circumstances.) |

cited in Flores v. Barr, No. 17-56297 archived on August 12, 2019

TABLE 11—FSA AND DHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 12(A), 12(A)(1)–(3), 12(B). | Transfer in a timely manner: Three days to five days max with exceptions, such as emergency or influx, which requires placement as expeditiously as possible. | 236.3(b)(5), (b)(10), (e)(1). | None. (*Note:* Following the TVPRA, the transfer provisions in FSA paragraph 12(A) apply to DHS only for accompanied minors. In addition, the proposed rule's definition of "emergency" clarifies that an emergency may create adequate cause to depart from any provision of proposed 236.3, not just the transfer timeline.) |
| 12(A)(4) ............. | Transfer within 5 days instead of 3 days in cases involving transport from remote areas or where an alien speaks an "unusual" language. | N/A ................... | None. (*Note:* Although DHS is not proposing a change in practice, it does not propose to codify this exception from the FSA in proposed 236.3(e) because operational improvements have rendered the exception unnecessary.) |
| 12(C) ................. | Written plan for "emergency" or "influx". | 236.3(e)(2) ........ | None. (*Note:* Like the FSA, the proposed rule requires a written plan. The written plan is contained in a range of guidance documents.) |
| 13 ...................... | Age determination ...................... | 236.3(c) ............ | None. (*Note:* The proposed rule includes a "totality of the circumstances" standard; the FSA does not contain a standard that conflicts with "totality of the circumstances.") |
| 14 ...................... | Release from custody where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others. Release is to, in order of preference: parent, legal guardian, adult relative, adult or entity, licensed program, adult seeking custody. | 236.3(j) (release generally). | The proposed rule adds that any decision to release must follow a determination that such release is permitted by law, including parole regulations. In addition, the proposed rule does not codify the list of individuals to whom a non-UAC minor can be released, because the TVPRA has overtaken this provision. Per the TVPRA, DHS does not have the authority to release juveniles to non-parents or legal guardians. Under the TVPRA, DHS may release a juvenile to a parent or legal guardian only. |
| 15 ...................... | Before release from custody, Form I–134 and agreement to certain terms must be executed. If emergency, then minor can be transferred temporarily to custodian but must notify INS in 72 hours. | N/A ................... | None. (*Note:* The proposed rule does not codify this portion of the FSA because (1) the TVPRA has overtaken this provision in part, and (2) these requirements, which are primarily for DHS's benefit, are not currently implemented.) |
| 16 ...................... | INS may terminate the custody if terms are not met. | N/A ................... | None. (*Note:* The proposed rule does not codify this portion of the FSA, because (1) the TVPRA has overtaken this provision in part, and (2) these requirements, which are primarily for DHS's benefit, are not currently implemented.) |
| 17 ...................... | Positive suitability assessment ..... | N/A ................... | None. (*Note:* The proposed rule does not codify this portion of the FSA, because the TVPRA has overtaken this provision. Per the TVPRA, DHS does not have the authority to release minors to non-parents/legal guardians.) |
| 18 ...................... | INS or licensed program must make and record the prompt and continuous efforts on its part toward family reunification efforts and release of minor consistent with FSA paragraph 14. | 236.3(j) .............. | None. |
| 19 ...................... | INS custody in licensed facilities until release or until immigration proceedings are concluded. Temporary transfers in event of an emergency. | 236.3(i), (i)(5) .... | None. |
| 20 ...................... | INS must publish a "Program Announcement" within 60 Days of the FSA's approval. | N/A ................... | None. (*Note:* This provision imposes a deadline that passed years ago. As a result, the proposed rule does not include this provision.) |
| 21 ...................... | Transfer to a suitable State or county juvenile detention facility if a minor has been charged or convicted of a crime with exceptions. | 236.3(i)(1) .......... | None. (*Note:* The proposed rule clarifies some of the exceptions to secure detention, consistent with current practice and in line with the intent underlying FSA paragraph 21(A)(i)–(ii). The proposed rule also removes the specific examples used in FSA.) |
| 22 ...................... | Escape risk definition ................... | 236.3(b)(6) ......... | None. (*Note:* the proposed rule uses final order of "removal" rather than deportation or exclusion, and considers past absconding from state or federal custody; and not just DHS or HHS custody.) |
| 23 ...................... | Least restrictive placement of minors available and appropriate. | 236.3(i)(2) .......... | None. |

Cited in Flores v. Barr, No. 17-56297 and 18-15388, argued August 12, 2019

TABLE 11—FSA AND DHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 24(A) | Bond redetermination hearing afforded. | 236.3(m) | None. (*Note:* The proposed rule adds language to specifically exclude those aliens for which IJs do not have jurisdiction, as provided in 8 CFR 1003.19.) |
| 24(B) | Judicial review of placement in a particular type of facility permitted or that facility does not comply with standards in Ex. 1. | N/A | None. (*Note:* The proposed rule does not expressly provide for judicial review of placement/compliance, but does not expressly bar such review.) |
| 24(C) | Notice of reasons provided to minor not in a licensed program/judicial review. | N/A | None. |
| 24(D) | All minors "not released" shall be given Form I–770, notice of right to judicial review, and list of free legal services. | 236.3(g)(1) | None. (*Note:* The proposed rule requires DHS to provide the notice of right to judicial review and list of counsel to those minors who are not UACs and who are transferred to or remain in a DHS detention facility. The corresponding FSA provisions apply to minors "not released." The difference in scope is a result of the TVPRA and reflects the relationship between Paragraph 12(A), which applies to the provision of certain rights (largely contained on the I–770) immediately following arrest, and Paragraph 28(D), which applies to all minors who are "not released," and so are detained by DHS. The language does not reflect a change in practice. The proposed rule also includes more detailed language with respect to the Form I–770 than the FSA; this language comes from current 8 CFR 236.3, and is consistent with the requirements of Paragraph 12(A).) |
| 24(E) | Additional information on precursors to seeking judicial review. | N/A | None. (*Note:* Responsibilities of the minor prior to bringing litigation are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 25 | Unaccompanied minors in INS custody should not be transported in vehicles with detained adults except when transport is from place of arrest/apprehension to an INS office, or when separate transportation would otherwise be impractical. | 236.3(f)(4) | None. (*Note:* Proposed rule makes a clarifying change: the proposed rule adds "or unavailable" as an exception to "impractical.") |
| 26 | Provide assistance in making transportation arrangement for release of minor to person or facility to whom released. | 236.3(j)(3) | None. (*Note:* The proposed rule would remove the reference to release to a "facility." DHS releases minors only to a parent or legal guardian; a referral to HHS is a transfer, not a release.) |
| 27 | Transfer between placements with possessions, notice to counsel. | 236.3(k) | None. |
| 28(A) | INS Juvenile Coordinator to monitor compliance with FSA and maintain records on all minors placed in proceedings and remain in custody for longer than 72 hours. | 236.3(o) | None. (*Note:* The proposed rule requires collection of relevant data for purposes of monitoring compliance. The list of data points is similar to the list in 28(A) but not identical.) |
| 28(B) | Plaintiffs' counsel may contact INS Juvenile Coordinator to request an investigation on why a minor has not been released. | N/A | This provision would no longer apply following termination of the FSA. (*Note:* Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 29 | Plaintiffs' counsel must be provided information pursuant to FSA paragraph 28 on a semi-annual basis; Plaintiffs' counsel have the opportunity to submit questions. | N/A | This provision would no longer apply following termination of the FSA. (*Note:* Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 30 | INS Juvenile Coordinator must report to the court annually. | N/A | This provision would no longer apply following termination of the FSA. (*Note:* Special provisions for reporting to the court are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 31 | Defendants can request a substantial compliance determination after one year of the FSA. | N/A | None. (*Note:* This provision imposed a timeframe related to court supervision of the FSA. As a result, the proposed rule does not include this provision.) |
| 32(A), (B), and (D). | Attorney-client visits with class members allowed for Plaintiffs' counsel at a facility. | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |

Flores v. Barr, No. 17-56297 archived on August 9

TABLE 11—FSA AND DHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 32(C) | Agreements for the placement of minors in non-INS facilities shall permit attorney-client visits, including by class counsel. | 236.3(i)(4)(xv) | None. (*Note:* Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, so the reference to class counsel is not included in the rule.) |
| 33 | Plaintiffs' counsel allowed to request access to, and visit licensed program facility or medium security facility or detention facility. | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |
| 34 | INS employees must be trained on FSA within 120 days of court approval. | N/A | None. (*Note:* This provision imposed a deadline that passed years ago. As a result, the proposed rule does not include this provision.) |
| 35 | Dismissal of action after court has determined substantial compliance. | N/A | None. (*Note:* Provisions specific to terminating the action are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 36 | Reservation of Rights | N/A | None. (*Note:* This provision is only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, it would no longer be relevant. As a result, the proposed rule does not include this provision.) |
| 37 | Notice and Dispute Resolution | N/A | None. (*Note:* This provision provides for ongoing enforcement of the FSA by the district court. As a result, the proposed rule does not include this provision.) |
| 38 | Publicity—joint press conference | N/A | None. (*Note:* This provision relates to an event that occurred years ago. As a result, the proposed rule does not include this provision.) |
| 39 | Attorneys' Fees and Costs | N/A | None. (*Note:* This provision imposed a deadline that passed years ago. As a result, the proposed rule does not include this provision.) |
| 40 | Termination 45 days after publication of final rule. | N/A | None. (*Note:* Provisions specific to terminating the FSA are not relevant or substantive terms, and are not included in the rule.) |
| 41 | Representations and Warranty | N/A | None. (*Note:* This provision is only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, it would no longer be relevant. As a result, the proposed rule does not include this provision.) |

cited in Flores v. Barr, No. 17-56297 and filed Aug. 15, 2019

## DHS

A primary source of new costs for the proposed rule would be as a result of the proposed alternative licensing process. To codify the requirements of the FSA, DHS is proposing in this rule that facilities that hold minors obtain state, county, or municipal licensing where appropriate licenses are available. If no such licensing regime is available, however, DHS proposes that it will employ an outside entity to ensure that the facility complies with family residential standards established by ICE and that meet the requirements for licensing under the FSA, thus fulfilling the intent of obtaining a license from a state or local agency. That would thus provide effectively the same substantive assurances that the state-licensing requirement exists to provide. ICE currently meets the proposed licensing requirements by requiring FRCs to adhere to the Family Residential Standards and monitoring the FRCs' compliance through an existing contract. Thus, DHS would not incur additional costs in fulfilling the requirements of the proposed alternative licensing scheme. However, most states

do not offer licensing for facilities like the FRCs.[25] Therefore, to meet the terms of the FSA, minors who are not UACs are generally held in FRCs for less than 20 days (see Table 5). As all FRCs would be licensed, or considered licensed, under this proposed rule, the proposed rule may result in extending detention of some minors, and their accompanying parent or legal guardian, in FRCs beyond 20 days. An increase in the average length of detention may increase the variable contract costs paid by ICE to the private contractor and government entity who operate and maintain the FRCs, as compared to the current operational environment.

ICE is unable to estimate how long detention would be extended for some categories of minors and their accompanying adults in FRCs due to this proposed rule. The average length of stay in the past is not a reliable source for future projections. The average length of stay prior to the court decisions in 2015 and 2017 reflect other policy decisions that will not be directly affected by this proposed rule. In

addition, the number of days some minors and their accompanying adults may be detained depends on several factors, including a number of factors that are beyond the scope of this proposed rule. Among other factors, these may include the number of minors and their accompanying adults who arrive in a facility on a given day; the timing and outcome of immigration court proceedings before an immigration judge; whether an individual is eligible for parole or bond; issuance of travel documents by foreign governments; transportation schedule and availability; the availability of bed space in an FRC; and other laws, regulations, guidance, and policies regarding removal not subject to this proposed rule.

Although DHS cannot reliably predict the increased average length of stay for affected minors and their accompanying adults in FRCs, DHS recognizes that generally only certain groups of aliens are likely to have their length of stay in an FRC increased as a result of this proposed rule, among other factors. For instance, aliens who have received a positive credible fear determination, and who are not suitable for parole, may be held throughout their asylum

[25] *See* the discussion of the definition of "licensed facility" *supra.*

proceedings. Likewise, aliens who have received a negative credible fear determination, have requested review of the determination by an immigration judge and had the negative determination upheld, and are awaiting removal, are likely to be held until removal can be effectuated. In FY 2017, 16,807 minors in FRCs went through the credible fear screening process and were released. Table 12 shows for FY 2017 the number of minors who went through the credible fear screening process who were released from FRCs. It does not include those minors who were removed while detained at an FRC. Those minors who were removed from an FRC would not have their lengths of stay increased pursuant to the changes proposed in this rule.

TABLE 12—FY 2017 MINORS AT FRCS WHO WENT THROUGH CREDIBLE FEAR SCREENING PROCESS

| | Number of minors at FRCs |
|---|---|
| Positive Credible Fear Determinations | 14,993 |
| Negative Credible Fear Determinations | 349 |
| *Immigration Judge Review Requested* | *317* |
| *Immigration Judge Review Not Requested* | *32* |
| Administratively Closed | 1,465 |

Of the 14,993 minors shown in Table 12 who had positive credible fear determinations, about 99 percent were paroled or released on their own recognizance. The remaining one percent of minors are those in categories that might have their length of stay in an FRC increased due to this proposed rule.

Separate from the population of minors referenced in Table 12, members of a family unit with administratively final orders of removal, once this rule has been finalized, are likely to be held until removed. 842 such minors who were detained and released at FRCs during FY 2017 either had final orders of removal at the time of their release or subsequently received final orders of removal following their release within the same FY. Minors like these 842 may be held in detention longer as a result of this rule. While DHS generally expects an increase in the average length of stay to affect only these groups, there may be others that may be affected.

In FY 2017, the total number of minors who might have been detained longer at an FRC is estimated to be the number of minors in an FRC who were

not paroled or released on order of their own recognizance (131), plus the number of such minors who had negative credible fear determinations (349), plus administratively closed cases (1,465), plus those who were released and either had final orders of removals at the time of their release or subsequently received final orders following their release (842), or 2,787. While the above analysis reflects the number of minors in these groups in the FY 2017, DHS is unable to forecast the future total number of such minors.

The remaining factor in estimating the costs that are attributed to a potentially increased length of stay for these groups of minors and their accompanying parent or legal guardian are the variable contract costs paid by ICE to the private contractor and government entity who operate and maintain the FRCs. The fixed and variable contract costs were obtained from ICE Office of Acquisition Management. For Berks, there is a $16 per-person, per-day fee in addition to the monthly fixed contract rate. Assuming that the contract terms are the same in the future, an increased number of days that all individuals would be at an FRC may also increase this total variable fee amount. Due to the uncertainty surrounding estimating an increased length of stay and the number of aliens this may affect, the total incremental cost of this per day per person fee is not estimated.

Educational services are provided at the Berks and Karnes FRCs at a variable cost per-student, per-day. The cost at Karnes is $75 per-student, per-day, and at Berks the cost is $79 per-student, per-day. There is a fixed monthly cost for educational services at Dilley of $342,083; it is not dependent on the number of students per day.

Assuming again that future contract terms are the same, the total education cost may increase if certain aliens, like the groups described above, are detained longer. However, the incremental variable education cost is not estimated because of the uncertainty surrounding the factors that make up the estimate of the average length of stay and the number of minors that may have an increased length of stay.

This rule also proposes to change current ICE practices for parole determinations to align them with applicable statutory and regulatory authority. ICE is currently complying with the June 27, 2017 court order while it is on appeal. In complying, every detained minor in expedited removal proceedings and awaiting a credible fear determination or determined not to have a credible fear receives an individualized parole determination

under the considerations laid out in 8 CFR 212.5(b), which considers only whether the minor is a flight risk. However, ICE proposes to revert to its practice prior to the 2017 court order for those minors in expedited removal proceedings, using its parole authorities under 8 CFR 235.3 sparingly for this category of aliens, as intended by Congress. *See* 8 U.S.C. 1225(b)(1)(B)(iii)(IV) (''Any alien subject to [expedited removal] shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.''). Under this standard, for aliens who are in expedited removal proceedings and are pending a credible fear determination or who have been found not to have such fear, release on parole can only satisfy this standard when there is a medical necessity or a law enforcement need. Accordingly, this change may result in fewer such minors or their accompanying parent or legal guardians being released on parole. Aliens in expedited removal proceedings are not generally detained in mandatory custody for long periods of time. Either a removal order is issued within a short amount of time or a Notice to Appear is issued, which may make the alien eligible for various forms of release. Consequently, DHS does not anticipate that these changes will result in extended periods of detention for minors who are in expedited removal proceedings.

At this time, ICE is unable to determine how the number of FRCs may change due to this proposed rule. There are many factors that would be considered in opening a new FRC, some of which are outside the scope of this proposed regulation, such as whether such a facility would be appropriate, based on the population of aliens crossing the border, anticipated capacity, projected average daily population, and projected costs.

With respect to CBP, the proposed rule is not anticipated to have an impact on current operations because CBP is currently implementing the relevant and substantive terms of the FSA, the HSA, and the TVPRA.

HHS

HHS has complied with the FSA for over 20 years. The proposed rule would codify current HHS compliance with the FSA, court orders, and statutes. Accordingly, HHS does not expect this proposed rule to impose any additional costs, beyond those costs incurred by the Federal Government to establish the 810 Hearings process within HHS.

This rule will shift responsibility for custody redetermination hearings for

UACs, now proposed to be referred to as 810 hearings, from DOJ to HHS. We estimate that some resources will be required to implement this shift. We believe that this burden will fall on DOJ and HHS staff, and we estimate that it will require approximately 2,000–4,000 hours to implement. This estimate reflects six to 12 staff working full-time for two months to create the new system. After this shift in responsibility has been implemented, we estimate that the rule will lead to no change in net resources required for 810 hearings, and therefore estimate no incremental costs or savings. We seek public comment on these estimates.

### (4) Benefits

The primary benefit of the proposed rule would be to ensure that applicable regulations reflect the current conditions of DHS detention, release, and treatment of minors and UACs, in accordance with the relevant and substantive terms of the FSA, the HSA, and the TVPRA.

Without codifying the FSA as proposed in this rule, family detention is a less effective tool to meet the enforcement mission of ICE. In many cases, families do not appear for immigration court hearings after being released from an FRC, and even when they do, many more fail to comply with the lawfully issued removal orders from the immigration courts and some families engage in dilatory legal tactics when ICE works to enforce those orders. By departing from the FSA in limited cases to reflect the intervening statutory and operational changes, ICE is reflecting its existing discretion to detain families together, as appropriate, given enforcement needs, which will ensure that family detention remains an effective enforcement tool.

HHS, having not been an original party to the FSA but having inherited some of its requirements, likewise benefits from the current operational environment with proposed rules that clearly delineate ORR's responsibilities from that of other Federal partners. Additionally, the proposed codification of the FSA terms, specifically the minimum standards for licensed facilities and the release process ensures a measure of consistency across the programs network of state licensed facilities.

The regulations are also designed to eliminate judicial management, through the FSA, of functions Congress delegated to the executive branch.

### (5) Conclusion

This proposed rule reflects current requirements to comply with the FSA,

court orders, the HSA, and the TVPRA. The Departments consider current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA to be the baseline for this analysis. Because these costs are already being incurred, they are not costs of this rule. The primary source of new costs for the proposed rule would be a result of the proposed alternative licensing process, changes to current ICE parole determination practices to align them with applicable statutory and regulatory authority, and the costs of shifting hearings from DOJ to HHS. ICE expects the proposed alternative licensing process and changes to current parole determination practices to extend detention of certain minors in FRCs. This may result in additional or longer detentions for certain minors, increasing annual variable costs paid by ICE to the operators of Berks and Karnes and costs to the individuals being detained, but due to the uncertainty surrounding estimating an increased length of stay and the number of aliens this may affect, this incremental cost is not quantified.

### (6) Alternatives

#### No Regulatory Action

The Departments considered not promulgating this rule. The Departments had been engaged in this alternative prior to proposing this rule, which has required the Government to adhere to the terms of the FSA, as interpreted by the courts, which also rejected the Government's efforts to amend the FSA to help it better conform to existing legal and operational realities. Continuing with this alternative would likely require the Government to operate through non-regulatory means in an uncertain environment subject to currently unknown future court interpretations of the FSA that may be difficult or operationally impracticable to implement and that could otherwise hamper operations. The Departments reject this alternative because past successful motions to enforce the Agreement have consistently expanded the FSA beyond what the Departments believe was its original and intended scope and imposed operationally impracticable or effectively impossible requirements not intended by the parties to the FSA and in tension with (if not incompatible with) current legal authorities. The Departments also reject this alternative because it does not address the current conflict between certain portions of the FSA and the HSA and TVPRA.

#### Comprehensive FSA/TVPRA/Asylum Regulation

The Departments considered proposing within this regulatory action additional regulations addressing further areas of authority under the TVPRA, to include those related to asylum proceedings for UACs. The Departments rejected this alternative in order to solely focus this regulatory action on implementing the terms of the FSA, and provisions of the HSA and TVPRA where they necessarily intersect with the FSA's provisions. And, promulgating this more targeted regulation does not preclude the Departments from subsequently issuing regulations to address broader issues.

#### Promulgate Regulations—Preferred Alternative

Legacy INS's successors are obligated under the FSA to initiate action to publish the relevant and substantive terms of the FSA as regulations. In the 2001 Stipulation, the parties agreed to a termination of the FSA ''45 days following the defendants' publication of final regulations implementing this Agreement.''[19] Under this alternative, the Departments are proposing to publish the relevant and substantive terms of the FSA as regulations, while maintaining the operational flexibility necessary to continue operations and ensuring that minors and UACs continue to be treated in accordance with the FSA, the HSA, and the TVPRA.

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended, requires federal agencies to consider the potential impact of regulations on small entities during rulemaking. The term ''small entities'' comprises small business, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. Individuals are not considered by the RFA to be a small entity.

An initial regulatory flexibility analysis follows.

(1) A description of the reasons why the action by the agency is being considered.

The purpose of this action is to promulgate regulations that implement the relevant and substantive terms of the FSA. This proposed rule would implement the relevant and substantive terms of the FSA and provisions of the HSA and TVPRA where they necessarily intersect with the FSA's provisions. Publication of final regulations would result in termination of the FSA, as provided for in FSA paragraph 40.

(2) A succinct statement of the objectives of, and legal basis for, the proposed rule.

The main purpose of this action is to promulgate regulations that implement the relevant and substantive terms of the FSA. The FSA provides standards for the detention, treatment, and transfer of minors and UACs. The Secretary of Homeland Security derives her authority to promulgate these proposed regulatory amendments primarily from the Immigration and Nationality Act (INA or Act), as amended, 8 U.S.C. 1101 *et seq.* The Secretary may ''establish such regulations'' as she deems necessary for carrying out her authorities under the INA. INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3). In addition, section 462 of the HSA and section 235 of the TVPRA prescribe substantive requirements and procedural safeguards to be implemented by DHS and HHS with respect to UACs. And court decisions have dictated how the FSA is to be implemented. *See, e.g., Flores* v. *Sessions,* 862 F.3d 863 (9th Cir. 2017); *Flores* v. *Lynch,* 828 F.3d 898 (9th Cir. 2016); *Flores* v. *Sessions,* No. 2:85–cv–04544 (C.D. Cal. June 27, 2017).

Section 462 of the HSA also transferred to the ORR Director ''functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization.'' 6 U.S.C. 279(a). The ORR Director may, for purposes of performing a function transferred by this section, ''exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function'' immediately before the transfer of the program. 6 U.S.C. 279(f)(1).

Consistent with provisions in the HSA, and 8 U.S.C. 1232(a), the TVPRA places the responsibility for the care and custody of UACs with the Secretary of Health and Human Services. Prior to the transfer of the program, the Commissioner of Immigration and Naturalization, through a delegation from the Attorney General, had authority ''to establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of this Act.'' INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3) (2002); 8 CFR 2.1 (2002). In accordance with the relevant savings and transfer provisions of the HSA, *see* 6 U.S.C. 279, 552, 557; *see also* 8 U.S.C. 1232(b)(1); the ORR Director now possesses the authority to promulgate regulations concerning ORR's

administration of its responsibilities under the HSA and TVPRA.

(3) A description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply.

This proposed rule would directly regulate DHS and HHS. DHS contracts with private contractors and a local government to operate and maintain FRCs, and with private contractors to provide transportation of minors and UACs. This rule would indirectly affect these entities to the extent that DHS contracts with them under the terms necessary to fulfill the FSA. To the degree this rule increases contract costs to DHS private contractors, it would be incurred by the Federal Government in the cost paid by the contract. Similarly, as of June 2018, HHS is funding non-profit organizations to provide shelter, counseling, medical care, legal services, and other support services to UACs in custody. HHS does not believe this rule would increase costs to any of their grantees.

ICE currently contracts with three operators of FRCs, two of which are businesses and the other a local governmental jurisdiction. ICE and CBP also each have one contractor that provides transportation. To determine if the private contractors that operate and maintain FRCs and the private contractors that provide transportation are small entities, DHS references the Small Business Administration (SBA) size standards represented by business average annual receipts. SBA's Table of Small Business Size Standards is matched to the North American Industry Classification System (NAICS) for these industries.[26] To determine if the local government that operates and maintains an FRC is a small entity, DHS applies the 50,000 size standard for governmental jurisdictions.

DHS finds that the revenue of the private contractors that operate and maintain two of the three FRCs to be greater than the SBA size standard of the industry represented by NAICS 531110: Lessors of Residential Buildings and Dwellings. The size standard classified by the SBA is $38.5 million for lessors of buildings space to the Federal Government by Owners.[27] The county population of the local government that operates and maintains the other FRC is over 50,000, based on

2017 U.S. Census Bureau annual resident population estimates.[28]

DHS finds that the revenue of the two private contractors that provide transportation to minors, in some cases their family members, and to UACs for DHS to be greater than the SBA size standard of these industries.[29] The SBA size standard for NAICS 561210 Facilities Support Services is $38.5 million. The SBA size standards for NAICS 561612 Security Guards and Patrol Services is $20.3 million.

Currently, HHS funds 37 grantees to provide services to UACs. HHS finds that all 37 current grantees are non-profits that do not appear to be dominant in their field. Consequently, HHS believes all 37 grantees are likely to be small entities for the purposes of the RFA.

The proposed changes to DHS and HHS regulations would not directly impact any small entities.

(4) A description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

The proposed rule would codify the relevant and substantive terms of the FSA. ICE believes the FRCs, which are operated and maintained by private contractors or a local government, comply with these provisions, and will continue to comply through future contract renewals. To the extent this rule increases variable contract costs, such as a per student per day education cost, to any detention facilities, the cost increases would be passed along to the Federal Government in the cost paid for the contract. However, DHS cannot say with certainty how much, if any, increase in variable education costs would result from this rule.

A primary source of new costs for the proposed rule would be as a result of the proposed alternative licensing process. ICE currently fulfills the requirements being proposed as an alternative to licensing through its existing FRC contracts. To codify the requirements of the FSA, DHS is proposing in this rule that facilities that hold minors obtain state, county, or municipal licensing where appropriate licenses are available. If no such licensing regime is available, however, DHS proposes that it will employ an

---

[26] U.S. Small Business Administration, Tables of Small Business Size Standards Matched to NAICS Codes (Oct. 1, 2017), available at *https://www.sba.gov/sites/default/files/files/Size_Standards_Table_2017.xlsx.*

[27] DHS obtained NAICS codes and 2016 annual sales data from *Hoovers.com.*

[28] Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2017. Source: U.S. Census Bureau, Population Division.

[29] DHS obtained NAICS codes and 2016 annual sales data from *Hoovers.com* and *ReferenceUSA.com.*

outside entity to ensure that the facility complies with family residential standards established by ICE and that meet the requirements for licensing under the FSA. That would fulfill the goals of obtaining a license from a state or local agency. Most states do not offer licensing for facilities like the FRCs.[30] Therefore, to meet the terms of the FSA, minors are generally held in FRCs for less than 20 days (see Table 5). As all FRCs would be licensed under this proposed rule, the proposed rule may result in extending detention of some minors and their accompanying parent or legal guardian in FRCs beyond 20 days. Additionally, this rule would change ICE parole determination practices, which may result in fewer aliens being paroled.

An increase in the average length of detention may increase the variable costs paid by ICE to the private contractors who operate and maintain Berks and Karnes, as compared to the current operational environment. Due to many uncertainties surrounding the forecast, DHS is unable to estimate the incremental variable costs due to this proposed rule. Refer to Section VI.A. Executive Orders 12866 and 13563: Regulatory Review for the description of the uncertainties.

As discussed above, DHS would incur these potential costs through the cost paid for the contract with these facilities.

There are no cost impacts to the contracts for providing transportation because this rule codifies current operations.

The Departments request information and data from the public that would assist in better understanding the direct effects of this proposed rule on small entities. Members of the public should submit a comment, as described in this proposed rule under Public Participation, if they think that their business, organization, or governmental jurisdiction qualifies as a small entity and that this proposed rule would have a significant economic impact on it. It would be helpful if commenters provide as much information as possible as to why this proposed rule would create an impact on small businesses.

(5) Identification, to the extent practicable, of all relevant federal rules that may duplicate, overlap or conflict with the proposed rule.

The Departments are unaware of any relevant Federal rule that may duplicate, overlap, or conflict with the proposed rule.

(6) Description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.

The Departments are not aware any alternatives to the proposed rule which accomplish the stated objectives that would minimize economic impact of the proposed rule on small entities. DHS requests comments and also seeks alternatives from the public that will accomplish the same objectives and minimize the proposed rule's economic impact on small entities.

*C. Small Business Regulatory Enforcement Fairness Act of 1996*

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121, 110 Stat. 847, 858–59, we want to assist small entities in understanding this proposed rule so that they can better evaluate its effects on them and participate in the rulemaking. If the proposed rule would affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please consult ICE or ORR, as appropriate, using the contact information provided in the **FOR FURTHER INFORMATION** section above.

*D. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, 109 Stat. 48 (codified at 2 U.S.C. 1501 *et seq.*), is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in the expenditure of $100 million or more (adjusted annually for inflation) in any 1 year by State, local, and tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The value equivalent of $100 million in 1995 adjusted for inflation to 2017 levels by the Consumer Price Index for All Urban Consumer (CPI–U) is $161 million.

This rule does not exceed the $100 million expenditure threshold in any 1 year when adjusted for inflation. Though this rule would not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble. Additionally, UMRA excludes from its definitions of "Federal intergovernmental mandate," and "Federal private sector mandate" those regulations imposing an enforceable duty on other levels of government or

the private sector which are a "condition of Federal assistance." 2 U.S.C. 658(5)(A)(i)(I), (7)(A)(i). The FSA provides the Departments with no direct authority to mandate binding standards on facilities of state and local governments or on operations of private sector entities. Instead, these requirements would impact such governments or entities only to the extent that they make voluntary decisions to contract with the Departments. Compliance with any standards that are not already otherwise in place resulting from this rule would be a condition of ongoing Federal assistance through such arrangements. Therefore, this rulemaking contains neither a federal intergovernmental mandate nor a private sector mandate.

*E. Congressional Review Act*

The Office of Information and Regulatory Affairs has determined that this rulemaking is not a major rule, as defined by 5 U.S.C. 804, for purposes of congressional review of agency rulemaking pursuant to the Congressional Review Act, Public Law 104–121, sec. 251, 110 Stat. 868, 873 (codified at 5 U.S.C. 804). This rulemaking would not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based companies to compete with foreign-based companies in domestic and export markets. If this rule is implemented as proposed, a report about the issuance of the final rule will be submitted to Congress and the Comptroller General of the United States prior to its effective date.

*F. Paperwork Reduction Act*

All Departments are required to submit to OMB for review and approval, any reporting or recordkeeping requirements inherent in a rule under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995) (codified at 44 U.S.C. 3501 *et seq.*). This proposed rule does not create or change a collection of information, therefore, is not subject to the Paperwork Reduction Act requirements.

However, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), ACF submitted a copy of this section to the Office of Management and Budget (OMB) for its review. This proposed rule complies with settlement agreements, court orders, and statutory requirements, most of whose terms have been in place for over 20 years. This proposed rule would not require additional information

---

[30] *See* the discussion of the definition of "licensed facility" *supra.*

collection requirements beyond those requirements. The reporting requirements associated with those practices have been approved under the requirements of the Paperwork Reduction Act and in accordance with 5 CFR part 1320. ACF received conditional approval from OMB for use of its forms on October 19, 2015, with an expiration date of October 31, 2018 (OMB Control Number 0970–0278). Separately, ACF received approval from OMB for its placement and service forms on July 6, 2017, with an expiration date of July 31, 2020 (OMB Control Number 0970–0498); a form associated with the specific consent process is currently pending approval with OMB (OMB Control Number 0970–0385).

### G. Executive Order 13132: Federalism

This proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. This proposed rule implements the FSA by codifying the Departments' practices that comply with the terms of the FSA and relevant law for the processing, transfer, and care and custody of alien juveniles. In codifying these practices, the Departments were mindful of their obligations to meet the requirements of the FSA while also minimizing conflicts between State law and Federal interests.

Insofar, however, as the proposed rule sets forth standards that might apply to immigration detention facilities and holding facilities operated by contract with State and local governments and private entities, this proposed rule has the potential to affect the States, although it would not affect the relationship between the National Government and the States or the distribution of power and responsibilities among the various levels of government and private entities. With respect to the State and local agencies, as well as the private entities, that contract with DHS and operate these facilities across the country, the FSA provides DHS with no direct authority to mandate binding standards on their facilities. Instead, these requirements will impact the State, local, and private entities only to the extent that they make voluntary decisions to contract with DHS for the processing, transportation, care, or custody of alien juveniles. This approach is fully consistent with DHS's historical relationship to State and local agencies in this context.

Typically HHS enters into cooperative agreements or contracts with non-profit organizations to provide shelter, care, and physical custody for UACs in a facility licensed by the appropriate State or local licensing authority. Where HHS enters into cooperative agreements or contacts with a state licensed facility, ORR requires that the non-profit organization administering the facility abide by all applicable State or local licensing regulations and laws. ORR designed agency policies and proposed regulations as well as the terms of HHS cooperative agreements and contracts with the agency's grantees/contractors to complement appropriate State and licensing rules, not supplant or replace the requirements.

Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

Notwithstanding the determination that the formal consultation process described in Executive Order 13132 is not required for this rule, the Departments welcome any comments from representatives of State and local juvenile or family residential facilities—among other individuals and groups—during the course of this rulemaking.

### H. Executive Order 12988: Civil Justice Reform

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988, *Civil Justice Reform,* to minimize litigation, eliminate ambiguity, and reduce burden.

### I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

Executive Order 13211 requires agencies to consider the impact of rules that significantly impact the supply, distribution, and use of energy. DHS has reviewed this proposed rule and determined that it is not a "significant energy action" under the order because, while it is a "significant regulatory action" under Executive Order 12866, it does not have a significant adverse effect on the supply, distribution, or use of energy. The Administrator of the Office of Information and Regulatory Affairs has not designated it as a significant energy action. Therefore, this proposed rule does not require a Statement of Energy Effects under Executive Order 13211.

### J. National Environmental Policy Act (NEPA)

The U.S. Department of Homeland Security Management Directive (MD) 023–01 Revision Number 01 and Instruction Manual (IM) 023–01–001–01 Revision Number 01 establish procedures that DHS and its Components use to implement the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321–4375, and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500–1508.

The CEQ regulations allow federal agencies to establish categories of actions that do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1508.4. The IM 023–01–001–01, Rev. 01 lists the Categorical Exclusions that DHS has found to have no such effect. IM 023–01–001–01 Rev. 01, Appendix A, Table 1.

For an action to be categorically excluded, IM 023–01–001–01 Rev. 01 requires that the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions;

(2) The action is not a piece of a larger action; and

(3) No extraordinary circumstances exist that create the potential for a significant environmental effect. IM 023–01–001–01 Rev. 01 § V(B)(2)(a)–(c).

Certain categories of proposed actions included in the Categorically Excluded actions list have a greater potential to involve extraordinary circumstances and require the preparation of a Record of Environmental Consideration to document the NEPA analysis. IM 023–01–001–01 Rev. 01 § V(B)(2).

This proposed rule would implement the relevant and substantive terms of the FSA, with such limited changes as are necessary to implement closely related provisions of the HSA and the TVPRA, and to ensure that the regulations set forth a sustainable operational model. The proposed rule would implement regulations to ensure the humane detention of alien juveniles, and satisfy the goals of the FSA, in a manner that is workable and enforceable.

DHS analyzed this proposed rule under MD 023–01 Rev. 01 and IM 023–01–001–01 Rev. 01. DHS has made a preliminary determination that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This proposed rule clearly

fits within the Categorical Exclusions found in IM 023–01–001–01 Rev. 01, Appendix A, Table 1, number A3(b) and A3(d). A3(b) reads as: The "Promulgation of rules . . . that implement, without substantive change, statutory or regulatory requirements." A3(d) reads as: The "Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect." This proposed rule is not part of a larger action. This proposed rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this proposed rule is categorically excluded from further NEPA review.

For purposes of the joint NPRM, ORR's functions are categorically exempted from NEPA requirements as ORR's state licensed facilities are operated under social service grants. While the exception specifically excludes "projects involving construction, renovation, or changes in land use," ORR is generally precluded from initiating these types of projects directly for traditional shelter care in state licensed facilities, as the agency lacks construction authority.

The Departments seek any comments or information that may lead to the discovery of any significant environmental effects from this proposed rule.

*K. Executive Order 12630: Governmental Actions and Interference With Constitutionally Protected Property Rights*

This proposed rule would not cause a taking of private property or otherwise have taking implications under Executive Order 12630, *Governmental Actions and Interference with Constitutionally Protected Property Rights.*

*L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

Executive Order 13045 requires agencies to consider the impacts of environmental health risk or safety risk that may disproportionately affect children. The Departments have reviewed this proposed rule and determined that this rule is not an economically significant rule and would not create an environmental risk to health or risk to safety that may disproportionately affect children. Therefore, the Departments have not prepared a statement under this executive order.

*M. National Technology Transfer and Advancement Act*

The National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through OMB, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impracticable. Voluntary consensus standards are technical standards (*e.g.,* specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies. This proposed rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

*N. Family Assessment*

The Departments have reviewed this proposed rule in accordance with the requirements of section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277. With respect to the criteria specified in section 654(c)(1), insofar as the proposed rule may ensure the continued availability of FRCs notwithstanding the lack of state licensure, the proposed rule may in some respects strengthen the stability of the family and the authority and rights of parents in the education, nurture, and supervision of their children, within the immigration detention context. The rule would also codify in regulation certain statutory policies with respect to the treatment of UACs. In general, however, as proposed, these regulations would not have an impact on family well-being as defined in this legislation. With respect to family well-being, this proposed rule codifies current requirements of settlement agreements, court orders, and statutes, most of whose terms have been in place for over 20 years, as well as HHS's related authorities.

**VII. List of Subjects and Regulatory Amendments**

List of Subjects

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 236*

Apprehension and detention of inadmissible and deportable aliens, Removal of aliens ordered removed,

Administrative practice and procedure, Aliens, Immigration.

*45 CFR Part 410*

Administrative practice and procedure, Child welfare, Immigration, Unaccompanied alien children, Reporting and recordkeeping requirements.

**DEPARTMENT OF HOMELAND SECURITY**

*8 CFR Chapter I*

For the reasons set forth in the preamble, parts 212 and 236 of chapter I are proposed to be amended as follows:

**PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE**

■ 1. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

■ 2. In § 212.5, revise paragraphs (b) introductory text and (b)(3) to read as follows:

**§ 212.5  Parole of aliens into the United States.**

\*    \*    \*    \*    \*

(b) The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(c) of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

\*    \*    \*    \*    \*

(3) Aliens who are defined as minors in § 236.3(b) of this chapter and are in DHS custody. The Executive Assistant Director, Enforcement and Removal Operations; directors of field operations; field office directors, deputy field office directors; or chief patrol agents shall follow the guidelines set forth in § 236.3(j) of this chapter and paragraphs (b)(3)(i) through (ii) of this section in determining under what conditions a minor should be paroled from detention:

(i) Minors may be released to a parent or legal guardian not in detention.

(ii) Minors may be released with an accompanying parent or legal guardian who is in detention.

\*    \*    \*    \*    \*

cited in Flores filed August 2019 / 2019 / as of August 2019

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 3. The authority citation for part 236 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 6 U.S.C. 112(a)(2), 112(a)(3), 112(b)(1), 112(e), 202, 251, 279, 291; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1232, 1357, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

■ 4. Section 236.3 is revised to read as follows:

### § 236.3   Processing, detention, and release of alien minors.

(a) *Generally.* (1) DHS treats all minors and UACs in its custody with dignity, respect and special concern for their particular vulnerability.

(2) The provisions of this section apply to all minors in the legal custody of DHS, including minors who are subject to the mandatory detention provisions of the INA and applicable regulations, to the extent authorized by law.

(b) *Definitions.* For the purposes of this section:

(1) *Minor* means any alien who has not attained eighteen (18) years of age and has not been:

(i) Emancipated in an appropriate state judicial proceeding; or

(ii) Incarcerated due to a conviction for a criminal offense in which he or she was tried as an adult.

(2) *Special Needs Minor* means a minor whose mental and/or physical condition requires special services and treatment as identified during an individualized needs assessment as referenced in paragraph (i)(4)(iii) of this section. A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse.

(3) *Unaccompanied Alien Child* (UAC) has the meaning provided in 6 U.S.C. 279(g)(2), that is, a child who has no lawful immigration status in the United States and who has not attained 18 years of age; and with respect to whom: There is no parent or legal guardian present in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody. An individual may meet the definition of UAC without meeting the definition of minor.

(4) *Custody* means within the physical and legal control of an institution or person.

(5) *Emergency* means an act or event (including, but not limited to, a natural disaster, facility fire, civil disturbance, or medical or public health concerns at one or more facilities) that prevents timely transport or placement of minors, or impacts other conditions provided by this section.

(6) *Escape-risk* means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk include, but are not limited to, whether:

(i) The minor is currently subject to a final order of removal;

(ii) The minor's immigration history includes: A prior breach of bond, a failure to appear before DHS or the immigration courts, evidence that the minor is indebted to organized smugglers for his transport, or a voluntary departure or previous removal from the United States pursuant to a final order of removal; or

(iii) The minor has previously absconded or attempted to abscond from state or federal custody.

(7) *Family unit* means a group of two or more aliens consisting of a minor or minors accompanied by his/her/their adult parent(s) or legal guardian(s). In determining the existence of a parental relationship or a legal guardianship for purposes of this definition, DHS will consider all available reliable evidence. If DHS determines that there is insufficient reliable evidence available that confirms the relationship, the minor will be treated as a UAC.

(8) *Family Residential Center* means a facility used by ICE for the detention of Family Units.

(9) *Licensed Facility* means an ICE detention facility that is licensed by the state, county, or municipality in which it is located, if such a licensing scheme exists. Licensed facilities shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health, and safety codes. If a licensing scheme for the detention of minors accompanied by a parent or legal guardian is not available in the state, county, or municipality in which an ICE detention facility is located, DHS shall employ an entity outside of DHS that has relevant audit experience to ensure compliance with the family residential standards established by ICE.

(10) *Influx* means a situation in which there are, at any given time, more than 130 minors or UACs eligible for placement in a licensed facility under this section or corresponding provisions of ORR regulations, including those who have been so placed or are awaiting such placement.

(11) *Non-Secure Facility* means a facility that meets the definition of non-secure in the state in which the facility is located. If no such definition of non-secure exists under state law, a DHS facility shall be deemed non-secure if egress from a portion of the facility's building is not prohibited through internal locks within the building or exterior locks and egress from the facility's premises is not prohibited through secure fencing around the perimeter of the building.

(12) *Office of Refugee Resettlement (ORR)* means the U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement.

(c) *Age Determination.* (1) For purposes of exercising the authorities described in this part, DHS shall determine the age of an alien in accordance with 8 U.S.C. 1232(b)(4). Age determination decisions shall be based upon the totality of the evidence and circumstances.

(2) If a reasonable person would conclude that an individual is an adult, despite his or her claim to be under the age of 18, DHS may treat such person as an adult for all purposes, including confinement and release on bond, recognizance, or other conditions of release. In making this determination, an immigration officer may require such an individual to submit to a medical or dental examination conducted by a medical professional or other appropriate procedures to verify his or her age.

(3) If an individual previously considered to have been an adult is subsequently determined to be a under the age of 18, DHS will then treat such individual as a minor or UAC as prescribed by this section.

(d) *Determining whether an alien is a UAC.* (1) Immigration officers will make a determination as to whether an alien under the age of 18 is a UAC at the time of encounter or apprehension and prior to the detention or release of such alien.

(2) When an alien previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such an alien, or when such alien has obtained lawful immigration status, the alien is no longer a UAC. An alien who is no longer a UAC is not eligible to receive legal protections limited to UACs under the relevant sections of the Act. Nothing in this paragraph affects USCIS' independent

determination of its initial jurisdiction over asylum applications filed by UACs pursuant to section 208(b)(3)(C) of the Act.

(3) *Age-out procedures.* When an alien previously determined to have been a UAC is no longer a UAC because he or she turns eighteen years old, relevant ORR and ICE procedures shall apply.

(e) *Transfer of minors who are not UACs from one facility to another.* (1) In the case of an influx or emergency, as defined in paragraph (b) of this section, DHS will transfer a minor who is not a UAC, and who does not meet the criteria for secure detention pursuant to paragraph (i)(1) of this section, to a licensed facility as defined in paragraph (b)(9) of this section, which is non-secure, as expeditiously as possible. Otherwise, to the extent consistent with law or court order, DHS will transfer such minor within three (3) days, if the minor was apprehended in a district in which a licensed program is located, or within five (5) days in all other cases.

(2) In the case of an emergency or influx, DHS will abide by written guidance detailing all reasonable efforts that it will take to transfer all minors who are not UACs as expeditiously as possible.

(f) *Transfer of UACs from DHS to HHS.* (1) All UACs apprehended by DHS, except those who are subject to the terms of 8 U.S.C. 1232(a)(2), will be transferred to ORR for care, custody, and placement in accordance with 6 U.S.C. 279 and 8 U.S.C. 1232.

(2) DHS will notify ORR within 48 hours upon the apprehension or discovery of a UAC or any claim or suspicion that an unaccompanied alien detained in DHS custody is under 18 years of age.

(3) Unless exceptional circumstances are present, DHS will transfer custody of a UAC as soon as practicable after receiving notification of an ORR placement, but no later than 72 hours after determining that the minor is a UAC per paragraph (d) of this section. In the case of exceptional circumstances, DHS will abide by written guidance detailing the efforts that it will take to transfer all UACs as required by law.

(4) *Conditions of transfer.* (i) A UAC will not be transported with an unrelated detained adult(s) unless the UAC is being transported from the place of apprehension to a DHS facility or if separate transportation is otherwise impractical or unavailable.

(ii) When separate transportation is impractical or unavailable, necessary precautions will be taken to ensure the UAC's safety, security, and well-being.

If a UAC is transported with any unrelated detained adult(s), DHS will separate the UAC from the unrelated adult(s) to the extent operationally feasible and take necessary precautions for protection of the UAC's safety, security, and well-being.

(g) *DHS procedures in the apprehension and processing of minors or UACs.*

(1) Processing. (i) *Notice of rights and request for disposition.* Every minor or UAC who enters DHS custody, including minors and UACs who request voluntary departure or request to withdraw their application for admission, will be issued a Form I–770, Notice of Rights and Request for Disposition, which will include a statement that the minor or UAC may make a telephone call to a parent, close relative, or friend. If the minor or UAC is believed to be less than 14 years of age, or is unable to comprehend the information contained in the Form I–770, the notice shall be read and explained to the minor or UAC in a language and manner that he or she understands. In the event that a minor or UAC is no longer amenable to voluntary departure or to a withdrawal of an application for admission, the minor or UAC will be issued a new Form I–770 or the Form I–770 will be updated, as needed.

(ii) *Notice of Right to Judicial Review.* Every minor who is not a UAC who is transferred to or remains in a DHS detention facility will be provided with a Notice of Right to Judicial Review, which informs the minor of his or her right to seek judicial review in United States District Court with jurisdiction and venue over the matter if the minor believes that his or her detention does not comply with the terms of paragraph (i) of this section.

(iii) *Current List of Counsel.* Every minor who is not a UAC who is transferred to or remains in a DHS detention facility will be provided the free legal service provider list, prepared pursuant to section 239(b)(2) of the Act.

(2) *DHS custodial care immediately following apprehension.* (i) Following the apprehension of a minor or UAC, DHS will process the minor or UAC as expeditiously as possible. Consistent with 6 CFR 115.114, minors and UACs shall be held in the least restrictive setting appropriate to the minor or UAC's age and special needs, provided that such setting is consistent with the need to protect the minor or UAC's well-being and that of others, as well as with any other laws, regulations, or legal requirements. DHS will hold minors and UACs in facilities that are safe and sanitary and that are consistent

with DHS's concern for their particular vulnerability. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, access to emergency medical assistance as needed, and adequate temperature and ventilation. DHS will provide adequate supervision and will provide contact with family members arrested with the minor or UAC in consideration of the safety and well-being of the minor or UAC, and operational feasibility. UACs generally will be held separately from unrelated adult detainees in accordance with 6 CFR 115.14(b) and 6 CFR 115.114(b). In the event that such separation is not immediately possible, UACs in facilities covered by 6 CFR 115.114 may be housed with an unrelated adult for no more than 24 hours except in the case of an emergency or other exigent circumstances.

(ii) Consistent with the statutory requirements, DHS will transfer UACs to HHS in accordance with the procedures described in paragraph (f) of this section.

(h) *Detention of family units.* DHS's policy is to maintain family unity, including by detaining families together where appropriate and consistent with law and available resources. If DHS determines that detention of a family unit is required by law, or is otherwise appropriate, the family unit may be transferred to a Family Residential Center which is a licensed facility and non-secure.

(i) *Detention of minors who are not UACs in DHS custody.* In any case in which DHS does not release a minor who is not a UAC, said minor shall remain in DHS detention. Consistent with 6 CFR 115.14, minors shall be detained in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to ensure the minor's timely appearance before DHS and the immigration courts and to protect the minor's well-being and that of others, as well as with any other laws, regulations, or legal requirements. The minor shall be placed temporarily in a licensed facility, which will be non-secure, until such time as release can be effected or until the minor's immigration proceedings are concluded, whichever occurs earlier. If immigration proceedings are concluded and result in a final order of removal, DHS will detain the minor for the purpose of removal. If immigration proceedings result in a grant of relief or protection from removal where both parties have waived appeal or the appeal period defined in 8 CFR

Vacated on August 23, 2021 under Flores

1003.38(b) has expired, DHS will release the minor.

(1) A minor who is not a UAC referenced under this paragraph may be held in or transferred to a suitable state or county juvenile detention facility, or a secure DHS detention facility, or DHS contracted facility having separate accommodations for minors, whenever the Field Office Director and the ICE supervisory or management personnel have probable cause to believe that the minor:

(i) Has been charged with, is chargeable with, or has been convicted of a crime or crimes, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act or acts, that fit within a pattern or practice of criminal activity;

(ii) Has been charged with, is chargeable with, or has been convicted of a crime or crimes, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act or acts, that involve violence against a person or the use or carrying of a weapon;

(iii) Has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in formal or state government custody or while in the presence of an immigration officer;

(iv) Has engaged, while in the licensed facility, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed facility in which the minor has been placed and transfer to another facility is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed facility;

(v) Is determined to be an escape-risk pursuant to paragraph (b)(6) of this section; or

(vi) Must be held in a secure facility for his or her own safety.

(2) DHS will not place a minor who is not a UAC in a secure facility pursuant to paragraph (i)(1) if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to a facility which would provide intensive staff supervision and counseling services or another licensed facility. All determinations to place a minor in a secure facility will be reviewed and approved by the Juvenile Coordinator referenced in paragraph (o) of this section. Secure facilities shall permit attorney-client visits in accordance with applicable facility rules and regulations.

(3) *Non-secure facility.* Unless a secure facility is otherwise authorized pursuant to this section, ICE facilities used for the detention of minors who

are not UACs shall be non-secure facilities.

(4) *Standards.* Non-secure, licensed ICE facilities to which minors who are not UACs are transferred pursuant to the procedures in paragraph (e) of this section shall abide by applicable standards established by ICE. At a minimum, such standards shall include provisions or arrangements for the following services for each minor who is not a UAC in its care:

(i) Proper physical care and maintenance, including suitable living, accommodations, food, appropriate clothing, and personal grooming items;

(ii) Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Centers for Disease Control and Prevention; administration of prescribed medication and special diets; appropriate mental health interventions when necessary;

(iii) An individualized needs assessment which includes:

(A) Various initial intake forms;

(B) Essential data relating to the identification and history of the minor and family;

(C) Identification of the minor's special needs including any specific problem(s) which appear to require immediate intervention;

(D) An educational assessment and plan;

(E) An assessment of family relationships and interaction with adults, peers and authority figures;

(F) A statement of religious preference and practice;

(G) An assessment of the minor's personal goals, strengths and weaknesses; and

(H) Identifying information regarding immediate family members, other relatives, godparents, or friends who may be residing in the United States and may be able to assist in family reunification;

(iv) Educational services appropriate to the minor's level of development and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program should include subjects similar to those found in U.S. programs and include science, social

studies, math, reading, writing, and physical education. The program design should be appropriate for the minor's estimated length of stay and can include the necessary skills appropriate for transition into a U.S. school district. The program should also include acculturation and adaptation services which include information regarding the development of social and inter-personal skills that contribute to those abilities as age appropriate;

(v) Appropriate reading materials in languages other than English for use during the minor's leisure time;

(vi) Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session;

(vii) At least one individual counseling session or mental health wellness interaction (if the minor does not want to participate in a counseling session) per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short-term objectives, and addressing both the developmental and crisis-related needs of each minor;

(viii) Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present and can be held in conjunction with other structured activities. It is a time when new minors present in the facility are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational activities, etc. It is a time for staff and minors to discuss whatever is on their minds and to resolve problems;

(ix) Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance;

(x) Whenever possible, access to religious services of the minor's choice;

(xi) Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor and preventing the transfer of contraband;

(xii) A reasonable right to privacy, which shall include the right to:

(A) Wear his or her own clothes, when available;

(B) Retain a private space in the residential facility for the storage of personal belongings;

(C) Talk privately on the phone, as permitted by applicable facility rules and regulations;

(D) Visit privately with guests, as permitted by applicable facility rules and regulations; and

(E) Receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

(xiii) When necessary, communication with adult relatives living in the United States and in foreign countries regarding legal issues related to the release and/or removal of the minor;

(xiv) Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the Government, the right to apply for asylum or to request voluntary departure; and

(xv) Attorney-client visits in accordance with applicable facility rules and regulations.

(5) In the event of an emergency, a licensed, non-secure facility described in paragraph (i) of this section may transfer temporary physical custody of a minor prior to securing permission from DHS, but shall notify DHS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

(j) *Release of minors from DHS custody.* DHS will make and record prompt and continuous efforts on its part toward the release of the minor. If DHS determines that detention of a minor who is not a UAC is not required to secure the minor's timely appearance before DHS or the immigration court, or to ensure the minor's safety or the safety of others, the minor may be released, as provided under existing statutes and regulations, pursuant to the procedures set forth in this paragraph.

(1) DHS will release a minor from custody to a parent or legal guardian who is available to provide care and physical custody.

(2) Prior to releasing to a parent or legal guardian, DHS will use all available reliable evidence to determine whether the relationship is bona fide. If no reliable evidence is available that confirms the relationship, the minor will be treated as a UAC and transferred into the custody of HHS as outlined in paragraph (f) of this section.

(3) For minors in DHS custody, DHS shall assist without undue delay in making transportation arrangements to the DHS office nearest the location of the person to whom a minor is to be released. DHS may, in its discretion, provide transportation to minors.

(4) Nothing herein shall require DHS to release a minor to any person or agency whom DHS has reason to believe may harm or neglect the minor or fail to present him or her before DHS or the immigration courts when requested to do so.

(k) *Procedures upon transfer.*—(1) *Possessions.* Whenever a minor or UAC is transferred from one ICE placement to another, or from an ICE placement to an ORR placement, he or she will be transferred with all possessions and legal papers; provided, however, that if the minor or UAC's possessions exceed the amount normally permitted by the carrier in use, the possessions shall be shipped to the minor or UAC in a timely manner.

(2) *Notice to counsel.* A minor or UAC who is represented will not be transferred from one ICE placement to another, or from an ICE placement to an ORR placement, until notice is provided to his or her counsel, except in unusual and compelling circumstances, such as where the safety of the minor or UAC or others is threatened or the minor or UAC has been determined to be an escape-risk, or where counsel has waived such notice. In unusual and compelling circumstances, notice will be sent to counsel within 24 hours following the transfer.

(l) *Notice to parent of refusal of release or application for relief.* (1) A parent shall be notified of any of the following requests if the parent is present in the United States and can reasonably be contacted, unless such notification is otherwise prohibited by law or DHS determines that notification of the parent would pose a risk to the minor's safety or well-being:

(i) A minor or UAC in DHS custody refuses to be released to his or her parent; or

(ii) A minor or a UAC seeks release from DHS custody or seeks voluntary departure or a withdrawal of an application for admission, parole, or any form of relief from removal before DHS, and that the grant of such request or relief may effectively terminate some interest inherent in the parent-child relationship and/or the minor or UAC's rights and interests are adverse with those of the parent.

(2) Upon notification, the parent will be afforded an opportunity to present his or her views and assert his or her interest to DHS before a determination is made as to the merits of the request for relief.

(m) *Bond hearings.* Bond determinations made by DHS for minors who are in removal proceedings pursuant to section 240 of the Act and who are also in DHS custody may be reviewed by an immigration judge pursuant to 8 CFR part 1236 to the extent permitted by 8 CFR 1003.19. Minors in DHS custody who are not in section 240 proceedings are ineligible to seek review by an immigration judge of their DHS custody determinations.

(n) *Retaking custody of a previously released minor.* (1) In addition to the ability to make a UAC determination upon each encounter as set forth in paragraph (c) of this section, DHS may take a minor back into custody if there is a material change in circumstances indicating the minor is an escape-risk, a danger to the community, or has a final order of removal. If the minor is accompanied, DHS shall place the minor in accordance with paragraphs (e) and (i) of this section. If the minor is a UAC, DHS shall transfer the minor into HHS custody in accordance with paragraph (e) of this section.

(2) DHS may take a minor back into custody if there is no longer a parent or legal guardian available to care for the minor. In these cases, DHS will treat the minor as a UAC and transfer custody to HHS as outlined in paragraph (e) of this section.

(3) Minors who are not UACs and who are taken back into DHS custody may request a custody redetermination hearing in accordance with paragraph (m) of this section and to the extent permitted by 8 CFR 1003.19 .

(o) *Monitoring.* (1) CBP and ICE each shall identify a Juvenile Coordinator for the purpose of monitoring compliance with the terms of this section.

(2) The Juvenile Coordinators shall collect and periodically examine relevant statistical information about UACs and minors who remain in CBP or ICE custody for longer than 72 hours. Such statistical information may include but not necessarily be limited to:

(i) Biographical information;

(ii) Dates of custody; and

(iii) Placements, transfers, removals, or releases from custody, including the reasons for a particular placement.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

*45 CFR Chapter IV*

For the reasons set forth in the preamble, part 410 of Chapter IV of title 45 of the Code of Federal Regulations is proposed to be amended as follows:

■ 10. Add part 410 to read as follows:

## PART 410—CARE AND PLACEMENT OF UNACCOMPANIED ALIEN CHILDREN

### Subpart A—Care and Placement of Unaccompanied Alien Children

Sec.
410.100  Scope of this part
410.101  Definitions
410.102  ORR care and placement of unaccompanied alien children

### Subpart B—Determining the Placement of an Unaccompanied Alien Child

Sec.
410.200  Purpose of this subpart
410.201  Considerations generally applicable to the placement of an unaccompanied alien child
410.202  Placement of an unaccompanied alien child in a licensed program
410.203  Criteria for placing an unaccompanied alien child in a secure facility
410.204  Considerations when determining whether an unaccompanied alien child is an escape risk
410.205  Applicability of § 410.203 for placement in a secure facility
410.206  Information for unaccompanied alien children concerning the reasons for his or her placement in a secure or staff secure facility
410.207  Custody of an unaccompanied alien child placed pursuant to this subpart
410.208  Special needs minors
410.209  Procedures during an emergency or influx

### Subpart C—Releasing an Unaccompanied Alien Child From ORR Custody

Sec.
410.300  Purpose of this subpart
410.301  Sponsors to whom ORR releases an unaccompanied alien child
410.302  Sponsor suitability assessment process requirements leading to release of an unaccompanied alien child from ORR custody to a sponsor

### Subpart D—Licensed Programs

Sec.
410.400  Purpose of this subpart
410.401  Applicability of this subpart
410.402  Minimum standards applicable to licensed programs
410.403  Ensuring that licensed programs are providing services as required by these regulations

### Subpart E—Transportation of an Unaccompanied Alien Child

Sec.
410.500  Conducting transportation for an unaccompanied alien child in ORR's custody

### Subpart F—Transfer of an Unaccompanied Alien Child

Sec.
410.600  Principles applicable to transfer of an unaccompanied alien child

### Subpart G—Age Determinations

Sec.

410.700  Conducting age determinations
410.701  Treatment of an individual who appears to be an adult

### Subpart H—Unaccompanied Alien Children's Objections to ORR Determinations

Sec.
410.800  Purpose of this Subpart
410.801  Procedures
410.810  Hearings

**Authority:** 6 U.S.C. 279, 8 U.S.C. 1103(a)(3), 8 U.S.C. 1232.

## Subpart A—Care and Placement of Unaccompanied Alien Children

### § 410.100  Scope of this part.

This part governs those aspects of the care, custody, and placement of unaccompanied alien children (UACs) agreed to in the settlement agreement reached in *Jenny Lisette Flores* v. *Janet Reno, Attorney General of the United States,* Case No. CV 85–4544–RJK (C.D. Cal. 1996). ORR operates the UAC program as authorized by section 462 of the Homeland Security Act of 2002, Public Law 107–296, 6 U.S.C. 279, and section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Public Law 110–457, 8 U.S.C. 1232. This part does not govern or describe the entire program.

### § 410.101  Definitions.

*DHS* means the Department of Homeland Security.

*Director* means the Director of the Office of Refugee Resettlement (ORR), Administration for Children and Families, Department of Health and Human Services.

*Emergency* means an act or event (including, but not limited to, a natural disaster, facility fire, civil disturbance, or medical or public health concerns at one or more facilities) that prevents timely transport or placement of UACs, or impacts other conditions provided by this part.

*Escape risk* means there is a serious risk that an unaccompanied alien child (UAC) will attempt to escape from custody.

*Influx* means a situation in which there are, at any given time, more than 130 minors or UACs eligible for placement in a licensed facility under this part or corresponding provisions of DHS regulations, including those who have been so placed or are awaiting such placement.

*Licensed program* means any program, agency, or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs UAC. A licensed program must meet the standards set forth in § 410.402 of this part. All homes and facilities operated by a licensed program, including facilities for special needs minors, are non-secure as required under State law. However, a facility for special needs minors may maintain that level of security permitted under State law which is necessary for the protection of a UAC or others in appropriate circumstances, *e.g.,* cases in which a UAC has drug or alcohol problems or is mentally ill.

*ORR* means the Office of Refugee Resettlement, Administration for Children and Families, Department of Health and Human Services.

*Secure facility* means a State or county juvenile detention facility or a secure ORR detention facility, or a facility with an ORR contract or cooperative agreement having separate accommodations for minors. A secure facility does not need to meet the requirements of § 410.402, and is not defined as a "licensed program" or "shelter" under this Part.

*Shelter* means a licensed program that meets the standards set forth in § 410.402 of this part.

*Special needs minor* means a UAC whose mental and/or physical condition requires special services and treatment by staff. A UAC may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A UAC who has suffered serious neglect or abuse may be considered a special needs minor if the UAC requires special services or treatment as a result of neglect or abuse.

*Sponsor,* also referred to as custodian, means an individual (or entity) to whom ORR releases a UAC out of ORR custody.

*Staff secure facility* means a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets the standards for licensed programs set forth in § 410.402 of this part. A staff secure facility is designed for a UAC who requires close supervision but does not need placement in a secure facility. It provides 24-hour awake supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff supervision, than a shelter in order to control problem behavior and to prevent escape. A staff secure facility may have a secure perimeter but is not equipped internally with major restraining construction or procedures typically associated with correctional facilities.

cited in Flores v. Barr, No. 17-56297 archived on August

*Unaccompanied alien child* (UAC) means an individual who: Has no lawful immigration status in the United States; has not attained 18 years of age; and with respect to whom: There is no parent or legal guardian in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody. When an alien previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such an alien, or when such alien has obtained lawful immigration status, the alien is no longer a UAC. An alien who is no longer a UAC is not eligible to receive legal protections limited to UACs.

### § 410.102   ORR care and placement of unaccompanied alien children.

ORR coordinates and implements the care and placement of UAC who are in ORR custody by reason of their immigration status.

For all UAC in ORR custody, DHS and DOJ handle other matters, including immigration benefits and enforcement matters, as set forth in their respective statutes, regulations and other authorities.

ORR shall hold UACs in facilities that are safe and sanitary and that are consistent with ORR's concern for the particular vulnerability of minors.

Within all placements, UAC shall be treated with dignity, respect, and special concern for their particular vulnerability.

## Subpart B—Determining the Placement of an Unaccompanied Alien Child

### § 410.200   Purpose of this subpart.

This subpart sets forth what ORR considers when placing a UAC in a particular ORR facility, in accordance with the Flores settlement agreement.

### § 410.201   Considerations generally applicable to the placement of an unaccompanied alien child.

(a) ORR places each UAC in the least restrictive setting that is in the best interest of the child and appropriate to the UAC's age and special needs, provided that such setting is consistent with its interests to ensure the UAC's timely appearance before DHS and the immigration courts and to protect the UAC's well-being and that of others.

(b) ORR separates UAC from delinquent offenders.

(c) ORR makes reasonable efforts to provide placements in those geographical areas where DHS apprehends the majority of UAC.

(d) Facilities where ORR places UAC will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the UAC is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect UAC from others, and contact with family members who were arrested with the minor.

(e) If there is no appropriate licensed program immediately available for placement of a UAC pursuant to Subpart B, and no one to whom ORR may release the UAC pursuant to Subpart C, the UAC may be placed in an ORR-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. In addition to the requirement that UAC shall be separated from delinquent offenders, every effort must be taken to ensure that the safety and well-being of the UAC detained in these facilities are satisfactorily provided for by the staff. ORR makes all reasonable efforts to place each UAC in a licensed program as expeditiously as possible.

(f) ORR makes and records the prompt and continuous efforts on its part toward family reunification. ORR continues such efforts at family reunification for as long as the minor is in ORR custody.

### § 410.202   Placement of an unaccompanied alien child in a licensed program.

(a) ORR places UAC into a licensed program promptly after a UAC is transferred to ORR legal custody, except in the following circumstances:

(1) UAC meeting the criteria for placement in a secure facility set forth in § 410.203 of this part;

(2) As otherwise required by any court decree or court-approved settlement; or,

(3) In the event of an emergency or influx of UAC into the United States, in which case ORR places the UAC as expeditiously as possible in accordance with § 410.209 of this part; or

(4) If a reasonable person would conclude that the UAC is an adult despite his or her claims to be a minor.

### § 410.203   Criteria for placing an unaccompanied alien child in a secure facility.

(a) Notwithstanding § 410.202 of this part, ORR may place a UAC in a secure facility if the UAC:

(1) Has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, and where ORR deems those circumstances demonstrate that the UAC poses a danger to self or others. ''Chargeable'' means that ORR has probable cause to believe that the UAC has committed a specified offense. This provision does not apply to a UAC whose offense is:

(i) An isolated offense that was not within a pattern or practice of criminal activity and did not involve violence against a person or the use or carrying of a weapon; or

(ii) A petty offense, which is not considered grounds for stricter means of detention in any case;

(2) While in DHS or ORR's custody or while in the presence of an immigration officer, has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself/herself or others);

(3) Has engaged, while in a licensed program or staff secure facility, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program or staff secure facility in which he or she has been placed and removal is necessary to ensure the welfare of the UAC or others, as determined by the staff of the licensed program or staff secure facility (*e.g.,* drug or alcohol abuse, stealing, fighting, intimidation of others, or sexually predatory behavior), and ORR determines the UAC poses a danger to self or others based on such conduct;

(4) For purposes of placement in a secure RTC, if a licensed psychologist or psychiatrist determines that the UAC poses a risk of harm to self or others.

(5) Is otherwise a danger to self or others.

(b) ORR Federal Field Specialists review and approve all placements of UAC in secure facilities consistent with legal requirements.

### § 410.204   Considerations when determining whether an unaccompanied alien child is an escape risk.

When determining whether a UAC is an escape risk, ORR considers, among other factors, whether:

(a) The UAC is currently under a final order of removal;

(b) The UAC's immigration history includes:

(1) A prior breach of a bond;

(2) A failure to appear before DHS or the immigration court;

(3) Evidence that the UAC is indebted to organized smugglers for his or her transport; or

(4) A voluntary departure or a previous removal from the United States pursuant to a final order of removal; and

(c) The UAC has previously absconded or attempted to abscond from state or federal custody.

### § 410.205  Applicability of § 410.203 for placement in a secure facility.

ORR does not place a UAC in a secure facility pursuant to § 410.203 of this part if less restrictive alternatives are available and appropriate under the circumstances. ORR may place a UAC in a staff secure facility or another licensed program as an alternative to a secure facility.

### § 410.206  Information for unaccompanied alien children concerning the reasons for his or her placement in a secure or staff secure facility.

Within a reasonable period of time, ORR provides each UAC placed or transferred to a secure or staff secure facility with a notice of the reasons for the placement in a language the UAC understands.

### § 410.207  Custody of an unaccompanied alien child placed pursuant to this subpart.

A UAC who is placed in a licensed program pursuant to this subpart remains in the custody of ORR, and may only be transferred or released under its authority. However, in the event of an emergency, a licensed program may transfer temporarily the physical placement of a UAC prior to securing permission from ORR, but must notify ORR of the transfer as soon as possible, but in all cases within eight hours of the transfer. Upon release to an approved sponsor, a UAC is no longer in the custody of ORR.

### § 410.208  Special needs minors.

ORR assesses each UAC to determine if he or she has special needs, and if so, places the UAC, whenever possible, in a licensed program in which ORR places unaccompanied alien children without special needs, but which provides services and treatment for such special needs.

### § 410.209  Procedures during an emergency or influx.

In the event of an emergency or influx that prevents the prompt placement of UAC in licensed programs, ORR makes all reasonable efforts to place each UAC in a licensed program as expeditiously as possible using the following procedures:

(a) ORR maintains an emergency placement list of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements.

(b) ORR implements its contingency plan on emergencies and influxes.

(c) Within one business day of the emergency or influx, ORR, if necessary, contacts the programs on the emergency placement list to determine available

placements. To the extent practicable, ORR will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

(d) In the event that the number of UAC needing placement exceeds the available appropriate placements on the emergency placement list, ORR works with governmental and nongovernmental organizations to locate additional placements through licensed programs, county social services departments, and foster family agencies.

(e) ORR maintains a list of UAC affected by the emergency or influx including each UAC's:

(1) Name;

(2) Date and country of birth;

(3) Date of placement in ORR's custody; and

(4) Place and date of current placement.

(f) Each year ORR reevaluates the number of regular placements needed for UAC to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of UAC eligible for placement in licensed programs.

## Subpart C—Releasing an Unaccompanied Alien Child From ORR Custody

### § 410.300  Purpose of this subpart.

This subpart covers the policies and procedures used to release, without unnecessary delay, a UAC from ORR custody to an approved sponsor.

### § 410.301  Sponsors to whom ORR releases an unaccompanied alien child.

(a) ORR releases a UAC to an approved sponsor without unnecessary delay, but may continue to retain custody of a UAC if ORR determines that continued custody is necessary to ensure the UAC's safety or the safety of others, or that continued custody is required to secure the UAC's timely appearance before DHS or the immigration courts.

(b) When ORR releases a UAC without unnecessary delay to an approved sponsor, it releases in the following order of preference:

(1) A parent;

(2) A legal guardian;

(3) An adult relative (brother, sister, aunt, uncle, or grandparent);

(4) An adult individual or entity designated by the parent or legal guardian as capable and willing to care for the UAC's well-being in:

(i) A declaration signed under penalty of perjury before an immigration or consular officer, or

(ii) Such other document that establishes to the satisfaction of ORR, in

its discretion, the affiant's parental relationship or guardianship;

(5) A licensed program willing to accept legal custody; or

(6) An adult individual or entity seeking custody, in the discretion of ORR, when it appears that there is no other likely alternative to long term custody, and family reunification does not appear to be a reasonable possibility.

### § 410.302  Sponsor suitability assessment process requirements leading to release of an unaccompanied alien child from Federal custody to a proposed sponsor.

(a) The licensed program providing care for the UAC shall make and record the prompt and continuous efforts on its part towards family reunification and the release of the UAC pursuant to the provisions of this section.

(b) ORR requires a background check, including verification of identity and which may include verification of employment of the individuals offering support, prior to release.

(c) ORR also may require further suitability assessment, which may include interviews of members of the household, investigation of the living conditions in which the UAC would be placed and the standard of care he or she would receive, a home visit, a fingerprint-based background and criminal records check on the prospective sponsor and on adult residents of the prospective sponsor's household, and follow-up visits after release. Any such assessment also takes into consideration the wishes and concerns of the UAC.

(d) If the conditions identified in TVPRA at 8 U.S.C. 1232(c)(3)(B) are met, and require a home study, no release to a sponsor may occur in the absence of such a home study.

(e) The proposed sponsor must sign an affidavit of support and a custodial release agreement of the conditions of release. The custodial release agreement requires that the sponsor:

(1) Provide for the UAC's physical, mental, and financial well-being;

(2) Ensure the UAC's presence at all future proceedings before DHS and the immigration courts;

(3) Ensure the UAC reports for removal from the United States if so ordered;

(4) Notify ORR, DHS, and the Executive Office for Immigration Review of any change of address within five days following a move;

(5) Notify ORR and DHS at least five days prior to the sponsor's departure from the United States, whether the departure is voluntary or pursuant to a grant of voluntary departure or an order of removal;

(6) Notify ORR and DHS if dependency proceedings involving the UAC are initiated and also notify the dependency court of any immigration proceedings pending against the UAC;

(7) Request written permission from ORR if the sponsor decides to transfer legal custody of the UAC to someone else. Also, in the event of an emergency (*e.g.*, serious illness or destruction of the home), a sponsor may transfer temporary physical custody of the UAC prior to securing permission from ORR, but the sponsor must notify ORR as soon as possible and no later than 72 hours after the transfer; and

(8) Notify ORR and DHS as soon as possible and no later than 24 hours of learning that the UAC has disappeared, has been threatened, or has been contacted in any way by an individual or individuals believed to represent an immigrant smuggling syndicate or organized crime.

(f) ORR is not required to release a UAC to any person or agency it has reason to believe may harm or neglect the UAC or fail to present him or her before DHS or the immigration courts when requested to do so.

## Subpart D—Licensed Programs

### §410.400   Purpose of this subpart.

This subpart covers the standards that licensed programs must meet in keeping with the principles UACs in custody with dignity, respect and special concern for their particular vulnerability.

### §410.401   Applicability of this subpart.

This subpart applies to all licensed programs, regardless of whether they are providing care in shelters, staff secure facilities, residential treatment centers, or foster care and group home settings.

### §410.402   Minimum standards applicable to licensed programs.

Licensed programs must:

(a) Be licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children.

(b) Comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety code;

(c) Provide or arrange for the following services for each UAC in care, including:

(1) Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items;

(2) Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for

infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the UAC was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary;

(3) An individualized needs assessment that must include:

(i) Various initial intake forms;

(ii) Essential data relating to the identification and history of the UAC and family;

(iii) Identification of the UAC's special needs including any specific problems that appear to require immediate intervention;

(iv) An educational assessment and plan;

(v) An assessment of family relationships and interaction with adults, peers and authority figures;

(vi) A statement of religious preference and practice;

(vii) An assessment of the UAC's personal goals, strengths and weaknesses; and

(viii) Identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States, and may be able to assist in family reunification; and

(4) Educational services appropriate to the UAC's level of development and communication skills in a structured classroom setting, Monday through Friday, which concentrate primarily on the development of basic academic competencies and secondarily on English Language Training (ELT), including:

(i) Instruction and educational and other reading materials in such languages as needed;

(ii) Instruction in basic academic areas that include science, social studies, math, reading, writing, and physical education; and

(iii) The provision to a UAC of appropriate reading materials in languages other than English for use during the UAC's leisure time;

(5) Activities according to a recreation and leisure time plan that include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities, which do not include time spent watching television. Activities must be increased to at least three hours on days when school is not in session;

(6) At least one individual counseling session per week conducted by trained

social work staff with the specific objectives of reviewing the UAC's progress, establishing new short-term objectives, and addressing both the developmental and crisis-related needs of each UAC;

(7) Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the UACs present. This is a time when new UACs are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational and other program activities, etc. This is a time for staff and UACs to discuss whatever is on their minds and to resolve problems;

(8) Acculturation and adaptation services that include information regarding the development of social and inter-personal skills that contribute to those abilities necessary to live independently and responsibly;

(9) Upon admission, a comprehensive orientation regarding program intent, services, rules (provided in writing and verbally), expectations and the availability of legal assistance;

(10) Whenever possible, access to religious services of the UAC's choice;

(11) Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff must respect the UAC's privacy while reasonably preventing the unauthorized release of the UAC;

(12) A reasonable right to privacy, which must include the right to:

(i) Wear his or her own clothes, when available;

(ii) Retain a private space in the residential facility, group or foster home for the storage of personal belongings;

(iii) Talk privately on the phone, as permitted by the house rules and regulations;

(iv) Visit privately with guests, as permitted by the house rules and regulations; and

(v) Receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband;

(13) Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for release of the UAC; and

(14) Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the

right to apply for asylum or to request voluntary departure in lieu of removal;

(d) Deliver services in a manner that is sensitive to the age, culture, native language and the complex needs of each UAC;

(e) Formulate program rules and discipline standards with consideration for the range of ages and maturity in the program and that are culturally sensitive to the needs of each UAC to ensure the following:

(1) UAC must not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping; and

(2) Any sanctions employed must not:

(i) Adversely affect either a UAC's health, or physical or psychological well-being; or

(ii) Deny UAC regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance;

(f) Develop a comprehensive and realistic individual plan for the care of each UAC in accordance with the UAC's needs as determined by the individualized needs assessment. Individual plans must be implemented and closely coordinated through an operative case management system;

(g) Develop, maintain and safeguard individual client case records. Licensed programs must develop a system of accountability that preserves the confidentiality of client information and protects the records from unauthorized use or disclosure; and

(h) Maintain adequate records and make regular reports as required by ORR that permit ORR to monitor and enforce these regulations and other requirements and standards as ORR may determine are in the interests of the UAC.

### § 410.403   Ensuring that licensed programs are providing services as required by these regulations.

ORR monitors compliance with the terms of these regulations.

## Subpart E—Transportation of an Unaccompanied Alien Child

### § 410.500   Conducting transportation for an unaccompanied alien child in ORR's custody.

(a) ORR does not transport UAC with adult detainees.

(b) When ORR plans to release a UAC from its custody under the family reunification provisions at sections 410.201 and 410.302 of this part, ORR assists without undue delay in making transportation arrangements. ORR may, in its discretion, provide transportation to UAC.

## Subpart F—Provisions for Transfer of an Unaccompanied Alien Child

### § 410.600   Principles applicable to transfer of an unaccompanied alien child.

(a) ORR transfers a UAC from one placement to another with all of his or her possessions and legal papers. ORR takes all necessary precautions for the protection of UACs during transportation with adults.

(b) If the UAC's possessions exceed the amount permitted normally by the carrier in use, the possessions are shipped to the UAC in a timely manner.

(c) ORR does not transfer a UAC who is represented by counsel without advance notice to his or her legal counsel. However, ORR may provide notice to counsel within 24 hours of the transfer in unusual and compelling circumstances such as:

(1) Where the safety of the UAC or others has been threatened;

(2) The UAC has been determined to be an escape risk consistent with § 410.204 of this part; or

(3) Where counsel has waived such notice.

## Subpart G—Age Determinations

### § 410.700   Conducting age determinations.

Procedures for determining the age of an individual must take into account multiple forms of evidence, including the non-exclusive use of radiographs, to determine the age of the individual. ORR may require an individual in ORR's custody to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If ORR subsequently determines that such an individual is a UAC, he or she will be treated in accordance with ORR's UAC regulations for all purposes.

### § 410.701   Treatment of an individual who appears to be an adult.

If, the procedures in § 410.700 would result in a reasonable person concluding that an individual is an adult, despite his or her claim to be under the age of 18, ORR must treat such person as an adult for all purposes.

## Subpart H—Unaccompanied Alien Children's Objections to ORR Determinations

### § 410.800   Purpose of this subpart.

This subpart concerns UACs' objections to ORR placement.

### § 410.801   Procedures.

(a) For UACs not placed in licensed programs, ORR shall—within a reasonable period of time—provide a

notice of the reasons for housing the minor in secure or staff secure facility. Such notice shall be in a language the UAC understands.

(b) ORR shall promptly provide each UAC not released with:

(i) A list of free legal services providers compiled by ORR and that is provided to UAC as part of a Legal Resource Guide for UAC (unless previously given to the UAC); and

(ii) The following explanation of the right of potential review: ORR usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may call a lawyer to seek assistance. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form.

### § 410.810   Hearings

(a) A UAC may request that an independent hearing officer employed by HHS determine, through a written decision, whether the UAC would present a risk of danger to the community or risk of flight if released.

(1) Requests under this section may be made by the UAC, his or her legal representative, or his or her parent or legal guardian.

(2) UACs placed in secure or staff secure facilities will receive a notice of the procedures under this section and may use a form provided to them to make a written request for a hearing under this section.

(b) In hearings conducted under this section, the burden is on the UAC to show that he or she will not be a danger to the community (or risk of flight) if released, using a preponderance of the evidence standard.

(c) In hearings under this section, the UAC may be represented by a person of his or her choosing, at no cost to the government. The UAC may present oral and written evidence to the hearing officer and may appear by video or teleconference. ORR may also choose to present evidence either in writing, or by appearing in person, or by video or teleconference.

(d) A hearing officer's decision that a UAC would not be a danger to the community (or risk of flight) if released is binding upon ORR, unless the provisions of paragraph (e) of this section apply.

(e) A hearing officer's decision under this section may be appealed to the Assistant Secretary of the Administration for Children and Families. Any such appeal request shall be in writing, and must be received

within 30 days of the hearing officer decision. The Assistant Secretary will reverse a hearing officer decision only if there is a clear error of fact, or if the decision includes an error of law. Appeal to the Assistant Secretary shall not effect a stay of the hearing officer's decision to release the UAC, unless within five business days of such hearing officer decision, the Assistant Secretary issues a decision in writing that release of the UAC would result in a significant danger to the community. Such a stay decision must include a description of behaviors of the UAC while in care and/or documented criminal or juvenile behavior records from the UAC demonstrating that the UAC would present a danger to community if released.

(f) Decisions under this section are final and binding on the Department, and a UAC may only seek another hearing under this section if the UAC can demonstrate a material change in circumstances. Similarly, ORR may request the hearing officer to make a new determination under this section if at least one month has passed since the original decision, and ORR can show that a material change in circumstances means the UAC should no longer be released.

(g) This section cannot be used to determine whether a UAC has a suitable sponsor, and neither the hearing officer nor the Assistant Secretary may order the UAC released.

(h) This section may not be invoked to determine the UAC's placement while in ORR custody. Nor may this section be invoked to determine level of custody for the UAC.

**Kirstjen M. Nielsen,**

*Secretary, Department of Homeland Security.*

**Alex M. Azar II,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2018–19052 Filed 9–6–18; 8:45 am]

**BILLING CODE 9111–28–P; 4184–45–P**

cited in Flores v. Barr, No. 17-56297 archived on August 12, 2019

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
>
> ► The proceeding involves a question of exceptional importance; or
>
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)    Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)    Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)    Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system.  No paper copies are required unless the Court orders otherwise.  If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper.  No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                                                    **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| | | | **TOTAL:** | $ |

***Example:*** *Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 10**                                                    *Rev. 12/01/2018*