In the United States District Court

Central District of California – Western Division


JENNY LISETTE FLORES, *et al.*, Plaintiffs,

v.

WILLIAM P. BARR, *et al.*, Defendants.


Case No. CV 85-4544-DMG (AGRx)

Hon. Dolly M. Gee, United States District Judge


# Second Report

# Of the Special Master/Independent Monitor


Andrea Sheridan Ordin
Special Master/Independent Monitor
Strumwasser & Woocher LLP
1094 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
(310) 576-1233

CONTENTS

1.   INTRODUCTION ................................................................ 1

2.   THE INFLUX AND EMERGENCY CONDITIONS OF
     UNACCOMPANIED MINORS AND FAMILY UNITS ........................... 5

3.   ALLEGED BREACHES OF THE FSA BY CBP ........................................ 8

     A.   Overcrowding and Duration of Custody .................................. 8

     B.   Food ............................................................................ 14

     C.   Ambient Temperature .................................................... 15

     D.   Remaining Issues .......................................................... 16

4.   ALLEGED BREACHES OF THE FSA BY ICE ........................................ 16

     A.   Standards for Duration of Custody ...................................... 17

     B.   Duration of ICE Custody ................................................ 18

5.   ALLEGED BREACHES OF THE FSA BY ORR ...................................... 21

     A.   Duration of Custody ...................................................... 21

     B.   A Temporary Influx Facility, Homestead Florida ..................... 31

     C.   Policy and Procedures for Administration of Psychotropic Drugs ....... 35

6.   SIGNIFICANT EVENTS NOT SPECIFICALLY COVERED BY THE
     COURT'S PRIOR ORDERS .................................................... 36

7.   NEAR-TERM EVENTS ........................................................ 42

## 1. INTRODUCTION

This Second Report of Independent Monitor/Special Master (Second Report) continues the analysis of the merits of claims by Plaintiffs of violations of the *Flores* Settlement Agreement (FSA, Doc. # 101), and the Court's Orders of June 27, 2017 (Doc. # 363) and July 30, 2018 (Doc. # 470) against U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS).

Unlike the First Report, which was designed primarily to "set the table" for the primary areas to examine, it was contemplated originally that this Second Report, which was only to cover events of March, April, May, and June 2019, would not only detail the examination by the Monitor of Defendants' compliance, but, as importantly, make conclusions and recommendations as to any violations found by the Monitor. However, as explained further below, the Monitor will defer drawing any conclusions in this Second Report, since at the time of writing, the Monitor has been sitting as a mediator in three mediations with counsel for Plaintiffs and Defendants. As will also be explained, at the urging of counsel, this Report will also comment on recent developments in July and August.

Because the period covered by this Second Report—indeed, virtually the entire period since the Monitor's appointment—has been characterized by a dramatic increase in the arrival of minors at the southern border. Part 2 of this Second Report summarizes the data on the magnitude of the increase in the arrivals of both minors and adults, particularly those seeking asylum.

**Work as Special Master**

Settlement negotiations are ongoing following sessions in three
mediation/litigation tracks before the Monitor.

In track one, beginning in early spring, the parties met and conferred
regarding informed consent for the administration of psychotropic
medications at HHS Residential Treatment Facilities, a central issue in the
Court's July 30, 2018 Order. (Doc. # 470.) On March 28, 2019, the Monitor
presided over a full-day mediation between the parties. As of August 15,
2019, the parties had significantly narrowed the issues but the conflict has
not yet been resolved.

In track two, on May 31, 2019, Plaintiffs applied for leave to file under
seal a Motion to Enforce concerning the length of stay and conditions at
HHS's Homestead facility. (Doc. # 547.) With the Court's leave, Plaintiffs
later filed on the public docket a redacted version of the Motion to Enforce.
(Doc. # 578.) On June 10, 2019, the Court ordered Plaintiffs' Motion to
Enforce to the Monitor for mediation, and referred the Motion to Enforce to
the Monitor for a Report and Recommendation if the mediation is ultimately
unsuccessful. (Doc. ## 553, 602.) The mediation took place on
June 20 and 21, 2019 in Washington D.C. The Defendants have filed
additional briefings (Doc. ## 609, 612) and the Court has ordered the
Plaintiffs to respond with a motion for hearing date directed to the Special
Master (Doc. # 623).

Mediation in track three arose from Plaintiffs' allegations of serious
and significant violations of the Court's June 27, 2017 Order and the FSA
with respect to the conditions at McAllen Station and the Centralized

Processing Center (commonly referred to as the "CPC-Ursula") in CBP's Rio Grande Valley (RGV) Border Patrol Sector and Clint Border Patrol station in CBP's El Paso Border Patrol Sector. The Notices of Non-Compliance (Notices) contain specific allegations of unsafe and unsanitary conditions in Clint border station, McAllen border station, and the CPC-Ursula, and describe dangerous conditions at those locations for infants and young mothers, and allege a need for curative measures on hygiene, nutrition and living conditions. The Notices were followed by an Application for Temporary Restraining Order (TRO Application, Doc. # 572), including more than 45 declarations of minors, parents, and medical experts, to which the government filed a Response (Doc. # 574) containing its initial opposition to the TRO Application. On June 28, 2019, the Court found that the emergent nature of the Plaintiffs' allegations demanded immediate action, and referred the TRO Application to expedited mediation before the Monitor. (Doc. # 576.)

Pursuant to the June 28, 2019 Order, the parties met in an all-day session on July 10, 2019. Senior CBP officials participated in that session. On July 12, 2019, the parties filed a Joint Status Report regarding the confidential mediation efforts. (Doc. # 599.) The Status Report references the agreement of the parties to the appointment of Dr. Paul Wise, MD, MPH as an expert consultant to the Monitor in assessing child health and safety conditions in CBP and ORR. The parties intend to engage in mediation again following the preparation of a report by Dr. Wise. Dr. Wise delivered his initial draft Report to counsel on August 15, 2019.

Since it is the Monitor's responsibility under the June 28, 2019 Order and Paragraph D.3 of the Appointment Order (Doc. # 494) to prepare a

Report and Recommendation to the Court should the parties be unable to reach agreement, this Report will detail only information gathered by the Monitor outside of the three concurrent mediations.

Part 3 of this Second Report will discuss the Monitor's examination of the allegations of violations by CBP related to the provision of safe and sanitary facilities while the minors are in CBP custody and CBP's compliance with the National Standards on Transportation, Escort, Detention, and Search (TEDS) and the Trafficking Victims Protection Reauthorization Act (TVPRA, 8 U.S.C. § 1232).

Part 4 of this Second Report details the length of stay of family units in the Karnes County Residential Center and South Texas Family Residential Center (Dilley), which are managed by ICE.

Part 5 of this Second Report will focus on the extent to which ORR and its private contractors have fulfilled the FSA's requirement to release minors as expeditiously as possible in the event of an emergency or influx.  All parties are in agreement that the entire system is in a condition of influx, but the parties are in disagreement as to whether ORR and the private contractors are in compliance. This Second Report provides aggregate statistics on the capacity and length-of stay issues as well as the nature of the Monitor's investigation when at Homestead on March 25 and 26, 2019.

Part 6 will identify certain significant events not specifically covered by the Court's prior Orders that have been reported in the public media.

Part 7 of this Second Report outlines near-term events.

## 2. THE INFLUX AND EMERGENCY CONDITIONS OF UNACCOMPANIED MINORS AND FAMILY UNITS

The rise in the number of unaccompanied alien children (UACs) and family units[1] crossing the border and presenting themselves to CBP over the last year is well known and has been dramatic. This increase from 2018 through 2019 has had an undeniable adverse impact on the performance of CBP, ICE, and ORR, which together have responsibility for the supervision and care of the minors and their families.

As UACs and family units cross the border and present themselves to CBP, the agency is tasked with encountering the UACs and family units and making the initial decisions of admissibility. CBP processes the initial paperwork which will identify them throughout their time in the United States. Table 1 is taken from data posted on the CBP website and shows the number of persons apprehended by the U.S. Border Patrol between ports of entry on the southwest border.[2] Table 1 indicates that the numbers of UACs and family units being apprehended have risen dramatically during an eight-month period. The impact of these increases has been felt in each of the Border Patrol facilities in the RGV Sector, especially the McAllen border station and CPC-Ursula. CPC-Ursula became operational in summer 2014 for the purpose of providing more open and habitable short-term detention for family units and UACs, whose crossings into the United States were

---

[1] The term "family units" refers to family members who are apprehended together by the U.S. Border Patrol. Thus, for example, two children apprehended while traveling with one adult parent or legal guardian would be represented as three individuals in the family unit data.

[2] Apprehension statistics are publicly available at https://www.cbp.gov/newsroom/stats/sw-border-migration

beginning to increase in numbers not seen before. During fiscal year 2019, June has shown the first modest monthly reduction in numbers of UACs and family units encountered at the border. Nonetheless, during that month, CBP apprehended 22,444 more persons in the RGV Sector than the agency had apprehended in October 2018.

| Monthly U.S. Border Patrol Apprehensions in RGV First Nine Months of FY 2019 | | | | |
|---|---|---|---|---|
| | UACs | Family Units | Single Adults | Total |
| October-18 | 2,308 | 11,525 | 6,920 | 20,753 |
| November-18 | 2,310 | 11,487 | 6,916 | 20,713 |
| December-18 | 1,881 | 10,630 | 5,861 | 18,372 |
| January-19 | 2,185 | 9,942 | 5,589 | 17,716 |
| February-19 | 2,912 | 14,430 | 8,024 | 25,366 |
| March-19 | 3,714 | 20,962 | 9,079 | 33,755 |
| April-19 | 3,761 | 22,895 | 10,073 | 36,729 |
| May-19 | 4,877 | 33,960 | 11,018 | 49,855 |
| June-19 | 3,903 | 30,165 | 9,129 | 43,197 |

*Table 1*

While touring the southwest border facilities, on March 27, 2019, then-Commissioner of CBP Kevin McAleenan addressed the national picture in a televised news conference in El Paso, stating:

> This stark and increasing shift to more vulnerable populations combined with overwhelming numbers, inadequate capacity to detain families and children at ICE and HHS respectively is creating a humanitarian crisis. In March, almost 40,000 children will come into CBP custody after completing a harrowing journey in the hands of violent and callous smugglers through Mexico. . . .

6

> We are applying the additional funding we received in the FY19 budget for humanitarian purposes, extending our medical contracts to key sectors including here in El Paso so that we may care for more migrants more expeditiously as they arrive. We're augmenting our law enforcement assets with contract support for migrant care and food services. We're enhancing our transportation contracts and establishing new processing facilities, including a planned center here in the El Paso area. . . .
>
> Even with all these steps, with the flows at these levels and increasing, combined with the lack of bed space from our partners, it means we will be continued [sic] to be challenged to provide humane care for those in our custody. . . .
>
> [W]e are doing everything we can to simply avoid a tragedy in a CBP facility. But with these numbers, with the types of illnesses we're seeing in the border, I fear that it's just a matter of time.[3]

Sadly, since March 27, 2019, more tragedies at the border have come to light, some occurring while migrants and children were in custody and some endured by those who made the perilous journey and died in the waters of the Rio Grande or in the unforgiving terrain of the desert. Although the childhood deaths of Mariee Juárez, Darlyn Cristabel Cordove-Valle, Jakelin Caal Maquín, Felipe Gomez Alonzo, Juan de León Gutiérrez, Wilmer Josué Ramírez Vásquez, and Carlos Hernandez Vásquez while or after being in custody of the United States government continue to be under investigation,

---

3 El Paso Press Conf. Trans., U.S. Customs and Border Protection (Mar. 27, 2019), *available at* https://www.cbp.gov/newsroom/speeches-and-statements/el-paso-press-conference-transcript.

Part 6 describes the preliminary information available through public
sources.

# 3. ALLEGED BREACHES OF THE FSA BY CBP

For CBP in the RGV Sector, the issues remain the same as in the First
Report. The allegations of severe overcrowding and excessive length of
custody, lack of appropriate food for minors, inability of detainees to sleep,
ambient temperatures outside a reasonably comfortable range, and lack of
access to medical treatment remain unresolved.

## A. Overcrowding and Duration of Custody

During this period, CBP continues to experience two related issues:
overcrowding of detention facilities and prolonged duration of time in
custody. It should be noted at the outset that excessive duration of CBP
custody and concomitant overcrowding can be exacerbated by conditions
downstream of CBP. The expectation that CBP will hold detainees for no
more than 72 hours is premised on the assumption that thereafter they will
become the responsibility of either ICE (for minors in family units) or ORR
(for UACs). (FSA, ¶12.A.) During the current influx, capacity at ORR, in
particular, has oftentimes been inadequate to receive detainees within 72
hours of their apprehensions, even if the processing has been completed.

The Monitor submitted a data request for the first three and one-half
months of 2019 (January 1–April 15) to determine the number of minors
daily in CBP custody in the RGV Sector for that period and to also determine
the duration of the minors' stay. The daily fluctuations are shown in Figure

1.[4]  On average, 1,101 minors were in CBP custody daily in the Rio Grande Valley, but that does not tell the whole story.



*Figure 1*

While the daily count of minors fluctuates considerably from day to day, the data suggest a gradual increase over the period of about 11.5

---

[4] The data for the beginning of January appeared to be incomplete, perhaps evincing a ramp-up of data capture. For present, descriptive purposes, the first 12 days of January have been omitted from Figure 1. All numbers discussed in this Part 3, concerning CBP, are for combined unaccompanied minors and those arriving in family units.

additional minors in custody per day through April 2019—a growth rate of roughly 350 juveniles per month.[5]

The focus of the Monitor's analysis of the CBP data is not merely on how many minors were in cells designed for far fewer detainees (and adult males at that), but also on how long minors remained in custody. The standard against which the Monitor assesses this performance is the requirement that CBP transfer minors out of CBP custody within 72 hours.[6] The data indicate that an individual minor in custody on a given day had been there, on average, for 62 hours, although that average ranged daily from as low as 21 hours to as high as 99.[7] The daily fluctuations are depicted in Figure 2.

---

[5] This figure was derived by regression to find the straight line (shown as the dashed line in Figure 1) that best fits the day-to-day fluctuations in the census of minors. That line rises at a rate of approximately 11.5 minors per day.

[6] *See* 8 U.S.C. § 1232(b)(3); *see also* TEDS Standards at § 5.6; FSA § V, ¶¶ 12.A, 19.

[7] Because these are "snapshots" of the custodial history of each minor in custody as of 6:00 a.m. EST each day, these numbers cannot be taken as a measure of the durations the minors *will have been held in custody at the end of custody*—the number relevant to the standard under the statute and TEDS Standards cited in the preceding footnote.  To illustrate, consider hypothetically that minors enter and leave custody at a uniform rate and that each minor will spend exactly three days in custody. At any given time, then, one-third of the population will have been there for three days, one-third for two days, and one-third for one day. Their average time in custody at that moment will be two days, even though eventually each will spend three days in custody. Consequently, the time-in-custody snapshot based on the census of each minor each day will yield numbers that are systematically lower than the average amount of time each minor will have spent in custody when he or she is discharged from CBP custody.  To derive the ultimate time in custody, the calculation must be based on the duration of each minor's time in custody *at the end of their custody* (upon book-out).  That number cannot be calculated with the data



*Figure 2*

As Figure 2 shows, the medians were lower than the averages (means) (varying from 12 to 58 hours), reflecting the presence of the percentage of minors who were experiencing more prolonged stays. That is confirmed by the top line of Figure 2, showing the number of hours of the individual who, on that day, had been in custody the longest. This number ranged from 42 to 348 hours. CBP has advised the Monitor that these high values typically reflect a minor who required prolonged hospitalization. Nevertheless, the data indicate that 90 percent of the minors ranged daily from 28 to 118 hours in custody (more than four days), averaging 80 hours. The data on the

CBP has provided the Monitor to date (which is based on an existing CBP management report).

remaining 10 percent shows that as many as 150–200 minors could be in custody from five to ten days. These figures were developed before the additional surge of minors in May of 2019.

Figure 3 shows, on a daily basis, how many minors being held in CBP custody had already been there for more than 72 hours[8] and what percentage of that population the number represented.[9]



*Figure 3*

---

[8] The data received by the Monitor categorize the minors' time in detention into categories, two of which are 48 to 72 hours and 72 to 96 hours, which are technically not mutually exclusive. The Monitor assumes that no minor actually had spent exactly 72 hours as of 6:00 a.m. and that there is no round off involved in placing each into the appropriate category, so there should not actually be any overlap. For purposes of this Report, minors in the 72-to-96 category are all assumed to have been in custody for over 72 hours.

[9] The first 12 days of January, for which the data appear not to be complete (see footnote 7, page 10, above), are again omitted from Figure 3.

12

An average of 227 minors each day, about 17 percent of those held by CBP on that day, had been in custody for more than 72 hours, peaking on April 1, 2019, when 890 minors—41% of those in custody—had already spent more than 72 hours awaiting book-out.[10]

This longer duration of custody has been accompanied by an increased detainee population, in turn leading to overcrowding of family units and unaccompanied minors into cramped concrete floor cells designed for single adult males. After preparing Figures 2 and 3, based on January through April 2019 data, the Monitor requested snapshot data in RGV and EPT for the period of June 1, 2019 through July 21, 2019. The data reflected both severe overcrowding and, on occasion, underutilization.

For example, the McAllen border station has a capacity for 382 single males. Yet, in June 2019, the juvenile population on June 1, 2019, was 633. The juvenile population exceeded 600 on three other days in June and was between 400 and 599 on another seven days.

The capacity for CPC-Ursula is 1,500, and during that month, for juveniles alone, there were nineteen days in which the juvenile population exceeded that total capacity, peaking at 1,787; for nine days that month the juvenile population exceeded 1,600, and on five of them it exceeded 1,700.

---

[10] And, of course, each of them will spend more hours in custody before being transferred out of CBP custody, and some minors in CBP custody that day who had not yet been in custody for more than 72 hours will ultimately have spent more than 72 hours. (See footnote 7, p. 10.) So these numbers cannot be taken to represent the number or percentage of minors who will have been in custody for longer than 72 hours before booking out.

Similarly, the Clint border station's in EPT's sector total capacity is 105. On June 1, 2019, it had a juvenile population as high as 676. The Clint facility, although not a part of the Rio Grande Valley Sector, has been of significant interest to the Court and has become a part of the Court's record (Doc. # 606-1).

The Monitor expects that more detailed examination of this data and other data provided by the CBP will be utilized in the mediation.

CBP has responded to the overcrowding by securing additional capacity. For example, as described by CBP Juvenile Coordinator Henry A. Moak, Jr. in his July 18, 2019 filing (Doc. # 606-1), a new processing facility near the Donna port of entry was announced, specifically designed to accommodate children and families. It became operational on May 2, 2019, and is expected to provide space for approximately 1,300 individuals beginning June 17, 2019. On July 1, 2019, there were 753 children on site at Donna. The Monitor and Dr. Wise toured the facility on August 1, 2019 in preparation for his Draft Interim Report.

### B. Food

Plaintiffs have alleged a lack of access to both sufficient food and age-appropriate food for infants and small children.

The Monitor has raised these issues with CBP leadership and has examined the current menus available in RGV Sector for detainee food and drinks. She has been provided a sample listing of the food delivered to both adults and minors at the CPC-Ursula and McAllen border station.  The Monitor has also examined the individual daily logs for minors at McAllen border station and CPC-Ursula, which record meals and snacks offered to

14

and received by the minors. The current menus for unaccompanied minors and families are presently the subject of review in CBP. The menus and contracts which were made available to the Monitor will be considered for nutritional and age-appropriate content in the pending mediation.

### C. Ambient Temperature

As outlined in the First Report, the Monitor personally observed the facilities at the McAllen border station and CPC-Ursula and has reviewed the Juvenile Coordinator Reports.

As noted in the First Report, with rare exceptions, the temperature at McAllen border station was at or near the lowest limit of the permissible temperatures, as low as 66 degrees. Minors continued to complain of severe discomfort, and mothers of infants said their children showed distress because of ambient temperatures that were measured between 64 and 70 degrees. The Monitor noted that even participants in the inspection and dressed in business clothes often found the temperature uncomfortably cool. The issue of changing the low end of the permissible range of temperature has been discussed by the Monitor with CBP leadership and that matter will be further discussed in the mediation process. The issue of temperature in Border Patrol facilities is not a new issue, nor is it limited to minors and their families, and has been the subject of expert testimony on the health impacts on adult detainees.[11]

---

[11] *See* Skipworth Decl.; Harber Decl.; and Powitz Decl. at 17–22, *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 U.S. Dist. LEXIS 189767 (D. Ariz. Nov. 18, 2016). *See also* Falk B. Effects of Thermal Stress During Rest and Exercise in the Paediatric Population. Sports Med. 1998;25:221-240.

### D. Remaining Issues

The First Report discussed some of the medical issues and the commitment of then-Commissioner of CBP Kevin McAleenan to increase medical assessments. The medical concerns have been brought into sharper focus by the serious allegations in Plaintiffs' June 26, 2019 TRO Application. Medical care for children, including the special needs of children of tender age, is among the topics of the ongoing mediation and of Dr. Wise's inquiries.

## 4. ALLEGED BREACHES OF THE FSA BY ICE

Currently, the vast majority of unaccompanied minors and families are within the custody of either the CBP or ORR. Nevertheless, the Monitor continues to review records of the ICE facilities at Dilley and Karnes to determine the length of stay and compliance with ICE's internal standard that minors and families be released within 20 days of apprehension.

As of April 1, 2019, the Karnes Family Residential Center transitioned to an adult-male facility.[12] As of May 6, 2019, Karnes had a total population of 687 males. The South Texas Dilley population was 1,051 family units.

---

[12] The services available at Karnes have been described in the First Report as particularly designed to provide support for families. Observation by the Monitor of the classrooms, library, and available computer rooms confirmed that the facility provided young families with time for education more comparable to a school than any other facility observed. Children moved freely within the secure facility and participated in sports in outside athletic fields and inside gyms. Although the Monitor heard of several outbreaks of disease and complaints about long waits for medical attention, the on-site medical facilities appeared well designed and well stocked, and doctors as well as full-time nursing personnel were available. The Monitor has initiated further discussions to determine the reasons for removing the facility from the purpose for which it was designed.

## A. Standards for Duration of Custody

There persists a common understanding that the FSA and the holdings of the various *Flores* Court rulings stated a "20 day rule," notwithstanding that this was a time limit that arose from Defendants' request for an extension of time from existing standards.  As counsel are well aware, failing the ability to place a minor in a licensed program or release a minor to an authorized adult within the FSA's prescribed three to five days, in the case of an influx or emergency, the minor must be placed in a licensed non-secure facility or with an authorized adult "as expeditiously as possible."  As this Court ruled in 2015:

> Assuming the existence of an "influx of minors into the United States," Paragraph 12A gives Defendants some flexibility to reasonably exceed the standard five-day requirement so long as the minor is placed with an authorized adult or in a non-secure licensed facility, in order of preference under Paragraph 14, "as expeditiously as possible." . . .
>
> While the Agreement does not permit Defendants to routinely detain children in unlicensed, secure facilities "for as long as they deem necessary" no matter what the circumstances, Paragraph 12A requires that Defendants "place all minors pursuant to Paragraph 19 as expeditiously as possible" in "the event of an emergency or influx of minors into the United States." This language, on its face, gives Defendants some latitude, provided it is exercised reasonably and in good faith, to deal with emergency situations.

*Flores v. Lynch*, 212 F. Supp. 3d 907, 914 & n.7 (C.D. Cal 2015), *aff'd in part* 828 F.3d 898 (9th Cir. 2016).

## B. Duration of ICE Custody

ICE has provided the Monitor with ten monthly files, each denominated "*Flores* Report," listing every accompanied minor[13] in ICE custody and containing a record for custody-related events for that minor. The Monitor has reviewed a monthly report for every month from November 2018 through April 2019,[14] for which the data were consolidated for analysis, creating a file covering 15,934 minors.

The *Flores* Reports contain data both on minors who were in custody part of each month but then released, and on minors who were released during the month. To avoid the problem inherent in snapshot reports that list the days in custody as of a given date, which for minors who remain in custody will end up spending more time (see fn. 6, p. 10), the Monitor limited the analysis to minors for whom the data include a release date (Book-out date).

There then remains one additional adjustment to be made. Among the minors who entered ICE custody most recently, some will have been placed elsewhere and some will not. The ones who remain cannot be assumed to be representative of all minors who entered ICE custody at the same time, since

---

[13] The reports also contain data on a small number of unaccompanied minors in ICE custody. This Report excludes from its analysis these UACs. The report also contains records from numerous facilities. Those facilities account for about 2% of the released accompanied minors. Since the timing requirements cover those facilities as well, the small number of minors released from them have not been excluded.

[14] The month in the name of the report appears to be the month in which it was prepared, covering the preceding calendar month. So the most recent file, denominated April 2019, covers events in March 2019.

18

it may be that those who remain have attributes that will make them difficult to place and wind up averaging more time in custody than those who booked out earlier.[15] To minimize this potential bias, the Monitor eliminated those cases that had entered ICE during the most recent month reported (March 2019 here).[16] That left five months of data, comprising 11,914 minors.

The statistics for those minors are shown in Table 2.

| Days Released Minors Spent in ICE Custody and Total Days in Government Custody | | |
|---|---|---|
| | ICE Days | Total Days |
| Mean | 14 | 18 |
| Median | 12 | 15 |
| 75th Percentile | 17 | 20 |
| 90th Percentile | 23 | 26 |

*Table 2*

The table summarizes durations both for the days spent in ICE custody, from initial ICE book-in date to book-out date, and the total days in custody, from initial apprehension by CBP to book-out. As it shows, roughly 75% of the minors spend no more than 17 days in ICE custody and no more than 20 days in custody overall. And 90% spent up to 23 days in ICE custody and no more

---

[15] This statistical phenomenon is sometimes called "survivorship bias"—the erroneous assumption that cases that are filtered out are not materially different from those that remain.

[16] Even in the remaining data, there will be some minors who booked out while others who arrived the same day did not, but over 95% of the ICE minors remained in custody (combined CBP and ICE) less than 31 days.

A disadvantage of eliminating the most recent cases is that the report is less up-to-date, but the results reported can more reliably be taken as showing the eventual duration of minors' custody during the period of analysis.

than 26 days overall. The distribution of discharged minors' time in ICE custody is shown in Figure 4.



*Figure 4*

As Figure 4 shows, a substantial majority of the minors were released by ICE within 20 days of their apprehension, but the distribution exhibits a long tail. There are about 2,000 of the 11,914 minors who spent more than 20 days in ICE custody, some of them a matter of months.

At the request of the Monitor, ICE Juvenile Coordinator Deane Dougherty reviewed eight cases at Karnes and Dilley to determine reasons for stays longer than 23 days. Several issues recurred in the eight cases: late claims of credible fear of returning to their countries of origin, appeals of negative findings of credible fear, time to clear a criminal conviction in the country of origin, administrative delays in scheduling credible-fear

interviews, and delay in retrieving records. These delays resulted in ICE custody ranging from 35 to 69 days. However, it is worth noting that in three of the eight cases it appears that the additional steps resulted in positive findings of credible fear or release pending resolution of litigation.

# 5. ALLEGED BREACHES OF THE FSA BY ORR

ORR currently maintains a network of over 120 state-licensed care facilities in 23 states. During influx periods, ORR also maintains facilities to accommodate the increased populations until the minors can be released to sponsors or to licensed non-secure facilities.

## A. Duration of Custody

The Monitor has examined data files provided by ORR containing its Unaccompanied Alien Children Program Monthly Statistics ("Monthly Statistics"), covering the period from October 2014 through April 2019 and showing the number of UACs under the care of ORR each month over the 54-month period. The data include monthly average capacity of all ORR facilities and a snapshot of the average time under care, as of the time of observation, for UACs in ORR custody during that month.[21]

Figure 5 plots the monthly average number of beds and the corresponding monthly average UAC population, illustrating how the capacity and population demands relate. The average UAC population

---

[21] As noted before, these figures systematically understate how long UACs ultimately remain under ORR care. (See fn. 6, p. 10.)

reached as high as 94% of capacity in June of 2018, and exceeded 90% in several other months. It should be emphasized that these percentages do not reflect the difficulty of matching a UAC's age and gender with the facilities having surplus beds. And, of course, the ability of ORR to increase capacity shown in Figure 5 cannot necessarily be generalized when, for example, a sharp influx of UACs arrives when the population may already be near capacity. Another constraint to be considered is the geographic distributions of UACs and identified sponsors.



*Figure 5*

The substantial fluctuations over time in the duration of care are shown in Figure 6, ranging from a low monthly average of 30 days to a high

of 90 days, with two relatively brief peaks of 90 in April of 2017 and in
November of 2018.[22]



*Figure 6*

The Monitor has also been provided more detailed files, denominated
Discharges, Referrals & Census DOJ-OIL *Flores* Data ("DOJ-OIL *Flores*
Data"), containing records of each minor entering ORR care each month, in
ORR care on the 15th of each month, and discharged from ORR care each

[22] ORR advises that the data for the subsequent months of May through July show
a further reduction in duration of care.  Those data will be incorporated in
subsequent analyses.

month from January 2018 through May 2019.[23] This more detailed data, while covering a shorter period, is amenable to further analysis not possible with the monthly summaries. The DOJ-OIL *Flores* Data files were consolidated to facilitate measurement of time in ORR custody across months.

Unfortunately, in the course of the Monitor's analysis, upon review of an analysis performed by Plaintiffs, and after consultation with ORR technical staff, it has become clear that the data thus far provided do not permit an accurate calculation of the total time a UAC has spent in ORR care as of his or her date of discharge.[24] However, the effect of the absence of the necessary data appears uniformly to be to understate the calculated duration of ORR custody. Consequently the durations calculated by the Monitor from these data can safely be taken as minima.

---

[23] These detailed files are also provided by Defendants monthly to counsel for Plaintiffs.

[24] Specifically, the monthly data on discharged UACs shows the date admitted to ORR and the date discharged, which the Monitor had initially subtracted from one another to calculate the duration of ORR custody. In the course of exchanging analyses with ORR and with Plaintiffs, two issues arose. First, the date coded for date of admission ("Date Admitted") is not, in fact, necessarily the date ORR custody began. A UAC may have multiple dates admitted, if they were transferred to ORR more than once among ORR facilities. The DOJ-OIL *Flores* Data contains only the last date admitted.  The more appropriate measure of the start of ORR custody would be the ORR placement date ("ORR_Placement_Date," sometimes coded as "Date_ORR_Approved"). Unfortunately, the DOJ-OIL *Flores* Data do not provide the placement date together with the date of discharge, the two quantities required for the appropriate measure of the duration of ORR care. (In principle, the Monitor could attempt to link the placement date in other tables to the discharge data. However, it is not clear that the data are complete enough to do so for the entire population of discharged UACs.) The Monitor is in discussions with ORR in order to obtain the data for an updated analysis in the next Report.

As will be seen, although there may be disagreements on whether these durations show expeditious releases, there is no disagreement among ORR, Plaintiffs, and the Monitor that the average duration of ORR care is substantially longer than a 20-day benchmark.

One observation that can be made from the DOJ-OIL *Flores* Data is that the discharge rate varied from month to month in a manner that that appears to be statistically related to the duration of ORR custody. **Error! Reference source not found.** contains a bar chart showing the number of UACs discharged from ORR care each month. There appears to be a fairly consistent increase in the number of UACs discharged, going from 2,975 in January 2018 to 8,512 in May 2019—a rate of increase of about 325 per month. However, there is a marked drop in the number of discharges starting in August 2018, and discharges do not recover to the July 2018 level until December 2018.



*Figure 7*

That is consistent with an apparent concomitant increase in the
number of days UACs remained in ORR care during this period. The red line
in Figure 7 shows the monthly average days of ORR care.[25] There appears to
be a fairly consistent increase in the number of UACs discharged, going from
2,975 in January 2018 to 8,512 in May 2019—a rate of increase of about 325
per month. However, there is a marked drop in the number of discharges

---

[25] Because of the problems with the DOJ-OIL *Flores* Data described at page 4, the
calculated average number of days in ORR care is not reliable, so the values are not
shown on the right-hand axis, but it appears reasonable to assume the month-to-
month fluctuations are fairly approximated.

starting in August 2018, and discharges do not recover to the July 2018 level
until December 2018.

This period roughly corresponds to reports the Monitor received of a
change in ORR procedures for clearing recipient families that was said to be
delaying placements. The Monitor was informed that in the second half of
2018, ORR began running background checks not only on the individual
sponsor but also on everyone else living with the sponsor, which, Plaintiffs
asserted, delayed placements. And that is consistent with a concomitant
increase in the number of days UACs remained in ORR care during this
period. The Government has confirmed that ORR issued a series of directives
to its staff and care-provider network concerning sponsor background checks.
In a signed declaration, ORR's Deputy Director Jallyn Sualog described an
April 2018 memorandum agreement among ORR, CBP, and ICE requiring all
prospective sponsors and all adult household members to provide
fingerprints, effective June 2018. (Doc. # 609-1, ¶¶ 12, 14.) That requirement
was progressively relaxed in operational directives dated December 18, 2018
and March 23, 2019. (*Id.* ¶¶ 15, 16.) Those months correspond to increases in
the number of UACs discharged by ORR.[26] Deputy Director Sualog confirms
that these operational directives relaxing the fingerprinting requirements
"significantly reduce the median length of care for UACs. (*Id.* ¶ 20.)

It may be useful to consider the duration of ORR custody of UACs in
terms of two categories of children: those for whom ORR is able to find and
clear a sponsor to whom the child may be discharged, and those for whom
such a sponsor cannot be found and who must be housed in an appropriate

---

[26] A third operational directive, dated June 10, 2019 (*id.* ¶ 17), falls outside of the
period covered in the data.

facility for longer. What constitutes an expeditious release to place a UAC with, say, his or her family (which is the dominant type of discharge) may not, in least in principle, be the same as what constitutes an expeditious release for other circumstances. So in order to determine whether a given minor is being released expeditiously, it may be necessary to take into account what kind of a release the UAC will eventually receive.

For this information, the Monitor has relied upon calculations proffered by ORR of the duration of care of each discharged UAC, categorized by the type of discharge. ORR's figures are contained in Table 3.

| UAC Discharged from ORR Care January 2018 to May 2019 | | | |
|---|---|---|---|
| Discharge Type | # of UAC | % of UAC | Average Length of Care |
| Age Out | 2,907 | 3.5% | 100 |
| Age Redetermination | 1,352 | 1.6% | 46 |
| DHS Family Shelter | 23 | 0.0% | 90 |
| Immigration Relief Granted | 98 | 0.1% | 651 |
| Local Law Enforcement | 19 | 0.0% | 123 |
| Marshal's Service | 1 | 0.0% | 15 |
| Ordered Removed | 68 | 0.1% | 126 |
| Other | 1,927 | 2.3% | 69 |
| Ranaway from Facility | 213 | 0.3% | 168 |
| Ranaway on Field Trip | 45 | 0.1% | 108 |
| Reunified (Individual Sponsor) | 73,619 | 89.6% | 62 |
| *Sponsor Category 1* | *32,355* | *39.4%* | *49* |
| *Sponsor Category 2* | *34,618* | *42.1%* | *65* |
| *Sponsor Category 3* | *6,646* | *8.1%* | *110* |
| Reunified (Program/Facility) | 702 | 0.9% | 181 |
| Voluntary Departure | 1,223 | 1.5% | 169 |
| **Grand Total** | **82,197** | **100.0%** | **67** |

*Table 3*

28

Table 3 shows ORR's calculation that overall, between January 2018 and May 2019, discharged UACs were spending 67 days in ORR care.

Table 3 also shows that the vast majority of the UACs—nearly 90% of UACs leaving ORR custody—are discharged to the care of individual sponsors. More generally, Table 3 suggests that the different circumstances of UACs being discharged calls for a more detailed assessment of the lengths of time UACs remain in ORR care, taking into account different characteristics of the cases.

As a measure of this difference, the Monitor sought to determine the average duration of ORR care by type of discharge. Again, the Monitor has accepted ORR's calculations, which are shown in Table 2, reflecting how many UACs it calculated had been under ORR care at their time of their discharge for 120 or more days.

| UAC Discharged from ORR Care January 2018 to May 2019 with LOC greater than or equal to 120 days | | |
|---|---|---|
| **Discharge Type** | **# of UAC** | **% of UAC** |
| Age Out | 839 | 6.2% |
| Age Redetermination | 157 | 1.2% |
| DHS Family Shelter | 4 | 0.0% |
| Immigration Relief Granted | 93 | 0.7% |
| Local Law Enforcement | 8 | 0.1% |
| Ordered Removed | 33 | 0.2% |
| Other | 196 | 1.5% |
| Ranaway from Facility | 112 | 0.8% |
| Ranaway on Field Trip | 14 | 0.1% |
| Reunified (Individual Sponsor) | 10,834 | 80.2% |
| *Sponsor Category 1* | *2,827* | *20.9%* |
| *Sponsor Category 2* | *5,185* | *38.4%* |
| *Sponsor Category 3* | *2,822* | *20.9%* |
| Reunified (Program/Facility) | 279 | 2.1% |
| Voluntary Departure | 937 | 6.9% |
| **Grand Total** | **13,506** | **100.0%** |

*Table 4*

Comparing the second column of Table 3 with the second column of Table 4 (in other words, comparing the number of UAC in each category with the number in that category who had been in ORR care for 120 or more days when discharged, it appears that overall 16% of UACs (13,506/82,197) remained in ORR care for at least 120 days before being discharged. Within the largest discharge category, those reunified with an individual sponsor, 15% spent at least 120 days under care. The percentage was lower, 9%, for those in Category 1 (those placed with parents or legal guardians) and highest, 42%, for those in Category 3 (those placed with unrelated sponsors).

## B. A Temporary Influx Facility, Homestead Florida

In March 2018, ORR reopened its temporary influx facility on federal land in Homestead Florida, in order to accommodate the increased numbers of unaccompanied minors in 2018 and 2019.

The Monitor examined the Homestead facility and conducted interviews over two days—*i.e.*, on March 25 and 26, 2019. At the time of her examination, there were approximately 1,800 resident unaccompanied minors, ages 13–17, approximately two-thirds male and one-third female.

Over the two days, the Monitor:

- Participated in joint interviews of the minors with Aurora Miranda Maese, the Juvenile Coordinator for ORR.
- Participated in joint interviews of the minors with lawyers and experts representing the Class Members.
- Reviewed contracts between ORR and Comprehensive Health Services, a subsidiary of Caliburn International, the ORR contractor at Homestead.
- Reviewed contract provisions related to safety of location, in case of storm or hurricane.
- Reviewed contracts related to minimum standards of performance and quality assurance.
- Reviewed list of all minors present at the time of the inspection, including length-of-stay of each minor.
- Observed classes for male unaccompanied minors and separate classes for female unaccompanied minors, which were held in a

31

100 ft x 200 ft soft-sided structure with soft-sided separations between the classrooms.

- Observed teachers speaking in Spanish and English, using microphones in order to be heard over noise from adjoining classrooms.
- Observed two large hygiene structures adjacent to hard-sided living quarters and the classroom structure.
- Observed minors in the south side fenced section, which is reserved for 13 to 16 year-old minors, and the north side section, which is reserved exclusively for 17 year-olds.
- Observed and spoke casually to children as they proceeded in single-file lines from building to building, under staff supervision, to classes, meetings with case workers, and physical exercise.
- Interviewed staff members regarding the rules of behavior for the minors and scheduled individual and group counseling sessions.
- Visited the cafeteria and interviewed the cafeteria manager regarding menus and nutritional content.
- Observed caseworkers in small room with telephone banks designated for implementation of family reunification.

At the Monitor's request, ORR developed explanatory tables describing the lengths of stay at the Homestead facility for May 9, 2019, which are set out below. Table 5 shows that, on that day, 2,262 UACs were housed at Homestead, 89% of whom had, on that date, been at Homestead for up to 45 days.

| Duration of Stays at Homestead | | |
|---|---|---|
| Census on May 9, 2019 at 7:30 a.m. | | |
| Days of Care | UACs | % of UACs |
| 0-45 days | 2,013 | 89.0% |
| 46-99 days | 238 | 10.5% |
| 100-200 days | 11 | 0.1% |
| 200 + days | - | 0.0% |

*Table 5*

The Monitor had observed that duration to discharge appears to be greater for cases that require a home study, the process in which ORR assesses the safety of the home to which the UAC is to be released. Table 6 illustrates the effect. It shows that from April through September 2018, UACs in Category 1—UACs to be placed with a parent or legal guardian— averaged 49 days at Homestead, compared to 58 days for UACs in Category 2—those to be placed with other relatives. Within Category 1, those requiring home study were held in Homestead for an average 94 days, compared to 47 days for UACs not requiring home study. Likewise in Category 2, those requiring home study were held 108 days, compared to only 64 for those not requiring home study.

| Days of Care at Homestead – Last 6 Months of FY 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sponsor Category 1 | | | Sponsor Category 2 | | | Categories 1 & 2 Combined |
| | No Home Study | Home Study Req'd | Combined | No Home Study | Home Study Req'd | Combined | |
| Apr-18 | 22 | | 22 | 46 | | 46 | 32 |
| May-18 | 27 | | 27 | 43 | | 43 | 34 |
| Jun-18 | 32 | 82 | 32 | 49 | 60 | 49 | 41 |
| Jul-18 | 52 | 77 | 54 | 61 | 70 | 61 | 59 |
| Aug-18 | 65 | 98 | 66 | 76 | 102 | 77 | 73 |
| Sep-18 | 77 | 107 | 80 | 86 | 119 | 89 | 85 |
| Averages | 47 | 94 | 49 | 64 | 108 | 65 | 58 |

*Table 6*

Table 7 shows the corresponding data for October 2018 through April 2019: Home study added 38 days in Homestead (63 v. 25) for Category 1 and 49 days (89 v. 40) for Category 2.

| Days of Care at Homestead – First 7 Months of FY 2019 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sponsor Category 1 | | | Sponsor Category 2 | | | Categories 1 & 2 Combined |
| | No Home Study | Home Study Req'd | Combined | No Home Study | Home Study Req'd | Combined | |
| Oct-18 | 73 | | 73 | 80 | | 80 | 77 |
| Nov-18 | 76 | 88 | 76 | 91 | 114 | 91 | 85 |
| Dec-18 | 69 | 126 | 71 | 88 | 125 | 90 | 80 |
| Jan-19 | 57 | 128 | 60 | 66 | 142 | 67 | 64 |
| Feb-19 | 44 | 103 | 49 | 54 | 119 | 56 | 54 |
| Mar-19 | 33 | 113 | 36 | 41 | 109 | 43 | 40 |
| Apr-19 | 25 | 63 | 26 | 40 | 89 | 40 | 33 |
| Averages | 42 | 102 | 44 | 54 | 112 | 56 | 50 |

*Table 7*

As discussed in the introduction, a mediation ordered by the Court was held in Washington D.C. on June 20 and 21, 2019. The issues to be resolved are still pending as noted on page 2. The Monitor will draw no conclusions from her observations and investigation thus far.

Nevertheless, it should also be noted that the Monitor has reviewed a statement from Jonathan Hayes, Director, Office of Refugee Resettlement dated August 14, 2019, supplied to Plaintiffs and the Monitor stating that all UACs previously sheltered at Homestead have been reunified with an appropriate sponsor or transferred to a state-licensed facility within the network of ORR-funded care providers and at this time, no children remain at Homestead and the facility is not accepting referrals. He further stated that ORR determined continued activation of Homestead is not necessary. However, he cautioned that Homestead is operating with reduced staff in the event the number of UACs referred to ORR increase significantly.

## C. Policy and Procedures for Administration of Psychotropic Drugs

The First Report discussed ORR's administration of psychotropic drugs to minors at Shiloh without informed written consent by a person authorized by state law or a court order. That was the subject of an initial meeting between Plaintiffs' experts and ORR and contractor personnel, leading to a subsequent meeting of the parties' medical professionals. *See* First Report, at 36, 42–43 (Doc. # 528).

The discussions have made significant progress, but remain the subject of mediation.

## 6. SIGNIFICANT EVENTS NOT SPECIFICALLY COVERED BY THE COURT'S PRIOR ORDERS

Since the spring of 2018, seven minors have died while in federal custody or shortly thereafter.[27] The following accounts draw from various media reports and public information released by CBP. Investigations by HHS and DHS OIGs, FBI, and local law enforcement are ongoing and have not yet been made public.

*Sept. 29, 2018*

*Darlyn Cristabel Cordove-Valle, 10, El Salvador[28]*

Darlyn was born with a heart murmur. She was brought to the U.S. border by acquaintances, who drove for four days from El Salvador. She was apprehended by CBP on March 1, 2018, at 9:45p.m. Upon examination, CBP officials determined that she had a heart condition. During her welfare check the next morning, she complained of chest pain and was sent to Edinburg Children's Hospital. On March 3, 2018, she was cleared for travel and returned to CBP custody, who then transferred her to HHS custody. HHS placed her at Baptists Christian Family Services shelter in San Antonio. At this time, HHS considered her to be "medically fragile" and she underwent

---

[27] *See generally* Molly Hennessy-Fiske, *Six Migrant Children Have Died in U.S. Custory. Here's What We Know About Them*, L.A. Times (May 24, 2019), https://www.latimes.com/nation/la-na-migrant-child-border-deaths-20190524-story.html *See also* Joel Rose, *A Toddler's Death Adds To Concerns About Migrant Detention*, NPR (August 28, 2018), https://www.npr.org/2018/08/28/642738732/a-toddlers-death-adds-to-concerns-about-migrant-detention

[28] *E.g.,* Jamie Ehrlich and Rosa Flores, *CBP Identifies 10-year-old Girl Who Died In Custody in September*, CNN (May 25, 2019), https://www.cnn.com/2019/05/24/politics/cbp-child-identified-us-custody-death-darlyn-cristabel-cordova-valle/index.html

surgery in San Antonio, which left her in a coma. In May 2018, she was transferred to a nursing facility in Phoenix.

On September 26, 2018, she was transferred to a nursing facility in Omaha, to be closer to her family. Three days later, she was taken to Children's Hospital of Omaha, and died due to respiratory distress and fever.

*Dec. 8, 2018*
*Jakelin Caal Maquín, 7, Guatemala (CBP information was provided in First Report.)[29]*

Jakelin and her father were apprehended on December 6, 2018, at 9:15 p.m. Her father reported that she was vomiting. Within twelve hours of their apprehension, she was hospitalized. An EMT revived her twice and she was flown to a hospital in El Paso, where she died the next day. An autopsy report stated her cause of death was bacterial infection streptococcal sepsis, which progressed rapidly and caused multiple organs to fail.

---

[29] *E.g.,* Amir Vera, *Autopsy Determines 7-year-old Guatemalan Girl Died From Sepsis While In US Custody*, CNN (March 30, 2019) https://www.cnn.com/2019/03/29/us/guatemala-jakelin-caal-maquin-autopsy/index.html; Joel Rose, *A Toddler's Death Adds To Concerns About Migrant Detention*, NPR (August 28, 2018), https://www.npr.org/2018/08/28/642738732/a-toddlers-death-adds-to-concerns-about-migrant-detention

Dec. 24, 2018

*Felipe Gomez Alonzo, 8, Guatemala (CBP information was provided in First Report)*[30]

Felipe and his father were apprehended on December 18, 2018, at about 1:00p.m., and were transferred to Paso Del Norte processing center.[31] On December 20, they were transferred to El Paso Border Patrol Station. Due to overcrowding at the El Paso station, they were transferred to the Alamogordo Border Patrol Station two days later.

On Christmas Eve, CBP agents took Felipe to the Gerald Champion Regional Medical Center, in Alamogordo, where he was observed for 90 minutes, diagnosed with a cold, given ibuprofen and amoxicillin, and was returned to federal custody. At about 7:00 p.m., Felipe vomited. His father declined medical assistance. At 10:00 p.m., agents took him back to the hospital, since there was no EMT on duty. His father reported that Felipe's condition had suddenly worsened. On the way to the hospital, Felipe vomited again and lost consciousness. The hospital was unable to revive him. A draft autopsy report stated that Felipe had had the flu and a bacterial infection.

---

[30] *E.g.,* Maria Sacchetti, *Official: Guatemalan Boy Who Died in U.S. Custody Tested Positive For Influenza B, Final Cause of Death Remains Under Investigation,* Wash. Post (December 28, 2018), https://www.washingtonpost.com/local/immigration/father-whose-son-died-in-custody-knew-bringing-him-would-ease-entry-into-us/2018/12/27/4c210bfc-0a1d-11e9-85b6-41c0fe0c5b8f_story.html; Chris Boyette, Dr. Edith Bracho-Sanchez and Michelle Mendoza, *Guatemalan Boy Died Of Flu And A Bacterial Infection While In US Custory, Autopsy Shows,* CNN (April 2, 2019), https://www.cnn.com/2019/04/02/us/guatemala-felipe-gomez-alonzo-autopsy/index.html

[31] Paso Del Norte processing center is separate from Paso Del Norte Port of Entry in El Paso, Texas.

*April 30, 2019*

*Juan de León Gutiérrez, 16, Guatemala[32]*

Juan traveled for about fifteen days with smugglers. While traveling, he complained of headaches, hunger, and poor sleep to his mother.

Juan was apprehended by CBP on April 19, 2019. He was transferred the next day to Southwest Key Casa Padre. On April 21, he woke up with chills, a fever and a headache. He was taken to the hospital, where he was treated and released. The next day, he was taken to the emergency room and placed in intensive care. Still in HHS custody, he was eventually airlifted to a children's hospital in Corpus Christi, and underwent an emergency operation to relieve pressure from a severe infection in his frontal lobe.

*May 14, 2019*

*Wilmer Josué Ramírez Vásquez, 2½, Guatemala[33]*

Wilmer and his mother were apprehended by CBP on April 3, 2019. On April 6, his mother told agents that he was sick, and he was taken to

---

[32] *E.g.,* Nicole Chavez, Michelle Mendoza, and Catherine E. Shoichet, *A Boy Left Home After A Drought Left His Family Eating One Meal A Day. He Died In US Custody Weeks Later,* CNN (May 7, 2019), https://www.cnn.com/2019/05/06/us/guatemalan-boy-federal-custody-death-family/index.html

[33] *E.g.,* Adolfo Flores, *A 2-year-old Boy Detained At The Border Has Died After WeeksIn The Hospital*, BuzzFeeed News (May 21, 2019), https://www.buzzfeednews.com/article/adolfoflores/toddler-dies-immigrant-border-us-texas-guatemala; Robert Moore and Maria Sacchetti, *Toddler Who Died After Being Taken Into Custody At The Mexican Border Suffered Multiple Diseases*, Wash. Post, (Jul. 2, 2019), https://www.washingtonpost.com/immigration/toddler-who-died-after-being-taken-into-custody-at-the-mexican-border-suffered-multiple-diseases/2019/07/02/5fda6674-9d03-11e9-9ed4-c9089972ad5a_story.html

Providence at Horizon hospital. The next day he was transferred via ambulance to Providence Children's Hospital in El Paso.

On April 8, they were given a Notice to Appear in immigration court and released from CBP custody at the hospital. Wilmer was diagnosed with pneumonia. He remained a patient at the hospital for a month and subsequently died there.

*May 20, 2019*
*Carlos Hernandez Vásquez, 16, Guatemala[34]*

Carlos was apprehended on May 13, 2019, and had an initial health screening. He was held at a CBP processing facility for six days, where he informed staff that he was feeling sick. A nurse practitioner diagnosed him with the flu and prescribed Tamiflu. That night he was transferred to Weslaco Station in order to contain the illness. (The *Los Angeles Times* reports that he first complained of symptoms at Weslaco, but other news outlets reported that he was moved to Weslaco after he was diagnosed in order to prevent the spread of the flu.) He was found dead the next morning, an hour after a wellness check. An autopsy concluded that Carlos died of the flu complicated by pneumonia and sepsis.

---

[34] *E.g.,* Graham Kates and Angel Canales, *Guatemalan Teen Boy Is Latest Migrant Child To Die In U.S. Custody,* CBS News (May 21, 2019), https://www.cbsnews.com/news/guatemalan-teen-boy-migrant-child-dies-in-border-patrol-custody;  Robert Moore, *Autopsy Offers Jarring new Details About The Death Of A 16-year-old Guatemalan Boy,* Texas Monthly (Jul. 24, 2019), https://www.texasmonthly.com/news/autopsy-details-death-guatemalan-migrant-child/

*May 10, 2018*
*Mariee Juárez, 20 months, Guatemala[35]*

Mariee and her mother were apprehended by CBP on March 1, 2018. They were held by CBP for three days and transferred to South Texas family Residential Center (Dilley). Mariee was deemed healthy at her intake medical exams. On March 11, Mariee began to show symptoms of a cold. While at Dilley, Mariee was seen by health care providers but not by a medical doctor. Her illness was unstable over the next few weeks, and ICE cleared Mariee and her mother for release and flying to New Jersey on March 25, 2018.

On March 26, Mariee was taken to a pediatrician, who prescribed a nebulizer and instructed her mother to take her to the emergency room if her breathing worsened. Later that day, Mariee was taken to the emergency room at JFK Medical Center. Two days later, she was transferred to the ICU. On March 30, Mariee was transferred to Jersey Shore University Medical Center where she was placed in a medically induced coma. On April 17, she was transferred to the Children's Hospital of Philadelphia, where they had a special Extracorporeal Membrane Oxygenation heart-lung bypass machine. On May 10, 2018, Mariee died from viral pneumonitis.

---

[35] *E.g.,* Taylor Dolven and Kathleen Caulderwood, *This Toddler Got Sick In ICE Detention. Two Months Later She Was Dead,* Vice News (Aug.27, 2018), https://news.vice.com/en_us/article/paw9ky/toddler-died-after-getting-sick-in-ice-custody; Joel Rose, *A Toddler's Death Adds To Concerns About Migrant Detention*, NPR (August 28, 2018), https://www.npr.org/2018/08/28/642738732/a-toddlers-death-adds-to-concerns-about-migrant-detention

Texas Child and Protective Services opened an investigation into Dilley and Mariee's death.

## 7. NEAR-TERM EVENTS

The principal proximate events concern the medical issues at CBP. The Monitor expects to resume the mediation on the CBP issues after receipt of Dr. Wise's final Interim Report, the draft of which was delivered to counsel on August 15, 2019. The Monitor will continue her investigation and analyses in order to reach recommendations to be made in her next report. She attended a site examination with Dr. Wise on August 1, 2019, and will be conducting additional document review and continue developing statistical analyses of CBP and ORR issues. In connection with mediations, she will share the results of those efforts with counsel. Formal mediation on these issues will resume in early September after Dr. Wise submits the final draft of his Interim Report to the Monitor on August 29, 2019.  (Doc. ## 599, 603.)

The Monitor expects that the other two pending proceedings—*i.e.*, (1) issues at Homestead, including expeditious release of UACs, and (2) psychotropic-drug informed consent at Shiloh—will be resolved in September, either with agreement or, in the absence of agreement, by proceeding to litigate the issues. The monitor expects to continue to draw upon Dr. Wise's expertise for health-related issues, whether in the context of mediation or in formulating findings and recommendations to the Court.