CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
Laura N. Diamond (Cal. Bar. No. 185062)
Rachel Leach (D.C. Bar No. 1047683)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
crholguin@centerforhumanrights.org
ldiamond@centerforhumanrights.org
rleach@centerforhumanrights.org

*Additional Plaintiffs' counsel on next page*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | | |
|---|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) | Case CV 85-4544 DMG-AGRx |
| | ) | |
| Plaintiffs, | ) | PLAINTIFFS' REPLY TO |
| | ) | DEFENDANTS' OPPOSITION TO |
| - vs - | ) | MOTION TO ENFORCE |
| | ) | |
| WILLIAM BARR, ATTORNEY | ) | |
| GENERAL | ) | |
| OF THE UNITED STATES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | [HON. DOLLY M. GEE] |

i

1    *Plaintiffs' counsel, continued:*

2

3    USF SCHOOL OF LAW IMMIGRATION CLINIC

4    Bill Ong Hing (Cal. Bar No. 61513)
     2130 Fulton Street

5    San Francisco, CA 94117-1080
     Telephone: (415) 422-4475

6    Email: bhing@usfca.edu

7

8    LA RAZA CENTRO LEGAL, INC.

9    Stephen A. Rosenbaum (Cal. Bar No. 98634)
     474 Valencia Street, Suite 295

10   San Francisco, CA 94103
     Telephone: (510) 387-3956

11   Email: srosenbaum@law.berkeley.edu

12   *Attorneys for plaintiffs*

13

14   */ / /*

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                ii

# Table of Contents

I.   INTRODUCTION ...................................................................................... 1

II.  ARGUMENT ........................................................................................... 4

    A.   BRIEFLY DETAINING APPREHENDED CLASS MEMBERS IN UNLICENSED
FACILITIES SUCH AS HOMESTEAD IS NOT PROHIBITED BY THE SETTLEMENT, BUT
DEFENDANTS MAY NOT HOLD MINORS IN UNLICENSED FACILITIES FOR LONG
PERIODS OF TIME BECAUSE THE FACILITIES ARE ON FEDERAL LAND OR MEET
"THE MAJORITY" OF THE SETTLEMENT'S LICENSING REQUIREMENTS. .............. 4

    B.   THE SETTLEMENT REQUIRES THAT ORR TRANSFER CLASS MEMBERS FROM
HOMESTEAD TO A LICENSED FACILITY "AS EXPEDITIOUSLY AS POSSIBLE," NOT
ON "AN ARBITRARY TIMELINE" ...................................................................... 11

    C.   ORR'S RULES ON RELEASE ARE INCONSISTENT WITH THE TERMS OF THE
SETTLEMENT AND CAUSE DELAYS AND DENIALS OF PROMPT RELEASE ........... 20

III.  CONCLUSION ..................................................................................... 23

/ / /

1

**Table of Authorities**

2

**Cases**

3

*Flores v. Johnson,* 212 F. Supp. 3d 864 (CD Cal. 2015) ............................... 6, 9

4

*Flores v. Lynch,* 828 F.3d 898 (9th Cir. 2016)............................................. 3, 20

5

6

7

**Rules**

8

Children Entering the United States Unaccompanied: Section 1, Placement in
ORR Care Provider Facilities," 1.7 (Placement and Operations During an

9

Influx), ................................................................................................. 5, 19

10

11

ORR Guide: Children Entering the United States Unaccompanied, 1.7.6. HPC
and Influx Care Facility Services ........................................................7, 8, 9

12

13

ORR Rule 1.2.1 .......................................................................................... 22

14

ORR Rule 1.7.2 ........................................................................................4, 17

15

ORR Rule 1.7.3 ........................................................................................... 4

16

17

ORR Rule 2.2.4. .......................................................................................... 26

18

ORR Rule 2.3.1 ........................................................................................... 23

19

ORR Rule 2.3.2 ........................................................................................... 17

20

ORR Rule 3.3.10 ........................................................................................ 26

21

22

Florida Administrative Code § 65C-14.042 Orientation.................................... 7

23

Florida Administrative Code § 65C-14.042 § 65C-14.044 Placement
Agreement................................................................................................ 7

24

25

Florida Administrative Code § 65C-14.042 § 65C-14.018 Community
Interaction .............................................................................................. 7

26

27

28

**Other Authorities**

2018 Individual Program Report: Homestead (April 11, 2019)...................... 22

Fla. Dep't Children & Families, Child Care Facility Handbook (October 2017) ............................................................................................................... 8

Graham Kates, CBS News, Nation's largest holding facility for migrant children expands again (April 4, 2019) ........................................................... 10

/ / /

# I.    INTRODUCTION[1]

On June 28, 2019, Plaintiffs filed a Motion to Enforce the Settlement
("Motion") regarding the detention of class members at Homestead
("Homestead"). [Doc. # 578].[2] On , 2019, this Court referred the Motion to the

_____

1 Defendants have forwarded to Plaintiffs a declaration executed by the Director
of the Office of Refugee Resettlement dated August 14, 2019, stating in part that
'[b]arring a dramatic increase in UACs referred to ORR and/or a decrease in the
licensed beds, I do not expect ORR to place UACs at Homestead in the coming
weeks and possible months." Declaration of Jonathan Hayes ¶ 13. News reports
state that on August 3, several hundred class members at Homestead were
abruptly relocated. A tropical wave in the Atlantic Ocean was what reportedly
triggered the move of the children. *See* The Miami Herald, *Homestead detention
center for immigrant children expected to reopen as soon as October* (August 13,
2019) available at https://www.msn.com/en-us/news/us/homestead-detention-
center-for-immigrant-children-expected-to-reopen-as-soon-as-october/ar-
AAFOpfL (last checked August 22, 2019). The Miami Herald report is based on
statements by a federal official who "oversees the operation." The article states
that HHS/ORR is expected to begin placing class members again in Homestead
"as early as October or November" or after the hurricane season ends.
Defendants reportedly plan to expand Homestead to detain as many as 3,200 class
members. U.S. Dep't Health & Human Servs., *Fact Sheet: Unaccompanied Alien
Children sheltered at Homestead Job Corps Site, Homestead, Florida*, April 1,
2019. (Available at
https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-
Sheltered-at-Homestead.pdf). Defendants have not agreed to modify their
challenged policies. Not using Homestead for a few weeks or "possibly" months
does not moot the pending motion inasmuch as Defendants could avoid judicial
review and then resume their challenged policies at any time. Nevertheless, the
parties are conferring and will discuss with the Special Monitor the terms under
which the motion may be held in abeyance. The parties may also continue
mediation with the Special Monitor.

2 Homestead is operated by the for-profit corporation Comprehensive Health
Services, Inc. ("CHS"). In February 2018, Defendants awarded CHS a $31 million
contract to oversee the Homestead detention camp. In April 2019, Defendants
awarded CHS a no-bid contract worth more than $341 million to expand
Homestead. *See* Washington Post, *Lawmakers ask watchdog to probe migrant teen
camp's contract* (May 14, 2019), available at https://www.apnews.com/.

Special Monitor ("Monitor") for a Report and Recommendation pursuant to Paragraph A.2 of the Appointment Order [Doc. ## 553]. On August 2, 2019, Defendants' filed their Response in Opposition ("Opposition") to the Motion. [Doc. # 609]. On August 2, 2019, Defendants also filed a Motion to Exclude Plaintiffs' Declarations and Request for an Evidentiary Hearing Before the Special Master ("Motion to Exclude"). [Doc. # 612]. On August 6, 2019, the Court referred the Motion to Exclude to the Monitor. [Doc. # 616]. Plaintiffs are filing a separate Partial Opposition to the Motion to Exclude.

While Defendants' pedantic Opposition nitpicks at details in class members' declarations, the factual disputes raised by Defendants are inconsequential to adjudication of the motion. As discussed *infra*, there are no material factual disputes with regards Defendants' written policies that undeniably result in denials and delays in class members being promptly released to sponsors under Paragraph 14 of the Settlement, class members not being expeditiously transferred to available and appropriate licensed placements under Paragraphs 12A and 19, and class members not having adequate telephonic contact with parents or other sponsors under Exhibit 1 Paragraph 11.

Both this Court and the Court of Appeals have made clear that the occurrence of "influxes" was taken into account in the Settlement.[3] Defendants

---

3 *See* Order Re Response to Order to Show Cause at 9-10 ("August 2015 Order") [Doc. # 189]; Order Re Plaintiffs' Motion to Enforce and Appoint a

are not free to create a new definition of an "influx" inconsistent with the plain terms of the Settlement,[4] and then deviate from the Settlement's terms when circumstances match their revised definition of an influx.

During an influx, the Settlement requires the prompt release of minors to available sponsors identified in Paragraph 14, and "[i]n any case in which [Defendants] do[ ] not release a minor pursuant to Paragraph 14 … such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 … or until the minor's immigration proceedings are concluded …" Settlement ¶ 19. "[A]ll minors [shall be placed in licensed facilities] pursuant to Paragraph 19 as expeditiously as possible." *Id*. ¶ 12.A.

Defendants admit that the only class members they allegedly expeditiously transfer from Homestead (or any influx center) to licensed facilities are those without sponsors (a group Defendants call "Category 4"

---

Special Monitor at 30 ("June 2017 Order") [Doc. # 363]; *Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016).

4 The Settlement defines an "influx" as existing when more than 130 minors in Defendants' custody are eligible for placement in a licensed program under Paragraph 19. Settlement ¶ 12.B. It is undisputed that almost since the Settlement was reached, an influx has existed. Significantly, the only requirement in the Settlement relevant here that are modified in an influx is that rather than placing minors in a licensed placement within three to five days of apprehension (Settlement ¶12.A), the minor must be placed in a licensed program "as expeditiously as possible …" Settlement ¶ 12.A.3 ("in the event of an emergency or influx of minors into the United States, in which case the [Defendants] shall place all minors [in licensed facilities] pursuant to Paragraph 19 as expeditiously as possible").

class members) and those with special needs. *See* Opposition at 10:1-4 [Doc. #

609]; Sualog Dec. at ¶ 41; ORR Rule 1.7.2 and ORR Rule 1.7.3. When

requiring the expeditious placement of minors in licensed facilities, the

Settlement makes no distinction between the groups Defendants say they

expeditiously place in licensed facilities and all other detained class members—

*i.e.* those with potential sponsors—who are neither a flight risk nor a danger.

Defendants' data shows that their policy has resulted in hundreds of class

members being detained at Homestead for weeks or months, even as newly

available beds in licensed facilities are filled with newly detained minors not

unlucky enough to be assigned to Homestead.

Regardless of the details in class members' or doctors' declarations with

which Defendants may quibble, their policies and the implementation of those

policies violate the plain terms of the Settlement.

## II.   ARGUMENT

### A. Briefly detaining apprehended class members in unlicensed facilities such as Homestead is not prohibited by the Settlement, but Defendants may not hold minors in unlicensed facilities for long periods of time because the facilities are on federal land or meet "the majority" of the Settlement's licensing requirements.

Defendants first argue that they may detain class members at Homestead

regardless of the Settlement's terms requiring expeditious placement in a

licensed facility because it "operates … on federal property and is therefore not

required to obtain a license from the State of Florida." Opposition at 8, *citing*

Declaration of Jallyn Sualog ("Sualog Decl.") [Doc. # 609-1]. ORR also states

that "[b]ecause of the temporary and emergency nature of Influx Care Facilities,

they may not be licensed or may be exempted from licensing requirements by

State and local licensing agencies." *See* Office of Refugee Resettlement, *ORR*

*Guide: Children Entering the United States Unaccompanied*, *Rule 1.7*

*Placement and Operations During an Influx* (last updated March 21, 2016),

available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-

states-unaccompanied-section-1#1.7.

　　　　Following apprehension the Settlement permits the detention of class

members for a brief period of time in unlicensed facilities while prompt and

continuous efforts are made at release.  However, if a class member is not

promptly released, the Settlement requires that Defendants transfer the minor to

a licensed facility "as expeditiously as possible." Settlement ¶ 12.A(3). The

Settlement nowhere creates an exception to this requirement for detention

facilities that Defendants choose to "operate … on federal property," or for

facilities for which they believe  are "not required to obtain a license" from the

state in which they are located.[5]

---

[5] When Defendants previously argued that they could hold class members in
unlicensed family detention facilities because a state license was not available
for the type of facility Defendants operated, this Court responded: "As the Court
previously stated, '[t]he fact that the family residential centers cannot be
licensed by an appropriate state agency simply means, that under the Agreement,
class members cannot be housed in these facilities except as permitted by the

Defendants also argue that "conditions at Homestead comply with the Agreement despite the fact that the facility does not have a state license." Opposition at 18.[6] They assert that ORR's contracts with Homestead "subject the facility to *the majority* of requirements that apply to state-licensed residential facilities. *Id.* (emphasis supplied)*, citing* Sualog Dec. ¶ 37.[7] In any

---

agreement.' July 24, 2015 Order, 212 F. Supp. 3d at 877." June 2017 Order at 29 [Doc. # 363].

6 The term "licensed program" refers to "any program, agency or organization that is *licensed by an appropriate State agency* to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 …" Settlement ¶ 6 (emphasis added). Exhibit 1 to the Settlement sets forth the requirements for a licensed facility, including an educational assessment and plan (Paragraph A.3(d)), educational services including science, social studies, math, reading, writing and physical education Mondays through Fridays (Paragraph A.4), identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification (Paragraph A.3(h)), individual counseling once a week (Paragraph A.6), group counseling twice a week (Paragraph A.7), visitation and contact with family members (Paragraph A.11), family reunification services and assistance inn obtaining legal guardianship when necessary for the release of the minor (Paragraph A.13), and development of a comprehensive individual plan for the care of each detained minor (Paragraph D). Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living. Paragraph C. ORR programs "shall maintain adequate records and make regular reports as required by the [ORR] that permit the [ORR] to monitor and enforce this order and other requirements and standards … [and that] are in the best interests of the minors." Paragraph F.

7 Defendants have not provided Plaintiffs or the Court with copies of their contracts with Comprehensive Health Services, Inc. Paragraph 37 of the Sualog Declaration provides no evidentiary support for her statement that Homestead complies with the "majority" of Florida's licensing requirements. Her declaration cites only to ORR Guide, Section 1.7 (Placement Operations During An Influx). That section says nothing about the extent to which Homestead

event, the Settlement nowhere permits detaining class members for extended

periods of time in facilities that meet "the majority" of requirements of a state-

licensed facility for the care of dependent minors. Settlement ¶ 6.[8]

_____

complies with Florida's licensing requirements or the Settlement's requirements
for licensed facilities. For example, ORR Guide Section 1.7.6, states that "[t]o
the extent practicable, non-State licensed … Influx Care Facilities [like
Homestead] are encouraged to provide the following services Educational
services; and Daily Recreational/Leisure time …" *Id*. On the other hand, the
Settlement requires licensed facilities provide educational services in a
structured classroom setting, Monday through Friday, including reading
materials in such languages as needed, and subjects including science, social
studies, math, reading, etc. Settlement, Exhibit 1, ¶ 4. While the ORR Guide
requires daily recreational time when "practicable," the Settlement requires that
licensed facilities provide daily outdoor activity, at least one hour per day of
large muscle activity, and one hour per day of structured leisure time activities,
increased to three hours on days when school is not in session. *Id*.¶ 5.
8 There are numerous Florida licensing requirements that Homestead fails to
comply with. For example, licensing standards in the state of Florida include
detailed requirements regarding staff training and credentials, child/caregiver
ratios, supervision, food preparation, sanitation, transportation, emergency
preparedness, and sleeping requirements, among many others. *See* Fla. Dep't
Children & Families, *Child Care Facility Handbook* (October 2017), available at
http://www.dcf.state.fl.us/programs/childcare/docs/handbook/Facility%20Handb
ook.pdf.  Florida regulations provide substantial protection for the safety and
security of minors in licensed facilities. *See also* Florida Administrative
Regulations § 65C-14.018 Community Interaction ("The facility shall … assure
that resident children are allowed to become a part of the community"); § 65C-
14.044 Placement Agreement ("The facility shall have a written agreement with
the child, parent, guardian, the department or the licensed child placing agency
which describes the … frequency of contact with the child's family …"); § 65C-
14.042 Orientation ("The facility shall have written policies that encourage and
support … telephone calls, and other forms of communication with parents …").
*See* Office of Refugee Resettlement, *ORR Guide: Children Entering the United
States Unaccompanied, 1.7.6. HPC and Influx Care Facility Services*
(last updated Mar. 21, 2016), available at
https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-
unaccompanied-section-1#1.7.

In addition, as this Court has recognized, "[t]he purpose of the [Settlement's] licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency." July 24, 2015 Order at 14. State child welfare licensing standards are designed to ensure that all child care programs meet minimum requirements to protect the health and well-being of children. In contrast to the comprehensive requirements of state child welfare licensure, ORR's requirements for its "Influx Care Facilities" are limited to "basic standards of care" that ignore well-established standards for the care of dependent minors.[9]

As the Court previously stated, "[t]he fact that the [ICE] family residential centers cannot be licensed by an appropriate state agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement." Order Re Plaintiffs' Motion to Enforce Settlement and Defendants' Motion to Amend Settlement Agreement, July 24, 2015 [Doc. # 177] at 12-13, *Flores v. Johnson,* 212 F. Supp. 3d 864, 877 (CD Cal. 2015).[10]

---

9 *See* Office of Refugee Resettlement, *ORR Guide: Children Entering the United States Unaccompanied, 1.7.6. HPC and Influx Care Facility Services* (last updated Mar. 21, 2016), available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.7.

10 *See* 212 F. Supp. 3d at 877–78 (discussing Defendants' argument and concluding that "Defendants are required to provide children who are not released temporary placement in a licensed program"). It also makes no difference whether Defendants provide amenities at Homestead, such as "meals,

Defendants argue that Homestead is not a "secure" facility "as that term is used in the Agreement," and that Plaintiffs "would have the court believe" that Homestead is a "juvenile detention center" described in Paragraph 21 of the Settlement. Opp. at 19. Plaintiffs simply argue that Defendants are required as expeditiously as possible to place minors in non-secure licensed facilities.

Defendants go on to admit that at Homestead the doors are locked and the facility is "surrounded by a fence." Opp. at 19-20. Homestead's facility administrator has "acknowledged that the facility is surrounded by a tall covered fence and monitored by a large team of patrolling private security contractors."[11] There is no question but that Homestead is a secure facility.[12]

While Defendants pretend that even though unlicensed Homestead meets the *Flores* standards for a licensed facility, the Settlement clearly states that

medical and dental services, recreational opportunities, and education for school-age children." July 24, 2015 Order at 13 [Doc. # 177]. Even "[a]ssuming the conditions are acceptable or … outstanding, however, Defendants cannot be in substantial compliance with the Agreement because the facilities are secure and non-licensed." *Id*. at 14.

11 Graham Kates, CBS News, *Nation's largest holding facility for migrant children expands again* (April 4, 2019), available at https://www.cbsnews.com/news/homestead-nations-largest-holding-facility-for-migrant-children-expands-again/ (last checked May 28, 2019).

12 *See also* Pls. Ex. 78, Declaration of AVL [Doc. # 578-5] (UACs are not allowed to leave Homestead and must be with a Youth Counselor who watches them all the time); Pls. Ex. 79 ¶ 9, Declaration of DMA [Doc. # 578-5] ("Children like me are not allowed to leave this detention center … The YCs [youth counselors] have told us that if a child tries to leave, the police or other officials will come looking for us"); *see also* Exhibit 3 at 13 [Doc. # 578-1] (includes numerous additional excerpts of declarations evidencing that Homestead is a secure facility).

1   licensed facilities "shall be *non-secure* …" Settlement at ¶ 6 (emphasis

2   added).[13]

3
4       Regardless whether Homestead is a secure facility, the Settlement requires

5   that Defendants transfer class members from Homestead to a licensed facility

6   "as expeditiously as possible" (Settlement ¶ 12.A(3)), which Defendants admit

7
8   they do not do so, except for special needs class members and those who have

9   no sponsors. Opposition at 10.

10      Returning to their unexpected influx argument, Defendants interpret the

11  terms of Exhibit 3 to the Settlement as evidence that "the parties never expected

12
13  that the government would be dealing with the numbers of minors available for

14  placement into its facilities as it is facing today." Opp. at 21. The parties agreed

15  that when the number of children available for placement exceeds 210,

16
17  *Defendants are obligated to "locate additional placements through licensed*

18  *programs, county social services departments, and foster family agencies.*" *Id.*

19  (emphasis supplied).

20      None of this language indicates that the parties "never expected that the

21  government would be dealing with the numbers of minors available for

22
23  placement into its facilities as it is facing today." Opp. at 21. In fact, this

24  language shows that it is Defendants' obligation to "locate additional

25
26

_____

27  13 Paragraph 11 provides that "[Defendants] shall place each detained minor in
28  the least restrictive setting appropriate to the minor's age and special needs.…"

placements" in licensed programs, county social services departments, or foster family agencies should they be required to comply with their obligation under Paragraphs 12.A(3) and 19 to place children in licensed facilities.[14]

No one disagrees that we are in an "influx" situation as defined in the Settlement. This simply means that instead of transferring class members to a licensed facility within 3 to 5 days following apprehension, the transfer must be accomplished "as expeditiously as possible." Settlement ¶ 12A(3). The Settlement requires that the transfer be to a licensed facility, not a facility like Homestead that is unlicensed even if it "operates on federal land" or meets "the majority" of a state's licensing or the Settlement's requirements for licensed facilities.

**B.     The Settlement requires that ORR transfer class members from Homestead to a licensed facility "as expeditiously as possible," not on "an arbitrary timeline."**

As discussed *supra*, unexpected numbers or not, the Settlement states that in any influx situation detained class members must be expeditiously transferred to a licensed program until such time as release can be affected in

---

14 The language of the Settlement makes clear that what the parties did *not* have in mind was that when the number of class members in custody exceeded 210 then Defendants would locate additional bed space in *unlicensed* detention facilities like Homestead. The Settlement states in plain terms that the additional placements will be in "licensed programs, county social services departments, [or] foster family agencies." *Id.*

11

accordance with Paragraph 14 or until the minor's immigration proceedings are concluded. Settlement ¶¶ 12A(3) and 19.

Plaintiffs' Motion proposed, *inter alia*, that the Court Order Defendants to transfer any class member after 20 days of detention at the unlicensed Homestead facility. Motion at 28. Defendants respond that such a ruling would "arbitrarily" set a time frame for transfers to licensed facilities, and "in the vast majority of cases, transferring a UAC from Homestead to a licensed facility after the child has been at Homestead for 20 days would be more harmful than beneficial to the child." Opp. at 23, *citing* Sualog Dec. ¶ 43. Ms. Sualog's conclusion is "[b]ased on the average length of care for the month of June 2019," which she points out was "30 days" for class members with Category 1 sponsors, "44 days" for those with Category 2 sponsors, and "88 days" for those with Category 3 sponsors. Sualog Dec. ¶ 43.[15]

Aside from the fact that 30, 44, and 88 days strongly indicate that Defendants are <u>not</u> as expeditiously as possible transferring class members to available licensed facilities, Ms. Sualog nowhere addresses the hundreds of class members who are detained at Homestead without being transferred to

---

15 Defendants' "averages" data changes from month to month. For example, on February 13, 2019, HHS reported that the "average" length of stay for class members detained at Homestead was 67 days.

licensed facilities for months *longer* than the "averages" she describes.[16] Per Defendants' monthly detention reports, as of June 2019:

- 4,143 (29.3%) class members were detained more than 90 days.

- 2,070 (14.6%) class members were detained between 61 and 90 days.

- 4,544 (32.1%) class members were detained between 31 and 60 days.

Ex. 1, Declaration of Peter Schey (August 23, 2019).

More importantly, Defendants' policy is that they simply do *not* transfer detained class members with Category 1, 2, and 3 sponsors -- *i.e.* the majority of class members -- to available licensed facilities no matter how long it may take to release these class members to their potential sponsors.

Having failed to transfer detained class members to available licensed facilities for weeks or months, Defendants argue that "[b]eing transferred to

_____

16 *See, e.g.,* Plaintiffs' Ex. 29 ¶¶ 11,12,14, Declaration of NDC [Doc. # 578-3] (class member presented herself at a border checkpoint in Texas on or about June 5, 2018, along with her father, step-mother, and three-month-old sister. She was separated from her family and had been detained for approximately *140 days* when her declaration was taken); Ex. 52 ¶¶ 1, 2, 4, Declaration of DCC [Doc. # 578-4] (class member is a fourteen-year-old boy with a mother in Maryland detained for about *164 days* when he executed his declaration); Defs' Ex. 2 [Doc. # 611-1] (Homestead medical clinic records show class member still detained after six months); Defs' Ex. 9 [Doc. # 611-2] (class member detained for six weeks at Homestead prior to release); Defs' Ex. 15 [Doc. # 611-3] (class member detained for 40 days at Homestead prior to release to an uncle); Defs' Ex. 16 [Doc. # 611-4] (class member detained at Homestead for 40 days prior to release to his sponsor); Defs' Ex. 11 [Doc. # 611-3] (class member detained for 77 days at Homestead prior to release to sponsor); Defs' Ex. 23 [Doc. # 611-5] (class member detained for 101 days at Homestead prior to release to his sponsor); Defs' Ex. 30 [Doc. # 611-6 (class member detained for 68 days prior to release to sponsor).

new facilities just as they are to be released, and after they have already developed positive connections with staff and other children in the Homestead facility, would be harmful to children." Opp. at 23-24, *citing* Sualog Dec. ¶ 43.[17]

/ / /

_____

17 Moreover, "a child's case manager – who likely has developed a relationship with the minor and his or her sponsor – would lose control of the reunification case, and the case would move to a new case manager … likely slowing the release process." *Id.*

Defendants nowhere explain or provide any documentary or evidentiary support for their position that transferring a class member to a licensed facility in accordance with the Settlement would "likely slow[ ] the release process."[18] Nor have Defendants provided any evidence linking class members' developing "relationships" with their case managers to class members' release times. The record discloses that class members generally only see their case managers once a week, hardly a basis for violating the Settlement and deferring a minor's transfer to an available licensed facility for months at a time.[19]

Defendants make clear that "[e]ach week, case management teams closely review lists of children who have been in care for 45 or more days, and 75 or more days, and discuss how to address any ongoing barriers to their

---

18 Nor have Defendants shown any evidence that release was delayed for class members with special needs who were expeditiously transferred to licensed facilities under Defendants' exception to the no-transfer rule.

19 *See* Pls. Ex. 23 Declaration of KDL [Doc. # 578-3] ("About eight days after arriving to Miami, I was finally taken to meet my case manager"); Pls. Ex. 29 Declaration of NDC [Doc. # 578-3] ("It wasn't until August 1, 2018 that I finally taken to see my …case manager … They explained that they were no longer handling my case"); Pls. Ex. 31 Declaration of OCG [Doc. # 578-3] ("To this day, I still don't know what it going to happen to me as I have not spoken to my case manager for over two weeks"); Pls. Ex. 36, Declaration of EA [Doc. # 578-4] ("I only see the clinician, or counsel, once every three weeks"); Pls. Ex. 50 Declaration of EGM [Doc. # 578-4] ("For the first fifteen days after I arrived here, I was not able to talk with a social worker … I was able to meet with a social worker for the first time about eight days ago"); ORR Rule 2.3.2 Case Managers ("The Case Manager provides weekly status updates … to the UAC on the child's case and provision of services, preferably in person") available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last accessed August 19, 2019).

15

release." Opp. at 10, *citing* Sualog Dec. ¶ 42. At these 45- and 75-day reviews,

Defendants "discuss any ongoing barriers to [class members'] release," *not* how

to expeditiously as possible transfer class members to licensed facilities.

Defendants concede that they do not  "focus[e] on transferring UACs

from Homestead into other [licensed] facilities," because their alleged "primary

goal" is to "release UACs … to sponsors as expeditiously as possible." Opp. at

24. The Settlement clearly requires that Defendants make and record continuous

efforts aimed at prompt release, but *also* that they as expeditiously as possible

transfer unreleased minors to available licensed facilities. However, Defendants

do not even "discuss" transferring minors at the 45 and 75 day reviews, nor do

they "focus" on the transfer of class members with Category 1-3 sponsors to

licensed facilities. They simply do not transfer them at all.[20]

Paragraph 12.A(3) clearly states "in the event of an … influx of minors

into the United States … [Defendants] shall place *all* minors [in licensed

facilities] pursuant to Paragraph 19 as expeditiously as possible …" *Id.*

(emphasis supplied).[21]

---

20 On the other hand, Defendants claim it is their policy to "expeditiously"
transfer class members with special needs and those with no available sponsors
(what Defendants call Category 4 class members) to licensed facilities.
Opposition at 10. Defendants actually offer no data or any evidence showing that
they have in fact "expeditiously" placed special needs and Category 4 minors in
licensed facilities as appropriate beds became available.
21 Paragraph 19 also refers to "all minors."

An evidentiary hearing is not necessary to assess whether the language of the Settlement supports Defendants' eliminating class members with potential Category 1-3 sponsors from the terms of Paragraphs 12A(3) and 19. The plain meaning of the words used in the Settlement make clear that the transfer provisions of Paragraphs 12A(3) and 19 apply to "all" class members, not just those with special needs or with no available sponsors.

Defendants obviously possess records and data regarding the availability of space in their licensed facilities. *Yet for no period of time have they or their declarants provided any records or data showing a lack of available space in their licensed facilities prevented the expeditious transfer of class members with Category 1-3 sponsors from Homestead to those facilities.*

Defendants generally deem bed space insufficient within its licensed care provider network when 85% of the available beds are occupied by class members.[22] When that occurs, class members meeting certain criteria are transferred to Homestead rather than to a licensed facility.[23]

---

22 Ex. 10, Deposition of Karen Husted, ORR Federal Field Specialist ("Husted Depo."), at 60:12-14. [Doc. # 578-2].

23 The ORR criteria for transfer to an Influx Facility include the minor being between 13-17 years of age; speaks either English or Spanish; has no known behavioral or medical issues; has no known special needs; is not be a danger to self or others; does not have a criminal history; is not a perpetrator or victim of smuggling or trafficking activities; is not part of a sibling group with a sibling(s) age 12 years or younger; and is not pregnant or parenting. ORR Rule 1.7.2.

Plaintiffs have *not* contested the placement of class members at Homestead when ORR may not have sufficient bed space available within its licensed care provider network to place unaccompanied alien children. Plaintiffs are challenging Defendants' failure to "as expeditiously as possible" transfer the longest held class members out of Homestead when appropriate bed space becomes available at licensed facilities as minors are released from those facilities under Paragraph 14.

It is undisputed that once at Homestead, the longest held minors with potential Category 1-3 sponsors have not been and are not being transferred to beds that become available as class members in licensed facilities are released. Instead, more recently apprehended minors are placed in available beds at licensed facilities.

The number of class members detained at Homestead does not fluctuate based on the number of class members being transferred to licensed facilities in accordance with the Settlement, but rather "changes on a daily basis as children are referred [to ORR] mostly by DHS and others are released to an appropriate sponsor." Sualog Dec. ¶ 40.

Indeed, there is "currently no[ ]" maximum amount of time ORR allows a child to be housed at Homestead. Husted Depo. at 60:10-21 [Doc. # 578-2]

Defendants claim that in June 2019 their licensed facilities were operating at 98% capacity. Even then, as the licensed facilities released their

residents, Defendants do not dispute that class members with potential Category 1-3 sponsors – *i.e.* all class members except those with special needs or with no sponsor – remained at Homestead for weeks or months while newly apprehended class members were placed in available licensed facilities. Opposition at 10; ORR Rule 1.2.1 Placement Considerations.

Instead, it is undisputed that class members remain at Homestead until they are eventually released to a sponsor, or are deported, or turn 18 years old and "age out" of unaccompanied minor status and are promptly transferred to an ICE detention facility for deportation.

In short, even when bed space becomes available at an ORR licensed facility, the longest held class members detained at Homestead are not transferred to the licensed facility with available bed space unless they have been identified as a special needs minor or as a Category 4 class member because they have no available sponsors.

To remedy Defendants' persistent violation of Paragraphs 12.A(3) and 19, selecting a number like 20 days for the transfer of minors to licensed facilities may, as Defendants argue, be arbitrary and not clearly supported by the plain text of the Settlement. Defendants should instead be ordered to transfer class members held the longest at Homestead to appropriate available

licensed facilities.[24] This would bring Defendants into compliance with the terms of the Settlement requiring that they transfer detained class members to licensed facilities as expeditiously as possible.

**C.      ORR's Rules on release are inconsistent with the terms of the Settlement and cause delays and denials of prompt release**

Defendants argue that ORR is in compliance with Paragraph 14 of the Settlement "because it releases UACs from Homestead to sponsors as expeditiously as possible." Opp. at 25. Defendants agree that this Court has already interpreted "as expeditiously as possible," under the Agreement to mean in good faith and due diligence by Defendants. *Id. citing Flores v. Lynch*, 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded, Flores v. Lynch,* 828 F.3d 898 (9th Cir. 2016). When it comes to release, Defendants argue "ORR has exercised … good faith and due diligence, and has taken the necessary steps to ensure that UACs at Homestead are released to sponsors in a manner that is expeditious, while also ensuring the safety of

---

24 Class members should only be transferred as expeditiously as possible to licensed facilities appropriate for the transferred minors taking into account the age, sex, accompanying siblings, and health. On the other hand, once an ORR Federal Field Specialist has approved a class member's release, and release appears to be reasonably imminent, Paragraph 12.A(3) likely would not require transfer to a licensed facility. ORR's Federal Field Specialists "have the authority to approve all unaccompanied alien children transfer and release decisions." ORR Rule 2.3.1 available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section2#2.6 (last checked August 20, 2019).

UACs with their sponsors upon release." Opp.at 25.[25] At best Defendants'

exhibits disclose sporadic and occasional efforts aimed at release.[26]

ORR Rule 2.2.1 is entitled "Identification of Qualified Sponsors."

Category 1 includes parents and legal guardians and is consistent with

Paragraph 14.A and .B of the Settlement.

ORR's Category 2A includes "[a]n immediate relative--a brother; sister;

grandparent or other close relatives (aunt, uncle, first cousin) who previously

served as the UAC's primary caregiver. (This includes biological relatives,

relatives through legal marriage, and half-siblings). Category 2B includes

"[a]n immediate relative -- including aunt, uncle, or first cousin who was not

previously the UAC's primary caregiver. (This includes biological relatives,

relatives through legal marriage, and half-siblings)." Category 2A is

---

25 Paragraph 14 provides that Defendants "shall release a minor from its custody without unnecessary delay." Defendants dedicate pages of their Opposition to show that some class members' case notes disclose occasional meetings with case managers, or legal orientations, or in a small number of cases a sponsor needed to secure a document to satisfy ORR that release could be accomplished safely. Opp. at 25-28. However, in not a single case have Defendants provided documentary evidence that "upon taking a minor into custody… [ORR] [m]a[d]e and record[ed] … prompt and continuous efforts … toward family reunification and the release of the minor pursuant to Paragraph 14 …" Settlement ¶ 18. Nor have Defendants provided evidence to show that "[s]uch efforts at family reunification … continue[d] so long as the minor [was] in [ORR] custody." *Id*.

26 *See, e.g.*, Defs' Ex. 11 [Doc. # 611-3] at 3-4 (a few phone calls); Defs' Ex. 22 [Doc. # 611-5] at 2-4 (a few conversations with sponsors and UAC about "outstanding documents").

inconsistent with Paragraph 12C which does not require that the relative was previously the UAC's primary caregiver.

ORR's Category 3 includes "Other sponsor[s], such as distant relatives and unrelated adult individuals." This category seemingly includes non-relative sponsors identified in Paragraph 14 of the Settlement (unrelated adults designated by a parent, licensed group homes, and other responsible unrelated adults). ORR's Category 4 includes class members with "[n]o sponsors identified."

ORR's policy is that potential Category 3 sponsors "who are unable to provide verifiable documentation of a familial relationship with the unaccompanied alien child must submit evidence that reliably and sufficiently demonstrates a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States. … ORR may require that the potential Category 3 sponsor, the UAC, and the child's family, establish ongoing regular contact while the child is in ORR care, prior to a release recommendation." ORR Rule 2.2.4.[27]

Nothing in the text of Paragraph 14 permits Defendants to restrict Category 3 sponsors – *i.e.* sponsors identified in the Settlement at ¶ 14 D-F –to

_____

27 There is no question but that Defendants implement this policy. *See, e.g.*, Defs' Ex. 31 [Doc. # 611-7] (class member's case manager was eventually able to locate a sponsor for him "after many delays cause by his lack of relationship to initial candidates for sponsorship").

those who can provide evidence that "demonstrates a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States," nor do ¶¶ 14D-F permit ORR to "require that the potential Category 3 sponsor, the UAC, and the child's family, establish ongoing regular contact while the child is in ORR care, prior to a release recommendation."[28]

## III.   CONCLUSION

For all the reasons stated above, Plaintiffs' Motion should be granted and Defendants ordered to (i) promptly release class members to sponsors described in Paragraph 14, (ii) as expeditiously as possible transfer class members to the first available licensed facility (taking into account the class member's age, sex, accompanying siblings, and health) unless an ORR Federal Field Specialist has approved a class member's release, and release appears to be reasonably imminent, and (iii) provide detained class members an hour a week to speak in private on the telephone with their parents or potential sponsors to facilitate prompt release.

---

28 Regular contact with class members is of course made more difficult by the fact that Defendants restrict class member phone calls with parents or sponsors to 20 minutes per week. *See* ORR Rule 3.3.10 Telephone Calls, Visitation, and Mail ("Unaccompanied alien children must be provided the opportunity to make a minimum of two telephone calls per week (10 minutes each) to family members and/or sponsors, in a private setting"); Pls. Ex. 33, Declaration of SLL, [Doc. # 578-3] (10 minutes twice a week); Pls. Ex. 48 Declaration of JNB [Doc. # 578-4] (same); Pls. Ex 15 Declaration of CJB [Doc. #587-3] (same).

23

1     Dated: August 23, 2019                    Respectfully submitted,

2

3                                               CENTER FOR HUMAN RIGHTS &
                                                CONSTITUTIONAL LAW
4                                               Peter A. Schey
5                                               Carlos Holguín

6                                               USF SCHOOL OF LAW
                                                IMMIGRATION CLINIC
7                                               Bill Ong Hing (Cal. Bar No. 61513)

8
                                                LA RAZA CENTRO LEGAL, INC.
9                                               Stephen A. Rosenbaum (Cal. Bar No.
10                                              98634)

11

12                                              */s/ Peter schey*
                                                Peter Schey
13                                              Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On this date, August 23, 2019, I electronically filed the following document(s):

- PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION TO ENFORCE

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

On August 23, 2019, I also served true and correct copies of the above document to the interested parties by sending copies to the email address of defendants' counsel Sarah Fabian.

/s/Peter Schey
*Attorney for Plaintiffs*

1

CV 85-4544-DMG (AGRX)