# EXHIBIT A
## (Proposed Amicus Brief)

JOHN S. PURCELL (SBN 158969)
john.purcell@arentfox.com
DAVID L. DUBROW
david.dubrow@arentfox.com
JAMES H. HULME
james.hulme@arentfox.com
JUSTIN A. GOLDBERG (SBN 293234)
justin.goldberg@arentfox.com
ANDREW DYKENS
andrew.dykens@arentfox.com
MOHAMMED T. FAROOQUI
mohammed.farooqui@arentfox.com
JAKE CHRISTENSEN
jake.christensen@arentfox.com
MELISSA A. TRENK
melissa.trenk@arentfox.com
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, California 90013
Telephone: 213.629.7400
Facsimile:  213.629.7401

Attorneys for *Amici Curiae*
American Academy of Child and Adolescent
Psychiatry, *et al*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al*., <br><br> Plaintiffs, <br><br> v. | Case No. 2:85-cv-4544-DMG <br><br> **Brief of *Amici Curiae* the American Academy of Child and Adolescent Psychiatry ("*Amicus* 1"), the American Academy of Pediatrics ("*Amicus* 2"), the American Academy of Pediatrics, California ("*Amicus* 3"), the American Federation of Teachers ("*Amicus* 4"), the American Medical Association ("*Amicus* 5"), the** |

1
2   WILLIAM BARR, Attorney General of
    the United States, *et al.*,
3
            Defendants.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**American Professional Society on the
Abuse of Children ("*Amicus* 6"), the
American Psychiatric Association
("*Amicus* 7"), the American
Psychoanalytic Association ("*Amicus*
8"), the California American
Professional Society on the Abuse of
Children ("*Amicus* 9"), the Center for
Law and Social Policy ("*Amicus* 10"),
the Children's Defense Fund
("*Amicus* 11"), the Lutheran
Immigration and Refugee Service
("*Amicus* 12"), the National
Association of Social Workers
("*Amicus* 13"), the National
Education Association ("*Amicus* 14"),
the Texas Pediatric Society ("*Amicus*
15"), the Women's Refugee
Commission ("*Amicus* 16"), together
with First Focus on Children
("*Amicus* 17"), Save the Children
Action Network, Inc. ("*Amicus* 18"),
Save the Children Federation, Inc.
("*Amicus* 19"), United States Fund for
UNICEF ("*Amicus* 20"), and ZERO
TO THREE ("*Amicus* 21"), in
support of Plaintiffs**

# <u>TABLE OF CONTENTS</u>

**Page**

I.  Introduction ...............................................................................................1

II. The *Amici* And Their Interests In The Case.....................................................2

III. Summary Of Deviations From FSA...................................................................3

    A.  The Rule Directly Harms Children By Eliminating Defendant's Duty To Release Immigrant Children To Their Families As Required By The FSA...........................................................................3

    B.  Release Will Be In DHS Discretion And It Is Likely That Children Will Be Indefinitely Detained Or Be Released And Separated From Their Accompanying Parent Remaining In Detention. ..............................................................................4

    C.  Under The Rule, The Facilities Will Be Self-Licensed, Overseen By Parties Hired By And Accountable Solely To The Administration, And Will Result In Materially Worse Conditions For Children. ......................................................5

        1.  Immigrant Children Likely Will Be Detained In Prison-like Conditions In Violation Of The Least Restrictive Environment Requirement.............................................5

        2.  Immigrant Children Will Be Placed In Self-Licensed Facilities In Violation Of The FSA. .............................6

    D.  The Rule's New Definitions Of Influx And Emergency Will Result In Longer Periods Of Detention. ..................................6

        1.  The Rule's Definition Of "Influx" Is Based On Outdated Data And Would Permit DHS To Operate In A De Facto Permanent State Of Influx. .........................6

        2.  The Rule's Definition Of "Emergency" Replaces Specified Time Frames With Vague Language Open To Broad Interpretation.................................................7

    E.  The Rule Abrogates Immigrant Children's Due Process Rights...........7

        1.  The Rule Deprives Immigrant Children Of Critical Rights

At Bond Hearings. ......................................................7

2.  The Rule Inhibits The Ability Of Children To
Meaningfully Participate In Court Proceedings And Strips
Children Of Critical Protections. ..................................8

IV.  The Rule Will Have A Devastating Impact For Immigrant Children..............9

A.  The Rule Ignores Humane Alternatives To Long-Term
Detention. .............................................................9

B.  The Rule Is In Direct Conflict With The Findings Of DHS's
Own Advisory Committee On Family Residential Centers. ...............11

C.  Detention Is Inherently Harmful To Children's Mental And
Physical Health ......................................................12

D.  Federal Detention Facilities' Conditions Seriously Compound
The Harm Inherent In Detention. ......................................18

E.  The Rule Will Have A Devastating Impact On The Educational
Development Of The Detained Children. ................................21

F.  Detention Erodes The Parent-Child Relationship And
Exacerbates The Immense Distress That Children In Detention
Already Experience. ..................................................23

V.  Conclusion.................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Beltran v. Cardall*,
    222 F. Supp. 3d 476 (E.D. Va. 2016) ................................................................. 8

*Flores v. Reno*,
    Case No. CV 85-4544-RJK(Px) (C.D. Cal. filed Jan. 17, 1997) ....................... 1

*Grassroots Leadership v. Texas Dep't of Family and Protective Servs.*
    (District Court of Travis County 2016),
    https://grassrootsleadership.org/sites/default/files/uploads/gli_v._df
    ps_final_judgment.pdf; .................................................................................... 20

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238 (1980) ........................................................................................... 8

**Statutes**

8 U.S.C. § 1232(c)(2)(A) ........................................................................................ 8

American Immigration Council. A Guide to Children Arriving at the
    Border: Laws ................................................................................................... 12

**Other Authorities**

8 C.F.R. § 236(d)(1) ............................................................................................... 9

8 C.F.R. § 236.3(b)(5) ............................................................................................ 7

8 C.F.R. § 236.3(b)(11) .......................................................................................... 5

8 C.F.R. § 236.3(h) ............................................................................................ 4, 5

8 C.F.R. § 236.3(j) .................................................................................................. 3

8 C.F.R. § 236.3(j)(4) ............................................................................................. 4

8 C.F.R. § 236.3(j)(5) ............................................................................................. 4

45 C.F.R. § 410.810(a) ........................................................................................... 8

45 C.F.R. § 410.810(b) ........................................................................................... 8

45 C.F.R. § 410.810(c) ................................................................ 8

84 Fed. Reg. 44,392 (Aug. 23, 2019) ........................................... *passim*

## I.  **Introduction**

This matter arises from the Trump Administration's effort to abandon the protections guaranteed children under the Flores Settlement Agreement "FSA". *Flores v. Reno*, Case No. CV 85-4544-RJK(Px) (C.D. Cal. filed Jan. 17, 1997).[1] Expressing disagreement with various court decisions implementing the FSA and ignoring the recommendations of its own DHS advisory committee ("Advisory Committee") that "detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children," 84 Fed. Reg. at 44,503, the Administration's Rule seeks to expand the detention of children and to do so indefinitely.[2] In other words, according to the Administration's own experts, its Rule is directly contrary to the best interests of children.

The primary purpose of the FSA is to protect immigrant children from harm. Indeed, the FSA explicitly states that the Administration is required to treat "all [children] in its custody with dignity, respect and special concern for their particular vulnerability as [children]." FSA ¶ 11. The FSA further emphasizes that detained children should be placed "in the least restrictive setting appropriate to the [child's] age and special needs . . . ." *Id.*

The seminal principles of dignity, respect, and least restrictive setting are also echoed in the FSA's mandates regarding the release of immigrant children. More specifically, the FSA provides that an immigrant child should be released without unreasonable delay. FSA, ¶¶ 14, 18.

Finally, the FSA requires that in the event that a child is to be placed in a "licensed program," such program shall be non-secure and "licensed by an appropriate State agency to provide residential, group, or foster care services for

---

[1] The new rule is: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44,392 (Aug. 23, 2019) ("Rule").

[2] The Rule is in direct violation of the FSA's requirement that the "final regulations shall not be inconsistent with the terms of" the FSA. FSA ¶ 9.

dependent children." FSA ¶ 6. The licensed program must meet all enumerated standards, including that the children must be provided with appropriate medical care, suitable living accommodations (including appropriate food, clothing and grooming items), and educational services. FSA, Ex. 1.

With the current proposal, the Administration seeks to gut the protections of the FSA for vulnerable children, in violation of the FSA itself. Rather than implementing the humane approach of the FSA to care for children seeking safety, the Rule confines these children for an indefinite period of time in "secure facilities" — a euphemism for a prison-like structure. These facilities would be licensed and overseen by the same federal agencies that have decisively demonstrated their widely-condemned methods of "caring" for these children. In addition, children in custody face a constant risk under the Rule of having their status changed to their immediate detriment.

The present situation under the FSA is barely tolerable for children. The Rule will make things much worse, with more children detained for longer periods of time under materially worse conditions. The Rule is not in the best interests of these children.

## II.   The *Amici* And Their Interests In The Case

The American Academy of Child and Adolescent Psychiatry ("*Amicus* 1"), the American Academy of Pediatrics ("*Amicus* 2"), the American Academy of Pediatrics, California ("*Amicus* 3"), the American Federation of Teachers ("*Amicus* 4"), the American Medical Association ("*Amicus* 5"), the American Professional Society on the Abuse of Children ("*Amicus* 6"), the American Psychiatric Association ("*Amicus* 7"), the American Psychoanalytic Association ("*Amicus* 8"), the California American Professional Society on the Abuse of Children ("*Amicus* 9"), the Center for Law and Social Policy ("*Amicus* 10"), the Children's Defense Fund ("*Amicus* 11"), the Lutheran Immigration and Refugee Service ("*Amicus* 12"), the National Association of Social Workers ("*Amicus* 13"), the National Education

Association ("*Amicus* 14"), the Texas Pediatric Society ("*Amicus* 15"), the Women's Refugee Commission ("*Amicus* 16"), together with First Focus on Children ("*Amicus* 17"), Save the Children Action Network, Inc. ("*Amicus* 18"), Save the Children Federation, Inc. ("*Amicus* 19"), United States Fund for UNICEF ("*Amicus* 20"), and ZERO TO THREE ("*Amicus* 21"), as organizations committed to the care, health, well-being, and welfare of immigrant children in the United States, respectfully submit this brief, as *amici curiae*, in support of Plaintiffs' opposition to the Rule.

*Amicus* 1, *Amicus* 2, *Amicus* 3, *Amicus* 4, *Amicus* 5, *Amicus* 6, *Amicus* 7, *Amicus* 8, *Amicus* 9, *Amicus* 13, *Amicus* 14, and *Amicus* 15 are non-profit professional organizations that are dedicated to the health, care, well-being, and treatment of children. *Amicus* 10, *Amicus* 11, *Amicus* 17, *Amicus* 18, *Amicus* 19, and *Amicus* 21 are national, non-profit organizations that focus on advancing policy solutions for children and families. *Amicus* 12, *Amicus* 16, and *Amicus* 20 are national, non-profit organizations that focus on the general welfare of children. Full statements on each *amicus* are included as Exhibit 1 to the Declaration of John Purcell. Formal comments submitted by certain of the *amici* during the proposed rule's comment period are included as Exhibit 2 to the Declaration of John Purcell.

## III.   Summary Of Deviations From FSA

### A.   *The Rule Directly Harms Children By Eliminating Defendant's Duty To Release Immigrant Children To Their Families As Required By The FSA.*

The Rule eliminates the Administration's duty to release accompanied children to family members in the community. Eliminating this requirement will result in significant short and long-term harm to children through the continued detention of children who would have otherwise been released.

Under 8 C.F.R. § 236.3(j), once DHS has determined detention is unnecessary to secure an accompanied child's attendance at immigration proceedings or to protect the child's safety, DHS "will make prompt and continuous efforts to release the

[child] to [a] parent or legal guardian." 8 C.F.R. § 236.3(j)(5).[3] However, the Rule states that where an accompanied child's parents are also detained, DHS's policy is to "maintain family unity" by "detaining families together." 8 C.F.R. § 236.3(h). DHS has also relieved itself of its duty to release accompanied children to *any* of their adult family members (sibling, aunt, uncle, or grandparent) listed in the FSA. Instead, 8 C.F.R. § 236.3(j)(5) states that "[r]elease of a [child] who is not a [unaccompanied child] to an adult relative other than a parent or legal guardian is within the unreviewable discretion of DHS." 8 C.F.R. § 236.3(j)(5). Thus, the Administration seeks to hedge its duty to release an immigrant child to an adult relative; rather such release purports to be unreviewable (and unlikely) given the Administration's preference for detaining children with their parents. However, neither the FSA, nor basic due process, allows the Administration to deny such release subject only to the "unreviewable discretion of DHS."

### B. *Release Will Be In DHS Discretion And It Is Likely That Children Will Be Indefinitely Detained Or Be Released And Separated From Their Accompanying Parent Remaining In Detention.*

Moreover, DHS has also granted itself unreviewable discretion to make determinations as to whether the detention of an accompanied child is required either to secure his or her timely appearance or to ensure the child's safety. 8 C.F.R. § 236.3(j)(4). Such determinations may be based on "any . . . probative information," including aggregate and historical data, officer experience, and statistical information even though DHS officers have little or no experience in child welfare and statistical data should never decide the fate of an individual child in custody. Significantly, the determinations are in the unreviewable discretion of DHS. Such unlimited discretion

---

[3] Notably, this language too is a diminution of DHS's responsibility under the FSA, which categorically requires the release of immigrant children to an approved custodian without unnecessary delay. *See* FSA ¶ 14.

affords DHS the authority to determine that detention is *always* necessary to secure timely appearance or ensure a child's safety.

Finally, if an accompanied child is not released, he or she "shall remain in DHS detention . . . until such time as release can be effected or until the [child's] immigration proceedings are concluded, whichever occurs earlier." 84 Fed. Reg. at 44,527. The interaction of 236.3(j)(4) and (5) and 236.3(h) make likely this outcome of the Rule for accompanied children: DHS will detain them indefinitely rather than release them to adult relatives who are willing and able to care for them. Or, in a clear contradiction to the purpose of the FSA, would permit the release of children to family while leaving their accompanying parent behind in immigration detention.

## C. <u>Under The Rule, The Facilities Will Be Self-Licensed, Overseen By Parties Hired By And Accountable Solely To The Administration, And Will Result In Materially Worse Conditions For Children.</u>

The facilities authorized to house immigrant children in the Rule will not meet the least restrictive setting requirement or the licensing requirements under the FSA.

### 1. *Immigrant Children Likely Will Be Detained In Prison-like Conditions In Violation Of The Least Restrictive Environment Requirement.*

The Administration's definition of "non-secure" in the Rule will indiscriminately allow them to detain children in the same types of facilities used to house convicted criminals: a facility is "non-secure" so long as "egress from a portion of the facility's building is not prohibited through internal locks within the building or exterior locks and egress from the facility's premises is not prohibited through secure fencing around the perimeter of the building." 84 Fed. Reg. at 44,526. Defendants could therefore entirely prohibit egress from a facility's detention area through internal locks, yet would call the facility "non-secure" so long as one part— a reception area, for example—is unlocked. *See* 8 C.F.R. § 236.3(b)(11).

2. *Immigrant Children Will Be Placed In Self-Licensed Facilities In Violation Of The FSA.*

The FSA requires a licensed program that accepts custody of immigrant children to be "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs [children]." FSA ¶ 6. In a major shift, the Rule exenterates the state licensing requirement to which accompanied children are entitled under the FSA. Instead, DHS will be able to detain children in facilities that are not licensed by any state child welfare agencies, and a third-party retained by DHS will be paid to certify Immigration and Customs Enforcement ("ICE") detention centers' compliance with DHS standards. However, DHS's inability to comply with the requirements of the FSA is well-known. Gutting these requirements by removing the state licensing mandate will result in materially worse conditions for children.

**D.** **_The Rule's New Definitions Of Influx And Emergency Will Result In Longer Periods Of Detention._**

1. *The Rule's Definition Of "Influx" Is Based On Outdated Data And Would Permit DHS To Operate In A De Facto Permanent State Of Influx.*

In defining "influx" as "more than 130 . . . children eligible for placement in a licensed facility," 84 Fed. Reg. at 44,526, the Rule fails to account for the increase in the number of unaccompanied children arriving annually or DHS's expanded operations since the FSA became effective in 1997. For example, in 1997, the number of juvenile shelter beds INS operated was 131, and so "influx" was naturally defined as more than 130 children. But from 1997 to 2000 alone, the number of juvenile shelter beds INS operated increased from 131 to 400.[4]

---

[4] https://oig.justice.gov/reports/INS/e0109/exec.htm.

Because DHS itself admits that it regularly has 130 children eligible for placement in licensed facilities, the Rule's definitions allow it to operate at a constant state of influx under relaxed standards.[5] The new definition of "influx" allows "as expeditiously as possible" to become the default for placing unaccompanied children and permits less stringent standards related to transfers and services.

> 2.    *The Rule's Definition Of "Emergency" Replaces Specified Time Frames With Vague Language Open To Broad Interpretation.*

The FSA defines an "emergency" as acts or events preventing placement of children within specified time periods. The Rule materially changes that definition to "an act or an event that prevents timely transport or placement of a [child], or could delay compliance with or temporarily excuse compliance with other provisions of the proposed rule." (84 Fed. Reg. at 44,412; Proposed 8 C.F.R. § 236.3(b)(5)). This fluid definition would excuse compliance with core FSA principles, such as timely providing food to a child, based on DHS's discretion and convenience.

In sum, the broad definitions in the Rule allow for so much discretion that they effectively convert the FSA's exceptions in the event of an emergency or influx into the default rule.

**E.    *The Rule Abrogates Immigrant Children's Due Process Rights.***

> 1.    *The Rule Deprives Immigrant Children Of Critical Rights At Bond Hearings.*

The FSA provides that a child in deportation proceedings "shall be afforded a bond redetermination hearing before an immigration judge . . . ."[6] The Rule, however, provides for a hearing before "an independent hearing officer employed by HHS," who will "determine, through a written decision, whether the [unaccompanied child]

---

[5] U.S. Department of Homeland Security and U.S. Department of Health and Human Services, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," 84 Fed. Reg. at 44,422-23

[6] FSA ¶ 24 A.

would present a risk of danger to the community or risk of flight if released."[7] Due process requires that unaccompanied children are provided, among other things, a meaningful opportunity to be heard before a neutral, independent arbiter.[8] Instead of providing an unaccompanied child with the opportunity to be heard by a neutral arbiter, the Rule provides that the unaccompanied child is subject to review by an HHS employee who is tasked with reviewing the decision of the agency by which he or she is employed. Courts have determined that similar procedures are in violation of due process.[9]

Furthermore, the Rule places the burden on the unaccompanied child "to show that he or she will not be a danger to the community or flight risk if released, using a preponderance of the evidence standard."[10] The unaccompanied child must also provide for his or her own counsel.[11] Imposing these burdens upon an unaccompanied child dramatically increases the chances that the child will be detained for long periods or deported without a proper legal hearing.[12]

> 2. *The Rule Inhibits The Ability Of Children To Meaningfully Participate In Court Proceedings And Strips Children Of Critical Protections.*

The Rule implements a scheme of re-evaluation of an immigrant child's status and provides that an immigrant child may lose his or her status upon the occurrence of certain events, thereby increasing the level of instability and uncertainty for those designated as unaccompanied children. More specifically, the Rule provides that a child who has previously been designated as an unaccompanied child undergo a

---

[7] 84 Fed. Reg. at 44,535; 45 C.F.R. § 410.810(a).

[8] *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

[9] *See, e.g., Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016).

[10] 84 Fed. Reg. at 44,535; 45 C.F.R. § 410.810(b).

[11] 84 Fed. Reg. at 44,535; 45 C.F.R. § 410.810(c).

[12] FSA ¶ 11; 8 U.S.C. § 1232(c)(2)(A).

Arent Fox LLP
Attorneys At Law
Los Angeles

redetermination process upon each contact with immigration officials, including when the immigrant child is encountered or apprehended and prior to the child's detention or release.[13] Such a system deprives the child of due process — the child will not know what rules to rely on because DHS may strip their legal protections upon re-evaluation in each encounter.

## IV. The Rule Will Have A Devastating Impact For Immigrant Children.

The asylum court process can take anywhere from six months to a few years.[14] Given the present court backlog, the time is generally years and not months. Therefore, under the Rule children are quite likely to be in federal detention centers for years.[15] The overwhelming scientific consensus in the child welfare, medical, pediatric, psychiatric, and educational professional communities, including all of the *amici curiae*, is that such long term detention would have an extremely significant negative impact on the physical, mental, and emotional health of detained children.

### A. *The Rule Ignores Humane Alternatives To Long-Term Detention.*

There is a humane alternative to the long-term detention of children with their parents in prison-like conditions. Following an increase in the number of families arriving in the United States in 2014, DHS introduced a pilot program in 2016 known as the Family Case Management Program ("FCMP"). The FCMP operated from January 2016 to June 2017 with 952 families across five major cities. The FCMP solely served families seeking asylum and used research-based individualized case management and partnerships with community-based organizations to give families in the program a deep understanding of the immigration process to encourage their compliance with U.S. immigration law.[16]

---

[13] 84 Fed. Reg. at 44,426, 44,526; 8 C.F.R. § 236(d)(1).

[14] https://immigrationforum.org/article/fact-sheet-u-s-asylum-process/

[15] *Id.*

[16] Women's Refugee Commission, Backgrounder: Family Case Management Program, 2018.

The FCMP was successful at ensuring compliance at a low cost. Of the program's participants, 99.3 percent attended their immigration court hearings and 99.4 percent attended their appointments with ICE.[17] Some of the participants were granted immigration relief including asylum, while others were ordered removed. Importantly, those who were ordered removed complied with their removal. The FCMP achieved extremely high rates of compliance at much lower costs than family detention. Detaining families in DHS facilities costs nearly $320 per person per day.[18] But, the FCMP costs $38 per day per family unit. Thus, the cost to detain a family of three for twenty days is more than twenty-five times the cost to enroll them in the FCMP.[19]

Similar programs offered through non-profit organizations and *amici* provide similar results. For example, between June 2013 and November 2014, 44 out of 46 formal referrals to the Lutheran Immigration and Refugee Services Community Support initiative were in complete compliance—an appearance rate of 95.6 percent. These holistic programs that offer case management services, and facilitate access to legal counsel as well as safe, affordable housing have been shown to substantially increase program compliance without the extensive and expensive use of electronic monitoring.[20]

---

https://www.womensrefugeecommission.org/rights/resources/1653-family-case-management-program

[17] *Id*.

[18] Department of Homeland Security, Budget Overview FY 2019, U.S. Immigration and Customs Enforcement, https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf.

[19] Women's Refugee Commission, Backgrounder: Family Case Management Program, 2018. https://www.womensrefugeecommission.org/rights/resources/1653-family-case-management-program

[20] *See* Zero to Three Comments on the Notice of Proposed Rulemaking to Apprehension Processing, Care, and Custody of Alien Minors and Unaccompanied

**B.**      **The Rule Is In Direct Conflict With The Findings Of DHS's Own Advisory Committee On Family Residential Centers.**

Not only are the Rule's provisions allowing for indefinite detention inconsistent with the FSA, they are also in direct conflict with findings of DHS's own ICE Advisory Committee on Family Residential Centers.

The Advisory Committee, composed of independent subject-matter experts, was established on July 24, 2015 and tasked with providing advice and recommendations to the Secretary of DHS through the Assistant Secretary for ICE on "matters concerning ICE's family residential centers."[21] On October 7, 2016, the Advisory Committee released a report and stated: "our overarching recommendation is for DHS simply [to] avoid detaining families."[22] The Advisory Committee recommended that "DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management or detention, is never in the best interest of children."[23]

The Advisory Committee's conclusions and recommendations were supported by several findings that detention exposes children to harm and therefore is not in the best interests of children. Indeed, the Advisory Committee noted that ICE's family residential standards were remarkably similar to standards developed by the

---

Alien Children, DHS Dkt. ICEB 2018-002, at 4 (Nov. 6, 2018); United States Government Accountability Office. (2014). *Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness*, http://www.gao.gov/assets/670/666911.pdf

[21] Rep. of the DHS Advisory Comm. on Family Residential Ctrs., "Final Report" (2016), at 1 (Introduction)

[22] *Id*. at 1 (Decisions to Detain and Release)

[23] *Id*.

Arent Fox LLP
Attorneys At Law
Los Angeles

American Correctional Association for adult criminal defendants incarcerated pretrial, in violation of ICE's statutory mandate as well as case law.[24]

In the face of these findings from its own Advisory Committee stating that the "best interests of the child … should favor release of the whole family together as soon as possible," the Government seeks not to use effective alternatives to detention or even to mitigate the risk of harm to children, but instead to increase the detention of children. The Rule is thus contrary to the explicit and unequivocal conclusions made by DHS's very own Advisory Committee.

### C. *Detention Is Inherently Harmful To Children's Mental And Physical Health*

Detention of children is a global issue condemned by respected human rights and professional organizations both within and beyond the United States.[25]

---

[24] *Id*. at 22-23.

[25] American Academy of Pediatrics Detention of Immigrant Children at 6; American Immigration Council. A Guide to Children Arriving at the Border: Laws, Policies and Responses (2015), https://www.americanimmigrationcouncil.org/research/guide-children-arriving-border-laws-policies-and-responses; CARA Family Detention Pro Bono Project. Letter of complaint from CARA to Office of Civil Rights and Civil Liberties and Office of Inspector General, Department of Homeland Security, Washington DC, March 28, 2016; AILA doc. no. 16032961,www.aila.org/advo-media/press-releases/ 2016/cara-crcl-complaint-concerns-regarding- detention; Lutheran Immigration and Refugee Service; The Women's Refugee Values, Again. Baltimore, MD: Lutheran Immigration and Refugee Service; 2014, https://www.speakcdn.com/assets/2474/lirswrc_lockingupfamilyvaluesagain_report_141114.pdf; Society for Community Research and Action Division 27 of the American Psychological Association. Policy statement on the incarceration of undocumented migrant families. Am J Community Psychol. 2016;57(1–2):255–263; UN Human Rights, *UN Experts to US: "Release Migrant Children from Detention and Stop Using them to Deter Irregular Migration"*, https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=23245&LangID=E; UN Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families (CMW), Joint general comment No. 4 (2017) of the Committee on the Protection of the Rights of All Migrant Workers

Overwhelmingly, medical research shows that even a short amount of time in detention is seriously harmful to children, particularly those who have already experienced trauma in their home countries or during their journey to the United States.[26] Studies of detained immigrants have found negative physical and emotional symptoms among detained children, including anxiety, depression and post-traumatic stress disorder.[27] At least one domestic study of children detained at the southwestern border of the United States confirms this body of research. Dr. Luis Zayas, a child mental health expert, evaluated nearly 50 children and mothers in multiple detention centers and found extremely high levels of anxiety, depression, suicide attempts, and regressions in child development.[28] These regressions include

---

and Members of Their Families and No. 23 (2017) of the Committee on the Rights of the Child on State obligations regarding the human rights of children in the context of international migration in countries of origin, transit, destination and return, November 16, 2017, CMW/C/GC/4-CRC/C/GC/23, https://www.refworld.org/docid/5a12942a2b.html, pages 2-4.

[26] *See* Zero to Three Comments at 3 & n.iii, Triggs, G. (2015) (citing The Forgotten Children: National Inquiry into Children in Immigration Detention 2014. The Medical Journal of Australia, 202(11), 553-555. Doi:10.5694/mja15.00551). Children in detention have also shown regression in child development, high levels of anxiety and depression, and suicide attempts. *Id.* at 3 (citing Acer, E., Byrne, O. (2015). Family Detention: Still Happening, Still Damaging. Human Rights First. http://www.humanrightsfirst.org/sites/default/files/HRF-family-detention-still-happening.pdf); *See* AAP, LIRS and Young Center Expert Letter at 2 (citing Linton JM, Griffin M, Shapiro AJ Detention of Immigrant Children. Pediatrics. 2017;139(5)); Society for Community Research and Action, Division 27 of the American Psychological Association, Policy Statement on the Incarceration of Undocumented Migrant Families. Am. J. Community Psychol. (2016)57:255–263.

[27] American Academy of Pediatrics Detention of Immigrant Children, at 6& nn. 55–57; Von Werthern M, Robjant K, Chui Z, Schon R, Ottisova L, Mason C, Katona C. The impact of immigration detention on mental health: a systematic review. *BMC Psychiatry* 2018;18:382.

[28] Claire Hutkins Seda, Dr. Luis Zayas Provides Testimony on Family Detention, Migrant Clinicians Network, 2015,

declines in language development, impaired cognitive development, bed wetting, decreased eating, sleep disturbances, social withdrawal, and aggression.[29]

Even brief periods of detention impact children's functioning, and worsening mental health symptoms increase the longer a child is in detention.[30] Prolonged detention has been shown to exacerbate trauma and its negative impacts, too: children in detention are ten (10) times more likely to develop post-traumatic stress disorder than adults, and their symptoms become increasingly common the longer a child is in detention.[31] Parents in detention centers have described regressive behavioral changes in their children, including decreased eating, sleep disturbances, clinginess, withdrawal, self-injurious behavior, and aggression.[32]

Detention is inappropriate and profoundly harmful for children of any age. It is particularly damaging to young children due to their particular needs for safe and

---

http://www.migrantclinician.org/blog/2015/jul/dr.-luis-zayas-provides-testimony-family-detention.html.

[29] Megan J. Wolff, Fact Sheet: The Impact of Family Detention on Children, 2018, http://psych-history.weill.cornell.edu/pdf/Family_Detention_Sheet.pdf ; American Academy of Pediatrics, Detention of Immigrant Children, at 6, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483

[30] See Zero to Three Comments at 3 & n.v (citing Mares, S. (2015), Fifteen years of detaining children who seek asylum in Australia – Evidence and consequences, Australian Psychiatry, 24(1), 1-14. Doi: 10.1177/1039856215620029).

[31] Australian Human Rights Commission, The Forgotten Children: National Inquiry on Immigrant Children in Detention, 2014, https://www.humanrights.gov.au/our-work/asylum-seekers-and-refugees/publications/forgotten-children-national-inquiry-children

[32] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, Policy Statement: Detention of Immigrant Children, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

stimulating environments in which to learn and grow, and the fact that the first years of a child's life are of paramount importance to their later success and well-being.[33]

Sending infants and toddlers, even with their parents, to institutional detention is profoundly destructive to the health and well-being of a young child. Decades of research in child development clearly show that physical and social environments have a significant impact on children's healthy development.[34] A baby's brain makes more than one million neural connections every second, growing faster than at any point later in their life. These connections are shaped by their experiences—both positive and negative—and the consequent level of harmful stress in their lives. For young children, exposure to an environment such as detention or jailing is actively detrimental to their growth and development.[35] Early childhood trauma has severe implications for both physical and emotional health over time, increasing young children's risk for learning difficulties, problems forming relationships, and adult health problems.[36]

In light of this overwhelming body of research regarding the detention of children, it is unsurprising that the American Medical Association, the American

---

[33] Harvard University, Center on the Developing Child, In Brief: Early Childhood Mental Health, 2013, https://developingchild.harvard.edu/resources/inbrief-early-childhood-mental-health/.

[34] *See* Zero to Three Comments at 3-4 & n.xii; (citing Felitti, V. J., Anda, R.F., Nordenberg, D., Williamson, D.F., Spitz, A.M., Edwards, V. et. al. (1998). Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults. American Journal of Preventative Medicine, 14(4), 245-258. Doi:10.1016/s0749-3797(98)00017-8).

[35] *See* Zero to Three Comments, at 2 & n.ii (citing Mares, S. (2015), Fifteen years of detaining children who seek asylum in Australia – Evidence and consequences, Australian Psychiatry, 24(1), 1-14. Doi: 10.1177/1039856215620029).

[36] *See* Zero to Three Comments at 4 & n. xiii (citing Fillmore, E. (2010). The Effects of Immigration Detention on the Health of Children and Families in the UK. Adoption & Fostering, 34(1), 88-91. Doi:10.1177/030857591003400112).

Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, the American College of Physicians, the American Psychological Association, the American Academy of Family Physicians, and the National Association of Social Workers have all publicly and strongly advocated for the end to family and child detention.

In 2018, the American College of Physicians released a policy stating that forced family detention—indefinitely holding children and their parents, or children and their other primary adult family caregivers, in government detention centers until the adults' immigration status is resolved—can be expected to result in considerable adverse harm to the detained children and other family members, including physical and mental health, that may follow them through their entire lives, and accordingly should not be implemented by the U.S. government.[37]

The American Psychiatric Association likewise recommends that "the maximum period of detention for children and their parents not go beyond the [FSA's] current limit of 20 days and that every effort be made to minimize the number of days spent by families in detention to decrease the negative consequences of detention for this vulnerable population."[38] The American Psychiatric Association recommends such limits because:

---

[37] American College of Physicians, The Health Impact of Family Detentions in Immigration Cases, July 3, 2018, https://www.acponline.org/acp_policy/policies/family_detention_position_statement_2018.pdf; American Academy of Pediatrics, Policy Statement: Detention of Immigrant Children, 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483;

[38] American Psychiatric Association, Comments in Response to Proposed Rulemaking: Apprehension, Processing, Care and Custody of Alien Minors and Unaccompanied Alien Children, at 2 (Nov. 6, 2018).

A substantial body of research links the trauma of childhood detention with lasting adverse outcomes, including an increased risk of mental illness, such as depression, anxiety, and post-traumatic stress disorder.[39] … These migration-related and post migration stressors can produce demoralization, grief, loneliness, loss of dignity, and feelings of helplessness as normal syndromes of distress that impede refugees from living healthy and productive lives.[40], [41]. It is critical that children remain with their parents, but this will not eliminate the risk of trauma. Prolongation of these families' detention will compound the already significant mental health consequences they face.[42]

The American Academy of Pediatrics also strongly opposes detaining children. "DHS detention facilities are not appropriate places for children … [because] even short periods of detention can cause psychological trauma and long-term mental health risks for children. Studies of detained immigrants have shown that

---

[39] *Id*. (citing Felitti, Vincent J et al. Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults. American Journal of Preventive Medicine, Volume 14, Issue 4, 245 – 258).

[40] *Id*. (citing Al-Krenawi, A., Lev-Wiesel, R., & Sehwail, M. (2007). Psychological symptomatology among Palestinian children living with political violence. Child and Adolescent Mental Health 12:27–31).

[41] *Id*. (citing Fernando, G.A., Miller, K.E., & Berger, D.E. (2010). Growing pains: the impact of disaster-related and daily stressors on the psychological and psychosocial functioning of youth in Sri Lanka. Child Development 81:1192-1210).

[42] *Id*. at 2.

1  children and parents may suffer negative physical and emotional symptoms from
2  detention, including anxiety, depression and post-traumatic stress disorder."[43]

3      The Administration disregarded the medical community's broad consensus as
4  well as DHS Advisory Committee on Family Residential Centers ("FRCs"), which
5  found in 2016 that appropriate standards of care for children and families are simply
6  impossible within the context of family detention and that detention or the separation
7  of families for purposes of immigration enforcement or management are never in the
8  best interest of children.[44]

9      **D.**     ***Federal Detention Facilities' Conditions Seriously Compound The***
10             ***Harm Inherent In Detention.***

11      Further compounding the risks to children's well-being, families in detention
12  face inadequate access to critical services including the medical and mental health
13  care they so desperately need. Children and families, babies and expectant mothers
14  in particular, need specialized medical and mental health services in order to ensure
15  healthy growth and development. Family residential facilities have consistently
16  failed to recruit adequate health staff including pediatricians, child and adolescent
17  psychiatrists, and pediatric nurses. Families released to non-custodial programs have
18  access to providers based in the community, but in detention their access to qualified

19

20

21
_____

22  [43] American Academy of Pediatrics Comments to DHS Dkt. No. ICEB. 2018-002,
23  Proposal Rulemaking: Apprehension, Processing Care, and Custody of Alien Minors
    and Unaccompanied Alien Children, at 7 (Nov. 5, 2018) (citing Julie M. Linton,
24  Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, Policy Statement:
    Detention        of        Immigrant        Children,        Apr.        2017,
25  http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483)).

26  [44] Immigration and Customs Enforcement, Report of the DHS Advisory Committee
27  on        Family        Residential        Centers,        2016,
    https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-
28  16093.pdf.

medical and mental health care professionals has been demonstrated to be severely limited.[45]

Visits to family detention centers by pediatric and mental health advocates have revealed discrepancies between the standards outlined by ICE and the actual services provided, including inadequate or inappropriate immunizations, delayed medical care, inadequate education services, and limited mental health services.[46]

Other reports from physicians providing medical care at immigration facilities describe prison-like conditions; inconsistent access to quality medical, dental, or mental health care.[47]

Two physicians from within DHS' own Office of Civil Rights and Civil Liberties found serious compliance issues in DHS-run facilities resulting in "imminent risk of significant mental health and medical harm."[48] The physicians were so alarmed, they sent a whistleblower letter to the Senate Whistleblowing Caucus. The DHS physicians stated that because of the intrinsic harm associated with detaining children, "there is no amount of programming that can ameliorate the harms created by the very act of confining children to detention centers. Detention of

---

[45] *See* Zero to Three Comments at 3.

[46] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, Policy Statement: Detention of Immigrant Children, Apr. 2017, at 5, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

[47] *See* American Medical Association, "AMA Adopts New Policies to Improve Health of Immigrants and Refugees," June 12, 2017, https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees. *See also* American Academy of Pediatrics Flores Comments at 8; Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, Policy Statement: Detention of Immigrant Children, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483

[48] Letter from Dr. Scott Allen and Dr. Pamela McPherson to the Honorable Charles Grassley and the Honorable Ron Wyden, July 17, 2018, at 3, https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf

innocent children should never occur in a civilized society, especially if there are less restrictive options, because the risk of harm to children simply cannot be justified." *Id*. at 2.

There are numerous examples of children being held in prisonlike conditions. In late 2015, the Texas Department of Family Protective Services introduced a regulation called the "FRC rule" that would allow the Dilley Detention Center to detain children while exempt from statewide health and safety standards. In June 2016, a judge ruled that such an exemption could put children at risk of abuse, particularly due to shared sleeping spaces with non-related adults. In December 2016, that decision was upheld by a federal judge.[49]

In its 2016 testimony on the Karnes County Residential Center (GEO Group)'s application for licensure under the Texas Department of Family and Protective Services as a General Residential Operation and Emergency Care Service Facility, the Texas Pediatric Society (TPS) found, "prison-like settings [such as those present at Karnes] do not aid in the healthy upbringing and development of children or enable their families to provide [the] best quality of care to their children." TPS testified that granting state licensure to a facility like Karnes would do the opposite of what state statute requires of such facilities – it would limit a child's opportunity for meaningful social interaction. Additionally, TPS found a lack of trauma-informed, mental health resources in the [rural] Karnes community and the intrinsic nature of these facilities

---

[49] American Academy of Pediatrics Flores Comments at 5; Alexa Garcia-Ditta, *Judge Halts Child Care License for Dilley Detention Center*, Texas Observer, June 2, 2016, https://www.texasobserver.org/immigrant-family-detention-license-hold/; , Final Judgement, D-1-GN-15-004336 *Grassroots Leadership v. Texas Dep't of Family and Protective Servs.*, (District Court of Travis County 2016), https://grassrootsleadership.org/sites/default/files/uploads/gli_v._dfps_final_judgment.pdf; Representative Lucille Roybal-Allard, Representative Pramila Jayapal, *In ICE Detention Pregnant Women Face Stress, Trauma, and Inadequate Care*, The Hill, Apr. 25, 2018, https://thehill.com/blogs/congress-blog/homeland-security/384602-in-ice-detention-pregnant-women-face-stress-trauma-and.

as detention centers are not conducive to the emotional and developmental needs of highly traumatized children.[50]

In a recent report on the current state of detention centers, the Office of Inspector General (OIG) found that current audits already, "do not ensure adequate oversight or systemic improvements in detention conditions."[51] The report highlights that the current lenient approach to inspections and onsite monitoring have led to inadequate responses by ICE and inconsistencies in implementing corrective actions. Some examples included facilities failing to notify ICE about alleged, or proven sexual assaults, or not allowing detainees to participate in recreation as required. It is therefore, particularly disturbing for DHS to plan to subject children to indefinite confinement in facilities that will be seriously detrimental to their health.

**E.      _The Rule Will Have A Devastating Impact On The Educational Development Of The Detained Children._**

The Rule will also have a devastating impact on the educational development of the detained children. Studies show that detained children face heightened barriers to learning. More specifically, these children display regression in language development and impaired cognitive development due to the persistent stress and substantial exposure to fear, labeled as "toxic stress."[52] Toxic stress has been shown

---

[50] American Academy of Pediatrics Flores Comments at 5; Joyce Elizabeth Mauk, MD, Testimony on Public Hearing for Karnes County Residential Center, Apr. 13, 2016, https://www.aap.org/en-us/advocacy-and-policy/state-advocacy/Documents/Testimony%20on%20GEO%20Detention%20Facility%20Karnes.pdf.

[51] Dept. of Homeland Security Office of Inspector General, ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements, OIG-18-67 (June 26, 2018),

https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[52] Megan J. Wolff, _Fact Sheet: The Impact of Family Detention on Children, 2018_, http://psych-history.weill.cornell.edu/pdf/Family_Detention_Sheet.pdf; Julie M. Linton, Marsha Griffin, Alan J. Shapiro, _Detention of Immigrant Children_, American

to interfere with the physical brain development of a child.[53] This can lead to developmental delays, potentially affecting the child's future performance at school.[54] Other experts have determined that exposure to this type of stress can have lifelong consequences for a child in terms of his or her educational development and economic productivity.[55] This is due, in part, to the fact that the detained child will experience physiological and psychological effects associated with toxic stress, for example, post-traumatic stress.[56] These effects are likely to significantly impair a child's ability to learn.[57]

Other studies show that children who are detained during critical years of their development are exposed to additional risks in terms of their education. More specifically, these studies show that children aged two to four in detention who lack access to preschool services face learning and development consequences at this

---

Academy of Pediatrics, 2017, at 2, https://pediatrics.aappublications.org/content/pediatrics/139/5/e20170483.full.pdf.

[53] Shonkoff, J.P., Garner A.S., AAP Committee on Psychosocial Aspects of Child and Family Health, et al. *The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, Pediatrics 2012; 129;e232, https://pediatrics.aappublications.org/content/pediatrics/129/1/e232.full.pdf.

[54] Dudley M, Steels Z, Mares S, Newman L. *Children and young people in immigration detention*, Curr Opin Psychiatry, 2012;25(4):285-292.

[55] American Academy of Pediatrics, *Letter to Secretary Johnson*, https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAP%20Letter%20to%20Secretary%20Johnson%20Family%20Detention%20Final.pdf.

[56] Dudley M, Steels Z, Mares S, Newman L. *Children and young people in immigration detention*, Curr Opin Psychiatry, 2012;25(4):285-292.

[57] *Id*.; K Robjant et al., *Mental Health Implications of Detaining Asylum Seekers: Systematic Review*, 194(4) Brit. J. of Psychiatry 306-312 (2009), https://pdfs.semanticscholar.org/ad17/2e7c889a6e3ccab263ab1e12909d41f6cd2b.pdf?_ga=2.139782069.788147620.1566760224-784155949.1566760224.

critical stage of brain development.[58] This risk persists when detained children are in their primary school age.[59] These children experience negative impacts on their learning due to the lack of school education, which has long term impacts on their cognitive development and academic progress.[60] The aforementioned findings are particularly concerning where the Rule does not explain how the federal government will provide "[e]ducational services appropriate to the child's level of development in a structured classroom setting," as required by the FSA. 84 Fed. Reg. at 44,440.

In sum, the Rule will deprive detained children of the opportunity to reach their full developmental and academic potential by increasing their exposure to toxic stress and restricting their access to educational programs with supportive norms and structures. This will create a substantial societal cost — those detained children whose education languishes and go on to live in this country will be much less able to contribute to society.

## F.   Detention Erodes The Parent-Child Relationship And Exacerbates The Immense Distress That Children In Detention Already Experience.

The result of the Rule is increased detention of accompanied children and their parents. Though DHS claims that provisions of the Rule would actually "strengthen the stability of the family[,]" 84 Fed. Reg. at 44,503, this assertion is unfounded and unsupported by data or studies. In reality, detention undermines the authority of parents, prevents parents from being able to respond to the needs of their children, and causes greater harm to the well-being of both children and their parents.

---

[58] Australian Human Rights Commission, *The Forgotten Child: National Inquiry into Children in Immigration Detention*, https://www.humanrights.gov.au/sites/default/files/document/publication/forgotten_children_2014.pdf.

[59] *Id.*

[60] *Id.*

Detained parents, who themselves are subject to the authority of DHS and its agents, lose their fundamental autonomy to make independent decisions regarding their children's diet, schedule, sleeping arrangement, discipline, medical care providers, education, and more.[61] In fact, reports indicate that detained parents have been unable to secure proper medical care for their children who had become ill as a result of eating contaminated food.[62] Since parents are unable to fulfill their usual caretaking role, studies show that children become confused by the existence of conflicting authority figures.[63] This interference in the development of the parent-child relationship is particularly disruptive for infants and toddlers.[64]

Research shows that children are impacted by the emotional well-being of their parents.[65] Since most detained adults suffer from mental health issues, including post-traumatic stress disorder and clinical depression, they are unable to adequately comfort and care for their children, and even pass their distress onto their children.[66]

_____

[61] Report of the Advisory Committee on Family Residential Centers, Final Report, at 37, 42 n.98; 2 Family Residential Standards 3.1, 4.3, 4.4, and 4.5.

[62] Eleni Bakst, *Immigration Detention is Making Kids Sick*, Human Rights First, November 22, 2017, https://www.humanrightsfirst.org/blog/immigration-detention-making-kids-sick.

[63] Kronick R, Rousseau C, Cleveland J. Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study. *Am J Orthopsychiatry.* 2015;85(3):287–294.

[64] Jack P. Shonkoff and Deborah A. Phillips, eds., From Neurons to Neighborhoods: The Science of Early Childhood Development, National Research Council and Institute of Medicine, 2000.

[65] Harvard University, Center on the Developing Child, "Maternal Depression Can Undermine the Development of Young Children."

[66] Janet Cleveland, Cécile Rousseau, and Rachel Kronick, Bill C-4: *The impact of detention and temporary status on asylum seekers' mental health* (Geneva, Switzerland: Global Detention Project, 2012)https://www.globaldetentionproject.org/wp-content/uploads/2016/06/Canada_cleveland.pdf; Rhitu Chatterjee, *Lengthy Detention of Migrant Children May Create Lasting Trauma, Say Researchers*, NPR.

Arent Fox LLP
Attorneys At Law
Los Angeles

This is especially problematic since children in detention are disproportionality exposed to trauma and thus in greater need of parental support, as reports show that children in family detention have been starved, taunted, and even sexually assaulted.[67]

The Administration's claim that the Rule would strengthen the stability of detained families is without merit. Overwhelming authority has concluded that even when families are detained together, the family structure is completely uprooted. This disturbance has both short and long-term negative effects on the mental and physical health of children and their parents.

## V.     <u>Conclusion</u>

The Administration's Rule should not stand. Indeed, the Rule is fatally flawed because there are alternatives to detention that are cheaper, more humane, and equally effective. Moreover, the Rule is fundamentally inconsistent with the FSA and common concepts of basic humanity. Children should not be subject to the harsh treatment that is allowed by the Rule. Families should not be "united" in prison-like facilities that fail to provide basic services, cost far more, and are inimical to physical and mental well-being. Rather, families should live together in our communities while awaiting their legal right to a court hearing. It is in the best interests of children that the Rule be rejected.

---

https://www.npr.org/sections/health-shots/2019/08/23/753757475/lengthy-detention-of-migrant-children-may-create-lasting-trauma-say-researchers.

[67] *See*, *e.g.*, Michael Grabell and Topher Sanders, *Immigrant Youth Shelters: If You're a Predator, It's a Gold Mine*, PROPUBLICA, July 27, 2018, https://www.propublica.org/article/immigrant-youth-shelters-sexual-abusefights-missing-children.

Dated:      August 30, 2019                    **ARENT FOX LLP**


By: /s/ John S. Purcell

JOHN S. PURCELL
DAVID L. DUBROW
JAMES H. HULME
JUSTIN A. GOLDBERG
MOHAMMED T. FAROOQUI
ANDREW DYKENS
MELISSA TRENK
JAKE CHRISTENSEN
**Attorneys for *Amici Curiae***
**The American Academy of Child and
Adolescent Psychiatry ("*Amicus* 1"), the
American Academy of Pediatrics
("*Amicus* 2"), the American Academy of
Pediatrics, California ("*Amicus* 3"), the
American Federation of Teachers
("*Amicus* 4"), the American Medical
Association ("*Amicus* 5"), the American
Professional Society on the Abuse of
Children ("*Amicus* 6"), the American
Psychiatric Association ("*Amicus* 7"),
the American Psychoanalytic
Association ("*Amicus* 8"), the California
American Professional Society on the
Abuse of Children ("*Amicus* 9"), the
Center for Law and Social Policy
("*Amicus* 10"), the Children's Defense
Fund ("*Amicus* 11"), the Lutheran
Immigration and Refugee Service
("*Amicus* 12"), the National Association
of Social Workers ("*Amicus* 13"), the
National Education Association
("*Amicus* 14"), the Texas Pediatric
Society ("*Amicus* 15"), the Women's
Refugee Commission ("*Amicus* 16"),
together with First Focus on Children
("*Amicus* 17"), Save the Children Action
Network, Inc. ("*Amicus* 18"), Save the**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Children Federation, Inc. ("*Amicus* 19"), United States Fund for UNICEF ("*Amicus* 20"), and ZERO TO THREE ("*Amicus* 21").**