JOHN S. PURCELL (SBN 158969)
john.purcell@arentfox.com
DAVID L. DUBROW
david.dubrow@arentfox.com
JAMES H. HULME
james.hulme@arentfox.com
JUSTIN A. GOLDBERG (SBN 293424)
justin.goldberg@arentfox.com
ANDREW DYKENS
andrew.dykens@arentfox.com
MOHAMMED T. FAROOQUI
mohammed.farooqui@arentfox.com
JAKE CHRISTENSEN
jake.christensen@arentfox.com
MELISSA A. TRENK
melissa.trenk@arentfox.com
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, California 90013
Telephone: 213.629.7400
Facsimile:  213.629.7401

Attorneys for *Amici Curiae*
American Academy of Child and Adolescent
Psychiatry, *et al.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM P. BARR, Attorney General of the United States, et al.,<br><br>Defendants. | Case No.  2:85-cv-4544-DMG<br><br>**Declaration of John S. Purcell in support of brief of *Amici Curiae* the American Academy of Child and Adolescent Psychiatry ("*Amicus* 1"), the American Academy of Pediatrics ("*Amicus* 2"), the American Academy of Pediatrics, California ("*Amicus* 3"), the American Federation of Teachers ("*Amicus* 4"), the American Medical Association ("*Amicus* 5"), the American Professional Society on the Abuse of Children ("*Amicus* 6"), the American Psychiatric Association ("*Amicus* 7"), the American Psychoanalytic Association ("*Amicus* 8"), the California American Professional Society on the Abuse of Children ("*Amicus* 9"), the Center for Law and Social Policy ("*Amicus* 10"), the Children's Defense Fund** |

("*Amicus* 11"), the Lutheran
Immigration and Refugee Service
("*Amicus* 12"), the National
Association of Social Workers
("*Amicus* 13"), the National
Education Association ("*Amicus* 14"),
the Texas Pediatric Society ("*Amicus*
15"), and the Women's Refugee
Commission ("*Amicus* 16"), together
with First Focus on Children
("*Amicus* 17"), Save the Children
Action Network, Inc. ("*Amicus* 18"),
Save the Children Federation, Inc.
("*Amicus* 19"), United States Fund for
UNICEF ("*Amicus* 20"), and ZERO
TO THREE ("*Amicus* 21"), in
support of Plaintiffs

I, John S. Purcell, of full age, hereby declare under penalty of perjury that the
following statements are true and correct:

1.   I am a partner in the law firm Arent Fox LLP, and am counsel for
*Amici Curiae* the American Academy of Child and Adolescent Psychiatry, the
American Academy of Pediatrics, the American Academy of Pediatrics, California,
the American Federation of Teachers, the American Medical Association, the
American Professional Society on the Abuse of Children, the American Psychiatric
Association, the American Psychoanalytic Association, the California American
Professional Society on the Abuse of Children, the Center for Law and Social
Policy, the Children's Defense Fund, First Focus on Children, the Lutheran
Immigration and Refugee Service, the National Association of Social Workers, the
National Education Association, the Texas Pediatric Society, Save the Children
Action Network, Inc., Save the Children Federation, Inc., and the Women's
Refugee Commission, together with First Focus on Children, Inc., UNICEF USA,
and ZERO TO THREE (together, "Amici Children's Organizations").

2.   I am an attorney licensed to practice law in the courts of the State of
California and am a member in good standing of the State Bar of California.

1        3.     I submit this Declaration based upon my personal knowledge of the

2 facts set forth herein and in support of the brief of the Amici Children's

3 Organizations in support of Plaintiffs.

4        4.     Attached hereto as Exhibit 1 are true and correct copies of the full

5 statements of interest of each of the Amici Children's Organizations.

6        5.     Attached hereto as Exhibit 2 are true and correct copies of formal

7 comments submitted by certain of the Amici Children's Organizations to the federal

8 government following its publication in the *Federal Register* of the Notice of

9 Proposed Rulemaking that preceded the final rule.

10        I declare under penalty of perjury under the laws of the State of California

11 that the foregoing is true and correct.

12                                                 */s/ John S. Purcell*

13 Dated:  August 30, 2019                  JOHN S. PURCELL

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1
(Amici Statements of Interest)

**FULL STATEMENT OF INTEREST OF *AMICI CURIAE***

*Amicus curiae* the American Academy of Child and Adolescent Psychiatry (AACAP) is a medical membership association established by child and adolescent psychiatrists in 1953. Now over 9,500+ members strong, AACAP is the leading national medical association dedicated to treating and improving the quality of life for the estimated 7-15 million American youth under 18 years of age who are affected by emotional, behavioral, developmental and mental disorders. AACAP's members actively research, evaluate, diagnose, and treat psychiatric disorders, and pride themselves on giving direction to and responding quickly to new developments in addressing the health care needs of children and their families.

*Amicus curiae* the American Academy of Pediatrics (AAP) represents 67,000 primary care pediatricians, pediatric medical subspecialists, and surgical specialists who are committed to the attainment of optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults. AAP believes that the future prosperity and well-being of the United States depends on the health and vitality of all of its children, without exception. Pediatricians know that even short periods of detention can have long-lasting consequences for children, including psychological trauma and mental health risks. There is no evidence that any amount of time in detention is safe for a child. All children—no matter where they or their parents were born—should have the right to access health care, remain united with their families, and pursue a high-quality education.

*Amicus curiae* the American Academy of Pediatrics, California (AAP-CA), is comprised of all California AAP chapters statewide, totaling over 5,000 pediatricians. Together, AAP-CA represents primary care and subspecialty pediatricians across California. The mission of the AAP-CA is to attain optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults in

California, regardless of immigration status. When the pain and suffering of any child is within our power as a community and as a nation to prevent and to mitigate, we must do so. Detention is a sanitized word for the circumstances in which we know many of these children are being held. We join with the AAP in asserting that there is no evidence that any amount of time in detention is safe for a child, and that all children—no matter where they or their parents were born—should have the right to access health care, remain united with their families, and pursue a high-quality education.

*Amicus curiae* the American Federation of Teachers (AFT), AFL-CIO, was founded in 1916 and today represents approximately 1.7 million members. The AFT has a longstanding history of supporting and advocating for the civil rights of its members and the communities they serve. AFT members are teachers and school support staff, nurses and healthcare professionals, and public sector employees who dedicate their lives to providing services to children and their families. AFT members are gravely concerned about the intensely traumatic and disruptive direct effects of long-term detention on immigrant children and their families, as proposed in the final rule, as well as the indirect effects of such detention to those connected in community with them.

*Amicus curiae* the American Medical Association (AMA) is the largest professional association of physicians, residents and medical students in the United States. Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all U.S. physicians, residents and medical students are represented in the AMA's policy making process. AMA members practice in every state and in every medical specialty. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. Families seeking refuge in the United States endure emotional and physical stress, which is only exacerbated when

they are separated from one another or held in family detention facilities during immigration proceedings. Childhood trauma and adverse childhood experiences created by inhumane treatment often create negative health impacts that can last a lifetime. Department of Homeland Security (DHS) family detention practices can result in unacceptable treatment of children and can violate the FSA guidelines. Because of these concerns, the AMA urges the Court to invalidate this final rule and instead give priority to supporting families and protecting the health and well-being of the children within those families.

*Amicus curiae* the American Professional Society on the Abuse of Children (APSAC) is the leading multi-disciplinary national organization for professionals serving children and families affected by child maltreatment, which includes both abuse and neglect. APSAC achieves its mission through sponsoring peer-reviewed publications, offering expert training and educational activities, policy leadership and collaboration, and consultation emphasizing theoretically sound, evidence-based principles. For 30 years, APSAC has played a central role in developing guidelines that address child maltreatment. APSAC is qualified to inform the DHS and the Department of Health and Human Services (HHS) about the damage maltreatment can inflict on children's brain development and cognitive ability. Of note, the final rule would cause harm not only to children held in detention, but also to children of Mexican, Central American, and other ethnic origins living in the United States, whether citizens or not. APSAC submits this brief to assist the Court in understanding the impact of detention, especially indefinite detention, on children's physical, emotional, and mental development. These facts provide important background information useful to a complete understanding of the potential impact of the rule currently promulgated by DHS and HHS.

*Amicus curiae* the American Psychiatric Association (APA), with more than 38,700 members, is the world's largest organization of physicians who specialize in

3

psychiatry. Through research, education, and advocacy, APA members work to ensure effective prevention, diagnosis, and accessible treatment of mental health and/or substance-use disorders. The final rule seeks to amend the FSA to allow DHS to keep "families who must or should be detained together at appropriately licensed family residential centers (FRCs) for the time needed to complete immigration proceedings." This vague guidance about how long families may be detained is concerning and has the potential to impose long-lasting trauma on detained children and their parents. In addition, prolongation of these families' detention will compound the already significant mental health consequences they face. APA recommends the maximum period of detention for children and their parents not go beyond the current limit of 20 days and that every effort be made to minimize the number of days spent by families in detention to decrease the negative consequences of detention for this vulnerable population. APA is also are gravely concerned that weakening facility requirements and oversight will lead to higher incidents of physical and sexual violence.

*Amicus curiae* the American Psychoanalytic Association (APSA) is the oldest and largest professional organization for psychoanalysts in North America, representing 3,000 members, 32 approved training institutes, and 38 affiliate societies throughout the United States. APSA has determined that the administration's use of cruel language, policies, and abuse is a form of psychological warfare. The rhetoric and policies of DHS—child separations, workplace raids and arrests, inadequate detention centers, and changing rules for seeking asylum—create psychological trauma and we know from both empirical evidence, as well as our clinical experience that this type of trauma and toxic stress causes long-lasting serious mental health issues such as depression, anxiety, PTSD, cognitive impairment, and even risk of suicide.

*Amicus curiae* the California American Professional Society on the Abuse of Children (CAPSAC), the state of California chapter of APSAC, provides additional support to California professionals working in the field of child abuse through training, consultation, advocacy and networking. CAPSAC plays a central role in developing guidelines addressing child maltreatment, qualifying it to inform DHS and HHS about the damage maltreatment can inflict on children's brain development and cognitive ability. CAPSAC's expertise focuses on preventing child maltreatment, regardless of citizenship status. CAPSAC submits this brief to assist the Court in understanding the impact of detention, especially indefinite detention, on children's physical, emotional, and mental development. These facts provide important background information vital to understanding the potential impact of the rule currently promulgated by DHS and HHS.

*Amicus curiae* the Center for Law and Social Policy (CLASP) is a national, nonpartisan, anti-poverty nonprofit advancing policy solutions for low-income people. CLASP develops practical yet visionary strategies for reducing poverty, promoting economic opportunity, and addressing barriers faced by people of color. CLASP has expertise in early care and education, early childhood development, child welfare, and immigration policy. CLASP strongly opposes this rule, which disregards child welfare practices and established standards for ensuring the best interests of children. If implemented, it would compromise the immediate safety and well-being of children and harm their long-term development. We urge the Court to consider the research on child development presented in this brief as evidence of the immense harm to children that would result from implementation of this rule.

*Amicus curiae* the Children's Defense Fund (CDF) is a 501(c)(3) non-profit child advocacy organization that has worked relentlessly for more than 40 years to ensure a level playing field for all children. CDF champions policies and programs that lift children out of poverty; protect them from abuse and neglect; and ensure their

access to health care, quality education and a moral and spiritual foundation. As written, the final rule would essentially permit indefinite detention of children, limit the family members to whom a detained child could be released, and roll back the minimal standards currently in place for children's access to health, education, and special needs accommodations. Furthermore, the final rule would allow detention centers to "self-certify" as child care facilities, a proposal that dismisses the concepts of oversight, accountability, and child care standards, and in the end represents a serious miscarriage of justice. Our main points of concern are the well-being and safety of immigrant children and families, the restrictions placed on children being released from detention centers, the potential for living conditions to considerably worsen in detention centers, and the unnecessarily high cost of the final rule. CDF strongly urges the Court to prevent the final rule from moving forward.

*Amicus curiae* the Lutheran Immigration and Refugee Service (LIRS), for decades, has been committed to providing direct services and advocating on behalf of unaccompanied migrant children and accompanied children and their families throughout the United States. LIRS oversees programs that provide long and short-term foster care, family reunification services, and post release services; LIRS services are trauma informed and designed to help children recover from the multiple hardships and traumas they experience from the time they spent in their home countries, throughout their journey to the United States and once they enter the United States. LIRS believes that our nation's immigration laws and system should always ensure that children's rights are placed front and center. Alternatively, we strongly believe that detention is not in the best interest of the child. In this regard, we support retaining the FSA, because it offers the best set of child protection standards. We would like to see these standards strengthened not weakened.

*Amicus curiae* the National Association of Social Workers (NASW) is the largest association of professional social workers in the United States, with nearly

120,000 members in 55 chapters, who provide vitally-needed services in a broad range of settings. The California Chapter of NASW has over 9,000 members. The Association also works to advance policies at all levels of government, including immigration and child welfare policies, that align with the profession's values and code of ethics. Among other things, NASW develops policy statements on issues of importance to society and the social work profession, including child welfare and immigration issues. NASW actively supports efforts to ensure that our most vulnerable children are served by systems designed to protect them from abuse and ensure their well-being. This includes efforts to ensure that children from immigrant families, regardless of citizenship status, are provided with the same societal protections as children from non-immigrant families. Advancing these rights is a vital priority for the social work profession in the twenty-first century.

*Amicus curiae* National Education Association (NEA) is a nationwide employee organization representing over three million members, the vast majority of whom serve as educators and education support professionals in our nation's public schools, colleges, and universities. NEA has a strong and longstanding commitment to ensuring that every child has access to a high-quality public education, regardless of immigration status. NEA is equally committed to the overall well-being of children, psychologically and developmentally. NEA members work directly with children in our schools every day, including immigrant children and children subject to trauma. NEA opposes the detention of children under any circumstances because it causes severe psychological harm and impairs children's ability to learn and grow.

*Amicus curiae* the Texas Pediatric Society (TPS), the Texas Chapter of the AAP, represents over 4,200 primary care pediatricians, pediatric medical subspecialists, surgical specialists, and medical students who believe that the most important resource of the State of Texas is its children, and pledges its efforts to promote their health and welfare. The goal of the TPS is that all children in the State

attain their full potential for physical, emotional, and social health. TPS agrees with the AAP that the future prosperity and well-being of the United States depends on the health and vitality of all of its children, without exception. TPS has consistently and firmly stated that children should not be subjected to detention and every child should receive developmentally appropriate daily care, medical care, and mental health care which is compassionate and responsive to their needs.

*Amicus curiae* First Focus on Children (First Focus) is a bipartisan advocacy organization dedicated to making children and families the priority in federal policy and budget decisions. One of First Focus's priority issues is to ensure that federal policies, including immigration policies, promote the health, safety, and well-being of children in immigrant families. First Focus is deeply opposed to any changes to FSA that would undermine protections for children and allow for their prolonged detention in family detention facilities. Additionally, First Focus opposes any proposals that would allow immigrant children to be detained in facilities licensed by the DHS which has proven time and time again to be woefully inadequate and dangerous for children. Any changes to current standards should focus on the best interest of the child and build on the FSA's protections. Immigration enforcement and policy decisions must consider the children affected by these decisions. This rule does not.

*Amicus curiae* Save the Children Action Network (SCAN), founded in 2014 as the political advocacy arm of Save the Children, is building bipartisan support to make sure every child has a strong start in life. SCAN is doing this by advocating for high-quality early learning for children in the United States, the safety of children arriving at the southern U.S. border and the protection of children living in conflict zones around the world. The final changes to the FSA would allow for long-term detention of families, pending immigration proceedings, a process that often takes years to complete. The final changes are cast as being in the best interest of the children

involved, but that is far from the truth – every minute a child is held in detention can cause irreparable harm. The final rule would also allow the administration to ignore basic standards of care, like access to hygiene and other basic needs. Seeking asylum is not a crime and the global evidence shows that detention has significant negative effects on a child's development and social and emotional well-being. This rule is inhumane and a grave violation of children's rights.

*Amicus curiae* Save the Children Federation, Inc., in the United States and around the world, gives children a healthy start in life, the opportunity to learn and protection from harm. Save the Children specializes in childhood health and nutrition, a culture of peace, governance, alternative care, and protection during migration, but one of our cross-cutting thematic priorities relates to the right to protection and the eradication of harmful practices towards children and adolescents. As noted above, the final changes to the FSA would allow for long-term detention of families, pending immigration proceedings, a process that often takes years to complete. The final changes are cast as being in the best interest of the children involved, but that is far from the truth – every minute a child is held in detention can cause irreparable harm. The final rule would also allow the administration to ignore basic standards of care, like access to hygiene and other basic needs. Seeking asylum is not a crime and the global evidence shows that detention has significant negative effects on a child's development and social and emotional well-being. This rule is inhumane and a grave violation of children's rights.

*Amicus curiae* United States Fund for UNICEF (UNICEF USA) supports the work of the United Nations Children's Fund (UNICEF) to put children first through fundraising, advocacy and education in the United States. UNICEF has helped save more children's lives than any other humanitarian organization by providing health care and immunizations, safe water and sanitation, nutrition, education, emergency relief and more. UNICEF USA is working toward the day when no children die from

preventable causes, and every child has a safe and healthy childhood. Our legal system, and our national conscience, require us to consider the best interests of the child in any legal or policy decision. This proposed rule, however, does not consider the harmful impacts of detention for any length of time on children. Experts have determined that one thing is absolutely clear: like separating children from parents, detention of children is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development. There are well-known and effective programs to protect families and children, allow them to exercise their rights under United States and inter-national law, and ensure that they abide by U.S. legal processes without detaining them. UNICEF USA urges the Federal Government to withdraw this final rule.

*Amicus curiae* the Women's Refugee Commission (WRC) is a non-governmental, non-profit organization that works to identify gaps, research solutions, and advocate for change to improve the lives of crisis-affected women and children. The WRC is a leading expert on the needs of refugee women and children, and the policies that can protect and empower them. For over two decades, the Women's Refugee Commission has monitored immigration detention facilities and migrant children's facilities operated under what is now the jurisdiction of Immigration and Customs Enforcement (ICE), Customs and Border Protection (CBP), and the Office of Refugee Resettlement (ORR), and interviewed facility staff, local service providers, asylum seekers, and migrant children about the policies, practices, and conditions of custody that relate to the ability to access to protection. WRC has been monitoring border screening policies, including family separation for over four years. The final rule has inherent flaws and is legally flawed in a myriad of ways: it violates international law, as well as United States constitutional and statutory law. As WRC has demonstrated for years, there is no humane way to detain families, and whenever families or children are in the care and custody of the Federal Government, safeguards

and basic minimum standards must not only be in place but met. The final rule undermines the intent behind the provisions of the FSA in that they are unconstitutionally vague, ultra vires, overbroad, and generally lack enforcement and oversight of the Federal Government's actions.

*Amicus curiae* ZERO TO THREE (ZTT) is a national nonprofit, nonpartisan organization founded more than 40 years ago to promote the well-being of infants and toddlers by translating the science of early childhood development for policymakers, practitioners, and parents. ZTT is a national leader on infant and early childhood mental health and early childhood development, and works to ensure that babies and toddlers benefit from the family and community connections critical to their well-being and healthy development. The final rule would wipe away these protections, allowing children in the company of their parents to be incarcerated indefinitely in detention facilities known as FRCs. The final rule also ignores the central FSA principle, reiterated many times, favoring a "General Policy Toward Release" in the case of migrant children being held in detention—including those held with their parents—and therefore the need for ending that detention as soon as possible.

# EXHIBIT 2
## (*Amici* Comments)

## Index of *Amici* Comments

1.  The American Academy of Child and Adolescent Psychiatry…………….13
2.  The American Academy of Pediatrics……………………………………..17
3.  The American Federation of Teachers………………………………….....29
4.  The American Medical Association……………………………………...…33
5.  The American Professional Society on the Abuse of Children…………….38
6.  The American Psychiatric Association………………………………….…50
7.  The Center for Law and Social Policy…………………………………......55
8.  The Children's Defense Fund…………………………………………….....66
9.  First Focus on Children……………………………………………………72
10. The Lutheran Immigration and Refugee Service………………………...77
11. The National Education Association………………………………………..86
12. The Texas Pediatric Society……………………………………………......91
13. UNICEF USA………………………………………………………………96
14. The Women's Refugee Commission……………………………………….99
15. ZERO TO THREE…………………………………………………………..128

# Comments of The American Academy of Child and Adolescent Psychiatry



AMERICAN ACADEMY OF
CHILD & ADOLESCENT
PSYCHIATRY

W W W . A A C A P . O R G

November 6, 2018

Kirstjen M. Nielsen
Secretary, Department of Homeland Security
Alex M. Azar, II, Secretary, Department of Health and Human Services
c/o Debbie Seguin, Assistant Director
Office of Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street, SW
Washington, DC 20536

Re:  Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children,
Notice of Proposed Rulemaking, DHS Docket No. ICEB-2018-0002

*Submitted Electronically*

Dear Secretaries Nielson and Azar:

The American Academy of Child and Adolescent Psychiatry (AACAP) appreciates the opportunity to
comment on  the Department of Homeland Security (DHS) and Department of Health and Human
Services (HHS) Notice of Proposed Rulemaking (NPRM) that would substantially modify the terms of the
Flores Settlement Agreement (FSA), which promulgated the standards under which minor children,
accompanied or unaccompanied, are detained and cared for while in U.S. custody. AACAP is the leading
medical professional organization for 9,400 child and adolescent psychiatrists committed to the welfare
of children, adolescents, and their families. We therefore have a strong interest in this proposed
rulemaking that would adversely affect children, adolescents, and their families, and we strongly oppose
the modifications to Paragraphs 14 and 19 of the FSA, which detail the release of minors in custody, and
the licensing standards of DHS facilities, respectively.

**Paragraph 14**

Paragraph 14 of the FSA outlines a "general policy favoring release" and currently requires DHS to
release a minor "without unnecessary delay" when DHS determines that the detention of a minor is not
required either to secure timely appearance before DHS or an immigration judge, or to ensure the
minor's safety or the safety of others.[1] "Without unnecessary delay" has been interpreted by the District
Court for the Central District of California to mean within an average of 20 days from the day on which
they arrive in the custody of immigration authorities.[2] Custodians to whom a minor can be released
under the FSA are a parent, legal guardian, adult relative, or an individual designated by the parent.  The

---

[1] https://www.aclu.org/sites/default/files/field_document/flores_settlement_final_plus_extension_of_settlement
011797.pdf
[2] https://www.aila.org/File/Related/14111359k.pdf

proposed rule, if finalized without significant revision, would permit the detention of family units together for the pendency of their immigration proceedings, which could mean, in practical terms, the detention of children for undetermined periods of time, and would necessitate the allocation of substantial resources to establish additional facilities suitable for the detention of families. Such modification would significantly undermine the original intent of the FSA and is unacceptable.

AACAP believes that these resources could be put to better use and recommends the expeditious hiring and onboarding of additional immigration judges to help cut through the backlog of cases, given the developmental and emotional harm of incarcerating children for long periods of time, even if incarcerated with their parents. Incarceration for long periods of time interferes with the normal development of a child and can lead to lifelong emotional problems, including depression, anxiety, substance use disorders, developmental regression, and post-traumatic stress disorder. Parents who find themselves in this highly stressful situation are also at risk of developing similar emotional problems, in addition to being less available and responsive to their children. This situation, in turn, can severely interrupt the natural attachment between children and parents[3]. There is a substantial body of research linking the trauma of childhood detention with adverse outcomes, and AACAP has recently made available several peer-reviewed journal articles published in the *Journal of the American Academy of Child and Adolescent Psychiatry*.[4] This collection of articles discusses the harm done to children from toxic levels of stress and the disruption in normal development that are inherent in being detained in U.S. custody.

Expedited immigration proceedings would minimize the harm being inflicted on families being held in custody for long periods of time.  AACAP believes that the federal government should prioritize this activity given the current backlog of immigration cases and the harm being done to children and families, many of whom have experienced war and violence in their home countries and are already at risk for stress and trauma.  According to a recent study, 83% of Central American migrants who flee their countries report violence as the primary reason.[5] Minimizing time in custody in addition to meeting the mental health needs of detained families are both essential in mitigating the harm being caused to these vulnerable children and families.

**Paragraph 19**

Paragraph 19 of the FSA outlines licensing requirements for DHS detention facilities. Under the FSA, DHS can only detain children and families in facilities that meet state or local government standards.  The proposed rule would modify this policy by permitting the federal government to deem a facility a licensed facility, if it were audited by a federal government-retained third-party.  AACAP believes that this would significantly undermine standards of care and protections for children, as currently required by the FSA, and we oppose this change as contrary to the mental and physical health needs of children and families in federal custody. Further, AACAP recognizes that the NPRM would provide DHS and HHS wide discretion to suspend all protections for children in the case of an emergency. The proposed

---

[3] https://www.jaacap.org/article/S0890-8567(11)00199-7/fulltext
[4] https://jaacap.org/toxicstress?utm_campaign=STMJ_1538681475_CALLP_HYBNCON&utm_medium=BAN&utm_source=WEB&dgcid=STMJ_1538681475_CALLP_HYBNCON
[5] https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0168692

regulatory definition of "emergency" stipulates that not only could an emergency delay placement of minors, but that it could also delay compliance with other provisions of the NPRM.

The NPRM states that: "The impact, severity, and timing of a given emergency dictate the operational feasibility of providing certain items to minors and thus the regulations cannot contain every possible reality DHS will face. Thus, the definition of 'emergency' is flexible and designed to cover a wide range or possible emergencies." As proposed, the revised definition of emergency would, in practical terms, provide DHS with the unfettered ability to declare emergencies when the agency is not able to meet the baseline needs of children in custody, for whatever reason, and we recommend that this definition be removed from the NPRM.

The FSA outlines several baseline standards for the treatment of children, including the provision of regular meals, medical care, counseling, educational opportunities, recreation, and religious services, among others, which the proposed rule retains. AACAP believes that these services, delivered by well-trained and caring individuals, are essential for the healthy development of children and must be retained.

In conclusion, AACAP is deeply concerned about the proposed modifications to the licensing process, the definition of "emergency," and the proposed change to length of stay in custody of children. AACAP opposes holding children in U.S. custody for lengthier periods of time than under the FSA. We urge that the proposed rule be modified significantly, or withdrawn, and resources be directed toward more productive activities that would bring faster resolution to this humanitarian crisis, such as hiring and onboarding more immigration judges to address the excessive backlog of immigration cases.

Thank you for your serious consideration of our concerns. Should you have questions, please contact Karen Ferguson, Deputy Director of Clinical Practice, at kferguson@aacap.org or Ronald Szabat, JD, LLM, Director of Government Affairs and Clinical Practice at rszabat@aacap.org.

Sincerely,

Karen Dineen Wagner, MD, PhD
President
American Academy of Child & Adolescent Psychiatry (AACAP)
3615 Wisconsin Avenue, NW
Washington, DC 20016-3007
O: (202) 966-7300
F: (202) 966-5894
www.aacap.org

# Comments of The American Academy of Pediatrics

# American Academy of Pediatrics

## DEDICATED TO THE HEALTH OF ALL CHILDREN®

**AAP Headquarters**
345 Park Blvd
Itasca, IL 60143
Phone: 630/626-6000
Fax: 847/434-8000
E-mail: kidsdocs@aap.org
www.aap.org

**Reply to**
**AAP Washington Office**
601 13th St NW, Suite 400N
Washington, DC 20005
Phone: 202/347-8600
E-mail: kids1st@aap.org

**Executive Committee**

**President**
Colleen A. Kraft, MD, FAAP

**President-Elect**
Kyle Yasuda, MD, FAAP

**Immediate Past President**
Fernando Stein, MD, FAAP

**CEO/Executive Vice President (Interim)**
Mark Del Monte, JD

**Board of Directors**

**District I**
Wendy S. Davis, MD, FAAP
Burlington, VT

**District II**
Warren M. Seigel, MD, FAAP
Brooklyn, NY

**District III**
David I. Bromberg, MD, FAAP
Frederick, MD

**District IV**
Jane Meschan Foy, MD, FAAP
Winston-Salem, NC

**District V**
Richard H. Tuck, MD, FAAP
Zanesville, OH

**District VI**
Pam K. Shaw, MD, FAAP
Kansas City, KS

**District VII**
Anthony D. Johnson, MD, FAAP
Little Rock, AR

**District VIII**
Martha C. Middlemist, MD, FAAP
Centennial, CO

**District IX**
Stuart A. Cohen, MD, FAAP
San Diego, CA

**District X**
Lisa A. Cosgrove, MD, FAAP
Merritt Island, FL

November 5, 2018

Debbie Seguin
Assistant Director
Office of Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

Re: DHS Docket No. ICEB-2018-0002, RIN 0970-AC42 1653-AA75, Proposed Rulemaking: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children

Dear Ms. Seguin:

The American Academy of Pediatrics (AAP), a non-profit professional organization of 67,000 primary care pediatricians, pediatric medical sub-specialists, and pediatric surgical specialists dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults, appreciates this opportunity to offer comments on the Department of Homeland Security's (DHS) Notice of Proposed Rulemaking: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children (DHS Docket No. ICEB-2018-0002).

The Proposed Rule is inconsistent with the terms of the Flores Settlement Agreement (FSA) and, if adopted as proposed, would severely undermine the current protections for children under the FSA. Should federal agencies carry out the rule as proposed, the ensuing loss of protections for immigrant children would be inconsistent with federal law including the *Homeland Security Act of 2002* (HSA) and the *William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA)*. The Proposed Rule would harm immigrant children and families by continuing to expose them to conditions and settings that are retraumatizing and unsafe, by effectively eliminating any credible licensure process for family detention centers, and by stripping unaccompanied children of that designation and protections required by federal law that are unique to them. For these reasons and others detailed below, DHS should rescind the Proposed Rule and instead prioritize the best interests of children and work to advance policies that are protective of immigrant families.

18

Children in the custody of their parents should never be detained. From the moment children are in the custody of the U.S., they deserve health care that meets guideline-based standards, treatment that mitigates harm or traumatization, and services that support their health and well-being. All immigrant children and families seeking safe haven in the U.S. should be treated with dignity and respect. In every decision about children, government decision-makers should prioritize the best interests of the child.[1]

The FSA sets strict national standards for the detention, treatment, and release of all minors detained in the legal custody of the federal government. It requires that children be held in the least restrictive setting appropriate for a child's needs and that children be released without unnecessary delay to a parent, legal guardian, adult relative (brother, sister, aunt, uncle, or grandparent), designate of the parent, or others.[2] [3] An August 2015 ruling by a California U.S. District Court in a case brought against DHS, *Flores v Johnson*, found that family detention centers are in violation of the Flores Settlement Agreement.[4] The court did not exclude children in family units from the FSA requirement that children be held in the least restrictive environment. The FSA requires that the regulations adopted to implement (and thus terminate) the FSA "shall not be inconsistent with the terms of [the FSA]". The Proposed Rule does not meet this standard.

AAP has been outspoken about the harms of family detention on children since 2017 because of the negative implications that detention has on child health. Visits to family detention centers by pediatricians reveal discrepancies between the standards outlined by Immigration and Customs Enforcement (ICE) and the actual services provided, including inadequate or inappropriate immunizations, delayed medical care, inadequate education services, and limited mental health services.[5] The Proposed Rule would result in the long-term, possibly indefinite, detention of children and is another example of a policy that seeks to inflict harm on children simply because they are immigrants.

## Alternative Federal Licensing of Family Residential Centers

In the Proposed Rule, DHS proposes to create a federal self-licensing scheme for family residential centers (FRCs), eliminating the current state licensure requirement for FRCs. This proposed change is inconsistent with the FSA. Paragraph 40 of the FSA requires that DHS hold the "general population" of minors in its custody in "facilities that are state licensed for the care of dependent minors" notwithstanding publishing of final regulation implementing the FSA. Detained children with their

---

[1] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.
[2] *The Flores Settlement Agreement*, case no. CV 85-4544-RJK(Px), 1996
[3] Lutheran Immigration and Refugee Service; Women's Refugee Commission; Kids in Need of Defense. *Flores Settlement Agreement & DHS Custody*. Baltimore, MD: Lutheran Immigration and Refugee Service; 2014.
[4] Lutheran Immigration and Refugee Service; Women's Refugee Commission. *Family Detention & the Flores Settlement Agreement*. Baltimore, MD: Lutheran Immigration and Refugee Service; 2015.
[5] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

parents in FRCs actually are "dependent" on the government, as it is the government (not the child's parents) that makes the rules, enforces discipline, provides food and water, and determines when medical attention can be sought and what the medical care will be.[6]

Additionally, the Proposed Rule does not provide a way to ensure the residential standards set by ICE would be a safe replacement for state licensing requirements. The self-licensure envisioned in the Proposed Rule weakens, not strengthens, oversight of FRCs. As such, the Proposed Rule does not adhere to the strict guidelines that the FSA requires.

The FSA specifically requires that federal authorities must transfer children in their custody to a "qualifying adult or a non-secure facility that is licensed by the states to provide residential, group, or foster care services for dependent children." The rule proposes an alternative federal licensing scheme, consistent with ICE standards for FRCs, that would govern the operation of family detention. The Proposed Rule purports that such a scheme would "provide effectively the same substantive protections that the state licensing requirement [in the Flores agreement] exists to provide" while at the same time acknowledging that "the proposed alternative license for FRCs...may result in additional or longer detention for certain minors."

State licensing standards for the care of children in out-of-home settings exist for the purposes of providing a baseline of protection for the health and safety of children in light of their particular needs and vulnerability.[7] Such licensing regulations can safeguard the health and safety of children by mitigating risks of injury or death, reducing the spread of communicable diseases and setting up conditions that promote positive child development. Such standards are put into place by agencies whose missions typically include safeguarding the wellbeing of children (such as a child welfare or child care agency). Additionally, those standards often have procedures in place to investigate claims of child abuse and neglect by state agencies.

An alternative licensing scheme would not be "materially identical to the underlying principles established by Flores" in that Flores recognizes the unique vulnerability of children and the unique considerations their status as children necessitates in licensing a detention facility. Regulations for the care of children can differ by age as well as children's developmental stage. A lack of attention to the

---

[6] In this connection, we take the opportunity to make the observation that currently, even under the FSA, Accompanied Children in detention in FRCs are not afforded the basic protections that State licensing affords to Unaccompanied Children in licensed programs even though the child in an FRC is still "dependent" on the Government. For example, children in FRCs are routinely housed in rooms with bunk beds accommodating several families so that a child sleeps right under, over, or next to unrelated adults (which, under the FSA, would not be allowed in a licensed program).

[7] Jack P. Shonkoff and Deborah A. Phillips, eds., From Neurons to Neighborhoods: The Science of Early Childhood Development, National Research Council and Institute of Medicine, 2000.

American Academy of Pediatrics: Page 4

unique needs of the youngest children is especially harmful, as the health and well-being of infants and toddlers is particularly dependent on their caregivers and environments.[8]

Independent, credible, and accountable monitoring of federal facilities such as FRCs to ensure compliance with evidence-based, licensing standards is critically important. For monitoring to be effective, the credibility and impartiality of the monitor is essential. In the Proposed Rule, DHS proposes to ensure compliance with standards through the use of a third-party auditor. The credibility and impartiality of a monitor whose client is the same entity being monitored raises significant concerns regarding credibility and impartiality.  In fact, the third-party auditor providing "oversight" is not required to actually certify that an FRC is in compliance with the applicable ICE-established residential standards.

Current standards for ICE family detention centers fail to address core components of child well-being and protection. These standards lack a recognition of the wide range of children's socio-emotional, health, mental health and physical developmental needs at varying ages.[9] Studies of detained immigrants in the U.S. describe prisonlike conditions; inconsistent access to quality medical, dental, or mental health care; and lack of appropriate developmental or educational opportunities. Parents interviewed for these reports described regressive behavioral changes in their children, including decreased eating, sleep disturbances, clinginess, withdrawal, self-injurious behavior, and aggression. Parents exhibited depression, anxiety, loss of locus of control, and a sense of powerlessness and hopelessness. Parents often faced difficulty parenting their children and subsequently experienced strained parent–child relationships. Detained families' sense of isolation and desperation were intensified by detention center practices that created communication barriers with the outside world (e.g., expensive telephone service and lack of Internet services).[10] Furthermore, various assessments— including a 2016 assessment made by the DHS Advisory Committee on Family Residential Centers— found that appropriate standards are simply impossible within the context of family detention and that detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children.[11]

The rule notes that family detention centers are not aligned with existing state licensing systems. In fact, the myriad licensing challenges that FRCs have faced demonstrate the importance of this requirement of the FSA and the crucial role that licensing and monitoring can play in guarding against and identifying

---

[8] Ross A. Thompson, "Early Attachment and Later Development," Handbook of Attachment: Theory, Research, and Clinical Applications, ed. Jude Cassidy and Phillip R. Shaver, 1999, 265-286; Anne Case and Christina Paxson, "Parental Behavior and Child Health," Health Affairs 21 (2002), http://content.healthaffairs.org/content/21/2/164.full.
[9] U.S. Department of Homeland Security, Family Residential Standards, U.S. Immigration and Customs Enforcement, 2018, https://www.ice.gov/detention-standards/family-residential.
[10] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, Policy Statement: Detention of Immigrant Children, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.
[11] Immigration and Customs Enforcement, Report of the DHS Advisory Committee on Family Residential Centers, 2016, https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

inappropriate conditions for children. For example, the T. Don Hutto Center in Texas closed after three years of operation due to multiple lawsuits related to the center's poor conditions.[12] In January 2016, the Pennsylvania Department of Human Services revoked the child care license of the Berks County Residential Center because DHS was found to be using its license inappropriately.[13] Yet, the facility continued to operate for a year with a suspended license raising serious questions about provisions of the Proposed Rule that would grant more, not less, oversight and monitoring of FRCs to DHS. In late 2015, the Texas Department of Family Protective Services introduced a regulation called the "FRC rule" that would allow the Dilley detention center to detain children while exempt from statewide health and safety standards. In June 2016, a judge ruled that such an exemption could put children at risk of abuse, particularly due to shared sleeping spaces with non-related adults. In December 2016, that decision was upheld by a federal judge.[14]

In its 2016 testimony on the Karnes County Residential Center (GEO Group)'s application for licensure under the Texas Department of Family and Protective Services as a General Residential Operation and emergency Care Service Facility, the Texas Pediatric Society (TPS) found, "prison-like settings [such as those present at Karnes] do not aid in the healthy upbringing and development of children or enable their families to provide [the] best quality of care to their children." TPS testified that granting state licensure to a facility like Karnes would do the opposite of what state statute requires of such facilities – it would limit a child's opportunity for meaningful social interaction. Additionally, TPS found a lack of trauma-informed, mental health resources in the [rural] Karnes community and the intrinsic nature of these facilities as detention centers are not conducive to the emotional and developmental needs of highly traumatized children.[15]

---

[12] American Civil Liberties Union, ACLU Challenges Illegal Detention of Immigrant Children Held in Prison-Like Conditions, 2007, https://www.aclu.org/news/aclu-challenges-illegal-detention-immigrant-children-held-prisonconditions?redirect=cpredirect/28865.

[13] Michael Matza, P*A Fights to Shut Down Immigrant Family Detention Center in Berks*, The Inquirer, 2017, http://www.philly.com/philly/news/pennsylvania/Pa-renews-effort-to-revoke-the-license-of-immigrant-familydetention-center---.html; Renée Feltz, *Pennsylvania Doubles Down on Revoking Child-Care License for Controversial Family Detention Center*, Rewire, 2017, https://rewire.news/article/2017/05/05/pennsylvania-doubles-revoking-child-care-licensecontroversial-family-detention-center/.

[14] Alexa Garcia-Ditta, *Judge Halts Child Care License for Dilley Detention Center*, Texas Observer, 2016, https://www.texasobserver.org/immigrant-family-detention-license-hold/; Grassroots Leadership v. Texas Department of Family and Protective Services, Final Judgement, D-1-GN-15-004336, District Court of Travis County 2016, https://grassrootsleadership.org/sites/default/files/uploads/gli_v._dfps_final_judgment.pdf; Representative Lucille Roybal-Allard, Representative Pramila Jayapal, *In ICE Detention Pregnant Women Face Stress, Trauma, and Inadequate Care,* The Hill, 2018, https://thehill.com/blogs/congress-blog/homeland-security/384602-in-ice-detention-pregnant-women-face-stress-trauma-and.

[15] Joyce Elizabeth Mauk, MD, *Testimony on Public Hearing for Karnes County Residential Center*, April 13, 2016, https://www.aap.org/en-us/advocacy-and-policy/state-advocacy/Documents/Testimony%20on%20GEO%20Detention%20Facility%20Karnes.pdf

American Academy of Pediatrics: Page 6

## Long-Term, Potentially Indefinite, Detention of Children

Under the alternate licensing scheme in the Proposed Rule, DHS would be granted a way to get around the FSA's requirement that children not be kept in secure, unlicensed facilities for more than 20 days.[16] Whereas the average length of stay in an FRC in FY 2014 was 47.4 days, after the FSA protections--including the 20-day limitation on detention--were enforced for accompanied children in 2015, the average length of stay had fallen to only 14.2 days (in FY 2017). While DHS argues that they are "unable to estimate the costs...because [they] are not sure how many individuals will be detained at FRCs after this rule is effective or for how much longer individuals may be detained because there are so many other variables to consider," these statistics point to what immigrant detention might look like without the *Flores* settlement in place.[17]

In fact, the stated rationale in the Proposed Rule for the self-licensure of FRCs for the housing and care of children on a long-term basis is to avoid the requirement of releasing children within 20 days from an FRC to a parent or relative or (if no parent or relative is available) to a state child welfare agency-licensed program. With the FRCs thus transformed into "licensed programs" for children based on the proposed alternative licensure scheme, DHS explains, children could then be kept in the FRCs beyond 20 days (*i.e.*, indefinitely pending resolution of all of the immigration proceedings relating to the child and his or her parents). As a result, and as explicitly intended by DHS in promulgating these proposed rules, DHS would detain children with their families for the entirety of their immigration proceedings--in effect, indefinitely. The core principle and requirement of the FSA is that migrant children taken into detention should be released from detention as "expeditiously" as possible. The FSA provides that minors taken into custody must be "expeditiously process[ed]."[18]

We would note that the Proposed Rule mirrors the government's request in July 2017 to the *Flores* court to modify the FSA to permit detention of children for up to the entire pendency of their and their parents' immigration proceedings.[19] We note that these proceedings typically take many months and can take years.[20] The court rejected that request. In July 2017, Judge Dolly Gee said that the government, "now seek[s] to hold minors in indefinite detention in unlicensed facilities, which would constitute a fundamental and material breach of the parties' Agreement."[21] The government now seeks, through  this Proposed Rule which it contends materially implements the FSA, to accomplish a material modification

---

[16] *Jenny Lisette Flores, et al. v. Loretta E. Lynch*, CV 85-04544, U.S. Dist. Court, Central Dist. Cali., Aug. 21, 2015, https://www.aila.org/File/Related/14111359p.pdf.
[17] Notice of Proposed Rulemaking, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," Sept. 7, 2018, 2018-19052.
[18] FSA, ¶ 12A.
[19] *Jenny L. Flores et al. v. Jefferson B. Sessions, III, et al.*, Case No. CV 85-4544-DMG, U.S. Dist. Ct. Central Dist. Cal., July 9, 2018.
[20] *Id.*
[21] *Id.* at 4.

of the FSA that the government sought from the court and the court rejected. The long-term detention of children in FRCs is antithetical to the FSA and runs counter to the best interest of children.

## Child Health Implications of Family Detention

As noted in the AAP's policy statement *Detention of Immigrant Children,* DHS detention facilities are not appropriate places for children. Immigrant children seeking safe haven in the U.S. should never be placed in detention facilities.[22] The American Medical Association has adopted a policy opposing family immigration detention given the negative health consequences that detention has on both children and their parents.[23]  In 2018, the American College of Physicians released a policy stating that "forced family detention—indefinitely holding children and their parents, or children and their other primary adult family caregivers, in government detention centers until the adults' immigration status is resolved—can be expected to result in considerable adverse harm to the detained children and other family members, including physical and mental health, that may follow them through their entire lives, and accordingly should not be implemented by the U.S. government."[24]

There is no evidence that any amount of time in detention is safe for children.[25] In fact, even short periods of detention can cause psychological trauma and long-term mental health risks for children.[26] Studies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression and posttraumatic stress disorder.[27] Detention itself undermines parental authority and capacity to respond to their children's needs; this difficulty is complicated by parental mental health problems.[28]  Parents in detention centers have described regressive behavioral changes in their children, including decreased eating, sleep disturbances, clinginess, withdrawal, self-injurious behavior, and aggression.[29]

Visits to family detention centers by pediatric and mental health advocates have revealed discrepancies between the standards outlined by ICE and the actual services provided, including inadequate or inappropriate immunizations, delayed medical care, inadequate education services, and limited mental

---

[22] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.
[23] American Medical Association, "AMA Adopts New Policies to Improve Health of Immigrants and Refugees," June 12, 2017, https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees.
[24] American College of Physicians, "The Health Impact of Family Detentions in Immigration Cases," July 3, 2018, https://www.acponline.org/acp_policy/policies/family_detention_position_statement_2018.pdf.
[25] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*

health services.[30] Other reports describe prison-like conditions; inconsistent access to quality medical, dental, or mental health care;[31] and lack of appropriate developmental or educational opportunities.[32]

In July, AAP, joined by thirteen other national medical and mental health organizations wrote to members of Congress voicing deep concerns about the treatment that immigrant children and their parents face in federal custody.[33]  The letter from these organizations notes that two physicians within DHS' Office of Civil Rights and Civil Liberties found serious compliance issues in DHS-run facilities resulting in "imminent risk of significant mental health and medical harm."[34] The DHS physicians stated that "detention of innocent children should never occur in a civilized society, especially if there are less restrictive options, because the risk of harm to children simply cannot be justified."[35] Currently, there is no mechanism for health professionals to regularly monitor the conditions in DHS facilities and their appropriateness for children.

After almost a year of investigation, the DHS Advisory Committee on Family Residential Centers concluded that detention is generally neither appropriate nor necessary for families— and that detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children.[36]  We must remember that immigrant children are still children. Protections for children in law or by the courts exist because children are uniquely vulnerable and are at high risk for trauma, trafficking, and violence. Proposals like this Proposed Rule that are inconsistent with the FSA and federal child trafficking laws in order to allow for the longer-term detention of children with or without their parents or to strip children of protections designed for their safety and well-being and put their health and well-being at risk.

## Use of Term "Emergency" and "Influx"

The Proposed Rule provides for broad exemptions to existing child protections by expansively defining the terms "emergency" and "influx."[37] These broad definitions provide massive leeway to DHS and HHS to selectively ignore the important children's rights provisions of the regulation, essentially leaving immigration operations impacting migrant children unregulated.

---

[30] *Id.*
[31] American Medical Association, "AMA Adopts New Policies to Improve Health of Immigrants and Refugees," June 12, 2017, https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees.
[32] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.
[33] Letter from American Academy of Pediatrics *et al.* to The Honorable Charles Grassley, *et al.*, July 24, 2018, https://downloads.aap.org/DOFA/Senate%20Congressional%20Oversight%20Request%20Letter%20Final%2007%2024%2018.pdf.
[34] Letter from Dr. Scott Allen and Dr. Pamela McPherson to the Honorable Charles Grassley and the Honorable Ron Wyden, July 17, 2018, https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf.
[35] *Id.*
[36] *Report of the DHS Advisory Committee on Family Residential Centers*, Sept. 30, 2016, https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.
[37] 83 FR 45496

The term emergency, under the Proposed Rule, means "an act or event...that prevents timely transport or placement of minors or impacts other conditions" touching on the basic needs of children including provision of snacks and meals or prolonged detention of children in border jails.[38] The regulations propose natural disaster, facility fire, civil disturbance, medical or public health concerns in the list of examples of such events but indicate that other kinds of events might also qualify, leaving significant room for interpretation.

An implication for use of the term "emergency" and "influx" by DHS and HHS is to allow the agencies to ignore the FSA's time limitations on transferring children out of DHS custody and making detention the "default".[39] Worryingly, the Proposed Rule would allow the government to routinely ignore standards of care included in the FSA such as the requirement that the government provide a meal or snack to a child at a certain periodicity and of certain quality while that child is detained, or the requirement to keep unaccompanied children held for periods of over a day separate from unrelated adults.[40]  The Proposed Rule's suggested use of terms like "emergency" and "influx" is inconsistent with the FSA and troubling for the care and treatment of children in federal custody.

## Loss of Protections for Unaccompanied Children (UAC)

While children are in the custody of the federal government, extra precautions must be in place to identify and protect children who have been victims of trafficking and to prevent recruitment of new children into the trafficking trade. Unaccompanied minors should have free or pro bono legal counsel with them for all appearances before an immigration judge. Children and families should have access to legal counsel throughout the immigration pathway.[41] Congress, DHS, and HHS have all recognized the special concern for the vulnerability of unaccompanied children (UAC). For example, the TVPRA authorizes HHS to appoint independent child advocates for child trafficking victims and other vulnerable UACs.

The Proposed Rule 236.3(d)(1) would authorize immigration officers to repeatedly re-determine a child's UAC status **on each encounter**, which permanently injects uncertainty over a child's UAC status. The Proposed Rule 263.3(d)(2) specifies three criteria that could each independently terminate a child's UAC status including when the UAC turns 18, when a parent or legal guardian in the U.S. is available to provide care and physical custody for the UAC, or when the UAC obtains lawful immigration status. Today, once a child is classified as a UAC, the child continues to be treated as a UAC regardless of whether they continue to meet the UAC definition.  This reinterpretation of existing DHS agency guidance and practice has major implications for the health and safety of children as well

---

[38] 83 FR 45525
[39] *See* 83 FR 45498.
[40] 83 FR 45496, 45526.
[41] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

American Academy of Pediatrics: Page 10

as their ability to pursue his or her affirmative asylum case. In addition to losing meaningful access to legal counsel upon loss of UAC status, a child would also lose access to other vital services that the Office of Refugee Resettlement care provider facilities are required to provide such as classroom education, health care, recreation, mental health services, and, in some cases, case management services. Congress, through the TVPRA and the HSA, distinguished between UACs and other minors. However, the Proposed Rule fails to offer a reasoned explanation for disregarding the distinction Congress made between the interests of UAC and other minors.

## Cost Benefit Analysis

In the Proposed Rule, DHS and HHS fail to estimate their anticipated costs, even while the Proposed Rule acknowledges that the alternative licensing scheme will likely mean that more children and parents are kept in custody for longer.[42] These costs are important and demonstrate a seriously flawed cost-benefit analysis both because it does not maximize net benefits and because it fails to quantify both costs and benefits. Even while declining to estimate their potential new spending, the agencies argue that "[t]his rule does not exceed the $100 million expenditure threshold,"[43] which would trigger additional review under Executive Order 12866, and also deem it a major rule under the terms of the Congressional Review Act.[44]

Additionally, the Proposed Rule fails to acknowledge a possible alternative to detention – a program referred to as Alternatives to Detention (ATD), a community-based alternative to detention for children held in family units. ATD is exponentially less expensive when compared with detention of children and families. The government reports a daily average cost of $10.55 for each person in the ATD program as compared to a daily average of $158 for each person in detention.[45] The decision to utilize ATD would thus save the government many millions of dollars.[46]

## Conclusion

Children, especially those who have been exposed to trauma and violence, should not be placed in settings that do not meet basic standards for their physical and mental health and that expose them to additional risk, fear, and trauma. It is the position of the AAP that children in the custody of their parents

---

[42] Notice of Proposed Rulemaking, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," September 7, 2018, 2018-19052, https://www.regulations.gov/document?D=ICEB-2018-0002-0001.
[43] *Ibid.* (Rule)
[44] U.S. President, Executive Order 12866, "Regulatory Planning and Review," *Federal Register*, Vol. 58, No. 190, Oct. 4, 1993, https://www.reginfo.gov/public/jsp/Utilities/EO_12866.pdf and 5 U.S.C. § 801.
[45] GAO, Immigration: Process and Challenges in the Management of Immigration Courts and Alternatives to Detention Program Report (Washington, D.C., Sept. 18, 2018).
[46] *Id.*

should never be detained, nor should they be separated from a parent. In every decision about children, government decision-makers should prioritize the best interests of the child.[47]

As detailed above, the Proposed Rule is inconsistent with the FSA and federal statute. As such, we urge DHS to rescind the Proposed Rule and instead prioritize the best interests of children and work to advance policies that are protective of immigrant families.

If you have any questions regarding these comments, please contact Tamar Magarik Haro, Senior Director, Federal & State Advocacy, in our Washington, DC office at tharo@aap.org or 202-347-8600.

Sincerely,

*Colleen A. Kraft*

Colleen A. Kraft, MD, MBA, FAAP
President

CAK/tmh

---

[47] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

# <u>Comments of The American Federation of Teachers</u>

 A Union of Professionals

American Federation of Teachers, AFL-CIO

AFT Teachers
AFT PSRP
AFT Higher Education
AFT Public Employees
AFT Nurses and Health
    Professionals

555 New Jersey Ave. N.W.
Washington, DC 20001
202-879-4400
www.aft.org

Randi Weingarten
PRESIDENT

Lorretta Johnson
SECRETARY-TREASURER

Mary Cathryn Ricker
EXECUTIVE VICE PRESIDENT

VICE PRESIDENTS

J. Philippe Abraham
Shelvy Y. Abrams
Barbara Bowen
Vicky Rae Byrd
Christine Campbell
Zeph Capo
Alex Caputo-Pearl
Donald Carlisto
Larry J. Carter, Jr.
Kathy A. Chavez
Melissa Cropper
Evelyn DeJesus
Aida Diaz Rivera
Jolene T. DiBrango
Marietta A. English
Eric Feaver
Francis J. Flynn
David Gray
Anthony M. Harmon
David Hecker
Jan Hochadel
Fedrick C. Ingram
Jerry T. Jordan
Ted Kirsch
Frederick E. Kowal
Louis Malfaro
Terrence Martin, Sr.
Joanne M. McCall
John McDonald
Daniel J. Montgomery
Michael Mulgrew
Candice Owley
Andrew Pallotta
Joshua Pechthalt
Paul Pecorale
David J. Quolke
Jesse Sharkey
Denise Specht
Wayne Spence
Tim Stoelb
Jessica J. Tang
Ann Twomey
Adam Urbanski

November 6, 2018

Debbie Seguin
Assistant Director
Office of Policy, U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street, SW
Washington, DC 20536

Dear Assistant Director Seguin:

On behalf of the 1.7 million members of the American Federation of Teachers, I write to oppose the proposed regulations to amend the Flores Settlement Agreement, DHS Docket No. ICEB-2018-0002. I urge the Trump administration to withdraw the proposed regulations and fully implement provisions of the Flores agreement to protect migrant children seeking asylum in the United States. AFT members are teachers and school support staff, nurses and healthcare professionals, and public sector employees who dedicate their lives to providing services to children and their families. Our members care for and teach the next generation and are horrified by the Trump administration's treatment of immigrants, especially migrant children.

The overarching principle of the Flores agreement—which has been in place for more than 20 years—is that vulnerable immigrant children, seeking protection in the United States, must be kept safe. While the Trump administration contends that its proposed regulations adhere to the spirit of the Flores agreement, nothing could be further from the truth. The Flores agreement provides a framework to ensure that immigrant children are treated humanely while in U.S. custody and that they are released from immigration detention as quickly as possible. It sets out standards to ensure that facilities are properly licensed and that children are getting basic food, health and education services. The proposed regulations would cruelly and systematically undermine this framework.

The proposed regulations would remove and weaken protections for children held in custody by the Department of Health and Human Services' Office of Refugee Resettlement and the Department of Homeland Security. If finalized, they would permit the indefinite detention of children and families, change the standards of care a detention facility needs to provide for children, and make it more difficult for a child to be released for urgent humanitarian reasons. We detail below specific ways the regulations would jeopardize children's mental health, well-being and safety.

The **American Federation of Teachers** is a union of professionals that champions fairness; democracy; economic opportunity; and high-quality public education, healthcare and public services for our students, their families and our communities. We are committed to advancing these principles through community engagement, organizing, collective bargaining and political activism, and especially through the work our members do.



AFT Comments/ DHS Docket No. ICEB-2018-0002/Page 2 of 3

<u>Allowance for Indefinite Detention of Children</u>

The proposed regulations would lead to the indefinite detention of children and would
directly disregard a core principle of the Flores agreement—that immigrant children
must be released from detention as "expeditiously" as possible. The Flores agreement
calls for the release of children from immigration detention within 20 days, stating that
the government must generally release a minor "without unnecessary delay." The
proposed regulations, however, would allow children to be detained with their parents
through the entirety of their removal proceedings, meaning children could be detained
for months or even years in immigration detention facilities. The average wait time for
an immigration case to be heard is 721 days, with wait times in some cases exceeding
four years. Overwhelming evidence shows the traumatizing effects of detention on
children and the irrevocable harm it has on their physical and mental health. AFT
members can attest to the long-term effects of such trauma, including chronic and toxic
levels of stress. Allowing the indefinite detention of children and families is cruel and
wholly inconsistent with American values and any existing standards of child welfare.
The best way to ensure children's well-being is to keep them out of detention facilities.

<u>Removal of State Licensing Requirements for Homeland Security Facilities Holding
Immigrant Children</u>

The Flores agreement requires the federal government to release children to a parent,
legal guardian or other family member as quickly as possible. If a family member is
unavailable, the government must release the child to a facility licensed by a state child
welfare agency program. The proposed regulations would dismantle existing
protections and allow the federal government to sidestep state-licensing requirements
of detention facilities holding children, leading to the removal of critical oversight over
the conditions in these facilities.

State licensing standards for the care of children exist to provide a baseline of
protection for the safety and health of children, taking into consideration children's
particular ages, development and vulnerabilities. Such licensing standards are put in
place by agencies that safeguard the well-being of children. Many AFT members and
other union members work at licensed care facilities that ensure adequate training and
qualifications for staff as well as important accountability mechanisms for the
institutions.

The proposed regulations would allow for self-licensing of the facilities that would hold
children and parents together, called family residential centers, rather than requiring
that they be licensed by a state child welfare agency. This self-licensure is akin to the fox
guarding the henhouse; it creates a serious lack of accountability and transparency that

AFT Comments/ DHS Docket No. ICEB-2018-0002/Page 3 of 3

will only worsen conditions for children and their families. The federal government has already demonstrated that it lacks the impartiality and expertise to ensure compliance with basic standards relating to the care and custody of migrant children. "Self-licensing" in this context is no more than an effort to evade the standards required by Flores.

Expansion of Situations in Which Safety Protections Are Suspended

The proposed regulations would allow federal agencies to weaken protections for children in the event of "emergencies" or an "influx" of migrants, both of which are defined broadly. For example, "influx" is defined as when more than 130 minors or unaccompanied children are eligible for placement in a licensed facility. And the protections that could be weakened or disregarded include things like the provision of basic meals and snacks. Based on the Trump administration's actions and rhetoric against immigrants, it is likely that the administration would invoke "emergency" or "influx" rules to exempt itself from meeting basic safety and care standards.

The Flores agreement establishes important protections for immigrant children, who are uniquely vulnerable. The AFT strongly believes that these children must be afforded due process and detained for as short a time as possible. When children are detained, they must be provided robust health and education services through facilities that are resourced, licensed and staffed with trained professionals. The AFT has for decades fought against the mistreatment of children and immigrant families, and the proposed regulations are yet another attack on this vulnerable population of future Americans and would wholly undermine the purpose of the Flores agreement. I urge you to reject the proposed regulations.

Sincerely,

Randi Weingarten
President

RW : emc opeiu#2 afl-cio

# <u>Comments of The American Medical Association</u>



JAMES L. MADARA, MD
EXECUTIVE VICE PRESIDENT, CEO

ama-assn.org
t (312) 464-5000

October 29, 2018

The Honorable Kirstjen M. Nielsen
Secretary
U.S. Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20528

The Honorable Alex M. Azar, II
Secretary
U.S. Department of Health & Human Services
Hubert H. Humphrey Building
200 Independence Avenue, SW
Washington, DC 20201

Ms. Debbie Seguin
Assistant Director
Office of Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street, SW
Washington, DC 20536

Re:   DHS Docket No. ICEB−2018−0002; Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children

Dear Secretary Nielsen, Secretary Azar, and Assistant Director Seguin:

On behalf of the physician and medical student members of the American Medical Association (AMA), I am writing to provide comments to the U.S. Department of Homeland Security (DHS) and the U.S. Department of Health and Human Services (HHS) on the Notice of Proposed Rulemaking (Proposed Rule or Proposal) on "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," published in the *Federal Register* on September 7, 2018 (83 Fed. Reg. 45486). We are deeply concerned about this Proposal's potential negative impact on immigrant children and their parents/caregivers and urge that the proposed rule be withdrawn.

Alternative Federal Licensing of Family Residential Centers

In the Proposed Rule, DHS proposes to create a federal licensing scheme for family residential centers (FRCs) and eliminate the state licensing requirement for FRCs. On its face, this provision of the Proposed Rule seems innocuous, but the effect of this provision would essentially allow U.S. Immigration and Customs Enforcement (ICE) to use certain federal facilities to detain family units together during their immigration proceedings.

Families seeking refuge in the U.S. already endure emotional and physical stress during the often long and dangerous journey to the U.S. This stress, and its impact on the health and well-being of children and their parents or caregivers, would be exacerbated if family units are detained during the pendency of their immigration proceedings. Studies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression, and post-

The Honorable Kirstjen M. Nielsen
The Honorable Alex M. Azar, II
Ms. Debbie Seguin
October 29, 2018
Page 2

traumatic stress disorder.[1] As a result, the AMA opposes the expansion of family immigration detention. Instead, we urge the Administration to give priority to supporting families and protecting the health and well-being of the children within those families. Prolonged detention of migrant children and their parents is not a solution to the earlier immigration issue created by the Administration's zero-tolerance policy which led to the forced separation of thousands of children from their parents and caregivers at the U.S. border.

The Flores Settlement Agreement (FSA), a decades-old court settlement put in place to ensure the safety and proper care of children in immigration detention, set strict national standards for the detention, treatment, and release of all minors (both accompanied and unaccompanied minors) in immigration custody.[2] The FSA generally requires that children be held in the least restrictive setting appropriate for a child's needs and that they be released without unnecessary delay to a parent, designate of the parent, or responsible adult as deemed appropriate.[3] The Proposed Rule seeks to dismantle the FSA by allowing minors with their parents to be detained in DHS licensed family detention facilities for the entirety of their immigration proceedings. This is troubling because the proposal could result in longer detention for minors, beyond the 20-day timeframe outlined in the FSA. Further, the proposal seeks to expand family detention facilities, and as discussed in detail below, current DHS family detention facilities do not adhere to the strict guidelines that the FSA requires, and the Proposed Rule does nothing to further adherence.

DHS acknowledges in the Preamble that the Proposed Rule may result in additional or longer detention for certain minors, but DHS is unsure how many individuals may be detained at FRCs if the Proposed Rule is implemented. We understand that there are numerous variables to consider, but given the focus by the Administration on border security, we believe a substantial number of migrating minor children may be impacted by the Proposed Rule. According to DHS, in fiscal year (FY) 2013, U.S. Customs and Border Protection (CBP) apprehended 14,855 family units at the southwest border of the U.S.; however, in FY 2018 the number had increased to 77,802.[4,5] As a result, the AMA believes that, as presently drafted, the proposed change in immigration policy would have a negative impact on the health and well-being of a significant number of migrating children and their families.

Under the FSA, the federal government is required to place the migrating child in a "licensed program." Generally, a "licensed program" is defined as one "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children," which must be "non-secure as required under state law" and meet the standards set forth in an exhibit attached to the FSA. In the Proposed Rule, the federal government contends that state licensing requirements have limited its ability to "effectively use family detention" because "many states have not succeeded in putting in place licensing schemes governing facilities that hold family units together." As a result, the Proposed Rule essentially would allow the federal government to transfer family units to facilities that are not "state licensed," as is currently required, in an effort to enable family detention during the pendency of immigration proceedings. Neither federal law nor the Immigration and Nationality Act provide a comprehensive

---

[1] http://pediatrics.aappublications.org/content/pediatrics/early/2017/03/09/peds.2017-0483.full.pdf
[2] Flores v. Lynch, 828 F. 3d 898, 905-08 (9th Cir. 2016)
[3] Flores v. Reno, CV 85-4544-RJK(Px).
[4] 83 Fed. Reg. 45493, Table 1—Family Unit Apprehensions at the Southwest Border by Fiscal Year.
[5] FY18 data does not include August and September 2018.

The Honorable Kirstjen M. Nielsen
The Honorable Alex M. Azar, II
Ms. Debbie Seguin
October 29, 2018
Page 3

framework for detaining alien families during their immigration proceedings. However, as discussed in greater detail below, thus far, DHS detention practices have resulted in substandard health care for children and adults. Furthermore, the minimal standards for the family detention facilities as detailed in the Proposed Rule are not identical to the minimal standards outlined in the FSA. It is our belief that the Proposed Rule does not fully implement the FSA as the federal government argues. Instead, the Proposed Rule seeks to terminate the FSA, along with its state licensing standards, and instead offers migrant children and their parents little in the way of strict standards and protections from negative physical and emotional treatment in these detention facilities.

Health and Safety Concerns

The Preamble states that the Proposed Rule seeks to ensure "all juveniles in the [federal] government's custody are treated with dignity, respect, and special concern for their particular vulnerability as minors." While this goal is laudable, it is not consistent with the recent practice at DHS facilities, as determined by the DHS Office of Inspector General (OIG). In a June 26, 2018, report, DHS OIG finalized its investigation of how and to what extent ICE examines detention conditions in more than 200 detention facilities. DHS OIG found that ICE was repeatedly granting waivers which allowed detention facilities to exempt themselves from standards that ICE deemed critically important, including those related to health, safety, and security.[6] Furthermore, the DHS OIG Report found that neither the inspections of the detention facilities conducted by the ICE Office of Detention Oversight or the private company ICE contracts with or the onsite monitoring program ICE uses 1) ensures consistent compliance with detention standards; and 2) promotes comprehensive deficiency corrections.

In a DHS OIG Report dated December 11, 2017, the DHS OIG found that medical care was delayed or not documented in ICE detention facilities, and detainee bathrooms were in poor condition and lacked basic hygiene supplies such as toilet paper, shampoo, and soap.[7] While we understand that these DHS OIG Reports are in reference to ICE adult detention facilities, the AMA remains deeply concerned that there is a pattern within DHS of providing substandard health care in poor living conditions to both adults and minors in immigration detention facilities. There is further evidence of this in a letter sent to Congress by two physicians within DHS' Office of Civil Rights and Civil Liberties. The physicians describe medical neglect and child endangerment in family detention facilities.[8] We remain unconvinced that the proposed federal licensing scheme for FRCs will provide an appropriate level of protection and oversight for the health and safety of these very vulnerable migrating children and their parents or caregivers.

Definition of Family Unit

Under current statute, minor aliens for whom bond has been posted, parole authorized, or ordered released on recognizance, must be released, in order of preference, to a parent, legal guardian, or adult relative if available. An adult relative is currently defined as a brother, sister, aunt, uncle, or grandparent who is not presently in DHS detention. The Proposed Rule seeks to remove the words "brother," "sister," "aunt," "uncle," or "grandparent," in 8 CFR §212.5 *Parole of aliens into the United States* and 8 CFR 236.3

---

[6] https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf
[7] https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf
[8] https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf

The Honorable Kirstjen M. Nielsen
The Honorable Alex M. Azar, II
Ms. Debbie Seguin
October 29, 2018
Page 4


*Detention and Release of Juveniles,* and replace these words with "parent or legal guardian." The AMA understands the need for the Administration to ensure terminology used is consistent as it seeks to codify provisions of the FSA; however, the AMA seeks additional clarification from DHS in reference to this proposal. Sometimes the caregiver crossing the border with a migrating child is not the child's parent or legal guardian, but remains the only family member the child has to provide comfort, safety, and stability. The Proposed Rule seems to treat the migrating child traveling with an adult sibling, aunt/uncle, or grandparent as an unaccompanied minor. If this provision is made final it will further exacerbate the Administration's original problem of separating children from their caregivers.

Conclusion

Families seeking refuge in the U.S. already endure emotional and physical stress, which is only exacerbated when they are separated from one another or held in family detention facilities during the pendency of their immigration proceedings. It is well known that childhood trauma and adverse childhood experiences created by inhumane treatment often create negative health impacts that can last an individual's entire lifespan. As detailed above, there is more than enough evidence to demonstrate that DHS family detention practices result in unacceptable treatment of children and do not comport with the strict guidelines that the FSA requires. Given our concerns, we urge DHS to withdraw this Proposed Rule and instead give priority to supporting families and protecting the health and well-being of the children within those families.

If you have any questions regarding this letter, please contact Margaret Garikes, Vice President of Federal Affairs, at margaret.garikes@ama-assn.org or 202-789-7409.

Sincerely,

James L. Madara, MD

cc:  Division of Policy, Office of the Director, Office of Refugee Resettlement, U.S. Department of Health & Human Services

# Comments of The American Professional Society on the Abuse of Children

**DETAILED COMMENTS in opposition to DHS Docket No. ICEB-2018-0002, RIN 0970-AC42 1653-AA75, Proposed Rulemaking: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children**

**APSAC objects to the Notice of Proposed Rule Making ("NPRM") in its entirety because it fails to codify the protections in the Flores Settlement Agreement ("FSA").** Indeed, in its elimination of key provisions, failure to define key terms like "secured facility," and relaxation of many FSA rules that can and must be preserved, the NPRM contravenes the child-protective core of the FSA and would subject migrant children to a broad range of harm up to and including child maltreatment and child abuse.

APSAC will focus its detailed comments on its areas of expertise, which have to do with the definition, identification, prevention, and remediation of child maltreatment and abuse. We focus on three areas of the NPRM: the health risks of detention, regardless of duration; the provisions enabling family detention centers to "self-license"; and the damage that the NPRM does to the psychological and emotional health of other children in the United States.

**1.      The NPRM enables the indefinite detention of children with their families.**

**The NPRM claims to effectuate the FSA. APSAC wishes to make clear, at the outset, that precisely the opposite is true. The NPRM eviscerates the FSA by enabling the indefinite detention of children.**

The core principle and requirement of the FSA is that migrant children taken into detention should be released from detention as "expeditiously" as possible. The FSA provides that minors taken into custody must be "expeditiously process[ed]."[1] The Section of the FSA entitled "General Policy Favoring Release," provides clearly and unambiguously that "the INS shall release a minor from its custody without unnecessary delay" (absent certain limited circumstances).[2] Moreover, while a child is detained, the FSA requires that "the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor...," and requires that such efforts "shall continue so long as the minor is in INS custody."[3]

The FSA requires that, within 3 (or, under certain circumstances, 5) days of a child being in federal immigration detention, the child must be released to a parent or relative, or if that is not possible then placed into a program licensed by a State child welfare agency (a "licensed program"). The FSA provides that a child cannot be held in detention in an "unlicensed program"[4]

---

[1] FSA, ¶ 12A.

[2] FSA, ¶ 14. The only exceptions to expeditious release are the unusual circumstances where there is a particular reason that detention is "required either to secure [the child's] timely appearance before the INS or immigration court, or to ensure the minor's safety or that of others." FSA, ¶ 14.

[3] FSA, ¶ 18.

[4] FSA, ¶ 6A "licensed program" is defined in the SFA as "any program, agency of organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors…and that] meets those standards for licensed programs set forth in Exhibit I [to the FSA]."

for longer than 3 days (or, under some circumstances, 5 days).[5]  If the Government faces an
"emergency" or a major "influx" of minor children at the border, then the 3 or 5-day timeframe
does not apply and the release must be effected "as expeditiously as possible."[6] In 2014, the court
acceded to the Government's request that a time period of up to 20 days be considered
"expeditious" in these circumstances. The 20-day period was set based on the government's
representation to the court that that is the amount of time required for the Government, "in good
faith and in the exercise of due diligence," to screen family members or others to whom a child
could be released.[7]

Further, under the FSA, the child's release must be to the "least restrictive setting"
possible--with priority given, first, to release to a parent or other family member and then to a
"licensed program" or, "when it appears that there is no other likely alternative to long term
detention and family reunification does not appear to be a reasonable possibility," then to another
suitable adult or entity seeking custody of the child.[8] These provisions reflect the two basic
premises of the FSA. First, pending a child's further immigration proceedings, the child should be
released almost immediately to family members or other acceptable sponsors rather than held in
detention. Second, if a child will remain in detention longer term (as contemplated by the FSA,
because there are no family members or acceptable sponsors to whom the child can be released),
then the child should not be in a federal immigration facility (*i.e.*, a facility such as an FRC--which,
we note, is similar to a prison setting), but, rather, should be in a setting that is licensed by a State
child welfare agency for the longer-term housing and care of children (such as a group home, foster
home or juvenile delinquent facility).

**By contrast, the Proposed Regulations provide for *indefinite* detention of
Accompanied Children in federal immigration facilities pending resolution of the long
process of their and their parents' immigration proceedings.** The Proposed Regulations
provide that Accompanied Children can be kept in detention in FRCs *indefinitely* during the
pendency of their and their parents' immigration proceedings.[9] These regulations mirror the

---

[5] FSA, ¶ 12.

[6] FSA, ¶ 12A(3). The term "emergency" is defined as follows: "[A]ny act or event that *prevents*
the [transfer] within the time frame provided." The FSA provides that "such emergencies include natural
disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies
(e.g., a chicken pox epidemic among a group of minors)." The phrase "influx of minors into the United
States" is defined as follows: "[T]hose circumstances where the INS has, at any given time, more than 130
minors eligible for placement in a licensed program…, including those who have been so placed or are
awaiting such placement." The FSA requires that, "[i]n preparation for an 'emergency' or 'influx,'…the
INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as
expeditiously as possible" (including the identification of potentially available "licensed programs"). *Id*.

[7] *See* Order re Response to Order to Show Cause, *Jenny L. Flores et al. v. Loretta Lynch*, Case No.
CV 85-04544 (U.S. Dist. Ct. Central Dist. Cali. Aug. 21, 2015), p. 10,
https://www.aila.org/File/Related/14111359p.pdf.

[8] FSA, ¶ 14.

[9] 83 FR 45493. We note that, under the FSA, the Government's policy with respect to
*Unaccompanied* Children (*i.e.*, children who cross the border *without* a parent or legal guardian) has been
to place them in a licensed program pending resolution of their immigration claims--at which time they
would then, depending on the resolution, either be removed from the country or returned to a licensed

Government's request in July 2017 to the *Flores* court to modify the FSA to permit detention of children for up to the entire pendency of their and their parents' immigration proceedings.[10] We note that these proceedings typically take many months and can take years.[11] The court rejected that request. Judge Gee noted that in July 2017, the government, "now seek[s] to hold minors in indefinite detention in unlicensed facilities, which would constitute a fundamental and material breach of the parties' Agreement."[12] The Government now seeks, through the Proposed Regulations that it contends materially *implement* the FSA, to accomplish the *material modification* of the FSA that the Government sought from the court and the court rejected.

### 2. Detention of children by DHS for any length of time durably harms their health. The longer the detention, the more harm done.

The main purpose of the proposed change, legalizing indefinite detention of children with their families although it is prohibited under the FSA, is harmful in and of itself. Although separation of children from their parents is inherently harmful, so is child detention. Numerous clinical studies have demonstrated that the mitigating factor of parental presence does not negate the damaging impact of detention on the physical and mental health of children.[13] In a retrospective analysis, detained children were reported to have tenfold increase in developing psychiatric disorders.[14] Studies of health difficulties of detained children found that most children since being detained reported symptoms of depression, sleep problems, loss of appetite, and somatic

---

program until they reached the age of majority and could be released. The Proposed Regulations would not change this policy relating to Unaccompanied Children. The change that the Proposed Regulations would effect is that *Accompanied* Children (*i.e.*, children who cross the border with a parent or legal guardian) would be detained indefinitely in federal immigration facilities (FRCs) pending resolution of their and their parents' immigration claims--rather than, as was the case before 2014, being released with their parents (subject to ankle monitoring, bond, or other compliance programs), or, as was the case under the family separation policy in April-June 2018, forcibly separated from their parents to be housed alone in a licensed program.

[10] *Jenny L. Flores et al. v. Jefferson B. Sessions, III, et al.*, Case No. CV 85-4544-DMG, U.S. Dist. Ct. Central Dist. Cal., July 9, 2018.

[11] *Id.*

[12] *Id.* at 4.

[13] Dudley, Michael, Zachary Steel, Sarah Mares, and Louise Newman. Children and Young People in Immigration Detention. Current Opinion Psychiatry 25, no. 4 (July 2012): 285-92. doi:10.1097/YCO.0b013e3283548676; Ehntholt, K., Trickey, D., Harris Hendriks, J., Chambers, H., Scott, M., Yule, W., & Tibbles, P. (2018). Mental health of unaccompanied asylum-seeking adolescents previously held in British detention centres. Clinical Child Psychology and Psychiatry, 23(2), 238–257; Kronick, R., Rousseau, C., & Cleveland, J. (2015). Asylum-seeking children's experiences of detention in Canada: A qualitative study. American Journal of Orthopsychiatry, 85(3), 287.

[14] Steel, Zachary, Shakeh Momartin, Catherine Bateman, Atena Hafshejani, Derrick M. Silove, Naleya Everson, Konya Roy, Michael Dudley, Louise Newman, Bijou Blick, and Sarah Mares. Psychiatric Status of Asylum Seeker Families Held for a Protracted Period in a Remote Detention Centre in Australia. Australian and New Zealand Journal of Public Health 28, no. 6 (September 25, 2004): 527-36. doi:10.1111/j.1467-842x.2004.tb00042.x.

complaints such as headaches and abdominal pains; specific concerns include inadequate nutritional provisions, restricted meal times, and child weight loss.[15]

There is no evidence that any amount of time in detention is safe for children.[16] In fact, even short periods of detention can cause psychological trauma and long-term mental health risks for children.[17] Studies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression and posttraumatic stress disorder.[18] Detention itself undermines parental authority and capacity to respond to their children's needs; this difficulty is complicated by parental mental health problems.[19] Parents in detention centers have described regressive behavioral changes in their children, including decreased eating, sleep disturbances, clinginess, withdrawal, self-injurious behavior, and aggression.[20]

While detention is inherently harmful to children, a history of child custodianship rife with medical neglect, medical error, and maltreatment makes detention by DHS yet worse. DHS' own medical experts recorded a case in which a 16-month-old baby lost a third of his body weight over 10 days because of untreated diarrheal disease, yet was never given IV fluids.[21] According to medical experts, DHS detention facilities are not appropriate places for children to be housed.  In 2017, the American Academy of Pediatrics published a policy statement titled *Detention of Immigrant Children* stating that immigrant children seeking safe haven in the United States should never be placed in detention facilities.[22] The American Medical Association has also adopted a policy opposing family immigration detention given the negative health consequences that detention has on both children and their parents.[23] In 2018, the American College of Physicians released a policy stating that "forced family detention—indefinitely holding children and their

---

[15] Lorek, Ann, Kimberly Ehntholt, Anne Nesbitt, Emmanuel Wey, Chipo Githinji, Eve Rossor, and Rush Wickramasinghe. The Mental and Physical Health Difficulties of Children Held within a British Immigration Detention Center: A Pilot Study. Child Abuse & Neglect 33, no. 9 (September 2009): 573-85. doi:10.1016/j.chiabu.2008.10.005.

[16] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] Dr. Scott Allen and Dr. Pamela McPherson, Letter to the Senate Whistleblowing Caucus, July 17, 2018, https://www.whistleblower.org/sites/default/files/Original%20Docs%20Letter.pdf.

[22] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

[23] American Medical Association, "AMA Adopts New Policies to Improve Health of Immigrants and Refugees," June 12, 2017, https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees.

APSAC Comment on DHS Docket No. ICEB-2018-002, 4

parents, or children and their other primary adult family caregivers, in government detention centers until the adults' immigration status is resolved—can be expected to result in considerable adverse harm to the detained children and other family members, including physical and mental health, that may follow them through their entire lives, and accordingly should not be implemented by the U.S. government."[24]

Despite these and many other warnings from medical experts, DHS proposes in this NPRM to substitute its own Immigration and Customs Enforcement (ICE) family residential standards where its family detention facilities cannot obtain licensing from state, municipal, or other appropriate child welfare entities.[25] This would have the effect of eliminating the critical Flores Settlement Agreement limitation on the detention of children in unlicensed facilities. As a result, and as explicitly intended by DHS in promulgating these proposed rules, DHS would detain children with their families for the entirety of their immigration proceedings--in effect, indefinitely.

Visits to family detention centers by pediatric and mental health advocates have revealed discrepancies between the standards outlined by ICE and the actual services provided, including inadequate or inappropriate immunizations, delayed medical care, inadequate education services, and limited mental health services.[26] Other reports describe prison-like conditions; inconsistent access to quality medical, dental, or mental health care;[27] and lack of appropriate developmental or educational opportunities.[28] Conditions in CBP processing facilities, which include forcing children to sleep on cement floors, open toilets, constant light exposure, insufficient food and water, no bathing facilities, and extremely cold temperatures, are traumatizing for children.[29] No child should ever have to endure these conditions.

In July, fourteen major medical organizations joined together to voice deep concerns about the treatment that immigrant children and their parents face in federal custody.[30] The letter from these organizations note that two physicians within DHS' Office of Civil Rights and Civil Liberties found serious compliance issues in DHS-run facilities resulting in "imminent risk of significant

---

[24] American College of Physicians, "The Health Impact of Family Detentions in Immigration Cases," July 3, 2018, https://www.acponline.org/acp_policy/policies/family_detention_position_statement_2018.pdf.

[25] *See* 83 FR 45525

[26] *Id.*

[27] American Medical Association, "AMA Adopts New Policies to Improve Health of Immigrants and Refugees," June 12, 2017, https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees.

[28] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

[29] *Id.*

[30] Letter from American Pediatric Association *et al.* to The Honorable Charles Grassley, *et al.*, July 24, 2018, https://downloads.aap.org/DOFA/Senate%20Congressional%20Oversight%20Request%20Letter%20Final%2007%2024%2018.pdf.

APSAC Comment on DHS Docket No. ICEB-2018-002, 5

mental health and medical harm."[31]   The DHS physicians stated that "detention of innocent children should never occur in a civilized society, especially if there are less restrictive options, because the risk of harm to children simply cannot be justified."[32] Currently, there is no mechanism for health professionals to regularly monitor the conditions in DHS facilities and their appropriateness for children.

After almost a year of investigation, the DHS Advisory Committee on Family Residential Centers concluded that detention is generally neither appropriate nor necessary for families— and that detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children.[33]   We must remember that immigrant children are still children. Protections for children in law or by the courts exist because children are uniquely vulnerable and are at high risk for trauma, trafficking, and violence. Proposals like this rule that seek to override the Flores Settlement Agreement in order to allow for the longer-term detention of children with or without their parents or to weaken federal child trafficking laws strip children of protections designed for their safety and well-being and put their health and well-being at risk.

Detention in conditions of neglect and potential abuse is even worse for children made yet more vulnerable by the conditions from which they fled and the conditions on the arduous journey north. Policymakers are advised to give due weight to public health studies which have found that many migrants are fleeing epidemic levels of violence, including homicide and physical and sexual assault, and are in need of international protection and services which address their specific medical and mental health needs.[34]

Unlimited detention also violates the prohibition against torture and ill-treatment under U.S. and international law. The UN Special Rapporteur on torture has unequivocally stated that ill-treatment can amount to torture if it is intentionally imposed "for the purpose of deterring, intimidating, or punishing migrants or their families, or coercing them into withdrawing their requests for asylum".[35] Indefinite detention has severe medical and mental health consequences.[36]

---

[31] Letter from Dr. Scott Allen and Dr. Pamela McPherson to the Honorable Charles Grassley and the Honorable Ron Wyden, July 17, 2018, https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf.

[32] *Id.*

[33] *Report of the DHS Advisory Committee on Family Residential Centers*, Sept. 30, 2016, https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[34] Keller A, Joscelyne A, Granski M, Rosenfeld B. Pre-Migration Trauma Exposure and Mental Health Functioning among Central American Migrants Arriving at the US Border. PloS ONE. 2017;12(1):e0168692.

[35] Rapport of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Nils Melzer, Migration-related Torture and Ill treatment, A/HRC/37/50 (February 2018).

[36] Physicians for Human Rights, Punishment before Justice: Indefinite Detention in the US (June 1, 2011), https://phr.org/resources/punishment-before-justice-indefinite-detention-in-the-us/.

APSAC Comment on DHS Docket No. ICEB-2018-002, 6

**2.      Allowing detention centers to "self-license" not only enables indefinite
detention; it eviscerates the core principles of the FSA and leaves children
without meaningful oversight of their detention.**

The Proposed Regulations accomplish the Government's preferred policy of indefinite
detention of children by providing that the federal Government can self-license its own federal
detention facilities. The Government explains in the Proposed Regulations that, to avoid the
requirement of releasing children within 20 days from an FRC to a parent or relative or (if no
parent or relative is available) to a State child welfare agency-licensed program, the federal
Government will consider parents in detention as not available and will authorize itself to *self*-
license FRCs for the housing and care of children on a long-term basis.[37] With the FRCs thus
transformed into "licensed programs" for children, the Government explains, children could then
be kept in the FRCs beyond 20 days (*i.e.*, indefinitely pending resolution of all of the immigration
proceedings relating to the child and his or her parents).

**Self-licensing is the equivalent of no licensing.** *Self*-licensing is an oxymoron, a
contradiction in terms.[38] It is axiomatic that one cannot license one's self. There is no assurance of
standards associated with "licensing" when the entity being licensed is also setting the licensing
standards and monitoring compliance with the standards set. The concept of licensing inherently
requires review or oversight by *another entity* than the one being regulated--or the concept of
licensing is transformed into "do as you wish." At a minimum, it is a clear perversion of the FSA's
requirement that children who are detained on a longer-term basis must be protected through the
establishment and monitoring of appropriate standards for their care and well-being (taking into
account their "special vulnerability as minors"). This perversion of the FSA's concept of a
"licensed program" that is suitable for children underscores that the Proposed Regulations do not
implement--and, in fact, flatly contradict--the key terms and the very purpose of the FSA.

---

[37] 83 FR 45525. The Government explains that, under the requirements of the FSA, the Government
has three options with respect to the custody of migrant children who are accompanied by a parent (or legal
guardian): "1) parole all family members into the United States; 2) detain the parent(s) or legal guardian(s)
and either release the juvenile to another person or legal guardian or transfer them to HHS to be treated as
an UAC [(*i.e.*, detain the children, separately from the parents, in state-licensed facilities for children who
are dependent on the state)]; or 3) detain the family unit together by placing them at an appropriate FRC
[(family residential center)] during [(i.e.., for "the pendency of] their immigration proceedings." The
Government states that it prefers the third option--and needs the Proposed Regulations because the FSA
creates "a barrier" to the utilization of this option given that the FSA prohibits prolonged (more than 20
days) detention of children in facilities that are not licensed by a State child welfare agency.  PR, § IV.C.1
(pp. 29-31).

[38] The concept of "self-licensing" does not even really exist. If one Googles "self- licensing," the
only result is a Wikipedia definition of a term "used in social psychology and marketing to describe the
subconscious phenomenon whereby increased confidence and security in one's self-image or self-concept
tends to make that individual worry less about the consequences of subsequent immoral behavior and,
therefore, [to be] more likely to make immoral choices and act immorally." *See, e.g.*,
https://en.wikipedia.org/wiki/Self-licensing.

APSAC Comment on DHS Docket No. ICEB-2018-002, 7

Ample evidence demonstrates that the Government is incapable of effectively or meaningfully inspecting its immigration detention facilities, a cruelly negligent failure of governance that puts the lives of children and adults alike at risk. Of particular note are recent reports from the Department of Homeland Security's own Office of the Inspector General (OIG), finding that Immigration and Customs Enforcement (ICE)'s inspections are "very, very, very difficult to fail".[39] This systemic failure is borne out by, among other examples, the "untimely and inadequate detainee medical care" and "nooses in detainee cells" found in the OIG's unannounced inspection of an ICE detention facility in Adelanto, California that had passed its most recent inspection only last year.[40] In another example, the Stewart Detention Center in Georgia passed its inspection just days before the suicide of a mentally-ill detainee kept in solitary confinement in violation of ICE's own detention standards.[41] These failures strongly indicate that the removal of the core outside licensing and monitoring protections of Flores in favor of the Government's proposed self-licensing scheme will jeopardize children's lives.

The Government justifies its proposed "licensing scheme" by pointing out that it is very difficult to accomplish the licensing of federal FRCs by State agencies because few States have agencies that establish standards and provide licenses for facilities that house children together with adults. Rather, State agencies typically license only facilities for the care of children who are alone and therefore "dependent" on the state, the Government explains. We submit that the very fact of the rarity of licensing for a situation where children are detained with their parents underscores that the natural, expected course would be children being released together with their parents to care for them (as was the Government's policy until 2014)[42], rather than detained together with their parent to be cared for by the Government.

Also, we observe that children in detention with their parents actually *are* "dependent" on the Government, as it is the Government (not the child's parents) that makes the rules, enforces discipline, provides the food and water, determines when medical attention can be sought and what medical care will be provided, etc.[43] Thus, the Government's emphasis on the lack of licensing for

---

[39] DHS Office of the Inspector General (OIG), ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements, OIG -18-67, June 26, 2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[40] DHS OIG, Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California, OIG 18-86, Sept. 27, 2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf.

[41] Spencer Woodman and Jose Olivares, *The Intercept*, "Immigrant Detainee Called ICE Help Line Before Killing Himself in Isolation Cell," Oct. 8, 2018, https://theintercept.com/2018/10/08/ice-detention-suicide-solitary-confinement/.

[42] *See* Wil S. Hylton, *The New York Times Magazine*, "The Shame of America's Family Detention Camps," Feb. 8, 2015, https://www.nytimes.com/2015/02/08/magazine/the-shame-of-americas-family-detention-camps.html.

[43] In this connection, we take the opportunity to make the observation that currently, even under the FSA, Accompanied Children in detention in FRCs are not afforded the basic protections that State licensing affords to Unaccompanied Children in licensed programs even though the child in an FRC is still "dependent" on the Government. For example, children in FRCs are routinely housed in rooms with bunk

APSAC Comment on DHS Docket No. ICEB-2018-002, 8

facilities housing children with their parents highlights that children who are detained with their
parents in FRCs are not, even under the FSA, protected by basic licensing-type standards set by
appropriate agencies. The only counterweight to this problem is that, at least, under the FSA, the
detention in federal facilities has been limited to 20 days.[44]

3.    **The indefinite detention of migrant children is harmful to the mental,
       emotional, and physical health of a large number of children living in the
       United States.**

As a subject matter expert on how maltreatment and toxic stress can damage the developing
bodies and brains of children, APSAC is knowledgeable about how not only physical, but also
psychological and emotional maltreatment can durably damage the developing bodies and brains
of children. The primary targets and potential future victims of the NPRM are migrant children
apprehended at our Southern border. But we at APSAC cannot forget that millions more migrant
and Latinx children, whether undocumented, legally present, or citizen, continue to be significantly
and perhaps severely harmed by the internment of migrant children. And it is highly likely that
other, non-Latinx children are harmed as well.

        The millions of Latinx children in the United States who immigrated from Mexico and
Central America or were born of immigrant parents, along with millions of immigrant and first-
generation children of other national origins, suffer raw fear of their fellow children's predicament.
Young children, citizen or otherwise, are not capable of understanding the nuances that distinguish
their situation from the suffering of interned children. Older children must surely feel horror,
sorrow, and worry. Children who are undocumented, but not detained, may suffer constant fear of
apprehension and detention themselves. Given the constantly escalating rhetoric around the
immigration enforcement debate, children have little respite from the fear. This is a recipe for toxic
stress, which takes a heavy toll on the developing bodies and brains of children, impacting
everything from their physical and mental health to their emotional regulation and cognitive
capacity. Conditions within the detention centers are nearly irrelevant to this toxicity. To children
observing how these migrant children are treated, the fact of child incarceration is enough.

        Recent research documents the impact on children's health of toxic stress caused by
deportation threat, discrimination, and racist public discourse. The animus toward Latinx migrants
currently expressed in the public sphere, including very recently the president's instruction to
troops at the border to regard a rock in the hands of a migrant as equivalent to a rifle and "fight
back accordingly," continues to intensify the effect. Further, the president has announced that no

---

beds accommodating several families so that a child sleeps right under, over, or next to unrelated adults
(which, under the FSA, would not be allowed in a licensed program).

[44] As discussed below, however, currently, Accompanied Children are being held in FRCs far
longer than 20 days. *See, e.g.,* Tal Kopan, *CNN*, "Reunited moms write letters from detention," Sep. 30,
2018,    https://www.cnn.com/2018/09/30/politics/separated-mothers-reunited-letters/index.html.    The
Government has justified this lack of compliance with the FSA on the basis that the litigation against family
separation was settled on the basis that families would not be separated. Therefore, the Government asserts,
it cannot release the children without the parents under the settlement terms. We observe that what the
Government really means is that, under the settlement, it cannot do what it wants to do (keep the parents in
detention) without also releasing the children--so it simply keeps the children in detention and claims that
it "has to" do so.

migrants of any age will be released; rather, they will be held in "massive cities of tents" for as long as their immigration process takes. For children in the United States listening to this discourse, and most especially for undocumented Latinx children (or children of the undocumented), the statement must be heard as a threat.

Several harms coalesce around these public statements, even in advance of the actual execution of the indefinite detention rules. Children witness rhetoric directed against their identity, families, and communities; the rhetoric is coming from their government, a putative source of safety and protection for them; the rhetoric influences non-Latinx children, leading to an increase in bullying; and their parents are stressed and anxious, which can affect the parent-child relationship and child development itself.

Further, expressions of animus are not just words to those whom they target; they have real psychological and physiological effects. Recent research confirms that "experiencing discrimination is associated with higher reported stress and poorer reported health."[45] There is a "clear relationship between discrimination and increased risk of mental disorders," controlling for other sources of stress.[46] These studies involved adult experiences of discrimination, but the more limited research on the impact of discrimination on children strongly suggests the same result.[47] Childhood experience of discrimination contributes to traumatic stress and negative health outcomes.[48] Negative portrayals of their race can cause children to experience toxic and chronic stress, particularly where—as here—such encounters make them feel less safe at school or in the outside world. Over time, toxic stress exerts a pernicious influence over mental and physical health, leading to greater risk of depression, suicide attempts, substance abuse, and a host of other ills.

The sheer size of the group of potentially affected children is overwhelming. According to a report by the Center on Budget and Policy Priorities, "[o]ne in four U.S. children — about 18

---

[45] Am. Psychol. Ass'n, *Stress in America: The Impact of Discrimination* 8 (2016).

[46] Article, "Unhealthy Treatment," *UCLA Sch. Of Pub. Health Mag.*, Autumn/Winter 2015, at 8, 9 (citing G.C. Gee et al., "The association between self-reported racial discrimination and 12-month DSM-IV mental disorders among Asian Americans nationwide," 64 *Social Sci. & Medicine* 1984 (2007)).

[47] For a review of relevant research, see L.M. Pachter & C.G. Coll, "Racism and Child Health: A Review of the Literature and Future Directions," 30 *J. Dev. Behav. Pediatr.* 255, at 255 (2009) (author manuscript). *See also* Am. Acad. of Pediatrics News, *Study finds exposure to racism harms children's health* (May 4, 2017). As Pachter and Coll note, research on the impact of discrimination on child health is a new and emerging area of study, but the available research strongly indicates negative health impacts.

[48] *See, e.g.*, M. Jernigan & J.H. Daniel, "Racial Trauma in the Lives of Black Children and Adolescents: Challenges and Clinical Implications," 4 *J. Child & Adolescent Trauma* 123, at 130 (2011) ("The implications of perceived racial and ethnic discrimination…are overwhelmingly associated with negative mental health outcomes such as depression, stress, anxiety, and psychological distress."); P. Cronholm et al., "Adverse Childhood Experiences: Expanding the Concept of Adversity," 49(3) *Am. J. Preventive Medicine* 354, 358 (2015) ("[S]tudies from different contexts have shown that witnessing or experiencing…discrimination is associated with concurrent negative health effects and increased participation in risk behaviors.").

million children under age 18 — live with at least one immigrant parent.[49] About 5 million children live with an unauthorized immigrant parent, and nearly 80 percent of these children are U.S. citizens;[50] the other 13 million live with a parent who is foreign born but either a legal resident or a U.S. citizen." Millions of American children are at risk of suffering toxic stress because they must witness—and fear—the indiscriminate and indefinite incarceration of untold numbers of children for acts they did not choose and cannot escape.

APSAC urges DHS and HHS to withdraw the NPRM and engage experts in child development, child trauma and child maltreatment to assist in their reconsideration of immigration enforcement policy regarding children and their families.

---

[49] Danilo Trisi and Guillermo Herrera, Center on Budget and Policy Priorities, Administration Actions Against Immigrant Families Harming Children Through Increased Fear, Loss of Needed Assistance, May 15, 2018 at 1, citing Jie Zong, Jeanne Batalova, and Jeffrey Hallock, "Frequently Requested Statistics on Immigrants and Immigration in the United States," Migration Policy Institute, February 8, 2018, http://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states#Children.

[50] Id. at 1, citing Randy Capps, Michael Fix, and Jie Zong, "A Profile of U.S. Children with Unauthorized Immigrant Parents," Migration Policy Institute, January 2016, http://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents.

APSAC Comment on DHS Docket No. ICEB-2018-002, 11

# Comments of The American Psychiatric Association



800 Maine Avenue, S.W.
Suite 900
Washington, D.C. 20024

Board of Trustees
2018-2019
Altha J. Stewart, M.D.
*President*
Bruce J. Schwartz, M.D.
*President-Elect*
Philip R. Muskin, M.D., M.A.
*Secretary*
Gregory W. Dalack, M.D.
*Treasurer*

Anita S. Everett, M.D.
Maria A. Oquendo, M.D., Ph.D.
Renée L. Binder, M.D.
*Past Presidents*

Eric M. Plakun, M.D.
Vivian B. Pender, M.D.
Roger Peele, M.D.
Cheryl D. Wills, M.D.
Jenny Boyer, M.D., Ph.D., J.D.
Melinda L. Young, M.D.
Annette M. Matthews, M.D.
Ayana Jordan, M.D., Ph.D.
Ramaswamy Viswanathan,
M.D., D.Sc.
Richard F. Summers, M.D.
Tanuja Gandhi, M.D.
Rana Elmaghraby, M.D.
*Trustees*

Assembly
2018-2019
James (Bob) R. Batterson, M.D.
*Speaker*
Paul J. O'Leary, M.D
*Speaker-Elect*
Seeth Vivek, M.D.
*Recorder*

Administration
Saul Levin, M.D., M.P.A.
*CEO and Medical Director*

November 6, 2018

Debbie Seguin
Assistant Director, Office of Policy
U.S. Immigration and Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

**RE: DHS Docket No. ICEB-2018-0002 – Comments in Response to Proposed Rulemaking: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children**

Dear Ms. Seguin,

On behalf of the American Psychiatric Association (APA), the national medical specialty society representing more than 37,800 psychiatric physicians nationwide, we are writing in response to the Department of Homeland Security's (DHS) proposed rule, *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, as published in the Federal Register on September 7, 2018. We appreciate the opportunity to provide feedback on this important proposal and write with concern about the proposed changes to the regulations established by the Flores Settlement Agreement (FSA). We focus our comments on the negative impacts this policy change would have on children and their families' mental health.

*Unlimited Detention Will Lead to Long-Lasting Trauma*
The FSA was originally adopted to protect the well-being of children who are detained by immigration authorities, and, as interpreted by the Courts, limits the amount of time children should be detained to 20 days. The proposed rule seeks to amend the FSA to allow the Department to keep "families who must or should be detained together at appropriately licensed family residential centers (FRCs) for the time needed to complete immigration proceedings."[1] This vague guidance about how long families may be detained is concerning and has the potential to impose long-lasting trauma on detained children and their parents.

Many families crossing the United States border are fleeing war and violence in their home countries and are already coping with the effects of stress and trauma. A recent study found that among Central American migrants arriving at the border, 83% reported violence as the primary reason for fleeing their

---

[1] Notice of Proposed Rulemaking, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," Federal Register, Vol. 83, No. 174, September 7, 2018, pgs. 45493-45494, https://www.regulations.gov/document?D=ICEB-2018-0002-0001.

country.[2] The exposure to violence included extortion, death threats, and being victims of domestic violence. Reports of serious violence are also common, with nearly one third of study participants (32.2%) reporting that a family member had been murdered.

A substantial body of research links the trauma of childhood detention with lasting adverse outcomes, including an increased risk of mental illness, such as depression, anxiety, and post-traumatic stress disorder.[3]  While people who are displaced can demonstrate high levels of resiliency, they can also experience disabling post-traumatic stress disorder or other consequences that adversely impact their medical, psychological, social, and spiritual well-being.  These consequences can range from demoralization to various sequelae, involving simple and complex trauma complicated by the migratory journey and resettlement process. These migration-related and postmigration stressors can produce demoralization, grief, loneliness, loss of dignity, and feelings of helplessness as normal syndromes of distress that impede refugees from living healthy and productive lives.[4,5] It is critical that children remain with their parents, but this will not eliminate the risk of trauma. Prolongation of these families' detention will compound the already significant mental health consequences they face.

**APA recommends the maximum period of detention for children and their parents not go beyond the current limit of 20 days and that every effort be made to minimize the number of days spent by families in detention to decrease the negative consequences of detention for this vulnerable population.**

*Weakened Facility Protections May Lead to Worse Health Outcomes*
In the proposed rule, DHS argues that the challenges in licensing of FRCs were the precursor to families being separated at the border this year.  To counter those challenges, the rule would eliminate this barrier by allowing facilities who may not be able to be licensed by state or local governments to become licensed and audited by a third-party auditor.  Loosening the licensing standards for facilities and handing off the oversight and accountability to a third party is concerning, given the risks that this presents to the protection of the safety, health, and well-being of children and their families.
Even before the announcement of this rule, the American Medical Association cautioned the federal immigration system to refrain from partnering with private facilities that do not meet the standards of medical care set by the National Commission on Correctional Health Care, due to the amount of reported preventable deaths in such settings.[6]  In a recent report on the current state of detention centers, the Office of Inspector General (OIG) found that current audits already, "do not ensure adequate oversight or

---

[2] Keller A, Joscelyne A, Granski M, Rosenfeld B. Pre-Migration Trauma Exposure and Mental Health Functioning among Central American Migrants Arriving at the US Border. PloS ONE. 2017;12(1):e0168692.
[3] Felitti, Vincent J et al. *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults*. American Journal of Preventive Medicine, Volume 14, Issue 4, 245 – 258.
[4] Al-Krenawi, A., Lev-Wiesel, R., & Sehwail, M. (2007). Psychological symptomatology among Palestinian children living with political violence. Child and Adolescent Mental Health 12:27–31.
[5] Fernando, G.A., Miller, K.E., & Berger, D.E. (2010). Growing pains: the impact of disaster-related and daily stressors on the psychological and psychosocial functioning of youth in Sri Lanka. Child Development 81:1192-1210.
[6] American Medical Association. AMA Adopts New Policies to Improve Health of Immigrants and Refugees (June 12, 2017). https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees.

systematic improvement in detention conditions."[7]   The report highlights that the current lenient approach to inspections and onsite monitoring have led to inadequate responses to Immigration and Customs Enforcement (ICE) and inconsistencies in implementing corrective actions. Some examples included facilities failing to notify ICE about alleged or proven sexual assaults or not allow detainees to participate in recreation for the required standard. We are gravely concerned that weakening facility requirements and oversight will lead to higher incidents of physical and sexual violence.

In addition, we are concerned about this proposal's impact on meeting the educational needs of detained children. The current policy of HHS's Office of Refugee Resettlement requires that children receive an educational assessment within 72 hours of detainment and a minimum of six hours of structured education, Monday through Friday, with learning materials that reflect diversity and sensitivity.[8] However, reports indicate that standardizing educational curriculum in detainment facilities poses several challenges, including the wide range of academic abilities among the children.[9] In some instances, detainment centers cannot meet the specific needs of children with disabilities and instructors have been forced to teach students who are heavily dosed with psychiatric drugs.  Combined with the fact that these children are in a particularly traumatic setting, it is clear facilities are not currently equipped to appropriately address the educational and emotional needs of children and the extension of this detention will only exasperate this problem.

The proposed rule also includes expanding the definitions of "emergency" in an effort to give DHS more flexibility to manage juvenile transfers.  This would allow for longer delays in the placement of minors and excuse noncompliance for an undetermined amount of time, adding stress to families.  For example, the proposal mentions that a snack or meal may be delayed in an emergency, but the guidance leaves the facility to decide the rationale and length of an emergency.  In the previously mentioned OIG report, investigators revealed that facilities are already failing to meet compliance and the growing issues with ICE agents granting waiver to exempt facilities from compliance resulting in health, safety, and security issues. It would be dangerous and negligible to legitimize a violation of minimum standards in FRCs for detainees.

**APA recommends DHS hold detainment centers accountable to the maximum safety and compliance requirements and make no exemptions to these standards. Rather than handing off oversight responsibility, we urge DHS to take a greater role and responsibility in eliminating the risks of maltreatment and neglect in FRCs.**

*Meeting the Mental Health Needs of Detained Families*

---

[7] Dept. of Homeland Security Office of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67 (June 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.
[8] Office of Refugee Resettlement, *Children Entering the United States Unaccompanied* (April 20, 2018), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.3.5
[9] Goldstein, Dana & Fernandez, Manny. (July 6, 2018) In a Migrant Shelter Classroom, 'It's Always Like the First Day of School.' *New York Times*. https://www.nytimes.com/2018/07/06/us/immigrants-shelters-schools-border.html

Research shows that despite the threat of punitive measures, families fleeing the Northern Triangle region of Central America will continue to flee violence to save their lives and those of their children.[10] It is critical that FRCs do better to meet the mental health needs of detained families.  Psychiatrists are uniquely qualified to help children and families recover from the trauma inflicted upon immigrants and refugees by displacement from and within their home countries and can provide direct psychotherapeutic and psychosocial interventions.[11]  Each FRC should staff their leadership teams with psychiatrists to appropriately care for persons suffering posttraumatic symptoms and other migration-related syndromes of distress.

Earlier this year, Drs. Scott Allen and Pamela McPherson, who respectively serve as the medical and psychiatric subject matter experts for the DHS, wrote a letter to the Congressional Whistleblower Caucus highlighting the agency's harmful practices in detention centers and their impact on the health of families. They noted that FRCs have largely failed in recruiting adequate health staff, including pediatricians, child and adolescent psychiatrists, and pediatric nurses.[12]  Their observations have true public health consequences, as noted in a facility where numerous children were vaccinated with adult doses of vaccine when the providers were not familiar with labels on pediatric vaccines.  Additionally, they warned that the detention centers were not equipped to screen detainees for trauma.  These factors, combined with the language barriers immigrant families face, can lead to preventing families from receiving the care they need while detained.  This is deeply troubling considering the unique and critical needs of immigrant families.

**We recommend DHS require each FRC to promptly identify and treat detainees' health and mental health needs, integrate psychiatrists into their programmatic leadership, and educate staff to deliver trauma-informed and culturally competent care.**

We urgently call on DHS to address each of these concerns. Thank you again for the opportunity to respond to this proposal. We welcome the opportunity to further continue this conversation and ask that you contact Kathy Orellana at korellana@psych.org if you have questions.

Sincerely,

Saul Levin, MD, MPA

Saul Levin, MD, MPA, FRCP-E
CEO and Medical Director

---

[10] Medecins sans Frontieres, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* (June 2017), https://www.msf.org/sites/msf.org/files/msf_forced-to-flee-central-americas-northern-triangle_e.pdf.
[11] American Psychiatric Association. Position Statement on the Role of Psychiatrists in Addressing Care for People Affected by Forced Displacement (2017). https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2017-People-Affected-by-Forced-Displacement.pdf
[12] Dr. Scott Allen and Dr. Pamela McPherson, Letter to the Senate Whistleblowing Caucus, July 17, 2018, https://www.whistleblower.org/sites/default/files/Original%20Docs%20Letter.pdf.

# Comments of The Center for Law and Social Policy



**DHS Docket No. ICEB–2018–0002**
**Debbie Seguin Assistant Director, Office of Policy,**
**U.S. Immigration and Customs Enforcement,**
**Department of Homeland Security,**
**500 12th Street SW, Washington, DC 20536**

**RE: Apprehension, Processing, Care and Custody of Alien Minors and Unaccompanied Alien
Children**

Dear Ms. Seguin,

The Center for Law and Social Policy (CLASP) is grateful for the opportunity to comment on this
proposed rule. CLASP strongly opposes the proposed changes to the Flores settlement agreement.
We urge the Administration to withdraw the regulation and uphold current provisions regarding
implementation of the Flores settlement.  The proposed regulations, which would expand the use of
family detention and weaken protections for migrant children, should be withdrawn because they
are inconsistent with the terms of the settlement and are inappropriate, ineffective, immoral, and at
great odds with decades of research on child wellbeing.

Established in 1968, CLASP is a national, non-partisan, non-profit, anti-poverty organization that
advances policy solutions for low-income people. CLASP staff have expertise in, and have conducted
national research, on how immigration enforcement policies impact the safety and wellbeing of
children.[1] For decades, CLASP has been a leading expert on early education policies that promote
the wellbeing and healthy development of low-income young children. We have a deep
understanding of the importance of health, safety, and quality standards in early childhood settings,
as well as the consequences for children and families when they do not have access to high-quality
settings or are cared for in suboptimal settings. These comments draw upon CLASP expertise in the
areas of child development, child care, child welfare, and immigration policy.

Our comments below explain why (1) the overall framework of the proposed regulations is deeply
flawed, harmful to children, unjustified, and inconsistent with the available research and evidence
and (2) many specific provisions cause additional harm to the safety and development of
unaccompanied children.

1.  **A deeply flawed proposal that would harm children**

The *Flores* settlement was established to ensure that migrant children in the custody of the federal
government are afforded critical protections and cared for in settings that are in the best interest of
the child. This is consistent with international, federal, and state laws recognizing that children are
unique from adults and should be afforded special protections. The unique developmental needs of
children, extensively described in a substantial research record, are of paramount importance when
crafting policies that directly impact their health, safety, and wellbeing.

At its core, this proposed rule relies on flawed rationales and ignores relevant research to justify the
expansion of family detention and the removal of protections for migrant children—both of which
would greatly undermine the safety, development, and wellbeing of children. The proposed rule
disregards decades of child welfare research and practice that uphold the best interests of children
and the crucial importance of the parent-child relationship. It also relies on false assertions that the
practice of detention itself strengthens the parent-child relationship and will deter other migrants
from the entering the United States.

Expanding the Harmful Practice of Family Detention

We are opposed to the harmful and dangerous practice of detaining children—alone or with their
parents—and firmly believe that all facilities overseeing the care of children should be subject to
standards established by an agency with expertise in child welfare. The expanded use of family
detention, as a result of this proposal, will have the following damaging effects:

- *Harms to mental and physical health.* Numerous medical experts have denounced
  immigration detention centers as harmful to the short- and long-term health of children.
  Research indicates that detention for any amount of time, but especially for an extended
  period, undercuts children's wellbeing. Dr. Luis Zayas, a child mental health expert, evaluated
  nearly 50 children and mothers in multiple detention centers and found extremely high levels
  of anxiety, depression, suicide attempts, and regressions in child development.[2] These
  regressions include declines in language development, impaired cognitive development, bed
  wetting, decreased eating, sleep disturbances, social withdrawal, and aggression.[3]
  Researchers have also found that the negative consequences of even brief detention can
  cause long-term trauma and mental health risks for children. Other medical experts have
  testified that detention centers have poor conditions and do not provide adequate access to
  health services, including long wait times for medical attention and inadequate treatment for
  chronic conditions.[4] In one case, an 18-month-old toddler died of respiratory failure after she
  and her mother were released from the Dilley detention center where she was provided
  inadequate treatment despite a consistently high fever and progressively worsening
  symptoms.[5]

- *Harms to young children.* Detention is harmful and inappropriate for children of any age, but it is particularly bad for young children. The first years of a child's life are of paramount importance to their later success and wellbeing.[6] Many children in family detention centers are infants, toddlers, or children under the age of six.[7] Young children's early experiences shape their long-term development. Detention centers are extremely stressful and unstable environments that often undermine parent-child relationships, which are the foundation of children's healthy development. Children's mental health and social-emotional development is also inextricably linked to that of their parents and caregivers, and the suffering of their parents has a collateral impact on them. Persistent and substantial exposure to fear and anxiety—sometimes called "toxic stress"—can do immense damage to children's health. This level of stress can interfere with young children's physical brain development leading to mental health disorders, developmental delays, and physical and mental health problems that last into adulthood.[8]

- *Harms to the parent-child relationship.* DHS claims that the "proposed rule may in some respects strengthen the stability of the family and the authority of and rights of parents in the education, nurture, and supervision of their children, within the immigrant detention context." This statement has no factual basis and runs counter to research showing that detention centers interfere with the parent-child relationship by undermining parental authority in matters of discipline and basic decision-making, such as child care, education, and social interactions.[9] Sharing bedrooms and eating quarters with multiple families on a daily basis prevents parents from creating normal family routines; this lack of control creates additional stress for parents that is passed on to children. For babies and toddlers, especially, institutions interfere with the developing parent-child relationship and create high levels of stress for parent and child.[10]

We ultimately concur with findings of the advisory committee of experts in child development, education, and children's rights that made the following over-arching recommendation with regards to family detention in its 2016 report:

> *DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children. DHS should discontinue the general use of family detention, reserving it for rare cases when necessary following an individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release. If such an assessment determines that continued custody is absolutely necessary, families should be detained for the shortest amount of time and in the least restrictive setting possible; all detention facilities should be licensed, non- secure and family-friendly.[11]*

<u>The rule is based on the flawed premise that family detention is effective.</u>

One of DHS's rationales for the prolonged use of family detention is that it will deter other migrants from entering the United States.[12] Neither family separation nor detention have been effective deterrents for migrants as shown by both DHS and external researchers.[13] Many of the families who are detained by DHS entered the United States to escape the extraordinarily high rates of murder and gender-based violence in El Salvador, Guatemala, and Honduras.[14] So long as the conditions in these countries are unchanged, families will continue to have a compelling motive to enter the United States and other countries in the region. It is important to note that many of the children and families who would be impacted by this rule are likely eligible for asylum based on U.S. Citizenship and Immigration Services (USCIS) data showing that nearly 88 percent of families in its detention centers have exhibited credible fear.[15]

<u>The rule ignores the effectiveness of more child-appropriate alternatives to detention programs.</u>

The rule sets up a false dichotomy between two options: family separation or detention. In fact, more humane and developmentally appropriate alternative methods exist to ensure that families comply with their immigration orders. Family case management models that place families in communities and connect them to services that support them throughout their immigration case not only provide a more humane and cost-effective alternative to detention, but also promote healthy child development and can help families better integrate into their new communities. In fact, following the increase in family units in 2014, DHS introduced a pilot program in 2016 known as the Family Case Management Program (FCMP). The FCMP operated from January 2016 to June 2017 with 952 families across five major cities. The FCMP solely served families seeking asylum and used research-based individualized case management and partnerships with community-based organizations to give families in the program a deep understanding of the immigration process to encourage their compliance with U.S. immigration law.[16]

The FCMP was successful at ensuring compliance at a low cost. Of the program's participants, 99.3 percent attended their immigration court hearings and 99.4 percent attended their appointments with ICE. Some of the participants were granted immigration relief including asylum, while others were ordered removed. Importantly, those who were ordered removed complied with their removal. The FCMP achieved extremely high rates of compliance at much lower costs than family detention. While detaining families in DHS facilities costs nearly $320 per person per day,[17] the FCMP costs $38 per day per family unit. The cost to detain a family of 3 for 20 days is more than 25 times the cost to enroll them in the FCMP.

<u>The rule would create a new licensing scheme that may put children's safety at risk.</u>

The Flores settlement specifically requires that federal authorities must transfer children in their custody to a "qualifying adult or a non-secure facility that is licensed by the states to provide

residential, group, or foster care services for dependent children." The rule proposes an alternative federal licensing scheme, consistent with ICE standards for family residential centers, that would govern the operation of family detention. The proposal purports that such a scheme would "provide effectively the same substantive protections that the state licensing requirement [in the Flores agreement] exists to provide" while at the same time acknowledging that "the proposed alternative license for FRCs…may result in additional or longer detention for certain minors."

State licensing standards for the care of children in out-of-home settings exist to provide a baseline of protection for the health and safety of children in light of their particular needs and vulnerability.[18] Such licensing regulations can safeguard the health and safety of children by mitigating risks of injury or death, reducing the spread of communicable diseases, and setting up conditions that promote positive child development. Agencies use such standards because their missions typically include safeguarding the wellbeing of children (such as a child welfare or child care agency). An alternative licensing scheme would not be "materially identical to the underlying principles established by Flores" in that Flores recognized the unique vulnerability of children and the unique considerations their status as children necessitates in licensing a detention facility. Regulations for the care of children differ by age as does children's development. A lack of attention to the unique needs of the youngest children is especially harmful because the health and wellbeing of infants and toddlers are dependent on their caregivers and environments.[19]

Moreover, research makes clear that more frequent observations of compliance, through the monitoring of standards, are more likely to yield compliance with licensing standards. For monitoring to play that critical role, the credibility and impartiality of the monitor is essential. In the proposed regulation, DHS proposes to ensure compliance through the use of a third-party auditor. A monitor whose client is the same entity being monitored raises significant concerns regarding the monitor's credibility and impartiality.

Current standards for ICE family detention centers fail to address core components of child wellbeing and protection. These standards lack a recognition of the wide range of children's socio-emotional, health, mental health, and physical developmental needs at varying ages.[20] Moreover, DHS has a history of mistreating families and children in its detention centers. The conditions in family detention centers are clearly not conducive to providing these vulnerable families with the support they need, and evidence suggests that children's mental health and development deteriorates the longer they are in detention.[21] Experts report regressions in child development, suicide attempts, and high levels of anxiety and depression among detained children.[22] Furthermore, various assessments—including a 2016 assessment made by a DHS-appointed advisory committee—have established that appropriate standards are simply impossible within the context of family detention.[23]

The rule notes that family detention centers are not aligned with existing state licensing systems. In fact, the myriad licensing challenges that detention facilities face demonstrate the importance of this requirement of the Flores settlement agreement and the crucial role of licensing and monitoring in guarding against and identifying inappropriate conditions for children. For example, the T. Don Hutto Center in Texas closed after three years of operation due to multiple lawsuits about the center's poor conditions.[24] In January 2016, the Pennsylvania Department of Human Services revoked the child care license of the Berks County Residential Center because DHS was found to be using its license inappropriately.[25] Demonstrating the agency's disregard for child care licensure standards and regulations, the facility continued to operate for a year with a suspended license.

In late 2015, the Texas Department of Family Protective Services introduced a regulation called the "FRC rule" that would allow the Dilley detention center to detain children while exempt from statewide health and safety standards. In June 2016, a judge ruled that such an exemption could put children at risk of abuse, particularly due to shared sleeping spaces with non-related adults. In December 2016, that decision was upheld by a federal judge.[26] The numerous reports of sexual abuse at DHS facilities and lack of adequate medical services point to the urgent need for appropriate oversight of facilities housing families and children.[27]

## 2. Undermining the Safety and Development of Unaccompanied Children

The proposal includes numerous troubling provisions that would weaken the protections guaranteed under existing law for unaccompanied children who enter the United States without their parents or family members. These changes would significantly exacerbate the trauma experienced by vulnerable children seeking refuge in the U.S.—a population that now includes an increasing number of young children—and put them at greater risk of being unnecessarily returned to the very danger they were seeking to escape. Specifically, the regulations would:

Limit the extent to which children can be released from detention.

The proposed changes under 8 CFR 212.5 would hold children in expedited removal proceedings to the same standard as adults in parole release decisions. Children—particularly those who have undergone trauma—experience great harm from any time in detention; therefore, it is critical that they remain eligible for release on a case-by-case basis, including discretion for humanitarian circumstances.[28] Prolonged detention has been shown to exacerbate trauma and its negative impacts. Children in detention are 10 times more likely to develop Post-Traumatic Stress Disorder (PSTD) than adults, and their symptoms become increasingly common the longer a child is in detention.[29] The proposed change would only allow release for medical necessity or for law enforcement purposes. It would also limit the extent to which an immigration judge can consider other risk factors such as reunification with family or mental health needs, putting numerous children at great risk for long-term developmental harm. U.S child welfare practices have moved

progressively away from placing children in congregate care. [30] Settings are chosen in consideration of the best interests of the child, including placing children in the least restrictive setting available and with a preference for placing children in the care of or in close proximity of family members.[31] The proposed rule moves even further away from well-accepted principles of child welfare by disregarding the best interest of the child and limiting children's release from detention facilities.

<u>Make it more difficult for unaccompanied children to reunify with family.</u>

Currently, children transferred to the care of the Office of Refugee Resettlement (ORR) can be released to a parent, legal guardian, or an adult relative. DHS proposes removing the terms "brother," "sister," "aunt," "uncle," or "grandparent" from the definition of "adult relative" and restricting release only to "parent or legal guardian." This proposal runs contrary to release standards specifically stipulated in the *Flores* settlement.[32] The proposal is also at odds with existing child welfare principles that recognize the importance of keeping children with their families whenever possible to minimize trauma, promote child wellbeing and reduce the harm to children from spending time in congregate care settings. A wealth of research guiding U.S. child welfare practice supports placing children who are not able to be reunified with parents in the care of relatives (also known as "kinship care")—including with grandparents and other adult relatives—to minimize the trauma caused by separating a child from a parent and to help maintain family and cultural ties.[33] By restricting the type of relative a child may be released to, DHS is increasing the likelihood of children being held indefinitely in institutional care—at great developmental risk—and denying them the ability to be reunited with family.

<u>Puts children at risk of losing their protections.</u>

Under 8 CFR 236 (c), the rule proposes creating a new process for determining the age of a minor based on a "reasonable person" standard, with little guidance on who would be qualified to make such a determination or what factors should be considered, other than medical and dental examinations. Under 8 CFR 236 (d), the rule proposes that unaccompanied minors undergo a redetermination process each time they are encountered by an immigration officer. These additional burdens would delay the extent to which children are afforded the protections they are entitled to as unaccompanied children and put them at risk of losing their protections throughout the duration of their immigration process. The rule also grants increased discretion to both DHS and the Department of Health and Human Services to suspend protections for unaccompanied children, reduce accountability, and put children at greater risk of being held in inappropriate conditions for extended periods of time.

**Conclusion**

As experts in child development, we strongly oppose this rule and urge the Administration to withdraw the rule and uphold the standards established by the Flores settlement. The changes outlined in the NPRM would compromise the immediate safety of vulnerable children and harm their long-term development. We are deeply concerned that the proposed rule would expand the harmful practice of jailing children with their families by creating a separate licensing system for such facilities. The rationale provided for this devastating harm to children and to the parent-child relationship is deeply flawed and ignores relevant research. No modest fixes will solve the fundamental problems with this regulation; it must be withdrawn.

Rather than roll back protections, the Administration should be focused on strengthening and expanding services to children and working to ensure that vulnerable children and their families are supported throughout the immigration enforcement process. There is never an appropriate reason to jail children, rob them of their basic needs, or needlessly separate them from their parents. Every child who comes into the custody of our government, regardless of immigration status or where they came from, should be guaranteed protection and services to mitigate trauma and promote their healthy development.

Endnotes

[1] Wendy Cervantes, Rebecca Ullrich, Hannah Matthews, *Our Children's Fear: Immigration Policy's Effects on Young Children,* CLASP, 2018, **https://www.clasp.org/publications/report/brief/our-childrens-fear-immigration-policys-effects-young-children.**
[2] Claire Hutkins Seda, *Dr. Luis Zayas Provides Testimony on Family Detention*, Migrant Clinicians Network, 2015, **http://www.migrantclinician.org/blog/2015/jul/dr.-luis-zayas-provides-testimony-family-detention.html.**
[3] Megan J. Wolff, *Fact Sheet: The Impact of Family Detention on Children, 2018,* **http://psych-history.weill.cornell.edu/pdf/Family_Detention_Sheet.pdf** ; Julie M. Linton, Marsha Griffin, Alan J. Shapiro, *Detention of Immigrant* Children, American Academy of Pediatrics, 2017, **http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483#ref-59** ; Olga Byrne, Eleanor Acer, *Family Detention: Still Happening, Still* Damaging, Human Rights First, 2015, **http://www.humanrightsfirst.org/sites/default/files/HRF-family-detention-still-happening.pdf.**
[4] Meredith Hoffman, *Prison Company Struggles to get License to Hold Children,* Associated Press, 2017, **https://apnews.com/adbd71efcfaf4b9a96c379face79fbe9/private-prison-company-struggles-get-license-family**; Human Rights First, *Family Detention in Berks County, Pennsylvania,* 2015, **http://www.humanrightsfirst.org/sites/default/files/HRF-Family-Det-Penn-rep-final.pdf.**
[5] Kaelyn Forde, *Mother of Toddler Who Died After Being Released From ICE Custody Files Wrongful Death Claim*, ABC News, 2018, **https://abcnews.go.com/US/mother-toddler-died-released-ice-custody-files-wrongful/story?id=57473060**.
[6] Harvard University Center on the Developing Child, *InBrief:Early Childhood Mental Health,*2013, **https://developingchild.harvard.edu/resources/inbrief-early-childhood-mental-health/**.
[7] Lutheran Immigration Refugee Service, Women's Refugee Commission, *Locking Up Family Values, Again,* 2014, **https://innovationlawlab.org/wp-content/uploads/2015/01/Fam-Detention-Again-Full-Report.pdf**.

[8] Harvard University Center on the Developing Child, *Key Concepts: Toxic Stress,* **https://developingchild.harvard.edu/science/key-concepts/toxic-stress/**; National Scientific Council on the Developing Child, Persistent Fear and Anxiety; Jack P. Shonkoff, Andrew S. Garner, et al. "The Lifelong Effects of Early Childhood Adversity and Toxic Stress," Pediatrics 129 (2012).

[9] Muzaffar Chishti, Sarah Pierce, *Trump Administration's New Indefinite Family Detention Policy: Deterrence Not Guaranteed, Migration Policy Institute, 2018,* **https://www.migrationpolicy.org/article/trump-administration-new-indefinite-family-detention-policy**

[10] Jack P. Shonkoff and Deborah A. Phillips, eds., From Neurons to Neighborhoods: The Science of Early Childhood Development, National Research Council and Institute of Medicine, 2000.

[11] Immigration and Customs Enforcement, *Report of the DHS Advisory Committee on Family Residential Centers, 2016,* **https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf**.

[12] Pamela Constable, *U.S. Holding Families in Custody to Keep Others from Crossing the Border,* The Washington Post, 2016, **https://www.washingtonpost.com/local/social-issues/us-holding-families-in-custody-to-keep-others-from-crossing-the-border/2016/03/05/14fc9fb6-da6d-11e5-891a-4ed04f4213e8_story.html?utm_term=.ea8544967ed9**.

[13] Muzaffar Chishti, Sarah Pierce, *Trump Administration's New Indefinite Family Detention Policy: Deterrence Not Guaranteed, Migration Policy Institute, 2018,* **https://www.migrationpolicy.org/article/trump-administration-new-indefinite-family-detention-policy**

[14] United Nations High Commissioner for Refugees, Women on the Run: First Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico, United Nations, 2015, **http://www.unhcr.org/enus/publications/operations/5630f24c6/women-run.html** .

[15] U.S. Citizenship and Immigration Services, *USCIS Asylum Division Family Facilities Reasonable Fear, 2015,* **https://www.uscis.gov/sites/default/files/USCIS/Outreach/PED-CF-RF-familiy-facilities-FY2015Q2.pdf**.

[16] Women's Refugee Commission*, Backgrounder: Family Case Management Program*, 2018 **https://www.womensrefugeecommission.org/rights/resources/1653-family-case-management-program**

[17]Department of Homeland Security, *Budget Overview FY 2019,* U.S. Immigration and Customs Enforcement, **https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf**.

[18] Jack P. Shonkoff and Deborah A. Phillips, eds., From Neurons to Neighborhoods: The Science of Early Childhood Development, National Research Council and Institute of Medicine, 2000.

[19] Ross A. Thompson, "Early Attachment and Later Development," Handbook of Attachment: Theory, Research, and Clinical Applications, ed. Jude Cassidy and Phillip R. Shaver, 1999, 265-286; Anne Case and Christina Paxson, "Parental Behavior and Child Health," Health Affairs 21 (2002), **http://content.healthaffairs.org/content/21/2/164.full**.

[20] U.S. Department of Homeland Security, *Family Residential Standards,* U.S. Immigration and Customs Enforcement, 2018, **https://www.ice.gov/detention-standards/family-residential**.

[21] Australian Human Rights Commission, *The Forgotten Children: National Inquiry on Immigrant Children in Detention*, 2014, **https://www.humanrights.gov.au/our-work/asylum-seekers-and-refugees/publications/forgotten-children-nationalinquiry-children**.

[22] Claire Hutkins Seda, *Dr. Luis Zayas Provides Testimony on Family Detention*, Migrant Clinicians Network, July 29, 2015, **http://www.migrantclinician.org/blog/2015/jul/dr.-luis-zayas-provides-testimony-family-detention.html**.

[23] Immigration and Customs Enforcement, *Report of the DHS Advisory Committee on Family Residential Centers, 2016,* **https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf**.

[24] American Civil Liberties Union, ACLU Challenges Illegal Detention of Immigrant Children Held in Prison-Like Conditions, 2007, **https://www.aclu.org/news/aclu-challenges-illegal-detention-immigrant-children-held-prisonconditions?redirect=cpredirect/28865**.

[25] Michael Matza, P*A Fights to Shut Down Immigrant Family Detention Center in Berks*, The Inquirer, 2017,**http://www2.philly.com/philly/news/pennsylvania/Pa-renews-effort-to-revoke-the-license-of-immigrant-family-detention-center---.html**; Renée Feltz, *Pennsylvania Doubles Down on Revoking Child-Care License for Controversial Family Detention Center*, Rewire, 2017,**https://rewire.news/article/2017/05/05/pennsylvania-doubles-revoking-child-care-license-controversial-family-detention-center/** .

[26] Alexa Garcia-Ditta, *Judge Halts Child Care License for Dilley Detention Center*, Texas Observer, 2016, **https://www.texasobserver.org/immigrant-family-detention-license-hold/**; Grassroots Leadership v. Texas Department of Family and Protective Services, Final Judgement, D-1-GN-15-004336, District Court of Travis County 2016,

https://grassrootsleadership.org/sites/default/files/uploads/gli_v._dfps_final_judgment.pdf; Representative Lucille Roybal-Allard, Representative Pramila Jayapal, *In ICE Detention Pregnant Women Face Stress, Trauma, and Inadequate Care,* The Hill, 2018, https://thehill.com/blogs/congress-blog/homeland-security/384602-in-ice-detention-pregnant-women-face-stress-trauma-and.

[27] Emily Kassie, *Sexual Assault inside ICE Detention: 2 Survivors Tell Their Stories,* The New York Times, 2018, https://www.nytimes.com/2018/07/17/us/sexual-assault-ice-detention-survivor-stories.html.

[28] Thomas M. Crea, Laurie Cook Heffron, et al., *How do Immigrant Children and Families Experience Immigrant Detention,* The Center on Immigration and Child Welfare, New Mexico State University School of Social Work, 2018, http://cimmcw.org/wp-content/uploads/Family-Detention-Research-Brief.pdf.

[29] Australian Human Rights Commission, *The Forgotten Children: National Inquiry on Immigrant Children in Detention*, 2015, https://www.humanrights.gov.au/our-work/asylum-seekers-and-refugees/publications/forgotten-children-national-inquiry-children.

[30] U.S. Department of Health and Human Services, *A National Look at the Use of Congregate Care in Child Welfare,* 2015, https://www.acf.hhs.gov/sites/default/files/cb/cbcongregatecare_brief.pdf.

[31] Annie E. Casey Foundation, *Rightsizing Congregate Care, 2009,* https://www.aecf.org/m/resourcedoc/AECF-RightsizingCongregateCare-2009.pdf.

[32] Reno v. Flores, 507 U.S. 292 (1993) https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf.

[33] Antonio Garcia, Amanda O'Reilly, et al., "The Influence of Caregiver Depression on Children in Non-Relative Foster Care Versus Kinship Care Placements," *Maternal and Child Health Journal* 19 (2014).

# Comments of The Children's Defense Fund



November 6, 2018

Submitted via email to ICE.Regulations@ice.dhs.gov

Debbie Seguin
Assistant Director
U.S. Immigration and Customs Enforcement Office of Policy
500 12th St., SW
Washington, D.C. 20536

Dear Ms. Seguin,

I am writing on behalf of the Children's Defense Fund of Texas in response to the Department of Homeland Security's (DHS) Notice of Proposed Rulemaking (proposed rule) to express our strong opposition to the proposed rule to amend regulations relating to the apprehension, processing, care, custody, and release of alien juveniles published in the Federal Register on September 7, 2018.

For over 15 years, the Children's Defense Fund-Texas has worked to ensure that every child has a Healthy Start and a Safe Start in life and successful passage to adulthood. CDF provides a strong, effective and independent voice for all the children of America who cannot vote, lobby or speak for themselves. We are committed to raising awareness about the challenges facing Texas children, connecting children and families to resources that help to meet their needs, and working with partners statewide to coordinate broad support for legislative action on behalf of Texas children and families.

For the reasons detailed in the comments that follow, DHS and the Department of Health and Human Services (HHS) should immediately withdraw their current proposal, and dedicate their efforts to advancing policies that safeguard the health, safety, and best interests of children and their families, not least through robust, good-faith compliance with the Flores Settlement Agreement.

As we write, thousands of vulnerable immigrant children are being forcibly held in detention centers under conditions that cause extreme distress and trauma. This is a violation of their human rights, and a violation of the commitments we, as a nation, have made about who we are and how we ought to treat people. As written, the proposed regulations would essentially permit indefinite detention of children, limit the family members to whom a detained child could be released, and roll back the minimal standards currently in place for children's access to health, education, and special needs accommodations. Furthermore, the regulations would allow detention centers to "self-certify" as child care facilities, a proposal that dismisses the concepts of oversight, accountability, and child care standards, and in the end represents a serious miscarriage of justice. Our main points of concern are the wellbeing and safety of immigrant children and families, the restrictions placed on children being released from detention centers, the potential for living conditions to considerably worsen in detention centers, and the unnecessarily high cost of the NPRM. We strongly urge you to consider these concerns before moving forward with the proposed changes.

To allow for the indefinite detention of migrant children is tantamount to child abuse. Any amount of time is too long for a migrant child to be held in a detention center. After fleeing a life filled with danger, violence, and fear, and then surviving the dangerous trek to the United States, to incarcerate these children is piling additional and unnecessary trauma upon them. Growing up in settings of

ongoing stress interferes with children's normal development, causing deep psychological stress as well as, intellectual and cognitive impairments.[1] These impacts can have harmful repercussions throughout a child's life.

According to medical experts, DHS detention facilities are not appropriate places for children to be housed.  In 2017, the American Academy of Pediatrics published a policy statement titled *Detention of Immigrant Children* stating that immigrant children seeking safe haven in the United States should never be placed in detention facilities.[2] The American Medical Association has also adopted a policy opposing family immigration detention given the negative health consequences that detention has on both children and their parents.[3]  In 2018, the American College of Physicians released a policy stating that "forced family detention—indefinitely holding children and their parents, or children and their other primary adult family caregivers, in government detention centers until the adults' immigration status is resolved—can be expected to result in considerable adverse harm to the detained children and other family members, including physical and mental health, that may follow them through their entire lives, and accordingly should not be implemented by the U.S. government."[4]

Despite these and many other warnings from medical experts, DHS proposes in this NPRM to substitute its own Immigration and Customs Enforcement (ICE) family residential standards where its family detention facilities cannot obtain licensing from state, municipal, or other appropriate child welfare entities.[5] This would have the effect of eliminating the critical Flores Settlement Agreement limitation on the detention of children in unlicensed facilities. As a result, and as explicitly intended by DHS in promulgating these proposed rules, DHS would detain children with their families for the entirety of their immigration proceedings--in effect, indefinitely.

The proposed rule would also include restrictions that will make it harder for children to be released from detention centers by changing the immediate release protocol by only allowing a child to be released to a parent or legal guardian. Since many parents of detained children are likely to be detained themselves, a majority of these children have little to no chance of seeing a speedy and just release. Immigrant children could spend months to years in detention while waiting for the release of their parent/guardian.

In Texas, the current living conditions in detention centers have been full of reports of negligence. There have been firsthand accounts in a lawsuit filed against the government's detention of children that included allegations of physical and verbal abuse, inedible food, undrinkable water, unhygienic bathroom facilities, and generally uninhabitable living conditions.[6] There are currently 13 detention centers across Texas, two of which are family detention centers. According to the report by the Unitarian Universalist Service Committee, *No Safe Haven Here: Children and Families Face Trauma in the Hands of U.S. Immigration*, the centers are not equipped — in terms of appropriate staff training,

---

[1] Linton, Julie M. et al. "Detention Of Immigrant Children". *Pediatrics*, vol 139, no. 5, 2017, p. e20170483. *American Academy Of Pediatrics (AAP)*, doi:10.1542/peds.2017-0483. http://pediatrics.aappublications.org/content/139/5/e20170483
[2] Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.
[3] American Medical Association, "AMA Adopts New Policies to Improve Health of Immigrants and Refugees," June 12, 2017, https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees.
[4] American College of Physicians, "The Health Impact of Family Detentions in Immigration Cases," July 3, 2018, https://www.acponline.org/acp_policy/policies/family_detention_position_statement_2018.pdf.
[5] *See* 83 FR 45525
[6] United States District Court Central District of California, Western Division. *Jenny Lisette Flores, Et Al. vs. Jefferson B. Sessions, Attorney General of the United States, Et Al.* 27 July 2018., https://www.documentcloud.org/documents/4609538-Flores-0716-459-4.html

infrastructure, and policies — to house and care for children without causing significant physical and emotional harm to them.[7]

Any length of detention is known to have negative short and long-term effects on the health and well-being of refugees, many of whom are children and the survivors of multiple traumas. *Indefinite* detention is guaranteed to trigger severe medical and mental health consequences.[8] Numerous clinical studies have demonstrated that the mitigating factor of parental presence does not negate the damaging impact of detention on the physical and mental health of children.[9] In a retrospective analysis, detained children were reported to have tenfold increase in developing psychiatric disorders.[10] Studies of health difficulties of detained children found that most children since being detained reported symptoms of depression, sleep problems, loss of appetite, and somatic complaints such as headaches and abdominal pains; specific concerns include inadequate nutritional provisions, restricted mealtimes, and child weight loss.[11] DHS' own medical experts recorded a case in which a 16-month-old baby lost a third of his body weight over 10 days because of untreated diarrheal disease, yet was never given IV fluids.[12]

Indeed, in Texas the evidence shows that the family residential centers at Karnes and Dilley are no different.  Women and children reported wait times of three to fourteen hours to receive medical care.[13] These wait times routinely occur in cases of serious and urgent conditions. In at least one instance, a mother who had to leave the medical line after waiting for hours was forced to sign a letter stating she refused medical care.[14] The children in these facilities have been through horrendously traumatic experiences such as rape; witnessing the murders of friends, family, and neighbors; death threats; kidnapping for ransom; widespread extortion; losing family members to gangland assassinations; and forced conscription of small children into violent gangs. Detention only serves to re-traumatize these already vulnerable children and families.[15] Dr. Amy Cohen, a child psychiatrist, has worked with trauma victims for over 30 years and has said that she has never spoken to more traumatized individuals.[16] Dr. Cohen worked with children and families in the McAllen, TX detention center and

---

[7] O'Connor, Kathleen et al. "No Safe Haven Here: Children And Families Face Trauma In The Hands Of U.S. Immigration". *Uusc.Org*, 2018, http://www.uusc.org/sites/default/files/no_safe_haven_here_-_children_and_families_face_trauma_in_the_hands_of_u.s._immigration.pdf.

[8] Physicians for Human Rights, Punishment before Justice: Indefinite Detention in the US (June 1, 2011), https://phr.org/resources/punishment-before-justice-indefinite-detention-in-the-us/.

[9] Dudley, Michael, Zachary Steel, Sarah Mares, and Louise Newman. Children and Young People in Immigration Detention. Current Opinion Psychiatry 25, no. 4 (July 2012): 285-92. doi:10.1097/YCO.0b013e3283548676; Ehntholt, K., Trickey, D., Harris Hendriks, J., Chambers, H., Scott, M., Yule, W., & Tibbles, P. (2018). Mental health of unaccompanied asylum-seeking adolescents previously held in British detention centres. Clinical Child Psychology and Psychiatry, 23(2), 238–257; Kronick, R., Rousseau, C., & Cleveland, J. (2015). Asylum-seeking children's experiences of detention in Canada: A qualitative study. American Journal of Orthopsychiatry, 85(3), 287.

[10] Steel, Zachary, Shakeh Momartin, Catherine Bateman, Atena Hafshejani, Derrick M. Silove, Naleya Everson, Konya Roy, Michael Dudley, Louise Newman, Bijou Blick, and Sarah Mares. Psychiatric Status of Asylum Seeker Families Held for a Protracted Period in a Remote Detention Centre in Australia. Australian and New Zealand Journal of Public Health 28, no. 6 (September 25, 2004): 527-36. doi:10.1111/j.1467-842x.2004.tb00042.x.

[11] Lorek, Ann, Kimberly Ehntholt, Anne Nesbitt, Emmanuel Wey, Chipo Githinji, Eve Rossor, and Rush Wickramasinghe. The Mental and Physical Health Difficulties of Children Held within a British Immigration Detention Center: A Pilot Study. Child Abuse & Neglect 33, no. 9 (September 2009): 573-85. doi:10.1016/j.chiabu.2008.10.005.

[12] Dr. Scott Allen and Dr. Pamela McPherson, Letter to the Senate Whistleblowing Caucus, July 17, 2018, https://www.whistleblower.org/sites/default/files/Original%20Docs%20Letter.pdf.

[13] Feliz, Wendy, and Maria Frausto. "Deplorable Medical Treatment At Family Detention Centers". *American Immigration Council*, 2018, https://www.americanimmigrationcouncil.org/news/deplorable-medical-treatment-family-detention-centers. Accessed 5 Nov 2018.

[14] Feliz, Wendy, and Maria Frausto. "Deplorable Medical Treatment At Family Detention Centers". *American Immigration Council*, 2018, https://www.americanimmigrationcouncil.org/news/deplorable-medical-treatment-family-detention-centers.

[15] Lee, Esther Yu Hsi. "How Immigration Detention Centers Retraumatize Women And Children Fleeing From Violence". *Thinkprogress.Org*, 2015, https://thinkprogress.org/how-immigration-detention-centers-retraumatize-women-and-children-fleeing-from-violence-5624ac39e0ec/.

[16] Cohen, Amy. "Child Immigration: Mental Health Issues". *SERMO*, 2014, http://blog.sermo.com/2014/08/15/child-immigration-mental-health-issues/

recounted their stories, of trauma and violence in their home countries, PTSD from the initial separation and detention in the United States, and their uncertain living conditions in detention centers.[17] Dr. Cohen concludes that these separation and detention conditions are sites of extreme and continuous trauma. Instead of providing the trauma-informed care refugees deserve, these facilities treat refugees and children inhumanely. Allowing families to be detained in these facilities implicitly validates the inhumane treatment of migrant families.

By seeking to extend the lengths of stay for children, the Administration is endorsing a practice that is in violation of international conventions for the treatment of refugees and asylees. According Article 37 of the United Nations Convention on the Rights of the Child (CRC), detention of children should "be used only as a measure of last resort and for the shortest appropriate period of time."[18] Additionally, the CRC states that children shall not be arbitrarily denied his or her liberty and should have "prompt access to legal and other appropriate assistance."[19] The immigrant families and children who enter the United States to seek asylum have broken no law – indeed, they are following international conventions for asylum, which dictate that an individual must present themselves at the border and ask to be given a hearing for asylum. Under the detention guidelines set forth by the United Nations High Commissioner for Refugees  (UNHCR), asylum seekers should only be detained under exceptional circumstances, *which does not include illegal entry.*[20] The UN Convention and Protocol on the status of refugees also states that there should not be penalties for illegal entry or presence for those refugees whose life or freedom was at risk.[21]

Our third concern focuses on the potential for these already inappropriate, often dangerous, and occasionally lethal conditions to worsen with the proposal for detention centers to self-certify. Under the proposed regulation that would supersede *Flores*, DHS would be able to detain children for prolonged periods in facilities that are not licensed by a state child welfare agency. The proposal would allow DHS to "employ an entity outside of DHS that has relevant audit experience to ensure compliance with the family residential standards established by ICE [Immigration and Customs Enforcement]."[22] DHS claims that this would provide "materially identical assurances about the conditions" of family detention centers while allowing for longer periods of detention.[23] However, as already discussed above in the comments about conditions in detention centers here in Texas, there is ample evidence of DHS's record of oversight, transparency, and accountability leave much to be desired in the care and treatment of detainees. This sort of self-certification, or third-party contractor certification, is the recipe for a further deterioration of conditions, and seeds concerns among child advocates that DHS is neither capable nor desirous of taking seriously its responsibility for the well-being of the children and families in its custody.

The Trump Administration has claimed that a primary reason for the push towards increasing and lengthening detention of immigrant families is to deter more immigrants and asylum-seekers from

---

[17] Cohen, Amy. ""They Are Struggling": A Child Psychiatrist Writes From A Texas Shelter". *Instyle*, 2018, https://www.instyle.com/news/immigrant-children-trump-policy-longterm-effects

[18] UN General Assembly. "Convention on the Rights of the Child."Article 37. *United Nations Treaty Series*, vol. 1577, 1989, https://www.ohchr.org/Documents/ProfessionalInterest/crc.pdf.

[19] UN General Assembly. "Convention on the Rights of the Child."Article 37.

[20] UN High Commissioner for Refugees. *Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention*." 2012, http://www.unhcr.org/505b10ee9.html.

[21] UN General Assembly. "Convention Relating to the Status of Refugees." *United Nations Treaty Series*, vol. 189, 1951, http://www.unhcr.org/en-us/3b66c2aa10.

[22] Department of Homeland Security and Department of Health and Human Services, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," *Federal Register*, Vol. 83, No. 174, Sept. 7, 2018, p. 45525. https://www.gpo.gov/fdsys/pkg/FR-2018-09-07/pdf/2018-19052.pdf (Downloaded Oct. 15, 2018)

[23] *Id.*, p. 45488.

entering the United States.[24] However, data shows that the flow of immigrant and asylum seekers to the U.S. has not decreased since the implementation of these harsh policies.  Immigrant families continue to choose to seek asylum in the U.S. because of the dire circumstances they are fleeing in their home countries. As a result, these harsh policies result in only harming children without attaining any intended benefits.  Unlimited detention also violates the prohibition against torture and ill-treatment under U.S. and international law. The UN Special Rapporteur on torture has unequivocally stated that ill-treatment can amount to torture if it is intentionally imposed "for the purpose of deterring, intimidating, or punishing migrants or their families, or coercing them into withdrawing their requests for asylum".[25]

The United States does not have to engage in such problematic, ineffective, and expensive policies when effective and cost-effective alternatives exist.  Before establishing family detention centers like Karnes in 2010 and Dilley in 2014, existing US policy allowed asylum seekers to be in community-based settings. Concerns about low rates of attendance for legal proceedings are easily answered. When an asylee is working with legal representation, asylum seekers attend their court date 98 percent of the time.  Community-based organizations take care of asylum seekers in trauma free settings for only $20 dollars a day and have up to 99% court attendance rate. Even an ankle monitoring system, which CDF would oppose as unnecessary, could be implemented for $8 a day. By contrast, the proposed regulations are estimated to cost approximately $2.8 billion per year, which would constitute an unnecessary strain on the national budget. It seems self-evident that the only parties who reap the benefit of indefinite detention are the private prison corporations who maintain these facilities, and they will be raking in the profits in record hauls.[26] We should not opt to waste resources when there are less harmful and more sustainable options at our disposal.

Thank you for this opportunity to submit comments on the NPRM.

We implore you to reject the proposed changes to the Flores Amendment. Adopting it will put these families through incredible stress and force these children to suffer unnecessary trauma. We, as Americans, should not stand by and pass regulations that harm the innocent families and children seeking a better life in our country.

Sincerely,

Patrick Bresette
Executive Director

---

[24] Jordan, Miriam et al. "Trump's Plans To Deter Migrants Could Mean New 'Voluntary' Family Separations". *Nytimes.Com*, 2018, https://www.nytimes.com/2018/10/22/us/migrant-families-crossing-border-trump.html. Accessed 5 Nov 2018.

[25] Rapport of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Nils Melzer, Migration-related Torture and Ill treatment, A/HRC/37/50 (February 2018).

[26] Zusha Elinson, The Wall Street Journal, "Trump's Immigrant-Detention Plans Benefit Private Prison Operators". https://www.wsj.com/articles/trumps-immigrant-detention-plans-benefit-these-companies-1530523800

# Comments of First Focus on Children



| 1400 Eye Street NW, Suite 650 | Washington, DC 20005 | T: 202.657.0670 | F: 202.657.0671 | www.firstfocus.org |

November 5, 2018

*Submitted via www.regulations.gov*

Debbie Seguin
Assistant Director
Office of Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

Re: DHS Docket No. ICEB-2018-0002, Comments in Response to Proposed Rulemaking:
Apprehension, Processing, Care, and Custody of Alien Minors and
Unaccompanied Alien Children

Dear Ms. Seguin:

I am writing on behalf of First Focus, a bipartisan children's advocacy organization dedicated to the
health and well-being of all children, to express strong opposition to the proposed rule to amend
regulations relating to the apprehension, processing, care, custody, and release of alien juveniles
published in the Federal Register on September 7, 2018.

At First Focus we believe that all children, regardless of their immigration status should have the
opportunity for healthy growth and development. We believe that as a nation, it is our collective
responsibility to ensure that children who are seeking asylum in the United States are not deterred
from doing so and that our government provides the best protections and services to these
vulnerable children during every step of the process. We also agree with the long-standing child
welfare principle that children should be placed in the least restrictive setting possible and that
children do best when they are in the care of their family.

After years of litigation surrounding the treatment of children in immigration detention, the Flores
Settlement Agreement (FSA) set national standards and protections for the detention, release, and
treatment of both accompanied and unaccompanied children.  We are deeply opposed to any
changes that would undermine these protections for children and allow for their prolonged
detention in family detention facilities. Additionally, we oppose any amendments that will
allow immigrant children to be detained in facilities licensed by the Department of Homeland
Security (DHS) which has proven time and time again to be woefully inadequate and dangerous for
children.

Any changes to current standards should focus on the best interest of the child and build on the Flores protections. In every U.S. system that serves children—from the education system to the child welfare system—there is a recognition that policies and practices should be informed by research and seek to achieve the best possible outcomes for the children involved. Immigration enforcement and immigration policy decisions must consider the long-term consequences for children affected by these decisions. This proposed rule does not.

Thank you for the opportunity to submit the comments below on the NPRM. You may contact Kristen Torres at Kristent@firstfocus.org or by phone 202-866-0647 for more information.

## Comments on the Proposed Rule

**The proposed rule would cause significant harm to children by allowing them to be detained in family detention facilities.**

The rule proposes to allow detention of children with their parent or legal guardians for an extended period of time. Despite the fact that we know that detention for any amount of time has negative life-long consequences for a child's mental and physical well-being, and these consequences are compounded for children who have already experienced significant trauma. Children in detention facilities are ten times more likely than adults to experience symptoms of Post-Traumatic Stress Disorder (PTSD), and those rates increase the longer a child is in detention.[1] According to another study, the experience of being detained is "acutely stressful for children—even when detention is brief."[2] In addition to harming a child's mental and physical health, medical experts have also found that the conditions of detention can have life-long consequences for a child's academic, economic, and social development.[3] The American Academy of Pediatrics recommends discontinuing the general use of family detention and instead use community-based alternatives to detention for children and families.[4] Experts at the United Nations Office of the High Commissioner urge that migrant children be treated first and foremost as children. While family unity needs to be preserved at all costs, it cannot be done at the expense of detaining entire families with children. Family-based alternatives to detention must be adopted urgently.[5] The American Medical Association also opposes family detention due to the negative health outcomes on both the children and their parents.[6]

In addition to the harmful consequences for a child's physical and mental well-being, detention has proven ineffective in deterring refugees from migrating and violates both international and U.S. law. Mothers who are fleeing extreme violence in order to protect their children will continue to seek refuge, even if that means risking long periods in detention. The alarming increase in gender-based violence and gang-related crime in the Northern Triangle continues to endanger the lives of children

---

[1] Australian Human Rights Commission. (2015). The Forgotten Children: National Inquiry on Immigrant Children in Detention. Available at: https://www.humanrights.gov.au/our-work/asylum-seekers-and-refugees/publications/forgotten-children-national-inquiry-children.
[2] Kronick, R. and Rousseau, C. (2015) "Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study, II." American Journal of Orthopsychiatry, Vol. 85, NO. 3, 287-294.
[3] American Academy of Pediatrics. (July 24, 2015). Letter to DHS Secretary Johnson. Available at: http://bit.ly/1XXcHXD
[4] *American Academy of Pediatrics Statement on Executive Order on Family Separation*, June 20, 2018, https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Statement-on-Executive-Order-on-Family-Separation.aspx
[5] https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=23245&LangID=E
[6] American Medical Association, "AMA Adopts New Policies to Improve Health of Immigrants and Refugees," June 12, 2017, https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees

2

and families. Focusing on enforcement is a misguided approach that puts children's lives at risk and ignores the need to address the root causes of the violence in the countries that these families are fleeing. Former Secretary of Homeland Security Jeh Johnson recently stated, so long as the powerful "push factors" of poverty and violence in Guatemala, Honduras and El Salvador persist, the United States will continue to wrestle with the problem of migration on the border.[7]

**The proposed rule to allow new DHS licensing schemes would subject children to harmful detention conditions in facilities not licensed for children.**

Under the proposed rule DHS would be able to detain children in facilities that are not licensed by state child welfare agencies. Rather, a third party employed by DHS would ensure compliance with ICE family residential standards. DHS's current record of oversight and accountability for immigration detention facilities has been documented to be inadequate and harmful for children. The horrific conditions of past family detention facilities such as the Don Hutto facility in Texas caused the federal government to close the facility in 2009 due to dangerously inadequate conditions for children.[8] The Berks County facility in Pennsylvania refused to renew their child care licensing and consequently children who have been detained for more than a year are exposed to poor medical conditions and have been reportedly suicidal due to the conditions of such prolonged detention.[9]

Additionally, a recent report by DHS's own Office of Inspector General (OIG) released a harrowing alert regarding the conditions for immigrant detainees at the Adelanto ICE Processing Center in California.[10] Inadequate medical care, inappropriate use of solitary confinement, and serious issues related to detainee safety were among a few things found by the OIG. Similarly, ICE's own Advisory Committee on Family Residential Centers (ACFRC) issued as its first recommendation that ICE should discontinue the practice of family detention.[11] [12] It would be dangerous and misguided to allow DHS to certify its own standards for facilities that detain children.

**The proposed rule would have a devastating impact on unaccompanied children and their access to humanitarian protections.**

The proposed rule allows for ICE to re-determine whether someone who has previously been designated as an Unaccompanied Alien Child (UAC), meets the definition each time they come into contact with them. This adds a continuous level of uncertainty and fear for UACs and increases the burden of proof for children and youth who have already experienced significant trauma in their life. The Trafficking Victims Protection Reauthorization Act (TVPRA) sets the standards for caring for UACs and recognizes the vulnerability of children fleeing violence and persecution. A one-time

---

[7] Jeh Charles Johnson, *Washington Post*, "Trump's 'zero-tolerance' border policy is immoral, un-American, and ineffective," June 18, 2018, https://www.washingtonpost.com/opinions/trumps-zero-tolerance-border-policy-is-immoral-un-american--and-ineffective/2018/06/18/efe4c514-732d-11e8-b4b7-308400242c2e_story.html?utm_term=.1cee2d9e23e5

[8] https://www.aclu.org/news/dhs-plan-improve-immigration-detention-and-close-hutto-facility-good-first-step?redirect=cpredirect/40612

[9] http://www.post-gazette.com/news/politics-nation/2018/07/09/Berks-county-residential-center-asylum-seekers-could-become-model-mass-family-detention/stories/201807070078

[10] https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf

[11] Immigration and Customs Enforcement, Advisory Committee on Family Residential Centers (ACFRC), *Report on the DHS Advisory Committee on Family Residential Centers*, October 7, 2016, https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf

[12] American Psychological Association, *Joint Letter Opposing Family Detention Expansion*, September 14, 2018 file:///Users/kristentorres/Downloads/APA-Joint-Letter-Opposing-Family-Detention-Expansion-09142018%20(1).pdf

**3**

determination of a child's status promotes due process, safety, and access to necessary protections. Additionally, a new definition proposes that when a minor reaches the age of 18 and a parent or legal guardian is the U.S. is available to provide care and physical custody for such an alien they are no longer eligible for the protections.  The fact that a UAC may once be deemed as unaccompanied and then lose this status is concerning regardless of the changing circumstances. Any removal of protections for vulnerable children will result in government sanctioned harm by forcing such youth to continuously relive their traumatic life experiences. The proposed rule could also strip children and youth of critical access to legal counsel and social services dedicated for unaccompanied alien children. By stripping the minimal protections afforded to children and forcing them to defend the rights afforded to them by the TVPRA, their safety, well-being, and ability to meaningfully participate in immigration proceedings are severely undermined.

Additionally, the proposed rule adds the word "generally" with regards to FSA's requirement to segregate unaccompanied minors from unrelated adults while being detained. This addition reduces the absolute requirement of the provision and allows for opportunities for DHS to bypass this requirement.  The proposed rule also adds an exception to the segregation of unaccompanied minors from unrelated adults, "*in the case of an emergency or other exigent circumstances.*" This will again allow for UACs to be housed with unrelated adults for extended periods of more than 24 hours if DHS determines the circumstances to be emergent or pressing.

**The proposed rule will reduce standards of care and custody of both accompanied and unaccompanied children.**

The proposed rule would define "emergency or influx" more broadly than current FSA provisions, which are limited to, "*circumstances that impact the placement of minors within the proper time frame.*" The broader definition would add that emergencies may also be deemed for circumstances which also delay compliance with other provisions such as the inability to give meals to children on schedule. This is problematic and concerning as it is an opportunity for DHS and HHS to excuse non-compliance of FSA provisions that provide time limitations currently set for transferring children out of DHS custody. This would expose more children to longer periods of time in dangerous conditions in DHS custody. Broadening this definition would also allow for more opportunities for the government to ignore standards of care include in the FSA.

Sincerely,

Bruce Lesley
President

4

76

# Comments of The Lutheran Immigration and Refugee Service



Lutheran Immigration
and Refugee Service

November 6, 2018

*Submitted online: https://www.regulations.gov*

**Re: DHS Docket No. ICEB-2018-0002, Comments in Response to Proposed Rulemaking on "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children"**

<u>**LIRS Comment**</u>

I.     **Introduction**

For decades, LIRS has been committed to providing direct services and advocating on behalf of unaccompanied migrant children and accompanied children and their families throughout the United States.  The children we support have fled war, civil conflict, persecution, trafficking, extreme poverty, or maltreatment. LIRS oversees programs that provide long and short-term foster care, family reunification services, and post release services. Our services our trauma informed and designed to help children recover from the multiple hardships and traumas they experience from the time they spent in their home countries, throughout their journey to the United States and once they enter the United States.

During the April-June 2018 family separation crisis LIRS was directly involved in providing support for family reunification.  We helped coordinate travel arrangements and worked with 37 partners in 33 states to provide support to separated families once they arrived at their final destinations.  450 parents and children received temporary housing, food and care immediately following reunification and LIRS provided 'immediate care and counseling to 148 children who had been separated from their parents'[1].  Throughout the process we closely monitored each case to make sure that families had adequate resources and support to provide a safe and loving environment for their children.

LIRS's subject-matter expertise and experiences derived from serving the needs of accompanied and unaccompanied migrant children and their families make us uniquely situated to evaluate and comment on the Department of Homeland Security (DHS) and Department of Health and Human Services (HHS) proposed changes to the Flores Settlement Agreement (FSA) that was published in the Federal Register on September 7, 2018[2], Notice of Proposed Rulemaking (NPRM), "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children" (hereafter referred to as "proposed rule".

---

[1] The United States council of Catholic Bishops/Migration and Refugee Service and Lutheran Immigration and Refugee Service.  2018. 'Serving Separated and Reunited Families: Lessons Learned and the Way Forward to Promote Family Unity. (Online at: https://www.lirs.org/wp-content/uploads/2018/10/Serving-Separated-and-Reunited-Families_Final-Report-10.16.18-updated.pdf).

[2] "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children", 83 Fed. Reg. 45484 (September 7, 2018).

National Headquarters: 700 Light Street, Baltimore, Maryland  21230  |  Phone: 410-230-2700  |  Fax: 410-230-2890  |  www.LIRS.org

Advocacy Office: 110 Maryland Avenue NE, Suite 506/507, Washington, DC  20002  |  Phone: 202-381-1030  |  Fax: 202-330-5807

78

Per the written terms of the FSA, any superseding rule and/or legislation must adhere to the protections that are afforded children under the FSA[3].  We agree with the government's statement, that all children in the custody of the government should be treated with "dignity, respect, and special concern for their particular vulnerability as minors."  However, in this comment we identify ways in which the proposed rule runs afoul of ensuring that children's dignity and vulnerability are protected and explain how it deviates from FSA by weakening child protection standards, causing more harmful outcomes than good.

LIRS believes that our nation's immigration laws and system should always ensure that children's rights are placed front and center.  Alternatively, we strongly believe that detention is not in the best interest of the child. In this regard, we support retaining the Flores Settlement Agreement (FSA) because it offers the best set of child protection standards. We would like to see these standards strengthened not weakened.

### Proposed 8 CFR § 236.3(b)(9) Alternative Federal Licensing Scheme

Ensuring that children are placed in non-secure facilities that are licensed and able to provide children with adequate food, medical care and education are some of the key protections that the FSA affords unaccompanied and accompanied children.  LIRS is concerned with the proposed rule because it introduces an "alternative federal licensing scheme" that will allow the government to detain children and their families for longer periods of time in states where FRC's do not meet state licensing requirements.  Not only does the proposed rule allow DHS to create its own detention facilities so that it can detain children longer, it also gives DHS the authority to hire outside contractors to inspect the detention facilities.

By seeking to detain children and their families for extended periods of time, the proposed rule materially alters the FSA and defies decisions reached in the U.S. District Court for the Central District of California.  The FSA is clear, states must license facilities that house both adults and children.  Moreover, a U.S. District Court Judge for the Central District of California ruled that "the fact that the family residential centers cannot be licensed by an appropriate state agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement"[4].

LIRS advises against the DHS's 'alternative licensing scheme' because it will imperil children in a myriad of ways.  Case in point, there have been recent instances where detained children have reportedly received poor food and medical treatment and experienced psychological, physical and sexual abuses.  Correspondingly, there is no evidence proffered by the government to indicate that detention conditions have improved.  Physicians from the American Medical Association (AMA) have recently observed that detention facilities are not a safe environment for children and state that:

---

[3] Flores Settlement Agreement (FSA), Flores et al. v. Reno, et. al., Case No. CV 85-4544 (C.D. Cal., Jan. 1, 1997) (Online at: https://cliniclegal.org/sites/default/files/attachments/flores_v._reno_settlement_agreement_1.pdf)
[4] Order on Motion to Enforce at 12-13, *Flores, et al. v. Johnson*, et al., cv-85-4544 (C.D. Cal. July 24, 2015); Order on Motion to Enforce at 29, *Flores, et al. v. Sessions,* et al., cv 85-4544 (C.D. Cal. June 27, 2017)

> "[p]hysicians believe that detention centers used by the U.S. Immigration and Customs Enforcement (ICE) have failed to prevent human rights abuses and substandard living conditions, and they provide inconsistent access to quality medical care[5]."

Indeed, the ultimate reason we have the FSA is because an unaccompanied 15 year old girl from El Salvador, Jenny Lissette Flores, was placed into a mixed sex detention facility with adults where she was regularly strip searched and mistreated[6].  The FSA provisions are designed to ensure that children, like Jenny Flores, are not harmed in detention and this has been partially accomplished by having detention facilities comply with child welfare standards and allow for independent inspections at detention facilities.

Looking to the FSA Paragraph 6, facilities can only be certified by a state's child welfare agency, an entity that can fully ensure that the government run FRC's do not mistreat children. Under the proposed rule, DHS will not only run its own family residential detention centers, it will be allowed to hire an outside entity to monitor its FRCs.   How can an outside entity, employed by the government, independently monitor the FRC's when DHS does not have the proven capability to engage in effective oversight?  Or as the AMA highlights in the following statement:

> "Data demonstrates that substandard medical care in immigrant detention facilities has led to preventable deaths, yet deficient inspections by ICE Office of Detention Oversight allow these issues to go unresolved," said Dr. Gurman. "The AMA will take necessary steps to urge that immigrant detention facilities achieve full compliance with the meaningful standards set by the National Commission on Correctional Health Care[7]."

The importance of having a knowledgeable and independent entity inspect and certify detention facilities is brought to light by DHS's recent experiences.  The Nakamoto Group Inc., serves an independent contractor that has been hired to inspect some of DHS's adult detention facilities. In a 2018 report by the Office of Inspector General, the OIG called into question thoroughness of Nakamoto Group Inc.'s oversight and cited an ICE official who called into question inspections and referred to them as ineffective[8].

According to the OIG report, inspections are not conducted on a regular basis and are limited in scope which has led to important concerns being overlooked[9].  In cases where violations have been disclosed to inspectors, ICE fails to "systematically hold facilities accountable" and "some deficiencies remain unaddressed for years[10]."  This is extremely disturbing, considering that

---

[5] American Medical Association. June 12, 2017. AMA Adopts New Policies to Improve Health of Immigrants and Refugees. (Online at: https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees)

[6] Rebeca M. López, *Codifying the Flores Settlement Agreement: Seeking to Protect Immigrant Children in U.S. Custody*, 95 Marq. L. Rev. 1635 (2012).

[7] Supra note 6.

[8] Department of Homeland Security Office of Inspector General. June 26, 2018. *ICE's Inspections and Monitoring of Detention Facilities do not Lead to Sustained Compliance or Systemic Improvements.*  (OIG-18-67) (Online at: https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf)

[9] Id.

[10] Id at 4.

some of the violations that were ignored for years included sexual assault and unfounded strip searches[11].

By the government's own admission related to negligent oversight practices, it currently cannot guarantee that it has the capability to provide oversight to existing detention facilities; and we are concerned that the government will not be able to provide oversight to any new facilities as the rule proposes.  What is certain is that through this proposed rule, and the government's attempt to create an alternative licensing scheme, more children and their family's lives will be imperiled.  Deviating from child welfare licensing protections and creating an alternative licensing scheme constitutes an undoing of the FSA and serves no legitimate purpose.

### Proposed 8 CFR 236.3(h)-Detention of Family Units

LIRS is very concerned with what we see as DHS's attempt to normalize the detention of children and expand its ability to detain children as 'family units' in family residential centers (FRC's).  Even the government's own Advisory Committee has advised against detaining families:

> "DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families—and that detention or the separation of families for the purposes of immigration enforcement or management are never in the best interest of children."  DHS Advisory Committee on Residential Centers[12]."

Under the terms of the FSA, the government is not permitted to detain children for over 20-days.  By seeking to detain families for long periods of time the proposed rule is in violation of the the material provisions and spirit of the FSA.  Detention is never in the best interests of the child.  'The best interests of the child' is a long-standing principle of the American legal system that recognizes that we have a moral obligation to tailor our laws in a manner that affords special protection to children because of their vulnerable status.   LIRS asks the government to forego its attempts at terminating the FSA, and to continue implementing the FSA in order protect children from harm not place them into harm's way.

The DHS maintains in 8 CFR 236.3(h) that family detention is amenable way to keep families together.  LIRS vehemently disagrees and suggests that the best way to keep families together is to allow them to be released into the community.  This approach also aligns with the intention of the FSA, which is to ensure that children are kept out of detention, but that, if they are detained, they are held in the 'least restrictive setting.'  Efforts to detain children are cruel, unnecessary and costly to taxpayers.  DHS should follow its own advice and "discontinue the general use of family detention, reserving it for rare cases when necessary following an

---

[11] Id. at 13.
[12] Department of Homeland Security; Immigration and Customs Enforcement. Report of the ICE Advisory Committee on Family Residential Centers.  (Online at: https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf)

individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release[13]."

_All forms of detention are harmful to children_

The American Medical Association (AMA), American Psychiatric Association (APA), American Academy of Pediatrics (AAP), and American College of Physicians (ACP) stand in agreement with the fact that children should not be detained because it is detrimental to their physical health and mental well-being.  The AAP, for instance, has concluded that short or long-term detention has a detrimental impact on children's physical and mental well-being[14].   Whereas, the ACP has issued the following statement:

> "ACP believes that forced family detention**—**_indefinitely holding children and their parents, or children and their other primary adult family caregivers, in government detention centers until the adults' immigration status is resolved_—can be expected to result in considerable adverse harm to the detained children and other family members that may follow them through their entire lives, and accordingly should not be implemented by the U.S. government[15]."

Even the government's own medical experts, like all major medical associations in the United States, have independently reached the same conclusion- that detaining children is harmful[16]. In a poignant and scathing rebuke to family detention, Dr. Scott Allen and Dr.Pamela McPherson stated the following:

> "In our professional opinion, there is no amount of programming that can ameliorate the harms created by the very act of confining children to detention centers. Detention of innocent children should never occur in a civilized society, especially if there are less restrictive options, because the risk of harm to children simply cannot be justified[17]."

With all the available information in the public domain and the weight of government and top medical experts in the United States speaking out against detaining children, we urge you to

---

[13] Id. at 5.

[14] Linton, J. MD et al. 2017. Detention of Immigrant Children. _Pediatrics_. 139(4). (Online at: http://pediatrics.aappublications.org/content/pediatrics/139/5/e20170483.full.pdf)

[15]  American College of Physicians. July 5, 2018. _ACP Says Family Detention Harms the Health of Children, Other Family Members._ (Online at: https://www.acponline.org/acp-newsroom/acp-says-family-detention-harms-the-health-of-children-other-family-members)

[16] Jordan, M. July 18, 2018. "Whilstle-Blowers Say Detaining Migrant Families 'Poses High Risk of Harm.'" _New York Times_. (Online at: https://www.nytimes.com/2018/07/18/us/migrant-children-family-detention-doctors.html); Dr. Allen and Dr. McPherson letter (online at: https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf)

[17] Dr. Allen and Dr. McPherson letter (online at: https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf)

take heed and put the needs of children first.   More to the point, it is not an *"if"*, or a *"maybe"*- medical experts concur with the fact that the consequences of family detention on children will *definitely* lead to life-long physical and mental ailments.

If implemented in its current form, the proposed rule will remove child protection standards that the FSA guarantees, and allow for children to be detained indefinitely, in 'alternative licensed facilities. Even with the current child protection provisions under the FSA, the Department of Homeland Security Office of Inspector General has reported on the substandard conditions of ICE detention[18].

There are human consequences that result from harmful detention conditions.   May we remind you of the recent death of little Mariee Juárez.  Just 18 months old, Mariee lost her life due to a respiratory infection that she developed from the poor sanitary conditions and substandard medical treatment she received while in ICE detention in Dilley, Texas[19].   According to the attorney representing Mariee's mother, Yazmin Juárez, "[t]he conditions at Dilley were unsanitary, unsafe and inappropriate for any small child[20]." Mariee's death is deeply troubling for many reasons.  Like the fact that her suffering and ultimate loss of life did not result in a compassionate response from the government, but rather a doubling down on efforts to detain families.  If the proposed rule is adopted in its current form, Mariee's death will not be the last, other little girls, boys, mothers and fathers will face similar and even greater risks without the protection of the FSA.

DHS makes two arguments in support of family detention.  First, that family detention is necessary to ensure that migrants comply with our immigration laws and do not abscond.  Second, that it is easier for families to pursue asylum if they are detained together. There is no evidence to support the government's claims that family detention correlates with immigration compliance and that preparing asylum claims are easier in detention.  In fact, there is overwhelming evidence that the opposite is true, that it is more difficult for asylees to prepare their asylum claims while detained.

As lawyers from the American Immigration Council (AIC) explain, detained family's immigration cases face a myriad of obstacles.  One, it is often difficult for detainees to obtain legal representation because detention facilities are located in remote areas. Two, detained immigrants do not have the ability to make regular phone calls while in detention and therefore cannot stay in regular contact with their attorney's. Three, it is more difficult for detained migrants to collect the necessary documents and evidence they need to support their asylum

---

[18] Supra notes 13 and 17. Department of Homeland Security Office of Inspector General. Management Alert— Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California. September 27, 2018.OIG-18-86. (Online at: https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf).

[19] Gonzalez, D. August 28, 2018. "Toddler Dies After Leaving Migrant Detention Center Prompting $40M Claim Against Eloy," *Arizona Republic*.  (Online at: https://www.azcentral.com/story/news/politics/immigration/2018/08/28/mariee-juarez-dies-after-leaving-detention-center-family-sues-eloy/1126840002/).

[20] Rose, Joel. August 28, 2018. "A Toddler's Death Adds to Concerns About Migrant Detention. *NPR*. (Online at: https://www.npr.org/2018/08/28/642738732/a-toddlers-death-adds-to-concerns-about-migrant-detention).

claims. However, when migrants are not detained the AIC finds that they are compliant with our immigration laws and wage successful asylum claims:

> "[o]f family members with completed asylum cases 92% had appeared for all their court hearings. Finally, this appearance rate was even higher when asylum applicants had counsel: among completed cases, 94 percent of released family members with counsel in their asylum case attended all their court hearings[21]."

_Alternative Forms of Detention: Less Expensive, Proven to be Effective_

We urge the government to consider community-based alternatives to detention which are more humane, more effective and less expensive approach to incarcerating families. Specifically, LIRS would like to see the government reinstate the successful Family Case Management Program that the administration terminated in June 2017.

The FCMP ran from January 2016 and June 2017 and surprisingly, it was terminated without justifiable cause. The administration cancelled FCMP despite that it was a proven success and cost effective. Or as reflected by the following facts:

- 99.3% attend their immigration court hearings
- 99.4% attend their appointments with ICE[22]

The government's proposed rule solely focuses on detention as a punitive measure for asylees which is misguided, goes against U.S. and international human rights and asylum law, and reverses the child protection standards contained in the FSA. In addition to the breaches of law and human costs of detention that we have thus far identified, there are financial costs to detention that impact all American tax payers. For instance, 'FCMP cost approximately $38 each day per family unit. By contrast, ICE family detention costs nearly $320 per person each day[23].

Through LIRS's work with children and families, we understand first-hand that one of the challenges migrants face when they enter the United States is navigating through our complex legal system. There is no evidence to support the government's contention that all migrants want to exploit our nation's immigration laws by entering the country and living underground. Statistics gathered from the FCMP pilot indicates that with community-based support and legal

---

[21] Ingrid Eagly, Esq., Steven Shafer, Esq. and Jana Whalley, Esq. August 16, 2018. _Detaining Families: A Study of Asylum Adjudication in Family Detention._ American Immigration Council. https://www.americanimmigrationcouncil.org/sites/default/files/research/detaining_families_a_study_of_asylum _adjudication_in_family_detention_final.pdf

[22] Women's Refugee Commission. Backgrounder: Family Case Management Program. (online at: https://www.womensrefugeecommission.org/rights/resources/1653-family-case-management-program last accessed November 1, 2018).

[23] Id.

services, migrant children and their families better understand their legal obligations in the
United States and are eager to comply.  Overall, the high rate of immigration compliance for
migrants participating in the FCMP strongly suggest that migrants, like the government, prefer
lawful pathways to staying in the United States.

LIRS would like to see the government direct its energy and government resources towards
efforts that assist children and their families with understanding their legal rights in the country
and helping migrants access attorneys.  We are a nation that prides itself in setting the global
standards for the rule of law and this role comes with responsibilities. As outlined in this section,
the FCMP is a more humane, successful, and cost-effective solution to ensure that law abiding
children and families seeking asylum adhere to our nation's immigration laws.


## Conclusion and Recommendations

Paragraph 9 of the FSA states that the final Flores regulations 'shall not be inconsistent with this
Agreement'[24].  However, LIRS finds that the proposed rule is inconsistent with child welfare
protections that are contained within the FSA and therefore recommend that the DHS and
HHS's proposed rule not be implemented.  Moreover, the FSA asks that the government treat
'all minors in its custody with dignity, respect and special concern for their particular vulnerability
as minors[25].'  LIRS has highlighted in this comment that children will be more vulnerable under
the terms of the proposed rule.  We are deeply concerned with the fact that the rule seeks to
detain children and their families throughout their immigration court proceedings, a process
which can take years.  When considering our experiences working with children, the prevailing
consensus amongst medical experts, which is that detention is harmful to children, we cannot
support this rule because it seeks to undo child protection standards and will put children in
danger.

1. *LIRS would like for the FSA to be retained and not altered by DHS and HHS's proposed
   rule.  We want children's best interests to be put first.  This rule fails to put children first,
   and instead seeks to strip away FSA child protection standards that are designed to
   keep children safe under our care.*

2. *Instead of creating an alternative federal license to indefinitely detain families, LIRS
   recommends that the government reinstate the Family Case Management Program
   because it has been proven to be successful and cost efficient.*

3. *LIRS believes that sacrificing the children's best interests standards is wrong and that
   more efforts should be made to ensure that children kept out of detention are held in the
   least restrictive setting.*

---

[24] FSA. Paragraph 9.
[25] Id.

# Comments of The National Education Association



1201 16th St., N.W.  |  Washington, DC  20036  |  Phone: (202) 833-4000

*Lily Eskelsen Garcia*
*President*

*Rebecca S. Pringle*
*Vice President*

*Princess R. Moss*
*Secretary-Treasurer*

*John C. Stocks*
*Executive Director*

October 23, 2018

**Sent via Electronic Submission at https://www.regulations.gov**

Debbie Seguin, Assistant Director
Office of Policy, U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street, S.W.
Washington, DC 20536

**RE    DHS Docket No. ICEB-2018-0002 Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children (RIN 1653-AA75, 0970-AC42)**

Dear Ms. Seguin:

　　The National Education Association ("NEA") appreciates the opportunity to comment on the notice by the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS") (together, the "Departments") of their proposed amendments to regulations relating to the apprehension, processing, care, custody, and release of alien juveniles (the "proposed rule"). The proposed rule is intended to terminate the 1997 Flores Settlement Agreement, as amended in 2001, ("FSA"), and introduce new regulations that are more likely to result in the indefinite detention of immigrant children and negatively impact their access to education. Such regulations are plainly "inconsistent" with the FSA's mandate to favor the release of children from government custody, and thus cannot serve as a valid basis to terminate the FSA.[1] NEA condemns the indefinite detention of immigrant children and families and respectfully opposes the proposed rule.

　　The *Flores* parties reached the FSA through their shared belief in the "particular vulnerability" of children.[2] That is why the FSA has a strong presumption in favor of releasing

---

[1] *Flores v. Reno* Settlement Agreement (1997) ¶ 9 ("The final regulations shall not be inconsistent with the terms of this Agreement.").

[2] *Id.* at ¶ 11.

immigrant children to a parent, legal guardian, family member, or other adult as authorized by a parent or legal guardian[3] or, when no such adult can be identified, to a state-licensed program that, *at a minimum*, complies "with all applicable state child welfare laws" and provides "[e]ducational services appropriate to the minor's level of development . . . in a structured classroom setting."[4]

NEA's more than three million members—comprised of teachers, school nurses, counselors, and education support professionals—know well the particular vulnerability of children and believe that an education is essential to advancing the worth, dignity, and equality of every child. Both experts and NEA's members also know that children are best equipped to succeed academically when they live in a stable home with an adult they trust and learn in a normal, structured and supportive classroom.[5]

But when children are in an unstable environment or when parents or other caregivers are unable to act as providers for their children, their education suffers. For example, children placed in temporary living facilities such as shelters, children experiencing homelessness, and children in foster care or separated from a parent all face significantly higher barriers to learning.[6] The proposed rule will deprive more children of the opportunity to reach their full developmental and academic potential by restricting their release to trusted caregivers and their access to schools with supportive norms and structures. Instead, the Departments seek to keep them in indefinite detention without adequate services and protections.

Despite purporting to "implement" the FSA, the Departments have proposed a rule that completely strips the FSA of its policy "favoring release" of children from government custody by limiting the types of sponsors with whom children can be placed.[7] The proposed rule also significantly increases the possibility that more children will be placed in "*indefinite* detention in unlicensed facilities"[8] by (1) introducing a federal licensing scheme administrated by U.S. Immigration and Customs Enforcement ("ICE") that may not provide the same protections and

---

[3] *Id.* at ¶¶ 11, 14, & 18.

[4] Exhibit 1 to *Flores v. Reno* Settlement Agreement (1997) ("Minimum Standards for State Licensed Programs").

[5] *See* American Academy of Pediatrics Committee on Early Childhood, Adoption and Dependent Care, *Developmental Issues for Young Children in Foster Care*, 106(5) PEDIATRICS 1145, 1146 (2000); 1 J. BOWLBY, ATTACHMENT AND LOSS: ATTACHMENT (Basic 1969); NATIONAL RESEARCH COUNCIL INSTITUTE OF MEDICINE, FROM NEURONS TO NEIGHBORHOODS: THE SCIENCE OF EARLY CHILDHOOD DEVELOPMENT (J.P. Shonkoff & D.A. Phillips eds., 2000).

[6] *See, e.g.*, Press Release, U.S. Department of Education, Education Department Releases Guidance on Homeless Children and Youth (Jul. 27, 2016), available at https://www.ed.gov/news/press-releases/education-department-releases-guidance-homeless-children-and-youth; U.S. Dep't of Educ. & U.S. Dep't of Health and Human Servs., Dear Colleague Letter: Elementary and Secondary Education Act (June 23, 2016), available at https://www2.ed.gov/policy/elsec/leg/essa/edhhsfostercaredcl.pdf.

[7] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45486, 45502 & 45528 (Proposed Sept. 7, 2018) (to be codified at 8 C.F.R. 236.3(j)).

[8] *See Flores, et al. v. Sessions, et al.*, Case No. CV 85-4544, Dkt. No. 455, 4 (C.D. Cal. Jul. 9, 2018) (emphasis in original).

Page **2** of **4**

services as state-licensed facilities,[9] and (2) expanding the types of "emergencies" that suspend
the Departments' obligations to place children in non-secure, licensed facilities.[10]

Whether a child is placed in an ICE-licensed or an unlicensed detention facility,
educational development will suffer.  It is well documented that long-term detention of *any form*,
even accompanied by a parent, is traumatic and will have lasting negative effects on learning and
development.[11]  Children react to detention with extreme distress, fear, and helplessness, all of
which can lead to various physiological and psychological harms and ultimately result in a
deterioration of functioning.[12]  Children studied in immigration detention facilities in Australia,
the United Kingdom, and the United States show consistent patterns of physiological harms,
including disruptive conduct, bed wetting, and sleep disturbances such as nightmares, night
terrors, and sleep-walking.[13]  Psychological symptoms observed in detained children include
severe depression, PTSD, psychotic disorders, deliberate self-harm and suicidal behavior, and
acute anxiety about delays in their own educational development.[14]  And smaller children are the
most vulnerable, often displaying regression in language development, social withdrawal,
impaired cognitive development, and other developmental delays.[15]  These negative
physiological and psychological outcomes affect broad areas of functioning, and are likely to
significantly, and even permanently, impair the ability to learn.[16]

---

[9] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg.
45486, 45525 (Proposed Sept. 7, 2018) (to be codified at 8 C.F.R. 263.3(b)(9) & (b)(11)).

[10] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg.
45486, 45496, 45525, & 44429-30 (Proposed Sept. 7, 2018) (to be codified at 8 C.F.R. 236.3(b)(5) & 45 C.F.R.
410.101, 202).

[11] A. Lorek et al., *The Mental and Physical Health Difficulties of Children Held Within a British Immigration
Detention Center: A Pilot Study*, 33(9) CHILD ABUSE & NEGL. 573 (2009); R. Kronick et al. *Asylum-seeking
Children's Experiences of Detention in Canada: A Qualitative Study*, 85(3) AM. J. ORTHOPSYCHIATRY 287 (2015);
S. Mares & J. Jureidini, *Psychiatric Assessment of Children and Families in Immigration Detention: Clinical,
Administrative and Ethical Issues*, 28(6) AUSTL. & N.Z. J. PUB. HEALTH 520 (2004); M. Dudley et al., *Children and
Young People in Immigration Detention*, 25(4) CURRENT OP. IN PSYCHIATRY 285 (2012).

[12] R. Kronick et al. *Asylum-seeking Children's Experiences of Detention in Canada: A Qualitative Study*, 85(3) AM.
J. ORTHOPSYCHIATRY 287 (2015).

[13] K. Robjant et al., *Mental Health Implications of Detaining Asylum Seekers: Systematic Review*, 194(4) BRIT. J. OF
PSYCHIATRY 306 (2009).

[14] *Id.*

[15] K. Robjant et al., *Mental Health Implications of Detaining Asylum Seekers: Systematic Review*, 194(4) BRIT. J. OF
PSYCHIATRY 306 (2009); M. Dudley et al., *Children and Young People in Immigration Detention*, 25(4) CURRENT
OP. IN PSYCHIATRY 285 (2012).

[16] *See, e.g.*, American Academy of Pediatrics, *Policy Statement on Early Childhood Adversity, Toxic Stress, and the
Role of the Pediatrician: Translating Developmental Science Into Lifelong Health*, 129 PEDIATRICS e224, e225
(2012); National Scientific Council on the Developing Child, Center on the Developing Child at Harvard U.,
*Persistent Fear and Anxiety Can Affect Young Children's Learning and Development: Working Paper No. 9* (2010),
http://www.developingchild.net.

Indefinite detention is never appropriate for children and will have a profoundly damaging effect on their educational development.[17]  What is more, the proposed rule does not even address how the Departments intend to provide "[e]ducational services appropriate to the minor's level of development . . . in a structured classroom setting", as is currently required under the FSA.  And in unlicensed "emergency" or "influx" facilities, the Departments may opt to provide *no* educational services at all.[18]  In short, the Departments' proposed rule will keep more children in government custody, contrary to the FSA's policy favoring release, and provides no assurance that detention facilities will even comply with the FSA's "minimum standards" for educational services.

NEA believes that all children deserve the best chance to learn and succeed.  We all suffer when we do not invest in the education and development of our children.  The parties to the FSA created a policy favoring children's release from government custody and providing for access to education.  The proposed rule is inconsistent with, and undermines the purposes of, the FSA.  The proposed rule must be withdrawn in favor of regulations consistent with the FSA.

Sincerely,

/s/
Alice O'Brien
General Counsel
National Education Association

/s/
Emma Leheny
Senior Counsel
National Education Association

/s/
Gypsy Moore
Civil Rights Law Fellow
National Education Association

---

[17] *See* U.S. Department of Homeland Security Advisory Committee on Family Residential Centers, *Report of the ICE Advisory Committee on Family Residential Centers* (Oct. 7, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf ("detention is generally neither appropriate nor necessary for families").

[18] *See* Office of Refugee Resettlement, ORR Guide: Children Entering the United States Unaccompanied, Section 1.7 Placement and Operations During an Influx (Mar. 21, 2016), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.7 ("To the extent practicable, non-State licensed HPCs and Influx Care Facilities are encouraged to provide . . . [e]ducational services."); *see also* Caitlin Dickerson, *Migrant Children Moved Under Cover of Darkness to a Texas Tent City*, N.Y. TIMES (Sept. 30, 2018), https://www.nytimes.com/2018/09/30/us/migrant-children-tent-city-texas.html.

## Comments of The Texas Pediatric Society



**Texas Pediatric Society, The Texas Chapter of the AAP**
401 West 15th Street, Suite 682   Austin, Texas 78701-1665
Phone (512) 370-1506 • FAX (512) 473-8659 • txpeds.org

**Executive Director**
Tricia Hall, CAE, CMP
(512) 370.1506
tricia.hall@txpeds.org

**Director of Special Programs
& TPS Foundation**
Amy White, CAE
(512) 370.1519
amy.white@txpeds.org

**Director of Advocacy & Health Policy**
Clayton Travis, MSSW
(512) 370.1516
clayton.travis@txpeds.org

**Member Services Manager**
Crystal Healey, CAE
(512) 370.1517
crystal.healey@txpeds.org

**Public Health Education Manager**
Kellie Dees
(512) 370.1509
kellie.dees@txpeds.org

**2018 - 2019 Officers
President**
Ben G. Raimer, MD

**President-Elect**
Tammy Camp, MD

**Immediate Past President**
Dennis A. Conrad, MD

**Chapter Chair**
Kimberly Avila Edwards, MD

**Alternate Chapter Chair**
Mark A. Ward, MD

**Secretary-Treasurer**
Seth Kaplan, MD

**TMA Delegate**
Ryan Van Ramshorst, MD

**Alt. TMA Delegate**
Charleta Guillory, MD

**Region Chairs**
Anu Partap, MD - North
Susan Wootton, MD - East
Lori Anderson, MD – South/Central
Lara Johnson, MD – West

**Member-at-Large**
Rebecca Huston, MD
Valerie Smith, MD

**Member-at-Large
Department/Resident Head**
Robert Nelson, MD

**Early Career Physician
Representative**
Marjan Linnell, MD

**Resident Representative**
Emily Hopkins, MD

**Alt. Resident Representative**
Ohmed Khilji, MD

**Medical Student Representative**
Alyssa Wilson

**Alt. Medical Student Representative**
Katie Higgins

November 6, 2018

Debbie Seguin
Assistant Director
Office of Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

Re: DHS Docket No. ICEB-2018-0002, RIN 0970-AC42 1653-AA75, Proposed Rulemaking: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children

Dear Ms. Seguin:

The 4,100 members of the Texas Pediatric Society (TPS), the Texas Chapter of the American Academy of Pediatrics, appreciates the opportunity to offer comments on the Department of Homeland Security's (DHS) Notice of Proposed Rulemaking: Apprehension, Processing, Care and Custody of Alien Minors and Unaccompanied Alien Children (DHs Docket No. ICEB-2018-0002).

TPS's vision is to ensure all children in the state attain their full potential for physical, emotional, and social health. Using this guiding principle, we find the Proposed Rule extremely problematic and in direct contradiction to promoting the health and wellbeing of children in our state and across the nation. In the most basic sense, the Proposed Rule is inconsistent with the spirit and technical requirements of the Flores Settlement Agreement (FSA) which set out to protect immigrant children. Thus, DHS should rescind the Proposed Rule and instead work within the requirements of the FSA to do what is in the best interest of every child and immigrant family.

**<u>No Child Should Ever be Detained.</u>**

The detention of children in facilities subject to this Proposed Rule is inherently traumatizing and can lead to negative long-term physical and mental health consequences.1 The FSA recognizes this and puts strict limits on the detention, treatment and release of all minors detained in the legal custody of the United States. The most important limit is ensuring children are held in the least restrictive setting, which is never a detention facility regardless of whether they are accompanied or unaccompanied. The FSA instructs that children be released without any unnecessary delay to a parent, legal guardian, adult relative, designate of the parent or others.2 It is the role of DHS to implement this requirement via regulation in the most faithful and technically accurate way possible. The allowances in the Proposed Rule outlined below are not faithful to the FSA and could put the health and wellbeing of children at risk.

---

1 Julie M. Linton, Marsha Griffin, Alan Shapiro, American Academy of Pediatrics, *Policy Statement: Detention of Immigrant Children*, Apr. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.
2 *The Flores Settlement Agreement*, case no. CV 85-4544-RJK(Px), 1996

**Alternative Federal Licensing of FRCs Does Not Provide Adequate Protection for Children.**

The Proposed Rule envisions a separate and alternate form of federal licensing for Family Residential Centers (FRCs) by Immigration and Customs Enforcement (ICE). This proposed scheme is in direct contradiction to the FSA, which requires minors in the custody of DHS to be held in facilities that are state licensed for the care of dependent minors. State licensure of facilities where children are being held for long periods of time has and should remain the responsibility of states, not that of the federal government. As a result of this responsibility, states have the licensing and child welfare infrastructure to care for the health and wellbeing of children in its custody. DHS has no such experience or expertise and there is no evidence that standards created by the Department would, in any way, protect the unique needs and vulnerabilities of children of all ages and with various histories of trauma. The true motivation for allowing ICE to promulgate standards for the licensing of FRCs is stated outright in the Proposed Rule in which DHS admits that "the proposed alternative license for FRCs... may result in additional or longer detention for certain minors". Based on the FSAs core principle that children be held in the least restrictive setting possible and that minors held in custody must be "expeditiously process[ed]", this result is unacceptable.

The intention to detain children for long periods of time was made apparent in a proposed rulemaking by the Texas Department of Family and Protective Services (DFPS) in late 2015. With pressure from federal authorities, DFPS attempted to create a new category of licensing standards for FRCs, exempting them from health and safety criteria expected of other General Residential Operations. The Texas Pediatric Society along with many other advocacy organizations submitted comments opposing the proposed rule, citing that offering a licensing category with inferior standards would put the health and safety of children at risk and prolong their detention.[3] Similarly, the federal Proposed Rule would create a new category of federal licensing for FRCs, undermining the health and safety of children and prolonging detention, which we continue to oppose.

Even more troubling is the Proposed Rule's intent to create broad exemption from DHS' own child protection standards with the use of the term "emergency" and "influx". These overly broad definitions allow DHS to selectively waive children's rights provisions of the regulation and undermines the Department's intent to self-regulate these FRCs.

**Detaining Children in FRCs Result in Real and Lasting Damage to their Health and Wellbeing.**

The Texas Pediatric Society, wholeheartedly affirms the American Academy of Pediatrics' policy statement *Detention of Immigrant Children* which states that DHS detention facilities are not appropriate places for children. TPS' first independent statement on the matter came in 2015 from then TPS President, Jason Terk, MD:

> "The crisis of refugee children arriving at our southern border has continued and appears to be increasing once again, with some areas in Texas experiencing a 14 to 85% increase in unaccompanied minors. They have endured traumatic experiences both prior to and during their perilous journeys which have caused significant harm to their health and long-term well-being. Texas Pediatric Society members responding to the crisis continue to report concerns with the detention process as well as unmet mental health needs.
>
> The Texas Pediatric Society urgently calls upon agencies in both the state and federal responses to this crisis to come together now with the charitable organizations assisting these children. This would enable better coordination and collaboration thereby reducing the additional trauma these children are experiencing from prolonged detention. Knowing that every child's life is sacred, we unequivocally state that children should not be subjected to prolonged detention and that they should receive

---

3 Texas Pediatric Society, Letter to Judge John J. Specia., Dec 13, 2015,
https://txpeds.org/sites/txpeds.org/files/documents/newsletters/tps-comments-on-dfps-detention-center-licensing.pdf

developmentally appropriate daily care, medical care, and mental health care which is compassionate and responsive to their needs."

TPS stands by this statement today and notes that the Proposed Rule does not address the concerns previously raised by TPS. In fact, the Proposed Rule would allow for the detention of children longer, possibly indefinite, periods of time in facilities that do not provide developmentally appropriate medical and mental health care in a compassionate and responsive manner.

Texas pediatricians affirmed this concern when visiting both the Karnes and Dilley FRCs in December of 2015. Children being detained suffer from immense trauma, from the violence in their country of origin to the dangerous journey to the United States in an attempt to seek asylum. Mothers who were interviewed by pediatricians reported behavioral changes and typical symptoms of acute stress and trauma including clinging, startling, irritability, and disrupted eating and sleeping in their children. Furthermore, children in these facilities miss out on crucial opportunities for social interaction and diverse, nurturing life experiences. These opportunities are highly restricted while under the supervision of FRCs. Additionally, pediatricians noted severe discrepancies between health and mental health services purported to be offered and that which mothers of children claimed to have received. Finally, pediatricians found that the intrinsic, prison-like nature of these facilities is antithetical to the healthy development of children and undermines the ability for mothers and fathers to properly care for and nurture their child.4

DHS' own medical and psychiatric subject matter experts of the Office of Civil Rights and Civil Liberties affirmed these findings in their letter to Congress in 2018. They found repeated instances of poor or no medical care which resulted in the endangerment of children. They concluded that family detention in and of itself is harmful to children and expansion of its use should not take place.5

**Unaccompanied Children Should Maintain their Protected Status throughout the Legal Process**

Unaccompanied children (UAC) while in the custody of the federal government have been recognized as a vulnerable population which need certain protections, including legal services, independent child advocates, classroom education, health care and case management services. The Proposed Rule seeks to reevaluate a child's UAC status with each encounter which has the effect, if not the purpose, of limiting the child's ability to receive these services. Without a reasonable explanation for this change in the Proposed Rule, there is no reason for its existence and it casts uncertainty on DHS' intent to do what is best for children in the Department's care.

In conclusion, the Proposed Rule is antithetical to the terms outlined in the Flores Settlement Agreement. DHS should be promulgating rules to further the goals of the Agreement instead of undermining it. To this end, DHS should more thoroughly investigate the usage of Alternatives to Detention – a program that humanely allows children in family united to reside in the community during their immigration proceedings. The Department would save tax payers millions of dollars by switching to this low-cost alternative to family detention.6

The pediatricians of Texas urge DHS to rescind the Proposed Rule and instead prioritize the best interests of children and work to advance policies that protect immigrant families.

---

4 Joyce Elizabeth Mauk, MD, *Testimony on Public Hearing for Karnes County Residential Center*, April 13, 2016, https://www.aap.org/en-us/advocacy-and-policy/state-advocacy/Documents/Testimony%20on%20GEO%20Detention%20Facility%20Karnes.pdf
5 Letter from Dr. Scott Allen and Dr. Pamela McPherson to the Honorable Charles Grassley and the Honorable Ron Wyden, July 17, 2018, https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf.
6 GAO, Immigration: Process and Challenges in the Management of Immigration Courts and Alternatives to Detention Program Report (Washington, D.C., Sept. 18, 2018).

If you have any questions regarding these comments, please contact Clayton Travis, Director of Advocacy and Health Policy at Clayton.Travis@txpeds.org or 512-370-1516.

Sincerely,

Ben G. Raimer, MD
President

Comments of UNICEF USA



October 24, 2018

**COMMENT ON PROPOSED RULE:**

*Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*

As a concerned citizen, I am disturbed by many aspects of the proposed rule regarding treatment and detention of migrant children[1] and how the changes would harm children, without improving U.S. security.  I want to comment specifically on proposed 8 CFR 236.3 (H), "Detention of Family Units."

The Flores Settlement Agreement (FSA)[2] set out a number of requirements regarding the treatment of children. In recent litigation about the Government's implementation of the FSA, a U.S. District Court ruled that the Department of Homeland Security (DHS) must transfer minors out of detention facilities "as expeditiously as possible."[3]  As the Government claimed DHS, on average, would detain minors for 20 days – supposedly the general length of time required to complete credible and reasonable fear processing at that time for migrants in expedited removal – that seems to have become the upper limit for detention of children with their families.

One explicit goal of this proposed rule is to eliminate any time limit on the detention of children and their families: "This rule would allow for detention…for the pendency of immigration proceedings…in order to permit families to be detained together and parents not be separated from their children."[4]  The proposed rule sets no limits on the detention period for children at all: "ICE is unable to estimate how long detention would be extended for some categories of minors and their accompanying adults in FRCs due to this proposed rule. The average length of stay in the past is not a reliable source for future projections."[5]

Our legal system, and our national conscience, require us to consider the best interests of the child in any legal or policy decision.  This proposed rule, however, does not consider the harmful impacts of detention for any length of time on children. Experts have determined that one thing is absolutely clear: like separating children from parents, detention of children is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development.[6]

---

[1] DHS Docket No. ICEB-2018-0002, Document Citation 83 FR 45486.

[2] See the full agreement here.

[3] *Flores v. Lynch,* 212 F. Supp. 3d 907 (C.D. Cal. 2015).

[4] *Federal Register,* Vol. 83, No. 174, Friday, September 7, 2018, p. 45493.

[5] *Federal Register,* p. 45518.

[6] See AAP Council on Community Pediatrics, *Detention of Immigrant Children* (2017)

For example, experts have repeatedly warned about the potentially severe and permanent impacts of both detention and family separation on children.  The American Academy of Pediatrics said in a 2017 policy statement[7] that immigrant children seeking safe haven in the United States should never be placed in detention facilities.  According to the AAP, studies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression and post-traumatic stress disorder. The AAP points out that detention creates toxic stress in children and adolescents that can profoundly impact their development.  Strong scientific evidence shows that toxic stress disrupts the development of brain architecture and other organ systems, and increases the risk for stress-related disease and cognitive impairment well into the adult years.[8,9]  Studies have shown that children who experience such traumatic events can suffer from symptoms of anxiety and post-traumatic stress disorder, have poorer behavioral and educational outcomes, and experience higher rates of poverty and food insecurity.

For these reasons, the Immigration and Customs Enforcement Advisory Committee on Family Residential Centers noted that detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children and must be avoided.[10]  I strongly agree.

There are well-known and effective programs to protect families and children, allow them to exercise their rights under U.S. and international law, and ensure that they abide by U.S. legal processes.  I urge you to withdraw this proposed rule.


Sincerely,


**Caryl Stern**

President and CEO, UNICEF USA
125 Maiden Lane
New York, NY 10038
Office: 212.922.2566

---

[7] http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483
[8] *AAP Committee on Psychosocial Aspects of Child and Family Health, Early Childhood Adversity, Toxic Stress, and the Role of the Pediatrician: Translating Developmental Science into Lifelong Health* (2012)
[9] See *https://www.childwelfare.gov/pubPDFs/brain_development.pdf.*
[10] *Report of the ICE Advisory Committee on Family Residential Centers,* October 7, 2016, p. 5.

# Comments of The Women's Refugee Commission



November 6, 2018

Ms. Debbie Seguin
Assistant Director
Office of Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

Division of Policy
Office of the Director
Office of Refugee Resettlement
Administration for Children and Families

**Re:     Comments on Proposed Rulemaking Regarding Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, DHS Docket No. ICEB-2018-0002**

For nearly three decades, the Women's Refugee Commission (WRC) has worked to improve the lives and protect the rights of women, children, and youth displaced by conflict and crisis. WRC's work transforms the lives of women, their families, and their communities all around the world, including at the southern border of the United States. WRC submits these comments in response to the Department of Homeland Security and the Department of Health and Human Services' Proposed Regulations to the *Flores* Settlement Agreement (the "Proposed Regulations"), 83 Fed. Reg. 45,486 (proposed Sept. 7, 2018) (to be codified at 8 C.F.R pts. 212 and 236, 45 C.F.R. pt. 410), to address their inherent flaws and to demonstrate that they are legally flawed in a myriad of ways: they violate international law, as well as United States constitutional and statutory law. As WRC has demonstrated for years, there is no humane way to detain families, and whenever families or children are in the care custody of the Federal Government, safeguards and basic minimum standards must not only be in place but met.

1

Unfortunately, the Government has failed consistently to honor the minimum standards governing the conditions of confinement of immigration children since the landmark *Flores* Settlement Agreement ("FSA") was agreed to in 1997.

In 2007 and again in 2014, WRC conducted two in-depth studies detailing the inhumane conditions for children and families in U.S. detention centers, titled *Locking Up Family Values* and *Locking Up Family Values, Again*, respectively.[1] In both studies—which included tours of many (more than 30) and various detention facilities in the United States and interviews with facility and Government officials, detained families, and legal and social service providers— WRC concluded that large-scale family detention does not comply with basic child welfare standards, results in egregious violations of our country's obligations under international law, undercuts individual due process rights, and sets a poor example for the rest of the world. The current family detention facilities, which are not licensed and secure, are not in compliance with the FSA for the detention of children beyond initial processing times. In this vein, WRC objects to the Proposed Regulations as they fail to conform to the FSA's basic safeguards for children in immigration custody. WRC steadfastly maintains that the Government's ongoing actions with respect to the detention of families and children violate the FSA, and advocates for the immediate reversal of family detention policies, dismantling of detention facilities, the release of families, and the prompt release of children with their accompanying parents or to another appropriately vetted adult. Where short-term custody is necessary, conditions must comply with basic child welfare standards and efforts for the release of children in compliance with the FSA.

As discussed in more detail below, the Proposed Regulations undermine the intent behind the provisions of the FSA in that they are unconstitutionally vague, ultra vires, overbroad, and generally lack enforcement and oversight of the Government's actions. The comments below are organized in the order of the Proposed Regulations, from beginning to end. Each section describes the deficiencies we have identified, along with relevant case and statutory citations, and concludes with a bulleted list of questions that we assert the Government has not adequately addressed and must legitimately address and resolve prior to publishing any final regulations relating to these Proposed Regulations. Given the wholesale infirmity of the Proposed Regulations, relevant law requires that the Proposed Regulations be withdrawn and a new notice

---

[1] *Locking Up Family Values*, Women's Commission for Refugee Women and Children & Lutheran Immigration and Refugee Service (Feb. 2007), https://www.womensrefugeecommission.org/images/zdocs/famdeten.pdf; *Locking up Family Values, Again*, Women's Refugee Commission & Lutheran Immigration and Refugee Service, (Oct. 2014), https://www.womensrefugeecommission.org/resources/document/1085-locking-up-family-values-again.

and comment period invoked to the extent that the Government seeks to implement regulations governing the conditions of confinement for children and families in immigration detention.[2]

### III.  Executive Summary

#### A.  Purpose of the Regulatory Action & Legal Authority
83 Fed. Reg. at 45,487-88

The Proposed Regulations purport to implement the "relevant and substantive terms" of the FSA.[3] However, the Proposed Regulations are woefully deficient in specifying what these provisions are and how the Government determined what portions were relevant and substantive. In fact, the Proposed Regulations imperfectly address many *Flores* provisions and arbitrarily refuse to implement *all* provisions as required by the FSA. This is acknowledged in the Proposed Regulations themselves, which concede that they depart from the text of the FSA. For example, the licensing requirement in the Proposed Regulations creates an alternative federal licensing regime for facilities instead of state agencies specifically because the current facilities are unable to meet *Flores*' licensing requirements based on child welfare principles.

Furthermore, the regulations state they take into account "certain changed circumstances" without further explanation or examples. Instead, the Government's Proposed Regulations continue to purport that the FSA has been "extended" to apply to accompanied minors and that enactment of the Homeland Security Act of 2002 ("HSA") and the Trafficking Victims Protection Act ("TVPRA") have rendered some of the substantive terms outdated. Notably, these mirror the arguments the Government made before Judge Gee in *Flores*, and they were soundly rejected by the Court's previous Orders. Instead, Judge Gee ruled that the FSA applies to all minors, accompanied or otherwise, and that the HSA and TVPRA do not change the Government's obligations. These orders in relevant part have been affirmed by the Ninth Circuit.

---

[2] A final rule is lawful only if its differences from the proposed rule are "in character with the original proposal" and a "logical outgrowth" of the original notice and comments. *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 851 (9th Cir. 2003) (citation omitted). The text of a final rule, therefore, may not be "distant" from that of what an agency initially proposed. *Clean Air Council v. Pruitt*, 862 F.3d 1, 10 (D.C. Cir. 2017); *Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

[3] For the purposes of these comments only, WRC is using the definitions set forth in the Proposed Regulations to avoid confusion.

3

As a result, the Government should withdraw the Proposed Regulations, and if it decides to issue new regulations, it must provide the answers to the following questions:

- How did the Government determine what the relevant portions of the FSA are?

- What portions did it determine were not relevant? Why?

- What "changed circumstances" did the Government consider?

- What substantive terms of the FSA does the Government consider outdated? Why?

- Why was the alternative federal licensing scheme necessary? On what evidence was this decision based?

- How will the alternative licensing scheme ensure compliance with child welfare standards and principles of the FSA?

- Why was the "best interests" standard omitted?

- Why was the least restrictive placement requirement omitted?


### C.  Costs and Benefits
83 Fed. Reg. at 45,488-89

The Government has outlined an incomplete estimate of costs and benefits for the Proposed Regulations, and it has declined to make estimates based on unknown factors, such as the number of persons detained, length of stay, etc. Specifically, the Government states that the primary source of new costs would be from the proposed alternative licensing process. The Government acknowledges the likelihood of increased costs paid by ICE based on the proposed changes to parole determinations (*see* Comments to Section 8 CFR 212.5 – Parole, *infra*), but nevertheless states that it is "unable to provide a quantified estimate of any increased FRC costs" relating to this change. 83 Fed. Reg. at 45,488. Independent groups have released detailed findings that show that the costs associated with the increased detention that would result from the Proposed Regulations (including the annual costs of detention beds and start-up costs of acquiring additional family residential centers) could increase costs between $201 million and $1.3 billion on an annual basis. *See* Philip E. Wolgin, *The High Costs of the Proposed* Flores *Regulation*, Center for American Progress (Oct. 19, 2018), https://cdn.americanprogress.org/content/uploads/2018/10/18054603/FloresHighCosts-brief-6.pdf. Separately and furthermore, the Proposed Regulations fail to account for the qualitative costs of failing to meet child welfare standards.

4

The failure of the Proposed Regulations to truly grapple with the potentially crippling additional costs associated with family detention is significant because there is little benefit to be recognized. Increased detention costs do not make sense in this context given the high compliance rates of children and adults with immigration court (and other) orders relating to release by immigration authorities. The Government outlines no cost-saving measures of its Proposed Regulations. Instead it only offers amorphous benefits such as implementing the FSA's provisions, terminating the Agreement in turn, and allowing for the purported sound administration of the detention and custody of alien minors in a way that violates the FSA.

The Government should withdraw the Proposed Regulations, and if it decides to issue new regulations, it must provide the answers to the following questions:

- What was the full accounting for costs and benefits?

- What are the bottom-line costs and benefits of the regulations?

- On what are these costs based?

- Why were alternatives to detention, such as the Family Case Management Program and others, not considered, especially those that are far more cost-effective than detention?

- How are length of stay and number of persons detained calculated?

- How is cost of detention calculated?

- How are costs related to quality of care and compliance with child welfare standards?

## IV.  Background and Purpose

### C.  Basis and Purpose of Regulatory Action
83 Fed. Reg. at 45,492-95

The Proposed Regulations state that the "practical implications" of the FSA, including the lack of state licensing for facilities, has effectively prevented the Government from detaining the family unit together at an appropriate facility during immigration proceedings. There are advantages, the Government asserts, of maintaining family unity during immigration proceedings, such as the best interests of the child. Additionally, the Government arbitrarily speculates that without these Proposed Regulations, adults with juveniles will be incentivized to continue trying to enter the country illegally.

5

However, the mere fact that the Government is struggling with the "practical implications" of
compliance with the FSA does not mean that the standards agreed upon by the parties in the FSA
can be unilaterally changed by the Government through these Proposed Regulations. To the
contrary, a requirement of the FSA is that "The final regulations shall not be inconsistent with
the terms of this Agreement." *Flores v. Reno*, No. 85-4544-RJK (Px), Stipulated Settlement
Agreement (C.D. Cal., Jan 17, 1997).

The Government provides no support for its assertions that the Proposed Regulations will deter
illegal entry into the country. Immigration experts have warned that the current administration's
treatment of immigrant families which the Proposed Regulations will codify and perpetuate are
ineffective as deterrents to illegal immigration. *See, e.g.,* Adam Isacson & Adeline Hite, *August
Border Statistics Show that Trump's Policies are Not Deterring Migration*, Washington Office
on Latin America (Sept. 13, 2018), https://www.wola.org/analysis/august-border-statistics-show-
trumps-policies-not-deterring-migration/; Michael Hiltzik, *The truth about 'zero tolerance': It
doesn't always work and always leads to disaster*, Los Angeles Times, June 22, 2018,
http://www.latimes.com/business/hiltzik/la-fi-hiltzik-zero-tolerance-20180622-story.html; Jeh
Charles Johnson, *Trump's 'zero tolerance' border policy is immoral, un-American — and
ineffective*, Washington Post, June 18, 2018, https://www.washingtonpost.com/opinions/trumps-
zero-tolerance-border-policy-is-immoral-un-american--and-ineffective/2018/06/18/efc4c514-
732d-11e8-b4b7-308400242c2e_story.html?utm_term=.d257ad9c7fa8.

It is deeply troubling that the explicit purpose of the Proposed Regulations, as set forth by the
Government, is to allow the government to deviate from specific provisions in the *Flores*
Settlement Agreement that it has found difficult to implement and to discourage immigration.
The FSA was focused on establishing procedures and conditions that meet approved and
established child welfare principles. The Government's stated purpose demonstrates that the
Proposed Regulations are in direct contrast to the FSA's intent and, thus, cannot be interpreted as
a good faith attempt to be consistent with the FSA's provisions that go straight to the heart of
ensuring child welfare.

**V. Discussion of Elements of the Proposed Rule**

    **A. DHS Regulations**

        **8 CFR 212.5 – Parole**
        83 Fed. Reg. at 45,495, 45,524

There are two categories of changes that DHS proposed with respect to this parole provision.
First, DHS proposes revisions to the persons to whom a minor may be released. As currently

written, a juvenile in custody may be released to a "relative (brother, sister, aunt, uncle, or grandparent) not in [] detention who is willing to sponsor a minor," and such a release can be had even if there is a relative of the minor in detention. DHS proposes to limit the persons to whom a "minor" may be released to "a parent or legal guardian not in detention" or, alternatively, "an accompanying parent or legal guardian who is in detention." DHS' proposal wholly removes the existing subsection, 8 CFR 212.5(b)(iii) that allowed a minor to identify and "on a case by-case basis" be released with a "non-relative in detention who accompanied him or her on arrival." DHS asserts that these changes are merely to align with the statutory authority, which provides DHS may only release a minor on parole to the custody of a parent or legal guardian. However, that approach undermines completely the negotiated settlement in *Flores* and is against all existing best standards for children's welfare.

The Proposed Regulations should be withdrawn. To the extent they are not or are proposed anew, the Government must answer the following questions:

- Under these revisions, can a minor be released to a parent or legal guardian not in detention even if the minor is an accompanied minor? If this is the intention, then why not follow the requirement in the FSA that a minor could be released to a non-custodial parent or legal guardian "notwithstanding that the [minor] has a [parent or legal guardian] who is in detention"? If this is not the intention, why is this limitation being imposed?

- Under these revisions, what happens where a minor is accompanied by a "relative," "brother," "sister," "aunt," "uncle," "or grandparent" who has not been formally appointed as the minor's "legal guardian"?

- Does the Government believe there is a practical way a "relative," "brother," "sister," "aunt," "uncle," "or grandparent" can be formally appointed as the minor's "legal guardian" such that minors may still be released on parole where otherwise authorized? What if the "relative," "brother," "sister," "aunt," "uncle," "or grandparent" is also in detention? Does the Government anticipate that this language change will create a logistical barrier to the parole release of minors?

- What has been DHS' practice in determining release with or to a "relative," "brother," "sister," "aunt," "uncle," "or grandparent"? How many minors were released on parole to a "relative," "brother," "sister," "aunt," "uncle," "or grandparent" who had not been formally appointed as the minor's "legal guardian" in the past year?

- What happens when a parent or legal guardian cannot be located for the minor?

- How does the Government believe these proposed changes limiting the ability of a minor to be released from detention comport with the spirit of the FSA?

Second, DHS proposes to limit the minors to whom the parole provision applies. As currently written, 212.5(b) provides that parole of juveniles who have been detained under 235.3(b) or 235.3(c) would be justified on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit." DHS proposes that 235.3(c) be removed from this section altogether. Accordingly, minors who are being detained in an expedited removal hearing (which only applies to accompanied minors) would be stripped of the ability to be paroled for an "urgent humanitarian reason" or a "significant public benefit" and would then instead face the strict standards of parole applied to adults in expedited removal proceedings. DHS suggests that the imposition of these stricter standards is the goal of the revision, stating that "[t]he current cross-reference to section 235.3(b) is confusing . . . because it suggests that the more flexible standard in section 212.5(b) might override [the provisions in 235.3(b)] when a minor is in expedited removal." 83 Fed. Reg. at 45,495. Initially, we note that there is nothing confusing about the current standard, and it is supported by best practices in standards governing child welfare. The proposed changes are arbitrary and capricious as they seek to circumvent international and U.S. law requirements that strongly prefer the least restrictive standard of confinement for children in immigration custody.

The Proposed Regulations should be withdrawn, and to the extent any regulations are proposed anew, the Government must answer the following questions about its approach:

- How large was the population of minors who were in detention under 235.3(c) and who were released on parole under 212.5(b) on a yearly basis for the past five years?

- Why is section 212.5(b) inappropriate for minors in removal under 235.3(c)? Why should accompanied minors not be permitted to be paroled on a case-by-case basis for an "urgent humanitarian reason" or a "significant public benefit"?

**8 CFR 236.3(b) – Definitions**
83 Fed. Reg. at 45,495-97, 45,525

## Emergency and Influx

The Proposed Regulations vastly expand the FSA's definition of "emergency" and "influx," the results of which will be weakened protections for minors. Under the Proposed Regulations, "emergency" would mean "an act or event (including, but not limited to, a natural disaster, facility fire, civil disturbance, or medical or public health concerns at one or more facilities) that prevents timely transport or placement of minors, *or impacts other conditions provided by this section*." 83 Fed. Reg. at 45,525 (emphasis added). "Influx" would be defined as "a situation in which there are, at any given time, more than 130 minors or UACs eligible for placement in a

licensed facility under this section or corresponding provisions of ORR regulations, including those who have been so placed or are awaiting such placement." *Id.* These proposed definitions could, and will almost certainly under this federal administration, be interpreted so broadly as to indefinitely suspend basic needs and standards for care of children and families in detention. Indeed, the Proposed Regulations provide an example of the type of requirement that might be waivable under this new, overly broad definition of "emergency;" namely, a meal or snack for a minor. *See* 83 Fed. Reg. at 45,496. Moreover, DHS is currently required by the TVPRA to transfer UAC's to ORR within 72 hours of determining that the child is a UAC and other minors within three to five days. 8 U.S.C. § 1232(b)(3) (2008). The demographics of arrivals at the southern border have changed drastically since the FSA. The number of child arrivals has increased over the years. It is no longer reasonable to consider 130 children to be an influx. Facilities, capacity, and norms have moved well beyond this number. Furthermore, these broad "emergency" and "influx" definitions will make longer stays more common and mean that detained children may not be provided with basic necessities, such as meals, or at the frequency that is developmentally recommended/necessary.

Particularly concerning is the fact that even without invoking "emergencies," CBP custody is often grossly negligent towards children and those in its custody. *See* University of Chicago Law School - International Human Rights Clinic, *Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection* (2018), https://chicagounbound.uchicago.edu/ihrc/1. Implementation of this rule would take away the ability to monitor or check the decision whether to deem a situation as an emergency as well as the conditions that would result from such a determination.

The suspension of protections for minors embedded in these definitions requires DHS to withdraw the Proposed Regulations. To the extent they are not or are proposed anew, the Government must respond to the following questions and comments:

- Provide the basis for which it arrived at these definitions that deviate greatly from those set forth in the FSA. As they currently stand, these proposed definitions provide for broad "emergency" loopholes for not meeting the standards of care set forth in the FSA.

- Who will review the determination of "emergency" or "influx"?

- Is there a maximum amount of time for any "emergency" to last?

- What would the consequence be—if any—for invoking the emergency when unwarranted?

9

- What is the current average daily number of UACs awaiting placement in a licensed ORR facility? What has the average number of UAC awaiting placement in a licensed ORR facility been for each of the past five years?

## Licensed Facility

The Proposed Regulations create a federal licensing scheme for family facilities. The Proposed Regulations define "licensed facility" in a way that would enable DHS to select an auditor for its own family detention facilities, effectively allowing DHS to license itself and hold minors for the duration of their immigration cases. The Proposed Regulations include a provision in the definition of "licensed facility" that says, "[i]f a licensing scheme for the detention of minors accompanied by a parent or legal guardian is not available in the state, county, or municipality in which an ICE detention facility is located, DHS shall employ an ***entity outside of DHS*** that has relevant audit experience to ensure compliance with the family residential standards established by ICE." 83 Fed. Reg. at 45,525 (emphasis added).

Implementation of this section could and would result in the prolonged detention of children in family detention centers. If DHS can license itself, it can also indefinitely detain children in these facilities. WRC and numerous other organizations, including the American Academy of Pediatrics and ICE's own Advisory Committee on Family Residential Centers have long documented the harm of family detention, even for short periods of time. *See*, *e.g.*, *Locking Up Family Values*, Women's Commission for Refugee Women and Children & Lutheran Immigration and Refugee Service (Feb. 2007), https://www.womensrefugeecommission.org/images/zdocs/famdeten.pdf; Julie M. Linton et al., *Detention of Immigrant Children*, 139 Pediatrics (Mar. 13, 2017), http://pediatrics.aappublications.org/content/139/5/e20170483; and *Report of the ICE Advisory Committee on Family Residential Centers* (Oct. 7, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf. These reports document the trauma and harm of family detention, including the absence of meaningful mental health and medical care in these facilities.

Moreover, neither the family residential standards nor a DHS-chosen entity to oversee compliance with these standards is the same as licensing in a state licensing scheme. "The purpose of the licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency." *See Flores v. Johnson*, 212 F. Supp. 3d 864, 879 (C.D. Cal. 2015). In 2015, the *Flores* Court rejected the Government's argument that the licensing provision did not apply to family residential centers because there was no state licensing process available for facilities that held children in custody along with their parents or guardians. This proposed section of the regulations ignores these prior court orders by offering modifications previously rejected by the *Flores* Court in 2015.

For the reasons above, the Proposed Regulations should be withdrawn. Before they are proposed
again, DHS must provide answers to the following questions:

- What is the legal basis for DHS to select an entity to monitor its own compliance with
  family residential standards? From where does this authority derive?

- What criteria would be used to select these outside entities?

- Who would these outside entities be?

- Would these outside entities have the legal authority to facilitate or recommend the
  opening of additional family detention facilities beyond the ones that currently exist? Or,
  conversely, would these outside entities have the legal authority to shut down facilities
  that are out of compliance? And who would audit their oversight?

- How would the independence and integrity of such an entity be guaranteed, especially
  considering the failure of DHS's current oversight mechanisms to ensure compliance
  with standards and child welfare norms?

Recently, DHS's Office of Inspector General ("OIG") found ICE's internal (Office of Detention
Oversight) and external inspections regime in the context of adult detention to be woefully
inadequate. *See* Office of Inspector General, OIG-18-67, ICE's Inspections and Monitoring of
Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements (2018),
https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf. In this
instance, ICE was employing an independent contractor, Nakamoto, to conduct its inspections.
*Id.* The OIG found the Nakamoto inspection practices "not consistently thorough." *Id.* The OIG
also found a lack of integrity in these inspections, particularly with respect to how Nakamoto
conducted its detainee interviews and instances where ICE refused to implement or enforce
compliance with detention standards. One ICE employee even described Nakamoto inspections
as "very, very, very difficult to fail." *Id.* Given OIG's recent findings and the frequency of repeat
deficiencies in the same facilities, DHS must withdraw the Proposed Regulations. To the extent
they are not or are again proposed, the Government must answer the following questions:

- Describe steps it will take to ensure the findings in OIG's report do not repeat themselves
  with respect to family residential inspections performed by third-party auditors.

- Confirm whether Nakamoto will participate or be considered as an "entity outside of
  DHS that has relevant audit experience."

11

- Confirm whether any independent contractor OIG identified as having insufficient inspection practices will serve as a third-party auditor to ensure compliance with family residential standards and whether OIG would have oversight over the external auditor(s).

- Identify how independent oversight and compliance with standards would be ensured when the oversight agency is contracted by DHS itself.

### 8 CFR 236.3(d) – Determining whether alien is a UAC
83 Fed. Reg. at 45,497, 45,525-26

The Proposed Regulations provide that even after an initial determination that a child is a UAC, immigration officers must redetermine whether someone is a UAC "each time" they encounter the child. The Proposed Regulations do not define "each time" and thus this provision is subject to great abuse. The Proposed Regulations further state that even though a child "may have been previously determined to be a UAC, [he or she] may no longer meet the definition if [he or she] reaches the age of 18, acquires legal status, or if a parent or legal guardian is available in the United States to provide care and physical custody. Once [a child] no longer meets the definition of a UAC, the legal protections afforded only to UACs under the law cease to apply." 83 Fed. Reg. at 45,497.

The Proposed Regulations also propose age determination decisions to be based upon the "totality of the evidence and circumstances." 83 Fed. Reg. at 45,525. A fundamental requirement for any agency's regulatory action is to provide definitions and criteria for consistent and nonarbitrary decision-making. *See, e.g.*, *S. Terminal Corp. v. EPA*, 504 F.2d 646, 670 (1st Cir. 1974) (cautioning against "arbitrary and unequal application"); *W. Virginia Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 863 n.75 (D.C. Cir. 1982) ("[A]n exercise of unfettered flexibility too often results in ad hoc judgments and arbitrary decisions, both of which are counterproductive to the greater regulatory goals of consistency in decisions and reasoned guidance upon which affected parties may rely."). This provision fails to set forth the guidelines immigration officers must follow to make these determinations and is utterly silent with respect to the level of training and or expertise required to conduct these determinations. This provision also fails to explain whether immigration officers will be required to submit recommendations to DHS headquarters about whether a child qualifies as a UAC.

This provision also fails to advance the public interest goal of effective administration of limited judicial resources. For example, under the Proposed Regulations, if a child's placement falls through, or the child goes back into the custody of ORR, he or she must then be reclassified as a UAC. Or, for a child who was classified as a UAC and began the asylum process with an

12

interview before an asylum officer, upon being stripped of UAC status, the child would then be back before an Immigration Judge.

Furthermore, constant re-evaluation and review with results that drastically affect a child's placement, rights, and access to protection create an unstable environment contrary to the intention and spirit of the FSA.

Given the due process concerns at stake with a child who loses UAC status, as well as both economic and judicial resources concerns, DHS should withdraw the Proposed Regulations, and to the extent they are proposed again, the Government must address the following questions:

- In an already backlogged system, how would this change advance the goal of effective administration of judicial resources?

- What guidelines must immigration officers follow to make UAC determinations? Are these guidelines consistent with current child welfare practice, the best interest of the child, and the FSA?

- What criteria will make up the "totality of the circumstances" judgment?

- How does re-evaluation and lack of stability affect the individual's vulnerability and best interest?

- How does a change in status affect the individual's need for any lost benefits or procedures?

- What level of training and/or expertise must the immigration officers have to make UAC determinations?

- Will immigration officers be required to submit recommendations to DHS headquarters concerning their UAC determinations?

- What input do child welfare professionals and ORR have in age determination and age determination mechanisms?

**8 CFR 236.3(o) – Monitoring**
83 Fed. Reg. at 45,504, 45,528

The Proposed Regulations suggest monitoring be performed by two Juvenile Coordinators—one for ICE and one for CBP. 83 Fed. Reg. at 45,504. The Proposed Regulations charge these

13

Juvenile Coordinators with "monitoring statistics about UACs and minors who remain in DHS custody for longer than 72 hours." *Id.* The Proposed Regulations allow the Juvenile Coordinators to collect hearing dates for aliens in DHS custody as well as "additional data points should they deem it appropriate given operational changes and other considerations." *Id.* This provision is extremely broad and ill defined. It does not provide meaningful standards necessary to implement adoption and ensure independent and meaningful monitoring. *See, e.g.*, *Checkosky v. SEC*, 139 F.3d 221, 226 (D.C. Cir. 1998) ("When an agency utterly fails to provide a standard for its decision, it runs afoul of more than one provision of the Administrative Procedure Act. . . . [A]n agency's failure to state its reasoning or to adopt an intelligible decisional standard is so glaring that we can declare with confidence that the agency action was arbitrary and capricious.") (internal quotations and citations omitted). To help avoid arbitrary and capricious action, DHS must withdraw this standard. If it does not or it proposes it again, the Government must answer the following questions:

- What are the additional data points and considerations the Juvenile Coordinators would be allowed to collect?

- To whom would the Juvenile Coordinators report this information?

- What are the "operational changes" to which this section refers?

- Who would determine what operational changes would necessitate the collection of "additional data" points?

- How would independence and accountability be ensured?

- What record keeping and data collection will be used to track performance, and how will those data points be used to ensure compliance?

- Will Juvenile Coordinators be provided with adequate resources and staffing to monitor these statistics in a meaningful and ongoing manner?

- Will CBP and ICE be required to provide data to Juvenile Coordinators, respectively, or will full, unfettered, and up-to-date access to internal databases, respectively, be required?

- What will the hiring process look like for Juvenile Coordinators? What qualifications would be required – e.g., some level of experience in each agency, child welfare training, or otherwise?

14

- Will there be a process by which Juvenile Coordinators can receive information and suggestions for additional data points or statistical lines of inquiry?

### B. HHS Regulations

#### 45 CFR 410 Subpart A – Care and Placement of Unaccompanied Alien Children
83 Fed. Reg. at 45,505, 45,529-30

This subpart provides for a "fluid" definition of an unaccompanied minor, in which "ORR's determination of whether a particular person is a UAC is an ongoing determination that may change based on the facts available to ORR." 83 Fed. Reg. at 45,505. It further proposes a definition for "secure facility," and states that the Department of Homeland Security will handle immigration benefits and enforcement. *Id.* There are three issues with this subpart, because it is 1) overbroad in failing to establish concrete guidelines with respect to ORR's "ongoing determination" of UAC qualifications; 2) unconstitutional because it lacks specific standards of care and due process protections with respect to deprivation of liberty and right to family in the placement of children in "secure facilities"; and 3) vague in that it fails to define implications of giving DHS the power to handle immigration benefits and enforcement. These deficiencies violate the important principle of clearly defined regulations that pass constitutional muster. *See generally Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865–866 (1984); *see also Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront*, 193 F.3d 730, 733 (3d Cir. 1999) ("[G]iving substantive effect to . . . a hopelessly vague regulation . . . disserves the very purpose behind the delegation of lawmaking power to administrative agencies.") (citation omitted); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 525 (1994) ("[A]gency rules should be clear and definite so that affected parties will have adequate notice concerning the agency's understanding of the law.") (Thomas, J., dissenting).

First, the Government's proposed language regarding an "ongoing determination" of "UAC" gives the Government unchecked power to change and disrupt a UAC's processing with a mere flick of the wrist. To the extent the Proposed Regulations are withdrawn and proposed again, the Government should specify the criteria and define what qualifies as "facts available to ORR" that could trigger a reevaluation of a minor's status and how those triggering facts will ensure that detained minors are treated with "dignity, respect, and special concern for their particular vulnerability," per the *Flores* Settlement Agreement. *See* 83 Fed. Reg. at 45,505. The Government must also explain how changes in a determination of unaccompanied status impact the affected minor or individual's vulnerability and whether and how that change affects the individual's need for any lost benefits or procedures.

15

Next, the Government's proposed definition of "secure facilities" and subsequent discussion exceeds the scope of the Government's power because it fails to define any measures to keep families together. Such an oversight is impermissible under federal law. *See, e.g.*, *Ms. L. v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018) ("The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as property. Certainly, that cannot satisfy the requirements of due process.").

Finally, as for benefits, the Government's proposed language does not discuss the implications of allowing DHS to handle benefits. For example, the language does not address whether benefits will impact a UAC's immigration proceedings, particularly as the Government is concurrently considering proposed changes to the regulations defining the meaning of a "public charge," which is grounds for "inadmissibility" under INA 212 (INA 212(a)(4)). Legislative history of the Homeland Security Act supports the concern of allowing the Department of Homeland Security to handle certain immigration issues. For example, a 2002 committee hearing expressed concern for "placing the immigration services functions into an organization with a paramilitary culture, designed to keep out terrorists." *See* Role of Immigration in the Department of Homeland Security Pursuant to H.R. 5005, the Homeland Security Act of 2002, at 45, Hearing before the Subcommittee on Immigration, Border Security, and Claims of the Committee of the Judiciary, June 27, 2002. This "[made] absolutely no sense" because, as the hearing noted, "the vast majority of people seeking immigration benefits on a day-to-day basis are already in the United States . . . [such as] young girls or women, already here, seeking protection from traffickers or smugglers . . . [or] unaccompanied minors seeking protection and support." *Id.* Therefore, should the Proposed Regulations be withdrawn and then proposed again, the Government should specify details regarding the processes DHS will use in issuing and determining benefits for UACs, including:

- Is there any limit to the ORR's "ongoing determination" of whether a person qualifies as a UAC?

- What specific criteria, or "facts available to ORR," could trigger a reevaluation of a minor's status as a UAC?

- Will there be any measures in place to ensure communication between siblings and family members when minors are placed in "secure facilities"?

- How is placement in a "secure facility" determined?

- How is review of justification and need for secure placement considered?

16

- How will the Government ensure that detained minors are treated with "dignity, respect, and special concern for their particular vulnerability"? Are there specific guidelines for concrete actions?

- How is the determination made to place a minor in a facility versus in foster care? Are there certain considerations or categories of minors that fall into either category?

- Does the provision of benefits, or application for the provision of benefits, harm or otherwise have any effect on a minor's case?

### 45 CFR 410 Subpart B – Determining the Placement of an Unaccompanied Alien Child

#### 45 CFR 410.201 – Considerations generally applicable to the placement of a UAC
83 Fed. Reg. at 45,505, 45,530-31

While discussing this section regarding the generally applicable considerations to placement, the Government asserts that the Proposed Regulations recognize "the general principles of the FSA that while in custody, UACs shall be treated with dignity, respect, and special concern for their particular vulnerability" and that this section in particular "generally parallels the FSA requirements." 45 CFR at 45,505. The Government notes that "ORR makes reasonable efforts to provide placements in the geographic areas where DHS apprehends the majority of UACs" and asserts that it complies with this provision because "ORR maintains the highest number of UAC beds in the state of Texas where most UACs are currently apprehended." *Id.* The Government does not otherwise provide any explanation for its enumeration of the generally applicable considerations for UAC placement. Accordingly, the Proposed Regulations are unsupported should be withdrawn. To the extent they are not or are again proposed, HHS must answer the following questions:

- What specific measures are required and will be taken to ensure respect for the dignity and vulnerability of UACs?

- What reasonable efforts will be made for the placement of UACs, including whether efforts to place UACs near family members is a factor?

- What is the exact geographic area that will be considered when making placements of UACs? On what is this information based?

17

**45 CFR 410.202 – Placement of a UAC in a licensed program**
83 Fed. Reg. at 45,505, 45,530

In the context of placement of a UAC, the Proposed Regulations then provide that ORR will place UACs into a licensed program "promptly" after the UACs are referred to ORR legal custody, except in enumerated circumstances, such as: in the event of an emergency influx; where the UAC meets criteria for placement in a secure facility; and as otherwise required by court decree or court-approved settlement. However, the Proposed Regulations fail to address the agency's practice that the *Flores* Court and others have identified fail to comply with relevant law, including but not limited to the FSA, and result in moving children "up" to secure facilities without any objectively valid documentation or support. Additionally, the Proposed Regulations inexplicably do not include the exception in the FSA that allows transfer within five days where an individual speaks an "unusual language."

The Proposed Regulations, therefore, should be withdrawn. To the extent they are not or are again proposed, HHS must answer the following questions:

- Will HHS consider any other exceptions when placing a UAC into a licensed program?

- Will the licensed programs have ongoing standards they must maintain? What are these criteria?

- Why was the transfer period exception omitted from the regulations?

- How does HHS define "unusual language"? What constitutes an "unusual language"?

**45 CFR 410.205 – Applicability of Sec. 410.203 for placement in a secure facility**
83 Fed. Reg. at 45,506, 45,531

The Proposed Regulations offer an unclear standard— "appropriate in the circumstances"—for placement in a secure facility, but it does not codify TVPRA's "least restrictive" language. The regulations also purport to remove the factor under the FSA of being an escape risk pursuant the TVPRA. Finally, the regulations do not include specific examples of behavior or offenses that could result in secure detention.

18

Therefore, the Proposed Regulations should be withdrawn. To the extent they are not or are proposed again, HHS must answer the following questions:

- How were these criteria selected?

- Will any other criteria be considered?

- How is a secure facility interpreted? How did HHS arrive at these criteria?

- How will any personal information learned about the UACs be stored? What privacy protections are available?

### 45 CFR 410.206 – Information for UAC concerning the reasons for his or her placement in a secure or staff secure facility
83 Fed. Reg. at 45,506, 45,531

The Proposed Regulations do not provide clarification of what the "reasonable time" is for transferring a UAC to a secured facility. As such, the Proposed Regulations should be withdrawn and to the extent they are proposed anew, HHS must answer the following questions before implementing the regulations:

- What is the "reasonable time" HHS considers when deciding a transfer?

- How were these criteria determined?

### 45 CFR 410.207 – Custody of a UAC placed pursuant to this subpart
83 Fed. Reg. at 45,506, 45,531

The Proposed Regulations provide that "upon release of an approved sponsor, a UAC is no longer in the custody of ORR." The explicit renunciation of responsibility for a UAC upon placement with a sponsor is problematic, particularly given known concerns about child trafficking. The omission of any follow-up mechanism creates a grave risk for dignity and vulnerability of a UAC who finds himself with an abusive sponsor. The Proposed Regulations should be withdrawn, and to the extent they are proposed again, HHS must answer the following questions:

- What criteria will HHS consider when releasing a UAC to an approved sponsor?

- What criteria will HHS consider when approving an individual as a sponsor?

19

- What protections will HHS take to ensure the UAC is safe with the sponsor, including post-placement and release?

- If HHS cites to its 30-day post-release follow-up call and/or its support hotline, do these constitute the universe of protections available post-release to children and, if so, how has HHS determined that these are sufficient?


### 45 CFR 410.208 – Special needs minors
83 Fed. Reg. at 45,506, 45,531

HHS offers this section without robust discussion and thus in an arbitrary and capricious manner. The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS must answer the following questions:

- How does HHS define a special needs minor?

- What considerations will HHS account for with respect to a special needs minor?


### 45 CFR 410.209 – Procedures during an emergency or influx
83 Fed. Reg. at 45,507, 45,531

The Proposed Regulations adopt the definition of "emergency" and "influx" from the FSA. Additionally, this section of the Proposed Regulations provides that UACs will be placed in a licensed program as "expeditiously as possible." However, the Proposed Regulations do not address meaningful and practical issues at play in these scenarios, such as where will the UAC be before this placement and what is the maximum timeframe before a UAC can be placed in a licensed program. These practical issues are relevant to understanding whether the Proposed Regulations comport with the requirements of the FSA.

The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS must answer the following questions:

- How will HHS determine if the "emergency influx" exception applies? What criteria will it consider?

- What is the time frame for placing UACs in a new licensed program if these procedures are invoked?

- What criteria or standards apply in an emergency or influx situation? How were these developed? What was considered in determining these factors?

### 45 CFR 410 Subpart C – Releasing a UAC from ORR Custody
83 Fed. Reg. at 45,507-08, 45,531-32

This subpart addresses the policies and procedures to release a UAC from ORR custody to an approved sponsor. *See* 83 Fed. Reg. at 45,507. Proposed 45 CFR 410.301 and 410.302 attempt to articulate a policy with respect to 1) when ORR will release a UAC and 2) to which individuals or entities ORR will release such UAC. *Id*. This subpart broadly states that ORR will release a UAC to a sponsor without "unnecessary delay" when ORR determines that the continued custody of the UAC is not required "either to secure the UAC's timely appearance before DHS or the immigration courts, or to ensure the UAC's safety or the safety of others." *Id*. This subpart goes on to propose several general factors that ORR will consider when determining whether a potential sponsor is "suitable" to take custody of the applicable UAC. The Proposed Regulations as drafted in this subpart are deficient for several reasons, including that the standard for releasing UACs and the determination of to which sponsors such UAC may be released are overly broad and vague. *See, e.g.*, *Chevron*, 467 U.S. at 865; *Checkosky*, 139 F.3d at 226 ("When an agency utterly fails to provide a standard for its decision, it runs afoul of more than one provision of the Administrative Procedure Act. . . . [A]n agency's failure to state its reasoning or to adopt an intelligible decisional standard is so glaring that we can declare with confidence that the agency action was arbitrary and capricious.") (internal quotations and citation omitted); *see also Shalala*, 512 U.S. at 525 (Thomas, J., dissenting) ("[A]gency rules should be clear and definite so that affected parties will have adequate notice concerning the agency's understanding of the law.").

The Government's language in Proposed 45 CFR 410.301 that it will release a UAC to a sponsor without "unnecessary delay" is problematic because the Proposed Regulations do not define what constitutes unnecessary delay or otherwise provide any standard for ORR to follow when it is making such determination. Considering the government's recent Memorandum of Agreement, it appears that the government is causing delay by adding unnecessary restrictions to the reunification process that not only delay the process but also discourage children from sharing all relevant information with authorities. *Backgrounder: ORR and DHS Information-Sharing Emphasizes Enforcement Over Child Safety*, Women's Refugee Commission & National Immigrant Justice Center (June 6, 2018), https://www.womensrefugeecommission.org/rights/gbv/resources/1642-backgrounder-memorandum-of-agreement-between-dhs-and-hhs-emphasizes-immigration-enforcement-over-child-safety.

21

Similarly, the Proposed Regulations do not provide any details regarding how ORR will determine that if a UAC were to be released, they would be at risk of not making a "timely appearance before DHS or the immigration courts." The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS must answer the following questions:

- What factors would militate against releasing a UAC due to such risk?

- How are those factors determined?

- Who is responsible for making such determinations?

- Is there a mechanism for mitigating that risk or an opportunity for a minor or sponsor to mitigate an identified risk?

- Conversely, how will ORR determine that a UAC's continued detention will ensure their own safety?

- How will ORR ensure that the information children share with their case managers and other ORR personnel is used for the children's best interest and that the children's privacy rights will not be violated (e.g., if this information is shared with DHS)?

The Proposed Regulations provide no guidance on the standard that ORR will use when making such determinations. There is nothing that provides clarity or definitiveness to UACs about the process or substance for determining whether the UAC should be released.

Proposed 45 CFR 410.302 attempts to outline the "process requirements leading to a release of a UAC from ORR custody to a sponsor." 83 Fed. Reg. 45,507. ORR may require a "suitability assessment" prior to releasing a UAC to a sponsor that would include a background check, investigation of the living conditions and the standard of care a UAC would receive, interviews with household members, a home visit and follow-up visits. *Id*. Furthermore, the Proposed Regulation would allow ORR to fingerprint potential sponsors and for background checks to be run "on their biometric and biographical data", which the Government asserts is consistent with "child welfare provisions." *Id*. Sponsors and other household members would also be subject to criminal record checks, including checking national criminal records/databases. While it is, of course, imperative that the UAC's safety is paramount, the process described in this subpart has, vis-à-vis the implementation of the FSA, led to undue delay in releasing the UAC from ORR's custody. Even more problematic is that the Proposed Regulations do not provide any mechanism for ensuring that the process for determining sponsor suitability isn't used by ORR (and DHS) to improperly arrest potential sponsors for solely administrative violations of law, such as being present in the country without valid immigration status. *Cf*. ORR, Children Entering the United States Unaccompanied (2015) at § 2.5.2 ("ORR does not disqualify potential sponsors on the

22

basis of their immigration status"). Proposed 45 CFR 410.302 also includes a statement, unsupported by any evidence, that in "many, if not most cases" the UAC has not lived with its biological parent for much or a significant portion of the UAC's life. *Id*. It is not clear why the Proposed Regulations include this naked assertion. The order of preference for releasing UAC's to sponsors provided that the parent or legal guardian of the UAC is the preferred sponsor. By asserting that the parent of the UAC may not be the preferred sponsor the Proposed Regulation conflicts with the order of preference set forth in the FSA.

### 45 CFR 410 Subpart D – What Standards Must Licensed Programs Meet?

**45 CFR 410.403 – Ensuring that licensed programs are providing
services as required by these regulations**
83 Fed. Reg. at 45,508, 45,533

The history of the FSA has shown that monitoring and oversight are critical components to ensure compliance with the requirements that are being proposed in this regulation. However, the Government has not included any monitoring regarding center compliance with licensing standards. *See* 45 CFR 410.403 ("ORR monitors compliance with the terms of this regulation."). By merely identifying ORR as the entity with monitoring authority, the regulation does not require monitoring at all, much less set forth the standards by which such compliance would be measured, the time intervals at which such compliance would be monitored, or the reporting mechanism by which such monitoring could be verified. This issue is compounded by ORR's known monitoring shortfalls, including ORR's prior monitoring of unaccompanied minor facilities in the past being found to be incomplete. *See* GAO, Unaccompanied Children: HHS Can Take Further Actions to Monitor Their Care, GAO-16-180 (Washington, D.C.: February 5, 2016). The Government Accountability Office expressed concern that ORR's failure to conduct monitoring signifies that "ORR may not be able to identify areas where children's care is not provided in accordance with ORR policies and the agreements with grantees." *Id.* ORR's failure to employ an auditor for its PREA monitoring of all 100-plus ORR facilities, due in February 2019, until the fall of 2018, despite having a three-year period to conduct the audit, demonstrates conclusively that ORR must be given requirements and guidelines if any monitoring is to be effectively performed.

Current access for thorough independent monitoring (with private access to speak to children) is exclusively given under the FSA. The Proposed Regulations provide no reliable or reasonable alternative monitoring process.

23

The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS must answer the following questions:

- When setting forth this oversight provision, did HHS consider alternative language that would make clear that monitoring was required by ORR, such as "ORR shall monitor compliance with the terms of this regulation"? If so, why was mandatory language not included?

- When setting forth this oversight provision, did HHS consider mandating a time period within which monitoring must be accomplished (e.g., annually, twice a year, every two years)? Why was a time period ultimately not included?

- When setting forth this oversight provision, did HHS consider standards and evaluations that would be used to ensure compliance? Why are all such provisions absent from this proposal?

- Did HHS consider what records ORR should collect, create, and maintain as part of its monitoring program? Which were considered and why were they ultimately not included in this proposed provision?

### 45 CFR 401 Subpart F – Transfer of a UAC
83 Fed. Reg. at 45,508, 45,533

This subpart provides that ORR may need to change the placement of a UAC for various reasons, including changes in placement availability and fluctuations in a UAC's immigration case. 83 Fed. Reg. at 45,508. However, the rule is unconstitutionally vague because it offers no specifications or limitations for how many times the ORR may change the placement of a UAC. Under the current language, this means that a UAC can be transferred every day, separated from family members, and subject to the traumatic effects of constant displacement. Frequent relocation also increases the challenges behind family reunification and identification, tracking of UACs, and the ability of children and adults to access counsel, including the network of pro bono lawyers around the country who have been trained in representing UACs and their parents. *See Ms. L.*, 310 F. Supp. 3d at 1144 (rejecting a system with no "effective … procedure for (1) tracking the children after they were separated from their parents"). These unaddressed obstacles implicate the Government's promise to treat UACs with "dignity, respect, and special concern for their particular vulnerability," as per the *Flores* Settlement Agreement. The Government should provide limitations and guidelines for ORR's ability to change the placement of a UAC, as well as clarify the details of how the safety determination will be made to trigger the 24-hour notice to the UAC's attorney.

24

Furthermore, the proposed language in this subpart states that ORR must take "all necessary precautions for the protection of UACs during transportation with adults" but does not otherwise address protection of UACs during transfer. 83 Fed. Reg. at 45,508. For example, if the transfer of UACs occurs without adults, the Government does not specify the relevant precautions. Unless the Government can show that minors are never transported without adults, such vagueness cannot stand. *See generally Chevron*, 467 U.S. at 865; *see also Shalala*, 512 U.S. at 525 ("By giving substantive effect to such a hopelessly vague regulation, the Court disserves the very purpose behind the delegation of lawmaking power to administrative agencies, which is to resolve . . . ambiguity in a statutory text.") (Thomas, J., dissenting) (quotation marks omitted), citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991). The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS must answer the following questions:

- Is there a rule or limitation as to how many times the ORR may change the placement of a UAC?

- What measures will the Government take to ensure that frequent transfers do not obstruct UAC's communication with counsel or the ability to obtain or retain counsel?

- How is the safety determination made to trigger the 24-hour notice to the UAC's attorney?

- What steps will the Government take to ensure that frequent relocation does not hinder or obstruct immigration proceedings?

- How, if at all, does an upcoming hearing or proceeding before an immigration court affect transfer determinations?

- Is there any notification of transfer to the minor's family? What if that family is also in custody? What about minor siblings that may also be in custody?

- What specific measures will be taken to ensure that "all necessary precautions for the protection of UACs during transportation with adults"? Are there any guidelines to these precautions?

- What about the transportation of UACs without adults?

- Under what circumstances are minors transported with adults, and by whom?

- Who is transporting the children?

      o  If a contractor in the main mode of transport, can the Government specify which
           contractors it uses, including their names?

      o  How are the drivers who transport the UACs selected and vetted?

      o  Are records kept of which drivers transported UACs?

      o  Is there a time limit on travel?

      o  Are there requirements regarding access to food, water, bathroom stops, rest
           breaks, or other measures during transport of UACs?

### 45 CFR 410 Subpart G – Age Determinations
83 Fed. Reg. at 45,508, 45,533

The Proposed Regulations take into account "multiple forms of evidence" when determining a
UACs age, including non-exclusive use of radiographs, and "may involve medical, dental, or
other appropriate procedures to verify age." HHS has failed to explain why and how the current
system, based in science, to determine age needs to be or should be modified. HHS has not set
forth any advantage in expanding beyond scientifically-based evidence and the obvious
drawback is the introduction of subjectivity to such determinations.

The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS
must answer the following questions before implementing the Proposed Regulations:

- What other evidence will HHS use to determine age?

- Are these evidentiary mechanisms accurate and accepted in medical circles and child
  welfare practice as appropriate and accurate indicators?

- How will HHS preserve and store this information to ensure the individual's private
  information is kept confidential?

- Will this evidence be shared with the UAC?

### 45 CFR 410 Subpart H – UACs' Objections to ORR Determinations
83 Fed. Reg. at 45,508, 45,533

This subpart is intended to address the process and procedures for UACs objecting to ORR's placement decisions. However, in the Proposed Regulations, HHS intentionally omits processes for objecting to ORR placement that are analogous to Paragraphs 24(B) and 24(C) of the FSA. *Id*. By excluding analogous provisions for these paragraphs, the Proposed Regulations materially weaken and undermine the FSA despite the requirement to implement the terms of the settlement agreement through the regulations. *Id*. at 45,486; *Flores v. Reno*, No. 85-4544-RJK (Px), Stipulated Settlement Agreement (C.D. Cal., Jan 17, 1997) ("The final regulations shall not be inconsistent with the terms of this Agreement."). The ability for UACs to challenge ORR determinations under the Proposed Regulations is significantly weaker than UAC's rights under the Settlement Agreement. The reasoning in this subpart that sovereign immunity would bar the right of a UAC to seek judicial review of ORR's placement decision with respect to such UAC is misplaced. Suits against the Government that seek prospective equitable relief are not barred by the doctrine of sovereign immunity. *See Ex Parte Young*, 209 U.S. 123 (1908). The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS must answer the following questions:

- Is HHS and ORR's intention to eliminate the right of UACs to commence judicial review of ORR's placement decision with respect to such UAC?

- Is HHS and ORR's view that UACs would be barred from challenging ORR's placement decision due to sovereign immunity?

- What standard of review would be applicable with respect to judicial review of a UAC's placement?

- Will the Proposed Regulations include any minimum standards for licensed programs as set forth in the FSA?

This subpart also provides that when a UAC is placed in a more "restrictive level of care", the UAC will receive a notice—within a reasonable period of time—explaining the reasons for "housing" such UAC in the more restrictive environment (the "Restrictive Housing Notice"). Furthermore, ORR will promptly provide each UAC not released with a list of free legal services compiled by ORR (unless such a list was previously given to the UAC). Given the unsettled and transitory nature of detention and placement in a facility, ORR should provide a list of free legal services to every UAC regardless of whether they've previously been provided with such a list. The Proposed Regulations should be withdrawn, and to the extent they are proposed anew, HHS must answer the following questions:

27

- What constitutes a reasonable period of time for delivery of the Restrictive Housing Notice to the UAC in a language that such UAC understands?

- If the UAC cannot yet read or speaks an uncommon language, what accommodations will ORR and HHS make to communicate the contents of the Restrictive Housing Notice?

- Does ORR intend to prevent UACs from challenging the placement decision?

- With respect to the list of free legal services to be provided by ORR to the UAC, why does ORR intend to give a list of free legal services to UACs only once?

# Comments of ZERO TO THREE



## ZERO TO THREE
Early connections last a lifetime

**Board of Directors**

Robert M. Chang
Lia Dean
Helen Egger
Robert Emde
Walter Gilliam
Mary Margaret Gleason
Brenda Jones Harden
Donna Levin
Alicia F. Lieberman
John Love
Matthew E. Melmed
Andrew Meltzoff
Lisa Mennet
Catherine E. Monk
Ann Pleshette Murphy
Brian A. Napack
Michael R. Olenick
Jeree H. Pawl
Rizwan Shah
Paul G. Spicer
Eugene Stein
Mindy Stein
Barbara Thompson
Ross Thompson
Ginger Ward
Charles Zeanah

**Directors Emeriti**

T. Berry Brazelton
Samuel J. Meisels
Kyle D. Pruett
Arnold J. Sameroff
Jack P. Shonkoff
Edward Zigler

**Founding Members**

T. Berry Brazelton
Selma Fraiberg
Stanley I. Greenspan
J. Ronald Lally
Bernard Levy
Reginald S. Lourie
Peter B. Neubauer
Robert A. Nover
Sally Provence
Julius B. Richmond
Albert J. Solnit
Leon J. Yarrow

**Executive Director**

Matthew E. Melmed

November 6, 2018

The Honorable Kirstjen M. Nielsen
Secretary of Homeland Security
Washington, D.C. 20528

The Honorable Alex M. Azar II
Secretary of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

RE: Comments on the Notice of Proposed Rulemaking to Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, DHS Docket No. ICEB-2018-0002

Dear Secretary Nielsen and Secretary Azar:

On behalf of ZERO TO THREE, I write to offer comments on the Notice of Proposed Rulemaking (NPRM) to the Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, proposed by the Departments of Homeland Security (DHS) and Health and Human Services (HHS). We will specifically address the change to regulations concerning the detention of family units. Out of deep concern for young children and the future of our country, ZERO TO THREE stands in strong, informed opposition to any practice that causes trauma and long-term harm to children. We believe family detention is such a practice and urge the Departments to discontinue efforts to promulgate regulations that will open the door to its widespread and prolonged use.

Founded more than 40 years ago, ZERO TO THREE is a national nonprofit organization whose mission is to ensure that all babies and toddlers have a strong start in life. We translate the science of early childhood development into useful knowledge and strategies for parents, practitioners, and policymakers. We work to ensure that babies and toddlers benefit from the family and community connections critical to their wellbeing and healthy development. Based on the science that tells us what young children need for healthy development, we believe this proposed rule change poses great harm. While our expertise, and thus the focus of our comments, centers on very young children, we believe family detention places children of any age at risk.

www.zerotothree.org • 1255 23rd Street, NW, Suite 350, Washington, DC 20037
Phone: (202) 638-1144 • Fax: (202) 638-0851 • Orders: (800) 899-4301

For decades, the wellbeing of immigrant children detained at our country's borders has been protected by the Flores Settlement Agreement (FSA), whose terms—agreed to by the government—are based on accepted child welfare principles. The FSA requires that children be treated with "dignity, respect, and special concern for their particular vulnerability as minors." The FSA provision that is paramount to safeguarding these rights is the principle that immigrant children should not be incarcerated, requiring them to be released "without unnecessary delay."[i]

This NPRM would wipe away these protections, allowing children in the company of their parents to be incarcerated indefinitely in detention facilities known as Family Residential Centers (FRC). The stated goal of the NPRM is to "allow for detention at FRCs for the pendency of immigration proceedings (subject to all applicable statutes and regulations governing their detention or release) in order to permit families to be detained together and parents not be separated from their children." (FR 45493) This provision ignores the central FSA principle, reiterated many times, favoring a "General Policy Toward Release" in the case of migrant children being held in detention—including those held with their parents--and therefore the need for ending that detention as soon as possible.

**8 CFR 236.3(h)—Detention of Family Units and 8 CFR 236.3(i)—Detention of Minors Who Are Not UACs in DHS Custody:**

ZERO TO THREE is deeply concerned about the overall direction of this Notice of Proposed Rulemaking, particularly the elements regarding the detention of children in family units and alone, in 8 CFR 236.3(h) and 8 CFR 236.3(i). We urge the Departments to drop this proposal to regulate child and family detention in a manner that allows indefinite detention of children with their parents. In accordance with internationally accepted child rights, immigrant and refugee children should be treated with dignity and respect and should not be exposed to conditions that may harm or traumatize them. Detaining families not only puts children at risk of harm but guarantees to bring with it the devastating and long-lasting impacts of trauma and toxic stress, in direct opposition to both internationally recognized rights as well as the legal requirements established in the FSA, that provide a critical level of protection of the best interests of refugee and immigrant children. While one rationale for these changes is the idea that family detention promotes children's wellbeing, decades of research leads us to believe the contrary – that any length of time in detention will induce damaging impacts to a child's development.

In making this recommendation, we are guided by the science of early childhood development that leads us to conclude: Sending infants and toddlers, even with their parents, to institutional detention is profoundly inadequate to nurture the health and well-being of a young child. Years of research in child development clearly show that babies' physical and social environments have a significant impact on their development. Young children, especially infants and toddlers are at particularly high risk. A baby's brain makes more than one million neural connections every second, growing faster than at any point later in their life. These connections are shaped by their experiences—both positive and negative—and the consequent level of harmful stress in their lives. For young children, particularly infants, exposure to an environment such as detention or jailing not only is insufficient to provide the positive experiences necessary for them to thrive, but is actively detrimental to their growth and development.

Family detention places children in an environment of confinement, deprivation of stimuli, and developmentally inappropriate and often harsh treatment, which cause severe stress for both the children and their caregivers. The trusting relationship infants and toddlers form with their close caregivers, most often

their parents, can help buffer them from chronically stressful situations that can be toxic to the developing brain. However, in situations where parents are experiencing their own intense stress and even fear from the conditions in detention facilities, this protective buffering capacity may be undermined, resulting in more harm to the child's wellbeing.

**No amount of time in detention has been proven safe for young children.** Research has consistently shown that even a short amount of time in detention is harmful to children, particularly those who have already experienced trauma in their home countries or during their journey.[ii] Evaluations of children who have been detained with their families reveal alarming outcomes for young children, with many displaying developmental delays and signs of emotional disturbance. The long-term harm of family detention on children is well known. Research has shown that children in detention are more susceptible to Post-Traumatic Stress Disorder (PTSD) symptoms as compared to adults.[iii] Further, researchers have found regressions in child development, suicide attempts, and high levels of anxiety and depression in children in detention.[iv] While even brief periods of detention impact children's functioning, worsening mental health symptoms increase the longer a child is in detention.[v]

If the legal protections established for children's care in such facilities, including time limits and regulations, are challenged and reversed, infants, toddlers and their families placed in detention facilities are entirely vulnerable to protracted, unlimited stays, abuse, and neglect. Reports indicate that children in federal detention have often suffered cruel and abusive treatment including in family detention facilities, where they have been starved, taunted, physically assaulted and forced to strip naked.[vi vii viii] One particularly disturbing account of such activity came this past July, when a federal judge ordered the Administration to remove children from a detention center that was using psychotropic drugs as a "chemical straitjacket".[ix]

In 8 CFR § 236.3(b) DHS posits that challenges to state licensing of family residential facilities are a justification for eliminating the Flores requirement of state licensing and permitting self-licensing by the federal government. However, challenges to licensing these facilities have come about as state oversight mechanisms exercised their authority to enforce accountability for unacceptable conditions of confinement for children and families. The difficulty in detaining children and families does not arise due to state licensing requirements—it arises because detention center facilities are fundamentally inappropriate for housing families for any length of time. Family detention by definition cannot comply with requirements that protect the safety, health and well-being of children.

Further compounding the risks to their well-being, families in detention may face inadequate access to services including the medical and mental health care they so desperately need. Children and families, babies and expectant mothers in particular, need specialized medical and mental health services in order to ensure healthy growth and development. This type of specialized, individually tailored services is generally not possible in the context of detention, and the unlikelihood of appropriate mental health care applies particularly to infants and toddlers. Family residential centers, all located in remote areas far from urban centers, have consistently failed to recruit adequate health staff including pediatricians, child and adolescent psychiatrists, and pediatric nurses. Families released through non-custodial measures have access to providers based in the community, but in detention their access to qualified medical and mental health professionals has been demonstrated to be severely inadequate.[xxi]

Decades of psychological and brain research have demonstrated that adverse experiences during this critical period of early childhood can have profound immediate and long-term harm on child development.[xii] This type

131

of trauma, particularly when not addressed by an experienced and trusted clinician, has severe implications for both physical and emotional health over time, increasing young children's risk for learning difficulties, problems forming relationships, and adult health problems. The problem is only exacerbated when children are returned to their homes or communities. Research has shown that children continue to have mental health problems which must be dealt with by pediatric and local mental health services that may not have any experience in dealing with children with traumatic experiences of family detention.[xiii]

We underscore that the experience of detention itself will be the cause of much of this trauma and again, urge the Departments to back away from a rule that will lead to such harm. In fact, when The Department of Homeland Security's (DHS) own advisory committee convened to inform the agency how to improve family detention, its top recommendation was that DHS should discontinue the practice. Furthermore, the committee determined that "detention is generally neither appropriate nor necessary for families" and that **detention of families for the purposes of immigration enforcement or management are never in the best interest of children.**

In conclusion, the detention of children and family units outlined in 8 CFR 236.3(h) and (i) are unacceptable. We strongly recommend that the Departments follow the central tenet of the FSA to release children expeditiously and eliminate family detention in all but the most short-term, transitory situations, as Flores contemplates. In light of the immense risk posed by detention, we reject the NPRM's assertion that family detention creates "advantages to family unity during immigration proceedings". There are proven, cost-effective alternatives to detention that maintain family unity and protect the best interests of vulnerable children, including tested community-based case management programs. Most recently, in 2013, Lutheran Immigration and Refugee Services (LIRS) entered into an agreement with Immigration and Customs Enforcement (ICE) to screen vulnerable immigrants for release from detention and enrollment in LIRS' Community Support Initiative. Between June 2013 and November 2014, 44 out of 46 formal referrals were in complete compliance – an appearance rate of 95.6%. These holistic programs that offer case management services, and facilitate access to legal counsel as well as safe, affordable housing have been shown to substantially increase program compliance without the extensive and expensive use of electronic monitoring.[xiv]

The science of child development, in conjunction with past experience, tell us that young children cannot be detained, with or without their families, without experiencing significant harm. Children must not be incarcerated.

Sincerely,

Matthew E. Melmed
Executive Director

---

[i] Flores v. Reno, Case No. CV 85-4544-RJK(Px), Stipulated Settlement Agreement (United States District Court, Central District of California, January 17, 1997.)

[ii] Mares, S. (2015). Fifteen years of detaining children who seek asylum in Australia – evidence and consequences. *Australasian Psychiatry, 24*(1), 1-14. doi:10.1177/1039856215620029

[iii] Triggs, G. (2015). The Forgotten Children: National Inquiry into Children in Immigration Detention 2014. *The Medical Journal of Australia, 202*(11), 553-555. doi:10.5694/mja15.00551

[iv] Acer, E., Byrne, O. (2015). Family Detention: Still Happening, Still Damaging. *Human Rights First.* http://www.humanrightsfirst.org/sites/default/files/HRF-family-detention-still-happening.pdf

[v] Mares, S. (2015). Fifteen years of detaining children who seek asylum in Australia – evidence and consequences. *Australasian Psychiatry, 24*(1), 1-14. doi:10.1177/1039856215620029

[vi] Lutheran Immigrant and Refugee Services and Women's Refugee Commission. (2014). Locking Up Family Values, Again: The Continued Failure of Immigration Family Detention. https://www.lirs.org/assets/2474/lirswrc_lockingupfamilyvaluesagain_report_141114.pdf

[vii] Doe v. Shenandoah Valley Juvenile Center Commission - Second Amended Class Action Complaint (United States District Court for the Western District of Virginia Harrisonburg Division, July 11, 2018).

[viii] Lucas R. v. Alex Azar, Case No. 2:18-CV-05741-DMG-PLA. Complaint for Injunctive Relief, Declaratory Relief, and Nominal Damages. (United States District Court Central District of California, June 28, 2018).

[ix] Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al., Case No. CV 85-4544-DMG (AGRx). (United States District Court Central District of California, July 30, 2018).

[x] Dr. Scott Allen and Dr. Pamela McPherson, Letter to the Senate Whistleblowing Caucus, July 17, 2018, https://www.whistleblower.org/sites/default/files/Original%20Docs%20Letter.pdf.

[xi] O'Connor, K., Thomas-Duckwitz, C., Nuñez-Mchiri, G. G. (2015). No Safe Haven Here: Mental Health Assessment of Women and Children Held in U.S. Immigration Detention. *Unitarian Universalist Service Committee.* http://www.uusc.org/sites/default/files/mental_health_assessment_of_women_and_children_u.s._immigration_detention.pdf

[xii] Felitti, V. J., Anda, R. F., Nordenberg, D., Williamson, D. F., Spitz, A. M., Edwards, V., . . . Marks, J. S. (1998). Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults. *American Journal of Preventive Medicine, 14*(4), 245-258. doi:10.1016/s0749-3797(98)00017-8

[xiii] Fillmore, E. (2010). The Effects of Immigration Detention on the Health of Children and Families in the UK. *Adoption & Fostering, 34*(1), 88-91. doi:10.1177/030857591003400112

[xiv] United States Government Accountability Office. (2014). Alternatives to Detention; Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness. https://www.gao.gov/assets/670/666911.pdf

133