# EXHIBIT 1

1  NATASHA E. DAUGHTREY (SBN 319975)
2  *NDaughtrey@goodwinlaw.com*
   **GOODWIN PROCTER** LLP
3  601 South Figueroa Street
4  41st Floor
   Los Angeles, California  90017
5  Tel.: +1 213 426 2500
6  Fax: +1 213 623 1673

7  Attorneys for *Amicus*
   Kids in Need of Defense
8

9  [*Additional counsel listed on signature page*]

10

11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14                  WESTERN DIVISION

15

16  JENNY FLORES, et al.,              Case No. 2:85-CV-04544-DMG-AGR

17          Plaintiffs,                **BRIEF OF *AMICI CURIAE* OF**
                                       **KIDS IN NEED OF DEFENSE ET**
18                                     **AL. IN SUPPORT OF**
                                       **PLAINTIFFS' SUPPLEMENTAL**
19      v.                             **MEMORANDUM IN SUPPORT**
                                       **OF MOTION TO ENFORCE**
20                                     **SETTLEMENT**
    WILLIAM BARR,
21
22          Defendant.
23

24

25

26

27

28

ACTIVE/100736400.11

# TABLE OF CONTENTS

**INTEREST OF AMICI CURIAE** ........................................................ 1

**INTRODUCTION** ........................................................................... 1

**ARGUMENT** .................................................................................. 3

I.   Congressionally Mandated Basic Protections for Unaccompanied Children Must Not Be Negated Through Repeated Redeterminations Under the UAC Definition ................................................................................... 3

II.  Expansive Exceptions for Emergencies and Influxes Create Loopholes in the Final Rule's Custody Standards. ........................................................ 8

III. The Final Rule Contravenes UACs' Right to a Bond Redetermination Hearing by an Immigration Judge and Undermines Critical Due Process Protections Afforded in Such Hearings ............................................. 13

IV.  The Final Rule Eliminates Critical Terms Providing Third-Party Oversight and Monitoring and Fails to Ensure Compliance with FSA Standards and Protections. .................................................................................. 17

V.   The Final Rule Advances Incorrect Assumptions about Deterrence to Support the Expanded Detention of Children and Families. .............................. 19

**CONCLUSION** ............................................................................... 22

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*First Charter Fin. Corp. v. United States*,
  669 F.2d 1342 (9th Cir. 1982) .......................................................................... 5

*Flores v. Lynch*,
  No. CV 85-4544-DMG (AGRx), 2017 WL 6049373 (C.D. Cal. Jan. 20, 2017) .................................................................................................... 14

*Flores v. Sessions*,
  862 F.3d 863 (9th Cir. 2017) .................................................................. 13, 15

*Horne v. Flores*,
  557 U.S. 433 (2009) ........................................................................................ 3

*RIL-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................... 20

*Rufo v. Inmates of Suffolk Cty. Jail*,
  502 U.S. 367(1992) ......................................................................................... 3

*United States v. Powers*,
  307 U.S. 214 (1939) ........................................................................................ 5

*Yates v. United States*,
  135 S. Ct. 1074 (2015) .................................................................................... 5

**Statutes**

Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002).......................................................................................................*passim*

William Wilberforce Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457 122 Stat. 5044 (2008) .............................................*passim*

**Other Authorities**

8 C.F.R. § 236.3 .......................................................................................... 4, 8

148 Cong. Rec. S8180 (2002) .......................................................................... 4

ii

154 Cong. Rec. S10886 (2008) ......................................................................... 7

73 Am. Jur. 2d Statutes § 156 ......................................................................... 5

Apprehension, Processing, Care, and Custody of Alien Minors and
    Unaccompanied Alien Children, 84 Fed. Reg. 44392 (Aug. 23,
    2019) (to be codified at 45 C.F.R. § 410) ...................................... *passim*

**Articles**

ACF, *Fact Sheet: Unaccompanied Alien Children (UAC) Program*
    (Aug. 8, 2019)
    https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-
    Children-Program-Fact-Sheet.pdf .......................................................... 4

Citizenship and Immigration Services Ombudsman, "Ensuring a Fair
    and Effective Asylum Process for Unaccompanied Children" (Sept.
    20, 2012),
    https://www.dhs.gov/sites/default/files/publications/cisomb-
    ensuring-fair-asylum-process-for-uac.pdf .............................................. 7

Citizenship and Immigration Services Ombudsman Recommendations,
    "Ensuring a Fair and Effective Asylum Process for Unaccompanied
    Children" (Apr. 28, 2013) ....................................................................... 7

Defense & Human Rights Center Fray Matías de Córdova, *Childhood
    Cut Short: Sexual and Gender-based Violence Against Central
    American Migrant and Refugee Children* ............................................. 19

DHS Acting Secretary of Homeland Security Kevin K. McAleenan on
    the DHS-HHS Federal Rule on Flores Agreement ............................... 20

HEALTH & HUMAN SERVS., *Concept and History of Permanency in
    U.S. Child Welfare*,
    https://www.childwelfare.gov/topics/permanency/overview/history/ ................. 8

Miriam Jordan, *Judge Orders Swift Action to Improve Conditions for
    Migrant Children in Texas*, N.Y. TIMES (June 29, 2019). ADD
    ORDER ................................................................................................... 18

BRIEF OF AMICI CURIAE

Muzaffar Chishti and Sarah Pierce, Migration Policy Institute, Policy
Beat, *Trump Administration's New Indefinite Family Detention
Policy: Deterrence Not Guaranteed* (Sept. 26, 2018).........................................20

Tom K. Wong, Center for American Progress, *Do Family Separation
and Detention Deter Immigration?* (July 24, 2018),
https://www.americanprogress.org/issues/immigration/reports/........................20

UNHCR, Children on the Run: Unaccompanied Children Leaving
Central American and Mexico and the Need for International
Protection (2014), http://www.unhcr.org/56fc266f4.html .................................19

USCIS, In-Country Refugee/Parole Processing for Minors in
Honduras, El Salvador and Guatemala (Central American Minors –
CAM), https://www.uscis.gov/CAM...................................................................21

iv

**INTEREST OF AMICI CURIAE**

The Amici Curiae ("Amici"), *see* Ex. A, serve immigrant and refugee children who are or have been in the custody of the Department of Homeland Security (DHS), the Department of Health and Human Services (HHS), or both. The manner in which DHS and HHS detain, process, treat, and release minors has a profound impact on children's abilities to access needed social services, legal representation, and humanitarian protection. Accordingly, Amici have a compelling interest in ensuring that the Flores Settlement Agreement (the "Settlement," or "FSA") remains in effect until it is fully and faithfully implemented by regulations. The final rule at issue not only fails to implement the FSA, but actively undermines its purposes and those of other critical federal laws and policies pertaining to children in the US immigration system.

**INTRODUCTION**

Children who have fled violence, persecution, abandonment, and other harm face enormous challenges upon arriving to the U.S., including healing from a history of trauma while navigating the U.S. immigration system. Protections that recognize the profound vulnerability and distinct needs of children, particularly unaccompanied children, are embodied in the FSA, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA),[1] the Homeland Security Act of 2002 (HSA),[2] regulations, longstanding agency policies, and the principle of the best interests of the child enshrined in state child welfare law.

---

[1] William Wilberforce Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457 122 Stat. 5044 (2008) ("TVPRA").

[2] Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002) ("HSA").

1

The Settlement calls for the promulgation of final regulations that implement its "relevant and substantive" terms and are "not inconsistent" with its terms.[3] Twenty years after its implementation, and following the enactment of laws and policies consistent with the Settlement's goals, Defendants have proposed a final rule that purports to provide "similar" substantive protections and standards and satisfy the Settlement's "basic purpose,"[4] while simultaneously calling the Settlement a "loophole" that needs to be "closed."[5]

In fact, the Final Rule contravenes the substance and purpose of the FSA, while also rolling back protections enshrined in the TVPRA and other substantive policies.  Amici will discuss some components of the Final Rule that contradict the Settlement's language and expose children to harm, contrary to the Settlement's intent, including: (1) rolling back Congressionally mandated basic protections based on repeated redeterminations of children's status as "unaccompanied alien children"; (2) the modification and relaxation of standards under which children are held and transferred; (3) the reassignment of bond redetermination hearings from neutral immigration judges to hearing officers within HHS; (4) the erosion of third-party monitoring and oversight; and (5) the erroneous reliance on expanded detention as a means of deterring child migration.

In these and other areas, Defendants unilaterally substitute their judgment for that of the Settlement's drafters and the Court.  Tellingly, Defendants view certain public comments expressing concern about inconsistency with the FSA as a reading

---

[3] FSA ¶ 9;  Dkt. No. 101, Ex. E.

[4] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44392 (Aug. 23, 2019) (to be codified at 45 C.F.R. § 410) ("Final Rule") (emphasis added)

[5] "Acting Secretary of Homeland Security Kevin K. McAleenan on the DHS-HHS Federal Rule on Flores Agreement" (Aug. 21, 2019), https://www.dhs.gov/news/2019/08/21/acting-secretary-mcaleenan-dhs-hhs-federal-rule-flores-agreement.

BRIEF OF AMICI CURIAE

of the FSA that "would mean that the Government is indefinitely bound by a decades-old consent decree—a consent decree signed by an Administration no longer in office, that can never be altered, even through Congress' sanctioned method of adopting binding policies through notice and comment rulemaking under the Administrative Procedure Act."[6]  Yet the sanctioned method for departing from the binding terms of a settlement agreement is not rulemaking, but a motion to this Court for relief from judgment.[7]

The discussion that follows reflects only some of the ways in which the Final Rule not only fails to support termination of the Settlement, but also runs counter to the best interests – in particular, the safety – of unaccompanied children.

## **ARGUMENT**

**I.   Congressionally Mandated Basic Protections for Unaccompanied Children Must Not Be Negated Through Repeated Redeterminations Under the UAC Definition.**

The term "unaccompanied alien child" does not appear in the FSA, but was first defined in the HSA, signaling Congress' concern for minors who enter the U.S. immigration system in that vulnerable status.  The term appears in the Final Rule "[b]ecause the HSA and the TVPRA specifically define UACs and impose certain requirements related only to UACs".[8]  In 2002, Congress assigned the care and custody of unaccompanied children not to DHS, but to HHS.[9]  Remarks in the Congressional Record reflect a protective intent: "It would not be appropriate to

---

[6] *See* Final Rule *supra* n.4 at 44483.

[7] *See, e.g., Horne v. Flores,* 557 U.S. 433, 488 (2009) (discussing Federal Rule of Civil Procedure 60(b)(5) as the proper mechanism for the government to seek to modify a consent decree); *see also Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 388 (1992) (stating that if the request rests on changes in law, the movant must demonstrate that such changes in law have made "one or more of the obligations placed upon the parties . . . impermissible," or "make legal what the decree was designed to prevent.")

[8] *See* Final Rule *supra* n.4 at 44412.

[9] *See* HSA *supra* n.2 at § 462 (b)(1); *see also* 6 U.S.C. § 279(b)(1).

3

transfer this responsibility to a Department of Homeland Security. . . ORR has decades of experience working with foreign-born children, and ORR administers a specialized resettlement program for unaccompanied refugee children."[10]

Building on this foundation, the TVPRA mandated a set of basic safeguards relating to children's apprehension, screening, custody, processing, adjudication, and services during and after federal custody – all keyed to the statutory UAC definition, as Defendants repeatedly note (e.g., 84 Fed. Reg. 4412, 4427, 44491). Defendants emphasize that "[UAC] status could change if an individual turns 18…or is placed with a legal guardian",[11] but the fact of having arrived in the U.S. at a given time in a vulnerable status does not change.  This Court must presume that Congress, too, understood that a child's age advances, and that the care of a parent or legal guardian is not only possible, but a desirable goal.  It does not follow therefrom that Congress contemplated interruption of the protections it conferred on UAC.  In decreeing that "[a]n alien who is no longer a UAC is not eligible to receive legal protections *limited* to UACs"[12], the presumption that such a limitation exists is unwarranted.

Fundamental to its statutory scheme, Congress commanded every federal agency (DHS included) to notify HHS of the presence or suspected presence of a UAC within 48 hours, and transfer UACs to HHS within 72 hours.[13] Congress thereby charged DHS with the duty to determine whether a child the Department encounters is or *may be* a UAC, but did not specify any authority to rescind such a determination.  Thus, by congressional design, a vast majority of UAC who encounter DHS are promptly identified as such,[14] triggering measures to enhance

---

[10] 148 Cong. Rec. S8180 (2002) (letter from Sen. Lieberman & Sen. Thompson).
[11] *See* Final Rule *supra* n.4 at 44491.
[12] *See* 8 C.F.R. § 236.3(d); Final Rule *supra* n.4 at 44526, 44531 (emphasis added).
[13] *See* TVPRA *supra* n.1 at § 235(b)(2)(3); 8 U.S.C. § 1232(b)(2), (3).
[14] *See* ACF, *Fact Sheet:  Unaccompanied Alien Children (UAC) Program* (Aug. 8, 2019) https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-

4

child safety and reduce some of the barriers to a child's meaningful participation in the immigration system. Among these measures are the right to removal proceedings under INA § 240,[15] access to counsel "to the greatest extent practicable,"[16] safety assessments by ORR before UACs are released from federal custody,[17] availability of child advocates,[18] and voluntary departure at no cost to the UAC.[19]

That these and other TVPRA protections must persist beyond a change in UAC status is evident in multiple ways:

- The simplest example is that several TVPRA protections for UAC were enacted and/or codified under the heading "Permanent protection for certain at-risk children."[20]

- Some UAC protections, by their nature, would be of little or no value if interrupted prematurely. It is impermissible to construe a statute in a way that renders any of its terms ineffective.[21] Thus, for example, the statutory

---

Program-Fact-Sheet.pdf ("UAC are referred to ORR by another federal agency, usually the Department of Homeland Security (DHS). Most children are placed into ORR care because they were apprehended by immigration authorities while trying to cross the border…").

[15] *See* TVPRA *supra* n.1 at § 235(a)(5)(D), 8 U.S.C. § 1232(a)(5)(D). This allows children who may otherwise be subject to expedited removal to pursue relief from removal before an immigration judge.

[16] *Id.* at § 235(c)(5).

[17] *Id.* at § 235(c)(3).

[18] *Id.* at § 235(c)(6).

[19] *Id.* at § 235(a)(5).

[20] *Id.* at § 235(d). *See Yates v. United States*, 135 S. Ct. 1074, 1083 (2015) (recognizing that although statutory "headings are not commanding," they may provide important "cues" about congressional intent).

[21] *See United States v. Powers*, 307 U.S. 214, 217 (1939) ("There is a presumption against a construction which would render a statute ineffective or inefficient, or which would cause grave public injury or even inconvenience."); *First Charter Fin. Corp. v. United States*, 669 F.2d 1342, 1350 (9th Cir. 1982) ("Construction which gives effect to all of the words of a statute or regulation is preferred over an

5

exemption for UAC from the one-year filing deadline for asylum[22] must not be read in such a way that the one-year bar could be reinstated against a child later determined to be "no longer a UAC" on the eve of expiration of the one-year time limit, or even after.

- Other TVPRA provisions protect children over a period of time that may extend past release to a parent or the child's 18th birthday. The TVPRA states that HHS "shall conduct follow-up services, during the pendency of removal proceedings, on children for whom a home study was conducted and is authorized to conduct follow-up services in cases involving children . . . who could benefit from ongoing assistance" – but does not specify that residing with a parent severs such services.[23]

- Stripping away UAC protections when UAC status changes would create counterproductive incentives.  For example, a child applying for asylum after a "redetermination" would face an adversarial hearing in immigration court.[24] This is not conducive to the child's participation in the process and may compound past trauma.  The pressure of an impending "redetermination" could thus incentivize a UAC to hurriedly file an asylum application, narrating painful and traumatic events in detail, but without assistance and adequate social services support.  This lack of support and preparation will diminish the child's claim and increase system inefficiencies.

---

interpretation which renders some of the statute or regulation ineffective."); 73 Am. Jur. 2d Statutes § 156 ("A statute should not be construed in such manner as to render it partly ineffective or inefficient if another construction will make it effective.").

[22] *See* TVPRA *supra* n.1 at § 235(d)(7).

[23] *Id.* at § 235(c)(3)(B).

[24] *Cf.* 8 U.S.C. § 1158(b)(3)(C) (USCIS has initial jurisdiction over an asylum application filed by a UAC).

6

The TVPRA protections were adopted "to protect children . . . who have escaped traumatic situations such as armed conflict, sweatshop labor, human trafficking, forced prostitution and other life threatening circumstances" and to fulfill "a special obligation to ensure that these children are treated humanely and fairly."[25]  The corresponding vulnerabilities do not end when a child turns 18 or reunites with a parent -- and most often persist throughout the long trajectory of an immigration case.  As explained in 2012 by the CIS Ombudsman, the "TVPRA's procedural and substantive protections were designed to remain available to UACs throughout removal proceedings, housing placement, and the pursuit of any available relief."[26]

In the asylum context, DHS initiated a practice of multiple redeterminations under the UAC definition soon after the TVPRA took effect.[27]  That approach undermined efficiency, uniformity, and predictability, and forced asylum officers to make assessments not within their expertise, as reported by the CIS Ombudsman following a study and extensive stakeholder input.[28]  The agency reversed the practice after four years.[29]  Yet in the Final Rule, both agencies adopt a policy of multiple redeterminations.[30]  Such serial redeterminations would entail repetitive

---

[25] 154 Cong. Rec. S10886 (2008).

[26] Office of the Citizenship and Immigration Services Ombudsman, "Ensuring a Fair and Effective Asylum Process for Unaccompanied Children" (Sept. 20, 2012), https://www.dhs.gov/sites/default/files/publications/cisomb-ensuring-fair-asylum-process-for-uac.pdf .

[27] *See* Joseph E. Langlois, Implementation of Statutory Change Providing USCIS with Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children" (March 25, 2009) at 4-5.

[28] *See* Office of the Citizenship and Immigration Services Ombudsman *supra* n.26.

[29] Lori Sciallaba, Responses to Citizenship and Immigration Services Ombudsman Recommendations, "Ensuring a Fair and Effective Asylum Process for Unaccompanied Children" (Apr. 28, 2013).

[30] 8 C.F.R. § 236.3(d)(1) (DHS will determine status "at the time of encounter or apprehension and prior to the detention or release of such alien"); *see* Final Rule

questioning of children during a time when they are detained and vulnerable. Children could be reclassified one or more times, potentially leading to changes in custody and sowing uncertainty in case timelines and legal decision-making.  These consequences are contrary to the goals of the FSA and violate well-accepted principles of child protection which prioritize stability and permanency.[31]

DHS states that its Final Rule on UAC determinations offers "greater fidelity to the laws affording special legal protections to UACs."[32]  Yet the rule utilizes redeterminations under the UAC definition in a manner that would strip children of critical protections, including the right to hearings better suited to their age and capacities.  Instead of deploying a new rule to "allow immigration officers to re-evaluate a child's UAC status at each encounter,"[33] Defendants should implement the durable protections Congress offered.

## II.    Expansive Exceptions for Emergencies and Influxes Create Loopholes in the Final Rule's Custody Standards.

Regarding the treatment of children immediately following apprehension, the FSA directs the Government to transfer minors from initial custody to a licensed program within three to five days of apprehension.[34]   Among the limited

---

*supra* n.4 at 44455 ("HHS will continuously evaluate whether an individual is a UAC").

[31] *See, e.g.,* Children's Bureau, Admin. for Children & Families, U.S. DEP'T OF HEALTH & HUMAN SERVS., *Concept and History of Permanency in U.S. Child Welfare*, https://www.childwelfare.gov/topics/permanency/overview/history/ (noting that "issues related to permanency" were explicitly included in federal legislation for the first time in the 1997 Adoption and Safe Families Act, which "connected safety and permanency by demonstrating how each factor was necessary in achieving overall child well-being").

[32] *See* Final Rule *supra* n.4.

[33] *Id.* at 44426.

[34] This transfer must be made within three days, if a licensed program is available in the district in which the child was apprehended, and within five days, if not.  *See* FSA *supra* n.3 at ¶ 12.

exceptions to this FSA requirement are cases of "influx" or "emergency," during which the time limits are relaxed and children must be transferred to a licensed program "as expeditiously as possible."[35]

With respect to "unaccompanied alien children," the TVPRA requires transfer from DHS to HHS within 72 hours, barring "exceptional circumstances."[36] HHS must then "promptly" place the child "in the least restrictive setting that is in the best interest of the child."[37]  Thus, in transferring an unaccompanied child, DHS and HHS must meet the TVPRA's more rigorous timelines, rather than those of the FSA.

### a. The Final Rule's Outdated Definition of Influx Allows Defendants to Continuously Operate Under Relaxed Standards, Contrary to the Best Interests of Children.

The Final Rule justifies departures from various FSA provisions as "respond[ing] to changed factual and operational circumstances,"[38] yet selectively retains the FSA's fixed definition of "influx," defined as having "more than 130 minors eligible for placement in a licensed program . . . including those who have been so placed or are awaiting such placement."[39]  We urge the Court to consider the number 130 in relation to the number of unaccompanied children in custody at the time of the FSA's approval, when contemplating what number would constitute an influx today.

Since 1997, arrivals of unaccompanied minors and families have increased, and the Government's operations and capacity have grown dramatically in

---

[35] *Id.* at ¶ 12A(3).
[36] *See* TVPRA *supra* n.1, 8 U.S.C. § 1232(b)(3).
[37] *Id.*, 8 U.S.C. § 1232(c)(2)(A).
[38] *See, e.g.*, Final Rule *supra* n.4 at 44397, 44393.
[39] *See* FSA *supra* n.3 at ¶ 12B; *see also* Final Rule *supra* n.4 at §§ 236.3(b)(10), 410.101, 410.202(a)(3), 410.202.

response.[40]  CBP has created several centralized processing centers for migrants, including two facilities in Texas for unaccompanied children and families.[41]  HHS notes that it "maintains the ability to rapidly set-up, expand, or contract influx infrastructure and services as needed."[42]

Despite these developments, the Final Rule relieves both Departments from strict compliance with the FSA's time periods, effectively permitting Defendants to operate under the FSA's more flexible standards for influx continuously. Consequently, the agencies may delay the transfer of children to licensed facilities better suited to provide appropriate care.

DHS asserts that it "makes sense" to retain the fixed "influx" definition, given its inclusion in the FSA, that it "remains relevant to current operational realities," and in light of "the need for DHS to have additional flexibility when it is dealing with anything other than a very small and manageable number of minors in its care."[43] Yet elsewhere in the Final Rule, DHS repeatedly emphasizes the need to

---

[40] *See* Final Rule *supra* n. 4 at 44423 ("CBP encountered 107,498 minors and UACs in FY 2018. Additionally, in May of 2019, the USBP apprehended 11,507 UACs along the southwest border along with 84,532 family units (accompanied minors and their parents). . . .Thus, these numbers show that CBP regularly has more than 130 minors and UACs in custody eligible for placement in a licensed facility.").

[41] *See* Dkt. No. 625 at 13-14 (Second Report of the Independent Monitor discussing the central processing center known as Ursula and a new processing center near the Donna port of entry that is specifically designed for children and families and became operational on May 2, 2019).

[42] *See* Final Rule *supra* n.4 at 44453.

[43] *Id*. at 44423.

*modify* the FSA, for example, to allow longer detention of children with families,[44] again citing "operational realities."[45]  DHS cannot have it both ways.

In both examples, DHS interprets the FSA's terms to accord with the Government's policy priorities, preferences, and convenience.[46] From authority to self-license family detention facilities to the codification of a continuous influx, the Final Rule provides Defendants with broad discretion to dispense with the FSA's requirements as they see fit.

Assurances that "CBP makes efforts to transfer all individuals, especially minors, out of CBP facilities as expeditiously as possible, and generally within 72 hours"[47] are aspirational statements that lack binding force. They pale in light of Plaintiffs' counsel's recent motion documenting children spending weeks in CBP custody in unsanitary conditions, without access to adequate food, water, toothbrushes, and soap.[48] The Final Rule grants HHS greater flexibility to hold children for longer periods in large-scale influx facilities rather than licensed shelters. This rule change follows inadequate efforts to prepare for large numbers of unaccompanied children over several years.

---

[44] *See id.* at 44398 ("[B]y modifying the literal text of the FSA (to the extent it has been interpreted to apply to accompanied minors) in limited cases to reflect and respond to intervening statutory and operational changes, DHS ensures that it retains discretion to detain families, as appropriate and pursuant to its statutory and regulatory authorities, to meet its enforcement needs, while still providing protections to minors that the FSA intended.").

[45] *See, e.g.*, *id.* at 44423, 44428, 44502, 44504, 44520, 44525.

[46] HHS states that "[f]or the purposes of continuity of joint operations and for the reasons DHS explains above, HHS adopts the same definition of influx." *Id.* at 44453.

[47] *Id.* at 44464.

[48] *See generally* Dkt. No. 572-1 (Plaintiffs' Mem. of Points & Auths. in Support of Plaintiffs' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause).

### b. The Final Rule's Broad Definition of "Emergency" Provides Undue Discretion to Relax FSA Standards.

The Final Rule broadens the FSA's definition of "emergency" from an act or event that prevents placement in a licensed program in the given time period to encompass an act or event "that prevents timely transport . . . of minors or *impacts other conditions provided by*" the Final Rule.[49]  Despite this change, DHS contends that its definition "does not depart from how the FSA defines an emergency act or event," but "recognizes that, in rare circumstances, an emergency may arise, *generally unanticipated*, that affects more than just the transfer of a minor from one facility to another."[50]  Yet the modified exception provides little clarity about the circumstances that might trigger a departure from the FSA's requirements and the ways in which conditions for children may be affected.[51]  Indeed, in describing the change DHS concedes that "the rule's definition of 'emergency' . . . may create adequate cause to depart from any provision of § 236.3, not just the transfer timeline."[52]

As with the exception for influx, Defendants provide themselves great latitude to depart from the FSA's minimum standards.[53]  In so doing, they prioritize operational efficiency above the safety of children. The FSA, with its core focus on

---

[49] *See* Final Rule *supra* n.4 at 44526 §§ 236.3(b)(5), 410.101 (emphasis added).
[50] *Id*. at 44413 (emphasis added).
[51] DHS provides as examples an electrical failure, during which air conditioning may break and temperature might temporarily be affected, or a medical emergency, during which meals for minors may be temporarily delayed while urgent medical care is provided to a child. Final Rule *supra* n.4 at 44413-14.
[52] *Id.* at 44512.
[53] For example, the Final Rule states that CBP records any emergency situations requiring the temporary suspension of FSA requirements in its electronic systems of records and "[t]o the extent it is able, CBP also maintains a sufficient stockpile of supplies, such as snacks, at its facilities to ensure that there are sufficient supplies available in an emergency situation." *Id*. at 44414.

12

ensuring all minors in government custody are treated with "dignity, respect and special concern for their particular vulnerability as minors," demands far more.[54]

### III.   The Final Rule Contravenes UACs' Right to a Bond Redetermination Hearing by an Immigration Judge and Undermines Critical Due Process Protections Afforded in Such Hearings.

The FSA provides that "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing *before an immigration judge* in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."[55]  Minors can appeal adverse bond redetermination decisions to the Board of Immigration Appeals and then to a federal Court of Appeals.

Final Rule § 410.810 removes bond redetermination hearings for UAC from the purview of an immigration judge and vests responsibility for the hearings with "an independent hearing officer employed by HHS."[56]  As discussed below, HHS' justifications for this departure from the Settlement are unsound.[57]

First and foremost, the Ninth Circuit held that the right to a bond hearing before an immigration judge as articulated in the FSA is consistent with and authorized by INA § 236, which gives the Attorney General authority (delegated to immigration judges in the regulations) to exercise discretion to release a detained alien on bond.[58]  Neither the bond authority vested in immigration judges pursuant to INA § 236 nor a UAC's right to a bond hearing before an immigration judge was revoked when the HSA assigned HHS responsibility for the care and placement of

---

[54] *See* FSA *supra* n.3 at ¶ 11.

[55] *Id*. at ¶ 24A (emphasis added).

[56] *See* 45 CFR § 410.810.

[57]*See* Final Rule *supra* n. 4 at 44476, 44478.

[58] *See Flores v. Sessions*, 862 F.3d 863, 867 (9th Cir. 2017) (affirming the district court's opinion in *Flores v. Lynch*, No. CV 85-4544-DMG-AGRx, 2017 WL 6049373 (C.D. Cal. Jan. 20, 2017)).

UACs.[59] Furthermore, "nothing in the TVPRA specifically states that it intended to cover the whole immigration scheme for unaccompanied minors" and the threshold question of "whether the child should be detained in the first place […] is for an immigration judge at a bond hearing to decide."[60]  Furthermore, "the HSA and the TVPRA contain no indication that they are intended to encompass the entire immigration framework for unaccompanied minors" and the threshold question of "whether the child should be detained in the first place […] is for an immigration judge at a bond hearing to decide."[61]  Reassigning it to HHS is an impermissible departure from FSA ¶ 24A.

### a. HHS' Child Welfare Expertise Does Not in Itself Eliminate the Risk of Prolonged Detention of UACs in HHS Custody.

HHS asserts that as a policy matter it should assume responsibility over bond hearings for children in its custody because it is an agency with expertise in child welfare best practices.

In practice and as contemplated in the Final Rule, § 410.810 is primarily applicable to children held in more restrictive secure or "medium-secure" settings, who have been found to present a flight risk or danger to self or others.[62]  Last year, the Ninth Circuit found that certain HHS practices applicable to children in staff-

---

[59] *Id.*

[60] *Flores v. Lynch*, No. CV 85-4544-DMG-(AGRx), 2017 WL 6049373, at *4 (C.D. Cal. Jan. 20, 2017).

[61] *Flores v. Sessions*, 862 F.3d at 876; *Flores v. Lynch*, No. CV 85-4544-DMG-AGRx, 2017 WL 6049373 (C.D. Cal. Jan. 20, 2017) *12.

[62] *See* Final Rule *supra* n.4 at 44477.  HHS' assertion that "ORR custody of UACs is not the equivalent of civil detention or immigration detention" is misleading. The conditions and restrictions imposed on a child's liberty in secure facilities and some medium-secure facilities mirror those of other civil, immigration and juvenile detention contexts.  For example, the secure facilities currently contracted by HHS are also contracted by state juvenile detention authorities to detain juveniles adjudicated of offenses by state authorities, and share programming, security procedures, and staff.

secure and secure placements prolonged children's detention and violated the FSA -
-for example, making such placements for reasons not permitted by the FSA; failure
to provide written notice of the reasons for such a placement; failure to comply with
state child welfare laws regarding the administration of psychotropic medications;
and failure to make and record prompt and continuous efforts to release children
found not to present a danger or flight risk.[63]

Amici regularly provide legal services to UACs who are or have been held in
restrictive placements including staff-secure or secure facilities, in some cases for
many months or over a year.  They witness first-hand the deleterious effects on
children of restrictive placement for *any* period of time – which worsen when
custody is prolonged.  For many children in secure and staff-secure detention, past
trauma is compounded by the conditions of restrictive custody. Detention fatigue
can negatively impact functions like memory and decision-making, which in turn
can impede the progression of their legal immigration case.

HHS' social and child welfare expertise does not in itself adequately protect
against the risk that children in custody may be subject to prolonged detention in
violation of the FSA.  As the Ninth Circuit held, the bond hearing provision at
FSA ¶ 24A ensuring that children can challenge their detention before an
immigration judge is a "fundamental protection guaranteed to unaccompanied
minors."[64]  Departing from this fundamental protection unequivocally violates the
FSA.

### b. The Final Rule Erodes Due Process Protections Required by the FSA, Including UACs' Right to Have Their Detention Reviewed by a Neutral Adjudicator Outside HHS.

Defendants assert that the new hearings before an independent hearing
officer would provide "substantively the same functions as bond hearings under

---

[63] *See See* https://youthlaw.org/wp-content/uploads/1997/05/Flores-MTE-order.pdf.
[64] *Flores v. Sessions*, 862 F.3d 863, 867 (9th Cir. 2017).

15

paragraph 24A of the FSA[.]"[65]  The Final Rule accommodates just one of the numerous concerns of commenters by placing the initial burden of production on HHS to show that a child presents a danger to the community or is a flight risk, before the burden shifts to the child to show otherwise by a preponderance of the evidence.[66] But of particular concern is that the rule is devoid of any burden on HHS to also establish in the context of such hearings that the designated placement is in fact the least restrictive setting in the child's best interest, which the FSA mandates when a child is placed or remains in secure detention.[67] The Ninth Circuit emphasized that in addition to providing children the right to challenge the basis of HHS' denial of release, a critical function of bond hearings is also to provide children the right to challenge the basis for their *continued placement* in secure detention.[68]

The Final Rule also fails to adequately address the due process concerns that arise when the same agency that denies a child's release due to a finding that he or she presents a danger to the community or is a flight risk is the agency charged with reviewing that decision. Supplanting the right to a bond hearing before an immigration judge with an internal agency hearing process provides HHS undue latitude to erode children's rights as both the decision-maker and adjudicator.

---

[65] *See* Final Rule *supra* n.4 at 44478.

[66] Final Rule *supra* n.4 at §410.810(b); in contrast, the Proposed Rule placed the sole burden on the UAC to show by a preponderance of the evidence that he or she will not be a danger to the community or flight-risk.

[67] *See* FSA *supra* n.3 at ¶ 21, 23; Exhibit E(2)(i).

[68] *See Flores v. Sessions*, 862 F.3d at 868 ("For those minors in secure detention, bond hearings additionally provide an opportunity to contest the basis of such confinement.  For example, the TVPRA allows children to be placed in secure detention facilities only if they pose a safety risk to themselves or others, or have committed a criminal offense.  Providing unaccompanied minors with the right to a hearing under Paragraph 24A therefore ensures that they are not held in secure detention without cause.")

16

Additionally, § 410.810 significantly hinders UACs' access to appellate review of adverse agency decisions.  Under that section, a UAC will be able to seek judicial review of an adverse hearing decision only after he or she has exhausted HHS' internal administrative appeals process,[69] but notably, there is no time period within which the agency must issue a final decision.  It is foreseeable that a UAC who appeals to the Assistant Secretary may wait many weeks or months for a decision, thereby extending his or her stay in restrictive custody before he or she is able to seek judicial review.[70]

Replacing bond hearings with an internal HHS hearing process also may limit UACs' access to counsel in those proceedings.  Under the current framework of legal services for UACs in HHS custody, HHS funds legal service providers for representation of children before the Department of Justice.  But representation by HHS-funded legal service providers in internal HHS proceedings may present inherent conflicts and interfere with UAC's ability to obtain counsel.

In sum, § 410.810 impermissibly dilutes the critical protection of a bond hearing before an immigration judge, as provided by FSA ¶ 24A.  HHS' justifications for supplanting this right with an internal agency process are deficient, and the Final Rule does not adequately safeguard against the risk that UACs in HHS' most restrictive placements will be subject to prolonged detention.

**IV. The Final Rule Eliminates Critical Terms Providing Third-Party Oversight and Monitoring and Fails to Ensure Compliance with FSA Standards and Protections.**

---

[69] The Final Rule allows a UAC to lodge an appeal within 30 days to the Assistant Secretary of the Administration for Children and Families.  *See* Final Rule *supra* n.4 at § 410.810 (e).

[70] In cases involving children who are close to aging out of HHS custody, judicial review of an HHS determination that he or she presents a danger to the community or is a flight risk is time-sensitive because it generally impacts consideration by DHS of a child's eligibility release on recognizance by DHS upon turning 18.

17

In the Final Rule, DHS purports to implement a policy to "help ensure that all DHS facilities satisfy applicable standards at all times," but states that the Monitoring procedures codified in § 236.3(o) are intended "to assist in its own internal monitoring" and refer to "an internal agency practice."[71]  Problematically, the Final Rule dispenses with many of the FSA's third-party monitoring and oversight provisions on the dubious grounds that "they were included to guide the operation of the agreement itself and, as such, are not relevant or substantive terms of the FSA."[72]  This argument is unavailing.

Contrary to Defendants' assertions, the FSA's monitoring provisions are at the very heart of the Parties' Agreement. As evidenced by the history of the case, Plaintiffs' repeated motions to enforce compliance with the Agreement, and the recent appointment of an Independent Monitor to oversee compliance with this Court's orders, the FSA's monitoring provisions are both plainly substantive and of enduring relevance and importance. The omission of these important safeguards in the Final Rule is fatal to Defendants' effort to terminate the FSA.

As recently as June of this year, this Court ordered an Independent Monitor to take action to remediate conditions at Border Patrol facilities in Texas, where Plaintiffs' counsel had reported children being held in unsanitary and frigid conditions, with insufficient food and clothing, and no access to soap, showers, or toothbrushes.[73] These circumstances are particularly troubling in light of the death

---

[71] *See* Final Rule *supra* n.4 at 44450.

[72] *Id.* at 44449. Although the Final Rule provides for third-party auditing of DHS' family detention facilities where state licensing is unavailable, audits would be limited to an evaluation of DHS' compliance with its own standards, and DHS would select and employ the auditor evaluating the agency's compliance.

[73] Miriam Jordan, *Judge Orders Swift Action to Improve Conditions for Migrant Children in Texas*, N.Y. TIMES (June 29, 2019), https://www.nytimes.com/2019/06/29/us/migrant-children-detention-texas.html; Dkt. No. 572-1 (Plaintiffs' Ex Parte application for Temporary Restraining Order as to Why a Preliminary Injunction and Contempt Order Should not Issue)

BRIEF OF AMICI CURIAE

of seven children while in or after being in the Government's custody since Spring 2018.[74]

The ability of Plaintiffs' counsel to interview children in the Government's custody in a confidential manner has been critical to identifying violations of the FSA and to seeking remedial action to ensure children are afforded the rights and treatment that the FSA requires. Internal monitoring, as provided by the Final Rule, is wholly inadequate to ensure compliance with the FSA's terms, and moreover, fails to acknowledge the natural difficulty children would face in expressing concerns to Government officials—while detained and without counsel--about their treatment by the very authorities detaining them. Faithful implementation of the FSA's terms demands that the Agreement's third-party monitoring provisions be given full effect.

## V.   The Final Rule Advances Incorrect Assumptions about Deterrence to Support the Expanded Detention of Children and Families.

To deter the migration of children and families, the Final Rule allows for the detention of families, including minor children, together for the duration of their immigration proceedings.  The Final Rule argues that family detention is important in part "due to the significant and ongoing influx of adults who have made the choice to enter the United States illegally with juveniles or make the dangerous overland journey to the border with juveniles, a practice that puts juveniles at significant risk of harm.  The expectation that adults with juveniles will remain in the United States outside of immigration detention may incentivize these risky practices."[75]  Pointing to the Defendants' detention of families throughout their proceedings in 2014, the Final Rule argues that "[a]lthough it is difficult to definitely prove a causal link . . . , DHS' assessment is that this change helped stem

---

[74] *See* Dkt No. 625 at 36-41.
[75] *See* Final Rule, *supra* n.4 at 44403-44404.

19

the border crisis, as it correlated with a significant drop in family migration."[76]  By embracing expanded family detention for purposes of deterring future migration, Defendants overlook and miscast the factors, including extreme violence, that are driving migration of children with or without their parents and families to the U.S.' Southern border.

Many of the unaccompanied children Amici serve come from El Salvador, Guatemala, and Honduras. These countries are currently among the most dangerous in the world, and children are particularly frequently targeted for violence, sexual abuse, extortion, forced recruitment by gangs and narco-traffickers, and human trafficking.[77]  Sexual and gender-based violence against women, children and LGBTI individuals is pervasive, and gangs frequently use such violence as a means of controlling territories or ensuring compliance with the gang's demands.[78]

While the Final Rule frames migration as a choice, the reality is that many children and families in the region are forced from their homes, communities, and countries in search of protection that their own governments are either unable or unwilling to provide. High impunity rates for crimes and corruption leave many children and families without a means of securing safety within their countries of origin. In the face of prevailing conditions, the Defendants' Final Rule retooling the FSA to justify prolonged detention of children is unlikely to effectively deter

---

[76] The Final Rule references a drop in family unit apprehensions at the Southwest Border from 68,445 in FY 2014 to 39,838 in FY 2015. *See* Final Rule *supra* n.4 at 44405.

[77] *See* UNHCR, Children on the Run: Unaccompanied Children Leaving Central American and Mexico and the Need for International Protection (2014), http://www.unhcr.org/56fc266f4.html.

[78] Kids in Need of Defense & Human Rights Center Fray Matías de Córdova, *Childhood Cut Short: Sexual and Gender-based Violence Against Central American Migrant and Refugee Children* (June 2017), https://supportkind.org/wp-content/uploads/2017/06/Childhood-Cut-Short-KIND-SGBV-Report_June2017.pdf.

20

migration[79] yet will make families increasingly vulnerable. It also may prove unlawful, as the Defendants' previous attempt to detain mothers and children for the general purpose of deterring immigration was enjoined by a federal court.[80]

Defendants state that "the primary objective of the rule is to implement the FSA in regulations, thereby terminating the FSA; it is not to utilize detention as a deterrent to migration."[81]  However, Acting DHS Secretary McAleenan's own statements introducing the Final Rule belie Defendants' motivations: "By eliminating the incentive to make the journey to the United States as a family, the new rule will reduce the unprecedented volume of family units that has strained the already limited resources of our Department components."[82]

Rather than positing family detention as a deterrent to migration, the Defendants should re-double efforts to address the root causes of child and family migration from Central America and provide additional assistance to strengthen

---

[79] Muzaffar Chishti and Sarah Pierce, Migration Policy Institute, Policy Beat, *Trump Administration's New Indefinite Family Detention Policy: Deterrence Not Guaranteed* (Sept. 26, 2018) ("While both detention and prosecution have been used by past administrations with some success to deter unauthorized flows of economic migrants, there is scant evidence that these would achieve similar outcomes with respect to today's arrivals of families and children from Central America, often driven by the desire to escape violence."); Tom K. Wong, Center for American Progress, *Do Family Separation and Detention Deter Immigration?* (July 24, 2018), https://www.americanprogress.org/issues/immigration/reports/.

[80] *RIL-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ("Defendants have presented little empirical evidence, moreover, that their detention policy event achieves its only desired effect – i.e., that it actually deters potential immigrants from Central America." at 189.)

[81] *See* Final Rule *supra* n.4 at 44484.

[82] DHS Acting Secretary of Homeland Security Kevin K. McAleenan on the DHS-HHS Federal Rule on Flores Agreement (August 21, 2019), https://www.dhs.gov/news/2019/08/21/acting-secretary-mcaleenan-dhs-hhs-federal-rule-flores-agreement

protection systems in the region. The Central American Minors Program (CAM),[83]
for example, enabled certain children to apply for protection in the United States
while still in their countries of origin. Yet in 2017, the Government shuttered this
small and narrowly tailored program, which allowed children to avoid having to
undertake dangerous journeys—a concern the Final Rule purports to address.
Defendants can better address the root causes of migration through support for
asylum and other protection systems in the region, and programming and support to
prevent and prosecute violence, and increase access to services for survivors.

## **CONCLUSION**

The foregoing discussion highlights only selected examples of how the Final
Rule fails to give effect to Settlement in a way that is consistent with other legal
requirements.  Because the Final Rule is inconsistent with the terms and principles
of the Settlement, Amici respectfully ask the Court to maintain the Settlement in
force and enjoin implementation of the Final Rule.


Dated:        August 30, 2019                    GOODWIN PROCTER LLP


                                                 By: /s/ Natasha E. Daughtrey
                                                 Natasha E. Daughtrey
                                                 Goodwin Procter LLP
                                                 601 S. Figueroa St.
                                                 Los Angeles, CA 90017

                                                 Attorney for *Amici*

---

[83] USCIS, In-Country Refugee/Parole Processing for Minors in Honduras, El
Salvador and Guatemala (Central American Minors – CAM),
https://www.uscis.gov/CAM.

BRIEF OF AMICI CURIAE

1    Dated:        August 30, 2019                    KIDS IN NEED OF DEFENSE

2

3                                              By: _____

4                                              Wendy Wylegala
                                               Kids in Need of Defense (KIND)
5                                              1251 Ave. of the Americas (c/o
                                               Lowenstein Sandler LLP)
6                                              New York, NY  10020
                                               Tel:  862-926-2069
7                                              Fax: 202-824-0702

8                                              Attorney for *Amicus* KIND

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28