1  CARLOS R. HOLGUÍN (CAL. BAR NO. 90754)
2  PETER A. SCHEY (CAL. BAR NO. 58232)
   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
3  256 SOUTH OCCIDENTAL BOULEVARD
   LOS ANGELES, CA 90057
4  TELEPHONE: (213) 388-8693
5  EMAIL:      CRHOLGUIN@CENTERFORHUMANRIGHTS.ORG
6              PSCHEY@CENTERFORHUMANRIGHTS.ORG

7  *Additional Plaintiffs' counsel on next page*

8              UNITED STATES DISTRICT COURT

9     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

10 | JENNY LISETTE FLORES, *et al.*,          | Case No. CV 85-4544-DMG(AGRx)
11 |                                          |
   |              Plaintiffs,                 | DECLARATIONS IN SUPPORT OF
12 |                                          | PLAINTIFFS' MOTION ENFORCING
   |         v.                               | SETTLEMENT NOTWITHSTANDING
13 |                                          | PUBLICATION OF FINAL RULE.
14 | WILLIAM BARR, Attorney General, *et*     |
   | *al.*,                                   | Before Hon. Dolly M. Gee
15 |                                          | Hearing:   None scheduled
   |              Defendants.                 |
16
17
18
19
20
21
22
23
24
25
26
27
28

*Counsel for Plaintiffs, continued*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Kevin Askew (Cal. Bar No. 238866)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:   (213) 629-2020
Email:         kaskew@orrick.com

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elyse Echtman (admitted *pro hac vice*)
Shaila Rahman Diwan (*admitted pro hac vice*)
Rene Kathawala (admitted *pro hac vice*)
51 West 52nd Street
New York, NY 10019-6142
Telephone:   212-506-5000
Email:         eechtman@orrick.com
Email:         sdiwan@orrick.com
Email:         rkathawala@orrick.com

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
FREYA PITTS (Cal. Bar No. 295878)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email:         lwelch@youthlaw.org
                  ndesai@youthlaw.org
                  fpitts@youthlaw.org

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email:         hscooper@ucdavis.edu

THE LAW FOUNDATION OF SILICON VALLEY
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)

ii

Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
152 North Third Street, 3rd floor
San Jose, CA 95112
Telephone:   (408) 280-2437
Facsimile:   (408) 288-8850
Email:       jenniferk@lawfoundation.org
             kate.manning@lawfoundation.org
             annettek@lawfoundation.org

*Attorneys for Plaintiffs*

DECLARATIONS IN SUPPORT OF PLAINTIFFS' MOTION
ENFORCING SETTLEMENT NOTWITHSTANDING
PUBLICATION OF FINAL RULE
CV 85-4544-DMG (AGRx)

# DECLARATION OF ANDREA MEZA, ESQ.

## DECLARATION OF ANDREA MEZA

I, Andrea Meza, declare the following:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2. I submit this declaration in support of Plaintiffs' Supplemental Memorandum in Support of Motion to Enforce Settlement in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California. To prepare this declaration, I have reviewed sections of the Final Rule, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," published in the Federal Register on August 23, 2019 (the "Final Rule"). I offer the below comments regarding my observations of families detained at the U.S. Immigration and Customs Enforcement ("ICE") Karnes County Residential Center ("Karnes") in Karnes City, Texas, and the ways in which the comments in the regulations diverge from the reality that I have observed over the years.

3. I am an attorney licensed and admitted in the State of Texas since October 2015. From 2015–2017, I was the Equal Justice Works fellow at the Refugee and Immigrant Center for Education and Legal Services ("RAICES") in San Antonio, Texas. During my fellowship, I helped develop the Karnes Pro Bono Project, which provides pro bono services for families and individuals detained at Karnes. From 2017–2018, I worked as the Albert M. Sacks Clinical Teaching and Advocacy Fellow at the Harvard Immigration and Refugee Clinical Program, where I supervised law students as they represented clients in immigration court proceedings. In 2018, I returned to RAICES in San Antonio, first as Associate Director of the Family Detention Program, and since March of 2019 as Director. In this position, I manage a staff of twenty-four, including eight attorneys, two law school graduates, twelve legal assistants, and two data clerks.

4. During my three years working with the Karnes Pro Bono Project, I have provided direct legal services and *pro se* assistance to hundreds of families. Between 2015–2017, I travelled to Karnes two or three times a week with staff attorneys, legal assistants, and groups of volunteers. Between 2015 and 2017, I estimate that I worked between twenty and thirty hours per week with detained women and children at Karnes. When I returned to RAICES in 2018, the population that ICE detained had shifted from women and their minor children to men with their minor sons.

## Karnes

5. Karnes is not a licensed childcare facility in the state of Texas. It does not comply with *Flores* standards, and thus ICE has not been able to legally hold families with minor children at this facility for more than approximately twenty days. The facility is a former prison for adult males. It has since been painted with murals, and toys and a playground now exist, but the very nature of the structure is that of a secure prison. Visitors must go through a metal detector to enter the visitation space. The visitation room is ringed by five smaller attorney visitation rooms with heavy grey metal doors. Detainees must pay

1

for phone calls. As of August 26, 2019, detained persons must be individually escorted to the visitation space by a guard. All aspects of movement within the facility are controlled and monitored by GEO guards. Children understand that they are not free to leave when they are detained. I have seen children cry in their parents' arms begging to leave Karnes. They tell their parents things like, "When can we leave? I don't want to be here anymore." I have seen sick toddlers, depressed teenagers and terrified parents. Based on all of my observations, Karnes is a carceral environment.

**Prolonged Detention at Karnes**

6. In the summer of 2018, ICE separated hundreds of families at the border under the Zero-Tolerance Policy. After families were ordered reunited in *Ms. L. v. ICE*, ICE chose to detain approximately 100 of these families at Karnes indefinitely. The parties stipulated that in order to avoid re-separation, the fathers were required to waive their sons' *Flores* rights in order to stay with them at Karnes, an unlicensed facility. This gave ICE the liberty to operate outside of *Flores* for this group of families, which we called the "*Ms. L.* families." Witnessing what these families experienced and working with staff who visited these families every weekday gave me unique insight into what would happen if ICE were not limited by how long they could detain families.

7. Through my experiences working with both women and children detained at Karnes, and the *Ms. L.* fathers and sons detained at Karnes, I have worked with hundreds of families subjected to months of detention. Although I believe that any amount of detention is harmful to families, the deterioration that occurs after about two weeks is noteworthy. In my experience, generally, families detained for more than two weeks at Karnes invariably suffer profound effects from their detention. Within about fifteen days, nearly every single family I have met with over three years has expressed exasperation and hopelessness in the face of their detention.

8. Many of the *Ms. L.* fathers complained that their sons were not eating, that they were dangerously thin. Fathers and sons reported depression and suicidal thoughts. Many of the men reported that they could not bear watching their sons cooped up in a prison indefinitely. Members of staff reported to me that at least one of the *Ms. L.* fathers asked them if taking his own life would get his son out of Karnes. The anguish of these families was so severe that many of our staff members developed serious vicarious trauma over the months of working with them.

9. Specifically, several themes have emerged from the complaints I have heard from families subject to detention at Karnes. These issues include lack of adequate medical care, illness related to the poor quality of food, and interference in the parent/child relationship.

    A. <u>Lack of Adequate Medical Care</u>

10. Hundreds of families have complained to RAICES staff about medical conditions at Karnes. In my observation, most families detained at Karnes suffer from some variation

2

of respiratory illness. In fact, among our RAICES team, we have termed this contagious
condition the "Karnes Kough," and multiple times a year our staff become ill with
respiratory complications. Repeatedly, families at Karnes have told us that when they
take their children to the medical office at Karnes, they are either turned away or given
ineffective liquid medication that does not ease their children's symptoms.

11. ICE officials have consistently insisted that medical services are available on an
immediate "walk-in" basis to all detained persons at Karnes. However, our clients have,
for years, described being turned away from medical services and told to return at an
unspecified later time. If there is a follow up appointment, that information is rarely
communicated in an effective manner that is understood by families at Karnes. Numerous
times, families have told me that they were turned away from medical care and were not
instructed specifically when to return.

12. Relatedly, we have also had numerous families tell us over the years that critical
medications, including HIV medications and inhalers have been taken from them and/or
their children upon arrival at Karnes

B. Illness related to inadequate food

13. I have met with hundreds of parents who have expressed to me that they and their
children suffer from gastrointestinal ailments due to the food at Karnes. Dozens and
dozens of parents describe how their children cannot eat or healthily digest the food that
is served in the cafeteria. Babies suffer from diarrhea and vomiting regularly at Karnes.
Parents who take their children to the medical center for digestive issues report that they
are often told to give their children more water. In the spring of 2019, one of our clients
was detained with his young son, who was under two years old. The child had constant
diarrhea and our staff regularly observed him in a state of distress during his meetings
with us in visitation. Our client regularly took his son to the clinic for help, but he
reported that they always insisted that his son was fine and was not losing any weight,
though the child had visibly lost weight.

14. The food provided at Karnes is not appropriate for these children. I have seen a menu
from the Karnes cafeteria, and items listed include chicken nuggets, hot dogs, tortillas,
and salad. When I have asked parents what their children were used to eating, they relate
that children are accustomed to eating whole foods such as rice, beans, eggs, fruit, fish,
and chicken. Mass-produced, processed foods served at Karnes are not nutritionally or
culturally appropriate for children at Karnes.

15. Furthermore, we have met with several families whose specific dietary needs were not
met. One family did not receive a response to their request for a diet appropriate to their
religious restrictions for months. Another father with gastritis was not served food
appropriate for his serious medical condition.

3

C.  Interference with parent/child relationship

16.  I have observed the deterioration of the parent-child relationship in families detained at Karnes, and many parents have told me about changes in their child's behavior during detention. Based on all of my observations, I do not see a way to humanely detain children and parents while respecting the dignity of the family unit or the special needs of children.

17.  I remember a young boy who was detained with his mother for months as she fought her expedited removal order to obtain a hearing to seek asylum protection for which she qualified. In the months that I worked with this woman on her case, I saw that each time her son came to the visitation space, he began to act out more and more. Where at first he would smile and shyly wave at me, weeks later he would scream and cry in his mother's arms as we sat in the small visitation room. He refused to be left alone with the toys in the larger visitation space because he couldn't see his mother, and his mother told me that he was afraid to be left without her in the childcare room.

18.  There are multiple onerous restrictions placed on breastfeeding at Karnes. Many mothers reported that breastfeeding was a cultural norm in their home countries, yet upon arrival at Karnes they were instructed not to openly breast feed, leading to shame in feeding their children. Mothers feared punishment for not covering their children's heads with a towel while feeding them, which many children not used to such conditions did not respond well to. This both interfered with the mother and child relationship and compromised the nutritional needs of the babies.

19.  In addition, several of the *Ms. L.* fathers shared that their sons grew to resent them during their time in detention. They confided that their sons blamed their fathers for their continued imprisonment and had grown angry with them. Both mothers and fathers frequently reported that previously content and obedient children began to get angry, misbehave, and fail to listen to the instruction of their parents during their time in detention. Parents blamed the condition of being in detention under government custody and their inability to discipline their children as they did at home for these changes in behavior.

20.  On numerous occasions, I have observed GEO guards inserting themselves within the parent/child relationship in ways that undermine the parents' autonomy. For example, when children are running around, as children do, guards routinely yell at parents that they need to take better care of their children. Naturally, children observe these interactions between the guards and their parents and based on my observations, this in turn has deleterious impacts on the parent/child relationship.

D.  Other concerns related to prolonged detention at Karnes

21.  Based on my extensive observations, detention of children with unrelated adults is not safe nor in the best interests of a child. There have been reports of abuse of children from non-related adults in family detention centers. Families are forced to share a small room

4

and sleep with at least one other family. This is a strange arrangement for any child. Some children revert to sleeping with their parents or wetting the bed in such conditions. However, parents report that they have been reprimanded for sleeping in the same bed as their child, even when such sleeping arrangements were the norm for the family before detention.

22. Children languish educationally and tire of repetitive school lessons. It is my understanding that the school curriculum repeats approximately every four weeks, so if a child is detained for more than a month, he or she will merely re-do the previous weeks' lessons.

23. Children are also often separated from their family members while in detention. Siblings who are over 18 years of age are not detained at Karnes. Both parents are never detained at Karnes, such that on many occasions, the parent not at Karnes is separated and detained in an adult detention facility. These scenarios are common, and the separations have harmful effects on children.

24. Families report that it is nearly impossible to sleep through the night at Karnes. GEO guards periodically open the dormitory cell doors, shine a flashlight onto each adult and child sleeping in the room, then let the heavy metal door slam shut. This is also frightening to children.

**Flores Regulations**

25. The United States Department of Homeland Security ("DHS") proposes self-monitoring and licensing of family detention centers. This prospect is troubling given DHS' history of failure to abide by the *Flores* settlement agreement, and given my first-hand experience working with ICE at Karnes. Over several years and under different administrations, it has been my experience that ICE rarely, if ever, seeks to ensure standards for the protection of children are effectuated at Karnes. For example, in November of 2016, ICE banned crayons, a welcome distraction for detained children, in the visitation space because, according to email correspondence from ICE, a child's errant markings on a table had "caused property damage to [GEO]." ICE stated that to make up for the banned crayons, they would place more toys in the visitation area. However, children in the visitation area were prohibited from playing with toys off of a small rug in the center of the room. I witnessed multiple GEO guards yell at toddlers to keep their toys on the rug in Spanish that the children could not understand. Children squabbling over toys could not be separated to play in separate parts of the room because they were absolutely prohibited from moving the toys off of the rug. Children could not take a toy into a private visitation room with their parent during a legal visit.

26. I have reviewed sections of the Final Rule, concerning Family Residential Centers, which provide numerous statements that are inconsistent with my observations during my visits to ICE family detention centers. I address below some of the most egregious inaccuracies.

5

A. Level of Security

27. It is nearly laughable to state that the measures to prevent exit from Karnes, including fencing, staff monitoring, and locked doors, are in place for the "protection" of children, including protection from "weather" and "traffic," as indicated in the commentary to the Final Rule. Karnes is located in a remote area many yards from a Farm to Market country road. There is little nearby traffic. It is unclear how the extensive security at Karnes protects children from weather.

28. Even within the detention center, families are not free to move around freely. For example, families are prohibited from entering the visitation space to access legal counsel of their own volition. There are census checks at least twice throughout the day that can take up to an hour to complete, during which time no detained person is allowed to move within the facility.

29. When the security doors at Karnes were unlocked in 2017 in an attempt to prove that the prison was not a "secure facility" for the purposes of licensure with the state legislature, I remember an incident in which a woman and her child saw the vending machines made available to GEO staff and visitors in a break room that separated the visitation room from the main hallway to exit the facility. The woman and her child opened the door to access the break room. Pandemonium ensued and the woman was accused of attempting to escape Karnes.

30. Claims that family detention centers are non-secure are simply false. It has never been the case that a family detained in ICE custody has been free to leave the facility or move around freely within the facility. Although they now keep the heavy metal prison doors that keep families inside the walls of Karnes unlocked, there are monitored security cameras at every exit and GEO guards stationed to patrol them. In order to exit the front door of Karnes, one must pass by ICE offices. The commentary in the Final Rule indicates that "additional points of egress to Dilley and Karnes" will be added; however this will not change the fact that the facility is secure.

B. Access to Legal Services & Court

31. The commentary in the Final Rule states that FRCs provide "liberal access to legal counsel and non-profit groups providing legal services. Interpreter services are available 24/7 via telephone. Private meetings rooms are available as is direct communication with the immigration courts." Each one of these assertions contradicts RAICES' experience serving families at Karnes since 2014.

32. Since 2014, when RAICES first began serving Karnes, access to counsel has been a significant and consistent issue. Karnes has consistently restricted RAICES' access to our clients. At times when we ask to meet with our clients, we are told that they can't be found, or they will make clients wait for hours before bringing them to us.

33. I am unaware of any telephone interpreter services used at Karnes.

6

34. In terms of private meetings rooms, there are only 5 total and the family population at
    Karnes exceeds 600 at times. Private attorneys are always provided first priority for the
    meeting rooms. On multiple occasions, RAICES attorneys have been kicked out of the
    private meetings rooms because they were needed by private attorneys. When that
    happens, we are forced to have confidential communications with our clients in open
    visitation areas.

35. Finally, in terms of communication with the immigration court, there is no way for
    families to do so. Even if there was technically a mechanism for them to communicate
    with the immigration court, these families face numerous practical, linguistic, and
    educational barriers that facility does not account for.

C. Recreational Activities

36. The published regulations highlight available recreational activities at family detention
    centers, presumably including Karnes. Though these may be generally available, the
    description falsely portrays that while in detention, families are simply free to roam
    around a recreational center full of ongoing activities for their enjoyment. This is not the
    case. The inherently coercive environment and the practical realities for these families
    preclude them from being able to access recreational opportunities. Families report that
    they feel pressure to work so that they can pay for bottled water and food that their
    children will actually eat, such as microwave noodle soup cups. Families also report that
    they wait for extended periods of time at the medical services office attempting to have
    their children's medical needs addressed. Some families report that they wait in their
    rooms for hours to be called to the visitation area for legal visit appointments because in
    their experience, GEO staff do not notify them that attorneys are available to meet with
    them unless the guards immediately find them in their rooms. For these and many other
    reasons, a depiction of family prisons as recreational centers is misleading and inaccurate.

D. Recourse for complaints

37. Over the years, we have heard countless complaints, ranging from families being denied
    additional food when they are hungry, children being medicated without their parent's
    consent, even though their parents are in Karnes, to families being held in solitary
    confinement as punishment. Any time we have raised issues to ICE at Karnes and they
    purport to attempt self-oversight, ICE officers insist on our clients being identified by
    name and A-number. ICE overwhelmingly has refused to look into general complaints
    citing lack of identification of the complainants. People detained at Karnes reasonably
    fear retribution for raising complaints against the authority that imprisons them. In fact,
    families were re-separated last year when families organized a hunger strike against their
    prolonged detention. In my experience, it is not within the enforcement mission of ICE to
    ensure that the best interests of children are protected or respected.

38. Thousands of families have passed through Karnes. I have met and spoken with hundreds
    of them about their experiences in detention. It is the overwhelming sentiment of detained

7

families and our staff that no amount of modifications to a prison, for any amount of
time, can make detention a safe and healthy environment for a child.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th
day of August, 2019, in San Antonio, Texas.

Andrea Meza
Director of Family Detention Services
Refugee and Immigrant Center for
Education and Legal Services

8

# DECLARATION OF BRIDGET CAMBRIA, ESQ.

## DECLARATION OF BRIDGET CAMBRIA, ESQ.

I, Bridget Cambria, declare and say as follows:

1.  My name is Bridget Cambria, Esq. and I am an attorney licensed to
    practice in the State of Pennsylvania since May of 2007. I submit this
    declaration in support of Plaintiffs' Supplemental Memorandum in
    Support of Motion to Enforce Settlement in *Flores v. Barr*, Case No. 85-
    cv-4544-DMG (AGRx), in the Central District of California. To prepare
    this declaration, I have reviewed sections of the Final Rule,
    "Apprehension, Processing, Care, and Custody of Alien Minors and
    Unaccompanied Alien Children," published in the Federal Register on
    August 23, 2019. This declaration describes my experiences and
    observations working with clients detained in an ICE family residential
    center, including detention practices and conditions and, in particular,
    access to counsel.

2.  For more than 12 years, I have exclusively practiced immigration law,
    working with children, families and adults, both in the detained and non-
    detained settings. In my practice, I have represented immigrants, children
    and families before Immigration Courts nationwide, the Board of
    Immigration Appeals, Federal District Courts and the Third Circuit Court
    of Appeals. I am a graduate of the Roger Williams School of Law, where

1

my studies focused on immigration and public interest law. Prior to law
school, in or about 2002, I was employed by the County of Berks as a
staff member at the Berks County Residential Center (hereinafter
"BCRC," previously and alternatively known as the "Berks County Youth
Center", "Berks Family Shelter", or the "Berks Family Detention
Center").

3. Currently, I am an attorney with and the Executive Director of Aldea –
   The People's Justice Center ("Aldea"), a non-profit located in Reading,
   Pennsylvania in the County of Berks.   Our organization, Aldea, provides
   universal representation to families detained at the Berks County
   Residential Center in Leesport, Pennsylvania. In the last five years, we
   have represented more than one thousand parents and children who have
   been detained in family detention in the BCRC.

4. In the course of employment, I have regular occasion to observe, and
   therefore am familiar with, the policies and practices of United States
   Immigration and Customs Enforcement (ICE) toward the detention, release,
   and treatment of children and parents in family detention and the Berks
   County Residential Center. I have also had the opportunity to observe how
   those policies and practices have changed over time.

2

5. This declaration is based on my personal knowledge. If called to testify in

   this case, I would testify competently about these facts.

**Detention Practices at the Berks County Residential Center**

6. The BCRC detains mothers, fathers and children. The BCRC detains

   children of all ages, as young as an 11-day-old newborn through children

   aged 17 years of age. If a child celebrates her 18th birthday while detained at

   the BCRC, she will be taken from her parent and placed in adult detention at

   the York County Prison.

7. Sometimes a family is detained as a single parent with a child/children or as

   an entire family with both parents. There are many instances where one

   parent, typically a father, is separated from the family and placed in adult

   detention in another prison – sometimes across the country.

8. The BCRC detains families seeking asylum in expedited removal and also

   families who are in regular removal proceedings. The BCRC detains

   families with pending matters before the Executive Office for Immigration

   Review, the Board of Immigration Appeals, and appeals before the U.S.

   Circuit Courts of Appeals as well as United States District Courts.

9. Detention practices by ICE at the BCRC since 2014 have changed several

   times. The facility has detained families for the entirety of their proceedings

   – including throughout their immigration court process and all subsequent

appeals. At other times, ICE paroled families to available sponsors within
the United States who have a safe and fixed address. As a result of these
constantly changing policies concerning children in detention, there have
been many times at the BCRC where children have been detained for
periods of time that fail to comply with the Flores Settlement Agreement
("FSA"). The detention of children reaches prolonged periods of time. Since
2014 detention periods of children have ranged from several weeks to as
long as 700 days.

10. Despite obligations under the FSA, ICE has detained children at the BCRC
for the entirety of their immigration cases. As a result, children have been
held in detention for upwards of two years, until either they were successful
in their asylum claim before the Immigration Court, were successful on
appeal at the Board of Immigration Appeals, were successful at the Third
Circuit or other federal appellate courts or were removed from the United
States.

11. Given the government's representations that they intend to detain families
indefinitely during the pendency of their cases, we believe that detention
periods will mirror those seen between 2014 and 2017, when children were
detained from one to two years until a final determination was made in their
immigration cases, including available appeals.

4

12. Based on my experience, the government is not speaking with candor when it alleges in commentary to its newly released regulations that family residential centers will only be used for very short term purposes. If the purpose of the new regulations is to detain families through the pendency of their cases, the inevitable result – which we have seen before – is months to years of detention of children. Today children sit in the BCRC accruing more than 60 days of detention with no end in sight.

13. When the government has previously detained children for prolonged periods of time at the BCRC, our clients reported, and we observed, detrimental effects on children's mental and physical health, familial relationships, sleep and eating, and ability to access legal assistance in their cases.

**Licensing of Family Residential Centers**

14. Currently, there are two active family detention centers in the United States. One is located in Dilley, Texas and called the South Texas Family Residential Center and the other is the BCRC, here in Pennsylvania.

15. In 2016, the Pennsylvania Department of Human Services revoked and refused to renew the license for the family detention facility in Pennsylvania, the BCRC.  The issue of whether to renew the license is currently pending a resolution of litigation.

16. My understanding is that should the government's regulations superseding Flores take effect, they will no longer require that detained children be held in a facility licensed by the state in which the facility resides. Rather third party groups will conduct audits of the facility which will be publicly available. Based on my experience, this is insufficient.

17. In the BCRC, for example, the State of Pennsylvania conducts routine and continuous inspections of the facility to ensure that certain regulations concerning the care of children are followed as required under Pennsylvania state law. Further, the state provides families, their lawyers and advocates with the ability to file complaints, concerns and grievances which can be followed up on by state child welfare authorities. Removing a license requirement will remove these protections.

**Secure Detention**

18. Family detention, as practiced today, is secure detention of children. The BCRC is a secure care facility under PA Code 3800.271-4. It is secure in several ways, however, most simply, no parent or child is free to leave the facility. Movement of every child or parent is observed within the facility. No parent or child can move from one area of the building to another without permission from staff. Further, to exit the building into the outside yard a child or parent must be escorted and/or observed throughout their

6

time outside. Families who have asked what would happen if they left the facility grounds have been told that they will be followed and face federal charges for escape from the facility.

19. Further, the Berks County Residential Handbook provided to detained families contains express provisions for "Escape," which is considered a "Major Offense" within the facility. It is in the same category of offenses within the handbook as Arson, Rape, Sexual Assault, Hostage Taking, or causing the Death of a Person.

20. Doors throughout the facility are equipped with scanning keycard locks and are locked and unlocked by BCRC personnel only. Guards monitor all areas of the facility and permit detained families to access only certain areas of the facility at certain times.

21. Residents are not allowed free movement throughout the facility or outside at various times, including after 8PM, and during all eating periods. Estimated times when detained families are permitted in outside recreation areas are 8:30AM to 11:30AM, 1:30PM to 4:30PM, and 6:30PM until the sun begins to set, however, they are not permitted outside without a guard escort or observation. At 8:00PM each day, all detained families are restricted to the second floor and no longer permitted even supervised free movement.

22. At times, guards have further restricted movement throughout the facility as a punishment, including, for example, when mothers have gone on hunger strike or have filed a lot of complaints.

23. Children are to be supervised by their parents at all times. Unlike the family detention center in Dilley, Texas, the BCRC does not have dedicated childcare staff. Although there is a "childcare room," it is just an empty room with some toys and no staff person assigned to it. Additionally, children are monitored by guards at the BCRC at all times.

24. After 8:00PM, families are subjected to 15-minute invasive bed checks, where members of the BCRC staff will enter each room, shine a flashlight in the room and check to see that each resident is accounted for. This results in as many as 40 sleep interruptions each night, for children and their parents attempting to sleep. For families who were detained nearly two years, they experienced nearly 29,000 sleep disruptions based on invasive and unnecessary bed checks, which are a practice of the BCRC.

**Activities and Games Do Not Alleviate Effects of Detention**

25. The government maintains in its comments on the new regulations that Family Residential Centers have indoor and outdoor activities that mitigate the effects of detention. However, this is not unsimilar to any jail in America with recreation time and activities in a confined environment.

8

Colorful paint or movie nights do not alleviate the fact that the children are

detained and they are not free to leave, that parents are not free to make

choices for themselves or their children, and that their routine is

predetermined – as it is in custody in any adult detention center in the

United States. Additionally, the activities cited by the government are not

available daily, are not consistent throughout each FRC, and are simply

examples of activities that have occurred at some time in the last five years

that family detention has existed at such a large scale.

26. Most of the activities that the government describes fail to address the issue

of secure detention and demonstrate a lack of understanding by the

government of the population they detain. These families are asylum

seekers. They have endured trauma. What we see is that children do not

want to play as detention progresses and rather, children become bored,

lethargic, and tremendously sad and helpless.

**Family Detention Undermines the Parent-Child Relationship**

27. In Family Residential Centers, parents are not responsible for

determinations as to the care of their children. Parents cannot determine

when their children wake up, what they eat or if they need to go to a

hospital. Parental decisions are made for children, by the facility procedures,

the guards within the facility and by ICE themselves. Children are told when

they can and cannot play, when they can or cannot be outside, when they

can eat and what they eat, and what happens when they misbehave – by the

facility and not their parents. Medical decisions, including whether a child

receives medical attention, what kind of medical attention and when a child

can receive medicine or treatment at a hospital, are made by ICE and the

facility. Often when children realize this dynamic, behavior issues emerge,

because children realize that their parents lack any control over their own

children.

28. The fact that ICE and the facility make parental decisions for children is

even more inappropriate because few employees at the BCRC speak

Spanish. If a detainee has a problem, they must make a language service

request, a guard must take them to a telephone to connect with an

interpreter, and an interpreter must be available. This arrangement does not

permit the care of children, especially in emergencies. For example, on one

occasion, there was a fire in the building and the BCRC's staff could not

speak with the detainees to organize an orderly exit from the facility and

ensure that all children were accounted for. This process creates particular

risks for families who speak less common languages.

**Culture of Fear**

29. ICE is present in all Family Residential Centers. This is substantially different from detention of unaccompanied minors. As a result, children see the persons who will deport them every day, all day long. Fear of deportation instills a child with fear every single second that a child is detained in a family residential center. For example, in the BCRC, children are deported from the facility in the middle of the night, normally between the hours of 2:30AM and 4:30AM. To remove a family, members of BCRC staff and ICE removal officers enter the room of the family, wake them, and physically remove them from the facility. If they resist, or request to make a call to family or an attorney, they face retaliation and in worst case scenarios physical restraint, including such restraint of a parent in front of their child.

30. A child is never told of plans for removal from the facility. As a result, a child is never prepared for the shock and fear of being awoken in the night and taken from their bed by force. Children see this happen to their friends and wonder, "When will I be taken?" They make relationships with other children, play with those children, only to have those friends disappear often to places where a child fears death. The constant apprehension, in combination with other stressors, makes daily life for a child in family detention unbearable, stressful and terrifying.

11

**Access to Legal Services**

31. The government comments that Family Residential Centers have private meeting rooms for legal meetings as well as provide access to legal service providers. In fact, access to legal services is disrupted by routine challenges for service providers and constantly changing policies about what is permitted in the facility, when visits are permitted, and who is permitted to visit.

32. The BCRC has two rooms dedicated for legal visits, in a facility that detains 96 people, and that intends to at a minimum double its capacity. The legal visit rooms border the room where Court is held and border the ICE offices. There is a lack of privacy, as none of the rooms are soundproofed, and conversations can be heard in both the Courtroom and the ICE offices.

33. Contrary to the government's statements in support of the newly released regulations, childcare is not provided to parents while they meet with their attorneys or representatives. We normally conduct legal services with children in the room. If something is particularly difficult, I have to ask or convince a guard to watch a child, or sometimes another family will watch a child. Also, contrary to the government's comments, interpreting services are not available for counsel to use.

12

34. Additionally, obtaining access to counsel is extremely burdensome. Legal visitors are not permitted to come into the facility unless they pass a 72-hour clearance period, which is instituted and mandated by ICE. This clearance period is required even for attorneys with clients detained at the BCRC, even though detention centers usually do not restrict legal visitors who have proof of a law license and evidence of representation in this way. Further, this restriction makes obtaining pro bono legal counsel difficult for children and their parents because in many cases asylum matters are conducted within the facility within 24-48 hours after entry into the facility or families are brought into the facility to begin removal – a time which is crucial for an attorney and her client.

35. Most recently, an ACLU supervisory attorney was barred from visiting her clients in the BCRC based on not satisfying the 72 hour clearance period. She had to conduct the legal visit while sitting in the facility parking lot by telephone, with our assistance.

36. Our attorneys and advocates in the BCRC consistently face retaliation and obstacles to providing complete and unfettered legal assistance. We work very hard to provide the best representation possible given the barriers and to comply with the rules as set by ICE. However, accessing legal services in detention is detrimental to a family's asylum case in many ways: (1) a

family's choice in legal counsel is limited, and often they cannot access the

counsel of their choice because of the detention placement and remoteness

of family detention; (2) the child and parent are not in an environment

where they can assist in their own case or access evidence in support of their

case; and (3) it is very difficult to manage a life or death asylum matter

before the asylum office or immigration court when your client is a child

suffering from the effects of not only the trauma they have fled, but the

compounded trauma of detention.

37. Many times, during legal visits, our child clients will fall asleep on the table

out of exhaustion or become too sick to participate in their case at all.

38. A legal service provider list is provided to detained families within FRCs.

However, in the BCRC, for example, the legal services list for York, PA and

Philadelphia, PA include no legal service provider that actually provides

representation to families detained at the BCRC. It is for that reason that we

created Aldea to provide that service, but it further demonstrates that the

detention of families does not provide unfettered legal access, rather it

inhibits it.

**Children's Experiences of Long Term Detention**

39. Children detained at the BCRC report adverse mental and physical health

effects from long term detention. Children have explained that, after

14

extended periods confined in one building, they became afraid and sick of

the walls around them, sometimes stating that the walls appeared in their

nightmares.

40. Children report difficulty sleeping because of the 15-minute bed checks and

environment of fear and anxiety.

41. Children threaten self-harm and even suicide. Children have disclosed to me

that they want to die, that they want to kill themselves because they see no

other way out of the building they are trapped in. Children tell me they want

to jump from a window. They take their ID from their neck and simulate

self-strangulation. They contemplate how they could harm themselves

within the facility.

42. I have observed that sickness is common and rampant, but FRCs do not

employ a pediatrician. Children report losing their appetite or, when they are

hungry, being denied "seconds" of a meal they like. The government's

representation in the regulations that families in FRCs get "all you can eat

meals" is untrue.

43. The government's representation that families at the BCRC have private

"suites where each family is housed separately" is untrue. Their rooms are

simply dorm rooms, with six beds crammed into one room. Multiple

families can occupy one room depending on their family composition.

15

Children are not permitted to sleep with their parents no matter their age. If a child suffers a nightmare and sneaks into bed with their parent, the child is physically removed by BCRC staff. The bathroom has no door; it's simply separated by a curtain that reaches knee length.

44. Families have also reported problems after release caused by children's time in detention, including problems in school, fear of entering buildings, and anger towards parents.

45. Based on my experience, it is disingenuous for the government to allege that family detention will be short term because during the only times they have utilized indefinite family detention, detention periods lasted from six months to 700 days. Additionally, the addition or reliance on activities like games or recreation is insufficient to address the integral problem I have observed with FRCs, which is that they operate as secure detention facilities and not shelters. Children are caged in FRCs, they are not free to leave, they constantly live in fear and constantly ask to be free.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of August, 2019 in Reading, Pennsylvania.

Bridget Cambria, Esq.

16

# DECLARATION OF MARK GREENBERG

# DECLARATION OF MARK GREENBERG

I, Mark Greenberg, declare as follows:

I submit this declaration in support of Plaintiffs' Supplemental Memorandum in Support of Motion to Enforce Settlement in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California. To prepare this declaration, I have reviewed sections of the Final Rule, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," published in the Federal Register on August 23, 2019. I offer the comments below regarding the importance of state licensure of facilities and of the general policy favoring release.

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2. I joined the Migration Policy Institute (MPI) as a Senior Fellow in July 2017. My work focuses on the intersections of migration policy with human services and social welfare policies. MPI is an independent, nonpartisan, nonprofit think tank in Washington, DC dedicated to analysis of the movement of people worldwide. MPI provides analysis, development, and evaluation of migration and refugee policies at local, national, and international levels. It seeks to improve immigration and integration policies through authoritative research and analysis, opportunities for learning and dialogue, and the development of new ideas to address complex policy questions.   The opinions expressed in this declaration are my personal opinions, and do not reflect an institutional position of the Migration Policy Institute.

3. From 2009-17, I worked at the Administration for Children and Families (ACF) in the U.S. Department of Health and Human Services. I served as ACF Deputy Assistant

Secretary for Policy from 2009-13; Acting Commissioner for the Administration for Children,
Youth, and Families from 2013-15; and Acting Assistant Secretary from 2013-17. ACF includes
the Office of Refugee Resettlement (ORR), which has responsibility for the refugee resettlement
and unaccompanied children program. Previously, I was Executive Director of the Georgetown
Center on Poverty, Inequality, and Public Policy, a joint initiative of the Georgetown Law Center
and Georgetown Public Policy Institute. In addition, I was Executive Director of the Center for
American Progress' Task Force on Poverty, and the Director of Policy for the Center for Law
and Social Policy (CLASP). I am a graduate of Harvard College and Harvard Law School.

4.       During the time that I was Acting Assistant Secretary of the Administration for
Children and Families (ACF), from October 2013-January 2017, I worked very closely with the
Office of Refugee Resettlement (ORR) on many issues concerning the Unaccompanied Alien
Children Program.   I worked with both ORR leadership and staff on issues of program
administration and policy development and met with ORR leadership on a weekly or biweekly
basis and frequently talked or corresponded with program leadership or staff numerous times
each day.   To the best of my recollection, I visited the Border at least five times during this
period, visiting shelters and talking with shelter staff, program staff, and children.  In addition to
visiting shelters in Texas, I also visited shelters in California and New York while at ACF.  I
frequently met with colleagues from Customs and Border Protection and Immigration and
Customs Enforcement and other parts of the Department of Homeland Security, along with
colleagues from the Department of Defense and other federal agencies on aspects of inter-agency
coordination.  I testified before Senate Committees or Subcommittees four times concerning the
Unaccompanied Alien Children Program during my time as Acting Assistant Secretary.

5.     During the time that I was at ACF and worked with ORR, I and my colleagues were very aware of *Flores* requirements. The standards listed in Exhibit 1 all seemed reasonable and appropriate as requirements for shelters in which children were residing, as did the requirement that shelters be state-licensed. We did not view these requirements as constraints on the ability to effectively operate the program for unaccompanied children. In fact, we found them to be helpful in ensuring that the facilities ORR funded met important requirements to protect the safety of children in its care.

6.     We recognized the importance of state licensure, because the basic requirements for shelters established by ORR were more general in nature, and state licensure involved much more specific detailed requirements relating to topics such as staff hiring and training and facilities conditions and services. Moreover, state licensure ensured state monitoring, which was an important protection given the limited nature of federal monitoring.

7.     While we appreciated the need for state licensed facilities, there were times when ORR was forced to rely on using influx facilities on federal properties. This happened if there was a sudden large increase in numbers of arrivals, because state licensure typically took in the range of 3-6 months. In 2014, when ORR did not have sufficient shelter capacity for all arriving children, children were backed up at CBP, and we recognized the crucial importance of having sufficient capacity to minimize the risk of that happening again. To avoid such back-ups, we engaged in extensive efforts to build licensed shelter capacity and to carefully track indicators of increased need. Only if standard capacity was insufficient did we turn to influx facilities which were not subject to state licensing.

8.      When we turned to influx facilities, our goal was always to use them for as short a period as possible.  Moreover, we established requirements that children would only be sent to influx shelters if they met a set of criteria, including being at least 13 years old, not pregnant, speaking English or Spanish, with no known medical or behavioral issues or other special needs.  Where possible, we also sought to only place children in influx facilities if they had good prospects of release to a sponsor within 2-3 weeks.  While these protections were not a substitute for state licensure, we concluded that they were important criteria to apply in light of the fact that these were typically large facilities and lacking the protections that came from state licensure.  To reiterate, the goal was always to use them for the shortest time possible.

9.      I have reviewed the _Flores_ final rule, including its approach to treatment of children who arrive with their parents.  I am deeply concerned about any approach that does not mandate the protections of state licensure for facilities, particularly if children will be in those facilities for more than a short period of time.  Without a comprehensive approach, that is lacking here, I do not believe federal standards could ever be an adequate substitute for state licensure.  And I am particularly concerned that the rule only references the Federal Residential standards and the fact that there will be auditing, without the agency committing itself by rule to either specific standards or any specific auditing requirements.  If the agency had committed itself by rule to specific standards and auditing requirements, one could compare such standards and auditing requirements to state licensing and monitoring.  But without such a commitment, it seems apparent to me that the rule is wholly lacking in ensuring standards and monitoring comparable to state licensure and monitoring.

10.     While I was at ACF, I and my colleagues were very aware of the *Flores* general policy favoring release, as well as the requirements of the Trafficking Victims Protection Reauthorization Act (TVPRA) that children should be placed in the least restrictive setting in the best interest of the child, being mindful of risks of flight and risk of danger to the child or others.  These principles were  consistent with the principles guiding ACF's broader work on behalf of children and families.  In policy and practice, we needed to make multiple judgments to determine what constituted appropriate vetting for parents, relatives and other sponsors to ensure that releases were safe and appropriate.  But we recognized that the best interest of children was to be with their parents or close relatives whenever possible, unless there were clear reasons why doing so could put children at risk.  And, if children could not be with parents or close relatives, ORR sought to place them with more distant relatives or family friends, guided both by the *Flores* and TVPRA requirements and the recognition that it is in the best interest of children to be with their family, and if that is not possible, to be in a family-like setting rather than an institutional setting.

11.     I am profoundly concerned that the *Flores* final rule does not reflect the *Flores* general policy favoring release and prioritizes the preference for detention over the best interests of children.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of August, 2019 in Washington, D.C.

Mark Greenberg
Senior Fellow
Migration Policy Institute

5

# DECLARATION OF DR. YENYS CASTILLO

# DECLARATION OF DR. YENYS CASTILLO

## INTRODUCTION

1. I am a clinical psychologist who conducts clinical and forensic psychological evaluations in a private practice setting. I specialize in the assessment and treatment of trauma-related disorders and dissociation. I routinely provide expert testimony and write advisory reports for Criminal, Civil, and Immigration courts involving various psycho-legal issues such as competence to proceed, risk, capital sentencing, juvenile re-sentencing, and psychological injury. Previously, I worked as the Chief Psychologist of the Miami-Dade County jails and as the Director of Psychology, Forensic Services, and Clinical Training at South Florida Evaluation and Treatment Center, a forensic hospital in Miami, FL.

2. I have an active psychology license in the state of Florida (License Number: PY9229; Expiration Date 5/31/2020). I received a Master's (M.S) Degree in Clinical Psychology from Barry University in September of 2006 and a Doctoral (Ph.D.) Degree in Clinical Psychology from Nova Southeastern University in December of 2013. I completed my Pre-Doctoral Internship at South Florida State Hospital in 2011 and my Post-Doctoral training in a private practice setting and a community mental health center for families, children, and adolescents.

3. I have extensive experience working with children and adolescents in various clinical settings. I am an ad hoc reviewer for the Journal of Trauma and Dissociation (peer-reviewed Journal of the International Society for the Study of Trauma and Dissociation; ISST-D) and Psychological Trauma: Theory, Research, Practice, and Policy (peer-reviewed journal of Division 56 Trauma). I have presented at local, national, and international conferences on the topic of psychological trauma. I am also fully bilingual in English and Spanish.

4. At the request of attorneys who represent detained children under the Flores Settlement Agreement, I evaluated children at the Yolo Juvenile Detention Center in Woodland, California for three days (September 24, 2018 through September 26, 2018) and at the Homestead facility in Miami, Florida for two days (February 6, 2019 and February 7, 2019). I base my clinical impressions of detained children and detention conditions on (1) tours of the facilities provided by management and (2) face-to-face clinical interviews with four girls and nine boys whose ages ranged from 13 to 17 and who described both the facilities in which they were detained and their experiences in other facilities.

(3) I also incorporated into my analysis the accounts of previously detained children who I have evaluated after their release as part of my work in private practice. The additional facilities described in the interviews include Southwest Key Casa Padre (SWK CP, Brownsville, Texas) and Northern Virginia Juvenile Detention Center (Nova).

5. I submit this declaration in support of Plaintiffs' Supplemental Memorandum in Support of Motion to Enforce Settlement in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California.  To prepare this declaration, I have reviewed sections of the Final Rule, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," published in the Federal Register on August 23, 2019. This declaration summarizes my observations of detained children at Office of Refugee Resettlement (ORR) Facilities, as well as the conditions at those facilities and the mental health and trauma-related services available.

6. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

## OBSERVATIONS OF CHILDREN AT ORR FACILITIES

7. **Children with histories of detention in ORR facilities reported chronic harm to their physical and mental wellbeing.** This is consistent with my experience working with detained children. Some of the mental health symptoms I have consistently observed in detained and previously detained children are recurrent and distressing memories, nightmares, avoidance of memories, thoughts, and feelings related to the trauma and/or people, places, situations, and conversations that remind them of the trauma, irritability, hypervigilance, hyperarousal, self-blame, views of the world and others as unsafe, problems with concentration, sleep disturbances, behavioral dysregulation, crying spells, excessive worry, bodily tension, self-injurious behaviors, and suicidal tendencies.

8. **Detained children reported psychological problems, including depression, anxiety, and posttraumatic symptoms, and adjustment disorders.** All of the children I interviewed reported symptoms of depression, anxiety, and posttraumatic stress. A 17-year-old boy from El Salvador whom I interviewed at the Homestead facility noted, "I cry almost every day." A 17-year-old

3 | Declaration of Dr. Yenys Castillo

Guatemalan girl, detained in the same facility, noted that although she experienced hardships in her home country, she first became depressed after being held in the U.S. Most of the children I interviewed reported feeling irritable and in a constant state of fear and vigilance, hallmark symptoms of posttraumatic stress. A 17-year-old Salvadorian boy detained in Homestead indicated that he is constantly angry and irritable and has a sense of dread as if something bad was about to occur.

9. **Some of the children I interviewed reported a history of self-injurious behaviors and suicidality, and all of them mentioned knowing other detained children who have engaged in cutting and have made suicidal gestures.** A 17-year-old Guatemalan boy, held at the Yolo facility, had a history of self-inflicting cuts and suicidal ideations and gestures stemming from missing his family. A 17-year-old Salvadorian boy at the Homestead facility told me that three of his friends cut themselves because of depression. A 17-year-old Guatemalan boy detained in Homestead indicated that he knows a 13-year-old boy who cries all the time and was referred to a psychologist for making cuts in his arms. A 17-year-old Indigenous Guatemalan boy mentioned that during his stay at an ORR-sponsored program, he began experiencing fear, irritability, and sadness due to being locked up and away from his family. Hence, he began cutting with objects and nails, leaving his forearms scarred. He also reported experiencing suicidal thoughts and making gestures such as putting a sheet around his neck. He noted that he learned to cut from other minors who taught him this was an effective way of modulating his emotional pain.

10. **Most of the children I interviewed at Homestead, Yolo, and my private practice indicated that they suffer from chronic headaches**. All of these children indicated that they did not suffer from headaches prior to their detention. A 17-year-old Guatemalan girl from Homestead noted, "The headaches are strong and do not go away. They worsen when I get depressed. I used to be healthy, and I'm scared because I don't know why I am having these headaches." Chronic headaches are troublesome because they could be a sign of high blood pressure, sleep deprivation, and of living under highly stressful conditions.

11. **Similarly, most of the children I interviewed indicated that they have difficulty falling and staying asleep**. Many of them noted that they think of their parents at night and worry about never leaving the facility or being incarcerated when turning 18. Some of the children indicated that they also have

4 | Declaration of Dr. Yenys Castillo

difficulty sleeping because their dorms are guarded by staff who talk to one
another loudly through the night. Sleep disturbances are a hallmark symptom of
depression, anxiety, and posttraumatic stress.

12. **Detained children indicated that their physical and mental wellbeing
increasingly deteriorated as they spent more days in detention.** A 17-year-
old girl Guatemalan girl, who had been detained at the Homestead facility for
233 days, indicated that she cries whenever a child leaves and she has to stay. A
17-year-old Salvadorian boy from the same facility reported a similar reaction.
He remarked, "I want to feel happy for the children who leave, but it hurts me
to see them leaving, knowing I have to stay. I wonder why me. It makes me feel
like I will be here forever."

13. **Detained children disclosed histories of multiple traumas in their home
countries and cited violence as one of the main reasons for migrating to the
United States.** All of the children I interviewed reported growing up in violent
and unsafe neighborhoods, two reported being kidnapped by gang members and
most reported losing a family member to violence. A 17-year-old Guatemalan
girl, detained at Homestead, explained that she lived in the "red zone," where
extortions, rapes, and murders are commonplace. A 14-year-old Honduran girl,
detained at Homestead, noted, "I had to come with my aunt because gang
members were raping all the girls in my town." Psychological trauma has
cumulative effects, such as individuals with histories of multiple traumatic
incidents being at an increased risk for physical and psychological deterioration.

14. **Detained children disclosed experiencing traumatic events during their
journey to the United States.** For instance, a 17-year-old Guatemalan girl
detained at Homestead said she slept seven days in the wilderness without water
or food. She also mentioned that during the journey, an adult man attempted to
rape her. A 17-year old Salvadorian boy, detained at Yolo, said he witnessed a
man being shot to death by members of a Mexican drug cartel. He also reported
seeing a man who lost his balance, fell from the train where they rode and was
decapitated by the train. At times, children cited government practices as
traumatic. For instance, a 14-year-old Honduran girl, detained at Homestead,
indicated that after the death of her mother, she migrated to the U.S. with her
aunt, fleeing dangerous conditions in her home country. The girl related that
immigration authorities separated her from her aunt without telling her why. She
remarked, "They did not tell me that I would never see my aunt again. They put
me in a cage for three days, and I cried nonstop. Then, they brought me to

5 | Declaration of Dr. Yenys Castillo

Florida. I eventually found out that my aunt was in another facility." At the time
of the interview, this girl had been in the Homestead facility for more than seven
months.

15. **All of the children I interviewed cited being continuously separated from
their parents and other caregivers for extended periods as an extreme form
of hardship.** For instance, a 17-year-old Guatemalan boy who is reportedly not
allowed to be reunified with his father because somebody in the household has
a nonviolent misdemeanor, noted, "All I ask God is to see my father. He is a
good father who gives me good advice. I sometimes feel that I will never get out
of this place." One child mentioned, "I think the government thinks that they are
taking care of me by not sending me with a person who may be dangerous, but
they don't realize that being here is very harmful to me."

16. **The children also reported stress from being separated from their
communities.** For instance, some children expressed concerns regarding not
attending a traditional school and missing on educational opportunities.
Although some ORR facilities offer classes, children do not have access to an
array of educational opportunities that could help them thrive and develop
appropriately. Some children indicated that they had adults outside ORR
facilities that were willing to mentor and assist them. However, they were not
allowed to be placed with them. Removing protective systems such as a child's
school, church, neighbors, extended family, and other community members can
erode children's resilience by undermining their sense of being loved, safe, and
effective and by removing growth-promoting opportunities. This is particularly
damaging to children with extensive trauma histories.

17. **All of the children I met with at the ORR facilities had extensive trauma
histories.** Most of them met DSM-5 criteria for an adjustment disorder. DSM-5
defines adjustment disorders as the development of emotional or behavioral
symptoms in response to an identifiable stressor occurring within three months
of the onset of the stressor. As detailed in the DSM-5, "By definition, the
disturbance in adjustment disorders lasts no longer than six months after the
stressor or its consequences have ceased…. If the stressor or its consequences
persist, the adjustment disorder may also continue to be present and become the
persistent form." Hence, for these children, detention conditions are both
creating and perpetuating adjustment disorders and contributing to their
psychological and social deterioration. Adjustment disorders, however, are
relatively minor compared to the more serious conditions I observed, such as

posttraumatic stress disorder and major depressive disorders. Given that all of the children I met have histories of trauma, their detention makes them particularly vulnerable to long-term and perhaps irreversible psychological and cognitive damage.

## CONDITIONS AT ORR FACILITIES

18. **Children detained at ORR Facilities lack privacy and freedom of movement.** A major issue brought up by the children I interviewed was their lack of privacy. Children complained that they are constantly surrounded by staff and other children. A 17-year-old Guatemalan girl at the Homestead facility remarked, "I am forced to be with people all the time. If I have to use the bathroom in the middle of the night, staff has to take me even when the bathroom is ten steps away. I do not have privacy to cry. I feel watched. I feel that I am at a breaking point." For individuals with histories of trauma, this lack of privacy and freedom may resemble conditions of abuse and be further re-traumatizing.

19. **In some ORR facilities, children live under prison-like conditions and the children view themselves as captives.** These facilities resemble prisons in the following ways: (1) The facility is fenced-in and secured; (2) The facility is heavily policed; (3) Children are not allowed to leave; (4) Children have to follow highly regimented routines (e.g., walking single file, not speaking to one another unless authorized); and (5) Children's days are fraught with tedium. The children I interviewed indicated that living under regimented conditions is difficult as they feel watched and monitored every minute of the day and night. They all disclosed a desire to live outside with family members and other willing sponsors. Some noted that expressing any desire to leave is interpreted by staff as "escape ideation," and can result in a report and their immigration case being delayed. Based on my clinical experience, this constant psychological pressure and highly regimented system can be damaging for children, especially for those with trauma histories. Being indefinitely incarcerated in such a regimented environment mimics conditions of abuse and can be further traumatizing and damaging to children's self-esteem and sense of autonomy. For example, some of the children I interviewed told me that they wonder whether they did something wrong to deserve living away from their caretakers under such restrictive conditions.

20. **Many children detained at ORR facilities lack opportunities for healthy**

7 | Declaration of Dr. Yenys Castillo

**psychological and social development.** Many of the children I interviewed indicated that it was hard to experience the lack of warmth in the ORR detention facilities. One of the most harmful practices I observed at the Homestead facility was a policy that prohibits children from touching one another. This constitutes psychological neglect. All of the children I interviewed cited not being able to touch one another as one of the most damaging conditions of their detention. A 17-year-old girl from Guatemala stated, "Sometimes I need a hug. I need advice. My girlfriends cannot braid my hair. If I see children crying, I cannot hug them to show them support." This same girl began sobbing later in the interview and kept repeating, "I need a hug. I am a human being. Why do they treat me like this?" A 17-year old boy from El Salvador related, "There was this younger boy who was always crying. I felt so bad for him and went to touch him and talk to him. But staff told me to leave him alone." At the Homestead facility, even siblings are not allowed to touch one another. Touch is important for human development because children must grow in an atmosphere where they feel safe and loved. Touch is particularly important for children in detention because they have long-standing histories of trauma and, at times, they only trust other children to talk about their current stressors. For example, I interviewed a 17-year-old girl who did not disclose a history of sexual abuse. This is not surprising given that many sexual abuse survivors do not disclose their abuse and that the girl had just met me. When I went to the other side of the facility, another girl told me that the 17-year-old girl I had seen the previous day had been sexually abused in her home country. She added, "She is like a sister to me. When she told me she was abused, she began crying. We cannot tell those things to the staff here because it can be used against us. I tried to touch her arm in support, and staff separated us as a punishment." A 16-year-old girl from Honduras noted, "I cannot touch anybody which is very uncomfortable. I really need a hug. Not being able to touch or be touched feels unnatural." During our tour of the facility, I saw a boy sobbing in line, without being acknowledged by staff or peers.

21. Additionally, I observed a lack of cultural responsiveness. I encountered an indigenous 17-year-old boy Guatemalan boy detained at Yolo, who indicated he was tasered for not understanding a command in English. I also evaluated a black 17-year-old Honduran boy who was being bullied by other children due to the color of his skin, with no intervention from staff. This same child sustained a fracture in his ankle which went untreated for five days. I saw documentation indicating that the referral somehow was not yet in the system. The note indicated that at that moment, the request was marked as urgent. When I

interviewed the child, he complained of intense pain and requested a nurse. The
nurse informed me that the child had a fractured leg and that he would be seen
at the hospital sometime in the upcoming days.

## MENTAL HEALTH AND TRAUMA-RELATED SERVICES AT ORR
## FACILITIES

22. **Although the children I interviewed at ORR facilities had complex trauma
histories and mental health needs, and some reported lengthy stays in
detention, there are few mental health services available to these children.**
Detained youth have distinctive mental health needs and trauma histories that
would require at a minimum access to individual counseling sessions as needed,
with a minimum frequency of once a week. The youth I interviewed had greater
needs given that being detained is a crisis situation and they did not have parental
figures to help them cope with their stress and navigate their current
circumstances. The frequency and length of treatment should be tailored to the
particular needs of each child. For instance, children who experience severe
depression and suicidality, may need daily interventions. In addition, children
must be guaranteed confidentiality and that whatever they say to their mental
health helpers is not used against them in terms of their immigration cases. Given
the complexity of these children's mental health needs and histories of trauma,
they should be treated by licensed mental health professionals who have
specialized training and experience in trauma and childhood development. In
addition, they would benefit from a multi-systemic therapy that incorporates
communication with their parents. They may also benefit from psychotropic
medications. However, any medications must be prescribed for justifiable
mental health issues and not just behavioral control and must involve parental
consent. Children may also require additional support in terms of understanding
the immigration system. Unlike adults, children may be incompetent to proceed,
in the absence of a mental illness, on the basis of psychosocial immaturity. Not
having access to their caregivers, children must have additional support in
making determinations regarding their cases.

23. Instead, based on my interviews, observations during tours, and clinical records,
it is clear to me that these youth receive instead only sporadic treatment with no
guarantee of confidentiality. In addition, the interpretations that I encountered
regarding children's behaviors evidenced that therapists did not have a thorough
understanding of trauma or childhood development. I also observed that children

were receiving medications for reasons not justified in their clinical charts and
that parents were not well aware of why their children were being medicated or
what are the medications' benefits, side-effects, and alternative treatments.
Finally, I observed that children lacked thorough information regarding their
immigration cases and did not have immediate access to social workers as the
facilities were understaffed. Without access to effective mental health and social
services, as described above, these children will not have the support to build
internal resources such as emotional regulation, self-efficacy, and social
competence to process their trauma and adjust to the adversity of being detained
and away from their families.

24. **Most of the children I interviewed in the various facilities indicated that
they are afraid of seeking the few mental health services available to them
because there is no guarantee of confidentiality and their disclosures can
negatively impact their immigration case and increase their length of stay
in the facilities.** At the Homestead facility, a 17-year-old Guatemalan boy said,
"I'm afraid to cry because they can take me to a psychologist, and I will have to
stay here longer." A 17-year-old Guatemalan girl from the same facility noted,
"I want to talk to a psychologist because I need help, but I don't want my case
to fall behind. I can't think of anything worse than staying here longer."
Similarly, a 17-year-old Salvadorian boy mentioned that he was kidnapped in
his home country and reported symptoms of posttraumatic stress. He noted, "I
feel that it would be good for me to talk to somebody. But I know that
psychologists will write it in my file, and it can be bad for me. It is also better
not to cry because they could send me to the psychologist, and my case will be
delayed." Some children also indicated that self-disclosures had had negative
repercussions. For instance, a 17-year-old Honduran boy at the Yolo Detention
Center disclosed being targeted by gangs for recruitment and was subsequently
labeled as being part of a gang.

25. **None of the facilities I visited had protocols in place to treat children in
accordance with their developmental state and trauma history.** The
Substance Abuse and Mental Health Services Administration (SAMHSA), a
branch of the U.S. Department of Health and Human Services, has proposed a
trauma-informed structure for organizations that integrates trauma research,
practice-generated knowledge, and feedback from trauma survivors. As detailed
in SAMHSA's (2014) *Concept of Trauma and Guidance for a Trauma-Informed
Approach*, a trauma-informed system (1) **Realizes** the widespread impact of
trauma and understands potential paths for recovery; (2) **Recognizes** the signs

10 | Declaration of Dr. Yenys Castillo

and symptoms of trauma in clients, families, staff, and others involved with the
system; (3) **Responds** by fully integrating knowledge about trauma into policies,
procedures, and practices, and (4) seeks to actively **Resist re-traumatization**.
SAMHSA's guidelines have now been adopted nationwide and have become a
standard of care for forensic, correctional, mental health, and medical facilities.
Facilities that incorporate trauma-informed practices, which are now the rule and
not the exception, conduct trauma screenings, and modify treatment to fit the
individual needs of clients. For example, therapists may assign female staff to a
female client who has been traumatized by men and does not feel comfortable
around them.

26. During my tours of Yolo and Homestead, when I asked what accommodations
clients with trauma histories receive, managers indicated that all children are
treated the same, and trauma histories are not taken into account. In addition,
both facilities had regimented conditions and unnatural rules that could create
and aggravate posttraumatic reactions. For instance, at the Yolo facility, staff
disclosed to me that they use wrist locks to make children comply with rules. An
indigenous Guatemalan child indicated that in the Northern Virginia Juvenile
Detention Center (NOVA) school in Alexandria, Virginia, various children
began to fight near him, and a guard told him to "cover." He remembered being
confused as he did not know what the word "cover" meant. So, the guard
proceeded to shoot him with an "electric gun," which caused him to collapse. He
mentioned waking up, seeing cables attached to his chest that were stemming
from the gun. He mentioned he was scared, irritable, and sad throughout his stay
at the facility, and his symptoms of posttraumatic stress were exacerbated by the
commonplace violence and the militaristic way he was treated by staff. At the
Yolo facility, there was documentation disclosing the use of force against some
of the children I assessed. One of the notes indicated that staff placed the arms
of a 17-year-old boy in rear wrist locks and secured his upper torso and legs.
Another note indicated that staff used pepper spray on this same child. This child
had an extensive trauma history which included being physically abused by his
older sister, experiencing the death of both of his parents, and being threatened
at gunpoint by local gangs.

27. In some ORR records I read, staff refer to some children as "manipulative" and
in need of "consequences." This demonstrates a **lack of understanding among
staff at ORR facilities of the complex clinical profile these children present
with,** for instance, the fact that anger and behavioral dysregulation may stem
from PTSD and not from a manipulative personality. It is widely accepted in

11 | Declaration of Dr. Yenys Castillo

correctional care that individuals should not be punished for behavior that stems from a mental condition. This highlights the importance of assigning trauma-informed staff to treat children with such complex profiles.

28. I have reviewed sections of the Final Rule concerning trauma, which state that "HHS ensures that ORR-funded care provider staff are trained in techniques for child-friendly and trauma-informed interviewing, ongoing assessment, observation, and treatment of the medical and behavioral health needs of UACs." This statement is inconsistent with my observations during my visits to ORR facilities.

29. According to the Final Rule, staff in ORR facilities are trained to identify children who have been smuggled or trafficked and there are policies and trainings involving the care of children. However, **most of the children I interviewed had a trauma condition which had been misdiagnosed and misinterpreted by staff as stemming from a conduct disorder or a choice made by the children.** In addition, I did not see any evidence-based treatments being utilized in the facilities I visited. A 17-year-old Guatemalan boy was labeled as cognitively challenged to the point that his mother would not be able to take care of him out of custody. However, when I talked to his mother over the phone, she indicated that her son did not have any cognitive problems but had become selectively mute after being kidnapped in his country of origin. She also noted that on the outside, he was receiving psychological services and that he only displayed self-injurious behaviors after being detained. During my assessment, the child did not describe any psychiatric symptoms that would require continued intensive supervision and treatment. In some of the records I read that staff described him as requiring "consequences" and as "not wanting" to control his own behavior, both statements being reflective of a lack of understanding regarding trauma.

30. Even if children obtained appropriate services at ORR facilities, separation and detention by themselves can be traumatizing and have long-lasting negative effects on children's physical and mental health.

I, Yenys Castillo, Ph.D., declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of August 2019, at Davie, Florida.



12 | Declaration of Dr. Yenys Castillo

Yenys Castillo, Ph.D.
Licensed Clinical Psychologist