JOSEPH H. HUNT
Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-3309
Fax: (202) 305-7000
Email: august.flentje@usdoj.gov
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel,
Office of Immigration Litigation
District Court Section

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | **DEFENDANTS' NOTICE OF TERMINATION OF *FLORES* SETTLEMENT AGREEMENT; AND MOTION IN THE ALTERNATIVE TO TERMINATE THE FLORES SETTLEMENT AGREEMENT** |
| v. | |
| WILLIAM P. BARR, Attorney General of the United States; *et al.*, | |
| Defendants. | |

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that the U.S. Department of Justice, the U.S. Department of Homeland Security (DHS) and the U.S. Department of Health and Human Services (HHS), by and through undersigned counsel, will bring this motion for hearing on September 27, 2019 or as soon thereafter as counsel may be heard, before United States District Judge Dolly M. Gee, in Courtroom 8C, 8th Floor, at the Los Angeles – 1st Street courthouse located within the Central District of California.

## COMPLIANCE WITH LOCAL RULE 7-3

This motion is made following telephonic meetings of counsel pursuant to L.R. 7-3, and paragraph 37 of the *Flores* Settlement Agreement ("Agreement"), which took place on August 22, 2019.

## NOTICE OF TERMINATION OF SETTLEMENT AGREEMENT

As set forth below, Defendants hereby give notice that the Agreement is terminated by its own terms as of October 7, 2019, which is forty-five days following the publication of final rules implementing the Agreement. Agreement ¶ 40. The Agreement is also terminated under the terms of the Homeland Security Act, 6 U.S.C. §§ 279(f)(2), 552(a)(1).

## MOTION TO TERMINATE SETTLEMENT AGREEMENT

In the alternative, if the Court determines that the Agreement does not terminate by its terms, DHS and HHS hereby move to terminate the Agreement under Federal Rules of Civil Procedure 60(b)(5) and (6). In light of the publication of regulations implementing the Agreement and the significant changes in circumstances since the Agreement was signed, the continuation of the Agreement is no longer possible, equitable, or in the public interest.

These motions are based upon the above Notice, the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this

action, and such other matters as may be presented to the Court at the time of the
hearing.

Dated: August 30, 2019              Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

*/s/ August E. Flentje*
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-3309
Fax: (202) 305-7000
Email: august.flentje@usdoj.gov

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section

*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ....................................................................................................1

II. BACKGROUND ...................................................................................................5

  A. THE ORIGINAL *FLORES* LITIGATION ....................................................5

  B. THE *FLORES* SETTLEMENT AGREEMENT ...........................................6

  C. RELEVANT *FLORES* LITIGATION HISTORY .........................................8

  D. PROCEDURAL HISTORY OF THE PRESENT FILING..........................10

  E. ISSUANCE OF REGULATIONS................................................................10

III.  ARGUMENT ...................................................................................................14

  A. THE AGREEMENT TERMINATES AFTER THE PROMULGATION OF REGULATIONS GOVERNING THE TREATMENT OF DETAINED MINORS....................................................................................................14

    1. The Regulations Set Out A Nationwide Policy For The Detention, Release, And Treatment Of Children And Implement The Relevant and Substantive Terms Of The Flores Settlement Agreement In Ensuring Minors Are Treated With Dignity, Respect, And Special Concern For Their Particular Vulnerability. ..................................................................15

    2. Plaintiffs' Motion to Enforce Included Minimal Objections to the Substantive Provisions of the Proposed Rule..........................................30

    3. The Agreement Expressly Incorporates APA Standards that Require the Consideration of Agency Expertise and Public Comments and Necessarily Prohibit any Preordained Outcome.....................................34

  B. PROMULGATION OF THE RULE TERMINATES THE AGREEMENT UNDER THE HSA......................................................................................41

  C. CONTINUED APPLICATION OF THE AGREEMENT IS NOT EQUITABLE OR IN THE PUBLIC INTEREST BECAUSE THE REGULATION PROVIDES A COMPREHENSIVE SCHEME GOVERNING THE CUSTODY OF ALIEN MINORS ...............................42

    1. Courts Must Be Flexible To Release Governmental Operations from Long Term Institutional Consent Decrees. ...............................................43

    2. Under These Standards The Public Interest Requires Termination of This Outdated Agreement in Institutional Litigation. ......................................47

D. THE PUBLIC INTEREST MILITATES TERMINATION GIVEN FLAWS
IN THE CERTIFIED CLASS ....................................................56

1. The Certified Class is Unwieldy And Not Cognizable Under Current
Standards. ....................................................................56

2. Other Flaws in the Class Further Justify Terminating the Agreement in
the Public Interest ..............................................................58

IV.  CONCLUSION ..........................................................................60

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Alliance To End Repression v City of Chicago*,
  742 F.2d 1007 (7th Cir. 1984).................................................................45

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ...........................................................................45

*Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*,
  627 F.2d 1151 (D.C. Cir. 1979) .........................................................39

*Bunikyte, ex rel. Bunikiene v. Chertoff*,
  No. A-07-CA-164-SS, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007).................22

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .................................................................. 35, 45

*Culbreath v. Dukakis*,
  695 F. Supp. 1350 (D. Mass. 1988) .....................................................50

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ....................................................... 58, 59

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................... 36, 39, 40

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ...........................................................................46

*Flores v. Barr*,
  No. 17-56297, 2019 WL 3820265 (9th Cir. Aug. 15, 2019) ................................9

*Flores v. Johnson*,
  212 F. Supp. 3d 864 (C.D. Cal. 2015).....................................................8

*Flores v. Lynch*,
  828 F.3d 898 (9th Cir. 2016) ........................................................ *passim*

*Flores v. Meese*,
  942 F.2d 1352 (9th Cir. 1991) ...............................................................6

*Flores v. Sessions*,
  862 F.3d 863 (9th Cir. 2017) ........................................................ *passim*

*Flores v. Sessions*,
  No. CV 85-4544-DMG (AGRx), 2018 WL 4945000 (C.D. Cal. July 9, 2018) ...26

*Frew ex rel. Frew v. Hawkins*,
  540 U.S.431 (2004) ...................................................................... 43, 45

*Hampton v. Mow Sun Wong*,
  426 U.S. 88 (1976) .............................................................................46

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ..................................................................45

*Heath v. De Courcy,*
  888 F.2d 1105 (6th Cir. 1989).............................................45

*Horne v. Flores,*
  557 U.S. 443 (2009) .................................................. *passim*

*In re Pearson,*
  990 F.2d 653 (1st Cir. 1993) ..............................................44

*Rufo v. Inmates of Suffolk Cty. Jail,*
  502 U.S. 367 (1992) ............................ 43, 44, 45, 47

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs,*
  *Enf't,* 319 F. Supp. 3d 491 (D.D.C. 2018) ..................27

*Jeff D. v. Otter,*
  643 F.3d 278 (9th Cir. 2011).............................................49

*Marlo v. UPS, Inc.,*
  639 F.3d 942 (9th Cir. 2011).............................................56

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ....................................... 46, 56, 59

*McGrath v. Potash,*
  199 F.2d 166 (D.C. Cir. 1952) ..........................................43

*Miller v. French,*
  530 U.S. 327 (2000) ...................................... 43, 44

*Money Store Inc. v. Harriscorp Finance Inc.,*
  885 F.2d 369 (7th Cir. 1989).............................................45

*Ms. L. v. U.S Immigration & Customs Enf't,*
  310 F. Supp. 3d 1133 (S.D. Cal. 2018) ................... 25, 27

*National Audubon Society v. Watt,*
  678 F.2d 299 (D.C. Cir. 1982) ..........................................45

*Nat'l Soft Drink Ass'n v. Block,*
  721 F.2d 1348 (D.C. Cir. 1983) ........................................38

*NLRB v. Wyman-Gordon Co.,*
  394 U.S. 759 (1969) ............................................................48

*Patterson v. Newpaper & Mail Deliverers' Union of New York & Vicinity,*
  13 F.3d 33 (2d Cir. 1993) ..................................................50

*Perez v. Mortg. Bankers Ass'n,*
  135 S. Ct. 1199 (2015) .......................................................35

*Reno v. Flores,*
  507 U.S. 292 (1993) .................................................. *passim*

iv

*Rodriguez v. West Publishing Corp.*,
  563 F.3d 948 (9th Cir. 2009) ............................................................. 56

*Rouser v. White*,
  825 F.3d 1076 (9th Cir. 2016) ........................................................... 49

*Sameena Inc. v. U.S. Air Force*,
  147 F.3d 1148 (9th Cir. 1998) ........................................................... 34

*Schall v. Martin*,
  467 U.S. 253 (1984) ......................................................................... 6

*Sys. Fed'n No. 91, Ry. Employees' Dep't, AFL-CIO v. Wright*,
  364 U.S. 642 (1961) .................................................................. 43, 44

*United States v. City of Miami*,
  2 F.3d 1497 (11th Cir. 1993) ....................................................... 49, 50

*United States v. Swift & Co.*,
  286 U.S. 106 (1932) ......................................................................... 44

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
  435 U.S. 519 (1978) ..................................................... 15, 17, 38

*Wal-Mart Stores, Inc., v. Dukes,
  et al.*, 564 U.S. 338 (2011) ....................................................... 57, 58

*Youngblood v. Dalzell*,
  925 F.2d 954 (6th Cir.1991) ............................................................. 49

## **STATUTES**

5 U.S.C. § 553 ........................................................... 35, 38, 39

5 U.S.C. § 553(b) .................................................................... 35

5 U.S.C. § 553(c) .................................................................... 35

5 U.S.C. § 701 ......................................................................... 35

5 U.S.C. § 706(A) .................................................................... 35

5 U.S.C. § 706(E) .................................................................... 35

6 U.S.C. § 279 ......................................................................... 18

6 U.S.C. § 279(a) ............................................................... 53, 58

6 U.S.C. § 279(b)(2) ................................................................ 18

6 U.S.C. § 552(a) .................................................................... 42

6 U.S.C. § 279 ......................................................................... 18

6 U.S.C. § 279(a) ............................................................... 53, 58

6 U.S.C. § 279(b)(1)(A) ................................................................... 54, 58

6 U.S.C. § 279(b)(1)(C) .........................................................................54

6 U.S.C. § 279(b)(1)(D) .........................................................................54

6 U.S.C. § 279(b)(2) ...............................................................................54

6 U.S.C. § 279(f)(2) ...........................................................................1, 42

6 U.S.C. § 279(g)(2) ...............................................................................58

6 U.S.C. § 542 .................................................................................. 53, 54

8 U.S.C. § 1225 ................................................................................ 13, 27

8 U.S.C. § 1229a ....................................................................................13

8 U.S.C. § 1232 ......................................................................................54

8 U.S.C. § 1232(a) .................................................................................19

8 U.S.C. § 1232(a)(5)(D) .......................................................................27

8 U.S.C. § 1232(b) .................................................................................19

8 U.S.C. § 1232(b)(1) ................................................................ 18, 27, 54

8 U.S.C. § 1232(b)(3) .............................................................................58

8 U.S.C. § 1232(c) .................................................................................18

8 U.S.C. § 1232(c)(2)(A) ............................................................... *passim*

8 U.S.C. § 1232(c)(3)(A) .......................................................................18

8 U.S.C. § 1252(a)(1) .............................................................................57

## LEGISLATIVE MATERIALS

Homeland Secuirty Act of 2002,
  Pub. L. No. 107-296, 116 Stat. 2135 (2002) ....................................9, 53

William Willberforce Trafficking Victims Protection Reauthorization Act of 2008
  Pub. L. No. 110-457, 122 Stat. 5044 (2008) ........................... 4,9, 11 54

## RULES

Fed. R. Civ. P. 17(c)(2) ..........................................................................59

Fed. R. Civ. P. 23(a)(2) ..........................................................................57

Fed. R. Civ. P. 60(b)(5) .......................................................................1, 43

Fed. R. Civ. P. 60(b)(6) ..........................................................................43

vi

# **REGULATIONS**

8 C.F.R. § 212.5(b)(3)(i) ................................................................ 12, 27, 30

8 C.F.R. § 236.3(a)(1) ...................................................................... 1, 11

8 C.F.R. § 236.3(b)(9) ........................................................................... 25

8 C.F.R. § 236.3(b)(11) ......................................................................... 31

8 C.F.R. § 236.3(e) ........................................................................ 33, 34

8 C.F.R. § 236.3(f)(3) ........................................................................... 19

8 C.F.R. § 236.3(f)(4)(i) ....................................................................... 20

8 C.F.R. § 236.3(g)(2) ............................................................ 11, 13, 20, 34

8 C.F.R. § 236.3(g)(2)(i) ....................................................................... 20

8 C.F.R. § 236.3(h) ............................................................................... 34

8 C.F.R. § 236.3(i) ................................................................................ 34

8 C.F.R. § 236.3(i)(2) ........................................................................... 13

8 C.F.R. §236.3(i)(3) ............................................................................ 24

8 C.F.R. § 236.3(i)(4) .................................................................... *passim*

8 C.F.R. § 236.3(i)(4)(iii)(H) ................................................................. 13

8 C.F.R. § 236.3(i)(4)(iv) ................................................................ 13,23

8 C.F.R. § 236.3(i)(4)(vii) ..................................................................... 23

8 C.F.R. § 236.3(i)(4)(xi) ...................................................................... 24

8 C.F.R. § 236.3(j) .......................................................................... 12, 13

8 C.F.R. § 236.3(j)(1) ........................................................................... 12

8 C.F.R. § 236.3(j)(4) ................................................................ 12, 26, 29, 31

8 C.F.R. § 236.3(j)(5)(i) ........................................................................ 27

8 C.F.R. § 236.3(m) ............................................................................. 13

8 C.F.R. § 236.3(o) .............................................................................. 20

8 C.F.R. § 1003.19 ............................................................................... 13

45 C.F.R. § 410.100 ............................................................................. 17

45 C.F.R. § 410.101 ............................................................................. 16

45 C.F.R. § 410.102 ..................................................................................11

45 C.F.R. § 410.102(d) ..........................................................................1, 11

45 C.F.R. § 410.201(c) .............................................................................17

45 C.F.R. § 410.201(f) .............................................................................12

45 C.F.R. § 410.202 ..................................................................................17

45 C.F.R. § 410.202(c) .............................................................................17

45 C.F.R. § 410.203 ..................................................................................17

45 C.F.R. § 410.203(a) ........................................................................ 17, 18

45 C.F.R. § 410.203(a)(5) .........................................................................32

45 C.F.R. § 410.203(b) .............................................................................18

45 C.F.R. § 410.203(c) .............................................................................18

45 C.F.R. § 410.203(d) .............................................................................32

45 C.F.R. § 410.301 ........................................................................... 11, 18

45 C.F.R. § 410.402 ...................................................................... 16,17, 38

45 C.F.R. § 410.810 .................................................................. 13, 18, 32, 34

45 C.F.R. § 410.810(a) .............................................................................19

## EXECUTIVE MATERIALS

Aliens Subject to a Bar on Entry Under Certain Presidential Procelemations;
  Procedures for Protection Claims, 83 Fed. Reg. 55,935 (Nov. 9, 2018)
  (codified at 8 C.F.R. pts. 1003 and 1208) ...........................................55

Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied
  Alien Children
  83 Fed. Reg. 4,5486 (Sept. 7, 2018)(to be codified at 45 C.F.R. pt 410) ............10

Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied
  Alien Children, 84 Fed. Reg. 44,392 (Aug. 23 2019)
  (to be codified at 45 C.F.R. pt. 410)......................................... *passim*

Detention and release of Juveniles
  53 Fed. Reg. 17,449, (May 17, 1988)(codified at 8 C.F.R. pts. 212 and 242) .......6

Exec. Order No 13841,Affording Congres an Opportunit to Address Family
  Separation, 83 Fed. Reg. 29,435 (June 20, 2018) ................................25

Processing, Detention, and Release of Juveniles,
  67 Fed. Reg. 1670 (Jan 14, 2002)(codified at 8 C.F.R. § 236)...........................36

Processing, Detention, and Release of Juveniles
    63 Fed. Reg. 39,759(July 24, 1998)(codified at 8 C.F.R. § 236)................. 14, 38

DHS Reorganization Plan Modification of January 30, 2003,
    H.R. Re Doc. No. 108-32 (2003) ...............................................................53

## **OTHER AUTHORITIES**

Gender, Law, and Detention Policy: Unexpected Effects on the Most Vulnerable
    Immigrants,
    25 Wis. J.L. Gender & Soc'y 301 (Fall 2010) ......................................54

*Fact Sheet* U.S. Department of Health and Human Services, Administration for
    Children and Families, Office of Refugee Resettlement, Unaccompanied Alien
    Children Program,
    https://www.acf.hhs.gov/sites/default/files/orr/unaccompaniedchildrensservicsfac
    tsheet.pdf (May 2014) ...................................................................................51

*Southwest Border Migration FY2019*, U.S. Customs and Border Protection
    https://www.cbp.gov/newsroom/stats/sw-border-migration ...............................55

Cindy Carcamo & Paloma Equivel, "At 'Freedom House,' a pattern of neglect,"
    Los Angeles Times, May 22, 2019, athttps://www.latimes.com/projects/la-me-
    immigrant-children-group-home-casa-libre-peter-schey ......................................60

Casa Libre: State officials step up enforcement against L.A. group home for
    migrant children
    Los Angeles Times, June 24 2019, https://www.latimes.com/local/lanow/la-me-
    casa-libre-enforcement-20190624-story.html ......................................................60

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF TERMINATION OF SETTLEMENT AGREEMENT; MOTION TO TERMINATE SETTLEMENT AGREEMENT; AND MOTION TO DECERTIFY CLASS**

## I.   INTRODUCTION

**A**.  The federal rules that were published on August 23, 2019 represent the culmination of more than 30 years of effort and experience in developing and implementing standards relating to the custody of children who are subject to the immigration laws of the United States.  These standards are designed to ensure due process for minors who are subject to immigration custody – the claim that formed the basis of this litigation – by providing standards of custody that are appropriate to the needs of children, enabling prompt unification of children with family members when children are apprehended alone, and creating regulatory standards for family residential centers (FRC) to allow children to remain with their parents in a protective environment when family units are apprehended together.  In sum, the final rule "sets out nationwide policy for the detention, release, and treatment of minors" to ensure that minors in the custody of HHS or DHS are treated "with dignity, respect and special concern for their particular vulnerability" as minors. Agreement ¶¶ 9, 11; 45 C.F.R. § 410.102(d); *see* 84 Fed. Reg. 44,392, 44,525, 44,531 (Aug. 23, 2019); 8 C.F.R. § 236.3(a)(1).

The new rules implement this basic purpose of the Flores Settlement Agreement and, by the terms of that Agreement, replace what was designed to be a temporary measure.  When the new rules go into effect on October 22, 2019, they will be the governing law for the treatment of children in immigration custody.  Most of the provisions of the new rules do not differ from the Flores Settlement Agreement—including, for example, the substantive provisions governing HHS custody of unaccompanied alien children as well as the provisions governing temporary U.S. Customs and Border Protection ("CBP") custody at the border. Indeed, in Plaintiffs' motion to enforce filed last year, beyond the provisions

governing families in custody together, they identified few if any substantive provisions of the proposed regulations with which they disagreed. *See* Mot. to Enforce at 12–16.

With respect to children accompanied by their parents or legal guardians—a situation entirely overlooked in the Agreement—the rules account for the greatly increased prevalence of families traveling to the border—and the key issues arising from that situation, including ensuring parents or legal guardians traveling with his or her children do not evade enforcement of the immigration laws and can remain with their children during immigration proceedings in a safe and appropriate custodial setting. The rule thus addresses the unique issues that are raised when releasing a minor in these circumstances. Where there are new provisions, changes from, or elaboration on provisions of the Agreement—like the provisions addressing family units—they are properly explained under the standards provided by the Administrative Procedure Act (APA) and serve the basic purpose of the Agreement to "set[] out nationwide policy for the detention, release, and treatment of minors" and to treat minors "with dignity, respect, and special concern for their particular vulnerability." All these provisions therefore properly implement the Agreement, resulting in termination of the Agreement by its own terms.

The parties agreed the Agreement would terminate upon the conclusion of this rulemaking process under the APA. The Agreement was intended only as a temporary measure until rules could be promulgated, and as the Ninth Circuit recently explained, the Agreement "would remain in effect until '45 days following defendants' publication of final regulations' governing the treatment of detained minors." *Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017). It was obvious at the time, as it is today, that the final rules would not and could not simply parrot the terms of the Agreement—instead, they would implement the Agreement's fundamental goal of setting out a policy for the detention, release, and treatment of minors that treats minors with special concern, while taking into account the

experience of the agencies in administering the Agreement, current operational circumstances, intervening law, and comment from the public.

By specifying that the Agreement would terminate upon the "publication of final regulations," the parties implicitly acknowledged that such termination would occur based on rules that differed from the Agreement in light of such considerations. This was class counsels' stated understanding at the time of stipulation and has remained so to this day—in 2003, class counsel stated that final rules must be "based on [the agency's] own experience," and in 2018, class counsel explained that some provisions were "out of date and must be revised to reflect operational realities." Class Counsel Comments at 14 (2018); Flores Class Counsel ORR Working Paper (Jan. 14, 2003). In fact, a settlement that provided for the issuance of rules without regard to considerations required under the APA would violate the APA and impermissibly bind federal action in perpetuity. Following the regulatory process that the parties agreed to, the government has now published rules that effectuate the central purpose of the Agreement: they "set[] out nationwide policy for the detention, release, and treatment of minors," and ensure minors are treated "with dignity, respect, and special concern for their particular vulnerability as minors." Agreement ¶¶ 9, 11. Publication of the regulation thus terminates what was designed to be a temporary measure until the rules could be issued.

**B**. It is a testament to the Agreement that after more than 20 years and a notice and comment process, the final regulation does not differ from the standards of the Agreement. As mentioned, other than the family residential center provisions, Plaintiffs identified very few substantive provisions of the proposed rule raising concerns in their Motion to Enforce filed last year. The substantive provisions governing the treatment of unaccompanied alien children (UAC) by HHS and DHS are taken verbatim from the Agreement—including, for example, the standard of care in facilities, the requirements for licensed programs, and the requirement of prompt transfer to licensed programs and release to a parent or other caregiver. The

primary change with respect to custody of UACs is procedural—namely, a hearing procedure for determining whether an unaccompanied minor presents a risk of danger to the community or a risk of flight that is under the auspices of HHS rather than the Department of Justice.  But that procedure includes the same regulatory protections of an immigration bond hearing while reflecting Congress's assignment to HHS of the custodial role over UACs.  The standards of care and transfer requirements for all minors—both unaccompanied and accompanied—in DHS custody—including by CBP and U.S. Immigration and Customs Enforcement (ICE)—also parallel those in the Agreement without substantial change.  The rule also incorporates relevant provisions of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), which was enacted subsequent to the implementation of the Agreement.

The only significant additions to or differences from the provisions of the Agreement arise with respect to custody of family units—minors who are apprehended and held in custody with a parent or legal guardian.  As the Ninth Circuit has explained, the complex issues that arise in this circumstance were not contemplated or addressed by the parties in drafting the Agreement.  *Flores v. Lynch*, 828 F.3d 898, 906–07 (9th Cir. 2016).  Yet the number of family members arriving together at the border has exploded—from a rare event in 1997; to under 15,000 in 2013; to around 400,000 so far this fiscal year.

Recognizing the significant interests at stake when a family unit is subject to immigration enforcement, the rule addresses this regulatory void and accounts for the interests at stake in these circumstances.  First, the rule accounts for the needs of the child by creating a custodial regime at non-secure family facilities that provides all the protections set out in the Agreement and a licensing system that allows for licensing by a state or, if unavailable, by the federal government with independent third-party auditing.  Second, the rule accounts for the needs of families by reducing barriers to family custody during the pendency of immigration proceedings.  Third,

the rule accounts for the important immigration enforcement interests of the United States by providing a regime where—if detention is authorized or required by statute and needed to avoid significant loopholes in the enforcement regime at the border— the family can remain together under conditions that are sensitive to the interests of the minor.  Fourth, the rules provide appropriate avenues for prompt release of minors:  either through process that look at flight risk and danger through bond or a revised parole regulation that parallels the standard of the Flores Settlement Agreement, or by permitting DHS to consider release of the minor to an alternate caregiver, when appropriate.  Thus, the rule reasonably addresses a significant gap in the Agreement concerning accompanied children in a manner consistent with the goals of the Agreement and informed by present circumstances.

Because the final rule is consistent with the relevant terms of the Agreement, complies with law enacted subsequent to its execution, reflects the latest conditions relating to alien children in the United States, and properly addresses comments and current circumstances in accordance with the APA, the Court should deny Plaintiffs' motion to enforce and confirm that the Agreement has terminated by its own terms.

## II.   BACKGROUND

### A.   The Original *Flores* Litigation

This case began on July 11, 1985.  Compl., ECF No. 1.  Plaintiffs brought their action on behalf of a class, later certified by the court, consisting of all aliens under the age of 18 who are detained by the INS Western Region because "a parent or legal guardian fails to personally appear to take custody of them."  *Reno v. Flores*, 507 U.S. 292, 296 (1993).  Plaintiffs brought seven claims (*id.*) challenging legacy INS's "policies, practices, and regulations regarding the detention and release of unaccompanied [alien] minors."  Agreement at 1.  The first two claims challenged— on constitutional, statutory, and international-law grounds—the INS Western Region policy concerning the detention and release of minor aliens; the remaining five claims challenged conditions of detention.  *See Flores*, 507 U.S. at 296–97.  The

parties entered into a settlement of on the detention conditions claims, and INS published a rule on May 17, 1988, governing the release of alien juveniles. *See* 53 Fed. Reg. 17449. Plaintiffs challenged that rule, and the district court invalidated it in part on substantive due process grounds, and the Ninth Circuit affirmed. *See Flores v. Meese*, 942 F.2d 1352, 1365 (9th Cir. 1991).

The Supreme Court then reversed the Ninth Circuit. *Flores*, 507 U.S. at 315. The Supreme Court rejected Plaintiffs' substantive-due-process claim, noting that "'juveniles, unlike adults, are always in some form of custody,'" "and where the custody of the parent or legal guardian fails, the government may . . . either exercise custody itself or appoint someone else to do so." 507 U.S. at 302 (quoting *Schall v. Martin*, 467 U.S. 253, 265 (1984)). The Supreme Court held that where a child has come within the Federal Government's control, "[m]inimum standards must be met, and the child's fundamental rights must not be impaired; but the decision to go beyond those requirements . . . is a policy judgment rather than a constitutional imperative." *Id.* at 304–05. The Supreme Court concluded that "[w]here a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution." *Id.* at 303. Consequently, the Supreme Court determined the new rule was a "reasonable response to the difficult problems presented when the Service arrests unaccompanied alien juveniles" and held, on its face, "INS regulation 242.24 accords with both the Constitution and the relevant statute." *Id.* at 315.

**B.      The *Flores* Settlement Agreement**

On remand, the parties entered into a settlement agreement to resolve the case. The Agreement was subjected to a highly streamlined approval process, which did not include a fairness hearing. Instead, it involved the posting of notices at a variety of facilities that instructed children "who object [to] . . . file a statement setting out their objections with the federal court" within 30 days. Class Notice at 1. Other

than providing the court's address, the notice provided the minors no other information regarding how objections might be developed or submitted. *Id.* There was also no procedure to evaluate the propriety of the settlement class that was certified in the settlement – comprising "all minors who are detained in the legal custody of the INS." *Id.* The Agreement defined "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS," other than emancipated minors or minors incarcerated due to a criminal conviction as an adult. Agreement ¶ 4. The district court approved this procedure on January 28, 1997, and the Agreement apparently became operative thirty days later, given that no objections were filed within the allotted period. *See id.* ¶ 9.

The stated purpose of the Agreement was to establish a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." Agreement ¶ 9. The Agreement addresses the custody of minors at all stages, starting with custody immediately following apprehension. *Id.* ¶ 12. Specifically, Paragraph 12 of the Agreement provides that minors will be expeditiously processed and provided a notice of rights, including the right to a bond redetermination hearing if applicable. *Id.* Following arrest, the INS shall hold minors in facilities that are "safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." *Id.* The Agreement states the INS will promptly transfer minors either under set timelines or, in the case of an influx, "as expeditiously as possible." *Id.* ¶ 12.A.3. "Influx" is defined as "those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program." *Id.* ¶ 12.B, Ex. 3.

The Agreement further addresses the procedures and practices governing the former INS's discretionary decisions to release or detain unaccompanied minors, and to whom they may be released. *See* Agreement ¶¶ 14–18 (describing the general framework for release of unaccompanied minors and announcing a "general policy favoring release"). Concerning minors who remain in the custody of the INS, the

Agreement requires (with certain exceptions) placement in a licensed program and provides guidelines for the conditions that must exist in such licensed programs. *Id.* ¶¶ 19–24, Ex. 1. Nowhere does the Agreement specify criteria for programs or conditions governing custody of family units.

The Agreement affords that "the court shall retain jurisdiction over this action." Agreement ¶ 35. The Agreement, however, was originally set to expire at the latest, within five years, and even earlier upon a determination by the Court that the INS was in substantial compliance. *Id.* ¶ 40. On December 7, 2001, the parties amended paragraph 40 to provide for a termination date of "45 days following defendants' publication of final regulations implementing this Agreement." Stipulation, Dec. 7, 2001, ECF No. 101.

### C.   Relevant *Flores* Litigation History

Since the Agreement took effect, there has been significant litigation over its terms and requirements. Most of that litigation has arisen from Plaintiffs' motions to enforce the Agreement.

Some litigation has focused on how to handle a rising influx of minors apprehended with their parents. On July 24, 2015, this Court ruled, among other things, that the Agreement applies to alien minors accompanied by their parents or legal guardians and that housing family units in what was referred to as "secure" and non-licensed family residential centers (FRCs) violated the Agreement. *Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015). In an August 2015 remedial order, this Court acknowledged a migration "surge" constitutes an "influx" under the Agreement, because the government had "more than 130 minors eligible for placement in a licensed program." *Id.* at 914. Accordingly, the Court found DHS' practice of temporarily holding accompanied minors in its family residential centers, even if those facilities were not "licensed" and "non-secure," was within the parameters of paragraph 12(A) of the Agreement. *Id.* at 914.

On appeal, the Ninth Circuit affirmed this Court's holding that the Agreement applies to accompanied minors but reversed the district court's determination that the Agreement required the release of accompanying parents. *Flores v. Lynch*, 828 F.3d 898, 907-09 (9th Cir. 2016).   In holding that the Agreement created no affirmative rights for parents, the Ninth Circuit noted that parents were not plaintiffs in the *Flores* action, nor are they members of the certified classes. *Id.* at 909.

Recently, the Ninth Circuit reviewed the June 27, 2017, decision of this Court granting Plaintiffs' motion to enforce concerning violation of the Agreement regarding detention conditions at Border Patrol stations in the Rio Grande Valley Sector, and the detention of minors in secure, unlicensed facilities. *Flores v. Barr*, No. 17-56297, 2019 WL 3820265, at *3 (9th Cir. Aug. 15, 2019).  The Ninth Circuit dismissed the appeal for lack of jurisdiction, leaving in place this Court's order.

A Monitor has been appointed to monitor Defendants' compliance with this Court's orders.  The Monitor has reviewed conditions at various facilities and been referred various issues in dispute between the parties.  Notably, the recent Monitor's report, filed August 19, 2019, acknowledged that the significant increase in the number of UACs and family units crossing the border and presenting themselves to CBP over the last year "is well known and has been dramatic." ECF No. 625-1 at 7, *see id.* at 1.

The Homeland Security Act of 2002 (HSA) and TVPRA also prompted this Court's involvement.  In a decision affirmed by the Ninth Circuit in *Flores v. Sessions*, 862 F.3d 863, 870 (9th Cir. 2017), this Court held that the statutes superseded portions of the Agreement, in that only HHS could determine the suitability of a UAC's sponsor.  Nevertheless, this Court reasoned that if Congress had intended to terminate the Agreement in whole or in part through passage of the HSA or TVPRA, it would have said so specifically.  This Court, also, found that UACs in HHS custody had a right to a bond hearing before an immigration judge to challenge any findings of flight risk or dangerousness.  *Id.* at 875, 880–81.  In

affirming this Court's decision, however, the Ninth Circuit acknowledged that determinations made at these bond hearings could not compel a child's release, because "a minor may not be released unless the agency charged with his or her care identifies a safe and appropriate placement." *Id.* at 868.

## D. Procedural History of the Present Filing

On September 7, 2018, DHS and HHS issued a notice of proposed rulemaking, *Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children*, to implement the Agreement. *See* 83 Fed. Reg. 45,486 (Sept. 7, 2018). The proposed rule resulted in the submission of over 100,000 comments to the relevant agencies. *See* https://www.regulations.gov/document?D=ICEB-2018-0002-0001.

During the comment period, on November 2, 2018, Plaintiffs filed a motion to enforce, asking this Court to enjoin the government from implementing final regulations. ECF No. 516. On November 21, 2018, the Court deferred ruling on Plaintiffs' motion until publication of a final rule. ECF No. 525. The Court directed that upon issuing the final rule, Defendants shall "forthwith file a notice to that effect" and the parties shall file simultaneous supplemental briefing addressing whether the rule is consistent with the terms of the Agreement. *Id.*

## E. Issuance of Regulations

On August 23, 2019, DHS and HHS published the final rule implementing the Agreement. *See* 84 Fed. Reg. 44,392 (Aug. 23, 2019). The key provisions of the final rule address the comprehensive and multi-faceted obligations and responsibilities that arise with respect to immigration custody and release of children at multiple federal agencies, consistent with governing law; the current circumstances on the ground; and, the main substantive provisions of the Agreement. Specifically, the rule includes provisions that parallel the Agreement's bedrock protections regarding placement and release following apprehension of UACs. These principles are also embodied in provisions addressing the custody of minors

apprehended with parents or legal guardians (*i.e.*, accompanied minors or non-UACs)—a topic not addressed by the Agreement. The stated purpose of the Agreement was to establish a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." Agreement ¶ 9. The regulation does exactly that, in a reasonable manner informed by changes in law and facts that have occurred since 1997.

As a threshold matter, the rule adopts the Agreement's commitment to treat all children in government custody with dignity, respect, and special concern for their particular vulnerability as minors. Agreement ¶ 11; *see* 84 Fed. Reg. 44,392, 44,525, 44,531 (Aug. 23, 2019). 45 C.F.R. § 410.102; 8 C.F.R. § 236.3(a)(1). To that end, the rule requires each detained minor be placed in the least restrictive setting appropriate for their age and special needs. Agreement ¶ 11; 45 C.F.R. § 410.102; 8 C.F.R. § 236.3(g)(2), (i); *see* 84 Fed. Reg. at 44,527. The rule further addresses the custody of all minors immediately following apprehension by mandating, consistent with the Agreement, that minors receive notice of rights and are placed in facilities that are safe and sanitary and which provide access to toilets and sinks, drinking water and food, medical assistance for emergencies, adequate temperature control and ventilation, and adequate supervision to protect minors from others. *Compare* 8 C.F.R. § 236.3(g)(2) *with* Agreement ¶ 12.A; *see also* 45 C.F.R. § 410.102(d).

The rule fundamentally parallels the Agreement's procedures and practices governing decisions to release or detain minors, and to whom they should or may be released. *See* Agreement ¶¶ 14–18 (describing the general framework for release of unaccompanied minors from INS custody and the procedures and priorities for release). For unaccompanied minors, release is governed by the relevant provisions of the TVPRA, which is incorporated into the rule. *See* 45 C.F.R. § 410.301. For accompanied minors, the rule implements this portion of the Agreement by adopting the general release provision in paragraph 14, provided that any decision to release

must follow a determination that such release is permitted by law, including a revised parole standard that parallels the paragraph 14 standard. *Compare* 8 C.F.R. § 236.3(j), *with* Agreement ¶ 14. The revised parole standard—in response to comments including from Plaintiffs—makes plain that, for those accompanied minors in expedited removal who have established a credible fear (as well as arriving alien minors placed into proceedings under section 240 of the Immigration and Nationality Act (INA)), parole will generally serve an urgent humanitarian reason warranting release on parole if DHS determines that detention is not required to secure the minor's timely appearance before DHS or the immigration court, or to ensure the minor's safety and well-being or the safety of others. This standard mirrors that in, and is derived from, Paragraph 14. *See* 8 C.F.R. § 236.3(j)(4). The regulation also permits release of accompanied minors, in DHS discretion, to adult relatives other than parents, including siblings, aunts, uncles, or grandparents. *See* 8 C.F.R. §§ 212.5(b)(3)(i) and 236.3(j). Likewise, the rule embraces the Agreement's terms requiring the government to make and record its prompt and continuous efforts toward family reunification and release of minors. *Compare* 8 C.F.R. § 236.3(j)(1) *and* 45 C.F.R. 410.201(f) *with* Agreement ¶ 18. Thus, the rule implements the Agreement's procedures governing decisions to release or detain minors.

The rule similarly parallels salient portions of the in specifying what to do when an accompanied minor remains in DHS custody. *See* Agreement ¶¶ 19, 21–24.A; 8 C.F.R. § 236.3(i)(4)(i–xv). This includes standards with which licensed facilities where such minors are held must comply that are directly incorporated from Exhibit 1 to the Agreement. *Compare* 8 U.S.C. § 236.3(i)(4)(i–xv) *with* Agreement Exhibit 1. Specifically, under the rule, licensed facilities must meet a minimum of 15 categories of needs, including: (i) proper physical care and maintenance, including suitable living accommodations, food and snacks, appropriate clothing, and personal grooming items; (ii) appropriate routine medical and dental care, family

planning services, and emergency health care services (including screening for infectious disease), within 48 hours of admission; and (iii) an individualized needs assessment including a family history and mental health assessment. *Id.* § 236.3(i)(4)(i–iii). Further, compared with Exhibit 1 of the Agreement, the regulation contains a slightly broadened educational services description and adds that program design should be appropriate for length of stay. *Id.* § 236.3(i)(4)(iv). Sensibly, these standards do not include "family reunification services," since accompanied minors are already with their parent or legal guardian. *See id.* § 236.3(i)(4)(iii)(H). Instead, the regulation more suitably provides for communication with adult relatives in the United States and internationally. *Id.* Finally, as in the Agreement, the rule provides for the least restrictive placement of minors available and appropriate. *Compare* 8 C.F.R. § 236.3(g)(2), (i)(2) *with* Agreement ¶ 23.

The rule also implements provisions of the Agreement requiring that minors in removal proceedings be provided with bond redetermination hearings in accordance with applicable federal law. *Compare* 8 C.F.R. § 236.3(m) *with* Agreement ¶ 24.A; *see also* 45 C.F.R. § 410.810. Specifically, the regulation at section 236.3(m) provides review of DHS bond determinations by immigration judges to the extent permitted by 8 C.F.R. § 1003.19, for minors who are: (1) in removal proceedings under INA § 240, 8 U.S.C. § 1229a; and (2) in DHS custody. Pursuant to INA Section 235, 8 U.S.C. § 1225, however, bond is not provided to accompanied minors who are subject to expedited removal procedures. *See id.* Instead, as we have explained, the parole standard is revised to parallel Paragraph 14 of the Agreement. 8 C.F.R. § 236.3(j). Like the bond hearing provisions, the HHS regulations at 45 C.F.R. § 410.810 provide for hearings where unaccompanied minors may make bond-like challenges to HHS custody, while also recognizing the HHS assumption of all custody of unaccompanied minors after Congress enacted the TVPRA.

## III.   ARGUMENT

### A.   The Agreement Terminates After the Promulgation of Regulations Governing the Treatment of Detained Minors

The parties unequivocally contracted that the Agreement would terminate upon issuance of implementing regulations using an APA rulemaking process. Agreement ¶ 40; Stipulation (Dec. 12, 2001), ECF No. 13 (providing a termination date of "45 days following defendants' publication of final regulations implementing this Agreement."). The parties acted against the backdrop of APA rulemaking standards, and thus did not specify any process for evaluation of those implementing regulations even though both Plaintiffs and Defendants agreed the regulations should not and would not replicate the terms of the Agreement in every respect. Indeed, the proposed rule issued in 1998—63 Fed. Reg. 39,759—was far less protective than the new Rule, yet the parties understood that proposal to be implementing the Agreement and to be subject notice and comment procedures. The most appropriate way to apply the termination provision is to consider the Agreement terminated upon the issuance of regulations that, as the Ninth Circuit explained, "govern the treatment of detained minors." *Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017). This is because the Agreement "was intended as a temporary measure" and "the parties stipulated that it would remain in effect'" only until the promulgation of those regulations "governing the treatment of detained minors." *Id.*

Accordingly, so long as those regulations implement the central purposes of the Agreement—to "set[] out a nationwide policy for the detention, release, and treatment of minors" that treats minors in custody "with dignity, respect, and special concern for their particular vulnerability," Agreement ¶¶ 9, 11,—the Agreement terminates. The new regulations may then be subject to judicial review to the extent otherwise provided for by the INA and the APA by affected minors who would be subject to the new rules. To the extent this Court conducts a substantive review of the new regulations in this proceeding, they should be reviewed under the standard

14

of review in the APA, which Plaintiffs necessarily agreed to in agreeing to terminate the Agreement upon conclusion of an APA rulemaking process. Any other standard would violate the APA, create additional procedures for rulemaking in violation of *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978), and would provide no viable governing rule for decision. Finally, to the extent the Court believes further litigation over specific issues addressed by the Rule is warranted, it should agree the Agreement is terminated except as to those specific issues.

> **1.    The Regulations Set Out A Nationwide Policy For The Detention, Release, And Treatment Of Children And Implement The Relevant and Substantive Terms Of The Flores Settlement Agreement In Ensuring Minors Are Treated With Dignity, Respect, And Special Concern For Their Particular Vulnerability.**

The final rule implements the Agreement for purposes of its termination provision. It is validation of the Agreement that after over 20 years and an extensive notice and public comment process, those relevant and substantive terms of the agreement are reflected, without substantial change, in parallel provisions of the final rules.

With respect to unaccompanied alien children, the regulation provides standards of care and custody that are identical to the standards set forth in the Agreement, while incorporating the relevant substantive provisions of the TVPRA. Specifically, the regulations contain provisions regarding transfer and release of unaccompanied minors (including the more stringent transfer timeline from the TVPRA) that are unchanged from the Agreement. The same is true for the standard of care in facilities housing unaccompanied minors, the requirements for licensed programs for unaccompanied minors, and the rules for promptly transferring those minors to licensed programs and releasing them to a parent or other caregiver. The only change with respect to custody over unaccompanied minors is procedural—

namely, a hearing procedure under the auspices of HHS rather than the Department of Justice—and reflects Congress's assignment to HHS of the custodial role over unaccompanied minors.

The standards of care and transfer requirements for unaccompanied minors in DHS custody—including by CBP and ICE—are also drawn from the Agreement without substantial change.

With respect to accompanied minors in DHS custody, the regulations fill in key gaps that were never addressed by the Agreement. The rule provides for the licensing of facilities where family units can be held in custody together—filling a key gap in the agreement that this Court and the Ninth Circuit have recognized. The rule recognizes the interest in family unity for parents or legal guardians traveling with their children that were not reflected in the original Agreement, but have been recognized since that time as family migration numbers have exploded. And the rule sets out circumstances under which family units or children in family units may be released from custody through bond or parole in a manner that parallels Agreement ¶ 14. It also provides authority under which children in family units may be released to another relative identified by a parent and determined to be appropriate in the discretion of DHS.

### a.   HHS Custody of Unaccompanied Minors

The provisions of the rule related to HHS and its custodial role with respect to unaccompanied minors are substantively identical to the Agreement. They adhere to the Agreement and statutory enactments establishing procedures for the processing, care, custody, and release of UACs who by law are subject to the care and custody of the Office of Refugee Resettlement (ORR). With respect to placement into a licensed program, section 410.101 defines a "licensed program" and requires that it meet the standards set forth in section 410.402. Both the definition of "licensed program" and the standards that it must meet are fully

16

consistent with paragraph 6 and Exhibit 1 of the Agreement.[1]  Section 410.202 states that ORR places a UAC into a non-secure, licensed program promptly after a UAC is transferred to ORR custody, except in certain enumerated circumstances.  45 C.F.R. § 410.202; *see also* 8 U.S.C. § 1232(c)(2)(A).  The provision is fully consistent with the Agreement.  *See* Agreement ¶ 12.  The exceptions to such placements are also entirely consistent with the Agreement.  *See* 45 C.F.R. § 410.202(c) (placing minors in licensed programs as expeditiously as possible during influx); 45 C.F.R. § 410.202 (addressing placement in a secure facility pursuant to a court decree or court-approved settlement).

Likewise, section 410.203 sets forth criteria for placing UACs in secure facilities that are entirely consistent with the Agreement's criteria and, indeed, are more protective than the Agreement given intervening changes in the law.[2]  The regulation does not include "escape risk" as a consideration for making a secure placement, even though the Agreement allowed escape risk to be considered. *Compare* 45 C.F.R. § 410.203 *with* Agreement ¶ 21.  The change derives from the TVPRA, which specifies that an unaccompanied child "shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense."  8 U.S.C. § 1232(c)(2)(A).  The rule does not provide examples of behaviors or offenses that may result in secure placement, in favor of a circumstance-specific review and approval procedure, consistent with the Agreement.  *Compare* 45 C.F.R. § 410.203(a) *with* Agreement ¶ 21.  A "Federal Field Specialist" reviews and

---

[1] Paragraph 6 of the Flores Settlement Agreement, defining a "licensed program," also contains a requirement that reasonable efforts be made to provide licensed placements in geographical areas where the majority of minors are apprehended. This language is found in the final rule at 45 C.F.R. § 410.201(c).

[2] A "secure facility" is "a State or county juvenile detention facility or a secure ORR detention facility, or a facility with an ORR contract or cooperative agreement having separate accommodations for minors."  45 C.F.R. § 410.100.  A secure facility does not need to meet the requirements of section 410.402.  *Id.*

approves placements in secure facilities.  45 C.F.R. § 410.203(b).  The Agreement assigned this review and approval task to a "regional juvenile coordinator," Agreement ¶ 23, but this is a position that exists only at DHS (and that previously existed within INS).  An ORR "Federal Field Specialist" is functionally equivalent to a "regional juvenile coordinator."  Additionally, and as an added protection, consistent with the TVPRA, 8 U.S.C. § 1232(c)(2)(A), the rule provides that ORR will review the placement of a UAC in a secure facility at least monthly to determine whether a new level of care is more appropriate.  45 C.F.R. § 410.203(c).

Finally, pursuant to section 410.301, ORR releases a UAC to a sponsor without unnecessary delay when ORR determines that continued custody is not required either to secure the UAC's timely appearance before DHS or the immigration courts, or to ensure the UAC's safety or the safety of others.  This is identical to paragraph 14 of the Agreement.  Section 410.301 also contains the list of individuals (and entities) to whom ORR releases a UAC.  The list follows the order of preference set out in the Agreement at paragraph 14.

Concerning what has been referred to as bond hearing procedures to consider flight risk and danger, the rules provide the substantive protections of paragraph 24 of the Agreement, while recognizing that unaccompanied minors are no longer charged any "bond" whatsoever in order to be released to a suitable sponsor, unaccompanied minors may not be released on their own recognizance, and ORR must determine a sponsor is suitable prior to release.  *See* 6 U.S.C. § 279(b)(2), (b)(4); 8 U.S.C. § 1232(c)(3)(A).  The rules reasonably reallocate responsibility for these hearings for minors in ORR care to HHS.  45 C.F.R. § 410.810.  In the HSA and TVPRA, Congress provided for HHS to be responsible for the custody and placement of UACs.  6 U.S.C. § 279; 8 U.S.C. § 1232(b)(1), (c).  The TVPRA imposed detailed requirements governing ORR's release of UACs to proposed custodians—including a provision authorizing ORR to consider a UAC's dangerousness and risk of flight in making placement decisions. *Id.* § 1232(c)(2)(A).

18

Consistent with the TVPRA, bond determinations for UACs in ORR custody will be made by an independent HHS hearing officer. 45 C.F.R. § 410.810(a). This process parallels the process described in the Agreement because, under both the rule and the Agreement, the individual who presides over the hearing resides within the same agency as the organization charged with custody of the UAC. Thus, the rule provides for the level of independence in the hearing process contemplated by the Agreement. These rules address the concerns identified by the Ninth Circuit in litigation over this issue. *See Flores*, 862 F.3d at 878 (noting that in contrast with the recently published rule, the then-existing ORR procedures were "governed by a manual" and did not include various procedural protections). Thus, provisions related to HHS bond hearings fully adopt the Agreement and statutory enactments.

> b. <u>Initial DHS Custody of Accompanied and Unaccompanied Minors.</u>

The rule implements existing Flores Settlement Agreement provisions related to DHS apprehension of minors—accompanied and unaccompanied—without material change. CBP frequently is frequently responsible for custodial care of a minor following apprehension and prior to transfer to ICE (if accompanied) or HHS (if unaccompanied). ICE also is responsible for temporary care of an unaccompanied minor apprehended in the interior. During this initial period, the transfer timeframe of the Agreement for UACs has been accelerated due to the intervening enactment of the TVPRA, requiring a transfer to HHS within 72 hours of determining that the alien is a UAC, absent certain specified circumstances. 8 U.S.C. § 1232(a), (b). That requirement is incorporated into the new rules. *See* 8 C.F.R. § 236.3(f)(3). The rules regarding transportation and detention of minors with unrelated adults also present no substantive change from the Agreement. *See* 8 C.F.R. § 236.3(f)(4)(i); 8 C.F.R. § 236.3(g)(2)(i).

With respect to the conditions of custody upon initial apprehension, section 236.3(g)(2) parallels the requirements in paragraphs 11 and 12.A of the

Agreement.  For instance, section (g)(2) continues to require that minors be held in the least restrictive setting appropriate for their age and special needs, consistent with applicable law.  Additionally, section (g)(2), like the Agreement's provisions governing initial custody, requires that minors be housed in facilities that are safe and sanitary, and that the facilities provide access to toilets and sinks, drinking water and food as appropriate, access to emergency medical assistance as needed, and adequate temperature and ventilation.  The preamble explains that CBP generally provides basic hygiene items and clean bedding, and makes reasonable efforts to provide showers to minors when they are approaching 48 hours in custody.  84 Fed. Reg. at 44,430.  Accordingly, the rule implements the substantive provisions related to DHS under the Agreement verbatim.

Further, in order to provide ongoing oversight and monitoring of conditions at CBP facilities, and in response to comments on the proposed rule, the final regulation clarifies the proposed role of Juvenile Coordinators.  *See* 84 Fed. Reg. at 44,409 (clarifying that the role of Juvenile Coordinator includes both "collect[ing] statistics" and "monitor[ing] compliance with the terms of the regulations").  This fully incorporates the role set out in Paragraph 28A of the Agreement.  The formal functions of the Juvenile Coordinators are set forth in section 236.3(o) of the final regulation, requiring CBP and ICE each to identify a Juvenile Coordinator for the purpose of monitoring statistics about UACs and minors who remain in DHS custody for longer than 72 hours, and to monitor compliance with the terms of the regulations.  The statistical information collected pursuant to this provision may include, but would not be limited to, biographical information, dates of custody, placement, transfers, removals, or releases from custody.  The Juvenile Coordinators may collect such data, if appropriate, and may also review additional data points should they deem it appropriate given operational changes and other considerations. The Juvenile Coordinator will also "monitor compliance (including for instance,

conducting facility visits, reviewing agency policies and procedures, or interviewing employees and/or detainees)."  84 Fed. Reg. at 44,450.[3]

### c.   Provisions Relating to Accompanied Minors

The custody and care of family units was not addressed by the parties in the Flores Settlement Agreement, and is subject to new regulatory provisions specifically designed to address those circumstances.  As the Court knows, there has been significant litigation over whether the Agreement applies to minors who are accompanied by a parent or legal guardian when apprehended.  The United States maintains its position for purposes of these proceedings that the Agreement does not apply to accompanied minors, and that the rule's provisions relating to accompanied minors are therefore not governed by the Agreement's termination provision.  In any event, even if the Agreement applies to these minors, court decisions and years of recent litigation have shown that the Agreement did not specifically, thoughtfully, or comprehensively address the complex issues that arise when a child is apprehended with a parent or legal guardian.  The rule attempts to address these circumstances in detail and, in doing so, fully comports with any possible review standard this Court might employ.

As a threshold matter, the Agreement is of limited assistance in evaluating the rule's provisions related to detention of accompanied minors, *i.e.*, children who are encountered with a parent or legal guardian.  As noted by the Ninth Circuit, "the

---

[3] Currently, CBP's Juvenile Coordinator conducts regular visits to CBP facilities to monitor compliance with the Agreement and with CBP policy related to the treatment of minors and UACs in CBP custody (including determining whether facilities are safe and sanitary and whether minors and UACs have access to adequate food and water).  *See* 84 Fed. Reg. at 44,431.  The Juvenile Coordinator also conducts reviews of juvenile custodial records as part of this monitoring role.  *Id.*  CBP also has juvenile coordinators in its field offices and sectors, who are responsible for managing all policies on the processing of juveniles within CBP facilities, coordinating within CBP and across DHS components to ensure the expeditious placement and transport of juveniles placed into removal proceedings by CBP, and informing CBP operational offices of any policy update.  *Id.*

Settlement does not address the potentially complex issues involving the housing of family units and the scope of parental rights for adults apprehended with their children." *Flores*, 828 F.3d at 906–07.  For example, Exhibit 1 of the Agreement, which sets forth requirements for licensed programs, "does not contain standards related to the detention of adults or family units." *Id.* at 906.  Indeed, the Ninth Circuit explained that the "parties gave inadequate attention to some potential problems of accompanied minors," and we have seen those problems play out in litigation over the last several years. *Id.* ("'[t]hough it is no defense that the Flores Settlement is outdated, it is apparent that this agreement did not anticipate the current emphasis on family detention'") (quoting *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007)).  The Agreement does not require the release of parents or legal guardians who are apprehended with their children, *Flores*, 828 F.3d at 909, and requiring release in those circumstances would create "incentive[s] for adults to bring juveniles on the dangerous journey to the United States and then put them in further danger by illegally crossing the United States border, in the expectation that coming as a family will result in an immediate release into the United States." 84 Fed. Reg. at 44,403. Consequently, given the parties' failure to specify provisions concerning detention of *accompanied* minors and their parents, the rule addresses this gap in a manner consistent with protections the Agreement provides for children, the interest in family unity, and the need for enforcement of immigration laws, given the operational realities of a family migration crisis that was not anticipated at the time of the Agreement.

*i.* First, the rules adopt key provisions from the Agreement regarding the conditions for facilities where accompanied children are held in custody.  Such facilities must satisfy all the requirements set forth in Exhibit 1 of the Agreement, and they must be licensed by a State or, if such a licensing scheme is unavailable,

comply with a process designed to provide independent review and similarly ensure compliance with the regulatory protections.

The rule at section 236.3(i)(4) adopts the Agreement's standards for the conditions that must exist in licensed facilities where accompanied minors are held in ICE custody. *See* Agreement, Exhibit 1. For example, the definition of "licensed facility" in section 236.3(i)(4)(i–xv) generally includes the Agreement's provisions regarding personal, medical, psychological, and educational needs, including compliance "with all applicable state child welfare laws and regulations and all state and local building, fire, health, and safety codes." Agreement, Ex. 1, (A). Under the Agreement, such a facility must be non-"secure," and the regulations include that same requirement for family residential centers. 8 C.F.R. § 236.3(i)(4). Compared with Exhibit 1 of the Agreement, ICE's requirements also contain a slightly broadened educational services description and add that program design should be appropriate for length of stay. 8 C.F.R. § 236.3(i)(4)(iv). Additionally, section 236.3(i)(4)(iv) continues to endorse the provision of appropriate foreign language reading materials for leisure time.

Further, section 236.3(i)(4)(vii) implements paragraph 6 of section A of Exhibit 1 of the Agreement, requiring licensed facilities to provide minors with at least one individual counseling session weekly. The rule modifies the Agreement slightly by requiring either one individual counseling session or one "mental health wellness interaction" per week, in acknowledgment of comments that a minor should not be required to participate in counseling if he or she does not wish to. 8 C.F.R. § 236.3(i)(4)(vii). Moreover, the rule maintains the Agreement's commitment to provide minors with privacy during family visits, limited only by the need to "reasonably prevent[] the unauthorized release of the minor." *Compare* Agreement, Ex. 1(A)(11) *with* 8 C.F.R. § 236.3(i)(4)(xi) (permitting staff to "reasonably prevent[] the unauthorized release of the minor and prevent[] the transfer of contraband."). This caveat presents no concrete impediment to the minor's privacy,

while also taking into account ICE's obligation to safeguard the minor's welfare. Compared with Exhibit 1 of the Agreement, these slight differences do not undercut the Agreement's central standards governing conditions of licensed programs. 8 C.F.R. § 236.3(i)(4)(xi).

With respect to licensing, the Agreement's requirement that programs in which minors may be detained during immigration proceedings be licensed "by an appropriate State agency . . . for dependent children" must be adapted to the unique circumstances presented by family units. *See* Agreement ¶ 6. Accompanied minors are, by definition, not subject to a "State agency . . . for dependent children" under the applicable provision of the Agreement, because they are with their parents. *See id.* And while the State of Texas has been working on a licensing system for facilities in that state housing families, most states have no licensing scheme for facilities to hold minors who are together with their parents or legal guardians—such facilities are unique to the immigration system—and the license in another state with a FRC, Pennsylvania, has been the subject of litigation. *See* 84 Fed. Reg. at 44,419. A few years ago, this Court concluded that at that time there were no facilities that could comply with the *Flores*-required licensing conditions *and* authorize adults to be housed in the same facility. *See* Order (June 27, 2017), ECF No. 363.

In response to this conundrum and gaps in the Agreement, the rule provides an alternative licensing scheme for ICE family residential centers for accompanied minors that is consistent with the substantive protections of the Agreement. Under paragraph 6 of the Agreement, a "licensed program" must generally be "non-secure," except in certain cases for special needs minors. The regulations likewise provide for family residential centers to be non-secure. 8 C.F.R. § 236.3(i)(3). Section 236.3(b)(9) also includes a definition of "licensed facility" that requires facilities to obtain licensing where appropriate licenses are available from a state, county, or municipality in which the facility is located. Where such licensing is not available, the rule creates an alternative oversight regime that requires DHS to

employ third parties to conduct audits of family detention centers to ensure compliance with ICE's family residential standards.  8 C.F.R. § 236.3(b)(9).  The rule also provides materially identical assurances about the conditions of facilities and implements the overarching purpose of the Agreement's licensing requirement, allowing families to remain together during their immigration proceedings.  *See* 8 C.F.R. § 236.3(i)(4)(i–xv).  These protections are therefore fully consistent with the overarching principles set out in the Agreement, but are specifically designed to address the attendant circumstances that were not considered by the parties – and for which the Agreement left a gap – relating to minors apprehended with their parents or legal guardians.

*ii*. The rule also accounts for the interest of accompanying parents in family unity that were not considered or addressed by the parties in negotiating the Agreement.  In June 2018, the President issued an executive order providing that it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."  Exe. Order No. 13841, § 1, *Affording Congress an Opportunity To Address Family Separation*, 83 Fed. Reg. 29,435 (June 20, 2018).  Shortly thereafter, a district court in San Diego recognized a strong interest in family unity when parents are apprehended with their children and paced in immigration proceedings together—interests that were not represented, facilitated, addressed, or even recognized by the Agreement.  *See Ms. L. v. U.S Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1143–48 (S.D. Cal. 2018).  This Court likewise recognized the interest in family unity (and the fact that these issues were not addressed by the Agreement) in acknowledging that in certain circumstances a parent would need to *waive* the Agreement to remain together in family custody.  *See Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at *3–5 (C.D. Cal. July 9, 2018).  Commenters on the Flores rule also expressed significant concerns about family separation.  *See*, *e.g.*, 84 Fed. Reg. at 44,392, 44,429.

25

1    These judgments by the President, this Court, other courts, and commenters

2    recognize there are important issues to be addressed that were not faced by the

3    parties in the Agreement.  Importantly, parents are not Plaintiffs in the *Flores* action

4    nor members of the certified class, and the Agreement provides "no affirmative

5    release rights for parents."  *Flores*, 828 F.3d at 909.  Indeed, as noted by the Ninth

6    Circuit, the context of the Agreement was the product of litigation "in which

7    unaccompanied minors argued that release to adults other than their parents was

8    preferable to remaining in custody until their parents could come get them."  *Flores*,

9    828 F.3d at 909.  Given the changes to the operational reality and these concerns

10   regarding family unity, the Agreement's original release provisions, governing

11   minors detained apart from their parents, are not necessarily applicable or

12   appropriately tailored for the situation when a minor is encountered with a parent.

13   The rule addresses the interest in family unity in three ways.  First, it sets out

14   a regulatory regime for family residential centers where families can remain in

15   custody together in non-secure, licensed facilities during the pendency of their

16   immigration proceedings, with conditions derived from the Agreement that replicate

17   those provided for UACs in ORR custody.

18   Second, the rule clarifies and amends parole standards in a manner that

19   parallels Paragraph 14 of the Agreement.  Thus, for those minors in expedited

20   removal who establish a credible fear, parole will generally serve an urgent

21   humanitarian reason warranting release on parole "if DHS determines that detention

22   is not required to secure the minor's timely appearance before DHS or the

23   immigration court, or to ensure the minor's safety and well-being or the safety of

24   others."  *Compare* 8 C.F.R. § 236.3(j)(4) with Flores Settlement Agreement ¶ 14

25   (release required "[w]here the INS determines that the detention of the minor is not

26   required either to secure his or her timely appearance before the INS or the

27   immigration court, or to ensure the minor's safety or that of others").

28

26

Third, it provides authority for DHS to release accompanied minors to another adult relative—including relatives identified by the parent in custody—who can provide appropriate care and treatment for the minor.  8 C.F.R. §§ 212.5(b)(3)(i), 236.3(j)(5)(i).

Together, these provisions address the interest in family unity within the larger context of immigration enforcement.  As one court explained, when there is a legitimate need to detain a parent, family integrity is not threatened, as the legitimate goals of immigration detention can be met "by temporarily detaining families together in family residential facilities."  *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 498 (D.D.C. 2018) (citing *Ms. L.*, 302 F. Supp. 3d at 1159–60).  There, parents may provide care to, or exercise custody and control over, their children in a facility licensed under the standards set forth in the rule.[4]

*iii*. The rule also accounts for the legitimate governmental interest in immigration enforcement and the strong Congressional preference that those arriving at the border—including parents with accompanying children—be detained pending a determination of their entitlement to be admitted to the United States.  8 U.S.C. § 1225 (detention required for applicants for admission); *see* 8 U.S.C. § 1232(a)(5)(D), (b)(1) (excluding from Section 1225 provisions *unaccompanied* alien children).  Although DHS may exercise its discretion to release accompanied minors and their parents or legal guardians, *nothing* in the Agreement states the government agreed to do so, and federal law generally provides for detention of aliens arriving at the border.  *See Flores*, 828 F. 3d at 908 (the Agreement does not

---

[4] As recognized by class counsel, "the migration experience 'means the loss of the familiar: home, language, belongings, cultural milieu, social networks and social status—without the support of an intact family to buffer against those losses.'"  *See* Class Counsel Comments at 29 (Nov. 6, 2018) (citations omitted).  This comment, oriented towards the conditions faced by unaccompanied children, reflects the importance of family unity that is made possible by the final rule.

27

require the release of parents).  Nevertheless, the absence of licensing systems for facilities that hold alien family units has effectively forced the government to treat the Agreement as if it included a requirement for release of family units.

By better approximating the treatment of family units to the treatment of adults, while ensuring family-appropriate handling if detention is required, the Flores Rule addresses a substantial loophole.  With that loophole in the law, there has been an explosion of family migration patterns—where the number of people traveling in family units has increased *over twenty-five times* the number in 2013, from 14,855 that year to nearly 400,000 thus far this fiscal year (with three months still remaining).  84 Fed. Reg. at 44,404; *see Flores*, 507 U.S. at 296 (observing that around 2,500 children were apprehended with family in 1990). [5]  Adults who choose to travel with children subject those children to a dangerous journey, a substantial risk of injury or death, and in some cases, exposure to violent traffickers.  *See* 84 Fed. Reg. at 44,403 (rule addresses "significant and ongoing surge of adults who have made the choice to enter the United States illegally with juveniles or make the dangerous overland journey to the border with juveniles, a practice that puts juveniles at significant risk of harm"); McAleenan Statement (Aug. 21, 2019) ("the new rule will protect children by reducing incentives for adults, including human smugglers, to exploit minors in the dangerous journey to our border").  Reducing the scope of that problem is an important and legitimate purpose behind this regulation.  The mandatory release of alien family units simply does not exist anywhere in the Agreement, cannot be assumed, and is squarely in conflict with congressional enactments.  *Id.*  To be sure, the rule clarifies parole standards that apply before credible fear is established, making clear that traveling with a child will not generally lead to a grant of parole *prior to* a credible fear determination, so as to ensure that

---

[5] The numbers through July 2019 are 474,787.  https://www.cbp.gov/newsroom/stats/sw-border-migration.  Family unit numbers represent the number of individuals apprehended with a family member (either a child under 18 years old, parent, or legal guardian).  84 Fed. Reg. at 44,404.

the standards for children match those of their parents with whom they are traveling. 84 Fed. Reg. at 44,393.  This is consistent with practice under the Agreement, where time has generally been provided to permit a prompt credible fear inquiry while families are at family residential centers.  *See* Order at 29–31 (June 27, 2017).  The regulation also states that if a credible fear of persecution is established, parole will generally be warranted if DHS determines that the minor is not a or flight risk, or that detention is required to ensure the minor's safety or the safety of others, a standard derived directly from Paragraph 14 of the Agreement.  *See* 8 C.F.R. § 236.3(j)(4); 84 Fed. Reg. at 44,529.  The rule thus provides that the standards governing release of minors are generally consistent with the standards governing release of their accompanying parents.  This consistency, combined with the licensing regime, eliminates what is currently a significant incentive to travel with children in order to avoid immigration enforcement rules that otherwise apply to adults crossing the border.  *See* 84 Fed. Reg. at 44,403.

In sum, by creating an alternative federal licensing scheme for non-secure family residential centers and clarifying parole standards, the rule eliminates the Agreement's unanticipated barrier to family unity while preserving DHS's ability to serve its statutory function and eliminating an incentive to travel with children to avoid immigration enforcement.  Importantly, the rule establishes family custody conditions and procedures, but it does not require detention.  *See* Class Counsel Comments at 39 (Nov. 6, 2018) (agreeing the rule "does not delineate the circumstances in which [family] detention might be deemed appropriate").  Instead, it clarifies parole standards so that individual officers can evaluate the need for detention using standards that largely parallel those in the Flores Settlement Agreement; it also allows release of an accompanied child to another adult relative in appropriate circumstances.   The final rule fills gaps not addressed in the Agreement with respect to family units, so as to "set[] out nationwide policy for the detention, release, and treatment of minors" in immigration custody and ensure those

minors traveling with parents are treated "with dignity, respect, and special concern for their particular vulnerability as minors." Agreement ¶¶ 9, 11. The rule therefore implements the Agreement, while simultaneously addressing issues not considered by the Agreement in a way that implements the Agreement's overarching purposes.

### 2. Plaintiffs' Motion to Enforce Included Minimal Objections to the Substantive Provisions of the Proposed Rule.

Given simultaneous briefing, the government does not know what objections Plaintiffs will raise with respect to the final rule. But we note that, beyond the provisions addressing family units, and putting aside Plaintiffs' rhetorical tone in that pleading and effort to obtain contempt sanctions, Plaintiffs raised minimal objections to the substance of the proposed rule in their Motion to Enforce filed in November 2018. And the final rule addresses some of Plaintiffs' primary objections to provisions relating to family units.

With respect to family units, Plaintiffs' primary complaint was that the "Defendants propose to detain accompanied children indefinitely." Mot. at 6. As an initial matter, there is absolutely nothing in the rule that contemplates indefinite detention of children. Rather, the rule sets forth procedures for the possible detention of minors during their immigration processing, a process that has a definitive end. Moreover, as explained above, the rules governing custody of minors accompanied by their parents or legal guardians balance multiple interests in a reasonable way and fill gaps the parties did not address in the Agreement. *Supra*, § 1.c. It is also important to emphasize that the final rules responded to comments addressing this issue in two important ways.

First, the rules authorize DHS to consider a request and release accompanied minors to an adult relative other than a parent or legal guardian in the discretion of DHS. 8 C.F.R. §§ 212.5(b)(3)(i). 236.3(b)(j)(5)(i); 84 Fed. Reg. at 44,411, 44,445 (based on comments, providing authority to release accompanied minors to other

non-detained adult relatives, including grandparents, aunts, uncles, brothers, or sisters); *see* Mot. at 7 (urging a procedure to allow release to alternate caregivers).

Second, in response to comments, including those from Plaintiffs, the new rule amends parole standards to provide that if a minor accompanied by his or her parent or legal guardian establishes credible fear, "paroling such minors who do not present a safety risk or risk of absconding will generally serve an urgent humanitarian reason" and that DHS "may also consider the minor's well-being." 84 Fed. Reg. at 44,445; *see* 8 C.F.R. § 236.3(j)(4).  As discussed above, this standard is parallel to Paragraph 14 of the Agreement.

In their Motion to Enforce, Plaintiffs also objected to the licensing scheme for family residential centers, Mot. at 8-11, but we have explained in detail how the final rules appropriately addressed this situation, which was not addressed between the parties in the Agreement, as this Court and the Ninth Circuit have explained. Plaintiffs do not explain how their approach—which would essentially make family custody impossible and require family release or family separation—is anything the parties contemplated.  Plaintiffs also asserted in the Motion to Enforce that family residential centers are not in fact "non-secure" under the proposed regulatory definition.  Mot. at 11.  The final regulations address this issue expressly and make clear that non-secure is defined by state law, a standard that derives directly from the Agreement.  8 C.F.R. § 236.3(b)(11); *see* 84 Fed. Reg. at 44,392, 44,423 ("DHS accepts the commenter's suggestion to add the language 'under state law' into the definition of 'non-secure' in this final rule"); Agreement ¶ 6 ("facilities shall be non-secure as required under state law").   The preamble also clarifies that family residential centers are "non-secure and a family is not physically prevented from leaving the facility."  84 Fed. Reg. at 44,400; *see also* 84 Fed. Reg. at 44,443 (in response to comments about egress, "DHS will be adding additional points of egress to the Dilley and Karnes facilities by September 30, 2019").

31

In their Motion to Enforce, Plaintiffs argued it was inappropriate for HHS to place a minor in a secure facility when the minor might pose "a danger to self and others." Mot. at 12 (citing 45 C.F.R. § 410.203(a)(5)). They argued this standard is too "vague" and does not properly implement Paragraph 11. *Id.* But the standard in the final rule comes directly from the TVPRA, *see* 8 U.S.C. § 1232(c)(2)(A), 84 Fed. Reg. at 44,455, is language common to the child welfare world, and parallels language in paragraph 21 of the Agreement.[6] Plaintiffs do not explain how HHS is able to disregard the statutory mandate of the TVPRA. Indeed, the standard in Paragraph 11 encompasses the same concern, yet in terms that are even more "vague" than the TVPRA and the final regulation. *See* Agreement ¶ 11 (INS shall place minors in the "least restrictive setting appropriate to the minor's age and special needs" while ensuring that the setting is consistent with "protect[ing] the minor's well-being and that of others"). In order to address the "vagueness" concern, in the final rule HHS added language stating that ORR's ability to place minors in secure facilities based on danger to self or others "does not abrogate any requirements to place UACs in the least restrictive setting appropriate to their age and special needs." 45 C.F.R. § 410.203(d). Moreover, under the hearing provisions, the minor has the opportunity to have an independent hearing officer review ORR's determination as to whether the minor poses a danger to self or others. 45 C.F.R. § 410.810.

Plaintiffs also argued that the hearing provided to children under 45 C.F.R. § 410.810 and Paragraph 24.A must be conducted by the Department of Justice

---

[6] Paragraph 21 of the Agreement defines conditions under which a minor may be placed in a secure facility, including a determination that the minor "has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others)" while in custody; "has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others;" and "must be held in a secure facility for his or her own safety."

rather than HHS.  As explained above, this is not a substantive change to the protections set out in the Agreement and provides the same procedural protections outlined by the Ninth Circuit, *Flores*, 862 F.3d at 878; *see* 84 Fed. Reg. at 44,476–77 ("independent hearing process that would be guided by the immigration judge bond hearing process currently in place" where child  "could choose to be represented by a person of his or her choosing, at no cost to the government" and "could present oral and written evidence to the hearing officer and could appear by video or teleconference.").  It is appropriate for an independent HHS hearing officer to conduct such a review—which does not derive from current immigration statutes—given that HHS is statutorily charged with custody of unaccompanied minors and because, at the time of the Agreement, such hearings also were performed within the same agency.  *See* 44 Fed. Reg. at 44,476–77; *Flores*, 862 F.3d at 875 (agreeing there was a "failure to address bond hearings in the HSA and TVPRA" as "neither statute [HSA or TVPRA] so much as mentions bond hearings for unaccompanied minors"); *id*. at 879 (function should be performed "regardless of which agency may now be charged with" the function because Agreement may be followed even after a "bureaucratic reorganization").  Because HHS is charged with the care of UACs, it would be inappropriate for immigration judges within the Department of Justice to make determinations regarding HHS custodial issues.

Plaintiffs' final argument in the Motion to Enforce was that the regulations removed the word "shall," and made requirements under the Agreement optional in the rules.  Mot. at 13–14.  This contention is not correct.  Instead, each of the examples cited by Plaintiffs—that licensed programs be non-secure, that the minor be placed in the least restrictive setting, that bond redeterminations hearings occur, and that the minor receive notice regarding secure detention decisions—are requirements set out in the regulations and are not optional.  *See* 8 C.F.R. § 236.3(e) (during an influx, "DHS *will transfer* a minor who is not a UAC . . . to a licensed facility . . . *as expeditiously as possible*" and within three or five days if there is not

an influx) (emphasis added); *id.* § 236.3(i) (accompanied minors "*shall be placed* temporarily in a licensed facility, which will be non-secure") (emphasis added); *id.* § 236.3(g)(2) ("minors and UACs *shall be held in the least restrictive setting appropriate*"); *id.* § 236.3(i) (accompanied minors in family units "*shall be detained in the least restrictive setting* appropriate"); 45 C.F.R. § 410.810 (UAC "may request" a hearing by an independent hearing officer); *id.* § 410.810(a) (if minor not placed in licensed program, ORR "shall provide a notice of the reasons").[7]   As the Ninth Circuit has explained, "[t]he Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates."  *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998).  None of these rationales provides a basis to override the reasoned decision-making reflected in the final rules.

### 3.    The Agreement Expressly Incorporates APA Standards that Require the Consideration of Agency Expertise and Public Comments and Necessarily Prohibit any Preordained Outcome.

As just explained, the final rule implements the Agreement without significant changes, other than to fill in gaps left unaddressed by the Agreement relating to families traveling together and other non-substantive changes.  The provisions of the rule achieve the overarching purposes of the Agreement, namely—to "set[] out nationwide policy for the detention, release, and treatment of minors" in immigration custody, to "publish the relevant and substantive terms of [the] Agreement," and to ensure that minors are treated "with dignity, respect, and special concern for their particular vulnerability as minors."  Agreement ¶¶ 9, 11.  The parties agreed to an APA process to replace the Agreement, and any challenge to the Rule accordingly

---

[7] Section 236.3(h), which provides that family units "may be transferred to an FRC" is written to establish that DHS has authority to make such a transfer, not to suggest that DHS may detain families in non-FRCs.  Instead, as Section 236.3(e) makes clear, DHS "will transfer" the family unit "as expeditiously as possible."  Hearings that "may" be requested under Section 410.810 are also not optional—they are mandatory when requested.

must be separately brought consistent with the APA and INA. The rule therefore replaces the Agreement and no further inquiry by this Court is appropriate.

        a.    <u>APA Standards of Review Apply to Any Review of the New Rules.</u>

Here, the government has promulgated the final rule consistent with the requirements of the APA, which the Agreement required for termination upon the promulgation of rules. Stipulation (Dec. 12, 2001), ECF No. 13 ("all terms of this agreement shall terminate 45 days following [Defendants'] publication of final regulations implementing this agreement."). Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for "notice-and-comment rulemaking." First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. 5 U.S.C. § 553(b). Second, when "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). "An agency must consider and respond to significant comments received during the period for public comment." *See Perez v. Mortg. Bankers Ass'n,* 135 S. Ct. 1199, 1203 (2015) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c). In sum, before an agency makes a rule, it normally must notify the public of the proposal, invite them to comment on its shortcomings, consider and respond to their arguments, and explain its final decision in a statement of the rule's basis and purposes. *Perez*, 135 S. Ct. at 1211.

Such rules are then subject to judicial review under terms set out by Congress in the APA. *See* 5 U.S.C. §§ 701–06. Rules are reviewed to determine if they are "arbitrary [or] capricious," "contrary to constitutional right," "in excess of statutory . . . authority," or "unsupported by substantial evidence." *Id.* § 706(A), (E).

These requirements apply to *every* substantive rule, and there is no exception for rules implementing an agreement with private parties like the Agreement in this case.  In other words, consistent with the APA, Plaintiffs cannot bind the agency to issue rules containing set provisions, evade the standard governing judicial review of those provisions, or impose a review standard different from that provided by the APA.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness" and "permits . . . the setting aside of agency action that is 'arbitrary' or 'capricious'").

The parties expressly agreed that the APA would apply to the rules implementing the Agreement when they agreed to its termination upon the "publication of rules implementing the Agreement."  Agreement ¶ 11.  Moreover, the parties understood and continue to understand that the promulgation of rules includes—as it must—the normal APA process, whereby the rules would not mimic the terms of the Agreement but reflect reasonable policy judgments based on current circumstances and comments from the public.  For example, Plaintiffs submitted comments on the then-pending proposed rules at the time the Agreement was extended, after the agency first published proposed rules implementing the agreement.  *See* 67 Fed. Reg. 1670 ("offer[ing] the public an additional opportunity to comment on the proposed rule, and particularly invites comments that relate to issues that have come to the public's attention since the close of the original comment period in 1998" such as "who speaks for the child with respect to immigration matters"); Joint Comments of the Center for Human Rights and Constitutional Law; the Youth Law Center; and The Women's Commission For Refugee Women & Children, filed March 15, 2002.

Further, in 2003, shortly after the Agreement was extended, Plaintiffs "[a]s class counsel" in *Flores*, submitted a policy paper "to provide a framework for discussing policy options."  ORR Working Paper (Jan. 14, 2003).  That paper stated

any final rules should "incorporate[e] . . . prior comments" submitted under the APA and reflect "learning from the first five years under the Settlement Agreement." *Id*. The Plaintiffs argued that the regulations should also reflect the "logistics and challenges of [ORR's] responsibilities for unaccompanied children" and be "based on [ORR's] own experience with unaccompanied children." *Id*. The letter "urge[d] ORR to propose new regulations based on its own experience with unaccompanied children, and then solicit extensive comments from advocates and interest groups before publishing final regulations." *Id*. The letter also stated that rules should be "consistent with the terms of the Settlement Agreement." In other words, Plaintiffs agreed that a rulemaking process resulting in rules that *differ* from the terms of the Agreement would be "*consistent with* the" Agreement. *Id*. (emphasis added). The rules cannot woodenly repeat the terms of the Agreement while also being "new" and "based on [the agency's] own experience with unaccompanied children," "incorporating . . . comments" as required under the APA and reflecting "learning from the first five years under the . . . Agreement." *Id*. If the final rule had to be identical to the Agreement, there would be no point to issuing regulations and it would be superfluous for the Agreement to include a provision for termination upon issuance of regulations. Instead, the only viable standard for evaluating the new rules are those Congress provided and the Agreement incorporates, namely—the APA.

More recently, Plaintiffs recommitted to the understanding that the APA process applies, by submitting comments in response to the proposed rules as "counsel to the plaintiff class in Flores." *See* Class Counsel Comments at 3 (Nov. 6, 2018). In those comments, class counsel at times demanded the final rules conform to the Settlement Agreement. *See id*. at 1. But counsel also urged *changes* from the Agreement, arguing that provisions of the Agreement regarding the definition of "influx" are "out of date and must be revised to reflect operational realities." *Id*. at 14. Additionally, counsel urged that provisions of the Agreement

relating to secure placement of minors have been abrogated by statute, and the rules must therefore depart from the Agreement. *Id.* at 21–22. There is only one plausible standard to review those changes given that the Agreement terminates upon conducting an APA regulatory process – and one that Plaintiffs cannot help but acknowledge in requesting changes: the standard provided by the APA.

Any other approach would render the APA rulemaking process a nullity. For example, if the court took the view that agency decision-makers were bound to finalize only the terms of the Agreement as written in 1997, decision-makers would be required to reach a decision on whether a rule should be issued and the contours of that rule *prior* to final agency action. Such a preordained result is inconsistent with basic APA formal rulemaking requirements such as notice and comment and cost-benefits analysis. 5 U.S.C. § 553. In fact, the parties acted against the backdrop of a 1998 proposed rule that was based on the substantive terms of the Agreement. *See* 63 Fed. Reg. 39,759 (July 24, 1998). The proposed rule was far less comprehensive and protective than the current final rule.[8] And if regulations identical to the Agreement had been promulgated at that time, surely the agencies would not have been barred from amending them now – it should be no different.

Congress intended these APA procedures to improve the quality of information available for rulemaking, to compel reexamination of the proposed rule in light of the arguments adduced during the comment period, and to facilitate judicial review by incorporation of this information into a rulemaking record. *See Nat'l Soft Drink Ass'n v. Block*, 721 F.2d 1348, 1353 (D.C. Cir. 1983); *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative

---

[8] For example, the 1998 proposed rule did not include the requirements for licensed facilities contained in Exhibit 1 of the Agreement. The Exhibit 1 standards are included in the current final rule at 8 C.F.R. § 236.3(i)(4) and 45 C.F.R. § 410.402.

record).  Importantly, "legislative facts adduced in rulemaking partake of agency expertise, prediction, and risk assessment;" these facts are "not easily assessed in terms of an empirically verifiable condition."  *Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1168 (D.C. Cir. 1979).  Thus, a rulemaking necessarily entails debate over these factual issues and the policy questions to which they pertain.  *Id*.  All of this is provided for under the APA process to advance the evolution of considered policy.  It is entirely inconsistent with the APA for a decisionmaker to approach rulemaking with an "unalterably closed mind on matters critical to the disposition."  *Id.*  This is particularly true when, as here, the prior policy was implemented over 20 years ago and circumstances at the border have changed dramatically during that time.  Consequently, in order to avoid collision between the Agreement and the APA—and to escape absurd results not intended by the parties at the time of contracting—determination of whether "implementation" of the Agreement is satisfied must be evaluated pursuant to the requirements of the APA's rulemaking process.  5 U.S.C. § 553.

> b.   <u>APA Standards are Satisfied Here.</u>

Any challenge to the new rules must be brought consistent with the APA.  The complaint in this action—filed over thirty years ago—obviously does not challenge the new rules.  This is true even though this case asserted constitutional claims and the Settlement Agreement resolved those constitutional claims.  *See Fox Television*, 556 U.S. at 516 (rejecting argument that "more stringent . . . review [applies] to agency actions that implicate constitutional liberties").  The Parties agreed that the Agreement would terminate upon completion of an APA rulemaking process, and thus the APA's standards for judicial review of such rules should govern any challenges to the rule.  Individuals who claim to be adversely impacted by the new rule have a remedy because they may pursue any cause of action related that would otherwise be available.

Even if the new rules were subject to APA review in this action as currently pled, they readily satisfy those standards. For the reasons explained in Section 1, the rule is the product of extensive and appropriate notice-and-comment procedures. Specifically, the notice-and-comment process included consideration of 100,073 comments from the public, including not only *Flores* class counsel, but also other noteworthy immigration and child advocacy organizations such as the American Academy of Pediatrics, American Psychiatric Association, National Association of Pediatric Nurse Practitioners, Center for Children's Law and Policy, National Immigrant Justice Center, and the Legal Aid Justice Center. The government, in turn, provided nearly 150 Federal Register pages of consolidated responses and made modifications to the proposed regulation based on public input. Where the regulation is different from the Agreement, the agencies provided a "reasoned explanation" for the difference and, in any event, the overarching goals of the Agreement remain intact. *See Fox Television*, 556 U.S. at 515; *see* Preamble pp. 403, *et seq.* (explaining departures from Flores Settlement Agreement). Accordingly, as required by the APA, the rule properly considered and incorporated comments from the public and explained the judgments of DHS and HHS regarding current operational circumstances. [9]

### c. The Rules Comport with the Due Process Clause.

The Agreement resolved claims brought under the Due Process Clause. Even if the Court thought it appropriate to consider whether the new rules comport to the Due Process Clause, they would need to show the rules were invalid on their face. *See Flores*, 507 U.S. at 300–01 (evaluating Plaintiffs' facial constitutional challenge to newly adopted regulations notwithstanding the parties' prior care agreement governing conditions of confinement for juveniles). And Plaintiffs "in such a case

---

[9] If the Court decides to review the final regulations under the APA, the government requests that the parties be given the opportunity to brief the issues seriatim, given the importance of the issues and the Court's order that this briefing address the sole issue of whether the regulations are consistent with the Agreement. ECF No. 525.

must establish that that no set of circumstances exist under which the [regulation] would be valid." *Id.* at 301.

The new rule easily survives facial constitutional scrutiny. The regulation overwhelmingly adopts the provisions of the Agreement and is the result of considered deliberation, including public input, guided by the agencies' expertise managing the Agreement for more than twenty years. Assuming the regulation implicates a protected liberty interest, the rules comport with substantive and procedural due process. Specifically, as the Supreme Court held in this case, "where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution." *Flores*, 507 U.S. at 303. Indeed, the *Flores* Court specifically recognized that "Congress has the authority to detain aliens . . . pending their deportation hearings." *Id.* at 306. The custody regime here is far more protective than that approved by the *Flores* Court—here, UACs are subject to all of the same protections as set forth in the Agreement, and non-UACs may remain with a parent or legal guardian in custody during the pendency of immigration proceedings, not alone; may receive discretionary release on bond or parole under the standard set out in the Agreement (as consistent with the statute and regulations); and may be released to an adult relative other than a parent or legal guardian in DHS's discretion. *See id.* at 305. As the new rules satisfy due process standards in a facial challenge, any future legal action would be subject to an individualized inquiry and challenge. *See id.* at 314 ("period of custody is inherently limited by the pending deportation hearing" and habeas corpus available to address if "juveniles are being held for undue periods").

## B.   Promulgation of the Rule Terminates the Agreement Under the HSA

The Agreement terminates for an additional reason—because Congress expressly gave HHS and DHS the authority to terminate legacy agency actions, including agreements like the Agreement, in enacting the HSA. The HSA contained

41

a provision regarding legacy agency actions that provides that "[c]ompleted administrative actions"—defined to include both regulations and "agreements"—"shall not be affected . . . but shall continue in effect . . . until amended, modified, terminated, set aside, or revoked in accordance with law by an officer of the United States or a court of competent jurisdiction."  6 U.S.C. § 552(a); *see also* 6 U.S.C. § 279(f)(2) (incorporating by reference the savings clause of the HSA into the TVPRA).   The Ninth Circuit has specifically held that the Flores Settlement Agreement is a "completed administrative action[]" under this statute and "remains in effect as an 'agreement' preceding the passage of the HSA."  *Flores*, 862 F.3d at 870.  Because the Ninth Circuit has held that it is an agreement under this provision, Congress expressly authorized it to be "amended, modified, terminated . . . or revoked . . . by an officer of the United States."  The final rule expressly invokes that provision, and accordingly terminates the Agreement.  *See* 84 Fed. Reg. at 44,399 ("The savings clause has been interpreted by courts to have maintained the FSA as enforceable against HHS and DHS.  By promulgating these final rules, HHS and DHS are completing an administrative action to terminate the FSA.").

## C.   Continued Application of the Agreement is Not Equitable or in the Public Interest Because the Regulation Provides a Comprehensive Scheme Governing the Custody of Alien Minors

Even if this Court were to view the Agreement as imposing a standard different from the APA to assess its termination, the Agreement should be terminated because it is no longer equitable or in the public interest to have a substantial portion of the immigration system administered through the judicial and not the executive branch.  First, the standards for institutional litigation require flexibility in terminating agreements of this sort that govern governmental operations, and declining to terminate would impinge upon the separation of powers.  Second, it is in the public interest to terminate the Agreement based on changes in the legal and factual landscape, including the massive increase in family migration,

intervening legislation, and now the publication of final rules governing this significant aspect of the immigration system.

### 1. Courts Must Be Flexible To Release Governmental Operations from Long Term Institutional Consent Decrees.

The Agreement squarely implicates the concerns courts have identified with long-term consent decrees. The Agreement has been treated as a consent decree, and such a decree "is subject to the continuing supervisory jurisdiction of the court, and therefore may be altered according to subsequent changes in the law." *Miller v. French*, 530 U.S. 327, 347–48 (2000) (citing *Rufo, v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 388 (1992)). Federal Rules of Civil Procedure 60(b)(5) and (6) provides that the Court may relieve a party from "a final judgment, order, or proceeding [if] applying [the prior action] prospectively is no longer equitable," or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5), (6); *see Frew ex rel Frew v. Hawkins*, 540 U.S. 431, 441(2004) ("The Rule encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances."); *McGrath v. Potash*, 199 F.2d 166, 167–68 (D.C. Cir. 1952) ("The statutory basis for the injunction having been removed by Congress, the injunction should be vacated"). The party seeking relief "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. That burden may be met by showing "a significant change either in factual conditions or in law." *Id.* at 384.

As the Supreme Court has explained, "the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Horne v. Flores*, 557 U.S. 443, 448 (2009). Permitting the change or termination of a consent decree in light of a change in law makes sense because consent "is to be read as directed toward events as they then were. It was not an abandonment of the right to exact

revision in the future, if revision should become necessary in adaptation to events to be." *Sys. Fed'n No. 91, Ry. Employees' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 651 (1961) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114–15 (1932)). Indeed, "prospective relief *must* be modified" where the agreement would conflict with subsequently enacted federal law. *Miller v. French*, 530 U.S. 327, 347–48 (2000) (quoting *Rufo*, 502 U.S. at 388).

Institutional reform decrees involving government operations require an even more flexible approach to termination. In *Horne*, 557 U.S. at 439 , in the context of institutional litigation that involved enforcement of a nine-year-old order, the Supreme Court criticized the lower courts for focusing too narrowly on the terms of the decree, and not focusing instead on the broader question, *viz.*, "whether, as a result of the important changes during the intervening years, the State was fulfilling its obligations under the [law] by other means." *Id.* The Court went on to observe that a "flexible approach" to modifying consent decrees allows courts to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id.* at 448 (internal quotations and citations omitted). Indeed, "[i]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper," *id.* at 450, and the "longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic process," *id.* at 453.

In *Rufo*, when a defendant moved to modify a consent decree ten years after its entry, the Supreme Court noted that "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees reach beyond the parties involved directly in the suit and impact the public's right to the sound and efficient operation of its institutions." 502 U.S. at 376, 381–382; *see also In re Pearson,* 990 F.2d 653, 658 (1st Cir. 1993) (district court "not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question

whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest."); *Heath v. De Courcy*, 888 F.2d 1105, 1110 (6th Cir. 1989) (public interest in modifying institutional consent decrees—which typically involve significant public interests—will ordinarily outweigh the interest of preserving the decree where sufficient reason for modification is shown).

As the Supreme Court has stated time and again, when a consent decree binds elected officials, it may "improperly deprive future officials of their designated legislative and executive powers." *Horne*, 557 U.S. at 449 (2009) (quoting *Frew*, 540 U.S. at 441 (2004)). And these concerns are heightened when a decree binds *federal* operations, as in those circumstances a long term decree threatens the constitutional separation of powers. As the D.C. Circuit has explained, there are "potentially serious constitutional questions about the power of the Executive Branch to restrict its exercise of discretion by contract with a private party." *National Audubon Society v. Watt*, 678 F.2d 299, 301 (D.C. Cir. 1982); *see Alliance To End Repression v. City of Chicago*, 742 F.2d 1007, 1020 (7th Cir. 1984) (interpreting FBI consent decree to ensure that "coequal branch of government" did not "improvidently surrender[] its obligations"; thus "maintain[ing] a proper separation of powers"); *The Money Store, Inc v. Harriscorp Finance Inc.*, 885 F.2d 369, 375–376(7th Cir. 1989) (Posner, J., concurring).

The *Rufo* Court went on to stress that "the public interest and considerations based on the allocation of powers within our federal system require that the district court defer to [government officials] who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification." 502 U.S. at 392. These concerns are paramount in cases involving immigration, where judicial management represents "a substantial intrusion" into the workings of the political branches entrusted to manage policies towards aliens. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268, n.18 (1977); *see Overton Park*, 401 U.S. at 420; *see*

*Harisiades v. Shaughnessy,* 342 U.S. 580, 588–589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). Indeed, the Supreme Court recognized these principles twenty-five years ago in this very litigation. *Flores*, 507 U.S. at 305 ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.")

One of the underpinnings for this long-recognized proposition is that immigration policy involves "changing political and economic circumstances" that are appropriate for the Legislature or Executive to determine, not the Judiciary. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Flores*, 507 U.S. at 305–06. This concern has particular force with respect to a consent decree designed to address due process claims, where a range of circumstances and changing equities impact the basis for claims here brought on a class-wide basis. *See Mathews*, 426 U.S. at 81 ("Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution"); *supra* § III.A.3.c (explaining why new rules are facially consistent with Due Process Clause)

The Court must be especially solicitous of this request to terminate the Agreement because the political and foreign policy implications and respect for the political branches' authority over immigration policy dictate a narrow standard of judicial review over executive and legislative decisions in the realm of immigration, *Fiallo v. Bell*, 430 U.S. 787, 796 (1977); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 (1976) (emphasizing that the "power over aliens is of a political character and therefore subject only to narrow judicial review") (citation omitted). To avoid the long-term transfer of executive power to the judiciary or private groups, the Supreme Court mandates that federal courts take a "flexible approach" when deciding motions to modify or dissolve consent decrees. *Horne*, 557 U.S. at 450.

Thus, courts may superintend the execution of the immigration laws—which must be rare indeed to begin with—only for as long as is truly necessary and must promptly return the responsibility for discharging the Government's obligations when "changed circumstances warrant." *Id.* These changed circumstances do not need to be either radical or sweeping; rather, it is sufficient that a "significant change" in factual circumstances or law "renders the continued enforcement of the judgment detrimental to the public interest." *Id.* at 453 (quoting *Rufo*, 502 U.S. at 384).

### 2. Under These Standards The Public Interest Requires Termination of This Outdated Agreement in Institutional Litigation.

Under the standards set forth above, the Agreement must be terminated because the public interest no longer justifies operation of major portions of the immigration system pursuant to an agreement entered by consent that by its terms are intended to be temporary, given the issuance of legislative rules, dramatic changes in circumstances, and intervening legislation. The Agreement has now bound four Presidential administrations charged by the people with developing immigration policy, and two agency defendants—DHS and HHS—that were never defendants in Plaintiffs' complaint. In fact, HHS was assigned functions by Congress in direct response to the types of concerns raised in this litigation and charged with improving the treatment of UACs, a mission it takes very seriously and of which these regulations are a key part. The Agreement has governed under circumstances where there is now a growing crisis at our southern border due to massive increases in family migration never envisioned by government policymakers or Plaintiffs in 1997. Authority over this large segment of immigration policy must now be returned to the normal democratic processes that answers to the people.

a.   The Agreement Should Terminate Because of the Promulgation of Regulations.

The public interest requires the decree to terminate because the government has now taken the significant step of issuing final, comprehensive regulations governing all aspects of the government's custody of minors—both accompanied and unaccompanied.  It has done so as provided for in the Agreement itself, *see* Agreement ¶ 40 (as amended), and at the urging of both this Court, *see* ECF No. 177 at 24, and the Ninth Circuit, *Flores*, 862 F.3d at 869.  The promulgation of these regulations conformed to APA procedural requirements imposed by Congress for regulations having the force of law. These procedural requirements "assure fairness and mature consideration of rules of general application."  *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969).  The final rule is more than sufficient reason to terminate the Agreement, because it is a fundamental change in law implementing the goals of the Agreement that can be evaluated on its own terms as appropriate. Indeed, continued enforcement of the Agreement, which was temporary by its terms in contemplation of such rulemaking, is not in the public interest now that the government officials tasked with elucidating, assessing, and solving problems that occur in immigration enforcement have issued comprehensive final regulations. Continued application of the twenty-two-year-old Agreement, notwithstanding the issuance of comprehensive regulations, would encroach on the Executive's authority to carry out its constitutional powers over immigration, as well as the public's substantial interest in having the details of immigration policy determined by the people, within statutory and constitutional limits.

When the *Flores* suit was filed in the 1980s and the parties later entered into the Agreement, there was limited federal law governing the detention of alien minors, and "the problem was apparently dealt with on a regional and ad hoc basis." *Flores*, 507 U.S. at 295.  The litigation was focused on unaccompanied minors, and the Agreement accordingly contains no provisions specifically addressing the

48

distinct circumstances and issues concerning minors apprehended with their parents. And the Agreement's purpose, by its own terms, was to temporarily "set[] out nationwide policy for the detention, release, and treatment of minors in the custody of the INS" until rules could be promulgated. Agreement ¶ 9. The final regulations now achieve this goal of a permanent and abiding set of rules governing the treatment of minors in immigration custody. The notice-and-comment process here was comprehensive, involving consideration of 100,073 comments from the public. The government, in turn, provided nearly 150 Federal Register pages of consolidated responses and made modifications to the proposed regulation based on public input. The rule explains in detail why the approaches it takes are called for by current circumstances at the various agencies and components that have responsibility for the custody of minors at various points in time. This is the process Plaintiffs' counsel called for in the Agreement and has continued to call for since that time. *See* 2003 Comments (ORR must issue new rules based on its experience). Consequently, the rigorous process that produced the rule involved a far more thorough, comprehensive analysis and review than that which shaped the Agreement, which provided no opportunity for public input, it implements, and rules far more protective than those issued back in 1998.

Courts have readily vacated settlement agreements when the goals of the settlement have been met. *See, e.g., United States v. City of Miami,* 2 F.3d 1497, 1505 (11th Cir. 1993) ("A court faced with a motion to terminate . . . a consent decree must begin by determining the basic purposes of the decree."). For example, the Ninth Circuit instructs district courts deciding a motion to vacate a settlement agreement to first consider "the more general goals of the [consent] decree which the terms were designed to accomplish." *Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011) (quoting *Youngblood v. Dalzell,* 925 F.2d 954, 960 (6th Cir.1991)). The Ninth Circuit has likewise reversed a district court's termination of a consent decree for "failing to explicitly consider the goals of the decree and only evaluating

compliance with individual action items." *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016).

Numerous courts have held that termination of a settlement agreement is appropriate if the district court concludes that the agreement "is clearly no longer necessary" to uphold the agreement's goals. *City of Miami*, 2 F.3d at 1508. This rationale was applied in *Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, where the Second Circuit upheld the district court's vacatur of a consent decree after the court concluded that the decree's stated objective of 25 percent minority representation in the newspaper delivery industry had been met. *Patterson*, 13 F.3d 33, 38 (2d Cir. 1993). Since "the decree [had] served its purpose," the Second Circuit held that "all of its provisions may be ended." *Id*. at 39. Finally, the Second Circuit reasoned that "the flexible standard for modifying [consent] decrees . . . entitles a court of equity to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached." *Id*. Similarly, in *Culbreath v. Dukakis*, the district court held that dismissal of a consent decree was warranted where defendants were achieving goals equal to, or greater than, the goals specified in the consent decree. *See Culbreath v. Dukakis*, 695 F. Supp. 1350 (D. Mass. 1988).

The reasoning underlying these guiding principles applies with even greater force here. As the Second Circuit held in *Patterson*, where a consent decree seeks pervasive change in long-established practices affecting significant numbers of people, and the changes are sought to vindicate significant rights of a public nature, "it is appropriate to apply a flexible standard in determining when modification or termination should be ordered in light of either changed circumstances or substantial attainment of the decree's objective." *Patterson*, 13 F.3d at 38. The government's promulgation of regulations governing the custody of minors satisfies the overarching objectives of the Agreement seeking a permanent set of comprehensive rules governing the treatment of minors in immigration custody. Accordingly, the

Agreement "is clearly no longer necessary" and should be terminated. *City of Miami*, 2 F.3d at 1508.

                b.    <u>The Agreement Should Terminate Because of Unprecedented Increase in Family Migration Since 1997.</u>

It is in the public interest to terminate the Agreement given the dramatic changes in family migration since 1997. The Surpeme Court explained in this case that "[f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Flores*, 507 U.S. at 305. Keeping the Agreement in place and thereby preventing the Executive from taking new approaches to addressing this unprecedented surge of family migration is inconsistent with the Supreme Court's admonition in this very case and not in the public interest.

Since the Agreement, the number of alien minors arriving in the United States, both accompanied and unaccompanied, has skyrocketed. In 1993, the Supreme Court recognized that a surge of "more than 8,500" minors during a one-year period—2,500 with families, and 6,000 unaccompanied—represented a "problem" that is "serious." *Reno*, 507 U.S. at 294. That "problem" number in the mid-1990s was the normal number of unaccompanied minors apprehended until about 2012.[10] In 2003, Flores class counsel discussed the unprecedented increase in the number of minors in immigration custody—from "130 in custody in 1996, to an average of nearly 500 juveniles in custody in 2000." 2003 Class Counsel Comments.

---

[10] *See* U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement, Unaccompanied Alien Children Program, *Fact Sheet* (May 2014) (before FY 2012, an average of 7,000 to 8,000 UACs were typically placed in ORR custody each year), https://www.acf.hhs.gov/sites/default/files/orr/unaccompanied_childrens_services_fact_sheet.pdf.

But even those numbers pale in comparison to what is faced today.  Regularly, over 10,000 UACs are in federal custody—compared to 130 in 1996—and hundreds of thousands of minors have been apprehended either alone or with families at the southern border so far this year—compared to the 8,500 identified by the Supreme Court as a "problem."  The significant year-to-year increases in the last decade are unprecedented and cannot be overstated.

For family units, the overall number of people in family units has increased by more than 25 times what they were in 2013—from FY 14,855 to more than 400,000 through June 2019.



**Figure 1: Family Unit Apprehensions and Inadmissibles at the Southwest Border by Fiscal Year**

\* Partial year data for FY 2019; through June.

84 Fed. Reg. at 44,404.

In FY 2019 so far, from October 2018 through July 2019, the total number of UAC apprehensions along the Southwest border was 69,157, and the total number of family unit apprehensions was 432,838.  An additional 3,838 UACs and 41,949 family units have been found inadmissible at ports of entry.  *See* U.S. Customs and Border Protection, Southwest Border Migration FY2019, available at: https://www.cbp.gov/newsroom/stats/sw-border-migration.  The dramatic increase in minors crossing the Southwest border in and of itself is a circumstance

52

necessitating termination of the Agreement because it was unforeseen by the parties and unaddressed in the Agreement—which instead had an influx provision that came into effect if *just 130 children* were in INS custody.   Accordingly, the federal government has now published regulations that provide a comprehensive approach to deal with the crisis that exists *today*, under the framework of *current* statutory provisions.

c.   The Agreement Should Terminate Because of Changes in Law Since 1997.

The law governing immigration and alien minors has changed significantly since the Agreement was entered, further warranting termination.   Congress has made major and important changes that restructure the government's responsibility for the care and custody of minors not accompanied by a parent or legal guardian. The HSA and TVPRA, like the *Flores* litigation that gave rise to the Agreement, are designed to create special protections for the most vulnerable minors—those who enter the United States unaccompanied by a parent or legal guardian.   These changes show that the treatment of accompanied minors was left to be governed by existing law and implementing regulations, by standards that take into account the framework applicable to their adult parents with whom they are traveling.

In 2002, Congress enacted the HSA.   Pub. L. No. 107-296, 116 Stat. 2135. The HSA created DHS, transferring most immigration functions formerly performed by INS to the newly formed DHS and its components, including CBP and ICE.   *See also* DHS Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (set forth as note to 6 U.S.C. § 542).

The HSA also transferred to HHS the responsibility for the care of "unaccompanied alien children" (UACs) "who are in Federal custody by reason of their immigration status."   HSA § 462(a), (b)(1)(A);) (codified at 6 U.S.C. § 279(a), (b)(1)(A)).   The HSA further transferred to HHS the responsibility for making all placement decisions for UACs, required HHS to coordinate these placement

decisions with DHS, and prohibited HHS from releasing UACs on their own recognizance. *See id.* § 279(b)(l)(C), (D), (b)(2).

The TVPRA, signed into law on December 23, 2008, provided further protections to UACs in government custody.  Indeed, the TVPRA itself should have terminated the Agreement in 2008:  the material portions of the Agreement addressing UACs were codified with the enactment of section 235 of the TVPRA, Pub. L. No. 110-457, § 235, 122 Stat. 5044, 5074–5082 (Dec. 23, 2008) (codified in principal part at 8 U.S.C. § 1232).  *See, e.g.*, Carla L. Reyes, "Gender, Law, and Detention Policy: Unexpected Effects on the Most Vulnerable Immigrants," 25 Wis. J.L. Gender & Soc'y 301, 309–10 (Fall 2010) ("The Flores Settlement Agreement serves as the primary foundation for UAC detention policy, and the [TVPRA] recently codified many of its provisions.").

The TVPRA provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services."   8 U.S.C. § 1232(b)(1).  It then details that care and custody under terms largely derived from the Agreement.  Plaintiffs, of course, have not argued that the Flores Settlement Agreement overrides this statute that comprehensively addresses the care and custody of UACs.

In addition to these statutory changes, the issuance of the new rules here themselves constitute a change in the law calling for termination of the Agreement because the regulations comprehensively address the entire subject matter of the Agreement.  That is especially so because the Agreement expressly provides that is will terminate upon the issuance of regulations implementing its provisions.

----------

The government recognizes that as recently as last year, this Court found that the prominent changes in statutory law and landscape of immigration as of a year ago were not significant enough, on their own, to warrant termination or amendment

54

of the Agreement, ECF Nos. 177, 455. We submit that conclusion was erroneous, and the numbers of children crossing the Southwest border continue to rise at an extraordinary pace in part due to court decisions that create a powerful incentive to travel with children and pursue asylum claims that are likely to fail, an issue of growing concern across the country that was recognized in the Rule. 84 Fed. Reg. 44485. This fiscal year the numbers of children and family units have jumped 400% over all of 2018, and three months remain in the year. *See* 84 Fed. Reg. at 44,496; U.S. Customs and Border Protection, Southwest Border Migration FY2019, https://www.cbp.gov/newsroom/stats/sw-border-migration. The numbers are over *25 times* those just back in 2013. *Id.* And together with this surge is the reality that most asylum claims are not meritorious—with only 17% of aliens with cases completed in 2018 who established a credible fear being granted asylum. 83 Fed. Reg. 55,935. And, in any event, the comprehensive regulations issued by the two Departments, when coupled with the changes in statutory law and immigration landscape, now require termination of the Agreement.

In sum, the Court should thus dissolve the Agreement because it is the very type of institutional decree that the Supreme Court cautioned against: it implicates the separation of powers and prevents the government from exercising its constitutional powers to develop new policies to address the changes in immigration to the United States. The Agreement, on its face, was intended to implement a nationwide policy and be temporary in nature. Refusing to terminate the Agreement would "insulate the policies embedded in the order . . . from challenge and amendment" merely because it was initially written as a litigation settlement rather than a regulation and despite the acknowledgment in the Agreement that it could be replaced through the regulatory process. *See Horne*, 557 U.S. at 453. The power to enforce the immigration laws—including those involving child migrants—rests in the Executive branch and its agencies; the Agreement, however, prevents the Executive from exercising its authority over the treatment of alien children.

*Mathews*, 426 U.S. at 81.  The Agreement essentially removes from the Executive the power to respond to new immigration challenges and places that power in the hands of the Judiciary, contrary to bedrock separation of powers principles.  Because the current statutory and regulatory landscape fully provides for the constitutional and statutory rights of alien minors—the purpose for which this litigation was originally instituted and for which the Agreement was put in place—it is time for the Court to end its superintendence of this aspect of immigration policy and to return responsibility for determining and executing that policy to the Executive branch.

### D. The Public Interest Militates Termination Given Flaws in the Certified Class

#### 1. The Certified Class is Unwieldy And Not Cognizable Under Current Standards.

The *Flores* class no longer satisfies Rule 23(a) because there are not common questions of law and facts that govern the custody of minors, and the class is far too large and unwieldy for class action treatment.  "A district court may decertify a class at any time."  *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009)).  The standard for class decertification is the same as the standard for class certification:  Plaintiffs may maintain the case as a class action only if they satisfy the requirements of Rule 23.  *See*, *e.g.*, *Marlo v. UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).  While we are not yet formally moving to decertify the class, fundamental flaws in the class require terminating the agreement in the public interest.

The class certified under the Agreement is defined as "[a]ll minors who are detained in the legal custody of the INS."  Agreement ¶ 10.  Putting to one side the government's position that the Agreement was never meant to apply to minors accompanied by their parents, the multitude of questions that are raised by the many circumstances under which alien minors can come into the custody of either of two government agencies is not suitable to class action treatment, as the case no longer presents "questions of fact or law that are common to the class."  Fed. R. Civ. P. 23(a)(2).

56

Most importantly, the due process protections that apply in these circumstances vary in many ways—whether the minor is apprehended at the border or upon illegally crossing the border, or in the interior; whether the minor is alone or with a parent; whether a parent or legal guardian is available in the United States; the age of the minor; the purpose served by various facilities where custody might take place for shorter or longer periods of time.  In short, there is no common question presented by this amorphous set of circumstances that is susceptible to a common answer.  *Wal-Mart Stores, Inc., v. Dukes, et al.*, 564 U.S. 338, 349 (2011).

The statutory and regulatory treatment of each of these circumstances also varies dramatically.  In 1997, when the Agreement was signed between Plaintiffs and the now-abolished INS, the INS was responsible for arresting, processing, detaining or releasing, and removing aliens, including the small number of minors both accompanied and unaccompanied.  Now two agencies—including multiple components of DHS—are responsible for the care and custody of hundreds of thousands of minors at different stages of the immigration process and under widely varying legal requirements and standards.  Moreover, the original *Flores* litigation solely challenged the detention of minors under what was, at the time, a discretionary detention statute implemented on an ad hoc basis without national standards.  *See Reno*, 507 U.S. at 309 ("Respondents contend that the regulation goes beyond the scope of the Attorney General's discretion to continue custody over arrested aliens under 8 U. S. C. § 1252(a)(1)").  Now, in 2019, *multiple* agencies have custody of alien minors at different times, and which agencies a minor will encounter, as well as which statutes govern their custody, depends on their legal status as accompanied or unaccompanied minors and whether they are apprehended at the border or in the interior.  *See Flores*, 862 F.3d at 874 ("There is no question that the HSA and TVPRA gave new responsibilities to ORR with respect to the care and custody of unaccompanied minors.").

Today, for instance, unaccompanied class members are not placed in the immigration detention facilities of DHS—INS's successor—but transferred into the custody of ORR, and then released to suitable custodians after ORR that ensures each custodian can care for the child and would not place him or her at risk. 8 U.S.C. § 1232(b)(3); *see* 6 U.S.C. § 279(a), (b)(1)(A), (g)(2). Where no suitable custodian is available, UACs may remain in ORR custody in a setting appropriate for their care. Further complicating the matter, ORR custody can include foster care facilities, group homes, residential treatment facilities, or, when the individual is determined by ORR to be a danger to self or community, non-punitive secure custody. *See* 8 U.S.C. § 1232(c)(2)(A). Minors accompanied by their parents, on the other hand, are subject to custody by DHS custody and their custody raises a range of issues relating to family unification and the need to enforce immigration statutes as to the parents. Given the diversity of agencies now involved in the detention of minors, and the variety of laws and factual scenarios that animate detention decisions, there is no longer a "Flores class" recognizable pursuant to Rule 23(a).

Indeed, as litigation under the Agreement has shown, this Court is managing the detention of aliens in a manner more akin to management by a federal agency, not efficiently resolving the issues raised by the class "in one stroke" or satisfying the "capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (citation and quotation removed); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (must be a "common pattern or practice that could affect the class as a whole").

## 2. Other Flaws in the Class Further Justify Terminating the Agreement in the Public Interest

Flaws in the class certification process and the oversight of major portions of the immigration system by class counsel further militate in favor of terminating the Agreement in the public interest. To begin, the class certification process was

problematic in this case.  A settlement class of "all minors" was certified here after minimal notice, no fairness hearing, and no special procedures to account for the fact this case involved a class of children without their parents, and children are not authorized to litigate in the federal courts without consent of a guardian.  *See* Fed. R. Civ. P. 17(c)(2).  No parents or guardians were involved in the certification process or provided notice of the certification.  *Id.*  Yet the Agreement created and continues to create significant tension with parental rights, particularly with respect to children accompanied by their parents or legal guardians.  The absence of parents and legal guardians from this litigation has led to further litigation and is an additional reason why the Agreement should be terminated.

It is also not in the public interest to allow class counsel to implement through litigation a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS."  Agreement ¶ 9.  There is no congressional enactment evincing the will of the people to imbue Plaintiffs' counsel with the government's constitutional role concerning immigration policy.  "For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government*."  Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see Reno*, 507 U.S. at 305. And yet, under the Agreement, for two decades a single set of lawyers has effectively implemented through litigation a large part of the immigration system involving multiple agencies, hundreds of thousands of class members, implicating vast public resources, and affecting hundreds of facilities—indefinitely.  This extraordinary deferral of policy judgments to private actors has resulted in significant conflicts among class counsel at the expense of the interests of the massive, amorphous, and ever-changing class they represent.  Lead counsel has also been the subject of significant questions about his competency with respect to the care of children— including the operation of a substandard facility for minor children, and other issues that give rise to conflicts of interest with his role as class counsel overseeing the

conditions children face in government facilities.  *See* https://www.latimes.com/ projects/la-me-immigrant-children-group-home-casa-libre-peter-schey/  (published May 22, 2019); https://www.latimes.com/local/lanow/la-me-casa-libre-enforcement -20190624-story.html (published June 24, 2019) (noting that licensing officials held a non-compliance conference concerning a pattern of violations and directed class counsel to provide "a detailed 'plan of correction,' which must be submitted to licensing staff by July 19").  For example, positions class counsel takes in defending the conduct at the facility he operates, *id.*, could conflict with the interests of minors he represents as class counsel.  And there are inherent conflicts between class counsel operating a licensed child migrant shelter while simultaneously administering an agreement that provides for the release of minors to "a licensed program willing to accept legal custody."  Agreement ¶ 14.E; Mot. to Enforce at 7 (arguing that regulations are insufficient because they do not authorize release of children to "a licensed juvenile shelter"); *see Flores*, 507 U.S. at 302 (Plaintiffs arguing in favor of requiring the government to release minors to "willing-and-able private custodian[s]").  Under these circumstances, it is not in the public interest to continue the Agreement, and instead the new rules should be evaluated on a standalone basis in an appropriate case filed by an appropriate plaintiff subject to the rules.

## IV.  CONCLUSION

The issuance of the rule terminates the Agreement.  The regulations substantively parallel the Agreement while exercising policy judgments developed over time that reflect a "reasonable response" to the difficult problems presented when the government encounters immigrant minors.  *Reno*, 507 U.S. at 315. If the Court grants the motion to enforce, the government respectfully requests further briefing on remedies.  Alternatively, the Court should vacate the Agreement in light of the significant changes in law and circumstances since 1997.

Dated: August 30, 2019          Respectfully submitted,

                                JOSEPH H. HUNT
                                Assistant Attorney General
                                Civil Division

                                */s/ August E. Flentje*
                                AUGUST E. FLENTJE
                                Special Counsel to the Assistant Attorney General
                                Civil Division
                                P.O. Box 868, Ben Franklin Station
                                Washington, D.C. 20044
                                Tel: (202) 514-3309
                                Fax: (202) 305-7000
                                Email: august.flentje@usdoj.gov

                                WILLIAM C. PEACHEY
                                Director, District Court Section
                                Office of Immigration Litigation
                                WILLIAM C. SILVIS
                                Assistant Director, District Court Section
                                Office of Immigration Litigation
                                SARAH B. FABIAN
                                Senior Litigation Counsel
                                Office of Immigration Litigation
                                District Court Section

                                *Attorneys for Defendants*

61

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.


/s/ August E. Flentje
AUGUST E. FLENTJE
U.S. Department of Justice
Civil Division

*Attorney for Defendants*