Sarah P. Alexander (SBN 291080)
spalexander@constantinecannon.com
**CONSTANTINE CANNON LLP**
150 California Street, Suite 1600
San Francisco, CA 94111
Telephone: (415) 639-4001
Facsimile: (415) 639-4002

*Attorney for Human Rights Watch & Amnesty International USA*

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

JENNY LISETTE FLORES, *et al.*,

Plaintiffs,

v.

WILLIAM BARR, Attorney General, *et al.*,

Defendants.

Case No. CV 85-4544-DMG(AGRx)

**BRIEF OF *AMICI CURIAE* HUMAN RIGHTS WATCH AND AMNESTY INTERNATIONAL USA IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

STATEMENT OF INTEREST ........................................................................1

INTRODUCTION ....................................................................................3

ARGUMENT ..........................................................................................3

I. THE RIGHTS OF CHILD MIGRANTS AND REFUGEES UNDER INTERNATIONAL LAW. ...............................................3

II. THE REGULATIONS DO NOT ADEQUATELY PROTECT THE RIGHTS OF CHILD MIGRANTS AND REFUGEES UNDER INTERNATIONAL LAW. ...............................................7

A. Prolonged detention threatens child migrants' human rights. ..........................................................................................7

B. The Regulations' standards for the conditions of detention raise the risk of human rights violations. ............................10

## TABLE OF AUTHORITIES

### Cases

*Graham v. Florida*,
560 U.S. 48 (2010) .......... 2

*Mubilanzila Mayeka & Kaniki Mitunga v. Belgium*,
46 Eur. Ct. H.R. 23 (2007) .......... 6

*Popov v. France*,
63 Eur. Ct. H.R. 8 (2012) .......... 6

*Rafael Ferrer-Mazorra et al. v. United States*,
Case 9.903, Inter-Am. Comm'n H.R., Report No. 51/01 (Apr. 4, 2001) .......... 5

*Rahimi v. Greece*,
App. No. 8687/08, Eur. Ct. H.R. (Apr. 5, 2011) .......... 6

*Roper v. Simmons*,
543 U.S. 551 (2005) .......... 2, 4

### Regulations

45 C.F.R. § 410.101 .......... 12, 13

8 C.F.R. § 236.3 .......... 9, 12

84 Fed. Reg. 44,392 (Aug. 23, 2019) .......... 3

### International Agreements

Convention on the Rights of the Child,
adopted Nov. 20, 1989, 1577 U.N.T.S. 3 .......... 4

G.A. Res. 217A(III), Universal Declaration of Human Rights, (Dec. 10, 1948) .......... 4

International Covenant on Civil and Political Rights,
opened for signature Dec. 19, 1966, 999 U.N.T.S. 171 .......... 4, 9, 11

### Other Authorities

Advisory Committee on Family Residential Centers, Report of the ICE Advisory Committee on FRCs (Oct. 7, 2016) .......... 6, 10

Amnesty International USA, No Home for Children: U.S. Government Detention of Children at Homestead Facility Cruel and Unlawful (July 17, 2019) .......... 11, 13

Amnesty International USA, You Don't Have Any Rights Here (Oct. 2018) .......... 11, 13

Comm. on Migrant Workers & CRC, Joint Gen. Comment No. 4/23,
U.N. Doc. CMW/C/GC/4-CRC/C/GC/23 (Nov. 16, 2017) .......... 5

Human Rights Comm., Gen. Comment No. 35, *Art. 9: Liberty and Sec. of Pers.*,
U.N. Doc. CCPR/C/GC/35 (Dec. 16, 2014) .......... 4

Human Rights Watch, Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention (June 20, 2018) ............ 11, 13

Human Rights Watch, In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells (Feb. 28, 2018)........................................... 11, 13

Juan Ernesto Mendez, *Treatment of Children Deprived of Their Liberty*, U.N. Doc. A/HRC/28/68 (Mar. 4, 2015)............................................................... 5

Julie M. Linton et al., *Policy Statement: Detention of Immigrant Children*, Am. Acad. Pediatrics (Apr. 2017)....................................................................... 10

Kim Ehntholt et al., *Mental Health of Unaccompanied Asylum-Seeking Adolescents Previously Held in British Detention Centres*, 23 Clinical Child Psychol. & Psychiatry 238 (2018)............................................ 10

Maria Sacchetti, *Trump administration moves to terminate court agreement, hold migrant children and parents longer*,\ Wash. Post (Aug. 21, 2019) ........................ 6

Michael Dudley et al., *Children and Young People in Immigration Detention*, 25 Current Op. Psychol. 285 (2012) ....................................................... 10

Nicole Acevedo, *Why are migrant children dying in U.S. custody?*, NBC News (May 29, 2019) ......................................................................................... 11

Press Release, Human Rights Watch, US: Trauma in Family Immigration Detention (May 15, 2015) ......................................................................................... 10

Press Release, Inter-Am. Comm'n H.R., IACHR Concludes Visit to Colombia's Border with Venezuela (Sept. 28, 2015)............................................................. 6

Rachel Kronick et al., *Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study*, 85 Am. J. Orthopsychiatry 287 (2015)................................................................. 10

Rights and Guarantees of Children in the Context of Migration and/or in Need of Int'l Prot., Inter-Am. Ct. H.R. (ser. A) No. OC-21/14 (Aug. 19, 2014).................................... 5

U.N. Gen. Assembly, *Report of the Independent Expert Leading the United Nations Global Study on Children Deprived of Liberty*, U.N. Doc. A/74/136 (July 11, 2019)....................................................................... 5

U.N. Secretary General, *Int'l Migration & Dev.*, U.N. Doc. A/68/190 (July 25, 2013)....................................................................... 6

UN High Commissioner for Refugees, *Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers & Alternatives to Detention* (2012) ............................................................................................................ 5, 7

UN Working Group on Arbitrary Detention, Rev. Delib. No. 5, U.N. Doc. A/HRC/39/45 (July 2, 2018)................................................................ 4

UNHCR, *UNHCR's Position Regarding the Detention of Refugee and Migrant Children in the Migration Context* (Jan. 2017)....................................................... 5

Zachary Steel et al., *Psychiatric Status of Asylum Seeker Families Held for a Protracted Period in a Remote Detention Centre in Australia*, 28 Austl. & N. Z. J. Pub. Health 527 (2004) .......... 10

## STATEMENT OF INTEREST

Human Rights Watch and Amnesty International USA respectfully submit this brief as *amici curiae* in support of Plaintiffs.[1] Human Rights Watch is a non-profit, independent organization that investigates allegations of human rights violations in more than 90 countries around the world, including in the United States, by interviewing witnesses, gathering information from a variety of sources, and issuing detailed reports. Where human rights violations have been found, Human Rights Watch advocates with governments and international organizations to remedy the violations and mobilizes public pressure for change. Human Rights Watch has monitored rights conditions for migrant youth in United States custody for over two decades, including in the lead up to the finalization of the *Flores* Settlement Agreement in 1997.

Amnesty International USA is a non-partisan, non-profit organization that, together with more than 70 national and territorial counterparts, makes up Amnesty International. Amnesty International is the world's largest grassroots human rights organization, comprising a global support base of more than seven million individual members, supporters, and activists in more than 150 countries and territories. Amnesty International engages in advocacy, litigation, and education to prevent and end human rights violations and to demand justice for those whose rights have been violated. Amnesty International's interest in this case stems from its expertise in conditions faced by migrants and refugees in the United States and principles relating to the human rights of migrants and refugees.

*Amici* believe that the Court in this matter would benefit from an exposition

[1] Counsel for all parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No persons other than the *amici* or their counsel made a monetary contribution to this brief's preparation or submission.

of human rights norms and principles on child migrants and refugees, and an explanation of how those norms and principles apply to this population. The federal courts have considered the persuasive value of human rights norms in analogous settings concerning the rights of a child. *See, e.g.*, *Graham v. Florida*, 560 U.S. 48, 80 (2010), *as modified* (July 6, 2010); *Roper v. Simmons*, 543 U.S. 551, 578 (2005). Human Rights Watch and Amnesty International USA respectfully submit that such an understanding would likewise be of assistance to this Court in deciding these issues.

# INTRODUCTION

On August 23, 2019, the Department of Homeland Security ("DHS") and Department of Health and Human Services ("HHS") issued a set of regulations ("*Flores* Regulations" or "Regulations") designed to terminate the *Flores* Settlement Agreement ("FSA" or "Settlement Agreement"). *See* 84 Fed. Reg. 44,392 (Aug. 23, 2019), https://www.govinfo.gov/content/pkg/FR-2019-08-23/pdf/2019-17927.pdf. Since the Settlement Agreement provides that regulations may terminate the Settlement Agreement only if the Court finds that the regulations "implement[]" the Agreement, the Regulations cannot serve their designed purpose unless the Court expressly finds that they implement the FSA. *See* FSA ¶ 9.

*Amici* respectfully submit that an understanding of international human rights law is helpful in evaluating whether the Regulations comply with the FSA's substantive terms.

# ARGUMENT

As recognized by the *Flores* litigation itself, child migrants and refugees are a particularly vulnerable group. They encounter significant challenges in obtaining the basic rights to which they are entitled under international law and human rights legal norms. Immigration detention of any length potentially results in grave detriment to their mental and physical health. Because the *Flores* Regulations fail to implement the Settlement Agreement's substantive protections, they put child migrants and refugees at increased and significant risk.

## I. THE RIGHTS OF CHILD MIGRANTS AND REFUGEES UNDER INTERNATIONAL LAW.

A brief examination of those laws and principles confirms the various fundamental ways in which the *Flores* Regulations put child migrants and refugees' human rights at risk.

The right to liberty is a fundamental norm of international human rights law, which, while not absolute, includes a strict prohibition on arbitrary detention. International Covenant on Civil and Political Rights ("ICCPR"), opened for signature Dec. 19, 1966, 999 U.N.T.S. 171, art. 9 (ratified by the United States June 8, 1992, without reservations, understandings, or declarations as to article 9 ("No one shall be subjected to arbitrary arrest or detention."); G.A. Res. 217A(III), Universal Declaration of Human Rights, art. 9(1) (Dec. 10, 1948); U.N. Working Group on Arbitrary Detention, Rev. Delib. No. 5, ¶ 8 U.N. Doc. A/HRC/39/45 (July 2, 2018) ("The prohibition of arbitrary detention is absolute, meaning that it is a non-derogable norm of customary international law, or *jus cogens*.").[2]

Detention is justified and not arbitrary only if it is lawful (that is, prescribed in law and based on allowed grounds); reasonable, necessary, and proportionate in light of the circumstances; and respectful of procedural safeguards, including, for example, the requirement that it be reassessed over time. *See* Human Rights Comm., Gen. Comment No. 35, *Art. 9: Liberty and Sec. of Pers.*, ¶ 12, U.N. Doc. CCPR/C/GC/35 (Dec. 16, 2014) ("H.R.C. Gen. Comment No. 35"); U.N. Working Group on Arbitrary Detention, *Rev. Delib. No. 5 on Deprivation of Liberty of Migrants* ("WGAD, Rev. Delib. No. 5"), ¶ 20 (Feb. 7, 2018).

The U.N. Working Group on Arbitrary Detention maintains that detention for adult migrants should only be used as an "exceptional measure of last resort, for the shortest period and only if justified by a legitimate purpose." WGAD, Rev. Delib.

---

[2] *See also* Convention on the Rights of the Child ("CRC"), adopted Nov. 20, 1989, 1577 U.N.T.S. 3, art. 37(b) ("No child shall be deprived of his or her liberty unlawfully or arbitrarily."). The United States signed the Convention on the Rights of the Child ("CRC") in 1995, though is the only country in the world that has not yet ratified it. As a signatory to the CRC, the United States is still obligated under customary international law to refrain from acts that would defeat the object and purpose of treaty. Furthermore, courts, including the Supreme Court, have previously looked to the CRC's standards as instructive. *See Roper*, 543 U.S. at 576 (citing CRC's prohibition on juvenile capital punishment as persuasive authority).

No. 5, ¶ 12. Mandatory detention of a class of persons exceeds the requirements of necessity and proportionality and constitutes arbitrary detention, as does excessive or indefinite detention. H.R.C. Gen. Comment No. 35, ¶ 18; WGAD, Rev. Delib. No. 5, ¶¶ 25–26.[3] The detention of asylum seekers is subject to still further procedural safeguards. *See* U.N. High Commissioner for Refugees (UNHCR), *Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers & Alternatives to Detention* ("*Detention Guidelines*") (2012).

International standards recognize that children should not be detained solely because of their or their parents' immigration status as it is never in their best interest.[4] *See, e.g.*, WGAD, Rev. Delib. No. 5, ¶ 11; Comm. on Migrant Workers & CRC, Joint Gen. Comment No. 4/23, ¶¶ 5–13, U.N. Doc. CMW/C/GC/4-CRC/C/GC/23 (Nov. 16, 2017); U.N. Gen. Assembly, *Report of the Independent Expert Leading the United Nations Global Study on Children Deprived of Liberty*, ¶ 56, U.N. Doc. A/74/136 (July 11, 2019); Juan Ernesto Mendez (Special Rapporteur on Torture and Other Cruel Inhuman or Degrading Treatment or Punishment), *Treatment of Children Deprived of Their Liberty* ("Mendez Report"), ¶ 80, U.N. Doc. A/HRC/28/68 (Mar. 4, 2015); Rights and Guarantees of Children in the Context of Migration and/or in Need of Int'l Prot., Inter-Am. Ct. H.R. (ser. A) No. OC-21/14 ¶¶ 154–60 (Aug. 19, 2014); UNHCR, *UNHCR's Position Regarding the Detention of Refugee and Migrant Children in the Migration Context* (Jan. 2017), https://www.refworld.org/docid/5885c2434.html. The U.N. Secretary-General thus concluded that: "Detention of migrant children constitutes a violation

---

[3] The Inter-American Commission on Human Rights has similarly concluded that the American Convention on Human Rights requires that immigration detention be used only in exceptional circumstances; there should be a presumption in favor of liberty, not of detention. *See Rafael Ferrer-Mazorra et al. v. United States*, Case 9.903, Inter-Am. Comm'n H.R., Report No. 51/01, ¶¶ 216–19 (Apr. 4, 2001).

[4] Indeed, there is an emerging international consensus that the CRC prohibits the detention of children for purely migration-related reasons.

of child rights." U.N. Secretary General, *Int'l Migration & Dev.*, ¶ 75, U.N. Doc. A/68/190 (July 25, 2013). DHS's Advisory Committee on Family Residential Centers ("FRCs") concluded that "detention or the separation of families for purposes of immigration enforcement or management are *never in the best interest of children*." Rep. of the ICE Advisory Comm. on FRCs, at 2, 5 (Oct. 7, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf (emphasis added).

The U.N. special rapporteur on torture additionally noted that immigration detention of children puts them at risk of cruel, inhuman, or degrading treatment or punishment. Mendez Report ¶ 80. Other international human rights bodies have expressed that even short-term immigration detention of children may rise to the level of "cruel, inhuman, and degrading treatment" because child migrants are "at greater risk of torture and mistreatment owing to their vulnerability and unique needs." Press Release, Inter-Am. Comm'n H.R., IACHR Concludes Visit to Colombia's Border with Venezuela (Sept. 28, 2015), http://www.oas.org/en/iachr/media_center/PReleases/2015/109A.asp; *cf. Popov v. France*, 63 Eur. Ct. H.R. 8 (2012) (holding child migrant's detention violated European human rights treaty's prohibition on torture); *Rahimi v. Greece*, App. No. 8687/08, Eur. Ct. H.R. (Apr. 5, 2011) (same); *Mubilanzila Mayeka & Kaniki Mitunga v. Belgium*, 46 Eur. Ct. H.R. 23 (2007) (same).

U.S. government officials have publicly argued that the *Flores* Regulations, and the widespread detention in FRCs that they impose, will deter "illegal" immigration at the southern border. *See* Maria Sacchetti, *Trump administration moves to terminate court agreement, hold migrant children and parents longer*, Wash. Post (Aug. 21, 2019), https://www.washingtonpost.com/immigration/trump-administration-moves-to-terminate-court-agreement-hold-migrant-children-and-parents-longer/2019/08/21/c268bb44-c28b-11e9-9986-1fb3e4397be4_story.html

(discussing federal officials who "hoped the threat of detention would send a powerful message to smugglers . . . ."). Detention policies aimed at deterrence are generally unlawful under international human rights law, as they dispense with the required individual assessment. Detention decisions must be based on an individual assessment of "necessity." *See* WGAD, Rev. Delib. No. 5, ¶ 20; H.R.C., Gen. Comment No. 35, ¶ 18; *see also* UNHCR, *Detention Guidelines*, Guideline 4.1.4 & ¶ 3. The necessity standard means that detention must be "absolutely indispensable" and "no other measure less onerous exists." WGAD, Rev. Delib. No. 5, ¶ 22; *cf.* UNHCR, *Detention Guidelines*, Guideline 4.1 (defining "necessity" as required for a "legitimate purpose," which is limited to the protection of "public order, public health or national security").

## II. THE REGULATIONS DO NOT ADEQUATELY PROTECT THE RIGHTS OF CHILD MIGRANTS AND REFUGEES UNDER INTERNATIONAL LAW.

While the Settlement Agreement, as interpreted by this and sister courts, limits the possible detention of children to 20 days (which arguably is already a violation of international law), the *Flores* Regulations provide for the potential *indefinite detention* of children during the pendency of immigration proceedings. The *Flores* Regulations also eliminate protections currently provided by the Settlement Agreement. In the process, the *Flores* Regulations put children at considerable risk of serious lasting physical and psychological harm.

### A. Prolonged detention threatens child migrants' human rights.

As discussed above, international legal bodies have repeatedly found that it is not in the best interests of a child to ever be detained. These bedrock principles are reflected in the FSA's requirement that the government prioritize children's freedom and reunification with family members/sponsors as expeditiously as possible. The FSA core section, "General Policy Favoring Release," provides unambiguously that

absent certain limited circumstances, "the INS shall release a minor from its custody without unnecessary delay."[5] FSA ¶ 14. This requirement further recognizes that children need a close and supportive relationship with a caregiver in order to thrive, and that detention risks grave harm to the child.

Moreover, while a child is detained, the FSA requires that "the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor . . . ," and requires that such efforts "shall continue so long as the minor is in INS custody." FSA ¶ 18. To the extent that a child remains in custody longer than the few days anticipated by the FSA, the FSA provides that the child shall be moved out of prison-like federal immigration facilities and into a non-secure "licensed program" equipped to provide for a dependent's care pursuant to state regulations. FSA ¶ 19.

It is thus a foundational principle of the FSA that pending a child's further immigration proceedings, the child should be released as soon as possible to family members or other acceptable sponsors rather than held in detention. Likewise, while the FSA contemplates that a child may remain in longer-term detention where there are no family members or acceptable sponsors to whom the child can be released, it requires that, in such circumstances, the child should not be in a federal immigration facility. Rather, the child must be in a setting that is licensed by a state child welfare agency for the longer-term housing and care of children.

These two basic tenets of the FSA move the United States towards implementing international legal principles that protect child migrants and recognize that any period of detention is not in the best interests of a child. *See generally supra* Section I. The United States should strictly limit detention for migrant and

[5] The Immigration and Naturalization Service (or INS) was reorganized into different entities under DHS's auspices in 2003. As the Settlement Agreement predates that change, the FSA continues to refer to the INS.

refugee children. The *Flores* Settlement Agreement, by imposing strict time limits on a child's detention, recognizes these principles. By contrast, the *Flores* Regulations provide for indefinite detention of accompanied children in federal immigration facilities pending resolution of the long process of their *and* their parents' immigration proceedings.[6] *See, e.g.*, 8 C.F.R. §§ 236.3(e), (h), (j)(3) (regulations failing to provide time limits for detention of children).

Legalizing indefinite detention of children with their families is in and of itself harmful to children's basic welfare. There is no evidence that any amount of time in detention is safe for children. Even short periods of detention can cause

---

[6] Disturbingly, the *Flores* Regulations also eliminate the requirement that DHS evaluate simultaneous release of a parent, legal guardian, or adult relative who is also detained when releasing juveniles from DHS custody. The prior version of 8 C.F.R. § 236.3(b)(2) provided that, when a minor in DHS custody is authorized for release on bond, parole, or recognizance, and there is no suitable sponsor available, DHS shall evaluate, on a "discretionary case-by-case basis," the simultaneous release of a "parent, legal guardian, or adult relative in Service detention." The *Flores* Regulations eliminate this provision entirely. Without the requirement to consider simultaneous release for parents along with their children, more children may be deprived of liberty as they are left in family detention for longer periods or separated from their parents and placed in Office of Refugee Resettlement ("ORR") custody as "unaccompanied" children. Eliminating discretion also entrenches the arbitrariness of detention irrespective of the circumstances of specific cases, and without regard for best interests of the child.

ORR is supposed to provide care and custody for children only until they can be released to appropriate sponsors in the community. As such, ORR custody serves a distinct role from DHS custody, as ORR's primary purpose is not to detain children throughout their removal proceedings but to enable expeditious reunification and release of children. This accords with international children's rights norms that call for respect for the rights, responsibilities, and duties of parents and members of the extended family and for the best interests of the child to be a primary consideration in all actions concerning children. *See, e,g.*, ICCPR, art. 24 (right of the child to "such measures of protection as are required by [their] status as a minor"); CRC, arts. 5, 3. The *Flores* Regulation's changes to the release standards overlook this critical responsibility.

psychological trauma and long-term mental health issues. *See* Julie M. Linton et al., *Policy Statement: Detention of Immigrant Children*, Am. Acad. Pediatrics (Apr. 2017), http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483. In a retrospective analysis, detained children were reported to have a tenfold increase in developing psychiatric disorders. Zachary Steel et al., *Psychiatric Status of Asylum Seeker Families Held for a Protracted Period in a Remote Detention Centre in Australia*, 28 Austl. & N. Z. J. Pub. Health 527 (2004). Numerous clinical studies have demonstrated that parental presence does not preclude the damaging impact of detention on the physical and mental health of children. *See, e.g.*, Michael Dudley et al., *Children and Young People in Immigration Detention*, 25 Current Op. Psychol. 285 (2012); Kim Ehntholt et al., *Mental Health of Unaccompanied Asylum-Seeking Adolescents Previously Held in British Detention Centres*, 23 Clinical Child Psychol. & Psychiatry 238 (2018); Rachel Kronick et al., *Asylum-Seeking Children's Experiences of Detention in Canada: A Qualitative Study*, 85 Am. J. Orthopsychiatry 287 (2015).

In 2015, families who had been detained for the United States for periods approaching a year reported trauma, depression, and suicidal thoughts in detention. *See* Press Release, Human Rights Watch, US: Trauma in Family Immigration Detention (May 15, 2015), https://www.hrw.org/news/2015/05/15/us-trauma-family-immigration-detention-0; *see also* Rep. of the ICE Advisory Comm. on FRCs (concluding that "detention is generally neither appropriate nor necessary for families—and that detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children.").

**B. The Regulations' standards for the conditions of detention raise the risk of human rights violations.**

The Regulations allow detention centers to evade state oversight and exploit

loopholes regarding standards of care. As such, they could exacerbate existing human rights violations within the detention system.

The ICCPR requires that all persons in detention "shall be treated with humanity and with respect for the inherent dignity of the human person." ICCPR, art. 10. The current conditions of confinement for child migrants in U.S. custody is already grossly inadequate. These dangerous conditions—including inadequate and inappropriate food, severely cold temperatures, bullying and abuse, and lack of medical care[7]—have been documented repeatedly. *See, e.g.*, Amnesty International USA, No Home for Children: U.S. Government Detention of Children at Homestead Facility Cruel and Unlawful ("No Home") (July 17, 2019), https://www.amnestyusa.org/reports/no-home-for-children-us-government-detention-of-children-at-homestead-facility-cruel-and-unlawful/; Amnesty International USA, You Don't Have Any Rights Here ("No Rights Here") (Oct. 2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF; Human Rights Watch, Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention ("Code Red") (June 20, 2018), https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration; Human Rights Watch, In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells ("In the Freezer") (Feb. 28, 2018), https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-

[7] These failures have real and tragic consequences. From 2010 through June 2018, at least 23 out of 74 deaths (of adults) in immigration detention were linked by outside experts to substandard medical care. *See* Human Rights Watch, Code Red (discussing medical expert review of 52 deaths that found 23 linked to "medical care lapses"). At least seven migrant children have died in immigration custody or soon after their release since March 2018. *See* Nicole Acevedo, *Why are migrant children dying in U.S. custody?*, NBC News (May 29, 2019), https://www.nbcnews.com/news/latino/why-are-migrant-children-dying-u-s-custody-n1010316.

holding-cells.

The *Flores* Regulations lack basic protections concerning the conditions of detention, which could worsen conditions further. First, the *Flores* Regulations eliminate the requirement that facilities detaining children with their families be properly licensed to "provide residential, group, or foster care services for dependent children" by the state in which they are located. *See* FSA ¶ 6; *compare* FSA Ex. 1 ("Licensed programs shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes") *with* 8 C.F.R. § 236.3(b)(9) (defining "Licensed Facility" as "an ICE detention facility that is licensed by the state, county, or municipality in which it is located, *if such a licensing process exists*" and if not, providing for an audit process "to ensure compliance with the family residential standards established by ICE" (emphasis added)). Eliminating the state licensing requirement removes a backstop that may ensure children are housed in facilities capable of providing for their health, safety, and welfare.

Second, the definition of "emergency" in the Regulations multiplies the risks for child migrants. Under the "emergency" conditions specified by the *Flores* Regulations, the government may simply ignore the basic needs of children, including even providing snacks and meals. *See* 8 C.F.R. § 236.3(b)(5) ("emergency" definition); 45 C.F.R. § 410.101 (same). The *Flores* Regulations broadly include natural disaster, facility fire, civil disturbance, and medical or public health concerns among the examples of such "emergency" events; nor is the list exclusive: The Regulations indicate that other kinds of events might also qualify, leaving significant room for interpretation. *See* 8 C.F.R. § 236.3(b)(5); 45 C.F.R. § 410.101. The Regulations' expansion of the emergency provisions to limit the protections provided during an emergency is especially worrying given the agencies' current record of failure to adhere to basic standards of child protection.

*See, e.g.*, Amnesty International, No Home; Amnesty International, No Rights Here, Human Rights Watch, Code Red; Human Rights Watch, In the Freezer.

In addition, the expansive use of the term "influx," which is supposed to describe an extraordinary circumstance like the term "emergency," puts children at risk of prolonged detention. Despite the changed circumstances from 20 years ago, the Government has kept the same definition of "influx" found in FSA ¶ 12(B), or "more than 130 minors eligible for placement in a licensed program . . . ." *See* 45 C.F.R. § 410.101. By failing to update this antiquated number, the *Flores* Regulations put the Government in a permanent state of "influx," leaving children more vulnerable.[8]

These changes replace the FSA with new standards that are neither safe nor humane under established international law principles. Legalizing prolonged and indefinite detention of families, eliminating the state licensing requirement, and institutionalizing a permanent state of "emergency" to justify failure to meet standards of care all will further compromise the treatment of migrant and refugee children and their families. Under these Regulations, children will inevitably find themselves in detention, which is not in their best interests under established international norms. And the Regulations could lead to inadequate conditions of confinement, compounding risks to their rights.

*Amici* Human Rights Watch and Amnesty International USA thus urge this court to weigh these realities, and the U.S. Government's human rights obligations,

---

[8] The FSA also uses the terms "influx" and "emergency," but the Settlement Agreement's provisions were intended to account for unexpected and significant increases in children in custody, and not to serve as a baseline standard for the agency's ongoing and routine care and placement of unaccompanied alien children in ORR custody. The broad definition of emergency and the failure to update the definition of influx in the *Flores* Regulations provide massive leeway to DHS and HHS to selectively ignore the important children's rights provisions, essentially leaving unregulated immigration enforcement operations impacting migrant and refugee children.

as it considers whether the *Flores* Regulations properly implement the substantive provisions of the *Flores* Settlement Agreement.

Dated: August 30, 2019

Respectfully submitted,

**CONSTANTINE CANNON LLP**

By: _s/ Sarah P. Alexander_

SARAH P. ALEXANDER
spalexander@constantinecannon.com
**CONSTANTINE CANNON LLP**
150 California Street, Suite 1600
San Francisco, CA 94111
Telephone: (415) 639-4001
Facsimile: (415) 639-4002

*Attorney for* Amici Curiae *Human Rights Watch & Amnesty International USA*