CHAPMAN AND CUTLER LLP
PETER BACH-Y-RITA, SBN 267442
bachyrita@chapman.com
595 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 278-9037

JOSEPH P. LOMBARDO*
lombardo@chapman.com
SARA T. GHADIRI*
ghadiri@chapman.com
ERIC S. SILVESTRI*
silvest@chapman.com
111 West Monroe Street, 16th Floor
Chicago, Illinois 60603
Telephone: (312) 845-3000
*pro hac vice pending

Attorneys for Lead Amicus
   Children's Rights

---

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

---

| | |
|---|---|
| JENNY LISETTE FLORES, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM P. BARR, Attorney General of the United States, *et al*., <br><br> Defendants. | Case No. 2:85-cv-4544-DMG (AGR) <br><br> **BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE** |

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-i-

# TABLE OF CONTENTS

PAGE

STATEMENT OF INTEREST ...................................... 1

ARGUMENT ........................................................ 4

   I.    THE FINAL RULES ARE INCONSISTENT WITH THE TERMS OF THE FSA .................................................... 5

        A.   The FSA's State-Licensing Regime Incorporates Basic Child Welfare Practices ..................... 6

        B.   The Final Rules Disregard the FSA's State-Licensing Regime .................................. 8

        C.   The Lack of Protections in the Final Rules Is Inconsistent with the FSA ......................... 8

            1.   Audits of Federal Residential Centers Are Not Equivalent to State Agency On-Site Inspections ............. 9

            2.   The Final Rules Do Not Provide an Adequate System for Reports of Abuse or Violations ................... 10

            3.   The Final Rules Do Not Provide a System for Addressing and Correcting Standards Violations ......... 13

   II.   THE FAILURE TO REQUIRE STATE-LAW LICENSURE FOR FAMILY RESIDENTIAL CENTERS WILL HARM CHILDREN AND THEIR FAMILIES ............................................ 15

        A.   The Final Rules' Treatment of Children as Prisoners is Inconsistent with the Terms of the FSA ........... 15

        B.   DHS's History Shows That Its Treatment of Children in Detention Is Inconsistent with State Licensing Standards ....................................... 18

CONCLUSION .................................................... 22

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-ii-

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Bunikyte, ex rel. Bunikiene v. Chertoff*, 2007 WL 1074070 (W.D. Tex.
    Apr. 9, 2007) ..................................................................................... 7

*Flores v. Johnson*, 212 F. Supp.3d 864 (C.D. Cal. 2015) ................................ 6, 7

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ......................................... 7

*Flores v. Sessions*, 2018 WL 4945000 (C.D. Cal. July 9, 2018) ........................ 6, 8

*In the Appeal of Berks Cty. Residential Ctr.*, Docket No. 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
    (Commonwealth of Pennsylvania Department of Human Services,
    Bureau of Hearings and Appeals filed November 23, 2015) ................................ 8

*Reno v. Flores*, 507 U.S. 292 (1993) ...................................................... 7

*See Grassroots Leadership v. Tex. Dep't of Family and Protective
    Servs.*, No. D-1-GN-15-004336, 2016 WL 9234059 (250th Tex.
    Jud. Dist. Ct. Dec. 16, 2016) ......................................................... 8


STATUTES

18 N.Y. COMP. CODES R. & REGS. § 413 ............................................. 14

42 U.S.C. § 671 ................................................................. 7, 9

42 U.S.C. § 675 ................................................................. 16

89 ILL. ADMIN. CODE § 383 ........................................................ 12

ARK. CODE ANN. § 9-28-113 ....................................................... 16

CAL. HEALTH & SAFETY CODE § 1538 ................................................ 11

CAL. HEALTH & SAFETY CODE § 1548 ................................................ 14

CAL. WELF. & INST. CODE § 16001 ................................................. 16

PA. CONS. STAT. § 2633 .......................................................... 16

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO
ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-iii-

Preventing Sex Trafficking and Strengthening Families Act, Pub. L.
No. 113-183, § 111, 128 Stat. 1919 (2014) ........................................ 16


OTHER AUTHORITIES

AMERICAN CORRECTIONAL ASSOCIATION, STANDARDS &
ACCREDITATION, AUG. 30, 2019 ........................................................ 18

Before You Submit a Complaint, U.S. DEP'T OF HEALTH & HUMAN
SERV., OFFICE OF INSPECTOR GENERAL ............................................. 13

CHILD WELFARE LEAGUE OF AMERICA, STANDARDS OF EXCELLENCE
FOR ABUSED OR NEGLECTED CHILDREN AND THEIR FAMILIES § 6.8
(2004) ..........................................................................................passim

CHILD WELFARE LEAGUE OF AMERICA, STANDARDS OF EXCELLENCE
FOR RESIDENTIAL SERVICES §4.12 (2004) ......................................... 15

DEP'T OF HEALTH & HUMAN SERVS. CHILDREN'S BUREAU,
DETERMINING THE BEST INTERESTS OF THE CHILD (2016) .................. 17

DEP'T OF HEALTH & HUMAN SERVS. CHILDREN'S BUREAU, MAKING
AND SCREENING REPORTS OF CHILD ABUSE AND NEGLECT (2017)..................... 12

DETENTION WATCH NETWORK, EXPOSE & CLOSE: ARTESIA FAMILY
RESIDENTIAL CENTER, NEW MEXICO (2014) ..................................... 20

HUMAN RIGHTS FIRST, FAMILY DETENTION: STILL HAPPENING, STILL
DAMAGING (2015) ........................................................................... 20

ICE ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS,
REPORT OF ICE COMMITTEE ON FAMILY RESIDENTIAL CENTERS
(2016) ...................................................................................... 19, 20

Ingrid Eagly, Steven Shafer & Jana Whalley, Detaining Families: A
Study of Asylum Adjudication in Family Detention, 106 CALIF. L.
REV. 785 (2018) ......................................................................... 21, 22

INT'L DETENTION COALITION, NEVER IN A CHILD'S BEST INTERESTS
(2017) ............................................................................................ 19

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION TO
ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-iv-

Julia Webster, *Her 19-Month-Old Daughter Died After Being Held at an ICE Facility. Here's What Yazmin Juárez Told Congress,* TIME (July 11, 2019) ................................................................. 20

Julie M. Linton, Marsha Griffin, Alan J. Shapiro, *Detention of Immigrant Children*, 139 PEDIATRICS 1 (2017) ........................ 5, 19, 20

Letter from American Immigration Council, American Immigration Lawyers Association, and Catholic Legal Immigration Network, Inc. to Cameron Quinn and John V. Kelly (February 28, 2019) ....................... 21

NATIONAL ASSOCIATION FOR REGULATORY ADMINISTRATION, BEST PRACTICES FOR HUMAN CARE REGULATION (2017) ........................ 9, 11, 12, 15

Nicole Acevedo, *Why Are Migrant Children Dying in Custody?*, NBC NEWS (May 29, 2019) ................................................... 21

*Office for Civil Rights and Civil Liberties*, U.S. DEP'T OF HOMELAND SECURITY (Aug. 21, 2019) ................................................. 13

Office of Inspector General, Dep't of Health & Human Servs., OEI-02-98-00570, State Oversight of Residential Facilities for Children (2000). ................................................... 11, 15, 16

OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-19-51, MANAGEMENT ALERT–DHS NEEDS TO ADDRESS DANGEROUS OVERCROWDING AND PROLONGED DETENTION OF CHILDREN AND ADULTS IN THE RIO GRANDE VALLEY (2019) ........................ 22

Press Release, Pennsylvania Auditor General, Auditor General DePasquale Launches Review of Detainees' Treatment in Berks County Residential Center (June 13, 2019) ........................ 21

Riane Roldan, *Lawyer: Inside an immigrant detention center in South Texas, "basic hygiene just doesn't exist"*, THE TEXAS TRIBUNE (June 23, 2019) ................................................................. 22

Scott Shuchart, *Building Meaningful Civil Rights and Liberties Oversight at the U.S. Department of Homeland Security*, CENTER FOR AMERICAN PROGRESS (April 2, 2019) ........................ 14

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

–v–

Simon Romero *et al.*, *The Stuff of Nightmares: Inside the migrant detention center in Clint, Texas*, EL PASO TIMES & N.Y. TIMES (July 6, 2019).................................................................................................. 22

U.S. IMMIGRATION AND CUSTOMS ENF'T, ICE/DRO RESIDENTIAL STANDARDS (2007) ............................................................... 14

REGULATIONS

12 C.F.R. 236.3 ........................................................................ 8

45 C.F.R. 410 .......................................................................... 4

Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44392-44535 (Aug. 23, 2019).................................................................... passim

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-vi-

## STATEMENT OF INTEREST

Children's Rights, together with the below-mentioned entities, respectfully submit this brief, as *amici curiae*, in support of Plaintiffs' Motion to Enforce Settlement Notwithstanding Publication of Final Rule. *Amici* are all non-profit organizations that work to improve outcomes for children and youth. Each has extensive experience in child welfare and related areas (such as immigration and juvenile justice), and together *amici* provide a wide range of legal and policy advocacy in those fields.

*Amici* have a substantial interest in the Court's resolution of this case because the issues this Court will decide will have a direct impact on their work and the populations served by their work, namely, vulnerable children and families, including non-citizens, who interact with the child welfare, juvenile justice, or immigration systems. As child welfare professionals, *amici* are well-positioned to articulate the nature of the potential harms at the center of this case. *Amici* understand the devastating effect that detention can have on children and their families, particularly if there is ineffective or inadequate oversight of the detention facilities. *Amici* include the following child welfare organizations:

**Children's Rights** is a national advocacy non-profit organization dedicated to improving the lives of vulnerable children in government systems. Children's Rights has successfully challenged unnecessary and harmful practices in the over-institutionalization of children in state custody, especially children who already have been traumatized as a result of separation from their homes and families. **The Center for the Study of Social Policy** (*"CSSP"*) is a national non-profit organization recognized for its leadership in reforming public systems and advancing policies that promote equity and improve the lives of children and families. Specifically, CSSP provides technical assistance and policy analysis on a broad set of policies affecting

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-1-

children and families, including best practices regarding safe and supportive out-of-home-placement and requirements to meet the well-being and needs of children and youth. **The Center for Children & Youth Justice** (*"CCYJ"*) is a 501(c)(3) non-profit organization with a mission to improve—through systems reform—the outcomes of children and youth who enter the juvenile justice, child welfare, and related systems. CCYJ works to ensure that such systems are integrated, unbiased, fueled with innovative ideas, and backed by rules and programs to achieve the best outcomes for children, youth, and young adults.  **The Center on Children and Families** (*"CCF"*) at the University of Florida Fredric G. Levin College of Law in Gainesville, Florida is an academic organization whose mission is to promote the highest quality teaching, research, and advocacy for children and their families. CCF supports interdisciplinary research in areas of importance to children, youth and families, and promotes child-centered, evidence-based policies and practices in dependency, juvenile justice, and other systems serving children and families. Its faculty has many decades of experience in advocacy for children and youth in a variety of settings. **The Children's Advocacy Institute** (*"CAI"*) is an academic, research, and advocacy center founded in 1989 at the University of San Diego School of Law. Conducted through offices in San Diego, Sacramento, and Washington, D.C., CAI's research and advocacy component leverages change for children and youth at the federal and state levels through impact litigation, regulatory and legislative advocacy, and public education.[1] **First Star, Inc.** (*"First Star"*) is a

---

[1]     One of CAI's current lawsuits is *Children's Advocacy Institute v. Office of Refugee Resettlement, et al.* (Case No. 3:19-cv-00462-GPC-BGS, S.D. Cal.), in which CAI is pursuing judicial relief pursuant to the Freedom of Information Act after the failure of four federal agencies to appropriately respond to requests for information pertaining to the status and well-being of detained children who were separated from their asylum-seeking parents—children who will be dramatically harmed by the abnegation of the FSA.

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-2-

national 501(c)(3) public charity dedicated to improving life for child victims of abuse and neglect. First Star partners with child welfare agencies, universities, and school districts to ensure foster youth have the academic, life skills, and adult support needed to successfully transition to higher education and adulthood. First Star knows first-hand the harm and trauma that unnecessary detention and institutionalization causes young people, creating trauma and post-traumatic stress that they carry with them for the rest of their lives, which negatively impacts their health and potential to thrive. **Juvenile Law Center** (*"JLC"*) advocates for rights, dignity, equity, and opportunity for youth in the child welfare and justice systems through litigation, appellate advocacy, submission of *amicus* briefs, policy reform, public education, training, consulting, and strategic communications. JLC strives to ensure that laws, policies, and practices affecting all youth, including those involved with the immigration system, advance racial and economic equity and are rooted in research, consistent with children's unique developmental characteristics, and reflective of international human rights values. **The Children's Law Center, Inc.** (*"CLC"*) is a non-profit organization committed to the protection and enhancement of the legal rights of children. For thirty years, CLC has worked in many settings, including the fields of special education, custody, and juvenile justice, to ensure that youth are treated humanely, can access services, and are represented by counsel. The **National Association for Counsel for Children** (*"NACC"*) is a non-profit child advocacy and professional membership association dedicated to enhancing the well-being of America's children. Founded in 1977, NACC works to strengthen legal advocacy for children and families by promoting well-resourced, high-quality legal advocacy, implementing best practices, advancing systemic improvement in child serving agencies, institutions and court systems and promoting a safe and nurturing childhood through legal and policy advocacy.

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-3-

*Amici* know and understand that practices such as indefinite detention and placement in unlicensed facilities, which are allowed by the Final Rules, are at odds with existing law, opposed to the policies and practices that *amici* fight for, and put children and families at risk of great harm. The Final Rules would place children and youth at risk of significant trauma, including physical, emotional, and cognitive harm, which will have a lifelong impact on their development and well-being because of the Final Rules' failure to include critical safety measures that amici and others have worked to implement in state child welfare schemes.

## ARGUMENT

The Flores Settlement Agreement (*"FSA"*)[2] establishes the conditions under which children are held in immigration and ensures those children a basic standard of care and protection. One of those requirements is that children be cared for in state-licensed facilities. The Final Rules[3] issued by the Department of Homeland Security (*"DHS"*) and the Department of Health and Human Services' (*"HHS"* and together with DHS, the *"Departments"*) at issue here effectively remove that requirement, and create a significant risk of great harm by impermissibly deviating from the FSA's legally binding requirements.

The FSA wisely requires state law protections that are based on decades of research and experience regarding child welfare policy and practice. These state licensing programs delineate the standards that a facility must meet and, critically, provide a system to monitor the facilities through a combination of on-site

---

[2] *Flores v. Reno*, Stipulated Settlement Agreement, CV 85-4544-RJK(Px) (C.D. Cal. Jan. 28, 1997).

[3] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44392-44535 (Aug. 23, 2019) (to be codified at 8 C.F.R. Parts 212 and 236, 45 C.F.R. 410) (the *"Final Rules"*).

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-4-

inspections, rapid responses to reports of violations, and follow-up to ensure compliance with the licensing standards.

The Final Rules provide none of those protections, removing the state licensing requirement without offering an even minimally adequate replacement. The government has set forth this plan in the Final Rules despite the fact that the DHS facilities have a long record of failing to adhere to basic child welfare standards, which has resulted in unsafe conditions for children and even deaths. Instead of being informed by child welfare and protection principles, the Final Rules are animated by criminal justice principles that prioritize incarceration and detention at the expense of child protection and care. The *amici*, who have extensive experience working with children and the field of child welfare, are witnesses to the real-world negative consequences of what happens when critical oversights and protections are abandoned. According to these and other experts dedicated to the well-being of children "there is no evidence that **any time** in detention is safe for children."[4] This Court must act to safeguard the important and necessary standards of decency and care that are embedded in the FSA.

I. THE FINAL RULES ARE INCONSISTENT WITH THE TERMS OF THE FSA.

Despite the Departments' contentions otherwise, a simple comparison makes immediately clear that the Final Rules do not provide the same necessary procedural safeguards as the FSA's state-licensing regime. The Final Rules provide limited details on what protections will be in place, and what detail they provide makes it clear that they are fundamentally inconsistent with the FSA in several key areas.

---

[4]   Julie M. Linton, Marsha Griffin, Alan J. Shapiro, *Detention of Immigrant Children*, 139 PEDIATRICS 1, 7 (2017) (emphasis added).

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-5-

### A.   The FSA's State-Licensing Regime Incorporates Basic Child Welfare Practices.

Under the FSA, children apprehended by border patrol officials who are not otherwise eligible for release may only be transferred to "licensed programs." FSA, ¶ 19. A "licensed program" is "any program, agency or organization that is licensed by an appropriate state agency." *Id*. at ¶ 6. The programs that hold children in detention must be licensed by a State agency to provide "residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors." *Id*. In addition to meeting applicable state licensing requirements, a "licensed program" must also meet other qualifications detailed in the FSA such as "comply[ing] with all applicable state child welfare laws and regulations and all state and local building, fire, health, and safety codes." FSA, Ex. 1. Licensed programs may not be secure facilities unless security is required for the health and well-being of a child, such as when the child is experiencing mental illness or drug addiction. *Id*. The FSA's requirement for state licensing provides critical expertise in the oversight of child welfare programs, ensuring that DHS's operations provide minimum standards of care for the health and safety of immigrant children. *See, e.g., Flores v. Johnson*, 212 F. Supp.3d 864, 879 (C.D. Cal. 2015) (licensing provision provides "essential protection of regular and comprehensive oversight by an independent child welfare agency").[5]

---

[5]   For these reasons, courts, including this one, have taken enforcement of the licensing requirement very seriously. *See Flores v. Sessions*, 85-CV-4544 (DMG)(AGRX), 2018 WL 4945000, at *3 (C.D. Cal. July 9, 2018) (rejecting the government's request for relief from the state licensing requirements as a "fundamental and material breach of the [*FSA*]"); *Flores v. Johnson*, 212 F. Supp. 3d 864, 881 (C.D. Cal. 2015) *aff'd Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (finding DHS in violation of the FSA for holding children in unlicensed and secure facilities); *see also Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *6, *8 (W.D. Tex. Apr.

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-6-

The Supreme Court has also outlined its expectations in the FSA context that children in federal immigration custody must receive the same standard of care as children in state custody.  Specifically, the Court explained that the principle of state *parens patriae* authority "applies to minors in detention" and therefore, when the federal government is responsible for the custody of a minor, the federal government is tasked with ensuring that "[m]inimum standards [are] met, and the child's fundamental rights [are not] impaired."[6]

This principle is underscored by the federal laws that contemplate the role of state agency licensing in the child welfare system as one of providing a mandatory floor of health and safety regulations and regular monitoring that will protect children from physical harm and enhance well-being. *See* 42 U.S.C. § 671(a)(10). Every state employs a licensing regime to ensure that every facility housing children meets minimum health and safety standards. *See id*. (requiring that states receiving funding under Title IV-E of the Social Security Act adopt licensing standards). The licensing regime has two main prongs: (1) each state must have licensing standards and policies to ensure the safety and well-being of children placed in residential facilities; and (2) each state must have the ability to ensure compliance with those standards. *See id*. These licensing regimes therefore delineate the standards that a facility must meet and, critically, provide a system to monitor the facilities through a combination of on-site inspections, rapid responses to reports of violations, and follow-up to ensure compliance with the state's licensing standards.

---

9, 2007) (finding that a facility was unlicensed and thus in violation of the FSA).

[6] *Reno v. Flores*, 507 U.S. 292, 304 (1993).

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-7-

**B.     The Final Rules Disregard the FSA's State-Licensing Regime**.

Under the Final Rules, in states without licensing schemes for facilities that hold entire families instead of just children, DHS may utilize its own "licensed facilities'' for minors accompanied by a parent or guardian. 12 C.F.R. 236.3(b)(9). As DHS admits, there are very few (if any, given pending litigation) states that license family detention centers.[7] The implication is that the vast majority of these Family Residential Centers (*"FRCs"*) will be self-licensed by DHS, with oversight by DHS based on standards set by DHS that DHS may change at will. *See* 84 Fed. Reg. at 44418. The new self-licensing scheme proposes that DHS will employ an outside auditor to ensure the facility complies with standards, which do not themselves appear in the Final Rules. *Id*. at 44394. The Final Rules also contemplate no new grievance process, and DHS instructs that individuals can file grievances through the Office of the Inspector General (*"OIG"*), the specific facility's grievance process, or DHS's Office for Civil Rights and Civil Liberties (*"CRCL"*). *Id*. at 44489. Further, DHS does not explain how deficiencies will be remediated short of withholding funds to offending contractors.  *Id*. at 44420.

**C.     The Lack of Protections in the Final Rules Is Inconsistent with the FSA**.

States employ compliance schemes to ensure facilities abide by standards and regulations, including (1) on-site inspections, (2) rapid responses to reports of violations, and (3) follow-up to remedy such violations. It is clear that the Final

---

[7]     *Flores v. Sessions*, CV 85-4544 (DMG)(AGRX), 2018 WL 4945000, at \*4 (C.D. Cal. July 9, 2018); *See Grassroots Leadership v. Tex. Dep't of Family and Protective Servs*., No. D-1-GN-15-004336, 2016 WL 9234059, at \*4 (250th Tex. Jud. Dist. Ct. Dec. 16, 2016); *In the Appeal of Berks Cty. Residential Ctr*., Docket No. 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 (Commonwealth of Pennsylvania Department of Human Services, Bureau of Hearings and Appeals filed November 23, 2015).

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-8-

Rules do not provide the same safeguards to children as the FSA does, and as such, the Final Rules are inconsistent with and cannot replace the FSA. FSA, ¶ 9.

      1.    <u>Audits of Federal Residential Centers Are Not Equivalent to State Agency On-Site Inspections</u>.

Most states require licensed facilities to undergo on-site inspections at least annually.[8] Such annual inspections are thorough, and generally include "an inspection of the physical plant, a review of records, and interviews with children or staff."[9] The physical review may consist of a walk-through of the facility looking for safety hazards, examining overall cleanliness, and assessing compliance with standards.[10] The record review may include analysis of treatment plans, progress reports, and medical records of children cared for at the facility, in addition to a

---

[8]    Office of Inspector General, Dep't of Health & Human Servs., *State Oversight of Residential Facilities for Children*, OEI-02-98-00570 (2000) at 2 (finding most states examined performed licensing inspections at least once a year); *see* NATIONAL ASSOCIATION FOR REGULATORY ADMINISTRATION, BEST PRACTICES FOR HUMAN CARE REGULATION 53 (2017) (stating licensing inspection should occur "at least twice-yearly"), https://www.naralicensing.org/assets/docs/Publications/BestPractices/nara%20best%20practices%20final.pdf [hereinafter "NARA Best Practices"]; CHILD WELFARE LEAGUE OF AMERICA, STANDARDS OF EXCELLENCE FOR ABUSED OR NEGLECTED CHILDREN AND THEIR FAMILIES § 6.8 (2004) (a licensing agency should "provide for the timely and consistent monitoring of the settings for which they are responsible. Programs should be monitored on-site at least annually, and unannounced monitoring should occur when warranted to ensure the quality care of children.") [hereinafter "CWLA Standards"]. The National Association for Regulatory Administration and Child Welfare League of America guidelines are of paramount importance under Title IV-E, as state standards are to be "reasonably in accord with recommended standards of national organizations concerned with standards for the institutions or homes… 42 U.S.C. § 671(a)(10)(A).

[9]    Office of Inspector General, Dep't of Health & Human Servs., *State Oversight of Residential Facilities for Children*, OEI-02-98-00570 (2000) at 15.

[10]    *Id*.

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-9-

review of training and background checks for personnel.[11] In interviews with children and staff, an inspector may ask about the food, treatment goals, and any unmet needs.[12]

DHS's plan to monitor family FRCs through infrequent audits is woefully inadequate compared to this paradigm. DHS does not commit to annual inspections. Instead, the new regulations only state that the FRCs will undergo "regular" audits.[13] DHS specifically "decline[d] to include" further details about the use of third parties to conduct inspections in the text of Final Rules. *Id*. at 44418. For example, the Final Rules are silent about which third parties will be selected, how they will be selected, and what oversight the Departments will have over them. There is also no indication in the Final Rules that licenses, once given, would ever expire or need to be renewed after auditing. DHS's minimal commitment to third-party audits is not sufficient to protect the welfare of children and families in the facilities, and falls far short of the thorough, on-site inspections that states are required to carry out under child welfare laws and regulations.

### 2. The Final Rules Do Not Provide an Adequate System for Reports of Abuse or Violations.

In addition to requiring annual on-site inspections, a functioning licensing process under state law requires the licensing authority to respond quickly to reports

---

[11]  *Id*. at 16.

[12]  *Id*.

[13]  As illustrated above, in the definition of "licensed facility," the new 12 CFR 236.3(b)(9) provides that if a state licensing scheme for detention of children accompanied by a parent or legal guardian is not available, DHS shall employ an outside entity to perform audits to "ensure compliance with the family residential standards established by ICE." Fed. Reg. 44526.

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-10-

of violations of licensing standards as well as reports of maltreatment and abuse.[14] The Child Welfare League of America specifies that a licensing agency should "respond to all reports of child abuse and neglect in any licensed facility and take prompt action to assure the safety of the children in those facilities."[15] The National Association for Regulatory Administration (*"NARA"*) states that licensing organizations should have "written guidelines to include timeframes for conducting complaint investigations and allegations of illegal operations."[16] To this end, "[a]ll states" require that reports of maltreatment be initiated "in a timely manner, generally within 72 hours," and even faster when a child may be in imminent danger.[17] States also typically specify timeframes for completing investigations, "generally between 30 and 60 days."[18] California, for example, maintains an anonymous hotline through which an individual or organization can file a complaint regarding a state-licensed community care facility.[19] Upon receiving a complaint, the licensing agency will make an unannounced visit to the facility within ten days.[20]

---

[14] Office of Inspector General, Dep't of Health & Human Servs., OEI-02-98-00570, State Oversight of Residential Facilities for Children, 2 (2000).

[15] CWLA Standards, § 6.8.

[16] NARA Best Practices at 55.

[17] DEP'T OF HEALTH & HUMAN SERVS. CHILDREN'S BUREAU, MAKING AND SCREENING REPORTS OF CHILD ABUSE AND NEGLECT 4 (2017), https://www.childwelfare.gov/pubPDFs/repproc.pdf#page=6&view=Summaries%20of%20State%20laws.

[18] *Id*.

[19] CALIFORNIA DEP'T SOCIAL SVCS. MAKE A COMPLAINT, http://www.cdss.ca.gov/Reporting/File-a-Complaint/CCLD-Complaints (last visited Aug. 28, 2019).

[20] *Id*.; CAL. HEALTH & SAFETY CODE § 1538(c)(1).

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-11-

As another example, Illinois requires that licensing investigations begin within two days of the state's receipt of a complaint and that investigations must be completed within thirty days.[21] This system helps ensure that licensed facilities comply with respective state health and safety standards, protecting vulnerable individuals in their care.

Under the Final Rules, by contrast, the Departments do not have an adequate system in place to investigate complaints about violations of standards or dangerous conditions in FRCs. In response to comments to the proposed rule that expressed concern about conditions at DHS facilities, DHS explained that individuals may file grievances through the OIG, the specific facility's grievance process, or CRCL. 84 Fed. Reg. at 44489. However, none of these processes provide a timely and effective method for addressing compliance with ICE's standards. The OIG and CRCL only investigate a few narrow categories of complaints, which do not fully encompass the safety concerns created by a FRC's failure to comply with child welfare standards.[22] Furthermore, in contrast to state licensing rules that require investigations to be promptly commenced and quickly completed, the OIG recommends that complainants wait at least six months before even following up on a request.[23] CRCL investigations often experience lengthy delays because no mandatory timeline governs agency responses to CRCL requests.[24] A grievance process through

---

[21]     89 ILL. ADMIN. CODE § 383.35(b).

[22]     *Before You Submit a Complaint*, U.S. DEP'T OF HEALTH & HUMAN SERV., OFFICE OF INSPECTOR GENERAL, https://oig.hhs.gov/fraud/report-fraud/before-you-submit.asp; *Office for Civil Rights and Civil Liberties*, U.S. DEP'T OF HOMELAND SECURITY (Aug. 21, 2019), https://www.dhs.gov/office-civil-rights-and-civil-liberties.

[23]     *Id*.

[24]     Scott Shuchart, *Building Meaningful Civil Rights and Liberties Oversight at the U.S. Department of Homeland Security*, CENTER FOR AMERICAN

the detention facility is similarly inappropriate for addressing compliance complaints. A facility cannot police its own compliance with the standards through a completely internal process.[25] Additionally, while ICE does have an Office of Detention Oversight, it is unclear whether it responds to complaints at all, and it certainly does not conduct unannounced inspections in response to complaints. *See* 84 Fed. Reg. at 44417. These methods of oversight cannot provide the prompt and effective response to complaints necessary to ensure children's health and safety while detained.

> ### 3.   The Final Rules Do Not Provide a System for Addressing and Correcting Violations of Standards.

The Final Rules also fail to provide adequate means for addressing risks to the health and safety of children when those risks are identified. As noted above, an adequate licensing regime requires more than merely determining whether a facility passes or fails an audit. The CWLA explains that in addition to setting standards and determining formal compliance, licensing agencies of residential services should "offer consultation in the development of policies, procedures, and organizational guidance to support quality service delivery; and withhold licensing from those agencies that do not meet the licensing requirements."[26] When a state finds that there

---

PROGRESS (April 2, 2019) https://www.americanprogress.org/issues/immigration/reports/2019/04/02/467776/building-meaningful-civil-rights-liberties-oversight-u-s-department-homeland-security/.

[25] U.S. IMMIGRATION AND CUSTOMS ENF'T, ICE/DRO RESIDENTIAL STANDARDS (2007) https://www.ice.gov/doclib/dro/family-residential/pdf/rs_grievance_system.pdf.

[26] CHILD WELFARE LEAGUE OF AMERICA, STANDARDS OF EXCELLENCE FOR RESIDENTIAL SERVICES §4.12 (2004); *see also* CWLA Standards, § 6.8 ("Following the completion of an investigation into allegations of child abuse or neglect, the licensing agency should establish a definitive plan with the licensee to correct any deficiencies in the setting that were identified in the investigation. The licensing agency should monitor the implantation of this

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-13-

are standards violations, it will typically "impose corrective action plans that outline what a facility needs to do to correct the violation."[27] Written plans should include "corrective action expectations" and "expected follow up by both the provider and the regulatory program," and require "completion within appropriate timeframes."[28]

State regulations and local codes typically follow these patterns.[29] For example, the California Department of Social Services suggests several methods of enforcing compliance, including denial of an application for capacity increase, citation of deficiencies, suspension or revocation of a license, civil penalties, and noncompliance conferences.[30] New York also provides a range of possible enforcement actions, including the development of corrective action plans, civil penalties, and temporary suspension or limitation of a license.[31]

---

plan and should notify the licensee when the plan has been completed to its satisfaction.")

[27] Office of Inspector General, Dep't of Health & Human Servs., OEI-02-98-00570, *State Oversight of Residential Facilities for Children* (2000) at 2

[28] NATIONAL ASSOCIATION FOR REGULATORY ADMINISTRATION, BEST PRACTICES FOR HUMAN CARE REGULATION 56 (2017), https://www.naralicensing.org/assets/docs/Publications/BestPractices/nara%20best%20practices%20final.pdf (Explaining that organizations should have "written guidelines to include timeframes for conducting complaint investigations and allegations of illegal operations.").

[29] Office of Inspector General, Dep't of Health & Human Servs., *State Oversight of Residential Facilities for Children*, OEI-02-98-00570 (2000) at 2.

[30] CALIFORNIA DEP'T SOCIAL SVCS. PUBLIC INFO AND POLICIES, http://www.cdss.ca.gov/inforesources/Childrens-Residential/Public-Info-and-Policies (last visited Aug. 28, 2019); *see also*, *e.g.*, CAL. HEALTH & SAFETY CODE § 1548.

[31] 18 N.Y. COMP. CODES R. & REGS. § 413.3(a).

---

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-14-

While DHS's response to comments on the proposed rule makes vague references to addressing deficiencies, 84 Fed. Reg. at 44417, the only concrete suggestion in the Final Rules is to withhold or deduct contractual funds for unsatisfactory performance. 84 Fed. Reg. 44420. While this may be an effective resolution for a simple breach of contract, it cannot be the sole remedy for violations of safety standards, especially considering that decreasing funding would compound those issues, leaving facilities with inadequate resources to care for their vulnerable populations.

II.   THE FAILURE TO REQUIRE STATE-LAW LICENSURE FOR FAMILY RESIDENTIAL CENTERS WILL HARM CHILDREN AND THEIR FAMILIES.

In additional to the clearly inconsistent functional details described above, there are also inconsistencies between the application of the FSA and Final Rules. These include (1) the Departments' reliance on standards for criminal incarceration rather than child-welfare standards, and (2) DHS's inability or unwillingness to meet basic safety standards, as evident by its treatment of children in its care. For these additional reasons, the Final Rules should not supplant the FSA.

A.   **The Final Rules' Treatment of Children as Prisoners is Inconsistent with the Terms of the FSA**.

Not only are DHS's licensing procedures inconsistent with the FSA, but DHS's standards themselves are inconsistent with the child welfare standards incorporated into the FSA. All facilities licensed by state child welfare systems are required by law to act in the best interest of the children in their care.[32] State child

---

[32]   DEP'T OF HEALTH & HUMAN SERVS. CHILDREN'S BUREAU, DETERMINING THE BEST INTERESTS OF THE CHILD 1 (2016), https://www.childwelfare.gov/pubpdfs/best_interest.pdf. ("All States … have statutes requiring that the child's best interests be considered whenever specified types of decisions are made regarding a child's custody, placement, or other critical life issues.").

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-15-

welfare systems must, for example, place children in the least restrictive placement appropriate, which in all but rare cases means a non-secure home or facility.[33] Child welfare systems are also required to take steps to give children in their custody as normal a childhood as possible.[34]

The Family Residential Standards established by Immigration and Customs Enforcement, which DHS states it will apply, are "based upon, and extremely similar to, standards developed by the American Correctional Association for adult criminal defendants incarcerated pretrial."[35] Those standards were specifically created for jails and prisons to "ensure staff and inmate safety and security; enhance staff morale; improve record maintenance and data management capabilities; assist in protecting the agency against litigation; and improve the function of the facility or agency at all levels."[36] In contrast to prison standards, licensing standards used in

---

[33]   42 U.S.C. § 675(5)(A) (requiring the state develop a case plan "designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting …").

[34]   *See* Preventing Sex Trafficking and Strengthening Families Act, Pub. L. No. 113-183, § 111, 128 Stat. 1919 (2014) (amending 42 U.S.C. 675 to require that states implement a "reasonable and prudent parent standard" for decisions made by a foster parent or a designated official for a child care institution, which protects the child while also allowing them to experience normalcy); *see also, e.g.,* CAL. WELF. & INST. CODE § 16001.9(a) (stating that foster children have the right to, among other things, participate in extracurricular and cultural activities, develop job skills, and have social contact with people outside of foster care); COLO. REV. STAT. § 19-7-101(1) (same); PA. CONS. STAT. § 2633 (same); ARK. CODE ANN. § 9-28-113 (stating that "[e]very child in foster care is endowed with the opportunities inherently belonging to all children").

[35]   *Id.*

[36]   AMERICAN CORRECTIONAL ASSOCIATION, STANDARDS & ACCREDITATION, http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accredit ation/ACA_Member/Standards_and_Accreditation/SAC.aspx?hkey=7f4cf7b f-2b27-4a6b-b124-36e5bd90b93d (last visited Aug. 30, 2019).

---

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-16-

child welfare specifically focus on "protect[ing] children from risks against which they would have little or no capacity for self-care and protection."[37] To this aim, any standards set by such licensing must "protect the safety and well-being of children."[38]

In October 2016, at the request of then-DHS Secretary Jeh Johnson, the ICE Advisory Committee on Family Residential Centers reviewed DHS's policies and practices relating to family detention, and recommended that DHS should "eliminate as many characteristics of criminalization and prisonization as practicable, and become as normalized as possible in their design and operation."[39] As the Advisory Committee recognized, holding children and their families as if they are pretrial defendants or convicted inmates "contributes to the erosion of their physical, psychological, and social well-being."[40] Such treatment is particularly harmful to

---

[37]   CWLA Standards at xvi.

[38]   *Id*. at § 6.8.

[39]   ICE ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS, REPORT OF ICE COMMITTEE ON FAMILY RESIDENTIAL CENTERS 27 (2016) [hereinafter "ICE Committee on FRC Report"] (explaining the origin of DHS's Family Residential Standards). DHS also explains in promulgating the Final Rules that it utilizes standards developed by the American Correctional Association in its oversight of the FRCs.  84 Fed. Reg. at 44420 (noting that the Performance Requirements Summary, which ICE uses to conduct quality assurance surveillance and to guide inspections of facilities, is based on standards developed by the American Correctional Association's Standards for Adult Local Detention); 84 Fed. Reg. at 44434 (noting that medical issues at FRCs are managed by the ICE Health Service Corps, which utilize standards drawn from the American Correctional Association among others to oversee the health care provided to detainees in ICE custody).

[40]   ICE Committee on FRC Report at 26.

---

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-17-

children.[41]    Children in immigration detention suffer from high rates of post-traumatic stress disorder, anxiety, depression, suicidal ideation, and other behavioral problems.[42] The detention of children, whether with their families or otherwise, also impedes a child's educational development.[43] Even detention **of less than two weeks** is "associated with negative health outcomes and potential long-term health and developmental consequences."[44] As the American Academy of Pediatrics explained, "there is no evidence that any time in detention is safe for children."[45]

Rather than using standards developed with the intent of protecting the safety and well-being of children in such a stressful environment, DHS has chosen to employ standards intended for use in correctional facilities.  This is inconsistent with the FSA's state-licensure requirement, and results in harmful conditions for the children detained.

      B.    **DHS's History Shows That Its Treatment of Children in Detention Is Inconsistent with the State Licensing Standards**.

DHS cannot be an appropriate entity to license facilities that hold children because it has routinely violated child welfare standards by mistreating children in

---

[41]    *See* INT'L DETENTION COALITION, NEVER IN A CHILD'S BEST INTERESTS 2 (2017),         http://idcoalition.org/wpcontent/uploads/2017/06/Briefing-Paper_Never-in-a-childsbest-interests_June-2017.pdf

[42]    Julie M. Linton, Marsha Griffin, Alan J. Shapiro, *Detention of Immigrant Children*, 139 PEDIATRICS 1, 10 (2017).

[43]    *See* DETENTION WATCH NETWORK, EXPOSE & CLOSE: ARTESIA FAMILY RESIDENTIAL CENTER, NEW MEXICO 2 (2014); ICE Committee on FRCs Report at 18.

[44]    HUMAN RIGHTS FIRST, FAMILY DETENTION: STILL HAPPENING, STILL DAMAGING 1 (2015).

[45]    Julie M. Linton, Marsha Griffin, Alan J. Shapiro, *Detention of Immigrant Children*, 139 PEDIATRICS 1, 6 (2017).

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-18-

its custody.  On May 10, 2018, Mariee Juárez, a nineteen-month-old-child, healthy when taken into ICE custody, died of a viral lung infection shortly after being released from the Dilley FRC.[46] At least seven other children are known to have died in, or shortly after having been released from, immigration custody **in less than a year**.[47]  Moreover, since 2009, ICE has been forced to close two FRCs because of inhumane conditions, including "unreasonably cold rooms, substandard food, and inadequate medical care."[48]  It is clear that DHS has not instituted effective policies to safeguard the well-being and safety of children.

As recently as February 2019, immigration advocates wrote to the government to complain about sub-standard medical treatment provided to infants detained at the Dilley FRC.[49] In addition, conditions at the Berks FRC triggered the need for a special report and audit from the Pennsylvania Auditor General, who in June 2019 cited allegations that "former Berks detainees have discussed conditions inside the

---

[46]   Julia Webster, *Her 19-Month-Old Daughter Died After Being Held at an ICE Facility. Here's What Yazmin Juárez Told Congress,* TIME (July 11, 2019) https://time.com/5624391/yazmin-juarez-migrant-mom-congressional-testimony/.

[47]   Nicole Acevedo, *Why Are Migrant Children Dying in Custody?*, NBC NEWS (May 29, 2019), http://www.nbcnews.com/news/latino/why-are-migrant-children-dying-u-s-custody-n1010316.

[48]   Ingrid Eagly, Steven Shafer & Jana Whalley, *Detaining Families: A Study of Asylum Adjudication in Family Detention*, 106 CALIF. L. REV. 785, 794 (2018).

[49]   Letter from American Immigration Council, American Immigration Lawyers Association, and Catholic Legal Immigration Network, Inc. to Cameron Quinn and John V. Kelly (February 28, 2019) *available at* http://americanimmigrationcouncil.org/sites/default/files/general_litigation/complaint_urges_immediate_release_of_infants_from_immigration_detention.pdf.

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-19-

facility, describing inadequate health care, sexual abuse, and other health and human rights abuses" as the reason for the investigation.[50]

This maltreatment is not only occurring in FRCs, but in other DHS facilities as well. As recently as June 2019, it was reported that for children in the DHS facility at the McAllen Central Processing Center, "basic hygiene just doesn't exist."[51] As of July 2019, conditions at DHS's border facility in Clint, Texas were worse: there, "children had no adequate access to medical care, had no basic sanitation, were exposed to extreme cold and did not have adequate access to drinking water or food."[52] Moreover, agency leadership knew for months that "some children had no beds to sleep on, no way to clean themselves and sometimes went hungry." *Id*.  In addition, DHS's own Office of the Inspector General recently issued a "management alert" in July 2019, citing conditions of extreme overcrowding, prolonged detention, and "limited" access to clean clothing and hot meals.[53]  These complaints are echoes

---

[50]    *See* Press Release, Pennsylvania Auditor General, Auditor General DePasquale Launches Review of Detainees' Treatment in Berks County Residential Center (June 13, 2019), https://www.paauditor.gov/press-releases/auditor-general-depasquale-launches-review-of-detainees-treatment-in-berks-county-residential-center.

[51]    Riane Roldan, *Lawyer: Inside an immigrant detention center in South Texas, "basic hygiene just doesn't exist"*, THE TEXAS TRIBUNE (June 23, 2019) https://www.texastribune.org/2019/06/23/immigrant-detention-center-mcalllen-overcrowded-filthy-conditions/.

[52]    Simon Romero *et al*., *The Stuff of Nightmares: Inside the migrant detention center in Clint, Texas*, EL PASO TIMES & N.Y. TIMES (July 6, 2019) https://www.elpasotimes.com/story/news/immigration/2019/07/06/border-patrol-el-paso-sector-migrant-detention-center-clint-immigration/1663750001/.

[53]    *See* OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-19-51. MANAGEMENT ALERT–DHS NEEDS TO ADDRESS DANGEROUS OVERCROWDING AND PROLONGED DETENTION OF CHILDREN AND ADULTS IN THE RIO GRANDE VALLEY, at 2-3 (July 2, 2019).

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-20-

of the same exact conditions that forced the closure of the Hutto and Artesia FRCs in 2009 and 2014.[54] These abuses are happening in non-state licensed facilities, and provide insight into DHS's performance when state oversight is absent.

DHS does not deny that children are being harmed in its border facilities. In fact, DHS's only responses to the abuses in CBP facilities is to state that "the only facilities required to be licensed under this rule (and under the FSA) are the FRCs" and further states that "these licensing requirements—and the public reporting of inspections—do not apply to DHS's short-term holding facilities (such as CBP facilities)." This assertion is untrue and inconsistent with the FSA.[55] Given the well-documented shortcomings of oversight and compliance in DHS-run detention facilities, any assurances that federal licensing will both meet the requirements under the FSA and actually be enforced is unpersuasive.

---

[54]   Ingrid Eagly, Steven Shafer & Jana Whalley, *Detaining Families: A Study of Asylum Adjudication in Family Detention*, 106 CALIF. L. REV. 785, 794 (2018).

[55]   FSA, at ¶¶ 12.A, 19; *see also* U.S. CUSTOMS AND BORDER PROTECTION, HOLD ROOMS AND SHORT TERM CUSTODY POLICY (June 2, 2008), https://foiarr.cbp.gov/docs/Policies_and_Procedures/2011/200842354_378/1104271006_Hold_Room_Custody_Directive_Reading_Room.pdf. The Hold Rooms and Short Term Custody Policy (*"Policy"*) applies to both adults and children, and purports to establish the "national policy for the temporary detention, transport and escort of persons by CBP." The Policy specifically cites and incorporates the FSA. *See id*. at § 6.2.4.1.

BRIEF OF CHILDREN'S ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT NOTWITHSTANDING PUBLICATION OF FINAL RULE

-21-

## CONCLUSION

The Final Rules are inconsistent with the terms of the FSA because they dispense wholesale with its most critical protections in favor of a new detention policy without supportable justification.   Furthermore, the Final Rules impermissibly conflict with the express terms and the underlying purpose of the FSA—to protect the health and well-being of immigrant children. To abandon the longstanding protections of the FSA for Defendants' new policy will put children at severe and immediate risk of harm. For these reasons, *amici* respectfully request this Court grant Plaintiffs' Motion to Enforce Settlement Notwithstanding Publication of Final Rule.

Dated: September 4, 2019                  Respectfully submitted,

                                          By:*/s/ Peter Bach-y-Rita*

                                          *Attorneys for Lead Amicus*
                                          *Children's Rights*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2019, a copy of the foregoing Brief of Children's Advocacy Organizations as *Amici Curiae* in Support of Plaintiffs' Motion to Enforce Settlement Notwithstanding Publication of Final Rule was filed and served pursuant to the Court's electronic filing procedures using CM/ECF.

*/s/        Peter Bach-y-Rita*
Peter Bach-y-Rita