1  CARLOS R. HOLGUÍN (CAL. BAR NO. 90754)
2  PETER A. SCHEY (CAL. BAR NO. 58232)
   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
3  256 SOUTH OCCIDENTAL BOULEVARD
   LOS ANGELES, CA 90057
4  TELEPHONE: (213) 388-8693
5  EMAIL:      CRHOLGUIN@CENTERFORHUMANRIGHTS.ORG
6              PSCHEY@CENTERFORHUMANRIGHTS.ORG

7  *Additional Plaintiffs' counsel on next page*

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| 10  JENNY LISETTE FLORES, *et al.*, | Case No. CV 85-4544-DMG(AGRx) |
| 11            Plaintiffs, | DECLARATIONS IN OPPOSITION TO DEFENDANTS' NOTICE OF TERMINATION OF *FLORES* SETTLEMENT AGREEMENT; AND MOTION IN THE ALTERNATIVE TO TERMINATE THE *FLORES* SETTLEMENT AGREEMENT. |
| 12        v. | |
| 13  WILLIAM BARR, Attorney General, *et al.*, | |
| 14 | |
| 15            Defendants. | Before Hon. Dolly M. Gee |
| 16 | Hearing:   September 27, 2019 |
| 17 | Time:      None specified |
| 18 | Room:      1st St. Courthouse          Courtroom 8C |

19
20
21
22
23
24
25
26
27
28

*Counsel for Plaintiffs, continued*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Kevin Askew (Cal. Bar No. 238866)
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020
Email:        kaskew@orrick.com

ORRICK, HERRINGTON & SUTCLIFFE LLP
Elyse Echtman (admitted *pro hac vice*)
Shaila Rahman Diwan (*admitted pro hac vice*)
Rene Kathawala (admitted *pro hac vice*)
51 West 52nd Street
New York, NY 10019-6142
Telephone:  212-506-5000
Email:        eechtman@orrick.com
Email:        sdiwan@orrick.com
Email:        rkathawala@orrick.com

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
FREYA PITTS (Cal. Bar No. 295878)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email:        lwelch@youthlaw.org
                 ndesai@youthlaw.org
                 fpitts@youthlaw.org

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email:        hscooper@ucdavis.edu

THE LAW FOUNDATION OF SILICON VALLEY
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)

1   Katherine H. Manning (Cal. Bar No. 229233)
2   Annette Kirkham (Cal. Bar No. 217958)
    152 North Third Street, 3rd floor
3   San Jose, CA 95112
    Telephone:   (408) 280-2437
4   Facsimile:   (408) 288-8850
5   Email:   jenniferk@lawfoundation.org
6            kate.manning@lawfoundation.org
             annettek@lawfoundation.org
7
    *Attorneys for Plaintiffs*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF FERNANDO CHANG-MUY

## DECLARATION OF FERNANDO CHANG-MUY

I, Fernando Chang-Muy, declare the following:

1. This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Terminate the *Flores* Settlement Agreement, in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California. To prepare this declaration, I have reviewed the government's Notice of Termination of Flores Settlement Agreement; and Motion in the Alternative to terminate the Flores Settlement Agreement.  I offer the below comments regarding my observations of some reasons as to why families flee Central America, and Honduras specifically.

3. I am the Thomas O'Boyle Lecturer in Law at the University of Pennsylvania School of Law. I also hold an appointment at the University of Pennsylvania Graduate School of Social Policy and Practice.  At Swarthmore College in Pennsylvania, I served as Assistant Dean and Equal Opportunity Officer. I have taught and lectured extensively on international refugee and human rights law, among other subjects, and have written on the detention of migrants in the United States and regional responses to forced migration in Central America. I am the editor of Social Work with Immigrants and Refugees.[1]

4. Before entering academia, between 1988 and 1993, I served as a Senior Legal Officer with the Office of the United Nations High Commissioner for Refugees and as a Human Rights Legal Officer with the United Nations World Health Organization in Geneva. I also served as the founding director of the Liberty Center for Survivors of Torture, a federally-funded project, which primarily served migrants and refugees. I also served as a Program Officer at the Philadelphia Foundation and coordinated two significant philanthropic collaboratives, the Emma Lazarus Collaborative and the Funders Collaborative for Strong Latino Communities. In 2008, Mayor Michael Nutter appointed me to serve as a Commissioner of the Philadelphia Human Relations Commission. Throughout my academic career, I also provided management consulting, support, coaching and training to government agencies, local and national philanthropic institutions, social service agencies, and social service agencies.

5. I hold a Bachelors in Arts from Loyola University in New Orleans, a Masters in Arts in Literature and Literature Theory from Georgetown University and a Juris Doctor from the Antioch University School of Law.

6. I began my legal career in the mid-1980s as a legal services attorney in Philadelphia, representing individuals fleeing persecution mainly from El Salvador, Guatemala or Nicaragua.  Later, with the Office of the United Nations High Commissioner for

---

[1] *See* Fernando Chang-Muy & Elaine P. Congress, *Social Work with Immigrants and Refugees: Legal Issues, Clinical Skills, and Advocacy*, Springer Publishing Company, New York, NY (2009).

1

Refugees, I made refugee status determinations for those seeking to be recognized as refugees in a variety of host countries e.g. Albanians in Greece, Haitians in Guantanamo. In some situations, some were unaccompanied children, or were with family members.

7. At the University of Pennsylvania Law School, I teach a course on International Refugee Law. As part of the course I supervise students who interview individuals seeking asylum or other forms of humanitarian protection in the United States.   Students conduct the refugee status determination interviews in detention facilities in York County, Pennsylvania, and in Elizabeth, New Jersey.

8. As faculty advisor to two human rights student groups, I accompany students on Spring Break service trips who in partnership with local non-governmental organizations conduct refugee status determination interviews. Under my training and supervision, students have interviewed Iraqis in Jordan, Syrians in Lebanon, Columbians in Ecuador, Nicaraguans in Costa Rica, Afghans in Greece.  Some of the asylum seekers and have been unaccompanied children, or with family members.

9. Over the course of my legal career beginning with Community Legal Services, with the Center for Survivors of Torture, in the United Nations, and my teaching and instruction in academia, I have interviewed hundreds of asylum seekers, including children who were fleeing unaccompanied and those fleeing with families.

10. The stated and increasingly explicit efforts by the US executive branch to deter migration by making the US immigration system harsher and more inhospitable to migrants in order to deter migration[2] has turned my focus to Central America, specifically Honduras.

11. In October 2018, I travelled to Mexico City to volunteer to provide trainings on US Immigration policy and practice. The audience were mainly Hondurans who had travelled together, in the so-called "caravans" trying to reach safety in the United States. In collaboration with a Mexican-based non-governmental organization, I with other US attorneys provided information to Hondurans whom the Mexican government had generously housed in Mexico City's main sports stadium.  For almost a week, we went in daily to explain how the US system works.  With megaphones in hand, while people lined up to take showers, and in the open air lunch and dinner tables, in the health clinic kiosks, in the pop up barber shop we explained how asylum works and answered questions.

12. That experience made me realize that it might be fruitful to raise awareness of US immigration and refugee laws *before* people left their countries of origin.

13. In May 2019, I traveled with a law student across Honduras to speak about the asylum laws of the United States to inform potential asylum seekers of the legal obstacles they

---

2 *See, e.g.,* Donald J. Trump (@realDonaldTrump), Twitter (Jul. 3, 2019, 4:33 PM), https://twitter.com/realDonaldTrump/status/1146514575048790019?s=20 ("If illegal Immigrants are unhappy with conditions in the quickly built or refitted detentions [sic] centers, just tell them not to come. All problems solved!")

would face and the rights to which they are entitled if they were to travel north to the
United States.

14. Although our goal was primarily educational, at the beginning of each presentation, we
    asked attendees to raise their hand if they could name five protected grounds of asylum
    (race, religion, nationality, political opinion or membership in a particular social group)
    or if they had heard of the new "Remain in Mexico" policy being implemented by the
    United States.

15. Our presentations occurred throughout all parts of Honduras: north, south east and west.
    Among all of our audiences which totaled around 2,000 people, not a single person raised
    their hand to indicate that they – or their perspective on the prospect of migrating north –
    were influenced by knowledge of the particular details of US asylum law or policy. This
    was true whether the presentations were located at an elite private university in San Pedro
    Sula, a rural church in the mountains, or a firehouse on the northern coast.

16. We explained legal methods to obtain lawful permanent residency e.g. family
    sponsorship. People asked questions like whether an uncle in San Antonio, Texas could
    sponsor a nephew, or whether a brother in Chicago could sponsor a sibling; and how
    much it costs for a father in Puerto Rico to sponsor a son. We also devoted most of the
    time in our discussion, though, explaining the grounds to win asylum, which is another
    method of gaining lawful permanent status and which is relevant to why people flee
    Honduras.

17. In our presentations, we did not hide the harsh realities of the current immigration
    process. We described the possibility that immigrants might be separated from their
    families, that they might be forced to wait for months in crime-ridden border towns in
    northern Mexico, placed in "perreras" or "dog pounds," and detained for extended
    periods of time with no opportunity for bail. We also explained that if they managed to
    post bond and leave the prisons, life outside of federal immigration detention could also
    be exceedingly difficult. We focused on everyday issues and challenges with accessing
    employment, housing, health services, and public education in the United States. Our
    intent was not to dissuade individuals from taking the dangerous trek north, but to
    provide them with information so that they could make an informed decision.

18. If the Administration's recent immigration policies – such as the detention, separation,
    and treatment of migrant children and families and "Remain in Mexico" policy – were a
    real deterrent, our audiences would have either been knowledgeable about them or
    deterred from migrating. Our audiences would have weighed the burdens of the migration
    journey, treatment at the border, and federal detention and decided that those costs were
    too high to warrant leaving their home countries. This was not the case.

19. Instead, at the end of our presentations, dozens of participants told us about the sense of
    hopelessness that pervades their country. In their analysis, the root cause of the problems
    was government corruption. They told us about the unending violence, the frequent

3

deaths, the gangs, and the utter lack of a safe future for their children and families. This corruption resulted in, amongst other things, a lack of books in schools and libraries, no medicines in hospitals, no living wage jobs.

20. One gentleman I met with was a university administrator who held three jobs: in the University, as a high school teacher at night school, and as a tutor on the weekends. At his high school which we visited, gated and guarded by soldiers with guns, he described the huge drop in enrollment after rival gangs recently battled over the surrounding neighborhood blocks. Kids from one neighborhood were afraid to travel to the high school because they had to cross through a rival gang's territory.

21. A firefighter told us he was considering fleeing because of threats against his daughter's life after declining a local gang's offer to sell drugs. A businessman from a rural town explained his plan to flee the death threats he expected for failing to pay an extortion fee.

22. In El Porvenir, in northern Honduras, I spoke with one young teacher about her students' "dream drawings." The vast majority of her students, she explained, drew pictures of themselves living in the United States as adults. "They know there's no future in Honduras," she said to us at a small town hall meeting. "These barriers at your border won't stop them from trying to achieve their dream."

23. On some days during our travels, we found that Hondurans blocked the roads by burning tires to protest privatization of education and medical services all due to the government's rampant corruption. Only days after we left, protestors tried to set fire to the US Embassy and the military opened fire at protesting university students.

24. When potential asylum-seekers are faced with these kinds of horrors at home, President Trump's treatment of detained immigrants and harsh border policies aren't a deterrent.

25. Factors such as government corruption and persecution pushes people to leave their homes. In our own country, the Pilgrims and Puritans came to the colonies to practice their religion which they could not in England. Members of the Society of Friends, disparagingly called Quakers and seen as dissidents in England, settled in Pennsylvania to practice their faith freely. If people can speak freely, have housing, employment, health, food, education, in sum: if they feel safe, they stay.

26. Indeed, around the globe, past and present, deterrence tactics to stem the flow of migration have rarely worked: Pirates roaming the seas did not deter countless Vietnamese migrants fleeing the war in Southeast Asia. And the European Union's interdiction policies in the Mediterranean didn't stop Syrians or North Africans from boarding rafts and dinghies and journeying away from civil unrest at home, despite the threat of discrimination that often awaited them.

27. The failure of deterrence – and the fact that harsh or in hospitable government actions don't deter those fleeing harm and persecution – is a repeated lesson of world events and of my own legal work. In the 1990s, while working for the UN, one of my

4

responsibilities was monitoring refugee status interviews of Haitians interdicted by the US Coast Guard, which were conducted by the then-Immigration and Nationality Services onboard the USS Comfort, a US naval vessel, in the Caribbean Sea (and who faced imminent detention at the US Naval Base at Guantanamo Bay, Cuba, at least in the short term, regardless of the outcome of those interviews). In interview after interview it was clear that the US policy of interdiction at sea did not deter Haitians fleeing a corrupt dictator, on unseaworthy boats and rafts, to seek safety. When children and families are fleeing for their lives, all obstacles pale in comparison to abuse, persecution or certain death.

28. In my experience working with immigrant children and families, neither harsh deterrence practices, nor the promise of particular legal protections have ever been a factor motivating or preventing children and families from seeking asylum or other forms of humanitarian immigration relief. This has been true since before the *Flores* Settlement Agreement was signed in 1997.

29. In my extensive experience, I have never had reason to believe that the *Flores* Settlement Agreement and subsequent court orders in the *Flores* case have influenced children and families from Central America in their decision to come to the United States. These children and families are coming to the United States because their home countries are deeply afflicted by corruption, crime, violence and poverty. Moreover, few to none of them are even aware of the existence of the *Flores* Settlement Agreement.

30. Based on what we saw and heard, to actually deter migrants, America, and our allies such as Canada and European Ministries of Foreign Affairs, must go to the root of the problem. That would mean a recommitment to support Honduras and the other Central American countries producing the vast majority of asylum seekers in our region.

31. In doing so, it cannot simply put money into the hands of a transparently corrupt government that has failed the public and completely lost its trust. The United States, through the US Agency for International Development (USAID) could instead back the many local civil society organizations we met with that are doing exceptional work in job training, education and community building. Funding to both civil society organizations and government ministries, however, must be monitored to ensure that the funds actually reach people and have positive measurable outcomes. With aid aimed at getting desperately needed medicines back into hospitals and books back into schools, streets and bridges fixed, people will stay.

32. Based on my 37 years of professional experience supporting immigrants and refugees, terminating the Flores Settlement Agreement and indefinitely detaining families, will not impact migration patterns.

5

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of September, 2019, in Philadelphia, Pennsylvania.

Fernando Chang-Muy
Thomas O'Boyle Lecturer in Law
University of Pennsylvania School of Law

6

# DECLARATION OF SUSAN F. MARTIN

## DECLARATION OF SUSAN F. MARTIN

I, Susan F. Martin, declare the following:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Terminate the Flores Settlement Agreement, in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California. I offer the below comments regarding my observations as to the historical role of family migration in the United States, including in the period immediately before the *Flores* Settlement Agreement, and the many reasons that United States ("US") lawmakers and policymakers were aware of the migration of children with families, not just unaccompanied minors, at that time.

3. I am a nationally- and internationally-recognized expert on international migration who has closely followed the evolution of all aspects of US policies for admission of immigrants and enforcement of immigration law.

4. From 1980-81, I served as the Research Director of the US Select Commission on Immigration and Refugee Policy, charged by Congress in 1978 to study and evaluate existing laws, policies, and procedures governing the admission of immigrants and refugees to the United States and to make administrative and legislative recommendations to the President and to Congress.

5. From 1981-1992, I was Director of Research and Policy at the Refugee Policy Group, a Washington DC based think tank. During this period, I conducted comparative, policy-relevant research on a wide range of issues concerning refugees and asylum-seekers, including those in detention.

6. I returned to government service from 1992-1997 as the Executive Director of the US Commission on Immigration Reform. The Commission, also called the "Jordan Commission" after its Chair the late Barbara Jordan, was created by Congress in 1990 to review and evaluate the implementation and impact of U.S. immigration policy and make reports of its findings and recommendations to Congress.

7. After the Commission's sunset on December 31, 1997, I founded the Institute for the Study of International Migration and held the Donald G. Herzberg Chair in International Migration at Georgetown University. Since 2016, I have been Professor Emerita at Georgetown University. During my tenure at Georgetown, I taught in both the School of Foreign Service and the Law Center. I also previously taught at Brandeis University and the University of Pennsylvania. In 2017-2018, I held the Laurie Chair in Women's Studies, in the Department of Women and Gender Studies, Rutgers University.

I hold an MA and PhD in the History of American Civilization from the University of Pennsylvania and a BA in History from Douglass College, Rutgers University. I currently

or recently have served as the President of the International Association for the Study of Forced Migration; a member of the US Comptroller General's Advisory Board and the Academic Advisory Board of the International Organization for Migration; and chair of the Thematic Working Group on Environmental Change and Migration for the Knowledge Partnership in Migration and Development (KNOMAD) at the World Bank.

8. I have also held various Board positions, including on the Board of the Advocacy Project, the Women's Refugee Commission, Center for Migration Studies, and Jesuit Refugee Service USA.

9. I am the author or editor of more than a dozen books and more than 125 articles and book chapters on migration and refugee issues in the US and internationally.

10. One of my specialties within US and international migration and refugee studies has been the impact of policies on families, with particular attention to the situation of women and children. My book, *Refugee Women*, was the first full-length monograph on issues facing women and girls in countries of first asylum, countries of return and countries of resettlement.[1]

11. In the mid-1980s, I co-authored one of the first studies of unaccompanied refugee children, including the use of detention; many of the recommendations in that study became part of the *Flores* settlement.[2]

12. In the late 1980s, I wrote the United Nations High Commissioner for Refugees ("UNHCR") first guidelines on protection of refugee women and contributed to the development of UNHCR's guidelines on refugee children.[3]

13. I have testified before the Senate Judiciary Committee on "How Comprehensive Immigration Reform Should Address the Needs of Women and Families" (March 2013) and the congressional U.S. Helsinki Commission on "Crossing Borders, Keeping Connected: Women, Migration and Development" (April 2008). These hearings shed light on the importance of family in migration patterns and policy responses.

14. In 2010, I published a book, *A Nation of Immigrants*, exploring the evolution of different competing models of immigration in the United States and placing modern trends and policy options into historical perspective.[4]

---

[1] *See* Susan F. Martin, *Refugee Women*, Zed Books (1992).
[2] *See* Susan F. Martin & Patricia W. Fagen, *Unaccompanied refugee children : the evolution of U.S. policies, 1939 to 1984,* Refugee Policy Group (1984).
[3] *See* United Nation High Comm'r for Refugees, *Guidelines on the Protection of Refugee Women* (July 1991), https://www.unhcr.org/en-us/publications/legal/3d4f915e4/guidelines-protection-refugee-women.html; United Nations High Comm'r for Refugees, *Guidelines for Refugee Children* (Aug. 1988), https://www.unhcr.org/en-us/protection/children/3b84c6c67/refugee-children-guidelines-protection-care.html.
[4] Susan F. Martin, *A Nation of Immigrants*, Georgetown University, Washington DC (June 2012).

2

15. Internationally and in the Western Hemisphere, including across US borders, patterns of migration involving children and the movement of families (such as children traveling with one or more parent) has been a consistent feature for decades if not centuries – and has waxed and waned depending on sociopolitical and environmental causes.

16. In 1905, my own father came to this country through such a process. My grandfather arrived in the US first and then sent tickets for his wife and young children to join him.

17. In short, the migration of children and family units across the southern US border, though recently and prominently in US headlines, is fundamentally not a new phenomenon.

18. For the reasons detailed below, I believe that US policymakers were aware of the irregular migration of accompanied children, not just unaccompanied children, when the original *Flores* Settlement Agreement was negotiated in 1997.

19. *First*, since the passage of the Immigration and Nationality Act of 1965, family (re)unification has been the cornerstone of US immigration policy.

20. The Immigration Act of 1990 ("1990 Immigration Act") retained the strong priority given to family (re)unification, ensuring that spouses, minor children and parents of US citizens are admitted without regard to any numerical limitations and establishing priorities for the admission of the adult children of US citizens, the minor and unmarried adult children of legal permanent residents, and the siblings of US citizens.

21. At present, a large majority (66 percents) of all of those legally admitted (including those present and admitted within US borders) as permanent residents are family members.

22. *Second*, the 1990 Immigration Act also recognized the importance of family unity for the spouses and minor children of those who obtained legal status under the Immigration Reform and Control Act of 1986 ("IRCA"). It, and subsequent legislation (such as the Legal Immigration and Family Equity Act ("LIFE")), provided a pathway to legal status for these individuals even if they had violated certain immigration laws to obtain entry into the United States – in other words, those who had migrated, together or separately, as family units.

23. In 1994, the US Commission on Immigration Reform, which was authorized in the 1990 Immigration Act, recommended additional visas to ensure that spouses and minor children in the large admissions backlog would be able to obtain legal status more expeditiously. These recommendations were repeated in the Commission's 1997 Report (which, among

---

5 This statistic pertains only to those admitted as immediate family of U.S. citizens or under family-sponsored preferences, and do not include the family members of those admitted under employment-based preferences or other admission categories. See https://www.dhs.gov/immigration-statistics/lawful-permanent-residents for more information.

other things, recommended adding 150,000 visas per year to permit the more rapid admission of the spouses and minor children of Legal Permanent Residents).[6]

24. These actions indicate that policymakers would have been well aware in 1997 that among those who entered without authorization were family members, including children, who would be subject to detention and deportation if apprehended by immigration authorities (and who were also the potential beneficiaries of expanded pathways to legal status under IRCA and subsequent legislation).

25. *Third*, the presence of entire families who had fled Central America for the United States during the 1980s civil wars was well-known to policymakers by the 1990s.

26. The sanctuary movement, through which hundreds of religious institutions and other groups across the US offered protection to Central Americans, often highlighted the situation of families they assisted in calling for relief from deportation for this population.

27. The 1990 Immigration Act included provisions for Temporary Protected Status ("TPS") of persons from El Salvador, including entire family units, who were in the US as of passage of the legislation. Notably, the original 1990 statute specifically empowered the Attorney General to waive the application of certain grounds for inadmissibility to prospective beneficiaries of TPS "to assure family unity."[7]

28. Also, in 1990, the settlement in *American Baptist Churches v. Thornburgh*, 760 F.Supp. 796 (N.D. Cal. 1991) ("ABC Settlement Agreement") required that the government hear anew asylum applications from Salvadorans and Guatemalans who had entered the US prior to 1990. (Congress mandated in the Refugee Act of 1980 that the spouse or children of those granted asylum were entitled to a derivative benefit of the same status as the principal applicant, thus the operation of the ABC Settlement Agreement would have likewise effectuated the goals of preserving the unity of affected family units.)

29. Congress recognized that these developments led to a significant backlog of immigration court cases, and also left many Central Americans in limbo—unable to obtain legal permanent residence and reunite with their family members. In response, Congress passed the Nicaraguan Adjustment and Central American Relief Act ("NACARA") in 1997. Among other things, NACARA directed the Attorney General to adjust to the status of lawful permanent resident certain migrants (Nicaraguans, Salvadorans, Guatemalans, Cubans, and nationals of former Soviet bloc countries) who had been present in the US for a continuous period of presence beginning before December 1, 1995 but waived the duration of presence period for both spouses and unmarried children under age 21 – as long as they were physically present on the date of application. In other words, primary applicants and their spouses and children under age 21 who had migrated together and been

---

[6] *See* U.S. Comm'n on Immigration Reform, *Becoming an American: Immigration and Immigrant Policy* 132 (1997), https://eric.ed.gov/?id=ED424310.
[7] *See* 104 Stat. 5033, Pub. L. No. 101-649 § 302(c)(2)(A)(ii) (November 29, 1990) (Appearing under Title III "Family Unity and Temporary Protected Status.").

4

present for a statutorily-designated period could attain status, as could spouses who had migrated with their minor (and young adult) children – *together, as family units*.

30. The original *Flores* Settlement Agreement was not adopted in a vacuum. The federal government was well aware that children were arriving in the United States alone as well as with their families – some through formal admission channels and others irregularly. The persistence of such patterns of migration – including as overall numbers of unaccompanied minors and children arriving as part of families have increased or decreased – was thus as much the case before and at the time of the *Flores* Settlement Agreement as it remains the case now.

31. Ensuring the safety of all children—regardless of their legal status or family connections—was then and should be now a primary consideration of all policymakers. The arrival of family units at the border, regardless of how significantly the numbers fluctuate, does not change this fundamental principle. The original *Flores* Settlement Agreement's provisions, particularly their emphasis on ensuring that children are as quickly released from detention as possible and housed while still in the custody of the government in the least restrictive setting, remain as needed today as they ever were. Any effort by the government to detain unaccompanied or accompanied children indefinitely should be seen for what it is—an unacceptable affront to long-standing principles of child protection and family unity.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of September, 2019, in Westlake Village, CA.

Susan F. Martin

# DECLARATION OF AMY THOMPSON

## DECLARATION OF AMY C. THOMPSON

I, Amy C. Thompson, declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Terminate the *Flores* Settlement Agreement, in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California. To prepare this declaration, I have reviewed United States ("U.S.") government reports on in-country conditions; the work of my colleagues in the field of migration studies in both academic journals and policy reports; and my own research, field notes, and publications. Additionally, I have conferred with colleagues on the ground in countries of origin to verify the continued validity of the following observations regarding the factors that motivate children and families to emigrate from Central America.

3. I completed my Ph.D. in Social Work at the University of Texas, Austin. I am presently a postdoctoral scholar at the Colegio de Sonora in Mexico, where my work focuses on understanding and contextualizing the factors surrounding Mexican child and family migration along Mexico's Northern border. My writing has appeared in numerous publications, including the Journal of Ethnic and Migration Studies, the North American Congress on Latin America (NACLA) Quarterly, and OIM's Ser Migrante, among other scholarly publications, and has been featured by Latino USA, the International Herald Tribune, the Associated Press/ Dallas Morning News, and other media outlets.

4. I have spent over 20 years researching child migration. I have interviewed many hundreds of Central American children and, in some instances, their families in order to understand their reasons for fleeing their home countries. As an undergraduate intern, I interviewed unaccompanied children in INS detention facilities to identify cases with potential grounds for immigration relief for ProBar, the ABA's probono legal aid clinic serving the Texas border. As a graduate student in public policy, I interviewed this same population in detention facilities along the U.S. Mexico border and Florida in developing my thesis. Then, as a professional public policy analyst, I conducted interviews with detained unaccompanied immigrant children in Border Patrol and ORR facilities, and with repatriated migrant children and their families in Mexico and Honduras.

5. Most recently, as a doctoral candidate, I have participated in an ongoing binational study of migrant youth for which I interviewed and conducted workshops with unaccompanied Central American youth detained in Mexican shelters for migrant youth. Currently, I am transitioning from this research project to my position with the College of Sonora in Mexico. Though the interview tools and foci for these various projects varied, understanding of the child's motivation for migration and of the circumstances surrounding their journey were consistent themes and objectives throughout.

Evelin's Story

6. Having worked with migrant Central American children for decades, I have collected many stories that shock the conscience. The story of Evelin, a 15-year-old Honduran girl, is one such story. When I interviewed Evelin, she was seven months pregnant and being held in a Mexican detention facility for migrant children. She came from a mountain city largely supported by surrounding agriculture. Evelin described her home town as 'incredibly beautiful, but very dangerous' due to the prevalence of gang activity.

7. Her overall appearance was slight and juvenile in stark contrast to her giant belly. Her speech became animated when she spoke of studying. She loves to study and was fixated on obtaining a pair of glasses so she could read again. She had hoped to attend the university one day, but in her first year of secondary school, she discovered she was pregnant and had to drop out.

8. When Evelin told her boyfriend about the pregnancy, he attacked her physically, kicking her in the stomach, and told her he would "rip the baby out" of her. Her boyfriend was involved in the local gang and she and her parents were repeatedly threatened that if she had the baby they would all be killed. Evelin has an uncle living in the United States who has been here for many years. Her cousins were born and raised here. Her family in the United States paid for her to join them with the promise of a safe home and the ability to study.

9. When Evelin shared her story with the staff at the Mexican shelter, they suggested she might apply for asylum in Mexico. However, Evelin did not believe Mexico could or would protect her from the gangs. Moreover, Evelin needed a support network of family for herself and her daughter, and Mexico could not offer that. Ultimately, Mexican officials deported Evelin back to Honduras despite her fear of return and concerns for the safety of her unborn daughter. In the days leading up to her deportation Evelin was quiet and resolute. She claimed she would try to find a way to have the baby in hiding and attempt the trip again, with her infant daughter.

10. Evelin's story illustrates how young parents, living in a state of flight or fight, make decisions based on survival instincts. They are not easily deterred or enticed by legal constructs, policies, and procedures of which they have no direct knowledge or experience.

Migration Trends

11. Based on my extensive experience, both in the field and reviewing the literature, Central American children and families currently migrate to the United States overwhelmingly due to external factors (including living with the threat or experience of murder, rape, injury, abuse, kidnapping, and forcible conscription by organized crime) combined with a failure or lack of social services and protections in their country of origin.

12. Factors that force displacement are commonly referred to as "push factors". In my experience, it is common for these factors to combine with more personal "pull factors", or incentives to migrate, such as reunification with a family member. My experience is validated in the work of other academics who have studied the motivations of Central

American migrants.[1] The complexity and severity of situations that force the international displacement of families is a common global issue.[2]

13. **Families do not flee their homelands, subjecting themselves and their children to the disruption of displacement and the risks of the journey, for a single motivating factor – least of all an obscure law or policy in a receiving country, such as the *Flores* Settlement in the United States – that may or may not afford some degree of protection from prolonged detention.**

14. Children and families do not cite the *Flores* Settlement Agreement or other legal protections in the United States as the reason why they are migrating. In fact, I have no reason to believe than any of the child migrants that I have met previously, or their parents, have ever heard of *Flores* or the protections it provides.

15. In 2014, under the previous Administration, some public leaders made similar spurious claims regarding the Trafficking Victims Protection Reauthorization Act ("TVPRA"), asserting that migrants' knowledge of that piece of legislation encouraged an influx of migration from Central America. At the time, I was in the field interviewing Central American youth and young families and my study participants made no mention of this legislation or any provisions within U.S law in our lengthy discussions of their motivations to migrate and their related expectations.

16. Furthermore, it is illogical to assume that migrants have knowledge of a Settlement Agreement that even most U.S. educated citizens do not know of or understand. U.S. State Department and United Nations Reports on Central American countries indicate challenges to the general population's access to a basic education, let alone access to the internet.[3]

17. While no two families' migration stories are identical, I have observed shifts in common themes over the last twenty years. In the 1990's and early 2000's, I encountered more stories of migrants motivated to reunify with family members (who had fled to the United States earlier, in the wake of civil war of Hurricane Mitch), whereas in the early to mid

---

[1] *See, e.g.,* Boerman, T., & Knapp, J. (2017). *Gang Culture and Violence Against Women in El Salvador, Honduras and Guatemala*. Immigration Briefings, (17-03); Boerman, T. (2018). *The Sociopolitical Context of Violence in El Salvador, Honduras and Guatemala*. Immigration Briefings, (18-10); Heidbrink, L. (2014). *Migrant Youth, Transnational Families, and the State: Care and Contested Interests*. Philadelphia: University of Pennsylvania Press.; Kennedy, E. (2014). *No childhood here: Why Central American children are fleeing their homes*. American Immigration Council. http://www.immigrationpolicy.org/research/no-childhood-here-why-central-american-children-are-fleeing-their-homes; Schmidt, S. (2017). *They need to give us a voice: Lessons from listening to unaccompanied Central American and Mexican children on helping children like themselves*. Journal on Migration and Human Security, 5(1), 57-81; Schmidt, S., and A. Somers. 2014. *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*. Washington, DC: UNHCR, http://www.unhcr.org/en-us/children-on-the run.html?query=children%20on%20the%20run.

[2] *See* Bhabha, J. (2014). *Child Migration and Human Rights in a Global Age* (1st ed edition.). Princeton, NJ: Princeton University Press.

[3] *See* U.S. Department of State. (2018). *Country Reports on Human Rights Practices: Report Submitted to the Committee on Foreign Affairs, US House of Representatives and Committee on Foreign Relations, US Senate by the Department of State in Accordance with Sections 116 (d) and 502B (b) of the Foreign Assistance Act of 1961, as Amended (Vol. 1)*. https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/; United Nations Development Programme. (2019). *Human Development Reports*. http://www.hdr.undp.org/en/countries.

2000's, migrants' stories began to include more veiled references to violence and organized crime which have since become the dominate and obvious "push" factor.

18. However, the reality is that a family's decision to migrate internationally is always multi-dimensional. The more recent dramatic fluctuations in the arrival of family units can be attributed to a composite of factors, not all of which are as overt as the extreme regional violence.

19. Scholars and policymakers have struggled to reconcile narrow legal definitions of refugees and asylees – focused on populations fleeing combat zones or persecution – with the reality of migration rooted in existential threats beyond war and political threats against individuals or classes.[4]

20. There is an emerging discourse on "subsistence" or "survival" migration in recognition of these multiple and intersecting factors beyond an individual's control, such as the effects of climate change, natural disasters, food shortages, and especially a state's inability or unwillingness to respond to such threats that can lead to forced internal and/or international displacement.[5] For example, in their study of the displacement of smallholder farming families in Nicaragua and Guatemala, Carte et al. observed loss of access to lands, a lack of access to food, and the migration of laborers as external factors that compounded to slowly force the displacement of traditional farming communities.[6]

21. In my own recent encounters with the migrant community along the southwest border, I have begun to hear more stories of families displaced from their traditional lands by drought and what is understood to be climate change. When combined with a lack of state stability and/or state corruption and pre-existing societal barriers – such as the prejudice against indigenous cultures – environmental changes can force a family's departure from a much-loved homeland.

22. The stability of Central American governments has long been in flux and itself influenced by external factors. The 2018 U.S. State Department's "Country Reports on Human Rights Practices" lists a number of indicators of state instability in Guatemala, Honduras, and El Salvador, including widespread corruption, lack of viable access to basic services (social, medical, educational) for much of the population, and lack of local policies to address the needs of internally displaced populations (such as dispossessed agricultural communities).[7] **No matter the combination of underlying factors, state instability can**

---

[4] McAdam, J. (2006). *The Refugee Convention as a rights blueprint for persons in need of international protection.* UNHCR, Evaluation and Policy Analysis Unit.

[5] *See* Betts, A. (2013). *Survival migration: Failed governance and the crisis of displacement.* Cornell University Press.

[6] *See* Carte, L., Schmook, B., Radel, C., & Johnson, R. (2019). *The Slow Displacement of Smallholder Farming Families: Land, Hunger, and Labor Migration in Nicaragua and Guatemala.* Land, *8*(6), 89; Carte, L., Radel, C., & Schmook, B. (2019). *Subsistence migration: Smallholder food security and the maintenance of agriculture through mobility in Nicaragua.* The Geographical Journal, *185*(2), 180-193.

[7] *See* U.S. Department of State. (2018). *Country Reports on Human Rights Practices: Report Submitted to the Committee on Foreign Affairs, US House of Representatives and Committee on Foreign Relations, US Senate by the Department of State in Accordance with Sections 116 (d) and 502B (b) of the Foreign Assistance Act of 1961.* https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/.

**make remaining at home untenable for families. The more the region destabilizes, the more families may be forced to make this choice.**

23. In summation, there is no evidence suggesting that detaining families in family residential centers will reduce the number of families attempting to migrate to the United States. As illustrated in the preceding case studies and evidenced in the literature, when individuals and families migrate because they perceive that doing so is necessary to their survival, the threat of detention is not a sufficient deterrent and the promise of fair treatment an irrelevant incentive.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on September 12, 2019 in Austin, Texas.

Amy C. Thompson

# DECLARATION OF TOM K. WONG

**Declaration of Tom K. Wong**

I, Tom K. Wong, declare as follows:

1.     I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Terminate the *Flores* Settlement Agreement, in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California. Specifically, I offer analysis illustrating that the 2015 *Flores* ruling did not cause an increase in family migration.

3.     I am a tenured Associate Professor at the University of California, San Diego (UCSD). I work in the Political Science Department, which is consistently ranked as one of the top ten political science departments nationally. I first joined the Political Science Department at UCSD in 2012, and became an Associate Professor with tenure in 2016. At UCSD, I am also the Director of the U.S. Immigration Policy Center (USIPC), which I founded in 2018, and the Director of the International Migration Studies Program Minor.

4.     I hold a B.A. and a Ph.D. in Political Science from the University of California, Riverside.

5.     Outside of academia, I have consulted and advised in the government and philanthropic sectors. From 2015-2016, I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders, where I worked on the immigration portfolio. I am also on the board of New American Leaders, the board of the California Immigrant Policy Center, and served on the advisory council of Unbound Philanthropy.

6.     I am an expert on U.S. immigration policy. I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on this subject. My most recent book analyzes 31,193 roll call votes on immigration-related legislation in Congress from 2005 to present, which makes it the most comprehensive analysis to date on contemporary immigration policies in the United States.

7.     I also have expertise in the conceptualization, design, and implementation of survey research, including surveying hard-to-reach undocumented populations. Several of the

1

1  peer-reviewed academic journal articles and reports that I have published are based on survey

2  research that I conceptualized, designed, and implemented. This includes embedding survey

3  experiments into questionnaires in order to randomize respondents to different experimental

4  conditions to identify causal treatment effects.

**The 2015 *Flores* Ruling Did Not Increase the Number of Apprehensions of Families at the**

**Southwest Border**

8.   In a Notice of Proposed Rulemaking (NPRM) titled, "Apprehension, Processing,
Care, and Custody of Alien Minors and Unaccompanied Alien Children" published September 7,
2018, the Department of Homeland Security (DHS) alleged that a 2015 federal court ruling on the
*Flores* Settlement Agreement (henceforth referred to as the 2015 *Flores* ruling) led to an increase
in the number of families arriving at the southwest border. DHS alleged that the 2015 *Flores*
ruling "severely limited the ability to maintain detention of families together" and "those
limitations correlated with a sharp increase in family migration."[1] DHS acknowledged that "it is
difficult to definitely prove the casual link" between the 2015 *Flores* ruling and an increase in
family migration. Nevertheless, in its Final Rule published August 23, 2019, DHS restated its
position that the 2015 *Flores* ruling "correlated with a sharp increase in family migration."[2] (In
support of its most recent Notice/Motion, the government describes this as "an explosion.")[3]

9.   As a preliminary matter, the Government's claims about correlation obfuscate the
fact that the 2015 *Flores* ruling came in the midst of an increasing trend of migrant family
apprehensions, as the graph below, produced by New York University Professors Adam Cox and
Ryan Goodman based on CPB apprehension data, shows:

[1] U.S. Department of Homeland Security (DHS). "Apprehension, Processing, Care, and Custody
of Alien Minors and Unaccompanied Alien Children," September 7, 2018, pgs. 45493-45494. Online at
(last accessed 9/10/19): https://www.regulations.gov/document?D=ICEB-2018-0002-0001

[2] U.S. Department of Homeland Security (DHS). "Apprehension, Processing, Care, and Custody
of Alien Minors and Unaccompanied Alien Children," August 23, 2019, pgs. 44484. Online at (last
accessed 9/10/19): https://www.federalregister.gov/documents/2019/08/23/2019-17927/apprehension-
processing-care-and-custody-of-alien-minors-and-unaccompanied-alien-children

[3] Defendant's Notice of Termination of *Flores* Settlement Agreement; and Motion in the
Alternative to Terminate the *Flores* Settlement Agreement at 28.

2

**Graph 1**



*Source:* Cox, Adam & Goodman, Ryan. 2018. Detention of Migrant Families as 'Deterrence': Ethical Flaws and Empirical Doubts, New York, NY: Just Security (relying on CBP apprehension data) *available at* https://www.justsecurity.org/58354/detention-migrant-families-deterrence-ethical-flaws-empirical-doubts/.

10.     Furthermore, in that same period, there was no significant difference in the overall trend of arrivals of minors traveling unaccompanied and children migrating with family members, as the graph below, produced by New York University Professors Adam Cox and Ryan Goodman based on CPB apprehension data, shows:

**Graph 2**



*Source:* Cox, Adam & Goodman, Ryan. 2018..Detention of Migrant Families as 'Deterrence': Ethical Flaws and Empirical Doubts, New York, NY: Just Security (relying on CBP apprehension data) *available at* https://www.justsecurity.org/58354/detention-migrant-families-deterrence-ethical-flaws-empirical-doubts/.

11.     However, while the trend lines of the raw apprehensions data presented above themselves undermine the Government's argument that the 2015 *Flores* ruling could cause an

1    increase that was already extant, further rigorous statistical analysis much more convincingly

2    establishes this same conclusion.

3        12.    In a report I published in October 2018,[4] I conducted such analysis and concluded

4    that there was no statistically significant increase in U.S. Border Patrol apprehensions of families

5    at the southwest border after the 2015 *Flores* ruling. In other words, there is no evidence that the

6    2015 *Flores* ruling increased the number of families arriving at the southwest border. Below I

7    describe my statistical analysis and how my analysis leads to this conclusion.

8        13.    Using interrupted time series analysis (ITSA) and publicly available data obtained

9    from U.S. Customs and Border Protection (CBP) (The monthly number of U.S. Border Patrol

10   apprehensions of families at the southwest border is a metric used by CBP as a proxy for number

11   of families coming to the border), I analyzed the relationship between the 2015 *Flores* ruling and

12   the monthly number of U.S. Border Patrol apprehensions of families at the southwest border.

13   ITSA is a quasi-experimental research design that is used to evaluate trends before, immediately

14   following, and during the period after an intervention, including a change in law such as the 2015

15   *Flores* ruling. ITSA estimates three main parameters: $\beta_1$ is the slope or trajectory of the outcome

16   variable before the start of the intervention; $\beta_2$ is the change in the level of the outcome variable

17   in the period immediately following the start of the intervention; and $\beta_3$ is the treatment effect of

18   the intervention over time.

19       14.    Table 1 presents the results of the ITSA analysis. To produce these results, I

20   created a statistical model, Model 1, which estimates the relationship between the

21   2015 *Flores* ruling and the monthly number of U.S. Border Patrol apprehensions of families at the

22   southwest border. As Table 1 shows, in Model 1, the $\beta_1$ coefficient is positive and statistically

23   significant, which affirms that the monthly number of apprehensions of families was increasing

24   before July 2015. Both the $\beta_2$ and $\beta_3$ coefficients are statistically insignificant, however, which

25

26       [4] Wong, Tom K. 2018. Did a 2015 *Flores* Court Ruling Increase the Number of Families Arriving
     at the Southwest Border? Washington, DC: Center for American Progress available at

27   https://www.americanprogress.org/issues/immigration/news/2018/10/16/459358/2015-flores-court-ruling-
     increase-number-families-arriving-southwest-border/.

28

shows that the 2015 *Flores* ruling is not statistically significantly related to an immediate or long-term increase in the monthly number of apprehensions of families at the southwest border.

15.     Put simply, this first analysis shows that the 2015 *Flores* ruling did not cause an increase in the migration of families.

### Table 1

TABLE 1
**The 2015 *Flores* ruling and the U.S. Border Patrol apprehensions of family units at the southwest border**

| *Flores* ruling time frame | Model 1 |
|---|---|
| β1 Pre-July 2015 | 106.2** |
| | 34.18 |
| β2 July 2015 | 579.7 |
| | 1,647.54 |
| β3 Post-July 2015 | -44.72 |
| | 52.81 |
| β0 Constant | 315.48 |
| | 345.51 |
| **Observations** | **83** |

Note: Six additional models were run specifying six different pseudo-interventions. The models produce qualitatively similar results. *significant at the .05 level, **significant at the .01 level, ***significant at .001 level; standard errors in parentheses.

Sources: Data for fiscal year 2012 are available at U.S. Customs and Border Protection, "United States Border Patrol Southwest Family Unit Subject and Unaccompanies Alien Children Apprehensions Fiscal Year 2016: Statement by Secretary Johnson on Southwest Border Security," available at https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016 (last accessed October 2018). Data for fiscal year 2013 to fiscal year 2017 are available at U.S. Customs and Border Protection, "United States Border Patrol Total Family Unit* Apprehensions By Month - FY 2013, FY 2014, FY 2015, FY 2016, FY 2017," available at https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20 Monthly%20Family%20Units%20by%20Sector%2C%20FY13-FY17.pdf (last accessed October 2018). Data for fiscal year 2018 are available at U.S. Customs and Border Protection, "Southwest Border Migration FY2018," available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed October 2018).

CAP

16.     To support even more confident statistical causal inference, I ran a series of variations on Model 1, specifying pseudo-interventions—meaning evaluating different start dates for any purported effect on family migration patterns from the 2015 *Flores* ruling—to address the possibility that more time needs to elapse before such an effect is evident. The pseudo-interventions analyzed include each of the six months after the 2015 *Flores* ruling. Additional models were run specifying the intervention as: August 2015; September 2015; October 2015; November 2015; December 2015; and January 2016. These variations on Model 1 produced qualitatively similar results to those presented in Table 1 and lead to the same conclusion: the 2015 *Flores* ruling is not statistically significantly related to increases in the monthly number of U.S. Border Patrol apprehensions of families at the southwest border.

17.     Again, this second analysis also shows that the 2015 *Flores* ruling did not cause an increase in the migration of families.

18.     Because the monthly numbers of family apprehensions at the southwest border exhibit seasonal trends, it is important to check the robustness of the results presented above using autoregressive integrated moving average (ARIMA) ITSA. ARIMA modeling removes time trends—the so-called "noise"—in order to isolate the impact of an intervention—known as the "signal". ARIMA modeling begins by identifying and removing noise, or the extent to which the data in a time series can be accurately predicted by time itself. Identifying and removing noise then allows one to evaluate the extent to which an intervention has an effect on an outcome of interest that is completely independent from underlying time (i.e., seasonal) trends.

19.     After seasonal trends are taken into account, the conclusion remains the same: the 2015 *Flores* ruling remains statistically insignificantly related to increases in the monthly number of family apprehensions at the southwest border. Figure 1 illustrates the results after time trends are removed.

**Figure 1**



20.    Table 2 reports the results of the ARIMA ITSA. To produce these results, I created a statistical model, Model 2, which re-estimates the relationship between the 2015 *Flores* ruling and apprehensions; it shows that after identifying and removing time trends, there is no statistically significant relationship between the 2015 *Flores* ruling and the monthly number of U.S. Border Patrol apprehensions of families at the southwest border.

**Table 2**

TABLE 2
**ARIMA ITSA results**

| *Flores* ruling time frame | Model 2<br>ARIMA (1,1,0) |
| --- | --- |
| July 2015 | 0.034 |
|  | 0.069 |
| **Observations** | **83** |

Note: The ARIMA (1,1,0) model indicates one lag and the first order difference of the detrended dependent variable. Standard errors are in parentheses.

Sources: Data for fiscal year 2012 are available at U.S. Customs and Border Protection, "United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016: Statement by Secretary Johnson on Southwest Border Security," available at https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016 (last accessed October 2018). Data for fiscal year 2013 to fiscal year 2017 are available at U.S. Customs and Border Protection, "United States Border Patrol: Total Family Unit" Apprehensions By Month-FY 2013, FY 2014, FY 2015, FY 2016, FY 2017," available at https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Family%20Units%20by%20Sector%2C%20FY13-FY17.pdf (last accessed October 2018). Data for fiscal year 2018 are available at U.S. Customs and Border Protection, "Southwest Border Migration FY2018," available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed October 2018).

CAP

21.    In the simplest terms, this final analysis also shows that the 2015 *Flores* ruling did not cause an increase in the migration of families.

22.    I note that my analysis presented above precedes the 84,490 family units apprehended by the U.S. Border Patrol in May 2019.[5] However, it would be irresponsible to suggest, as a matter of statistical causal inference, that the 2015 *Flores* ruling caused the increase in the number of families apprehended at the southwest border in May 2019. To begin, from July 2015 to May 2019, a total of 45 months elapsed. However, it is not just the length of time in between the 2015 *Flores* ruling and the 2019 increase in the number of families apprehended at the southwest border that is at issue, but also the fact that the 2015 *Flores* ruling was a constant during this entire time period. A constant simply cannot cause an outcome that varies over time. **It is not possible to credibly compare recently-reported CBP data on family apprehensions to previously reported data.**

---

[5] U.S. Customs and Border Protection. "Southwest Border Migration FY19," September 9, 2019. Online at (last accessed September 10, 2019): https://www.cbp.gov/newsroom/stats/sw-border-migration

(continued…)

23.     Moreover, it is unclear whether the method used to count the number of families apprehended at the southwest border has changed in recent years.

24.     For example, in data published by CBP titled, "Southwest Border Migration FY2017,"[6] there is no asterisk next to "Family Units." However, in data currently published by CBP titled "Southwest Border Migration FY2019," there is an asterisk next to "Family Units," which reads, "Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol."[7] Whereas in the absence of the asterisk one is left to conclude that "Family Units" refers to the number of families apprehended at the border, the presence of the asterisk implies a count of all of the individuals in the families that are apprehended at the border. Such a substantial methodological change could double or triple the reported number and would generally materially increase the total number of "family unit" apprehensions reported to the public. To the extent that the underlying method used to count the number of families apprehended at the southwest border has changed, one is unable to credibly compare recently reported data to previously reported data.

**Conclusion: The implication of this analysis is that application of the *Flores* agreement is not a driver of migration trends.**

25.     The underlying thrust of the Government's arguments about the trends in apprehension data and migration patterns at the southern border seems to be that they demonstrate that US immigration policy is the primary driver of migration trends and, as a result, the public interest requires the Government be given maximum flexibility to manage this policy in order to control (and reduce) migration – including through more aggressively using detention (including in facilities that are not state licensed) as a deterrent. However, rigorous statistical analysis of the Government's own data shows that this factual premise is wrong. As demonstrated above, the 2015 *Flores* ruling did not cause an increase in the migration of families to the United States.

---

[6] U.S. Customs and Border Protection. "Southwest Border Migration FY17," December 15, 2017. Online at (last accessed September 10, 2019): https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017

[7] U.S. Customs and Border Protection. "Southwest Border Migration FY19," September 9, 2019. Online at (last accessed September 10, 2019): https://www.cbp.gov/newsroom/stats/sw-border-migration

8

Furthermore, based on this analysis, it is reasonable to extrapolate and surmise that enforcement and detention policy generally and the existence and interpretation of the *Flores* settlement agreement in particular does not have a causal impact on migration trends.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on September 11, 2019, in San Diego, California.

_____
Tom K. Wong
Associate Professor
University of California at San Diego

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
Rachel Leach (D.C. Bar No. 1047683)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org
        ldiamond@centerforhumanrights.org
        rleach@centerforhumanrights.org

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>    Plaintiffs,<br><br>- vs -<br><br>WILLIAM P. BARR, Attorney General of the United States, *et al.*,<br><br>    Defendants. | Case No. CV 85-4544 DMG (AGRx)<br><br>DECLARATION OF CLASS COUNSEL IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE IN re PRELIMINARY INJUNCTION AND CONTEMPT<br><br>[HON. DOLLY M. GEE] |

1    *Plaintiffs' counsel, continued:*

2

3 LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 803161)

4 FREYA PITTS (Cal. Bar No. 295878)
National Center for Youth Law

5

6 405 14th Street, 15th Floor
Oakland, CA 94612

7 Telephone: (510) 835-8098

8 Email:     lwelch@youthlaw.org
           ndesai@youthlaw.org

9            pjuneja@youthlaw.og

10            fpitts@youthlaw.org

11 HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic

12 University of California Davis School of Law

13 One Shields Ave. TB 30
Davis, CA 95616

14 Telephone: (530) 754-4833

15 Email:     hscooper@ucdavis.edu

16

17 KEVIN ASKEW (CAL. BAR NO. 238866)
Orrick, Herrington & Sutcliffe LLP

18 777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017

19 Telephone:   (213) 629-2020

20 Email:     kaskew@orrick.com

21 ELYSE ECHTMAN (ADMITTED *PRO HAC VICE*)
SHAILA RAHMAN DIWAN (*ADMITTED PRO HAC VICE*)

22 RENE KATHAWALA (ADMITTED *PRO HAC VICE*)

23 Orrick, Herrington & Sutcliffe
51 West 52nd Street

24 New York, NY 10019-6142

25 Telephone:   212-506-5000

26 Email:     eechtman@orrick.com
           sdiwan@orrick.com

27            rkathawala@orrick.com

28

## DECLARATION OF PETER SCHEY

I, Peter A. Schey, depose and say:

1. This declaration is made in support of Plaintiffs' Opposition to Motion in the Alternative to Terminate the *Flores* Settlement Agreement.

2. Defendants' Motion in the Alternative to Terminate the *Flores* Settlement Agreement ("Motion") [Doc. #639], cites, without discussion or analysis, two newspaper articles about Casa Libre, a licensed shelter for minors released from Defendants' custody. Motion at 60. The undersigned class counsel founded and serves as Board President of Casa Libre. Defendants argue that "the positions class counsel takes in defending the conduct at the facility he operates … could conflict with the interests of minors he represents as class counsel." *Id*. And there are "inherent conflicts between class counsel operating a licensed child migrant shelter while simultaneously administering an agreement that provides for the release of minors to 'a licensed program willing to accept legal custody.'" *Id. quoting* Agreement ¶ 14.E

3. While the Casa Libre shelter has been issued about 130 citations by its licensing agency, about 80% of those citations were issued well over a decade ago when the home was starting up operations. Given the large size of the three-story historic home, the number of citations it has received over about fifteen years is not unusual. Many of its citations are for items such as having white curtains instead of dark ones, or a leaking faucet in one of five bathrooms. The program's license is and always has been current. The program has always timely corrected any conditions its

licensing authority requested be corrected. The program is in good standing with its licensing authority.

4. Seven of the eight current residents were released to the program by the Office of Refugee Resettlement—an agency from which Casa Libre has neither sought nor received funding—after a review of the program's operations and communications with its licensing authority.

5. There have never been and presently are no inherent conflicts—or conflicts of any kind—that have ever come to my attention between serving as President of the Board of Casa Libre while seeking compliance with the *Flores* agreement that provides, in part, for the release of minors to a licensed program willing to accept custody. Motion at 60.

I declare under penalty of the perjury that the foregoing facts are true and correct.

Executed this 12th day of September, 2019, in Los Angeles, California.


Peter A. Schey