JOSEPH H. HUNT
Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-3309
Fax: (202) 305-7000
Email: august.flentje@usdoj.gov
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
JEFFREY S. ROBINS
Deputy Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel,
Office of Immigration Litigation
District Court Section

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) Case No. CV 85-4544-DMG |
| Plaintiffs, | ) |
| | ) **DEFENDANTS' REPLY TO** |
| v. | ) **PLAINTIFFS' OPPOSITION TO** |
| | ) **DEFENDANTS' MOTION IN THE** |
| WILLIAM P. BARR, Attorney | ) **ALTERNATIVE TO TERMINATE** |
| General of the United States; *et al.*, | ) **THE FLORES SETTLEMENT** |
| | ) **AGREEMENT** |
| Defendants. | ) |
| | ) **Date: September 27, 2019** |
| | ) **Time: 9:30 a.m.** |
| | ) **Dept: Courtroom 8C** |
| | ) **Judge: Hon. Dolly M. Gee** |
| | ) |

# <u>TABLE OF CONTENTS</u>

I.    DISSOLUTION OF THE AGREEMENT IS APPROPRIATE UNDER RULE 60(B)............................................................3

II.   THE RULE PERMISSIBLY IMPLEMENTS THE SETTLEMENT AGREEMENT.................................................6

III.  PLAINTIFFS HAVE PROVIDED NO ARGUMENT FOR CONTINUING THE AGREEMENT WITH RESPECT TO ANY ISSUE OTHER THAN THOSE PROVISIONS THEY SAY ADDRESS FAMILY CUSTODY.............................................18

IV.   CONCLUSION ......................................................20

# TABLE OF AUTHORITIES

## CASES

*Akina v. Hawaii*,
  835 F.3d 1003 (9th Cir. 2016)...............................................................17

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ..............................................................................16

*Citizens for a Better Env't v. Gorsuch*,
  718 F.2d 1117 (D.C. Cir. 1983) .................................... 13, 14, 15, 16, 17

*City of Los Angeles v. Barr*,
  929 F.3d 1163 (9th Cir. 2019).................................................................5

*Cooper v. Harris*,
  87 F.R.D. 107 (E.D. Pa. 1980) ...............................................................18

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ............................................................... *passim*

*FERC v. Elec. Power Supply Assn.*,
  577 U. S. ——, 136 S.Ct. 760 (2016) ......................................................15

*Flores v. Lynch*,
  828 F.3d 898 (9th Cir. 2016)...........................................................3, 12

*Freeman v. Pitts*,
  503 U.S. 467 (1992) ................................................................................7

*Heath v. De Courcy*,
  888 F.2d 1105 (6th Cir. 1989)................................................................6

*Horne v. Flores*,
  557 U.S. 433 ................................................................... 3, 4, 5, 6

*In re Pearson*,
  990 F.2d 653 (1st Cir. 1993) ..................................................................6

*Jeff D. v. Otter*,
  643 F.3d 278 (9th Cir. 2011)................................................................................7

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ......................................................................................12

*Landon v. Plasencia*,
  459 U.S. 21 (1982) ............................................................................................5

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956) ........................................................................................10

*Lucas R. v. Azar*,
  CV185741DMGPLAX, 2018 WL 7200716 (C.D. Cal. Dec. 27, 2018)................2

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ............................................................................................3

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
  463 U.S. 29 (1983) ..........................................................................................16

*National Audubon Society v. Watt*,
  678 F.2d 299 (D.C. Cir. 1982) ..........................................................................3

*Phillips v. Sheriff of Cook Cty.*,
  828 F.3d 541 (7th Cir. 2016)............................................................................18

*Princeton Univ. v. Schmid*,
  455 U.S. 100 (1982) ........................................................................................17

*Reno v. Flores*,
  507 U.S. 292 ............................................................................. 3, 7, 11, 13, 20

*Rufo v. Inmates of Suffolk Cty. Jail*,
  502 U.S. 367 (1992) ........................................................................................1, 6

*Sacora v. Thomas*,
  628 F.3d 1059 (9th Cir. 2010)............................................................................5

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019).........................................................................10

*Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
  435 U.S. 519 (1978) .....................................................................................17

*Zamani v. Carnes,*
  491 F.3d 990 (9th Cir. 2007) .....................................................................2, 3

## **STATUTES**

5 U. S. C. § 706(2)(A)..................................................................................16

8 U.S.C. § 1225(b) ........................................................................................9

8 U.S.C. § 1225(b)(1).................................................................................11

8 U.S.C. § 1232(a)(5)(D) ..............................................................................9

## **RULES**

Fed. R. Evid. 602 ...........................................................................................4

Fed. R. Evid. 702 ...........................................................................................4

Fed. R. Civ. P. 7(b)(1)(B) ..............................................................................2

Fed. R. Civ. P. 60 ...........................................................................................1

Fed. R. Evid. P. 60(b) ....................................................................... 4,6, 17, 18

Fed. R. Civ. P.60(b)(5)...................................................................................4

Fed. R. Civ. P.60(b)(6)...................................................................................4

## **REGULATIONS**

8 C.F.R. § 212.5(b) ......................................................................................13

8 C.F.R. § 212.5(b)(3)(i)..............................................................................13

8 C.F.R. § 236.3(a)(1) ........................................................................ 1, 8, 17

8 C.F.R. § 236.3(b)(9)..................................................................................12

iv

8 C.F.R. § 236.3(i)(3) ................................................................12

8 C.F.R. § 236.3(i)(4) ................................................................12

8 C.F.R. § 236.3(i)(4)(ii) ...........................................................12

8 C.F.R. § 236.3(i)(4)(iv) ..........................................................12

8 C.F.R. § 236.3(i)(4)(vii) .........................................................12

8 C.F.R. § 236.3(j)(2) ................................................................13

8 C.F.R. § 236.3(j)(4) ...........................................................8, 13

8 C.F.R. § 236.3(j)(5)(i) ............................................................13

8 C.F.R. § 236.3(m) ..................................................................13

45 C.F.R. § 410.102 ...................................................................7

45 C.F.R. § 410.102(d) .........................................................1, 17

## ADMINISTRATIVE MATERIAL

Apprehension, Processing, Care and Custody of Alien Minors and unaccompanied
   Alien Children 84 Fed. Reg. 44392 (Aug 23, 2019)(to be codefied at
   8 C.F.R. § 212, 236 and 45 C.F.R. § 410).................................... *passim*

v

## REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN THE ALTERNATIVE TO TERMINATE THE SETTLEMENT AGREEMENT

Plaintiffs' Opposition, ECF No. 668, fails to contend with the most significant change in circumstances that warrants termination of the Flores Agreement under Rule 60: the publication of comprehensive rules that effectuate the central tenet of the Flores Agreement to establish a "nationwide policy for the detention, release, and treatment of minors," "implement[] th[e] Agreement" including its "relevant and substantive terms," and ensure that minors in immigration custody are treated "with dignity, respect and special concern for their particular vulnerability." Agreement ¶¶ 9, 11, 40; 45 C.F.R. § 410.102(d); *see* 84 Fed. Reg. 44,392; 44,525; 44,531 (Aug. 23, 2019); 8 C.F.R. § 236.3(a)(1).  This change, in conjunction with the fact that the Rule accounts for the agencies' judgments regarding how to address dramatic changes in border migration, over 20 years of experience under the Flores Agreement, and over 100,000 public comments, calls for termination of the Agreement if this Court disagrees with the government's position that the Agreement terminates of its own accord on October 7, 2019. In sum, "the public interest and considerations based on the allocation of powers within our federal system require" deference to this established Administrative Procedure Act (APA) process by officials "who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 392 (1992). This is particularly true given that the parties agreed the Agreement would terminate upon the publication of federal rules implementing it using an APA rulemaking process. Agreement ¶ 40.

As to the substance of the regulations, Plaintiffs repeatedly employ the charged rhetoric of "indefinite detention" in unlicensed family residential centers. Opp. 15. But they do not contend with (or even acknowledge) the reality that the final Rule parallels the release standard of the Flores Agreement, and fully defers to State licensing unless the State decides to forgo regulation. The agency therefore

addressed irregular family migration and custody – an aspect of regulation that the Ninth Circuit has acknowledged the parties failed to contend with – in a way that shows "special concern" for minors, parallels the "relevant and substantive terms" of the Agreement, and implements the Agreement.  Agreement ¶¶ 9, 11, 40.

Nor do Plaintiffs contend with the reality that nearly all of the other provisions of the new rules parallel the Agreement precisely—including, for example, the substantive provisions governing Health and Human Services' ("HHS") custody of unaccompanied alien children as well as the provisions governing temporary U.S. Customs and Border Protection ("CBP") custody at the border. Plaintiffs do not address these provisions at all in their opposition. In any event, the agencies explained why it made sense to parallel the Agreement's provisions on these points, and in those few areas where the Rules differ from the Agreement, the agencies provided nearly 150 Federal Register pages of consolidated, reasoned responses, and made modifications to the proposed regulation based on public input.  Accordingly, termination of the Agreement is warranted because the Rule was promulgated consistent with the Administrative Procedure Act's ("APA") rulemaking process, Plaintiffs have failed to identify any deficiency in that process, and the Rule reflects public comment, the agencies' reasoned effort to address dramatic changes in the operational environment, and experience administering the Agreement over the past generation. *See* ECF No. 639.[1]

---

[1] This Reply addresses only the government's motion to terminate – it does not address Plaintiffs' motion to enforce or the government's notice of termination, although the issues overlap. We note, however, that in Plaintiffs' supplemental brief in support of their motion to enforce, they asked this Court to enter an order entirely different from the relief sought in the motion.  *Compare* ECF No. 634-2 *with* No. ECF No. 516-1.  That new relief cannot properly be granted without being sought in a new motion and an opportunity for the government to respond to that motion.  *See* Fed. R. Civ. P. 7(b)(1)(B) ("A request for a court order must be made by motion. The motion must: ... state with particularity the grounds for seeking the order."); *Lucas R. v. Azar*, No. CV185741DMGPLAX, 2018 WL 7200716, at *7 n.10 (C.D. Cal. Dec. 27, 2018) (same); *see also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

# I.   DISSOLUTION OF THE AGREEMENT IS APPROPRIATE UNDER RULE 60(B)

Federal Rules of Civil Procedure 60(b)(5) and (6) provide that the Court may relieve a party from "a final judgment, order, or proceeding [if] applying [the prior action] prospectively is no longer equitable," or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5), (6). The ultimate standard is the public interest, and a decree such as that at issue here should be vacated when the government "[is] fulfilling its obligations under the [law] by other means." *Horne v. Flores*, 557 U.S. 433, 439. A "flexible approach" is critical with respect to institutional reform decrees to "ensure that responsibility for discharging the [government's] obligations is returned promptly to the [government] and its officials when the circumstances warrant." *Id*. at 448. These concerns are heightened with respect to decrees binding the federal government, *National Audubon Society v. Watt*, 678 F.2d 299, 301 (D.C. Cir. 1982), and in the area of immigration where the federal government must be able to adapt to changing circumstances. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see Reno v. Flores*, 507 U.S. 292, 305 (1993) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").

In their Opposition, Plaintiffs show single-minded focus on changed factual circumstances, the scope of the Agreement, and prior litigation of those issues (Opp. 1-2), asserting that the recent explosion in irregular family migration and how to address it was anticipated by the parties. This is a remarkable argument given that the "Settlement does not address the potentially complex issues involving the housing of family units," *Flores v. Lynch*, 828 F.3d 898, 906–07 (9th Cir. 2016), and the influx provision speaks to *130 minors* in custody, whereas this year we are on

pace to see *nearly a million* irregular family migrants on the southwest border.[2] The notion that the Agreement anticipated this problem and addresses the complex issues it presents, and that the Executive is therefore hamstrung in addressing it through the Rule, is not an assessment grounded in reality.[3] *See* 84 Fed. Reg. at 44,403 (rule addresses "significant and ongoing surge of adults who have made the choice to enter the United States illegally with juveniles or make the dangerous overland journey to the border with juveniles, a practice that puts juveniles at significant risk of harm"). Instead, as the Supreme Court has explained, "the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Horne*, 557 U.S. at 448.

Further, that explosion in irregular migration is not even the most fundamental reason for terminating the Agreement under Rule 60(b). Instead, it is the

_____

[2] The opinion declarations attached to Plaintiffs' opposition should not be considered by this Court to the extent they speculate regarding the impact of border policies or the state of mind of policymakers in the 1990s. *See* ECF No. 668-1, Chang-Muy Decl. ¶¶ 17-32; Martin Decl. ¶¶ 18-31; Thompson Decl. ¶¶ 11-23; Wong Decl. ¶¶ 8-25. Plaintiffs specifically refers to these submissions as being the views of "academic experts." ECF No. 668 at 18. As with other submissions made by Plaintiffs, these declarations should not be considered because (1) the declarants lack personal knowledge under Rule 602 of the Federal Rules of Evidence, and thus the evidence is based on hearsay or speculation, (2) the declarants' testimony contains improper lay witness opinion testimony under Rule 701 of the Federal Rules of Evidence, (3) none of the declarations satisfy the expert-testimony-foundation requirements of Rule 702 of the Federal Rules of Evidence, and/or (4) the declarations, to the extent they purport to present expert opinions, do not satisfy *Daubert* and its progeny. *See* Motion to Exclude, ECF No. 461 (filed Sept. 6, 2019). Additionally, to the extent this Court reviews the determinations made in the Rule, the declarations are not part of that review as they are not part of the administrative record.

[3] Plaintiffs argue that the law of the case precludes certain aspects of the final Rule governing accompanied minors. ECF No. 668 at 4-8. But that is not correct – instead, the Rule must be evaluated on its own terms. In any event, the government made those points to preserve them for further review.

promulgation of comprehensive federal rules governing the treatment of minors in immigration custody that compels termination of the Agreement under Rule 60(b). As an initial matter, it is in the public interest to have settled legislative rules governing the treatment of minors in immigration custody that were promulgated using the APA process for public input. It is also in the public interest to protect the country's borders and enforce its immigration laws. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982). The Rule balances these interests, is well-reasoned—issued based on a generation of experience under the Flores Agreement and after consideration of tens of thousands of public comments—and ensures alien minors are treated with dignity, respect, and special concern for their particular vulnerability.

Contrary to Plaintiffs' unhelpful rhetoric, Plaintiffs are not the guardians of the public interest. Rather, it is the federal agencies, tasked with implementing the laws of the people's duly-elected representatives through the APA's framework of reasoned decision-making, that choose between reasonable policy alternatives in the public interest. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2570 (2019). Having considered the relevant factors, weighed the risks and benefits, and articulated a satisfactory explanation for the Rule in a thorough and detailed discussion, overriding the agencies' reasonable exercise of policymaking judgment would improperly substitute Plaintiffs' judgment for the judgment of the agencies made with input from the public under the terms Congress prescribed in the APA. *See Horne*, 557 U.S. at 453 (consent decree should not "improperly interfere with a State's democratic process").

The Rule is supported by reasonable justifications rooted in the government's "experience," *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010), and easily satisfies the review standard under the APA, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176-77 (9th Cir. 2019). At base, Plaintiffs' arguments generally assert that the agencies' reasoning should be rejected because they would have chosen different

alternatives. A court, however, may not set aside an agency's policymaking judgment because others would have preferred alternative choices. *Dep't of Commerce*, 139 S. Ct. at 2573. Instead, as the Supreme Court explained in *Horne*, the key question is "whether, as a result of the important changes during the intervening years, the [government is] fulfilling its obligations under the [law] by other means." *Id.* Here, they are: Defendants have promulgated a rule, through standard APA rulemaking procedures, that comprehensively governs the treatment of minors in immigration custody and ensures that such minors are treated with dignity, respect, and special concern for their vulnerability.

The proper way to test this new regulatory scheme is through an appropriate challenge filed under the APA by a plaintiff who alleges a cognizable injury. Whether the Rule is contrary to law under the APA is a determination that has yet to be made in any case. Plaintiffs merely wish to prevent review of the Rule on its merits by prolonging the outdated institutional decree. This request does not square with the flexible approach demanded by precedent addressing decrees in institutional reform litigation concerning the ongoing operation of government programs. *Horne*, 557 U.S. at 439; *see Rufo*, 502 U.S. at 376, 381–382 ("the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees reach beyond the parties involved directly in the suit and impact the public's right to the sound and efficient operation of its institutions"); *In re Pearson,* 990 F.2d 653, 658 (1st Cir. 1993) (district court "not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest."); *Heath v. De Courcy*, 888 F.2d 1105, 1110 (6th Cir. 1989) (public interest in modifying institutional consent decrees—which typically

involve significant public interests—will ordinarily outweigh the interest of preserving the decree where sufficient reason for modification is shown).

## II.   THE RULE PERMISSIBLY IMPLEMENTS THE SETTLEMENT AGREEMENT

**A.** Whether looked at under the termination provision, or through the lens of Rule 60(b), Plaintiffs acknowledge that the Rules "need not 'mirror' the Settlement" in order to terminate the Agreement. ECF No. 668 at 9.  And they have asserted that certain parts of the Agreement should *not* have been incorporated into the final Rule. ECF 639 at 14. But Plaintiffs provide no viable standard for evaluating any differences or updates either in the context of a motion to terminate or under the termination provision itself.  For all of the reasons explained in the government's motion, the only plausible standard to evaluate the new Rule is the APA.

To the extent that plaintiffs instead envision termination if the Rule "implement[s] the Settlement in good faith," *id.*, that standard is easily met. The Rule was plainly issued in "good faith," and plaintiffs cannot show otherwise. *See Dep't of Commerce*, 139 S. Ct. at 2573-74 (recognizing a "narrow exception" to normal APA review standard that applies only upon "a 'strong showing of bad faith'"). Indeed, the Rule serves to accomplish the "general goals of the decree" and easily comports with "'those provisions of law and the Constitution that were the predicate for judicial intervention in the first instance.'" *Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011) (quoting *Freeman v. Pitts*, 503 U.S. 467, 491 (1992)); *see Flores*, 507 U.S. at 305.

**1.** First, the Rule undeniably accomplishes the core goal of the Agreement, to establish by Rule a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." Agreement ¶ 9. The Rule treats minors in custody with "dignity, respect, and special concern for their particular vulnerability as minors." Agreement ¶ 11; *see* 84 Fed. Reg. 44,392; 44,525; 44,531 (Aug. 23, 2019). 45 C.F.R. § 410.102; 8 C.F.R. § 236.3(a)(1). As we explained in our Motion (pp. 11-

14), the Rule achieves these purposes by setting custodial standards for facilities that parallel the agreement – both with respect to initial temporary custody by CBP or ICE and custody in facilities that are state-licensed for the care of unaccompanied minors by HHS or accompanied minors by ICE. The rule also provides standards of release that mirror the standards in the Agreement and incorporate, where appropriate, the Trafficking Victims Protection Reauthorization Act (TVPRA).

**2.** Plaintiffs argue that the Rule "fundamentally degrades" the treatment of minors accompanied by a parent or legal guardian by permitting "indefinite" detention in "unlicensed facilities." *Id.* at 13, 15. But Plaintiffs are attacking an imaginary rule, not the actual Rule.

First, for certain minors who are subject to expedited removal and establish a credible fear, the Rule provides a parole standard that parallels the release standard in the Agreement. Under Paragraph 14 of the Agreement, a minor is released "[w]here the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others." And under the Rule, if a minor in expedited removal establishes credible fear, parole will generally serve an urgent humanitarian reason warranting release "if [Department of Homeland Security] DHS determines that detention is not required to secure the minor's timely appearance before DHS or the immigration court, or to ensure the minor's safety and well-being or the safety of others." 8 C.F.R. § 236.3(j)(4). Plaintiffs fail to address this parallel standard or explain how utilizing such a standard "fundamentally degrades" the treatment of minors.  Nor do they explain how family custody for minors who present a danger or a flight risk would be improper or unwarranted.

Second, for minors in expedited removal where credible fear has not yet been established, the Rule clarifies the parole rule to ensure that minors are treated in the same way as the parent or legal guardian who is with them. This permits what this Court has previously approved – the family remaining in custody together for the

short period during which credible fear is assessed. *See* Order at 29-31 (June 27, 2017). Plaintiffs do not address this at all in their motion.[4]

Third, for accompanied or unaccompanied minors who are not subject to expedited removal, the Rule governs release in a way that parallels the Agreement and, where applicable, the TVPRA.[5] The only difference is that custody hearings for unaccompanied minors are conducted by independent hearing officers at HHS— a change that Plaintiffs do not address in their Opposition and that we have explained, is reasonably justified and does not represent a departure from the "relevant and substantive terms" of the Agreement.

**3.** With respect to the licensing of family residential centers, Plaintiffs again are attacking an imaginary rule, not the actual rule. The Rule *fully defers* to states in licensing family residential centers, and provides an alternative independent review scheme only if states decline to provide for licensing. As the Rule explains, "to the extent state licensing is available, DHS will seek licensure." 84 Fed. Reg. 44419. Further, as the Rule explains, there are currently family residential centers in just two states. In Pennsylvania, while there is ongoing litigation, the facility is currently

---

[4] Plaintiffs include improper opinion declarations (*see supra* n.2) with their filing reasoning that policy-makers in the 1990s were aware of (much smaller) irregular family migration patterns at that time. *See* ECF No. 668-1, Matin Decl. ⁋ 18. If that is the case, policymakers were aware that minor children accompanied by parents were subject to expedited removal and mandatory detention under 8 U.S.C. § 1225(b). *Compare* § 1225(b) (requiring detention) *with* 8 U.S.C. § 1232(a)(5)(D) (excluding only certain unaccompanied alien children from expedited removal detention and procedures).

[5] Plaintiffs rely heavily on the provision of Paragraph 9 requiring that rulemaking be commenced "within 120 days" of the 1997 approval date, that those regulations implement the "relevant and substantive terms of this Agreement" and not be "inconsistent with the terms of this Agreement." Those standards pertained to a rulemaking that was never finalized and at a time when the Agreement was designed to terminate of its own accord in five years irrespective of regulatory action. And while the Rule satisfies these Paragraph 9 standards, they are not the correct standard for termination – which is the more flexible Paragraph 40 provision requiring simply that the regulations "implement[] this Agreement."

licensed by the state and "continues to be regularly inspected by the Pennsylvania Department of Human Services." 84 Fed. Reg. 44,419. In Texas, state "authorities have inspected facilities . . . regularly," and litigation barriers have recently been lifted to permit state licensure. *Id*. Thus, state licensing and oversight is the norm, not the exception.

DHS addressed the state licensing requirement in detail in the Rule as well as comments on the proposed rule, and explained that state licensure was preferred, but that if a state does not license, "DHS will require third parties to conduct inspections to ensure compliance with . . . the terms of this rule" – in other words, the requirements that come directly from the Agreement, Exhibit 1, which ensure the facilities are operated with special concern to the welfare of minors who are there. *Id*. at 44,418. The results of those independent inspections will be publicly posted. *Id.* This approach is both appropriately deferential to state regulators while preventing states from attempting to use their control over licensing to effectuate a state ban on federal immigration custody. *See California v. McAleenan*, No. 2:19-cv-7390 DMG(AGRx), ECF No. 32 at 18 (arguing both that state licensure is required to preserve state regulatory interests and that family residential centers are "fundamentally incompatible with state licensing").

As the Ninth Circuit recently explained, while a State has "the general authority to ensure the health and welfare of . . . detainees in facilities within its borders," there is a "clear interference with federal activity" that is preempted by federal law where a "state[] prevented the federal government from entering into agreements with its chosen contractors until the states' own licensing standards were satisfied." *United States v. California*, 921 F.3d 865, 885-86 (9th Cir. 2019) (discussing *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) (per curiam)). This is because a state cannot engage in "active frustration of the federal government's ability to discharge its operations" which would happen when a state "require[s] that federal detention decisions . . . conform to state law . . . or mandate that ICE

contractors obtain a state license." *Id.* Thus, a state cannot use its licensing scheme to bar a form of immigration custody it does not like, and DHS reasonably employed an alternative oversight methodology to avoid that result. Plaintiffs do not explain how these reasonable judgments regarding an issue that the Ninth Circuit has explained is one of several "potentially complex issues" that "the Settlement does not address" are arbitrary and capricious or inconsistent with the fundamental purpose of the Agreement. And this system readily satisfies facial constitutional scrutiny, as the Supreme Court previously explained: "where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution." *Flores*, 507 U.S. at 303. In sum, by deferring to state regulators and creating independent review to ensure compliance with the Rule in the event a state chooses not to license, the licensing scheme implements the "relevant and substantive terms" of the Agreement.

**4.** The Rule also makes clear that while the purpose of creating regulations governing family custody "is not to utilize detention as a deterrent," proper enforcement of immigration laws can be a deterrent to migration, and proper enforcement of immigration laws will include detention in cases where "detention is mandatory" and in other cases where DHS is "appropriately exercising the enforcement discretion Congress has vested in DHS." 84 Fed. Reg. at 44,484-85. Thus, "[t]o the extent that the effect of enforcing the laws passed by Congress is to deter some migrants from making the journey to the United States, that effect is merely a result of enforcing the laws currently in place," not some impermissible "retribution." *Id.*; *see* ECF No. 668 at 19-20. Accordingly, the Rule appropriately addresses the issue of deterrence.

In support of their arguments, Plaintiffs assert that Defendants improperly relied on deterrence as a rationale in the Rule. ECF No. 668 at 18-19. Plaintiffs' opaque argument is unavailing. To be sure, much of the statutory regime at the border – such as the expedited removal statute – was enacted by Congress to provide

tools to efficiently address irregular migration in ways that no doubt have a deterrent effect. The expedited removal statute, for one, requires detention until removal and permits release in only very narrow circumstances. 8 U.S.C. § 1225(b)(1). The Supreme Court has "recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process," and accepted that Congress, justifiably concerned that aliens who are not detained may pose a danger or may fail to appear for their removal hearings, could require that aliens be detained during removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 857 (2018); *Flores*, 507 U.S. at 306 ("Congress has the authority to detain aliens . . . pending their deportation hearings"). For its part, the Rule recognizes the harm irregular migration can cause to children. 84 Fed. Reg. at 44,403 (addressing "significant and ongoing surge of adults who have made the choice to enter the United States illegally with juveniles or make the dangerous overland journey to the border with juveniles, a practice that puts juveniles at significant risk of harm").

**5.** In addition to disregarding the express protections in the Rule, Plaintiffs' hyperbole about the setting of standards for family residential centers is unwarranted and does not justify preserving an Agreement that the Ninth Circuit has explained, "does not address" these issues. *Flores*, 828 F.3d at 906–07. Indeed, the Ninth Circuit has recognized the "potentially complex issues involving the housing of family units" who have come into immigration custody. The Rule addresses those issues in a reasonable way. First, the Rule adopts key protections paralleling the Flores Agreement with respect to family residential centers: they must provide all of the conditions of custody that the Flores Agreement included for the care of children (8 C.F.R. § 236.3(i)(4)), including medical, education, and counseling services (8 C.F.R. § 236.3(i)(4)(ii), (iv), (vii)); they must be licensed by the state if licensing if it is available, and subject to independent review if a state declines to engage in such licensing (8 C.F.R. § 236.3(b)(9)); and they must be non-secure (8 C.F.R. §

236.3(i)(3)).

Second, the Rule provides release standards that reasonably balance the interests of children, parents, and immigration enforcement, while avoiding the creation of significant loopholes for parents who arrive at the border with children. The Rule creates a regulatory regime for residential centers where families can remain together pending immigration proceedings or removal. Moreover, as we have explained, the Rule incorporates bond and parole standards that assess the flight risk and danger presented by release – standards that come from the Flores Agreement ¶ 14 and that are familiar to immigration law. *See* 8 C.F.R. § 236.3(j)(4) (parole standard); § 236.3(m) (bond). To close a significant enforcement loophole, the Rule clarifies the parole rule that applies when minors accompanied by their parents or legal guardians have not established a credible fear of persecution. 8 C.F.R. §§ 212.5(b), 236.3(j)(2). The Rule also provides authority for DHS to release accompanied minors to certain other close adult relatives—including a relative identified by the parent in custody—who can provide appropriate care and treatment for the minor. 8 C.F.R. §§ 212.5(b)(3)(i), 236.3(j)(5)(i); *see Flores*, 507 U.S. at 304-05 (discussing release to an "available parent, *close relative*, or legal guardian") (emphasis added); *id.* at 311 n.6 ("Categorical distinctions between relatives and nonrelatives, and between relatives of varying degree of affinity, have always played a predominant role in determining child custody and in innumerable other aspects of domestic relations."). Plaintiffs disregard all of these provisions in urging that the rule does not implement the Flores Agreement.

**B.** Notwithstanding their admission that the Rule need not "mirror" the Agreement—and their failure to explain why a Rule largely paralleling the Agreement does not implement it—Plaintiffs argue that "holding Defendants to their commitment to promulgate regulations that 'implement' and are not 'inconsistent'" with the Agreement, would "not violate the APA." ECF No. 668 at 10. Relying on *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1128 (D.C. Cir. 1983),

1    Plaintiffs contend that a consent decree requiring "rulemaking does not impair
2    agency discretion because the decree itself is the work of the agency." ECF No. 668
3    at 10.  But Defendants are not attacking the Agreement; they are seeking to <u>effectuate</u>
4    the Agreement through issuance of the final regulations it contemplated. Plaintiffs
5    misapply *Better Env't*, which supports the termination of the Agreement here.

6          In *Better Env't*, environmental groups sued the Environmental Protection
7    Agency (EPA) for failure to comply with the statutory directive that the agency
8    promulgate various regulations under the Clean Water Act. 718 F.2d at 1120. The
9    environmental groups filed suit to determine what action the EPA should be required
10   to take in order to correct that deficiency. *Id.* As a result, the parties agreed to a
11   consent decree whereby the EPA would take "process" rather than "result" oriented
12   steps to "identify and study" additional pollutants beyond CWA requirements, by
13   implementing a study program to identify other pollutants and initiate "'regulatory
14   action.'" *Id.* at 1121, 1123–24. The consent decree contained a detailed program for
15   developing regulations and mandated the use of certain scientific methodologies and
16   decision-making criteria by EPA in determining whether additional regulations
17   should be issued and whether other pollutants should be included in the regulatory
18   scheme. *Id*. at 1120-21. Importantly, the consent decree "did not specify the
19   substantive result of any regulations EPA was to propose and only required EPA to
20   initiate 'regulatory action' for other pollutants identified through the research
21   program." *Id.* The resulting regulations were to be promulgated in phases, following
22   "full notice and comment." *Id*. at 1121.

23         Subsequently, intervener corporations sued to vacate the consent decree based
24   on two theories: (1) the district court had no power to approve the provisions of the
25   agreement directing EPA to take actions not required to remedy specific violations
26   of the CWA; and (2) these provisions impermissibly infringed on the EPA's
27   statutory discretion by precluding actions otherwise open under the CWA. *Better
28   Env't*, 718 F.2d at 1122. The *Better Env't* court's resolution of these challenges

counsel termination of the Flores Agreement.

First, the court in *Better Env't* determined that the district court did not err in granting the decree even though the parties agreed to procedures beyond the CWA. *Better Env't*, 718 F.2d at 1126. Applying contract principles that guide review of consent decrees, the court emphasized its "duty when passing upon a settlement agreement is fundamentally different from its duty in trying a case on the merits," and focused on "overall fairness to beneficiaries and consistency with the public interest.'" *Id.* (citations omitted). The court then explained that it found this review satisfied because "the agreement left the scope, substance and particulars of 'regulatory action' to the [agencies'] discretion, as subject to the rulemaking process." *Better Env't*, 718 F.2d at 1124. So too here.  The Agreement's termination provision plainly contemplates an APA rulemaking process, which "call[s] for value-laden decisionmaking and the weighing of incommensurables under conditions of uncertainty." *Dep't of Commerce*, 139 S. Ct. at 2571. The agencies engaged in precisely this task, considering divergent views and selecting between permissible alternatives to establish a nationwide policy governing the treatment of minors in immigration custody. *Id.* (citing *FERC v. Elec. Power Supply Assn.*, 136 S.Ct. 760, 782 (2016)). Plaintiffs, like the interveners in *Better Env't*, were "free to influence the content of the proposed regulations by participating in the rulemaking proceedings" and "can attack the legality of [the] final regulations" in subsequent litigation under the APA. 718 F.2d at 1121. Plaintiffs, however, may not dictate the outcome of rulemaking proceedings.

Further, like *Better Env't*, the Flores Agreement does not provide for the Court's review of the agencies' "substantive judgments" under the regulation. *Better Env't*, 718 F.2d at 1121. Besides infringing on established APA review principles, such involvement would enmesh the court in the merits of the parties' interests in the course of settling the dispute. *Id.* at 1125-26. As noted in *Better Env't*, such involvement would undermine "precisely the desire to avoid a protracted

15

examination of the parties' legal rights which underlies consent decrees. Not only the parties, but the general public, benefit from the saving of time and money that results from the voluntary settlement of litigation." *Id.* at 1126; *compare* Flores Agreement at p.3, Recitals (settlement agreement "best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years") .

**C.** At base, Plaintiffs invite the Court to disregard the APA by engaging in a balancing of the agencies' choices in order to determine whether the Rule implements the Agreement in "good faith" or meets some other non-APA standard. ECF No. 668 at 9-10. But even if this case were an APA challenge based on the new rule—and it is not—the Court's review would properly be circumscribed to the deferential "arbitrary and capricious" standard, not a "good faith" or other analysis. *See* 5 U. S. C. § 706(2)(A). The scope of review is "narrow" and limited to determining whether the agencies "examined 'the relevant data' and articulated 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce*, 139 S. Ct. 2551 at 2569 (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court may not substitute its judgment for that of the agencies, but instead must confine itself to ensuring that the agencies "remained 'within the bounds of reasoned decisionmaking.'" *Id.* (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)). Here, the agencies gave a thorough account of their actions and met these APA standards.  Accordingly, the Court should decline Plaintiffs' creative offer to depart from the established standard of review, and engage in some other standard of review of the Rule.  And to the extent that this Court thinks it appropriate to proceed to review the rule under the APA, the Court should uphold the Rule for all of the

1    reasons discussed in the government's motion.[6]  ECF No. 639, at 14-41.

2         Here, the parties agreed that the Flores Agreement would terminate upon

3    promulgation of rules implementing its overarching principles. Agreement ¶¶ 9, 11.

4    Defendants have now done so. 45 C.F.R. § 410.102(d); *see* 84 Fed. Reg. 44,392;

5    44,525; 44,531 (Aug. 23, 2019); 8 C.F.R. § 236.3(a)(1). Just like in *Vermont Yankee*,

6    it is undisputed in Plaintiffs' Opposition that the agencies have complied with the

7    procedural requirements of the APA, and Plaintiffs may not second guess the

8    product of that legitimate process. *Better Env't*, 718 F.2d at 1128 (citing *Vermont*

9    *Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc..*, 435 U.S. 519 (1978));

10   *see* ECF No. 668. Contrary to Plaintiffs' assertion, Defendants do not contend they

11   may be excused from their commitment to promulgate implementing regulations

12   providing a comprehensive nationwide scheme concerning minors in immigration

13   detention. *See* ECF No. 639 at 14-41 (surveying Rule implementing the Flores

14   Agreement pursuant to the APA process). Rather, Defendants have established that

15   the Rule fulfills precisely that commitment.  It implements the overarching goals of

16   the Flores Agreement and, as Plaintiffs unequivocally admit, "need not mirror"

17   every provision of the Agreement to trigger the terminating provision. ECF No. 668

18   at 9-10. Consequently, the publication of the Rule – which reflects the dramatically

19   changed regulatory landscape, over 20 years of agency experience under the

20

---

21   [6] Additionally, Plaintiffs' request for discovery in this case, where the Defendants

22   have produced a thorough administrative record providing detailed statistics on
     changes in the immigration landscape, is meritless.  ECF No. 668 at 16 n.19.

23   Plaintiffs also seek discovery to "determine whether termination of the Settlement
     would result in any constitutional violations." *Id.*  Plaintiffs fail to specify what

24   constitutional violations they believe will occur. In any event, Plaintiffs may not

25   seek discovery of what *might happen in the future*. Any opinion by this court at this
     juncture about hypothetical constitutional violations "would amount to an

26   impermissible advisory opinion." *Akina v. Hawaii*, 835 F.3d 1003, 1010–11 (9th Cir.

27   2016) (citing *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982) (per curiam)
     ("We do not sit to decide hypothetical issues or to give advisory opinions about

28   issues as to which there are not adverse parties before us.")).

Agreement, and the incorporation of public comments – either terminated the Agreement of its own force or calls for this Court to terminate the Agreement under Rule 60(b).

**D**. As we explained in our motion, the public interest also calls for terminating the Agreement in part due to fundamental problems with the certified class. The class is far too unwieldy for management in a single litigation, given the multiple parties with impacted interests, the multiple agencies involved, and the multiple circumstances presented by minors in immigration custody with or without parents. It is also clear that accompanied minors were not addressed in the class notice procedures. And the Due Process Clause and the Agreement apply differently in different circumstances, such that resolution of these issues has not revealed a common answer, as years of disputes before this Court make plain. Plaintiffs argue primarily that it is too late to decertify the class, but our argument at this time is not for decertification, but instead for termination of the Agreement given these ongoing flaws in the Class. They also disregard established law that just as the Agreement can be terminated under Rule 60(b), a class can be decertified if warranted under that standard. *See Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 559 (7th Cir. 2016) (Rule 60(b) not the proper vehicle for reconsidering an order denying class certification before final judgment is entered); *Cooper v. Harris*, 87 F.R.D. 107, 108 (E.D. Pa. 1980) (applying rule 60(b) to request to alter scope of certified class after final judgment).  And Plaintiffs do not address the conflicts of interest presented by designated class counsel – indeed, in an attached declaration, that counsel acknowledges the very real possibility of serious conflicts. *See* Schey Declaration ¶¶ 4-5 (arguing that 130 citations for poor conditions at his shelter are not serious, and conceding that the Defendants are releasing children into the shelter he operates).

## III. PLAINTIFFS HAVE PROVIDED NO ARGUMENT FOR CONTINUING THE AGREEMENT WITH RESPECT TO ANY ISSUE OTHER THAN THOSE PROVISIONS THEY SAY ADDRESSES FAMILY CUSTODY.

Plaintiffs' opposition only addresses certain provisions of the Flores Agreement to the extent that Plaintiffs have claimed they pertain to family custody over accompanied minors. *See* ECF No. 668 at 1 (the Agreement "protect[s] accompanied minors"); *id*. at 3 (asserting there will be "indefinite[ detention] . . . in unlicensed 'family residential centers'"); *id*. at 4-6 (law of the case prevents reconsideration of holdings that Agreement applies to accompanied minors); *id*. at 8 ("surge in family units" crossing the border does not call for termination); *id*. at 13 (settlement goals "eviscerate[d]" by family custody provisions that fail to ensure "children are detained no longer than necessary . . . in state-licensed facilities"); *id*. at 15 (settlement "only thing standing between children and indefinite detention in unlicensed facilities"); *id.* at 17 n. 20 (Rule "allow[s] Defendants to detain accompanied children in unlicensed facilities indefinitely").[7]  Plaintiffs also agree that to the extent the Agreement is superseded in part, it can no longer be enforced. *See id*. at 7 n.9 (agreeing Defendants could "argue against complying with . . . individual provisions" that are superseded by law); *id*. at 12 n. 15 (agreeing it may be appropriate to terminate certain provisions of the agreement upon a showing under Rule 60(b)).  Accordingly, even if this Court were to reject the argument that the Agreement should be terminated in full given the promulgation of comprehensive regulations, Defendants have explained why the new Rule properly supersedes the Agreement, and Plaintiffs have not attempted to show any basis for it to continue in force with respect to nearly all of its provisions, including those governing initial custody of minors by DHS and those governing HHS custody of unaccompanied alien children.  Thus, even fully crediting Plaintiffs' opposition, and

---

[7] Plaintiffs' only other complaint about the Rule – that certain provisions that were mandatory are now voluntary (*id*. at 13) – is simply incorrect.  *See* ECF 639 at 33-34.

1   without waiving our argument that the Agreement does not apply to accompanied

2   minors at all, the Agreement must accordingly be modified or terminated except to

3   the extent that a specific provision of the Agreement has been interpreted to apply

4   to accompanied minors and the Court concludes that the provision of the regulations

5   governing the same subject is invalid.

## IV.   CONCLUSION

If the Court concludes that the Agreement has not terminated of its own force, *see* ECF No. 639, the Court should terminate the Agreement under Rule 60(b), given the publication of the Rule, which implements the Agreement and the agencies' judgments with respect to a dramatically changed operational landscape, over 20 years of experience under the Agreement, and public comment. The Rule reflects a "reasonable response" to the difficult problems presented when the government encounters immigrant minors and ensures that such minors will be treated with dignity, respect, and special attention for their particular vulnerability. *Reno*, 507 U.S. at 315.

Dated: September 20, 2019     Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

*/s/ August E. Flentje*
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-3309
Fax: (202) 305-7000
Email: august.flentje@usdoj.gov

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
JEFFREY S. ROBINS
Deputy Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS

Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2019, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ August E. Flentje
AUGUST E. FLENTJE
U.S. Department of Justice
Civil Division

*Attorney for Defendants*