UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE DOLLY M. GEE, JUDGE PRESIDING

---

**JENNY L FLORES**, et al., )
)
)
)
Plaintiffs, )
)No. 85-4544DMG
vs. )
)
**JEFFERSON B. SESSIONS**, III, et al., )
)
)
Defendants. )
_____________________________________)

Reporter's Transcript of Proceedings
STATUS CONFERENCE
Los Angeles, California
FRIDAY, JULY 27, 2018
10:00 A.M.

ANNE KIELWASSER, CRR, RPR, CSR
Official Court Reporter
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Telephone: (213) 894-2969
anne.kielwasser@gmail.com

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

**Carlos Holguin**
Center For Human Rights and Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
213-388-8693 x 309
Fax: 213-386-9484
E-mail: Crholguin@centerforhumanrights.org

**Peter A Schey**
Center For Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
213-388-8693
Fax: 213-386-9484
E-mail: Pschey@centerforhumanrights.org

**Holly S Cooper**
UC Davis School of Law
Clinical Programs
One Shields Avenue TB 30
Davis, CA 95616
530-754-4833
Fax: 530-752-0822
E-mail: Hscooper@ucdavis.edu

**Leecia Welch**
National Center for Youth Law
405 Fourteenth Street 15th Floor
Oakland, CA 94612
510-835-8098
Fax: 510-835-8099
E-mail: Lwelch@youthlaw.org

ON BEHALF OF THE DEFENDANTS:

**Sarah B Fabian**
US Department of Justice
Office of Immigration Litigation
PO Box 868 Ben Franklin Station
Washington, document 20044
202-532-4824
Fax: 202-305-7000
E-mail: Sarah.b.fabian@usdoj.gov

FRIDAY, JULY 27, 2018 10:00 A.M.

~ ~ ~

P R O C E E D I N G S

~ ~ ~

10:09:55 COURT CLERK: Calling Item No. 1. CV 85-4544DMG. Flores versus Jeff Sessions, et al.

10:10:04 Counsel, your appearances please.

10:10:04 **MR. SCHEY:** Good morning, Your Honor. Peter Schey appearing for the plaintiffs. I'll be handling the status conference side of things.

10:10:12 **MR. HOLGUIN:** Good morning, Your Honor. Carlos Holguin appearing on behalf of plaintiffs. With me are Holly Cooper and Leecia Welch, co-counsel appearing on the motion to enforce.

10:10:22 **THE COURT:** Good morning.

10:10:22 **MS. FABIAN:** Good morning, Your Honor. Sarah Fabian with the Department of Justice appearing on the defendant of the defendants. And I have with me today Linda Sarbo with the General Counsel of Department of Health and Human Services.

10:10:34 **THE COURT:** Good morning. All right, good morning, everyone.

10:10:36 I assume that you've had a chance to review the Court's tentative on the motion to enforce?

10:10:40 **MR. HOLGUIN:** Yes, Your Honor.

10:10:41 **THE COURT:** All right, who would like to address the tentative?

10:10:43

10:10:56 Please state your name for the record again.

10:10:59 **MR. HOLGUIN:** Yes, Carlos Holguin. Center For Human Rights and Constitutional Law.

10:11:04

10:11:04 I have --

10:11:05 Apparently the -- the main thing I would like to comment on in the tentative is with respect to the Court's remedial authority to fashion procedural remedies for substantive violations of the settlement.

10:11:07

10:11:11

10:11:17

10:11:19 In looking at the tentative, it seems as though there is some confusion in that, what -- what appears to be happening is there's confusion between constitutional claims and the contractual claims that are stated under the settlement.

10:11:28

10:11:34

10:11:38

10:11:42

10:11:42 The authority that we've cited and particularly the authority of a Court to fashion remedies for substantive violations of a consent decree is something that the Ninth Circuit has analogized to a court's authority to remedy constitutional violations, and so we have cited Gerstein and Miranda, two examples where the Supreme Court, without regard to the due process clause prescribed procedural remedies for violations of the Fourth Amendment and the Fifth Amendment respectively in Gerstein and Miranda.

10:11:46

10:11:49

10:11:51

10:11:55

10:11:59

10:12:02

10:12:06

10:12:08

10:12:13 If one accepts that the Court's remedial

authority with respect to enforcing a consent decree is analogous to that -- that a court would have in fashioning remedies for substantive constitutional violations, then I believe the logical conclusion would be that the Court would have the authority that plaintiffs have suggested to remedy substantive violations of this consent decree via creating the procedures that plaintiffs have requested.

That being said, I think everyone here is aware that we have filed a supplemental complaint, the ^ Lucas R. complaint, in which we raised directly those particular matters. And I would --

If -- if it's something that the Court would consider doing, to reserve ruling on the remedial authority for the Flores settlement until ^ Lucas R. can be more developed and presented to the Court for a decision by way of a motion for summary judgment or some other means of resolving that matter.

**THE COURT:** Well, I think that this is a matter that is of some urgency; though, I'm not inclined to withhold my ruling and wait for the other case to wind its way through discovery and -- and other procedural aspects of a case that has just begun.

**MR. HOLGUIN:** No, I'm not suggesting that Court postpone its rulings, only that the portions that deal with the Court's remedial authority under -- to enforce a consent

decree.

In other words, is what the plaintiffs are alleging the government is doing with respect to the denial of due process. Whether the denial of due process in those three practices, the step-up practice, the custodial vetting practice and medication process, whether those practices violate or -- or should be remedied by way of fashioning a procedural protection is something that could perhaps wait.

**THE COURT:** All right.

**MR. HOLGUIN:** As far as the rest of it goes, we're very interested in having a very prompt remedy and very prompt relief especially for the medications and the -- the secure confinement of class members.

**THE COURT:** All right. Well, this was a motion to enforce the settlement.

**MR. HOLGUIN:** Yes.

**THE COURT:** And I have hewed very closely to what this motion is about. This is not a ruling on any other theory that you might have in some other lawsuit. I am not considering anything in the other lawsuit.

I think that the cases you've cited are not necessarily as broad as you suggest. They didn't arise in a motion to enforce a consent decree. There may have been an underlying consent decree which gave rise to, for example, a 1983 action or a claim under a constitutional provision in a

habeas petition, but it was not a motion to enforce a settlement agreement.

So, I think that you are conflating some of those concepts here; and so my ruling here is exclusively based on a motion to enforce.

**MR. HOLGUIN:** Very well, Your Honor. Then the plaintiffs will have nothing further.

**THE COURT:** All right, thank you.

Ms. Fabian?

**MS. FABIAN:** Your Honor, I have a few points I wanted to sort of walk through some of the points that the Court has ordered and -- and discuss those and see if there might be some slight changes that we would ask for from some of the ordering paragraphs from the Court.

So, taking them in order, the first order in paragraph -- requiring defendants to transfer class members out of Shiloh -- umm --

**THE COURT:** "Unless."

**MS. FABIAN:** Without -- "unless there is a determination that the class member poses a risk of harm to self or others."

The concern that we have with that, Your Honor, is the safety of the children being transferred out. We want to ask if you --

Looking further at the language of paragraph

11 notes that the least restrictive setting provision concerns with a setting appropriate to special needs and also that any such placement is -- looks at the ability to protect the class members' wellbeing and that of others.

What we would propose is that considering that language as well, that any order to transfer would also allow for an individualized consideration by the treating physician, we'd be willing to have that be in conjunction with plaintiffs' counsel or with a -- another -- with -- with more independent evaluation, but we would want to make sure that any transfer was done ensuring a continuity of care that considered whether any sort of quick transfer would harm the treatment of the child.

So, I -- I think we --we would ask if the Court would consider those further provisions of paragraph 11, and if any order is to -- to make a transfer, that it also include a consideration of the -- any harm to the child and the continuity of care of the child for the mental health reasons that the child might be in Shiloh in the first place and make sure that continuity of care can be maintained in the transfer.

**THE COURT:** I think that that paragraph contemplates what you suggest insofar as it says that: "The class members who do not fall within that exception shall be placed in a setting that takes into account their special

10:17:52 needs." So, I'm not quite sure what you are suggesting.

10:17:57 Is there some particular language that you 10:18:00 are suggesting? Because it cites to paragraph 11 of the 10:18:04 Flores Agreement.

10:18:05 **MS. FABIAN:** Right. I think what I would say is 10:18:07 that we would want to make sure that that evaluation could be 10:18:10 made really -- that there was time prior to the transfer to 10:18:13 make that evaluation, that is, to consider --

10:18:17 The order suggests that the -- that as soon 10:18:20 as the determination is made, that perhaps there is not a 10:18:22 danger to self or others, that transfer is required --

10:18:25 **THE COURT:** Well, I'm open to having a proposal as 10:18:28 to a timeframe if that should happen. I'm not necessarily 10:18:31 suggesting it must happen instantaneously, as I know that 10:18:36 things like that don't necessarily happen instantaneously.

10:18:40 It may be something that counsel should meet 10:18:43 and confer with, to see if there is a reasonable deadline by 10:18:46 which that can be accomplished.

10:18:48 **MS. FABIAN:** I -- I think -- I think that -- that 10:18:53 would be reasonable. I think it's something that we might 10:18:56 agree on in terms of wanting to ensure continuity of care in 10:19:01 the health of the child.

10:19:01 So, I think that if there were a 10:19:04 meet-and-confer about a -- a reasonable deadline, to make 10:19:07 sure that happened. There is a limited number of children in

10:19:12 the facility, so it wouldn't be -- it -- it wouldn't be a -- 10:19:14 a large number, but I think given some time to make sure that 10:19:19 happened, then we'd be willing to work with plaintiffs on 10:19:21 that.

10:19:21 **THE COURT:** All right. I have a question for you. 10:19:24 The reason why I've focused on Shiloh RTC is because I didn't 10:19:28 see anything in the record suggesting that other RTCs are 10:19:33 quite as restrictive as Shiloh. But perhaps you know. Are 10:19:36 other RTCs 24-hour surveillance?

10:19:42 **MS. FABIAN:** I don't have that information, Your 10:19:44 Honor. I'd be willing to make a submission on that if the 10:19:48 Court wanted. But I believe there is one other facility, the 10:19:52 Mercy First facility. But I don't -- I don't have 10:19:55 information on that.

10:19:56 **THE COURT:** All right. But I guess you should 10:19:58 consider this as sort of, as a bellwether, if in fact there 10:20:04 are other RTCs that are as restrictive and stringent as 10:20:09 Shiloh is, then this order provides some guidance in that 10:20:14 regard.

10:20:14 **MS. FABIAN:** Understood, Your Honor.

10:20:31 I believe, then, the next ordering paragraph 10:20:34 would be on page 19 of the tentative. The -- it's the 10:20:41 second -- it's the second ordering section of that paragraph. 10:20:46 *The Court orders defendants to remove from a secured facility* 10:20:53 *class members placed there solely because the class member*

10:20:54 *may be chargeable or the class member reported gang* 10:20:58 *involvement or displayed gang affiliation while in care.*

10:21:03 I think the -- the clarification we would 10:21:07 seek on that is in -- in many of those cases the child has 10:21:10 now been in care for some time. And so there is more 10:21:14 information that ORR has about that child, about their 10:21:19 amenability to stay in secure care and whether secure care is 10:21:24 necessary.

10:21:25 So, I think our concern is that immediately 10:21:29 removing individuals based on information -- based on what 10:21:33 information may or may not have been present at the time they 10:21:37 were initially placed into care would require ORR to ignore 10:21:42 any information that's developed since that time, and 10:21:45 regarding the -- the child's safety or any other concerns 10:21:51 that ORR might have about the placement of that child.

10:21:54 So, I think --

10:21:56 **THE COURT:** Well, would it help to say: "Who was 10:21:58 placed there," or: "Whose placement has been maintained 10:22:00 there"?

10:22:08 **MS. FABIAN:** I think -- I think to the extent it 10:22:11 is -- that the placement is maintained there is solely on 10:22:14 that basis, that would allow us to consider -- if there is 10:22:17 new information, consider whether that warrants staying in -- 10:22:21 in secured care.

10:22:22 I think that would be consistent with the

obligation to also review every 30 days to make sure that staying in secured care --

**THE COURT:** All right, I will add that language.

**MS. FABIAN:** Thank you, Your Honor.

Turning to page 23, and of course I think it goes without saying that the defendants stand on our arguments in the brief to the extent that we have argued other than the Court's results, we of course maintain those objections; but I'm not going to repeat them, as I understand the Court has had plenty of time to review the briefs.

So -- but I do want to -- and -- and -- on page 23, I think the -- the concern really here is that whether the situation is that -- if -- to have a federal court overseeing the agreement interpreting the state law of each license for ORR facilities, it creates a potential difficulty. ORR is relying on the state licensing facilities to oversee their licensing provisions and to oversee the compliance with state law.

There is of course the concern with having the federal court look at the state law and look at the licensing and look at compliance with that state law and be in charge -- be -- be reviewing whether the state licensing facilities are -- are correct in -- in continuing to determine that ORR facilities are complying with their own state laws.

10:24:05 Specifically, I think, what one point in here that highlights that a little bit is the concern or the requirement that a class member -- that ORR would need to obtain a court order authorizing medication in certain circumstances. That law, of course, develops out of the state foster care system; and in the state foster care system of course there are times where a court order would be necessary to overrule the wishes of the parent; however, in ORR situation, which is unique, there is frequently a situation where there is no parent or no adult who is authorized to -- to authorize the medical care, and in that case requiring ORR who then has custody, has legal custody of the child to seek out a state court order in order to medicate --

10:25:03 It's inconsistent with the -- the purpose of that state law. And so I think that's reflected then in the fact that the state licensing board understands the unique nature of ORR care and does not required that provision at least -- or has not required that ORR seeks court orders in those situations.

10:25:24 So, I think that is why -- I think that is an example of why we would say that allowing the state licensing board to determine whether -- how to apply the state laws in these arenas to the ORR facilities is really the best course of action.

10:25:42 **THE COURT:** All right, let me respond to that in two ways. First, I am applying the literal terms of the consent decree. This is something that the parties agreed to. If there are things that now appear to be difficult because of conflicts with the law, I would expect that both sides should be able to meet and confer and talk through those problems and see if you can reach some sort of accommodation as to what makes sense in the context that you find yourself in.

10:26:18 That is not for me to impose new terms into an agreement that you have -- that the parties have agreed to and that has been in place for nearly 20 years.

10:26:31 Secondly, the point that you're making about the state overseeing these institutions is problematic because I didn't see anything in the record where the Texas authorities had made specific findings with which I am now conflicting.

10:26:54 There are many situations in which state law theoretically oversees many things; for example, wage-and-hour laws, the anti-discrimination laws. That does not mean that parties cannot bring a claim in federal court when a state entity is supposedly overseeing certain areas.

10:27:16 In this case I have not seen anything in the record to suggest that Texas has made a specific finding that this ruling conflicts with.

10:27:28 **MS. FABIAN:** I think that -- that may be correct, Your Honor, I think, but it is -- that it is true, I think the record does reflect that the Texas licensing authorities are overseeing the facility, they are conducting evaluations of the facility, they are determining whether the facility should maintain its licensing and -- that involves some of these issues.

So, I think part of that -- and -- and I think that is important in that they are determining whether there are state laws that are designed to apply to state facilities. In what way, though, it should apply to this facility.

So, in fact, the state licensing authorities have some ability to determine the nuance of their stat law and how they would like it to apply to these types of facilities; whereas, this Court may be adhering to the letter of the Texas law without the ability to -- to evaluate those nuances of the state law.

**THE COURT:** Well, as I said, I am applying the consent decree as was drafted. If you have some basis for asserting that Texas thinks that I am construing their law incorrectly, you certainly can bring to my attention some declaration from a Texas authority that says there is some either state authority or some practice that has been implicated by my ruling that is contrary to how they

interpret their law, and I certainly would take that into account. But I have not seen that.

**MS. FABIAN:** May I have a moment, Your Honor?

**THE COURT:** Yes.

**MS. FABIAN:** I think --

Just to clarify, I think, in part the concern is sort of the broader implications of there being a need to come to this Court for a variety of licensing situations in different states and to evaluate state law. I think this may be one where I would suggest that we -- we meet and confer with plaintiffs to determine if there is a better system than requiring that this Court interpret state law in -- in conjunction with each licensing provision.

Whether there -- there is another system of oversight of -- of that compliance other than the state licensing provisions, that may be something that the parties could talk about. It is challenging for ORR to maintain its licenses and to have oversight by the state authorities that it then can't rely on because a motion is filed and ask this Court to separately interpret that state law and whether they are complying.

So, it seems, I think, our -- our concern is sort of the big picture of being able to rely on that oversight and not being concerned that that may be -- may be changed by bringing it to this Court at different times.

10:31:06 And so I -- I think at a minimum I would ask that perhaps that before -- before we conclude what -- how this state law does apply, that perhaps there would be an order for the parties to -- to meet and confer and see if an alternative system could be --

**THE COURT:** Well, as I said, I am applying the parties' language in their consent decree, and so my ruling will stand.

If the parties subsequently decide to meet and confer and file an amendment to the consent decree and agree on a different path, then certainly I will be happy to consider it then; but until that happens, I am bound to apply the consent decree that the parties agreed to at the outset.

And if you think that Texas believes that I should not be applying their law in the manner in which it is written and that my textual interpretation of their law is incorrect, you certainly can bring that to my attention.

**MS. FABIAN:** Understood, Your Honor.

Turning to page 29, it's my understanding that, in any event, that the director of these processes is currently enjoined, at least in part, in -- by a court in New York. That said, I think there is --

**THE COURT:** I'm sorry, the director of what?

**MS. FABIAN:** Sorry. That the ORR director review process, that is referenced on pages 28 and 29 of the

10:32:55 tentative.

10:32:56 **THE COURT:** Oh. Has been enjoined?

10:32:58 **MS. FABIAN:** Has been enjoined. It's a 10:33:00 preliminary injunction, but it is the subject of -- of 10:33:02 litigation in New York. And I -- I don't know -- I don't 10:33:08 want to speak exactly on the scope of that injunction or how 10:33:11 it's being implemented. I need to look into that further, 10:33:15 but I just wanted the Court to be aware that there is an 10:33:18 injunction.

10:33:18 **THE COURT:** All right. Well, it seems that my 10:33:19 order is consistent with it, then.

10:33:22 **MS. FABIAN:** But what I would say is that to the 10:33:24 extent -- and -- and perhaps in the time available I'm not -- 10:33:31 I'm not reading it clearly. But the -- the issue is that 10:33:36 director review --

10:33:38 As I understand it, and I understood 10:33:40 plaintiffs' concern to be that for -- for individuals who may 10:33:43 be considered a danger but do not seek a bond hearing, that 10:33:47 the concern is then that director review slows down the 10:33:51 process. But the -- the issue I would take with that is that 10:33:57 it is really up to --

10:33:59 I know that generally we -- ORR does not 10:34:05 provide a notice of a bond hearing to children now in secure 10:34:08 or staff-secure care, but that does not mean that if those 10:34:12 children --

10:34:13 And that is simply just to avoid confusing children who may not be considered a danger of being held on the basis of being a danger so that they don't believe they need to get a bond hearing because, as I think the language said, it would not -- it would not serve any purpose for them.

10:34:31 But that said, if there is reason to believe that those children are being held on the basis that they're a danger, they would still be entitled to a bond hearing.

10:34:40 So, I think the -- the confusion I have here is just that -- if -- the director review functions where a child has the ability to get a bond hearing and chooses not to, and that is that then if there still is -- there still are considerations of danger, then the agency should still have an option for a final review of that danger.

10:35:06 And I can tell you, and it's in the record in the case in New York, that the -- the considerations for that director review was to create a -- a level of oversight at the highest levels of the agency for children who had been considered a danger so that the agency has sort of a unified level of oversight before those children were released in -- in the absence of a bond hearing.

10:35:35 **THE COURT:** Well, now you're confusing me, because I don't see how my ruling conflicts with anything that you're saying.

If the ORR thinks that someone is potentially someone who is either a danger to self or others, then they would not have been released to a less restrictive setting to begin with, nor would they probably have prevailed in a bond hearing, nor would they be placed in a secure or staff-secure facility based on incomplete, inaccurate or erroneous information.

**MS. FABIAN:** I think in some cases that individuals -- the children may be stepped down to other settings, but there may remain a concern of danger for that child if released from the facility. At times there's -- there are situations where a level of care can be -- being in a structured setting with a certain level of care can mitigate dangers, but -- and so the child can be stepped down while they remain in care; but because of extraneous factors upon release, there remain concerns that -- about danger that ORR might consider before release. And I think in those cases the child would have the right to bring those concerns to a bond hearing.

And so I think what -- what the concern is here that -- and -- and understanding that the -- that the practice is currently enjoined; but to the extent that that practice is reworked or considered in -- in another -- in another function, I think the idea is that if ORR has concerns related to danger, and if that child chooses not to

10:37:27 have those concerns reviewed in a bond hearing, the agency wants to reserve the ability to have another level of review of that danger where that is not being reviewed by an immigration judge.

10:37:41 **THE COURT:** All right, well, I don't want to have the tail wagging the dog here. It sounds like a theoretical situation. I have not been presented with any specific scenario that presents that particular fact pattern.

10:37:55 Obviously, if that becomes an issue and you think that there needs to be a modification of my order because that poses a specific threat, you can certainly bring that to my attention when it becomes something real as opposed to a hypothetical.

10:38:14 **MS. FABIAN:** Understood, Your Honor.

10:38:21 I think I'm on the final order in paragraph --

10:38:25 I would say that there -- I think the agency would object in -- in general to --

10:38:33 There are times where --

10:38:37 **THE COURT:** Which one are you talking about now?

10:38:39 **MS. FABIAN:** I'm sorry, the final order in paragraph -- on -- on page 30.

10:38:44 I think at times the -- the --

10:38:47 The agency is challenged in providing post-release services after release because the agency does

10:38:56 lose some authority over the child and its ability to -- to create requirements related to that release after the child is -- is released because the agency also doesn't have the ability to take the child back into custody. That said, I think --

**THE COURT:** Why do you say that? The Flores agreement specifically says that you can if the sponsor is not suitable.

**MS. FABIAN:** I think under --

That does provide the authority; however, ORR as an agency doesn't have the ability to take children back into custody. Children at times may come back into custody through enforcement action by DHS agencies, but ORR itself will not -- does not take action to go out and take a child back into custody.

So, in that, they may have the authority under the agreement; but in practice, they don't have that ability --

**THE COURT:** You mean it's their policy not to.

**MS. FABIAN:** I'm not sure that they have the authority to do so, in that, ORR doesn't -- doesn't arrest -- doesn't take individuals into custody. They accept individuals into custody from a transfer from another agency.

That said, Your Honor, I do think that the -- the individualized assessment as long as it can take into

10:40:18 account where there might be services necessary and concerns about being able to implement them after release would -- would be prohibitive to being able to provide those services, I think that that would -- that an individualized assessment could allow for -- for those concerns to be -- to be dealt with.

10:40:44 **THE COURT:** All right. Well, it does say that you have the right to make an individualized assessment in light of particularized needs of the child. So that appears to address your concern.

10:40:56 **MS. FABIAN:** Okay. Then --

10:40:59 **THE COURT:** All right, anything else?

10:41:01 **MS. FABIAN:** May I confer briefly, Your Honor?

10:41:04 **THE COURT:** Yes.

10:41:05 (Discussion off the record.)

10:41:59 **MS. FABIAN:** Nothing further, Your Honor. Thank you.

10:42:00 **THE COURT:** All right, thank you.

10:42:03 Yes?

10:42:04 **MR. HOLGUIN:** Yes, Your Honor. With respect to a number of items that -- that the Court has ordered individualized assessment, for example, with respect to the need for post-release services, the problem we've been having is that the Office of Refuge Resettlement in conducting assessments tends to act unilaterally and autocratically;

10:42:37 meaning, there is no opportunity for the child or his or her counsel or his or her parent to have any input into the process that ORR is purportedly going through.

Since the determination is made entirely behind closed doors, there is very little assurance that that decision is actually correct and reflects the best interests of the children involved.

So, for example, in -- we -- plaintiffs would request that whenever there is going to be an individualized assessment or determination that the child receives, and/or his or her proposed custodian, receive notice of what the government is going to determine, be permitted to examine the evidence in support of the government's position and be permitted a timely opportunity to submit countervailing evidence should they disagree with the government's proposed action.

**THE COURT:** All right. Well, this is what I call the goose/gander rule. When I apply the words of the contract to the government and say that they have to comply with the requirements that are set forth in the parties' consent decree, that also means that plaintiff has to live with the language of the consent decree and can't get anything more than what is in the consent decree.

I'm certainly willing to add the language that is in paragraph 17, which says that such assessment

should also take into consideration the wishes and concerns of the minor, because that is what is stated in the consent decree, but I can't just insert new procedural requirements that are not contained within the four corners of the parties' agreement.

**MR. HOLGUIN:** Very well, Your Honor.

The -- the second point I would make is that, the evidence before the Court demonstrates that class members essentially suffer a continuum of trauma. That is, that as they spend more and more time in ORR custody, they become more and more desperate, more and more depressed; and at that point in time behavioral problems can ensue.

And some of the things that the evidence shows ORR has been doing include step-ups as well as medicating. And so when the Court agrees that the defendants can take into account activity that has occurred prior to class members being stepped to, for example, Shiloh or RTC or juvenile hall like Yolo, a lot of times those behavioral problems have been in fact triggered by the -- by the very lengthy detention and the conditions that children are subjected to in those facilities, whether they've been placed without any notice or opportunity to be heard.

So, in terms of very real, practical reasons, a child who would not be involved in what they call serious incident reports or what have you would be entitled to remain

10:45:40 in a -- in a licensed facility but for conduct that was triggered by the very lengthy detention and the conditions they experience themselves.

10:45:47 So we would encourage the Court to leave the -- the proposed order with respect to Shiloh and so forth as -- as it is written.

10:45:55 Thank you.

10:45:56 **THE COURT:** All right. Thank you.

10:45:57 If there is nothing more, then I think we're going to need to move on to the status conference.

10:46:06 Ms. Fabian, do you have anything further?

10:46:12 **MS. FABIAN:** Nothing further, Your Honor.

10:46:13 **THE COURT:** All right. Then the motion to enforce will be taken under submission.

10:46:21 Moving on to the status conference. Are Mr. Moak and Ms. Dougherty here?

10:46:29 **MS. FABIAN:** They're not, Your Honor. I -- they had asked if they should be present, and I had not received an order from the Court.

10:46:35 **THE COURT:** All right. Well, I didn't require that they be present, but I simply wanted to express my gratitude to them for their efforts to provide me with their reports.

10:46:48 The problem here, as we have had from the very beginning of this case, is that there seems to be a

10:46:58 disconnect between what the defendants observed at these facilities and what the people who have been contacted by plaintiffs have told them with regard to what happens at these facilities.

And it has been now three years since I issued my first order enforcing the Flores agreement. It has been probably over a year since my initial order last year talking about the conditions of these facilities; and while I do appreciate the defendant's efforts in providing me with the monitoring reports and their efforts to go out and observe the sites personally, it seems like there continue to be persistent problems that are contrary to the orders that I have issued.

And I've come to the conclusion that I cannot be at all of those places myself, and so I need to appoint an independent monitor to be able to give me an objective viewpoint about what is going on at those facilities.

My approach, I think, would be to ask the parties to meet and confer and see if you can agree on an independent monitor; and if you are not able to do so, then you can submit two proposed monitors per side, and I will decide either on one of them; or if I don't think any of them are appropriate, then I will appoint the monitor. So, I will invite your comment as to that approach.

**MR. SCHEY:** Peter Schey for the plaintiffs.

10:49:02 I -- I think that approach makes sense. I
10:49:08 would -- I would ask that there be a relatively short time,
10:49:11 that they not be several months.

10:49:14 **THE COURT:** No, at most it will be two weeks.

10:49:17 **MR. SCHEY:** Sounds fine. I'd have no further
10:49:21 comments on this. If the Court has questions --

10:49:27 Well, maybe one other comment. We -- I had
10:49:31 mentioned in the most recent memorandum that I filed that it
10:49:44 also appears to us that in terms of this release procedure or
10:49:54 at least evaluation for release, that perhaps what would be
10:50:02 helpful is -- there is an exhibit to the settlement that sort
10:50:09 of describes instructions to government employees who were
10:50:18 dealing with the class members, and it covers quite a bit of
10:50:22 ground, but it -- it doesn't seem to cover kind of how class
10:50:31 members, whether accompanied or unaccompanied should be
10:50:35 advised of their options under the settlement.

10:50:41 And we continue to find them, you know, we,
10:50:47 in about 250 class members and parents over the past six
10:50:57 weeks or so, and we just continue to find that they're
10:51:02 unfamiliar with the options under paragraph 14, and they're
10:51:07 certainly unaware that they can change their mind, that a
10:51:11 mother could say for now I want to keep my kid with me, but
10:51:15 in three weeks or four weeks the mother has the right to
10:51:18 change her mind.

10:51:19 So, I'm not really sure what I'm suggesting

other than possibly that we would meet and confer with the government in -- and I think this is what I suggested in the memo, that we would meet and confer and then see if we can come up with --

I think it will be relatively simple. I think it would be a script and a form that, you know, old -- older unaccompanied minors could be provided, and that parents could be provided. Just so these -- we're sure that everybody understands theirs rights and understands that they can change their mind.

**THE COURT:** Are you talking about the right to a bond hearing, the right to have a list of legal services or to contest their placement or all of the above?

**MR. SCHEY:** You know, the biggest problem that we have observed is understanding their options under paragraph 14. So, it's really the options for release. Especially now, because -- I don't know if the Court is aware where -- not sure if I made the Court aware, that this is something we probably will address down the -- down the road in not too distant future, but one of the things that this administration has done is --

They're entitled to do, obviously, before a kid is released under paragraph 14, they're entitled to do some sort of a home assessment, make sure the person they're going to release the minor to -- which could be a parent up

10:53:15 here, or an undetained parent, could be a relative, could be a person designated by a parent, could be a licensed group home.

One of the problems we're now facing is that this administration has instructed ORR when they're doing these assessments to not only assess a suitability but to assess whether the person is undocumented; and if the person is undocumented, to tell them that ORR is going report them to ICE.

So, that obviously discourages mothers and fathers and uncles and aunts and grandparents to come forward. So that makes more important options 3 and 4, which is that the parent can designate somebody, and it also makes more important the licensed group home, that children can be released to licensed group homes.

But I gave the Court as an exhibit, I think it's Exhibit 2, our first crack at coming up with a list of licensed group homes that actually have bed space available that could be shared with class members where their mothers could say, by the way, for option No. 4, it's kind of meaningless if you don't give them a list of -- of licensed group homes that might be available.

So, we started that. We -- we didn't -- we haven't done the comprehensive job, but we -- we did national surveys in the communities with the largest with

Central American communities where we think kids would be headed, and we sort of -- just to show it is possible to do, to come up with a list like that.

So, I think that because of this new policy of telling people: By the way, if you're undocumented, we're not only assessing your fitness but we're going to turn you over to -- to ICE, which makes the options 3 and 4 more important.

It -- it's really the -- the knowledge about the options under 14 that -- that people just don't seem to be aware of, and they're certainly not aware -- like, mothers are not aware that they can change their mind, if they have a sister here, and they decided for the first two or three weeks I want to keep my kid with me, but they're never made aware that you can change your mind.

So, I'm not suggesting the Court jump into this immediately, but it seems to me that a meet-and-confer to see if we can come up with just a system to adequately advise people with -- along with the monitor, I -- I just think that based on -- on the monitoring work that we have done, I believe that will go a long way towards solving a lot of problems that we currently face.

**THE COURT:** Well, as you know, Mr. Schey, it has always been my urging that the parties meet and confer whenever they have an issue regarding the interpretation of

10:56:30 the consent decree.

10:56:31 **MR. SCHEY:** Yes.

10:56:32 **THE COURT:** I am limited to the language of the consent decree; but you, as the parties to that consent decree, can at any time meet and confer and change the language or add new language or come up with new issues that you need to address without my permission.

10:56:49 It is your agreement, and so it is subject to any change that you, as the parties, think are appropriate. So, don't think that I am going to stand in the way of your meeting and conferring with each other to try to come up with new and improved language to address some of the issues that have cropped up in recent times. It seems to me it certainly is well worth the effort to try to do that.

10:57:22 **MR. SCHEY:** I appreciate that.

10:57:23 I guess one other point I would just raise is, with regards to the appointment of the special monitor, I'm not sure I gave the Court a proposed order -- seems like it was a long time ago. I think it's still pretty relevant, but I do think that given the -- the issues that were raised in the motion that the Court just addressed, the ORR issues, and given --

10:58:06 Now we're just starting to do monitoring at ORR facilities, but we went to the largest facility just about three weeks ago, and the first thing that struck us is

that it's supposedly licensed; although, we couldn't get a copy of the license, but it's clearly secure. There is no question. There's like a thousand kids there, and there is no question it's a secure facility. We've got all the problems that were raised with today's hearing.

So, it just seems to me that the -- the scope of the -- of the -- the monitor's responsibility or authority should really be over all -- all parts of the settlements, not just focus on border patrol or ICE when 30,000 kids a year are going into ORR custody.

So, I -- I would just recommend that when -- when the details are -- are worked out, sort of using the proposed order that -- as a starting points or -- umm -- that we provided the Court, that a special monitor be able to monitor compliance by all these defendants, not by two, not by two-thirds, which will -- could then continue to lead to problems.

**THE COURT:** I am not sure I'm following you. Are you saying that it should be not just as to the Rio Grande sector or --

**MR. SCHEY:** Yes, correct. Because the -- you know, the -- the declarations that we just provided to the Court is over 200, we did monitoring everywhere, and the problems were just as pervasive on the southern border of California, Arizona, Texas. So, if the Court looks at those

11:00:08 declarations -- and of course the initial motion that we 11:00:11 filed wasn't limited to -- although the evidence tend to be 11:00:16 mostly about the Rio Grande.

11:00:19 But the monitoring that we have done in 11:00:22 December, and again in -- and especially the monitoring we've 11:00:27 done in June and July of this year, equal problems from -- 11:00:35 from San Ysidro all the way to the Rio Grande is definitely 11:00:42 not limited to the Rio Grande. And we've seen an 11:00:46 intensification with all this chaos that the administration 11:00:51 has caused. There is -- when --

11:00:53 When we first filed this motion, average 11:00:55 child was in the CBP custody maybe one to three days. Now it 11:01:01 looks more like three to six days. And that's true in San 11:01:07 Ysidro, Chula Vista, El Centro, the three or four facilities 11:01:12 we visited in -- in Arizona and the facilities outside of the 11:01:19 Rio Grande and inside the Rio Grande in Texas.

11:01:22 So, this time we visited all the facilities, 11:01:26 because we were looking at sort of comprehensive compliance. 11:01:31 And you -- when you look at those declarations, every one of 11:01:38 the problems, whether it's food, potable water, not having 11:01:43 sleeping mats, not having blankets, all those issues, not 11:01:49 having toiletries, not being told about their rights, 11:01:53 whatever it is, those issues are consistent along the 11:01:59 southern -- the southern border, and that's -- that's what 11:02:03 the evidence currently shows.

So, personally, I think it would be -- we're just going to continue to have problems if we were to get a special monitor and limit her jurisdiction to the Rio Grande at this point.

We got just as many declarations from children who we interviewed in San Ysidro, Chula Vista, and El Centro, and three or four border patrol facilities that we visited in Texas. And these were two-day visits. They weren't like in-and-out for like an hour. We were there for two full days, basically, conducting these interviews. And there is absolutely no difference in the reporting about the problems that caused inhuman conditions that they faced. There is absolutely no difference in any one of those -- those sectors of the -- of the border patrol.

And then with regards to ICE, whether they're in Texas or in Pennsylvania, they're the same issue.

**THE COURT:** All right, well, let me hear from --

**MR. SCHEY:** So -- now, so my opinion would be if we're going to appoint a special monitor, let her check it out. I mean if she goes to El Centro and says, wow, everything is great, should move on to the next sector. But I think to limit her to one sector would be a real mistake.

Thank you.

**THE COURT:** All right, Ms. Fabian?

**MS. FABIAN:** Your Honor, I -- I think --

11:03:55 And maybe this is just a clarification of your intended order. I think --

11:04:00 It will be our position that ordering a special monitor would be -- is over and above what the Court did in the June 27th order last year. It would, I think --

11:04:09 In the June 27th order the Court made clear that you were not finding civil sanctions; you were ordering enforcement of the agreement.

11:04:17 **THE COURT:** I remember what I said at that time.

11:04:18 What I said was that I was going to implement the parties' juvenile coordinator positions that was in the Flores agreement and apparently had not been activated for many years. I have done that. I still intend to keep having a juvenile coordinator. They should still continue to operate pursuant to the requirements of the Flores Agreement. But because I have now had a fuller record that shows that there continue to be persistent problems even after my June 2017 order, I think it is necessary now because of the complexity of this matter and because of the persistent problems, to have an independent monitor provide me with reports.

11:05:05 **MS. FABIAN:** And our position would be that in order make that, I think the Court would need to find by clear and convincing evidence that there is a violation of the agreement in order impose the requirement of the

independent monitor over and above the enforcing the agreement. And so, I think --

**THE COURT:** They are not moving for contempt. And I don't need to find contempt in order to have a monitor or a special master. I have inherent authority under Rule 53 to appoint one.

I think they have shown by at least a preponderance of the evidence that there continue to be persistent problems. And while, as I said, I appreciate the reports that these juvenile coordinators have provided, that does not appear to be the entire story, and I intend to have an independent monitor provide me with their reports.

**MS. FABIAN:** I think, again, I would say we would strongly disagree that the evidence shows that, even by a preponderance, that there are violations.

I think the most recent declarations we haven't had a chance to fully review them, but I do -- I have already seen examples of our records that conflict with some of the statements that were made by these --

I think, you know -- we -- we believe we haven't had a chance for a full evidentiary hearing on this, but there should be an opportunity for individuals to come and to testify in this and for you to hear from the special master -- or from the juvenile coordinators themselves, and give the Court the opportunity to really make the evidentiary

findings before appointing a special master.

I think that it is -- this case has been difficult because it has been -- very much been tried in declarations, and there has been limited opportunity. And certainly in the last year we did make an attempt to -- juvenile coordinators did make an attempt to review the statements that were made by -- by plaintiffs in the declarations that were submitted.

But I think, as an evidentiary matter, that the government should have the opportunity to confront those statements and to respond, and to -- to really have the findings that lead to the appointment of a special master before that is done.

**THE COURT:** Well, we have had hundreds of declarations submitted; and if you wish to have time to respond to them, I will certainly give you the option to do that. But I think that there are already things that are apparent from those declarations that need to be addressed sooner rather than later.

I realize that there are issues that relate to the conditions at these facilities that are subjective, whether someone is cold, too cold or doesn't have enough food, sometimes is a subjective issue; but whether someone has had proper notice about certain things they're entitled to under the agreement, whether they've gotten sick because

they have eaten expired or spoiled food, or whether they're being allowed to access drinking water, those are issues that are of immediate concern.

And so if you want to submit some responses to the declarations, I understand you haven't had a chance to do that. I will give you time to do that. But that will not change my decision to have an independent monitor make sure that the order that I issued in June is complied with sooner rather than later.

**MS. FABIAN:** I think we would ask for the opportunity to respond in order to oppose the appointment of a special monitor. If -- if that's not an option, if the Court intends to order the special monitor anyway, I'm not sure that responding --

**THE COURT:** Well, if you want to respond and say that these hundreds of people who have submitted declarations have lied or that the information that they have provided in these declarations is inaccurate in some way that helps to make a fuller record, the monitor can certainly take those into account if you think that that's important; but as you know, from the very beginning when we started this motion to enforce situation, we have had problems with the defendant's recordkeeping.

So, the fact that your records seem to contradict the individual declarations that have been

submitted doesn't help me because you're basically asking me to make a credibility determination that your records are more accurate than the people who have submitted declarations. I don't know whether that's true or not.

I'm hoping that an independent monitor will be able to cut through the disputes regarding what is happening on the ground and provide me with a realistic and impartial and unbiased report of what is happening.

**MS. FABIAN:** And I think that -- our position is -- and we have, of course, appealed this issue as well -- is that -- the government really has submitted evidence in response to these, including evidence of the government's practices and policies on the ground.

And specific to the RGV, the declaration of Chief Padilla from the RGV explaining the -- the practices that -- that do conflate at times with the statements of class members. And so I think there is some expectation that those would be entitled to some presumption of regularity that the government is complying with its practices. And that then if our data does support our evidence that -- of our policies and practices, that there is in fact evidence in the record that would counter the statements of -- of a specific --

**THE COURT:** How does -- how does Officer Padilla's declaration that they have a policy and a practice contradict

the percipient witnesses' declarations of what they have encountered?

**MS. FABIAN:** Well, for example --

**THE COURT:** Employers can have policies saying they don't discriminate and they don't engage in sexual harassment. Does that mean that people don't actually encounter discrimination or sexual harassment at the workplace?

**MS. FABIAN:** I think, for example, there is -- with regard to water, there is -- there are -- in -- in the Rio Grande Valley there are, in cells, there is either a water fountain that is available in the cell, and sometimes in addition there is the use of -- of a water jug. Frequently that -- our data shows that those are tested regularly, that it is -- that the sinks are tested for being able to work, that the policy is to provide cups. Umm -- and then --

**THE COURT:** So, wouldn't an independent monitor be able to confirm that?

**MS. FABIAN:** Our position would be, though --

**THE COURT:** It seems to me it would redound to your benefit as well to have an independent monitor being able to identify these issues.

**MS. FABIAN:** I think our initial position would be that, first, the evidentiary finding of breach has to be made

11:12:20 before it would be appropriate to have a special monitor.

11:12:23 **THE COURT:** I think I've already made a finding of breach time and again, if anyone bothers to read any of my orders.

11:12:33 **MS. FABIAN:** I -- I definitely read them, Your Honor. And we -- I -- I know that is Your Honor's order. I think what it -- what seems to be is that there has now been an additional evidentiary submissions, and now there is additional remedy being imposed, our position would be that that would require a -- a supplemental evidentiary finding of breach. But I understand --

11:12:57 And we would be happy to -- to make a submission on that point if -- in order to oppose the imposition of the additional remedy.

11:13:08 I want to make another point, and I don't know if this goes to whether it would be useful for us to file something. The --

11:13:16 A couple of points that I think go to what Mr. Schey was saying. The -- the Court's order, the June 27th order that we're building on here is specific to -- it has specific findings of breach. Those are what the Court ordered the juvenile coordinators to be monitoring. There were separate juvenile coordinators because they are very different issues that conditions in CVP facilities, and certain -- more legal practices at the ICE facilities. So,

they were very specific practices that the Court found breach back in June, and that the juvenile coordinators have been monitoring.

Mr. Schey mentioned that it -- well, the juvenile coordinator for CBT because he was appointed to that position and wanted to take the benefit of anything he was doing in RGV and spread it more broadly, he did value it and oversee more broadly. And plaintiffs did respond more broadly; but, specifically, if the Court is to -- is appointing a -- an independent monitor to oversee more broadly, I think that would be another reason why it would be important to have -- to have additional -- the evidentiary finding that a monitor was required more broadly.

We would object to a monitor now being appointed to -- to look beyond the findings of breach in the Court's original June order, and beyond the issues that were the subject of the June order.

Plaintiffs have raised a number -- a number of new complaints in their latest quarterly response that are -- that are unrelated to those issues.

And I think given where we are procedurally, it's important that any order for a special monitor be limited to the findings of breach that were made in the June order to the extent the Court believes that those continue and that further evidentiary -- the evidence now warrants

appointment of a special monitor.

**THE COURT:** I agree with you, Ms. Fabian, in that regard.

With regard to the juvenile coordinator, I am expecting that the juvenile coordinators will comply with the terms of the Flores agreement, in that, they shall monitor compliance with the terms of this agreement; meaning, they have broad authority to make sure that the terms of the Flores agreement are being complied with, they are not restricted to monitoring the agreement simply based on my June 2017 order.

Under the agreement, they had an obligation for the past nearly 20 years to monitor compliance with this agreement. The fact that they haven't done so doesn't mean that they shouldn't be doing that.

With regard to the special monitor that I am intending to appoint, it will be to make sure that the breaches that I found in my June 2014 -- I mean, 2017 order are addressed, and that there is compliance in that regard.

I know that the plaintiffs have presented declarations from people in other facilities. I think they did so even within their first motion to enforce. But the finding that I made was pertaining to the Rio Grande sector because that appeared to be where the most prevalent problems occurred.

11:16:52 Whatever special monitor I appoint, unless they're super man or super woman, is not going to be able to monitor the entire country and everything that is happening in every sector. They have to be able to address specific findings that I have made and deal with those; and in the future, if there are new issues that arise, we will have to deal with them in a separate motion.

11:17:17 But the special monitor is going to have to address the issues that were identified in my previous order. No one will want to be the monitor if they are simply asked to have a wholesale review of every facility in the entire country. That is just not a realistic thing to ask one person to do.

11:17:42 So, those are my thoughts as to the special monitor. I'm going to ask the parties to meet and confer within the next two weeks to come up with a proposal for someone to engage in these duties.

11:17:57 I will even ask you to meet and confer as to the proposed language that you would like me to include in the order appointing the special monitor. I won't hold my breath as to whether you'll be able to agree on those things or not, but I'm happy to accept any suggestions that you might have as to the language to include. If you submit it, and I don't agree with it, I'll come up with my own language.

11:18:22 But it would behoove both parties to step

11:18:26 back, take a deep breath, and try to objectively come up with some language that a special monitor would find useful in implementing the order.

**MS. FABIAN:** And I would like to, again -- I know that we did this last year, but I would like to also again invite the Court --

I know you -- you cannot monitor all the facilities, and -- but if -- if Your Honor would like to visit a facility in the Rio Grande Valley or elsewhere, I would be happy to arrange that. I know my clients would welcome you and would like to show you the facility.

**THE COURT:** All right, there may come a time in the future where that might happen, but for now I'm going to ask you to meet and confer about the appointment of the special monitor.

**MS. FABIAN:** Thank you, Your Honor.

**THE COURT:** All right.

Anything further?

**MR. SCHEY:** Nothing further.

**THE COURT:** All right. Then, within two weeks I will ask that you submit a joint status report regarding your efforts to agree on a special monitor. If you cannot agree, then you will propose two proposed monitors per side. I will consider -- and then include of course their resume or CV as to their qualifications.

11:19:31 I would prefer if there is someone who has
11:19:34 some experience with immigration related matters so that they
11:19:40 can hit the ground running and don't have a sharp learning
11:19:44 curve. But I would ask that you submit that information
11:19:47 within two weeks. That is, by --

11:19:50 What is the date two weeks from now?

11:19:51 August 10th.

11:20:04 And as I said, if I don't find that the
11:20:07 proposed monitors that you've submitted are adequate for the
11:20:11 job, I will appoint someone myself.

11:20:15 All right?

11:20:20 We are adjourned.

11:20:39 MS. FABIAN: Thank you, Your Honor.

11:20:39 (Proceedings concluded.)

11:20:40 (Court adjourned.)

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript of the stenographically recorded proceedings in the above matter.

Fees charged for this transcript, less any circuit fee reduction and/or deposit, are in conformance with the regulations of the judicial conference of the United States.

/S/Anne Kielwasser ______________________________ 08/01/2018 ____________________

Anne Kielwasser, CRR, RPR, CSR
Official Court Reporter

Date

## /

**/S/Anne** [1] - 48:10

## 0

**08/01/2018** [1] - 48:10

## 1

**1** [1] - 3:5
**10:00** [2] - 1:18, 3:1
**10th** [1] - 47:7
**11** [3] - 8:1, 8:16, 9:3
**14** [4] - 28:20, 29:16, 29:23, 31:10
**15th** [1] - 2:17
**17** [1] - 24:25
**19** [1] - 10:22
**1983** [1] - 6:25

## 2

**2** [1] - 30:17
**20** [2] - 14:12, 44:13
**200** [1] - 33:23
**20044** [1] - 2:24
**2014** [1] - 44:18
**2017** [3] - 36:18, 44:11, 44:18
**2018** [2] - 1:17, 3:1
**202-305-7000** [1] - 2:25
**202-532-4824** [1] - 2:24
**213** [1] - 1:25
**213-386-9484** [2] - 2:6, 2:10
**213-388-8693** [2] - 2:5, 2:9
**23** [2] - 12:5, 12:12
**24-hour** [1] - 10:9
**250** [1] - 28:18
**256** [2] - 2:4, 2:8
**27** [2] - 1:17, 3:1
**27th** [3] - 36:5, 36:6, 42:20
**28** [1] - 17:25
**29** [2] - 17:19, 17:25

## 3

**3** [2] - 30:12, 31:7
**30** [3] - 2:13, 12:1, 21:22
**30,000** [1] - 33:9
**309** [1] - 2:5

## 4

**4** [3] - 30:12, 30:20, 31:7
**405** [1] - 2:17

## 5

**510-835-8098** [1] - 2:18
**510-835-8099** [1] - 2:19
**53** [1] - 37:5
**530-752-0822** [1] - 2:15
**530-754-4833** [1] - 2:14

## 8

**85-4544DMG** [2] - 1:10, 3:5
**868** [1] - 2:23
**894-2969** [1] - 1:25

## 9

**90057** [2] - 2:5, 2:9
**94612** [1] - 2:18
**95616** [1] - 2:14

## A

**A.M** [2] - 1:18, 3:1
**ability** [9] - 8:3, 15:14, 15:17, 19:12, 21:2, 22:1, 22:4, 22:11, 22:18
**able** [14] - 14:6, 16:23, 23:2, 23:3, 27:16, 27:20, 33:14, 40:6, 41:16, 41:19, 41:23, 45:2, 45:4, 45:21
**absence** [1] - 19:22
**absolutely** [2] - 35:11, 35:13
**accept** [2] - 22:22, 45:22
**accepts** [1] - 4:25
**access** [1] - 39:2
**accommodation** [1] - 14:8
**accompanied** [1] - 28:15
**accomplished** [1] - 9:18
**account** [5] - 8:25, 16:2, 23:1, 25:16, 39:20
**accurate** [1] - 40:3
**act** [1] - 23:25
**action** [5] - 6:25, 13:25, 22:13, 22:14, 24:16
**activated** [1] - 36:12
**activity** [1] - 25:16
**add** [3] - 12:3, 24:24, 32:6
**addition** [1] - 41:13
**additional** [4] - 42:8, 42:9, 42:14, 43:12
**address** [7] - 4:1, 23:10, 29:19, 32:7, 32:12, 45:4, 45:9
**addressed** [3] - 32:21, 38:18, 44:19
**adequate** [1] - 47:9
**adequately** [1] - 31:18
**adhering** [1] - 15:16
**adjourned** [2] - 47:12, 47:15
**administration** [3] - 29:21, 30:5, 34:9
**adult** [1] - 13:10
**advise** [1] - 31:19
**advised** [1] - 28:16
**affiliation** [1] - 11:2
**agencies** [1] - 22:13
**agency** [10] - 19:14, 19:19, 19:20, 21:1, 21:17, 21:24, 21:25, 22:3, 22:11, 22:23
**ago** [2] - 32:19, 32:25
**agree** [8] - 9:21, 17:11, 27:19, 44:2, 45:21, 45:24, 46:22
**agreed** [3] - 14:3, 14:11, 17:13
**agreement** [19] - 7:2, 12:14, 14:11, 22:7, 22:17, 25:5, 27:6, 32:8, 36:8, 36:12, 36:25, 37:2, 38:25, 44:6, 44:7, 44:9, 44:10, 44:12, 44:14
**Agreement** [2] - 9:4, 36:15
**agrees** [1] - 25:15
**al** [3] - 1:8, 1:12, 3:6
**alleging** [1] - 6:3
**allow** [3] - 8:7, 11:22, 23:5
**allowed** [1] - 39:2
**allowing** [1] - 13:22
**alternative** [1] - 17:5
**amenability** [1] - 11:7
**Amendment** [2] - 4:23, 4:24
**amendment** [1] - 17:10
**American** [1] - 31:1
**analogized** [1] - 4:19
**analogous** [1] - 5:2
**Angeles** [3] - 1:17, 2:5, 2:9
**Anne** [1] - 48:11
**ANNE** [1] - 1:22
**anne.kielwasser@ gmail.com** [1] - 1:25
**anti** [1] - 14:20
**anti-discrimination** [1] - 14:20
**anyway** [1] - 39:13
**apparent** [1] - 38:18
**appealed** [1] - 40:10
**appear** [2] - 14:4, 37:11
**appearances** [1] - 3:7
**appeared** [1] - 44:24
**appearing** [4] - 3:9, 3:12, 3:13, 3:17
**apply** [7] - 13:23, 15:10, 15:11, 15:15, 17:3, 17:12, 24:18
**applying** [4] - 14:2, 15:19, 17:6, 17:15
**appoint** [7] - 27:15, 27:23, 35:19, 37:6, 44:17, 45:1, 47:10
**appointed** [2] - 43:5, 43:15
**appointing** [3] - 38:1, 43:10, 45:20
**appointment** [5] - 32:17, 38:12, 39:11, 44:1, 46:14
**appreciate** [3] - 27:9, 32:15, 37:9
**approach** [3] - 27:18, 27:24, 28:1
**appropriate** [4] - 8:2, 27:23, 32:9, 42:1
**areas** [1] - 14:22
**arenas** [1] - 13:24
**argued** [1] - 12:7
**arguments** [1] - 12:7
**arise** [2] - 6:22, 45:6
**Arizona** [2] - 33:25, 34:15
**arrange** [1] - 46:10
**arrest** [1] - 22:21
**aspects** [1] - 5:21
**asserting** [1] - 15:21
**assess** [2] - 30:6, 30:7
**assessing** [1] - 31:6
**assessment** [7] - 22:25, 23:4, 23:8, 23:22, 24:10, 24:25, 29:24
**assessments** [2] - 23:25, 30:6
**assume** [1] - 3:23
**assurance** [1] - 24:5
**attempt** [2] - 38:5, 38:6
**attention** [3] - 15:22, 17:17, 21:12
**August** [1] - 47:7
**aunts** [1] - 30:11
**authorities** [4] - 14:16, 15:3, 15:13, 16:18
**authority** [17] - 4:9, 4:16, 4:17, 4:19, 5:1, 5:5, 5:13, 5:25, 15:23, 15:24, 22:1, 22:10, 22:16, 22:21, 33:7, 37:5, 44:8
**authorize** [1] - 13:11
**authorized** [1] - 13:11
**authorizing** [1] - 13:4
**autocratically** [1] - 23:25
**available** [4] - 18:13, 30:18, 30:22, 41:12
**Avenue** [1] - 2:13
**average** [1] - 34:11
**avoid** [1] - 19:1
**aware** [8] - 5:9, 18:8, 29:17, 29:18, 31:11, 31:12, 31:15

## B

**based** [6] - 7:5, 11:10, 20:6, 31:20, 44:10
**basis** [4] - 11:22, 15:20, 19:3, 19:8
**become** [1] - 25:10
**becomes** [2] - 21:9, 21:12
**bed** [1] - 30:18
**begin** [1] - 20:4
**beginning** [2] - 26:25, 39:21
**begun** [1] - 5:22
**BEHALF** [2] - 2:2, 2:21
**behalf** [1] - 3:12
**behavioral** [2] - 25:12, 25:18
**behind** [1] - 24:5
**behoove** [1] - 45:25
**believes** [2] - 17:14, 43:24
**bellwether** [1] - 10:16
**Ben** [1] - 2:23
**benefit** [2] - 41:22, 43:6
**best** [2] - 13:24, 24:6
**better** [1] - 16:11
**between** [2] - 4:13,

27:1
**beyond** [2] - 43:15, 43:16
**big** [1] - 16:23
**biggest** [1] - 29:14
**bit** [2] - 13:2, 28:13
**blankets** [1] - 34:21
**board** [2] - 13:17, 13:23
**bond** [10] - 18:18, 18:23, 19:4, 19:9, 19:12, 19:22, 20:4, 20:19, 21:1, 29:12
**border** [5] - 33:9, 33:24, 34:24, 35:7, 35:14
**bothers** [1] - 42:3
**Boulevard** [2] - 2:4, 2:8
**bound** [1] - 17:12
**Box** [1] - 2:23
**breach** [7] - 41:25, 42:3, 42:11, 42:21, 43:1, 43:15, 43:23
**breaches** [1] - 44:18
**breath** [2] - 45:21, 46:1
**brief** [1] - 12:7
**briefly** [1] - 23:13
**briefs** [1] - 12:10
**bring** [5] - 14:21, 15:22, 17:17, 20:18, 21:11
**bringing** [1] - 16:25
**broad** [2] - 6:22, 44:8
**broader** [1] - 16:7
**broadly** [5] - 43:7, 43:8, 43:9, 43:11, 43:13
**building** [1] - 42:20

## C

**CA** [4] - 2:5, 2:9, 2:14, 2:18
**CALIFORNIA** [2] - 1:2, 1:24
**California** [2] - 1:17, 33:25
**cannot** [4] - 14:21, 27:14, 46:7, 46:22
**care** [19] - 8:11, 8:18, 8:20, 9:21, 11:2, 11:5, 11:7, 11:12, 11:24, 12:2, 13:6, 13:11, 13:18, 18:24, 20:12, 20:13, 20:15
**Carlos** [3] - 2:3, 3:11, 4:4
**case** [7] - 5:20, 5:21,

13:12, 14:23, 19:17, 26:25, 38:2
**cases** [4] - 6:21, 11:4, 20:8, 20:18
**caused** [2] - 34:10, 35:12
**CBP** [1] - 34:12
**CBT** [1] - 43:5
**cell** [1] - 41:12
**cells** [1] - 41:11
**Center** [4] - 2:4, 2:8, 2:17, 4:4
**Central** [1] - 31:1
**CENTRAL** [2] - 1:2, 1:24
**Centro** [3] - 34:14, 35:7, 35:20
**certain** [5] - 13:4, 14:22, 20:13, 38:24, 42:25
**certainly** [12] - 15:22, 16:1, 17:11, 17:17, 21:11, 24:24, 28:21, 31:11, 32:13, 38:5, 38:16, 39:19
**certify** [1] - 48:2
**challenged** [1] - 21:24
**challenging** [1] - 16:17
**chance** [4] - 3:23, 37:17, 37:21, 39:5
**change** [8] - 28:21, 28:24, 29:10, 31:12, 31:15, 32:5, 32:9, 39:7
**changed** [1] - 16:25
**changes** [1] - 7:13
**chaos** [1] - 34:9
**charge** [1] - 12:22
**chargeable** [1] - 11:1
**charged** [1] - 48:5
**check** [1] - 35:19
**Chief** [1] - 40:15
**child** [23] - 8:13, 8:17, 8:18, 8:19, 9:22, 11:4, 11:6, 11:15, 13:13, 19:12, 20:11, 20:14, 20:18, 20:25, 22:1, 22:2, 22:4, 22:14, 23:9, 24:1, 24:10, 25:24, 34:12
**child's** [1] - 11:14
**children** [15] - 7:23, 9:25, 18:23, 18:25, 19:2, 19:8, 19:19, 19:21, 20:9, 22:11, 22:12, 24:7, 25:20, 30:14, 35:6
**chooses** [2] - 19:12, 20:25

**Chula** [2] - 34:14, 35:6
**Circuit** [1] - 4:19
**circuit** [1] - 48:5
**circumstances** [1] - 13:5
**cited** [3] - 4:16, 4:20, 6:21
**cites** [1] - 9:3
**civil** [1] - 36:7
**claim** [2] - 6:25, 14:21
**claims** [2] - 4:14
**clarification** [2] - 11:3, 36:1
**clarify** [1] - 16:6
**class** [16] - 6:13, 7:16, 7:20, 8:4, 8:24, 10:25, 11:1, 13:3, 25:8, 25:17, 28:13, 28:14, 28:18, 30:19, 40:17
**clause** [1] - 4:22
**clear** [2] - 36:6, 36:24
**clearly** [2] - 18:14, 33:2
**CLERK** [1] - 3:5
**clients** [1] - 46:10
**Clinical** [1] - 2:13
**closed** [1] - 24:5
**closely** [1] - 6:17
**co** [1] - 3:13
**co-counsel** [1] - 3:13
**cold** [2] - 38:22
**coming** [1] - 30:17
**comment** [3] - 4:8, 27:24, 28:7
**comments** [1] - 28:6
**communities** [2] - 30:25, 31:1
**complaint** [2] - 5:9, 5:10
**complaints** [1] - 43:19
**complexity** [1] - 36:19
**compliance** [8] - 12:18, 12:21, 16:15, 33:15, 34:18, 44:7, 44:13, 44:19
**complied** [2] - 39:8, 44:9
**comply** [2] - 24:19, 44:5
**complying** [3] - 12:24, 16:21, 40:19
**comprehensive** [2] - 30:24, 34:18
**concepts** [1] - 7:4
**concern** [13] - 7:22, 11:9, 12:12, 12:19, 13:2, 16:6, 16:22, 18:17, 18:19, 20:10, 20:20, 23:10, 39:3

**concerned** [1] - 16:24
**concerns** [9] - 8:2, 11:14, 20:16, 20:18, 20:25, 21:1, 23:1, 23:5, 25:1
**conclude** [1] - 17:2
**concluded** [1] - 47:14
**conclusion** [2] - 5:4, 27:14
**conditions** [6] - 25:20, 26:2, 27:8, 35:12, 38:21, 42:24
**conduct** [1] - 26:1
**conducting** [3] - 15:4, 23:24, 35:10
**confer** [16] - 9:17, 9:24, 14:6, 16:10, 17:4, 17:10, 23:13, 27:19, 29:1, 29:3, 31:17, 31:24, 32:5, 45:15, 45:18, 46:14
**conference** [4] - 3:10, 26:10, 26:15, 48:7
**CONFERENCE** [1] - 1:16
**conferring** [1] - 32:11
**confinement** [1] - 6:13
**confirm** [1] - 41:19
**conflate** [1] - 40:16
**conflating** [1] - 7:3
**conflict** [1] - 37:18
**conflicting** [1] - 14:17
**conflicts** [3] - 14:5, 14:25, 19:24
**conformance** [1] - 48:6
**confront** [1] - 38:10
**confusing** [2] - 19:1, 19:23
**confusion** [3] - 4:12, 4:13, 19:10
**conjunction** [2] - 8:8, 16:13
**consent** [18] - 4:18, 5:1, 5:6, 5:25, 6:23, 6:24, 14:3, 15:20, 17:7, 17:10, 17:13, 24:21, 24:22, 24:23, 25:2, 32:1, 32:4
**consider** [9] - 5:13, 8:15, 9:8, 10:16, 11:22, 11:23, 17:12, 20:17, 46:24
**consideration** [3] - 8:7, 8:17, 25:1
**considerations** [2] - 19:14, 19:17
**considered** [5] - 8:12, 18:18, 19:2, 19:20, 20:23

**considering** [2] - 6:20, 8:5
**consistent** [3] - 11:25, 18:11, 34:23
**constitutional** [4] - 4:13, 4:20, 5:3, 6:25
**Constitutional** [3] - 2:4, 2:8, 4:5
**construing** [1] - 15:21
**contacted** [1] - 27:2
**contained** [1] - 25:4
**contemplates** [1] - 8:23
**contempt** [2] - 37:3, 37:4
**contest** [1] - 29:13
**context** [1] - 14:8
**continue** [9] - 27:11, 28:17, 28:19, 33:16, 35:2, 36:14, 36:17, 37:8, 43:24
**continuing** [1] - 12:23
**continuity** [4] - 8:11, 8:18, 8:20, 9:21
**continuum** [1] - 25:9
**contract** [1] - 24:19
**contractual** [1] - 4:14
**contradict** [2] - 39:25, 40:25
**contrary** [2] - 15:25, 27:12
**convincing** [1] - 36:24
**Cooper** [2] - 2:12, 3:13
**coordinator** [4] - 36:11, 36:14, 43:5, 44:4
**coordinators** [7] - 37:10, 37:24, 38:6, 42:22, 42:23, 43:2, 44:5
**copy** [1] - 33:2
**corners** [1] - 25:4
**correct** [5] - 12:23, 15:1, 24:6, 33:21, 48:2
**Counsel** [2] - 3:7, 3:19
**counsel** [4] - 3:13, 8:9, 9:16, 24:2
**counter** [1] - 40:22
**countervailing** [1] - 24:14
**country** [2] - 45:3, 45:12
**couple** [1] - 42:18
**course** [9] - 12:5, 12:8, 12:19, 13:5, 13:7, 13:24, 34:1, 40:10, 46:24
**COURT** [58] - 1:1,

1:23, 3:5, 3:15, 3:21, 4:1, 5:18, 6:9, 6:14, 6:17, 7:8, 7:18, 8:22, 9:12, 10:5, 10:15, 11:17, 12:3, 14:1, 15:19, 16:4, 17:6, 17:23, 18:2, 18:10, 19:23, 21:5, 21:20, 22:6, 22:19, 23:7, 23:12, 23:14, 23:18, 24:17, 26:8, 26:13, 26:20, 28:4, 29:11, 31:23, 32:3, 33:18, 35:17, 35:24, 36:9, 37:3, 38:14, 39:15, 40:24, 41:4, 41:18, 41:21, 42:2, 44:2, 46:12, 46:17, 46:20
**court** [9] - 5:2, 12:14, 12:20, 13:4, 13:7, 13:13, 13:19, 14:21, 17:21
**Court** [46] - 1:23, 4:17, 4:21, 5:4, 5:12, 5:15, 5:23, 7:12, 7:14, 8:15, 10:12, 10:24, 12:10, 15:16, 16:8, 16:12, 16:20, 16:25, 18:8, 23:21, 25:8, 25:15, 26:4, 26:19, 28:6, 29:17, 29:18, 30:16, 31:16, 32:18, 32:21, 33:14, 33:23, 33:25, 36:4, 36:6, 36:23, 37:25, 39:13, 42:21, 43:1, 43:9, 43:24, 46:6, 47:15, 48:11
**Court's** [7] - 3:24, 4:8, 4:25, 5:25, 12:8, 42:19, 43:16
**court's** [1] - 4:19
**cover** [1] - 28:14
**covers** [1] - 28:13
**crack** [1] - 30:17
**create** [2] - 19:18, 22:2
**creates** [1] - 12:15
**creating** [1] - 5:6
**credibility** [1] - 40:2
**crholguin@centerforhumanrights.org** [1] - 2:6
**cropped** [1] - 32:13
**CRR** [2] - 1:22, 48:11
**CSR** [2] - 1:22, 48:11
**cups** [1] - 41:16
**curve** [1] - 47:4
**custodial** [1] - 6:5
**custodian** [1] - 24:11
**custody** [11] - 13:12, 22:4, 22:12, 22:15, 22:22, 22:23, 25:10, 33:10, 34:12
**cut** [1] - 40:6
**CV** [2] - 3:5, 46:24
**CVP** [1] - 42:24

## D

**danger** [13] - 9:11, 18:18, 19:2, 19:3, 19:9, 19:14, 19:15, 19:20, 20:2, 20:10, 20:16, 20:25, 21:3
**dangers** [1] - 20:14
**data** [2] - 40:20, 41:14
**date** [1] - 47:6
**Date** [1] - 48:11
**Davis** [2] - 2:12, 2:14
**days** [4] - 12:1, 34:12, 34:13, 35:10
**deadline** [2] - 9:17, 9:24
**deal** [3] - 5:24, 45:5, 45:7
**dealing** [1] - 28:13
**dealt** [1] - 23:5
**December** [1] - 34:5
**decide** [2] - 17:9, 27:22
**decided** [1] - 31:13
**decision** [3] - 5:15, 24:6, 39:7
**declaration** [3] - 15:23, 40:14, 40:25
**declarations** [16] - 33:22, 34:1, 34:19, 35:5, 37:16, 38:4, 38:8, 38:15, 38:18, 39:5, 39:16, 39:18, 39:25, 40:4, 41:1, 44:21
**decree** [18] - 4:18, 5:1, 5:6, 6:1, 6:23, 6:24, 14:3, 15:20, 17:7, 17:10, 17:13, 24:21, 24:22, 24:23, 25:3, 32:1, 32:4, 32:5
**deep** [1] - 46:1
**defendant** [1] - 3:18
**defendant's** [2] - 27:9, 39:22
**defendants** [8] - 1:13, 3:18, 7:16, 10:24, 12:6, 25:15, 27:1, 33:15
**DEFENDANTS** [1] - 2:21
**definitely** [2] - 34:7, 42:5
**demonstrates** [1] - 25:8
**denial** [2] - 6:3, 6:4
**Department** [3] - 2:22, 3:17, 3:19
**deposit** [1] - 48:6
**depressed** [1] - 25:11
**describes** [1] - 28:12
**designate** [1] - 30:13
**designated** [1] - 30:2
**designed** [1] - 15:10
**desperate** [1] - 25:11
**details** [1] - 33:12
**detention** [2] - 25:20, 26:2
**determination** [5] - 7:20, 9:10, 24:4, 24:10, 40:2
**determine** [5] - 12:24, 13:23, 15:14, 16:11, 24:12
**determining** [2] - 15:5, 15:9
**developed** [2] - 5:15, 11:13
**develops** [1] - 13:5
**DHS** [1] - 22:13
**difference** [2] - 35:11, 35:13
**different** [4] - 16:9, 16:25, 17:11, 42:24
**difficult** [2] - 14:4, 38:3
**difficulty** [1] - 12:16
**directly** [1] - 5:10
**director** [7] - 17:20, 17:23, 17:24, 18:15, 18:19, 19:11, 19:18
**disagree** [2] - 24:15, 37:14
**disconnect** [1] - 27:1
**discourages** [1] - 30:10
**discovery** [1] - 5:21
**discriminate** [1] - 41:5
**discrimination** [2] - 14:20, 41:7
**discuss** [1] - 7:12
**Discussion** [1] - 23:15
**displayed** [1] - 11:2
**disputes** [1] - 40:6
**distant** [1] - 29:20
**DISTRICT** [4] - 1:1, 1:2, 1:23, 1:24
**document** [1] - 2:24
**dog** [1] - 21:6
**DOLLY** [1] - 1:4
**done** [9] - 8:11, 29:21, 30:24, 31:21, 34:4, 34:6, 36:13, 38:13, 44:14
**doors** [1] - 24:5
**Dougherty** [1] - 26:16
**down** [5] - 18:19, 20:9, 20:14, 29:19
**drafted** [1] - 15:20
**drinking** [1] - 39:2
**due** [3] - 4:22, 6:4
**duties** [1] - 45:17

## E

**e-mail** [5] - 2:6, 2:10, 2:15, 2:19, 2:25
**eaten** [1] - 39:1
**effort** [1] - 32:14
**efforts** [4] - 26:22, 27:9, 27:10, 46:22
**either** [4] - 15:24, 20:2, 27:22, 41:11
**El** [3] - 34:14, 35:7, 35:20
**elsewhere** [1] - 46:9
**employees** [1] - 28:12
**employers** [1] - 41:4
**encounter** [1] - 41:7
**encountered** [1] - 41:2
**encourage** [1] - 26:4
**enforce** [10] - 3:14, 3:24, 5:25, 6:15, 6:23, 7:1, 7:5, 26:13, 39:22, 44:22
**enforcement** [2] - 22:13, 36:8
**enforcing** [3] - 5:1, 27:6, 37:1
**engage** [2] - 41:5, 45:17
**enjoined** [4] - 17:21, 18:2, 18:3, 20:22
**ensue** [1] - 25:12
**ensure** [1] - 9:21
**ensuring** [1] - 8:11
**entire** [3] - 37:11, 45:3, 45:11
**entirely** [1] - 24:4
**entitled** [6] - 19:9, 25:25, 29:22, 29:23, 38:24, 40:18
**entity** [1] - 14:22
**equal** [1] - 34:6
**erroneous** [1] - 20:6
**especially** [3] - 6:12, 29:16, 34:5
**essentially** [1] - 25:9
**et** [3] - 1:8, 1:12, 3:6
**evaluate** [2] - 15:17, 16:9
**evaluation** [4] - 8:10, 9:6, 9:8, 28:10
**evaluations** [1] - 15:4
**event** [1] - 17:20
**everywhere** [1] - 33:23
**evidence** [14] - 24:13, 24:15, 25:8, 25:13, 34:2, 34:25, 36:24, 37:8, 37:14, 40:11, 40:12, 40:20, 40:21, 43:25
**evidentiary** [8] - 37:21, 37:25, 38:9, 41:25, 42:8, 42:10, 43:12, 43:25
**exactly** [1] - 18:6
**examine** [1] - 24:12
**example** [8] - 6:24, 13:22, 14:19, 23:22, 24:8, 25:17, 41:3, 41:9
**examples** [2] - 4:21, 37:18
**exception** [1] - 8:24
**exclusively** [1] - 7:4
**exhibit** [2] - 28:11, 30:16
**Exhibit** [1] - 30:17
**expect** [1] - 14:5
**expectation** [1] - 40:17
**expecting** [1] - 44:5
**experience** [2] - 26:3, 47:2
**expired** [1] - 39:1
**explaining** [1] - 40:15
**express** [1] - 26:21
**extent** [5] - 11:20, 12:7, 18:13, 20:22, 43:24
**extraneous** [1] - 20:15

## F

**Fabian** [6] - 2:22, 3:17, 7:9, 26:11, 35:24, 44:2
**FABIAN** [39] - 3:16, 7:10, 7:19, 9:5, 9:19, 10:10, 10:20, 11:20, 12:4, 15:1, 16:3, 16:5, 17:18, 17:24, 18:3, 18:12, 20:8, 21:14, 21:21, 22:9, 22:20, 23:11, 23:13, 23:16, 26:12, 26:17, 35:25, 36:22, 37:13, 39:10, 40:9, 41:3, 41:9, 41:20, 41:24, 42:5, 46:4, 46:16,

47:13
**face** [1] - 31:22
**faced** [1] - 35:12
**facilities** [22] - 12:15, 12:16, 12:23, 12:24, 13:24, 15:11, 15:16, 25:21, 27:2, 27:4, 27:8, 27:17, 32:24, 34:14, 34:15, 34:17, 35:7, 38:21, 42:24, 42:25, 44:21, 46:8
**facility** [16] - 10:1, 10:12, 10:13, 10:24, 15:4, 15:5, 15:12, 20:6, 20:11, 26:1, 32:24, 33:4, 45:11, 46:9, 46:11
**facing** [1] - 30:4
**fact** [8] - 10:16, 13:17, 15:13, 21:8, 25:19, 39:24, 40:21, 44:14
**factors** [1] - 20:15
**fall** [1] - 8:24
**far** [1] - 6:10
**fashion** [2] - 4:9, 4:17
**fashioning** [2] - 5:2, 6:7
**fathers** [1] - 30:11
**Fax** [5] - 2:6, 2:10, 2:15, 2:19, 2:25
**federal** [3] - 12:13, 12:20, 14:21
**fee** [1] - 48:5
**fees** [1] - 48:5
**few** [1] - 7:10
**Fifth** [1] - 4:24
**file** [2] - 17:10, 42:17
**filed** [5] - 5:9, 16:19, 28:8, 34:2, 34:11
**final** [3] - 19:15, 21:15, 21:21
**findings** [7] - 14:16, 38:1, 38:12, 42:21, 43:15, 43:23, 45:5
**fine** [1] - 28:5
**First** [1] - 10:13
**first** [10] - 7:15, 8:19, 14:2, 27:6, 30:17, 31:13, 32:25, 34:11, 41:25, 44:22
**fitness** [1] - 31:6
**Floor** [1] - 2:17
**Flores** [8] - 5:14, 9:4, 22:6, 27:6, 36:12, 36:15, 44:6, 44:9
**FLORES** [1] - 1:8
**flores** [1] - 3:6
**focus** [1] - 33:9
**focused** [1] - 10:6
**following** [1] - 33:18
**food** [3] - 34:20, 38:23, 39:1
**foregoing** [1] - 48:2
**form** [1] - 29:6
**forth** [2] - 24:20, 26:5
**forward** [1] - 30:12
**foster** [2] - 13:6
**fountain** [1] - 41:12
**four** [4] - 25:4, 28:23, 34:14, 35:7
**Fourteenth** [1] - 2:17
**Fourth** [1] - 4:23
**Franklin** [1] - 2:23
**frequently** [2] - 13:9, 41:14
**FRIDAY** [2] - 1:17, 3:1
**full** [2] - 35:10, 37:21
**fuller** [2] - 36:16, 39:19
**fully** [1] - 37:17
**function** [1] - 20:24
**functions** [1] - 19:11
**future** [3] - 29:20, 45:6, 46:13

## G

**gang** [2] - 11:1, 11:2
**GEE** [1] - 1:4
**General** [1] - 3:19
**general** [1] - 21:18
**generally** [1] - 18:22
**Gerstein** [2] - 4:21, 4:24
**given** [4] - 10:2, 32:20, 32:22, 43:21
**goose/gander** [1] - 24:18
**government** [8] - 6:3, 24:12, 24:19, 28:12, 29:2, 38:10, 40:11, 40:19
**government's** [3] - 24:13, 24:15, 40:12
**Grande** [10] - 33:19, 34:3, 34:7, 34:8, 34:16, 35:3, 41:11, 44:23, 46:9
**grandparents** [1] - 30:11
**gratitude** [1] - 26:22
**great** [1] - 35:21
**ground** [4] - 28:14, 40:7, 40:13, 47:3
**group** [5] - 30:2, 30:14, 30:15, 30:18, 30:22
**guess** [2] - 10:15, 32:16
**guidance** [1] - 10:18

## H

**habeas** [1] - 7:1
**hall** [1] - 25:18
**handling** [1] - 3:9
**happy** [4] - 17:11, 42:12, 45:22, 46:10
**harassment** [2] - 41:6, 41:7
**harm** [3] - 7:20, 8:12, 8:17
**headed** [1] - 31:2
**Health** [1] - 3:19
**health** [2] - 8:18, 9:22
**hear** [2] - 35:17, 37:23
**heard** [1] - 25:22
**hearing** [12] - 18:18, 18:23, 19:4, 19:9, 19:12, 19:22, 20:5, 20:19, 21:1, 29:12, 33:5, 37:21
**held** [2] - 19:2, 19:8
**help** [2] - 11:17, 40:1
**helpful** [1] - 28:11
**helps** [1] - 39:18
**hereby** [1] - 48:2
**hewed** [1] - 6:17
**highest** [1] - 19:19
**highlights** [1] - 13:2
**hit** [1] - 47:3
**hold** [1] - 45:20
**Holguin** [3] - 2:3, 3:12, 4:4
**HOLGUIN** [9] - 3:11, 3:25, 4:4, 5:23, 6:10, 6:16, 7:6, 23:20, 25:6
**Holly** [2] - 2:12, 3:12
**home** [3] - 29:24, 30:3, 30:14
**homes** [3] - 30:15, 30:18, 30:22
**Honor** [26] - 3:8, 3:11, 3:16, 3:25, 7:6, 7:10, 7:23, 10:11, 10:20, 12:4, 15:2, 16:3, 17:18, 21:14, 22:24, 23:13, 23:16, 23:20, 25:6, 26:12, 26:17, 35:25, 42:6, 46:8, 46:16, 47:13
**Honor's** [1] - 42:6
**HONORABLE** [1] - 1:4
**hoping** [1] - 40:5
**hour** [2] - 14:20, 35:9
**hscooper@ucdavis.edu** [1] - 2:15
**Human** [4] - 2:4, 2:8, 3:20, 4:5
**hundreds** [2] - 38:14, 39:16
**hypothetical** [1] - 21:13

## I

**ICE** [5] - 30:9, 31:7, 33:9, 35:15, 42:25
**idea** [1] - 20:24
**identified** [1] - 45:9
**identify** [1] - 41:23
**ignore** [1] - 11:12
**III** [1] - 1:12
**immediate** [1] - 39:3
**immediately** [2] - 11:9, 31:17
**Immigration** [1] - 2:23
**immigration** [2] - 21:4, 47:2
**impartial** [1] - 40:8
**implement** [2] - 23:2, 36:10
**implemented** [1] - 18:7
**implementing** [1] - 46:3
**implicated** [1] - 15:25
**implications** [1] - 16:7
**important** [7] - 15:9, 30:12, 30:14, 31:8, 39:20, 43:12, 43:22
**impose** [2] - 14:10, 36:25
**imposed** [1] - 42:9
**imposition** [1] - 42:14
**improved** [1] - 32:12
**in-and-out** [1] - 35:9
**inaccurate** [2] - 20:6, 39:18
**incident** [1] - 25:25
**inclined** [1] - 5:19
**include** [5] - 8:17, 25:14, 45:19, 45:23, 46:24
**including** [1] - 40:12
**incomplete** [1] - 20:6
**inconsistent** [1] - 13:15
**incorrect** [1] - 17:17
**incorrectly** [1] - 15:22
**independent** [11] - 8:10, 27:16, 27:20, 36:20, 37:1, 37:12, 39:7, 40:5, 41:18, 41:22, 43:10
**individual** [1] - 39:25
**individualized** [6] - 8:7, 22:25, 23:4, 23:8, 23:22, 24:9
**individuals** [6] - 11:10, 18:17, 20:9, 22:22, 22:23, 37:22
**information** [10] - 10:10, 10:14, 11:6, 11:10, 11:11, 11:13, 11:23, 20:7, 39:17, 47:4
**inherent** [1] - 37:5
**inhuman** [1] - 35:12
**initial** [3] - 27:7, 34:1, 41:24
**injunction** [3] - 18:4, 18:6, 18:9
**input** [1] - 24:2
**insert** [1] - 25:3
**inside** [1] - 34:16
**insofar** [1] - 8:23
**instantaneously** [2] - 9:14, 9:15
**institutions** [1] - 14:14
**instructed** [1] - 30:5
**instructions** [1] - 28:12
**intend** [2] - 36:13, 37:11
**intended** [1] - 36:2
**intending** [1] - 44:17
**intends** [1] - 39:13
**intensification** [1] - 34:9
**interested** [1] - 6:11
**interests** [1] - 24:6
**interpret** [3] - 16:1, 16:12, 16:20
**interpretation** [2] - 17:16, 31:25
**interpreting** [1] - 12:14
**interviewed** [1] - 35:6
**interviews** [1] - 35:10
**invite** [2] - 27:24, 46:6
**involved** [2] - 24:7, 25:24
**involvement** [1] - 11:2
**involves** [1] - 15:6
**issue** [7] - 18:14, 18:20, 21:9, 31:25, 35:16, 38:23, 40:10
**issued** [3] - 27:6, 27:13, 39:8
**issues** [15] - 15:7, 32:6, 32:12, 32:20, 32:21, 34:21, 34:23, 38:20, 39:2, 41:23, 42:24, 43:16, 43:20, 45:6, 45:9
**Item** [1] - 3:5
**items** [1] - 23:21
**itself** [1] - 22:13

**J**

**Jeff** [1] - 3:6
**JEFFERSON** [1] - 1:12
**JENNY** [1] - 1:8
**job** [2] - 30:24, 47:10
**joint** [1] - 46:21
**JUDGE** [1] - 1:4
**judge** [1] - 21:4
**judgment** [1] - 5:16
**judicial** [1] - 48:7
**jug** [1] - 41:13
**July** [1] - 34:6
**JULY** [2] - 1:17, 3:1
**jump** [1] - 31:16
**June** [12] - 34:6, 36:5, 36:6, 36:17, 39:8, 42:19, 43:2, 43:16, 43:17, 43:23, 44:11, 44:18
**jurisdiction** [1] - 35:3
**Justice** [2] - 2:22, 3:17
**juvenile** [12] - 25:18, 36:11, 36:14, 37:10, 37:24, 38:6, 42:22, 42:23, 43:2, 43:5, 44:4, 44:5

**K**

**keep** [3] - 28:22, 31:14, 36:13
**kid** [3] - 28:22, 29:23, 31:14
**kids** [3] - 31:1, 33:3, 33:9
**Kielwasser** [2] - 48:10, 48:11
**KIELWASSER** [1] - 1:22
**kind** [2] - 28:14, 30:20
**knowledge** [1] - 31:9

**L**

**language** [16] - 7:25, 8:6, 9:2, 12:3, 17:7, 19:4, 24:22, 24:24, 32:3, 32:6, 32:12, 45:19, 45:23, 45:24, 46:2
**large** [1] - 10:2
**largest** [2] - 30:25, 32:24
**last** [4] - 27:7, 36:5, 38:5, 46:5
**latest** [1] - 43:19
**law** [19] - 12:14, 12:18, 12:20, 12:21, 13:5, 13:16, 14:5, 14:18, 15:14, 15:17, 15:18, 15:21, 16:1, 16:9, 16:12, 16:20, 17:3, 17:15, 17:16
**Law** [5] - 2:4, 2:8, 2:12, 2:17, 4:5
**laws** [5] - 12:25, 13:23, 14:20, 15:10
**lawsuit** [2] - 6:19, 6:20
**lead** [2] - 33:16, 38:12
**learning** [1] - 47:3
**least** [5] - 8:1, 13:19, 17:21, 28:10, 37:7
**leave** [1] - 26:4
**Leecia** [2] - 2:16, 3:13
**legal** [3] - 13:12, 29:12, 42:25
**lengthy** [2] - 25:20, 26:2
**less** [2] - 20:3, 48:5
**letter** [1] - 15:16
**level** [5] - 19:18, 19:21, 20:12, 20:13, 21:2
**levels** [1] - 19:19
**license** [2] - 12:15, 33:2
**licensed** [7] - 26:1, 30:2, 30:14, 30:15, 30:18, 30:21, 33:1
**licenses** [1] - 16:18
**licensing** [12] - 12:16, 12:17, 12:21, 12:22, 13:17, 13:22, 15:3, 15:6, 15:13, 16:8, 16:13, 16:16
**lied** [1] - 39:17
**light** [1] - 23:8
**limit** [2] - 35:3, 35:22
**limited** [6] - 9:25, 32:3, 34:2, 34:8, 38:4, 43:23
**Linda** [1] - 3:18
**list** [4] - 29:12, 30:17, 30:21, 31:3
**literal** [1] - 14:2
**litigation** [1] - 18:5
**Litigation** [1] - 2:23
**live** [1] - 24:21
**logical** [1] - 5:4
**look** [6] - 12:20, 12:21, 18:7, 34:19, 43:15
**looking** [3] - 4:11, 7:25, 34:18
**looks** [3] - 8:3, 33:25, 34:13
**Los** [3] - 1:17, 2:5, 2:9
**lose** [1] - 22:1
**Lucas** [2] - 5:10, 5:14
**lwelch@youthlaw.org** [1] - 2:19

**M**

**mail** [5] - 2:6, 2:10, 2:15, 2:19, 2:25
**main** [1] - 4:7
**maintain** [3] - 12:8, 15:6, 16:17
**maintained** [3] - 8:20, 11:18, 11:21
**man** [1] - 45:2
**manner** [1] - 17:15
**master** [4] - 37:5, 37:24, 38:1, 38:12
**mats** [1] - 34:21
**matter** [5] - 5:17, 5:18, 36:19, 38:9, 48:4
**matters** [2] - 5:11, 47:2
**mean** [7] - 14:21, 18:24, 22:19, 35:20, 41:6, 44:14, 44:18
**meaning** [2] - 24:1, 44:7
**meaningless** [1] - 30:21
**means** [2] - 5:16, 24:21
**medical** [1] - 13:11
**medicate** [1] - 13:14
**medicating** [1] - 25:15
**medication** [2] - 6:6, 13:4
**medications** [1] - 6:12
**meet** [15] - 9:16, 9:24, 14:6, 16:10, 17:4, 17:9, 27:19, 29:1, 29:3, 31:17, 31:24, 32:5, 45:15, 45:18, 46:14
**meet-and-confer** [2] - 9:24, 31:17
**meeting** [1] - 32:11
**member** [4] - 7:20, 10:25, 11:1, 13:3
**members** [11] - 6:13, 7:16, 8:24, 10:25, 25:8, 25:17, 28:13, 28:15, 28:18, 30:19, 40:17
**members'** [1] - 8:4
**memo** [1] - 29:3
**memorandum** [1] - 28:8
**mental** [1] - 8:18
**mentioned** [2] - 28:8, 43:4
**Mercy** [1] - 10:13
**might** [10] - 6:19, 7:13, 8:19, 9:20, 11:15, 20:17, 23:1, 30:22, 45:23, 46:13
**mind** [5] - 28:21, 28:24, 29:10, 31:12, 31:15
**minimum** [1] - 17:1
**minor** [2] - 25:2, 29:25
**minors** [1] - 29:7
**Miranda** [2] - 4:21, 4:24
**mistake** [1] - 35:22
**mitigate** [1] - 20:14
**Moak** [1] - 26:16
**modification** [1] - 21:10
**moment** [1] - 16:3
**monitor** [40] - 27:16, 27:20, 27:23, 31:19, 32:17, 33:14, 33:15, 35:3, 35:19, 36:4, 36:20, 37:1, 37:4, 37:12, 39:7, 39:12, 39:13, 39:19, 40:5, 41:18, 41:22, 42:1, 43:10, 43:13, 43:14, 43:22, 44:1, 44:6, 44:13, 44:16, 45:1, 45:3, 45:8, 45:10, 45:15, 45:20, 46:2, 46:7, 46:15, 46:22
**monitor's** [1] - 33:7
**monitoring** [9] - 27:10, 31:20, 32:23, 33:23, 34:4, 34:5, 42:22, 43:3, 44:10
**monitors** [3] - 27:21, 46:23, 47:9
**months** [1] - 28:3
**morning** [6] - 3:8, 3:11, 3:15, 3:16, 3:21, 3:22
**most** [4] - 28:4, 28:8, 37:16, 44:24
**mostly** [1] - 34:3
**mother** [2] - 28:22, 28:23
**mothers** [3] - 30:10, 30:19, 31:11
**motion** [16] - 3:13, 3:24, 5:16, 6:14, 6:18, 6:23, 7:1, 7:5, 16:19, 26:13, 32:21, 34:1, 34:11, 39:21, 44:22, 45:7
**move** [2] - 26:10, 35:21
**moving** [2] - 26:15, 37:3
**MR** [18] - 3:8, 3:11, 3:25, 4:4, 5:23, 6:10, 6:16, 7:6, 23:20, 25:6, 27:25, 28:5, 29:14, 32:2, 32:15, 33:21, 35:18, 46:19
**MS** [39] - 3:16, 7:10, 7:19, 9:5, 9:19, 10:10, 10:20, 11:20, 12:4, 15:1, 16:3, 16:5, 17:18, 17:24, 18:3, 18:12, 20:8, 21:14, 21:21, 22:9, 22:20, 23:11, 23:13, 23:16, 26:12, 26:17, 35:25, 36:22, 37:13, 39:10, 40:9, 41:3, 41:9, 41:20, 41:24, 42:5, 46:4, 46:16, 47:13
**must** [1] - 9:14

**N**

**name** [1] - 4:3
**National** [1] - 2:17
**national** [1] - 30:25
**nature** [1] - 13:18
**nearly** [2] - 14:12, 44:13
**necessarily** [3] - 6:22, 9:13, 9:15
**necessary** [4] - 11:8, 13:8, 23:1, 36:18
**need** [11] - 13:3, 16:7, 18:7, 19:4, 23:23, 26:10, 27:15, 32:7, 36:23, 37:4, 38:18
**needs** [4] - 8:2, 9:1, 21:10, 23:9
**never** [1] - 31:14
**new** [9] - 11:23, 14:10, 25:3, 31:4, 32:6, 32:12, 43:19, 45:6
**New** [3] - 17:21, 18:5, 19:17
**next** [3] - 10:21, 35:21, 45:16
**Ninth** [1] - 4:19
**notes** [1] - 8:1
**nothing** [5] - 7:7, 23:16, 26:9, 26:12, 46:19
**notice** [4] - 18:23, 24:11, 25:22, 38:24
**nuance** [1] - 15:14
**nuances** [1] - 15:18
**number** [5] - 9:25, 10:2, 23:21, 43:18

## O

**Oakland** [1] - 2:18
**object** [2] - 21:18, 43:14
**objections** [1] - 12:9
**objective** [1] - 27:16
**objectively** [1] - 46:1
**obligation** [2] - 12:1, 44:12
**observe** [1] - 27:11
**observed** [2] - 27:1, 29:15
**obtain** [1] - 13:4
**obviously** [3] - 21:9, 29:22, 30:10
**Occidental** [2] - 2:4, 2:8
**occurred** [2] - 25:16, 44:25
**OF** [4] - 1:2, 1:24, 2:2, 2:21
**Office** [2] - 2:23, 23:24
**Officer** [1] - 40:24
**official** [1] - 48:11
**Official** [1] - 1:23
**old** [1] - 29:6
**older** [1] - 29:7
**ON** [2] - 2:2, 2:21
**one** [17] - 4:25, 10:12, 13:1, 16:10, 21:20, 27:22, 28:7, 29:20, 30:4, 32:16, 34:12, 34:19, 35:13, 35:22, 37:6, 45:10, 45:12
**One** [1] - 2:13
**open** [1] - 9:12
**operate** [1] - 36:15
**opinion** [1] - 35:18
**opportunity** [8] - 24:1, 24:14, 25:22, 37:22, 37:25, 38:4, 38:10, 39:11
**oppose** [2] - 39:11, 42:13
**opposed** [1] - 21:13
**option** [4] - 19:15, 30:20, 38:16, 39:12
**options** [7] - 28:16, 28:20, 29:15, 29:16, 30:12, 31:7, 31:10
**order** [44] - 7:15, 8:6, 8:16, 9:9, 10:18, 13:4, 13:7, 13:13, 17:4, 18:11, 21:10, 21:15, 21:21, 26:5, 26:19, 27:6, 27:7, 32:18, 33:13, 36:2, 36:5, 36:6, 36:18, 36:23, 36:25, 37:4, 39:8, 39:11, 39:13, 42:6, 42:13, 42:19, 42:20, 43:16, 43:17, 43:22, 43:24, 44:11, 44:18, 45:9, 45:20, 46:3
**ordered** [3] - 7:12, 23:21, 42:22
**ordering** [5] - 7:14, 10:21, 10:23, 36:3, 36:7
**orders** [4] - 10:24, 13:19, 27:12, 42:4
**original** [1] - 43:16
**ORR** [29] - 11:6, 11:12, 11:15, 12:15, 12:16, 12:24, 13:3, 13:9, 13:12, 13:18, 13:19, 13:24, 16:17, 17:24, 18:22, 20:1, 20:17, 20:24, 22:10, 22:13, 22:21, 24:3, 25:10, 25:14, 30:5, 30:8, 32:21, 32:24, 33:10
**outset** [1] - 17:13
**outside** [1] - 34:15
**overrule** [1] - 13:8
**oversee** [4] - 12:17, 43:8, 43:10
**overseeing** [4] - 12:14, 14:14, 14:22, 15:4
**oversees** [1] - 14:19
**oversight** [5] - 16:15, 16:18, 16:24, 19:18, 19:21
**own** [2] - 12:24, 45:24

## P

**Padilla** [1] - 40:15
**Padilla's** [1] - 40:24
**page** [5] - 10:22, 12:5, 12:12, 17:19, 21:22
**pages** [1] - 17:25
**paragraph** [13] - 7:16, 7:25, 8:15, 8:22, 9:3, 10:21, 10:23, 21:16, 21:22, 24:25, 28:20, 29:15, 29:23
**paragraphs** [1] - 7:14
**parent** [7] - 13:8, 13:10, 24:2, 29:25, 30:1, 30:2, 30:13
**parents** [2] - 28:18, 29:8
**part** [3] - 15:8, 16:6, 17:21
**particular** [3] - 5:11, 9:2, 21:8
**particularized** [1] - 23:9
**particularly** [1] - 4:17
**parties** [13] - 14:3, 14:11, 14:21, 16:16, 17:4, 17:9, 17:13, 27:19, 31:24, 32:4, 32:9, 45:15, 45:25
**parties'** [4] - 17:7, 24:20, 25:5, 36:11
**parts** [1] - 33:8
**past** [2] - 28:18, 44:13
**path** [1] - 17:11
**patrol** [3] - 33:9, 35:7, 35:14
**pattern** [1] - 21:8
**Pennsylvania** [1] - 35:16
**people** [8] - 27:2, 31:5, 31:10, 31:19, 39:16, 40:3, 41:6, 44:21
**per** [2] - 27:21, 46:23
**percipient** [1] - 41:1
**perhaps** [7] - 6:8, 9:10, 10:8, 17:2, 17:3, 18:13, 28:10
**permission** [1] - 32:7
**permitted** [2] - 24:12, 24:14
**persistent** [4] - 27:12, 36:17, 36:19, 37:9
**person** [5] - 29:24, 30:2, 30:7, 45:13
**personally** [2] - 27:11, 35:1
**pertaining** [1] - 44:23
**pervasive** [1] - 33:24
**Peter** [3] - 2:7, 3:8, 27:25
**petition** [1] - 7:1
**physician** [1] - 8:8
**picture** [1] - 16:23
**place** [2] - 8:19, 14:12
**placed** [6] - 8:25, 10:25, 11:12, 11:18, 20:5, 25:21
**placement** [5] - 8:3, 11:15, 11:18, 11:21, 29:13
**places** [1] - 27:15
**plaintiff** [1] - 24:21
**plaintiffs** [16] - 1:10, 3:9, 3:12, 5:5, 5:7, 6:2, 7:7, 10:3, 16:11, 24:8, 27:3, 27:25, 38:7, 43:8, 43:18, 44:20
**PLAINTIFFS** [1] - 2:2
**plaintiffs'** [2] - 8:9, 18:17
**plenty** [1] - 12:10
**PO** [1] - 2:23
**point** [8] - 13:1, 14:13, 25:7, 25:12, 32:16, 35:4, 42:13, 42:15
**points** [4] - 7:10, 7:11, 33:13, 42:18
**policies** [3] - 40:13, 40:21, 41:4
**policy** [4] - 22:19, 31:4, 40:25, 41:16
**portions** [1] - 5:24
**poses** [2] - 7:20, 21:11
**position** [8] - 24:13, 36:3, 36:22, 40:9, 41:20, 41:24, 42:9, 43:6
**positions** [1] - 36:11
**possible** [1] - 31:2
**possibly** [1] - 29:1
**post** [2] - 21:25, 23:23
**post-release** [2] - 21:25, 23:23
**postpone** [1] - 5:24
**potable** [1] - 34:20
**potential** [1] - 12:15
**potentially** [1] - 20:1
**practical** [1] - 25:23
**practice** [7] - 6:5, 6:6, 15:24, 20:22, 20:23, 22:17, 40:25
**practices** [8] - 6:5, 6:6, 40:13, 40:15, 40:19, 40:21, 42:25, 43:1
**prefer** [1] - 47:1
**preliminary** [1] - 18:4
**preponderance** [2] - 37:8, 37:15
**prescribed** [1] - 4:22
**present** [3] - 11:11, 26:18, 26:21
**presented** [3] - 5:15, 21:7, 44:20
**presents** [1] - 21:8
**PRESIDING** [1] - 1:4
**presumption** [1] - 40:18
**pretty** [1] - 32:19
**prevailed** [1] - 20:4
**prevalent** [1] - 44:24
**previous** [1] - 45:9
**problem** [3] - 23:23, 26:24, 29:14
**problematic** [1] - 14:14
**problems** [18] - 14:7, 25:12, 25:19, 27:12, 30:4, 31:22, 33:5, 33:17, 33:24, 34:6, 34:20, 35:2, 35:12, 36:17, 36:20, 37:9, 39:22, 44:24
**procedural** [5] - 4:9, 4:23, 5:21, 6:8, 25:3
**procedurally** [1] - 43:21
**procedure** [1] - 28:9
**procedures** [1] - 5:7
**Proceedings** [2] - 1:16, 47:14
**proceedings** [1] - 48:3
**process** [7] - 4:22, 6:4, 6:6, 17:25, 18:20, 24:3
**processes** [1] - 17:20
**Programs** [1] - 2:13
**prohibitive** [1] - 23:3
**prompt** [2] - 6:11, 6:12
**proper** [1] - 38:24
**proposal** [2] - 9:12, 45:16
**propose** [2] - 8:5, 46:23
**proposed** [9] - 24:11, 24:15, 26:5, 27:21, 32:18, 33:13, 45:19, 46:23, 47:9
**protect** [1] - 8:3
**protection** [1] - 6:8
**provide** [8] - 18:23, 22:10, 23:3, 26:22, 36:20, 37:12, 40:7, 41:16
**provided** [6] - 29:7, 29:8, 33:14, 33:22, 37:10, 39:17
**provides** [1] - 10:18
**providing** [2] - 21:24, 27:9
**provision** [4] - 6:25, 8:1, 13:18, 16:13
**provisions** [3] - 8:15, 12:17, 16:16
**pschey@centerforhumanrights.org** [1] - 2:10
**purportedly** [1] - 24:3
**purpose** [2] - 13:15, 19:5
**pursuant** [1] - 36:15

## Q

**qualifications** [1] - 46:25
**quarterly** [1] - 43:19
**questions** [1] - 28:6
**quick** [1] - 8:12

**quite** [3] - 9:1, 10:8, 28:13

## R

**raise** [1] - 32:16
**raised** [4] - 5:10, 32:20, 33:5, 43:18
**rather** [2] - 38:19, 39:9
**reach** [1] - 14:7
**read** [2] - 42:3, 42:5
**reading** [1] - 18:14
**real** [3] - 21:12, 25:23, 35:22
**realistic** [2] - 40:7, 45:12
**realize** [1] - 38:20
**really** [11] - 9:7, 12:12, 13:24, 18:21, 28:25, 29:16, 31:9, 33:8, 37:25, 38:11, 40:11
**reason** [3] - 10:6, 19:7, 43:11
**reasonable** [3] - 9:17, 9:20, 9:24
**reasons** [2] - 8:19, 25:23
**receive** [1] - 24:11
**received** [1] - 26:18
**receives** [1] - 24:10
**recent** [3] - 28:8, 32:13, 37:16
**recommend** [1] - 33:11
**record** [10] - 4:3, 10:7, 14:15, 14:24, 15:3, 19:16, 23:15, 36:16, 39:19, 40:22
**recorded** [1] - 48:3
**recordkeeping** [1] - 39:23
**records** [3] - 37:18, 39:24, 40:2
**redound** [1] - 41:21
**reduction** [1] - 48:6
**referenced** [1] - 17:25
**reflect** [1] - 15:3
**reflected** [1] - 13:16
**reflects** [1] - 24:6
**Refuge** [1] - 23:24
**regard** [8] - 4:22, 10:19, 27:3, 41:10, 44:3, 44:4, 44:16, 44:19
**regarding** [4] - 11:14, 31:25, 40:6, 46:21
**regards** [2] - 32:17, 35:15
**regularity** [1] - 40:18
**regularly** [1] - 41:15
**regulations** [1] - 48:7
**relate** [1] - 38:20
**related** [3] - 20:25, 22:2, 47:2
**relative** [1] - 30:1
**relatively** [2] - 28:2, 29:5
**release** [11] - 20:16, 20:17, 21:25, 22:2, 23:2, 23:23, 28:9, 28:10, 29:16, 29:25
**released** [6] - 19:21, 20:3, 20:11, 22:3, 29:23, 30:15
**relevant** [1] - 32:19
**relief** [1] - 6:12
**rely** [2] - 16:19, 16:23
**relying** [1] - 12:16
**remain** [4] - 20:10, 20:15, 20:16, 25:25
**remedial** [4] - 4:9, 4:25, 5:13, 5:25
**remedied** [1] - 6:7
**remedies** [4] - 4:9, 4:17, 4:23, 5:3
**remedy** [5] - 4:20, 5:5, 6:11, 42:9, 42:14
**remember** [1] - 36:9
**remove** [1] - 10:24
**removing** [1] - 11:10
**repeat** [1] - 12:9
**report** [3] - 30:8, 40:8, 46:21
**reported** [1] - 11:1
**Reporter** [2] - 1:23, 48:11
**Reporter's** [1] - 1:16
**reporting** [1] - 35:11
**reports** [6] - 25:25, 26:23, 27:10, 36:21, 37:10, 37:12
**request** [1] - 24:9
**requested** [1] - 5:7
**require** [3] - 11:12, 26:20, 42:10
**required** [4] - 9:11, 13:18, 13:19, 43:13
**requirement** [2] - 13:3, 36:25
**requirements** [4] - 22:2, 24:20, 25:3, 36:15
**requiring** [3] - 7:16, 13:12, 16:12
**reserve** [2] - 5:13, 21:2
**Resettlement** [1] - 23:24
**resolving** [1] - 5:17
**respect** [6] - 4:8, 5:1, 6:3, 23:20, 23:22, 26:5
**respectively** [1] - 4:24
**respond** [6] - 14:1, 38:11, 38:16, 39:11, 39:15, 43:8
**responding** [1] - 39:14
**response** [2] - 40:12, 43:19
**responses** [1] - 39:4
**responsibility** [1] - 33:7
**rest** [1] - 6:10
**restricted** [1] - 44:10
**restrictive** [4] - 8:1, 10:8, 10:17, 20:3
**results** [1] - 12:8
**resume** [1] - 46:24
**review** [13] - 3:23, 12:1, 12:10, 17:24, 18:15, 18:19, 19:11, 19:15, 19:18, 21:2, 37:17, 38:6, 45:11
**reviewed** [2] - 21:1, 21:3
**reviewing** [1] - 12:22
**reworked** [1] - 20:23
**RGV** [3] - 40:14, 40:15, 43:7
**rights** [2] - 29:9, 34:22
**Rights** [3] - 2:4, 2:8, 4:5
**Rio** [10] - 33:19, 34:3, 34:7, 34:8, 34:16, 35:3, 41:11, 44:23, 46:9
**rise** [1] - 6:24
**risk** [1] - 7:20
**road** [1] - 29:19
**RPR** [2] - 1:22, 48:11
**RTC** [2] - 10:6, 25:17
**RTCs** [3] - 10:7, 10:9, 10:17
**Rule** [1] - 37:5
**rule** [1] - 24:18
**ruling** [8] - 5:13, 5:20, 6:18, 7:4, 14:25, 15:25, 17:7, 19:24
**rulings** [1] - 5:24
**running** [1] - 47:3

## S

**safety** [2] - 7:23, 11:14
**San** [3] - 34:7, 34:13, 35:6
**sanctions** [1] - 36:7
**Sarah** [2] - 2:22, 3:16
**sarah.b.fabian@usdoj.gov** [1] - 2:25
**Sarbo** [1] - 3:19
**scenario** [1] - 21:8
**Schey** [6] - 2:7, 3:8, 27:25, 31:23, 42:19, 43:4
**SCHEY** [9] - 3:8, 27:25, 28:5, 29:14, 32:2, 32:15, 33:21, 35:18, 46:19
**School** [1] - 2:12
**scope** [2] - 18:6, 33:6
**script** [1] - 29:6
**second** [3] - 10:23, 25:7
**secondly** [1] - 14:13
**section** [1] - 10:23
**sector** [5] - 33:20, 35:21, 35:22, 44:23, 45:4
**sectors** [1] - 35:14
**secure** [9] - 6:13, 11:7, 18:23, 18:24, 20:5, 33:2, 33:4
**secured** [3] - 10:24, 11:24, 12:2
**see** [10] - 7:12, 9:17, 10:7, 14:7, 14:15, 17:4, 19:24, 27:19, 29:3, 31:18
**seek** [3] - 11:4, 13:13, 18:18
**seeks** [1] - 13:19
**seem** [3] - 28:14, 31:10, 39:24
**self** [3] - 7:21, 9:11, 20:2
**sense** [2] - 14:8, 28:1
**separate** [2] - 42:23, 45:7
**separately** [1] - 16:20
**serious** [1] - 25:24
**serve** [1] - 19:5
**Services** [1] - 3:20
**services** [5] - 21:25, 23:1, 23:3, 23:23, 29:12
**Sessions** [1] - 3:6
**SESSIONS** [1] - 1:12
**set** [1] - 24:20
**setting** [5] - 8:1, 8:2, 8:25, 20:3, 20:13
**settings** [1] - 20:10
**settlement** [7] - 4:10, 4:15, 5:14, 6:15, 7:2, 28:11, 28:16
**settlements** [1] - 33:8
**several** [1] - 28:3
**sexual** [2] - 41:5, 41:7
**shall** [2] - 8:24, 44:6
**shared** [1] - 30:19
**sharp** [1] - 47:3
**Shields** [1] - 2:13
**Shiloh** [7] - 7:17, 8:19, 10:6, 10:8, 10:18, 25:17, 26:5
**short** [1] - 28:2
**show** [2] - 31:2, 46:11
**shown** [1] - 37:7
**shows** [5] - 25:14, 34:25, 36:16, 37:14, 41:14
**sick** [1] - 38:25
**side** [3] - 3:10, 27:21, 46:23
**sides** [1] - 14:6
**simple** [1] - 29:5
**simply** [4] - 19:1, 26:21, 44:10, 45:10
**sinks** [1] - 41:15
**sister** [1] - 31:13
**sites** [1] - 27:11
**situation** [5] - 12:13, 13:9, 13:10, 21:7, 39:22
**situations** [4] - 13:20, 14:18, 16:8, 20:12
**six** [2] - 28:18, 34:13
**sleeping** [1] - 34:21
**slight** [1] - 7:13
**slows** [1] - 18:19
**solely** [2] - 10:25, 11:21
**solving** [1] - 31:21
**someone** [7] - 20:1, 20:2, 38:22, 38:23, 45:17, 47:1, 47:10
**sometimes** [2] - 38:23, 41:12
**soon** [1] - 9:9
**sooner** [2] - 38:19, 39:8
**sorry** [3] - 17:23, 17:24, 21:21
**sort** [12] - 7:11, 8:12, 10:16, 14:7, 16:7, 16:23, 19:20, 28:11, 29:24, 31:2, 33:12, 34:18
**sounds** [2] - 21:6, 28:5
**South** [2] - 2:4, 2:8
**southern** [3] - 33:24, 34:24
**space** [1] - 30:18
**special** [24] - 8:2, 8:25, 32:17, 33:14, 35:3, 35:19, 36:4, 37:5, 37:23, 38:1, 38:12, 39:12, 39:13,

42:1, 43:22, 44:1, 44:16, 45:1, 45:8, 45:14, 45:20, 46:2, 46:15, 46:22
**specific** [10] - 14:16, 14:24, 21:7, 21:11, 40:14, 40:23, 42:20, 42:21, 43:1, 45:4
**specifically** [3] - 13:1, 22:7, 43:9
**spend** [1] - 25:10
**spoiled** [1] - 39:1
**sponsor** [1] - 22:7
**spread** [1] - 43:7
**staff** [2] - 18:24, 20:5
**staff-secure** [2] - 18:24, 20:5
**stand** [3] - 12:6, 17:8, 32:10
**started** [2] - 30:23, 39:21
**starting** [2] - 32:23, 33:13
**stat** [1] - 15:14
**state** [29] - 4:3, 12:14, 12:16, 12:18, 12:20, 12:21, 12:22, 12:25, 13:6, 13:13, 13:16, 13:17, 13:22, 13:23, 14:14, 14:18, 14:22, 15:10, 15:13, 15:18, 15:24, 16:9, 16:12, 16:15, 16:18, 16:20, 17:3
**statements** [5] - 37:19, 38:7, 38:11, 40:16, 40:22
**STATES** [2] - 1:1, 1:23
**States** [1] - 48:7
**states** [1] - 16:9
**Station** [1] - 2:23
**status** [4] - 3:9, 26:10, 26:15, 46:21
**STATUS** [1] - 1:16
**stay** [1] - 11:7
**staying** [2] - 11:23, 12:2
**stenographically** [1] - 48:3
**step** [3] - 6:5, 25:14, 45:25
**step-up** [1] - 6:5
**step-ups** [1] - 25:14
**stepped** [3] - 20:9, 20:14, 25:17
**still** [7] - 19:9, 19:13, 19:14, 32:19, 36:13, 36:14
**story** [1] - 37:11
**Street** [1] - 2:17
**stringent** [1] - 10:17
**strongly** [1] - 37:14
**struck** [1] - 32:25
**structured** [1] - 20:13
**subject** [3] - 18:4, 32:8, 43:17
**subjected** [1] - 25:21
**subjective** [2] - 38:21, 38:23
**submission** [3] - 10:11, 26:14, 42:13
**submissions** [1] - 42:8
**submit** [6] - 24:14, 27:21, 39:4, 45:23, 46:21, 47:4
**submitted** [7] - 38:8, 38:15, 39:16, 40:1, 40:3, 40:11, 47:9
**subsequently** [1] - 17:9
**substantive** [4] - 4:10, 4:18, 5:3, 5:6
**suffer** [1] - 25:9
**suggest** [4] - 6:22, 8:23, 14:24, 16:10
**suggested** [2] - 5:5, 29:2
**suggesting** [7] - 5:23, 9:1, 9:3, 9:14, 10:7, 28:25, 31:16
**suggestions** [1] - 45:22
**suggests** [1] - 9:9
**suitability** [1] - 30:6
**suitable** [1] - 22:8
**summary** [1] - 5:16
**super** [2] - 45:2
**supplemental** [2] - 5:9, 42:10
**support** [2] - 24:13, 40:20
**supposedly** [2] - 14:22, 33:1
**Supreme** [1] - 4:21
**surveillance** [1] - 10:9
**surveys** [1] - 30:25
**system** [6] - 13:6, 16:11, 16:14, 17:5, 31:18

**T**

**tail** [1] - 21:6
**TB** [1] - 2:13
**telephone** [1] - 1:25
**tend** [1] - 34:2
**tends** [1] - 23:25
**tentative** [6] - 3:24, 4:2, 4:8, 4:11, 10:22, 18:1
**terms** [8] - 9:21, 14:2, 14:10, 25:23, 28:9, 44:6, 44:7, 44:8
**tested** [2] - 41:14, 41:15
**testify** [1] - 37:23
**Texas** [11] - 14:15, 14:24, 15:3, 15:17, 15:21, 15:23, 17:14, 33:25, 34:16, 35:8, 35:16
**textual** [1] - 17:16
**THE** [57] - 2:2, 2:21, 3:15, 3:21, 4:1, 5:18, 6:9, 6:14, 6:17, 7:8, 7:18, 8:22, 9:12, 10:5, 10:15, 11:17, 12:3, 14:1, 15:19, 16:4, 17:6, 17:23, 18:2, 18:10, 19:23, 21:5, 21:20, 22:6, 22:19, 23:7, 23:12, 23:14, 23:18, 24:17, 26:8, 26:13, 26:20, 28:4, 29:11, 31:23, 32:3, 33:18, 35:17, 35:24, 36:9, 37:3, 38:14, 39:15, 40:24, 41:4, 41:18, 41:21, 42:2, 44:2, 46:12, 46:17, 46:20
**theirs** [1] - 29:9
**themselves** [2] - 26:3, 37:24
**theoretical** [1] - 21:6
**theoretically** [1] - 14:19
**theory** [1] - 6:19
**they've** [2] - 25:21, 38:25
**thinks** [2] - 15:21, 20:1
**thirds** [1] - 33:16
**thoughts** [1] - 45:14
**thousand** [1] - 33:3
**threat** [1] - 21:11
**three** [9] - 6:5, 27:5, 28:23, 31:13, 32:25, 34:12, 34:13, 34:14, 35:7
**timeframe** [1] - 9:13
**timely** [1] - 24:14
**today** [1] - 3:18
**today's** [1] - 33:5
**toiletries** [1] - 34:22
**towards** [1] - 31:21
**Transcript** [1] - 1:16
**transcript** [2] - 48:3, 48:5
**transfer** [9] - 7:16, 8:6, 8:11, 8:12, 8:16, 8:21, 9:7, 9:11, 22:23
**transferred** [1] - 7:23
**trauma** [1] - 25:9
**treating** [1] - 8:7
**treatment** [1] - 8:13
**tried** [1] - 38:3
**triggered** [2] - 25:19, 26:2
**true** [4] - 15:2, 34:13, 40:4, 48:2
**try** [3] - 32:11, 32:14, 46:1
**turn** [1] - 31:6
**turning** [2] - 12:5, 17:19
**two** [14] - 4:21, 14:2, 27:21, 28:4, 31:13, 33:15, 33:16, 35:8, 35:10, 45:16, 46:20, 46:23, 47:5, 47:6
**two-day** [1] - 35:8
**two-thirds** [1] - 33:16
**types** [1] - 15:15

**U**

**UC** [1] - 2:12
**umm** [3] - 7:17, 33:13, 41:16
**unaccompanied** [2] - 28:15, 29:7
**unaware** [1] - 28:21
**unbiased** [1] - 40:8
**uncles** [1] - 30:11
**under** [14] - 4:14, 5:25, 6:25, 22:9, 22:17, 26:14, 28:16, 28:20, 29:15, 29:23, 31:10, 37:5, 38:25, 44:12
**underlying** [1] - 6:24
**understood** [4] - 10:20, 17:18, 18:16, 21:14
**undetained** [1] - 30:1
**undocumented** [3] - 30:7, 30:8, 31:5
**unfamiliar** [1] - 28:20
**unified** [1] - 19:20
**unilaterally** [1] - 23:25
**unique** [2] - 13:9, 13:17
**United** [1] - 48:7
**UNITED** [2] - 1:1, 1:23
**unless** [3] - 7:18, 7:19, 45:1
**unrelated** [1] - 43:20
**up** [13] - 6:5, 18:21, 29:4, 29:25, 30:17, 31:3, 31:18, 32:6, 32:11, 32:13, 45:16, 45:24, 46:1
**ups** [1] - 25:14
**urgency** [1] - 5:19
**urging** [1] - 31:24
**US** [1] - 2:22
**useful** [2] - 42:16, 46:2

**V**

**Valley** [2] - 41:11, 46:9
**value** [1] - 43:7
**variety** [1] - 16:8
**versus** [1] - 3:6
**vetting** [1] - 6:5
**via** [1] - 5:6
**viewpoint** [1] - 27:17
**violate** [1] - 6:7
**violation** [1] - 36:24
**violations** [7] - 4:10, 4:18, 4:20, 4:23, 5:3, 5:6, 37:15
**visit** [1] - 46:9
**visited** [3] - 34:15, 34:17, 35:8
**visits** [1] - 35:8
**Vista** [2] - 34:14, 35:6
**vS** [1] - 1:11

**W**

**wage** [1] - 14:20
**wage-and-hour** [1] - 14:20
**wagging** [1] - 21:6
**wait** [2] - 5:20, 6:8
**walk** [1] - 7:11
**wants** [1] - 21:2
**warrants** [2] - 11:23, 43:25
**Washington** [1] - 2:24
**water** [5] - 34:20, 39:2, 41:10, 41:12, 41:13
**ways** [1] - 14:2
**weeks** [10] - 28:4, 28:19, 28:23, 31:14, 32:25, 45:16, 46:20, 47:5, 47:6
**Welch** [2] - 2:16, 3:13
**welcome** [1] - 46:11
**wellbeing** [1] - 8:4
**whereas** [1] - 15:16
**wholesale** [1] - 45:11
**willing** [4] - 8:8, 10:3, 10:11, 24:24
**wind** [1] - 5:20
**wish** [1] - 38:15

**wishes** [2] - 13:8, 25:1
**withhold** [1] - 5:19
**witnesses'** [1] - 41:1
**woman** [1] - 45:2
**words** [2] - 6:2, 24:18
**workplace** [1] - 41:8
**worth** [1] - 32:14
**wow** [1] - 35:20
**written** [2] - 17:16, 26:6

**Y**

**year** [7] - 27:7, 33:10, 34:6, 36:5, 38:5, 46:5
**years** [4] - 14:12, 27:5, 36:13, 44:13
**Yolo** [1] - 25:18
**York** [3] - 17:22, 18:5, 19:17
**yourself** [1] - 14:9
**Youth** [1] - 2:17
**Ysidro** [3] - 34:7, 34:14, 35:6