CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (58232)
Carlos R. Holguín (90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: pschey@centerforhumanrights.org

*Attorneys for Plaintiffs*

*Additional counsel listed on following pages*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores., *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>William Barr, Attorney General of the United States, *et al.*,<br><br>　　　　Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**.<br><br>Hearing:  None set<br><br>[HON. DOLLY M. GEE] |

USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing (Cal. Bar No. 61513)
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu

LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum (Cal. Bar No. 98634)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

UNIVERSITY OF CALIFORNIA DAVIS
SCHOOL OF LAW
Immigration Law Clinic
Holly S. Cooper (197626)
One Shields Avenue, TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

THE LAW FOUNDATION OF SILICON VALLEY

Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone: (408) 280-2437
Email: kate.manning@lawfoundation.org

*Of counsel:*
ALDEA - THE PEOPLE'S JUSTICE CENTER
Bridget Cambria
532 Walnut Street
Reading, PA 19601
Phone: (484) 877-8002
Fax: (484) 926-2032
Email: bridget.cambria@cambriaklinelaw

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

    A.  The COVID-19 Global Pandemic Demands Measures be Taken to Enforce
    the Agreement and Protect the Health and Safety of Class Members. .................. 3

    B.  Class Members Detained in Congregate Settings Are At High Risk of
    Contracting COVID-19. ..................................................................................... 4

        1.  Pandemic Risks in Congregate Settings ...................................... 5

        2.  Conditions at Defendants' Detention Facilities ............................ 8

        4.  Defendants' Recently Adopted Safety Measures for Congregate Care
        Facilities Fail to Protect Class Members from COVID-19. ............................ 10

III.  ARGUMENT ...................................................................................... 15

    A.  Standard for Injunctive Relief Under Fed. R. Civ. P. 65. .............................. 15

    B.  Class Members Are Likely to Succeed on the Merits of Their Claims. ........ 15

        1.     Right to Prompt Release ........................................................ 16

        2.     Right to safe and sanitary conditions of detention ................................. 21

    C.  Absent a Temporary Restraining Order, Class Members In Congregate
    Facilities Will Suffer Irreparable Injury. .............................................................. 22

    D.  The Equities Weigh Heavily in Plaintiffs' Favor and the Issuance of the
    Temporary Restraining Order and Preliminary Injunction is in the Public Interest.
    ____ .................................................................................................................. 22

VII.  CONCLUSION .......................................................................................... 24

/ / /

TABLE OF AUTHORITIES

**Cases**

*Adams v. Johns-Manville Corp.*, 876 F.2d 702 (9th Cir. 1989) .................................1

*All For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).....................15

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987)...................................23

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014)............................................15

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018)....................................................23

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016).......................................................16

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) .....................................................1

*Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011) .........................................................1

*Labor/Cmty. Strategy Ctr. v. Los Angeles Cty. Metro. Transp. Auth.*, 263 F.3d 1041 (9th Cir. 2001) ...................................................................................................23

*McNearney v. Washington Dep't of Corr.*, No. 11-cv-5930 RBL/KLS, 2012 WL 3545267, at *15 (W.D. Wash. June 15, 2012) ......................................................23

*Nodine v. Shiley Inc.*, 240 F.3d 1149 (9th Cir. 2001)..............................................16

*Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983)....................................................23

*United States v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) ...................................16

*Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), *aff'd sub nom Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).................................................................................................................22

*Xochiohua-Jaimes v. Barr*, No.18-71460 (March 23, 2020) ...................................1

**Statutes**

8 U.S.C. § 1232 (c)(3)(B)........................................................................................19

**Other authorities**

Amra Uzicanin and Joanna Gaines, *Community Congregate Settings*, CDC FIELD EPIDEMIOLOGY MANUAL, U.S. Centers for Disease Control and Prevention.........4

Camilo Montoya-Galvez, *3 workers at facilities housing migrant kids in U.S. custody test positive for coronavirus*, CBS NEWS, March 23, 2020 .....................4

*Coronavirus COVID-19 Global Cases*, Ctr. Systems ...........................................4, 5

David Nagel, *Updated List on Statewide School Closures with Closure Dates*, THE JOURNAL, Mar. 24, 2020.....................................................................................14

Dong Y, Mo X, Hu Y, et al. *Epidemiological characteristics of 2143 pediatric patients with 2019 coronavirus disease in China*, Pediatrics, 2020....................10

*Governor Newson Takes Emergency Action & Authorizes $150 Million in Funding to Protect Homeless Californians from COVID-19*, Office of Gov. Gavin Newsom (Mar. 18, 2020) .................................................................................15

*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* ............................................................5, 8

Jack Healy & Serge F. Kovaleski, *The Coronavirus's Rampage Through a Suburban Nursing Home*, THE NEW YORK TIMES, Mar. 21, 2020 .......................5

Julia Craven, Rikers Island Has 52 Confirmed COVID-19 Cases, SLATE, Mar. 25, 2020...................................................................................................................6

Office of Refugee Resettlement, *Facts and Data: Length of Care*...........................18

Sarah Mervosh and Denise Lu, *See Which States and Cities Have Told Residents to Stay Home*, THE NEW YORK TIMES, Mar. 24, 2020...............................................14

*See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ...................................23

Silvia Foster-Frau, *Seven Migrant Children in Federal Custody Await Coronavirus Test Results*, SAN ANTONIO EXPRESS NEWS, updated Mar. 25, 2020 ...................6

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) ................23

The White House & U.S. Centers for Disease Control & Prevention, *The President's Coronavirus Guidelines for America: 15 Days to Slow the Spread*, Mar. 16, 2020 ..................................................................................................11

U.S. Center for Disease Control, *Are you at risk for serious illness?*, Mar. 18, 2020 ..........................................................................................................................10

U.S. Centers for Disease Control & Prevention, *How to Protect Yourself*, Mar. 18, 2020.................................................................................................................11

U.S. Centers for Disease Control & Prevention, *Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases*, Updated Mar. 22, 2020 .....................11

U.S. Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Mar. 23, 2020 ...................................................................................................5

Victoria Forster, *What Have Scientists Learned About COVID-19 and Coronavirus By Using Cruise Ship Data?*, FORBES, Mar. 22, 2020 ..........................................5

*Xochiohua-Jaimes v. Barr*, No.18-71460 (March 23, 2020) ....................................1

## I.    INTRODUCTION

On January 28, 1997, this Court approved the Flores Settlement Agreement ("Agreement"). *See Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). Plaintiffs now seek a temporary order protecting class members whom the Defendants the Immigration and Customs Enforcement ("ICE") and Office of Refugee Resettlement ("ORR") are holding in congregate detention from the clear and present danger the COVID-19 pandemic poses to their safety and well-being.[1]

Medical experts, including the United States Center for Disease Control and Prevention ("CDC"), unanimously demand that everyone practice physical distancing, avoid groups of ten or more, self-isolate, and take like precautions that are all but impossible for children held in congregate detention primarily because of Defendants non-compliance with plain terms of the Agreement.[2]

The spread of COVID-19 into Defendants' facilities is not speculative.[3] It has already infected ORR's MercyFirst and Abbott House congregate facilities in New

---

[1] "[A] motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract." *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989). As described numerous times in this litigation, the Flores Settlement is a consent decree. *See, e.g., Flores v. Sessions*, 862 F.3d 863, 874 (9th Cir. 2017); Order re Pls.' Mot. to Enforce at 3 [Doc. # 177]; Order re Pls.' Mot. to Enforce & Appoint a Special Monitor at 2–4 [Doc. # 363]. Because consent decrees have 'many of the attributes of ordinary contracts [and] . . . should be construed basically as contracts,' the doctrine of substantial compliance, or substantial performance, may be employed." *Jeff D. v. Otter*, 643 F.3d 278, 283–84 (9th Cir. 2011) (internal citation omitted).

[2] Just days ago this Court of Appeals stated in brief and stark terms: "In light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court *sua sponte* orders that Petitioner be immediately released from [immigration] detention and that removal of Petitioner be stayed pending final disposition by this court." *Xochiohua-Jaimes v. Barr*, No.18-71460 (March 23, 2020) (citations omitted).

[3] ORR has stopped placing children in detention facilities in California, Washington, Oregon and Pennsylvania. Declaration of Peter Schey, March 24, 2020, Exhibit  at ¶  ("Schey").

1  York and facilities housing ICE detainees.[4] At least one child is now in quarantine

2  awaiting test results in the ICE family detention center in Berks, Pennsylvania.

3  Declaration of Bridget Cambria ¶ 36 ("Cambria Decl.") (Exhibit H).

4         The Agreement "sets out nationwide policy for the detention, release, and

5  treatment of minors in the custody of the [Defendants] …" Agreement at ¶ 9. The

6  certified class includes "[a]ll minors who are detained in the legal custody of the

7  [Defendants]." *Id*. ¶ 10. It requires that Defendants "treats[ ] and shall continue to

8  treat, all minors in its custody with dignity, respect and special concern for their

9  particular vulnerability as minors." *Id*. ¶ 11.[5] It requires that except for class members

10 who are flight risks or a danger, class members shall be released without unnecessary

11 delay to listed sponsors, *id*. ¶¶ 14 and 18, and if not promptly released, must "as

12 expeditiously as possible," *id*. ¶ 12.A.3, be transferred to a "non-secure" program

13 licensed by a state for the care of dependent children. *Id*. ¶¶ 6 and 19, and Exhibit 1.

14        The obvious ways to comply with the Agreement and protect class members'

15 safety are to (1) expedite children's release to sponsors identified in Paragraph 14, and

16 (2) not detain children in congregate unlicensed facilities where their risk of exposure

   to COVID-19 is high.

17        At the same time, the Agreement's terms that encourage and ensure compliance

18 with the Agreement's substantive rights must also be enforced, including for example,

19 providing class members not released with an explanation for the decision to detain

20 them, providing access to legal counsel and notices to legal counsel necessary for

21 ───────────────

22 [4] *See* Hamed Aleaziz, *A Staff Member at a Facility Housing Unaccompanied Immigrant Children Has Tested Positive for the Coronavirus*, BuzzFeed News,

23 March 19, 2020, *available at* www.buzzfeednews.com/article/hamedaleaziz/staff-member-coronavirus-diagnosis-unaccompanied-immigrant (last visited March 26,

24 2020). *See also* Hamed Aleaziz, *An ICE Detainee Has Become the First to Test

25 Positive for the Coronavirus*, BuzzFeed News, March 24, 2020, *available at* www.buzzfeednews.com/article/hamedaleaziz/immigrant-ice-detention-facility-

26 coronavirus-test (last visited Mar. 26, 2020)

27 [5] It also requires that "[f]ollowing arrest, the [Defendants] shall hold minors in

28 facilities that are safe and sanitary and that  are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id*. ¶ 12.A.

2

MEMO OF Ps&As  IN SUPPORT OF EX PARTE APP  FOR TRO AND
OSC WHY A  PRELIMINARY INJUNCTION SHOULD NOT ISSUE
CV 85-4544-DMG-AGRX

class members to knowingly and intelligently exercise their *Flores* rights, and recording Defendants' prompt and "continuous" efforts aimed at release that the Agreement requires.

Under present circumstances, it is reasonable and necessary to order Defendants to promptly release children to available custodians, or if they are not entitled to release under Paragraph 14, to transfer them to non-congregate settings, or justify why it has done neither. Unless they are a flight risk or a danger, or there is good cause for not doing so,[6] minors should generally be released within seven days. To insure that Defendants are complying with the Agreement and making prompt efforts aimed at the release of minors, Defendants should provide the Special Master and Class Counsel the information identified by this Court in its Order Appointing Special Master [Doc. # 494] at B.1.c.i(i)-(x), ii(i)-(vi), and iii. These measures will reduce the number of detained class members remaining in congregate detention making more room and more medical resources available to them, and thus providing them a better chance to protect themselves against an onslaught of contagion.

## II.   STATEMENT OF FACTS

### A.   *The COVID-19 Global Pandemic Demands Measures be Taken to Enforce the Agreement and Protect the Health and Safety of Class Members.*

COVID-19 is a novel, deadly and highly infectious disease that has developed into a global pandemic and spread in all 50 states. Declaration of Dr. Katherine Peeler ("Peeler Decl.") ¶ 5 (Exhibit A); Declaration of Dr. Craig W. Haney ("Haney Decl.") ¶ 3 (Exhibit B); Declaration of Dr. Julie DeAun Graves ¶ 6 ("Graves Decl.") (Exhibit C); Declaration of Jaimie Meyer ¶ 20 ("Meyer Decl.") (Exhibit D). At present there is no vaccine and no cure for COVID-19. Haney Decl. ¶ 5. No one has immunity. Haney Decl. ¶ 5. The disease spreads through respiratory droplets and can be transmitted

---

[6] Defendants may possess good cause for any legitimate reason involving the release of a minor including the unavailability of a sponsor.

1  through person to person contact—including contact with asymptotic individuals—

2  and through contact with inanimate surfaces. Meyer Decl. ¶ 20; Graves Decl. ¶ 8.

3       In the United States, about 52,215 people have been diagnosed and at least 675

4  people have died as of March 24, 2020. Peeler Decl. ¶ 5.[7] Given the severe shortage of

5  COVID-19 tests, these numbers underestimate the true spread of the disease. Graves

6  Decl. ¶ 7. This pandemic has unfortunately already reached the ORR and ICE

7  systems, with several staff members at ORR facilities and at least one ICE detainee

8  testing positive for COVID-19.[8]

9      **B.**    ***Class Members Detained in Congregate Settings Are At High Risk of***

10            ***Contracting COVID-19.***

11

12       Almost all class members not released by Defendants are incarcerated in

13  congregate settings in ICE detention centers and ORR contract facilities in close and

14  constant proximity to other children, adults, and staff members. *See* Cambria ¶ 10, 15-

15  19, 27; Declaration of Shalyn Fluharty ("Fluharty Decl.") ¶ 6-18, 21 (Exhibit I);

16  Declaration of Andrea Meza ("Meza Decl.") ¶ 40 (Exhibit J).[9] As the CDC has

17  [7] For updated statistics, see *Coronavirus COVID-19 Global Cases*, Ctr. Systems Science & Engineering, Johns Hopkins Univ., (JHU),

18  https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda759470fd40

19  2994423467b48e9ecf6.

20  [8] Camilo Montoya-Galvez, *3 workers at facilities housing migrant kids in U.S. custody test positive for coronavirus*, CBS NEWS, March 23, 2020,

21  https://www.cbsnews.com/news/coronavirus-migrant-children-workers-test-

22  positive. Priscilla Alvarez and Catherine E. Shoichet, *First ICE Detainee Tests Positive for Coronavirus*, CNN, Mar. 24, 2020,

23  https://www.cnn.com/2020/03/24/us/ice-detainee-coronavirus/index.html.

24  [9] *See* Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Guide to Terms, https://www.acf.hhs.gov/orr/resource/children-

25  entering-the-united-states-unaccompanied-guide-to-terms (defining "shelter," for

26  example, as "a residential care provider facility in which all of the programmatic components are administered on-site …"); *see also* Amra Uzicanin and Joanna

27  Gaines, *Community Congregate Settings*, CDC FIELD EPIDEMIOLOGY MANUAL,

28  U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/eis/field-epi-

warned, detained individuals who "live, work, eat, study, and recreate within congregate environments" are at heightened risk of contracting COVID-19.[10]

### 1. Pandemic Risks in Congregate Settings

COVID-19 is a highly contagious disease for which there is no cure or vaccine. Graves Decl. ¶ 8; Haney Decl. ¶ 5. In the United States, about 69,246 people have been diagnosed and at least 1,046 people have died as of 9:08AM Pacific Standard Time on March 26, 2020.[11] The only known way to avoid transmission of COVID-19 is for individuals to engage in "social distancing" (maintaining a distance of at least six feet from the nearest person) and frequent hand washing. Graves Decl. ¶ 8. For this reason, the CDC deems social distancing a "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[12]

The rapid transmission of COVID-19 in congregate settings is clearly evidenced by the tragic spread of the virus within cruise ships, nursing homes, and prisons worldwide. Over 800 people tested positive for COVID-19 on cruise ships in Japan and off the coast of California.[13] At a nursing home facility in Kirkland, Washington, two-thirds of the residents and 47 staff tested positive for COVID-19, with 35 people ultimately dying from the virus.[14] On March 21, 2020, Mayor de

---

manual/chapters/community-settings.html (last reviewed Dec. 13, 2018) (defining "congregate settings" to include "detention facilities").

[10] U.S. Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Mar. 23, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last checked March 25, 2020)

[11] For updated statistics, see *Coronavirus COVID-19 Global Cases*, Ctr. Systems Science & Engineering, Johns Hopkins Univ.

[12] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.*

[13] Victoria Forster, *What Have Scientists Learned About COVID-19 and Coronavirus By Using Cruise Ship Data?*, FORBES, Mar. 22, 2020, https://www.forbes.com/sites/victoriaforster/2020/03/22/what-have-scientists-learned-from-using-cruise-ship-data-to-learn-about-covid-19/#3591554f406d.

[14] Jack Healy & Serge F. Kovaleski, *The Coronavirus's Rampage Through a Suburban Nursing Home*, THE NEW YORK TIMES, Mar. 21, 2020,

Blasio announced that at least 21 inmates and 17 employees at the Rikers Island
Correctional Center tested positive for COVID-19, a drastic increase from the first
case identified just three days earlier,[15] and even more so a week later.[16] As noted
above, three workers at facilities housing class members in ORR custody have
reportedly tested positive for coronavirus,[17] and now at least seven children in a
different facility await results.[18] In addition, recent reports reveal that at least one ICE
detainee and one ICE employee have tested positive,[19] and ten (10) immigrant
detainees at ICE's Aurora facility are in isolation for possible exposure to
coronavirus.[20]

---

https://www.nytimes.com/2020/03/21/us/coronavirus-nursing-home-kirkland-life-care.html; *see also* John Balance, *Louisiana identifies new cluster of coronavirus cases in Donaldsonville retirement home*, THE ADVOCATE, March 23, 2020, https://www.theadvocate.com/batonrouge/news/coronavirus/articlea47f606c-6d33-11ea-83ff-139136d51400.html (discussing outbreaks at two Louisiana retirement homes).

[15] *21 Inmates, 17 Employees Test Positive for COVID-19 on Rikers Island*, NBC NEW YORK, Mar. 21, 2020, https://www.nbcnewyork.com/news/coronavirus/21-inmates-17-employees-test-positive-for-covid-19-on-rikers-island-officials/2338242/.

[16] In just a few days, the number of confirmed cases has risen to at least 52 inmates with an additional 96 under observation and awaiting test results. Julia Craven, Rikers Island Has 52 Confirmed COVID-19 Cases, SLATE, Mar. 25, 2020, https://slate.com/news-and-politics/2020/03/coronavirus-is-spreading-on-rikers-island.html.

[17] *See* n.3, supra.

[18] Silvia Foster-Frau, *Seven Migrant Children in Federal Custody Await Coronavirus Test Results*, SAN ANTONIO EXPRESS NEWS, updated Mar. 25, 2020, available at https://www.expressnews.com/news/us-world/border-mexico/article/Seven-migrant-children-in-federal-custody-await-15154725.php

[19] *Id.* (detainee);  Hamed Aleaziz, *Medical Worker at an ICE Detention Facility for Immigrants Has Tested Positive for the Coronavirus*, BUZZ FEED NEWS, Mar. 19, 2020, available at https://www.buzzfeednews.com/article/hamedaleaziz/ice-medical-worker-coronavirus.

[20] Sam Tabachnik, *Ten Detainees at Aurora's ICE Detention Facility Isolated for Possible Exposure to Coronavirus*, THE DENVER POST, March 17, 2020, available at https://www.denverpost.com/2020/03/17/coronavirus-ice-detention-geo-group-aurora-colorado/ (last checked March 24, 2020).

6

Correctional public health experts recommend that "to reduce the likelihood of exposure to detainees, facility personnel, and the general public, it is essential to consider releasing all detainees who do not pose an immediate risk to public safety." Letter to Congress by Professors Scott Allen and Josiah Rich (March 19, 2020) ("Letter to Congress") at 6 (Exhibit G);[21] Meyer Decl. ¶¶ 7-35.[22] Promptly reducing the number of class members in congregate detention environments by expeditiously releasing them to sponsors as required by the Agreement will protect the safety of those minors as well as the communities around them.[23]

---

[21] Professors. Scott Allen and Josiah Rich serve as medical subject matter experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL"). *Id*. at 1. Dr. Allen has conducted numerous investigations of immigration detention facilities on CRCL's behalf over the past five years. *Id*. at 2.

[22]  Medical expert and instructor of pediatrics at Harvard Medical School Dr. Peeler, similarly declares:

*Releasing children into the custody of properly screened family sponsors is the best and safest way to prevent the spread of disease and reduce the threat to this vulnerable detained people. This includes allowing families detained at family detention centers to be released together. It is my professional opinion that this step is both necessary and urgent. The window of opportunity is rapidly narrowing for mitigation of COVID-19 in these facilities. It is a matter of days, not weeks*.

Peeler Decl. ¶ 39 (emphasis supplied). In addition, "[c]hildren in particular are vulnerable to the mental health consequences of detention." Declaration of Dr. Mira Zein ("Zein Decl.") at 2 (Exhibit 9). Growing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections. *Id*.at 1. People with a weakened immune system have an" increased risk of developing more severe forms of COVID-19, including complications like pneumonia, because their immune response is not strong enough to fight diseases like COVID-19." *Id*. at 2.

[23] An outbreak of COVID-19 in a congregate environment where class members are detained could quickly overwhelm local health care services and cause class members or Defendants' staff to be transported to more distant hospitals and clinics, utilizing more resources and potentially exposing health care workers in communities where the disease has yet to become prevalent. *See* Graves at ¶ 36; Letter to Congress Profs. Allen and Rich at 4.

## 2.   Conditions at Defendants' Detention Facilities

The congregate detention conditions at Defendants' ICE and ORR facilities renders it nearly impossible for detained class members to engage in the required infection control policies, such as social distancing and increased hygiene, necessary to mitigate the risk of COVID-19 transmission. Declaration of Dr. Nancy E. Wang ("Wang Decl.") at ¶ 17 (Exhibit E); Graves Decl. at ¶¶ 11-12; Letter to Congress at 5.

Defendants' facilities share the risk factors of other congregate settings for the spread of COVID-19. Children in Defendants' facilities live in close quarters, share multiple communal spaces every day, and cannot consistently maintain the recommended six feet distance from others. Graves Decl. at ¶ 11-12.[24]

### a.   ICE Detention Centers

Class members in ICE detention facilities cannot maintain any semblance of nationally mandated social distancing, where they are in nearly constant close contact with other detainees, employees, and ICE personnel. Cambria Decl. ¶¶ 15, 16, 25. ICE does not provide widespread access to basic hygiene products, such as soap or hand sanitizer. *Id.* ¶ 28; Declaration of Shalyn Fluarty ("Fluarty Decl.") ¶ 18. ICE and has not provided even minimally sufficient education to detainees about how to prevent the transmission of COVID-19. Cambria Decl. ¶ 27, Fluarty Decl. ¶ 17.

Moreover, ICE detention facilities do not have the medical infrastructure to meet the demands of a pandemic. Meza Decl. ¶ 35. Even one infected person in a facility can infect the majority of people in the facility. Graves ¶ 11. Families

---

[24] Like other detention centers, Defendants' facilities are accessible to staff and other outside contractors who may transmit the virus. Meyer Decl. ¶ 8; Graves Decl. ¶ 11, 27. The CDC has warned that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.*

consistently express fear that, if forced to remain in ICE detention, they will die from COVID-19.. Fluarty Decl. ¶ 23.

### b. ORR Facilities

Class members are similarly at risk in ORR facilities, which often house multiple children in single rooms, with some sleeping in bunk beds placed close together. Declaration Of Peter Schey In Support Of *Ex Parte* Application For Temporary Restraining Order And Order To Show Cause Re: Preliminary Injunction ("Schey") ¶ 5. Children are required to participate in group activities and classes where they share space with others in confined areas. Children share school materials, telephones, televisions, dining tables, and other equipment with other children. *Id.*

In Defendants' facilities, toilets, sinks, and showers are shared and are used regularly by large numbers of children. *Id.* Children in ORR facilities do not always have independent access to soap and water or hand sanitizer. *Id.* In many facilities, access to soap and water is limited to bathrooms. *Id.* Some facilities require children to ask permission to use the bathroom and require staff supervision in bathroom areas. *Id.* Children eat their meals in communal areas, in close proximity to other children and staff. *Id.* Communal dining areas also create dangerous situations for the spread of COVID-19. Graves Decl. ¶ 11.

### 3. Risks to Detained Children

Children in Defendants' custody are at risk of serious illness if they contract COVID-19. Severe illness and death from COVID-19 have been reported in people of all ages, including children. Graves at ¶ 7. Even children without identifiable risk factors can become seriously ill from COVID-19.[25] The largest study of pediatric COVID-19 patients to date showed that approximately 6% of infected children and

---

[25] *See* Amara Walker, Alta Spells, and Melissa Alonson, *12-year-old girl with coronavirus is on a ventilator and fighting for her life*, CNN, March 22, 2020, https://www.cnn.com/2020/03/22/us/georgia-coronavirus-girl-hospitalized/index.html, *Panama: 13-year-old girl with coronavirus dies, officials say,* AL JAZEERA, Mar. 23, 2020, https://www.aljazeera.com/news/2020/03/panama-13-year-girl-coronavirus-dies-officials-200323193144873.html.

9

MEMO OF Ps&As  IN SUPPORT OF EX PARTE APP FOR TRO AND
OSC WHY A  PRELIMINARY INJUNCTION SHOULD NOT ISSUE
CV 85-4544-DMG-AGRX

11% of infected infants suffered from respiratory failure, shock, encephalopathy, heart failure, coagulation dysfunction, acute kidney injury, and life-threatening organ dysfunction.[26] While children do seem to be less susceptible to COVID-19 compared with adults, ""there have still been a significant number of pediatric cases reported, including those becoming critically ill." Peeler Decl. ¶ 8, citing Yuanyuan Dong, et al., "Epidemiological Characteristics of 2143 Pediatric Patients With 2019 Coronavirus Disease in China," *Pediatrics* (pre-publication release online Mar. 16, 2020).

Certain children in ORR and ICE custody are at even higher risk of serious illness if they contract COVID-19, including those with chronic illnesses or compromised immune systems.[27] Youth who are pregnant or parenting, or who have pre-existing health conditions, may be similarly vulnerable.[28]

### 4. Defendants' Recently Adopted Safety Measures for Congregate Care Facilities Fail to Protect Class Members from COVID-19.

---

[26] *See* Dong Y, Mo X, Hu Y, et al. *Epidemiological characteristics of 2143 pediatric patients with 2019 coronavirus disease in China*, Pediatrics, 2020, https://pediatrics.aappublications.org/content/pediatrics/early/2020/03/16/peds.2020-0702.full.pdf.

[27] *See* U.S. Center for Disease Control, *Are you at risk for serious illness?*, Mar. 18, 2020, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

[28] Many children in ORR and ICE custody have also experienced intense trauma in their home countries and on their journey to the United States that may be exacerbated by the stress and uncertainty of detention.[28] Post-traumatic stress disorder and related conditions are associated with weakened immune systems and a heightened susceptibility to infection. Graves Decl. at ¶ 13. The uncertainty and anxiety created by the pandemic creates unique risks for children. Haney Decl. at ¶ 12-16. Particularly during an emergency of this nature, children need the support of caring family or caregivers. *Id.* To the extent that Defendants' programs respond to this public health risk by further isolating children and limiting opportunities for recreation or visits, this may further traumatize vulnerable children. Haney Decl. at ¶ 12; Meyer Decl. at ¶¶ 30, 34.

### a. ORR Guidance

ORR's COVID-19 Interim Guidance for ORR Programs ("ORR Guidance"), issued its contracted facilities on March 19, 2020 (Exhibit L), is inadequate to protect children in ORR custody from the transmission of COVID-19 and contrary to current CDC guidelines as well as widespread public health practice. *See* Graves Decl. ¶¶ 17-24; Wang Decl. at ¶ 20-26.

The CDC has stated that "[t]he best way to prevent illness is to avoid being exposed to this virus."[29] To minimize exposure, current CDC guidance stresses the importance of practicing "social distancing" and frequently washing hands.[30] The CDC defines social distancing as "remaining out of congregate settings, avoiding mass gatherings, and maintaining distance (approximately 6 feet or 2 meters) from others when possible."[31] On March 16, 2020, the White House introduced "The President's Coronavirus Guidelines for America," which urged people to "avoid social gatherings in groups of more than 10 people," and "[d]isinfect frequently used items and surfaces as much as possible," and urged states to "close schools in affected and surrounding areas," and close indoor and outdoor venues where groups of people generally congregate, such as restaurants, food courts, and gyms."[32]

The ORR Guidance makes no mention of requiring or encouraging social or physical distancing between children or staff, nor of limiting the gathering of groups

---

[29] U.S. Centers for Disease Control & Prevention, *How to Protect Yourself*, Mar. 18, 2020,  https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html.
[30] *Id.*
[31] U.S. Centers for Disease Control & Prevention, *Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases*, Updated Mar. 22, 2020, https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html.
[32] The White House & U.S. Centers for Disease Control & Prevention, *The President's Coronavirus Guidelines for America: 15 Days to Slow the Spread*, Mar. 16, 2020, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20coronavirus-guidance8.5x11315PM.pdf.

of children or staff within facilities. *See* Graves Decl. at ¶18; Wang Decl. at ¶ 21; Exhibit L (ORR Interim Guidance).[33] This is not surprising, as it is nearly impossible for children detained in ORR facilities to engage in appropriate social distancing to prevent the transmission of COVID-19. Flamm Decl. ¶ 12. Unless the number of children at these facilities is drastically reduced, the majority of these facilities have insufficient space to allow children to maintain the required six-foot distance between themselves and the nearest child or staff member. Graves Decl. ¶¶ 28-32; Wang Decl. ¶ 28. Partial implementation of social distancing will not adequately protect individuals from the spread of disease. *See* Graves at ¶ 28.

ORR may issue updated guidance in the coming days or weeks that adheres more closely to the new CDC Detention Facility Guidance. However, unless the updated guidance also provides for the expedited release of children such that strict adherence to social distancing within ORR facilities is possible, it will not adequately protect against the transmission of COVID-19 and the risk of serious illness and death for detained children. See Graves Decl. ¶¶ 28-33; Wang Decl. ¶ 20.

### b. ICE's Guidance

---

[33] The ORR Guidance also neglects to:
• Provide information on managing the spread of disease among particularly vulnerable children, such as those with heart disease, diabetes, asthma or other chronic respiratory disease, those with compromised immune systems, and infants. *See* Graves ¶ 22; Wang ¶ 22.
• Anticipate a situation in which more children need to be quarantined than an ORR facility's isolation rooms can accommodate. *See* Graves at ¶ 21; Wang at ¶ 24.
• Ensure that children have independent access to hand washing and sanitizing supplies. *See* Graves ¶ 20. In many facilities, the only access to soap and water is located in the bathrooms and children are required to ask permission and obtain a staff escort before going to the bathrooms.
• Provide a screening or testing protocol for children not deemed to be "at risk" but still exhibiting COVID-19 symptoms, which could allow the spread of disease. *See* Graves ¶ 23; Wang at ¶¶ 22, 25.
• Provide that symptomatic children are provided with appropriate personal protective equipment to prevent the potential spread of disease. *See* Graves ¶ 24.

ICE's COVID-19 guidance is similarly inadequate. It makes no mention of requiring or encouraging social or physical distancing between detainees or staff, nor of limiting the gathering of groups of detainees or staff within facilities.[34] ICE guidance also insufficient with respect to protective equipment such as masks and gloves, quarantine measures and transportation of ill and potentially infected detainees. Graves Decl. ¶¶ 14-16.

Legal counsel who routinely serve children in ICE custody report ICE is not following CDC guidelines to prevent the spread of COVID-19. Cambria Decl. ¶¶ 16-19. "It is impossible for detained parents and children at the BCRC to practice social distancing." *Id.* ¶ 25. The is no education provided on how to prevent the spread, nor is there adequate soap and hand sanitizers or other daily essentials needed to reduce the risk of exposure. *Id.* ¶ 27-29. Unless the number of children and families at these facilities is drastically reduced, the majority of these facilities have insufficient space to allow detainees to maintain the required six-foot distance between themselves and the nearest child or staff member. Cambria Decl. ¶ 25, 41.

ICE states that it continues to incorporate CDC's COVID-19 guidance, which is built upon the already established infectious disease monitoring and management protocols currently in use by the agency.[35] In addition, ICE states that it is actively working with state and local health partners "to determine if any detainee requires additional testing or monitoring to combat the spread of the virus." *Id*. However, legal counsel who routinely serve children in ICE custody report that class members sleep in overcrowded group settings (Cambria ¶ 16), share common bathrooms (Cambria ¶ 17), throughout the day are required to congregate together (Cambria ¶ 18),  eat in a common area (Cambria ¶ 20), parents and children have not been educated about the COVID-19 outbreak (Cambria ¶ 29), parents and children have inadequate access to soap and hand sanitizer (Cambria ¶ 30), they are not provided gloves or masks

---

[34] See U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19*, https://www.ice.gov/covid19 (Updated March 25, 2020).
[35] *Id.*

(Cambria ¶ 31), are overseen by facility staff showing signs of illness (Cambria 33), and children showing symptoms like coughing, fever, sore throats, lethargy, congestion, and difficulty breathing, go untreated. (Cambria ¶ 34). *See also* Meza and Fluharty (same issues at Texas family detention facilities).

### c. ORR's and ICE's Guidelines Fall Far Below Federal, State and Local Mandates

Many states have issued extraordinary and unprecedented measures to ensure "social distancing" and over 160 million Americans have been ordered to "shelter in place."[36] For example, on March 19, 2020, Governor Gavin Newsom ordered 40 million Californians to stay in their homes, with limited exceptions, and maintain a minimum distance of 6 feet from others.[37] The following day, New York issued similar orders, requiring a distance of "at least six feet" between people in public, cancelling all "non-essential gatherings of individuals of *any* size for *any* reasons," closing *all* non-essential business, and requiring those essential business that remain open to "implement rules that help facilitate social distancing of at least six feet."[38] Within the past two weeks, Washington D.C. and forty-six states have mandated statewide school closures.[39]

States have also adopted measures to limit exposure in congregate settings like homeless shelters. On February 24, 2020, New York issued guidance for homeless shelters.[40] Even so, weeks later, individuals in New York homeless shelters have still

[36] Sarah Mervosh and Denise Lu, *See Which States and Cities Have Told Residents to Stay Home*, THE NEW YORK TIMES, Mar. 24, 2020, available at https://nytimes.com/interactive/2020/us/cornoavirus-stay-at-home-order.html.
[37] https://covid19.ca.gov/.
[38] https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order
[39] David Nagel, *Updated List on Statewide School Closures with Closure Dates*, THE JOURNAL, Mar. 24, 2020, available at https://thejournal.com/articles/2020/03/17/list-of-states-shutting-down-all-their-schools-grows-to-36.aspx?m=1
[40] *Interim COVID-19 Guidance for Homeless Shelters*, NYC DEPT. OF HEALTH, https://on.nyc.gov/39g0slr (last visited Mar. 25, 2020).

tested positive for COVID-19.[41] Recognizing that large shelters are particularly susceptible to the spread of COVID-19, California is setting up shelters in trailers, hotels and motels to facilitate social distancing.[42]

## III. ARGUMENT

### A. *Standard for Injunctive Relief Under Fed. R. Civ. P. 65.*

A plaintiff seeking preliminary relief under Federal Rule of Civil Procedure 65 must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (noting standards for issuing temporary restraining orders and preliminary injunctions are "substantially identical"). In balancing these elements, "a stronger showing of one element may offset a weaker showing of another." *All For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, when the likelihood of grave irreparable injury is palpable and the balance of equities tips sharply in plaintiffs' favor, the plaintiff need only "demonstrate a fair chance of success on the merits or questions serious enough to require litigation." *Arc of Cal. v. Douglas*, 757 F.3d 975, 993-94 (9th Cir. 2014) (internal quotations and citation omitted).

### B. *Class Members Are Likely to Succeed on the Merits of Their Claims.*

The foregoing has demonstrated that class members in Defendants' congregate detention are sitting ducks waiting to contract COVID-19. The threat of irreparable injury to their health and safety is palpable. Class Members therefore need only

---

[41] *Coronavirus 'Attack Rate' in N.Y. Concerns White House,* NYC TIMES (Mar. 24, 2020), available at https://www.nytimes.com/2020/03/23/nyregion/coronavirus-new-york-update.html.

[42] *Governor Newson Takes Emergency Action & Authorizes $150 Million in Funding to Protect Homeless Californians from COVID-19*, Office of Gov. Gavin Newsom (Mar. 18, 2020), available at https://gov.cal.gov/2020/03/18/governor-newsom-takes-emergency-action-authorizes-150-million-in-funding-to-protect-homeless-californians-from-covid-19/.

demonstrate "a fair chance of success on the merits or questions serious enough to require litigation" to secure preliminary relief. *Arc of Cal.*, 757 F.3d at 993-94 (internal quotations and citation omitted); *All. for the Wild Rockies*, 632 F.3d at 1132 ("'[S]erious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met.").[43] Class Members' prospects here far exceed a "fair chance" of succeeding on the merits.

The *Flores* Settlements vests children who have custodians available to receive them with substantive rights against ORR's keeping them in congregate care, and protects children detained with their families in ICE facilities. This is especially true during a global pandemic, which will only worsen in the coming days.

1.     Right to Prompt Release

The Agreement protects all minors in immigration-related detention, whether they are taken into custody alone or in the company of parents or other relatives. *Flores v. Lynch*, 828 F.3d 898, 905-07 (9th Cir. 2016) ("*Flores I*").[44]

The Agreement obliges the Government to "release a minor from its custody without unnecessary delay. . . ." Agreement ¶ 14. The Agreement further requires the Government to "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14." *Id.* ¶ 18.

---

[43] Plaintiff's evidence meets and exceeds even the higher "likelihood of success of the merits" standard that applies when the equites are not as starkly balanced as they are here.  Preliminary relief is therefore appropriate under either standard.

[44] "The Settlement is a consent decree, which, 'like a contract, must be discerned within its *four* corners, extrinsic evidence being relevant only to resolve ambiguity in the decree.'" *Flores I*, 828 F.3d at 904 (quoting *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005)). The district court was therefore called upon to interpret the Agreement according to its "plain language," *Nodine v. Shiley Inc.*, 240 F.3d 1149, 1154 (9th Cir. 2001), construe it "as a whole and every part interpreted with reference to the whole," *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) (citation omitted), and prefer "reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." *Id.*

If more than one potential custodian is available, the Government must generally release a child first to a parent, then to a legal guardian, adult relative (sibling, aunt, uncle, or grandparent), an unrelated adult or entity designated by the minor's parent, a licensed program, and finally, if there is no likely alternative to long-term detention, a reputable unrelated adult. *Id*. ¶ 14A-F.

Additionally, the *Flores* Settlement provides: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, [Defendants] *shall release a minor from [their] custody without unnecessary delay" to a parent, guardian,* adult relative (brother, sister, aunt, uncle, or grandparent), or a licensed group home. Agreement (emphasis added). Further grounding Defendants' obligation to minimize children's detention, ¶ 18 of the Agreement provides, "Upon taking a minor into custody, the INS . . . shall make and record the prompt and continuous efforts on its part toward . . . the release of the minor . . ." According to the most recent ORR data at Plaintiffs' disposal, as of March 13, 2020, ORR had 3,622 children in custody, 1,193 of whom—nearly a third—the agency had placed in congregate settings after having detained them for 30 days or more. Schey ¶ 3. ORR's data do not indicate why the agency failed to release these children, nor how many of these 1,193 have custodians available to care for them, yet the vast majority undoubtedly do.[45]

---

[45] ORR categorizes detained children pursuant to the affinity of potential custodians appears in § 2.2.1 of its online Policy Guide, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7 (last visited March 23, 2020). Roughly 42 percent of children in ORR custody are "Category 1": that is, they have parents or guardians in the United States. Schey at ¶ 9 (authenticating ORR materials produced during meeting at Shiloh RTC with class Counsel Carlos Holguin and Special Master Andrea Sheridan Ordin). Another 47 percent are "Category 2": that is, they have another "immediate" relative—a brother, sister, grandparent, aunt, uncle, or first cousin—to whom they could be released. *Id*. Another 11 percent are "Category 3": that is, children with "other sponsors," such as "more distant relatives and unrelated adult

In 2019, children remained in ORR custody for an average of 66 days, and many children are detained for substantially longer periods of time.  *See* Office of Refugee Resettlement, *Facts and Data: Length of Care*, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last visited March 23, 2020).

Under ORR's procedures —

a.      ORR does not decide within any time certain whether a detained minor's parent or other proposed custodian is suitable;

b.      ORR does not provide a detained minor, or his or her parent or other proposed custodian, an opportunity to inspect or rebut evidence derogatory of the proposed custodian's fitness;

c.      ORR does not afford a detained minor or his or her proposed custodian a hearing before a neutral and detached decisionmaker either before or after ORR declares a potential custodian unfit;

d.      Once ORR decides a proposed custodian is unsuitable, it need not inform a detained minor or the proposed custodian of its decision for up to 30 days;

e.      ORR allows detained minors no appeal or other administrative recourse from its finding a proposed custodian unsuitable, though such a decision nearly always prolongs the minor's detention;

f.      Except for parents and legal guardians, ORR allows rejected custodians no appeal from a decision declaring them unfit, which nearly always prolongs an affected minor's detention;

g.      As for parents and legal guardians, ORR's policy requires them to submit a written request to HHS's Assistant Secretary for Children and Families to be heard regarding ORR's declaring them unfit, but a hearing need not be convened within any time certain.

---

individuals." *Id*. The remainder are "Category 4": children for whom ORR has identified no potential custodian.

www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited March 24, 2020).

In the vast majority of cases,[46] delay releasing class members is attributable either to (1) entirely elective investigatory measures, or (2) administrative torpor or indifference.[47]

Seven days should be more than enough for ORR to manage post-release risk. *See e.g.*, Declaration of James Owens, Feb. 7, 2018, Exhibit K, ¶ 6 (state dependency courts determine cause to detain children within three days); Exhibit M (ORR Manual of Procedures, at § 2.2.2 (care providers generally expected to complete custodian evaluations within 10-21 days), § 2.7.2 (case coordinators expected to make recommendation within 1 business day), and § 2.7.3 (Federal Field Specialists expected to make release decisions within 1-2 business days of receiving case coordinator recommendations)). Class counsel recently secured the release of a class member in ORR custody to his undocumented father in about five days. Schey 3. Any marginal gains to that ORR may claim for child safety from their prolonged investigations of sponsors for more than 30 days cannot outweigh the harm congregate detention will inevitably cause to the health and safety of children in ORR and ICE custody.

---

[46] The TVPRA, 8 U.S.C. § 1232 (c)(3)(B) does require ORR to conduct home studies before releasing trafficking and abuse victims and children with special needs, but relatively few class members—and certainly not a third—fall within these special categories. Nor is there any apparent reason ORR could not generally complete a home study within 30 days. See MAP § (directing that cases be referred for home studies within  days and completed within  days of referral).

[47] In devising its own requirements for proposed custodians, ORR has an established track record of arbitrariness and vacillation. *See, e.g.*, Order re Plaintiffs' Motion to Enforce Class Action Settlement, July 30, 2018 (Doc. #470) at 27-29 (disapproving ORR requirement that its director approve release of any child placed in a restrictive setting); *id*. at 29-30 (disapproving ORR requirement that myriad post-release services be in place before any child is released to a sponsor subjected to a home study).

19

MEMO OF Ps&As  IN SUPPORT OF EX PARTE APP  FOR TRO AND OSC WHY  A  PRELIMINARY INJUNCTION SHOULD NOT ISSUE CV 85-4544-DMG-AGRX

*For its part, ICE simply does not undertake or record any efforts aimed at the release of minors as required by Paragraphs 14 and 18 of the Agreement.* Schey ¶ 7. During the mandatory meet and confer conference Defendants made clear this is the case, and it is fully confirmed by all legal services providers who represent detained class members in their individual cases. *Id. See also* Cambria ¶ 39; Fluharty ¶ 44; Meza ¶ 43.

Pursuant to the terms of the Agreement and Court Order, Defendants provide monthly data of class members in custody to Plaintiffs' class counsel. The most recent data provided to class counsel is for the month of February 2020. Schey ¶ 2.

A preliminary review of data provided by Defendants to class counsel on a monthly basis shows that during February 2020 ICE detained about 3,359 class members in ICE family detention facilities. Schey ¶ 4. Of these class members it appears two (2) were apprehended in 2014. *Id*. Four (4) were apprehended in 2018 and have been detained for over fourteen months. *Id*. About ten (10) have been detained for about one year and another ten (10) have been detained for about eleven months. *Id*. About twenty-six (26) have been detained for about ten months, fifteen (15) for about nine (9) months, eleven (11) for about eight (8) months, fifty-eight (58) for about seven (7) months, ninety six (96) for about six (6) months, two hundred and five (205) five (5) months, one hundred and fifty-one (151) for about four (4) months, two hundred and ninety-three (293) for three (3) months, and nine hundred and eighty (980) have been detained for two months. *Id*. In short, about 1,861 class members appear now in ICE custody have been detained for three months or longer with no efforts made by Defendants to release them under the terms of the Agreement.[48]

When the alternative is to leave children on the tracks with the COVID-19 train fast approaching, Defendants' not releasing minors without unnecessary delay and ICE's blatant violation of the Agreement and this Court's Orders, are unconscionable.

---

[48] During February about 23 class members were released by ICE on "orders of recognizance," and about 348 were released on parole. *Id*.

The temporary procedural relief Plaintiffs seek is a minimal step to protect children's substantive rights under the Agreement and the Court's prior Orders requiring the prompt release of minors who are neither a flight risk nor a danger. The children's right to Defendants' compliance with the Agreement they reached with Plaintiffs has now become critically important to avoid unnecessarily keeping children in congregate detention endangering their health and well-being during a global pandemic.

2.     Right to safe and sanitary conditions of detention

The Settlement further requires that ICE and ORR understand that children in immigration detention are vulnerable, even when they are detained with their families. The Settlement, therefore, requires that *all* decisions on a minor's custody *must* be made taking into account the particular vulnerability of children *as well* as to protect *the minor's well-being and that of others. See id.* at ¶ 11. Additionally, Paragraph 12 of the *Flores* Settlement requires Defendants detain children "in facilities that are safe and sanitary and that are consistent with [their] concern for the  particular vulnerability of minors."

Paragraphs 6 and 19 of the Settlement require Defendants to place the general population of detained children in state-licensed facilities that comply with both state health and safety standards and the minimum standards listed in Exhibit 1 to the Settlement. These include "[p]roper physical care and maintenance, including suitable living accommodations." Settlement Exhibit 1, ¶ A.1. Exhibit 1 requires, *inter alia*, "[a]ppropriate routine medical … care, … emergency health care services, … screening for infectious disease[ ] within 48 hours of admission …[and] immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control." *Id*. The parties to the Agreement clearly agreed that the health of detained class members was of paramount importance.

During a public health crisis, Defendants continuing to detain class members in congregate detention for long periods of time while delaying or entirely ignoring their right to release without unreasonable delay is in prima facie violation of their

obligation to provide class members with safe conditions of detention. Agreement ¶ 12. As a result, there is a high likelihood that Class Members have been and will continue to be subjected to the risk of death or serious illness and the traumatic effects of heightened isolation associated with this pandemic.  *See* Graves at ¶ 13; Haney at ¶ 12.[49]

This Court should require Defendants to articulate good cause for exposing children to the clear dangers of congregate detention in lieu of release to their families or transfer to non-congregate settings.

### C.    *Absent a Temporary Restraining Order, Class Members In Congregate Facilities Will Suffer Irreparable Injury.*

 "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Spark Indus., LLC v. Kretek Int'l, Inc*., No. CV 14-5726-GW(ASX), 2014 WL 12600262, at *3 (C.D. Cal. July 29, 2014) (citations omitted). Increased risk of exposure to a deadly virus by virtue of placement in congregate detention facility for children who are neither flight risks nor a danger represents a paradigmatic example of imminent irreparable harm.[50]

### D.    *The Equities Weigh Heavily in Plaintiffs' Favor and the Issuance of the Temporary Restraining Order and Preliminary Injunction is in the Public Interest.*

In this case, the equities and public interest merge into a single balancing test because the Defendants are government officials.  *See Nken v. Holder*, 556 U.S. 418,

---

[49] Class Members will also be deprived of essential support from family members or other caring adults at this time of extreme stress and anxiety. Haney at ¶ 12-16.

[50] An imminent threat to health and safety constitutes irreparable harm.  In *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), *aff'd sub nom Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017), the court issued an injunction to curb inhumane treatment of civil immigration detainees where evidence demonstrated "the physiological effects of sleep deprivation or constant discomfort that comes from an inadequate food supply, or health risks related to exposure due to contaminated water or unsanitary cells, or medical risks associated with being unable to continue taking prescription medications or being exposed to communicable diseases."

435 (2009); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).  In balancing the equities, "[a] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Arc of Cal.*, 757 F.3d at 991 (*quoting Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).[51]

The balance here tips decidedly in favor of Plaintiffs' interest in health and safety.  Unless this Court intervenes, class members are likely to suffer serious and severe irreparable harm, including potential exposure to COVID-19 and the effects thereof should they become infected. No purported government interest justifies subjecting children to these conditions.  *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Faced with [] a conflict between financial concerns and *preventable* human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.") (emphasis added), *quoted by Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017).

Granting Plaintiffs' motion would not subject Defendants to any identifiable hardship outweighing the irreparable harm to class members' health and safety. Moreover, "it is obvious that compliance with the [Agreement] is in the public interest." *N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) (The "public interest favors applying federal law correctly.").[52]

---

[51] In performing this balancing, "the Ninth Circuit expects lower courts to protect physical harm to an individual over monetary costs to government entities." *McNearney v. Washington Dep't of Corr.*, No. 11-cv-5930 RBL/KLS, 2012 WL 3545267, at *15 (W.D. Wash. June 15, 2012).

[52] Because the requested temporary restraining order and preliminary injunction would simply mandate compliance with the Agreement, which is "enforceable as a judicial decree," *Labor/Cmty. Strategy Ctr. v. Los Angeles Cty. Metro. Transp. Auth.*, 263 F.3d 1041, 1048 (9th Cir. 2001), the Government could suffer no harm as a result.

Granting Plaintiffs' request for preliminary relief also serves the public interest because allowing COVID-19 to spread in Defendants' facilities endangers the general public. As public health experts have explained, reducing the number of individuals in dangerous congregate care settings protects both those individuals and the communities around them.  An outbreak of COVID-19 in a congregate environment, such as an ORR or ICE facility, could quickly overtake the capacity of local health care resources, and would likely require transport of infected class members, potentially to areas where COVID-19 has not yet spread.   *See* Graves at ¶ 36; Letter to Congress Profs. Allen and Rich at 4.

Accordingly, the proposed temporary Order proposed by Plaintiffs will cause no countervailing injury to Defendants, and serves the broader public interest.

## VII.   CONCLUSION

For the foregoing reasons, the Court should grant this application for a temporary restraining order and order Defendants to show cause why a preliminary injunction should not issue in the form lodged herewith.

Dated:   March 26, 2020

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Peter A. Schey
Carlos R. Holguin

USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing

LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum

UNIVERSITY OF CALIFORNIA DAVIS
SCHOOL OF LAW
Immigration Law Clinic
Holly S. Cooper

THE LAW FOUNDATION OF SILICON VALLEY
Jennifer Kelleher Cloyd
Katherine H. Manning

1                  Annette Kirkham

2

3                  *Of counsel:*

4                  ALDEA - THE PEOPLE'S JUSTICE CENTER

5                  Bridget Cambria

6

7                        */s/ Peter Schey*

8                  Peter A. Schey

                  *Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On March 26, 2020, I electronically filed the following document(s):

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**.

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/Peter Schey
*Attorney for Plaintiffs*