# EXHIBIT B

# DECLARATION OF DR. CRAIG W. HANEY, PHD

**I, Craig W. Haney, declare as follows:**

1.  I am a Distinguished Professor of Psychology and UC Presidential Chair at the University of California Santa Cruz in Santa Cruz, California, where I engage in research applying social psychological principles to legal settings, including the assessment of the psychological effects of living and working in institutional environments, especially the psychological effects of incarceration. I was a co-founder and co-director of the UC Criminal Justice & Health Consortium – a collaborative effort of researchers, experts and advocates from across the University of California system working to bring evidence-based health and healthcare solutions to criminal justice reform in California and nationwide.

2.  I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations on jail- and prison-related issues. Those agencies and organizations include the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the United States Department of Justice, the Department of Health and Human Services (HHS), the Department of Homeland Security, and the White House (under both the Clinton and Obama Administrations).

3.  I was the detention expert for the U.S. Commission on International Religious Freedom's study group on the treatment of asylum seekers in expedited removal, and testified to Congress in 2005 about the conditions of confinement to which they were exposed nationwide. In 2012, I testified as an expert witness before the Judiciary Committee of the United States Senate in a hearing that focused on the use and effects of solitary confinement and was appointed as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. My research, writing, and testimony have been cited by state courts, including the California

Supreme Court, and by Federal District Courts, Circuit Courts of
Appeal, and the United States Supreme Court.[1]

4.     COVID-19 is a serious, highly contagious disease and has reached
pandemic status. At least 234,073 people around the world have
received confirmed diagnoses of COVID-19 as of March 20, 2020,[2]
including 15,219 people in the United States.[3] At least 9,840 people
have died globally as a result of COVID-19 as of March 20, 2020,[4]
including 201 in the United States.[5] These numbers are predicted
by health officials to increase, perhaps exponentially. For example,
the CDC has estimated that as many as 214 million people may
eventually be infected in the United States, and that as many as 21
million could require hospitalization.[6]

5.     The COVID-19 Pandemic poses such a threat to the public health
and safety in the State of California that, on March 4, 2020,
Governor Gavin Newsom declared a statewide State of Emergency/
On March 19, 2020, he ordered all California residents to stay home
or at their place of residence except to facilitate certain authorized
necessary activities.[7] His office has estimated that, in the absence

---

[1] For example, see *Brown v. Plata,* 563 U.S. 493 (2011).

[2] World Health Organization, *Coronavirus disease (COVID-19) Outbreak,*
https://www.who.int/emergencies/diseases/novel-coronavirus-2019

[3] Center for Disease Control and Prevention, *Coronavirus Disease 2019
(COVID-19): Cases in U.S.,* https://www.cdc.gov/coronavirus/2019-ncov/cases-
updates/cases-in-us.html.

[4] *Supra,* fn. 2.

[5] *Supra,* fn. 3.

[6] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths,* N.Y. TIMES
(Mar. 18, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-
estimate.html.

[7] Executive Department, State of California, Executive Order N-33-20,
https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf

of taking appropriate steps to mitigate the spread of the virus, as
many as 56% of all Californians will contract it.[8]

6.      COVID-19 is a novel virus. At present there is no vaccine and no
        cure for COVID-19. No one has immunity. Currently, the most
        effective way to control the virus is to use preventive strategies,
        including social distancing, in order to maximize our healthcare
        capacity to treat a manageable number of patients. Otherwise,
        healthcare resources will be overwhelmed and the Pandemic will
        certainly be exacerbated.

7.      Social distancing presents serious challenges for everyone in every
        part of our society, but nowhere more than in penal institutions and
        detention facilities, where living conditions are unusually sparse,
        prisoners and detainees necessarily live in unescapably close
        quarters, and have unavoidable contact with one another. Juvenile
        institutions and detention facilities (including those for
        accompanied and unaccompanied minors in various forms of
        immigration detention) are no exception to this general
        institutional rule.

8.      Moreover, jails, prisons, and immigration facilities are already
        extremely stressful environments for adult prisoners and for
        children who are confined in such secure facilities.[9] Research has

---

[8] Office of the Governor, "Letter to President Donald Trump" (March 18,
2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.18.20-Letter-
USNS-Mercy-Hospital-Ship.pdf.

[9] Much of this evidence is summarized in several book-length treatments of
the topic. For example, see: Haney, C., *Reforming Punishment: Psychological
Limits to the Pains of Imprisonment.* Washington, DC: American
Psychological Association (2006); Liebling, A., & Maruna, S. (Eds.), *The
Effects of Imprisonment.* Cullompton, UK: Willan (2005); and National
Research Council (2014). *The Growth of Incarceration in the United States:
Exploring the Causes and Consequences.* Washington, DC: The National
Academies Press. In addition, there are numerous empirical studies and
published reviews of the available literature. For example, see: Haney, C.,
Prison effects in the age of mass incarceration. *Prison Journal, 92,* 1-24
(2012); Johns, D., Confronting the disabling effects of imprisonment: Toward
prehabilitation. Social Justice, 45(1), 27-55.

shown that these environments are psychologically and medically harmful in their own right, leaving formerly incarcerated persons with higher rates of certain kinds of psychiatric and medical problems.[10] In fact, incarceration leads to higher rates of morbidity (illness rates) and mortality (i.e., it lowers the age at which people die).[11]

9.     The COVID-19 Pandemic presents penal institutions and detention facilities with an enormous challenge that they are ill-equipped to handle. Secure juvenile facilities in particular lack the operational capacity to address the needs of youth in custody in a crisis of this magnitude. They do not have the resources needed to provide youth with ready access to cleaning and sanitation supplies, or to ensure that staff sanitize all potentially contaminated surfaces during the day. Most lack the capacity to provide more than minimal emergency mental health or medical care. Yet the demand for such services in this crisis will grow, stretching already scarce treatment resources even further. In addition, secure juvenile facilities typically provide children in custody with very limited access to telephonic or other forms of remote visiting. However, these ways of connecting to others will become critically important if contact visiting is limited or eliminated. Furthermore, juvenile facilities

[10] E.g., see: Schnittaker, J. (2014). The psychological dimensions and the social consequences of incarceration. *Annals of the American Association of Political and Social Science, 651,* 122-138; Turney, K., Wildeman, C., & Schnittker, J., As fathers and felons: Explaining the effects of current and recent incarceration on major depression. *Journal of Health and Social Behaviour, 53(4),* 465-481 (2012). See, also: Listwan, S., Colvin, M., Hanley, D., & Flannery, D., Victimization, social support, and psychological well-being: A study of recently released prisoners. *Criminal Justice and Behavior, 37(10),* 1140-1159 (2010).

[11] E.g., see: Binswanger, I., Stern, M., Deyo, R., et al., Release from prison: A high risk of death for former inmates. *New England Journal of Medicine, 356,* 157-165; Massoglia, M. Incarceration as Exposure: The Prison, Infectious Disease, and Other Stress-Related Illnesses. *Journal of Health and Social Behavior, 49(1),* 56-71; and Massolglia, M., & Remster, B., Linkages Between Incarceration and Health. *Public Health Reports, 134*(Supplement 1), 85-145 (2019); and Patterson, E. (2013). The dose-response of time served in prison on mortality: New York state, 1989-2003. *American Journal of Public Health, 103(3),* 523-528.

cannot readily protect youth from contact with staff who regularly
enter facilities after having been in the outside world. Staff
members are at risk of contracting COVID-19 and then
transmitting it to both youth and other staff inside.

10.     Penal settings have limited options to implement the social
distancing that is now required in response the COVID-19
Pandemic. It is very likely that many of them will resort to the use
of solitary confinement. Indeed, I have seen precisely this form of
social distancing utilized as a matter of course in numerous
correctional institutions throughout the country, where medical
quarantines are conducted in prison infirmaries or other housing
units by effectively placing prisoners in solitary confinement.

11.     Yet the experience of solitary confinement inflicts an additional set
of very serious harmful effects that significantly undermine mental
and physical health. The scientific literature on the harmfulness of
solitary confinement in jails and prisons is now widely accepted and
the research findings are consistent and alarming.[12] This research
has led a number of professional mental and physical health-
related, legal, human rights, and even correctional organizations to
call for severe limitations on the degree to which solitary
confinement is employed—specifically by significantly limiting
when, for how long, and on whom it can be imposed.[13]

---

[12] These many studies have been carefully reviewed in a number of
publications. For example, see: K. Cloyes, D. Lovell, D. Allen & L. Rhodes,
Assessment of psychosocial impairment in a supermaximum security unit
sample. *Criminal Justice and Behavior, 33*, 760-781 (2006); S. Grassian,
Psychiatric effects of solitary confinement. *Washington University Journal of
Law & Policy, 22*, 325-383 (2006); C. Haney, Restricting the use of solitary
confinement. *Annual Review of Criminology, 1*, 285-310 (2018); C. Haney &
M. Lynch, Regulating prisons of the future: The psychological consequences
of solitary and supermax confinement. *New York Review of Law & Social
Change, 23*, 477-570 (1997); and P. Smith, The effects of solitary confinement
on prison inmates: A brief history and review of the literature, in Michael
Tonry (Ed.), *Crime and Justice* (pp. 441-528). *Volume 34*. Chicago: University
of Chicago Press (2006).

[13] For a list of these organizations and their specific recommendations, see:
Haney, C. (2018) Restricting the use of solitary confinement. *Annual Review
of Criminology, 1*, 285-310; Haney, C., Ahalt, C., & Williams, B., et al. (2020).

Declaration of Dr. Craig W. Haney, Ph.D.

12.     Although there is some variation in the specific recommendations, virtually all of them call for the drastic reduction or outright elimination of the use of solitary confinement with juveniles.[14] That is, because of the categorically greater vulnerability of children to harsh conditions of confinement and the potentially irreversible mental and physical harm that they are more likely to experience, solitary confinement should rarely if ever be imposed on them. In fact, current California law significantly limits the use of solitary or solitary-like confinement[15] for juveniles to durations of no longer than four hours. In rare instances when longer times are absolutely necessary, in response to emergency or exigent circumstances, they must be limited to the shortest amount of additional time possible and, even then, always under the care of a licensed physician.[16] These severe limitations on the use of solitary confinement with children are critically important to acknowledge and adhere to in the face of the COVID-19 Pandemic and in the context of the social distancing steps that juvenile institutions are likely to engage in.

13.     The COVID-19 Pandemic will be a traumatic experience for many, especially for children. In the case of children housed in juvenile institutions and detention facilities, this trauma will affect an already highly traumatized population. In addition to the traumatic

---

Consensus statement of the Santa Cruz summit on solitary confinement. *Northwestern Law Review*, in press.

[14] For example, in December 2015, the U.N. General Assembly adopted the United Nations Standard Minimum Rules for the Treatment of Prisoners ("The Nelson Mandela Rules") that, among other things, prohibited the use of solitary confinement for juveniles. See: Commission on Crime Prevention and Criminal Justice. 2015. *United Nations standard minimum rules for the treatment of prisoners.* New York: UN Economic and Social Council.

[15] Juvenile facilities often use different terms for solitary confinement, such as "segregation," "isolation," "seclusion," and "room confinement." My statements about solitary confinement apply to these terms as well. (E.g. see, Sue Burrell and Ji Seon Song, Ending "Solitary Confinement" of Youth in California. *Children's Legal Rights Journal, 39,* 42, 45 (2019).)

[16] Calif. Welf. & Inst. Code § 208.3.

Declaration of Dr. Craig W. Haney, Ph.D.

effects of incarceration itself for children,[17] and the added trauma
produced by harsh conditions of juvenile confinement (such as
solitary confinement), it is important to recognize that most
incarcerated children have already experienced numerous
childhood "risk factors" or "adverse childhood experiences."[18] Thus,
juvenile incarceration represents a form of "retraumatization" for
many of them. And even this retraumatization can be made worse,
for example by placement in solitary confinement. It is thus hard to
imagine a more vulnerable population whose very significant needs
should be treated with the utmost sensitivity in the face of this
Pandemic.

14.     Indeed, the United States Center for Disease Control and
        Prevention (CDC) has acknowledged that the COVID-19 Pandemic
        poses a threat the mental as well as physical health of the nation,
        especially to its children and teens.[19] In order to mitigate the
        stressors created by the COVID-19 Pandemic, the CDC has
        recommended that parents and other caregivers undertake the
        following practices to support their children:[20]

        • Take time to talk with your child or teen about the
          COVID-19 outbreak. Answer questions and share facts
          about COVID-19 in a way that your child or teen can
          understand.

        • Reassure your child or teen that they are safe. Let them
          know it is ok if they feel upset. Share with them how you

---

[17] For example, see: Sue Burrell, Trauma and the Environment of Care in
Juvenile Institutions, *National Child Traumatic Stress Network* (2013).

[18] For example, see: Carly Dierkhising, Susan Ko, Briana Woods-Jaeger, et
al., Trauma Histories among Justice-Involved Youth: Findings from the
National Child Traumatic Stress Network, *European Journal of
Psychotraumatology*, *4*, (2013)

[19] Center for Disease Control and Prevention, *Manage Anxiety & Stress*,
https://www.cdc.gov/coronavirus/2019-ncov/prepare/managing-stress-
anxiety.html

[20] *Ibid.*

deal with your own stress so that they can learn how to cope from you.

- Limit your family's exposure to news coverage of the event, including social media. Children may misinterpret what they hear and can be frightened about something they do not understand.

- Try to keep up with regular routines. If schools are closed, create a schedule for learning activities and relaxing or fun activities.

- Be a role model. Take breaks, get plenty of sleep, exercise, and eat well. Connect with your friends and family members.

15.   Similarly, the World Health Organization (WHO) also has recognized that the COVID-19 poses an existential threat to the mental health of children.[21] The WHO recommended that care providers undertake the following practices to support the mental health of children in their care:[22]

- Help children find positive ways to express feelings such as fear and sadness. Every child has their own way to express emotions. Sometimes engaging in a creative activity, such as playing, and drawing can facilitate this process. Children feel relieved if they can express and communicate their feelings in a safe and supportive environment

- Keep children close to their parents and family, if considered safe for the child, and avoid separating

---

[21] World Health Organization, *Helping children cope with stress during the 2019-nCoV outbreak,* https://www.who.int/docs/default-source/coronaviruse/helping-children-cope-with-stress-print.pdf?sfvrsn=f3a063ff_2

[22] World Health Organization, *Mental Health and Psychosocial Considerations During COVID-19 Outbreak,* https://www.who.int/docs/default-source/coronaviruse/mental-health-considerations.pdf

children and their caregivers as much as possible. If a child needs to be separated from their primary caregiver, ensure that appropriate alternative care is provided and that a social worker, or equivalent, will regularly follow up on the child. Further, ensure that during periods of separation, regular contact with parents and caregivers is maintained, such as twice-daily scheduled phone or video calls or other age-appropriate communication (e.g., social media depending on the age of the child).

• Maintain familiar routines in daily life as much as possible, or create new routines, especially if children must stay at home. Provide engaging age appropriate activities for children, including activities for their learning. As much as possible, encourage children to continue to play and socialize with others, even if only within the family when advised to restrict social contract.

• During times of stress and crisis, it is common for children to seek more attachment and be more demanding on parents. Discuss COVID-19 with your children using honest and age appropriate way. If your children have concerns, addressing those together may ease their anxiety. Children will observe adults' behaviors and emotions for cues on how to manage their own emotions during difficult times.

16.   The COVID-19 Pandemic is a natural disaster that has already had a significant worldwide impact whose catastrophic effects are beginning to mount in the United States. The Pandemic has traumatic psychological as well as physical consequences. The consequences are especially severe for children who are not only experiencing the Pandemic but also trying to comprehend its magnitude and implications. They are seeking safety in an otherwise suddenly unsafe-feeling world. Not surprisingly, the CDC and WHO both recommend intense and expansive forms of family support, caring, and coping to ameliorate these traumatic effects. Yet this kind of familial support, caring, and coping is simply unavailable in (and in essence precluded by) juvenile institutions.

17.   Thus, it should be obvious that few if any of the CDC or WHO recommendations for the appropriate way to address the needs of

Declaration of Dr. Craig W. Haney, Ph.D.

children in light of the present Pandemic can be effectively implemented in a secure juvenile facility. Of course, their recommendations for optimizing children's meaningful family contacts and ensuring that children are able to follow as normal a routine as possible should apply no less forcefully to children who have been placed in juvenile institutions. In fact, for the aforementioned reasons, in light of the likely past trauma they have suffered and the traumatic nature of their present circumstances, the recommendations apply with even more logic and force.

18.   As I have noted, the continued detention/confinement of children during the COVID-19 Pandemic constitutes a grave threat to their physical and mental health. Young people confined to juvenile facilities are vulnerable emotionally; they are separated from their families; they likely face unhealthy and unsanitary physical conditions in such institutions, which will exacerbate any existing medical conditions and heighten the risk of their contracting and transmitting coronavirus; and their incarceration in the midst of this crisis will likely result in their placement in settings that are the equivalent of solitary confinement, placing them at even greater risk. The combination of these factors argues in favor of removing them from secure institutions and returning them to their families for proper protection and care. Of course, the release of children from secure institutions can and should be done with adequate measures to protect them, their families and the broader community.[23]

19.   With these things in mind, it is my professional opinion that releasing and returning incarcerated children to their families, where they can receive the kind of familial support that the CDC and WHO recommend, is the best possible course of action to take in response to the COVID-19 Pandemic.

---

[23] *See* Council for State Governments, Justice Center, "Seven Questions About Reentry Amid COVID Confusion."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 25, 2020 at Santa Cruz, California.

_Craig W. Haney_

DR. CRAIG W. HANEY, PH.D., J.D.