# EXHIBIT H

# DECLARATION OF BRIDGET CAMBRIA, ESQ.

I, Bridget Cambria, declare and say as follows:

1. My name is Bridget Cambria, Esq. and I am an attorney licensed to practice in the State of Pennsylvania since May of 2007. This declaration describes my experiences and observations working with clients detained in an ICE family residential center, including detention practices and conditions and, in particular, issues concerning the detention of parents and children in the Berks Family Residential Center during the COVID-19 pandemic, their concerns about contracting a life-threatening illness in detention and the conditions of detention which threaten the lives of the families in immigration family detention in Pennsylvania.

2. For more than 12 years, I have exclusively practiced immigration law, working with children, families and adults, both in the detained and non-detained settings. In my practice, I have represented immigrants, children and families before Immigration Courts nationwide, the Board of Immigration Appeals, Federal District Courts and the Third Circuit Court of Appeals. I am a graduate of the Roger Williams School of Law, where my studies focused on immigration and public interest law. Prior to law school, on or about 2002, I was employed by the County of Berks as a staff member at the Berks County Residential Center (hereinafter "BCRC," previously and alternatively known as the "Berks County Youth Center", "Berks Family Shelter", or the "Berks Family Detention Center").

3. Currently, I am an attorney with, and the Executive Director of, Aldea – The People's Justice Center ("Aldea"), a non-profit located in Reading, Pennsylvania in the County of Berks. Our organization, Aldea, offers universal representation to families detained at the Berks County Residential Center in Leesport, Pennsylvania. In the last five years, we have represented more than one thousand parents and children who have been detained in family detention in the BCRC.

4. In the course of employment, I have regular occasion to observe, and therefore am familiar with, the policies and practices of United States Immigration and Customs Enforcement ("ICE") toward the detention, release, and treatment of children and parents in family detention generally and the Berks County Residential Center. I have also had the opportunity to observe detention practices and detention conditions for families detained by ICE in Pennsylvania.

5. Aldea maintains a near daily presence on the ground at the BCRC providing *pro bono* legal services to detained families at no cost to ensure that all detained families and children have access to legal services in immigration matters, which often times is a matter of life and death. Families detained at the BCRC are seeking protection from persecution and torture and are actively pursuing asylum, withholding of removal and protection under the United Nations Convention Against Torture. Although the majority of families detained in Berks are from Mexico, Guatemala, Honduras and El Salvador, families in the BCRC come from all over the world. Other countries currently represented in the detained population at Berks include also families from Haiti and

India.

6. Prior to arriving at Berks, the vast majority of families are first detained in a "*hielera*" ("icebox") prior to arriving at Berks. Our clients frequently report they were crammed into a large, cold cell for multiple days without access to hot meals, showers, toiletries, medical care, and beds while in CBP custody. Following this time in unsanitary conditions in CBP the families are transported to airports and flown to the BCRC. Often we observe families and children arriving to the facility ill due to the poor conditions in CBP custody, and often children and families fall ill shortly after arriving at the detention center as a result of the same.

**Detention Practices at the Berks County Residential Center**

7. I have provided legal services to the BCRC for more than five years and am a Flores Consultant, meaning that I participate in discussions concerning the legal rights of detained minors pursuant to the Flores Settlement Agreement (FSA). It is undoubtable that the current pandemic prevents appropriate care of minors in ICE custody as required under the FSA which requires that custody determinations must be made while taking into account the particular vulnerability of children as well as to protect the minor's well being and that of others. See Paragraph 11. The FSA requires safe and sanitary conditions for children and that they be processed expeditiously. The FSA requires a detention determination without unnecessary delay and that the determination be made to not only ensure appearance in court, but to ensure the safety of minors or others. See Paragraph 12 and 14. Further, if for some reason, such as danger, the DHS desires to continue to detain the child, they are obligated to immediately provide a bond hearing before an immigration judge, in every case. Paragraph 24A. Further, in the case of detained children, in consideration of bond, simultaneous release of the detained parent pursuant to 8 C.F.R. 1236.3(2) must be considered.

8. I have also had an opportunity to tour the BCRC facility in my capacity as a Flores monitor. Up until March 20, 2020 ALDEA continued to provide services on the ground during the COVID-19 outbreak as we are obligated by the EOIR to provide legal representation in Immigration Courts that remain open. Detained Immigration Courts have not shuttered during the pandemic, therefore our clients, detention centers, and our employees remain at risk. Since March, 20, 2020 when legal visitation was ended by order of Pennsylvania Governor Tom Wolf, we have had to rely on staff providing parents legal phone calls to us. We are not able to visually inspect the well-being of the children in custody at this time. Parents are scared for themselves and their children at this time. Further, both the workers in the facility and the surrounding community is being put at an unnecessary risk.

9. Our clients, who are parents and class members are still subject to an immigration process while detained, including court and asylum interviews, despite not being afforded legal visitation. Further, class members and parents are subject to deportation despite being denied legal visitation for safety reasons related to COVID-19.

10. The BCRC detains mothers, fathers and children. The BCRC detains children of all ages, as young as an 11-day-old newborn through children aged 17 years of age. The current population of Berks consists of children as young as 6 months old to children who are teenagers. The BCRC can detain up to 96 persons at one time. As of this writing, we can estimate that about 50 mothers, fathers and children are detained at the BCRC, a facility that consists of one building where the detainees are in close quarters. The placement determination of families in the BCRC, rather than placement in liberty, is made by ICE. The majority of families apprehended by the Department of Homeland Security ("DHS") are not subject to confinement. By and large, families subject to removal from the United States are subject to alternatives to detention. Those in family detention are the exception and not the rule.

11. Family detention by the DHS occurs only in the BCRC in Leesport, Pennsylvania, the South Texas Family Residential Center in Dilley, Texas and the Karnes County Residential Center, in Karnes, Texas. A family cannot be detained in any other facility in the United States. For that reason, families are transported from every part of the United States into the family detention centers in Texas and Pennsylvania. We receive families from the Southern Border, from interior apprehensions by ICE throughout the United States and apprehensions at the Northern Border.

12. Not a single family in the Berks County Residential Center has a criminal record. Every family in the BCRC is an asylum seeker, with a pending proceeding with the Asylum Office or the Executive Office for Immigration Review. Every family is considered a "civil detainee." Every detained family would be subject to the same civil immigration proceeding whether in detention or outside of detention.

13. Routinely, detained families are released from the BCRC by ICE and placed with their families, friends and sponsors who reside in the United States without necessary intervention by a Judge or the requirement of payment of a monetary bond given the particular vulnerability of children, to ensure proper care of children outside of a detention environment, and because asylum-seeking detainees can provide a fixed address wherein the family will reside while abiding by alternatives to detention, including electronic monitoring, phone monitoring, in person ICE supervision appointments and/or participation in an intensive supervision appearance program.

14. Family detention is the secure detention of parents and children. The BCRC is a secure care facility. It is a secure facility in several ways, however, most simply, no parent or child is free to leave the facility.

15. The BCRC is a facility that consists of a single building. It is owned and operated by the County of Berks. The facility is staffed with more than 60 employees. Further, the facility has a medical clinic, which is staffed with medical personnel of an unknown number. The building is also occupied by ICE who operates a Field Office from within the same building as the family detention center. The ICE offices are fully staffed with ICE personnel of an unknown number. It includes the Enforcement and Removal Officers assigned to the BCRC itself, as well as ICE personnel who operate in the field throughout the surrounding region, administrative personnel for the family detention center as well

as the ICE office itself. The ICE offices also possess holding areas for local ICE arrests, including those persons arrested by ICE in the Berks County area as well as those ICE detainees released from local jails pursuant to ICE detainers. An unknown number of detainees are processed at the BCRC over and above the families detained at the center. There is a constant ebb and flow of officers, personnel, families, children and detainees that come and go from the BCRC.

16. Families in the BCRC are held in very close spaces with lots of other detainees, employees of the facility and ICE personnel. The detainees sleep in rooms with six beds to a room. Each of the currently detained families are in overcrowded bedroom spaces. The detainees state that less than one half, of one meter of space divides the beds in their room. Detained families are advised of this in their Resident Handbook. See attached excerpts from the Resident Handbook. "At the Center, you will be living in close proximity with other families, so personal hygiene is essential. You are expected to bathe regularly and keep your hair clean." [See Handbook page 13] Further, "due to the communal nature of the Center … children from different families may room together, and non-related adults room together." [See Handbook Page 9] Detained families often are required to use the same items, spaces, and toys which are located throughout the detention center. "Residents are expected to share common equipment such as telephones, televisions, tables, recreational games and other equipment." [See Handbook Page 9].

17. The more than 50 current detainees are limited to two floors of a single building, where they share limited common areas, shared sleeping quarters, shared bathrooms, and a very cramped dining area.

18. Throughout the day, detained parents and children are mandated to congregate together, including three census periods, three lunch periods and times when free movement is prohibited. At no point is a family permitted to leave the building into the recreation area, except where given permission and at no point may a family leave the facility of their own choosing without being under the threat of federal criminal arrest.

19. Census requires detainees to report to the bedroom floor courtesy desk as a family to check in from 6:30am TO 7:30am 3:00pm TO 4:00pm 7:30pm TO 8:00pm. Failure to comply results in discipline. [See Handbook page 15].

20. Meals are provided in a single dining room three times a day, for both detained families and employees of the Berks facility. The families currently report more than 60 people are in the dining room during meal periods. Detained families, including small children, are required to be present in the dining room from: 7:30am to 8:00am 12:00pm to 1:00pm 5:30pm to 6:30pm. [See Handbook Page 17.]

21. The BCRC has a medical unit which is operated by Immigration Health Services Corps. There is no pediatrician nor gynecologist. A doctor is not present in the facility at all times, but comes and goes from the facility. All medical decisions for parents and children are made by the medical unit, including diagnosis, treatment, over-the-counter medication, and whether a parent or child should receive a test or visit a hospital.

22. Detained families are not allowed free movement throughout the BCRC or in recreation at various times, including after 8PM, and during all eating periods. Estimated times when detained families are permitted in outside recreation areas are 8:30AM to 11:30AM, 1:30PM to 4:30PM, and 6:30PM until the sun begins to set, however, they are not permitted outside without a guard escort or observation. At 8:00PM each day, all detained families are restricted to the second floor and no longer permitted even supervised free movement.

23. Children are to be in the company of their parents at all times. In Family Residential Centers, parents are not responsible for determinations as to the care of their children. Parents cannot determine when their children wake up, what they eat or if they need to go to a hospital. Parental decisions are made for children, by the facility procedures, the guards within the facility and by ICE themselves. Children are told when they can and cannot play, when they can or cannot be outside, when they can eat and what they eat, and what happens when they misbehave – by the facility and not their parents. Medical decisions are not made by parents, either. Those decisions are made by ICE medical personnel or County facility staff.

24. Finally, at the BCRC, few employees speak Spanish. If a detainee has a problem, they must make a language service request, a guard must take them to a telephone to connect with an interpreter by phone, and an interpreter must be available. This arrangement does not permit adequate care of children, especially during emergencies.

25. In a pandemic, the lack of in person interpreters in facilities that detain immigrants threatens the lives of the parents and children they detain. There is no way to communicate an emergency to a staff member quickly if neither the detainee nor the staff understands what is being said. This is unacceptable in an environment with children during the COVID-19 outbreak.

**Detention Conditions at the BCRC During the COVID-19 Pandemic**

26. I have had the opportunity to interview the detainees about their concerns and worries with the outbreak of the COVID-19 pandemic. The families are scared.

27. It is impossible for detained parents and children at the BCRC to practice social distancing—remaining 6 feet from others— as has been recommended to combat the COVID-19 pandemic. Based upon my observations at Berks, it would be impossible for detained individuals to create the distance between themselves and other detainees necessary to protect themselves. Detainees are forced to sleep in close quarters with others, share crowded bathrooms, and are forced to congregate in small communal areas. There are no more than two floors of permitted movement space for every single detainee limited to a handful of small rooms.

28. Clients of Aldea are very concerned that they will be exposed to COVID-19 and that they lack access to appropriate testing or medical treatment services while in detention. This is exacerbated by the fact that they cannot make medical decisions for themselves or their children. Without exception, each family interviewed by Aldea has reported that their children are currently ill, or were recently ill. Without exception, the families

advised knowing about the outbreak only through news reports and are upset that the facility has not advised them the reality of what is happening on the outside of detention.

29. Detainees report that children and parents were not educated about the COVID-19 outbreak. They were not advised of different processes or procedures employed by the facility to prevent spread. They report a sign was posted saying "Wash your hands" in Spanish, but that other posters were in the English language and they are unable to read them. One detained family reported they were told to "cough in their elbow" and that was all.

30. Many families report having inadequate access to soap and hand sanitizer at the facility. Families report that hand sanitizer is available only for the staff and not for the detainees. I can report that there is hand sanitizer in the lobby of the facility, which is inaccessible to the detainees, as well as the legal visit room. I have instructed the detainees to use the hand sanitizer within the legal area. The families report it is not available elsewhere for them to use freely. The families report at times a lack of access to hand and body soap. In some instances, they reported no soap in bathrooms and broken dispensers which have not been fixed.

31. Detainees do not have gloves or masks. Upon observation, staff was not wearing masks. Residents reported that the staff did use gloves when treating the detained families. Detainees only have access to gloves when they clean. They are paid $1 dollar a day to participate in a voluntary work program which, in part, cleans the facility. Upon observation there is no outside cleaning service. Cleaning is conducted by the families and the shelter care counselors of the BCRC.

32. Families expressed great concern about the health of their children. They express that they see staff of the facility spray cleaning product throughout a room, but do not wipe anything. They state they see the staff spray cleaning product directly on top of the children's toys, that both ill and well children play with toys, and parents fear that children often touch many things and put toys in their mouth, spreading germs.

33. The detained families reported that children, parents and staff within the facility have shown signs of illness. Residents have noticed that some staff have disappeared from work, and the families are concerned that the staff is exhibiting symptoms. The detained families are exceptionally worried about new families being introduced into the BCRC without adequate screening, since they report that families are arriving sick into the center.

34. Families report that children who show symptoms like constant cough, fever, sore throat, lethargy, congestion, difficulty breathing or sleeping, lack of appetite often go untreated. When treated, they are only provided Tylenol and it takes much time to receive actual medicine. Often, families report they are told the problem is allergies and that is all. This is true even in the time of the COVID-19 pandemic. Two days prior to this writing, Aldea staff requested "cough syrup" for a two-year-old boy who has a persistent cough and upon appearance was visibly ill. We requested the medicine when asked to inquire by client, as is often the case when children are ill for a prolonged time without treatment. Upon request to we were asked "What is cough syrup?" Then upon speaking

with a caseworker to continue to ask for cough medicine, we were advised that we could not ask him that it was medical's decision, and when we asked to fill out a resident request form for cough medicine, were told that that such a request didn't exist, despite such requests being available pursuant to the detainee handbook. [See Handbook Page 8]

35. Families often face an impossible wall to receiving medical care in detention, which rings the alarm to legal service providers as to what will happen when the pandemic hits the detained population. It will result in a threat to the lives of men, women, parents and children.

36. As of this writing, we are unaware of any parent, child or employee at the BCRC who has tested positive for COVID-19, this is despite the fact that the families and children do have cold and flu-like illnesses and staff has become absent from the facility. However, we are aware of a mother and child who is currently in medical isolation in Berks for COVID-19 related concerns. This occurred after a child fell ill at the facility and developed breathing issues. The child was taken to a hospital for lung related problems. She was at the hospital for several hours and then returned to the detention center. She and her mother were immediately isolated from the other families and even isolated from the child's father, who is also detained at the Berks family detention center. Despite the fact that we are counsel, we have not been advised the nature of the illness, the exact tests conducted, nor the concerns for this client or other clients in the facility. The isolated family reports the child received a COVID-19 test and are awaiting results. Mother and Father have received no test.

37. The facility can, and has, isolated families at different times. During medical isolation in detention, a parent is isolated with their children. They are isolated together even when only one of the members of the family unit is ill. There is no physical capability to medically quarantine everyone.

38. The facility does not have 24/7 doctors on site and cannot treat emergencies. A hospital is closely located to the detention facility, however, an outbreak of COVID-19 with parents and children at Berks will overwhelm the small local hospital that is currently dealing with the population of Berks County and the city of Reading, PA. Further, and undoubtedly, should one person at the BCRC contract the COVID-19 virus, every person in the BCRC may be affected given the communal nature of family detention.

39. ICE makes no efforts under Paragraph 14 of the Flores settlement to make and record prompt and continuous efforts aimed at the release of minors without unnecessary delay. Settlement ¶¶ 14 and 18.

40. Since the COVID-19 pandemic, legal visitation to class members and their parents has been discontinued. In order to talk to our clients, we must request a legal call which is then facilitated by a member of the detention staff.

41. To the best of my knowledge, the ICE family detention at Berks continues to operate without a state license issued for the care of dependent children. Rather, since the State of PA rescinded and failed to renew the facility's previous license which permitted only

the care of children in the Residential Center (and not the commingling of unrelated adults), the facility has appealed the decision of non-renewal of the license. The State of Pennsylvania has stipulated to the continued operation of the facility until the litigation is resolved. Said litigation has been in process for approximately four years with no end in sight.

42. The facility is secure and any class member who leaves the facility is subject to immediate arrest. Based on our representation of hundreds of clients in family detention, ICE ignores numerous provisions in Exhibit 1 to the Flores settlement as our clients often complain about inadequate medical and physical care of class members in ICE detention.

43. Neither Flores class members nor parents have been provided written reasons as to why Defendants placed them in secure detention upon apprehension nor through continuing detention. This is in violation of Paragraph 24C of the Settlement which requires a written explanation as to the reasons why secure placement is required or necessary.

44. Defendants have not offered Flores Class Members bond hearings as required under Paragraph 24A which requires bond hearings, in every case.

45. Finally, counsel is not kept apprised as to certain transfers of class members outside of the facility as required by Paragraph 27. Although in some instances Defendants will provide a "Transfer Notice," Counsel is not advised when class members are taken from the facility and hospitalized, nor when they are taken from the facility for removal, nor when release of the class member is effectuated.

46. I have reviewed the recommendations of the CDC concerning COVID-19. The facility cannot accommodate the recommendations of the CDC to prevent the spread of COVID-19. The facility is a communal space.

47. Further, it detains children with their parents. Children, in an environment with many other children, cannot adhere or respect the necessary guidelines to socially distance or to prevent spread of an extremely contagious illness. The mothers, fathers and children are already compromised medically considering the fact they have been subject to detention conditions which affect their health. Children and their parents in family detention are currently at risk for physical harm as a result of COVID-19.

48. For the safety of children, we have repeatedly recommended that ICE release children with their accompanying parent(s). We have repeated these requests, staunchly, given the COVID-19 national health crisis and pandemic which threatens the lives of class members and their parents. To date ICE has refused to release parents with their children, only doing so on the occasions when a parent is released because of developments in the parent's removal case.

49. In a time of national crisis, the Settlement and controlling law regarding family unity provides mechanisms to place children outside detention, ensure the safety of children, and to ensure family unity. ICE has refused to utilize their own processes to protect Flores class members – including access to parole where an asylum-seeking family poses

no danger to the public. The inaction by the Defendants threatens the lives of those detained, those who work in the facility and the public at large.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct pursuant to 28 U.S.C. ¶ 1746.

Executed this 25th day of March, 2020 in Reading, Pennsylvania.

Bridget Cambria, Esq.

Case 2:85-cv-04544-DMG-AGR   Document 733-10   Filed 03/26/20   Page 11 of 11   Page ID #:34181