# EXHIBIT I

# DECLARATION OF SHALYN FLUHARTY

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are based on my personal knowledge, and I can testify competently to them if called upon to do so. I submit this sworn declaration in support of Plaintiffs' Motion for Temporary Restraining Order.

2. I direct the Dilley Pro Bono Project (the "Dilley Project" or "DPBP"), formerly known as the CARA Pro Bono Project, in Dilley, Texas, where I have served as the Managing Attorney since December 2016. In this capacity, I supervise a small team of attorneys and full-time paralegals, and a rotating group of volunteers. I have been practicing law since 2010, and my practice has focused on representing detained unaccompanied immigrant children and detained immigrant families before the Executive Office of Immigration Review ("EOIR") and the Department of Homeland Security ("DHS").

3. DPBP is a volunteer-based unincorporated association that provides pro bono legal services and undertakes advocacy on behalf of detained asylum-seeking mothers and their children at the South Texas Family Residential Center in Dilley, Texas (the "Dilley Detention Center" or "Dilley"). ICE has capacity to detain up to 2,400 women and children at the Dilley Detention Center at any given time. The facility is operated by CoreCivic, a private prison company contracted by ICE. Medical services in Dilley are provided by the ICE Health Service Corps.

4. On June 27, 2017 this court issued an order subsequent to a motion to enforce declaring, once again, that the government must comply with the terms of the Flores Settlement Agreement as it relates to accompanied children. Based upon my experience leading a free legal

1

services program that provides nearly universal representation in Dilley, and daily observations of ICE policy and practice at the Dilley Detention Center, I believe that ICE did not implement a single change to the way it processes, treats, or detains class members subsequent to the Court's June 27, 2017 order. Today – almost three years later - ICE continues its categorical and indiscriminate policy of detaining all accompanied children in a secure unlicensed facility without making any efforts towards release and detaining children for well over 20 days.

5. The government's refusal to comply with the Settlement harms children. This harm is greatly exacerbated by the realities of COVID-19, which poses a heightened danger to class members who are uniquely vulnerable given their age and detention in ICE's largest detention facility in the country.

6. Based upon my work with the Dilley Project, I am familiar with the population of asylum seekers that passes through the Dilley Detention Center. Although many of the families detained in Dilley are from El Salvador, Guatemala, and Honduras, I have represented families from all over the world. Many of the asylum seekers at Dilley have experienced severe forms of trauma, including child abuse, rape, incest, domestic and other violence, and other forms of persecution. As a consequence of their past trauma, journey, and detention, the children detained at Dilley often suffer from post-traumatic stress disorder, anxiety, and depression. These realities make the protections of the Settlement Agreement critical for class members; children must feel safe.

**Social Distancing is not possible at the Dilley Detention Center.**

7. Social distancing—keeping a distance of six feet from others—is impossible for families who wish to protect themselves from COVID-19 while detained in Dilley.

2

8. Before arriving at the Dilley Detention Center, most families are detained at a Customs and Border Patrol ("CBP") processing center. Families are then transported to Dilley in a bus with many other families. Our clients frequently report that they were crammed into a large, cold cell for multiple days without access to hot meals, showers, toiletries, medical care, or beds while in CBP custody.

9. The Dilley Detention Center is comprised of numerous trailers which are enclosed by a perimeter that keeps families from leaving. Detainees are surrounded by hundreds of other detainees at any given time and required to share bedrooms, the bathroom, and numerous communal spaces.

10. ICE and CoreCivic limit the movement of DPBP staff and volunteers to four specific locations in the facility. The legal visitation trailer is a large trailer just beyond the Dilley Detention Center's security entrance. It has capacity to hold 135 people at any given time. The trailer has one large common room where up to approximately 90 people receive *Know Your Rights* presentations and wait for an appointment with a lawyer at any given time. The legal visitation trailer also houses 14 individual rooms that are used for legal and social visitation with detained families. In order to seek legal services — whether through in-person visitation or telephonically — a detainee must go to the legal visitation trailer where there are numerous other detainees waiting to speak with counsel most, if not all, of the time. Although there are telephones located in each housing unit, these telephones are not free and phone calls are recorded and not confidential.

11. The "court" building is a large trailer with numerous rooms, including five courtrooms that are used for immigration court proceedings and meetings hosted by ICE. The court trailer also contains smaller rooms used for consular visitation and asylum interviews, and

3

two large waiting rooms where 20 or more families are required to wait side by side for their appointments, interviews, and court hearings. Meetings and appointments that occur in the court building are mandatory, not optional. Although perhaps an individual could choose to not go to their asylum interview or court hearing, this would ultimately be deemed by the government a decision to abandon their request for asylum, and place them at risk of immediate removal. When a court docket or asylum interviews are scheduled, the EOIR and asylum office schedule numerous families at the same time. In other words, in order to attend a court hearing or interview, a family is required to be close to a high volume of other families who are simultaneously scheduled to appear.

12. Despite the COVID-19 pandemic, USCIS, EOIR, and ICE continue business as usual. In fact, over the last two weeks, the immigration courts have scheduled numerous families for immigration court hearings, and immigration judges have ordered them deported, despite the fact that DPBP has been unable to conduct in-person visitation or represent clients before the court. This is particularly troubling because DPBP fills a critical gap for families who are detained in Dilley. EOIR generally fails to provide Dilley families with any advance written notice of their immigration court hearings, and DPBP previously informed families when they were scheduled for court. Currently, families do not know they have been scheduled for a court hearing until a guard informs them the day of their hearing, or late in the night the evening before. Additionally, there is no mechanism for families to submit documents to the immigration judge in Dilley, as there are no on-site court personnel, and all hearings are conducted by Video Teleconference. Without access to representation, this means families detained in Dilley currently have no way to file critical evidence in support of their claims.

13. The "asylum" building is a trailer with numerous individual meeting rooms and a lobby that holds approximately 20 people at a time. Families who are scheduled for credible or reasonable fear interviews with the asylum office are scheduled in groups, and wait in the lobby together, before being called to their interview.

14. "Building 100" is a trailer used by ICE for meetings with large groups of families, and by DPBP for group legal presentations, when DPBP was still able to enter the facility. Building 100 has capacity to hold approximately 45 people at a time. The space is not large, and families who attend meetings in Building 100 are typically required to sit approximately six inches away from other individuals who attend the meeting.

15. During intake processing at the Dilley Detention Center, the personal possessions of arriving families are inventoried and stored. Families are provided with uniforms, processed by ICE officials, and given a brief medical screening. During intake — which can last for hours — families wait their turn in line surrounded by numerous other families.

16. Families are assigned to a "neighborhood" and room during intake, where they are housed. A neighborhood is comprised of multiple trailers that are connected by walkways and car ports. Most dormitories contain six bunkbeds (12 beds) that are separated from one another by a few feet. The dormitory has a couch that is shared by everyone in the room. The dormitories do not have a bathroom. Rather, families share a bathroom with many others who sleep in different rooms within their neighborhood. Neighborhoods also have a community room, where detainees gather and have meetings required by CoreCivic.

17. The Dilley Detention Center maintains numerous common spaces, including: (1) a dining hall that holds hundreds of people; (2) a school, divided by multiple classrooms that hold approximately 20 children each; (3) a large gymnasium that is used for group exercise

5

classes and as a waiting room for medical appointments; (4) outdoor playgrounds and spaces where groups of children and families congregate; (5) a large auditorium that holds approximately 200 people; (6) a library; and (7) a small building used to dispense medication to detainees who wait in line at designated times each day.

18. Mothers currently report that detainees are crowded in lines in the dining room, and that there are no efforts to keep individuals from touching or breathing on the food. These reports are consistent with what I personally observed during a courtesy tour that I received from ICE in 2017. Mothers have also informed DPBP staff that as of March 20, 2020, the school and daycare at the detention facility continue to operate.

19. Based upon my observations in Dilley, it would be impossible for detained individuals to create distance between themselves and other detainees. Detainees are required to share rooms and the bathroom and must wait in large communal areas in order to receive access to legal services, medical care, education, and to participate in their legal proceedings.

20. Many DPBP clients are concerned they will be exposed to COVID-19 and not have access to adequate testing or treatment. Detained families have access to television in Dilley and have learned about the outbreak — and its risks and symptoms — by watching the news. To date, DPBP staff is not aware of any formal education provided to families regarding COVID-19 and precautions for limiting its transmission.

21. If social distancing were possible in Dilley, it would require the facility to take extreme measures. For example, the facility could eliminate the use of communal spaces, eliminate access to education, and order families to remain in their sleeping area 24 hours a day. These measures, or similar measures, would make the facility — which is already secure — even

6

more restrictive. We see children deteriorate greatly while detained as is, and would expect to see a significant increase in the psychological and behavioral regression of detained children.

**The conditions at the Dilley Detention Center are not safe and sanitary for children.**

22. Many families report having inadequate access to soap and hand sanitizer at the facility. On March 17, 2020, one mother noted that she had not been able to find soap all morning, and that there was no soap available to her until at least 1:30 in the afternoon. Another mother informed DPBP staff that the soap dispenser in her room had been broken for three weeks, despite repeatedly notifying staff at the detention center. Several mothers also reported that they have not been provided with additional soap or hand sanitizer to account for the heightened need for hand washing. One child noted on March 19, 2020 that there was no hand sanitizer available in the dining hall.

23. Several mothers report they have not been provided with adequate cleaning supplies to clean their rooms, which they are required to do. On March 18, 2020, twenty-three mothers stated that they were not provided with disinfectant wipes, and that their requests for disinfectant wipes were denied. One mother reported that she was only given paper towels to clean her room. Another mother stated that she asked CoreCivic staff for cleaning supplies, and was informed cleaning supplies were being rationed because the facility has a short supply.

24. Several mothers have reported to DPBP staff that there have been no heightened efforts to clean or disinfect common areas in the detention center. Several families state the bathrooms are extremely dirty. One mother noted that she has only observed detention center staff disinfect areas once per day. Another mother noted that she has never seen the communal computer in the library cleaned or disinfected.

25. Facemasks are generally not available to families in Dilley, not even to

7

individuals who are sick. Families report that although some medical staff at the facility wears gloves, many do not wear masks. They consistently report that guards at the jail also do not wear masks. Mothers have observed facility staff coughing, and staff who appear to be sick with a fever, who are not wearing a mask. One child reported that she had an appointment with a dentist who coughed throughout their appointment.

26. On March 18, 2020, DPBP conducted a survey with 27 detained families to learn more about the facility's COVID-19 response plan and implementation. Survey results revealed the following:

    a. 18.5% of families surveyed stated the mother or child had a high fever within the last 24 hours;

    b. 63% of families stated the mother or child had a new or continuous cough;

    c. 40.7% of families stated that someone else in their dormitory presented with a new or uncontrollable cough or high fever;

    d. 16.7% of families stated they had encountered a facility employee or visitor who had an uncontrollable cough or apparent fever who returned to the facility after the first day they observed their symptoms;

    e. 46.2% of families stated they had not been advised to wash their hands for 20 seconds;

    f. 40.7% of families stated they had not been provided with tissues or advised to cough or sneeze into a tissue;

    g. 88.9% of families stated they had not been provided with masks, gloves, or cleaning supplies to perform cleaning tasks in their housing unit;

    h. 70.4% of families stated they had not been provided with additional soap or hand sanitizer to make it easier to wash their hands;

    i. 51.8% of families stated they have not seen facility staff frequently clean and disinfect objects and surfaces that are

    regularly touched;

  j. 81.5% of families stated that individuals who show signs of illness are not provided with a facemask;

  k. 81.5% of families stated that individuals who show signs of new or uncontrollable cough, or a high fever, are not transferred to an outside facility or the hospital, and are not placed in isolation; and

  l. 85.2% of families stated that potentially infected persons are not grouped together in the same room or housing unit.

**Children detained at the Dilley Detention Center have inadequate access to medical care.**

  27. Families have repeatedly reported inadequate access to medical care in Dilley. Detainees are frequently required to wait two to three hours in a crowded waiting room in order to speak with a medical provider, and there have been times when DPBP clients have reported waiting eight hours to see a doctor. DPBP clients regularly report they are denied access to medical assessment, follow-up, and treatment. Mothers often tell DPBP staff they fear their child will die in detention due to illness and a lack of medical care. This fear became a reality for one of DPBP's former clients, Yazmin Jaurez, whose 18-month-old daughter Mariee died shortly after release from Dilley due to an untreated infection.

  28. As of March 20, 2020, DPBP staff was unaware of any mother or child who had been tested for COVID-19, despite the fact that many individuals currently detained in Dilley have flu-like symptoms. This is consistent with our ongoing observation in Dilley that detainees are regularly deprived of timely and appropriate medical evaluation and treatment, even in the most egregious of circumstances.

  29. Our clients report that sick individuals are intermingled with the rest of the population in Dilley, despite exhibiting a cough, fever, and other COVID-19 symptoms.

9

Seventeen mothers informed DPBP staff on March 18, 2020 that either they or their child had a cough or a high fever, and yet none of them had been tested for COVID-19 or been placed in isolation. The same day, eleven mothers reported that there was at least one other person in their dormitory that was presenting with a new or uncontrollable cough or a high fever.

30. On March 19, 2020, two families detained in Dilley reported that eight new families had arrived at the facility that day. Both families reported that one of the newly arrived mothers was exhibiting COVID-19 symptoms and had been provided a facemask. Her child, however, was not provided with a facemask.

31. On March 25, 2020, one family represented by DPBP reported that she was taken to a hospital while in immigration detention immediately prior to her placement at the detention center in Dilley. While hospitalized, a doctor stated she (1) required a COVID-19 test based upon her symptoms, (2) should consistently wear a mask, and (3) required quarantine for a minimum of 14 days. However, upon arriving to Dilley, our client was deprived of a test for COVID-19, informed she did not need to wear a mask, and placed with the general population.

32. Failure to test individuals who display COVID-19 symptoms is of particular concern to many DPBP clients. One mother informed DPBP staff that her five-year-old daughter has experienced fatigue and a severe cough for a week. When the mother sought medical care in Dilley, she was told to give her daughter water, and that there is no cough medicine available for children. The family was not given advisals regarding COVID-19 or tested for it.

33. DPBP represents many mothers and children with pre-existing medical conditions who are particularly vulnerable to COVID-19. Although these individuals are uniquely susceptible to the harms of COVID-19 under any circumstance, many state their condition has deteriorated due to inadequate access to medical care while detained, placing them at even

10

greater risk.

34. DPBP is aware of at least five children with asthma who remained detained as of March 23, 2020. One mother informed DPBP staff that her eight-year-old asthmatic child was transported to a hospital after he was struggling to breathe. After the child's release from the hospital, however, he was not provided with an inhaler or the necessary follow-up care. DPBP staff spoke to another mother whose seven-year-old son was diagnosed with asthma while detained. The child's condition has deteriorated significantly during his five months in detention. In early February 2020, the mother sought medical care for her son because he was struggling to breathe. Dilley medical staff refused to provide the child with treatment until the next morning, when his lips turned blue and he required emergency transportation to the hospital and more than 24 hours on an oxygen tank.

35. DPBP represents several pregnant women, including women with high-risk pregnancies. Many of these women have been deprived access to critical medical services because there is no on-site OBGYN available. Our pregnant clients frequently report that it is particularly difficult for them to care for their accompanying child while detained without the support of family, particularly while they are sick.

31. DPBP also represents numerous clients with heart-related problems, including a five- year-old child with a heart murmur that has experienced chronic fatigue, loss of appetite, excessive sweating and lethargy, and a fifteen-year-old child that was hospitalized while in CBP custody for heart palpitations. Another fifteen-year-old child represented by DPBP has suffered cardiac attacks for approximately four of the almost seven months that she has been in detention. The child's mother reports that on numerous occasions her daughter has suffered episodes where she develops heart palpitations, a prickling sensation in her limbs, trouble breathing, dizziness,

11

nausea, sweating, and sudden fatigue. On one occasion in February 2020, while suffering another cardiac attack, the child had trouble breathing and became dizzy. Upon seeking medical attention in Dilley, a medical staff member told the child to "calm down" and only checked her blood pressure after her mother insisted.

32. DPBP also represents numerous children with anemia, including one mother and a son who are both anemic. That mother informed DPBP staff that she sought supplements for her son shortly after they arrived at the detention facility in September 2019, but was turned away from the medical unit. After her son was determined by medical staff to be underweight, he was prescribed Pediasure. The child has not received additional treatment.

33. The above examples are a few of many. An additional non-exhaustive list of medical conditions currently experienced by individuals detained at Dilley includes: diabetes, thyroiditis, hyper-thyroidism, tooth infections, vitiligo, epilepsy, gastric liver damage, tachycardia, eye infection, chronic gastritis, and seizure disorder. Medical conditions reported by our clients that are currently untreated and not sufficiently evaluated, or evaluated at all, include: heart palpitations, heart murmurs, deteriorating vision, undiagnosed lumps with accompanying pain and swelling, kidney inflammation and complications, continued vomiting, severe migraines, numbness in limbs, tumors and ovarian cysts. In addition, there is a child who recently survived a severe skull fracture, a child who is a cancer survivor, and a mother who recently required surgery while detained.

34. Although there are medical service providers on-site at Dilley, specialists are not available to detainees and the facility is not able to respond to medical emergencies. The facility is 20 minutes away from the Frio Hospital, a very small hospital located in Pearsall, Texas. The Frio Hospital is not equipped to respond to medical emergencies, and the overwhelming majority

of individuals who require heightened medical care are transported to a hospital in San Antonio, which is approximately one-and-a-half hours away from Dilley. I previously represented a fifteen-year-old child who was detained in Dilley for more than seven months. The child was released shortly after she attempted to hang herself from a shower rod in the bathroom because of the overwhelming distress she felt while detained. One evening, my client was transported to Frio Hospital to determine if she required further psychiatric care. The hospital did not have anyone on-site who was qualified to provide a suicide assessment; a medical professional needed to commute from over two hours a way to conduct the assessment for the hospital.

35. Should emergency medical care be needed for someone impacted by COVID-19 who is detained in Dilley, they would need to be transported to a hospital in San Antonio. Unfortunately, if one person is infected in Dilley, it is likely the entire population will quickly become infected. If 2,400 individuals required hospitalization at once in San Antonio, the system would become flooded and neither the families detained in Dilley, or individuals who require hospitalization from the San Antonio community, would have the access and medical care they require.

**ICE maintains a presumption of detention policy for children detained in Dilley.**

36. In Dilley, ICE maintains a presumption of detention policy for all children. Categorically, ICE detains all children who are not in ongoing removal proceedings, including all children who have been issued an order of expedited removal, regardless of whether their order of expedited removal is final.

37. ICE also detains children for extended periods of time who are in removal proceedings under section 240 of the Immigration and Nationality Act. For example, I represented a teenager who was detained for more than five months while her removal

13

proceeding continued during her detention. I also represented approximately 100 children who, after being separated from their mothers pursuant to the government's Zero Tolerance policy, were deemed "unaccompanied children" and placed in removal proceedings. Upon court-ordered reunification with their mothers, these children were detained in Dilley for approximately four additional months with their mothers, despite the fact that they had previously been issued Notices to Appear in removal proceedings.

38. During my time in Dilley, I have never seen ICE make an individualized assessment regarding whether a child is a danger to society or a fight risk. I have also never seen evidence that CBP made an individualized assessment that a child is a danger or flight risk before the child was transferred to Dilley.

39. I have on numerous occasions requested that ICE provide me with a copy of any and all written determinations that a child is a flight risk or danger. To date, I have never been provided any documentation that confirms that an assessment of flight risk or danger was ever made.

40. In February 2020, the Dilley Pro Bono Project conducted a survey with 419 mothers and 560 children. As a part of the survey, mothers were asked whether they had ever been told, either orally or in writing, why their children were being detained. 98.5 percent of mothers reported they never received any explanation for why their children were being detained and could not be released.

**The Dilley Detention Center is not licensed by the state of Texas.**

41. To the best of my knowledge, the Dilley Detention Center continues to operate without a license issued by Texas for the care of dependent children. The facility has never been licensed in the last four years. For this reason, ICE repeatedly informs mothers that they must

14

"care for" their children at all times.

42. The Dilley Detention Center remains a secure facility, and any class member who leaves the facility is subject to immediate arrest.

43. I have represented many mothers with severe medical conditions that required hospitalization while in ICE custody. I have one client who was hospitalized for more than a month at a hospital in San Antonio. During her hospitalization, my client's toddler was left behind at the Dilley Detention Center alone. I do not know who took care of the child in the mother's absence.

### ICE does not make efforts to release children detained in Dilley and subjects children to prolonged detention.

44. ICE makes no efforts under Paragraph 14 of the *Flores* settlement to make and record prompt and continuous efforts aimed at the release of minors without unnecessary delay. Settlement ¶¶ 14 & 18.

45. ICE categorically takes the position that *Flores* class members will only be released if an accompanying parent is released. ICE does not identify potential sponsors, call sponsors, or conduct suitability assessments.

46. ICE also maintains the position that it is exempt from the requirements of the *Flores* Settlement for children with removal orders. Former ICE Office of Chief Counsel Deputy Chief Counsel, Susan Aikman, stated in writing in reference to a detained child and their parent that they "are awaiting removal and therefore do not fall under *Flores*." I understand ICE's position to be that individuals with non-final orders of expedited removal and non-final orders of removal issued removal proceedings under Section 240 of the INA are "awaiting removal".

47. Between February 1 and February 4, 2020 the Dilley Pro Bono Project conducted

15

a random survey with 560 children, within 419 family units, who were detained in Dilley during that time period. The children surveyed had been detained for an average of 66 days.

48. Of the 419 families surveyed in February 2020, 275 families had been detained for more than 20 days as of February 1, 2020. In other terms, 32 percent of the children surveyed had been detained for twenty days or less; 67 percent of children had been detained for over 21 days. These statistics do not capture what percentage of children overall are detained in Dilley for under 20 days because the survey was conducted with 560 children who remained detained, and it is most likely the 32 percent of children who had not yet been detained for 20 days on February 1, 2020 will be in the future. Based upon our current experience representing families in Dilley, the overwhelming majority of families are detained well past 20 days.

49. Of the 560 children surveyed, 179 children had been detained over 100 days as of February 1, 2020. This includes five infants just over a year old who had spent more than 100 days in detention.

50. As of March 25, 2020 Dilley Project records — which are not exhaustive — show that more than 22 children have been detained more than 160 days; that more than 10 children who are still detained have been in detention for over 200 days; and over 7 children have been detained for more than 220 days. One child has now been detained for 229 days.

**ICE does not initiate bond proceedings for children detained in Dilley.**

51. ICE does not initiate bond proceedings on behalf of children detained in Dilley with EOIR. In fact, ICE counsel has taken the position before the immigration judge that the court does not have jurisdiction to order the release of an accompanied child detained in Dilley.

**ICE does not provide advance notice to counsel before transferring a child.**

52. ICE does not provide advance notice to counsel prior to the transfer of a

16

represented child. Despite repeated requests from the Dilley Project, ICE consistently fails to provide notice to counsel prior to transferring a child to another facility, to the hospital, or off-site for removal. The one exception to this is that ICE provides written notice in advance of removal for Salvadoran children, as required by the *Orantes* Injunction.

53.     In addition, the Dilley Project has experienced extreme delay in communicating with both parents and children who were taken to a San Antonio for hospital treatment. ICE instructs CoreCivic that attorneys are not allowed to visit or communicate with a hospitalized client without advance approval from ICE. On numerous occasions, we have waited days before receiving approval from ICE to visit a child who was at the hospital. This delay is particularly prejudicial when the child has already been hospitalized for many days before their attorney discovers they are in the hospital at all.

54.     When children and mothers are hospitalized, two CoreCivic guards remain with them during their entire stay. This is particularly intrusive and scary for children who frequently do not feel comfortable speaking with their medical team in the presence of government-contracted guards. This was the situation of one child who was committed to a psychiatric hospital after she experienced suicidal ideation and attempts. The child informed me the guards felt like her shadows, and that she did not feel comfortable sharing the reasons she wanted to harm herself — which related to her prolonged detention and treatment in detention — in the presence of CoreCivic guards.

55.     An outbreak of COVID-19 would have devastating affects at the South Texas Family Residential Center. This court's intervention is urgent.

I declare under penalty of perjury that the foregoing is true and correct.

17

Executed March 25, 2020 in San Antonio, Texas.

/s/_____
Shalyn Fluharty