EXHIBIT J

## DECLARATION OF ANDREA MEZA

I, Andrea Meza, swearing under penalties of perjury, make the following declaration:

1.      My name is Andrea Meza and I am an attorney and the Director of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). I have been the program Director since March 2019. Prior to my position as Director I served as the Associate Director from October 2018-March 2019. From September 2015 to July 2017 I was an Equal Justice Works Fellow and provided direct legal services to families at Karnes. I have been licensed in the state of Texas since November 6, 2015.

2.      RAICES, with volunteers and pro bono attorneys, has provided free legal services at Karnes County Family Residential Center in Karnes City, Texas ("Karnes family detention center" or "Karnes") since its opening as a family detention center in August 2014. In 2018, RAICES provided legal services to over 8,000 people detained at Karnes. RAICES' Family Detention Services program strives to provide free, universal representation through all phases of the immigration process during detention at Karnes.

3.      RAICES is the primary non-profit legal services provider at Karnes,

the only pro bono legal services organization operating on the ground at Karnes,

and the primary source of free legal representation for Karnes detained persons.

RAICES estimates that it provides free legal services to between 80-95% of the

population at Karnes.

4.      The Karnes family detention center is located in Karnes City, Texas,

which is a small town about an hour southeast of San Antonio. The town of

Kenedy, Texas is the slightly larger town about a ten-minute drive away from

Karnes City. The hospital closest to the Karnes family detention center is the Otto

Kaiser Memorial Hospital in Kenedy, which has about 25 staffed beds. I have

heard of several cases when individuals detained at Karnes were first taken to Otto

Kaiser, then transferred to a larger more intensive hospital in San Antonio, Texas.

5.      I have visited the Karnes family detention center hundreds of times to

meet with clients since 2015. I have heard complaints about medical services at

Karnes for years. The population at Karnes generally is released from detention

within 4-6 weeks, but at various periods of time, the population has been detained

for months at a time. No matter the circumstance, the complaints I have heard

about the inadequacy of medical services at Karnes remain the same. There is no

pediatrician or OB-GYN on staff at Karnes. Families report being attended to by

nurses who pay their complaints little heed.

6.      I have had a stakeholder relationship with ICE Assistant Field Office

Directors at Karnes throughout my work with RAICES. In January of 2020, Anthony Hofbauer became the Assistant Field Office Director at Karnes . Assistant Field Office Director Anthony Hofbauer ("AFOD Hofbauer") and I have maintained regular communication about changes at Karnes. Since he began his position at Karnes, AFOD Hofbauer has attempted to make changes to improve conditions at Karnes. However, these attempted improvements have often been thwarted by the culture of indifference and fear that permeates the GEO and ICE staff at Karnes, and also by restraints inherent to the facilities and design of the Karnes family detention center.

7.     Karnes was originally built to detain single adult men. It is a secure, prison-like setting, though through the years of its existence as a family detention center, cosmetic changes have been made, such as painting murals and hanging colorful art on the walls.  The doors are heavy metal doors that require pushing a button to request entry or exit. Many have only very small windows. I have never been permitted entry into the space where detained families are held beyond the main visitation room. From what I can see through a window in the visitation room, and from what I have heard from clients, GEO, and ICE, Karnes is set up in square units surrounding courtyards. Playgrounds were added to the courtyards when the detention center began to imprison families. Cells where families sleep have bunk beds, a TV, and a small table inside, and my understanding is that multiple families share a single bathroom, and often share a room.  The cells are

organized into "patios", and there are several shared recreation rooms. There is

one cafeteria, one library , and one medical unit for the entire detention center. An

additional wing of cells and a courtyard were added to Karnes after it became a

family detention center, but I am not aware that any additional cafeterias,

libraries, or medical units were constructed. I regularly hear clients, GEO, and ICE

refer to these spaces in the singular, such as saying that a client is "in medical" or

"needs to go to medical."

8.      The visitation space at Karnes consists of a main room a bit larger

than a typical school classroom, surrounded by five private rooms. Three of those

rooms are equipped with a telephone. In order to enter the visitation area from

within Karnes, detained persons must pass through a "sally port" type hallway that

connects the outdoor courtyard to the main visitation room. Where the door from

the sally port meets the main visitation room, there is a desk set up where one to

three GEO staff sit and monitor visitation. Detained persons are not permitted

entry into the main visitation room without permission from GEO staff. There are

several tables and chairs set up in the main visitation room, but meetings at these

tables are not confidential because GEO staff is present at their desk in the main

visitation room. Additionally, many GEO and ICE employees use the visitation

space as a means for their ingress and egress between the main part of the

detention center where families are held and the lobby and main entry hallway of

Karnes that connects to ICE and GEO administrative offices. There is frequently

regular foot traffic throughout the day in the main visitation room.

9. In my years providing legal services to families at Karnes, I have heard consistent complaints about the medical services provided by GEO. Detained persons regularly complain that their needs are not addressed in the medical unit. Over the years, when I have brought up complaints about medical services to ICE, supervisors regularly state that medical services are available 24 hours on a walk-in basis. They indicate that therefore, complaints about the availability and quality of medical care are unfounded. However, clients specifically state that there are prohibitively long waits at the medical unit. For years clients have told me that they have waited hours at medical without being attended to. They additionally state that often, medical staff ignore their needs. Detained persons regularly report that medical staff dismiss their concerns or say that there is nothing that can be done for the reported ailment at Karnes. The most commonly reported recommendations from medical staff include the following: ibuprofen, cough syrup, water, and eating more food. RAICES has represented clients with cancer, brain damage, diabetes, HIV, and many women who recently suffered rape or miscarriage, who have reported deficient or no medical care at Karnes.

10. ICE regularly detains children at Karnes for well more than twenty days; it is not uncommon for children to be detained over 100 days at Karnes. I am not aware of ICE ever having made an individualized assessment as to whether a child is a

danger to society or a flight risk.  I have never spoken with a parent detained at Karnes

who had received an explanation as to why his or her child was detained.  I am not

aware of any instance in which ICE initiated bond proceedings for a child detained at

Karnes.  Only rarely has ICE ever provided advance notice of a removal of a child,

and it has only done so for children from El Salvador pursuant to the *Orantes*

settlement agreement.  This notice has happened sporadically; it is not common for

ICE to give RAICES notice of a transfer or removal of a Salvadoran child.

11.    Over the years, I have heard of occasions in which the severity of a

child's medical situation required hospitalization.  I am not aware of RAICES having

received notice from ICE of these hospitalizations.  I remember one specific instance

in which a child detained at Karnes was hospitalized in San Antonio.  During his

hospitalization, I was unable to contact the child or his mother though RAICES

represented the family at the time.

12.    On March 13th, I spoke with AFOD Hofbauer over the phone about

changes in visitation at Karnes given concerns about the COVID-19 virus. This

was the first of several times that I spoke with the AFOD about COVID-19 and its

impact on Karnes. AFOD Hofbauer informed me that he had just received word

through "executive order" which prohibited community visitors. AFOD Hofbauer

informed me that legal visitation would continue at Karnes.

13.    AFOD Hofbauer stated that the changes to legal visitation would

consist of the following: legal visitors would be subjected to a temperature check

and a short questionnaire on a daily basis.

14.    AFOD Hofbauer told me that he would offer skype and facetime  options

for legal visitation beginning on Monday March 16. He said that GEO did not yet

have the iPads for these video visits, so legal visitation could be conducted by phone

over the weekend.

15.    I asked AFOD Hofbauer how many rooms would be available for

legal video calls and he told me that there wouldn't be many, given the space

constraints at Karnes. He said that if we needed more iPads, he would ask the

GEO Warden if the request could be accommodated.

16.    AFOD Hofbauer told me that there was a "possibility [ICE] might not

be going to work either, we might be teleworking."

17.    On Sunday March 15th, I emailed AFOD Hofbauer to see if he had an

update in protocol regarding COVID-19. He stated:

> Morning, we have identified more tablets if you all prefer that method. I'm
>
> waiting to hear back from the Warden to see if the thermometer has arrived
>
> but all else is the same ........ We have about eight tablets available and we
>
> can utilize all the offices in visitation, if needed. We will make every
>
> attempt available to ensure the meetings are confidential. I have attached the
>
> [legal visitation] screening questionnaire, as requested.

18.    On Tuesday March 17th, I had a meeting with AFOD Hofbauer over

the phone for a little more than an hour. He informed me that there were two

iPads available for FaceTime calls and six other iPads that were not yet
functional. He said that detained persons would be able to use iPads in visitation,
he suggested they might be able to use them in their dormitory cells, and said that
they likely could not use them in private courtroom areas because of staffing
needs to monitor that space.

19.    I asked AFOD Hofbauer about plans to address COVID-19. He
stated that he was in "close communication" with Karnes County officials, the
CDC, and the ICE Health Services Corps. He said that there were "no concerns,
no cases for COVID-19." When I asked him if he had a plan for what would
happen if someone were to test positive he said he had some guidance, but that it
would be a new situation for all involved if someone were to have COVID-19.

20.    I asked AFOD Hofbauer how they were testing for COVID-19. He
told me that they were taking temperatures of detained families while they were in
the carport before they entered the detention center, and asking a few questions.
He indicated that he did not have access to tests for COVID-19.

21.    AFOD Hofbauer has thus far proven to be helpful and
accommodating to us, and I expressed appreciation for that. I asked him frankly if
he was concerned about his staff given the President's warning not to congregate
in groups of more than ten people, and I asked him if there were plans to "shut
down" Karnes. AFOD Hofbauer expressed that he and others at ICE were
concerned about spread of the virus and had raised those concerns through their

channels, but that he and his superiors were waiting on guidance from ICE

Headquarters as to how to respond.

22.   AFOD Hofbauer has demonstrated that he is very reasonable and

understanding, unlike many other ICE officials I've encountered, even officials

with whom I considered myself to have a decent working relationship. My

impression is that the AFOD is, quite reasonably, concerned about the safety of all

who are in Karnes, but that he has not been given the authority to address the

issue as he would like to see it addressed.

23.   I directly asked the AFOD if he had considered releasing people from

Karnes given concerns about large groups and COVID-19. I told him that in the

past, RAICES has helped ICE facilitate release of families, and that we were

willing to work with ICE to do so in the event that release is ordered. I mentioned

that in December of 2016, there was a mass release that was poorly coordinated

and that we were interested in working with ICE to avoid a similar situation.

When I pressed AFOD Hofbauer regarding whether he had considered releasing

all families at Karnes he said: "Unfortunately I can't comment on that, I wish I had

the ability to do that but I can't comment on that."

24.   I then asked AFOD Hofbauer a series of questions related to the

COVID-19 response:

a.      First I asked whether the facility had a written exposure control

plan approved by a physician. AFOD Hofbauer responded that he did not have a

plan, but he said that GEO had a written plan in the event of an exposure. I asked when the plan was last reviewed and updated and he stated that he would have to ask GEO.

b.          I asked if there were any updates in protocols for medical, dental, and laboratory equipment and instruments to be appropriately cleaned, decontaminated, and sterilized per applicable recommendations and/or regulations. AFOD Hofbauer responded that GEO goes above and beyond in cleaning and that Karnes is one of the nicest facilities he had ever seen. The AFOD told me that there are full cleanings two to three times daily. He stated that detained families do additional cleaning in their rooms themselves. AFOD Hofbauer said that because of the alcohol level in hand sanitizer, he could not provide hand sanitizer to the families because of the Family Residential Standards, but he said that there was "plenty" of hand soap.

c.          l then specifically asked who cleans the rooms. AFOD Hofbauer told me that GEO staff and detained persons clean the rooms, and that detained persons help clean the facility generally. I asked if there had been any changes to the cleaning solutions used and he said that the solutions were formulated according to standards that are uniform across the country. He stated that the standards allow for a certain percentage dilution with water.

d.          I asked if there were protocols for biohazardous waste disposal and the AFOD did not have that specific information available.

e.           I asked AFOD Hofbauer if he was aware of anyone currently in

medical isolation. He said that there were some cases of people in observation based

on CDC guidance based on countries through which they had traveled. I asked what

"observation" meant, and he told me it meant that they cannot leave the medical unit. He

said that they would be on a 14 day observation period. I asked him if entire family

units were in observation together, he said yes.

f.           I asked AFOD Hofbauer if there is there a functioning negative

pressure room for patients requiring respiratory isolation. AFOD Hofbauer said

that there are "more than five" negative pressure rooms. He indicated that there

are two medical areas, but I did not follow up and ask whether that meant that

there are actually two medical unit clinics where detained persons may receive

services. As mentioned above, I am only aware of the existence of one medical

unit clinic where detained persons may receive services.

g.           I asked what procedures are used to disinfect bedding and

clothing. AFOD Hofbauer indicated that was a question for GEO, but that he did

know that when a family leaves and a new family is going to come in, that the

room is "deep cleaned" before the new family enters, and that sometimes this

even causes a delay at intake as there is a wait time to go to the room while it's

thoroughly cleaned.

h.           I asked AFOD Hofbauer what considerations are taken for

pregnant women and children in terms of treatment. He implied that release of

families including those with pregnant women, children, and those with health

concerns was being evaluated on a case by case basis, but that there was currently

no guidance to generally release pregnant women.

     i.       I asked AFOD Hofbauer how often environmental health

inspections are conducted. He said that there is a yearly safety inspection, that

GEO does a daily inspection of all rooms as part of their shift, and that there

are monthly inspections and other regular inspections by outside authorities.

     J.       I asked AFOD Hofbauer if there were any changes in the

protocols for cleaning food, utensils, and dishes. He said that the same

standard for sanitizing dishes that is specific to family residential centers

remains in use.

     k.       I asked AFOD Hobauer if there were specific screenings for

people with respiratory illnesses such as asthma. He said that there are regular

medical screenings at intake, and that the medical unit is open 24/7. I

mentioned that clients often tel1 us about long wait times at medical, and he

said that receiving services should be "automatic."

     l.       I asked whether there are facemasks, gloves, and cleaning supplies

available. He said that these items are available for officers, and that GEO has

them as well, but that they will be available in case of an emergency situation.

AFOD Hofbauer indicated that if our staff were present and someone were to

have COVID-19, that ICE would make surgical masks available temporarily

to our team.

m.         I asked what precautions are taken in terms of aerosolized treatments that may adversely affect persons with chronic respiratory diseases. AFOD Hofbauer indicated he was not aware of any specific precautions. He said that medical had higher grade cleaners than what is used sleeping areas.

n.         AFOD Hofbauer asked the supervisory deportation officers, who report directly to him, if there were other precautions in place. He said that besides the tests (temperature tests and questionnaire), it appeared that most things were going on as usual.

o.         AFOD Hofbauer indicated that the biggest change at the detention center was education, meaning giving the families detained information about the virus and the need for more frequent hand washing.

p.         I asked if there were handwashing stations set up for people before entering the cafeteria, and AFOD Hofbauer said that the only stations available were in their rooms and in any restroom.

q.         My colleague, Javier Hidalgo, our team's supervising attorney, asked AFOD Hofbauer if there had been any scale back on staff. The AFOD said that school is up and running and that there haven't been any issues with employees not showing up for work.

r.         I asked if sick leave was available for staff. and AFOD Hofbauer stated that it is.

25.    From Monday March 16 to Thursday March 19, the staff that I supervise reported a number of concerning deficiencies, and that they observed very few precautions being taken by GEO or ICE at Karnes. They observed GEO and ICE employees shaking hands with each other, and even joking about their colleagues who were working at Karnes while exhibiting flu-like symptoms. Our staff also reported that upon entry to Karnes, their temperature is taken and they must complete a survey about their recent travel, however no Karnes staff members are wearing gloves or masks when they are reviewing identification or personal items, and that counters and commonly touched surfaces in the entrance do not appear to be wiped down or disinfected apart from regular cleaning. Detained persons used phones in visitation and there were no cleaning supplies available to wipe down phones, tables, or chairs between use. Toys in the visitation area were not cleaned between use, and the GEO staff in visitation handle detained persons' identification cards but did not use gloves or take any additional sanitary measures.

26.    During this time, staff reported that detained persons repeatedly raised serious concerns about their and their families' health at Karnes. Nearly everyone that our staff spoke to expressed concern that many children were suffering from diarrhea and vomiting, that pregnant women were not receiving appropriate care, and that everyone - though in particular, children - were losing alarming amounts of weight. Detained families expressed fear about the threat posed by COVID-19

and the lack of appropriate precautions taken at Karnes. They report that cafeteria

staff do not wear masks, that requests for masks or gloves by detainees to Karnes

staff are denied, and that detainees are not provided soap and must purchase it

from the commissary.

27.     On March 20, 2020 around 6:00 PM, AFOD Hofbauer called me to

give me further updates about the COVID-19 response at Karnes. He clarified that

masks and personal protective equipment would only be available in the event of

an emergency. He said that he does not have a lot of resources because of the

demand for masks around the country.

28.     AFOD Hofbauer told me that there would be additional changes at

Karnes due to an order from the Governor prohibiting gatherings of more than ten

people. He said that legal visitation would continue, but that there would be no

person to person contact. AFOD Hofbauer indicated that in order for us to conduct

in-person visitation at Karnes, we would have to wear gloves, masks, and

protective eyewear.

29.     AFOD Hofbauer indicated that at some detention centers, legal

visitation could function with one attorney in a visitation room then "the other

across the haH" but that such an arrangement was not possible at Karnes because

of the limited space for legal visitation at the detention center.

30.     In this conversation AFOD Hofbauer stated "We're [employees and legal

visitors] the ones on the outside; we're a risk to them [detained famines], not them to

us."

31.    AFOD Hofbauer stated that with the governor's new restriction, we
could meet with no more than ten people in visitation at any given time.

32.    I asked AFOD Hofbauer what would happen at meal times. He said,
'That is a good question. Yeah we're gonna have to figure something out... feeding
times will take forever. We're going to be eating all day. I'd have to check with the
warden because that's more of a facilities issue." He opined that grouping detained
families together in settings of more than ten people might not be problematic
because they are people who have already been in contact with each other, as
opposed to outsiders coming into the detention center. It is evident to me that
while AFOD Hofbauer may be doing his best to address the COVID-19 threat
within his authority, that he has received very little practical guidance as to how
precautions for families and staff at Karnes may be implemented in a detained
prison setting. His responses to me indicate the impossibility of full compliance
with the most protective measures as recommended by the CDC and local
authorities.

33.    Staff who visited Karnes on Friday March 20, 2020, when GEO
began to implement the 10-person rule in visitation, reported that deficiencies in
application of precautions for COVID-19 continued. Their observations
demonstrate that it is impossible for necessary precautions to be effectuated in a
detention center environment, especially with a family population.

34.     Although it is my understanding that schools have been ordered

closed in the State of Texas, as of March 20, 2020 children at Karnes continued to

attend the school inside the detention center, making social distancing impossible.

35.     Additionally, staff who visited Karnes on March 20th observed that

GEO interpreted the 10 person rule to mean that no more than ten clients could be

present in the main visitation room at a given time. It did not appear that GEO

staff or RAICES staff were counted in that ten person limit. Because of

requirements that family units remain together during the day, most families

arrive together for a legal visitation appointment. However, because of the 10

person rule, only one representative of the family can enter the large visitation

room at a time. The rest of the family was forced to wait in the small "sally port"

room. This meant that more than ten people from multiple families were cramped

into a small space while they waited for one person from each of their families to

meet with legal representatives.

36.     Our staff observed that a play carpet in the main visitation room was

removed, so babies were forced to play on the hard floor. Staff observed adult

clients suffering from constant cough during their legal visit. They observed the

near impossibility of avoiding touching one's face, especially for those with babies

and small children, who often sit in their parents' laps. They saw, during a GEO

shift change, that many GEO employees were crowded shoulder to shoulder in the

main entry hallway waiting to clock out and leave.

37.    As of Monday March 23rd, 2020, our staff have moved to complete

remote visitation.  We speak with our clients over the phone and via FaceTime on

iPads.  We have been instructed that if we wish to visit our clients in person, we must

supply our own personal protective equipment, including N-95 masks which are

nearly universally out of stock.

38.    It is my understanding that as of Monday March 23rd, 2020, the detention

center is currently attempting to implement social distancing measures.  However,

given the prison-like setting of Karnes, the effectiveness of such measures is

questionable, and the harm these measures will cause to children is inevitable.

Families report that they are instructed to stay in their rooms as much as possible

during the day.  They are prohibited from moving around the detention center in

groups of more than 10, including at the medical center.  Families report that their

children must be with them at all times, and that the daycare and school are currently

closed.  Families are now served breakfast within their cells.  Some families indicate

that they are only allowed to leave their rooms for short periods of time at lunch and

dinner.  During these meal times, families are now grouped into tables of 10.

Apparently, however, these meals are still eaten in a cafeteria setting with

approximately 100 individuals.  Other families report that all meals are delivered to

their rooms.

39.    Staff at Karnes do not use personal protective equipment in their

interactions with families at Karnes.  Social distancing measures do little to protect

families imprisoned at Karnes if they continually come into contact with staff who leave the detention center daily.

40.     Furthermore, some ICE personnel have begun to telework.  This indicates that ICE is aware of the threat of coronavirus for their own staff at Karnes.  Detained families held in close quarters are even more vulnerable to infection.

41.     Families report that after news of the O.M.G. v. Wolf lawsuit was broadcast on the television, TVs are now set to a channel that shows movies, and they are prohibited from watching the news.

42.     Despite concerns regarding the COVID-19 pandemic, ICE, USCIS, and EOIR are continuing adjudication and removal operations.  Out of concern for detained families and our staff, RAICES has shifted to remote legal visitation.  The fact that government immigration agencies are continuing near-normal operations has resulted in further hindrances to access to counsel and due process for families at Karnes.  For example, USCIS has indicated that they will not accept Form G-28, Notice of Appearance of Attorney or Accredited Representative, without an original signature.  Normally, our staff could obtain a client signature on Form G-28 and submit it to the USCIS asylum office the same day for emergency situations.  Now, we must meet with a client, establish representation, and fax Form G-28 to Karnes, then meet with the client virtually the following day to direct them to sign the G-28, and thereafter coordinate with ICE to arrange in-person pick up of the documents.  At best, a situation that could have been handled in an hour or so will now take at least

two days to arrange.  In this time, expedited removal orders are effectuated.

43.    Furthermore, since Monday March 23rd, 2020, approximately thirty families have been scheduled for hearings this week, most with only a day of notice. It is not uncommon for EOIR to schedule families for court with little notice, but such a high volume of cases is out of the ordinary.  RAICES staff calls the EOIR hotline number for all clients waiting for court daily.  When we are able to meet with families in person at Karnes, we can more quickly facilitate calling in families who are scheduled for court at the last minute to adequately prepare them for their hearings. However, because of restraints on visitation due to COVID-19, we have been unable to meet with all families before their last-minute court hearings.  Most of the families we met with this week were not even aware that they had been scheduled for a hearing until RAICES staff informed them.

44.    My experience over the years at Karnes and our RAICES staff's experience this week indicate that it is inherently impossible to effectively implement adequate safety precautions for COVID-19 at the Karnes detention center. The medical care has been deficient for years, as Karnes has never invested in building a culture of care, typically most families are not detained long enough for GEO to be held accountable for their inattention to detained persons' medical needs. The medical staff at Karnes is not equipped to respond to a pandemic situation. The remote location of Karnes means that an outbreak of COVID-19 will decimate the detained population and will immensely impact care

available to the local community. The physical construction of Karnes as a prison

makes it impossible for social distancing measures to be implemented. Families

are constantly in close contact with each other and with staff who come in and out

of the detention center daily. Even if the extreme measure of a strict quarantine of

family units to individual rooms were taken, bathrooms are shared, and children,

babies, and pregnant women would be forced into effective solitary confinement,

which would amount to torture.

45.    The detention setting of Karnes is a serious public health concern not

only for the families detained there, but also for ICE and GEO staff who are not

equipped to take necessary precautionary measures at Karnes. It is impossible to

keep staff and detained families in Karnes safe from the threat of a serious

COVID-19 outbreak as long as the detention center remains open.

46.    To the best of my knowledge, the ICE family detention facility at Karnes

continues to operate without a license issued by Texas for the care of dependent

children. The facility is secure and any class member who leaves the facility is subject

to immediate arrest. Based on our representation of hundreds of clients in family

detention, ICE ignores numerous provisions in Exhibit 1 to the Flores settlement,

including, for example, failing to provide complete medical examination (including

screening for infectious disease) within 48 hours of admission, individualized

needs assessments, at least one (1) individual counseling session per week conducted

by trained social work staff, a reasonable right to privacy, and family reunification

services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of minors.

47.   ICE makes no efforts under Paragraph 14 of the Flores settlement to make and record prompt and continuous efforts aimed at the release of minors without unnecessary delay. Settlement ¶¶ 14 and 18. ICE takes the position that *Flores* class members will only be released if an accompanying parent is released, generally because the parent has passed a credible fear interview.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 25, 2020

Andrea Meza

San Antonio. Texas