JOSEPH H. HUNT
Assistant Attorney General
Civil Division
SCOTT G. STEWART
Deputy Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsel
    Tel:  (202) 616-0473
    Fax:  (202) 305-7000
    Email:  Nicole.murley@usdoj.gov

*Attorneys for Defendants*

KATELYN MASETTA-ALVAREZ
DAVID BYERLEY
Trial Attorneys
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LORETTA LYNCH, Attorney General of the United States; *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG<br><br><br>**RESPONSE TO PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER** |

1

## I.   __INTRODUCTION__

On March 26, 2020, Plaintiffs filed an *ex parte* application alleging violations of the *Flores* Settlement Agreement ("FSA" or "Agreement"), and seeking a temporary restraining order ("TRO") against Defendants U.S. Immigration and Customs Enforcement ("ICE") and Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"). ECF No. 733-1 ("TRO Motion"). Defendants file this response to preliminarily highlight for the Court their opposition points to Plaintiffs' TRO Motion.[1]

As an initial matter, it is important for the Court to keep in mind that Plaintiffs are seeking remedies that are not well thought out, that are outside of the four corners of the Agreement, that at times are wholly inconsistent with the Agreement, and that are highly likely to expose class members to harm outside of government custody. Their proposed remedies would create confusion that will substantially interfere with the government's efforts to keep the children in its custody safe from the Coronavirus Disease-19 ("COVID-19") epidemic currently threatening all individuals within the United States. The COVID-19 pandemic has presented tremendous challenges for our Nation. But the Executive Branch is responding to those challenges for everyone in the country, and specifically for the class members at issue in this case.

As explained extensively below, ORR is carefully, thoroughly, and expeditiously safeguarding the health and interests of the unaccompanied alien children ("UACs") entrusted to its care under federal law. *See* 8 U.S.C. § 1232.

---

[1] The Court's rules related to the filing of an ex parte TRO allow the responding party twenty-four hours to respond. However, because the Court set this TRO Motion for hearing at 2:00 pm on March 27, 2020, ECF No. 734, less than twenty-four hours after the TRO Motion was filed, Defendants are filing their response in less than twenty-four hours so that the Court has the benefit of Defendants' preliminary positions on these issues before the argument.

Likewise, ICE is following state guidance as well as CDC guidelines in managing its Family Residential Centers ("FRCs") based on the current state protocols to address COVID-19. Plaintiffs' TRO Motion does not warrant a disruption of the careful efforts that ICE and ORR have taken to safely house the class members who are in their custody.

The Court should deny a TRO here in no small part because Plaintiffs are asking this Court to order injunctive relief that goes beyond simply ordering that Defendants comply with the plain terms of the Agreement. The relief sought would impose extensive obligations—including procedural and coercive remedies that have no basis in the Agreement—on the government. *See, e.g.,* TRO Motion, Proposed Order, ECF No. 733-17, at ¶¶ 4, 5, 6, 7, 8. Such relief is not appropriately sought in a motion to enforce the Agreement, let alone through a TRO which is intended only to preserve the status quo while issues are more fully litigated. Indeed, the rushed and sweeping relief that Plaintiffs seek threatens to increase the risk of harm to class members in ICE and ORR custody by eliminating existing protections and creating confusion.

Moreover, because Plaintiffs seek relief for alleged violations of the Agreement that is coercive in nature, they must establish that Defendants have breached the Agreement by clear and convincing evidence. However, Plaintiffs have not submitted any evidence of a breach of the Agreement, let alone evidence that shows a breach by clear and convincing evidence.  Plaintiffs have submitted multiple declarations in conjunction with their TRO Motion. Most of these declarations do not pertain to  the current crisis, nor do they allege existing violations of the Agreement in the conditions at facilities, and they do not purport to describe how ICE or ORR are addressing the crisis. ICE and ORR are taking extraordinary actions to protect children in their custody from harm.

3

Defendants have had less than twenty-four hours to review and respond to Plaintiffs' allegations. In light of the expansive and inappropriate relief sought by Plaintiffs, and the exacting burden that Plaintiffs must meet to obtain such relief, Defendants should—at a minimum—be provided a full and fair opportunity to review and respond to the extensive briefing and evidence that Plaintiffs have filed with this Court before the Court rules on Plaintiffs' requests. Therefore, the Court should deny Plaintiffs' request for a TRO, or if the Court determines that Plaintiffs' claims should go forward, then the Court should provide Defendants a full and fair opportunity to respond to the speculative allegations that Plaintiffs have lodged against them and set a schedule for briefing these issues.

In any event, Plaintiffs' TRO motion should be denied because Plaintiffs' request for a TRO is legally and factually unsound. First, Plaintiffs' allegations that Defendants are breaching the Agreement rely on strained readings of its terms, and ask this Court to find that the Agreement's procedures regarding release must be disregarded because of the current COVID-19 crisis. Plaintiffs also base their claims on speculative allegations of potential harm, and a second-guessing of the extensive safety measures taken by the government in favor of their own proposals. This Court should decline to give new and strained meanings to the terms of the Agreement simply because Plaintiffs now allege that the existing terms of the Agreement are insufficient in light of the present challenge.

Plaintiffs' proposed order would also have the Court order extensive procedural and coercive relief that is found nowhere within the four corners of the Agreement. This Court has already held that procedural remedies are not available to Plaintiffs for violations of the Agreement. *See* ECF No. 470 (July 30, 2018) at 2-3 (concluding that Plaintiffs are entitled to only such relief as is explicitly or implicitly authorized by the Agreement and not procedural remedies that are not

4

set forth in the FSA). Ignoring this previous ruling, Plaintiffs' TRO Motion asks the Court to order ORR to apply an entirely new standard—found nowhere in the Agreement—for evaluating the propriety of releasing a class member to a potential sponsor, and asks the Court to impose a seven-day deadline for release that is similarly unfounded. Plaintiffs do so despite the fact that this Court has also previously found that ORR's existing release processes do not violate the Agreement, *id.* at 25-27, that ICE's processes of considering class members for release are currently subject to ongoing monitoring, and notwithstanding the fact that Plaintiffs' proposed remedy would also violate the Trafficking Victims Protection and Reauthorization Act of 2008 ("TVPRA"). *See* Proposed Order at ¶ 4. Likewise, Plaintiffs seek to add requirements to Paragraph 24.C that are contained nowhere within the text of that provision, *id.* at ¶ 3, and Plaintiffs also ask the Court to order Defendants to take  specific steps regarding the custody of class members that are contained nowhere within the Agreement. *Id.* at ¶¶ 7-9.

Plaintiffs further seek coercive remedies such as additional monitoring by Special Master Andrea Ordin and Dr. Paul Wise, and reporting requirements that go beyond the monitoring provisions of the Agreement, *see id.* at ¶¶ 5, 7, despite having made no showing—let alone a showing by clear and convincing evidence—that Defendants are in violation of the Agreement. This Court has declined before to order remedies that are entirely outside of the four corners of the Agreement, and it should again decline to do so here, particularly where Plaintiffs have failed to establish any actual or imminent violation of any provision of the Agreement and the requests made by Plaintiffs are more likely to harm than help the COVID-19 response by ICE and ORR.

## II.   **FACTUAL BACKGROUND**

**Plaintiffs' TRO Motion**

On March 26, 2020, Plaintiffs filed their TRO Motion. Plaintiffs' motion comes as a result the COVID-19 pandemic, "a novel, deadly and highly infectious disease that has developed into a global pandemic and spread in all 50 states." TRO Motion at 3. Plaintiffs allege that "all class members not released by Defendants are incarcerated in congregate settings in ICE detention and ORR contract facilities in close and constant proximity to other children, adults, and staff members" and are therefore "at heightened risk of contracting COVID-19." *Id.* at 4-5.

Specifically, Plaintiffs allege Defendants do "not provide widespread access to basic hygiene products, such as soap or hand sanitizer" or "minimally sufficient education to detainees about how to prevent the transmission of COVID-19." *Id.* at 8, 14. Plaintiffs acknowledge that Defendants have provided extensive guidance, but abruptly dismiss it as "inadequate," without addressing the substance of the guidance. *Id.* at 13. Plaintiffs instead rely on various declarations from their own counsel to support their conclusion that "ICE is not following CDC guidelines to prevent the spread of COVID-19." *Id.* (citing hearsay information contained in the declaration of Plaintiffs' counsel Bridget Cambria, ¶¶ 16-19); *see also id.* at 8-9 (describing conditions in ICE FRCs based on hearsay information contained in the declarations of Bridget Cambria and Shalyn Fluarty). Likewise, Plaintiffs' allegations regarding conditions in ORR facilities are supported only by a declaration from class counsel Peter Schey, who did not participate in the site visits that form the basis for the information contained in the declaration. *See id.* at 9.

6

It is based upon these unsupported allegations regarding the conditions in ICE and ORR facilities, and their incorrect assertion that these facilities are not following CDC guidelines, that Plaintiffs then argue that the *Flores* Settlement Agreement requires Defendants to "promptly release" all class members to custodians without statutorily mandated vetting, or in the alternative, to transfer class members to "non-congregate settings"[2] in light of the COVID-19 pandemic. *Id.* at 3, 21. Plaintiffs make two arguments in this regard. First, Plaintiffs argue that the general "policy favoring release" paragraph should result in release in light of COVID-19. *Id.* at 16-18. Second, Plaintiffs contend that the "safe and sanitary" provisions of the FSA are violated by merely "continuing to detain class members" during this pandemic. *Id.* at 20-21¶ 12A. In essence, Plaintiffs argue that because "[n]o one has immunity," from the COVID-19 virus, all class members should be hastily released to sponsors without statutorily mandated vetting. *Id.* at 3 (citing Haney Decl. ¶ 5). Yet at the same time, Plaintiffs' proposed order encourages release, but at the same time, acknowledges that release might will not always be an "option." The order is more likely to cause confusion than to help ICE or ORR address the current crisis.

Plaintiffs' proposed order also seeks extensive relief, much of which appears untethered to their claims of breach. Specifically, Plaintiffs ask the Court to: (1) order Defendants to make a written individualized written determination of whether the class member is a danger or flight risk, which they claim is required by Paragraphs 21-22 of the Agreement; (2) order ICE to make and record prompt

---

[2] Plaintiffs define ""on-congregate care" as "settings in which a class member is permitted to maintain physical distance from others, avoid contact with ten or more individuals, and observe such other measures to avoid contracting COVID-19 as the Centers for Disease Control and Prevention may prescribe as public health policy for the general public during the COVID-19 emergency." Proposed Order at 3.

and continuous efforts toward the release of class members in accordance with
Paragraphs 14 and 18 of the Agreement; (3) expand the scope of Paragraph 24C
of the Agreement to require Defendants to promptly provide the class member, or
if accompanied their parent or legal guardian, and the class member's attorney of
record, a copy of Defendants' determination why any class member cannot be
released without unnecessary delay and the reasons the Defendants deemed the
class member a danger or flight risk; (4) change the standard by which Defendants
make release decisions for class members by ordering the immediate release of all
class members to any available custodian, absent a good cause based on articulable
facts to believe that the custodian described would harm or neglect a released class
member, or absent a determination that a class member is a flight risk or danger;
(5) order additional reporting requirements for class members not released from
custody within seven days; (6) order that Defendants comply with the notice
requirements in paragraph 27, and also expand those requirements for transfers
related to medical care; (7) order that any class member not released within seven
(7) days be held in "non-congregate care," and create new reporting requirements
regarding release and conditions of confinement; (8) order Defendants to comply
with Plaintiffs' suggestions regarding conditions of custody and standards of
medical care for COVID-19 in their facilities; and (9) add a definition for "non-
congregate care" to the Agreement.

**ORR Facilities**

ORR's official response to COVID-19 dates at least to January 31, 2020,
when the Secretary of Health and Human Services declared COVID-19 a public
health emergency. From the first appearance of COVID-19 in the United States,
ORR has monitored the developing public health situation, including both federal
and state mandates applicable to the jurisdictions in which ORR grantee care

provider facilities—the locations where UACs in ORR custody and care reside—
operate.  Defs' Ex. A, ¶ 17.  ORR has provided regular updates on infection
prevention and control protocols, and has issued guidance on the screening and
management of potential COVID-19 exposure among UACs, facility personnel,
and visitors, consistent with official guidance from the Center for Disease Control
(CDC), a coordinate part of the Department of Health and Human Services. *Id.*

ORR is specially equipped to deal with viral and bacterial outbreaks. It has
significant experience in identifying, containing, and treating contagious diseases,
including seasonal influenza (flu), measles (rubella), mumps (parotitis), chicken
pox (varicella), and tuberculosis. *See* Defs' Ex. A, ¶ 15. ORR was thus ahead of
the curve in developing protocols, policies, and experience relating to infections
disease containment since well before the onset of COVID-19. *See id.* ¶ 15-17.

ORR's policies relating to managing communicable disease are extensive,
including policies requiring routine assessment of travel history when a child
arrives at a care provider program, as well as medical screenings and vaccinations
within 48 hours; ability to isolate or quarantine individuals for infectious disease
control; hand hygiene and respiratory etiquette educational efforts; and
established communicable disease reporting to the local health authority. Defs'
Ex.  A, ¶ 16, 16n.6 (citing ORR Policy Guide § 3.4.6 (Management of
Communicable Diseases); § 3.4.7 (Maintaining Health Care Records and
Confidentiality)).

Even with its significant experience successfully managing communicable
diseases, ORR's response to COVID-19 remains highly responsive and adaptable
to the particular challenges of COVID-19. *See Id.* ¶ 15, *et seq*. To enhance its
efforts to prevent the risk of exposure to COVID-19, ORR has mandated that all
visitors and staff seeking to enter any grantee care provider facility answer

COVID-19 screening questions and submit to a mandatory temperature check. *Id*. ¶ 18. Except for UACs being processed for admission, grantee care-provider facilities are required to deny access to anyone who has a fever of 100°F or above; who exhibits symptoms of an acute respiratory infection; who has had contact with someone with a confirmed COVID-19 diagnosis in the previous 14 days; who has been tested for COVID-19 and is awaiting test results; or in the previous 14 days, has traveled to a country identified by the CDC as having widespread, sustained community transmission of COVID-19. *Id*. All UACs entering ORR care are screened for COVID-19 exposure or symptoms consistent with CDC COVID-19 guidelines. *Id*. ¶ 19. UACs at risk of COVID-19 exposure based on reported travel history, but without symptoms, are quarantined and monitored for 14 days. *Id*. ¶ 20. UACs who exhibit COVID-19 symptoms will be isolated and tested in consultation with the local health authority. *Id*. ¶ 20.

Alongside measures to prevent the exposure to COVID-19, ORR has instituted a rigorous monitoring regime to assure that any UAC who exhibits symptoms of COVID-19 is identified and appropriately isolated in consultation with the local health authority. Defs' Ex. A, ¶ 21. During this time in isolation, UAC receive the same services as their non-isolated peers in the same facility, although services—particularly education services—may be adjusted to accommodate proper infection-control procedures. *Id.* ¶ 28.

ORR has also required that each grantee care-provider facility monitor the temperature of every UAC in care. *Id.* ¶ 22. Children's temperatures are recorded twice daily. *Id*. If any UAC has a temperature above 100°F, the grantee care provider must immediately alert ORR, and must do so each day any child has a temperature over 100°F. *Id*. Further, any UAC who exhibit symptoms consistent with COVID-19 will be immediately isolated and referred for evaluation by a

licensed medical provider, in consultation with local health authority, and tested for COVID-19, if that is the health provider or public health authority's guidance. *Id*. ¶ 23.

The isolation procedures are the same for any UAC determined to be at risk for COVID-19 exposure or infection. Defs' Ex. A, ¶ 24. More specifically, the affected UAC will be provided a private room, with a closed door and bathroom access, preferably a private bathroom that is not used by others. *Id*. State and local health officials, along with ORR's health division, are notified and consulted for additional guidance on risk assessment, symptom monitoring, and isolation/quarantine. *Id*. Any facility personnel who enter an occupied isolation room are required to wear personal protective equipment, including an N95 respiratory mask and goggles or a face shield, per CDC guidelines. *Id*. ¶ 25. If a UAC in isolation needs to leave the isolation room for any reason (e.g., to attend a medical appointment, etc.), the UAC must wear a surgical mask. *Id*. ¶ 26. If a UAC needs to be transported to a health clinic or other off-site location, the facility must notify the local health department for guidance on proper precautions during transport. *Id*. ¶ 27. The facility is also required to alert the intended destination in advance so proper infection control measures may be undertaken. *Id*. UACs are required to remain in isolation until cleared by appropriate health officials. *Id*. ¶ 28.

Besides extensive procedures to limit exposure to individual facilities and address and treat any affected UAC who may have COVID-19, ORR has also implemented further protocols to limit the overall risk of spreading COVID-19. ORR has stopped the placement of UAC at grantee care facilities in California, New York, and Washington due to COVID-19 outbreaks in those states. Defs' Ex. A, ¶ 32. ORR continues to monitor applicable state guidance to determine

11

whether conditions warrant the suspension of placements in any particular locale, and will make changes as circumstances require. *Id*. ¶¶ 32-33. Further, ORR prioritizes local placements for all new referrals from DHS for UACs in order to limit the need for travel on commercial airliners, but may use commercial airliners to reunify a UAC with a sponsor, if it is safe to do so. *Id*. ¶ 33. . Care-providers must consult with their Federal Field Specialist if a UAC will be traveling to a jurisdiction with widespread community transmission of COVID-19 or that is subject to a community-wide "lock down." In such cases, release should be postponed until it is determined to be safe for the UAC to travel to their destination. This safety assessment includes consideration of the particular UAC's unique medical needs and vulnerabilities, and the UAC's respective medical specialists are consulted in the safety planning process. *Id*.

Before the outbreak, ORR had been working on a telehealth initiative to increase UAC access to healthcare resources. Defs' Ex. A, ¶ 34. In light of orders restricting movement in New York and California, ORR rolled out its telehealth program in those locations ahead of schedule in order to ensure care provider facilities are able to provide UACs with access to medical care without leaving facilities. *Id*.

As of March 26, 2020, there were four confirmed cases among UAC in ORR care provider facilities.  Defs' Ex. A, ¶ 35.  All four cases were in a single facility in New York State, and the affected UACs are currently in isolation, per ORR and CDC guidelines, and are receiving appropriate monitoring and medical care.  *Id.*  Eighteen UACs in the care provider network had been tested, with at least eleven returning negative results.  *Id.* ¶ 36.  While the tests were pending, pursuant to CDC Guidance, any UAC who had undergone COVID-19 testing was considered presumptively positive until results are available (usually, within three

or four days after testing). *Id.* ¶ 37. Eight program staff/contractors or foster parents at five care-provider programs located in New York, Washington, and Texas have self-reported testing positive for COVID-19. *Id.* ¶ 38. ORR's medical team and the affected programs have worked in close coordination with the local public health departments on appropriate public health measures, which typically involve self-quarantine at home, and the tracking and monitoring of the affected staff members' contacts within the care-provider facility, per CDC guidance. *Id.* The protocols discussed above are in place to prevent the further spread of COVID-19, and ORR is providing medical care to those affected children.

CDC has issued guidance on COVID-19 containment in various congregate settings, including colleges, nursing homes, prisons, and homeless shelters. Attachment Q ¶ 41. ORR has implemented such guidance applicable to the extent it can be applied to grantee care provider facilities, has consulted with CDC regarding ORR's COVID-19 containment and mitigation strategies and has been told by CDC that they are consistent with CDC's recommendations. *Id*. Indeed, CDC has advised that ORR's current COVID-19 procedures are consistent with CDC guidance for congregate settings and in some respects "actually exceed those set forth in the CDC guidance to congregate care facilities." *See* Defs. Ex. K. CDC also advises that expedited release and moving UAC children outside of custody likely increases risk of exposing UAC to COVID-19 relative to remaining in custody, given that they are currently housed in well-controlled environments and may be transferred to areas where there is widespread community transmission, or to homes where there may be persons who have been exposed. *Id.* ¶¶ 20, 22-24.

**ICE Family Residential Centers**

Children detained in the three ICE detention facilities exclusively holding migrant family units in the United States: Berks County Residential Center in Leesport, Pennsylvania; South Texas Family Residential Center in Dilley, Texas; and Karnes County Family Residential Center in Karnes City, Texas (collectively, the "FRCs").

Since the initial reports of COVID-19, ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to ICE Health Service Corps ("IHSC") staff for the screening and management of potential exposure among detainees. Declaration of Tae Johnson, Defs' Ex. M, ¶ 9. Moreover, ICE continues to adapt and, through daily monitoring of the CDC website, incorporates in its procedures any updates to the CDC's COVID-19 guidance. *Id.* ¶ 10. Also, ICE is actively working with state and local health partners to determine if any detainee requires additional testing or monitoring to combat the spread of the virus. *Id.*

As a general policy, in testing for COVID-19, IHSC is also following guidance issued by the CDC to safeguard those in its custody and care. *See* ICE Guidance on COVID-19, https://www.ice.gov/covid19. Detainees are being tested for COVID-19 in line with CDC guidance. In some cases, medical staff at ICE detention facilities are collecting specimens from ICE detainees for processing at a commercial or public health lab. *Id.* In other cases, including when a detainee requires a higher level of care, ICE sends the detainee to a local hospital to be tested at the discretion of the treating provider at the hospital. *Id.* ICE transports individuals with moderate to severe symptoms, or those who require higher levels of care or monitoring, to appropriate hospitals with expertise in high risk care. *Id.* As of the date of this motion, on the best information provided, two detainees and

14

three ICE detention facility employees have tested positive for COVID-19. *Id*.; Defs' Ex. M, ¶11n.2.  Both detainees are located in New Jersey. *Id*. In addition, for ICE Air charter removals, individuals must pass a medical screening prior to boarding the aircraft. In accordance with IHSC guidance, any detainee with a temperature of 100.4 degrees or higher will be immediately referred to a medical provider for further evaluation and observation. *Id*. There are no confirmed cases of COVID-19 at any of the FRCs.

ICE is following state guidance in managing FRCs based on the current state protocols to address COVID-19. As a precautionary measure, ICE has temporarily suspended civilian access and all social visitation at the Berks FRC. Defs' Ex. M, ¶ 24. Additional medical screening has been implemented to include mandatory temperature screening for all staff entering the facility pursuant to ICE, CDC and IHSC guidance, and residents and staff are monitored daily for symptoms of any influenza-like illness. *Id*. ¶ 26. The Berks FRC is staffed by IHSC, which ensures compliance with national health care standards at all detention facilities. *Id*. ¶ 7. In addition, ICE complies with all issued mandates from the Pennsylvania Department of Health and Human Services, as well as CDC guidance. *Id*. ¶ 30. This includes the suspension, as of March 20, 2020, of in-person legal visits and the temporary suspension of all community field, shopping, and social trips outside the facility. *Id.* ¶ 24. Likewise, in accordance with the Pennsylvania Governor's orders, the school and all volunteer programs that would expose residents to in-person contact were suspended on March 13, 2020. *Id*.

Similarly, at the FRCs in Texas, as of March 13, 2020, ICE temporarily suspended social visitation. *Id*. ¶ 21. Intake of new residents at those FRCs also is temporarily limited, and ICE is employing extra screening measures, including temperature checks, soliciting information on all travel patterns, and answering

additional medical questions before approval to enter the facilities. *Id*. ¶ 23. These extra measures are completed in the sally port of the facility, prior to the resident physically gaining access to the site. *Id*. At Karnes, all legal visitors are required to complete a COVID-19 questionnaire prior to entering the facility and undergo temperature screening. *Id*. ¶ 22. If any answer to the questionnaire is "yes" and/or if a temperature reading of 100.4 or greater is noted during scanning, access is denied. The same procedures in effect at Karnes, which is staffed by contract medical personnel with IHSC oversight, will be implemented immediately upon receipt of the thermometers that have been purchased for Dilley. *Id*. At Dilley, additional questions are asked of all visitors, and if any medical concerns are noted, the visitor is denied access. *Id*. ¶ 23. Dilley is staffed by IHSC. *Id*. ¶ 7. As of March 21, 2020, ICE is requiring all attorneys and legal representatives who wish to have a contact-visit with clients at Karnes and Dilley to wear appropriate Personal Protective Equipment. *Id*. ¶ 22. Further, on March 20, 2020, the schools in these two FRCs were closed in compliance with a directive from Texas Governor. *Id*. ¶ 19.

### III.   **LEGAL STANDARD FOR TRO**

The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotations omitted); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In moving for a temporary restraining order or a preliminary injunction plaintiffs "must establish that [they are] likely to

succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.*

The Ninth Circuit has adopted a "sliding scale" test for issuing preliminary injunctions, under which "serious questions going to the merits and a hardship balance that tips *sharply* towards the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (emphasis added). Thus, Plaintiffs must show that the injunction or TRO is in the public interest and that there is a likelihood, not merely a possibility of irreparable injury. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held.  *See Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974) (noting that TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"); *see also Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (noting that "courts have recognized very few circumstances justifying the issuance of an ex parte TRO"). Moreover, "[w]here a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing a preliminary injunction." *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984); *see also Committee of Cent. American Refugees v. Immigration & Naturalization Service*, 795 F.2d 1434, 1442 (9th Cir. 1986). For mandatory preliminary relief to be granted Plaintiffs "must establish that the law and facts *clearly favor* [their]

17

position." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original).

Additionally, requests for coercive remedies such as the ones made by Plaintiffs fall under the framework of a civil contempt proceeding, requiring Plaintiffs to bear the burden of proof by clear and convincing evidence. *See Bailey v. Roob*, 567 F.3d 930, 934-35 (7th Cir. 2009) ("The parties agree that this circuit's case law requires the party seeking sanctions to demonstrate that the opposing party is in violation of a court order by clear and convincing evidence."); *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016) (discussing how court-ordered remedies designed to ensure compliance with a settlement agreement, and to cure breach, are properly considered under civil contempt standards).

## IV.   ARGUMENT

### A.   The Relief Sought is Not Appropriate for a Temporary Restraining Order.

A TRO should not issue here because Plaintiffs are not making the type of request for which a TRO is appropriately sought. The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held. *See Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974) (noting that TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"); *see also Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (noting that "courts have recognized very few circumstances justifying the issuance of an ex parte TRO").

Here, Plaintiffs seek to alter – not preserve – the status quo. For example, Plaintiffs ask the Court to order ORR to apply an entirely new standard—found nowhere in the Agreement—for evaluating the propriety of releasing a class

18

member to a potential sponsor, and ask the Court to impose a seven-day deadline for release that is similarly unfounded. *See* Proposed Order at ¶ 4. Likewise, Plaintiffs seek to add requirements to Paragraph 24.C that are contained nowhere within the text of that provision, *id.* at ¶ 3, and Plaintiffs also ask the Court to order Defendants to take specific actions related to the custody of class members that are contained nowhere within the Agreement. *Id.* at ¶¶ 7-9. Plaintiffs finally seek coercive remedies such as monitoring by Special Master Andrea Ordin and Dr. Paul Wise, and reporting requirements that go beyond the monitoring provisions of the Agreement. *See id.* at ¶¶ 5, 7.

Plaintiffs moreover ask the Court to impose these substantial obligations on Defendants while Defendants have had less than twenty-four hours to review and respond to their allegations, and therefore are unable to obtain a full and fair adjudication of the claims before the Court. And, because Plaintiffs ask the Court to order coercive remedies, they are not entitled to relief unless they can establish to the Court's satisfaction that Defendants are in breach of the Agreement by clear and convincing evidence. *See Bailey v. Roob*, 567 F.3d 930, 934-35 (7th Cir. 2009) ("The parties agree that this circuit's case law requires the party seeking sanctions to demonstrate that the opposing party is in violation of a court order by clear and convincing evidence."); *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016) (discussing how court-ordered remedies designed to ensure compliance with a settlement agreement, and to cure breach, are properly considered under civil contempt standards). Where, as here, Plaintiffs have made only speculative allegations of possible violations of the Agreement, and have not in any way tied their allegations of breach to the relief they are seeking, the Court should not order remedies, much less the ones proposed that go far beyond the terms of the Agreement. And in any event, the Court should not find that Defendants are in

violation of the Agreement by clear and convincing evidence in the context of a TRO filing, where Defendants have shown their extensive efforts taken to implement CDC guidance in addressing COVID-19, and where Defendants are denied the ability to fully present their defense. Thus, for all of the above reasons, the Court should deny Plaintiffs' request for a TRO.

**B.      Plaintiffs do not Make the Requisite Showing for a Temporary Restraining Order**

### 1.  Plaintiffs are Unlikely to Prevail on the Merits

Should the Court consider the substance of Plaintiffs' TRO Motion, then it should nonetheless deny the motion because Plaintiffs have shown no likelihood of success on the merits. Likelihood of success on the merits is a threshold issue: "[W]hen 'a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three [elements].'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (*en banc*) (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)) (internal quotation marks omitted). Plaintiffs cannot succeed on the merits of their TRO Motion because neither of Plaintiffs' claims that Defendants are in breach of the Agreement has merit, nor do their claims support any finding of entitlement to the requested relief.

*a.  Plaintiffs have not established that Defendants violated any "right to prompt release" contained in the Agreement.*

Plaintiffs argue that Defendants are in violation of Paragraphs 14 and 18 of the Agreement, and as a remedy ask the Court to order Defendants to follow certain procedures that, for the most part, are not required by the Agreement. *See* TRO Motion at 16-21; Proposed Order at ¶¶ 1-6. Plaintiffs' claims should fail with regard to both ORR facilities and ICE FRCs.

20

ORR Claim: With regard to ORR facilities, Plaintiffs assert that ORR holds 1,193, or "nearly a third" of the class members in their custody in congregate care facilities for more than thirty days, and further opine that "ORR's data do not indicate why the agency failed to release these children, nor how many of these 1,193 have custodians available to care for them, yet the vast majority undoubtedly do." TRO Motion at 17. Plaintiffs then provide a list of assertions regarding ORR's practices in making release decisions that are nowhere in the Agreement, including: making a suitability decision "within any time certain;" providing class members or potential custodians an opportunity to inspect or rebut evidence relating to suitability, offering an adversarial court-like hearing process to challenge a suitability determination not yet reached; and requiring staff to issue formal denials of suitability determinations. *Id.* at 18. Citing evidence from the unrelated area of state dependency hearing, and without any operative evidence therefore, Plaintiffs next assert that, in fact, "[s]even days should be more than enough for ORR to manage post-release risk." *Id.* at 19. And Plaintiffs then summarily conclude that "[a]ny marginal gains to [sic.] that ORR may claim for child safety from their prolonged investigations of sponsors for more than 30 days cannot outweigh the harm congregate detention will inevitably cause to the health and safety of children in ORR . . . custody." *Id.*

Plaintiffs' argument is flawed on every level. First, Plaintiffs rely on the unsupported assumption that the "vast majority" of class members who are held in custody for over thirty days "undoubtedly" have sponsors to whom, Plaintiffs contend, they should be released. This presumption is entirely unsupported by any evidence and should be given no weight. ORR is motivated to promptly conduct sponsor vetting and reunite UAC with their sponsors promptly, but safely. Plaintiffs next appear to assert that Defendants are in breach of the Agreement

21

because they fail to provide the procedures contained in Plaintiffs' list. Yet Plaintiffs entirely fail to establish—or even argue—that their list of desired procedures is in any way required by the terms of the Agreement. Plaintiffs' arguments in this regard, as well as their request for the imposition of corresponding procedural remedies, simply rehash previous arguments made by Plaintiffs, and rejected by this Court, for the imposition of similar remedies based on similarly flawed allegations regarding "unnecessary delay" in the release of class members from ORR. *See* July 30 Order at 25-27. While ORR is working hard to ensure children in its legal custody are safe given the current crisis, nothing about the crisis draws this Court's July 30 ruling into question and the release procedures ORR employs are fully consistent with the *Flores* Agreement.

Finally, Plaintiffs' assertions that seven days "should be more than enough" for ORR to make release decisions, and that "marginal gains" to child safety from ORR's suitability analyses "cannot outweigh" the harm faced by class members in ORR custody, are speculative and entirely unsupported by the evidence. In fact, this Court has previously rejected Plaintiffs' claims that ORR's procedures for suitability analysis create unnecessary delay concluding that, "the Court cannot find on this evidentiary record that these measures *per se* 'unnecessarily delay' the release of Class Members. . . . In fact, they appear to be reasonably calculated to protect Class Members from 'harm or neglect' and to ensure that they have an adequate 'standard of care.'" ECF No. 470 (July 30, 2018) at 26 (citing Agreement at ¶¶ 11, 14, 17, 18). Even if Plaintiffs' request for a seven day limitation on ORR's release decisions was supported by any term of the Agreement, which it is not, Plaintiffs simply have not established that their allegations regarding risks inherent in congregate care from the COVID-19 pandemic—even if true—would in all cases, outweigh the risks inherent in forcing ORR to release class members

to unsuitable sponsors (including unrelated or distantly related applicants) who could not be properly vetted in the manner the Agreement provides and that Congress required in the TVPRA. Because Plaintiffs' argument is entirely without basis in the plain terms of the Agreement or the applicable facts, Plaintiffs' claim that ORR violates any class members' right to prompt release must fail.

ICE Claims: ICE likewise does not violate any right to prompt release held by any class member in an ICE FRC. Plaintiffs' claim is premised first and foremost on their assertions regarding the length of stay for class members in ICE FRC's. Plaintiffs assert that there were 3,359 class members detained in ICE FRCs based on the February 2020 monthly report. TRO Motion at 20. Plaintiffs also alleged that "about 1,861 class members in ICE custody appear to have been detained for three months or longer with no efforts made by Defendants to release them under the terms of the Agreement." *Id.* This, however, is a misreading of the monthly report. There were 1,607 unique cases for February 2020, but there are 3,359 lines of data in the report that represent the complete detention history of each unique case. This information is included in the data notes accompanying the monthly report. While Defendants have not had sufficient time to review the evidence to refute Plaintiffs' data assertions in this response, it is sufficient at this time to note that the fact that Plaintiffs' reading of this data is incorrect should be found to undermine their arguments on this point and counsel against issuing a TRO.

In any event, Plaintiffs' contention that ICE has made "no efforts to release" class members under the Agreement is unfounded, and ignores the nature of detention in an ICE FRC. In fact, ICE's decisions to release class members from ICE FRCs may be impacted by various factors, including the applicable detention authority, the status of any removal, credible fear, or reasonable fear proceedings,

judicial or administrative stays, and humanitarian factors. Plaintiffs' unsupported assertion that all class members in ICE FRC's are necessarily experiencing "unnecessary delay" is unsupported. Further, ICE's compliance with the "prompt release" provisions of the Agreement are currently subject to monitoring by the Special Master/Independent Monitor. See ECF No. 494, at 4. The Special Master/Independent Monitor has raised no concerns to ICE regarding its compliance with these provisions, nor have any such concerns been reported to the Court. To the extent that Plaintiffs believe that ICE is not in compliance with these provisions, they should be required to follow the "dispute resolution" provisions contained in the Court's Monitoring Order, ECF No. 494, at 20-21.

### b. Plaintiffs have not established that Defendants violated any "right to safe and sanitary conditions of detention" contained in the Agreement.

Plaintiffs seek to challenge the conditions of care, and specifically the medical care, being provided to minors at ICE FRCs and ORR grantee shelters. TRO Motion at 26-27. Plaintiffs' argument here boils down to one simple contention—that due to COVID-19, all congregate custody is inherently unhealthy and violates the Settlement Agreement. *Id.* Under Plaintiffs' theory, Defendants *de facto* violate the Agreement—regardless of the specific requirements concerning standards of care that are outlined in the Agreement— simply because class members are being held in congregate care facilities by ICE and ORR during the COVID-19 pandemic. Plaintiffs' argument disregards CDC guidance and state pandemic response instructions that provide standards of care for congregate care facilities but do not provide for or recommend shuttering them. More importantly, because Plaintiffs' argument ignores the plain terms of the

24

Agreement, and in fact is tied in no way to anything that is actually required by the Agreement, it is inherently flawed and should be rejected.'

Plaintiffs' argument further fails for several reasons. As an initial matter, while all ICE and ORR facilities holding children are being maintained in a safe and sanitary manner during this pandemic, Plaintiffs misstate the applicability of Paragraph 12A. TRO Motion at 26. That section of the Agreement requires that "*[f]ollowing arrest*, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." Agreement ¶ 12.A (emphasis added). By its plain terms, and read in conjunction with the other terms of the Agreement, Paragraph 12A is meant to apply to the initial custody immediately following arrest, and does not apply once a child is transferred to state-licensed facility maintained by ORR, or to Berks which is licensed by the State of Pennsylvania. Instead, different more detailed state standards apply to those facilities, and ICE also applies the applicable state licensing standards to the ICE FRCs in Texas even though the licensing itself has been held up by litigation.

Moreover, even if Paragraph 12A might be found to apply to ICE FRCs in Texas to the extent that they are not yet licensed, the fact is that the medical care in the Texas ICE FRCs is subject to State authorities and is designed to comply with States standards as well as with the more rigorous requirements of Exhibit 1, providing standards for licensed facilities and not the more general provisions of Paragraph 12A designed to address initial custody. The Court should not read the "safe and sanitary" requirement in Paragraph 12A to require more stringent conditions than the detailed provisions included in Paragraphs 6, as well as Exhibit 1, which is what the parties agreed to state-licensed facilities. And the Court should not countenance arguments that augment the stringent terms the parties

25

agreed to for licensed facilities in Paragraphs 6 and Exhibit 1, by relying on the general and unrelated language of "safe and sanitary."

In the context of U.S. Border Patrol facilities, the Ninth Circuit explained that "assuring 'safe and sanitary' conditions includes protecting children from developing short-or long-term illnesses as well as protecting them from accidental or intentional injury." *Flores v. Barr*, 934 F.3d 910, 916 n.6 (9th Cir. 2019). And, as previously explained, Exhibit 1 specifically envisions a custodial response to infectious disease. This provision, even if it applies, however, should not be read to mandate compulsory release of class members based on the existence of a pandemic to which "[n]o one has immunity." TRO Motion at 3. Rather, even if this provision applies, it should reasonably be read to mandate no more than that the government take appropriate steps to ensure a safe and sanitary environment that is appropriate in light of the exigent circumstances.

In other cases involving institutional custody, a Plaintiff "must show" that the precautions taken to prevent harm are "objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *see also Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001) ("Many Americans live under conditions of exposure to various contaminants. The [Constitution] does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans."). The institution is not charged with a guaranty of no injury; instead, the state is charged with taking reasonable steps to protect those in custody. *Cf. Steading v. Thompson*, 941 F.2d 498, 499 (7th Cir. 1991) ("neither negligence nor strict liability is the appropriate inquiry in prison-conditions cases."). Even the CDC has acknowledged this reality by providing specified guidance for detained settings. *See* Exhibit L. Here, the Agreement simply should not be read to impose liability for a violation of this

26

provision on Defendants where even the limited evidence Defendants have been able to provide during this short response period plainly shows that Defendants have taken extensive, good faith efforts to provide a safe and sanitary environment in the face of the COVID-19 pandemic.

In any event, the applicable sections of the Agreement here are Paragraphs 6 and 19, which require Defendants to place class members in state-licensed facilities that comply with both state health and safety standards and the minimum standards listed in Exhibit 1 to the Settlement. In its July 30, 2018 order, the Court made clear that Exhibit 1 requires medical care that complies with applicable state laws. *See* ECF No. 470 July 30 Order at 3, n.5. Plaintiffs make no claim that the medical care being provided in ORR facilities or ICE FRCs does not comply with Exhibit 1 of the *Flores* Agreement. Plaintiffs also have not demonstrated that Defendants are not complying with state health and safety standards or with any of the items specifically enumerated in Exhibit 1.

In addressing the government's COVID-19 guidelines that are in place, Plaintiffs seek to suggest that the measures taken by Defendants "fall far below federal, state, and local mandates to reduce the spread of COVID-19," highlighting states' general "shelter in place" orders, as well as protocols for homeless shelters and prisons. Yet, Plaintiffs do not cite any state guidance requiring congregate care facilities to release all children in care, nor could they. *See* e.g., https://www.cdss.ca.gov/Portals/9/CCLD/PINs/2020/CRP/PIN-20-02-CRP.pdf (recommendations for child residential centers in California). And in fact, Plaintiffs' reliance on generalized "shelter in place" guidance is misplaced. Rather, on March 23, 2020, the CDC published interim guidance for the management of COVID-19 in correctional or detention facilities. According to the CDC, '[t]his document is intended to provide guiding principles for healthcare and

non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities." *See* Exhibit L. Plaintiffs' failure to rely on the applicable guidance in assessing Defendants' guidelines seriously undermines the reliability of their assertions regarding those guidelines.

Ultimately, Plaintiffs are arguing that the standards of medical care they negotiated for, and agreed to, are insufficient. Plaintiffs' argument boils down to a contention that the government can never meet the requirements of the Settlement during the global pandemic and therefore all class members must be released. But even state law standards and CDC guidance do not provide for closing institutional custody facilities – they provide heightened care regimes that ORR and ICE are aggressively implementing.  Plaintiffs request therefore not only has no basis in the agreement, it has no basis in the guidance of health officials. Plaintiffs cannot ask this Court to read new requirements into the four corners of the Agreement simply because the COVID-19 pandemic raises new and unique challenges for Defendants.

In fact, Defendants have risen to these new and unique challenges in ways that go above and beyond anything that is required or anticipated by the terms of the Agreement and that serve to implement CDC and state law guidance. ORR has taken extensive measures to address the risks that COVID-19 could present to the UACs in its case. ORR has implemented a number of heightened safety precautions to ensure minors in its custody are not exposed to COVID-19 and that should those precautions not succeed, minors would receive the proper medical

care. To prevent infection, ORR guidance to its network of care providers requires any UAC exhibiting symptoms consistent with COVID-19, such as coughing, fever, or difficulty breathing, at any point during their time in ORR care, to be immediately isolated and referred for evaluation by a licensed medical provider, in consultation with the local health authority. Sualog Decl., Defs' Ex. A ¶¶ 18-22.  Temperature checks are taken twice a day for UACs in care, with temperatures over 100 degrees requiring elevation to ORR, and visitors may not enter shelters who exhibit any of the above symptoms. *Id.* ¶¶ 18, 22. Further, if a UAC is recommended for testing by the health care provider or public health department, the UAC will receive testing. *Id.* ¶ 23. ORR has also initiated telehealth capabilities in California and New York to ensure care provider facilities are able to provide UAC with access to medical care without having to leave their facilities. *Id.* ¶ 34.  And for the rare cases where a UAC becomes infected with COVID-19, like the four children at the one NY shelter above, full medical quarantine is available for the other children in care, and the child is guaranteed to receive appropriate medical treatment. *Id.* ¶¶ 23-28; ORR Guide § 3.4.6.

ORR maintains rigorous protocols for handling infectious diseases for children in care, including mandatory staff training requirements, quarantine capabilities across ORR's network of care providers that suitable for housing children, hygiene education, and medical screenings. *See* ORR Guide § 3.4.6. To further ensure the safety of children in care, ORR has also issued extensive field guidance on the COVID-19 pandemic to its care provider network on March 2, March 13, March 19, March 20, and March 23, which implement important safety measures such as mandatory temperature checks for children and visitors; placement and travel restrictions to and from at-risk facilities; and heightened medical care.  See Exhibits R-W.  These guidelines are consistent with state child

welfare agencies who have children in congregate care, including New York and California, two epicenters of the COVID-19 pandemic.

Although ICE has reported no cases of COVID-19 among residents or staff at any of its three FRCs, *see* Decl. of Johnson, Defs' Ex. M, ¶ 11, in an abundance of caution, both Karnes and Dilley are proactively reviewing cases involving pregnant females, adults over 50, and other individuals identified by medical professional as high-risk to determine whether discretionary release is a viable option. *Id*. ¶ 12. Additionally, staff at Karnes and Dilley are employing extra screening measures during intake of new residents, including temperature checks, soliciting information on all travel patterns, and answering additional medical questions before giving approval to enter the facilities. *Id*. at ¶ 23. Meanwhile, Berks has suspended all intake of new residents. *Id*. ¶ 13.

Additionally, each FRC is implementing new protocols and procedures in accordance with CDC guidance, designed to limit the potential transmission of COVID-19 within the facilities. These procedures include the types of things Plaintiffs are asking for, such as increasing the availability of hand sanitizers and soap and the addition of new sanitizing stations and/or increased oversight over the maintenance of sanitizing stations throughout the FRCs, including those available for residents to use in the medical areas and dining facilities. *Id.* ¶¶ 16, 27. ICE is also conducting deep cleaning and increasing the frequency of cleaning in common areas where residents congregate. *Id.* ¶¶ 18, 28. FRC staff frequently cleans and disinfects "high-touch" surfaces such as tables, door handles, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, sinks, and seats in waiting areas. *Id*. The school and educational programs at each FRC have been suspended in accordance with applicable orders from the Governors of Pennsylvania and Texas. Defs' Ex. M., ¶¶ 19, 24.

To maximize "social distancing" and reduce the risk of exposure as much as possible, ICE is encouraging residents to stay in their family's housing areas and limiting gatherings to small groups in the common areas. *Id.* ¶ 21. At Dilley, meal times are being staggered between neighborhoods and in small groups in order to promote social distancing within the dining facility. *Id*. ¶ 20. At Karnes, ICE is immediately implementing "satellite feeding," meaning that hot meals will be provided to residents in their assigned suites three times per day. *Id*. At Berks, food service will be staggered for residents and lengthened in duration, as needed, and seating in the dining hall modified to provide assigned seating for families with more space between individuals. *Id*. ¶ 29. Additionally, ICE has temporarily suspended social visitation for families and friends at all three FRCs. *Id*. ¶¶ 21, 24. In-person visits for legal service providers have been suspended at Berks, *Id*. ¶ 24, and while attorneys and legal representatives currently are permitted to visit Karnes and Dilley, ICE is working with local pro bono attorneys to coordinate telephonic legal visitation and other forms of non-contact legal presentation, with tablets and video conferencing being utilized at both facilities. *Id*. ¶ 22.

### c. The Court should not order the other remedies requested by Plaintiffs.

Much of the relief request by Plaintiffs is divorced from the arguments raised in the TRO. In addition to the reasons provided above why Plaintiffs' TRO should be denied, the Court should further consider the following specific errors and concerns that should preclude the entry of Plaintiffs' requested relief:

Proposed Order ¶ 1 – As an initial matter, it is unclear what, if any, relationship this proposed remedy has to concerns related to the COVID-19 pandemic. In any event, Paragraphs 21 and 22 of the Agreement concern decisions to place a class member into a secure facility. It is unclear how Plaintiffs'

requested procedures relate to, or are required by, Paragraphs 14 or 18, or how they are otherwise related to any alleged breach of the Agreement. In any event, to the extent Plaintiffs appear to be contending that this remedy is required by the Court's June 27, 2017 order, ECF No. 363, that order is subject to the provisions of the Court's Monitoring Order, ECF No. 494, and thus this request should be resolved under the provisions of that order.

Proposed Order ¶ 2 – As an initial matter, it is unclear what, if any, relationship this proposed remedy has to concerns related to the COVID-19 pandemic. In any event, this proposed relief is squarely covered by the Court's June 27, 2017 order, ECF No. 363, and subject to the provisions of the Court's Monitoring Order, ECF No. 494. Thus, this request should be resolved under the provisions of that order.

Proposed Order ¶ 3 – As an initial matter, it is unclear what, if any, relationship this proposed remedy has to concerns related to the COVID-19 pandemic. In any event, this proposed relief misstates the requirements of Paragraph 24.C. Paragraph 24C does not require notice of Defendants' determination of why a class member "cannot be released without unnecessary delay.". It requires a notice of the reasons for housing a minor in a medium-secure or secure facility. ORR complies by providing each UAC placed in a staff-secure or secure facility with a Notice of Placement. *See* § 1.4.2 of Children Entering the United States Unaccompanied (herein "ORR Policy Guide"), available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.3.  This relief is, in fact, not required by any provision of the Agreement, and seeks to impose procedural remedies beyond the plain terms of the Agreement.

Proposed Order ¶ 4 – This proposed relief is not required by the Agreement, and is not consistent with the Agreement which allows ORR to determine the suitability of any custodian before a class member is released so long as the determination of suitability does not cause "unnecessary delay." *See* Agreement ¶¶ 14, 17. Instead, this proposed relief creates an entirely new standard for the release of class members that is based only on Plaintiffs' speculative assertions that such a standard would be preferable, but is not based in any way on the terms of the Agreement. Moreover, this relief would violate the TVPRA, which prohibits the release of unaccompanied alien children from ORR custody absent a determination of suitability for the sponsor to whom the child is being released. *See* 8 U.S.C. § 1232(c)(3)(A). Instead of the TVPRA and a typical child welfare process, Plaintiffs seek to reverse the suitability assessment. Rather than the applicant demonstrating suitability, they suggest that ORR should demonstrate non-suitability. Finally, to the extent Plaintiffs are contending that such relief is required by the Court's June 27, 2017 order—a contention that is not correct—this request should be resolved under the provisions of the Court's Monitoring Order, ECF No. 494.

Proposed Order ¶ 5 – This proposed relief creates a seven-day timeline for release that is found nowhere in the Agreement. Moreover, it seeks to impose coercive remedies of monitoring and reporting that are not contained in the Agreement, and that are not based on any establishment of breach by Defendants by clear and convincing evidence. Moreover, the request relief would be unduly burdensome on ORR. Plaintiffs request reporting on a long list of information beyond the information the Settlement Agreement currently requires.

Proposed Order ¶ 6 – This proposed relief is entirely unfounded because even to the extent it is consistent with Paragraph 27 of the Agreement, Plaintiffs

have not shown or argued that Defendants are violating the requirements of the Paragraph, and thus no relief is warranted. Notably, this Court denied a previous motion by Plaintiffs to enforce this provision. *See* ECF No. 363 (June 27, 2017 Order) at 32. In any event, the relief request mimics actions ORR already takes. *See* ORR Policy Guide at § 1.4  ("Once the Federal Field Specialist approves a transfer request, the referring and receiving care providers coordinate logistics, including the transfer date (generally within 3 days). The referring care provider notifies all designated stakeholders of the transfer (for example, the child's attorney").

Proposed Order ¶¶ 7-9 – The proposed relief in these paragraphs seeks to impose coercive remedies of monitoring and reporting that are not contained in the Agreement, and that are not based on any establishment of breach by Defendants by clear and convincing evidence. Instead, as Defendants have shown, ORR and ICE are taking comprehensive actions to implement CDC and state guidance on protecting individuals from COVID-19.  Moreover, the Ninth Circuit has held that the Agreement should not be interpreted "to provide release rights to adults." *Flores v. Lynch*, 828 F.3d 898, 908 (9th Cir. 2016) ("The Settlement does not explicitly provide any rights to adults.").

Through these paragraphs, Plaintiffs ask this Court to impose, on an expedited basis, extensive specific care requirements despite the fact that they have established no breach of the terms of the Agreement related to conditions of confinement, and despite the fact that the relief they seek here is untethered to any specific term of the Agreement. This Court should not substantially alter the terms of the Agreement to which the parties agreed simply based on Plaintiffs' disagreements with the manner in which Defendants are responding to the COVID-19 pandemic.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 2. **Plaintiffs have not Shown Irreparable Harm**

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Conclusory or speculative allegations are not enough to establish a likelihood of irreparable harm. *Herb Reed Enters., LLC v. Florida Entm't Mgmt.*, Inc., 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (finding irreparable harm not established by statements that "are conclusory and without sufficient support in facts").

Plaintiffs allege that only release from government custody into the public will spare them the heightened risk of adverse consequences from COVID-19. However, Plaintiffs alleged harm—that their custodial status increases their risk of COVID-19—is entirely speculative. *See also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").Plaintiffs' claims of future injury are hypothetical, and Plaintiffs are not entitled to immediate release from custody based on a conjectural injury that they have not suffered and may never suffer. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (finding standing based on fear, even one that is reasonable, "improperly waters down the fundamental requirements of Article

35

III."). Accordingly, Plaintiffs have not met their burden to show that they will suffer irreparable harm in the absence of preliminary relief.

### 3.   The Balance of Harms and Public Interest Favor Respondents

It is well-settled that the public interest in enforcement of United States immigration laws is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law." (internal marks omitted)).

Defendants disagree with Plaintiffs' assertion that there is "[n]o purported government interest" in detention of those who disregard immigration laws or that Defendants and the public would not suffer "any identifiable hardship" from an order that Defendants cannot house any child without lawful immigration status. TRO Motion at 23. Defendants have a legitimate need to maintain an orderly immigration process, and an order prohibiting the custody of UACs and accompanied alien minors would encourage child smuggling and trafficking. Moreover, even as to minors already in custody, such an indiscriminate order would be obviously disruptive to the orderly administration of facilities nationwide. *Bell v. Wolfish*, 441 U.S. 520, 540 (1979) ("The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained."); *see also* Cohn Decl., Ex. K at ¶¶ 20-23 (opining ORR's current COVID-19 procedures are consistent with CDC guidance and in some

respects exceed them; that expedited release would likely increase risk of exposure to COVID-19; and that "although there is a risk of cases of COVID-19 in a UAC facility among UAC or staff, with all of the protective measures ORR has implemented and the current space available in facilities to manage ill UAC, based on currently available information the overall risk to UAC is lower in the facilities than traveling and placing children in home environments in some locations in the U.S. at this time."). *See* Sualog Decl., Ex. A at ¶¶ 42-51 (serious concerns regarding peremptory release, and the widespread community transmission of COVID-19; as well the request to jettison core safeguards for UAC and mass release to applicant sponsors still undergoing vetting).

Plaintiffs essentially ask the Court to abrogate many of the plain terms of the Agreement, and to declare *any* congregate custody of class members a violation of the Agreement because of the COVID-19 pandemic. Such a result would upend the parties' agreements, create significant confusion as to the procedures that ORR and ICE are required to follow in caring for class members during this crisis, and potentially put class members at risk for other harms. The disruptive effect of such an order would go beyond the COVID-19 pandemic. This danger of attendant harm is too great to be permissible at this preliminary stage.

Because Plaintiffs cannot show that the balance of hardships and public interest tips in their favor, the Court should deny Plaintiffs' request for preliminary relief.

## C. The Court should afford little or no weight to Plaintiffs' declarations.

The Court should afford little or no weight to Plaintiffs' declarations because are supported solely by inadmissible evidence, which casts doubt on their reliability. Courts have discretion to give inadmissible evidence "some weight" in ruling on the merits of an application for temporary restraining order or

preliminary injunction, when doing so would prevent irreparable harm before trial. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). Thus, the standard is not that a district court *must* consider hearsay or otherwise inadmissible evidence in deciding to issue the emergency relief, but rather, a district court *may*, in its discretion, accept hearsay and otherwise inadmissible evidence when considering whether to issue emergency relief. *See*, *e.g.*, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction"). Ultimately, the issue is what weight the Court should afford to the otherwise inadmissible evidence. *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 356 n.4 (C.D. Cal. 1982) ("The weight to be accorded such evidence is a matter for the Court's discretion."); *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015).

The Court should give the evidence in Plaintiffs' declarations little or no weight, because the declarations are significantly lacking in any foundational support on which the Court could find that Plaintiffs are entitled to the requested relief. The declarations are not based on personal knowledge of the current conditions of the family residential units, and the physicians' declarations lack a sufficient factual basis for their opinions. Because these declarations lack indicia of reliability, they merit little, if any, weight.

### 1. **The Court should afford little to no weight to assertions that lack personal knowledge of the current conditions of the facilities.**

None of the declarants has personal knowledge of the *current* conditions and COVID-19 precautions within ORR or ICE facilities, which dilutes the evidentiary weight of their declarations. Rule 602 mandates that "[a] witness may

38

testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Statements in declarations are generally inadmissible unless the declaration itself affirmatively demonstrates that the declarant has personal knowledge of those facts. *See Los Angeles Times Communications LLC v. Dept. of the Army*, 442 F. Supp. 2d 880, 886 (C.D. Cal. 2006) ("Generally, Rule 602 requires that a witness' testimony be based on events perceived by the witness through one of the five senses."); *X17 v. Lavandeira*, No. CV0607608-VBF, 2007 WL 790061, at *3 (C.D. Cal. Mar. 8, 2007) (finding that the declarations submitted on a motion for preliminary injunction were inadmissible because they lacked personal knowledge).

Here, the declarations by counsel are not reliable to assess the current conditions of the ORR and ICE facilities because they are based on counsels' observations of the facilities from previous weeks. Because the nation's response is fluid and constantly changing, and given the rapidly evolving response of state governors to COVID-19, a declaration based on observations from one or two weeks ago does not represent the current COVID-19 precautions that ICE or ORR is taking. The declarations provided by counsel, physicians, and class members are based on observations from, at the latest, last week. *See* ECF 733-10, ¶ 8 (Declaration of Attorney Bridgett Cambria) (although it is unclear when Ms. Cambria last visited the facility, it was sometime before March 20, 2020, when Pennsylvania ended in-person visitation); ECF 733-12 (Declaration of Andrea Meza), ¶ 7 (conceding that she has never been permitted to visit the living areas and, instead, basing her assertions on "reports" of observations by unknown staff on March 20, 2020). Much has transpired during the past two weeks to combat the spread of COVID-19 in the states, nationwide, as well as at ICE and ORR in terms of, among other things, knowledge about and proper precautions to combat the

39

spread of COVID-19. *See* Declaration of Tae Johnson, Defs' Ex. M. Thus, the attorneys' reports of observations from at least seven days ago is not a reliable indicator of current conditions in the immigration facilities.

Likewise, to compensate for their lack of personal knowledge, most of the declarations rely on inadmissible hearsay in their assertions regarding current facility conditions. Out-of-court statements offered to prove the truth of the matter asserted constitute hearsay. Fed. R. Evid. 801. Hearsay is "a statement that, (1) the declarant does not make while testifying at the current trial or hearing and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Even when the Federal Rules of Evidence are relaxed in a particular proceeding, declarations that are "recounted by memory" after speaking with the declarants lack "any indicia of reliability." *Charlebois v. Angels Baseball, LP*, No. SACV 10-0853 DOC ANX, 2011 WL 2610122, at *8 (C.D. Cal. June 30, 2011) (declining to consider any evidence that "comes by way of an unsigned declaration or of a recollection of counsel or its staff" because such evidence constituted "unreliable, hearsay-based declarations."). Absent a showing that "the consideration of hearsay evidence is warranted," such as "the difficulty of obtaining affidavits from persons who would be competent to testify at trial," courts prohibit hearsay evidence, even in the emergency-relief context. *X17, Inc. v. Lavandeira*, No. CV06-7608-VBF(JCX), 2007 WL 790061, at *3 (C.D. Cal. Mar. 8, 2007).

Here, this Court should afford assertions based on inadmissible hearsay little to no weight because they lack indicia of reliability—especially because they involve unknown declarants who have a stake in this litigation. For example, Shalyn Fluharty bases most of her declaration on what unnamed, unknown "mothers" "report" and on "surveys" of parents and children. *See generally* ECF

733-11. We do not know who the declarants in the surveys are, nor what the survey questions were asking. Likewise, Ms. Cambria extensively relies on statements made by "detainees," and "many families." *See, generally*, 733-10. Also, Attorney James Owen states that he has been "advised" about the reasons for not releasing a minor, but does not state where he obtained this information. ECF 733-13, ¶ 9. Because the declarations are based on hearsay statements of unnamed, unknown individuals, such anecdotal evidence lack indicia of reliability and consideration of such evidence is not warranted.

However, perhaps the greatest indicator of the declarants' inherent unreliability is Attorney Peter Schey's declaration that is use to support Plaintiffs' assertions regarding ORR facilities Attorney Schey bases his testimony on assertions that he has "visited or coordinated numerous ORR, ICE and CBP facility site visits…most recently this year on March 5, 6 and 9, in Los Angeles and San Diego…" ECF 733-2, ¶ 5. But ORR records do not show that Mr. Schey was present at any of the visits on March 5, 6 or 9. Therefore, even if Mr. Schey coordinated or arranged the visits, he has no personal knowledge of the current conditions of the ORR shelters, and no declarant appears to have recently visited an ORR-funded care provider. Considering the declarants' general lack of personal knowledge about the present conditions of ICE and ORR facilities, this Court should not afford the declarations regarding COVID-19 precautions much or any weight.

### 2. Expert opinions regarding the medical care currently available in ORR and ICE facilities should receive little to no weight.

Like the declarant attorneys, the declarant physicians lack a sufficient factual basis about the current conditions of the ORR and ICE facilities, and therefore any specialized opinions about the facilities' conditions hold little

41

weight. Opinions based on scientific, technical, or specialized knowledge are governed by Rule 702. Rule 702 provides that a qualified witness may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if:

> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case.

Importantly, Rule 702 requires the trial judge to ensure that expert opinions are not only relevant, but also reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). To be reliable, the underlying facts or data upon which an expert relies must be reliable; when an expert does not cite factual support for their opinion, it lacks indicia of reliability. *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985 ABC (EX), 2003 WL 27366247, at *3 (C.D. Cal. Feb. 24, 2003) (finding the expert testimony unreliable because it amounted to "conclusory opinions lacking any factual basis."). When an expert relies on facts and data that predate the issue before the court, the opinion is unreliable. *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016) (holding that the expert's calculations were unreliable because they examined data for the five years *preceding* the challenged action.).

Here, the declarant physicians' opinions are not based on sufficient facts or data because they either fail to state where they obtained their knowledge of the facilities conditions, or base their opinions on their experiences at immigration facilities from previous months or years—well before COVID-19. For example, most of Dr. Peeler's factual statements, in fact, lack any citation to support; it is unclear from where she obtained her information, making her opinions about

facility conditions inherently unreliable. *See generally* 733-3; *Northrop Grumman Corp.*, 2003 WL 27366247, at *3. Likewise, although Dr. Wang bases her opinion on her personal observations at immigration facilities, her last observation at a non-influx ORR shelter was in July 2018, almost two years before the outbreak of COVID-19. ECF 733-7, ¶ 4. Thus, her opinions based on conditions preceding the COVID-19 outbreak are not indicative of the current conditions given the rapidly evolving situation. *ThermoLife Int'l*, 648 F. App'x at 614. And the physicians' letter to Congress (ECF 733-9) is an unsworn statement, thereby lacking indicia of reliability. *Northrop Grumman Corp.*, 2003 WL 27366247, at *3. Because the physicians' declarations do not rely on sufficient facts and data, this Court should afford them little to no weight.[3]

## V.   **CONCLUSION**

Because Plaintiffs cannot satisfy the requirements for preliminary relief, Defendants respectfully request the Court deny Plaintiffs' Motion for a Temporary Restraining Order.

---

[3] Defendants also recommend that reliance on the "largest study of pediatric COVID-19 patients" for an affirmative temporary restraining order is inappropriate on an expedited basis, without further review of the evidence. For example, the large study does not appear to say what Plaintiffs suggest about statistics (ECF 733-1 at 15). *Epidemiological characteristics of 2143 pediatric patients with 2019 coronavirus disease in China*, Pediatrics, 2020, https://pediatrics.aappublications.org/content/pediatrics/early/2020/03/16/peds.2020-0702.full.pdf. Commentary on such article suggests further investigation may be warranted. Cruz A, Zeichner S, *COVID-19 in children: initial characterization of the pediatric disease*, Pediatrics, 2020, https://pediatrics.aappublications.org/content/pediatrics/early/2020/03/16/peds.2020-0834.full.pdf.

DATED: March 27, 2020

JOSEPH H. HUNT
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Nicole N. Murley*
NICOLE N. MURLEY
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants*

44

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2020, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Nicole N. Murley*
NICOLE N. MURLEY
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants