# DEFENDANTS'

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R., *et al.*,

    Plaintiffs,

v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

    Defendants.

Case No.: 2:18-CV-5741 DMG (PLAx)

District Judge Dolly M. Gee

## DECLARATION OF JALLYN SUALOG, DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT

I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1. I am the Deputy Director of the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

2. I have held the position of Deputy Director since June 2018. I was previously the Director of Children's Services from September 2013 through June 2018. I have worked at ORR since February 2007. I have a Master's of Arts in Clinical Psychology. Before joining ORR, I worked as a mental health professional and managed the child welfare and social services programs for Hawaii's largest non-profit organization.

3. As the Deputy Director of ORR, I have responsibility for the oversight of the Unaccompanied Alien Children ("UAC") program, including all aspects of operations, planning and logistics, medical services, and monitoring. My job duties include the formulation and implementation of ORR's response to COVID-19 across its network of grantee care-provider facilities.

4. My testimony in this declaration is based upon my personal knowledge of ORR's response to COVID-19, information obtained from records and systems maintained by ORR in the regular course of performing my job duties, and CDC guidance documents regarding COVID-19, which I obtained from the CDC's official website and reviewed in connection with the performance of my duties.

5. I am testifying in this declaration to the best of my knowledge, and understand that this declaration is for use in the *Lucas R.* case.

1

*Background*

6. ORR is the agency charged with the care and custody of UAC pursuant to 8 U.S.C. § 1232(c) and other provisions. As such, ORR is committed to providing for the safety and well-being of all UAC in its care, as well as protecting the health and safety of the communities in which these children live—including from the risk of COVID-19.

7. To carry out its mission, ORR relies on a network of grantee care-provider facilities located across the country. There are a total of 107 facilities in the ORR grantee care-provider network that house UAC in a congregate setting: 98 shelters, 6 staff secure facilities, 1 secure facility, and 2 residential treatment centers ("RTCs").

8. Although each care-provider facility is unique in terms of its physical layout and capabilities, the ORR Guide generally defines a shelter as "a residential care provider facility in which all of the programmatic components are administered on-site, in the least restrictive environment."[1]

9. A staff secure facility is generally defined as "a facility that maintains stricter security measures, such as higher staff to unaccompanied alien children ratio for supervision, than a shelter in order to control disruptive behavior and to prevent escape. A staff secure facility is for unaccompanied alien children who may require close supervision but do not need placement in a secure facility. Service provision is tailored to address an unaccompanied alien child's individual needs and to manage the behaviors that necessitated the child's placement into this more restrictive setting. The staff secure atmosphere reflects a more shelter, home-like setting rather than secure detention. Unlike many secure care providers, a staff secure care provider is not equipped internally with multiple locked pods or cell units."[2]

10. A secure facility is generally defined as "a facility with a physically secure structure and staff able to control violent behavior. ORR uses a secure facility as the most restrictive placement option for an unaccompanied alien child who poses a danger to self or others or has been charged with having committed a criminal offense. A secure facility may be a licensed detention center or a highly structured therapeutic facility."[3]

11. An RTC is generally defined as "a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through

---

[1] ORR, Children Entering the United States Unaccompanied: Guide to Terms (Mar. 21, 2016), "Shelter care," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Shelter Care.

[2] *Id.*, "Staff secure care," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Staff Secure Care.

[3] *Id.*, "Secure care," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Secure Care.

2

non-coercive, coordinated, individualized care, specialized services and interventions. Residential treatment centers provide highly customized care and services to individuals following either a community based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. ORR uses a RTC at the recommendation of a psychiatrist or psychologist or with ORR Treatment Authorization Request (TAR) approval for an unaccompanied alien child who poses a danger to self or others and does not require inpatient hospitalization."[4]

12. As of March 25, 2020, there are a total of 3,374 UAC in ORR care. This includes 439 UAC in long-term foster care and 374 UAC in transitional foster care, which are not congregate settings. For congregate settings only, there are 2,505 UAC in shelter facilities, 28 in staff secure facilities, 12 in secure facilities, and 16 in RTCs.

13. Currently, ORR's care-provider facilities are operating significantly below their maximum capacity and historical highs. For example, at this time last year (March of 2019), ORR was receiving approximately 8,000 monthly referrals and had almost 12,000 minors in care with an 87% occupancy rate (including influx and variance beds). In contrast, February referrals from 2020 were approximately 2,000 per month with approximately 3,600 minors in care, and a 28% occupancy rate (including influx and variance beds). As a result, ORR currently has additional capacity and more opportunity to ensure social distancing and isolation within the care provider network.

14. In addition, CDC recently issued an order under Public Health authorities suspending introduction of certain persons into the United States.[5] As a result, for the near-term, ORR is likely to have sufficient capacity to continue to implement necessary social distancing and/or isolation.

*ORR Infection Control Measures in Care Provider Facilities*

15. ORR has significant historical experience with the identification, mitigation, and treatment of contagious diseases affecting UAC, including seasonal influenza (flu), mumps (parotitis), chicken pox (varicella), and tuberculosis. Accordingly, ORR has policies pertaining to infectious disease control that predate the COVID-19 pandemic.

16. ORR's general, long-standing policies concerning the management of communicable disease require the routine assessment of travel history when a child arrives at a care-provider program; medical screenings and vaccinations within 48 hours of arriving at ORR shelters; ability to isolate or

---

[4] *Id.*, "Residential Treatment Center (RTC)," available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Residential Treatment Center.

[5] CDC Order Under Sections 362 and 365 of the Public Health Service Act (42 U.S.C. §§ 265, 268), available at https://www.cdc.gov/quarantine/order-suspending-introduction-certain-persons.html.

3

quarantine individuals for the purpose of infectious disease control; hand hygiene and respiratory etiquette education efforts; and established communicable disease reporting to the local health authority.[6]

17. Since the first reports of COVID-19 in the U.S., ORR has monitored the public health reporting on COVID-19 in the jurisdictions in which grantee care-provider facilities operate. ORR has provided regular updates to grantee care-provider facilities on infection prevention and control, and issued guidance regarding the screening and management of UAC, facility personnel, and visitors who have potentially been exposed to COVID-19. All of these measures are rooted in CDC guidance.[7]

18. To prevent those who may have been exposed to, or who may be infected with COVID-19 from entering ORR facilities, ORR has mandated that all visitors and staff seeking to enter any grantee care-provider facility answer COVID-19 screening questions and submit to a mandatory temperature check. With the exception of UAC who are being processed for admission, grantee care-provider facilities are required to deny access to anyone with a fever of 100°F or above; or who exhibits signs of symptoms of an acute respiratory infection, such as a cough or shortness of breath; or who has had contact with someone with a confirmed diagnosis of COVID-19 in the previous 14 days; or who has been tested for COVID-19 and is awaiting test results; or who, in the previous 14 days, has traveled to a country identified by the CDC as having widespread, sustained community transmission of COVID-19.

19. In addition, UAC entering ORR care are screened for COVID-19 exposure or symptoms during their initial medical examination ("IME"), which has been expanded to include a COVID-19 health screening protocol consistent with CDC COVID-19 guidelines.

20. UAC at risk of COVID-19 exposure based on reported travel history, but without symptoms, are quarantined and monitored for 14 days. UAC who exhibit COVID-19 symptoms during their IME are isolated and tested in consultation with the local health authority.

21. ORR has also instituted a rigorous symptom-monitoring regime to ensure that any UAC in any facility who begins exhibiting potential symptoms of COVID-19 after their IME is immediately identified and appropriately isolated in consultation with the local health authority.

22. Since March 19, 2020, ORR has required each grantee care-provider facility to monitor the temperature of every UAC in care. UACs' temperatures are taken twice daily, once in the morning and again in the evening, and are recorded in a master census temperature report that each facility is required to maintain. If any UAC is found to have a temperature above 100°F, the grantee care-provider is required

---

[6] *See* ORR Policy Guide § 3.4.6 Management of Communicable Diseases, § 3.4.7 Maintaining Health Care Records and Confidentiality, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-3.

[7] CDC, Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases, https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html.

to immediately alert ORR. The grantee care-provider is required to alert ORR each day that any child has a temperature over 100°F. So for example, if a UAC has a 101°F fever for three days, ORR will be alerted of this fact every day for the duration of the child's fever. Early identification of potential COVID-19 cases allows for early introduction of appropriate public health measures.

23. Any UAC exhibiting symptoms consistent with COVID-19, such as coughing, fever, or difficulty breathing, at any point during their time in ORR care are to be immediately isolated and referred for evaluation by a licensed medical provider, in consultation with the local health authority. If a UAC is recommended for testing by the healthcare provider or public health department, the UAC will receive testing.

24. The same isolation procedures are used for any UAC determined to be at risk for COVID-19 exposure or infection, whether based on information collected during the IME, or through subsequent monitoring. The affected UAC will be provided with a private room, with a closed door and bathroom access, preferably a private bathroom that is not used by other staff or UAC. State and local health departments, along with ORR's Division of Health for Unaccompanied Children ("DHUC") are immediately notified and consulted for additional guidance on risk assessment, symptom monitoring, and isolation or quarantine.

25. Facility personnel who enter an occupied isolation room are required to wear personal protective equipment, including an N95 respirator and goggles or a face shield, per CDC guidelines.

26. If a UAC in isolation needs to leave the isolation room for any reason (e.g., to attend a medical appointment, etc.), the UAC must wear a surgical mask for the duration of their time outside the isolation room.

27. If a UAC must be transported to a health clinic or other off-site location, the facility must notify the local health department for guidance on proper precautions during transport. The facility is also required to alert the intended destination so that proper infection control measures may be implemented prior to the UAC's arrival.

28. UAC are required to remain in isolation until cleared by the local health department or DHUC. During this time in isolation, UAC receive the same services as their non-isolated peers in the same facility, although services—particularly education services—may be adjusted to accommodate proper infection-control procedures.

29. Any room, object, or vehicle used by a UAC in isolation is thoroughly sanitized afterwards.[8]

---

[8] *See* CDC, Disinfecting Your Facility if Someone is Sick, https://www.cdc.gov/coronavirus/2019-ncov/prepare/disinfecting-building-facility.html.

30. To assess whether each grantee care-provider facility has appropriate stores of personal protective equipment ("PPE") to safely respond in the event COVID-19 is detected within their facility, on March 13, 2020, ORR inventoried all care providers for their current levels of PPE (e.g., surgical masks and gowns, face shields, N95 respirators) and cleaning/disinfecting supplies, as well as the number of staff who are involved in cleaning and maintenance activities. Any facility that encounters difficulty maintaining adequate levels of COVID-19 related supplies may request additional stores from FEMA, and ORR may assist in facilitating any such requests.

31. Program staff will provide an affected UAC with notice of the isolation requirement and address questions or concerns the child may have about medical isolation, as well as potential delays to anticipated transfers or discharge plans. In order to protect the health of UAC and the local community, *UAC cannot be transferred either to another facility or released to a sponsor until cleared by local health authorities and DHUC*.

*ORR Suspensions of Placements and Releases*

32. Beginning on March 9, 2020, ORR stopped placements of UAC on a rolling basis in the states of California, New York, and Washington due to the ongoing outbreaks of COVID-19 among the general public in those states. ORR is continually monitoring the jurisdictions in which its grantee care-provider facilities operate to determine whether the conditions in the community surrounding the facility warrant the suspension of placements due to concerns related to COVID-19.

33. In addition, ORR is prioritizing local placements for all new referrals from DHS in order to limit the need for UAC to travel on commercial airliners, which poses a risk of exposing passengers (including UAC) to COVID-19. Care providers may still use air travel to reunify a UAC with their sponsor if it is safe to do so. However, care providers are required to assess the safety of the UAC's ultimate destination, in order to anticipate logistical issues associated with COVID-19 disruptions. Care-provider facilities are required to consult with their Federal Field Specialist ("FFS"), or delegee, if a UAC will be traveling to a jurisdiction with widespread community transmission of COVID-19 or that is subject to a community-wide "lock down," such as California. In such cases, release should be postponed until it is determined to be safe for the UAC to travel to their destination. This safety assessment includes consideration of the particular UAC's unique medical needs and vulnerabilities, and the UAC's respective medical specialists are consulted in the safety planning process.

34. Prior to the COVID-19 pandemic, ORR was working on a telehealth initiative to increase UAC's access to healthcare resources that may not be physically present in their locality. In light of the state orders restricting the movement of people generally in California, New York, and elsewhere, ORR has rolled out its telehealth capabilities ahead of schedule in numerous jurisdictions in order to ensure care-

6

provider facilities are able to provide UAC with access to medical care without having to leave their facilities. Those jurisdictions are: California, New York, Connecticut, Maryland, Massachusetts, New Jersey, Pennsylvania, Texas, and Virginia. Further, ORR is awaiting final approval from telehealth providers in Arizona, Florida, Illinois, Michigan, Washington, and Oregon, and anticipates the service will be available in these locations in the near future.

*COVID-19 Cases in ORR Grantee Care Provider Facilities*

35. As of March 26, 2020, there have been four confirmed COVID-19 cases among UAC across all ORR care-provider facilities. All four cases were in a single facility in New York state, and the affected UAC are currently in isolation, per ORR and CDC guidelines, and are receiving appropriate monitoring and medical care.

36. Currently, 18 UAC in the care-provider network have been tested. As noted, four tested positive for COVID-19, 11 tested negative for COVID-19, and three have test results pending.

37. Pursuant to CDC Guidance, any UAC who has undergone COVID-19 testing is considered presumptively positive until results are available (typically within 3-4 after testing) and are placed in isolation as a precautionary measure.

38. In addition, a total of eight program staff, contractors or foster parents at five care-provider programs across New York, Washington, and Texas have self-reported testing positive for COVID-19. ORR's medical team and the affected programs have worked in close coordination with the local public health departments on appropriate public health measures, which typically involve self-quarantine at home, and the tracking and monitoring of the affected staff members' contacts within the care-provider facility, per CDC guidance.[9]

39. In addition to the COVID-19 protocols described above, care-provider facilities are directed to follow any local requirements issued by the state licensing agency or other local public health authority related to the identification, reporting, and control of communicable diseases that are more stringent than ORR's protocols.

*Assessment of Plaintiffs' Assertions*

40. In their March 22, 2020 correspondence, Plaintiffs stated that they "are advised that *congregate care is inherently incongruent with the recommendations of the Centers for Disease Control and Prevention*, state health authorities, and epidemiologists, all of whom recommend (if not mandate) social distancing and related safety precautions that are difficult, if not impossible, to observe in facilities

---

[9] CDC, Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases, https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html.

housing more than ten Class Members." *See* Ltr. from C. Holguin (Ctr. for Human Rights & Const. Law), to D. Shieh (DOJ), dated Mar. 22, 2020, at 2 (emphasis added), attached hereto as "Exhibit A."

41. CDC, however, has issued guidance on COVID-19 containment in various congregate settings, including colleges,[10] nursing homes,[11] prisons,[12] and homeless shelters.[13] ORR has implemented such guidance to the extent that it can be applied to its grantee care-provider facilities. Further, ORR has consulted with CDC regarding ORR's COVID-19 containment and mitigation strategies and has been told by CDC that they are consistent with CDC's recommendations.

42. I have serious concerns about the proposals in Plaintiffs' March 22 correspondence that call for the expedited release of UAC to potential sponsors. In particular, the immediate, blanket release of UAC to sponsors located in jurisdictions with widespread community transmission of COVID-19 would pose a risk to the health and welfare of the UAC. UAC are currently housed in settings where infection control protocols are rigorously enforced. In contrast, upon release, UAC may be exposed to COVID-19 in airports or transit systems, or through sponsors who have been exposed to COVID-19, or through circulation in communities with widespread community transmission of COVID-19.

43. Many sponsors are also located in states that are currently under "lock down" in which residents' freedom of movement has been significantly curtailed in an effort to control the spread of COVID-19, such as California, Washington, and New York. If anything, the current ORR approach is consistent with those "lock down" orders in that UAC are shielded from UAC community transmission.

44. ORR's efforts to safely release UAC to safe, approved sponsors remain ongoing. But Plaintiffs' proposal to release UAC to sponsors who are still undergoing vetting would materially increase the risk of release to a sponsor who potentially cannot or will not shelter in place with the UAC, or who may not adhere to appropriate infection control practices (e.g., social distancing), or who may circulate with the UAC in areas with widespread community transmission of COVID-19, all of which increase the health risks to the UAC. Plaintiffs' proposal would also increase the risk of release to a sponsor who, because vetting has not yet completed, is, or will become unable to financially support the UAC due to COVID-19-related business closures, layoffs, or furloughs.

---

[10] CDC, Interim Guidance for Administrators of U.S. Higher Education, https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-ihe-response.html.

[11] CDC, Preventing the Spread of COVID-19 in Retirement Communities and Independent Living Facilities (Interim Guidance), https://www.cdc.gov/coronavirus/2019-ncov/community/retirement/guidance-retirement-response.html.

[12] CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[13] CDC, Interim Guidance for Homeless Service Providers to Plan and Response to Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html.

8

45. The immediate, blanket release of UAC to sponsors who are still undergoing vetting would also deprive these UAC of access to the significant medical resources of ORR (including testing for COVID-19). Once they leave ORR's care they are limited by the resources of their sponsor's household and local community, at a time when important medical resources may be in short supply.[14]

46. Plaintiffs propose that ORR can expedite the release of UAC to potential sponsors on Plaintiffs' terms while adequately vetting the sponsors for the new child welfare and public health concerns that have arisen in recent months and are continuing to evolve. Plaintiffs, however, do not identify the safeguards that ORR can jettison from the sponsor vetting process without putting UAC at risk.

47. Plaintiffs also overlook the fact that fingerprinting remains a key component for many sponsors in the sponsor vetting process, particularly sponsors who are not parents or close relatives. Such fingerprinting has been affected by the recent closures of some digital fingerprinting sites due to COVID-19.

48. Thirty-nine digital fingerprinting sites in 21 states[15] have, as of March 24, 2020, either closed, curtailed their hours of operation, or switched to an "appointment only" system in response the public health threat posed by COVID-19. Fingerprinting is a key component of the background check process that is needed to fulfill the requirements of the TVPRA and ensure UAC are not released into the custody of sponsors with disqualifying criminal histories, such as convicted human traffickers and pedophiles. Potential sponsors for whom ORR requires fingerprints (including those who are not Category 1 or 2A sponsors)[16] must be able to undergo fingerprinting in order for background checks to be performed.

49. To compensate for the reduced availability of digital fingerprinting, ORR's has directed care providers to automatically mail fingerprint cards to all individuals identified in family reunification applications, so that given limited hours at digital fingerprint locations, potential sponsors are aware of the ability to have fingerprints taken on fingerprint cards, including at a local law enforcement agency. While fingerprint cards are often used, this alternative to digital fingerprinting could take longer for potential sponsors to execute given the additional steps involved, and the reliance on the mail system to transmit the cards.

---

[14] ORR is aware of one instance in which 3 UAC who were recommended for COVID-19 testing were unable to immediately obtain a COVID-19 test due to the particular community's system for allocating tests among primary care providers. DHUC is monitoring this situation and will intervene as necessary to assure the UAC have prompt access to COVID-19 testing.

[15] Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Louisiana, Massachusetts, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Texas, Virginia, and Washington.

[16] ORR Policy Guide § 2.2.1, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2.1 (defining Category 2A sponsors; Category 1 sponsors are parents or legal guardians; Category 1 and 2A sponsors generally do not require fingerprinting, unless there is a special concern).

9

50. My opinion is that ORR cannot safely release UAC to sponsors absent vetting that includes the completion of fingerprint-based background checks where required, or other protective measures, such as home studies, which are required in certain instances by the TVPRA. This is especially true during the current public health emergency. The jettisoning of core safeguards in the sponsor vetting process in order to effectuate the immediate release of UAC would expose UAC to not only public health dangers but also material child welfare and safety risks.

51. Plaintiffs also request a full adversarial hearing in order for UAC to challenge failures to (yet) release to individuals applying to be sponsors (including individuals still undergoing vetting). In my opinion, the creation and operation of such an adversarial hearing process during the current public health emergency would require ORR to redeploy federal and grantee staff from program operations, and materially degrade the ability of ORR to conduct sponsor vetting and work with grantee care-provider facilities to maintain appropriate infection control measures and protect the health and safety of UAC at the facilities. My opinion is that to maximize child welfare during the current public health emergency, the federal and grantee staff need to focus on program operations with the goal of releasing UAC to sponsors only when it is safe to do so.

Executed on March 27, 2020.

_____

Jallyn Sualog

# Exhibit Q, Attachment A

March 22, 2020 Letter from Plaintiffs' Counsel

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693 Facsimile: (213) 386-9484
www.centerforhumanrights.org

March 22, 2020

Daniel Shieh
Benjamin Mark Moss
Marina C. Stevenson
Civil Division, Office of Immigration Litigation
United States Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Via email.*

Re: *Lucas R. et al. v. Azar et al*, 2:18-cv-05741-DMG-PLA.

Dear Counsel:

Plaintiffs request that the parties meet and confer tomorrow, March 23, 2020, to explore ways in which the parties may cooperatively address the grave risk that Class Members[1] in the above-referenced action are now facing, or will shortly face, in ORR congregate care facilities as a result of the COVID-19 pandemic and public health national emergency. Absent a cooperative agreement, Plaintiffs will need to file a temporary restraining order ("TRO") immediately seeking relief from the Court, as described below.

Plaintiffs are advised that congregate care is inherently incongruent with the recommendations of the Centers for Disease Control and Prevention, state health authorities, and epidemiologists, all of whom recommend (if not mandate) social distancing and related safety precautions that are difficult, if not impossible, to observe in facilities housing more than ten Class Members.

We accordingly wish to discuss expediting the release of Class Members to available custodians. We, of course, appreciate the need to protect children against abuse or neglect following release, but believe that such risks need to be balanced against the substantial and immediate dangers that children would face as COVID-19 spreads through congregate care facilities. *See* TVPRA, 8 U.S.C. § 1232(c)(2)(A) (requiring ORR "promptly" place detained children "in the least restrictive setting that is *in the best interest of the child*" (emphasis added)).

We are already aware that Class Members have been exposed to COVID-19 at the MercyFirst and Abbott House programs in New York. We have also been informed that ORR has stopped

---

[1] Class Members include all youth within any of the five classes the Court certified in its order of November 2, 2018 (ECF No. 126), as modified by order entered December 27, 2018 (ECF No. 141).

Daniel Shieh  
Benjamin Mark Moss  
Marina C. Stevenson  
March 22, 2020  
Page 2 of 3

placing Class Members at numerous other shelters in New York, as well as some in California, Washington, Oregon and Pennsylvania, though we do not know whether Class Members at shelters in these states have likewise been exposed to COVID-19.

As such, it is no longer in the best interest of many, if not all, Class Members to remain housed in congregate care, particularly where recommended and/or mandatory safety precautions are not observed and Class Members' exposure to COVID-19 is highly likely. *See* TVPRA, 8 U.S.C. § 1232(c)(2)(A). During this rapidly expanding and unprecedented public health crisis, Class Members' health and welfare must be paramount, as mandated by the TVPRA and state, local, and national authorities, among others.

We accordingly propose that the parties discuss the following:

1) The steps ORR has taken and is taking to ensure the safety of Class Members in light of the COVID-19 pandemic.

2) Whether, with respect to all members of the "unfit custodian class," as defined in the Court's order of December 27, 2018 (ECF No. 141) ("Unfit Custodian Class Members"), absent good cause based on articulable facts to believe that available custodian(s) would harm or neglect a class member, or that an individual class member presents a current danger to the public, ORR would be amenable to expediting release of all Unfit Custodian Class Members to available custodians who have been vetted and meet the safety threshold noted above, or else place such Unfit Custodian Class Members in non-congregate care.

3) Whether, with respect to Unfit Custodian Class Members whom it fails to release or place in non-congregate care, ORR would be amenable to amending Policy Guide § 2.7.8, *available at* www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7 (last visited March 22, 2020), effective immediately, to provide as follows:

>a. All Unfit Custodian Class Members shall have the right of administrative appeal without regard to the degree of family affinity of their available custodians.
>
>b. The Assistant Secretary for Children and Families, or his or her designee, shall afford each administratively appealing Unfit Custodian Class Member —
>
>>i. a reasonable opportunity to examine ORR's evidence and reasons for the Unfit Custodian Class Member's continued detention in advance of any hearing;
>>
>>ii. the right to be represented by counsel;
>>
>>iii. a reasonable opportunity to submit documentary evidence and testimony in support of release;

Daniel Shieh<br>
Benjamin Mark Moss<br>
Marina C. Stevenson<br>
March 22, 2020<br>
Page 3 of 3

> iv. an opportunity to be heard via teleconference or video conference within five business days of filing an administrative appeal; and
>
> v. a written decision issued no later than three business days following the administrative hearing directing the Unfit Custodian Class Member's immediate release, transfer to non-congregate care, or else setting out the reasons for continued custody and placement in congregate care.

Plaintiffs sincerely hope the parties can work jointly to protect the health and welfare of Class Members under increasingly difficult conditions, but are prepared to pursue all available legal remedies should such cooperation prove unsuccessful. Accordingly, Plaintiffs intend to apply for a TRO and order to show cause re: preliminary injunction by no later than the close of business on March 24, 2020, in the event the parties have not reached an agreement on the above. The requested relief will include all items discussed herein.

Should Defendants decline this invitation to confer, pursuant to Local Rule 7-19, Plaintiffs ask that Defendants advise whether they oppose the application for a TRO.

> Thank you,
>
> *s/ Carlos Holguín*
>
> Carlos Holguín
> One of the attorneys for Plaintiffs