JOSEPH H. HUNT
Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsel
    Tel:  (202) 616-0473
    Fax:  (202) 305-7000
    Email:  Nicole.murley@usdoj.gov

KATELYN MASETTA-ALVAREZ
DAVID BYERLEY
Trial Attorneys
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LORETTA LYNCH, Attorney General of the United States; *et al.,* <br><br> Defendants. | Case No. CV 85-4544-DMG <br><br><br> **DEFENDANTS' SUPPLEMENTAL RESPONSE TO PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

1

## I.   **INTRODUCTION**

The Court ordered Defendants to show cause why it should not issue a preliminary injunction: (1) requiring Defendants to make and record continuous efforts to release class members; (2) enjoining the U.S. Department of Health and Human Services, Office of Refugee Resettlement ("ORR") from keeping minors who have suitable custodians in congregate custody due to an "unexplained failure to promptly release these minors to suitable sponsors under the [Trafficking Victims Protection and Reauthorization Act ("TVPRA")];" and (3) enjoining U.S. Immigration and Customs Enforcement ("ICE") from keeping minors who have suitable custodians in congregate custody due to an "unexplained failure to release these minors within 20 days, especially given the emergent circumstances and the Court's prior orders requiring the same." March 28, 2020 Order to Show Cause, ECF No. 740, at 13-14 ("OSC"). For the reasons below, as well as the reasons explained in Defendants' March 27, 2020 TRO opposition brief, ECF No. 736,[1] and based on the evidence attached hereto and submitted in conjunction with Defendants' TRO opposition, such an injunction is not warranted.

Specifically, the Court should not issue any injunctive relief here because Plaintiffs have not met their burden to show that Defendants have violated any existing terms of the *Flores* Settlement Agreement ("Agreement"). The OSC would impose on Defendants a new requirement—found nowhere in the Agreement—that any "***unexplained delay*** in releasing a child in ORR and ICE custody violates [] Paragraphs 14 and 18 of the FSA." OSC at 11 (emphasis in original). This reading of the Agreement incorrectly adds to the requirements of

---

[1] Defendants incorporate into this response all of the argument and evidence submitted in conjunction with their initial TRO opposition brief, and provide this response as a supplement to that initial briefing.

Paragraphs 14 and 18 of the Agreement, and thereby alters the plain terms of the Agreement agreed to by the parties and entered by this Court in 1997. In fact, the plain terms of the Agreement require that Defendants "make" efforts towards release, those efforts must be "prompt and continuous[,]" and Defendants must "record" these efforts. *See* Agreement, ¶¶ 14, 18. Rather than hold Defendants to a requirement not found in the Agreement, the Court should instead look at whether Plaintiffs have met their burden to establish that Defendants are in violation of the Agreement's plain terms. Because Plaintiffs have not met that burden, the Court should not issue the proposed preliminary injunctive relief.

## II.   SUPPLEMENTAL FACTUAL BACKGROUND

### March 27, 2020 Order

On March 27, 2020, this Court issued a decision on Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order, as well as an order to show cause. OSC, ECF No. 740. Importantly, the government's initial response was provided in less than 24 hours in order to provide the Court with some initial information in advance of the hearing. Defendants submit that this Court's conclusions in the OSC regarding the evidence presented by Plaintiffs should be treated as preliminary and tentative given the expedited timing, and the correspondingly largely one-sided (and, Defendants maintain, inaccurate) factual presentation that was before the Court.

First, the Court analyzed Plaintiffs' assertions that Defendants were in violation of the Agreement's provisions related to safe and sanitary conditions and appropriate medical care. *Id.* at 5-9. The Court started by addressing the conditions in ORR facilities. *Id.* at 5-7. Considering the numerous steps that ORR was taking in response to the Coronavirus-19 ("COVID-19") pandemic, and the opinion of the Chief Medical Officer of the CDC's National Center for Immunizations and

Respiratory Diseases that ORR was meeting or exceeding CDC guidelines with its response, the Court concluded that "Plaintiffs have not shown a likelihood of success on the merits as to this part of their claim against ORR." *Id.* at 6-7.

Next, the Court looked at the conditions in ICE family residential centers ("FRCs"). *Id.* at 7-9. The Court concluded that for the ICE facilities, Plaintiffs had shown serious questions as to the merits of their claim that ICE has breached the FSA with regard to the provision of safe and sanitary conditions and appropriate medical care and living accommodations in the context of the COVID-19 outbreak. *Id.* at 8. The Court found that ICE guidance was outdated because it was last updated slightly less than two weeks prior, and in any case, it was deficient because it "does not mention social distancing, increased personal hygiene, or increased testing and medical care . . . . Nor does the ICE Guidance recognize the potential psychological harm of quarantining or isolating children for the duration of this pandemic." *Id.* at 7-8. Relying on declarations by Plaintiffs' counsel, the Court found, for ICE FRCs, that there was "uneven implementation of the recommended public health measures" and that "large proportions of [adult detainees] have conditions that render them vulnerable to COVID-19 and/or already show symptoms associated with COVID-19[.]" *Id.* at 8. The Court acknowledged many of the preventive measures taken by Defendants as to the ICE FRCs, but still found that "Plaintiffs have raised serious questions as to the merits of their claim that ICE is not compliant with its FSA obligations in the context of the COVID-19 outbreak." *Id.* The Court ordered "heightened inspections of ICE facilities and, to a more limited extent, ORR facilities to ensure the existence of safe and sanitary conditions." *Id.* at 9.

Next, the Court analyzed whether ORR and ICE were complying with the Agreement's requirement to release class members without unnecessary delay,

4

and record efforts toward release. As to ORR, the Court noted that it "previously found that some of ORR's policies, even if they result in delays in releasing minors to adult custodians, appeared to be reasonably calculated to protect Class Members from harm or neglect and to ensure that they have an adequate standard of care." *Id.* at 9 (quoting *Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 10162328, at *18 (C.D. Cal. July 30, 2018). However, "the change in factual circumstances" required a reexamination of whether ORR could continue to detain class members in congregate settings. *Id.* The Court further noted that "ORR's data do not indicate why the agency failed to release [class members] or how many of them have sponsors." *Id.* Thus, the Court found that ORR had an "apparent failure" to make and record prompt and continuous efforts towards the release of class members which made it difficult to ascertain "how many of the minors' releases to suitable custodians have been delayed without good reason." *Id.* at 10 (citing Agreement, ¶ 18). The Court therefore concluded that "though ORR may have justifications under the TVPRA for delaying release, Plaintiffs have raised serious questions going to the merits of their claim that ORR is in violation of the FSA's recording requirement." *Id.* at 10.

With regard to ICE, the Court found that Plaintiffs had provided evidence "to indicate that ICE does not undertake or record any efforts aimed at the release of minors as required by Paragraphs 14 and 18 of the Agreement." *Id.* In so finding, the Court relied on Plaintiffs' expert declarations, and on data submitted by Plaintiffs. *Id.* at 10-11. Because the government had not had the time necessary to submit any responsive data, the Court concluded that "[w]ithout any contrary data [from Defendants]," Plaintiffs had "shown a strong likelihood of success on their claim that ICE has not undertaken or recorded efforts to promptly release the Class Members in its custody." *Id.* at 11. Ultimately, the Court held that:

Because COVID-19 poses unprecedented threats to the safety of Class
Members and all who come in contact with them, including ORR and
ICE staff, healthcare providers, and local populations, the Court finds
that any *unexplained delay* in releasing a child in ORR and ICE custody
violates [] Paragraphs 14 and 18 of the FSA, which require the agencies
to release Class Members in their custody without unnecessary delay
and make and record efforts to release the Class Members.

*Id.* at 11.

In its analysis of the remainder of the TRO factors, the Court found that
regardless of the preventive measures taken by ORR and ICE, Plaintiffs suffer
irreparable harm. *Id.* at 12. However, he Court agreed with Defendants that
"rushing to release minors *en masse* in the midst of the current travel restrictions
or to release them to potentially unfit custodians based on limited information"
was not in the class members' best interests. *Id.* at 13.

The Court ordered Defendants to show cause why the Court should not
issue a preliminary injunction that: (1) requires Defendants to make and record
continuous efforts to release class members; (2) enjoins Defendants from keeping
minors who have suitable custodians in congregate custody due to ORR's
unexplained failure to promptly release these minors to suitable sponsors under
the TVPRA; and (3) enjoins Defendants from keeping minors who have suitable
custodians in congregate custody due to ICE's unexplained failure to release these
minors within 20 days. *Id.* at 13-14. The Court also ordered: (1) an inspection of
ORR and ICE facilities by the agencies' juvenile coordinators, along with a report
of the inspections to be provided to the Court and the Monitor by April 9, 2020;
(2) ORR and ICE to provide to the Monitor, Class Counsel, and the Court the
information listed in the Order Appointing Special Master/Independent Monitor,
at B.1.c.i(i)-(x) and a summary of efforts toward family reunification or release of
the detained Class Member; and (3) ORR and ICE should "make every effort to

promptly and safely release Class Members in accordance with Paragraphs 14 and 18 of the FSA and the Court's prior orders." *Id.* at 14-15.

### Supplemental Information Regarding ORR Facilities, Record Keeping, and Release Procedures.

ORR submits the attached declaration of Jallyn Sualog and exhibits, which supplement the information submitted with Defendants' March 27, 2020 TRO opposition filing. Specifically, the Sualog Declaration explains:

- the continuous efforts made by ORR and its licensed providers towards safe and timely reunification for minors in ORR custody, Sualog Decl. ¶¶ 7-11;
- the manner in which ORR's licensed providers record those efforts, *id.* at ¶¶ 12-17;
- additional issues that affect ORR's processes for ensuring the safe and timely release of minors during the COVID-19 pandemic, *id.* at 18-22;
- a description of the processes that would be necessary to obtain and report the information that Plaintiffs seek, and the processes employed to gather the explanatory information required under the Court's OSC, *id.* at ¶¶ 23-30, 36-40;
- a summary of relevant ORR statistical data, *id.* at ¶¶ 31-35; and
- a summary of existing oversight of ORR, *id.* at ¶¶ 41-53.

ORR is also submitting under seal, and to Plaintiffs, the Court, and the Monitor, the factual data required by the OSC. On or before April 9, 2020, ORR will provide to the Court and the Monitor, video of ORR facilities and the juvenile coordinator reporting required by the OSC.

### Supplemental Information Regarding ICE Family Residential Centers, Record Keeping, and Release Procedures

ICE submits the attached declarations of Melissa Harper, Christopher George, and Michael Sheridan, which supplement the information submitted with

7

Defendants' March 27, 2020 TRO opposition filing. Specifically, these declarations explain:

- the manner in which ICE complies with the Agreement's requirement to "make and record continuous efforts to release class members," Harper Decl. ¶¶ 8-12, George Decl. ¶¶ 20-22, Sheridan Decl. ¶¶ 28-29, 52-53;

- the manner by which ICE is complying with applicable COVID-19 guidance at each of its FRCs, Harper Decl. ¶¶ 5-7, George Decl. ¶¶ 9-17, Sheridan Decl. ¶¶ 34-40; and

- census data for the FRCs including: the capacity of each FRC, the current census numbers for each FRC, recent releases from FRCs, and information about the times in custody at FRCs as well as further information regarding class members who have remained in ICE custody at an FRC for more than 20 days, Harper Decl. ¶¶ 1-4, George Decl. ¶¶ 15, 20-22, Sheridan Decl. ¶¶ 16, 39, 52-53.

ICE is also submitting under seal, and to Plaintiffs, the Court, and the Monitor, the factual data required by the OSC. On or before April 9, 2020, ICE will provide to the Court and the Monitor, video of ICE facilities and the juvenile coordinator reporting required by the OSC.

### III.   SUPPLEMENTAL ARGUMENT

#### A.   ICE is Following Applicable Guidance Regarding Conditions in FRCs.

The Court should reverse its conclusion that Plaintiffs have shown a likelihood that the conditions at ICE FRCs are not in compliance with the Agreement. As the Court recognized in the OSC, the Fluharty, Meza, and Cambria attorney declarations should be considered only to the extent that they reflect the personal knowledge of the declarants. *See* OSC at 8 n.10. Given the rapidly

changing factual circumstances surrounding the COVID-19 crisis, and the agencies' response thereto, these declarations should now be disregarded because they are stale and do not reflect the current conditions or the guidance in place in the facilities. Specifically, these declarations were signed on March 25, 2020, and appear largely to reflect conditions in the facilities during the week of March 16-20, 2020. *See* ECF No. 733-10 at ¶ 8; ECF No. 733-1 at ¶¶ 18, 22, 23, 26, 28, 29, 30, 31, 50; ECF No. 733-12 at ¶¶ 18-24, 25, 27-32, 33-36, 38.

As Defendants' evidence reflects, changes subsequent to that time period have rendered many of these observations obsolete, and therefore they should not be used to support the issuance of a preliminary injunction. *See, e.g., Safety Today, Inc. v. Roy*, No. 2:12-CV-510, 2012 WL 12872708, at *3 (S.D. Ohio Oct. 12, 2012) (holding that stale evidence is not enough to support a preliminary injunction). On March 20, 2020, the BFRC suspended all in-person legal visits, in accordance with Pennsylvania Governor Wolf's county and statewide stay at home orders. George Decl. ¶ 17.d. Thus, any personal observations contained in the Cambria declaration must have been prior to March 20, 2020. *See* Cambria Decl. ¶ 8. Moreover, on March 18, 2020, the BFRC suspended all new admissions. George Decl. ¶ 17.b. The BFRC has reduced its population and currently is operating at only 22% capacity. George Decl. ¶ 15. As of April 5, 2020, the BFRC is only housing one family unit per bedroom, comprised of a mother or father and their accompanying children, to enhance separation and encourage social distancing to the greatest extent possible. George Decl. ¶ 17.z.

In order to ensure that personal hygiene items remain fully stocked for the use of all residents, the BFRC increased its orders of all supplies including, but not limited to, soap and hand sanitizer, at the end of February 2020. George Decl. ¶ 17.bb. As of March 12, 2020, residents are routinely informed about the

availability of personal protective equipment (PPE), such as masks and gloves, and such PPE are provided to residents upon request. George Decl. ¶ 17.a. As of the same date, BFRC lifted a ban on the use of alcohol-based hand sanitizers for all staff and residents. George Decl. ¶ 17.i. The BFRC also continually supplies residents with soap for washing hands, and soap dispensers are checked daily and immediately replenished as necessary. *Id*. Hand sanitizer dispensers and sanitizing wipes are located throughout the facility for use by the residents and the BFRC staff. *Id*. Since March 7, 2020, the BFRC engages in continued frequent cleaning and disinfecting of commonly touched surfaces, such as tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks. George Decl. ¶¶ 17.j and l. These areas are cleaned various times each day and/or at the direction of a BFRC supervisor, as appropriate. *Id*. Recreational items, computers, children toys and entertainment devices are cleaned as soon as a resident is finished using the item(s). George Decl. ¶ 17.k. As of March 12, 2020, BFRC increased the frequency in which preventative cleaning procedures are taking place from multiple times a day to continuously throughout the day. George Decl. ¶ 17.k.

As of April 3, 2020, there are zero confirmed cases of COVID-19 at the BFRC.  George Decl. ¶ 14. Although the BFRC has not processed in new families since March 18, 2020, the existing protocols require that, during intake, residents are assessed for fever and respiratory illness, asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with sustained community transmission in the past two weeks. George Decl. ¶ 11. Further, BFRC residents are screened for the presence of a fever, cough, or sore throat within 24 hours of known exposure to someone who tested positive for COVID-19, and/or

recent travel through high-risk countries. George Decl. ¶ 10. If a resident is exposed to an individual who tests positive for COVID-19 but is asymptomatic, the resident's movement will be restricted for the duration of the most recent incubation period (14 days after most recent exposure to an ill individual). George Decl. ¶ 12. The resident will be housed with other residents who were also potentially exposed to COVID-19 and will be monitored daily for fever and symptoms of respiratory illness. *Id*. As part of their normal duties, BFRC staff maintains "sight and sound" of all residents – meaning they monitor the residents constantly to see if they are displaying any symptoms or behavior warranting immediate referral to the in-house heath care provider for evaluation and treatment, as appropriate. George Decl. ¶ 14.b.

If any resident shows the onset of fever and/or respiratory illness, he or she will be referred for evaluation to the onsite medical provider. George Decl. ¶ 12. If the resident is then diagnosed with COVID-19, per ICE guidance, the resident will be quarantined in accordance with CDC, as well as state and local health department guidelines. *Id.* As of March 19, 2020, the BFRC implemented medical screening for residents and staff for influenza like illness (ILI) symptoms pursuant to ICE, CDC, and IHSC guidance, and has engaged in regular monitoring, as previously described, in order to determine if anyone develops any ILI symptoms throughout the course of the day. George Decl. ¶¶ 17.q and s. On March 18, 2020, IHSC, in coordination with offsite healthcare providers, temporarily suspended all scheduled elective medical procedures for all residents consistent with CDC guidance. George Decl. ¶ 13. BFRC also complies with all state mandates and guidelines and has been inspected by the Pennsylvania Department of Human Services as recently as March 30, 2020, well-after attorney Cambria's reported observations prior to March 20, 2020. George Decl. ¶¶ 7, 17.c-d., 18.

With regard to the two Texas facilities, recent changes also should be considered, and ICE should be found in compliance with applicable guidelines. As of April 2, 2020, there are zero confirmed cases of COVID-19 at the STFRC. Sheridan Decl. at ¶ 15.a. As of April 3, 2020, there are zero confirmed cases of COVID-19 at the KCFRC. *Id*. ¶ 38.a. To provide enough space to allow for social distancing, the STFRC has reduced its population, and is now operating at only 25% capacity, placing no more than 1-2 family units in a housing unit. Sheridan Decl. ¶¶ 7 and 16. The KCFRC has also reduced its population and is now currently operating at only approximately 52% capacity. Sheridan Decl. ¶ 39. Additionally, both the STFRC and KCFRC have implemented numerous social distancing strategies within the facilities in order to increase physical space between residents. Sheridan Decl. ¶¶ 17 and 25.  For example, in both facilities, no more than 10 residents at a time are allowed in any common area. Sheridan Decl. ¶¶ 25.a and 49.a. Further, at the STFRC, based on the amount of space available to implement social distancing within the library, gymnasium, and chapel, no more than 50 residents are allowed in these areas, at any given time. Sheridan Decl. at ¶ 25.b. In order to accomplish this and still provide access to all residents who choose to use these parts of the FRCs, a schedule has been established to ensure access for each neighborhood and complex within the facility. *Id*. While the KCFRC is using satellite dining,[2] the dining halls at the STFRC have been rearranged so that resident families are more than 6-feet apart while eating their meals, and each neighborhood and complex is escorted individually to the dining facilities to ensure appropriate occupancy. Sheridan

---

[2] Satellite dining is accomplished using individual containers, such as pots with lids, or larger conveyances that can move objects in bulk, such as enclosed, satellite dining carts. All food safety provisions (sanitation, safe handling, storage, etc.) apply to food in transit.

Decl. ¶¶ 25.b and 49.b. Pursuant to Texas state guidance, group activities and school have been suspended indefinitely at both facilities. Sheridan Decl. ¶¶ 25.e and 49.c.

As of March 23, 2020, at the STFRC, all common areas including, but not limited to, resident housing areas, law libraries, dining halls, medical areas, Intake areas, door handles throughout the facility, desk and counter surfaces in high traffic areas, lobby seating areas, restrooms, court rooms, and any other areas the facility identifies as needing such cleaning, are being disinfected every 2 hours from 8:00am – 8:00pm per day. Sheridan Decl. ¶ 17.a. Residents are educated through social-distanced, in-person, one-on-one meetings with their assigned CoreCivic Case Managers on best practices to keep from spreading any contagions. Sheridan Decl. ¶ 17.e. Educational posters with illustrations demonstrating good hygiene practices have been placed throughout the STFRC to include resident living areas. *Id*. There are soap dispensers, paper towels, and sinks in every suite, pantry, restroom and shower area. Sheridan Decl. ¶ 17.f. In addition, there are hand sanitizer dispensers at recreation, library, visitation, intake and dining; and, there are posters indicating proper hand washing technique, as well as, posters in English, Spanish, and French Creole promoting handwashing, social distancing, and general prevention of spread in all suites, pantries, laundry area, activity rooms, telephone rooms, and other common areas around the STFRC, such as recreation, library, dining and chapel. *Id*. STFRC further complies with Texas state mandates to prevent the spread of infection. Sheridan Decl. ¶ 26.

Pursuant to CDC guidelines, the KCFRC has increased sanitation frequency and provides additional sanitation supplies to residents and staff. Sheridan Decl. ¶ 40. There are staff cleaning teams working to disinfect the high touch areas

throughout the entire day. *Id*. The evening staff cleaning crew uses spray disinfectant in the play areas and around the grounds. *Id*. All cleaning products used for this process are CDC approved. *Id*. Further, residents are provided additional cleaning products, which are placed on the clean cart, such as the CDC-approved disinfectant Halt. Sheridan Decl. ¶ 40.b. The clean cart is available to housing areas and residents for use in their rooms and common areas upon request. *Id*. Alcohol based disinfectant dispensers have been placed in lobby areas for public and staff use, and internal facility areas are equipped with disinfectant dispensers for use by residents and staff. Sheridan Decl. ¶¶ 40.b. and c. As in the STFRC, residents at the KCFRC are educated through in-person, one-on-one meetings with their designated GEO Case Manager on best practices to keep from spreading any contagion, and educational posters with illustrations demonstrating good hygiene practices have been placed throughout the facility to include detainee living areas; and, posters, in English and Spanish, illustrating hand washing techniques, proper use of soap, the 20-second timeframe for washing, proper use of paper towels for drying, and proper disposal of paper towels have also been posted. Sheridan Decl. ¶ 40.e and f. Residents are provided with liquid soap in their bathroom, there is ample access to running water for hand washing and drying supplies. Sheridan Decl. ¶ 40.f. There is a coordinated effort between Case Management and the Fire & Safety departments to inspect all staff restrooms, residents' rooms, and any other location that may have a hand-washing station to ensure there is an abundance of soap, disposable paper towels, tissue/toilet paper, and a trash receptacle. *Id*.

Pursuant to CDC guidelines, during intake medical screenings at the STFRC and KCFRC, new residents are assessed for fever and respiratory illness, and are asked to confirm whether they have had close contact with a person with

laboratory-confirmed COVID-19 in the past 14 days and whether they have traveled from or through area(s) with sustained community transmission in the prior two weeks. Sheridan Decl. ¶¶ 11 and 35. If a resident presents with symptoms consistent with COVID-19, he or she will be placed in isolation and will be tested. Sheridan Decl. ¶¶ 12 and 36. If testing is positive, the resident will remain isolated, per CDC guidelines, and will be treated, and in case of any clinical deterioration, the resident will be referred to a local hospital. *Id.* Further, ICE's IHSC guidance provides that, in cases of known exposure to a person with confirmed COVID-19, asymptomatic residents are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill resident) and are monitored daily for fever and symptoms of respiratory illness.[3] *Id.* Residents who show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. *Id.* Cohorting is discontinued when the 14-day incubation period ends with no new cases presenting. Sheridan Decl. ¶¶ 13 and 37. Per ICE policy, residents diagnosed with any communicable disease, including COVID-19, and who require isolation, are placed in an appropriate setting in accordance with CDC or state and local health department guidelines. *Id.* In addition, KCFRC complies with Texas state mandates to prevent the spread of infection. Sheridan Decl. ¶ 50.

---

[3] Cohorting is an infection-prevention strategy involving housing together residents who were exposed to a person with an infectious organism but who are asymptomatic.  This practice lasts for the duration of the 14-day incubation period, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients.

**B.      Defendants Make and Record Efforts Toward Release, and
Release Class Members Without Unnecessary Delay.**

The OSC requires Defendants to show cause why the Court should not issue

an injunction:

> (1) requiring Defendants to make and record continuous efforts to
> release class members; (2) enjoining Defendants from keeping minors
> who have suitable custodians in congregate custody due to ORR's
> unexplained failure to promptly release these minors to suitable
> sponsors under the TVPRA; and (3) enjoining Defendants from
> keeping minors who have suitable custodians in congregate custody
> due to ICE's unexplained failure to release these minors within 20 days,
> especially given the emergent circumstances and the Court's prior
> orders requiring the same (*see, e.g.,* July 24, 2015 Order [Doc. # 177],
> June 27, 2017 Order [Doc. # 363], July 9, 2018 Order [Doc. # 455],
> July 30, 2018 Order [Doc. # 470]).

OSC at 13-14.

As explained below in Section B.1, as a general matter, no injunction should

issue to the extent that it is based on the requirement that Defendants avoid

"unexplained delay" in the release of class members, because such a requirement

is found nowhere in the agreement. Moreover, with regard to the issue (1), as

shown in the attached declarations of Jallyn Sualog and Deane Dougherty, and

explained below in Sections B.2 and B.3, no injunction should issue because

Defendants are in full compliance with Paragraph 18's requirement that they make

and record prompt and continuous efforts to release class members. With regard

to issue (2), as shown in the attached declaration of Jallyn Sualog, and explained

below in Section B.2, no preliminary injunction should issue against ORR,

because ORR's existing processes provide for the prompt and safe release of class

members, without unnecessary delay, to custodians who have been determined to

be suitable as provided by both Paragraph 17 of the Agreement and the TVPRA.

Finally, with regard to issue (3), as explained below in Section B.3, no preliminary

injunction should issue against ICE because ICE continues to comply with the plain terms of Paragraphs 14 and 18 of the Agreement, and continues to employ the processes for compliance that it has followed for over 2.5 years following initial approval from the Court, and without any indication from the Court or the Monitor that those processes are not in compliance with the Agreement.

### 1. The Court Should Not Reinterpret the Existing Terms of the Agreement Based on the COVID-19 Pandemic.

In the OSC, the Court held that "[b]ecause COVID-19 poses unprecedented threats to the safety of Class Members and all who come in contact with them, including ORR and ICE staff, healthcare providers, and local populations, the Court finds that any *unexplained delay* in releasing a child in ORR and ICE custody violates of Paragraphs 14 and 18 of the FSA, which require the agencies to release Class Members in their custody without unnecessary delay and make and record efforts to release the Class Members." OSC at 11 (emphasis in original). This reading of the Agreement, however, incorrectly adds to the requirements of Paragraphs 14 and 18 of the Agreement, and thereby alters the plain terms of the Agreement as it was agreed to by the parties and entered by this Court in 1997.

As this Court has recognized, "[t]he *Flores* Agreement is a binding contract and a consent decree . . . . It is a creature of the parties' own contractual agreements and is analyzed as a contract for purposes of enforcement." *Flores v. Barr*, 407 F. Supp. 3d 909, 931 (C.D. Cal. 2019); *see also City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) ("A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles."). Like a contract, a consent decree "must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." *United States v. Asarco*, 430 F.3d 972, 980 (9th Cir. 2005); *see also*

*v. Armour & Co.*, 402 U.S. 673, 681  (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.").

A prohibition on "unexplained delay" is in essence a requirement that the government provide an individualized and ongoing explanation of why each class member has not yet been released. But no requirement that Defendants "explain delay" in individual cases is contained within the four corners of the Agreement. The Agreement "should be read to give effect to all of its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). The requirement contained in Paragraph 14 is that Defendants must avoid "unnecessary delay." That paragraph does not, by its plain terms, contain any requirement to explain why each class member remains in custody. Or, put another way using the terms the Court used on the OSC, Paragraph 14 contains no prohibition on "unexplained delay." Agreement, ¶ 14. Paragraph 17 then provides broad and permissive authority for the government to conduct suitability determinations before releasing a class member pursuant to Paragraph 14. *See* Agreement, ¶ 17 (providing that the government "may" conduct a suitability analysis before release, and allowing that such analyses "may" include a number of components, while also permitting the consideration of additional factors as well).

Read together, these provisions provide broad authority for Defendants to take the time necessary to carry out the processes and procedures they determine are necessary to ensure that proposed custodians are suitable prior to release. Carrying out those processes and procedures is not "unnecessary" delay of release—in fact it is not a delay at all. Rather, it is a necessary step to ensure children are released to custodians with adequate living conditions who can

provide for the child's needs, and whose identity and background have been adequately vetted. These processes and procedures thus are expressly permitted by the Agreement (and for unaccompanied children, are required by the TVPRA). Other provisions provide that the government is not required to release class members who are a danger or a flight risk, *see* Agreement, ¶¶ 14, 19, and therefore allow parole and bond considerations in circumstances where those legal regimes apply. Applying those legal regimes is also not unnecessary delay (or, for that matter, unexplained delay).

Paragraph 18 then reiterates that Defendants must "make" these release efforts, provides that these release efforts must be "prompt and continuous[,]" and requires that that Defendants must "record" these release efforts. *See* Agreement, ¶ 18. Notably, however, despite having agreed that recording is required, the parties did not include any requirement in the Agreement that the information recorded pursuant to this Paragraph be provided on an individualized basis to Plaintiffs or otherwise be "explained" in any way. *See* Agreement, ¶ 29 (requiring that information collected under Paragraph 28 must be provided to Plaintiffs' counsel, but making no mention of the information recorded under Paragraph 18). This is consistent with the nature of the Agreement, which was negotiated to resolve the obligations of the government with regard to the class as a whole, and to allow Plaintiffs' counsel to monitor the government's compliance on a class-wide basis. Paragraph 29 does provide an avenue by which Plaintiffs' counsel, or attorneys working with them, could represent any class member individually and then obtain the very information they are asking this Court to order Defendants to

provide.[4] But the information the parties agreed to exchange under the Agreement is consistent with the role of Plaintiffs' counsel as counsel for the class, and not for individual class members.

The word "explain" is contained in the Agreement only one time, in a paragraph that is unrelated to Defendants' release efforts. *See* Agreement, ¶ 30. There is no requirement found within the four corners of the Agreement that Defendants must "explain" their individual release or sponsorship decisions – or, more to the point, provide any continuing explanation as to why each individual class member remains in custody. Moreover, requiring Defendants to provide this information to *Flores* class counsel on an ongoing basis would impose a new and substantial burden on the government. And in fact, for class members in ORR custody, it would require that the individuals who are responsible for making efforts towards releasing class members instead take time away from those efforts to compile information to explain, on an ongoing basis, why each class member

_____

[4] Paragraph 32 allows Class Counsel to arrange attorney-client visits with class members. Agreement, ¶ 32. Nothing prohibits such counsel from then entering into individual representation agreements with the minor, or from referring the minor to *pro bono* counsel. Attorneys of record can obtain individual records, advocate for the minor, and, if necessary seek relief on the minor's behalf. *See, e.g.,* Agreement ¶ 24B and D. ORR policy and procedures also require care providers to explain to minors a variety of legal-services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, and the right to apply for asylum or to request voluntary departure in lieu of deportation. Sualog Decl. ¶ 16. This information is included as part of the initial orientation that children receive upon entering a care provider. *Id.* (citing ORR Policy Guide § 3.3.). As part of the legal-services orientation, children also receive lists of pro bono attorneys whom they can contact for assistance. *Id.* ¶ 17. In addition, non-profit, independent legal services providers work with ORR's contractor, Vera Institute of Justice, to provide legal screenings and know your rights presentations, and offer direct representation in some instances. *Id.*

remains in ORR custody. *See* Sualog Decl. ¶¶ 23-30, 36-40.[5] Because such a requirement would be inconsistent with the Agreement's existing terms, and because the parties did not bargain for or agree to any such requirement in 1997, the Court should not read the Agreement to require that Defendants avoid "unexplained delay." *See* OSC at 11.

Defendants, of course, recognize that COVID-19 is "a novel (new) disease" that "poses a serious public health risk." It can "cause mild to severe illness," with "most severe illness occurring in older adults."[6] But, the understandable concern with this novel disease does not mean the Court should "reexamin[e]" longstanding terms of the Agreement, nor supplement the plain meaning of the existing terms with new requirements. *See* OSC at 9, 11.[7] As this Court previously held, a key feature "of a binding contract is its certitude." *Flores*, 407 F. Supp. 3d. at 931. Here, there have been more than two decades of "certitude" that Defendants "record" efforts at release in accordance with Paragraph 18, not report or "explain" those efforts to class counsel.

---

[5] It is also worth noting that providing information to class counsel is not necessary to ensure that Defendants are subject to oversight. The Agreement's requirement that facilities be state licensed provides a layer of oversight through state licensing authorities. *See* Agreement ¶ 6, Exhibit 1; *see also* Sualog Decl at ¶¶ 41-53; George Decl. ¶ 7; Sheridan Decl. ¶¶ 3, 9, 33. And of course, all agencies are subject to intensive oversight from Congress and inspectors general. *See* Sualog Decl at ¶¶ 41-53. Moreover, the Independent Monitor appointed in this case has been engaged in ongoing monitoring of Defendants since she was appointed in 2018. *See* ECF No. 494.

[6] Centers for Disease Control and Prevention, Situation Summary, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fsummary.html (last visited Apr. 4, 2020).

[7] In fact, according to the declaration from Dr. Cohn, the CDC Deputy Incident Manager for the COVID-19 response, "moving . . . children outside of custody likely increases risk of exposing UAC to COVID-19 relative to remaining in custody." Cohn Decl ECF No. 736-11 at ¶ 24, and while in custody, children have access to "strong medical care that is equal to or greater than what they would have in the community should they need it." *Id*. at ¶ 26.

Plaintiffs suggest—without showing any actual nexus—that this changed interpretation of the Agreement's requirements is necessary because of the COVID-19 pandemic. *See* TRO Motion at 3-4, 20-21; *see also* OSC at 9, 11. Plaintiffs are wrong. The "basic goal of contract interpretation" is to give effect to the parties' mutual intent "at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,* 109 Cal.App.4th 944, 955 (Cal. Ct. App. 2003) (citing Cal. Civ. Code § 1636). When discerning the parties' mutual intent, courts may "not substitute one party's view of what the contract should have said for the terms that are actually contained within the document." *Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1123 (C.D. Cal. 2007) (citation and internal quotations omitted). In other words, "the courts do not make contracts for the parties." *Id.* (citation and internal quotations omitted). In this instance, the terms of the Agreement were fixed at the time the Agreement was entered into in 1997, and the Court should not bless Plaintiffs' efforts to use the COVID-19 crisis as an excuse to reinterpret or redefine the existing terms of the Agreement. Indeed, the Agreement specifically contemplated the reality that infectious disease would be managed in the context of the custody provisions laid out in the Agreement. *See* Agreement, Exhibit 1 at A.2 (requiring "a complete medical examination (including screening for infectious disease) within 48 hours of admission").

If changed factual circumstances make Plaintiffs wish that they had negotiated different terms in the Agreement then they should be required to negotiate an amendment of the Agreement through the appropriate channels. *See* ECF No. 455 at 7 ("Of course, the parties are always free to meet and confer regarding any contractual amendments on which they can mutually agree. This is basic contract law."); *see also LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221,

1236, 1237 n.44 (11th Cir. 2018) (holding that "[i]f the party holding the injunction wishes to modify the provision, the party must move the district court to effect the modification," instead of modifying the injunction at a show cause hearing). Absent renegotiation, Plaintiffs should be held to the terms of the Agreement that they agreed to, and the Court should evaluate Defendants' compliance with Paragraphs 14 and 18 of the Agreement based on those Paragraphs' plain terms.

Thus, the procedural posture of this case—an action to enforce terms of an existing settlement agreement—means that Plaintiffs bear the burden to show that Defendants violated the existing terms of the Agreement, and the Court should evaluate the pending motion through that lens. *See Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*, 520 F.Supp.2d 1184, 1194 (C.D. Cal. 2007) ("Plaintiff has the burden at trial of proving all elements of its breach of contract claim."). Plaintiffs should not prevail in bringing claims based on inferences and a lack of evidence, seeking benefits that they now wish they had bargained to receive under the Agreement. And the Court should not find Defendants in breach, and should not order any injunctive relief, unless it finds that Plaintiffs have met their burden to establish that Defendants are in breach of the existing terms of the Agreement based on non-speculative, admissible evidence regarding Defendants' compliance or lack thereof.

### 2. ORR Makes and Records Efforts Toward Release, and Releases Class Members Without Unnecessary Delay.

#### a. *ORR Makes and Records Efforts Toward Release.*

ORR has substantial, longstanding procedures to ensure that licensed care providers in its network comply with the requirements of Paragraphs 14 and 18 that they "make and record the prompt and continuous efforts on its part toward

family reunification and release of the minor . . . ." Agreement, ¶ 18; *see also* Sualog Decl. ¶ 7.

First, ORR requires all licensed care providers to follow the directive to "make" efforts towards release. To ensure that this requirement is fulfilled, ORR incorporates reunification requirements in its Cooperative Agreement for Residential Services, which requires that grantees agree to comply with HHS policy and regulations. *Id.* ¶ 8, Attachment A. Among other things, the Cooperative Agreement requires that grantees develop effective program management structures that will promote the "safe and timely release of unaccompanied children" *Id.* ORR's UAC Policy Guide ("ORR Policy Guide") and ORR's UAC Manual of Procedures ("ORR MAP") also contain detailed steps on reunification that grantees must follow. *Id.* (citing ORR Policy Guide § 2 and ORR MAP § 2); *see also id.* ¶ 9.

Under ORR Policy, Case Managers (working for the grantee licensed care providers) must initiate and maintain ongoing communication with the potential sponsor, gather sponsor information, and assess whether the potential sponsor is a suitable sponsor who can safely provide for the physical and mental well-being of the minor in order to formulate a recommendation on release. *Id.* ¶ 10. (citing ORR Policy Guide §2.3.2). Case Managers also ensure that information is gathered or shared with the appropriate staff and stakeholders during the reunification process. *Id.* ¶ 11. The Case Manager provides weekly status updates to the Case Coordinator and Federal Field Specialist ("FFS") regarding progress towards reunification, as well as any potential challenges that may delay a release. *Id.* (citing ORR MAP § 3.3.1); *see also id.* ¶ 13. The Case Manager also meets weekly with the unaccompanied child to provide updates on his or her case. *Id.* ¶¶ 11, 15. Finally, the Case Manager informs other stakeholders, which may include local

24

legal service providers, attorneys of record, and child advocates, of the progress of a child's case, including notification that an unaccompanied alien child may not have a potential sponsor, and any final release decisions. *Id.* ¶¶ 11, 15.

Second, ORR "records" all of these efforts at reunification, and requires its licensed care provider grantees to do the same. *Id.* ¶ 12 (citing ORR MAP § 3.3.1). Much of the documentation is maintained in an online reporting system known as the "UAC Portal." *Id.* ¶ 14. The Case Manager is responsible for timely entry and organization of documents, records and other information in the UAC case file, including records generated and gathered for and by the UAC and their sponsor. *Id.* ¶ 12. The weekly meetings between the Case Managers and the FFS, described above, are recorded in weekly case manager notes, which become part of the case file. *Id.* ¶ 13 (citing ORR MAP § 2.2.4); *see also id.*, Ex. E (sample of case manager notes). Documentation of the reunification efforts also includes: the recording of information from any potential sponsor's Family Reunification Application ("FRA") as well as uploading the FRA to the UAC Portal; family session(s) case notes (clinician and case manager observations of interactions/conversations between UAC and potential sponsor); and assessment(s) based on interviews with UAC, UAC's family, UAC's caregiver in home country, and sponsor's neighbors (conducted in-person or via video conference). *Id.* Case Managers also are required to record any concerns with the uploaded sponsor information by flagging the information in the Case Manager's notes, and elevating any such concerns to the Case Coordinator and/or FFS. *Id.*

In addition to the above, case managers fill out 30-day case reviews regarding the status of reunification. *Id.* ¶ 14 (citing UAC MAP § 3.3.1). The UAC Case Review is continuously updated both on regular 30-day intervals, and as new

25

information is received. *Id.* (citing UAC MAP § 3.3.1). Case review notes are maintained in the UAC Portal. *Id.* ¶ 14, Attachment F.

The above evidence regarding ORR's making and recording of efforts towards release is not disputed by any of the evidence submitted with Plaintiffs' TRO Motion. Any suggestion that ORR might not be following the above processes is incorrect, speculative, and not based on any evidence or any prior concerns or problems that have arisen with regard to ORR's compliance with the Agreement. In the absence of any such evidence, Plaintiffs have not met their burden to show that ORR is in breach of Paragraphs 14 and 18 of the Agreement.

In addressing whether ORR complies with this provision of the Agreement, the Court preliminarily relied on numbers submitted by Plaintiffs showing the lengths of time that minors remain in ORR custody. OSC at 9-10. As an initial matter, any reliance on numbers submitted from the Dilley Pro Bono Project to evaluate ORR would be inappropriate because Dilley is an ICE facility. *See id*; *see also* Sheridan Decl. ¶ 1. Additionally, as the Court has recognized, these numbers on their own do not provide any basis to conclude that ORR violates the Agreement; these numbers do not provide any information about the reasons why any individual class member may remain in ORR custody, or whether any delay in release may be "unnecessary" so as to signal a lack of compliance with the Agreement. *See* OSC at 9 ("ORR's data do not indicate why the agency failed to release these minors or how many of them have sponsors."); *see also* ECF No. 470 at 24-25 n.6 ("In the abstract, however, this data is unhelpful because it is unclear how ORR's policies and practices have affected each UAC's length of stay.").

As Ms. Sualog explains in her attached declaration, the numbers provided by Plaintiffs are not helpful in evaluating whether minors unnecessarily remain in

custody. *See* Sualog Decl. ¶¶ 31-35. For example, Plaintiffs allege that the data show that more than 11 percent of minors are in care for more than six months, a number the Court found "incredibl[e]." OSC at 9. But that number apparently failed to exclude minors in long-term foster care (a non-congregate care setting where children are expected to reside for the long-term). Sualog Decl. ¶ 34. Likewise, that number apparently fails to account for—and exclude—children who have no viable sponsor who may be able to take custody of them. *Id.*

Including children who lack a viable sponsor in these calculations will necessarily skew the percentages of children who have longer lengths of care, particularly as the overall numbers of children in care decreases. *Id.* Such modeling does not allow for a fair evaluation of ORR efforts to release UAC promptly and safely because ORR generally has no control over whether some children ultimately lack a viable sponsor. *Id.* When children with no viable sponsor, and children who are not in congregate care settings, are excluded from the calculations, the number of children in care beyond six months decreases to about 3% of those currently in custody. *Id.* ¶ 35. And even this number may not reveal the full picture, because sponsor identification is an ongoing process. *Id.* The fact that a minor currently is being counted in a category showing that he or she has an available potential sponsor does not necessarily mean that the minor has had a potential sponsor from the date he or she entered ORR custody, as the sponsor may recently have been identified. *Id.* Importantly, as well, the numbers do not show whether or when a proposed sponsor has returned the sponsor application documents, nor do they establish that the sponsor being considered is actually a "suitable" sponsor who will continue with the process, and who eventually will be determined "suitable" such that he or she can take physical custody of a child and care for him or her. *Id.* at ¶¶ 24-26.

Thus, Plaintiffs' statistics are just that – statistics. They do not bear upon the underlying facts, and they do not show that ORR is failing to make prompt and continuous efforts towards the release of minors in its care. They offer no information as to the time at which a sponsor may have returned a sponsor application or other important documentation, or on whether the sponsors being considered are suitable to care for children or intend to continue with the sponsorship process to the end. And, more generally, any analysis of the numbers could not establish a violation in light of the evidence above regarding the substantial processes ORR has for making such efforts. Thus, the Court should not conclude that Plaintiffs have met their burden to show that ORR is in violation of the Agreement in this regard.

Likewise, these numbers do not establish that ORR is in violation of the Agreement's recording requirement. The OSC notes the numbers, and then states that ORR's "apparent failure" to comply with the recording requirement "makes it more difficult to ascertain how many of the minors' releases to suitable custodians have been delayed without good reason." OSC at 10. But as discussed above, Plaintiffs' numbers are inapposite, and ORR does in fact record this information extensively, on an individualized basis for each and every class member in its care. *See* Sualog Decl. ¶¶ 12-17; *see also* ORR Data Response, submitted concurrently. Plaintiffs' TRO Motion contains absolutely no claim or evidence that would support a conclusion that ORR does not record such information, especially in light of Ms. Sualog's testimony. The information recorded by ORR in fact does allow ORR to identify any and all "justifications under the TVPRA for delaying release" for any individual class member. *See* OSC at 10; *see also* Sualog Decl. ¶¶ 23-30, 36-40; ORR Data Response, submitted concurrently. And ORR's systems provide constant oversight of the release

processes, using this recorded information, in a manner that ensures that class members are released to sponsors promptly, and without any unnecessary delay. *See* Agreement, ¶ 14, Sualog Decl. ¶¶ 7-17.

The fact that Plaintiffs do not have this "recorded" information does not—and should not—constitute an "apparent failure" on the part of ORR to comply with Agreement's recording requirement, OSC at 10, because Paragraph 18 contains no such requirement. *See* Agreement, ¶ 18. Thus, there is no basis for this Court to conclude that Plaintiffs have met their burden to show that ORR violates the requirements of Paragraphs 14 and 18 that it "make and record the prompt and continuous efforts" toward the release of class members, and therefore the Court should not issue any injunction against ORR.

### b. ORR Releases Class Members Without Unnecessary Delay.

The OSC notes that "[t]his Court has previously found that some of ORR's policies, even if they result in delays in releasing minors to adult custodians, 'appear to be reasonably calculated to protect Class Members from 'harm or neglect' and to ensure that they have an adequate 'standard of care.''" OSC at 9 (quoting *Flores v. Sessions*, Case No. 85-4544, 2018 WL 10162328, at *18 (C.D. Cal., July 30, 2018); Agreement at ¶¶ 11, 17). The OSC then adds, however, that "the change in factual circumstances now requires a reexamination of whether ORR's continued custody of children in congregate settings meets the Agreement's requirement that Class Members be released without unnecessary delay." *Id.*

For the reasons discussed above, the Court should not reexamine its previous ruling on this issue based on Plaintiffs' new allegations of changed factual circumstances. The Court also should not order that COVID-19 requires ORR to change or limit its safety protocols so that children could be released in a

29

more expedited manner. Plaintiffs have not explained why or how COVID-19 should cause ORR to modify any of the steps in its release processes, or why such modifications could be appropriately addressed by any class-wide injunction under the Agreement. As of March 29, 2020, ORR had 3,152 class members in its care and custody, Sualog Decl. ¶ 6. That number includes minors in long-term and transitional foster care, which are not congregate settings. *Id.* When those minors are excluded, there are 2,281 minors in shelter facilities, 6 in staff secure facilities, 12 in secure facilities, 14 in therapeutic group homes and 15 in residential treatment centers. *Id.* Each of those facilities will necessarily vary based on numerous factors including the facility's size, location, and the age ranges and gender of children in care. Likewise, each class member's potential release to a sponsor is impacted by numerous different factors. *See* Sualog Decl. ¶¶ 18, 32-35; ORR Data Response, submitted concurrently. These variances, and Plaintiffs' failure to identify any uniform impact of the COVID-19 pandemic that directly impacts any of the specific steps that are part of ORR's existing processes, caution against this Court imposing any form of class-wide injunction.

In fact, ORR's procedures for making and recording continuous efforts at reunification are designed to allow ORR to assess the suitability of potential sponsors on a case-by-case basis, taking into account the wide variety of circumstances that might occur in each situation. *Id.* ¶ 18; ORR Data Response, submitted concurrently. This means that these procedures are already suited to deal with the additional complications that arise in from the COVID-19 pandemic, where the situation—including the incidence of COVID-19 in the community, the potential sponsor's home situation, and the needs of the child—is likely to be rapidly evolving. *Id.* ¶ 19. For example, many sponsors may be located in states that are currently under "shelter in place" directives in which residents' freedom

of movement has been significantly curtailed in an effort to control the spread of COVID-19, such as California, Washington, and New York. *Id.* ¶ 20. At the same time, many of the minors in ORR custody are currently housed in settings where infection control protocols are able to be rigorously enforced. *Id.* Releasing children in some circumstances might require that the children and their escorts transit through airports or other transit systems, or might expose children to sponsors or others who are living in communities with widespread community transmission—while this would not be prohibitive to release in all circumstances, ORR should have the ability to consider these issues in making release determinations and arrangements. *Id.* ¶ 21. And some applicant sponsors may be experiencing business closures, layoffs, or furloughs, or be subject to stay-at-home orders that limit their ability to pick up or care for the child. *Id.* ¶ 22. ORR's case-by-case reunification process allows the agency to consider each situation as a unique case, including changes to the sponsor's household that may have suddenly appeared due to COVID-19. *Id.* Accordingly, this Court should not find that COVID-19 requires it to reevaluate its prior conclusions regarding ORR's release processes, and should instead decline to issue a class-wide injunction against ORR that would interfere with these processes, and undermine ORR's ability to ensure the safety of the minors in its custody, as well as minors it is releasing from its custody, on a case-by-case basis.

### 3. ICE Makes and Records Efforts Toward Release, and Releases Class Members Without Unnecessary Delay.

The OSC concludes that "Plaintiffs have shown a strong likelihood of success on their claim that ICE has not undertaken or recorded efforts to promptly release the Class Members in its custody." OSC at 11. In reaching this conclusion, the OSC relies on declarations from Plaintiffs' counsel as well as data provided by Plaintiffs, noting the fact that ICE had not had the opportunity to provide

responsive data given the short time period it had to respond to Plaintiffs' TRO Motion. *Id.* The OSC also cited to earlier decisions regarding the requirements that ICE must follow to comply with this provision of the Agreement. *See* OSC at 10 (citing *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1067 (C.D. Cal. 2017); *Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at \*2 (C.D. Cal. July 9, 2018)).

As described below, since at least September 8, 2017, ICE has been clear with the Court, the Plaintiffs, and the Monitor, about the manner in which it has been complying with the Agreement's requirements regarding expeditious release, and making and recording efforts towards release. Neither the Court nor the Monitor has ever informed ICE that their processes do not comply with the existing terms of the Agreement or the Court's orders. And in fact, the Monitor has reported on these processes in both of her reports, and has never found or even suggested that Defendants' procedures do not comply with the Agreement or the Court's orders. Accordingly, the Court should conclude that ICE is in compliance with the requirements of Paragraphs 14 and 18 of the Agreement, and should not issue any preliminary injunction against ICE.

In the June 27, 2017 order cited above, the Court ordered ICE to appoint a juvenile coordinator in accordance with Paragraph 24A of the Agreement. 394 F. Supp. 3d at 1072. On August 24, 2017, the Court approved ICE's proposal to appoint Deane Dougherty an its juvenile coordinator, and ordered that she file a declaration detailing what she has done to familiarize herself with the issues identified in the Court's June 27, 2017 order, and what course of action she proposed to undertake to address the deficiencies outlined in that order. *See* ECF No. 371. Ms. Dougherty filed that declaration on September 8, 2017. *See* ECF No. 374-2. In that declaration, Ms. Dougherty outlined the manner by which ICE was

complying with the provisions of the Court's order requiring that it make and record continuous efforts towards the release of class members, and release class members as expeditiously as possible. ECF No. 374-2, ¶¶ 8-9. Ms. Dougherty also outlined the manner by which she intended to monitor ICE's future compliance with those provisions of the Agreement and the Court's order. ECF No. 374-2, ¶¶ 8-9.

Specifically, on the issue of making and recording continuous efforts towards release, Ms. Dougherty explained:

> ICE has issued guidance directing FRCs to evaluate whether, upon initially taking a class member into custody, the class member is eligible for parole under conditions established by 8 U.S.C. §1182(d)(5) and 8 C.F.R. § 212.5(b). Class members will be reevaluated for parole when new, pertinent information is received concerning continued custody. In addition, when an FSA class member is admitted into an FRC, ICE asks the parent of the class member the opportunity to list potential sponsors.

*Id.* ¶ 8.a. In order to ensure that FRCs were complying with the Agreement, Ms. Dougherty explained that she intended to conduct random spot checks on the A-files of a random selection of at least five percent of class members to ensure that the files contain the sponsor election form, as well as a copy of the parole decision, which reflects ICE's "recording" of efforts in this regard. *Id.* ¶ 8.b.

On the issue of expeditious release, Ms. Dougherty explained:

> A vast majority of FSA class members in FRCs are in expedited removal proceedings, pursuant to 8 U.S.C. § 1225(b), or have final expedited removal orders. Independent of the efforts to release described in paragraph 8 above, FSA class members may have made claims of fear of returning to their home country. Credible fear claims are initially evaluated by U.S. Citizenship and Immigration Services (USCIS). If USCIS finds that a credible fear has not been established, the class member may

33

seek review of the USCIS determination before an immigration judge. At any time where USCIS or an Immigration Judge has determined that the class member does not have a credible fear of return, the class member may request that USCIS reconsider the negative determination. Even though the credible fear process takes time, the Opinion notes that 95 percent of FSA class members at the FRCs are released within 20 days or less. Nonetheless, the Court has expressed concern that class members detained over 20 days are not being released or removed as expeditiously as possible.

*Id.* ¶ 9.a. Ms. Dougherty proposed that in order to monitor compliance with this provision of the Agreement, she would receive weekly lists of class members who had been at an ICE FRC for longer than twenty days from ICE, to include the number of days the class member had been at the FRC and the reasons they were not released within twenty days. *Id.* ¶ 9.b. She then proposed that she would "review the reports to ensure the FRCs have a valid reason for any delay past 20 days and, when appropriate, [] ensure that appropriate corrective action is taken." *Id.*

On October 18, 2017, the Court issued an order stating it had reviewed Ms. Dougherty's declaration, and setting a schedule for Ms. Dougherty to provide quarterly monitoring reports to the Court in accordance with her proposal. ECF No. 380. Thereafter, Ms. Dougherty filed reports on December 1, 2017, March 2, 2018, and June 1, 2018. ECF Nos. 384-2, 402-2, and 430-2. In each of those reports, Ms. Dougherty advised the Court of the results of her monitoring efforts, which she conducted in the manner described in her initial declaration. *See* ECF Nos. 384-2 at 3-6, 7-8, 9; 402-2 at 3-6, and 430-2 at 2-6.

Following each report, Plaintiffs filed a response. *See* ECF Nos. 388, 406, 463. In her March 2, 2018 report, Ms. Dougherty responded to assertions made by Plaintiffs in response to her previous report. *See* ECF No. 402-2 at 8-9, 12-13, 13-16. In Plaintiffs' March 30, 2018 response, Plaintiffs reiterated many of their

34

objections, complaining that Ms. Dougherty had not provided them with copies of the parole determination worksheets she had reviewed, and objecting generally to the manner in which ICE was complying with the Court's order to make and record efforts towards release. *See* ECF No. 406 at 21-24. Plaintiffs likewise objected to the manner by which Ms. Dougherty was evaluating compliance with the expeditious release requirement. *Id.* at 29-31. The Court made no statement on any of Plaintiffs' objections during this time period, and Ms. Dougherty continued to monitor ICE's compliance in the manner initially approved by the Court. *See* ECF No. 430-2. Plaintiffs' final response to Ms. Dougherty's report again reiterated Plaintiffs' objections, and asked the Court to order the appointment of a Special Master. ECF No. 463.

Following a hearing on July 27, 2018, the Court ordered that a Special Master/Independent Monitor ("Monitor") be appointed to take over the monitoring of, among other things, ICE's compliance with these provisions of the Agreement. *See* ECF No. 469. On August 24, 2018, Ms. Dougherty also filed a responsive report for consideration by the Monitor, to address assertions made by Plaintiffs. *See* ECF No. 475-1. In that filing, Ms. Dougherty once again reiterated her explanation as to ICE's manner of complying with the Agreement and with the Court's June 27, 2017 order, and explained the process by which she was monitoring compliance with those provisions. *Id.* at 3-4. Following the appointment of the Monitor, the Court ordered that Ms. Dougherty should now file annual reports, and Ms. Dougherty last did so on July 1, 2019. *See* ECF No. 583-2. In that report, Ms. Dougherty once again evaluated ICE for compliance with the applicable provisions in the same manner as she had done in her previous reports. *Id.*

35

Ms. Ordin was appointed as the Monitor on October 5, 2018, and has been responsible for ongoing monitoring of ICE's compliance with these provisions of the Agreement since that time. ECF No. 494. Ms. Ordin has submitted two reports in her capacity as the Monitor, on March 6, 2019 (ECF No. 528) and August 19, 2019 (ECF No. 625). In her first report, Ms. Ordin addressed the issue of release without unnecessary delay from ICE facilities. *See* ECF No. 528 at 30-36. Ms. Ordin noted some "common reasons that unaccompanied [sic.] children remain in [ICE] custody over 20 days[,]" and stated no concerns or opinions about those reasons. *Id.* at 31. Likewise Ms. Ordin also noted the average lengths of stay in two of the ICE FRCs, and also stated no concerns or opinions about those numbers. *Id.* at 33, 36-36.

In her August 20, 2019 report, Ms. Ordin provided further analysis of "alleged breaches of the FSA by ICE." ECF No. 625 at 16-21. This report provided a much more in depth evaluation of ICE data regarding the lengths of time that class members spend in ICE FRCs. *Id.* at 18-21. The report observed that:

> At the request of the Monitor, ICE Juvenile Coordinator Deane Dougherty reviewed eight cases at Karnes and Dilley to determine reasons for stays longer than 23 days. Several issues recurred in the eight cases: late claims of credible fear of returning to their countries of origin, appeals of negative findings of credible fear, time to clear a criminal conviction in the country of origin, administrative delays in scheduling credible-fear interviews, and delay in retrieving records. These delays resulted in ICE custody ranging from 35 to 69 days. However, it is worth noting that in three of the eight cases it appears that the additional steps resulted in positive findings of credible fear or release pending resolution of litigation.

*Id.* at 20-21. The report stated no concerns about these reasons for continued custody past 20 days, nor did it further opine on these reasons, or on ICE's release processes in general.

36

The attached declarations from ICE make clear that ICE continues to comply with the requirements of Paragraphs 14 and 18 of the Agreement in the same manner as it has since at least September 8, 2017, without any objection from the Court or the Monitor. *See* Harper Decl. ¶¶ 8-12. Accordingly, the Court should conclude that ICE complies with the requirements of Paragraphs 14 and 18 of the Agreement, and should not issue any preliminary injunction against ICE.

The OSC states, however, that Plaintiffs' evidence "indicate[s] that ICE does not undertake or record any efforts aimed at the release of minors as required by Paragraphs 14 and 18 of the Agreement." OSC at 10. To the extent that this conclusion rests on inferences drawn from Plaintiffs' unrebutted data regarding lengths of stay, the Court should revisit that conclusion in light of the evidence submitted herewith.

First, as explained in Defendants' previous submissions (and acknowledged in Ms. Schey's most recent updated declaration), the numbers submitted by Plaintiffs and relied upon in the OSC are incorrect. *See* TRO Opposition, ECF No. 736, at 23; Schey Supplemental Declaration, ECF No. 744. And in any event, Ms. Harper's declaration makes clear that those numbers are no longer current, as there have been a significant number of releases from the ICE FRCs since that time. *See* Harper Decl. ¶¶ 1-4. Additionally, Ms. Harper's declaration, along with the declarations of Mr. George and Mr. Sheridan, reflect that all three FRCs are currently operating significantly below their total capacity (52% at Karnes, 25% at Dilley, and 22% at Berks), and that all three facilities have released—and continue to release—individuals in accordance with the Agreement as well as ICE's guidelines for considering individuals for release in light of the COVID-19 pandemic. Harper Decl. ¶¶ 1-4; George Decl. ¶ 15; Sheridan Decl. ¶¶ 16, 39. The data required by the OSC, and being filed under seal concurrently herewith,

further makes clear that for those class members who remain in custody, their custody is consistent with the Agreement, and with prior orders of this Court. Thus, viewed as a whole, the evidence submitted by ICE makes clear that ICE continues to assess class members for release, and to make and record efforts towards release, in the same manner that the Court and Monitor have been fully apprised of, and found acceptable, for 2.5 years.

To the extent that the OSC relies on declarations from Plaintiffs' counsel this evidence also does not establish any violation of the Agreement by Defendants. The OSC relies on four declarations from counsel on this point. *See* OSC at 10. First, the OSC relies on the Declaration of Peter Schey, but the paragraph upon which the Court relies is based on Mr. Schey's recounting of statements made by others, and therefore constitutes inadmissible hearsay that should be disregarded. *See* Schey Decl., ECF No. 733-2, ¶ 7. Second, the OSC relies on the statement of counsel Bridget Cambria that "ICE makes no efforts under Paragraph 14 of the Flores settlement to make and record prompt and continuous efforts aimed at the release of minors without unnecessary delay." Cambria Decl., ECF No. 733-10, ¶ 39 (citing Agreement, ¶¶ 14, 18). This statement, however, is just a conclusory legal opinion, that provides no factual assertions, and should not be relied upon by this Court. *See EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1050 (C.D. Cal. 2013), *aff'd*, No. 15-56311, 686 Fed. Appx. 486 (9th Cir. Apr. 10, 2017) (concluding that when an attorney declarant draws "legal conclusions regarding the application of law to the facts of th[e] case," the court properly disregards the declaration when deciding the motion); *Yarborough v. United States*, No. 10-346-VAP, 2013 WL 12130568, at *1 (C.D. Cal. Mar. 19, 2013) ("Plaintiff is not entitled to injunctive relief on the basis of conclusory allegations, or simply because he requests it.") (citing *Am.*

*Passage Media Corp. v. Cass Commc'ns. Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985); *Goldie's Bookstore, Inc. v. Sup. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)).

Finally, the OSC relies upon the declarations of Shalyn Fluharty and Andrea Meza. OSC at 10 (citing Fluharty Decl., ¶¶ 38-40; Meza Decl., ¶¶ 10, 43). In the cited paragraphs, Ms. Fluharty states that she has "never seen ICE make an individualized assessment regarding whether a child is a danger to society or a fight risk[,]" and has "never been provided any documentation that confirms that an assessment of flight risk or danger was ever made." Fluharty Decl. ¶¶ 38-39. She further states that according to a survey conducted of mothers held at Dilley, "98.5 percent of mothers reported they never received any explanation for why their children were being detained and could not be released." *Id.* ¶ 40. Ms. Meza states that she is "not aware of ICE ever having made an individualized assessment as to whether a child is a danger to society or flight risk[,]" and has "never spoken with a parent detained at Karnes who had received an explanation as to why his or her child was detained." Meza Decl. ¶ 10. For all of the reasons discussed above, the fact that these two counsel are not aware of the processes by which ICE assessed flight risk and evaluates class members for parole does not violate the Agreement. The Agreement contains no such requirement, and the evidence shows that ICE nonetheless "makes' and "records" such efforts in the same manner that has been submitted to the Court, and overseen by the Monitor, for 2.5 years.

Finally, Plaintiffs have provided no basis to find that the COVID-19 pandemic warrants any form of interim injunctive relief, or provides any basis for this court to revisit or reexamine the plain terms of the Agreement, and the processes which ICE has followed for over 2.5 years without any indication from the Court or the Monitor that those processes are not in compliance with the

39

Agreement. As described above, in Section III.A, and shown in the evidence submitted herewith, ICE has taken—and continues to take—steps in each of its FRCs to follow all applicable guidance, including taking steps to release individuals from custody.

For all of the above reasons, the Court should not issue the proposed preliminary injunctive relief, and should not require ICE to alter the process by which it has complied with the Agreement for the past 2.5 years. Should the Court believe that these processes require further evaluation, the proper way for that to occur is for the Monitor to evaluate them in the course of her normal monitoring duties.

**IV.    CONCLUSION**

Because Plaintiffs cannot satisfy the requirements for preliminary relief, Defendants respectfully request the Court deny Plaintiffs' Motion, and conclude that Defendants have shown cause why a preliminary injunction should not issue.

DATED: April 6, 2020

JOSEPH H. HUNT
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants*

41

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2020, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants