# DEFENDANTS' EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM BARR, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*, <br><br> Defendants. | Case No.:  2:85-CV-4544 DMG (AGRx) <br><br> District Judge Dolly M. Gee |

## DECLARATION OF JALLYN SUALOG, DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT

I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1. I am the Deputy Director for Children's Programs for the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

2. I have held the position of Deputy Director for Children's Programs since June of 2018. I was previously the Director of Children's Services since September 2013. I have worked at ORR since February 2007. I have a Master's of Arts in Clinical Psychology. Before joining ORR, I worked as a mental health professional and managed the child welfare and social services programs for Hawaii's largest non-profit organization.

3. As the Deputy Director for Children's Programs for ORR, I have responsibility for the oversight of the Unaccompanied Alien Children ("UAC") program, including all aspects of operations, planning and logistics, medical services, and monitoring. My professional duties generally encompass overseeing the care provider network of licensed programs, and ensuring compliance with ORR requirements, such as making and recording continuous efforts towards reunification and release in accordance with the *Flores* settlement agreement.

4. In addition to my personal knowledge regarding ORR policy on making and recording continuous efforts toward reunification and release, this declaration is based upon knowledge and information obtained from various records and systems maintained by ORR in the regular course of business, consulting with the ORR data team, and reviewing the Court order issued Saturday, March 28, 2020. I provide this

declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

5. I am submitting this declaration for use in responding to the Court's Order Re Plaintiffs' Ex Parte Application for Restraining Order and Order to Show Cause Re Preliminary Injunction, ECF No. 740. Below I describe how ORR complies with the *Flores* settlement agreement provision in paragraph 18. That provision states: "Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody." I also explain why Plaintiffs' request that ORR not just record continuous efforts (or direct licensed programs to do so) but also regularly report the status of such efforts would be impracticable and extraordinarily time-consuming. Finally, I explain the intense Congressional and other oversight of the ORR program, explain how ORR arrived at the explanatory information provided in response to the Order to Show Cause, and present data related to the length of care for children.

6. As of March 29, 2020, there are a total of 3,152 UAC in ORR's care and custody, including long-term and transitional foster care, which are not congregate settings. With respect to congregate settings only, there are 2,281 UAC in shelter facilities, 6 in staff secure facilities, 12 in secure facilities, 14 in therapeutic group homes and 15 in RTCs.[1]

Making efforts at reunification

7. ORR requires its network of licensed care providers to make and record continuous efforts at reunification.

8. ORR incorporates reunification requirements in the Cooperative Agreement for Residential Services ("Cooperative Agreement") (attached hereto as Ex. A), which requires that grantees agree to comply with HHS policy and regulations. *See* Ex. A at 2, 7. Grantees must also develop an effective program management structure designed to, *inter alia*, promote positive outcomes including the safe and timely release of unaccompanied children. *Id*. at 7. The Cooperative Agreement requires facility-grantees to develop annual training based on the Safe and Timely Release process as well as on ORR operational policies and relevant guidance. *Id*. at 20. Within these ORR operational policies and procedures—specifically, ORR's UAC Policy Guide ("ORR Policy Guide") and its UAC Manual of Procedures ("ORR MAP")—ORR maintains detailed steps on reunification. *See* ORR Policy Guide § 2 and ORR MAP § 2 (Safe and Timely Release from ORR Care) (attached hereto as Ex. C).

9. While the ORR Policy Guide and MAP speak for themselves, relevant provisions include beginning the process of finding family members or others who may be qualified to care for an

---

[1] There are also 437 UAC in long term foster care and another 358 in transitional foster care, neither of which is considered to be a congregate setting.

2

unaccompanied alien child as soon as the child enters ORR's care. ORR Policy Guide § 2 (attached hereto as Ex. B). Section 2 of the ORR Policy Guide sets out the reunification process and key participants in effectuating the safe and timely release of children in ORR's care.

10. Under Section 2 of the Policy Guide, the Case Manager's role within the release process is to initiate and maintain ongoing communication with the potential sponsor, gather sponsor information, and assess whether the potential sponsor is a suitable sponsor who can safely provide for the physical and mental well-being of the minor in order to formulate a recommendation on release. *See* ORR Policy Guide §2.3.2.

11. According to Section 3 of the ORR MAP (attached hereto as Ex. D), the Case Manager also ensures that information is gathered or shared with the appropriate staff and stakeholders during the reunification process. The Case Manager provides weekly status updates to the Case Coordinator and FFS on progress in achieving a safe and timely release and potential challenges that may delay a release. *Id.*, *see also* ORR MAP § 3.3.1. The Case Manager meets weekly to update the unaccompanied child on his or her case and provision of services. The Case Manager informs other stakeholders of the progress of a child's case, including notification that an unaccompanied alien child may not have a potential sponsor, and any final release decisions. Stakeholders may also include local legal service providers, attorneys of record, and child advocates.

Recording efforts at reunification

12. ORR also records efforts at reunification, and requires its licensed care provider grantees to do the same. *See* ORR MAP § 3.3.1 (Case Management). The Case Manager takes lead responsibility, under the grant, for timely entry and organization of documents, records and other information in the UAC case file, including records generated and gathered for the UAC and their sponsor. *Id.*

13. Each week, case managers (who work for the grantee care providers) and the Federal Field Specialist ("FFS"), a federal employee, meet to discuss each child's reunification case. *See* UAC MAP § 3.3.1. The Case Manager records those efforts in weekly case manager notes, which become part of the case file. ORR MAP § 2.2.4. The robust documentation of the reunification effort also includes an explanation of potential sponsor's relationship with the UAC in the Family Reunification Application, confirmed by UAC's family; updates to the Case Status page with data from the potential sponsor's Family Reunification Application ("FRA") and uploading the FRA to the UAC Portal's UAC Documents tab; family session(s) case notes (clinician and case manager observations of interactions/conversations between UAC and potential sponsor); and assessment(s) based on interviews with UAC, UAC's family, UAC's caregiver in home country, and sponsor's neighbors (conducted in-person or via video conference). Such documentation also requires the case manager to note any concerns in the uploaded sponsor information by flagging the

3

information in the case manager's notes and elevating any such findings to the case coordinator and/or FFS. *Id.* An example of such weekly notes is attached to this declaration (attached hereto as Ex. E).

14. In addition, case managers fill out 30-day case reviews to discuss the status of reunification. UAC MAP § 3.3.1. The case manager continuously updates the UAC Case Review within 30 calendar days after admission (90 days for LTFC) or when the care provider receives required or relevant information that was unknown during the time of assessment" or "receives additional information from the UAC or other sources." *Id*. A new UAC Case Review is created every 30 days after admission into a facility (90 days for LTFC) and "[a]ny time there is a substantial change in the UAC's case information (e.g., upon reunification, age out, or voluntary departure)." *Id*. Case review notes appear in an online reporting system maintained by ORR, known as the "UAC Portal" (*see* attached screen shot of UAC Case Review from the UAC Portal, Ex. F).

15. The case manager also is required to meet with the minor on a weekly basis to discuss the status of his or her case, including reunification. *See* ORR MAP § 3.3.1. The case manager is available to the minor's attorney of record, as well, to discuss the reunification case. *Id.*

16. ORR policy and procedures also require care providers to include legal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation. Such information is included as part of the initial orientation that children receive upon entering a care provider. ORR Policy Guide § 3.3.[2]

17. As part of legal services orientation, children receive lists of pro bono attorneys whom they can contact for assistance. In addition, non-profit, independent legal services providers work with ORR's contractor, Vera Institute of Justice, to arrive on-site to care providers, provide legal screenings, know your rights presentations, and offer direct representation in some instances.

Ensuring safe and timely release

18. Importantly, ORR's procedures for making and recording continuous efforts at reunification are designed to allow ORR to assess the suitability of potential sponsors on a case-by-case basis, taking into account the wide variety of circumstances that might occur in each situation.

19. Particularly in the wake of pandemic like COVID-19, where the situation is rapidly evolving, it is important to ensure that the agency charged with overseeing safe and timely release is able to have the tools necessary to address rapidly changing guidance and situational factors, including the incidence of COVID-19 in the community, the potential sponsor's home situation, and the needs of the child.

---

[2] *See also* ORR Legal Resources Guide, available at https://www.acf.hhs.gov/orr/resource/unaccompanied-childrens-services.

4

20. Many sponsors are located in states that are currently under "shelter in place" in which residents' freedom of movement has been significantly curtailed in an effort to control the spread of COVID-19, such as California, Washington, and New York. In contrast, UAC are currently housed in settings where infection control protocols are rigorously enforced.

21. Releasing children may also require transit through airports or other transit systems, or exposing them to sponsors or others, who themselves live in communities with widespread community transmission.

22. Some applicant sponsors may be experiencing business closures, layoffs, or furloughs, or are themselves subject to stay-at-home orders. ORR's case-by-case reunification process allows the agency to consider each situation as a unique case, including changes to the sponsor's household that may have suddenly appeared due to COVID-19.

<u>Statistical or regular reports on reunification status would be impracticable and extraordinarily time-consuming</u>

23. Because each reunification case is unique, Plaintiffs' request that ORR regularly share or explain why minors remain in care would not be practicable.

24. Care providers record the status of each minor's reunification case in narrative form, in a text-based report. However, each minor's case is different and the status of reunification efforts will vary based on the child and the potential sponsor. For example, one child's potential sponsor may have moved in with new roommates, and such roommates, as a child welfare matter and ORR Policy, must receive background checks, and in some cases fingerprints, to ensure they do not pose a risk to the child. If a new roommate does not want to be identified (or in some cases fingerprinted), this can present challenges to reunification that the case manager at the licensed care provider must work through with the potential sponsor and in consultation with the FFS for that program.

25. In other cases, the potential sponsor may not be sending back documents, and is not responding to emails and follow up calls. In those cases, the case manager will need to work with the potential sponsor to ensure that s/he can submit the necessary paperwork, and submit the full family reunification application. In my experience, case managers are very persistent about following up with potential sponsors and ensuring that they submit all required information and documentation, often leaving several messages, and using pre-paid FedEx or UPS packages to ensure potential sponsors are able to send documentation.

26. In still other cases, the potential sponsor may have withdrawn from the process, after initial contacts seemed promising. As the case file narratives show, the underlying causes of sponsor withdrawal are varied and complicated. In some cases, unfortunately, they decide that a minor has exhibited behavior that they are not willing or not able to address. In other cases, they are moving or obtaining a new job, and

cannot take in a child. Especially when potential sponsors are distantly related or unrelated, or even in cases where the biological relationship is close but there is no or little prior familiarity, ORR must take special care to ensure that the sponsor will achieve permanence for the child and not neglect his or her needs.

27. The above are hypotheticals representative of what I see regularly in my work at ORR. While they are representative, they are not exhaustive of the types of scenarios presented to ORR –each case is unique and the possible permutations of what is causing a minor to remain in custody cannot be reduced to uniform statistical markers.

28. ORR files also contain highly personal information about potential sponsors who have applied for sponsorship, including information on criminal "hits" and findings from child abuse and neglect ("CA/N") checks. *Flores* counsel are not counsel to the applicant sponsors. Yet, explaining why a child remains in care might require sharing the criminal background or CA/N results when the applicants have not consented to their information being shared.

29. In other cases, the case files may contain personal information about a minor, such as pregnancy or mental health/psychiatric information. However, such minors may have declined attorney visits from *Flores* counsel. Under Paragraph 32.D. of the *Flores* settlement agreement, minors may refuse to meet with *Flores* counsel, and yet sharing information on why the minor is not yet reunified may require sharing this personal information. I am aware of at least one minor who refused to meet with *Flores* counsel, and yet whose mental health information is being shared under the Order to Show Cause.

30. In my opinion, having to extract and refine narrative information for each child in care would be extraordinarily time-consuming. ORR would need to either extract such information from the UAC Portal on a manual, case-by-case basis for the thousands of children in care, or have its grantee care providers do so. Such efforts would likely take at least 2-4 hours per case, and necessarily detract from efforts to care for and reunify children and operate the program. This would be even more burdensome if ORR were to see an influx in UAC across the Southwestern border and a corresponding increase in its nationwide census.

ORR Data

31. While it would be impracticable for ORR to regularly report to *Flores* counsel why children remain in care, ORR does provide monthly statistical reporting to *Flores* counsel consistent with the settlement agreement. Such reporting includes data on: (1) biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in ORR care, (3) each ORR placement location and date placed, removed or released, (4) sponsor name and type, and (5) out-of-network placement with date and location. *See* ORR November 2019 Flores Report (attached hereto to as Ex. G). ORR also shares such data with the Special Master, Andrea Ordin.

32. I also understand that *Flores* counsel have presented a report, apparently compiled from ORR's monthly statistical reporting. To evaluate the reliability of such report, I asked the ORR data team to compile data regarding the length of care for each unaccompanied alien child in care as of March 29, 2020, based on the current category of potential sponsor. It also is important to note that the listed category of potential sponsor is subject to change. Because grantee care providers and ORR are continuously attempting to reunify children with sponsors, category does not remain static. For example, one sponsor may fall through and another sponsor pursued. If two potential sponsors are being evaluated, concurrently, the care provider will identify one as the primary applicant, but continue with concurrent planning. Often, ORR care providers go to extraordinary lengths to identify potential sponsors where neither the minor nor his or her parent(s) in home country could identify one. As shown in the attached declaration, Ex. H, in one case, case managers reached out to a store close to the location of the minor's father in Honduras. By talking to individuals at the store, the case manager was successful in locating a caregiver who had cared for the minor in home country. By eventually connecting with such caregiver, the case manager was able to locate a half-brother living in Connecticut, thus moving the minor from Category 4 (no viable sponsor) to Category 2 (sponsor is a close relative, such as a sibling, grandparent, aunt/uncle or first cousin).

33. The table below shows children in care as of March 29, 2020. Category 1 refers to minors who, as of March 29, had parent/legal guardian potential sponsors. Category 2 potential sponsors are close relatives, including grandparents, adult siblings, aunts/uncles, and first cousins; Category 3 are distantly related relatives, family friends or other unrelated applicants. Finally, Category 4 refers to minors who lack a viable sponsor.

34. As the table demonstrates, the length of care for UAC with viable sponsors, regardless of category (categories 1-3) is notably shorter than those UAC without viable a sponsor (category 4). Plaintiffs presented data they allege shows that more than 11 percent of minors are in care for more than six months. But, that data apparently failed to exclude those in long-term foster care. (Children are transferred to long-term foster care after a determination is made that the child will be in ORR custody for an extended period of time.) In addition, Plaintiffs' data apparently failed to exclude children without a viable sponsor. ORR generally has no control over whether some children ultimately lack a viable sponsor. Plaintiffs' inclusion of children who lack a viable sponsor in Plaintiffs' results will thus necessarily lead to longer average lengths of care (especially as census decreases), and will result in higher percentages in care beyond six months. Such modeling does not enable the evaluation of ORR efforts to release UAC promptly and safely because, again, ORR generally has no control over whether some children ultimately lack a viable sponsor.

35. When children with no viable sponsor are excluded from calculations, the percentage of children in care beyond six months decreases substantially. For example, the table below shows 279 minors in care (other than long-term foster care) for more than 180 days, resulting in about 10% of all cases

(279/2715). But this 10% figure is unhelpful, because the majority of those 279 cases are children with no viable sponsor. When such children are excluded from the calculation, the table shows 86 minors in care for more than 180 days, or about 3% (86/2715).[3] And, as noted above, even this figure may not reveal the full picture, because sponsor identification is an ongoing process. As an example, just because the table counts a minor as "Category3," this does not necessarily mean the minor has had a Category 3 potential sponsor from the date he or she entered ORR custody, as the sponsor may have recently been identified.

| As of March 29, 2020, # of UAC in ORR custody (excluding those in LTFC) | | | | | | |
|---|---|---|---|---|---|---|
| Length of Care(days) | Category 1 | Category 2 | Category 3 | Category 4* | Total | % of total |
| 1-30 | 346 | 519 | 161 | 321 | 1347 | 49.61% |
| 31-60 | 146 | 259 | 128 | 92 | 625 | 23.02% |
| 61-90 | 24 | 70 | 36 | 53 | 183 | 6.74% |
| 91-120 | 16 | 25 | 35 | 66 | 142 | 5.23% |
| 121-150 | 9 | 20 | 16 | 32 | 77 | 2.84% |
| 151-180 | 3 | 13 | 11 | 35 | 62 | 2.28% |
| 181-210 | 4 | 1 | 6 | 20 | 31 | 1.14% |
| 211-240 | 4 | 5 | 5 | 28 | 42 | 1.55% |
| 241-270 | 1 | 7 | 2 | 17 | 27 | 0.99% |
| 271-300 | 2 | 2 | 11 | 33 | 48 | 1.77% |
| 301-330 | 3 | 3 | 6 | 24 | 36 | 1.33% |
| 331-360 | 3 | 1 | 3 | 15 | 22 | 0.81% |
| 361+ | 4 | 5 | 8 | 56 | 73 | 2.69% |
| Total | 565 | 930 | 428 | 792 | 2715 | 100.00% |

*No sponsor identified/minor lacks viable sponsor.

Responding to the Court's Order to Show Cause

36. To respond to the Court order, ORR identified UAC located in the eight states identified, California, Illinois, Louisiana, Massachusetts, Michigan, New Jersey, New York, and Washington. This count resulted in more than 500 minors in about 34 separate grantee congregate care provider facilities.[4]

37. On Tuesday, March 31, ORR sent spreadsheets to each of the 34 care providers to provide rationales for why each child remained in care, as well as the other information requested in the Order (i.e., regarding transfers and psychological and psychiatric evaluations). Developing the approach to responding to the Order required approximately 159 hours of central office staff time, as central office staff developed the plan for response, spoke with Federal Field Specialists and Contract Field Specialists to explain the assignment and approach, and consulted with leadership for approval. If central office staff had not been

---

[3] If Plaintiffs included long-term foster care children in their calculations, the figures are even less representative.

[4] *Note:* No ORR congregate care providers were located in Louisiana or Massachusetts.

working on such response, they would have likely been focusing on responding to individual care providers' questions on policy and procedure (including many in response to COVID-19), developing policies and procedures on other priorities for ORR, and (for FFS's) working on reunifications, transfers or other care-provider specific issues.

38. We asked each care provider to keep track of how long it took to pull information from case files in order to compile information and complete the request. Care providers reported spending 254 time to respond to our request.

39. We also asked care providers to report on how they would have spent such time otherwise. Care providers reported they would have spent time focusing on reunifications, as well as other priorities.

40. Once we received the spreadsheets, central office staff again reviewed the information collection and spent hours doing so. Again, such time otherwise would have been spent consulting on individual cases, including responses to COVID-19, and working on continuous improvement for the program.

ORR and its facilities are subject to oversight by Congress, OIG, and the States

41. ORR is subject to intensive oversight from Congress, and HHS staff communicate frequently with Congress members or staff.

42. For example, the Joint Explanatory Statement ("JES") for the HHS fiscal year 2020 appropriation includes numerous reporting provisions, including public reporting, monthly reporting, and bi-monthly reporting, in addition to the typical one-time reports.

43. Pursuant to the JES, ORR notifies Congress prior to all new funding opportunity announcements, grant or contract awards, or plans to lease or acquire property, including associated timelines and cost.[5]

44. ORR also publicly reports on children separated from a parent or legal guardian. It reports to Congress on state licensing violations by facility and steps taken to address infractions.

45. Importantly, the JES includes provisions for Congress to oversee lengths of custody. The JES states: "The agreement directs ORR to provide a briefing to the Committees within 120 days of enactment of this Act on options and plans for children who have been in ORR custody for extended periods of time. In addition, ORR is directed to continue to prioritize case management services and staffing, including Federal Field Specialists, lowering the ratio of children per case coordinator."[6]

46. ORR also provides both weekly and monthly reports on length of care to Appropriations staff.

---

[5] Joint Explanatory Statement for the Further Consolidated Appropriations Act 2020 at pp. 108-112, available at https://www.appropriations.senate.gov/imo/media/doc/HR%201865%20-%20SOM%20FY20.pdf.

[6] *Id.* at 109

47. The JES includes ORR reports on coordinating with the National Child Traumatic Stress Network, which is a network of grantees funded by the Substance Abuse Mental Health Services Administration ("SAMHSA") within HHS and which received a $4 million appropriation for work with UAC; reports on "new models of delivery"; reports on responses to Office of the Inspector General recommendations; a spend plan of current and projected spending, every 60 days; reports on temporary influx shelters; and finally, reports on tender age children.

48. HHS reports to the public on sexual abuse and sexual harassment reported within the care provider network; on separated children; on the latest UAC data; on releases of UAC to sponsors by county; releases of UAC to sponsors by state; and general statistics for the fiscal year.[7]

49. HHS – through ORR, the HHS budget office, or the HHS legislative offices – is in contact with Congress or Congressional staff at least weekly, and often more often. If a Member of Congress wishes to arrange a call with HHS leadership, such leadership is made available to the greatest extent practicable, often within a day or two.

50. Staff within HHS and ORR are tasked with responding to individual Congressional inquiries for information. Congress members or congressional staff will send emails or official correspondence and ORR responds to such requests. HHS and ORR also respond to committee oversight requests for documents – currently four are pending.

51. In addition to robust Congressional reporting and communication, HHS leadership also appear for Congressional hearings. In calendar year 2019 HHS leadership appeared for about eight Congressional hearings regarding the UAC Program, including in February, April, May, July and September of 2019.

52. The Government Accountability Office ("GAO") also may conduct audits of HHS and ORR. To date for fiscal year 2020, GAO has one open audit, and has issued two reports.

53. ORR care providers are state-licensed group homes. They are subject to state licensing oversight.

I, Jallyn N. Sualog, declare under penalty of perjury that the foregoing and true and correct. Executed on April 3, 2020.

_____
Jallyn Sualog

---

[7] HHS, Unaccompanied Alien Children Information, available at https://www.hhs.gov/programs/social-services/unaccompanied-alien-children/index.html.