

**ADMINISTRATION FOR**
# CHILDREN & FAMILIES

**Office of Refugee Resettlement** | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

## The UAC Manual of Procedures (UAC MAP)

### *For ORR Staff, Contractors, and Grantees*

## Section 3: Services

**Office of Refugee Resettlement**
**Office of the Director**
**The Division of Policy and Procedures**
**July 2019 – Version 1.1**

# Section 3: Services

**Table of Contents**

3.1 Summary of Services ................................................................................................ 5

3.2 Care Provider Admissions and Orientation for UAC ............................................... 6

3.2.1 Admissions for UAC ............................................................................................. 6

    Quick Glance: UAC Personal Property ..................................................................... 8

    Quick Glance: Tips for Completing the Initial Intakes Assessment .......................... 10

3.2.2 Orientation ......................................................................................................... 11

    Quick Glance: Orientation Accessibility ................................................................. 12

    Quick Glance: Care Provider Grievance Policies and Procedures ........................... 13

3.3 Care Provider Required Services ........................................................................... 16

3.3.1 UAC Assessment and Case Review ..................................................................... 16

    Quick Glance: Guide to the Assessment for Risk .................................................... 18

    Quick Glance: Guide to the UAC Assessment ......................................................... 19

    Quick Glance: Guide to the Individual Service Plan ................................................ 21

    Quick Glance: Guide to the UAC Case Review ........................................................ 22

    Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History ...... 24

    Quick Glance: Summary of UAC Case Records ........................................................ 26

3.3.2 Long Term and Concurrent Planning .................................................................. 27

3.3.3 Screening for Child Trafficking and Services for Victims ..................................... 27

3.3.4 Safety Planning .................................................................................................. 29

3.3.5 Academic Educational Services ........................................................................... 31

3.3.6 Vocational Educational Services ......................................................................... 33

3.3.7 Services Related to Culture, Language, and Religious Observation ..................... 33

3.3.8 Recreation and Leisure Time Services ................................................................ 34

3.3.9 Nutritional Services ............................................................................................ 35

3.3.10 Telephone Calls, Visitation, and Mail ............................................................... 35

3.3.11 Clothing and Personal Grooming ...................................................................... 37

3.3.12 Assignment of Chores ....................................................................................... 37

3.3.13 Behavior Management ........................................................................................... 38

3.3.14 Transportation Services ........................................................................................ 39

3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations in RTCs ............ 41

3.3.16 Notification and Reporting of the Death of a UAC ............................................... 42

3.3.17 Use of Restraints During Transport and in Immigration Court ............................ 42

3.3.18 Restraints in Immigration Court and Asylum Interviews ..................................... 43

3.4 Health Services .......................................................................................................... 43

3.4.1 Health Care Eligibility and General Standards ...................................................... 44

3.4.2 Initial Medical and Dental Examinations .............................................................. 44

3.4.3 Requests for Health Care Services ........................................................................ 48

3.4.4 Medication Administration and Management ....................................................... 48

3.4.5 Responding to Medical Emergencies ..................................................................... 48

3.4.6 Management of Communicable Diseases .............................................................. 49

3.4.7 Maintaining Health Care Records and Confidentiality .......................................... 49

3.4.8 Medical Clearance Prior to Release or Transfer .................................................... 49

3.4.9 Provider Reimbursement ...................................................................................... 49

3.5 Guiding Principles for the Care of UAC Who are LGBTQI ........................................... 50

3.5.1 Zero Tolerance for Discrimination and Harassment .............................................. 50

3.5.2 Prohibition on Segregation and Isolation .............................................................. 50

3.5.3 Confidentiality with Regards to Sexual Orientation and Gender Identity .............. 50

3.5.4 Housing ................................................................................................................. 50

3.5.5 Restroom and Dressing Area Accommodations ..................................................... 50

3.6 Long-Term Foster Care ............................................................................................... 50

3.6.1 ORR Long-Term Foster Care Service Provision ...................................................... 51

3.6.2 Change in Placements While in ORR Long-Term Foster Care ................................. 54

3.6.3 Additional Questions and Answers About This Topic ............................................. 54

Appendix 3.1 Checklist for Child Friendly Environment ................................................... 55

Appendix 3.2 Initial Intakes Assessment ......................................................................... 58

Appendix 3.3 *Garza v. Azar* Notice (English and Spanish) ............................................... 61

Appendix 3.4 Notice for Shelters (English and Spanish) ................................................ 63

Appendix 3.5 Assessment for Risk ................................................................................. 64

Appendix 3.6 Interviewing Guidance for Clinicians and Caseworkers .......................... 67

Appendix 3.7 UAC Assessment ..................................................................................... 71

Appendix 3.8 Individual Service Plan ............................................................................ 77

Appendix 3.9 UAC Case Review .................................................................................... 78

Appendix 3.10 OYAS-RET Interviewing Guidance, OYAS-RET Score Sheet, and the OYAS Reentry Self-Report Questionnaire ........................................................................... 82

Look for these **icons** for quick cues on what is required for a specific procedure or a reference to a particular policy in the UAC Policy Guide.

📖 **UAC Policy Guide (ORR Guide to Children Entering the United Stated Unaccompanied)**
✉ Email
📫 Mail
🕐 Tasks associated with a deadline
📑 Form or other template
🖱 UAC Portal
☎ Phone call

## 3.1 Summary of Services

📖 **See Section 3.1 of UAC Policy Guide**

### OVERVIEW

This section includes procedures for care providers who are administering required services for UAC in ORR care, including admissions and orientation; UAC screenings, assessments and required notices; education; nutritional services; services related to culture, language, and religious observation; recreation and leisure time; telephone calls and visitation rights; and other mandated services.

Care providers are required to provide services in a child-friendly, structured, safe, and productive environment that meets respective state guidelines, relevant federal law and settlement agreements, their Cooperative Agreements, the ORR Policy Guide and the UAC Manual of Operations (UAC MAP) and local building, fire, and health and safety codes. For general guidance see **Appendix 3.1 Checklist for Child Friendly Environment**.

These services must be sensitive to the age, culture, religion, dietary needs, native language, sexual orientation, gender identity, and other important individual needs of each UAC. All UAC in ORR care are entitled to human rights protections and freedom from discrimination and abuse.

Care providers must administer all services and assessments for all UAC even if a UAC is in ORR custody for a short time.  Care providers are required to have the capacity to provide services in the language spoken by the majority of UAC in their facility and/or provide translation services.

ORR expects care providers to tailor the dissemination of information, such as the orientation regarding sexual abuse and sexual harassment, in a manner that is appropriate for tender aged UAC and other younger UAC in their care. ORR also expects clinicians and other qualified staff to find effective ways to tailor delivery of services, such as substituting standard group counseling sessions for direct observation and therapeutic play and games in an informal setting, to address post trauma needs of younger UAC.

Care providers must provide UAC who are placed into staff secure, secure, and RTC with notice of the reasons for the placement or continued placement. Care providers must regularly review a restrictive placement for a possible "step downs" to a less restrictive environment.

## 3.2 Care Provider Admissions and Orientation for UAC

 **See Section 3.2 of the UAC Policy Guide**

### OVERVIEW

Care provider services begin when the care provider takes physical custody of the UAC. At that point, the care provider admits the UAC into the care provider program via the UAC Portal, provides food and beverages and other services, and notifies and informs UAC of his or her rights and responsibilities. The care provider gives the UAC an orientation within **48 hours of admission**.

| Key Players | Responsibilities |
|---|---|
| Designated care provider staff | Admits UAC into program, provides placement authorization form and required notifications to UAC, conducts an initial medical exam, and provides a standard orientation to all UAC. |

| Related Forms/Instruments | Used By |
|---|---|
| *Placement Authorization Form* | Designated care provider staff |
| *Authorization for Medical, Dental, and Mental Health Care* | Designated care provider staff |
| *Initial Intakes Assessment* and *Interviewing Guidance for Clinicians and Caseworkers* | Designated care provider staff |
| *Notice of Placement in a Restrictive Setting* | Designated care provider staff |
| *Notice to Juvenile Aliens in Federal Facilities Funded by DHS or HHS by Reason of Their Immigration Status* | Designated care provider staff |
| *Legal Resource Guide for UAC* | Designated care provider staff |
| *Initial Medical Exam* | Designated care provider staff |

## 3.2.1 Admissions for UAC

 **See Section 3.2.1 of the UAC Policy Guide**

### PROCEDURES

1. **Upon arrival at the care provider facility**, the designated staff admits the UAC to the care provider program in the UAC Portal by completing the following steps:

- Go to the Admission tab of their specific program. **NOTE:** ORR care providers with more than one facility must designate the correct program from the list (see **Fig. 3.1 UAC Portal Admission Navigation Tab**).

## Fig. 3.1 UAC Portal Admission Navigation Tab



- Enter the UAC case file by clicking on the Alien number on the left-hand side which brings the user to the Admission screen (see **Fig. 3.2 Admission Screen**).

- Select "admit" under status.

- If the UAC did not arrive at the program, contact ORR Intakes to confirm the status of the UAC and ask ORR Intakes if "cancel" should be selected for the status of the UAC (do not select the status "pending").

- Answer "yes" to the question "By selecting "Yes" in this field…" and fill in the date and time, and click "save."

- Upload all DHS documents and forms given to the facility at placement.

**NOTE: UAC MAP Section 1.3.4 UAC Transferred to ORR Custody** includes a "**Quick Glance: How to Admit UAC to Program**" as well as additional guidance on reviewing and uploading DHS records in the UAC Portal.

## Fig. 3.2 Admission Screen



**NOTE:** Foster parents are not responsible for admitting UAC.

2. **Within 2 hours of admission and within 4 hours of admission into an HPC or Influx Care Facility**, the designated staff:

- Provides food and beverage to the UAC (asking about any food allergies and/or dietary restrictions);

- Allows the UAC to shower or bathe, with assistance if required due to disability or young age;

- Provides the UAC with clean clothing, clean bedding, and personal hygiene items and documents this in the UAC case file;

- Ensures, to the extent practical under the circumstances, that the UAC does not come into contact with other UAC currently placed at the program until he or she has showered/bathed and eaten;

- Creates an inventory list for all cash and other property obtained at admission. The UAC must sign the inventory sheet and the care provider must provide the UAC with a copy of the inventory, retaining the original document in the UAC case file. See **Quick Glance: UAC Personal Property**. ⏱🗐

## Quick Glance: UAC Personal Property

Care providers must conduct an inventory of all UAC cash and property upon admission into the care provider's care. UAC belongings that are stored must be kept in a secure location to be returned to the UAC at release or transfer. Care providers must prevent mishandling, loss, or theft of the UAC's personal cash and property. UAC

UAC's personal property should be thoroughly cleaned and sanitized before storage or use by the UAC. UAC should have access to their personal property upon request, if safety allows, during normal business hours or other reasonable time during the weekends or holidays.

Care providers must develop a waiver for UAC who wish to keep certain pre-approved items, such as religious bracelets or prayer books or materials, in their possession while in care. The inventory must be updated to include any additional property the UAC received during the UAC's stay with the care provider.

In the event that a UAC runs away, the care provider must keep any property the UAC leaves behind for 90 days. If the UAC does not contact the care provider to claim their property within 90 days, gently used clothing or other similar items may be donated to a local charity or shelter. If the UAC leaves items of value ($25 or more in cash, jewelry), the care provider must try to contact the parent or family either in home country or in the United States for their preference (mail the property or donate).  If the care provider is unable to reach the parent or family, items of value may be donated to a local charity or shelter. The care provide may recycle or dispose of any items that are unable to be donated

3. **Within 24 hours of admission**, the designated care provider staff:

- Verifies that all DHS documents that accompanied the UAC are complete and accurate. If the UAC's reported name or date of birth is incorrect, the designated staff attempts to verify the information on the UAC birth certificate through school records and/or the UAC's parents, if possible (see also step 4 below).

- Takes the UAC's photograph and uploads it to the UAC portal. (**NOTE**: Care providers may take photographs and record videotapes of UAC in care for purposes of identification or for the child's personal use. ORR prohibits release of any photographs or videotapes of any UAC for public use, including for training purposes or for promotional materials without written authorization from ORR.)

- Determines if it is safe to allow the UAC to contact family members or other relatives, following ORR policy and procedures and the care provider's internal safety procedures. Provides UAC an opportunity with assistance, as necessary, to contact family members, or other relatives, or the UAC's consulate.

- Uploads the following into the UAC Portal and saves a copy in the UAC case file case file with appropriate signatures:
  - *Placement Authorization* form
  - *Authorization for Medical Dental and Mental Health Care* form
  - *Page 2 of Legal Resource Guide – Legal Service Provider List for UAC*
  - Supporting documents from referring federal agency (e.g. DHS) 📷✔️🖑 🖺

**NOTE**: If there are concerns that the UAC may be 18 years of age or older, the designated staff follows the procedures outlined in **UAC MAP Section 1.6.2 Instructions**.

4. **Within 24 hours of obtaining the UAC birth certificate** and the name and age of the UAC doesn't match the DHS records, the designated care provider staff notifies the local DHS FOJC about the discrepancy in information and includes information about how the discrepancy was identified and the attempts made to verify the information, such as verification from Consulate. The notification includes a request to DHS FOJC for an updated Notice to Appear (NTA) to reflect the correct name and A number. If the UAC has an attorney, cc the attorney in the correspondence. (also see **UAC MAP Section 1.3.4 Transfer of Custody to ORR**). The designated staff makes changes to the name and/or DOB in the UAC Portal. 📷✔️🖑 🖺

5. **Within 24 hours of admission**, care provider staff trained in the use of the *Initial Intakes Assessment* form:

- Interviews the UAC in a private setting using all questions in the assessment to identify any immediate needs and/or issues.

- Completes all sections of the *Initial Intakes Assessment* in the UAC Portal.

- Saves a copy in the UAC case file.

- If the UAC responses raise suspicions that the UAC's health or life is at imminent risk or his/her condition places the safety of others at imminent risk, calls 9-1-1 for crisis response and transportation to the nearest emergency room; follows significant incident reporting procedures (see **Ops Guide Section 5.7.3 Significant Incidents**).

- Determines if the UAC's responses indicate that he/she falls under any of the criteria for trafficking under TVPRA. 🕐🗐

See **Quick Glance: Tips for Completing the Initial Intakes Assessment** and **Appendix 3.2 Initial Intakes Assessment**

**NOTE:** Care providers must complete a new *Initial Intakes Assessment* after each transfer within the ORR network.

## Quick Glance: Tips for Completing the Initial Intakes Assessment

The Initial Intakes Assessment allows the care provider to identity any immediate needs or issues, identity the severity of any medical or mental health needs and ensure that the needs are met; facilitate gathering of basic identifying information, and inform the UAC's initial housing/bed assignment.

Phrase questions in a child-friendly and culturally appropriate manner to engage the UAC. Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.

**UAC Basic Information**—Auto-populates in the UAC Portal

**Family Information**—Document any relative or non-relative contracts in the United States as well as the name and contact information of anyone that the UAC wishes to inform of their placement.

**Medical**—Document any observable or reported medical needs and immediately report them to the clinician, lead case manager, program director, or other supervisor designated for follow-up care, and/or any on-call medical staff member for further guidance on the need to seek immediate medical care.

**Mental Health**--Document any observable or reported mental health questions in this section and/or if any concerning behaviors or emotions were observed or reported and immediately report them to the clinician, lead case manager, program director, or other

supervisor designated for follow-up care for further guidance on the need to seek mental health care.

**Safety Assessment**--Document any observations and/or concerns that the UAC has regarding his/her safety. If the UAC answers "yes" to any of the safety assessment concerns, immediately report them to the clinician, lead case manager, program director, or other supervisor designated for follow-up care for further guidance.

**Interviewer Summary of Critical Issues that Need Immediate Attention** and **Action Taken**—Summarize critical issues and note the steps taken to address identified critical issues as well as any actions for the immediate future.

**Certification**—Enter name, title, and date and time the assessment was completed. If a translator was used, enter the translator's, name, language translated, and the date and time.

**See also** UAC Policy Guide Section 5.8 Significant Incident Reports and Notification Requirements **for information gathered at intakes that may require an SIR.**

6.  **Within 48 hours of admission**, for secure, staff-secure or non-TAR (Treatment Authorization Request) residential treatment center programs **only**, the care provider staff:

    - Provides the UAC with the *Notice of Placement in a Restrictive Setting* and ensures that the UAC signs or marks the notice. The original signed form is placed in the UAC case file and a copy uploaded to UAC Portal.  (If the UAC refuses or declines to sign the form, the staff member should note that on the form and complete the staff section).

    - Notifies the UAC of the opportunity to request a *Flores* bond hearing (see **UAC MAP Section 2.9 Bond Hearings for Unaccompanied Alien Children**). 🌐📑✍

7.  **Within 2 business days**, the designed staff ensures that UAC receives an initial medical exam and uploads the *Initial Medical Exam* form and any prior medical evaluations (for UAC transfers) into the UAC Portal and saves a copy into the Health tab (see **3.4.2 Initial Medical and Dental Examinations**) the UAC case file. 🌐📑✍

## 3.2.2 Orientation

📖 **See Section 3.2.2 of the UAC Policy Guide**

**PROCEDURES**

**Quick Glance: Orientation Accessibility**

The care provider must present the orientation in a way that is appropriate for the age, culture, and language of the child or youth. The orientation must be provided in formats that are accessible to UAC with limited English proficiency, visual or audio impairments, or other type of disability, as well as those with limited literacy skills.

- If the UAC is not literate, the care provider must verbally explain all the documents in the UAC's native or preferred language.

- If forms are not translated into a language that the UAC can read, the care provider staff must verbally translate the document for the child or youth and document in the UAC's case file that the form was verbally translated.

- Care providers lacking staff who speak a UAC's native or preferred language must make every attempt to utilize a professional translation service for the UAC's orientation. In cases where no such service exists or is unavailable, care providers must consult with the FFS, PO and other relevant stakeholders to create and implement a strategy for communicating with the UAC as effectively as possible. One possible strategy may be to create a written translation of the orientation information and documents.

1. **Within 48 hours of admission**, the care provider provides a standardized orientation for all UAC that, at a minimum (see **Quick Glance: Orientation Accessibility** above), includes the following topics:

   - Explanation of the nature of the UAC's custody in ORR including the fact that they will either be released to a qualified sponsor in the United States; or they will attend a court hearing to request to go home to their family; or will request to work with an attorney to file for legal relief to stay in the United States.

   - Emphasis that the UAC must attend an immigration court hearing whichever occurs first either:
     - After the UAC is released to a sponsor at a court located nearest the sponsor; or
     - After the UAC has been in ORR custody for 60 days at a court located near the care provider, or
     - While in ORR custody, the UAC may request at any time to go to immigration court earlier and not wait the full 60 days.

   - Care provider rules, responsibilities, and procedures;

   - Care provider behavior management policies;

   - Care provider grievance policies and procedures (see **Quick Glance: Care Provider Grievance Policies and Procedures**);

   - Care provider daily schedule;

- The UAC's rights and responsibilities;

- The fact that they will get a legal rights presentation by a legal rights attorney ("The Know Your Rights" presentation) and will receive a pamphlet about the immigration process;

- Emergency and evacuation procedures;

- Explanation regarding the possibility of transfer to another care provider facility or an influx care facility. ☺

## Quick Glance: Care Provider Grievance Policies and Procedures

Care providers must have written internal grievance policies and procedures that meet the following standards.

If needed or requested by the UAC, a staff member, another youth, a family member, UAC's legal representative or a legal service provider may help a UAC write up the grievance. All staff must be trained on the grievance policy and procedures. Extra copies of the UAC grievance forms need to be readily available to UAC.

Examples of grievance may include, but are not limited to:
- Complaints of services denied/not being provided to the UAC
- Forceful religious observation
- Unresolved complaints regarding shelter environment/living conditions
- Sexual abuse, sexual harassment, or inappropriate sexual behavior
- Breach of confidentiality by staff
- Staff putting UAC at risk of harm
- Unnecessary monitoring of mail/phone calls

Written grievance policies and procedures must be easily understood by children and provided in the languages of the majority of UAC in care. The grievance procedure must clearly explain the following: the process for initiating a grievance, how and by whom the grievance will be addressed and the procedure to follow if the grievance is not addressed in a satisfactory manner.

The care provider must take into consideration the age and maturity of the child when processing any grievance. Copies of written grievances and their final resolutions must be maintained in the UAC's case file.

The care provider must implement policies and procedures to identity and handle time-sensitive incidents reported through a grievance that involve an immediate threat to the health, safety, or welfare or a child or youth. In the case of medical emergencies, staff must ensure the minor receives proper medical attention.

The care provider must address the grievance policy and procedures during program orientation and post grievance procedures in a common area. Each UAC in attendance must receive a copy.

Care providers must report all UAC grievances according to ORR reporting policies and procedures. (For example, if the grievance is about a fight between UAC, they report via a regular SIR. If the grievance is about sexual harassment, they report it as a SA/SIR) The program must provide a written decision or response to the grievance within 5 days of receipt. Care providers must immediately respond to allegations of sexual abuse or sexual harassment reported via a grievance. If the grievance involves an immediate threat to the health, safety, or welfare of a UAC, the care provider must immediately respond as needed.

2. **Within 48 hours of admission,** the care provider must provide all UAC with a separate orientation  from any immigration-related topics, on sexual abuse and sexual harassment policies and procedures, including but not limited to:

- Zero tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior;

- The right of UAC to be free from sexual abuse and sexual harassment as well as the UAC's right to be free from retaliation for reporting such incidents;

- Definitions and examples of UAC-on-UAC sexual abuse, staff-on-UAC sexual abuse, coercive sexual activity, appropriate and inappropriate relationships, and sexual harassment;

- How to report sexual abuse and sexual harassment, including:
  - Reporting to any care provider staff member, volunteer or contractor either verbally, in writing, or via a grievance;
  - Reporting to ORR by telling an FFS or calling the ORR Hotline;
  - Informing an outside community service provider via telephone or in writing;
  - Reporting to consular officials via telephone or in writing.

- An explanation of a UAC's right to receive treatment and counseling if the UAC is abused.

- Boundaries and respecting one another.

As part of the orientation, the care provider must

- Provide every UAC with the **ORR Pamphlet (What You Need to Know About Sexual Abuse and Harassment**;

- Provide every UAC with a care provider pamphlet that contains, at a minimum, the following:

o The care provider's policies and procedures related to sexual abuse and sexual harassment;

o The child or youth's rights and responsibilities related to sexual abuse and sexual harassment;

o How to contact diplomatic or consular personnel.

- Provide every UAC information regarding the local and/or national service providers and organizations (local child advocacy centers, rape crisis centers, immigrant victim service providers, and or other community service provider to provide services to victims of sexual abuse and sexual harassment that occurred at the care provider facility) available to assist UAC.

Care providers must document in case files that every UAC received the orientation and the ORR and care provider pamphlets as well as the list of local and/or national service organizations available to assist UAC, as noted below in **Quick Glance: Summary of UAC Case Records**.

3. As part of the orientation described in step 2 above, the care provider provides verbal and written notice  to ALL UAC regardless of gender the notice in English and Spanish related to the *Garza v. Arza* court ruling as well as the **ORR Pamphlet (What You Need to Know About Sexual Abuse and Harassment)**.

**See Appendix 3.3 *Garza v. Azar* Notice (English and Spanish)**

**NOTE:** The *Garza v. Azar* ruling includes a requirement to post the English and Spanish versions of the notice on housing bulletin boards adjacent to the notice required by ORR's Interim Final Rule. Care providers must display ORR Posters and notices in prominent locations throughout the facility, including on housing bulletin boards, next to telephones, and throughout the care provider facility. See **UAC Policy Guide 4.7.2 Bulletin Board Postings**.

4. ORR also requires care providers to post an additional notice, "The Notice for Shelters" adjacent to the *Garza v. Azar* notice.  In addition, providers must make available the "A Woman's Right to Know" booklet in places where reading materials, pamphlets, and other information are made available to UAC, in color where possible. The booklet is available at **https://dshs.texas.gov/wrtk/**.

Care providers must also provide all UAC with a written copy in Spanish and English of "The Notice for Shelters" as well as verbally explaining the content in the notice at time of orientation.

**See Appendix 3.4 Notice for Shelters (English and Spanish)**

5. The care provider's designated staff provides the UAC a tour of the care provider's facility and shows what various areas are used for, noting emergency evacuation routes

and exits. If safety does not allow for a tour, the facility layout and emergency routes and exits must be verbally explained to the UAC.

6. The care provider documents that the UAC receives all orientation information in the UAC case file. 🗐

## 3.3 Care Provider Required Services

📖 **See Section 3.3 of the UAC Policy Guide**

### OVERVIEW

This section includes procedures for all *Flores* mandated services for care providers in all settings, including standard shelter, restrictive settings, and long term foster care.

| Key Players | Responsibilities |
|---|---|
| Case manager or clinician | Conducts *Assessment for Risk* and *UAC Assessment*; develops *Individual Service Plan* and *UAC Case Review* (case manager). |
| Other care provider staff | Provide services, including education, transportation, activities related to *Flores* mandated services. |
| Foster care parent(s) | Provides services in a community setting |

| Related Forms/Instruments | Used By |
|---|---|
| *Assessment for Risk* | Qualified case manager or clinician (**UAC Policy Guide 4.8.1** notes who may conduct the assessment) |
| *UAC Assessment* | Qualified case manager or clinician |
| *Individual Service Plan* | Qualified case manager or clinician |
| *UAC Case Review* | Qualified case manager or clinician |
| *Ohio Youth Assessment System (OYAS) Reentry (RET) Tool*<br>• *OYAS-RET Interview Guide*<br>• *OYAS-RET Score Sheet*<br>• *OYAS-RET Self Report Questionnaire* | Qualified case manager or clinician in secure and staff secure facilities |

## 3.3.1 UAC Assessment and Case Review

📖 **See Section 3.3.1 of the UAC Policy Guide**

## PROCEDURES

### Assessment for Risk

1. **Within 72 hours of admission**, a qualified case manager or clinician conducts an *Assessment for Risk* to assess the UAC for risk of being a victim or a perpetrator of sexual abuse while in ORR care. The case manager or clinician:

   - Interviews the UAC in a private setting in a child-friendly and culturally appropriate manner using all questions in the instrument (see **UAC Policy Guide Section 4.8.1 Assessment for Risk**).

   - Uses the specific questions in the assessment, but also draws upon their professional training and experience to obtain additional information to complete a thorough assessment.

   - Completes all sections of the *Assessment for Risk* in the UAC Portal using information gathered from a variety of sources, including, but not limited to, the *Assessment for Risk* interview, any other conversations with the UAC, court records, case files, behavioral records, and other relevant documentation.

   - Saves a copy of the *Assessment for Risk* in the UAC case file. 🕑📄

2. The clinician reviews the results:

   - Makes an individualized determination to ensure the safety and health of the child, using the Assessment for Risk, along with any other completed assessments to inform the child's assignment for housing, education, recreation, and other services.

   - Considers the youth's gender self-identification and the health and safety of UAC when making a housing assignment for a transgender or intersex UAC (see **UAC Policy Guide Section 4.8.2 Use of Assessment Information**).

   - Does not use the result of the Assessment for Risk to place a child on one-on-one supervision unless there are exigent circumstances (see **UAC Policy Guide Section 4.8.2**).

   - Reports any UAC disclosures made during the assessment in accordance with ORR policies and Procedures.

   - If the assessment indicates that the child experienced prior sexual victimization or perpetrated sexual abuse, ensures follow-up, as appropriate, with any necessary medical or mental health services.

- If medical or mental health referral is necessary, the UAC must receive a medical and/or mental health evaluation **no later than 72 hours after the referral**.

- If the UAC's responses indicate that they fall under any of the criteria for a mandatory or discretionary home study and/or post release services, immediately refers the case following the referral process (see **UAC MAP Section 2.4.2 Home Study Requirement**). ⊕

3. The case manager or clinician:

- Continuously updates the *Assessment for Risk* when the case manager or clinician learns any new information that would change the housing, education, recreation, and other service assignments of the UAC.

- Updates the *Assessment for Risk* **every 30 calendar days** while the UAC is in care (**every 90 days for UAC in long term foster care**).

- Completes a new Assessment for Risk after each transfer within the ORR network of care. This includes transfers to an Influx Care Facility.

- Immediately reports any significant changes in behaviors indicative of emotional stress, significant shifts in behavior and/or symptoms requiring intervention of a mental health professional to the Shift Supervisor and Lead Clinician. ⊕▤

**NOTE**: Do not delete previously entered information when updating the *Assessment for Risk*.

See **Quick Glance: Guide to the Assessment for Risk** and **Appendix 3.5 Assessment for Risk**

---

### Quick Glance: Guide to the Assessment for Risk

**UAC Basic Information**—Auto-populates in the UAC Portal.

**Information Clinicians or Qualified Case Managers Obtain from Child or Youth**—Document the UAC's responses.

**Questions for Clinicians or Qualified Case Managers to Answer**—Document your professional assessment of the individual case based on observations and information reported by the UAC during the interview and review of case files and other records.

**Housing, Other Service Assignments, and Follow-Up**—Document any housing or other service assignments needed to ensure the safety and well-being of the UAC. Indicate specific actions and follow-up. If housing and other service assignments changed at any time, including after the initial placement, describe the change, the reason for the change, and date in this section.

---

> **Certification**—Enter the signature of the official completing the assessment including name, title, and the date and time the assessment was completed. If using a translator, have the translator enter his/her signature, name, the language translated, and the date and time the assessment was completed.

## UAC Assessment

1. **Within 5 calendar days of admission,** a qualified case manager or clinician conducts a UAC Assessment by

    - Interviewing the UAC in a private setting using the *Interviewing Guidance for Clinicians and Case Workers* to evaluate the UAC for services and as a basis for the UAC's release plan.

    - Completing all sections of the *UAC Assessment* in the UAC Portal (see **Quick Glance: Guide to the UAC Assessment**). ⏲▤

**See Appendix 3.6 Interviewing Guidance for Clinicians and Caseworkers**

2. If the qualified case manager or clinician needs to update the *UAC Assessment* **past the five calendar day time frame**, he or she enters the additional required or relevant information into the *UAC Case Review*. ⏲▤

3. If the UAC's responses indicate that he/she falls under any of the criteria for a mandatory or discretionary home study and/or post release services, immediately refers the case following the referral process (see **UAC MAP Section 2.4.2 Home Study Requirement**).

4. The UAC Assessment must be fully completed before:

    - Submitting a home study referral

    - Submitting a release recommendation

    - Submitting a transfer request except in the case of an emergency transfer

    - The case coordinator issues a third-party recommendation. ⏲▤

**NOTE**: Complete a new UAC Assessment after each transfer within the ORR network of care.

## Quick Glance: Guide to the UAC Assessment

The UAC Assessment interview must be in a private setting. The interviewer must phrase questions in a child-friendly and culturally appropriate manner to engage the UAC. The interviewer must ask follow-up questions based on the UAC responses to obtain as much detail needed to inform the following: individual service plan, safety plan, and the UAC's

release plan, regardless if the questions are explicitly stated in the *UAC Assessment* instrument and the *Interviewing Guidance for Clinicians and Case Workers*.

**Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.**

The questions may be asked out of order so that the interview may flow naturally.

Assessment of the UAC does not end with the interview. The interviewer must continue to build a rapport with the UAC and continuously assess him/her while the UAC remains in ORR care.

**UAC Basic Information—**Auto-populates in the UAC Portal.

**Additional Basic UAC Information—**Document the city and neighborhood of origin, previous placement, religious affiliation, case manager's name, and clinician's name.

**Journey and Apprehension—**Document the circumstances leading up to and including the UAC's journey to the United States and his/her apprehension.

**Family and Significant Relationships—**Document familial and other significant relationships in the UAC's country of origin and in the United States.

**Medical—**Document any health concerns raised by the UAC, the UAC's medical and medication history, and any reported allergies. Review the UAC Portal Health Tab to ensure that the initial medical exam was completed and fully documented. If a medical exam is not completed, notify medical staff immediately. If the information required is in the UAC Portal Health Tab, write "see Health Tab" in lieu of entering the information.

**Education—**Document the UAC's academic history in order to determine the appropriate educational services for the UAC.

**Legal—**Document the provision of legal services while in ORR custody and whether the legal service provider identified possible legal relief.

**Criminal History—**Document any criminal history disclosed by the UAC to help determine if the UAC is in the appropriate level of care or if the UAC needs further assessment.

**Mental Health and Behavior—**Document the UAC's mental status during the interview to evaluate the UAC's level of post-traumatic stress, depression, and exposure to violence and the UAC's substance use history.

**Trafficking—**Document any trafficking concerns in the UAC's country of origin, during the UAC's journey, and in the United States. This includes concerns related to coercion, debt bondage/labor trafficking, and commercial sex trafficking.

**Mandatory TVPRA 2008—**Document whether the case requires a TVPRA-mandated home study based on information gathered in the assessment and from any other relevant sources.

**Additional information**—Report any additional information that may be pertinent to the UAC's identified needs that has not been covered in the sections above or that requires further elaboration. Identity assessment areas that require immediate follow-up or intervention. Note any significant issues that are not urgent but may require additional assessment, observation, or services.

**Certification**—Enter the signature of the official completing the assessment including name, title, and the date and time the assessment was completed. If a translator was used, have the translator enter his/her signature, name, the language translated, and the date and time the assessment was completed.

See [Appendix 3.7 UAC Assessment](#)

### Individual Service Plan

1. **Within 5 calendar days of admission and concurrent with completion of the UAC Assessment,** the case manager uses information gathered from preceding interviews and assessments (i.e., *Initial Intakes Assessment, UAC Assessment, Assessment for Risk*) to complete in the UAC Portal an *Individual Service Plan (ISP)* for the UAC (see **Quick Glance: Guide to the ISP**). ⏲📋✐

2. Creates a new *ISP* **every 30 calendar days after admission— (90 calendar days for LTFC)** and any time there is a substantive changes in the UAC's case information. **NOTE**: the 30 days is always after admission, even though another *ISP* might have occurred in the interim. ⏲📋✐

   **NOTE**: Complete a new *ISP* after each transfer within the ORR network of care.

**Quick Glance: Guide to the Individual Service Plan**

Case managers complete the following sections of the *Individual Service Plan (ISP)* in the UAC Portal:

**UAC Basic Information**—Auto-populates in the UAC Portal.

**Mandatory Services**—Document the start and end date and the person responsible for mandatory services. If the service only occurs once and does not span over multiple days, the start and end dates will be the same. If the service is ongoing, an end date does not need to be entered until the UAC is released from care.

**Other Services (optional)**—Document any additional services; enter the type of service, task, frequency, start and end date, and person responsible.

**Certificate**—Enter the signature, name, title, and date and time the *ISP* was completed. Include a copy of the certified ISP in the UAC case file.

See [Appendix 3.8 Individual Service Plan](#)

### UAC Case Review

1. **After 30 calendar days in care or when substantive changes or receipt of additional information after the UAC Assessment *is* complete,** the case manager completes all sections of the UAC Case Review in the UAC Portal. See **Quick Glance: UAC Case Review**. ⊕▤✓🖑

---

**Quick Glance: Guide to the UAC Case Review**

Case managers complete the following sections of the *UAC Case Review* in the UAC Portal:

**UAC Basic Information—**Auto-populates in the UAC Portal.

**Medical—**Document any observable or reported medical needs. If any observed or reported medical concerns are checked in this section, they must be immediately reported to the clinician, lead case manager, program director, shift supervisor, and/or any on-call medical staff member for further guidance on the need to seek immediate medical care.

**NOTE:** If the information required in this section is in the UAC Portal Health Tab, the case manager may write "see Health Tab" in lieu of entering the information.

**Legal—**Document provision of legal services while in ORR care and whether the legal service provider identified possible legal relief.

**Trafficking—**Document any trafficking concerns in the UAC's country of origin, during the UAC's journey, and in the United States. This includes concerns related to coercion, debt bondage/labor trafficking, and commercial sex trafficking. **NOTE:** Click "yes" to the question that the child is a victim of a severe form of trafficking in persons if ORR has issued a trafficking eligibility letter for the UAC even if the case is still waiting for the final Trafficking Eligibility Letter from OTIP.

**Mandatory TVPRA 2008—**Document whether the case requires a TVPRA-mandated home study based on information gathered in the assessment and from any other relevant sources.

Recommendations—Document the current release recommendation for the UAC.

**Care Plan—**Document actions taken and outline care plans that have or will be implemented to address reunification, legal, and mental health needs, and/or issues.

**Certificate—**Enter the signature, name, title, and date and time the assessment was completed.

---

2. If the UAC's responses indicate that he/she falls under any of the criteria for a mandatory or discretionary home study and/or post-release services, the case manager immediately refers the case following the referral process in **UAC MAP Section 2.4.2**.

3. The case manager maintains direct contact with each UAC in care and **meets at least once a week** with each UAC to discuss reunification options. The case manager documents the weekly meetings with the UAC and communication with potential sponsors in the UAC case file. 📑🕐

4. The case manager continuously updates the *UAC Case Review* **within 30 calendar days after admission (90 days for LTFC)** or in the following circumstances:

   - The care provider receives required or relevant information that was unknown during the time of the assessment

   - The care provider receives additional information from the UAC or other sources.

   **NOTE:** Do not delete previously entered information when updating the *UAC Case Review.* 📑🕐

5. The case manager creates a new UAC Case Review:

   - **Every 30 calendar days after admission** into a shelter, staff secure, secure, transitional foster care or residential treatment center care provider facility

   - **Every 90 calendar days after admission** into an ORR long term foster care program

   - Any time there is a substantial change in the UAC's case information (e.g., upon reunification, age out, or voluntary departure) 📑🕐

See [**Appendix 3.9 UAC Case Review**](#)

## UAC with Known, Disclosed, or Alleged Violent Criminal History

1. In addition to *the Initial Intake Assessment, UAC Assessment, ISP*, and *UAC Case Review*, the case manager gathers criminal history information as described in the **Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History**.

   The case manager **immediately** elevates the criminal history information to the clinician, case coordinator and the assigned FFS to review placement based on the alleged crime and completes an *SIR* and notifies the UAC's parents/legal guardian, potential sponsor, attorney of record or the local legal service provider, and child advocate, if applicable. The FFS reviews the case, placement, and sponsorship and notifies DHS ICE to request that they verify the criminal activity, which may include an Interpol check or record request from the UAC's Consulate.

For UAC with known, disclosed, or alleged violent criminal history, clinicians must request a psychologist perform a psychological risk assessment as described below. Where appropriate, collect criminal history information and the completed psychological assessment. The psychological assessment must be completed **within 7 business days of the child's admission (or when care provider is made aware of the criminal history.** The psychological evaluation focuses on:

- Current level of functioning
- Treatment recommendations
- Placement recommendations
- Risk assessment
- Psychosexual (if applicable) ☺

2. The clinician reviews the psychological assessment in collaboration with the case manager to determine if the UAC is in the appropriate placement level of care and if the UAC needs any additional services.

3. The case manager notifies the assigned FFS and case coordinator of any case updates and follows ORR home study policy and procedures for cases that meet the TVPRA or other home study criteria. ✎

## Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History

If a UAC has a known, disclosed, or alleged violent criminal history that includes violence toward others (e.g., murder, attempted murder, rape, sexual assault, assault with a deadly weapon, arson, an act that resulted in the serious injury or death of another), the case manager  and FFS work together to gather information about the activity.

**UAC Adjudicated in the United States**

1. The case manager obtains UAC criminal records, court records, court disposition, correctional detention records, child welfare records, mental health records, dental records, medical records, police reports, proof of rehabilitation, and letters of explanation of the incident(s).

2. The case manager identifies and contacts the parole or probation officer and/or child welfare worker assigned to the UAC, if any.

If the case manager is unable to successfully obtain criminal records or contact the courts or law enforcement entities, he/she documents attempts to obtain additional information and elevates the issue to the FFS for assistance.

If criminal records are no longer available because they have been expunged, the case manager verifies as much information as possible with the relevant court or law enforcement entity; documents efforts to obtain information in the UAC Case Review, and proceeds with making a recommendation regarding the suitability of the potential sponsor and current ORR placement level.

**UAC Reportedly Involved in Criminal Activity in His/Her Country of Origin**

1. The case manager reaches out to the Country of Origin Consulate for assistance in corroborating any allegations. **NOTE:** Do not reach out to the Consulate if the UAC has filed a credible fear claim.

2. The FFS asks DHS and/or other law enforcement entities for assistance in verifying criminal activity in country of origin.

*All UAC in Secure and Staff Secure*

1. All UACs placed in secure and staff secure must undergo a risk assessment **within 30 days of referral to the program** by a clinician trained in the use of the *Ohio Department of Youth Services (OYAS) Reentry Tool*, which is comprised of the *OYAS-RET Interview Guide, OYAS-RET Score Sheet,* and *OYAS-RET Self Report Questionnaire*.   Clinicians use *OYAS Reentry Tool* in conjunction with other appropriate clinical assessment tools and their professional judgement to establish a comprehensive assessment of risk level. The clinician uploads completed *OYAS-RET Interview Guide, OYAS-RET Score Sheet,* and *OYAS-RET Self Report Questionnaire* into the UAC Portal and saves copies in the UAC Portal and in the UAC case file.

   **NOTE: Prior to the interview, the clinician must inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.** 🕐📋🖐

2. UAC in staff secure and secure undergo a re-assessment **every 30 days following the initial *OYAS* assessment** and the file updated in the UAC Portal and case file. 🕐📋

   **See UAC MAP Section 1.4.2 30 Day Restrictive Placement Case Review**

**See Appendix 3.10 OYAS-RET Interviewing Guidance, OYAS-RET Score Sheet, and the OYAS Reentry Self-Report Questionnaire**

## CASE MANAGEMENT

1.  Case managers are responsible for gathering and maintaining the UAC case records. This includes keeping the UAC Portal up-to-date as well as the hard copy file. See **Quick Glance: Summary of UAC Case Records**. Case managers manage the case file by:

- Timely entry and organization of documents, records, and any other information in the UAC case file.

- Including records generated and gathered for the UAC and his/her sponsor.

- Storing hard copy UAC case files in a secure location accessible only to case managers, clinicians and other designated staff and archiving records in a secure location.

## Quick Glance: Summary of UAC Case Records

The master case file is the complete UAC file.  For service delivery, programs typically maintain documents separately while the child is in care (i.e. the phone logs might be housed in areas where UAC make the actual calls, medical usually keeps their documents separate while the child is in care, some required document are on the UAC Portal, etc.)

When a child is discharged, programs must consolidate all the separate files into a master case file, so that all the information is in one place.  Depending on the facility, the master case file is either electronic or hard copy or a combination of both.

The UAC Case File includes at minimum (see **UAC Policy Guide Section 5.6.2 Maintaining Case Files**):

- Criminal or delinquency records, including but not limited to, police reports, arrest records, court information, and probation records

- Psychological, psychiatric, and/or psychosocial records

- Individual Service Planning

- Educational assessments and records, including individualized education plans, report cards, and other education status updates

- Clinical screening tools

- Medical records, including but not limited to, immunization records, TB tests, physicals, prescription information, specialist visits, ER visits, drug and alcohol treatment, Treatment Authorization Requests, other medical treatment and follow-up

- Dental records, including but not limited to, documenting the UAC's scheduled dentist visit, reporting on the dental visit, any dental exams and any dental work

- Significant Incident Reports and internal incident reports

- Official ORR forms (such as Placement Authorization, Notice of Placement in a Restrictive Setting

- Any documentation required under State licensing

2. Case managers must meet with each UAC at a minimum of once a week to assess and discuss case outcome goals and services. UAC placed temporarily in hospitals and mental health facilities should continue to receive visits from case managers at a minimum of once a week to assess and communicate the needs and progress of UAC to the care provider staff and the FFS. Case managers must document these meetings with the UAC in the case manager notes section of the UAC case file. 🗐

3. Case manager must participate in weekly staffing meeting with care provider staff and the Case Coordinator to provide recommendations for best course of action on behalf of UAC. (See additional case management consultations for UAC in restrictive environments).

## 3.3.2 Long Term and Concurrent Planning

📖 **See Section 3.3.2 of the UAC Policy Guide**

## 3.3.3 Screening for Child Trafficking and Services for Victims

📖 **See Section 3.3.3 of the UAC Policy Guide**

### PROCEDURES

**UAC Assessment Tool**

📖 **See Section 3.3.1 of the UAC Policy Guide**

**Referrals**

1. If the care provider suspects the child may be a victim of trafficking, refer the case to the Office on Trafficking in Persons (OTIP) **within 24 hours.** ⏱

2. Care provider make referrals by emailing the child's *Significant Incident Report (SIR)* with trafficking concerns and the child's *UAC Assessment* to **Childtrafficking@acf.hhs.gov**. ✉

3. In cases where the care provider is uncertain whether a child may be a victim of trafficking, or if the care provider is uncertain whether to make a referral, the care provider can email OTIP at **Childtrafficking@acf.hhs.gov** or call OTIP at **202-205-4582** to schedule a case staffing. ✉ ☎

**Eligibility and Interim Assistance Letters**

📖 **See Sections 3.3.3 and 5.6.2 of the UAC Policy Guide**

1. OTIP issues and mails the Eligibility and Interim Assistance Letters to the care provider facility in which the child is currently housed.  The care provider must retain the letter until the child leaves the care provider's custody.  The original letter must go with the child upon release or transfer per **UAC Policy Guide Section 5.6.2 Maintaining Case Files**. 📑

2. If the care provider submitted a referral to OTIP and the child leaves the care provider's custody before the Eligibility or Interim Assistance Letter arrives, the care provider must immediately notify OTIP and provide an updated address and point of contact for the child by emailing **Childtrafficking@acf.hhs.gov**. The timely notification of a change of address is imperative to ensure that the child can access time-limited benefits and services. ✉

When a care provider receives Eligibility and Interim Assistance Letters while the child is in their care:

1. The care provider must explain next steps and help the child and child's sponsor to understand the benefits and the services available to the child, including comprehensive case management services through the Trafficking Victim Assistance Program (TVAP).

   - Information about services is available here:
     **https://www.acf.hhs.gov/sites/default/files/otip/traffickingservices.pdf**

   - Information about TVAP case management services is available here:
     **https://www.acf.hhs.gov/otip/trafficking-victim-assistance-program-grantees**

2. When OTIP issues an Interim Assistance Letter, OTIP will include a TVAP provider on the email to help facilitate the process of connecting the child to TVAP case management services. After receipt of this email, the care provider must give the TVAP provider the child's most recent contact information to ensure the child receive services. ✉

3. The care provide must explain to the child and child's sponsor the importance of keeping the original copy of the Interim Assistance and/or Eligibility Letter in order to access benefits and services.

4. If there are any questions regarding victim assistance, benefits, or local service referrals, the care provider, child, or child's sponsor can call the National Human Trafficking Hotline (NHTH) at **888-373-7888**, which is available 24 hours a day, 7 days a week. ☎

5. If there are any questions about state-specific protocols for benefits and services, the state refugee coordinators can provide further guidance.

6.  Document the details of these discussions and explanations in the UAC case file. 

When a child has a case that is being reviewed by OTIP and is discharged from the care of a care provider *prior* to receiving the Eligibility or Interim Assistance Letter determination, the care provider must:

1.  Explain the Child Eligibility process to the child and child's sponsor to help them to understand that the child's case is still under review by OTIP and to expect an upcoming decision on their case from the care provider, post-release services worker, or the identified point of contact.

2.  Explain to the child and child's sponsor what to do should the child receive an Interim Assistance and/or Eligibility Letter, as well as the benefits and the services that are available to the child should the child be issued a letter.

3.  Explain to the child and child's sponsor the importance of keeping the original copy of the Interim Assistance and/or Eligibility Letter in order to access benefits and services.

4.  When OTIP issues an Interim Assistance Letter, OTIP will include a TVAP provider on the email to help facilitate the process of connecting the child to TVAP case management services. While the child may be in the care of their sponsor, after receipt of this email, the care provider must give the TVAP provider the child's most recent contact information so that the child receives services. ✉

5.  If there are any questions regarding victim assistance, benefits, or local service referrals, the care provider, child, or child's sponsor can call the National Human Trafficking Hotline (NHTH) at **888-373-7888**, which is available 24 hours a day, 7 days a week. ☎

6.  If there are any questions about state-specific protocols for benefits and services, the state refugee coordinators can provide further guidance.

7.  Document the details of these discussions and explanations in the UAC case file. 📑

## 3.3.4 Safety Planning

📖 **See Section 3.3.4 of the UAC Policy Guide**

Care providers must develop a written safety and security plan contained in the care provider's policies and procedures to maintain safety. The safety plan must address the following emergencies: runaways, evacuations, medical and mental health emergencies, and disease outbreaks.

Care providers and foster care programs and homes must meet the safety requirements maintained by their local/state licensing entity, fire code regulations, and local zoning and building code regulations.

Care providers must submit all state and local licensing reports including citations, monitoring assessments and corrective actions, to the ORR PO **within three business days of receipt** of such reports, citations, or assessments. ⊠ ☺

### *Safety Planning for Field Trips or Other Off-Site Outings*

The program must consider staffing ratios for field trips and outings for the safety of UAC as well as the type of outing.  The ratio should be higher than expected under normal conditions.

UAC not eligible for field trips or outings include:

- Those currently on 1:1 supervision

- Those determined to be a run risk

- UAC who have not completed all initial assessments

- UAC whose identity is in question

- UAC with behavior in last 48 hours that if done in public would draw unnecessary attention to all UAC at the outing or be deemed unsafe or aggressive.

### *Procedures for UAC Who Run Away*

In cases involving an unauthorized absence by a UAC (runaway), care providers should NOT discharge the UAC for **24-48 hours** (depending on the circumstances). They should follow emergency SIR reporting and notifications procedures that are outlined in the ORR Ops Guide Section 5.7.2. Emergency Incidents. ☺

### *Evacuations*

Care providers must establish written evacuation plans for implementation in the event of earthquakes, fires, hurricanes, tornadoes, other natural disasters or other potentially dangerous situations that threaten the safety of the program or the UAC's placement. Foster care provider agencies shall have an evacuation plan for all foster homes. Emergency or respite care homes may be designated for this purpose. Foster care programs that provide other ORR residential care may use the shelter care facility, where appropriate.

Procedures shall also include a list of agencies and individuals to notify in the event of an evacuation. The list must include all relevant ORR contacts, the DHS, and local law enforcement. The emergency contact list shall be posted in the care provider's office area in a visible location.

Care providers shall identify information of importance to transport during the evacuation, including information on each UAC (identifying any health information, including allergies and prescription medications), a photo of each UAC, information on each UAC's potential sponsor, and important telephone numbers.

Additionally, care providers shall identify items of importance to transport during the evacuation, including medications taken by any UAC, and any other items that are essential to the well-being of any individual or group of UAC. In the event of an emergency, care provider staff will not be expected to physically remove case files. However, care providers shall have in place procedures to protect service and organizational records, whether in electronic or paper form, from destruction by fire, water, loss, other damage and from unauthorized access. Care providers are expected to comply with their state licensing requirements regarding the protection of records.

Care providers must conduct evacuation drills **every 60 days** to ensure maximum preparedness in the event of a disaster or potentially dangerous situation. Additional evacuation drills may occur depending on state licensing requirements. Each drill must use alarms and the complete and orderly evacuation of the building. Care providers must follow state licensing requirements pertaining to the specific content of the drill. Foster care programs must follow state licensing requirements for evacuation drills with all foster homes providing care to the ORR. ⊕

## 3.3.5 Academic Educational Services

📖 **See Section 3.3.5 of the UAC Policy Guide**

1. **Within 72 hours of admission**, a teacher or trained staff must assess a UAC to determine an individual educational competency level and document the assessment in the UAC case file and in the Education Tab under Assessments in the UAC Portal (see **Fig. 3.3 Education Assessment Tab**). ⊕🖱

**Fig. 3.3 Education Assessment Tab**



| Assessments | |
|---|---|
| ⊞ Initial Intakes Assessment | |
| ⊞ Assessment for Risk | >\| Add New |
| ⊞ UAC Assessment | |
| ⊞ Sponsor Information | >\| Sponsor |
| ⊞ ISP | >\| Add New |
| ⊞ UAC Case Review | >\| Add New |
| ⊞ Historical SIR | |
| ⊞ Historical Medical Record | >\| Add New |
| ⊞ Education | >\| Add New |
| ⊞ UAC Long Term Foster Care Travel Request | >\| Add New |
| ⊞ UAC Document(s) | >\| Add New |
| ⊞ Trigger Reports | |

2. Care providers must design a minimum of six hours of educational coursework to meet the unique competency levels of the UAC in care (as well as the *Flores* requirements), including linguistically appropriate educational materials and English language training, Monday through Friday, throughout the year. The care provider must submit the curriculum to the PO for approval (see below for exceptions for LTFC and Parenting UAC. Breaks for federal holidays do not need ORR approval). Educational field trips may count toward the six hours of coursework if approved by the PO.

   Daily class attendance must be documented in the UAC's case file. Care providers must provide academic reporting and progress notes on the UAC including transcripts, grades, or other assessments. These documents  must be updated in the case file and in the UAC Portal. 🗐

3. **Upon release to a sponsor**, the care provider must include educational assessments and records. See **UAC MAP Section 2.8 Release from ORR Custody**. 🕐🗐

*Parenting UAC*

Parenting UACs who recently had a baby should follow the doctor's orders regarding when they may return to a full school day. The care provider should email the PO and FFS when a UAC will be out of school for an extended period of time and when the UAC returns to the classroom setting. For UAC who have toddlers, the care provider must care for the toddler so that the UAC may attend school.

*Long Term Foster Care*

UAC who are in LTFC receive academic instructions in a community setting. Because most school districts do not offer year round academic instruction, LTFC providers must work with their POs to develop a summer learning schedule for UAC in care.

## 3.3.6 Vocational Educational Services

📖 **See Section 3.3.6 of the UAC Policy Guide**

1. Vocational programs may not replace academic education or substitute for basic subject areas, nor the required six hours of academic instruction.

2. The care provider must obtain prior authorization from their assigned PO before implementing a vocational program. The following information must be submitted in the authorization request:

   - Name of vocation or trade

   - Rationale

   - Staff qualifications

   - Location of vocational training

   - Safety precautions (staff)

   - Safety education (students)

   - Student capacity

   - Frequency and duration of course

   - Community partnerships

   - Course curriculum

   - Policy and procedures for standardizing the process of selling UAC created items and dispensing funds to the UAC from a sale of any item made by a UAC.

## 3.3.7 Services Related to Culture, Language, and Religious Observation

📖 **See Section 3.3.7 of the UAC Policy Guide**

1. The care provider must support the cultural identity of UAC through various programs and services, which may include:

   - Contact with family or other support system through telephone calls, letters, or visits

   - Addressing the UAC by his or her given names

- Inclusion of cultural awareness in daily activities, such as menus, clothing, and hygiene routines
- Celebration of culture-specific events and holidays
- Academic education covering various cultures within a classroom setting

2. Care providers must ensure that UAC obtain skills necessary for acculturation in the United States. In addition to English language classes, services may include:

- Access to community services
- Academic learning, including geography
- Celebration of U.S. holidays
- Discussion of U.S. laws
- Food and entertainment (e.g., music, books, magazines, and dancing)
- Field trips to local historical, scientific, or cultural points of interest

3. Care providers must make every effort to provide on-site staff or interpreters who speak the native language of each UAC. If staff or on-site interpreters are unavailable in the geographic region of the care providers, they may utilize a paid translation services, such as a telephone-accessible language line.

4. Care providers must make every reasonable effort to provide services in the UAC's preferred language. The UAC may choose to communicate in his or her preferred or native language (safety of UAC and staff permitting).

5. Care providers must grant UAC every opportunity to observe and practice their spiritual or religious beliefs. Care providers must provide the following:

- Assurances that religious and spiritual beliefs, including food preparation and dietary restrictions are permitted and accommodated;
- Internal procedures reflective of ORR religious services policy
- Religious items, books, or clothing at the UAC's request, provided that these requests are reasonable.

## 3.3.8 Recreation and Leisure Time Services

📖 **See Section 3.3.8 of the UAC Policy Guide**

1. Care providers must have a recreation and leisure plan that includes daily outdoor activity, weather permitting. The plan:

- Must include at least one hour per day of large muscle activity and one hour per day of structured leisure time activity that does not include time spent watching television.

- Be increased to three hours on days when school is not in session.

- Not be included in the 6 hours per day of required educational services.

- Account for insufficient onsite recreation areas by taking UAC to off-site parks, community recreation centers or other locations (off-site recreation involves a higher staff-to-child ratio—see staff ratios for field trips and outings).

**NOTE:** Care provider may not restrict outdoor recreational time because a UAC has previously run away or is a flight risk. Care providers are required to mitigate any flight risk concerns and allow UAC access to outdoor activities.

2. Care provider must provide, at a minimum, one monthly opportunity for escorted visits to the surrounding community for all UAC.

3. Foster parents must provide opportunities for recreation as part of the regular activities of the family. UAC in individual foster homes must participate in normal family and community activities with consideration to the demands of school, homework, and extra-curricular activities.

4. Care providers must document UAC's participation in physical activity, leisure time and off site visits in the UAC case file. 📑

## 3.3.9 Nutritional Services

📖 **See Section 3.3.9 of the UAC Policy Guide**

## 3.3.10 Telephone Calls, Visitation, and Mail

📖 **See Section 3.3.10 of the UAC Policy Guide**

1. Care providers must develop internal procedures to accommodate potential visitors and include safety and privacy measures to ensure that the UAC and facility are safe and that the UAC may communicate with the visitor in private. The care provider should ensure the UAC's case file includes the approved list of visitors and a log documenting any visits.

2. Care providers must provide UAC the opportunity to make a minimum of two telephone calls per week (minimum 10 minutes each) to family members and/or sponsors in a private setting—this includes those living in the United States and abroad. UAC telephone calls must be private. A clinician or case manager or other professional staff may only listen in on a UAC conversation with the approval of the FFS, based on safety concerns. Care providers must document the weekly phone calls in the UAC case files as well as a list of approved contacts.

3. Care providers may use social media under supervision of the case manager to find and contact family members or potential sponsors for a particular UAC. A case manager or other staff must supervisor the use of social media for these purposes. While in care, UAC may not post to a social media site. Pictures or any identifying information of UAC in care (present or in the past) should not be posted to the care provider's Facebook or in any other care provider social media content.

4. UAC in LTFC may have access to cell phones and social media. The LTFC provider must ensure that every foster parent has ground rules in place on the safe use of social media and electronic devices, including cell phones and computers.  Ground rules should reflect the following best practices:

   • No UAC under the age of 13 may join Facebook or other social media sites.

   • Privacy settings for the Internet and Facebook must be set to the strictest levels.

   • Keeping the computer in a central location and high traffic zone for all users.

   • A requirement that all UAC understand the ground rules for social media and cell phone use in the household.

   • Telling UAC to avoid responding to questionnaires, free giveaways and contests (these links make children susceptible to identity theft).

   • Foster parent monitoring of pictures posted by UAC online and vetting of friends to make sure he/she is not a target. (A UAC's online friends should match his/her friends. Foster parents must have access to UAC Facebook page at any time.)

   • Limiting use of computer, cell phone, and TV or gaming systems (i.e., only allowing cell phone usage at certain hours in the evening or after homework is completed).

   • Educating UAC on importance of protecting their online reputation and being aware of online dangers.

   • Foster parents must demonstrate and insist on proper technology etiquette, such as no bullying or teasing. Adults in the household must

also teach youth to avoid disclosures and sharing of personal information, such as where they will be at a certain time or other information that may put them or others at risk of harm.

## 3.3.11 Clothing and Personal Grooming

📖 **See Section 3.3.11 of the UAC Policy Guide**

1. Care providers must confiscate or cover any gang-related UAC tattoos, accessory or other item by:

    - Covering gang symbol tattoos at all times

    - Replacing or repairing immediately defaced care provider property, including schools books and notebooks with gang-related symbols

    - Confiscating clothing with any religious symbol that may denote gang affiliation

    - Confiscating clothing worn by UAC in a certain manner that denotes gang affiliation

    - Room checks to ensure that UAC are not defacing property with gang symbols.

    Further procedures may be developed by the care provider as deemed necessary and safe for containing gang-related symbols, tattoos, and accessories. 📖

2. Upon UAC arrival, the care provider must wash and store the UAC clothing and must supply the UAC with clothing for court dates, classrooms, outdoor recreation, and sleeping, as well as undergarments and footwear and personal grooming items.

3. At a minimum of once a week, staff will collect soiled clothes to wash and return to the UAC in a timely manner.

4. Care providers may require UAC to wear school uniforms during school hours and school-related outings as long as UAC are allowed to wear their personal clothing at all other times.

## 3.3.12 Assignment of Chores

📖 **See Section 3.3.12 of the UAC Policy Guide**

1. Care providers must have written policies and procedures for chores that reflect the following:

   - UAC may not be assigned chores that generate income for care providers or replace duties of paid staff

   - UAC must be medically screened before being assigned chores

   - Assignments must be developmentally and age appropriate

   - Chores must not interfere with participation in educational services, leisure or recreation, or meal times, as well as time set aside for showers or other personal hygiene activities

   - UAC has the right to request an accommodation to a chore type or schedule based on religious or cultural beliefs

   - Chores may include the maintenance of a child's sleeping area and personal space as well as help cleaning classrooms

   - Staff and not UAC should apply any cleaning agents

   - UAC should not be responsible for cleaning bathrooms in common areas

   - UAC must have equal cleaning responsibilities

   - Chores/cleaning may not be used as a means of punishment

   - Cleaning supplies must be maintained in a locked area

   - UAC may not be forced to maintain uncomfortable positions while cleaning and must wear appropriate clothing and footwear

## 3.3.13 Behavior Management

📖 **See Section 3.3.13 of the UAC Policy Guide**

All care providers (including LTFC) must have a behavioral management plan that meet child welfare best practice standards. All interventions must be positive and strength-based. Care providers may never subject UAC to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Behavior management plans must not affect the requirements of the Flores Settlement Agreement, including daily outdoor activity or leisure time.

The strength-based behavioral management policy must include the following:

   - Credentials of the personnel involved in developing, approving, implementing, monitoring, and overseeing the implementation of the behavior management policy and procedures.

- System for training and assuring the competency (both written and practical) of individuals involved in all facets of behavior management.

- Procedures on how to handle, report, and follow-up behavioral incidents and emergencies.

- Documentation that all staff who come into contact with children subscribe to a Code of Ethics.

- Policy of providers that indicate that they must comply with discipline and restraint requirement as stated within the state licensure requirements.

- Crisis prevention/intervention procedures (i.e., approved de-escalation techniques, system for elevating instances of behavior that are dangerous to self or others to trained staff for review)

- Clearly articulated rules for the facility/home, list of minor and major behavioral infractions, earned privileges, and system for discipline that allow UAC to develop self-control, positive coping skills and the ability to assume responsibility for his or her actions.

- Any time of solitary time as a result of behavior must meet state licensing standards.

## PROCEDURES

1. Care providers must submit their behavior management plan to their PO for approval. ✉

2. Care providers and foster/group homes must post the program rules and grievance procedures in English and language of majority of UAC in care.

3. Care providers may conduct drug testing of UAC in accordance with state licensing requirements. Care providers must have reason for testing the minor and document the information in the minor's medical records in the UAC Portal and in the UAC case file. Behavior management plans must not include drug testing as a consequence or as a form of intervention.

# 3.3.14 Transportation Services

📖 **See Section 3.3.14 of the UAC Policy Guide**

1. Care providers must comply with all local licensing requirements and state and federal regulations, including but not limited to the following:

- Train all staff responsible for transporting UAC.

- Transport UAC in a safe and humane manner and under the supervision of trained and experienced personnel.

- Transport UAC in a manner that is appropriate to the UAC's age and physical and mental needs, including proper use of car seats for young children.

- Transport UAC with special needs in vehicles that can best accommodate their needs.

- The number of staff escorts must meet (or exceed) the minimum staff/child ratio required by the transporting care provider's licensing agency.

- To the greatest extent possible under the circumstances when transporting UAC, assign transport staff of the same gender as the child or youth.

- Maintain constant "line of sight and sound" supervision of each UAC during transport.

- All occupants must wear a seat belt when the vehicle is moving.

- The driver must have a valid state driver's license and have a cleared driving record.

- The driver must drive defensively and take care to protect the occupants and vehicle, obey traffic laws, and report damage or accidents immediately to the care provider.

- Complete a vehicle inspection report, including an odometer reading, following each trip.

- Create and maintain a manifest of UAC transported and account for each UAC at exit or entrance of the vehicle.

- Regularly maintain and inspect all vehicles used for transportation.

- Take immediate action for any defect that could render the vehicle unsafe and/or inoperable.

2. For any secure transportation:

- It must involve a trained care provider staff or an agency experienced in secure transportation. Training must include the following: conflict resolution without the use of physical or mechanical restraints, the safe and effective use of approved soft restraints, and the emergency use of safe and approved physical restraints during an emergency response.

- Trained shelter or foster care staff may transport UAC in their care to a staff-secure or secure placement as long as the staff's or UAC's safety is not compromised.

- Make all transportation decisions on a case-by-case basis in consultation with the FFS.

- For UAC in ORR funded staff secure facilities, shelter facilities, group homes, and foster care homes, ORR prohibits the use of mechanical restraints at any time.

- For transport of UAC's in ORR-funded secure detention facilities, ORR authorizes (but does not require) the use of soft restraints. If the transport can be safe and secure without mechanical restraints, then do not use restraints. ORR does not authorize hard restraints except in an emergency response during a secure transport.

Care providers must submit to their PO operational details concerning secure transportation services, use of mechanical restraints during secure transport and use of mechanical restraints in response to an emergency.

3. UAC with serious physical or mental health issues or exposed to a communicable disease should not be moved until medically cleared by a health care professional or ORR is consulted.

- The health care professional must email the medical clearance to the care provider and the FFS.

- If a care provider must move a UAC with a communicable respiratory disease (e.g., infectious TB), the UAC must wear a mask at all times and the care provider must implement Universal Precautions. If exposure is undetermined, the care provider should employ an emergency vehicle and consult with the Division of Health for Unaccompanied Children (DHUC).

## 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations in RTCs

📖 **See Section 3.3.15 of the UAC Policy Guide**

## 3.3.16 Notification and Reporting of the Death of a UAC

📖 **See Section 3.3.16 of the UAC Policy Guide**

Care providers must follow *SIR* reporting and notification procedures (see ORR Ops Guide Section 5.8.1 Emergency Incidents).

In addition to Emergency SIR reporting and notification procedures, in the event of a UAC death, care providers immediately notify ORR/DHUC, the FFS, the FFS Supervisor and the Project Officer. ORR/DHUC informs the ORR Director and as appropriate other senior ORR officials.

After notification, the ORR Director or designee coordinates with the ACF Office of Legislative Affairs and Budget (ACF/OLAB), HHS Assistant Secretary for Legislation (HHS/ASL), and HHS Assistant Secretary for Financial Resources (ACF/ASFR) to notify the appropriate Congressional officials of the UAC's death as certified by a medical doctor within 24 hours of certification of the death.

HHS/ASL notifies the appropriate Congressional officials with the following information regarding the deceased child:

- Age;
- Nationality;
- Gender;
- Time of death;
- Cause of death (if known) as attested to by a physician;
- Place of death; and,
- Name of child (only if next of kin has been notified and do not object to the name being released).

HHS/ASL may provide the cause of death to Congressional officials in a subsequent notification if at the time of the original reporting the cause was unknown, or if the findings regarding the cause were later changed.

## 3.3.17 Use of Restraints During Transport and in Immigration Court

📖 **See Section 3.3.17 of the UAC Policy Guide**

## 3.3.18 Restraints in Immigration Court and Asylum Interviews

📖 **See Section 3.3.18 of the UAC Policy Guide**

## 3.4 Health Services

📖 **See Section 3.4 of the UAC Policy Guide**

ORR's Division of Health for Unaccompanied Children (DHUC) oversees public health screening and the provision of health services to UAC in ORR care.  DHUC monitors for serious medical conditions and infectious diseases of public health importance through an automated notification system. DHUC responds to care provider programs 24 hours a day, 7 days a week and provides management guidance on infectious diseases, serious mental health conditions, and complex medical cases.  DHUC also ensures reporting of public health information to the appropriate public health authorities.

Each care provider program that accepts placement of children in ORR custody must have an established network of healthcare providers, including specialists, emergency care services, mental health practitioners, and dental providers that will accept ORR's fee-for-service billing system.

ORR has developed its health care policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel and communities. Through its care providers and other health care professionals and based on the requirements of the Flores Settlement Agreement, ORR provides the following services:

- Routine medical and dental care
- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception
- Emergency health services
- A complete medical examination (including screening for infectious diseases) **within two business days**
- Immunizations in accordance with recommendations of the Centers for Disease Control and Prevention (CDC)
- Administration of prescribed medications and special diets
- Appropriate mental health interventions

Under the terms of the Flores Settlement Agreement, ORR care providers must also provide:

- At least one individual counseling session per week conducted by a trained social work staff with the specific objective of reviewing the child's progress, establishing new short term objectives, and addressing both the developmental and crisis related needs of each child and

- Group counseling sessions at least once a week that may be adjusted according to the needs of the population.

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each unaccompanied alien child. Care providers also must meet state and local licensing and public health requirements.

Care providers must have policies and procedures based on state or local laws and regulations to ensure the safe, discreet, and confidential provision of prescription and nonprescription medications to unaccompanied alien children, secure storage of medications, and controlled administration and disposal of all drugs.

From intake to release, care providers must observe all children for signs or symptoms of communicable diseases and act accordingly to protect others against possible infection.

Care providers must have an identified space within the shelter facility that may be used for quarantine or isolation in the event that an unaccompanied alien child must be separated from the general population for a medical reason. The space must be suitable to house a child for days or weeks.

The care provider must have written policies, procedures, and practices that protect the confidentiality of medical information.

## 3.4.1 Health Care Eligibility and General Standards

📖 **See Section 3.4.1 of the UAC Policy Guide**

## 3.4.2 Initial Medical and Dental Examinations

📖 **See Section 3.4.2 of the UAC Policy Guide**

Each child must receive an initial medical examination (IME) within **2 business days** of admission to ORR. The purposes of the IME are to assess general health, administer vaccinations in keeping with U.S. standards, find out about health conditions that require further attention, and detect contagious diseases, such as influenza or tuberculosis. The IME is based on a well-child examination, adapted for the UAC population with consideration of

screening recommendations from the American Academy of Pediatrics, the Centers for Disease Control and Prevention (CDC), and the U.S. Preventive Services Task Force (USPSTF).

Components of the IME are outlined in the **Initial Medical Exam Form, the Supplemental TB Screening Form, and** *Program Guidance – Revised Initial Medical Exam Requirements*. The IME covers the following elements:

- History and physical: Vital signs, documentation of allergies, vision screen ($\geq$5 years), a medical history, a review of systems (signs and symptoms), and a physical exam.

- Review of psychosocial risk: Mental health screening, physical abuse history, sexual activity/abuse history, and substance use history.

- Risk- and age-based laboratory testing: Influenza (if symptomatic with fever and cough or sore throat); pregnancy (girls $\geq$10 years and girls <10 years who have reached menarche or reported sexual activity); lead level (6 months up to 6 years); HIV (adolescents $\geq$13 years and children <13 years who have reported sexual activity); hepatitis C (history of IV drug use); hepatitis B (history of IV drug use or sexual activity); and chlamydia, gonorrhea, and syphilis (history of sexual activity).

- TB screening: All children (except for babies of UAC who are born in the United States) are screened with a tuberculin skin test (TST) or blood test (interferon-gamma release assay [IGRA]); IGRA is the preferred test for children $\geq$2 years.  All adolescents $\geq$15 years also receive a chest x-ray (posterior-anterior [PA] view). Children <15 years only receive a chest x-ray if their TST or IGRA result is positive. Radiologists are to review and issue a report of their findings on all imaging studies including, chest x-rays.

- Assessment and plan: Clinical findings noted and diagnoses made, medications prescribed, vaccinations given (in accordance with the Advisory Committee on Immunization Practices [ACIP] catch-up schedule: **https://www.cdc.gov/vaccines/schedules/hcp/child-adolescent.html**, labs ordered/refused, and referrals or follow-up recommended.

All elements of the IME should be started within **2 business days of the child's admission** to the care provider program. The IME is performed or supervised by licensed physicians (MD/DO) or non-physician practitioners (NP or PA). The **Initial Medical Exam Form** should be completed by the healthcare provider during the IME. The **Supplemental TB Screening Form** should be filled out by the healthcare provider performing the IME or by the health department if the provider does not perform these services. Data from these forms must be entered into the IME form in the UAC Portal; all health documents (screening forms, lab results, chest x-ray reports, vaccination records) must also be uploaded to the UAC Portal.

For babies born in the United States to girls in ORR care, a Medicaid application should be prepared and submitted. The initial check-up should be documented in the UAC Portal and the office notes uploaded. 📑🕐✓👆

**Vaccinations**

UAC are eligible for the Vaccine for Children (VFC) Program and should be vaccinated by a VFC provider. Simultaneous administration of all indicated vaccines per the **ACIP catch up schedule** should be given during the IME. Minor illnesses (diarrhea, urinary tract infection, mild upper respiratory infection, and other low-grade febrile illness) are not contraindications to vaccination; in general, antibiotic treatment is not a contraindication to vaccination. Live virus vaccines (MMR and varicella), human papillomavirus (HPV), and polio (IPV) vaccines should be deferred for **pregnant girls**, but pregnant girls should receive all other indicated vaccinations: **https://www.cdc.gov/vaccines/pregnancy/hcp/guidelines.html**.

TB testing (TST or IGRA) can be done before or on the same day that live virus vaccines are administered; live vaccines may interfere with the response to TB testing and cause false negative results if TB testing is done 1 day to 4 weeks after administration of live vaccines. If a child will need hepatitis B testing (hepatitis B surface antigen), it is preferable to draw blood samples before administering vaccines since hepatitis B vaccine given before blood samples are collected can cause false positive hepatitis B results. If it is not logistically feasible to collect blood before vaccines are administered, other hepatitis B tests (hepatitis B core antibody and hepatitis B surface antibody) will need to be ordered to confirm active infection if the hepatitis B surface antigen result is positive. ☺

**Repeat Examinations**

Children who are transferred to another care provider program do not need to undergo another IME, unless specifically required by state law. If a new IME is required by state law, the care provider program should inform the FFS as well as the Division of Health for Unaccompanied Children (DHUC), and cite the relevant law for ORR review. If a new IME is performed, the new healthcare provider should be given a copy of the previous IME, including all lab and chest x-ray reports and vaccination records. Depending on the timing and previous diagnoses, not all components of the IME should be repeated; the care provider should consult with DHUC on these cases. For example, if the child was previously diagnosed with latent tuberculosis infection (LTBI), a repeat TB test (e.g., TST/IGRA, CXR) should not be performed. The vaccination record should be reviewed and the next round of vaccines given at the appropriate interval.

Children who are released from ORR custody, but are referred back into care will need another IME; however, they may not need all the components, depending on the results of their previous IME, length of time they were out of ORR custody, and exposure risk. In general, TB screening should be repeated if **more than 6 months have elapsed since the last screening** or if a new exposure to active TB is reported since the last screening and the child was not previously diagnosed with LTBI; if previously performed, HIV testing should be repeated if new exposure risk since last IME is revealed (IV drug use, sexual activity since last IME) and the child was not previously diagnosed with HIV infection; if previously performed, sexually transmitted disease testing should be repeated if new sexual activity since last IME is disclosed. The care provider should consult with DHUC on these cases. ☺

**Follow-up Care**

Children should receive follow-up care for conditions identified during health exams, as directed by the healthcare provider. Examples:

- Children who fail a vision test (20/40 or worse in either or both eyes) during the IME should be referred to an optometrist.

- Pregnant girls should be referred for prenatal care.

- Children with a positive HIV test should be referred to an infectious disease specialist.

Children who remain in care for longer than 30 days should receive their next set of vaccinations per the **ACIP catch up schedule**. Children who remain in ORR care long-term should have routine well-child examinations scheduled at recommended intervals; in children over the age of 3 years, annual health exams are advised.

All follow-up care evaluations should be documented in the UAC Portal and documentation uploaded. 🕮🖐

## Initial Dental Exam and Follow-Up Care

Care providers must provide appropriate dental care to UAC by providing initial dental evaluations, urgent dental care services, and follow-up dental services, as necessary. Prior ORR authorization is required for all dental services.

### Initial Dental Evaluation and Six (6)-Month Dental Evaluation

Care providers must provide UAC an initial dental evaluation **within 90 days but not before 60 days after the UAC's date of admission into ORR care**. If state guidelines require an initial dental evaluation with a dentist before the UAC's 60th day in care, the care provider must email evidence of the relevant state guidelines to the Division of Health for Unaccompanied Children (DHUC) for prior authorization in advance of any dental provider visit occurring before the UAC's 60th day in ORR care. 🕮✉

The initial dental examination must be completed in a single visit to a dental provider. UAC may only receive one initial dental examination while in ORR care. If a UAC is in ORR care for six (6) months or longer, the care provider may schedule another dental evaluation. Dental evaluations may occur every six (6) months to ensure UAC dental health. ORR may, in its discretion, approve preventive dental services only for children in ORR care for six (6) months or longer. 🕮

If a UAC is transferred to another ORR care provider, the referring care provider must include all dental documentation with the UAC's transfer documentation, including initial dental examination information, if one was provided. 🗐

**Urgent Dental Care**

ORR will authorize urgent dental care, only if the UAC:

- Is experiencing acute tooth pain;

- Needs one or more procedures to maintain basic function; OR

- Has a severe and/or acute infection or a severe and/or acute infection is imminent (e.g. an abscess in a tooth or gums).

**Follow-Up Dental Services**

If a UAC received an initial dental evaluation and was given a treatment plan, care providers may request follow-up dental services via a TAR for UAC:

- Who have been in ORR care for longer than 90 days; OR

- Who are in long-term foster care.

If the UAC's treatment plan requires several procedures, care providers must ensure that the dental provider's treatment plan prioritizes procedures and treatments based on urgency and severity. DHUC will only approve up to four (4) procedures at one time but has discretion to approve more than four (4) procedures in one TAR in exceptional cases.

For each UAC requiring follow-up dental services, care providers may only submit up to four (4) procedures in one TAR and submit one TAR at a time. To request additional follow-up procedures, care providers must wait two weeks after the UAC's initial follow-up dental visit in order to submit another TAR to request up to four (4) more procedures. Care providers may repeat this two-week process until all follow-up dental procedures are complete. 

## 3.4.3 Requests for Health Care Services

📖 **See Section 3.4.3 of the UAC Policy Guide**

## 3.4.4 Medication Administration and Management

📖 **See Section 3.4.4 of the UAC Policy Guide**

## 3.4.5 Responding to Medical Emergencies

📖 **See Section 3.4.5 of the UAC Policy Guide**

## 3.4.6 Management of Communicable Diseases

📖 **See Section 3.4.6 of the UAC Policy Guide**

## 3.4.7 Maintaining Health Care Records and Confidentiality

📖 **See Section 3.4.7 of the UAC Policy Guide**

## 3.4.8 Medical Clearance Prior to Release or Transfer

📖 **See Section 3.4.8 of the UAC Policy Guide**

## 3.4.9 Provider Reimbursement

📖 **See Section 3.4.9 of the UAC Policy Guide**

Payment for health services while in ORR care is managed by a third party entity, Point Comfort Underwriters (PCU). Healthcare providers are encouraged to enter into an agreement with PCU *before* providing care for UACs. Contracting with PCU in advance will facilitate the appointment scheduling and billing process.  Programs should submit the names of selected healthcare providers directly to PCU who will then contact the healthcare providers and work out an agreement. Facilities providing emergency or urgent services do not need to have an agreement with PCU prior to administering care.

Care provider programs must obtain approval from PCU by submitting a Treatment Authorization Request (TAR) before a mental, dental, and medical service occurs, unless it is an emergency or urgent. Guidance on submitting TARs can be found on the PCU Portal, **https://maps.pointcomfort.com/login**.

Payment for the IME is pre-approved with the Initial Examination Authorization number, which is automatically generated on each child's ID document in the PCU Portal. All labs and chest x-rays that are part of the IME are included under the Initial Examination Authorization number, and do not require separate TARs as long as tests are performed within 72 hours of the IME date.

ORR will not approve or reimburse retroactive TARs submitted for dental procedures but may, in its discretion, allow exceptions for dental emergencies that occur over a weekend or federal holiday.

## 3.5 Guiding Principles for the Care of UAC Who are LGBTQI

📖 **See Section 3.5 of the UAC Policy Guide**

## 3.5.1 Zero Tolerance for Discrimination and Harassment

📖 **See Section 3.5.1 of the UAC Policy Guide**

## 3.5.2 Prohibition on Segregation and Isolation

📖 **See Section 3.5.2 of the UAC Policy Guide**

## 3.5.3 Confidentiality with Regards to Sexual Orientation and Gender Identity

📖 **See Section 3.5.3 of the UAC Policy Guide**

## 3.5.4 Housing

📖 **See Section 3.5.4 of the UAC Policy Guide**

## 3.5.5 Restroom and Dressing Area Accommodations

📖 **See Section 3.5.5 of the UAC Policy Guide**

## 3.6 Long-Term Foster Care

📖 **See Section 3.6 of the UAC Policy Guide**

## OVERVIEW

Foster care is the least restrictive placement option in the ORR continuum of care. As a community-based form of care, not all services will be provided within the residential structure of the foster/group home. UAC will typically access different elements of their care in several locations, including but not limited to, public school, foster care agency offices, foster homes, and counseling centers. ORR generally uses foster care, therefore, for more long-term placement and care of children, and implementation of procedures for their care may differ from shelter care settings.

Each foster family home must be licensed in accordance with state licensing regulations. However, ORR does not permit more than six children to a two-parent foster home, even if state licensing requirements allow for higher ratios. The number of children includes both foster and biological children. State-licensed group homes may have higher ratios, which are permissible by ORR. Placements must be based in individual needs and characteristics of each child and the overall makeup of the identified foster home.

Categories of long-term foster care providers include:

- Basic foster care: UAC resides with an unrelated licensed foster parent(s) and requires only the minimal services required in a licensed foster care setting.

- Therapeutic foster care: UAC resides with an unrelated licensed foster parent(s) but receives additional treatment services and/or supervision specific to the identified treatment needs. UAC with significant emotional, behavioral, medical, and/or developmental needs receive structured treatment within a therapeutic foster care setting.

- Basic group home: UAC resides in a living arrangement with a designated house parent(s) and/or staff. This setting is for those UAC who do not wish to be in a family setting.

- Therapeutic group home: UAC resides in a living arrangement with a designated house parent(s) and/or staff. The setting is for those UAC that have difficulties within a family setting and require therapeutic services/interventions due to significant emotional, behavioral, medical, and/or development needs.

## 3.6.1 ORR Long-Term Foster Care Service Provision

📖 **See Section 3.6.1 of the UAC Policy Guide**

## PROCEDURES

In long-term foster care, an ORR care provider places the UAC with a state-certified caregiver, referred to as a "foster parent" or "house parent." The care provider is responsible for recruiting, assessing, selecting, credentialing, training, monitoring, and retaining foster/house parents and foster care sites.

The long-term foster care provider must establish community contacts for children, especially with regards to educational, health, spiritual, extra-curricular and recreational resources.

### *Educational Services in a Community Based School*

UAC in a foster home attend state-regulated public school or other state-licensed educational programs in the local school district of the foster and/or group home during the academic year. The foster care provider and foster parent take part in the selection of and arrangements for educational programs appropriate to UAC's age and abilities. Foster care providers and foster parents collaborate with school personnel and advocate as needed when there are any problems with UAC in the school setting.

In conjunction with the foster parents, the care provider's case manager takes an active role in attending school conferences, individual education plan (IEP) meetings, and similar activities, whenever possible.

For public school breaks longer than two weeks, care providers are required to develop a plan of study for UAC who are placed in foster care and submit it to their PO for approval.

**NOTE:** ORR is reviewing the year-round academic requirements for LTFC in light of the difficulty of individual foster homes to provide 6 hours of structured educational activities in the summer months.

### *Telephone Calls, Visitation, and Mail*

(also see **3.3.10 Telephone Calls, Visitation, and Mail**)

UAC placed in LTFC can have access to a personal cell phone, computers, and other communication methods that help prepare them for making a successful transition to independent living. However, the care provider must develop and disseminate ground rules for foster homes to enforce with all UAC in care. Care providers or foster parents must communicate these ground rules verbally and in writing to the UAC.
Family visitation follows state licensing regulations. ORR does not permit family visits to take place in foster homes or group homes, but they may occur at the administrative offices of the foster care provider.

Long-term foster care providers are not required to maintain telephone logs, except in cases with identified safety concern. In such cases, providers must maintain telephone logs as indicated in the child's safety plan.

### Travel and Overnight Trips

Requests for travel and overnight trips must follow state licensing regulations.
Any travel or overnight trip request requiring custodian consent by state regulations and any travel request involving a child with flight risk or safety concerns requires prior approval by ORR. The care provider submits a request to the FFS **10 days prior to the trip departure date** and keeps a copy in the UAC's file. ⏱✉🗐

Travel requests include information regarding travel destination, dates, mode and purpose, contact information and relationship of individual accompanying the UAC and exploration of any safety or security concerns.

### Counseling Services

In accordance with the *Flores* Settlement Agreement, UAC in LTFC receive weekly individual counseling.

LTFC providers are encouraged to adapt group-counseling activities suitable to a community-based setting, such as youth advisory boards and foster youth support groups.

**NOTE:** At the request of a UAC, care providers are not required to complete the weekly individual counseling session or the group counseling session requirement of two group sessions per week. (See the addendum to the Cooperative Agreement.) Care providers must document this change in the UAC case file. ✉🗐

### Case Management Services

1.  LTFC care providers must implement and administer a case management system that tracks and monitors a UAC's progress on a regular basis to ensure that each UAC receives the full range of program services.

2.  Care providers' case managers meet with UAC, at a minimum, once a month, either in person (preferred) or by telephone. The foster care provider uses an interdisciplinary team approach that includes active participation by the child (as appropriate) and a complementary partnership between the case manager and foster parents, and other agency staff members and stakeholders as needed.

4.  Case managers maintain the Individual Service Plan and **update every 90 days**. Planning for independent living should be included as part of the ISP for UAC in LTFC (meal planning, cooking, nutritional requirements, medical checkups, available health care, and financial literacy). ⏱🗐

5.   The case manager maintains the UAC's records in the UAC Portal. 🖱

## 3.6.2 Change in Placements While in ORR Long-Term Foster Care

📖 **See Section 3.6.2 of the UAC Policy Guide**

### PROCEDURES

Foster care providers (LTFC and TFC) must notify the FFS, CFS and the CC **24 hours prior to a placement change** and follow state licensing requirements. The foster care provider must document the change of placement in the UAC's case file. ⊕ ✉ 📄

## 3.6.3 Additional Questions and Answers About This Topic

📖 **See Section 3.6.3 of the UAC Policy Guide**

Q: Can a minor in LTFC work during the summer?

A: Yes, barring any concerns by the PO, if he/she has the proper credentials, including any necessary permits required under state law and is still in the UAC program.
If h/she is transferred to URM, then the decision would be made by the legal guardian, or whoever has legal authority for him (which may be the alien himself if he's above the age of majority) following state law where the minor resides.

Q: One of our foster parents has offered paying for driving lessons for one of our UAC in care. If this permitted?

A: Yes, if state licensing approves.

Q: What employment forms does a foster parent need to provide to the LTFC or TFC provider?

A: All foster parents must provide an I-9 form to ensure that he/she may work in the United States.

Q: May foster families have pets in the home?

A: As long as state licensing requirements are met (including proper pet vaccines and licensing), the PO has the discretion to approve. Foster families must be vigilant for signs of allergies in the UAC.

# Appendix 3.1 Checklist for Child Friendly Environment

The ORR policy is to ensure that, while adhering to state licensing requirements, UAC receive care a within a child-friendly residential environment that does not pose a safety risk to the child, staff, or neighborhood or a risk to the child of sexual abuse, sexual harassment, and inappropriate sexual behavior. The residential structure should emphasize a non-institutional, home-like atmosphere of care in the least restrictive environment.

| General Residential Structure | Yes/No |
|---|---|
| Controlled entry and exit from premises | |
| Clean | |
| Child-friendly (e.g. no fire, safety, or trip hazards; murals, colorful wall paint, pictures/posters on wall, etc.; youth permitted to personalize assigned room area with pictures, personal art work, etc.) | |
| Furniture and building are properly maintained | |
| Well-ventilated | |
| Adequately heated/cooled | |
| Cleaning chemicals inaccessible to youth | |
| Medical supplies/prescriptions inaccessible to youth | |
| Alarm systems in designated areas of the residential structure | |
| Video monitoring in common and living areas | |
| "Mirrored Windows"/windows in offices where staff and visitors meet with youth 1:1 | |
| Evacuation procedures posted prominently on each floor and at eye level for children and youth | |
| Fire extinguishers and smoke detectors in good working order and inspected as required | |
| Unsafe areas and equipment  inaccessible to youth | |
| Infants/Toddlers – age appropriate furniture (e.g. cribs/bedding, high chairs, toys, outlet covers) | |
| Preprogrammed phones that provide some level of privacy and are accessible to youth | |
| **Documents that should be posted/accessible to youth (In English and Spanish/language most commonly spoken by youth)** | **Yes/No** |
| Grievance policies and procedures  (grievance forms readily available to youth) | |
| ORR posters with phone numbers for UC to report sexual abuse/harassment | |
| ORR _and_ care provider pamphlets on sexual abuse/harassment (additional copies readily available) | |
| _Garza_ and other ORR Required Notices and Booklets | |
| **Bedrooms** | **Yes/No** |
| Adequately accommodate all youth (e.g. individual bed with mattress for each youth) | |

| | |
|---|---|
| Natural Light/Dark at night | |
| Private place for youth to store personal belongings | |
| Provision of appropriate bed linens | |
| Desk and chair in room | |
| **Bathrooms** | **Yes/No** |
| Soap | |
| Toilet paper | |
| Towels | |
| Hygiene items | |
| Bathroom in good working order (e.g. toilets, sinks, drains, etc.) | |
| Hot/cold water available in sink and shower/bath tub | |
| Appropriate privacy | |
| **Kitchen** | **Yes/No** |
| UAC dietary restrictions posted/accessible to staff | |
| Food stored in a sanitary manner | |
| Knives/sharp objects inaccessible to youth | |
| **Outdoor Areas** | **Yes/No** |
| Video monitoring for exterior of building and surrounding premises | |
| Play equipment safe and in good repair | |
| **Vehicles** | **Yes/No** |
| Vehicle in good repair including, car seats and seatbelts, fire extinguisher; first aid kit. | |
| Insurance/Inspection current | |
| **Other** | **Yes/No** |
| Secure locations to store UAC personal property/valuables | |

# Guidance Checklist for Child-Friendly Environment – Individual Foster Home Checklist

The ORR policy is to ensure that, while adhering to state licensing requirements, UAC are provided care and placement within a child-friendly residential environment that does not pose a safety risk to the child, staff, or neighborhood. The residential structure should emphasize a non-institutional, home-like atmosphere of care in the least restrictive environment.

| **General Residential Structure** | **Yes/No** |
|---|---|
| Clean | |
| Child-friendly (e.g. no fire, safety, or trip hazards) | |
| Furniture and foster home are properly maintained | |
| Well-ventilated | |
| Adequately heated/cooled | |
| Cleaning chemicals inaccessible to youth | |
| Medical supplies/prescriptions inaccessible to youth | |

| | |
|---|---|
| Evacuation procedures posted prominently on each floor | |
| Fire extinguishers and smoke detectors in good working order | |
| Unsafe areas inaccessible to youth | |
| Infants/Toddlers – age appropriate furniture (e.g. cribs/bedding, high chairs, toys, outlet covers) | |
| **Documents that should be posted/accessible to youth** | **Yes/No** |
| Foster home rules | |
| **Bedrooms** | **Yes/No** |
| Adequately accommodate all youth (e.g. individual bed with mattress for each youth) | |
| Natural Light/Dark at night | |
| Private place for youth to store personal belongings | |
| Provision of appropriate bed linens | |
| **Bathrooms** | **Yes/No** |
| Soap | |
| Toilet paper | |
| Towels | |
| Hygiene items | |
| Toilets in good repair | |
| Hot/cold water available in sink and shower/bath tub | |
| Appropriate privacy | |
| **Kitchen** | **Yes/No** |
| UAC dietary restrictions posted/accessible | |
| Food stored in a sanitary manner | |
| Knives/sharp objects inaccessible to youth | |
| **Outdoor Areas** | **Yes/No** |
| Play equipment safe and in good repair | |
| **Vehicles** | **Yes/No** |
| Vehicle in good repair including, car seats and seatbelts | |
| Insurance/Inspection current | |

# Appendix 3.2 Initial Intakes Assessment

| UC Basic Information |
|---|

**First Name:**

**Last Name:**

**AKA:**
**Status:**
| **Date of Birth:** | **Gender:** |
| **A No.:** | **LOS:** |
| **Age:** | **Current Program:** |
| **Child's Country of Birth:** | **Admitted Date:** |

| Initial Intakes Assessment |
|---|

A staff member trained in use of this form completes it within 24 hours of the child's admission at the care provider facility. The staff member completing this form must be trained to ask and gather sensitive information in a child-friendly and culturally appropriate manner. The purpose of this interview is to learn about the child and demonstrate to him/her that caring for his/her safety and well-being is the care provider's foremost goal. In particular, these questions should help identify the severity of any medical or mental health needs the child has, ensure that the needs are appropriately met, facilitate gathering of basic identifying information, and inform the child's initial housing/bed assignment.

| **Child's Arrival Date/Time:** | **Intake Interview Date/Time:** |
| **Child's Primary Language:** | |
| **Intake conducted in what language:** | |
| **Date of departure from home country:** | **Date of Arrival in the US (approx.):** |

**Family Information**

Do you know anybody in the U.S.? Include relative and non-relative contacts in this section.

| Name | Relationship | Address | Phone |
|---|---|---|---|

Is there someone we can contact to let them know you are here?

**Medical**

| Have you experienced any physical/medical problems today or in the last 30 days? | ◯ Yes ◯ No |
|---|---|

If yes, please explain:

| Have you experienced any physical/medical problems? | ◯ Yes ◯ No |
|---|---|

If yes, please explain:

| Do you have any allergies? | ◯ Yes ◯ No |
|---|---|

If yes, please explain:

| Do you have any special dietary needs? | ◯ Yes ◯ No |
|---|---|

If yes, please explain:

Are you currently taking any prescribed or other medication? If yes, list below. Other medication may include herbal remedies, over-the-counter remedies etc.

◯ Yes ◯ No

**Medication**

| Medication | Dose | Purpose |
|---|---|---|

Observable or reported medical concerns (Check all that apply).

| Concern | Yes/No |
|---|---|
| Coughing | ◯ Yes ◯ No |
| Difficulty Breathing | ◯ Yes ◯ No |
| Dehydration | ◯ Yes ◯ No |
| Dizziness | ◯ Yes ◯ No |
| Confusion | ◯ Yes ◯ No |
| Fever | ◯ Yes ◯ No |
| Pregnant | ◯ Yes ◯ No |
| Exhaustion | ◯ Yes ◯ No |
| Lice | ◯ Yes ◯ No |
| Injuries | ◯ Yes ◯ No |
| Bruises | ◯ Yes ◯ No |
| Burns | ◯ Yes ◯ No |
| Scabies | ◯ Yes ◯ No |
| Vomiting | ◯ Yes ◯ No |
| Abdominal Pain | ◯ Yes ◯ No |
| Coughing Blood | ◯ Yes ◯ No |
| Nausea | ◯ Yes ◯ No |

| | |
|---|---|
| Skin lesions/rash | Yes No |
| Sever/persistent headache | Yes No |
| Jaundice (Yellowing of the skin/whites of eyes) | Yes No |
| Neurological symptoms (Spasm, tics, uncontrollable movements, paralysis or numbness of any part of the body) | Yes No |
| Others(list) | Yes No |

If injuries, wounds, bruises present, describe them and how they occurred:

List of other medical concerns:

Have you ever been to a doctor or stayed in a hospital?          Yes No

If yes, please list any visit or stay for any reason. Also include visits to other healers or alternative treatment providers:

Do you have a history of tuberculosis?          Yes No

If yes explain:

Do you have a history of seizures of convulsions?          Yes No

If yes explain:

Do you have any scars, birthmarks, or tattoos?          Yes No

If yes explain:

If any observed or reported medical concerns are checked in the sections above, please report these to Program Director, shift supervisor, and/or on call medical staff immediately for further guidance on the need to seek immediate medical care.

**Mental Health (Check all that apply)**

| Concern | Yes/NO |
|---|---|
| Tried to hurt yourself? | Yes No |
| Had urges to beat, injure or harm someone? | Yes No |
| Harmed anyone? | Yes No |
| Thought of attempting suicide or hurting yourself? | Yes No |
| Attempted suicide? | Yes No |
| Heard voices that others do not? | Yes No |
| Seen things or people that others do not see? | Yes No |
| Had trouble controlling anger or violent behavior? | Yes No |
| Are you having thoughts of harming yourself or someone else? | |

Please explain any checked answers above:

**Observable emotional concerns (Check all that apply)**

| Concern | Yes/NO |
|---|---|
| Cooperative | Yes No |
| Uncooperative | Yes No |
| Alert | Yes No |
| Distracted | Yes No |
| Calm | Yes No |
| Excited | Yes No |
| Nervous | Yes No |
| Agitated | Yes No |
| Confused | Yes No |
| Sad | Yes No |
| Angry | Yes No |
| Other | Yes No |

If any the UC answered "yes" to any of the mental health questions and/or if any concerning behaviors and emotions were observed or reported, report to Program Director, shift supervisor, and/or any on call clinical staff immediately for further guidance on the need to seek mental health care.

Are you having thoughts of harming yourself or someone else?

**Safety Assessment**

Do you feel safe now?          Yes No

Explain if No:

Do you fear that someone will harm you?          Yes No

Explain if yes:

If the child answered "yes" to any of the safety health questions, report to Program Director or shift supervisor immediately for further guidance on how to ensure the child's safety.
Explain to the child where the child's room will be located in the facility, the number of potential roommates, the age and sex of the roommates, and the bathroom and shower area associated with the potential room assignment. After having explained this, does he or          Yes No
she identify any specific fears about this potential housing assignment?

Do you need anything right now?

Interviewer summary of critical issues that need immediate attention:

Action taken (each action should correspond to the concern described above):

**Assessment For Risk**

The Assessment for Risk be completed by a Clinicianor qualified Case Manager within 72 hours of a child or youth's admission to the care provider facility.

Do you feel safe in your current room assignment or the assignment that will be given to you?          Yes No

Explain:

Has anyone made any inappropriate comments to you about your body, clothes, or appearance that made you uncomfortable so far at this facility?          Yes No

Explain:

Do you identify as:                                                                                                  [dropdown]

If the child or youth identified as transgendered or intersex, then ask whether the child or youth would rather have a female or male staff          ○ Male Staff   ○ Female Staff
member conduct a pat down search if one was necessary?

Do you feel safe telling people about your sexual preference during your time in ORR care?                          ○ Yes ○ No

Explain:

Is there something that you think we can do to help you feel safe and comfortable while you are here?                ○ Yes ○ Not at this time

Explain:

Do you find that people make a lot of sexual comments to you or about you?*                                         ○ Yes ○ No

Explain:

Have you ever been sexually active?                                                                                 [dropdown]

Have you ever felt like you needed to perform sexual favors or allow someone to touch your body in a sexual way in order to avoid              ○ Yes ○ No
additional harm, to obtain things you needed or wanted, or to be accepted by a person or group of people?

Explain:

Have you ever been in trouble for having sex with another person?                                                   ○ Yes ○ No

Explain:

Have you ever had to talk to a counselor, social worker, psychologist, teacher, or any other adult because of a sexual experience you           ○ Yes ○ No
had?

Explain:

**QUESTIONS FOR CLINICIAN TO ANSWER: [Every Question Must Be Answered]**

Does the child or youth exhibit any gender nonconforming appearance or manner?                                      ○ Yes ○ No

Explain:

Does the child or youth have any current or criminal charges?                                                       ○ Yes ○ No

Explain:

Does the child or youth have any mental, physical, or developmental disability or illness or suspected of having any of the above?

What is the child's physical size and stature?        [dropdown]      ○ Average     ○ Smaller than Average          ○ Larger than Average

Other specific information that may indicate heightened needs and/or additional safety precautions:                 ○ Yes ○ No

Explain:

**HOUSING, OTHER SERVICE ASSIGNMENTS, AND FOLLOW-UP**

Housing and Other Service Plan

Clinician shared appropriate information with relevant care provider facility team                                  ☐

Explain:

Child or youth provided with psycho education on identified issue                                                   ☐

Explain:

Child or youth provided with information on how to report threats, intimidation, or harassment by other children, youth, or facility staff  ☐

Explain:

Child or youth moved to a private room                                                                              ☐

Explain:

Child or youth moved to a room/dormitory area that matches the child or youth's gender identity (if different from sex)       ☐

Child or youth provided with alternative bathroom facilities or schedule                                            ☐

Explain:

Child or youth placed in educational or activities group(s) to reflect child or youth's gender identity (if different from sex)    ☐

Explain:

Developed and implemented a safety plan between child or youth, clinician, and care provider staff to address a specific issue    ☐

Explain:

Implemented increased clinical sessions                                                                             ☐

Explain:

Child or youth referred for professional mental health services                                                    ☐

Explain:

Child or youth placed on closer staff supervision                                                                   ☐

Explain:

Staffed with FFS and CC for possible transfer                                                                       ☐

Explain:

Other                                                                                                               ☐

Explain:


Staff Signature:                                                          Date:

Staff Name:                                                               Staff Title:


Translator's Signature:                                                   Date:

Translator's Name:                                                        Language:


UAC MAP Section 3: Services (Version 1.1)                                                              60

## Appendix 3.3 *Garza v. Azar* Notice (English and Spanish)

---

Please read this notice.

If you are pregnant, you have the right to decide whether to have the baby or to have an abortion.

No one who works for the government or the shelter can force your decision either way.

No one who works for the government or the shelter can tell anyone about your pregnancy or  decision to have an abortion if you don't want them to do so.

---

A United States court has approved a legal case on behalf of all pregnant women in this shelter. The legal case was filed to prevent the government or the shelter from interfering with your ability to get information about abortion, and to get an abortion if you want one. If you are pregnant, you are protected by the lawsuit.

If you are pregnant and are having problems getting information about abortion, or getting an abortion, or if feel that you are being pressured not to get an abortion, please contact attorney Lindsey Kaley by telephone at 212-549-2633 or email at lkaley@aclu.org.  She speaks English and Spanish. Please tell her:

- Your name

- Your A-number

- Your location (shelter name, city, state)

---

Por favor lea este aviso.

Si está embarazada, tiene el derecho a decidir si desea tener un bebé o un aborto.

Ningún agente del gobierno ni personal del albergue puede forzar su decisión de una manera u otra.

Ningún agente del gobierno ni personal del albergue puede decirle a nadie sobre su embarazo o la  decisión de hacerse un aborto si no quiere que lo haga.

---

Un tribunal de los Estados Unidos ha aprobado un caso legal en nombre de todas las mujeres embarazadas en este albergue. El caso legal fue presentado para impedir que el gobierno o el albergue interfieran con su capacidad de obtener información sobre el aborto y hacerse un aborto si lo desea.

Si está embarazada, está protegida por la demanda judicial.

Si está embarazada y tiene problemas para obtener información sobre el aborto o para hacerse un aborto, o si siente que la están presionando para que no consiga un aborto, por favor contacte la abogada Lindsey Kaley por teléfono al 212-549-2633 o por correo electrónico a lkaley@aclu.org. Ella habla inglés y español. Por favor dile:

- Su nombre

- Su número A

- Su ubicación (nombre del albergue, cuidad, estado)

## Appendix 3.4 Notice for Shelters (English and Spanish)

**If you are pregnant and want information about support for your pregnancy, you may speak to your clinician. As an alternative, you may call any of the following organizations, which are experienced in counseling women who have an unexpected pregnancy:**

**Option Line: 1-800-712-HELP**

**Pregnancy Decision Line: 1-877-791-5475**

**Sisters of Life: 1-877-777-1277**

**If you are pregnant, the Office of Refugee Resettlement will provide prenatal and medical care for you. If you give birth while in ORR custody, ORR will care for both you and your child.**

**ORR also offers assistance to help you care for your child, or – if you wish—to plan for an adoption.**

**Regardless of any decisions you make or have made regarding your pregnancy, you can count on ORR to provide you with the same high standard of care.**

**If you have any questions about this information, please ask your clinician or case manager.**

## Appendix 3.5 Assessment for Risk





9. Have you ever felt like you needed to perform sexual favors or allow someone to touch your body in a sexual way in order to avoid additional harm, to obtain something you needed or wanted, or to be accepted by a person or group of people?   ○ Yes ⊙ No

If Yes, explain:
N/A

10 Have you ever spoken to a counselor, social worker, psychologist, teacher, or any other adult because of a sexual experience you had?   ○ Yes ⊙ No

If Yes, explain:
N/A

INSTRUCTIONS: After interviewing the child or youth and reviewing relevant case files and other records, Clinicians and Qualified Case Managers must use their professional opinion to answer the following questions.

**QUESTIONS FOR CLINICIANS OR QUALIFIED CASE MANAGERS TO ANSWER**

1. Does the child or youth exhibit any gender nonconforming appearance or manner?   ○ Yes ⊙ No

If Yes, explain:
N/A

2. Does the child or youth have any current or past criminal charges?   ○ Yes ⊙ No

If Yes, List the Charges and Explain:
N/A

3. Does the child or youth have any mental, physical, or developmental disability or illness or suspected of having any of the above?
⊙ No
○ Yes                    ☐ Mental ☐ Physical ☐ Developmental
                         Explain:  N/A
○ Suspected              ☐ Mental ☐ Physical ☐ Developmental
                         Explain:  N/A

4. What is the child's physical size and stature?        ⊙ Average        ○ Smaller than Average        ○ Larger than Average

5. Other specific information that may indicate heightened needs and/or additional safety precaution:   ○ Yes ⊙ No

If Yes, explain:
N/A

INSTRUCTIONS: After completing the above assessment, determine if any housing and other service assignments are needed to ensure the safety and well-being of the child or youth. Describe housing and other service assignments here. Indicate specific actions and follow-up. If housing and other service assignments are changed at any time, including after the initial placement, describe the change and the reason for the change here.

**HOUSING, OTHER SERVICE ASSIGNMENTS, AND FOLLOW-UP**

1. Housing and Other Service Plan

N/A

2. If the child or youth identified as Transgender or Intersex, Click Here: ☐
   If you clicked the box, answer the following:
   (a) The child or youth was placed in a room/dormitory that reflects the minor's preference        ○ Yes ○ No
   Explain:                                              N/A
   (b) The child or youth was placed in educational or activities group(s) to reflect the minor's preference        ○ Yes ○ No
   Explain:                                              N/A

3. Actions Taken (Mark all that apply)
   ☐ Clinician or Qualified Case Manager shared appropriate information with relevant care provider facility team
   Explain:
   N/A
   ☐ Child or youth provided with psycho education on identified issue
   Explain:
   ☐ Child or youth provided with information on how to report threats, intimidation, or harassment by other children, youth, or facility staff
   Explain:
   ██████████████████████████████████████████████████████████
   ██████████
   ☐ Developed and implemented an in care safety plan between child or youth, clinician, and care provider staff to address a specific issue
   Explain:
   ☐ Child or youth provided with additional or alternate restroom accommodations
   Explain:
   N/A
   ☐ Implemented increased clinical sessions
   Explain:
   N/A
   ☐ Child or youth referred for professional/external mental health services
   Date of Referral:
   Explain:

☐ Child or youth referred for medical services

**Date of Referral:**

**Explain:**

N/A

☐ Child or youth placed on closer staff supervision

**Explain:**

N/A

☐ Staffed with FFS and CC for possible transfer

**Explain:**

N/A

☐ Other

**Explain:**

N/A

☐ Other Attachments

| | |
|---|---|
| | |

**Staff Signature:** ▉▉▉▉          **Date/Time:** ▉▉▉▉▉▉

**Staff Name:** ▉▉▉▉

**Staff Title:** Clinician

**Translator's Signature:**          **Date/Time:**

**Translator's Name:**

**Language:**

# Appendix 3.6 Interviewing Guidance for Clinicians and Caseworkers

## INTERVIEWING GUIDANCE FOR CLINICIANS AND CASEWORKERS

Case Workers and Clinicians must use the suggested questions below when initially interviewing UAC for the Case Summary and ISP.  During interviews with UAC, Clinicians and Case Workers must follow-up on UAC's comments and responses appropriately.   They must avoid reading the following questions verbatim and instead use them as a guide to engaging UAC and to track if all areas have been assessed. Both professionals must also continue to build rapport with the UAC and continuously assess the UAC during his/her placement.

## SUGGESTED INTERVIEW QUESTIONS

### BACKGROUND HISTORY

- Where did you reside prior to arriving here at this program?
- How long did you live there?
- With whom did you live?
- What was your experience like there?
- What did a typical day look like for you?
- Have you lived anywhere else?  With whom?  When and for how long?
- What brought you to the United States?
- When did you leave home country?
- With whom did you travel to the U.S.?

- What happened along the journey here?
- How and where were you apprehended?
- What was your plan for when you arrived in the U.S.?  With whom did you plan to live, if anyone?
- Where were you planning on living and what were you planning on doing in the U.S.?
- Had you been to the U.S. before this journey?  *If yes*- When did you come to the U.S.?  For how long were you in the U.S.?  What brought you here then?

### FAMILY/SIGNIFICANT RELATIONSHIPS

*If the Case Worker has already gathered contact information regarding the UAC's family, it may not necessary for you to gather this information.*

- Where are your mother and father?
- Do you have siblings?
- Do you have family in the U.S.?  Do you know anyone else in the U.S.?
- *If yes to any of the above, for each person:* What is his/her name and age?  Where does he/she live? What has your relationship been like with him/her?  When is the last time you contact with him/her, and what kind of contact did you have (e-mail, phone, mail)?  How often have you been in contact with his/her and for how long?  What kind of contact have you had in the past with him/her?  Do you have his/her current contact information?

- Are you a parent to a child?  *If yes*- Where is the child?  Who is the mother/father?  How would you like to be involved as a parent to your child?
- Are you married or single?  *If the UAC is married*- Who is your spouse?  Where is your spouse?  How long have you been married?  What is your relationship like with your spouse?

### CULTURAL BACKGROUND

- What languages and dialects do you speak?
- Are you spiritual or religious?  *If yes*- What are your beliefs?
- What faith do you practice, if any?  How do you practice your faith?
- Are there traditions you have practiced, through your family or in your home country, which are important to you?  *If yes*- What are they?

- While in DCS care, what religious practices or traditions do you want to continue?
- Is there anything else you would like to share about your culture or background?

### MEDICAL

- Do you have any medical conditions that you know of?  *If yes*- Please explain.
- Do you feel any pain/discomfort?  *If yes*- Please explain.
- Have you ever been hospitalized?  *If yes*- When?  What happened?  How long were you hospitalized for and where?  What was the outcome of the hospitalization?
- Have you ever received medical treatment?  *If yes*- What for and when?  What happened?  What was the outcome of this treatment?  Where was the treatment provided?

- Have you ever taken medication?  *If yes*- What was the medication(s)?  When is the last time you took this medication?  Do you know the dosage?  *If yes*- what is the dosage and times taken per day?  To your knowledge, should you still be on any medication?
- Do you have any allergies?  *If yes*- What are you allergic to?
- Have you been sexually active?  *If yes*- when is the last sexual encounter you had and with whom?  Did you practice safe sex?
- Have you ever caught an illness from sexual contact?  *If yes*- What illness, from whom and when?
- Is it possible that you are pregnant?  What was the date of your last menstrual cycle?

## CRIMINAL HISTORY

- Have you ever been arrested or charged with a crime?  *If yes, for each charge ask*:  What happened?  When did this happen?  Where did this happen? What was the outcome in court?
- Are you on probation?  *If yes*- When did probation start?  How long will it last and in what state?  What are the conditions of your probation?  Do you know the name and number of your probation officer?
- Are you on parole?  *If yes*- When did parole start?  How long will it last and in what state? What are the conditions of your parole?  Do you know the name and number of your parole officer?

- Have you ever been held in juvenile detention or adult jail?  *If yes*- How many times?  *For each time*- Where were you held?  How long were you incarcerated? What were the dates of incarceration, as you can best remember?
- Have you experienced any violence or threats while in government custody (local, state and DCS custody)?  *If yes*- What happened?  Where did this happen? When did this happen?
- Have you ever been involved in a gang?  *If yes*- What gang(s) and for how long?  How did you become involved?  When did you become involved?  What was your involvement in the gang?  Did you have specific roles or responsibilities?  *If yes*- What were these roles and responsibilities?

## EDUCATION

- What other schools have you attended?  When did you attend these schools?
- How many years of schooling have you had?
- Where did you last attend school?  What level/grade was this?

- What classes/subjects do you feel strongest in?
- What classes/subjects would you like to work on or improve?
- What are your educational goals (e.g.: high school diploma, GED)?

## LEGAL

- Do you have and have you ever had an attorney?  *If yes and if applicable*- What is the attorney's name and contact information?  On what matter/case did this attorney represent you and in what court?  When (what dates) did the attorney represent you?  Who provided or arranged for your attorney?

## UAC's PRIMARY AND CONCURRENT CASE OUTCOME GOALS

- What is your first choice for where and with whom you want to live after being in DCS care?
- What makes this your first choice?
- Right now, what is your second choice for where you want to live/be after being in DCS care?

*If there is a potential sponsor(s), for each potential sponsor:*
- Have you lived with this person before?  *If yes*-
  - When did you live with this person?
  - Where did you live with this person?
  - For how long did you live with this person?
  - What was it like living with this person before?
  - What did your day look like?
  - Did you attend school?
  - Did you work?  *If yes*- What kind of work were you doing?
  - Where did you sleep?
  - How did this person discipline you?
  - Who else lived in the home?
  - When is the last time you had contact with this person?
  - What kind (phone/e-mail etc) of contact have you had?
  - How frequent was your contact?

## SHORT-TERM GOALS

- What goals would you like to accomplish while in DCS care?  These goals can be anything from educational, vocational, athletic, artistic, and/or related to how you want to feel or behave.

## OTHER SIGNIFICANT ISSUES

- Is there anything else you think we should know?

## STRENGTHS/RESILIENCY/COPING SKILLS

- What do you think are your biggest strengths?
- What do you think are your best skills?

- What kinds of activities do you enjoy doing?
- What/who has helped you get through difficulties?

## BEHAVIORAL ISSUES

| | |
|---|---|
| • What was your behavior like in the past, before coming to DCS? | • Was your behavior any different before you were in DCS care?  *If yes-* How was your behavior different?  What do you think makes your behavior different here? |

## MENTAL HEALTH

*Assess UAC's orientation to person, time and place:*
- What's your name?
- Do you know today's date?  What is today's date?
- Do you know where you are?  Where?

In the past 60 days, have you had any of the following happen?  (*If UAC answers yes to any of the following, ask follow-up questions for more details*).
- Sleeping too little or too much
- Had nightmares
- Had difficulty paying attention
- Felt hopeless about the future
- Felt very sad
- Experienced serious anxiety
- Had trouble controlling anger or violent behavior

Have you ever had any of the following happen:  (*If UAC answers yes to any of the following, ask follow-up questions for more details*).
- Ever tried to hurt yourself
- Had urges to beat, injure or harm someone
- Ever thought about attempting suicide
- Ever attempted suicide
- Heard voices that others do not hear

*Use your clinical skills to conduct additional clinical assessment of the UAC as appropriate to evaluate the UAC's level of post-traumatic stress, depression and exposure to violence.  Below are some example questions.  Conduct additional assessment and ask different questions when needed and appropriate:*
- Do you have any mental health conditions that you know of?  *If yes-* What conditions?
- Have you ever been psychiatrically hospitalized?  *If yes-* When?  What happened?  How long were you hospitalized for and where?  What was the outcome of the hospitalization?
- Have you ever received mental health treatment?  *If yes-* What for and when?  What happened?  What was the outcome of this treatment?  Where was the treatment provided?
- Have you ever taken psychotropic medication?  *If yes-* Which medications have you taken?  When is the last time you took this medication?  What is the dosage and times taken per day, if you recall?  To your knowledge, should you still be on any medication?  *If yes-* What medication?
- Have you ever used drugs or alcohol?  What are the names of substances?  *For each substance:* What was your age when you first used?  How often did you use and how much?  What was the last date you used?
- Did anyone in your family use drugs or consume alcohol?  *If yes-* Who?  What substances did he/she use?  How much and how often?

## TRAUMA AND CHILD PROTECTION

- Have you ever lived on the street?  *If yes-* Can you describe how this happened?  Where and for how long did you live on the street?
- Have you witnessed acts of violence?  *If yes-* What happened?
- Have you lost any friends or family to violence?  *If yes-* What happened?
- Have you ever been hit or hurt in any way that left bruises or other marks on or caused pain?  *If yes-* What happened?  When did this happen?  How many times did this happen?  Who hurt you?  Where is this person/people now?

- Has anyone ever touched you or did something in a way that made you feel uncomfortable or confused?  *If yes-* What happened?  When did this happen?  How many times did this happen?  Who did this?  Where is this person now?
- Has anyone ever forced you to touch someone or to do anything uncomfortable?  *If yes-* What happened?  When did this happen?  How many times did this happen?  Who did this?  Where is this person now?

## TRAFFICKING AND EXPLOITATION

*Recruitment /Transportation:*
- Who planned/organized your journey?
- What were you told about the arrangements before the journey?
- Did the arrangements change during the journey?  *If yes-* How did they change?
- Does your family owe money to anyone for the journey?
- How much money was charged or promised?
- Who is expecting to be paid?
- Are you expected to pay for the journey?  *If yes- H*ow?
- What do you expect will happen if the person owed is not paid?
*Coercion/Control Indicators:*
- Did anyone threaten you or your family?   *If yes-* Who and what happened?
- Were you ever physically harmed?
- Was anyone around you ever physically harmed?  *If yes-* Who was harmed and what happened?

*Debt Bondage/Labor Trafficking Indicators:*
- Were you involved in any labor or services?
- Did you perform any work or provide any services?
- Who arranged the work?
- What type of work did you perform?
- What was the work schedule? (Hours per day, days per week, what times of day/night?)
- Did you have to work for anyone in a home?
- What were you told when he/she began working?
- Did work conditions change over time?
- Is there a debt?  *If yes-* Has any debt amount increased? By how much? When did it increase? Why did it increase?
- Have you or your family ever been threatened over payment or work for the journey?   *If yes-* Who threatened you and how exactly?

- Were you ever held against your will?  *If yes-* Who held you and what happened?
- Did anything bad happen to anyone else in this situation or anyone else who tried to leave?  *If yes-* What happened exactly?
- How many other people were in this situation?
- Did anyone ever keep/destroy your documents?  *If yes-* Who did this and what documents?
- Did anyone ever threaten to report you to the police/immigration? *If yes-* Who did this and what did they say exactly?
- Are you worried anyone might be trying to find you?

- What did you expect would happen if you left the job or stopped working?
- Were you ever made to work or do anything you did not want to do?
- Were you paid to work?
- Did you receive pay or did someone else keep the pay?
- Were you paid what was promised when you started working?
- Were expenses taken out of the pay?  What did the pay go towards?
- How did you get to the work site?
- Where did you live while working?

*Commercial Sex Indicators*
- Did anyone ever ask you to see you naked or in your underwear in exchange for money/anything of value?
- Did anyone ever pay/accept money/anything of value from other people in order to see you naked or in your underwear?
- Did anyone ever ask to take pictures or recording of you naked or engaged in sex acts?   If so, did they offer you money/anything of value to do this or did they accept money/anything of value from others in order to see these pictures or recordings?
- Did anyone ever ask or expect you to perform sexual acts in exchange for money/anything of value?  *If yes-* Who asked you and what happened?
- Did anyone ever promise or give money/anything of value to you in exchange for sexual acts? *If yes-* Who asked you?  What did he/she promise?

## Appendix 3.7 UAC Assessment

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104-13) Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection of information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.   OMB Control No: 0970-0498, Expiration date: 07/31/2020

| UAC Basic Information |
|---|

First Name:

Last Name:

AKA:
Status:
Date of Birth:
A No.:
Age:
Country of Birth:
City of Origin:

Gender:
LOS:
Current Program:
Admitted Date:
Neighborhood of Origin:

| Additional Basic UC Information |
|---|

Previous Placement:
Religious Affiliation:
Case Manager:
Clinician:

| Journey and Apprehension |
|---|

Describe day to day life in home country:
Why did you decide to travel to the U.S. at this time?

*Did the child mention any U.S. immigration policy or practice as a factor in his/her decision to travel to the U.S.?*
○ Yes ○ No

*For UC aged 14-17 ONLY: Did the child mention economic, job, or educational opportunities as a factor in his/her decision to travel to the U.S. ?*
○ Yes ○ No

When did you leave your home country (month, day, year)?

*How long did the trip take?*

How did you get to the U.S.?

Who did you travel with?

Who were you living with when you decided to leave your home country?

Where were you planning on living in the U.S. and with whom?

Where were you apprehended?

*At which U.S. Border Patrol sector did the child cross into the U.S.?*
Bridge of the Americas, TX

Have you ever been to the U.S. before? ○ Yes ○ No
If yes, when?

The child's experience and additional information regarding journey and apprehension:

| Family/Significant Relationships |
|---|

Has Family in Country of Origin? (If yes, list below)   ☐ Yes ☐ No
Family in Country of Origin

| Name | Age | DOB | Relationship |
|---|---|---|---|
|  |  |  | -- Select Relationship -- |
|  |  |  | -- Select Relationship -- |

Has Family in the U.S.? (If yes, list below)   ○ Yes ○ No
Family and Family Friends in the U.S.

| Name | Age | DOB | Relationship |
|---|---|---|---|
|  |  |  | -- Select Relationship -- |

Parent's whereabouts?

Are you married?   ○ Yes ○ No
Spouse Name, Age, and Location:



| Has Children? (If yes, list below) | | | | Yes ○ No ○ | |
| Children | | | | | |

| Name of Child | Age | DOB | Current Location | Name of Mother/Father |
|---|---|---|---|---|

Have you ever been hurt, physically, mentally or emotionally by someone taking care of you?   Yes ○ No ○

If yes, who and when?

Have you ever been taken to the hospital/emergency room because you were hurt?   Yes ○ No ○

If yes, explain:

What does the word "discipline" mean to you?

| Medical |
|---|

List any allergies:

Do you feel unwell?   Yes ○ No ○

If yes, what are your symptoms?

Additional medical information:

Medical History

| Condition | Yes/NO | Date of Diagnosis/Clarification |
|---|---|---|
| Pregnant | Yes ○ No ○ | |
| Tuberculosis | Yes ○ No ○ | |
| Varicella | Yes ○ No ○ | |
| Measles | Yes ○ No ○ | |
| Mumps | Yes ○ No ○ | |
| Rubella | Yes ○ No ○ | |
| Asthma | Yes ○ No ○ | |
| Diabetes | Yes ○ No ○ | |
| Cancer | Yes ○ No ○ | |
| Cardiac Issues | Yes ○ No ○ | |
| Sexually Transmitted Disease | Yes ○ No ○ | |
| Respiratory/Lung Disorder | Yes ○ No ○ | |
| Physical Disability | Yes ○ No ○ | |

Medication History

| Education |
|---|

What is the highest level of education you have completed?

When was the last time you were in school? What age?

| Legal |
|---|

Know Your Rights Presentation provided?   Yes ○ No ○

When?:

Legal screening completed?   Yes ○ No ○

When?:

Any possible legal relief identified?   Yes ○ No ○

Specify:

| Criminal History |
|---|

Any Criminal history? (If yes, list below)   Yes ○ No ○

List any Felony convictions:

List any Misdemeanor convictions:

List any Probation/Parole:

List and describe any disclosed criminal activity:

Additional information:

History of Incarceration

| Crime | Date | Length of Sentence | Location |
|---|---|---|---|

## Mental Health/Behavior

### Mental Status Evaluation

| | |
|---|---|
| **Attitude** | ○ Calm and Cooperative ○ Other |
| | **If other, describe:** |
| **Behavior** | ○ No Unusual Movements or Psychomotor Changes ○ Other |
| | **If other, describe:** |
| **Speech** | ○ Normal Rate/Tone/Volume ○ Other |
| | **If other, describe:** |
| **Affect** | --- Please Select --- |
| | **If other, describe:** |
| **Mood** | --- Please Select --- |
| | **If other, describe:** |
| **Thought Process** | ○ Goal-oriented and Logical ○ Disorganized ○ Other |
| | **If other, describe:** |

**Thought Content**

| Suicidal Ideation | | Homicidal Ideation | |
|---|---|---|---|
| ○ None ○ Passive ○ Active | | ○ None ○ Passive ○ Active | |
| If active: | | If active: | |
| **Plan** | ○ Yes ○ No | **Plan** | ○ Yes ○ No |
| **Intent** | ○ Yes ○ No | **Intent** | ○ Yes ○ No |
| **Means** | ○ Yes ○ No | **Means** | ○ Yes ○ No |

| | |
|---|---|
| | --- Please Select --- |
| | **If other, describe:** |
| **Perception** | ○ No Hallucinations or Delusions During Interview ○ Other |
| **Orientation** | ☐ Time ☐ Place ☐ Person ☐ Self |
| | **If other, describe:** |
| **Memory/Concentration** | ☐ Short term intact ☐ Long term intact ☐ distractible/Inattentive |
| | **If other, describe:** |
| **Insight/Judgment** | ○ Good ○ Fair ○ Poor |

### Mental Health

| | |
|---|---|
| Have you ever talked to a psychiatrist, psychologist, therapist, social worker or counselor about an emotional problem? | ○ Yes ○ No |
| **When:** | |
| Have you ever felt you needed help with your emotional problems, or have you had people tell you that you should get help for your emotional problems? | ○ Yes ○ No |
| **When:** | |
| Have you ever been advised to take medication for anxiety, depression, hearing voices or for any other emotional problems? | ○ Yes ○ No |
| **When:** | |
| Have you ever been seen in a psychiatric emergency room or been hospitalized for psychiatric reasons? | ○ Yes ○ No |
| **When:** | |
| Have you ever heard voices no one else could hear or seen objects or things that others could not see? | ○ Yes ○ No |
| **When:** | |
| Have you ever been depressed for weeks at a time, lost interest or pleasure in most activities, had trouble concentrating and making decisions or thought about killing yourself? | ○ Yes ○ No |
| **When:** | |
| Did you ever attempt to kill yourself? | ○ Yes ○ No |
| **When:** | |
| Have you ever had nightmares or flashbacks as a result of being involved in some traumatic/terrible event? For example, warfare, gang fights, fire, domestic violence, rape, murder, accident, being killed. | ○ Yes ○ No |
| **When:** | |
| Have you ever given in to an aggressive urge or impulse on more than one occasion that resulted in serious harm to others or led to the destruction of property? | ○ Yes ○ No |
| **When:** | |

### Substance Use History

| Substance | Used (even once) | Frequency of Use | Date of Last Use |
|---|---|---|---|
| Alcohol | ○ Yes ○ No | | |
| Marijuana | ○ Yes ○ No | | |
| Cocaine | ○ Yes ○ No | | |
| Other Stimulants (Meth, Ritalin, etc) | ○ Yes ○ No | | |
| Heroin | ○ Yes ○ No | | |
| Other Opiates (Oxycodone, Morphine, etc) | ○ Yes ○ No | | |
| Nicotine | ○ Yes ○ No | | |

| Trafficking |
|---|

**Who planned/organized your journey?**

**Did a family member or family friend pay for your travel to the U.S.?** ☐ Yes ☐ No
**What were you told about the arrangements before the journey?**

**Did the arrangements change during the journey?** ☐ Yes ☐ No
**If yes, how?**

**Does your family or family friend owe money to anyone for the journey?** ☐ Yes ☐ No
**If yes, how much?**

**Whom is the money owed?**

**Who is expected to pay?**

**What do you expect to happen if payment is not made?**

| Coercion Indicators |
|---|

**Did anyone threaten your or your family?** ☐ Yes ☐ No
**If yes, who made the threats?**

**Were you ever physically harmed?** ☐ Yes ☐ No
**If yes, how?**

**Was anyone around you ever physically harmed?** ☐ Yes ☐ No
**If yes, how?**

**Were you ever held against your will?** ☐ Yes ☐ No
**If yes, where?**

**Did anything bad happen to anyone else in this situation or anyone else who tried to leave?** ☐ Yes ☐ No
**What happened and to whom?**

**Did anyone ever keep/destroy your documents?** ☐ Yes ☐ No
**If yes, who and what?**

**Did anyone ever threaten to report you to the police/immigration?** ☐ Yes ☐ No
**If yes, who?**

**Are you worried anyone might be trying to find you?** ☐ Yes ☐ No
**If yes, who?**

| Debt Bondage/ Labor Trafficking |
|---|

**Did you perform any work or provide any services?** ☐ Yes ☐ No
**If yes, what and where?**

**Who arranged the work?**

**What type of work did you perform?**

**What was the work schedule?**

**Did work conditions change over time?**

**Is there a debt?** ☐ Yes ☐ No
**If yes, has any debt amount increased?** ☐ Yes ☐ No
**By how much?**

**When did it increase?**

**Why did it increase?**
**Have you or your family ever been threatened over payment or work for the journey?** ☐ Yes ☐ No
**If yes, who threatened you and how?**

**What did you expect would happen if you left the job or stopped working?**

**Were you ever made to work or do anything you did not want to do?** ☐ Yes ☐ No
**Did you receive pay or did someone else keep the pay?**

**Were you paid what was promised when you started working?**

**Were expenses taken out of the pay?** ☐ Yes ☐ No
**If yes what?**

How did you get to the work site?

Where did you live while working?

**Commercial Sex Indicators**

| | |
|---|---|
| Did anyone ever ask you to see you naked or in your underwear in exchange for money/anything of value? | ○Yes ○No |
| Did anyone ever pay/accept money/anything of value from other people in order to see you naked or in your underwear? | ○Yes ○No |
| Did anyone ever ask to take pictures or recording of you naked or engaged in sex acts? | ○Yes ○No |
| If so, did they offer you money/anything of value to do this or did they accept money/anything of value from others in order to see these pictures or recordings? | ○Yes ○No |
| Did anyone ever ask or expect you to perform sexual acts in exchange for money/anything of value? | ○Yes ○No |
| Did anyone ever promise or give money or anything of value to you in exchange for sexual acts? | ○Yes ○No |
| Based on the information provided above in the "Trafficking" section, is there a trafficking concern? | ○Yes ○No |

If yes, date of trafficking referral:

**Sponsor Information (List by Priority)**

| Current Sponsor | Cat (1,2,3) | Sponsor Name | DOB | Address | Phone | Legal Status | Relationship |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**Sponsor Risk Assessment**

| | |
|---|---|
| Substance abuse concerns? | ○Yes ○No |
| If yes, explain: | |
| Domestic violence concerns? | ○Yes ○No |
| If yes, explain: | |
| Child abuse or neglect concerns? | ○Yes ○No |
| If yes, explain: | |
| Mental health issues? | ○Yes ○No |
| If yes, explain: | |
| Does the sponsor have any family support? | ○Yes ○No |
| Specify: | |
| Does the sponsor have any identified special needs? | ○Yes ○No |
| If yes, explain: | |
| Does the sponsor have financial needs? | ○Yes ○No |
| If yes, explain: | |
| Does the sponsor have adequate housing? | ○Yes ○No |
| If yes, explain: | |

Are there any concerns with the disciplinary practices/philosophy of sponsor?

| | |
|---|---|
| Does the sponsor have any criminal history? | ○Yes ○No |

List any Felony convictions:

List any Misdemeanor convictions:

List any Probation/Parole:

List and describe any disclosed criminal activity:



**List and describe any disclosed criminal activity:**

| History of Incarceration: | Crime | Date | Length of Sentence | Location |
|---|---|---|---|---|

**Are there any parent/child relational issues?**  ○ Yes ○ No
**If yes, explain:**

**Does the sponsor have an Order of Removal?**  ○ Yes ○ No
**If yes, date issued:**

**Has the sponsor sponsored any other UC in DCS care?**  ○ Yes ○ No
**Additional sponsor information:**

| Sponsor Sponsored UCs: | Name of UC | A Number | Relationship | Facility sponsored from |
|---|---|---|---|---|

### Mandatory TVPRA 2008

**Based on the most recent trafficking screening, is the child a victim of a severe form of trafficking in persons? (Indicate 'yes' only if ORR has issued a trafficking eligibility letter for UC.)**  ○ Yes ○ No
**Date eligibility letter issued:**

**Based on the most recent screening for disabilities, does the child have a disability as defined in section 3 of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102(1)?**  ○ Yes ○ No
**If yes, specify disability:**

**Based on the most recent screening, has the child been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened?**  ○ Yes ○ No
**If yes, provide a short summary:**

**Based on the sponsor risk assessment, does the sponsor clearly present a risk of abuse, maltreatment, exploitation, or trafficking to the UC?**  ○ Yes ○ No
**If yes, provide a short summary:**

### Additional Information

**Please input any additional information if needed:**

### Additional Information

**Please input any additional information if needed:**

### Certification

**Signature:**          **Date:**
                       **Print Name:**

**Title:**

# Appendix 3.8 Individual Service Plan



| UC Basic Information | | |
|---|---|---|
| First Name: | | |
| Last Name: | | |
| AKA: | | |
| Status: | | |
| Date of Birth: | Gender: | |
| A No.: | LOS: | |
| Age: | Current Program: | |
| Country of Birth: | Admitted Date: | |

| Individual Service Plan | | | | | | |
|---|---|---|---|---|---|---|
| Case Manager: | | | | | | |
| Clinician: | | | | | | |

**Mandatory Services**

| Service | Task | Frequency | Start Date | End Date | Person Responsible |
|---|---|---|---|---|---|
| Orientation | Program Orientation | One Time | | | |
| Assessment | UC Assessment | One Time | | | |
| Medical | Medical Exam w/in 48 Hours of Admission | One Time | | | |
| Education | Assessment | One Time | | | |
| | Plan | One Time | | | |
| | Classes | Daily | | | |
| Recreation and Leisure | Large Muscle Activity and Leisure Time | 1 hour of each/weekday; 5 hours total/weekends | | | |
| Individual Counseling | Session | Once Weekly | | | |
| Group Counceling | Session | Twice weekly (or once weekly with community meeting) | | | |
| Group Counceling | Session | Twice weekly (or once weekly with community meeting) | | | |
| Access to Religious Services | Attendance | Up on request | | | |
| Case Management | Discharge Planning; Family Reunification | Ongoing Once weekly meetings with UAC for updates | | | |
| Legal Orientation | KYR Presentation; Legal Screening | One Time each | | | |
| Vocation | Training and Activities | Once weekly | | | |

**Other Services**

| Service | Tasks | Frequency | Start Date | End Date | Person Responsible |
|---|---|---|---|---|---|
| | | | | | |

**Certificate**

| Signature: | Date: |
|---|---|
| Print Name: | Title: |

# Appendix 3.9 UAC Case Review



| UAC Basic Information | | |
|---|---|---|
| First Name: | | |
| Last Name: | | |

AKA:
Status:
Date of Birth:
A No.:
Age:
Country of Birth:

Gender:
LOS:
Current Program:
Admitted Date:

○ 30 day Case Review ○ Discharge ○ Transfer      Are there any changes?:      ○ Yes ○ No

**Previous Placement:**
test
**Religious Affiliation:**
test
**Case Manager:**
test
**Clinician:**
test

Document any new information regarding the UC not indicated in the UC Assessment and/or the previous case summary below

| Medical | | |
|---|---|---|

List any allergies:
Do you feel unwell?
○ Yes ○ No
If yes, what are your symptoms?
Additional medical information:
Medical History

| Condition | Yes/NO | Date of Diagnosis/Clarification |
|---|---|---|
| Pregnant | ○ Yes ○ No | |
| Tuberculosis | ○ Yes ○ No | |
| Varicella | ○ Yes ○ No | |
| Measles | ○ Yes ○ No | |
| Mumps | ○ Yes ○ No | |
| Rubella | ○ Yes ○ No | |
| Asthma | ○ Yes ○ No | |
| Diabetes | ○ Yes ○ No | |
| Cancer | ○ Yes ○ No | |
| Cardiac Issues | ○ Yes ○ No | |
| Sexually Transmitted Disease | ○ Yes ○ No | |
| Respiratory/Lung Disorder | ○ Yes ○ No | |
| Physical Disability | ○ Yes ○ No | |

Medication History

| Medication | Dosage | Timeframe | Medical Condition |
|---|---|---|---|

| Legal | | |
|---|---|---|

Know Your Rights Presentation provided?
○ Yes ○ No
Date:
Legal screening completed?
○ Yes ○ No
Date:
Any possible legal relief identified?
○ Yes ○ No
Specify:



**Mental Health**

Provide a short summary of the UAC's current functioning:

**Psychological Evaluation**

Date of Evaluation:

Evaluator:

Axis I:

Axis II:

Axis III:

Axis IV:

Axis V:

Summary of Recommendations:

**Trafficking**

Who planned/organized your journey?

What were you told about the arrangements before the journey?

Did the arrangements change during the journey?  ☐ ☐ Yes No

If yes, how?

Does your family owe money to anyone for the journey?  ☐ ☐ Yes No

If yes, how much?

Whom is the money owed?

Who is expected to pay?

What do you expect to happen if payment is not made?

**Coercion Indicators**

Did anyone threaten your or your family?  ☐ ☐ Yes No

If yes, who made the threats?

Were you ever physically harmed?  ☐ ☐ Yes No

If yes, how?

Was anyone around you ever physically harmed?  ☐ ☐ Yes No

If yes, who?

Were you ever held against your will?  ☐ ☐ Yes No

If yes, where?

Did anything bad happen to anyone else in this situation or anyone else who tried to leave?  ☐ ☐ Yes No

What happened and to whom?

Did anyone ever keep/destroy your documents?  ☐ ☐ Yes No

If yes, who and what?

Did anyone ever threaten to report you to the police/immigration?  ☐ ☐ Yes No

If yes, who?

Are you worried anyone might be trying to find you?  ☐ ☐ Yes No

If yes, who?

**Debt Bondage/ Labor Trafficking**

Did you perform any work or provide any services?  ☐ ☐ Yes No

If yes, what and where?

Who arranged the work?

What type of work did you perform?

What was the work schedule?

Did work conditions change over time?

Is there a debt?  ☐ ☐ Yes No



| | Yes No |
|---|---|
| If yes, has any debt amount increased? | ☐ ☐ |

| By how much? |
|---|
| When did it increase? |
| Why did it increase? |
| Have you or your family ever been threatened over payment or work for the journey? |

| | Yes No |
|---|---|
| | ☐ ☐ |

| If yes, who threatened you and how? |
|---|
| What did you expect would happen if you left the job or stopped working? |
| Were you ever made to work or do anything you did not want to do? |

| | Yes No |
|---|---|
| | ☐ ☐ |

| Did you receive pay or did someone else keep the pay? |
|---|
| Were you paid what was promised when you started working? |
| Were expenses taken out of the pay? |

| | Yes No |
|---|---|
| | ☐ ☐ |

| If yes what? |
|---|
| How did you get to the work site? |
| Where did you live while working? |

**Commercial Sex Indicators**

| | Yes No |
|---|---|
| Did anyone ever ask you to see you naked or in your underwear in exchange for money/anything of value? | ☐ ☐ |
| Did anyone ever pay/accept money/anything of value from other people in order to see you naked or in your underwear? | ☐ ☐ |
| Did anyone ever ask to take pictures or recording of you naked or engaged in sex acts? | ☐ ☐ |
| If so, did they offer you money/anything of value to do this or did they accept money/anything of value from others in order to see these pictures or recordings? | ☐ ☐ |
| Did anyone ever ask or expect you to perform sexual acts in exchange for money/anything of value? | ☐ ☐ |
| Did anyone ever promise or give money or anything of value to you in exchange for sexual acts? | ☐ ☐ |
| Based on the information provided above in the "Trafficking" section, is there a trafficking concern? | ☐ ☐ |

| If yes, date of trafficking referral: |
|---|

**Sponsor Information (List by Priority)**

| Current Sponsor | Cat {1,2,3} | Sponsor Name | DOB | Address | Phone | Legal Status | Relationship |
|---|---|---|---|---|---|---|---|
| ☐ | | | | | | | |

**Sponsor Risk Assessment** Sponsor Risk Assessment

| | |
|---|---|
| Substance abuse concerns? | ☐Yes☐ No |
| If yes, explain: | |
| Domestic violence concerns? | ☐Yes☐ No |
| If yes, explain: | |
| Child abuse or neglect concerns? | ☐Yes☐ No |
| If yes, explain: | |
| Mental health issues? | ☐Yes☐ No |
| If yes, explain: | |
| Does the sponsor have any family support? | ☐Yes☐ No |
| Specify: | |
| Does the sponsor have any identified special needs? | ☐Yes☐ No |
| If yes, explain: | |
| Does the sponsor have financial needs? | ☐Yes☐ No |
| If yes, explain: | |
| Does the sponsor have adequate housing? | ☐Yes☐ No |
| If yes, explain: | |
| Are there any concerns with the disciplinary practices/philosophy of sponsor? | ☐Yes☐ No |

| Does the sponsor have any criminal history? |
|---|
| List any Felony convictions: |
| List any Misdemeanor convictions: |
| List any Probation/Parole: |
| List and describe any disclosed criminal activity: |

| History of Incarceration: | Crime | Date | Length of Sentense | Location |
|---|---|---|---|---|

| | |
|---|---|
| Are there any parent/child relational issues? | ○ Yes ○ No |
| If yes, explain: | |
| Does the sponsor have an Order of Removal? | ○ Yes ○ No |
| If yes, date issued: | |
| Has the sponsor sponsored any other UC in DCS care? | ○ Yes ○ No |
| Additional sponsor information | |

| Sponsor Sponsored UCs: | Name of UC | A Number | Relationship | Facility sponsored from |
|---|---|---|---|---|
| | | | | |

### Mandatory TVPRA 2008

| | |
|---|---|
| Based on the most recent trafficking screening, is the child a victim of a severe form of trafficking in persons? (Indicate 'yes' only if ORR has issued a trafficking eligibility letter for UC.) | ○ ○ Yes No |
| Date eligibility letter issued: | |
| Based on the most recent screening for disabilities, does the child have a disability as defined in section 3 of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102(1)? | ○ ○ Yes No |
| If yes, specify disability: | |
| Based on the most recent screening, has the child been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened? | ○ ○ Yes No |
| If yes, provide a short summary: | |
| Based on the sponsor risk assessment, does the sponsor clearly present a risk of abuse, maltreatment, exploitation, or trafficking to the UC? | ○ ○ Yes No |
| If yes, provide a short summary: | |

### Recommendations

| | |
|---|---|
| Discharge: | ○ Yes ○ No |
| Sponsor: | |
| Discharge w/ Post Release: | ○ Yes ○ No |
| Date of PR referral: | |
| Refer to Home Study | ○ Yes ○ No |
| Reason for HS referral: | |

### Care Plan

| |
|---|
| Reunification: |
| Legal: |
| Mental Health: |

### Certification

| |
|---|
| Signature: |
| Date: |
| Print Name: |
| Title: |

## Appendix 3.10 OYAS-RET Interviewing Guidance, OYAS-RET Score Sheet, and the OYAS Reentry Self-Report Questionnaire

**Prior to using these tools: Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.**

# OHIO YOUTH ASSESSMENT SYSTEM
# REENTRY TOOL (OYAS-RET)
# INTERVIEW GUIDE



The interview guide is designed to assist the assessor in gathering the information necessary to accurately assess the youth on the OYAS-RET. It is important to establish rapport with the youth, and while it is recommended that the interview guide be closely followed, the wording of the questions may vary. Here are some tips for conducting the interview:

- Conduct the interview in a relaxed and private environment.

- Explain the purpose of the interview and stress the need for honesty and complete answers to questions.

- Do not hesitate to use follow-up questions and probe. Examples of follow-up questions:
    - Tell me more; I want to be certain that I understand you.
    - What happened next?
    - Could you explain that further?
    - What do you mean?
    - Can you describe some examples?
    - How did that make you feel?

- Remember what information you are trying to obtain. Develop clear examples and remember there are sometimes differences in perception.

- Remember that the interviewer sets the tone. Be patient, and try not to correct or teach.


- Whenever possible, use open-ended questions where the respondent provides his or her opinion and is able to elaborate. For example, "Tell me more about your relationship with..."

- Avoid double-barreled questions where the respondent is asked a combination of questions:
    - "How is your relationship with your mother and father?"

- Avoid biased questions where the respondent is led in a certain direction.
    - "Your relationship with your mother isn't bad, is it?"

Also, remember that the interview is only one source of information. Official records and collateral sources, such as family members or other professionals, should also be consulted. It is important to corroborate the youth's responses whenever possible.

Note: Throughout the interview guide there will be questions marked with an *. These questions are available on the self-report questionnaire also. If the interviewer is using the self-report questionnaire with the youth, they do not necessarily have to ask these questions.

## The following domains are scored:

1. Juvenile Justice History
2. Family and Living Arrangements
3. Peers and Social Support Network
4. Education and Employment
5. Pro-Social Skills
6. Substance Abuse, Mental Health, and Personality
7. Values, Beliefs, and Attitudes

| Name: | |
|---|---|
| Gender: | ☐ Male ☐ Female |
| Race: | ☐ Caucasian ☐ Black/Africa-American ☐ Native American<br>☐ Asian ☐ Pacific Islander |
| Ethnicity: | ☐ Hispanic/Latino ☐ Non-Hispanic |
| Date of Birth: | |
| County: | |
| Education (highest completed): | ☐ 8th or less ☐ 9th ☐ 10th ☐ 11th ☐ HS Diploma/GED |

## 1.0 Juvenile Justice History

Items:

1.1) Documented Contact with Juvenile Justice System
    0 = 14 or older
    1 = 13 or younger

1.2) Attempted and/or Escaped from Residential Facility
    0 = No history of attempt/escape
    1 = History of attempt/escape

1.3) History of Selling Drugs

    0 = Has never sold drugs

    1 = Has sold drugs

1.4) Physical Altercation with an Authority Figure

    0 = No history of physical altercation with authority figure

    1 = Has a history of physical altercation with authority figure

1.5) Weapon Used During a Crime

    0 = Never used a weapon during a crime

    1 = Has used a weapon during a crime

1.6) Victim Physically Harmed During Offense

    0 = Has never physically harmed a person during a crime

    1 = Has physically harmed a person during a crime

1.7) Received a Major Sanction while in Residential Care

    0 = Has never received a major sanction while in residential care

    1 = Has received at least 1 major sanction while in residential care

*I am going to ask you a few questions about your past.*

1. *How old were you the first time you got in trouble?

    a. What did you do?

    b. What happened?

2. How about the most recent offense, tell me about it.

3. How many times altogether have you gotten in trouble with the law?

a. Of those, how many resulted in adjudication?

b. What offenses were you adjudicated on?

4. Have you ever sold drugs?

a. *If so, how often?

　○ Never　　　○ Once in a While　　　○ Sometimes　　　○ Often

5. Did you ever use a weapon during any of the offenses you got into trouble for? Is so, tell me about that.

6. Has anyone gotten hurt during an offense that you have committed?

7. Tell me about any physical fights you have been in with staff.

a. What about any other authority figures (e.g., police, teachers/school personnel, detention workers, bosses, etc.)?

8. Have you ever been held in detention?

9. How about another residential facility besides this one?

a. If so, have you ever gotten into trouble for trying to leave a residential facility without permission?

b. Were you charged with AWOL?

10. Since being in the facility, have you received any consequences?

a. If yes, for what?

b. What happened to you as the result of the the consequence?

## 2.0 Family and Living Arrangement

Items:

2.1) Family is Important
- 0 = Family is very important to the youth
- 1 = Family is not very important to the youth

2.2) Family Member(s) Arrested
- 0 = No
- 1 = Yes

2.3) Parents/Caregivers Use Appropriate Consequences
- 0 = Parents/caregivers use appropriate consequences most of the time
- 1 = Parents/caregivers use inappropriate consequences

2.4) Positive Relationship with Person at Planned Residence
- 0 = Positive/supportive relationship with adult at planned residence
- 1 = Does not have a positive relationship with adult at planned residence

*I am going to ask you a few questions about your family.*

1. Tell me about your biological parents and/or adoptive parents.

a. How often do you have contact with them?

b. If the youth was raised by non-biological parents, ask them about their relationship with these parents also.

2. Who were you living with the last time you were in the community?

 

    a. How well did you get along with the people you were living with?

 

3. *How would you rate the following statement: "My family is important to me?"

   ○ Strongly Agree     ○ Agree     ○ Disagree     ○ Strongly Disagree

    a. How often do you talk to them?

 

    b. Over the phone? Visitation?

 

3. *How many close family members (e.g., parents, siblings) have been arrested before?
   ○ 0     ○ 1     ○ 2     ○ 3+

    a. Have any of them ever been in jail/prison?

 

5. Tell me about the consequences your parents/caregivers gave you when you got in trouble.

 

a. Have you ever gotten grounded? If so, how long?

b. Have you ever been hit as a punishment?

6. Tell me about where you are going to live when you leave here.

a. How well do you get along with them?

b. Do you think the people you are going to live with are supportive?

## 3.0 Peers and Social Support Network

Items:

3.1) Acquaintances Use Drugs
   0 = 5 or fewer acquaintances use drugs
   1 = 6 or more acquaintances use drugs

3.2) Friends Fight
   0 = Friends do not get in fights often
   1 = Friends fight a lot

3.3) Friends Use Drugs
   0 = Less than 50% of friends use drugs
   1 = 50% or more of friends use drugs

3.4) Friends Arrested

      0 = Less than 50% of friends have been arrested

      1 = 50% or more of friends have been arrested

3.5) Relationship with Youth on Unit

      0 = Gets along with youth on the unit

      1 = Does not get along with youth on the unit

3.6) Relationship with Staff

      0 = Gets along with staff at the facility

      1 = Does not get along with staff at the facility

3.7) Friends/Family Associated with Gang Activity

      0 = Friends are not part of a gang

      1 = Friends are part of a gang

3.8) Arrested with Friends

      0 = Not arrested with friends

      1 = Arrested with friends

3.9) Adults in the Community are Supportive

      0 = Adults in the community are supportive

      1 = Adults in the community are not supportive

*I am going to ask you a set of questions about the people that you know. Some of the questions will be about acquaintances and some will be about your close friends.*

1. Talking about your acquaintances (people who you know but are not your close friends), how many have been in trouble with the law?

 

    a. For what?

 

2. *How about the number of acquaintances that use drugs? Do you know about how many (outside the facility) use substances?

  ⭘ 0 to 5     ⭘ 6 to 10     ⭘ 11 to 15     ⭘ 16 to 20     ⭘ 21+

*Now focusing on your friends:*

3. Tell me about your close friends (consider those in the community as well as in the facility).

How many friends would you say you have? [_____]

    a. Of those friends, how many use alcohol? [_____]

    b. Of those friends, how many use drugs? [_____]

    a. Of those friends, how many have been suspended/expelled from school? [_____]

    a. Of those friends, how many have been in detention? [_____]

    a. Of those friends, how many have been arrested? [_____]

4. *How would you rate the following statement: "My friends get into physical fights?"

    ○ Never    ○ Sometimes    ○ Often

5. *How many times have you been arrested/committed a crime while you have been with your friends?

[_____]

6. *How many of your friends are involved in a gang? [_____]

7. *As for the youth on your unit, how well do you get along with them?

    ○ Not at All    ○ Ok    ○ Somewhat    ○ Good    ○ Very Good

    a. Do you consider any of them to be your friends?

[_____]

8. *How about staff? How well do you get along with them at the facility?

　　○ Not at All　　○ Ok　　○ Somewhat　　○ Good　　○ Very Good

9. As for the community you will be living in, tell me about any non-family members that you feel are supportive.

a. Have you talked to any of them since you have been here?

## 4.0 Education and Employment

Items:

4.1) Truant from School
　　0 = Never been charged with truancy
　　1 = Charged with truancy

4.2) Expelled - Ever
　　0 = Never been expelled from school
　　1 = Expelled from school

4.3) Effort in School
　　0 = Effort in school
　　1 = Little effort in school

4.4) Relationship with Current School Personnel/Employer
　　0 = Positive relationship with school personnel/employer
　　1 = No positive relationship with school personnel/employer

*This section focuses on education and employment. If the youth is employed full-time or her/his primary focus is employment item 4.3 should be scored based on employment.*

1. Tell me about school before you came to the facility.

a. When was the first time you skipped class?

b. How often did you skip class?

c. *How many times were you charged with truancy in the last two years?

2. Were you ever expelled from school?

3. *How did you get along with teachers?

a. Did you consider any of them positive influences?

b. If yes, how many?

c. Were they available to help you outside the classroom?

d. How about school since you have been here?

4. Have you been in trouble at school since you have been here?

*Now I am going to ask you questions about any jobs you have had.*

5. Describe any jobs you have ever had.

    a. Did you get along with your co-workers?

    b. How about your boss?

    c. Did you ever have a problem with staff or co-workers?

6. Describe any problems that you had.

7. How did it end up?

8. What is the longest you worked at a job?

9. How about the shortest time?

## 5.0 Pro-Social Skills

Items:

5.1)  Can Identify Triggers/High Risk Situations
    0 = Identifies high risk situations

    1 = Does not identify high risk situations

5.2)  Weighs Pro/Cons of a Situation
    0 = Weighs the pros and cons of a situation
    1 = Does not weigh the pros and cons of a situation

5.3)  Pro-Social decision Making
    0 = Demonstrates pro-social decision making
    1 = Does not demonstrate pro-social decision making

5.4)  Frustration Tolerance
    0 = Adequate skills to manage frustration
    1 = Some/minimal skills to manage frustration

1.  What kinds of things lead you to get into trouble?

2.  Tell me about a time where you did not realize you were headed for trouble, but looking back on it, you should have seen trouble coming your way.

*I am going to ask you a set of scenarios. I want you to think of the answer that best fits with what you would normally do. [NOTE TO INTERVIEWER: probe to determine whether the youth can identify high-risk situations and then whether they are able to weigh pros/cons of that situation before they engage in any behavior for each scenario.]*

3. Scenario #1:  If one of our friends asked you to go to a party, would you go?

a. Why or why not?

b. What if you knew there would be alcohol and drugs there?

4. Scenario #2:  If you found a wallet with $100 in it, what would you do?

5. Scenario #3:  If you knew your friend was driving a car that was not his/hers, would you get in the car?

a. Why or why not?

6. Switching gears for a second. Tell me about stuff that makes you frustrated.

a. When was the last time you felt frustrated?

b. How hard is it to deal with things when you are frustrated?

c. You ever just give up?

**Staff Rating: Can the youth identify triggers/high risk situations effectively?**

○ No          ○ Somewhat          ○ Yes

**Staff Rating: Does the youth weigh pros/cons?**

○ No          ○ Somewhat          ○ Yes

**Interviewer's Impressions:**

**Can the youth tie behavior to the consequence?**

**Rate the youth on his/her ability to understand the consequences of his/her actions.**

○ None          ○ Very Little          ○ Some          ○ Good

**Staff Rating: Does the youth make pro-social decisions given these scenarios?**

○ No          ○ Somewhat          ○ Yes

**Staff Rating: Does the youth have adequate skills to handle frustration?**

○ No          ○ Somewhat          ○ Yes

## 6.0 Substance Abuse, Mental Health, and Personality

Items:

6.1)  Age of Drug Onset
       0 = 13 or older
       1 = 12 or younger

6.2)  Others Complained about Drug/Alcohol Use
       0 = No one has complained about substance use
       1 = Others have complained about substance use

6.3)  Failed Drug Test within Past 6 Month
       0 = Has not failed drug test within past 6 months
       1 = Has failed drug test within past 6 months

6.4)  Alcohol/Drugs have Caused a Problem in Major Life Area
       0 = Alcohol/Drugs have not caused a problem
       1 = Alcohol/Drugs have caused a problem

6.5)  Used Substances While in Residential Facility
       0 = Has not used alcohol or drugs while in the facility
       1 = Has used alcohol and/or drugs while in the facility

6.6)  Inflated Self-Esteem
       0 = Appropriate level of self-esteem
       1 = Inflated self-esteem

6.7)  Risk Taking Behavior
       0 = Does not generally take risks
       1 = Takes risks

*Now we are going to talk about any alcohol or drugs you have used.*

1. Tell me about any drugs that you have used.

|  | Type of Drug | How often were you using at time of arrest (e.g., daily, weekly, etc.)? | How much? | Most ever? | Last use (date or about how long ago)? |
|---|---|---|---|---|---|
| - + |  |  |  |  |  |
| - + |  |  |  |  |  |
| - + |  |  |  |  |  |
| - + |  |  |  |  |  |

2. How old were you the first time you used marijuana?

a. How about any other drugs?

3. Tell me about what your [insert appropriate adult: parent, counselor, uncle/aunt] thinks about your [drug/alcohol] use.

a. *Has anyone complained [showed concern] about your alcohol/drug use?

4. When is the last time you took a drug test?

a. What were the results?

5. Have you ever tested positive for drugs?

a. If so, how long ago?

6. Given what you have told me so far, do you think that drugs and/or alcohol have caused you any problems?

a. How has your use affected school?

b. How about with your family?

c. Legal problems?

d. Friends?

7. What kind of drugs have you seen while in the facility?

a. What about while you were still living in the facility but out on pass?

b. Have you ever seen anyone use drugs while in the facility? What about alcohol?

c. Have you ever had an opportunity to use drugs while in the facility? What about alcohol?

d. Have you used drugs while in the facility? What about alcohol?

e. How about on a community pass?

*I am going to ask you some questions about yourself.*

8. *On a scale of 1 to 10 how cool do you consider yourself?

9. *If your friends had to rate you, how cool would they rate you on a scale of 1 to 10?

10. Tell me about any situations that you have participated in that you would consider risky (dangerous).

a. Would you consider yourself a risk taker?

b. Have you ever driven a car without a driver's license?

c. What is the fastest you have driven a car (or been in a car)?

d. Have you ever stolen something when you had enough money to pay for it?

e. Ever carry a loaded gun? How about into a place where you weren't supposed to have it (e.g., school)?

f. Have you ever taken any drugs that you did not know what they were?

## 7.0 Values, Beliefs, and Attitudes

Items:

7.1) Pro-Criminal Statements
       0 = No/Few pro-criminal beliefs
       1 = Some/A lot of pro-criminal beliefs

7.2) Negative Attitudes Towards Supervision
       0 = Will complete supervision without problems
       1 = Will have a difficult time with supervision

   7.3) Attitude Supports Substance Use
          0 = Not supportive of substance use
          1 = Supportive of substance use

   7.4) Demonstrates Remorse for Offense
          0 = Full remorse
          1 = Some remorse
          2 = No remorse

7.5) Demonstrates Empathy Towards Others
     0 = Demonstrates empathy towards others
     1 = Does not show empathy towards others

7.6) Attitude Towards Gangs
     0 = negative attitude towards gangs
     1 = Supportive of gangs

*I am now going to ask you some questions about your beliefs and values. [NOTE TO INTERVIEWER: This section should be rated based on the entire interview. There are some questions that are provided as suggestions if you do not feel that you have captured the necessary information to score these items.]*

1. Based on what you have told me, what do you think about being on parole?

 

    a. Tell me about your plan to make it on parole.

 

2. What do you see as your parole (probation) officer's job?

 

3. *How would you rate the following statement: "I will get off supervision without any problems."

○ Strongly Agree    ○ Agree    ○ Disagree    ○ Strongly Disagree

4. What do you think about marijuana? Should it be legal?

 

    a. How about other drugs?

 

4. What do you think about marijuana? Should it be legal?

a. How about other drugs?

b. What are the chances that you use drugs in the next couple of years?

5. You talked about your offense earlier. Tell me how it affected the people involved.

a. How was your family affected?

b. If you could change anything about your offense what would it be?

6. Ever think about how people's behavior affects others?

7. What about how your behavior affects others?

8. Would you say that you generally care about others?

9. What do you think about gangs?

10. Do you think that gangs are helpful?

11. Should youth be allowed to join a gang?

**Staff Rating: Does the youth use pro-criminal statements?**

○ None          ○ Few          ○ Some          ○ A Lot

\* If the youth is rated some/a lot this item should be scored a 1.

**Staff Rating: Youth has negative attitude towards supervision.**

○ Strongly Agree          ○ Agree          ○ Disagree          ○ Strongly Disagree

**Staff Rating: Youth's attitude towards substance use.**

○ Supportive of Drug/Alcohol Use          ○ Somewhat Supportive          ○ Not Supportive

**Staff Rating: Does the youth demonstrate remorse for offense?**

○ Full Remorse          ○ Some Remorse          ○ No Remorse

**Staff Rating: Youth's level of empathy towards others.**

○ None          ○ Very Little          ○ Some          ○ Good

\* If the youth is rated as none or very little this item should be scored a 1.

**Staff Rating: Supportive of Gangs**

○ Highly Supportive      ○ Supportive      ○ Somewhat Supportive      ○ Not Supportive

\* If the youth is rated highly supportive, supportive, or somewhat supportive this item should be scored a 1.

# OHIO YOUTH ASSESSMENT SYSTEM
# REENTRY TOOL (OYAS-RET)
# SCORE SHEET



**Name** [ ]      **Date** [ ]

## 1.0 Juvenile Justice History

1.1) Documented contact with juvenile justice system          [ ]
    0 = 14 or older
    1 = 13 or younger

1.2) Attempted and/or escaped from residential facility          [ ]
    0 = No history of attempt/escape
    1 = History of attempt/escape

1.3) History of selling drugs          [ ]
    0 = Has never sold drugs
    1 = Has sold drugs

1.4) Physical Altercation with an authority figure          [ ]
    0 = No history of physical altercation with authority figure
    1 = Has a history of physical altercation with authority figure

1.5) Weapon used during a crime          [ ]
    0 = Never used a weapon during a crime
    1 = Has used a weapon during a crime

1.6) Victim physically harmed during offense          [ ]
    0 = Has never physically harmed a person during a crime
    1 = Has  physically harmed a person during a crime

1.7) Received a major sanction while in residential care          [ ]
    0 = Has never received a major sanction while in residential care
    1 = Has received at least 1 major sanction while in residential care

        **TOTAL** [ ]

## 2.0 Family and Living Arrangements

2.1) Family is important          [ ]
    0 = Family is very important to the youth
    1 = Family is not very important to the youth

2.2) Family member(s) arrested

    0 = No

    1 = Yes

2.3) Parents use appropriate consequences

    0 = Parents use appropriate consequences most of the time

    1 = Parents use inappropriate consequences

2.4) Positive relationship with person at planned residence

    0 = Positive/supportive relationship with adult at planned residence

    1 = Does not have a positive relationship with adult at planned residence

**TOTAL**

| | Strength | Barrier |
|---|---|---|
| Family supportive of change | ○ | ○ |
| Family is engaged | ○ | ○ |
| Family willing to participate in treatment | ○ | ○ |
| Family is stable | ○ | ○ |
| History of abuse/neglect | ○ | ○ |
| TOTAL: | 0 | 0 |

## 3.0 Peers and Social Support Network

3.1) Acquaintances Use Drugs

    0 = 5 or fewer acquaintances use drugs

    1 = 6 or more acquaintances use drugs

3.2) Friends Fight

    0 = Friends do not get in fights often

    1 = Friends fight a lot

3.3) Friends Use Drugs

    0 = Less than 50% of friends use drugs

    1 = 50% or more of friends use drugs

3.4) Friends Arrested

    0 = Less than 50% of friends have been arrested

    1 = 50% or more of friends have been arrested

3.5) Relationship with Youth on Unit

    0 = Gets along with youth on the unit

    1 = Does not get along with youth on the unit

3.6) Relationship with Staff

    0 = Gets along with staff at the facility

    1 = Does not get along with staff at the facility

3.7) Friends/Family Associated with Gang Activity

    0 = No friends/family in a gang

    1 = Friends/family in a gang

3.8) Arrested/Charged with Friends

       0 = Not arrested/charged with friends

       1 = Arrested/charged with friends

3.9) Adults in the community are supportive

       0 = Adults in the community are supportive

       1 = Adults in the community are not supportive

| | Strength | Barrier | TOTAL | |
|---|---|---|---|---|
| Pro-social peers | ○ | ○ | | |
| Manage antisocial peers effectively | ○ | ○ | | |
| Pro-social leisure activities | ○ | ○ | | |
| Motivation to make new friends | ○ | ○ | | |
| TOTAL: | 0 | 0 | | |

## 4.0 Education and Employment

4.1) Truant from school

       0 = Never been charged with truancy

       1 = Charged with truancy

4.2) Expelled ever

       0 = Never been expelled from school

       1 = Expelled from School

4.3) Effort in School

       0 = Effort in school

       1 = Little effort in school

4.4) Relationship with Current School Personnel/Employer

       0 = Positive relationship with school personnel/employer

       1 = No positive relationship with school personnel/employer

**TOTAL**

| | Strength | Barrier |
|---|---|---|
| Motivation for education | ○ | ○ |
| Motivation for employment | ○ | ○ |
| Has HS Diploma/GED | ○ | ○ |
| Previous employment experience | ○ | ○ |
| Individualized education plan | ○ | ○ |
| Parents supportive of education | ○ | ○ |
| Parents supportive of employment | ○ | ○ |
| TOTAL: | 0 | 0 |

## 5.0 Pro-Social Skills

5.1) Can identify triggers/high risk situations

       0 = Identifies high risk situations

       1 = Does not identify high risk situations

5.2) Weighs pro/cons of a situation

       0 = Weighs the pros and cons of a situation

       1 = Does not weigh the pros and cons of a situation

5.3) Pro-social decision making

    0 = Demonstrates pro-social decision making
    1 = Does not demonstrate pro-social decision making

5.4) Frustration Tolerance

    0 = Adequate skills to manage frustration
    1 = Some/minimal skills to manage frustration

**TOTAL**

| | Strength | Barrier |
|---|---|---|
| Ability to manage own behavior | ○ | ○ |
| Motivated to learn new skills | ○ | ○ |
| Age appropriate social skills | ○ | ○ |
| Availability of pro-social models | ○ | ○ |
| TOTAL: | 0 | 0 |

## 6.0 Substance Abuse, Mental Health, and Personality

6.1) Age of Drug Onset

    0 = 13 or older
    1 = 12 or younger

6.2) Others Complained about Youth's Drug/Alcohol Use

    0 = No one has complained about substance use
    1 = Others have complained about substance use

6.3) Positive Drug Test within Past 6 Months

    0 = Has not failed drug test within past 6 months
    1 = Has failed drug test within past 6 months

6.4) Alcohol/Drugs have Caused Problem in Major Life Area

    0 = Alcohol/Drugs have not caused a problem
    1 = Alcohol/Drugs have caused a problem

6.5) Used Substances While in Residential Facility

    0 = Has not used alcohol or drugs while in the facility
    1 = Has used alcohol or drugs while in the facility

6.6) Inflated Self-Esteem

    0 = Appropriate level of self-esteem
    1 = Inflated self-esteem

6.7) Risk Taking Behavior

    0 = Does not generally take risks
    1 = Takes risks

| | | | **TOTAL** | |

| | Strength | Barrier | |
|---|---|---|---|
| Motivation to stop using | ○ | ○ | |
| History of substance abuse | ○ | ○ | |
| Sober support network | ○ | ○ | |
| Motivated for treatment | ○ | ○ | |
| Attitude towards psychotropic med | ○ | ○ | |
| Stable mental health issues | ○ | ○ | |
| Anger Management | ○ | ○ | |
| TOTAL: | **0** | **0** | |

## 7.0 Values, Beliefs, and Attitudes

7.1) Pro-Criminal Sentiments

    0 = No/few pro-criminal sentiments
    1 = Some/a lot of pro-criminal sentiments

7.2) Negative Attitudes Towards Supervision

    0 = Will complete supervision without problems
    1 = Will have a difficult time with supervision

7.3) Attitude Supports Substance Use

    0 = Not supportive of substance use
    1 = Supportive of substance use

7.4) Demonstrates Remorse for Offense

    0 = Full remorse
    1 = Some remorse
    2 = No remorse

7.5) Demonstrates Empathy Towards Others

    0 = Demonstrates empathy towards others
    1 = Does not show empathy towards others

7.6) Attitude Towards Gangs

    0 = Negative attitude towards gangs
    1 = Supportive of gangs

| | **TOTAL** | |

| | Strength | Barrier |
|---|---|---|
| Motivation to change | ○ | ○ |
| Take responsibility for offense | ○ | ○ |
| Supportive of pro-social lifestyle | ○ | ○ |
| TOTAL: | **0** | **0** |

Overall Impressions

Total Risk Score

Total Number of Strengths      **0**

Total Number of Barriers      **0**

## SCORING

|  | Cutoffs | Recidivism Rates | Youth Score |
|---|---|---|---|
| LOW | 0 - 15 | 15% |  |
| MODERATE | 16 - 24 | 35% |  |
| HIGH | 25 - 42 | 67% |  |

Instrument Risk Level      LOW          MODERATE          HIGH

Override

Final Risk Level      ○ LOW          ○ MODERATE          ○ HIGH




# OHIO YOUTH ASSESSMENT SYSTEM
## REENTRY SELF-REPORT
## QUESTIONNAIRE

*Please fill this out to the best of your ability. Your responses will be used to help make the best decisions regarding your situation.*

1.  How old were you when you first got in trouble with the law? _____

     a.  What did you do to get in trouble? _____

       _____

2.  How often have you sold drugs?

   Never          Once in a while       Sometimes       Often

3.  My family is important to me.

   Strongly agree       Agree          Disagree       Strongly Disagree

4.  How many close family members (parents, siblings) have been arrested before?

   0            1            2            3+

5.  Who are you planning on living with when you get released? _____

     a.  Of those you are going to live with, who do you get along with the best? _____

     b.  Rate your relationship with this person.

   Very Good       Good       OK       Poor       Very poor

6.  My friends fight.

   All of the time         Often         Sometimes         Rarely         Never

7.  When you are out of the facility how many people would you say you "hang out" with but do not

   consider your close friends? _____

8.  Of those that you hang out with (outside the facility), but are not close friends, how many of them use

   drugs?

   0 to 5              6 to 10            11 to 15          16 to 20          21+

9.  How well do you get along with youth on the unit?

   Not at all           Somewhat          OK               Good             Very good

10. How well do you get along with the staff at the program/facility?

   Not at all           Somewhat          OK               Good             Very good

11. How many of your friends or family are involved in a gang? _____

12. Have you ever been arrested with any of your friends?                    ☐ No          ☐ Yes

13. How many times have you been charged with truancy in the past 2 years?

   0                   1                 2                3+

14. How many times have you been expelled from school?

   0                   1                 2                3+

15.  How many school staff do you have a positive relationship with currently?

| 0 | 1 | 2 | 3 | 4+ |
|---|---|---|---|---|

16.  Have you ever been employed?                                    ☐ No        ☐ Yes

17. How did you get along with your boss?

Never employed     Not at all    Somewhat     OK    Good     Very good

18. Has anyone complained about your use of drugs?                        ☐ No        ☐ Yes

19. Has anyone complained about your use of alcohol?                      ☐ No        ☐ Yes

20. On a scale of 1 to 10 rate yourself on how cool you are?     _____
(10 is the most cool)

21. On a scale of 1 to 10 how cool would your friends rate you?     _____
(10 is the most cool)

22. I will make it off supervision without getting in to trouble.

Strongly agree        Agree          Disagree        Strongly disagree

23. I believe that marijuana should be legalized.

Strongly agree        Agree          Disagree        Strongly disagree

24. People should be allowed to use drugs without any legal consequences.

    Strongly agree        Agree        Disagree        Strongly disagree

25. There are some good things about gangs.

    Strongly agree        Agree        Disagree        Strongly disagree

26. I am friends with people in a gang.    ☐ No    ☐ Yes

27. Have you ever experienced any of the following?

| | No | Yes |
|---|---|---|
| Neglect | ☐ No | ☐ Yes |
| Sexual abuse | ☐ No | ☐ Yes |
| Physical abuse | ☐ No | ☐ Yes |