UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

A.E.S.C.

        Plaintiffs-Petitioners,

v.

JONATHAN HAYES, et al

        Defendants-Respondents.

## DECLARATION OF JAMES DE LA CRUZ, ADMINISTRATION FOR CHILDREN AND FAMILIES, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES

I, James S. De La Cruz, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows:

1. I am the Senior Field Program Specialist Supervisor for the Office of Refugee Resettlement ("ORR"), a component of the Administration for Children and Families within the United States Department of Health and Human Services ("HHS"). I supervise all Supervisory Federal Field Specialists ("FFS") within ORR. The following statements are based on my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records of HHS, and information supplied to me by current HHS employees. I am located in Washington, D.C.

2. On October 31, 2019, A.E.S.C. was stepped down from SVJC to a less restrictive placement. As of 5 a.m. October 31, A.E.S.C. had been discharged from SVJC in order to travel to

the less restrictive care provider, BCFS San Antonio Staff Secure, in San Antonio, Texas, which is a state-licensed facility.

3. SVJC is a secure facility – the highest level of restriction in the ORR network of care providers. A minority of unaccompanied children in the legal custody of ORR reside in such secure placements. Out of approximately 4,000 minors in ORR custody, about 22 are currently in the two secure facilities maintained by ORR – SVJC and another secure facility in Yolo County, California. Secure facilities are facilities with a physically secure structure and staff able to control violent behavior. ORR uses a secure facility as the most restrictive placement option for minors who pose a danger to self or others or have been charged with having committed a criminal offense. *See* ORR Guide to Terms, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms.

4. ORR and care provider staff continuously review minors placed in secure facilities to determine whether they should be moved to a less restrictive placement. These reviews occur at least every 30 days, and often more frequently, such as on a weekly basis.

5. In A.E.S.C.'s case, the case manager recommended step-down on October 9, 2019 after A.E.S.C. completed 30 days of good behavior. The recommendation then went before a "case coordinator" under contract with ORR, who concurred in the step-down. Finally, the FFS for SVJC approved the step-down recommendation and accordant transfer on October 18, 2019. Although the FFS approved A.E.S.C.'s transfer to a less restrictive level of care, ORR still had to find a facility with available beds and that would accept A.E.S.C. for transfer. On October 30, 2019, ORR learned that BCFS San Antonio could accept A.E.S.C., and SVJC scheduled the transfer for October 31, 2019.

6. SVJC also notified the Capital Area Immigration Rights ("CAIR") office of the step-down as early as 10 days prior to his transfer. On October 21, 2019, the Case Manager at SVJC sent

the CAIR Coalition a census of all ORR-funded minors housed at SVJC. For A.E.S.C., the census notes: "SD [step-down] approved. Pending acceptance." SVJC sent this census to the ducsinfo@caircoalition.org email address. On October 28, 2019 another census (including the same information that step-down was approved, but pending acceptance by a less restrictive placement) was again sent to CAIR. On October 30, 2019, SVJC again emailed Caroline Hodge at CAIR (among others) to notify CAIR that A.E.S.C. would be transferred from SVJC to the less secure care provider, BCFS San Antonio. I understand that Ms. Hodge then requested a phone call with A.E.S.C. prior to his transfer, and SVJC facilitated the confidential phone call on October 30, 2019.

7. As a matter of policy and practice, A.E.S.C.'s Case Manager would have been meeting with him on a weekly basis and informing him of the status of his case, including a potential, and then, approved step-down. Thus, A.E.S.C. in conversations with his attorneys would also have been able to notify them of the upcoming transfer.

8. ORR policy is to ensure that care provider staff continuously work to reunify the unaccompanied alien children in the legal custody of ORR without unnecessary delay, taking into account that potential sponsors must be evaluated for the risk they could pose to the minor, and that children are released safely.

9. When A.E.S.C. first arrived at SVJC, the documents show he was asking for repatriation to his home country of Honduras. SVJC case managers worked with him and advised that he should speak to CAIR attorneys first, before deciding on such repatriation. SVJC also immediately began working with A.E.S.C. to determine if there were family members in the United States with whom he could reunify. These efforts – to locate a possible family member to serve as a potential sponsor for A.E.S.C. – continued through the month of June.

10. In early June, case managers contacted the Honduran Consulate to request assistance in locating A.E.S.C.'s family in Honduras. Calls to the consulate were made weekly for updates, but

3

the consulate often did not pick up and voice mail was full. SVJC case managers also reached out to a store close to the location of A.E.S.C.'s father in Honduras (A.E.S.C.'s mother has passed away). The Case Manager was successful in obtaining the father's location, and also learned that A.E.S.C. had a female adult caregiver in Honduras, who had served like an adoptive mother and allowed A.E.S.C. to live with her. Eventually, after calling the store numerous times, the Case Manager reached the caregiver. This caregiver reported on a half-brother living in the United States – in Bridgeport, Connecticut. The caregiver reported she would gather information on the brother and provide the information at a later date. The SVJC Case Manager also made contact with A.E.S.C.'s father in Honduras. A.E.S.C.'s father said he would gather contact information on the brother and report back.

11. The documents show that by early July, A.E.S.C.'s brother had called SVJC and requested a call back. A.E.S.C.'s brother said he was willing to act as a sponsor, and the case manager said she would send the family reunification packet the next day on July 3, 2019, which she did. SVJC facilitated phone calls between A.E.S.C. and his brother. The sponsor confirmed he would be willing to be fingerprinted at a police station. The SVJC case manager provided the brother with visitation information if he were interested in visiting. By July 15, however, A.E.S.C.'s brother had not yet submitted the application or indeed any paperwork. The case manager called to follow up and asked about the family reunification packet. The sponsor reported he was still working on the forms and would send them back that week. The case manager asked if the brother had any questions, but he said he did not. The Case Manager reminded A.E.S.C.'s brother that until the forms came in, fingerprint appointments could not be scheduled, and that the longer it takes for the forms, the slower the case will move. On July 23, the Case Manager attempted to contact A.E.S.C.'s brother, but there was no answer, and the voicemail box was full. Another phone call was attempted later in the day, but again, the voicemail box was full. On July 25, the Case Manager successfully

contacted A.E.S.C.'s brother. He said he was in the process of moving and had not completed the documents. He said he would send the documents no later than the next week. He also said he did not possess his own birth certificate (which is required to prove relationship), and would have to request it from his home country. The Case Manager advised to send everything but the birth certificate and then send the birth certificate when it arrived. On July 30, 2019, the Case Manager again contacted A.E.S.C.'s sponsor for an update. The brother reported that he was still working on gathering the documents. Also, A.E.S.C.'s father in Honduras had not provided the "Letter of Designation" that would acknowledge and agree for A.E.S.C. to live with a custodian other than a parent. SVJC's Case Manager advised to send the letter of designation once received. The Case Manager also highlighted other documents required by the family reunification packet, including proof of address, proof of identity, and a photographic ID. The sponsor said he did not have copies of his ID, but the Case Manager said he could send a picture via email or text. The Case Manager advised that the brother should call her with any questions and she would reach out in a few days.

12. Throughout August, the case notes show the Case Manager continuing to work with the sponsor but the brother failing to provide supporting documents or delaying responses. On August 2, 2019, A.E.S.C.'s Case Manager contacted the brother for an update. He said he had been locked out of his car at work and his car was 30 minutes away from home. He said he was very busy and had not been able to send the documents. On August 7, the Case Manager again reached out for an update. The sponsor was very apologetic and said he would be sending the documents for sure. He said they were filled out, but he had not been able to make it to the post office. On August 9, 2019, SVJC received an incomplete family reunification packet (including the signed "Authorization for Request of Information," an application form, and confirmation that A.E.S.C.'s brother had read the sponsor handbook). The package lacked supporting documentation, such as proof of address and proof of identity. On August 16, 2019, the Case Manager attempted to contact A.E.S.C.'s brother to

obtain the missing documents. The brother was not sure what documents the Case Manager was referring to, and the Case Manager explained the pending documents and examples of documents that could be sent. The Case Manager also said she had sent an email, but the sponsor reported he had not received it. The Case Manager asked him to check spam or to send the Case Manager an email so they could establish email communication. On August 21, 2019, the Case Manager again sent a prepaid FedEx package with pending family reunification packet documents and instructions. As of August 21, 2019, the sponsor had not yet sent fingerprints on provided fingerprint cards in order to run a criminal background check.

13. In September of 2019, SVJC continued to work with A.E.S.C.'s brother to attempt to finalize the reunification and the release of A.E.S.C. from custody, however, the process delayed due to the brother moving residences and household members not being willing to provide information that ORR could use to ensure A.E.S.C.'s safety. A.E.S.C.'s brother had reported he was living with two other adults. Such adults, then, would also require fingerprints to ensure ORR did not release A.E.S.C. to live with adults that could put him at risk. A.E.S.C.'s brother, however, reported that his housemate was unwilling to participate in the sponsorship process. On September 12, the Case Manager attempted to contact A.E.S.C.'s brother, but there was no answer – the Case Manager left a voicemail. Again, on September 13, the Case Manager left a message requesting a callback on the housemate and documents. Later the Case Manager was able to connect with A.E.S.C.'s brother, and the brother confirmed that he would be moving in with his cousin whom he understood would need to provide information in order to be evaluated by ORR. On September 18, the Case Manager attempted to connect with the brother but there was no answer. On September 19, 2019, they connected – but the brother had not yet spoken to his cousin. As of September 24, 2019, there were still no updates from A.E.S.C.'s sponsor. However, on September 25, 2019, A.E.S.C.'s brother confirmed that his cousin would be willing to participate and he would be sending documents that

week. As of September 30, 2019, however, the Case Manager could see (through tracking the prepaid FedEx package) that the brother had not yet placed the additional documents in the mail. The Case Manager called A.E.S.C.'s brother for an update, and said that the FedEx tracking showed no package in the mail. The sponsor said he had almost all the documents ready, but he still needed his housemate's fingerprints. When asked if he, the brother, had been fingerprinted, he said he had not, but that he and the housemate were planning on going together.

14. The sponsorship process continued through October, with A.E.S.C.'s brother unfortunately unable to meet the requirements for a complete family reunification packet, and the SVJC Case Manager attempting to guide him through the process. On October 8, 2019, an SVJC Case Manager contacted A.E.S.C.'s brother for an update. He reported that his cousin was now not willing to continue with the process, so he was going to move to an apartment just for himself and A.E.S.C. (This would be A.E.S.C.'s brother's third move since beginning the reunification process.) The Case Manager reminded him that he would need to identify a backup caregiver if he was living alone, and he expressed that he was stressed about trying to find another person who could assist in sponsorship. He said he would call his father to see if his father could help and would respond by the end of the week. The Case Manager said she would call at the end of the week for an update and reminded him to send a copy of his ID or other completed documents. By October 11, 2019, A.E.S.C.'s brother had sent a blurry copy of his ID, but no other information necessary for the family reunification package. On October 15, 2019, when asked if he had contacted his father as a backup caregiver, the brother said it was unlikely his father would agree to such a process and that he would contact another uncle to determine A.E.S.C.'s care plan. As of October 16, 2019, FedEx tracking revealed that the family reunification package supporting documents had not been placed in the mail. On October 23, 2019, the Case Manager attempted to contact A.E.S.C.'s brother, but there was no answer. The Case Manager left a message, asking for a call back. On October 24, 2019, the

Case Manager again attempted to contact A.E.S.C.'s brother, but there was no answer, and the Case Manager left a voicemail. On October 29, 2019, the Case Manager contacted A.E.S.C.'s brother for an update on documents and a backup care plan. He said he had found a backup caregiver, and that he would have information that week, including fingerprints. Unfortunately, at the time of A.E.S.C.'s step-down, his brother had not completed the family reunification packet.

15. While placed at SVJC, A.E.S.C. was notified of his right to request a Flores bond hearing. These hearings are available for children whose release is being denied or delayed solely due to the minor's own characteristics of being a danger to self or community were they released. The hearings are before immigration judges. A.E.S.C. did not request a bond hearing.

16. I understand that BCFS San Antonio recently contacted A.E.S.C.'s brother, on November 12, 2019, and confirmed that his brother had not yet completed his Family Reunification Packet (including for example, identity information for new household members, as well as a backup caregiver).

17. In addition, on November 4, 2019, A.E.S.C. disclosed behavior that triggered a referral to the Office of Trafficking in Persons as a victim of trafficking. This identification as a victim of trafficking also mandates a home study under the Trafficking Victims Protection Reauthorization Act. See 8 U.S.C. § 1232(c)(3)(B) ("A home study shall be conducted for a child who is a victim of a severe form of trafficking in persons . . . .").

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 14, 2019.

SIGNED: _/s/ James De La Cruz_

James De La Cruz, Senior Field Program

Specialist Supervisor