1  CENTER FOR HUMAN RIGHTS &
2  CONSTITUTIONAL LAW
   Peter A. Schey (Cal. Bar No. 58232)
3  Carlos Holguín (Cal. Bar No. 90754)
4  256 South Occidental Boulevard
   Los Angeles, CA  90057
5  Telephone: (213) 388-8693
6  Facsimile: (213) 386-9484
   Email:pschey@centerforhumanrights.org
7       crholguin@centerforhumanrights.org

8

9  *Listing continues on next page*

10 *Attorneys for Plaintiffs*

11

12         UNITED STATES DISTRICT COURT

13         CENTRAL DISTRICT OF CALIFORNIA

14              WESTERN DIVISION

15

16 Jenny Lisette Flores., *et al.*,          Case No. CV 85-4544-DMG-AGRx

17              Plaintiffs,                  **PLAINTIFFS' REPLY TO**
                                             **DEFENDANTS' OPPOSITION TO**
18       v.                                  **EX PARTE APPLICATION FOR**
                                             **TEMPORARY RESTRAINING**
19                                           **ORDER AND ORDER TO SHOW**
   William Barr, Attorney General of the    **CAUSE RE PRELIMINARY**
20 United States, *et al.*,                  **INJUNCTION.**

21              Defendants.

22                                           Hearing:  April 10, 2020
23                                           Time: 10:00 a.m.

24                                           [HON. DOLLY M. GEE]
25

26

27

28

UNIVERSITY OF CALIFORNIA DAVIS
SCHOOL OF LAW
Immigration Law Clinic
Jonathan P. Mulligan (803383)
Holly S. Cooper (197626)
One Shields Avenue, TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (208741)
Neha Desai (CAL. RLSA NO. 803161)
Poonam Juneja (300848)
Freya Pitts (295878)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email:  lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        fpitts@youthlaw.org

USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing (Cal. Bar No. 61513)
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu

LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum (Cal. Bar No. 98634)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)

4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone: (408) 280-2437
Email: kate.manning@lawfoundation.org

*Of counsel:*

ALDEA - THE PEOPLE'S JUSTICE CENTER
Bridget Cambria
532 Walnut Street
Reading, PA 19601
Phone: (484) 877-8002
Fax: (484) 926-2032
Email: bridget.cambria@cambriaklinelaw.com

# TABLE OF CONTENTS

I.      INTRODUCTION ..........................................**Error! Bookmark not defined.**

II.     The Evidence Shows that ICE Unnecessarily Delays Class Members' Release and Fails to Maintain Safe and Sanitary Conditions ....... **Error! Bookmark not defined.**

    A. Defendants Have Provided No Evidence that they are Complying with the Agreement's Release Provisions in ICE Facilities ......... **Error! Bookmark not defined.**

    B. ICE facilities are unable to meet the Agreement's Safe and Sanitary Requirements in light of the COVID-19 global pandemic ... **Error! Bookmark not defined.**

III.    The evidence shows that ORR continues to unnecessarily delay class members' release. ..........................................**Error! Bookmark not defined.**

    A. ORR's lack of guidance and conflicting directives relating to COVID-19 have unnecessarily extended class members' detention. **Error! Bookmark not defined.**

    B. ORR's discretionary fingerprinting requirements detract from child safety during conditions of a global pandemic. ..........**Error! Bookmark not defined.**

    C. No physical home studies are being conducted during the COVID-19 pandemic, yet ORR continues to confine children in congregate settings for want of a discretionary home study..................**Error! Bookmark not defined.**

    D. ORR pursues a near-blanket policy against releasing class members wrongfully subjected to removal proceedings under MPP. .. **Error! Bookmark not defined.**

IV.     ORR fails to release children from congregate detention without unnecessary delay. ..........................................**Error! Bookmark not defined.**

    A. ORR's refusing to release class members because they are subjects of non-final removal orders violates Settlement ¶ 14 **Error! Bookmark not defined.**

    B. ORR's delay in releasing class members it has exposed to COVID-19 is a prima facie breach of Settlement ¶ 14 that cannot be justified as a valid response to a public health emergency.............**Error! Bookmark not defined.**

    C. ORR's demanding discretionary fingerprinting and home studies during a national health emergency needlessly prolongs class members' confinement. **Error! Bookmark not defined.**

    D. The Court's temporary restraining order appears to be reducing unnecessary ORR detention. The Court should continue to enjoin ORR against needlessly prolonging class members' confinement, and require regular reporting. .**Error! Bookmark not defined.**

IV.     Additional reporting is justified by Defendants' failure to comply with the Agreement combined with the current COVID-19 pandemic ...............**Error! Bookmark not defined.**

IV.     Conclusion ....................................................**Error! Bookmark not defined.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Slater,*
  528 U.S. 216 (2000) ................................................................................ 26

*Disney Enters. v. Vidangel Inc.,*
  2019 WL 4565168 (C.D. Cal. 2019) ........................................................ 26

*EduMoz, LLC v. Republic of Mozambique,* 968 F. Supp. 2d 1041, 1050 (C.D. Cal. 2013), *aff'd,* No. 15-56311, 686 Fed. Appx. 486 (9th Cir. Apr. 10, 2017) .......... 8

*Flores v. Lynch,*
  828 F.3d 898 (9th Cir. 2016) ............................................................. 5, 10

*Flores v. Sessions,*
  862 F.3d 863 (9th Cir. 2017) .................................................................. 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ................................................................................ 26

*Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.,*
  523 F. Supp. 2d 1113 (C.D. Cal. 2007) ................................................... 28

*Kelly v. Wengler,*
  822 F.3d 1085 (9th Cir. 2016) ................................................................ 29

*Kennewick Irrigation Dist. v. United States,*
  880 F.2d 1018 (9th Cir. 1989) .................................................................. 5

*LGS Architects, Inc. v. Concordia Homes of Nevada,*
  434 F.3d 1150 (9th Cir. 2006) ................................................................ 26

*Nodine v. Shiley Inc.,*
  240 F.3d 1149 (9th Cir. 2001) .................................................................. 5

*Rouser v. White,*
  707 F. Supp. 2d 1055 (E.D. Cal. 2010) .................................................. 26

*United States v. Asarco Inc.,*
  430 F.3d 972 (9th Cir. 2005) .................................................................... 5

*United States v. Swift & Co.,*
  286 U.S. 106 (1932) ................................................................................ 29

**Statutes**

8 U.S.C. § 1229a(c)(7) ................................................................................ 19

8 U.S.C. § 1232(c)(3)(B) ...................................................................... 15, 23

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION
CV 85-4544-DMG-AGRX

**I    INTRODUCTION**

As this Court is well aware, we are in the midst of the most significant pandemic in generations.[1] A highly contagious and deadly virus COVID-19 has swept the globe. The lethality rate of COVID-19 and serious respiratory disease caused by this coronavirus is estimated between 0.3% and 3.5%, at least 535 times deadlier than the common flu that kills thousands a year.[2] All age groups, including some children, have contracted the disease,[3] and the World Health Organization estimates that one in five people who do contract it require hospitalization.[4] On March 13, 2020, President Trump declared a national state of emergency.[5] As of March 26, 2020, the United States led the world in confirmed cases of COVID-19.[6] The virus is spreading exponentially: U.S cases doubled in the five-day period prior to April 2nd.[7]

---

[1] John M. Barry, The Single Most Important Lesson from the 1918 Influenza, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[2] As of today, April 8, 2020, there were 1,450,343 confirmed cases globally, with 83,568 deaths and 308,167 recoveries. Johns Hopkins University of Medicine, Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University, https://cutt.ly/StEyn2U

[3] Robert Verity, PhD., et al., Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis, Lancet Infec Dis (March 30, 2020), 6.

[4] World Health Organization, Q&A on Coronaviruses (COVID-19), "Should I Worry About COVID-19?," https://cutt.ly/YtEyrxl.

[5] Derek Hawkins et al., Trump Declares Coronavirus Outbreak a National Emergency, Wash. Post
(March 13, 2020, 10:46 AM), https://cutt.ly/ftWyIPb

[6] Donald G. McNeil, Jr., The U.S. Now Leads the World in Confirmed Coronavirus Cases, New York
Times (March 26, 2020), https://cutt.ly/QtQ7zz6.

[7] Donald G. McNeil, Jr., The U.S. Now Leads the World in Confirmed Coronavirus Cases, New York
Times (March 26, 2020), https://cutt.ly/QtQ7zz6.

There is no vaccine or cure for COVID-19. The best course, according to public health experts, is to slow and prevent transmission, primarily through a practice known as "social distancing."[8] Social distancing requires all people to stay at least six feet away from all other people to control the spread of the virus. These measures are particularly important because the coronavirus spreads aggressively, and people can spread it even if they do not feel sick or exhibit any symptoms.[9]  The only assured way to curb the pandemic is through dramatically reducing contact for all.[10]

Consequently, every American institution—from schools[11] to places of worship,[12] from businesses[13] to legislatures[14] and the courts[15]—has been exhorted to reduce the number of people in close quarters, if not empty entirely.[16] They have also been told to undertake aggressive sanitation measures, such as cleaning and

---

[8] World Health Organization, Coronavirus, https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19.").

[9] Centers for Disease Control and Prevention, How Coronavirus Spreads, https://cutt.ly/CtYRkkC.

[10] Harry Stevens, Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve," Wash. Post. (March 14, 2020), https://cutt.ly/etYRnkz

[11] Centers for Disease Control and Prevention, Interim Guidance for Administrators of US K-12 Schools and Child Care Programs, https://cutt.ly/ItRPq5n.

[12] Centers for Disease Control and Prevention, Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19), https://cutt.ly/KtRPk1k.

[13] Centers for Disease Control and Prevention, Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19), https://cutt.ly/stRPvg4

[14] Nat'l Conf. of State Legislatures, Coronavirus and State Legislatures in the News, https://cutt.ly/4tRPQne.a

[15] *See, e.g.*, Court Orders and Updates During COVID-19 Pandemic https://www.uscourts.gov/about-federal-courts/court-website-links/court-orders-and-updates-during-covid19-pandemic

[16] As of April 3, 2020, fully 311 million Americans were being urged by their City, County, Parish, Territory, and/or State governments to stay at home to reduce the spread of coronavirus. *See* Sarah Mervosh, Denise Lu, Vanessa Swales, Which States and Cities Have Told Residents to Stay at Home, NEW YORK TIMES (last updated April 3, 2020), available at: https://cutt.ly/CtDMZY0

disinfecting all surfaces for exacting periods of time with products with particular alcohol contents, and closing off any areas used by a sick person.[17]

The spread of COVID-19 into Defendants' detention facilities is not speculative. Detention facilities are largely incapable of implementing these recommendations, and incarcerated people are already dying as a result. For example, as of February 29, 2020, at the peak of the outbreak in Wuhan, China —where COVID-19 originated—*over half of all new infection cases were incarcerated people*.[18] On Rikers Island, the rate of infection among incarcerated people is over eight times the rate of infection in New York City generally, and 45 times higher than the rate in Wuhan, China.[19] Fourteen prisoners have died of COVID-19 in Bucks County, Pennsylvania.[20] Three inmates have died of the disease at FSL Elkton, a federal prison near Youngstown, Ohio.[21] It has already infected ORR's MercyFirst and Abbott House congregate facilities in New York and facilities housing ICE detainees.[22]

---

[17] Centers for Disease Control and Prevention, Cleaning and Disinfecting Your Facility, https://cutt.ly/atYE7F9

[18] Zi Yang, Cracks in the System: COVID-19 in Chinese Prisons, THE DIPLOMAT (March 9, 2020), available at https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/.

[19] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released. The rates of infection rely on publicly released data collected by the Legal Aid Society. See LEGAL AID SOCIETY, Analysis of COVID-19 Infection Rate in NYC Jails (last visited April 5, 2020), available at: https://cutt.ly/RtYTbWd.

[20] Larry R. King, Bucks County COVID-19 Deaths Reach 14; Four Cases Confirmed at Prison (April 4, 2020), available at: https://cutt.ly/utD6u5F.

[21] Rachel Polansky, 3 inmates at eastern Ohio prison dead from suspected cases of COVID-19, WKYC (April 4, 2020, 11:18 p.m.), available at: https://cutt.ly/7tD6wlA.

[22] *See* Hamed Aleaziz, *A Staff Member at a Facility Housing Unaccompanied Immigrant Children Has Tested Positive for the Coronavirus*, BUZZFEED NEWS, March 19, 2020, *available at* www.buzzfeednews.com/article/hamedaleaziz/staff-member-coronavirus-diagnosis-unaccompanied-immigrant (last visited March 26, 2020). *See also* Hamed Aleaziz, *An ICE Detainee Has Become the First to Test*

3

The *Flores* Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [Defendants] …" Agreement at ¶ 9. It requires that Defendants "treat[ ] and shall continue to treat, all minors in [their] custody with dignity, respect and special concern for their particular vulnerability as minors." *Id*. ¶ 11.[23] It requires that except for class members who are flight risks or a danger, class members shall be released without unnecessary delay to listed sponsors, *id*. ¶¶ 14 and 18, and if not promptly released, must "as expeditiously as possible," *id*. ¶ 12.A.3, be transferred to a "non-secure" program licensed by a state for the care of dependent children. *Id*. ¶¶ 6 and 19, and Exhibit 1 to the Agreement.

In light of the COVID-19 crisis, Plaintiffs sought a temporary order protecting class members whom defendants the Immigration and Customs Enforcement ("ICE") and Office of Refugee Resettlement ("ORR") are holding in congregate detention from the clear and present danger the COVID-19 pandemic poses to their safety and well-being. [Doc. # 733].[24]

On March 28, 2020, this Court issued an Order Re Plaintiffs' Ex Parte Application For Restraining Order And Order To Show Cause Re Preliminary Injunction ("Order"). [Doc. # 740]. On April 6, 2020, Defendants filed their Supplemental Response to Plaintiffs' Request for a Temporary Restraining Order and Preliminary Injunction ("Defs' Supp. Response") [Doc.# 746].

Defendants argue that the Court should not issue "any" injunctive relief because Plaintiffs have "not met their burden to show that Defendants have violated any existing terms of the *Flores* Settlement Agreement …" Defs' Supp. Response at 2. In

---

*Positive for the Coronavirus*, BUZZFEED NEWS, March 24, 2020, *available at* www.buzzfeednews.com/article/hamedaleaziz/immigrant-ice-detention-facility-coronavirus-test (last visited Mar. 26, 2020)

[23] It also requires that "[f]ollowing arrest, the [Defendants] shall hold minors in facilities that are safe and sanitary and that are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id*. ¶ 12.A.

[24] Plaintiffs' application for a temporary restraining order and OSC discussed the standards for injunctive relief under Fed. R. Civ. P. 65 and those standards will not be repeated in this memorandum. [Doc.# 733-1 at 15-22].

addition, Defendants argue that the Order imposes on Defendants "a new requirement—found nowhere in the Agreement—that any '*unexplained delay* in releasing a child in ORR and ICE custody violates [] Paragraphs 14 and 18 of the FSA.'" *Id. citing* Order at 11 (emphasis in original).

However, as Defendants concede, "the Agreement require[s] that Defendants 'make' efforts towards release, those efforts must be 'prompt and continuous[,]' and Defendants must 'record' these efforts." Defs' Supp. Response at 3*, quoting* Agreement, ¶¶ 14, 18. Requiring that Defendants share with the Court and Plaintiffs' class counsel the information they are required to "record" does not in any substantive way modify the terms of the Agreement. It is an appropriate mechanism to encourage substantial compliance with the terms of the Agreement without changing those terms, and ensures that the Court and class counsel are kept informed regarding compliance.

As discussed below, Plaintiffs have met their burden and the Court should issue the proposed preliminary injunctive relief.

## II.   THE EVIDENCE SHOWS THAT ICE UNNECESSARILY DELAYS CLASS MEMBERS' RELEASE AND FAILS TO MAINTAIN SAFE AND SANITARY CONDITIONS

### A. Defendants Have Provided No Evidence that they are Complying with the Agreement's Release Provisions in ICE Facilities

The Agreement protects all minors in immigration-related detention, whether they are taken into custody alone or in the company of parents or other relatives. *Flores v. Lynch*, 828 F.3d 898, 905-07 (9th Cir. 2016) ("*Flores I*").[25]

---

[25] "The Settlement is a consent decree, which, 'like a contract, must be discerned within its *four* corners, extrinsic evidence being relevant only to resolve ambiguity in the decree.'" *Flores I*, 828 F.3d at 904 (quoting *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005)). The district court was therefore called upon to interpret the Agreement according to its "plain language," *Nodine v. Shiley Inc.*, 240 F.3d 1149, 1154 (9th Cir. 2001), construe it "as a whole and every part interpreted with reference to the whole," *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) (citation omitted), and prefer "reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory," *id.*

In short, in unambiguous terms the Agreement obliges the Defendants to "release a minor from its custody without unnecessary delay. . . ." Agreement ¶ 14. The Agreement further requires the Government to "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14." *Id*. ¶ 18.[26] The evidence shows that ICE simply does not undertake or record any efforts aimed at the. release of minors as required by Paragraphs 14 and 18 of the Agreement. *See* Second Supplemental Declaration of Peter Schey in Support of Ex Parte Application for Order To Show Cause Re: Preliminary Injunction ("Schey Supp. Dec.") at ¶ 6. [Doc. # 744].[27]

Pursuant to the terms of the Agreement and Court Order, Defendants provide monthly data of class members in custody to Plaintiffs' class counsel. The most recent data provided to class counsel is for the month of February 2020. Schey Supp. Dec. ¶ 2.[28]

The ICE March 2020 data provided for the month of February 2020 indicates 1,607 class members in ICE family detention facilities. Schey Supp. Dec. ¶ 4. With regards the 1,607 class members ICE's February 2020 data includes, it appears: One (1) was apprehended in 2014. Two (2) were apprehended in 2018 and have been detained about fourteen months. Four (4) have been detained for about one year.

---

[26] If more than one potential custodian is available, the Government must generally release a child first to a parent, then to a legal guardian, adult relative (sibling, aunt, uncle, or grandparent), an unrelated adult or entity designated by the minor's parent, a licensed program, and finally, if there is no likely alternative to long-term detention, a reputable unrelated adult. *Id*. ¶ 14A-F.

[27] During the mandatory meet and confer conference Defendants made clear this is the case, and it is fully confirmed by all legal services providers who represent detained class members in their individual cases. *Id. See also* Cambria ¶ 39 [Doc.# 733-10]; Fluharty ¶ 44 [Doc.# 733-11]; Meza ¶ 43 [Doc.# 733-12].

[28] As indicated in class counsel's letter to Defendants dated February 11, 2020 [Doc. # 738, Exhibit Q, the monthly data provided by Defendants is often difficult to understand and incomplete. Defendants have agreed to meet and confer concerning deficiencies in Defendants' monthly data class counsel identified in my February 11, 2020 correspondence, though that meet and confer has not yet taken place. Schey ¶ 3 [Doc. # 733-2].

Three (3) have been detained for about eleven (11) months. Ten (10) have been detained for about ten (10) months. Six (6) have been detained for about for about nine (9) months. Five (5) have been detained for about for about eight (8) months. Forty-nine (49) have been detained for about for about seven (7) months. Fifty-seven (57) have been detained for about for about six (6) months. One hundred and three (103) have been detained for about for about five (5) months. Eighty-four (84) have been detained for about for about four (4) months. One hundred and fifty-seven (157) have been detained for about three (3) months. Four hundred and fifty-three (453) have been detained for about two (2) months. *Id*. Thus about 934 class members (58%) have been detained by ICE for two months or longer. *Id*. ¶ 5.[29] While Defendants have released class members since the parties' meet and confer regarding the present application for relief, hundreds remain in custody and it does not appear the percentages regarding length of detention have changed.

The data provided by Defendants in response to the Court's Order confirm that no efforts are taken by ICE to release class members. Nowhere does the data disclose efforts aimed at release or transfer to a licensed facility.[30] In the column labeled "Reason for length of stay details," the vast majority of rows include no details at

---

[29] The fact that class counsel's initial declaration in support of Plaintiffs' TRO application included numbers that were "incorrect" is irrelevant to the present assessment of compliance. Defs' Supp. Response at 37. This is particularly true given the fact that Defendants were not themselves able, at least without the court's order, to supply data themselves. Defendants do not dispute the numbers discussed above and reported in the Second Supplemental Declaration of Peter Schey in Support of Ex Parte Application for Order to Show Cause Re: Preliminary Injunction. [Doc. # 744].

[30] Row after row of the data state the class members are detained because "In custody-pending USCIS response" (without explaining what this even means), or "In custody- pending IJ hearing/decision"(without stating how long this may take), or "Pending motions to change venue and to reopen with the immigration court," or "Cannot be removed due to pending litigation," or "Under 20 Days in custody," or "In custody - pending removal," or "criminal history" (yet listed as not a danger).

all.[31] The data does not "make[ ] clear that for those class members who remain in custody, their custody is consistent with the Agreement." Defs' Supp. Response at 38. Rather, the data appears to show no prompt and continuous efforts to release class members from ICE facilities.[32]

Defendants attempt to excuse their non-compliance with the terms of the Agreement and this Court's prior Orders by claiming that "ICE has been clear with the Court, the Plaintiffs, and the Monitor, about the manner in which it has been complying with the Agreement's requirements regarding expeditious release, and making and recording efforts towards release." Defs' Supp. Response at 32.[33] Defendants attempt to shift the blame to the Court, the Special Master, or class counsel for their non-compliance with the Agreement is frivolous.[34]

_____

[31] A very small number of entries record "details" like "Administrative hold" (whatever that means), or "Stay of Removal/Motion to reopen," or "Title 42," or "MMV v. Barr class member."

[32] Defendants' complaining about the reliability of declarations submitted by attorneys representing class members detained in ICE custody and coordinating pro bono projects at those facilities is also without merit. Defs' Supp. Response at 38. These lawyers were not so much "draw[ing] 'legal conclusions regarding the application of law to the facts of th[e] case,'" Defs' Supp. Response at 38 *quoting EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1050 (C.D. Cal. 2013), *aff'd*, No. 15-56311, 686 Fed. Appx. 486 (9th Cir. Apr. 10, 2017), as they were simply reporting on their personal observations made in the course of representing class members.

[33] They opine that "[n]either the Court nor the Monitor has ever informed ICE that their processes do not comply with the existing terms of the Agreement or the Court's orders." *Id*. Accordingly, Defendants argue that "the Court should conclude that ICE is in compliance with the requirements of Paragraphs 14 and 18 of the Agreement, and should not issue any preliminary injunction against ICE." *Id*.

[34] Defendants' reliance on reports submitted by the ICE juvenile monitor Deane Dougherty in the Fall of 2017 and early 2018 does nothing to excuse current non-compliance. Defs' Supp. Response at 32 *citing* Doc. ## 374-2, 384-2, 402-2, and 430-2. As defendants acknowledge, Plaintiffs objected to these reports. *See, e.g*. Doc. ## 388, 406, 463. Indeed, Plaintiffs' final response to Ms. Dougherty's report again reiterated Plaintiffs' objections, and urged the Court to order the appointment of a Special Master, which it did. Doc. ## 463, 469, and 494. As the Court is aware,

Defendants previously argued that "the Agreement does not require them to make and record continuous efforts to release accompanied minors who are in [ICE custody in] expedited removal proceedings." Order Re Plaintiffs' Motion to Enforce and Appoint a Special Monitor (June 27, 2017) ("2017 Order") at 20. They also argued that "under 'the plain terms of the Agreement, if detention of a minor is required to secure his or her appearance before ICE for removal, or before an immigration judge, ICE is not obligated to release the minor.'" *Id*. at 23. Both arguments were rejected by this Court and the Court of Appeals.[35]

When Defendants previously argued that "ICE lacks the 'institutional capacity or resources to assess whether an adult (other than a parent or guardian) seeking custody of a minor already detained with a parent is a suitable custodian who will house the minor in a suitable home environment'" this Court clearly responded "[t]his failure to assess [non-detained] non-parent/guardian custodians flies in the face of the Flores Agreement." *Id*. at 26.[36]

_____

the Special Master has since about June 2019 focused much of her attention on mediating Plaintiffs' application for injunctive relief concerning conditions in CBP facilities where several minors died in 2018 and 2019. *See, e.g.*, Joint Status Reports [Doc.## 722, 727, 729]. Since during this time there was no pending motion to enforce dealing with ICE facilities, it is hardly evidence of current compliance that Ms. Ordin's August 20, 2019 report "stated no concerns" over an earlier report by Ms. Dougherty regarding why eight random cases at Karnes and Dilley involved class members' stays of longer than 23 days. Defs' Supp. Response at 36.

[35] "The Court disagrees with Defendants that class members' placement in expedited removal absolves them of their obligations under the Agreement to make individualized determinations regarding a minor's risk of absconding." *Id*. citing Agreement ¶ 14. "Indeed, under both the Agreement and 8 C.F.R. section 212.5(b), part of the release/parole analysis includes a case-by-case assessment of whether the minor poses a flight risk." *Id*. at 24-25. "[T]he Flores Agreement creates an affirmative obligation on the part of Defendants to individually assess each class members' release …" *Id*. at 25.

[36] Defendants' arguments were also rejected by the Court of Appeals: "[T]he government's own regulations contemplate that minors in expedited removal proceedings may be considered for release, just as the Agreement requires. Rather than modifying the Agreement, the district court appropriately interpreted it as

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION
CV 85-4544-DMG-AGRX

It is disingenuous for Defendants to somehow now shift the blame for their non-compliance with the Agreement on the Court, the Special Monitor, and Plaintiffs' counsel.

**B. ICE facilities are unable to meet the Agreement's Safe and Sanitary Requirements in light of the COVID-19 global pandemic**

ICE's COVID-19 guidance is similarly inadequate. Declaration of Dr. Julie DeAun Graves at ¶¶ 14-16, Ex. C to TRO App. [Doc. #733-5]; Ex. L, Declaration of Dr. Katherine Peeler; Ex. M, Declaration of Dr. Craig Haney. It makes no mention of requiring or encouraging social or physical distancing between detainees or staff, nor of limiting the gathering of groups of detainees or staff within facilities.[37] ICE guidance is also insufficient with respect to protective equipment such as masks and gloves, quarantine measures and transportation of ill and potentially infected detainees.

ICE states that it continues to incorporate CDC's COVID-19 guidance.[38] ICE states that it is actively working with state and local health partners "to determine if any detainee requires additional testing or monitoring to combat the spread of the virus." *Id*. However, legal counsel who serve children in ICE custody report that class members are routinely placed in congregate settings.

Multiple families continue to be detained in a single, locked facility. Ex. N., Declaration of Bridget Cambria ¶ 17 ("Cambria Decl."). While ICE has reduced the number of families, many areas within facilities still necessitate congregation by design. Cambria Decl. ¶ 24. Families continue to report being denied their own hand

---

consistent with both the INA and our prior interpretation of the Agreement." Ninth Circuit Opinion (August 15, 2019) at 17 [Doc.# 44-1]. "The Agreement 'creates a presumption in favor of releasing minors.' *Flores v. Lynch*, 828 F.3d at 901; *accord Flores v. Sessions*, 862 F.3d at 866. That presumption is fully consistent with the Act's expedited removal provisions." *Id*. at 15.

[37] See U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19*, https://www.ice.gov/covid19 (Updated March 25, 2020).

[38] *Id*.

10

sanitizer, masks, or gloves, except when cleaning the facility. *Id.* ¶ 27. ICE has not made sufficient, if any, efforts to provide suitable medical care. *Id.* ¶ 33.

Education about COVID-19 continues to be lacking. While some posters have been added, for example, families report not being instructed, in a language they understand, about the nature of COVID-19 or efforts to protect them. Cambria Decl. ¶ 30. Families continue to quite understandably be scared for their lives. Even one infected person in a facility can infect the majority of people in the facility. Declaration of Dr. Julie DeAun Graves at ¶ 11 [Doc. # 733-5].  For example, as of April 8, 2020, "every family at the BCRC has expressed a fear of contracting COVID-19 and dying. Cambria Decl. ¶ 13.

## III.   THE EVIDENCE SHOWS THAT ORR CONTINUES TO UNNECESSARILY DELAY CLASS MEMBERS' RELEASE.

### A.   ORR's lack of guidance and conflicting directives relating to COVID-19 have unnecessarily extended class members' detention.

In responding to the COVID-19 pandemic, ORR has adopted policies that unnecessarily extend class members' detention in congregate care.  Practices such as a blanket ban on release of all children placed in New York and blocking release of children to states with "shelter in place" orders such as California, New York, and Washington,[39] directly impeded the release of children who were otherwise

---

[39] Of course, the COVID-19 virus does not respect state boundaries, and ORR's detention facility personnel have now exposed class members to the contagion in Texas, as well. *See* E. Trovall, *7 Staff Members Test Positive At Houston-Area Shelter For Migrant Children*, HOUSTON PUBLIC MEDIA, Apr. 7, 2020, www.houstonpublicmedia.org/articles/news/health-science/coronavirus/2020/04/07/366215/7-staff-members-test-positive-at-houston-area-shelter-for-migrant-children/ (last visited April 7, 2020). A growing number of counties in Texas, too, now have a shelter-in-place orders. *See Coronavirus in Texas: What we know, latest updates*, STATESMAN, Mar. 25, 2020, https://www.statesman.com/news/20200310/coronavirus-in-texas-what-we-know-latest-updates (last visited April 7, 2020)("By Tuesday, April 1, over half of Texas'

ready and eligible to be released from congregate care to their sponsors, prolonging their detention and increasing their risk of exposure to COVID-19.[40]  *See* Ex. H, Declaration of Hannah P. Flamm ¶¶ 6-7, 10, 14-5 ("Flamm Decl."); Gahng Decl. ¶ 9; Declaration of Jallyn Sualog at 6 ¶ 33 [Doc. # 736-1].

"ORR Field Guidance #4, COVID-19 Discharge Guidance," submitted on April 6, 2020, as Exhibit I to the declaration of Jallyn Sualog in support of ORR's supplemental response, similarly permits ORR to postpone release of children at any facility with one or more confirmed COVID-19 cases.  ORR's express policy of "automatically postponing release for any child in a facility with a confirmed COVID-19 case does not align with public health practice and only serves to increase these children's risk of exposure." Ex. G, Declaration of Dr. Julie De Aun Graves ¶¶ 4, 7 ("Graves Decl.").  Even children known to be exposed to COVID-19 "can be safely released to sponsors" as long as appropriate precautions are taken. *Id.*

Moreover, ORR's lack of transparency and inconsistent directives to the field have resulted in unnecessary delays and confusion, impeding advocates' ability to advocate for and advise their clients, causing anxiety among detained children, and further impairing class members' safe and expeditious release to their sponsors. Lawyers and advocates report that ORR shifts release policies and practices with little or no notice to stakeholders. *See* Flamm Decl. ¶ 16; Ex. K, Declaration of

---

254 counties reported coronavirus cases."). Needless to say, with the inexorable spread of corona virus into all 50 states, ORR's refusing to release class members to an ever-expanding list of states with shelter-in-place orders will eventually block children's release entirely.

[40] *See, e.g.*, ORR Data Response, M.P.O., LSS NY Bronx Shelter ("Case was approved with straight release but was informed that because of the current pandemic minors will not be released from ORR care."); R.S.A.D., Children's Village Shelter ("Case was approved for release on 03/24/2020. Per ORR HQs, All NY programs are to stop all discharges at this time until further notice.").

Maria J. Bocanegra ¶¶ 8-14 ("Bocanegra Decl."); Ex. D, Declaration of Anthony Enriquez ¶¶ 5-9, 13 ("Enriquez Decl."); Declaration of Elisa Ghang ¶ 17.

## B.    ORR's discretionary fingerprinting requirements detract from child safety during conditions of a global pandemic.

Numerous children also remain stuck in ORR detention because the current public health crisis makes it impossible for their potential sponsors and household members to comply with fingerprinting requirements.[41] Cubas Decl. ¶ 11-12; Enriquez Decl. ¶ 16; Gahng Decl. ¶ 9, 13. Neither the TVPRA nor any other federal law requires ORR to collect fingerprints, 8 U.S.C. § 1232(c)(3). Under current circumstances, ORR's blanket fingerprinting requirements constitute an insurmountable impediment to release and needlessly endanger children. *See* Cubas Decl. ¶ 11-12; Enriquez Decl. ¶ 14-16; Ex. I, Declaration of Erin Maxwell ¶¶ 9-10 ("Maxwell Decl.").

ORR demands fingerprints from a wide range of sponsors, household members, and backup care providers, even in the absence of any individualized safety concern.[42]  *See* Maxwell Decl. ¶ 9-10.  For example, ORR requires all

---

[41]    *See, e.g.*, ORR Data Response, E.E.O.L., Children's Village Shelter ("Sponsor's FP appointment was canceled due to COVID-19 outbreak. CM will reschedule sponsor's FP appointment when FP site reopens."); E.A.J.R., Mercy First Shelter ("At this time SP needs to be fingerprinted but due to the virus many sites are closed and therefore SP cannot get fingerprinted at this time."); A.S., SWK Pleasant Hill ("CM attempted to make a FP appointment; however, the ORR fingerprint sites in New Jersey have been closed due to the COVID19 shelter in place state order."); J.G.L., Maryville San Francisco ("[T]his case manager called the sheriff's and state police department of Portland Oregon. Both locations informed this case manager that they would not be fingerprinting anyone until further notice."); O.A.L., Rising Ground Shelter ("Sponsor is unable to locate a Fingerprint site in Indianapolis, IN. No digital sites are in Indiana. Police Precinct do not complete fingerprint cards and the county clerk office is currently closed due to COVID-19 crisis.").

[42]    *See, e.g.*, ORR Data Response, C.C.G., BCS Modesto ("[T]here are no concerns with the sponsor's ability to care for UC" and "internet background check

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CV 85-4544-DMG-AGRX

potential Category 2B and Category 3 sponsors, including aunts, uncles, and first

cousins who have not previously served as the child's primary caregiver, to submit

fingerprints. *See* ORR Policy Guide §§ 2.2.1, 2.5, 2.5.1. With nearly all

fingerprinting locations shut down across the country, children with sponsors in

these categories are currently in limbo.[43]

ORR also requires fingerprints in all cases where a home study is conducted,

regardless of the relationship between the child and the sponsor and regardless of

whether the home study is related to concerns about the sponsor's background. In

cases with a home study, ORR requires fingerprints from all potential sponsors

(including parents), in addition to all non-sponsor adult household members and all

adult caregivers identified in a sponsor care plan. *See* ORR Policy Guide § 2.5.1.

This requirement extends to TVPRA-mandated home studies for all children with

disabilities, children who were victims of a severe form of trafficking, and children

who were victims of physical or sexual abuse. *See* 8 U.S.C. § 1232(c)(3)(B). These

---

on sponsor and HHMs; cleared" but "sponsor has not been able to get fingerprinted
due to the closure of digital sites"); K.M.F.Q., LSS NY Bronx Shelter ("Address
verification completed, Sex Offender and Background check completed and clear,
proof of income received," but "there has been delays in the fingerprints due to
fingerprint site been close").

[43]     *See, e.g.*, ORR Data Response, E.A.L.V., Children's Village Shelter
("Minor's cousin wasn't able to be fingerprint because the Police department is
close for civilians; as this moment, they are only working with an emergency case
due to the COVID-19. The sponsor will be fingerprint after the police department
opens for the public."); O.R.R.D., Crittenton ("Case manager received documents
from the aunt on 3/11. All digital fingerprinting sites for fingerprint card services
(police stations included) have been closed until further notice near Sponsor's
residence."); C.D.T.C., Maryville San Francisco ("The distant relative returned the
completed FRA on March 18, 2020 and the background check results returned clear
on March 18, 2020. Case is only pending fingerprint appointment for the sponsor.
Fingrprint [sic] sites and police station are closed at the moment."); R.A.V.,
Children's Home Kingston ("Background checks were cleared on 3/16/2020. Due
to being a distant relative, fingerprint cards were mailed out to sponsor on 3/12/20.
Due to the national health emergency crisis, the sponsor is having difficulty getting
fingerprinted as his state of residence is in a lockdown.").

especially vulnerable children therefore face additional barriers to release even if their potential sponsor and household members are in no way connected to past trafficking or abuse concerns. *See, e.g.,* Ex. J., Declaration of Porfirio Tzoc Paau ¶¶ 3-6 ("Paau Decl.").  ORR's automatic fingerprinting requirements for home study cases are not mandated by the TVPRA.

ORR itself has acknowledged that blanket fingerprinting requirements unrelated to specific concerns about individual sponsors do not promote child welfare. *See* Enriquez Decl. ¶ 15.  In September 2019, then-ORR Director Jonathan Hayes testified to Congress that ORR facilitated the release of children in its custody by ending most fingerprinting requirements for parents, grandparents, adult siblings, and adult household members.[44] Mr. Hayes explained that fingerprinting household members "did not deliver any new or additional information that would . . . change the decision to discharge that child to his or her family member."[45] He further testified that ORR followed the recommendation of care providers by ending mandatory fingerprinting for parents, grandparents, and adult siblings absent a specific red flag in public records checks.[46] HHS Assistant Secretary Lynn Johnson similarly observed in December 2018 that ORR's expanded fingerprinting policy was "not adding anything to the protection or the safety for these children."[47] Given ORR's recognition that children can be safely released to grandparents or siblings without requiring fingerprints, there is no justification to keep children in

---

[44]    Testimony of Jonathan Hayes before the Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, U.S. House Committee on Appropriations, Sept. 18, 2019 at 1:29:00-1:31:00, https://www.c-span.org/video/?464368-1/administration-officials-testify-migrant-children-mental-health.

[45]    *Id.*

[46]    *Id.*

[47]    *After policy reversal, hundreds of detained children could be released,* PBS, Dec. 19, 2018,  https://www.pbs.org/newshour/show/after-policy-reversal-hundreds-of-detained-migrant-children-could-be-released.

custody indefinitely simply because their aunts or cousins cannot appear for fingerprinting.[48]

ORR already has policies in place to waive fingerprint requirements in narrow circumstances. For instance, under current ORR procedures, a child may be released to a Category 2B sponsor prior to the receipt of fingerprint check results in certain circumstances, including where there are no other documented risks to the child, the child is not especially vulnerable, and the case is not being referred to a

---

[48] Notably, state child welfare agencies have recognized that the current crisis requires adjusting ordinary fingerprinting requirements. Although California generally requires foster families to submit fingerprints within ten days or five business days of receiving an emergency placement of a dependent child, the California Department of Social Services has instructed counties that individuals who are unable to live scan fingerprints can do so within 15 days of when the stay at home order is lifted. California Dep't of Social Services, Providing Optimal Child Welfare and Probation Services to Children and Families During Coronavirus (COVID-19) California State of Emergency, All-County Letter No. 20-25, March 21, 2020, https://www.cwda.org/sites/main/files/file-attachments/cws_acl_20-25.pdf?1584992522. Minnesota and Utah have similarly temporarily suspended fingerprint requirements and are using alternative mechanisms to conduct background checks of foster care providers. *See* Minnesota Department of Human Services, Emergency background studies – NetStudy 2.0, Frequently Asked Questions, https://mn.gov/dhs/general-public/background-studies/covid-19/emergency-background-studies-faqs.jsp (accessed April 7, 2020); Utah Foster Care, *The Path to Placement*, Paperwork: Background Screening (Live Scan) Application & Instructions, https://utahfostercare.org/path (accessed April 7, 2020). In Washington state, the governor temporarily waived some fingerprinting requirements for child care workers, recognizing that fingerprint services are less available in the current crisis and fingerprinting appointments involve a risk of exposure to COVID-19. Jay Inslee, Proclamation by the Governor Amending Proclamations 20-15: 20-31 Department of Children, Youth, and Families – Child Care and Background Checks, March 26, 2020, https://www.governor.wa.gov/sites/default/files/proclamations/20-31%20-%20COVID-19%20DCYF%20Child%20Care-Background%20Checks%20%28tmp%29.pdf (accessed April 7, 2020).

home study.[49] ORR's procedures also permit the use of an FBI/BSU Civil Name Check in lieu of fingerprints when fingerprints are returned as unclassifiable.[50]

Given that submitting fingerprints is currently impossible for sponsors in many areas throughout the country, ORR must expand these exceptions and alternative verification mechanisms to ensure that ORR does not detain children for the pendency of the pandemic simply because of a lack of fingerprints. *See* Enriquez Decl. ¶ 16.

> **C.     No physical home studies are being conducted during the COVID-19 pandemic, yet ORR continues to confine children in congregate settings for want of a discretionary home study.**

The current public health crisis has made home studies impractical if not impossible. Although the TVPRA mandates some home studies, ORR also chooses to condition children's release on the completion of discretionary home studies. For example, ORR policy "requires a home study before releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children" or "for children who are 12 years and under before releasing to a non-relative sponsor." ORR Policy Guide § 2.4.2. ORR also allows case managers and case coordinators to request home studies when they want additional information about the sponsor. *Id.*

ORR is currently detaining children pending discretionary home studies, which have been indefinitely postponed in light of the COVID-19 crisis.[51] Gahng

---

[49]     Defs.' Ex. C-1 at 52-53, UAC Map Sec. 2 [Doc. # 746-4]. ORR also has procedures to follow up in the event that derogatory information about a sponsor is discovered after release. *Id.* at 53.

[50]     *Id.* at 56.

[51]     *See, e.g.,* ORR Data Response, M.A.S.P., Children's Home Poughkeepsie ("Due to sponsor having three previous sponsorships require a mandated ORR home study, which was requested on March 27, 2020 . . . When approved the home

Decl. ¶ 13; Cubas Decl. ¶ 11. At least one child is being held pending a *second* discretionary home study.[52] Although there is no clear timeline for resuming home studies, ORR does not appear to be exploring alternative mechanisms to address any concerns it may have about these sponsors. Instead, ORR continues to detain vulnerable children pending completion of home studies that are not required by law and cannot be completed in the foreseeable future. *See* Enriquez Decl. ¶ 15-16.

### D. ORR pursues a near-blanket policy against releasing class members wrongfully subjected to removal proceedings under MPP.

ORR's Data Response to the TRO issued by this Court corroborates ORR's no-release policy. The government's data shows at least four children who have not been discharged from detention because of a pending Migrant Protection Protocols ("MPP") case or removal order stemming from the MPP.[53] These minors continue to

---

study will be on hold due to the national health emergency crisis."); W.N.S.L., Maryville San Francisco ("Attempt to sponsor an unrelated minor plus sponsoring an unrelated minor requires a discretionary home study, which was requested on March 30, 2020. Although the Home Study provider accepted the referral, the home study is currently on hold due to the national health emergency crisis."); J.A.J.C., Maryville San Francisco ("Discrepant information between sponsor/sister and prevouis [sic] sponsor/family friend on sponsor assessments requires a discretionary home study, which was requested on March 2, 2020. Although the Home Study provider accepted the referral, the home study is currently on hold due to the national health emergency crisis.").

[52] *See* ORR Data Response, T.D.N., David & Margaret ("The additional household members did not want to provide their identification nor complete fingerprints. Sponsor decided to relocate on 3/20/20. A second home visit was requested to be completed on 3/20/20 and was accepted. The home study is currently on hold due to the concerns about conducting a home visit.").

[53] *See* ORR Data Response, Ka.M.O.R., Abbott House Irvington ("The minor has not been discharge from program due to being an MPP case"); Ke.M.O.R., Abbott House Irvington, (same); H.E.E.R., Center for Family Services, ("The minor has an MPP Case"); E.I.S.L., Children's Village Staff Secure, ("At this time minor isn't eligible for reunification due to his current deportation order.").

be detained even though they are otherwise eligible for release,[54] and, absent release, they will endure prolonged, indefinite detention due to protracted appellate processes[55] and travel prohibitions during the COVID-19 pandemic.

## IV.  ORR FAILS TO RELEASE CHILDREN FROM CONGREGATE DETENTION WITHOUT UNNECESSARY DELAY.

### A.  ORR's refusing to release class members because they are subjects of non-final removal orders violates Settlement ¶ 14.

1. ORR's near-blanket policy against releasing class members during the pendency of administrative appeals violates Settlement ¶ 14.

ORR's policy and practice of not releasing minors with MPP removal orders, *see* Sec. III.D, *supra*; Cubas Decl. ¶ 6-9,[56] violates ¶ 14 of the *Flores* Agreement, which states, in relevant part: "Where the INS determines that the detention of the

---

[54] *Id.*, Ka.M.O.R., Abbott House Irvington ("The CM provided the sponsor with the FRP on 2/7/2020 and the sponsor provided the completed [Family Reunification Packet] and all needed documentation on 2/11/2020. The minor has not been discharged from program due to being an MPP case"); Ke.M.O.R., Abbott House Irvington, (same); H.E.E.R., Center for Family Services, ("The minor has an MPP Case. . . The discretionary home study was remanded by the FFS due to CM premature request due to the UC's legal status.").

[55] Appeals before the BIA can take as long as 14-23 months. Declaration of Charles J. Vernon ("Vernon Decl.") ¶¶ 5-6. Any petition for review with a circuit court may take several years. *See, e.g.*, *Office of the Clerk Frequently Asked Questions*, United States Courts for the Ninth Circuit, updated December 2019, available at https://www.ca9.uscourts.gov/content/faq.php. In some cases, legal service providers must also file to reopen removal orders under 8 U.S.C. § 1229a(c)(7). If ORR insists on delaying reunification efforts while unaccompanied children pursue appeals and motions to reopen, children could endure years of detention in violation of the *Flores* Settlement Agreement.

[56] *See also*, Memorandum in Support of Petitioners' Motion for A Temporary Restraining Order and Preliminary Injunction, *A.C.H.C. et. al v. Barr*, No. 20-cv-00770-RDM (D.D.C. Mar. 20, 2020) (Dkt. 5).

19

minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay . . . ."

The procedural posture of each unaccompanied minor's case at the time of entry, and at the time of reunification, varies. Cubas Decl. ¶¶ 7-9. The basis for the order of removal also varies and is often outside the child's control, requiring the child to seek to reopen and litigate his case before the immigration court. *Id*.[57] Requiring ORR to maintain custody of these children until they are able to reopen their cases and possibly appeal to the BIA and/or a circuit court means potentially holding these children for several years, if not indefinitely. Cubas Decl. ¶¶ 7-9.

ORR's erroneous practice of refusing to release these class members– even when they are otherwise eligible for reunification with a vetted sponsor – will result in the potential for indefinite delay while children wait for final orders. Such timelines are "unnecessary delays" in direct violation of the Agreement.

2. <u>Nothing in the Settlement denies class members with preliminary orders of removal in ORR custody the right to release without unnecessary delay</u>.

Settlement ¶ 14 generally requires ORR to release children to available custodians without unnecessary delay. The agreement guarantees this right of prompt release to "[a]ll minors who are detained in the legal custody of [ORR]." Settlement ¶ 10. Nothing in the agreement suggests that ORR may refuse to release children for weeks or months because DHS previously placed them in the MPP program or because an immigration judge thereafter ordered them removed.

At most, Settlement ¶ 14 would permit ORR to continue to detain a

---

[57] See also, *Human Rights Fiasco: The Trump Administration's Dangerous Asylum Returns Continue*, HUMAN RIGHTS FIRST, pgs. 23, 27, https://www.humanrightsfirst.org/resource/human-rights-fiasco-trump-administration-s-dangerous-asylum-returns-continue.

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CV 85-4544-DMG-AGRX

minor when "required . . . to secure his or her timely appearance before the INS or the immigration court . . . ." Settlement ¶ 14. However, ORR has long insisted that it does not refuse release on grounds of flight-risk. Ex. F, Letter from Sarah B. Fabian, U.S. DEP'T OF JUSTICE, Sept. 12, 2017, at 3 ("Because ORR does not make findings of 'flight risk,' (that is, that the UAC is likely to not appear for his or her removal proceeding), and does not retain custody of UAC on such basis, there is no need for an immigration judge to issue findings on 'risk of flight,' as this factor does not figure in to ORR determinations on release.").[58]

ORR's refusal to release class members because DHS ordered them to "wait in Mexico" or because an immigration judge ordered them removed unnecessarily prolongs children's detention despite the clear and present risks the COVID-19 pandemic poses to their health and safety in congregate facilities. This Court should accordingly enjoin ORR to release class members without unnecessary delay notwithstanding any preliminary order of removal.

**B.     ORR's delay in releasing class members it has exposed to COVID-19 is a *prima facie* breach of Settlement ¶ 14 that cannot be justified as a valid response to a public health emergency.**

The Settlement guarantees class members release to their custodians without unnessary delay.  ORR's myriad confusing policies postponing release – whether from all facilities in New York, to all states under a shelter-

_____

[58] Settlement ¶ 22 allows ORR to detain class members in unlicensed, restrictive placements if they are serious "escape-risks." And although ORR does not refuse release on account of flight-risk, it does regularly "step up" class members to more restrictive settings because it deems them escape-risks. *See* ORR Policy Guide § 1.2.4 (providing for step up to staff-secure facility on account of escape risk). According to Settlement ¶ 22, however, whether a "minor is currently under a final order of deportation or exclusion" is only one factor ORR must consider in determining whether she or he is an escape-risk.

21

in-place or similar order, or from any facility with a confirmed COVID-19
case – violate this mandate.  Class members with a vetted, appropriate
sponsor have the right to prompt release, particularly in the context of a
global pandemic, when children are physically and psychologically safer
outside of congregate care.

Any appeal to the COVID-19 public health emergency to justify the
prolonged detention of class members is in error, because public health
considerations in fact weigh in favor of release.  Postponing release of all
children in any facility with a confirmed COVID-19 case increases children's
risk of exposure.  Graves Decl. ¶ 4.  Further, efforts to quarantine an ORR
facility would be futile because of the rotating staffing.  *Id.* ¶ 6.  The safest
path is to release children, including those known to be exposed, using
appropriate personal protective equipment and mandated self-quarantine
measures.  *Id.* ¶¶ 7, 8, 9.

**C.   ORR's demanding discretionary fingerprinting and home studies
during a national health emergency needlessly prolongs class
members' confinement.**

Given that COVID-19 has rendered fingerprinting virtually impossible in
many areas of the country, ORR unnecessarily delays the release of class members
by continuing to enforce a blanket policy requiring fingerprints from all Category
2B and Category 3 sponsors and all sponsors, adult household members, and care
providers in certain cases, including where a home study is conducted. *See* Defs.'
Ex. B, ORR Policy Guide § 2.5.1 ("ORR Policy Guide") [Doc. # 746-3]; *see also
Flores v. Sessions*, 2018 WL 10162328, at *21 (C.D. Cal. July 30, 2018) ("ORR's
*blanket* rule requiring that post-release services are in place before releasing a Class
Member to a sponsor for whom home study services were conducted violates
Paragraph 14 and 18's bar on unnecessarily delaying the release of Class
Members."). These fingerprint requirements are not mandated by the TVPRA, are

22

not based on individualized safety concerns, and have been deemed unnecessary by ORR itself as applied to other family members such as parents, grandparents, and siblings.[59] *See* 8 U.S.C. § 1232(c)(3); Sec. III.B, *supra*. ORR has the capacity to conduct background checks without the need for fingerprints and already conducts these checks for all potential sponsors. *See* ORR Policy Guide § 2.5.1. In the absence of a clear individualized need for fingerprinting, ORR's policy of requiring fingerprints for entire categories of individuals notwithstanding the current pandemic constitutes an unnecessary obstacle to release and places class members at grave risk of physical and psychological harm. Ex. B, Declaration of Dr. Amy Cohen ¶ 4-6 ("Cohen Decl.").

ORR further delays the release of some class members by requiring discretionary home studies. *See* Sec. III.C, *supra*. The TVPRA requires home studies for four categories of children, including children who were victims of a severe form of trafficking, children with disabilities, children who were victims of physical or sexual abuse under certain circumstances, and children "whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence." 8 U.S.C. § 1232(c)(3)(B); *see also* ORR Policy Guide § 2.4.2. ORR also chooses to require discretionary home studies in circumstances not mandated by the TVPRA, such as when a non-relative sponsor wishes to sponsor multiple children or when a case manager and case coordinator recommend a home study. ORR Policy Guide § 2.4.2. Given the current public health crisis, these discretionary home studies have transformed into indefinite holds on release. To comply with its obligation to

---

[59] Notably, the Settlement affords the same level of preference for release to brothers, sisters, aunts, uncles, and grandparents. *See* Settlement ¶ 14.C. Yet ORR's fingerprinting policy means that a child with a Category 2B sponsor such as an aunt or uncle will likely remain detained for the duration of the pandemic whereas a child with a Category 2A sponsor such as a sibling or grandparent can be released expeditiously. *See* ORR Policy Guide §§ 2.2.1, 2.5.1.

release children "from its custody without unnecessary delay," ORR must permit

sponsors alternative mechanisms to address ORR's concerns, which could include

home studies conducted remotely or providing sponsors with supportive post-

release services. Settlement ¶ 14.

**D.    The Court's temporary restraining order appears to be reducing unnecessary ORR detention. The Court should continue to enjoin ORR against needlessly prolonging class members' confinement, and require regular reporting.**

Plaintiffs have had insufficient time to assess fully the impact the

Court's March 28, 2020, temporary restraining order has had on ORR's

compliance with Settlement ¶ 14. Preliminary reports, however, indicate that

despite its continuing to engage in practices that needlessly prolong

children's detention, ORR, at least in some regions, is now, in response to the

Court's TRO, taking to heart its obligation under Settlement ¶ 14 to release

class members without unnecessary delay. Flamm Decl. ¶ 7-8; Enriquez

Decl. ¶ 10.

Unfortunately, over the next weeks and months, the COVID-19 pandemic is

likely to grow even worse. *See, e.g.*, E. Emanuel, *We Can Safely Restart the

Economy in June. Here's How*, N.Y. TIMES, Mar. 28, 2020, *available at*

www.nytimes.com/2020/03/28/opinion/coronavirus-economy.html (last visited

Apr. 8, 2020) ("Yet it is likely that one million Americans are infected with

coronavirus, and if that number doubles every six days, 100 million Americans will

have Covid-19 by early May. If 1 percent of those infected die, there would still be

a million deaths. That's the equivalent of what 10 Hiroshima bombs would do, or

nearly double the number of annual cancer deaths."); J. Kayyem, *The Crisis Could

Last 18 Months. Be Prepared*, THE ATLANTIC, Mar. 21, 2020, *available at*

www.theatlantic.com/ideas/archive/2020/03/there-isnt-going-be-all-clear-

signal/608512/ (last visited Apr. 8, 2020) ("From a public-health standard, the

pandemic will not end for another 18 months. The only complete resolution—a

vaccine—could be at least that far away."). As the pandemic worsens, so, too, do the dangers children experience in congregate detention. The need for injunctive relief will likely only grow stronger over the next weeks.

It is too late for ORR to deny that it has, in the past, needlessly prolonged children's detention in violation of ¶ 14. *See, e.g.*, Order re Plaintiffs' Motion to Enforce Class Action Settlement at 27-29, July 30, 2018 [Doc. #470] (disapproving ORR requirement that its director approve release of any child placed in a restrictive setting); *id*. at 29-30 (disapproving ORR requirement that myriad post-release services be in place before any child is released to a sponsor subjected to a home study).[60]

If ORR sincerely intends to release children without unnecessary delay for the duration of the pandemic, a preliminary injunction will do it no harm. *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("The Defendants cannot be harmed by an order enjoining an action they will not take."); *Polo*

---

[60] *See also* Decl. of Mother of Nicolás C., Exhibits in Support of Motion to Enforce Settlement, Apr. 16, 2018 (Doc. #421-1), Exhibit 1 (PX 3, 7) ¶¶ 7-8 (ORR refused to release son because mother had earlier suffered from cancer; "I believe that a mother has the right to take care of her child even though she is incapacitated, although I am not. It occurred to me that they were looking for an excuse to deny me my son[.] . . ."); Decl. of Camila G., (Doc. #421-4), Exhibit 55 (PX 393) ¶ 8 (youth detained for one year and three months; "My case worker told me that the only reason that I haven't been released to my aunt . . . is because I don't have an official birth certificate[.] . . . My mother died before she could register me for [one]."); Decl. of  Carlos A. (Doc. #421-3), Exhibit 31 (PX 176) ¶ 10 (minor detained four months; "My case manager said the only reason that I haven't been released is that the government is now reviewing my case. They have not told me how long it would take . . . ."); Decl. of Miguel B., (Doc. #421-3), Exhibit 32 (PX 179) ¶ 5 (youth detained five months; "My mom began trying to get me back . . . . Someone came to inspect her house and everything came out well. Neither of us understands why I am still here."); Decl. of Roberto F. (Doc. #421-3), Exhibit 37 (PX 214, 217) ¶ 6 (youth detained ten months; "[M]y mom moved from Kansas to Texas to be closer to me. . . . They continued to take long making the decision to let me live with her. According to her, the government did a study of the home, and everything went well.").

*Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) (same). If it does not, a continuing injunction will be essential. This Court's order is bearing fruit. Now is not the time to leave ORR to resume its old ways.[61]

## IV.   Additional reporting is justified by Defendants' failure to comply with the Agreement combined with the current COVID-19 pandemic

In light of Defendants' persistent failure to comply with the release and transfer provisions of the Agreement, and to encourage compliance and permit reasonable monitoring of compliance, the Court should order that Defendants temporarily provide the Special Master/Independent Monitor and Class Counsel the information identified by this Court in its Order Appointing Special Master [Doc. # 494] at B.1.c.i(i)-(x), ii(i)-(vi), and iii. Such data should temporarily be provided at reasonable intervals, perhaps every week or every two or four weeks.

The Court's Order required Defendants by April 6, 2020, to provide the information listed in the Order Appointing Special Master at B.1.c.i(i)-(x), "as well as a brief summary of efforts toward family reunification or release of the detained Class Member," for all class members held in ICE custody in any FRC, and ORR

---

[61] The Supreme Court has held that voluntary cessation of allegedly illegal conduct by a defendant does not moot a plaintiff's claim for injunctive relief. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Refusing an injunction on account of voluntary cessation "leave[s] [t]he defendant . . . free to return to his old ways." *Id.* (internal quotations omitted, alteration in original). Rather, a claim for injunctive relief becomes moot upon voluntary cessation of illegal conduct only if the defendant satisfies the "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again . . . ." *Id.* (internal quotations omitted, alteration in original). ORR's partial compliance with a temporary restraining order for a few days is no reason to deny a preliminary injunction. Voluntary cessation of unlawful activity does not render a request for preliminary injunctive relief moot unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1153 (9th Cir. 2006) (quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000)); *Disney Enters., Inc. v. Vidangel Inc.*, 2019 WL 4565168, at *1 (C.D. Cal. Sept. 5, 2019) (compliance with preliminary injunction "does not moot injunctive relief."); *Rouser v. White*, 707 F. Supp. 2d 1055, 1071 (E.D. Cal. 2010) (voluntary cessation does not preclude issuance of preliminary injunction).

1    facilities located in States that had 3,000 or more confirmed cases of COVID-19 as

2    of the date of the Order. Order at 14.[62]

3         Plaintiffs also sought on a temporary basis an Order requiring that

4    Defendants provide the Special Master and Class Counsel with the data listed in the

5    Order Appointing Special Master at B.1.c.iii.[63] Providing this data is perhaps the

6    most effective method for encouraging substantial compliance with the release and

7    transfer provisions of the Agreement, and likely the only way for the Court and

8    class counsel to effectively monitor compliance with the Agreement. These

9    measures will almost certainly reduce the number of detained class members

10   unnecessarily remaining in congregate detention, and thus provide them and those

11   not released a better chance to protect themselves against an onslaught of

12   contagion.

13   _____

14   [62] The states include California, Illinois, Louisiana, Massachusetts, Michigan, New Jersey, New York, and Washington. *Id*. The Order also stated "To the extent possible, ORR should endeavor to provide the requested information for all Class Members in their custody." *Id*.

15

16

17   [63] iii. Continuous Efforts at Release Pursuant to Paragraph 14 of the Agreement:

18   (i) The dates on which the option for release was explained by Defendants' employees to Class Members or their accompanying parents, the names of the officers who provided the information, the location where the information was provided, and the dates on which the information was provided,

19

20

21   (ii) the dates on which a Class Member's parent opted her or his Class Member child out of the release provisions of the Agreement,

22   (iii) the dates on which efforts were made and recorded by Defendants' employees to release the Class Member pursuant to Paragraph 14 of the Settlement, and the names, titles, and locations of the person(s) who made such efforts,

23

24   (iv) identities of relatives, friends or licensed group homes contacted for release or placement of the Class Member under Paragraph 14, and the dates of such contacts, and names, titles, and locations of Defendants' employees who made the contacts, and

25

26   (v) the results of efforts aimed at release of the Class Member pursuant to Paragraph 14 of the Settlement. *See* Proposed Order at ¶ 5. [Doc.# 733-18]. This information would be provided under the parties existing or a revised confidentiality agreement and would not be publicly available.

27

28

27

Defendants oppose any additional reporting requirement, arguing that "[w]hen discerning the parties' mutual intent, courts may "not substitute one party's view of what the contract should have said for the terms that are actually contained within the document.'" Defs.' Supp. Response at 22, *quoting Headlands Reserve, LLC v. Ctr. for Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1123 (C.D. Cal. 2007) (citation and internal quotations omitted). Requiring the data Plaintiffs' have proposed is hardly a significant change altering the substantive requirements of the Agreement. Indeed, Paragraph 28.B already states that "[s]hould Plaintiffs' counsel have *reasonable cause* to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case *and inform Plaintiffs' counsel of the reasons why the minor has not been released.*" Agreement ¶ 28.B (emphasis supplied). The evidence on file including the data provided by Defendants gives Plaintiffs' counsel reasonable cause to believe that many or most minors in custody for more than about twenty days should have been released pursuant to Paragraph 14, and Plaintiffs' counsel may therefore request that these cases be investigated the and that Defendants inform Plaintiffs' counsel of the reasons why theses minors have not been released.[64]

---

[64] The Order Appointing Special Master similarly requires that if requested by the Special Master, and "if the Class Member was not released under Paragraph 14 of the Agreement or placed pursuant to Paragraphs 12A(3) and/or 19 of the Agreement within 20 days of apprehension," Defendants must provide "the reason why the Class Member was not released under Paragraph 14 of the Agreement or placed under Paragraph 12A(3) and/or 19 of the Agreement," [Doc.# 494 at ¶ B.1.c.i.viii], and *regardless* of whether Class Members are detained for more than 20 days, upon request must provide, *inter alia*, "dates on which the option for release was explained by Defendants' employees to Class Members or their accompanying parents," and "the dates on which efforts were made and recorded by Defendants' employees to release the Class Member pursuant to Paragraph 14 of the Settlement, and the names, titles, and locations of the person(s) who made such efforts." *Id*. ¶ B.1.c.iii.i, iii.

The Court clearly has authority to Order these interim measures. *See, e.g. Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000) (the enjoined party's "history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted'); *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 12-16, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971) (the Court derives authority to fashion remedies in this instance from multiple sources, including the Court's broad and flexible equitable powers to remedy past wrongs); *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent … If the reservation [to modify a decree] had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery"); *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("Under well-established law, substantial violation of a court order constitutes a significant change in factual circumstances. . . . [T]he court's extension of the settlement agreement returned Plaintiffs to the position they would have occupied had [the defendant] not violated the agreement from its inception. The modification of the settlement agreement was therefore well within the court's inherent power).

IV.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's application for a preliminary injunction.


Dated:   April 8, 2020         CENTER FOR HUMAN RIGHTS AND
                               CONSTITUTIONAL LAW
                               Peter A. Schey
                               Carlos R. Holguin

                               USF SCHOOL OF LAW IMMIGRATION CLINIC
                               Bill Ong Hing

                               LA RAZA CENTRO LEGAL, INC.
                               Stephen Rosenbaum

                               UNIVERSITY OF CALIFORNIA DAVIS
                               SCHOOL OF LAW

Immigration Law Clinic
Holly S. Cooper
Jonathan P. Mulligan

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch
Neha Desai
Poonam Juneja
Freya Pitts

THE LAW FOUNDATION OF SILICON VALLEY
Jennifer Kelleher Cloyd
Katherine H. Manning
Annette Kirkham

*Of counsel:*

ALDEA - THE PEOPLE'S JUSTICE CENTER
Bridget Cambria

            */s/ Peter Schey*
Peter A. Schey
*Attorneys for Plaintiffs*

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION
CV 85-4544-DMG-AGRX