# EXHIBIT L



Through evidence, change is possible.

Physicians for Human Rights

256 West 38th Street
9th Floor
New York, NY 10018

+1.646.564.3720
phr.org

**Declaration of Dr. Katherine Peeler (MD, FAAP)**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

**I. Background**

1. I am Dr. Katherine Peeler. I am a medical expert for Physicians for Human Rights (PHR), and instructor of pediatrics at Harvard Medical School. I am a pediatric critical care physician at Boston Children's Hospital where I am a staff physician in the Division of Medical Critical Care. A Fellow of the American Academy of Pediatrics, I completed my residency training at the University of Michigan Pediatrics Residency program. I completed my fellowship training in pediatric critical care medicine at Boston Children's Hospital, where I also served as chief fellow. I received my medical degree from The Geisel School of Medicine at Dartmouth.

2. I am the faculty leader for Harvard Student Human Rights Collaborative, a role in which I supervise and advise medical students in activities related to promoting health as a human right. In addition, I am the medical director of the Harvard Medical School Asylum Clinic, which focuses on medical-legal issues of asylum seekers, including immigration detention. I have written extensively and given talks and lectures about such issues nationally and internationally. In my role as medical expert at PHR, I have performed dozens of forensic evaluations of pediatric and adult asylum-seeker cases, testifying to the consistency between their physical and psychological scars and their histories of trauma for which they seek asylum, including for asylum seekers in detention. In this same role, I have also researched, written about, and been interviewed the health of immigrants in federal custody.[1] I am regularly quoted in the media as an expert on child and family detention.[2]

3. As an attending physician at Boston Children's Hospital, I work with a diverse population, routinely taking care of patients aged newborn through their 40s, some previously healthy, many with a background of medical complexity, and with myriad socioeconomic backgrounds, hailing from all 50 states and many countries around the world. I routinely come into contact with victims of abuse, trauma, and poverty, where I regularly assess their medical as well as psychosocial needs in the context of their and their family's social determinants of health (such as

---

[1] *See*, *e.g.* Katherine Peeler, "Thousands Of Immigrant Kids Are Detained, Far From Their Parents. They Need Protection From COVID-19, Too," *Cognoscenti* (Mar 20, 2020), https://www.wbur.org/cognoscenti/2020/03/20/migrant-kids-coronavirus-covid-19-katherine-peeler; Katherine Peeler, "Forced Family Separation Isn't Just Traumatic. It's Torture," *Cognoscenti* (Feb 28, 2020), https://www.wbur.org/cognoscenti/2020/02/28/p-h-r-family-separation-katie-peeler; Katherine Peeler, et al. "Sleep Deprivation of Detained Children: Another Reason to End Child Detention," *Health and Human Rights Journal* (Jan 20, 2020).

[2] 12 detained babies have been released from ICE custody in Dilley, Texas, CBS News, https://www.cbsnews.com/news/immigrant-children-detained-12-babies-released-from-ice-custody-detention-center-dilley-texas-2019-03-04/; 'It's Horrifying to Think About': Migrants and Their Young Children Are Held in Isolation at Family Detention Centers, Rewire News, https://rewire.news/article/2019/03/05/its-horrifying-to-think-about-migrants-and-their-young-children-are-held-in-isolation-at-family-detention-centers/; A fifth migrant child died in US custody. Why does this keep happening?, Pacific Standard, https://psmag.com/news/a-fifth-migrant-child-died-in-u-s-custody-why-does-this-keep-happening.

housing and food insecurity).

4. My CV is attached as Exhibit A.

5. I have read the April 6, 2020 Declarations of Mr. Michael Sheridan, Mr. Christopher George, and Ms. Mellissa Harper, and my declaration herein takes into account the information they have declared.

**II. COVID-19**

6. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. COVID-19 has now reached pandemic status. As of April 7, 2020, according to the World Health Organization (WHO), 1,279,722 people have been diagnosed with COVID-19 around the world (including 68,766 is just the prior 24 hours) and 72,614 have died.[3] In the United States, about 397,754 people have been diagnosed and at least 12,956 people have died as of the same date.[4] The numbers of infection and death in the United States are likely underestimated due to the continued lack of test kits available.

7. The transmission of SARS-CoV-2 is growing exponentially. Nationally, projections by the Centers for Disease Control and Prevention (CDC) indicate that more than 200 million people in the United States could be infected with SARS-CoV- 2 over the course of the pandemic without effective public health intervention, with as many as 1.5 million deaths in certain projections.

8. The novel coronavirus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but also survives on surfaces for some period of time and can sometimes be spread as an airborne pathogen during certain aerosol-generating procedures like suctioning a patient. It is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where SARS- CoV-2 originated, the average infected person passed the virus on to two the three other people; transmission occurred at a distance of three to six feet. The "contagiousness" of this novel coronavirus – its R0 (the number of people who can get infected from a single infected person) – is twice that of the flu. Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus.

9. COVID-19 is a serious disease, which can lead to respiratory failure, kidney failure, and death. Older patients and patients with chronic underlying conditions are at a particularly high risk for severe cases and complications.[5] While children seem to be less susceptible to COVID-19 compared with adults, there have still been a significant number of pediatric cases reported, including those becoming critically ill.[6] In my work as a pediatric intensivist, I have seen this firsthand. Often, the children most susceptible are those with baseline immunodeficiencies or other complex medical disorders. The need for care, including intensive care, and the likelihood

---

[3] *See* Coronavirus disease 2019 (COVID-19) Situation Report - 78, World Health Organization, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200407-sitrep-78-covid-19.pdf?sfvrsn=bc43e1b_2, accessed April 8, 2020 (at 10:30 AM EST).

[4] *See* Mitch Smith, et al., Coronavirus in the U.S.: Latest Map and Case Count, *The New York Times*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Spotlight&pgtype=Homepage, access April 8, 2020 (at 10:30 AM EST).

[5] Fei Zhou, et al., "Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China," *The Lancet* (published online Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

[6] Yuanyuan Dong, et al., "Epidemiological Characteristics of 2143 Pediatric Patients With 2019 Coronavirus Disease in China," *Pediatrics* (pre-publication release online Mar. 16, 2020), https://pediatrics.aappublications.org/content/pediatrics/early/2020/03/16/peds.2020-0702.full.pdf



of death, is much higher from COVID-19 than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about 10 times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. According to preliminary data from China, serious illness, sometimes resulting in death, occurs in up to 16 percent of cases.[7]

10. The CDC previously identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age, including: blood disorders, chronic kidney or liver disease, immunosuppression, endocrine disorders (including diabetes), metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

11. Those in high-risk categories who do not die may have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that are likely to soon be in very short supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities. Patients who do not die from serious cases of COVID-19 may also face prolonged recovery periods, including extensive rehabilitation from neurological damage and loss of respiratory capacity.

12. Complications from COVID-19, including severe damage to lung, heart, liver, or other organs, can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

13. There is no vaccine to prevent COVID-19. There is no known cure or specific antiviral treatment for COVID-19 at this time.

14. COVID-19 prevention strategies include containment and mitigation. Containment requires identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Unfortunately, due to the lack of testing availability, most public health experts agree that it is too late to effectively implement a containment strategy in the United States at large.

15. As the infectious disease spreads in a community, public health demands mitigation strategies, which include scrupulous hand hygiene and social distancing. For that reason, public health officials have recommended extraordinary measures to combat the rapid spread of COVID-19. Schools, courts, collegiate and professional sports, theater, and other congregate settings have been closed as part of this risk mitigation strategy. Additionally, many cities have requested that all non-essential businesses close, and that all citizens stay at-home until instructed otherwise unless they work for an essential operation.

**III. Detention Centers, Shelters, and other Group Facilities**

16. The risk posed by infectious diseases in immigration detention facilities holding children, including temporary influx facilities and shelters, is significantly higher than in the community, both in terms of risk of exposure and transmission and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

17. Globally, outbreaks of contagious diseases are all too common in confined detention settings and are more common than in the community at large. Though they contain a captive population, these settings are not isolated from exposure. ICE has temporarily suspended social visitation in

---

[7] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention, accessed Mar. 14, 2020, https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

all detention facilities.[8] However, staff arrive and leave on a shift basis; there is no ability to adequately screen staff for new, asymptomatic infection. Contractors and vendors also pass between communities and facilities and can bring infectious diseases into facilities. People are often transported to, from, and between facilities.

18. Unaccompanied alien children (UAC) are in the custody of the U.S. government and housed in a variety of location types ranging from large temporary influx facilities, to group homes, to shelters, all managed by the Office of Refugee Resettlement (ORR). As of April 8, 2020, there was still no information on ORR's website as to how it was responding to the COVID outbreak either in terms of protecting the children in its care or its staff. All it lists are links to the CDC.[9]

19. Influx facilities are shelters used by ORR when its other facilities are at full or near full capacity. These facilities are exempt from many of the guidelines other permanent facilities must follow as they are supposed to be used in emergencies and for temporary periods only. As they are built on federal sites, this further exempts them from state child welfare licensing requirements, enabling poor health and safety standards and making children more vulnerable to physical and mental health risks. Such lack of regulatory oversight and poor infrastructure have enabled the sexual assault, medical neglect, and physical abuse of children in ORR custody.[10] It is not clear what regulations they are required to follow when it comes to public health and pandemics.

20. Detention centers and ORR facilities housing children often do not have access to vital community health resources that can be crucial in identifying infectious diseases, including sufficient testing equipment and laboratories. This is especially true when, as now, there is a shortage in available test kits, and the state and commercial laboratories are overwhelmed with high numbers of test requests.

21. During an infectious disease outbreak, a containment strategy requires people who are ill to be isolated and that caregivers have adequate personal protective equipment (PPE). Detention centers and shelters are often under-resourced and ill-equipped to provide sufficient PPE for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak. This is especially true when, as now, facemasks are already in short supply. Per Mr. George's declaration, in paragraph 17a, residents are informed about the availability of PPE, but this is only provided upon request. Per the recent CDC guidance, everyone should be wearing masks when in public settings, which would certainly include congregate settings such as ORR shelters or FRCs.[11]

22. When detained, people have much less opportunity to protect themselves by social distancing than they would in the community. Congregate settings such as detention centers and shelters allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When children live in close, crowded quarters and must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater.

---

[8] *ICE Guidance on Covid-19*, U.S. Immigration and Customs Enforcement, accessed Mar. 24, 2020 (at 10pm EST), https://www.ice.gov/covid19.
[9] *ORR COVID-19 Resources*, Office of Refugee Resettlement, accessed April 8, 2020 (at 10:30 AM EST), https://www.acf.hhs.gov/orr/orr-covid-19-resources.
[10] Jennie Rose Nelson, "The Fight for Unaccompanied Immigrant Children's Rights", *North American Congress on Latin America*, January 14, 2020, https://nacla.org/news/2020/01/03/unaccompanied-immigration-children
[11] *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, Centers for Disease Control and Prevention, accessed April 8, 2020 (at 10:40 AM EST) https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html

23. Toilets, sinks, and showers are shared, without disinfection between use. Children are congregated for group legal visits in small rooms without evidence of cleaning the rooms before or after. Placing a child in such a setting therefore dramatically reduces her ability to protect herself from being exposed to and acquiring infectious diseases.

24. Additionally, ORR facilities are often unable to adequately provide the mitigation recommendations described above. During an infectious disease outbreak, people can protect themselves by washing hands. During a recent visit to an ORR shelter, attorneys from Kids in Need of Defense (KIND) noted that the soap in the bathroom was watered down.[12] High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this not done frequently enough in these settings given the high frequency of touch that occurs.

25. Detention centers and shelters are often poorly equipped to manage infectious disease outbreaks. Most lack onsite medical facilities or 24-hour medical care. The medical facilities at such centers are not sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, children who are infected and ill need to be isolated in specialized negative pressure rooms. It is not clear how many, if any, negative pressure rooms exist at the various ORR facilities.

26. Even assuming adequate space, solitary confinement is not an effective disease containment strategy. Isolation of people who are ill using solitary confinement is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms, air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff. This makes both containing the illness and caring for those who have become infected much more difficult.

27. Mr. George's declaration, paragraph 12, discussing cohorting residents who have been exposed to an individual who tests positive for COVID-19 but is asymptomatic. Cohorting is not the same as quarantine. Cohorting is a practice of grouping together patients who are known to have the same infectious disease in order to treat them while keeping other sick patients without the disease separate. Cohorting asymptomatic but potentially exposed people is much more likely to lead to an outbreak within that cohorted cluster because some of those people have not been infected, and likely some have. This is a dangerous practice.

28. By definition, UAC in ORR facilities are already far away from their families. Many of these children suffer from mental health disorders related to the trauma they suffered in their home countries, their journeys to the United States, and exacerbated by their separation from their families. Solitary isolation of children is never appropriate developmentally, and this specifically vulnerable group of children would be at high risk of mental health emergencies if placed in solitary isolation.

29. Infectious disease outbreaks, such as COVID-19, may exacerbate existing mental health conditions and contribute to the development of new mental health conditions.[13] Mental health conditions may be exacerbated by the stress of detention during the COVID-19 pandemic, including isolation and lack of visitation and lack of information leading to increased worry and uncertainty. Moreover, failure to provide adequate mental health care to UAC, as is already firmly

---

[12] Katherine Peeler, "Thousands Of Immigrant Kids Are Detained, Far From Their Parents. They Need Protection From COVID-19, Too," *Cognoscenti* (Mar 20, 2020), https://www.wbur.org/cognoscenti/2020/03/20/migrant-kids-coronavirus-covid-19-katherine-peeler.
[13] Brian Honermann, *An "Epidemic Within an Outbreak:" The Mental Health Consequences of Infectious Disease Epidemics*, O'Neill Institute for National and Global Health Law (Feb. 26, 2015), accessed Mar. 24, 2020 (10:30pm EST), https://oneill.law.georgetown.edu/epidemic-within-outbreak-mental-health-consequences-infectious-disease-epidemics/.

documented in ORR facilities, is likely to worsen during an outbreak such as COVID-19, given the already stretch healthcare force responding to this pandemic.[14] The scientific evidence points to a bi-directional relationship between mental health conditions and infectious diseases. Not only are individuals with mental health conditions more at risk for communicable diseases, they are also harder to treat, once infected, due to the nature of their underlying mental health disorder. For individuals in these facilities, especially those with chronic mental health conditions, the experience of an epidemic and the lack of care while confined to small, crowded quarters can itself be traumatizing, compounding the trauma of incarceration.

30. A coronavirus brought into a detention facility can quickly spread among the dense detainee cohort. Soon enough many are sick – including high-risk groups such as those with chronic conditions – quickly overwhelming the already strained health infrastructure within the facility. This can also lead to a strain on the surrounding hospitals to which these individuals may be transferred.

31. As has been documented, there is already evidence of SARS-CoV-2 at ORR facilities, with 3 staff members and one foster parent confirmed positive in New York as of March 23, 2020,[15] and 7 staff members confirmed positive at a Houston-area shelter as of April 7, 2020.[16] This demonstrates that despite the measures taken as described in the declarations of Ms. Harper, Mr. George, and Mr. Sheridan, the virus continues to spread.

32. The risk of a rapid spread of infectious disease has been borne out during past epidemics of influenza in confined settings, namely jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in two facilities in Maine, resulting in two inmate deaths.[17] Subsequent CDC investigations of 995 inmates and 235 staff members across the two facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[18] H1N1 is far less contagious than COVID-19. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications – unlike COVID-19, for which there is currently neither.

33. In recent years in immigration detention facilities, overcrowding, poor hygiene measures, medical negligence, and poor access to resources and medical care have led to outbreaks of other infectious diseases as well, including mumps and chickenpox.

34. Additionally, as health systems inside facilities are taxed, children with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the

---

[14] *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* (Sep. 3, 2019), U.S. Department of Health and Human Services Office of Inspector General, accessed Mar. 24, 2020 (10:30pm EST). https://oig.hhs.gov/oei/reports/oei-09-18-00431.asp?utm_source=website&utm_medium=asp&utm_campaign=uac-mental-health-report.

[15] Camilo Montoya-Galvez, "3 workers at facilities housing migrant kids in U.S. custody test positive for coronavirus," *CBS News* (Mar. 23, 2020), https://www.cbsnews.com/news/coronavirus-migrant-children-workers-test-positive/.

[16] Elizabeth Trovall, "7 Staff Members Test Positive At Houston-Area Shelter For Migrant Children," *Houston Public Media* (April 7, 2020), https://www.houstonpublicmedia.org/articles/news/health-science/coronavirus/2020/04/07/366215/7-staff-members-test-positive-at-houston-area-shelter-for-migrant-children/.

[17] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention, Apr. 6, 2020, https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

[18] David M. Reutter, "Swine Flu Widespread in Prisons and Jails, but Deaths are Few," *Prison Legal News* (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.

care they need for these conditions. There has been a history of delayed recognition both of chronic disorders and serious medical needs in ORR facilities.[19]

35. We have ample basis to conclude that detention settings are equally unprepared for the rapid spread of SARS-CoV-2. Not surprisingly, Chinese prison officials report that more than 500 COVID-19 cases in the current outbreak stemmed from the Hubei province prisons. In Israel, an entire prison was quarantined.

36. In my professional opinion, it is inevitable that SARS-CoV-2, the virus that causes COVID-19, will continue to infect federal immigration detention centers and ORR facilities in the United States. This is consistent with the prediction of other experts that all prisons and jails and other facilities where people are detained involuntarily should anticipate that the coronavirus will enter their facility.

**IV. Conclusion and Recommendations**

37. For the reasons above, it is my professional judgment that children placed in ORR's facilities are at a significantly higher risk of infection with SARS-CoV-2 as compared to the population in the community and that they are at a significantly higher risk of complications and poor outcomes if they do become infected. These outcomes include severe illness (including respiratory, cardiac, and kidney failure) and even death.

38. Given that the only viable public health strategy available in the United States currently is risk mitigation, reducing the size of the population in detention facilities is crucially important to reducing the level of risk both for those within those facilities and for the community at large. Not doing so is not only inadvisable but also reckless, given the public health realities we now face in the United States.

39. Even with the best-laid plans to address the spread of SARS-CoV-2 in detention facilities, the release of children at a high risk of infection, complications, and poor outcomes is a key part of a risk mitigation strategy. Despite efforts taken by ICE and ORR, I continue to that the only viable public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of an effective vaccine for prevention or effective treatment for the disease at this stage. My professional opinion is consistent with the view of the medical profession as a whole that there are no conditions of confinement in detention settings that can adequately manage the serious risk of harm for high-risk individuals during the COVID-19 pandemic.

40. Immediate and safe release is crucial for individuals with chronic illnesses or other preexisting conditions (e.g., blood disorders, chronic kidney or liver disease, immunosuppression, endocrine disorders, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy).

41. Releasing children into the custody of properly screened family sponsors is the best and safest way to prevent the spread of disease and reduce the threat to this vulnerable detained people. This includes allowing families detained at family detention centers to be released together. It is my professional opinion that this step is both necessary and urgent. The window of opportunity is rapidly narrowing for mitigation of COVID-19 in these facilities. It is a matter of days, not weeks.

---

[19] Rosa Flores, et al. "Nearly a year after a 10-year-old died in US custody, her father remembers the last time he saw her alive," *CNN* (May 27, 2019), https://www.cnn.com/2019/05/27/us/darlyn-cristabel-cordova-valle-funeral-father-aunt/index.html.



42. Release of the most vulnerable people also reduces the burden on these facilities' limited health care infrastructure, as it lessens the likelihood that an overwhelming number of children or staff will become seriously ill from COVID-19 at the same time. It also allows for decreased staffing if the census is decreased, mitigating the likelihood of further spread.

43. Release of the most vulnerable people also reduces the burden on regional hospitals and health centers, which will otherwise bear the brunt of having to treat these individuals when infected, thus reducing the number of hospital beds and equipment available for the general population.

### V. Expert Disclosures

44. I have not testified as an expert at trial or by deposition in the past twelve months. I declare under penalty of perjury that the foregoing is true and correct, executed this 8 day of April, 2020 in Boston, MA.

*[signature]*

Katherine Peeler, M.D, FAAP