# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 20-cv-00133-RM**

GABRIEL VILLEGAS CASTRO,
Petitioner,

v.

WILLIAM BARR, in his official capacity as United States Attorney General,
MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and
Customs Enforcement,
CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security,
JOHN MARTINEZ, in his official capacity as Acting ICE Denver Field Office Director,
and
JOHNNY CHOATE, in his official capacity as warden of the Aurora Contract Detention
Facility
owned and operated by GEO Group Inc.,
Respondents.

---

## DECLARATION OF CHARLES J. VERNON. ESQ.

---

I, Charles J. Vernon, pursuant to 28 U.S.C. § 1746, and based on my personal

knowledge and information made known to me from official records reasonably relied

upon by me in the course of my employment, hereby declare as follows relating to the

above-captioned matter:

1. I am attorney licensed by the Supreme Court of Colorado and employed as a

   Senior Staff Attorney with the Rocky Mountain Immigrant Advocacy Network

   ("RMIAN") in Westminster, CO since August 27, 2018. RMIAN is a non-profit

   organization that provides free legal services to noncitizens detained in Aurora,

   Colorado as well as to families and detained youth before the non-detained court

in Denver, Colorado. Previously I was employed in various capacities at the Florence Immigrant and Refugee Rights Project ("FIRRP") in Florence, AZ, beginning on January 3, 2012. FIRRP is a similar non-profit organization that affords legal services to clients at no cost.

2. In the course of my employment for both organizations, a significant percentage of my caseload since 2013 has involved representing individuals in removal proceedings who are deemed incompetent to represent themselves and, as such, appointed counsel through the National Qualified Representative Program ("NQRP"). At FIRRP, such cases are also governed by the permanent injunction in *Franco-Gonzalez v. Holder*, No. CV-10-02211 DMG (DTBx), 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013). I represent the Petitioner, Gabriel Villegas Castro, in all aspects of his removal proceedings before the Executive Office for Immigration Review pursuant to an NQRP appointment.

3. While at FIRRP, I regularly represented individuals by appointment pursuant to both *Franco-Gonzalez* and NQRP. As a result, I have extensive experience providing legal counsel to clients deemed mentally incompetent who sought and received custody redetermination hearings before the immigration court. A significant number of my clients, and those of my colleagues, were subject to mandatory detention under 8 U.S.C. §§ 1225(b), 1226(c), & 1231(a)(5), but nevertheless received bond hearings pursuant to the *Franco-Gonzalez* permanent injunction after six months of detention. Immigration judges released several numerous such clients on bond or conditional parole. Separately, it is within the discretion of the Department of Homeland Security to release people

who are otherwise subject to mandatory detention, as I have seen them exercise

this authority on more than one occasion.

4. While employed at FIRRP, I also regularly handled appeals before the BIA in

both Franco/NQRP cases and in other removal cases. Additionally, through my

prior duties at FIRRP under the Legal Orientation Program, which provides legal

support to pro se litigants, assisted dozens of other respondents in removal

proceedings with the process of filing their own appeals. Virtually all of these

were matters involving detained respondents.

5. In my experience, the BIA frequently suspends the prescribed the regulatory time

frames for adjudication and disposition of appeals, even in detained cases. The

BIA has the power to order supplemental briefing and oral argument, and may

hold appeals in abeyance pending the outcome of another relevant matter. I have

personally handled or been involved with three detained appeals where the BIA

ordered supplemental briefing. Moreover, I have observed that where there is a

dissenting opinion, the BIA has suspended the regulatory time frames.

6. I have represented, supervised, or supported at least three detained appeals

where the BIA took between 14 and 23 months to decide the appeal. These

include *In re V-P-,* Axxx-xxx-344 (BIA June 29, 2017); *In re D-M-R-,* Axxx-xxx-

524 (BIA June 9, 2015); and *In re O-V-M-,* Axxx-xxx-938 (BIA July 31, 2019).

There were three separate IJ decisions, and three separate BIA appeals in *In re

D-M-R-.* The first of the three appeals lasted approximately 23 months from the

date of the immigration judge's decision to the BIA's decision remanding the

matter. Because these cases are not available on Westlaw, I am attaching them
to my declaration.

7. I have also assisted approximately ten pro se respondents at the Eloy Detention
Center in Eloy, AZ, to file their detained appeals where I observed that the BIA
took between one and three years to decide the appeal. In those cases, the BIA
appeared to be holding the cases in abeyance pending a decision in *Matter of A-
R-C-G-,* 26 I&N Dec. 388 (BIA 2014), which addressed the viability of a particular
social group in relation to an asylum claim.

8. The immigration court in Aurora, CO, appointed me to represent Mr. Villegas
Castro in his removal proceedings pursuant to the NQRP. I first appeared on his
behalf on March 8, 2019, and requested a two-week continuance to review the
record of proceedings.

9. On March 22, 2019, I again appeared on Mr. Villegas Castro's behalf and
requested the opportunity to submit a successive asylum application based on
changed personal circumstances. The Department of Homeland Security ("DHS")
opposed the request, and the immigration judge ordered briefing by both parties.
Briefing was completed on April 8, 2019.

10. On April 23, 2019, at a master calendar hearing, the immigration judge
announced his decision allowing Mr. Villegas Castro to proceed on a successive
asylum application. He unilaterally adjourned the matter until May 17, 2019, to
allow Mr. Villegas Castro time to prepare and submit the application where no
continuance was requested. On May 17, 2019, I appeared with Mr. Villegas
Castro and submitted the application on his behalf; the immigration judge then

set a merits hearing date of August 21, 2019. Neither party requested a continuance, and the hearing went forward on that date. The immigration judge took the matter under advisement and issued a decision granting Mr. Villegas Castro asylum on September 16, 2019.

11. On October 7, 2019, the DHS submitted a Notice of Appeal from the immigration judge's September 16, 2019 decision. Thereafter, the BIA issued a briefing schedule with a deadline for both parties of December 10, 2019. On Mr. Villegas Castro's behalf, I timely filed a motion for summary affirmance of the immigration judge's decision on that date.

12. The DHS brief arrived at the BIA on December 11, 2019, and as it was untimely, the BIA rejected it. The DHS then resubmitted the brief on or about December 23, 2019. The DHS also filed a motion to amend its opening brief on or about December 20, 2019. On Mr. Villegas Castro's behalf, I filed oppositions to both motions on December 31, 2019. Neither party has submitted any additional briefs, motions, or other pleadings to the BIA as of this writing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is all true and correct to the best of my knowledge and belief.


 _s/ Charles J. Vernon_____                    Date: March 10, 2020

Charles J. Vernon, Esq.
Senior Staff Attorney
Rocky Mountain Immigrant Advocacy Network
7301 Federal Blvd Ste 300
Westminster, CO 80030

U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

_____

5107 Leesburg Pike, Suite 2000
Falls Church, Virginia 20530

Vernon, Charles
**Florence Immigrant and Refugee Rights Project**
**PO Box 654**
**Florence, AZ 85132**

**DHS/ICE Office of Chief Counsel - EAZ**
**P.O. Box 25158**
**Phoenix, AZ 85002**

Name: R█████, D████ M█████████          A ██████████

**Date of this notice: 6/9/2015**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

Enclosure

Panel Members:
Adkins-Blanch, Charles K.
Greer, Anne J.
Miller, Neil P.

taylert
Userteam: Docket

For more unpublished BIA decisions, visit
www.irac.net/unpublished/index/

Cite as: D-M-R- (BIA June 9, 2015)

Immigrant & Refugee Appellate Center, LLC | www.irac.net

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 20530

File: ██████████ – Eloy, AZ          Date:   JUN - 9 2015

In re: D████M██████████R████ a.k.a. Maria Merida Espinosa a.k.a. Susana Lopez

IN REMOVAL PROCEEDINGS

CERTIFICATION

ON BEHALF OF RESPONDENT:   Charles Vernon, Accredited Representative

ON BEHALF OF DHS:          Julie Nelson
                           Assistant Chief Counsel

CHARGE:

    Notice:   Sec.   212(a)(6)(A)(i), I&N Act [8 U.S.C. § 1182(a)(6)(A)(i)] -
              Present without being admitted or paroled

    Lodged:   Sec.   212(a)(7)(A)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(A)(i)(I)] -
              Immigrant - no valid immigrant visa or entry document

APPLICATION:  Asylum; withholding of removal; Convention Against Torture

    The respondent, a 52-year-old native and citizen of El Salvador, appeals from the Immigration Judge's March 3, 2015, decision denying her applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The appeal will be dismissed in part and sustained in part.

    This case has a lengthy procedural history culminating in the Immigration Judge's certification of her March 3, 2015, decision to the Board following the Board's remand directing the Immigration Judge to apply recent jurisprudence on the evolving issue of particular social group. [1] *See Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014), *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014), and *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014).

    The factual basis of the respondent's claim was set forth in the Immigration Judge's initial decision on September 15, 2011, and is not meaningfully disputed by the parties (9/15/11 I.J. Dec. at 4-6). The respondent was subjected to repeated and severe abuse by the man she lived with for more than 15 years. The couple eventually had 5 children together, who were also abused. The respondent did not own any property or have money, and was afraid to call the police. The respondent testified that she knew of other women who were trapped in similar relationships.

---

[1] There are three separate decisions from the Immigration Judge, which are identified by date when cited.

In 1996, the respondent first left El Salvador for Mexico.  For 3 years, she returned to El Salvador each month because her children were still there and she was trying to bring them to Mexico.  She described recurring problems with her partner when she made her return trips.  In March 2001, the respondent first entered the United States without inspection.  In 2005, she returned to Mexico because one of her daughters was sick.  Sometime later in 2005, she returned to the United States without inspection after several unsuccessful attempts.  In 2009, the respondent was returned to Mexico by immigration officials.  The respondent last entered the United States on November 15, 2009.  In May 2011, one of the respondent's sons told her that her former partner still intends to harm her.

An asylum application must be filed within 1 year of the applicant's last arrival in the United States.  *See* section 208(a)(2)(B) of the Act; 8 C.F.R. § 1208.4(a)(2); *Matter of F-P-R-*, 24 I&N Dec. 681 (BIA 2008).  In her September 15, 2011, decision, the Immigration Judge found that the respondent's May 5, 2011, asylum application was not timely filed within 1 year of her November 15, 2009, arrival date (9/15/11 I.J. Dec. at 9).  Although the respondent concedes that the record does not currently establish that she qualifies for an exception to the 1-year filing deadline, she seeks an opportunity to further address this issue before the Immigration Judge.

We conclude pursuant to our de novo review over questions of law that the respondent is ineligible for asylum under section 208 of the Act because she did not file a timely asylum application or establish that an exception applies.[2]  *See* 8 C.F.R. § 1003.1(d)(3)(ii).  The respondent has been in removal proceedings since 2011.  She did not challenge the 1-year bar finding in her initial appeal in 2011, and she has not advanced any arguments in the subsequent years that her failure to timely file was the result of changed or extraordinary circumstances.  Under these facts, we decline to remand for further consideration of the issue.  We therefore dismiss the respondent's appeal of the denial of her application for asylum.[3]

With respect to withholding of removal under section 241(b)(3) of the Act, the Immigration Judge found that the respondent met her burden of establishing that the harm she suffered rose to the level of persecution within the meaning of the Act, and that the Salvadoran government was unwilling or unable to control the persecutor in this case (9/15/11 I.J. Dec. at 11, 14).  We agree with the Immigration Judge's findings in these respects.  The critical issue here is whether the respondent defined a cognizable particular social group and if so, whether she was persecuted on account of her membership in that particular social group.  8 C.F.R. § 1208.16(b)(1).  The respondent has advanced numerous social groups during the course of these proceedings (3/3/15

---

[2]  Because the respondent is ineligible for asylum under section 208 of the Act, she is necessarily ineligible for humanitarian asylum.  *See* 8 C.F.R. § 1208.13(b)(1)(iii).

[3]  The Immigration Judge found that the respondent had not been convicted of a particularly serious crime barring her application for withholding of removal (9/15/11 I.J. Dec. at 14).  The DHS has not challenged this determination.

Cite as: D-M-R- (BIA June 9, 2015)

I.J. Dec. at 2). We will focus on the proffered social group defined as "El Salvadoran women in domestic relationships who are unable to leave."

We recently held that depending on the facts and evidence in an individual case, victims of domestic violence can establish membership in a cognizable particular social group that forms the basis of a claim for asylum or withholding of removal. *Matter of A-R-C-G-, supra.* In that case, we held that under the facts and evidence, "married women in Guatemala who are unable to leave their relationship" was a cognizable particular social group. We also recently clarified our particular social group jurisprudence. In doing so, we stated that an applicant seeking asylum or withholding of removal based on his or her membership in a particular social group must establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question (renaming the former concept of "social visibility"). *Matter of M-E-V-G-, supra*; *Matter of W-G-R-, supra.*

Here, the Immigration Judge found that the proposed social group "El Salvadoran women in domestic relationships who are unable to leave" was distinguishable from "married women in Guatemala who are unable to leave their relationship" because the respondent was not married to Jose (3/3/15 I.J. Dec. at 3). The Immigration Judge also found that the group was not defined with particularity and did not meet the social distinction test (3/3/15 I.J. Dec. at 4).

We disagree. First, we note that our decision in *Matter of A-R-C-G-, supra*, does not necessarily require that an applicant seeking asylum or withholding of removal based on domestic violence have been married to his or her abuser. Rather, we look to the characteristics of the relationship to determine its nature. Here, the respondent was in a lengthy relationship with her abuser, the couple had 5 children together, and the respondent tried to leave him on several occasions. These facts are similar to those in *Matter of A-R-C-G-, supra*, even though the respondent in that case was formally married to her abuser. We are thus satisfied that the respondent has established that members of her proffered social group share a common immutable characteristic of being women in domestic relationships that they are unable to leave.

We also disagree with the Immigration Judge's conclusory finding that the group is not defined with particularity (9/15/11 I.J. Dec. at 10; 3/3/15 I.J. Dec. at 3). The terms used to describe the group – "women," "domestic relationship," and "unable to leave" can be sufficiently particular in society, and we find them to be so here. *See Matter of A-R-C-G-, supra at 393.*

We also disagree that "El Salvadoran women in domestic relationships who are unable to leave" is not socially distinct. In her September 15, 2011, decision, the Immigration Judge found that there "is nothing from a social perspective that would distinguish the member from the rest of the population or cause others in the proposed social group to recognize herself as a member of the group" (9/15/11 I.J. Dec. at 10). Notably, the group analyzed in that decision was "poor women in violent relationships in El Salvador," not "El Salvadoran women in domestic relationships who are unable to leave." The Immigration Judge does not further discuss the issue of social distinction (formally "social visibility") in her November 29, 2013, decision. In her most recent decision, she held that "while the record suggests that victims of domestic violence are viewed as a distinct group within society, as evidenced by laws and programs enacted for the

3

benefit of such group, the respondent's group does not appear to be as socially distinct" (3/3/15 I.J. Dec. at 4). However, in our view, these facts found by the Immigration Judge support the proposition that the group is socially distinct. Moreover, the respondent testified that she knew other women in similar relationships and that it was normal in Salvadoran society to be trapped in bad relationships with no recourse from the police. Finally, the country conditions evidence cited by the respondent on appeal supports our conclusion that the group is socially distinct (Respondent's Br. at 20-21).

In light of the foregoing, we conclude that "El Salvadoran women in domestic relationships who are unable to leave" is a cognizable particular social group in this case. We further find the Immigration Judge's alternative determination that the group was not "one central reason" for the persecution to be clearly erroneous (9/15/11 I.J. Dec. at 11, 14; 11/29/13 I.J. Dec. at 3; 3/3/15 I.J. Dec. at 4-5). *See* 8 C.F.R. § 1003.1(d)(3)(i); *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007); *Matter of N-M-*, 25 I&N Dec. 526, 532 (BIA 2011) (a persecutor's actual motive is a matter of fact to be determined by the Immigration Judge and reviewed by this Board for clear error). The respondent's inability to leave the relationship in the broader context of Salvadoran society supports a nexus determination in this matter. *See Matter of A-R-C-G-*, supra at 394. We therefore conclude that the respondent suffered past persecution on account of a particular social group. Accordingly, the burden shifts to the DHS to establish that there has been a fundamental change in circumstances such that the respondent no longer has a clear probability of future persecution. 8 C.F.R. § 1208.16(b)(1)(ii). Alternatively, the DHS bears the burden of showing that internal relocation is possible and is not unreasonable (*Id.*).

The Immigration Judge made an alternative finding that even assuming that the respondent had established past persecution on account of a statutorily enumerated ground, the DHS met its burden of proof on both the changed country conditions and internal relocation issues (9/15/11 I.J. Dec. at 14-15; 11/29/13 I.J. Dec. at 3; 3/3/15 I.J. Dec. at 5). The Immigration Judge reasoned that the respondent had not been back to El Salvador for many years, and "there has been some change in country conditions pertaining to the treatment of domestic violence matters." (9/15/11 I.J. Dec. at 14-15) She further noted that the respondent's former domestic partner is now 59 years old, and the respondent has family members in El Salvador that could assist her.

We disagree with the Immigration Judge. In our view, these limited observations by the Immigration Judge are not sufficiently developed or linked to evidence in the record to support the conclusions she reached. Rather, based on the record, we conclude that the DHS has not met its burden of rebutting the presumption of future persecution or showing that internal relocation is possible and is not unreasonable. We therefore conclude that the respondent is eligible for the withholding of removal under section 241(b)(3) of the Act.

Accordingly, the following orders will be entered.

ORDER: The respondent's appeal of the denial of asylum under section 208 of the Act is dismissed.

FURTHER ORDER: The respondent's appeal of the denial of withholding of removal under section 241(b)(3) of the Act is sustained.

FURTHER ORDER: Pursuant to 8 C.F.R. § 1003.1(d)(6), the record is remanded to the Immigration Judge for the purpose of allowing the Department of Homeland Security the opportunity to complete or update identity, law enforcement, or security investigations or examinations, and further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h).

FOR THE BOARD

5



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

Vernon, Charles
Florence Immigrant and Refugee Rights
Project
PO Box 654
Florence, AZ 85132

DHS/ICE Office of Chief Counsel - EAZ
Eloy Detention Ctr,1705 E. Hanna Rd
Eloy, AZ 85131

Name: P    , V                                         ·344

Date of this notice: 6/29/2017

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

Cynthia L. Crosby
Deputy Chief Clerk

Enclosure

Panel Members:
Kendall Clark, Molly
Greer, Anne J.
Kelly, Edward F.

Userteam: Docket

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 20530

File:   A      344 – Eloy, AZ

Date:   **JUN 29 2017**

In re: V.    P

IN REMOVAL PROCEEDINGS

APPEAL AND MOTION

ON BEHALF OF RESPONDENT:   Charles Vernon, Accredited Representative

ON BEHALF OF DHS:        Danielle Sigmund
                         Assistant Chief Counsel

CHARGE:

| | | |
|---|---|---|
| Notice: | Sec. | 237(a)(2)(B)(i), I&N Act [8 U.S.C. § 1227(a)(2)(B)(i)] - Convicted of controlled substance violation |
| Lodged: | Sec. | 237(a)(2)(A)(ii), I&N Act [8 U.S.C. § 1227(a)(2)(A)(ii)] - Convicted of two or more crimes involving moral turpitude |

APPLICATION:   Asylum; withholding of removal; Convention Against Torture; special-rule cancellation of removal

This matter was last before the Board on October 31, 2014, at which time we granted a motion to remand for the respondent to appear before the Immigration Judge with counsel in the first instance. We found that the Immigration Judge had committed clear error in finding the respondent competent, and had rendered her decision without providing adequate safeguards. We vacated the Immigration Judge's decision, and remanded the record for further proceedings with the benefit of the qualified representative and any additional safeguards the Immigration Judge deemed necessary, including the possibility of administrative closure.

On remand, the Immigration Judge conducted de novo proceedings on the respondent's removability and eligibility for relief or protection from removal. After receiving additional testimony and evidence, the Immigration Judge issued a new decision dated September 1, 2015, in which she found that the presence of the qualified representative was sufficient to safeguard the respondent's rights and privileges in the proceedings,[1] and denied the respondent's request that

---

[1] As additional safeguards, the Immigration Judge accepted a new asylum application prepared by his representative without the respondent's signature (I.J. at 4; Exh. 61; Remand Tr. at 64), and permitted the respondent's representative to conduct limited direct examination of the respondent, received the respondent's proffered testimony, and accepted his fear of harm expressed therein as subjectively reasonable (I.J. at 5-6, 13-14).

A      344

she administratively close or terminate the proceedings (I.J. at 21-22).[2]  The Immigration Judge found that the DHS carried its burden of establishing the respondent's foreign birth (I.J. at 7-8; Exh. 52) and that the respondent did not rebut the presumption of alienage by showing that he automatically acquired United States citizenship pursuant to section 320 of the Immigration and Nationality Act, 8 U.S.C. § 1431, when either his mother[3] or his step-father[4] naturalized (I.J. at 8).

The Immigration Judge further held that the respondent was removable as charged under sections 237(a)(2)(B)(i) and 237(a)(2)(A)(ii) of the Act, 8 U.S.C. §§ 1227(a)(2)(B)(i), (A)(ii) (I.J. at 8-12).  Regarding relief or protection from removal, the Immigration Judge accepted the respondent's testimony as credible (I.J. at 13-14) and held that he established he suffered past persecution on account of a protected ground (I.J. at 16-17), but that the DHS had rebutted the resulting presumption of a well-founded fear of future persecution (I.J. at 17) and the respondent had not established that humanitarian asylum was warranted (I.J. at 17-18).  The Immigration Judge also denied withholding of removal under the Act (I.J. at 18-19), and protection under the Convention Against Torture (I.J. at 19-21).

On review, we are not persuaded to reverse the Immigration Judge's determination that the respondent is removable as charged under section 237(a)(2)(A)(ii) of the Act (I.J. at 10-12; Resp't Br. at 9-10, 17-24).  The Immigration Judge held that the respondent's two shoplifting offenses, in violation of ARIZ. REV. STAT. § 13-1805, were categorically for crimes involving moral turpitude ("CIMTs"), notwithstanding that the statutory language includes the word "deprive," which means a permanent or a temporary taking under Arizona law, because it was reasonable to assume the takings were with the intent of permanently retaining the merchandise, and because there was not a realistic probability of being prosecuted for a mere temporary taking.

On appeal, the respondent argues that the statute is overbroad as to the intent element because one may be convicted with an intent to effect a temporarily taking, that the statute is not divisible because an Arizona jury need not be unanimous as to the means by which a defendant demonstrated the requisite intent, and that the realistic probability test has been satisfied because the statutory language explicitly covers minimum conduct that falls outside the definition of a CIMT. During the pendency of the appeal, however, we addressed this question in *Matter of Diaz-Lizarraga*, 26 I&N Dec. 847 (BIA 2016).  We held that ARIZ. REV. STAT. § 13-1805, the precise statute of conviction at issue in this case, "defines a categorical crime involving moral turpitude despite the fact that it does not require the accused to intend a *literally* permanent taking." *Id.* at

---

[2]  For clarity, we note that all citations to the Immigration Judge's decision are to her most recent decision, dated September 1, 2015, and that all citations to the transcript are to the post-remand transcript.

[3]  The Immigration Judge found that the respondent's mother did not naturalize until after the respondent's 18th birthday (I.J. at 8).

[4]  The Immigration Judge found that the respondent's step-father naturalized 4 years before he married the respondent's mother and, moreover, that there was no evidence presented that he ever adopted the respondent (I.J. at 8 n.2).

A      344

852 (emphasis in original).  Accordingly, we affirm the Immigration Judge's removability finding
based on our precedential holding in *Matter of Diaz-Lizarraga.*

Because we affirm the Immigration Judge's determination that the respondent is removable as
charged under section 237(a)(2)(A)(ii) of the Act, we find it unnecessary to address the
respondent's appellate contention that his 2012 conviction for possession of drug paraphernalia
did not render him removable as charged under section 237(a)(2)(B)(i) of the Act because neither
the statute of conviction, ARIZ. REV. STAT. § 13-3415(A), nor the probation statute, ARIZ. REV.
STAT. § 13-901(H)(4), makes the specific controlled substance an essential element of the offense
(I.J. at 9-10; Resp't Br. at 8, 10-17).[5]

Regarding relief or protection from removal, the respondent concedes on appeal that the DHS
carried its burden of proof to rebut the presumption that the respondent has a well-founded fear of
future persecution on the basis of the original claim by showing there had been a fundamental
change in circumstances such that he no longer has a well-founded fear of persecution in
(I.J. at 17; Resp't Br. at 24). *See* 8 C.F.R. § 1208.13(b)(1)(i); *Matter of D-I-M-*, 24 I&N Dec. 448,
450 (BIA 2008).  He argues that the Immigration Judge should have granted him "humanitarian
asylum" in the absence of a well-founded fear because he established there is a reasonable
possibility that he may suffer other serious harm upon his removal to Poland (Resp't Br. at 24-34).
*See* 8 C.F.R. § 1208.13(b)(iii)(B); *Matter of L-S-*, 25 I&N Dec. 705, 713-14 (BIA 2012).

Under the facts and circumstances presented, we agree with the respondent that there is a
reasonable possibility he may suffer other serious harm upon removal to ‾            Resp't Br. at 27-
34).  *See Matter of L-S-, supra*, at 714.  The record reflects the respondent faces a reasonable
possibility of debilitation, homelessness, and victimization in :            .  He has severe mental health
issues and is "unlikely to receive the psychological intervention he needs to maintain stability" in
that country (I.J. at 6; Exh. 63, at 16).  He has a history of homelessness and unemployment in the
United States, and his risk of homelessness in            would be compounded by the fact that he
lacks family support, has not been to            since coming to the United States at the age of 2, has
a child's-level grasp of the            language and no written proficiency, and lacks any remaining
ties to that country (I.J. at 5, 16; Exh. 63, at 43).  Further, his strong subjective fear of returning
would add to his distress, the expert stated he would be at "extremely high risk for victimization,"
and the country conditions evidence indicates he may face abuse if imprisoned or inadequate care
as a person with disabilities in            (Exh. 63, at 16, 112-14; Exh. 64, at 1, 3-4; Tr. at 96-97).

Thus, on this record, we conclude the respondent has demonstrated there is a reasonable
possibility he may suffer other serious harm upon his removal to            , and has demonstrated
eligibility for asylum in the absence of well-founded fear of persecution.  While we in no way
condone the respondent's criminal history, which includes convictions for shoplifting and
possession of drug paraphernalia, in light of the reasonable possibility the respondent may suffer

---

[5] Because it bears on the respondent's eligibility for asylum, we separately note that the parties
and the Immigration Judge appear to agree that the respondent's paraphernalia conviction does not
constitute a particularly serious crime for purposes of asylum (Resp't Br. at 25 n.4).

3

A.        344

other serious harm upon his removal, we also conclude the respondent warrants humanitarian
asylum in discretion.  Accordingly, the appeal will be dismissed in part and sustained in part, and
the record will be remanded the record to permit the DHS to conduct the necessary background
investigation.[6]  The following orders will be entered.

ORDER:  The appeal is dismissed in part and sustained in part.

FURTHER ORDER:  Pursuant to 8 C.F.R. § 1003.1(d)(6), the record is remanded to the
Immigration Judge for the purpose of allowing the Department of Homeland Security the
opportunity to complete or update identity, law enforcement, or security investigations or
examinations, and further proceedings, if necessary, and for the entry of an order as provided by
8 C.F.R. § 1003.47(h).

FOR THE BOARD

Board Member Anne J. Greer respectfully dissents and would not find the respondent to merit
humanitarian asylum in the exercise of discretion.

---

[6] Although we need not decide whether administrative closure was appropriate in this case, we
are troubled by the Immigration Judge's apparent hostility to the respondent's discussion of
administrative closure as a safeguard, especially because we directed her to consider the possibility
of administrative closure in our October 31, 2014, decision (Board decision dated Oct. 31, 2014,
at 1; I.J. at 21-22; Resp't Br. at 34-39; Tr. at 22-26, 53-57, 64, 75-76).



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

Bradley, Elizabeth J.
**Florence Immigrant and Refugee Rights Project**
738 N. 5th Ave., Suite 103
Tucson, AZ 85705

DHS/ICE Office of Chief Counsel - EAZ
Eloy Detention Ctr,1705 E. Hanna Rd
Eloy, AZ 85131

Name: V.     M     O                              A          -938

**Date of this notice: 7/31/2019**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

Donna Carr

Donna Carr
Chief Clerk

Enclosure

Panel Members:
Liebowitz, Ellen C
Mullane, Hugh G.
Malphrus, Garry D.

MalikA
Userteam: Docket

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

File:   A        -938 – Eloy, AZ                              Date:

In re:  O     : V.          ' M'                                    JUL 3 1 2019

IN REMOVAL PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Elizabeth J. Bradley, Esquire

ON BEHALF OF DHS:   Elly Laff
                    Assistant Chief Counsel

APPLICATION:   Withholding of removal; Convention Against Torture

The respondent, a native and citizen of  .      ', has appealed an Immigration Judge's June 6, 2018, decision, denying his applications for withholding of removal under section 241(b)(3)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(A), and deferral of removal under the Convention Against Torture, 8 C.F.R. §§ 1208.16(c), 1208.18. The Department of Homeland Security ("DHS") filed a Motion for Summary Affirmance. On May 2, 2019, a three-member panel of the Board heard oral argument in this matter.   Both parties submitted supplemental briefs in advance of the oral argument. The record will be remanded.[1]

We review findings of fact determined by an Immigration Judge, including credibility findings, under a "clearly erroneous" standard. 8 C.F.R. § 1003.1(d)(3)(i).  We review questions of law, discretion, and judgment, and all other issues in appeals from decisions of Immigration Judges, de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

In 2007, the respondent was convicted of the offense of "Menacing Felony–Real/Simulated Weapon," in violation of section 18-3-206 of the Colorado Revised Statutes, for which he was sentenced to 3 years' imprisonment (Exh. 15, Tab A, at 5; Exh. 2c, tab R, at 90; IJ at 17).  Based

---

[1]   The record reflects that the respondent suffers from mental illness (IJ at 2; Exh. 2a).  The DHS issued a "Notice of *Franco-Gonzalez* Class Membership" (Exh. 2a), entitling the respondent to certain procedural protections, as set forth in *Franco-Gonzalez v. Holder*, 2014 WL 5475097 (C.D. Cal. Oct. 29, 2014) ("*Franco* Implementation Order"), the order further implementing the permanent injunction in *Franco-Gonzalez v. Holder*, 2013 WL 8115423 (C.D. Cal. 2013).  The Immigration Judge properly followed the procedures set forth in the *Franco* Implementation Order in assessing the respondent's mental competency (IJ at 2). The Immigration Judge concluded that the respondent is not mentally competent to participate in immigration proceedings without safeguards.  She insured that sufficient safeguards were implemented, including the appointment of a qualified representative, in compliance with the injunctions issued in the *Franco-Gonzalez* class action lawsuit (Exh. 2; Tr. at 18-19).  The respondent, who continues to be represented by counsel, does not contest this issue on appeal.

A        938

on an examination of the nature of the crime, the type of sentence imposed, and the circumstances and underlying facts of the conviction, the Immigration Judge found that this conviction was for a "particularly serious crime," rendering the respondent statutorily ineligible for withholding of removal (IJ at 17-19). Section 241(b)(3)(B)(ii) of the Act; *see also Matter of N-A-M-*, 24 I&N Dec. 336, 342 (BIA 2007); *see also Delgado v. Holder*, 648 F.3d 1095, 1107 (9th Cir. 2011) ("[A] crime is particularly serious if the nature of the conviction, the underlying facts and circumstances and the sentence imposed justify the presumption that the convicted immigrant is a danger to the community.").

As noted by the Immigration Judge, the respondent conceded, through counsel, before the Immigration Judge that the respondent is not eligible for asylum or withholding of removal (IJ at 16 n.8; Respondent's Closing Arguments, May 7, 2018, at 21-22; Respondent's Reply to DHS's Closing Argument, May 29, 2018, at 13). To the extent that the respondent contests the denial of withholding of removal on appeal (Respondent's Br. at 55-61), that issue is waived. *See Matter of J-Y-C-*, 24 I&N Dec. 260, 261 n. 1 (BIA 2007) (issues not raised below are waived on appeal); *Matter of Jimenez-Santillano*, 21 I&N Dec. 567, 570 n.2 (BIA 1996) (recognizing that we need not consider an issue raised for the first time on appeal).

The Immigration Judge also found the respondent to be not credible. Under the REAL ID Act, an adverse credibility finding must be based on consideration of the totality of the circumstances and all relevant factors, including the demeanor, candor, or responsiveness of the applicant, the inherent plausibility of the applicant's account, the consistency between the applicant's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record, and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim. Sections 208(b)(1)(B)(iii), 240(c)(4)(C) and 241(b)(3)(C) of the Act; *see also Matter of A-B-*, 27 I&N Dec. 316, 342 (2018).

The adverse credibility finding cannot be upheld as currently constituted, and the record will be remanded for further fact finding and analysis regarding the respondent's credibility.[2] In this regard, the Immigration Judge noted that the respondent failed to mention any fear of harm when apprehended by United States immigration agents in July 2014 and June 2015, despite allegedly experiencing years of persecution and torture in Mexico (IJ at 13-14). The Immigration Judge found it significant that the respondent instead chose to voluntarily return to Mexico on both occasions instead of seeking asylum in the United States. *Id.*; *see Loho v. Mukasey*, 531 F.3d 1016,

---

[2] The dissent criticizes us for remanding on this basis. However, the dissent does not opine whether the adverse credibility finding is sufficient based on the current record under the law of the Ninth Circuit. It also does not address all of the reasons we provide for determining that the adverse credibility finding cannot be upheld as currently constituted, including the Immigration Judge's failure to confront the respondent with certain inconsistencies as mandated by the law of this circuit. Our decision to remand comports with our limited ability to find facts on appeal and provides the opportunity for the Immigration Judge, as the finder of fact, to reassess credibility in the first instance in light of aspects of her decision which do not comport with Ninth Circuit law or otherwise warrant further consideration.

A        -938

1018 (9th Cir. 2008) (holding that Loho's two voluntary returns to her home country "inherently
undermines her testimony that she experienced past suffering or that she feared returning home"
and thus supported an adverse credibility finding).

However, the respondent did not voluntarily return to      ; he was removed from the United
States through the expedited removal process.  Moreover, there is no documentary evidence
establishing that he was asked about any fear of harm in Mexico on those two occasions
(Respondent's Br. at 15).  The July 30, 2014, Record of Deportable Alien does not mention
whether the respondent was asked about his fear of returning to     , or whether he was given
the opportunity to seek asylum (Exh. 18, Tab G, at 102-03), and the respondent expressly denies
that he was asked about his fear of harm in       (Tr. at 101).  Furthermore, there is no record
pertaining to the respondent's June 18, 2015 expedited removal.  Although the August 2015
Record of Deportable Alien indicates that the respondent had been previously removed pursuant
to expedited removal on June 18, 2015, there is no indication as to whether he was questioned
about his fear of harm in       on that occasion (Exh. 2c, Tab T, at 102).

The Immigration Judge also cites two apparent inconsistencies in the record regarding the
number of times that the respondent transported drugs for the cartel, and the number of arrests the
respondent experienced in       (IJ at 14).  On October 14, 2015, the respondent testified that
he transported drugs for the cartel "just once" (Tr. at 7; IJ at 14), yet the respondent later testified
that he was forced to transport drugs on numerous occasions over a period of several months (IJ at
14-15; Tr. at 93, 99, 211, 218).  However, the earlier statements about drug transportation were
made before a qualified representative was appointed pursuant to *Franco-Gonzalez v. Holder*,
2013 WL 8115423 (Exh. 2; Tr. at 18-19), and this was not expressly considered by the Immigration
Judge.  These two inconsistencies would not alone be adequate to support an adverse credibility
finding in this circuit.

Additionally, the Immigration Judge noted that the respondent stated in his August 13, 2015,
Record of Sworn Statement that he had never been arrested in any other country, which conflicts
with his asylum application and testimony that he was arrested and held in pre-trial detention in
   ` for 4 years (IJ at 14; Exh. 2c, Tab N, at 66; Exh. 17 at 5; Tr. at 61-75).  The Immigration
Judge also noted that in the August 13, 2015, Record of Sworn Statement, the respondent only
mentioned the harm he suffered and fears from the mafia and drug cartels and did not mention
harm from the      authorities (IJ at 14).  However, the Immigration Judge did not give the
respondent an opportunity to explain these discrepancies and omissions in accordance with Ninth
Circuit law. *See Shrestha v. Holder*, 590 F.3d 1034, 1044 (9th Cir. 2010) ("In order to ensure a
fair hearing, the immigration judge must not only identify specific inconsistencies, but also address
in a reasoned manner the explanations that the alien offers for these perceived inconsistencies.");
*Soto-Olarte v. Holder*, 555 F.3d 1089, 1092 (9th Cir. 2009) (Immigration Judges must offer the
petitioner an opportunity to explain the inconsistencies upon which the adverse credibility
determination is based).  She should provide the respondent with the opportunity to do so on
remand.

Moreover, the Board recently held that when deciding whether to consider a border interview
in making a credibility determination, an Immigration Judge should assess the accuracy and
reliability of the interview based on the totality of the circumstances, rather than relying on any

A.        -938

one factor. *Matter of J-C-H-F-*, 27 I&N Dec. 211 (BIA 2018). On remand, the Immigration Judge should accordingly assess the reliability of the interview, including the circumstances under which the respondent's specific statements were made. *Id.* at 214; *see also* IJ at 8-9; Tr. at 100-19; Exh. 18, Tab E.

On remand, the Immigration Judge should consider the totality of the record in assessing the respondent's credibility. *Shrestha v. Holder*, 590 F.3d at 1040. This includes any previous statements regarding his fear of returning to             , as well as the totality of his testimony before the Immigration Judge and any corroborative evidence.

The Immigration Judge should also reconsider her alternative decision denying the respondent's application for protection under the Convention Against Torture. The Immigration Judge concluded that even if the respondent was credible, he has not shown that it is more likely than not that he would be tortured at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity in Mexico (IJ at 19-28). 8 C.F.R. §§ 1208.16(c)(2) and 1208.18(a)(1); *see also Aguilar-Ramos v. Holder*, 594 F.3d 701, 705-06 (9th Cir. 2010); *Arteaga v. Mukasey*, 511 F.3d 940, 948-49 (9th Cir. 2007).

In 2009, the respondent was arrested by police in             for suspicion of homicide, and he was held in pre-trial detention in a prison with cartel members for 4 years (IJ at 20; Exh. 18, Tab I).[3] During his detention, he and other prisoners were stripped naked, forced to lay down on the cold ground, and were beaten with spring-loaded metal batons for 7 hours by federal police officers in an effort to obtain information regarding the location of firearms at the prison (IJ at 20; Tr. at 69-72, 241). The respondent also testified that he was beaten by federal police and military police on other occasions at the prison in an effort to make him confess that he worked for a cartel (IJ at 6; Tr. at 71-72).

For an act to constitute "torture" it must be "specifically intended to inflict severe physical or mental pain or suffering." 8 C.F.R. § 1208.18(a)(5); *Matter of J-R-G-P-*, 27 I&N Dec. 482, 484 (BIA 2018). The Immigration Judge found that the police in the prison were acting pursuant to a lawful sanction, namely to obtain information, and that the beatings therefore did not constitute torture (IJ at 20-21). 8 C.F.R. § 1208.18(a)(3) ("Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."). However, although the respondent's prolonged pre-trial detention may have been lawful, the prison and military officials who beat him and his fellow inmates for 7 hours and who beat the respondent on other occasions to elicit information and a confession as to cartel membership, clearly had a specific intent to inflict torture for an illicit purpose. Although "[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions," 8 C.F.R. § 1208.18(a)(3), we, as does the DHS on appeal, agree with the respondent that the mistreatment the respondent suffered in prison was not inflicted pursuant to lawful sanctions (DHS Supplemental Br. at 14 n.9). *See Vinh Tan Nguyen v. Holder*, 763 F.3d 1022, 1031 (9th Cir. 2014) (where the record reflects "that 'severe physical mistreatment' rising to the level of torture 'is a common occurrence' in Vietnamese custody, the pain or suffering that Vietnam is likely to inflict on Nguyen would not constitute a lawful

---

[3] A criminal court eventually determined that there was insufficient evidence to convict (IJ at 6).

A           ⌐938

sanction"). As we explained in *Matter of J-E-*, 23 I&N Dec. 291, 298 (BIA 2002), harm inflicted for an illicit purpose, such as "*obtaining information or a confession*; punishment for a victim's or another's act; *intimidating or coercing a victim or another*; or any discriminatory purpose," does not constitute harm arising from lawful sanctions (emphasis added).

To the extent that the Immigration Judge found that the harm experienced by the respondent at the prison did not rise to the level of torture given the lack of evidence that he sought medical treatment (IJ at 20), the respondent did testify that his back is scarred from the beatings (Tr. at 241). Moreover, the Ninth Circuit has held that the fact that a respondent did not require medical treatment is not necessarily fatal to a claim of persecution or torture. *Mihalev v. Ashcroft*, 388 F.3d 722, 730 (9th Cir. 2004) ("The fact that Petitioner suffered no serious bodily injury and required no medical attention makes the question [of persecution] closer. But it would be a strange rule if the absence or presence of a broken arm were the dispositive fact."); *see also Quan v. Gonzales*, 428 F.3d 883, 888 (9th Cir. 2005) (holding that using an electrically-charged baton on a prisoner may constitute persecution, even when there are no long-term effects and the prisoner does not seek medical attention).

The Immigration Judge also found a lack of sufficient state action or acquiescence in the harm inflicted at the prison, given that the national law prohibits arbitrary arrest and allows legal mechanisms to challenge one's detention (IJ at 22). However, the Ninth Circuit has held that uniformed, on-duty police officers and military officers are "'prototypical state actor[s]'" and constitute "public officials" for purposes of the Convention Against Torture. *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1079 (9th Cir. 2015). If a perpetrator is a public official, there is no need to address acquiescence. Therefore, the individuals who inflicted the harm at the prison were state actors.

The Immigration Judge also found that the harm suffered by the respondent at the hands of municipal police officers in 2014 and 2015, which included beating the respondent, detaining him, burning him with a car lighter, pointing guns at his head, and leaving him for dead in an abandoned warehouse (IJ at 8-9, 26; Tr. at 107-08, 115-17, 245-47), did not constitute torture (IJ at 26). The Immigration Judge further found that even if the respondent had established that these officers had tortured, or more likely than not would torture, the respondent, he failed to establish that the              government would acquiesce,[4] given the measures taken by the             government to combat corruption, improve security, and oppose drug cartels (IJ at 27-28). However, as recognized by the DHS in its supplemental brief, the Ninth Circuit has expressly rejected this argument (DHS Supplemental Br. at 22 n.13). In *Madrigal v. Holder*, 716 F.3d 499, 510 (9th Cir. 2013), the Ninth Circuit held that "if public officials at the state and local level in Mexico would acquiesce in any torture [petitioner] is likely to suffer, this satisfies [the Convention Against Torture's] requirement that a public official acquiesce in the torture, even if the federal government

---

[4] Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity. *Barajas-Romero v. Lynch*, 846 F.3d 351, 361 (9th Cir. 2017); *Garcia-Milian v. Holder*, 755 F.3d 1026, 1034 (9th Cir. 2014); *Ornelas–Chavez v. Gonzales*, 458 F.3d 1052, 1059 (9th Cir. 2006).

ʱ        -938

in Mexico would not similarly acquiesce." The Ninth Circuit reaffirmed this holding in *Barajas-Romero v. Lynch*, 846 F.3d at 362, holding that there is no "rogue official" exception under the Convention Against Torture, and that protection may be based on the actions of off-duty police officers, even where they were not acting in an official capacity, so long as they carried out the acts or knowingly acquiesced in the acts.

Turning to the respondent's fear of torture by the cartel, the Immigration Judge found that the respondent did not establish a clear probability that he will be tortured by cartel members with the acquiescence of a _____ overnment official (IJ at 22-26). The respondent testified that he was beaten, burned, and subjected to prolonged detention and forced drug trafficking by the Cartel in 2014 and 2015 in _____ (IJ at 13; Exh. 17 at 5; IJ at 13; Tr. at 81-99). Specifically, the armed cartel members kept the respondent and a group of other men imprisoned at gunpoint, and they beat or murdered those who resisted (IJ at 7; Tr. at 87-91, 93-96). The respondent testified that he was beaten, and that on one occasion the cartel members poured gasoline on his foot and set it on fire, causing permanent scarring (IJ at 7; Tr.at 91-93, 96; Exh. 18, Tab D, at 84-85). After 3 months, the respondent was able to escape (IJ at 8; Tr. at 96). However, the cartel located him, beat him again, and took him back to the compound (IJ at 8; Tr. at 98). He was forced to resume transporting drugs for them, under threat of death to himself and his family (IJ at 8; Tr. at 98-99). The respondent was able to escape again when he got separated from his group while transporting drugs. He turned himself in to border patrol officials and provided them with the drug cartel's transportation routes (Tr. at 99-100).

The Immigration Judge should further consider her finding that the harm suffered by the respondent at the hands of the cartel does not rise to level of torture (IJ at 23). *See Matter of J-E-*, 23 I&N Dec. at 302 (noting that "deliberate vicious acts such as burning with cigarettes ... may constitute acts of torture"). The fact that the respondent initially agreed to transport the drugs in exchange for passage to the United States does not negate the fact that if credible, he was later forced into captivity and forced to continue trafficking drugs (IJ at 22-23). Nor does the fact that the respondent was allowed on occasion to leave the compound to go to a nearby store negate the fact that he was held against his will under threat of death, beaten repeatedly, and set on fire by the cartel members. *Id.*

The Immigration Judge should also reassess, upon consideration of the totality of the evidence, her finding that the respondent did not establish a clear probability that the cartel would torture him if he returned to _____. *See Ridore v. Holder*, 696 F.3d 907 (9th Cir. 2012) (what is likely to happen to an alien upon removal is a factual question for the Immigration Judge). In particular, although the Immigration Judge acknowledged the widespread presence of the '_____ \ cartel (IJ at 23; Exh. 12, Tabs A-U), she found that the respondent could safely relocate within ¯_____ ¸, given that 1_____ "is a large country," and the cartel only harmed him in ¯_____ ¸ (IJ at 23). 8 C.F.R. § 1208.16(c)(2) (in deciding whether an applicant for CAT has satisfied his or her burden of proof, all relevant evidence, including but not limited to the possibility of relocation within the country of removal, must be considered); *Maldonado v. Lynch*, 786 F.3d 1155 (9th Cir. 2015).

However, Dr. Jeremy Slack, whom the Immigration Judge found to be "a credible expert witness" regarding "conflict in ₁_____ as it relates to drug trafficking" (IJ at 16), concluded that the respondent faces a great risk of torture because he will be easily identified by cartels due to his

6

A      -938

tattoos, and because he escaped and attempted to report the cartel to the police (Tr. at 149-50).  In
Dr. Slack's opinion, there is almost a "100 percent" certainty that the cartel would find out about
his reporting attempts (Tr. at 150), and "more likely than not" that the respondent would be tortured
before he could leave ̄       to relocate (Tr. at 151).  He explained that the cartels have a network
of informants across the country who report on individuals entering their territory, especially those
with tattoos (Tr. at 152).  Moreover, he stated that "there is organized crime in practically every
part of       ̕" (Tr. at 179), and he found it "extremely likely" that even if the respondent is able
to move to another state, word will get back to the      ̦ cartel of his presence (Tr. at 152), or
rival cartels in those areas would likely interrogate and torture the respondent to found out which
cartel he works for (Tr. at 153).  In other words, according to Dr. Slack, the respondent would not
be safe anywhere in  ı      ̦, because of his past interactions with the cartel and his physical
appearance (Tr. at 77).

     The Immigration Judge gave little weight to Dr. Slack's opinion, noting that it was based
primarily on "an ethnographic survey of 1200 participants … based entirely on uncorroborated
stories told by people Dr. Slack encountered" (IJ at 23; Exh. 18, Tab A; Tr. at 131-33).  However,
an Immigration Judge must "state[ ] reasons in the record why the [expert] testimony was
insufficient to establish the probability of torture necessary to grant CAT relief." *Cole v. Holder*,
659 F.3d 762, 772 (9th Cir. 2011).  Dr. Slack testified that "ethnography is considered the gold
standard in my field for studying things like drug cartel activities, violence, and drug trafficking,"
explaining that "spending time in very hard-to-access areas with very hard-to-access populations
gives much more information that one could get with government statistics or survey data" (Tr. at
133).  Furthermore, Dr. Slack has published 19 scholarly articles and two books on the topic, and
his credentials were not questioned at the hearing (Tr. at 133-34; Exh. 18, Tab A, at 2-3; 15-25).
Notably, the DHS did not challenge the qualifications of the expert below or on appeal, nor did
the DHS argue below or on appeal that the methodology employed by the expert in his studies was
flawed or constituted an inadequate basis to support his opinion.  Because the Immigration Judge
"failed to give reasoned consideration" to the expert's testimony or adequately explain her basis
for disregarding the expert's opinion, we will remand the record for further consideration of the
expert's testimony.  *Id.* at 773.

     In assessing the likelihood that the cartel would find the respondent and torture him upon his
return to  ̦     , the Immigration Judge should also consider that after the respondent previously
escaped from the cartel, the cartel located him in  .         a city 200 miles away from the
cartel's compound in      ̧̕ (IJ at 8; Tr. at 98, 217).  They beat him, kidnapped him, and forced
him back into drug trafficking.  *See Barajas-Romero v. Lynch*, 846 F.3d at 364 (although a
petitioner bears the ultimate burden to prove he would be tortured if returned to his country, the
petitioner does not bear the burden to show that it is impossible to avoid torture by internally
relocating within a country).

     In addition, the Immigration Judge should revisit her determination that the respondent had not
established that the cartels acted or would act at the instigation of, or with the consent or
acquiescence of, a public official or other person acting in an official capacity in       (IJ at 24-

A⁻⁻     -938

26).  8 C.F.R. §§ 1208.16(c)(2) and 1208.18(a)(1).[5]  State involvement or acquiescence in torture, within meaning of the Convention Against Torture, may be established where police officials were corrupt, and worked on behalf of criminals or gangsters. *Barajas-Romero v. Lynch*, 846 F.3d at 351.  While ⌐      ⌐ is making efforts to address corruption and cartel violence, the Department of State Country Report in the record states that "[i]mpunity and corruption in the law enforcement and justice system remained serious problems" (Exh. 11, Tab B. at 185).  The report goes on to state that "[t]here were numerous reports the government or its agents committed arbitrary or unlawful killings, often with impunity.  Organized criminal groups also were implicated in numerous killings, often acting with impunity and at times in league with corrupt state, local, and security officials." *Id.*  Furthermore, Dr. Slack testified that the cartels have a close relationship with the government (Tr. at 137-38), and the Immigration Judge acknowledged that the country condition materials in the record attribute the ⌐       Cartel's infiltration throughout ⌐     as a result of its strong ties to the national government (IJ at 25; Exh. 12, Tab A, at 17; Exh. 12, Tab B, at 71; Exh. 13, Tab Q, at 228-30).  *See Madrigal v. Holder*, 716 F.3d at 510 (holding that the petitioner had a plausible CAT claim based on the ⌐ ⌐ government's inability to control the Los Zetas drug cartel where "[v]oluminous evidence" showed "that corruption of public officials in Mexico remains a problem, particularly at the state and local levels of government, with police officers and prison guards frequently working directly on behalf of drug cartels").

Moreover, if credible, the respondent's own encounters with the ⌐       ⌐ authorities support a finding of governmental acquiescence.  The record reflects that although the respondent made multiple attempts to report the abuse he suffered at the hands of the cartel, the authorities refused to protect him or investigate his claims.  In fact, as discussed above, on some occasions the authorities harmed the respondent.  For example, the respondent sought help at the city hall and at the local police station in ⌐   ⌐, where the authorities mocked him and refused to help him (Tr. at 103, 243). The military guards at the ⌐       checkpoint told him he needed to leave the area and refused to offer him any protection (Tr. at 104-05, 243-44).  The police in Santa Ana laughed at him, detained him overnight, then drove him outside the city limits and told him to go away (Tr. at 106-07, 244). When he sought help from the police in ⌐       ⌐, the police punched him, burned him with him with a cigarette lighter, and put him in a truck, which he was able to jump out of to escape (Tr. at 107-08, 244).  Finally, when he told the police in ⌐       ⌐s of his fear of harm from the cartel, they pointed guns at him, told him to lay down in their truck, took him to an abandoned warehouse where they left him for dead (IJ at 26; Tr. at 115, 117, 245).  *See Barajas-Romero v. Lynch*, 846 F.3d at 361 (acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity); *Garcia-Milian v. Holder*, 755 F.3d at 1034 ("Evidence that the police were aware of a particular crime, but failed to bring the perpetrators to justice, is not in itself sufficient to establish acquiescence in the crime. Instead, there must be evidence that the police are unable or unwilling to oppose the crime.").

---

[5] We note that, as acknowledged by the DHS, the Immigration Judge erred in a portion of her analysis by invoking the "unable and unwilling to control" standard which does not apply to claims under the Convention Against Torture (IJ at 25-26; DHS Supplemental Br. at 20, n.12).

A\        -938

The dissent, and to a lesser extent the DHS, attempt to argue that it is highly significant that the respondent failed to show that any public official had knowledge that the cartel members were harming the respondent "prior to any harm that he might have experienced" (DHS Supplemental Br. at 16-17). However, the controlling federal circuit in this case has repeatedly rejected this argument. *See, e.g., Madrigal v. Holder*, 716 F.3d at 509 ("Although the public official must have 'awareness' of the torturous activity, he need not have actual knowledge of the specific incident of torture."); *Cordoba v. Holder*, 726 F.3d 1106, 1117 (9th Cir. 2013) (same); *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1060 (9th Cir. 2006 (finding that the Immigration Judge "imposed a higher burden of proof than is permitted under CAT" by resting his decision "on the unwarranted premise that the only way a public official can have such awareness, and thus that the duty to intervene can arise, is if the applicant reports the alleged torture to him.").[6]

In light of the foregoing, the record will be remanded for further consideration of the respondent's credibility and eligibility for protection under the Convention Against Torture. The Immigration Judge should consider the aggregate risk of torture to the respondent from the various sources of harm he fears. *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015) (holding that Convention Against Torture claims "must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible [Convention Against Torture] claims."); *Cole v. Holder*, 659 F.3d at 775 (stating that the consideration of the risk of torture must "tak[e] into account all possible sources of torture").[7] Furthermore, in adjudicating the respondent's claim that he will be tortured on account of his mental illness, the Immigration Judge should consider our recent case in *Matter of J-R-G-P-*, 27 I&N Dec. 482, which involved a similar claim of an alien asserting that he would be arrested and either imprisoned or committed to a mental health facility in `       `, where law enforcement officials or mental health workers would have the specific intent to torture him. In remanding, we express no opinion on the ultimate outcome of these proceedings.

Accordingly, the following order will be entered.

ORDER: The record is remanded for further proceedings consistent with the foregoing opinion.

*Ellen Rubowitz*
FOR THE BOARD

---

[6] We note that the dissent states "the majority ignores the definition of acquiescence in the regulations." However, we are bound to follow the law of the Ninth Circuit in this case, and the dissent does not address the import of the cited cases and makes no effort to distinguish these binding cases.

[7] Insofar as the dissent asserts that the respondent has presented only two separate and distinct claims, the case law of the Ninth Circuit specifically instructs us not to treat a Convention Against Torture claim in this manner, but rather take into account all possible sources of torture. *See e.g., Cole v. Holder*, 659 F.3d at 775. The dissent does not dispute that if credible, the respondent was tortured by authorities in the past and by the cartel, as well being mistreated by police officers when he tried to report the cartel and seek police assistance.

9

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

File: A(        938 – Eloy, AZ                     Date:

In re: O   V       M(                                            JUL 3 1 2019

DISSENTING OPINION: Hugh G. Mullane

      Respondent has two separate and distinct claims for protection under the Convention Against Torture. The first relates to mistreatment he suffered in the /            .... prison during his pre-trial detention. The second relates to mistreatment he suffered at the hands of the            cartel. Leaving aside, for the moment, the Immigration Judge's credibility finding, the central question is whether the respondent has shown "that it is more likely than not that he . . . would be tortured if removed" to .       . 8 C.F.R. § 1208.16(c)(2). The majority remands for the Immigration Judge to reconsider the case, but they do so without adequately considering dispositive issues.

      The problem with the respondent's claim with respect to the mistreatment he suffered in the            prison is the unlikeliness of its recurrence. According to the Immigration Judge, the respondent was detained at             because he was charged with homicide (I.J. at 5). While the majority disagrees with the Immigration Judge about the severity of the harm and whether it was pursuant to lawful sanction, the majority does not dispute the Immigration Judge's ultimate finding that he will not be detained and tortured by '           law enforcement (I.J. at 21). The evidence of past torture is relevant (and important) to the question of future torture but there is no presumption of future torture. *See* 8 C.F.R. § 1208.16(c)(3)(i); *Maldonado v. Lynch*, 786 F.3d 1155, 1167 (9th Cir. 2015). Moreover, the Immigration Judge's factual findings relating to why the respondent is not likely to re-experience the mistreatment he suffered in Aquiles Serdan are not clearly erroneous.

      Future problems the respondent may experience with '         cartel is a different question. In order to prevail based on this claim, the respondent must show that the torture "is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). The question is whether a public official acquiesced to the mistreatment the            Cartel perpetrated against respondent. In analyzing this part of the respondent's claim, the majority ignores the definition of acquiescence in the regulations. The regulation says: "Acquiescence of a public official requires that the public official, *prior to the activity constituting torture*, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7) (emphasis added). The majority effectively reads out the "prior to activity constituting torture" requirement and relies on actions taken (and not taken) after the respondent escaped from the          cartel. *See* Maj. Op. at 8. This is contrary to the plain language of the regulations. *See Garcia-Milan v. Holder*, 755 F.3d 1026, 1034 (9th Cir. 2014)("Evidence that police were aware of a particular crime, but failed to bring the perpetrators to justice, is not in itself sufficient to establish acquiescence in the crime."); *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (9th Cir. 2004) ("Indeed, were we to follow this reasoning, a person could obtain CAT relief merely because he was attacked by a gang of neighborhood thugs whom the police were unable to apprehend."). The majority cites no evidence that government officials knew about the            cartel's activities at the ranch and breached their legal responsibility to stop it. Instead,

A        ·938

the majority points to the inadequacy of the assistance the local police provided to the respondent *after* he escaped the          cartel.

Turning to the Immigration Judge's adverse credibility finding, the majority indicates that it "cannot be upheld as currently constituted" (Maj. Op. at 2), but never concludes that the finding is clearly erroneous. An Immigration Judge's credibility finding is reviewed for clear error. 8 C.F.R. § 1003.1(d)(3)(i); *Matter of A-B-*, 27 I&N Dec. 318, 345 (A.G. 2018) ("Board failed to give adequate deference to the credibility determinations and improperly substituted its own assessment of the evidence."). The majority faults the Immigration Judge for describing the respondent's removal pursuant to expedited removal orders in 2014 and 2015, as "voluntary returns" where the Immigration Judge stated that they were removals (I.J. at 13) and merely used the phrase "voluntary returns" to indicate that respondent did not request asylum. The majority ignores the Immigration Judge's reliance on the multiple incident reports relating to the impermissible possession of tattoo equipment that undermine his claim that he will be a target in because of his tattoos (I.J. at 14). Furthermore, the respondent's inconsistent statement about the number of times he transported marijuana are deemed unreliable because one of the statements was made before a qualified representative was appointed, even though the statement was made to a different Immigration Judge, no case law prohibits such blanket exclusion, and the Immigration Judge considered the circumstances of the statements. The majority has strayed from the deferential standard of review we are obligated to afford an Immigration Judge.

For all these reasons, I would affirm the Immigration Judge.

Hugh G. Mullane

2