# EXHIBIT O

**APRIL 8, 2020 SUPPLEMENTAL DECLARATION OF SHALYN FLUHARTY**

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I have previously submitted a declaration to the Court in this matter. The facts presented in that declaration remain true and correct. The facts set forth below are based on my personal knowledge, and I can testify competently to them if called upon to do so.

2. As previously stated, I direct the Dilley Pro Bono Project (the "Project" or "DPBP") in Dilley, Texas. In this capacity I am familiar with ICE's practices and policies at the South Texas Family Residential Center ("STFRC") from December 2016 to the present time.

*DPBP's Efforts to Assist ICE in Facilitating the Prompt and Orderly Release of Families.*

3. ICE has been ordered to promptly release parents from the South Texas Family Residential Center by the court in *OMG v. Wolff,* 1:20-cv-00786, and children by Judge Dolly M. Gee of the District Court for the Central District of California. *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), Dkt. No. 740 (C.D. Cal. Mar. 28, 2020).

4. In an effort to assist ICE in facilitating the prompt and orderly release of families who have been detained in excess of 20 days at STFRC, Allison Herre, DPBP Managing Attorney, provided ICE with a list of all detained families known to DPBP who have been detained for more than 120 days on March 31, 2020 and for between 20 and 120 days, on April 2, 2020, by electronic correspondence. Each list included the name, location and phone number of the individual who is available to receive the family upon release. I have attached this information as Exhibit A to this declaration.

*DPBP's Efforts to Assist ICE in Identifying Medically Fragile Families.*

5. DPBP has also attempted to assist ICE in identifying families with medical conditions who are particularly vulnerable to COVID-19 contagion and harm. On March 24, 2020, DPBP provided ICE with a list of 30 individuals with known medical conditions, and on April 2, 2020, DPBP provided ICE with an additional list with a total of 42 individuals with known medical conditions. On April 8, 2020, DPBP provided ICE with a list of 46 total individuals with known medical conditions that remain detained. These lists are not

exhaustive; there are certainly additional individuals with medical conditions whose condition remains unknown to DPBP.

6. Of the 73 individuals with medical conditions identified in the three communications to ICE detailed above, 46 individuals remain detained as of April 8, 2020.

### *Survey of 46 Detained Families Regarding Conditions at STFRC.*

7. On April 2, April 3, and April 5, 2020, DPBP staff conducted surveys of 46 DPBP clients who are currently detained at STFRC. Surveys were conducted telephonically with detained individuals using a standardized form questionnaire.

8. Twenty mothers (43 percent of mothers surveyed) informed staff that either they or their children were experiencing symptoms of COVID-19, including loss of taste; high fever; new or uncontrollable cough; vomiting; shortness of breath; and/or diarrhea.

9. Thirty-nine mothers (85 percent of mothers surveyed) reported not having seen signs around the detention center instructing them what to do if they or a family member began presenting symptoms of COVID-19.

10. Thirty-five mothers (76 percent of mothers surveyed) reported they did not believe there was a medical professional available to answer their questions regarding COVID-19 at STFRC.

11. Forty-six mothers (100% of mothers surveyed) reported individuals who are detained at STFRC who develop symptoms indicative of COVID-19 subsequent to their arrival at the facility are not medically screened and that no one, to their knowledge, detained at the facility has been formally tested for COVID-19.

12. Twenty-nine mothers (63 percent of mothers surveyed) reported they have been aware of, seen, or come into contact with families that had recently arrived at the detention center.

13. Thirty-two mothers (70 percent of mothers surveyed) indicated that there were no restrictions on who could be outside their rooms at the same time, and many noted that large groups of individuals frequently gathered together.

14. Forty mothers (87 percent of mothers surveyed) indicated that families were made to wait in lines with more than 15 people; 16 mothers indicated that there were 50 or more individuals in that line.

15. Twenty-eight mothers (61 percent of mothers surveyed) reported that there had been recreational activities since March 30, 2020 that involved large groups of people, where they were not able to socially distance themselves from others.

16. Forty-three mothers (93 percent of mothers surveyed) reported they rarely, or never, have access to cleaning supplies at STFRC.

17. Twenty mothers (43 percent of mothers surveyed) reported they do not have regular access to Kleenex, 46 mothers (100 percent of mothers surveyed) reported they do not have access to masks, and 44 mothers (96 percent reported) they do not have access to gloves.

18. Twenty-three mothers (50 percent of mothers surveyed) reported that they have asked at least once asked for one of the following items, and been denied: soap, tissues, cleaning supplies, gloves, disinfectant wipes, hand sanitizer, laundry detergent, and face masks.

19. Thirty-five mothers (78 percent of mothers surveyed) reported that they share their sleeping area with at least one other family; 20 mothers stated there are 4 people in their room, 2 stated there are 5 people in their room, and two stated there were 6 people in their room.

20. Eighteen mothers (39 percent of mothers surveyed) reported they are not able to maintain a distance of at least six feet between them and the other individuals who sleep in their room.

21. Twelve mothers (26 percent of mothers surveyed) reported they have observed guards display symptoms indicative of COVID-19.

22. Fifteen mothers (32 percent of mothers surveyed) stated guards at STFRC do not maintain a distance of two meters from them (approximately six feet).

23. Thirty-three mothers (72 percent of mothers surveyed) stated individuals who recently arrived to STFRC are not grouped together or separated from others at the facility,

24. Forty-six mothers (100 percent of mothers surveyed) reported that they had a sponsor in the United States.

***Response to Video Footage of STFRC and Declarations Submitted by Michael Sheridan and Melissa B. Harper.***

25. I have read the Declarations of Michael Sheridan and Melissa B. Harper, both dated April 6, 2020, and reviewed the video of the South Texas Family Residential Center submitted to the court in the OMG case.

26. As detailed elsewhere in this declaration, many DPBP clients have provided DPBP with information that conflicts with Mr. Sheridan's declaration. The following information included in Mr. Sheridan's declaration, in particular, conflicts with repeated, nearly universal, reports from our clients:

   a. Families use communal bathrooms, which are not disinfected after each individual use;

   b. Families share tables in the dining hall with other families, and sit side by side with different families every day;

   c. Families continue to congregate in large numbers, including with more than 40 people at a time, like at church or in the gymnasium;

   d. Individuals who exhibit symptoms of COVID-19, such as cough, fever, body aches, diarrhea, and shortness of breath, are regularly not quarantined or placed into isolation;

   e. Individuals who report COVID-19 symptoms to on-site medical providers are not tested for COVID-19 or monitored;

   f. Living spaces are cleaned inconsistently and not regularly disinfected;

   g. Access to personal protective equipment and cleaning supplies is commonly not available to families; and

   h. Education regarding COVID-19 symptoms and prevention practices has been inconsistently provided, and not provided, to numerous detainees.

27. Over the last four years, DPBP clients have repeatedly reported limited access to medical care at STFRC, including long wait times to receive medical attention and being denied access to specialty and emergency care.  Mr. Sheridan states that there are 20 medical housing unit beds and six designated isolation rooms at STFRC. In my experience, the medical facilitates available at STFRC have consistently been insufficient to meet the medical needs of detained families. For this reason, I have reason to believe the medical facilities at STFRC would be insufficient to meet the needs of families infected by COVID-19 should an outbreak occur.

28. Mr. Sheridan declares that STFRC uses a cohort system, in which individuals who have been in proximity to other individuals who have tested positive for COVID-19 are segregated from other detainees for a 14-day period. Based upon the collective reports of DPBP clients, individuals in Customs and Border Patrol custody are not tested, or infrequently tested, for COVID-19. This cohorting strategy is therefore most likely ineffective in determining who has, or has not, had exposure to other individuals with COVID-19.

29. I have represented numerous individuals – mothers and children – who required emergency medical treatment at a hospital while detained subsequent to denied access to medical care at STFRC. Many of my clients reported their medical condition to the facility and sought medical assistance prior to hospitalization, which was denied. As a result, the medical condition became exacerbated, and in some circumstances, life threatening. Based upon this experience, I am gravely concerned by ICE's purported plan of treating individuals who test positive for COVID-19 at STFRC.

30. Mr. Sheridan's declaration fails to mention the number of ventilators available at STFRC, the number of COVID-19 tests that have been taken at STFRC, and the number of COVID-19 tests that are available at STFRC, should they be needed. I am not aware of anyone detained at STFRC being tested for COVID-19.

31. Mr. Sheridan repeatedly states that individuals who require medical attention not available at STFRC may be transported to a "local" hospital. The nearest hospital to STFRC – the Frio Regional Hospital - is located in Pearsall, Texas, approximately 20 minutes away. This hospital is small and unable to respond to most medical emergencies. In my experience, the Frio Regional Hospital is regularly used as a location of secondary screening, where medical professionals decide if emergency medical care is truly needed. If so, individuals are transported to a hospital in San Antonio, approximately 80 minutes away from STFRC.

32. Mr. Sheridan reports that a hand washing video is played for detainees at STFRC. We have interviewed large volumes of clients at STFRC regarding their access to COVID-19 education and hygiene education. To my knowledge, none of our clients have reported watching this video.

33. Mr. Sheridan states that ICE assesses whether or not a child is a flight risk or danger upon initial arrival to STFRC. I have never seen ICE release a child after this purported initial assessment based upon a finding that the child was not a flight risk of danger. Of the thousands of families DPBP has represented, families are released categorically (through often untimely) if they have been issued a Notice to Appear and detained in every other circumstance. The one exception to this rule is in rare circumstances in which ICE determines that an individual has a medical condition so severe they are not suitable to detention. It is my understanding that individuals who have a criminal record or purported criminal history are generally deemed unsuitable for placement at STFRC and not detained there.

34. Paragraph 15 of Mr. Sheridan's declaration states that the facility regularly tracks medical cases included on a medical "watch list". In my experience, DPBP frequently flags severe medical conditions of clients who are not on ICE's "watch list", but should be. This experience in hundreds of cases calls into questions ICE's ability to adequately identify cases that should be placed on the watch list for tracking.

35. It is clear from the video footage of STFRC and Mr. Sheridan's declaration that the procedures now implemented at STFRC – though insufficient – would be impossible to maintain if the population at STFRC grew.

36. Mr. Sheridan states that attorneys may visit with clients in-person if, and only if, they wear masks, eye protection, and gloves. However, as reported by the families detained at STFRC, CoreCivic staff, ICE officials, and contractors frequently do not wear these items at STFRC.

37. In reviewing the video footage provided to the court, there are numerous locations at the facility that were not recorded. To my knowledge, these spaces include, at minimum, the following: the facility entrance lobby, inside of the asylum office building, the asylum office lobby, the courtrooms, the courtroom lobby, the waiting area for asylum interviews that are conducted inside the court building, building 100, the location where individuals get medication, and the general grounds at the facility.

***Ongoing Violations of the Flores Settlement Agreement at STFRC.***

38. On April 5, 2020 the Dilley Project submitted a complaint to the Department of Homeland Security Office of Civil Rights and Civil Liberties with other non-profit organizations detailing the ongoing violations of the Flores Settlement Agreement at STFRC. A copy of the submitted complaint is attached to this declaration as Exhibit B.

39. ICE does not make individualized assessments regarding whether a child is a danger or flight risk prior to detaining the child as required by Paragraph 14 of the FSA. I am not aware of any child or parent with a history of absconding or criminal history who is currently detained.

40. ICE fails to honor the FSA's requirement that ICE apply a general policy favoring the release of children, as required by section VI of the FSA. Instead, and in violation of Judge Gee's repeated court orders, ICE maintains a categorical presumption of detention policy for children, based upon the procedural posture of their immigration case. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1065 (C.D. Cal. 2017) (citing FSA, ¶ 14).

41. ICE is prohibited from using a child's immigration status, or the procedural posture of their immigration case, to justify their detention. Nonetheless, the overwhelming majority of children who are currently detained at STFRC are in the process of seeking asylum in the United States. Some children are in ongoing expedited removal proceedings; some children have pending appeals before the Board of Immigration Appeals; some children have pending Motions to Reopen with the Immigration Judge; and some children have pending claims before a federal court challenging the legality of the laws and procedures applied to them during their asylum process. None of these children have final orders of removal and none of these children may be removed from the United States at this time.

42. STFRC is a secure unlicensed facility in violation of paragraphs 11 and 19 of the FSA. *Flores v. Sessions*, 394 F. Supp. 3d at 1070.

43. Under these paragraphs, children may not be detained in a facility that is unlicensed or secure and must always be detained in the least restrictive setting.

44. ICE has failed to provide the children detained at STFRC with a notice regarding why they have been deemed to be a flight risk or danger as required paragraph 24C of the FSA. Although Judge Gee ordered the government to provide its justification for any and every child who remained detained at STFRC on April 6, 2020, the government has not

provided this information to any of the children who remain detained in Dilley, or to
DPBP, their counsel of record. *Id.*

45. Paragraphs 12A and 14 of the FSA require ICE to release children from detention without
unnecessary delay, in less than 20 days. On April 4, 2020, DPBP was able to calculate the
exact length of detention for 242 children who remained detained at STFRC. Of these
242 children, 231 of them (95%) had been detained in excess of 20 days. The average for
length of detention for these 242 children was 87 days, with: 109 children detained
between 21 and 50 days; 57 children detained between 51 and 99 days; 18 children
detained between 100 and 200 days; and 47 children detained for over 200 days.

46. There is unnecessary delay at every part of the process for families detained in STFRC.
By way of example, DPBP currently represents:

- A child who was detained for 25 days before his credible fear interview occurred;
- A child who did not receive a credible fear decision from the asylum office until
  24 days after his initial credible fear interview;
- A child who waited 122 days for a hearing with the immigration judge to be
  scheduled;
- A child who has been waiting for 63 days for removal to his home country,
  subsequent to the issuance of a final order of expedited removal; and
- A child whose negative credible fear finding was vacated by the Immigration
  Judge 48 days ago, on February 21, 2020 who remains detained as of April 8,
  2020.

47. Paragraph 18 of the FSA requires ICE to make and record prompt and continuous efforts
to release children in its custody. To my knowledge, ICE has not made a single effort to
release the children who remain detained at STFRC.

48. The FSA requires ICE to comply with all applicable state child welfare laws and
regulations. FSA Ex. 1A. ICE's ongoing detention of children also violates TEX. FAM.
CODE § 54.011(f), which prohibits the detention of children for the sole purpose of
deportation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 8, 2020 in San Antonio, Texas.


_____

Shalyn Fluharty

# EXHIBIT A
# IN SUPPORT OF
# DECLARATION OF
# SHALYN FLUHARTY
# TO BE FILED
# SEPARATELY
# UNDER SEAL

# EXHIBITS B-G
# IN SUPPORT OF
# DECLARATION OF
# SHALYN FLUHARTY
# ATTACHED HERE

# EXHIBIT B

 

April 5, 2020

Via Electronic Mail

Cameron Quinn
Office of Civil Rights and Civil Liberties
Department of Homeland Security
Washington, D.C. 20528

> **RE:** **Request for Investigation into the Prolonged Detention of Accompanied Immigrant Children in Violation of the *Flores* Settlement Agreement and Judge Gee's March 28, 2020 Order**

Dear Ms. Quinn:

Proyecto Dilley, ALDEA – The People's Justice Center ("Aldea"), and the Refugee and Immigrant Center for Education and Legal Services ("RAICES") (together, the "Legal Services Providers" or "LSPs"), submit this complaint (the "Complaint") on behalf of 341 accompanied children who are detained in the three Family Residential Centers in the United States: the South Texas Family Residential Center ("Dilley") in Dilley, Texas; the Karnes County Residential Center ("Karnes") in Karnes City, Texas; and the Berks Family Residential Center ("Berks") in Leesport, Pennsylvania (together, the "Family Detention Centers").

Complainants seek immediate investigation into their prolonged detention. Immigration and Customs Enforcement ("ICE") is detaining the children in secure, unlicensed Family Detention Centers in violation of the *Flores* Settlement Agreement ("*Flores* Settlement" or "FSA"). ICE unlawfully maintains a policy which categorically presumes detention for accompanied children and detains children for well over twenty days in blatant disregard for numerous orders issued by Judge Dolly M. Gee of the United States District Court for the Central District of California. *See Flores v. Barr*, No. CV-85-4544-DMG (AGRx), Dkt. No. 740 (C.D. Cal. Mar. 28, 2020) ("March 28, 2020 Order"); *Flores v. Sessions*, 394 F. Supp. 3d 1041 (C.D. Cal. 2017); *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015), *overruled in part and affirmed in part by Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016); *Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015). Complainants—like all accompanied children subjected to unjustified prolonged detention—must be released.

Investigation into Complainants' unlawful detention is urgent given the COVID-19 pandemic. Family Detention Centers are congregate care settings—veritable petri dishes for disease that do not allow for social distancing, adequate access to emergency medical care,[1]

---

[1] *See* Letter from Drs. Allen and Rich to Congress (Mar. 19, 2020), https://www.documentcloud.org/documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html.

appropriate sanitation and hygiene, or the provision of necessary personal protective equipment.

On March 28, 2020, in light of the COVID-19 pandemic, Judge Gee ordered ICE to immediately "make every effort to promptly and safely release Class Members in accordance with Paragraphs 14 and 18 of the [*Flores* Settlement] and the Court's prior orders."  March 28, 2020 Order at 15.  As of yesterday, April 4, 2020, Complainants remain detained.  They therefore request immediate investigation into ICE's failure to release them.

## I.      Complainants and their Legal Services Providers

This Complaint is submitted on behalf of 341 children[2] who are currently detained in violation of the *Flores* Settlement by five legal services providers who represent and support them:

> *Proyecto Dilley:*  Proyecto Dilley provides free legal services to mothers and children who are detained at the South Texas Family Residential Center in Dilley, Texas.  To date, Proyecto Dilley has represented 66,545 detained families through a volunteer-based pro bono model.[3]

> *ALDEA – The People's Justice Center:*  Aldea provides universal pro bono legal services to families detained at the Berks County Residential Center in Leesport, Pennsylvania and works to provide a holistic approach to meeting the multi-faceted needs of the immigrant community.  Since 2015, Aldea has represented thousands of asylum-seeking families detained in Pennsylvania and remote locations throughout the country.

> *Refugee and Immigrant Center for Education and Legal Services:*  The Refugee and Immigrant Center for Education and Legal Services ("RAICES") operates the Karnes Pro Bono Project, which provides pro bono legal services to the families detained at the Karnes County Residential Center in Karnes City, Texas.  RAICES has provided direct legal representation to over 15,000 families detained at Karnes since 2014, when Karnes first began to detain asylum-seeking families.

> *University of Texas at Austin School of Law, Immigration Clinic:*  The Immigration Clinic represents vulnerable low-income immigrants from all over the world before the immigration and federal courts and the Department of Homeland Security.  Since 2014, the Immigration Clinic has provided pro bono legal services for families detained at the Karnes County Family Detention Center in Karnes, Texas.

---

[2]  The children who submit this Complaint are identified by name and A# in Exhibit A.  Complainants are seven children detained at Berks, 103 children detained at Karnes, and 231 children detained at Dilley.
[3]  Proyecto Dilley was formerly known as the "CARA Family Detention Pro Bono Project" and the "Dilley Pro Bono Project."

*Catholic Legal Immigration Network (CLINIC)*:  CLINIC has protected the rights of immigrants in partnership with its network of legal immigration programs since its founding in 1988.   CLINIC advocates for the just and humane treatment of immigrants through direct representation, pro bono referrals, engagement with policy makers, Freedom of Information Act requests, reports, and federal litigation.

## II. ICE's Policy of Detaining Accompanied Children in Unlicensed, Secure Facilities for More Than Twenty Days Violates the *Flores* Settlement Agreement and Reflects a Flagrant Disregard for the Orders to Enforce Issued by Judge Dolly M. Gee.

For over twenty years, the *Flores* Settlement has set minimum conditions of detention for immigrant children and determined whether a child may be detained at all.  The *Flores* Settlement "creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards."  *Flores v. Lynch*, 828 F.3d at 901; *see also* FSA, ¶¶ 12A, 14.  Despite the legally-binding terms of the *Flores* Settlement, the Department of Homeland Security (the "Department") breaches its contractual duties to accompanied children by failing to:

- Maintain a "general policy favoring release," FSA, § VI;
- Conduct individualized assessments to determine whether a child poses a flight risk or danger to the themselves or others prior to placing them in detention, FSA ¶ 14;
- Hold children whose detention is justified in non-secure, state-licensed facilities, FSA, ¶¶ 19, 23;
- "[P]rovide minors not placed in a licensed program with a notice of the reasons for housing the minor in a detention or medium security facility," FSA ¶ 24C;
- "[R]elease [] minor[s] . . . without unnecessary delay" within twenty days, FSA ¶ 14; *Flores v. Sessions*, 394 F. Supp. 3d at 1070–71; and
- "[M]ake and record the prompt and continuous efforts . . . toward family reunification and the release of the minor," FSA ¶ 18.

The Department's refusal to comply with each of these provisions of the *Flores* Settlement endangers the welfare of the Complainants and all accompanied children who, as a result, languish in detention centers that jeopardize their safety and wellbeing. Investigation and intervention by the Office of Civil Rights and Civil Liberties ("CRCL") is therefore necessary and urgent.

3

**A. The Department's categorical detention of accompanied children, and failure to make individualized assessments regarding whether a child is a flight risk or danger to themselves or others, violates Paragraph 14 of the *Flores* Settlement and its "general policy favoring release."**

The primary guiding principle of the *Flores* Settlement is its "policy favoring release." FSA, § VI. The only circumstances under which a child may be held in detention are when the Department has made an individualized determination that the detention of the minor is required to (1) "secure his or her timely appearance before the [Department] or the immigration court," or (2) "ensure the minor's safety or that of others." FSA, ¶ 14. Absent such a determination, "the [Department] shall release a minor from its custody without unnecessary delay." *Id.*

Judge Gee has time and again reiterated ICE's obligation to promptly release accompanied minors in its custody. In June 2017, Judge Gee made it clear that *both* the *Flores* Settlement and the Department's own regulations require "a case-by-case assessment" of whether the minor poses a flight risk or danger to the community. *Flores v. Sessions*, 394 F. Supp. 3d at 1065; *see* FSA ¶ 14; 8 C.F.R. § 212.5(b). Most recently, on March 28, 2020, Judge Gee reiterated ICE's obligation to "comply with the unambiguous charge of the *Flores* Agreement to make *individualized* determinations regarding a minor's flight risk rather than blanket determinations." March 28, 2020 Order at 10 (quoting *Flores v. Sessions*, 394 F. Supp. 3d at 1067) (emphasis in original).

In direct contradiction to the requirements of the *Flores* Settlement, ICE maintains a policy which presumes detention for accompanied children at the Family Detention Centers. ICE does not make an individualized assessment regarding flight risk or danger for *any* detained accompanied child. Instead, every child placed in expedited removal proceedings who has not been issued a Notice to Appear and every child ordered removed in proceedings under section 240 of the Immigration and Nationality Act—notwithstanding an ongoing asylum proceeding or appeal—is detained. This policy coerces children to make an untenable decision: fight for protection from persecution while detained or abandon their claims for asylum.

ICE's current policy of detaining accompanied children throughout the expedited removal process and subsequent to the issuance of an order of removal ignores Judge Gee's ruling that ICE must make an individualized assessment for every child "notwithstanding the general mandatory-detention practice" in expedited removal cases. *Flores v. Sessions*, 394 F. Supp. 3d at 1066; *see* 8 U.S.C. § 1225. Judge Gee has made clear that the procedural posture of a child's immigration case—even when the child has an order of removal—does not "absolve [the Department] of their obligations under the *Flores* Settlement to make individualized determinations regarding a minor's risk of absconding." *Flores v. Sessions*, 394 F. Supp. 3d at 1065 (citing FSA, ¶ 14).

The Complainants have no criminal history and no history of absconding. ICE has never deemed them to be a flight risk or a danger to themselves of others, nor given them the protection of the individualized assessment they are due. Accordingly, ICE's decision to

categorically detain Complainants conflicts with the *Flores* Settlement's policy favoring release and is unlawful.  FSA, ¶ 14.

**B. Complainants' prolonged detention in unlicensed, secure facilities violates Paragraphs 11 and 19 of the *Flores* Settlement and its requirement that children be detained in the "least restrictive setting."**

Pursuant to the *Flores* Settlement, children who are determined to be a flight risk or a danger to themselves or others under Paragraph 14 may be "placed temporarily in a licensed program until such a time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier."  FSA, ¶ 19.  Even under those circumstances, ICE "shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that each setting is consistent with its interests to ensure the minor's timely appearance before the [Department] and the immigration courts and to protect the minor's well-being and that of others."  FSA, ¶ 11.

In 2015, Judge Gee determined that "according to the language of the Agreement, [ICE] must house children who are not released in a non-secure facility that is licensed by the appropriate state agency to care for dependent children."  *Flores v. Johnson*, 212 F. Supp. 3d at 877.  "The fact that the family residential centers cannot be licensed by an appropriate state agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement."  *Id.*  In 2017, Judge Gee "once again [found] that because the family residential centers are secure, unlicensed facilities, [ICE] cannot be deemed in substantial compliance with the Agreement."  *Flores v. Sessions*, 394 F. Supp. 3d at 1070.

It is undisputed that the three Family Detention Centers in Berks, Dilley, and Karnes are all secure and unlicensed.  *See id.* at 1068–69 ("Defendants do not dispute that the family residential centers continue to be unlicensed"; "Defendants do not dispute that the facilities are secure").  And for Complainants and all children that have never been determined to be a flight risk or a danger to others, detention in a secure, unlicensed facility is *not* the "least restrictive setting appropriate to the minor's age and special needs."  FSA, ¶ 11.  Therefore, ICE's choice to detain Complainants at the Family Detention Centers is unlawful.

**C. ICE's failure to provide Complainants—and all accompanied children—with notice as to why they have been placed in secure detention violates Paragraph 24C of the *Flores* Settlement.**

ICE is required to provide all "minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention" facility.  FSA, ¶ 24C.  The *Flores* Settlement provides for "judicial review of [the Department's] placement decisions," and therefore the Department is required to provide children detained at the Family Detention Centers—secure, unlicensed facilities—with an explanation for their detention in these facilities.  *Id.*; see *Flores v. Sessions*, 394 F. Supp. 3d at 1070 (finding, "once again," that the "family residential centers are secure, unlicensed facilities").

Complainants have never received this required notice.  The LSPs at all three Family Detention Centers have observed that the Department continuously fails to provide the children detained at Family Detention Centers with "a notice of the reasons for housing the minor in a detention" facility.  FSA, ¶ 24C.  In fact, none of the LSPs have ever seen a notice provided to any of their child clients.  Moreover, during a survey of 419 families detained in Dilley in early February 2020, 413 families reported never receiving notice as to why their children were detained in an unlicensed, secure detention facility in violation of Paragraph 24C of the *Flores* Settlement.[4]

The Department's failure to provide notice of its reasons for placing an accompanied child in a secure facility underscores what the LSPs know to be true:  the Department detains accompanied immigrant children without justification in violation of law.

### D.  ICE's refusal to release Complainants without unnecessary delay in less than twenty days violates Paragraphs 12A and 14 of the *Flores* Settlement.

The *Flores* Settlement requires that ICE "expeditiously process the minor" and "release a minor from its custody without unnecessary delay" to a parent, legal guardian, or other qualified adult custodian.  FSA, ¶¶ 12, 14.  Even when detention is justified, a child may only be detained "until such time as release can be effected in accordance with Paragraph 14 . . . or until the minor's immigration proceedings are concluded, whichever occurs earlier."  FSA, ¶ 19.

In August 2015, Judge Gee determined that the detention of accompanied children for more than twenty days was unnecessary and unacceptable.  Therefore, the Department— generally—may not detain a child for more than twenty days.  *Id.* at ¶¶ 12A, 14, 19; *Flores v. Lynch*, 212 F. Supp. 3d at 913–14.  Judge Gee found that the Department "routinely failed to proceed as expeditiously as possible," and, "in some instances, [was] still unnecessarily dragging their feet" when it came to the release of detained accompanied children.  *Flores v. Lynch*, 212 F. Supp. 3d at 913.

In 2017, Judge Gee again found that the Department failed to comply with its obligations under the *Flores* Settlement to promptly release accompanied children.  *Flores v. Sessions*, 394 F. Supp. 3d at 1071.  At that time, the Department was failing—as it is now— to release children from secure, unlicensed facilities without unnecessary delay.  *Id.* at 1070.  Judge Gee determined that a "significant number" of families in 2015 and 2016 were detained for over twenty days.  *Id.* at 1070–71.  Most recently, Judge Gee reminded ICE— "yet again—that 'hold[ing] minors in indefinite detention in unlicensed facilities, . . . constitute[s] a fundamental and material breach of the parties' Agreement.'"  March 28, 2020 Order at 10 (citing *Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018)).

---

[4]  Three individuals did not respond to this question.

"ICE [] must [] comply with the Agreement's requirement to release minors without unnecessary delay," within twenty days.  *Id.*  The data unequivocally shows that ICE is not in compliance.

### 1.  Overview of the Data Presented

In an effort to provide CRCL with data regarding the prolonged and unlawful detention of accompanied children, the LSPs have gathered and analyzed statistics regarding the length of detention of their child clients.  Although the Department's data—which CRCL should pull and analyze—will provide the most accurate picture of the Department's non-compliance with the *Flores* Settlement, the LSPs believe the statistics below confirm the reality that children are held well beyond twenty days, and in some cases, indefinitely.

To provide insight into the length of detention of children nationally, the LSPs at Dilley, Karnes, and Berks have reviewed the records of children detained at the Family Detention Centers as of yesterday, April 4, 2020.  On April 4, 2020, seven children were detained at Berks; at least 103 children were detained at Karnes; and at least 269 children were detained at Dilley.

Proyecto Dilley and RAICES have also aggregated the data collected during a survey at each detention center during a 24-hour snapshot in time, between January 31, 2020 and February 1, 2020.  During this period of time, there were, *at a minimum,* 403 children (65.4 percent of the total child population surveyed in Dilley and Karnes) between the ages of one and seventeen detained for over twenty days.[5]  One hundred and seventy-seven children (28.7 percent of the total population of children surveyed in Dilley and Karnes) were detained in excess of 100 days during the same period of time.

Karnes has capacity to detain up to 830 people.  On January 31, 2020, RAICES was aware of 119 individuals (56 families) who were detained at Karnes.  Due to the relatively low population in Karnes on January 31, 2020, RAICES believes the data collected reflects most, if not all, people detained at Karnes at that time.  The data presented herein is based upon the circumstances of all 56 families RAICES represented on January 31, 2020.

Dilley has the capacity to detain up to 2,400 mothers and children at any given time.  On February 1, 2020, there were approximately 1,200–1,400 mothers and children detained at Dilley.  Although the data pulled for this Complaint was collected from 419 families surveyed between February 1, 2020 and February 4, 2020, it aggregates the data of each of those families on the fixed date of February 1, 2020.  Given the large volume of families randomly surveyed, Proyecto Dilley believes the data collected accurately reflects the reality of all families detained in Dilley in early February 2020.

---

[5]  For purposes of the data presented herein, the date of initial detention is the date a child came into the Department's custody for the first time (for example, the date a child was apprehended by Customs and Border Protection, prior to the child's transfer to Berks, Karnes, or Dilley).

On April 4, 2020, all 341 Complainants had been detained for periods ranging from 21 days to 238 days. Complainants' already prolonged periods of detention will only increase unless ICE complies with its obligations under the *Flores* Settlement and Judge Gee's repeated orders to "make every effort to promptly and safely release Class Members." March 28, 2020 Order at 15.

### 2. Dilley

On February 1, 2020, a survey of 419 detained families (with 560 children) revealed an average detention period of 66 days—significantly over the twenty days prescribed by the *Flores* Settlement and Judge Gee's repeated court orders. *See Flores v. Sessions*, 394 F. Supp. 3d at 1070–71. This does not mean that children surveyed were released from detention after 66 days; rather, this data indicates that on February 1, 2020, on average children had been detained 66 days and had not yet been released. These families had spent between three and 180 days in detention.

Of the 419 families surveyed, the majority—275 families (373 children)—were detained for more than twenty days as of February 1, 2020 (65.6 percent of families surveyed at Dilley). Five of the children surveyed were infants just over a year old on February 1, 2020 who had spent over 100 days in detention. Two of those infants remain in detention today. There were at least 19 one-year-olds in detention on February 1, 2020, and 28 two-year-olds. Only 144 families, representing 32 percent of families surveyed, were detained for twenty days or less. Again, this does not mean that 32 percent of the families surveyed were released from detention within 20 days, but rather that they had been detained for less than 20 days at the time they were surveyed.

Of the 560 children surveyed at Dilley, 175 children (31.2 percent of children surveyed) had already been detained for over 100 days as of February 1, 2020.

As of April 4, 2020, Proyecto Dilley is aware of at least 493 detained individuals— including 269 children in 224 unique family units. Of these 269 children, Proyecto Dilley has been able to confirm the exact date of initial detention for 242 children. Of those 242 children, 231 children (95 percent) have been detained for over 20 days, with an average length of detention of 87 days.

Of the 231 children who have been detained in violation of the *Flores* Settlement, 109 children have been detained between 21 and 50 days; 57 children have been detained between 51 and 99 days; 18 children have been detained between 100 and 200 days; and 47 children have been detained for over 200 days. The Complainants detained at Dilley range in age from one to seventeen. Several of these children have celebrated birthdays at Dilley—in the last two months, one child turned two and another turned thirteen. The two-year-old has been detained for 210 days. The thirteen-year-old has been detained for 238 days—the longest period of detention for any child currently detained at the three Family Detention Centers.

### 3. Karnes

From approximately October 1, 2019 to February 18, 2020, Karnes detained fathers and their children.  Of the approximately 300 families detained at Karnes between October 1, 2019[6] and January 31, 2020, at least 238 of those families (or 79 percent) were detained for over twenty days in violation of the *Flores* Settlement.  Eight of those families were detained for over 100 days.

On January 31, 2020, RAICES was aware of 119 individuals (56 families) who were detained at Karnes.  The average length of detention of these families on January 31, 2020 was 35.7 days.  Of those 119 individuals, 63 were children, ranging in age from one to seventeen years old.  Thirty-one children (approximately 55 percent) had been detained for over twenty days, in violation of the *Flores* Settlement.

For the 31 children detained at Karnes for more than twenty days as of January 31, 2020, the length of detention varied greatly.  Eighteen children had been detained between 21 and 50 days; ten children had been detained between 51 and 99 days; and three children had been detained for over 100 days.  By way of example, the children surveyed included a one-year-old that had been detained for 85 days; a three-year-old that had been detained for 94 days; and a ten-year-old that had been detained for 168 days.  All three of those children celebrated their birthdays in detention.

On approximately February 18, 2020, Karnes began to detain entire nuclear family units:  mothers, fathers, and children.  As of April 4, 2020, there are at least 375 individuals detained at Karnes, at least 230 of which are children.  The Complainants detained at Karnes are the 103 children (within 73 family units) that have been detained for over 20 days.  These children are between seven months and seventeen years old and have been detained for an average of 47 days.

### 4. Berks

After a flurry of releases following federal litigation,[7] there are, as of April 4, 2020, seven children (within six family units) detained at Berks.  The Complainants detained at Berks are almost all infants and toddlers:  they are 16 months, 19 months, two, three, five, and eleven years old.[8]  The current average length of detention is 26.2 days, and this number continues to increase every day while children remain detained.

Historically, children in Berks have been detained in high volumes, indefinitely.  For example, on March 24, 2020, a girl was released after 166 days; on January 31, 2020, a boy

---

[6]  Immediately prior to October 1, 2019, Karnes was used to detain adults without children.

[7]  *See O.M.G. v. Wolf*, 1:20-cv-00786-JEB, March 30, 2020 Minute Order (D.D.C. Mar. 30, 2020) (applying the *Flores* Court's March 28, 2020 Order to all parents detained in the Family Detention Centers and requiring ICE to "make every effort to promptly and safely release" both minors and their accompanying parents who have been detained for more than twenty days); *see also* March 28, 2020 Order at 15.

[8]  The age of the last Complainant is unknown.

was released after 208 days; on March 31, 2020, a girl was released after 268 days; and in 2017, an eight-year-old boy was finally ordered released from Berks after he was detained for 707 days.[9]

### E. ICE fails to "make and record" efforts to release the Complainants—and all accompanied children—as required by Paragraph 18 of the *Flores* Settlement.

An initial finding that detention is necessary does not relieve the Department of its obligation to continue efforts to release a child from immigration custody. Pursuant to its contractual obligations under the *Flores* Settlement, the Department shall "make and record the prompt and continuous efforts on its part towards family reunification and the release of the minor." FSA, ¶ 18. ICE's duty to make documented efforts to release a child is ongoing until release has been accomplished or "until the minor's immigration proceedings are concluded, whichever occurs earlier." FSA, ¶ 19.

In August 2015, Judge Gee ordered the Department to comply with the *Flores* Settlement and "make and record prompt and continuous efforts towards . . . the release of" children. *Flores v. Lynch*, 212 F. Supp. 3d at 916. In June 2017, Judge Gee found that the Department had "all but concede[d] their failure to make and record efforts to release children in accordance with" Paragraph 14 of the *Flores* Settlement. *Flores v. Sessions*, 394 F. Supp. 3d at 1067. Despite this admonishment, the Department continues to fail in its obligation to document continuous efforts to release accompanied children.

The Complainants and their attorneys of record have never seen any evidence that the Department is "making and recording" efforts to release them from detention. In fact, the surveys of 560 children detained at Dilley on February 1, 2020, revealed that ICE did not make an individualized decision to detain any of the 560 children when they were initially placed in detention at a Family Detention Center, nor make any efforts to release them subsequent to the detention.[10] The LSPs assert that ICE has made *no* efforts towards the release of *any* detained accompanied child independent of ICE's application of a categorical policy of detention and release based only upon the procedural posture of a child's immigration case.

---

[9] *See* Renee Feltz, *Boy Detained 707 Days "Did A Little Dance" When Ordered Released From ICE Custody*, Rewire.News (Aug. 18, 2017), https://rewire.news/article/2017/08/18/boy-detained-707-days-little-dance-ordered-released-ice-custody.

[10] The overwhelming majority of families surveyed at Dilley—98.5 percent—reported never receiving any written explanation for why the children were being detained and could not be released. Similarly, 410 families (97.8 percent) reported never receiving even a verbal explanation for why the children were being detained.

**F.   The prolonged detention of children in violation of the _Flores_ Settlement causes and exacerbates documented physical and psychological harms.**

Detention in Dilley, Karnes, and Berks has been shown to have harmful effects on individuals detained there, even for short periods of time.[11]   Over a prolonged period of detention—as most families currently experience—these effects are significantly exacerbated.   Studies have confirmed that "detention negatively impacts mental health outcomes for refugee children, adolescents, and adults.   The marginalizing and restricting environment re-traumatizes asylum seekers, an already vulnerable population with a significant pre-existing history of trauma."   Physicians for Human Rights, _The Impact of Immigration Detention on Migrant Mental Health_ at 5.

Both LSPs and parents have observed significant deteriorations in the mental health of children detained in violation of the _Flores_ Settlement, as children struggle with anxiety, depression, and even self-harm.   For example, C.R.R. and her two children were detained at Dilley for 164 days.   C.R.R.'s son, V.G.R., who turned seven while in detention, fell into a deep depression.   Ex. D (Declaration of C.R.R.), ¶ 14.   After V.G.R. was hospitalized for a day and a half due to a severe asthma attack, C.R.R. watched her son's depression worsen after he caught a glimpse of the "outside world" on his way back to the detention center from the hospital.   _Id._ at ¶¶ 7, 13.   On his seventh birthday, V.G.R. told his mother that "if [they] didn't get a positive[12], he wanted to kill himself because he couldn't go back to Mexico."   _Id._ at ¶ 14.

LSPs at the Family Detention Centers have also spoken to many parents that have observed behavioral changes in their children while in detention.   For example, S.C.C., a Guatemalan father who was detained at Karnes with his ten-year-old son, described the changes he had seen in his son's behavior.   Ex. G. (Declaration of S.C.C.), ¶ 14.   After spending five months in detention—three months in Berks, and two months in Karnes— S.C.C.'s son began acting out and crying often, in large part because he was "convinced that [they] will remain in detention forever."   _Id._ at ¶¶ 14–16.   Similarly, C.S.M., a ten-year-old boy who was detained in Dilley for 139 days before being deported from the United States, described feeling "very sad" and "very depressed," and not wanting to get out of bed.   Ex. E (Declaration of C.S.M.), ¶¶ 5–6; _see also_ Ex. F (Declaration of E.M.R.).   C.S.M. also wrote, "I can't take being here anymore.   My heart is broken.   I feel like I am going to die here, and no one will care."   Ex. E, at ¶ 10.

---

[11]     _See_ American Immigration Lawyers Association, AILA Doc. 15062537 (June 25, 2015), https://www.aila.org/advo-media/press-releases/2015/impact-family-detention-mental-health/complaint-crcl; _Report of the ICE Advisory Committee on Family Residential Centers_, (Oct. 7, 2016), bit.ly/39BTHLg; Physicians for Human Rights, _The Impact of Immigration Detention on Migrant Mental Health_, PHR Issue Brief (Oct. 2018), https://go.aws/2SbHh74; Physicians for Human Rights, Letter to Sec. Kirstjen Nielsen Regarding the Detention of Infants (Feb. 2019), https://www.aila.org/infonet/complaint-urges-immediate-release-of-infants; American Academy of Pediatrics, _Recommendations for Preventive Pediatric Health Care_ (March 2019), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf.

[12]   In reference to a "positive" decision in his asylum proceeding.

The prolonged detention of children also exacerbates their ability to access necessary and adequate medical care.  Many families report that they are unable to access appropriate medical care at the facilities, the consequences of which are exacerbated when children are detained for weeks and months on end.  For example, S.C.M., a fifteen-year-old girl who has been detained in Dilley for 219 days, described her inability to access adequate medical treatment for her gastritis and her tachycardia.  Ex. B (Declaration of S.C.M.).  Despite repeatedly seeking medical treatment at Dilley for seven months for her gastritis and heart condition, S.C.M. was told "there are no medicines," that "there is nothing they can do for [her]," and that she should just "drink water."  Ex. B, ¶¶ 9–10.  O.H.G., a father detained at Karnes with his three-year-old son, described his son's worsening physical condition ever since their arrival at Karnes two months prior.  Ex. C (Declaration of O.H.G.).  O.H.G.'s son had a cough that "only worsened" as they remained detained, and they received limited help from medical staff at Karnes.  Ex. C, at ¶¶ 9–10.

These issues have been exacerbated by the COVID-19 pandemic.  While the pandemic ravages the world, Complainants and their parents are acutely susceptible to COVID-19 given their compromised immune systems, unaddressed pre-existing medical conditions, and their inability to access appropriate medical care while enduring prolonged detention in a congregate environment.[13]

## III.   Request for Investigation

Complainants seek immediate investigation into ICE's failure to comply with the terms of the *Flores* Settlement and refusal to abide by the orders issued by Judge Gee.  In particular, Complainants ask CRCL to:

- Review any and all Department training materials regarding the *Flores* Settlement to evaluate the appropriateness of their content and the frequency of their use;

- Review each Complainant's A file to assess whether CBP or ICE:  (1) individually assessed whether the child is a flight risk or danger to themselves or others; (2) provided the child with written notice of the reason for his or her placement in secure detention; or (3) made documented efforts to release the child;

- Analyze whether ICE's purported justification for detaining each Complainant complies with the terms of the *Flores* Settlement and Judge Gee's Orders; and

- Review statistics regarding the length of detention of accompanied children in each Family Detention Center and analyze how statistics have changed over time.

---

[13]  *See* Letter from Drs. Allen and Rich to Congress (Mar. 19, 2020), https://www.documentcloud.org/documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html.

12

IV.     **Conclusion**

Across the three secure, unlicensed Family Detention Centers in the United States, hundreds of children are being detained in violation of the terms of the *Flores* Settlement, which the Department is contractually obligated to honor, and in violation of Judge Gee's Orders on March 28, 2020, July 30, 2018, June 27, 2017 and July 24, 2015.  *See* FSA, ¶¶ 12A, 14.   ICE's duties under the *Flores* Settlement are not superfluous, but critical protections to the welfare of child class members.  Each additional day Complainants are detained in violation of law places them at risk of harm.  As their time in detention carries inexplicably on, Complainants—infants, toddlers, school-age children, and teenagers—are left to suffer the deterioration of their physical and mental health in a secure, unlicensed facility where they have been unlawfully kept for more than twenty days.


Respectfully submitted,


_____
Stephanie M. Alvarez-Jones, Esq.
Justice Catalyst Fellow
Proyecto Dilley

_____
Shalyn Fluharty, Esq.
Director
Proyecto Dilley


_____
Andrea Meza, Esq.
Director, Family Detention Services
RAICES

_____
Manoj Govindaiah, Esq.
Director of Litigation
RAICES


_____
Elissa Steglich, Esq.
Clinical Professor and Co-Director
Immigration Clinic
University of Texas, School of Law

_____
Denise Gilman, Esq.
Clinical Professor and Co-Director
Immigration Clinic
University of Texas, School of Law


13

Michelle Mendez, Esq.
Director, Defending Vulnerable Populations Program
CLINIC

Anna Marie Gallagher, Esq.
Executive Director
CLINIC

Bridget Cambria, Esq.
Executive Director
ALDEA – The People's Justice Center

14

## **EXHIBITS**

**Exhibit A**          List of Complainants

**Exhibit B**          Declaration of S.C.M. (Dilley)

**Exhibit C**          Declaration of O.H.G. (Karnes)

**Exhibit D**          Declaration of C.R.R. (Dilley)

**Exhibit E**          Declaration of C.S.M. (Dilley)

**Exhibit F**          Declaration of E.M.R. (Dilley)

**Exhibit G**          Declaration of S.C.C. (Karnes)

# EXHIBIT A

Redacted to protect Complainants' privacy

# EXHIBIT

# B

**Declaration of** ██████████████

I, ████████████████, under penalty of perjury that the following is true and correct to the best of my knowledge and recollection.

1. My name is ████████████████████ (A# ████████████). I was born on ████████. I am fifteen years old.

2. My mother and I fled Honduras in July 2019. If we go back to Honduras, I am afraid that the MS-18 gang will kill my mother and me.

3. I have been detained for almost six months. As of February 26, 2020, I will have been detained for approximately 185 days. I've been locked up in the South Texas Family Detention Center for approximately 182 days.

4. I am not doing well, either physically or psychologically. I have been suffering from a number of medical issues here, and I'm afraid something will happen to me while I'm locked up here.

5. I have a heart problem that causes me to have cardiac attacks where my heart beats really fast, I start sweating, I get very nauseous, and I feel like I'm about to pass out. I have had this problem for many years, but it has gotten worse since I have been in detention. I've had several of these attacks while I've been here.

6. My mother and I have been trying to get ICE's help for months. They finally took me to see a cardiologist last month, the cardiologist said he was worried about my palpitations and that he needed to keep seeing me. I have been given a type of monitor that is supposed to track when I have these attacks, but I'm still afraid that something will happen to me because it doesn't mean I will get medical help right away.

7. I also suffer from gastritis, and it has gotten much worse in the past few months because of the food here. I can barely eat anything because my stomach hurts so bad. When I do eat, I usually get really nauseous, throw up, and feel a burning in my chest.

8. I keep asking for medical help here. The doctors here gave me some pills, but they didn't do too much to help the pain. When I tell this to the doctors, they just tell me to "drink water" and that I'm fine. The doctors here randomly stop giving me these pills every few days. It doesn't feel like the pill has helped me at all.

9.  Whenever I go to the doctor, they tell me that there are no medicines that can help me and that there is nothing they can do for me.  Sometimes they give me ibuprofen, other times they tell me to drink water.

10.  Last week, I had another cardiac attack that made it hard to breathe and made me extremely dizzy.  When I went to the doctor to get help, all they did was tell me to "calm down."  They didn't even want to check my blood pressure.

11.  The pain in my stomach keeps me up at night.  There are times where I can't sleep for several nights in a row.

12.  I think they've forgotten the children here.  We are growing up in this jail and I'm going to carry this trauma with me my whole life.

13.  I don't know what's going to happen to me.  I'm afraid I might die here, but I would rather die here than in my country, because either way I fear I am going to die.  It seems like no one remembers that I'm a human, too.

I, ████████████████ swear under the penalties of perjury that the attached declaration
is true and correct to the best of my abilities.  This declaration was read back to me word for word
in Spanish, a language in which I am fluent.

████████████  _____

Signature ()

02-26-20

Date

I Stephanie Alvarez-Jones, certify that I am proficient in both Spanish and English.  I read
the declaration above in its entirety to ████████████████ in Spanish.

Signature

2-26-2020 .

Date

# EXHIBIT C

**Declaration of** ███████████████████████

I, █████████████████████████████, declare under penalty of perjury that the following is true and correct to the best of my knowledge and recollection.

**CONDITIONS IN CBP CUSTODY AND MY EXPERIENCE IN MPP WERE TERRIBLE**

1. I entered the United States with my 3-year-old son, ███████████████████, ████████████, seeking asylum after gangs in Honduras threatened to kill my family after they killed my brothers-in-law. We entered the US via the desert in June 2019 and turned ourselves in to a CBP officer that was patrolling the area.

2. There were three adults and three children. The officer treated us very badly. He put all six of us on the back of the Border Patrol car and we sat cramped the entire way. Since we had little room to move, my son sat on my lap. He was so tired that he fell asleep on the ride. The entire ride to the processing facility in El Paso, Texas took about an hour and a half. At one point, the CBP officer said in Spanish "Ya la entrada gratis a Estados Unidos se acaba. Ya van para Mexico" ("Your free ride in the United States is over. You're going to Mexico"). This made me scared but I felt resigned to do whatever the officers asked of me.

3. CBP officers took us for processing at a facility in El Paso, Texas. The conditions inside were horrible. It was very cold and cramped and we had to sleep on the floor. There were also many flies inside. I remember seeing how flies would rest on children's lips as they slept. I also remember how horrible the food was. We only got cold sandwiches and burritos to eat about twice a day. The food was not enough. I was not accustomed to that kind of fud but also it was not enough. Children would also get juice. Still, my son complained about the food and did not want to eat it. We spent about 3 days there. While there, an officer told us that our case would continue in Mexico and that from there, we would only be allowed back into the US to see the judge regarding our case.

4. When we arrived in Juarez, Mexico, as a result of MPP, with no shelter to stay in. Officers told us they had no room or shelters in Juarez for us and that we were on our own to find a place to stay. Luckily, a friend of mine I met in detention had already given me the number of another man he knew in Juarez that could rent my son and me a room. When we left the Juarez facility, I called the man and he picked us up about 3 hours later. We remained at his home for about 5 months while we attended court and worked on our case.

5. Due to a personal conflict between my landlord and another tenant, the police broke into the house, including the room I was staying in, and confiscated everything I owned, including my immigration documents and pass to enter the US for court.

6.  As result of the Mexican police confiscating my papers, I missed my third court notice. I
    was afraid that the US government would order me deported because I remember the
    Immigration Judge saying that I would be deported if I fail to attend court. Since I could
    not enter the US any longer because Mexican police took my documents, I re-entered the
    US to ask for another court date. This time, I was afraid to claim fear because I did not
    want to be sent to Mexico. I said that I was not afraid to return to Honduras and as a
    result, I was scheduled for deportation. I would rather return to my home in Honduras,
    than to run the risk of living in Mexico due to MPP.

7.  Upon re-entering, on November 27, 2019, CBP held us for another 3 days in CBP
    facilities, first in New Mexico and then in El Paso. The conditions in the New Mexico
    facility were better than in El Paso. In New Mexico, ████ and I got our own cell to sleep
    in with cushions to sleep on the floor. There were also fewer people there and we each
    received bottles of water to drink, which was better than drinking out of the jug of
    chlorinated water in El Paso.

8.  The day I was supposed to be deported to Honduras, ICE transferred us to Karnes County
    Residential Center ("Karnes"). An officer told me that they would transfer me instead of
    deporting me.

### THE HEALTH OF MY SON AND I HAS DETERIORATED SINCE BEING AT KARNES

9.  We arrived at Karnes on December 5, 2019. Since we arrived my son has been ill with a
    cold. He's developed a cough that has only worsened and has had high temperatures.

10. My son has also begun to show signs of severe bloating and has developed lots of gas
    since arriving in detention. I think the milk here is making him sick. I think that he may
    be lactose-intolerant. I have taken him to the medical center about 3 times (2 times for his
    problems breathing, and another for his stomach problems). The nurse only gave him
    Pepto-Bismol for his stomach problems but that did not help. She also gave him cough
    syrup for his cough, which helped. My son also does not sleep well at night because
    officers constantly slam the door when they perform headcount in the middle of the night.
    Additionally, our room door does not close all the way. As a result, the cold gets in at
    night, making the room too cold for ████ to sleep in. I told a GEO officer conducting
    headcount about the problem and he said he would be more mindful. However, since
    officers rotate, I don't think other officers knew about the problem and continued leaving
    the door ajar.

11. The food at Karnes is not appropriate or enough for children. We must wake children up
    at 6am so that they can eat. In Honduras, ████ would wake up around 8am and eat
    breakfast around 9am. I would give him formula milk and he would drink it all without
    presenting any stomach discomfort. I believe that my son's bloating problems stem from
    his poor diet at Karnes and possible lactose-intolerance. When children try to take a piece

of fruit outside of the cafeteria, the GEO officer there yells at them and throws the fruit away, even if they were just too full to eat it then. This happens almost daily. Officers prefer to see food go to waste than to feed the children. Many parents have complained to the GEO to report the officer. Since the report about two weeks ago, she has been better with us.

12. Since January 20, 2020, I have also begun to feel dizzy and have been vomiting. I have not felt this way before entering detention. When I spoke to the medical staff that day, the nurse gave me Pepto-Bismol and sent me away. She told me to return another day because the doctor was not in. When I got to my room, I began to feel dizzy again and ended up vomiting. I do not know why I feel this way. I have not returned to see the medical team since because I felt dismissed by the medical staff. They recommended I drink water and otherwise sent me away.

13. Lately, I have also been having active dreams at night. Over a period of three days, I dreamt profusely every night. I only know of one other detainee that has showed the same signs. He was a Garifuna speaker also from Honduras. I think this happens because of all we have been through. We're both constantly worried about our families back home and our children detained with us. When I told the mental health nurse about the dreams I was having, she said that there was nothing they could do but that I could join a group on Saturdays to talk about my mental health.

14. I am also developing pain in my kidneys as a result of not drinking enough water. I do not drink the water here because it tastes like chemicals. Many detainees do not drink the water for the same reasons. I find it unjust that we do not get clean water. I speak with other parents about how the water at Karnes harms us. I have noticed that the water makes me very itchy after I shower and that I have developed dandruff as result of showering here. I have never developed dandruff before being in detention.

### GEO OFFICERS MISTREAT US AT KARNES

15. GEO officers constantly yell at children while they play. One day, ████ was playing at jungle gym when the officer yelled at him "I have told you many times not to play here". He said that he did not want children falling and getting hurt but I disagree with how he yelled at ████ My son began to cry and ran to me. I had to take him to our room because he would not stop crying.

16. Another time, I was waiting in line at the cafeteria when my son found a toy on the floor and began to play with it. The GEO officer in the cafeteria—a short, heavy-set white woman in maroon GEO uniform—yelled at him that toys are not allowed there, to take it back to the other patio. I told her that the toy was already there. She said that that was not true and made us get out of line to return the toy. She often yells at detainees and their children. One day, a friend was waiting in line when he sat down on a chair while he

waited, she yelled at him saying "you cannot sit there!".

17. Another day, I was on my way to my room from breakfast when I saw another detainee, a
Haitian man, arguing with three GEO officers about how they throw the door when
conducting headcount at night. Although I am not sure how, GEO officers disciplined
him for his complaint. I did not see him for about 4 or 5 days. I though he had been
released but he was in isolation during the day while his 2-year old son remained in the
day care until nighttime when the Haitian man could return to his room and be with child.

### MY SON'S BEHAVIOR HAS CHANGED SINCE WE HAVE BEEN DETAINED

18. My son has changed since we arrived here. He does not want to walk on his own
anymore and insists that I carry him everywhere we go.

19. He is also struggling with his sleep. Even when he falls asleep he becomes restless and
moves a lot throughout the night. He did not move this much before being detained.
Especially this week, he has been so restless that I have been unable to sleep. He does not
feel safe here.

20. I want to release from detention with my son because we cannot stand being in detention
anymore. █████ no longer wants to eat; he is suffering. I don't care if I am deported, I
just cannot see my son suffer. I know how best to care for him, his eating patterns, what
milk he likes, and how he sleeps. I need to be released with him so that I can he can grow
healthy.

A#:_____ ▮▮▮▮▮▮▮▮

I, _____▮▮▮▮▮▮▮▮_____, swear under penalties of perjury that the above

declaration is true and accurate to the best of my abilities. This declaration was read back to me

in _____Spanish_____, a language in which I am fluent.

▮▮▮▮▮▮▮▮▮▮

Signature

_____02 / 13 / 2020_____
Date


## CERTIFICATE OF INTERPRETATION


I, _____Aramis Mundil_____, certify that I speak English and_____Spanish_____.

I read the foregoing in the_____Spanish_____language to ▮▮▮▮▮▮▮▮

telephonic interpreter in the_____and_____languages. The

interpreter read the foregoing in the_____language to_____

before the declarant signed it.


_____
Signature

_____02/13/ 2020_____
Date


2511 Texas 1604 Loop, #201
San Antonio, TX 78258
Interpreter Address


(855) 571-8342
Interpreter Telephone

# EXHIBIT

# D

**Declaration of ███████████**

I, ██████████████, under penalty of perjury that the following is true and correct to the
best of my knowledge and recollection.

1. My name is ████████████ (██████████).  I was born in Michoacan,
   Mexico.  I was born on ████████.  I came to the United States with my daughter,
   ███████████████ (███████████), who is twelve years old, and my son,
   ████████████ (A# ██████), who just turned seven.

2. I am seeking asylum in the United States because my family and I have been threatened
   by the Cartel Jalisco Nueva Generacion.  I fear they will kill me and my children if we go
   back to Mexico.

3. My children and I have been in detention for approximately 139 days.  As of February
   26, 2020, we have been detained in Dilley for 137 days.

4. My seven-year-old son has been terribly sick since he has been in detention.  He's had
   multiple severe asthma attacks and has a very hard time breathing at night.  The doctors
   here kept him overnight on one occasion because he was struggling to breathe.  Several
   weeks ago, my son had to be transported by ambulance to a hospital because he couldn't
   breathe.

5. I am terrified for my son's health.  He suffered from asthma in Mexico, but he has been
   getting consistently worse the past five months we have been in detention.  Even the
   doctors here have told me that being here is only going to make it worse.

6. I have also seen a terrible change in my son's mental health.  When my son was
   transported back from the hospital a few weeks ago, he saw the outside world for the first
   time after nearly five months in detention.  When he got back to the detention center, he
   fell into a deep depression.  I have never seen my son like this before.

7. My son has been crying uncontrollably.  And on the day of his birthday, after coming
   back from the hospital, he told me he would rather kill himself than return to Mexico.  He
   has said the same thing several times.

8. For the past several weeks, my son has stopped eating.  He barely sleeps, and when he
   does, he has nightmares.  He tells me that he has nightmares of dying or of being trapped
   in hell.  He never had those dreams before.

9.  A few days ago, my son started punching himself in the legs.  He was inconsolable and
    wouldn't stop crying.

10. My son has also started wetting the bed.  He hasn't done this in years.  And for the past
    several weeks, my son has also refused to go to school.  He also refuses to bathe.

11. My son has even started to yell at me and fight with his sister.  He wasn't like this before.
    He was a playful, calm boy.

12. It breaks my heart to see my son like this.  I don't know what to do.  I tried to get him
    help from the psychologists here, but they just gave him a book to color in.  I am terrified
    that he is going to try to hurt himself.  And I also know that he won't get better as long as
    we are locked in here.

I █████████████████████ swear under the penalties of perjury that the attached declaration
is true and correct to the best of my abilities.  This declaration was read back to me word for word
in Spanish, a language in which I am fluent.

██████████████████████            02 - 26 - 20
Signature                                         Date


I  Stephanie Alvarez-Jones , certify that I am proficient in both Spanish and English.  I read
the declaration above in its entirety to ███████████████ in Spanish.

_Stephanie Q. Alez_                              2-26-2020
Signature                                         Date

# EXHIBIT E

**Declaration of** ███████████████

I, ██████████████████████, declare under penalty of perjury that the following is true and correct to the best of my knowledge and recollection.

1. My name is ████████████████████ (████████████). I am ten years old. I was born on ████████████.

2. I am from El Salvador. My mom and I ran away from El Salvador because bad men were threatening to kill us.

3. I am detained in a center in Dilley, Texas. I have been here since October 16, 2019. Before that, I was detained for two days in a very cold place. I have heard people call it the ice box. It is a terrible place. They barely gave us any food there.

4. On February 18, 2020, I will have been detained for approximately 130 days. I will have been here at Dilley for approximately 128 days.

5. I am very sad here. I don't eat. I don't have energy. I feel very depressed.

6. I don't want to get out of bed in the mornings. I just want to lay there and cry. I cry every day.

7. I don't want to go to school. I had several friends here, and it made me happy to see them. But they've all been deported now. I miss them. There is no one for me to play with. I don't want to be here anymore.

8. I never liked being here, but I've been really unhappy for the last two months. I feel like there's no hope for my mom and me.

9. I can't be here anymore. I just want to be free. I want to eat a mango again. That's my favorite food, and I haven't had one in months. I want to see my dog again, too. His name is Ranger.

10. I can't take being here anymore. My heart is broken. I feel like I am going to die here, and no one will care. I am so sad for the sick children here. All I want is for someone to help us.

I, ██████████████████ , swear under the penalties of perjury that the attached declaration is true and correct to the best of my abilities.  This declaration was read back to me word for word in Spanish, a language in which I am fluent.

████████████████████          _____          2|18|2020
Signature                                                Date

I Stephanie Alvarez-Jones , certify that I am proficient in both Spanish and English.  I read the declaration above in its entirety to ████████████████ in Spanish.

_____          2|18|2020 .
Signature                                                Date

# EXHIBIT F

**Declaration of** 

I, ███████████████████, declare under penalty of perjury that the following is true and correct to the best of my knowledge and recollection.

1. My name is ███████████████ (███████████). I am from Ahuachapan, El Salvador. I was born on ███████████. I came to the United States on approximately October 14, 2019, with my son, █████████████████ (███████). He is ten years old.

2. I am seeking asylum in the United States because my son and I have repeatedly been threatened with death by members of the Mara 18 Gang.

3. My son and I arrived at the United States-Mexico border on or around October 14, 2019, and we were apprehended by CBP officers. We were then taken to the "ice box" and held there for two days until we were taken to the detention center in Dilley, Texas. We have been detained in Dilley, Texas since October 16, 2019.

**I have watched my son deteriorate while in detention.**

4. As of February 18, 2020, my son and I have been detained for approximately 130 days.

5. I have seen some big changes in my son's behavior since we have been in detention. He is no longer the ten-year-old boy I knew.

6. He used to be a happy and energetic boy. He loved to go to school and play with his friends. He was always smiling, and he loved to eat. Even when we first arrived in Dilley, he eagerly began to learn English. He was a wonderful student—even the teachers here in Dilley agreed.

7. He was so excited to see snow for the first time once we were released from detention. He would tell me often that he couldn't wait to build a snowman.

8. Now, all my boy does is cry. Starting in December, my son changed. He doesn't eat, and he doesn't want to go to school. All he does is stay in bed and cry. He is sad all the time. And because my son barely eats, he has lost a ton of weight.

9. I know he will leave this place psychologically scarred. It has changed him, and he is not the same boy he used to be.

10. It breaks my heart to see him like this and hear him cry all the time. I feel awful. I thought I was doing the best for my son, doing everything I could to protect him. Instead, this has hurt him more.

# EXHIBIT
# G

**Declaration of** ███████████████**, A** ██─██─█
**Regarding Prolonged Detention in Violation of _Flores_**

I, ███████████, A██─██─█, declare under penalty of perjury that the following is true and correct to the best of my knowledge and recollection.

## THE CONDITIONS IN CBP CUSTODY WERE INHUMANE

1. I entered the United States with my son, ███████████ (10 years old), in May 2019 seeking asylum after a group of men in Guatemala threatened to kill my family if. When we arrived at the Mexico-USA border, we decided to cross the river into the US in order to turn ourselves in to CBP. From there, CBP held us for about 8 days in three different processing centers. The conditions inside these facilities were inhumane.

2. We spent a few days inside the hielera or "ice box". It was very cold. This prevented us from even getting any sleep. Only children received thin aluminum sheets as blankets while adults had to suffer without them. Even though the officers never directly yelled at me or my son, they would yell at us as a group in English. I do not know what they said but they were not kind to us. The food inside the hielera was minimal. We each received one burrito and a fruit. Although neither my son or I got sick during our time there, we did see other people getting sick and throwing up.

3. I also did not drink the water because it smelled like bleach and chemical. I was afraid that the water would make me sick. I was also afraid that I would become dehydrated. The water at Karnes is the same. I only feel safe drinking bottled water because I know it's filtered but I do not have any money to buy it.

4. After being released from CBP custody, we moved to California to live with my sponsor. The lady we were staying with, however, was very strict and did not allow us to check the mail. As a result of this, we missed our court notice and court. Due to this, we were ordered deported and sent to Berks County Family Residential Center ("Berks") to be processed for deportation.

5. We entered Berks on or around August 16, 2019. In October 2019, we boarded a plane to return to Guatemala but when we arrived in Dallas, an ICE officer told me that my lawyer from Berks had submitted an appeal regarding my deportation and that my son and I would be returned to Berks. We spent about another month there before being transferred to Karnes County Family Residential Center ("Karnes") on November 25, 2019. We have been detained here since.

6. In total, my son and I have been detained for over 5 months. It is clear to me the effect detention is having on my son and on me.

7. For the most part, we were treated well at Berks. A few officers cared about our well-being, made sure we were taken care of medically, and respected my decision to not eat when I was not hungry. The same cannot be said for Karnes. Also, the food at Berks was better. They served us rice and beans. They also give us rice and beans at Karnes but it's often undercooked and raw. I do not feel comfortable eating food at Karnes.

8. Despite this, my son suffered mistreatment at the hands of his teacher at Berks. She would yell at the kids often. One day, she ordered my son move to another desk and when my son tried to get another chair but could not because it was too big, she yelled at him saying, "if you cannot do it, then leave it alone".

**GEO OFFICERS HAVE MISTREATED MY SON AND I AT KARNES**

9. Since arriving at Karnes, we have suffered much more from mistreatment at the hands of GEO officers. They are very rude to us, especially to my son. One day while my son was playing outside, an officer grabbed him by the hand and pulled him because my son was being indecisive about which team to join. The officer said: "If you do not want to play, then get out." Since my son began to cry, we went to our room.

10. Another time, a GEO officer saw children playing in the yard with a makeshift ball made from socks and he took it from them and threw it away. We thought he would return with an actual ball but he never came back.

11. Officer also often tell children that they cannot play on the jungle gym and they yell at them when they do.

12. One day, I was returning from my room with my kid because we went to use the restroom and when an officer saw me, he accused me of leaving my child alone, even though he was in front of us, and yelled at me: "Why are you not with your kid? Where is your kid? I have been watching you." I responded to him that that I have been with my child all along. Later that day, another GEO officer found me and told me that I was right, that he had been watching me too. However, he admitted that GEO officers are there "to yell at people".

13. We also suffer mistreatment when we go eat. The GEO officer there yells at us all the time. When I told her one day that I did not want to eat, an option I had at Berks, she yelled me, "You have to grab a tray. Throw it away if you want!". I felt bad that I would be wasting food because the officers forced me to grab it.

**MY SON'S BEHAVIOR HAS CHANGED SINCE ARRIVING AT KARNES**

14. Since being detained, I have seen how my son has changed. I think his behavior has changed because he's convinced that we will remain in detention forever. As a result, he does not respect me anymore. It used to be that I corrected him for his mistakes, and he

would listen to me, but now he does not respect my authority. For example, he now refuses to listen to me when I tell him to do his homework. When I offer to help, he says that he does not want my help. He did not used to be this way. He used to like school and like working with me on his assignment. I do not feel like I can tell him anything because I might make things worse.

15. I have also noticed that lately, he's been disrespecting and insulting his peers. This makes me sad because I did not raise him that way. I am afraid that this change in behavior will continue to affect our relationship even after we're released.

16. My son also cries often. He was not this way in Guatemala. He says that he wants to leave detention. He does not want to be in here another day.

17. Being in detention has also affected me. I constantly worry about seeing my son detained and worry about my family back home. I have been sleeping less and sometimes only get about an hour of sleep. This is made worse by the routine headcounts in the middle of the night. I feel like we're treated worse than dogs here. Dogs, at least, get happy whenever they are left to go out of their pen. We are held here with no way out.

A#: ████████████

I, ████████████████ , swear under penalties of perjury that the above
declaration is true and accurate to the best of my abilities. This declaration was read back
to me in _____Spanish_____ , a language in which I am fluent.

λ 0I / 2I / 2020
Date ████████████

X ████████████
Signature

## CERTIFICATE OF INTERPRETATION

I, __Aramis Mendez__ , certify that I am competent in the English and
_____Spanish_____ languages and that this interpretation was true and
accurate to the best of my abilities. I read the foregoing to
████████████ in _____Spanish_____ before they
signed it.

_____
Interpreter Signature

01 / 21 / 2020
Date

2511 Texas 1604 Loop, # 201
San Antonio, TX 78258
Interpreter's Address

(855) 571-8342
Interpreter's Phone Number