# Defendants' Exhibit 7

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>WILLIAM BARR, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,<br><br>　　　　Defendants. | Case No.: 2:85-CV-4544 DMG (AGRx)<br><br>District Judge Dolly M. Gee |

# **DECLARATION OF JALLYN SUALOG, DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT**

　　I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

　　1.　My position and experience are detailed in my declaration of April 3, 2020.

　　2.　I am submitting this declaration to provide some additional information in response to arguments raised for the first time in Plaintiffs' Reply regarding the Court's recent Order to Show Cause, ECF No. 754. In particular, I explain (a) the Office of Refugee Resettlement's ("ORR's") recent April 6, 2020 Field Guidance, (b) how ORR is addressing fingerprints and home studies in light of COVID-19, (c) why both home studies and fingerprints are essential to carrying out ORR's anti-trafficking mission, as directed by Congress in the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and finally, (d) ORR policy on minors subject to imminent removal.

　　3.　First, it is important to understand that, like many if not most institutions, ORR is responding to the rapidly-changing COVID-19 public health emergency on an ongoing basis. Because of the nature of this crisis, ORR necessarily and reasonably continues to put out guidance as the situation evolves, and as it gains experience with what is a worldwide event.

***COVID-19 guidance, including April 6, 2020 guidance.***

　　4.　All ORR guidance concerning COVID-19 prevention and infection control measures are adapted from CDC COVID-19 guidelines, with consideration of the congregate setting and programmatic requirements of the unaccompanied children program. The guidance is developed primarily by ORR's Division of Health for Unaccompanied Children ("DHUC"), with input from subject matter experts at the Centers for Disease Control and Prevention ("CDC"). Other ORR guidance related to COVID-19,

1

including release protocols and transit guidance, are developed by ORR's Division of Policy and Procedures and the Division of Unaccompanied Children Operations, with input from the DHUC. CDC also provides review and input when necessary.

5. The April 6, 2020 Field Guidance was thus cleared in this manner before it was released. The Field Guidance is designed to offer a flexible approach for ORR and its grantee care providers to address the threats posed by COVID-19, while still ensuring that children are released as expeditiously as possible and protecting the health of the minors in care, their families, and the public at large. Plaintiffs make several misstatements about this guidance to which I respond below.

6. ORR did not issue the April 6 Guidance due to pending litigation. Guidance in response to COVID-19 (including the April 6, 2020 guidance) has been under development regardless of pending litigation. If anything, the significant resources spent responding to the TRO in this case and others has detracted from ORR's ability to focus on other policy priorities, including COVID-19.

7. The April 6 guidance provides, in part, that "ORR may postpone release of a UAC to a sponsor: (a) If an ORR care provider facility . . . experience[s] one or more confirmed cases of active COVID-19 infection in either children or staff, releases are temporarily postponed for all children at the care provider facility . . . until ORR's Division of Health for Unaccompanied Children (DHUC) lifts the hold on releases or allows the release of specific children on a case by case basis following CDC recommendations."

8. The guidance places responsibility with the health professionals in the DHUC, and allows case-by-case releases. I understand that Plaintiffs have taken issue with this guidance, and instead recommend immediate release, without regard to a COVID-19 infection in the care provider.

9. I have discussed this concept with my Division of Health for Unaccompanied Children, which has advised that such a policy would not provide time to discern which children were potentially exposed to COVID-19 and therefore requiring quarantine to prevent further spread of the virus (the primary purpose of the pause in releases). Additionally, neglecting to take the time to discern which children were exposed to a case before releasing them could mean that children at higher risk of severe disease, such as those with certain preexisting medical conditions, would not be identified for more intensive medical monitoring.

10. The April 6, 2020 guidance also provides:"(b) If a sponsor or a member of the sponsor's household has an active COVID-19 infection, postpone release until a medical or public health professional determines it is safe to release the UAC to the sponsor household."  A footnote explains: "For COVID-19 patients who are not hospitalized, isolation may be discontinued if the CDC recommended isolation time has passed since symptom onset, or if 3 days have passed since

recovery/resolution of fever and improvement of symptoms. https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html. However, if other members of the household are quarantined and then go on to develop illness, the timeframe could be longer than 14 days."

11. This provision of the policy places decision-making authority with medical professionals. However, I understand Plaintiffs have taken issue with this provision in favor of a policy of immediate release. I have consulted with DHUC about such policy. DHUC advises that such immediate release, without considering whether an active COVID-19 infection exists within the household, and without first confirming with a medical or public health professional that release remains safe for the minor, would be against best public health practices for COVID-19.

12. Plaintiffs also point to information ORR provided in response to the Order to Show Cause reflecting a temporary hold on releases in New York. Such information, however, stems from a time prior to the April 6 Guidance, and reflects ORR judgment in order to best safeguard the safety of children in light of the multiple reports of widespread exposure in the state. As noted above, ORR originally issued a hold on March 25. After consultation with the New York State and New York City Departments of Health and the CDC, ORR resumed developed a set of criteria for discharges from New York and lifted the hold on April 3. Further, the criteria developed for New York was incorporated in the April 6 network-wide guidance to ensure safe and timely discharge of any UAC in ORR care during the COVID-19 pandemic. This guidance included that all children approaching age out must have a post-18 plan in place, which includes a recommendation for a non-secure placement, if appropriate. In the event a child is within 30 days of aging out and postponing release may result in their transfer to DHS/ICE custody, the FFS and Case Coordinator should be notified for further instruction.

*Fingerprints.*

13. With respect to fingerprints, I understand that Plaintiffs advocate for abrogating some fingerprint requirements to address COVID-19. COVID-19 has affected a number of digital fingerprint sites. Some such sites have reduced hours and some have closed. As a result, ORR directed care providers to mail fingerprint cards to applicant sponsors so that they could obtain ink-based prints and mail them for review. ORR is just beginning to learn of police stations and other locations not accepting fingerprinting appointments at this time. ORR, through the Program Support Center (PSC), has consulted with the Federal Bureau of Investigations (FBI) to find other options for sponsors to obtain the fingerprints necessary to run a full criminal background check. Notably, more immediate relatives and parent applicants are not ordinarily subject to a fingerprint check, unless there is a special concern (such as the minor is a victim of trafficking). But for more distant relatives, ORR reasonably takes additional precautions, and it is ORR's position that for these cases it is important to ensure that the sponsor does

3

not have a criminal record that will jeopardize the safety of the child. Such fingerprint background checks also accord with fingerprint checks for applicant foster care parents, including relatives who will act as foster parents (kinship guardians), within the child welfare system.

14. In spite of the challenges presented by COVID-19, from March 15 through April 4, 2020, discharge numbers for children in ORR care remained robust. During this period, minors in ORR custody were discharged daily, with fluctuations ranging from a low amount of 26 UAC to a high amount of 123 UAC discharged in a day.



15. ORR must retain the ability to balance the risk of releasing a child to a sponsor with a dangerous criminal background against potential risks of COVID-19 exposure. In my view, eliminating fingerprint checks on a blanket basis, due to the COVID-19 threat, would inappropriately endanger children. Certainly, there may be particular cases with individualized factors, and ORR has the authority to, and does, on a case-by-case basis, waive fingerprinting requirements. But, a blanket injunction would jeopardize children and undermine ORR's ability to fulfill Congress' directive that it protect children from "traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity."[1]

*Home studies.*

16. The same issues discussed above with regard to balancing potential risks would also apply to home studies, including discretionary home studies. Contrary to Plaintiffs' allegations, ORR has

---

[1] 8 U.S.C. § 1232(c)(1).

already allowed for virtual home studies where possible. Eliminating home studies on any generalized basis as a response to COVID-19, however, would undermine child welfare.

17. Under the TVPRA, home studies are required where: (a) the child is a victim of a severe form of trafficking in persons; (b) the child is a special needs child with a disability as defined by section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102); (c) the child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; or (d) the child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking, to the child based on all available objective evidence. As a matter of policy, ORR also requires a home study (e) before releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children; and (f) before releasing a child 12 years and under to a non-relative. Finally, care providers and case coordinators may recommend a home study, and the Federal Field Specialist will need to approve such recommendation.

18. ORR's policy has been developed after years of experience, including experiences where children were released to labor traffickers who sought to exploit the children, even after the children's parents in the home country had assured the care provider staff and signed declarations that the applicant sponsors were "family friends," who had lived for years as neighbors or family friends. The ability to allow a discretionary home study allows the care provider staff—the individuals with the greatest exposure to both the children and the applicant sponsor–the flexibility to use their professional judgment when further investigation is advisable. Similarly, protecting children 12 and under, and flagging unrelated applicants who have sponsored multiple children in the past, accords with protecting the welfare of the child, and ensuring ORR does not release to traffickers, smugglers, or those who would seek to exploit vulnerable children.

19. Home studies can be especially important in understanding whether an applicant sponsor has an undisclosed roommate or household member. While the applicant sponsor may believe that the roommate/household member is unthreatening, individuals who are not a threat to adults may nevertheless pose a grave risk to children. Eliminating some or all non-statutory home studies would, I believe, endanger children, and unnecessarily put children at risk.

*Imminent removals.*

20. Plaintiffs suggest that ORR holds children with removal orders, indefinitely. This is untrue. Indeed, the April 6, 2020 guidance states: "In the event a child has a pending . . . removal order, care providers work with their ORR/FFS to determine whether DHS/ICE plans to execute the order and initiate removal. If removal appears unlikely, evaluate the child for release following general ORR

5

policies and procedures." If, however, a minor in ORR care is to be imminently removed, as in a recent case in Maryland, ORR will work with ICE to ensure the minor appears for his or her scheduled removal. If, as in the recent case, it then becomes clear that the removal order will be reopened, appealed, or otherwise delayed, then ORR policy is for release to be pursued, in accordance with the TVPRA, ORR policy, and procedure.

I, Jallyn N. Sualog, declare under penalty of perjury that the foregoing and true and correct. Executed on April _9_, 2020.

_____
Jallyn Sualog