# Defendants' Exhibit 8

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES, *et al.*,

    Plaintiffs,

v.

WILLIAM BARR, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,

    Defendants.

Case No. CV 85-4544

District Judge Dolly M. Gee

## DECLARATION OF JUNE DORN, NATIONAL ADOPTION SPECIALIST, CHILDREN'S BUREAU, ADMINISTRATION FOR CHILDREN AND FAMILIES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

I, June Dorn, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

*Background and Qualifications*

1. I am currently the National Adoption Specialist for the Children's Bureau, an Office within the Administration for Children and Families (ACF), U.S. Department of Health and Human Services (HHS).

2. I have held the position of National Adoption Specialist at the Children's Bureau since July 2012. I received a Masters of Arts in Social Policy from the School of Social Service Administration at the University of Chicago in 1977. Prior to coming to the Children's Bureau, I worked for 30 years for the Illinois Department of Children and Family Services (IDCFS), the last 12 of which I served as the State Adoption Administrator. While working at IDCFS, I had responsibility for: the development and implementation of adoption and post-adoption policy; standards and programs for children in the child welfare system; recruitment, licensing and development of foster care and adoptive homes (kinship caregivers and non-relatives); the development and implementation of the Statewide Kin Guardianship Assistance Program; and statewide supervision of staff providing services to adoptive and guardianship homes. Throughout my lengthy career in child welfare, I have gained considerable experience in statewide permanency planning programs, including foster care and adoption, in addition to state policy and procedures, including those impacted by the Title IV-E program, the Child Abuse Prevention and Treatment Act, Safe and Stable programs, and the Adoption and Safe Families Act.

1

3.   As the National Adoption Specialist for the Children's Bureau, I ensure the effective and efficient development and implementation of overall strategies, and specific operational activities to identify and address issues, trends, and problems in the field of child welfare, particularly related to permanency planning and adoption. Specifically, I promote the leadership of the Children's Bureau in adoption through service and consultation to the Bureau, HHS, States, Tribes, national child welfare organizations and the general public.

4.   I also provide technical assistance in the area of adoption and child welfare, and stimulate program development by: (1) planning and implementing initiatives that promote the improvement of child welfare services; (2) writing analytical papers and memoranda which address key issues in adoption and child welfare; (3) working in partnership with and providing technical assistance to national organizations and other Federal agencies to promote the improvement of adoption and child welfare services; (4) conducting briefings of agency staff and senior officials on emerging issues in adoption and in child welfare; (5) providing technical assistance on adoption programmatic issues to Children's Bureau Central and Regional Office staff, Administration on Children Youth and Families (ACYF) staff, States, Tribes, grantees, non-grantees, service providers, local public and private agencies and other parts of the Federal government (e.g., HHS Office of Inspector General, Department of State, and General Accounting Office). I also serve as the Project Officer for grants, cooperative agreements, and contracts. In that role, I develop grant announcements, engage in application reviews, process awards, review required reports, provide assistance for timely problem resolution, and provide guidance on policy and methodological issues.

5.   In the course of performing my various duties, I review and am familiar with Federal laws governing practices in state child welfare systems that concern the vetting of kinship caregivers, foster parents, and adoptive parents.

6.   In addition to my personal knowledge regarding such Federal child welfare laws and the state practices that they govern, this declaration is also based upon other knowledge and information I obtained in the regular course of business throughout my career in child welfare, which spans nearly 38 years. This declaration is also based on certain ORR policies and procedures, as are described below, which I reviewed for purposes of comparison to parallel requirements in Federal laws that govern practices in state child welfare systems. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above-captioned case.

7.   I am submitting this declaration in order to describe how ORR's policies and procedures for vetting potential sponsors for unaccompanied alien children (UAC) in ORR federal care and custody

2

are consistent with parallel Federal laws governing practices in state child welfare systems that concern the vetting of kinship caregivers, foster parents, and adoptive parents.

8. The Children's Bureau administers the federal child welfare programs authorized under titles IV-B and IV-E of the Social Security Act and the Child Abuse Prevention and Treatment Act. It partners with federal, state, tribal, and local agencies to provide support and guidance for the well-being of children and families across the nation.

9. To carry out its mission, the Children's Bureau engages in the following activities: provides guidance on federal law, policy and program regulations; funds essential services, helping states and tribes operate every aspect of their child welfare systems; supports innovation through competitive, peer-reviewed grants for research and program development; offers training and technical assistance to improve child welfare service delivery; monitors child welfare services to help states and tribes achieve positive outcomes for children and families; and shares research to help child welfare professionals improve their services.

10. In my view, ORR's practices and requirements for evaluating the suitability of applicant sponsors (parents, other relatives, and non-relatives) prior to releasing UAC from care are consistent with parallel Federal child welfare laws that govern state practices for ensuring kinship caregivers, foster care providers, and adoptive parents are fit and appropriate placements for the children under their jurisdiction.

***ORR Policies and Procedures***

11. ORR's operational policies and procedures as articulated in ORR's UAC Policy Guide (ORR Policy Guide) and its UAC Manual of Procedures (ORR MAP) detail key steps necessary for the safe and timely release of UAC from federal care and custody, including the vetting of parents and legal guardians and other relative and non-relative sponsors. *See generally* ORR Policy Guide § 2 and ORR MAP § 2 (Safe and Timely Release from ORR Care).[1]

12. According to ORR Policy Guide Section 2.1, ORR evaluates potential sponsors' ability to provide for the child's physical and mental well-being, as required by law (*i.e.*, the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232(c)(3)(A)). ORR also protects children from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity.

---

[1] *See* ORR Policy Guide Sec. 2 - Safe and Timely Release Process, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2; Section 2 of the MAP, ECF 746-4.

3

13. ORR's sponsorship process and assessment criteria include: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks (which may include fingerprinting for certain sponsors), and in some cases home studies; and post-release planning. *See* ORR Policy Guide § 2.1 (summary of safe and timely release process); *see also* ORR Policy Guide §§ 2.2 (sponsor application process); § 2.4 (sponsor assessment criteria and home studies); § 2.5 (sponsorship assessment and background check investigations); and § 2.7 (recommendations and decisions on release).

***Similarities Between ORR and State Child Welfare Vetting Processes***

14. These practices, requirements, and timelines for evaluating the suitability and appropriateness of sponsors prior to releasing children from ORR's care, which involves the unique context of federal custody, are nonetheless consistent with general assessment processes in state child welfare programs that are governed by Federal child welfare laws. These laws include the Adoption and Safe Families Act (ASFA),[2] the Child Abuse Prevention and Treatment Act (CAPTA),[3] and model state licensing standards.[4]

15. Similarly, ORR's processes for the vetting of sponsors, while appropriately tailored to meet ORR's goals of the safe and timely release of UAC, are generally consistent with various state statutes on home study requirements for foster parents[5] or adoptive parents,[6] the placement of children with relatives,[7] and background checks for prospective foster, adoptive, and kinship caregivers.[8] These have been summarized and analyzed by the Children's Bureau.

---

[2] *See* State IV-E Plan requirements as set forth in ASFA, at 42 U.S.C. §§ 671(a)(10), (19), (20) & (36), including: § 671(a)(1) (requires states to have licensing standards reasonably in accord with "recommended standards of national organizations" and allows case-by-case waiver of non-safety standards for kin); § 671(a)(19) (requires states to consider giving preference to relative caregivers when determining child placements, provided that the relative caregiver meets State child protective standards); § 671(a)(20) (basic federal standard for background checks required for foster and adoptive parent licensing); and § 671(a)(36) (model federal licensing standards which states are encouraged to follow).

[3] *See* CAPTA, 42 U.S.C. § 5106a(b)(2)(B)(xxii) (extends the requirement for criminal background checks on foster and adoptive parents to include other adults living in the home).

[4] *See* Children's Bureau Model Licensing Standards, available at: https://www.acf.hhs.gov/sites/default/files/cb/im1901.pdf.

[5] *See* Children's Bureau, Home Study Requirements for Foster Parents, available at: https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/homestudyreqs/.

[6] *See* Children's Bureau, Home Study Requirements for Prospective Parents in Domestic Adoption, available at: https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/homestudyreqs-adoption/.

[7] *See* Children's Bureau, Placement of Children with Relatives, available at: https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/placement/.

[8] *See* Children's Bureau, Background Checks for Prospective Foster, Adoptive, and Kinship Caregivers, available at: https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/background/.

16. Notably, under title IV-E of the Social Security Act, all state child welfare systems must require background checks for prospective foster, adoptive, and kinship caregivers, as well as other adult household members.[9]

17. Such background check requirements may vary by jurisdiction, and states may expand upon federal mandates,[10] but the background checks must include at the least the following: criminal records checks, including fingerprint-based checks of national crime information databases, for all prospective foster or adoptive parents prior to the placement of the child; and child abuse and neglect registry background checks in all states where the prospective caregivers and any adult household member have lived in the last five years.

18. Likewise, kinship caregivers and members of their households must submit to criminal records checks (including fingerprinting), and child abuse and neglect registry background checks are required for kinship caregivers and their household members before the kinship caregiver may receive kinship guardianship assistance payments on behalf of a child.[11]

19. Similarly, ORR requires a background check of all potential sponsors and their adult household members. *See* ORR Policy Guide § 2.5 (sponsorship assessment and background check investigations).

20. The type of background checks performed on a sponsor and adult household members depends in part on the sponsor's relationship with the child, if any. *Id.*[12] In particular, ORR requires a public records background check of criminal history and sex offender databases for all potential sponsors and adult household members. Fingerprinting is required of all sponsors in Categories 2B and 3, as well as some Category 1 or 2A sponsors, and in some cases, adult household members and caregivers. *See* ORR Policy Guide § 2.5 (sponsorship assessment and background check investigations); *id.* at § 2.5.1 (background check requirements). In certain cases, ORR requires sponsors, adult household members, and adult caregivers to undergo a background check search of state child abuse and neglect (CA/N) registries maintained by individual states. *Id.* at § 2.5.1.

---

[9] *See* ASFA, 42 U.S.C. § 671(a)(20) (basic federal standard for background checks required for foster and adoptive parent licensing); CAPTA, 42 U.S.C. § 5106a(b)(2)(B)(xxii) (extends the requirement for criminal background checks on foster and adoptive parents to include other adults living in the home).

[10] *See* Children's Bureau, Background Checks for Prospective Foster, Adoptive, and Kinship Caregivers, available at: https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/background/.

[11] *See* ASFA, 42 U.S.C. § 671(a)(20)(C). *See* CAPTA, 42 U.S.C. § 5106a(b)(2)(B)(xxii) (extends the requirement for criminal background checks on foster and adoptive parents to include other adults living in the home, including relatives and non-relatives).

[12] *See* ORR Policy Guide § 2.2.1.

5

21. In state child welfare systems, licensing authorities require that home studies are done on a prospective foster parent (including kinship foster homes),[13] or a prospective adoptive parent for any child being placed in a licensed home.[14] While particular state licensing requirements vary considerably by jurisdiction, all are generally aimed at reducing risks to the health, safety and well-being of children in foster care. *Id.*

22. Consistent with this general purpose, for UAC in the unique context of ORR federal care and custody, the TVPRA, *see* 8 U.S.C. § 1232(c)(3)(B), mandates that home studies are done under specified circumstances including when: the child is a victim of a severe form of trafficking in persons; the child is a special needs child with a disability; the child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; or the child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking. *See* ORR Policy Guide § 2.4.2 (Home Study Requirement). "ORR also requires a home study before releasing a child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children." *Id.*

23. ORR similarly requires a home study before a child younger than 12 may be released to a non-relative sponsor. *Id.* In circumstances where a home study would likely provide additional information needed to determine whether the sponsor is able to care for the health, safety and well-being of the child, ORR may also request a home study on a discretionary basis. *Id.*

24. In sum, a home study of a potential sponsor for a UAC "must present a comprehensive and detailed assessment of the sponsor's ability to care for the needs of the child and address any additional information that emerges during the course of the home study regarding the sponsor, the sponsor's household or the child." *Id.*

***Impact of COVID-19 Pandemic***

25. The Children's Bureau has recognized that state foster care populations are impacted by the Coronavirus Disease 2019 (COVID-19) pandemic, and has been updating various resources and guidance for states on its website.[15]

---

[13] *See* Children's Bureau, Home Study Requirements for Foster Parents, available at: https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/homestudyreqs/.

[14] *See id.; see also* Children's Bureau, Home Study Requirements for Prospective Parents in Domestic Adoption, available at: https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/homestudyreqs-adoption/.

[15] See the COVID-19 Resources provided by the Children's Bureau, at https://www.acf.hhs.gov/cb/resource/covid-19-resources.

26. I understand that ORR has likewise recognized that COVID-19 affects children in its care and has been issuing guidance on an ongoing basis to its care provider grantees, including flexibilities in fulfilling vetting requirements in light of the pandemic.[16]

27. The current situation presents significant challenges to how children are served in state child welfare systems, as well as in ORR's UAC program. However, consistent with applicable public health guidelines, both systems must still implement policies in a manner that assures that the safety, health, and welfare of children continues.

I, June Dorn, declare under penalty of perjury that the foregoing is true and correct. Executed on April 9, 2020.

*June Dorn*
June Dorn

---

[16] *See, e.g.*, ORR Field Guidance #4, COVID-19 Discharge Guidance (dated April 6, 2020), ECF 746-11.

7