1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE DOLLY M. GEE, JUDGE PRESIDING

4  LUCAS R., ET AL.,                )
                                    )
5                                   )
                                    )
6                    Plaintiffs,    )
                                    )
7                                   )
                                    )
8          Vs.                      )   No. CV18-05741-DMG
                                    )       CV85-4544-DMG
9                                   )
                                    )
10 ALEX AZAR, ET AL.,               )
                                    )
11                                  )
                                    )
12                   Defendants.    )
                                    )
13 _____ )

14

15

16      REPORTER'S TRANSCRIPT OF VIDEO PROCEEDINGS

17      FOR CASE 85-4544 AND RELATED CASE 18-05741

18              *VIDEO TELECONFERENCE*

19            FRIDAY, MARCH 27, 2020

20

21

22        MIRIAM V. BAIRD, CSR 11893, CCRA
       OFFICIAL U.S. DISTRICT COURT REPORTER
23       411 WEST FOURTH STREET, SUITE 1-053
            SANTA ANA, CALIFORNIA 92701
24              MVB11893@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3    IN BEHALF OF THE PLAINTIFFS,    PETER A. SCHEY
      JENNY L. FLORES, ET AL.         CENTER FOR HUMAN RIGHTS AND
 4    AND LUCAS R,  ET AL.:           CONSTITUTIONAL LAW
                                      256 SOUTH OCCIDENTAL
 5                                    BOULEVARD
                                      LOS ANGELES, CA 90057
 6
                                      LEECIA WELCH
 7                                    NATIONAL CENTER FOR YOUTH
                                      LAW
 8                                    1212 BROADWAY, SUITE 600
                                      OAKLAND, CA 94612
 9

10

11

12    IN BEHALF OF THE DEFENDANT,    SARAH B. FABIAN
      ALEX AZAR, ET AL.,:            US DEPARTMENT OF JUSTICE
13                                   OFFICE OF IMMIGRATION
                                     LITIGATION
14                                   PO BOX 868 BEN FRANKLIN
                                     STATION
15                                   WASHINGTON, DC 20044

16                                   SCOTT G. STEWART
                                     US DEPARTMENT OF JUSTICE
17                                   950 PENNSYLVANIA AVENUE NW
                                     WASHINGTON, DC 20530
18

19
      ALSO PRESENT:SPECIAL MASTER ANDREA ORDIN
20    REBECCA TARNEJA
      CARLOS HOLGUIN
21    KATHERINE MANNING
      HOLLY HOOPER
22    NEHA DESA
      DAISY FELT
23    SUMMER WYNN
      BRENDA SHUM
24    AUGUST FLENTJE
      CARTER WHITE
25
```

```
 1        LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 27, 2020; 2:00 P.M.

 2                              ---

 3

 4             THE CLERK:  Calling CV85-4544, Jenny L. Flores

 5    versus William Barr, et al., and Lucas R., et al., vs. Alex

 6    Azar, et al.

 7             Your Honor, we're ready for you.

 8             THE COURT:  All right.  Thank you.  Hello everyone.

 9    This is my first video conference hearing.  So I want to just

10    set some ground rules to make sure that we can hear everybody

11    and so that the court reporter can take down who is speaking

12    at any given time.  Please remember that when you speak, to

13    state your name before you speak.

14             I received a lot of filings in the very recent few

15    hours and I've read them.  Obviously, I've read the Lucas R

16    papers with greater attention since the Flores opposition was

17    just filed fairly short time ago.  But I wanted to ask if the

18    parties would stipulate that the Court can use the

19    declarations filed in Lucas R for the Flores case and vice

20    versa?  Subject to any evidentiary objections, of course.

21             MR. SCHEY:  This is Peter Schey for the plaintiffs

22    in Flores.  That's fine for plaintiffs in Flores.

23             MR. STEWART:  Scott Stewart for the government,

24    Your Honor.  With the caveat Your Honor noted subject to

25    objections, that's fine with the government.
```

1          THE COURT:  All right.  Thank you.  So I'm mindful

2     of the fact that some of you are calling on East Coast time.

3     It's 5:00 o'clock there.  I want to cut to the chase.  There

4     is no need for a long discussion about the COVID-19.  I'm

5     well aware of it.  Obviously, it's in both sides' papers.

6     We're all living through it.  The reason why we're having

7     this video conference is because of the serious public health

8     emergency.  In fact, the courthouse is closed to the public.

9     So I'm well aware of the emergent nature of the situation.

10    So we don't need to waste time on that.

11          In fact, two weeks ago -- almost two weeks ago, I

12    asked my special monitor to contact you folks to make sure

13    you were geared up for addressing this emergency.  I didn't

14    really mean gear up for litigation.  I meant gearing up for

15    the addressing of the problem, but here we are.  We have two

16    TROs.  So let me tell you what my thinking is on it to begin

17    with.  With all due respect to the plaintiffs in Lucas R, you

18    did a monumental job of putting together a lot of information

19    for the Court in a short time, but I'm going to focus this

20    hearing primarily on the Flores TRO application, because to a

21    certain extent, I think that the issues raised in the context

22    of Lucas R are kind of like trying to fit a square peg into a

23    round hole.

24          So I'm going to try to address the -- but both

25    sides -- both cases are concerned about through the Flores

1    TRO application.  As I said, I have read through the papers,

2    and, as you know, I'm obviously familiar with all of the

3    various orders I've issued in the past, which cover many of

4    these subjects already.  So my initial thinking is that I am

5    going to deny the TRO with respect to the request for an

6    order that the ORR release minor class members, because I

7    don't think that plaintiffs have shown that the ORR is not in

8    substantial compliance with the safe and sanitary

9    requirements of the Flores agreement.  By releasing, I mean

10   en masse, releasing them right away.  I don't think that's

11   responsible given the current environment.  I think there

12   needs to be an orderly process.

13          So that gets me to that aspect of the TRO that I'm

14   granting, which is that plaintiffs have shown that both ICE

15   and ORR appear to have failed to comply with the Flores

16   agreement and for that matter, my prior orders' requirements

17   to make and record continuous efforts to release class

18   members and place them in suitable homes, whether it be with

19   guardians that are listed in order of preference under the

20   Flores agreement or in non-secure licensed facilities.

21          I also am going to grant the plaintiffs' TRO

22   request to the extent that they have shown that ICE may not

23   have been in substantial compliance with CDC guidelines, such

24   that ICE facilities may not be safe and sanitary for the

25   purposes of the current crisis.

1    So with that, I will open up any comments that

2 counsel for Flores would like to make.  Then I'll hear from

3 the defendants.

4    Mr. Schey.

5    MR. SCHEY:  Yes, this is Mr. Schey.  Thank you very

6 much, Your Honor.  Thank you for reading the materials on

7 such short order.  I guess, a couple of things.  One thing we

8 would like the Court to consider, and I'm not sure based on

9 what the Court has said up to now, it just wasn't clear if

10 the Court would consider it or not consider it, but in

11 paragraph five of the proposed temporary restraining order,

12 we make reference to certain data that I think the Court

13 contemplated the defendants would be collecting, because in

14 its order appointing the special master at Section V1, the

15 Court had said if the special master requests the following

16 kind of data, you shall give it to her.

17    That data I identify it in paragraph five, although

18 I incorrectly identified a paragraph lower case Roman Numeral

19 2, 1 through 6, which actually applies to CBP, so I would

20 actually drop that from the request.  The balance of that

21 material that the Court obviously contemplated the government

22 would be collecting, and it seems to me if the -- if the

23 defendants were actually complying with the Court's previous

24 orders, they would be collecting this kind of data and -- and

25 it -- it included, for example, in their V1C, and then three,

1    it includes things like the dates on which the option for

2    these was explained to defendants.  The dates on which the

3    class member -- if a parent opted out her class member child,

4    the date that that happened.  The dates on which efforts were

5    made and recorded by defendants to release, et cetera.  So

6    it's about five or six things.

7           We just think it would be enormously helpful if in

8    a temporary restraining order the Court could indicate that

9    that that kind of data should be shared with both the special

10   master without her requesting it in this emergency situation,

11   and it should also be shared with class counsel.  I think

12   that would go a long way towards encouraging compliance with

13   the terms of the settlement paragraph 14, paragraph 18,

14   paragraph 19, but particularly paragraph 14 -- it would go

15   toward a long way of encouraging government to actually

16   comply if they have to share data showing that they are

17   complying with plaintiffs' class counsel.

18          The Court has previously enhanced the reporting

19   requirements.  I unfortunately don't recall when the Court

20   did it, but previously, the government was required to give

21   us certain data every six months, and the Court then required

22   that they do it every month.  They have been doing that.

23   There have been -- there are some ongoing disputes about it,

24   but it does not include any of this kind of information that

25   they -- the data that we get on a monthly basis.  It's

8

1    confidential.  We don't disclose it to anybody.  We just use

2    it for monitoring purposes.  The data we do already get is

3    name, place of birth, date of birth, date of apprehension,

4    and date of placement.  Every time that kid is moved from one

5    facility to another, we do get that data.  What we don't get

6    is any data that efforts could be made to comply with

7    paragraph 14.  So that is something that -- that we would

8    like the -- the Court to consider.

9          The other two parts we had in there, paragraph 6

10   and 7, paragraph six, really just involves -- again, the

11   language for this is in the settlement, but the declarations

12   that we have filed, particularly the three declarations

13   really the most knowledgeable people about the ICE facilities

14   because they run programs at that facility -- at those

15   facilities that provide legal services for the families

16   there, including the children.  They have indicated in their

17   declarations that when people get transferred or moved, they

18   often do not get advance notice of that, which paragraph 27

19   says they should.  In these times where kids may be moved

20   from one facility to another possibly because of the current

21   crisis situation, just keeping their lawyers informed of

22   where these kids are moved to, would, I think, be important.

23         Finally, we would just encourage the paragraph H,

24   which really is fairly soft to the extent it says to the

25   extent that just maximum extent possible that to the extent

1    that children are not released, that the defendants and maybe

2    it would just be ICE, maybe ICE and ORR, but the defendants

3    comply with those A through whatever it -- A through H with

4    those provisions.  Again, we -- it was relatively soft

5    declaration in the sense that we didn't say you have to

6    comply in a hundred percent of the cases.  We just said to

7    the maximum extent that it is possible, you do those things

8    outlined in A through H.

9              So those are the only comments that I would make,

10   Your Honor.

11             THE COURT:  Before we move on to comments from the

12   defense.  I'm going to ask my court clerk whether we can stop

13   any people from coming onto the conference late because it

14   keeps causing the audio for the person speaking to go out,

15   and I'm sure the court reporter is having a hard time hearing

16   when that happens.

17             THE CLERK:  Your Honor, I don't think we can stop

18   calls from coming in.  What we could do is once the Court is

19   speaking, if they do hear that, beep repeat that sentence

20   again.  Remind everyone that just joined in, if you're not

21   speaking, please mute your phones.  That keeps the feedback

22   down.  Thank you.

23             THE COURT:  All right.  Who from the defense would

24   like to speak at this time?

25             MS. FABIAN:  Your Honor, this is Sarah Fabian for

1    the defendants.  Would it be possible for me to ask a

2    clarifying question to focus the comments that I think might

3    be the most helpful here?

4            THE COURT:  Sure.

5            MS. FABIAN:  Specifically, it would be -- I -- I

6    want to understand -- I understand that the Court is granting

7    the TRO in part.  Is the -- is that grant tied to specific

8    injunctive relief that you intend to require the government

9    to follow, because understanding what the Court expects of

10   the government in response to that grant would be very

11   helpful for me to focus the information that I think might be

12   helpful to respond.

13           THE COURT:  All right.  Well, this is tentative.  I

14   haven't obviously put all of this in writing yet, but these

15   are my current thoughts:  That would be to require the

16   defendants to make a record of continuous efforts to release

17   class members or place them in suitable -- with suitable

18   custodians or with -- in the list of preferences that is

19   identified in paragraph 12 of the Flores agreement.

20   Enjoining defendants from keeping minors in congregate

21   custody either by ORR not promptly releasing minors to fit

22   custodians or ICE continuing to detain minors without

23   justification for more than 20 days, which this Court has

24   already previously ordered in prior orders.  For minors who

25   remain detained in congregate settings that ICE implement to

```
 1    the maximum extent possible the CDC interim guidance on

 2    management of COVID-19 in detention facilities.

 3             MS. FABIAN:  Thank you, Your Honor.

 4             THE COURT:  There are some other thoughts that I

 5    have with regard to the monitoring, which I will share with

 6    you in a moment, but that's kind of the gist or the most

 7    substantive part of what I'm trying to tell you is going to

 8    be in the order.

 9             MS. FABIAN:  Thank you, Your Honor.  That's very

10    helpful.  With regard to the make and record, I think the

11    government would dispute Your Honor's finding, but I do think

12    that is something that has been for ICE, at least, the

13    subject of -- already the subject of some monitoring by

14    Ms. Ordin.  It is something that we have been reporting to

15    her.  I know that the focus of the monitoring has gone to

16    other issues more recently, but that is information that we

17    have shared with her and continue to share with her.  I think

18    that, you know, we would -- we would -- of course, this TRO

19    process has been a very quick turnaround for the government.

20    We would -- we would welcome the opportunity to present more

21    evidence on that topic, but I think that being the subject of

22    ongoing monitoring already, the best forum to address that

23    might be through continuing to work with Ms. Ordin on that

24    particular issue.

25             As far as --
```

1        THE COURT:  Let me just interrupt you for a moment

2   so that I can be more clear.  I am particularly concerned

3   about the statistics showing that there are large numbers of

4   minors who remain in custody, hundreds of them, in fact, for

5   four months or five months or more.  So the objective of this

6   order is for the government to show cause why those minors

7   have not been placed.

8        MS. FABIAN:  Thank you, Your Honor.  I share your

9   concern with those numbers, but my primary concern is that

10  they are -- the little I know of them right now, they are

11  just incorrect.  I -- as you note on page 23 of our brief,

12  we -- we tried to look at the numbers very quickly to see if

13  we could provide Your Honor with -- with corrections.  We did

14  not have the time to pull updated or corrected information,

15  but what we do know is that the baseline number of numbers in

16  custody is incorrectly determined, and we can only presume

17  then that the rest of the calculations may likely rely on

18  other -- you know, misunderstandings of the data.  I -- I --

19  so I understand Your Honor's concern with those numbers.  I

20  can't give you other numbers now, but what I can say is that

21  with more time, I think ICE would like the opportunity to be

22  able to -- to look and see and to provide their own numbers

23  there to see if we can't reconcile those numbers.

24        THE COURT:  What about ORR?

25        MS. FABIAN:  For ORR, I think it's a different

```
1    issue.  As far as make and record, that is -- that is
2    something that occurs on a -- well, let me ask this -- I
3    guess, Your Honor, if -- if I understand then Your Honor to
4    be saying the same concern is the length of time in custody
5    in ORR, I'm not sure that plaintiffs have really presented
6    any evidence on that topic.  Their evidence on that topic is
7    somewhat speculative as far as the reasons for longer care.
8    I think what they state as far as the reasons for longer care
9    is not consistent with our understanding of children in care,
10   but, you know, what I would say on that is -- I think when
11   Your Honor references the 20 days, that 20-day ruling was
12   with regard to unlicensed facilities.  ORR facilities are
13   licensed.  So they're not -- the 20-day limitation was based
14   on the expeditiously as possible portion of the order
15   relating to unlicensed facilities.
16           So the --
17           THE COURT:  I understand that.  I think the -- I
18   think the standard is prompt.
19           MS. FABIAN:  It is prompt.  In Your Honor's
20   July 30th order, the decision was that it had to do with
21   whether the minors were released without unnecessary delay as
22   required by paragraph 14.  In that order, the parties were
23   talking about specific requirements that ORR had placed
24   related to determining suitability of the minors under
25   paragraph 17, and it -- in that -- in looking at those
```

```
 1    provisions, the Court found that -- that ORR had not been

 2    engaging in unnecessary delay.  I think what -- what I don't

 3    see in plaintiffs' motion is any evidence that due to

 4    COVID-19 or due to any emergent issues now, there are new or

 5    different concerns about the time and the processes that ORR

 6    is using to release.

 7              I think -- if there are --

 8              THE COURT:  Let me ask you this, Ms. Fabian:  Since

 9    the plaintiffs don't necessarily have access to the

10    statistics, which, I guess, is the point of Mr. Schey's

11    request that you provide that type of information.  What we

12    do know at least as of February of 2020 is that there were

13    over 3,000 people in ORR custody.

14              Now, if you're saying that those 3,000 people have

15    been there for only less than 30 days, then that would be one

16    thing.  If they've been there for more than 30 days or any

17    subpart of that number, then that is of concern as well.

18              MS. FABIAN:  Your Honor, I -- I guess I would say

19    there's been nothing in this case that has imposed any sort

20    of inherent 30-day limitation on ORR custody.  I understand

21    the concerns with --

22              THE COURT:  I'm not suggesting that there is

23    anything that specifically says 30 days.  I'm just -- I'm

24    using that as kind of a broad marker for what may or may not

25    be prompt.
```

1          MS. FABIAN:  Your Honor, I -- I understand that.  I

2     don't think that we've ever litigated or briefed the issue of

3     what would be part of the -- a prompt requirement.  I

4     think 3,000 children in custody is -- is a very low number

5     for ORR number, in fact, right now.  ORR's -- has a very low

6     percentage of its overall beds.  You know, intakes are

7     reduced now as part of the response to the pandemic.

8          So I couldn't say -- I wasn't able to gather

9     information in this short time sort of what the range of

10    reasons are for any children who are remaining in care.

11    However, what I would say is that there -- the evidence that

12    plaintiffs are relying on is entirely speculative.  It is

13    sort of a supposition that there are available sponsors for

14    these children.  I think that where there are available

15    sponsors, ORR is taking steps to expeditiously release.  ORR

16    has no equities in keeping the children in custody.

17          I think on a case-by-case basis, when issues are

18    brought with delays in release to our attention, that we have

19    dealt with them in various circumstances.  I think -- the

20    only recent order from this Court was, in fact, that the

21    suitability analysis that ORR was conducting were consistent

22    with the agreement.  So I -- I -- I don't believe that

23    plaintiffs' motion brings up any new reason to find that

24    there are delays or unnecessary delays or, you know, that --

25    that ORR's releases and process for release is anything but

1    prompt.

2            THE COURT:  All right.  Well, Ms. Fabian, I cannot

3    tell the plaintiffs to come up with data that they don't have

4    because you won't give it to them.  The issue here, separate

5    and apart from the TRO, is that there is a concern in this

6    current climate with COVID-19 that congregate facilities may

7    be causing problems for maintaining safe and sanitary

8    conditions.  So that is at least a serious question.  If

9    there are over 3,000 in ORR custody.

10           Now, I understand that that we're not talking about

11   one facility.  We're talking about many facilities throughout

12   the country.  So plaintiffs have not done a particularly good

13   job of separating out what facility might be overcrowded or

14   may have more people than can apply the CDC guidelines.  I

15   understand that.  But they also don't have the information.

16   I can't sit here and say, let's just ignore it because we

17   don't know what the numbers are.

18           I have the obligation to oversee the implementation

19   of this agreement.  So if they have raised a serious

20   question, then you should probably give us some information

21   about what the snapshot looks like.  I'm not necessarily

22   going to say you have to do that on a daily basis, but at

23   least let us know in this current crisis what it looks like

24   on the ground.

25           MS. FABIAN:  Your Honor, I -- I understand the

1    Court's concern.  I -- I -- I would say, you know, first and

2    foremost, we are talking about the agreement.  The agreement

3    is the plaintiffs would be given certain information.  So to

4    the extent the plaintiffs don't have information they didn't

5    bargain to receive, that is not a violation of the agreement.

6    It is simply the consequences of the bargain that they

7    struck.

8            As far as providing information about -- I mean,

9    congregate care is not in and of itself a violation of the

10   agreement either.  I understand the concerns.  I think that,

11   you know, to the extent the Court intends to order monitoring

12   of that and require the provision of the information

13   consistent with the order that the Court has previously

14   issued that monitoring by Ms. Ordin would be consistent with

15   this Court's prior orders.  That providing that information

16   to Ms. Ordin, you know, subject to that type of order would

17   be consistent with the Court's prior orders.  There is --

18   providing additional information adding provisions to the

19   agreement that require the provision of additional

20   information to plaintiffs is an entirely separate thing and

21   would expand the agreement and would seem inconsistent with

22   this Court's prior statements that plaintiffs are entitled to

23   only the bargains that they struck in --

24           THE COURT:  Have you been providing that

25   information to Ms. Ordin?

1          MS. FABIAN:  Well, MS. Ordin is not currently

2     set -- I mean, the monitoring order, as far as ORR, is

3     limited to the Court's July 30th order.  So that, you know,

4     to the extent we're talking about new claims of violation and

5     new issues as far as congregate care, if the Court believes

6     that there are monitoring issues related to Flores and the

7     method of providing congregate care, you know, I think --

8     it's not our position at this time that that -- that is the

9     subject of Ms. Ordin's monitoring scope, but --

10          THE COURT:  Well, obviously, I'm not going to say

11     that every detention facility has to close down because it's

12     congregate care.  My concern here is that there is

13     noncompliance with -- potentially noncompliance with prompt

14     release of minors pursuant to the agreement.  So the only way

15     that I can determine whether or not that is true -- maybe

16     it's not true.  I don't know.  The only way that I can

17     determine if that is true is for you to provide information,

18     whether that's to Ms. Ordin alone or to Ms. Ordin and the

19     plaintiffs, I'll have to think about that.  The issue is that

20     you have the data and nobody else does.

21          MS. FABIAN:  I do believe -- I certainly defer to

22     Ms. Ordin.  I do believe that she has received information

23     regarding times in custody in ORR over the period of

24     monitoring, and that we have had discussions about that.  I

25     do believe that Ms. Ordin recently spoke with the juvenile

```
1    coordinator for ORR or at least -- perhaps, they were not
2    able to connect, but I know that.  So -- so I do -- I do
3    believe that that is information that to some extent has been
4    provided to Ms. Ordin and that could be provided going
5    forward particularly with regard to, you know -- I -- again,
6    I defer to Ms. Ordin, but I believe that our juvenile
7    coordinator has been very forthcoming with that sort of data
8    upon request.
9           So I -- I think if there is a way forward,
10   certainly with Ms. Ordin, that we can provide more
11   information that would help look into that issue.  I think
12   that is something that would be consistent and -- and easily
13   done relative to the way that things have been proceeding.  I
14   think our -- our objection as far as the TRO is whether there
15   is anything in the TRO that establishes that the time of
16   custody has -- has changed or that there is any inherent
17   violation, because the same procedures are being followed,
18   but now they're being followed during the current crisis.  I
19   think that -- that that alone does not provide a basis to
20   find that existing procedures that were otherwise consistent
21   with the agreement are now in violation.
22          THE COURT:  Could you please state for the record
23   the name of the juvenile coordinator for ORR.
24          MS. FABIAN:  Her first name is Aurora.  I cannot
25   off the top of my head remember her last name.  Ms. Ordin is
```

1     smiling.  She may remember.

2            THE COURT:  Except we can't hear Ms. Ordin.  I will

3     get Ms. Ordin's response later.

4            Now we can hear Ms. Ordin.

5            MS. ORDIN:  It's Aurora Maese, M-a-e-s-e.  I can

6     add also that we had a two-day meeting scheduled for

7     March 16th and March 17th in which I was asking specifically,

8     and they were going to give me very specific hour-long

9     meetings based upon length of stay, placement, and various

10    other positions in particular the medical side.  Because of

11    the crisis, that trip was canceled.  The -- my own theory of

12    working with Aurora Maese is that I would be setting up

13    hourly telephonic conferences to try to obtain that material.

14           On a regular basis, the only material I get is the

15    material the plaintiffs get, the monthly reports about length

16    of stay.  So anyways, I think the process interfered with

17    being able to get just exactly the information the plaintiffs

18    have been wanting.

19           THE COURT:  All right.  Is there anything else you

20    would like to address, Ms. Fabian?

21           MS. FABIAN:  Your Honor, I do want to reiterate my

22    concern with the potential of ordering release within --

23    particular -- within 20 days, particularly with regard to

24    ORR.  I think the 20-day time limit was ordered with regard

25    to the expeditiously as possible provision related to

1    unlicensed facilities.  So I want to highlight that there is

2    no applicability of that 20-day timeframe to the licensed

3    facilities managed by ORR.

4            I -- I want to note -- and it may -- it --

5    depending on the Court's intention here, I have

6    information -- I want to stress that the government's

7    response to these issues is -- is sort of rapidly evolving.

8    So, you know, with a very short turnaround time, I think we

9    submitted information that was prepared for some other cases

10   to give Your Honor the best that we could do as far as giving

11   information about the conditions.  I understand Your Honor is

12   not finding that ORR is in violation as far as conditions.

13           I want to highlight the applicable CDC order here

14   is the CDC order relating to detention facilities and

15   congregate care facilities and not the CDC order that is

16   federally applicable that was focused upon by plaintiffs.  So

17   to the extent the Court intends to order ICE to comply with

18   the CDC, I would request or would urge that the Court order

19   that compliance to be with the CDC order that we submitted.

20   I believe it's Exhibit L to our opposition filing.

21           I also want to note that just 48 minutes before

22   this hearing I got an e-mail with, you know, five bullet

23   points of additional measures that ICE is undertaking with

24   regard to implementing various measures providing for more

25   space.  You know, I'm happy to read them here for the Court

```
 1    or to submit supplemental filings on those measures.  I think
 2    the rapidly evolving nature of these steps that ICE is taking
 3    and the steps that the -- is being highlighted by the fact
 4    that, you know, even between our filing and this hearing,
 5    there were additional improvements to the steps that ICE is
 6    taking in its facilities.
 7              THE COURT:  Yes, I understand that, Ms. Fabian.  I
 8    appreciate that it is a fluid situation.  I know that things
 9    change probably on a daily basis.  I would have preferred
10    that the parties had continued to work with the special
11    monitor to try to work through these issues, rather than deal
12    with litigation in the midst of all of this, but that is what
13    I've been presented.  So there's nothing to prevent the
14    parties, however, after this hearing, to continue their
15    efforts to try to resolve these issues in as expeditiously
16    way as possible.  I think that issuing orders is a blunt
17    instrument.  It is not tailored to some of nuances that exist
18    in this current environment.  So it's not my favorite
19    approach, but it is a crisis.  So I think we need to attend
20    to some of these issues that have been raised.
21              With regard to what you consider to be prompt,
22    Ms. Fabian, do you have some thought as to what "prompt"
23    means?
24              MS. FABIAN:  Your Honor, with regard to -- if
25    we're -- if you're asking with regard to ORR, I think the
```

1     important consideration -- and I know this is an -- is an

2     answer for -- a very lawyerly answer, it will certainly

3     depend on the circumstances of the child's case.  I think as

4     a general matter, there are steps that both Flores and TVPRA

5     require and other cases that they permit.  Those are designed

6     to ensure the safety of the release.

7            I think Mr. Schey referenced in his filing a case

8     where recently we were able to work together and have a child

9     released to his father in only a few days.  That was a case

10    where the child had been with his father previously and came

11    into ORR custody through -- through a series of events, but

12    it was -- it was a positive outcome.  In that case, ORR was

13    able to release the child back to his father quickly.  I

14    think that was a -- a -- an example of where the parties

15    worked together on these issues.  It -- it does work well.

16    Ms. Ordin was involved in that as well.

17           I think as a general matter, prompt is as quickly

18    as ORR can do so while ensuring to take the steps necessary

19    to ensure the safety of the child.  That is the steps

20    required by the TVPRA to ensure that there is a suitable

21    custodian for release.  I think that some of the issues

22    raised by plaintiffs in their briefing involving danger and

23    flight risk, to the extent -- I think many of those may have

24    been intended to refer to ICE custody rather than ORR

25    custody, and not resolved in many ways by this Court's order

1    and the Ninth Circuit's order regarding bond hearing.  I

2    don't believe that sort of the danger aspect is an issue for

3    releases from ORR at this time.  I think that it really is

4    how quickly can ORR conduct the safety and suitability

5    analysis that ensures that the child is going to a suitable

6    custodian.

7              I -- I would acknowledge in this time, there may be

8    other issues that are going into those analyses.  I'm not

9    aware of it.  You know, if there are specific cases of that,

10   I certainly welcome anyone to bring those to my attention.  I

11   will work with ORR on them.

12             THE COURT:  Mr. Schey, that actually raises a

13   question that I had.  That is, if you're aware that there are

14   minors who have suitable custodians and yet have not been

15   placed by them, why is it not feasible for them to simply

16   utilize the procedure that is provided in the Flores

17   agreement to seek a --

18             MR. SCHEY:  Yeah.  That's a good question.  Can you

19   hear me okay, Your Honor?

20             THE COURT:  I can hear you.

21             MR. SCHEY:  Okay.  Perfect.  Yeah.  I'd like to

22   answer that question.  Also just add a couple of other

23   details, if I may.  One is that to the best -- the data that

24   we do get and we do have ongoing disputes with them about the

25   scope of this data, but that's for another day.  But the data

1    that we do have, the most recent data that we have been able

2    to analyze with regards to ORR, which was data at the end of

3    January.  So we were able to analyze it in February.  We have

4    no real reason to believe that this would be any different in

5    March or December of 2019.

6            What that data indicates is that in ORR custody,

7    about 15 percent, that is 1, 5.  15 percent of the detained

8    minors were therefore 61 to 90 days.  About 31.9 percent.

9    This is data analyzed for us by folks at Stanford University.

10   It seemed pretty competent.

11           THE COURT:  Is this in the record?

12           MR. SCHEY:  You know, I'm happy to submit this.

13   It's not in the record.  So just for information for the

14   Court.  But I am happy to submit this report that I have, a

15   written report from Stanford that has analyzed the January

16   data.  What it indicates is 31 percent were there for 31 to

17   60 days.  15 percent were there for 61 to 90 days.  Seven

18   percent were there from 91 to 100 days.  Approximately,

19   3.9 percent were there for 121 to 150 days.  Then the

20   percentage gets smaller.

21           But just to give a sense that -- by the way, the

22   data that I put into my declaration, that comes from the data

23   that they gave us for February.  So that -- the Stanford

24   folks had not had time to analyze that for us yet.  I

25   analyzed that pretty carefully.  And so the data that I gave

1    to the Court about the length of detention of those children,

2    that came directly from the data that shared with us in -- in

3    February.  So I -- I think it's pretty accurate.

4              THE COURT:  Mr. Schey, I think the question is

5    about ORR data.  The data that you supplied for ICE is broken

6    down by time period.  So that is much more --

7              MR. SCHEY:  Exactly.

8              THE COURT:  The ORR data is not as explicit.

9              MR. SCHEY:  Yeah.  I'm happy.  I mean, I could file

10   this as soon as we get off the call.  It's a -- it's about a

11   five-page report.  And it -- it looks at from ten different

12   ways.  So it is interesting.  I would be happy to -- like I

13   said, I could just this report with the -- it's managed by a

14   Dr. Nancy Wang, who is one of the experts.  One of our expert

15   declarations, although her declaration doesn't go to this

16   data management stuff.  I'm happy to submit it to the -- to

17   the Court.

18              Now, you know, with regards to this business about

19   the data, I would just circle back to this:  That getting the

20   data from the government about which we get every month about

21   sort of length of stay, how long was a kid in defendant's

22   custody and were they moved?  You know, when did they go from

23   border patrol to ICE or to ORR.  If they were in ICE, when

24   were they moved from one facility to another facility, and

25   same with ORR.  If they were in ORR custody, when were they

```
 1   moved from one facility to another facility?  We get this for
 2   every single kid in custody.  So it's quite granular.  I
 3   mean, you know, it would be thousands -- it's a spreadsheet
 4   with thousands of rows on the spreadsheet.
 5           The underlying problem, at least from the
 6   standpoint of our -- the way that we look at this as
 7   plaintiffs' counsel, the underlying problem is that data
 8   tells us nothing about why a child was not released.  It
 9   tells us nothing about the efforts that were being made.  The
10   settlement specifically says at paragraph 14 and 18,
11   specifically says that the government is supposed to make and
12   record continuous efforts really from the time of
13   apprehension, let's leave border patrol out of this for a
14   second.  It says from the time of apprehension, it is
15   supposed to make and record continuous efforts aimed at the
16   release of children without unnecessary delay is the
17   language.
18           But -- and so if they're making an -- so the
19   settlement requires that they not only make these efforts, it
20   specifically says make and record.  So if they're recording
21   that information about the steps that they're taking, they're
22   obviously going to record well, who took the steps.  I mean,
23   you would think so.  You would think they would record the
24   time, the date that they took those steps.  You would think
25   that they would record the results that, you know, we called
```

1    the sponsor.  The sponsor didn't pick up.  We told the

2    sponsor we need X.  We need an affidavit.  They haven't

3    gotten it to us.  You would think that logically that to

4    implement the steps that the settlement calls for, which is

5    efforts aimed at the release, and that you've got to record

6    those efforts, then it shouldn't be the end of the world for

7    the government to share that information with us.  It's all

8    confidential.  Just like the data they already give us is

9    confidential, which includes name, it includes date of birth,

10   place of birth.  That's all confidential.  We don't -- we

11   never made that public.

12        You would think that it would be not that difficult

13   for them to give us that information, which would then really

14   put us -- for really the first time, it would put us in a

15   position to be able to have an intelligent discussion with

16   the government to say, look, in these 20 cases or whatever it

17   is, 50 cases, a hundred cases, we totally agree with you.  We

18   can see why it took even 60 days, 70 days, 80 days to release

19   a kid.  We can see that you're making reasonable steps to

20   release this kid.  It's not your ineptitude or your lethargy

21   or your ignoring the settlement.

22        On the other hand, with these 30 or 40 cases, we

23   think there's a big problem.  We could then at least have an

24   intelligent meet-and-confer with the government about those

25   cases.  And to be honest, you know, more importantly, as

```
 1    happened in this case that I mentioned in just one sentence

 2    in my affidavit -- my declaration, and that Sarah mentioned

 3    to you a few minutes ago, I mean, in that one case, I was

 4    able to get that kind of information.  I was able to get the

 5    name of the sponsor.  With that information, I was able to

 6    help secure the release of that kid within five days.  Had I

 7    not had that information, it would have taken a month or two

 8    months or three months to get that kid released.  It was a

 9    four-year-old boy who was separated from his father.  It was

10    only my access to that information that gave me the ability

11    to work with a father and to work with -- Sarah got involved.

12    People at ORR got involved.  Sure enough, five days later

13    this kid was released to his father.

14            So if we have that kind of information, it's not

15    only that it would allow us to intelligently assess the

16    extent to which they are complying, whether it's ICE or ORR,

17    it would not only allow us to intelligently assess whether

18    they're in compliance or not, whether they're making

19    reasonable efforts -- we're not looking for a hundred percent

20    perfection.  We're looking for 80 percent or substantial

21    compliance.

22            THE COURT:  How do you respond to Ms. Fabian's

23    point that it's not required under the agreement?

24            MR. SCHEY:  That's a good point.  Just let me add

25    one other quick point then I will respond to that.  The other
```

1    quick point is we have over a thousand volunteer lawyers

2    willing to help with Flores issues and compliance, volunteer

3    lawyers.  If we -- if we had that information, we -- we

4    could -- we could have a large number of pro bono lawyers

5    helping the sponsors to get their kids out.  It would

6    probably reduce by, lord knows what, maybe 50, 75 percent.

7    It would reduce the amount of time that kids are in custody,

8    because there are lawyers more than willing -- we have a

9    website called reunify.org, www.reunify.org where lawyers can

10   sign up to help with Flores monitoring.  We have over a

11   thousand lawyers who have signed up who want to help pro

12   bono.

13          So to respond to your question, the Court, as I

14   mentioned previously, the Court on several occasions has --

15   has provided relief that was not specifically set forth in

16   the settlement.  That, for example, with regards to the

17   provision of data to us, the settlement said they should

18   provide this data every six months.  And then in -- I forget

19   if it was the 16 or 17 order that the Court issued, the Court

20   said well, you know, to really be ensure increased compliance

21   and to facilitate the monitoring, I'm going to increase that

22   to once a month.  Nobody -- to the best of my recollection,

23   nobody appealed that.  Nobody had a big problem with that.

24   Government has been providing us with that data once a month.

25          It seems to me that in these extraordinary times

```
1    and emergent times where a misstep could result in a lot of
2    class members suffering severe health consequences, possibly
3    life endangering consequences, it seems to me that since the
4    agreement already says that it's supposed to be recording
5    this data, it seems to me that as part of its remedial
6    powers, it seems to me that the Court would have the power to
7    say that the -- that that -- that if you're not going to
8    release a kid within X amount of time, I suggested seven
9    days.  It could be one day.  It could be ten days.  In some
10   reasonable period of time, if you're not going to release a
11   child, then share with the class counsel the data that you're
12   supposed to record anyway under paragraph 14, share that data
13   with the class counsel under the existing confidentiality
14   agreements.  You know, it wouldn't be any different than a
15   Court having said in its order appointing the special
16   master -- and there, the Court seemed to believe, and we, of
17   course, believed that the Court had the power to do this.
18   And the Court said in that order well, if the special master
19   requests the dates on which you made these efforts, who made
20   the efforts, what was the result of the efforts, and the
21   Court ordered the government to provide that data to Andrea
22   Ordin, you know, if she requested it.  Well, the government
23   appealed that order, but then dismissed its appeal.
24            So that -- if the Court had the authority to put it
25   in that order to say well, give this to Ms. Ordin if she
```

```
1    requests it, then it seems to me, it would also have the

2    authority to say, give this same information -- give it to

3    class counsel.  It's going to be equally confidential, and I

4    would think the authority would be the same in both

5    situations.

6           So that's how I would respond to that question,

7    Your Honor.

8           MS. WELCH:  Your Honor, this is Leecia Welch.  I

9    think there's a great deal of overlap right now in the

10   discussions on Flores and Lucas R with regards to these

11   issues.  I'm wondering if there's going to be an opportunity

12   for us to respond as well?

13          THE COURT:  Why don't you take that opportunity

14   right now.

15          MS. WELCH:  Well, I guess to start off, I mean, I

16   think it probably goes without saying that plaintiffs share

17   the Courts concerns that children are languishing in ORR

18   custody for greater than 30 days.  That is -- you know,

19   that's the reason why we filed our due process claim in Lucas

20   R, and, you know, we obviously now have the unfit custodian

21   class that is exactly that group of children with the caveat

22   that our class has a family reunification packet that has

23   been submitted to ORR, and 30 days have passed without ORR

24   acting on that packet.

25          So I think we are of the position that the issues
```

1    that we're raising in the TRO are very much consistent with

2    what we raised in our first amended complaint.  So we don't

3    think that what we're doing here is, you know, putting a

4    round peg in a square hole at all.  We think what we're doing

5    is responding to a crisis situation that makes the -- the due

6    process protections that this class is entitled to all the

7    more important and all the more urgent.

8            THE COURT:  Ms. Welch, the problem I have with the

9    remedy that you seek in Lucas R is that it appears to me to

10   be a mandatory injunction.  It would in effect impose

11   procedures that you have requested as the relief in your

12   lawsuit.  It would be a victory in your lawsuit.

13           MS. WELCH:  So I -- I would say this:  I mean,

14   we -- we feel that those procedures are absolutely justified

15   under the circumstances that we find ourselves, but what we

16   think is most important is that there be an individualized

17   kind of analysis of why children who have been languishing

18   for more than 30 days and are now facing a deadly virus are

19   not being released from ORR custody.

20           So I think there is a lot of overlap between what

21   Mr. Schey was talking about in terms of the need for ORR to

22   provide individualized information on why children are not

23   being released.

24           THE COURT:  Which is why I'm dealing with this

25   issue in the Flores case and not in the Lucas R case.  The

```
1    Lucas R case is a class action that deals with certain

2    overarching issues relating to procedural due process among

3    other things.  So an individualized analysis about whether

4    one child or another was kept longer than another child is

5    not, I think, an appropriate exercise in the Lucas R case.

6               MS. WELCH:  We think that the plaintiff should have

7    an opportunity to contest their ongoing detention in the face

8    of a virus that is deadly.

9               THE COURT:  Which is what the Flores plaintiffs are

10   doing.

11              MS. WELCH:  I understand that.  So I think what

12   we're saying here is that we think that -- that Lucas R

13   provides an alternate path for a remedy.  We think that it

14   should be more individualized than simply providing the data

15   that Mr. Schey has been discussing.  We think that due

16   process requires more.

17              THE COURT:  All right.

18              MR. SCHEY:  This is Mr. Schey.  Yeah.  This is

19   Peter.  If I could add one or two more things.  I am not

20   requesting a -- just numbers.  I already get numbers.  What

21   I'm requesting is that if they don't release a kid within a

22   certain amount of time, whether they are in ORR or ICE

23   custody, they explain us -- just like now, they give us the

24   names of thousands and thousands of kid, every single kid,

25   including the kids they release like my kid, who was released
```

1     in four or five days.  His name also appears.

2             What I am saying is if they don't release a kid

3     within a certain amount of time, they should just tell us

4     why.  It might be very simple.  It could be two words, three

5     words.  Mother waived the kid's right to release.  Okay.

6     Fine.  It could be whatever.  It could be there is no

7     sponsor.  It could be a sponsor hasn't responded.  Hasn't

8     given us what we need.  That way we would have some -- an

9     understanding as to why they're not releasing the kids.  That

10    way we can engage in discussions with Sarah.  We can engage

11    in discussions with the special master, and if need be, we

12    would definitely, if need be, we could then come to the Court

13    if we felt that was necessary.

14            Really more importantly, we could help get these

15    kids out, which would be helpful to everybody.  To the

16    defendants and to the children who are being detained and to

17    their parents and their grandmothers and the sisters and the

18    mothers who are ready, willing, and able to receive them.  So

19    I just wanted to make that point.  I'm not looking for more

20    numbers.  I am looking for why didn't you release this kid.

21    Again, it doesn't have to be a long book or several pages.

22    It could literally be one sentence about what -- you know,

23    why didn't you release the kid and what were the efforts that

24    you made.  Supposedly, they're recording that.  If they

25    recording that, then it shouldn't be that hard for the

1    government to share that with us.

2           The one other point I wanted to make briefly was

3    what Ms. Fabian was saying well, about ICE and maybe they're

4    doing it or whatever.  They're not doing it.  They're not

5    making any -- you know, when the Court allowed us to take

6    depositions, whatever it was a couple years ago, then they

7    said, oh, yeah, when I deposed the ICE people, oh, yeah,

8    we're making these efforts.  That was a couple years ago.

9           Now -- I put this in my affidavit.  When we had the

10   meet-and-confer, they conceded they're making zero efforts.

11   They told us that during the meet-and-confer.  The three

12   declarations that I submitted from the three people who are

13   the most knowledgeable people on the face of the earth other

14   than the people working for ICE, because they represent

15   hundreds upon hundreds of these families in those three ICE

16   family detention centers.  They said in their declarations

17   and in the motion -- in the application, I cite to the

18   particular paragraphs where they say that, zero -- zero

19   efforts aimed at release.  Mothers are not told about it.

20   Zero efforts are being made aimed at the prompt release of

21   those children.

22           You know, we all know when we first argued the

23   first motion that we brought, and Carlos Holguin argued the

24   motion and Leon -- I forget his last name -- argued for the

25   government.  We first appeared in front of you.  I think it

```
 1    was late 2015.  You -- it was the Court that raised the

 2    question and said about the family detention, well, what if a

 3    mother doesn't want the kid released?  You, the plaintiff,

 4    you don't expect them to just be torn away from the mother,

 5    do you?  We said, no, of course, not.  President Trump

 6    accuses us of that.  Of course, not.  We made clear that a

 7    mother -- in fact, if you look at the -- your order of

 8    reference for the special master, you put in there as one of

 9    the things that they should record is did the mother opt the

10    kid out of the class, or the father opt the kid out of the

11    class.

12            So we're not saying that every single kid has to be

13    released, because you may have a situation where -- you could

14    have multiple different situations where there's a very

15    legitimate reason why the kid is not being released.  All

16    we're saying is in order for us to effectively monitor this

17    situation, in order for us to help kids get out of detention,

18    in order to encourage the government to actually comply with

19    paragraph 14, if they have to share information with us about

20    why they're not releasing a kid within some period of time --

21    whatever that may be that the Court decides -- that is going

22    to more than anything else that we can think of right now,

23    that is going to encourage compliance, because they'll no

24    longer be a secret that ORR and ICE know about.  Nobody else

25    knows about.  That would more than anything else that we can
```

1    think about encourage the prompt release of these children.

2         That's not to detract from the Lucas R claims,

3    which at some point will be litigated that -- or a kid is not

4    going to be released within an X amount of time, whatever it

5    is 30 days, they should have a due process hearing.  That's a

6    separate question.  What I'm trying to get to is how do we

7    enforce and ensure to the maximum extent reasonably possible

8    how do we enforce compliance with paragraph 14.  Providing --

9    providing us with that data.  That's all of I have to say,

10   Your Honor.

11        MS. WELCH:  Your Honor, this Leecia Welch.  I would

12   agree with Mr. Schey wholeheartedly and just basically focus

13   on the fact that Lucas R provides an alternative basis for

14   getting this very vital information at this crucial time.

15        MS. FABIAN:  Your Honor, if I may respond just in a

16   very --

17        THE COURT:  For the record, this is Sarah Fabian.

18        MS. FABIAN:  Yes.  This is Sarah Fabian for the

19   defendants.

20        The data that Mr. Schey is talking about -- we've

21   had these discussions extensively with Mr. Schey, with

22   Ms. Ordin.  ORR keeps information about children as general

23   matter on a very individualized basis.  Mr. Schey knows and

24   many of the counsel here would know that, you know, when

25   they've requested case files with regard to individual

1    children, they've received those case files.  It's a

2    burdensome some process of pulling the case file, providing

3    the information requested.  It's not something that ORR could

4    quickly and easily do to provide -- you know, even if

5    Mr. Schey says one line here, I mean, with only 3,000

6    children in custody, that is 3,000 lines that sort of have to

7    be pulled from the file and pulled together and provided in a

8    way that could be turned over to plaintiffs.

9         Where that requirement is not in the agreement and

10    not really -- there's no -- no basis to find that this --

11    this information that needs to be provided in the agreement.

12         THE COURT:  Ms. Fabian, I have ordered the

13    compliance with that provision at least twice now in prior

14    orders.  The first time was five years ago.  How much longer

15    do I have to wait and continue to keep arguing about this

16    compliance?  Does it have to come through contempt?  Is it

17    better that you try to work something out that allows some

18    glimmer of information as to how you're complying.  It's not

19    sufficient for me to have ordered this -- not once, not

20    twice, but maybe three times now that you comply with that

21    provision, and then you say, but we can't give you any

22    statistics as to whether we're complying or not.

23         MS. FABIAN:  Your Honor has never ordered ORR to

24    comply with that provision.  That -- the orders that

25    Your Honor is referring to both relate to findings related to

```
1    DHS.  Those findings are now the subject of the monitoring

2    order and the monitor's ongoing --

3            THE COURT:  I understand that.  That is a very

4    lawyerly response.  The problem here is that we now have a

5    TRO that does raise ORR, and it applies the same principle.

6    So why should the result be different?

7            MS. FABIAN:  Well, Your Honor, it is then the first

8    time that this principle is being raised and addressed for

9    ORR.  It's saying that, you know, in an emergency basis

10   because of the current crisis, the Court should address

11   this -- this issue that is being raised for the first time,

12   and it is saying that -- that procedures and processes and --

13   and, you know, that -- that the 30-day limit should all be

14   imposed here on this expedited basis without --

15           THE COURT:  I'm not.  Let me make it clear.  I'm

16   not imposing a 30-day limit.  I'm looking for a snapshot.

17   I'm trying to set some parameters to get that snapshot.

18   That's not a rule going forward.  It's for me to have some

19   evidentiary basis to understand that you are or are not in

20   compliance.

21           MS. FABIAN:  Your Honor, I think to the extent that

22   the question is the current times in custody for ORR, I would

23   ask Mr. Schey is talking about a report that was compiled

24   based on data from -- where we are all aware that there was

25   significant crisis of different kind at the border, and that
```

1    certainly impacted the times in custody.  We had a lot of

2    discussions on those numbers and on those -- so the -- the

3    report that Mr. Schey is referring to is a report that covers

4    the time frame of last summer.  Those numbers are very

5    different from when ORR had -- had -- three to four times as

6    many children in custody as it does now.

7            So if the question is -- if the Court is asking for

8    the opportunity to sort of look at the situation now, the

9    numbers now -- if what the Court is looking to do is to

10   analyze the situation now, the times in custody now and to

11   provide whether the Court wants to look at it in the first

12   instance or to ask the monitor to take a look at that, I

13   think it's something that can be done.  None of that data is

14   currently before the Court.

15           Nothing in the TRO establishes that this important

16   question and the issue of times in custody and ORR's

17   processes that -- that they need to or should be dealt with

18   in the context of a TRO where the need for a TRO related to

19   the current crisis is not tied to the issue of whether there

20   are currently violations of ORR's release processes.

21           There's just no showing in the motion that it --

22   that if ORR has challenges or impediments to its -- in its

23   release processes that need to be addressed, nothing ties

24   those to the current crisis.  So whether that is an issue

25   that needs to be looked at by the Court and/or by the monitor

```
 1   is certainly an open question.  It's not a question that the
 2   record establishes needs to be dealt with on an expedited
 3   basis through a TRO where the Court has said that the problem
 4   is that there is a lack of evidence here.
 5              THE COURT:  Well, apparently Mr. Schey is going to
 6   file something tomorrow or tonight that will provide some
 7   evidentiary support for the problem of prolonged detention.
 8              So I think --
 9              MR. SCHEY:  Your Honor, just to be -- this is
10   Peter Schey.
11              Just to be clear, the data that I'm referring to
12   has nothing to do with the summer or the crisis that we had
13   at the border in April and May that resulted in us filing the
14   motion in June about border patrol conditions, and that's the
15   subject of the settlement that almost -- I hope is very close
16   to completion.  The data I'm referring to is January of 2020.
17              So hopefully there's no more kids still in custody
18   from that April of 2019 situation.  This is current data.
19   This is the most current data that we have.  I'm happy to
20   file the whole -- the whole spreadsheet that they gave us.  I
21   can file that under seal later today, and I'm happy to also
22   file the report that we got from the Stanford University
23   folks, which I don't have to file under seal because it
24   doesn't have the names.  I'm happy to file that.  It's very
25   clear.  It is about three pages' long.  It just provides the
```

1    data that I had just told you about.  Because they give us --

2    it's just the raw data.  It's in a spreadsheet.  If you

3    then -- it takes a little bit of manipulation to look at --

4    you can even do it with the data that they gave us.  I mean,

5    the Stanford folks make nice charts.  They make it easy to

6    understand.

7         With the ICE data that I put in my declaration, I

8    did those calculations myself.  They may not be a hundred

9    percent correct.  I think they're close.  I think they're

10   99 percent correct.  It was just a process I had to go

11   through looking at the ICE data to figure out -- and the ICE

12   data I was looking was actually from February.

13        THE COURT:  All right.

14        MR. SCHEY:  The most recent.

15        THE COURT:  Mr. Schey, we've been going for almost

16   an hour and a half now.  The court reporter needs a break.

17   Unless there is anything else that anybody needs to raise

18   very quickly, I'm going to adjourn.

19        MR. SCHEY:  Nothing else.

20        MS. WELCH:  Your Honor, this is Leecia Welch for

21   the Lucas R plaintiffs.  I guess, the last thing I would like

22   to say is that, you know, as we look all across the country,

23   we have huge numbers of inmates from correctional facilities,

24   including hundreds of inmates in New Jersey and New York

25   being released in light of the spread of COVID-19.  We have

1    ICE detainees being released in the past few days on the same

2    sort of procedural due process arguments that the Lucas R

3    plaintiffs are presenting to this Court.

4            So we do feel like they're highly relevant, and

5    they provide all the more protection for our clients during

6    this time.  Certainly, more at a greater magnitude than when

7    we filed our first amended complaint.  So if you have any

8    other specific concerns about the scope of the remedy or what

9    we're seeking, we would love to be able to address them.

10           THE COURT:  All right.  Well, I understand that

11   there are adults who are being released who are non-violent

12   offenders in order to reduce overcrowding in prisons.  I have

13   serious concerns about en masse ordering the government to

14   release thousands of minors without knowing where they're

15   going, to whom they're going, and whether they will be

16   exposed to even worse conditions where they're going.

17           So I don't think that's the responsible way to deal

18   with this.  I am interested in getting people out who have

19   been held longer than they should be and that would have

20   available suitable custodians.  I need to know that is done

21   in an orderly fashion and in a way that is not a danger to

22   the minors.  I don't think an individualized inquiry of that

23   sort is appropriate in the Lucas R case.

24           MS. WELCH:  We understand that the inquiry needs to

25   be individualized.  We think that is what due process

```
 1    requires.  We're not seeking a wholesale release of thousands

 2    of children.  We're seeking release of children that are

 3    limited to the unfit custodian class who have been in custody

 4    for longer than 30 days with a family reunification packet on

 5    file and who have not been released.

 6              So ORR has had well over 30 days to consider the

 7    appropriateness of the custodian, and if they have found that

 8    custodian to be inappropriate, then they can provide that

 9    information, as we've requested.  But we agree with you that

10    the release needs to be orderly.  We feel like we've

11    presented a remedy that could accomplish that.

12              THE COURT:  Thank you.

13              Anything further?

14              MR. SCHEY:  This is Mr. Schey.  I'm so sorry to

15    have one final comment, but I cannot resist.  One thing that

16    I want to make absolutely clear that we, in the Flores case,

17    are not seeking the en masse, you know, put them out on the

18    street release of children within seven days or 10 days or

19    20 days.  What we are saying is that the settlement itself

20    calls for without unnecessary delay, and another place it

21    uses the word expeditiously that -- that defendants do their

22    job and that defendants assess an appropriate placement for

23    that kid, and that in -- and we think that can be done -- I

24    did it three weeks ago.

25              THE COURT:  I understand, Mr. Schey.  I heard you
```

```
1    tell me already.

2              MR. SCHEY:  Okay.

3              THE COURT:  Okay.

4              MR. SCHEY:  So we're not looking for mass release.

5              THE COURT:  I understand that.  I've looked at --

6              MR. SCHEY:  Okay.

7              THE COURT:  -- the proposed orders on both cases.

8    I understand what you're looking for.  I am very familiar

9    with this case.

10             MR. SCHEY:  Okay.  Thank you.

11             THE COURT:  I've lived with it now for five years.

12   So don't assume that I don't know what you're talking about.

13   My issue --

14             MR. SCHEY:  Okay.  Thank you.

15             THE COURT:  My final parting comment to all of you

16   is that I have issued orders up the wazoo during these past

17   five years.  I would like to have compliance with those

18   orders.  The best way to get compliance with those orders is

19   to finalize some of the negotiations you've been engaged in

20   with the assistance of the special monitor and our medical

21   consultants so that you have specific standards to apply in

22   certain contexts.  I don't see why some of those standards

23   once you agree to them couldn't also be adopted in some

24   fashion in the ORR, if necessary.

25             MR. SCHEY:  Right.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Those are things that are best suited

2     for your negotiations with the assistance of the special

3     master.  When you asked me for an order whether it's through

4     a TRO or a preliminary injunction or any other format, it is

5     a blunt instrument.  I cannot deal with some of the nuances

6     that you're dealing with within the contours of the Flores

7     settlement agreement alone.  Some of the issues you're

8     talking about need to be thrashed out.  Maybe you need to

9     have a supplemental agreement on certain things.  Some things

10    I cannot order because they are not provided for in the

11    agreement.

12         So I would urge both sides again to redouble their

13    efforts to try to get some sort of resolution about protocols

14    and procedures that can be applied as soon as possible to

15    these facilities.  We have an emergency on our hands.  We

16    have to stop dithering about how to do this.  We know what

17    the agreement provides.  You know what I've said in multiple

18    prior orders in the past.  You don't need me to keep

19    repeating myself.

20         So I urge you for the sake of these minors and

21    given the crisis that has befallen us, you need to act with

22    due diligence.  I can issue as many orders as you want me to

23    issue, but until and unless you folks agree to implement it

24    on the ground, it's going to be meaningless.

25         Do I make myself clear?

1          MR. SCHEY:  Yes, Your Honor, very clear.

2          MS. FABIAN:  Yes, Your Honor.

3          THE COURT:  All right.  We are adjourned.

4          MR. SCHEY:  Thank you.

5          MS. FABIAN:  Thank you, Your Honor.

6          MS. WELCH:  Thank you.

7          (Proceedings concluded at 2:30 p.m).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                          CERTIFICATE

1    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

2    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

3    THE ABOVE MATTER.

4    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

5    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

6    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

7

8    /s/ Miriam V. Baird            04/10/2020

9    MIRIAM V. BAIRD                        DATE
     OFFICIAL REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25