JOSEPH H. HUNT
Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsel
    Tel:  (202) 532-4824
    Fax:  (202) 305-7000
    Email:  Sarah.B.Fabian@usdoj.gov

KATELYN MASETTA-ALVAREZ
DAVID BYERLEY
Trial Attorneys
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>    Plaintiffs,<br><br>      v.<br><br>WILLIAM P. BARR, Attorney General of the United States; *et al.,*<br><br>    Defendants. | Case No. CV 85-4544-DMG<br><br><br>**DEFENDANTS' SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................ 1

II.   SUPPLEMENTAL FACTUAL BACKGROUND .......................................3

    April 10, 2020 Order .................................................................3

    Supplemental Information Regarding ICE......................................4

    Supplemental Information Regarding ORR .....................................4

III.   SUPPLEMENTAL ARGUMENT ..................................................4

  A. The Court Should Not Order Any Relief Unless It Finds That Plaintiffs Have Met Their Burden to Show That Defendants are in Violation of the Agreement. ...................................4

  B. Plaintiffs Have Not Met Their Burden to Show That Conditions at ICE FRCs Violate the Agreement. ............................................8

  C. ICE Makes and Records Prompt and Continuous Efforts to Release Class Members in Accordance With the Agreement and This Court's Orders. ............................................14

  D. ORR's Release Practices Do Not Result in Unnecessary Delay................20

IV.   CONCLUSION .............................................................................25

i

1

## <u>TABLE OF AUTHORITIES</u>

2

CASES

*CBS Broad., Inc. v. EchoStar Comm. Corp.*,
   265 F.3d 1193 (11th Cir. 2001) .......................................................................9

*Flores v. Sessions*
   394 F. Supp. 3d 1041 (C.D. Cal. 2017) ................................................ 17, 19, 20

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
   109 Cal. App. 4th 944 (Cal. Ct. App. 2003) ......................................................6

*Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*,
   523 F. Supp. 2d 1113 (C.D. Cal. 2007) ............................................................6

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir. 2016) ..........................................................................8

*LSSi Data Corp. v. Comcast Phone, LLC*,
   696 F.3d 1114 (11th Cir. 2012) .........................................................................7

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ..........................................................................8

*Milliken v. Bradley*,
   433 U.S. 267 (1977)..........................................................................................8

*Ms. L., et al. v. ICE, et al.*,
   10 F. Supp. 1133 (S.D. Cal., June 26, 2018) ............................................. 18, 19

*Safety Today, Inc. v. Roy*,
   No. 2:12-CV-510, 2012 WL 12872708
   (S.D. Ohio Oct. 12, 2012).................................................................................11

*Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*,
   520 F. Supp. 2d 1184 (C.D. Cal. 2007) ............................................................5

STATUTES

8 U.S.C. §1182(d)(5).......................................................................................20

8 U.S.C. § 1226(a)..........................................................................................15

ii

# REGULATIONS

8 C.F.R. § 212.5(b)...................................................................................................18

## I.   **INTRODUCTION**

The Court has, for a second time, ordered Defendants to show cause why it should not issue a preliminary injunction: (1) requiring Defendants to make and record continuous efforts to release class members; (2) enjoining the U.S. Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR") from keeping minors who have suitable custodians in congregate custody due to an "unexplained failure to promptly release these minors to suitable sponsors under the [Trafficking Victims Protection and Reauthorization Act ("TVPRA")];" and (3) enjoining the U.S. Immigration and Customs Enforcement ("ICE") from keeping minors who have suitable custodians in congregate custody due to an "unexplained failure to release these minors within 20 days, especially given the emergent circumstances and the Court's prior orders requiring the same." *See* March 28, 2020 Order to Show Cause, ECF No. 740, at 13-14 ("OSC"); April 10, 2020 Order Permitting Supplemental Briefing, ECF No. 768, at 5 ("Second OSC"). For the reasons below, as well as the reasons explained in Defendants' March 27, 2020 TRO opposition brief, ECF No. 736, Defendants' supplemental opposition brief, ECF No. 746, and Defendants' Objection and Response to Plaintiffs' Reply Brief, ECF No. 762, and based on the evidence attached hereto and submitted in conjunction with Defendants' prior briefs, such an injunction is not warranted.[1]

Through new evidence and arguments submitted in conjunction with their reply brief, Plaintiffs seek a second opportunity to make their case after having failed to meet their evidentiary burden to show that Defendants are in breach of

---

[1] Defendants incorporate into this response all of the argument and evidence submitted in conjunction with their prior briefing, and provide this response as a supplement to that prior briefing.

1

the *Flores* Settlement Agreement ("Agreement") in their original motion. To the extent Plaintiffs continue to seek—and the Court contemplates—an injunction that is akin to an order to enforce certain terms of the Agreement, the Court should consider Plaintiffs' claims under the standards applicable to a motion to enforce, and should decide whether Plaintiffs have shown by a preponderance of the evidence that Defendants are violating any terms of the Agreement. The Court also should require Plaintiffs to meet their burden of presenting evidence of breach, and should not shift the burden of production to Defendants, or presume a breach because data disclosures required by the Agreement are narrower than Plaintiffs would prefer.

In any event, Plaintiffs fail to show that ICE is in violation of the Agreement. For their claims regarding the conditions at ICE family residential centers ("FRCs"), Plaintiffs seek to rely on outdated and/or inadmissible evidence in an attempt to meet their burden, and Defendants' evidence shows that ICE continues to follow all applicable U.S. Center for Disease Control ("CDC") and state guidelines for responding to the COVID-19 pandemic at its FRCs and to adapt to the evolving crisis; thus, Plaintiffs cannot meet their burden in this regard. Plaintiffs also have not shown that ICE is in violation of the Agreement's requirement that ICE make and record continuous efforts at release. The evidence submitted by ICE makes clear that it considers each class member in an ICE FRC for release on an individualized basis in accordance with the Agreement and this Court's prior orders, and in the same manner as was explained to this Court and to the Monitor over two and a half years ago.

Additionally, Plaintiffs' newly-raised arguments against ORR fail to establish that ORR is in violation of the Agreement. Plaintiffs' Reply seeks to take advantage of the COVID-19 pandemic to ask this Court to eliminate or curtail

2

ORR policies that they dislike, but that are critical for child safety. Plaintiffs' proposed elimination of these important processes should be rejected because it would create new and additional risks of harm to children over and above any risks that might result from this pandemic. ORR's child welfare experts have carefully considered and implemented these policies to protect child welfare, and to comply with Congress's mandate that ORR ensure the safe release of unaccompanied children to potential sponsors. At the same time, ORR continues to work closely with the CDC and other departments within HHS to respond to the COVID-19 pandemic. ORR's policies are designed to implement the most recent available information while also remaining flexible to allow for broad application as needed. Plaintiffs have made no showing that ORR is violating the Agreement in any way, and the Court therefore should reject their continued attempts to micromanage ORR's operations.

## II.   SUPPLEMENTAL FACTUAL BACKGROUND

### April 10, 2020 Order

On April 10, 2020, the Court issued its Order Extending Temporary Restraining Order and Permitting Supplemental Briefing. Second OSC, ECF No. 768. In the Second OSC, the Court addressed the evidence submitted by Defendants in response to its March 28, 2020 OSC, ECF No. 740, as well as videos and reports submitted by the ICE and ORR juvenile coordinators. Second OSC at 1-3. Based on this data and evidence provided by Defendants, the Court found that "Plaintiffs identify several issues that may result in unnecessary delay of minors' release in violation of the Agreement.]" *Id.* at 2. Recognizing that those issues were newly raised in Plaintiffs' reply brief, the Court then gave Defendants the opportunity to file a second supplemental opposition brief, and identified a number of questions that Defendants should answer in that briefing. *Id.* at 3-4. The

3

Court extended the existing temporary restraining order while the supplemental briefing is completed. *Id.* at 4-5.

### Supplemental Information Regarding ICE

ICE submits the attached declarations of Michael Sheridan and Christopher George, which supplement the information submitted with Defendants' March 27, 2020 TRO opposition filing (ECF No. 736), Defendants' April 6, 2020 Supplemental Response (ECF No. 746), and Defendants' Objections and Response to Plaintiffs' Reply Brief (ECF No. 762). *See* Def.s' Exs. 9 and 10. Specifically, these declarations address the allegations contained in Plaintiffs' latest declarations regarding conditions at ICE FRCs related to the COVID-19 pandemic, and discuss any new developments at these facilities as part of ICE's rapidly-evolving and ongoing efforts to respond to this public health crisis.

### Supplemental Information Regarding ORR.

ORR submits the attached declaration of Jallyn Sualog and exhibits, which supplement the information submitted with Defendants' March 27, 2020 TRO opposition filing (ECF No. 736), Defendants' April 6, 2020 Supplemental Response (ECF No. 746), and Defendants' Objections and Response to Plaintiffs' Reply Brief (ECF No. 762).   *See* Def.s' Ex. 11. Specifically, the Sualog Declaration responds to new issues raised in Plaintiffs' reply brief, and specifically addresses the questions asked by the Court in the Second OSC regarding the effect of COVID-19 on certain of ORR's release processes.

### III.   SUPPLEMENTAL ARGUMENT

#### A.   The Court Should Not Order Any Relief Unless It Finds That Plaintiffs Have Met Their Burden to Show That Defendants are in Violation of the Agreement.

Plaintiffs have now had multiple opportunities to meet their burden to establish that Defendants are in breach of the Agreement, yet they still have not

4

done so. Plaintiffs' original motion, ECF No. 733, sought a temporary restraining order, and an order to show cause why a preliminary injunction should not issue. The Court's March 27, 2020 and April 10, 2020 orders then granted certain temporary relief, and ordered Defendants to show cause why a preliminary injunction should not issue. ECF Nos. 740 at 13-15, 768 at 5-6. The preliminary injunction proposed by the Court, which is described in greater detail above, would require Defendants to comply with Paragraph 18 of the Agreement, and would enjoin Defendants from not releasing minors under Paragraph 14 of the Agreement, as interpreted by the Court. *Id.* Thus, in essence, the proposed injunction would be an order enforcing the Agreement.

Defendants submit that the pending motion therefore should be considered under the same standards as a motion to enforce. Under that standard, as Defendants have previously argued, the Court should not order any relief here unless Plaintiffs meet their burden to show that Defendants are in violation of the existing terms of the Agreement. *See Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*, 520 F. Supp. 2d 1184, 1194 (C.D. Cal. 2007) ("Plaintiff has the burden at trial of proving all elements of its breach of contract claim."). Plaintiffs should be required to meet this burden by a preponderance of the evidence. *See* Order, June 27, 2017 ECF No. 363 ("2017 Order") at 3 ("Plaintiffs' motion asserts breach of contract and seeks enforcement of the Agreement. The Court therefore will apply the preponderance of the evidence standard to Plaintiffs' motion to enforce.") If Plaintiffs do not carry that burden, then this Court should not order any relief.

The Court should not consider the pending motion under a more lenient standard. Plaintiffs' stated basis for requesting relief on a preliminary and expedited basis, as opposed to filing a motion to enforce, is founded on their

contentions that the COVID-19 pandemic should somehow inform the Court's reading of the Agreement and the obligations the Agreement places on the government. As Defendants have explained elsewhere, the Agreement should not be interpreted differently based on any new or different factual circumstances that exist as a result of the COVID-19 pandemic, because the "basic goal of contract interpretation" is to give effect to the parties' mutual intent "at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,* 109 Cal. App. 4th 944, 955 (Cal. Ct. App. 2003) (citing Cal. Civ. Code § 1636); *see also Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1123 (C.D. Cal. 2007) (citation and internal quotations omitted) (When discerning the parties' mutual intent, courts may "not substitute one party's view of what the contract should have said for the terms that are actually contained within the document."). Plaintiffs have not met their burden of showing that interim relief relating to COVID-19 is appropriate. In any event, should the Court determine that some sort of interim relief is needed, that relief must be limited to these limited and specific circumstances, and apply only while the current state of emergency remains in effect.

Under any standard, Plaintiffs should be held to their burden of proof. The Second OSC states:

> In the context of Plaintiffs' motion, however, where they have pointed to evidence that certain of Defendants' policies have caused "unnecessary delay" in the release of eligible Class Members, Defendants must explain why these policies are not "unnecessary" or have not caused delay in order to meet their evidentiary burden of responding to Plaintiffs' motion and to facilitate the transfer of relevant information to the Court. An unsatisfactory explanation or an unexplained delay in a Class Member's release may be evidence of "unnecessary delay" in release.

6

Second OSC at 4. But whatever standard is applied, the burden is on Plaintiffs to establish that any of Defendants' policies result in "unnecessary delay," and the Court should not place any evidentiary burden on Defendants, nor should it conclude that any of Defendants' policies regarding the release of class members are *per se* unnecessary simply because they may be "unexplained." *See LSSi Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1123 (11th Cir. 2012) (quoting *CBS Broad., Inc. v. EchoStar Comm. Corp.,* 265 F.3d 1193, 1202 (11th Cir. 2001)) (stating that in order to meet their burden to obtain injunctive relief, Plaintiffs must "make some *prima facie* showing" to ensure that the opposing party "is not saddled with the burden of production, initially").[2] Under any test, the evidentiary burden to establish breach of the Agreement should be placed squarely on Plaintiffs.

Because Plaintiffs have not shown that Defendants are in breach of the Agreement under any standard, the Court should not conclude that they are entitled to any relief.[3]

---

[2] In the OSC, the Court evaluated Plaintiffs' claims under the "serious questions" test. "Serious questions" are "questions which cannot be resolved one way or the other at the hearing on the injunction . . . ." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.1988), *cert. denied*, 490 U.S. 1035 (1989). As discussed above, this test is not appropriate where Plaintiffs are, in fact, seeking to enforce existing terms of the Agreement. In any event, where Plaintiffs rely on speculation, rather than evidence, to assert that Defendants are in breach of the Agreement, and where Defendants have now submitted substantial evidence showing that they are in compliance with the Agreement's terms, then the Court should not find that Plaintiffs have raised even "serious questions" as to breach, let alone met their burden to establish breach by a preponderance of the evidence.

[3] Defendants also reiterate that where Plaintiffs cannot meet their burden to show that Defendants are in breach of the Agreement, the Court likewise should not conclude that additional monitoring is warranted, or that Defendants should provide information to Plaintiffs that is not otherwise required by the plain terms of the Agreement. The Ninth Circuit has "long held" that district courts must tailor injunctive relief to "remedy the specific harm alleged."

**B.     Plaintiffs Have Not Met Their Burden to Show That Conditions at ICE FRCs Violate the Agreement.**

Based on the evidence now before the Court, including all evidence submitted by ICE thus far as well as the additional declarations of Michael Sheridan and Christopher George submitted herewith, the Court should conclude that Plaintiffs have not met their burden to establish that the conditions at ICE FRCs are not in compliance with the Agreement. On April 9, 2020, Plaintiffs filed supplemental evidence in conjunction with their Reply. This supplemental evidence included ten declarations which identified the declarants only by their initials. Consistent with applicable rules prohibiting late-filed evidence and new arguments submitted in reply briefing, Defendants asked the Court to strike Plaintiffs' new evidence because it could have, and should have, been submitted in conjunction with their motion. In the alternative, Defendants requested the opportunity to respond to these new late-filed evidentiary submissions. In the April 10, 2020 Order, the Court directed Defendants to address Plaintiffs' supplemental declarations in their Second Supplemental Response. ECF No. 768.

Plaintiffs' continue to rely on declarations—now purportedly updated— from Bridget Cambria, regarding the Berks FRC ("BFRC"), ECF No. 759-14,

---

*Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (citations omitted). Thus, if an injunction is "aimed at eliminating a condition that…does not flow from such a violation," the injunction "exceeds the scope of the district court's power." *Id.* (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977). An order providing Plaintiffs relief in the form of additional monitoring not only would require that the Court first find Defendants in breach of the Agreement, but also that the breach be established by the heightened standard of clear-and-convincing evidence. *See Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016) (discussing how court-ordered remedies designed to ensure compliance with a settlement agreement, and to cure breach, are properly considered under civil contempt standards).

8

Shalyn Fluharty, regarding the South Texas FRC (STFRC") (ECF No. 761-1)[4] and Andrea Meza, regarding Karnes FRC ("KFRC") (ECF No. 761-7), dated April 7, 8, and 9, respectively.[5] As Defendants' evidence reflects, continuous changes as a result of the government's rapidly-evolving response to the COVID-19 pandemic have again rendered many of the observations of Plaintiffs' witnesses obsolete, and therefore they should not be used to support the issuance of a preliminary injunction. *See, e.g., Safety Today, Inc. v. Roy*, No. 2:12-CV-510, 2012 WL 12872708, at *3 (S.D. Ohio Oct. 12, 2012) (holding that stale evidence is not enough to support a preliminary injunction).

For example, on April 10, 2020, ICE ERO released new guidance for ICE facilities that builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees.[6] The guidance also provides best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis. Also, Effective April 7, 2020, all Berks County staff at the BFRC are required at all times to wear a mask that covers their nose and mouth while at the BFRC. *See* ECF No. 755-2. This requirement is pursuant to an April 7, 2020 policy issued by Berks County and applies county-wide to all employees engaged in county

---

[4] Notably, Ms. Fluharty has not been on site at STFRC for more than one year. Sheridan Decl. ¶ 2.

[5] Defendants once again object to these declarations because they are based in significant part on hearsay, and include several assertions that lack any foundation, making it difficult in many instances for Defendants to investigate or respond to assertions made by the declarants. To the extent that these declarations do not comply with the Rules of Evidence, the Court should decline to consider them.

[6] *See* COVID-19 Pandemic Response Requirements (PRR), available at: https://www.ice.gov/sites/default/files/documents/Document/2020/eroCOVID19responseReqs CleanFacilities.pdf

business, whether in a county owned or leased facility or out in the community. *See* ECF No. 755-2. In accordance with the policy, residents at the BFRC have been provided masks and gloves to wear within the facility. *Id.*

In addition, these declarations do not meet Plaintiffs' burden because they are refuted by ICE's evidence submitted by individuals who have first-hand knowledge of ICE's operations and the conditions in its FRCs. First, the Declaration of Michael Sheridan responds to the allegations made in the Fluharty and Meza declarations. That declaration makes clear that the allegations in those declarations do not meet Plaintiffs' burden on their claims. Specifically, Mr Sheridan's declaration establishes the following:

Currently, at STFRC, case managers go dorm-to-dorm discussing COVID-19 with residents, and a CDC handwashing guidelines video, in English and Spanish, is played on a continuous loop on a dedicated channel, along with the increased postings of CDC handwashing posters in English and Spanish to ensure residents are informed about COVID-19. *See* Sheridan Decl. ¶ 3. Every resident dorm room has a sink and liquid hand soap dispenser and liquid hand soap is also available in the pantry area. *Id.* In addition, hand sanitizer pumps are placed throughout the facility. *Id.* Families arriving at the facility with unverified travel histories undergo the 14-day quarantine, but families that have been in DHS custody for 14 days, and medically cleared prior to intake, are not quarantined at STFRC unless they present COVID-19 symptoms during the intake process. To comply with social distancing guidelines during mealtimes, families are brought into the dining facility and seated at a table of 8. *Id.* ¶ 6. Each table is called up to receive their meals one at a time and must abide by the social distancing markers on the floor, which outline 6 feet between residents while in line, with no more than 8 residents in the line at one time. The facility groups meal times by

10

neighborhood in order to maintain small groups in the dining facility and to ensure social distancing. *Id.* The facility engages in continued frequent cleaning and disinfecting of commonly touched surfaces, such as tables, doorknobs, handles, phones, and playground equipment, at scheduled intervals throughout the day. *Id*. ¶¶ 7-8.

At STFRC, there is a process for all residents to initiate requests for health services on a daily basis. Sheridan Decl. ¶ 5(d). Clinical services are available to residents seven days a week and are performed by physicians or other qualified health care professional. *Id.* ¶ 5(e). The facility has a sick call procedure allowing residents unrestricted opportunities to freely request health care services (including mental health and dental services) provided by physicians or other qualified health care professionals. *Id*. ¶ 5(f). In addition, there are twenty-four hour emergency medical, dental, and mental health services. *Id*. ¶ 5(g).

At KCFRC, residents are informed about COVID-19 via public announcements, which are designed to keep residents informed of facility updates, changes of routine practices, and the latest information on the coronavirus. *Id*. ¶ 13(e). There is also signage posted throughout the facility describing health standards and facility sanitization practices. *Id*. ¶ 13(g). Hand sanitizer pumps are places in locations throughout the facility. Id. ¶ 12. Family units entering the facility are placed in individual rooms until the 14-day observation period is satisfied. *Id.* ¶ 13 (i). Residents are currently provided meals in their suites, and not in the dining rooms, to meet social distancing requirements. *Id.* ¶ 13 (v). The facility engages in continued frequent cleaning and disinfecting of commonly touched surfaces, such as tables, doorknobs, light switches, counter tops, door handles, desks, phones, vents, keyboards, toilet, faucets, sinks, and showers. *Id*¶

11

13(b). The facility has established "clean teams" that utilize the CDC and EPA recommended cleaning products which kills germs on these surfaces. *Id.*

At KCFRC, there is a process for all residents to initiate requests for health services on a daily basis, and health care request forms are readily available to all residents. *Id.* ¶ 13(d); *see als   Id.* ¶ 14. The facility has a sick call procedure allowing residents unrestricted opportunities to freely request health care services provided by a physician or other qualified licensed medical health care professionals in a clinical setting. *Id.* Clinical services are available to residents in a clinical setting at least 5 days a week and are performed by a physician or other qualified health care professional. *Id.* In addition, there are twenty-four (24) hour emergency medical, dental, and mental health services.  *Id.*

The declaration of Christopher George likewise responds to the declaration submitted by Plaintiffs' counsel Bridget Cambria, and refutes many of the allegations contained therein. Specifically, this declaration establishes the following:

At BFRC, residents have been provided information regarding COVID-19 and preventative measures to mitigate the spread of the virus. *See* George Decl. ¶ 12. Specifically, personal meetings were held with the residents on March 22, 2020 and March 23, 2020, respectively, and were conducted in the Spanish and Creole languages.  *Id.* Residents at the BFRC are informed by BFRC staff of the availability of personal protective equipment (PPE), specifically gloves and masks. *Id.* at ¶ 14.  In addition, on April 8, 2020, each resident was issued a cloth mask for their use and subsequent reuse after washing. *Id.* BRFC has increased the number of hand sanitizer stations from 7 to 11, and increased the number of hand sanitizer stations around the facility. *Id.* at ¶ 17. Similarly, residents have access to soap and may wash their hands in their private bathrooms, the communal

bathrooms, and at the sinks in the kitchenettes on the residential floors. *Id.* BFRC altered dining hall protocols to promote social distancing with families being called to the cafeteria one at a time and at staggered intervals. *Id.* at ¶ 9. As explained in previous declarations, FRC staff have augmented normal cleaning procedures to further mitigate against the potential spread of COVID-19. *Id.* at ¶ 20. In addition, Residents have access to licensed medical staff that are on site 24 hours a day, seven days a week. *Id.* at ¶ 26.

The Court also should decline to consider the ten declarations submitted in conjunction with Plaintiffs' reply, where the declarants' identities were not provided to the Court or to Defendants. *See* Declaration of S.C.M., dated Feb. 26, 2020, ECF No. 761-1; Declaration of O.H.G., dated Feb. 13, 2020, ECF No. 761-1; Declaration of C.R.R., dated Feb 26, 2020, ECF No. 761-1; Declaration of C.S.M., dated Feb, 18, 2020, ECF No. 761-1; Declaration of E.M.R. (unsigned and undated), ECF No. 761-1; Declaration of S.C.C., dated Jan. 21, 2020, ECF No. 761-1; Declaration of D.A.M., dated April 8, 2020, ECF No. 761-2; Declaration of M.A.R., dated April 3, 2020, ECF No. 761-3; Declaration of M.J.P., dated April 8, 2020, ECF No. 761-4; Declaration of G.M.M., dated April 3, 2020, ECF No. 761-5. Plaintiffs did not move to seal these declarations in whole or in part, nor did they provide the identities of the declarants to Defendants at the time of filing, making it impossible for Defendants to evaluate basic information regarding the accuracy of the declarations. Notably, several of these declarations are also dated before the filing of Plaintiffs' original motion, yet Plaintiffs provide no explanation why they waited to file them until April 9, 2020.

On April 14, Defendants reached out to Plaintiffs' counsel asking them to provide Defendants with the names and A-numbers of the ten declarants who provided declarations using initials. Plaintiffs did not respond to this request.

13

Defendants followed up the next day explaining that Defendants need the identifying information for the individual class member declarants to be able to respond to the claims raised therein. Plaintiffs' responded that they were the process of collecting the identifying information, but that before they would provide the information they would require that Defendants make certain assurances with regard to those individuals. Defendants pointed out that Plaintiffs did not move to file the declarants names under seal, nor did they request permission from the Court to withhold these names, and that they were obligated to provide this information to Defendants if they wished to rely on the declarations. Plaintiffs provided names for eight of the declarants late in the evening on April 16, 2020,[7] but stated that the remaining two declarants would not consent to providing that information to Defendants. Because Defendants either have not received identifying information, or received that information too late to allow them to properly investigate the allegations contained in those declarations, Defendants renew their request that the Court decline to consider them, and also decline to consider the testimony of any of Plaintiffs' witnesses that is made in reliance on these statements.

### C.  ICE Makes and Records Prompt and Continuous Efforts to Release Class Members in Accordance With the Agreement and This Court's Orders.

Relying on information produced in response to the OSC, the Second OSC asks ICE to respond to the following inquiries:

ICE's uniform perfunctory explanations for non-release seem to imply that a blanket prohibition on release exists as to minors who are

---

[7] Plaintiffs provided information for S.C.M., C.R.R., C.S.M., E.M.R., D.A.M., M.A.R., M.J.P., and G.M.M. When Plaintiffs provided this information, they also noted that several of these witnesses have already been removed or released from ICE custody.

14

categorized as "pending IJ hearing/decision," "pending USCIS response," or are plaintiffs or class members in litigation. Do these explanations contravene this Court's June 27, 2017 Order [see Doc. # 363 at 20–27; 394 F. Supp. 3d 1041, 1063–1068 (C.D. Cal. 2017)]? What individualized parole determinations and continuous efforts to secure a minor's release does ICE undertake in these categories, especially in light of the COVID-19 pandemic?

Second OSC at 3-4. ICE provides the following information in response to the Court's questions, and to further explain the manner by which it is complying with the Agreement, and the Court's orders.

As an initial matter, it is worth noting that the data reviewed by the Court does not include all families who entered U.S. Department of Homeland Security ("DHS") custody in the first three months of 2020, but only those who were in custody as of March 28, 2020. *See* Declaration of Melissa Harper, ECF No. 746-12, ¶ 8. The vast majority of family units are: (1) never placed into immigration custody; (2) never transferred to ICE custody for placement at a family residential center ("FRC"); or, (3) quickly released from ICE custody either as a matter of discretion under 8 U.S.C. § 1226(a), or through the parole process. *See* Harper Decl. ¶¶ 9-12. In the first three months of 2020, over 19,700 members of family units came into U.S. Customs and Border Protection ("CBP") custody. *See* U.S. Customs and Border Protection, Southwest Border Migration FY2020, available at: https://www.cbp.gov/newsroom/stats/sw-border-migration (last viewed April 15, 2020). Yet, on April 5, 2020, only 1,004 individuals (and only 498 class members) were in ICE FRCs. Harper Decl. ¶ 2. Thus, in considering this data, the Court should remember that a significant number of class members are never placed into ICE FRCs in the first instance or are otherwise quickly released from ICE custody.

Moreover, the evidence shows that all family unit members reflected in the data presented to the Court were considered for release under the discretionary

15

standard in 8 U.S.C. §1226(a), or for parole, consistent with the applicable statutes, and this Court's 2017 Order. *See* Harper Decl. ¶¶ 9-11; Dougherty Report, ECF 374-2, ¶ 8.a (ICE "direct[ed] FRCs to evaluate whether, upon initially taking a class member into custody, the class member is eligible for parole."). Consistent with this Court's 2017 Order, and Paragraph 14 of the Agreement, the individualized parole inquiry applicable to minors evaluates the potential for flight risk. *See* Parole Worksheet, ECF No. 384-2 at 7-8. Thus, the data presented to the Court concerns class members who underwent an individualized parole determination consistent with the Court's 2017 Order.

Reviewing the data provided to the Court in conjunction with the above understanding of ICE's parole process demonstrates that ICE is, in fact, in compliance with the Agreement. Specifically, with regard to the first two data points identified by the Court—minors in expedited removal proceedings with a "pending IJ hearing/decision" or "pending USCIS response"—this Court previously held that the custody of class members in these particular categories is permissible as long as their release or transfer from ICE custody occurs "as expeditiously as possible," or "as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear . . . ." *See* Order, ECF No. 189, at 10 (Aug. 21, 2015).[8]

---

[8] The August 2015 order was issued after Defendants responded to an order to show cause by objecting that the Court's proposed relief "would functionally terminate the ability of DHS to place families into expedited removal or reinstatement proceedings, which cannot be completed in three to five days." *Id.* at 9. The government explained that it needed to be able to detain families in ICE FRCs for "the time needed for credible fear and reasonable fear processing[,]" which at that time took an average of about 20 days. *Id.* The Court explained that Defendants' "fears that the remedial order will contravene the INA are unfounded." *Id.* The Court held that the release or transfer of a class member from an ICE FRC should occur "as expeditiously as

At the time of that order, existing "extenuating circumstances" caused the process to take, on average, 20 days. *Id*.

As Ms. Harper described in her declaration, current detention times for minors in expedited removal proceedings with a "pending IJ hearing/decision" or "pending USCIS response" will "typically depend on the speed and results of credible and reasonable fear interviews conducted by [USCIS], as well as, immigration proceedings conducted by the Executive Office for Immigration Review." Harper Decl. ¶ 10. Since the Court originally examined this issue in 2015, the speed at which USCIS has been able to process credible/reasonable fear claims has decreased while, at the same time, denial rates have increased. *See*

https://www.uscis.gov/tools/reports-studies/immigration-forms-data/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions.  Nonetheless, Plaintiffs have presented no evidence that would suggest that these proceedings do not presently occur in good faith and with due diligence just as they did in 2015. Thus, there is no basis upon which this Court should find that custody of

---

possible," and noted that, "[a]t a given time and under extenuating circumstances, if 20 days is as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear, then the recently-implemented DHS polices may fall within the parameters of Paragraph 12A of the Agreement, especially if the brief extension of time will permit the DHS to keep the family unit together." *Id.* at 10. The order noted Plaintiffs' objection that the Agreement "does not permit Defendants to routinely detain children in unlicensed, secure facilities 'for as long as they deem necessary' no matter what the circumstances," but concluded that the language of Paragraph 12A requiring "that Defendants 'place all minors pursuant to Paragraph 19 as expeditiously as possible' in 'the event of an emergency or influx of minors into the United States' . . . , on its face, gives Defendants some latitude, provided it is exercised reasonably and in good faith, to deal with emergency situations." *Id.* at 10 n.7. Thus, while the rule announced in the order has come to be referred to as a "20-day rule," that was not in fact the rule announced by the Court's order; rather, the 2015 order required the release of a class member from an ICE FRC to occur "as expeditiously as possible," and allowed that the time necessary for the completion of credible fear proceedings, when undertaken "reasonably and in good faith," could fall within that definition. *Id.*

these class members during their expedited removal proceedings violates the terms of the Agreement, or the Court's 2017 Order.

The 2017 Order further interpreted the Agreement to require Defendants to "comply with the unambiguous charge of the *Flores* Agreement to make individualized determinations regarding a minor's flight risk rather than blanket determinations," for minors in expedited removal proceedings. 2017 Order at 25. The Order requires that parole determinations be made in accordance with the standards set forth in 8 C.F.R. § 212.5(b). *Id.* In explaining this requirement, however, the Court recognized that "[u]ltimately, based upon an individualized review of the facts, Defendants may conclude that it is in the best interests of an accompanied minor to remain with a parent who is in detention." *Id.*

As Ms. Dougherty explained in 2017, to fulfill this directive from the Court:

> ICE has issued guidance directing FRCs to evaluate whether, upon initially taking a class member into custody, the class member is eligible for parole under conditions established by 8 U.S.C. §1182(d)(5) and 8 C.F.R. § 212.5(b). Class members will be reevaluated for parole when new, pertinent information is received concerning continued custody. In addition, when an FSA class member is admitted into an FRC, ICE asks the parent of the class member the opportunity to list potential sponsors.

*See* Defendants' Supplemental Opposition, ECF No. 746 at 33 (quoting Declaration of Deane Dougherty, Sept. 8, 2017, ECF No. 374-2 at ¶ 8.a.). Individualized parole evaluations are reflected in parole worksheets that are placed in the minors' files, which Ms. Dougherty monitors for compliance in the manner described in Defendants' previous filing. *See* ECF No. 747 at 32-35; *see also* Parole Worksheet, ECF No. 384-2 at 7-8. Accordingly, the custody of class members identified by these two data points in the records reviewed by the Court—that is, class members in expedited removal proceedings with a "pending

18

IJ hearing/decision" or "pending USCIS response"—does not violate the
Agreement because each of those class members received individualized parole
determinations in accordance with the Agreement and the Court's 2017 Order.[9]

The third category of data identified by the Court reflects minors who "are
subject to final orders of removal [but who cannot be removed because they are]
subject to judicial and administrative stays of removal issued by various courts in
various cases, which may impact the length of stay at an FRC." Harper Decl. ¶
11. As Ms. Harper explained, "cases involving family units with final orders of
removal at FRCs that are subject to judicial stays are individually evaluated for
risk of flight to determine whether continued detention is necessary or whether
release is a viable option." *Id.* Notably, the Agreement provides that whether "the
minor is currently under a final order of [removal]" is a factor ICE may consider
"when determining whether a minor is an escape-risk or not[.]" Agreement ¶ 22.
ICE's individualized evaluation of these class members for risk of flight to

_____

[9] The 2017 Order also held that, in some circumstances, it may be necessary for ICE to consider
releasing a child from an ICE FRC to a sponsor other than the child's parent with whom the
child is detained. *Id.* at 26. Plaintiffs cite to this portion of the Court's Order, but do not explain
what they ask the Court to find with regard to this provision. *See* Reply, ECF No. 754 at 15-16.
Since the 2017 Order was issued, Defendants have been enjoined in separate class action
litigation from separating class member parents from their children, absent a waiver of the
parent's right to be detained with their children at an ICE FRC. *See Ms. L., et al. v. ICE, et al.*,
10 F. Supp. 1133, 1149 (S.D. Cal., June 26, 2018) ("Defendants, and their officers, agents,
servants, employees, attorneys, and all those who are in active concert or participation with
them, are preliminarily enjoined from detaining Class Members in DHS custody without and
apart from their minor children, absent a determination that the parent is unfit or presents a
danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be
reunited with the child in DHS custody"). In light of this injunction, ICE generally does not
initiate the separation of a child from a Ms. L. class member parent and would not do so unless
the Ms. L. class member parent affirmatively waived his or her Ms. L. rights. To the extent that
Plaintiffs in this case seek to require ICE to separate them from their parents, such a request
would likely need to be pursued by their parents—class members in the Ms. L. case—and could
require that the parent obtain individualized relief or approval from the Ms. L. court.

determine whether they can be released is consistent with that Order, and with Paragraphs 14 and 22 of the Agreement. Therefore, there is good reason to conclude that ICE's processes in this regard likewise comply with the Agreement. Plaintiffs also have provided no evidence demonstrating any reason to believe— let alone to meet Plaintiffs' burden by a preponderance of the evidence—that ICE's custody of these class members violates the Agreement.

Finally, to the extent the Court is seeking information regarding any impact on ICE's individualized consideration of class members for release "in light of the COVID-19 pandemic[,]" Second OSC at 4, Ms. Harper explains that, "[i]n addition to the FRC intake questions designed to identify possible sponsors, and other factors that are considered in evaluating continued detention or release, the FRCs proactively screened their populations for individuals that are potentially at a higher risk for serious illness from COVID-19, including pregnant detainees and detainees over the age of 50 years, if any, to determine whether continued detention was appropriate. The FRCs will continue to implement additional COVID-19 guidance as it is received." Harper Decl. ¶ 12. Thus, the individualized considerations the Court has found are required by the Agreement have in fact been adapted to take into consideration compliance with applicable COVID-19 guidance, and will continue to reflect COVID-19 guidance as that guidance is received. Accordingly, the advent of the COVID-19 pandemic provides no basis for the Court to conclude that ICE is not complying with the Agreement.

**D.     ORR's Release Practices Do Not Result in Unnecessary Delay.**

The Court directed ORR to respond to four sets of questions. ORR's responses to the Court's questions are provided below.

QUESTIONS:

- Does ORR have a blanket ban on releasing children placed in states where there are "shelter in place" or "stay at home" orders? Now that 42 states have these "stay at home orders" in place, has that ban been extended to states other than New York, California, and Washington? How does ORR perform an individualized assessment of each minor's eligibility for release in states where "stay at home" orders are in place?

- Does ORR maintain a policy of postponing release of all minors in a facility with a confirmed case of COVID-19? Does ORR consider releasing minors to be quarantined in a sponsor's home? If not, why not?

ORR'S RESPONSE: ORR does not have a blanket ban. Sualog Third Decl. at ¶ 3. ORR may determine that postponing release of a UAC to a sponsor who lives in a confirmed shelter in place location is in the child's best interest, but each unification decision is made on a case-by-case basis, in compliance with the April 6, 2020 Guidance. *Id.* at ¶ 5.

The April 6 guidance explains that "ORR may postpone release of a UAC to a sponsor: (a) If an ORR care provider facility . . . experience[s] one or more confirmed cases of active COVID-19 infection in either children or staff, releases are temporarily postponed for all children at the care provider facility . . . until ORR's Division of Health for Unaccompanied Children (DHUC) lifts the hold on releases or allows the release of specific children on a case by case basis following CDC recommendations." Sualog Second Decl., ECF 762-1, at ¶ 7.

The guidance places responsibility with the health professionals in the DHUC, and allows case-by-case releases, which permits time to discern which children were potentially exposed to COVID-19 and therefore require quarantine to prevent further spread of the virus (the primary purpose of the pause in releases), and to evaluate whether children are at higher risk of severe disease and require more intensive medical monitoring. *Id.* at ¶¶ 8-9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Even if there is a temporary hold on releases due to an active COVID-19 infection, DHUC can allow release of specific children on a case-by-case basis following CDC recommendations on the public health management of persons with potential exposure to COVID-19. Sualog Third Decl. at ¶ 5. Factors that are taken into consideration when determining if an exposed minor can complete the required 14 day quarantine at the sponsor's home include: whether commercial air travel is required to travel to the sponsor's home, presence of health conditions that place the child or sponsor household at higher risk, and the ability of the sponsor to maintain the child's quarantine and active symptom monitoring for 14 days. *Id.*

The April 6, 2020 guidance also provides: "(b) If a sponsor or a member of the sponsor's household has an active COVID-19 infection, postpone release until a medical or public health professional determines it is safe to release the UAC to the sponsor household." A footnote explains: "For COVID-19 patients who are not hospitalized, isolation may be discontinued if the CDC recommended isolation time has passed since symptom onset, or if 3 days have passed since recovery/resolution of fever and improvement of symptoms. https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html. However, if other members of the household are quarantined and then go on to develop illness, the timeframe could be longer than 14 days." This provision of the policy accords with best public health practices, places decision-making authority with medical professionals, and allows consideration of whether an active COVID-19 infection exists within the household, and confirming with a medical or public health professional that release remains safe for the minor. Sualog Second Decl. at ¶¶ 10-11.

ORR's policies continue to develop in response to the rapidly-changing COVID-19 public health emergency. *Id.* at ¶ 3. All ORR guidance concerning COVID-19 prevention and infection control measures are adapted from CDC COVID-19 guidelines, with consideration of the congregate setting and programmatic requirements of the unaccompanied children program. The guidance is developed primarily by ORR's DHUC with input from subject matter experts at CDC. CDC also provides review and input when necessary. *Id.* at ¶¶ 3-4. ORR also did not develop or issue the April 6 Guidance because of litigation *Id.*

QUESTIONS:
- In light of the unavailability of fingerprinting facilities in many areas due to COVID-19, will ORR adjust its fingerprinting requirements for eligible vetted sponsors? For example, would ORR consider postponing or suspending its fingerprinting requirements like some state child services agencies have done due to the pandemic?

ORR'S RESPONSE: ORR has not made a determination to eliminate fingerprinting, but has adjusted procedures to account for the COVID-19 pandemic (for example mailing fingerprint cards, Sualog Second Decl. at ¶ 13, working with potential sponsors to locate available fingerprint locations, keeping the provider network frequently apprised of digital fingerprint locations, and working with currently closed fingerprint locations to locate PPE so that they may re-open). Sualog Third Decl. at ¶ 6. Many digital fingerprint locations remain open – some with reduced hours. Those that have closed are working to re-open, with nine closed at the time of Ms. Sualog's third declaration. *Id.* The ORR discharge rate also has remained steady, and ORR closely monitors its discharge rate to identify potential inefficiencies in processes. *Id.* at ¶¶ 4, 6. While most parents/legal guardians or immediate relatives are not required to undergo fingerprinting, *id.* at ¶ 7, those that are will not be considered eligible or vetted

until such clearance has occurred. *Id.* at ¶ 9. ORR also differs from state child welfare agencies, because children are not being removed from abuse, abandonment, or neglect in the parent or legal guardian's home, thus state policies – such as those for emergency placements – would not necessarily be instructive for ORR. ORR also continues to have digital fingerprint locations with more expected to come back online. *Id.* at ¶ 8. ORR has made the judgment that suspending fingerprinting requirements at this time would jeopardize children and undermine ORR's ability to fulfill Congress' directive that it protect children from "traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." Sualog Second Decl. at ¶ 15. *See also id.* at ¶ 18 (explaining that ORR's policy has been developed after years of experience).

QUESTION:
- Why does the Migrant Protection Protocols affect a minor's eligibility to be released?

ORR'S RESPONSE: The Migrant Protection Protocols ("MPP") do not affect a minor's eligibility to be released. Plaintiffs' assertions regarding the MPP do not appear to concern the program itself, but rather refer to situations where a minor is in ORR custody, but has a final order of removal because he or she previously was in removal proceedings with a parent under the MPP. For ORR's purposes, if a minor has an executable final order of removal, and the minor is scheduled to be deported to his or her home country pursuant to that final order of removal in short order, then ORR will retain the minor in custody and work with immigration authorities to ensure the minor appears to be removed. If it becomes apparent, however, that removal is not imminent, ORR follows ordinary release protocols. Sualog Third Decl. at ¶ 10.

24

It is also worth noting that the declaration of Jallyn Sualog responds to the Court's conclusion that "medical consensus is that any form of congregate care puts a child in custody at higher risk of infection." Second OSC at 4. Ms. Sualog explains that, in fact, expert opinions regarding congregate care infection *relative to* expedited release to unvetted sponsors does not appear to have a consensus. *Id.* at ¶ 11; *see* Cohn Decl. in *Lucas R. v. Azar,* Case No. 2:18-CV-5741 DMG, ECF 230-11, ¶¶ 22-26.

## IV.    CONCLUSION

Plaintiffs have not met their burden, under any standard, to show that Defendants are in violation of any provisions of the Agreement. Therefore, the Court should deny Plaintiffs' motion, and should conclude that Defendants have shown cause why a preliminary injunction should not issue.


///


///


///


25

DATED: April 17, 2020

JOSEPH H. HUNT
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants*

26

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2020, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants
