Case 2:85-cv-04544-DMG-AGR Document 772-5 Filed 04/17/20 Page 1 of 8 Page ID #:36668

# Defendants' Exhibit 10

## **DECLARATION OF CHRISTOPHER GEORGE**

I, Christopher George, hereby declare that the following statements are true and correct to the best of my knowledge, information and belief:

1. I am an Assistant Field Office Director (AFOD) for the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) – Philadelphia Office. I began my employment with ICE on October 14, 2007 as an Immigration Enforcement Agent and later served as a Deportation Officer and Supervisory Detention and Deportation Officer. I have held my current position as an AFOD, since August 2018. As part of my current duties, I oversee the day-to-day operations relating to the case management of aliens detained at the Berks Family Residential Center (BFRC), located in Leesport, Pennsylvania.

2. I have reviewed the affidavit filed by attorney Bridget Cambria and provide the following response, which is based on my personal knowledge and on information provided to me in my official capacity.

**Compliance with CDC COVID-19 Prevention Guidelines at the BFRC**

3. ICE continues to implement the Centers for Disease Control and Prevention's (CDC) *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*.

4. Since the commencement of the COVID-19 outbreak in the United States in January 2020, none of the 254 individuals who were housed or continue to be housed at the BFRC have tested positive for the disease. Moreover, no resident at the BFRC has been suspected of having COVID-19.

    a. As noted in my prior declaration, dated April 7, 2020, there was a minor child who was tested for COVID-19, although she was not suspected of having the disease given that her symptoms were consistent with a cold, and did not also include fever and other indicia associated with COVID-19. As a cautionary measure and due to the availability of a test, the child was tested and found not to have the disease. During the period the child, who is 5 years-old, was being evaluated, she was quarantined with her mother so as not to have quarantine alone. Contrary to Ms. Cambria's assertion, neither the child's mother nor her father presented with any medical symptoms, to include symptoms for COVID-19. Moreover, under current CDC guidelines, testing of either parent, both of whom were asymptotic, was not required, especially where, again, the child was not suspected of having COVID-19 and, indeed, tested negative for the disease.

    b. Additionally, Ms. Cambria incorrectly states in her declaration that DHS failed to provide Aldea, the organization for which she works, the results of the child's COVID-19 test. In fact, I personally emailed a response to Ms. Cambria and Ms. Kane (the

    Aldea attorney who had made the actual request), on April 7, 2019, to inform them of the negative COVID-19 test results. Moreover, I provided Ms. Kane and Ms. Cambria with the proper medical waiver forms, as well as, information explaining how to obtain the child's medical records, insofar as ERO does not retain official medical records for detainees. The child's parents were also informed of the child's test results and were free to share them with Ms. Cambria, at any time. Further, the child's parents can and were able to, at any time, request and obtain any and all medical records pertaining to the child from the ICE Health Service Corps (IHSC) at the BFRC, just as other residents represented by Aldea have done in the past.

Promotion of Social Distancing

5. As reflected in the video of the BFRC, previously submitted into evidence, the BFRC is laid out in a dormitory style and offers a family-friendly environment that includes several day rooms, TV and multiple recreation/ activity rooms, library, and a toddler playroom. Additionally, there is a dining room, gym, and other free space, where residents may socialize, if they so choose.

6. The BFRC has approximately 58,995 square feet of communal area for its residents, thereby allowing ample space for movement around the facility, while also social distancing. The facility's current population is sixteen (16) residents. The BFRC also has 10 acres of outdoor space.

7. The BFRC staff has followed the CDC's evolving recommendations regarding social distancing and routinely reminds and encourages the residents to practice social distancing, i.e., remain at least six (6) feet apart when congregating.

8. Insofar as the BFRC is an unsecured facility, residents can freely move within the program areas, such as the TV and multiple recreation/activity rooms of the facility, without permission, or may elect to remain in their individual rooms, which also contain private bathrooms. As stated in my prior declaration, each family, comprised of a parent and their accompanying child(ren), are now housed in their own rooms, which are, on average, approximately 430 square feet, further allowing for social distancing.

Changed Dining Hall Protocols Due to COVID-19

9. Normal dining hall protocols were altered on March 16, 2020, in order to promote social distancing. Specifically, families are now called to the cafeteria one at a time and at staggered intervals, in order to avoid congregation of multiple families at once. Residents also are required to wash their hands and use hand sanitizer prior to entering the dining hall.

10. Each family is served buffet style by BFRC staff, who wear gloves, masks and hair nets. Each family is also assigned to an individual table. All tables within the dining hall have been separated by approximately six (6) feet in order to maintain social distancing.

11. Notably, the residents continue to receive quality nutritional food.  The BFRC also maintains strict sanitation and hygienic practices to ensure against contamination of the food, and to meet governmental health and safety codes.

Sharing of Information Regarding COVID-19

12. The BFRC residents have been provided information about COVID-19 and instruction on preventative measures to mitigate against the spread of COVID-19.  Specifically, personal meetings were held with the residents on March 22, 2020, and March 23, 2020, respectively, and were conducted in the Spanish and Creole languages.  In order to further ensure the residents' understanding of the instructions, there are CDC informational posters in the Spanish and Creole languages – representative of the languages currently spoken by the residents – relating to COVID-19 and instructions on handwashing, the use of hand sanitizers and the need for social distancing.  Ms. Cambria's assertation that the BFRC staff are not bilingual is false, as the BFRC staff employs five (5) native Spanish speakers, nine (9) conversational Spanish speakers and two (2) native creole speakers, among other languages. Theses staff members regularly communicate with residents in their native language.  BFRC staff also frequently reinforce the CDC guidance with the residents, to include doing demonstrations if a resident does not appear to understand.

13. Residents also have access to the Internet where they can read news stories and conduct research about COVID-19 in their preferred language.  Likewise, the residents may also communicate via telephone or email with their family and friends, who may also provide additional information regarding COVID-19.  Spanish-speaking residents may also watch the news and other television programs in Spanish.

Availability of PPE, Hand Sanitizer and Soap

14. As discussed in my prior declarations, dated April 7, 2020, and April 8, 2020, residents at the BFRC are being informed by BFRC staff of the availability of personal protective equipment (PPE), specifically gloves and masks, although the residents did not actively seek to wear the PPE.  It was not until an April 7, 2020, Berks County policy was issued that directed that all BFRC staff wear a mask while working at the BFRC did the residents begin to accept and utilize the offered PPE.  In addition, on April 8, 2020, each resident was issued a cloth mask for their use and subsequent reuse after washing.

15. Residents may request new masks and gloves, which are disposable, at any time.  BFRC staff provides the residents with new masks and gloves every week, or as otherwise needed in accordance with CDC and ERO guidance. At times, residents are choosing not to wear PPE while outside their rooms.

16. Additionally, residents who are released from the BFRC are offered and provided PPE upon their departure. To date only one family has declined the PPE.

17. Hand sanitizer stations and sanitizing wipes were available at the BFRC even prior to the COVID-19 outbreak. As of February 2020, the BFRC has augmented the number of hand

sanitizer stations from 7 to 11. The number of containers of sanitizing wipes have also increased around the facility. The BFRC also maintains ample supply of hand sanitizer and wipes to ensure constant availability. Similarly, residents have access to soap and may wash their hands in their private bathrooms and the communal bathrooms. BFRC staff routinely monitor soap supply levels and immediately refill the soap dispensers when low.

Cleaning Schedule at the BFRC

18. In accordance with the Family Residential Standards, residents are required to properly maintain their living areas within the BFRC. Each adult resident is responsible for daily personal housekeeping to include straightening their bedroom, making their bed, picking up debris, and cleaning the floor, as well as, cleaning their private bathroom.

19. Residents are not required to conduct any other cleaning within the facility. They may participate in ongoing voluntary work programs, that include cleaning portions of the facility. The only voluntary work program that has been temporarily suspended due to COVID-19 is voluntary kitchen work program.

20. As discussed in my April 7, 2020, declaration at paragraph 17, subsections J, K, L and T, the BFRC staff has augmented its normal cleaning procedures to further mitigate against the potential spread of COVID-19.

21. The video of the BFRC that I recorded on April 2, 2020, accurately reflects daily conditions within the facility. Moreover, the BFRC has fostered and maintained a clean and organized environment during my tenure overseeing operations at the BFRC.

22. Ms. Cambria's suggestion that the BFRC was cleaned and organized solely for purposes of the video, and by extension, this litigation, is without merit. There is no evidence of any complaints having been made by the residents or, indeed their attorneys, regarding the cleanliness and organization of the facility. More significantly, the BFRC is routinely subject to unannounced monthly inspections by the Pennsylvania Department of Human Services (PADHS), the last of which was conducted between March 31, 2020 and April 7, 2020. At no time has PADHS cited lack of cleanliness or organization as an issue in need of improvement.

Screening of Incoming Families at the BFRC

23. As previously discussed in my declaration, dated April 7, 2020, the BFRC has not taken in new families since March 18, 2020. Since February 2020, IHSC instituted additional intake protocols consistent with CDC guidelines regarding the screening of individuals for COVID-19, that remain in place and were used at the time each of the families went through the intake process at the BFRC.

24. There is no requirement under existing CDC guidelines that individuals who have no symptoms associated with the disease be tested for COVID-19, where the individual has not otherwise been exposed to a person who has tested positive for the disease. Even assuming Ms. Cambria's assertions regarding the families' prior detention with U.S. Customs and Border

Protection are correct, there is no evidence that, at the time of the families' admissions to the BFRC, they were symptomatic for COVID-19 such that a COVID-19 test was required or that met epidemiologic risk criteria warranting monitoring for 14 days.

**Medical Care Provided at the BFRC**

25. Medical services at the BFRC are administered by IHSC personnel, who are responsible for providing care and ensuring that the quality and appropriateness of health services, including those related to mental health, dental care, and emergency care, for the BFRC residents are in accordance with the Family Residential Standards and applicable medical guidelines.

26. Residents have access to licensed medical staff on site 24 hours a day, seven (7) days a week. Medical staff that residents have access to include physician assistants, a psychologist, licensed clinical social workers, licensed RNs and LPNs, psychiatrists, nurse practitioners, and medical doctors. Dental services provided to the residents are conducted by outside dental care providers contracted by Berks County. Additionally, specialized medical services, such as ENT specialists, gynecological specialists, gastroenterologist specialists, orthopedic specialists, ophthalmologist specialists, are provided by local medical providers on an as needed or emergent basis. On March 18, 2020, IHSC, in coordination with offsite healthcare providers, temporarily suspended scheduled elective medical procedures for all residents consistent with CDC COVID-19 guidelines.

27. Based on my discussions with Lieutenant Commander Illecia Benefield, IHSC at the BFRC continue to operate in compliance with the CDC guidelines relating to COVID-19.

28. Monthly inspections conducted by the PADHS include review of the medical services provided at the BFRC, and there have been no findings that evidence a major deficiency or lack of suitable and proper healthcare services being provided to the residents. Moreover, monthly inspections of the BFRC are also conducted by DLH Corporation, which engages in comprehensive review of all Family Residential Standards to include provided medical services. IHSC routinely passes all medical inspections and reviews by the DLH Corporation and PADHS.

.
**Continued Legal Access for Families at the BFRC**

29. BFRC residents are able to contact legal service providers on the Executive Office for Immigration Review's list of pro bono legal services at no cost using the ICE free-access telephone system. Residents are also permitted to purchase phone cards that allow them to make phone calls to legal service providers, family, and friends without assistance from BFRC staff. If residents do not have the money to purchase a phone card and would like to contact their attorney, BFRC staff will arrange for them to make toll free calls. Telephone calls to legal providers are not monitored or recorded.

30. Since I have worked at the BFRC, I have neither received nor been made aware of a complaint about the quality of the phone system at the BFRC that was made by an attorney or resident. Indeed, it is only through this current litigation that Ms. Cambria, or any member of Aldea, has

made an assertion that the phones at the BFRC have very little quality connection and often drop calls. Moreover, it has been my experience that attorneys who represent the residents at the BFRC have been appreciative and thankful to the BFRC staff, who routinely assist the residents, as needed, in utilizing the telephone system so that they may communicate with their attorneys, family and others.

31. Additionally, during this temporary suspension of in-person legal visits due to COVID-19, I have not seen any complaints from Ms. Cambria, representatives from Aldea, or the residents regarding the lack of legal access. It is only through Ms. Cambria's supplemental declaration that this issue has been raised. Residents have access to the telephones at the BFRC 24 hours a day, seven (7) days a week. In fact, in the video of the facility I recorded, a resident is seen utilizing the phone room in private. It is also worth noting that Ms. Cambria emailed me while I was videotaping the facility, after she was contacted by her clients who expressed concerns to her about being recorded. This further belies Ms. Cambria's contention that the residents lack legal access. Additionally, there have been other instances where residents have communicated with Ms. Cambria telephonically, to include non-regular visiting hours to inform her of removals from the BFRC, trips to the local hospital, and other activities.

32. Given that residents' access to their attorneys has remained constant, they are able to continue to prepare for their interviews before U.S. Citizenship and Immigration Services (USCIS) and hearings before the Immigration Court, as well as assist in reviewing, preparing, and/or approving legal documents that have been filed on their behalf before various tribunals. Furthermore, in the lone instance that the BFRC caseworkers were not present (specifically on Good Friday) the BFRC supervisory staff took over the responsibility of ensuring legal access would proceed telephonically.

**Immigration Status and Length of Detention for the Families Currently at the BFRC**

33. ICE conducts individualized parole reviews for both the minors and their parent(s). These reviews are conducted continuously - upon arrival at the BFRC and throughout the immigration process. The factors ICE considers when making parole determinations, which includes assessment as to whether minor is a flight risk, are consistent with section 212(d)(5) of the Immigration and Nationality Act (INA) and accompanying regulations, and in compliance with ICE policy and the Flores Settlement Agreement.

34. As of April 17, 2020, the minors at the BFRC have been held for a period longer than 20 days. In every one of these cases, the minor is being held pursuant to a final order of removal. ICE has determined that the minors and their parents are flight risks upon a thorough and individualized review of their cases.

35. Of the five (5) families, four (4) are the subjects of final expedited removal orders, issued pursuant to section 235(b)(1) of the INA. The families received negative credible fear determinations before USCIS and on *de novo* review before an Immigration Judge. Additionally, USCIS denied the four (4) families' requests for reconsideration of the negative credible fear determination. The U.S. District Court for the District of Columbia in *M.M.V. et al., v. Barr, et al.*, No. 19-2773 (D.D.C.) granted the families an administrative stay

of removal and their request to join the ongoing litigation filed by several other families challenging the credible fear process. At the time the stay orders were issued, the families' removal was imminent. ICE intends to remove the families in the event the stay orders are lifted.

36. The remaining family was ordered removed by an Immigration Judge. The family was pending removal to Ecuador prior to the COVID-19 outbreak, which resulted in the Ecuadorian government halting all travel to Ecuador. The family, through counsel, filed a motion to reopen with the Immigration Court on March 27, 2020, as well as a stay of removal, which was subsequently granted. The motion to reopen remains pending. ICE intends to remove the families in the event the stay orders are lifted.

Executed on this 17 day of April, 2020.

_____
Christopher George
Assistant Field Office Director
Enforcement and Removal Operations – Philadelphia Office
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security