CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | Case No. CV 85-4544-DMG-AGRx |
| Plaintiffs, | **PLAINTIFFS' REPLY TO DEFENDANTS' SUPPLEMENTAL OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| v. | |
| WILLIAM BARR, Attorney General of the United States, *et al.*, | Hearing:  April 24, 2020 Time: 10:00 a.m. |
| Defendants. | [HON. DOLLY M. GEE] |

1
2    UNIVERSITY OF CALIFORNIA DAVIS
     SCHOOL OF LAW
3    Immigration Law Clinic
4    Holly S. Cooper (Cal. Bar No. 197626)
     Daisy O. Felt (Cal. Bar No. 307958)
5    One Shields Avenue, TB 30
6    Davis, CA 95616
     Telephone: (530) 754-4833
7    Email: hscooper@ucdavis.edu
8
     NATIONAL CENTER FOR YOUTH LAW
9    Leecia Welch (Cal. Bar No. 208741)
10   Neha Desai (CAL. RLSA NO. 803161)
     Poonam Juneja (Cal. Bar No. 300848)
11   Freya Pitts (Cal. Bar No. 295878)
12   1212 Broadway, Suite 600
     Oakland, CA 94612
13   Telephone: (510) 835-8098
14   Email:  lwelch@youthlaw.org
             ndesai@youthlaw.org
15           pjuneja@youthlaw.org
16           fpitts@youthlaw.org
17   USF SCHOOL OF LAW IMMIGRATION CLINIC
18   Bill Ong Hing (Cal. Bar No. 61513)
     2130 Fulton Street
19   San Francisco, CA 94117-1080
20   Telephone: (415) 422-4475
     Email: bhing@usfca.edu
21
     LA RAZA CENTRO LEGAL, INC.
22   Stephen Rosenbaum (Cal. Bar No. 98634)
23   474 Valencia Street, #295
     San Francisco, CA 94103
24   Telephone: (415) 575-3500
25
     THE LAW FOUNDATION OF SILICON VALLEY
26   LEGAL ADVOCATES FOR CHILDREN AND YOUTH
27   Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
     Katherine H. Manning (Cal. Bar No. 229233)
28

PLAINTIFFS' REPLY TO DEFENDANTS' SUPPLEMENTAL
OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION
CV 85-4544-DMG-AGRx

Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone: (408) 280-2437
Email: kate.manning@lawfoundation.org

*Of counsel:*

ALDEA - THE PEOPLE'S JUSTICE CENTER
Bridget Cambria
532 Walnut Street
Reading, PA 19601
Phone: (484) 877-8002
Fax: (484) 926-2032
Email: bridget.cambria@cambriaklinelaw.com

iii

# TABLE OF CONTENTS

INTRODUCTION....................................................................................................1

ARGUMENT .........................................................................................................4

I. Plaintiffs prevail on either a preliminary injunction or motion to enforce standard. .............................................................................................................4

II. ICE fails to meet the agreement's safe and sanitary requirements in light of the covid-19 global pandemic. ......................................................................5

III. ICE fails to promptly release children without unnecessary delay. .................10

IV. ORR fails to release children without unnecessary delay.................................15

    A. ORR's guidelines prescribe unnecessary delay in releasing class members whom ORR has exposed to COVID-19 in its congregate facilities. ....................15

    B. ORR has failed to justify its refusal to adjust fingerprinting or home study requirements during the COVID-19 pandemic despite the unnecessary delays such requirements are causing..............................................................................17

    C. ORR fails to contest Plaintiffs' evidence that it is refusing to release class members because they have non-final orders of removal. ...................................20

    D. The Court's temporary restraining order appears to be resulting in the release of some children in ORR custody. .......................................................................22

V. Plaintiffs have more than carried their burden of proving Defendants' violations of the Settlement.......................................................................................23

CONCLUSION ....................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Arc of Cal. v. Douglas*,
  757 F.3d 975, 983 (9th Cir. 2014) ....................................................................2, 4

*Flores v. Lynch*,
  828 F.3d 898, 910 (9th Cir. 2016) ........................................................................22

*Flores v. Sessions*,
  862 F.3d 863, 879 (9th Cir. 2017) ........................................................................22

*Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at *2 (C.D.
  Cal. July 9, 2018) ................................................................................................10

*Fraihat v. ICE*,
  No. 19-cv-1546-JGB-SHK, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020).........23

*In re Grand Jury Proceedings*,
  800 F.2d 1293 (4th Cir. 1986) ..............................................................................24

*In re Screws Antitrust Litig.*,
  91 F.R.D. 47 (D. Mass. 1982) ...............................................................................24

*Melendres v. Arpaio*,
  695 F.3d 990, 1002 (9th Cir. 2012) ......................................................................23

*Rouser v. White*,
  707 F. Supp. 2d 1055 (E.D. Cal. 2010) ................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................................4

**Statutes**

8 C.F.R. § 212.5(b) .......................................................................................................11

8 C.F.R.§ 212.5(b)(3)(i) and (ii) ...................................................................................11

8 U.S.C. § 1232(a)(5)(D)(i) ..........................................................................................21

8 U.S.C.§§ 1158(b)(3)(C), 1232(d)(8) .........................................................................21

## INTRODUCTION

The gravamen of Plaintiffs' application for a temporary restraining order and preliminary injunction is simple: confining children in congregate facilities during the worsening COVID-19 public health emergency is presumptively unsafe and unreasonable.  As this Court has twice found, "[T]he medical consensus is that any form of congregate care puts a child in custody at higher risk of infection. *See* TRO at 6, 12. Any unnecessary delay in releasing a minor is, under normal circumstances, a violation of the Agreement, but the current pandemic makes the Agreement's promise to protect and expeditiously release minors even more critical to their safety." Order Extending Temporary Restraining Order and Permitting Supp. Briefing, April 10, 2020, at 4 [Doc. #768] ("April 10 Order") (*citing* Order re Plaintiffs' Ex Parte Application for Restraining Order and Order to Show Cause re Prelim. Injunction, March 28, 2020 [Doc. #740] ("March 28 Order").

Subsequent events have confirmed these findings.  To date, ICE reports 287 confirmed detainee cases at 28 facilities around the country and 35 confirmed cases of ICE detention facility staff at many of the same locations.[1] As for ORR, as of April 20, 2020, there are media reports that 42 children at ORR's Heartland Alliance facility in Chicago, along with at least two staff members, have tested positive for COVID-19.[2] It would be no surprise if the remaining 27 children at

---

[1] Immigration & Customs Enforcement, *ICE Guidance on COVID-19: Confirmed Cases*, Apr. 21, 2020, https://bit.ly/2yDYfmZ. The number of ICE staff at detention facilities does not appear to include individuals such as guards, vendors, or medical service providers who work at those facilities and are not employed by ICE. *Id.*

[2] Camilo Montoya-Galvez, *Chicago coronavirus outbreak infects dozens of migrant children in U.S. Custody*, CBS News, Apr. 14, 2020, https://cbsn.ws/2VLUQe3; Melissa Sanchez, *At Least 19 Children at a Chicago Shelter for Immigrant Detainees Have Tested Positive for COVID-19*, Pro

that facility were also infected. As of last Wednesday, at least eight additional COVID-19 cases had been confirmed among children in other ORR facilities, and 69 staff members at ORR facilities in seven states had reportedly contracted COVID-19 as well.[3]

Due to shortages in testing nationwide and because asymptomatic individuals may spread the disease, experts agree that known cases are likely the "tip of the iceberg." Ex. PPP, Declaration of Homer Venters ¶ 1 (filed in *Fraihat v. U.S. Immigration and Customs Enforcement*, Case No. 5:19-cv-01546-JGB-SHK (C.D. Cal), Doc. #113-2). And the rapid spread of COVID-19 at Heartland Alliance only underscores the vast odds against a child avoiding infection once the virus enters a congregate facility.

The declarations of Michael Sheridan ("ICE Sheridan Decl.") [Doc. #772-1], and Christopher George ("ICE George Decl.") [Doc. #772-5] explain in detail each step ICE has allegedly taken to comply with CDC guidelines at the Karnes, Dilley and Berks detention facilities since the Court's recent temporary Orders. However, nowhere in these declarations do they address efforts by ICE *aimed at the release of class members* as required by the *Flores* Settlement Agreement ("Agreement") paragraphs 14 and 18, and this Court's March 28 and April 10 Orders.  Nor has ICE made efforts to release youth detained in juvenile jails. Ex. O, Declaration of Samantha Ratcliffe ¶ 10 ("Ratcliffe Decl.").

---

PUBLICA, Apr. 13, 2020, https://bit.ly/2XUCBpt; Melissa Sanchez (@msanchezMIA), Twitter (Apr 20, 2020,  7:51 AM), https://bit.ly/3ap8lpd.

[3] Melissa Sanchez, *At Least 19 Children at a Chicago Shelter for Immigrant Detainees Have Tested Positive for COVID-19*, PRO PUBLICA, Apr. 13, 2020, https://bit.ly/2XUCBpt; Priscilla Alvarez, *27 Migrant Children in US Government Custody Test Positive for Coronavirus*, CNN, Apr. 14, 2020, https://cnn.it/34SoySw; Suzanne Monyak, *Amid Pandemic, Hearings for Detained Migrant Kids Go On*, LAW 360, Apr. 19, 2020, https://bit.ly/2KmvNZD.

PLAINTIFFS' REPLY TO DEFENDANTS' SUPPLEMENTAL
OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION
CV 85-4544-DMG-AGRX

The ICE data provided showed *no* steps—let alone steps taken and recorded without unnecessary delay—being taken to process class members for release to sponsors identified in ¶ 14 of the Agreement. Some children continue to be detained in excess of 18 months, and ICE's reasons for denying release were entirely unrelated to the Agreement release factors.

Nevertheless, Defendants claim that they are in compliance with the Agreement and the Court's prior Orders by using a "worksheet" to make "individualized parole inquir[ies] applicable to minors [to] evaluate[ ] the potential for flight risk of each minor." Defs.' Second Supp. Response 16 [Doc. #772] (citing Parole Worksheet, Doc. #384-2 at 7-8). However, that worksheet on its face makes clear that even if it is scrupulously used*,* it nowhere incorporates children's rights to prompt release under the Agreement.[4]

Defendants' persistence in contemptuously ignoring the Agreement and this Court's prior Orders, coupled with the danger to the lives of class members created with the onset of an unprecedented pandemic, calls for more than this Court repeating for the *umpteenth* time what the Agreement requires, which Defendants will again ignore. Plaintiffs are submitting herewith a proposed temporary Order that would at least for a temporary period ensure Defendants' compliance with the essential terms of the Agreement and prevent class members from becoming ill or dying.[5]

---

[4] For example, the "flight risk" criteria fails to adopt anything close to the flight risk criteria the parties specifically agreed to in the Agreement. *See* Agreement ¶¶ 21.D, 22.

[5] An Order in the form lodged herewith should therefore be entered requiring compliance for a period of 60 days with particularized remedies designed to safeguard class members' right to "safe and sanitary" conditions of detention (Agreement ¶ 12A), and to be "treated … with … special concern for their particular vulnerability as minors," (*id.* ¶ 11), and to prompt release to available sponsors (*id.* ¶¶ 14 and 18), and to detain minors in the least restrictive setting (*id.* ¶ 11 and 23) as set forth in the Order.

The COVID-19 pandemic shows no signs of abating anytime soon. The progress that began with the Court's TROs should be sustained and expanded. The only way that will happen is if the Court preliminarily enjoins Defendants against unnecessarily delaying children's release.

## ARGUMENT

### I. PLAINTIFFS PREVAIL ON EITHER A PRELIMINARY INJUNCTION OR MOTION TO ENFORCE STANDARD.

Defendants incorrectly argue that a preponderance of the evidence standard, rather than the preliminary injunction standard, should apply because "in essence, the proposed injunction would be an order enforcing the Agreement." Defs.' Second Supp. Response 5 [Doc. #772].[6] Plaintiffs prevail under either standard.

The standard articulated in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), indicates that preliminary injunctive relief is applied on a "sliding scale." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). Where, as here, the likelihood of grave irreparable injury is palpable and the balance of equities tips sharply in Plaintiffs' favor, Plaintiffs need only "demonstrate a fair chance of success on the merits or questions serious enough to require litigation." *Id.* at 993. Plaintiffs easily satisfy this test.

Even if the Court converts the instant motion into a motion to enforce, Plaintiffs still meet their burden because Defendants have violated the Agreement "for the umpteenth time," and Plaintiffs have shown this by more than a preponderance of the evidence. *See* Order re Pls.' Mot. to Enforce and Appoint a

---

[6] Under Defendants' logic, any motion implicating the Agreement is a motion to enforce and thus requires a showing by a "preponderance of the evidence" of a "violation of the existing terms of the Agreement." *See* Defs.' Second Supp. Response 5 [Doc. #772].

4

Special Monitor 3, June 27, 2017 [Doc. #363] ("2017 Order"); Order Extending
TRO 3 [Doc. #768].[7]

## II.   ICE FAILS TO MEET THE AGREEMENT'S SAFE AND SANITARY REQUIREMENTS IN LIGHT OF THE COVID-19 GLOBAL PANDEMIC.

ICE continues to fall woefully short of meeting even basic CDC guidelines
for the safety and sanitation required to prevent the spread of COVID-19 in
correctional and detention facilities. Families and children continue to be detained
in secure congregate facilities with all spaces being shared by detained families,
facility staff, ICE staff, and others. Ex. V, Declaration of Bridget Cambria ¶ 19
("Cambria Decl."). Families share units with as many as six other families. Ex.
HHH, Declaration of Andrea Meza ¶ 9(r) ("Meza Decl."). Detainees continue to
congregate in settings of as many as 25 to 100 people. Cambria Decl. ¶ 23; Meza
Decl. ¶ 9(l).

Plaintiffs' evidence demonstrates that ICE's detention centers, both its family
residential centers ("FRCs") and its juvenile jails, run afoul of the Agreement.
Declarations refute the assertions in ICE's Sheridan and George Declarations [Doc.
#772-1, #772-5] regarding the conditions at ICE detention centers related to the
COVID-19 pandemic, as well as ICE's failure to even have a mechanism to assess
available sponsors so class members can be promptly released consistent with
paragraphs 14 and 18 of the Agreement during the COVID-19 pandemic. *See, e.g.*,
Meza Decl. ¶ 9 (surveying 17 families and finding the majority did not have access
to infection prevention items, cleaning supplies, or social distancing opportunities);
Cambria Decl. ¶¶ 7-12 (describing a lack of testing or protocols to ensure safety),

---

[7] Nor is there any merit to Defendants' argument that Plaintiffs request relief
beyond what the Agreement provides. The Court correctly found that its "TRO does
not read a new requirement of 'unexplained delay' into the FSA." *See* April 10
Order at 4.

¶¶ 13-20 (difficulties in achieving social distancing in congregate care at Berks), ¶¶ 21-24 (lack of protection in dining halls); ¶¶ 25-27 (no updated information since March 23, 2020), ¶¶ 28-34 (detainees are paid $1/day to clean common areas); *see also* Ex. BB, Declaration of Shalyn Fluharty ("Fluharty Decl.") ¶¶ 37-39 (surveying 32 families and finding that social distancing has been impossible at STFRC), ¶ 40-41(lack of education regarding COVID-19), ¶ 42 (soap and sanitizer dispensers are often empty); ¶ 44 (75% of surveyed families reporting less than 20% of staff at STFRC wear gloves or masks); Exs. CC-GGG, Compiled declarations from residents at Dilley; Exhibit; Ex. T, Declaration of X.E.S. ¶¶ 6, 7, 15 ("X.E.S. Decl.") (immigrant children are left at contract juvenile jails even as all United States citizen children are released, are not provided basic PPE, and receive no mental health support). Moreover, even if ICE engages in the protective measure outlined in the declarations of ICE officials Sheridan and George, the best ICE can hope for is to "reduce" the risk that detained class members will become infected, ill, or die.[8]

---

[8] Even if ICE engages in all the specific preparation, prevention, and management measures CDC recommends, *this can only "help reduce the risk of transmission and severe disease from COVID-19" by an unstated level*. *See* Centers for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2VP7pFt (emphasis added). Compliance with CDC policies is made all the more difficult because ICE contracts out the detention of class members and their families. The CDC notes that such contractors "are organizationally distinct and responsible for [their] own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting." *Id.* The CDC also notes that "[p]ersons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas." *Id.* at 2. And "[i]ncarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to … fear of isolation." *Id.*

In addition, it is undisputed that congregate care facilities remain inherently vulnerable to the introduction and fast spread of COVID-19.[9] While there are fewer cases of COVID-19 among children compared to cases among adults, CDC reports that in the U.S., 2% of confirmed cases were among minors, and thus, without adding the extra risk of being in a detention center, as of April 21, 2020, as many as 15,521 children may have been diagnosed with COVID-19 and over 800 children may have died.[10] Due to the range of symptoms children may have, including coughing, sore throats, headaches, or poor feeding or appetite, Defendants simply may not recognize class members who have become infected.[11] Thus, although children may appear to be less susceptible to contracting the virus, ". . . common health concerns affecting many class members, such as asthma, malnutrition, and immunosuppression, may make them more susceptible to serious forms of the disease." March 28 Order at 6.

Finally, the spread of COVID-19 within these detention facilities is not speculative. Ex. N, Declaration of Daisy O. Felt ¶¶ 3-15. Detention facilities are largely incapable of implementing the range of CDC's recommendations and incarcerated people are already being infected at a rate far higher than non-detained populations.[12]

---

[9] It is also undisputed that all age groups, including children, have contracted the disease. Robert Verity, PhD., et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis*, THE LANCET, Mar. 30, 2020, at 6, https://bit.ly/2RVLZVS.

[10] Centers for Disease Control & Prevention, *Burden of COVID-19 Among Children*, https://bit.ly/2XX7byI.

[11] Centers for Disease Control & Prevention, *Clinical Presentation in Children*, https://bit.ly/2XX7byI.

[12] *See, e.g.* David Mills & Emily Galvin-Almanza, *As many as 100,000 incarcerated people in our jails and prisons will die from the coronavirus, unless the US acts now*, BUSINESS INSIDER, Apr. 2, 2020, https://bit.ly/3aya77o; Bill Chappel, *73% Of Inmates At An Ohio Prison Test Positive For Coronavirus*, NPR, Apr. 20, 2020,

**A. FRCs are not safe and sanitary.**

No regular facility cleaning schedules exist at FRCs. Cambria Decl. ¶¶ 33-34. While some additional hand sanitizer stations have been provided, families attempting to use both soap and hand sanitizer dispensers have found them empty within the last seven days. Fluharty Decl. ¶ 42. Guards and staff are not required by ICE to wear PPE, including masks and gloves. Fluharty Decl. ¶ 44; Meza Decl. ¶ 8. In some facilities, children have not been provided with masks to wear. Meza Decl. ¶ 9(f). In others, the masks provided are too large for them. Meza Decl. ¶ 9(f); Cambria Decl. ¶ 29.[13]

ICE has not engaged in even minimally sufficient efforts to educate children about best practices or protocols for preventing the spread of COVID-19. Cambria Decl. ¶ 25. Language barriers continue to present a dangerous situation for communicating critical safety information in an emergency. *Id.* ¶ 26.

In a time when consistent medical care is of utmost importance, ICE is failing to ensure that the children it detains receive proper medical attention.[14]

---

https://n.pr/3eLNiAo; Angie Jackson & Kristi Tanner, *The High COVID-19 Infection Rate At This Michigan Prison Has Inmates Fearing For Their Health*, BUZZFEED NEWS, Apr. 16, 2020, https://bit.ly/2XU9r9T; Legal Aid Society, *COVID-19 Infection Tracking in NYC Jails*, https://cutt.ly/RtYTbWd.

[13] Families are not instructed in how to use the limited PPE they are provided or when they will receive new PPE. Meza Decl. 9(f). For example, when given cloth masks, families are not instructed on how to wash them or what to wear to protect themselves while they are doing so. Cambria Decl. ¶ 30.

[14] At BCRC, for example, one person is being kept in medical isolation based on a fever while others with fever have not received that same protocol. Cambria Decl. ¶ 40. At Cowlitz, youth no longer have access to critical services and suffer extreme isolation. Ratcliffe Decl. ¶ 22. Only one youth has been tested for COVID-19 at BCRC (over the objections of ICE and at the urging of local medical providers) even though several detainees have experienced fevers, coughs, sore throats, difficulty breathing, and other symptoms, and even in light of the fact that BCRC is located in a region of Pennsylvania with some of the highest rates of COVID-19 in the nation. Cambria Decl. ¶¶ 11, 57.

The limited efforts ICE has made thus far to comply with CDC guidelines fall far short of maintaining the safety and sanitation necessary to prevent the spread of COVID-19 in its FRCs and juvenile jails. At the same time, ICE continues to ignore and indeed have no procedures to comply with the prompt release provisions of the Agreement.

**B. Juvenile jails are not safe and sanitary.**

The safety at Cowlitz County Youth Service Center ("Cowlitz") and Northern Oregon Juvenile Detention ("NORCOR") are of critical concern given that, "juvenile facilities in particular lack the operational capacity to address the needs of youth in custody in a crisis of this magnitude." Declaration of Craig Haney ¶ 9 [Doc. #759-13]. At Cowlitz, staff only recently started wearing face masks and youth have not been provided any face masks. Exhibit Q, Declaration of A.F.P.P. ¶ 5 ("A.F.P.P. Decl."); X.E.S. Decl. ¶ 7. Youth have limited family contact. X.E.S. Decl. ¶ 12. Mental health services have stopped completely. X.E.S. Decl. ¶ 15; A.F.P.P. Decl. ¶ 18; Exhibit R, Declaration of B.B.B. ¶ 8 ("B.B.B. Decl."). With extremely limited support or information, children are worried they will be infected by the virus and describe being "afraid all the time." A.F.P.P. Decl. ¶ 8; *see also* Ratcliffe Decl. ¶ 22. Moreover, the county that has custody of the juveniles in criminal custody at Cowlitz has recognized the extreme health concerns and has released all children in county custody.[15] Both facilities have also been investigated for inhumane conditions of confinement.[16]

---

[15] Cowlitz County, Washington, *Cowlitz County Youth Services Update*, Apr. 13, 2020, https://bit.ly/2RXWgB5.

[16] Blake Ellis & Melanie Hicken, *'Secret and unaccountable': Where some immigrant teens are being taken by ICE*, CNN, Nov. 30, 2019, https://cnn.it/2Kt6k0w; Nina Shapiro, *I didn't know where to look for him: ICE ships kids across the country to Pacific Northwest jails*, THE SEATTLE TIMES, Aug. 3, 2019, https://bit.ly/3atV7ro; Alex Bruell, *Juvy Director: ICE detainees treated the same as other Cowlitz offenders*, THE SEATTLE TIMES, Feb. 10, 2020,

### III.   ICE FAILS TO PROMPTLY RELEASE CHILDREN WITHOUT UNNECESSARY DELAY.

As the Court is well aware, the Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [Defendants] …" Agreement ¶ 9. It requires that Defendants "treat[ ] and shall continue to treat, all minors in [their] custody with dignity, respect and special concern for their particular vulnerability as minors." *Id*. ¶ 11.[17] Considering "the Court's past orders, the exigencies of the circumstances, COVID-19's highly contagious nature, and the imminence of the threat," March 28 Order at 9, ICE's compliance with the release provisions of the Agreement is crucial. The Court *"*remind[ed] Defendants—yet again—that 'hold[ing] minors in indefinite detention in unlicensed facilities, . . . constitute[s] a fundamental and material breach of the parties' Agreement*. '"* March 28 Order at 10 (quoting *Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018)). ICE therefore "must … comply with the Agreement's requirement to release minors without unnecessary delay and 'make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor.'" *Id.* (quoting Agreement ¶¶ 12, 14).

The Court found credible evidence "to indicate that ICE does not undertake or record any efforts aimed at the release of minors as required by Paragraphs 14 and 18 of the Agreement." *Id.* (citing Schey Decl. ¶ 7 [Doc. #733-2]; Cambria Decl. ¶ 39 [Doc. #733-10]; Fluharty Decl. ¶¶ 38–40 [Doc. #733-11]; Meza Decl. ¶¶ 10,

---

https://bit.ly/2xUdoAP (describing the use of a restraint chair where children can be strapped from 15 to 45 minutes at a time and high rates of self-harm at Cowlitz); Disability Rights Oregon, *"Don't Look Around": A Window Into Inhumane Conditions for Youth at NORCOR*, Winter 2017, https://bit.ly/2VsQ9GQ (citing extreme punitive measures, including lengthy solitary confinement).

[17] It also requires that "[f]ollowing arrest, the [Defendants] shall hold minors in facilities that are safe and sanitary and that are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id.* ¶ 12.A.

43 [Doc. #733-12]). The additional evidence more recently submitted by both Plaintiffs and Defendants now fully confirms the Court's tentative finding.[18]

As Defendants concede, they merely assess class members for release *only* under their "parole" authority using the "parole worksheet." ICE claims it makes "individualized parole inquir[ies] applicable to minors [to] evaluate[ ] the potential for flight risk of each minor."[19] However, Defendants' parole worksheet says nothing about making and recording continuous steps without unnecessary delay towards the release of minors to sponsors. Instead, the worksheet states it must be used "when considering minors for parole from custody," not release pursuant to Agreement paragraphs 14 and 18.[20] *Defendants' parole regulation is nothing like the Flores terms.*[21] It further renders efforts at release discretionary, not mandatory.[22]

---

[18] It is now clear that not only does ICE not make and record continuous efforts aimed at the release of class members to sponsors identified in Paragraph 14, and do this "without unnecessary delay" as the Agreement requires, *it is undisputed that it does not even have a program, or policies, or any existing procedures in place to do this*. There is simply total non-compliance.

[19] Defs.' Second Supp. Response 16 [Doc. # 772] (citing Parole Worksheet 7-8 [Doc. #384-2]).

[20] The instruction makes clear it is to determine parole not under the Agreement, but instead whether the minor is "eligible for parole pursuant to the standard in Immigration and Nationality Act Section 212(d)(5)(A) and 8 C.F.R. § 212(d)(5)." *Id.*

[21] The parole regulation states: "The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(c) of this chapter [i.e. all class members in expedited removal] would generally be justified only on a *case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit*,'" provided the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b) (emphasis added).

[22] The parole regulation states that "(i) Minors *may* be released to a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, or grandparent) not in detention," and also that "(ii) Minors *may* be released with an accompanying parent or legal guardian who is in detention." 8 C.F.R.§ 212.5(b)(3)(i) and (ii) (emphasis added). Neither the "worksheet" nor the parole regulation recognize a presumption of release, or steps that must be taken and recorded from the time of apprehension aimed at the release of minors without unnecessary delay.

Defendants have not produced "worksheets", nor claimed anywhere in the 19 pages of declarations of ICE's Supervisory Management and Program Analyst Sheridan [Doc.# 772-1] and Assistant Field Office Director George [Doc.# 772-5], that the agency is making and recording efforts to release children as required by Agreement paragraphs 14 and 18, and this Court's March 28 and April 10 Orders.

ICE has made no additional efforts to comply with the Agreement's release provisions since this Court's March 28 Order and, in fact, the number of releases from Karnes have since *decreased*. Meza Decl.¶¶ 18-19; *see also* Ex. III, Declaration of Javier Hidalgo ¶¶ 9-13, 15 (citing at least 33 instances of what appear to be unnecessary release delays since March and only four written responses to fifteen requests for parole).

At BCRC, even though every family has been detained in excess of twenty days, none of them have received an individualized parole determination, nor have they been evaluated for release based on individualized factors. Cambria Decl. ¶ 51. Advocates have not been made aware of any parole determinations, and certainly not that such determinations are conducted continuously as stated in the Declaration of Officer George. Cambria Decl. ¶ 49. Similarly, purported parole assessments at STFRC are described as "cursory, categorical, and predetermined. Release based upon an individualized determination is the exception, not the rule." Fluharty Decl. ¶ 18.

Even worse, at ICE's contract facilities in Oregon and Washington, there is no evidence at all of ICE's efforts to release children, despite having parents willing to assume custody, and ICE concedes in its own evidence the children are not dangerous. A.P.P. Decl. ¶¶ 11-12; Ex. S, Declaration of M.E.B.R. ("M.E.B.R. Decl.") ¶¶ 9-10; Ex. U, Declaration of M.D.J.S. ("M.D.J.S. Decl.") ¶¶ 9-10.[23] These

---

[23] Data Response to Order to Show Cause lines 222, 225, 227, 244 [Doc. #756] (vaguely noting "criminal history" as reason for detention longer than 20 days, but marking "no" as to whether the youth poses a risk to self or others).

youth are languishing in indefinite detention without any efforts, much less prompt efforts, to reunify the children with their parents or place them in the least restrictive setting. *See, e.g.*, X.E.S. Decl. ¶¶ 3-4 (has lived in the U.S. since she was 11 months old, detained at Cowlitz over four months); B.B.B. Decl. ¶ 4 (has been detained by ICE in juvenile jails for over 18 months). Such indefinite detention, especially where ICE concedes the children are not dangerous, violates the core tenants of the Agreement.  *See* March 28 Order.

Children, families, and advocates remain rightfully worried that, absent a court order for release, ICE will continue to detain class members and families without making actual efforts to promptly release them.[24] ICE has no existing policy or program to assess a potential sponsor's ability to care for a released class member, and in light of the dangers now presented by COVID-19, the *only* "*immediate way to ensure that class members are promptly released is to release the class members with their detained parents to their sponsors*." Meza Decl. ¶ 58 (emphasis added).[25]

The Court's April 10 Order noted that Defendants' "uniform perfunctory explanations for non-release seem to imply that a blanket prohibition on release exists as to minors who are categorized as 'pending IJ hearing/decision,' 'pending USCIS response,' or are plaintiffs or class members in litigation," and asked: "Do

---

[24] On April 17, 2020, Acting Director of Immigration and Customs Enforcement Matthew T. Albence and Acting Commissioner of Customs and Border Protection Mark Morgan briefed the Committee on Oversight and Reform on how ICE is addressing coronavirus risks in immigration detention facilities. See Ex. M, Declaration of Peter Schey ¶ 2. According to the press release, Acting Director Albence stated that "'our review of our existing population has been completed'" and that ICE does not plan to release any other detainees to slow the spread of coronavirus in detention facilities. *Id.* ¶ 3.

[25] When for its reasons ICE decides to a release a family, they "are promptly released from custody the same day, or immediately the following day." Meza Decl. ¶ 59.

these explanations contravene this Court's June 27, 2017 Order …?"April 10 Order at 3. The Court also asked: "What individualized parole determinations and continuous efforts to secure a minor's release does ICE undertake in these categories, especially in light of the COVID-19 pandemic?" *Id*. 3-4.

The uncontroverted evidence and discussion above make clear that ICE *does* have a practice of uniformly not releasing class members because they are "pending IJ hearing/decision," "pending USCIS response," are "plaintiffs or class members in litigation," or just happen to be detained with a parent or otherwise considered accompanied. As for the second question, the uncontroverted evidence and discussion above make clear that ICE has *not* undertaken and still is not undertaking continuous efforts to secure class members' release in light of the COVID-19 pandemic.[26]

In light of the above, the current dangers COVID-19 presents to class members' safety, and ICE's unwillingness and *current inability* to quickly establish procedures to start assessing sponsors for the release of class members as required by paragraphs 14 and 18 of the Agreement, Plaintiffs propose that the Court issue a

---

[26] The evidence also makes clear that attorneys of record are not provided with updated information regarding the medical status of their clients or how many staff and detainees have been isolated, or tested positive for COVID-19 at the detention centers where their clients are detained. Unlike detention agencies like the U.S. Bureau of Prisons which almost daily make available data on COVID-19 cases, ICE does not make that data available to the public, class members, their parents, or their counsel of record. *See, e.g.* Cambria Decl. ¶¶ 8-9 (request for result of client's COVID-19 test requested March 25,2020, and only responded to April 7, 2020, after much back and forth between ICE and counsel for a Flores class member, and approximately 12 emails, including providing a G-28, Notice of Entry of Appearance, a HIPPA authorization, an Immigration Health Service Corp Request, and a DHS Privacy Waiver); Meza Decl. ¶ 9(q).

preliminary injunction for a temporary period of 60 days enjoining ICE as set forth in the Proposed Order filed herewith.[27]

## IV.   ORR FAILS TO RELEASE CHILDREN WITHOUT UNNECESSARY DELAY.

### A.   ORR's guidelines prescribe unnecessary delay in releasing class members whom ORR has exposed to COVID-19 in its congregate facilities.

The Court directed ORR to address (i) whether it maintains "a policy of postponing release of all minors in a facility with a confirmed case of COVID-19"; (ii) whether "ORR consider[s] releasing minors to be quarantined in a sponsor's home"; and (iii) if it does not, "why not." Order at 4.

In response, ORR states that it follows its "field guidance" of April 6, 2020 ("April 6 Guidance") [Doc. #746-11]. *See* Ex. 11, Declaration of Jallyn Sualog ¶ 5 ("Sualog Decl.") [Doc. #772-6]. The April 6 Guidance provides that a confirmed case (either a child or staff) triggers temporary postponement of releases for "all children at the care provider facility . . . until ORR's Division of Health for Unaccompanied Children (DHUC) lifts the hold on releases *or* allows the release of specific children on a case by case basis." April 6 Guidance at 1 (emphasis added).

On its face, this policy unnecessarily delays class members' release. First, ORR's policy nowhere requires a medical professional to approve continued detention on a case-by-case basis. To the contrary, it declares that *all* children's releases must be delayed until and unless the DHUC says otherwise *or* approves the release of specific children case-by-case. Delaying the release of children in facilities with known COVID-19 exposure "is like leaving them in a burning house

---

[27] Plaintiffs' class counsel's efforts to reach an agreement with Defendants to bring ICE into prompt compliance with the release provisions of the Agreement possibly permitting the withdrawal of Plaintiffs' application for a preliminary injunction as it pertains to ICE compliance have to date been futile. *See* Schey Decl. ¶ 9.

PLAINTIFFS' REPLY TO DEFENDANTS' SUPPLEMENTAL
OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY
INJUNCTION
CV 85-4544-DMG-AGRX

rather than going in to rescue them and take them to safety." Ex. A, Declaration of Dr. Julie DeAun Graves ¶ 7 ("Graves Decl."); *see also* Ex. B, Declaration of Dr. Amy Cohen ¶ 4 (ORR's delaying exposed children's release is "far more likely to increase the spread of Coronavirus than to prevent or slow it, placing the children, ORR staff, and the public in even greater danger").

Neither the April 6 Guidance nor ORR's supplemental declaration illuminate how ORR chooses children for possible case-by-case release. ORR's policy says nothing about affording children, their families, or their counsel any right *to apply* for case-by-case release, or any information about the availability of release or the criteria used.[28] *See* Ex. F, Declaration of Ashley Huebner ¶ 8 ("Huebner Decl."); *see also* Ex. I, Declaration of Maria J. Bocanegra  ¶¶ 6-10, 12; Ex. D, Declaration of Ana Raquel Devereaux ¶¶ 12-19 ("Devereaux Decl.").[29]

For children who have been exposed, the DHUC is purportedly required to evaluate: "[1] whether commercial air travel is required to travel to the sponsor's home, [2] presence of health conditions that place the child or sponsor household at higher risk, and [3] the ability of the sponsor to maintain the child's quarantine and active symptom monitoring for 14 days." Sualog Decl. ¶ 5 [Doc. #772-6]. It is not apparent why the DHUC's expertise is even relevant to the first and third criteria: no specialized expertise is required to determine whether travel by air is

---

[28] Regarding the criteria, the April 6 Guidance states only that the DHUC will make individual release decisions "following CDC recommendations." April 6 Guidance at 1. Plaintiffs have been unable to identify any expressly applicable CDC recommendations, and Defendants identify none.

[29] Defendants state that the DHUC reviews "permit[] time to discern which children were potentially exposed to COVID-19 and therefore require quarantine . . . and to evaluate whether children are at higher risk of severe disease and require more intensive medical monitoring." Defs.' Second Supp. Response 21. Care providers – who should already be aware of children who are at risk and familiar with patterns of movement in their facilities – should be able to provide DHUC with this information within 1-2 hours of a confirmed case. Graves Decl. ¶¶ 8-10.

PLAINTIFFS' REPLY TO DEFENDANTS' SUPPLEMENTAL OPPOSITION TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
CV 85-4544-DMG-AGRX

required or to query children's families about their ability to quarantine an exposed child following release. *See* Graves Decl. ¶ 12. Such determinations, as well as whether a child or custodian is at elevated risk of infection, should take little time regardless.

Finally, the April 6 Guidance nowhere posits *any* time limit on either (1) how long class members may be detained *en masse* awaiting the DHUC's decision to lift a general ban on release or (2) how long the DHUC will take to decide whether to exempt an individual child. Several children at Heartland Alliance have had their previously approved releases placed "on hold" indefinitely. Huebner Decl. ¶¶ 21-22.  At least two children at shelters in Illinois and Maryland are at risk of aging out into ICE custody instead of reunifying with approved sponsors because their releases have been placed on hold. *See* Huebner Decl. ¶ 21; Ex. G, Declaration of Claudia Cubas ¶¶ 10-11 ("Cubas Decl.").

In summary, the April 6 Guidance *begins* by prescribing blanket congregate detention whenever children are exposed to COVID-19. It then *allows* the DHUC to consider releasing an unknown number of children, selected according to unknown criteria, case-by-case, but never actually *requires* the DHUC to consider any case-by-case releases. The April 6 Guidance is a virtual road map for unnecessarily, if not arbitrarily, delaying release.

**B.    ORR has failed to justify its refusal to adjust fingerprinting or home study requirements during the COVID-19 pandemic despite the unnecessary delays such requirements are causing.**

Although ORR's Data Response reveals that sponsors across the country are currently unable to submit fingerprints,[30] ORR steadfastly refuses to adjust

---

[30] ORR represents that "[a] number" of the 51 cases the Court identified, Order Extending TRO at 2 [Doc. #768], have been resolved, Sualog Decl. ¶ 6 [Doc. #772-6], but offers no details as to how many children remain detained pending fingerprints or how many sponsors still lack access to fingerprinting locations.

17

fingerprinting requirements, even temporarily. *See* Pls.' Reply 13-14 n.42-44 [Doc. #759]; Defs.' Second Supp. Response 23 [Doc. #772].[31]

Defendants fail to explain why ORR cannot resolve the two specific obstacles to release Plaintiffs identified: fingerprinting mandates for (1) all Category 2B and Category 3 sponsors, and (2) all potential sponsors, non-sponsor adult household members, and adult caregivers in every case referred for a home study. *See* Pls.' Reply 13-17, 22-23; ORR Policy Guide §§ 2.5; 2.5.1.[32]

As outlined in Plaintiffs' Reply, ORR stopped fingerprinting all sponsors and adult household members after concluding that it did not protect children and unnecessarily impeded release. *See* Pls.' Reply 15 [Doc. #759]. Defendants fail to explain why, if children can be safely released to parents, grandparents, and siblings based on public records checks, additional fingerprint-based checks remain essential for aunts or cousins, even in this pandemic.[33] ORR Policy Guide §§ 2.2.1; 2.5; 2.5.1; *see also* Order Extending TRO at 4 [Doc. #768] ("An unsatisfactory explanation or an unexplained delay in a Class Member's release may be *evidence* of 'unnecessary delay' in release.") (emphasis in original).[34]

---

[31] ORR acknowledges it can waive these requirements, Sualog Decl. ¶ 15 [Doc. #762-1], but suggests that adjustments are unnecessary because it houses children in state-licensed facilities, Sualog Decl. ¶ 8 [Doc. #772-6]. This ignores the harm of prolonged detention in congregate settings even under ordinary circumstances, let alone in the face of a global pandemic where they are placed at an extremely high risk of COVID-19 exposure. *See* Ex K, Declaration of E.R.V.R. ¶¶ 2-3, 8-14.

[32] Plaintiffs do not fault ORR for requiring fingerprinting of sponsors and adult household members "[w]here a public records check reveals possible disqualifying factors . . . or where there is a documented risk to the safety of the" child. ORR Policy Guide § 2.5.1.

[33] The declaration of June Dorn [Doc #762-2] fails to explain why ORR requires fingerprints from some sponsors and household members but not others.

[34] Nor has ORR provided *any* justification for requiring fingerprinting for all sponsors (including parents), adult household members, and care providers in every home study case, regardless of the basis for the home study. *See* ORR Policy Guide

Defendants offer vague assurances that some fingerprinting locations have reopened or will reopen. But Defendants do not and cannot deny that fingerprinting is and will likely remain a serious obstacle to release for the duration of the COVID-19 pandemic. Even if some fingerprint sites reopen, many sponsors, household members, and care providers may risk exposure to COVID-19 by attending a fingerprinting appointment.[35] Legal service providers from numerous states report that fingerprinting is impeding children's release even as the pandemic spreads.[36] *See* Cubas Decl. ¶ 12; Devereaux Decl. ¶ 10; Ex. C., Declaration of Anthony Enriquez ¶ 8 ("Enriquez Decl."); Ex. H., Declaration of Elisa Gahng ¶¶ 13-15 ("Gahng Decl."); "Huebner Decl. ¶ 12-14; Ex. E, Declaration of Clare Murphy Shaw ¶¶ 6-9 ("Shaw Decl.").

---

§ 2.5.1. This policy is arbitrary, and results in vulnerable children—including children who require a home study under the TVPRA based on their disability—will remain in congregate detention on account of impossible or impracticable fingerprint demands even when there are no actual safety concerns regarding their sponsors. *See* 8 U.S.C. § 1232(c)(3)(B).

[35] Public health concerns have motivated the suspension of some state fingerprinting requirements. *See* Jay Inslee, *Proclamation by the Governor Amending Proclamations 20-05: 20-31 Department of Children, Youth, and Families – Child Care and Background Checks*, Mar. 26, 2020, https://bit.ly/2VQhFgm (Washington); Justice Information Bureau Criminal Records Unit, NEW HAMPSHIRE DEP'T OF SAFETY, https://bit.ly/3cOG3pV (New Hampshire).

[36] The suspension of in-person home studies is also delaying the release of class members. *See* Pls.' Reply 17-18 [Doc. #759]; Cubas Decl. ¶ 12; Enriquez Decl. ¶¶ 8-9; Huebner Decl. ¶¶ 16-18; Shaw Decl. ¶¶ 10-11. Although ORR asserts that it allows virtual home studies where possible, Sualog Decl. ¶ 16 [Doc. #762-1], it does not appear to have issued relevant guidance. *See* Enriquez Decl. ¶¶ 14. Practice in the field appears inconsistent and the lack of guidance renders legal service providers unable to effectively advocate for their clients' release. Enriquez Decl. ¶¶ 3-4, 14; Huebner Decl. ¶ 19. As a result, some children remain unnecessarily detained due to ORR's refusal to consider alternatives to in-person home studies, including in situations where children are at imminent risk of aging out. Huebner Decl. ¶¶ 18-20.

As noted in Plaintiffs' Reply, ORR's refusal to adjust its fingerprinting policies stands in stark contrast to the common-sense decision of state child welfare authorities to temporarily suspend fingerprinting requirements and instead rely on name-based background checks.[37] *See* Pls.' Reply 16 n.49. HHS's Children's Bureau recently approved this practice after receiving "numerous requests" from state child welfare agencies and finding that agencies may be unable to safely fingerprint prospective foster parents because of the public health emergency.[38]

C.   **ORR fails to contest Plaintiffs' evidence that it is refusing to release class members because they have non-final orders of removal.**

With respect to class members with non-legally executable and non-final orders of removal, ORR makes no effort to refute Plaintiffs' showing that: (1) MPP orders of removal are legally invalid as applied to unaccompanied minors; (2) class members are generally entitled to release notwithstanding an immigration judge's order of removal; and (3) immigration judges' removal orders are in no way "final" – children who appeal may not be removed until their appeals are resolved, if ever.

---

[37]   Contrary to ORR's view that fingerprinting will soon be feasible, state authorities continue to issue updated guidance suspending certain background check requirements because of the pandemic. *See, e.g.*, Oregon Dep't of Human Services, *DHS Child Welfare Procedure Manual* (rev. 4/15/20), https://bit.ly/3bxJP6E; Wisconsin Dep't of Children and Families, *Fingerprint Background Check Requirements Update During 2020 COVID-19 Public Health Emergency, DCF Order #30*, 2, Apr. 20, 2020, https://bit.ly/2RYtWhU; Washington State Dep't of Children, Youth, and Families, *Child Welfare, Temporary Actions in Response to COVID-19: General Questions*, https://bit.ly/2xGKK6e; Gavin Newsom, Executive Order N-53-20, Apr. 17, 2020, https://bit.ly/2yytEHA.

[38] *See* Jerry Milner, *Letter to Child Welfare Leaders, Children's Bureau, Administration for Children and Families, Dep't of Health & Human Services*, 1, Apr. 15, 2020, https://bit.ly/2zil684.

The TVPRA requires that unaccompanied children be placed in section 240 proceedings with special protections to apply for asylum before USCIS.[39]  Because accompanied minors in MPP proceedings lose these rights, a child reclassified as an unaccompanied minor should regain full TVPRA protections, and the MPP order of removal should not impact release. Instead of honoring the vulnerabilities of unaccompanied minors, however, ORR has refused to release children to suitable sponsors if they have any proceedings pending or adjudicated under MPP.[40] *See* Ex. H, Declaration of Elisa Gahng ¶ 11 ("Gahng Decl.");[41] Ex. G, Declaration of Claudia R. Cubas ¶¶ 5-9 ("Cubas Decl.").[42]

Conceding the foregoing, ORR instead argues that it refuses to release children only "if Immigration and Customs Enforcement ("ICE") informs ORR that the minor has an executable final order of removal, and the minor is scheduled to be

---

[39] 8 U.S.C. § 1232(a)(5)(D)(i) ("Any unaccompanied alien child sought to be removed . . . shall be placed in removal proceedings under [INA] section 240 . . ."). Children also have a right to apply for affirmative asylum in a non-adversarial proceeding before USCIS. 8 U.S.C.§§ 1158(b)(3)(C), 1232(d)(8).

[40] Mem. in Supp. of Ptrs.' Mot. for a TRO and Prelim. Injunction, *A.C.H.C. et. al v. Barr*, No. 20-cv-00770-RDM (D.D.C. Mar. 20, 2020) (Doc. 5).

[41] Referring to a document indicating that the release of six children with MPP removal orders will be delayed pending the resolution of their appeals.

[42] Additionally, Immigration Judges' orders of removal are not final if they are on appeal before the Board of Immigration Appeals. When an unaccompanied minor timely appeals a removal order, the order is not final until the Board dismisses the appeal, or the Board or Attorney General subsequently order removal. 8 C.F.R. § 1241.1. And even when minors do have legally executable final orders of removal, some may be subject to indefinite detention due to the impossibility of carrying out actual deportation during the COVID-19 global pandemic. *See, e.g.*, Mary Louise Kelly, *Guatemala Suspends Deportations From U.S. After 70 Test Positive For Coronavirus*, All Things Considered, NATIONAL PUBLIC RADIO, Apr. 17, 2020, https://n.pr/34St6IP (Guatemala); El Salvador Suspends Deportations from U.S., Mexico Over Coronavirus, REUTERS, Mar. 18, 2020, https://reut.rs/2XZqrvl (El Salvador); U.N. says Saudi deportations of Ethiopian migrants risks spreading coronavirus, REUTERS, Apr. 13, 2020, https://reut.rs/3auzE1e (U.N. recommendation against "large-scale deportations").

deported to his or her home country pursuant to that final order of removal in short order . . . ." Sualog 3 at ¶ 10. According to ORR, "If it becomes apparent that deportation is not imminent, then ORR follows ordinary release protocols." *Id*.

Conspicuously absent from ORR's policy is *any* attempt to specify just when it thinks deportation is "imminent," or likely to be carried out "in short order." And attorneys and family members continue to report children languishing for weeks or months in congregate detention during a pandemic despite having appealed initial removal orders, the validity of which will remain undecided for months. *See* Cubas Decl. ¶¶ 7-9; Devereaux Decl. ¶¶ 6-9; Gahng Decl. ¶¶ 11-12; Ex. J.,  Declaration of D.V.V.C. ¶¶ 4-8, 13-14; *see also* Declaration of Charles J. Vernon ¶¶ 5-6 (Doc. #759-1) (Board can take as long as 14 to 23 months to decide an appeal).

Finally, the Court should not allow ORR to pass the buck to ICE for needlessly delaying release. No specialized expertise is required to discern that a child has appealed a removal order or that an appeal will take months to decide. In all events, both ORR and ICE are defendants. Neither may blame the other to excuse breaching the Agreement. *Flores v. Sessions*, 862 F.3d 863, 879 (9th Cir. 2017) ("'[T]here is no reason why [the] bureaucratic reorganization' enacted by the HSA and TVPRA 'should prohibit the government from adhering to the [Flores] Settlement.'" (quoting *Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016))).

**D.     The Court's temporary restraining order appears to be resulting in the release of some children in ORR custody.**

Following the Court's March 28 Order, some advocates report that ORR began releasing children whom it had previously insisted should remain detained. *See* Enriquez Decl. ¶ 7 ("I am heartened that ORR appears to have relaxed blanket policies impeding or freezing release of our clients in New York. . . . These releases occurred shortly after the TRO rulings issued in response to the plaintiffs' motion and the spotlight being shined on these issues"). It appears that ORR may be releasing children it would have detained but for this Court's orders. The

1    pandemic shows no signs of subsiding anytime soon and it is now painfully clear

2    that ORR cannot protect children from contracting coronavirus in congregate

3    detention. Now is not the time to allow ORR to return to business as usual.

4            Any compliance with the TRO does not obviate the need for a preliminary

5    injunction protecting children from unnecessary detention. *See Rouser v. White*,

6    707 F. Supp. 2d 1055, 1071 (E.D. Cal. 2010) (voluntary cessation does not

7    preclude preliminary injunction); *Fraihat v. ICE*, No. 19-cv-1546-JGB-SHK, 2020

8    WL 1932570, at *29 (C.D. Cal. Apr. 20, 2020) ("Defendants' halting start to

9    pandemic response does not remove the need for preliminary relief, because

10   Defendants have not argued or shown that delays or non-enforcement of ICE

11   facility-wide policies will cease."). If ORR plans to release children without

12   unnecessary delay for the duration of the pandemic, a preliminary injunction will

13   do it no harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

14   **V.    PLAINTIFFS HAVE MORE THAN CARRIED THEIR BURDEN OF PROVING

15         DEFENDANTS' VIOLATIONS OF THE AGREEMENT.**

16

17           Defendants urge the Court to deny a preliminary injunction on the grounds

18   that Plaintiffs have failed to carry their burden of proving a current breach of the

19   Agreement. *See, e.g.*, Defs.' Second Supp. Response 7 [Doc. #772].

20           Defendants' answers to the Court's questions eliminate any doubt that ORR

21   continues to delay children's release unnecessarily, while ICE simply ignores the

22   release provisions of Agreement.

23           With effective physical monitoring of Defendants' facilities all but

24   impossible, Defendants have nearly exclusive access to information regarding the

25   treatment and conditions class members are experiencing. Plaintiffs' April 14,

26   2020 request that the Independent Monitor gather basic information from

27   Defendants concerning their efforts to reduce congregate detention is currently

28   under submission. *See* Ex. L, Declaration of Carlos Holguín (enclosing copy of

23

Plaintiffs' Letter to Special Master Andrea Sheridan Ordin). But Defendants, of course, could have furnished all or part of this information themselves in response to the Court's questions; they have not.

Similarly, as will be detailed in a forthcoming joint status report, Defendants report that ICE and ORR have yet to decide whether they will voluntarily disclose requested information to minors' immigration counsel. Individual children's attorneys report that, if anything, ORR is becoming less forthcoming with sharing information about clients' health and safety. *See, e.g.*, Deveraux Decl. ¶¶ 12-19.

Defendants simultaneously withhold basic information and complain that Plaintiffs' evidence is insufficient. But there is an "obvious unfair advantage [in] affording only one side 'exclusive access to a storehouse of relevant fact.'" *In re Grand Jury Proceedings*, 800 F.2d 1293, 1302-03 (4th Cir. 1986) (quoting *In re Screws Antitrust Litig*, 91 F.R.D. 47, 50 (D. Mass. 1982)); *see also* Ex. QQQ, Reporter's Transcript of Video Proceedings 16, March 27, 2020 (noting unequal access to information between the parties).

The Court should accordingly hold that Plaintiffs have carried their burden and enjoin Defendants to produce information sufficient to permit assessment of their ongoing compliance with the Agreement during the COVID-19 pandemic.

CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' application for a preliminary injunction in the form filed herewith.

Dated:   April 22, 2020.          CENTER FOR HUMAN RIGHTS AND
                                  CONSTITUTIONAL LAW
                                  Peter A. Schey
                                  Carlos R. Holguin

                                  USF SCHOOL OF LAW IMMIGRATION CLINIC
                                  Bill Ong Hing

                                  LA RAZA CENTRO LEGAL, INC.

24

1

Stephen Rosenbaum

2

UNIVERSITY OF CALIFORNIA DAVIS
SCHOOL OF LAW

3

Immigration Law Clinic
Holly S. Cooper
Daisy O. Felt

4

5

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch

6

Neha Desai
Poonam Juneja
Freya Pitts

7

8

THE LAW FOUNDATION OF SILICON VALLEY
Jennifer Kelleher Cloyd

9

Katherine H. Manning
Annette Kirkham

10

11

*Of counsel:*

12

ALDEA - THE PEOPLE'S JUSTICE CENTER
Bridget Cambria

13

14

_____*/s/ Peter Schey*_____
Peter A. Schey

15

*Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

25