# EXHIBIT M

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (58232)
Carlos R. Holguín (90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: pschey@centerforhumanrights.org
crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM BARR, Attorney General of the United States, *et al.*, <br><br> Defendants. | Case No. CV 85-4544-DMG-AGRx <br><br> **DECLARATION OF PETER SCHEY IN SUPPORT OF *EX PARTE* APPLICATION FOR ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** <br><br> Hearing: April 24, 2020 10 AM <br> [HON. DOLLY M. GEE] |

1   *Counsel for Plaintiffs, continued*

2   USF SCHOOL OF LAW IMMIGRATION CLINIC
    Bill Ong Hing (Cal. Bar No. 61513)
3   2130 Fulton Street
    San Francisco, CA 94117-1080
4   Telephone: (415) 422-4475
5   Email: bhing@usfca.edu

6   LA RAZA CENTRO LEGAL, INC.
7   Stephen Rosenbaum (Cal. Bar No. 98634)
    474 Valencia Street, #295
8   San Francisco, CA 94103
9   Telephone: (415) 575-3500

10  UNIVERSITY OF CALIFORNIA DAVIS
11  SCHOOL OF LAW
    Immigration Law Clinic
12  Holly S. Cooper (197626)
13  One Shields Avenue, TB 30
    Davis, CA 95616
14  Telephone: (530) 754-4833
15  Email: hscooper@ucdavis.edu

16  THE LAW FOUNDATION OF SILICON VALLEY
17  Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
    Katherine H. Manning (Cal. Bar No. 229233)
18  Annette Kirkham (Cal. Bar No. 217958)
19  4 North Second Street, Suite 1300
    San Jose, CA 95113
20  Telephone: (408) 280-2437
21  Email: kate.manning@lawfoundation.org

22  *Of counsel:*

23  ALDEA - THE PEOPLE'S JUSTICE CENTER
24  Bridget Cambria
    532 Walnut Street
25  Reading, PA 19601
    Phone: (484) 877-8002
26  Fax: (484) 926-2032
27  Email: bridget.cambria@cambriaklinelaw.com

28

I, Peter Schey, hereby declare:

1. I am an attorney admitted to the bar of the United States District Court for the Central District of California. I am one of the attorneys who serve as class counsel for Plaintiffs in the above-captioned action. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057. I execute this declaration in support of Plaintiffs' ex parte application for an order to show cause re: preliminary injunction protecting *Flores* class members from irreparable injury during the COVID-19 national public health emergency. I declare that the following statements are true to the best of my knowledge, information, and belief, formed after reasonable inquiry of the circumstances. I have personal knowledge of the facts set forth below and, if called as a witness, I could and would testify competently as follows.

2. On April 17, 2020, Acting Director of Immigration and Customs Enforcement Matthew T. Albence and Acting Commissioner of Customs and Border Protection Mark Morgan briefed the Committee on Oversight and Reform on how the Department of Homeland Security is addressing coronavirus risks in immigration detention facilities.

3. Attached as Exhibit A is a true and correct copy of a press release from Representative Carolyn B. Maloney, the Chairwoman of the Committee.

3. According to the press release, Acting Director Albence stated that "'our review of our existing population has been completed'" and that ICE does not plan to release any other detainees to slow the spread of coronavirus in detention facilities.

4. In addition, Acting Director Albence stated that "'only 400 detainees have been tested'" for COVID-19, and that ICE "'would certainly do more testing'" if additional test kits were available.

5. Attached as Exhibit B is ICE's "COVID-19 Pandemic Response Requirements" dated April 10, 2020.

6. ICE also has information available entitled "ICE Guidance on COVID-19" available at https://www.ice.gov/coronavirus The Guidance under heading What is

ICE doing to ensure detainees in custody are well-cared for during this crisis? states: "ICE has maintained a pandemic workforce protection plan since February 2014, which was last updated in May 2017. This plan provides specific guidance for biological threats such as COVID-19. ICE instituted applicable parts of the plan in January 2020 upon the discovery of the potential threat of COVID-19." In short, ICE became aware of the dangers of the COVID-19 pandemic in January 2020 and started measures involving a "pandemic workforce protection plan" and yet took no known measures to expedite the release of detained class members until ordered to do so by this Court on March 28, 2020.

7. The Guidance further states that in March, ICE's Enforcement and Removal Operations (ERO) "convened a working group between medical professionals, disease control specialists, detention experts, and field operators to identify additional enhanced steps to minimize the spread of the virus." And at a later date began to "evaluate[ ] its detained population based upon the CDC's guidance for people who might be at higher risk for severe illness as a result of COVID-19 to determine whether continued detention was appropriate." *Id*. Still, no guidance has appeared requiring ICE to "determine whether continued detention [of class members and their parents] was appropriate."

8. On April 14, 2020, I forwarded an email message to Defendants' counsel Sarah Fabian requesting a meet and confer pursuant to the Court's Order that "[t]he parties' counsel shall meet and confer regarding (1) certain disclosures, including information regarding existence of COVID-19 infection among Class Members, that should be provided to minors' immigration counsel; and (2) the quality of the data that Defendants provide to Class Counsel pursuant to Paragraph 28A of the FSA." The parties met and conferred on April 21, 2020, but Defendants limited the discussion to item one of the Court's Order and made no commitments regarding disclosures, including information regarding existence of COVID-19 infection among Class Members, that should be provided to minors' immigration counsel.

9. The Court has urged the parties to make efforts to resolve any issues involved in the. pending application for a preliminary injunction. On April 16, 2020, I forwarded to Defendants' counsel Sarah Fabian a written proposal regarding steps ICE could take to come into prompt compliance with the *Flores* Settlement Agreement, and requested a prompt meet and confer regarding the proposals. To date Defendants have not agreed to meet and confer to discuss Plaintiffs' proposals. On April 22, 2020, I again forwarded to Defendants' counsel a proposal that if implemented could result in the withdrawal of the pending application for a preliminary injunction with regards ICE's alleged non-compliance with the FSA. Defendants' counsel advised me that the proposal has been forwarded to. ICE for its consideration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 22nd day of April, 2020, at Ojai, California.

Peter A. Schey

EXHIBIT A

# DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus

Apr 17, 2020   | Press Release

Washington, D.C. (Apr. 17, 2020)—Today, Acting Director of Immigration and Customs Enforcement (ICE) Matthew T. Albence and Acting Commissioner of Customs and Border Protection (CBP) Mark Morgan briefed the Committee on Oversight and Reform on how the Department of Homeland Security (DHS) is addressing coronavirus risks in immigration detention facilities.

Rep. Carolyn B. Maloney, the Chairwoman of the Committee, issued the following statement:

> "The Trump Administration faces a stark choice:  save lives by releasing asylum seekers and other nonviolent immigrants who never should have been locked up in the first place, or aggravate the spread of coronavirus in detention centers.  Today, Administration officials told our Committee they have chosen to continue detaining thousands of immigrants who came to our country to escape persecution or torture, have no criminal records, and are not flight risks."

Rep. Jamie Raskin, the Chairman of Subcommittee on Civil Rights and Civil Liberties, issued the following statement:

> "That briefing left me more troubled—not less—about the Trump Administration's cavalier indifference to the human suffering caused by this runaway plague on our land.  ICE continues to unnecessarily detain thousands of non-violent immigrants locked up in holding facilities that are rampant breeding grounds for transmission of the coronavirus.  ICE confirmed it has no plans to release any more detainees.  It confirmed that its testing of detainees and staff is as sporadic and flawed as the federal government's overall approach to public testing.  This is a dangerous situation for detainees and staff alike.  Nursing homes and cruise ships show how this virus can cut a path like wildfire through close quarters.  The time to act to save lives is right now."

Below are key takeaways from today's briefing:

- **Refusal to Release Thousands of Nonviolent Immigrants.**

Acting Director Albence stated that "our review of our existing population has been completed" and that ICE does not plan to release any other detainees to slow the spread of coronavirus in detention facilities. ICE has released fewer than 700 vulnerable individuals and is continuing to detain more than 32,000 men and women. More than 5,500 of these detainees have established that they fled persecution or torture, and more than 14,000 have no criminal convictions or pending criminal charges.

- **Deficient Testing of Detainees Despite Increasing Outbreaks.**

ICE publicly confirmed that 105 detainees and 25 employees in at least 29 detention centers now have coronavirus. However, Acting Director Albence revealed today that only 400 detainees have been tested. Although many more detainees were exposed and need testing, Mr. Albence stated that ICE has a limited number of tests and that "we would certainly do more testing" if additional test kits were available. Mr. Albence also confirmed that ICE does not routinely test detainees before deporting them.

**DHS Claims That Detention During Pandemic is a Necessary Deterrent.**

Acting Director Albence asserted that releasing non-violent immigrants to protect them from being infected and sickened with coronavirus could give the impression that the Administration is "not enforcing our immigration laws," which would be a "huge pull factor" and create a "rush at the borders."

On March 11, 2020, Chairwoman Maloney and Chairman sent a letter requesting the Department's plans to prevent an outbreak in its detention facilities.

On April 7, 2020, Chairwoman Maloney and Chairman Raskin sent a letter calling on DHS to release non-violent detainees to minimize the spread of the disease.

Since then, the number of confirmed cases in ICE custody has increased five-fold, with hundreds more exposed to the virus.

**Issues:** Coronavirus, Immigration and Border Issues

116th Congress

    

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

EXHIBIT B

25
26
27
28





# ERO

# U.S. Immigration and Customs Enforcement Enforcement and Removal Operations

## COVID-19 Pandemic Response Requirements



U.S. Immigration and Customs Enforcement

# Table of Contents

PURPOSE AND SCOPE ........................................................................................................... 3

INTRODUCTION ................................................................................................................... 3

OBJECTIVES ....................................................................................................................... 4

CONCEPT OF OPERATIONS .................................................................................................. 5

    DEDICATED ICE DETENTION FACILITIES ......................................................................... 5

    NON-DEDICATED ICE DETENTION FACILITIES ................................................................. 6

    ALL FACILITIES HOUSING ICE DETAINEES ...................................................................... 7

        PREPAREDNESS ........................................................................................................ 7

        PREVENTION ........................................................................................................... 11

        MANAGEMENT ......................................................................................................... 14

ATTACHMENTS ................................................................................................................. 18

## PURPOSE AND SCOPE

The U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Coronavirus Disease 2019 (COVID-19) Pandemic Response Requirements (PRR) sets forth expectations and assists ICE detention facility operators to sustain detention operations, while mitigating risk to the safety and well-being of detainees, staff, contractors, visitors, and stakeholders due to COVID-19.  Consistent with ICE's overall adjustments to its immigration enforcement posture,[1] the ERO PRR builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis.  The ERO PRR has been developed in consoltation with the Centers for Disease Control and Prevention (CDC) and is a dynamic document that will be updated as additional/revised information and best practices become available.

## INTRODUCTION

As the CDC has explained:

> COVID-19 is a communicable disease caused by a novel (new) coronavirus, SARS-CoV-2, that was first identified as the cause of an outbreak of respiratory illness that began in Wuhan Hubei Province, People's Republic of China (China).

> COVID-19 appears to spread easily and sustainably within communities. The virus is thought to transfer primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes; it may transfer through contact with surfaces or objects contaminated with these droplets. There is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms. The ease of transmission presents a risk of a surge in hospitalizations for COVID-19, which would reduce available hospital capacity. Such a surge has been identified as a likely contributing factor to the high mortality rate for COVID-19 cases in Italy and China.

> Symptoms include fever, cough, and shortness of breath, and typically appear 2-14 days after exposure. Manifestations of severe disease include severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock, and multi-organ failure. According to the [World Health Organization], approximately 3.4% of reported COVID-19 cases have resulted in death globally. This mortality rate is higher among older adults or those with compromised immune systems. Older adults and people who have severe chronic medical conditions like heart, lung or kidney disease are also at higher risk for more serious COVID-19 illness. Early data suggest older people are twice as likely to have serious COVID-19 illness.

---

[1] *See, e.g.*, Attachment A, U.S. Immigration and Customs Enforcement, *Updated ICE statement on COVID-19*  (Mar. 18, 2020), https://www.ice.gov/news/releases/updated-ice-statement-covid-19.

Given the seriousness and pervasiveness of COVID-19, ICE is taking necessary and prompt measures in response.  ICE is providing guidance on the minimum measures required for facilities housing ICE detainees to implement to ensure consistent practices throughout its detention operations and the provision of medical care across the full spectrum of detention facilities to mitigate the spread of COVID-19.  The ICE detention standards applicable to all facilities used to house ICE detainees have long required that each such facility have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, treatment, and education.  Those requirements include reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.[2]  The measures set forth in the PRR, allow ICE personnel and detention providers to properly discharge their obligations under those standards in light of the unique challenges posed by COVID-19.

## OBJECTIVES

The ERO PRR is designed to establish consistency across ICE detention facilities by establishing mandatory requirements and best practices all detention facilities housing ICE detainees are expected to follow during the COVID-19 pandemic.  Consistent with ICE detention standards, all facilities housing ICE detainees  are required to have a COVID-19 mitigation plan that meets the following four objectives:

- To protect employees, contractors, detainees, visitors to the facility, and stakeholders from exposure to the virus;
- To maintain essential functions and services at the facility throughout the pendency of the pandemic;
- To reduce movement and limit interaction of detainees with others outside their assigned housing units, as well as staff and others, and to promote social distancing within housing units; and
- To establish means to monitor, cohort, quarantine, and isolate the sick from the well.[3]

---

[2] *See, e.g.,* Attachment B, ICE National Detention Standards 2019, Standard 4.3, Medical Care, at II.D.2 (p. 114), https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf; Attachment C, 2011 ICE Performance-Based National Detention Standards (PBNDS), Revised 2016, Standard 4.3, Part V.C.1 (p. 261), https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf; Attachment D, 2008 ICE PBNDS, Standard 4-22, Medical Care, V.C.1 (pp. 5-6*),* https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf.

[3] A *cohort* is a group of persons with a similar condition grouped or housed together for observation over a period of time.  Isolation and quarantine are public health practices used to protect the public from exposure to individuals who have or may have a contagious disease.  For purposes of this document, and as defined by the CDC, *quarantine* as the separation of a person or group of people reasonably believed to have been exposed to a communicable disease but not yet symptomatic, from others who have not been exposed, to prevent the possible spread of the communicable disease.  For purposes of this document, and as defined by the CDC, *isolation* as the separation of a person or group of people known or reasonably

## CONCEPT OF OPERATIONS

The ERO PRR is intended for use across ICE's entire detention network, applying to all facilities housing ICE detainees, including ICE-owned Service Processing Centers, facilities operated by private vendors, and facilities operated by local government agencies that have mixed populations of which ICE detainees comprise only a small fraction.

---

### DEDICATED ICE DETENTION FACILITIES

---

*All ICE dedicated detention facilities[4] must:*

- Comply with the provisions of their relevant ICE contract or service agreement.

- Comply with the ICE national detention standards applicable to the facility, generally the Performance-Based National Detention Standards 2011 (PBNDS 2011).

- Comply with the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Attachment E).

- Follow ICE's March 27, 2020 Memorandum to Detention Wardens and Superintendents on COVID-19 Action Plan Revision 1, and subsequent updates (Attachment F).

- Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.

- Notify both the local ERO Field Office Director (or designee) and the Field Medical Coordinator as soon as practicable, but in no case more than 12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19, including:

  o People aged 65 and older

  o People of all ages with underlying medical conditions, particularly if not well controlled, including:

    ▪ People with chronic lung disease or moderate to severe asthma
    ▪ People who have serious heart conditions
    ▪ People who are immunocompromised
      • Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or

---

believed to be infected with a communicable disease and potentially infectious from others to prevent the spread of the communicable disease.

[4] Dedicated detention facilities are facilities that house only ICE detainees.  Dedicated facilities may be ICE-owned Service Processing Centers, privately owned Contract Detention Facilities, or facilities operated by state or local governments that hold no other detention populations except ICE detainees.

> AIDS, and prolonged use of corticosteroids and other immune weakening medications
> - People with severe obesity (body mass index [BMI] of 40 or higher)
> - People with diabetes
> - People with chronic kidney disease undergoing dialysis
> - People with liver disease

Notification shall be made via e-mail from the facility's Health Services Administrator (HSA) (or equivalent) and contain the following subject line for ease of identification: "Notification of COVID-19 High Risk Detainee (A-Number)." At a minimum the HSA will provide the following information:

- Detainee name
- Detention location
- Current medical issues as well as medications currently prescribed
- Facility medical Point of Contact (POC) and phone number

---

## NON-DEDICATED ICE DETENTION FACILITIES

---

*All non-dedicated detention facilities and local jails housing ICE detainees <u>must</u>:*

- Comply with the provisions of their relevant ICE contract or service agreement.

- Comply with the ICE national detention standards applicable to the facility, generally the 2019 National Detention Standards.

- Comply with the CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*.

- Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.

- Notify both the ERO Field Office Director (or designee) and Field Medical Coordinator as soon as practicable, but in no case more than 12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19, including:

  - People aged 65 and older

  - People of all ages with underlying medical conditions, particularly if not well controlled, including:

    - People with chronic lung disease or moderate to severe asthma
    - People who have serious heart conditions
    - People who are immunocompromised
      - Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or

AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

Notification should be made via e-mail from the facility's HSA (or equivalent) and should contain the following subject line for ease of identification: "Notification of COVID-19 High Risk Detainee (A-Number)." Other standardized means of communicating this information to ICE are acceptable. At a minimum the HSA will provide the following information:

- Detainee name
- Detention location
- Current medical issues as well as medications currently prescribed
- Facility medical POC and phone number

---

### ALL FACILITIES HOUSING ICE DETAINEES

---

*In addition to the specific measures listed above, all detention facilities housing ICE detainees <u>must also</u> comply with the following:*

### <u>PREPAREDNESS</u>

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and detainees about these preparations and how they may temporarily alter daily life.

➢ **Develop information-sharing systems with partners.**

- Identify points of contact in relevant state, local, tribal, and/or territorial public health department before cases develop.

- Communicate with other correctional and detention facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.

➢ **Review existing pandemic, influenza, all-hazards, and disaster plans, and revise for COVID-19, and ensure that they meet the requirements of ICE's detention standards.**

➢ **Offer the seasonal influenza vaccine to all detained persons (existing populations and new intakes) and staff throughout the influenza season, where possible.**

➤ **Staffing**

- Review sick leave policies to ensure that staff can stay home when sick and determine which officials will have the authority to send symptomatic staff home. Staff who report for work with symptoms of COVID-19 must be sent home and advised to follow CDC-recommended steps for persons exhibiting COVID-19 symptoms.

- Staff who test positive for COVID-19 must inform their workplace and personal contacts immediately. If a staff member has a confirmed COVID-19 infection, the relevant employers will inform other staff of their possible exposure to COVID-19 in the workplace consistent with any legal limitations on the sharing of such information. Exposed employees must then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

- Identify staff whose duties would allow them to work from home and allow them to work from home in order to promote social distancing and further reduce the risk of COVID-19 transmission.

- Determine minimum levels of staff in all categories required for the facility to function safely.

- Follow the Public Health Recommendations for Community-Related Exposure.[5]

➤ **Supplies**

- Ensure that sufficient stocks of hygiene supplies (soap, hand sanitizer, tissues), personal protective equipment (PPE) (to include facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls), and medical supplies (consistent with the healthcare capabilities of the facility) are on hand, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility.

- Note that shortages of N95 respirators are anticipated during the COVID-19 response. Based on local and regional situational analysis of PPE supplies, face masks should be used when the supply chain of N95 respirators cannot meet the demand.

- Follow COVID-19: Strategies for Optimizing the Supply of PPE.[6]

- Soiled PPE items should be disposed in leak-proof plastic bags that are tied at the top and not re-opened. Bags can be disposed of in the regular solid waste stream.

- Cloth face coverings should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19. Cloth face masks should:

---

[5] Attachment G, Centers of Disease Control and Prevention, *Public Health Recommendations for Community-Related Exposure*, https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited Apr. 9, 2020).

[6] Attachment H, Centers for Disease Control and Prevention, *Strategies to Optimize the Supply of PPE and Equipment*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited Apr. 9, 2020).

- fit snugly but comfortably against the side of the face
- be secured with ties or ear loops where possible or securely tied
- include multiple layers of fabric
- allow for breathing without restriction
- be able to be laundered and machine dried without damage or change to shape.

➢ **Hygiene**

- Reinforce healthy hygiene practices and provide and restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).

- Require all persons within the facility to cover their mouth and nose with their elbow (or ideally with a tissue) rather than with their hand when they cough or sneeze, and to throw all tissues in the trash immediately after use.  Provide detainees and staff no-cost access to tissues and no-touch receptacles for disposal.

- Require all persons within the facility to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing their nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

- Provide detainees and staff no-cost, unlimited access to supplies for hand cleansing, including liquid soap, running water, hand drying machines or disposable paper towels, and no-touch trash receptacles.

- Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.

- Require all persons within the facility to avoid touching their eyes, nose, or mouth without cleaning their hands first.

- Post signage throughout the facility reminding detained persons and staff to practice good hand hygiene and cough etiquette (printable materials for community-based settings can be found on the CDC website). Signage must be in English and Spanish, as well as any other common languages for the detainee population at the facility.

- Prohibit sharing of eating utensils, dishes, and cups.

- Prohibit non-essential personal contact such as handshakes, hugs, and high-fives.

➢ **Cleaning/Disinfecting Practices**

- Adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response.[7]

- Several times a day using household cleaners and Environmental Protection Agency-registered disinfectants, clean and disinfect surfaces and objects that are

---

[7] Attachment I, Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited Apr. 9, 2020).

frequently touched, especially in common areas (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment). The Environmental Protection Agency's (EPA) list of certified cleaning products is located here.

- Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

- Ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.

- Facility leadership will ensure that there is adequate oversight and supervision of all individuals responsible for cleaning and disinfecting these areas.

### *CDC Recommended Cleaning Tips*

**Hard (Non-porous) Surfaces**

- If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

- For disinfection, most common EPA-registered household disinfectants should be effective.

  - A list of products that are EPA-approved for use against the virus that causes COVID-19 is available here. Follow the manufacturer's instructions for all cleaning and disinfection products for concentration, application method and contact time, etc.

  - Additionally, diluted household bleach solutions (at least 1000ppm sodium hypochlorite) can be used if appropriate for the surface. Follow manufacturer's instructions for application, ensuring a contact time of at least 1 minute, and allowing proper ventilation during and after application. Check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted.

    - Prepare a bleach solution by mixing:

      - 5 tablespoons (1/3 cup) bleach per gallon of water or
      - 4 teaspoons bleach per quart of water

**Soft (Porous) Surfaces**

- For soft (porous) surfaces such as carpeted floor, rugs, and drapes, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

  - If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

o Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and that are suitable for porous surfaces.[8]

**Electronics**

- For electronics such as tablets, touch screens, keyboards, remote controls, and ATM machines, remove visible contamination if present.

  o Follow the manufacturer's instructions for all cleaning and disinfection products.

  o Consider use of wipeable covers for electronics.

  o If no manufacturer guidance is available, consider the use of alcohol-based wipes or sprays containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

**Linens, Clothing, and Other Items That Go in the Laundry**

- In order to minimize the possibility of dispersing virus through the air, do not shake dirty laundry.

- Wash items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely. Dirty laundry that has been in contact with an ill person can be washed with other people's items.

- Clean and disinfect hampers or other carts for transporting laundry according to guidance above for hard or soft surfaces.

<u>PREVENTION</u>

Detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission.

➢ **Perform pre-intake screening for all staff and new entrants for symptoms of COVID-19.**

Screening should take place before staff and new intakes enter the facility or just inside the facility, where practicable. For new admissions, this should occur before beginning the intake process, in order to identify and immediately isolate any detainee with symptoms before the individual comingles with others or is placed in

---

[8] Attachment J, U.S. Environmental Protection Agency, *List N: Disinfectants for Use Against SARS-CoV-2*, https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2 (last visited Apr. 9, 2020).

the general population.  This should include temperature screening of all staff and new entrants, as well as a verbal symptoms check.

- Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions based on Interim Guidance: Managing COVID-19 in Correctional/Detention Facilities:

  o Today or in the past 24 hours, have you had any of the following symptoms?

    ▪ Fever, felt feverish, or had chills?

    ▪ Cough?

    ▪ Difficulty breathing?

  o In the past 14 days, have you had contact with a person known to be infected with COVID-19 where you were not wearing the recommended proper PPE?

- If staff have symptoms of COVID-19 (fever, cough, shortness of breath): they must be denied access to the facility.

- If any new intake has symptoms of COVID-19:

  o Require the individual to wear a face mask.

  o Ensure that staff interacting with the symptomatic individual wears recommended PPE.

  o Isolate the individual and refer to healthcare staff for further evaluation.

  o Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective isolation and necessary medical care.

- If an individual is a close contact of a known COVID-19 case or has traveled to an affected area (but has no COVID-19 symptoms), quarantine the individual and monitor for symptoms two times per day for 14 days.

➢ **Visitation**

- During suspended (social) or modified (legal) visitation programs, provide access to virtual visitation options where available.  When not possible, verbally screen all visitors on entry for symptoms of COVID-19 and perform temperature checks, when possible.  ICE continues to explore opportunities to enhance attorney access while legal visits are being impacted.  For facilities at which immigration hearings are conducted or where detainees are otherwise held who have cases pending immigration proceedings, this may include:

  o Adding all immigration attorneys of record to the Talton Pro-bono platform.

  o Requiring facilities to establish a process for detainees/immigration attorneys to schedule appointments and facilitate the calls.

  o Leveraging technology (e.g., tablets, smartphones) to facilitate attorney/client communication.

- Working with the various detention contractors and telephone service providers to ensure that all detainees receive some number of free calls per week.

- Communicate with the public about any changes to facility operations, including visitation programs.  Facilities are encouraged to prohibit or, at a minimum, significantly adopt restricted visitation programs, and to suspend all volunteer work assignments for detainees assigned to food service, and other assignments where applicable.

➢ **Where possible, restrict transfers of detained non-ICE populations to and from other jurisdictions and facilities unless necessary for medical evaluation, isolation/quarantine, clinical care, or extenuating security concerns.**

➢ **Consider suspending work release programs for inmates at shared facilities to reduce overall risk of introduction and transmission of COVID-19 into the facility.**

➢ **When feasible and consistent with security priorities, encourage staff to maintain a distance greater than six feet from an individual that appears feverish or ill and/or with respiratory symptoms while interviewing, escorting, or interacting in other ways, unless wearing PPE.**

➢ **Additional Measures to Facilitate Social Distancing**

- Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement the following measures to the extent practicable:

  - Efforts should be made to reduce the population to approximately 75% of capacity.

  - Where detainee populations are such that such cells are available, to the extent possible, house detainees in individual rooms.

  - Recommend that detainees sharing sleeping quarters sleep "head-to-foot."

  - Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.

  - Staff and detainees should be directed to avoid congregating in groups of 10 or more, employing social distancing strategies at all times.

  - Whenever possible, all staff and detainees should maintain a distance of six feet from one another.

  - If practicable, beds in housing units should be rearranged to allow for sufficient separation during sleeping hours.

<u>MANAGEMENT</u>

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

*ICE Custody Review for Potentially High-Risk Detainees*

Upon being informed of a detainee who may potentially be at higher risk for serious illness from exposure to COVID-19, ERO will review the case to determine whether continued detention is appropriate.[9]  ICE will make such custody determinations on a case-by-case basis, pursuant to the applicable legal standards, with due consideration of the public health considerations implicated.

➢ **Considerable effort should be made to quarantine all new entrants for 14 days before they enter the general population.**

- To do this, facilities should consider cohorting daily intakes; two days of new intakes, or multiple days on new intakes, in designated areas prior to placement into the general population.  Given the significant variance in facility attributes and characteristics, cohorting options and capabilities will differ across the various detention facilities housing ICE detainees.  ICE encourages all facilities to adopt the most effective cohorting methods practicable based on the individual facility characteristics taking into account the number new intakes anticipated per day.

➢ **For suspected or confirmed COVID-19 cases:**

- Isolate the individual immediately in a separate environment from other individuals.  Facilities should make every possible effort to isolate persons individually.  Each isolated individual should be assigned his or her own housing space and bathroom where possible.  Cohorting should only be practiced if there are no other available options.  <u>Only individuals who are laboratory-confirmed COVID-19 cases should be isolated as a cohort.  Do not cohort confirmed cases with suspected cases or case contacts.</u>

- Ensure that the individual is always wearing a face mask (if it does not restrict breathing) when outside of the isolation space, and whenever another individual enters the isolation room.  Masks should be changed at least daily, and when visibly soiled or wet.

---

[9] Attachment K, Assistant Director Peter Berg, Enforcement and Removal Operations, *Updated Guidance: COVID-19 Detained Docket Review* (Apr. 4, 2020).

- If the number of confirmed cases exceeds the number of individual isolation spaces available in the facility, then ICE must be promptly notified so that transfer to other facilities, transfers to hospitals, or release can be coordinated immediately.  Until such time as transfer or release is arranged, the facility must be especially mindful of cases that are at higher risk of severe illness from COVID-19.  Ideally, ill detainees should not be cohorted with other infected individuals.  If cohorting of ill detainees is unavoidable, make all possible accommodations until transfer occurs to prevent transmission of other infectious diseases to the higher-risk individual (For example, allocate more space for a higher-risk individual within a shared isolation room).

- Review the CDC's preferred method of medically isolating COVID-19 cases here depending on the space available in a particular facility.  In order of preference, individuals under medical isolation should be housed:

  o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully.

  o Separately, in single cells with solid walls but without solid doors.

  o As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.

  o As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.

  o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19).

  o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.

- Maintain isolation until all the CDC criteria have been met:

  o The individual has been free from fever for 72 hours without the use of fever-reducing medications.

  o The individual's other symptoms have improved (e.g., cough, shortness of breath).

  o The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart.

  o At least 7 days have passed since the date of the individual's first positive COVID-19 test and he or she has had no subsequent illness.

- Meals should be provided to COVID-19 cases in their isolation rooms.  Isolated cases should throw disposable food service items in the trash in their isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items must clean their hands after removing gloves.

- Laundry from a COVID-19 case can be washed with other individuals' laundry.

  o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard gloves after each use, and clean their hands after handling.

  o Do not shake dirty laundry. This will minimize the possibility of dispersing the virus through the air.

  o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

  o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

**ATTACHMENTS**

| ATTACHMENT LETTER | DOCUMENT NAME AND CITATION |
|---|---|
| A | U.S. Immigration and Customs Enforcement, *Updated ICE statement on COVID-19* (Mar. 18, 2020), https://www.ice.gov/news/releases/updated-ice-statement-covid-19. |
| B | ICE National Detention Standards 2019, Standard 4.3, Medical Care, https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf. |
| C | 2011 ICE Performance-Based National Detention Standards, Revised 2016, Standard 4.3, https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf. |
| D | 2008 ICE Performance-Based National Detention Standards, Standard 4-22, Medical Care, https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf. |
| E | Centers of Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf. |
| F | Memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, *Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27. 2020). |
| G | Centers of Disease Control and Prevention, *Public Health Recommendations for Community-Related Exposure*, https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited Apr. 9, 2020). |
| H | Centers for Disease Control and Prevention, *Strategies to Optimize the Supply of PPE and Equipment*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited Apr. 9, 2020). |
| I | Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited Apr. 9, 2020). |

| | | |
|---|---|---|
| J | U.S. Environmental Protection Agency, *List N: Disinfectants for Use Against SARS-CoV-2*, https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2 (last visited Apr. 9, 2020). |
| K | Assistant Director Peter Berg, Enforcement and Removal Operations, *Updated Guidance: COVID-19 Detained Docket Review* (Apr. 4, 2020). |