# EXHIBIT V

**DECLARATION OF BRIDGET CAMBRIA, ESQ.**

I, Bridget Cambria, declare and say as follows:

1. My name is Bridget Cambria, and I am providing this second supplemental declaration to depict the situation of detained families in immigration detention in Pennsylvania during the COVID-19 pandemic, and the incorporation of protective measures. This is also a declaration in response to the statements provided by the government in the *O.M.G. v. Wolf* litigation, as well as the ongoing litigation concerning the *Flores Settlement*.

2. My statements are based on my review of the evidence provided by the government and my organization's continued representation of detained families in Pennsylvania during the COVID-19 pandemic. Presently, our organization represents all remaining families who are detained at the Berks County Residential Center ("BCRC") consisting of five families.

3. Currently in the BCRC are a family from Ecuador with a five-year-old child, a Mexican family with a one-year-old infant, a Haitian family with a one-year-old infant, a Haitian family with an 11-year-old child and a three-year-old toddler, and a Haitian family with a two-year-old toddler.

4. Each family has been detained for more than 20 days and each family has a sponsor willing and able to receive them in their home. Upon admission to the BCRC, each family provided an intake with officials from Immigration and Customs Enforcement which includes questions as to "who" their sponsor is, "where" their sponsor lives, the relationship of the sponsor, and a "contact" phone number for each. Our organization has collected the same information as well.

5. Each family is seeking asylum and requesting the right to pursue an application for asylum. Each family in the BCRC has a court ordered stay of removal and cannot be removed from the United States. No family's removal from the United States is reasonably foreseeable at this time.

6. As of this writing, Pennsylvania is one of the most affected areas in the United States with respect to the COVID-19 pandemic. The United States at present has 823,257 cases. Pennsylvania currently has 35,249 positive cases and 1,614 deaths. We continue to be under stay at home orders from the Governor of Pennsylvania, businesses that provide legal services must be closed, and in fact in person legal visitation at the BCRC remains prohibited.

**Lack of Testing or Protocols to Ensure Safety:**

7. As of this writing we are aware of only one five-year-old girl in the BCRC who has been tested for COVID-19. She was tested upon demonstrating cold symptoms, trouble breathing, and concerns for her lungs. Although the government contends that, in their opinion, these symptoms did not require testing and that she was not suspected of having COVID-19, upon a visit to a local hospital, medical staff determined that a test

      was appropriate.

8. We asked for confirmation that this girl's COVID test was negative from AFOD Christopher George on March 25, 2020. As previously stated in my declaration of April 7, 2020, "16.   AFOD George only provided a response to the child's counsel today, April 7, 2020, confirming that the child's test was negative.[1]" This only occurred after much back and forth between ICE and counsel for a Flores class member, approximately 12 emails, including providing a G-28, Notice of Entry of Appearance, a HIPPA authorization, an Immigration Health Service Corp Request, and a DHS Privacy Waiver.. We expect during times of crisis to work collaboratively with the DHS to protect the interests of children and parents in the custody of the United States government, not a run around or obstruction which threaten those children and parents who remain in their care.

9. Importantly, just yesterday, this young girl's father spiked a fever and has been placed in medical isolation. We have not been advised by ICE even though we are counsel of record for this family. We are unaware if this father will be tested for COVID-19 or whether he has been tested. We are unable to communicate with him. He is separated from his wife and daughter within the same building. However, just yesterday, he was in the general population of the Berks facility. Again, we will affirmatively seek to obtain COVID-19 information for our client with signed authorizations and hope we will receive more candid and cooperative information sharing to quell the fears of our clients and ensure they understand what is happening to them.

10. The government provides that 254 persons have been detained at the BCRC since the pandemic began and that one girl has been tested. This means that only 0.39% of all persons detained in the BCRC have been tested during the COVID-19 crisis.

11. This does not mean that detained parents and children have not been ill in the BCRC since the COVID pandemic began. Each of the remaining families in the BCRC were brought in the month of March and remain detained in excess of 20 days. A census of the families determined that they and their children have suffered the following health conditions while in the BCRC: fevers, coughs, sore throats, difficulty breathing, abnormal bleeding, sores in their mouths and over their bodies including their genitals.

12. The failure to ensure appropriate monitoring, care and testing in detained facilities is well documented. The DHS has indicated that out of its nearly 34,000 detainees, at most 400 have been tested, and of those a substantial number of individuals detained by ICE have tested positive[2]. Removals to Guatemala have halted by order of their President, as planes full of detainees were removed to Guatemala and a substantial number of those

---

[1] In Officer George's declaration of April 17, 2020 at paragraph 4B he states "Additionally, Ms. Cambria incorrectly states in her declaration that DHS failed to provide Aldea, the organization for which she works, the results of the child's COVID-19 test. In fact, I personally emailed a response to Ms. Cambria and Ms. Kane (the Aldea attorney who had made the actual request), on April 7, 2019, to inform them of the negative COVID-19 test results." This statement is not true and contradicted by my April 7, 2020 declaration at paragraph 16 demonstrating a lack of careful review of the record of which he is complaining as well as the fact that I requested initially on March 25, 2020, accompanied by a G-28, for confirmation of the negative COVID-19 test.

[2] https://www.nytimes.com/aponline/2020/04/17/world/americas/ap-lt-virus-outbreak-deportees.html "Scant Testing in US Migration System Risks Spreading Virus" New York Times. April 17, 2020.

detainees landed in Guatemala positive for COVID-19[3]. Haiti has also reported that COVID-19 positive detainees are being removed to their country as well, a country with no infrastructure to contain a pandemic, with catastrophic consequences[4]. The failure to ensure the care of people detained by ICE and in this case some of the most vulnerable parents and children, threatens the lives of the detained, the lives of the workers in each facility, and their surrounding communities.

**Social Distancing in Congregate Care Settings:**

13. Again, Pennsylvania is suffering dramatically in the COVID-19 pandemic in the United States. Congregate care settings are the most problematic because people live in a commingling environment. For example, according to the PA Department of Health, more than half of the deaths in Berks County are attributable to congregate care settings.[5]

14. The BCRC is a congregate care setting where asylum-seeking parents and children live detained in a single building they are not free to leave. Despite Officer George in paragraph 8 of his April 17, 2020 declaration representing that the BCRC is "unsecured" the *Flores* Court has held, since July 24, 2015, that it is a secure facility and has in multiple orders since that time, reaffirmed as such.  See *Flores* order of July 24, 2015; see also *Flores* order of September 27, 2019, "'[s]ecure in this context refers to a detention facility where individuals are held in custody and are not free to leave." Furthermore, even prior to the Courts 2015 order, counsel for the government in the Flores matter has also stated to the Court that the BCRC is a secure facility.

15. It is important that ICE officials familiarize themselves with the orders of the *Flores* court to understand their obligations under the Settlement to which they are bound. DHS' lack of understanding their obligations under Flores became readily apparent when the pandemic ensued and when violations under various paragraphs of the Settlement were brought to the attention of the *Flores* Court.

16. Families are not free to leave the BCRC. Additionally, families are not free to roam the building without permission and oftentimes without escort. When a family is outside the facility, they are followed and escorted by BCRC staff. To walk from one floor to the other, said movements must be authorized. Mothers and children are separated from their fathers within the facility, and a father cannot, for example, check on their child who is not well and is in their room. They cannot enter the dining area, unless it is time to eat and staff permit. Beginning at 8pm every family is subjected to bed checks, every fifteen minutes, where they are inspected with a flashlight. This sleep disruption occurs every fifteen minutes from 8PM till the morning, approximately 40 times a night, 280 times a week, 800 times in 20 days and so on as the detention of a family continues.

---

[3] https://www.nytimes.com/2020/04/18/us/deportations-coronavirus-guatemala.html "U.S. Deported Thousands Amid Covid-19 Outbreak. Some Proved to Be Sick." New York Times. April 18, 2020.
[4] https://www.usnews.com/news/top-news/articles/2020-04-20/exporting-coronavirus-infections-among-us-deportees-reach-haiti-mexico "Exporting Coronavirus? Infections Among U.S. Deportees Reach Haiti, Mexico" U.S. News and World Report. April 20, 2020.
[5] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx

These checks are made on children and infants, as well. They are at all times monitored by facility staff, because the facility is a secure detention center for immigrant families.

17. A fence surrounds the outside area where families are permitted to move during recreation periods and under visual monitoring by facility staff, an area which by no means encompasses 10 acres. As stated in prior declarations, recreation periods are not when the families desire, but rather when permitted by facility staff. Additionally, signage is posted around the facility depicting that it is a "restricted" and "secure" area.

18. The offense of "Escape" is listed as infraction number (312) in the Berks County facility handbook. It is listed as a "Major Offense." Other "Major Offenses" include (303) Sexual Assault and Rape, (309) Death of a Person, (311) Hostage Taking, and (301) Arson.

19. Aside from the representations as to the size of the BCRC in the government's declarations, the video proffered by them is a representation of the facility and demonstrates its size. It also demonstrates the fact that in all aspects of the facility, it is a commingling facility. Bathrooms are shared, shower rooms are shared, bedrooms are shared, "day rooms" are shared, TV rooms are shared, the playroom is shared and every other room in the facility is shared by detained families, Berks staff, ICE staff, medical staff and others. Approximately half of the BCRC building itself is a local ICE field office, which not only addresses the families detained in the BCRC, but the surrounding community, the local jail, and other ICE enforcement actions in the area.

20. AFOD George's declaration supports the congregate nature of the BCRC. In describing the facility, he states detainees are free to "socialize" and describes the facility as a "communal area." For this reason, COVID-19 remains a very real threat to the detained families in the BCRC, the staff who work within the facility as well as the surrounding community where many of us live.

**Dining Hall Procedures:**

21. A census of all families at the BCRC was conducted to obtain descriptions of the procedures for each mealtime in the BCRC. Unlike the recommendations to "stagger" mealtimes, as is recommended in the CDC guidance, the BCRC has not engaged in staggered mealtimes. There is one mealtime for breakfast, one mealtime for lunch, and one mealtime for dinner. This is for all families and any employees who are eating as well.

22. When the families first arrived, they describe that the dining protocols within the facility did not take the virus seriously. However, dining hall procedures have since changed within the last two or three weeks as reported by the families. Not to the degree in the declaration provided by the government, however.

23. A sanitizer station was placed outside the dining hall for families to sanitize their hands. All of the families are in the dining hall to eat during all meals, as well as employees. Families estimate the number of people in the dining hall at one time to be more than 25 people. Each family is served their food individually, but all families eat together at the same time. The staff who provide the foot are wearing gloves and masks to serve food.

  Only one family is now permitted to sit at a table at one time.

24. I am unable to comment on the current nutritional content of the food, as I have not eaten it and the government has not provided the nutritional content of the food. However, the families continue to report that at times the food renders themselves or their children ill, or that their children are not eating, whether it be the quality of the food or the stress of the fact that their family remains in prolonged detention.

**Learning about COVID-19 in Family Detention:**

25. AFOD George correctly states that the detained families were provided information on COVID-19 during the week of March 23, 2020, directly following the commencement of litigation in *OMG v. Wolf* and the filing of a temporary restraining order in the *Flores* litigation.  Posters were placed in the facility following litigation as well and just prior to the taping of the facility by the government. The verbal COVID instructions were provided by caseworkers within the BCRC, according to the families, and with the use of telephonic interpreters. Since this initial discussion, on or about March 23, 2020 no family has had a follow-up meeting concerning COVID-19, continued understanding of the pandemic, or any updated information as is required pursuant to the Centers for Disease Control and Prevention's (CDC) *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, see page 12*.

26. It remains the case that detained families at the BCRC are isolated by their languages. Despite AFOD Georges representations that BCRC staff is bilingual in Spanish and Creole, it is not confirmed by the families who are detained, nor in practice while representing families for the last five years in detention at the BCRC[6]. In a census of every family in the BCRC, we asked each family to state how many BCRC staff have spoken to them in their language. For the three Creole speakers, they state that no facility staff have ever spoken to them in their language, and that most of the time the staff will try to talk to them with hand signals or broken Spanish. In all other times a telephonic interpreter is used. With regard to the Spanish language families, they state that perhaps two BCRC staff are fluent Spanish language speakers, the remaining BCRC staff know words in Spanish like "bathroom" or "food," and also use hand signals but cannot communicate with them clearly without a phone interpreter. We would not concede that "conversational" Spanish speakers are sufficient to communicate safety concerns for the COVID-19 pandemic, and also are not sure of what the measure is for a conversational Spanish speaker other than knowing simple prison vocabulary in Spanish. Finally, even if the low number of bilingual staff is accurate, who are not identified nor their positions, it is not a sufficient number of employees to ensure that bilingual staff is present for every shift. This is incredibly dangerous for emergency situations concerning children and their parents generally, but certainly during a pandemic.

27. The families remain very scared within the BCRC. They fear for their well-being, they fear based on the fact they are in a congregate care setting, with unavoidable potential

---

[6] AFOD George again failed to carefully review the prior declaration in stating that "Ms. Cambria's assertation that the BFRC staff are not bilingual is false," I did not say that "no" BCRC staff were bilingual, I stated only a "few" BCRC staff were bilingual in Spanish, please see paragraph 30 of my April 7, 2020 declaration.

for COVID-19 spread, and finally they are afraid because they are so isolated – both in language and their living. They can no longer receive visitation, legal or otherwise.

**Cleaning, Sanitation and availability of Personal Protective Equipment in the BCRC:**

28. The County of Berks initiated a requirement that all employees in county facilities, as of April 7, 2020, must wear protective masks at all times. Prior to this date, no such initiative existed. Notably, this was not initiated by the DHS, but rather by the County of Berks as the COVID-19 situation in the surrounding population has continued to deteriorate including a large number of positive COVID cases as well as corresponding deaths.

29. Initially the families were provided surgical masks. Each family was provided one mask per detainee, including children. The masks were too large for the children's faces, as they are infants and small children. The children, by and large, destroyed the masks shortly after receiving them. The following day they were provided one cloth mask per detainee, including children. All of the masks, again, are the same size, despite a third of the detainees being small children. The masks, again, are too large for the children, and again, the children resort to playing and destroying the masks, rather than wearing them.

30. The detainees were simply told to wash the masks but were provided no instructions how to wash the masks properly, how to care for the masks, nor what to replace the masks with while the masks were being washed.

31. The families acknowledge that hand sanitizer stations have been placed in several areas of the BCRC. However, one detainee stated that the sanitizer wipes which had been placed by the phones have disappeared.

32. It is important to understand, however, that the FRCs detain adults and children. Children are not capable of participating in proper social distancing or adequate hygiene to ensure that COVID-19 is not spread. Children are by their nature not able to practice appropriate social distancing. The children in the BCRC are ages 1, 2, 3, 5, and 11. They will play and socialize. They will touch things and put things in their mouths. Each family has complained that it is difficult for them, as parents, to control their children and ensure proper protocols because their children are young and the nature of the facility is communal.

33. Cleaning in the BCRC is completed by BCRC Shelter Care Counselors and the detainees themselves. There is no outside cleaning service to ensure that the facility is properly sanitized, even during a pandemic. The families report that each day a list of cleaning responsibilities is posted in the facility for the families to complete. For this cleaning, the individuals will receive a dollar a day. The cleaning chores, as reported, include the common areas, the bathrooms, the showers, the hallways, the kids playroom and other common areas. When cleaning the detainees are provided gloves. These cleaning duties are not including the personal living areas of each family, which they are also responsible for cleaning.

34. Detained families do not report seeing "deep cleaning" but do see staff cleaning, by spraying a liquid on toys and certain areas where people sit. In addition, they reported seeing staff cleaning more prior to the filming of the facility. Although AFOD George characterizes this statement as "without merit," I am simply relaying what is observed by the detained families in the BCRC. No additional cleaning schedules or cleaning regimens enacted by ICE specifically for the BCRC and pursuant to the CDC guidelines have been provided in litigation. Such schedules and plans, for example with times, locations, who cleans and what was cleaned, could be easily maintained and provided by the Defendants and the BCRC to satisfy any concerns.

**COVID-19 Screening of Individuals in the FRCs:**

35. The BCRC has not admitted any new families since March 18, 2020.

36. Again, to reiterate, on information and belief, only one person, a child age five, has of the writing of this declaration been tested for COVID-19.

37. Government declarations submitted with the evidence in the Flores matters state that they remain in compliance with CDC guidelines regarding who should receive COVID-19 testing or necessary precautions as the guidelines suggest. Said representations fail to account that detained families have had symptoms that could trigger CDC compliance as well as fails to account for the fact that asymptomatic individuals may be present and may threaten others who remain detained in a congregate care setting. Further, there are no representations as to whether any Berks County or ICE employee with access to the BCRC has exhibited symptoms of COVID-19, have been tested, or have been found to be positive.

38. On information and belief, the State of Pennsylvania is now conducting any inspections through Facetime Phone applications, and not on-site physical inspections to ensure the safety of their state employees. Said inspections are simply insufficient to ensure the proper protection of the detainees in Berks especially where such inspections do not take into account interviews with families who remain detained, especially minor children.

39. Although medical care is provided in the facility, we routinely receive concerns from families regarding the care and their lack of understanding of what care is being provided and why. First, as stated before, only one person has been tested for COVID in the facility. Second, numerous families have complained of ailments which may or may not be COVID related, including fevers, sore throats, sores and difficulty breathing. In some instances families have received medical care and treatment and others have not. In many instances families are provided medication and treatments but are not aware of what medication they are taking and why. Insomuch as families have stated this, we have obtained declarations from families to outline these concerns.

40. Officer George provides in his declaration that he communicated with the medical providers at the BCRC and that they continue to operate in compliance with CDC guidelines, but does not offer supporting declarations about what those guidelines are and how they are specifically being followed in the BCRC. For example, currently one of

our clients is in medical isolation based on a fever. Other children with fevers have not received that protocol. It is unclear under which circumstances a person detained at the BCRC receives protective measures and under what circumstances they do not. It also fails to address how the facility is or will combat asymptomatic transmission of COVID-19.

**Legal Access at the BCRC:**

41. In person legal access is not permitted at the present time in the BCRC. This means that since March 20, 2020, we have been unable to visually inspect the well being of our clients, including clients who are 1, 2, 3, 5, and 11 years old.

42. We are permitted phone call visitation to provide legal services for detained individuals at the BCRC. Importantly, USCIS and EOIR are continuing legal proceedings for those individuals who are detained, therefore, we are restricted to provide ongoing legal services remotely to our detained clients. For persons who are not detained, EOIR has postponed proceedings.

43. Aldea – The People's Justice Center is a legal service provider accredited by the Executive Office for Immigration Review, and is listed on the pro bono service list for each Pennsylvania court and jurisdiction.

44. Because our services have become remote, we have set up a specific telephone number so that detained families can dial our number for free to receive assistance without utilizing a phone card. Additionally, we set up days of legal calls with the caseworkers at the BCRC to check on the status of our clients.

45. Normally, legal visitation was permitted from 8AM to 8PM daily and without exception. This is in conformation with the legal visitation hours on the residential standards developed for the BCRC. Our visitation times have been minimized since the end of in person legal visitation. We may only telephonically visit with clients when a caseworker is on shift. We were initially provided a weekly schedule when phone calls can be made. Importantly, we cannot have calls during the following hours which are mealtimes, namely between 12:00PM and 1:30PM and 5:00PM and 630P.M. Aside from this, our new telephonic visitation hours are as follows: Monday from 8:00AM to 7:30PM; Tuesday from 8:00AM to 5:30PM; Wednesday from 8:00AM to 5:30PM; Thursday from 8:00AM to 5:30PM; Friday from 8:00AM to 7:30PM; Saturday from 10:30AM to 7:30PM; and Sunday from 10:30AM to 7:30PM.

46. Despite these schedules, on certain days caseworkers were not always on shift to facilitate legal calls during these scheduled hours. On the days where caseworkers have been on shift, they have been helpful in arranging calls between the detainees and counsel.

47. Although Officer George represents that he is not aware of any times where complaints have been made that phone calls were of poor quality or at times drop calls, he was specifically copied on a complaint on March 24, 2020.  Additionally, on numerous occasions during Asylum interviews for the last several months calls have disconnected,

interpreters have been disconnected from calls and the Asylum office has described that the calls are of poor quality. Importantly, each time a call is dropped, USCIS contacts ICE to reconnect the lines. During some interviews, calls have dropped as many as six times. In any event, it is simply an illustration of the difficulty of lawyering through telephone. In the case of representing children, it is even more problematic.

48. With respect to the families' complaints concerning their being videotaped, they merely requested that the their faces not be filmed and their privacy as asylum seekers be respected. They still appeared visible on camera during the filming regardless of their request.

**Failure to Follow *Flores* Guidelines as instructed by the Court:**

49. In his initial declaration at paragraph 20, Officer George represented to the *Flores* Court that detention determinations were made for the families currently detained upon their entry into the facility. He has now changed his position that parole determination are "conducted continuously." We are not aware of any such determinations and not aware that they are conducted continuously.

50. We are not aware of any parole determinations being made for any family in the BCRC and have not received, at any point, a written parole determination for any of the five families who are detained at the BCRC at this time, let alone continuous individualized parole determinations.

51. Importantly, each family at the BCRC has been detained in excess of 20 days. In that time, they have not received an individualized parole determination. No family has been evaluated for release based on individual factors in each of their cases. No family is a known flight risk, nor do they have any negative factor which would lend themselves to being a flight risk during the COVID pandemic.

52. No minor in the instant matter is a flight risk, they are ages 1, 2, 3, 5 and 11. Even more importantly, no minor is an escape risk, which is the appropriate standards under Flores and paragraph 22 of the Settlement. There is no adverse immigration or criminal history which would lend itself to an adverse determination under the Settlement. Rather, and to the contrary, each family has dedicated counsel and is a claimant in matters to vindicate their asylum rights under the INA. Because of their legitimate claims for relief, certain Federal Courts and certain Immigration Courts have provided each family and class member with a stay of removal. As a result, in no case is removal reasonably foreseeable and no parent or child can be removed from the United States.

53. Counsel for the families has not received what the government represents are individualized analyses of custody determinations in their cases. Instead, the sole determination appears to be linked to their pending immigration matters, under which a Court has seen fit to stay removal. Importantly, to receive a stay of removal one must satisfy certain *Nken* factors, including a likelihood of success on the merits of their claims.

54. For those four families who have received stays pursuant to *M.M.V. et al., v. Barr, et al.*,

No. 19-2773 (D.D.C.), they are challenging their improper and unconstitutional treatment during the credible fear process which includes the introduction of adversarial interview techniques, failure to apply proper case law to their individual situations, improper application of the Transit Ban to each case, and other constitutional bases to challenge the underlying negative credible fear determination in each case. They maintain a legitimate right to seek review of their determinations as the credible fear process has recently changed and given they maintain very real fears of death upon removal. For these families, it appears as though they are being punished for seeking review of their cases. Decisions on custody as it relates to *Flores* class members cannot be solely based on the status of one's immigration case.

55. The final family at issue has a bona fide motion to reopen pending before the San Antonio Immigration Court. Further, that Court has issued the family a stay of removal. Importantly, the matter involves the kidnapping and trafficking of this family, and the minor involved. Removal is not foreseeable, and in fact their motion is highly meritorious. Their continued detention is not appropriate as they have pending matters before the Immigration Court, dedicated counsel and a safe and available sponsor.

56. For each of these five families, I outlined in my previous declaration how every family has a close family member who is an available sponsor. Each family member has a home to receive the detained family. In no way does AFOD George's declaration take into account the guidelines of the Settlement, the pandemic in the United States nor the individual factors in each case to reach the determination that the family and minor are a flight risk – it is the state of their immigration case alone. And in each case, clearly, they are not removable at this time. Flight risks during a pandemic can be mitigated by alternatives to detention, for example electronic monitoring and supervision. It is not proper to subject families with no foreseeable removal to congregate care settings where they are more likely to contract COVID-19.

57. As I previously stated, each day the families remain detained, their lives are placed at greater risk. As an example, at this moment, a five year old girl's father is in isolation with a fever and difficulty breathing. No one in the facility is being tested, despite the region in Pennsylvania where they are being held has some of the highest rates of COVID-19 in the nation. Removal is not a possibility at present.

58. Since the March 28, 2020 order of the Flores Court, efforts at release have ceased at the BCRC. It is my experience working with families in FRCs that ICE rarely attempts to comply with the requirements of the Settlement, specifically for accompanied minors with regards to Paragraphs 14 and 18. We are now in the midst of a pandemic and these requirements and obligations of the Settlement are more important than ever. The immediate way to ensure that class members are promptly released is to release the class members with their detained parents to their sponsors. When a release determination has been made by ICE, families are promptly released from custody the same day, or immediately the following day.  In addition, ICE does, at times,  routinely exercise its discretion to release families at any point of their immigration proceedings, regardless of the posture - especially in times of a health crisis or significant public benefit. We are in a moment of a significant public health crisis. This fact has been recognized in the *Flores* Court in CDCA, with regard to children, as well as the *OMG*

      Court, in DDC, with regard to their accompanying parents.

59. A limited order that ICE must release class members, and their accompanying family given the dangers posed by the COVID-19 pandemic with respect to congregate care setting is the quickest and most comprehensive way to ensure the safety of all class members, to protect the employees in each facility where families are detained, to protect the communities where family detention centers are present, and to protect health services in these rural areas. Most importantly, such a decision would satisfy the safe and sanitary requirement pursuant to the *Flores* Settlement for all class members and foreclose an impending public health crisis in ICE's FRCs. It will save lives.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. ¶ 1746. Executed this 21th of April, 2020 in Reading, Pennsylvania.

_____
Bridget Cambria, Esq