# EXHIBIT BB

**APRIL 21, 2020 SUPPLEMENTAL DECLARATION OF SHALYN FLUHARTY**

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.  I have previously submitted two declarations in this matter.  The facts presented in those declarations remain true and correct. The facts contained in this declaration are based on my personal knowledge, and I can testify competently to them if called upon to do so. I submit this sworn declaration in support of Plaintiffs' Motion for Temporary Restraining Order.

2.  The last day I visited the South Texas Family Residential Center ("STFRC") was Thursday, November 14, 2019. That day I met with Assistant Field Office Director Richard Hunt, and then Office of the Chief Counsel, Deputy Chief Counsel, Susan Aikman. Attached to this declaration as Exhibit 1 is a copy of the agenda I prepared for that meeting. Most relevant to the matter before the court is agenda item 11:

    > "DPBP currently represents hundreds of families who have been detained for more than 60 days. Can ICE please clarify its current position regarding the *Flores* Settlement Agreement's presumption of release from detention for children? How does ICE track and review the length of detention for children, and consider for release families who have been detained in excess of *Flores*' requirements?"

    Many of the families that were detained for over 60 days on November 14, 2019 remain detained today.

3.  During the same meeting I provided ICE with a non-exhaustive list of individuals with significant medical conditions who were detained on November 14, 2019 who required access to medical care. A redacted copy of this list is attached to my declaration as Exhibit 2. The list identifies: (3) detained individuals with cancer or tumors; (3) detained individuals with nervous system concerns, (4) detained individuals with heart and cardiovascular issues; (2) detained individuals with mental health concerns; (4) detained individuals with kidney- or organ-related issues; (8) detained individuals who required additional medical evaluation and assessment; and (12) detained pregnant women.

4.  I do not know why the declaration of Michael Sheridan ("Sheridan Declaration") states that I have not been physically present at STFRC for a year. Presumably, the Sheridan Declaration attempts to imply that I do not have firsthand knowledge of the policies and practices enacted at STFRC.

5.  I spent the first seven years of my legal career representing unaccompanied immigrant children held in the care and custody of the Office of Refugee Resettlement. I represented children detained in California, Illinois, New York, and Texas. Of the approximately 25 ORR detention facilities that I have visited, attorneys were permitted to walk through the interior of the facility. At STFRC, however, attorneys are restricted to a designated legal visitation trailer[1] that sits just beyond the security entrance.

6.  STFRC is more restrictive than all ORR facilities I have visited, including secure ORR facilities. For example, when entering STFRC, attorneys must place all of their belongings through an x-ray machine, pass through a metal detector, and be scanned with a security wand from head to toe. They are prohibited from entering the facility with a cell phone, hand sanitizer, crayons or coloring books.

7.  Given the rules at STFRC, my firsthand knowledge of ICE and CoreCivic practices and policies comes from: (1) conversations with ICE officials, (2) conversations with CoreCivic employees, (3) direct conversations with hundreds of detained mothers and children, and (4) information shared with me by DPBP staff and volunteers who have spoken with detained individuals, ICE officials, and CoreCivic staff.

8.  Although Dilley Pro Bono Project ("DPBP") staff has halted in-person visitation with families detained at STFRC in response to the COVID-19 pandemic, DPBP continues to provide legal services to detained families remotely by telephone. DPBP staff had approximately 166 telephonic meetings with families the week of March 23, 2020; 199 telephonic meetings with families the week of March 30, 2020; 332 telephonic meetings with families the week of April 6, 2020; and 84 telephonic meetings with families the week of April 13, 2020. During each of these meetings, DPBP staff interviewed clients regarding facility conditions and ICE action relevant to the matters before the Court. All information gathered from DPBP clients was made available to me.

***The only way to ensure the orderly and prompt release of accompanied class members in the midst of the COVID-19 pandemic is to order their release to their immediately available legal guardian.***

9.  ICE has had 22 days since the Court's March 28, 2020 Order to release class members. It has failed to do so. Given the rising risks of the COVID-19 pandemic, this court should order the release of accompanied children to their first preference custodian – a parent – within 48 hours. This is the person who is immediately available, making prompt and orderly release possible.

---

[1] Attorneys may also go to the asylum office building and courtrooms, if escorted.

10. ICE does not have the infrastructure to vet non-parent guardians or coordinate the travel of children across the country alone. It has had years to establish this infrastructure, and has failed to do so. Unlike unaccompanied children, accompanied children do not journey to the United States with pre-identified future legal guardians with whom they will reside in the United States. Rather, parents travel with their children and make arrangements to be received by a receiving person *with* their child. In other words, in my experience, the overwhelming majority of individuals who agree to receive and support a family unit upon release do so with the condition that the child's accompanying parent will provide care for the child. Even if ICE had the infrastructure and resources to facilitate reunification safely for accompanied children to a non-accompanying custodian like ORR, the realities of migration for family units presents additional hurdles to identifying appropriate sponsors that need not be confronted in the midst of the coronavirus pandemic. Releasing accompanied class members to their parent is the only way for the DHS to immediately comply with the *Flores* Settlement Agreement ("FSA").

11. The high risk of COVID-19 infection also weighs sharply in favor of releasing accompanied class members to their accompanying parent. Should class members require medical attention subsequent to release from ICE custody, they will require the presence of a parent who is capable of making emergency medical decisions on their behalf.

12. Most critically, ICE has subjected many class members to the harms of prolonged detention the FSA was established to prevent. As detailed by numerous declarations from parents and children in multiple family detention centers, children subjected to prolonged detention face behavioral regression, depression, loss of appetite, and other trauma associated with the detention itself. Family separation would pose another significant trauma to class members who require the love and care of their accompanying parent now more than ever.

13. A parent is immediately available for all accompanied class members, and release to that parent is unquestionably the safest, fastest, and most orderly path to facilitate their release. In my experience, 48 hours is a reasonable amount of time for ICE to facilitate the release of class members from STFRC; ICE has regularly released high volumes of class members within 48 hours. To the extent ICE requires assistance coordinating travel arrangements for all currently detained families, DPBP is also ready to provide immediate assistance.

***Despite the Court's Orders on March 28, 2020 and April 10, 2020, ICE has made no efforts to release hundreds of class members detained at STFRC***

14. In order to provide an accurate snapshot of the current conditions at STFRC, DPBP conducted a survey with 32 families on April 20 and April 21, 2020. Each family

3

surveyed has been detained at STFRC for more than 218 days. Data collected in the survey is identified and incorporated below.

15. ICE data provided to the Court shows that ICE fails to release class members promptly and instead, subjects detained children to indefinite detention. The release of class members is therefore not just delayed, but denied.

16. Failing to release class members has been well-calculated by the Department of Homeland Security ("DHS"). Within the last nine months, DHS has: (1) eliminated access to asylum for individuals who travel through another country before crossing the southern border, with few exceptions; (2) replaced specially trained asylum officers with Customs and Border Patrol agents who conduct interviews telephonically, rather than in-person; (3) eliminated meaningful access to orientation in advance of credible fear interviews; (4) established a policy of denying requests to reschedule credible fear interviews, trampling the right to consult; (5) eliminated supervisory review of credible fear determinations when individuals are subjected to the Safe Third Country Transit Bar; (6) required families to complete credible fear interviews and immigration court hearings while detained in border patrol stations; and (7) forced children to wait in danger in Mexico to seek asylum in the United States. Each of these unconstitutional policies has spurred litigation that remains pending. DHS's efforts to abolish the protections for children and families fleeing persecution that are prescribed by federal and international law cannot justify the government's failure to comply with the FSA. Any and all delay in class members' release at this time is caused solely by the government.

17. DHS' blatant disregard for the terms of the FSA during a global pandemic puts class members' lives at risk. Prompt release is critically important. ICE asserts it continuously evaluates families for parole. To the extent ICE evaluates the release of class members, based upon my experience, it does so in secret, untethered to the presumption of release requirement of the FSA.

18. Even when counsel requests parole on behalf of a class member, requests are rarely, if ever, granted. Families are only released if they have been issued a Notice to Appear, have a specific medical condition pre-determined by ICE to justify release (for example, pregnancy with over six months gestation), or a severe medical condition - that ICE believes is severe.[2]  In short, any and all purported parole assessments by ICE for families detained at STFRC are cursory, categorical, and predetermined. Release based upon an individualized determination is the exception, not the rule.

---

[2] As further discussed *infra,* ICE regularly fails to release a significant percentage of individuals with medical issues deemed severe by outside medical professions.

19. ICE asserts it has assessed all individuals in its custody nationwide for immediate release in consideration of COVID-19 risk factors. As discussed *infra,* high volumes of class members with heightened risk for negative health outcomes given a medical condition independent of COVID-19, remain detained.

20. DPBP data corroborates the reality that ICE refuses to comply with the terms of the FSA and ongoing orders by this Court. On March 28, 2020 the Court ordered ICE to promptly release class members. DPBP has closely tracked the detention status of 248 family units who were detained on March 31, 2020. Between March 31, 2020 and April 21, 2020—a period of 22 days—ICE released 112 of those families, or 45 percent. In other words, despite the Court's orders on March 28, 2020 and April 10, 2020, only 45 percent of the families represented by DPBP who were in custody 22 days ago have been released.

21. Of the families who were released, I believe release decisions were made – again – categorically. Specifically, based upon information and belief, only individuals in the following categories were released: (1) individuals who were issued Notices to Appear; (2) individuals who were removed, and (3) individuals with medical conditions identified for release under recent COVID-19 ICE policy.

22. On April 21, 2020, DPBP was aware of 164 family units with 204 individual children who were in custody at STFRC. Attached as Exhibit 3 to this declaration is a list of all 204 children known to DPBP who are detained, identified by initials, with their total days in detention.  The average length of detention[3] for all children tracked by DPBP who were detained on April 21, 2020 was 109 days.[4]

23. Twenty-five days have passed since class counsel filed the Motion for Temporary Restraining Order with the Court on March 25, 2020.  At least 184 children who were detained at STFRC on that date remain detained on April 21, 2020. To my knowledge, ICE has made no efforts to release these 184 children.

24. The Court has found that the procedural posture of a child's immigration case is irrelevant to the Department's duty to release a child from detention. Nonetheless, 197 of the 204 children known to DPBP who are currently detained at STFRC are still in the process of seeking protection in the United States. DPBP records reveal that the 204 children tracked by the Project who are detained at STFRC as of April 21, 2020 are in the following procedural postures:

---

[3] Length of detention is calculated from the child's date of initial apprehension by ICE or CBP.
[4] This calculation does not include the length of detention for four children, for whom DPBP has been unable to determine their exact date of initial apprehension.

- Children pending a credible or reasonable fear interview: 0
- Children pending results of credible or reasonable fear interview: 3
- Children issued Notices to Appear subsequent to a positive credible fear finding or the vacature of their negative credible fear finding by the immigration judge: 24
- Children awaiting negative credible or reasonable fear review hearings: 5
- Children with orders of expedited removal who have challenged those orders in *M.M.V. v. Wolf* and *A.B.B. v. Morgan*: 77
- Children with orders of expedited removal who have filed, or will soon file, a Request for Reconsideration ("RFR") with the asylum office[5]: 63
- Children with appeals pending before the Board of Immigration Appeals that include an automatic stay of removal: 3
- Children who filed, or will soon file, a Motion to Reopen *in absentia* with the immigration judge: 2
- Children pending removal who do not have stays of removal, including children with pending appeals before the BIA[6]:  10
- Children not included in the above categories whose exact procedural posture remains unknown, but who have not exhausted all efforts to seek protection in the United States: 17

25. Of the 197 children who are in the process of pursuing their claims for protection, at least[7] 189 have, or will soon have, stays of removal. Individuals who are pending a credible or reasonable fear interview, or a negative credible or reasonable fear review hearing before the immigration judge, may not be removed by operation of law. Plaintiffs in *M.M.V. v. Wolf* and *A.B.B. v. Morgan* were issued stays of removal and may not be removed pending determinations in each respective case. The removal of individuals who

---

[5] This number does not include families with stays of removal issued by a federal court that may also have a RFR pending or forthcoming.

[6] As previously indicated, 3 of the 10 children indicated above who are "pending removal" have appeals pending with the BIA.

[7] There are 17 children who continue to pursue their asylum claims, but whose exact procedural posture is unknown to DPBP. Two of these children are in quarantine, and DPBP has been unable to communicate with the child or their mother. One of these children is represented by outside counsel, and DPBP has been unable to confirm whether the appeal filed by outside counsel with the BIA was filed timely (and therefore includes an automatic stay of removal), or whether, although filed, the family does not have a stay of removal as a matter of right. Two children's procedural posture is unknown because they were initially subjected to the Asylum Cooperative Agreement ("ACA") with Guatemala. Removal flights connected to the ACA program are currently on hold, leaving these two children in legal limbo. Lastly, the results of the negative fear review proceedings conducted for 12 children remain unknown to DPBP because the Executive Office of Immigration Review has not updated its automated court information system for each case for over two weeks. Either way, each of these families continues to seek protection in the United States.

file a Request for Reconsideration with the asylum office is stayed while their request remains pending. Individuals who file a motion to reopen *in absentia* have a stay of removal while the motion is considered by the immigration judge. Lastly, individuals who file a direct appeal with the Board of Immigration Appeals may not be removed during the appeal period, if the appeal is timely filed.

26. To my knowledge, there are currently 10 children detained at STFRC—or approximately five percent of the 204 individual children tracked by DPBP—who do not have the benefit of a stay of removal, or the prospect of securing an automatic stay of removal in the near future. Seven of these children have final orders of expedited removal because they decided not to pursue immigration judge review of their negative fear finding or already filed a Request for Reconsideration, which was denied. Two children—mother J.S.L.P. and children I.V.L. and L.V.L.—were initially placed in removal proceedings and returned to Mexico under the Migration Protection Protocols ("MPP"). Once returned to Mexico, the family was kidnapped, and therefore, unable to appear at their immigration court hearing and ordered removed *in absentia*. After J.S.L.P. and her children escaped their kidnappers, immigration officials placed them at STFRC. J.S.L.P. filed a motion to reopen, which was denied by the immigration judge. DPBP subsequently filed an appeal with the Board of Immigration Appeals. Individuals in this procedural posture do not have  the benefit of an automatic stay of removal, even though their case is on appeal. Accordingly, even though J.S.L.P. and her children filed an appeal with the BIA that is currently pending, they are subject to removal from the United States in the interim.

27. The last family—N.B.G.F. and her child J.V.G.—were also ordered removed without counsel in removal proceedings. They did not file a timely appeal with the BIA, and therefore, are subject to removal and do not have access to an automatic stay of removal at this time.

28. Based upon information and belief, all children and parents currently detained at STFRC have no criminal record and have not been deemed to be a danger by ICE. This belief is based upon our review of DPBP client records, interviews with clients, and the reality that parents with criminal histories or an alleged propensity for violence are separated from their accompanying children and placed in adult detention.

29. Based upon information and belief, none of the mothers or children who are currently detained at STFRC have tried to escape from the facility or been deemed a flight risk by ICE.

30. In the survey conducted by DPBP with 32 families on April 20 and 21, 2020:

- 100% of mothers and children stated they have no criminal history;
- 100% of mothers reported that no CoreCivic or ICE official has informed them that their child is dangerous; and
- 100% of mothers reported that no CoreCivic or ICE official has indicated that their child is a flight risk.

31. One hundred percent of families surveyed also stated that ICE has not made any efforts to facilitate their release, despite the fact that ICE has had contact information for their receiving person since their arrival to STFRC.[8]  Specifically, surveyed families stated that ICE has failed to contact their receiving person in order to request that they purchase travel arrangements for the family.  DPBP provided ICE with an updated spreadsheet of all families detained at STFRC with the contact information of their receiving person on March 31, 2020, April 2, 2020, and April 18, 2020.

***Conditions at STFRC remain unsafe and unsanitary and time is of the essence to release class members.***

32. ICE and CoreCivic practices at STFRC continue to change in response to litigation. The fluidity of ICE practices at STFRC reinforces the need for quick and clear court intervention. Additionally, despite the facts put forth in the Sheridan Declaration, declarations from families detained at STFRC show that application of STFRC practices implemented to protect families is inconsistent at best throughout the facility. Absent an order from the court, for example, ICE could increase the number of families detained at STFRC to 2,400 individuals overnight, exacerbating the risk of infection for class members.

33. Time is of the essence to facilitate the release of class members. ICE's ongoing refusal to abide by this Court's orders places class members in life-threatening danger. Ongoing monitoring is an insufficient remedy given the history of this litigation and the urgency with which the court must act to ensure class members are not held in unsafe and unsanitary conditions.

34. The case of declarant N.B.G.F. reveals the urgency of the matter before the Court. N.B.G.F. began having symptoms indicative of COVID-19 approximately two weeks ago, including coughing, headaches, body aches, vomiting, difficulty breathing, and shaking. While displaying these symptoms, N.B.G.F. was mixed with the general population at STFRC.

---

[8] The overwhelming majority of families surveyed indicated that they provided their receiving persons contact information to Customs and Border Patrol agents during processing, to ICE officials during their intake process at STFRC, and to the asylum officer during their credible or reasonable fear interview.

35. The evening of April 16, 2020 N.B.G.F. became progressively worse, and fainted. She had a fever. CoreCivic staff escorted N.B.G.F. to the medical unit. Hours later, in the middle of the night, ICE officials ordered N.B.G.F. to collect her things and transported her to the San Antonio airport to begin the removal process.

36. N.B.G.F. coughed during the entirety of her San Antonio flight, felt dizzy, and was unable to track what was happening around her. When her San Antonio flight stopped for layover, airport staff immediately transitioned N.B.G.F. to a makeshift hospital on-site at the airport. In assessing N.B.G.F.'s symptoms, independent medical professionals determined that N.B.G.F. required a COVID-19 test, and was not well enough to be cleared for flight. N.B.G.F. was returned to STFRC, and is currently in the quarantine unit. The results of her COVID-19 test are unknown.

37. Social distancing has been, and will continue to be, impossible at STFRC. The survey conducted by DPBP on April 20 and 21, 2020 asked "Within the last 24 hours, how many times have you or your child been closer than six feet to someone else."  As expected, families reported:

   - Never: 0%
   - 1-5 times: 9.4%
   - 5-10 times: 40.6%
   - More than 10 times: 18.8%
   - More than 20 times: 21.9%
   - More than 30 times: 9.4%

38. Similarly, when asked "How many times a day does your child touch another child?", 68.8 percent of mothers surveyed reported that their child touches another child at least five times a day.

39. While 84.4 percent of families surveyed stated they are currently the only family in their sleeping trailer, 15.6 percent of families surveyed stated they currently share a sleeping trailer with one other family. Although ICE's efforts to reduce the number of individuals in each room from six family units to one is a step in the right direction, this change is meaningless if families are not socially distanced throughout the day, which is impossible in a congregate care facility.

40. The survey asked families if they had seen a video that explains how to wash their hands in Spanish or English. 96.9 percent of the families surveyed said "no"; one family said "yes". When I was provided with a tour of STFRC in 2017, I was shown the trailer where

individuals are processed for intake and release. I recall a television being located in that area, and being informed by Mr. Sheridan that videos are frequently played on that television "on loop". This area is an area families have access to when going through intake or being processed for release from the facility, but generally, not during their detention. I have reason to believe this is where the video described by the Sheridan declaration is played. If this is the case, the location of the television explains why families who are not recent arrivals to the facility have not had access to the video, and have never seen it.

41. 93.8 percent of families surveyed stated they have never had a one-to-one conversation with a case manager who provided them with COVID-19 education or an opportunity to express concerns and ask questions. If this purported conversation happens with newly arriving families, families who are currently detained have not had access to it.

42. When asked "Have you attempted to use hand sanitizer but found the dispenser empty any time over the last seven days?", 50 percent of families surveyed reported "yes". Similarly, 46.9 percent of families reported they have found a soap dispenser out of soap within the last seven days.

43. 87.5 percent of families surveyed reported that they have recently been given a facemask. However, most families indicated that although masks were made available, they are generally not worn. 96.9 percent of families reported they have not been given gloves.

44. When asked whether they have seen guards and other employees who work at STFRC wearing gloves or masks, 18.8 percent of families reported that they have seen no one who works at the facility wearing gloves or masks, and 75 percent of families reported they have seen 20 percent or less of the individuals who work at STFRC wearing gloves or masks. The remaining 6.2 percent of families stated they have seen STFRC employees wearing gloves or facemasks more than 20 percent of the time.

45. When asked about scheduling restrictions at the dining hall, 93.8 percent of families surveyed reported that they are only allowed to go to the dining hall when scheduled for lunch and dinner, and not any time the dining hall is open, and that families are scheduled to eat within a 30 minute time slot.

46. 84.4 percent of families surveyed stated they have not had direct access to any cleaning supplies other than paper towels in the last seven days.

47. When asked how many times the telephone in their sleeping trailer is cleaned, 71 percent of families stated once a day, and 25.8 percent of families stated twice a day. I do not know what phones in the facility are cleaned every two hours.

48. Families generally were unable to verify or reject the assertions in the Sheridan declaration that other areas of the facility – such as the pantry – are cleaned every two hours, as families are not in these locations long enough to monitor how many times throughout the day in total they are cleaned.

49. Above all, as detailed in my prior declarations, the medical care at STFRC is sorely insufficient generally, and certainly, during COVID-19. In my experience, ICE's mission to remove non-citizens as expeditiously as possible is ICE's number one priority - at the expense of the individuals it detains. The case of K.P.Z.R. is illustrative. K.P.Z.R. and her son, A.R.Z.R., were detained for nearly a month in a border processing station in Donna, Texas. While in CBP custody, A.R.Z.R. became medically fragile. When his breathing became so labored he could no longer breathe, A.R.Z.R. was transported to the hospital and hospitalized for approximately five days. Immediately prior to A.R.Z.R.'s hospitalization, his mother participated in a credible fear interview, where she explained that shortly before fleeing her home country, she was beaten so severely her shoulder bone was broken. She nonetheless received a negative credible fear determination. Immediately after A.R.Z.R.'s hospitalization, K.P.Z.R. was required to participate in a negative credible fear review proceeding by phone while still in CBP custody. After K.P.Z.R.'s negative determination was affirmed by an immigration judge, despite A.R.Z.R.'s recent hospitalization, ICE placed the family at STFRC. K.P.Z.R. subsequently challenged the propriety of her credible fear process in federal court, and now has the benefit of a court-ordered stay of removal. On April 12, 2020, DPBP filed a complaint with DHS's Office of Civil Rights and Civil Liberties. The complaint is attached here as Exhibit 4. A similar example is also documented in email correspondence from DPBP to ICE, on behalf of mother J.S.L.P., which is attached as Exhibit 5.

50. The example of K.P.Z.R. reveals that DHS does not make truly individualized assessments prior to deciding a child should be transferred to ICE custody and detained. If it did, DHS (hopefully) would have determined that A.R.Z.R. was not suitable for detention, rather than transporting him to STFRC. In my experience, ICE's release decision making is arbitrary and categorical. Between 2015 and 2017, I regularly met with families who were released by CBP in McAllen, Texas over the weekends, where I provided Know Your Rights presentations at the Sacred Heart church to families while they awaited the departure of the bus that would take them to their final destination. This experience, combined with my work at STFRC, has made it clear to me that ICE

primarily makes release determinations based upon the availability of detention space, the procedural posture of a child's case, and the local ICE practice. For example, in particular geographic locations, during certain periods of time, all families have been released.

51. It is unclear to me if the data reported for families not transferred to family detention centers in the Sheridan Declaration includes families placed in MPP. My suspicion is that it does. Accordingly, I would like to clarify that individuals placed in MPP are "detained" pursuant to the plain language of 8 C.F.R. § 235.3(d). The regulations implementing INA 235(b)(2)(C) state in full: *"In its discretion, the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of [INA] section 235(b) and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing."* 8 C.F.R. § 235.3(d).

52. As indicated *supra,* DPBP regularly represents children with medical needs that make them uniquely unsuitable for detention in a congregate care setting. As of April 21, 2020, DPBP is aware of 62 families with medical conditions who remain detained. The number of detained individuals who have medical conditions is significantly higher, as in many instances both the mother and her child(ren) are ill.

53. On March 24, April 2, April 8, and April 17, 2020, DPBP provided ICE with lists of mothers and children with medical conditions we believe make each individual unsuitable for detention. Since March 24, 2020, DPBP has flagged for ICE a total of 97 family units that, given their medical needs, should be promptly released. Since March 24, 2020, ICE has only released 35 of the families (36 percent) identified as having medical conditions, and a number of these families were released following a positive finding of credible fear and being served with a notice to appear.

54. Families consistently report that they are denied access to necessary medical care while detained at STFRC. This is indeed my experience, and is reflected in the survey conducted by DPBP on April 20 and 21, in which 59.4% of the families stated that they personally had been denied access to medical care while detained. For this reason, a COVID-19 pandemic at STFRC would most certainly leave families - and class members in particular - at risk for significant harm, including death.

55. For all of these reasons, class members require additional action by this court to ensure compliance with the FSA, and the safety of class members who face near certain harm while detained.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in San Antonio, Texas on April 22, 2020.

Shalyn Fluharty

# EXHIBIT 1



Shalyn Fluharty <shay@caraprobono.org>

---

## Liaison Meeting | November 14, 2019 at 10:00

**Shalyn Fluharty** <shay@caraprobono.org>　　　　　　　　　Wed, Nov 13, 2019 at 9:55 AM
To: "Hunt, Richard M" <Richard.M.Hunt@ice.dhs.gov>, otg <otg@caraprobono.org>
Cc: "Aikman, Susan" <Susan.Aikman@ice.dhs.gov>, "Douglas, Audrey M" <Audrey.M.Douglas@uscis.dhs.gov>, Allison
Herre <allison@caraprobono.org>, "Tami Goodlette(SAT)" <tgoodlette@trla.org>

Good morning all -

Please find our proposed agenda for tomorrow's meeting attached. Please let us know if there are any additional agenda
items you would like for us to be prepared to discuss. I have also attached a list of cases that we would like to bring to
ICE's attention based upon medical and pregnancy conditions. We will come to the ICE building at 9:30, and call Audrey
once united.

SIncerely,

Shalyn Fluharty

[Quoted text hidden]

---

**2 attachments**

 **Liaison Meeting_November 14, 2019.docx**
18K

 **Medical and Pregnancy Cases .xlsx**
13K

**Liaison Meeting**
**November 14, 2019, at 9:30 a.m.**

*Introductions and overview of relevant staffing changes/stakeholder points of contact:*

    (1) DPBP
    (2) ICE
    (3) USCIS

*Asylum office items:*

    (2) What is the best way, and when is the best time, to notify the asylum office that individuals have been erroneously subjected to the Safe Third Country Transit Bar? We have numerous clients who are Mexican, or who did not enter through the Southern border, in this situation.

    (3) Can the asylum office delineate in its daily emails how many individuals are scheduled for initial CFI, v. FIGs?

    (4) Can USCIS clarify when G-56s are distributed by CC for Monday interviews. Is it Friday night, if the asylum office is not scheduled to work over the weekend?

    (5) Can the asylum office clarify its current rare language policy? We have noticed numerous families scheduled for six interviews before a rare language NTA was issued. Have the timelines for CFI adjudication changed in anyway?

    (6) We are working with numerous families who were served with negative decisions, and subsequently scheduled for a follow-up interview. Can USCIS explain in what situations this may occur? Was this in error?

*ICE and USCIS:*

    (7) DPBP has seen numerous individuals issued Notices to Appear while in MPP, subsequently brought to Dilley, and erroneously placed in expedited removal in violation of court order. In Law Lab v. McAleenan, the Ninth Circuit Court of Appeals found: "We read the statute to create two mutually exclusive *post-inspection* categories. In our view, those who are not processed for expedited removal under 1225(b)(1) are the "other aliens" subject to the general rule of 1225(b)(2)." (P. 9). "Under that reading of the statute, 1225(b)(1) does not apply to an applicant who is processed under 1225(b)(2)(A), even if that individual is rendered inadmissible by 1182(a)(6)(C) or (a)(7)." This finding is consistent with the government's position in the litigation, that DHS can choose whether to place someone in proceedings under INA 240 and return them to Mexico, *or* place them in proceedings under INA 235, but not both. We seek clarification regarding the process DPBP should use to raise cases in which the government has erroneously subjected an individual to both 235 and 240 proceedings.

    (8) What policies and procedures guide ICE and USCIS action when an individual placed in expedited removal asserts United States citizenship?

*ICE:*

(9) Does ICE have any predictions regarding future intake numbers in Dilley? We have observed a small number of new intakes each day, primarily with Mexican nationals.

(10)　　We are working with families who have been waiting for IJ review for over two months (served decisions in the beginning of September). Does ICE have any information regarding EOIR capacity and/or delay for negative credible and reasonable fear review hearings?

(11)　　DPBP currently represents hundreds of families who have been detained for more than 60 days. Can ICE please clarify its current position regarding the Flores Settlement Agreement's presumption of release from detention for children? How does ICE track and review the length of detention for children, and consider for release families who have been detained in excess of Flores' requirements?

**(12)**　　Can ICE clarify its policy regarding the detention of pregnant women? Is it still ICE's policy to not detain individuals who are more than six months pregnant? How does ICE currently track and review the pregnancy timeline of woman detained at STFRC, and complications related to pregnancy that may weigh in favor of release? How does ICE prefer DPBP escalate cases, and which cases are useful for escalation? **We would like to bring the attached cases to ICE's attention. Please note the information reported in the attachment was received from client statements.**

**(13)**　　We have seen a growing number of individuals detained at STFRC with significant medical needs. Many of our clients have been informed they require medical attention that will not be provided while they are detained. What types of cases would ICE like DPBP to escalate for review, and what is the preferred method of escalation? **We would like to bring the attached cases to ICE's attention. Please note the information reported in the attachment was received from client statements.**

(14)　　Over the last two weeks, CC has not had the list of DPBP volunteers who were cleared to enter the facility. Can ICE clarify who is responsible for sending this list, and when it is sent each week?

(15)　　There is one electrical outlet, and one phone line, in the visitation trailer that are not functioning. Can ICE and/or CC assist in repairing the electrical outlet and phone line?

(16)　　We serve as attorney of record before ICE on behalf of numerous individuals who have outside counsel in their immigration court proceeding. We ask that ICE provide Orantes notice as required to all attorneys of record, including DPBP and outside counsel.

# EXHIBIT 2

| Name | Medical Issues |
|------|----------------|
| | CANCER/TUMORS |
| B.I.L.A | B.I.L.A ( A# ) reports she was diagnosed with cervical cancer in January and received no follow-up for the 5 months she spent in ICE custody before being transferred to Dilley. At STFRC, she was given another pap smear but never told the results; she continues to have stomach pain and vomiting. She was given a pap smeat and biopsy on 10/17 and as of 11/8 had not been given any results or updates about her condition. |
| KGJ | KGJ ( A# ) reports she has six tumors in her right breast and chest, the largest being the diameter of a quarter. She states the tumors have noticeable grown during her time in detention. She is in constant severe pain, is having trouble sleeping, and is experiencing problems with menstruation. Although she does not know whether she has cancer, she has a family history of breast cancer. IHSC doctors gave her ibuprofen and an ultrasound. IHSC doctors informed Ms. K.G.J the tumors were benign, although this does not relieve the pain they are causing. Doctors in Guatemala told her she needed urgent surgery in mid-September.  Given the conflict in information provided by two medical professionals, Ms. K.G.J seeks a second opinion. |
| A.R.G.D.S | A.R.G.D.S de Silva reports her 17 year old daughter K.D.S.B. ( A# ) has a lump in her breast and was taking medicine for it in Brazil (two medicines, one gamas; the other unknown). The oncologist in Brazil said they would have to operate if the nodule continued growing, which it has. Clients report they have mentioned this concern to IHSC doctors twice, and were given Ibuprofen. |
| | NERVOUS SYSTEM |
| Y.E.Q.D.M | Y.E.Q.D.M ( A# ) has a condition resembling hydrocephalus, in which a buildup of fluid in her brain almost resulted in her death 8 years ago. A neurologist inserted a valve into her brain to drain the fluid to her stomach, but that she required annual check-ups to make sure the valve was functioning and would not require another surgery. Ms. Y.E.Q.D.M. has not had another check-up since 2017 and is overdue for an appointment with a neurologist to make sure that she is not in danger of another fluid buildup in her brain. She has been experiencing severe headaches, nausea, dizziness, vision problems, trouble staying awake, and fainting for almost a week. |
| K.D.C | K.D.C. ( A# ) had a stroke in December 2017, which manifested in the form of drooping in the left side of her face and resulted in Bell's Palsy, as diagnosed by a doctor in EL Salvador. She says that one week before the stroke she started feeling that the left side of her tongue had fallen asleep, and decreased taste on that side of her tongue. She had difficulty forming words, sucking from a straw, and trouble swallowing to the point where she would almost choke. She is currently experiencing pain on the left side of her neck, under and behind her left ear, and radiating down her shoulder intermittently for 2-3 minutes at a time. She is sometimes unable to pronounce words. |
| M.B.M. | M.B.M. ( A# ) has had a severe headache for over two and a half weeks, including tingling along the back of her head, pain along her face and ears, sensitivity to light, and trouble sleeping. She went to the clinic and the nurses gave her one painkiller and said she would have to come back to talk to a doctor. She came back and they did the same thing, only giving her one pill. She has been advised to avoid the light, which is impossible to do in a detention setting. She is also feeling nausea, burning/swelling feelings around her lips, dizziness. This client seeks additional evaluation and medical attention. |
| | HEART/CARDIOVASCULAR SYSTEM |

| | |
|---|---|
| A.C.G. | ██████ A.C.G. ████ ( A# ███ ) was hospitalized on 10/30 for complications related to her high blood pressure, including vertigo, head and chest pain, dizziness, fainting, and convulsions. She was hospitalized a second time on 11/1 after reacting poorly to the stress of dicussing her medical condition before her CFI. She then remained under medical observation for at least four days with lingering symptoms. She returned to IHSC on 11/7 with a headache and chest pain and was told by medical staff "not to exaggerate." She was diagnosed with diabetes, thyroid issues, and vertigo, and is now taking eight pills daily. She continues to experience changes in palate and trouble keeping her eyes open in addition to the chest and head pain. She was also diagnosed six months ago with an ulcer in her womb, which she was told would have to be removed. |
| E.Y.A.D.M | ██████ E.Y.A.D.M ████ ( A# ███ ) reports that she has a medical condition that results in severe migraines, and numbness on one side of her face. The medical condition is a result of a lack of oxygen reaching the brain, and we believe it to be brain hypoxia. She arrived to the US with medication, which was confiscated and thrown out by CBP; at Dilley, she has only received acetaminophen for the headaches. |
| L.R.H. | ██████ L.R.H ████ ( A# ███ ) has an oversized heart and was told by cardiologists before she left that she would need an operation. She is currently experiencing trouble breathing, walking, and standing up without losing consciousness. She was given blood pressure medicine from IHSC and and told to come back for more investigations. |
| F.A. | ██████ F.A. ███ ( A# ███ ) suffered a heart attack at the age of 22 a violent attack and had experienced further heart palpitations following recent domestic abuse and other stressful situations. She reports that she had been prescribed medication at STFC but that her chest still aches. |
| **MENTAL HEALTH NEEDS** | |
| M.M.F.L. | ██████ M.M.F.L. ████ ( A# ███ )'s 7 year old son, ███ Y.A.R.F ████ ( A# ███ ) is exhibiting behavior indicative of his need for additional mental health support and environmental changes. IHSC doctors labeled YARF "hyperactive" and prescribed him medication that has not yet shown effects, although they had to halve his originally prescribed dose because he was falling asleep in school. He runs away from the room in the middle of the night, throws his clothes everywhere, soils himself, destroys things, scratches himself until he bleeds, and is easily triggered by other people at STFRC. His behavior continues regressing in detention, and multiple STFRC doctors and guards repeatedly tell MMFL that her son should not be detained at STFRC. |
| Y.M.R. | ██████ Y.M.R ████ ( A# ███ )'s 11 year old son, ███ C.G.M. ████ ( A# ███ ) is experiencing severe depression, and the need for mental health intervention. An IHSC psychologist prescribed CGM r sleeping pills. Given that CGM 's depression has manifested in oversleeping, mother declined. Mother reports no additional treatment was offered. |
| **KIDNEY (AND OTHER ORGANS)** | |
| M.D.C.R.M. | ██████ M.D.C.R.M. ████ ( A# ███ )' 12 year old daughter ███ E.P.R ████ ( A# ███ ) is missing several organs including a vaginal canal, uterus, and one kidney. She is months overdue for an appointment with a nephrologist to make sure her remaining kidney is functioning normally. Ms MDCRM requested lab tests of EPR 's kidney function from IHSC, but was told to wait until she was released because they cannot provide such specialized care at STFRC. EPR also has double scolioisis and was required to do daily water therapy to keep her spine strong, which she has not been able to continue at STFRC. |

| | |
|---|---|
| A.J. | A.J. ( A# )'s three year old H.J. has a hernia and was told by IHSC doctors that he cannot get treatment here and needs to seek treatment after release. H.J. is now not eating due to stomach pain. STFRC doctors informed Ms. A.J there is no medication that would help because the hernia has to be removed. |
| M.L.Z | M.L.Z ( A# ) was diagnosed with postpartum preeclampsia, inflamed kidneys, gastritis, and colitis in Mexico. She has been experiencing extreme nausea and vomiting; diarrhea; leg, waist, and back pain; trouble eating and sleeping; and overall weakness. |
| P.G.G. | P.G.G. ( A# )'s son J.G.G. ( A# ) was born with a congenital kidney problem resulting in one small kidney and one regular sized kidney. Doctors in mexico stated that he would eventually need a kidney transplant, and therefore that he needs lab tests every six months. He has not had one in the last six months. He has had blood and urine tests done STFRC, and was informed his health is fine. |

### NEED FOR DIAGNOSIS OR FURTHER EVALUATION

| | |
|---|---|
| C.H.G. | C.H.G. ( A# )'s 14 year old daughter slipped on a spill at the gym and landed on her knee. It has been swollen and causing unbearable pain, but medical staff told her they cannot give her an X-ray in Dilley and that she has to wait until she is released for additional care. The family believes an X-ray is needed, and seeks additional accommodations, such as crutches. |
| M.C.M | M.C.M ( A# ) has been experiencing undiagnosed stomach pain in detention for 1.5 months. She has been subjected to X-rays, TB tests, and a medication regimen of up to 10 pills a day, but nothing has been able to relieve her symptoms. Some of the medicine she was prescribed resulted in lose in eyesight; she also continues to experience insomnia, dizziness, and loss of appetite. Her daughter, L.M.C. ( A# ), is also experiencing undiagnosed stomach pain, loss of appetite, and difficulty sleeping. |
| I.L.R.O | I.L.R.O. ( A# )'s 11 year old son I.Y.R ( A# )'s stomach gets swollen and he feels burning when he pees; officials at STFRC escorted him to medical on 11/7 because he looked pregnant. He was prescribed water with medicinal powder of some kind which has not been helping. He has been unable to sleep and eat due to the pain and spends all of his free time on the toilet because he has the constant sensation of eneding to pee. |
| B.S.R. | B.S.R. ( A# ) has a torn ligament in her arm and is now losing mobility. She has been to medical twice and was told they don't have the treatment she needs here. |
| V.D.S.P | V.D.S.P. ( A# ) has an inflamed tendon in her knee requiring Betaudo injections every three months. She got one before leaving for the US but has now been in family detention for so long that she is overdue and experiencing knee pain and trouble walking. After each injection she needs to rest for 8 days and not walk at all. Her son, V.M.V.P. ( A# ) has had a fever for a week, as well as cough, headaches, and trouble sleeping. He recently developed a rash that has not subsided despite numerous visits with IHSC staff. |
| A.L.G.T | A.L.G.T. ( A# )'s 3 year old daughter, D.P.G. ( A# ) has a rash that has spread from her stomach to her hands, feet, and groin. Ms. A.L.G.T took DPG to IHSC for an examination but they only looked at her hands in the hallway and gave her oral medication, despite Ana's insistence that DPG would throw up any pills she tried to take. She requested topical cream and was denied. DPG has been unable to sleep because of the intense itching. |

| Name | Description |
|---|---|
| **B.V.C.A.** ▮ | **B.V.C.A.** ▮ **A#** ▮) has had pain in her uterin since September 20, as well as in her spine and waist. It has been getting worse. She can not bend down, sit down, or put on clothes. She has created a makeshift bandage around her waist to ease the pain. She has visited IHSC, but the interventions provided have failed to resolve her pain. She has lost appetite, and has ongoing trouble with urination, due to the pain. She is also suffering from vision problems that coincide with her headaches. Blanca believes this stems from an attack she suffered in Ecuador, after which everything started hurting. ▮BVCA▮'s 5 year old daughter, ▮**G.F.S.C.**▮, has a heart disease/heart murmer -- sweats excessively, gets red in the face, and is dehydrated. She was taken to San Antonio for further examination. Daughter is not eating well, tires easily, and has ongoing trouble breathing. |
| **A. A.A.** ▮ | **A.A.A.** ▮ child has signs of hepatitis B (according to Ecuadorian doctors). Her child is not eating. She was prescribed diarrhea medicine by IHSC, but child does not have diarrhea. |

### PREGNANCY-RELATED

| Name | Description |
|---|---|
| **K.J.M** ▮ | **K.J.M.** ▮ ( **A#** ▮) is 7 months pregnant and has a uterine infection. She was sent to the hospital for testing where she was told the infection could cause a miscarriage. |
| **K.G.T.D.Q.** ▮ | **K.G.T.D.Q.** ▮ s ( **A#** ▮) is 7 months pregnant. She has a history of anxiety attacks, sometimes resulting in loss of consciousness; and was brought to the hospital on November 4 for further evaluation. She has had complications with both of her previous pregnancies, including her first child who was born premature at 7 months, and her second child who was born underweight after she was hospitalized at 8 months in order to avoid giving birth prematurely. |
| **M.G.H.E.** ▮ | **M.G.H.E** ▮ ( **A#** ▮) is 6 months pregnant. She was hospitalized with a uterine infection around October 29 and told she would need follow-up at the Pearsall hospital in two days, but has yet to be scheduled for a check-up. The uterine infection has caused severe pain that has prevented her from walking and sensations that feel like contractions. She requested treatment from IHSC on November 4th but was told they couldn't do anything if she was not bleeding. |
| **B.Y.G.M.** ▮ | **B.Y.G.M** ▮ **A#** ▮) is 2 months pregnant and bleeding. She was hospitalized on 11/1 and told that there was a chance she would miscarry if the fetus changed position in the wrong way. She was told she would need to come back to the hospital but when she returned to the IHSC clinic for further evaluation she was told only to drink more water. |
| **D.I.** ▮ | **D.I.** ▮ ( **A#** ▮) is 4 months pregnant. She has high blood pressure, anemia, and PTSD symptoms stemming from the rape that led to this conception. She also has a history of depression including three past suicide attempts. |
| **E.C.H.** ▮ | **E.C.H.** ▮ ( **A#** ▮) is 4 months along in her geriatric pregnancy; this is considered high-risk because she is 41 years old. |
| **F.M.V.** ▮ | **F.M.V.** ▮ ( **A#** ▮) is 5 months pregnant and experiencing nausea, vomiting, headaches, loss of appetite, and lethargy. Her last child was born premature at 7 months and needed additional care. |
| **S.S.A.M.** ▮ | **S.S.A.M.** ▮ ( **A#** ▮) is 5 months pregnant and has had a previous miscarriage. |
| **K.E. P.D.** ▮ | **K.E. P.D.** ▮ ( **A#** ▮ is 7 months pregnant and experiencing nausea, dizziness, lightheadedness, loss of appetite, and trouble sleeping. She had a miscarriage 7 years ago. |

| | |
|---|---|
| A.M. A. ███████ | A.M.A. ████████ ( ██ A# ██ ) is 4 months pregnant and now has severe undiagnosed vaginal itch. |
| M.B.M.P ███████ | M.B.M.P. ████████ ( ██ A# ██ ) is 4 months pregnant. |
| K.N.M. ██████████ | ██ A# ██ . We believe this family has now been released. We raise this case because we seek clarification regarding the process for clearing someone this far along for travel. |

# EXHIBIT 3

**Length of detention for children detained at STFRC on April 21, 2020**

| Child's Initials | Days Detained |
|:---:|:---:|
| M.E.C. | 255 |
| M.A.S. | 250 |
| A.P.O. | 250 |
| M.B.P. | 249 |
| V.L.O. | 247 |
| D.L.O. | 247 |
| A.G.D. | 246 |
| A.V.C. | 245 |
| D.M.S. | 245 |
| N.M.M. | 245 |
| M.F.L. | 245 |
| A.A.M. | 244 |
| C.L.A. | 242 |
| J.D.S.O. | 242 |
| R.F.L. | 242 |
| A.R.G. | 242 |
| A.R.M. | 241 |
| S.C.M. | 240 |
| J.F.P. | 240 |
| B.S.C. | 240 |
| A.R.A. | 239 |
| C.A.A. | 239 |
| W.C.G. | 239 |
| L.C.R. | 238 |
| J.M.H. | 238 |
| I.G.L. | 238 |
| A.G.L. | 238 |
| C.G.M. | 237 |
| A.G.H. | 237 |
| G.M.A. | 237 |
| E.A.N. | 227 |
| Y.H.A. | 227 |
| A.C.B. | 227 |
| E.C.G. | 227 |
| N.C.L. | 226 |
| S.B.P. | 226 |
| M.R.M. | 224 |
| E.P.V. | 224 |
| M.D.D. | 222 |

| | |
|---|---|
| A.V.L. | 222 |
| A.G.M.P. | 218 |
| A.J.P.P. | 218 |
| C.P.P. | 218 |
| M.I.E. | 218 |
| Y.M.C. | 213 |
| C.G.C. | 213 |
| I.C.B. | 213 |
| L.A.O. | 211 |
| D.A.O. | 211 |
| S.R.H. | 211 |
| W.A.A. | 207 |
| S.R.S. | 207 |
| A.V.M. | 206 |
| Y.M.G. | 205 |
| S.G.L. | 202 |
| T.T.G. | 202 |
| Y.C. | 200 |
| A.P.C. | 200 |
| D.M.H. | 200 |
| C.M.R. | 189 |
| K.H.L. | 170 |
| M.A.C. | 104 |
| M.H.S. | 102 |
| E.S.V. | 102 |
| J.M.F. | 99 |
| Z.M.F. | 99 |
| E.G.F. | 99 |
| D.M. | 97 |
| J.R.V. | 93 |
| J.Y.R.V. | 93 |
| Z.F. | 93 |
| K.T.M. | 92 |
| E.D.K.M. | 92 |
| S.B.B. | 87 |
| D.P.V. | 86 |
| V.G.S. | 81 |
| E.B.A. | 80 |
| M.O.P. | 79 |
| C.H.P. | 78 |
| I.H.P. | 78 |
| K.L.O. | 78 |
| E.O.G. | 77 |

| | |
|---|---|
| D.O.G. | 77 |
| D.A.F. | 76 |
| J.E.M. | 75 |
| A.M.R. | 75 |
| D.K. | 75 |
| C.S.H. | 74 |
| W.O.M. | 74 |
| J.L. | 73 |
| J.P. | 72 |
| M.C.M. | 72 |
| I.V.L. | 72 |
| L.V.L. | 72 |
| J.X.M. | 71 |
| A.M.M. | 71 |
| E.A.V. | 70 |
| N.F.V. | 70 |
| V.G.S. | 69 |
| M.A.M. | 68 |
| A.E.M. | 68 |
| E.O.S. | 68 |
| E.R.S. | 67 |
| A.R.S. | 67 |
| B.R.S. | 67 |
| W.L.S. | 67 |
| D.A.R. | 67 |
| N.R.V. | 66 |
| C.J.V. | 66 |
| Y.R.L. | 65 |
| A.R.L. | 65 |
| E.G.F. | 65 |
| I.F.B. | 63 |
| J.C.L. | 61 |
| M.L.V. | 60 |
| T.W.E. | 60 |
| E.F.C. | 59 |
| S.M.L. | 59 |
| M.C.G. | 58 |
| E.R.R. | 57 |
| A.L.M. | 56 |
| A.O. | 56 |
| J.Q. | 55 |
| M.A.P. | 55 |
| G.S.P. | 54 |

| | |
|---|---|
| S.L.P. | 53 |
| N.L.P. | 53 |
| E.L.P. | 53 |
| A.G.Q. | 52 |
| J.C.P. | 51 |
| Z.C.P. | 52 |
| D.C.M. | 51 |
| V.V.P. | 51 |
| J.C.P.R. | 51 |
| A.S.R. | 51 |
| J.P. | 50 |
| M.H.M. | 50 |
| J.H.M. | 50 |
| M.M.N. | 50 |
| M.C.T. | 49 |
| M.C.T. | 49 |
| A.V. | 49 |
| W.B. | 49 |
| J.L.B. | 49 |
| W.G.B. | 49 |
| D.M.D. | 48 |
| J.A.R. | 48 |
| Y.A.L. | 48 |
| E.C.B. | 48 |
| K.D.H. | 48 |
| A.G.A. | 47 |
| I.B.G. | 46 |
| J.L.M. | 46 |
| D.E. | 46 |
| A.D. | 46 |
| H.S. | 46 |
| N.N.U. | 45 |
| D.N.U. | 45 |
| A.Z.R. | 45 |
| O.P.P. | 43 |
| D.C. | 43 |
| A.A.M. | 43 |
| A.A.L. | 43 |
| A.M.H. | 43 |
| A.B.S. | 43 |
| J.B.S. | 43 |
| J.V.G. | 43 |
| J.H.P. | 42 |

| | |
|---|---|
| A.S.A. | 42 |
| R.M.L. | 42 |
| J.H.P. | 42 |
| M.C. | 42 |
| M.A.C. | 42 |
| Child of M.K. | 42 |
| J.A.C. | 41 |
| E.B.C. | 41 |
| D.C.R. | 40 |
| K.O.G. | 40 |
| E.S.S. | 39 |
| G.S.S. | 39 |
| M.M.F. | 37 |
| D.S.M. | 37 |
| A.M.M. | 37 |
| C.F. | 36 |
| A.S.G. | 36 |
| N.C.V. | 36 |
| G.S.T. | 36 |
| S.L.V. | 35 |
| K.F.A. | 34 |
| M.E.R. | 34 |
| O.E.R. | 34 |
| M.E.R. | 34 |
| T.V.M. | 34 |
| J.V.M. | 34 |
| B.E. | 33 |
| D.P. | 31 |
| W.A.S. | 28 |
| C.A.M. | 28 |
| J.M.M. | 27 |
| D.M. | 27 |
| V.T.P. | Unknown |
| Child of V.C.S. | Unknown |
| F.P.P. | Unknown |
| C.P.P. | Unknown |

EXHIBIT 4



Shalyn Fluharty <shay@caraprobono.org>

## CRCL Complaint | Discrimination on Account of Disability | Medical Neglect | Removal Imminent

**Shalyn Fluharty** <shay@caraprobono.org>                                Tue, Apr 21, 2020 at 11:39 AM
To: Audrey Mulholland <audrey@caraprobono.org>
Cc: "Bromer, Zachary" <zachary.bromer@hq.dhs.gov>, "Quinn, Cameron" <cameron.quinn@hq.dhs.gov>, "Salvano-Dunn, Dana" <dana.salvano-dunn@hq.dhs.gov>, CRCLCompliance <CRCLCompliance@hq.dhs.gov>, otg <otg@caraprobono.org>, Extended OTG <extendedotg@caraprobono.org>, Allison Herre <allison@caraprobono.org>

Good afternoon,

I write at this time to supplement our initial complaint, and request further investigation into ICE's procedures for medically clearing families to fly. As detailed in our complaint on April 12, 2020, we had reason to believe ICE intended to remove a family despite a child's severe medical condition, placing the child at risk of harm in the process.

We supplement our complaint at this time and ask CRCL to investigate the cases of the two families indicated below. Both families were presumably cleared to fly by IHSC. However, after the families were flown from the San Antonio airport to the Houston airport (we believe) for removal on April 17, 2020, they required immediate hospitalization and were prohibited from further travel by medical professionals at the airport. It is clear that neither of these families should have been placed on a plane.



N███ B███ G███ F███, I███ 651
J███ S███ L███ P███, ███ 871

The Dilley Pro Bono Project has extensive electronic correspondence with ICE informing ICE of ongoing and severe medical concerns for each of these families. The facts show that IHSC and ICE are ignoring their legal duty of care to families at STFRC when proceeding with removal despite clear evidence that removal is not safe. These realities are exacerbated in the face of a global pandemic. There are indications at least one of these families may be COVID-19 positive and was not treated, tested or quarantined for weeks while placed in the general population at STFRC prior to attempted removal.

We will further supplement this complaint with additional documentation in the near future, yet submit this now to request immediate investigation and the issuance of a Z hold for that purpose. We reiterate our request that CRCL fully investigate this issue across the board, and specifically, encourage CRCL to request and review all circumstances over the last four years in which families have required emergency medical care during the removal process. DPBP has a growing list of these cases.

ICE has a duty of care to families, and removal cannot justify loss of life. Thank you for your consideration.

Shalyn Fluharty

On Sun, Apr 12, 2020 at 9:23 PM Audrey Mulholland <audrey@caraprobono.org> wrote:
Good evening,



The Dilley Pro Bono Project respectfully submits the attached complaint to the Office of Civil Rights and Civil Liberties on behalf of Ms. K███ P███ Z███ R███ (A# ███ 774) and her one-year-old son, A███ R███ Z███ R███ (A# ███ 775). This complaint alleges discrimination on account of a disability in the credible fear interview process and asserts that A███—who was hospitalized for five days while in CBP custody after he stopped breathing—faces near certain death if forced to travel by air at this time.



**Ms. Z███ R███ and A███ are scheduled for removal and undersigned counsel has reason to believe removal could proceed as early as tomorrow.** Counsel urges CRCL to issue a Z hold to: (1) ensure IHSC has carefully reviewed all relevant medical records—including A███'s hospital records—prior to clearing him for flight, and (2) facilitate external review of A███'s medical records by an independent expert who can provide a second opinion regarding A███'s safety to fly. External review of A███'s medical file is needed because IHSC has failed to provide A███ with adequate evaluation and treatment during

his detention at the South Texas Family Residential Center and has subjected A███ to unsafe and unsanitary conditions of detention that have exacerbated his medical fragility.

    <u>**Counsel believes this case requires immediate and delicate action—even over the weekend.  A one-year-old child's life is at risk due to medical neglect that could lead to wrongful death.**</u> The fact that A███'s mother was required to proceed with a credible fear interview in CBP custody while deprived medical treatment for a broken bone, in the face of her son's rapidly deteriorating condition, calls into question the integrity of Ms. Z████ R████'s credible fear proceeding and the validity of this family's orders of expedited removal. As detailed in the attached complaint, CRCL investigation is necessary.

Additionally, during the COVID-19 pandemic, we are unable to travel to the detention facility where Ms. Z████ R████ and her son, A███, are presently held to obtain signatures on the G-28s. Please accept the attached DETAINED G-28 in the meantime.

Sincerely,

Audrey Mulholland, on behalf of Allison Herre, Esq.


--
Audrey Mulholland
Law Graduate | Justice Fellow, Immigrant Justice Corps
*Dilley Pro Bono Project*
Pronouns: she/her/hers

# Dilley Pro Bono Project

## A Project of the Immigration Justice Campaign

April 12, 2020

CRCLCompliance@hq.dhs.gov; zachary.bromer@hq.dhs.gov; cameron.quinn@hq.dhs.gov; dana.salvano-dunn@hq.dhs.gov

**Re:**   **CRCL COMPLAINT: Discrimination on Account of Disability | Medical Neglect | Removal Imminent**

K████ P██ Z████ R████ (A#████ 774)
A███ R█ Z████ R████ (A#████ 775)

## **INDEX OF EXHIBITS**

**Ex. A**  Notice of Claim Pursuant to A.R.S. § 12-821.01, Mariee Juarez

Dear DHS Office of Civil Rights and Civil Liberties:

The Dilley Pro Bono Project respectfully submits a complaint to the Office of Civil Rights and Civil Liberties on behalf of Ms. K████ P██ Z██ a R████ (A#████ 774) and her one-year-old son, A███ R█ Z████ R████ (A#████ 775). This complaint alleges discrimination on account of disability in the credible fear interview process and asserts that A███—who was hospitalized for five days while in CBP custody after he stopped breathing—faces near certain death if forced to travel by air at this time.

**Ms. Z████ R████ and A███ are scheduled for removal and undersigned counsel has reason to believe removal could proceed as early as tomorrow.** Counsel urges CRCL to issue a Z hold to: (1) ensure IHSC has carefully reviewed all relevant medical records—including A███'s hospital records—prior to clearing him for flight, and (2) facilitate external review of A███'s medical records by an independent expert who can provide a second opinion regarding A███'s safety to fly. External review of A███'s medical file is needed because IHSC has failed to provide A███ with adequate evaluation and treatment during his detention at the South Texas Family Residential Center and has subjected A███ to unsafe and unsanitary conditions of detention that have exacerbated his medical fragility.

Counsel believes this case requires immediate and delicate action—even over the weekend. A one-year-old child's life is at risk due to medical neglect that could lead to wrongful death. The fact that A███'s mother was required to proceed with a credible fear interview in CBP custody while deprived medical treatment for a broken bone, in the face of her son's rapidly deteriorating health, calls into question the integrity of Ms. Z████ R████'s credible fear proceeding and the validity of this family's orders of expedited removal.

As further detailed below, CRCL investigation is necessary.

## I.   FACTUAL & PROCEDURAL HISTORY

Customs and Border Patrol apprehended Ms. Z███ R███ and her son on March 8, 2020. Ms. Z███ R███ had a credible fear interview (CFI) on March 12, 2020 while subjected to the Prompt Asylum Claim Review ("PACR") program. An immigration judge affirmed the Asylum Officer's negative credible fear finding on March 26, 2020.

Immediately prior to Ms. Z███ R███'s journey to the United States, M███ M█████—her kidnapper and A███'s father—beat her so severely he broke her shoulder bone. Ms. Z███ R███ received medical treatment in Guatemala, was placed in a shoulder brace that immobilized her shoulder, and proscribed pain medication.

The most recent incident of physical harm Ms. Z███ R███ survived in Guatemala is one incident of many. Given the years of physical beatings, rape, and psychological harm Ms. Z███ R███ endured, she experiences ongoing debilitating anxiety. Ms. Z███ R███ has disclosed numerous indicators of post-traumatic stress disorder and depression to counsel. She states she feels like she is drowning when she thinks about the harm she has suffered, and that at times, she becomes so flooded with feelings and anxiety she passes out.

While in CBP custody, Ms. Z███ R███'s pain medication and shoulder brace were confiscated. At the time of her credible fear interview, she had not had access to medication management or her shoulder brace for four days. During her interview Ms. Z███ R███ recalls feeling immense pain and being unable to use her arm, lie down, sleep, or perform basic functions to care for herself—such as change her clothes or hold her child. She reports her physical pain was all consuming.

During her credible fear interview, the asylum officer asked Ms. Z███ R███, "Do you have any illnesses or medical conditions at this time?" Ms. Z███ R███ responded, "My arm is broken. They checked me yesterday for it. The people here know about it." She further responded that she was not taking any medication. The asylum officer then asked Ms. Z███ R███, if her shoulder fracture was a result of harm suffered in her country, to which she responded, "yes." Although the asylum officer asked Ms. Z███ R███z whether her condition would affect her ability to interview, she understood this question only literally in the sense that there was nothing that would physically prevent her from speaking. The asylum officer failed to ask Ms. Z███ R███ if she was experiencing any pain as a result of her shoulder or any other follow-up questions to gauge her physical and mental wellbeing. The officer also failed to ask Ms. Z███ R███ if her son, A███, had any medical conditions.

A███ does have medical conditions, which compounded Ms. Z███ R███'s inability to concentrate and fully participate in her credible fear interview. A███ was born premature because of the physical abuse Ms. Z███ R███ suffered during her pregnancy. Doctors in Guatemala informed Ms. Z███ R███ that A███'s lungs were weak at the time of his birth.

While in CBP custody in Donna, Texas, A███ developed flu-like symptoms that impacted



his ability to breathe. A▇▇▇'s health had deteriorated so significantly by the time of Ms. Z▇▇
R▇▇▇'s credible fear interview that he cried and coughed throughout the entire interview. Ms.
Z▇▇ R▇▇▇ states she could not concentrate or communicate well. Ms. Z▇▇ R▇▇'s
physical pain, and the health and wellbeing of her son, were all she could focus on.

Shortly after Ms. Z▇▇ R▇▇▇'s interview, A▇▇'s temperature spiked, his breathing
became labored, and he tested positive for the flu. At first, CBP placed the family in medical
isolation. When A▇▇'s breathing nearly stopped, he was rushed to the hospital, where he
remained for five days. A▇▇ was placed on a ventilator. His blood pressure plummeted.

The hospital conducted numerous tests on A▇▇ and prescribed multiple medications. The
medical staff at the hospital directed Ms. Z▇▇ R▇▇ to return to the hospital immediately if
A▇▇ got worse. Ms. Z▇▇ R▇▇ recalls being told her son may require a blood transfusion.
After being discharged from the hospital, CBP confiscated A▇▇'s discharge paperwork and he
was only given one medication.

On April 4, 2020 ICE transferred Ms. Z▇▇ R▇▇ and A▇▇ to STFRC in Dilley,
Texas. On Thursday, April 9, A▇▇n began to deteriorate once again. A▇▇ developed a fever
and cough, and his breathing became greatly restricted. Medical staff at STFRC prescribed
A▇▇ acetaminophen. Unfortunately, A▇▇'s symptoms have only intensified. Ms. Z▇
R▇▇ reports that A▇▇'s current symptoms parallel his symptoms immediately prior to his
hospitalization.

## II.   DISCRIMINATION ON ACCOUNT OF DISABILITY

Ms. Z▇▇ R▇▇ was interviewed without required accommodations in violation of the
Rehabilitation Act of 1973, *Matter of M-A-M-*, and the Fifth Amendment to the United States
Constitution.

The Rehabilitation Act of 1973 prohibits federal departments from excluding a person from
participation, denying the benefits of, or discriminating against a person based on their disability.
29 U.S.C. § 504(a). The Rehabilitation Act defines "disability" with the definition used by the
Americans with Disabilities Act ("ADA") of 1990. A disability is "a physical or mental
impairment that substantially limits one or more major life activities of such individual." *See* 29
U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1). Major life activities include, but are not limited to:
"caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,
lifting, bending, speaking, breathing, earning, reading, ***concentrating, thinking, communicating,***
and working." 42 U.S.C. § 12102(2)(A) (emphasis added). The definition of "disability" must be
construed in favor of broad coverage of individuals. 42 U.S.C. § 12102(4)(A).

The Rehabilitation Act goes on to define "an individual with a significant disability" as an
individual "who has a severe physical or mental impairment which seriously limits one or more
functional capacities (such as mobility, ***communication***, self-care, self-direction, interpersonal
skills, work tolerance, or work skills) . . . ." 29 U.S.C. § 705(21)(A)(i) (emphasis added).
According to guidance from the Equal Employment Opportunity Commission, "the ADA rule
defines 'mental impairment' to include '[a]ny mental or psychological disorder, such as . . .

emotional or mental illness.' Examples of 'emotional or mental illness[es]' include major depression, bipolar disorder, anxiety disorders (which include panic disorder, obsessive compulsive disorder, and post-traumatic stress disorder), schizophrenia, and personality disorders." U.S. Equal Employment Opportunity Commission, EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (March 25, 1997) (emphasis added).

Ms. Z█████ R██████'s broken shoulder and accompanying pain, her extreme anxiety that made her feel like she was drowning while recounting abuse during her interview, and her worry over her son's rapidly deteriorating health constitute physical *and* mental impairments pursuant to the Rehabilitation Act and its adoption of the Americans with Disabilities Act definition of "disability." *See* 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1). These physical and mental impairments substantially impacted Ms. Z██████ R██████'s ability to concentrate, think, and communicate during her CFI.

Ms. Z█████ R██████'s interview process was prejudiced by the Asylum Office's failure to make necessary accommodations for her physical and mental impairments. She was unable to concentrate, think, or effectively communicate during her interview because she was in physical pain, psychological stress, and was paralyzed with worry and anxiety over the health of her son, A████, who only a few short days later would be hospitalized.

Although the Asylum Officer asked about her illnesses or medical conditions, there were no questions or inquiries into her level of pain or state of mind. Furthermore, the Asylum Officer did not inquire at all into the health of her son, which would have allowed Ms. Z█████ R████ to share her concern and anxiety with his health.

For these reasons, the Asylum Office failed to provide Ms. Z█████ R████ with reasonable accommodations during the CFI process as required by Section 504 of the Rehabilitation Act. As a result, Ms. Z████ R██████ and her one-year-old son, A███, have been denied meaningful access to the protections they are due pursuant to 8 U.S.C. § 208.30.

## III.   MEDICAL NEGLECT AND POTENTIAL WRONGFUL DEATH

On August 28, 2018 the mother of Mariee Juarez, a one-year-old who died shortly after release from STFRC, sued on behalf of her daughter under the Federal Torts Claims Act for wrongful death and medical neglect. *See* Exhibit A. At issue in Mariee's case was the process utilized to medically "clear" Mariee for travel. In Mariee's case, no one physically evaluated her prior to her discharge from STFRC. Instead, a "licensed vocational nurse" completed a "Transfer Summary." This summary constituted the entirety of Mariee's "medical clearance" process. Days later, Mariee was dead.

Under Texas law, a licensed vocational nurse is not authorized to perform comprehensive patient assessments, to initiate any nursing care plan, or to implement or evaluate patient care. As detailed in the lawsuit filed by Mariee's mother, a licensed vocational nurse is also not qualified to make a determination regarding whether an individual may be cleared to travel, as doing so

exceeds the scope of the license.

A█████ is a one-year-old who—like Mariee—is displaying symptoms of a grave medical condition that requires heightened treatment and care. Counsel's goal in filing this complaint is to ensure that ICE's haste to remove this family does not result in a wrongful death tragedy. ICE has a legal duty of care to A█████ and an obligation to put his safety and wellbeing first under the *Flores* Settlement Agreement.

A█████ is currently experiencing a high fever and difficulty breathing, only a few weeks after his initial hospitalization. A█████ previously required a ventilator to survive. A ventilator will certainly not be accessible to A█████ while on an international flight. It is of paramount importance that A█████ is not cleared to fly without appropriate evaluation and thoughtful care.

IHSC has proven—in A█████'s case and the case of Mariee—it is unlikely to comply with its duty of care. For this reason, counsel asks CRCL to oversee ICE's action in this case and to engage an independent medical provider whose number one interest is A█████'s health, not his rapid removal.

## IV. REQUEST FOR INVESTIGATION

DPBP requests CRCL to oversee the medical care provided to Ms. Z█████ R█████ and A█████ moving forward, and their removal process. In addition, DPBP asks CRCL to investigate whether:

(1) CBP provided Ms. Z█████ R█████ with appropriate medical care for her broken shoulder, including, whether she was provided necessary medication and appropriate sleeping conditions;

(2) CBP's confiscation of Ms. Z█████ R█████'s brace and medication, and A█████'s medication and medical records, was appropriate;

(3) CBP failed to provide A█████ with necessary medical care prior to his hospitalization;

(4) ICE has provided Ms. Z█████ R█████ and A█████ with appropriate medical treatment while detained at STFRC;

(5) CBP provided ICE with A█████'s hospital records, and whether those records were provided to IHSC and reviewed;

(6) CBP and ICE returned A█████'s hospital discharge paperwork to his mother, as required;

(7) A█████ was medically cleared for travel by a qualified individual who physically examined him and the entirety of his medical history;

(8) the asylum officer who interviewed Ms. Z███ R███ was provided with adequate training on the legal requirements of the Rehabilitation Act; and

(9) the asylum officer who interviewed Ms. Z███ R███ was provided with adequate training on how to screen applicants for disabilities—including trauma—and how to provide necessary accommodations.

## V.    CONCLUSION

CRCL should immediately issue a Z hold to ensure A███'s life is not at risk before he is put on a plane. During its investigation, CRCL should closely evaluate whether the orders of expedited removal issued to A███ and Ms. Z███ R███ are legally valid, given the asylum officer's failure to provide necessary accommodations after CBP confiscated Ms. Z███ R███'s medication as required by the Rehabilitation Act. Ms. Z███ R███ merits full and fair adjudication of her claim of credible fear and meaningful review is required by international and federal law.

Thank you for your consideration.

Respectfully submitted,

/s/ _____

Audrey Mulholland, on behalf of Allison Herre, Esq.
Law Graduate / Staff Attorney
Dilley Pro Bono Project

# EXHIBIT 5



Allison Herre <allison@caraprobono.org>

---

## URGENT: Request for Medical Release with NTA | 871

**Allison Herre** <allison@caraprobono.org>                                    Tue, Mar 31, 2020 at 7:09 AM
To: STFRC-CARA-Requests <STFRC-CARA-Requests@ice.dhs.gov>, "Hunt, Richard M" <Richard.M.Hunt@ice.dhs.gov>,
otg <otg@caraprobono.org>, Extended OTG <extendedotg@caraprobono.org>

Good morning,

DPBP client J███ S███ L███ P███ (█████ 871) and her minor children, █████ A█████ V█████ L███ (█████ 870) and L███ █████ █████ 869) are currently detained at the South Texas Family Residential Center. Ms. L███ P███ reports chest pain and related complications due to high blood pressure.

Ms. L███ P███ reports that in August 2019, she was hospitalized for 8 days due to pre-eclampsia. Since then, Ms. L███ P███ reports she's had to monitor her blood pressure. In the past three days, Ms. L███ P███ reports experiencing intense chest pain, dizziness, headaches, and numbness in her right foot.

Ms. L███ P███ further reports that she saw doctors at STFRC today and was told her blood pressure was high. She reports receiving two pills for headaches and a throat infection. Ms. L███ P███ reports being told to come back tomorrow, March 31, 2020 to continue monitoring her high blood pressure.

The Dilley Pro Bono Project (DPBP) is gravely concerned at the risk the spread of COVID-19 could pose to detained individuals in general and, in particular, to individuals with pre-existing conditions Ms. L███ P███ and who are potentially immuno-compromised.

The novel coronavirus (COVID-19) has led to a global pandemic where, in only a few months, over 600,000 people have been infected and over 30,000 have died, with these numbers rapidly increasing daily.[1] Doctors and the Center for Disease Control (CDC) have reached consensus that the most effective measure to reduce the risk of COVID-19 is a process called "social distancing."[2] Social distancing policies adopted by federal, state, and local governments to stop the spread of COVID-19, such as "shelter in place" and home self-quarantines are impossible to implement in high-density detention facilities such as STFRC where families eat, sleep, and live together in close quarters and in frequent contact with others and areas where others have been. Additionally, we now know that COVID-19 can live on surfaces for hours or even days depending on the surface thereby increasing the chances of spreading the virus in congregate detention settings even when physical distancing is enforced among detainees.[3]

Detained individuals face a unique and elevated risk of contracting COVID-19.  According to Dr. Homer Venters, former chief medical officer of New York City Jail System, "[w]hen COVID-19 arrives in a community, it will show up in jails and prisons. This has already happened in China, which has a lower rate of incarceration than the U.S. […]. Our efforts should focus on the reality that COVID won't be kept out […]."[4] Or, as Dr. Anne Spaulding, Emory Center for the Health of Incarcerated Persons, put it in a presentation to correctional facility employees, "a prison or jail is a self-contained environment, both those incarcerated and those who watch over them are at risk for airborne infections."[5]

The CDC recently reported that, "Older people and people of all ages with severe underlying health conditions — like heart disease, lung disease and diabetes, for example — seem to be at higher risk of developing serious COVID-19 illness."[6] Ms. L███ P███'s high blood pressure and accompanying symptoms puts her at risk of serious complications if she were to contract COVID-19. Concern over the rapid spread of COVID-19 in high-density and high-contact detention centers has even resulted in criminal detention centers in San Antonio, TX and Berks, PA to release prisoners over concerns for their well-being and to preemptively decrease the spread of COVID-19.[7]

It is a matter of when, and not if, COVID-19 reaches STFRC. In fact, on March 19, 2020 both ICE and the Office of Refugee Resettlement ("ORR") reported their first cases of COVID-19 in detention centers they run.

ICE has an affirmative, constitutional duty to provide for the health and safety of detained individuals and to "assume some responsibility for [their] safety and general well-being."[8] Furthermore, the mothers and children detained at

STFRC must "be furnished with the basic human needs, one of which is 'reasonable safety.'"[9] The risk of contracting a
contagious communicable disease (such as COVID-19) constitutes an "unsafe, life-threatening condition" risking the
"reasonable safety" of *all* detained mothers and children. This ever-present risk is even greater for individuals such as Ms.
█ P█████ with preexisting conditions that make the seriousness of contracting COVID-19 even greater.

ICE has already recognized the risk that COVID-19 imposes to public safety. A newly released enforcement policy states
that "ICE Enforcement and Removal Operations (ERO) will focus enforcement on public safety risks and individuals
subject to mandatory detention based on criminal grounds."[10] Furthermore, DHS maintains numerous policies granting
ICE discretion in immigration enforcement and detention. ICE has the authority to exercise favorable prosecutorial
discretion in "a broad range of discretionary enforcement decisions," including deciding to file an NTA and whom to detain
or to release. This decision should be based on "all relevant factors," including "whether the person […] suffers from
severe mental or physical illness."[11] "Absent extraordinary circumstances […] field office directors should not expend
detention resources on aliens who are known to be suffering from serious physical or mental illness."[12] Additionally,
DHS may parole a noncitizen into the United States "for urgent humanitarian reasons or significant public benefit,"[13] if
the noncitizen's continued detention is "not in the public interest" and he or she "present[s] neither a security risk nor a
risk of absconding."[14]

While DPBP maintains that all families detained at STFRC are at risk of adverse health consequences posed by
exposure to COVID-19, this family requires immediate release because of the underlying health condition of Ms. L█
P███ which makes them vulnerable to long-term organ damage and even death. ICE has both the authority and
discretion to release Ms. L███ P███ with an NTA and should follow its own internal guidance and focus enforcement
and detention efforts elsewhere.

Thank you for your prompt attention to this matter.  We ask for a written response to this request. G-28 is attached.

Best,

Allison E. Herre
Managing Attorney
Dilley Pro Bono Project

---

[1]  Coronavirus Disease (COVID-19) Pandemic, World Health Organization, last visited Mar. 29,
2020, https://www.who.int/emergencies/diseases/novel-coronavirus-2019
.

[2]  Prof. Scott A. Allen & Prof. Josiah Rich, Letter to Congress on COVID-19, Mar. 19, 2020, https://www.
documentcloud.org/documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html

[3]  "Q&A on Coronaviruses (COVID-19)," World Health Organization, last visited Mar. 30, 2020, https://www.who.int/news-
room/q-a-detail/q-a-coronaviruses
.

[4]  Dr. Homer Venters, *Four Ways to Protect Our Jails and Prisons from Coronavirus*, The Hill, Feb. 29,
2020, https://thehill.com/opinion/criminal-justice/485236-4-ways-to-protect-our-jails-and-prisons-from-coronavirus

[5]  Dr. Anne Spaulding, *Coronavirus and the Correctional Facility: for Correctional Staff Leadership*, Mar. 9,
2020, https://www.ncchc.org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf
.

[6]  Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), People at Higher Risk and
Special Populations*, Mar. 7, 2020, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/index.html
.

[7]   Jacob Beltran, *Bexar Sheriff Releases More than 200 from Downtown San Antonio Jail Amid Coronavirus Concerns,* San Antonio Express News, Mar. 20, 2020, https://www.expressnews.com/news/local/article/Sheriff-quarantines-11-deputies-releases-more-15144847.php
; *Berks Jail Freeing Some Inmates in Effort to Avoid Virus,* 69 News, Mar. 19, 2020, https://www.wfmz.com/health/coronavirus/berks-jail-freeing-some-inmates-in-effort-to-avoid-virus/article_7d3229c8-69ea-11ea-a960-8b97f5a94d08.html .

[8]   *See DeShaney v. Winnebago County Dept. Soc. Servs.,* 489 U.S. 189, 199-200 (1989).

[9]   *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

[10]   Updated ICE Statement on COVID-19, U.S. Immigration and Customs Enforcement, Mar. 18, 2020, https://www.ice.gov/news/releases/updated-ice-statement-covid-19

[11]   Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens, June 17, 2011, https://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf .

[12]   Policies for Apprehension, Detention, and Removal of Undocumented Immigrants, November 20, 2014, https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf .

[13]   INA § 212(d)(5)(A).

[14]   8 C.F.R. § 212.5(b).

---

**213.436.871.G28.pdf**
304K



Brianna Rennix <brianna@caraprobono.org>

---

## URGENT: Request for Medical Release with NTA | 871

**Brianna Rennix** <brianna@caraprobono.org>                    Tue, Mar 31, 2020 at 7:15 PM
To: Allison Herre <allison@caraprobono.org>
Cc: STFRC-CARA-Requests <STFRC-CARA-Requests@ice.dhs.gov>, "Hunt, Richard M"
<Richard.M.Hunt@ice.dhs.gov>, otg <otg@caraprobono.org>, Extended OTG <extendedotg@caraprobono.org>

Good evening,

Following up on our correspondence yesterday, we understand that Ms. L█████ P██████ experienced a dramatic heart rate increase yesterday and began to lose consciousness, after which she was taken to an off-site hospital for treatment. She has since been returned to STFRC, where she remains under medical supervision to monitor her heart rate and blood pressure. The CDC confirms that individuals with heart conditions may be at risk for severe illness if they come into contact with coronavirus. See "Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19),* People Who Are At Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

We reiterate our concern that Ms. L█████ P██████' pre-existing medical conditions place her at high risk if she contracts COVID-19 while detained in a congregate facility, and request that she be released immediately.

Thank you,
Brianna Rennix
[Quoted text hidden]