# EXHIBIT HHH

## SUPPLEMENTAL DECLARATION OF ANDREA MEZA

I, Andrea Meza, swearing under penalties of perjury, make the following declaration:

1. I previously submitted a declaration to the Court in this matter. I now submit this supplemental sworn declaration. The facts set forth below are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. My name is Andrea Meza and I am an attorney and the Director of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). I have been the program Director since March 2019. Prior to my position as Director I served as the Associate Director from October 2018-March 2019. From September 2015 to July 2017 I was an Equal Justice Work Fellow and provided direct legal services to families at Karnes. I have been licensed in the state of Texas since November 6, 2015.

3. I have read the Defendants' Second Supplemental Opposition, ECF 772, as well as the Declaration of Michael Sheridan dated April 17, 2020, ECF 772-1.

**Access to Counsel**

4. Although RAICES has implemented remote visitation since March 23, 2020, our staff have continued visitation via telephone and iPad, when available. Since our implementation of remote visitation practices, I have spoken to detained families over the phone. I am also in daily contemporaneous contact with our staff who communicate with me as they are on the phone or iPad with families detained at Karnes. I often direct lines of questioning to multiple staff in real time as they relay our clients' responses to me. Therefore, I communicate daily over a period of time of at least ten hours with detained families at Karnes through the attorneys and legal assistants who I supervise.

5. Barriers to access to counsel continue as ICE attempts to comply with the CDC guidelines for COVID-19 in congregate settings. Though the posted hours for legal visitation are 8:00 a.m. to 8:00 p.m., it has not been RAICES experience that these are the actual visitation hours. In recent weeks our staff has called Karnes at approximately 8:20

a.m. or 8:30 a.m. daily to request that our clients be called into visitation for requested 9:00 a.m. meetings. Often, our staff is informed that GEO staff assigned to legal visitation have not yet arrived for their scheduled shift, though visitation is meant to begin at 8:00 a.m. Though visitation is scheduled to end at 8:00 p.m., GEO staff frequently and arbitrarily insist that clients must leave visitation around 7:45 or 7:50 p.m. so that 1) they may be counted in the census and/or 2) GEO staff can avoid repercussions for clocking out of their shift late.

6. In addition, ICE's continued detention of families in the midst of the COVID-19 pandemic has created new barriers to access to counsel for families at Karnes. Specifically, I am aware that families who arrive at Karnes may be held in quarantine for 14 days. On at least two occasions we attempted to meet with families referred to us, but because they had been in quarantine, we were not able to meet with them before their deportations. Over the five years of our work at Karnes, our clients often refer their newly arrived roommates or friends at Karnes to RAICES for legal services. Prior to the COVID-19 pandemic, we were also able to meet with groups of up to twenty of our clients at once for group presentations about general information. These group sessions built cohesive trust between the families detained at Karnes and RAICES. Because recent arrivals to Karnes are in isolation, these networks of referrals have been broken and families are not aware that there are free legal services available at Karnes. There is no way for RAICES to ascertain how many families may be deported from Karnes without ever speaking to an attorney because of changes at Karnes due to COVID-19.

7. Furthermore, I am aware of at least two families from India at Karnes. Our clients report that there are multiple clients from India at Karnes. If these families recently arrived at Karnes and are in quarantine, they face additional language barriers to access counsel and legal information. ICE has only begun to provide some information in Haitian Creole after I asked Assistant Field Office Director Anthony Hofbauer ("AFOD Hofbauer") whether he could provide general information in Haitian Creole. I am not aware of any information provided by ICE or GEO to families at Karnes in languages other than English, Spanish, and now in limited cases, Haitian Creole.

**Efforts to Comply with CDC Guidelines**

8. On Monday April 13, 2020, I emailed AFOD Hofbauer to ask whether ICE would accept donations of face masks for families. AFOD Hofbauer replied on April 20, 2020 that "the entire facility" had been provided with training and face masks which were optional to wear. There is no requirement to wear face masks despite the fact that on Thursday April 16, 2020 San Antonio Mayor Ron Nirenberg signed an ordinance to require all San Antonio residents older than 10 to wear a face covering in public.

9. On Monday April 20, 2020 and Tuesday April 21, 2020 RAICES staff conducted a survey of seventeen families at Karnes regarding current implementation of the CDC guidelines for COVID-19 in congregate settings, particularly as described in Defendant's Exhibit 9, Declaration of Michael Sheridan, and this Court's order. The survey responses indicate the following:

   a. Fifteen out of seventeen survey participants report that they were not quarantined for 14 days upon arrival at Karnes.

   b. Six out of seventeen survey participants report having been denied medical care at Karnes.

   c. Participants were asked whether they or their family members suffered from ongoing or chronic illnesses, including conditions that placed them at higher risk for COVID-19. Two participants reported that they suffer from high blood pressure, one participant reported a stomach ulcer, and one participant identified that they suffered from psychological trauma. One participant reported that his son has a heart condition, two participants reported that a family member has asthma, and five participants reported that a family member at Karnes suffers from high blood pressure.

   d. Survey participants were asked whether they, their family members, GEO or ICE, or other detained persons had experienced cough, fever, or shortness of breath. One participant reported a cough, five reported family members with cough, two reported roommates with cough, six reported other detained persons with cough,

and three reported having seen GEO or ICE personnel with cough. Four participants reported having observed other detained persons with a fever. Three participants reported having seen other detained persons suffer from shortness of breath, and one participant indicated that they had observed GEO or ICE personnel with shortness of breath. Participants who reported that they and their family members had suffered from cough, fever, or shortness of breath were asked whether they had been treated. Three participants reported that they or their family members had not received adequate treatment for these symptoms at Karnes.

e. Twelve out of seventeen survey participants report that they have not been offered a flu vaccine.

f. While fourteen out of seventeen survey participants reported receipt of a face mask, eight participants stated that their children were not provided with a mask and ten reported that they were given no instruction about how to use their mask. Only one survey participant indicated that they had the means to clean their mask.

g. Sixteen out of seventeen survey participants report that, contrary to the ICE-ERO COVID-19 Pandemic Response Requirements issued April 10, 2020, there are no free tissues available at Karnes.

h. Six out of seventeen survey participants report that no one from ICE or GEO has instructed them not to touch their eyes, nose, or mouth without first washing their hands.

i. Survey participants were asked whether there is hand sanitizer available for use in the medical area, intake, visitation, law library, recreation yard, food service area, and gym. The responses are as follows:

  i. Medical: 5 report that there are hand sanitizing stations, 3 report that there are not, 2 report that there are hand sanitizing stations but that they are not able to use them, and 7 are unaware of the availability of hand sanitizer at medical.

ii. Intake: 1 reported that there are hand sanitizing stations, 3 report that there are not, 2 report that there are hand sanitizing stations but that they are not able to use them, and 11 are unaware of the availability of hand sanitizer at intake.

iii. Visitation: 4 report that there are hand sanitizing stations, 7 report that there are not, 2 report that there are hand sanitizing stations but that they are not able to use them, and 5 are unaware of the availability of hand sanitizer at visitation.

iv. Law library: 1 reported that there are hand sanitizing stations, 7 report that there are not, 1 report that there are hand sanitizing stations but that they are not able to use them, and 8 are unaware of the availability of hand sanitizer at the law library.

v. Recreation Yard: 2 report that there are hand sanitizing stations, 9 report that there are not, and 6 are unaware of the availability of hand sanitizer at the recreation yard.

vi. Food service: 1 reported that there are hand sanitizing stations, 7 report that there are not, and 9 are unaware of the availability of hand sanitizer at the food service area.

vii. Gym: 1 report that there are hand sanitizing stations, 4 report that there are not, and 12 are unaware of the availability of hand sanitizer at the gym.

viii. The fact that so many participants are not aware of the availability of hand sanitizer at Karnes calls into question not only the actual presence of such hand sanitizing stations, but also the efforts to educate detained families about safety during a pandemic and whether heightened hygiene practices are actually promoted at Karnes.

j. Six out of seventeen survey participants reported that a GEO or ICE officer has been within six feet of them. Reported examples of the failure to abide by social

      distancing guidelines occur when GEO or ICE staff interact with detained persons in the recreation yard, when they enter detained families' sleeping quarters to check their identification cards, when they are served food items, and when detained persons report to work or receive documentation of pay.

k. Seven out of seventeen survey participants report having been in a space with more than nine other detained persons. Reported examples of the failure to abide by social distancing guidelines include when families are on the patio together, in the laundry areas, especially when lines are formed, when waiting outside of visitation. One survey participant stated "pretty much all the time you are around 20-25 people." Another survey participant reported that she sees 15-20 people in the laundry room. Another participant reported that "everyone" is outside at recreation time at the same time.

l. Six out of seventeen survey respondents reported that they had to leave their rooms to pick up their meals. Survey responses indicate that attempted efforts at social distancing include only allowing approximately ten people to pick up their meals at a time, but that during meal time, many groups of ten pass through the same food service area. One participant indicated that "everyone is present at the same time, it is about 100 people or more. We get our trays and return to our rooms to eat."

m. Nine out of seventeen survey participants indicate that there has been no extension in the hours for recreation time, library availability, or meal time.

n. No more than three out of seventeen survey participants reported having seen high touch surfaces, including tables, door knobs, light switches, counter tops, door handles, desks, phones, vents, keyboards, toilets, sinks, or showers cleaned hourly. Instead, the majority of participants reported that these high touch areas are only cleaned twice a day and that detained families are responsible for cleaning.

o. Only two survey participants indicated that they had heard and understood announcements given twice a day as of April 9 regarding coronavirus. Other participants reported that they had heard announcements but could not understand them because of poor audio quality, that they had heard announcements but could not understand them because announcements were only provided in English and Spanish, and other participants reported that announcements were only made for a week and have not been made since.

p. Three survey participants stated that they have seen signs with information about coronavirus, but that the signs are not in their native language.

q. Fifteen participants responded to a question regarding the availability of news about coronavirus on the internet. Six participants indicated that when they have gone to the library, there is either no or limited internet access; one participant of this group indicated that GEO told them that there is no internet. Four participants indicated that they do not know how to find news on the internet. Two indicated that they cannot go to the library, and four participants reported that they did not know that they could go to the library to find information about coronavirus. Only one participant reported that they can go to the library and know how to do online research about coronavirus.

r. In Defendants' Exhibit 9, Michael Sheridan indicated that no more than two families currently share a room. However, nine out of seventeen survey participants reported that more than two total family units are detained in their room. Three participants reported that they share a room with four other family units, one participant reported sharing with five other family units, and two participants indicated that they share a room with six other family units.

s. Eleven out of seventeen survey participants indicated that no one has instructed them to sleep "head to toe and toe to head."

t. Only six out of seventeen survey participants reported that their children were given an educational packet in a language they understand. Two survey

> participants indicated that their children were given an educational packet, but in a language that they do not understand.
>
> u. Nine families were asked whether ICE had told them why their child was in detention and whether ICE had asked for their sponsor's information. All families asked reported that ICE had not told them why their children were in detention and that ICE had not asked for their sponsor's information.

10. Other complaints captured in the survey included three participants who specifically complained of lack of medical care for their children, concerns about the potential spread of coronavirus at Karnes, complaints about poor quality and quantity of food provided, including three instances of hair in food, and that on Saturday April 18, 2020, there was not water available with meals.

11. These survey responses highlight language barriers for families at Karnes to access information about health and safety during the COVID-19 pandemic. It has now been over a month since ICE has attempted to implement safety protocols for families at Karnes. Efforts to abide by the CDC guidelines in the last several weeks indicate that ICE continues to fail to implement policies inclusive of non-Spanish speakers; that ICE and GEO have failed to adequately educate families about safety in a pandemic, and in fact have limited access to information about the pandemic by cutting news service in bedrooms; and that the requirement of the Flores Settlement Agreement and the Family Residential Standards that families be detained in a non-secure setting cannot be reconciled with social distancing restrictions called for in the CDC guidelines.

**Efforts to Release Minors and Their Parents**

12. Among many data points regarding information such as length of time in detention, procedural posture of cases, and demographics of families, our team regularly records data regarding the number of client families reported released from Karnes by GEO. Our records indicate that the total releases per week have actually decreased since this Court's March 28th order. Specifically, the data collected about releases as of April 21, 2020 shows:

    a. Thirty-one RAICES client families released the week of March 16, 2020.

    b. Thirty RAICES client families released the week of March 23, 2020.

    c. Thirty-one RAICES client families released the week of March 30, 2020.

    d. Twenty-four RAICES client families released the week of April 6, 2020.

    e. Twelve RAICES client families released the week of April 13, 2020.

13. The majority of the families at Karnes are in the process of pursuing their claims for asylum. Specifically, thirty one out of eighty three individuals about whom RAICES has data as of April 20, 2020 are in the process of having their credible or reasonable fear cases adjudicated before USCIS or EOIR.

14. Many families at Karnes remain in ICE custody for weeks even after they have final decisions regarding their credible or reasonable fear claims. As of April 20, 2020, four families received positive fear determinations from an immigration judge who reviewed USCIS' decision in their credible or reasonable fear interviews. These determinations were made on April 9th, 10th, and 14th, 2020. All four families remain in detention at least a week after their positive fear determinations. All have sponsors in the U.S. willing and able to receive them.

15. Additionally, many families wait weeks for deportation. Specifically, as of April 20, 2020, out of eighty three individuals, twenty-three are waiting to be deported. At least three families had requests for reconsideration submitted to USCIS denied in March 2020. One family's request for reconsideration was denied on March 10th; they have been waiting for deportation for forty-three days.

16. One family moved to reopen their immigration proceedings before EOIR, and their motion was granted. ICE refused to release the family. An immigration judge set bond for the father and son on April 16, 2020, after 57 days in detention. At least two other families have pending motions to reopen their removal proceedings, which can involve a lengthy process of appeal.

17. All families that RAICES is aware of at Karnes have sponsors in the United States who will receive them if released. I am not aware of any adults detained at Karnes with criminal history.

18. RAICES experience has shown that ICE has no mechanism in place to comply with Paragraphs 14 and 18 of the Flores Settlement Agreement. I have no reason to believe that ICE will establish such a procedure, particularly given the fact that releases from Karnes have decreased since this Court's March 28th order. My experience in the years I have provided legal services to families at Karnes indicates that ICE has not ever, and has no incentive to, comply with Paragraphs 14 and 18 of the Settlement Agreement for accompanied Flores class members. Furthermore, the only way to ensure that Flores class members at Karnes are promptly released is to release them with their detained parents to their sponsors. In my experience ICE can arrange release of a family in as little as one day, and often works with sponsors to arrange release of a family within 2-3 days. Furthermore, ICE has released class members with their parents in the past regardless of whether families are in expedited removal. For example, dozens of families have been released to complete a credible or reasonable fear interview outside of detention because of interpretation issues. Similarly, many families have been released while a parent has an expedited removal order. Even more families have been released before a negative credible or reasonable fear determination has been reviewed before an immigration judge. ICE has exercised its discretion in hundreds of cases to release entire family units regardless of their procedural posture, and before the conclusion of expedited removal proceedings. There is no reason for ICE not to do the same given the global COVID-19 pandemic.

19. A temporary order that ICE must release family units given the danger posed by COVID-19 in congregate settings is the only way to ensure class members' right to safe and sanitary detention conditions, to avoid a public health crisis for local communities whose healthcare infrastructures will be overwhelmed by an outbreak of COVID-19 at Karnes, and to ensure that no child becomes ill or dies from COVID-19 at Karnes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 21, 2020

San Antonio, Texas

_____

Andrea Meza