# EXHIBIT PPP

1  Timothy P. Fox (CA Bar 157750)
   *tfox@creeclaw.org*
2  Elizabeth Jordan*
   *ejordan@creeclaw.org*
3  CIVIL RIGHTS EDUCATION AND
   ENFORCEMENT CENTER
4  1245 E. Colfax Avenue, Suite 400
5  Denver, CO 80218
   Tel: (303) 757-7901
6  Fax: (303) 872-9072

7  Lisa Graybill*
   *lisa.graybill@splcenter.org*           Stuart Seaborn (CA Bar 198590)
8  Jared Davidson*                          *sseaborn@dralegal.org*
   *jared.davidson@splcenter.org*           Melissa Riess (CA Bar 295959)
9  SOUTHERN POVERTY LAW                    *mriess@dralegal.org*
   CENTER                                  DISABILITY RIGHTS ADVOCATES
10 201 St. Charles Avenue, Suite 2000      2001 Center Street, 4th Floor
11 New Orleans, Louisiana 70170            Berkeley, California 94704
   Tel: (504) 486-8982                     Tel: (510) 665-8644
12 Fax: (504) 486-8947                     Fax: (510) 665-8511

13
14
15 Attorneys for Plaintiffs (continued on next page)

16          **UNITED STATES DISTRICT COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
17          **EASTERN DIVISION – RIVERSIDE**

18 | | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, | Case No.: 19-cv-01546-JGB(SHKx) |
| Plaintiffs, | **Supplemental Declaration of Homer Venters in Support of Plaintiffs' Reply Brief in Support of Emergency Motion for Preliminary Injunction** |
| v. | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | |
| Defendants. | Date: April 13, 2020<br>Time: 9:00 a.m.<br>Hon. Jesus G. Bernal |

William F. Alderman (CA Bar 47381)
walderman@orrick.com
Jake Routhier (CA Bar 324452)
jrouthier@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
mjohnson1@willkie.com
Dania Bardavid**
dbardavid@willkie.com
Jessica Blanton**
jblanton@willkie.com
Joseph Bretschneider**
jbretschneider@willkie.com
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
maia.fleischman@splcenter.org
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel: (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
cbrandt-young@dralegal.org
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
mmermelstein@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
lcoutoumanos@willkie.com
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
shalini.agarwal@splcenter.org
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
pgonzalez@creeclaw.org
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

I, Homer Venters, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**Factual Developments Regarding COVID-19 Since My Prior Declaration**

1. In the past two weeks, COVID-19 has entered into correctional facilities, including numerous ICE detention centers, as predicted. ICE reports that, as of April 7, there have been 19 detained people in 11 facilities, 11 ICE employees in 6 facilities, and 60 ICE employees not assigned to a facility who have all tested positive for COVID-19.[1] This is likely just the tip of the iceberg in terms of the number of ICE staff and detainees who are already infected but are unaware due to the lack of testing nationwide, and the fact that people who are infected can be asymptomatic for several days.

2. New information about the transmissibility of COVID-19 has also been revealed that is relevant to the health of ICE detainees and staff.

   a. COVID-19 appears to be transmissible through aerosolized fecal contact. This is relevant because the plume of aerosolized fecal material that occurs when a toilet is flushed is not addressable by closing the lid of ICE detainee toilets, which lack a lid. This mode of transmission would pose a threat to anyone sharing a cell with a person who has COVID-19 and could occur before a person becomes symptomatic. This mode of transmission could also extend beyond cellmates, especially in circumstances where common bathrooms exist or where open communication between cells exists.[2]

   b. CDC and state guidelines now recommend the use of protective masks for anyone who is in close contact with others, at less than 6 feet

---

[1] *ICE Guidance on COVID-19*, IMMIGRATION & CUSTOMS ENFORCEMENT (Updated Apr. 3, 2020), https://www.ice.gov/coronavirus.
[2] https://www.medpagetoday.com/infectiousdisease/covid19/85315

1

Case 2:85-cv-04544-DMG-AGR   Document 774-70   Filed 04/02/20   Page 5 of 18   Page ID
#:37282
Case 3:19-cv-01546-JGB-SHK   Document 113-7   Filed 04/09/20   Page 5 of 17   Page ID
#:1882

distance.[3] This recommendation would apply to staff and detainees alike.

c. The rate of COVID-19 infection spread in correctional settings is extremely rapid. The data from the NYC jail system reveal that in the space of two weeks, the facility went from zero confirmed infections, to 2, then 38, then 574.[4]



This rapid rate of increase in COVID-19 infections in detention settings has overwhelmed local hospitals and required the deployment of National Guard troops in several states to supplement the lack of staffing and resources.[5] This rapid spread has also resulted in up to half of all detained people and housing areas in a given facility being placed into quarantine as each new case emerges and the close

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html

[4] *Board of Correction Daily Covid-19 Update*, NEW YORK BD. OF CORR. (updated Apr. 3, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Public_Reports/Board%20of%20Correction%20Daily%20Public%20Report_4_3_2020_TO%20PUBLISH.pdf.

[5] https://www.cantonrep.com/news/20200406/coronavirus-dewine-sending-national-guard-to-elkton-federal-prison-east-of-canton-after-3-deaths And https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-19-overwhelm-joliet-hospital/6064085/

2

contacts for each case enter into quarantine for 14 days. For facilities operating at over 75 percent of capacity, this process will be essentially impossible as newly identified cases require initiating quarantine areas for a prescribed 14-day period and housing areas are not available for these date-based cohorts. The consequence will be either a) mixing of different quarantine cohorts, which will not only extend the effective quarantine period past 14 days but also increase the spread of potentially infected people from different areas of the facility, or b) failure to establish quarantine cohorts all together, meaning that close contacts of cases will remain mixed with other detainees, also increasing the spread of COVID-19 throughout the facility.

**ICE Guidelines Contradict or Omit Several Important CDC Guidelines**

3. I have reviewed ICE's March 6 and March 27, 2020 documents addressing COVID-19, as well as declarations by ICE Captain Moon and IHSC Physician Rivera and the webpage that ICE has established concerning COVID-19. I have also reviewed the April 4, 2020 guidance from ICE Enforcement and Removal Operations. Collectively, these policies continue to be deficient and at odds with recommendations of the CDC regarding detention settings in a manner that threatens the health and survival of ICE detainees.

    a. ICE protocols and guidance fail to address the key recommendation of the CDC on the need for adequate intake screening of detainees. CDC guidance makes clear that everyone arriving in a detention facility should be screened for signs and symptom of COVID-19, but ICE protocols rely on questions about travel or other known contacts as a precursor to temperature checks and other sign and symptom checks. ICE protocols and guidance also fail to clearly mandate that all

symptomatic patients be immediately given a mask and placed in medical isolation, and that all staff who have further contact with that patient wear personal protective equipment, as set forth in the CDC guidelines. The ICE protocol also fails to address the now-standard CDC advice that everyone who cannot engage in social distancing wear a face covering.[6]

b. ICE protocols and guidance fail to address the key recommendation of the CDC on the need for monitoring and care of symptomatic patients.

　　i. The CDC guidelines make clear that patients who exhibit symptoms of COVID-19 should be immediately placed in medical isolation. ICE guidelines and protocols only invoke this response for newly arrived detainees who also answered yes on screening questions. This approach results in a failure to actively screen the large majority of detainees: people who are already detained.

　　ii. CDC guidelines clearly indicate the need for twice-daily monitoring of patients who are symptomatic or in quarantine, and ICE only mandates a daily check.

　　iii. ICE makes no mention of access to masks for patients in quarantine settings.

　　iv. ICE fails to present a plan for how isolation will be conducted when the number of people exceeds the number of existing isolation rooms or cells. This is almost certain to occur in the coming weeks at multiple facilities.

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html

4

Case 2:85-cv-04544-DMG-AGR Document 774-70 Filed 04/02/20 Page 8 of 18 Page ID
Case 5:19-cv-01546-JGB-SHK Document 113-2 Filed 04/09/20 Page 7 of 17 Page ID
#:37285
#:1885

    c.  ICE protocols and guidance fail to address the key recommendation of the CDC on the need for social distancing. ICE's March 27 memo mentions social distancing briefly, but fails to address how ICE facilities will enact modified meal or recreation times and also fails to address the most common scenarios in which high risk detainees find themselves in close quarters, including shared cells, medication lines, bathroom facilities, common walkways and day rooms, sally ports and transportation. This critical issue is also ignored in the declarations of Captain Moon. Again, because there is no cure for COVID-19, social distancing remains the most effective means of prevention, and ICE has failed to meaningfully implement this precaution into its guidance.

    d.  ICE protocols and guidance fail to address the key recommendation of the CDC on the need to limit transportation of detainees as a means to limit the spread of COVID-19. CDC guidelines state that transfers should be limited to those that are absolutely necessary and that receiving facilities must have capacity to isolate symptomatic patients upon arrival. ICE protocols and guidance fails to address these issues. CDC guidelines make clear the need for a clear plan for all aspects of transport of suspected COVID-19 infected people, and ICE does not have or report such a plan. This critical issue is also ignored in the declarations of Captain Moon.

    e.  ICE protocols and guidance fail to address the key recommendation of the CDC on the need for environmental cleaning of both housing areas and other common spaces within facilities. CDC guidelines provide clear details about the types of cleaning agents and cleaning processes that should be employed, while ICE provide no guidance to facilities on this critical issue. The declarations of Captain Moon that

5

Case 2:85-cv-04544-DMG-AGR   Document 774-70   Filed 04/02/20   Page 9 of 18   Page ID
#:37286
Case 3:19-cv-01546-JGB-SHK   Document 113-7   Filed 04/09/20   Page 8 of 17   Page ID
#:1886

state generally that ICE is providing adequate environmental cleaning stand in stark contrast to the declarations of detainees to the contrary, cited in my previous report. The reliance on detainees for conducting critical environmental cleaning, without proper training, protection or supervision, represents a gross deviation from correctional practices, and will likely contribute to the spread of COVID-19 throughout the ICE detention system.

f. ICE protocols and guidance fail to address the key recommendation of the CDC on the need for adequate staffing and training of staff. ICE's March 27 memo simply states that "facilities are expected to be appropriately staffed," but provides no guidance whatsoever on how that can be accomplished in the context of existing staffing gaps, a decreased workforce, and increased needs resulting from steps required to screen, monitor and treat detainees for COVID-19. CDC guidelines make clear the need for a concrete plan for ensuring adequate staffing as part of the COVID-19 response. These guidelines also make clear the need to orient staff to the critical need to stay home if and when they experience symptoms of COVID-19 infection. In sum, aside from its March 27 "expectation" of appropriate staffing levels, ICE has not implemented any meaningful oversight system to ensure that staffing levels are appropriate. Critically, appropriate staffing levels refers not only to a sufficient number of staff but also to a sufficient number of qualified staff. In my experience, many facilities rely heavily on guards and LPNs to do medical work that they are not qualified to do; likewise, many facilities rely on RNs to do medical work that only doctors or physician-assistants are qualified to do. There is no indication whatsoever that ICE is implementing

    procedures to ensure not only sufficient numbers of staff but also sufficient numbers of qualified staff. The declaration of Dr. Rivera confirms that ICE is relying on an emergency staffing plan from 2014, updated in 2017, but the current shortages in staffing for health staff in particular, stretch across all communities, and staffing shortages represent a real emergency in many settings already. This is particularly concerning given that many ICE facilities are located in rural areas far from qualified medical professionals. This is a very serious defect that must be immediately remediated because access to qualified medical professionals is crucial during this rapidly evolving pandemic.

g. Several CDC guidelines address people with factors that put them at an increased risk of significant injury or death, but the ICE protocols do not even identify what precautions should be taken to protect people with those risk factors in ICE custody. In addition, the Apr. 4 list of risk factors for serious illness and death from COVID-19 infection developed by ICE is inconsistent with CDC guidelines and fails to adequately advise facilities on which detainees are at elevated risk. This list is included in a memo to Field Office Directors regarding Docket Review, and fails to include very basic risk factors identified by the CDC, including body mass index over 40 and being a current or former smoker.[7] By apparently assigning this process to field directors and their staff, who are not medical professionals, advising security staff to check with medical professionals after the fact, and failing to include CDC-identified risk factors, this docket

---

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html And https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

Case 2:85-cv-04544-DMG-AGR   Document 774-70   Filed 04/03/20   Page 11 of 18   Page ID
#:37288
Case 5:19-cv-01546-JGB-SHK   Document 113-20   Filed 04/09/20   Page 10 of 17   Page ID
#:1886

review process will likely leave many people with true risk factors in detention. This is particularly the case if they're detained under certain immigration law provisions, where the guidance recommends officers not release them despite risks. Thus, the guidance appears to be just that – guidance, and the risk factors are not determinative. In fact, the guidance appears to not make these risk factors determinative for release—even for people who are not subject to mandatory detention. ICE also identifies people under that age of 60 in this cohort but the age of 55 is appropriate. Because detained people have consistently been identified as having higher levels of health problems that reflect 10-15 years more progressed than chronological age, numerous organizations and research studies have used the age of 55 to define the lower limit of older detainees.[8] ICE also limits the high risk period for women to 2 weeks after child birth, yet one of the most serious increased risk during pregnancy is hypercoagulable state, which increases the risk of blood clots in the large veins of the lower extremities, and sometimes in the lung which can prove fatal. This risk extends to 6 weeks post-partum and also occurs independently with COVID-19 infection.[9] Accordingly, ICE should include these definitions in its list of risk factors. ICE should also put in place a mechanism to ensure that risk factors reflect the evolving science and data concerning COVID-19, since it is likely that additional risk factors will emerge as more data is collected. The declaration of Dr.

---

[8] https://nicic.gov/aging-prison and https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/
[9] https://www.acog.org/patient-resources/faqs/womens-health/preventing-deep-vein-thrombosis And https://www.medpagetoday.com/infectiousdisease/covid19/85865.

Rivera not only fails to identify what risk factors are being considered by ICE medical staff, but also fails to mention any plan to determine which currently detained people have these risk factors, and what special protections, if any, will be created for this high-risk cohort.

**ICE's Inadequate Response to COVID-19 in Areas Where There is no Direct CDC Guidance**

4. Numerous and significant failures of the ICE response to COVID-19 also exist in areas in which the CDC does not provide direct guidance, but that detention facilities must implement. These failures threaten the health and survival of ICE detainees.

    a. Neither the ICE COVID-19 protocols nor the declarations set forth any policies or protocols addressing release of medically vulnerable detained people in light of the significant risks to those people posed by COVID-19. This must be done immediately and is in contrast to the efforts made in many prison and jail systems across the country. The Apr. 4 promulgation of an incomplete list of risk factors in a memo relating to discretion for release occurs in a complete vacuum of guidance on special protection and clinical management of people with those risk factors while in detention. This Memo describes an overly discretionary decisionmaking process for release that does not sufficiently favor depopulation as public health requires and that has no urgency to it. Reviews and releases must be undertaken immediately.

    b. ICE does not have any mechanisms to monitor or promote the health of all people in its charge. This failure is documented in many reports about ICE's inadequate healthcare system, but now poses a grave risk to their survival as ICE struggles to mount a competent response to

9

COVID-19 across more than 150 facilities, on behalf of roughly 40,000 detainees and almost as many direct and contract staff. The declaration of Dr. Rivera reflects that no incident command system is in place to manage this response, and reporting and communication among direct and contract health and security leadership of the ICE detention system occurs in a fragmented, one-way, or as-needed basis.

    i. ICE's March 27 memo takes the dangerous approach of limiting clinical guidelines for COVID-19 response to the detainees being provided direct care by ICE health services corps (IHSC) staff, which represents approximately 13,000 detainees.[10] As a result, detention centers operated by public and private contractors are not provided with this guidance. This approach to management of the COVID-19 outbreak ensures that vital information will remain in these facilities, instead of being acted upon by ICE. As a result, ICE will not know when its own policies or even basic standard of infection control are being followed. ICE's failure to properly monitor and oversee medical care at its detention centers has been a chronic concern in the health services provided to ICE detainees prior to this outbreak and has been cited as a core failure of ICE in its obligations to establish quality assurance throughout its detention network.[11] There is no indication that ICE can adequately monitor the response across its system to COVID-19. Absent robust and centralized oversight, ICE will

---

[10] https://www.ice.gov/ice-health-service-corps and
[11] https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf
And https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf

10

    not be able to provide a coordinated response informed by on-the-ground data from detention centers. This is in stark contrast to many prison systems across the country that are coordinating their efforts, including with health departments.

  ii. ICE has no plan or even capacity to provide daily clinical guidance to all of the clinical staff it relies on to care for ICE detainees, whether at ICE-operated facilities or contract facilities. This is a core failure because of the new nature of COVID-19 and constantly changing clinical guidance on how to treat patients. Daily briefings with health administrators and medical and nursing leadership should be held, which are both a core aspect of outbreak management and provide a critical avenue for receiving feedback on real-time conditions inside facilities. ICE has not articulated any plan to ensure that this type of basic communication is in place across its network of detention settings. This guidance should also include uniform recommendations on when and how to transport patients to the hospital. Failure to implement this kind of procedure—particularly in light of the other defects described herein—poses a significant risk to the health and lives ICE detainees.

  iii. ICE has failed to establish the type of COVID-19 surveillance that is required to manage their COVID-19 response. Because ICE is responsible for approximately 40,000 lives inside over 150 facilities, with a wide variety of contract and administration types, ICE leadership, namely the IHSC, must establish a competent surveillance system for COVID-19 that includes, at a minimum, a dashboard reflecting critical and real-time

11

information for clinical cases and facility resources. A dashboard is a collection of real time data used to manage healthcare and other operations, and COVID-19 dashboards are now used by every state and the federal government to manage their day to day resource and clinical responses to this pandemic.[12] My experience during H1N1 when my team and I needed to create an outbreak dashboard for 13 jails holding 15,000 patients was that we were able to design and implement this approach in a 3-4 week timeline, but that we established data streams from hotspots and most impacted facilities within a week. This approach for ICE would include, but not be limited to the following variables and would be utilized by IHSC leadership to track each individual facility and then roll up to State, regional and national dashboards;

| Clinical Surveillance (number of detainees) | | | | | |
|---|---|---|---|---|---|
| Number of symptomatic (w and w/o CDC risk factors) | Number awaiting/received tests (w and w/o CDC risk factors) | Number positive tests (w and w/o CDC risk factors) | Number of detainees in quarantine (w and w/o CDC risk factors) quarantine*[13] | Number of patients awaiting/in/returned from hospital for COVID-19 (w and w/o CDC risk factors) | Number of patients awaiting/in/returned from hospital for COVID-19(w and w/o CDC risk factors) |
| Resource allocation | | | | | |
| Deficit in security FTE | Deficit in nursing/mid-level/MD FTE | PPE deficits by masks/gowns/gloves etc. | Cleaning, soap, hand sanitizer | Sinks and other plumbing not operational | Restrictions in local hospital beds[14] |

---

[12] Example of FL State COVID-19 dashboard https://experience.arcgis.com/experience/96dd742462124fa0b38ddedb9b25e429.

[13] An additional data mandate for every facility is to create a histograms that shows the number of people in quarantine for each of the 14 days, so that the facility, State, regional and national data can show the trends in quarantine and new cases.

[14] Many correctional facilities are already experiencing restrictions from local hospitals. Some local hospitals have informed detention centers that they will only accept COVID-19 patients, while others have restricted all access.

12

| | | | supply deficits | | |
|---|---|---|---|---|---|

This centralized surveillance is absolutely necessary in COVID-response. On the clinical side, some local hospitals have already closed their doors to incarcerated patients and the lack of access of ICE patients to hospital-level care (such as intensive care beds and respiratory rehabilitation) should be a core concern for ICE--not one that can be resolved by local facilities alone. On the resource side, the staffing requirements are extremely acute in detention settings and the deployment of the Ohio National Guard in a prison in Ohio should trigger immediate high-level review of staffing, PPE and other resources issues across the ICE network. ICE's surveillance system must also account for the availability of hospital beds and intensive care unit beds (as well as other hospital-level equipment, such as ventilators, that are lacking in facilities but crucial for COVID-19 treatment). Currently ICE appears not to provide this kind of crucial surveillance and coordination. In addition, many patients will require nursing home placement in subacute care settings, a resource traditionally inaccessible to most ICE detainees because of their lack of insurance status. Absent tracking of this kind of crucial data, ICE will not be able to ensure that individuals in its custody have access to life-saving medical care. One critical measure in assessing staffing is to measure the staffing *deficit* (unmet need) to perform the work of the facility, not use the baseline staffing matrix. If a facility has 1,000 detainees and regularly employs 150 security staff, 5

13

      physicians and 25 nurses across three shifts, by example, the arrival of COVID-19 in the facility will require significantly more work to be done, with additional security and nursing staff working in quarantine units and medical clinics particularly, and additional security staff needed to enable social distancing, which is a labor intensive process.

   iv. The Apr. 4 ICE memo to Field Directors on identification and release of detained people with risk factors for serious illness and death from COVID-19 infection is both incomplete and revelatory. ICE has omitted multiple important risk factors identified by the CDC in its own list, but has also failed to create any surveillance of the outbreak across facilities that includes the number of patients experiencing symptoms, confirmed COVID-19 infection or hospitalization by presence or absence of CDC risk factors.

5. As ICE determines to release people from detention, they should be afforded symptom screening akin to what is done with staff, but the release of detainees to the community will lower their own risks of infection and will also serve to flatten the overall epidemic curve by decreasing the rate of new infections and the demands on local hospital systems. From a medical and epidemiologic standpoint, people are safer from COVID-19 infection when not detained, and the epidemic curve of COVID-19 on the general community is flattened by having fewer people detained.

6. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge.

Signature:

14

Homer Venters MD, MS

Date: 4/9/2020

Location: Port Washington, NY