1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3             HONORABLE DOLLY M. GEE, JUDGE PRESIDING

4    JENNY L. FLORES,                    )
                                         )
5                                        )
                                         )
6                        Plaintiffs,     )
                                         )
7                                        )
                                         )
8          Vs.                           )   No. CV85-4544-DMG
                                         )
9                                        )
                                         )
10   WILLIAM BARR, ET AL.,               )
                                         )
11                                       )
                                         )
12                       Defendants.     )
                                         )
13   _____     )

14

15

16     REPORTER'S TRANSCRIPT OF VIDEO TELECONFERENCE PROCEEDINGS

17        *ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION*

18                    FRIDAY, APRIL 24, 2020

19

20

21

22

23             MIRIAM V. BAIRD, CSR 11893, CCRA
            OFFICIAL U.S. DISTRICT COURT REPORTER
24          411 WEST FOURTH STREET, SUITE 1-053
              SANTA ANA, CALIFORNIA 92701
25                 MVB11893@aol.com

1                        **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFFS,**      PETER A. SCHEY
     **JENNY L. FLORES:**                   (TELEPHONICALLY)
4                                          CENTER FOR HUMAN RIGHTS AND
                                           CONSTITUTIONAL LAW
5                                          256 SOUTH OCCIDENTAL
                                           BOULEVARD
6                                          LOS ANGELES, CA 90057
                                           - AND -
7                                          LEECIA WELCH
                                           (TELEPHONICALLY)
8                                          NATIONAL CENTER FOR YOUTH
                                           LAW
9                                          1212 BROADWAY, SUITE 600
                                           OAKLAND, CA 94612
10

11

12

13   **IN BEHALF OF THE DEFENDANT,**       SARAH B. FABIAN
     **WILLIAM BARR, ET AL.,:**             (VIDEO APPEARANCE)
14                                         US DEPARTMENT OF JUSTICE
                                           OFFICE OF IMMIGRATION
15                                         LITIGATION
                                           PO BOX 868 BEN FRANKLIN
16                                         STATION
                                           WASHINGTON, DC 20044
17

18

19   **ALSO PRESENT:**
     **SPECIAL MASTER ANDREA ORDIN**
20   **DR. PAUL WISE**
     **CARLOS HOLGUIN**
21   **KATHERINE MANNING**
     **HOLLY COOPER**
22   **NEHA DESAI**
     **DAISY FELT**
23
     **JUVENILE COORDINATORS:**
24   **DEANE DOUGHERTY**
     **AURORA MIRANDA-MAESE**
25

```
 1        LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 24, 2020; 10:00 A.M.

 2                              ---

 3

 4             THE CLERK:  Calling CV85-4555, Jenny L. Flores, et

 5     al., versus William Barr, et al.  This court is now in

 6     session.

 7             On video and telephone, we have Mr. Peter Schey.

 8     Carolos Holguin.  Katherin Manning.  Leecia Welch.  Elise

 9     Etchman.  Holly Cooper.  Neha Desai.  Daisy O. Felt for

10     plaintiffs.

11             For defense, we have Sarah Fabian.  Also in the

12     courtroom, we have Ms. Andrea Ordin, special master.  On the

13     phone, we have Dr. Paul Wise.

14             THE COURT:  Good morning, everyone.  Let me just

15     remind folks who are on the telephone that in the past we

16     have had some audio gaps whenever people come in and leave

17     the phone conference.  So when you hear a beep, that means

18     that the court reporter may not have caught what you said

19     during that beep.  Those of you who are on the phone, if at

20     all possible, please stay on the phone if you plan to listen

21     in on the hearing rather than going in and out of the hearing

22     during the course of it.  And if you are on the phone and you

23     wish to speak, please make sure that you state your name when

24     you speak.  Oh, and reminder that there is no recording of

25     the hearing that should be taking place.
```

1          All right.  After four weeks of litigation, we are

2    now finally here at the hearing on whether or not a

3    preliminary injunction should issue.  Let me just say that

4    having considered this issue, and I certainly understand why

5    the plaintiffs decided to bring an ex parte application for

6    TRO under the circumstances.  These are extraordinary

7    circumstances.  There were issues that needed be addressed as

8    rapidly as possible.  But I want to remind everyone that for

9    23 years now we've had the Flores settlement agreement.  That

10   is a consent decree.  That is also a permanent injunction.

11   So, therefore, it doesn't make sense in that context to have

12   a preliminary injunction, which is interim relief to preserve

13   the status quo pending a trial on the merits.  We are not

14   going to have a trial on the merits.  We already have had a

15   settlement.  We have already an agreement that I'm going to

16   be able to enforce.  So convert the request for preliminary

17   injunction into a motion to enforce.  Will, therefore, apply

18   the preponderance of the evidence standard to evaluating the

19   motion.

20          I don't have a written tentative for you yet,

21   unfortunately, but I will give you my oral tentative.  Then I

22   will give you a chance to respond after that.  I think we've

23   already set out quickly in prior orders the issues that need

24   to be addressed.  Last -- in the past day or so, there have

25   been over 70 declarations that have been filed by the

1    plaintiffs.  I have tried to absorb and digest all of the

2    things that have been submitted in that short time.  I do

3    note that there are some new issues that were raised in those

4    declarations that were not raised in the original

5    application.  So, therefore, I am not going to be addressing

6    those new issues.  I'm going to be focusing on the issues

7    that have been crystalized pursuant to the original

8    application.  If there are any new issues that are not

9    addressed by this Court's ruling, then I will expect the

10    parties will pursue those other issues if they need to,

11    either through juvenile coordinators or through the

12    independent monitor.

13          First of all, I'm going to address some of the

14    issues regarding ORR.  Although there was an initial request

15    that the Court issue orders with regard to ORR failing to

16    make and record continuous efforts toward release, I think

17    that the record is clear that ORR has made and continues to

18    make records of their efforts at release.  I think I made a

19    finding in that regard in my last order.  I find no need to

20    disturb that ruling at this time.  I do want to commend ORR

21    for doing a really good job of recording its efforts, because

22    that has certainly made our lives easier in terms of seeing

23    what it is that you do on a regular basis.  I don't

24    underestimate the effort that it takes to keep those records.

25    So keep up the good work in that regard.

1          I'm going to -- I'm going to next address the

2     issues of unnecessary delay with regard to some ORR policies.

3     First of all, with regard to the ban on releasing class

4     members to or from certain states, I think that was something

5     that occurred early on during the pandemic.  I don't

6     necessarily fault ORR for exercising caution during those

7     initial days.  It appears that ORR has now lifted any blanket

8     ban on releasing minors from facilities in states hardest hit

9     by Covid-19.  So I think that the plaintiffs' requested

10    relief in that regard is now moot.

11          With regard to the ban on releasing class members

12    with exposure to Covid-19 or to sponsor households with

13    confirmed cases of Covid-19, I don't necessarily quarrel with

14    the ORR's April 6th guidance in the abstract that requires a

15    medical professional to examine each case for possible

16    release.  The problem is whether this policy is being

17    implemented in a way that may cause unnecessary delay.  So as

18    a result, I'm going to require further monitoring as to

19    whether or not the implementation of that guidance is in

20    effect causing unnecessary delays and requiring ORR to

21    provide me with further reports regarding the time frame in

22    which it takes for medical evaluation to take place.  That

23    policy I think is a conservative policy, but it may be

24    warranted under the circumstances.  But I want to make sure

25    that the policy is being implemented in a way that still

1    respects the requirement in the Flores agreement for

2    expeditious release when individualized circumstances require

3    it.

4            With regard to the issue of fingerprinting and home

5    studies for certain potential sponsors, I think that

6    plaintiffs have shown that fingerprint checks for Category 2B

7    and 3 sponsors with clear records, have caused necessary

8    delay under certain circumstances.  Because the ORR has

9    indicated its willingness to expedite cases involving

10   fingerprinting where there are available fingerprinting

11   facilities, I'm going to ask for further reports from the

12   juvenile coordinators on that in the future, but I'm also

13   going to order that there be provisional release of class

14   members to Category 2B and 3 sponsors who have otherwise

15   satisfied ORR's criteria contingent upon those sponsors

16   agreeing to submit fingerprints at a later final when

17   fingerprint be is available.

18           With regard to the willingness to use virtual home

19   studies, as I mentioned in my last order, the ORR is using

20   virtual home studies on a case-by-case basis, but that too

21   will be the subject of further reporting in the future just

22   to make sure that that is, in fact, happening and that's not

23   causing a log jam in otherwise appropriate releases.

24           With regard to the migrant protection protocol, I

25   confess I'm not entirely clear on what that protocol has to

```
 1   do with release or not release, but I can say that that
 2   policy just like any other pending proceedings or
 3   participation in class action proceedings or anything like
 4   that, if it results in a prolonged detention where
 5   deportation is not imminent, then it is causing unnecessary
 6   delay.
 7        So I'm going to grant the motion to enforce as to
 8   any policies that require non-release based on MM -- MPP
 9   or -- what is it, MMP?  MPP or other removal proceedings that
10   do not have a specific explanation for why release would
11   either be -- would either cause a flight risk or a danger to
12   the minor or others.  I think that takes care of the issues
13   that were raised with regard to ORR.
14        I'm now going to turn to the issues with regard to
15   ICE.  I think I already hinted as to what I'm going to do
16   with regard to the FRC policy of not releasing minors who are
17   subject to MPP, participation in class litigation, pending IJ
18   hearing decision, or pending USCIS response.  I saw nothing
19   in the record that indicates that ICE has made continuous
20   efforts to make individualized evaluations or assessments of
21   release for minors in their custody.  Therefore, I find that
22   plaintiffs have shown by a preponderance of the evidence that
23   ICE is in breach of its paragraph 14 and 18 duties, as well
24   as this Court's June 27th 2017 order relating to minors
25   remaining in ICE custody for longer than 20 days due to those
```

```
 1    categories.  I note that defendants have stated that the fact
 2    that is there is a final removal order means that you have
 3    made some sort of determination that they are a flight risk,
 4    but I don't think that is a satisfactory explanation --
 5    removal is not imminent.  I think I made that clear
 6    previously in my June 2017 order.
 7              So as a result of these findings, I'm going to
 8    order that ORR and ICE will continue to make every effort to
 9    promptly and safely release class members who have suitable
10    custodians in accordance with paragraphs 14 and 18 of the
11    Flores settlement agreement and the Court's prior orders,
12    including those categorized as MPP, participation in class
13    litigation, pending a hearing decision -- or pending USCIS
14    response, absent a specific finding that they are a flight
15    risk or a danger to themselves or others.
16              For the duration of shelter-in-place orders and
17    fingerprinting location closures due to the pandemic, I'm
18    going to institute provisional release of class members with
19    Category 2B and Category 3 sponsors whose name only
20    background checks yield no red flags and for whom
21    fingerprinting is unavailable, provided that these sponsors
22    agree to submit fingerprints as soon as practicable after the
23    release of the minor and within a reasonable time frame
24    specified by ORR.  ORR may continue to require fingerprints
25    prior to release of a minor during the pandemic if
```

1    fingerprinting is readily available, or if it conducts an

2    individualized assessment and determines that fingerprinting

3    is necessary to address a documented risk of safety to the

4    minor.

5         I'm going to continue to ask that the independent

6    monitor continue and exercise her duties to request such

7    further information regarding defendants' continuous efforts

8    at release as she deems appropriate pursuant to her authority

9    under my order appointing her and in consideration of the

10   concerns that will be outlined in my order in this case, as

11   well as my prior orders regarding minors in prolonged

12   detention due to a final order of removal.  If the monitor

13   believes that sharing that information with plaintiffs'

14   counsel on a case-by-case basis subject to a protective order

15   would assist her in resolving individualized questions of

16   prolonged detention, she may do so in the exercise of her

17   discretion.

18        The next set of requirements will be directed to

19   the juvenile coordinators.  The juvenile coordinators shall

20   continue to perform their duties under paragraphs 28A and

21   28B -- the juvenile coordinators will continue to perform

22   their duties under paragraphs 28A and 28B of the Flores

23   settlement agreement.  Pursuant to the Court's July 27, 2018

24   order, the juvenile coordinators will continue to file their

25   annual compliance reports by July 1st, including an

1    assessment of ICE and ORR compliance with CDC guidelines for

2    detention facilities.  Given the exigencies of the current

3    pandemic, the Court will also order interim written reports

4    to be filed by the 15th of each month starting in May and

5    continuing for each month thereafter for the duration of the

6    pandemic.

7            The additional monitoring and interim reports by

8    Aurora Miranda-Maese, the juvenile coordinator for ORR, shall

9    cover the following topics:  Measures taken to expedite the

10   release of class members to suitable custodians during the

11   Covid-19 health emergency, including the status of

12   fingerprinting and home study policies and practices in

13   compliance with my order and providing census data as to

14   any -- providing census data as to any minors who remain in

15   custody due to lack of fingerprinting or home studies.

16           Second, identify the location of any ORR facility

17   that had had any individual, whether detainee or staff, who

18   has tested positive for Covid-19 and provide a status report

19   and census of those infected at that facility.

20           Three, with respect to minors placed at congregate

21   facilities in which either a detainee or staff has tested

22   positive for Covid-19, the specific reason the minor is

23   located there have not been released or transferred to a

24   non-congregate setting.

25           Fourth, identify any policies and/or practices

1    aimed at identifying and protecting minors who are at

2    heightened risk of serious illness or death should they

3    contract Covid-19.

4           Fifth, explain whether medical professionals at ORR

5    are making expeditious individual assessments about a class

6    member's eligibility for release when the class member has

7    been exposed to Covid-19 or has a sponsor whose household has

8    a confirmed case of Covid-19 and provide the average time in

9    which such individual assessments take place during the

10   reporting period.

11          Six, explain whether ORR is making individualized

12   assessments regarding its ability to release minors subject

13   to removal orders under the MPP, including census data and

14   reasons for non-release.

15          The additional monitoring and interim reports by

16   Deane Dougherty, the juvenile coordinator for ICE, will cover

17   the following topics.  I should mention that in going over

18   the findings with regard to ICE, I neglected to say that I'm

19   granting plaintiffs' motion to enforce as to ICE's uneven

20   compliance with paragraph 12 and Exhibit 1 of the Flores

21   settlement agreement; that is, safe and sanitary conditions

22   such that continued heightened monitoring is warranted.

23          Going back to the reporting that I will require

24   from Ms. Dougherty.  First, measures taken to expedite the

25   release of class members to suitable custodians during the

1    health emergency -- Covid-19 health emergency, including

2    whether ICE is making individualized release determinations

3    and re-determinations for each class member held in the FRCs

4    and making records of the same and providing a census of

5    minors remaining in custody longer than 20 days and the

6    specific reason therefore.

7          Two, the status of ICE's implementation of Covid-19

8    guidances.

9          Three, identify the location of any ICE facility

10   that has had any individual, whether detainee or staff, who

11   has tested positive for Covid-19 and provide a status report

12   and census of those infected at that facility during the

13   reporting period.

14         Four, with respect to minors in ICE facilities in

15   which either a detainee or staff has tested positive for

16   Covid-19, the specific reason the minors located there have

17   not been released or transferred to a non-congregate setting.

18         Five, identify any policies and/or practices aimed

19   at identifying and protecting minors who are at heightened

20   risk of serious illness or death should they contract

21   Covid-19.

22         I'm going to hold a further video status conference

23   on May 22nd at 11:00 o'clock a.m. to discuss compliance with

24   my order.  I'm going to require the parties to continue to

25   meet and confer regarding the quality of the data that

```
 1    defendants provide to class counsel pursuant to paragraph 28A

 2    of the agreement.  The parties will submit a joint status

 3    report regarding the outcome of the efforts by June 15th.

 4            I know that's a long summary, but if you would like

 5    to address my oral tentative, you may do so.

 6            MS. FABIAN:  Your Honor, this is Sarah Fabian for

 7    the government.  A couple -- first, I want to note that

 8    Ms. Dougherty and Ms. Miranda-Maese are on the line today.

 9    So if -- I know that Your Honor had asked for that, and if

10    you had any questions or comments for them, they are

11    available on that.  I will give them an opportunity if they

12    want to say anything about -- about Your Honor's tentative as

13    well.  They are available to do that.

14            THE COURT:  Thank you.  I appreciate that they have

15    appeared for this video conference.  I do have some things I

16    would like to say to them at the end of this hearing --

17    towards the end of this hearing.

18            MS. FABIAN:  Great.  On the ORR points, I do want

19    to the mention one thing.  I'm not sure, but for Your Honor's

20    awareness, the provisional fingerprinting issue, because ORR

21    doesn't have the ability to take minors back into custody, I

22    do want to make clear that a provisional release subject to

23    awaiting fingerprints would -- would really, in effect, be a

24    permanent release.  So that it would be a waiver of the

25    fingerprinting requirements in that context.  I can
```

```
 1    certainly -- I would need to consult with my client about
 2    what -- if there's something that -- that we could propose as
 3    far as follow-up, as far as obtaining fingerprints, but I
 4    just -- I do want to point out that the inability for ORR to
 5    take children back into custody would mean that regardless of
 6    later received fingerprinting results, that that would in
 7    effect be a permanent result pending those fingerprints
 8    results.
 9              THE COURT:  Let me ask you this, Ms. Fabian:  Under
10    ordinary circumstances, if a child or a minor has been
11    released to a sponsor, and then subsequently ORR comes into
12    knowledge of some issues regarding the sponsor's suitability,
13    what is the recourse that ORR has to communicate those
14    concerns to someone who would be able to do something about
15    it?
16              MS. FABIAN:  I think that it will vary by
17    situation.  In general, I think there would be -- there could
18    be some communication with state authorities.  It's --
19    it's -- the situations that I'm aware of where ORR becomes
20    aware of that information, it -- it frequently happens when
21    the minor comes back into custody.  So once -- once ORR
22    releases a child and, for example, if there are post-release
23    services, and came to ORR's attention that there was an
24    issue, I believe ORR would communicate with state child
25    welfare authorities.  I'll let Ms. Miranda-Maese correct me
```

1    if I'm wrong on that.  I believe that would be the process.

2    ORR just wouldn't have the ability to take the child back

3    into custody.

4            THE COURT:  All right.  Is Ms. Miranda-Maese on the

5    phone?

6            MS. MIRANDA-MAESE:  Yes, Your Honor, I'm present.

7            THE COURT:  Are you able to comment on what would

8    happen if, for example, fingerprints were taken or obtained

9    after the release of the minor and showed concerns?

10           MS. MIRANDA-MAESE:  Your Honor, I believe

11   Ms. Fabian is correct on that.  I would definitely need to

12   obtain more information as to what other options we have.

13   Since I have been juvenile coordinator, there has not been

14   any information that I know of where we would be able to

15   bring a child back into ORR custody.  That doesn't mean it

16   may not be something that can happen, but definitely will

17   check into that with other ORR staff that I work with.

18           THE COURT:  I'm not necessarily saying that it has

19   to be a regaining of custody of the minor, but whether there

20   are other avenues that can be pursued to make sure that the

21   minor is safe and perhaps taken out of the custody of someone

22   whose fingerprints show a specific problem.

23           MS. MIRANDA-MAESE:  Right.  I don't believe there

24   is any options at this time.  I mean, we would -- I need

25   federal authority for that.  I can certainly check into that

1     further, Your Honor.

2              THE COURT:  All right.  Ms. Fabian, do you have any

3     other issues that you'd like to raise?

4              MS. FABIAN:  Yes.  I wanted to -- to walk through

5     and perhaps clarify my understanding of Your Honor's

6     tentative with regard to ICE.  It's -- it's the government's

7     position and -- that we -- that the government that -- that

8     ICE is doing individualized evaluations for release through

9     the parole determination worksheets.  I know that Ms. Ordin

10    recently reviewed some of those worksheets.  That is what

11    Ms. Dougherty reviews for her monitoring.  So I -- I

12    first wanted to clarify for my own understanding if it's the

13    Court's order that those parole worksheets do not constitute

14    the individualized determination.  I -- we understood that to

15    be the sort of -- the -- the purpose of the Court -- of the

16    2017 order was to say that ICE was required to do those

17    individualized parole determinations.

18             So it is the government's position that we are

19    doing those parole worksheets for all individuals in ICE

20    custody for the families, and that those are -- that those do

21    constitute the individualized determination.

22             THE COURT:  I have looked -- I've looked at the

23    parole worksheets.  They do not provide very much

24    information.  I think that is reflected in Ms. Ordin's status

25    report where she indicated that she had to ask for further

1   information from ICE in order to determine what reasons were

2   being given for someone being held.  What has been identified

3   in those worksheets appear to be the very opaque reasons that

4   I've listed in my order, which are things like MPP or pending

5   IJ hearing, pending USCIS response.  Those are not very

6   illuminating, especially when you compare them to ORR's notes

7   regarding their efforts at continuous release.

8            MS. FABIAN:  I think -- Your Honor, I want to --

9   maybe -- I could just clarify sort of the government's

10  position on some of that just to see if it helps my

11  understanding.  The -- there are two separate -- my

12  understanding of Ms. Ordin's report is that there are really

13  two separate parts to the issue and two separate parts to the

14  process.  The parole determination worksheet is done at the

15  outset of custody and again during custody, if circumstances

16  change.  And that is what ICE's position is the

17  individualized determination as to the family and the need to

18  maintain them in custody.

19           Now, for the two categories that Your Honor

20  mentioned first, those who are pending a USCIS response or

21  pending an IJ decision, those individuals are within the

22  credible fear process and are awaiting a decision on credible

23  fear, and that is the same circumstances that was addressed

24  in the Court's 2017 order, which is the -- the sort of

25  outcome of that process will determine whether the family is

1    put into 240 proceedings and, therefore, can be released from

2    custody together, or whether the -- they are ordered removed

3    and can be removed together.  And the goal of that process is

4    to keep the family together until it can be completed.  There

5    is a determination done whether they need to complete that

6    process in custody or out of custody, but -- but during that

7    time in -- those notes reflect families that are within that

8    process.  And the goal is to keep the families together.

9           I want to --

10          THE COURT:  Let me explain something, Ms. Fabian.

11   When I see an explanation for hundreds of people that say,

12   pending IJ hearing, that is a description.  That is not an

13   explanation of why someone is a flight risk.  That is an

14   explanation of where they are in the process.  Just because

15   someone is pending an IJ hearing, doesn't necessarily mean

16   that they are a flight risk.  I totally understand your

17   desire to maintain the family unit.  If you have in your

18   records a record that you have you inquired of the custodian

19   of the minor that they -- whether they wish to have the minor

20   exercise their Flores rights or not, and the custodian

21   decides to waive the minor's Flores rights, that certainly a

22   good explanation for why someone has continued to remain in

23   custody.  But having an explanation that there is a pending

24   IJ hearing is no explanation, because practically everyone

25   who comes into your system will have a pending IJ hearing at

```
 1    some point.

 2                MR. SCHEY:  Your Honor, this is Peter Schey.  May I

 3    just comment on this briefly?

 4                THE COURT:  You can be heard as soon as I finish

 5    with Ms. Fabian.

 6                MR. SCHEY:  Thank you so much.

 7                MS. FABIAN:  I think -- I want to follow up on that

 8    because I think that gets me to what I was saying is sort of

 9    potentially a two-part question, which is the issue of --

10    of -- I think it's reflected in Ms. Ordin's report as well,

11    which is the issue of whether efforts are made to release the

12    child separately from the parent.  That's addressed -- I

13    believe it's footnote nine in our filing.  It's briefly

14    addressed.  I do -- it -- the government does have concerns

15    with that process.  I understand that Your Honor's order in

16    2017 did reflect that that -- that ICE does have that

17    authority and that ability.  There -- there remain several

18    questions as to how that would be implemented.  I want to

19    note other litigation, including the Ms. L litigation --

20                THE COURT.  That is Ms. L, as in the letter L.

21                MS. FABIAN:  So the Ms. L litigation that do limit

22    the government's ability to waive the parent's rights and to

23    release the child separately.  It's currently -- I've

24    discussed this with Ms. Ordin as well.  Currently, it's --

25    currently, it's the government's position that the government
```

```
1    is not seeking a waiver from the parent.  It's -- it's --
2    it's somewhat of an open question what the process would be
3    if the -- if the parent were to come to the government
4    seeking to waive their right to -- to keep their child with
5    them and to have the child released, there are -- that has
6    been the subject of discussions in the Ms. L litigation, and
7    has not really been fully resolved.
8           So I want -- I guess I would ask for clarity from
9    the Court if you -- if there is an expectation that the
10   government be pursuing that -- pursuing release of the child
11   separately from the parent.  There are a lot of very
12   sensitive issues and other litigation that needs to be taken
13   into consideration.  So we would ask for as much clarity as
14   the Court can provide us your expectations and your view of
15   the obligations of the government in that regard.
16          I -- I would note that we would -- I would note our
17   likely need to involve other courts and to consider other
18   litigation and, perhaps, come back to the Court with those
19   concerns.
20          THE COURT:  Can you point me to any order that has
21   issued in the Ms. L litigation that would inhibit your
22   ability to inquire of whether a parent wishes their child to
23   be placed with an available and suitable custodian?
24          MS. FABIAN:  Your Honor, I would not say it's a
25   specific prohibition.  What I would say is in that
```

```
 1    litigation, the government -- when the government has
 2    obtained waivers, they have been challenged.  There's been --
 3    there's some concern that there's a somewhat inherently
 4    coercive nature of the government obtaining a waiver from the
 5    parent in its custody as far as the release of the child.
 6            So the -- the preference of the government is that
 7    if we're talking about the right of a parent to be -- to
 8    remain with their child or to have their child released
 9    separately that the waiver -- the onus for the waiver would
10    be for the parent to affirmatively waive likely with
11    assistance of counsel.  We just -- to be honest, Your Honor,
12    we -- I'm not aware of situations where that has been asked.
13    I know that it is in the briefing suggested as a possibility,
14    but it's not a situation that I see frequently, which is
15    having -- being requested from counsel that we release the
16    child separately.  It seems to be the preference of
17    individual counsel that the child be kept with the parent,
18    and they be released together.  But I don't experience -- I
19    don't experience requests from counsel that we release the
20    child separately.
21            So it -- I can't say precisely what the next step
22    would be if we received that request, and I'd certainly have
23    to -- have to inquire of my client to be sure that we have
24    not received that request, but I personally haven't seen
25    those.
```

1            THE COURT:  All right.  Mr. Schey, do you wish to

2    address this issue?

3            MR. SCHEY:  Yes, briefly, Your Honor.  Thank you so

4    much.  As I think we've pointed out in the briefing,

5    defendants' parole regulation is nothing like the terms of

6    the Flores case.  If you look at the parole form that they

7    use, which they cite and, I guess, was attached to

8    Deane Dougherty's juvenile coordinator's report that is filed

9    at 384 -- docket 384-2 and the attachment to that.  If you

10   look at that form, the very top of the form there are two

11   fundamental questions.

12            The first question -- they're not the Flores

13   questions.  They're the parole statute and the parole

14   regulation questions.  Parole regulation, which is quoted at

15   the -- at the top of the form, 8CFR22L(DD)(5).  The first two

16   questions at the top of the parole form is number one, has an

17   urgent humanitarian reason been established?  It's yes or no.

18            Two is has a significant public benefit been

19   established?  It's yes or no.  If yes, then the form requires

20   of the officer to explain.  And it says, for example, medical

21   or law enforcement reasons.  If it's two nos, I would assume

22   there's no reason for them to keep completing the rest of the

23   form.  Those -- those -- those criteria for whether or not

24   they're going to grant a class member or, I guess, a class

25   member's parents parole status are obviously completely

1    different from --

2            THE COURT:  Yes.  Mr. Schey, I understand that.  I

3    have actually seen the form.  I understand that there is a

4    difference between a parole determination versus a Flores

5    release determination.

6            MR. SCHEY:  Yes.

7            THE COURT:  The question that I would like you to

8    answer is Ms. Fabian's concern about whether or not

9    plaintiffs are seeking release of minors separate from their

10   parents or parent.

11           MR. SCHEY:  Yeah.  Well, I think two things about

12   that, Your Honor.  First, Ms. Fabian has suggested that that

13   might run afoul --

14           THE COURT:  Mr. Schey, are you on a cell phone?

15           MR. SCHEY:  I am.  It's the only line I have

16   available to me.  Can you hear me okay now?

17           THE COURT:  Yes.

18           MR. SCHEY:  Okay.

19           THE COURT:  The reporter should let us know if she

20   is having trouble hearing you.

21           MR. SCHEY:  Thank you, Your Honor.

22           So the two things.  One is with regard to what

23   Ms. Fabian said about the Ms. L case, that is reported at 310

24   F.Supp.3d 1133.  It does not in any way interfere with or

25   conflict with the rights that minors have under the Flores

1    agreement.

2         The only thing Ms. L case addresses is the forced

3    separation of children from their parents during the period

4    when the Trump administration decided that it would

5    criminally prosecute the parents.  So there is no

6    interference with -- there's no conflict between the Ms. L

7    injunction and this case.

8         Secondly, this Court has really addressed this

9    previously.  This is not a new question.  I think the Court

10   first addressed it in 2015 at the hearings, and again

11   addressed it in 2017.  There is no question that a child,

12   whether accompanied or unaccompanied, has the right to a

13   prompt release under paragraphs 14 and 18, just as there's no

14   question that the minor has a right to safe and sanitary

15   conditions under paragraph 12, whether they are accompanied

16   or unaccompanied, and the right to be placed in a licensed

17   facility, et cetera.

18        I think the Court recognized long ago that a parent

19   as in I think most class action cases, maybe not every single

20   one, but I think the Court recognized long ago, and I think

21   the parties agreed long ago that a parent does have the

22   option to opt a child out of the release benefits part of the

23   settlement; however, in order to do that, the parent

24   obviously needs to be fully advised about the scope of the

25   settlement, needs to be fully advised that whatever decision

```
 1   they make until their decision is executed has a right to
 2   change their mind, and I think certainly would have the right
 3   to consult with counsel about what their decision should be.
 4            So I think that -- that is -- those are the
 5   parameters.  I think the Court itself first addressed that in
 6   the very first hearing that we had when they set up mass
 7   family detention.  I recall that hearing where the Court
 8   itself proposed or put that question to the parties, and the
 9   parties were in agreement that the Flores settlement was
10   never intended to forcibly separate children from their
11   accompanying parents, but at the same time, mainly because
12   they're accompanied, does not mean that they waive -- that
13   automatically that their right to release disappears.  That
14   is exactly what the government has brought two or three
15   motions now to basically wipe out the release rights of
16   accompanied minors.  It is also what they attempted to do in
17   their final regulations, which this Court enjoined.  It is
18   also what they attempted to do, I think, it was in June of
19   2018 when they brought their emergency motion to in essence
20   wipe out the rights of accompanied children.  The Court
21   rejected that.
22            So I don't think it's as complicated as Ms. Fabian
23   presents it.  I -- I think it's fairly straightforward.
24            THE COURT:  All right.  Mr. Schey, I do remember
25   very clearly this issue.
```

1          MR. SCHEY:  Thank you.

2          THE COURT:  It is complicated only because of the

3    government's policy of holding the adults.  As you know, in

4    my 2015 order, I relied on other law outside of the Flores

5    agreement that says that adults have a right to a bond

6    hearing within six months of their detention, and said if

7    those adults have a right to a bond hearing are then

8    released, they should be able to be released with their

9    children.  The Ninth Circuit reversed me on that subject on

10   the ground that there are no release rights under Flores for

11   adults.  I understand that.  I never intended to say that

12   there were adult release rights under Flores, but that under

13   other law, that adults may have release rights, or at least a

14   bond hearing where they may have an independent determination

15   of their right to be released.

16          This issue only becomes complicated because the

17   current administration does not want to release adults;

18   therefore, we have this quandary of whether children should

19   be released separate from their parents.  I don't

20   particularly like the idea of children being released with --

21   away from their parents, but as I've said before, it is the

22   parents' decision to make, not the government's.

23          So I understand the question that Ms. Fabian has

24   posed.  There is an issue of the coercive nature of the

25   question being posed by the government to the parents about

1    whether they wish to have their child exercise their Flores

2    settlement agreement rights separate and apart from the

3    parents.  I think the answer to that question is that there

4    needs to be a process that allows a parent to make that

5    determination.  That has to include notice of what the rights

6    are, the opportunity to have counsel advise them, and an

7    opportunity to make a decision about whether to allow their

8    children to exercise those rights or not.  That may be a

9    separate issue that has to be the subject of either a

10   meet-and-confer by counsel in this case, or perhaps it's

11   already being challenged in other cases, as Ms. Fabian seems

12   to be intimating.  I don't know.  I'm not aware of any other

13   litigation that bears on this issue.

14          I think I've said it before in my prior orders, and

15   that is, that it is the parent's decision to make.

16          MR. SCHEY:  This is Mr. Schey, Your Honor.  There

17   is one other complication that we mentioned in the brief.

18   That is that right at this minute, and perhaps this is

19   something that the Court should include in its order.  It

20   really does not appear that ICE -- if a parent wants their

21   child released, it doesn't appear that ICE has set up the

22   mechanism to do that.  I think it needs to do so.  They --

23   maybe it is something we can meet and confer over the next

24   few weeks and report back to the Court.  We have proposed to

25   the government various ways to address this, but right now

1   they just -- they just rely on their parole worksheet,

2   basically.

3           THE COURT:  Well, Ms. Fabian, I think the answer to

4   your concern is that this probably should be the subject of

5   some meet-and-confer so that there is some agreement from

6   plaintiffs as to what the process is that should be used to

7   allow a parent to make that determination.

8           MS. FABIAN:  Your Honor, I -- I understand that.  I

9   think our concern -- we will certainly, of course, review

10  whatever Your Honor orders and act accordingly.  I -- I just

11  want to note, however, counsel here don't represent the

12  parents.  That there are counsel who represent at least the

13  Ms. L parents.  There are other counsel who do represent the

14  parents.

15          So as far as Mr. Schey's supposition about the

16  manner in which parents should assert or waive theirs rights,

17  I think we would -- we would have to consider how to also

18  make sure that we took into the account that the parents are

19  frequently likely separately represented.  And to the extent

20  we're talking about rights that flow to the parents, those

21  are rights that don't flow from the settlement agreement.  We

22  have had in other litigation, for example, in the Ms. L and

23  other context situations where we have counsel for the

24  children and counsel for the parents somewhat sometimes at --

25  differing on how to protect the rights of -- of the two

 1   parties.

 2          So -- I -- I think we would have to take a look at

 3   whatever Your Honor ordered and consider how to make sure we

 4   involved the rights of the parents and any attorneys on that

 5   front and perhaps circle back to the Court once we -- once we

 6   saw that, once we reviewed that.

 7          THE COURT:  All right.  I understand that issue.

 8   There may be others who may need to have some input into what

 9   the process is.  I'm just saying that with regard to Flores

10   rights, a minor has rights under the agreement.  And I don't

11   think the government can simply make a blanket assertion that

12   they must stay in custody because their parents have to stay

13   in custody.  There has to be some kind of individualized

14   determination.

15          MS. FABIAN:  I understand, Your Honor.  The -- the

16   one other point from Your Honor's tentative that I wanted to

17   note was the -- the final -- individuals with the final order

18   are in a separate -- in a separate context from the

19   individuals who are in the process -- are currently within

20   the process of -- of pursuing credible fear.  I just want to

21   note the government's position again with the --

22          THE COURT:  There was another person who left the

23   call.

24          MS. FABIAN:  Sorry I didn't hear that one.  So for

25   individuals with the final order, they are generally being

1   held pending approval.  They are being held pending their

2   removal, and I would note that counsel for Flores have in the

3   past acknowledged that some custody during that time is

4   permissible.  They are receiving a custody determination to

5   evaluate flight risk consistent with the agreement, which

6   notes that a final order is an indicator of flight risk.

7   It -- in many of the --

8           THE COURT:  It's one of the factors, Ms. Fabian.

9   It is not the determinative factor.

10          MS. FABIAN:  I -- I understand.  Your Honor has

11  noted that that would not be a basis for blanket custody.  So

12  there is an individualized evaluation done.  I would note

13  that there are individuals with final orders who are released

14  and others who currently remain in custody.  That reflects

15  the individualized determination.  There are -- for example,

16  there is current litigation for -- that covers, I believe, a

17  couple -- I think there are 250 individuals whose removal is

18  currently stayed based on this other litigation.  23 of whom

19  were set for removal just yesterday, and whose removal was

20  stayed at the last minute.

21          So they remain now in custody in -- so there is --

22  not all of those 250 are currently in custody.  Some are;

23  some are not.  There are individuals who are subject to final

24  orders of removal who are, you know -- that ICE is prepared

25  to remove them.  Some of whom have been determined a flight

```
 1    risk and determined to remain in ICE custody.  Some of whom

 2    who could be removed but/for stays of removal that are

 3    obtained from other courts.

 4            THE COURT:  If I had been presented with some

 5    evidence in the way of internal records that indicated that

 6    there had been an individualized determination about a

 7    particular person being a flight risk other than that there

 8    was a pending IJ hearing, then I would certainly have noted

 9    that and would have credited your argument that

10    individualized determinations are being made.  But on the

11    evidence that is currently in the record, I don't have that.

12    I don't know why ICE has determined that someone who has a

13    pending IJ hearing is a flight risk versus some other minor

14    who has a pending IJ hearing who is not a flight risk.

15            MS. FABIAN:  Your Honor, I think the answer to that

16    as an evidentiary matter, I think would be that there is a

17    combination of the spreadsheet that Your Honor reviewed and

18    the individualized review in the parole worksheet, which I

19    don't believe that all of those were presented to the Court,

20    but they -- they could be made available.

21            Now, I can't -- as I sit here today, I have -- I'd

22    have to look at those worksheets to be sure that that would

23    answer Your Honor's question.  I -- I'm not going to assert

24    that now.  I haven't looked at them and don't have them in

25    front of me.  Our position would be that that spreadsheet
```

```
 1    alone doesn't give the answer as to why the determination was

 2    made to retain the person in custody.  It's that in

 3    combination with the parole worksheet.  I do understand Your

 4    Honor's concerns and ruling on that point.  I just wanted to

 5    clarify that -- that would -- that that would be our position

 6    as to what reflects the decision.

 7                 THE COURT:  Well, given that you will have an

 8    opportunity to file a report by May 15th that gives a census

 9    as to these individuals, then I will fully expect that there

10    will be an explanation as to why certain individuals who have

11    an IJ hearing pending are considered a flight risk.

12                 MS. FABIAN:  I understand, Your Honor.  Thank you.

13                 THE COURT:  If they are not, I will expect that

14    they won't appear on the census anymore, because they will

15    have been released.

16                 MS. FABIAN:  Understood, Your Honor.

17                 THE COURT:  All right.  Any other questions or

18    comments?

19                 MR. SCHEY:  This is Peter Schey.  I'm sorry -- go

20    ahead.

21                 THE COURT:  Ms. Fabian, were you going to continue

22    on?

23                 MS. FABIAN:  I was not, Your Honor.

24                 THE COURT:  Okay.  Mr. Schey.

25                 MR. SCHEY:  Yeah.  Just one other thing,
```

```
1    Your Honor.  We had suggested that -- that you permit the
2    parties as you did, I think it was in 2017, as I recall the
3    summer of 2017, where you permitted class counsel to --
4              THE COURT:  Can you repeat yourself.  We just had
5    somebody else leave the call.
6              MR. SCHEY:  Yes.  I'll start over.  I just wanted
7    to see if the Court would at least consider, as it did in
8    2017, a brief period when class counsel could conduct limited
9    discovery.
10             Now, I know the Court has provided intensified
11   monitoring by the Court-appointed monitors, both internal and
12   Ms. Ordin.  I think that's positive, but on the other hand,
13   class counsel does represent these minors, and it -- it --
14   and -- and it seems as if it would be reasonable under the
15   present circumstances and given some of the factual disputes
16   that the Court was -- was being presented with, and just
17   given the emergent nature of the current situation, if -- if
18   class counsel can also be provided some limited additional
19   monitoring during this crisis period.
20             So I just wanted to see if the Court would at least
21   consider that for a 30-day period, in addition to the
22   internal monitors being able to intensify their monitoring,
23   and Ms. Ordin being able to intensify her monitoring, that
24   class counsel could also participate in that by having a
25   limited period of limited discovery.
```

1          THE COURT:  Mr. Schey, that gives me an

2     opportunity, I think, to segue into some comments that I want

3     to make about the role of the juvenile coordinators and how

4     we need to institutionalize monitoring of this case.  This

5     case has been pending for 35 years.  The Flores agreement is

6     23 years old.  The case is closed.  I am not anxious to have

7     more litigation on a case in which you have already won a

8     permanent injunction.  It reminds me of Albert Einstein's

9     statement that the definition of insanity is doing the same

10    thing over and over again and expecting different results.  I

11    want to try something different.  I want to stop having

12    litigation and try to just aim for results.

13          If I have to have hearings with you every month to

14    do that, I will do that.  If I have to have Ms. Ordin oversee

15    all of these issues that I've identified as problems, I will

16    do that.  But I do not find it valuable to have weeks and

17    weeks of litigation and filing of papers and counterpoints

18    and declarations.  My God, I had 70 declarations that I

19    needed to digest in a day.  This is not my idea of an ideal

20    situation for enforcing the settlement agreement.

21          Now, this pandemic has caused some serious

22    dislocation in our society.  Nearly a million people have

23    been infected in the United States.  Over 45,000 people have

24    died.  So this is deadly serious.  I am deadly serious about

25    making sure that this agreement is enforced finally.

1    Hopefully, it doesn't take the pandemic to get us to a place

2    where we need to take these provisions in the agreement

3    seriously.

4        I have asked the juvenile coordinators to be

5    present on this hearing because, first of all, I want to

6    express my appreciation to them for providing the reports, as

7    well as being my eyes and ears on the ground.  You are a key

8    component of enforcement of the Flores settlement agreement.

9    I want you to understand that you are very important to this

10   process.  It is my hope that you will be neutral in your

11   review of problems that exist.  The honest brokers.  You are

12   reporting to me.  As far as I'm concerned, I hope that you

13   are Switzerland.  I want you to look at problems that are

14   arising and address those problems.  I don't want any spin.

15   I want the truth from you, because for far too long there's

16   been a disconnect between what defendants tell me and what

17   plaintiffs tell me about the conditions.  I want it to stop.

18   I want there to be a process that is institutionalized for

19   dealing with problems so that litigation is not necessary

20   every time there is a dispute.  It took us four weeks to get

21   to this point.  I would prefer that there would be some

22   informal mechanism where you can get disputes resolved

23   quickly without the filing of briefs.

24       Now, I understand that in an emergency sometimes an

25   ex parte application is necessary.  I'm not faulting anyone

1   for having done that, but I also want to make it clear that

2   this is a marathon and not a sprint.  You're going to have to

3   live with this agreement for a long time unless Congress

4   decides to do something about it.  I don't see that happening

5   anytime soon.  So I think you need to get used to the idea of

6   applying the agreements dispute resolution procedures.

7           So to Ms. Dougherty and to Ms. Miranda-Maese, I

8   want to make sure that you understand that you are an

9   important part of this process.  I rely on you to provide me

10  with honest reports.  I'm not asking you for reports because

11  I'm just creating make work for you and wanting to harass you

12  and wanting you to do work that is unnecessary.  I'm doing

13  this because in this environment it is very important that we

14  are abiding by the terms of this agreement so that children

15  are not endangered.

16          Go ahead.  Please identify yourself.

17          MS. WELCH:  Your Honor, this is Leecia Welch for

18  the plaintiff.  I appreciate what you're saying.  I just have

19  one final comment I wanted to make in response to

20  Ms. Fabian's comments regarding Your Honor's tentative ruling

21  relating to fingerprinting, if I may?

22          THE COURT:  Okay.  Go ahead.

23          MS. WELCH:  Thank you.  So plaintiffs' position on

24  this is that if ORR does learn about information from

25  fingerprinting that raises documented safety concerns after a

```
 1    child has been released to a sponsor, that Your Honor's that
 2    the proper course would be for them to refer the situation to
 3    state and local child welfare protective services.  I think
 4    in support of that, we would note that that is already ORR's
 5    own policy.  So if you look at ORR policy MAP Section 2.5.1,
 6    it is -- it already anticipates this situation.  It says that
 7    if -- basically, if derogatory information does comes to
 8    light after release, that an FFS would make a case-by-case
 9    determination on what follow-up is required.  State CPS or
10    law enforcement may be notified.  That the FFS may also
11    attempt to refer for post-release services.  So that's one
12    area of policy that I think is relevant.
13            Also, if you look at Section 2.8.4 regarding safety
14    and well-being follow-up call, the end of that paragraph says
15    that if a care provider believes that a child is unsafe, then
16    the care provider must comply with mandatory reporting laws,
17    state licensing requirements, and federal laws regarding
18    reporting to local child protective agencies and law
19    enforcement.
20            So I think ORR policy already anticipates this sort
21    of situation.  Without going into detail, this has been the
22    position that ORR has taken in depositions in other cases.
23    So we believe this is already an ORR policy.  It would be
24    perfectly appropriate to apply those policies to the Court's
25    order pertaining to provisional fingerprinting.
```

1          THE COURT:  Thank you.  Anyone else?  All right.

2     If there is nothing further, then I am going to take this

3     matter under submission.  I will issue a written ruling

4     shortly.  I'll just remind the parties that there will be a

5     May 22nd, 2020 further status conference by video conference

6     at 11:00 o'clock.

7               We are adjourned.

8               MS. WELCH:  Thank you, Your Honor.

9               MR. SCHEY:  Thank you, Your Honor.

10              MS. FABIAN:  Thank you, Your Honor.

11              (Proceedings concluded at 10:15 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2     I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

 3     TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

 4     THE ABOVE MATTER.

 5     FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

 6     REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

 7     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9     /s/ Miriam V. Baird         04/29/2020

10     MIRIAM V. BAIRD                     DATE
       OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```