CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org


*Listing continues on next page*
*Attorneys for Plaintiffs*


UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>WILLIAM BARR, Attorney General of the United States, *et al*.,<br><br>                    Defendants. | Case No. CV 85-4544-DMG-AGRx<br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF FILING OF ICE JUVENILE COORDINATOR REPORT**<br><br>Hearing:  May 22, 2020<br>Time: 11:00 a.m.<br><br>[HON. DOLLY M. GEE] |

1

2   UNIVERSITY OF CALIFORNIA DAVIS

3   SCHOOL OF LAW
    Immigration Law Clinic
4   Holly S. Cooper (197626)

5   Daisy O. Felt (CA 307958)
    One Shields Avenue, TB 30
6   Davis, CA 95616

7   Telephone: (530) 754-4833
    Email: hscooper@ucdavis.edu
8

9   NATIONAL CENTER FOR YOUTH LAW
    Leecia Welch (208741)
10  Neha Desai (CAL. RLSA NO. 803161)

11  Poonam Juneja (300848)
    Freya Pitts (295878)
12  1212 Broadway, Suite 600

13  Oakland, CA 94612
    Telephone: (510) 835-8098
14  Email:  lwelch@youthlaw.org

15          ndesai@youthlaw.org
            pjuneja@youthlaw.org
16          fpitts@youthlaw.org

17
    USF SCHOOL OF LAW IMMIGRATION CLINIC
18    Bill Ong Hing (Cal. Bar No. 61513)

19    2130 Fulton Street
      San Francisco, CA 94117-1080
20    Telephone: (415) 422-4475

21    Email: bhing@usfca.edu

22
    LA RAZA CENTRO LEGAL, INC.
23  Stephen Rosenbaum (Cal. Bar No. 98634)

24  474 Valencia Street, #295
    San Francisco, CA 94103
25  Telephone: (415) 575-3500

26

27

28

THE LAW FOUNDATION OF SILICON VALLEY
LEGAL ADVOCATES FOR CHILDREN AND YOUTH
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone: (408) 280-2437
Email: kate.manning@lawfoundation.org


*Of counsel:*

ALDEA - THE PEOPLE'S JUSTICE CENTER
Bridget Cambria
532 Walnut Street
Reading, PA 19601
Phone: (484) 877-8002
Fax: (484) 926-2032
Email: bridget.cambria@cambriaklinelaw.com

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     ICE CONTINUES TO FAIL TO MEET THE AGREEMENT'S SAFE AND SANITARY REQUIREMENTS IN LIGHT OF THE COVID-19 PANDEMIC. .... 5

III.   ICE FAILS TO PROMPTLY RELEASE CHILDREN WITHOUT UNNECESSARY DELAY AND ITS WAIVERS WERE ILLEGALLY AND IMPROPERLY SECURED ................................................................................... 15

    A.   FAMILY REUNIFICATION CENTERS (FRCS) ................................................. 16

    B.   JUVENILE DETENTION CENTERS ................................................................ 20

V.     CONCLUSION ............................................................................................ 22

/ / /

I.      INTRODUCTION

The gravamen of Plaintiffs' application for temporary relief in this matter
was relatively simple: confining children in congregate facilities during the
worsening COVID-19 public health emergency is presumptively unsafe and
unreasonable. As this Court has twice found, "[T]he medical consensus is that any
form of congregate care puts a child in custody at higher risk of infection … Any
unnecessary delay in releasing a minor is, under normal circumstances, a violation
of the FSA, but the current pandemic makes the Agreement's promise to protect
and expeditiously release minors even more critical to their safety." Order, April
10, 2020 (Doc. #768) at 4 (*citing* Order, March 28, 2020 (Doc. #740)).

Prior to the April 24, 2020, hearing, Plaintiffs continued to argue that ICE
had failed to keep Class Members "in facilities that are safe and sanitary and that
are consistent with [its] concern for the particular vulnerability of minors." *See* Pls.'
Second Reply at 10 [Doc. # 774], *quoting* Agreement at ¶ 12 [Doc. # 101].
Plaintiffs also contended that ICE failed to comply with its obligations under the
FSA to "release a minor from its custody without unnecessary delay" and "make
and record the prompt and continuous efforts on [their] part toward family
reunification and the release of the minor." Pls.' Second Reply at 15, 20, *quoting*
Agreement at ¶¶ 14, 18. In addition, Plaintiffs argued that ICE violated its
obligation to detain minors in the least restrictive setting, as set forth in the FSA.
Pls.' Second Reply at 8, n.5, *citing* Agreement at ¶¶ 11, 23. The Court granted in
part and denied in part Plaintiffs' request for enforcement of the FSA. Order re
Plaintiffs' Motion to Enforce at 3 ("April 24, 2020 Order") [Doc.# 784.]

Regarding conditions in ICE's Family Residential Centers ("FRCs"), the
Court found "Plaintiffs have raised significant concerns by a preponderance of the
evidence about each FRC's ability to provide safe and sanitary conditions ... ICE's

uneven compliance with Paragraph 12 and Exhibit 1 of the FSA warrants continued heightened monitoring." April 24, 2020 Order at 6.

Plaintiffs also argued that ICE unnecessarily delays Class Members' release by failing to make individualized release decisions, in violation of Paragraph 14 of the FSA, and also fails to record efforts undertaken, in violation of Paragraph 18. April 24, 2020 Order at 14. The Court found that "Defendants have … failed to demonstrate actual individualized evaluations of flight risk, or refusals of parents to waive their right to remain detained with their children, or other explanations for prolonged detention of Class Members awaiting IJ or USCIS determinations." *Id*. at 15. Because ICE did not submit evidence of individualized release assessments for Class Members awaiting asylum decisions, "much less evidence that ICE makes and records individual assessments in a prompt and continuous manner," the Court found ICE in violation of the FSA's Paragraph 18 (as well as the Court's prior June 27, 2017 Order) with regard to Class Members in expedited removal proceedings who are "pending IJ hearing/decision" or "pending USCIS response." April 24, 2020 Order at 16.

The Court also found that Plaintiffs have shown by a preponderance of the evidence that ICE is in breach of its Paragraph 14 and 18 duties and past Court Orders "with regard to minors subject to final orders of removal, including those issued under the MPP and/or stayed by participation in federal litigation." *Id*. at 18.

In light of the foregoing, the Court ordered that ORR and ICE "shall continue to make every effort to promptly and safely release Class Members who have suitable custodians in accordance with Paragraphs 14 and 18 of the FSA and the Court's prior orders, including those categorized as 'MPP,' participants in class litigation, 'pending IJ hearing/decision' or 'pending USCIS response,' absent a specific and individualized determination that they are a flight risk or a danger to themselves or others, or a *proper waiver of Flores rights …" Id*. at 18 (emphasis

2

added), *citing* July 24, 2015 Order [Doc. # 177], June 27, 2017 Order [Doc. # 363], July 9, 2018 Order [Doc. # 455], July 30, 2018 Order [Doc. # 470].[1]

Given the exigencies of the current pandemic, the Court ordered interim written reports to be filed by ORR and ICE monitors by the 15th of each month starting in May 2020, and ordered the ICE Juvenile Coordinator to cover the following topics, among others chosen by her:

i.   Measures taken to expedite the release of Class Members to suitable custodians during the COVID-19 health emergency, including whether ICE is making individualized release determinations and redeterminations for each Class Member held in the FRCs and making records of the same, and provide a census of minors remaining in custody at FRCs longer than 20 days and the specific reason therefor;

ii.  Monitor the status of ICE's implementation of its COVID-19 guidances;

iii. Identify the location of any ICE facility that has had any individual, whether detainee or staff member, test positive for COVID-19, and provide a status report and census of those infected at that facility during the reporting period;

iv.  With respect to minors in an ICE facility in which either a detainee or staff member has tested positive for COVID-19, identify the specific reason the minors located there have not been released or transferred to a non-congregate setting; and

v.   Describe any policies and/or practices aimed at identifying and protecting minors who are at heightened risk of serious illness or death should they contract COVID-19.

---

[1] The Court noted that parents may waive their children's Flores rights. April 24, 2020 Order at 15, n. 6, *citing* July 9, 2018 Order at 6 [Doc. # 455]. It also noted that Defendants have been enjoined in separate class action litigation from separating class member parents from their children, absent an affirmative, knowing, and voluntary waiver of the parent's right to be detained with their children at an ICE FRC. *See* Ms. L. v. ICE, 310 F. Supp. 3d 1133, 1149 (S.D. Cal., June 26, 2018).

Pursuant to the Court's April 24, 2020 Order, on May 15, 2020, Defendants timely filed the Juvenile Coordinators' reports. Notice of Filing of Juvenile Coordinator Reports [Doc. ## 788, 788-1, 788-2.]

Plaintiffs provide this submission in response to the ICE Juvenile Coordinator Reports. As discussed below, with regards ICE's FRCs, detained parents and children continue to be held in congregate settings with little protection from the spread of or infection by the COVID-19 virus. ICE has also made no efforts to release or transfer minors detained in juvenile jails.

On the issue of prompt release, the ICE Juvenile Coordinator's Report [Doc.# 788-1] concedes that ICE continues to evaluate Class Members for release based on a "Parole Worksheet" that on its face is materially inconsistent with the plain language of the FSA, and the agency's purported securing of parents' waivers of their children's right to release under the FSA was obtained in a matter of days

• without notice to parents' and Class Members' counsel of record,

• without parents or Class Members having any opportunity to consult with their counsel of record,

• without counsel of record for Class Members and parents being present,

• without providing parents or Class Members with an oral or written notice of Class Members' rights under the FSA,

• without providing parents or Class Members with a notice of Class Members' rights in a language parents or Class Members understood,

• without advising parents or Class Members that any decision they made to have a Class Member released could be reversed prior to the Class Member actually being released,

• without explaining what steps ICE would take, if any, to assess the ability of designated sponsors to safely care for released Class Members, and

• without advising parents that they could apply for parole so they could possibly be released with their child under 8 CFR 212.5(b)(3)(ii).

Thus, any purported "waivers" of Class Members' FSA rights ICE obtained were hardly "proper waiver[s] of *Flores* rights," nor were they "affirmative, knowing, and voluntary" waivers of the parents' right to be detained with their children. April 24, 2020 Order at 15 n. 6 and 18.

II.    ICE CONTINUES TO FAIL TO MEET THE AGREEMENT'S SAFE AND SANITARY REQUIREMENTS IN LIGHT OF THE COVID-19 PANDEMIC.

The ICE Juvenile Coordinator's report states that "the agency is taking and continues to take steps to detect and mitigate the spread of COVID-19 throughout its detention facility network, including its FRCs. ." ICE Report at 4 [Doc.# 788-1.][2]

The ICE Report states that beginning in late March 2020, "the FRCs began identifying residents with certain medical conditions that place the resident at a higher risk for serious illness or death from COVID-19 and promptly reviewed those cases to determine whether release was appropriate." *Id*. at 5. However, the ICE report nowhere explains which detainees or how many detainess at the FRCs were "at a higher risk for serious illness or death from COVID-19," what their "medical conditions" were, or whether any of them were released because of their vulnerability or medical conditions. The ICE Report does say that the "review" involved Class Members or parents "who medical professionals identify as high-risk remains ongoing …" *Id*. However, the report does not identify the Class

---

[2] As of Thursday, May 14, 2020, no residents or staff members have tested positive for COVID-19 at the three ICE FRCs. ICE Report at 5. However, one staff member at the South Texas FRC (STFRC) tested positive for COVID-19 and the employee has since been medically cleared and returned to work at the STFRC. *Id*. As of May 14, 2020, no residents or staff members have tested positive for COVID-19 at the two secure juvenile facilities housing minors under paragraph 21A of the FSA, NORCOR Juvenile Detention Center and Cowlitz County Juvenile Detention Center. *Id*. However, LSPs are not aware of any youth being tested for COVID-19. Exhibit D, Ratcliffe Decl. ¶ 23.

Members or parents who medical professionals "identify as high-risk," nor does it state how many detainees at the FRCs have been identified by medical professionals as "high-risk," or in which FRCs they are detained, or why they have not been released.

The COVID-19 pandemic shows no signs of abating anytime soon. The evidence shows that ICE continues to fall short of meeting even basic CDC guidelines for the safety and sanitation required to prevent the spread of COVID-19 in detention facilities. Social distancing, the cornerstone of COVID prevention, remains impossible as families and children continue to be detained in secure congregate facilities with all spaces being shared by detained families, facility staff, ICE staff, and others. See Exhibit A, Declaration of Shalyn Fluharty ("Fluharty Decl.") at ¶¶ 16-18 ("Rather than using the additional space available at STFRC to further limit the number of people who share communal bathrooms, time in the dining hall, the library, etc., STFRC has closed certain 'neighborhoods,' consolidating families into other neighborhoods that remain open … [M]others report eating in the dining hall with approximately forty people at a time and that eight individuals continue to eat at a table at a time … Families continue to report large gatherings in the gym and other locations.  One mother estimated that there were approximately sixty individuals in the gym at the same time last week"); Exhibit B, Declaration of Bridget Cambria ("Cambria Decl.") ¶ 7 ("Despite the lower census, families continue to report that they cannot socially distance in FRCs due to their nature as congregate care facilities. They further report that children in the BCRC are unable to comprehend or practice social distancing given their age, lack of maturity, and nature as curious infants, toddlers and young children"); Exhibit C, Declaration of Andrea Meza ("Meza Decl.") ¶ 8, 13, 21 (" Families in quarantine break social distancing when they gather during recreation time, and precautions to minimize the threat of COVID-19 are all but abandoned for families after they are out of 14 day intake quarantine … During recreation time, twice a

day, families are permitted to mingle in a shared recreation yard with multiple families … Social distancing is not promoted for families in the general population").

Class members' parents report that conditions in the FRCs remain unsafe and unsanitary. See Fluharty Decl. at ¶¶ 10-11 ("Conditions at the STFRC in Dilley remain unsafe and unsanitary, like before. The same inadequate cleaning measures … and lack of information sharing have persisted as we enter yet another month of the COVID-19 pandemic. Inadequate and substandard cleaning and infection prevention mechanisms still persist at STFRC. As recently as yesterday, May 19, 2020, mothers report being denied disinfectant spray and disinfectant wipes to clean their rooms, being served in the dining hall by individuals who do not wear gloves, and the ongoing use of detained mothers to facilitate cleaning, rather than professional cleaning staff."); Cambria Decl. ¶ 6, 14 ("conditions have remained unchanged since this Honorable Court's finding that they are not safe or sanitary in light of the COVID-19 pandemic ... Families report conditions in the facilities remain unchanged and that they continue to feel unsafe and unprotected from COVID-19. According to our clients, they are provided with 1 mask per person every 8 days … Children are still suffering from effects of detention including poor appetite, colds, infections, and other physical issues related to their detention in close quarters with other asylum-seeking families"); Meza Decl. ¶ 11, 12, 16,19 ("Families are given one mask per person, though not all children are provided masks ... Rooms are only cleaned once per day, and they are cleaned by the detained individuals themselves.  Families report that cleaning supplies are not readily available and must be requested … Families surveyed on May 19, 2020 reported that GEO and ICE do not regularly use masks when they interact with the general population …")

At Dilley where most families are detained, "[a]ccess to hand sanitizer has diminished since my previous report to the court." Fluharty Decl. at ¶ 13. Families

report that the hand sanitizer that was previously available for use in the dining area has been replaced with hand soap. *Id*. Because the hand soap requires water, and "water is not easily accessible where the dispensers are located, the dispensers in the dining hall go unused." *Id*. At Karnes, "[f]amilies do not report that hand sanitizer is available …" Meza Decl. ¶ 19.

Moreover, even if ICE engaged in each and every protective measure outlined in the previously filed declarations of ICE officials Sheridan and George, the best ICE can hope for is to "reduce" the risk that detained class members will become infected, ill, or die.[3] It is undisputed that congregate care facilities remain inherently vulnerable to the introduction and fast spread of COVID-19.[4]

The spread of COVID-19 into Defendants' detention facilities is not speculative. Detention facilities are largely incapable of implementing the range of CDC's recommendations and incarcerated people are already being infected at a

---

[3] Even if ICE engages in all the specific preparation, prevention, and management measures CDC recommends, *this can only "help reduce the risk of transmission and severe disease from COVID-19" by an unstated level*. *See* https://www.cdc.gov/coronavirus/2019-ncov/downloads/managing-COVID19-in-correctional-detention.pdf (emphasis supplied). Compliance with CDC policies is made all the more difficult because ICE contracts out the detention of class members and their families. The CDC notes that such contractors "are organizationally distinct and responsible for [their] own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting." https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf. CDC also notes that "[p]ersons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas." *Id*. at 2. And "[i]ncarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to … fear of isolation." *Id*.

[4] It is also undisputed that all age groups, including children, have contracted the disease. Robert Verity, PhD., et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis*, THE LANCET (March 30, 2020), at 6, https://www.thelancet.com/pdfs/journals/laninf/PIIS1473-3099(20)30243-7.pdf.

---

PLAINTIFFS' RESPONSE TO DEFENDANTS' JUVENILE
COORDINATOR REPORTS
CV 85-4544-DMG-AGRX

rate far higher than non-detained populations.[5]  By May 13, 2020, at least 25,239 people in prison had tested positive for the illness, *a 25 percent increase from the week before*. The Marshall Project, A State-by-State Look at Coronavirus in Prisons (May 15, 2020).[6]

The South Texas Detention Complex, an ICE-contracted detention center operated by the GEO group, is located in Pearsall, Texas. Pearsall, approximately a 15 minute drive from Dilley, Texas. As of May 19, 2020, 32 detained individuals have tested positive for COVID-19 and five GEO employees have tested positive.[7] The COVID-19 outbreak in Pearsall poses considerable risk to the Class Members and their parents detained in Dilley because "ICE employees frequently work at both facilities." Fluharty Decl. ¶ 23. ICE's Office of Chief Counsel has attorneys that work weekly in Dilley and Pearsall. Id. The Frio Hospital located in Pearsall "regularly treats individuals who are detained in both facilities." *Id.*

---

[5]  *See, e.g.* David Mills & Emily Galvin-Almanza, *As many as 100,000 incarcerated people in our jails and prisons will die from the coronavirus, unless the US acts now*, BUSINESS INSIDER (April 2, 2020), https://www.businessinsider.com/failure-to-release-prisoners-is-condemning-thousands-to-death-2020-4; Bill Chappel, *73% Of Inmates At An Ohio Prison Test Positive For Coronavirus*, NPR (April 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus; Angie Jackson & Kristi Tanner, *The High COVID-19 Infection Rate At This Michigan Prison Has Inmates Fearing For Their Health*, BUZZFEED NEWS (April 16, 2020), https://www.buzzfeednews.com/article/angiejackson/coronavirus-prison-inmates-michigan-parnall-covid; Deborah Becker, News More Than 150 Positive COVID-19 Cases Reported Among Prisoners, Staff Inside Mass. Jails And Prisons, WBUR NEWS (April 15, 2020), https://www.wbur.org/news/2020/04/15/jails-prisons-latest-coronavirus-cases-mtc; COVID-19 Infection Tracking in NYC Jails, LEGAL AID SOCIETY, (last visited April 22, 2020), available at: https://cutt.ly/RtYTbWd.
[6] Available at https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last checked May 20, 2020).
[7] ICE Guidance on COVID-19, Confirmed Cases, https://www.ice.gov/coronavirus (last accessed May 20, 2020 at 5:20 p.m.).

Children across the U.S. continue to be vulnerable to COVID. While there are fewer cases of COVID-19 among children compared to cases among adults, CDC reports that in the U.S., about 2% of confirmed cases were among minors, and thus, without adding the extra risk of being in a detention center, as of May 20, 2020, about 31,645 children may have been diagnosed with COVID-19 and over 1,833 children may have died.[8] Moreover, serious complications from COVID are arising in children specifically.[9] Defendants still have not addressed the reality that due to the range of symptoms children may have, including coughing, sore throats, headaches, or poor feeding or appetite, Defendants simply may not recognize class members who have become infected.[10] Nor have they grappled with the fact that although children may appear to be less susceptible to contracting the virus, common health concerns affecting many Class Members, such as asthma, malnutrition, and immunosuppression, may make them more susceptible to serious forms of the disease. March 28, 2020 Order at 6.

The ICE Report states that the agency identifies detained individuals who have medical conditions that place them at a heightened risk for serious illness or death if infected by COVID-19 and reviews these cases to determine if release is appropriate, however, Proyecto Dilley has identified numerous mothers and children with serious medical conditions who remain detained. Fluharty Decl. ¶ 24. Of the 111 Class Members currently detained, twenty-six report medical issues. *Id*. ¶ 25. In addition, thirty-nine mothers report having medical conditions. *Id*.

---

[8] *Burden of COVID-19 Among Children*, CDC (updated April 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pediatric-hcp.html
[9] **Boston Children's Hospital. May 8, 2020. Covid-19 and a serious inflammatory syndrome in children: Unpacking recent warnings. Available at: https://discoveries.childrenshospital.org/covid-19-inflammatory-syndrome-children/**
[10] *See* https://www.cdc.gov/covid-data-tracker/index.html; *see also* Clinical Presentation in Children, CDC https://www.cdc.gov/coronavirus/2019-ncov/hcp/pediatric-hcp.html (last checked May 20, 2020)

Currently detained class members suffer from issues including, but not limited to: asthma, gastritis, high blood pressure, heart murmurs, fainting, abdominal pain, anemia, and Guillain-Barre disease. *Id.*

Proyecto Dilley wrote to ICE on March 24, 2020, April 2, 2020, April 8, 2020, April 15, 2020, April 17, 2020 and April 20, 2020 to request the release of specific children and mothers with serious medical conditions that make them particularly inappropriate for detention. *Id.* 26.

> For example, Proyecto Dilley requested custody review and release for: a
> child with epilepsy; a one-year-old baby who, subsequent to five days of
> hospitalization while in Customs and Border Protection custody, had newly
> exacerbating symptoms that affected his breathing; several children with
> heart murmurs; a child with tachycardia, cardiac attacks, and uncontrolled
> gastritis; a child that was hospitalized while in ICE custody because he
> couldn't breathe and was turning blue; a mother who was hospitalized due to
> uncontrolled high blood pressure; several mothers who were experiencing
> complications with their pregnancies; and several mothers and children with
> asthma. *See* Exhibit 4. ICE did not respond to five of the six requests
> submitted by Proyecto Dilley.

*Id.*[11] Proyecto Dilley has documented numerous cases in which children detained at STFRC have been deprived necessary medical care. *Id.* ¶ 29. In one case a child detained for 101 days first fell ill two years ago and became weak and started to have problems with balance, walking, running, and any sort of physical activity

---

[11] Specific cases that were brought to ICE's attention were similarly ignored. For example, on May 7, 2020, Proyecto Dilley requested the release of a seven-year-old who had been diagnosed at STFRC with a potential infection in his abdomen and thyroid. Fluharty Decl. ¶ 27. Medical staff at the facility informed the mother that her son required additional testing that could not be provided at STFRC because the facility lacked the medical equipment and expertise to provide further examination. *Id.* ICE did not respond to the Proyecto Dilley's request for release and information, and the child remains detained. *Id.*

11

normal for a child of his age. *Id*. Shortly after arriving at STFRC the boy was hospitalized for approximately five days. *Id*. His mother reports that doctors conducted several tests, including an ultrasound and a lumbar puncture. *Id*. The Class Member was diagnosed with Guillian-Barre syndrome. *Id*. The doctors informed his mother that the boy required intensive physical therapy—a minimum of three times a week for two-hour intervals, or one hour a day. *Id*. His mother reports that the doctor conveyed that any delay in treatment would lead to a longer healing process. *Id*. ICE Health Service Corp (IHSC) staff at STFRC told the Classs Member's mother upon the boy's release from the hospital that they were waiting for outpatient physical therapy to be scheduled. *Id*. As of May 20, 2020, the mother is still waiting for her son's physical therapy to be scheduled, and her son has not been placed on any medication or offered alternative treatment at STFRC. *Id*. Currently, the boy "suffers from weakness and numbness in his extremities, has problems with balance, and has trouble walking or standing upright for extended periods of time without falling down." *Id*.[12]

At Karnes, ICE has failed to properly review cases of children with medical issues for prompt release. Meza Decl. ¶ 23. For example, one three year old now detained for three months "has suffered from an infection in his penis, fever, vomiting, diarrhea, constipation, hemorrhoids, and behavioral changes as a result of prolonged detention. After several attempts to get medical care, nothing has worked. The toddler continues to suffer discomfort when he tries to use the restroom and as a result, does not want to eat. On one occasion, a GEO guard

---

[12] On April 20 and May 7, 2020, Proyecto Dilley informed ICE of individuals, both Class Members and their parents, for whom ICE was required to conduct a custody redetermination pursuant to *Fraihat v. ICE*, Case No. 5:19-cv-01546-JGB-SHK, ECF No. 132, at 38 (C.D. Cal. Apr. 20, 2020). Fluharty Decl. ¶ 33. Of thirty-four mothers with medical conditions who were surveyed on May 19, 2020, *none* of them reported being informed that their custody status had been, or would be, reviewed. *Id*.

12

1  threw away the fruits and snacks the child's mother was saving in their room for
2  him when he got hungry." *Id.* ¶ 24.

3      The child's parents were interviewed via video-conference by a volunteer
4  doctor arranged by the Family Detention Services Program at the Refugee and
5  Immigrant Center for Education and Legal Services ("RAICES"). See Exhibit D,
6  Declaration of Dr. Matthew Gartland ("Gartland Decl."). The child's parents
7  described symptoms of severe constipation including passage of hard stool,
8  straining and painful defecation, and stool frequency less than 3 times per week as
9  well as red flag symptoms including weight loss, bloody stools, and abdominal
10 distension that denote severe constipation. *Id.* ¶ 6. The child's parents report these
11 symptoms began toward the end of March, around the time he had a diarrheal
12 illness followed shortly thereafter by influenza. *Id.* The parents report requesting
13 medical evaluation on multiple occasions and being told it was not an emergency or
14 that they would have to wait to see the pediatrician, who has a limited on-site
15 schedule. *Id.* ¶ 10. Dr. Gartland is

16     concerned that he has demonstrated high risk features including persistent
17     rectal bleeding, abdominal distension, avoidance of food, and weight loss.
18     Importantly, he has not received several key first-line interventions including
19     dietary changes, increased physical activity, and increased water
20     consumption. As a consequence of persistent rectal pain, the child  has
21     developed behavioral changes that likely worsen the constipation. The
22     consequences of not addressing this situation include risk for malnutrition,
23     ongoing pain and traumatization, urinary tract infection due to impacted stool
24     putting pressure on bladder, and long-lasting functional constipation that can
25     persist into adulthood.

26 *Id.* ¶ 13.

27     Another child, who will celebrate his 5th birthday next week, recently arrived
28 at Karnes though he suffers from hydrocephalus. *Id.* ¶ 25. This medical condition

13

requires constant diligent monitoring from neurosurgeons, neurologists, and other specialists. *Id*. Normally, this child's parents take him to the neurosurgeon once a month to evaluate the shunt in his head and ensure that liquid is draining properly. *Id*. The neurosurgeon also regularly measures his head to ensure that it is growing properly. *Id*. These appointments are vital to this child's health and wellbeing because if liquid begins to accumulate in his head, he risks losing his life. *Id*. This Class Member also regularly sees a pulmonologist to monitor his lung development because his lungs have developed prematurely. *Id*. However, "the only doctor he has seen in detention is not a specialist with the expertise needed to examine his shunt. This doctor looked at the boy's head and told his mother that everything was fine." *Id*.

The safety at Cowlitz County Youth Service Center ("Cowlitz") and Northern Oregon Juvenile Detention ("NORCOR") are also of ongoing concern given that, "juvenile facilities in particular lack the operational capacity to address the needs of youth in custody in a crisis of this magnitude." Dkt. 759-13 Declaration of Craig Haney ¶ 9. At Cowlitz, youth have limited family contact. X.E.S. Decl. ¶ 12 [Doc. # xx]. Mental health services have stopped completely. X.E.S. Decl. ¶ 15 [Doc. # xx].; A.P.P. Decl. ¶ 18 [Doc. # xx].; Exhibit R, Declaration of B.B.B. ("B.B.B. Decl.") ¶ 8 [Doc. # xx].. With extremely limited support or information, children are worried they will be infected by the virus and describe being "afraid all the time." A.P.P. Decl. ¶ 8 [Doc. # xx]., *see also* Ratcliffe Decl. ¶ 22 [Doc. # xx].. Moreover, the county that has custody of the juveniles in criminal custody at Cowlitz has recognized the extreme health concerns and has released all U.S. citizen children in county custody.[13]

---

[13] *Cowlitz County Youth Services Update.* Cowlitz County, Washington. April 13, 2020, https://www.co.cowlitz.wa.us/CivicAlerts.aspx?AID=405.

III.   ICE FAILS TO PROMPTLY RELEASE CHILDREN WITHOUT UNNECESSARY DELAY AND ITS WAIVERS WERE ILLEGALLY AND IMPROPERLY SECURED.

As the Court is well aware, the FSA requires that Defendants "treat[ ] and shall continue to treat, all minors in [their] custody with dignity, respect and special concern for their particular vulnerability as minors." *Id*. ¶ 11.[14] Considering "the Court's past orders, the exigencies of the circumstances, COVID-19's highly contagious nature, and the imminence of the threat," March 28, 2020, Order at 9, ICE's compliance with the release provisions of the FSA is crucial. The Court "remind[ed] Defendants—yet again—that 'hold[ing] minors in indefinite detention in unlicensed facilities, . . . constitute[s] a fundamental and material breach of the parties' Agreement. '"[15] ICE therefore "must … comply with the Agreement's requirement to release minors without unnecessary delay and 'make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor.'" *Id. quoting* Agreement ¶¶ 12, 14.

The Court found credible evidence "to indicate that ICE does not undertake or record any efforts aimed at the release of minors as required by Paragraphs 14 and 18 of the Agreement."[16] The additional evidence submitted by Plaintiffs and Defendants fully confirms the Court's findings.[17]

---

[14] It also requires that "[f]ollowing arrest, the [Defendants] shall hold minors in facilities that are safe and sanitary and that  are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id*. ¶ 12.A.

[15] March 28, 2020, Order at 10, *quoting Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018).

[16] *Id*. at 10, citing Schey Decl. ¶ 7; Cambria Decl. ¶ 39; Fluharty Decl. ¶ 38–40; Meza Decl. ¶¶ 10, 43.

[17] It is now clear that not only does ICE not make and record continuous efforts aimed at the release of class members to sponsors identified in Paragraph 14, and do this "without unnecessary delay" as the Agreement requires, *it is undisputed that it does not even have a program, or policies, or any existing procedures in place to do this*.

15

### A.    Family Reunification Centers (FRCs)

As the ICE. Juvenile Coordinator's Report states, during the week of May 10, 2020, "officers at FRCs were instructed to conduct new parole determinations for all minors held in ICE custody." *Id*. at 2. ICE assessed class members for release *only* using its "parole worksheet." ICE Report at 2-3. The ICE Report does not indicate that any class members were interviewed. It appears only parents of class members were interviewed.

Defendants' parole worksheet says nothing about making and recording continuous steps without unnecessary delay towards the release of minors to sponsors. Instead, the worksheet states it must be used "when considering minors for parole from custody," not release pursuant to FSA ¶¶ 14, 18.[18] *Defendants' parole regulation is nothing like the Flores terms.[19]* It further renders efforts at release entirely discretionary, not mandatory.[20]

Defendants have not produced completed "worksheets" for any Class Members either to the Court or to Class Counsel.

---

[18] The instruction makes clear it is to determine parole not under the FSA, but instead whether the minor is "eligible for parole pursuant to the standard in Immigration and Nationality Act Section 212(d)(5)(A) and 8 C.F.R. $ 212(d)(5)." *Id.*

[19] It states: "The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(c) of this chapter [i.e. all class members in expedited removal] would generally be justified only on a *case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,*' provided the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b) (emphasis supplied).

[20] It does state that "(i) Minors *may* be released to a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, or grandparent) not in detention," and also that "(ii) Minors *may* be released with an accompanying parent or legal guardian who is in detention." 8 C.F.R.§ 212.5(b)(3)(i) and (ii) (emphasis added). Neither the "worksheet" nor the parole regulation recognize a presumption of release, or steps that must be taken and recorded from the time of apprehension aimed at the release of minors without unnecessary delay.

ICE's interviews with Class Members' parents to determine if they wanted to be "separated" from their children were conducted --

• without notice to parents' and Class Members' counsel of record or the opportunity to consult with their counsel of record, *see* Cambria Decl. ¶ 12 ("On May 14, 2020, we learned that ICE had met with our clients without giving us notice of these meetings …"); Meza Decl. ¶ 32, 36 ("On the morning of Thursday May 14, 2020, Multiple RAICES staff members began to alert me … that the clients with whom they were meeting via telephone and video-call had been approached by ICE the day prior to 'sign agreements to separate them from their children … Clients informed staff that every family at Karnes had been presented with this form … RAICES was provided with no notice of these meetings"); Fluharty Decl. ¶ 36 ("ICE did not provide Proyecto Dilley with advance notice of the meetings held with our clients…");

• without counsel of record for Class Members and parents being present, *see* Cambria Decl. ¶ 12 ("[ICE] met with our clients without giving us … an opportunity, to be present"); Meza Decl. ¶ 33, 36 ("[a client] tried to speak with RAICES on the phone but ICE did not give him enough time and told him that he would have 'problems' if he did not sign the form … No family was provided the opportunity to meet with counsel prior to or during the meeting with ICE regarding potential separation"); Fluharty Decl. ¶ 36, 50 (" ("ICE did not … facilitate our participation during the meetings … The overwhelming majority of mothers stated they did not wish to make a decision, or sign any documents, without having the opportunity to consult with their attorney.");

• without providing parents or Class Members with an oral or written notice of Class Members' rights under the FSA, *see* Cambria Decl. ¶ 12c ("[Parents] were explained no process or procedures in place to separate them from their very small children …"); Meza Decl. ¶ 35 ("Reports from families demonstrate that ICE did not even minimally attempt to inform families of *Flores* class member's rights

17

under the *Flores* Settlement Agreement. No family reported that their brief conversation with ICE included information about their child's rights under the *Flores* Settlement Agreement."); Fluharty Decl. ¶ 42, 45, 52 ("Women state they were told 'I'm giving you a document, you have to sign it' … ICE officers provided misleading, if not materially false, information to mothers during the meeting … [One] mother states she was told 'if you do not sign, you will be deported'");

• without providing parents or Class Members with a notice of Class Members' rights in a language parents or Class Members understood, *see* Meza Decl. ¶ 37, 38 ("These meetings were fraught with troubling and coercive behavior on the part of ICE.  For instance, one indigenous father reported that when he informed ICE that he did not understand much Spanish, ICE dismissed his concerns and proceeded with the interview in Spanish … A family who states that they understand approximately sixty-percent of Spanish was not provided with a Portuguese interpreter … One father reported that the ICE officer who spoke to him spoke poor Spanish and that the father had difficulty understanding him.  He understood that when the ICE officer told him to 'sign here' that it was an order, and that he did not have the option to decline signature"); Fluharty Decl. ¶ 39, 56 ("Some mothers state an officer explained that 'we came to inform you on the part of ICE that your kids will be turned in to sponsors and you will stay' … One mother who speaks an indigenous language informed ICE she could not communicate in Spanish … Without the assistance of an interpreter, the officer gave the mother two pieces of paper and indicated she must sign them, speaking in Spanish only … Confused, the mother refused to sign the documents. The officer then reportedly yelled at the mother, telling her that if she did not sign, she would be deported");

• without advising parents or Class Members that any decision they made to have a Class Member released could be reversed prior to the Class Member actually being released, *see* Meza Decl. ¶ 35 ("Families were not advised that they could

change their decision at a later date"); Fluharty Decl. ¶ 39, 53 ("mothers state they were instructed to decide whether they wanted to be with their children in detention, or separated from their child so their child could reside with a sponsor … Some mothers who were left in the hallway and not initially placed in a courtroom state they were never provided with any information at all … At least one mother signed a document, changed her mind, and asked if she could redo the form … The mother went back and asked an ICE officer if she could un-sign the document. The ICE officer said 'no', 'that there was nothing to be done', and that she should 'leave immediately');

• without explaining what steps ICE would take, if any, to assess the ability of designated sponsors to safely care for released Class Members, *see* Meza Decl. ¶ 35 ("ICE did not explain to families what steps, if any, they would take to assess the ability of the sponsor to care for the child if the family chose to have their child or children released from detention"); Fluharty Decl. ¶ 46, 51  ("100 percent of interviewed mothers reported that they were not told … [w]hat steps, if any, would be taken before their child went to live with a sponsor … When [one mother] learned she was not allowed to consult with her attorney, the mother refused to sign the form and told other mothers that it was not a good idea to sign. An officer then told the mother to stop spreading negativity and called her 'Riff Raff.'"); and

• without advising parents that they could apply for parole so they could possibly be released with their child under 8 CFR 212.5(b)(3)(ii). *See* Cambria Decl. ¶ 12d (" Each family was told that if they opted to separate themselves from their children, they – the parents – would remain in detention"); Meza Decl. ¶ 35 ("At these meetings, parents were not informed that they could be considered for parole"); Fluharty Decl. ¶ 45, 54 ("Another ICE officer told mothers that 'because of their attorneys', they must remain detained without their children … One mother

states an ICE officer indicated that he wanted all of the families to 'go home,' or be deported.")[21]

### B.    Juvenile Detention Centers

As of May 20, 2020, three Class Members continue to be detained by ICE at Cowlitz Juvenile Detention Center in Washington and two are now detained by ICE at NORCOR Juvenile Detention Center in Oregon. The ICE Report includes a grid that cites to "circumstances surrounding detention" for Class Members detained by ICE in juvenile jails, each of which appears to describe ICE's justification for initial placement. ICE Report at 9 and 11. However, the Report is devoid of any basis for the ongoing indefinite detention of Class Members in these facilities.

The ICE Report does not claim that the agency engaged in any individualized assessment of dangerousness or specific flight risk for any of these Class Members, nor does it appear that the agency has made *any* efforts to release these Class Members to their relatives or transfer them to the least restrictive placement.[22] Instead, without speaking to the children or their parents or otherwise conducting any apparent individualized assessments of the children at Cowlitz, ICE summarily denied each of their requests for release during the pandemic within one to three days. Exhibit D, Ratcliffe Declaration. ¶ 13.[23]

Such denials are particularly egregious for minors in juvenile jails. Given the harsh conditions of juvenile confinement on an already traumatized population

---

[21] The ICE Report also asserts that all listed Class Members are deemed a flight risk. It fails to explain how or why these determinations were made, nor does it state or suggest that the detailed terms of the FSA regarding flight risk were applied when making these determinations.

[22] *See e.g.* Exhibit U M.D.J.S. Decl. ¶¶ 9,12; Exhibit Q A.P.P. Decl. ¶¶ 11,13; Exhibit S M.E.B.R. Decl. ¶¶ 9, 12 [Dkt 774].

[23] *See also* Exhibit T Declaration of X.E.S. ¶ 14 (request sent April 6, 2020, denial received April 7, 2020); Exhibit P. Declaration of  A.F.P.P. ¶ 13 and Exhibit R Declaration of B.B.B. ¶ 11 (for both, request sent April 14, 2020 and denial received April 17, 2020) [Dkt 774].

during a globally distressing time, "it is thus hard to imagine a more vulnerable
population [than incarcerated children] whose very significant needs should be
treated with the utmost sensitivity in the face of this Pandemic." Exhibit M
Declaration of Dr. Craig Haney ¶ 13 [Dkt 759]. The continued detention of these
Class Members in secure facilities is "a grave threat to their physical and mental
health." *Id*. at 19. Moreover, their "incarceration during this crisis will likely result
in their placement in settings that are the equivalent of solitary confinement, placing
them at even greater risk." *Id*. This concern is a reality at Cowlitz where, for
example, one youth's sole human interaction for an entire month was with a guard.
Ratcliffe Decl. ¶ 25.

Sensitivity to the vulnerabilities of detained minors has already prompted the
release of all United States citizen children from Cowlitz (except for two minors
being held pursuant to out-of-state contracts). Ratcliffe Decl. ¶ 18. However,
instead of releasing Class Members, ICE has detained a second Class Member at
NORCOR in the midst of this pandemic, totaling five Class Members incarcerated
by ICE in institutions whose harsh conditions of confinement (including excessive
use of solitary confinement and strapping children to a confinement chair), lack of
transparency, and disparate treatment of ICE detainees have prompted alarming
reports from human rights organizations as recently as April 22, 2020.[24]

---

[24] University of Washington, Center for Human Rights. *Immigration Family
Separation in Northwest Juvenile Jails*. April 22, 2020. Available at:
https://jsis.washington.edu/humanrights/2020/04/22/cowlitz-norcor-immigrant-
family-separation/; Disability Rights Oregon. *"Don't Look Around":A Window
Into Inhumane Conditions for Youth at NORCOR*. Winter 2017. Available at:
https://bit.ly/2VsQ9GQ; *See also* CNN. *'Secret and unaccountable': Where some
immigrant teens are being taken by ICE*. November 30, 2019. Available at:
https://www.cnn.com/2019/10/24/us/ice-kids-detention-invs/index.html

Given the current stakes of this public health crisis[25], the availability of family members for reunification with the Class Members at Cowlitz, and the unique vulnerability of youth incarcerated in juvenile detention centers, ICE's failure to make any efforts to release Class Members from juvenile detention facilities or to place them in the least restrictive environment is a clear violation of the *Flores* Settlement Agreement.

V.   CONCLUSION

For the foregoing reasons, the Court should  reject Defendants' purported compliance with the FSA and this Court's prior Orders by way of its securing of waivers of Class Members' rights through brief coercive interviews with parents outside of the presence of their counsel of record. The Court should reiterate that all Class Members, including accompanied Class Members, are covered by the FSA's conditions *and* release provisions, and may wish to order that the parties promptly meet and confer to address how *Flores* rights may be explained to parents in a fair and efficient manner and report back to the Court by a date certain. Plaintiffs also respectfully request that the Court order that ICE make immediate efforts to release Class Members detained at juvenile jails and either reunite them with family or, in the alternative, transfer them to the least restrictive placement, prioritizing close proximity to family.

Dated:   May 21, 2020.          CENTER FOR HUMAN RIGHTS AND
                                CONSTITUTIONAL LAW
                                Peter A. Schey
                                Carlos R. Holguin

---

[25] The Sentencing Project. *COVID-19 in Juvenile Facilities*. May 14, 2020. Available at: https://www.sentencingproject.org/publications/covid-19-in-juvenile-facilities/ (As of May 19, 2020, there are at least 463 known youth and 534 known staff members who have tested positive for COVID-19 in juvenile jails).

22

USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing

LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum

UNIVERSITY OF CALIFORNIA DAVIS
SCHOOL OF LAW
Immigration Law Clinic
Holly S. Cooper
Daisy O. Felt

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch
Neha Desai
Poonam Juneja
Freya Pitts

THE LAW FOUNDATION OF SILICON VALLEY
Jennifer Kelleher Cloyd
Katherine H. Manning
Annette Kirkham


*Of counsel:*

ALDEA - THE PEOPLE'S JUSTICE CENTER
Bridget Cambria


           */s/ Peter Schey*
Peter A. Schey
*Attorneys for Plaintiffs*

23