# EXHIBIT B

## MAY 20, 2020 SUPPLEMENTAL DECLARATION OF SHALYN FLUHARTY

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I have previously submitted three declarations in this matter.  The facts presented in those declarations remain true and correct. The facts contained in this declaration are based on my personal knowledge, and I can testify competently to them if called upon to do so. I am now providing this supplementary declaration to update the court concerning the detention of families in the South Texas Family Residential Center (STFRC) during the COVID-19 pandemic.

***Despite this Court's March 28, April 10, and April 24, 2020 Orders, ICE has failed to conduct individualized assessments and release class members from detention.***

2. ICE has had 27 days since this Court's April 24, 2020 Order to release class members. Instead, it has kept 111 children locked away in a secure, unlicensed facility—which is in and of itself a violation of this Court's prior orders and the *Flores* Settlement Agreement.

3. As of May 20, 2020, 196 individuals remain detained at STFRC.[1]  These individuals make up 85 family units. There are currently 111 children detained at STFRC, ranging in age from one year old to seventeen years old.  Attached as Exhibit 1 to this declaration is a list of all 111 children, identified by their initials, known to Proyecto Dilley who are currently detained and their total length of detention. Although ICE has released some children since the court's prior order, releases are minimal and the 111 children who remain detained are effectively stuck in detention.

4. The average length of detention for children at STFRC is 169 days as of May 20, 2020.[2] One child, a thirteen-year-old boy, has been detained for 284 days.  55 children have been detained for over 200 days; 15 have been detained between 101 and 131 days; 36 have been detained between 39 and 98 days; and five have been detained less than twenty days.

5. Of the 85 families that are currently detained at STFRC: two families have Notices to Appear; one family is awaiting the result of their credible fear interview; one family has a motion to reopen pending with the Immigration Judge; two families have pending appeals with the Board of Immigration Appeals; sixty-seven families have stays of removal

---

[1] This number does not include detained families who remain unknown to Proyecto Dilley, if any, because they have been placed in quarantine and limited in their ability to make contact with counsel to request legal assistance. Proyecto Dilley was formerly known as the Dilley Pro Bono Project.

[2] Length of detention is calculated from the child's date of initial apprehension by ICE or CBP.

issued by a federal court; and twelve families are pending removal. Accordingly, there are 74 families—or 87 percent of families currently detained at STFRC—for whom removal is not imminent.

6.  Proyecto Dilley's attempts to facilitate ICE's compliance with this Court's orders have repeatedly been ignored. We previously wrote to ICE on March 31, 2020, April 2, 2020, and April 18, 2020 to request the release of detained children as required by the *Flores* Settlement Agreement and Judge Gee's court orders. ICE did not respond to our requests.

7.  To date, Proyecto Dilley is unaware of *any* individualized release assessments that have been conducted for children who are currently detained at STFRC. To the extent ICE has conducted an individualized assessment of flight risk or danger for a detained child, neither the child, the child's mother, nor Proyecto Dilley is aware of that individualized determination.

8.  Since the Court's April 24, 2020 Order, releases at STFRC have halted. 106 of the 111 children who are currently detained were in detention at the time of this Court's April 24, 2020 Order. 100 Class Members have been detained at STFRC since this Court's first order during the COVID-19 pandemic, on March 28, 2020.

9.  In addition, on May 19, 2020, one family reported to Proyecto Dilley staff that new families had arrived to STFRC. As of May 20, 2020, Proyecto Dilley has been unable to verify or contact any of these families, as they are believed to be in the "quarantine neighborhood" for new arrivals, where access to counsel is restricted.

***Conditions at STFRC remain unsafe and unsanitary.***

10. Conditions at STFRC in Dilley remain unsafe and unsanitary, like before. The same inadequate cleaning measures, inability to socially distance, and lack of information sharing have persisted as we enter yet another month of the COVID-19 pandemic.

11. Inadequate and substandard cleaning and infection prevention mechanisms still persist at STFRC. As recently as yesterday, May 19, 2020, mothers report being denied disinfectant spray and disinfectant wipes to clean their rooms, being served in the dining hall by individuals who do not wear gloves, and the ongoing use of detained mothers to facilitate cleaning, rather than professional cleaning staff.

12. Detained mothers continue to make facemasks for detained families, and are being paid $1 per hour for their work. One mother making the masks reports that she repeatedly asks why they are making additional masks and who they are for, but she has yet to receive and answer.

13. Access to hand sanitizer has diminished since my previous report to the Court. Families currently report that the hand sanitizer that was previously available for use in the dining area has been replaced with hand soap. Because the hand soap requires water, and water is not easily accessible where the dispensers are located, the dispensers in the dining hall go unused. Mothers have also reported as recently as May 19, 2020 that tables are not consistently cleaned after a family finishes eating.

14. We continue to receive reports that PPE availability and use remains inconsistent. For the first time starting last week, families report that the majority of detention center staff are now wearing facemasks. However, the use of gloves is infrequent, and at least one mother reported as recently as May 19, 2020 that she was served food in the dining hall by someone who was not wearing gloves.

15. Families report that they still have not received any formal education regarding COVID-19. Mothers have disclosed that they still have questions about what they should and can do to protect themselves, the symptoms for COVID-19, and what they should do if they or their child develop symptoms, and report that no one at STFRC has answered these questions for them.

**Social distancing remains impossible at STFRC.**

16. Although the number of individuals currently detained at STFRC is small when compared to the facility's total capacity, facility operations have failed to ensure social distancing. Rather than using the additional space available at STFRC to further limit the number of people who share communal bathrooms, time in the dining hall, the library, etc., STFRC has closed certain "neighborhoods," consolidating families into other neighborhoods that remain open. This has resulted in the ongoing shuffling of families from one neighborhood to the other. Two weeks ago, for example, all families in the "red" neighborhood were moved to and combined with the "green" neighborhood. Last week, all families in the "yellow" neighborhood were moved to the "red" neighborhood.

17. As recently as May 19, 2020, mothers report eating in the dining hall with approximately forty people at a time and that eight individuals continue to eat at a table at a time.

18. Families continue to report large gatherings in the gym and other locations. One mother estimated that there were approximately sixty individuals in the gym at the same time last week.

**STFRC does not conduct adequate COVID-19 testing or implement sufficient COVID-19 testing protocols.**

19. Since my last report to the Court, I have learned that STFRC has received a COVID-19 testing machine. I do not know how or when the testing machine is used, and have reason

3

to believe that it is used solely in advance of removal for individuals who are being removed to Guatemala.

20. Despite the COVID-19 testing machine that is now available at STFRC, Proyecto Dilley clients who remain detained report generally that they have not been tested for COVID-19 at STFRC, even though they may have symptoms indicative of COVID-19, such as chest pain, fever, and body aches.

**An ICE facility 15 minutes away from STFRC is experiencing a COVID-19 outbreak.**

21. The South Texas Detention Complex, an ICE-contracted detention center operated by the GEO group, is located in Pearsall, Texas. Pearsall, Texas is approximately a 15 minute drive from Dilley, Texas.

22. At the beginning of May 2020, ICE first reported a case of COVID-19 at the South Texas Detention Complex. As of May 19, 2020, 32 detained individuals have tested positive for COVID-19 and five GEO employees have tested positive.[3]

23. The COVID-19 outbreak in Pearsall poses considerable risk to the families who are detained in Dilley because ICE employees frequently work at both facilities. For example, ICE's Office of Chief Counsel has attorneys that work weekly in Dilley and Pearsall. In addition, the Frio Hospital located in Pearsall regularly treats individuals who are detained in both facilities.

**Detained children and their parents are regularly denied access to necessary medical care at STFRC.**

24. ICE does not appropriately identify, assess, or consider for release children (and parents) who are at "high-risk" for serious illness or death from COVID-19. The government's May 15, 2020 submission states that ICE identifies detained individuals who have medical conditions that place them at a heightened risk for serious illness or death if infected by COVID-19 and promptly reviews the case of each individual to determine if release is appropriate. *See* May 2020 Interim Report of Juvenile Coordinator Deane Dougherty, Doc # 788-1. However, Proyecto Dilley has identified numerous mothers and children with serious medical conditions who remain detained.

25. Of the 111 class members currently detained, twenty-six report medical issues. In addition, thirty-eight mothers report having medical conditions. Currently detained class members suffer from issues including, but not limited to: asthma, gastritis, high blood

---

[3] ICE Guidance on COVID-19, Confirmed Cases, https://www.ice.gov/coronavirus (last accessed May 20, 2020 at 5:20 p.m.).

pressure, heart murmurs, fainting, abdominal pain, anemia, and Guillain-Barre disease. Mothers suffer from conditions including asthma, high blood pressure, chest pain, thyroid disease, liver disease, kidney problems, and diabetes.

26. ICE submissions state that ICE reviews the custody status of individuals detained at STFRC any time new information is presented. Proyecto Dilley wrote to ICE on March 24, 2020, April 2, 2020, April 8, 2020, April 15, 2020, April 17, 2020 and April 20, 2020 to request the release of specific children and mothers with serious medical conditions that make them particularly inappropriate for detention. For example, Proyecto Dilley requested custody review and release for: a child with epilepsy; a one-year-old baby who, subsequent to five days of hospitalization while in Customs and Border Protection custody, had newly exacerbating symptoms that affected his breathing; several children with heart murmurs; a child with tachycardia, cardiac attacks, and uncontrolled gastritis; a child that was hospitalized while in ICE custody because he couldn't breathe and was turning blue; a mother who was hospitalized due to uncontrolled high blood pressure; several mothers who were experiencing complications with their pregnancies; and several mothers and children with asthma. ICE did not respond to five of the six requests submitted by Proyecto Dilley. ICE did respond to our April 2, 2020, letter to advise us that ICE cannot does not rely upon information provided by Proyecto Dilley in relation to the medical condition of detained individuals.

27. Specific cases that are brought to ICE's attention are similarly ignored. For example, on May 7, 2020, Proyecto Dilley requested the release of a seven-year-old who had been diagnosed at STFRC with a potential infection in his abdomen and thyroid. Medical staff at the facility informed the mother that her son required additional testing that could not be provided at STFRC because the facility lacks the medical equipment and expertise to provide further examination. ICE did not respond to the Proyecto Dilley's request for release and information, and the child remains detained.

28. On May 13, 2020, Proyecto Dilley requested the release of a mother who has a tumor growing in the back of her neck. The mother has informed medical staff at STFRC that she is experiencing severe headaches, impaired vision, impaired mobility, and memory loss. The mother also has high blood pressure. The mother reported that medical staff at STFRC told her the tumor was "dangerous," but that there is no specialist available at STFRC to further evaluate it. Proyecto Dilley has still not received a response to this request for release.

29. We have documented numerous cases in which children detained at STFRC have been deprived necessary medical care while detained. Such is the case with J.S.P., a child who has been detained for 101 days. J.S.P.'s mother reports that J.S.P. first fell ill two years ago and became weak and started to have problems with balance, walking, running, and

any sort of physical activity normal for a child of his age. Shortly after arriving at STFRC at the beginning of February 2020, J.S.P.—a six-year-old boy—was hospitalized for approximately five days. J.S.P.'s mother reports that doctors conducted several tests, including an ultrasound and a lumbar puncture. It was at that time that J.S.P. was diagnosed with Guillian-Barre syndrome. The doctors at the hospital informed J.S.P.'s mother that J.S.P. required intensive physical therapy—a minimum of three times a week for two-hour intervals, or one hour a day. J.S.P.'s mother reports that the doctor at the hospital conveyed that any delay in treatment would only lead to a longer healing process for J.S.P. ICE Health Service Corp (IHSC) staff at STFRC told J.S.P.'s mother upon their release from the hospital that they were waiting for outpatient physical therapy to be scheduled. J.S.P.'s mother reports that she went again to IHSC on March 18, 2020 to ask about her son's physical therapy, and she was told it was still waiting to be scheduled. As of today, May 20, 2020, she is still waiting for her son's physical therapy to be scheduled, and her son has not been placed on any medication or offered alternative treatment at STFRC. Currently, J.S.P. suffers from weakness and numbness in his extremities, has problems with balance, and has trouble walking or standing upright for extended periods of time without falling down.

30. Proyecto Dilley represents numerous mothers with medical conditions, who are not appropriate for detention, and who have been denied access to necessary medical care while detained. ICE's custody review for individuals with medical conditions does not appear to be ongoing. Although Proyecto Dilley has represented numerous individuals who were released in relation to a medical issue, release typically does not occur until after an individual's medical condition has become absolutely critical.

31. One mother has suffered from kidney problems for approximately four years. Four years ago, this mother was hospitalized twice when she experienced nausea, vomited blood, fever, and had blood in her urine and stool. Doctors in her home country told her that one of her kidneys was not working well and told her that she required follow up care. Doctors placed her on a treatment regime for a year and half and told her that if her condition deteriorated, she would require dialysis. Over the past three years, she had regular follow-up appointments and testing to monitor her condition. In or around mid-December 2019, while detained at STFRC, she began to feel pain in her abdomen and vomit blood. When transported to a hospital—presumably in San Antonio because it was more than an hour away—a doctor determined she had an infection in her kidney, prescribed her with an antibiotic, and gave her an injection for the pain. In April 2020, this mother again sought medical treatment because she was experiencing abdominal pain in her right side and vomiting blood. On May 15, 2020, this mother again sought treatment because she was experiencing abdominal pain and swelling and had begun vomiting blood. Medical staff at STFRC told her they couldn't transport her off-site for emergency care because of coronavirus. She received no additional testing, and was prescribed ibuprofen for her pain. As of May 20, 2020, this mother reports that she still is

experiencing pain in her right abdomen, and believes she requires further testing and specialty care.

32. The hospitalization of a parent poses particular challenges for children at STFRC, which remains, and has always been, an unlicensed facility. In my experience, when a mother is transported for emergency medical care off-site, her child is left unaccompanied at STFRC. Proyecto Dilley has represented mothers who were hospitalized for more than a month, while their toddler remained at STFRC alone.

33. On April 20 and May 7, 2020, Proyecto Dilley informed ICE of individuals, both Class Members and their parents, for whom ICE was required to conduct a custody redetermination pursuant to *Fraihat v. ICE.*[4] Of thirty-four mothers with medical conditions who were surveyed on May 19, 2020, *none* of them reported being informed that their custody status had been, or would be, reviewed.

**On May 14, 2020 ICE implemented a facility-wide family separation or indefinite detention policy at STFRC. The process was coercive.**

34. On May 14, 2020 ICE met with the overwhelming majority of mothers detained at STFRC. During the meeting, mothers were asked to choose between keeping their child with them in detention, and their child's release from detention to live with another adult.[5] Mothers were presented with documents, and asked to sign them.

35. Proyecto Dilley staff conducted detailed interviews with 44 mothers on May 18, 2020 regarding what occurred during their meeting with ICE. Paragraphs 35 through 58 below are based upon first-hand accounts of the women interviewed. Any and all facts herein can be submitted through a sworn statement of each individual mother. This declaration attempts to minimize the overall submissions provided to the court while capturing the group-wide and individual experiences of our clients.

36. ICE did not provide Proyecto Dilley with advance notice of the meetings held with our clients, or facilitate our participation during the meetings. Although Proyecto Dilley requested a copy of the forms presented to and/or signed by our clients, ICE denied our request.

---

[4] ICE is required to conduct timely custody redeterminations for all *Fraihat v. ICE* class members, including individuals whose custody has already been reviewed. *Fraihat v. ICE*, Case No. 5:19-cv-01546-JGB-SHK, ECF No. 132, at 38 (C.D. Cal. Apr. 20, 2020). The nationwide preliminary injunction issued by the Central District of California on April 20, 2020 requires such custody determinations for <u>all</u> individuals in ICE custody who possess certain "Risk Factors" or disabilities, such as being over the age of 55, being pregnant, or having certain chronic health conditions. *Id*

[5] One mother reported she meet with ICE on May 13, 2020 and one mother reported she meet with ICE on May 15, 2020.

37. Women report that on May 14, 2020 ICE called a meeting with all detained mothers at approximately 9:30 a.m. in the "Court" building. Mothers report 10 to 20 ICE officers, and numerous CoreCivic guards, were present in the Court building during the meeting.

38. Upon arrival, mothers were divided into groups of approximately 10-12 women and placed in approximately five different small courtrooms. Women were asked to sit side by side. Because there were too many mothers to fit in the available courtrooms at once, many mothers waited in the hallway until it was their turn to pass into a courtroom. Women described the experience as "chaotic" and "disorganized." To the extent reports provided by mothers differ, I believe it is because the ICE officers who spoke with mothers at STFRC provided inconsistent information and utilized different procedures.

39. Once sitting in one of the courtrooms, ICE officers spoke to mothers for five to ten minutes as a group. Thirty five of 44 (79.5 percent) mothers informed Proyecto Dilley that during the meeting, ICE officers asked them to choose between being separated from their child so the child could leave the facility to reside with a sponsor, and keeping their child with them in detention. Some mothers state an officer explained that "we came to inform you on the part of ICE that your kids will be turned in to sponsors and you will stay". Other mothers state they were instructed to decide whether they wanted to be with their children in detention, or separated from their child so their child could reside with a sponsor. Most mothers were also asked to confirm the name, address, and contact information for the family's receiving person. Some mothers who were left in the hallway and not initially placed in a courtroom state they were never provided with any information at all. This is consistent with the reports of nine (20.5 percent) mothers that they were presented with forms to sign, but never presented with any questions regarding the detention of their child or family separation.

40. After this brief explanation, ICE officers spoke with the majority of women individually. 25 of the 44 mothers (56.8 percent) we interviewed report they were asked to sign a form; 19 (43.2 percent) women report they were not asked to sign a form. Many mothers state they were asked to provide their signature on more than one document. During these individual meetings—which occurred while women were pulled to the front of the courtroom with other mothers in the room waiting their turn—mothers observed ICE officers completing a form that was between one and four pages. The form was not translated to mothers and was written in English. Mothers were not provided with a copy of the form to read or keep. At least one officer told a mother that although she could not be given a copy of the form a copy, a copy would be provided to her lawyer.

41. ICE officers provided mothers with conflicting information regarding the purpose and significance of signing the form(s). Some women were told they should sign the document if they were in agreement with being separated from their children. Other

mothers were told their signature was irrelevant and meaningless. Many mothers believed signing the form indicated they would be separated from their children, and deported alone. One mother states an ICE officer described the purpose of signing the forms in this way: "whatever you sign, it's just the same as what you've already signed. And it doesn't matter what you sign because we will do what we want."

42. Although some mothers state they were told they were not required to sign documents if they did not want to, many mothers report being forced to sign. Women state they were told "I'm giving you a document, you have to sign it." Some ICE officers and CoreCivic guards informed mothers that signing the form would "benefit" them, and that signing the form would be "positive" for them. As a result, many mothers believed something negative would happen if they did not sign the form. Some mothers understood they would be separated from their children, and deported without them, if they did not sign the form. Other mothers feared they would be separated from their children and deported without them, even if they did sign the form.

43. Mothers consistently report that they felt nervous, confused and scared during the meeting. One mother explained her experience like this: "I couldn't understand if they could actually take my child away and I was trying to ask the other women and they didn't know." One mother was informed directly that she would be separated from her daughter, her daughter would go to her father (even though the child's father is not the family's designated sponsor), and she would be deported.

44. Some women report ICE used a hand raising process to determine which mothers agreed to being separated from their child. One mother explained, "They asked us to raise our hands if we wanted our children to live with our sponsors." Another said, "It made me feel very bad. As a mother this was the worst thing we could have been asked." Many mothers describe feeling physically ill when they were presented with questions regarding possible separation from their child. One mother described feeling like her "heart was going to fall out."

45. ICE officers provided misleading, if not materially false, information to mothers during the meeting. One ICE officer told a mother if it was up to him, he would "let everyone go." ICE has the discretion to release family units, and has chosen not to do so. Another ICE officer told mothers that "because of their attorneys", they must remain detained without their children. One mother states "I asked them if they would separate me from my child and they said 'no' that they were just going to add this to my folder." Another woman, however, was told that her "child would be immediately released" if she signed the form. Many mothers were told that if they choose to be separated from their child, the mother would remain at STFRC. No single women are detained at STFRC; the facility is only houses family units.

46. Although four of the forty-four (9.1 percent) women interviewed by Proyecto Dilley
stated they were allowed to ask ICE officers questions, 40 (90.9 percent) women state
they were not able to ask any questions. No mother was provided information regarding
what would happen if her child was separated from her and released to the community
alone. 100 percent of interviewed mothers reported that they were not told:

- What steps, if any, would be taken before their child went to live with a sponsor;
- How their child would travel to their sponsor;
- When they would see their child again, if separated; or
- If their child would be deported, if they were deported.

47. 12 of the 44 (27.3 percent) mothers surveyed reported that the sponsor designated to
receive their family is a friend with no blood relation. In some cases, a family's receiving
person is a friend of a friend, or a friend of a family member. Six (13.6 percent) mothers
state they have never met their designated sponsor, and 17 (38.6 percent) mothers state
their child(ren) has never met their designated sponsor.

48. Only two mothers (4.5 percent) surveyed by Proyecto Dilley state that they would feel
comfortable leaving their child in the care of their designated sponsor. One mother
explained, "I would feel comfortable, but it would make me very sad." Another stated,
"to escape the misery that I am going to return to, I would like to send my child there if I
need to."

49. Many mothers stated that they would not feel comfortable leaving their child in the care
of their designated sponsor. One mother explained, "My only company and partner in life
is my child. My life has no meaning without him. Life for me doesn't mean anything if I
don't have my child with me. He's the one who gives me strength." Another mother
stated, "because of my daughter's health, she needs me. I would also feel so sad, because
she is a teenager, and this is the time she needs me most." Another mother stated she
could not be separated from her child because "he is still very young, and breastfeeding."
Another mother exclaimed that she could not be separated from her child, "because she's
my only daughter, and she's never been away from me."

50. The overwhelming majority of mothers stated they did not wish to make a decision, or
sign any documents, without having the opportunity to consult with their attorney. Many
mothers also wished to have time to speak with their children before making a decision.
Mothers report they were told they needed to sign and could speak with their attorney
later. Many women asked for a copy of the form they were required to sign so that they
could share it with their lawyer. Their requests were denied.

51. One mother asked if she could consult with her attorney before signing the form. When
she learned she was not allowed to consult with her attorney, the mother refused to sign

the form and told other mothers that it was not a good idea to sign. An officer then told the mother to stop spreading negativity and called her "riff raff." The officer became angry and told the mother to "back up" because he was "police." The mother said that this experience left her filled with anguish. She felt like she had been treated like a "simple-minded person." When her son found out, he broke down crying and begged his mother not to sign anything that would separate them.

52. When asked about how they were treated by ICE officers during these conversations, mothers report that "they were treating us fine until moms started to refuse to sign." After refusing to sign the documents presented, mothers describe feeling degraded, intimidated, and afraid. 13 of the 44 mothers (29.5 percent) interviewed stated they felt intimidated during the meeting. Once a mother indicated she did not wish to sign a document, mothers report being told "if you don't sign, then get out." Another mother states she was told "if you do not sign, you will be deported." Multiple women report being told when refusing to sign the form that their failure to sign would be communicated to the Judge, and that they should be ready to "explain" their refusal to sign to the Judge.

53. At least one mother signed a document, changed her mind, and asked if she could redo the form. She regretted her decision and signature. The mother went back and asked an ICE officer if she could un-sign the document. The ICE officer said "no," "that there was nothing to be done," and that she should "leave immediately."

54. Mothers state that some of the ICE officers acted "angry," "aggressive," like "bullies," and "rude." One mother reports that ICE officers were laughing at the women. Another stated ICE referred to the women's children as "creatures," a reference used to refer to the children of animals in Spanish. One mother states an ICE officer indicated that he wanted all of the families to "go home," or be deported. Multiple mothers report that when they were first told they may be separated from their children, they remained silent. The ICE officer who provided the information then stated sarcastically, as if mimicking one of the women, "thank you officer!" He then stated, "this is why I love my job" while making the sign of the cross. Many mothers report that the entire meeting seemed like a joke to the ICE officers present. In the words of one mother in reference to one particular ICE officer, "we all felt he was really enjoying watching us suffer." One mother states she was told "I'm not your enemy but I'm not your friend. I don't care about you". Several mothers informed Proyecto Dilley staff that officials called them "stupid," and other mothers report hearing officers call women "imbéciles" and "dumb."

55. Proyecto Dilley represents many mothers who speak limited or no Spanish. One mother stated that at the beginning of the meeting, ICE officers asked if there were any mothers who did not understand any Spanish and stated that the meeting would be quick. As a result, mothers who speak limited Spanish did not self-identify their need for an

interpreter, erroneously believing the meeting would include simple, unimportant, information.

56. Other mothers report informed ICE they did not speak Spanish and being taken out of the group meeting. One mother who speaks an indigenous language informed ICE she could not communicate in Spanish. An ICE officer attempted to secure an interpreter by telephone but was unable to. Without the assistance of an interpreter, the officer gave the mother two pieces of paper and indicated she must sign them, speaking in Spanish only. The mother reports the officer continued to repeat the word "positive" in Spanish, which is the word commonly utilized at STFRC to indicate that the asylum office has provided a family with a positive decision in their case. Confused, the mother refused to sign the documents. The officer then reportedly yelled at the mother, telling her that if she did not sign, she would be deported. The officer then demanded the mother sign the papers "right now" and called her a "liar" for indicating she could not understand Spanish. The mother reiterated that she did not understand and refused to sign, despite feeling pressure to do so from the officers surrounding her.  After several minutes of refusing to sign, one of the officers told her what she understood to mean "we have no use for you here, so get out."  The mother reports that the officer then put his hands on her and physically pushed her out of the room.  This officer then beckoned a detention center employee who grabbed the mother and forced her to leave.  The mother immediately went to her room and sobbed.

57. Many mothers expressed overwhelming frustration to Proyecto Dilley regarding the meeting held with ICE. One mother summed up her feelings about the meeting in this way:

> "We have been here for long time, I think that this is a huge proof that we can't go back to our countries. I have been here eight months, we have been suffering and bearing abuses, and this is because we are scared of going back. We have been here in this detention center, separated from other family members, it's unfair that they want to separate our children at this point. After everything we have been through. It is absurd."

58. Most mothers report their children were unable to accompany them to the meeting because CoreCivic and ICE advised mothers children were required to wait in the child care area. As a result even teenage children were not provided with the opportunity to participate in the meeting, and mothers were unable to consult with their children regarding the information presented by ICE. However, because all families were gathered together at one time, and the child care area was full, some mothers were required to bring their children.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Fort Myers, Florida on May 20, 2020.

_____

Shalyn Fluharty

# Exhibit 1

# Length of detention for children detained at STFRC on May 20, 2020

**Length of detention for children detained at STFRC on May 20, 2020**

| Child's Initials | Days Detained |
|---|---|
| M.E.C. | 284 |
| M.A.S. | 279 |
| A.P.O. | 279 |
| M.B.P. | 278 |
| C.G.M. | 277 |
| V.L.O. | 276 |
| D.L.O. | 276 |
| A.G.D. | 275 |
| N.M.M. | 274 |
| S.V.C. | 274 |
| D.M.S. | 274 |
| M.F.L. | 274 |
| A.A.M. | 273 |
| J.S.O. | 271 |
| R.F.L. | 271 |
| A.R.G. | 271 |
| C.L.A. | 271 |
| S.M.C. | 269 |
| A.R.M. | 270 |
| J.F.P. | 269 |
| B.S.C. | 269 |
| A.R.A. | 268 |
| C.A.A. | 268 |
| W.C.G. | 268 |
| I.G.L. | 267 |
| A.G.L. | 267 |

| | |
|---|---|
| L.C.R. | 267 |
| J.M.H. | 267 |
| A.G.H. | 266 |
| Y.H.A. | 256 |
| A.C.B. | 256 |
| E.C.G. | 256 |
| E.A.N. | 256 |
| S.B.P. | 255 |
| N.C.L. | 255 |
| E.P.V. | 253 |
| M.R.M. | 253 |
| M.D.D. | 251 |
| A.V.L. | 251 |
| A.M.P. | 247 |
| A.P.P. | 247 |
| C.P.P. | 247 |
| M.I.E. | 247 |
| L.A.O. | 240 |
| D.A.O. | 240 |
| S.R.H. | 240 |
| S.R.S. | 236 |
| W.A.A. | 236 |
| A.V.M. | 235 |
| S.G.L. | 231 |
| T.T.G. | 231 |
| A.P.C. | 229 |
| Y.Y.C. | 229 |
| D.M.H. | 229 |
| C.M.R. | 218 |

| | |
|---|---|
| E.S.V. | 131 |
| J.M.F. | 128 |
| Z.M.F. | 128 |
| E.G.F. | 128 |
| D.M. | 126 |
| J.R.V. | 122 |
| J.R.V. | 122 |
| Z.Z.F. | 122 |
| K.T.M. | 121 |
| E.K.M. | 121 |
| S.B.B. | 116 |
| D.K. | 104 |
| J.J.P. | 101 |
| I.V.L. | 101 |
| L.V.L. | 101 |
| V.G.S. | 98 |
| E.R.S. | 96 |
| A.R.S. | 96 |
| B.R.S. | 96 |
| W.L.S. | 96 |
| J.C.L. | 90 |
| G.S.P. | 85 |
| J.Q. | 84 |
| M.H.S. | 83 |
| S.L.P. | 83 |
| N.L.P. | 83 |
| E.L.P. | 83 |
| M.H.M. | 79 |
| J.H.M. | 79 |

| | |
|---|---|
| A.G.Q. | 81 |
| J.P.R. | 80 |
| W.G.B. | 78 |
| M.C.T. | 78 |
| M.C.T. | 78 |
| A.A.V. | 78 |
| W.W.B. | 78 |
| A.A.P. | 75 |
| H.A.P. | 75 |
| A.Z.R. | 74 |
| A.B.S. | 72 |
| J.B.S. | 72 |
| A.M.H. | 72 |
| F.P.P. | 72 |
| C.P.P. | 72 |
| D.S.M. | 66 |
| A.M.M. | 66 |
| B.E. | 63 |
| T.V.M. | 63 |
| J.M.V. | 63 |
| V.T.P. | 63 |
| C.T.C. | 39 |
| S.B.K. | 19 |
| J.B.K. | 19 |
| C.B.K. | 19 |
| A. | 18 |
| S.S.H. | 17 |