# EXHIBIT C

## SUPPLEMENTAL DECLARATION OF ANDREA MEZA

I, Andrea Meza, swearing under penalties of perjury, make the following declaration:

1. I previously submitted a declaration to the Court in this matter. I now submit this supplemental sworn declaration. The facts set forth below are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. My name is Andrea Meza and I am an attorney and the Director of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). I have been the program Director since March 2019. Prior to my position as Director I served as the Associate Director from October 2018-March 2019. From September 2015 to July 2017 I was an Equal Justice Work Fellow and provided direct legal services to families at Karnes. I have been licensed in the state of Texas since November 6, 2015.

**Ongoing Prolonged Detention at the Secure Karnes family detention center**

3. The majority of the families currently detained at Karnes are effectively trapped in a dangerous "limbo" situation as the Covid-19 pandemic spreads in South Texas, and ICE has made few efforts to release remaining families.

4. The families detained at Karnes have been in ICE custody for on average, 70 days. Two families have been detained for 102 days total. The children in these families are two years old and five years old. In the last month, six new families that RAICES represents have arrived at Karnes who have been detained between 19-17 days. All other families have been detained for at least 65 days. There have not been multiple releases since April 28, 2020. This is to say, all but six families that RAICES represents at Karnes were detained when this Court issued its April 24, 2020 order.

5. Of the twenty-nine *Flores* Class members that RAICES represents, 10 are waiting for an immigration judge to review their fear determination, and ten are waiting for results of their fear interview. Two have pending Motions to Reopen, and three are waiting for their fear

interview to be scheduled.  This means that for 86% of RAICES class member clients, removal is not imminent.

6.  Out of 132 RAICES client families released from Karnes since March 20, 2020, 63 were deported, 49 were confirmed released to their sponsors, and 20 are unconfirmed deported or released.  Those deported since March 20, 2020 had been detained for an average of 63 days.

7.  Furthermore, Karnes is still an unlicensed, secure facility.  Often, GEO requires that families have escort even around the detention center premises.  From May 2019-October 2019, the population at Karnes was comprised of single adult women.  During that time, the Assistant Field Office Director (AFOD) of Karnes (who has since moved to another position elsewhere within ICE) took steps to make the facility more secure, including moving the metal detector to the front of the lobby, such that no one can enter the lobby without passing through security.  In early 2020, a new AFOD was assigned to Karnes.  Though Karnes had detained families since October 2019, many of the increased security measures were not retrofitted with the change in population, including the placement of the metal detector.  Additionally, in early 2020 GEO constructed a metal fence around the entire perimeter of Karnes, including the parking lot.  There is now a staffed, locked gate to prevent entry into the parking lot.  Therefore, Karnes has become more secure than ever over the past year and a half.

**Conditions at Karnes Remain Unsafe and Unsanitary**

8.  The conditions at Karnes remain unsafe and unsanitary for children and adults alike.  The only changes that have occurred have been to loosen safety precautions.  Families in quarantine break social distancing when they gather during recreation time, and precautions to minimize the threat of COVID-19 are all but abandoned for families after they are out of 14 day intake quarantine.

9.  In recent weeks, when a family arrives at Karnes, they are kept in a 14 day quarantine.  RAICES represents approximately six families in quarantine, but because these families are kept in isolation, they do not have the same access to RAICES sign-up sheets as those

in the general population, nor do they learn about RAICES' legal services through word of mouth as those in the general population do. Therefore, we cannot be sure how many families are detained in quarantine, but it is certain that new families continue to arrive at Karnes. When one recently arrived father asked GEO why he and his family were kept in quarantine instead of being tested for COVID-19, he was told that it was because tests are too expensive.

10. When a family is in quarantine, nuclear family units that include both parents are separated; fathers are kept in solitary confinement, and mothers and children are kept in a room alone. RAICES client families in quarantine surveyed on May 19, 2020 report that GEO takes minimal precautions for COVID-19, such as using face masks and gloves.

11. Families are given one mask per person, though not all children are provided masks. The majority of families who recently arrived at Karnes do not speak Spanish. They report that their education about COVID-19 and the use of PPE consists of a written pamphlet. For those who speak Spanish, a brief orientation about the virus is provided at intake. Other than that, the only other education provided is via posted signage in English and Spanish. Currently, approximately 45% of the families RAICES serves at Karnes are Haitian. Haitian families continue to report that information is not provided to them in Haitian Creole.

12. Social distancing is not kept in quarantine and cleaning is minimal. Rooms are only cleaned once per day, and they are cleaned by the detained individuals themselves. Families report that cleaning supplies are not readily available and must be requested.

13. During recreation time, twice a day, families are permitted to mingle in a shared recreation yard with multiple families. Otherwise parents and children must remain in their rooms at all times. As described in the attached exhibit, Declaration of Matthew Gartland, M.D., the inability of children to engage in normal levels of physical activity in prison can be a factor leading to serious health issues. Such was the case for the four year old child Dr. Gartland evaluated, who has suffered from hemorrhoids, constipation, bloody stools, and other digestive issues for three months at Karnes.

14. After a family leaves quarantine, the minimal precautions in place while they were in isolation are abandoned and unenforced. In the general population, families spend hours outside in a shared recreation area with dozens of other families. While in the general population, mothers and their children are still separated from the father of the family, but now each shares a room with at least one if not more individuals from different families.

15. Families are provided one mask each. One father stated that when he was given a mask, the instruction he received about its use was that he could either wear it or not, it was his choice. A father who speaks Russian stated that he was not given instructions about how to use his mask, but that he "figured it out." Another father reported that he is not wearing his mask because it is so flimsy that he is worried that if he or someone in his room becomes ill after prolonged use of his mask, the mask will not protect him. He is saving the mask.

16. Families surveyed on May 19, 2020 reported that GEO and ICE do not regularly use masks when they interact with the general population. Parents reported that they could not discern a pattern as to who was wearing a mask when, and for what reason. For example, one parent observed a group of guards mingling together, some with masks, and some without. They report that guards do not wear gloves when they interact with the general population.

17. Since the implementation of stay at home orders, RAICES staff members have been conducting visitation via phone and iPad. Our staff have observed that GEO guards who staff visitation do not wear masks or gloves.

18. Families report that in the last week, the barber shop and gym, which were previously closed as a COVID-19 safety precaution, have re-opened. One father works as a barber, he says that while he has a mask, the adult men and boys whose hair he cuts are not required to wear a mask or take any safety precautions.

19. In the general population, cleaning only happens twice per day. Parents may work as cleaners and can earn up to $3.00 per day. Bar soap costs $2.00 at Karnes. Otherwise, families must use liquid soap, the same soap provided at handwashing stations, to bathe. Families report that currently, soap dispensers sometimes do run out of soap, and that hand

washing stations are only available in certain areas. Families do not report that hand sanitizer is available.

20. News programming continues to be unavailable on televisions since the COVID-19 outbreak began and families began to ask questions about their safety at Karnes during the pandemic. One father reported that there is a lot of confusion about the virus because families do not receive ongoing or updated information about developments with the spread of the virus, its symptoms, or care. Another father lamented that Haitians who don't speak Spanish would much better understand what little information was provided about the use of a mask and guidelines about social distancing if it had been provided in Haitian Creole.

21. Social distancing is not promoted for families in the general population. Although Karnes is functioning at approximately 9% capacity, these families share their rooms with individuals from at least one, often three, other families. Entire sections of the detention center remain closed. Families report that none of the second floor rooms are in use, and that there is no spacing between occupied rooms. GEO staff have told RAICES staff that there have been no staffing changes to reflect the decreased population. Therefore, families at Karnes are held in dense quarters with a high ratio of employees - who leave the detention center daily - present and congregating throughout the spaces where families are held.

22. I am concerned about the possible spread of COVID-19 at Karnes particularly given a widespread outbreak of COVID-19 at the South Texas Detention Complex, an immigration detention center about an hour and a half away from Karnes, approximately 45 minutes outside of San Antonio. Both facilities are owned and operated by GEO Group. ICE has not provided any information regarding whether or not ICE officers, GEO contractors, or other service providers commute between the two facilities.

**ICE Does Not Provide Proper Medical Care to Families at Karnes and Fails to Release Medically Vulnerable Families**

23. In my years of experience providing legal services to families at Karnes, families consistently report that medical care is deficient or neglectful. This is due to a culture of

indifference from medical staff as well as the limited staffing and experience of medical
personnel. ICE historically has detained adults with serious medical conditions such as
HIV and cancer, and continues to detain medically vulnerable children. When an adult
with a medical concern is taken off-site for treatment, their children are left in medical
isolation. Currently, ICE has failed to properly review cases of children with medical
issues for prompt release.

24. For instance, a three year old now detained for three months at Karnes has suffered from
an infection in his penis, fever, vomiting, diarrhea, constipation, hemorrhoids, and
behavioral changes as a result of prolonged detention. After several attempts to get medical
care, nothing has worked. The toddler continues to suffer discomfort when he tries to use
the restroom and as a result, does not want to eat. On one occasion, a GEO guard threw
away the fruits and snacks the child's mother was saving in their room for him when he
got hungry. The guard's only explanation for this act was that it was policy to do so. On
two separate occasions, the family has spent time in medical isolation. Once when the
toddler was presenting a fever, he, his mother, and his older brother spent 3 days without
seeing their father. On another occasion they spent a 2-week quarantine at Karnes as a
result of the toddler getting x-rays at an outside hospital after another person at Karnes
accidentally jammed his finger on the door. At the hospital, they were the only people
without any PPE (face masks, gloves) as ICE did not provide them with the necessary
protective equipment for this off-site visit. In an exhibit attached to this declaration, Dr.
Gartland reports that continued detention is putting this child's health at risk. This case is
exemplary to illustrate that ICE does not appropriately identify, treat, assess, and consider
for release children who are at "high-risk" for serious illness or death from COVID-19,
much less on an ongoing basis.

25. Another child, who will celebrate his 5th birthday next week, recently arrived at Karnes
though he suffers from hydrocephalus. This serious medical condition requires constant
diligent monitoring from neurosurgeons, neurologists, and other specialists. Normally, this
child's parents take him to the neurosurgeon once a month to evaluate the shunt in his head
and ensure that liquid is draining properly. The neurosurgeon also regularly measures his
head to ensure that it is growing properly. These appointments are vital to this child's health

and wellbeing because if liquid begins to accumulate in his head, he risks losing his life. This little boy also regularly sees a pulmonologist to monitor his lung development because his lungs have developed prematurely. Because of his medical conditions, he also receives regular care from an ear doctor and has his diet and nutrition monitored. However, the only doctor he has seen in detention is not a specialist with the expertise needed to examine his shunt. This doctor looked at the boy's head and told his mother that everything was fine. His mother noticed that the doctor did not examine her child's shunt the way that the neurosurgeon does and he did not actually evaluate the shunt to make sure it was in place and that the liquid was draining properly. It is unclear why this family was placed into expedited removal proceedings to begin with. This family's case illustrates that DHS does not make proper evaluations of what conditions are most safe and sanitary for children in their custody. On Tuesday May 19th, RAICES sent a request for release to ICE for this family. ICE has not responded.

**ICE's Failure to Make Continuous Efforts Towards Release of Class Members**

26. Following this Court's April 24, 2020 order, RAICES submitted parole requests on behalf of all of our client children and parents for whom we had not yet requested parole. ICE has not provided a written response to any of these parole requests.

27. The only communication from ICE concerning any parole decision to date occurred in correspondence from May 1, 2020. On that date, an ICE Officer communicated to one of our staff attorneys that he was waiting for the court hearing for a RAICES client to be scheduled before he would make a final parole determination. This communication demonstrates that despite this Court's unambiguous order that a pending immigration case or a final order alone cannot be the basis of a custody determination, ICE continues to use these factors as the primary, if not the only, basis for continued detention of minors and their families.

28. Though to the best of my knowledge, RAICES requested evidence of ICE custody determinations for each of our client families at least once, and in many cases more than once, to date, we have not received individualized custody determinations for any member of a client family unit, including *Flores* class members.

29. Indeed, it is unclear whether ICE has even reviewed or considered the parole requests submitted to ICE. Often, when RAICES staff submits parole requests to ICE by email, RAICES staff sends the email with read receipt requested. In fact, for a parole request submitted May 8, 2020, RAICES received notification that the email submitting the parole request was "deleted without being read on Monday, May 11, 2020 11:29:10 AM (UTC-06:00) Central Time" by Anthony Hofbauer, the Assistant Field Office Director at Karnes.

30. According to ICE's submission to this Court, ICE states that it will assess parole every 90 days. In RAICES general experience, this review occurs with no notice to detained families or their counsel, and results in a cursory custody determination that does not indicate an individualized decision based on flight risk or danger to the community. Furthermore, review of custody after three months, especially for a *Flores* class member, does not constitute ongoing review.

**Threat of Family Separation at Karnes**

31. On Wednesday May 13, 2020, a RAICES staff attorney learned from a client family at Karnes that ICE approached the detained father and asked him to consent to release of his child to their sponsor while the father remained in detention. This staff attorney spoke with an ICE Supervisory Detention and Deportation Officer (SDDO) that same day who informed our staff attorney that ICE had to re-serve forms given at intake because of *Flores* litigation. This SDDO assured our staff attorney that RAICES would be provided a copy of the form that this client was asked to sign. Despite multiple follow-up requests asking for a copy of the form executed by this client, to date, RAICES has not received the form in question signed by this client.

32. On the morning of Thursday May 14, 2020, Multiple RAICES staff members began to alert me and other members of our team that the clients with whom they were meeting via telephone and video-call had been approached by ICE the day prior to "sign agreements to separate them from their children." Clients informed staff that every family at Karnes had been presented with this form.

33. Clients informed RAICES that the forms presented to them the day prior were in English. At least one father informed RAICES that when ICE began their meeting with him, he tried to speak with RAICES on the phone but ICE did not give him enough time and told him that he would have "problems" if he did not sign the form. This client told a RAICES staff attorney that ICE informed him that the ordeal was RAICES' doing because RAICES was advocating for release of children without their parents.

34. For the remainder of the day on Thursday May 14, 2020, RAICES staff scheduled client meetings with all detained client families to discuss the meetings with ICE the day prior. Every client family with whom RAICES met confirmed that on May 13, 2020, ICE asked them whether or not they wanted to be separated from their children. Every client family reported that this interaction took no more than a few minutes. Every family member with whom we spoke indicated that when asked, they communicated to ICE that they did not wish to be separated from their children. Nor did any parent wish to be detained indefinitely with their children, as related to us in our follow up conversations with families.

35. Reports from families demonstrate that ICE did not even minimally attempt to inform families of *Flores* class member's rights under the *Flores* Settlement Agreement. No family reported that their brief conversation with ICE included information about their child's rights under the *Flores* Settlement Agreement. No family was provided any documentation of notice of their rights under the Settlement Agreement, nor were they provided any paperwork or copies of documentation at this meeting. Families were not advised that they could change their decision at a later date. ICE did not explain to families what steps, if any, they would take to assess the ability of the sponsor to care for the child if the family chose to have their child or children released from detention. At these meetings, parents were not informed that they could be considered for parole.

36. No family was provided the opportunity to meet with counsel prior to or during the meeting with ICE regarding potential separation. RAICES was provided with no notice of these meetings. The majority of RAICES' client families at Karnes consented to have RAICES request a copy of the form on their behalf. For these client families, RAICES attorneys emailed ICE to request a copy of the client-specific form ICE used in these meetings.

Neither RAICES nor the families themselves have received a copy of any of the forms they signed.

37. These meetings were fraught with troubling and coercive behavior on the part of ICE.  For instance, one indigenous father reported that when he informed ICE that he did not understand much Spanish, ICE dismissed his concerns and proceeded with the interview in Spanish.  A father who speaks basic, but not fluent English was not provided with an interpreter.  A family who states that they understand approximately sixty-percent of Spanish was not provided with a Portuguese interpreter.  A mother and father pair were given no time to consult with each other about their choice; they reported that they did not even see the form because they have been kept in quarantine and the ICE officer stayed a few meters away from them as he filled out their form.  One family reported that ICE asked them whether they consented to have their child put into foster care or put up for adoption. Another father reported that ICE had pre-filled his form before his meeting.

38. One father reported that the ICE officer who spoke to him spoke poor Spanish and that the father had difficulty understanding him.  He understood that when the ICE officer told him to "sign here" that it was an order, and that he did not have the option to decline signature. This man's wife asked the ICE officer if the signature would affect his case, to which the officer replied "no it won't affect you at all."

39. One father speaks basic English.  He informed RAICES that on May 13, 2020 he was brought into a room to find his wife and two children seated speaking with officers in English.  ICE asked him in English "Do you agree to be separated from your children while you and your wife stay here for court proceedings?"   All members of his family emphatically stated that they did not wish to be separated from each other.

40. ICE's implementation of a binary choice at Karnes was confusing and alarming for families detained at Karnes.  It is unclear why ICE failed to conduct a comprehensive review of custody determinations for families detained at Karnes after the last set of multiple releases on April 28, 2020,  until the day prior to their reporting deadline in the *Flores* and *OMG* cases.  To the extent that families did not sign the paperwork ICE used, especially those

who requested to speak to counsel, ICE's submission that all families chose to waive their child's *Flores* rights is false.

41. In addition, to pose this question to parents in the midst of a global epidemic, and without access to counsel, only added to the coercive nature of ICE's actions. Parents at Karnes are worried about the safety of their children in a forced congregate setting. A choice to remain in detention in their child is a choice to expose them to COVID-19 should an outbreak occur.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 21, 2020

San Antonio, Texas

Andrea Meza

## DECLARATION OF DR. MATTHEW GARTLAND

I, Dr. Matthew Gartland, hereby declare under penalty of perjury, that the following is true and

correct to the best of my knowledge.

1. I am a US-trained physician fully licensed to practice medicine in the State of Massachusetts. I

   am an Attending Physician in the Division of General Internal Medicine at Brigham and

   Women's Hospital in Boston, MA, and Pediatrics at Newton Wellesley Hospital, Newton, MA.

   In these roles, I take care of patients of all ages. I am an Instructor at Harvard Medical School in

   Boston, MA.

2. I am a graduate of Vanderbilt University School of Medicine in Nashville, TN. I completed

   residency in Internal Medicine and Pediatrics at Massachusetts General Hospital in Boston, MA.

   My training includes extensive experience in the interview and physical examination of children,

   adolescents, and adults including psychosocial evaluation, evaluation and treatment of medical

   and psychiatric conditions. I have passed all three steps of the United States Medical Licensing

   Examination Board exams. I am board-certified in Internal Medicine and Pediatrics. I am a

   Fellow in the American Academy of Pediatrics and a member of the Council on Immigrant

   Child and Family Health.

3. I am the Director and a volunteer for the Massachusetts General Hospital Asylum Clinic located

   in Boston, MA, and in this capacity, I have conducted more than twenty-five medical and

   psychological evaluations of persons seeking asylum in the United States including with

   individuals in ICE detention, and children.

4. On Wednesday, May 20, 2020 at 12pm CST I interviewed a family, a mother, father and their

   two children R.S.A. and C.A.B. via video-conference in a volunteer capacity. I have reviewed

medical records for R.S.A. provided to me by the Refugee and Immigrant Center for Education and Legal Services (RAICES) with permission from his parents.

## SUMMARY OF MEDICAL ISSUES OF R.S.A (A213-201-283)

5.   This family arrived at Karnes County Family Residential Center (KCFRC) on 2/22/2020. His parents report the child has no past medical history including no history of constipation. His parents describe multiple medical problems for the child since their arrival including severe constipation complicated by hemorrhoids with rectal bleeding, abdominal pain, and weight loss; behavioral changes and anxiety; painful urination; influenza infection; a fractured finger; and risk of COVID-19 infection. I will describe each of these medical issues in greater detail based on my interview with the child's family and a review of his medical record.

## SEVERE CONSTIPATION

6.   The child's parents describe symptoms of severe constipation including passage of hard stool, straining and painful defecation, and stool frequency less than 3 times per week as well as red flag symptoms including weight loss, bloody stools, and abdominal distension that denote severe constipation.[1] The child's parents report these symptoms began toward the end of March, around the time he had a diarrheal illness followed shortly thereafter by influenza. The parents mention the child's diet consists of low-fiber foods such as the meal they ate today, macaroni and cheese with hot dogs. The few vegetables they are given are not appealing to the child (broccoli, carrots), and when they are given fruit it is typically apples and bananas. The foods provided to the toddler are the same as those provided to the adults. He is not given high fiber foods such as wheat bread, brown rice, high-fiber cereal, nuts, and dried fruits like raisins and prunes.

---

[1] McInerny, Thomas K., and American Academy of Pediatrics. American Academy of Pediatrics Textbook of Pediatric Care. Vol. 2nd edition, American Academy of Pediatrics, 2017.

7.  The child was prescribed hemorrhoid cream on 3/25, at the same time he started Tamiflu as treatment for his influenza infection. Around that time, he had gone more than 4 days without having a bowel movement and his mother had to help him to defecate using a damp cloth. He was not started on any treatment for constipation at the time the hemorrhoid cream was prescribed.

8.  On 4/7/2020, the child was evaluated by a provider (name not legible in medical record) who noted the child was constipated, eating poorly, and had a distended abdomen with decreased bowel sounds on examination. The provider recommended increasing water intake and encouraging the child to eat prunes, raisins, and celery. The provider ordered a *clean out*, meaning the child was given a laxative (Miralax) on 4/8/20 every hour for a total of 5 doses to clear out hard, impacted stool. He was then started on daily maintenance therapy with a laxative. He was seen by Dr. R. Shore on 4/15 who wrote that the child had soft stool on a daily basis at that point.

9.  The parents report that the child has continued to have severe constipation since that time. He has complained on multiple occasions about crampy abdominal pain, rectal pain, and bleeding with defecation. The mother has seen hemorrhoids around the rectum with intermittent inflammation causing pain and bleeding. The parents report that no dietary changes were implemented following the doctor's recommendations, and on more than one occasion fruit the mother had saved for her son has been taken from their room by guards. The child's diet continues to be low in fiber. They report the child has been eating poorly due to pain and the provision of food not suited for a toddler. He lost weight early on in his course with constipation. At one point the mother had to tie a ribbon around the child's waist to hold up his pants because they were loose.

10. The parents report requesting medical evaluation on multiple occasions and being told it was not an emergency or that they would have to wait to see the pediatrician, who has a limited on-site schedule. In late April they called RAICES to report the child passed a large amount of blood.

11. Constipation in children is frequently due to inadequate hydration, low-fiber and high milk-containing diet, minimal activity level, slow intestinal transit as can occur following gastrointestinal infection, and behavioral factors such as avoidance of toileting and withholding due to pain, unsanitary conditions, or lack of privacy. Constipation commonly occurs in toddlers with changes in diet. These factors were all present in this child.

12. Over the course of nearly three months he has received important medical interventions including a *clean out* and the prescription of daily maintenance laxative. However, the child has not had access to high fiber foods nor changes to the underlying conditions including diet and activity level that put him at risk for constipation. This is despite multiple requests by the child's family for dietary changes as recommended in documentation by a physician in the facility's clinic.

13. I am concerned that he has demonstrated high risk features including persistent rectal bleeding, abdominal distension, avoidance of food, and weight loss. Importantly, he has not received several key first-line interventions including dietary changes, increased physical activity, and increased water consumption. As a consequence of persistent rectal pain, the child  has developed behavioral changes that likely worsen the constipation. The consequences of not addressing this situation include risk for malnutrition, ongoing pain and traumatization, urinary tract infection due to impacted stool putting pressure on bladder, and long-lasting functional constipation that can persist into adulthood.

14. He has not improved with the initial measures prescribed by the physician at KCFRC. His condition requires specialized medical attention including referral to pediatric gastroenterologist and work with a nutritionist. If the behavioral changes of avoidance and holding continue, he may require attention from a behavioral health therapist. Implementation of dietary changes including increase in dietary fiber with the introduction of whole-grain breads and cereals, increasing the child's fruit and vegetable intake, and adequate hydration are essential to his improvement. Most importantly, I believe he would benefit from alleviation of the underlying conditions of family detention that predispose him to severe constipation.

### BEHAVIORAL CHANGES AND ANXIETY

15. The parents report the child demonstrated behavioral changes including aggressive behavior, tantrums, agitation, and anxiety shortly after arrival in the family detention center.

16. The child's medical records include a mental health screening progress record written by provider Gonzales, LMSW, on 2/24/20 that notes adjustment problems, aggressive behaviors, whining and clinging. At that time the parents requested family psychological services. The child was evaluated by a Psychologist, Dr. Daniel Diaz, Ph.D., on 2/26/20 who noted the child was engaged in aggressive, demanding behaviors, agitation, and tantrums. Dr. Diaz's note includes reference to a follow-up appointment on 3/4/20. The child's parents report that they did not see a psychologist again after that first visit.

17. Subsequent mental health progress notes by provider Gonzales and provider Leal, MHCW, note ongoing aggressive behavior, adjustment problems, and parents request for mental health services (3/9/20), and notes by the provider that the family "requires referral to family therapy" (3/9/20 and 3/23/20) and "is currently in therapy." (3/17/2020). Progress notes on 3/30, 4/6, and

4/20 do not reference any ongoing therapy. The parents say they have not received any family therapy and that the behaviors have continued.

## PAINFUL URINATION

18. On 3/16/20 the patient was seen in the medical clinic at the KCFRC for a complaint of painful urination. The provider (name not legible in medical record) diagnosed him with phimosis, an inability to retract the foreskin in an uncircumcised male often due to normal adhesions or inflammation. The provider noted irritation and prescribed triple antibiotic ointment, steroid cream, and ibuprofen for pain.

19. This irritation of the penis occurred concurrently with a diarrheal illness during which the child had many loose bowel movements a day. Irritation from contact with feces may have led to the child's diagnosis of phimosis and painful urination.

## INFLUENZA INFECTION

20. On 3/25/20, after two days of high fever, vomiting, and dehydration, the child was diagnosed with suspected influenza infection and prescribed Tamiflu for treatment. The medical record refers to diagnosis of "Flu A+" and "Flu B+," though test results are not reported directly. The mother reports she was worried the child was very sick in the two days prior to receiving medical attention, during which time she requested medical care. Following evaluation on 3/25, the child was kept with the mother in medical isolation for several days. Of note, the parents declined influenza vaccination on arrival to the facility. They reported to me that the child had been vaccinated earlier in the season while in Mexico.

## FRACTURED FINGER

21. On 4/30/20, the child injured his finger. He was playing near a door around lunchtime when someone opened it and accidentally pinched his finger. The parents report the finger became

swollen and purple. The child waited many hours before being taken to an off-site medical facility just before midnight. He was given ibuprofen for pain and the finger was put in a splint.

## RISK OF COVID-19 INFECTION

22. Following the child's visit to the local medical facility on 4/30 for the fractured finger, the entire family was placed into quarantine for approximately 2 weeks due to risk of exposure to COVID-19. During the trip to the medical facility, the child and his father were not provided with masks. This includes the long period of time in which they were in the waiting room at the medical facility.

23. The mother reports the family has only been given masks on two occasions since the start of the pandemic, including in their time in quarantine. They have been instructed to re-use masks for multiple days and were not given replacements even when the masks became dirty and started to rip. She notes that staff in the facility frequently wear their masks around their necks, not covering their mouth and nose.

24. While in quarantine, the children were only given approximately 30-40 minutes a day outside their small room. This isolation, including separation from the child's father, had a negative impact on the child's behavior.

## ASSESSMENT

25. Following my evaluation and review of medical records, I am concerned about the ongoing health and well-being of the child, R.S.A. He continues to experience severe constipation. This condition has its roots in dietary changes and low-fiber contents in the diet. During two visits with physicians, the child received several important and effective treatments including laxatives, however, an essential recommendation for the child to receive a modified diet was not accommodated in the facility. Multiple subsequent appeals for additional medical care have

gone unanswered, and almost two months later the child continues to have frequent abdominal and rectal pain, and bleeding from hemorrhoids.

26. In addition, the child has had multiple illnesses and injuries over the past 3 months including behavioral changes and adjustment problems associated with the family's detention, diarrheal illness, painful urination, influenza infection, and a fractured finger. While injuries and infections can occur in children in a community-setting, each of these specific episodes has a relationship with the detention-setting: changes in mental health made worse by detention and lack of access to adequate mental health services, risk for infectious diseases in a congregate living situation, irritation of the genitalia related to hygiene, and an injury suffered in an environment not designed to house a young child.

27. Beyond a discussion of specific health problems experienced by this child, detention of children and families is fundamentally injurious to children's well-being and development, putting them at lifelong risk for physical and mental health consequences. This is the position taken by my professional organization, the American Academy of Pediatrics, and there is ample evidence in medical research to demonstrate the harm of even short periods of detention.

28. In my professional opinion, this child is at risk for greater harm if he continues to be held in detention. Additionally, I do not believe this harm would be alleviated by the release of the child without one or both of his parents, as family unity is a core aspect of children's health and development. Separation from a parent can cause significant psychological trauma in a child.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 20th day of May, in Boston, MA

Matthew Gartland, MD