1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
       crholguin@centerforhumanrights.org
*Listing continues on next page*
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | Case No. CV 85-4544-DMG-AGRx |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF FILING OF ICE JUVENILE COORDINATOR REPORT** |
| v. | |
| WILLIAM BARR, Attorney General of the United States, *et al.*, | Hearing:  June 26, 2020 Time: 11:00 a.m. [HON. DOLLY M. GEE] |
| Defendants. | |

USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing (Cal. Bar No. 61513)
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu

LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum (Cal. Bar No. 98634)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500

THE LAW FOUNDATION OF SILICON VALLEY
Jennifer Kelleher Cloyd (Cal. Bar No. 197348)
Katherine H. Manning (Cal. Bar No. 229233)
Annette Kirkham (Cal. Bar No. 217958)
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone: (408) 280-2437
Email: kate.manning@lawfoundation.org

UNIVERSITY OF CALIFORNIA DAVIS
SCHOOL OF LAW
Immigration Law Clinic
Holly S. Cooper (197626)
One Shields Avenue, TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................1

II.   ICE FAILS TO PROMPTLY RELEASE CHILDREN WITHOUT
UNNECESSARY DELAY AND ITS WAIVERS WERE ILLEGALLY AND
IMPROPERLY SECURED. ..........................................................................4

   A.   FAMILY REUNIFICATION CENTERS (FRCs)....................................5

   B.   JUVENILE DETENTION CENTERS ...................................................13

III.  ICE CONTINUES TO FAIL TO MEET THE AGREEMENT'S SAFE AND
SANITARY REQUIREMENTS IN LIGHT OF THE COVID-19 PANDEMIC....17

V.    CONCLUSION ................................................................................24

/ / /

I.        INTRODUCTION

The gravamen of Plaintiffs' emergency motion to enforce was relatively simple: confining children in congregate facilities during the worsening COVID-19 public health emergency is presumptively unsafe and unreasonable. As this Court has twice found, "[T]he medical consensus is that any form of congregate care puts a child in custody at higher risk of infection … Any *unnecessary delay* in releasing a minor is, under normal circumstances, a violation of the FSA, but the current pandemic makes the Agreement's promise to protect and expeditiously release minors even more critical to their safety." Order, April 10, 2020 (Doc. #768) at 4 (emphasis added) (*citing* Order, March 28, 2020 (Doc. #740)).

Prior to the April 24, 2020, hearing, Plaintiffs argued that ICE had failed to keep Class Members "in facilities that are safe and sanitary and that are consistent with [its] concern for the particular vulnerability of minors." *See* Pls.' Second Reply at 10 [Doc. # 774], *quoting* Agreement at ¶ 12 [Doc. # 101]. Plaintiffs also contended that ICE failed to comply with its obligations under the FSA to "release a minor from its custody without unnecessary delay" and "make and record the prompt and continuous efforts on [their] part toward family reunification and the release of the minor." Pls.' Second Reply at 15, 20, *quoting* Agreement at ¶¶ 14, 18. In addition, Plaintiffs argued that ICE violated its obligation to detain minors in the least restrictive setting, as set forth in the FSA. Pls.' Second Reply at 8, n.5, *citing* Agreement at ¶¶ 11, 23. The Court granted in part and denied in part Plaintiffs' request for enforcement of the FSA. Order re Plaintiffs' Motion to Enforce at 3 ("April 24, 2020 Order") [Doc.# 784.]

Regarding conditions in ICE's Family Residential Centers ("FRCs"), the Court found "Plaintiffs have raised significant concerns by a preponderance of the evidence about each FRC's ability to provide safe and sanitary conditions ... ICE's uneven compliance with Paragraph 12 and Exhibit 1 of the FSA warrants continued heightened monitoring." April 24, 2020 Order at 6.

1   Plaintiffs also argued that ICE unnecessarily delays Class Members' release
2   by failing to make individualized release decisions, in violation of Paragraph 14 of
3   the FSA, and also fails to record efforts undertaken, in violation of Paragraph 18.
4   April 24, 2020 Order at 14. The Court found that "Defendants have … failed to
5   demonstrate actual individualized evaluations of flight risk, or refusals of parents to
6   waive their right to remain detained with their children, or other explanations for
7   prolonged detention of Class Members awaiting IJ or USCIS determinations." *Id*. at
8   15. Because ICE did not submit evidence of individualized release assessments for
9   Class Members awaiting asylum decisions, "much less evidence that ICE makes
10  and records individual assessments in a prompt and continuous manner," the Court
11  found ICE in violation of the FSA's Paragraph 18 (as well as the Court's prior June
12  27, 2017 Order) with regard to Class Members in expedited removal proceedings
13  who are "pending IJ hearing/decision" or "pending USCIS response." April 24,
14  2020 Order at 16.

15      The Court also found that Plaintiffs have shown by a preponderance of the
16  evidence that ICE is in breach of its Paragraph 14 and 18 duties and past Court
17  Orders "with regard to minors subject to final orders of removal, including those
18  issued under the MPP and/or stayed by participation in federal litigation." *Id*. at 18.

19      In light of the foregoing, the Court ordered that ORR and ICE "shall continue
20  to make every effort to promptly and safely release Class Members who have
21  suitable custodians in accordance with Paragraphs 14 and 18 of the FSA and the
22  Court's prior orders, including those categorized as 'MPP,' participants in class
23  litigation, 'pending IJ hearing/decision' or 'pending USCIS response,' absent a
24  specific and individualized determination that they are a flight risk or a danger to
25  themselves or others, or a *proper waiver of Flores rights* …" *Id*. at 18 (emphasis

2

added), *citing* July 24, 2015 Order [Doc. # 177], June 27, 2017 Order [Doc. # 363], July 9, 2018 Order [Doc. # 455], July 30, 2018 Order [Doc. # 470].[1]

In its most recent Order Re Updated Juvenile Coordinator Reports of May 22, 2020 [Doc. # 799] ("May 22, 2020, Order"), the Court stated in relevant part:

> The ICE report continues to show lack of compliance with Paragraph 18 of the FSA, which requires Defendants to "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." … The information submitted by ICE continues to show cursory explanations for denying minors release under the FSA, including vague categories such as "USCIS/IJ Review," which the Court previously criticized … This report thus fails to show how ICE has cured the deficiencies already identified by the Court in its April 24, 2020 Order. Moreover, although the Court finds that ICE did not seek or obtain formal waivers from detained parents of their children's Flores rights during ICE officers' conversations with detained parents on or about May 15, 2020, those conversations caused confusion … and did not appear to serve the agency's legitimate purpose of making continuous individualized inquiries regarding efforts to release minors. Finally, the Court remains concerned with the implementation of public health guidances at the Family Residential Centers (FRCs), given the declarations submitted by Plaintiffs showing that there are minors in custody with pre-existing medical conditions and that conditions remain unsafe and crowded—despite reduced populations—at each FRC.

---

[1] The Court noted that parents may waive their children's Flores rights. April 24, 2020 Order at 15, n. 6, *citing* July 9, 2018 Order at 6 [Doc. # 455]. It also noted that Defendants have been enjoined in separate class action litigation from separating class member parents from their children, absent an affirmative, knowing, and voluntary waiver of the parent's right to be detained with their children at an ICE FRC. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal., June 26, 2018).

*Id.* at 2 (citations omitted). Accordingly, the Court ordered in part that "the ICE
Juvenile Coordinator shall provide specific explanations for the continued detention
of each minor detained at an FRC beyond 20 days." *Id* at 3.

ICE Juvenile Coordinator Ms. Deane Dougherty's June 2020 Interim Report
was filed June 10, 2020 ("Report"). [Doc.# 813-1]. Her report covers both the
conditions at family detention centers in light of the COVID-19 pandemic, as well
as the reasons why class members have not been released. Plaintiffs now respond to
this Report.[2]

II.     ICE FAILS TO PROMPTLY RELEASE CHILDREN WITHOUT UNNECESSARY DELAY
        AND ITS WAIVERS WERE ILLEGALLY AND IMPROPERLY SECURED.

As the Court is well aware, the FSA requires that Defendants "treat[ ] and shall
continue to treat, all minors in [their] custody with dignity, respect and special
concern for their particular vulnerability as minors." *Id*. ¶ 11.[3] Considering "the
Court's past orders, the exigencies of the circumstances, COVID-19's highly
contagious nature, and the imminence of the threat," March 28, 2020, Order at 9,
ICE's compliance with the release provisions of the FSA is crucial. The Court
"remind[ed] Defendants—yet again—that 'hold[ing] minors in indefinite detention in
unlicensed facilities, . . . constitute[s] a fundamental and material breach of the
parties' Agreement.'"[4] ICE therefore "must … comply with the Agreement's
requirement to release minors without unnecessary delay and 'make and record the

---

[2] Plaintiffs may seek the Court's consent to file additional declarations in response
to the Juvenile Coordinator's Report that have been prepared by advocates
representing detained families and shared with Plaintiffs' counsel but without
consent to file with this Reply unless Plaintiffs' counsel agreed to solely advocate
for certain legal positions Plaintiffs have thus far been unable to agree to.

[3] It also requires that "[f]ollowing arrest, the [Defendants] shall hold minors in
facilities that are safe and sanitary and that are consistent with the [Defendants']
concern for the particular vulnerability of minors." *Id*. ¶ 12.A.

[4] March 28, 2020, Order at 10, *quoting Flores v. Sessions*, No. CV 85-4544-DMG
(AGRx), 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018).

PLAINTIFFS' RESPONSE TO DEFENDANTS' JUVENILE
COORDINATOR REPORTS
CV 85-4544-DMG-AGRX

prompt and continuous efforts on its part toward family reunification and the release of the minor.'" *Id. quoting* Agreement ¶¶ 12, 14.

The Court found credible evidence "to indicate that ICE does not undertake or record any efforts aimed at the release of minors as required by Paragraphs 14 and 18 of the Agreement." *Id.* at 10, citing Schey Decl. ¶ 7; Cambria Decl. ¶ 39; Fluharty Decl. ¶ 38–40; Meza Decl. ¶¶ 10, 43. The additional evidence submitted by Plaintiffs and Defendants confirmed the Court's findings.[5]

## A.    Family Reunification Centers (FRCs)

The ICE Juvenile Coordinator's Report states, the class members who have not been released have been "determined to be flight risks and/or the parent or legal guardian has not designated a caregiver for the Class Member." Report at 9. Seven Class Members "are subject to expedited removal orders but remain in the credible fear process … Whether these Class Members should be released from custody will be reassessed once they complete the credible fear process." *Id.* at 9-10. Other "Class Members are pending decisions on motions to reopen before the immigration judge, and ICE is closely monitoring the docket for decisions in those cases and will reevaluate whether parole [i.e. release of the Class Member] is appropriate based on the orders entered." *Id.* One Class Member whose "negative credible fear finding by USCIS was vacated by an immigration judge," following which the minor was placed in regular section 240 removal proceedings, "has since been released from the FRC." *Id.* at 10.

Exhibit B to the Report filed under seal provides additional details about why each Class Member has not been released. For example, Class Member LSG (Report Ex. B at p. 2 of Doc # 815-2), has not been released in part because the

---

[5] It is now clear that not only does ICE not make and record continuous efforts aimed at the release of class members to sponsors identified in Paragraph 14, and do this "without unnecessary delay" as the Agreement requires, *it is undisputed that it does not even have a program, or policies, or any existing procedures in place to do this.*

"Family Unit was added to DAM V. BARR plaintiff list and a stay of removal was placed." The Report note s that "The stay in D.A.M. remains in effect, and oral argument is tentatively scheduled for September 2020." Report at 7. ICE therefore appears ready to detain this Class Member for several more months because a federal court has stayed his removal.

Class member JMM-H (Report Ex. B at p. 6 of Doc # 815-2), has been detained at a family detention center since August 29, 2019. There is no evidence that CBP undertook any efforts aimed at his release. He has bene in ICE custody since September 1, 2019. *Id*. He has an "administrative stay of removal in MMV v. BARR." *Id*. The Report states nothing about why the minor was not assessed for released from September 2019 until May 4, 2020, when "ICE conducted a second parole review for minor." *Id*. At that time, parole was denied because the "[m]inor was found to be a flight risk as he is subject to a final order of removal and will be scheduled for the next removal flight to his country of citizenship." The Report does not explain how long the minor has been waiting for a flight to his country of citizenship" or how long it may be before such a flight is arranged.

Class Member MER-M (Report Ex. B at p. 9 of Doc # 815-2), has not been released in part because the "of the administrative stay of removal in D.A.M." *Id*. As stated above, the Report notes that "The stay in D.A.M. remains in effect, and oral argument is tentatively scheduled for September 2020." Report at 7. ICE therefore appears ready to detain this Class Member for several more months because a federal court has stayed his removal. The Report provides no explanation why a "parole review" (i.e. consideration of release) was not conducted between September 16,2019, and June 4, 2020. *Id*.

Class Member MM (Report Ex. B at p. 13 of Doc # 815-2), has been in custody since May 17, 2020. On 5/21/2020, a "Parole Review" was conducted for minor. *Id*. Parole was denied "because the minor was in the credible fear interview process and detention was required to complete the process …" *Id*. On May 29,

2020, USCIS found that the minor has a credible fear of returning to Uzbekistan but the "[c]hilds release on parole is contingent on mother's release." *Id*.

Class Member WGR-S (Report Ex. B at p. 17 of Doc # 815-2), has been in custody since February 15, 2020. On February 18, 2020, a "Parole Review" was conducted for the minor. *Id*. Parole was denied "because the minor was in the credible fear interview process and detention was required to complete the process …" *Id*. On April 1, 2020, the Class Member "was issued a stay of removal as a plaintiff in the ABB v. MORGAN litigation." *Id*. On May 14, 2020, ICE conducted a second "parole review … and [a]t that time, parole was denied." Id. The report does not explain why no further parole review was conducted between February 18, 2020, and May 14, 2020. Nor does the Report explain why on May 14, 2020 parole was denied.

The reports on all detained Class Members repeat virtually identical language explaining their prolonged detention: stays of removal in various pending federal cases, an absence of transportation, or some aspect of their asylum cases remain pending before the USCIS or the Immigration Court. *None of the reporting indicates that without unnecessary delay ICE has made and recorded continuous efforts aimed at the possible release of Class Members*. Indeed, so-called "parole reviews," using only the "Parole Worksheet" which entirely fails to adopt the Settlement's release criteria, appear to take place weeks or often months apart.

Defendants' parole worksheet says nothing about making and recording continuous steps without unnecessary delay towards the release of minors to sponsors. Instead, the worksheet states it must be used "when considering minors for parole from custody," not release pursuant to FSA ¶¶ 14, 18.[6] *Defendants' parole regulation*

---

[6] The instruction makes clear it is to determine parole not under the FSA, but instead whether the minor is "eligible for parole pursuant to the standard in Immigration and Nationality Act Section 212(d)(5)(A) and 8 C.F.R. $ 212(d)(5)." *Id.*

*is nothing like the Flores terms.[7]* It further renders efforts at release entirely discretionary, not mandatory.[8]

All Class Members' ICE reports also uniformly state "[a]dditionally, minor's parent has not designated a caregiver to whom ICE could consider releasing the minor."

However, Defendants have not produced a single completed "Parole Worksheet" for any Class Member or any document on which sponsors would be listed to confirm their position that no parent has designated any potential sponsors to whom their children may be released.

At the same time, because of the COVID-19 pandemic, Defendants have cancelled any monitoring by Class Counsel to ascertain the extent to which Class Members' parents have identified potential sponsors.

In addition, declarations already on file indicate that parents and class members through counsel have submitted numerous requests for release on parole indicating they have in fact identified sponsors to whom they wish to be released. *See, e.g.* Declaration of Shalyn Fluharty ¶ 6 ("Fluharty Decl.") [Doc.# 796-2-Exhibit B] ("Proyecto Dilley's attempts to facilitate ICE's compliance with this Court's orders have repeatedly been ignored. We previously wrote to ICE on March 31, 2020, April 2, 2020, and April 18, 2020 to request the release of detained

---

[7] It states: "The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(c) of this chapter [i.e. all class members in expedited removal] would generally be justified only on a *case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,'* provided the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b) (emphasis supplied).

[8] It does state that "(i) Minors *may* be released to a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, or grandparent) not in detention," and also that "(ii) Minors *may* be released with an accompanying parent or legal guardian who is in detention." 8 C.F.R.§ 212.5(b)(3)(i) and (ii) (emphasis added). Neither the "worksheet" nor the parole regulation recognize a presumption of release, or steps that must be taken and recorded from the time of apprehension aimed at the release of minors without unnecessary delay.

PLAINTIFFS' RESPONSE TO DEFENDANTS' JUVENILE
COORDINATOR REPORTS
CV 85-4544-DMG-AGRX

children as required by the Flores Settlement Agreement and Judge Gee's court orders. ICE did not respond to our requests"); Declaration of Andrea Meza ¶¶ 26-30 ("Meza Decl.") [Doc.# 796-3, Exhibit C] ("Following this Court's April 24, 2020 order, RAICES submitted parole requests on behalf of all of our client children and parents for whom we had not yet requested parole. ICE has not provided a written response to any of these parole requests"); Declaration of Javier Hidalgo ¶ 14 [Doc.# 774-63 Exhibit III] ("Our team has repeatedly found it necessary to submit parole requests to ICE-ERO an d/or file motions for custody redetermination pursuant to Flores with the San Antonio Immigration Court to prompt ICE-EROP to take an[y]action towards release").

The evidence also indicates that ICE's interviews with Class Members' parents to determine if they wanted to be "separated" from their children were conducted --

• without notice to parents' and Class Members' counsel of record or the opportunity to consult with their counsel of record, *see* Cambria Decl. ¶ 12 ("On May 14, 2020, we learned that ICE had met with our clients without giving us notice of these meetings …"); Meza Decl. ¶ 32, 36 ("On the morning of Thursday May 14, 2020, Multiple RAICES staff members began to alert me … that the clients with whom they were meeting via telephone and video-call had been approached by ICE the day prior to 'sign agreements to separate them from their children … Clients informed staff that every family at Karnes had been presented with this form … RAICES was provided with no notice of these meetings"); Fluharty Decl. ¶ 36 ("ICE did not provide Proyecto Dilley with advance notice of the meetings held with our clients…");

• without counsel of record for Class Members and parents being present, *see* Cambria Decl. ¶ 12 [.# 796-1, Exhibit A] ("[ICE] met with our clients without giving us … an opportunity, to be present"); Meza Decl. ¶ 33, 36 ("[a client] tried to speak with RAICES on the phone but ICE did not give him enough time and told him that he would have 'problems' if he did not sign the form … No family was

provided the opportunity to meet with counsel prior to or during the meeting with ICE regarding potential separation"); Fluharty Decl. ¶ 36, 50 (" ("ICE did not … facilitate our participation during the meetings … The overwhelming majority of mothers stated they did not wish to make a decision, or sign any documents, without having the opportunity to consult with their attorney.");

• without providing parents or Class Members with an oral or written notice of Class Members' rights under the FSA, *see* Cambria Decl. ¶ 12c ("[Parents] were explained no process or procedures in place to separate them from their very small children …"); Meza Decl. ¶ 35 ("Reports from families demonstrate that ICE did not even minimally attempt to inform families of *Flores* class member's rights under the *Flores* Settlement Agreement. No family reported that their brief conversation with ICE included information about their child's rights under the *Flores* Settlement Agreement."); Fluharty Decl. ¶ 42, 45, 52 ("Women state they were told 'I'm giving you a document, you have to sign it' … ICE officers provided misleading, if not materially false, information to mothers during the meeting … [One] mother states she was told 'if you do not sign, you will be deported'");

• without providing parents or Class Members with a notice of Class Members' rights in a language parents or Class Members understood, *see* Meza Decl. ¶ 37, 38 ("These meetings were fraught with troubling and coercive behavior on the part of ICE.  For instance, one indigenous father reported that when he informed ICE that he did not understand much Spanish, ICE dismissed his concerns and proceeded with the interview in Spanish … A family who states that they understand approximately sixty-percent of Spanish was not provided with a Portuguese interpreter … One father reported that the ICE officer who spoke to him spoke poor Spanish and that the father had difficulty understanding him.  He understood that when the ICE officer told him to 'sign here' that it was an order, and that he did not have the option to decline signature"); Fluharty Decl. ¶ 39, 56 ("Some mothers state an officer explained that 'we came to inform you on the part of ICE that your kids will be turned in to sponsors and you will stay' … One

1   mother who speaks an indigenous language informed ICE she could not
2   communicate in Spanish … Without the assistance of an interpreter, the officer
3   gave the mother two pieces of paper and indicated she must sign them, speaking in
4   Spanish only … Confused, the mother refused to sign the documents. The officer
5   then reportedly yelled at the mother, telling her that if she did not sign, she would
6   be deported");

7           • without advising parents or Class Members that any decision they made to
8   have a Class Member released could be reversed prior to the Class Member actually
9   being released, *see* Meza Decl. ¶ 35 ("Families were not advised that they could
10  change their decision at a later date"); Fluharty Decl. ¶ 39, 53 ("mothers state they
11  were instructed to decide whether they wanted to be with their children in
12  detention, or separated from their child so their child could reside with a sponsor
    … Some mothers who were left in the hallway and not initially placed in a
13  courtroom state they were never provided with any information at all … At least
14  one mother signed a document, changed her mind, and asked if she could redo the
15  form … The mother went back and asked an ICE officer if she could un-sign the
16  document. The ICE officer said 'no', 'that there was nothing to be done', and that
17  she should 'leave immediately'");

18          • without explaining what steps ICE would take, if any, to assess the ability
19  of designated sponsors to safely care for released Class Members, *see* Meza Decl. ¶
20  35 ("ICE did not explain to families what steps, if any, they would take to assess
21  the ability of the sponsor to care for the child if the family chose to have their child
22  or children released from detention"); Fluharty Decl. ¶ 46, 51  ("100 percent of
23  interviewed mothers reported that they were not told … [w]hat steps, if any, would
24  be taken before their child went to live with a sponsor … When [one mother]
25  learned she was not allowed to consult with her attorney, the mother refused to sign
26  the form and told other mothers that it was not a good idea to sign. An officer then
27  told the mother to stop spreading negativity and called her 'Riff Raff.'"); and

28

                                    11

• without advising parents that they could apply for parole so they could possibly be released with their child under 8 CFR 212.5(b)(3)(ii). *See* Cambria Decl. ¶ 12d (" Each family was told that if they opted to separate themselves from their children, they – the parents – would remain in detention"); Meza Decl. ¶ 35 ("At these meetings, parents were not informed that they could be considered for parole"); Fluharty Decl. ¶ 45, 54 ("Another ICE officer told mothers that 'because of their attorneys', they must remain detained without their children … One mother states an ICE officer indicated that he wanted all of the families to 'go home,' or be deported.")

In its most recent Order, this Court concluded that "although the Court finds that ICE did not seek or obtain formal waivers from detained parents of their children's Flores rights during ICE officers' conversations with detained parents on or about May 15, 2020, those conversations caused confusion and unnecessary emotional upheaval and did not appear to serve the agency's legitimate purpose of making continuous individualized inquiries regarding efforts to release minors." May 22, 2020, Order at 2.

For the reasons stated above, at this stage the Court can provide little weight to the Juvenile Coordinator's Report to the extent that it reports that no "minor's parent has … designated a caregiver to whom ICE could consider releasing the minor." Indeed, it is not even clear how this information was conveyed to the Juvenile Coordinator by ICE. It is entirely unclear whether the Juvenile Coordinator reviewed parents' or Class Members' ICE "A" files to assess whether parents had designated sponsors to whom they or their children could be released.

The FSA provides children with a presumption of release, the right to be detained in safe and sanitary conditions, and the right to be detained—when determined to be a danger or flight risk subsequent to an individualized assessment—in an unsecure and licensed facility. *Flores* Settlement Agreement ¶¶ 11, 12A, 14; *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016).

Defendants continue to hold accompanied children for more than 20 days in

12

unlicensed, secure facilities absent individualized assessments regarding whether a
child is a danger or flight risk as defined in the FSA.

The delay in ICE's compliance with the terms of the FSA and this Court's
March 28, 2020, April 10, 2020, April 24, 2020 and May 22, 2020 Orders has
resulted in the detention of Class Members in facilities that are not safe and sanitary
and where they are at extreme risk of contracting the deadly coronavirus.

Defendants have failed to provide sufficient justification for the ongoing
detention of Class Members in violation of the FSA. Time is of the essence to
release Class Members who remain detained in congregate care facilities in the
midst of a global pandemic. Plaintiffs therefore propose that ICE be ordered to
release all detained class members who have not been determined to be flight risks
or a danger in accordance with the terms of the FSA within 72 hours of the issuance
of the Court's Order.

## B.    Juvenile Detention Centers

Upon identifying youth detained by ICE at two juvenile jails in the Pacific
Northwest in Defendants' Data Response [Dkt 756] (April 8, 2020), Plaintiffs
informed this Court of class members "languishing in indefinite detention without
any efforts, much less prompt efforts, to reunify the children with their parents or
place them in the least restrictive setting." Plaintiffs' Second Reply [Dkt 774 at 18
of 30] (April 21, 2020). Initially, this Court declined to address the issues pertaining
to these children as they were raised for the first time in Plaintiffs' Second Reply.

This Court did, however, "refer them to the ICE Juvenile Coordinator for
further investigation and report." Order Re Plaintiffs' Motion to Enforce [Dkt 784
at 4] (April 24, 2020).[9]

The May 15, 2020, ICE Juvenile Coordinator's Report stated that no
residents or staff had tested positive for COVID-19 at Cowlitz or NORCOR as of

---

[9] On May 15, 2020, Class Counsel submitted a letter via email regarding concerns
for the prolonged detention and harsh conditions of confinement for these youth to
Government Counsel and Special Monitor Andrea Ordin and requested the letter be
forwarded to ICE Juvenile Coordinator Deane Dougherty.

May 14, 2020. [Dkt 788-1 at 5] (May 15, 2020). The Report also included two grids identifying youth detained in ICE jails, with "flight risk" marked in the column labeled "Parole Denial Reason" for each youth. [Dkt 788 at 9 and 11]. The final column of the grid, labeled "Additional Details/Other" included brief descriptions of the "circumstances surrounding detention," which only referenced ICE's initial apprehension of each youth. *Id*.

However, as described in Plaintiffs' Response, the Report was "devoid of any basis for the ongoing indefinite detention of Class Members" and did not demonstrate that ICE had made or recorded *any* efforts to release class members or place them in the least restrictive setting. [Dkt 796 at 24 of 27] (May 21, 2020). Plaintiffs again emphasized the exceptional vulnerability of minors placed indefinitely in juvenile jails thousands of miles from family – particularly during a global pandemic – as a "grave threat to their physical and mental health." [Dkt 796 at 25 of 27], *citing* Exhibit M Declaration of Craig Haney ¶ 13 [Dkt 759]. Plaintiffs requested this Court order that "ICE make immediate efforts to release Class Members detained at juvenile jails and either reunite them with family or, in the alternative, transfer them to the least restrictive placement, prioritizing close proximity to family." *Id*. at 26 of 27.

On May 22, 2020, this Court ordered: "The parties shall also meet and confer regarding the status of minors currently detained at juvenile detention facilities, as already covered in the April 24, 2020 Order. If necessary, the parties may thereafter request a briefing schedule on these issues." Order Re Updated Juvenile Coordinator Reports [Dkt 799 at 4] (May 22, 2020).

On June 3, 2020, Special Monitor Andrea Ordin participated in a phone conference regarding Class Counsel's ongoing concerns for ICE's prolonged detention of Class Members at juvenile detention facilities. Class Counsel has also requested a meet and confer with Defendants' counsel and prior to the next status conference will file a Plantiffs' or joint status report.

14

The most recent ICE Juvenile Coordinator Report refers to these youth only insofar, "[a]s of Tuesday, June 9, 2020, no residents or staff members have tested positive for COVID-19 at the two secure juvenile facilities housing minors under paragraph 21 of the FSA" and that while one non-ICE detainee at NORCOR presented with a symptom of COVID-19, that youth was moved to quarantine and tested by the local health department with a test result on June 8, 2020 being negative. [Dkt 813-1 at 16 of 17] (June 10, 2020).

The Report fails to provide any data as to the identity of children detained by ICE at juvenile detention facilities, much less any indicia of efforts made by ICE to release them or transfer them to the least restrictive placement. It also fails to evidence any individualized determination that youth are a flight risk or danger. A cursory reference to Paragraph 21 of the FSA hardly suffices to abrogate ICE of its ongoing duty to comply with the core tenets of the FSA by making and recording efforts to promptly release children and place them, at all times, in the least restrictive setting.

As of June 17, 2020, two youth remain detained at Cowlitz. B.B.B. has been detained at Cowlitz for over twelve months and in ICE custody for more than twenty months. ICE May 2020 Flores Report at Lines 118-20. A.F.P.P. has been detained at Cowlitz for nine months. *Id.* at Lines 127-30. B.B.B. and A.F.P.P. have Category A sponsors, their mothers, both of whom previously submitted declarations to this Court attesting to their desire and capacity to have their children returned to their care. [Dkt 774 at 18 of 30], *citing* Exhibit Q A.P.P. Decl. and Exhibit S M.E.B.R. Decl.[10]

Instead of releasing youth already experiencing exceptionally prolonged confinement during a global pandemic, ICE has confined at least two additional youth at NORCOR: K.J.A.B. and F.J.D.E. K.J.A.B. has been detained since May 8,

_____

[10] X.E.S., who has been in the United States since she was eleven months old and was detained at Cowlitz in near solitary confinement for over six months, was finally released on bond over the Government's objection on May 21, 2020. Ratcliffe Decl. 19.

2020. ICE May 2020 Flores Report at Lines 543-45. K.J.A.B.'s mother and stepfather are available to care for him. Exhibit 1 filed herewith, Ratcliffe Decl. ¶ 16.

F.J.D.E. was detained at NORCOR, but appears to have been deported before legal service providers could even assess his case. Ratcliffe Decl. ¶ 16.

Y.R.R., who had been detained at NORCOR since January 30, 2020, appears to have been deported as of May 20, 2020. ICE May 2020 Flores Report at Line 121. Plaintiffs request information immediately regarding the circumstances of deportation for both F.J.D.E. and Y.R.R.

ICE has made no efforts to meet, communicate with, or individually assess the youth detained at Cowlitz or NORCOR, nor to meet with or individually assess their sponsors, or otherwise comply with the core provisions of the FSA requiring prompt release and placement in the least restrictive setting. Ratcliffe Decl. ¶¶ 16, 17. Nor has ICE individually assessed any of the youth for dangerousness or risk of flight. *Id.* at ¶ 20.

ICE's indiscriminate labeling of minors as "flight risks" as a basis for indefinite detention in juvenile jails, particularly without ongoing individualized assessments or evaluations or any communication with the youth or their parents, constitutes abject noncompliance with the FSA and is a violation of this Court's general April 24, 2020 order. ("ORR and ICE shall continue to make every effort to promptly and safely release Class Members who have suitable custodians in accordance with Paragraphs 14 and 18 of the FSA and the Court's prior orders, including those categorized as "MPP," participants in class litigation, "pending IJ hearing/decision" or "pending USCIS response," absent a specific and individualized determination that they are a flight risk or a danger to themselves or others, or a proper waiver of *Flores* rights (*see, e.g.*, July 24, 2015 Order [Doc. # 177], June 27, 2017 Order [Doc. # 363], July 9, 2018 Order [Doc. # 455], July 30, 2018 Order [Doc. # 470]").

16

The need for FSA compliance is particularly urgent given that A.F.P.P. will turn 18 on July 7, 2020 and ICE detains youth at Cowlitz and NORCOR until they age out, at which time they are transferred to adult ICE facilities. Ratcliffe Decl. ¶¶ 6, 9.

Finally, it must be underscored that the chronically harsh conditions of confinement at both Cowlitz and NORCOR have prompted independent human rights investigations and reports. [Dkt 774 at 9 of 30]. Currently, youth at Cowlitz do not have access to the outdoors, nor do they have any access to family, clergy, or mental health support. Ratcliffe Decl. ¶ 8. Youth at NORCOR also lack family, clergy, or mental health support and K.J.A.B. is essentially confined in isolation. Ratcliffe Decl. ¶ 12-13.

Therefore, Class Counsel respectfully requests this Court order the immediate release of A.F.P.P., B.B.B., and K.J.A.B. to their respective sponsor parents and order ICE to make and record efforts to promptly release all youth detained in juvenile jails or, in the alternative, to transfer them to the least restrictive placement, prioritizing close proximity to family.

Furthermore, given the isolating location of Cowlitz and NORCOR, the history of conditions issues and the evidence of prolonged detention of youth at these facilities, Plaintiffs request notification through whatever means this Court deems proper immediately upon placement of any youth at Cowlitz or NORCOR juvenile detention facilities.

III.   ICE CONTINUES TO FAIL TO MEET THE AGREEMENT'S SAFE AND SANITARY REQUIREMENTS IN LIGHT OF THE COVID-19 PANDEMIC.

This Court's May 22, 2020, Order states in part:

the Court remains concerned with the implementation of public health guidances at the Family Residential Centers (FRCs), given the declarations submitted by Plaintiffs showing that there are minors in custody with pre-existing medical conditions and that conditions

17

1    remain unsafe and crowded—despite reduced populations—at each

2    FRC. See, e.g., Cambria Decl. [Doc. # 796-1]; Fluharty Decl. [Doc. #

3    796-2]; Meza Decl. [Doc. # 796-3]

4    *Id*. at 2.

5         The Juvenile Coordinator's Report states in part that "families comingle

6    during waking hours," *id*. at 11, hand sanitizer is available only to residents at

7    "desks, dining halls, and other common areas," *id*. at 12, "residents must ask the

8    staff for access to certain cleaning supplies," *id*., a cleaning crew is only assigned to

9    complete a thorough sanitation of each room "once it becomes vacant," *id*., social

10   distancing is allegedly enforced during recreational activities by redirecting

11   residents only "if they are found gathering in groups of ten (10) or more," *id*. at 13.

12        It appears that conditions have remained largely unchanged since this Court's

13   earlier findings regarding the dangers posed by detaining Class Members in

14   detention centers during the COVID-19 pandemic.

15        Nor is there any indication that ICE has considered these dangers when

     making its "parole" determinations.

16        Defendants family detention centers are *communal* facilities where unrelated

17   adults, families, and children commingle each day and throughout the day.

18        The communal areas do not permit adequate social distancing. Detainess

19   share chairs, desks, phones, computers, toys, showers, restrooms, and eating areas.

20        Additionally, the ICE response fails to account for the fact that Class

21   Members in these facilities are most often infants and young children who cannot,

22   themselves, practice social distancing. In fact, several of the children are too young

23   to wear a mask to prevent infection and spread of COVID-19. Children will

24   commingle, play with toys, touch things, cough and sneeze and more, and often

25   will not keep a mask on 24/7 – certainly not the children who the CDC doesn't even

26   recommend wearing masks due to the suffocation risk.

27        The ICE report nowhere explains which detainees or how many detainess at

28   the FRCs are at a higher risk for serious illness or death from COVID-19, what

their "medical conditions" are, or whether any of them were released because of their vulnerability or medical conditions. Nor does the Report identify the Class Members or parents who medical professionals have identified as high-risk, nor does it state how many detainees at the FRCs have been identified by medical professionals as "high-risk," or in which FRCs they are detained, or why they have not been released.

As Plaintiffs' previously filed declarations discuss, social distancing, the cornerstone of COVID prevention, remains impossible as families and children continue to be detained in secure congregate facilities with all spaces being shared by detained families, facility staff, ICE staff, and others. See e.g. Fluharty Decl. at ¶¶ 16-18 ("Rather than using the additional space available at STFRC to further limit the number of people who share communal bathrooms, time in the dining hall, the library, etc., STFRC has closed certain 'neighborhoods,' consolidating families into other neighborhoods that remain open … [M]others report eating in the dining hall with approximately forty people at a time and that eight individuals continue to eat at a table at a time … Families continue to report large gatherings in the gym and other locations.  One mother estimated that there were approximately sixty individuals in the gym at the same time last week"); Cambria Decl. ¶ 7 ("Despite the lower census, families continue to report that they cannot socially distance in FRCs due to their nature as congregate care facilities. They further report that children in the BCRC are unable to comprehend or practice social distancing given their age, lack of maturity, and nature as curious infants, toddlers and young children"); Meza Decl. ¶ 8, 13, 21 (" Families in quarantine break social distancing when they gather during recreation time, and precautions to minimize the threat of COVID-19 are all but abandoned for families after they are out of 14 day intake quarantine … During recreation time, twice a day, families are permitted to mingle in a shared recreation yard with multiple families … Social distancing is not promoted for families in the general population").

Class members' parents report that conditions in the FRCs remain unsafe and unsanitary. See Fluharty Decl. at ¶¶ 10-11 ("Conditions at the STFRC in Dilley remain unsafe and unsanitary, like before. The same inadequate cleaning measures … and lack of information sharing have persisted as we enter yet another month of the COVID-19 pandemic. Inadequate and substandard cleaning and infection prevention mechanisms still persist at STFRC. As recently as yesterday, May 19, 2020, mothers report being denied disinfectant spray and disinfectant wipes to clean their rooms, being served in the dining hall by individuals who do not wear gloves, and the ongoing use of detained mothers to facilitate cleaning, rather than professional cleaning staff."); Cambria Decl. ¶ 6, 14 ("Families report conditions in the facilities remain unchanged and that they continue to feel unsafe and unprotected from COVID-19. According to our clients, they are provided with 1 mask per person every 8 days … Children are still suffering from effects of detention including poor appetite, colds, infections, and other physical issues related to their detention in close quarters with other asylum-seeking families"); Meza Decl. ¶ 11, 12, 16,19 ("Families are given one mask per person, though not all children are provided masks ... Rooms are only cleaned once per day, and they are cleaned by the detained individuals themselves.  Families report that cleaning supplies are not readily available and must be requested … Families surveyed on May 19, 2020 reported that GEO and ICE do not regularly use masks when they interact with the general population …")

Moreover, even if ICE engaged in each and every protective measure outlined in the previously filed declarations of ICE officials Sheridan and George, the best ICE can hope for is to "reduce" the risk that detained class members will become infected, ill, or die.[11] It is undisputed that congregate care facilities remain

---

[11] Even if ICE engages in all the specific preparation, prevention, and management measures CDC recommends, *this can only "help reduce the risk of transmission and severe disease from COVID-19" by an unstated level.  See* https://www.cdc.gov/coronavirus/2019-ncov/downloads/managing-COVID19-in-

1  inherently vulnerable to the introduction and fast spread of COVID-19.[12] The

2  spread of COVID-19 into Defendants' detention facilities is not speculative.

3  Detention facilities are largely incapable of implementing the range of CDC's

4  recommendations and incarcerated people are already being infected at a rate far

5  higher than non-detained populations.[13]

6

7

_____

8  correctional-detention.pdf (emphasis supplied). Compliance with CDC policies is
9  made all the more difficult because ICE contracts out the detention of class
   members and their families. The CDC notes that such contractors "are
10 organizationally distinct and responsible for [their] own operational, personnel, and
   occupational health protocols and may be prohibited from issuing guidance or
11 providing services to other employers or their staff within the same setting."
12 https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-
   detention.pdf. CDC also notes that "[p]ersons incarcerated/detained in a particular
13 facility often come from a variety of locations, increasing the potential to introduce
14 COVID-19 from different geographic areas." *Id*. at 2. And "[i]ncarcerated persons
   may hesitate to report symptoms of COVID-19 or seek medical care due to … fear
15 of isolation." *Id*.
16 [12] It is also undisputed that all age groups, including children, have contracted the
17 disease. Robert Verity, PhD., et al., *Estimates of the Severity of Coronavirus
   Disease 2019: A Model-Based Analysis*, THE LANCET (March 30, 2020), at 6,
18 https://www.thelancet.com/pdfs/journals/laninf/PIIS1473-3099(20)30243-7.pdf.
19 [13]  *See, e.g.* David Mills & Emily Galvin-Almanza, *As many as 100,000 incarcerated
20 people in our jails and prisons will die from the coronavirus, unless the US acts now*,
   BUSINESS INSIDER (April 2, 2020), https://www.businessinsider.com/failure-to-
21 release-prisoners-is-condemning-thousands-to-death-2020-4; Bill Chappel, *73% Of
22 Inmates At An Ohio Prison Test Positive For Coronavirus*, NPR (April 20, 2020),
   https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-
23 inmates-at-an-ohio-prison-test-positive-for-coronavirus; Angie Jackson & Kristi
24 Tanner, *The High COVID-19 Infection Rate At This Michigan Prison Has Inmates
   Fearing For Their Health*, BUZZFEED NEWS (April 16, 2020),
25 https://www.buzzfeednews.com/article/angiejackson/coronavirus-prison-inmates-
26 michigan-parnall-covid; Deborah Becker, News More Than 150 Positive COVID-19
   Cases Reported Among Prisoners, Staff Inside Mass. Jails And Prisons, WBUR
27 NEWS (April 15, 2020), https://www.wbur.org/news/2020/04/15/jails-prisons-latest-
28 coronavirus-cases-mtc; COVID-19 Infection Tracking in NYC Jails, LEGAL AID
   SOCIETY, (last visited April 22, 2020), available at: https://cutt.ly/RtYTbWd.

At the start of the COVID-19 pandemic, epidemiologists warned that jails and prisons would be breeding grounds for infectious disease, thanks to their densely packed populations and uncertain access to hygiene products and medical care. And, sure enough, the four biggest known clusters of outbreaks in the U.S. on June 3 were all linked to correctional facilities, according to a tracking project by The New York Times.[14]

By June 9, at least 43,967 incarcerated people in the United States had tested positive for COVID-19, an 8 percent increase from the week before.[15]

On June 11, 2020, ICE reported 22 positive cases of COVID-19 at its Eloy Detention Center. Four days later, that number had jumped 460%, to 123 confirmed cases.[16]

Children across the U.S. continue to be vulnerable to COVID. While there are fewer cases of COVID-19 among children compared to cases among adults, CDC reports that in the U.S., about 2% of confirmed cases were among minors, and thus, without adding the extra risk of being in a detention center, as of May 20, 2020, about 31,645 children may have been diagnosed with COVID-19 and over 1,833 children may have died.[17] Moreover, serious complications from COVID are arising in children specifically.[18]

---

14 Available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last checked June 17, 2020).

[15] Available at https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last checked June 17, 2020).

[16] COVID-19 Cases at Eloy Detention Center surge by 460%, AZMirror (June 15, 2020), available at azmirror.com/blog/covid-19-cases-at-eloy-detention-center-surge-by-460-since-Friday/

[17] *Burden of COVID-19 Among Children*, CDC (updated April 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pediatric-hcp.html

[18] Boston Children's Hospital. May 8, 2020. Covid-19 and a serious inflammatory syndrome in children: Unpacking recent warnings. Available at: https://discoveries.childrenshospital.org/covid-19-inflammatory-syndrome-children/

22

Defendants still have not addressed the reality that due to the range of symptoms children may have, including coughing[, ] sore throats, headaches, or poor feeding or appetite, Defendants simply may not recognize class members who have become infected.[19] Nor have they grappled with the fact that although children may appear to be less susceptible to contracting the virus, common health concerns affecting many Class Members, such as asthma, malnutrition, and immunosuppression, may make them more susceptible to serious forms of the disease. March 28, 2020 Order at 6.

The ICE Reports state that the agency identifies detained individuals who have medical conditions that place them at a heightened risk for serious illness or death if infected by COVID-19 and reviews these cases to determine if release is appropriate, however, Proyecto Dilley has identified numerous mothers and children with serious medical conditions who remain detained. Fluharty Decl. ¶ 24. Of the 111 Class Members detained in May, twenty-six report medical issues. *Id*. ¶ 25. In addition, thirty-nine mothers reported having medical conditions. *Id*.

As the Court is well aware, the FSA requires that Defendants "treat[ ] and shall continue to treat, all minors in [their] custody with dignity, respect and special concern for their particular vulnerability as minors." *Id*. ¶ 11.[20] Considering "the Court's past orders, the exigencies of the circumstances, COVID-19's highly contagious nature, and the imminence of the threat," March 28, 2020, Order at 9, ICE's compliance with the release provisions of the FSA is crucial. The Court "remind[ed] Defendants—yet again—that 'hold[ing] minors in indefinite detention in unlicensed facilities, . . . constitute[s] a fundamental and material breach of the

---

[19] *See* https://www.cdc.gov/covid-data-tracker/index.html; *see also* Clinical Presentation in Children, CDC https://www.cdc.gov/coronavirus/2019-ncov/hcp/pediatric-hcp.html (last checked June 17, 2020)

[20] It also requires that "[f]ollowing arrest, the [Defendants] shall hold minors in facilities that are safe and sanitary and that are consistent with the [Defendants'] concern for the particular vulnerability of minors." *Id*. ¶ 12.A.

parties' Agreement. '"[21] ICE therefore "must … comply with the Agreement's requirement to release minors without unnecessary delay and 'make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor.'" *Id. quoting* Agreement ¶¶ 12, 14.

V.    CONCLUSION

For the foregoing reasons, the Court should reject Defendants' claims of compliance with the FSA and the Court's prior Orders by way of its conducting "parole" interviews every few months using standards wholly inconsistent with the FSA and securing of waivers of Class Members' rights through brief coercive interviews with parents outside of the presence of their counsel of record. The Court should reiterate that all Class Members are covered by the FSA's conditions *and* release provisions, and should now Order that detained accompanied Class Members be released within seventy-two hours to sponsors identified by Class Members' parents.

Dated:   June 17, 2020.             CENTER FOR HUMAN RIGHTS AND
                                     CONSTITUTIONAL LAW
                                     Peter A. Schey
                                     Carlos R. Holguin

                                     USF SCHOOL OF LAW IMMIGRATION CLINIC
                                     Bill Ong Hing

                                     LA RAZA CENTRO LEGAL, INC.
                                     Stephen Rosenbaum

                                     UNIVERSITY OF CALIFORNIA DAVIS
                                     SCHOOL OF LAW
                                     Immigration Law Clinic
                                     Holly S. Cooper
                                     Daisy O. Felt

---

[21] March 28, 2020, Order at 10, *quoting Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018).

1

2    THE LAW FOUNDATION OF SILICON VALLEY
     Jennifer Kelleher Cloyd
3    Katherine H. Manning
     Annette Kirkham
4

5

6              _____/s/ Peter Schey_____
               Peter A. Schey
7              *Attorneys for Plaintiffs*
     / / /
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO DEFENDANTS' JUVENILE
COORDINATOR REPORTS
CV 85-4544-DMG-AGRX

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2020, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Peter Schey*
PETER SCHEY
Center for Human Rights and
Constitutional Law

Attorney for Plaintiffs