Gretchen Nelson, SBN: 112566
Gabriel S. Barenfeld, SBN: 224146
NELSON & FRAENKEL LLP
601 So. Figueroa Street, Suite 2050
Los Angeles, CA  90017
Phone:  (213) 622-6469 / Fax:  (213) 622-6019
Email:  gnelson@nflawfirm.com
Email:  gbarenfeld@nflawfirm.com

[Additional counsel listed on signature page]

*Attorneys for Amici and Movant*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>WILLIAM BARR, Attorney General of the United States, *et al.*,<br><br>    Defendants. | Case No. 8:19-cv-01115-DOC-DFM<br><br>**EX PARTE APPLICATION FOR LEAVE TO PARTICIPATE AS AMICUS CURIAE**<br>[Submission on the Papers]<br><br>COURTROOM:   8C<br>JUDGE:         Hon. Dolly Gee |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE** that on June 26, 2020, at 11:00 a.m. in Courtroom 8C of the above-titled court, located at United States Courthouse, 350 West 1st Street, Los Angeles, CA, 90012, movants RAICES, Proyecto Dilley, and Aldea - the People's Justice Center ("Aldea") (collectively "*Amici* applicants") will, and hereby do, move for an order permitting them to participate as *amicus curiae*

with regard to Plaintiffs' Emergency *Ex Parte* Application for Temporary Restraining Order [Doc. # 733], which this Court subsequently construed as a Motion to Enforce [Doc. #784] (the "Motion to Enforce"), which is currently scheduled to be heard at the status conference on the above-referenced date, time, and location.

This motion is made on the grounds that the Court has inherent authority to allow the participation of an *amicus curiae*. *Amici* applicants' participation as *amicus curiae* is helpful and desirable because it will facilitate a more complete understanding of the issues before the Court. This motion is based on this Notice and Notice of Motion, the accompanying brief of *Amicus Curiae* and supporting declarations, all papers and pleadings on file in this action, and upon such further evidence and argument as may be presented to the Court in connection with the motion.

Pursuant to Local Rule 7-19.1, *Amici* applicants advised counsel for Plaintiffs and counsel for Defendants as to the date and substance of movants' proposed *ex parte* application. Counsel for Plaintiff indicated that they have no objection to the filing of the *amicus brief* and exhibits. Counsel for Defendants stated the following: "The government consents to the filing of an amicus brief consistent with the applicable federal and local rules. The government opposes the submission of evidence in this case by a non-party. The government also notes that there is no pending motion before the Court, and objects to the consideration by the Court of briefing that is outside the scope of the ongoing Juvenile Coordinator reporting and of evidence submitted by a non-party to which Defendants have had no opportunity to respond to this filing."

### Authority to Accept *Amici* Briefing

A "district court has broad discretion to appoint *amicus curiae*." *Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir. 1982)*, abrogated on other grounds by Sandin v. Conner,* 515 U.S. 472 (1995). The "classic role" of *amici curiae* is "assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the

court's attention to law that escaped consideration." *Miller-Wohl Co., Inc. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982). "District courts frequently welcome *amicus* briefs from nonparties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has 'unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'" *Safari Club Intern. v. Harris*, No. 2:14-cv-01856-GEB-AC, 2015 WL 1255491, at *1 (E.D. Cal. Jan. 14, 2015) (*citing NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005)); *see also California v. U.S. Dep't of Labor*, No. 2:13-cv-02069-KJM-DAD, 2014 WL 12691095, at *1 (E.D. Cal. Jan. 14, 2014) (leave to file *amicus* brief granted where case implicated constitutional issues and therefore had "potential ramifications beyond the parties directly involved"). "The touchstone is whether the *amicus* is 'helpful,' and there is no requirement 'that *amici* must be totally disinterested.'" *California v. U.S. Dept. of Labor*, 2014 WL 12691095, at *1 (citing *Hoptowit*, 682 F.2d at 1260). This Court therefore has authority to permit *Amici* applicants to participate as *amicus curiae*, and grant leave to file the attached brief.

*Amici* applicants are three legal service providers that represent families (parents and children) that are detained by Immigration and Customs Enforcement ("ICE"). *Amici* applicants bring unique information and perspective to the issues currently before the court and should be granted leave to submit a brief on those important issues. *See Missouri v. Harris*, No. 2:14-cv-00341-KJM-KJN, 2014 WL 2987284, at *2 (E.D. Cal. Jul. 1, 2014) ("An *amicus* brief should normally be allowed when, among other considerations, the *amicus* has unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide.") (internal citation omitted). *Amici* applicants reviewed the ICE Juvenile Coordinator's June 10, 2020 Report (the "JC Report") and identified material factual misrepresentations and inconsistencies. The *amicus* submission will provide factual clarifications *Amici* applicants are uniquely positioned to

provide. Ultimately, *Amici* applicants' *amicus* submission will offer context and facts that clarify ICE's continued and flagrant disregard for its obligations under the *Flores* Settlement Agreement ("FSA").

Accordingly, for the reasons set forth herein, the Court should grant leave for *Amici* applicants to submit an *amicus* brief.

## Interest of *Amici* Applicants

### Refugee and Immigrant Center for Education and Legal Services

The Refugee and Immigrant Center for Education and Legal Services is a 501(c)(3) non-profit legal and social services agency based in San Antonio, Texas, that defends the rights of immigrants and refugees, empowers individuals, families, and communities, and advocates for their liberty and justice. RAICES' Family Detention Services program ("RAICES") provides *pro bono* legal services for non-citizen asylum seekers detained at the Karnes Family Residential Center ("Karnes") in Karnes City, Texas through a model of universal representation. The population served by RAICES at Karnes is family units comprised of *Flores* Class Member children and their accompanying parents—who are not class members. The scope of RAICES' legal services generally includes know your rights presentations and advisals, legal representation in expedited removal proceedings, and advocacy on behalf of the parents and children.

### Proyecto Dilley

Proyecto Dilley (formerly known as the "CARA Pro Bono Project" and "Dilley Pro Bono Project") provides free legal services to asylum-seeking mothers and children who are detained at the South Texas Family Residential Center ("STFRC" or "Dilley") in Dilley, Texas through a volunteer-based model. Since December 2014, Proyecto Dilley has represented more than 99 percent of the families detained at STFRC. Proyecto Dilley currently works with 100 percent of the families who remain detained in Dilley.

### Aldea - The People's Justice Center

Aldea was formed, in part, as a response to the continued detention of mothers, fathers, and children at the Berks County Residential Center ("Berks"), an immigrant detention center in Leesport, Pennsylvania that holds asylum seeking families. Aldea's attorneys have represented detained families at Berks for nearly four years and offers universal representation for every family detained in Pennsylvania. Since 2016, Aldea has represented thousands of families who were detained in Berks and currently represents 100 percent of all families detained in Berks. It is Aldea's mission to ensure that no parent and child detained at Berks is forced to navigate the complex immigration process alone.

**RAICES, Proyecto Dilley, and Aldea**

This case is of critical concern to the *Amici* applicants in light of their longstanding commitment to asylum-seekers and their advocacy on behalf of detained families, including detained children, in particular. The *Amici* applicants seek to protect the rights of immigrant children in accordance with the language and intent of the *Flores* Settlement.

<strong>Conclusion</strong>

For the foregoing reasons, this Court should grant *Amici* applicants leave to file the accompanying *Amicus* Brief and declarations.

Respectfully Submitted,

DATED: December 18, 2019                    NELSON & FRAENKEL LLP

/s/ Gabriel S. Barenfeld
Gretchen Nelson, SBN: 112566
Gabriel S. Barenfeld, SBN: 224146
601 So. Figueroa Street, Suite 2050
Los Angeles, CA  90017
Tel:  (213) 622-6469
Fax:  (213) 622-6019
Email:  gnelson@nflawfirm.com;
          gbarenfeld@nflawfirm.com

ANDREA MEZA, Esq.
Director of Family Detention Services
RAICES
2511 N Loop 1604 W, Suite 201
San Antonio, Texas 78258
Andrea.Meza@raicestexas.org
(*Pro Hac Vice* admission pending)

SHALYN FLUHARTY, Esq.
Director
Proyecto Dilley
Shay@caraprobono.org
(Pro Hac Vice admission pending)

BRIDGET CAMBRIA, Esq.
Executive Director
ALDEA - The People's Justice Center
532 Walnut St.
Reading, PA 19601
bridget@aldeapjc.org
(Pro Hac Vice admission pending)

*Attorneys for Amici*

6

Gretchen Nelson, SBN: 112566
Gabriel S. Barenfeld, SBN: 224146
NELSON & FRAENKEL LLP
601 So. Figueroa Street, Suite 2050
Los Angeles, CA  90017
Phone:  (213) 622-6469 / Fax:  (213) 622-6019
Email:  gnelson@nflawfirm.com
Email:  gbarenfeld@nflawfirm.com

[Additional counsel listed on signature page]

*Attorneys for Amici and Movant*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>    Plaintiffs,<br><br>              v.<br><br>WILLIAM BARR, Attorney General of the United States, *et al.*,<br><br>    Defendants. | Case No. 8:19-cv-01115-DOC-DFM<br><br>**[PROPOSED] AMICUS BRIEF**<br><br>COURTROOM:  8C<br>JUDGE:        Hon. Dolly Gee |

i

# <u>TABLE OF CONTENTS</u>

I.    Introduction ...................................................................................... 1

II.   Summary of Argument ..................................................................... 2

III.  Argument ......................................................................................... 4

   A.    The ICE Juvenile Coordinator's June 10, 2020 Report is Unresponsive
to Section IV(4)(a)(i) of the Court's April 24, 2020 Order Because it is
Internally Inconsistent, Factually Inaccurate, and Incomplete. ....................... 4

      1.    The JC Report is inconsistent and factually inaccurate as to
conditions of custody, removal, legal case status, and date of final order of
removal of Class Members. ........................................................................... 4

      2.    The JC Report is factually inaccurate as it failed to include
information about its review of sponsor information. ................................... 7

      3.   ICE erroneously relies upon the parents' failure to separate from
their child as a reason for detention. ............................................................ 8

      4.    The JC report demonstrates that ICE conducted arbitrary custody
reviews, but also omits certain details of its haphazard process. ................. 8

   B.    ICE does not make and record continuous efforts at release of Class
Members. ............................................................................................................. 9

   C.    Determining that Class Members who Participate in Federal Litigation
are not Entitled to Expedient Release Under the FSA Violates Class
Members' Constitutional Rights ........................................................................ 11

   D.    COVID-19 continues to pose a grave health concern at the FRCs, and
ICE continues to fail in the proper implementation of CDC guidelines. ........ 13

   E.    ICE's Continued Detention of Class Members Harms Children .......... 15

IV.  Conclusion ..................................................................................... 16

## I.   Introduction

RAICES Family Detention Services Program, Proyecto Dilley (formerly known as the "CARA Pro Bono Project" and "Dilley Pro Bono Project"), and Aldea - the People's Justice Center ("Aldea") (collectively as "*Amici*") file this brief as *amici curiae* in support of Plaintiffs' Emergency *Ex Parte* Application for Temporary Restraining Order [Doc. # 733], which this court subsequently construed as a Motion to Enforce [Doc. #784] (the "Motion to Enforce"). *Amici* sought leave to file this brief in a preceding application, which contains statements of interest for each organization. *Amici* coordinate and provide direct legal services for families who are detained at the Karnes County Residential Center ("Karnes"), the South Texas Family Residential Center ("STFRC" or "Dilley"), and the Berks County Residential Center ("Berks").

*Amici* are well-positioned to provide the Court with information regarding Immigration and Customs Enforcement's ("ICE") continued violations of the *Flores* Settlement Agreement ("FSA") and disregard for orders issued by this Court. In its April 24, 2020 and May 22, 2020 Orders, this Court cited evidence provided by *Amici* through class counsel to find that ICE was not in compliance with Paragraph 18 of the FSA, which requires Defendants to "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." *Flores* Agreement, at ¶ 18 [Doc. # 101]; *see* April 24, 2020 Order at 17 (citing Cambria Decl. [Doc. # 774-24]; Fluharty Decl. [Doc. # 774-30]) [Doc #784]. In its May 22, 2020 Order, this Court remained concerned with the implementation of public health guidelines at the Family Residential Centers (FRCs) given *Amici* declarations presented through class counsel concerning facility conditions that place detained children—including children with pre-existing medical conditions—at risk during the coronavirus ("COVID-19") public health crisis, despite reduced populations at each FRC. *See, e.g.*, Cambria Decl. [Doc. # 796-1]; Fluharty Decl. [Doc. # 796-2]; Meza Decl. [Doc. # 796-3]. Finding the May 15, 2020 report filed by ICE deficient

for these reasons, the Court ordered the ICE Juvenile Coordinator to file updated reports and allowed Plaintiffs to respond to those.

The Juvenile Coordinators filed a new interim report on June 10, 2020 ("JC Report"). Plaintiffs' counsel provided the Court with a response on June 17, 2020, but without the information and perspective of *Amici*.

*Amici* seek to assist the Court by providing critical information regarding ICE's prolonged detention of Class Members in unsafe and unsanitary conditions in violation of this Court's orders and the FSA. *Amici* have unique perspectives and relevant facts that remain unknown to the Court. *Amici's* identification of material inaccuracies in the JC Report that are used to justify the indefinite detention of Class Members has public interest implications. *Amici's* unique information and perspectives were not provided to the Court by either party. *Amici* cannot provide their perspectives and relevant facts through class counsel because doing so may raise conflicts to our representation of the families at the three FRCs.

## II.   Summary of Argument

On April 24, 2020, the Court ordered the ICE Juvenile Coordinator to submit interim written reports during the COVID-19 pandemic. [Doc. # 784] In addition to reporting on compliance with guidelines from the Centers for Disease Control and Prevention ("CDC") for detention facilities, the Court order also directed the Juvenile Coordinator to report on the measures taken to expedite the release of Class Members to suitable custodians during the COVID-19 health emergency, whether ICE is making and recording individualized release determinations and redeterminations for each Class Member held in the FRCs; and the specific reasons children at FRCs remain detained for more than 20 days. April 24, 2020 Order, at 20–21 [Doc # 784].

The Court explicitly authorized the Independent Monitor to request "such further information regarding safe and sanitary conditions and/or Defendants' continuous efforts at release as she deems appropriate" from ICE, in order to fulfill her reporting mandate. *Id.* at 19.

On May 15, 2020 the ICE Juvenile Coordinator filed a cursory and vague interim report with the Court. [Doc. # 788]. In response, the Court again ordered the Juvenile Coordinator to "provide specific explanations for the continued detention of each minor detained at an FRC beyond 20 days." May 22, 2020 Order [Doc. # 799].

On June 10, 2020, without exercising her broad power to affirmatively solicit, review, and analyze data from ICE, the Juvenile Coordinator filed the JC Report solely based upon a "paper audit." [Doc. # 813]. *Amici*—the direct service providers to *Flores* Class Members detained by ICE at the FRCs—have closely reviewed the Juvenile Coordinator's Report.

The Juvenile Coordinator's submission is non-responsive to the Court's April 24, 2020 [Doc. # 784] and May 22, 2020 [Doc. # 799] Orders. As detailed below, the report is internally inconsistent, factually inaccurate, and incomplete in material ways. Critically, rather than providing FSA-compliant reasons to justify the prolonged detention of Class Members, the Juvenile Coordinator's Report blames ICE's failure to release Class Members primarily on Class Member's participation in federal litigation to defend their legal rights, Class Member's immigration case status, or their parent's decision not to be separated from their child.

ICE continues to show lack of compliance with Paragraph 18 of the FSA, which requires Defendants to "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." *Flores* Agreement, at ¶ 18 [Doc. # 101]. Indeed, the arbitrariness of ICE's custody determinations for Class Members is highlighted by the attached sworn statements of Bridget Cambria, Shalyn Fluharty, and Andrea Meza.

ICE's continued failure to comply with the FSA, especially while ICE continues to hold *Flores* Class Members in congregate settings in the midst of a global pandemic, is egregious and requires this Court's intervention. ICE's proven determination to detain Class Members without cause in the face of ongoing litigation, and subsequent to clear court orders requiring the opposite, proves the

1  futility of negotiations between the parties and additional reporting deadlines.

2  **III.    Argument**

3       ICE has yet to provide an adequate explanation, as required by Paragraph 14

4  of the FSA, for each individual Class Members' continued detention. This Court is

5  reliant upon the information provided by ICE in assessing its compliance with the

6  FSA. However, *Amici's* review of the JC Report reveals factual inaccuracies, internal

7  inconsistencies, and material failures to include facts that are critical to release

8  assessments for Class Members.

9       **A. The ICE Juvenile Coordinator's June 10, 2020 Report is**

10      **Unresponsive to Section IV(4)(a)(i) of the Court's April 24, 2020**

11      **Order Because it is Internally Inconsistent, Factually Inaccurate,**

12      **and Incomplete.**

13      The JC Report presents the Court with false information regarding facts such

14  as length of detention for Class Members, imminency of removal, and procedural

15  posture.[1] Furthermore, information in the JC Report is not consistent with

16  information that ICE provided to RAICES in written custody determinations

17  subsequent to this Court's recent orders. *See* Meza Decl. ¶ 30.

18      **1. The JC Report is inconsistent and factually inaccurate as to**

19      **conditions of custody, removal, legal case status, and date of**

20      **final order of removal of Class Members.**

21      The Court is reliant upon information provided by the ICE Juvenile

22  Coordinator to adjudicate the issues before the Court. The data reported, however, is

23  repeatedly wrong and inconsistent. First, ICE records a Class Member's final date of

24  removal differently across cases in the JC Report. In some cases, ICE lists the date

25  an order of expedited removal was issued to a Class Member at the border. In other

26  cases, ICE records the date an immigration judge affirmed the Class Member's

27  ---

[1] In addition, the declarations attached herein also identify the multitude of internal inconsistencies in the JC Report.

28  The JC Report is so littered with these inconsistencies that, in addition to the factual inaccuracies and incomplete records noted *infra*, the JC Report is unreliable.

4

negative credible fear determination in court. In other cases still, ICE records a date that is neither the date an order of expedited removal was initially issued, nor the date the order of expedited removal was affirmed by the immigration judge.

Second, the JC Report states that the "typical" population housed at FRCs are "booked in-and-out of custody within approximately 20 days." [Doc. # 813]. This is a falsehood ICE has presented to the Court. As of June 17, 2020, Proyecto Dilley had determined that the average length of detention for Class Members detained at Dilley was 217.7 days. *See* Fluharty Decl. ¶ 14. The average length of detention for Class Members at Karnes since January 2020 is 53 days. The average length of detention for Class Members in Berks is 109 days.

Third, ICE repeatedly states or implies in the JC Report that Class Members' removal is imminent. [Doc. # 813]. This is incorrect. *See* Fluharty Decl. ¶¶ 16–17. All Class Members who are plaintiffs in *D.A.M. v. Barr*, and additional Class Members who are plaintiffs in *A.B.B. v. Wolf* and *M.M.V. v. Barr*, have administrative stays of removal issued by a federal court. ICE does not and cannot know when these administrative stays will be lifted. Yet despite removal not being imminent for these Class Members, ICE nonetheless cites imminency of removal in support of keeping families detained. *See* Fluharty Decl. ¶¶ 16-17. ICE states within each of its parole determinations that *Flores* Class members will be removed on the "*next flight*," or that the Class Member is a flight risk because of the "very short time period for manifesting the flight," when in actuality the Class Member has an indefinite stay of removal and they legally cannot be removed.

ICE also reports false information regarding the timing of removal flights. All Class Members who are plaintiffs in *D.A.M. v. Barr* have administrative stays of removal issued by a federal court. *See* Fluharty Decl. ¶ 26. ICE, without knowing when those administrative stays will be lifted, nonetheless makes statements such as, "Expected Date of Removal: Next Flight Available" for many Class Members. *Id.*

5

To say that a Class Member's "order is final and she is ready for removal to Guatemala immediately upon resolution of the administrative stay of removal in *M.M.V. v. Barr*" ignores the reality that the Class Member may not be removable for many months, if ever. *Id.* To state that a Class Member "is subject to a final order of removal and will be scheduled for the *next removal flight*" (emphasis added) is highly improbable, and definitely unprovable, at this time.

Fourth, the information contained in many *Flores* Release Summaries is inaccurate and inconsistent with the government's chart in Exhibit B of the JC Report. For example, ICE misstates a child's initial entry date, and the date and manner in which she and her parents were forcibly kidnapped and brought into the United States. *See* Cambria Decl. ¶ 42. Exhibit B of the ICE JC Report conflicts directly, and repeatedly, with the individual "*Flores* Release Summaries" provided to the Court. The inconsistencies include discrepancies in how ICE records and reports relevant information, and the information reported for a Class Member. An analysis of the data reported for particular children highlights the conflict in how the data is entered. *See* Fluharty Decl. ¶ 20.

Fifth, ICE falsely reports that certain Class Members are plaintiffs in federal litigation when, in fact, they are not plaintiffs in said litigation. *See* Fluharty Decl. ¶ 23 .ICE appears to have arbitrarily weighed a Class Member's participation in federal litigation differently when assessing the release of individualized Class Members. *See* Fluharty Decl. ¶ 22. ICE therefore wrongly attributes its decision to deny release to Class Members based upon their participation in litigation that they are not even a part of. *Id.*

Sixth, ICE also falsely reports the status of Class Members' immigration case. For example, in the case of D.E.R., ICE's *Flores* Release Summary states, "ER or 240 hearing: ER," "IJ Review: affirm," and that "Parole was denied because the minor was in the credible fear interview process and detention was required to complete the process." However, D.E.R. was placed in removal proceedings and

6

returned to Mexico pursuant to the Migrant Protection Protocols and never placed in expedited removal proceedings. This is one of many examples of misstatements in the Juvenile Coordinator's June 10, 2020 Report regarding the procedural posture of a Class Member's case.

Seventh, ICE's custody determinations claim *Flores* Class Members did not establish that they were "alien juveniles." *See* Meza Decl. ¶19. However, this information is omitted from the JC report. Additionally, ICE uniformly lists "ID Provided? N/A" in each child's *Flores* Release Summary. However, ICE is in possession of almost every minor's identification documents. *See* Fluharty Decl. ¶ 29.

### 2. The JC Report is factually inaccurate as it failed to include information about its review of sponsor information.

The JC report erroneously states that families failed to provide ICE with information for individuals who are able and willing to receive them. This material inaccuracy indicates that ICE has not recorded information that has been repeatedly provided by Class Members or purposely misleads the Court. Class Members and their parents have repeatedly provided ICE with the name, phone number, address, and relationship of the adult who is ready and willing to receive the family. Fluharty Decl. ¶ 28. As counsel, Proyecto Dilley has also provided sponsor information directly to ICE on behalf of Class Members on March 31, 2020, April 2, 2020, April 18, 2020, April 30, 2020, May 7, 2020, and May 13, 2020. *See* Fluharty Decl. ¶ 5. Similarly, RAICES provided information for Class Members' sponsors through requests for release after ICE's failure to provide written custody determinations. *See* Meza Decl. ¶¶ 4, 33, 39, 46. Aldea has previously confirmed that parents detained at Berks have confirmed the contact information for their sponsors. *See* Cambria Decl. ¶ 12 [Doc. # 796-1]. Therefore, the Report's assertions that Class Members have not provided this information to ICE is simply false.

ICE's explanations for detention of some Class Members at the FRCs focused

on a Class Member's immigration case status with cursory mention attached to each
that release was also denied "because the parent had not designated a caregiver to
whom ICE could consider releasing the minor." Importantly, there is no evidence
that ICE actually considered the existence of a "caregiver," rather than *only*
considering the immigration case status of Class Members when it denied parole.
Based on *Amici*'s records of having provided sponsor information to ICE, and the
experiences of its clients and staff in which ICE primarily focused on immigration
case status in custody review, it appears that ICE may have added the statement,
"because the parent had not designated a caregiver to whom ICE could consider
releasing the minor," to their explanations of continued custody of Class Members
before the filing of the JC Report to this Court but subsequent to ICE's actual denial
of parole based on impermissible considerations of immigration case status. *See*
Meza Decl. ¶¶ 2, 13, 30-41, 46.

### 3. ICE erroneously relies upon the parents' failure to separate from their child as a reason for detention.

This Court previously held "that ICE did not seek or obtain formal waivers
from detained parents of their children's *Flores* rights during ICE officers'
conversations with detained parents on or about May 15, 2020, those conversations
caused confusion and unnecessary emotional upheaval and did not appear to serve
the agency's legitimate purpose of making continuous individualized inquiries
regarding efforts to release minors." May 22, 2020 Order [Doc. # 799]. Indeed, none
of the parents represented by *Amici* chose to waive their children's *Flores* rights to
be released, nor did they waive their right to not be separated from their children.
Parents represented by *Amici* did not choose either option, nor were they under any
legal obligation to make that choice. Each of these Class Members is detained with a
parent, with whom they could be released pursuant to 8 C.F.R. § 1236.3.

### 4. The JC report demonstrates that ICE conducted arbitrary custody reviews, but also omits certain details of its

**haphazard process.**

The JC Report indicates that parole assessments conducted by ICE for detained families were conducted in accordance with INA § 212(d)(5), 8 C.F.R. § 212.5(b), and paragraph 14 of the FSA. The JC Report fails to indicate why ICE's custody review process has not incorporated the provisions detailed at 8 C.F.R. § 236.3 and 8 C.F.R. § 1236.3. The information provided to the Court fails to sufficiently document ICE's efforts to assess the release of children to their detained parent, as required by 8 C.F.R. § 236.3 and 8 C.F.R. § 1236.3, which ICE is required to do when no other custodian for the child is available. *See* Fluharty Decl. ¶ 6.

Furthermore, the JC report does not include information about ICE's arbitrary and inconsistent scheduling of custody determination interviews to purportedly review custody of Class Members at Karnes in response to affirmatively filed parole requests following this Court's recent orders. In these interviews, ICE provided *Flores* class members minimal meaningful opportunity to access counsel, little to no consideration of individual circumstances related to Class Member children, and cursory - at times flippant - participation from ICE. *See* Meza Decl. ¶10.

Moreover, ICE did not focus on the detention of the Class Member when conducting parole interviews. *See* Meza Decl. ¶13. In those interviews, ICE appeared to dismiss the relevant facts and documentation that reflect *Flores* criteria for release of minors from ICE custody. *See* Meza Decl. ¶12. Some Class Members also had serious medical conditions such that continued detention would not be appropriate, but ICE disregarded those concerns.  *See* Meza Decl. ¶20**.**

## B. ICE does not make and record continuous efforts at release of Class Members.

ICE is required to make "prompt and continuous," documented efforts towards the release of Class Members pursuant to paragraph 18 of the FSA. The JC Report confirms that ICE has failed to make "continuous efforts" towards the release of Class Members at each of the three FRCs. The Flores Release Summaries in the JC

9

Report indicate that ICE reviewed the custody status for most Class Members on two occasions. Two custody (re)determinations, when Class Members at the three FRCs have been detained for upwards of 100 days, cannot be considered "prompt and continuous." This is consistent with *Amici's* experience, wherein ICE does not regularly make and record efforts to release Class Members, despite repeated instruction by this Court to do so. See May 22, 2020 Order [Doc. # 799]; April 24, 2020 Order [Doc. # 784]; April 10, 2020 Order [Doc. # 768]; March 28, 2020 Order [Doc. # 740]; June 27, 2017 Order [Doc. # 363]; July 24, 2015 Order [Doc. # 177].

The JC Report indicates that ICE reviewed the case of most Class Members on May 14, 2020. See Fluharty Decl. ¶ 11. As this Court is aware, ICE had a submission deadline on this matter on May 15, 2020. This suggests ICE conducted parole determinations for Class Members in a cursory manner simply because of a filing deadline before this Court, and not because it has systematically integrated an ongoing parole review process for Class Members, as is required by the FSA. Id. Furthermore, to date, ICE has not provided written responses to the pending parole requests for Class Members and parents detained at Berks. *See* Cambria Decl. ¶ 46.

The JC Report also fails to include other dates during which Amici know custody reviews have—or should have—occurred. For example, because ICE continues to detain RAICES Class Member clients without communication to RAICES about their efforts to seek release of its clients on April 24, 2020, RAICES began filing requests for release on parole on behalf of *Flores* Class Members detained at Karnes. *See* Meza Decl. ¶ 3. For every parole request submitted on behalf of a Flores class member, RAICES had previously sent ICE at least one email notifying them that the class member's prolonged detention was potentially in violation of the FSA. *See* Meza Decl. ¶¶ 3–4. There is no indication that ICE considered the information provided in these affirmative requests for release in the JC's submission, and ICE's responses to these requests do not match information provided to this Court in the JC report. *See* Meza Decl. ¶ 7. Similarly, Proyecto Dilley

10

has repeatedly submitted requests for release for Class Members, providing evidence that documents a Class Member's medical condition. Records of these requests are also absent from the JC's Report. And even though families were notified and interviewed in order to assess their potential release pursuant to Section 241 of the INA, these dates are also not indicated.

### C. Determining that Class Members who Participate in Federal Litigation are not Entitled to Expedient Release Under the FSA Violates Class Members' Constitutional Rights

As detailed in the Juvenile Coordinator's Report, many Class Members and their non-class member parents are plaintiffs in separate litigation that challenges the fairness and legality of the procedures applied to them in the expedited removal process.

Contrary to the FSA and this Court's orders, ICE erroneously asserts that a Class Member's status as a plaintiff in a federal action provides justification for indefinite detention. The FSA requires the government "release a minor from its custody without unnecessary delay" absent a finding the minor is a flight risk or danger. *Flores* Agreement ¶¶ 14, 18. The Court has previously ruled that participation in separate litigation does not impact a Class Member's right to release. April 24, 2020 Order [Doc. # 784].

ICE's determination that Class Members who assert their rights in federal court are not entitled to release under the FSA infringes upon Class Members' rights under the First and Fifth Amendments to the U.S. Constitution.

Class Members' participation in in litigation is a form of protected speech under the First Amendment. *See Smith v. Arkansas State Highway Employees, Local 1315*, 441 US 463, 464 (1979) ("The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances."). ICE's decision to indefinitely detain Class Members *because* they have asserted their legal rights violates their First

11

Amendment rights and significantly restricts access to the courts. ICE's policy of suspending the presumption of release embedded in the FSA for Class Members who participate in federal litigation has already coerced numerous Class Members and their parents to abandon their constitutionally-protected right to pursue their grievances through litigation; after enduring the psychologically-damaging effects of detention, many Class Members who were previously plaintiffs in *M.M.V v. Barr* withdrew from the litigation in order to be released from detention through removal.

Similarly the indefinite detention of Class Members who pursue their legal claims through federal litigation raises serious due process concerns in violation of the Fifth Amendment. A Class Member's decision to vindicate their legal rights cannot justify punishment in the form of prolonged detention in conflict with the FSA. Conditions of confinement violate an individual's right to due process when they amount to "punishment.". *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Prolonged detention causes life-long injury to children[2] and amounts to a punitive consequence. ICE's decision to impose this consequence on Class Members because of their choice to pursue their legal rights is evident in the Juvenile Coordinator's report, which repeatedly cites to a Class Member's status as a plaintiff as the sole reason for their detention.

ICE has repeatedly advised Class Members who are Plaintiffs in *M.M.V. v. Barr* that they will not be released from detention *because* of their participation in the lawsuit, and that should they wish to be released from detention, they should dismiss themselves from the litigation and request removal from the United States. This context clarifies that ICE has leveraged detention to punish Class Members who

---

[2] *See* Report of the ICE Advisory Committee on Family Residential Centers (October 7, 2016), bit.ly/39BTHLg. *See also* Physicians for Human Rights, *The Impact of Immigration Detention on Migrant Mental Health*, PHR Issue Brief (October 2018), https://go.aws/2SbHh74. *See also* Physicians for Human Rights, Letter to Sec. Kirstjen Nielsen Regarding the Detention of Infants (Feb. 28, 2019), https://phr.org/wp-content/uploads/2019/03/022819_PHR-Letter_Infant-Detention-1.pdf; American Academy of Pediatrics, Recommendations for Preventive Pediatric Health Care (March 2019), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf.

have pursued their right to bring civil claims before the courts. Moreover, the government has no legitimate objective in detaining Class Members indefinitely during a global pandemic. The documented harms of indefinite detention on children, paired with the government's lack of legitimate purpose for detaining Class Members, and documented decision to detain Class Members *because* they are litigants, supports a finding that Class Members are subjected to "punishment."

The refusal to release Class Members who pursue litigation chills access to courts for potential future litigants in FRCs, who will be reluctant to pursue legally-meritorious legal claims if they believe doing so will result in the indefinite detention of their children. Indeed, ICE has repeatedly informed families who are detained at Dilley that the reason they may not be released from detention is because they chose to participate in federal litigation.

ICE, as detailed in the June 10, 2020 Juvenile Coordinator Report, has denied Class Members release from detention in conflict with the FSA, an adverse action that has already deterred individuals from exercising their right to participate in civil litigation. ICE's decision to deny release to Class Members was motivated, at least in part, because of Class Members participation in civil litigation.

**D. COVID-19 continues to pose a grave health concern at the FRCs, and ICE continues to fail in the proper implementation of CDC guidelines.**

A COVID-19 outbreak is inching ever closer in all three FRCs. As of June 25, 2020, eleven detained adults and children tested positive for COVID-19 at Karnes. Two CoreCivic employees and one ICE official who work at Dilley have also tested positive for COVID-19, and numerous families have been moved to quarantine. *See generally* Nomaan Merchant, *Isolated and Afraid, Detained Migrant Kids Worry about Virus*, Border Report (June 23, 2020, 10:26 AM), *https://www.borderreport.com/hot-topics/migrant-centers/detained-in-isolation-migrant-families-fear-catching-virus*. Berks County is a hotbed of COVID-19. *See*

13

Cambria Decl. ¶ 24. Thirty-five people have died of COVID-19 at Berks Heim, a county-owned and operated nursing home across the street from the detention center. *Id*. According to testing done by the PA National Guard and Department of Health, as of two weeks ago about 97 residents as well as 31 Berks County employees were currently or formerly positive for COVID-19. *Id*. Berks County employees also work in the detention center. *Id*.

In the JC report, ICE fails to acknowledge the lack of ability for Class Members and parents to socially distance at all three FRCs. *See* Cambria Decl. ¶ 19. ICE statements in the report fail to account for the fact that FRCs are *communal* facilities where unrelated adults, families and children commingle each day. *Id*. Although there may be enough physical space for families to socially distance, families are only permitted in certain parts of the facility or outdoors during certain times of the day, and their access to spaces are governed by detention staff. *See* Cambria Decl. ¶ 20. The communal areas do not permit adequate social distancing and the Facility Handbook themselves states that families will live in close proximity with other families. *Id*.

The ICE response also fails to account for the fact that many detained Class Members are infants and young children who thus cannot practice social distancing and cannot legally wear masks. *See* Cambria Decl. ¶ 23. Illnesses, viruses, and contagious diseases or infections therefore can spread quickly affecting all children and parents. *Id*.

The provision of disposable masks at every FRC remains insufficient. For example, at BCRC ICE provides one disposable mask every eight days. *See* Cambria Decl. ¶ 26. The facility only provides adult-sized masks. *Id.* ICE correctly states that children under two are not supposed to wear masks of any kind due to the risk of suffocation. *Id. at* ¶ 27. This leaves these young children at risk of exposure to COVID-19 and places every other parent, Class Member, and employee in the facility equally at risk of contracting COVID-19. *Id*.

There is an apparent disconnect between ICE and facility staff regarding facility policies and/or a lack of instruction to detained parents concerning COVID-19. *See* Cambria Decl. ¶ 29. For example, ICE states that detained individuals can simply request another mask or additional cleaning supplies. Detained families are not aware that this is the case. *Id.* The same disconnect applies to the availability of gloves. *See* Cambria Decl. ¶ 30.

The circumstances at Berks provide one example of the risk Class Members face while detained in facilities that prevent social distancing. An outbreak of viral stomatitis, a highly contagious disease, causing bleeding from the mouth, sores on children's lips, mouths, and throats, and trouble eating and breathing, spread among *many* children at Berks. *See* Cambria Decl. ¶ 31. ICE's admission to the spread of this disease confirms that children cannot safely be detained during the COVID-19 pandemic. JC Report [Doc. # 813].

### E. ICE's Continued Detention of Class Members Harms Children

The ever-expanding reach of the deadly COVID-19 pandemic and ICE's failure to comply with the FSA and continued detention of Class Members creates dangerous and harmful situations. ICE continues to detain Class Members in violation of the FSA at the secure and unlicensed congregate FRCs. Especially during a global pandemic, ICE's continued detention of children puts Class Members at great risk. Release of Class Members does not preclude release of their accompanying parents—in fact, release of children with parent is acknowledged and encouraged by the regulations at 8 C.F.R. § 1236.3, and release of completely family units has been ICE's pattern and practice since 2014.[3] RAICES, Proyecto Dilley, and

---

[3] Indeed, simultaneous release would allow ICE to also comply with the the Court's injunction in *Ms. L*, which prohibits "[ICE] from separating migrant parents and their minor children in the future absent a determination that the parent was unfit or presented a danger to his or her child or had a criminal history or communicable disease." *Ms. L. v. U.S. Immigration & Customs Enf't*, 415 F. Supp. 3d 980, 983 (S.D. Cal. 2020). As this Court pointed out during the April 24, 2020 hearing, the issue of simultaneous release "is complicated only because of the government's policy of holding adults." [Tr. 27:2-3]. Notwithstanding, how ICE complies with the FSA and

ALDEA are ready to continue their practice of working closely with parents of Class Members and with ICE to facilitate release. *See* Cambria Decl. ¶ 50; Fluharty Decl. ¶34; Meza Decl. ¶4.

**IV.     Conclusion**

ICE continues to violate the FSA and prolong the detention of *Flores* Class Members, despite its obligations under the FSA and this Court's prior orders. Absent this Court's intervention, there is nothing to indicate ICE won't continue to violate the FSA with impunity.

Dated June 25, 2020

Respectfully Submitted,

 /s/ Gabriel S. Barenfeld                          ANDREA MEZA, esq.
Gretchen M. Nelson                                Director of Family Detention Services
Gabriel Barenfeld                                 RAICES
Nelson & Fraenkel LLP                             2511 N Loop 1604 W, Suite 201
601 So. Figueroa Street                           San Antonio, Texas 78258
Suite 2050                                        Andrea.Meza@raicestexas.org
Los Angeles, California 90017                     (*Pro Hac Vice* admission pending)


SHALYN FLUHARTY, esq.                             BRIDGET CAMBRIA, Esq.
Director                                          Executive Director
Proyecto Dilley                                   ALDEA - The People's Justice Center
Shay@caraprobono.org                              532 Walnut St.
(*Pro Hac Vice* admission pending)                Reading, PA 19601
                                                  bridget@aldeapjc.org
                                                  (*Pro Hac Vice* admission pending)

---

other court orders and settlement agreements is beyond the scope of what is at issue here, namely *whether* ICE is complying with the FSA and how this Court should remedy ICE's noncompliance in light of the ongoing and growing pandemic.