# DECLARATION OF BRIDGET CAMBRIA, ESQ.

I, Bridget Cambria, declare and say as follows:

1. My name is Bridget Cambria, Esq. and I am an attorney with, and the Executive Director of, Aldea – The People's Justice Center ("Aldea"), a non-profit located in Reading, Pennsylvania in the County of Berks. Our organization, Aldea, offers universal representation to families detained at the Berks County Residential Center in Leesport, Pennsylvania. In the last five years, we have represented more than one thousand parents and children who have been detained in family detention in the Berks County Residential Center ("BCRC").

2. I previously filed declarations in the *Flores* with respect to compliance with the Flores Settlement Agreement, and more recently with regards to enforcement of *Flores* during the COVID-19 pandemic. I am now providing this supplementary declaration to update the court concerning the detention of families in the BCRC during the COVID-19 pandemic and to respond to the ICE Juvenile Coordinator Report which was filed by the Defendants on June 10, 2020. I have reviewed the report and certain documents concerning the clients we represent for immigration and detention matters before Immigration and Customs Enforcement.

3. Aldea continues to represent every family who remains detained in the BCRC during COVID-19, consisting of four asylum seeking immigrant families with matters pending in federal courts, the immigration court, and before the United States Citizenship and Immigration Services for humanitarian applications for relief and protection.

4. At this moment, all families continue to be detained in the BCRC in excess of 20 days. All families remain in detention since March of 2020. Two families have been detained for 106 days and two families have been detained for 97 days.

5. Each of the four remaining detained families cannot be removed from the United States at this time as they are subject to stays of removal issued by either a Federal Court or an Immigration Court. One family was granted a reconsideration of a negative credible fear finding by the USCIS Asylum Office and are scheduled for a re-interview on June 19, 2020. As such, this family is in active credible fear proceedings.

6. Additionally, one family has a pending application for T-Nonimmigrant Status before USCIS as the family was subjected to severe trafficking into the United States, including the forced imprisonment and kidnapping of this family for ransom – including such violence being directed at the child.

7. Conditions have remained unchanged since this Honorable Court's finding that the BCRC is not safe or sanitary in light of the COVID-19 pandemic. There remains an ongoing lack of education for detainees concerning the pandemic and, more strikingly, a lack of concern by authorities of the importance or risk COVID-19 poses on families in congregate care with regard to their determinations on custody.

**ICE's position that being a Plaintiff in a Federal Action asserting their individual asylum rights and also their Constitutional rights pursuant to the 5th Amendment to ensure the safety and physical integrity of parents and children during the COVID-19 pandemic is justification for indefinite detention is in error:**

8. The Flores Court has repeatedly maintained that children's rights under the settlement bear no correlation to their immigration case nor the immigration case of class members parents. In fact, ICE in their submission to this Court on June 10 reassert this fact.

9. However, despite writing that they understand that the immigration case bears no relation to Flores protections afforded to minors – such as safe and sanitary conditions of detention or continuous efforts at placement out of detention – ICE thereafter immediately finds that certain class members who are asserting their rights in both their asylum proceedings and removal processes are to assume the blame for the extremely long detention lengths in the FRCs.

10. This assertion is without merit for several reasons:

    a. The length of detention for class members who are not Plaintiffs in federal actions and are simply in the asylum process pursuant to credible or reasonable fear proceedings or standard 240 proceedings are still detained in unsafe and unsanitary conditions, are still held in secure and unlicensed facilities, are still not subject to ongoing and continuous efforts at placement outside of detention, are still detained at lengths of time not permitted pursuant to the Flores Settlement.

    b. Similarly, regardless of whether a detained family pursues judicial review of their asylum or removal process before a Federal Court, the rights of Flores class members is unchanged. Otherwise children would have to choose whether to abandon Flores rights or to abandon their Constitutional and statutory rights pursuant to the Immigration and Nationality Act or regulations governing their process. There is not a requirement that children choose one right over another. Class members maintain rights under the Settlement and the Constitution and the INA and governing regulations – and cannot unduly be stripped of those rights arbitrarily.

    c. Therefore, the class members who are seeking judicial review in Federal Court are also being detained in violation of the Settlement in that are they are still detained in unsafe and unsanitary conditions – especially in light of COVID-19, are still held in secure and unlicensed facilities, are still not subject to ongoing and continuous efforts at placement outside of detention, are still detained at lengths of time not permitted pursuant to the Flores Settlement.

11. Those families who are Plaintiffs in Federal Actions asserting their Constitutional and statutory rights under the laws and regulations governing asylum have received, not only consideration of their claims by appropriate Federal Courts, but also have received stays of removal from Federal Judges who deem their claims have merit and also where they have found that each plaintiff will suffer irreparable harm if their claims are not heard.

12. Importantly, the overarching issue in each case cited by ICE in their report is not whether the families will suffer harm – judges have determined that the families will suffer harm both in writing and by granting stays of removal – but rather whether the government can skirt the deprivation of the rights of Plaintiff families through various jurisdiction stripping provisions in the INA, thereby stripping Federal Courts of all judicial review of their claims.

13. The Plaintiffs in *M.M.V. v. Barr* contest various challenged asylum directives[1] which were ordered by the DHS to alter the credible fear process at the Family Residential Centers to force a substantial number of negative fear findings within family detention. At present, this matter is before the Court of Appears for the D.C. Circuit to determine whether the Court has jurisdiction to review the substantial changes to the asylum fear process. In the underlying District Court case, a stay of removal was issued for about a six-month period. The Judge ultimately determined that she had jurisdiction over some Plaintiffs and not others. In all cases, the Judge determined that the families would be irreparably harmed by removal. The matter is now on appeal subject to an expedited briefing schedule.

a. [1] Defendants have failed to inform Plaintiffs of the standards and process by which Plaintiffs' claims would be judged. Plaintiffs have a right to a legal orientation in advance of their credible fear interviews and to be oriented to any changes in legal standards when they occur. E.g., 8 C.F.R. §§ 235.3(b)(4), 208.30(d)(2).
b. Variation of the changing policies, standards, and practices has been implemented inconsistently and haphazardly to the detriment of each Plaintiff.  For example, interviewers did not receive appropriate, required training, including training to assess whether aliens fall under exceptions to the newly promulgated Asylum Bar; use of  CBP law-enforcement officers to conduct credible fear interviews, despite the fact that, on information and belief, these CBP officers lack the training that, under the INA and related regulations, constitutes a necessary prerequisite to acting as an Asylum Officer (e.g. 8 U.S.C. § 1225(e); 8 C.F.R. § 208.1).
c. Defendants summarily announce negative asylum determinations, often directly to the applicant in the middle of the interview. Previously, such decisions were provided later after all testimony was solicited in support of the asylum-seeker's claim in a non-adversarial interview designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear" as required by law, and only after review and concurrence by a supervisory asylum officer. E.g., 8 C.F.R. § 208.30(d).
d. Interviewers now improperly limit questioning, so they fail to elicit testimony necessary to develop all facts relevant or supportive of an asylum-seeker's eligibility for asylum, withholding of removal, and CAT protection under the "significant possibility" standard required for credible fear proceedings. E.g., 8 C.F.R. § 208.30(d).
e. Many Plaintiffs were interviewed not once, but three or more times on three or more separate dates, over a timespan of several weeks or more, often by multiple officers including CBP officers. These law enforcement-type interrogation tactics and consequent delay in final adjudication of Plaintiffs' claims intimidate Plaintiffs, as well as prejudice their ability to recall the exact specifics of what was discussed at each prior interview. See 8 C.F.R. § 208.30(d).
f. Defendants now schedule interviews on unnecessarily truncated scheduling without sufficient advance written notice to facilitate Plaintiffs' ability to meaningfully consult with counsel or an advisor, abrogating Plaintiffs' rights. See, e.g., 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4).
g. Plaintiffs were initially placed in credible fear proceedings under INA 235, 8 U.S.C. § 1225 and received summary determinations of asylum ineligibility, interviewers immediately subjected Plaintiffs to RFI-type evaluation and determination, continuing the initial interview but applying the higher RFI standard without notice, orientation or access to counsel.
h. Specifically, Defendants' interviewers are now rejecting the most favorable case law in credible fear proceedings, when assessing an asylum seeker's eligibility for withholding of removal, and in assessing relief under the Convention Against Torture.
i. A policy requiring each positive fear finding by the interviewer and positive fear concurrence by the supervisory asylum officer, to then be further reviewed by USCIS's Fraud Detection and National Security Directorate. Members of the Fraud Detection unit lack experience or training relevant to the adjudication of asylum applications as required by law (e.g., 8 U.S.C. § 1225(e)).
j. Interviewers now withhold critical information relied upon when issuing a negative fear determination, which among other harms, prejudices and impairs Plaintiffs rights of review by an administrative immigration judge (as Plaintiffs are never fully told of the basis of their denial). 8 CFR 208.30(e)(1).
k. Officers have abandoned Child-Sensitive Treatment in Credible Fear Proceedings by requiring telephonic interviews for families and children, depriving Plaintiffs of necessary accommodations, using adversarial techniques and using CBP officers as asylum officers 8 C.F.R. § 208.30(d).

14. The Plaintiffs in *D.A.M. v. Barr* contest other issues related to COVID-19, specifically that the removal procedures of ICE during COVID-19 are not sufficient to ensure the safety of deportees, that no COVID-19 procedures have actually been adopted to protect detainees, and that a removal process that places deportees at substantial risk for contracting COVID-19 are unlawful pursuant to the 5th Amendment.

15. These dangers have been evidenced by the ever increasing numbers of positive COVID-19 detainees in ICE detention, comingling of deportees from different detention centers, including those who have tested positive for COVID-19, for the purpose of removal, the transfers of persons in between detention centers spreading COVID-19, the removal of persons and families who have tested positive upon removal from the United States, and the foreign government's response to receiving families from the US during the pandemic especially for those who test positive. The government, again, is asserting that the parents and their children are foreclosed judicial review.

16. Many children remain detained in violation of Flores simply because they are a Plaintiff in a federal case or are challenging their order of removal in any other manner which has justified a stay of removal. The failure to provide Flores rights to these children violate the Settlement.

17. At this moment, many detained children have stays of removal that are indefinite in time and scope. Insomuch as their removal is not foreseeable, it is not appropriate to base their detention on the simple fact that they are seeking judicial review in a federal court. That is their legal right. It is also a false statement within each of ICE's parole determinations that Flores class members will be removed on the "*next flight*," where that child has an indefinite stay of removal. Obviously, the child will not be removed on the next flight, as they legally cannot be removed. Prior to removal, the child must fail in their claim, a stay would have to be lifted, as well as any injunctive rights on appeal. Only then could removal arrangements be made.

18. Children asserting valid legal rights in Federal Courts, where Judges have considered and thereafter granted stays of removal based on the facts and law at issue do not deprive Flores class members their Settlement rights, nor does it serve a basis to deny any and all Plaintiffs in federal actions parole categorically without specific individualized determinations.

**Response to Issues Concerning the Lack of Ability to Socially Distance in the BCRC, a congregate care facility:**

19. ICE states in their report that the BCRC offers a *communal* area with "ample space for movement around the facility, while allowing for social distancing," and "outdoor space available to residents." These statements fail to account for the fact that the BCRC is a *communal* facility where unrelated adults, families and children commingle each day and throughout the day. Families are only permitted in certain parts of the facility at certain times of the day. They are also only allowed outside during certain parts of the day. At all times their movements are supervised by onsite staff, and their

movements are authorized by the permission of the staff within the facility.

20. Access to indoor areas and outdoor spaces are governed by the rules of the facility. A family is not allowed outside any time they wish, they are simply allowed outside when permission is allowed. Families are not permitted in all areas of the facility at all times, just in their rooms and communal areas as the detained schedule permits, and at all times are physically monitored by detention staff.

21. The BCRC is a congregate care facility consisting of a single building with two floors, with sleeping quarters and communal spaces like a communal day room, a communal chapel, a communal playroom and communal showers and restrooms. Each of these areas do not permit adequate social distancing. They share chairs, desks, phones, computers, toys, showers, restrooms, and all eat during the same meal periods – in fact the only time they are not in a communal space is when they are in bed.

22. The Berks Handbook addresses the lack of social distancing available at the BCRC and states, [a]t the Center, you will be living in close proximity with other families," "outside of free movement hours, residents are expected to remain on the bedroom floor," "[d]ue to the communal nature of the Center, residents are expected to change their clothes in the shower rooms or their bathroom," "[d]ue to the communal nature of the Center, where children from different families may room together and non-related adults room together," "[r]esidents are expected to share common equipment such as telephones, televisions, tables, recreation games and other equipment."

23. Additionally, the ICE response fails to account for the fact that the class members in this facility are mainly infants and young children who cannot, themselves, practice social distancing. In fact, several of the children are too young to even legally wear a mask to prevent infection and spread of COVID-19. The ages of the class members currently in the BCRC are age 11, 5, 3, 2, and 1. Children often want to play with each other, share toys, are not physically restrained nor competent to adhere to social distancing. As such, illnesses, viruses and other contagious diseases or infections normally quickly spread throughout the family detention center affecting all children and parents in the BCRC.

24. Families continue to express fear for themselves and their children in light of COVID-19. They express great fear as a result of many outside people who come and go from the facility which include Berks staff, medical staff, and the attached ICE Field Office. Berks County continues to be a hotbed of COVID-19. In the building across the street from the BCRC, the Berks Heim, a county owned and run nursing home, about 35 people have died from COVID-19. The PA National Guard and Department of Health ordered testing of all residents in the Heim, and it demonstrated that as of two weeks ago about 97 residents were currently or formerly positive as well as 31 Berks County staff[2]. Importantly, Berks County employees also work in the BCRC. Therefore, the parents' concerns for themselves and their families remain valid.

25. Since my last update with this Honorable Court no other family has been released from custody and no family has received a written response to their pending parole

---

[2] https://www.pottsmerc.com/news/coronavirus/mass-testing-at-berks-heim-finds-34-more-coronavirus-positives-county-says/article_c3d01da7-068f-5d83-81c6-3c7fe6875ce8.html

      requests. Currently in the BCRC is a family from Ecuador with a five-year-old child, a Haitian family with a one-year-old infant, a Haitian family with an 11-year-old child and a three-year-old toddler, and a Haitian family with a two-year-old infant. Their custody status remains unchanged since my last declaration. All families continue to be in the credible fear process, in removal proceedings, and/or are subject to court ordered stays of removal which are indefinite and as a result removal is not foreseeable at this time.

**BCRC policy of one disposable mask every eight days is not sufficient to protect parents and their children from COVID-19 exposure:**

26. The policy remains at the BCRC that detained parents and children are provided one disposable mask every eight days. Any other mask that was provided to the families was either provided by our organization or from a community donation. Additionally, the disposable masks provided cannot protect the children in the facility, as they are adult size masks.

27. ICE correctly states that children under 2 are not supposed to wear masks of any kind due to the risk of suffocation. This not only underscores – but emphasizes – that young small children cannot be safely detained during COVID-19. Not only are they not safe, but their open exposure to COVID-19 places every other parent, child and employee in the facility at risk of contracting COVID-19.

28. If ICE cannot protect the young minor children from COVID-19 spread because of physical limitations, then they should not be detained in the first place during the COVID-19 pandemic where alternatives to detention exist. They are risking the lives of the infants in their care, as well as all detainees and employees present in spaces where infants are detained.

29. Finally, ICE states that detainees may simply request another mask if they want one. Not a single-family reports being instructed that they can receive a replacement mask when they want one. Each family, however, knows that they receive a new disposable mask every 8 days. This demonstrates a lack of instruction concerning COVID-19 with detained parents and/or a disconnect between ICE and facility staff or policies.

30. The disconnect remains concerning glove availability within the facility. ICE correctly states that gloves are provided to detained parents when they clean their rooms and the rest of the BCRC pursuant to a work program where the parents are paid $1 per day. The families state that at no other time are gloves readily available to them.

**Viral Stomatitis outbreaks among children in the BCRC are demonstrative of the lack of ability to socially distance and the lack of safe and sanitary conditions for children during the COVID-19 pandemic**

31. For several months, children from various families have complained about bumps and sores on their children's lips, in their children's mouths and in the throats of the children causing pain, discomfort, trouble eating and breathing, bad breath and

> bleeding. Parents report waking to their children's sheets being covered in blood from the mouths of their infants and young children. It has affected children currently detained and other children who have since been released from the facility.

32. Following some children being sent to a hospital as a result, a diagnosis of viral stomatitis has emerged. And in fact, families indicate that the medical providers within the BCRC described their issues as being caused by a virus spreading throughout the facility.

33. I have had an opportunity to review the medical records for each of the children currently detained and can confirm that viral stomatitis is the conclusion from hospital providers. I am unclear why ICE placed the word virus in quotes – when in fact, stomatitis is caused by an underlying viral infection[3].

34. In any event, the fact that a highly contagious disease has already spread throughout the BCRC is easily demonstrative as to how COVID-19 could similarly spread. In fact, the spread of this virus occurred both before COVID-19 lockdowns began and post COVID-19 lockdowns as instituted in the State of Pennsylvania. At least one child experienced a reemergence of the stomatitis. The children who remain in detention post-symptoms now possess scars on their lips from the sores resulting from the stomatitis infection.

35. ICE attributes the viral spread of stomatitis in the BCRC to parents "sharing sippy cups" without proper cleaning. No family reported that they were told by doctors that the sharing of sippy cups was the reason for their infections. In fact, most of the families posit that their belief is that children share toys, and often put those toys in their mouths resulting in the spread of the virus.

36. However, this justification by ICE is simply another demonstration as to why children cannot safely be detained during the COVID-19 pandemic, given its highly contagious nature. Children cannot adhere to social distancing requirements and are not physically restrained. Children will commingle, play with toys, touch things, cough and sneeze and more, and often will not keep a mask on 24/7 – certainly not the children who the CDC doesn't even recommend wearing masks due to the suffocation risk.

**ICE's Flores Summaries are insufficient, incorrect, and not individualized**

37. The parole worksheets provided to this Honorable Court continue to fail to provide an

---

[3] *See* U.S. National Library of Medicine. https://medlineplus.gov/ency/article/001383.htm

"Herpetic stomatitis - Herpetic stomatitis is a viral infection of the mouth that causes sores and ulcers. These mouth ulcers are not the same as canker sores, which are not caused by a virus…Causes: Herpetic stomatitis is an infection caused by the herpes simplex virus (HSV), or oral herpes. Young children commonly get it when they are first exposed to HSV. The first outbreak is usually the most severe. HSV can easily be spread from one child to another…Symptoms may include: Blisters in the mouth, often on the tongue, cheeks, roof of the mouth, gums, and on the border between the inside of the lip and the skin next to it; After blisters pop, they form ulcers in the mouth, often on the tongue or cheeks; Difficulty swallowing; Drooling; Fever, often as high as 104°F (40°C), which may occur 1 to 2 days before blisters and ulcers appear; Irritability; Mouth pain; Swollen gums; Symptoms may be so uncomfortable that your child doesn't want to eat or drink; Bad breath and a coated tongue are common side effects…Outlook (Prognosis)…Your child should recover completely within 10 days without treatment…Your child will have the herpes virus for life. In most people, the virus stays inactive in their body. If the virus wakes up again, it most often causes a cold sore on the mouth. Sometimes, it can affect the inside of the mouth, but it won't be as severe as the first episode."

      individualized determination for each family at the BCRC as to why they remain detained during the COVID-19 pandemic. They also contain factually inaccurate information.

38. At no point, prior to May 14, 2020, was any parent asked if they wanted to separate from their child, thereby sending their child to a sponsor while the parent remained in detention. This choice was never presented to a family prior to May 14, despite ICE indicating on these forms that each family was provided a parole review initially upon entering the BCRC.

39. It is for that reason that each family called our offices immediately after meeting with ICE, because they were confused, startled, and failed to understand what their refusal to separate from their children would mean. It also startled them, because at no other time had ICE met with to ask questions, other than their initial intake into the facility.

40. The Flores Release Summaries demonstrate ICE has failed in their responsibility to continuously provide efforts to place class members outside of detention. In fact, it appears this, at most, was conducted two times. One, the moment they arrived at the BCRC and second, when instructed by this Court – and even then, ICE's compliance was arbitrary and ministerial.

41. As is stated concerning the other two FRCs, information contained in the Summary reports is at parts inaccurate and not consistent with our efforts as legal service providers as well as the postures of their legal cases is not in every case stated correctly.

42. One minor J.O.E., for example, who has a stay of removal issued by the Immigration Court, a motion to reopen pending and submitted an application for a trafficking visa – ICE maintains that it will remove her despite that application being lodged and pending with USCIS. It further misstates the child's initial entry date (real date 2/3/2020), the date and manner in which she and her parents were forcibly kidnapped and brought back into the United States, subsequent to their MPP placement, and thereafter ransomed, and fails to state that she and her parents are cooperating with law enforcement concerning their trafficking. It maintains that they will remove her and her parents, but in the same summary states that the country to which they will be deported has "closed its borders" due to the COVID-19 pandemic.

43. The remaining three children's summaries for the BCRC are identical in their reliance solely on the parents' immigration case to determine parole for the minor and in fact, they differ only in their biographic information.

44. The Flores Release Summaries provide that removal of the class member will occur on the "next flight." This is not true, as each minor cannot be removed in the foreseeable future as they are each subject to a stay of removal.

45. The Flores Release Summaries do not contain an individualized analysis for each child, but rather are predominantly determined by the parents' immigration case and the parents' failure to separate from their child. Each summary provides much of the same information which was previously provided to this Court.

46. In fact, each family at the BCRC has a home willing to receive them, they have

      provided that information to ICE and have offered to accept whatever alternatives to detention are prescribed by ICE. However, as stated before, we, as counsel, have never received a denial of parole in writing and in fact have never received a response to our written request for parole which was filed with our local AFOD and ERO Supervisor.

47.     At no point were the medical conditions of parents or their children considered in each summary nor was the prevalence of the COVID-19 pandemic a consideration.

48.     At no point were the continued violations of Flores rights for each child considered in each parole summary.

**Conclusions:**

49.     At this moment, the government remains in substantial noncompliance with the settlement. They continue to detain children in secure, unlicensed facilities which are not safe or sanitary. They continue to do so during a pandemic. They have shirked on their responsibilities to comply with countless orders issued by this Court, and have in turn required children to languish in detention during their substantial noncompliance rather than address the issues which have led us to this point: children in indefinite detention with no safe alternative, but for the safe release of children in its custody to be done consistently with how ICE has done so for the last five years, into the custody of their parents to ensure care during the pandemic. This remains a consideration that *must* be made in light of 8 C.F.R. 1236.3.

50.     Legal service providers remain ready to provide exact sponsor information, including address, phone, and name and we also remain ready to provide appropriate safe transportation for families from custody to their sponsors in light of COVID-19. We remain ready to assist clients post release to ensure the best compliance with requirements of any alternatives to detention placed on our clients.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct pursuant to 28 U.S.C. ¶ 1746.

Executed this 17th day of June 2020 in Reading, Pennsylvania.

Bridget Cambria, Esq.