## JUNE 17, 2020 SUPPLEMENTAL DECLARATION OF SHALYN FLUHARTY

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I have previously submitted multiple declarations in this matter. I provide this supplementary declaration to clarify information detailed in the ICE Juvenile Coordinator's June 10, 2020 Report and to advise the Court of material factual inaccuracies detailed in Exhibit B of the Report. I also write to inform the Court of recent information that indicates the potential presence of COVID-19 at the South Texas Family Residential Center in Dilley, Texas ("STFRC" or "Dilley").

2. The detention of children at Dilley has become indefinite without justification. ICE has failed to make specific, individualized custody determinations for Class Members. Many children have been detained for more than nine months and for nearly three months since the Court's March 28, 2020 Order. The Court should order the immediate release of specific children who remain detained in violation of the *Flores* Settlement Agreement ("FSA" or "Agreement") during the COVID-19 pandemic. This relief is necessary to give meaning to the terms of the Agreement and to ensure that Class Members are not subjected to irreversible harm. *See* generally, Exhibit A, Letter to the Special Monitor from Legal Services Providers submitted on June 13, 2020 (without accompanying Exhibits).

### New information indicates possible COVID-19 contagion at STFRC.

3. On June 16, 2020 three mothers and a child represented by Proyecto Dilley—M.J.P., Y.O.T., J.D.C.L., and J.S.P.– advised Proyecto Dilley that individuals present at STFRC have tested positive for COVID-19. Two of the mothers and the child informed Proyecto Dilley staff that one CoreCivic employee tested positive for COVID-19. *See* Exhibit B, Declaration of Y.O.T.; Exhibit C, Declaration of J.S.P.; Exhibit D, Declaration of J.D.C.L. Another mother stated that a medical provider informed her "there is a [positive] case" at STFRC. Exhibit E, Declaration of M.J.P.

4. On June 17, 2020 I emailed Immigration and Customs Enforcement Assistant Field Office Director Richard Hunt to advise him of the above-stated information. I requested confirmation regarding whether there have been any positive COVID-19 tests for individuals who work at STFRC or are detained there. I further requested that ICE test all mothers and children detained at STFRC. As of the signing of this declaration, I have not received a response.

*The ICE Juvenile Coordinator's report mischaracterizes the immediacy of removal for Class Members detained at Dilley and implies Class Members have failed to indicate a receiving person, or been deemed a flight risk or danger, when they have not.*

5.   The ICE Juvenile Coordinator's report is inaccurate because it is based upon a "paper audit." As detailed at length in the following section, the documents reviewed by the ICE Juvenile Coordinator—to the extent they include the information contained in Exhibit B of the ICE Juvenile Coordinator's report—are wrong.

6.   The ICE Juvenile Coordinator's report indicates that parole assessments conducted by ICE for detained families were conducted in accordance with INA § 212(d)(5), 8 C.F.R. § 212.5(b), and paragraph 14 of the FSA. The report fails to indicate why ICE's custody review process has not incorporated the provisions detailed at 8 C.F.R. § 236.3 and 8 C.F.R. § 1236.3. The information provided to the Court fails to sufficiently document ICE's efforts to assess the release of children to their detained parent, as required by 8 C.F.R. § 236.3 and 8 C.F.R. § 1236.3, which ICE is required to do when no other custodian for the child is available.

7.   The ICE Juvenile Coordinator's report confirms that ICE Deportation Officers were reminded that "parole should not be denied to a minor based solely on the existence of a final order of removal." However, the rest of the ICE Juvenile Coordinator's report, and the report's accompanying exhibits, detail that the sole basis for the ongoing detention of Class Members at Dilley is in fact a final order of removal. Take, for example, the summary narrative of child N.K.M.M., which states, "Minor was found to be a flight risk as she is subject to a final order of removal and will be scheduled for the next removal flight to her country of citizenship." In addition to being an unlawful assessment of flight risk, this statement is also untrue, as we believe a flight to Nicaragua departed on or around June 11, 2020, and N.K.M.M. and her mother were not—and could not be—deported on it.

8.   The ICE Juvenile Coordinator's report states that "Class Members who remain at the FRCs have not met . . . standards for release." I am not aware of any facts that justify a determination that a Class Member or parent detained at Dilley is a danger or flight risk, separate and apart from an order of removal. Class Members and their parents have repeatedly provided ICE with the name, phone number, address, and relationship of the adult who is ready and willing to receive the family. I therefore strongly contest the ICE Juvenile Coordinator's assertion that ICE has deemed Class Members "to be flight risks and/or [that] the parent or legal guardian has not designated a caregiver for the Class Member."

9.  Three families currently detained in Dilley were issued orders of removal by an immigration judge in proceedings under section 240 of the Immigration and Nationality Act ("INA"). Two of these three families were forced to wait in Mexico during their immigration court proceedings while subjected to the Migration Protection Protocols ("MPP"). Both families were ordered removed *in absentia* when they failed to appear in court. These families did not appear because they were kidnapped by transnational criminal organizations in Mexico and held against their will on the date of their immigration court hearings. These facts form the basis of their pending Motions to Reopen. The third family lost their asylum case and filed a timely appeal of the immigration judge's decision with the Board of Immigration Appeals. This family has never missed court date or ICE check-in.

10. The ICE Juvenile Coordinator's report confirms that ICE has failed to make "continuous efforts" towards the release of Class Members. Exhibit B of the ICE Juvenile Coordinator's report shows ICE has reviewed the custody status of Class Members detained at Dilley, generally, on two separate occasions. First, ICE has made (with two exceptions) a custody determination within the first few days of a Class Member's arrival to Dilley. In my experience, this "parole determination" is meaningless. Customs and Border Patrol ("CBP") decides—prior to a family's transfer to ICE—whether a family should be detained in ICE custody. This decision by CBP, in my experience, is categorical: when CBP issues an order of Expedited Removal to a family, the family is transferred to ICE custody and ongoing detention is presumed. Although in some circumstances ICE discovers that a family was accidentally transferred to Dilley by CBP—for example, when one of the family members has a delicate medical condition that CBP was not aware of or the family was already issued a Notice to Appear—the presumption is that families sent to Dilley are done so because CBP has *already* determined on behalf of the Department of Homeland Security that they should be detained while the family is in credible or reasonable fear proceedings. As a result, in my experience, ICE's intake process when families first arrive to STFRC does not constitute a meaningful "parole" review process for Class Members.

11. The ICE Juvenile Coordinator's report indicates that ICE reviewed the case of most Class Members detained at STFRC on May 14, 2020. ICE had a submission deadline with this Court on May 15, 2020. This timeline is relevant because it confirms that ICE conducted parole determinations for Class Members because of a filing deadline before this Court, and not because it has systemically integrated ongoing parole review for Class Members, as is required by the FSA.

12. I am not surprised by ICE's failure to meaningfully and continuously review the custody status of Class Members. Unlike ICE Class Members who are held in the care and

custody of the Office of Refugee Resettlement, accompanied children do not have the benefit of full-time Case Managers who are dedicated to making and documenting efforts to release children from custody.

13. Although the release of Class Members, regardless of reason, is important proof of compliance with the FSA, the release of *some* Class Members is not evidence that the ongoing detention of *other* Class Members is FSA compliant. The statistics most relevant to an assessing ICE's compliance with the FSA is (1) the number of Class Members in detention, (2) the number of days the Class Member has been detained, and (3) the reasons the Class Member has been deemed a danger or flight risk.

14. The ICE Juvenile Coordinator's report states that the "typical" population housed at FRCs are "booked in-and-out of custody within approximately 20 days." This has not been my experience since July 2019. I have reason to believe the Court's review of the total number of children booked into Dilley since July 2019, and the total number of children released within 20 days would reveal a minuscule percentage of children actually released within the 20-day period. Critically, this statistic would clarify that the "typical" population in Dilley now faces detention far beyond 20 days. In fact, Proyecto Dilley has determined that the current average length of detention for Class Members detained at STFRC is 217.7 days.

15. As detailed in the ICE Juvenile Coordinator's report, many Class Members detained at Dilley are plaintiffs in litigation that challenges the fairness and legality of the procedures applied to them in the expedited removal process. Although Class Members do not challenge their orders of expedited removal directly, they challenge whether or not the process they were provided complies with the expedited removal statute, its implementing regulations, and the United States Constitution. As a remedy, plaintiffs seek the opportunity to have new credible fear interviews that comply with the law. Class Members have a right to challenge the policies applied to them in the expedited removal process pursuant to 8 U.S.C. § 1252(e)(3). A Class Member's decision to vindicate their legal rights cannot justify punishment in the form of prolonged detention in conflict with the FSA.

16. Importantly, removal for Class Members detained in Dilley—with few exceptions—is not imminent. As noted in the ICE Juvenile Coordinator's report, many Class Members were issued a stay of removal on September 25, 2019 that extended for eight months, until May 15, 2020. The stay of removal that was issued in *D.A.M. v. Barr* on May 18, 2020 has no end date and may last until the entire case is resolved. Notably, *D.A.M.* plaintiffs assert the removal process itself during COVID-19 places them in danger of contracting the coronavirus. Unfortunately, COVID-19 infection rates continue to soar

inside ICE detention facilities and within the state of Texas, making the issues raised in
*D.A.M. v. Barr* far from moot, and unlikely to resolve in the immediate future.

17. ICE also states that removal in imminent for children who do not have travel documents
necessary for travel. For example, E.G.S.V.'s order of expedited removal became final on
February 21, 2020 and ICE has not obtained travel documents; K.M.T.M.'s order of
removal became final on February 6, 2020 and ICE does not have travel documents; and
D.E.R. has been detained for 124 days and does not have travel documents. These
examples confirm that removal is not imminent.

***Exhibit B of the ICE Juvenile Coordinator's June 10, 2020 Report is factually inaccurate in
material ways.***

18. Although Proyecto Dilley serves as an attorney of record for all of the children listed in
Exhibit B of the ICE Juvenile Coordinator's June 10, 2020 Report, this is the first time
that I have been afforded the opportunity to review the un-redacted Class Member-
specific information provided by ICE in these proceedings.

19. The Juvenile Coordinator's report is factually inaccurate in material ways. The
government must do better.

20. Exhibit B of the report is internally inconsistent. The spreadsheet within the Exhibit
conflicts directly, and repeatedly, with the individual "Flores Release Summaries"
provided to the Court. The inconsistencies include discrepancies in how ICE records and
reports relevant information, and the information reported for a Class Member. For
example, in some cases ICE reports the "final order date" as the date the order of
Expedited Removal was initially issued at the border, prior to an individual's credible
fear interview. In other cases, however, ICE reports the "final order date" as the date the
immigration judge affirmed an asylum-seeker's negative credible fear decision. An
analysis of the data reported for particular children highlights the conflict in how the data
is entered. For example, in the case of child S.R.S., the immigration judge affirmed
S.R.S.'s negative credible fear determination on November 21, 2019; however, ICE lists
September 30, 2019 as the date of S.R.S.'s Final Order Date on the spreadsheet in Exhibit
B of the report. In S.R.S.'s individual Release Summary, however, November 21, 2019 is
listed as the Final Order date.

21. An additional example of inconsistency can be seen in the cases of child V.L.O. and
D.L.O., two sisters who arrived at the United States, and subsequently to Dilley, together
as a family unit with their mother. The spreadsheet in Exhibit B lists a different Final
Order Date for D.L.O. and V.L.O., even though all orders and decisions in their credible
fear process have occurred simultaneously on the same dates.

22. ICE also seems to have arbitrarily weighed a Class Member's participation in federal
litigation differently when assessing the release of individualized Class Members. For

example, the case summary of some children indicates their participation as a plaintiff in *M.M.V. v. Barr* as a reason for denying release. Other children are also plaintiffs in *M.M.V. v. Barr*, but their participation is not referenced at all in their release case summary. Similarly, *D.A.M. v. Barr* is referenced in the case summary of some Class Members who are plaintiffs in *D.A.M. v. Barr*. However, *D.A.M. v. Barr* is not referenced in the case summaries of other Class Members, who are also plaintiffs.

23. Most alarmingly, ICE falsely reports that certain Class Members are plaintiffs in federal litigation when, in fact, they are not plaintiffs in said litigation. Class Members who are plaintiffs in *M.M.V. v. Barr* are not necessarily plaintiffs in *D.A.M. v. Barr*, and severely children are plaintiffs in *M.M.V.* and not *D.A.M.* This is problematic because ICE wrongly attributes its decision to deny release to Class Members based upon their participation in litigation that they are not even a part of. For example, C.F.L.A. and A.A.G.Q. are not, and never were, plaintiffs in *D.A.M. v. Barr*. However, the narrative in their release summary states, "Minor's order is final and he is ready for removal immediately upon resolution of the administrative stay of removal in *D.A.M.*"

24. ICE also reports false information regarding the timing of removal flights. From my experience, removal flights to non-Central American countries do not depart with regularity and depart much more infrequently. The case summaries appear to have cut and pasted language regarding the timing of flights, stating "removal flights to [country] occur 2-3 times each week." While this may be true for some Central American countries, it has never been true, in my experience, for families being removed to Ecuador. Nonetheless in the case summary of C.F.L.A., the narrative states "Removal flights to Ecuador occur 2-3 times each week." However, in the summary narrative of another Ecuadoran child, J.A.C.L., ICE states, more realistically, that "Removal flights to Ecuador occur two times per month."

25. ICE's reports regarding removal timelines directly conflict in other ways as well. For example, in the case of N.C.L.—a Class Member who is a plaintiff in both *M.M.V. v. Barr* and *D.A.M. v. Barr*—ICE reports N.C.L.'s expected date of removal as "next available flight." In contrast, in the release summary of S.R.S., a Class Member who is also a plaintiff in both *M.M.V. v. Barr* and *D.A.M. v. Barr*, ICE lists S.R.S.'s expected date of removal as "pending litigation."

26. All children who are plaintiffs in *D.A.M. v. Barr* have administrative stays of removal issued by a federal court. ICE has no way to know when those administrative stays will be lifted, yet nonetheless makes statements such as, "Expected Date of Removal: Next Flight Available" for many Class Members. To say that a Class Member's "order is final and she is ready for removal to Guatemala immediately upon resolution of the administrative stay of removal in *M.M.V. v. Barr*" ignores the reality that the Class Member may not be removable for many months, if ever. To state that a Class Member "is subject to a final order of removal and will be scheduled for the *next removal flight*" (emphasis added) is highly improbable, and definitely unprovable, at this time. ICE's explanation that a Class Member is a flight risk because of the "very short time period for manifesting the flight" is therefore misleading.

27. ICE's explanation in the case of Class Member V.S.S. is equally puzzling. In the child's summary narrative, ICE states, "Removal flights to Cuba have not been scheduled by ICE AIR ops," providing no additional information about how long the child can expect to be detained, and failing to justify the copy-pasted statement that follows: "Due to the frequency of removal flights and the very short time period for manifesting the flight, it is unlikely that the minor would present himself (sic) for removal in a timely manner." These sentences are contradictory and highlight arbitrary decision-making in assessing flight risk and release for Class Members.

28. ICE's *Flores* Release Summaries report that Class Members have not designated a receiving person. As I have stated in previously, this is false. Class Members and their parents have repeatedly provided ICE with the name, phone number, address, and contact information of their receiving person. As counsel, Proyecto Dilley has provided sponsor information directly to ICE on behalf of Class Members on March 31, 2020, April 2, 2020, April 18, 2020, April 30, 2020, May 7, 2020 and May 13, 2020.

29. ICE uniformly lists "ID Provided? N/A" in each child's *Flores* Release Summary. However, ICE is in possession of almost every minor's Identification documents. Proyecto Dilley even provided ICE directly with a copy of the passport for S.E.V.C.

30. ICE also reports incorrect information regarding the status of Class Members' immigration case. The reported information is frequently inconsistently reported for a Class Member. For example, in the case of C.P.C., ICE reports that the case status is "Final order from 240 proceedings" in one location and repeatedly references expedited removal proceedings in another. C.P.C.'s narrative summary furthers the confusion regarding his procedural posture, and states: "The FAMU was processed for expedited removal . . . USCIS found that the minor did not have a credible fear of returning to Ecuador . . . the IJ affirmed USCIS' negative fear finding" and also that "Minor's order is final and he is ready for removal to Ecuador immediately upon resolution of the administrative stay of removal due to Motion to Reopen Case." C.P.C., however, is not in expedited removal proceedings, and instead, was placed in INA 240 proceedings and as a Motion to Reopen pending with the Immigration Judge.

31. The case of J.A.C.L. reveals a similar inaccuracy. J.A.C.L. has never been placed in expedited removal. Rather, J.A.C.L. is in regular removal proceedings under INA 240. However, J.A.C.L.'s summary narrative incorrectly states that: "Parole was denied because the minor was in the credible fear interview process and detention was required to complete the process."

32. Another example of ICE justifying a Class Member's detention with faulty information exists in the case of S.E.V.C. S.E.V.C.'s summary narrative states that "[o]n 12/17/2019, the FAMU was paroled (MMV vs. Barr) through the Brownsville Port of Entry . . . Parole was denied because the minor was in the credible fear interview process and detention was required to complete the process." However, S.E.V.C.'s credible fear interview was

completed on August 30, 2019 and an IJ affirmed the Asylum Officer's decision on September 30, 2019.

***COVID-19 continues to present risks of harm to families detained at STFRC.***

33. The information detailed in my previous declarations regarding conditions at STFRC remains true and accurate to the best of my knowledge. In response to the ICE Juvenile Coordinator's report, to the extent cleaning supplies are available for use by detained families, many families are unaware that cleaning supplies are available and may be requested. Additionally, Proyecto Dilley is tracking a growing number of detained children who are experiencing nosebleeds. We have reason to believe these nosebleeds may be a result of the use of new chemical cleaning supplies being used at STFRC.

***Proyecto Dilley is available, capable, and willing to assist in coordinating release efforts for released Class Members.***

34. If this court finds it appropriate to order the prompt release of Class Members, Proyecto Dilley is available, capable, and willing to provide assistance to ensure the release process is orderly. Proyecto Dilley can provide transportation from the facility to the bus station or airport, secure local temporary housing for families who await travel, purchase travel tickets for families who do not have tickets purchases and communicate directly with sponsors to coordinate travel logistics.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in San Antonio, Texas on June 17, 2020.

_____

Shalyn Fluharty

# EXHIBIT A

 

**RAICES**   **aldea**   **PROYECTO DILLEY**

June 13, 2020

Andrea Sheridan Ordin
Special Monitor
*Flores v. Barr*, 2:85-cv-04544-DMG (AGRx)
aordin@strumwooch.com

Dr. Paul Wise
Independent Medical Expert
*Flores v. Barr*, 2:85-cv-04544-DMG (AGRx)
pwise@standford.edu

**RE:  Enhanced monitoring of medical care provided in Family Residential Centers**

Dear Ms. Ordin and Dr. Wise:

Proyecto Dilley[1], RAICES, and ALDEA - The People's Justice Center, represent Class Members and their parents[2] who are detained at the South Texas Family Residential Center in Dilley, Texas ("Dilley"); the Karnes County Residential Center in Karnes City, Texas ("Karnes"); and the Berks County Residential Center in Leesport, Pennsylvania ("Berks"), respectively (together, the "Family Residential Centers" or "FRCs").

We write *ex parte*[3] to provide information, request investigation, and submit recommendations pursuant to Judge Dolly M. Gee's May 22, 2020 Order, which called on you to

> provide enhanced monitoring of the FRC's care of minors, [with] the ability to (a) request and obtain copies of medical care data and policies; (b) have telephone or videoconference access to persons most knowledgeable at the FRCs with whom they can  discuss the baseline of custodian medical care, health care protocols, and COVID-19 prevention practices; (c) consider protocols for identifying minors who have serious medical conditions that may make them more vulnerable to COVID-19; (d) interview minors with serious medical conditions or, as appropriate, their guardians; and (e) make such recommendations for remedial action that they deem appropriate.

---

[1] Formerly known as the Dilley Pro Bono Project and the CARA Pro Bono Project.
[2] Based upon our records, we collectively represent the overwhelming majority of the families detained at each FRC.
[3] Pursuant to the *Flores* Court's order appointing the Special Monitor.  *See Flores v. Sessions*, 2:85-cv-4544 DMG (AGRx), Doc. # 494 (C.D. Cal. Oct. 5, 2018).

*Flores v. Barr*, 2:85-cv-4544 DMG (AGRx), Doc. # 799, 3 (C.D. Cal. May 22, 2020).  Your enhanced monitoring and subsequent reporting to the court is urgently needed to protect the 109[4] Class Members currently detained at Dilley, Karnes, and Berks.[5]  The situation at the FRCs remains dire, and Class Members are exposed on a daily basis to the risk of detrimental health outcomes both due to the inadequate baseline of medical care and inadequate preventative, testing, and treatment measures that are available to combat the very real threat of COVID-19.  These risks are exacerbated by Class Members' prolonged detention in secure, unlicensed congregate care facilities that are not compliant with the terms of the *Flores* Settlement Agreement ("FSA").  *See Flores v. Johnson*, 212 F. Supp. 3d 864, 877 (C.D. Cal. 2015).

It is our hope that the information provided below will assist you in carrying out a much-needed investigation into the provision of medical care at the FRCs.  We would also welcome an additional opportunity to speak with you about the issues identified below and offer our further assistance as you conduct your investigation.

I.      **Baseline medical care provided at the FRCs is dangerously inadequate and does not provide a safe and sanitary environment.**

In order to best represent and advocate for our clients, Proyecto Dilley, RAICES, and Aldea regularly request and review medical records, and consult with medical experts when necessary.  We also speak—on a daily basis—to clients who express concerns regarding the medical care they have received at the FRCs.

There is an inherent conflict of interest between Immigration and Custom Enforcement's ("ICE") mission to arrest, detain, and deport non-citizens and its duty to ensure the safety and wellbeing of children.  We have repeatedly observed ICE safeguard its law enforcement objectives instead of the health and care of children in its custody.  When medical care is provided by a third-party contractor—such as the GEO Group or Berks County—the financial bottom-line can dictate the quality of care provided, rather than the health and best interests of the child.  As a result, children are deprived of necessary medical treatment and placed at risk of serious harm while detained.

### A.  History of Negligent Medical Care at the Family Residential Centers

From the beginning, medical care at Dilley, Karnes, and Berks has been substandard at best, and negligent at worst.  Medical care at Dilley is provided by ICE Health Service Corps

---

[4]  Proyecto Dilley is aware of 90 children currently detained at Dilley.  RAICES is aware of 14 children currently detained at Karnes. Aldea is aware of five children currently detained at Berks.

[5]  We believe, and the studies have shown, that detention in and of itself is harmful to children. *See* Letter of Drs. Scott A. Allen and Pamela McPherson to Congress (July 17, 2018), https://www.whistleblower.org/wp-content/uploads/2019/01/Original-Docs-Letter.pdf (noting that "[t]he fundamental flaw of family detention is not just the risk posed by the *conditions* of confinement—it's the incarceration of innocent children itself.  In our professional opinion, there is no amount of programming that can ameliorate the harms created by the very act of confining children to detention centers.") (hereinafter "July 2018 Letter to Congress").  This report, however, focuses on the required provision of adequate medical care to Class Members detained by ICE.

("IHSC"); at Karnes, by the GEO Group; and at Berks, by Berks County. The history of inadequate medical services provided to children at the FRCs is well documented in complaints filed with the Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL"); the observations and subsequent reports of pediatricians who have studied the FRCs; whistleblower complaints to Congress by the doctors in charge of CRCL's medical review; and the observations of Proyecto Dilley, RAICES, and Aldea.

On July 30, 2015, several organizations jointly filed a CRCL complaint highlighting specific failings in the provision of medical care at the three FRCs. The complaint documented instances of medical professionals at the FRCs providing "insufficient information about medical care to mothers and disregard [for] their concerns, the information they provide and their complaints." *See* CRCL Complaint at 1 (July 30, 2015).[6] The complaint also included descriptions of "[m]edical staff frequently direct[ing] mothers and children to 'drink more water' regardless of the illnesses or injuries presented," reports that families were made to wait between three to fourteen hours for medical care, and instances of inadequate follow-up treatment. *Id.* at 2. The complaint further detailed one incident that took place in Dilley in early July 2015, where over 250 children were vaccinated—without their mothers' consent—with an adult dose of the Hepatitis A vaccine. *Id.*

Dr. Alan Shapiro is a pediatrician who has participated in immigration detention monitoring groups and the *Flores* monitoring team. *See* Exhibit A (Declaration of Dr. Alan Shapiro).[7] Dr. Shapiro's monitoring trips to the FRCs "revealed [a] lack of adequate health staff and inadequate services (medical and mental health), inappropriately trained staff (e.g. no pediatricians, lack of bilingual mental health professionals), delays in receiving care, staff dismissive of detainee medical complaints leading to poor outcomes and under-detection of acute and chronic conditions." *Id.* at ¶ 11. These factors, including "parental reluctance to seek medical attention due to previous experience not being taken seriously by the medical team, and transfer to other medical facilities when in fact a child has been found to need higher level care," he determined, were factors that may have led to the "severe illness or death of children" at the FRCs. *Id.* at ¶ 38.

In 2017, the American Immigration Council and several other organizations filed another complaint with CRCL raising concerns about the conditions of detention and lack of quality medical care that was provided to pregnant women in ICE custody. CRCL Complaint (Nov. 13, 2017).[8] While an August 2016 ICE policy memorandum determined that pregnant women should not be detained at FRCs, Proyecto Dilley, RAICES, and Aldea have continually worked with and advocated for pregnant women detained at the FRCs. *Id.* at 1–2. The complaint highlights the stories of many women detained at Dilley and Karnes, who describe high-risk pregnancies without adequate medical care.

---

[6] *Available at* https://www.aila.org/advo-media/press-releases/2015/deplorable-medical-treatment-at-fam-detention-ctrs/public-version-of-complaint-to-crcl.

[7] This declaration was filed in *D.A.M. v. Barr*, 1:20-cv-01321-CRC, Doc. # 21 (D.D.C. May 26, 2020).

[8] *Available at* https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/complaint_increasing_numbers_of_pregnant_women_facing_harm_in_detention.pdf.

On July 17, 2018, two doctors who served as the "medical and psychiatric subject matter experts for" CRCL wrote a damning letter to Congress.  Letter from Drs. Allen & Pamela to Congress, at 1 (July 17, 2018).[9]  Doctors Scott A. Allen and Pamela McPherson detailed their concerns—which they felt duty-bound to raise despite their work for DHS—about the harm posed to children detained in FRCs.  *Id.* at 1.  As a result of ten different investigations of the FRCs, which "revealed serious compliance issues resulting in harm to children," Doctors Allen and McPherson determined that the FRCs had "significant deficiencies that violate[d] federal detention center standards . . . despite repeated assurances that cited shortcomings w[ould] be corrected." *Id.* at 4.  Doctors Allen and McPherson identified the following areas of concern:  (1) the detention of children in inadequate facilities (e.g. Karnes was formerly a medium security adult prison); (2) unqualified medical staff; and (3) the failure to provide adequate care for individuals expressing suicidal ideations.  *Id.* at 4–5.

In February 2019, several organizations submitted a CRCL complaint detailing the detention of infants at Dilley—including at least nine who were less than a year old.  *See* CRCL Complaint (Feb. 28, 2019).[10]  Without the availability of specialized medical care for infants, any period in detention—and in particular lengthy periods of detention—pose a heightened risk.  This is especially the case since infants are "especially vulnerable to serious illnesses, pain, disability, and even death from preventable infections and diseases," and frequent well-child visits are recommended.  *Id.* at 2.  ICE has, historically and currently, been unable to provide the required level of care.

Young children are particularly prone to illness while detained in a congregate care setting and baby-specific treatment and care-related items are regularly unavailable to parents at FRCs. In one case, a fifteen-month-old baby detained in January of 2020 suffered a cold and continuous diarrhea during his four-month detention at Karnes.  The baby's father took his child to the medical center and requested access to medication and formula because his son was sick and unable to digest the food provided at the cafeteria.  Both requests were denied.  By the time the family was deported, the baby had spent almost a quarter of his life in ICE detention.  This is one example of many in which particularly young children have experienced ongoing illness, weight loss, and lack of access to medical care in all three FRCs.

As detailed in the August 19, 2019 Second Report of the Special Master/Independent Monitor, several children tragically died in government custody or shortly after release in 2018.[11] Mariee Juarez was a twenty-month-old baby who was detained at Dilley with her mother in early March 2018.  *See* Exhibit B (Notice of Claim Pursuant to A.R.S. § 12-821.01).  When she arrived at Dilley, Mariee was a healthy child but, within a week, she developed an upper respiratory infection, diarrhea, and vomiting.  Despite multiple visits to the medical clinic, and Mariee presenting with 102- and 104-degree fevers, Mariee was medically cleared to travel by a "licensed vocational nurse" who was unqualified to make such a determination and who did not conduct an

---

[9] Available at https://www.whistleblower.org/wp-content/uploads/2019/01/Original-Docs-Letter.pdf.
[10] Available at
https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/complaint_urges_imme
diate_release_of_infants_from_immigration_detention.pdf.
[11] *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), Dkt. No. 625-1 at 43 (C.D. Cal. Aug. 19, 2019).

in-person evaluation, as mandated by ICE policy.  Two days after she was released, Mariee was hospitalized.  She died on May 20, 2018.

### B. Ongoing Instances of Negligent Medical Care at the Family Residential Centers

The standard of medical care for children—and their parents—at the FRCs has not improved over the past five years.  Proyecto Dilley, RAICES, and Aldea continue to document, individually and collectively, instances of medical neglect at each facility.  We urge you to investigate the quality of care for *all* Class Members detained at the FRCs.  However, to best facilitate your investigation, we have highlighted several cases that we believe show the gravity of the problems at the FRCs.

The family residential standards provide that each individual detained at an FRC is entitled to prevention and diagnosis services and "treatment of medical, dental, and mental health conditions."  ICE Family Residential Standard, § 4.3(II).  Despite this mandate, the cases highlighted below document continued systemic failures to provide adequate medical care at Dilley, Karnes, and Berks, including the failures to:

- medically evaluate Class Members and their parents;
- appropriately screen and test for COVID-19 infection;
- timely identify medical needs that require heightened levels of care;
- provide Class Members and their attorneys of record timely access to their medical file;
- explain medical diagnosis and treatment plans;
- provide medical services in a language detained parents and children can understand;
- provide appropriate medication;
- request and review medical records related to sentinel events and life-threatening diagnoses that occurred prior to detention;
- ensure children with sick parent(s) have appropriate care;
- practice CDC-compliant quarantine procedures[12]; and
- ensure travel by air is medically safe for a parent or child before they are placed on a flight.

ICE continues to detain Class Members and parents with medical conditions that make them categorically vulnerable to death should they contract COVID-19.  Although ICE releases families from custody based upon medical conditions, in many instances ICE's decision to release a family occurs *after* a sentinel event that would have been avoided with release and appropriate medical care.  ICE's practice of detaining individuals with medical conditions unless the condition becomes critical is inconsistent with ICE's duty to maintain a safe and sanitary environment uniquely tailored to the special vulnerability of children.

#### 1. M.M.R. (Released)

---

[12] Specifically, the FRCs continue to use cohorting procedures that conflict with CDC guidance and place medically vulnerable individuals in "quarantine" with individuals suspected of COVID-19 infection.

M.M.R. is a five-year-old child who was brought to Dilley in January 2020 after he, his mother, and his infant brother were detained by ICE.  One month prior to the family's detention, M.M.R. survived a skull fracture and was placed under the care of a pediatric neurologist.  In disregard for the dangers posed by air travel and detention, ICE flew M.M.R. to Texas and detained him at Dilley.  While detained, M.M.R.'s condition deteriorated and he developed alarming symptoms of heightened brain injury, including severe headaches, extreme sensitivity to sound, increased aggression, and wild flailing and bed-wetting at night.

Proyecto Dilley alerted ICE to these concerns on February 3, 2020, and included a letter from an independent medical evaluator with clinical recommendations that M.M.R. required time-sensitive specialty care outside of detention.  Counsel's request for M.M.R.'s release was denied until a lawsuit was filed on M.M.R.'s behalf.

### 2. C.O.M. (Released)

C.O.M., then fourteen years old, and her mother were detained at Dilley for approximately seven months between June 2018 and February 2019.  While she was detained at Dilley, C.O.M. became severely depressed, experienced night terrors and bed-wetting, and engaged in escalating self-harming behaviors.  Although an independent psychological evaluator detailed C.O.M.'s growing suicidal ideation in a report submitted to ICE in September 2018, and mental health professionals who work for IHSC advised ICE that C.O.M. should be considered for release, C.O.M. remain detained.  On one occasion, after C.O.M. suffered a panic attack, ICE placed C.O.M. and her mother in a windowless isolation room for a week.  On another occasion, subsequent to C.O.M.'s confession to self-harming thoughts, a mental health professional threatened to separate C.O.M. from her mother.  ICE finally released C.O.M. after she attempted to hang herself from a shower rod with a bedsheet.

### 3. M.P.A. (Detained)

M.P.A. is a thirty-two-year-old mother who has been detained at Dilley for 107 days with her one-year-old son, who is breast-feeding.  Prior to her flight to the United States, M.P.A. survived repeated incidents of blunt trauma to the head that left her unconscious and many incidents of sexual violence.  M.P.A. was kicked in the head, beaten with bats, repeatedly punched, and beaten with iron rods.  Medical providers at Dilley have diagnosed M.P.A. with insomnia, anxiety, and adjustment disorder with mixed anxiety and depressed mood. M.P.A.'s medical records reveal additional medical conditions, including high blood pressure, hypertension, high glucose (that remains unevaluated and untreated), gastritis, infectious gastroenteritis and colitis, and ongoing undiagnosed chest pain.

Most critically, M.P.A.'s medical records document an undetermined mass on the base of her skull that has grown from 3 cm in diameter on March 6, 2020 to "approximately 5 inches, width 3 inches, and height 2-3 inches."  The medical records state the tumor "will have to be surgically removed" and that the mass is increasingly painful.  M.P.A. "experiences persistent, daily headaches and blurry vision at various times throughout the day.  She feels like she cannot get any rest, and has difficulty falling asleep at night, along with early morning awakening . . . she is just so tired all of the time.  She is also concerned about the mass on the back of her neck getting

larger and causing pain when trying to lay on the bed flat." The mass is causing "peripheral pulses and tingling." M.P.A. is unable to walk straight, feels unsafe carrying her infant son, and regularly feels like she is "drunk".

An independent medical expert who reviewed M.P.A.'s medical records determined that additional testing is urgently needed to determine whether her tumor is cancerous. See Exhibit I, Declaration of Dr. Abhishek Dhar. M.P.A.'s IHSC medical records note that the growing neck mass requires follow-up, but no diagnostic studies have been ordered.

M.P.A.'s one-year-old son is also sick. M.P.A. had numerous complications during her pregnancy with her son and was hospitalized twice before his birth. While detained M.P.A.'s son has developed diarrhea, a fever, and a rash on his body and mouth. He has a history of heart murmur and an elevated heart rate.

### 4. J.S.P. (Released)

J.S.P is a six-year-old boy who was detained at Dilley with his mother for approximately 128 days. Several days after arriving at Dilley in February 2020, J.S.P. was rushed to the Children's Hospital in San Antonio ("CHOSA") and hospitalized for five days while doctors conducted multiple tests, including a brain MRI and a lumbar puncture. Doctors diagnosed J.S.P. with Guillain-Barre Syndrome, a rare disorder in which the body's immune system attacks the body's nerves, which can cause weakness, tingling, and eventually paralysis. Medical professionals at the hospital advised that J.S.P. required time-sensitive medical intervention, including targeted physical therapy. ICE and IHSC failed to implement the hospital's treatment plan and J.S.P. remained detained for four additional months, until an immigration judge determined that he has a credible fear of persecution or torture if returned to his home country. Dr. Bronwyn Baz, an independent medical expert secured by Proyecto Dilley to review J.S.P.'s medical records, determined that in addition to Guillain-Barre Syndrome, J.S.P. has several other illnesses and symptoms that indicate a compromised immune system, as evidenced by the child's skin lesions, respiratory illnesses, and all-over body rash. *See* Exhibit J, Declaration of Dr. Bronwyn Baz. Despite these conditions—which were known and documented by ICE—J.S.P. remained detained in a large detention center while struggling to walk, suffering frequent falls, and being denied prescribed medical care.

### 5. M.A.R. (Detained)

M.A.R. and her son have been detained for 260 days. When M.A.R. arrived at Dilley in October 2019, she knew she was pregnant. On the day of her arrival in Dilley, a urine test confirmed her pregnancy. The next day, M.A.R. informed an IHSC doctor that she was experiencing light bleeding. The doctor, who was not an OBGYN, advised M.A.R. to rest, but conducted no examinations or ultrasounds. Over the next three to four weeks, M.A.R. experienced daily bleeding and abdominal pain. She sought medical attention regularly at Dilley, but again, was not provided access to an OBGYN, and was not provided with an ultrasound. Eventually— approximately two weeks after she first informed IHSC that she was experiencing bleeding— M.A.R. was transported to off-site for an ultrasound, however, no interpreter was available and information regarding M.A.R.'s medical condition was communicated to the guards that transported her, not to her directly.

In late October or early November 2019, IHSC medical staff informed M.A.R. that she was actually never pregnant, and instead, that she had started menopause.  Distraught, M.A.R. sought clarification from a social worker, who consulted with a doctor, before informing M.A.R. that she had had a miscarriage.

### 6.  *A.C.G. (Released)*

A.C.G. is a 54-year-old mother who was detained in Dilley for an estimated 119 days in late 2019.  A.C.G. was hospitalized on four separate occasions prior to her release from Dilley.  On or around October 30, 2019, A.C.G. was hospitalized with complications related to high blood pressure, including vertigo, head and chest pain, dizziness, fainting, and convulsions.  A.C.G. was subsequently hospitalized on November 1, 2019, and again on November 17, 2019, after she fainted.  Eventually, on December 7, 2019, A.C.G. was hospitalized for five days after she fainted with a blood pressure of almost 300.  Between hospitalizations, A.C.G. repeatedly sought medical care from IHSC for her headache and chest pain.  IHSC medical staff instructed A.C.G. "not to exaggerate."  Each time A.C.G. was hospitalized, her daughters remained at Dilley, alone.  A.C.G. fainted two more times, until she and her daughters were finally released for detention.

### 7.  *S.B.B. (Released)*

S.B.B. is an eight-year-old boy who was detained for a total of 123 days.  S.B.B. had been diagnosed with appendicitis in his home country in May 2019, and doctors there recommended surgery and careful monitoring of his appendix.  *See* Exhibit C, Declaration of A.B.B.  S.B.B.'s pain resolved until April 2020, when he was in ICE custody.  S.B.B. began experiencing fevers and headaches and discovered a cyst on his neck.  On April 8, 2020, S.B.B.'s mother took him to the clinic, and reports her son's pain was dismissed without further evaluation.  Several days later, S.B.B. developed abdominal pain, diarrhea, vomiting, and a lump in his side.  His mother recognized these symptoms as appendicitis and sought medical care for her son.  Medical staff at Dilley informed S.B.B.'s mother that he may have an abdominal or thyroid infection, but that they did not have the equipment and expertise to conduct additional testing.  Rather than transport S.B.B. off-site for testing, IHSC staff kept S.B.B. in observation for three days without conducting any tests or providing pain medication.  At one point, S.B.B.'s mother reports that S.B.B. fainted from the pain.  After three days, S.B.B. was released from medical observation at Dilley.  Doctors told his mother that his pain was "normal" and that it had been "just gas."

In the middle of the night on May 21, 2020, S.B.B. experienced severe pain on his side.  When he and his mother sought medical attention at the clinic, the nurses sent them away because "there are no doctors at night."  The next afternoon, S.B.B.'s mother took him again to the clinic.  A doctor told S.B.B.'s mother that although it was "nothing serious," they were going to send S.B.B. to the hospital, nonetheless.  The Children's Hospital of San Antonio conducted blood tests and an ultrasound, concluded that S.B.B. had an inflamed appendix, and scheduled S.B.B. for surgery.

Two days after surgery, S.B.B. and his mother were transported back to Dilley. S.B.B. was placed in medical observation at Dilley, and then transferred to the quarantine unit,[13] despite S.B.B. having tested negative for coronavirus at the hospital. During this time S.B.B. was not provided pain medication, as prescribed. S.B.B. and his mother were released from detention approximately one week after S.B.B.'s surgery.

### 8.  J.L.P. (Released)

J.L.P. was detained at Dilley for three months with her fifteen-year-old daughter and seven-year-old son. J.L.P. experienced severe uncontrolled high blood pressure during her detention. *See generally* Exhibit D, Declaration of J.L.P. Despite repeatedly seeking medical attention at Dilley, J.L.P.'s blood pressure remained uncontrolled, and she experienced headaches, chest pain, heart palpitations, dizziness, nausea, and blurred vision. On or around March 30, 2020, J.L.P. was sent to the hospital where she underwent testing and was given medication for her high blood pressure. She was also diagnosed with a kidney infection.

Two weeks later, on April 16, 2020, ICE attempted to deport J.L.P. However, J.L.P. lost consciousness during her first flight and was rushed for emergency care during her layover. ICE attempted to remove J.L.P. a second time, on April 29, 2020. However, at the tarmac the airline carrier learned J.L.P. had been denied blood pressure medication all day and was not transported with any medication at all. The flight was cancelled. ICE successfully removed J.L.P. and her children on May 27, 2020.

Upon review of J.L.P.'s medical records, an independent medical expert determined that J.L.P.'s records "reveal[ed] severely uncontrolled hypertension (high blood pressure), tachycardia (rapid heart rate) of uncertain etiology, and worsening stage 2 chronic kidney disease." Exhibit K, Declaration of Dr. Carolyn Payne, at 2. Furthermore, Dr. Payne concluded that the "symptoms of chest pain, fatigue, throbbing headache, vision changes, and now evidence of worsening of kidney function (GFR decreased to 58 on 5/11/2020 vs. normal on 3/31) are all suspicious for end-organ damage resulting from uncontrolled, severe hypertension." *Id.* She noted that further investigation and testing should be given to assess J.L.P.'s hypertension and kidney dysfunction. *Id.* at 2–3. Dr. Payne also noted that one of the medications J.L.P. was prescribed at Dilley for her hypertension "is not considered first-line or even effective in the treatment of hypertension by expert recommendations." *Id.* at 3. Dr. Payne's evaluation, which was submitted to ICE, noted her "strong medical recommendation that [J.L.P.] not travel by airplane for the sake of continued protection against COVID-19 and to avoid another life-threatening episode of Hypertensive Emergency at high altitudes." *Id.*

### 9.  One year old with diarrhea for 20 days (Released)

In February 2019, a RAICES client at Karnes reported that his one-year-old son, who had been healthy before his arrival at Karnes, was ill. His child developed a cold and fever two days after arrival at Karnes and began throwing up the milk provided by the facility. He began to have

---

[13]  As we have previously noted, Proyecto Dilley believes that the "quarantine unit" in Dilley is an area of the facility that is used to cohort new arrivals, individuals who have been transported outside of the facility, and other individuals suspected of having COVID-19.

constant diarrhea.  The father took his child to the medical center where he was kept for one day. However, the baby was only provided milk and never received any age-appropriate food accommodations.  The father reported that he saw that his child was losing weight by viewing the scale at the medical unit, although GEO staff told him that his child was not losing weight.  GEO staff told the father that his baby needed to eat the food provided in the cafeteria.  After an extensive public campaign focused on the fact that a one-year-old had suffered diarrhea for twenty days, ICE finally released the family.

### 10. Four-year-old child with severe constipation, hemorrhoids, and multiple additional medical issues (Released)

A four year old detained from March to May of 2020 suffered from extreme constipation, hemorrhoids, and several other medical issues during his detention at Karnes.  This child was examined by pediatrician Dr. Matthew Gartland, who is an instructor at Harvard Medical School and the Director with the Massachusetts General Hospital Asylum Clinic.  Exhibit E, Declaration of Dr. Matthew Gartland.  Dr. Gartland concluded the child suffered from severe constipation and rectal bleeding because of a low-fiber diet not suitable for a toddler.  Importantly, Dr. Gartland noted that the lack of physical activity for the child in detention was a contributing factor to his deteriorating health.  Dr. Gartland determined the child required therapy for behavioral issues that developed at Karnes and made a referral for therapeutic intervention to the Karnes medical team, which was rejected.  The child also suffered from pain urinating, influenza, and a fractured finger. hen he and his family were taken to an off-site medical facility to treat the finger fracture, none of them were provided with masks, putting them at risk of exposure to COVID-19.

### 11. Seven-year-old child with unaccommodated food allergies and severe psychological distress and regression (Detained)

A seven-year-old child who has been detained at Karnes for two months has not received dietary accommodation for his severe food allergies, and has experienced severe behavioral regression due to PTSD, including meowing like a cat instead of speaking.  This child was evaluated by Dr. Fiona Danaher, an Attending Physician in the Department of Pediatrics at Massachusetts General Hospital for Children and an instructor at Harvard Medical School.  *See* Exhibit F, Declaration of Dr. Danaher.  In her report, Dr. Danaher notes that for the first month of his detention, GEO made no accommodations for the child's multiple, potentially life-threatening food allergies.   Since then, the only accommodation that has been made is to remove the food items to which the child is allergic but not replace them with alternative nutritive foods, which has resulted in his weight loss.  Dr. Danaher states that a necessary epinephrine auto-injector does not appear to be listed on the ICE formulary.

Additionally, Dr. Danaher reports that the child exhibited symptoms of influenza or a possible COVID-19 infection that began three days after his arrival at Karnes and continued for *seven weeks*.  He was not tested for either infection nor was he offered Tylenol or ibuprofen for his pain.  Dr. Danaher states that based on his mother's description of the dosing of medication provided, it does not appear that the child was treated with Tamiflu.

Finally, this child suffers from PTSD and has exhibited many signs of trauma.  His separation from his father, who he only sees for approximately five-and-a-half hours per day while

detained, has exacerbated his stress.  This child now suffers from nightmares, wets the bed, and insists on sleeping with his mother.  He wants to sleep during the day so as not to be awakened by the hourly intrusive checks at night.  He has regressed in his behavior and instead of speaking, he makes animal noises.  He appears to dissociate and fears people in uniform after he and his family were kidnapped.  Dr. Danaher states that "successful treatment" of this child "requires mitigating the traumatic stressors in his environment that constantly remind him of his family's kidnapping."  She recommends that "to be truly effective, therapeutic intervention must include complete reunification of his nuclear family and release from detention."

### 12. Five-year-old child denied treatment for dextrocardia and ulcerative colitis (Released)

A five-year-old child detained at Karnes in October of 2019 was diagnosed with dextrocardia and ulcerative colitis in his home country.  Both conditions require lifelong treatment, and after his diagnosis in 2017, the child was on a regimented treatment plan requiring daily medication.  Though the family brought their medication with them as they fled their home country, they ran out shortly before entering the United States.  Upon arrival at Karnes, the child's father provided the GEO medical staff with evidence of his son's diagnosis.  No one at Karnes followed up with the family regarding treatment for the child's medical conditions during their nearly two months of detention.

### 13. Three-year-old child with severe respiratory complications detained during COVID-19 pandemic (Released)

A three-year-old child detained in February of 2020 experienced difficulty breathing prior to his detention at Karnes.  When he and his parents were in Mexico, they were able to treat his breathing issues with medication.  At Karnes, the child again experienced difficulty breathing.  His parents took him to the medical center for treatment, but, unlike in Mexico, the medicine available to him did not help his symptoms.  The child could not sleep at night because of his persistent cough.  After over twenty days at Karnes, the child's breathing stopped twice.  His mother rushed for medical assistance from GEO.  Luckily, the child was able to recover his breath, but the response of the doctor at Karnes was to advise that he continue on the same medication that was not improving his symptoms.  Through the remainder of his time at Karnes, into late March 2020, when it was clear that the COVID-19 pandemic was a threat to those in detention, this three year old struggled to sleep and coughed through the night.

### 14. Ongoing inadequate medical care for pregnant women

There is no gynecologist or women's health specialist available for women at Karnes. Under the previous administration, it was general policy that pregnant women were not detained at Karnes.  *See* CRCL Complaint (Nov. 13, 2017).  Under the current administration, pregnant women are detained though there is little to no infrastructure to provide women with prenatal care. For example, one woman detained at Karnes in March 2020 went to the medical unit to report her pregnancy.  The medical staff told the woman that she was not pregnant and said that if she continued to insist that she was, she would "be put in a room with an IV by herself like a 'crazy' person" and that she would "be deported."  Of note, this woman is Black and the two GEO nurses who spoke to her were white.  During her fear interview with the asylum office, the officer noticed

that the woman was in discomfort.  The officer stopped the interview so that she could seek medical care.  GEO took the woman to a hospital off-site where it was confirmed that she was indeed pregnant.

Another woman detained at Karnes in March of 2020 was three months pregnant.  She reported that she could not eat due to stomach pain.  She vomited frequently and could often only drink water.  At times, she vomited blood.  This mother reported that the water at Karnes made her nauseous because it smelled like chlorine.  Additionally, she had a medical history of fainting under stress and panic.  She and her family were worried about her health because of the stress she was under at Karnes.

## II.   The failure to provide timely and appropriate medical care increases the occurrence of sentinel events at the FRCs.  As a result, parents are regularly committed to the hospital for emergency care while children remain alone in unlicensed facilities.

Although the adequacy of medical care provided to children at FRCs is the focus of the Monitor and Dr. Wise's investigation, a parent's health directly impacts the safety, care, and wellbeing of Class Members.  Incapacitated parents are unable to provide supervision and care for their child.  When mothers and fathers are committed to the hospital while in ICE custody, their children are left behind—alone—in a facility that is not licensed to provide childcare.  This is of particular concern for the facilities in Texas, where CoreCivic[14] and GEO staff are not certified or trained caregivers for children.  In one case, a toddler was cared for by CoreCivic guards over a month while his mother was hospitalized in San Antonio.  In another case, a six-month-old infant was supervised by guards while their parent received off-site medical care.

On multiple occasions at Karnes, GEO has kept children in medical isolation when their mothers required medical care, even though their fathers are also detained at Karnes.  Nuclear family units are detained separately at Karnes, with children under the care of their mother while fathers are held separately.  In one case, the children of a family at Karnes were inexplicably left under the care of GEO medical staff when their mother was taken off-site for medical care, although the children's father was also detained at Karnes.  In this case, GEO did not inform the father that his wife was transported off-site for medical services nor that his children were left behind.  In another case, a mother was treated within Karnes for her medical symptoms.  Though her husband was also detained at Karnes, their child was forced to stay in medical isolation during the night under the watch of GEO guards unlicensed to provide childcare.  The child's father was told that because his child was a girl, she could not stay with her father.

Multiple RAICES clients detained at Karnes have refused to allow RAICES to advocate for ICE to ensure that they receive appropriate medical treatment because they fear separation and isolation from their children.  For example, one parent exhibited signs of kidney failure.  Though this parent complained of severe symptoms, the parent chose to forego medical attention out of fear of separation from their child.

In all of these cases, neither RAICES nor Proyecto Dilley received notice when their client was transferred to an off-site facility for medical care.  *See* FSA, ¶ 27 (stating that "[n]o minor

---

[14] CoreCivic is the private corporation contracted by ICE to run the facility in Dilley.

who is represented by counsel shall be transferred <u>without advance notice to such counsel</u>, except in unusual and compelling circumstances") (emphasis added).  As a result, children are detained for extended periods of time without access to counsel, which eliminates counsel's ability to provide oversight of the situation.

**III.**    **The FRCs, which Judge Gee deemed unsafe during COVID-19, lack appropriate precautions and protocols relating to COVID-19 and thereby place Class Members at risk of harm.**

In her April 24, 2020 Order to Enforce, Judge Gee determined that the FRCs were not "safe and sanitary." *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), Dkt. No. 784 (C.D. Cal. Apr. 24, 2020).  The obligation to provide "safe and sanitary" conditions, she noted, "includes protecting children from developing short- or long-term illnesses as well as protecting them from accidental or intentional injury." *Id.* at 5 (quoting *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019)).

Despite having months to develop and execute an appropriate response to the COVID-19 pandemic and the vulnerable population in its custody, ICE has failed to implement sufficient mechanisms to protect Class Members and their parents.  *See id.* at 6.  Across the three FRCs, ICE has failed to utilize adequate testing practices for COVID-19; appropriate screening mechanisms to identify and release individuals who are particularly vulnerable should they contract COVID-19; and proper screening mechanisms to ensure individuals are safe to fly in advance of release from detention (and in advance of removal in particular).  ICE's failure on all these counts has already caused severe and long-lasting harm to Class Members and their parents.

In addition, some of the attempts ICE has made to sanitize the detention facilities have *not* been made in consideration of the "particular vulnerability [of] minors." FSA, ¶ 11.  For example, Proyecto Dilley has received several reports of children suffering from nosebleeds, headaches, and other symptoms.  Proyecto Dilley believes that these symptoms may be the result of the use of new chemical disinfectants that are being used at the facility.[15]  One mother who works on the cleaning crew at Dilley reported to Proyecto Dilley staff that the disinfectant that she was required to use changed in April 2020.  Since that time, she has been required to put on gloves and goggles to carry out her normal cleaning duties.  She reports that each of her children developed nosebleeds shortly after the new disinfectant was put in use.

Overtime, medical professionals have determined that children infected by COVID-19 display different symptoms than adults, and that infection with COVID-19 can place a child at risk of death.  Dr. Shapiro explains that studies and data have shown that COVID-19 does in fact have a severe impact on children.  Dr. Shapiro notes that "[c]hildren who develop COVID-19 illness have been reported to deteriorate rapidly," which "is unlike the course of other viral illness in children." Ex. A, ¶ 38.  Therefore, ready access to hospitals is absolutely necessary to provide the

---

[15] *See* Canela Lopez, *Report Finds ICE Detention Center is Using a Disinfectant Over 50 Times a Day that Causes Bleeding and Pain*, INSIDER (June 5, 2020), https://www.insider.com/report-detention-centers-use-disinfectant-causing-bleeding-and-pain-2020-6.

required medical intervention that is not available at the FRCs.  *See* Letter from Drs. Allen & Rich to Congress (Mar. 19, 2020), at 4.[16]

All three FRCs are located in regions that have experienced outbreaks of COVID-19, and the two Texas FRCs are located in remote areas that are far from hospitals equipped to provide specialized emergency care to children.  The Children's Hospital of San Antonio (CHOSA), is the hospital used by both Karnes and Dilley when a child has a severe medical emergency. CHOSA is approximately one hour away from Karnes and an hour and a half away from Dilley. Karnes is 10 minutes away from the Otto Kaiser Memorial Hospital (25-staffed beds) and 40 minutes away from the Christus Spohn Beeville hospital (40-staffed beds). Dilley is located 20 minutes away from the Frio County Hospital, a small community hospital in Pearsall, Texas. Frio County Hospital regularly provides care to individuals who are detained at the South Texas ICE Processing Center, a more than 1,000-bed ICE detention facility.  Critically, this ICE facility is experiencing a COVID-19 outbreak; there are currently 22 active cases of COVID-19 at the facility, and 47 individuals have tested positive for COVID-19 overall.[17]

To date, Frio, Karnes, and Berks counties, where Dilley, Karnes, and Berks are located, have reported cases of COVID-19.  San Antonio has reported an increase in positive coronavirus cases, reporting 192 new cases on June 12, 2020 and a total of 1,450 active cases.[18]  Berks County, Pennsylvania, is experiencing a particularly severe COVID-19 outbreak, and has had an uptick in positive cases this week.[19]  The Berks facility is right next door to the Berks Heim nursing home, where 35 individuals have died from COVID-19.[20]  This impacts not only Class Members, but their parents and detention center personnel.

It is now known that children with COVID-19 not only suffer symptoms of the viral infection, but they may also experience Multisystem Inflammatory Syndrome in Children (MIS-C) or Pediatric Multisystem Inflammatory Illness (PMIS).  As Dr. Shapiro notes, common symptoms of MIS-C/PIMS include shock, severe abdominal pain and diarrhea, acute kidney injury, myocardial involvement, carotid artery inflammation, neurocognitive symptoms, rash and inflammation of mucous membranes, and respiratory symptoms.  See Ex. A, ¶ 33.  Dr. Shapiro emphasizes that "the majority of children who have contracted MIS-C have been previously healthy without underlying medical conditions." *Id.* at ¶ 35.

---

[16] Available at https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.

[17] ICE Guidance on COVID-19, ICE, https://www.ice.gov/coronavirus (last visited June 13, 2020).

[18] *See* Surveillance, City of San Antonio, https://covid19.sanantonio.gov/About-COVID-19/Dashboards-Data/Surveillance (last visited June 12, 2020).

[19] *See* Keith Mayer, *Coronavirus Cases Tick Up in PA., Berks County*, READING EAGLE *(June 12, 2020), https://www.readingeagle.com/coronavirus/coronavirus-cases-tick-up-in-pa-berks-county/article_ea2fe7c2-acca-11ea-bcd5-4f7d762fa421.html*

[20] *See* Keither Mayer, *Berks County Calling in State and Federal Agencies, National Guard for Advice, Testing at Berks Heim*, READING EAGLE (May 20, 2020), https://www.readingeagle.com/coronavirus/berks-county-calling-in-state-and-federal-agencies-national-guard-for-advice-testing-at-berks/article_28f4d6b6-9aa6-11ea-99bc-a3c170748a1a.html.

There is no doubt that the risk of a COVID-19 outbreak at the FRCs is a public health concern for not only *Flores* class member children, but also their families, detention center staff, and their communities.

### A. ICE has failed to institute thorough COVID-19 testing at the FRCs

Testing for COVID-19 remains sporadic across the three FRCs, despite the urgent need to identify cases of COVID-19 among detained children and parents.

In March 2020, Doctors Scott A. Allen and Josiah "Jody" Rich, subject-matter experts for CRCL, wrote to Congress to express their "grave[] concern[] about the need to implement immediate and effective mitigation strategies to slow the spread of the coronavirus and resulting infections of COVID-19" in ICE detention centers. Letter by Drs. Allen & Rich to Congress, at 1–2. Doctors Allen and Rich noted that "proactive approaches" were required to protect detained populations from the coronavirus. *Id.* at 5. First among these approaches was the development of "[p]rocesses for screening, *testing*, isolation and quarantine." *Id.* (emphasis added).

Testing for COVID-19 remains a critical defense against the spread of coronavirus since the virus can be transmitted through "asymptomatic or mildly symptomatic" individuals. Ex. A, ¶ 27. As Dr. Shapiro explained in his sworn statement, "covert cases" may "represent up to 60 percent of all COVID-19 infections." *Id.* Yet, both Class Members and their parents have reported that they have *not* been tested for COVID-19 despite presenting to the medical clinic with COVID-19 symptoms. Our clients report that there is *no* general testing regimen—either upon arrival, when presenting with symptoms, upon release, or prior to deportation (except for families from Guatemala).

In addition, as noted above, it is now known that COVID-19 can cause MIS-C or PMIS in children who contract the coronavirus.[21] *See* Ex. A, ¶ 33. The Centers for Disease Control and Prevention ("CDC") has urged parents to seek medical assistance if a child develops:

- fever;
- abdominal pain;
- vomiting;
- diarrhea;
- neck pain;
- rash;
- bloodshot eyes; or
- lethargy.[22]

The warning signs of MIS-C/PMIS are different than those of COVID-19, and yet neither Proyecto Dilley nor RAICES has observed any screening or additional testing for children who present with

---

[21] *See also* Pam Belluck, *New Inflammatory Condition in Children Probably Linked to Coronavirus, Study Finds*, N.Y. Times (May 13, 2020), https://nyti.ms/2YZE2Dq.

[22] CDC, *For Parents: Multisystem Inflammatory Syndrome in Children (MIS-C) associated with COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/children/mis-c.html (last visited June 12, 2020).

any of the above-noted symptoms.  In fact, Proyecto Dilley is aware of several children who have presented with fever, rash, and bloodshot eyes, but who have not been tested for COVID-19.

**B. ICE has failed to implement adequate screening mechanisms and release procedures for individuals with illnesses and pre-existing conditions that place them at higher risk of COVID-19.**

Now, several months into this pandemic and after over 400,000 lives have been lost worldwide from COVID-19,[23] it is well known that certain illnesses and pre-existing conditions "place individuals at increased risk for severe COVID-19 infection."  Ex. A, ¶ 56.  The CDC has found that individuals of "all ages with underlying medical conditions, *particularly if not well controlled*," are at heightened risk if they have:

- chronic lung disease or moderate to severe asthma;
- serious heart conditions;
- immunocompromised[24];
- severe obesity (body mass index [BMI] of 40 or higher);
- diabetes;
- chronic kidney disease undergoing dialysis; or
- liver disease.[25]

It is critical that ICE identify the Class Members and adults who are at particular risk for more adverse consequences of COVID-19.  However, as has been reiterated by Plaintiffs before Judge Gee, ICE's procedures for identifying those who are at heightened risk remain deficient. Many individuals with medical vulnerabilities remain detained, and our efforts to identify children and parents with medical conditions that weigh in favor of release have gone ignored.[26]

---

[23]   *See* Coronavirus Resource Center, Johns Hopkins University of Medicine, https://coronavirus.jhu.edu/map.html (last visited June 9, 2020).

[24] The CDC notes that "[m]any conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."  *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 10, 2020).

[25] CDC, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 10, 2020) (emphasis added).

[26] Proyecto Dilley wrote to ICE on March 24, 2020, April 2, 2020, April 8, 2020, April 15, 2020, April 17, 2020 and April 20, 2020 to request the release of children and mothers with serious medical conditions that make them particularly inappropriate for detention, particularly in the time of COVID-19. In one of those letters, Proyecto Dilley specifically highlighted nine Class Members and mothers with asthma for whom COVID-19 is particularly dangerous.  To date, the *only* response Proyecto Dilley has received to its attempts to alert ICE to at-risk individuals in detention was an email sent on April 2, 2020 in which ICE informed Proyecto Dilley that despite identifying individuals with medical concerns, the information provided by Proyecto Dilley would not be relied upon in assessing release.

RAICES wrote to ICE on March 13, 2020, March 30, 2020, April 7, 2020, April 21, 2020, May 6, 2020, June 1, 2020 to alert ICE to Class Member minors and their families with serious medical conditions. RAICES alerted ICE to eleven class members with serious medical conditions and in need of medical care

Dr. Shapiro evaluated a declaration of Melissa B. Harper, who is the Chief of the Juvenile and Family Residential Management Unit Chief at ICE's Enforcement and Removal Operations Unit, filed in *D.A.M. v. Barr*, 1:20-cv-01321-CRC (D.D.C. May 21, 2020), in which she described ICE's efforts to identify those at the FRCs with preexisting conditions.  He expressed concern about the "efficacy" of ICE's verbal screening mechanisms.  Ex. A, ¶ 55; *see also* Exhibit G, Declaration of Melissa Harper.  Verbal screening mechanisms are particularly problematic, he concluded, given that many individuals "don't know their medical histories due to lack of healthcare services in their country of origin and because of inconsistent medical services that currently exist in FRCs, especially for children."  Ex. A, at ¶ 56.

For example, Proyecto Dilley staff spoke to one mother who was deported with her gravely ill nine-year-old son subsequent to the family's removal from the United States.  *See* Exhibit H, Declaration of M.C.P.  M.C.P. reported that her son, G.C.C., had a fever for eleven days prior to their deportation.  An X-ray of G.C.C.'s chest while in Dilley revealed that he had liquid in his lungs.  *Id.* at ¶ 4.  M.C.P. was told this was "normal."  Meanwhile, G.C.C.'s symptoms worsened, and he was not tested for COVID-19.  *Id.* at ¶¶ 4, 11

When M.C.P. was removed in mid-April, G.C.C. was in critical condition.  As soon as they landed in Guatemala, they were rushed to the hospital.  *Id.* at ¶ 13.  G.C.C. was diagnosed with pneumonia and required emergency surgery to remove part of his lung.  *Id.*  G.C.C. remained hospitalized for a month after his deportation.  *Id.*

### C. ICE's failure to release detained families with risk factors for COVID-19 flies in the face of the preliminary injunction order issued in *Fraihat v. ICE*

In addition to its obligations under *Flores,* ICE is required to conduct timely custody redeterminations for all *Fraihat v. ICE* Class Members, including individuals whose custody has already been reviewed.  *Fraihat v. ICE*, --- F. Supp. 3d. ---, 2020 WL 1932570, at *29 (C.D. Cal. Apr. 20, 2020).  The *Fraihat* court found ICE's response to the COVID-19 pandemic systemically deficient and ICE conduct deliberately indifferent to the spread of COVID-19 in violation of the U.S. Constitution and federal disability law.  *Id.* at *23, *25.  The court certified a class defined by people with specific "risk factors," and ordered ICE to conduct custody redeterminations for **all** *Fraihat* Class Members in a nationwide preliminary injunction issued on April 20, 2020.  *Id.* at *29.  Specifically, any individual detained at a FRC with one of the following conditions is a *Fraihat* Class Member whose custody status must be redetermined by ICE and whose medical condition must be identified and tracked:

1. Pregnancy;
2. Over 55 years of age;
3. High blood pressure;
4. Liver disease;
5. Diabetes;

---

unavailable to them at Karnes.  While ICE often acknowledged receipt of RAICES' correspondence, at no time were the medical concerns addressed.

6. Cancer;
7. Kidney disease;
8. Auto-immune diseases;
9. Severe psychiatric illness;
10. History of transplantation;
11. HIV/AIDS;
12. Cardiovascular disease, including: congestive heart failure, history of myocardial infarction, history of cardiac surgery; and
13. Chronic respiratory disease, including: asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases.

*Id.* at \*16, n. 20. Proyecto Dilley is aware of twelve children who are *Fraihat* class members who remain detained at Dilley who suffer from high blood pressure; chronic respiratory disease; and liver disease.

Although ICE's obligation to conduct custody redeterminations for certain vulnerable individuals stems from this separate litigation, the *Fraihat* Court's identification and emphasis on certain vulnerable categories of individuals is directly applicable to Judge Gee's order to evaluate ICE's "protocols for identifying minors who have serious medical conditions that may make them more vulnerable to COVID-19." May 22, 2020 Order at 3. Children and parents with high blood pressure, chronic respiratory disease (including asthma), diabetes, and kidney disease— individuals for whom continued detention means an "unreasonable risk of infection, severe illness, and death"—remain detained in unlicensed, unsafe, and unsanitary detention facilities. *Fraihat*, 2020 WL 1932570, at \*19.

## IV.   **Request For Specific Investigative Measures**

In accordance with the powers enumerated in Judge Gee's October 5, 2018 Order, specifically Sections A.2 and A.6, and Judge Gee's May 22, 2020 Order charging the Special Monitor and Dr. Wise to "provide enhanced monitoring of the FRCs' care of minors," we request that Dr. Wise take the following investigative steps, in addition to any additional steps you deem appropriate:

1. Request and review the medical file of all children who have received off-site medical treatment at each FRC over the last twelve months. Determine, in your medical opinion, whether: (a) the child was timely and appropriately evaluated at the FRC; (b) referral for outside medical services was timely and appropriate; and (c) detention in a congregate facility increased the propensity of a negative health outcome for the child prior or subsequent to outside referral and treatment;

2. Request and review the medical file for all parents who have required hospitalization for more than 24 hours at each FRC over the last 12 months. Determine, in your medical opinion, whether: (a) the parent was timely and appropriately evaluated at each FRC; (b) referral for outside medical services was timely and appropriate; (c) detention in a congregate facility increased the propensity for a negative health outcome for the parent

prior or subsequent to outside referral and treatment; (d) the parent's medical condition was likely to impact the parent's ability to provide care for their child unassisted—in consideration of their medical condition and their child(ren)'s age(s)—prior to or subsequent to hospitalization; and (e) if returned to the FRC for continued detention subsequent to hospitalization, whether detention in a congregate facility increased the parent's propensity for negative health outcomes.

3. Request a list of all currently detained children and parents who have been identified as "high risk" by ICE and review the child and parent's medical records to determine whether: (a) the list includes all individuals identified by Aldea, RAICES, and Proyecto Dilley as "high risk", and if not, the reasons why not; (b) the treatment provided to each child and parent while detained is consistent with current medical standards; and (c) whether the ongoing detention of each parent or child increases the risk of negative outcomes.

4. Review all policies and procedures related to the use of "quarantine" or "cohorting" at each FRC.[27]

5. Request a list of all parents and children who have been placed in "quarantine" at each FRC since March 2020 and the following information: (a) whether the parent or child was tested for COVID-19, and if not, why not; (b) the reason the child or parent was placed in quarantine; (c) the dates each parent or child was placed in quarantine; and (d) the date the family was released from the FRC, if released.  Based upon this information, determine, in your medical opinion, whether the policies and procedures at each FRC effectively minimize exposure to COVID-19 and safeguard the health of individuals placed in "quarantine."

6. Request a list of medication ordered at each FRC in the last twelve months, and a list of the diagnosis related to the medication prescribed.  Determine, in your medical opinion, whether medication ordered and prescribed for parents and children at each FRC is appropriate, with a focus on prescriptions used to treat common medical conditions, including, but not limited to:  anxiety, high blood pressure, diabetes, insomnia, and seizure disorders.

7. Request a list of all parents and children who have been discharged from an FRC with medication within the last 12 months, and a list of the diagnosis related to the medication prescribed.  Determine, in your medical opinion, whether air travel presented a risk of negative health outcomes for parent or child given their medical condition at the time discharge from the FRC occurred.

8. Request and review the availability of formula, milk, and other dietary items specific to young children that are available at each FRC.  Determine, in your medical opinion, whether the formula available to children at each FRC is appropriate for children with

---

[27] We note that "quarantine" placement at Dilley relates to the specific location an individual is detained. For example, the "blue" neighborhood has been identified as the "quarantine" unit. The blue neighborhood frequently houses some individuals who recently arrived at the facility, individuals who display symptoms reflective of COVID-19, and individuals who have high-risk medical conditions.

unique needs, and whether the procedures used to provide specialized dietary accommodations facilitate the prompt provision of appropriate formula and food.

9. Request and review a list of all children who have presented with any of the following symptoms at each FRC since March 2020: abdominal pain, vomiting, diarrhea, neck pain, rash, bloodshot eyes, or lethargy. Determine whether these children were tested for COVID-19, or should have been.

10. Review any and all written policies and procedures at each FRC for identifying pre-existing medical conditions. In consideration of the fact that intake procedures have changed significantly at each FRC over the past ten months, we ask that your investigation include a review of the policies and procedures used to determine pre-existing medical conditions during intake, and subsequent to intake.

11. Request a list of all medical providers who work at each FRC and the following information for each provider: (a) their qualifications; (b) the hours they are scheduled to work; (c) their language abilities; and (d) clarification regarding when they work on-site or remotely. We are aware of numerous medical providers who provide telephonic care through an on-call system that limits the provider's true availability to families in detention. We ask you to determine, in your medical opinion, whether medical staffing is appropriate at each FRC currently, and when each FRC is at total capacity.

12. Interview Class Members and their parents regarding their experience with the medical care at each FRC. In Dilley, we request you speak with all individuals listed in Exhibit L;

13. Investigate the use of harmful, toxic chemical disinfectants at the FRCs and the appropriateness of their use;

14. Investigate the separation of parents from their children when a parent is transported off-site for medical testing or emergency medical care, and any and all ICE protocols for child-care during that time.

## V.    Recommendations

The *Flores* Settlement requires ICE to keep its facilities "safe and sanitary . . . consistent with [ICE's] concern for the particular vulnerability of minors." We recommend you prepare and file an Interim Report and Recommendation to Judge Gee at the soonest available time, detailing the findings of your investigation and your recommendations for ensuring the safety and wellbeing of Class Members. In particular, we urge you to consider the following recommendations to the court:

1. The use of FRCs be suspended until: (a) the pandemic ends; (b) the facilities are licensed; and/or (c) each FRC demonstrates an ability to provide appropriate medical care;

2.   The immediate release of all children who possess medical conditions that place them at particularly high risk of COVID-19;

3.   The creation of a standing process for Aldea, RAICES, Proyecto Dilley, and other attorneys who represent children at FRCs to request external review of the medical care provided to a detained child by Dr. Wise;

4.   COVID-19 testing for all individuals detained at FRCs, on an ongoing basis, throughout the pandemic, regardless of symptoms;

5.   Advance notification to counsel whenever a parent or child is transferred off-site, including for medical treatment or removal, as is already required by the *Flores* Settlement Agreement, ¶ 27; and

6.   Unrestricted telephonic or in-person access to counsel when a parent or child is hospitalized, if approved by hospital staff.

Safe and sanitary conditions require access to appropriate medical care and safety from COVID-19. Judge Gee has determined that FRCs are not "safe and sanitary." We believe this finding is accurate, not only because FRCs are congregate care facilities and we are in the midst of a global pandemic, but also because the baseline medical care provided to detained children and their caretakers is deficient. We thank you for your thoughtful attention to this important matter.

Sincerely,

_____

Shalyn Fluharty, Esq.
Director
Proyecto Dilley
Shay@caraprobono.org
(917) 364-3419

_____

Stephanie M. Alvarez-Jones
Justice Catalyst Fellow
Proyecto Dilley
stephanie@caraprobono.org
(210) 212-3760

21



Manoj Govindaiah

_____

Andrea Meza, Esq.
Director, Family Detention Services
RAICES
Andrea.Meza@raicestexas.org
(210) 610-6143

_____

Manoj Govindaiah
Director of Litigation
RAICES
Manoj.Govinaiah@raicestexas.org

_____

Bridget Cambria, Esq.
Executive Director
ALDEA – The People's Justice Center
bridget@aldeapjc.org

# EXHIBIT B

## Declaration of Y.O.T.

1. My name is Y.O.T. I am a Salvadoran national detained at the South Texas Family Residential Center with my two teenage daughters, V.L.O. and D.L.O. We have been detained for 304 days.

2. My daughters and I were recently moved from the red parrot neighborhood to hallway #2 of the green turtle neighborhood. This morning, around 8 or 9 AM, as I was heading out of the complex, I talked to a guard who works in the hallway. I don't know her name yet because I only recently moved to the green neighborhood. She told me to be careful because two officials had tested positive for coronavirus-- one who works in the green gym. She said she thinks the other one works in hallway #1 of the green turtle neighborhood because he hasn't been to work for many days. She told me to tell my daughters not to take off their masks.

3. My daughters went to the gym this morning around 8 AM to knit, and there they were told by the guards who checked them in that they should be sure not to take off their masks, that it was dangerous because there were officials who have stopped coming to work because they have been hospitalized with coronavirus.

## Declaration of Mackenzie Levy

I, Mackenzie Levy, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am a legal assistant and Family Separation Coordinator with the Dilley Pro Bono Project where I have worked since August 2018.

2. I am fluent in the Spanish and English languages.

3. On June 17, 2020, I spoke with Y.O.T. by telephone. Given the COVID-19 pandemic, I was unable to enter the South Texas Family Residential Center to meet with Y.O.T. in-person.

4. During my telephone call Y.O.T., I read the entirety of the "Declaration of Y.O.T." in Spanish.

5. I swear under the penalty of perjury that Y.O.T. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 17, 2020 in San Antonio, Texas.

Mackenzie Levy

# EXHIBIT C

**Declaration of J.S.P.**

1. My name is J.S.P. I am a Honduran national detained at the South Texas Family Residential Center with my 11 year-old son, M.A.S. We have been detained for 307 days.

2. My son and I live in the green turtle neighborhood. M.A.S. likes to play with his friends, so we often spend almost the whole day in the green gym. Sometimes the guards in the gym wear masks, specifically when their supervisors come to check in on them; but otherwise, they usually do not wear masks. I have never seen the guards in the gym wear gloves.

3. In addition to the guards who check us in at the desk, there are other guards who will fetch materials for our crafts, and others who watch the kids to make sure they don't hurt themselves or get into fights. We often make contact with their hands when they pass out supplies for knitting, paper for origami, or drawings, crayons, markers, or colored pencils to color with.

4. On June 16, 2020, after lunch, M.A.S. and I went to the gym to do origami. While we were there, one of the captains arrived in the gym and I saw him hand some pieces of paper to the two officers at the desk; both of them received copies of the paper. They talked among themselves but I was too far away to hear what they were saying. The guards who received the paperwork reviewed it and looked worried.

5. The captain left the guards and papers at the desk and left the gym. I got closer to look at them. After being detained for so long, I have learned to read some English and from what I understood, an officer who had been working here on June 9th has not come back to work because he was infected with coronavirus. The piece of paper also said to inform the residents.

6. I asked one of the guards at the desk about this matter. I said, "Tell me the truth, I don't know if I have understood the English; this document, what is it about?" He responded, "what do you think it means?" I said, "that one of your coworkers is infected with coronavirus." "Yes," he said, but didn't confirm that it was just one. He looked scared. He added, "there is no reason for them not to release you now." I wanted to talk to him more, but he told me, "talk to your lawyer."

7. I have not seen anyone inform any of the families detained here in any official manner that there has been a positive case of coronavirus among the staff. We are all very scared that we are surely going to catch coronavirus now, and even more anxious about the fact that new families have continued to arrive.

Declaration of Mackenzie Levy

I, Mackenzie Levy, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am a legal assistant and Family Separation Coordinator with the Dilley Pro Bono Project where I have worked since August 2018.
2. I am fluent in the Spanish and English languages.
3. On June 17, 2020, I spoke with J.S.P. by telephone. Given the COVID-19 pandemic, I was unable to enter the South Texas Family Residential Center to meet with J.S.P. in-person.
4. During my telephone call J.S.P., I read the entirety of the "Declaration of J.S.P." in Spanish.
5. I swear under the penalty of perjury that J.S.P. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 17, 2020 in San Antonio, Texas.


Mackenzie Levy

# EXHIBIT D

**Declaration of J. D. C. L.**

1. My name is J. D. C. L. I am a 17-year-old Ecuadorian national detained at the South Texas Family Residential Center with my mother, Z. E. L.. We have been detained for 116 days.

2. On June 16, 2020  around 3:15pm, my mom and I went inside the library and asked to use a computer. I was asked by the CoreCivic employees to fill out a paper. As I was writing down my A number, I heard three female CoreCivic employees speaking to each other by the entrance. Even though I don't know their names, I have seen them many times when my mother and I visit the library.

3. The employees were speaking in English. The first employee was a large woman. The second employee was an older woman. The third employee was a young and slim woman. The first employee said, "I didn't know there was a coronavirus case in the center." The third employee said, "Be quiet. The residents don't know about this." The first employee stopped talking.

4. I learned to speak English in Ecuador through a two-year scholarship. From Monday to Friday, I spent two hours a day in intensive classes. This opportunity allowed me to understand what the CoreCivic employees were saying.


**Declaration of Brian Elizalde**

I, Brian Elizalde, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am a legal assistant with the Dilley Pro Bono Project where I have worked since August 2019.
2. I am fluent in the Spanish and English languages.
3. On June 17, 2020, I spoke with J. D. C. L. by telephone. Given the COVID-19 pandemic, I was unable to enter the South Texas Family Residential Center to meet with J. D. C. L. in-person.
4. During my telephone call J.D.C.L. I read the entirety of the "Declaration of J. D. C. L." in English.
5. I swear under the penalty of perjury that J. D. C. L. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 17, 2020 in San Antonio, Texas.


_____

Brian Elizalde

# EXHIBIT E

### Declaration of M.J.P.

1.  My name is M.J.P. I am a Honduran national. I am currently detained at the South Texas Family Residential Center with my two daughters, 17 year old A.M.P., 13 year old A.P.P., and my 9 year old son, C.C.P.

2.  I have been walking for my health because I am prediabetic. This morning around 8 AM I set off for my morning walk. I have trouble breathing wearing masks when I walk, so I take them off when I'm by myself or just with my children outside. This morning, I was walking past the green complex when a female guard called over to me and said to put it back on because "there had been a positive case of coronavirus here."

3.  Later this morning, I ran into my psychologist, Dr. Ortiz, as I was returning from the store, and she was heading to the clinic. She asked how I was and I said I was concerned about the coronavirus, because I had just heard there was a positive case here. She said "Yes, I heard there was a case here. They already told us that there was a case and we should make sure our masks are on tight."


### Declaration of Mackenzie Levy

I, Mackenzie Levy, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.   I am a legal assistant and Family Separation Coordinator with the Dilley Pro Bono Project where I have worked since August 2018.
2.  I am fluent in the Spanish and English languages.
3.  On June 17, 2020, I spoke with M.J.P. by telephone. Given the COVID-19 pandemic, I was unable to enter the South Texas Family Residential Center to meet with M.J.P. in-person.
4.  During my telephone call M.J.P., I read the entirety of the "Declaration of M.J.P." in Spanish.
5.  I swear under the penalty of perjury that M.J.P. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 17, 2020 in San Antonio, Texas.


_____

Mackenzie Levy