**SUPPLEMENTAL DECLARATION OF ANDREA MEZA**

I, Andrea Meza, swearing under penalties of perjury, make the following declaration:

1. I previously submitted a declaration to the Court in this matter. I now submit this supplemental sworn declaration. The facts set forth below are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. My name is Andrea Meza and I am an attorney and the Director of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). I have been the program Director since March 2019. Prior to my position as Director I served as the Associate Director from October 2018-March 2019. From September 2015 to July 2017 I was an Equal Justice Work Fellow and provided direct legal services to families at Karnes. I have been licensed in the state of Texas since November 6, 2015.

**Circumstances of COVID-19 and ICE's failure to meaningfully review custody for Class Members warrant the release of *Flores* Class Members detained at Karnes.**

3. ICE continues to detain *Flores* class members for a prolonged time in unsafe and unsanitary congregate conditions at the Karnes County Residential Center ("Karnes"). Especially during a global pandemic, ICE's continued detention of children puts Class Members at great risk. Under these circumstances the court should order release of detained minors whose release does not pose a risk of escape or danger as defined by the *Flores* Settlement Agreement ("FSA"), within 72 hours.

4. RAICES often, and currently, works with ICE to facilitate release of *Flores* Class Members ("Class Members") and their parents from Karnes. RAICES provides ICE with sponsor information, finds sponsors for the few families who do not have sponsors, and purchases tickets for travel for Class Members and their parents to be with their sponsors. If this Court orders ICE to release Class Members within 72 hours, ICE may simultaneously release parents under 8 C.F.R. 1236.3 - as it has done for five years - and RAICES will work closely with parents of Class Members and with ICE to facilitate release. We are prepared to explain terms of the FSA and other pertinent settlement agreements to families.

Indeed, RAICES has either provided sponsor information to ICE weeks ago, or will promptly do so for recently arrived families. For every case where this Court finds that continued detention of a Class Member is an impermissible violation of the FSA, RAICES will work with ICE to facilitate release of the Class Member.

5. Since March 28, 2020, RAICES has represented approximately 229 *Flores* Class Members. RAICES' staff regularly emails ICE to notify them when one of our Class Member clients has been detained for more than 20 days.  In our experience, ICE does not regularly make and record efforts to release class members.  ICE rarely if ever responds to our emails about prolonged detention of class members, and rarely provides written notice of a custody determination for a Class Member at Karnes. In a previous order, this Court cited RAICES supervising attorney Javier Hidalgo's declaration demonstrating that RAICES consistently emails ICE to request an explanation for the prolonged detention of Class Members in violation of *Flores* standards, and that ICE has consistently failed to respond to these emails.

6. Because ICE continued to detain RAICES Class Member clients without communication to RAICES about their efforts to seek release of our clients on April 24, 2020, RAICES began filing parole requests on behalf of *Flores* Class Members detained at Karnes. For every parole request submitted on behalf of a *Flores* class member, RAICES had previously sent ICE at least one email notifying them that the class member's prolonged detention was potentially in violation of the FSA.

7. Since April 24, 2020, RAICES has filed parole requests on behalf of 20 Flores Class Members and their parents, who have been detained at the Karnes County Residential Center ("Karnes" or "the detention center") for over 20 days. In these parole requests, RAICES attorneys requested the prompt release of the Flores Class Members and outlined that custody decisions for minors must comply with this Court's orders and the FSA standards.

8. The conduct of ICE in review of Class Members' custody and the reasons cited in custody determination decisions have been arbitrary, and are demonstrative that ICE continues to fail in its compliance with this Court's recent orders and the FSA.

9. Furthermore, I have reviewed the "FLORES RELEASE SUMMARY" documentation submitted by the ICE Juvenile Coordinator in her report dated June 12, 2020 for RAICES Class Member clients.  The reasoning for continued detention of Class Members provided in this documentation continues to fall short of compliance with the FSA requirements, and is not reflective of evidence made available to ICE in support of release of Class Members. For example, one class member was found to be a flight risk because of a pending motion to reopen despite his and his father's compliance with ICE reporting requirements over their two years in the United States.

**ICE's process for review of custody was haphazard and chaotic.**

10. Following RAICES' submission of parole requests for our clients detained at Karnes, ICE haphazardly conducted parole interviews with fewer than 10 parents of *Flores* Class Members for the purposes of making parole determinations.  ICE conducted parole interviews for approximately 41% of Class Members for whom RAICES filed parole requests during this time period.  These inconsistent and varied interviews did not demonstrate compliance with custody considerations agreed to in the FSA nor further instruction provided in subsequent orders by this Court.  They were characterized by minimal meaningful opportunity to access counsel, little to no consideration of individual circumstances related to Class Member children, and cursory - at times flippant - participation from ICE.

11. For example, ICE attempted to conduct interviews in the absence of counsel, despite being on notice that RAICES represented the *Flores* Class Members and had filed the parole requests on their behalf.  Clients reported feeling like they had no choice but to continue without their attorney, because, for example, the Deportation Officer insisted that they could not reach the attorney despite having called the incorrect phone number. Two interviews were conducted hours before the scheduled time. One parent described to RAICES that he had to explain to a Deportation Officer that the RAICES hotline for detained families was not the appropriate number to call to reach his attorney, especially because it was Memorial Day. The Deportation Officer proceeded without the attorney, saying it was "not his problem." Our clients describe Deportation Officers being rude, intimidating, and dismissive of their concerns for their children. The Deportation Officers

made parents sign their parole denials, despite our clients' protests to doing so in the absence of their attorneys. While ICE later called RAICES attorneys to conduct additional interviews, those additional interviews did not correct the errors of the first ones.

12. Next, ICE appeared to dismiss the relevant facts and documentation that reflect Flores criteria for releasing minors from ICE custody. Parents and attorneys presented facts and concerns that go directly to factors the FSA instructs ICE to consider in making custody determinations, but were met with dismissal. For example, one child has a food allergy that has not been sufficiently accommodated at Karnes, rendering Karnes a facility that does not meet the FSA's requirements for safe and sanitary custody conditions. ICE dismissed this concern, telling the parent during his interview, "What, do you want McDonalds?" and refused to consider a professional medical evaluation in making the parole determination for this Class Member.

13. Further, ICE did not focus on the detention of the Class Member when conducting parole interviews. When ICE did conduct parole interviews and attorneys were present, officers spoke exclusively to the parents of Flores Class Members and to their attorneys, and did not engage in any meaningful questioning. The questions that ICE asked did not appear to go to the criteria relied upon in their final custody determinations. ICE officers did not ask about factors relating to being a flight risk, they did not ask about criminal history or being a danger to the community, and they certainly did not ask those questions with specific regard to the Class Members. According to RAICES attorneys and clients, ICE asked questions about the following subjects when conducting parole interviews at Karnes:

A. Details about the sponsor's contact information and whether the sponsor can provide for transportation from the detention center
B. Whether they need more time to submit documents to support their request
C. Whether they had an Immigration Court hearing
D. Whether they had been interviewed by the Asylum Office
E. The results of their hearing with the Immigration Judge
F. The results of their interview with the Asylum Office

14. As evidenced by the questions asked, ICE officers primarily, if not exclusively, considered information that Judge Gee deemed inappropriate in making custody determinations for minors--namely, they considered immigration case status. Again, ICE should not have even needed the parole requests to communicate to Class Members their efforts at release or their reason for detention, and yet ICE still provided insufficient reasoning when prompted to do so by the parole requests.

**ICE's custody decisions for Class Members at Karnes are arbitrary and do not reflect circumstances which favor Class Members' release.**

15. Since April 24, 2020, ICE has paroled one Class Member about whom RAICES has communicated--a four-year-old child suffering from hydrocephalus. This child suffers from a severe medical condition, so extreme that it was plainly obvious that Karnes could not meet the *Flores* requirements for providing custody conditions that are "safe and sanitary . . . consistent with [ICE's] concern for the particular vulnerability of minors." FSA, ¶ 12. ICE should have been aware of this child's condition even before RAICES reached out, but it took RAICES's communication to prompt ICE to put forth the effort to promptly release the minor in compliance with Judge Gee's orders. ***Of note, this child was released while he and his family were waiting for "IJ review" (review by an immigration judge of a negative credible or reasonable fear finding) - a reason that ICE often cites for the continued detention of Class Members.***

16. RAICES has only received written custody determinations for Flores Class Members in response to parole requests filed on their behalf; despite emailed requests, ICE has not provided custody determinations outside of a formal parole review process. This means that RAICES has only received written custody determinations for ten *Flores* Class Members, approximately 3.9% of clients who are Class Members detained at Karnes since March 28, 2020. The determinations indicate that ICE made decisions arbitrarily, regardless of the Class Members submission of evidence to demonstrate that their detention is not necessary to secure their appearance before ICE or the Immigration Court and that ICE cannot provide them safe and sanitary conditions given their medical concerns, the duration of their detention, or their ties to the community.

17. All Class Members had been detained for over 80 days at the time of their parole decisions. In some instances, ICE waited until after the Flores Class Members had been deported to provide RAICES counsel with their negative parole determination. ICE failed to respond to the parole requests of eight Class Members before they were deported. Six Class Members were deported without being given a parole determination nor an explanation as to why ICE denied their release.

18. In their written parole decisions, ICE offered explanations to families based on criteria that directly contradict Judge Gee's April 24, 2020 order and May 22, 2020 order. One father described a Deportation Officer telling him, "you have to wait for your court date," and stating that this statement was the final decision on his parole request. That family is still detained, and on June 12, 2020, 92 days after being taken into immigration custody, was scheduled for a court hearing on June 17, 2020, 97 days after initial custody.  The hearing on June 17, 2020, was cancelled and it is unclear when it will be rescheduled.  Another father reported being told something similar, that he needed to "wait for an answer from the judge." That family is still detained, 99 days after their arrival to Karnes, despite the fact that the Class Member suffers from asthma. There was no specific mention of the Class Member in either instance. These parents described feeling confused and devastated by the Deportation Officer's explanations.

19. In the parole denials, ICE also stated that Class Members did not establish that they were "alien juveniles." One ground for denying parole on ICE's form states that, "you have failed to demonstrate that you are: (1) an alien who has a serious medical condition such that continued detention would not be appropriate; (2) an individual who has been medically certified as pregnant; (3) an alien juvenile; (4) an alien who will be a witness in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) an alien whose continued detention is not in the public interest." ICE checked this box for children. Presumably, these children almost certainly did demonstrate to ICE's satisfaction that they are alien juveniles, or they would never have been detained at Karnes, a facility that detains only juvenile children and their parents.

20. Some of those Class Members also had serious medical conditions such that continued detention would not be appropriate, but ICE disregarded those concerns. For example, one

child who had been detained for 105 days at the time of his parole interview had a severe tooth infection that left his tooth rotting and he was in so much pain that he could not eat or sleep because of it. ICE was provided this information both before and during the interview, and should have known about the child's condition because of his visits to the clinic at Karnes. Yet, ICE nevertheless denied parole and in fact specifically indicated, contrary to information known to ICE, that he did not suffer from a serious medical condition. Another child suffers from serious food allergies. At Karnes, he is not given sufficient food to replace the foods that he cannot eat. Even though RAICES provided an independent medical evaluation for this child and ICE was previously made aware of his condition, ICE denied having received this evaluation and appeared to disregard it, denying his parole and making no mention of this information.

21. ICE cited flight risk as the reason for denial of parole for all families that received denials, but in no case did ICE expand upon the basis by which this determination was made in its written documentation of parole denials provided to RAICES. The Class Members cases are in a variety of procedural postures. One was awaiting Immigration Judge Review of their Negative Credible Fear Decision, one was awaiting a decision on their Request for Reconsideration, one has a pending Motion to Reopen, and one has a pending appeal of a Motion to Reopen in the Board of Immigration Appeals, and several had removal orders. Flight risk was marked even for an eight-year-old child with significant community ties including having lived in the United States for two years, attending school and playing sports here, and having his mother and siblings present in the United States outside of detention.

22. ICE did not provide a response to the parole request nor an explanation of the prolonged detention of one Class Member who received a final removal order on March 3, 2020 and was detained until May 26, 2020, 84 days after receiving the final removal order. That Class Member had strong factors mitigating concerns for flight risk, including having a mother that resides in the United States.

**The reasons cited for continued detention of Class Members in the Juvenile Coordinator's Report misrepresent information provided to ICE in support of release of Class Members.**

23. RAICES has reviewed the "FLORES RELEASE SUMMARY" forms that ICE submitted to the Court for four Class Member clients and found that these records continue to demonstrate ICE's failure to conduct custody determinations in compliance with the *Flores* Settlement Agreement and Judge Gee's subsequent orders. ICE referred to May 13 "parole reviews" for each of these Class Members, apparently referring to conversations ICE officers had with families about waiving their *Flores* rights, which were the subject of review at this Court's last hearing. In the May 22, 2020 order, this Court expounded on those conversations, describing them as having, "caused confusion and unnecessary emotional upheaval and did not appear to serve the agency's legitimate purpose of making continuous and individualized inquiries regarding efforts to release minors."[1]

24. In addition, ICE did not provide information regarding custody determinations for all Class Members currently detained at Karnes. To illustrate, RAICES represents 13 Class Members detained at Karnes, including eight Class Members currently detained for over 20 days, one who will have been detained for over 20 days this week, and one who will be detained for 20 days next week, should they remain detained. ICE provided "FLORES RELEASE SUMMARY" worksheets for only four RAICES clients who are Class members. Of note, ICE filed these worksheets on June 10, 2020, yet it appears that ICE last reviewed Class Member cases for custody determinations a staggering 28 days earlier, on May 13, 2020, despite Judge Gee's order to ICE to, "continue to make every effort to promptly and safely release Class Members."[2] ICE's reasons for detaining these Class Members still appear arbitrary, even if more detailed than the reasons that they provided to RAICES in response to parole requests.

25. Furthermore, ICE's custody determinations do not reflect consideration of evidence available to them to support release of Class Member children. For example, for each of the four Class Members clients for whom RAICES reviewed "FLORES RELEASE SUMMARY" documentation, ICE indicates that the parent has not designated a "caregiver" to whom ICE could release the minor. These determinations are unfounded, considering that each of these Class Members is detained with a parent, with whom they

---

[1]  *Flores v. Barr*, Case No. 2:85-cv-04544-DMG-AGR at 2 (C.D. Cal. May 22, 2020) at 2.
[2]   *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), Dkt. No. 784 (C.D. Cal. Apr. 24, 2020) at 18.

could be released pursuant to 8 C.F.R. § 1236.3.  Moreover, parents do not recall being asked to identify a caregiver; however, each of these four Class Members *did* provide ICE with the name of a sponsor who could receive them in their requests for parole. Additionally, ICE did not provide an expected date of removal for any of these four Class Members, indicating that they are presently being detained indefinitely.

26. The statements that ICE made regarding detention and flight risk in these four summaries directly contravene this Court's orders by apparently weighing immigration case status more than any other factor in considering parole.  The April 24, 2020 order of this court makes it clear that the explanations ICE gave for this child are insufficient reasons for prolonging a Class Member's detention.

### A.  Class Member HFFM AXXX-XXX-704

27. In the first custody explanation for Class Member HFFM AXXX-XXX-704, p. 98 of the government's June 10, 2020 filing, ICE made errors as to the removability of the child and exhibited a lack of continuous efforts towards his release. The Juvenile Coordinator Report states that:

> Minor, HFFM, and his parent, NFM, were encountered by USBP on 2/9/2020. The FAMU was processed as bag and baggage. On 2/12/2020, the FAMU was booked into KCRC. On 2/12/2020, a Flores parole review was conducted for minor. **Parole was denied because the minor was a final order and detention was required to complete the removal process**. On 2/22/2020 FAMU's attorney filed a Motion to Re-Open which resulted in an automatic stay of removal.

> On 05/13/2020, ICE conducted a second parole review for minor. At that time, parole was denied. **Minor was found to be a flight risk as he is pending the outcome of the Motion to Re-Open**. Minor will be scheduled for the next removal flight to his country of citizenship. Removal flights to Honduras occur 2-3 times each week. Due to the frequency of removal flights and the very short time period for manifesting the flight, it is unlikely that minor would present himself for removal in a timely manner. Failure to depart the US timely would cause minor to become a fugitive from ICE, negatively impacting his ability to attain future immigration benefits. Additionally, minor's parent has not designated a caregiver to whom ICE could consider releasing the minor.

28. ICE states that it conducted parole reviews for the Class Member on February 12, 2020
    and on May 13, 2020.  However it failed to communicate any decision on the Class
    Member's parole, or respond to RAICES April 2, 2020 parole request until May 31, 2020.
    On that date, this Class Member's father notified RAICES that he received a parole denial
    that same morning, dated May 29, 2020, attached as **Exhibit A**.  This denial stated that
    parole for the Class Member minor was denied because "You have not established to ICE's
    satisfaction that you are not a flight risk" and:

    > You have failed to demonstrate that you are: (1) an alien who has a serious medical
    > condition such that continued detention would not be appropriate; (2) an individual
    > who has been medically certified as pregnant; (3) an alien juvenile; (4) an alien who
    > will be a witness in proceedings being, or to be, conducted by judicial, administrative,
    > or legislative bodies in the United States; or (5) an alien whose continued detention is
    > not in the public interest.

29. ICE's purported reasons for denying HFFM's parole in their May 29, 2020 Parole Denial
    do not appear to be based in fact.  First, contrary to ICE's denial worksheet, HFFM *is,
    indeed* "an alien juvenile."  Furthermore, the Parole request submitted on behalf of HFFM
    on April 2, 2020 included information that HFFM was suffering from digestive issues at
    Karnes and was unable to eat, and it also listed a sponsor in the United States who could
    receive HFFM upon release.  On May 11, 2020, RAICES submitted additional evidence
    regarding HFFM's sponsor, a first cousin of HFFM's father who his father grew up with,
    including proof of the sponsor's employment, address, work authorization, and valid Texas
    state identification card.  There is no indication that ICE considered any of this evidence
    in either their May 29, 2020 parole denial or the June 10, 2020 Juvenile Coordinator's
    report.

30. Moreover, HFFM's father reported that when ICE served him the parole denial forms for
    him and his son, ICE did not mention the Class Member nor specifically explain the reason
    for the Class Member's parole denial. The parent described the encounter as lasting no
    more than five minutes.

31. This Class Member has an MPP order of removal as he was kidnapped in Mexico and was
    consequently unable to attend court, but he now has a pending Motion to Reopen based on
    these compelling and exceptional circumstances. Nevertheless, ICE states that the Class

Member "will be scheduled for the next removal flight," while simultaneously acknowledging that there is a stay of removal in the child's case. ICE states that it is unlikely the child would present himself for removal in a timely manner. ICE's explanation for this Class Member's prolonged detention fails to take into account that ICE **cannot** execute the removal order, that HFFM's case may be reopened, that if it is not reopened, the Class Member may appeal such a decision and that the remainder of the legal process could take months, during which time ICE would **still** be unable to execute the removal order.  ICE explicitly states that they found this Class Member to be a flight risk, "as he is pending the outcome of the Motion to Reopen." As stated above, this reasoning is entirely in violation of this Court's specific instruction that it is  inappropriate to deny release of a child simply because he has a removal order, particularly where, as in this case, it is not known when or if ICE will remove him.

### B.   Class Member EMUA, AXXX-XXX-453

32. In the second custody explanation that ICE provided for a RAICES client Class Member, on p. 113 of the Government's June 10, 2020 submission, ICE provided explanations inconsistent with the information they have provided to RAICES, and inconsistent with this Court's orders and the *Flores* standards. Of note, the form on which ICE denied EMUA's parole on May 28, 2020, attached as **Exhibit B**, varies significantly from that provided for HFFM.  The Juvenile Coordinator's report states:

> Minor, EMUA, and his parent, JJUC reported to the San Antonio Resident Office on 3/10/2020. The FAMU was processed for Bag & Baggage since an immigration judge ordered the FAMU removed in-absentia on 8/6/2019. On 3/10/2020, the FAMU was booked into KCRC. On 3/10/2020, a Flores parole review was conducted for minor. **Parole was denied due to the final order of removal** and detention was required to complete the removal process and because the parent had not designated a caregiver to whom ICE could consider releasing the minor. On 3/20/2020, a Motion to Re-Open was filed for this FAMU.

> On 5/13/2020, ICE conducted a second parole review for minor. At that time, parole was denied. **Minor's parent has not designated a caregiver to whom ICE could consider releasing the minor.**

33. ICE states that it conducted parole reviews for the minor on March 10, 2020 and May 13, 2020 and denied parole both times, because "detention was required to complete the removal process and because the parent had not designated a caregiver to whom ICE could consider releasing the minor." This determination is simply wrong.  In EMUA's parole request submitted May 11, 2020, his *mother, with whom he has resided in San Antonio, Texas for two years*, was listed as the sponsor available to him and his father.  Inexplicably, ICE cited "You have not established to ICE's satisfaction that you are not a flight risk" and "You did not establish, to ICE's satisfaction, substantial ties to the community" as their reasons for denial of parole on May 25, 2020.  This reasoning is notably absent from the reasoning provided in the Juvenile Coordinator's report to this Court.

34. Not only do EMUA and his family have significant community ties given their two years of residence in the United States, but EMUA and his father - to whom his case is linked - have demonstrated that they are not, in fact, a flight risk.  Namely, EMUA and his father presented themselves at a Port of Entry to seek asylum, and they have diligently attended ICE check ins for two years.  They did not receive notice of court, and it was at an ICE check in, after their removal order was entered without their notice, that ICE apprehended EMUA and his father.  There is no evidence to support ICE's contention that EMUA is a flight risk, and there is significant evidence to rebut ICE's assertion that EMUA does not have community ties.

35. Finally, it is unclear why, if ICE conducted a parole review on May 13, 2020, it gave the Class Member notice of a parole interview on May 18, then conducted a parole interview on May 25, 2020, and provided its parole decision on May 28, 2020. This summary indicates that ICE either did not review the Class Member's parole at the time of the interview, or that ICE did not update the summary before submitting it to the Court.

### C.  Class Member SLG, AXXX-XXX-533

36. The third Class Member for whom ICE provided a custody explanation similarly demonstrates irregularity in ICE's reasoning for continued detention. The report of the Juvenile Coordinator states:

Minor, SLG, and her parent, HLL, were encountered by CBP on 03/12/2020.

The FAMU was processed for expedited removal, at which time the father claimed a fear of returning to Mexico.

On 03/15/2020, the FAMU was booked into KCRC. On 03/15/2020, a Flores parole review was conducted for minor. **Parole was denied because the minor was in the credible fear interview process and detention was required to complete the process** and because the parent had not designated a caregiver to whom ICE could consider releasing the minor. On 03/27/2020, USCIS found that the minor did not have a credible fear of returning to Mexico.

On 5/13/2020, ICE conducted a second parole review for minor. At that time, parole was denied. **Minor was in the credible fear interview process and detention was required to complete the process** and because the parent had not designated a caregiver to whom ICE could consider releasing the minor. **The minor and the FAMU are pending IJ Review.**

37. In this case again, ICE's explanation to this Court in the report of the Juvenile Coordinator is incongruent with ICE's denial of parole provided in writing to SLG through her parent and to RAICES on May 28, 2020.  The written notice of denial of parole that ICE provided for SLG, attached as **Exhibit C**, is on the same form as that provided to Class Member HFFM, detailed above, but also differs from that provided to Class Member EMUA.  These discrepancies demonstrate ICE's failure to consistently make and record efforts to release minors according to this Court's multiple orders.

38. As with the other Class Member examples, ICE stated that it reviewed this Class Member's case for parole on March 15, 2020 and again on May 13, 2020, failing to mention that it conducted a parole interview on May 25, 2020.  It is unclear whether ICE simply failed to mention the parole interview to this Court, or rather did not actually review the minor's case for parole on May 25. Whatever the case may be, the absence of this fact demonstrates that the Class Member's summary is incomplete.

39. Here, ICE marked in its May 28, 2020 parole denial, **Exhibit C**, that parole was denied for SLG because "You have not established to ICE's satisfaction that you are not a flight risk," with no further explanation.  There is no indication that ICE considered the fact that a family member sponsor was named for SLG in her May 27, 2020 parole request.

40. In contrast, in its report to this Court, ICE states, "detention was required to complete the [credible fear interview] process." This is not an accurate depiction of the legal reality of the credible fear process, or any necessity of ICE to continue detention of a Class Member. In fact, ICE has the discretion to issue a Notice to Appear to individuals within its custody, and even if they do not, a Class Member may continue the credible fear process from outside of detention.  In fact, this scenario often occurs when, for example, the Asylum Office cannot find the proper interpreter to conduct an interview within a timely fashion. In RAICES' experience, these Class Members and their parents are subsequently *released from detention to complete the credible fear process outside of detention.*  It has also been RAICES' experience that in some cases, including the case of a child with hydrocephalus mentioned above, ICE will release a Class Member and their parents *even if the Class Member received a negative credible fear determination and therefore may have an executable expedited removal order.*

41.  At the time of ICE's filing on June 10, 2020, this Class Member had been waiting for 72 days and still had not been scheduled for the hearing he had been awaiting.  In its April 24, 2020 order, this Court stated that ICE responses to parole requests which state the reason for a child's prolonged detention as having to do with waiting for a decision in the credible fear process, fail to meet the requirements of the FSA.[3]

### D.  Class Member BCMC, AXXX-XXX-538

42. In the fourth release summary that ICE provided for a RAICES client Class Member, it similarly failed to make mention of the parole interview, failed to consider appropriate *Flores* release standards, and inappropriately based its explanation off of the child's immigration case status. The Juvenile Coordinator report states that:

> Minor, BCMC, and his parent, HEMC, were encountered by BP on 03/21/2020. The FAMU was processed for Bag & Baggage since an immigration judge ordered the FAMU removed in-absentia on 09/26/2019. On 03/27/2020, the FAMU was booked into KCRC. On 3/27/2020, a Flores parole review was conducted for minor. **Parole was denied due to the final order of removal and detention was required to complete the removal process** and because the parent had not designated a

---

[3] *Id.* at 16.

caregiver to whom ICE could consider releasing the minor. On 04/14/2020, a Motion to Re-Open was filed. On 04/27/2020, the IJ denied the Motion to Re-Open. On 5/08/2020, an appeal of the Motion to Re-Open denial was filed with the BIA for this FAMU.

On 5/13/2020, ICE conducted a second parole review for minor. At that time, parole was denied. **Minor was found to be a flight risk as he is subject to a final order of removal and will be scheduled for the next removal flight to his country of citizenship**. Removal flights to Nicaragua occur bi-weekly. Due to the frequency of removal flights and the very short time period for manifesting the flight, it is unlikely that minor would present himself for removal in a timely manner. Failure to depart the US timely would cause minor to become a fugitive from ICE, negatively impacting his ability to attain future immigration benefits.

Additionally, minor's parent has not designated a caregiver to whom ICE could consider releasing the minor. On 05/26/20 an emergency stay request was filed with the BIA.

43. The information provided to this Court in the Juvenile Coordinator's report is either incomplete or misleading.  First, ICE stated that this child does not have a stay of removal in place. Actually, BCMC's case should be stayed automatically given the relevant statutory and regulatory provisions; RAICES only filed a stay with the Board of Immigration Appeals in this case out of an abundance of caution.[4]  ICE again makes no mention of this Class Member's May 26, 2020 parole interview and subsequent decision, only making reference to a March 27, 2020 and May 13, 2020 parole review. Furthermore, ICE states that the child, "will be scheduled for the next removal flight to his country of citizenship," while they cannot at this time execute his removal order, and cannot know when or if they will be able to do so.

44. Importantly, The parole denial provided to RAICES for BCMC dated May 29, 2020,  and attached as **Exhibit D**, stated that parole for the Class Member minor was denied because "You have not established to ICE's satisfaction that you are not a flight risk" and:

---

[4] "The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal." 8 C.F.R. § 1003.23(b)(4)(iii)(C).

> You have failed to demonstrate that you are: (1) an alien who has a serious medical
> condition such that continued detention would not be appropriate; (2) an individual
> who has been medically certified as pregnant; (3) an alien juvenile; (4) an alien who
> will be a witness in proceedings being, or to be, conducted by judicial,
> administrative, or legislative bodies in the United States; or (5) an alien whose
> continued detention is not in the public interest.

Not only does this denial fail to make note of the fact that BCMC's May 11, 2020 parole
request lists a sponsor, but it also is simply wrong as 1) BCMC is, in fact, "an alien
juvenile," and 2) has a serious medical condition such that continued detention would not
be appropriate.

45. This Class Member child has a severe food allergy, as described in **Exhibit E**, Declaration
of Dr. Fiona Danaher, attached, that has not been accommodated at Karnes.  RAICES
brought this allergy to ICE's attention on May 6, 2020, in BCMC's original parole request
dated May 11, 2020, and again in a supplement to the original parole request dated May
26, 2020 which contained **Exhibit E**.  Dr. Danaher states in her declaration that BCMC
"also has a history of reactive airway disease (i.e., asthma in a young child)" which places
him at greater risk if he were infected with COVID-19.  Importantly, regarding conditions
at Karnes for BCMC, Dr. Danaher notes:

> I am concerned that [BCMC] was repeatedly served tomato-based foods despite a
> described history of anaphylactic reaction to tomatoes, and that his parents were
> placed in the position of having to withhold food from their child to protect him.
> Anaphylaxis is a dangerous allergic reaction that can impair breathing by causing
> throat swelling and airway constriction. It can also cause distributive shock,
> meaning that rapid dilation of blood vessels leads to inadequate perfusion to support
> the body's organs. ***Anaphylaxis can progress rapidly, and if left untreated can
> prove fatal***.

46. **The conditions described in Dr. Danaher's declaration, submitted to ICE on May 26,
2020, demonstrate that Karnes is not a safe and sanitary location for Class Member
BCMC.  ICE continues to fail to accommodate BCMC's dietary requirements**.  As
recently as June 16, 2020, BCMC's mother reported that BCMC was served meat with
tomato sauce.  Instead of providing him with an alternate source of protein, Karnes staff
took the meat and gave BCMC three pieces of bread, telling him "eat it or throw it out."

47. Though the information regarding BCMC's health condition was available to ICE, neither his May 29, 2020 parole denial nor the explanation provided to this Court make any mention that ICE considered the health risks to BCMC with continued detention.

**Conclusion**

48. ICE repeatedly lists immigration-case-status-related reasons for denial of parole with cursory mention attached to each that parole was also denied "because the parent had not designated a caregiver to whom ICE could consider releasing the minor."  There is no indication that ICE reviewed sponsorship information available to the agency in any of the custody determinations.  Furthermore, there is no evidence that ICE actually considered the existence of a "caregiver," rather than *only* considering the immigration case status of Class Members when it denied parole.  None of the parole denials provided to Class Members or their RAICES representatives indicate that sponsorship information was considered or was deemed insufficient.  Based on RAICES records and the experiences of our clients and staff, it appears that ICE may have added on "because the parent had not designated a caregiver to whom ICE could consider releasing the minor" to their explanations of continued custody of Class Members before the filing of the Juvenile Coordinator's report to this Court but subsequent to ICE's actual denial of parole based on impermissible considerations of immigration case status.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 17, 2020

San Antonio, Texas

Andrea Meza

# EXHIBIT A

*Enforcement and Removal Operations*

U.S. **Department of Homeland Security**
409 FM 1144
Karnes City, Texas 78118



**U.S. Immigration
and Customs
Enforcement**

May 29, 2020

**HFFM**
C/O Karnes County Residential Center
409 FM 1144
Karnes City, TX 78118

In Reference to: A#**HFFM** 704

## INTERIM NOTICE DECLINING PAROLE

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided not to parole you from custody at this time. The decision to authorize parole is discretionary. As part of its parole determination, ICE reviewed immigration records and any supplemental documentation that you provided. After reviewing all available information, ICE has determined that parole is not appropriate in your case at this time based on the following reason(s):

☐ You have not established your identity to the satisfaction of ICE.

☒ You have not established to ICE's satisfaction that you are not a flight risk.

☐ You have not established to ICE's satisfaction that you are not a security risk or a danger to the community.

☒ You have failed to demonstrate that you are: (1) an alien who has a serious medical condition such that continued detention would not be appropriate; (2) an individual who has been medically certified as pregnant; (3) an alien juvenile; (4) an alien who will be a witness in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) an alien whose continued detention is not in the public interest.

☐ Other: _____

_____

### Re-Determination

You may request re-determination of this decision in writing, based upon changed circumstances in your case. Such changed circumstances or documentation should relate to the reason(s) indicated above why ICE is not paroling you from custody at this time. If there are multiple grounds checked above, you should try to provide further evidence addressing each of them.

If you request re-determination of this decision, please direct your written request to your designated ERO officer. Such a re-determination request should include a copy of this letter and any other ICE written decision declining to authorize parole, and clearly explain what changed circumstances and relevant documents you would like considered.

ICE previously provided you with a written decision declining to authorize parole, and you have failed to provide additional documentation or to demonstrate any significant changed circumstances which would alter ICE's previous determination.

I certify that I received a copy of this notice.

**HFFM**

Alien Name

**HFFM**

Alien Signature

5/29/20

Date

## ☐ I WISH TO REQUEST A RE-DETERMINATION OF MY PAROLE DECISION. MY SUPPORTING DOCUMENTATION IS ATTACHED.

| CERTIFICATE OF SERVICE |
| --- |
| I certify that on today's date, I served the respondent a copy of this parole notice by the following method (as checked): |

☐ In person  ☐ Other: _____

Emma Peralis

ICE Official Name

_ICE Official Signature_

5/29/20

Date

# EXHIBIT B

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
409 FM1144
Karnes City, Texas 78118

 **U.S. Immigration
and Customs
Enforcement**

May 28, 2020

EMUA

C/O Karnes County Residential Center
409 FM 1144
Karnes City, TX 78118

In Reference to: A# EMUA 453

## NOTIFICATION DECLINING TO GRANT PAROLE

Dear Mr EMUA :

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided not
to parole you from detention at this time. Under ICE policy, arriving aliens determined by an
Asylum Officer to have a credible fear of persecution or torture are initially considered for parole.
While the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to
aliens determined to have a credible fear if they establish their identity and that they pose neither a
flight risk nor danger to the community.

As part of its determination whether to parole you, on May 25, 2020, ICE conducted an initial
interview with you. Your immigration files and any supplemental documentation that you provided
were reviewed at that time. After reviewing all available information, ICE has determined that
parole is not appropriate in your case at this time based on the following reason(s):

☐ You have not established your identity to the satisfaction of ICE.
    ☐ You did not present valid, government-issued documentation of identity, or any
       documents you submitted did not, to ICE's satisfaction, establish your identity.
    ☐ You did not provide third-party verification of your identity, or any third-party
       information you provided did not, to ICE's satisfaction, establish your identity.
    ☐ You did not, to ICE's satisfaction, establish your identity through credible statements.

☒ You have not established to ICE's satisfaction that you are not a flight risk.
    ☐ You failed to provide, to ICE's satisfaction, a valid U.S. address where you will reside while
       your immigration case is pending.
    ☒ You did not establish, to ICE's satisfaction, substantial ties to the community.
    ☐ Imposition of a bond or other conditions of parole would not ensure, to ICE's satisfaction,
       your appearance at required immigration hearings pending the outcome of your case.

☐ You have not established to ICE's satisfaction that you are not a danger to the community or U.S. security. In making this determination, ICE has taken into account any evidence of past criminal activity, activity contrary to U.S. national security interests, activity giving rise to concerns of public safety or danger to the community, disciplinary infractions or incidents, or other criminal or detention history that shows you have harmed or would likely harm yourself or others.

☐ Additional exceptional, overriding factors (e.g., law enforcement interests or potential foreign policy consequences) in your case militate against parole, as follows:

_____

_____

☐ ICE previously provided you with a written decision declining to grant parole, and you have failed to provide additional documentation or to demonstrate any significant changed circumstances which would alter ICE's previous determination.

You may request a redetermination of this decision in writing, based upon changed circumstances in your case or additional documentation you would like ICE to consider. Such changed circumstances or documentation should relate to the reason(s) indicated above why ICE is not paroling you from custody at this time. For example, if you have not established your identity to ICE's satisfaction, you may wish to consider providing previously unfurnished government-issued documents such as passports, birth certificates, or identity cards. Identity can also be established through written statements prepared by individuals whom you know in the United States and whose identity ICE can verify to its satisfaction. These statements should include the address of the person you know in the United States and evidence of his or her identity. Finally, if there are multiple grounds checked above, you should try to provide further evidence addressing each of them.

If you request redetermination of this decision, please direct your written request to the address above, include a copy of this letter and any other prior ICE written decision(s) declining to grant you parole, and clearly explain what changed circumstances or additional documents you would like considered. Failure to provide satisfactory documentation and explanation may result in a denial of your request for redetermination.

Sincerely,

Anthony Hofbauer
*Assistant Field Office Director*
Karnes County Residential Center

# EXHIBIT C

*Enforcement and Removal Operations*

U.S. Department of Homeland Security
409 FM 1144
Karnes City, Texas 78118



**U.S. Immigration
and Customs
Enforcement**

May 28, 2020

**SLG**

C/O Karnes County Residential Center
409 FM 1144
Karnes City, TX 78118

In Reference to: A# **SLG** 633

## INTERIM NOTICE DECLINING PAROLE

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided not to parole you from custody at this time. The decision to authorize parole is discretionary. As part of its parole determination, ICE reviewed immigration records and any supplemental documentation that you provided. After reviewing all available information, ICE has determined that parole is not appropriate in your case at this time based on the following reason(s):

☐ You have not established your identity to the satisfaction of ICE.

☒ You have not established to ICE's satisfaction that you are not a flight risk.

☐ You have not established to ICE's satisfaction that you are not a security risk or a danger to the community.

☐ You have failed to demonstrate that you are: (1) an alien who has a serious medical condition such that continued detention would not be appropriate; (2) an individual who has been medically certified as pregnant; (3) an alien juvenile; (4) an alien who will be a witness in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) an alien whose continued detention is not in the public interest.

☐ Other: _____

### Re-Determination

You may request re-determination of this decision in writing, based upon changed circumstances in your case. Such changed circumstances or documentation should relate to the reason(s) indicated above why ICE is not paroling you from custody at this time. If there are multiple grounds checked above, you should try to provide further evidence addressing each of them.

If you request re-determination of this decision, please direct your written request to your designated ERO officer. Such a re-determination request should include a copy of this letter and any other ICE written decision declining to authorize parole, and clearly explain what changed circumstances and relevant documents you would like considered.

ICE previously provided you with a written decision declining to authorize parole, and you have failed to provide additional documentation or to demonstrate any significant changed circumstances *FATHER* which would alter ICE's previous determination. *INDE.*

I certify that I received a copy of this notice.

**SLG**

Alien Name _____ Alien Signature _____

*FATHER SIGNED FOR CHILD*

5 - 28 - 20
Date

□ **I WISH TO REQUEST A RE-DETERMINATION OF MY PAROLE DECISION. MY SUPPORTING DOCUMENTATION IS ATTACHED.**

---

### CERTIFICATE OF SERVICE

I certify that on today's date, I served the respondent a copy of this parole notice by the following method (as checked):

□ In person   □ Other: _____

F8440 Castillo
Deportation Officer
DHS-ICE

ICE Official Name _____   ICE Official Signature _____

5 - 28 - 20
Date

# EXHIBIT D

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
409 FM 1144
Karnes City, Texas 78118



U.S. Immigration
and Customs
Enforcement

05/29/2020

BCMC

C/O Karnes County Residential Center

409 FM 1144

Karnes City, TX 78118

In Reference to: A# BCMC 538

## INTERIM NOTICE DECLINING PAROLE

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided not to parole you from custody at this time. The decision to authorize parole is discretionary. As part of its parole determination, ICE reviewed immigration records and any supplemental documentation that you provided. After reviewing all available information, ICE has determined that parole is not appropriate in your case at this time based on the following reason(s):

☐ You have not established your identity to the satisfaction of ICE.

☑ You have not established to ICE's satisfaction that you are not a flight risk.

☐ You have not established to ICE's satisfaction that you are not a security risk or a danger to the community.

☑ You have failed to demonstrate that you are: (1) an alien who has a serious medical condition such that continued detention would not be appropriate; (2) an individual who has been medically certified as pregnant; (3) an alien juvenile; (4) an alien who will be a witness in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) an alien whose continued detention is not in the public interest.

☐ Other: _____

_____

### Re-Determination

You may request re-determination of this decision in writing, based upon changed circumstances in your case. Such changed circumstances or documentation should relate to the reason(s) indicated above why ICE is not paroling you from custody at this time. If there are multiple grounds checked above, you should try to provide further evidence addressing each of them.

If you request re-determination of this decision, please direct your written request to your designated ERO officer. Such a re-determination request should include a copy of this letter and any other ICE written decision declining to authorize parole, and clearly explain what changed circumstances and relevant documents you would like considered.

☐ ICE previously provided you with a written decision declining to authorize parole, and you have failed to provide additional documentation or to demonstrate any significant changed circumstances which would alter ICE's previous determination.

I certify that I received a copy of this notice.

| BCMC | BCMC | 05/29/2020 |
|------|------|------------|
| Alien Name | Alien Signature | Date |

## ☑ I WISH TO REQUEST A RE-DETERMINATION OF MY PAROLE DECISION. MY SUPPORTING DOCUMENTATION IS ATTACHED.

---

**CERTIFICATE OF SERVICE**

I certify that on today's date, I served the respondent a copy of this parole notice by the following method (as checked):

☑ In person  ☐ Other: _____

N Bachelier

ICE Official Name: **N Bachelier**
**Deportation Officer**
**DHS-ICE**

ICE Official Signature

05/29/2020

Date

# EXHIBIT E

## <u>DECLARATION OF DR. FIONA DANAHER</u>

I, Dr. Fiona Danaher, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge.

1. I am a US trained physician fully licensed to practice medicine in the State of Massachusetts. I am an Attending Physician in the Department of Pediatrics at Massachusetts General Hospital for Children, where I care for patients ranging in age from newborns to young adults. I work as both a primary care and child abuse pediatrician. I am an Instructor at Harvard Medical School in Boston, MA.

2. I am a graduate of Mount Sinai School of Medicine in New York, NY. I completed residency in Pediatrics at Massachusetts General Hospital. My residency training included extensive experience interviewing and conducting physical exams of children, adolescents, and young adults to treat both medical and psychiatric conditions. I have passed all three steps of the United States Medical Licensing Examination Board exams. I am board-certified in Pediatrics.

3. I am a Fellow in the American Academy of Pediatrics and a member of the Council on Immigrant Child and Family Health. I chair the Massachusetts General Hospital Immigrant Health Coalition.

4. I have attended a specific training about the medical evaluation of asylum seekers of all ages entitled, "Introduction to Forensic Evaluation and Documentation of Trauma in Asylum-Seekers," hosted by the Harvard Medical School chapter of Physicians for Human Rights.

5. I am a volunteer for the Massachusetts General Hospital Asylum Clinic, and in this capacity, I conduct medical and psychological evaluations of persons seeking asylum in the United States, including individuals in ICE detention.

6. On Monday, May 25, 2020 at 10am CST, I interviewed ▮▮▮▮▮▮▮▮▮, mother (DOB: ▮▮▮▮▮), and ▮▮▮▮▮▮▮▮▮, child (DOB: ▮▮▮▮▮) via video-conference in a

volunteer capacity. I have reviewed the declaration of ███████████████, father (DOB: ███████), provided to me by the Refugee and Immigrant Center for Education and Legal Services (RAICES). No medical records were available for review.

SUMMARY OF MEDICAL ISSUES OF ██████████████████████ (A# ██████████)

7.   ██████ and his family arrived at Karnes County Family Residential Center (KCFRC) on 3/26/2020. His mother reports that prior to their arrival, ██████ had a remote history of reactive airway disease and had been diagnosed with multiple allergies to foods, medication, and bee stings, but he was otherwise a healthy, developmentally normal child. His mother expresses multiple concerns for his health during their time at KCFRC, including persistent exposure to a known food allergen placing ██████ at risk of a potentially serious allergic reaction; symptoms concerning for possible COVID-19 infection for which he received minimal medical attention, as well as ongoing risk of exposure to COVID-19 infection; and symptoms concerning for post-traumatic stress disorder (PTSD) exacerbated by his continuing detention. I will describe each of these medical issues in greater detail based on my interview with the child's mother and review of the father's declaration.

ALLERGIES

8.   ██████ was diagnosed with a severe allergy to tomatoes around age 2-2.5 years when he developed throat swelling, rash, vomiting, and diarrhea after ingesting several tomatoes. These symptoms are consistent with anaphylaxis, a potentially life-threatening allergic reaction. He was admitted to the hospital for treatment, where he subsequently developed a fever and was administered penicillin out of concern for possible infection. The penicillin worsened his rash, which led to an additional diagnosis of penicillin allergy. He remained hospitalized for 1.5-2 weeks while his symptoms persisted. His mother states he was discharged with a diagnosis of allergic reactions and possible infection, though no source of infection was identified.

2

9. Around age 5, ███ pediatrician diagnosed him with an allergy to pork, as he developed vomiting and diarrhea every time he ate it. He was also diagnosed with a bee sting allergy around age 1.5, after a bee sting on his arm caused him to develop arm swelling and shortness of breath, followed by a seizure and fever while awaiting treatment in the emergency room.

10. ███ also has a history of reactive airway disease (i.e., asthma in a young child), for which he was treated with nebulized albuterol. His last exacerbation was 3 years ago.

11. Taken together, ███ history of multiple allergies and reactive airway disease suggest he is an atopic child, meaning he has a genetic predisposition to developing allergic diseases. This is borne out by the strong family history of atopic conditions on his mother's side. His maternal grandmother, great-grandmother, and cousin exhibit various serious allergies to seafood, milk, and medications; his mother and aunt have asthma; and his aunt and cousins have eczema.

12. Given the concern for atopy, his pediatrician recommended that he be evaluated by an allergist, but his parents never had the opportunity to take him. They managed his allergies by maintaining strict avoidance of his known allergic triggers. The pediatrician advised his parents to give him cetirizine for any mild allergic reactions, but to take him directly to the hospital if he developed significant symptoms.

13. His mother states the family reported ███ allergies upon their intake at KCFRC and the information was added to his file. However, KCFRC continued to serve ███ tomato-based foods, forcing his mother to withhold such foods from ███ when they were served, out of fear that he could develop another anaphylactic reaction. The facility only adjusted his diet more than a month after his arrival, once the family's attorney intervened. Now his mother reports that when the menu includes foods like spaghetti with tomato sauce, he is simply served spaghetti with nothing on it, or if meat is cooked in a tomato-based sauce, he is given bread instead of meat. These meals are both nutritionally incomplete and unappetizing for ███.

14. His mother reports that ▮▮▮ used to eat eagerly before coming to Karnes, but he now has a poor appetite and barely eats some days unless his parents buy him instant soup or crackers from the commissary. His mother expresses concern that he is losing weight, as he used to look a little chubby but now his ribs are becoming visible. His low fiber diet and decreased intake have led to constipation with sometimes painful bowel movements. At one point his mother saw blood when wiping him, suggesting he may be developing hemorrhoids as a result of the constipation.

15. I am concerned that ▮▮▮ was repeatedly served tomato-based foods despite a described history of anaphylactic reaction to tomatoes, and that his parents were placed in the position of having to withhold food from their child to protect him. Anaphylaxis is a dangerous allergic reaction that can impair breathing by causing throat swelling and airway constriction. It can also cause distributive shock, meaning that rapid dilation of blood vessels leads to inadequate perfusion to support the body's organs. Anaphylaxis can progress rapidly, and if left untreated can prove fatal.

16. Safe management of ▮▮▮ allergies requires that he not be exposed to even small quantities of his known allergens. It also requires that a dose of intramuscular epinephrine, such as an epinephrine auto-injector, be kept accessible for emergency treatment in case of accidental exposure. Epinephrine does not appear to be listed on the ICE formulary. ▮▮▮ should undergo evaluation by a pediatric allergist to assess the full extent of his allergies.

17. I am also concerned by ▮▮▮ mother's description of his weight loss. While ▮▮▮ should not eat any foods containing tomatoes or pork, it is still important that he be provided with nutritionally balanced meals to support healthy growth and development. Foods containing tomatoes and pork should be replaced with other foods of similar nutritional value, rather than just removed without substitution. Inclusion of high fiber foods such as whole grains, fruits and vegetables will be important in resolving his constipation.

RISK OF COVID-19 INFECTION

18. ████ mother relates that upon the family's arrival to KCFRC, they were placed into 14 day quarantine. ████ and his mother were separated from his father for quarantine without warning or explanation; the family found this extremely traumatic, as they had previously been separated by kidnappers in Mexico. ████ and his mother were placed into a room together and only permitted to go outside for 30 minutes each day. ████ would cry when he saw his father outside the window.

19. ████ was reportedly healthy when he entered quarantine, but about 3 days after his arrival he developed sore throat, dry cough, nasal congestion, abdominal pain, diarrhea, and leg pain severe enough that he did not want to walk. He also complained of headache several times. His mother states that he was evaluated by a nurse at the facility who took his vital signs, but no testing was performed. The nurse provided a liquid medication that ████ took each night for 6 nights, without improvement. His mother states she was not told the name of the medicine, just that it was for treating colds. She does not recall him being offered Tylenol or ibuprofen for his pain.

20. ████ leg pain, abdominal pain, diarrhea, and headaches resolved after several days, but his sore throat, cough, and nasal congestion persisted. His mother reports he again saw the nurse, who switched him to an allergy medication (mother is unsure of name), but his upper respiratory symptoms continued unabated for approximately 7 weeks in total.

21. In ████ third week at KCFRC, his mother reports he developed an itchy rash on his arms and back that would come and go. His mother states that around this time was the only occasion when he saw a pediatrician rather than a nurse. He was diagnosed with an environmental allergy and switched to another allergy medication (mother is unsure of name), again without improvement. The family eventually purchased hydrocortisone cream from the commissary, which treated the rash effectively.

22. ███ upper respiratory symptoms finally resolved 1 week ago. He is not currently taking any medications.

23. ███ mother reports that all newly arrived detainees are placed in 14 day quarantine out of concern for COVID-19 risk. However, she states she has seen some of the facility's staff members coughing, and she reports that the majority of the staff do not wear masks. She states there is no hand sanitizer available, and the only place detainees can wash their hands is in their rooms, as the other bathrooms in the facility are almost always closed.

24. I am concerned that ███ exhibited many symptoms concerning for possible COVID-19 infection or influenza, but he was not tested for either infection, and he reportedly received minimal medical monitoring or treatment. According to his mother, he was not offered Tylenol or ibuprofen for his pain. The dosing interval for the nightly medication he was prescribed suggests he was not treated with Tamiflu for potential influenza.

25. It is also highly concerning that staff overseeing detainees in a congregate setting are not wearing masks during the COVID-19 epidemic, and that handwashing facilities are not being made more readily available to detainees. Statistical modeling suggests that COVID-19 spreads extremely easily in such settings.[1] Indeed, to date more than 1,200 ICE detainees have been diagnosed with COVID-19, and 2 have died. Only 2,394 of ICE's more than 26,000 detainees have received testing for COVID-19, and approximately 50% of those results have been positive, suggesting too few detainees are being tested to ensure safe conditions in these facilities.[2]

POST-TRAUMATIC STRESS DISORDER

---

[1] Irvine M, Coombs D, Skarha J, del Pozo B, Rich J, Taxman F, Green TC. Modeling COVID-19 and Its Impacts on U.S. Immigration and Customs Enforcement (ICE) Detention Facilities, 2020. J Urban Health. 2020 May 15;1-9. doi: 10.1007/s11524-020-00441-x. Online ahead of print.

[2] Montoya-Galvez, C. Second immigrant dies of coronavirus complications while in ICE custody. May 25, 2020. https://www.cbsnews.com/news/second-immigrant-dies-of-coronavirus-complications-while-in-ice-custody/

26. As mentioned previously, ▊ and his parents were kidnapped in Mexico and separated from each other. This incident was extremely frightening to ▊, who believed that he or his parents might be killed. He is very close to his father, and he was re-traumatized by the abrupt separation from his father upon his family's placement in quarantine when they arrived at KCFRC. Since men are housed in separate quarters from women and children, he can currently only see his father for about 5.5 hours each day, which he finds very difficult. He has become very clingy toward his mother as a result.

27. ▊ mother relates that he was a happy, developmentally normal child prior to leaving their country of origin. He was fully potty trained by age 1.5 years. However, since his arrival at KCFRC, he has begun to wet the bed, and he wakes up crying from nightmares. He insists on sleeping with his mother, which is a new behavior. His mother reports that staff enter their room hourly overnight to conduct suicide prevention checks, which disrupts ▊ sleep. (When they were in quarantine, staff would shine flashlights in detainees' faces during each check; now staff just come in, check the bathroom, and leave again.) He often has trouble falling asleep at night and wants to sleep during the day instead so that his sleep won't be interrupted by the hourly checks. His mother notes that getting him out of bed in the morning has become challenging.

28. ▊ has regressed developmentally. He used to be a talkative child, but now he does not speak much. When his mother asks him a question, he responds by meowing like a cat. He used to be able to independently resolve conflicts with other children, but now he just reacts to stressful interactions with playmates by making animal noises. He finds it difficult to form new relationships.

29. Since his arrival at KCFRC, ▊ sometimes seems to dissociate, adopting a blank look and not responding to his mother when she speaks to him. She believes he has blocked some memories of the kidnapping but that other memories still intrude, as she has observed him re-enacting the

7

event by pretending to abduct other children. He has developed a significant fear of people with guns or uniforms, which makes it difficult for him to interact with some of the KCFRC staff. He startles extremely easily, crying and hiding behind his mother when he hears loud noises. He has grown irritable, and has started to hit himself in the head whenever he feels sad or anxious. He exhibits low mood and energy on most days, and he no longer enjoys activities he used to love. He was a good student in his home country but now has difficulty concentrating on the educational worksheets provided by KCFRC. His appetite has diminished significantly, an issue exacerbated by the incomplete diet offered due to his allergies, as described above.

30. ███████ mother worries that being locked up and continuously monitored at KCFRC serves as a constant, traumatic reminder of the family's kidnapping. His mother states he has not received any mental health treatment since arriving at KCFRC, and that she has not pursued it as she is not aware that the facility might offer therapy for children his age.

31. ███████ psychological symptoms meet DSM-5 criteria for a diagnosis of PTSD.[3] He was exposed to a potentially life threatening event when his family was kidnapped, and his family's continued detention reminds him daily of that experience. He is exhibiting multiple intrusion symptoms, including nightmares, re-enactment of the traumatic event in play, marked physiological reaction to loud noises, and distress at exposure to external reminders of the event such as staff members wearing uniforms, whom he deliberately avoids. He exhibits negative alterations in cognition and mood, including difficulty remembering certain details of the traumatic event, a persistent negative emotional state, diminished interest in activities he normally enjoys, and estrangement from his peers. He demonstrates marked alterations in arousal and reactivity, including irritable and self-injurious behavior, an exaggerated startle response, and difficulties with sleep and

---

[3] Center for Substance Abuse Treatment (US). Trauma-Informed Care in Behavioral Health Services. Rockville (MD): Substance Abuse and Mental Health Services Administration (US); 2014. (Treatment Improvement Protocol (TIP) Series, No. 57.) Exhibit 1.3-4, DSM-5 Diagnostic Criteria for PTSD. Available from: https://www.ncbi.nlm.nih.gov/books/NBK207191/box/part1_ch3.box16/

concentration. His symptoms have been ongoing for more than 1 month and have led to significant functional impairment and developmental regression.

32. ███ would benefit from mental health therapy for his PTSD. However, successful treatment requires mitigating the traumatic stressors in his environment that constantly remind him of his family's kidnapping. Therefore, to be truly effective, therapeutic intervention must include complete reunification of his nuclear family and release from detention.

ASSESSMENT

33. Following my evaluation of ████████████████, I am concerned about his ongoing physical health and emotional well-being were he to remain in detention. KCFRC's prolonged failure to make appropriate dietary accommodations based upon allergies diagnosed by the child's pediatrician placed him at risk for a serious, potentially life-threatening allergic reaction; yet despite generating this risk, it is unclear based on the published ICE formulary whether the facility has epinephrine on hand to manage an episode of anaphylaxis. He is now being offered a nutritionally inadequate diet that, based on his mother's report, appears to be contributing to weight loss, constipation, and hemorrhoids. The child exhibited symptoms concerning for COVID-19 or influenza infection but received minimal monitoring, evaluation or treatment. He and other detainees remain at significant risk for COVID-19 infection due to inadequate access to hand hygiene facilities and lack of personal protective equipment use by staff. Finally, his psychological presentation is concerning for developmental regression and untreated PTSD which is continuously exacerbated by his ongoing detention.

34. Beyond a discussion of specific health problems experienced by this child, detention of children and families is fundamentally injurious to children's well-being and development, putting them at lifelong risk for physical and mental health consequences. This is the position taken by my

professional organization, the American Academy of Pediatrics, and there is ample evidence in

medical research to demonstrate the harm of even short periods of detention.[4]

35.  In my professional opinion, this child is at risk for greater harm if he continues to be held in

detention. Additionally, I do not believe this harm would be alleviated by the release of the child

without one or both of his parents, as family unity is a core aspect of children's health and

development. Separation from a parent can cause significant psychological trauma in a child.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true
and correct.

Executed on this, the 25th day of May, in Winchester, MA.

Fiona Danaher, MD, MPH

---

[4] Linton JM, Griffin M, Shapiro AJ; Council on Community Pediatrics. Detention of immigrant children. Pediatrics.
2017;139(5):e20170483pmid:28289140