# ATTACHMENT B



# U.S. Customs and Border Protection Juvenile Coordinator Report

*Flores v. Barr*, Case No. CV 85-4544 (C.D. Cal.)
*July 1, 2020*





U.S. Department of Homeland Security
Washington, DC 20229

Honorable Dolly M. Gee
U.S. District Court for the Central District of California
350 West 1st St.
Los Angeles, CA 90012
Courtroom 8C, 8th Floor


Dear Judge Gee:

I respectfully submit my annual U.S. Customs and Border Protection (CBP) Juvenile Coordinator report in accordance with Paragraph 28A of the *Flores* Settlement Agreement (FSA) and this Court's Orders dated June 27, 2017 and July 27, 2018.

Early during this reporting period, I determined that my office would expand our monitoring capabilities to ensure robust oversight of CBP's compliance with the FSA.  In my dual role as the CBP Chief Accountability Officer and CBP Juvenile Coordinator, I formally established the Juvenile Coordinator's Office (JCO) within the CBP Office of Accountability.  JCO reports directly to me, and their primary responsibility is to monitor the Agency's compliance with the FSA.  JCO is comprised of experienced individuals with diverse educational and professional backgrounds, who have been integral in developing and expanding the monitoring program since my appointment in 2017.  Collectively, the team has conducted 140 Flores inspections, interviewed 119 children (or parents on their child's behalf), and reviewed 279 declarations filed by Plaintiffs in this litigation in order to proactively identify and mitigate areas of concern.  Given JCO's expertise, I rely on their observations and insight into CBP policies and procedures related to children in custody.  Through JCO, I have enhanced oversight of CBP facilities holding children, which ultimately ensures CBP remains in compliance with the FSA.

Between July 3, 2019 and June 5, 2020, JCO and I conducted 12 inspections of CBP facilities through various methods.  The present travel restrictions associated with the COVID-19 pandemic required my monitoring to transition to virtual inspections, which began in April 2020.  By leveraging technology, we conducted remote inspections that allowed us to determine the conditions on the ground.  In total, JCO and I conducted eight in-person inspections, four virtual inspections, and interviewed 19 children or parents on their child's behalf.  Based on my findings, through observations, interviews, and ongoing engagement with agents and officers in the field, I find that CBP is substantially compliant with the FSA.

I also continued to support the Special Master/Independent Monitor by facilitating various requests for data and information and by engaging with her directly to explain how CBP maintained compliance throughout the year.  I welcome her expertise and feedback on monitoring compliance with the FSA.

Although the COVID-19 outbreak has temporarily halted on-the-ground inspections and vastly reduced the number of children in custody, I remain committed to ensuring that all children in CBP custody are held in appropriate conditions consistent with the FSA.  To that end, I will continue to conduct remote inspections until official travel resumes.

In 2019, conditions on the ground changed rapidly.  Moving forward, CBP must be prepared to accommodate increasing numbers of children and families in custody regardless of the present conditions.  I have observed CBP take action to address critical and immediate needs, as well as prepare for future surges across the Southwest Border.  I will continue to support Agency planning efforts to ensure ongoing compliance with the FSA.  I submit this report in good faith as an honest and true recording of actions taken during this reporting period.

Respectfully,

Henry A. Moak, Jr.
Chief Accountability Officer,
U.S. Customs and Border Protection



# CBP Juvenile Coordinator Report

## Table of Contents

I.   Introduction ........................................................................................................... 1

II.  Significant Events ................................................................................................. 2

III. Monitoring Activities ........................................................................................... 4

   A.  Site Visits ......................................................................................................... 4

   B.  Spot Checks ................................................................................................... 37

   C.  Flores Virtual Inspections (FVIs) ................................................................. 51

   D.  Key Insights and Takeaways ........................................................................ 57

IV.  Conclusion .......................................................................................................... 61

Appendix: List of Acronyms ..................................................................................... 63

# I.  Introduction

This is the second annual United States (U.S.) Customs and Border Protection (CBP) Juvenile Coordinator Report submitted in accordance with Paragraph 28A of the *Flores* Settlement Agreement (FSA) and this Court's June 27, 2017 and July 27, 2018 Orders.

This report documents my activities between July 3, 2019 through June 5, 2020 to monitor and report on CBP's compliance with the FSA.  While this Court's June 27, 2017 Order applies only to the U.S. Border Patrol (USBP) Rio Grande Valley (RGV) Sector, my responsibility as the CBP Juvenile Coordinator requires me to monitor compliance with the FSA nationwide.  As such, this report documents my observations across the Southwest Border, at CBP facilities both in and outside RGV Sector.  My focus continues to be on the Southwest Border because that is where the overwhelming majority of children are held in CBP custody.[1]  Therefore, I did not conduct any site visits to facilities along the northern border.

The first section pertains to significant developments that occurred during this reporting period that shaped my monitoring activities and demonstrated CBP's continued commitment to enhanced medical support across the Southwest Border.  These actions included the creation of a new division, the Juvenile Coordinator's Office (JCO) to assist me in monitoring compliance with FSA; the development of a new inspection protocol, which allows for virtual inspections of CBP facilities during the current COVID-19 pandemic; and the enhancement of medical capabilities across the Southwest Border.

The second section outlines JCO's and my observations from five site visits, three spot checks, and four virtual inspections.  During these inspections, I conducted ten interviews with children and/or parents, and JCO conducted an additional six interviews.  In total, JCO and I interviewed 19 children and/or their parents.  The site visit inspection protocol focuses on five core areas:  physical inspection, review of medical capabilities, data review, contract services, and interviews with children and/or parents; the inspection protocol applies to both USBP and the Office of Field Operations (OFO).  My team and I conducted five site visits in the RGV and El Paso (EPT) Sectors, in November 2019 and January 2020, respectively.  Additionally, my team conducted spot checks in RGV Sector in March 2020, which were shortened versions of the site visit protocol and allowed smaller teams to conduct inspections.  The spot checks conducted in March were follow-up reviews to our previous site visits in November.  Finally, in light of the current COVID-19 pandemic and related travel restrictions, JCO developed the Flores Virtual Inspection (FVI) protocol.  The FVI allowed JCO to continue monitoring FSA

---

[1] For the purposes of this report, "children" refers to both unaccompanied alien children (UAC), as well as alien children (those under the age of 18) who are part of a family unit (i.e. accompanied by a parent).

1

compliance via remote inspections of facilities holding children.  JCO conducted FVIs from April through June 2020 at three USBP facilities and one OFO port of entry (POE).

The last section reflects on the observations and results from all monitoring activities conducted by JCO and me.  These activities included inspections of CBP facilities, discussions with onsite CBP personnel and contractors, interviews with children and/or parents, and reviews of children's custodial records and completed A-Files.  Taken together, I believe this provides sufficient basis for me to conclude that CBP continues to substantially comply with the FSA.

# II.   Significant Events

During this reporting period, there were several developments related to care and custody of children.  First, I established JCO in order to enhance oversight of Agency compliance with the FSA.  CBP also continued to enhance its medical capabilities across the Southwest Border.  Finally, the COVID-19 pandemic not only reduced the number of children in custody, but also changed how I monitored compliance with the FSA.  This section highlights these developments.

Creation of JCO

I established JCO on October 1, 2019.  This division builds on my significant monitoring efforts in previous years.  The JCO team is comprised of experienced individuals with diverse educational and professional backgrounds in law, elementary education, auditing, mission support, and law enforcement.  JCO developed and implemented expanded monitoring protocols, in consultation with USBP, OFO, and the CBP Senior Medical Advisor (SMA), which incorporated the FSA and relevant CBP policies and procedures. JCO regularly engages agency stakeholders from USBP, OFO, Office of Acquisitions, and the SMA's office to communicate findings, share best practices, and stay informed of critical developments in the field.  Through oversight and coordination across multiple components, JCO provides actionable and operationally-informed recommendations to enhance CBP policies and procedures, and proactively identifies and mitigates areas of concern.

Medical Care

Throughout this reporting period, CBP continued to enhance its medical capabilities and provide medical care beyond the terms of the FSA.  At the close of this reporting period, contract medical personnel were onsite at 50 USBP and 13 OFO facilities across the Southwest Border.  By comparison, in December 2018, contract medical personnel were onsite at four USBP facilities; and in July 2019, contract medical were onsite at five OFO facilities.  In order to respond to the unprecedented surge of children and families

encountered last year, U.S. Public Health, U.S. Coast Guard, and Department of Defense medical teams augmented CBP medical care through September 2019.  I observed these teams in place when I was onsite during the last reporting period.  In addition, during this reporting period, CBP worked with the American Academy of Pediatrics to produce a video for CBP Emergency Medical Technicians to supplement training on recognizing the signs of a child in medical crisis.  The video was delivered to CBP in September 2019 and integrated into training soon after.

Finally, in December 2019, CBP published the CBP Directive 2210-004 - *Enhanced Medical Support Efforts,* which directed agency efforts for medical support to mitigate risks involving individuals in custody along the Southwest Border.  This directive standardized medical care across the Southwest Border.  Subsequently, CBP published both a USBP and OFO *Implementation Plan for the Medical Directive* that further standardized medical interactions, recordation, and monitoring.  In addition to its primary responsibility to monitor compliance with the FSA, JCO also supports the Agency's multi-layered approach to medical oversight through inspections and compliance monitoring in accordance with its responsibilities outlined in the Directive and implementation plans.  Throughout this reporting period, JCO and I observed an increased presence of contract medical personnel onsite, and increasingly more standardized medical processes across sectors and facilities.  Both the Directive and implementation plans exceed the terms of the FSA.

COVID-19 Pandemic

This reporting period was unique because of the COVID-19 pandemic, which required a new approach to monitoring conditions of custody.  On March 13, 2020, President Trump declared that the COVID-19 pandemic in the U.S. constituted a national emergency.[2]  At this time, I made the decision to pause all official travel related to monitoring CBP facilities and directed JCO to develop alternative methods of monitoring.  Subsequently, on March 20, 2020, the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention issued an Order suspending introduction of persons traveling from Canada or Mexico into the U.S.[3]  This Order remains in effect at the time of writing this report.  While this Order significantly reduced the number of persons in CBP custody, my priority continues to be ensuring FSA requirements are met for any and all children in CBP custody.  JCO developed and implemented an FVI protocol to continue inspecting CBP facilities until in-person inspections resumed.

---

[2] *See*, Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 18, 2020).
[3] *See*, 85 Fed. Reg. 16559 (Mar. 20, 2020).

# III.   Monitoring Activities

During this reporting period, my team and I conducted five site visits, and I instructed my team to conduct three spot checks and four FVIs.  The following section describes each of the facilities inspected as well as JCO's and my observations and results.  It is important to note that the description of CBP facilities and operations in this section only incorporate what we observed at that particular time.

## A. Site Visits

From July 3, 2019 through January 30, 2020, JCO and I conducted five site visits to CBP facilities in RGV and EPT Sectors utilizing enhanced monitoring protocols.

### i.   *Methodology*

This was the first reporting period during which JCO was officially established and dedicated to monitoring compliance with the FSA.  From July 3 through October 1, 2019, the team focused on preparing for fiscal year 2020 inspections and monitoring activities by formally delineating team responsibilities, finalizing an inspection schedule covering the Southwest Border to include announced and unannounced site visits, and enhancing the previous years' inspection protocol.

JCO reviewed historical CBP data related to UACs and families in order to select locations where children and families were typically held in CBP custody.  Based on the data, our CBP institutional knowledge and experience, and FSA Court Orders, JCO developed a fiscal year 2020 travel schedule that included USBP and OFO locations across the Southwest Border.  The first half of the year focused on announced site visits to RGV and EPT Sectors, for two reasons.  First, these sectors were the epicenter of last year's surge.  Secondly, these sectors were the focus of this Court's In Chambers - Order re Plaintiffs' Ex Parte Application for a Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction and Contempt Order Should Not Issue.  I made the decision to conduct announced site visits during the first half of the fiscal year to ensure maximum participation and communication between Headquarters and the field.  It was important to me that I met with RGV and EPT Sector leadership at the beginning of these site visits to clearly articulate the purpose of my site visits, the areas of review, and to open lines of communication between my newly established team and the field.  To further demonstrate the importance of these site visits, facilitate greater visibility of FSA inspections at the Headquarters-level, and provide subject matter expertise on the various areas reviewed, I invited the CBP SMA and the USBP Acting Associate Chief of Specialty Programs and Planning to accompany JCO and me on our site visits.  CBP's SMA provided guidance and real time feedback on interpreting the answers we received during interviews pertaining to the medical care children received.

Traveling with the USBP Acting Associate Chief of Specialty Programs and Planning allowed us to highlight the importance of the FSA inspections and streamlined communication between Headquarters, field, and my team.

From October 1, 2019 through January 31, 2020, my team and I conducted five site visits to the following locations in RGV and EPT Sectors in Texas: Central Processing Center-Ursula (CPC-Ursula), the soft-sided facility in Donna (Donna), Weslaco Station, the Temporary Holding Facility (THF) in El Paso, and Clint Station.

Since being appointed the CBP Juvenile Coordinator in 2017, I have conducted both announced and unannounced site visits across the Southwest Border to both USBP and OFO locations.  The site visits planned for the second half of the fiscal year included unannounced site visits to USBP facilities as well as visits to OFO POEs.  The second half of our inspection schedule was not completed due to the COVID-19 pandemic. While I understand unannounced site visits are a way to confirm that agents and officers comply with the FSA while executing their day-to-day responsibilities, in my experience, agents and officers conduct themselves professionally and in accordance with the FSA regardless of advanced notice of my arrival.  When official travel resumes, I will continue to utilize unannounced site visits as one tool for monitoring and ensuring compliance; however, it is not the only tool.  As such, I believe my announced site visits, combined with other activities described in this report, provided the accurate and complete representation of the operating environment I needed to assess compliance with the FSA.

During this reporting period, I continued the general site visit process described in my June 1, 2018 and July 1, 2019 reports, which included inspecting the facilities, speaking with agents and contractors, and conducting interviews with children and/or parents who volunteered to speak with my team or me.  Based on lessons learned from previous inspections, JCO developed expanded inspection protocols that formalized the inspection process and incorporated the FSA and relevant CBP policy, including CBP National Standards on Transport, Escort, Detention, and Search (TEDS) and the CBP Directive 2210-004 - *Enhanced Medical Support Effort.*[4]  The inspection protocol focuses on five core areas: physical inspection, review of medical capabilities, data review, review of contract services, and interviews with children and/or parents.  The inspection protocol developed during this reporting period applied to both USBP and OFO; however, because of the COVID-19 pandemic and pausing JCO's travel schedule, all five site visits were conducted in the USBP RGV and EPT Sectors.  For each site visit, JCO followed the general process described below.

---

[4] CBP Directive 2210-004 – *Enhanced Medical Support Effort* was effective December 30, 2019

Physical Inspection

JCO conducted a review of the holding area and observed whether toilets, sinks, and ventilation were operational, whether the temperature was within the required range, and whether the area was safe and sanitary.  To make this determination, JCO entered each hold room where children were present and flushed the toilets, tested the sink and water fountain, and measured the temperature of the hold room with JCO's temperature gauge to determine whether the temperature was within CBP's acceptable range of 66 °F to 80 °F.  JCO noted the type of drinking water that was available and the varieties of snacks and meals available.  Furthermore, JCO noted the availability of various care items, such as: cots/mats, blankets, hygiene products (soap, toothbrushes and toothpaste, and feminine hygiene products), baby formula, bottles, clean clothing, and showers for children.  JCO completed a random check of the available food items to confirm whether the items were within the expiration dates.

Data Review

JCO identified a sample of at least five children onsite at the time of inspection and requested their corresponding USBP e3 Detention Module (e3DM) custodial records for review.  For this report, "custodial record" denotes the data collected in e3DM.  Custodial actions, like meals provided, or confirmation that hold rooms are within the acceptable temperature range, are typically recorded in e3DM.  JCO determined whether custodial actions, including the following, were recorded in the system:  acceptance/refusal of meals; snacks provided; water available; welfare checks; showers provided; medical services provided; and hold room temperature.  Additionally, while onsite, JCO reviewed the A-Files of the sampled children to determine whether they received the Notice of Rights of Judicial Review (I-770) and list of free legal services providers.

Medical Capabilities

CBP has taken significant steps to expand its medical capabilities across the Southwest Border beyond the terms of the FSA.  By design, the monitoring protocol for this core area was not limited to the FSA requirement to provide emergency medical care as appropriate, but instead, captured the breadth of medical capabilities at each location visited.

JCO interviewed the medical personnel onsite and, at three locations, JCO also interviewed a supervisory agent familiar with the medical processes onsite to understand the medical support and capabilities available for children.  We also observed the entire medical process, focusing on what care children received and when.  JCO reviewed CBP procedures for documenting medical services, for the provision of prescription and over-the-counter medications, for making referrals to local medical personnel or transferring

children to hospitals, and for providing continuous medical supervision.  JCO reviewed all medical forms utilized by the facility to document medical care provided to children.

At each location, JCO selected a sample of at least five children onsite at the time of the review who were receiving medical care and requested the corresponding USBP e3DM custodial records to review whether applicable medical custodial actions were recorded. This sample was different from the sample pulled for the  data review because it included only children under medical supervision.  This review of their records focused exclusively on medical documentation, such as medical checks, hospital transfers, and medication provided.

<u>Contract Services</u>

During this reporting period, the focus was on key service areas repeatedly mentioned in Plaintiff declarations.  These key areas included food services, caregivers, security, and janitorial services.  While onsite, JCO observed the contract services performed and interviewed contractors to understand the extent of the services performed, whether there were any challenges with the existing services, and if additional requirements could be fulfilled through new contracts or the modification of current contracts.  During this reporting period, the primary intent was to gather information related to the key contract service areas.

<u>Interviews with Children and/or Parents</u>

During this reporting period, I continued to interview children and/or parents who volunteered to speak to me or members of my team.  My primary goal for conducting interviews was to understand the experiences of children in CBP custody.  It was important that children and/or parents felt comfortable sharing their experiences, including any issues they may have experienced while in custody.  For that reason, all interviews were conducted in open and accessible locations.  During the previous reporting period, I utilized plain-clothes agents and officers, to the largest extent possible, to serve as translators during interviews.  During this reporting period, two plain-clothes, non-law enforcement members of my team, including a native speaker of Spanish, exclusively conducted all interviews to remove any potential uneasiness that children and/or parents might have felt about discussing personnel onsite or issues that occurred while in custody.  Together, the JCO interviewers possessed the policy expertise and interviewing skills necessary to build rapport with the children and/or parents interviewed, and cover a broad range of topics related to the FSA.  The interviewers covered the widest range of topics possible while maintaining a conversational tone and posing open ended questions to the maximum extent possible.  As such, specific details related to all requirements of the FSA were not always covered in each interview.  The interviews conducted during my site visits were led by my team members, but I participated in them and guided the development of the questions.  I directed the two

members of my team to continue conducting interviews even when I was not onsite so that we could collect the most comprehensive information about conditions of custody.

For each location where interviews were conducted, JCO requested a roll call to identify all hold rooms where children and families were present. The interviewer then went to the specific hold rooms to speak to the children and/or parents. In each hold room, the interviewer explained in Spanish that we were requesting volunteers to share their experience about being in CBP custody. The interviewer made clear that these interviews were voluntary, could be stopped at any time, and that their participation or the content of their interview would not affect any immigration processing or disposition. Interviews with UACs were limited to those who were 14-years-old and older because that is typically the age at which CBP has determined children are able to comprehend and sign the immigration forms in their A-Files. If children held in a different hold room from their parent volunteered for an interview, the interviewer also spoke to the parent and requested his or her participation during the interview. After the interview, JCO pulled the A-Files of all children interviewed whose processing was complete to confirm whether the A-File contained the I-770 and list of free legal services providers. This was in addition to the sample of children pulled for the data and medical reviews. JCO did not review the A-Files of children who were still being processed because the A-File had not been completed. The completed A-Files were the only records associated with the children interviewed that JCO reviewed onsite. JCO reviewed the complete custodial records of the interviewed children after they had left CBP custody. Additionally, if the child or parent interviewed provided information that required additional clarification or was inconsistent with our understanding of the facility's processes or CBP's standards of professionalism, JCO immediately discussed it with management and/or the appropriate staff, for clarification or resolution. For example, if a mother indicated that her child had been prescribed medication but that it had not been administered, JCO followed up with the medical personnel to determine the status of the child, actions that had been taken, and whether additional action needed to be taken.

As explained in my 2019 report, reviewing the custodial records of the children interviewed provided me with a more complete picture of the child's time in custody, from start-date to end-date (often referred to as book-in and book-out). JCO compared the data recorded with our observations, and information provided during interviews. Taken together, this allowed for a more comprehensive evaluation of whether the facility complied with FSA requirements and whether these activities were recorded.

My monitoring protocols and oversight strategy continues to evolve based on lessons learned. Formalizing the inspection protocol with these five core areas of review provided me with enhanced situational awareness and more robustly captured CBP's multi-faceted approach to FSA compliance. In addition, I listened to guidance from USBP, OFO, and CBP's SMA to enhance the inspection protocol to address potential concerns more fully and make sure I covered all aspects of a child's time in CBP custody.

I believe this site visit methodology provided me with sufficient information to assess Agency compliance.

      ii.   *Observations and Results*

This section outlines my observations and results, and where applicable, includes details of my interviews with children and/or their parents.  For each interview, I incorporated data from the child's custodial records that I reviewed after my visit, and, if available at the time of my visit, the child's A-File.

Centralized Processing Center- Ursula (CPC-Ursula)

On November 18, 2019 at 9:00 AM, my team and I arrived at CPC-Ursula.  The SMA and USBP Assistant Chief accompanied us on this site visit to observe the expanded protocol and provide operational expertise to inform our inspection process.  This was the first time we utilized the expanded protocol described above.

At CPC-Ursula, we inspected the facility, spoke with agents and contractors onsite, including medical personnel and guards, interviewed children and/or parents, and reviewed e3DM custodial records and completed A-Files.  At the time of our visit, there were 107 children onsite: 15 were UACs and 92 were Accompanied Alien Children (AACs).

CPC-Ursula was divided into two sections.  The first section was dedicated to intake and processing.  Here, hold rooms were located on either side of the processing area and computer stations were grouped in the center to facilitate both in-person and virtual processing.  The supervisory agent explained that children typically entered the facility through the sally port where they received an initial medical check.  Medical personnel onsite explained the initial medical intake process included checking for scabies, lice, or other ailments.  During this medical check, medical personnel explained that all children's temperatures were taken.  If a medical issue was observed during that time or the child had a fever, medical personnel explained that the child would be brought to the medical treatment room.  If no medical issues were observed at that time, the supervisor explained that children were then brought to the processing side to begin processing and were given a snack.  I understand that medical checks were conducted for all children onsite, but those with observed medical issues in the sally port were seen first.

My team and I observed children in four hold rooms in the processing area, grouped together by various factors, including age, sex, and status as accompanied or unaccompanied.  All four hold rooms provided access to functioning toilets, functioning sinks, and drinking water.  Soap was not available in the hold rooms; however, hand sanitizer was available upon request.  I observed that children in one hold room had just

9

received snacks and were using Mylar blankets.  The temperature of the hold rooms ranged from 73 °F to 75 °F.

The non-processing side of the facility was grouped into four color-coded pods, where children were assigned based on various factors, including age, sex, and status as accompanied or unaccompanied.  Children were in all four pods.

Each pod contained multiple rooms, which opened to a large common area and restrooms.  The rooms were open to allow continuous access to the common area and restrooms.  Each common area had a television for entertainment and viewing the UAC video.[5]  During the inspection, children's movies were playing on the televisions. Crackers, apples, juice, diapers, baby wipes, baby formula, baby food, single use bottles, feminine hygiene products, dental hygiene products, deodorant, hand sanitizer, hand wipes, and paper towels were also accessible in the common areas of the pods.  Cups and five-gallon jugs of drinking water were located in each pod and available for drinking. An agent explained that the water jugs were cleaned daily.  I observed children using mats and Mylar blankets in the pods, and an agent explained that the mats were replaced daily in order to be sanitized.  Signs with pictures were displayed in the holding area to inform individuals they could ask for medical assistance and items they may need like food, water, and blankets.  Since my last visit to CPC-Ursula on July 1, 2019, permanent toilets and sinks were installed and operational.  All toilets and sinks were functional, and soap was available for hand washing in each pod.  The temperatures in each pod ranged from 74 °F to 77 °F.

I observed the facility's food and supplies available for agents to provide to children. The supervisor informed us that a food service contractor delivered and distributed meals three times a day.  Meals included burritos or sandwiches and bottled water.   I also observed various snacks and food items in storage, including crackers, apples, baby food, baby formula, milk, juice, and Pedialyte.  All were within their expiration dates.

Shower and laundry facilities were available onsite.  The supervisor informed us that children could typically shower upon arrival and receive clean clothing while their clothes were laundered.  Showers were provided in regular intervals thereafter.  I observed contractors onsite to supervise and assist as appropriate with showers, and to launder clothing.  Toiletries, including toothbrushes and toothpaste, deodorant, body wipes, shampoo, body soap, and feminine hygiene products were available for use. Infant and toddler items were also available for use, including single use bottles, diapers in various sizes, diaper cream, baby wipes, and car seats.  Shoes and clothing items, such

---

[5] The Know What to Expect videos, are two videos that explain what to expect in custody in easy to understand language appropriate for UACs, as well as accompanied children.  While these videos were made specifically for UACs, I understand accompanied children are often shown these videos as well.  When minors view these two videos, USBP records it as "UAC video" shown in its system of record.  For this report, I follow USBP's nomenclature to reflect what I saw in each child's custodial records.

as T-shirts, sweatshirts, sweatpants, underwear, socks, and beanies were available in a variety of sizes.

Contract medical personnel were onsite at all times, and pediatric advisors were on-call for medical personnel to consult.  Medical personnel onsite explained that all children received a medical check conducted in the sally port to reduce the likelihood of spreading contagious conditions.  Once medical personnel completed this sally port interaction, they put a wristband on the child's wrist to signify that the medical check was conducted. I observed children wearing the wristbands in the facility.  Once inside the building, medical personnel explained that all children also received an enhanced medical check that included recording the child's vital signs and medical history, including any current medications and allergies, and identifying any physical or mental health concerns. Medical personnel explained that all children were medically cleared prior to being transferred from CBP custody, which was conducted in the same manner as when children first arrived, including a temperature and symptom check and verification of if they are on medication.

Medical personnel also explained that they maintained a whiteboard with pertinent patient information in the medical treatment room to ensure medications were administered properly and any recurring follow-up was completed.  Medical personnel added that when children returned from the hospital or other offsite medical providers, the standard process was for agents to bring the child to the medical treatment room upon their return.  Medical personnel would review any medical documentation brought back with the child to determine the appropriate next steps.  Any ongoing monitoring or medication to be administered was tracked on the whiteboard.  Medical personnel explained they consulted their whiteboard to determine who needed to be seen, and would request an agent bring that child to the medical treatment area.  In addition, for prescribed medications, medical personnel also completed a medication dosage and frequency form for agents to input into e3DM.  E3DM included a medication alert to signal USBP agents when to take a child to the medical personnel for the next dose of medication.  Medical personnel explained that all medications were stored with the child's property unless they needed to be refrigerated.  Then, the medication was stored in the refrigerator in the medical treatment room.

JCO reviewed three children's e3DM custodial records for medical care documentation. Prescription information was recorded in e3DM for two of the three children who were receiving medication according to the medical whiteboard.  Per JCO's interview with medical personnel onsite, the medical personnel continuously reviewed and updated their own whiteboard and would request agents bring children to the medical treatment area for follow-up.  Therefore, despite it not being recorded in e3DM, I believe the process in place ensured the child received medication as needed.

JCO also reviewed a sample of five children's custodial records and A-Files. Completion of a medical check was noted in each of the logs. One of the five children was held over 48 hours, and the child's log recorded showers or bodily cleansing products provided. Two of the three UACs sampled had U.S. Health and Human Services, Office of Refugee Resettlement (ORR) placements and the third UAC was Voluntary Returned to Mexico. While not a FSA requirement, JCO identified one log that had gaps in the recordation of welfare checks and a missing recordation of one lunch. Based on conversations with agents and contractors, I believe that the child had lunch, but that it was not recorded. Agents told JCO that RGV Sector sent a daily report to the stations noting the custodial actions they failed to record. I believe recognizing these unreported custodial actions will ultimately enhance recordkeeping in the future.

JCO did not request amenity reports while onsite. However, the physical inspection did not identify any issues with the hold rooms or pods holding children on the day of the inspection.

The A-File of only one of the five children sampled was completed and available for review. The available A-File contained an I-770 and a list of free legal services providers.

While onsite, I interviewed four children and/or their parents with the JCO interviewers. My first interview was with M.T.S., a 17-year-old female from Honduras, and her mother. According to custodial records, M.T.S. and her mother were apprehended on November 15, 2019 at 10:30 PM. At the time of our interview, M.T.S. and her mother had been in custody approximately 66 hours.

M.T.S. estimated she was on the processing side of the facility for about 24 hours before she was transferred to the non-processing side. The custodial records confirmed M.T.S. spent the first night in the processing side of the facility before being moved to the non-processing side the following evening. M.T.S. informed me, and the custodial records showed, that she received a mat and Mylar blanket. M.T.S. said that she had been able to sleep, but was woken up around 5:00 AM because people were talking around her. M.T.S. explained she and her mother had been placed in separate pods on the non-processing side and that she had not talked to her mother since moving there. She explained she did not know she could ask to speak to her mother, so she did not ask. M.T.S. also described her interaction with medical personnel, informing me they asked whether she was ill or if she was taking prescriptions, and checked her head for lice. M.T.S. informed me that she had a "bone issue," which she did not report to the medical personnel because she was not hurting at that time. I informed her she could ask to see the medical personnel if she began experiencing any pain or any other health issues while in custody. Because she answered no to the medical questions, M.T.S. explained she had not had any further interaction or spoken one-on-one with the medical personnel. I observed she was wearing a wristband, which the medical personnel onsite explained was

provided to children after the initial medical interaction in the sally port. Custodial records indicated a medical check was performed shortly after she arrived. M.T.S. told me that she received three meals a day with snacks. She said she did not necessarily like the food, but she was eating it. M.T.S. confirmed she had access to drinking water, snacks, and milk at all times. She told me the water tasted different, like "chlorine." I explained to her that the water in the five-gallon jug was safe to drink and that water tasted different in Texas. M.T.S. confirmed she had access to functioning toilets and functioning sinks. She also stated that she showered on November 16, after arriving the previous night, and on the day of the interview, which was November 18, 2019. Custodial records documented shower provided on both dates. M.T.S. explained that her clothes were laundered each time she showered and that she brushed her teeth daily. Custodial records noted she received clean clothes one of the times she showered. Custodial records also noted dental hygiene products were provided, but did not show each day as M.T.S. described. I asked her about the temperature of the facility and she responded that it was "ok." M.T.S. informed me that the caregivers treated her with respect and she had not had any negative interactions with the guards in the pod. The next day when I was at Donna, I observed M.T.S. returning from the hospital. She told me she went to the hospital because of the bone issue she referenced during our interview. Custodial records also documented she was transferred to the hospital and returned to Donna that day. After the interview, JCO reviewed M.T.S.'s completed A-file, which included the I-770 and list of free legal services providers. According to her custodial records, M.T.S. was transferred from CBP custody on November 20, 2019. She was in CBP custody approximately 104 hours total.

Next, I interviewed K.M.R. and her father. K.M.R. was a 14-year-old female from El Salvador. K.M.R. was apprehended on November 17, 2019 at 1:30 PM. At the time of our interview, K.M.R. had been in CBP custody for approximately 27 hours.

K.M.R. told me that the apprehending agent was respectful, and that she and her father were transferred directly to CPC-Ursula. K.M.R. described her interactions with the medical personnel, including that the medical personnel asked her questions about her health and if she was taking any medications. She also noted that the medical personnel checked her skin and hair. The medical check was recorded in K.M.R.'s custodial records. I observed K.M.R. wearing a wristband, which the medical personnel onsite explained was provided to children after the initial medical interaction in the sally port. Next, K.M.R. explained she and her father continued with the processing. During this time, she informed me they received a sandwich, crackers, juice, and water. Custodial records indicated she received a meal and snack. She also stated she received a blanket. After the initial processing was complete, K.M.R. explained she moved to the non-processing side of the facility where she and her father were in separate pods. I understand K.M.R. was in a different pod than her father to ensure she was not in the same pod as unrelated adult males. She told me that she asked a guard if she could speak to her father, but he told her not unless it was an emergency. K.M.R. confirmed she also

received a mat when she moved to the non-processing side.  The custodial records indicated she received a mat and Mylar blanket when she moved to the processing side of the facility the same evening as she arrived.  K.M.R. informed me she showered on the day she arrived and that she received clean clothes to wear while hers were laundered; however, shower and clean clothes provided were not recorded.  She told me she was able to sleep over night, but that it was a little cold.  She mentioned that she did not have her sweater the previous night because it was being washed with the rest of her clothes and had not been returned. I observed she was wearing the clothes provided at the facility.  On the day of the interview, and her second day at the facility, K.M.R. explained she was woken up by another girl in her pod telling her it was time to eat breakfast. K.M.R. stated she received a burrito and bottled water; custodial records documented the meal provided.  She also explained that bottled water was given each time food was provided, and that crackers and juice were available for her to take whenever she wanted. K.M.R. told me she had brushed her teeth the morning of the interview, and custodial records showed she received a dental hygiene product.  K.M.R. also confirmed that she had access to functioning toilets and functioning sinks throughout her time in custody. She told me there was soap to wash her hands.  At the time of the interview, K.M.R. had not completed processing.  As such, I did not review her A-File.  K.M.R. was in CBP custody approximately 65 hours total.

I also interviewed J.S.B. and his mother.  J.S.B. was a 14-year-old male from Honduras who was apprehended with his mother.  According to custodial records, J.S.B. was apprehended on November 16, 2019 at 11:00 PM.  At the time of our interview, J.S.B. had been in CBP custody for approximately 41 hours.

J.S.B. described the apprehending agent as respectful, nice, and even funny.  He explained that he and his mother were transported directly to CPC-Ursula.  When he arrived at the facility, J.S.B. explained that a medical personnel asked him questions about his health, including whether he was currently ill or taking any medications.  J.S.B. informed me that the medical personnel gave him the wristband during this interaction. A medical check is documented in his custodial records.  Next, J.S.B. informed me he received a burrito and milk, and was moved to the processing side of the facility at which time he was placed in a different hold room from his mother.  I understand J.S.B. was assigned to a different hold room than his mother so that he would not be held with unrelated adult women.  J.S.B.'s custodial records did not document the meal he received after medical, but it showed he received a hot meal for breakfast the following morning. J.S.B. informed me that he slept on the processing side of the facility the first night, and then was moved to the non-processing side later.  The custodial records indicated J.S.B. was moved to the non-processing side of the facility the following morning.  The custodial records also showed that J.S.B. received a Mylar blanket on the processing side, and a mat and Mylar blanket on the non-processing side.  J.S.B. informed me he had both a mat and blanket, but it is not clear whether he had both a mat and blanket during the first night or after he moved to the non-processing side of the facility.  He informed me

14

that he was able to sleep overnight, but the lights bothered him.  J.S.B. told me has received three meals each day and that drinking water and snacks were always available. He also explained that he had brushed his teeth each morning and showered each day. J.S.B. confirmed that his clothes were also washed.  Custodial records indicated he took a shower and received a dental hygiene product and clean clothes the first day he arrived. The custodial records only indicated a dental hygiene product was provided on the day of the interview.  J.S.B. told me that he did not have an issue with the temperature of the facility.  During the interview, J.S.B. described several different incidents with the guards supervising him.  J.S.B. stated that in the processing area, he tried to communicate across the pod with his mother, but he was not allowed to do this.  There was another instance where a guard said he was stubborn because J.S.B. approached the pod where his mother was and tried to communicate with her while he was being transferred outside of his pod. My understanding is that these incidents occurred when guards were escorting children to a different area and were unable to facilitate contact at that moment.  However, J.S.B. and his mother were together for the interview and I assured them that J.S.B. could ask to speak to his mother when he wanted to.  On another occasion, a guard started calling juveniles in his pod either for roll call or to escort children to another area of the facility, and because J.S.B. did not move, J.S.B. informed me it looked as if the guard was going to tap him with his boot.  J.S.B. described that the same thing had also happened previously when a guard tapped him with his boot to wake him up; the mother explained to me that J.S.B. was a sound sleeper.  Still, J.S.B. expressed he felt safe at the facility.  I discussed these interactions with the facility leadership and informed our point of contact at USBP Headquarters, who concurred that all guards supervising children in custody should treat children respectfully and should not use their boot to wake sleeping children. J.S.B. had not completed processing at the time of our interview, thus I did not review his A-File.  According to the custodial records, J.S.B. was moved to Donna the next day and was transferred from CBP custody on November 21, 2019.  J.S.B. was in CBP custody approximately 103 hours total.

Finally, I interviewed a woman with a two-month-old child, S.C.C.  At the time of the interview, the woman presented as the child's mother.  After reviewing the child's custodial records after my site visit, I found that USBP determined the woman was not the mother of the child and notified U.S. Health and Human Services, Office of Refugee Resettlement (ORR).  The custodial records indicated the woman and child were apprehended on November 15, 2019 at 7:15 PM.  According to the child's custodial records, USBP determined the woman was not the child's mother on November 19, 2019 at 11:00 PM, and subsequently notified ORR.  The child received an ORR placement and was transferred from CBP custody within approximately 18 hours of when USBP discovered that the woman was not the child's mother.  The woman volunteered to be interviewed, and she continued to present herself as the child's mother throughout the process.

15

The woman described the apprehending agent as respectful and confirmed that she spoke to medical personnel after arriving at CPC-Ursula. The medical personnel told her to keep S.C.C. away from other children who were coughing since S.C.C. was not vaccinated. Custodial records indicated a medical check occurred the night she arrived at the facility. The woman also informed me that she asked for formula to feed S.C.C. and the agent provided it to her. I instructed the JCO interviewer to explain to the woman that all bottles were single use and that she should use a new bottle each time she fed S.C.C. The woman was not aware that the bottles were single use, and I asked her to tell the other mothers as well if she observed them re-using bottles. The woman explained that she and S.C.C. only received a Mylar blanket on the processing side, but mats were available on the non-processing side. Custodial records indicated a Mylar blanket was provided the first night, and a Mylar blanket and mat were provided in the morning. The woman explained that the child was sleeping, but would occasionally be woken up by other children or guards calling for individuals to be interviewed or moved from the pod. She indicated this occurred during the day and night. The woman confirmed that she had access to diapers and baby formula throughout their time in custody. She also informed me that S.C.C.'s clothes were washed, and S.C.C. was given clean clothes to wear until hers were returned. This was not included in the custodial records. I observed S.C.C. was wearing a beanie, which the woman informed me she had brought with her. S.C.C.'s A-File was not completed at the time of the interview, and as such, JCO did not review it. S.C.C. was in CBP custody for approximately 117 hours total. Once she was identified as a UAC, S.C.C. was in CBP custody approximately 18 hours before being transferred to her ORR placement on November 20, 2019.

Based on JCO's and my observations, interviews, and data review, I believe that CPC-Ursula was substantially compliant with the FSA. Overall, the physical inspection revealed access to functioning sinks, functioning toilets, and all hold rooms and pods were within the appropriate temperature range. Additionally, snacks, fruit, drinking water, and formula were available for children and their parents. While there were instances of inconsistent data entry, it appears that these actions occurred despite CBP not recording them. JCO observed agents and guards in the pods at all times; therefore, despite gaps in "welfare checks" being recorded, children were consistently supervised. Furthermore, I discussed the unprofessional guard interactions with facility leadership while onsite. The location acknowledged this behavior was inconsistent with our standards of professionalism and intended to use this information to take corrective actions. Due to these considerations and actions, I believe CPC-Ursula was substantially compliant with the FSA.

<u>Donna Soft-Sided Facility</u>

On November 19, 2019 at 9:00 AM, my team and I arrived at the Donna soft-sided facility (Donna). The SMA and USBP Assistant Chief accompanied us on this site visit.

At Donna, we inspected the facility, spoke with agents and contractors onsite, including medical personnel and guards, interviewed children and/or parents, and reviewed e3DM custodial records and completed A-Files.  At the time of our visit, there were 143 accompanied children onsite.

Donna was comprised of a series of pods, or rooms, for intake, processing, and holding families.  One pod was dedicated to intake processing and medical.  Children were assigned to various pods depending on age and their head of household.  My team and I observed children in five of the pods.  The pods were large open areas that allowed children to move freely.  Similar to CPC-Ursula, a guard tower was positioned in the center of the holding pods for constant supervision, with televisions mounted on the tower for entertainment.  Benches or risers were placed in front of the televisions to create a sitting area for children.  Bottled water was available for drinking in each pod.  Changing stations with diapers, baby wipes, diaper cream, formula, and purified water were available in the pods.  Some pods had single use bottles available at the changing stations, while other pods had bottles available upon request in the guard tower.  The supervisor explained that the bottles were moved to the guard tower to prevent children from playing with them and potentially being injured.  The supervisor stated parents could request a bottle at any time.  Feminine hygiene products were also available in the pods.  All pods, including the processing area, provided access to portable toilets and handwashing stations with soap.  The temperature of the pods ranged between 72 °F to 75 °F.  All areas appeared clean.  The supervisor explained that contractors professionally cleaned the pods once during each of the three shifts.  Mylar blankets and mats were available and being used by children in the pods.

My team and I observed the food and supplies available for children.  Per the supervisor, meals were prepared and distributed by a contractor three times a day.  Meals may include burritos or sandwiches and bottled water.  Snacks, including animal crackers, snack bars, peanut butter sandwich crackers, juice drinks and water, baby formula, and Pedialyte were available. The supervisor informed me snacks were provided at regularly scheduled times during the day.  All items were within the expiration date.

Moreover, shower and laundry facilities were available onsite.  Shoes and clean clothes for children, including T-shirts, sweatpants, sweatshirts, socks, and underwear were available in a variety of sizes.  Various hygiene products were also stocked and available, including toothbrushes and toothpaste, body soap, shampoo, body wipes, and feminine hygiene products.  Additional infant and toddler items were also stocked, including diapers, baby wipes, single use bottles, and car seats.

Contract medical personnel were available onsite at all times.  Medical personnel explained that there was typically either a physician assistant or nurse practitioner with support staff for each shift.  Medical personnel also explained that pediatric advisors were on-call for them to consult.  All children received a medical check in the sally port upon

arrival to check for lice, scabies, or other ailments.  Medical personnel explained that the medical staff asked a series of questions in the sally port that included whether children were experiencing any symptoms of illness or mental distress, whether they were currently taking medications, or had other conditions of which medical personnel should be aware.  If there was a positive response to any of those questions during intake, the medical personnel explained they would conduct an enhanced medical check, which consisted of a physical exam and taking vital signs.  Once the medical check was completed, the child received a wristband.  Medical personnel explained that all children also received a medical check prior to leaving the facility, which included a quick body scan and temperature check.  If the child was on medication, medical personnel filled out a travel clearance form noting the medication.

Like at CPC-Ursula, medical personnel maintained a whiteboard with pertinent patient information in the medical treatment area to ensure medications were administered properly.  Medical personnel explained they consulted their whiteboard to determine who needed to be seen, and would request an agent bring that child to the medical treatment area.  In addition, for prescribed medications, medical personnel also completed a medication dosage and frequency form for agents to input into e3DM.  E3DM included a medication alert to signal USBP agents when to take a child to the medical personnel for the next dose of medications.  Medical personnel explained that most medications were stored with the child's property unless it needed to be refrigerated.  Then, the medication was stored in the refrigerator in the medical treatment area.  JCO reviewed seven accompanied children's e3DM custody logs.  Prescription information was recorded in e3DM for six of the seven children sampled who were receiving medication per the medical whiteboard.  Two of the seven custody logs were missing recordation of doses of medication.  Based on conversations with the medical personnel, and their reliance on the medical whiteboard, I believe the children received the medication, but it was not recorded in e3DM.

In addition to the medical data review, JCO also reviewed a sample of five children's custodial records in e3DM to determine whether additional custodial actions were recorded.  JCO noted duplicate data entries for meals provided: four logs had two lunches recorded on November 19, 2019, and one log had two lunches recorded on November 18, 2019.  There were no comments indicating whether extra meals were provided, such that JCO could not determine whether the children received an extra meal or whether this was a data recordation error.  The sample of custodial records revealed Donna recorded welfare checks frequently, with most recorded every 15 minutes.

While onsite, I interviewed three children and/or their parents with the assistance of the JCO interviewers.   My first interview was with C.L.R. and her mother.  C.L.R. was a 15-year-old female from Guatemala.  According to C.L.R.'s custodial records, she was apprehended on November 7, 2019 at 1:36 AM.  At the time of the interview, C.L.R. had been in CBP custody for approximately 298 hours.  C.L.R. informed me she and her

mother were waiting for an available flight to Guatemala.  Custodial records indicated
C.L.R. transferred to Donna first, and then on November 12, 2019, she transferred to
CPC-Ursula.  Based on the custodial records, C.L.R. returned to Donna on November 14
where she remained until she was transferred from CBP custody.

C.L.R. described the initial medical check with medical personnel and added that the
medical personnel encouraged her and the other migrants she arrived with to drink plenty
of water.  This medical check did not appear in her custodial records until November 12,
which is when she was transferred to CPC-Ursula.  C.L.R. informed me that throughout
her time in custody she received three meals a day and that snacks and drinking water
were available.  She also confirmed that she had access to functioning toilets and
functioning sinks with soap throughout her time in custody, and that she received a mat
and Mylar blanket at both facilities.  Custodial records also showed she received a mat
and Mylar blanket at both facilities.  C.L.R. explained that she has brushed her teeth each
day and that she showered on her third day in custody and every two days after that.
Custodial records noted she received a dental hygiene product each day and shower
provided was recorded every other day beginning on November 8.  C.L.R. confirmed that
she received clean clothes while her clothes were washed, which was noted in the
custodial records.  C.L.R. explained that it was sometimes cold in the morning, or when
there were fewer people in the pod, but she added that the Mylar blanket provided
warmth.  C.L.R. compared both locations and stated that it was warmer at CPC-Ursula.
She also informed me there were more things to do at Donna because the children were
able to play with balls and walk around more, in addition to watching television.  C.L.R.
stated she was able to sleep at both places, and that she was woken up earlier at CPC-
Ursula.  She told me that both facilities kept the lights on overnight.  C.L.R. explained
that at CPC-Ursula she and her mother were placed in different pods, but that they could
still see one another.  C.L.R. and her mother were in different pods at the time of the
interview as well, which C.L.R. explained occurred when they returned to Donna.  I did
not review the A-File because it was not onsite.  C.L.R. was transferred from CBP
custody on November 21, 2019.  She was in CBP custody for approximately 335 hours
total.

Next, I interviewed the mother of two children, D.R.S., a seven-year-old female, and
D.R., a one-year-old male.  The family was from Guatemala.  According to the children's
custodial records, they were apprehended on November 15, 2019 at 9:25 PM.  At the time
of the interview, the family had been in custody for approximately 87 hours.

The mother informed me that the family was transferred to CPC-Ursula, where she
described the initial interaction with medical personnel, which was also recorded in the
children's custodial records.  She explained that medical personnel asked whether her
children were ill or taking any medications, and checked the children's skin and hair in
the sally port.  Next, the mother explained the family moved inside where they received a
sandwich and a juice.  The meal was not recorded, but snacks and juice provided was

19

included in the children's custodial records the evening they arrived at CPC-Ursula.  The mother explained the family was assigned to a hold room and given blankets, where they slept for approximately two hours before were called by an agent to continue processing.  The provision of Mylar blankets was recorded in the children's custodial records.  After the family completed initial processing, the mother explained the family moved to another hold room.  She also confirmed that the family received a mat in that hold room as well.  Custodial records noted the children received Mylar blankets and mats on November 16.  The mother informed me, and the custodial records confirmed, that both children showered on November 16 and received meals three times a day while at CPC-Ursula.  The custodial records documented meals were provided at regular intervals.  She also informed me that the family had showered while at Donna; however this was not recorded.  The children's custodial records showed clean clothes were provided, which I understand typically occurred at the same time individuals showered so that their clothes could be washed.  The day before the interview, while still at CPC-Ursula, the mother informed me that her son started feeling ill and she requested that he see the medical personnel.  She informed me the medical personnel started her son on a course of antibiotics in CPC-Ursula before the family transferred to Donna that night.  The mother told me that her son had not received the antibiotic at Donna; however, custodial records showed the son received the same antibiotic around 8:00 AM and 8:00 PM on November 19, the day of our interview.  After the mother informed me about her son, I directed JCO to follow up with the medical personnel onsite.  The personnel reviewed the medical documentation in the treatment area and confirmed the son received the antibiotic that morning.  She explained that the medical personnel who administered the antibiotic did not speak Spanish.  I requested that she follow up with the mother and son to clear up this miscommunication.  The medical personnel explained, in Spanish, the times that her son would receive future doses and answered any additional questions.  One of the JCO interviewers accompanied the medical personnel and confirmed to me the medical personnel explained the treatment plan to the mother. The custodial records also indicated the son was seen at 11:00 AM for a "checkup."

The mother also discussed with me that there were different kinds of formula available at CPC-Ursula and Donna, and that her son preferred the one at CPC-Ursula.  She said her son was drinking regular milk instead at Donna.  She also mentioned that while at CPC-Ursula, guards told her to use the five-gallon jug of drinking water for mixing the formula when she asked for bottled water because her son did not like the taste of the water from the jug.  Although the mother indicated the formula was different at the two locations, she confirmed that formula was available at both locations.  While discussing formula, I asked her whether she was using a new bottle each time.  The mother informed me she had taken a bottle from CPC-Ursula before they were transferred and was continuing to use that bottle because she had not seen any bottles available in her pod.  I explained that she should use a new bottle each time and informed her she should request it from an agent.  I directed JCO to follow up with the agents in the pod to determine why the bottles were not available for anyone to take as needed.  JCO learned that agents moved

the bottles to the guard tower and were handing out new bottles as requested to avoid the smaller children playing with the bottles, and possible injuries if the children stepped on or tripped over the bottles. There was a sign at the guard tower that informed individuals they could request items, including bottles. I requested that the agents inform individuals in the pod that new bottles were available upon request to clear up any confusion. JCO reviewed the children's completed A-Files. Both A-Files included the I-770 forms and list of free legal services providers. According to custodial records, D.R.S. and D.R. were transferred from CBP custody on November 20, 2019. The children were in CBP custody for 105 hours total.

Based on JCO's and my observations, data and medical reviews, and interviews with children and/or parents, I believe that Donna was substantially compliant with the FSA. The physical inspection revealed the pods were safe and sanitary, and all pods measured within the appropriate temperature range. Functioning toilets, functioning sinks with soap, drinking water, and snacks were available. Meals were provided three times each day. Additionally, JCO and I observed contract medical personnel onsite, and when we followed up on a specific child, the medical personnel were able to immediately pull medical documentation and confirm the child received his antibiotic. The medical personnel also explained to the mother the treatment plan and answered her questions. As such, Donna was substantially compliant with the FSA.

Weslaco Station

On November 20, 2019 at 9:00 AM, my team arrived at Weslaco Station. I was not onsite for this visit; however, JCO advised me of their observations and results upon their return. The SMA and USBP Assistant Chief accompanied my team on this site visit.

At Weslaco Station, JCO inspected the facility; spoke with agents and contractors onsite, including medical personnel; and reviewed e3DM custodial records and completed A-Files. At this time, Weslaco Station was used as a medical isolation facility for RGV Sector. There were four children onsite: one UAC and three AACs. The three AACs were either diagnosed with the flu or were exposed to it by their parent. The UAC was being treated for chicken pox, and his uncle was in the hold room with him. Because the uncle was not the child's legal guardian, the child was a UAC. JCO did not interview children during this site visit due to their illnesses.

The children onsite were in three different hold rooms. Because the children were isolated for medical reasons, JCO did not enter two of the hold rooms where children were located. As such, JCO could not confirm whether the toilets and sinks were functioning. An agent informed JCO that agents regularly checked the hold rooms to ensure the toilets and sinks were functioning properly. The agent also explained that the children would tell them if something was wrong in the hold room. The other room where children were held had just been professionally cleaned, and the children had not

returned to the hold room.  JCO confirmed that all toilets and sinks were functioning and
there was access to drinking water in that hold room.  JCO observed all three hold rooms
had a five-gallon water jug with cups, as well as a water fountain that was connected to
the sink.  An agent explained that agents cleaned the water jug each morning before
refilling it.  While soap was unavailable in the hold rooms, the agent explained that
individuals in custody were escorted to the sally port each morning to wash their hands
and brush their teeth.  JCO confirmed there was soap available in the sally port for
individuals to wash their hands.  JCO also observed hand sanitizer was available in the
processing area.  JCO was able to take the temperature of all three rooms and confirmed
they were within the appropriate range.  The rooms all measured between 69 °F and 73
°F.  JCO also confirmed that mats and Mylar blankets were available.

JCO observed the food and supplies available for agents to provide to children.  At the
time of the site visit, a food services contract was not in place at Weslaco Station.  The
supervisor explained that agents prepared meals for individuals in custody in the kitchen
area.  Food and snacks were purchased by the station.  The supervisor did not believe a
food services contract was required at that time due to the relatively low number of
individuals in custody.  Meals included microwavable burritos and hot pockets, bologna
sandwiches, or catered food.  While onsite, JCO observed a meal served to children
consisting of a burrito, applesauce, and juice.  JCO also observed the kitchen and food
storage area.  Food items available for infants and children included, baby cereal, baby
formula, baby food, juice, and Pedialyte.  An agent explained that staff checked the
expiration dates before serving food to children, and performed a daily inventory check
of the kitchen and storage area.  JCO confirmed the food items were within their
expiration dates.  JCO also observed various supplies available for infants and children,
including bottles, diapers, baby wipes, baby soap, body wipes, hand and body soap,
toothbrushes and toothpaste, feminine hygiene products, and car seats.  Shoes and
clothing were available in a variety of sizes and included sweatpants, socks, and
underwear.  JCO noted that a shower trailer was onsite and operational, but showers were
not being provided to individuals in custody.  An agent explained that the Weslaco
Station did not currently have a caregiver contract in place to facilitate showering
individuals.  At the time of the review, agents were providing bodily cleansing product in
lieu of showers.  As of December 14, 2019, a contracted caregiver was in place at
Weslaco Station to monitor showers and assist as appropriate.  Showers were operational
and being used when JCO returned on March 5, 2020.

Contract medical personnel were onsite at all times.  JCO interviewed the nurse
practitioner who was on duty at the time of the site visit.  She described the station's
medical capabilities and processes.  The nurse practitioner explained that a typical shift
included a physician assistant or a nurse practitioner, and a medical support staff
member.  The nurse practitioner explained that they talked to all incoming children and
asked questions related to physical and mental health, and discussed the treatment plan
with the child or parent.  The nurse practitioner explained that flu testing was conducted

onsite and pregnancy tests were conducted prior to prescribing a medication that was contraindicated for pregnancy. Medical personnel explained medications were stored in the medical treatment room, but individuals kept their asthma inhalers with them. The nurse practitioner noted that sometimes it was difficult to get hospital discharge paperwork because the hospitals refused to give it to the medical personnel. However, she stated if a child went to the hospital, agents brought the child back to medical personnel upon the child's return to discuss the treatment with them and/or their parents.

Just like CPC-Ursula and Donna, JCO observed that medical personnel maintained a whiteboard with pertinent patient information in the medical treatment area to ensure medications were administered properly. The nurse practitioner explained that medical personnel consulted their whiteboard to determine who needed to be seen, and would request an agent bring that child to the medical treatment area. In addition, for prescribed medications, medical personnel also completed a medication dosage and frequency form for agents to input into e3DM. E3DM included a medication alert to signal USBP agents when to take a child to the medical personnel for the next dose of medication. An agent also informed JCO that they performed welfare checks every 15 minutes.

The nurse practitioner explained that medical personnel conducted follow-up examinations in the hold rooms for containment reasons. She explained that for children with fevers, checks occurred every hour until the fever fell below 100.4 °F, and then every four to six hours. The nurse practitioner noted that even if she were specifically checking on one person in a hold room she would ask the others in the hold room how they felt and whether they needed to be examined. She also explained that prior to children leaving, medical personnel conducted a final health check and discussed follow-up care after release.

JCO reviewed the e3DM custodial actions for all four children onsite and their A-Files. One of the custody logs noted "no medical conditions found;" however, the log also noted that medical treatment was provided, including flu medication. In addition, medication provided was not recorded in e3DM for a child who was receiving medication per the medical whiteboard. Based on my interview with the nurse practitioner, and confirmation that the medical personnel relied on their whiteboard, I believe that the child received medication, but that it was not recorded in e3DM. Additionally, all four logs had two breakfasts recorded on November 20, and two logs had two lunches recorded on November 19. It could be that the children received two breakfast, or that there was a data recordation error and the children only received a single breakfast; USBP was unable to determine which occurred. Furthermore, most welfare checks were recorded at least every 15 minutes. Based on my conversation with agents and the nurse practitioner, I believe that agents and the medical personnel continuously checked on children at regular intervals. Showers were not available at the facility, which was noted on the logs. However, the facility did provide, and record, bodily cleansing products. JCO also reviewed the amenity reports prepared the day before and the day of our inspection.

23

According to the amenity reports, there were no issues reported for the three hold rooms where the children were located. JCO's physical inspection also confirmed the amenity report for that day. Finally, JCO reviewed the children's A-Files. All A-Files included the I-770 form, and three of the A-Files included the list of free legal services providers.

Overall, I believe Weslaco Station was substantially compliant with the FSA. The hold rooms were safe and sanitary, provided access to functioning toilets, functioning sinks, and drinking water, and were recorded within the appropriate temperature range. While the hold rooms themselves did not have soap, agents escorted the children to the sally port to brush their teeth and wash their hands each morning. JCO also observed hand sanitizer was available in the processing area. Moreover, although the shower facility was not being used, Weslaco provided bodily cleansing products to individuals in custody. Weslaco Station was currently being used as the medical isolation station. As such, children were transferred to Weslaco Station from other facilities like CPC-Ursula and Donna where showers were provided, and were typically transferred back to those facilities when medically cleared. Moreover, JCO interviewed the medical personnel onsite who described the medical process and ongoing monitoring of children's health through the whiteboard. While I continue to emphasize the importance of accurate and complete data entry of custodial actions, I do not believe the data inconsistencies JCO noted impact compliance with the FSA. Therefore, I believe that Weslaco Station was substantially compliant with the FSA.

<u>Temporary Holding Facility</u>

On January 29, 2020 at 9:00 AM, my team and I arrived at the Temporary Holding Facility (THF) in El Paso Sector. Like Donna, THF was a soft-sided facility stood up last year in response to the unprecedented surge of children and families in custody, and became operational in May 2019. THF was constructed next to El Paso Station, but it operated independently. The SMA and USBP Assistant Chief accompanied us on this site visit. We inspected the facility, spoke with agents and contractors onsite, including medical personnel and guards, interviewed children and/or parents, and reviewed e3DM custodial records and completed A-Files. At the time of our visit, THF was used for holding families in custody. There were 197 AACs onsite.

Like Donna, THF consisted of a series of pods, or rooms, for intake, processing, and holding families. One pod was dedicated to intake processing and medical. JCO and I observed children in the processing area and four pods. The pods were large open areas that allowed children to move freely. A guard tower was positioned in the center of the holding pods for constant supervision. An agent informed my team that two agents were assigned to each pod day and night, and that there were unarmed guards at either side of the pod entrances to provide additional monitoring. Televisions were mounted to the tower for entertainment. Benches or risers were placed in front of the televisions to create a sitting area for children. I observed children playing with toy cars. Changing

stations with diapers, baby wipes, and baby formula were available in the pods holding male and female head of household with their young children. Single use bottles were also available, and I observed a father preparing a bottle for his child. Feminine hygiene products were available in the pods for older girls and female head of household. Bottled water was available in each pod, as well as freely accessible snacks. An agent explained that fresh fruit was also available and left in the pod for three days before being replaced. I observed signs in the pods encouraging individuals to ask for food, water, blankets, and medical assistance, if needed.

All pods, including the processing area, provided access to portable toilets and handwashing stations with soap. The temperature of the pods measured either 72 °F or 73 °F. Later during the site visit, my team re-checked the temperature of one of the pods and noticed it had dropped to 68 °F, which was within the lower end of the appropriate temperature range. JCO informed the agent in the pod, who explained that contractors maintained temperature controls as part of the wraparound services for the facility. The agent explained that every hour the contractors verified with the agents assigned to the pod that the temperature was within the appropriate range. I understand that if the temperature was outside the range, the contractor would adjust the temperature at that time. I observed individuals in one of the pods had their jackets and were wearing them. Cloth blankets and mats were also available and being used by children in the pods.[6] All areas appeared clean. The supervisor explained that contractors professionally cleaned the pods at least three times a day, once per shift. I observed the cleaning crew onsite at the time of our visit.

JCO and I observed the food and supplies available onsite for agents to provide to children. An agent explained, and I observed, that snacks and water bottles were accessible within each pod at all times. THF utilized food service contractors to fulfill all meal requirements for individuals in custody. The food service contractors provided two hot meals and one cold meal each day. I observed the lunch meal being served, which included a burrito, chips, and bottled water. During an interview with medical contractors, JCO learned there had been a potential food poisoning case as multiple adults and children were vomiting the day before our visit. The medical staff stated that agents were concerned and informed them about the situation. Upon discussion with Station and Sector management, I learned that the CBP personnel overseeing the food services contract took immediate action and directed the contractor to discontinue utilizing the sub-contractor.

Additional food items available for children included baby food, baby formula, juice, milk, Pedialyte, and snacks, such as chips, animal crackers, sandwich crackers, snack bars, cookies, and fruit cups. All items were within their expiration dates. THF also had

---

[6] On February 7, 2020, JCO was informed of a sector-wide decision to discontinue the use of cloth blankets and return to providing Mylar blankets to individuals.

various supplies available for children, including diapers, baby wipes, diaper cream, shampoo, body soap, and toothbrushes and toothpaste. Shoes and clothing in various sizes were also available, including sweatshirts, sweatpants, T-shirts, underwear, and socks. Laundry and shower facilities were available onsite. Caregivers were not onsite at THF; however, an agent explained that children were able to shower, and agents supervised the process. The agent explained that showers were provided at least every 48 hours or upon request, and that children received clean clothes, and toothbrushes and toothpaste when they took showers.

Contract medical personnel were onsite at all times, and a pediatric advisor was on-call for medical personnel to consult. My team observed various encounters children had with medical personnel, interviewed the nurse practitioner onsite about the facility's medical capabilities and processes, and advised me of their observations and interviews. Medical personnel stated that all individuals received a general health check prior to entering the facility. In addition, medical personnel asked all children questions related to mental and physical health, checked their vital signs, and reviewed any medications children were taking when they arrived at the facility. All medications were stored in the medical area. After completing the medical check, children received a wristband to indicate they had completed the initial medical check.

JCO observed a medical encounter where the parent stated that her infant had vomited four times the night before and asked that the child be evaluated at the hospital. Medical personnel approved the transport to the hospital. JCO also observed a medication review where medical personnel reviewed the medication the child was apprehended with, and discussed with the parent what the child took it for, the dosage, and when the child should receive it next. Medical personnel noted that the child only brought enough medication for a couple of days, and they would need to order more for the child. JCO's observations of these interactions showed me that medical personnel listened and addressed parents' medical concerns regarding their children.

The medical personnel explained that whenever medical personnel prescribed medication for a child, they completed a medication dosage and frequency form for agents to input into e3DM. Agents took the form provided by medical personnel, and entered the relevant information into the child's e3DM profile. This triggered a medication alert on e3DM which signaled USBP agents when to take the child to the medical personnel for the next dose of medication. Given the volume of individuals in custody at the facility at the time, the medical personnel mainly relied on e3DM to keep track of the times patients needed medication. Medical personnel explained that upon leaving THF, all children received an exit medical check, during which time medical personnel verified whether children were receiving medication, and took their temperature. If a child was on medication, the medicine was transferred with the child. Documentation pertaining to hospital stays or external doctor visits was also transferred with the child.

JCO selected a sample of ten children who were receiving medical care onsite and reviewed their e3DM custody logs.  JCO noted that one of the four children receiving a prescription did not have it documented in e3DM.  Because medical personnel mainly relied on e3DM for tracking medications administered, it is important that agents accurately enter custodial actions pertaining to medication and treatment into e3DM.  Although medical personnel mainly relied on e3DM, they still maintained their own records that documented each time medication was provided, even if this information was not tracked on the whiteboard.  Therefore, it is likely the child received the medication as prescribed, even if medical staff primarily relied on e3DM for tracking the times that children needed medication administered.

JCO also reviewed the custodial actions recorded and maintained in e3DM, as well as the completed A-Files, for six children who were onsite at the time of our visit.  Completion of a medical check was noted in each of the logs.  Five of the six children held over 48 hours did not have showers recorded in their custodial records; however, I observed the shower facilities were operational and an agent confirmed showers were typically provided every 48 hours.  In addition, JCO identified instances where agents duplicated or inconsistently entered custodial actions in e3DM.  For example, showers were recorded for three children on January 24, 2020 at 6:18 PM, 8:58 PM, and 8:59 PM, a breakfast was recorded at both 7:26 AM and 7:49 AM, and a lunch was recorded at 12:13 PM and 12:29 PM.  JCO noted that welfare checks were inconsistently entered, resulting in four to twelve hour gaps in the recording of welfare checks in all six logs.  JCO discussed these gaps with facility management, who assured JCO that children were constantly supervised.  I observed agents in the pods and unarmed guards by the entrance of the pods.  Five of the children sampled had been processed and had completed A-Files.  JCO reviewed the five completed A-files, and noted three of the A-Files contained I-770 forms and four A-Files contained the list of free legal services providers.  JCO also reviewed amenity reports for the pods and no issues were reported, which was also confirmed during JCO's physical inspection.

Finally, while onsite, I interviewed two mothers.  My first interview was with the mother of two sons, P.F.M. and J.F.M., ages 10 and four-years-old, respectively.  The family was from Guatemala.  The mother explained they were apprehended in Arizona by USBP, and received a date to appear before an immigration court in El Paso, Texas.  The mother informed me she and her sons were at two CBP facilities while in Arizona.  The mother explained that the family was returned to Mexico to await proceedings and subsequently re-entered through the POE in El Paso for their court appearance.  From the POE, the mother explained they were transported to court, and then transported to a station.  The custodial records indicated the family was returned to Mexico on January 3, 2020 and the family was then booked in at Paso Del Norte Processing Center on January 24, 2020.  The custodial records indicated the family was transferred to THF briefly and they were

27

subsequently moved to El Paso Station the same day.  The family stayed at El Paso Station for two days before they returned to THF on January 26, 2019.  The mother explained she was waiting for a translator for an interview because she spoke a particular dialect.  Because there was not an available translator to conduct the interview, she and her sons were transferred to THF while a translator was located.  JCO communicated with the mother in Spanish.  She informed me she needed the interpreter because she was not familiar with legal terminology in Spanish.  At the time of my interview, the family had been in CBP custody for approximately 117 hours since they were booked in on January 24 in El Paso, Texas.

The mother informed me that medical personnel saw her sons in Arizona and when they arrived in Texas.  I believed she was referring to the medical check, which included medical personnel checking a child's skin and hair, and asking whether the child was ill or taking any medications.  The children's custodial records noted the medical check was conducted in Arizona; however, the custodial records did not document the medical check in Texas.  The mother told me that P.F.M. had a sore throat and ear pain while at the first Texas station.  She stated that medical personnel gave him "throat drops."  The mother informed me that by the time they were transferred back to THF, her son was feeling better.

The mother confirmed the family received meals and snacks while in CBP facilities in Arizona and Texas.  In Arizona, she described regularly scheduled meal times and stated the family had access to drinking water and snacks at all times.  The mother noted that there was not a variety of meals served in Arizona, stating each meal included a burrito.  In the Texas facilities, she stated the meals consisted of burritos and sandwiches.  The mother confirmed drinking water was available at all times in Texas, but that snacks, including crackers and apples, were only available at certain times at THF.  She noticed juice was available the day before the interview as well.  The mother did not specify whether snacks were always available, or if they were provided at certain times at the other Texas facilities.  The mother also stated that her four-year-old son was drinking formula from a bottle while in custody.  She stated bottles were available at all the CBP facilities, except for the first Texas station where her family was held after her court appearance.  The mother stated she was using the same bottle each time because she did not know it was disposable.  I informed her that the bottles were disposable and that she should request a new bottle from an agent if the bottles were not in her pod.  The mother mentioned to me that while her family was at El Paso Station, she requested formula from an agent.  She informed me that the agent explained how to mix the formula and told her to continue to ask for formula if she needed it.  The mother told me that the agent explained that even if he was not working a shift, she should ask another agent for formula if she needed it.

The mother informed me that her family received mats and Mylar blankets while in the
Arizona facilities.  She stated that at the first Texas station, only blankets were available.
She elaborated, adding there was one mat in the hold room, but someone else was using
it.  She also stated that the other mothers in the hold room were reusing the cloth blankets
left behind by others in the hold room.  The mother stated that blankets were available at
El Paso Station, but mats were unavailable.  The mother informed me she requested
another blanket to lay on the floor to use as a mat and the agent provided it.  The
custodial records documented the children received blankets and/or mats at the various
CBP facilities except for at THF.  JCO observed mats and blankets were available to
children at THF.  The mother also told me that El Paso Station dimmed the lights
overnight, unlike other CBP facilities where her family was held.

Moreover, the mother stated that the family showered once while in custody in Arizona
and once while in Texas, which was the day before my interview.  Custodial records
documented that a shower was provided in both Arizona and Texas.  The mother
confirmed that there were soap and towels available when they showered at THF, and
that the family brushed their teeth at the same time.  Custodial records did not document
that dental hygiene products were provided at the same time the shower was provided;
however, it was documented on other occasions in Arizona and Texas.

Finally, the mother informed me that there were functioning toilets and functioning sinks
at all of the facilities in Arizona and Texas.  She noted that soap was available in
Arizona.  She also told me that soap and paper towels were available at THF, but not at
the other two Texas stations.  The mother stated all of the facilities were clean, except for
the first station in Texas; she did not explain why she felt it was not clean.  Moreover, the
mother expressed that she felt all of the facilities were cold, but she did not specify
whether her kids also felt cold or if the blankets provided warmth.  At the time of the
interview, her pod measured within the appropriate temperature range.  After the
interview, JCO reviewed both children's completed A-Files, which contained the list of
free legal services providers.  According to custodial records, P.F.M. and J.F.M. were
transferred from CBP custody on February 3, 2020.  The children were in custody for 334
hours total from their re-entry at the POE in El Paso.

My second interview was with a mother and her seven-year-old son, O.P.C., from
Guatemala.  The family was apprehended on January 27, 2020 at 10:09 AM.  The mother
explained she was apprehended with her son and 16-year-old niece.  Only the mother and
son were present for the interview.  Because the niece was not apprehended with a parent
or legal guardian, she was an UAC.  The mother explained that her niece was transported
separately from her husband and son, and she had not spoken to her niece since they were

apprehended.[7]  At the time of the interview, O.P.C. had been in CBP custody for approximately 53 hours.

The mother explained that she and O.P.C. were transported to THF directly.  She told me that when they arrived, they removed their wet clothes, and they received dry clothes. Clothing provided was not included in O.P.C.'s custodial records.  Next, the mother stated the family saw medical personnel.  She told me that medical personnel took their temperatures and checked their heads and skin.  Once complete, the mother stated the medical personnel gave each of them a wristband.  I observed the mother wearing the wristband.  I did not confirm whether O.P.C. was also wearing the wristband at the time of the interview; however, his custodial records showed the medical check was completed.  The mother told me that her son had a respiratory issue and that he got sick easily.  I asked whether she informed the medical personnel and she stated she did not because her son was not currently sick.

After the interaction with the medical personnel, the mother explained she and her son were assigned to a pod.  The mother informed me that she and O.P.C. received a burrito, apples, crackers, milk, and bottled water.  Custodial records documented that a meal and snack were provided.  They informed me that they had not finished eating all of their food before they were called to continue processing in another area of THF and were unable to take their food with them.  After processing, the mother explained they were assigned to another pod at THF and each received a mat and cloth blanket.  O.P.C.'s custodial records also document provision of the mat and blanket.  That same afternoon, the mother explained she and her son were transferred to El Paso Station.  The mother informed me that they stayed at the station overnight and received a blanket.  Both actions are noted in O.P.C.'s custodial records.

After the first night at the station, the mother explained she and her son returned to THF, were assigned to a pod, and received new blankets and mats.  O.P.C.'s custodial records did not show the provision of a blanket and mat when they returned to THF.  The mother stated the lights were not dimmed at night, but she stated her child had still been able to sleep.  On January 29, the day of my interview, the mother explained that she and her son were transferred to El Paso Station again.  The mother explained that she and her son just returned to THF shortly before our interview.  She explained that when transferred back to THF, she and her son missed lunch.  I asked an agent supervising the pod if extra meals were available; however, the agent informed me that since lunch was served more than two hours ago, the contractor had discarded the leftover food.  The agent stated the contractor would return to serve dinner that evening, and provided additional snacks for

---

[7]  The next day, on January 30, 2020, I visited Clint Station, which was typically where UACs were held in El Paso Sector.  I reviewed the roll call and saw that the niece was not onsite.  After returning to Headquarters, I reviewed the niece's custodial records.  According to her custodial records, she received an ORR placement and was transferred from CBP custody on January 28, 2020.  She was in CBP custody for approximately 25 hours.

the mother and son to eat until then.  The mother mentioned that, in general, the food that was provided to her son upset his stomach.

The mother informed me that she and her son had not showered or brushed their teeth at either El Paso Station or THF.  Custodial records indicated dental hygiene products were provided on several occasions prior to the interview and that a shower was provided the day before the interview.  She confirmed that both the station and THF had functioning toilets and sinks.  The mother explained that soap to wash their hands and paper towels to dry their hands were available at THF only.  She also confirmed she and her son had access to drinking water at both locations.  The mother mentioned that she did not know she could drink from the water fountain at the station; we informed her she could drink this water.  She also mentioned five-gallon water jugs were available at the station.  The mother told me that, at THF, bottled water was available on a table in the pod.  She stated she took water during snack or meal times, but did not know she was able to take bottled water during the rest of the day.  She told me she observed agents tell other women in the pod to sit down when it appeared they were walking to the table where water was placed, which made her think she could not take bottled water throughout the day.  I do not know the specific details about the situations the mother described, but I informed her she could take bottled water as needed.  At the time of the interview, there were male and female head of household on opposite sides of the pod, with agents and contract guards supervising.  I observed a father preparing a bottle for his child using bottled water that he took from a table in the pod.  The mother also told me she felt the temperature at THF was more comfortable than the temperature at El Paso Station, but she said that her son had been fine with the temperature.  After the interview, JCO reviewed O.P.C.'s completed A-file, which included the list of free legal services providers.  O.P.C. was transferred from CBP custody on February 10, 2020.  According to custodial records, O.P.C. was in CBP custody for 328 hours total.

Based on my observations, JCO's review, and interviews, I believe THF was substantially compliant with the FSA.  All pods were recorded within the appropriate temperature range, and provided access to functioning toilets, functioning sinks with soap, drinking water, and snacks.  Additionally, when issues were identified, agents and CBP personnel took immediate action to mitigate the situation.  For example, CBP personnel overseeing the food services contract directed the contractor to discontinue utilizing the sub-contractor after learning about the possible food poisoning incident.  Moreover, when JCO informed the agent that a mother and son had missed lunch while in transit, the agent provided snacks for the family to eat until the contractor returned to provide the dinner meal.  Although data completeness and recordation continued to be a challenge, I do not believe that this affected CBP's compliance with the FSA.  Based on observations, interviews with agents, contractors, and children and/or their parents, it appears custodial actions occurred more often than they were recorded.  Finally, my interviews revealed situations where a mother observed interactions between agents and other women in the pod, and as a result, did not ask or take items that were available.  I

informed her that the items were for the individuals in the pod and they could take what
they needed.  During this site visit, I toured the modular Central Processing Center
(MCPC), which replaced the soft-sided THF in March 2020.  I learned that caregivers
would be onsite to assist UACs and families as needed.  I believed utilizing caregiver
support for UACs and families would mitigate many of the issues identified during my
interview like clarifying instructions and replenishing food and supplies.  Therefore, I
believe THF was substantially compliant with the FSA.

Clint Station

On January 30, 2020 at 9:00 AM, JCO arrived at Clint Station in El Paso Sector.  I did
not participate in this site visit.  JCO advised me of their observations and results upon
their return.  The SMA and USBP Assistant Chief accompanied JCO on this site visit.
Here, JCO inspected the facility, spoke with agents and contractors onsite, including
medical personnel and caregivers, interviewed children, and reviewed e3DM custodial
records and completed A-Files.  At the time of JCO's visit, Clint Station was designated
for holding UACs in El Paso Sector.  There were 18 UACs onsite.

Children were in two hold rooms at the time of our visit.  The hold room doors were left
unlocked to allow children to move freely into the processing area where they could
interact with other children or play with available items like stuffed toys, activity books,
and crayons.  Chips, cookies, pudding, juice, and bottled water were also available in the
processing area for children to take as needed.  A male caregiver was in the hold room
with the male UACs, and a female caregiver was in the hold room with the female UACs;
a five-year-old boy was also in this hold room playing with the female caregiver.  The
caregivers were all Spanish speakers.  JCO observed the children playing cards and with
balls.  Some of the older female UACs were painting their nails.  Televisions were
mounted in each hold room to provide entertainment.

Inside the hold rooms, there were stacking cots, allowing each child to have a cot.  Cloth
blankets were also in the hold rooms, and extra blankets were laying on the unused cots.[8]
Both hold rooms had functioning toilets and functioning sinks with soap.  The
temperature in the hold rooms measured 72 °F and 73 °F.  The hold rooms and
processing area appeared clean.  An agent informed JCO that the processing area and
hold rooms were professionally cleaned twice a day.  Shower facilities were available
onsite.  The supervisor explained that children showered and brushed their teeth daily.
The caregivers supervised the showers and provided assistance, as appropriate.  Clint
Station also had an area with several washers and dryers where clothes and blankets were
laundered, as needed.

---

[8] On February 7, 2020, JCO was informed of a Sector-wide decision to discontinue the use of cloth
blankets and return to providing Mylar blankets to individuals in custody.

JCO observed the food and supplies available for agents to provide to children.  An agent
explained that food service contractors prepared and delivered meals to the station, and
that snacks were available at all times.  An agent explained that food items were kept in
the processing area and the storage room.  The agent informed JCO that food was
inventoried and arranged so that the items closest to their expiration dates were placed at
the top.  JCO observed various food items in storage, including baby cereal, baby food,
baby formula, juice, Pedialyte, burritos, bologna sandwiches, chips, cookies, and
pudding.  All items were within their expiration dates.  JCO also observed various
supplies available for children, including baby bottles, diapers, diaper cream, baby wipes,
body wipes, shampoo, body wash, toothbrushes and toothpaste, hand soap, and feminine
hygiene products.  Shoes and clothes in various sizes were also available, including
sweatshirts, sweatpants, underwear, and socks.

Contract medical personnel were onsite at all times.  The medical treatment room was
located in the processing area near the snack and toy table.  Medical personnel were
sitting at a table in front of the medical treatment room in the open and with the children
in sight.  JCO interviewed the nurse practitioner onsite.  The nurse practitioner explained
that upon a child's arrival, medical personnel conducted a health check that included
checking for lice, scabies, or other ailments, taking the child's temperature and vitals,
conducting a physical exam, and asking questions about the child's physical and mental
health.  The nurse practitioner also informed JCO that all children were medically cleared
prior to leaving the facility, which included taking each child's temperature and checking
if the child was ill or had any contagious conditions.  The nurse practitioner also
explained that the medical personnel and agents communicated with each other to ensure
that any child who was prescribed medication was transferred with the needed
medication.  The nurse practitioner explained that the medical personnel maintained a
whiteboard with pertinent patient information to ensure medications were administered
properly.  Medical personnel informed JCO they consulted their whiteboard to determine
who needed to be seen, and would request an agent bring that child to the medical
treatment area.  In addition, for prescribed medications, medical personnel also
completed a medication dosage and frequency form for agents to input into e3DM.
E3DM included a medication alert to signal USBP agents when to take a child to the
medical personnel for the next dose of medication.  The nurse practitioner explained that
all medications were stored in the medical treatment room.  At the time of our visit, none
of the children were receiving ongoing medical care.  As such, JCO did not review any
custody logs specifically for medical documentation.

However, JCO reviewed the custody logs of five children selected as part of the broader
data review.  All UACs in this sample had been in custody for less than 48 hours.
Completion of a medical check was noted in each of the child's custodial records.  The
records indicated all five UACs were provided a bodily cleansing product, and three had
showers.  JCO found there were instances where custodial actions were either missing or
inconsistently logged.  For example, JCO noted four to seven hour gaps in the recording

of welfare checks in all five logs.  Three of the five children sampled were processed and
their A-Files were completed.  All three A-Files contained an I-770 and a list of free legal
services providers.  Next, JCO reviewed the amenity reports associated with the hold
rooms in the station.  The amenity reports showed that the supervisor noted one of the
two toilets in a hold room was not functioning, and that he requested repair.  All toilets
were functioning at the time of JCO's visit, indicating the one malfunctioning toilet had
been fixed prior to JCO's arrival.

Finally, JCO interviewed two UACs while onsite who were 14 and 15-years-old,
respectively.  W.F.F. was a 14-year-old male from Guatemala who was apprehended on
January 29, 2020 at 8:35 AM.  At the time of the interview, W.F.F. had been in CBP
custody for approximately 27 hours.

W.F.F. informed JCO he was apprehended with a group of older friends, two of whom
were also onsite.  He informed JCO that the apprehending agent was respectful and asked
whether anyone was ill.  W.F.F. expressed that he felt calm and at ease with the agent
during this process.  Custodial records indicated W.F.F. was transferred to Paso Del
Norte Processing Center that morning, and transferred to Clint Station the same
afternoon.  W.F.F. did not specifically discuss the conditions at Paso Del Norte
Processing Center, but he stated he received food and saw medical personnel when he
arrived.  W.F.F. stated that when he arrived at Clint Station, he received a snack.  He also
described the interaction with the medical personnel, telling JCO the medical personnel
asked him questions about his health, and checked his skin and hair.  The custodial
records indicated he received a medical check and food shortly after arriving at both Paso
Del Norte Processing Center and Clint Station.  JCO observed W.F.F. wearing multiple
wristbands, which JCO understood were used by the medical personnel to signal medical
checks had been completed for that child.

W.F.F. stated that after the medical check at Clint Station, he was escorted to the shower
facilities where he was provided clean clothes and shoes.  He mentioned that he received
new shoes because his shoes were wet from crossing the river before he was
apprehended.  JCO observed W.F.F. wearing clothing and shoes provided by the station.
He explained that he placed his dirty clothes in a laundry bag, which was currently in his
hold room.  W.F.F. explained that the caregiver onsite facilitated the shower process.  He
confirmed hygiene items like shampoo, body soap, and deodorant, were available.
W.F.F. stated he also brushed his teeth during this time.  His custodial records
documented that a shower, dental hygiene product, and clean clothing were provided.
After the shower, W.F.F. explained that he received a hot meal consisting of meat,
potatoes, corn, and juice.  This meal was documented in his custodial records.  W.F.F.
added that he received enough food, that it was good, and that it did not upset his
stomach.  Next, W.F.F. explained he selected an empty cot in the hold room and received
a new blanket.  The provision of a sleeping cot and blanket were recorded in his custodial
records.  W.F.F. stated he fell asleep and was woken up for processing later that night

while others in the hold room were still sleeping.  He estimated the processing took about 25 minutes, and he stated that, after processing, he went back to sleep.  His custodial records indicated processing was marked complete around 5:00 AM.  W.F.F. said he woke up on his own that morning, brushed his teeth, and received breakfast consisting of a burrito, fruit cup, and orange juice.  After eating, he went back to sleep.  W.F.F.'s custodial records documented that a meal and dental hygiene product were provided that morning.  Custodial records also documented that a shower was provided during this time, but W.F.F. did not mention this shower during the interview.

W.F.F. expressed that he felt safe and comfortable with the agents and caregivers at Clint Station, adding the caregiver joked around with him and the other males in his hold room. He also explained that the males in his hold room played cards and with a ball inside the hold room.  JCO observed these activities while onsite.  W.F.F. explained the hold room was clean and that he had observed a cleaning crew onsite.  He confirmed that he had access to drinking water at all times and that the hold room had soap and toilet paper.  He added that caregivers provided towels for the males in the hold room to dry their hands after washing them.  W.F.F. also described the temperature of the hold room as normal. W.F.F. told JCO that since arriving at the station, he had called and spoken to his 18-year-old brother in the U.S.  After the interview, JCO reviewed W.F.F.'s completed A-File, which included the I-770 and list of free legal services providers.  Custodial records indicated an ORR placement was received on January 30, and that he was transferred from CBP custody on January 31, 2020.  W.F.F. was in CBP custody for approximately 48 hours total.

JCO's second interview was with B.C.L., a 15-year-old female from Guatemala.  B.C.L. was apprehended on January 29, 2020 at 10:20 AM.  At the time of the interview, B.C.L. had been in CBP custody for approximately 25 hours.

B.C.L. explained the apprehending agent asked her questions about her age and if she was by herself.  B.C.L. informed JCO there were three other UACs in the group with her, and that the agent separated the UACs from the unrelated adults in their group.  B.C.L. stated she was transported to a different station first, which custodial records indicated was Paso Del Norte Processing Center.  There, B.C.L. told JCO she saw medical personnel, received a snack, water, shoes, and socks.  B.C.L. explained that she had crossed a river prior to apprehension, and JCO understood that she received shoes and socks at the station because her shoes and socks were wet.  Custodial records documented the medical check and meal provided.  B.C.L. explained she was transferred to Clint Station, and when she arrived, she received a hot meal consisting of meat, corn, potatoes, Jell-O, juice, and crackers.  B.C.L. noted that she ate all of the food, and her stomach was not upset.  She noted snacks were available at all times to take as needed.  Her custodial records indicated a meal was provided after she was booked into Clint Station.  While B.C.L. did not specifically mention medical personnel upon arrival at Clint Station, her custodial records indicated she received a medical check at Clint Station as well.  JCO

observed she was wearing multiple wristbands, which JCO learned during its various site visits indicated a medical check was provided.

B.C.L. informed JCO that after she ate, she took a shower, brushed her teeth, and received clean clothes, including sweatpants, sweatshirt, socks, shoes, and underwear. B.C.L. informed JCO that her dirty clothes were currently in a laundry bag in her hold room. She also confirmed the availability of hygiene items, including shampoo and deodorant. Shower, dental hygiene product, and clean clothes provided were also included in her custodial record after she was booked into Clint Station.

Before going to bed the night she was apprehended, B.C.L. stated she received a comb to brush her hair and a new blanket. She explained she selected her cot from the available ones in the hold room. Provision of sleeping cot and blanket were included in her custodial records. B.C.L. informed JCO that the lights were dimmed, and she was able to sleep. She shared that she was woken up when other females in the hold room were called to complete processing, and that she also continued her processing at some point during the night. Her custodial records indicated processing was marked complete that night at 12:37 AM. She stated that in the morning, she and the other females in the hold room woke up on their own. B.C.L. informed JCO she received breakfast, which consisted of a burrito, Jell-O, and juice. She also stated she brushed her teeth and showered. Meal, shower, and dental hygiene product provided were documented in her custodial records. B.C.L. noted that the temperature of Clint Station was fine, and there were functioning toilets and functioning sinks. She told JCO she was able to wash her hands with soap and dry her hands. B.C.L. also explained that feminine hygiene products were available, and the females in the hold room could get them from the agents or medical personnel onsite. She also mentioned that these items were available in the shower area. B.C.L. expressed to JCO that she felt safe and that she felt comfortable approaching the agents at Clint Station. After the interview, JCO reviewed B.C.L.'s completed A-File, which included the I-770 and list of free legal services providers. B.C.L. received ORR placement on January 30, 2020 and was transferred from CBP custody on January 31, 2020. She was in CBP custody for approximately 50 hours.

Based on JCO's observations, interviews, and data review, I believe that Clint Station substantially complied with the FSA. The hold rooms were clean, measured within the appropriate temperature range, and provided access to functioning toilets and functioning sinks with soap. JCO observed chips, juice, and bottled water available in the processing area for children to take as they wanted, and the children interviewed confirmed they received meals at regular intervals. Although JCO noted instances of inconsistent data entry, I do not believe that this affects compliance with the FSA. One of the data entries inconsistently recorded was welfare checks. However, JCO observed caregivers onsite engaging with the UACs in their hold room, and the children also confirmed the caregivers monitored the hold rooms. Moreover, the nurse practitioner was sitting at table near the snack table and clearly visible to the children and approachable. Based on

36

JCO's interviews with caregivers and medical personnel, I believe they will promptly notify USBP of any concerns they have about a child. As such, I believe Clint Station substantially complied with the FSA.

## B. Spot Checks

The week of March 2, 2020, JCO conducted three spot checks in the RGV Sector at Donna, CPC-Ursula, and Weslaco Station. Spot checks are shortened versions of the site visit protocol to allow smaller teams to conduct inspections. Spot checks can be conducted for myriad reasons, including time-sensitive events requiring an immediate response, logistical constraints, or as follow-up to previous site visits. Depending on the reason for the visit, the spot check protocol can be adapted to fit the present need. The spot checks during this review period were conducted to follow up on our previous site visit to RGV Sector. Unannounced site visits to RGV Sector were tentatively planned for later in the year; however, the rise of COVID-19 cases in the U.S. left future travel uncertain, and it was important that my team continue in person monitoring for as long as possible. Since our last trip to RGV Sector was the week of November 18, 2019, I directed JCO to conduct an announced spot check of RGV Sector in early March. I did not participate in the spot checks; however, JCO advised me of their observations upon their return.

### i. Methodology

The spot checks at the RGV Sector reviewed the same core areas as the full site visit protocol. Although the spot check protocol was less comprehensive in the questions that were asked, it still provided on-the-ground insight regarding present conditions and provided sufficient detail for me to assess compliance with the FSA. The questions eliminated for the spot check protocol related to CBP policy and procedures rather than FSA requirements. Onsite, JCO conducted a physical inspection, discussed operations and procedures related to children in custody with agents and contractors, and interviewed children and/or parents. Remotely, JCO reviewed custodial records of children in custody at those locations. The following sections detail JCO's observations and results.

### ii. Observations and Results

Donna

On March 3, 2020 at 9:00 AM, my team arrived at Donna. JCO inspected the facility, interviewed contractors, including medical personnel, interviewed children and/or parents, and reviewed the interviewed children's completed A-Files. At the time of the spot check, there were 127 AACs onsite.

Children were present in four of the pods.  Portable toilets and handwashing stations with soap and paper towels were available in each pod.  Water bottles were also available in each pod at all times.  Agents informed JCO that snacks were provided each day at regular intervals.  Signs were posted in the pods encouraging individuals to ask for items they needed, including food, water, blankets, bottles, and medical assistance.  The pods appeared clean, and JCO observed a professional cleaning crew mopping one of the pods while onsite.  Parents and children were using mats and Mylar blankets in the pods.  The temperature of the pods were within the appropriate range, and measured between 74.6 °F and 75.8 °F.  All pods had a television available, and JCO observed several children watching it.

JCO also observed the food and supplies available for agents to provide to children.  An agent explained that a food services contractor prepared and distributed meals three times a day.  Baby formula, animal crackers, snack bars, and Pedialyte were available and within their expiration dates.  Diapers, baby wipes, body soap, toothbrushes and toothpaste, shampoo, deodorant, and feminine hygiene products were also available.  JCO observed that clothing in various sizes was available, including T-shirts, sweatpants, sweatshirts, socks, underwear, and beanies.  Shower facilities and laundry services were available onsite.  At the time of the site visit, caregivers were not onsite.  Instead, agents supervised the pods and shower facilities.  JCO observed agents in one of the pods getting parents and children ready to go to the shower facilities.

Contract medical personnel were onsite at all times.  The medical personnel continued to utilize a whiteboard to track pertinent patient information related to medications and ongoing monitoring.  JCO interviewed the medical personnel onsite who discussed the medical process.  The process and medical capabilities discussed during this spot check generally mirrored JCO's discussions during its previous site visits.  Medical personnel explained that there were Spanish speakers each shift, and translation services were available for other languages.  Medical personnel also confirmed that they were the only ones who administered medications.  Medical personnel completed a medication dosage and frequency form and provided it to the agents to input into e3DM.  The form also included the property number associated with each medication so the medications could be retrieved from the child's property by an agent for the medical personnel to administer.  Agents took the form provided by medical personnel and entered the relevant information into the child's e3DM profile.  This triggered a medication alert on e3DM, which signaled USBP agents when to take the child to the medical personnel for the next dose of medication.  Prescriptions requiring refrigeration were stored in the refrigerator in the medical treatment room.  Medical personnel explained that the medical staff did not go into the pods for follow-up.  Based on the whiteboard, the medical personnel determined which patients required follow-up and requested agents to bring the child to the medical treatment area.

While onsite JCO took a picture of the medical whiteboard, and a JCO team member remotely reviewed the medical documentation captured in e3DM for six children under medical supervision.  JCO identified four instances where children who were provided medication per the whiteboard did not have it logged in their custodial records.  JCO noted that two of the children's custodial records showed a five-day difference between when they arrived and when the medical check was documented.  Finally, four of the children did not have their medical condition, as identified on the whiteboard, logged in e3DM.  While thorough data entry in e3DM is important for documenting medical treatment and care provided, I understand that this is not the only way that this information is monitored and recorded.  Medical personnel explained to JCO that they rely upon their own whiteboard to track and provide medication, and they also described the various medical documentation completed and maintained onsite.  Likewise, medical personnel described the general process from intake through medically clearing a child to be transferred out of CBP custody.  JCO and I have observed these processes as well.  Despite various medical treatments and checks not being recorded in e3DM, I am confident that the processes in place by the medical personnel onsite ensured these medical actions took place.

JCO also pulled a sample of five children's custodial records who were in custody at Donna on February 28, 2020, and reviewed the data remotely.  While not a FSA requirement, completion of a medical check was not recorded in one of the five logs.  In addition, JCO identified that agents were duplicating or inconsistently recording custodial actions in e3DM.  For example, all five logs had five to seven-hour gaps in the recording of welfare checks.  Moreover, agents duplicated at least one meal in all five logs.  JCO did not review any amenity reports or A-Files remotely.  In conversations with JCO, agents and medical personnel explained the processes for medical care, welfare checks, and meal service.  These processes ensured the actions were completed even if they were not logged in e3DM.

Finally, JCO interviewed the parents of two siblings, ages four and two, and the mother of a three-year-old.  J.T.H. and J.H. were a four-year-old male and a two-year-old female, respectively.  The children were from Ecuador and apprehended with their mother and father on February 26, 2020 at 7:15 PM.  At the time of the interview, J.T.H. and J.H. were in CBP custody approximately 136 hours.  Additionally, at the time of the interview, J.T.H. was in a pod with his father and J.H. was in a pod with her mother.  JCO interviewed the mother first.

The mother explained the family was apprehended together and that the apprehending agent was respectful.  She stated the family was transferred to another CBP facility first and spent two nights there.  Custodial records showed the family was transferred to McAllen Station following apprehension, and less than two hours later, was transferred to

CPC-Ursula.  Two days later, on February 28, the custodial records documented the family was transferred to Donna, which was where JCO interviewed them on March 3.

The mother described the medical check after arrival at CPC-Ursula, which included looking at the children's skin and heads, and asking whether the children were taking medication.  This medical check was not documented in the children's custodial records.  After the medical check, the mother explained she and the children received a sandwich, chips, apple, and juice.  This meal was documented in the children's custodial records.  She also confirmed they each received a mat and Mylar blanket, and that the children slept overnight.  Mat and Mylar blanket provided were not documented in the children's custodial records.  The mother explained she and her children were assigned to one pod and her husband was assigned to a different pod.  The mother stated that the next morning she and the children received breakfast, brushed their teeth, showered, and received clean clothes.  The children's custodial records did not document these actions.  She told JCO the family's clothes were laundered and returned to them prior to being transferred to Donna.  While at CPC-Ursula, the mother confirmed access to functioning toilets and functioning sinks with soap and paper towels.  She also confirmed drinking water and snacks were available at all times.  The mother stated her son ate the food provided and her daughter had the formula available in the pod.  The mother confirmed she could ask for as many bottles as she needed for her child.  She also stated the temperature of CPC-Ursula was fine.  After two days at CPC-Ursula, the mother explained she, her husband, and two children all transferred to Donna.  The mother explained that when they arrived at Donna, medical personnel checked the children again and, then, they received food.  The medical check at Donna and meal provided were documented in both children's custodial records.

At Donna, the mother explained she and J.T.H received three meals a day and snacks, and that bottles were available for her to use each time she fed her daughter.  She explained that bottled water was always available and snacks were handed out twice each day in between meals.  The mother confirmed she and the children had access to functioning toilets and functioning sinks with soap and paper towels.  She also explained she and the children brushed their teeth daily and showered every other day.  Showers and dental hygiene products were documented in both children's custodial records throughout their time in custody.  The mother stated she and the children received clean clothes to wear while their clothes were laundered.  The children's custodial records did not show clean clothing provided while at Donna.  She also confirmed that she and the children each received a mat and Mylar blanket, and that the lights were dimmed at night.  A mat and Mylar blanket provided was recorded in the children's custodial records several days after they first arrived.  Like CPC-Ursula, the mother stated that the temperature at Donna was fine.  The mother shared that her daughter started to feel ill while at Donna, and the mother asked to see medical personnel.  The mother stated agents facilitated this request, and her daughter was seen by the medical personnel onsite.  J.H.'s custodial records document she began receiving antibiotics on March 1 and

continued receiving them until March 3 at which time she completed her course of antibiotics.  The mother explained both children were initially with her, while her husband was in a different pod.  She explained J.T.H. missed his father, and she requested J.T.H. be moved to her husband's pod.  She stated agents facilitated this request, and J.T.H. moved to his father's pod the day before the interview.

Next, JCO interviewed the father with J.T.H.  The father provided similar information as the mother, including that agents treated the family with respect and that they received a medical check.  The father confirmed that J.T.H. was eating the meals and snacks provided.  The father also confirmed that J.T.H. received a mat when he moved to his father's pod, the lights were dimmed at night, and J.T.H. was able to sleep.  The father confirmed the pod had functioning toilets and functioning sinks with soap and paper towels.  The father also explained that he and J.T.H. brushed their teeth daily.  Meals, snacks, and dental hygiene products provided were documented in J.T.H.'s custodial records after he moved to the pod with his father.  Provision of a mat and Mylar blanket was not documented.  JCO reviewed the children's completed A-Files.  Both A-Files included the I-770 forms and list of free legal services providers.  According to the children's custodial records, they were transferred from CBP custody on March 4, 2020. J.T.H. and J.H. were in CBP custody for approximately 154 hours total.

The last interview was with a mother and her three-year-old son, J.V.V., from Mexico. The mother explained she, her husband, and her child had presented at Brownsville POE. The mother explained the family was interviewed and held overnight in OFO custody before they were transferred to Donna, where JCO interviewed the mother.  Custodial records indicated the family was taken into CBP custody on February 25, 2020 at 9:43 AM and, subsequently, transferred to Donna the following day.  At the time of the interview, the family had been in CBP custody for approximately 169 hours.

The mother stated the OFO officers treated the family well.  She said the family received meals and snacks regularly, and water was available for them to drink at the POE.  The mother confirmed access to functioning toilets and functioning sinks with soap and paper towels.  She also stated that at the POE the family received mats and Mylar blankets, and the lights were dimmed.  The mother stated the family was able to sleep, but they were woken up multiple times to continue processing.  She explained that while in OFO custody, the family received a medical check.  The mother stated J.V.V. did not receive a medical check when they transferred to Donna.  A medical check; however, is documented in J.V.V.'s custodial records upon arriving at Donna.

Once the family transferred to Donna, the mother explained she and J.V.V. were assigned to a different pod than her husband.  The mother confirmed that while at Donna, she and J.V.V. received three meals each day, and snacks and drinking water were available.  She stated that J.V.V. could eat the food provided, but she was also feeding him formula.  The mother was not aware the bottles were single use.  JCO informed her she should use a

new bottle each time she fed J.V.V. and explained she could ask an agent for as many bottles a she needed. After the interview, JCO provided the mother with a new baby bottle and reminded her that she could request a new bottle whenever she needed. JCO also pointed out the sign posted in the pod informing individuals they could request items they needed. The sign specifically referenced bottles. The mother did not mention whether she and J.V.V. received a mat and Mylar blanket at Donna, but she did mention that the lights were dimmed at night. Provision of a mat and Mylar blanket were documented in J.V.V.'s custodial records several days after he arrived at the facility. The mother told JCO that the temperature at Donna was colder than at the previous facility; however, she did not express that the temperature at Donna was uncomfortable.

The mother stated she and J.V.V. brushed their teeth each day and that they showered every couple of days. She mentioned shampoo, soap, and towels were available when they showered, and that they received clean clothes to wear while their clothes were laundered. Custodial records indicated J.V.V. showered the day he arrived and then, every other day. Clean clothing provided was not documented each time he showered. Dental hygiene product provided was recorded intermittently on the days prior to our interview.

The mother also explained that J.V.V. injured his finger at Donna and that she accompanied him to the hospital. Custodial records noted J.V.V. was transported to the hospital on March 1 for a laceration on his finger and he returned to Donna later that night. The mother confirmed that she communicated in Spanish with the medical personnel at OFO and at Donna. The mother also informed JCO that throughout the family's time in custody, agents and officers had treated them with respect.

JCO reviewed J.V.V.'s completed A-File, which included the I-770 and list of free legal services providers. According to the custodial records, the family was transferred from CBP custody on March 5, 2020. He was in CBP custody for approximately 215 hours total.

Based on JCO's spot check, I believe Donna was substantially compliant with the FSA. Children had access to food, drinking water, functioning toilets, functioning sinks with soap, and the pods were maintained within the appropriate temperature range. JCO observed professional cleaning crews maintaining the cleanliness of the pods and saw that shower facilities were available and used. While there continued to be challenges with complete recordation of custodial actions, JCO's observations and interviews confirmed that these actions typically took place leading me to believe it was a data entry error. I was also pleased to hear that JCO observed, and noted in interviews with parents, that agents were more engaged with the individuals in custody than compared to our November 2019 inspection. The parents JCO interviewed during this spot check

generally indicated more positive interactions with agents, and brought up examples of agents providing items requested or answering questions.  JCO also observed that agents were more accessible within each pod during this site visit.  The agents were walking around the pod instead of sitting in the guard tower as observed during our previous visit.  Overall, I believe Donna substantially complied with the FSA.

CPC-Ursula

On March 4, 2020 at 9:00 AM, JCO arrived at CPC-Ursula.  There, JCO inspected the facility, interviewed contractors, including medical personnel, interviewed children and/or parents, and reviewed those children's completed A-Files.  There were 69 children onsite, 43 UACs and 26 AACs.

Children were held in both the processing and non-processing side of the facility.  On the processing side, children were present in three hold rooms.  Functioning toilets, functioning sinks, and five-gallon water jugs with paper cups were available in each room.  The temperature of the rooms were recorded within the appropriate range, and measured between 66 °F and 66.8 °F.  This is on the lower end of the range, but nevertheless, it is still within the appropriate temperature range.  JCO observed Mylar blankets were available and being used for warmth.

On the non-processing side of the facility, children were present in four of the pods.  Functioning toilets and functioning sinks with soap and paper towels were available in each pod.  Five-gallon water jugs with cups, bottled water, snacks, baby formula, bottles, diapers, baby wipes, and feminine hygiene products were accessible in each pod at all times.  Signs were posted in the pods encouraging individuals to ask for items they needed, including food, water, blankets, bottles, and medical assistance.  Parents and children were using mats and Mylar blankets in the pods.  The pods appeared clean, and agents informed JCO that pods were professionally cleaned twice a day.  JCO observed a professional cleaning crew mopping one of the pods and cleaning the mats.  The temperature of the pods were recorded within the appropriate range, and measured between 69.8 °F and 71 °F.  Each pod had a television used to play movies.  Shower and laundry facilities were available onsite.

JCO also observed the food and supplies available for agents to provide to children.  An agent explained that a food services contractor prepared and distributed meals three times a day.  Baby formula, baby food, juice, milk, and Pedialyte were available and within the expiration date.  Diapers, baby wipes, diaper cream, body soap, shampoo, deodorant, toothbrushes and toothpaste, and feminine hygiene products were also available.  JCO observed shoes and clothing in various sizes were available, including T-shirts, sweatpants, sweatshirts, underwear, and socks.  JCO also observed additional Mylar blankets and mats were available.

Contract medical personnel were onsite at all times.  JCO interviewed the medical personnel and discussed the medical process.  The process and medical capabilities discussed during this spot check generally mirrored JCO's discussions during its previous site visit.  Medical personnel continued to utilize a whiteboard to track pertinent patient information related to medications and ongoing monitoring.

Moreover, JCO observed caregivers onsite, and interviewed the supervisor caregiver. The supervisor explained that five caregivers, one male and four females, facilitated the shower process and assisted as appropriate.  The caregivers informed JCO that they provided clean clothes and towels to children, and explained that hygiene items were available for them to use when showering.  The caregivers also instructed the children to place their dirty clothes in the laundry bags provided so that the clothes could be washed and returned to them.  In addition, the supervisor explained that the caregivers monitored and provided general care to infants and young children in custody.  All of the caregivers onsite spoke Spanish.

During my previous visit, one of the children I interviewed informed me that a guard had tapped him with his boot to wake him up.  During this trip, JCO interviewed the supervising contract guard on duty, who informed them that the company's management issued email guidance emphasizing professionalism, including reminders that guards must not yell or tap children with their boots in order to wake them up. He explained that if a child did not wake up when called, he would not touch the sleeping child.  Instead, he explained that he would ask another child to wake up the sleeping child.  The supervisor also explained that he reminded the guards under him that the bottles were for single use only.  He also told JCO that the guards in the pods distributed toothbrushes and toothpaste to children, and ensured these items were discarded after each use.  Finally, the supervisor explained that guards or agents escorted children receiving medication to the medical treatment room at the appropriate times.

JCO pulled a sample of five children's custodial records who were in custody at CPC-Ursula on February 27, 2020, and reviewed the data remotely.  While not a FSA requirement, JCO identified that agents inconsistently recorded custodial actions in e3DM.  For example, all five logs had five to nine-hour gaps in the recording of welfare checks.  On February 27, 2020, one log had a 14-hour gap and one log had a 22-hour gap. Moreover, a breakfast and lunch provided were not recorded on February 26, 2020 in all five logs.  Despite the inconsistent entries, I believe that welfare checks were performed. All of the levels of supervision and engagement ensure that children at CPC-Ursula are consistently checked on even when a welfare check is not recorded in e3DM.  Caregivers are onsite to monitor and assist with infants and young children, and guards are in the pods at all times to supervise.  Likewise, medical professionals use the whiteboard to track which children require follow-up and request agents or guards bring the children to the medical treatment room.  Based on JCO's interviews with caregivers, guards, and

medical personnel, I believe they will promptly notify USBP of any concerns they have about a child.  Per the amenity report for March 4, 2020, when the team was onsite, the pods did not have issues; this was confirmed by JCO's physical inspection.

JCO interviewed three children at CPC-Ursula: two UACs and one child with her mother.  The first interview was with M.R.N., an unaccompanied 16-year-old male from Honduras.  M.R.N was apprehended on March 4, 2020 at 12:35 AM.  At the time of the interview, M.R.N. had been in CBP custody approximately 12 hours.

M.R.N. told JCO the apprehending agent treated him well and gave him a face mask and water when the agent saw him coughing.  M.R.N. also said that the agent asked him if he was feeling well.  M.R.N. was still wearing the face mask when JCO interviewed him.  M.R.N. said he was transported to CPC-Ursula and seen by medical personnel.  M.R.N. confirmed the medical personnel spoke Spanish.  The medical check was documented on his custodial records, and JCO observed M.R.N. was wearing a wristband.  M.R.N. explained that after the medical check, he received food and was assigned to a hold room.  His custodial records indicated he received a meal and snack.  M.R.N. stated he fell asleep for a bit before he was woken up to continue processing.  After processing, he told JCO he went back to sleep.  M.R.N. stated he slept on the processing side of the facility and, in the morning, moved to the non-processing side of the facility.  M.R.N. confirmed he received a mat and Mylar blanket, and that the lights were dimmed.  His custodial records only noted a Mylar blanket was provided.

M.R.N. informed JCO that in the morning he received breakfast, showered, and brushed his teeth.  His custodial records documented that a meal, shower, and dental hygiene product were provided.  M.R.N. also mentioned the caregivers facilitated the shower process.  He mentioned shampoo, soap, and towels were available.  M.R.N. explained that he received clean clothes to wear while his clothes were being laundered.  JCO observed M.R.N. wearing the clothes provided at CPC-Ursula, including a sweatshirt and sweatpants.  M.R.N. stated the clothes were warm.  Provision of clean clothing was not recorded.  M.R.N. confirmed access to functioning toilets and functioning sinks with soap and paper towels.  He also stated that drinking water was always available.  He told JCO he did not know if snacks were always available because he had been in the facility for a short amount of time.  JCO showed M.R.N. the snacks in his pod when he returned from the interview.  M.R.N. also mentioned he watched television in his pod.  After the interview, JCO reviewed M.R.N.'s completed A-File, which contained the I-770 and list of free legal services providers.  According to his custodial records, M.R.N. received an ORR placement on March 4, 2020, and was transferred from CBP custody on March 5, 2020.  He was in CBP custody for approximately 32 hours.

Next, JCO interviewed C.M.M., an unaccompanied 16-year-old female from Honduras.  C.M.M. was apprehended on March 3, 2020 at 8:20 PM.  At the time of the interview, C.M.M. had been in custody approximately 16 hours.

45

C.M.M. stated the apprehending agent asked if she was feeling ill and offered her water. When she arrived at CPC-Ursula, C.M.M. explained medical personnel asked her questions about her health, and afterwards, gave her a wristband.  The medical check was documented in her custodial records, and JCO observed C.M.M. wearing the wristband. C.M.M. explained that she, then, continued to the processing side of the facility and received a sandwich, juice, and crackers.  On her way to the processing side of the facility, C.M.M. stated an agent told her she could take as many snacks as she needed. The custodial records noted she received a meal and snacks.  C.M.M. mentioned that during processing, she called her mother, and the processing agent explained to her that she could call her mother again in a couple of days.  She mentioned that all of the agents she interacted with during processing were nice.

Next, C.M.M. stated she moved to the non-processing side of the facility where she received a mat and Mylar blanket.  C.M.M. told JCO she slept during the night, and that the lights remained on.  Custodial records noted she received a Mylar blanket.  In the morning, she received breakfast, which included a burrito, granola bar, apple, milk, and bottled water.  This meal was documented in her custodial records.  After breakfast, C.M.M. informed JCO that she showered and brushed her teeth.  She explained that caregivers facilitated the shower process, and that shampoo, soap, and towels were available.  She explained that during the shower process the caregivers would also remind the females that feminine hygiene products were available.  C.M.M. told JCO that she received warm, clean clothes.  C.M.M. stated her clothes were laundered and returned to her.  Shower, dental hygiene product, and clean clothes provided were documented in her custodial records.  C.M.M. stated she received lunch prior to JCO's interview, which included a burrito, chips, and milk.  This meal was documented in her custodial records.

C.M.M. confirmed she had access to functioning toilets, functioning sinks, and drinking water on both the processing and non-processing sides of the facility.  She explained that the non-processing side of the facility also had soap to wash her hands and paper towels to dry them.  C.M.M. informed JCO that snacks and feminine hygiene products were always available in her pod.  C.M.M. stated the temperature on the processing side of the facility was cold; however, it was better on the non-processing side of the facility.  She also explained that she could have as many Mylar blankets as she needed, telling JCO that she had three and could take more if needed.  C.M.M. informed JCO she was able to watch television.  After the interview, JCO reviewed C.M.M.'s completed A-File, which contained the I-770 and list of free legal services providers.  According to her custodial records, C.M.M. received an ORR placement on March 4, 2020, and she was transferred from CBP custody on March 5, 2020.  She was in CBP custody for approximately 37 hours.

Finally, JCO interviewed I.M.S., an 11-year-old female from El Salvador and her mother. I.M.S. was apprehended with her mother on March 4, 2020 at 12:10 AM. At the time of the interview, I.M.S. had been in CBP custody for approximately 12 hours.

The mother explained she and her daughter were transferred to a station for approximately four hours before they were transferred to CPC-Ursula. Custodial records indicated I.M.S. was transferred to Rio Grande City Station first, before being transferred to CPC-Ursula. The mother stated that while at Rio Grande City, they did not receive anything to eat or receive Mylar blankets. The mother also stated that the station felt cold. The mother explained that once transferred to CPC-Ursula, the Spanish-speaking medical personnel checked her daughter, and the family received crackers and juice. The mother explained she and her daughter were then assigned to a hold room on the processing side of the facility and received Mylar blankets. The medical check, as well as snacks and Mylar blanket provided, were noted in I.M.S.'s custodial records.

Later that morning, the mother explained she and her daughter received breakfast, showered, and brushed their teeth. She also informed JCO that she and her daughter received clean clothes. The mother told JCO that caregivers facilitated the shower process and explained what to do with their dirty clothes. The mother mentioned that shampoo, soap, and towels were available. JCO observed the mother and daughter wearing clothes provided at CPC-Ursula. The daughter was wearing her own jacket during the interview. The mother mentioned that she and her daughter were wearing their own shoes, but that their shoes were still wet from before they were apprehended. JCO informed an agent, who provided the mother and daughter with shoes. I.M.S.'s custodial records documented that a meal, shower, and dental hygiene product were provided. The custodial records did not show clean clothes were provided.

When the family moved to the non-processing side of the facility, the mother and daughter were assigned to different pods. I.M.S. confirmed she received a mat and blanket when she moved to the pod, but it was not recorded in her custodial records. The mother and I.M.S. confirmed they had access to functioning toilets, functioning sinks, and drinking water throughout their time in custody. They noted that soap was available in the pods on the non-processing side of the facility. The daughter was not aware that snacks were available in her pod. JCO showed her the snacks when she returned from the interview. The mother expressed that she and her daughter felt safe and were treated with respect while in CBP custody. I.M.S.'s A-File was not complete so JCO did not review it. I.M.S. was transferred from CBP custody on March 22, 2020. I.M.S. spent approximately 431 hours in CBP custody.

Based on JCO's spot check, I believe CPC-Ursula was substantially compliant with the FSA. Children had access to food, drinking water, functioning toilets, and functioning sinks with soap, and the pods were maintained within the appropriate temperature range. JCO observed professional cleaning crews maintaining the cleanliness of the pods and

saw that shower facilities were available and used.  JCO's interviews and observations, reflected more positive interactions with guards.  The supervisor guard confirmed management issued guidance emphasizing professional conduct, and he explained how he wakes children up without touching them.  While there continues to be data entry challenges, JCO's observations and interviews confirmed that custodial actions typically occurred despite not being recorded.  Overall, I believe CPC-Ursula substantially complied with the FSA.

<u>Weslaco Station</u>

On March 5, 2020 at 9:00 AM, my team arrived at Weslaco Station.  I was not onsite for this visit; however, JCO advised me of their observations and results upon their return. JCO inspected the facility, interviewed contractors, including medical personnel, interviewed a parent on her child's behalf, and reviewed the child's completed A-file.  At the time of the spot check, there were four AACs onsite with the following conditions: flu, flu exposure, chicken pox, and herpangina.  As during my November 2019 site visit, Weslaco Station was designated as an isolation station for RGV Sector.

JCO observed children in three different hold rooms.  JCO confirmed each hold room provided access to functioning toilets, functioning sinks, and drinking water.  Soap was not available in the hold room, but it was available in the sally port.  JCO observed hand sanitizer in the processing area.  Children had mats and Mylar blankets in the hold rooms. The temperature of the pods were recorded within the appropriate range, and measured between 68.3 °F and 73.4 °F.

JCO observed an agent preparing and hand delivering lunch to children, which consisted of a hot pocket or a bologna sandwich.  During this process, the agent interacted with each individual in custody, and gave the children a choice of what they wanted to eat. The agent informed JCO that breakfast and lunch meals were prepared onsite by agents. For dinner, agents purchased meals from local restaurants.

JCO also observed the food and supplies available for agents to provide to children. Baby formula, juice, and Pedialyte were available and within their expiration dates. Diapers, baby wipes, diaper cream, body wipes, soap, shampoo, deodorant, toothbrushes and toothpaste, combs, and feminine hygiene products were available.  JCO observed shoes and clothing in various sizes were available, including T-shirts, sweatpants, sweatshirts, underwear, socks, and beanies.

As previously indicated, RGV Sector personnel confirmed Weslaco began providing showers on December 14, 2019, once a contracted caregiver was assigned to the station. During this site visit, JCO observed the shower facilities were operational and in use.  A female caregiver, who spoke Spanish, assisted with shower monitoring and facilitated onsite laundry services.  The caregiver explained that a male agent monitored showers for

the male children.  The caregiver also informed JCO that showers were provided every other day to the children onsite.  Furthermore, JCO interviewed two laundry contractors who were assigned to Weslaco Station.  The laundry contractors explained they provided laundry services, and cleaned and disinfected the shower facility.

Medical personnel were onsite at all times.  JCO interviewed the medical personnel onsite, who discussed the medical process.  The process and medical capabilities discussed during this spot check generally mirrored JCO's discussions during its previous site visits.  Medical personnel explained that children were not medically cleared from Weslaco Station until their fever was gone.  Medical personnel explained they typically checked a child's status every four hours, unless the child had a fever; in which case, they checked the child every hour until the fever was gone.  Medication needing refrigeration was stored in the medical treatment room, while non-refrigerated medication was stored with the child's property.

JCO observed that medical personnel maintained an electronic whiteboard with pertinent patient information in the medical treatment area to ensure medications were administered properly.  While onsite, JCO took a picture of the electronic medical whiteboard printout, and remotely reviewed the medical documentation captured in e3DM for the four children under medical supervision.  All four had welfare check recordation gaps, including an approximately 4.5 hour gap.  According to the electronic whiteboard and e3DM, three of the four children were not supposed to be receiving medication; however, all four of the children's custody logs had a recordation of medication provided.  One of the comments entered by an agent stated that "medication given to every subject that is on treatment," implying that medication was given only to children who were supposed to be receiving it.  Based on JCO's interviews with agents and medical personnel, it is likely this was a data entry error where the action "medication given" was logged for all individuals in custody instead of logged only for the specific children or adults who were receiving medication.

JCO reviewed the data remotely before the spot check for the only child in custody at the Weslaco Station on February 26, 2020.  This allowed my team to discuss any identified challenges with agents while they were onsite.  JCO identified that agents were inconsistently recording welfare checks in e3DM.  While onsite, an agent explained that welfare checks were conducted every 15 minutes by walking around the processing area and checking on children in their hold room.  During the day, the agent explained that if the child is sleeping or does not appear to moving, the agent will wake the child up to confirm the child is ok.  From 11:00 PM to 5:00 AM, the agent explained welfare checks continued to be conducted every 15 minutes by walking around to each hold room, but the agent explained that agents do not wake the child up and interrupt the child's sleep.  According to the child's custodial records, various welfare checks were recorded at 30-minute intervals, with one entered after approximately an hour.  Based on the agent's

description of the welfare checks process, and the ongoing medical monitoring the medical personnel described, I believe that children are consistently supervised even if welfare checks are recorded inconsistently.  Per the amenity report for March 5, 2020, when the team was onsite, no issues were reported.  This was also confirmed by JCO's physical inspection.

Finally, JCO interviewed one mother while at Weslaco Station.  A.A.V. was a three-year-old female from Guatemala who was apprehended with her mother on February 28, 2020 at 4:05 PM.  At the time of the interview, the family had been in CBP custody for approximately 138 hours.

According to the custodial records, the family was transferred to Rio Grande City Station, and within the hour, the family was transferred to CPC-Ursula.  The custodial records showed the family was then transferred to Donna on March 1, 2020 before they were ultimately transferred to Weslaco Station on March 2, 2020.  The mother explained she and her daughter had been at three CBP facilities, which JCO understood she was referring to CPC-Ursula, Donna, and Weslaco Station, since these were the facilities where she and her daughter had stayed overnight.

The mother explained she and her daughter were transferred to Weslaco Station because medical personnel diagnosed A.A.V. as having a contagious virus, and the daughter needed to be placed in isolation.  The mother explained that A.A.V. received a medical check from medical personnel when she arrived at CPC-Ursula.  After arriving at Donna, the mother explained she requested for her daughter to be seen by the medical personnel onsite and agents facilitated this request.  The custodial records documented that medical personnel diagnosed the child with herpangina and that the mother and daughter would be transferred to Weslaco Station for isolation.  The custodial records show A.A.V. and her mother were transferred to Weslaco Station that same day.  Medication provided was documented in A.A.V.'s custodial records the night she arrived at Weslaco Station and throughout the next day.

The mother told JCO that throughout the family's time in custody, they received three meals a day, had a mat and Mylar blanket, and had access to drinking water, functioning toilets, and functioning sinks.  She noted that Weslaco was the only station without soap in the hold rooms.  The mother also informed JCO that she and her child had showered at CPC-Ursula, Donna, and Weslaco Station.  She also stated A.A.V. had her clothes washed and returned to her.  A.A.V.'s custodial records did not include clean clothing provided or that a shower was provided at CPC-Ursula.  Her custodial records documented she showered once while at Donna and twice at Weslaco Station prior to JCO's interview.  The mother explained that at Weslaco Station, agents provided snacks from a snack cart, and that she felt comfortable asking agents for snacks for her daughter.  The mother also explained that at Weslaco Station, she and her daughter received burritos, sandwiches, and food ordered from restaurants.  The mother told JCO that

A.A.V. was eating the food and that the family had not been hungry while in custody. After the interview, JCO reviewed A.A.V.'s completed A-File, which contained a list of free legal services providers.  According to the custodial records, A.A.V. and her mother were transferred to Donna on March 7, 2020.  The family was transferred from CBP custody on March 12, 2020.  A.A.V. was in CBP custody for approximately 299 hours total.

Based upon JCO's spot check, I believe Weslaco Station was substantially compliant with the FSA.  JCO confirmed children had access to meals, snacks, and drinking water, and confirmed the hold rooms all provided access to functioning toilets, functioning sinks, and drinking water.  Although soap was not available in the hold room, during my earlier site visit I learned that agents escorted children to the sally port each morning to brush their teeth and wash their hands.  JCO also observed hand sanitizer in the processing area.  Additionally, since my November 2019 site visit, the shower facility was being used, and JCO observed a caregiver onsite to facilitate the shower process. While there were still challenges with data completeness concerning welfare checks and medication provided, JCO discussed the medical process and ongoing monitoring with the medical personnel onsite.  Medical personnel maintain the electronic whiteboard and their own documentation, even if medical actions are not logged in e3DM.  JCO also confirmed that agents conducted regular welfare checks and discussed what this entailed. Based on these discussions, and my observations from my previous visit, I believe children were being consistently monitored despite welfare checks being inconsistently recorded.  Overall, I believe that Weslaco Station was substantially compliant.

## C. Flores Virtual Inspections (FVIs)

Given the travel restrictions related to the COVID-19 pandemic, JCO developed and implemented a remote inspections protocol that leveraged technology to allow for continuous monitoring of FSA compliance.  During this reporting period, JCO conducted FVIs at three USBP facilities and one OFO POE.

### i. *Methodology*

Two factors influenced the OFO and USBP locations selected for the FVIs.  First, JCO and I selected facilities that were likely to continue holding children even when there were reduced numbers of individuals in custody.  This was based on historical data from the previous six months, which narrowed down locations where children were more likely to be in custody.   Second, facilities outside of RGV and EPT were strongly considered to ensure consistent monitoring across the Southwest Border, beyond RGV and EPT Sectors. However, an FVI was only conducted at a particular facility when it had children in custody.

On April 29, 2020, JCO conducted the FVI beta test at EPT's MCPC.  Six additional facilities were tentatively scheduled to follow the beta test.[9]  Of the six additional locations scheduled, children were onsite at only three locations during the FVI timeframe.  In total, JCO conducted four FVIs at the following locations:  MCPC in EPT Sector, CPC-Ursula in RGV Sector, El Centro Station in El Centro Sector, and San Ysidro POE in the OFO San Diego Field Office.

All facilities originally scheduled received an FVI pre-brief via video conference.  During the pre-brief, JCO provided information on the history of JCO, the purpose of the FVI, and the areas to be reviewed.  In addition, the facilities were given the opportunity to ask questions.  At the conclusion of each FVI, JCO conducted an exit-brief, informing the facilities of the results of the inspection.  In addition, JCO communicated our observations to OFO and USBP Headquarters as well as to the points of contact at the inspected facilities.

The FVI took approximately half a day to complete and involved the assistance of onsite agents or officers.  The FVI focused on the following areas.

<u>Physical Inspections</u>

Hold room inspections were conducted via video conferencing on a government mobile phone.  The physical inspection of the hold room included, flushing toilets, running water in the sinks, measuring the temperature of the hold rooms, and verifying overall conditions of the hold room were safe and sanitary.  The physical inspection also included other areas related to care and custody, such as food storage, supplies, and shower facilities.  JCO completed a video conference call with the location, and an agent/officer walked around showing the facility's storage area and its contents.

<u>Data Review</u>

A sample based on the onsite population of children was selected for the data review.  The sampled custodial records and amenity reports were reviewed to ensure that custodial actions, such as meals provided, welfare checks, and medical checks, were recorded and that issues with the hold rooms were addressed.  In addition, JCO interviewed supervisory and non-supervisory personnel involved with the custody process and the recording of custodial actions.

---

[9]  The six additional facilities scheduled were as follows: Brown Field Station in San Diego Sector, Yuma Station in Yuma Sector, Weslaco Station and CPC-Ursula in RGV Sector, El Centro Station in El Centro Sector, and San Ysidro POE in San Diego Field Office.

Medical capabilities

JCO interviewed a supervisor familiar with the medical capabilities of the facility. If children were under medical care at the time of the FVI, JCO selected a sample and reviewed the children's custodial records to determine whether medical actions such as hospitalizations and medications were recorded.

ii.  *Observations and Results*

The following sections detail JCO's observations and results from the four FVIs conducted.

a.  U.S. Border Patrol Facilities

El Paso MCPC

JCO conducted the FVI beta test at the El Paso MCPC on April 29, 2020. This was a brand new facility designed specifically for children and families, and intended to replace the THF soft-sided facility. I toured the MCPC before construction was complete during my January 2020 site visit to El Paso Sector. The MCPC was operational beginning March 2020. At the time of the FVI, the MCPC was holding two children, one UAC and one AAC.

The physical site inspection confirmed that the facility provided access to the following: meals and snacks (all within their expiration dates); drinking water; functioning toilets; functioning sinks; and cots/mats and blankets. JCO observed, via video conference, that the pods with children were clean, and within the temperature range of 66 °F to 80 °F. JCO also noted that the MCPC storage area was fully stocked with warm clothing in multiple sizes, and supplies such as bottles, baby formula, baby diapers, diaper cream, baby wipes, hand sanitizer, soap and shampoo, toothbrushes and toothpaste, feminine hygiene products, flip flops, juice, milk, cups, paper towels, and car seats. The MCPC had showers onsite. In addition, each pod holding children had a designated play area with safety mats, and the facility had an outdoor play area with ample space to run around. The MCPC had contract medical personnel and contract caregivers onsite.

The data review identified that the facility consistently recorded cot/mat and blanket provided, dental hygiene product provided, shower provided, body cleansing product provided, clean clothing provided, and the UAC video shown. In addition, no discrepancies were noted with the recording of meals. However, JCO found that welfare checks were not recorded at night, resulting in an eight-hour gap in recordation in one of two custodial records reviewed.

53

The medical capabilities review showed that the medical checks were performed and recorded in e3DM. The two children in custody did not require additional medical attention, per our interview with the supervisor and review of custodial records.

Based on the FVI, I believe MCPC was substantially compliant with the FSA. JCO confirmed the facility provided meals and snacks, and the pods measured within the appropriate temperature range and provided access to drinking water, functioning toilets, and functioning sinks. During the brief-out, JCO discussed the gap in welfare checks at night. The sector leadership concurred that welfare checks should be recorded at night. Overall, I believe that the MCPC was substantially compliant with the FSA.

CPC-Ursula

JCO conducted the FVI at the CPC-Ursula on May 20, 2020. The facility was holding eight children, five UACs and three AACs.

The physical site inspection confirmed that the facility provided access to the following: meals and snacks (all within their expiration dates); drinking water; functioning toilets; functioning sinks; and cots/mats and blankets. JCO observed, via video conference, that the pods with children were clean, and within the temperature range of 66 °F to 80 °F. JCO also noted that the CPC-Ursula storage area was fully stocked with warm clothing in multiple sizes, and supplies, such as bottles, baby formula, baby diapers, diaper cream, baby wipes, hand sanitizer, soap, shampoo, toothbrushes and toothpaste, feminine hygiene products, flip flops, juice, milk, cups, paper towels, and car seats. CPC-Ursula had showers onsite. The holding areas had signs posted encouraging individuals to ask for food, water, blankets and medical assistance (if needed). In addition, the pods holding children had ample space for them move around freely and there was a separate caregiver section had a safe play area for toddlers. CPC-Ursula had contract medical personnel and contract caregivers onsite.

The data review identified that the facility consistently recorded cot/mat and blanket provided, dental hygiene product provided, shower provided, body cleansing product provided, clean clothing provided, and the UAC video shown. In addition, no discrepancies were noted with the recording of meals. While not a FSA requirement, JCO noted that welfare checks were not always recorded at night, resulting in five to seven-hour gaps in recordation in seven of the eight custodial records reviewed.

The medical capabilities review verified that the medical checks were performed and recorded in e3DM. Per the medical whiteboard discussed in the previous section on CPC-Ursula, one of the AACs was diagnosed with Acute Gastroenteritis by onsite contract medical personnel, given Pedialyte, and later diagnosed as no longer presenting symptoms. The medical incident was recorded on both the medical whiteboard and in the custodial records in e3DM.

Based on the FVI, I believe CPC-Ursula was substantially compliant with the FSA. JCO confirmed the facility provided meals and snacks, and the pods measured within the appropriate temperature range and provided access to drinking water, functioning toilets, and functioning sinks. While there were still challenges with data recordation, there was improvement. During the FVI, JCO did not identify any missing recordation of meals provided as it did during both the site visit and spot check previously conducted at CPC-Ursula. Furthermore, although welfare checks were inconsistently recorded, JCO and my site visits confirmed that children were supervised by guards in pods, caregivers assisted with infants and young children, and medical personnel conducted medical monitoring and follow-up depending on the medical need. Based off JCO's previous interviews with caregivers, medical personnel, and contracted guards, I believe they will promptly notify USBP of any concerns they have about a child. Therefore, even if welfare checks were not recorded, agents and contract support consistently engaged with children throughout their time in custody. Overall, I believe that CPC-Ursula was substantially compliant with the FSA.

El Centro Station

JCO conducted the FVI at El Centro Station on May 27, 2020. The facility was holding two UACs.

The physical site inspection confirmed that the facility provided access to the following: meals and snacks (all within their expiration dates); drinking water; functioning toilets; functioning sinks; and cots/mats and blankets. JCO observed that the hold room with children was clean. JCO also noted that the El Centro Station storage area was fully stocked with warm clothing in multiple sizes, and supplies such as bottles, baby formula, baby diapers, diaper cream, baby wipes, hand sanitizer, soap, shampoo, toothbrushes and toothpaste, feminine hygiene products, flip flops, juice, milk, cups, paper towels, and car seats. El Centro Station had showers onsite. There was a designated play area with toys for the children. Contract medical personnel were onsite.

JCO noted that temperature of the hold room was not within the accepted range of 66 °F to 80 °F. The temperature of the hold room measured 64 °F. The supervisor informed JCO that the temperature was colder than the acceptable range due to the HVAC repair work being conducted at the facility, and explained repairs were scheduled to be completed by June 15, 2020. To compensate for the low temperatures agents provided extra blankets and warm clothing to the children.

The data review did not identify any issue in the recording of custodial actions. The medical capabilities review verified that the medical checks were performed and recorded in e3DM. The two children in custody did not require additional medical attention, per our interview with the supervisor and review of the custodial records.

Based on the results of the FVI, I believe that El Centro Station was substantially compliant with the FSA. JCO confirmed the facility provided meals and snacks, drinking water, functioning toilets, and functioning sinks. Although a hold room measured below the accepted range, agents at El Centro provided the children additional blankets and clothing for warmth. Therefore, I believe El Centro Station was substantially compliant with the FSA.

      b.   Office of Field Operations Facility

<u>San Ysidro POE</u>

JCO conducted the FVI of the San Ysidro POE on June 3, 2020. The facility was holding two AACs.

The physical site inspection confirmed that the facility provided access to the following: meals and snacks (all within their expiration dates); drinking water; functioning toilets; functioning sinks; and cots/mats and blankets. JCO observed, via video conference, that the children's hold room was clean, and within the temperature range of 66 °F to 80 °F. JCO also noted that the San Ysidro POE storage area was fully stocked with warm clothing in multiple sizes, and supplies, such as bottles, baby formula, baby diapers, diaper cream, baby wipes, hand sanitizer, soap, shampoo, toothbrushes and toothpaste, feminine hygiene products, flip flops, juice, milk, cups, paper towels, and car seats. The San Ysidro POE had showers onsite. The POE had contract medical personnel onsite.

The data review did not identify any issue in the recording of custodial actions. JCO identified an OFO "best practice" in the welfare check icon incorporated into the new Unified Secondary (USEC) system, which is OFO's system of record. USEC reminds officers to record welfare checks timely. The USEC system has a color-coded check mark on the welfare check icon that is either green, yellow, or red depending on the time that elapsed since the last recorded welfare check.

The medical capabilities review verified that the medical checks were performed and recorded in USEC. The two children in custody did not require additional medical attention per our interview with the supervisor and review of the custodial records.

Based on the FVI, I believe San Ysidro POE was substantially compliant with the FSA. JCO confirmed the facility provided meals and snacks, and the hold room measured within the appropriate temperature range and provided access to drinking water, functioning toilets, and functioning sinks. Therefore, I believe that San Ysidro POE was substantially compliant with the FSA.

## D. Key Insights and Takeaways

Based on JCO's and my observations from 12 inspections; interviews with agents, officers, contractors, and 19 children and/or parents; as well as review of custodial records and completed A-files, I conclude that CBP substantially complied with the FSA.

JCO and I observed, and confirmed through interviews with agents, officers, and children and/or parents on their child's behalf, that all of the CBP facilities we visited provided access to regular meals and snacks through various means that best fit their operating environment. For the most part, CBP facilities leveraged food services contracts to provide three meals each day. At Weslaco Station, JCO observed and confirmed in their interview with a mother and daughter that agents prepared breakfast and lunch, and ordered dinner for individuals in custody from local restaurants. The supervisory agent explained this framework worked best for the station because it tended to have lower numbers of individuals in custody. JCO and I observed there were also a variety of snacks available in all of the facilities, such as chips, cookies, crackers, and snack bars. In several facilities, fresh fruit was also available. JCO observed and confirmed through interviews that snacks typically were available for children to take as needed. Even in facilities where snacks were not available in the hold room or pod at all times, interviews with children and/or parent's on their child's behalf confirmed snacks were generally provided at regular intervals.

JCO and I also noted the availability of age-appropriate food for children, including baby formula, in each facility we inspected. Single use bottles were also available, typically accessible in the pod or hold room, but in some locations, available upon request. JCO and I observed signs posted in pods indicating individuals could ask for items they needed, including bottles. Based on interviews, it appeared some parents were unaware that bottles were single use only, even when accessible in the pod. In each interview where JCO or I learned a parent was re-using bottles, we immediately clarified to the parent that the bottles were single use and a new bottle was available either in the pod, or upon request. After the interview, JCO showed the parent where the bottles were located or accompanied the parent to request a bottle and reiterated to the parent that he or she could continue to ask for as many bottles as he or she needed. Continuing to provide clear instructions and repeating these instructions periodically when agents, officers, contract guards, and caregivers interact with individuals in custody or provide items, like bottles, would clarify these instances of misunderstanding or confusion. I shared this insight with facility leadership while onsite this year, and was pleased when JCO reported the supervisory contract guard at CPC-Ursula reminded his guards that bottles were single use only. The guards were interacting with the parents in the pods daily and replenishing supplies in the pods, which included bottles. I believe that with the supervisor reminding his guards, the guards, in turn, would be more likely to pass on this instruction to parents and continue to remind parents, as needed.

Each facility also had various options for providing drinking water, such as water fountains in hold rooms, regularly cleaned five-gallon water jugs with cups, and/or bottled water.  Also, the facilities all provided access to functioning toilets and functioning sinks.  Most of the inspected CBP facilities also provided soap for children to wash their hands in the hold room or pod.  Where soap was not available in the hold room or pod, JCO noted that, in most cases, the processing area near the hold rooms had hand sanitizer.  Additionally, Weslaco Station had soap available in the sally port, and agents explained children washed their hands there every morning.

Throughout this reporting period, JCO only noted one instance where a hold room fell below the appropriate temperature range.  At El Centro Station, on May 27, 2020, one hold room measured below the acceptable range by 2°F.  The supervisor informed JCO that the temperature was colder than the acceptable range due to the HVAC repair work being conducted at the facility, which was scheduled to be completed on June 15, 2020.  To compensate for the low temperatures agents provided extra blankets and warm clothing to the children.

Additionally, every facility I visited had a janitorial contract in place to clean and sanitize the holding areas.  JCO and I observed janitorial crews onsite, and during interviews, children and parents also mentioned the hold rooms and pods were professionally cleaned.  All the facilities JCO reviewed had onsite showers for children to use.  Although Weslaco Station had showers onsite at the time of our November site visit, they were not in use because a caregiver had not been assigned to oversee the showers.  However, when showers were not available for use, the facility provided a bodily cleansing product to all the children at regular intervals.  A contracted caregiver was in place on December 14, 2019 and Weslaco station began using the showers at that point.  JCO confirmed that showers were in use during our March 2020 spot check.  In all our interviews with children and parents, they confirmed they had showered and received clean clothes at some point while in CBP custody.  Some of the children and parents even explained that their own clothes had been laundered and returned to them by the time of our interview.

At every facility my team and I inspected, children had blankets and access to mats or cots.  During our interviews, children using Mylar blankets confirmed that they were warm.  Children or parents, on their child's behalf, also confirmed they were able to sleep.  There were instances during my interviews where children, or parents on their child's behalf, informed me they were transferred to multiple facilities while in CBP custody and sometimes a facility only provided a blanket (and not a mat).  I did not inspect these facilities so I cannot confirm whether children had access to mats.  JCO's monitoring protocols incorporated the FSA and relevant CBP policy, including TEDS.  Per TEDS, all children must be provided clean bedding, which is defined as any combination of a blanket, mat, or cot.  I believe that the TEDs provision provides a

sufficient basis to assess compliance in CBP facilities.  To the extent that operational capacity allows, I believe CBP should ensure children have access to a blanket as well as a cot or mat.  However, the fact that some children may not have access to a cot or mat does not, in my opinion, mean that a facility is not compliant with the FSA.

JCO and I also observed and confirmed, through interviews with agents, officers, contractors, and children or parents on their child's behalf, the multilayered approach CBP facilities used to ensure adequate supervision.  For example, JCO and I observed that at CPC-Ursula, Donna, THF, and Clint Station, an agent or a caregiver was present in each of the holding areas.  Weslaco Station was designated as an isolation station at the time of my visit, and agents described conducting welfare checks every 15 minutes, which were also generally documented in various custodial records JCO reviewed.  Although agents or officers were not present in the hold rooms with the children at El Centro Station and San Ysidro POE, as in the other facilities visited, there was constant monitoring via cameras in the hold rooms and the data review indicated welfare checks were performed regularly to ensure the health and safety of the children.

As I noted throughout this report, the medical care provided to children in CBP custody goes beyond the requirements of the FSA.  At the close of this reporting period, contract medical personnel were onsite at 50 USBP and 13 OFO facilities across the Southwest Border.  By comparison, in December 2018, contract medical personnel were onsite at four USBP facilities; and in July 2019, contract medical personnel were onsite at five OFO facilities.  All the facilities we visited had contract medical personnel onsite at all times.  In addition, CBP continued to enhance and standardize medical support across its facilities, resulting in the issuance of the CBP Directive 2210-004 *Enhanced Medical Support Efforts* and implementation plans.  Over the course of this year, JCO observed standard forms utilized at the various locations and medical personnel described similar processes from intake through transfer from CBP custody.  JCO observed medical care throughout our site visits and saw contract medical personnel listening and addressing parents' concerns.  When JCO learned, through one of our interviews, that a parent did not know that her son received his medication, JCO met with the medical personnel and verified that the medication was provided.  Then, JCO asked medical personnel to explain the treatment plan to the mother in Spanish.  During subsequent site visits, JCO confirmed with various medical personnel that there were Spanish speakers on shift and translation services could also be used for other languages.

Furthermore, when issues arose, systems were in place and CBP personnel took action to remedy or mitigate any issues.  For example, upon learning of a possible food poisoning incident at Donna, the CBP personnel overseeing the food services contract directed the contractor to discontinue using the sub-contractor.  Additionally, when agents learned that a mother and son missed lunch while they were in transit between facilities, the agent provided the mother and son with additional snacks until the contractor arrived to serve the dinner meal.  Moreover, at Clint Station JCO reviewed an amenity report and noted

59

that a repair request was initiated by the supervisor for one of the toilets in a hold room. By the time JCO arrived, the Clint Station had already made the needed repairs, and both toilets were functioning.

During one of my interviews, a child stated that a guard tapped him with a boot to wake him up. While the mother stated that her child was difficult to wake up because he was a sound sleeper, I discussed this interaction with facility leadership and informed our point of contact at USBP Headquarters. They all agreed that guards monitoring children should treat them respectfully and should not use their boot to wake up sleeping children. The next time JCO was onsite, a supervisory guard confirmed that management had issued guidance emphasizing professionalism and that guards should not tap children with their boot to wake them up.

One challenge that remained consistent across inspections was data completeness and recordation. Regardless of whether recordation of all custodial actions completed is required under the FSA, I continue to believe that thorough recordkeeping is important to document the agency's compliance with the FSA as well as the dedicated efforts of the agents and officers in the field. During our data reviews of custodial actions recorded at various facilities, we noticed discrepancies mainly in the recordation of meals and welfare checks. JCO and I observed meals provided, and we confirmed meals were provided at regular intervals during our interviews with children and/or parents on their child's behalf. JCO's and my observations and interviews highlighted that where discrepancies occurred, it was most commonly because agents and officers did not record custodial actions, not that these actions did not occur.

The frequency with which welfare checks were performed, what constituted a welfare check, and whether welfare checks were recorded was a common discussion during JCO's and my inspections. JCO and I observed, and confirmed with agents and officers during inspections that, agents, officers, and contract support regularly engaged with children and provided adequate supervision to ensure their health and safety. However, JCO noted some gaps of four hours or more in the recordation of welfare checks. One location explained that there were gaps in the recordation of welfare checks during night hours because welfare checks were only recorded when an agent directly engaged with the child. Therefore, if an agent observed the child sleeping, without any obvious signs of physical distress, it would not be recorded in e3DM as a welfare check. While not a FSA requirement, I directed JCO to engage with USBP sectors to determine whether additional guidance or action is required to clarify how welfare checks are performed and recorded. JCO has begun meeting with various sectors and facilities on this issue, and will continue to discuss this during the next reporting period.

Ultimately, based on JCO's and my observations from 12 inspections; interviews with agents, officers, contractors, and 19 children and/or parents on their child's behalf; as well as review of custodial records and completed A-files, I conclude that CBP

substantially complied with the FSA.  During this reporting period, JCO and I observed, and our interviews confirmed, that in general, children received regular meals and snacks; had access to drinking water, functioning toilets, functioning sinks, emergency medical assistance if needed; were held in rooms or pods with adequate temperature control and ventilation; and were adequately supervised, had contact with family members, and received a notice of rights.  Overall, JCO and I observed that the facilities we visited were safe and sanitary, and consistent with the Agency's concern for the particular vulnerability of children.

# IV.  Conclusion

From July 3, 2019 to June 5, 2020, I completed five site visits and directed JCO to conduct three spot checks and four FVIs at facilities across the Southwest Border and advise me of their observations.  As part of these 12 inspections, JCO interviewed 19 children and/or their parents and reviewed 99 custodial records.  Taken together, these activities provided me with sufficient basis to conclude that CBP held children in a manner that was consistent with the FSA.

Throughout JCO's and my inspections, we observed CBP applying lessons learned during last year's  unprecedented surge of UACs and families, and ensuring that conditions of custody met and went beyond the terms of the FSA.  JCO and I noted the continued expansion of onsite medical personnel across the Southwest Border, as well as the increased standardization of medical processes.  Likewise, JCO and I also observed the increased presence of caregivers to provide instructions, replenish food and supplies, and assist and supervise children as appropriate.  Shower and laundry facilities were also increasingly available and provided to children.

During last year's reporting period, CBP experienced a full-scale humanitarian and border security crisis as it deployed all available resources to meet critical and immediate needs.  This year, the number of children in custody has decreased drastically due to the COVID-19 pandemic and resulting national emergency.  Regardless of the number of children in custody, my responsibility is to ensure ongoing compliance with the FSA.  To that end, I directed my team to pivot to remote inspections and we will continue to conduct FVIs until official travel resumes and we can conduct site visits to CBP facilities across the Southwest Border.

JCO and I will continue to build on our monitoring protocols, and enhance our capabilities to best support the Agency's compliance with the FSA.  JCO is developing analytical and visualization tools to better analyze and organize the results from our inspections.  I will continue to engage agents and officers in the field to identify potential areas of concern related to conditions of custody, and I will continue to make

recommendations or take action, when necessary, to ensure conditions of custody meet
the terms of the FSA.

# Appendix: List of Acronyms

| Acronym | Definition |
|---|---|
| **A-file** | Alien File |
| **A-number** | Alien Number |
| **AAC** | Accompanied Alien Children |
| **CAO** | Chief Accountability Officer |
| **CBP** | U.S. Customs and Border Protection |
| **CPC** | Centralized Processing Center |
| **DHS** | U.S. Department of Homeland Security |
| **e3DM** | Enforcement Integrated Database e3 Detention Module |
| **EPT** | El Paso Sector |
| **FSA** | *Flores* Settlement Agreement |
| **HHS** | U.S. Department of Health and Human Services |
| **ICE** | U.S. Immigration and Customs Enforcement |
| **MPP** | Migrant Protection Protocols |
| **OAct** | Office of Accountability |
| **OFO** | Office of Field Operations |
| **ORR** | U.S. Health and Human Services, Office of Refugee Resettlement |
| **POE** | Port of Entry |
| **RGV** | Rio Grande Valley Sector |
| **UAC** | Unaccompanied Alien Child(ren) |
| **USBP** | U.S. Border Patrol |