# ATTACHMENT C

# ORR Juvenile Coordinator Report

## Table of Contents

I.   **Introduction**.................................................................................................... 1

II.  **Year in Review / Overview**.......................................................................... 1-12

    a.  Family Reunification Process.................................................. 1-4

    b.  Services while in Custody....................................................... 4-11

    c.  Legal Services and Child Advocacy........................................ 11-12

III. **ORR Policies and Other Agency Guidance**................................................ 12-19

IV.  **Demographics of UAC**................................................................................ 19-26

    a.  ORR Capacity, Referrals, Census and Discharges................................. 19-21

    b.  Demographics of UAC Referred to ORR................................. 21-26

V.   **Special Populations**.................................................................................. 26-34

    a.  Placement Types..................................................................... 26-30

    b.  Notice of Placement............................................................... 30-31

    c.  UAC Appeals of More Restrictive Placement Decision....................... 31-32

    d.  Services Provided.................................................................... 32-34

    e.  Special Populations Updates.................................................. 34

VI.  **Juvenile Coordinator Site Visits**............................................................... 34-39

VII. **Summary**.................................................................................................. 40

**ORR JUVENILE COORDINATOR ANNUAL REPORT**

**July 1, 2020**

**Aurora Miranda-Maese, ORR Juvenile Coordinator**

## Introduction

This is the first annual report for the Office of Refugee Resettlement submitted by the Juvenile Coordinator to The Honorable Dolly Gee. This report is submitted in accordance with Paragraph 30 of the Flores Settlement Agreement (FSA) and this Court's July 27, 2018 Court Order, in addition to the Court's Order on April 24, 2020. Pursuant to the April 24, 2020 Court Order, the Juvenile Coordinators were directed to file an annual report by July 1, 2020.

The U.S. Department of Health and Human Services (HHS), Administration for Children and Families, Office of Refugee Resettlement (ORR) required a consultant to serve as a Juvenile Coordinator under the Flores Settlement Agreement, which is the subject of enforcement actions before Your Honor. The role of the Juvenile Coordinator is to review, assess, and report to ORR and the court-appointed Special Master and, when necessary, the Court on compliance with the terms of Paragraph 28A of the Flores Settlement Agreement. The undersigned was hired as the ORR Juvenile Coordinator under contract, beginning on December 18, 2018.

This report documents ORR services, processes, and policies throughout various departments. The report also summarizes the Juvenile Coordinator's site visits to the various shelters from June 1, 2019 through May 31, 2020.

## Year in Review / Overview

### Family Reunification Process

The Office Refugee Resettlement (ORR) has policies and procedures to ensure that it makes continual efforts to unify unaccompanied alien children (UAC) in ORR custody and care with approved sponsors in a safe and timely manner. ORR evaluates each child's case and bases release decisions on child welfare principles and the best interest of the child standard. As required by statute, qualified sponsors must be capable of providing for the child's physical and mental well-being.

ORR's safe and timely release process involves several steps, including: the identification of potential sponsors; processing of the sponsor's application; interviews; assessment of sponsor suitability, including verification of the potential sponsor's identity and relationship to the child (if any); background checks; in some cases, home studies; and post-release case planning.

After UAC enter ORR custody, care provider staff arrange contact with their parents, legal guardians, or relatives, and the process of identifying a suitable sponsor begins. The vast majority of sponsors are parents or close relatives living in the United States.

ORR releases UAC to approved sponsors in the following order of preference:

- **Category 1:** Parent or legal guardian, including qualifying step-parents who have legal or joint custody of the child or teen.

- **Category 2A:** An immediate relative— a brother, sister, grandparent, or other relative (aunt, uncle, first cousin) who previously served as the UAC's primary caregiver. This includes biological relatives, relatives through legal marriage, and half-siblings.

- **Category 2B:** An immediate relative—including aunt, uncle, or first cousin who was not previously the UAC's primary caregiver. This includes biological relatives, relatives through legal marriage.

- **Category 3:** Distant relatives or unrelated individuals.

- **Category 4:** This category is utilized for UAC with no identified sponsor.

A child's sponsorship category may be fluid as new potential sponsors are identified or potential sponsors withdraw from the process and other individuals are identified as potential new sponsors. For example, a category 3 sponsor may begin the process but later withdraw. Unless another sponsor is located, the UAC's sponsorship status will be designated as category 4. Upon locating a new sponsor, the sponsorship designation will change to the new sponsor's category (i.e. Category 1, 2A, 2B, or 3). The fluidity of sponsorship is unique to each child. Where ORR is aware of multiple potential sponsors, ORR may work concurrently with all of the multiple sponsors on the family reunification process with the intentions of furthering efforts at safe and timely release of the UAC despite the possible withdrawal of a sponsor.

Within 24 hours of identifying a potential sponsor, the child's Case Manager at the ORR-funded care provider facility sends the Family Reunification Packet (FRP) to the potential sponsor. The Case Manager assists the potential sponsor in completing the FRP, which includes an application, sponsor declaration, and, if applicable, an authorization for release of information and letter of designation for care of the child. The potential sponsor must also provide documentation proving identity, immigration status or United States citizenship, address, and their relationship to the child. All of this documentation is used as part of the overall sponsor assessment process.

The Case Manager also assesses each potential sponsor's ability to provide for the physical and mental well-being of the UAC through the sponsor assessment and interview. The assessment determines the potential sponsor's strengths, resources, risk factors and special concerns within the context of the child's own needs, strengths, risk factors, and relationship to the potential sponsor.

As part of the family reunification process, the potential sponsor should attend a presentation known as the Legal Orientation Program for Custodians. The program is managed by the Office of Legal Access Programs, within the Executive Office for Immigration Review at the U.S. Department of Justice. The purpose of this program is to inform potential sponsors of their responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of

2008 (TVPRA of 2008), see 8 U.S.C. 1232. The program also provides information about pro bono immigration legal services available for the child.

### Background Checks

ORR requires a criminal public records check and a sex offender registry check of all potential sponsors, their adult household members, and adult caregivers identified in the sponsor care plan. Fingerprint-based background checks and/or child abuse and neglect checks may also be required.

To begin the background check process, the potential sponsor, adult household members, and adult caregivers identified in the sponsor care plan must provide a copy of a valid government-issued photo identification. Those undergoing a fingerprint-based background check must also provide a completed *Authorization for Release of Information* form and submit their fingerprints.

The type of background checks performed on a potential sponsor and their adult household members is dependent in part on the potential sponsor's relationship, if any, with the child. All Category 2B and 3 potential sponsors (that is, those who are not related to the UAC, who are non-immediate family members or certain close relatives who have never previously served as the UAC's primary caregiver) must be fingerprinted.

In addition, Category 1 and 2A potential sponsors (such as parents, step-parents, close relatives), non-sponsor adult household members, and adult caregivers identified in the sponsor care plan could be subject to fingerprinting under certain circumstances, such as when specific risks to the UAC have been identified, the UAC is particularly vulnerable, or a home study is required.

The fingerprints are cross-checked with the Federal Bureau of Investigation's National Criminal History Check, state repository records, and the U.S. Department of Homeland Security's arrest records. In addition, ORR performs public record checks on all potential sponsors, non-sponsor adult household members, and adult caregivers identified in sponsor care plans, to ensure child safety.

### Case Management

During the family reunification process, the Case Manager provides weekly status updates to the Case Coordinator (nongovernmental independent third-party reviewers), and the ORR Federal Field Specialist (ORR/FFS) on the progress in achieving a safe and timely release, as well as potential challenges that may delay a release. The Case Manager also provides weekly status updates (monthly for children in ORR's Long Term Foster Care) to the UAC on their case. The Case Manager informs other stakeholders of the progress of a child's case, including notification that a UAC may not have a potential sponsor, and any final release decisions. Stakeholders may include local legal service providers and attorneys of record, other local service providers, Child Advocates (independent third party advocates who are appointed by ORR for select UAC who are victims of trafficking or otherwise especially vulnerable), post-release and home study providers.

### Home Studies

In some cases, ORR requires a home study before releasing a child with a potential sponsor. Home studies are mandatory for certain cases identified in law (see, 8 U.S.C. 1232(c)(3)(B)), including for a child who is a victim of trafficking; a child with a disability; where the child has been a victim of physical or sexual

abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; and where the child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking, to the child based on all available objective evidence. Additionally, ORR requires a home study for any child pending reunification with a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. ORR also requires a home study for children who are 12 years and under before unification with a non-relative sponsor. Home studies may also be authorized with the concurrence of the case manager and the case coordinator as approved by ORR for cases where the home study is likely to provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child.

### Individuals Involved in the Release Decision

The Case Manager must make a recommendation to release a child to a potential sponsor after the Case Manager has evaluated the potential sponsor, completed the background checks, and collected all required supporting documents, such as documentation proving the potential sponsor's and household members' identities, as well as the potential sponsor's relationship to the child. Once the Case Manager makes their recommendation, the case is forwarded to the Case Coordinator, who also makes a release recommendation. Both recommendations are provided to ORR's Federal Field Specialist (ORR/FFS), who is an ORR employee with several years of past experience the child welfare related services. After reviewing the case, the supporting documents, and taking into consideration the recommendations provided, the ORR/FFS makes a decision to approve release when he/she determines that the release is to a safe environment, the potential sponsor can care for the health and well-being of the child, and the potential sponsor agrees that the child will appear for all immigration proceedings.

The ORR/FFS may approve a release with post-release services in certain cases, such as when the child's sponsor underwent a home study; the child was released to a non-relative sponsor; or when the release is determined to be safe and appropriate, but the UAC and sponsor would benefit from additional assistance with resources in the community and/or to address other concerns, such as mental health or other needs.

Once unified with a sponsor, minors are expected to appear for any pending immigration proceedings. ORR notifies U.S. Immigration and Customs Enforcement within 24 hours of the reunification of all UAC with sponsors. The notification includes the address of the released child, as well as the name of the sponsor.

## Services while in Custody

### Phases of Care

The table below describes the phases of care from the time a minor is admitted to the ORR shelter care network up to the time when the minor is discharged from the ORR shelter care network.

**ADMISSION** PHASE (Day 0-2)

> Contact Family

> Initial Intakes Assessment

> Initiate Family Reunification Process

**ASSESSMENT PHASE** (Days 2-10)

> Orientation

> Initial Medical Exam

> Assessment For Risk

> UAC Assessment

> Educational Assessment

> Individual Service Plan

> Know Your Rights (KYR) Presentation And Individualized Legal Screening

> Notice of Placement for UAC in more restrictive settings (i.e. secure, RTC, staff secure)

**CASE MANAGEMENT PHASE** (Ongoing Until Release)

> Services (health services, educational, recreational, etc.)

> Case Review

> Updates to the Individual Service Plan

> Family Reunification Efforts

> Home Study

**DISCHARGE** PHASE

> Transfer

> Release from ORR Custody

> Post Release Services

> 30-Day Safety and Well Being Call

## Health Services

Within ORR's Unaccompanied Children Programs, the Division of Health for Unaccompanied Children (DHUC) oversees public health screening and the provision of health services to children in ORR care. DHUC monitors for serious medical conditions and infectious disease of public health importance through an automated notification system. DHUC responds to care provider programs seven (7) days a week and provides management guidance on infectious diseases, serious mental health conditions, and complex medical cases. DHUC also ensures reporting of public health information to the appropriate public health authorities.

DHUC is comprised of 16 medical and public health professionals including 6 Medical Officers (3 pediatricians, 1 family medicine, 1 preventive medicine, 1 child & adolescent psychiatrist; all Board Certified in their specialty), 2 Epidemiologists (1 PhD level), 1 Nurse Epidemiologist, 1 Licensed Clinical Social Worker, 1 Epidemiologist/data manager and 5 Medical Services Coordinators.  Four team members received additional training through the Centers for Disease Control and Prevention (CDC) Epidemic Intelligence Service program, a 2-year applied epidemiology fellowship. In addition, both epidemiologists previously worked in infectious diseases at the CDC. Nine members are Commissioned Officers in the United States Public Health Service (USPHS) Commissioned Corps.

ORR provides care provider program staff with standardized guidance on health care and screening for all children 0 through 17 years of age that is similar to guidance for U.S. residents. Any child who is identified though intakes screening or the initial medical exam as having a unique medical or mental health need is referred to a specialist (e.g., psychiatrist, cardiologist) for further evaluation. In addition, children must be offered the opportunity to participate in a weekly counseling session aimed at identifying issues.  ORR requires care provider programs to submit significant incident reports on any behaviors or conditions that indicate a child may be experiencing a serious medical or mental health condition which may pose a danger to him/herself or others.

### Initial Medical Examination

Each child must receive an initial medical examination (IME) within two business days of admission. The purposes of the IME are to assess general health, administer vaccinations in keeping with U.S. standards, identify health conditions that require further attention, and detect contagious diseases, such as influenza or tuberculosis. The IME is performed by a licensed health care provider (MD, DO, NP, or PA). The IME is based on a well-child examination, adapted for the unaccompanied children population with consideration of screening recommendations from the American Academy of Pediatrics, the CDC, and the U.S. Preventive Services Task Force. If a vaccination record is not located or a child is not up-to-date, the child receives all vaccinations in accordance with the Advisory Committee on Immunization Practices recommended catch-up schedule, approved by the CDC. Children also receive seasonal influenza vaccine. Data from the IME is entered into a web-based data repository accessible by DHUC staff who routinely monitor reports to ensure care provider programs are adhering to ORR guidelines and timelines. Some health conditions may manifest after a child is transferred to a shelter facility. If a health issue arises, the child will receive prompt attention and medical care is provided.

### Medical Services

ORR facilitates and funds health care for all children in its custody. ORR has developed its health care policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel and communities. Through ORR's care providers and other health care professionals, children receive the following services:

- Routine medical and dental care

- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception

- Emergency health services

- ▪ A complete medical examination (including screening for infectious diseases) within 2 business days of admission (excluding weekends and holidays and unless the youth was recently examined at another facility)

- ▪ Immunizations

- ▪ Administration of prescribed medications and special diets

- ▪ Appropriate mental health interventions

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each child.

### *Public Health Surveillance*

DHUC routinely tracks instances of infectious disease occurring among children in care and advises care provider staff on infection prevention, infection control, and public health reporting in line with local, state, and federal disease-specific public health guidelines. This includes influenza and other common infectious diseases that might occur in the ORR program setting.

### *Division Initiatives during the Reporting Period*

#### Staffing

To strengthen and expand DHUC's current medical, mental, and public health expertise and staff resources to ORR care provider programs, DHUC was granted approval to hire additional employees to increase DHUC staffing to 22 medical and public health professionals.  Over the course of the past 12 months, DHUC has been actively advertising and hiring staff to serve our mission.  Additionally, staff expansion allowed for DHUC to create focused teams to support ongoing efforts to ensure proper and timely heath care delivery to children. As of 6/21/2020, of the 6 remaining open positions, applicant interviews are being scheduled for 2 nurse practitioner positions; one pediatrician applicant accepted an employment offer, and the job announcement for the Team Lead (psychiatrist) for Mental and Behavioral Health Services closes on June 26, 2020.

#### Influenza

Children in ORR care are routinely vaccinated against influenza as part of their initial medical exam. Because the timing of the influenza season in the countries children are traveling from or through may differ compared to the U.S., DHUC recommends that care providers continue to vaccinate children against influenza through June 30th of each year, when seasonal influenza vaccine is set to expire. DHUC routinely monitors influenza activity among the care provider programs to assess the need for further public health interventions specific to each influenza season.

In 2019, DHUC worked with CDC on recommendations for use of extended shelf life influenza vaccine through August of 2019, or until the next seasonal influenza vaccine was available, whichever occurred first. This recommendation was made for children temporarily residing in larger care provider facilities with capacities greater than 100 beds because risk of influenza transmission is potentially higher in these

facilities. Specific lots of seasonal influenza vaccine were approved and designated by the U.S. Food and Drug Administration (FDA) for this purpose.

<u>COVID-19</u>

During the current pandemic of COVID-19, DHUC has expanded its routine infectious disease surveillance and response activities to include:

- Real-time tracking of changes in federal, state, and local public health guidance, and medical and public health understanding (spread, prevention etc.) of the virus/disease.

- Real-time development and revisions of ORR guidance to keep pace with changes in federal guidance and the scientific understanding of COVID-19.

- Depending on local health department capacity and local epidemiology of the disease, DHUC can lead care provider programs in their public health responses if health departments are overwhelmed.

- DHUC plays a more active role in responding to care provider staff illness.

To support care provider programs, ORR and DHUC issued guidance to programs in March, 2020. This included information on planning and coordination with local public health and clinical care facilities, staff and visitor COVID-19 screening, identification of COVID-19 risk factors among children, and responding to both children exposed to COVID-19 and children diagnosed with COVID-19.

DHUC reassigned eight staff members to ORR's COVID-19 response, allowing for tracking of individual possible or known COVID-19 exposure events across the care provider network. DHUC staff provide individualized public health and clinical guidance adapted for each unique situation.

Additionally, DHUC tracks the number of children diagnosed with COVID-19, as well as the number of COVID-19 tests performed across the care provider network using information in the UAC Portal. ORR/DHUC continues to monitor the situation around COVID-19 closely and coordinates all response efforts with the CDC and local public health officials to ensure the safety and well-being of children, staff at the facilities, and their respective communities within ORR's network of care providers throughout the country.

<u>Latent Tuberculosis Reporting</u>

As part of the initial medical exam, children receive tuberculosis (TB) screening that can result in a diagnosis of latent tuberculosis infection (LTBI). LTBI is a condition requiring treatment to prevent progression to active TB disease, a threat to both the individual's and the public's health. LTBI treatment takes 3–9 months depending on the treatment type. Children are not routinely treated for LTBI while in ORR care before being unified with a sponsor because often the average length of stay with a care provider program is shorter than the amount of time required to treat LTBI, and because there could be negative health effects from discontinuing LTBI treatment without completing the treatment course (such as developing drug-resistant TB). Up until June 2018, no formal process for notifying state health departments of unaccompanied children with LTBI being unified into their jurisdiction was in place to ensure that children could receive LTBI treatment after leaving ORR care. Sponsors live in all 50 states,

necessitating a reporting system that was secure, flexible, and acceptable to a diverse array of public health agencies.

During June 2018–January 2020, DHUC developed a post-unification LTBI reporting system to support states in identifying and treating unified children with LTBI living in their state. To build the system, DHUC collaborated with CDC's Epi-X program, a secure web-based network for public health information exchange, to securely transfer of detailed data on cases of LTBI among unified children between ORR and state TB control programs. DHUC built relationships with 40 state and local TB control programs across the country. At this time, DHUC sends an LTBI report to each of those 40 TB control programs twice a year that includes contact information for children diagnosed with LTBI while in ORR care so that the TB control programs can reach out to the unified children and connect them with LTBI treatment programs. DHUC continues to collaborate with state TB control programs to determine appropriate reporting frequencies.

Mental Health Trainings

Over the past 12 months, ORR continues to strengthen mental and behavioral health services and delivery to children while in ORR care. DHUC is pursuing development of a comprehensive mental and behavioral program. Initial efforts have focused on training of federal and program staff on Mental Health Literacy— a 6 part series, developed by ORR's child and adolescent psychiatrist. The series focuses on 1) Basic Psychopathology, 2) Basic Psychopharmacology, 3) Suicidality and Non-Suicide Self-Injury, 4) Sexuality and Gender Identity, 5) Education Issues, and 6) Behavior Modification. Additionally, federal staff received training on the appropriate use of Residential Treatment Centers (RTCs).

Telemedicine Expansion

Another key aspect of DHUC's medical operations over the last year targeted increasing grantee access to, and use of, telehealth services, particularly during the COVID-19 pandemic. In collaboration with Point Comfort Underwriters, DHUC enlisted a Pediatric Urgent Care organization that could provide acute care telehealth medical services to many ORR programs. This telehealth capability allowed for children to be evaluated, treated, or triaged to hospitals and clinics for acute medical issues, thereby limiting exposure to COVID-19. Currently, 20 states with ORR contracted medical providers were able to use telemedicine to care for children in ORR care, including programs in AZ, CA, CO, CT, FL, IL, IN, KS, MA, MD, MI, NJ, NY, OR, PA, SC, TN, TX, VA, WA. Similarly, many ORR contracted psychologists and psychiatrists in the local community were set up for telemedicine and able to provide continued mental health services. During March through June 2020, there have been nearly 350 medical/mental health telemedicine encounters for unaccompanied children.

Children with Special Health Care Needs

To ensure proper and appropriate medical service delivery to those in need, DHUC continues to identify and monitor children with special health care needs while in ORR care. From June 2019 to May 2020, DHUC provided technical guidance and oversight to its grantees who cared for nearly 875 UAC with special health care needs. These children had a variety of medical conditions including, but not limited to, cardiac, oncologic, genetic, ophthalmologic, gastrointestinal, auto-immune, and developmental conditions. DHUC worked with grantee staff to secure access to appropriate medical providers nationally. Through ongoing collaboration with external pediatric advocacy stakeholders and academic medical centers, DHUC

9

expanded the pool of pediatric specialists available to evaluate and provide clinical services to unaccompanied children with special health care needs while in ORR care. These medical specialists are urged to continue providing services after unification, if possible.

Additionally, 120 serious medical procedures were approved during this time period, including but not limited to heart, orthopedic, ENT, urologic, and dental surgeries. In October 2019, DHUC facilitated the successful renal transplantation of a child in need of a kidney. Eight months post-transplant, the child continues to do well. Additionally, ORR and DHUC worked closely with a team of child advocates, legal service providers and cardiologists to assist a child with heart failure gain appropriate resources, including successfully transferring care to a transplant center in the community where the child was unified.

### Educational Services and Physical Activity

The Office of Refugee Resettlement (ORR) complies with all minimum standards for educational services, recreation, and leisure time services for unaccompanied alien children (UAC), as set forth in the Flores Settlement Agreement.

ORR provides educational services that are appropriate to a minor's level of development and communication skills, in a structured classroom setting from Monday through Friday. There are six hours of academic educational coursework per day. Care providers conduct an educational assessment within 72-hours of a minor's admission into the care provider facility to determine the child's academic level, along with specific needs the UAC may have.

Educational services primarily focuses on the development of basic academic competencies and secondarily on English Language Training. Basic academic areas of study include Science, Social Studies, Math, Reading, Writing and Physical Education. Educational services must include appropriate reading materials in languages other than English for use during leisure time. Academic reports and progress notes are included and updated in the minor's case file, which is either sent to another care provider in the event of a transfer or released to the UAC upon discharge from ORR care.

UAC in community based foster homes or group homes (e.g. long term foster care) receive academic instruction at a local public school. ORR's long term foster care is family foster care and group home care for UAC who are expected to be in ORR care for a prolonged period of four months or more because they do not have eligible sponsors and they have been identified as potentially eligible for immigration relief in the United States.[1]

In addition to academic education, UAC must also be provided an opportunity for independent study, special projects, acculturation services, and vocational training. Care providers create vocational training that will provide UAC with practical and competitive job skills and assist them in the preparation for adulthood. Some children may also be eligible for pre-General Education Degree classes and college preparatory tutorials where appropriate and commiserate with the child's academic level.

UAC entering ORR custody come from a wide array of cultures, practices, languages, and beliefs. Care providers must have the cultural awareness and systems in place to support the cultural identity and

---

[1] In addition, the ORR Policy Guide at section 1.2.6 notes that the minor should be under the age of 17 and 6 months at time of placement.

needs of each UAC. Acculturation services help UAC obtain the skills necessary to acculturate to the United States and to live independently and responsibly.  Furthermore, acculturation services provided to UAC include English language classes, access to community services, and academic education (e.g. classes in geography, discussion of U.S. law, etc.).

In addition, care provider programs provide daily outdoor activity, weather permitting, with at least one hour per day of large muscle activity and one hour per day of structured leisure time activities. Activities are increased to a total of three hours on days when school is not in session (e.g., a national holiday). Care providers can take UAC off-site to parks, community recreation centers, or other locations (note that off-site recreation involves a higher staff-to-child ratio).

For UAC in community foster homes (transitional and long term foster care), foster parents must provide opportunities for recreation as part of the regular activities of the family.

## Legal Services and Child Advocacy

ORR ensures that UAC in ORR custody are informed of their rights and provided a legal consultation with licensed attorneys through a legal services contract. Within ten (10) business days of admission to an ORR facility, these legal service providers are required to hold a Know Your Rights presentation and individualized legal screening for possible immigration relief. These activities occur for UAC newly admitted to ORR custody as well as for UAC transferred from one ORR facility to another. In addition, UAC are provided a Legal Resource Guide, which includes a state by state listing of attorneys and legal service providers as well as documents for requesting a Flores Bond Redetermination Hearing.

Although most legal service provider attorneys will not become the individual representatives for UACs, ORR's legal services contract funds limited scope direct representation on immigration related matters. Some of the limited scope direct representation funded through the legal services contract include assisting UAC in seeking asylum and Special Immigrant Juvenile status (SIJ), Office of Trafficking in Person (OTIP) certification of eligibility letters, and voluntary departure. ORR funded limited scope representation also continues for some UAC after their release from ORR custody.

In addition to ORR's funded limited scope representation, UAC in ORR custody have access to legal services through other funding or pro bono counsel. In some cases, attorneys elect to represent UAC as Friend of Court rather than serve as their attorney of record. The attorney and the UAC determine whether non ORR-funded representation occurs through separate funding, pro bono, or as a Friend of Court.

ORR policy requires that attorneys representing UAC have unlimited telephone access to their client. ORR also instructs care providers to provide confidential settings for attorneys to meet with their clients.

In addition to legal service providers, ORR contracts with a different group of legal professionals who serve as Child Advocates. Child Advocates are appointed for UAC who present particular vulnerabilities such as being a victim of human trafficking. As required by statue, Child Advocates have robust access to UAC information, ORR facility staff and UAC. They also have access to UAC case files and make independent recommendations based on the best interest determinations for a UAC. Their duties include: conducting periodic visits with UAC and care provider staff; assisting UAC in understanding legal and care-related issues; advocating in the best interest of the UAC and submit best interest determinations (BIDs) to ORR

11

for consideration regarding care, placement and release of UAC; and collaborating with care provider staff and ORR on case management progress.

## ORR Policies and Other Agency Guidance

There were several policies, operational directives, and other agency guidance that were disseminated during the reporting period. The chart below highlights the official ORR guidance disseminated during the reporting period.

| Guidance | Description | Date |
|---|---|---|
| *Operational Directive #3* | ORR suspended the reconciliation of ICE background check results from sponsors (or others) who require fingerprint background checks. ORR continues to obtain fingerprint checks conducted by the FBI (which are cross checked with DHS sources, including ICE). However, ORR suspended the downloading of ICE background check results (the immigration status verification checks).<br><br>Case Managers must inform subjects of fingerprint background checks on the current restrictions on DHS' ability to target a sponsor (using information from the ORR background check process) for immigration enforcement purposes, unless the sponsor has been charged or convicted of a felony, other crime, or has certain associations. | June 10, 2019 |
| *Child Abuse and Neglect (CA/N) Check State Form Instructions* | Updated instructions for Colorado. | June 12, 2019 |
| *Operational Directive #4* | Sponsor Category 2 was divided into two sub-categories: Category 2A and 2B.<br><br>Category 2A: An immediate relative--a brother; sister; grandparent or other close relatives (aunt, uncle, first cousin) who previously served as the UAC's primary caregiver. (This includes biological relatives, relatives through legal marriage, and half-siblings).<br><br>Category 2B: An immediate relative-- including aunt, uncle, or first cousin who was not previously the UAC's primary caregiver. (This includes biological relatives, | June 18, 2019 |

| | | |
|---|---|---|
| | relatives through legal marriage). CA/N checks are no longer universally required for Category 3 cases. It is now only required where a case is referred for a home study or a special concern is identified.<br><br>CA/N check results are only required prior to release in any case requiring a CA/N check where there is a specific and substantial child welfare concern associated with the case. | |
| ***UAC Manual of Procedures (MAP):***<br><br>***Section 2.2.1 Identification of Qualified Sponsors;***<br><br>***Section 2.2.2 Contacting Potential Sponsors;***<br><br>***Section 2.2.4 Required Documents for Submission with the Application for Release;***<br><br>***Section 2.5.1 Background Check Requirements;***<br><br>***Section 2.8.2 Transfer of Physical Custody; Appendix 2.14; and Appendix 2.12.*** | Update related to sponsors; sponsor assessments and background checks; interviews with sponsors; and release request guidance. | June 24, 2019 |
| ***Family Reunification Packet*** | Minor formatting updates were made to several documents. Major updates were made to the Authorization for Release of Information and Family Reunification Application. | June 27, 2019 |
| ***ORR Digital Fingerprint Site List*** | Update to the field. | June 27, 2019 |
| ***ORR Policy Guide Section 2.2.4 Sponsor Assessment Criteria and*** | Absence of evidence of bona fide preexisting relationship for Category 3 potential sponsors is no longer an absolute bar on release, but ORR takes into account the preexisting relationship. ORR may require | July 3, 2019 |

| | | |
|---|---|---|
| *Home Studies; UAC MAP Section 2* | a Category 3 sponsor to establish regular ongoing contact prior to release. | |
| *ORR Policy Guide Section 4.11 Incident Reviews and Data Collection; Section 4.11.1 Incident Reviews* | New requirements related to sexual abuse and sexual harassment incident reviews and data collection. | July 8, 2019 |
| *CA/N Check State Form Instructions* | Updated instructions for Washington State and the Bronx, NY. | July 15, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | July 15, 2019 |
| *ORR Policy Guide Section 3.3.16 Notification and Reporting of the Death of a UAC and Section 5.8.1 Emergency Incidents* | Added notification to Congressional officials in the event of a child's death while in ORR legal custody. | July 22, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | July 24, 2019 |
| *CA/N Check State Form Instructions* | Updates for Maryland, Oklahoma, and Texas. | July 25, 2019 |
| *CA/N Check State Form Instructions* | Updates for Idaho, Georgia, and Utah. | July 30, 2019 |
| *CA/N Check State Form Instructions* | Updates for Alaska, Arizona, Arkansas, District of Columbia, Florida, Hawaii, Missouri, Nebraska, New Jersey, New Hampshire, North Dakota, New York, Texas, West Virginia, Wisconsin, and Wyoming. | August 20, 2019 |
| *FINAL RULE: Apprehension, Processing, Care, and Custody of Alien Minors* | Office of the Federal Register published a joint rule by the U.S. Department of Homeland Security and the U.S. | August 23, 2019 |

| | | |
|---|---|---|
| *and Unaccompanied Alien Children* | Department of Health and Human Services [8 CFR Parts 212 and 236, and 45 CFR Part 410]. | |
| *ORR Digital Fingerprint Site List* | Update to the field. | September 10, 2019 |
| *ORR Policy Guide Section 7 Policies for Influx Care Facilities* | Revised policies on influx care facilities to recognize language adopted as part of the bipartisan Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Pub. L. 116-26 (July 1, 2019). | September 18, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | October 8, 2019 |
| *DHS Restrictions on Use of Information Obtained from ORR* | Update notifying care providers that the information-sharing restrictions remain in effect while the federal government is under a continuing resolution. | October 10, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | October 24, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | November 14, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | December 3, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | December 20, 2019 |
| *ORR Digital Fingerprint Site List* | Update to the field. | December 23, 2019 |
| *CA/N Check State Form Instructions* | Updates for North Carolina. | January 9, 2020 |

| *CA/N Check State Form Instructions* | Updates for Nebraska, New Jersey, Ohio. | January 15, 2020 |
|---|---|---|
| *ORR Digital Fingerprint Site List* | Update to the field. | January 27, 2020 |
| *Family Reunification Packet Update* | Congress wrote a similar restriction prohibiting DHS from using certain information obtained from ORR for immigration enforcement purposes found in the Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Pub. L. 116-26 (July 1, 2019) into the Consolidated Appropriations Act of 2020 (Consolidated Appropriations Act, 2020, Pub. L. 116-93, §216). The footnote in the Authorization for Release of Information was updated to reference the Consolidated Appropriations Act of 2020. The current restriction is in effect until September 30, 2020. | January 30, 2020 |
| *U.S. Immigration and Customs Enforcement (ICE) Fingerprinting Guidance* | ICE issued updated guidance to its field offices regarding the collection of fingerprints of minors who turn 14 while in Federal (including HHS) custody. Pursuant to federal statute, ORR staff and care providers must make the minor available for fingerprint collections. | February 13, 2020 |
| *CA/N Check State Form Instructions* | Updates for Colorado. | February 13, 2020 |
| *CA/N Check State Form Instructions* | Updates for Nevada. | March 26, 2020 |
| *ORR Digital Fingerprint Site List* | Update to the field. | April 16, 2020 |
| *CA/N Check State Forms* | Update from the Program Support Center on updated forms. | May 18, 2020 |

16

| | | |
|---|---|---|
| ***Fingerprint Waiver Instructions: Flores Update*** | Instructions on a waiver request process for ORR/Federal Field Specialists and Contract Field Specialists to assist with reunification cases where an approved release is delayed due to COVID-19 fingerprinting challenges. The waiver process specifically relates to cases where Family Reunification Applications have been fully completed for Category 2B and Category 3 cases. If the sponsorship application is complete and all supporting documentation has been submitted in satisfaction of ORR's policies, then sponsors, adult household members, or adult care givers who would otherwise be required to submit fingerprints under ORR policy may have this requirement waived. This process is dependent on there being no other documented child welfare safety concerns. Fingerprint checks and results are still required prior to release of a UAC in all instances where a home study was ordered due to past abuse/neglect on the part of the parent and/or legal guardian/home country caretaker. | May 19, 2020 |
| ***ORR Digital Fingerprint Site List*** | Update to the field. | June 23, 2020 |

The table below highlights ORR's COVID-19 guidance to the field:

| Guidance | Version | Date |
|---|---|---|
| COVID-19 Interim Guidance for ORR Programs | 1.0 | March 2, 2020 |
| HHS COVID-19 Update (03.12.20) | 1.0 | March 12, 2020 |
| COVID-19 Guidance: Initial Medical Exam Documentation | 1.0 | March 13, 2020 |
| COVID-19 Guidance: Contact Investigation Documentation | 1.0 | March 13, 2020 |
| COVID-19 Interim Guidance for ORR Programs<br><br>    - Staff and visitor symptom screen<br><br>    - UAC discharge and transfer symptom screen<br><br>    - COVID-19 educational materials for sponsors/discharge | 2.0 | March 13, 2020 |
| Personal Protective Equipment Calculation Guidance and Spreadsheet | 1.0 | March 13, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | March 16-20, 2020 |
| ORR Field Guidance: COVID-19 Temperature Checks | 1.0 | March 19, 2020 |
| ORR COVID FAQ #1 | 1.0 | March 20, 2020 |
| ORR Field Guidance: COVID-19 Temperature Checks | 2.0 | March 23, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | March 23-27, 2020 |
| COVID-19 Guidance: Initial Medical Exam Documentation | 2.0 | March 28, 2020 |
| COVID-19 Guidance: Contact Investigation Documentation | 2.0 | March 28, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | March 30, 2020 |
| ORR Field Guidance #4: COVID-19 Discharge Guidance | 1.0 | April 6, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | April 6-7, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | April 14-18, 2020 |
| ORR COVID FAQ #2 | 1.0 | April 16, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | April 20, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | April 28-30, 2020 |
| ORR Field Guidance #5: Home Study/Post Release Services COVID Practice Guidance | 1.0 | May 6, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | May 8, 2020 |
| COVID-19 ORR Digital Fingerprint Site Schedule Changes & Closings | N/A | May 21, 2020 |

| Centers for Disease Control and Prevention Health Advisory | 1.0 | May 28, 2020 |
|---|---|---|
| ORR COVID FAQ #3 | 1.0 | June 12, 2020 |

# Demographics of UAC

## ORR Capacity, Referrals, Census and Discharges

During the reporting period, ORR's discharge rate consistently outpaced the rate of referrals. However, during the initial months of the reporting period, ORR's census remained high due to the influx of unaccompanied alien children that began in 2017. Therefore, the high referral rate during the influx obscured the high rate of discharges accomplished by ORR during the same period.

Conversely, during the latter months of the reporting period, ORR experienced a significant reduction of referrals as a result of the COVID-19 national health emergency.  As a result of restrictions limiting immigrants' entry into the United States due to COVID-19, few minors were referred to ORR during April and May 2020. However, ORR's efforts to safely and timely discharge minors in ORR custody continued during the national health emergency.  Consequently, by May 2020 ORR's census reached the lowest levels in recent history.

The amount of time that a minor remained in ORR custody before they were discharged (known as Length of Care) fluctuated. The lowest average length of care reported was 42 days while the highest occurred in May 2020 at 101 days. Length of care is affected by many factors unique to each minor's case. Some of these factors include the availability and willingness of a person to sponsor the minor, the sponsor's timely completion of the family reunification process, and whether a minor's circumstances require a home study. During the latter part of the reporting period, length of care was further complicated by the closures and stay-at-home orders imposed due to the COVID-19 outbreak. The high length of care value in May 2020 also reflects the minors in custody with the most complex cases and for whom discharge requires more effort to accomplish. As the census decreases, these minors will comprise a higher percentage of the total, thus increasing the average length of care.

Detailed information about ORR's bed capacity, referrals to ORR custody, discharges, and length of care during the reporting period is provided below with the statistical data presented in a table and graphs.

*Table 1: ORR Bed Capacity, Referrals, Census, and Discharges*

| Month/Year | Bed Capacity | Referrals | Census | Discharges | Length of Care |
|---|---|---|---|---|---|
| June 2019 | 14554 | 8829 | 13432 | 9125 | 42 |
| July 2019 | 15728 | 5167 | 11049 | 8867 | 43 |
| August 2019 | 14533 | 3107 | 7751 | 5986 | 50 |
| September 2019 | 13368 | 2450 | 5775 | 3832 | 57 |
| October 2019 | 13267 | 2246 | 4530 | 3128 | 58 |
| November 2019 | 12440 | 2554 | 4054 | 2566 | 54 |
| December 2019 | 12936 | 2595 | 4236 | 2731 | 43 |
| January 2020 | 13130 | 1900 | 3621 | 2330 | 48 |
| February 2020 | 13119 | 2273 | 3617 | 2313 | 47 |
| March 2020 | 13132 | 1852 | 3541 | 2318 | 42 |
| April 2020 | 13265 | 62 | 2331 | 1427 | 63 |
| May 2020 | 13341 | 39 | 1396 | 610 | 101 |

*Figure 1: Comparison of ORR Bed Capacity, Census, Discharges, and Referrals*



*Figure 2: Length of Care of Minors Discharged from ORR Custody*



## Demographics of UAC referred to ORR

Most UAC referred to ORR custody are males aged 15 to 17 years old who originate from the Northern Triangle countries of El Salvador, Guatemala, and Honduras. Detailed information about the demographics of minors referred to ORR during the reporting period is provided below in with the statistical data presented in tables and graphs.

## Country of Origin

The majority of minors referred to ORR originated from Guatemala (41%). Honduras follows as the second largest originating country (29%) and El Salvador is the third largest originating country (18%). Minors from various other countries such as India represent 8% of the referrals and minors from Mexico represent 4% of referrals. The table and figures below details referral data for each month as well as the total values during the reporting period.

*Figure 1: Referrals to ORR Custody by Country of Origin*



*Table 1: Referrals to ORR Custody by Country of Origin*

|  | El Salvador | Guatemala | Honduras | Mexico | Other |
|---|---|---|---|---|---|
| June 2019 | 1968 | 3520 | 2708 | 140 | 493 |
| July 2019 | 1217 | 1616 | 1854 | 127 | 353 |
| August 2019 | 640 | 949 | 1077 | 150 | 291 |
| September 2019 | 423 | 755 | 725 | 160 | 387 |
| October 2019 | 382 | 895 | 628 | 152 | 179 |
| November 2019 | 314 | 1289 | 626 | 121 | 204 |
| December 2019 | 321 | 1334 | 551 | 163 | 226 |
| January 2020 | 255 | 986 | 384 | 129 | 146 |
| February 2020 | 307 | 1141 | 497 | 154 | 174 |
| March 2020 | 253 | 897 | 485 | 74 | 143 |
| April 2020 | 6 | 17 | 5 | 5 | 29 |
| May 2020 | 1 | 1 | 6 | 16 | 15 |
| *TOTAL* | *6087* | *13400* | *9546* | *1391* | *2640* |



*Figure 2: Monthly Referrals to ORR Custody by Country of Origin*

## Minor's Age

Eighty-three percent (83%) of minors referred to ORR during the reporting period were aged 13 to 17 years. Most of the minors fall between the age groups of 15-16 (36%) and 17 (35%). Tender aged minors, who are defined as aged 12 years or younger, represent 16% of the referrals to ORR during the reporting period. One percent (1%) of the referral represent persons who were subsequently determined to be aged 18 years or older. The table and figures below detail referral data for each month as well as the total values during the reporting period.

*Figure 3: Total Referrals to ORR Custody by Minor's Age*



23

*Table 2: Age of Minors Referred to ORR Custody*

|  | Ages 0-5 | Ages 6-12 | Ages 13-14 | Ages 15-16 | Age 17 | Age 18 |
|---|---|---|---|---|---|---|
| June 2019 | 299 | 1298 | 1103 | 3163 | 2933 | 33 |
| July 2019 | 184 | 776 | 666 | 1793 | 1722 | 26 |
| August 2019 | 120 | 447 | 391 | 1082 | 1053 | 14 |
| September 2019 | 96 | 366 | 309 | 785 | 883 | 11 |
| October 2019 | 82 | 267 | 280 | 824 | 784 | 9 |
| November 2019 | 86 | 311 | 341 | 899 | 907 | 10 |
| December 2019 | 76 | 280 | 292 | 1026 | 910 | 11 |
| January 2020 | 58 | 209 | 197 | 707 | 698 | 31 |
| February 2020 | 71 | 250 | 247 | 867 | 804 | 34 |
| March 2020 | 33 | 204 | 178 | 705 | 684 | 48 |
| April 2020 | 9 | 9 | 2 | 19 | 23 | 0 |
| May 2020 | 4 | 12 | 1 | 10 | 10 | 2 |
| *TOTAL* | *1118* | *4429* | *4007* | *11880* | *11411* | *229* |

*Figure 4: Monthly Referrals to ORR Custody by Minor's Age*



### Minor's Gender

Two thirds (66%) of the minors referred to ORR custody during the reporting period were males.  In addition, referrals of male minors outpaced female referrals every month. The table and figures below detail referral data for each month as well as the total values during the reporting period.

*Figure 5: Referrals to ORR Custody by the Minor's Gender*



*Table 3: Gender of Minors Referred to ORR Custody*

|  | Male | Female |
|---|---|---|
| June 2019 | 5601 | 3228 |
| July 2019 | 3330 | 1837 |
| August 2019 | 1976 | 1137 |
| September 2019 | 1553 | 897 |
| October 2019 | 1496 | 750 |
| November 2019 | 1697 | 857 |
| December 2019 | 1776 | 819 |
| January 2020 | 1306 | 594 |
| February 2020 | 1603 | 670 |
| March 2020 | 1315 | 537 |
| April 2020 | 38 | 24 |
| May 2020 | 24 | 15 |
| **TOTAL** | 21715 | 11365 |

25



*Figure 6: Monthly Referrals to ORR Custody by Minor's Gender*

## Special Populations

### Placement Types

ORR maintains a variety of placement settings based on the individual needs of Unaccompanied Alien Children (UAC). Though the majority of UAC are placed in least restrictive settings such as shelter and transitional foster care, ORR has capacity for those UAC who require a heightened level of care and supervision.  As mandated by law, ORR places an unaccompanied alien child in the least restrictive setting that is in the best interests of the child. Currently, ORR has three specialized levels of care to accommodate those UAC who require a heightened level of care and supervision. The program types include Staff Secure, Residential Treatment Centers (RTC) and Secure. Any time a UAC is placed in a Staff Secure, RTC, or Secure, there is an extensive process to determine if the UAC qualifies for these levels of care.

### *Staff Secure*

The ORR Policy Guide in Section 1 describes all of the considerations regarding placement and transfer. Readers should refer to the Policy Guide for such standards. [2]

Per the ORR Policy Guide Section 1.2.4: Secure and Staff Secure Care Provider Facilities and Children Entering the United States Unaccompanied:

A staff secure care provider is a facility that maintains stricter security measures, such as higher staff to unaccompanied alien children ratio for supervision, than a shelter in order to control disruptive behavior

---

[2] If there is a conflict between this Report and the ORR Policy Guide, please note such conflict is unintentional. The ORR Policy Guide, in such a circumstance, governs ORR Policy and Practice.

and to prevent escape. A staff secure facility is for unaccompanied alien children who may require close supervision but do not need placement in a secure facility. Service provision is tailored to address an unaccompanied alien child's individual needs and to manage the behaviors that necessitated the child's placement into this more restrictive setting. The staff secure atmosphere reflects a more shelter, home-like setting rather than secure detention. Unlike many secure care providers, a staff secure care provider is not equipped internally with multiple locked pods or cell units. In almost all states, staff-secure providers maintain identical type of license as a non-secure care provider, and for such purposes are not viewed as different from a non-secure care provider.

Those UAC who have been identified for a staff secure setting have either arrived by transfer, or as a direct referral from ORR Intakes. In placing UAC in Staff Secure via transfer or direct intake, ORR considers if the child:

- Has been unacceptably disruptive behavior to the normal functioning of a shelter care facility such that a transfer is necessary to ensure the welfare of others;

- Is an escape risk;

- Has reported gang involvement (including prior to placement in ORR custody) or displayed gang affiliation while in care;

- Has non-violent criminal or delinquent history not warranting placement in a secure care provider facility, such as isolated or petty offenses; or,

- Is ready for step down from a secure facility.

Additionally, the referring ORR Care Provider must conduct ongoing assessments and staff the UAC's case with a Case Coordinator and Federal Field Specialist prior to referral. Once it has been determined that the UAC can be referred to Staff Secure, the referring ORR/GDIT Case Coordinator refers the UAC's case to a Staff Secure provider who reviews the case and determines if the UAC is appropriate for their facility. If the UAC meets the receiving Staff Secure criteria and doesn't violate their state licensing requirements, the UAC will be accepted. ORR currently has six staff secures within the ORR network.

### *Residential Treatment Center (RTC)*

Section 1.4.6 of the ORR Guide provides information on placement in an RTC. When a UAC has been recommended into an RTC, a licensed psychologist or psychiatrist must have determined that the youth is a danger to self or others. In addition, ORR will consider transfer to an RTC only if a licensed psychologist or psychiatrist has determined the following:

- The unaccompanied alien child has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis).

- The child's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting.

- The unaccompanied alien child requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities.

- The child presents a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as, medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24 hour supervision, supportive services or therapeutic services).

A residential treatment center is a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services and interventions. Residential treatment centers provide highly customized care and services to individuals following either a community based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. ORR uses an RTC at the recommendation of a psychiatrist or psychologist or with ORR Treatment Authorization Request (TAR) approval for an unaccompanied alien child who poses a danger to self or others and does not require inpatient hospitalization. Unlike acute care psychiatric hospitals that offer emergency and/or life threatening mental health services, RTC provide longer term therapeutic services to treat mental health needs.  Those UAC who enter RTC facilities are referred from various ORR facilities throughout the United States. Prior to a UAC being considered for RTC, the referring ORR care providers must conduct ongoing assessments and staff the UAC case with Case Coordinator and Federal Field Specialist prior to referral. Once the psychological or psychiatric evaluation has been completed, and the UAC has been recommended for RTC placement, the referring Case Coordinator refers the UAC to an RTC placement who reviews the case and makes the determination whether the UAC is appropriate for their facility. The transfer process to an RTC is the same as Staff Secure programs with the exception that UAC must have a recommendation from a licensed clinical psychologist or psychiatrist prior to referral.  Currently, ORR operates two RTC's in the United States.

### *Secure*

A secure setting is a facility with a physically secure structure with staff who are able to control violent behavior. ORR uses a secure facility as the most restrictive placement option for an unaccompanied alien child who poses a danger to self or others or has been charged with having committed a criminal offense. A secure facility may be a licensed juvenile detention center or a highly structured therapeutic facility. An ORR secure facility receives UAC as direct referrals from the ORR Intake Team, or transfers from various ORR Care Providers. One or more of the following is required for UAC to be placed in a secure facility:

- Has been charged with a crime, is chargeable with a crime, or has been convicted of a crime; or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; and assesses whether the crimes or delinquent acts were:

    a) Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon (e.g., breaking and entering, vandalism, DUI, status offenses, etc.); or

b) Petty offenses which are not considered grounds for a stricter means of detention in any case (e.g., shoplifting, joy riding, disturbing the peace).

- Has committed, or has made credible threats, to commit a violent or malicious act while in ORR custody;

- Has committed, threatened to commit, or engaged in serious, self-harming behavior that poses a danger to self while in ORR custody;

- Has engaged in conduct that has proven to be unacceptably disruptive of the normal functioning of a staff secure facility in which the youth is placed such that transfer may be necessary to ensure the welfare of the UAC or others;

- Has self-disclosed violent criminal history in ORR custody that requires further assessment; or

- Has a history of or displays sexual predatory behavior, or has engaged in inappropriate sexual behavior

Prior to a UAC being considered for Secure care, referring ORR care providers must conduct ongoing assessments and staff the UAC's case with a Case Coordinator and Federal Field Specialist prior to referral. Once it has been determined the UAC can be referred to Secure, the referring Case Coordinator refers the UAC to a Secure provider who reviews the case and makes a determination if the UAC is appropriate for their facility. Currently, there is one ORR secure facility in the United States.

### *Out of Network Placements*

Since 2015, ORR's Policy Guide (at section 1.2) has provided that "ORR makes every effort to place children and youth within the ORR funded care provider network. However, there may be instances when ORR determines there is no care provider available within the network to provide specialized services needed for special needs cases. In those cases, ORR will consider an alternative placement. An ORR Supervisor and ORR Project Officer must approve these placements."

ORR ensures the safety of UAC in Out of Network (OON) Placements by continuing to monitor their progress throughout the life of the case, and ensuring that UAC case plan goals continue to be pursued, whether it be family reunification or an alternative case plan goal.

OON placements are state-licensed child care facilities that provide care to those UAC who exhibit significant mental health or special needs that cannot be met within the ORR care provider network. In order for a UAC to enter an OON placement, the UAC must receive a psychological or psychiatric evaluation recommending a level of care that ORR cannot secure in its existing network. Prior to a UAC being referred to OON provider, the UAC must be referred and denied by all recommended ORR placements. Additionally, the UAC's case must be reviewed by the Federal Field Specialist Supervisors and the Federal Field Specialist Supervisor of Special Populations prior to referring a UAC to an OON placement. Once it has been determined that OON placements can be explored for the UAC, the minor's attorney of record must be notified.

When the UAC is accepted to the OON placement and is transferred to the program, the ORR referring program must continue to actively work on the UAC's family reunification case and or concurrent case plan goal. The managing ORR care provider must maintain regular contact with the OON provider to ensure the OON is providing the UAC with regular contact with UAC's attorney of record, child advocate, and if necessary, the consulate or embassy. The managing ORR care provider participates in weekly staffing's with the OON placement and receives regular reports and incident reports. Any concerns identified by the assigned ORR care provider must be elevated to ORR. In addition, the assigned ORR care provider ensures the UAC maintains his or her regular approved contacts with family. The Federal Field Specialist and or Contract Field Staff conducts monthly visits with the UAC and meets with OON placement to discuss any concerns as they arise. The assigned Federal Field Specialist works in collaboration with the OON care provider and the assigned ORR care provider to ensure all the guidance is followed and the UAC's case continues to move towards the case plan goal.

From June 1, 2019 to May 31, 2020, ORR had a total of 24 UAC in OON settings. All UAC placed in OON settings were denied placement within the ORR network and were recommended a higher level of care ORR could not provide within network.

## Notice of Placement

Once a UAC enters a specialized level of care such as a Staff Secure, RTC, Secure, or OON placement setting, the ORR care provider must review the Notice of Placement (NOP) with the UAC within 48 hours of placement. At this time, the assigned Case Manager at the ORR facility will review the NOP in the UAC's language of their understanding. The Case Manager at the ORR Care Provider facility must select the correct reason(s) on the NOP that lead to the UAC's placement and provide additional narrative as to why the UAC was placed the Staff Secure, RTC, Secure, or OON placement setting. The NOP is reviewed every 30 days or earlier to determine if the UAC should remain in placement or be transferred to a least restrictive setting. At any time, the UAC may request a formal review of their NOP and request an attorney or child advocate to support them in contesting their existing placement.

On a monthly basis, The ORR Flores Compliance Team reviews every UAC's NOP to ensure the Staff Secures, RTC and Secures are in full compliance with the NOP procedures and placement criteria. Each month, the Flores Compliance team reviews each UAC's NOP to ensure each UAC is placed properly and that the reasons for placement are documented appropriately on the NOP. In addition, the Flores Compliance Team reviews the NOP's are completed within the mandated timeframes and that the NOP is reviewed with the UAC in their preferred language.  If these milestones are not captured accurately on the NOP, ORR holds the program accountable by citing them with a Corrective Action Plan that informs them of the specific violation. The program is then required to submit a plan to ORR explaining how the Corrective Action will be resolved. The Flores Compliance Team has provided multiple trainings to all the ORR facilities and continues to provide training as needed.

Those UAC who have been identified for transfer to Staff Secure, RTC, or Secure go through vigorous process to determine if they qualify based on the NOP criteria. In addition to the NOP criteria, the ORR Care Provider, Case Coordinator and Federal Field Specialist must consider the totality of the case when conducting a transfer. All evidence such as the UAC's family reunification case status, legal status, medical, behavioral and mental health issues, and current functioning in the facility must be considered. Once it has been determined the UAC meets criteria for transfer, the Case Coordinator distributes the transfer

request to the programs recommended. The receiving program reviews the transfer request to determine if the UAC meets their criteria and does not violate their respective state child care licensing requirements. Once the UAC is accepted and the transferred to the receiving care provider, the UAC and the new Case Manager review NOP reviewing the reasons why the UAC was transferred. The UAC, UAC's family/potential sponsor, local DHS office, DOJ/EOIR Court, Child Advocate (if applicable) are all notified of the UAC's transfer. Irrespective of the transfer, the receiving program continues to work on the UAC's primary case plan goal.

## UAC Appeals of More Restrictive Placement Decision

UAC placed in more restrictive settings are able to appeal either their placement decision or the fact that they may not be released due to danger through various methods. The first method is by requesting a Flores Bond Redetermination Hearing (FBRH), which is available to all UAC in ORR custody irrespective of the level of placement. The second method is by requesting an administrative review by ORR's Placement Review Panel (PRP). The PRP is available only to UAC placed in secure or RTC settings. Each method is discussed below.

### *Flores Bond Redetermination Hearing*

Soon after admission to an ORR facility, all UAC receive the Legal Resource Guide, which includes a copy of the Flores Bond Redetermination Hearing forms in English and Spanish. In addition, UAC placed in Staff Secure, Secure, RTC, and OON facilities are reminded of their option to request an FBRH and provided an opportunity to do so during their review of the Notice of Placement. The explanation and opportunity is provided to UAC in more restrictive placement every 30 days and at the time their Notice of Placement is reviewed. In addition, UAC are able to request an FBRH at any time while in ORR custody. In an FBRH, the immigration judge decides whether the child poses a danger to the community. For the majority of children in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. For these children, a bond hearing is not beneficial. An immigration judge does not rule on any of the following: (a) release to a sponsor; (b) the UAC's placement or conditions of placement while in ORR custody; or (c) release a child on his or her own recognizance, although ORR will take into consideration the immigration judge's decision about the youth's level of danger when assessing the youth's placement and conditions of placement.

For UAC without an attorney of record, ORR facilitates their FBRH request by filing it on their behalf with the Immigration Court in the area where they are placed. ORR also files responsive documents, which either contest the UAC's position or indicates that ORR does not consider the UAC a danger to themselves or the community. The table below provides details on the five (5) FBRH requests filed by UAC from June 1, 2019 to May 31, 2020.

| Date | Shelter Type | ORR Response | Disposition |
|------|------|------|------|
| June 2019 | Transitional Foster Care | N/A | UAC discharged before hearing |
| July 2019 | Staff Secure | No Contest Letter supported by Behavioral Management Plan w/UAC | UAC discharged before hearing |
| September 2019 | Shelter | No Concern Letter | Bond Granted |
| March 2020 | RTC | NA | UAC discharged before hearing |
| April 2020 | Shelter | NA | UAC discharged before hearing |

***Placement Review Panel***

Beginning 30 days after their initial placement in secure or RTC facilities, UAC can appeal their continued placement by requesting an administrative review before a panel of ORR staff. This administrative review is called the Placement Review Panel (PRP) and consists of three ORR staff. The ORR staff are personnel who have several years of experience as professionals in the fields of child welfare, mental health and related policy. They are also veteran HHS staff, with experience in ORR's UAC Program.

The PRP ensures that the UAC (or their attorney of record) reviews any evidence supporting their continued placement at the secure or RTC placement prior to holding the panel. In addition, the UAC (or their attorney) can opt to provide the PRP a written statement and/or request a hearing. It is the UAC's decision whether to have both a written statement and a hearing or elect to engage in only one of the options. In cases where the UAC does not have an attorney of record, ORR encourages the program to seek assistance from a contracted legal service provider or a Child Advocate. ORR also arranges for the Juvenile Coordinator to act as an advocate for the UAC if needed. After reviewing the evidence, statements, and holding the hearing (if elected), the PRP provides the UAC a written decision regarding their placement. The table below provides details on the four (4) PRP requests filed by UAC from June 1, 2019 to May 31, 2020.

| Date | Shelter Type | Disposition |
|------|------|------|
| March 2020 | Secure | Request withdrawn by UAC/Aged Out |
| March 2020 | Secure | UAC Stepped Down via NOP Decision |
| March 2020 | Secure | UAC Stepped Down via NOP Decision |
| March 2020 | Secure | PRP decision directing Step Down |

## Services Provided

Upon arrival, UAC's are immediately engaged in services at the Staff Secure, RTC, and Secure facilities. ORR Care providers are required to provide safe, child-friendly, and structured environments that meet

their respective state licensing requirements, their Cooperative Agreements, the ORR Policy Guide, the UAC Manual of Operations (UAC MAP), settlement agreements, state law, and relevant federal law. All services must be sensitive to each UAC's age, culture, religion, sexual orientation, native language, gender identity, dietary needs and any additional needs for each UAC. Regardless of a UAC's time in care, these services must be provided to every UAC. ORR Care providers are required to have capacity to provide services in the UAC native language. Services provided to each UAC must tailor the delivery of services to each UAC and be notified of the reasons for being placed in a Staff Secure, RTC or Secure level.

Once a UAC enters a Staff Secure, RTC or Secure placement, the UAC basic needs are addressed.  The ORR care provider then provides the UAC an orientation within the first 48 hours of placement and reviews the Notice of Placement stating the specific reasons why the UAC was placed in a higher level of care. UAC are allowed to contact people that are listed on their respective contact list (family, sponsor, child advocate, attorney of record etc.) and contact the consulate/embassy if requested. The Initial Intakes assessment is completed upon being placed in a Staff Secure, RTC or Secure to identify and address any immediate needs or issues. Within two business days, the UAC is provided an medical exam and provided an orientation of the program that explains their rights while in federal custody, and the process of being released to a qualified sponsor or working with an attorney to explore any legal remedy. The ORR Care provider reviews the programs rules, responsibilities, behavior management policies, grievance policies and procedures, daily schedule, UAC rights and responsibilities, acknowledgment that they will receive a legal rights presentation by a legal service provider, receive evacuation procedures and the explanation of being transferred to another facility in case of influx. All UAC are screened within the first 72 hours to determine if the UAC is at risk of being a victim or perpetrator of sexual abuse while in care by their respective case manager or clinician.

### Staff Secure

Staff Secure programs provide a variety of services to support the UAC their case plan goals. The UAC has weekly clinical sessions with their respective clinician. In addition, they participate in two groups a week. One group is with the clinician and one is with the program staff to discuss program rules, or particular issue in the program. The UAC meets weekly with their Case Manager to receive updates on their family reunification, or alternate case plan goals. All children in Staff Secure have daily outdoor recreation time, earn the ability to do field trips, and attend school five times a week.

### Secure

Secure programs provide a variety of services to support the UAC their case plan goals. The UAC has, at a minimum one weekly session with their respective clinician. In addition, they participate in two groups a week. One group is with the clinician and one is with the program staff to discuss program rules, or particular issue in the program. The UAC will meet weekly with their Case Manager to receive updates on their family reunification, or alternate case plan goals. All UAC in Secure placements have daily recreation and attend school five times a week.

*Residential Treatment Center (RTC)*

RTC's develop treatment plans for each UAC dependent on the medical, mental and behavioral health needs. The RTC's conduct family therapy sessions with the UAC's sponsor and/or family.  Often, UAC diagnosed with mental health needs may also present with complex medical needs which require the support of specialized medical services as discussed above in the Health Services section of this report. RTC assist in coordinating these medical specialist follow up as part of their treatment planning and service provision.

Depending on the UAC treatment plan, they may meet multiple times a week with their assigned clinician and participate in daily therapeutic groups. RTC have treatment teams to discuss the progress of each UAC and to regularly review treatment plans and they regularly consult with their attending medical professional on psychotropic medication and any other presenting issues.

## Special Populations Updates

ORR is currently developing mechanisms to improve delivery of services to UAC in Staff Secure, RTC, and Secure placements. ORR is currently updating its Cooperative Agreements for all Staff Secure, RTC and Secure. The primary goals is to ensure training for ORR Care Provider staff is standardized and is specific for the particular level of care. Additionally, ORR is ensuring that Staff Secure, RTC and Secure facilities are utilizing interventions rooted in child welfare best practices and are trauma informed.

Recently, ORR has submitted a Funding Opportunity Announcement to expand its existing capacity of Staff Secure, RTC and other therapeutic facilities with the expectation of developing a more robust continuum of care, and to reduce the number of Out of Network Placements.

ORR is proposing additional child welfare best practices to further mitigate transferring UAC to higher levels of care. These additional services are aimed at further reducing placements, reducing transfers to higher levels of care and decreasing length of stay in ORR custody. This would involve wraparound service teams separate from the ORR Care provider to engage the minor, family, and possibly others to support the UAC during the family reunification process or other case plan goals.

## Juvenile Coordinator Site Visits

During the reporting period the Juvenile Coordinator conducted site visits to seven shelters. The purpose of these site visits was to:

1.  Review, assess and report to ORR and the Special Master, Ms. Andrea Sheridan Ordin (and, if necessary, the Court) on ORR's compliance with the Court's 2017 and 2018 Orders, and explain any reasons for any substantial noncompliance, to include:

    ▪ Visiting ORR-funded shelters, interviewing staff at such shelters, interviewing ORR staff, and reviewing data; and

    ▪ Making recommendations for approving compliance within ORR

2. Perform any functions as ordered by the Court

3. Respond to concerns raised by Plaintiffs' counsel related to the Flores Agreement

The following summaries are from the site reviews conducted by the undersigned during this reporting period. At the request of Ms. Ordin, I also include a summary of my site visit to the Homestead Influx Care Facility, which occurred prior to the period covered by this report.

### *Homestead Influx Shelter (Homestead, FL)*
**March 25 – 26, 2019**

A site visit at Homestead Influx Shelter was conducted with the Special Master. Homestead is a facility/compound with various stand-alone buildings that encompass approximately 50 acres in Homestead, Florida. The facility housed over 2,200 minors at the time of the visit (Homestead is now closed). Given that the length of stay for children had increased over time at the influx facility, a site review of Homestead was performed to gain insight into the length of stay for some minors and to have a better understanding of the operations at this facility as well as to interview staff and minors. This site visit gave us the opportunity to observe minors in an influx shelter setting during the course of their daily activities.

During the site visit, minors interviewed advised they were very grateful for the good care they had received since they arrived at Homestead. They liked the staff and enjoyed the outdoor activities and the food they were given was good and plentiful. Observations made at the cafeteria while lunch was served appeared to be appetizing and servings appeared generous. The living areas were clean and spacious and bathrooms were within the quarters where several minors slept.

Some minors interviewed, reported being told their case would be delayed if they misbehaved or had any serious incident reports on file. With regard to length of stay at Homestead, there appeared to be on the job training issues with some case managers, which contributed to prolonged periods at the Homestead Influx Shelter. Subsequent to this visit, this information was discussed with ORR and it was recommended inaccuracies being told to minors by staff be clarified and staff workers be retrained on how to effectively communicate with minors, to ensure accurate information is always conveyed. The project officer advised Homestead executive team members of this, which resulted in additional training and written documentation for staff to assure they provide truthful information to minors as to what constitutes delays in their release and affirm their awareness that UAC behavior would not result in any reunification delays.

### Mercy First RTC (Syosset, NY)
**June 18 – 19, 2019**

The Juvenile Coordinator conducted this shelter site visit with an ORR policy analyst. Mercy First Residential Treatment Center (RTC) is located in Syosset, NY, which is situated in the Long Island area. The RTC is located on grounds that also house other residential shelters for both domestic children and UAC. It is a campus type setting with spacious surroundings and there are benches and walking areas to move freely from one housing unit to another throughout the campus.

The minors who were interviewed reported experiencing good treatment and services by their clinicians. They felt the clinical team was understanding of their specific needs and they had established a good rapport and relationship with them.  The minors reported their clinicians were very effective in assisting them with their frustrations of shelter life sans familial support, and in helping address their sadness, depression, that at times, were overwhelming to them.  Several of the minors interviewed also advised that their clinician was oftentimes, the only person able to have a calming effect on them as they were able to help them deescalate a problem in their living quarters.

The majority of minors advised they were very dissatisfied with the meals/food at Mercy First RTC.  They claimed the food was tasteless and the same meals were frequently served.  Although no minor claimed they did not get enough food to eat, several of the minors advised they would oftentimes not finish the food served on their plate for the reasons stated above.  This was seen as a recommendation for improvement by the majority of the minors interviewed.

Mercy First utilized a team approach to psychotropic medication management when treating minors.  The director, the nurse practitioner, and the nurses and clinicians are all involved in the management of psychotropic medication for each of the minors.  They all are stakeholders in managing the minor's medication so that the medication treats the core symptoms of their diagnosis.  The staff interviewed appeared to be quite knowledgeable about each of the minors in the program, the diagnosis of these minors, and the medication used to manage their mental health issues.  Mercy First staff advised their concerns regarding the minors that were transferred to the RTC were experiencing significant behavioral issues, which the staff was not equipped to handle.  Mercy First managers advised the psycho-education approach is important to all staff and a valuable component in an integrative care program.

All of the minors interviewed were knowledgeable about their medication and advised they could ask their clinician and/or doctor questions about their medication at any time, with ease. The psychotropic medication administered to them was explained as was their diagnosis.  Several of the minors advised their biggest concern at this facility was insomnia, along with experiencing depression and anxiety.  All of the minors knew of their rights and the right to challenge their placement, and understood the rules of the shelter.  Additionally, the minors advised they were not denied the right to talk to their families and/or sponsor.  The Juvenile Coordinator discussed Mercy First concerns with the ORR Policy Team regarding the behavioral issues, and recommended additional training be provided to the staff.

### BCFS San Antonio Staff Secure (San Antonio, TX)
**July 9 – 10, 2019**

BCFS is a staff secure shelter located in San Antonio, Texas.  Several of the UAC interviewed indicated that the shelter does a good job in providing an adequate level of care. The shelter provides minors with plenty of food and most liked the food/meals.  The UAC confirmed that sufficient water was always available. The housing units in all areas, especially where the minors reside, appeared to be warm and inviting and the facilities looked clean in all living quarters.  The housing units are similar to living in any home and the minors all advised they appreciated the aesthetics, the cleanliness, the food, and the small shelter setting. Many UAC reported the care and living environment provided them a sense of security and lessoned their feelings of being homesick.

A few minors raised a concern regarding the lack of being provided new shoes when their old shoes have worn out, and the explanation for this was that the shoe sizes that seem to be the most popular with the minors are at times unavailable.  The Juvenile Coordinator met with the executive team managers at BCFS to discuss this and advised the UAC should not have to wait several days or weeks to obtain a new pair of shoes. This was also reported to the ORR policy team at a subsequent de-briefing meeting.

There is room for improvement in providing minors further education and information regarding the psychotropic medications they are taking, as the three minors that were administered medication did not have a full understanding as to the medication they were given, the reasons for it nor its side effects.  This was also conveyed to the BCFS executive management team at the exit meeting as well as to the ORR Policy Team.

### Friends of Youth Therapeutic Staff Secure (Renton, WA)
**October 21 – 22, 2019**

Friends of Youth is located in Renton, WA, which is a suburb of Seattle. This therapeutic staff secure shelter provides robust mental health services to UAC as well as treatment to UAC who were exhibiting inappropriate sexual behavior.  Evidence based practices are used such as DBT (Dialectical Behavior Therapy), which staff advised are providing good outcomes.  Group therapy is also a component used in this facility and the Juvenile Coordinator had the opportunity to observe a group therapy session.  All minors in the group were engaged and contributed to the discussions.

There is room for improvement in some areas such as providing the minors with more shoes and clothing as needed. One of the minor's had athletic shoes that ripped in the soles, and advised it was very frustrating to not have more clothing items especially when they outgrow them and/or get worn out. This was brought forward at the exit meeting with Friends of Youth executive members in addition to the ORR Policy Team and the Project Officer responsible for handling this contract.

Another concern raised by the Juvenile Coordinator was the low number of minors accepted into Friends of Youth and how ORR could assist and support this program to increase their transfer-in rate.

The minors need to be provided more education as to the medication they are being prescribed, to include regular follow-up care and conversations as to the side effects and efficacy of the medication.  Some minors advised that they received too many consequences for minor infractions which causes them to get frustrated and discouraged.  This information was discussed with the Friends of Youth executive team

members at the exit meeting and it was recommended that the facility discuss and explain what constitutes sanctions and consequences more thoroughly with minors and define what is relevant that warrants a consequence. The Juvenile Coordinator recommended to Friends of Youth an internal policy could be useful for lesser types of infractions that require attention and some corrective action, while incorporating teaching moments and valuable lesson takeaways for the minors. The Juvenile Coordinator held subsequent meetings with the ORR Policy Team as well as the Project Officer assigned to this program with regard to the issues concerning psychotropic medication and the clothing/shoes.

### *Selma Carson Home Staff Secure (Tacoma, WA)*
**October 23 – October 24, 2019**

Selma Care Home is a is a 32-bed staff secure shelter, however only three minors were in care at the time of this site visit. Due to the low census at this facility, the minors in care were able to receive more individualized attention. Only one minor was taking psychotropic medication but he could not fully explain what the medication was that he was prescribed nor what the side effects, if any, the medication had.

As a result of this site visit, recommendations to both the executive team members at Selma Carson Home and the ORR Policy Team were made by the undersigned, which included providing further education to minors regarding the psychotropic medication they are administered. Also, it was recommended that this facility provide minors with the necessary community outings as the UAC were not being taken on outings within the community. Additionally, a streamlined approach to the transfer process would benefit Selma Carson Home to reduce the time spent on the review of case files prior to accepting a minor. A meeting was also held with the Project Officer assigned to this program for further action.

### *SWK Casa Franklin Shelter (El Paso, TX)*
**December 13, 2019**

This shelter site visit was conducted with the Special Master, Ms. Andrea Sheridan Ordin. The standard of care was impressive to see at Casa Franklin. The minors are afforded daily recreation time where knitting, culinary arts and media classes are taught as well as vocational training. The minors are taken on field trips on a regular basis, which can include trips to libraries, museums, the planetarium, etc. They are also taken to sporting locations/events, and to movies and pizza dinners. The minors have access to religious services every Tuesday and Sunday, and are also taken to Christian and Evangelical services within the city, based on their preferences.

However, of notice to the Juvenile Coordinator was the lack of outdoor space, patios and outside sitting areas as the shelter is embedded in the downtown urban area with little room for outdoor activities. Casa Franklin recognized this deficiency and in order to meet the outdoor activity requirement, the children are taken to a nearby park twice daily. Overall, Casa Franklin seemed to provide good care and staff appear to be fully vested in doing good work with all UAC.

### *Upbring Transitional Foster Care (El Paso, TX)*
**December 13, 2019**

The site visit at Upbring Transitional Foster Care shelter was conducted with the Special Master. The minors at Upbring TFC spend their days at the program and return to their foster families in the evening. The staff at Upbring TFC struck the Juvenile Coordinator as passionate and dedicated to the care of the minors at this facility, and are striving hard to meet the UAC needs.  There is a strong team comprised of the executive team members, case managers and clinicians, and the educational and medical team members to care for the minors and most of them met with the Special Master and the undersigned to discuss their program, the UAC in care, and to address any questions we had.

According to the staff, foster parents are in abundance in this community and they have a strong system of word-of-mouth referrals as staff members advised this is tight-knit community.

Additionally, the Special Master and the undersigned were taken to a foster home to meet a foster family in the El Paso area, who had five UAC in care at the present time. The foster parents had three teen female UAC, ages 15, 16 and 17, and two younger children, ages 2 years and 11 months.  The minors were not in the home at the time of the visit as the girls were still in school, and the young children were at the Upbring facility during the day.  It was a positive and enlightening interview; although, interviewing the children at the facility and at the foster family home would have been very worthwhile.

### *Shenandoah Valley Juvenile Center (Staunton, VA)*
**January 28 – 31, 2020**

A review of this facility was conducted in conjunction with an ORR Monitor.  This was the Juvenile Coordinator's second visit to this facility.  Shenandoah is a secure facility and the only secure facility in the ORR care network at the time of this visit.  Several minors were interviewed at this facility and the majority of them advised they had developed a good rapport and relationship with their case managers and clinicians.  Several minors advised their primary concerns surrounded treatment of them by the direct care workers.  The majority of UAC also reported the food quality and limited amount of food at all meals was poor and very limited and most were still hungry after their meal.  These concerns were discussed with the executive management team at the exit meeting as well as with ORR management in subsequent meetings after the review.  Shenandoah advised on the next day after the exit meeting that an additional snack would be added immediately.

Also discussed with executive team members at Shenandoah and ORR staff was the Juvenile Coordinator's recommendation for better education and communication on the psychotropic medications several UAC were being prescribed as some did not know what medications they were taking, the reasons for it or the side effects of the medication.

The UAC's concerns over their poor treatment by direct care staff was discussed with the executive team at Shenandoah, the Federal Field Specialist and with ORR Policy team members.  There is room for improvement at this facility as noted, however, ORR is focusing on addressing the needs of these special populations and the Juvenile Coordinator is part of these working teams to continue to make strides in elevating the care and services to UAC at Shenandoah and at other shelters that serve special populations.

## Summary

The undersigned respectfully submits this report to the Court pursuant to the Court Orders as previously stated above. The Juvenile Coordinator will continue to work independently and with the Special Master, to assure adherence to Flores Settlement Agreement.