# O.M.G. v. Wolf

# FILINGS

# IN THE UNITED STATES DISTRICT COURT
# FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*; | Case No. 1:20-cv00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | The Honorable James E. Boasberg |
| *Respondents*. | |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees and new intakes in the Family Residential Center ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 80. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I. Karnes County Family Residential Center ("Karnes FRC")

<u>New intake 1</u>: New intake 1 arrived at Karnes on July 1, 2020, and was tested due to being a new arrival. New intake 1 was asymptomatic, but reported that two family members had previously tested positive. On July 7, 2020, New intake 1's test returned positive on, but the spouse's test was negative. New Intake 1 remains asymptomatic, but is being assessed for symptoms two times per day. New intake 1 is, and will remain, in quarantine for 14 days and is being monitored for symptoms twice per day.

<u>New intake 2</u>: New intake 2 arrived at Karnes on July 1, 2020, and was tested due to being a new arrival. New intake 2 was asymptomatic, but reported that two family members had previously tested positive. On July 7, 2020, New intake 2's test returned positive, but the test for the previously exposed family member returned negative. New intake 2 remains

asymptomatic, but is being assessed for symptoms two times per day. New intake 2 is and will remain in quarantine for 14 days and is being monitored for symptoms twice per day.

New intake 3: New intake 3 arrived at Karnes on July 1, 2020, and was tested due to being a new arrival.  New intake 3 was asymptomatic, but reported that two family members had previously tested positive. On July 7, 2020, New intake 3's test returned positive but the test for their previously exposed family member returned negative. New intake 3 remains asymptomatic, but is being assessed for symptoms two times per day. New intake 3 is and will remain in quarantine for 14 days and is being monitored for symptoms twice per day.  The other July 1, 2020 new intakes remain in quarantine.


**II. South Texas Family Residential Center ("Dilley FRC")**

Employee 1: Employee 1 is a resident supervisor-recreation who was tested at an off-site facility on July 1, 2020, due to experiencing symptoms. Employee 1 received positive results on July 7, 2020. Employee 1 was last at Dilley FRC on June 30, 2020. Contact tracing through video surveillance and an interview is being conducted. Employee 1 is, and will remain, in quarantine for 14 days after the positive result.

Employee 2: Employee 2 is a resident supervisor who was tested at an off-site facility on June 29, 2020, due to experiencing symptoms.  The results came back negative. Employee 2 was re-tested on July 1, 2020,  and received positive results on the same day.  This positive result was reported to HR on July 7, 2020.  Employee 2 was last at Dilley FRC on June 29, 2020. Video surveillance conducted for Employee 2 determined that in June 29, 2020, Employee 2 was in direct contact with other employees.  However, during observation within camera range, during this contact, all involved employees wore masks and there was no kind of physical contact. All employees in contact with Employee 2 on June 29, 2020,

will be notified of potential exposure.  Employee 2 was off-duty for the 48 hour period

preceding the last date on site. Employee 2 is, and will remain, in quarantine for 14 days.

Respondents will appraise the Court of any further developments as it receives them

from ICE.

RESPECTFULLY SUBMITTED this 9th day of July 2020.

<div style="margin-left:40%">

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW
Washington, DC 20530
Telephone:  (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
ELIANIS PEREZ
Assistant Director

s/  *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Defendants*

</div>

# IN THE UNITED STATES DISTRICT COURT
# FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*; <br><br> *Petitioners*, <br><br> v. <br><br> Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, <br><br> *Respondents*. | Case No. 1:20-cv00786-JEB <br><br> **NOTICE OF COVID-19 POSITIVE CASES** <br><br> The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees and new intakes in the Family Residential Center ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 81. U.S. Immigration and Customs Enforcement ("ICE") informs the Department of Justice of the following:

## I. Karnes County Family Residential Center ("Karnes FRC")

<u>New intake 1:</u> New intake 1 arrived at Karnes on July 8, 2020, and was tested due to being a new arrival. New intake 1 was asymptomatic. On July 11, 2020, New intake 1's test returned positive. New Intake 1 remains asymptomatic, but is being assessed for symptoms two times per day. New intake 1 is, and will remain, in quarantine for 14 days and is being monitored for symptoms twice per day.

<u>New intake 2</u>: New intake 2 arrived at Karnes on July 8, 2020, and was tested due to being a new arrival. New intake 2 was asymptomatic, but during the medical history and physical assessment, the Karnes medical provider noted an irregular respiration rate and rhythm. The medical provider ordered an EKG within three days and medicine for Intake 2's complaints of gastric irritation. On July 1, 2020, New intake 2's test returned positive. New intake 2 remains asymptomatic, but is being assessed for symptoms two times per day. New

intake 2 is and will remain in quarantine for 14 days and is being monitored for symptoms twice per day.

**II. South Texas Family Residential Center ("Dilley FRC")**

Employee 1: Employee 1 is a resident supervisor-perimeter patrol, who tested at an off-site facility on July 6, 2020, after experiencing symptoms. On July 9, 2020, the results came back positive. Employee 1 was last at Dilley FRC on July 1, 2020. Contact tracing is being conducted via video surveillance review and interview with Employee 1. Employee 1 is and will remain in quarantine for 14 days from the date of the positive result.

Employee 2: Employee 2 is a resident supervisor-relief, who tested at an off-site facility on June 29, 2020, as a prophylactic measure. On July 10, 2020, the test results came back positive. Employee 2 is asymptomatic. Contact tracing via video review is being conducted for the 48-hour period preceding their test date and for the period from their test date to their last date on site. Employee 2's medical doctor has advised them to re-test on July 20, 2020. Employee 2 is and will remain in quarantine.

Employee 3: Employee 3 is an administrative compliance officer, who has been working from home since March 28, 2020, because they were self-identified as a high-risk group. Employee 3 was tested at an off-site facility on July 6, 2020, after experiencing symptoms. On July 11, 2020, the results came back positive. Employee 3 is and will remain in quarantine.  No contract tracing conducted because employee works exclusively from home.


Respondents will appraise the Court of any further developments as it receives them from ICE.


//

RESPECTFULLY SUBMITTED this 12th day of July 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW
Washington, DC 20530
Telephone:  (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 1:20-cv-00786-JEB |
| Chad WOLF, Acting Secretary of the U.S. | ) |
| Department of Homeland Security, *et al.*, | ) |
| | ) |
| Respondents. | ) |
| | ) |
| | ) |

## RESPONDENTS' AMENDED OPPOSITION TO PETITIONERS' JULY 2, 2020 MOTION FOR PRELIMINARY INJUNCTION

Respondents hereby submit this Amended Opposition to Petitioners' July 2, 2020 Motion for Preliminary Injunction to correct a scrivener's error. Specifically, on page three, Respondents note that 34 new intakes at Karnes tested positive for COVID-19. The original filed version erroneously noted that "34 employees" had tested positive. This amended version corrects that error by replacing "employees" with "new intakes."

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 1:20-cv-00786-JEB |
| Chad WOLF, Acting Secretary of the U.S. | ) |
| Department of Homeland Security, *et al.*, | ) |
| | ) |
| Respondents. | ) |
| | ) |
| | ) |

## AMENDED RESPONDENTS' OPPOSITION TO PETITIONERS'
## JULY 2, 2020 MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

UPDATED STATEMENT OF FACTS ........................................................................... 1

LEGAL STANDARD for PRELIMINARY INJUNCTIONS ........................................... 4

ARGUMENT .................................................................................................................. 6

I.    PETITIONERS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD
      OF SUCCESS ON THE MERITS OF THEIR CLAIMS ...................................... 6

      A.  Petitioners Have Not Established a Fifth Amendment Due Process Violation ................. 6

          1.  Petitioners have not established that their conditions of confinement
              amount to punishment under *Bell v. Wolfish*. ........................................................... 6

          2.  Petitioners omit from their analysis any discussion of the legitimate
              governmental objective in securing their removal. .................................................. 11

          3.  Petitioners have not established that Respondents have acted with deliberate
              indifference. ................................................................................................................ 13

          4.  Regardless of which standard applies, adequate preventative measures satisfy
              constitutional requirements in the COVID-19 context. ........................................... 17

      B.  The *Flores* Court's Finding of Contractual Violations Under the *Flores* Settlement
          Agreement Does Not Equate to a Constitutional Violation ............................................. 20

          1.  Petitioners improperly conflate the legal standards for a *Flores* Settlement
              Agreement contract violation with the Due Process analysis under the Fifth
              Amendment. ................................................................................................................ 20

          2.  Petitioners erroneously ask this Court to expand the release rights provided to
              minors under the *Flores* Settlement Agreement to adults. ...................................... 22

II.   PETITIONERS HAVE FAILED TO SHOW A LIKELIHOOD OF IRREPARABLE
      HARM ABSENT THEIR REQUESTED PRELIMINARY RELIEF. ............................... 24

III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FACTORS FAVOR
      RESPONDENTS ........................................................................................................... 25

IV.   RELEASE IS NOT THE APPROPRIATE REMEDY FOR A CONDITIONS OF
      CONFINEMENT CLAIM .............................................................................................. 27

V.    THE COURT SHOULD SEVER PETITIONERS' CLAIMS FOR EACH FACILITY
      AND TRANSFER THEM TO A MORE APPROPRIATE VENUE .............................. 31

CONCLUSION ............................................................................................................... 38

i

## TABLE OF AUTHORITIES

**Cases**

*A.S.M. v. Donahue*, No. 20-cv-62, 2020 WL 1847158 (M.D. Ga. Apr. 10, 2020) ...................... 29

*Abel v. United States*, 362 U.S. 217 (1960) ............................................................. 11

*Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) .................................. 5

*Aracely R. v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. 2018) ......................................... 4

*Banks v. Booth*, No. CV 20-cv-849 (CKK) 2020 WL 1914896 (D.D.C. Apr. 19, 2020) ....... 13, 29

*Bartko v. Dep't of Justice*, Civ. A. No. 13-1135, 2015 WL 13673371 (D.D.C. Mar. 12, 2015) .... 5

*\*Bell v. Wolfish*, 441 U.S. 520 (1979) ................................................................. *passim*

*Benavides v. Gartland*, No. 20-46, 2020 WL 1914916 (S.D. Ga. Apr. 18, 2020) ......................... 8

*Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211 (D.C. Cir. 1981) ............................ 12, 26

*Bowring v. Godwin,* 551 F.2d 44 (4th Cir. 1977) ....................................................... 14

*Buleishvili v. Hoover*, Civ. A., No. 20-607, 2020 WL 1911507 (M.D. Pa. Apr. 20, 2020) ........... 8

*Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070
(W.D. Tex. Apr. 9, 2007) ................................................................................... 22

*\*C.G.B. v. Wolf*, No. 20-cv-1072 (CRC), 2020 WL 2935111 (D.D.C. June 2, 2020) ........... *passim*

*C.N., et al., v. Pennsylvania Dep't of Human Servs.*, No., 268 M.D. 2020
(Pa. Commw. Ct. Jul. 7, 2020) ....................................................................... 4, 30

*Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018) ......... 4, 5

*Cameron v. Thornburg*, 983 F.2d 253 (D.C. Cir. 1993) ............................................... 36, 37

*Carlson v. Landon*, 342 U.S. 524 (1952) ................................................................. 11

*Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001) ....................................................... 16

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ................. 5, 24

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ......................................................... 4

*Coreas v. Bounds*, Civ. A., 20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020) .................... 8, 19

*Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1 (D.D.C. 2015) ....................................... 5, 7

*Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018) .................................................................... 4

*Davidson v. Dist. of Columbia*, 736 F. Supp. 2d 115 (D.D.C. 2010) ..................................... 31, 33

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 387 U.S. App. D.C. 205 (D.C. Cir. 2009) 4

*Dawson v. Asher*, 2020 WL 1704324 (W.D. Wash. Apr. 8, 2020) ......................................... 8, 14

*Dawson v. Asher*, Civ. No. 20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020) .... 8, 12, 29

*Demore v. Kim*, 538 U.S. 510 (2003) ........................................................................................ 12

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) .............................. 14, 17

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) .................................................................. 5

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................................... 14, 16

*Farris v. Rice*, 453 F. Supp. 2d 76 (D.D.C. 2006) ......................................................................... 5

*Flores v. Barr*, 407 F. Supp. 3d 909 (C.D. Cal. 2019) ................................................................. 20

*Flores v. Barr*, No. CV854544DMGAGRX, 2020 WL 2128663 (C.D. Cal. Mar. 28, 2020) ...... 23

*Flores v. Barr*, No. CV854544DMGAGRX, 2020 WL 3488040
  (C.D. Cal. June 26, 2020) ..................................................................................... 20, 23, 25

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ...................................................................... 22, 23

*Flores v. Sessions*, 394 F. Supp. 3d 1041 (C.D. Cal. 2017) ........................................................ 23

*Flores v. Sessions*, No. CV854544DMGAGRX, 2017 WL 8943169 (C.D. Cal. Nov. 14, 2017) 23

*Garnett v. Zeilinger*, 313 F. Supp. 3d 147 (D.D.C. 2018) ........................................................... 27

*Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ................................................................... 5, 24

*Hardy v. District of Columbia*, 601 F. Supp. 2d 182  (D.C. Cir. 2009) ........................................ 13

*Hassoun v. Searls*, No. 19-cv-370, 2020 WL 1819670 (W.D.N.Y. Apr. 10, 2020) .................... 30

*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982) ........................................................................ 28

*Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192 (D. D.C. 2010) ...................... 4

*Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754 (3d Cir. 1979) ........................................ 28

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ........................................................................ 12, 15

*Jimenez v. R&D Masonry, Inc.*, No. 15-cv-1255, 2015 WL 7428533
  (D.D.C. Nov. 20, 2015) ............................................................................................................. 35

*Jones v. Horne*, 634 F.3d 588 (D.C. Cir. 2011) ........................................................................ 11

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ........................................................................ 13

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................ 4

*Milliken v. Bradley*, (Milliken II), 433 U.S. 267 (1977) ............................................................. 27

*Mott Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237 (D.D.C. 2015) ..................... 5

*Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) ............................................................... 26

*Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review*,
  Civ. A., No. 20-852, 2020 WL 2026971 (D.D.C. Apr. 28, 2020) .......................................... 27

*Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42 (D.D.C. 2006) ............................................. 36

*Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846 (9th Cir. 2007) ..................................... 22

*Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974) ................................................................. 28

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................................. 12, 27

*O.K. v. Bush,* 344 F. Supp. 2d 44 (D.D.C. 2004) ....................................................................... 14

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) .................................................................... 26

*Pinson v. U.S. Dep't of Justice*, 74 F. Supp. 3d 283 (D.D.C. 2014) ............................................. 31

*Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005) .......................................... 24

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) .............................................. 26

*Reynolds v. Wagner*, 128 F.3d 166 (3d Cir. 1997) ..................................................................... 13

*Rhodes v. Chapman*, 452 U.S. 337 (1981) ................................................................................. 28

*Roman v. Wolf*, No. 20-55436, 2020 WL 2188048 (9th Cir. May 5, 2020) ................................. 19

*Sacal-Micha v. Longoria*, Civ. A., No. 20-37, 2020 WL 1815691 (S.D. Tex. Apr. 9, 2020) ...... 16

*Sacal-Micha v. Longoria*, Civ. A., No. 20-37, --- F.Supp.3d ----, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020) .................................................................................................. 30, 31

*Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29 (D.D.C. 2014) ...................................... 25

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) .................................................... 26

*Singh v. McConville*, 187 F. Supp. 3d 152 (D.D.C. 2016) ............................................ 5

*\*Spaeth v. Michigan State Univ. College of Law*, 845 F. Supp. 2d 48 (D.D.C. 2012).......... *passim*

*Starnes v. McGuire*, 512 F.2d 918 (D.C. Cir. 1974) ................................................... 37

*Swain v. Junior*, No. 20-11622, 2020 WL 2161317 (11th Cir. May 5, 2020) ............................. 19

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) ....................................... 28, 34

*Toure v. Hott*, Civ. A. No. 20-395, 2020 WL 2092639 (E.D. Va. Apr. 29, 2020) .............. 8, 9, 29

*Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13 (D.D.C. 1996) ....................... 34, 35, 36

*United Farm Workers v. Chao*, 593 F. Supp. 2d 166 (D.D.C. 2009) ............................................ 5

*United States v. Bolton*, No. 1:20-CV-1580 (RCL), 2020 WL 3401940 (D.D.C. June 20, 2020) . 5

*United States v. Dade,* 959 F.3d 1136 (9th Cir. 2020) .................................................. 19

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) .............................................. 26

*United States v. Otunyo*, Cr. No. 18-251, 2020 WL 2065041 (D.D.C. Apr. 28, 2020).......... 28, 29

*United States v. Riggins*, Case No. CR-20-10 (CKK), 2020 WL 19844263 (D.D.C. Apr. 27, 2020) ................................................................................................. 13

*Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) ..................................................... 19

*Verma v. Doll*, No 4:20-CV-14, 2020 WL 1814149 (M.D. Pa. Apr. 9, 2020) ............................ 18

*Villafuerte v. United States*, No. 7:16-CV-619, 2017 WL 8793751 (S.D. Tex. Oct. 11, 2017)... 23

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) .................................... 4, 7, 9, 15

*Wong Wing v. United States*, 163 U.S. 228 (1896) ...................................................... 12

*Young v. Dir., BOP*, 367 F.2d 331 (D.C. Cir. 1966) .................................................. 37

**Statutes**

28 U.S.C. § 1391(e)(1) ....................................................................................... 35

28 U.S.C. § 1404(a) .......................................................................................... 34

**Rules**

Fed. R. Civ. P. 20(a)(1) ............................................................................. 31, 32, 33

Fed. R. Civ. P. 21 ..................................................................................... 31, 32

**Other Authorities**

U.S. Const. amend. V ..................................................................................... *passim*

*ERO COVID-19 Pandemic Response Requirements*, U.S. Immigration and
    Customs Enforcement (Version 1.0, Apr. 10, 2020) ...................................... *passim*

## INTRODUCTION

The Court should deny Petitioners' Motion for Preliminary Injunction ("Pet. PI Mot.")

(ECF Nos. 78) requiring Respondents to promptly release Petitioners and all detainees in the

Family Residential Centers known as Berks County Residential Center (Leesport, Pennsylvania);

South Texas Family Residential Center (Dilley, Texas); and Karnes County Residential Center

(Karnes City, Texas), (collectively, "FRCs").

First, Petitioners' constitutional claims lack merit. Second, Petitioners do not have a

cognizable injury, much less an irreparable one. Finally, the balance of equities and public

interest tilt against granting a preliminary injunction. The Court should, thus, deny Petitioners'

motion, and, *sua sponte*, sever Petitioners' claims and transfer them to each FRC's home forum.

## UPDATED STATEMENT OF FACTS

Respondents continue to implement the U.S. Centers for Disease Control ("CDC")

Interim Guidance on Management of Coronavirus 2019 in Correctional and Detention Facilities,

available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-

detention/guidance-correctional-detention.html, ("CDC Guidance"), and ICE Enforcement and

Removal Operations COVID-19 Pandemic Response Requirements (" ICE PRR"), available at

https://www.ice.gov/sites/default/files/documents/Document/2020/eroCOVID19responseReqsCl

eanFacilities.pdf, giving due consideration not only to individuals' health, but also to the various

Court orders related to those in ICE custody.[1] Respondents' health and safety protocols include,

but are not limited to, enhanced mitigation, screening, and testing; quarantining/cohorting;

---

[1] Respondents incorporate by reference the detailed statement of facts and procedural history
outlined in their pending motion to dismiss. ECF Nos. 58, 58-1. Respondents also incorporate by
reference the information included in the numerous declarations provided throughout this
litigation. *See generally* ECF Nos. 19-1, 39-1, 39-2, 39-3, 51-2, 51-3, 51-4, 51-5, 51-6, 56.

practicing social distancing; providing and using masks/face coverings; and continually
educating residents regarding COVID-19.

<u>Berks Family Residential Center (BFRC or Berks), Leesport, Pennsylvania</u>

As outlined in the attached Declaration by Christopher George, an Assistant Field Office
Director ("AFOD") for the U.S. Department of Homeland Security ("DHS"), U.S. Immigration
and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO")'s
Philadelphia Office ("George Decl.") (Ex. 1), the BFRC continues to follow Pennsylvania, ICE,
and CDC guidelines in its care of the BFRC residents. *See also* Ex. 4 - *C.N., et al. v.
Pennsylvania Dep't of Human Servs.*, No. 268 M.D. 2020, July 7, 2020 Mem. Op. at 10-25, 27-
28 (Pa. Commw. Ct.) (unpublished) (denying petitioners emergency motion seeking their
removal from BFRC to avoid infection during the COVID-19 pandemic, and entering judgment
in favor of respondents—detailing all the health and safety efforts the BFRC has implemented to
mitigate the risk of residents being exposed to or contracting COVID-19).

As of July 7, 2020, the BFRC housed five (5) families for a total of 16 residents. George
Decl. ¶ 2. On June 22, 2020, four (4) of the families comprising 13 residents were tested for
COVID-19 and the test results showed that zero (0) residents tested positive for COVID-19. *Id.* ¶
19. The remaining family, consisting of three (3) residents, was admitted to Berks on July 7,
2020 and was given a COVID-19 test on the same day. *Id.* ¶ 21. The results of the tests remain
pending. *Id.* As of July 8, 2020, there have been no residents or staff at the BFRC who have
tested positive for COVID-19. *Id.* ¶ 20.

<u>South Texas Family Residential Center (STFRC), Dilley, Texas</u>

As outlined in the attached Declaration by Richard Hunt, an AFOD for DHS-ICE-ERO's
San Antonio Office ("Hunt Decl.") (Ex. 2 ¶ 2), as of July 7, 2020, STFRC has a total of 174

residents, 75 adults, and 99 juveniles. Of that population, 19 residents are new intakes, having

spent nine days or less in custody. *Id*. Since June 4, 2020, all new intakes at STFRC are tested

for COVID-19 during the initial intake process using LabCorp, SARS-CoV-2 testing. *Id*. ¶ 3.

STFRC conducted saturation testing on June 23/24, 2020. *Id*. ¶ 9. All residents already at

the facility tested negative for the COVID-19 virus. *Id*. Although 14 employees have tested

positive for the COVID-19 virus[2] to date, STFRC has zero (0) COVID-19 cases among the

resident population due to the thorough and cautious actions taken to prevent and protect

residents and staff from possible COVID-19 spread at the facility. *Id*.; ECF Nos. 73, 75, 79, 80,

81.

### Karnes County Family Residential Center (KCFRC), Karnes City, Texas

As outlined in the attached Declaration by Anthony Hofbauer, an AFOD for DHS-ICE-

ERO's San Antonio Office ("Hofbauer Decl.") (Ex. 3 ¶ 2), as of July 7, 2020, KCFRC has a total

of 129 residents, comprised of 71 adults and 58 juveniles. As of July 7, 2020, only new arrivals

to the facility have tested positive, and all of the new arrival intakes have been isolated and

cohorted since their arrival. *Id*. ¶ 5. Specifically, 34 new intakes have tested positive for COVID-

19 during their first 14-day quarantine period while under cohort status. *Id*. Although 34 new

intakes at KCFRC have tested positive for COVID-19 virus, no families in the general

population have tested positive. *Id*. Comprehensive protocols are in place for the protection of

staff and patients, including but not limited to, the issuance of and appropriate use of personal

---

[2] On June 25, 2020, the Court ordered Respondents to file notices within 48 hours of any new
positive COVID-19 test results for any employees or residents at the FRCs. Respondents have
since been filing periodic notices in response to the June 25, 2020 Minute Order. Nonetheless,
there may be a discrepancy in the numbers reported through notices and the numbers reported
in this memorandum because the numbers reported here include positive cases recorded prior to
the June 25, 2020 order. Three of the positive employee cases at Dilley occurred prior to the June 25,
2020, reporting requirement was instituted by this Court.

protective equipment in accordance with CDC guidance; limited movement, hand sanitizing stations, and educational materials posted throughout in both English and Spanish. *Id.* ¶¶ 3, 12; ECF Nos. 70, 73, 75, 77, 79, 80, 81.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

"'A preliminary injunction is an extraordinary remedy never awarded as of right,' but 'only when the party seeking the relief, by a clear showing, carries the burden of persuasion[.]'" *Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 166 (D.D.C. 2018) (Moss, J.) (denying motion for preliminary injunction) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008), and *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)); *Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D. D.C. 2010) (The moving party bears the burden to demonstrate, by a clear showing, that the requested relief is warranted).

"To secure a preliminary injunction, a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Cal. Ass'n*, 344 F. Supp. 3d at 166 (quoting *Winter*, 555 U.S. at 20); *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). "Of these factors, likelihood of success on the merits and irreparable harm are particularly crucial." *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 125 (D.D.C. 2018) (Contreras, J.) (denying, in part, preliminary injunction).[3]

---

[3] "Before the Supreme Court's decision in *Winter*, courts weighed these factors on a 'sliding scale,' allowing 'an unusually strong showing on one of the factors' to overcome a weaker showing on another." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92, 387 U.S. App. D.C. 205 (D.C. Cir. 2009)). The D.C. Circuit has expressly declined to address the viability of the "sliding scale" approach post-*Winter*. *See Davis*, 571 F.3d at 1292 (stating that "[w]e need not decide whether"

"The power to issue a preliminary injunction . . . should be sparingly exercised." *Mott
Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 243 (D.D.C. 2015) (Walton, J.)
(denying preliminary injunction) (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir.
1969)). Moreover, "a party seeking a preliminary injunction must clear two, non-negotiable
hurdles[,]" namely (i) establish that the Court has subject matter jurisdiction over the plaintiff's
claims, and (ii) demonstrate that the party will "likely" suffer irreparable harm if the injunction is
not entered—"a mere 'possibility' of harm will not suffice." *Cal Ass'n*, 344 F. Supp. 3d at 167
(collecting citations). A movant alleging "speculative injuries" cannot meet the "'high standard
for irreparable injury' sufficient to warrant the extraordinary relief of a TRO," and "the Court
need not reach the other factors relevant to the issue of injunctive relief." *United Farm Workers
v. Chao*, 593 F. Supp. 2d 166, 171 (D.D.C. 2009) (quoting *Chaplaincy of Full Gospel Churches
v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see Bartko v. Dep't of Justice*, Civ. A. No. 13-
1135, 2015 WL 13673371, at *2 (D.D.C. Mar. 12, 2015) ("[t]he Court need not grant injunctive
relief 'against something merely feared as liable to occur at some indefinite time'") (quoting
*Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And where a party seeks to change
the status quo through action rather than merely to preserve the status quo—typically the moving
party must meet an even higher standard than in the ordinary case: the movant must show
'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v.
Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006) (citing authorities). As demonstrated below,

---

that approach is still viable "because the [movants] fail even under the 'sliding scale' analysis").
Other courts have found that *Winter* prohibits use of the "sliding scale" approach. *See, e.g., Am.
Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *Daily Caller v. U.S.
Dep't of State*, 152 F. Supp. 3d 1, 5–6 (D.D.C. 2015); *see also Singh v. McConville*, 187 F. Supp.
3d 152, 160 (D.D.C. 2016); *also see United States v. Bolton*, No. 1:20-CV-1580 (RCL), 2020
WL 3401940, at *3 (D.D.C. June 20, 2020) (holding that a movant must  "meet four independent
requirements" to obtain injunctive relief).

Petitioners cannot show a likelihood of success on the merits, and Petitioners have been unable

to establish a likelihood of irreparable harm.  As such, Petitioners' request for a preliminary

injunction should be denied.

## ARGUMENT

## I.    PETITIONERS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

Petitioners' constitutional claims are unlikely to succeed on the merits. Petitioners' true

claim is that *any* confinement of families at the FRCs during the COVID-19 pandemic violates

the Constitution. Petitioners in effect invite the Court to recognize a due process right to

immediate, discretionary release during this pandemic. Petitioners have no such due process

right. Moreover, Petitioners have not met their burden to show that their confinement amounts to

punishment, and their analysis conspicuously fails to address the Government's legitimate non-

punitive objective in immigration detention. Furthermore, Petitioners have not established that

Respondents have acted with deliberate indifference because the record demonstrates that ICE

has implemented measures to mitigate the spread of COVID-19. For all these reasons, Petitioners

are unable to demonstrate a likelihood of success on the merits, and their request for preliminary

injunctive relief should be denied.

### A.    Petitioners Have Not Established a Fifth Amendment Due Process Violation

1.    Petitioners have not established that their conditions of confinement amount to punishment under *Bell v. Wolfish.*

Due process under the Fifth Amendment "requires that a pretrial detainee not be

punished." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). "In evaluating the constitutionality of

conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions

amount to punishment of the detainee." *Id.* at 535. To establish that their detention conditions

amount to "punishment" in violation of the Fifth Amendment, Petitioners must show that the

particular condition is either: (1) "imposed for the purpose of punishment" or intended to punish;

or (2) the "condition is not reasonably related to a legitimate goal-if it is arbitrary or

purposeless." *Id.* at 538-39 ("Thus, if a particular condition or restriction of pretrial detention is

reasonably related to a legitimate governmental objective, it does not, without more, amount to

'punishment.'").

However, Petitioners do not allege that Respondents are subjecting them to conditions

with a "purpose" or "intent" to punish. Nor could Petitioners make any such allegation, as their

detention is clearly authorized by statute and serves a non-punitive governmental objective that

the Supreme Court has repeatedly recognized as legitimate. *See* Section I.A.2., *infra*. Instead,

Petitioners appear to argue that Respondents are subjecting them to "unsafe conditions" that

amount to "cruel and unusual punishment." Pet. PI Memo at 15. Petitioners contend that their

confinement during a global pandemic is "unsafe and punitive in violation of [their] Fifth

Amendment rights" because of the "danger of contracting a dangerous and often deadly disease."

*Id.* at 7-8. Most notably, Petitioners allege "inconsistent use of personal protective equipment" at

the FRCs and claim that some areas within the facilities "do not permit adequate social

distancing." *Id*. at 17-18.

Indeed, Petitioners' motion concedes that they are essentially asking this Court to hold

that detaining *any* individual during an outbreak of a contagious illness is necessarily

unconstitutional. *Id.* at 16-17 ("Petitioners' core contentions [are] that even good compliance

with CDC guidance will not likely be sufficient to fully protect minors and their families from

Covid-19 while in ICE detention and that ICE facilities convey an inherently greater risk of

COVID-19 than most settings.") (internal marks omitted). But numerous courts have wisely

rejected this extreme and legally unsupported position. *See C.G.B. v. Wolf*, No. 20-cv-1072

(CRC), 2020 WL 2935111 *22, 28 (D.D.C. June 2, 2020) (denying TRO request seeking release

of all detainee-petitioners—"the most intrusive measure"); *Coreas v. Bounds*, Civ. A. 20-0780,

2020 WL 1663133, at *12 (D. Md. Apr. 3, 2020) (denying TRO and noting that the "Court is not

presently prepared to adopt this position"); *Dawson v. Asher*, Civ. A. No. 20-0409, 2020 WL

1304557, at *2 (W.D. Wash. Mar. 19, 2020) (denying TRO in part because "Plaintiffs do not cite

to authority, and the court is aware of none, under which the fact of detention itself becomes an

'excessive' condition solely due to the risk of communicable disease outbreak—even one as

serious as COVID-19."); *Buleishvili v. Hoover*, Civ. A. No. 20-607, 2020 WL 1911507, at *6

(M.D. Pa. Apr. 20, 2020) (denying habeas petition and stating that "there is no perfect solution

for preventing the spread of COVID-19 virus in detention facilities"); *Toure v. Hott*, Civ. A. No.

20-395, 2020 WL 2092639 (E.D. Va. Apr. 29, 2020) (holding that even in this pandemic

"continued detention may validly be attributed to the Government's legitimate nonpunitive

objective").

       Similarly, courts have reasoned that even to the extent that some aspects of detention

necessarily increase the risk of exposure to contagious diseases, "the Constitution does not

require that detention facilities reduce the risk of harm to zero." *C.G.B. v. Wolf*, 2020 WL

2935111, at *23 (quoting *Benavides v. Gartland*, No. 20-46, 2020 WL 1914916, at *5 (S.D. Ga.

Apr. 18, 2020) (denying TRO and rejecting petitioners' claims that an outbreak of COVID-19 at

the facility is imminent . . .")). And specifically, "under the Fifth Amendment, Respondents are

not required to eliminate *any* risk to Petitioners." *Dawson v. Asher*, 2020 WL 1704324, at *12

(W.D. Wash. Apr. 8, 2020) (emphasis added) (denying TRO seeking immediate release from

immigration detention in light of COVID-19); *C.G.B.*, 2020 WL 2935111, at *25 (finding that

even several alleged violations of the ICE PRR "are concerning, but nevertheless are unlikely to

establish unconstitutional conditions of confinement."); *N.Z.M. v. Wolf*, Case No. 5:20-CV-24

(S.D. Tex. Apr. 9, 2020) (holding that the "Court cannot grant extraordinary relief based on

generic concerns that apply to every detainee in federal custody."). Indeed, even Petitioners'

requested form of relief—immediate release from the FRCs—would fail to meet this standard, as

Petitioners would still be at risk of contracting COVID-19 while among the public at large. As

Petitioners accurately acknowledge, millions of people across the United States have contracted

COVID-19 and thousands more continue to do so every day. Pet. PI Memo at 10. Put simply,

"this Court cannot put an end to the COVID-19 pandemic." *Id.* at 22. Therefore, Petitioners'

contention that Respondents have not eliminated the risk of contracting COVID-19 in the FRCs

because "consistent social distancing is not possible" and "masking is at best intermittent" does

not rise to the level of punishment required to establish a violation of the Fifth Amendment.

Moreover, the "record is replete with evidence" of measures taken by Respondents to

reduce the COVID-19 risk at the FRCs, including dramatic reductions in the population of each

facility. *See Toure*, 2020 WL 2092639 (denying TRO and citing Virginia detention facilities'

steps to prevent virus spread and improve capacity to treat it); *Brown v. DHS*, Case No. 3:20-cv-

0119 (M.D. Pa. Apr. 20, 2020) (denying release where ICE has implemented similar sanitation

and CDC-compliant protocols as in this case). As summarized above and detailed in the

declarations that Respondents have filed previously, the FRCs have implemented a long list of

actions to mitigate the risk of COVID-19 transmission. *See generally* ECF Nos. 19-1, 39-1, 39-2,

39-3, 51-2, 51-3, 51-4, 51-5, 51-6, 56; Ex. 1 – George Decl.; Ex. 2 – Hunt Decl.; Ex. 3 –

Hofbauer Decl. Specifically, facilities have increased sanitation and disinfecting of housing and

common spaces. ECF Nos. 39-2 ¶¶ 17, 40; 39-3 ¶¶ i, k; 51-2 ¶ 7; 51-3 ¶ 35. They have also

distributed face masks to all residents and facility staff. ECF Nos. 51-2 ¶¶ 15-17, 23; 51-3 ¶ 9;

Case 2:85-cv-04544-DMG-AGR   Document 841-1   Filed 07/13/20   Page 25 of 185   Page ID
#:38881
Case 1:20-cv-00786-JEB   Document 23-1   Filed 07/10/20   Page 17 of 45

Hunt Decl. ¶ 8; George Decl. ¶¶ 43-47. Facilities have educated residents on COVID-19, the use

of face masks, and general virus precautions through posters, flyers, and personal presentations.

ECF Nos. 39-2 ¶¶ 17, 18, 40, 41; 39-3 ¶ 17; 51-2; Hunt Decl. ¶ 8. Furthermore, in addition to

reducing the number of residents at each facility to allow for more spacing in housing units and

at mealtimes, the facilities have re-arranged dining halls or implemented satellite feeding to

promote social distancing and reduce congestion in common areas. ECF Nos. 39-2 ¶¶ 25, 49; 39-

3 ¶¶ 6, 17; 51-3 ¶¶ 27-29. The facilities have also limited and controlled access to common areas

like the library, gymnasium, or chapel. ECF Nos. 39-2 ¶ 25, 49; 39-3 ¶ 25. To further promote

distancing and to minimize the risk of viral transmission, the facilities have also suspended in-

person social visitation, facility tours, and non-essential civilian access. ECF Nos. 39-2 ¶¶ 19,

23; 39-3 ¶ 17.

Moreover, each FRC has implemented policies to thoroughly test residents for the

COVID-19 virus. Since June 4, 2020, all new intakes at Berks and Dilley are tested for COVID-

19 during the initial intake process. Hunt Decl. ¶ 3; George Decl. ¶ 29. All new intakes at Karnes

are also tested during the intake process. Hofbauer Decl. ¶ 5.c. On June 22, 2020, all individuals

housed at Berks on that date were tested for COVID-19, and zero residents tested positive for

COVID-19. George Decl. ¶ 19. On June 23 and 24, 2020, Dilley conducted testing of all

residents already at the facility, all of whom tested negative for COVID-19. Hunt Decl. ¶ 9. As

of July 7, 2020, 34 residents at Karnes have tested positive for COVID-19, all of whom were

new intakes who tested positive during their first 14-day quarantine period. Hofbauer Decl. ¶ 5.a.

No residents in the general population at Karnes have tested positive. *Id.* ¶ 5.c.

Notably, Petitioners' allegations generally do not dispute that the FRCs have taken the

precautions referenced above. Instead, Petitioners assert that these measures are not fully

10

effective or that compliance with these measures is not always perfect. *See* Pet. PI Memo at 16-19 (asserting, *inter alia*, that not all areas of the FRCs allow for sufficient distancing, that residents are provided face masks but are not given new masks often enough, and generally alleging "inconsistent implementation"). But the fact that these efforts are imperfect does not convert reasonable precautions to mitigate the risk of COVID-19 into a violation of Petitioners' due process rights. Simply stated, none of Petitioners' statements describe conditions that "amount to punishment" or are "excessive" in relation to the legitimate objective of immigration detention.

        2.    <u>Petitioners omit from their analysis any discussion of the legitimate governmental objective in securing their removal.</u>

As explained above, Petitioners have not demonstrated a likelihood of success on the merits of their due process claim because they have failed to show that their detention "amount[s] to punishment." *Wolfish*, 441 U.S. at 535. Absent a "showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose [to it]." *Id.* at 538. "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Id.* at 539. The "substantive due process protections afforded by *Bell v. Wolfish* and its progeny against punishment contemplate that a legitimate government interest may require additional restrictions on pretrial detainees." *Jones v. Horne*, 634 F.3d 588, 598 (D.C. Cir. 2011).

The Supreme Court has long recognized that "detention is necessarily a part of the deportation procedure." *Carlson v. Landon*, 342 U.S. 524 (1952). The laws authorizing immigration officials to arrest aliens subject to removal and to detain them for removal

proceedings, and subsequently for removal, have been in place for over a century. *See Abel v. United States*, 362 U.S. 217, 232-37 (1960). Indeed, the Supreme Court has affirmed that "detention during deportation proceedings is a constitutionally valid aspect of the deportation process," and reasoned that removal proceedings "would be in vain if those accused could not be held in custody pending the inquiry into their true character." *See generally Jennings v. Rodriguez*, 138 S. Ct. 830 (2018); *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the [statutory scheme enacted by Congress], and permit[s] and prolong[s] a continuing violation of United States law." (internal marks omitted)).

Petitioners' strategy to omit any discussion of the Government's legitimate objective in detaining them does not eliminate its existence. Indisputably, Respondents have a lawfully recognized substantial interest in enforcing immigration law, protecting the community (including, sometimes, protecting immigration detainees from themselves) and preventing them from absconding. *Demore*, 538 U.S. at 515. Accordingly, Petitioners have not shown that their detention, or any of the conditions they assail, amount to punishment. *See Dawson*, 2020 WL 1304557, at *2 ("[P]reventing aliens from absconding and ensuring that they appear for removal proceedings is a legitimate governmental objective . . . Plaintiffs' current confinement does not appear excessive in relation to that objective.").

12

3.     <u>Petitioners have not established that Respondents have acted with deliberate indifference.</u>

In this Circuit, both the Eight Amendment and the Fifth Amendment apply to the conditions of confinement. The rights guaranteed by the Eight Amendment to convicted prisoners subject to penal incarceration also apply under the Fifth Amendment to non-penal incarceration or confinement, including pre-trial and civil detainees. *Hardy v. District of Columbia*, 601 F. Supp. 2d 182 (D.C. Cir. 2009); *United States v. Riggins*, Case No. CR-20-10 (CKK) 2020 WL 19844263 (D.D.C. Apr. 27, 2020); *Reynolds v. Wagner*, 128 F.3d 166, 173, 188 (3d Cir. 1997). The difference between the two is that the Eight Amendment prevents "cruel and unusual punishment," whereas "a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy*, 601 F. Supp. 2d at 188; *Riggins*, 2020 WL 19844263, at *3. "Because a pretrial detainee's rights under the Fifth Amendment are at least as great as those afforded to a convicted prisoner under the Eighth Amendment, applying the Eighth Amendment "'deliberate indifference' standard to measure whether the plaintiffs have alleged a violation of their clearly established Fifth Amendment rights is appropriate." *Id*. at 189; *but see C.G.B.*, 2020 WL 2935111, at *22 n.31 (noting that while the D.C. Circuit has not addressed the issue, "many circuit courts have extended [an "objectively unreasonable" standard] to apply to . . . due process claims by pre-trial detainees.").[4]

---

[4] Respondents acknowledge that other judges in this district have concluded that the objective reasonableness standard from *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) applies in this context. *See C.G.B.*, 2020 WL 2935111, at *22; *Banks v. Booth*, No. CV 20-cv-849 (CKK) 2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020) (holding a civil detainee "need only show that prison conditions are objectively unreasonable in order to state a claim under the due process clause"). However, the D.C. Circuit has not addressed this issue and therefore Respondents maintain that the proper standard for civil conditions-of-confinement claims is the subjective "deliberate indifference" standard articulated by the Supreme Court in *Wolfish*. Moreover, Petitioners cannot demonstrate a likelihood of success even under *Kingsley*'s objective standard. *See Section I.A.4, infra.*

The deliberate indifference standard is not easily surmountable, as even malpractice does not rise to deliberate indifference—"deliberate indifference describes a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). As it relates to medical services, this Circuit has noted that "courts will not intervene upon allegations of mere negligence, mistake or difference of opinion." *O.K. v. Bush,* 344 F. Supp. 2d 44, 61 (D.D.C. 2004) (Bates, J.) (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)). Absent a showing of misconduct that rises to the level of deliberate indifference, courts will not sit as boards of review over the medical decisions of prison officials, and they will not second-guess the adequacy of a particular course of treatment. *Bowring*, 551 F.2d at 48.

Petitioners do not explain how their factual allegations rise to the deliberate indifference necessary to sustain a conditions-of-confinement claim under the Fifth Amendment Due Process Clause. Instead, they incorrectly assert that an analysis under the Fifth Amendment requires a lesser objective standard of "reasonable safety" rather than the subjective "deliberate indifference" standard. *See* Pet. PI Memo at 14. Respondents fully acknowledge that "'when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.'" *Dawson*, 2020 WL 1704324, at *10 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989)). However, Respondents reiterate that when evaluating the constitutionality of pretrial detention conditions under the Fifth Amendment, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Wolfish*, 441 U.S. at 535; *see also Dawson*, 2020 WL 1704324, at *10. Punishment may be shown through express intent or a restriction or condition that is not "reasonably related to a legitimate governmental objective." *Bell*, 441 U.S. at 539. As discussed above, the Supreme Court has long

recognized that preventing detainees from absconding and ensuring that they appear for removal

proceedings are legitimate, non-punitive governmental objectives. *See Jennings*, 138 S. Ct. at

836.

Petitioners have failed to allege facts sufficient to show that ICE has acted with deliberate

indifference or with intent to punish. The allegations in Petitioners' motion broadly fall into three

categories that do little, if anything, to show that the conditions at the FRCs violate the

constitution. *See* Pet. PI Memo at 17-18. First, Petitioners allege that some areas of the FRCs "do

not permit adequate social distancing" and that some children are "too young" to understand how

to practice social distancing. *Id.* at 17. Second, Petitioners allege that use of personal protective

equipment is "inconsistent" and that residents "are being provided new masks less than once a

week." *Id.* at 17-18. Third, Petitioners allege "deficient medical care" generally, and reference a

recent non-COVID-related viral outbreak at Berks and "inconsistent quarantine instructions" by

FRC staff. *Id.* at 18.[5] But even assuming that all of Petitioners' allegations are true—and

Respondents' declarations dispute many of them, *see generally* ECF Nos. 19-1, 39-1, 39-2, 39-3,

51-2, 51-3, 51-4, 51-5, 51-6, 56; Hunt Decl.; George Decl.; Hofbauer Decl.—they still do not

support a reasonable inference that the conditions amount to punishment or result from deliberate

indifference. In fact, Petitioners' allegations mostly serve to demonstrate that ICE has imposed

numerous preventative measures within the FRCs. The fact that these efforts are not perfect and

cannot completely eliminate the health risk posed by COVID-19 does not constitute "deliberate

---

[5] Petitioners also repeatedly reference the *Flores* court's recent finding that the conditions *for
children* violate their *contractual rights under the FSA*. Pet. PI Memo at 8, 13-17, 20-24. But that
is a separate question entirely from whether the conditions *for adults* violate the *Constitution*
because they are punitive and result from deliberate indifference. *See* Section I.A.1, *supra*.
Petitioners cannot simply cite to the *Flores* court's findings to show that the conditions for adults
are unconstitutional.

indifference" and does not convert Respondents' reasonable efforts to mitigate risk into a constitutional violation. Accordingly, Petitioners' allegations simply cannot sustain a valid conditions-of-confinement claim, much less demonstrate a likelihood of success on the merits of that claim.

Where a pandemic, such as this one, poses a threat to everyone without discrimination, Petitioners do not gain a right of release by merely citing to the pandemic. *See also Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001) ("Many Americans live under conditions of exposure to various contaminants. The [Constitution] does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans."). In short, there is no precedent for the suggestion that if the government cannot guarantee a clean bill of health for those in custody, then it cannot maintain custody at all. Indeed, the very existence of a "deliberate indifference" standard demonstrates the Supreme Court's understanding and acceptance of the fact that the detention setting carries a degree of inherent and legally permissible risk, even in non-penal confinement. The Supreme Court expressly held as much in *Wolfish*, stating that due process permits civil and pre-trial detainees to be exposed to "inherent incidents of confinement." *Wolfish*, 441 U.S. at 537; *see also Farmer*, 511 U.S. at 834 ("not . . . every injury suffered by one prisoner . . . translates into constitutional liability for prison officials responsible for the victim's safety."); *Sacal-Micha v. Longoria*, Civ. A. No. 20-37, 2020 WL 1815691, at *7-8 (S.D. Tex. Apr. 9, 2020) ("the record reflects that ICE has provided constant medical attention to Sacal, and has implemented preventative measures to reduce the risk of Sacal contracting COVID-19. Those measures may ultimately prove insufficient. But the implementation of those measures preclude a finding that ICE has refused to care for Sacal or otherwise exhibited wanton disregard for his serious medical needs.").

Based on the record before the Court, Petitioners are unlikely to succeed in establishing that the conditions of Petitioners' confinement amount to a violation of the Fifth Amendment. Accordingly, this Court should decline to grant a preliminary injunction on this basis.

        4.    <u>Regardless of which standard applies, adequate preventative measures satisfy constitutional requirements in the COVID-19 context.</u>

Under either the subjective "deliberate indifference" standard from *Wolfish*, or the objective "reasonableness" standard from *Kingsley*, Petitioners cannot show a likelihood of success on the merits because the record demonstrates that ICE has implemented numerous measures to mitigate the risk of COVID-19 within the FRCs. Because due process requires the government to ensure the reasonable safety of inmates, *see Deshaney,* 489 U.S. at 199, when facilities have implemented preventative measures that courts have deemed sufficient to reduce an inmate's risk of contracting diseases such as COVID-19, courts have found that these actions satisfy constitutional requirements. *See, e.g.*, *C.G.B.*, 2020 WL 2935111, at *24 ("The Court is convinced that ICE's capacity reductions and substantial compliance with the [ICE] PRR would suffice to provide most people in civil immigration detention—certainly young and healthy ones—with at least a reasonable degree of safety."); *Gomes v. DHS*, No. 20-cv-453-LM, Dkt. No. 218, Order, at 7, 19-20 (D.N.H. July 1, 2020) (finding that, under either the subjective "deliberate indifference" standard or an objective unreasonableness standard, detainees had not shown a likelihood of success on their Due Process claims where the facility had adopted many measures to reduce the risk of COVID-19, even though those measures were imperfect); *Aslanturk v. Hott*, No. 20-cv-433-RDA-JFA, Dkt. No. 12, Order, at 20-22 (E.D. Va. May 8, 2020) (attached as Ex. 5) (denying request for release by 69-year-old diabetic detainee at a facility where COVID-19 was present, where facility was operating at 60% capacity and had taken reasonable steps to prevent additional spread of the virus, including isolating the infected

individuals); *Peter O.C. v. Tsoukaris*, No. 20-cv-4622-SDW, Dkt. No. 13, Opinion, at 6-7

(D.N.J. May 7, 2020) (attached as Ex. 6) (denying request for release by detainee who claimed to

be at high-risk for COVID-19, given facility's steps to mitigate the risk of the virus to inmates,

including increased cleaning, availability of medical staff, increased testing, and establishing a

quarantine area for those who become infected); *Murai v. Adducci*, No. 20-cv-10816, Dkt. No. 8,

Order Denying Without Prejudice Petitioner's Motion for Temporary Restraining Order, at 3

(E.D. Mich. Apr. 16, 2020) (attached as Ex. 7) (finding that claims that "no detention conditions

could adequately protect" petitioner to be "excessive conjecture to support the issuance of a

TRO" and denying request for immediate release of ICE detainee due to COVID-19, where the

facility did not have any confirmed COVID-19 cases but where petitioner alleged that other

inmates were "visibly ill"); *Verma v. Doll*, No 4:20-CV-14, 2020 WL 1814149, at *6 (M.D. Pa.

Apr. 9, 2020) (finding no deliberate indifference with respect to a 67-year-old detainee who had

a medical history including four stents placed in his heart to treat cardiovascular disease,

prediabetes, elevated lipids, and high blood pressure, where, in spite of a detainee testing positive

for COVID-19, facility officials took reasonable steps to limit the spread of COVID-19

throughout the facility); *Umarbaev v. Lowe*, No. 20-cv-413, Dkt. No. 16, Memorandum, at 15-16

(M.D. Pa. Apr. 9, 2020) (attached as Ex. 8) (finding no deliberate indifference to detainee's risk

of contracting COVID-19, even though COVID-19 was present at the facility, where proactive

steps had been taken to protect against the spread of the virus) *cf. Ramirez v. Culley*, No. 20-cv-

609, Dkt. No. 20, Order Denying Motion for Temporary Restraining Order, at 4-6 (D. Nev. Apr.

9, 2020) (attached as Ex. 9) (finding no likelihood of success on the merits by petitioner with

pre-diabetes, hypertension, and high cholesterol, where the facility had implemented measures to

protect against the spread of COVID-19, although in a facility where there were no positive cases

18

of COVID-19); *Coreas*, 2020 WL 1663133, at *12 (finding again, albeit in a detention facility

that had no confirmed cases of COVID-19, that where facility was below capacity and had taken

steps to prevent the spread of COVID-19, high-risk petitioners were not entitled to release

pursuant to a TRO alleging due process violations, stating that "[t]o adopt Petitioners' position

would be to hold that the detention of any high-risk immigration detainee during the pandemic is

necessarily unconstitutional, a position that the Court is not presently prepared to adopt.").

As a result, appellate courts across the country have begun to stay injunctions granting

class relief similar to the relief that Petitioners seek here. *See, e.g.*, *Roman v. Wolf*, No. 20-

55436, 2020 WL 2188048 (9th Cir. May 5, 2020) (unpublished) (staying a preliminary

injunction that directed the release of immigration detainees and imposed numerous other

requirements based on COVID-19 claims); *Valentine v. Collier*, 956 F.3d 797, 799-804 (5th Cir.

2020) (per curiam), mot. to vacate stay denied, No. 19A1034 (5th Cir. May 14, 2020) (staying an

injunction that imposed a series of requirements, such as cleaning and provision of additional

sanitizers and paper products, for a class of "disabled and high-risk" inmates in a state prison that

had experienced an outbreak of COVID-19, after finding the injunction to be an "intrusive

order[]", inflicting irreparable harm on both the State and the public, and finding that the district

court erred in finding an Eighth Amendment violation); *Swain v. Junior*, No. 20-11622, 2020

WL 2161317, at *1 (11th Cir. May 5, 2020) (per curiam) (staying injunction obtained by inmates

representing a "medically vulnerable" subclass of inmates at a facility where several inmates had

tested positive for the virus, after determining that the district court's reliance on the facility's

"increase in COVID-19 infections" as proof that officials "deliberately disregarded an intolerable

risk" reflected the district court's misunderstanding of the Eighth Amendment inquiry and the

requirements for a preliminary injunction); *see also United States v. Dade,* 959 F.3d 1136, 1139

19

(9th Cir. 2020) (denying request for release pending habeas petition on the basis of the COVID-

19 pandemic, as the existence of the COVID-19 pandemic alone did not meet the requirements

of an "exceptional circumstance" that would justify release). In short, when detention facilities

have made reasonable, diligent efforts to respond to the COVID-19 pandemic and mitigate its

spread with respect to detainees, the conditions of confinement are not unconstitutional.

> **B.** **The *Flores* Court's Finding of Contractual Violations Under the *Flores*
> Settlement Agreement Does Not Equate to a Constitutional Violation**

>> 1. Petitioners improperly conflate the legal standards for a *Flores* Settlement
>> Agreement contract violation with the Due Process analysis under the
>> Fifth Amendment.

Petitioners incorrectly ask this Court to conclude that the *Flores* court's finding of

contractual violations in *Flores* warranting heightened monitoring and enhanced application of

the release procedures required under the *Flores* Settlement Agreement ("FSA") provides a basis

to resolve the Fifth Amendment issue in the present case. *See Flores v. Barr*, No.

CV854544DMGAGRX, 2020 WL 3488040, *1 (C.D. Cal. June 26, 2020); Petitioners'

Memorandum In Support Of Motion For Preliminary Injunction ("Pet. PI Memo") ECF No. 78-1

at 15-16. In so doing, Petitioners appear to conflate the contractual nature and scope of the FSA,

*see Flores v. Barr*, 407 F. Supp. 3d 909, 928-31 (C.D. Cal. 2019) (noting that the Agreement "is

a creature of the parties' own contractual agreements" memorialized as a "consent decree" that is

"the work of [the Government] and the other parties" in the underlying *Flores* litigation), with

the salient legal standard in the present case—a constitutional inquiry into whether the conditions

at the FRCs amount to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("In evaluating

the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is

whether those conditions amount to punishment of the detainee.").

Case 2:85-cv-04544-DMG-AGR   Document 847-1   Filed 07/13/20   Page 36 of 183   Page ID
#:38892
Case 1:20-cv-00786-JEB   Document 23-1   Filed 07/10/20   Page 28 of 45

Indeed, Petitioners appear to concede that the legal standards for the two cases differ. *See* Pet. PI Memo at 15-16 (acknowledging that Petitioners' request "for preliminary relief pose different legal questions to Judge Gee (contractual violation of the Flores Settlement Agreement) and this Court (violation of Fifth Amendment rights)"). But Petitioners attempt to resolve this issue by asserting that the two analyses contain overlapping *factual* considerations, and that this therefore necessitates that this Court reach their desired result. *See id.* ("both questions turn on the same factual determination: whether the FRCs provide 'safe' conditions"). Petitioners' proposed approach is over-simplified, however, because parlaying factual considerations that are common on their face, but potentially different in application, does not bridge the gap between the differing legal standards for the two analyses.

Specifically, the question of whether a facility provides "safe and sanitary" conditions consistent with the FSA is one of contractual interpretation, requiring the *Flores* court to analyze the intent of the parties to the Agreement in using those terms. FSA ¶ 12.A. While the *Bell* analysis might involve an analysis of the "safety" of a facility, there is no basis to find that this Court must adopt the *Flores* court's use of that term. Moreover, the overall evaluation that this Court should conduct in determining whether conditions at ICE FRCs are "punitive" is not limited to considerations of "safety," but rather requires a balancing of conditions against their governmental purpose that is found nowhere in the *Flores* court's analysis.

Accordingly, because Petitioners' assertions are vague and seek to over-simplify the questions that this Court must address, the Court should decline Petitioners' invitation to broadly equate contractual violations as due process violations under the Fifth Amendment.

2.     Petitioners erroneously ask this Court to expand the release rights
provided to minors under the *Flores* Settlement Agreement to adults.

Petitioners also argue that the *Flores* court's recent orders demonstrate a Fifth

Amendment violation for the adult Petitioners in this case that requires this Court to order the

release of parents in the same manner that the *Flores* court ordered the release of class member

minors in that case. Pet. PI Memo at 8-9. With regard to the conditions at the FRCs, Petitioners

again rely on the same misunderstanding as discussed above—that the legal standards for a

contractual violation under the FSA, and for due process violations under the Fifth Amendment,

are the same. As discussed above, however, equating the two starkly different standards is an

improper conflation.

Moreover, to the extent that Petitioners are asking this Court to order the release of the

adult parents of *Flores* class member minors, Petitioners' argument ignores the fact that the

*Flores* court's orders requiring ICE to consider minors at FRCs for release are based on release

rights that are provided specifically to minors in the FSA, *see* FSA ¶¶ 14, 18, and that the Ninth

Circuit has directly held do not apply to the minors' adult parents. *See Flores v. Lynch*, 828 F.3d

898, 905 (9th Cir. 2016). Specifically, the Ninth Circuit held that,

> "The district court erred in interpreting the Settlement to provide release rights to
> adults. The Settlement does not explicitly provide any rights to adults. *Bunikyte,
> ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, *16
> (W.D. Tex. Apr. 9, 2007). The fact that the Settlement grants class members a
> right to preferential release to a parent over others does not mean that the
> government must also make a parent available; it simply means that, if available,
> a parent is the first choice. Because "the plain language of [the] consent decree is
> clear, we need not evaluate any extrinsic evidence to ascertain the true intent of
> the parties." *See Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th
> Cir. 2007). In any case, the extrinsic evidence does not show that the parties
> intended to grant release rights to parents. "In fact, the context of the *Flores*
> Settlement argues against this result: the Settlement was the product of litigation
> in which unaccompanied minors argued that release to adults other than their
> parents was preferable to remaining in custody until their parents could come get
> them." *Bunikyte*, 2007 WL 1074070 at *16."

*Flores*, 828 F.3d at 908-09; *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1066 n.17 (C.D. Cal.

2017). The Ninth Circuit's order thus unequivocally precludes Petitioners' arguments that any

release rights that the *Flores* court finds apply to minors under the FSA may be applied to adults,

whose detention is governed entirely by the Immigration and Nationality Act, and not by the

release provisions of the FSA.

Since the Ninth Circuit's decision in 2016, courts have time and again affirmed and

reiterated the holding that the FSA does not apply to adults. *See, e.g.*, *Flores v. Barr*, No.

CV854544DMGAGRX, 2020 WL 2128663, at *7 (C.D. Cal. Mar. 28, 2020); *Flores v. Sessions*,

No. CV854544DMGAGRX, 2017 WL 8943169, at *4 (C.D. Cal. Nov. 14, 2017); *see also*

*Villafuerte v. United States*, No. 7:16-CV-619, 2017 WL 8793751, at *2 (S.D. Tex. Oct. 11,

2017) (same). And in fact, Petitioners have acknowledged as much in a previous filing. *See* ECF

No. 53 at 5-6. It is fatal to their arguments then that Petitioners do not address the Ninth Circuit

precedent and its progeny in their present motion and provide no explanation as to why this

Court should ignore this relevant precedent and hold that the FSA extends to parents. To be sure,

the *Flores* court recognized that it could not order the release of parents under the FSA, *see*

*Flores*, 2020 WL 3488040, at *3 ¶ 1 (insofar as it relates to the FSA, the court noted that legal

guardians/parents may be released "if ICE exercises its discretion to release the adults"), and

Petitioners here cannot ask this Court to do what the *Flores* court has clearly acknowledged it

cannot. Therefore, without more, Petitioners have not demonstrated how Judge Gee's most

recent orders applying the release provisions of the FSA to minors can be applied by this Court

to the adult Petitioners in this case.

## II. PETITIONERS HAVE FAILED TO SHOW A LIKELIHOOD OF IRREPARABLE HARM ABSENT THEIR REQUESTED PRELIMINARY RELIEF.

A movant is required to demonstrate an irreparable injury, which Petitioners have not

done here. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir.

2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to

issue a preliminary injunction, even if the other three factors entering the calculus merit such

relief.").  "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the

movant's injury is '*certain*, *great*[,] and *actual*—not theoretical—and *imminent*, creating a clear

and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v.

Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669,

674 (D.C. Cir. 1985)).

Here, Petitioners have not established that any *specific* Petitioner will suffer irreparable

harm in the absence of the demanded relief. Petitioners instead argue in sweeping language that

they all face irreparable harm "in the form of continued detention in unsafe and punitive

conditions," Pet. PI Memo at 23. Petitioners continue that "numerous confirmed cases of

COVID-19 at the FRCs," show that the immigration detention systems are a "tinderbox" for

COVID-19 infection. *Id*. But as Respondents various declarations demonstrate ICE and the

relevant FRCs have implemented numerous protocols and procedures, in accordance with the

guidance issued by the CDC, and the ICE PRR to prevent and mitigate the risk of harm to

Petitioners. ECF Nos. 39; 39-1; 39-2; 39-3; 50; 51-1; 51-2; 51-3, 51-4, and 56; *see also C.G.B.*,

2020 WL 2935111 at *2-4 (outlining several steps ICE and the CDC have taken to contain the

virus in detention facilities).

Further, each FRC has implemented policies to thoroughly test new intakes and the

reported COVID-19 positive results have been limited to these new intakes, who are subject to

24

automatic quarantine for at least 14 days and housed separately from the FRC residents. *See*
Hunt Decl. ¶ 3; George Decl. ¶ 29; Hofbauer Decl. ¶ 5.c. Notably, none of the residents in the
general population have tested positive for COVID-19 at any of the facilities. *See* George Decl. ¶
19. (As of June 22, 2020, all individuals housed at Berks on that date were tested for COVID-19,
and zero residents tested positive for COVID-19); Hunt Decl. ¶ 9 (As of June 23 and 24, 2020,
Dilley conducted testing of all residents already at the facility, all whom tested negative for
COVID-19); Hofbauer Decl. ¶ 5.c. (No residents in the general population at Karnes have tested
positive). Thus, even assuming contracting COVID-19 constitutes irreparable harm, Petitioners
have not shown that any one of them is certain to or imminently at risk of infection.

Furthermore, ICE has implemented measures to identify residents who are especially
vulnerable and with high risk factors. Hunt Decl. ¶ 7; Hofbauer Decl. ¶ 12. All residents are
screened by medical staff for any chronic care illnesses upon intake. *Id.* And all residents with
high risk factors are identified in EARM with a Risk Factor alert code. *Id.* In addition, cases
involving risk factors are reviewed and evaluated for possible release based on vulnerabilities.
Hunt Decl. ¶ 7.

Petitioners also claim that they face irreparable harm by facing "the false 'choice' of
family separation or continued detention of children who have been ordered released by the
*Flores* court." Pet. PI Memo at 24. But first, as explained *supra*, Argument Section at I.B., Judge
Gee's order in *Flores* (2020 WL 3488040)—providing for the transfer of Class Members who
have resided at the FRCs for more than 20 days to non-congregate settings—stems from a
contractual analysis of the FSA, not any due process analysis, or a determination of a likelihood
of irreparable harm absent such transfer, as required under the injunction standard that applies
here. Second, the fact that the *Flores* order allows for legal adult guardians/parents to withhold

consent and keep the minor with them in the FRCs similarly fails to establish a likelihood of

irreparable injury, given the various health and safety protocols that ICE continues to implement

and enforce at the FRCs. At this juncture—with no families in general population at the FRCs

testing positive for COVID-19—Petitioners' assertions that the children are in "harm's way" are

purely speculative. Third, the Court should, and must, reject Petitioners' attempt to recast this

case as a case about family separation, particularly as it pertains to the irreparable harm factor.

Rather, this matter is, and has always been, a challenge to the conditions of confinement at the

FRCs and whether they comport with due process standards and, as shown above, they do. Thus,

Petitioners do not face likely, irreparable harm absent release. Nonetheless, the Government has

sought to detain migrant families together whenever possible, a proposition that Judge Sabraw

readily agreed with. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FACTORS FAVOR RESPONDENTS

Finally, Petitioners have not demonstrated that "the balance of equities tips in their

favor," and that "an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392

(D.C. Cir. 2011). When the government is a party to the litigation, these two factors merge and

"are one and the same, because the government's interest is the public interest."  *Pursuing Am.'s

Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

Here, the balance of the equities and the public interest tip decidedly in favor of

Respondents. To begin, it is well-settled that the public interest in enforcement of United States

immigration laws is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976);

*Blackie's House of Beef, Inc.*, 659 F.2d at 1221 ("The Supreme Court has recognized that the

public interest in enforcement of the immigration laws is significant."); *see also Nken*, 556 U.S.

at 435 ("There is always a public interest in prompt execution of removal orders). That interest does not disappear during a pandemic.

Indeed, the public interest favors the continuation of detainee-specific analyses. And as reflected by the significant decrease in the FRCs' total resident population, Respondents have made and continue to make detainee-specific assessments for releases. The public interest favors the continuation of these detainee-specific assessments over the blunt and legally dubious instrument of enjoining the detention of all FRC residents. "[W]here the Court has a less intrusive means" of ensuring legal compliance, "the public interest would weigh towards choosing such options, especially where ... the plaintiffs seek a mandatory ('do this') rather than prohibitory ('don't do this') injunction." *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 160 (D.D.C. 2018). And as another court in this District found, "[w]here, as here, the government has taken steps to craft policies to address the public health issues associated with COVID-19 while continuing to enforce the immigration laws, and where the Court is certainly not well-positioned to second-guess those health and safety determinations, the public interest does not point in favor of granting injunctive relief." *See Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review*, Civ. A. No. 20-852, 2020 WL 2026971, at *12 (D.D.C. Apr. 28, 2020).

## IV. RELEASE IS NOT THE APPROPRIATE REMEDY FOR A CONDITIONS OF CONFINEMENT CLAIM

Even if this Court were to find a constitutional violation in the conditions of confinement at each of the three FRCs, the appropriate remedy is a change to the violative conditions—not release. *See Milliken v. Bradley* (Milliken II), 433 U.S. 267, 280 (1977) (noting that the nature of the "remedy is to be determined by the nature and scope of the constitutional violation" and thus must be "related to 'the condition alleged to offend the Constitution'"). Indeed, where a

27

constitutional violation has occurred, "[t]he function of a court is limited to … fashioning a remedy that does no more and no less than correct that particular constitutional violation." *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (citing *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981) and *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971)). "[I]t is axiomatic that the remedial power of a district court is coterminous with the scope of the constitutional violation found to exist." *Newman v. Alabama*, 503 F.2d 1320, 1332-33 (5th Cir. 1974). Therefore, the constitutional remedy should mirror the constitutional violation; otherwise, the Court would grant to Petitioners that to which they have no entitlement, while permitting an allegedly unconstitutional deficiency to continue. *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("Systemic deficiencies in staffing which effectively deny inmates access to qualified medical personnel for diagnosis and treatment of serious health problems have been held to violate constitutional requirements… [and] court[s have] ordered the hiring of additional medical staff, both physicians and nurses, to bring the level of medical care up to the constitutional minimum.").

Here, Petitioners purport that they reside in an environment where they "cannot engage in proper hygiene," nor "social distance". ECF No. 1, Petitioners' Petition for Writ of Mandamus and Complaint for Declaratory and Injunctive Relief ("Pet. Compl.") at ¶¶ 91, 99. Petitioners also allege deficiencies in personal protective equipment practices, education about COVID-19, and medical preparedness at the FRCs, Pet. PI Memo at 17. Releasing Petitioners does nothing to remedy or improve any of these conditions. Because Petitioners are not lawfully entitled to release, and release would not improve the conditions at the FRCs, the Court should decline to order it. *See United States v. Otunyo*, Cr. No. 18-251, 2020 WL 2065041, *13 (D.D.C. Apr. 28, 2020) ("release of a defendant is among the most drastic remedies available for addressing

unconstitutional conditions of confinement, and this remedy is not ordered lightly"); *see also*
*Dawson*, 2020 WL 1304557, at *2 (noting that plaintiffs provided no authority that "would
justify immediate release, as opposed to injunctive relief that would leave plaintiffs detained
while ameliorating any alleged violative conditions within the facility"); *Toure v. Hott*, 2020 WL
2092639, at *9  (holding in denying TRO even in this pandemic "[i]njunctive relief in this
instance would require that any deficient conditions of confinement be cured"); *A.S.M. v.
Donahue*, No. 20-cv-62, 2020 WL 1847158, *2 (M.D. Ga. Apr. 10, 2020) ("[t]he remedy for this
type of claim … is modification of the conditions of confinement to eliminate the constitutional
violation" and not release).

Petitioners nevertheless argue that "numerous courts [] have already found release to be
an appropriate remedy for civil detainees facing similarly unsafe conditions due to COVID-19,"
Pet. PI Memo at 21, citing a few out-of-circuit district court cases that ordered individualized
bail hearings. Petitioners' argument, however, fails to recognize that courts in this District have
repeatedly declined to order release for conditions of confinement claims based on COVID-19,
like Petitioners' claims here. In fact, a court in this District specifically concluded that
"[u]nconstitutional conditions of confinement can typically be remedied without resorting to the
release of a defendant." *Otunyo*, 2020 WL 2065041, at *13 (explaining that "release of a
defendant is among the most drastic remedies available for addressing unconstitutional
conditions of confinement, and this remedy is not ordered lightly"); *see also C.G.B.*, 2020 WL
2935111 at *28 (concluding that "the primary remedy that plaintiffs seek—their immediate
release from ICE custody—is the most intrusive measure possible and plaintiffs have failed to
show that such incursion is necessary to redress the complained-of violations," and citing cases);
*Banks*, 2020 WL 1914896, at *13 (despite finding that plaintiffs were entitled to some injunctive

29

relief based on COVID-19 allegations, refusing to order the release of any inmates detained at correctional facilities). Contrary to Petitioners' out-of-circuit cases, courts in this District have ordered amelioration as an appropriate remedy, not release.

Nor should the Court be persuaded by Petitioners' claim that no alternative remedy short of release will suffice to ensure their safety at the FRCs. Petitioners contend that, because FRCs "are congregate detention facilities" and "one cannot reasonably expect Respondents will adequately implement any alternative remedial order," release is essential. Pet. PI Memo at 22-23. Petitioners are incorrect. With respect to Berks, the Commonwealth Court of Pennsylvania concluded that it "has adequate space for social distancing as it is a 58,000 square foot facility with an additional outdoor recreation area of at least three acres." *C.N., et al. v. Pennsylvania Dep't of Human Servs.*, No. 268 M.D. 2020, July 7, 2020 Mem. Op. at 27-28 (Pa. Commw. Ct.); *see also* George Decl. ¶¶ 38-42. Likewise, in *Hassoun v. Searls*, No. 19-cv-370, 2020 WL 1819670, *8 (W.D.N.Y. Apr. 10, 2020), the court found that the petitioner was "fully able to remain six feet from any other detainees and thus can follow the CDC's social distancing guidelines." *See also C.G.B.*, 2020 WL 2935111, at *23 (rejecting notion that "any detention that does not allow detainees to perfectly practice social distancing would be *per se* unconstitutional"); *Sacal-Micha*, 2020 WL 1518861, at *5-6 (rejecting broad argument that detention facility was "incapable of protecting petitioner from contracting COVID-19 and providing appropriate medical attention should he be infected"). Furthermore, as discussed in detail in each of the three ICE declarations filed simultaneously with this opposition, ICE and its facility partners have provided protection from COVID-19 and health care to its detainees well in excess of what the Constitution requires. *See, generally*, George Decl.; Hunt Decl.; Hofbauer Decl.; *see also C.G.B.*, 2020 WL 2935111, at *23 ("due process only requires the Government to

provide detainees with '*reasonable* safety,' not perfect safety"). But even if the Court disagrees, it should order the facilities to take those additional actions necessary to bring them into compliance with constitutional strictures, not order release. *C.G.B.*, 2020 WL 2935111, at *31 (declining to order ICE to comply with COVID-19 Pandemic Response Requirements where "ICE is making steady progress towards constitutionally sufficient protections against COVID-19" and "[o]verlapping and unnecessary judicial involvement in the Government's management of its immigration detention facilities would be contrary to the public interest"); *Sacal-Micha v. Longoria*, Civ. A., No. 20-37, --- F.Supp.3d ----, 2020 WL 1518861, at *6 (S.D. Tex. Mar. 27, 2020) ("the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety … does not warrant his release").

## V.    THE COURT SHOULD SEVER PETITIONERS' CLAIMS FOR EACH FACILITY AND TRANSFER THEM TO A MORE APPROPRIATE VENUE

Petitioners assert claims regarding the various conditions of confinement at three different FRCs; yet, there is no reason why their claims should be joined together in a single action. The Court should, thus, *sua sponte* sever Petitioners' claims and transfer them to each FRC's home forum. *See Pinson v. U.S. Dep't of Justice*, 74 F. Supp. 3d 283, 291 (D.D.C. 2014) (citing Fed. R. Civ. P. 21); *Spaeth v. Michigan State Univ. College of Law*, 845 F. Supp. 2d 48, 53 n.6 (D.D.C. 2012).

The Court may sever claims if parties are improperly joined. *See* Fed. R. Civ. P. 21. "In determining whether parties are misjoined for purposes of Rule 21, courts apply the permissive joinder requirements of Rule 20(a)." *Davidson v. Dist. of Columbia*, 736 F. Supp. 2d 115, 119 (D.D.C. 2010). Under Rule 20(a), "[p]ersons may join in one action as plaintiffs if: (A) they assert any right to relief … with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" *and* "(B) any question of law or fact common to all

31

plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). If the Rule 20(a) test is not satisfied,

plaintiffs are not properly joined and the Court may sever them under Rule 21. *Spaeth*, 845 F.

Supp. 2d at 53.

      Here, it is evident that Petitioners are improperly joined. First, their claims do not satisfy

the first prong of Rule 20(a) because they are not "logically related," having spawned from

different occurrences and events at different FRCs pertaining to different petitioners. *Spaeth*, 845

F. Supp. 2d at 53. Petitioners are spread among three facilities in three different cities, each with

different community dynamics, and each varying in size, location, and conditions. For example,

the FRCs have varying housing arrangements and different detainee density, and each FRC is

responding to COVID-19 based on its individual needs and circumstances. Moreover, some

petitioners are children who have rights under the FSA while the adult petitioners do not. And

although Petitioners are all detained at an FRC, their risk of contracting and becoming ill with

COVID-19 is vastly different given the different risk profiles for COVID-19 based on

differences in any underlying health conditions. Petitioners, themselves, appear to acknowledge

these key differences in arguing that the FRCs' "unevenly implemented written protocols" are

insufficient to comply with their FSA obligation to "provide safe and sanitary conditions." Pet PI

Memo at 15.

      Other than all being detained at the FRCs, Petitioners have proffered nothing to show that

their claims are logically related in any way—much less that they raise a common "question of

law or fact." The fact that Petitioners' claims are premised on the same legal theory—a Fifth

Amendment due process violation—is insufficient. *Spaeth*, 845 F. Supp. 2d at 54. The simple

fact is that Petitioners' claims involve different people who are alleged to have suffered from

different action taken by different government actors at different FRCs and at different times. It

is, therefore, plain that Petitioners' claims should not be joined together in one action. *Id.* at 53-57 (plaintiff's discrimination claims against four universities were misjoined where plaintiff did not allege that defendants' actions occurred in the same location or at the same time and the complaint suggested that defendants acted independently when they evaluated his candidacy and decided against interviewing or hiring him); *C.G.B.*, 2020 WL 2935111, at *21 (Rule 20(a) requirements were not met because there was no "substantial overlap in the facts" of the new plaintiffs' claims and the existing plaintiffs' claims; the new plaintiffs were held in different detention centers, experienced different treatment during their detention, and had different medical histories); *Davidson*, 736 F. Supp. 2d at 120-21 (concluding that Rule 20(a) was not met where plaintiffs' claims arose out of separate administrative proceedings that resulted in separate determinations issued on different dates involving different students).

Furthermore, Rule 21 must be read in conjunction with Rule 42(b), which allows the Court to sever claims to prevent prejudice to any party. *Davidson*, 736 F. Supp. 2d at 121. Proper consideration of Petitioners' due process claims necessarily turns on an individualized analysis of each petitioner's circumstances and the particular conditions of the facility where that petitioner is detained. *Wolfish*, 441 U.S. at 535; *see also C.G.B.*, 2020 WL 2935111, at *16 (explaining that "multiple subsidiary issues [are] *necessarily* involved" in resolving plaintiffs' conditions of confinement claim that turn on "ICE's day-to-day operations in each individual detention facility (and for that matter, in each individual unit in which putative class members are housed)"). Petitioners, however, have lumped all of their alleged violations together in the hope that the Court will blur the relevant distinctions between each FRC and find the conditions at all three FRCs unconstitutional. *See, e.g.*, Pet. PI Memo at 18 (relying on Judge Gee's finding that at one FRC, staff did not wear masks at all times to challenge conditions at the other two

33

FRCs); *id.* at 16 (arguing that "[j]ust as Judge Gee found the FRCs unsafe for the child

Petitioners and a violation of their contractual *Flores* rights, so too should this Court find the

FRCs unsafe for *all* Petitioners and a violation of their Fifth Amendment rights."). Petitioners'

true intention is unmistakably clear: they want the Court to impart the alleged misdeeds of one

FRC to the other FRCs, unfairly resulting in "guilt by association." *See Spaeth*, 845 F. Supp. 2d

at 56. Because proceeding in this fashion would prejudice Respondents, the Court should sever

Petitioners' claims to eliminate that risk. *Id.*; *cf. C.G.B.*, 2020 WL 2935111, at *19 (recognizing

that claims of alleged violations at different facilities were not susceptible to generalized proof,

because "proof that, say, the La Palma Detention Center is inadequately implementing social

distancing measures sheds little light on the situation at Nevada Southern").

      Finally, after Petitioners' claims are severed into three separate actions for each of the

three FRCs, the Court should transfer each case to that FRC's home forum. "For the convenience

of parties and witnesses, in the interest of justice," the Court may transfer each severed case "to

any other district or division where it might have been brought." 28 U.S.C. § 1404(a). A

defendant must make two showings to justify transfer under § 1404(a): first, that the plaintiff

could have brought the action in the proposed transferee district and, second, that considerations

of convenience and the interest of justice weigh in favor of transfer to that district. *Trout

Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 15-16 (D.D.C. 1996).[6] Respondents make

both showings.

---

[6] This second inquiry requires the district court to weigh a number of case-specific factors related
to both the public and private interests at stake. Private-interest factors include: (1) the plaintiff's
choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4)
the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to
sources of proof. *Trout Unlimited*, 944 F. Supp. at 16. Public-interest factors include: (1) the
transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of

Case 2:85-cv-04544-DMG-AGR  Document 341-1  Filed 07/13/20  Page 50 of 185  Page ID
Case 1:20-cv-00786-JEB  Document 23-1  Filed 07/30/20  Page 42 of 45
#:38906

There is no question that Petitioners could have filed their claims regarding Berks in the

Eastern District of Pennsylvania and their claims pertaining to Dilley and Karnes in the Western

District of Texas. Where, as here, a defendant "is an officer or employee of the United States,"

venue is proper in any district in which: "(A) a defendant in the action resides, (B) a substantial

part of the events or omissions giving rise to the claim occurred . . ., or (C) the plaintiff resides if

no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Venue is proper in the

Eastern District of Pennsylvania (Berks) and the Western District of Texas (Dilley and Karnes)

because a substantial part, if not all, of the events or omissions giving to Petitioners' claims

occurred in those districts. Notably, Petitioners are also housed in these districts, where they are

detained, not in Washington, D.C.

Also, considerations of convenience and the interest of justice weigh in favor of transfer.

While Petitioners filed suit in this District, *none* of them are alleged to reside in Washington,

D.C., and *none* of the FRCs are located here. Pet. Compl. at ¶¶ 2, 20-56; *Jimenez v. R&D

Masonry, Inc.*, No. 15-cv-1255, 2015 WL 7428533, *3 (D.D.C. Nov. 20, 2015) ("when 'the

forum preferred by the plaintiff is not his home forum,' and the defendant prefers the plaintiff's

home forum, then there is little reason to defer to the plaintiff's preference") (citation omitted).

Nor have Petitioners alleged that *any* of "the material events that form the factual predicate" of

their claims occurred in this District. *Jimenez*, 2015 WL 7428533, at *3; *see also Trout

Unlimited*, 944 F. Supp. at 17 (deference to plaintiff's choice of forum is mitigated where that

forum has "no meaningful ties to the controversy and no particular interest in the parties or

subject matter"); *see generally*, Pet. Compl. It is also very likely that any probable witnesses,

_____

the transferor and transferee courts; and (3) the local interest in having local controversies
decided at home. *Id.*

relevant documents, and other evidence will be in the Eastern District of Pennsylvania and the

Western District of Texas where the FRCs are located—not in this District. *Spaeth*, 845 F. Supp.

2d at 59. To the extent that Petitioners seek to establish a nexus between their claims and this

District merely by naming high-ranking government officials as Respondents, such tactics have

not proven successful. *See, e.g., Cameron v. Thornburg*, 983 F.2d 253, 256-57 (D.C. Cir. 1993)

(where venue allegation "depends on a wholly unsubstantiated assumption that policy decisions

made in Washington ultimately affected Cameron's treatment at Terre Haute" and "complaint

did not allege a single rule or policy emanating from Washington that affected his case," case

was transferred case to Southern District of Indiana where the relevant events and omissions

occurred and where prison at issue was located); *Trout Unlimited*, 944 F. Supp. 13 at 17-18

(finding relationship of the challenged agency action to Washington, D.C. "attenuated" and

transferring case to Colorado, where the challenged decision-making process occurred). Because

Petitioners' claims fundamentally revolve around the three FRCs and the alleged acts and

omissions of FRC personnel, Petitioners' inclusion of the DHS Secretary and Attorney General

simply do not warrant litigating this suit in this District. *Id.* As a result, the private-interest

factors overwhelmingly weigh in favor transfer.

      The public-interest factors similarly tilt towards transfer. First, this District, the Eastern

District of Pennsylvania, and the Western District of Texas are all equally capable of handling

the issues of federal law that govern this case, as "this Court follows 'the principle that the

transferee federal court is competent to decide federal issues correctly.'" *See Nat'l Wildlife Fed'n*

*v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006) (citation omitted). This factor, therefore, does

not weigh in favor of or against transfer. The second public-interest factor—relative court

congestion—is an especially significant consideration for courts in the District of Columbia

because any number of lawsuits involving federal agencies and officials, like this one, could be brought here simply because agency headquarters are located in the District. *Cameron*, 983 F.2d at 256. Consequently, courts in this District long ago recognized that lawsuits brought by individuals located in other parts of the country are better heard by the courts in the districts where those individuals are located and where the events were alleged to have occurred, to prevent the courts here from becoming overwhelmed by such lawsuits. *See, e.g.*, *Young v. Dir., BOP*, 367 F.2d 331, 332-33 (D.C. Cir. 1966); *Starnes v. McGuire*, 512 F.2d 918, 928-29 (D.C. Cir. 1974).[7] Perhaps the third factor presents the most compelling reason to transfer these cases. Pennsylvania and Texas both have a significant stake in having these local controversies resolved where they arise and where the people will be the most affected. *Trout Unlimited*, 944 F. Supp. at 17, 19-20 (holding that because the challenged decisions directly impacted the lands, waters, wildlife, and people of Colorado, Colorado had more of a connection to the case than the District of Columbia). These concerns are especially important here where Petitioners' claims implicate community-specific issues of COVID-19 risks and prevention. Under these circumstances, the Court can, and should, sever Petitioners' misjoined claims and transfer each to the district where the FRC at issue is located.

---

[7] Nonetheless, the most recent data published by the U.S. Courts for the 12-month period ending March 31, 2020, do not appear to reflect a significant difference between the average times from filing to disposition in civil cases in the District of Columbia (5 months), the Eastern District of Pennsylvania (5.8 months), and the Western District of Texas (6 months). *See* U.S. District Courts-Civil Federal Judicial Caseload Statistics (Mar. 31, 2020) (https://www.uscourts.gov/statistics/table/c-5/federal-judicial-caseload-statistics/2020/03/31). As all three venues are well-suited to handle these cases, this factor is neutral. *Jimenez*, 2015 WL 7428533, at *4.

## CONCLUSION

For the foregoing reasons, the Court should deny Petitioners' motion for preliminary

injunction.

RESPECTFULLY SUBMITTED this 9th day of July 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW
Washington, DC 20530
Telephone:  (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Facsimile (202) 305-7000
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Respondents*

**RESPONDENTS' EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

O.M.G., *et al.*,               )

                       )

        Petitioners,        )

                       )

v.                         )      Case No. 1:20-cv-00786-JEB

                       )

Chad F. Wolf, Acting Secretary of    )

the U.S. Department of Homeland    )

Security, *et al.*,            )

                       )

        Respondents.      )

_____)

## <u>DECLARATION OF CHRISTOPHER GEORGE</u>

I, Christopher George, hereby declare that the following statements are true and correct to the best of my knowledge, information and belief:

1. I am an Assistant Field Office Director (AFOD) for the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) – Philadelphia Office. I began my employment with ICE on October 14, 2007, as an Immigration Enforcement Agent and later served as a Deportation Officer and Supervisory Detention and Deportation Officer. I have held my current position as an AFOD, since August 2018. As part of my current duties, I oversee the day-to-day operations relating to the case management of aliens detained at the Berks Family Residential Center (BFRC), located in Leesport, Pennsylvania.

2. This declaration is to supplement my prior declarations submitted in the instant case. All the information contained in my prior declarations remains true and correct.

3. The following additional information is based on my personal knowledge and on information provided to me in my official capacity.

### <u>Pennsylvania COVID-19 Related Protocols</u>

4. On April 17, 2020, Governor Tom Wolf issued a three (3) phased plan (Red, Yellow and Green Phases) for reopening Pennsylvania. The 3-Phased Plan can be found at the following link: https://www.governor.pa.gov/process-to-reopen-pennsylvania/.

5. The "Red Phase" has the most restrictive protocols in place aimed at minimizing the spread of COVID-19, to include strict social distancing requirements and closures of non-life sustaining businesses, in-person instruction, and childcare facilities. The "Yellow Phase" is directed towards resuming Pennsylvania's economy while staying abreast of public health

data so to ensure the spread of COVID-19 remains contained to the greatest extent possible. This phase also allows for the easing of some restrictions on work and social interactions while keeping in place the closure of schools, gyms, and other indoor recreation centers, hair and nail salons, as well as limitations around large gatherings. The final phase is the "Green Phase," which eases most restrictions, to include the suspension of the stay at home and business closure orders, in order to allow Pennsylvania's economy to strategically reopen while continuing to prioritize public health. This phase also facilitates a return to a "new normal," while continuing to monitor public health indicators and adjust orders and restrictions as necessary to ensure the spread of COVID-19 remains at a minimum.

6. As of June 26, 2020, there are no counties in Pennsylvania that are presently operating at the Red Phase. Significantly, Governor Wolf's previously issued Stay-At-Home Order, dated April 1, 2020, which restricted individuals from leaving their residence other than to perform limited activities and allowable essential travel, was lifted on June 5, 2020, thereby allowing the counties to move into the next phase of reopening.

7. As of July 3, 2020, Lebanon County is the only county within Pennsylvania presently operating at the Yellow Phase.

8. As of July 3, 2020, all other counties in Pennsylvania, including Berks County, are presently operating under the Green Phase.

9. On July 1, 2020, Dr. Rachel Levine, Secretary of the Pennsylvania Department of Health issued an Order, entitled "Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings," requiring individuals to use face coverings, when, among other things, in any indoor location where members of the public are generally permitted and when engaged in work that involves working in or walking through common areas, or in any room or enclosed area where other people, except for members of the person's own household or residence, are present when unable to physically distance.

10. Dr. Levine's Order also provides narrow exceptions to the face covering requirement in instances where, among others, the individual: cannot wear a face mask due to a medical condition; is unable to remove the face covering my himself or herself; or the individual is under age two.

11. This mandatory face covering requirement, which remains in effect until further notice was implemented in order to avoid a resurgence of COVID-19 cases within Pennsylvania, especially now that Governor Wolf has reopened the State.

12. Dr. Levine's Order can be found at: https://www.governor.pa.gov/wp-content/uploads/2020/07/20200701-SOH-Universal-Face-Coverings-Order.pdf

**Enhanced COVID-19 Mitigation Requirements**

13. The BFRC continues to follow Pennsylvania, ICE and Centers for Disease Control and Prevention (CDC) guidelines in its care of the BFRC residents.

14. These guidelines now also include the Pennsylvania Department of Human Services, June 5, 2020 guidance, entitled "Guidance from the Department of Human Services, Office of Children Youth and Families to Support a Phased Approach to Ongoing Mitigation Efforts Preventing the Spread of the Coronavirus Disease 2019." The purpose of the guidance is to ensure child welfare service providers have a shared understanding of expectations for how services will shift and resume as counties transition through Governor Wolf's 3-Phased Plan. The guidance can be found here: https://www.dhs.pa.gov/coronavirus/Pages/OCYF-Guidance-to-Support-Phase-Mitigation-Efforts.aspx.

**BFRC Population**

15. The BFRC presently houses five (5) families for a total of 16 residents.

16. The Executive Director for the BFRC, upon consultation with Berks County Executive Leadership, previously suspended admissions to the BFRC due to the COVID-19 pandemic. This restriction was lifted on or about April 20, 2020 pursuant to ICE's request and with the understanding that only one (1) family would continue to be housed per room and, were both parents are present, the adult male would be housed in his own room. This parameter is in order to ensure that residents will be able to continue to socially distance within the facility.

17. On March 18, 2020, the BFRC housed a total of five (5) families comprised of sixteen (16) residents. On June 11, 2020, one family consisting of two (2) adults and one (1) child was removed to Mexico.

18. There were no other releases or admissions until July 7, 2020, when a family comprised of one (1) adult and two (2) children was admitted to the facility.

**Recent COVID-19 Testing at the BFRC**

19. On June 22, 2020, all residents housed at the BFRC on that date were tested for COVID-19. The results of the tests showed that zero (0) residents tested positive for COVID-19.

20. As of July 8, 2020, there have been no residents or staff at the BFRC who have tested positive for COVID-19.

21. The most recently admitted family was tested for COVID-19 on July 7, 2020 and the test results remain pending.

## COVID-19 Cases within the BFRC's Surrounding Area

22. The BFRC staff do not work in the local nursing homes and more specifically at the Berks Heim Nursing Home (Berks Heim).  Likewise, Berks Heim has its own dedicated staff, who do not perform any duties within the BFRC.  Additionally, there is no known instance(s) of any BFRC staff member having visited Berks Heim since the onset of the COVID-19 pandemic.  Similarly, no members of the Berks Heim staff have visited the BFRC. Even prior to the pandemic, Berks County employees who are employed within the various departments are not permitted to be within the BFRC.

23. While it has been alleged that the prevalence of COVID-19 within the surrounding community will likely lead to COVID-19 infections at the BFRC, likely brought in by BFRC staff, this claim is belied by the fact that the BFRC has had zero (0) confirmed cases among staff or residents, despite its proximity to Berks Heim, which has sadly seen positive COVID-19 cases and deaths.

24. To provide some insight on the surrounding community, the BFRC is located in Leesport, Pennsylvania, which is identified by area code 19533, and has population of approximately 1,898 people.  According to the Pennsylvania Department of Health, as of July 6, 2020, Berks County, in which Leesport is located and whose approximate population is 421,164, had a total of 4,425 confirmed COVID-19 cases – representing a little over one percent of its entire population.

25. Additionally, pursuant to the Pennsylvania Department of Health's COVID-19 Early Warning Monitoring System Dashboard, there also appears to be a general downward trend of COVID-19 cases within Berks County.  When comparing the period of June 26 to July 2 with the period of June 19 to June 25:

   - the difference of confirmed COVID-19 cases was -8;
   - the difference of the daily number of COVID-19 cases was -3;
   - the difference in the average daily number of COVID-19 patients on ventilators was -.01; and
   - the percentage of hospital emergency department visits in the last seven (7) days due to COVID-19 like-illness was .6%.

## Enhanced COVID-19 Screening Procedures for BFRC Staff

26. ICE, ICE Health Service Corps (IHSC), and BFRC staff continue to be subject to daily temperature checks prior to the start of each shift.

27. All staff are also required to undergo a medical screening that requires that they report, prior to starting their shift, whether on that day or within the last 24 hours they have had any of the following symptoms: fever, felt feverish; repeated shaking with chills; cough; difficulty breathing or shortness of breath; headache; new loss of taste or smell; diarrhea; and/or muscle pain or sore throat. These same symptoms must also be reported to management if the staff member experiences these symptoms while on shift.  Additionally, staff members must

immediately advise their manager if they have had contact with a person known to be infected with COVID-19 or is being tested for COVID-19 based on showing signs and symptoms for COVID-19 within the past 14 days.

28. If a staff member presents with an elevated temperature or has any known symptom(s) for COVID-19, he or she is not permitted entry to the BFRC and is immediately sent home. The staff member would be required to obtain medical clearance from his or her health care provider prior to being allowed to return to work.  If a staff member presents with any COVID-19 related symptoms during the course of their workday, the aforementioned procedure would also apply.  Moreover, with either scenario, contact tracing would be conducted to determine whether the employee had close contact to any other residents and/or staff members at the BFRC, so that additional determinations can be made on potentially effected individuals who then will be treated consistent with current CDC guidelines: https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/contact-tracing.html.

### Enhanced COVID-19 Screening Procedures for BFRC Residents

29.  As of June 4, 2020, IHSC at the BFRC updated its procedures to require that all incoming families be tested for COVID-19, upon consent, during the intake screening process.

30. During this screening process IHSC medical staff will explain to the family the COVID-19 testing process (e.g., specimen collection procedure, where the test will be performed) and that the family will be placed in cohort for a 14-day period.  Cohorting is an infection prevention strategy which involves housing detainees together who were exposed or may have been exposed to a person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients.

31. The family will be advised that the testing is not mandatory, but that the family will still be monitored for signs and symptoms during the 14-day intake cohort process, and that their refusal to be tested will be documented in their medical files.  If a family refuses to be tested, they will be offered testing again while in the 14-day cohort period.

32. A medical consent form must be signed by all members of the family, except for the minors, agreeing to be tested.

33. If the COVID-19 test results for each family member is negative and they have no COVID-19 related signs and symptoms during their 14-day intake cohort period, the family will be released to the general population at the end of the 14-day cohort period.

34. Family members who test positive will be managed as per existing IHSC COVID-19 guidance, which is derived from the CDC guidelines that can be found here: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

35. Notably, families that test negative for COVID-19 and are still under the 14-day intake cohort period will not be cleared to transfer and/or be removed from the United States until the 14-day intake cohort period is completed.

36. This same screening procedure also applies to residents who leave the facility for offsite appointments by a local healthcare provider and then return to the BFRC.

37. The process identified above is to be monitored for effectiveness and compliance on a weekly basis by the local Health Services Administrator, Assistant Health Services Administrator and Advanced Practice Provider and be tracked in writing.

## Enhanced Social Distancing Protocols

38. As more fully discussed in my prior declaration, given the limited number of residents at the BFRC – presently 16 – there is plenty of space for the residents to engage in social distancing, including when residents are in the BFRC's two main communal living areas or within the different recreational rooms within the facility. Significantly, the families have the freedom of movement throughout the facility's recreational spaces from 8 a.m. to 8 p.m.  Moreover, Children 10 years and older can move freely with their parent's permission. For adults and children 10 years and older (with parental permission), the free movement is also extended to the outside campus area.

39. Social distancing is accomplished through the BFRC staff's continued communication with the residents reminding them to social distance, as well as through signs posted throughout the facility in the residents' native languages discussing the need and way to socially distance from each other.  Additionally, group activities have been canceled unless social distancing may be accomplished.

40. During mealtimes, the families' entry into the dining hall is staggered and each family (of which there are currently five (5)) is required to sit at their own table and six (6) feet apart from the other families.  Residents and families that are in cohort status have their meals personally delivered to them and are not comingled with other residents.

41. Likewise, the use of shared bathroom and shower facilities is staggered to ensure only one family's use at a time. Additionally, residents in cohort status do not share the same showers as those residents in general population.  Shower facilities are cleaned after each use by a resident who is in cohort status.

42. To date, there have been no complaints by the residents to BFRC or ICE staff regarding their inability to engage in social distancing while at the BFRC.

**Enhanced Requirement for the Use of Masks/Face Coverings**

43. Consistent with Dr. Levine's July 1, 2020 Order directing the universal wearing of face coverings, all residents and staff at the BFRC are required to wear a face covering, defined as "a covering of the nose and mouth that is secured to the head with ties, straps, or loops over the ears or is wrapped around the lower face." Additionally, BFRC staff continue to be bound by prior guidance issued by Berks County on April 7, 2020, which directed that all Berks County employees wear face masks while working.

44. Additionally, on July 6, 2020, I informed the BFRC's Executive Director both orally and in writing of the BFRC's continued obligation to ensure the wearing of masks or face coverings among its staff and the residents. Director Edwards has reinforced this standard with her staff. Significantly, both the BFRC staff and residents have been following the wearing of face masks.

45. The BFRC staff will also conduct additional one-on-one training with each family each month, effective immediately, explaining the importance of wearing a mask, how to wear a mask, and how to request for additional masks. The families will be encouraged to ask questions so to ensure their full understanding. IHSC medical staff will also conduct additional one-on-one training with each family weekly, effective immediately, explaining the importance of wearing a mask, how to wear a mask, and how to request for additional masks. The families will be encouraged to ask questions so to ensure their full understanding.

46. BFRC residents will also be informed of the availability of additional masks when provided new disposable masks each Tuesday. The families will be encouraged to ask questions so to ensure their full understanding.

47. The BFRC, in coordination with ICE, is also in the process of enhancing their accounting procedures to better document, among other things, when masks are issued to the residents and whether instructions regarding the use and request of additional masks have been provided to the residents. The goal is to have this updated accounting system in place the week of July 13, 2020.

**The BFRC's Educational Program**

48. The BFRC resumed its educational program as of July 7, 2020. Only two (2) of the 7 children at the BFRC are presently eligible and of age to attend school. They are ages 11 and 5. There are two (2) additional school aged children (ages 5 and 14) who were admitted to the BFRC on July 7, 2020 but will not begin to attend classes until they complete the 14-day intake cohort period.

49. All school aged children will receive age-appropriate one-on-one instruction by a bilingual teacher, who is certified to teach in Pennsylvania and who has completed "English as a Second Language" certification programs. The information taught to the students follows the Pennsylvania Board of Education curriculum and guidelines.

50.  The schedule for the two children currently eligible to attend school is as follows:

- The 11-year-old attends class from 9:00 a.m. to 10:30 a.m., Tuesday through Thursday each week.
- The 5-year-old attends class from 10:45 a.m. to 11:45 a.m., Tuesday through Thursday each week.

51.  The COVID-19 protocols within the BFRC will continue to be practiced in the classroom each day.  For example, after each student's educational session is completed, the classroom is thoroughly cleaned by BFRC staff, with emphasis on surfaces, high touchpoint areas and implements used.  Additionally, and consistent with Dr. Levine's July 1, 2020 Order, both the students and teachers are required to wear a face covering during school, since students and staff are considered to members of the public who are congregating in indoor locations.  There are limited exceptions to the face covering requirement while in school.  Specifically, students may remove their face coverings when eating or drinking when spaced at least six (6) feet apart; when seated at desks or assigned workspaces that are at least six (6) feet apart; or when engaged in any activity where the students can be at least six (6) feet apart.

Executed on this 8th day of July, 2020.

_____

Christopher George
Assistant Field Office Director (AFOD)
Enforcement and Removal Operations – Philadelphia Office
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Case 2:85-cv-04544-DMG-AGR   Document 847-12   Filed 07/13/20   Page 63 of 183   Page ID
#:38919
Case 1:20-cv-00786-JEB   Document 82-2   Filed 07/09/20   Page 1 of 7

**RESPONDENTS' EXHIBIT 2**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) |
| | ) |
| Chad F. Wolf, Acting Secretary of | ) |
| the U.S. Department of Homeland | ) |
| Security, *et al.*, | ) |
| | ) |
| Respondents. | ) |

Case No. 1:20-cv-00786-JEB

## DECLARATION OF RICHARD M. HUNT

    I, Richard M. Hunt, pursuant to 28 U.S.C. § 1746, under penalty of perjury, and based upon personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, hereby make the following declaration with respect to the above-captioned matter.

1.  I am an Assistant Field Office Director (AFOD) for the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) – San Antonio Office.  I began my employment with ICE in April 2007, as a Deportation Officer and Supervisory Detention and Deportation Officer.  I have held my current position as an AFOD, since August 2018.  As part of my current duties, I oversee the day-to-day operations relating to the case management of aliens detained at the South Texas Family Residential Center (STFRC), located in Dilley, Texas.

2.  As of July 7, 2020, STFRC has a total of 174 residents, 75 adults and 99 juveniles.  Of the current population, 19 residents are new intake, having nine days or less in custody.

3. Since June 4, 2020, all new intakes at STFRC are tested for COVID-19 during the initial
   intake process using LabCorp, SARS-CoV-2 testing.

4. STFRC has five neighborhoods that house residents. Each neighborhood has 480 beds. New
   intake families are housed in the Blue Butterfly neighborhood for a 14-day observation
   period before entering the general population. If a resident, who is part of a family unit, tests
   positive for COVID-19 and shows symptoms, the whole family unit is housed in the medical
   housing unit in a negative pressure room and treated for the virus accordingly. If a resident,
   who is part of a family unit, tests positive for COVID-19 but is asymptomatic, the whole
   family unit is housed in the medical housing unit, in a standard room, and monitored
   regularly to identify any symptoms or complications. If space were to run out in the medical
   housing unit, the Blue Butterfly neighborhood would be used as overflow housing, given that
   there is a medical annex in that complex. All residents who test positive are retested per
   medical protocol and released into general population once they have tested negative and are
   asymptomatic.

5. At STFRC, it is the employees' responsibility to get tested outside of the facility (since ICE
   Health Services Corps [IHSC] only tests residents) if they feel ill. ICE headquarters senior
   leadership has emailed out guidance, and local STFRC leadership have briefed staff on CDC
   guidance, COVID signs and symptoms, social distancing, mask wearing and universal
   precautions and testing locations.

6. If an employee (contractor or government) gets tested for COVID-19 and receives a positive
   result, the employee is placed in a non-work status. The employee is interviewed for contact
   tracing to identify their last day of work, any employee contact, and any resident contact.
   Other information is gathered including, but not limited to: symptoms the employee is

experiencing, how the employee may have contracted the virus (community spread, close

contact with a sick family member, etc.), reason for testing, and the employee's current status

(hospitalized, at home/self-quarantine, etc.).  A review of the facility's closed-circuit camera

system is conducted to identify any additional resident or staff contact that may have

occurred in addition to the contact identified during the interview.  A deep clean of all areas

with which the employee had contact is conducted.  The employee must provide medical

clearance prior to returning to work (i.e., doctor's note, proof of negative test result).  As an

additional precautionary measure, government employees are placed on telework status for

an additional week after medical clearance, to allow for a full recovery and to ensure the

employee is asymptomatic prior to their return to duty.

7. If a person is identified (via contact tracing, video review, or self-identified) to have been in

contact with a person who has tested positive, the following steps are taken:

- Government employee – a government employee who has been identified as having close

    contact with an infected person, but who has no COVID-19 symptoms, is placed on

    telework status for-14 days to monitor for symptoms.  The employee's supervisor

    conducts daily status checks with the employee.  If the employee remains without

    symptoms during the 14-day period, the employee is allowed to return to their regular

    work schedule.

- Contract employee – a contract employee who has been identified as having close contact

    with an infected person is placed on leave status for a minimum of 5 days to monitor for

    symptoms.  Human Resources makes contact with that employee after 5 days and verifies

    whether the employee is symptomatic or asymptomatic.  If the employee is symptomatic,

    the employee remains on leave status until they provide medical clearance to return to

work.  If the employee is asymptomatic, the employee is allowed to return to work on
their regularly scheduled days.[1]

- Resident – a resident who has been identified as having close contact with an infected
  person is placed under observation in the Blue Butterfly neighborhood for 14 days to
  monitor for symptoms.  STFRC has a staffed medical office in the Blue Butterfly
  neighborhood.

8.  All residents are screened by IHSC medical staff for any chronic care illnesses upon intake.
All residents with risk factors (*Fraihat*) are identified in EARM with a Risk Factor alert
code.  All cases involving risk factors are reviewed and evaluated for possible release based
on vulnerabilities.

9.  The following are additional measures being taken at STFRC to protect residents and staff:

- The policy of seating one family per table in the dining facility is strictly enforced.

- Staff who are found not to be wearing masks in the facility are counseled and disciplined.

- Residents are issued two cloth masks and additional surgical masks and they are required
  to wear a mask at all times while outside of their suites.

- STFRC has increased resident education on the proper use of PPE and universal
  precautions.  Education is provided to the residents regarding masking, as well as proper

---

[1] The contractors' policy requires that those employees who return to work after five days without symptoms must
submit to heightened screening procedures and increased PPE, must be assigned to posts that allow for social
distancing from other staff and detainees, must wear masks, and are subject to mandatory requirement of self-
monitoring of symptoms and increased sanitization of workspace. This is consistent with the April 20, 2020, U.S.
Centers for Disease Control and Prevention, Implementing Safety Practices for Critical Infrastructure Workers Who
May Have Had Exposure to a Person with Suspected or Confirmed COVID-19, *available at*
https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html ("To
ensure continuity of operations of essential functions, CDC advises that critical infrastructure workers may be
permitted to continue work following potential exposure to COVID-19, provided they remain asymptomatic and
additional precautions are implemented to protect them and the community.")
.

4

hand washing.  This education is covered in town halls, posted throughout the facility, and played on a dedicated channel on all TVs.  Residents identified as not consistently wearing masks are provided increased education on universal precautions.

- Increased signage is maintained around the facility regarding the proper CDC guidance, PPE, Universal Precautions; to provide further information as to how to avoid exposure. Signs are posted in Spanish and English throughout the entire facility.  Additionally, the CDC handwashing and universal precaution videos are played on a constant loop in a dedicated television channel in both languages.

- CDC guidelines have been implemented throughout the facility to include: limited movement, issuance of PPE, hand sanitizing stations, and educational materials posted throughout facility, as discussed in prior declarations filed with this Court.

- All residents are currently housed one family per room to limit exposure to other residents.

- During the 14-day observation period, only one family is allowed outside of their suite at a time to limit exposure to other residents.

- All employees must: complete the Employee Wellness Screening (including temperature checks) each day prior to work, wear a face mask at all times while working within the facility, and practice social distancing.

- All residents who leave the facility for off-site medical appointments are required to fulfill a 14-day observation period in Blue Butterfly neighborhood, upon their return.

- All employees at STFRC are encouraged to stay home and get tested if they feel ill.

- Employee reporting of positive tests is strictly enforced.

5

10. Since the beginning of the pandemic, there have been 11 contract employees and 3
   government employees who have tested positive for COVID-19.  These cases have had
   extensive contact tracing and video review, resulting in extremely limited resident contact.  5
   residents were sent to observation for 14 days and tested negative for the virus.  No residents
   have fallen ill due to these cases.

11. STFRC conducted saturation testing on June 23/24, 2020. All residents already at the facility
   (meaning they were not new intakes) tested negative for the COVID-19 virus. To date,
   STFRC has zero COVID-19 -cases among the resident population due to the thorough and
   cautious actions taken to prevent the spread of COVID 19 at the facility.

Executed this 9th day of July, 2020.


Richard M. Hunt
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
Department of Homeland Security

Case 1:20-cv-00786-JEB   Document 82-3   Filed 07/09/20   Page 1 of 8

**RESPONDENTS' EXHIBIT 3**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

O.M.G., *et. al.*,  )
                                   )
     Petitioners,  )
                                   )
v.  )     Case No.: 1:20-cv-00786-JEB
                                   )
CHAD WOLF, Acting Secretary of the U.S.  )
Department of Homeland Security, *et al.*,  )
                                   )
     Respondents.  )
                                   )

## DECLARATION OF ANTHONY S. HOFBAUER

I, Anthony S. Hofbauer, pursuant to 28 U.S.C. § 1746, under penalty of perjury, and based upon personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am an Assistant Field Office Director (AFOD) for the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) – San Antonio office. I began my employment with ICE in March 2006, as a Deportation Officer and Supervisory Detention and Deportation Officer. I have held my current position as an AFOD since December 2019. As part of my current duties, I oversee the day-to-day operations relating to the case management of aliens detained at the Karnes County Family Residential Center (KCFRC), located in Karnes City, Texas. Prior to assuming my current position, I worked in various other positions within the DHS since 2003. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity.

2. As of July 7, 2020, the number of residents housed at the KCFRC is a total of 129

7

residents, comprised of 71 adults and 58 juveniles. Of the current juvenile population, 45 residents are new intake. Of the adult population, 51 residents are new intake.

3.  Comprehensive protocols are in place for the protection of staff and patients, including the appropriate use of personal protective equipment (PPE), in accordance with Centers for Disease Control (CDC) guidance.

4.  By isolating and testing families as they enter the facility, medical staff are able to provide the necessary care for new residents while preventing those already in custody from possible exposure.

5.  As of July 7, 2020, 34 residents have tested positive for COVID-19.

    a.  All 34 of the COVID-19 positive residents have been new intakes, who have tested positive for COVID-19 during the first 14-day quarantine period while under cohort status. No families in general population have tested positive.

    b.  Of the 34 new intake residents that tested positive, 22 arrived as new intakes from the Del Rio, Texas area; 9 from the San Diego, California area; 1 from Yuma, Arizona; and 1 from Eagle Pass, Texas.

    c.  Testing: ICE uses molecular testing methodologies recognized by the CDC to detect SARS-CoV-2 and technology that has been approved by and granted Emergency Use Authorization (EUA) by the U.S. Food and Drug Administration (FDA), including a combination of the Abbott ID NOW instruments for Rapid RNA testing, as well as existing laboratory testing capabilities from commercial laboratories. All residents are tested during the intake process, and prior to coming into contact with residents in the general population. Additionally, some foreign countries require ICE to test individuals as a precaution prior to removal at which time the Abbott ID NOW is utilized along with other testing measures, all dependent on a country's request. The

7

agency's full response to COVID-19 can be viewed at www.ICE.gov/COVID19.

d. Cohorting: All incoming residents are cohorted in individual suites (mothers are housed with the children) for fourteen (14) days and are assessed for signs and symptoms of COVID-19.  If a resident has to go to an outside appointment or the emergency room/hospital, the 14-day cohort restarts when the resident returns to the facility.

e. Quarantine: Incoming residents that test positive for COVID-19 during the intake process are isolated for an additional 14 days from the date the test results are received.  The residents who are in close, direct contact with the positive COVID-19 patient (parents/siblings) are also isolated for an additional 14 days from the date of the positive test results.  Usually, the family members of a positive patient are separated from the patient for purposes of the 14-day period.  However, there are some circumstances where this is not possible, e.g., where a mother is breast feeding.  As of July 8, 2020, all families have been separated by diagnosis, e.g., positive patients are housed with other positive patients and negative patients with other negative patients.

f. Test Results: All incoming residents are informed of the results of testing during intake.

g. Positive Cases: On July 2, 2020, ICE ERO Leadership and IHSC released "Updated COVID-19 Screening and Cohorting Practices for New Arrival Detainees" which detailed specific information on how to deal with positive COVID-19 cases.

h. Contact Monitoring: As of July 7, 2020, only new arrivals to the facility have tested positive, and all of the new arrivals have been isolated and cohorted since

7

their arrival. If a resident in general population tests positive, the GEO medical staff will monitor the resident and begin contact tracing.

6. Both ERO and GEO contract employees must wear PPE at all times in and around the facility and must undergo a temperature check prior to entering the facility.

7. When an employee comes into contact with someone who has tested positive, subsequent procedures are determined by whether the contact was exposure or whether it was close contact.

    a. For contact exposures only, self-observation for symptoms is required, and PPE is mandatory. All other CDC guidelines are required.

    b. High risk exposure (close contact) as defined by the CDC is exposure for more than 15 minutes and at a distance less than 6 feet.

8. For ERO employees who come into close contact with someone who tests positive for COVID-19, the following procedures apply:

    a. If experiencing symptoms as outlined in the CDC guidelines, an ERO employee must notify the supervisor and will be placed on a 14-day quarantine. An ERO employee may not return to work until completion of the 14 days and the absence of any symptoms (medication free) for 72 hours or 10 days since the onset of symptoms. A COVID-19 test is recommended. If tested for COVID, and the result is negative, the ERO employee will remain in quarantine for 14 days. Contact tracing will occur, all staff will be notified accordingly, and the appropriate measures will be taken (i.e. self-observe or quarantine), all depending on the level and type of exposure.

    b. If not experiencing symptoms as outlined in the CDC guidelines, an ERO employee must complete the Employee Wellness Screening each day prior to work. During a Wellness Screening, employees are asked: whether they have

experienced fever, chills, cough, difficulty breathing, or loss of taste or smell within the last 24 hours; whether they have been in close contact with anyone diagnosed with COVID-19; and, whether they have traveled to New York, New Jersey, or the Connecticut Tri-State area.  And again, per the protocol for all employees, they must wear a face mask at all times while at work; and practice social distancing. A temperature check is conducted upon entering the facility.

9.  For GEO contract employees, the following procedures apply for an employee who comes into close contact with someone who tests positive for COVID-19:

    a.  If experiencing symptoms as outlined in the CDC guidelines, a GEO contract employee must notify Human Resources (HR) and is placed on a 14-day quarantine.   A GEO contract employee may not return to work until completion of the 14 days and the absence of symptoms (medication free) for 72 hours.

    b.  If not experiencing symptoms as outlined in the CDC guidelines, a GEO contract employee must complete the Employee Wellness Screening each day prior to work; wear a face mask at all times while at work; and practice social distancing.

    c.  The GEO contract employee's temperature will be checked twice a day, once upon arrival to work and once 2 hours prior to the end of their shift.

10. For employees that came into contact with a person who is displaying symptoms but who tested negative, continued monitoring of those individuals is followed.

    a.  If not experiencing symptoms as outlined in the CDC guidelines, the employee must complete the Employee Wellness Screening each day prior to work; wear a face mask at all times while at work; and practice social distancing.

    b.  GEO employee's temperature is checked twice a day; once upon arrival to

7

work, and once 2 hours prior to the end of their shift.

    c.   ERO employees must undergo a temperature check prior to entering the facility.

    d.   Employees' temperatures are checked every time they enter the facility, even if they have only departed for a short period.

11. When either an ERO or GEO contract employee tests positive for COVID-19, the employee must report to HR or management who will place the employee on leave for a minimum of 14 days, as per CDC guidelines.  HR or management will notify the local Health Department and begin contact tracing, and HR or management will contact the employee on a weekly basis to check on their health status. Once the employee has completed the 14 days and is asymptomatic as per CDC guidelines, they must obtain approval from HR or management to return to work. ERO employees must provide a medical clearance to return to work (e.g., a doctor's note or proof of a negative test).

12. Measures implemented by ICE to protect residents with high risk factors identified in the *Fraihat* litigation and CDC for COVID-19 include, but are not limited to, sufficiently screening residents for these risk factors and identifying individuals who are especially vulnerable.

    a.   All residents are screened for any chronic care illnesses upon intake by GEO Medical.  All residents with risk factors (*Fraihat*) are identified in EARM with a Risk Factor alert code.  All cases are reviewed and evaluated for possible release based on vulnerabilities.

    b.   CDC guidelines have been implemented throughout the facility, including limited movement, issuance of PPE, hand sanitizing stations, and educational materials posted throughout.

    c.   All residents are currently housed separately during their stay to limit exposure

to other residents during their initial 14-day quarantine. Once the 14-day quarantine period is over, families are transferred to general population but continue to be housed separately. In general population, families can co-mingle but must continue to comply with CDC and facility guidelines to protect one another from exposure to COVID-19. All residents are also still required to wear appropriate PPE.

d. Residents are issued a surgical mask and are required to wear the mask while outside of their designated suite during their 14-day quarantine.

e. Only one family is allowed outside of their suite at a time to limit exposure to other residents during their 14-day quarantine.

f. All staff are required to wear a mask or cloth face covering that covers the nose and mouth.

13. This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above-captioned case.

Signed on this 8th day of July 2020.

Anthony S. Hofbauer
Assistant Field Office Director – San Antonio
ICE Enforcement and Removal Operations

7

Case 1:20-cv-00786-JEB   Document 82-4   Filed 07/09/20   Page 1 of 33

**RESPONDENTS' EXHIBIT 4**

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

C.N., B.L., and minor child B.K.L.N.;      :
J.A.R., E.G.M., and minor child J.G.;      :
M.N., P.M., and minor child H.M.N.;        :
M.C., G.S.C., and minor children           :
G.R.S.C. and N.B.T.; M.E.L., E.O.E.,       :
and minor child J.O.E.,                    :
                    Petitioners            :
                                           :
           v.                              :      No. 268 M.D. 2020
                                           :      Heard: May 26, 2020
Pennsylvania Department of                 :
Human Services,                            :
                    Respondent             :


BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                               FILED: July 7, 2020


On April 23, 2020, C.N., B.L., and minor child B.K.L.N.; J.A.R.,
E.G.M. and minor child J.G.; M.N., P.M. and minor child H.M.N.; M.C., G.S.C. and
minor children G.R.S.C. and N.B.T.; and M.E.L., E.O.E. and minor child J.O.E.
(collectively, Petitioners)[1] filed an Emergency Petition for Issuance of a Writ of

---

[1] On May 19, 2020, Petitioners filed a motion for protective order requesting that their
testimony at trial be shielded from livestream to protect their identities – essentially, that the virtual
courtroom be closed. They further requested that the Court only use their initials during the
hearing, and that they be permitted to file their full names under seal. The Court granted this
motion, which was unopposed by the Department of Human Services (Department). As such,
Petitioners will be referred to throughout this opinion by their initials or as "Petitioners."

Mandamus (Petition) addressed to this Court's original jurisdiction.[2]  Petitioners seek an order directing the Pennsylvania Department of Human Services (Department) to issue an emergency order removing them from the Berks County Residential Center (BCRC) to avoid potential infection during the COVID-19 pandemic.[3]  The Court held a non-jury trial on May 26, 27, and 29, 2020, via WebEx. After review of the record and evidence in this matter, the Court enters a verdict in favor of the Department and against Petitioners.

## **Background**

Petitioners are immigrant parents and their children who are detained at BCRC pending federal immigration proceedings.  BCRC is a two-story, single building congregate care facility, meaning the individuals are housed together with communal sleeping quarters, bathrooms, dining facilities, and recreational areas. BCRC has an Intergovernmental Services Agreement with the federal Immigration and Customs Enforcement Agency (ICE) to provide this residential program.  While

---

[2] Petitioners initially filed an application for extraordinary relief in the Supreme Court of Pennsylvania, under the Court's King's Bench jurisdiction.  *See C.N., et al. v. Pennsylvania Department of Human Services* (Pa., 76 MM 2020).  On April 16, 2020, the Supreme Court issued an order, *per curiam,* denying Petitioners' application without prejudice to file an action in this Court or with the Department of Human Services (Department) itself.  That order further directed that if an action was filed here, the Commonwealth Court "shall establish an expedited schedule for such matter and shall move expeditiously to resolve the matter so as to prevent further potential harm to Petitioners."  (Supreme Ct. April 16, 2020 Order pp. 1-2.)

[3] Along with the Petition, Petitioners simultaneously filed an application for special relief in the nature of an application for peremptory judgment in mandamus.  On May 6, 2020, the Court issued a memorandum and order denying Petitioners' application, noting peremptory judgment was not appropriate as there were genuine issues of material fact.  *See Dusman v. Board of Directors of Chambersburg Area School District*, 113 A.3d 362 (Pa. Cmwlth. 2015).

the Petitioners and other BCRC residents are technically in federal custody, BCRC
itself is licensed and overseen by the Department and subject to its regulations.

Of particular importance here, Department Regulation 20.37 titled
"Emergency removal of residents" (the Regulation or Regulation 20.37), provides
as follows:

> If the Department finds evidence of gross incompetence,
> negligence, misconduct in operating the facility or agency,
> or mistreatment or abuse of clients, likely to constitute an
> immediate and serious danger to the life or health of the
> clients, the Department will take immediate action to
> remove the clients from the facility or agency. If physical
> obstruction is offered to prevent removal of the clients the
> Department will request law enforcement authorities to
> assist in the removal of the clients.

55 Pa. Code § 20.37. An order issued pursuant to this provision is referred to as an
emergency removal order (ERO).

Petitioners assert that conditions at BCRC and the facility's response to
the COVID-19 pandemic rise to the level of necessitating an ERO. Petitioners claim
that COVID-19 presents a severe danger to public health, in particular to individuals
detained in enclosed environments such as BCRC, and that the Department has not
taken adequate action to protect them. They aver:

> Petitioners are at high risk of contracting COVID-19 while
> in custody. Social distancing is not possible in the
> enclosed conditions of the detention center; . . . ICE and
> BCRC personnel are not providing adequate safety
> precautions to prevent detainees from contracting and
> spreading COVID-19; and employees come and go from
> their home and their communities[.] The only viable way
> to protect the children and families at BCRC is for them to
> be removed from the center and released to their sponsors.

3

(Petition ¶ 2) (footnote omitted).  With respect to children, Petitioners note that they play together, touch each other, share toys, put things in their mouths, and cannot be expected to observe the same rules and norms of social distancing that are expected of adults.  Therefore, it is impossible for children in the BCRC's enclosed, communal environment to avoid potential contamination.

Moreover, Petitioners aver that numerous parents and children in the facility are sick with cold-like symptoms, such as coughs, congestion and fever, and that they have observed numerous staff members exhibiting similar symptoms. (Petition ¶ 25.)  Yet when detainees request medicine for their children, it is allegedly not provided for days or weeks, if at all.  Petitioners assert that BCRC lacks the medical infrastructure to address the spread of infectious disease and does not have a pediatrician on staff.  They further claim that they have not been briefed by BCRC staff or ICE on COVID-19 or what precautions they should be taking to prevent the spread of the virus.  Petitioners allege that BCRC has not provided adequate personal protective equipment (PPE); appropriately sized masks for children have not been provided; soap dispensers in the facility are broken; and BCRC is not properly sanitized as it relies on the detained civil population itself to clean the facility.

Petitioners note that the purpose of the Department's regulations is "to protect the health, safety and well-being of children receiving care in a child residential facility through the formulation, application and enforcement of minimum licensing requirements."  55 Pa. Code § 3801.  They assert that the conditions at BCRC, as outlined above, constitute an immediate and serious danger to Petitioners' life or health, triggering the Department's duty to issue an ERO pursuant to Department Regulation 20.37, 55 Pa. Code § 20.37.  Moreover, they assert that BCRC's response to the COVID-19 health crisis – in particular, its failure

4

to adequately protect Petitioners from infection by a highly contagious and deadly disease – has demonstrated its incompetence, negligence, or misconduct in operating the facility. Because the Department has failed to act on its own given these conditions, Petitioners claim they have no other adequate and appropriate remedy than to seek mandamus.

On April 28, 2020, the Department filed an answer with new matter denying the material allegations in the Petition. The Department averred that it recently conducted a remote inspection of BCRC during which the licensing technician, Erin Roman, found no evidence of gross incompetence, negligence, or misconduct in the operation of BCRC, or mistreatment or abuse of residents. In addition, the Department noted that BCRC had policies in place to respond to and mitigate the effects of COVID-19. As such, the Department concluded there are not circumstances that constitute an immediate and serious danger to the life or health of residents at BCRC; therefore, an ERO was not warranted.

Prior to the start of testimony, this Court heard oral argument on the Department's motion *in limine* seeking to exclude (1) all evidence prior to December 2019, as being outside the relevant timeframe of the allegations in the Petition and, therefore, irrelevant and not probative of Petitioners' claims; (2) the testimony of proposed witness Carol Anne Donohoe, Esquire, as Attorney Donohoe lacks personal knowledge as to the conditions at BCRC from December 2019 onward; (3) the testimony and declaration of proposed witness Bridget Cambria, Esquire, to the extent it relies on inadmissible hearsay; and (4) statements found in newspaper articles, learned treatises, or periodicals as inadmissible hearsay if introduced to establish the truth of the matters asserted. Following argument, the Court orally

5

denied Respondent's motion *in limine* in its entirety, and issued a formal order to this effect on June 15, 2020.

During trial, Petitioners called the following witnesses: (1) Petitioner B.L.; (2) Petitioner P.M.; (3) Alan Shapiro, M.D.;[4] (4) Attorney Cambria; and (5) Attorney Donohoe. The deposition testimony of Jeanne Parisi, Bureau Director for Human Services Licensing, was also entered into the record, in its entirety, upon stipulation of the parties. The Department called the following witnesses: (1) Erin Roman, a Licensing Technician with the Department; and (2) Diane Edwards, BCRC's Executive Director (Director Edwards).[5]

The Court admitted the following exhibits into evidence at trial without objection or upon stipulation of the parties:

---

[4] In their pretrial statement, Petitioners indicated that they intended to call Dr. Shapiro as an expert witness. While they summarized Dr. Shapiro's potential testimony, Petitioners failed to specify in what areas they intended to qualify Dr. Shapiro as an expert. Moreover, at trial, Petitioners failed to offer Dr. Shapiro as an expert witness, in any area, and there was no stipulation between the parties as to his expert qualifications. *See* Notes of Testimony (N.T.) 156:13-16. Given these facts, the Court cannot consider Dr. Shapiro's expert opinions in this matter.

[5] On April 27, 2020, the County of Berks (County), which operates the BCRC, filed an application seeking leave to intervene in this matter. Following oral argument, the Court issued a Memorandum and Order on April 29, 2020, stating that the County's interests are currently aligned with, and adequately represented by the Department. Therefore, the County's application was denied without prejudice to request leave to intervene in the future if the licensing status of the BCRC changed, or for any other good cause shown. *See* Pa. R.C.P. No. 2329. On the second day of trial, May 27, 2020, the County filed a renewed application for leave to intervene citing concerns over Petitioners' line of questioning of the Department's witnesses, in particular regarding BCRC's licensing status and any potential violations. The Court orally denied the County's renewed application on the record immediately following argument, and issued an order to this effect on June 15, 2020. The Court did permit counsel for the County, Attorney Matthew Connell, to be present and raise objections during the testimony of Director Edwards, in particular to ward against any potential conflict of interest with counsel for the Department.

6

## Exhibits

**Petitioners' Exhibits:**

| | |
|---|---|
| P-1 | Alan J. Shapiro, M.D. – Curriculum Vitae |
| P-2 | May 21, 2020 deposition transcript of Jeanne Parisi |
| P-4 | Declaration of Erin Roman dated April 28, 2020 |
| P-5 | Video file (5 seconds) |
| P-6 | Video file (9 seconds) |
| P-8 | May 21, 2020 deposition transcript of Erin Roman (page 42 only) |
| P-26 | *O.M.G., et al. v. Wolf*, D.D.C., No. 1:20-cv-00786, Emergency Verified Petition for a Writ of Mandamus and Complaint for Declaratory and Injunctive Relief, filed March 21, 2020 (page 1 only) |
| P-29 | *Flores, et al. v. Barr*, C.Dist. Cal., No. 2:85-cv-04544, April 24, 2020 Order re: Plaintiffs' Motion to Enforce |
| P-36 | Petitioners' Interrogatory Number 18 and Department's Response thereto |

**Department's Exhibits:**

| | |
|---|---|
| R-1 | April 7, 2020 email from Erin Roman to Louis Bisignani and Brian Hazlak |
| R-2 | Email string ending with March 18, 2020 email from Diane Edwards to Brian Hazlak, Erin Roman and David Smith (1 page) |

7

| R-2-A | Email string ending with March 25, 2020 email from Diane Edwards to Brian Hazlak, Louis Bisignani and Erin Roman (4 pages) |
| R-3 | Email string ending with March 25, 2020 email from Diane Edwards to Erin Roman, Brian Hazlak, Louis Bisignani, and David Smith (1 page) |
| R-4 | Email string ending with March 26, 2020 email from Diane Edwards to Brian Hazlak, Louis Bisignani and Erin Roman (5 pages) |
| R-5 | Email string ending with March 30, 2020 email from Diane Edwards to Erin Roman, Brian Hazlak, Louis Bisignani and David Smith (3 pages) |
| R-6 | Email string ending with March 26, 2020 email from Louis Bisignani to Erin Roman, Brian Hazlak and Jacqulyn Maddon (3 pages) |
| R-7 | Email dated March 30, 2020 from Diane Edwards to Erin Roman with attachments (fire drills) (4 pages) |
| R-8-A Parts 1 & 2, and R-8-B Parts 1 & 2 | Email dated March 31, 2020 from Diane Edwards to Erin Roman and David Smith with attachments (juvenile resident admission files) (58 pages total) |
| R-9-A Parts 1, 2 & 3, and R-9-B Parts 1, 2 & 3 | Email dated March 31, 2020 from Diane Edwards to Erin Roman and David Smith with attachments (additional juvenile resident admission files) (74 pages total) |
| R-10 | Email string ending with March 31, 2020 email from Diane Edwards to Erin Roman |

Case 1:20-cv-00786-JEB Document 32-4 Filed 07/09/20 Page 10 of 83

(3 pages)

| | |
|---|---|
| R-11 | Juvenile Admission Report dated April 6, 2020 (4 pages) |
| R-12 | Email string ending with April 6, 2020 email from Diane Edwards to Erin Roman and Brian Hazlak (3 pages) |
| R-13-A, and R-13-B Parts 1, 2 & 3 | ICE medical records for BCRC child residents (101 pages total) |
| R-14 | Email string ending with April 7, 2020 email from Illecia Benefield to Erin Roman (2 pages) |
| R-15 | ICE COVID-19 Poster in various languages (4 pages) |
| R-17 | Email dated April 14, 2020 from Diane Edwards to Brian Hazlak, Erin Roman, David Smith and Louis Bisignani (2 pages) |
| R-18 | Email string ending with April 22, 2020 email from Diane Edwards to Erin Roman, Brian Hazlak and David Smith (4 pages) |
| R-19 | Email dated May 5, 2020 from Diane Edwards to Erin Roman and Brandon Witmer with attachments (fire drills) (4 pages) |
| R-20 | Juvenile Admission Report dated May 5, 2020 (4 pages) |
| R-21 | Email dated May 5, 2020 from Diane Edwards to Erin Roman and David Smith (1 page) |
| R-22 | Email string ending with May 6, 2020 |

9

email from Diane Edwards to Erin Roman
and David Smith (3 pages)

R-23                              Erin Roman's inspection report from
BCRC May Inspection (7 pages)

R-24                              Erin Roman's hand written notes from
BCRC May Inspection (2 pages)

The Court also admitted the following exhibits into evidence over objection:

**Petitioners' Exhibits:**

P-3                                 Email string between Petitioners'
immigration counsel and the Department
(15 pages)

P-24A, B & C, and             ICE medical records for BCRC child
P-25B                          residents (127 pages total)

The Court makes the following findings of fact based on the evidence presented throughout the course of the proceedings.

## Findings of Fact

1. Petitioner B.L., a 29-year-old man from Haiti, has been detained at BCRC with his wife, C.N., and their one-year-old son, B.K.L.N., since March 18, 2020. Notes of Testimony (N.T.) 27:24, 28:1-20, 29:13-19.

2. Petitioner P.M., a 37-year-old man from Haiti, has been detained at BCRC with his wife, M.N., and their two-year-old daughter, H.M.N., since March 18, 2020. N.T. 61:6-10, 63:20-25, 64:1-5.

10

3. Petitioners B.L. and P.M. both speak Haitian Creole, and both understand some Spanish. N.T. 31:13-25, 32:4-10, 68:14-22.

4. Translators and language services are available to BCRC so staff can communicate and discuss issues with residents. N.T. 490:13-15.

5. The federal government provides BCRC with at least two contracted language lines for translation services 24 hours a day, 7 days a week. N.T. 472:5-10.

6. BCRC employs one individual who can interpret Haitian French, one individual who can interpret Haitian Creole, at least three individuals whose native language is Spanish, and at least nine individuals who can speak conversational Spanish. N.T. 471:1-13. These BCRC staff members are on duty at a variety of shifts, dates, and times. N.T. 471:14-23.

7. BCRC's is a two-floor facility, N.T. 452:20, with approximately 58,000 square feet. N.T. 450:15-451:2.

8. BCRC can accommodate, and is licensed for 96 individuals. N.T. 452:10-12.

9. On the last day of trial, May 29, 2020, BCRC's total census was 13 individuals. N.T. 452:13-15.

10. BCRC's configuration is in the shape of a "V," with a communal recreational area in the center and two wings that veer off from the central area. N.T. 452:24-453:7.

11. Each wing in BCRC's second floor has 8 bedrooms, each of which is over 400 square feet. N.T. 453:1-3, 450:17-18. Each bedroom has a private bathroom with a toilet, sink, soap dispenser, and towel dispenser. N.T. 454:8-11.

12.   As of May 29, 2020, each family unit at BCRC had its own bedroom. N.T. 453:8-13.

13.   Each wing also has a shower room that consists of six shower stalls – one shower room is designated as a female shower room, the other as a male shower room. N.T. 454:8-14.

14.   BCRC provides residents with toothpaste, a toothbrush, combs, shampoo, hand soap, feminine hygiene products, toilet paper, and towels. N.T. 456:8-14. BCRC also provides clean sheets for residents once a week. N.T. 456:14.

15.   If a resident does not like the brand or type of hygiene product provided by BCRC, the resident can purchase something different at BCRC's commissary. N.T. 456:15-24.

16.   BCRC's program areas where the resident can move about freely include the communal recreational areas, with televisions and kitchenettes; a chapel; a fitness room; a movie area; a classroom wing; an area for legal and social visits; and a dining room. N.T. 450:3-14, 460:20-462:3.

17.   BCRC has three to four acres of outdoor space for residents to use for recreational purposes. N.T. 451:7-18, 452:2-17.

18.   BCRC cleans for the prevention of all diseases. N.T. 461:13-462:5.

19.   Beginning March 18, 2020, BCRC enhanced its preventive cleaning of the facility. Exhibits R-2, P-4 ¶ 15(d); N.T. 463:13-16.

20.   BCRC's shelter care counselors conduct most of the cleaning in the facility, including the communal bathrooms, other communal areas, vehicles, outside areas, doorknobs, high-touch areas, telephones, computers, keyboards, and walls. N.T. 462:14-463:10.

21.  BCRC's shelter care counselors are present on the program floors on all shifts, 24 hours a day, 7 days a week.  N.T. 462:17-19.

22.  BCRC staff perform two normal preventative cleanings per shift, six times per day, in addition to disinfecting common areas three or four additional times per day.  Exhibit R-12 at 2.

23.  Residents clean their own private bedrooms, bathrooms, and the shower areas, N.T. 464:4-15, and are responsible to disinfect all children's toys after each use.  Exhibit R-23 at 2.

24.  BCRC provides buckets, mops, and gloves to all staff and residents for cleaning.  N.T. 467:4-15.

25.  BCRC staff do hygiene checks to ensure that the areas the residents are responsible for cleaning are cleaned properly.  N.T. 464:16-20.  If BCRC determines that such an area is not cleaned properly, then BCRC will clean the area, ensuring the resident is present if the area is the resident's bedroom.  N.T. 464:21-465:6.

26.  For cleaning purposes, BCRC uses a disinfectant called Virex and Clorox Anywhere Spray.  N.T. 466:16-25.

27.  BCRC provides Purell wipes and 70 percent alcohol sanitizer for staff and residents.  Exhibit R-23 at 2; N.T. 467:1-3.

28.  BCRC has provided at least 11 wall-mounted and stand-alone hand sanitizer dispensers in the program areas for residents and staff.  N.T. 473:14-21, 473:24-474:6.

29.  BCRC has posted multilingual signs in the facility to encourage frequent handwashing.  N.T. 475:24-476:3.

13

30.  Before mealtimes, BCRC staff encourages residents to return to their rooms to wash their hands.  N.T. 476:4-8.

31.  BCRC has implemented social distancing requirements in the dining room, bedroom areas, and communal activity areas.  N.T. 468:8-13.

32.  BCRC has posted signage to remind residents about social distancing.  Exhibits R-15, R-23 at 1; N.T. 469:14-15.

33.  One family unit uses the communal showers at a time to maintain social distancing.  N.T. 485:15-21.

34.  Prior to the COVID-19 pandemic, residents all lined up in the dining room for meals.  Residents now enter the dining room as a family unit, one at a time, after the previous family has been served.  Exhibit R-23 at 3, 5; N.T. 488:19-489:2, 490:1-3.

35.  BCRC has removed some tables from the dining room and assigned each family unit to a particular table.  Exhibit R-23 at 5; N.T. 489:5-8, 23-25.

36.  BCRC staff guide the families to their respective tables after they are served food.  Exhibit R-23 at 5; N.T. 489:19-25.

37.  If BCRC staff were to observe residents commingling during meals, then staff would remind the residents to maintain social distancing.  N.T. 490:7-15.

38.  BCRC has interpreters or language services available for when staff counsel and redirect residents to practice social distancing.  N.T. 470:8-19.

39.  If Director Edwards, her supervisors, or staff observed another BCRC staff member not practicing social distancing, then that staff member would be reminded of the CDC guidelines on social distancing.  Exhibit R-23 at 1; N.T. 469:11-470:5, 472:15-18.

14

40. Beginning April 7, 2020, BCRC provided disposable masks for all residents. N.T. 477:20-21, 479:15-16. BCRC residents are given one reusable mask every week, N.T. 477:25-478:3, and they can request and be given new masks or gloves at any time. Exhibit R-23 at 2; N.T. 478:4-16, 479:20-23.

41. On April 8, 2020, BCRC received a donation of cloth washable, reusable masks, and every resident received one. N.T. 477:21-24.

42. BCRC staff are required to wear a face mask at all times within the facility. Exhibit R-23 at 2; N.T. 477:17-19.

43. Since April 7, 2020, BCRC has required staff to wear gloves at all times. N.T. 482:18-19.

44. BCRC has 12 glove stations with boxes of gloves throughout the facility, including the common areas. N.T. 484:12-485:6.

45. The Immigration Health Services Corps provides on-site general primary care to all residents at BCRC, including mental health, medical care, assessments, and wellness visits. N.T. 495:3-18, 21-22; 496:3-4.

46. The Immigration Health Services Corps has over 15 full-time medical staff, including a physician assistant, nurses, and psychologists. N.T. 496:7-13.

47. Sick calls are available twice a day for adult residents, and 24 hours a day, 7 days a week for child residents. Exhibit R-23 at 3.

48. If a resident were to require hospitalization, BCRC would take that resident to a hospital that has entered into a memorandum of understanding with BCRC to provide care to its residents. N.T. 496:6-497:11.

49. Petitioner B.K.L.N. fell and hit his head while at BCRC, and afterward was unable to sleep. B.L., B.K.L.N.'s father, does not believe his son

15

received appropriate treatment of diagnosis by the medical staff at BCRC.  N.T.
40:16-25, 41:1-3.

50.  Petitioner B.K.L.N. contracted a virus that lead to sores around his
mouth and him not being able to eat.  Petitioner B.K.L.N. also had a fever and
congestion for three days, and was not tested for COVID-19.  N.T. 37:17-25, 38:1-
20.

51.  Petitioner B.L., B.K.L.N.'s father, testified that his family is living
in constant fear.  N.T. 38:19-20.

52.  Petitioner P.M.'s two-year-old daughter, Petitioner H.M.N., had a
fever while detained at BCRC, and was not tested for COVID-19.  N.T. 74:23-25,
75:1-25.

53.  Director Edwards has been in her position at BCRC since 2013.
N.T. 446:12-18.

54.  Director Edwards oversees all program components of BCRC,
including policies, procedures, regulations, and standards.  N.T. 445:24-446:3.

55.  To ensure the program runs properly, Director Edwards takes trips
around BCRC to observe what is going on in the facility.  N.T. 472:19-22.

56.  Director Edwards educates herself on the guidance the Centers for
Disease Control and Prevention (CDC) has issued regarding COVID-19, and
continually checks the CDC's guidance to ensure BCRC is following the updated
revisions.  N.T. 457:3-13, 514:24-515:1.

57.  BCRC has trained its staff as to the CDC's COVID-19 guidance
and has provided staff with written materials, which the staff must sign-off as having
received.  N.T. 458:18-459:12, 515:2-15.

58. BCRC staff are to adhere to hand hygiene, respiratory hygiene, and cough etiquette as found in the CDC's infection control guidance. Exhibit R-23 at 2.

59. BCRC has posted signage with the CDC's COVID-19 guidance for residents to view and read. N.T. 486:13-17, 515:16-20. That signage is written in English, Spanish, French, and Creole. N.T. 515:21-516:5.

60. BCRC staff had meetings with each family unit to educate the residents about COVID-19. N.T. 488:4-11, 517:4-10. During those meetings, a translator or language service was available. N.T. 486:8-9, 488:12-18.

61. As of March 18, 2020, BCRC suspended: all new admissions to the facility, Exhibits R-2, P-4 ¶ 15(a), N.T. 494:1-3; all visits to the facility, Exhibits R-2, P-4 ¶ 15(b), R-23 at 2, N.T. 493:12-14; and all field trips, Exhibits R-2, P-4 ¶ 15(c).

62. BCRC has been screening staff for COVID-19 since the middle of March. N.T. 491:7-9, 17-18.

63. Before a staff member enters BCRC, he or she is asked screening questions recommended in the CDC's guidance. Exhibit R-23 at 2; N.T. 491:7-9. These questions cover symptoms of COVID-19 such as fever, chills, cold and cough, difficulty breathing, and loss of senses of taste and smell. N.T. 491:17-24.

64. BCRC revises its screening questions for staff any time the CDC's guidance changes. N.T. 491:9-10, 24.

65. If an individual staff member answers "yes" to any of the screening questions, then BCRC will not allow that individual into the program areas and will send the individual home. N.T. 491:11-13, 492:3-5.

17

66.  If the individual staff member answers "no" to the screening questions, then the individual's temperature is taken. Exhibit R-23 at 2, N.T. 491:13-14, 492:6-8.

67.  Pursuant to the CDC's guidance, if a staff member has a temperature of 100.4 degrees Fahrenheit or higher, then BCRC will not allow that individual into the program areas and will send the individual home. N.T. 492:6-21.

68.  Every resident is medically screened upon admission to BCRC. N.T. 493:23-24.

69.  Medical staff, who have access to program areas, look for symptoms of COVID-19 in BCRC residents. N.T. 494:11-18.

70.  Medical staff take the temperatures of BCRC residents every day before lunch. Exhibit R-23 at 3; N.T. 494:19-21.

71.  Medical staff only allow one family unit in the medical clinic at a time. Exhibit R-23 at 3.

72.  If a resident presents with symptoms of COVID-19, BCRC will place the resident in quarantine in their bedroom. N.T. 497:23-498:1.

73.  If a resident tests positive for COVID-19, BCRC will place the resident in medical isolation in a negative pressure room in the Medical Department. N.T. 497:20-22. The negative pressure room has its own air system. N.T. 498:2-7.

74. One staff person at BCRC presented with potential COVID-19-like symptoms, was tested for the virus, and the result was negative. Exhibits R-16, R-17; N.T. 498:16-23.

75. Two residents at BCRC – Petitioner J.O.E. and her father – have presented with potential COVID-19-like symptoms, were tested for the virus, and

both residents tested negative.  Exhibits R-2, R-4, R-18; N.T. 498:24-499:4, 521:18-522:7.

76.  If someone in BCRC were suspected of having COVID-19, BCRC would report this to the Department as a critical incident.  N.T. 499:23.

77.  The Department conducts monthly monitoring inspections of BCRC.  N.T. 267:17-24.

78.  Ms. Roman is the Department's Licensing Technician responsible for inspecting BCRC.  N.T. 267:17-24.  She has been conducting monthly inspections of BCRC for approximately four years.  Exhibit P-4 ¶ 7.

79.  As part of their work duties, the Department's Licensing Technicians are responsible for observing whether conditions exist at a facility that would warrant an ERO.  N.T. 264:7-10.

80.  An ERO is considered when a facility licensed by the Department presents imminent health and safety issues that can only be mitigated through the removal of the licensee's residents.  Exhibit P-2 at 28:4-18.

81.  If a Licensing Technician finds conditions that may warrant an ERO, the technician will remain at the facility, contact his or her supervisor, and discuss how to proceed.  N.T. 264:21-25, 265:3-5.

82.  The Department may respond to a licensing violation by requiring the facility to develop a plan of correction to bring it into compliance with the applicable regulations.  Exhibit P-2 at 32:19-33:2; N.T. 266:12-23.

83.  License revocation is a remedy the Department uses for more serious licensing violations.  N.T. 266:24-267:4.

84.  Ms. Roman conducted a remote inspection of BCRC from March 31, 2020 to April 7, 2020 (March/April Inspection).  Exhibit R-3; N.T. 272:11-15, 284:1-8.

85.  The March/April Inspection included a telephone interview with Director Edwards, a visual walk-through of BCRC using the mobile application FaceTime, and a desk review of documents Ms. Roman requested from BCRC and ICE.  N.T. 291:6-13.

86.  During the FaceTime tour of BCRC, Ms. Roman was able to observe hallways, sanitary conditions, common areas, staff stations, and exterior conditions of the building.  N.T. 291:6-292:12.

87.  Director Edwards complied with Ms. Roman's directives while conducting the FaceTime tour of BCRC.  N.T. 292:18-21.

88.  As part of the March/April Inspection, Ms. Roman inspected the following documents:  fire drill records, Exhibit R-7, N.T. 297:24-298:13; child resident intake documents, Exhibits R-8-A, R-8-B, R-9-A, R-9-B, N.T. 303:20-304:23, 305:23-309:11; child resident admission reports, Exhibit R-11, N.T. 310:12-311:9, 311:24-312:1; records of initial physical examinations of child residents, child resident health and safety assessments, and child resident health and safety plans, Exhibits R-13-A, R-13-B, N.T. 313:12-318:1, 319:8-20, 320:6-13.

89.  Ms. Roman's interview of Director Edwards included questions about BCRC's COVID-19 mitigation efforts and policies that were put in place to reduce the likelihood of introducing COVID-19 into the facility.  N.T. 325:23-327:12.

90.  Based on the March/April Inspection, Ms. Roman made the following conclusions:

20

(a) that BCRC had implemented adequate COVID-19 mitigation policies, N.T. 329:16-25;

(b) that BCRC residents could adequately social distance due to the number of residents and size of the facility, N.T. 330:4-25; and

(c) that there was no evidence to support an ERO, N.T. 332:2-7.

91.  On April 7, 2020, Ms. Roman sent an email to her supervisors detailing the findings of her inspection.  Exhibit R-1; N.T. 332:15-334:8.

92.  Ms. Roman conducted a remote inspection of BCRC on May 6, 2020 (May Inspection).  N.T. 272:8-10.

93.  On May 6, 2020, BCRC's total resident census was 16 residents – 10 adults and 6 children.  Exhibit R-23 at 1.

94.  Ms. Roman created a written report of her findings from the May Inspection, including her interviews with BCRC staff, observations during the video review, and summaries of interviews she conducted with BCRC residents.  Exhibit R-23; N.T. 347:2-356:6.

95.  Ms. Roman again utilized the FaceTime application to conduct remote video observation of the conditions at BCRC for the May Inspection.  Exhibit R-23 at 4-5; N.T. 350:10-22.

96.  Because residents of BCRC complained after being filmed during the March/April Inspection, Ms. Roman instead utilized the FaceTime application to observe live video from BCRC's surveillance monitors during the May Inspection.  Exhibit R-10; N.T. 293:10-17, 350:19-21.

97.  Through the May FaceTime tour, Ms. Roman was able to see hand-sanitizer stations, signage relating to COVID-19, and residents washing their hands.  Exhibit R-23 at 4-5.

21

98.    As part of the May Inspection, Ms. Roman reviewed and considered the following documents:  fire drill records, Exhibit R-19, N.T. 342:2-343:4; child resident admissions reports, Exhibit R-20, N.T. 343:5-344:4; the list of residents who were released since the March/April Inspection, Exhibit R-21, N.T. 344:4-23; and emails Director Edwards sent to her regarding a resident's concerns related to COVID-19 and BCRC's response to those concerns, Exhibit R-22, N.T. 344:24-346:25.

99.    Ms. Roman conducted a video conference with Director Edwards as part of the May Inspection, which included the following subjects: BCRC's census; how many staff were working on each shift; whether anyone tested positive for COVID-19; the signs and symptoms that lead to the testing of a resident; whether the residents were compliant with social distancing; how staff communicate with residents; general precautions for COVID-19; screening of staff when they report to work; face masks and other PPE; the cleaning and sanitizing of the facility; visitation policies; and how BCRC was following the CDC's COVID-19 guidance.  Exhibit R-23 at 1-2.

100.    Ms. Roman conducted a telephone interview with BCRC's Medical Department as part of the May Inspection, which included the following subjects: the Medical Department's protocol for monitoring for COVID-19; sick calls; information on a resident child who was tested for COVID-19; whether the Medical Department observed social distancing; PPE; and the mental health of the residents.  Exhibit R-23 at 3-4.

101.    Medical staff reported to Ms. Roman that no resident has requested a sick call with signs or symptoms of COVID-19, and that no resident has

been afebrile since they started taking temperature checks on April 21, 2020. Exhibit R-23 at 3.

102. As part of the May Inspection, Ms. Roman conducted interviews with adult residents of BCRC, including the adult Petitioners. Exhibits R-23 at 5-7, R-24; N.T. 353:20-355:1.

103. During the May Inspection, Ms. Roman utilized either BCRC staff who speak the residents' native language or a language interpreter service to communicate with BCRC residents. N.T. 359:25-361:11.

104. Ms. Roman's resident interviews included 13 questions that specifically addressed the residents' concerns about COVID-19 and BCRC's mitigation efforts. Exhibit R-23 at 5-6.

105. Ms. Roman took handwritten notes of her questions and the responses she received during her resident interviews. Exhibit R-24; N.T. 356:7-358:3.

106. All residents reported to Ms. Roman that they are physically healthy and have been informed of COVID-19 through information from staff members, the news, posters on the walls of the facility, and speaking with other residents. Exhibit R-23 at 6.

107. As for measures to mitigate the spread of COVID-19, residents described washing hands, wearing a mask, social distancing, using hand sanitizer, wiping off surfaces and toys, and covering their faces when coughing or sneezing. Exhibit R-23 at 6.

108. In her May Inspection report, Ms. Roman noted that a few residents expressed feelings of stress and concern about their families' safety due to

23

COVID-19, particularly if BCRC staff were to become infected. Exhibit R-23 at 6; N.T. 380:4-7, 20-25, 381:1-3, 384:17-25, 385:1-25.

109. Residents reported that BCRC staff wear face masks and that every family has their own bedroom. Exhibit R-23 at 6.

110. Residents admitted to Ms. Roman that they do not wear their masks all of the time. Exhibits R-23 at 6, R-24 at 1; N.T. 379:19-22.

111. Residents stated that they practice social distancing and were able to describe what that term means. Exhibit R-23 at 6.

112. During the May Inspection, Ms. Roman saw residents closer than six feet apart and residents who were not wearing masks. N.T. 380:1-3, 384:34-35, 385:1-5.

113. Based on the May Inspection, Ms. Roman made the following conclusions:

(a) that BCRC was being proactive in implementing COVID-19 mitigation measures, N.T. 358:19-359:24;

(b) that BCRC residents were safe and understood COVID-19 safety protocols, *id.*;

(c) that BCRC residents were not in immediate danger or harm due to COVID-19, *id.*;

(d) that there was no evidence to suggest the health and safety of BCRC child residents was at risk, N.T. 361:12-362:7; and

(e) that there was no basis for an ERO. *Id.*

114. Ms. Roman sent her written monthly inspection report of BCRC to her supervisors. N.T. 355:20-356:6.

24

115.  As of May 29, 2020, the Department had not issued an ERO against BCRC.  N.T. 330:12-14.

## **Evidentiary Ruling**

The Court SUSTAINS the Department's hearsay objections to the testimony of Attorneys Cambria and Donohoe regarding statements Petitioners made to them about their health and obtaining medical treatment while at BCRC. Petitioners maintain that the hearsay exception in Pennsylvania Rule of Evidence 803(4), Pa. R.E. 803(4), for statements made for medical diagnosis and treatment applies.  However, the Court finds that Petitioners failed to establish that the statements Petitioners made to their immigration counsel, during the course of representation, were made for the purpose of receiving treatment, or that they were necessary and proper for diagnosis and treatment.  *Commonwealth v. Smith*, 681 A.2d 1288, 1291 (Pa. 1996).  Therefore, the Court holds that the exception in Pa. R.E. 803(4) does not apply here and the testimony is excluded as inadmissible hearsay.

## **Discussion**

Mandamus is an extraordinary remedy that lies only to compel performance of a ministerial act or a mandatory duty by a government official. *Sanders v. Wetzel*, 223 A.3d 735, 739 (Pa. Cmwlth. 2019); *Sinkiewicz v. Susquehanna County Board of Commissioners*, 131 A.3d 541, 546 (Pa. Cmwlth. 2015).  A petitioner seeking mandamus relief must establish that he or she (1) has a clear legal right, (2) the respondent has a corresponding legal duty, and (3) there is no other adequate remedy at law.  *Sanders*, 233 A.3d at 739; *Sinkiewicz*, 131 A.3d

at 546.  The purpose of a writ of mandamus is "to enforce rights that have been clearly established.  Mandamus may not be used to establish legal rights or to compel performance of discretionary acts. . . ."  *Sanders*, 233 A.3d at 739 (quoting *Tindell v. Department of Corrections*, 87 A.3d 1029, 1034 (Pa. Cmwlth. 2014)).  *See also Mazin v. Bureau of Professional and Occupational Affairs*, 950 A.2d 382 (Pa. Cmwlth. 2008).  Moreover, "[t]he petitioner's right to performance of a mandatory duty must be well-defined, clear and specific; where any doubt exists, mandamus relief will not lie."  *Kegerise v. Delgrande*, 183 A.3d 997, 1004 (Pa. 2018) (citation omitted).

Here, Petitioners have failed to prove they have a clear legal right and the Department has a mandatory duty to issue an ERO.  As for the second issue, Petitioners summarily argue that the Department's duty to issue an ERO under Regulation 20.37 is mandatory and leaves no room for discretion.  Their argument centers on the fact that Regulation 20.37 contains the word "will" – that "the Department will take immediate action to remove the clients from the facility or agency."  55 Pa. Code § 20.37 (emphasis added).  Petitioners maintain that use of this affirmative or conditional language constitutes a mandatory duty for the Department to issue an ERO.

However, Petitioners argument ignores the preceding language of Regulation 20.37 which states that an ERO is appropriate "[i]f the Department finds evidence of gross incompetence, negligence, misconduct in operating the facility or agency, or mistreatment or abuse of clients, likely to constitute an immediate and serious danger to the life or health of the clients. . . ."  *Id.*  Taken, as it must, in its entirety, the plain language of the Regulation necessarily vests within the Department the discretion to determine if evidence exists that meets the applicable

legal standards. More to the point, whether the conditions at BCRC meet the threshold for issuance of an ERO is a subjective determination within the Department's discretion and expertise. Mandamus is simply not the appropriate vehicle or remedy as the Department does not have a mandatory duty to issue an ERO.

Even if Regulation 20.37 could be said to impose a mandatory duty on the Department, the Court finds that Petitioners have not demonstrated a clear legal right to an ERO under the circumstances. Petitioners point to their subjective and unsupported allegations as the basis for claiming that the conditions at BCRC, and the facility's response to the COVID-19 pandemic, demonstrate gross incompetence, negligence, or misconduct likely to constitute an immediate and serious danger to their lives or health.

The uncontroverted evidence belies Petitioners' subjective fears and demonstrates that BCRC has taken steps to mitigate the risk of residents being exposed to or contracting COVID-19. Specifically, BCRC suspended admissions, visitation and field trips as of March 18, 2020. Staff has been trained regarding the CDC's COVID-19 guidance and are required to adhere to the CDC's infection control guidance pertaining to hand hygiene, respiratory hygiene, and cough etiquette. While Petitioners claim no one from BCRC ever spoke to them regarding COVID-19, Director Edwards credibly testified otherwise. She specifically stated that staff met with each family unit to educate residents about COVID-19, and that a translator or language service was available during those meetings.

Despite Petitioners' allegations to the contrary, BCRC has adequate space for social distancing as it is a 58,000 square foot facility with an additional outdoor recreation area of at least three acres. While BCRC can accommodate up

27

to 96 residents, it currently only houses 13 residents and each family has its own bedroom. Moreover, BCRC has instituted policies that stagger use of the communal showers and entry to the dining area to avoid families being in contact with one another. The ability to adequately social distance exists at BCRC, and it is incumbent on the residents to follow this practice.

As for cleaning and PPE, BCRC has significantly enhanced its preventive cleaning of the facility. It has also provided at least 11 hand sanitizer dispensers throughout the facility, for both residents and staff, and residents are encouraged to wash their hands. Staff are required to wear face masks and gloves at all times within the facility, and there are 12 glove stations located throughout BCRC, including in the common areas. While residents are typically only provided one disposable face mask per week, they can request and will be given a new disposable mask at any time, and they also have been given reusable masks. Again, while the record contains evidence that residents do not always practice social distancing measures or wear their masks, that is inherently by choice and not due to lack of ability.

With respect to medical care, there are over 15 full-time medical staff at BCRC and the facility has developed specific policies for placing a resident in quarantine if he or she presents symptoms of COVID-19. In addition, if a resident tests positive for the virus, he or she will be placed in medical isolation in a negative pressure room. Sick calls are available twice a day for adult residents, and are always available for child residents. The residents were given a medical examination and screened upon entry to BCRC, and medical staff takes the temperature of all residents every day prior to lunch. BCRC staff has also been screened daily since March 2020. Staff are not permitted to enter the facility if they have a fever of 100.4

or higher, or if they fail to appropriately answer any of the daily screening questions they are asked. No residents or staff have tested positive for COVID-19.

Petitioners B.L. and P.M. both testified regarding the concerns they have regarding being detained at BCRC during the COVID-19 pandemic. In particular, they expressed their fears about being in an enclosed environment, whether staff might bring the virus into the facility, and what type of care they may receive if they or their family members contract the virus. The Court does not doubt Petitioners' testimony or the fear they expressed for themselves and their families during this unprecedented time. However, these subjective concerns do not support the extraordinary remedy requested here, especially in light of the Department's ample evidence regarding BCRC's mitigation efforts. Given the facts of record, Petitioners simply have not demonstrated a clear right to an ERO.

In the alternative, Petitioners argue that if application of the ERO standard falls within the Department's discretion, the Department's failure to issue an ERO during the COVID-19 pandemic is arbitrary or based on a mistaken view of the law. Petitioners assert there is no written protocol for issuing an ERO other than Regulation 20.37 itself, and that the Department's decision not to issue an ERO here was made without sufficient information due to its deficient monitoring protocols of BCRC.

Petitioners are correct that mandamus can be appropriate, in certain circumstances, when a discretionary act is involved. "Where the action sought to be compelled is discretionary, mandamus will not lie to control that discretionary act, . . . but courts will review the exercise of the actor's discretion where it is arbitrary or fraudulently exercised or is based upon a mistaken view of the law." *Banfield v.*

29

*Cortes*, 110 A.3d 155, 175 (Pa. 2015) (quoting *Pennsylvania State Association of County Commissioners v. Commonwealth*, 681 A.2d 699, 701-02 (Pa. 1996)).

This narrow application of mandamus is not appropriate in the present case. First, the Department has exercised its discretion and this is not an instance of an agency merely "sitting on its hands" so to speak. Ms. Roman credibly testified regarding her remote inspections of the facility since March of this year, which included interviews with Director Edwards, members of the Medical Department, and Petitioners themselves. She also reviewed extensive documentation and was able to see the facility through use of the FaceTime application. Based upon these inspections, Ms. Roman concluded that the BCRC residents, including Petitioners, were not in immediate danger or harm due to COVID-19, there was no evidence that their health and safety was at risk, and there was no evidence to support an ERO. Ms. Roman relayed her findings and conclusions to her supervisors, and the Department determined that an ERO was not warranted. This is not an instance where the Department has refused to exercise its discretion, and the law is well settled that mandamus is not to be used to control the Department's discretion. *See, e.g., Banfield*; *Sinkiewicz*.

Second, the Court notes the ample evidence provided by the Department demonstrating the mitigation efforts BCRC has implemented to prevent residents from being exposed to COVID-19, as well as the facility's ability to place residents in quarantine or even medical isolation in a negative pressure room if they were to test positive. Given the uncontradicted evidence of record, the Court finds that the Department's decision that an ERO was not warranted is reasonable, and that the Department did not act arbitrarily in exercising its discretion.

30

## **Conclusion**

Petitioners have failed to prove they have a clear legal right and the Department has a mandatory duty to issue an ERO, two necessary elements for the issuance of a writ of mandamus.  Moreover, the Court finds that the Department acted reasonably in determining that an ERO was not warranted under the circumstances.  Accordingly, the Court finds in favor of the Department and against Petitioners.

_____

Michael H. Wojcik, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

C.N., B.L., and minor child B.K.L.N.;          :
J.A.R., E.G.M., and minor child J.G.;          :
M.N., P.M., and minor child H.M.N.;            :
M.C., G.S.C., and minor children              :
G.R.S.C. and N.B.T., M.E.L., E.O.E.,          :
and minor child J.O.E.,                       :
                            Petitioners        :
                                               :
                   v.                          :          No. 268 M.D. 2020
                                               :
Pennsylvania Department of                     :
Human Services,                                :
                            Respondent         :

**O R D E R**

NOW, this 7th day of July, 2020, after a non-jury trial in the above-captioned matter, the Court enters a verdict in favor of the Respondent Pennsylvania Department of Human Services and against Petitioners.

_____
Michael H. Wojcik, Judge

Certified from the Record

JUL − 7 2020

And Order Exit

**RESPONDENTS' EXHIBIT 5**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Ejder Aslanturk,            )
                         )
       Petitioner,      )
                         )
    v.                    )     Civil No. 1:20-cv-00433 (RDA-JFA)
                         )
Russell Hott, *et al.*,    )
                         )
       Respondents.   )

## ORDER

This matter comes before the Court on Petitioner Ejder Aslanturk's ("Petitioner") Motion for Temporary Restraining Order and/or Preliminary Injunction ("TRO/Preliminary Injunction Motion") (Dkt. 5). Considering Petitioner's Habeas Petition (Dkt. 1); the TRO/Preliminary Injunction Motion; Petitioner's Memorandum in Support of the TRO/Preliminary Injunction Motion (Dkt. 6) and the documents attached thereto; the Government's Memorandum in Opposition (Dkt. 7) and the documents attached thereto; and Petitioner's Reply (Dkt. 9) and the documents attached thereto; for the following reasons, it is hereby ORDERED that Petitioner's TRO/Preliminary Injunction Motion (Dkt. 5) is DENIED.

### I. BACKGROUND

#### A. Factual Background

##### i. *Petitioner's Background*

The factual background of Petitioner's circumstances is not insignificant and, in many aspects, drives the analysis of this case. Petitioner is a citizen of Turkey who on March 5, 2011, originally came to the United States on a tourist visa, which granted him permission to remain in the United States until September 4, 2011. Dkt. Nos. 7, 4; Dkt. 7-1, ¶ 5; 6-9, 2. In the years prior

to coming to the United States, and while living in Turkey, Petitioner owned a large construction company, started a "pro-peace newspaper . . . [which] publiciz[ed] the view of the Democratic Leftist Party[,]" and "ran for mayor as a Democratic Leftist Party candidate on a pro-peace platform." Dkt. 1, ¶¶ 7-10. In the year that he ran for mayor, Petitioner was required to "close his newspaper after it was shot at." *Id.* at ¶ 9.

On October 21, 2011, Petitioner was the subject of an INTERPOL Red Notice, which was triggered by the Turkish government's issuance of a warrant for Petitioner's arrest.[1] Dkt. Nos. 7, 3; 71, ¶ 9. Petitioner "is wanted in Turkey to serve a seven-year and six-month sentence pursuant to a 2007 conviction for forgery and issuing false documents." Dkt. 7-1, ¶ 9. While in Turkey, "Petitioner was convicted of filing fraudulent documents related to a construction project, which resulted in the loss of approximately $200,000 in government funds." *Id.* at ¶ 9; *see also* Dkt. 1, ¶ 12.

### ii.   *Petitioner's Immigration Proceedings*

Although his tourist visa expired on September 4, 2011, on May 4, 2012, while still within the United States, Petitioner submitted an application to the United States Citizenship and Immigration Services ("USCIS") to become a "Lawful Permanent Resident." Dkt. 7, 4. During the pendency of his application for Lawful Permanent Resident status, Petitioner also applied for an advance parole document that would grant him permission to travel internationally and return to the United States. Dkt. Nos. 7, 4; 1, ¶ 15; 7-1, ¶ 7; 6-9, 2. On September 1, 2012, the USCIS

---

[1] "'A Red Notice is a request to locate and provisionally arrest an individual pending extradition. It is issued by [Interpol's] General Secretariat at the request of a member country or an international tribunal based on a valid national arrest warrant." *Guan v. Barr*, 925 F.3d 1022, 1030 n. 2 (9th Cir. 2019) (quoting Interpol, Red Notices, https://www.interpol.int/INTERPOL-expertise/Notices/Red-Notices). "Although a Red Notice 'is not an international arrest warrant,' it 'is the closest instrument to an international arrest warrant in use today.'" *Id.*

approved Petitioner's advanced parole application. Dkt. Nos. 7, 4; 7-1, ¶ 7. Accordingly, on May 9, 2013, Petitioner "travelled abroad and presented himself after arrival from a cruise ship for admission to the United States at Key West, Florida[.]" Dkt. 7, 3. There, Petitioner was "paroled into the United States . . . to resume his application for adjustment of status." Dkt. 6-9, 2.

On July 5, 2017, the USCIS denied Petitioner's application to become a Lawful Permanent Resident because Petitioner "did not provide sufficient documents to establish that [his] arrest in Turkey was dismissed." *Id.* at 2-3. Petitioner then requested that USCIS "reopen and reconsider" its decision on his application. *Id.* at 3. On April 18, 2018, USCIS did so and requested additional evidence to establish that Petitioner's case in Turkey was dismissed, as Petitioner had claimed. *Id.* However, on December 6, 2018, USCIS ultimately denied Petitioner's application for adjustment to Lawful Permanent Resident status. Dkt. Nos. 6-9, 3; 7, 3; 7-1, ¶ 8.

On January 15, 2019, upon the direction of the United States Immigration and Customs Enforcement agency ("ICE"), Petitioner appeared at an ICE office located in Fairfax, Virginia. Dkt. Nos. 7, 3; 7-1, ¶ 10. There, he was arrested by ICE officers pursuant to an administrative arrest warrant. *Id.* Three days later, ICE officers served Petitioner with a Notice to Appear, Form I-862, which "charged Petitioner with being removable from the United States under 8 U.S.C. § 1182(7)(A)(i)(I) [INA § 212(a)(7)(A)(i)(I)] for being an 'intending immigrant but without an approved visa or other approval to being in the United States as an immigrant.'" Dkt. Nos. 6-9, 3; 7, 3. Accordingly, pending his removal proceedings, Petitioner was detained at the Caroline Detention Facility in Bowling Green, Virginia, where he still remains. Dkt. Nos. 7, 3; 7-1, ¶ 11.

On February 27, 2019, Petitioner appeared before the Arlington Immigration Court in Arlington, Virginia ("Immigration Court"). Dkt. 7, 3. Petitioner was represented by counsel and through counsel, he conceded his removability and again applied for the adjustment of his status

to Lawful Permanent Resident, which included "an application to waive any criminal grounds of inadmissibility." *Id.* The Immigration Court then set the matter for a hearing on March 26, 2019, regarding Petitioner's application for the adjustment of his status. *Id.*; 7-1, ¶ 13. Accordingly, Petitioner again appeared before the Immigration Court on March 26, 2019, for such a hearing. Dkt. Nos. 7, 3-4; 7-1, ¶ 14.

Following the hearing, on May 8, 2019, the Immigration Court denied Petitioner's application for the adjustment of his status to Lawful Permanent Resident. Dkt. Nos. 6-9, 3; 7, 4; Dkt. 7-1, ¶ 15. The Immigration Court also set the matter for a hearing on Petitioner's applications for asylum, withholding, and protection under the Convention Against Torture. Dkt. Nos. 6-9, 20; 7-1, ¶ 15.

On May 21, 2019, Petitioner appeared with counsel before the Immigration Court for his first hearing concerning his applications for asylum, withholding, and protection under the Convention Against Torture. Dkt. 7-1, ¶ 16. That day, the hearing adjudicating Petitioner's applications under the Convention Against Torture commenced, but the matter was continued due to the amount of time that the proceedings required. *Id.* On July 16, 2019, that court continued to hear the merits of the proceedings. *Id.* at ¶ 18. The remainder of the evidence was heard that day, and the Immigration Court took the matter under advisement to issue a written decision. *Id.*

On October 25, 2019, the Immigration Court issued its written decision, which denied Petitioner's applications for removal and deferral. Dkt. 6-10, 4. The Immigration Court further ordered that Petitioner's "application for asylum shall be deemed frivolous, and [that Petitioner] shall be permanently ineligible for any future benefits under the INA, pursuant to INA § 208(d)(6) and 8 C.F.R. § 1208.20." Dkt. 6-10, 4, 20. The Immigration Court further ordered that Petitioner be removed to Turkey. *Id.* at 20.

4

On November 22, 2019, Petitioner appealed the findings of the Immigration Court to the Board of Immigration Appeals ("BIA"). Dkt. Nos. 1, ¶ 21; 7, 4. The BIA issued a briefing schedule requiring both parties to file their briefs on February 4, 2020. Dkt. 7, 4. The parties did so. *Id.* The appeal before the BIA remains pending. *Id.*; Dkt. 1, ¶ 21.

Since Petitioner's removal proceedings have been pending, he has twice requested that ICE release him from immigration custody on parole – first on January 25, 2019, and a second time on April 2, 2020. Dkt. 7, 4. Both requests were denied. *Id.*

After Petitioner submitted to ICE his April 2, 2020, request for release, on April 4, 2020, ICE ordered all its filed offices "to identify detainees at a higher risk for complications from COVID-19 and to consider whether continued detention remained appropriate." *Id.* at 5. Petitioner was so identified. *Id.* Accordingly, ICE considered not only Petitioner's parole request, but also "performed the required reassessment of Petitioner's custody status as required by the agency's April 4, [2020,] order, taking the COVID-19 pandemic and Petitioner's medical history into account as [ ] factor[s] in those considerations." *Id.* ICE apparently also considered that "Petitioner is wanted by another sovereign nation to serve a significant criminal sentence and that the Immigration [Court] concluded that Petitioner lied to the court." *Id.* Taking these considerations into account, on April 17, 2020, ICE denied Petitioner's April 2, 2020, request for release.

### iii. COVID-19

According to the Centers for Disease Control and Prevention ("CDC"), "Coronavirus (COVID-19) is an illness caused by a virus that can spread from person to person." One "can become infected from respiratory droplets when an infected person coughs, sneezes, or talks." People "may also be able to [contract the virus] by touching a surface or object that has the virus

on it, and then by touching [their] mouth, nose, or eyes." Because at present, there is no vaccine to protect against COVID-19, the CDC advises that the "best way to protect [one]self is to avoid being exposed to the virus that causes COVID-19." The CDC further counsels that good preventative measures include (1) avoiding close contact with others; (2) wearing a face mask; (3) cleaning and disinfecting frequently touched surfaces; and (4) frequent hand washing with soap and water for a minimum of 20 seconds. The CDC has also indicated that while everyone is at risk of contracting the virus, "[o]lder adults and people of any age who have serious underlying medical conditions may be a higher risk for more severe illness."

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. Jaime Ducharme, *World Health Organization Declares COVID-19 a 'Pandemic.' Here's What That Means*, TIME MAGAZINE, Mar. 11, 2020, https://time.com/5791661/who-coronavirus-pandemic-declaration/, (last visited May 5, 2020).

"Since the onset of reports of . . . COVID-19 . . ., ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees." Dkt. 7-2. On January 22, 2020, the ICE Health Services Corps ("IHSCS"), who provides "direct medical, dental, and mental health patient care" to ICE detainees, first began providing guidance to its field staff. *Id.* at ¶ 7. IHSCS continues to update such staff with "guidance to remain consistent with CDC guidelines." *Id.*

There is no question that this Pandemic has presented health challenges throughout the world. Along with these international health challenges, the challenges facing those deemed most vulnerable in our institutions have created compelling questions of both constitutional and humanistic dimension.

6

Turning to the specifics of Petitioner's circumstances, the record indicates that the Caroline Detention Facility, where Petitioner is currently being held, is presently operating at approximately 60% capacity. *Dkt. 7-2*, ¶¶ 3, 4. The Caroline Detention Facility has medical staff on site seven days each week between the hours of 5:00 a.m. and 11:30 p.m., and a physician is on call seven days of the week, 24 hours of the day. *Id.* at ¶ 5. "Detainees have access to [a] sick call daily and 24/7 access to Urgent Care." *Id.*

Since the COVID-19 outbreak, medical staff at the Caroline Detention Facility have "regularly" communicated with the Rappahannock Area Health District of the Virginia Department of Health, which is the health district in which the Caroline Detention Facility is located, concerning "screening and response measures." *Id.* at ¶ 9. The Virginia Department of Health has also made COVID-19 testing kits available to the Caroline Detention Facility "as the need arises." *Id.*

In response to the COVID-19 outbreak, the Caroline Detention Facility has also provided detainees with disinfectants to "clean their living areas, and with soap to promote frequent hand-hygiene." *Id.* at ¶ 10. The detention facility has also "increased the cleaning and disinfecting of communal spaces" such as the kitchen, communal bathrooms, and phone booths. *Id.* Professional visits have been limited to "noncontact" and social visitations have been suspended. *Id.* at ¶ 11. Upon their entrance into the detention facility, staff members are screened for symptoms, exposure, and travel. *Id.* at ¶ 12. Those staff members whose temperature exceeds 100.3 degrees Fahrenheit are denied entrance. *Id.* Staff members are required to wear masks while in the detention facility, *id.*, and as of April 23, 2020, all detainees have been provided with and are encouraged to wear masks any time they leave their cell. *Id.* at ¶ 14.

Detainees have received COVID-19 prevention education both orally and in writing. *Id.* They have been encouraged to "socially distance themselves from one another, regularly wash their hands, and not touch their faces." *Id.* at ¶ 16. All incoming detainees are "cohorted or isolated during their first 14 days of arrival. Cohorting is an infection-prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic." *Id.* at ¶ 17.

On April 28, 2020, IHSCS reported that four detainees at the Caroline Detention Facility had been suspected of having COVID-19. *Id* at ¶ 20. Ultimately, two of the detainees tested positive for the COVID-19 virus and two of the suspected individuals tested negative. *Id.* Petitioner was housed in the same four-person cell as an individual who was suspected of being infected with the virus. *Id.* However, that individual tested negative for the COVID-19 virus. *Id.* When the person in Petitioner's cell was suspected of having contracted the virus, each of the individuals in that cell were "moved into a single cell" and were placed on cohort status. *Id.* The detainees who tested positive were immediately isolated upon their entrance to the facility and have continued to remain isolated. *Id.* Pursuant to ICE's screening and intake protocols, it appears that "none of the detainees in the general population have been exposed to the detainees who were tested positive." Dkt. 7,7.

### B. Procedural Background

On April 20, 2020, Petitioner filed this action styled as a Habeas Petition in this Court. Petitioner's Habeas Petition raised the following four claims. Dkt. 1. First, that the length of his detention without a bond hearing violated his due process rights under the Fifth Amendment to the United States Constitution ("Claim One"). *Id*, at ¶¶ 57- 68. Second, that Respondents are violating Petitioner's substantive due process rights under the Fifth Amendment because Respondents are

8

housing Petitioner in "life-threatening conditions that do not adequately protect [Petitioner] from COVID-19" ("Claim Two"). *Id.* at ¶¶ 70-71. Petitioner claims that these conditions "lack a reasonable relationship to any legitimate governmental purpose and are excessive in relation to the purpose of confinement . . . ." *Id.* at ¶ 72. Third, Petitioner maintains that Respondents have also violated his substantive due process rights under the Fifth Amendment because they have submitted him to punitive conditions of confinement and acted with deliberate indifference to his health and safety ("Claim Three"). *Id.* at ¶¶ 73-76. Fourth and finally, Petitioner posits that Respondents have violated the Rehabilitation Act because they have failed to reasonably accommodate Petitioner's "disabilities" and have discriminated against Petitioner because of such disabilities ("Claim Four"). *Id.* at ¶¶ 77-84. Petitioner in his Habeas Petition requests that this Court (1) order his immediate release; (2) order "the government to provide him with a prompt hearing before an immigration judge;" (3) award Petitioner reasonable costs and attorney's fees; and (4) grant any other relief that the Court deems just and proper. Dkt. 1, 23.

Then, on April 24, 2020, Petitioner filed his TRO/Preliminary Injunction Motion requesting that this Court grant Petitioner immediate release from ICE custody at the Caroline Detention Facility. Dkt. Nos. 1; 5. On April 28, 2020, Respondents filed their Memorandum in Opposition. Dkt. 7. On April 29, 2020, Petitioner filed his brief in reply. Dkt. 9. This matter is fully briefed and is now ripe for disposition. In light of this Court's General Order 2020-12, Local Civil Rule 13(J), and Fed. R. Civ. P. 78, this Court finds that an oral hearing would not aid in the decisional process and the Court will rule upon the TRO/Preliminary Injunction Motion without such a hearing.

## II. STANDARD OF REVIEW

"A preliminary injunction [or TRO] is 'an extraordinary remedy that may only be awarded upon a clear showing that the [the petitioner] is entitled to relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Prop. LP.*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)). For a petitioner to demonstrate that he deserves such relief, he "must establish that: (1) [he] is likely to succeed on the merits; (2) [he] is likely to suffer irreparable harm without the preliminary injunction [or TRO]; (3) the balance of the equities tips in its favor; and (4) the injunction [or TRO] is in the public interest." *Winter*, 555 U.S. at 20. "The failure to show any one of the relevant factors mandates denial of the preliminary injunction [or TRO]." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016) (citation omitted).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

This Court finds that Petitioner has not met his burden of clearly showing that he is likely to succeed on the merits of his claims. Petitioner has not done so (1) because two out of the three claims he raises in support of his TRO/Preliminary Injunction Motion are not cognizable under 28 U.S.C. § 2241; and (2) because Petitioner's claims appear to fail substantively.[2] Therefore, this Court must deny Petitioner's request for a preliminary injunction or a temporary restraining order.

---

[2] The Court recognizes that Petitioner's Habeas Petition raises a total of four claims. However, while Petitioner's claim that Respondents have violated the Rehabilitation Act appears in his Habeas Petition, Petitioner does not raise this claim as a ground for injunctive relief in his TRO/Preliminary Injunction Motion, which is presently before the Court. Accordingly, the Court will not address this allegation concerning the Rehabilitation Act in its determination on whether to grant the requested preliminary injunction or temporary restraining order.

### 1. Petitioner's Claims Under § 2241 Are Unlikely to Succeed

It bears repeating that "a preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (citing *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981). In the instant matter, Petitioner's TRO/Preliminary Injunction Motion requests that he be immediately released. Dkt. 5. However, claims challenging the conditions under which a detainee is confined, are not properly raised through a petition for habeas corpus.

The Supreme Court of the United States has indicated that "[f]ederal law opens two main avenues of relief on complaints related to imprisonment: a petition for habeas corpus . . . and a complaint under the Civil Rights Act . . . ." *Hill v. McDonough*, 547 U.S. 573, 579 (2006) (internal citations omitted). The Supreme Court has opined that "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Id.* (internal citations omitted). Conversely, claims raising "the circumstances of confinement" may be pursued under 42 U.S.C. § 1983. *Id.*

The United States Court of Appeals for the Fourth Circuit has recently noted that the Supreme Court has found that "habeas petitions are traditionally brought to challenge 'the very fact or duration of [ ] physical imprisonment . . . .'" *Wilborn v. Mansukhani*, 795 Fed. App'x. 157, 163 (4th Cir. 2019) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)). Nevertheless, the Fourth Circuit has also indicated that the Supreme Court has yet left open the question of "whether a claim that unquestionably falls outside of the 'core' of habeas can nonetheless be brought in a habeas petition." *Wilborn*, 795 Fed. Appx. at 163.

11

There presently exists a circuit split on this question. "Seven of the ten circuits that have addressed the issue in a published decision have concluded that claims challenging the conditions of confinement cannot be brought in a habeas petition." *Id.* (comparing *Nettles v. Grounds*, 830 F.3d 922, 933–34 (9th Cir. 2016) (adopting the view post-*Preiser* that conditions-of-confinement claims, which fall outside "the core of habeas corpus," must be brought in a civil rights claim rather than in a habeas petition), *Spencer v. Haynes*, 774 F.3d 467, 469–70 (8th Cir. 2014) (same), *Cardona v. Bledsoe*, 681 F.3d 533, 537 (3d Cir. 2012) (same), *Davis v. Fechtel*, 150 F.3d 486, 490 (5th Cir. 1998) (same), *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811–12 (10th Cir. 1997) (same), *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991) (same), and *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (same), with *Aamer v. Obama*, 742 F.3d 1023, 1036 (D.C. Cir. 2014) (holding that prisoners can challenge the form of detention under habeas), *Jiminian v. Nash*, 245 F.3d 144, 146–47 (2d Cir. 2001) (allowing prisoners to challenge "prison disciplinary actions, prison transfers, type of detention and prison conditions" as "challenges [to] the execution of a federal prisoner's sentence" under § 2241), and *Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1977) (holding conditions-of-confinement claims are cognizable under § 2241)).

The Fourth Circuit has not yet issued a published decision "relying on *Preiser* to hold that conditions-of-confinement claims are not cognizable in habeas proceedings." *Wilborn*, 795 Fed. App'x. at 163. Yet, the Fourth Circuit, in an unpublished opinion, *Wilborn v. Mansukhani*, has addressed the issue of whether claims that "unquestionably fall[ ] outside of the 'core' of habeas can nonetheless be brought in a habeas petition." 795 Fed. App'x. 157, 163 (4th Cir. 2019). In *Wilborn*, the Fourth Circuit commented, as it had on a previous occasion, that "'courts have generally held that a § 1983 suit or a *Bivens* action is the appropriate means of challenging conditions of confinement, whereas § 2241 petitions are not.'" *Id.* (quoting *Rodriquez v. Ratledge*,

12

715 F. App'x 261, 265-66 (4th Cir. 2017)). The *Wilborn* court, ultimately concluded that claims attacking the conditions of confinement go beyond the scope of habeas corpus and should be challenged as a civil rights action. 795 Fed. App'x. at 163.

This Court now, as it has in a prior opinion, "agrees with the weight of published authority and the Fourth Circuit's unpublished decisions, which hold that § 2241 is an improper vehicle for such a challenge." *Toure, et al. v. Hott, et al.*, No. 1:20-cv-395, Dkt. 33, 12. Thus, with these principles in mind, the Court finds that Claim One of Petitioner's Habeas Petition is cognizable under § 2241. Claims Two and Three are not.

On April 20, 2020, Petitioner filed his Habeas Petition, pursuant to 28 U.S.C. § 2241, which set forth the following claims.[3] Dkt. 1. First, Petitioner argues that his Fifth Amendment procedural due process rights have been violated because of the length of his detention without a bond hearing. *Id.* at ¶¶ 57-68. Second, Petitioner maintains that his Fifth Amendment substantive due process rights have been violated because the conditions under which he is detained constitute "punitive conditions of confinement[,]" which "lack a reasonable relationship to any legitimate governmental purpose[.]" *Id.* at ¶¶ 69-72. Third, Petitioner believes that Respondents have violated his substantive due process rights under the Fifth Amendment because Respondents have acted with "deliberate indifference" to Petitioner's health and safety by "subjecting [Petitioner] to a high risk of contracting COVID-19[.]" *Id.* at ¶¶ 73-76.

Respondents argue that Petitioner has not clearly shown that he will likely be successful on the merits of his claims because Petitioner is using § 2241 as a means to challenge the "conditions of his detention" and not the legality of Petitioner's confinement itself. Dkt. 7, 11-14.

---

[3] For the reasons set forth above (*supra*, p. 10, n. 2), this Court will not address Petitioner's likelihood of success on Claim Four, which alleges that Respondents violated the Rehabilitation Act.

Said otherwise, it is Respondents' position that § 2241 is not the appropriate vehicle by which Petitioner may challenge the conditions of confinement. *Id.*

However, the Court finds that as an initial matter, only Claims Two and Three attack the conditions under which Petitioner is detained. *See* Dkt. 1, ¶ 71 (Petitioner's second cause of action claim that Respondents are "housing [Petitioner] in life-threatening conditions that do not adequately protect him from COVID-19"); *id.* at ¶ 73-76 (Petitioner's third cause of action alleges that Respondents, by detaining Petitioner, are subjecting Petitioner to "punitive conditions of confinement"). Conversely, Petitioner, in his first cause of action, claims that the length of his detention without a bond hearing is unconstitutional. *See id.* at ¶ 58 ("[Petitioner's] prolonged detention without a bond hearing violates the Due Process clause of the Fifth Amendment. The Due Process clause requires a bond hearing when immigration detention becomes unreasonably prolonged.").

Therefore, the Court finds that Claims Two and Three, which challenge the conditions of Petitioner's confinement, are not cognizable under § 2241. Given that these claims are not cognizable as habeas petitions, Petitioner is unlikely to be successful on the merits, and the relief he seeks is unavailable to him.

However, while habeas petitions are not the appropriate vehicle to challenge conditions of confinement, they are appropriate to challenge the duration of detention. The Supreme Court has held that where a prisoner is "challenging the very fact or duration of his physical imprisonment and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser*, 411 U.S. at 484. Petitioner's first claim, attacking the length of his detention and requesting release, is such a claim. Dkt. 1, ¶¶ 57-68, p. 23. Therefore, this Court finds that a § 2241 is the proper

vehicle by which Petitioner could challenge such a claim. Yet, even though § 2241 may be such an appropriate vehicle, the Court is constrained to deny the relief which Petitioner requests for the reasons that follow (*infra*, p. 15-18).

### 2. *Petitioner's Substantive Claims Are Unlikely to Succeed on the Merits*

For the following reasons, this Court finds that the merits of Petitioner's claims are likely to prove unsuccessful.

### a. Claim One

Although this Court has concluded that § 2241 may be a proper vehicle by which Petitioner may challenge the duration of his detention, the Court finds that Petitioner is unlikely to succeed on the merits of Claim One, given his status as an arriving alien. In his first claim, Petitioner, a self-described "arriving alien," contends that the length of his detention without a bond hearing violates his procedural due process rights. Dkt. 1, ¶¶ 16, 57-68. In relevant part, the designation "arriving alien" is defined as:

> an applicant for admission coming or attempting to come into the United States at a port-of-entry . . . whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of this Act . . . and even after any such parole is terminated or revoked.

8 C.F.R. § 1.2. "Section 212(d)(5) authorizes the Attorney General to parole into the United States temporarily aliens who arrive at the border seeking detention." *Joshi v. Dist. Director, I.N.S.*, 720 F.2d 799, 803 (4th Cir. 1983). Petitioner indicates that he was so "paroled back into [this] country on May 9, 2013." Dkt. 1, ¶ 16, 6 n. 1.

The Fourth Circuit has noted that "[a]lthough a paroled alien is physically present in the United States, he is characterized as stopped at the gates." *Joshi*, 720 F.2d at 803 (citing *Kaplan v. Tod*, 267 U.S. 228, 230 (1925)). Petitioner's designation as an arriving alien who has been

paroled pursuant to 8 C.F.R. § 212(d)(5), and effectively "stopped at the gates" is significant because under Supreme Court precedent, the rights afforded to those who have effectively been "stopped at the gates" of the United States differ from "aliens who have once passed through our gates, even illegally . . . ." *Shaughnessy v. United States, ex rel. Mezei*, 346 U.S. 206, 212 (1953). While aliens who have "passed through our gates" are entitled to "proceedings conforming to traditional standards of fairness encompassed in due process of law[,]" "an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Shaughnessy*, 346 U.S. at 212 (citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)); *see also Hong v. United States*, 244 F. Supp. 2d 627, 634 (E.D. Va. 2003) ("[A]liens on the threshold of initial entry are entitled only to the procedure authorized by Congress . . . .").

It is undisputed that Petitioner is presently detained pursuant to 8 U.S.C. § 1225(b), which governs the expedited removal of inadmissible arriving aliens. Petitioner concedes that he is. In *Jennings v. Rodriguez*, the Supreme Court considered the question of whether 8 U.S.C. §§ 1225(b)(1) and (b)(2) impose a "6-month limit on the length of detention," and if once that period has elapsed, "aliens previously detained under those provisions" are entitled to bond hearings in "certain circumstances." 138 S.Ct. 830, 842-43 (2018). In considering these arguments, the Court commented that "[8 U.S.C.] § 1225 applies to aliens seeking entry into the United States," and when "[r]ead most naturally . . . mandate[s] detention of applicants for admission until certain proceedings have concluded." *Jennings v. Rodriguez*, 138 S.Ct. 830, 842 (2018). "Once those proceedings end, detention under § 1225(b) must end as well. Until that point, however, nothing in the statutory text imposes any limit on the length of detention. And . . . § 1225(b)(2) says

[no]thing whatsoever about bond hearings." *Id.* Ultimately, the *Jennings* Court rejected the argument that § 1225(b)(2) "can be construed to contain implicit limitations on the length of detention," noting that such a construction of the statute is not "plausible." *Id.*

In applying this standard to the case at bar, two concepts are clear. First, it is abundantly clear that the due process rights afforded to Petitioner as an arriving alien are not those of the "traditional standards of fairness encompassed in due process of law[,]" but rather, Petitioner's due process rights flow from those prescribed by Congress. *Shaughnessy*, 346 U.S. at 212. Second, that Petitioner, who is detained pursuant to § 1225(b)(2), must "be detained until such bond proceedings have concluded." *Jennings*, 138 S.Ct. at 842. Because Petitioner is currently appealing to the BIA the Immigration Court's determination that he be removed, Petitioner's removal proceedings are still pending. Accordingly, since Petitioner's proceedings are still pending due to his appeal, this Court could not order that he be released. This is because § 1225(b)(2) does not "contain implicit limitations on the length of detention." *Id.*

Alternatively, Petitioner argues that he should not remain detained because "perhaps unlike some recent clandestine entrants[,]" "he is not an outlaw whom the government found lurking in the shadows." Dkt. 9, 5. The Court will not ignore binding, Supreme Court precedent in favor of this argument.

Additionally, Petitioner cites to *Bah v. Barr*, 409 F. Supp. 3d 464, 472 (E.D. Va. 2019), and *Portillo v. Hott*, 322 F. Supp. 3d 698, 708-09 (E.D. Va. 2018), where this Court ordered that the petitioners receive a bond hearing before an immigration judge.

However, Petitioner's reliance on these cases is misplaced. In neither *Bah* nor *Portillo*, were the petitioners detained as arriving aliens pursuant to § 1225(b), as Petitioner is here. In both *Bah* and *Portillo*, this Court found that the petitioners were detained pursuant to § 1226. This fact

17

played a key role in the Court's determinations that those petitioners' lengthy detentions warranted bond hearings. *See Bah*, 409 F. Supp. 3d at 472 (noting that the dispute between the parties over which statute applied was not "inconsequential" because if "§ 1226 applie[d], the[n the] path to a bond hearing is quite clear. For it is well-established that aliens detained under § 1226 must receive bond hearings if their lengthy detentions violate Due Process," whereas that principle was not necessarily true under another statue); *Portillo*, 322 F. Supp. at 701 (commenting that it was "important" that the petitioner was detained pursuant § 1226 because "§ 1226 generally provides for bond hearings with the caveat that § 1226(c) requires the detention of certain 'criminal aliens'"). Because this case concerns an individual who has been designated as an arriving alien and detained pursuant to § 1225(b), this Court finds *Bah* and *Portillo* to be inapplicable.

For these reasons, this Court finds that Petitioner has failed to meet his burden of clearly establishing that he would be likely to succeed on Claim One.

### b. Claim Two

Petitioner's second claim is that Respondents have subjected him to "unlawful punishment" in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution because they are housing Petitioner "in life-threating conditions that do not adequately protect Petitioner from COVID-19." Dkt. 1 at ¶¶ 69-72. Petitioner further alleges that such "conditions of confinement lack a reasonable relationship to any legitimate governmental purpose and are excessive in relation to the purpose of confinement . . . ." *Id.* at ¶ 72.

Assuming for purposes of this analysis, that Congress has indeed decided to extend Petitioner due process rights commensurate with the Fifth Amendment under *Shaughnessy*, 346 U.S. at 212, this Court finds that Petitioner's second claim still fails because it cannot be said that

Petitioner is being punished as his detention is reasonably related to a legitimate government objective.

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, "a detained may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (citations omitted). Accordingly, the Supreme Court has indicated that "[i]n evaluating the constitutionality or conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law," courts are to inquire as to "whether those conditions amount to punishment of the detainee." *Id.* at 535.

The Fourth Circuit has held that

> [T]o prevail on a substantive due process claim, a pretrial detainee must show unconstitutional punishment by proving that the challenged conditions were either "(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred."

*Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018) (finding that a pretrial detainee's "detention in solitary confinement for three-and-a-half years was punitive, and thus unconstitutional") (quoting *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 251 (4th Cir. 2005)). However, where "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Wolfish*, 441 U.S. at 539.

In the case at hand, Petitioner does not contend that Respondents have imposed upon Petitioner conditions of detention with "an expressed intent to punish" him. Instead, Petitioner alleges that the conditions of his detention are "not reasonably related to a legitimate nonpunitive governmental objective." Dkt. Nos. 1, ¶ 72; 6, 13. Accordingly, this Court will "evaluate the

evidence and ascertain the relationship between the actions taken against the detainee and the custodian's supporting rationale. That inquiry turns on whether the actions taken may be attributed to an alternative, nonpunitive rationale, and whether they appear 'excessive in relation to the alternative purpose assigned.'" *Williamson*, 912 F.3d at 178 (internal citation omitted) (quoting *Robles v. Prince George's Cty. Maryland*, 302 F.3d 262, 269 (4th Cir. 2002)). It is not this Court's role to determine "how best to operate a detention facility." *Wolfish*, 441 U.S. at 539. Rather, this Court is to "be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact . . . ." *Id.*

On the one hand, Petitioner argues because he has "several underlying health conditions," inclusive of "coronary atherosclerosis, high blood pressure, diabetes, obesity, post-traumatic ankle arthritis, and extensive dental implants leading to frequent infections," and he is 69-years-old, Petitioner is "especially susceptible to serious illness, disability[,] and death if he contracts COVID-19[;]" a novel disease which Petitioner hypothesizes his detention facility "is not equipped to take adequate measures that would prevent Petitioner from contracting[.]" Dkt. Nos. 6, 13; 1, ¶ 23.

On the other hand, Respondents attempt to rebut Petitioner's argument by urging that they have an interest in "preventing Petitioner from absconding and protecting the public." Dkt. 7, 19. Respondents contend that this interest is only "heightened by the fact that Petitioner presents an extraordinary flight risk, is wanted for a criminal conviction in another country, and was found not credible by the Immigration Court in his requests for relief." *Id.* Moreover, Respondents aver, that "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely

populated resident may be subject to outbreaks." *Id.* at 18 (citing *Shepard v. Dallas Cnty.*, 591 F.3d 445, 454 (5th Cir. 2009).

"[P]reventing detained aliens from absconding and ensuring that they appear for removal proceedings is a legitimate governmental objective." *Dawson v. Asher*, No. C20-0409, 2020 WL 1304557, at \*2 (W.D. Wash. Mar. 19, 2020) (citing *Jennings*, 138 S.Ct. at 836 (2018); *Denmore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001)).  This Court finds that continuing to detain Petitioner is reasonably related to the legitimate government interest of preventing Petitioner from absconding and ensuring his appearance for his removal proceedings. Thus, a reasonable relation for the confinement exists, and "does not, without more, amount to 'punishment.'" *Wolfish*, 441 U.S. at 539.

Further, similarly to the Western District of Washington, this Court is unaware of any binding precedent which indicates that "the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak – even one as serious as COVID-19." *Dawson*, 2020 WL 1304557, at \*2.  Nor does Petitioner cite to any such authority. Accordingly, Petitioner's continued detention may be said to be reasonably related to a legitimate, nonpunitive, Governmental objective.  "To adopt Petitioner['s] position would be to hold that the detention of any high-risk immigration detainee during the pandemic is necessarily unconstitutional," and this Court, like the United States District Court for the District of Maryland is not presently prepared to adopt that view.  *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at \*12 (D. Md. Apr. 3, 2020).

21

Moreover, although Petitioner argues that the Caroline Detention Facility is not suited to prevent Petitioner from contracting COVID-19,[4] the record contains an abundance of evidence that it is in fact equipped with adequate measures to do so. Based on the Declaration of Lieutenant Stephanie Mros, MPH, BSN, RN, CCHP, the Assistant Health Services Administrator at the Caroline Detention Facility, the Caroline Detention facility has, amongst other preventative procedures, increased sanitation measures, implemented quarantine procedures, and limited the amount of foot traffic; provided detainees with masks, informed detainees of the appropriate measures for virus prevention; and utilized both internal and external resources to diagnose and deal with cases of COVID-19.  Dkt. 7-2. A fact that cannot be ignored is that the Caroline Detention Facility recently had two detainees who contracted the virus, however, the detention facility successfully isolated those individuals and both of the individuals who tested positive are in stable condition. Dkt. 7-2, ¶ 20.  In sum, this Court finds that the Caroline Detention Facility is, as it has attested to through its first responders, working "24/7" to take both proactive and reactive steps to ensure the safety of both the individuals who work in the facility and those who are detained. *See generally* Dkt. 7-2.  This Court finds that at this juncture, these steps appear to have been effective, especially in light of the fact that at present, there are still no more than two

---

[4] In support of this position that the conditions at the Caroline Detention Facility, where Petitioner is being held, are "life-threatening," and thereby inadequate, Petitioner's counsel has submitted to the Court two affidavits from Dr. Luke A. Stevens. Dkt. Nos. 6-3; 9-1. It appears to the Court that Dr. Stevens, is the brother of Petitioner's counsel, Mark Alastair Stevens; works as an Emergency Physician in the Emergency Department at Signature Healthcare Brockton Hospital in Brockton, Massachusetts; and has based his affidavits on hearsay. *See* Dkt. 6-3, ¶ 2 (indicating that in assessing Petitioner's risk of exposure to COVID-19 he reviewed Petitioner's own affidavit, Petitioner's medical records, and the "complaint" filed in this case). While "[a]n affidavit in support of a temporary restraining order can be based on hearsay . . . . the fact that the affidavit is based on hearsay is a factor in determining the weight of the affidavit." *H.J. Meyers & Co. v. Euripides*, 2:96cv172, 1996 U.S. Dist. Lexis 17217, at *7 (E.D. Va. Mar. 18, 1996).  In light of these facts, the Court certainly notes, and has taken into account, the weight that should be afforded to Dr. Stevens's testimony.

confirmed cases at the Caroline Detention Facility. *See* U.S. Immigration and Customs Enforcement, ICE Guidance on COVID-19: Confirmed Cases, https://www.ice.gov/coronavirus (last visited May 5, 2020) (indicating that there are still only two diagnosed cases of COVID-19 at the Caroline Detention Facility).

Significantly, Petitioner has provided inapposite authority in support of his position. Petitioner has cited to *Thakker v. Doll*, 1:20-cv-480, Dkt. 47 (E.D. Pa. Mar. 31, 2020), a case out of the Eastern District of Pennsylvania, in which the Court "relied in part on the fact that the facilities had significant overcrowding and unsanitary conditions including the presence of rats." *See Coreas*, 2020 WL 1663133, at *12 (discussing *Thacker v. Doll*, 1:20-cv-480, Dkt. 47 at 14, 20-21 (E.D. Pa. Mar. 31, 2020). The Caroline Detention Facility is not confronted by these conditions in that it has heightened its levels of cleanliness, encouraged individuals to wear masks, and targeted contaminated surfaces. The Caroline Detention Facility is also operating at 60% capacity and thus cannot reasonably be said to be overcrowded. Thus, Petitioner's reliance on *Thakker* is misplaced.

Petitioner also analogizes this case to *Zadvydas v. Davis*, 533 U.S. 678 (2001) noting that "the Supreme Court explained that [ ] '[t]here is no sufficiently strong special justification . . . for indefinite civil detention." Dkt. 6, 13 (citing *Zadvydas*, 533 U.S. at 690). Petitioner advances *Zadvydas*, to argue the point that "[i]f the government's interest cannot justify indefinite detention, it also cannot justify the similarly 'potentially permanent' medical harm and death that [Petitioner] could well face." Dkt. 6, 14. Yet, the *Zadvydas*, case is not analogous to the case at bar in this respect. In *Zadvydas*, the Supreme Court considered the injury of indefinite civil detention which ensued as a result of statutory authority. *See Zadvydas*, 533 U.S. at 690. That specific injury, though potentially permanent, commenced when an individual was detained. *Id*. Yet, here, the potentially permanent injury, which Petitioner raises here is speculative given that Petitioner will

23

only be injured in the manner he raises should he be first exposed to the virus, then also contract the virus, and then also develop severe symptoms.

Therefore, this Court finds that Petitioner has not met his burden of showing a likelihood of success with respect to his claim that his confinement is an unlawful punishment.

### c.   Claim Three

Petitioner  also has not shown a likelihood of success on his claim that Respondents have been deliberately indifferent by "subjecting [Petitioner] to a high risk of contracting COVID-19 in disregard of the threat that this [virus] poses to his health and safety." Dkt. 1, ¶ 76.  Petitioner maintains that such actions are in violation of his substantive due process rights under the Fifth Amendment to the United States Constitution. *Id.* at ¶ 74.  Again, for purposes of this analysis, the Court will assume that Congress has afforded Petitioner due process rights equal in scope to that of the Fifth Amendment. However, even assuming *arguendo*, the Court is constrained to find that Petitioner's point fails.

The Supreme Court has opined that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes . . . a corresponding duty to assume some responsibility for his safety and general wellbeing." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*, 489 U.S. 189, 199-200 (1989) (citing *Younberg v. Romero*, 457 U.S. 307, 317 (1982)).  The rationale behind this principle is that

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200 (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Youngberg*, 457 U.S. at 315-16 (1982)).  Accordingly, "[i]n [a] substantive due process analysis, it is the State's

24

affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." *DeShaney*, 489 U.S. at 200.

Individuals in civil detention "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 at 321-22. Pursuant to the Eighth Amendment, detainees are protected from "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 103 (citations omitted). Thus, the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). As such, the Fourth Circuit has determined that "a pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs'" under the Eighth Amendment. *Martin v. Gentile*, 849 F.2d 863, 871 (1988).

A petitioner may sustain a deliberate indifference claim against a prison official where such officials are "maintaining inhumane conditions of confinement or [are] failing to render medical assistance." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). The alleged deprivation must be "sufficiently serious" and prison officials must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 937 (1994) (internal citations and quotation marks omitted). While the determination of the severity of the medical need implicates an objective inquiry, whether the prison personnel knew of and disregarded the risk to the detainee's health and safety is subjective. *Iko v. Shreve*, 525 F.3d 223, 241 (4th Cir. 2008).

To be sure, to establish deliberate indifference, Petitioner must meet "a very high standard[,]" *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999), for the standard is "higher [ ] for culpability than mere negligence or even civil recklessness[,]" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). In the context of medical care, a petitioner as established deliberate indifference where he shows that the treatment he receives, or lack thereof, is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Roger v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Therefore, even in instances where "prison officials [] actually knew of a substantial risk to inmate health or safety" and that particular harm ultimately occurs, the officials "may be found free from liability if they responded reasonably to the risk." *Farmer*, 511 U.S. at 844. "[O]fficials who act reasonably cannot be found liable[.]" *Id.* at 845.

This Court finds that Respondents have not been deliberately indifferent to Petitioner's medical needs. To the contrary, in these most trying times, the Respondents have been responsive, thorough, proactive, and humane in their reaction to the challenges presented by COVID-19. The Court recognizes that the rapid spread of COVID-19 has posed serious challenges for our national and global community. The need for social distancing in response to the COVID-19 pandemic has presented challenges particularly for most, if not all, of the detention facilities across our country. The Court has considered the affidavits presented to the Court by both the Petitioner and the Respondents. In considering the points raised by the parties, the Court cannot conclude that Petitioner's due process rights have been violated as a result of deliberate indifference when the record clearly establishes that Respondents have been anything but that.

Based on the record, it is not likely that Petitioner can establish that Respondents "kn[e]w[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 834, 937

26

(internal citations and quotation marks omitted). Examples of the actions taken by personnel at the Caroline Detention Facility, where Petitioner is detained include that staff have provided detainees with disinfectants and masks; promoted frequent hand-hygiene; increased cleaning and disinfecting of communal spaces; suspended in-person social visitation and implemented "video visitation;" limited "professional visits to "non-contact" encounters; continually screen staff and vendors when they enter the facilities for exposure and symptoms; educated detainees on COVID-19 prevention both orally and in print; and isolates incoming detainees during their first 14 days of arrival. Dkt. 7-2. In addition to each of these examples of how the Caroline Detention Facility has reacted to the health concerns attendant with the spread of COVID-19, the Caroline Detention Facility is operating at 60% capacity and has rooms which could provide for social distancing even in a place where such practice may be found to be more challenging. Thus, Respondents have taken reasonable actions to protect Petitioner from COVID-19.

Because a determination of deliberate indifference requires that both elements be met, and Petitioner has failed to clearly show that he is likely to prevail as to the subjective prong, the Court does not need to decide whether Petitioner has satisfied the objective prong. Accordingly, the Court finds that Petitioner is not likely to succeed on this claim.

### B. Irreparable Harm

In addition to demonstrating that he is likely to succeed on the merits of his claims, Petitioner must also show that he will be irreparably harmed. Petitioner argues that he will be irreparably harmed for two reasons. First, the denial of his constitutional right in and of itself constitutes an irreparable harm. Second, his "increased risk of death, severe, illness, and disability" constitute irreparable harm. Dkt. 6, 20-21. The Court is not persuaded to accept either argument.

27

While the Fourth Circuit has indicated that "the denial of a constitutional right" in its own right "constitutes irreparable harm for purposes of equitable jurisdiction," *Ross v. Messe*, 818 F.2d 1132, 1135 (4th Cir. 1987), there must be some constitutional right that has been violated for such a finding. For the reasons articulated above (*supra*, p. 18-27), the Supreme Court and the Fourth Circuit have not found there to have been a constitutional right that has been violated. Accordingly, Petitioner's argument as to this first point fails.

With respect to Petitioner's second argument concerning irreparable harm, this point is premised on his position that "because he has underlying medical conditions that increases his likelihood of severe illness or death if he contracts COVID-19," he should be released. Dkt. 6, 20. Yet, to sufficiently satisfy the requirement of irreparable harm, Petitioner must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. The mere "possibility of irreparable harm" will not do. *Id.* Not only must this harm be likely but the alleged harm must "be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002).

Here, the Court finds the alleged harm to be speculative, and the mere possibility for the harm of which Petitioner complains is, too attenuated from the circumstances at hand. As other courts have found, "[e]very person in the United States, whether in a detention facility or not, faces COVID-19 exposure." *Albino-Martinez v. Adduci*, No. 2:20-cv-10893, 2020 WL 1872362, at *4 (E.D. Mich. Apr. 14, 2020) (citing *United States v. Steward*, No. S1:20cr0052(DLC), 2020 WL 1468005, at *5 (S.D.N.Y. Mar. 26, 2020)). As such, release does not necessarily reduce the possibility of Petitioner's exposure. Thus, the Court finds that Petitioner has failed to clearly show irreparable harm.

## C. Balance of Equities / Public Interest

Generally, where the Government is the opposing party, the requirements that a petitioner show that the balance of equities and public interest are in their favor, merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court, in this instance, sees no reason to depart from this general rule.

Petitioner argues that the public interest and the balance of equities warrant relief because Petitioner's "continued detention is unconstitutional and unlawful." Dkt. 6, 20-21. Petitioner also claims that the public interest and the balance of equities do not fall in Respondents' favor because "a governmental entity 'is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which . . . is likely to be found unconstitutional." *Id.* Because at this point, the Court finds that Petitioner's detention is neither unconstitutional nor unlawful (*supra*, p. 10-27), the public interest and balance of equities cannot be said to favor his release.

Thus, the Court finds that these factors also weigh against granting Petitioner's motion for a temporary restraining order or preliminary injunction.

## IV. CONCLUSION

For the reasons stated above, Petitioner has failed to clearly establish a likelihood of success, irreparable harm, or that the balance of the equities or public interest favor granting a preliminary injunction.

Accordingly, Petitioner has failed to carry his burden, and the motion for a temporary restraining order or a preliminary injunction (Dkt. 5) is DENIED.

It is SO ORDERED.

Alexandria, Virginia
May 8th, 2020

/s/
Rossie D. Alston, Jr.
United States District Judge

29

**RESPONDENTS' EXHIBIT 6**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PETER O. C.,

    Petitioner,

v.

JOHN TSOUKARIS, et al.,

    Respondents.

Civil Action No. 20-4622 (SDW)

OPINION

**WIGENTON,** District Judge:

   Presently before the Court is the petition for a writ of habeas corpus of Petitioner, Peter O.
C., filed pursuant to 28 U.S.C. § 2241.  (ECF No. 1).  Also before the Court is Petitioner's motion
seeking a temporary restraining order.  (ECF No. 3).  Following an order to answer, the
Government filed responses to the petition and motion (ECF No. 7), to which Petitioner has
replied.  (ECF No. 9). For the following reasons, this Court will deny the petition without prejudice
and will deny the motion as moot in light of the denial of Petitioner's habeas petition.


## I. BACKGROUND

   Petitioner is a native and citizen of Ghana who was admitted to the United States for a
period not to exceed six months in May 2014.  (Document 6 attached to ECF No. 7 at 6).  Petitioner
overstayed his visa, however, and illegally remained in the United States after its expiration.  (*Id.*).
Petitioner was thereafter convicted of receiving stolen property with a value of more than $75,000
on August 15, 2018.  (*Id.*).  Petitioner was sentenced to seven years imprisonment as a result.  (*Id.*).
On January 23, 2020, Petitioner was taken into immigration custody and placed in removal
proceedings based on his criminal history and overstay.  (*Id.* at 3-9).  Petitioner has been detained

pursuant to the Government's mandatory detention authority under 8 U.S.C. § 1226(a) since that time. (*Id.* at 11). Petitioner suffers from hypertension and obesity, both of which he, through his medical expert, contends place him at risk of severe complications were he to become infected with COVID-19. (*See* Document 8 attached to ECF No. 9). Petitioner's hypertension is being treated, however, at the facility – by the admission of Petitioner's own expert, he has been treated at least twice for that issue during the month of April, during which he was provided medication and was seen by medical staff including a doctor.[1] (*Id.*).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2241(c), habeas relief may be extended to a prisoner only when he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A federal court has jurisdiction over such a petition if the petitioner is "in custody" and the custody is allegedly "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). As Petitioner is currently detained within this Court's jurisdiction, by a custodian within the Court's jurisdiction, and asserts that his continued detention violates due process, this Court has jurisdiction over his claims. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 494-95, 500 (1973); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

---

[1] Petitioner's medical expert does contend that the treatment may not have been sufficient, or that the jail's medical staff may not have done enough diagnostic work on Petitioner during these sick visits. (Document 8 attached to ECF No. 9 at 4). The expert makes these inferences, however, largely based on what is *not* stated in the brief notes contained in Petitioner's medical records, and his assumption that Petitioner's vital signs were not checked because it is not explicitly noted in Petitioner's chart, as well as the expert's unfamiliarity with a term used by jail medical staff. (*Id.*). The record of this matter is at best unclear whether Petitioner's expert's inferences are accurate.

## B. Analysis

In his habeas petition and briefing in this matter, Petitioner argues that he should be released from prison because he has been subjected to punitive conditions of confinement and has received insufficient medical care in light of his medical history and the threat posed by the COVID-19 epidemic.  As this Court recently explained, assuming the COVID-19 pandemic is a sufficiently severe circumstance that would warrant permitting a habeas claim based upon Petitioner's conditions of confinement, claims such as Petitioner's

> could be construed in two fashions – as a claim asserting that the jail has been deliberately indifferent to Petitioner's medical needs, or as a claim asserting that the conditions under which he is detained amount to an unconstitutional application of punishment without a supporting conviction in violation of the Due Process Clause.  As there is no clear guidance from the Courts of Appeals or Supreme Court on how to adjudicate such claims in light of an ongoing pandemic, many courts have found that insufficient jail action in light of the virus can serve as a basis for release under [the circumstances], *see, e.g,*, *Rafael L.O. v. Decker*, No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Cristian A.R. v. Thomas Decker, et al.*, No. 20-3600 (D.N.J. Apr. 12, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted.  *See, e.g.,* *Dawson v. Asher*, No. 20-409, 2020 WL 1304557 (W.D. Wa. Mar. 19, 2020) (rejecting TRO request because detainees could not succeed on merits of request for relief without at least showing concrete likelihood of actual injury as opposed to mere speculation in light of the legitimate governmental interest in detaining aliens throughout removal proceedings); *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020) (rejecting habeas TRO based on medical conditions of confinement claim as that claim normally must be brought under § 1983, and in any event such a claim is not likely to succeed in the absence of a showing of deliberate indifference to the detainees medical needs); *Lopez v.*

*Lowe*, No. 20-563, 2020 WL 1689874 (M.D. Pa. Apr. 7, 2020) (denying request for TRO by habeas petitioner as he could not establish deliberate indifference to his medical needs).

   Turning first to the issue of Petitioner's medical needs, for an immigration detainee to make out a claim for relief based on a jail official's insufficient treatment or deliberate indifference to his medical needs under the Due Process Clause, he must show both that he is subject to a sufficiently serious medical need, and that jail officials have been deliberately indifferent to that need. *See, e.g., Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). Even assuming that [the threat of] COVID-19 in and of itself is a sufficiently serious need, or that Petitioner's [asthma] is sufficiently serious to oblige the jail to take action to alleviate the risk presented by the virus, success on such a claim would still require Petitioner to show that officials at the jail were deliberately indifferent to that need – i.e. that Respondents "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety." *Natale*, 318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This requires that the [respondent] was "both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . dr[e]w th[at] inference." *Id.* Where some treatment or proscriptive action designed to alleviate the medical need has been provided and the dispute is over the adequacy of the treatment or preventative steps taken, federal courts "are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)). Neither a detainee's subjective dissatisfaction or disagreement with the professional judgment of medical staff as to how best to deal with a medical issue are normally sufficient to establish deliberate indifference. *Hairston v. Director Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

. . . .

   . . . A claim challenging conditions [of confinement] under the Due Process Clause [under the theory that those conditions amount to punishment in the absence of a supporting conviction in turn] has both a subjective and objective component – the objective component requiring a showing that the deprivation involved in the

conditions was sufficiently serious, and the subjective component requiring that jail officials act with a sufficiently culpable mind. [*Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979))]. The subjective component can be established by showing an express intent to punish; or by showing that the conditions in question were arbitrary, purposeless, or excessive in relation to the ascribed governmental objective. *Id.* Conditions which are reasonably related to a legitimate government interest and which are not excessive in relationship to that interest will therefore not support a claim in the absence of a showing of an express intent to punish. *Id.* at 67-69. . . . [I]mmigration detention is clearly reasonably related to a legitimate government interest – the Government's interest in securing those subject to removal proceedings pending the conclusion of those proceedings in order to ensure they do not abscond and that they attend those proceedings while also ensuring they are not a danger to the community in the meantime. *See, Dawson*, 2020 WL 1304557 at *2; *see also Jennings*, 138 S. Ct. at 836; *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas*, 533 U.S. at 690-91.

*Jorge V.S. v. Green*, No. 20-3675, 2020 WL 1921936, at *2-4 (D.N.J. Apr. 21, 2020).

In this matter, Petitioner is detained pursuant to the Government's mandatory detention authority pursuant to 8 U.S.C. § 1226(c), which applies to aliens such as Petitioner who have qualifying convictions. As the Supreme Court has held, mandatory detention under § 1226(c) "serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings," an interest that the Court went to considerable lengths was compelling and a more than adequate basis for mandatory detention throughout the pendency of those proceedings. *See Demore*, 538 U.S. at 518-28. Both the Third Circuit and this Court have further recognized that the statute further serves the purpose of ensuring that criminal aliens do not present a danger to the community while they are in removal proceedings. *See, e.g., Chavez-Alvarez v. Warden York County Prison*, 783 F.3d 469 (3d Cir. 2015); *Dryden v. Green*, 321 F. Supp. 3d 496, 502 (D.N.J. 2018). Indeed, these interests are so compelling that this Court has recognized that the statute will ordinarily support continued detention without so much as a bond hearing for well over

a year. *Id.* There is thus no question that detention under the statute both serves a legitimate government interest.

Turning to the conditions of confinement, it is clear that the jail in which Petitioner is detained has taken numerous concrete steps to alleviate and mitigate the risk COVID-19 presents to its inmate population. The jail has increased the availability of medical staff; insured nurses, practitioners, and doctors are always either on hand or on call at all times; limited or eliminated entrance into the facility of outside vendors, volunteers, and visitors; has required medical screenings for all incoming detainees and staff members including temperature checks upon arrival; begun the daily monitoring and separate housing of those detainees who suffer from health conditions putting them at high risk under CDC guidelines; established a quarantine area for those who become infected; increased supplies on site including cleaning supplies and COVID-19 testing kits; increased cleaning staff and has begun sanitizing and cleaning housing units "no less than three times per day;" provided "unlimited" soap and water access for all detainees and provided disinfectant spray upon request under the supervision of jail staff; begun placing new arrivals in quarantine for fourteen days before placing them in general population; provided masks, gloves, and full protective equipment to jail staff; and has begun rolling out "rapid COVID-19 testing for its entire population" to support the jail's quarantine and containment strategy. (Document 5 attached to ECF No. 7 at 1-14). The jail has also put into place policies for handling infected inmates including immediate medical evaluations for those showing symptoms, providing daily sick calls to detainees, providing surgical masks to those with signs or symptoms of respiratory illness, full testing at University Hospital for any detainee who shows moderate to severe symptoms, the quarantining of those who show even mild symptoms, and the isolation of detainees who have tested positive for the virus. (*Id.* at 8-10). Where warranted, antiviral

medications are provided, and regardless of the need for medications, those who test positive or show even mild symptoms are quarantined for fourteen days in single occupancy cells "to ensure social distancing." (*Id.* at 9-10). All of these measures taken to limit or alleviate the effects of COVID-19 on the jail population clearly show that the conditions to which Petitioner has been subjected are not excessive in relation to the Government's interest in detaining criminal aliens, and that the conditions under which Petitioner has been confined are instead rationally related to a legitimate government interest and therefore pass constitutional muster. As Petitioner has not otherwise shown any express intent to punish him, Petitioner's conditions of confinement claim thus fails.

Petitioner's claim fairs no better when treated as a direct medical claim. Both the concrete steps outlined above and the specific treatment and medication Petitioner has received indicate that the jail staff have not been deliberately indifferent to his needs, but have instead taken steps to protect him and have treated his medical issues when he has brought them to the attention of the medical staff. The disagreement with the treatment he received expressed by Petitioner's medical expert is insufficient to raise Petitioner's dispute to the level of a constitutional violation, *White v. Napolean*, 897 F.2d at 110, and is patently insufficient to warrant the extreme form of relief Petitioner requests in light of Petitioner's criminal history, the treatment Petitioner has received, and the concrete steps the jail has taken to protect Petitioner. *V.S.*, 2020 WL 1921936 at *3 ("That these steps do not guarantee Petitioner will remain healthy and free of the disease is immaterial, the constitution requires no such perfection."); *see also Sacal-Micha;* 2020 WL 1518861 at *6. As this Court finds that Petitioner has neither shown that jail staff have been deliberately indifferent to his medical needs, nor that he has been subjected to unconstitutional conditions of

confinement, Petitioner's habeas petition is denied, and Petitioner's motion seeking a temporary restraining order is denied as moot in light of the denial of this matter.

## III. CONCLUSION

For the reasons expressed above, Petitioner's habeas petition (ECF No. 1) is DENIED WITHOUT PREJUDICE and his motion seeking a temporary restraining order (ECF No. 3) is DENIED as moot in light of the denial of his habeas petition. An appropriate order follows.

Dated: May 7, 2020

_s/Susan D. Wigenton_
Hon. Susan D. Wigenton,
United States District Judge

Case 5:20-cv-00786-JFB   Document 82-7   Filed 07/09/20   Page 1 of 6

**RESPONDENTS' EXHIBIT 7**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

MOHAMAD AHMAD MURAI,

                 Petitioner,

v.

                                       Case No. 20-10816

REBECCA ADDUCCI,
MATTHEW T. ALBENCE,
KEVIN MCALEENAN, and
WILLIAM P. BARR,

                 Respondents.

_____/

## ORDER DENYING WITHOUT PREJUDICE PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER

On March 27, 2020, Petitioner Mohamad Ahmad Murai filed a petition for writ of habeas corpus under 28 U.S.C. § 2241. (ECF No. 1.) Petitioner is currently detained by the United States Immigration Customs and Enforcement Agency at the Calhoun County Detention Center in Battle Creek, Michigan. He alleges that the current threat of infection from the COVID-19 virus and the potential for serious medical complications while in confinement pose an ongoing and unjustifiable risk to Petitioner's health, violating Petitioner's Fifth Amendment right to due process. The court is asked to grant injunctive relief, releasing Petitioner from detention, as well as to award attorney fees.

On April 13, 2020, Petitioner filed a motion for a temporary restraining order ("TRO"), seeking immediate release from detention. (ECF No. 5.) The stringent requirements for issuance of a TRO under Federal Rule of Civil Procedure 65(b) signify that TROs are extraordinary remedies that "run[] counter to the notion of court action taken before reasonable notice and opportunity to be heard has been granted to both

sides of a dispute." *Granny Goose Foods v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974). Petitioner must "clearly show that immediate and irreparable injury, loss, or damage will result . . . before [Respondents] can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Specifically, the court must consider four factors: "(1) [W]hether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the [relief] would cause substantial harm to others, and (4) whether the public interest would be served by granting the [relief]." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (quoting *Ne. Ohio Coal. for Homeless and Serv. Emps. Int'l Union v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). Petitioner's attorney must also "certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B).

A temporary restraining order is not warranted at this time. Petitioner has not demonstrated that the risk to his health is immediate and irreparable. He argues that a portion of the detainees at his facility are in "lockdown," some detainees are "visibly ill," one detainee was brought to his facility after "coughing and [having] a fever." (ECF No. 5, PageID.265.) However, the tendered speculation as to what conditions other detainees may have, particularly whether those detainees have contracted COVID-19, in a correctional facility with no confirmed cases of COVID-19, does not constitute an sufficiently clear basis to find an immediate threat warranting the extreme remedy of an affirmative injunction without the benefit of a government response.

This is especially important where Respondents appear capable of explaining the precautions being taken to mitigate the threat of COVID-19. For instance, Petitioner

does not detail whether any individual detainee with a cough and fever has been quarantined; the court is left to guess. Petitioner also asserts that "new detainees arrive almost daily," but does not describe whether or not they are screened, tested, or quarantined upon arrival. (ECF No. 5, PageID.265.)

Petitioner argues that tight quarters in any place of confinement and shared facilities with other detainees will ensure Petitioner contracts COVID-19. (*Id.*, PageID.276 (emphasis added) ("[T]here are *no detention conditions* that can adequately or constitutionally house [Petitioner].").) The argument, at least this portion of it, proves too much. No place of confinement can properly hold Petitioner or those resembling him, Petitioner says, and the doors of confinement must therefore swing open. This is excessively conjectural to support the issuance of a TRO. Based on the evidence currently presented, the court is not convinced any and all confinement conditions will immediately and "without loss of time" cause Petitioner to suffer a serious case of COVID-19. Fed. R. Civ. P. 65(b)(1)(A); *Brunner*, 543 F.3d at 361; *Immediate*, Webster's Third International Dictionary, Unabridged (2020) ("[O]ccurring, acting, or accomplished without loss of time: made or done at once.").

Additionally, the court observes that Petitioner filed his habeas petition on March 27, but did not seek a TRO until April 13. Petitioner during those seventeen days attempted to follow the normal process of adversarial litigation by serving Respondents and allowing them to respond. For those two weeks, Petitioner gave at least an appearance of controlled concern relative to the evolving threat from COVID-19.

This is also significant because Petitioner has yet to properly serve Respondents. Petitioner's attorney filed a declaration indicating that Petitioner's habeas petition was

3

mailed to the U.S. Attorney for the Eastern District of Michigan after discovering the U.S. Attorney's office was closed. (ECF No. 3-1, PageID.203-04, ¶¶ 4, 6.) However, there are no allegations or evidence that the petition and summons have been mailed to the U.S. Attorney General or the government officials named as respondents in this suit, as is required by Federal Rule of Civil Procedure Rule 4(i)(2).

Petitioner's attorney must "certif[y] in writing any efforts made to give [Respondents] notice" and explain why notice should not be required. Fed. R. Civ. P. 65(b)(1)(B). Petitioner's attorney has stated "Respondents' offices were closed" and she has not received "respon[ses] to inquiries by phone and email." (ECF No. 5, PageID.253-54.) Counsel has not detailed whether the offices, phone numbers, and emails referenced are those of the U.S. Attorney's or that of Respondents and the U.S. Attorney General, neither of which apparently have been served. Petitioner's attorney did not provide a written explanation for why notice should not be required. Fed. R. Civ. P. 65(b)(1)(B). Without providing Respondents with service, reasonable notice, or an opportunity to respond, the court finds an injunction unwarranted.

Based on the information currently presented, the court will deny Petitioner's motion for a TRO. The court will issue an order requiring Respondents to file an expedited response to the petition after being served. Accordingly,

IT IS ORDERED that Petitioner's "Emergency Motion for Temporary Restraining Order" (ECF No. 5) is DENIED WITHOUT PREJUDICE.

s/Robert H. Cleland                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  April 16, 2020

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 16, 2020, by electronic and/or ordinary mail.

s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\20-10816.MURAI.TRO.RMK.RHC.docx

5

Case 1:20-cv-00786-JEB   Document 92-8   Filed 07/09/20   Page 1 of 19

# RESPONDENTS' EXHIBIT 8

Case 2:85-cv-04544-DMG-AGR   Document 828-8   Filed 07/08/20   Page 2 of 19   Page ID
#:39013
Case 1:20-cv-00413-YK   Document 16   Filed 04/08/20   Page 1 of 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KANAT UMARBAEV,          :
    Petitioner           :
                           :         No. 1:20-cv-00413
    v.                     :
                           :         (Judge Kane)
WARDEN CRAIG A. LOWE    :
    Respondent         :

## MEMORANDUM

Petitioner Kanat Umarbaev ("Petitioner") is currently confined at the Pike County

Correctional Facility ("PCCF"), a detainee of the United States Department of Homeland

Security ("DHS"), Immigration and Customs Enforcement ("ICE"). On March 10, 2020,

Petitioner, then proceeding pro se, initiated the above-captioned action by filing a petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1), alleging that his continued

detention by ICE had exceeded constitutional limits. Following an Order to show cause (Doc.

No. 4), Respondent filed a response, contending that Petitioner's detention is lawful (Doc. No.

8). On March 30, 2020, counsel appeared on Petitioner's behalf. (Doc. No. 7.) On April 6,

2020, Petitioner filed a traverse supplementing his original § 2241 petition (Doc. No. 9) and a

motion for expedited consideration and/or an emergency hearing raising an additional claim

based upon the COVID-19 pandemic (Doc. No. 10). In an Order dated April 7, 2020, the Court

directed Respondent to file a supplemental response addressing the arguments raised in

Petitioner's traverse by 12:00 p.m. on April 8, 2020. (Doc. No. 11.) Respondent has done so.

(Doc. No. 14.) Petitioner's § 2241 petition, therefore, is ripe for disposition. The Court will

grant Petitioner's motion for expedited consideration (Doc. No. 10) to the extent that this

Memorandum serves as the Court's expedited review of Petitioner's § 2241 petition (Doc. No.

1). For the reasons set forth below, Petitioner's § 2241 petition will be denied.

## I.    BACKGROUND

### A.    Petitioner's Immigration Proceedings

Petitioner is a native of the former Union of Soviet Socialist Republics ("USSR") and a citizen of Kyrgyzstan.  (Doc. No. 8-1 at 12.)  He was admitted to the United States on February 22, 2000, as a non-immigration visitor for pleasure.  (Id.)  Petitioner had authorization to remain in the United States until August 22, 2000.  (Id.)  On January 4, 2001, ICE issued a Notice to Appear, charging Petitioner with being removable pursuant to § 237(a)(1)(B) of the Immigration and Nationality Act ("INA") because he remained in the United States for a time longer than that permitted.  (Id.)  At a hearing before an immigration judge, Petitioner conceded his removability as charged.  (Id.)

Thereafter, Petitioner filed applications for asylum and withholding of removal.  (Id. at 9.)  On March 14, 2003, an immigration judge denied Petitioner's applications for relief and ordered him removed to Kyrgyzstan.  (Id.)  On August 13, 2003, Petitioner was convicted in New York of driving while intoxicated ("DWI").  (Id. at 20.)  On May 25, 2004, the Board of Immigration Appeals ("BIA") summarily dismissed Petitioner's appeal from the immigration judge's March 14, 2003 order because Petitioner had failed to file a brief or statement in support of his appeal.  (Id. at 16.)  On June 30, 2004, Petitioner sustained a second DWI conviction in New York.  (Id. at 20.)

On August 28, 2019, a DHS Fugitive Operations Team apprehended and detained Petitioner.  (Id. at 19.)  ICE began taking steps to execute Petitioner's removal order, including requesting a travel document from the Embassy of Kyrgyzstan.  (Id. at 4.)  On October 8, 2019, Petitioner filed a motion to reopen his removal proceedings with the BIA.  (Doc. No. 9 at 28-46.)  Petitioner asserted that his recent conversion to Christianity, coupled with current conditions for

Christians in Kyrgyzstan, warranted reopening of his proceedings and supported a new application for asylum. (Id. at 28.) On December 15, 2019, DHS received a travel document for Petitioner from the Embassy of Kyrgyzstan and scheduled Petitioner for removal on January 3, 2020. (Doc. No. 8-1 at 4.) On January 2, 2020, the BIA denied Petitioner's request for a stay of removal pending consideration of his motion to reopen, stating that there was little likelihood that his motion to reopen would be granted. (Id. at 28.)

On January 3, 2020, DHS transported Petitioner to the John F. Kennedy International Airport to place him on a commercial flight to Moscow, Russia, with a connecting flight to Bishkek, Kyrgyzstan. (Id. at 5.) That same day, Petitioner filed a petition for review, along with an emergency motion for a stay of removal, with the United States Court of Appeals for the Second Circuit. (Id. at 30-39.) DHS attempted to place Petitioner on the airplane at the final boarding call. (Id. at 5.) Petitioner, however, "actively and physically fail[ed] to comply with ICE's orders by 'falling on the floor.'" (Id.) The removal attempt "was called off and [Petitioner] was removed from the airport and placed in the ICE transport vehicle." (Id.) Moments later, the Second Circuit granted Petitioner's emergency motion for a stay of removal. (Id. at 42.)

On January 21, 2020, DHS conducted a custody review and determined that Petitioner would remain detained pending a decision on his petition for review. (Id. at 44.) The DHS observed that Petitioner's final order of removal had been in effect since May 25, 2004 and that Petitioner had been an ICE fugitive from 2004 until 2019. (Id.) DHS also noted that Petitioner "ha[s] multiple convictions for driving under the influence." (Id.) DHS concluded that Petitioner posed "a flight risk and a significant public threat." (Id.)

3

Case 2:85-cv-00765-VJES Document 928 Filed 07/09/20 Page 5 of 19   Page ID
Case 4:20-cv-00425-RM Document 16 Filed 06/09/20 Page 4 of 18
#:39016

Petitioner filed the instant § 2241 petition on March 10, 2020.  (Doc. No. 1.)  On March

16, 2020, an immigration judge conducted a bond hearing for Petitioner pursuant to Guerrero-

Sanchez v. Warden York County Prison, 905 F.3d 208 (3d Cir. 2018).  (Doc. No. 8-1 at 46.)  The

immigration judge denied Petitioner's request for a custody redetermination, concluding that

Petitioner "remains a risk of danger to persons and property."  (Id.)  On March 24, 2020,

Petitioner filed a motion for reconsideration of the immigration judge's decision.  (Doc. No. 9 at

234-40.)  That same day, Petitioner, through emails by counsel, requested that ICE release him

from custody to "seek medical treatment for symptoms that may be related to the coronavirus."

(Id. at 244.)  Petitioner's counsel asserted that Petitioner was "experiencing a sore throat,

shortness of breath[,] and [a] runny nose."  (Id. at 245.)  Counsel also noted that Petitioner

"suffers from high blood pressure, which has not been well controlled during his detention."

(Id.)  On March 31, 2020, DHS denied Petitioner's request for release.  (Id. at 244.)  As of the

date of this Memorandum and Order, Petitioner's motion to reopen is still pending before the

BIA and his petition for review is still pending before the Second Circuit.

**B.      COVID-19 and Conditions at PCCF**

Coronavirus Disease 2019 (COVID-19) "is an infectious disease caused by a newly

discovered coronavirus."  See Coronavirus Overview, WORLD HEALTH ORGANIZATION,

https://www.who.int/health-topics/coronavirus#tab=tab_1 (last accessed Apr. 8, 2020).  The

COVID-19 virus "is spreading very easily and sustainably between people."  See How COVID-

19 Spreads, CENTERS FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last

accessed Apr. 8, 2020).  "Most people infected with the COVID-19 virus will experience mild to

moderate respiratory illness and recover without requiring special treatment."  Id.  However,

4

some infected individuals will experience severe illness, and certain groups, including "[o]lder

people[] and those with underlying medical problems like cardiovascular disease, diabetes,

chronic respiratory disease, and cancer" are at a higher risk of developing serious illness.  See id.

In the past few weeks, governments have imposed policies designed to curb the spread of

COVID-19.  For example, businesses deemed not life sustaining have been closed in

Pennsylvania since March 21, 2020.  See Order of the Governor of the Commonwealth of

Pennsylvania Regarding the Closure of All Businesses that Are Not Life Sustaining,

https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-

Order (Mar. 19, 2020).  Additionally, on April 1, 2020, Governor Wolf issued an order for

individuals to stay home that applies to the Commonwealth of Pennsylvania in its entirety

through April 30, 2020.  See Order of the Governor of the Commonwealth of Pennsylvania for

Individuals to Stay at Home, OFFICE OF THE GOVERNOR OF PENNSYLVANIA,

https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-

Home-Order.pdf (Apr. 1, 2020).  Since the onset of the pandemic, "ICE epidemiologists have

been tracking the outbreak, regularly updating infection prevention and control protocols, and

issuing guidance to field staff on screening and management of potential exposure among

detainees."  (Doc. No. 14-1 at 4.)

      PCCF "has the capacity to house 375 detainees and has historically often operated near

capacity."  (Id.)  As of April 3, 2020, "there were only 250 combined inmates and detainees

housed a[t] the facility."  (Id.)  Upon admission, each detainee is screened for disabilities.  (Id.)

During "intake medical screenings, detainees are assessed for fever and respiratory illness, are

asked to confirm if they have had close contact with a person with laboratory-confirmed

COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with

Case 2:85-cv-00765-VEF Document 828 Filed 07/08/20 Page 7 of 93   Page ID
Case 1:20-cv-00725-JES Document 18 Filed 05/08/20 Page 2 of 18
#:39018

sustained community transmission in the past two weeks." (Id.) Those who "present symptoms

compatible with COVID-19 will be placed in isolation, where they will be tested." (Id.) If a test

is positive, that inmate remains isolated and treated and, if necessary, is referred to a local

hospital. (Id.) As of April 4, 2020, four (4) ICE detainees at PCCF have tested positive for

COVID-19, as have five (5) correctional officers. (Id. at 7.) The detainees are in quarantine

under medical observation, and the correctional officers are under self-quarantine. (Id.)

In the case of known exposure to someone who has been confirmed to have COVID-19,

"asymptomatic detainees are placed in cohorts with restricted movement for the duration of the

most recent incubation period . . . and are monitored daily for fever and symptoms of respiratory

illness." (Id. at 5.) Cohorting "is an infection prevention strategy" that "involves housing

detainees together who were exposed to a person with an infectious organism but are

asymptomatic." (Id.) This practice lasts for fourteen (14) days "because individuals with these

and other communicable diseases can be contagious before they develop symptoms and can

serve as undetected source patients." (Id.) Those who show "onset of fever and/or respiratory

illness are referred to a medical provider for evaluation." (Id.) Cohorting "is discontinued when

the 14-day incubation period completes with no new cases." (Id.) Pursuant to ICE policy,

"detainees diagnosed with any communicable disease who require isolation are placed in an

appropriate setting in accordance with CDC or state and local health department guidelines."

(Id.)

PCCF has "instituted a modified lockdown schedule" in response to COVID-19. (Id. at

8.) Movement throughout the facility is restricted. (Id.) "Detainees['] ability to leave their cells

is staggered in order to promote social distancing." (Id.) All detainees are required to maintain

social distancing when not within the same cell, and meals are served to detainees within their

cells.  (Id.)  All staff members are required to wear masks.  (Id.)  "Daily temperature checks and screening for influenza like illness (ILI) symptoms have been implemented for all detainees." (Id.)  "If any detainee displays ILI symptoms, they[,] along with any cell mates, are placed in quarantine."  (Id.)  Staff have also "increased the frequency of cleaning and disinfecting, including often used touch surfaces."  (Id.)

### C.    Petitioner's Recent Medical History

On April 1, 2020, Petitioner presented to the medical department at PCCF with upper respiratory complaints.  (Doc. No. 15 at 2.)  Medical staff noted that Petitioner was unable to take certain medications because of his history of high blood pressure.  (Id.)  Petitioner was prescribed Tylenol, an antihistamine, and cough medication.  (Id.)  At that time, Petitioner's temperature was 98.3 degrees.  (Id. at 8.)  Medical staff educated Petitioner on reporting worsening symptoms and increasing his fluid intake.  (Id. at 2.)

On April 3, 2020, Petitioner was placed into medical quarantine because of "possible" COVID-19 exposure.  (Id. at 3.)  Medical staff directed that his temperature be checked twice daily.  (Id.)  Any fever reducers were discontinued until the end of the fourteen (14)-day quarantine period.  (Id.)  On April 4, 2020, Petitioner complained that he had a sore throat.  (Id. at 7.)  Staff noted that he already had a cold pack, but that Tylenol and Motrin were unable to be used for his unit.  (Id.)  Petitioner's temperature on April 4, 2020 was 98.4 degrees at the first check and 97.6 at the second check.  (Id.)  Petitioner has not had a temperature over 98.9 degrees through April 7, 2020.  (Id. at 5-6.)

## II.    LEGAL STANDARD

Under 8 U.S.C. § 2241(c), a prisoner or detainee may receive habeas relief only if he "is in custody in violation of the Constitution or laws or treaties of the United States."  See 28

U.S.C. § 2241(c)(3); <u>see also</u> <u>Maleng v. Cook</u>, 490 U.S. 488, 490 (1989).  Because Petitioner is currently detained within the jurisdiction of this Court and asserts that his continued detention violates due process, this Court has jurisdiction over his § 2241 petition.  <u>See</u> <u>Zadvydas v. Davis</u>, 533 U.S. 678, 699 (2001); <u>Spencer v. Kemna</u>, 523 U.S. 1, 7 (1998).

## III.   DISCUSSION

In the instant case, the parties do not dispute that Petitioner is currently detained pursuant to 8 U.S.C. § 1231(a), which provides for the detention of individuals who are subject to a final order of removal.  <u>See</u> 8 U.S.C. § 1231(a); <u>cf.</u> <u>Diouf v. Mukasey</u>, 542 F.3d 1222, 1229-30 (9th Cir. 2008) (concluding that the alien petitioner was detained under § 1231(a) because his pending appeal and stay of removal did not entail judicial review of a removal order but instead involved review of the denial of a motion to reopen).  That section provides that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."  <u>See</u> 8 U.S.C. § 1231(a)(1)(A).  During this ninety (90)-day period, "the Attorney General shall detain the alien.  Under no circumstance during the removal period shall the Attorney General release an alien who has been found . . . deportable under section 1227(a)(2)."  <u>See</u> <u>id.</u> § 1231(a)(2).  After the ninety (90)-day period expires, the alien's detention may continue, or he may be released on supervision.  <u>See</u> <u>id.</u> § 1231(a)(3), (6).

The Supreme Court has concluded, however, that § 1231 "limits an alien's post-removal-period detention to a period reasonably necessary to bring about the alien's removal from the United States.  It does not permit indefinite detention."  <u>See</u> <u>Zadvydas</u>, 533 U.S. at 698.  Thus, "[o]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute."  <u>See</u> <u>id.</u> at 699.  To establish a uniform baseline, the Supreme Court concluded that a

period of six (6) months is a "presumptively reasonable period of detention."  See id. at 701.

Moreover, the United States Court of Appeals for the Third Circuit has concluded that "an alien

detained under § 1231(a)(6) is generally entitled to a bond hearing after six months (i.e., 180

days) of custody."  See Guerrero-Sanchez, 905 F.3d at 226.  Following such a hearing, the alien

"is entitled to be released from detention unless the government establishes that the alien poses a

risk of flight or a danger to the community."  See id. at 224 (quoting Diouf v. Napolitano, 634

F.3d 1081, 1092 (9th Cir. 2011)).  "The Government must meet its burden in such bond hearings

by clear and convincing evidence."  See id. at 224 n.12.

     As noted supra, Petitioner has been detained pursuant to § 1231(a)(6) since August 28,

2019.  As of the date of this Memorandum, therefore, Petitioner has been detained for over seven

(7) months, which is beyond the presumptively reasonable six (6)-month period set forth in

Zadvydas and Guerrero-Sanchez.  The parties do not dispute that on March 16, 2020, an

immigration judge conducted a bond hearing pursuant to Guerrero-Sanchez and concluded that

Petitioner should remain detained because he "remains a risk of danger to persons and property."

(Doc. No. 8-1 at 46.)  Petitioner, however, now asserts that he is entitled to habeas relief because:

(1) the immigration judge violated his right to due process by applying the wrong legal standard,

failing to afford the procedural safeguards mandated by Guerrero-Sanchez, and misapplying BIA

precedent; and (2) his detention violates due process because "he is at higher than normal risk of

serious illness or death if he contracts the COVID-19 virus and DHS is unable to mitigate the

risk that he will be infected."  (Doc. No. 9 at 22.)  The Court considers each argument in turn.

###     A.     Review of Petitioner's March 16, 2020 Custody Determination

     On March 16, 2020, an immigration judge denied Petitioner's request for a custody

determination.  (Doc. No. 9 at 231.)  The immigration judge noted that Petitioner's request was

brought pursuant to 8 C.F.R. § 1236 and denied his request, concluding that Petitioner "remains a risk of danger to persons and property." (Id.) Petitioner now asserts that the immigration judge violated his due process rights by applying the wrong legal standard and misapplying BIA precedent. (Id. at 10-16.) Respondent asserts that the Court lacks jurisdiction over Petitioner's claim because Petitioner failed to exhaust his administrative remedies. (Doc. No. 14 at 12-13.) For the reasons discussed below, the Court agrees with Respondent.

The Third Circuit has noted that requiring exhaustion of administrative remedies for habeas petitions fosters important goals because: "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." See Moscato v. Fed. Bureau of Prisons, 98 F.3d 757, 761-62 (3d Cir. 1996). "These very important purposes are frequently furthered by requiring aliens who receive a bond hearing before the immigration judge to exhaust their administrative remedies and raise any issues with the BIA prior to seeking federal habeas corpus relief." Chajchic v. Rowley, No. 1:17-cv-457, 2017 WL 4401895, at *3 (M.D. Pa. July 25, 2017), report and recommendation adopted, 2017 WL 4387062 (Oct. 3, 2017). In the instant case, the record before the Court reflects that on March 24, 2020, Petitioner filed a motion for reconsideration of the immigration judge's March 16, 2020 order denying his request for bond. (Doc. No. 9 at 234-40.) As of the date of this Memorandum and Order, that motion remains pending before the immigration judge. Thus, Petitioner's arguments regarding the alleged deficiencies in the immigration judge's orders have not yet been exhausted at the administrative level. Accordingly, to the extent Petitioner requests that the Court review the immigration

10

judge's March 16, 2020 order denying him bond, the Court lacks jurisdiction to do so at this time.[1]

### B. COVID-19 Claim

Petitioner also maintains that his detention violates due process because he is at heightened risk of serious illness or death should he contract the COVID-19 virus. (Doc. No. 9 at 16-22.) Petitioner suggests that he is particularly unsafe because he is "an older person suffering from hypertension, high cholesterol[,] and possible immune compromising anemia." (Id. at 22.) Petitioner seeks immediate release, arguing that "DHS's inability to protect him and failure to release him amount to a life-threatening violation of his constitutional right to due process." (Id. at 22-23.)

As an initial matter, Respondent asserts that a § 2241 petition is not the proper vehicle for Petitioner's claim, maintaining that such a claim must instead be raised in a civil rights action. (Doc. No. 14 at 15-19.) While the issue of whether Petitioner may pursue such a claim in a § 2241 petition has not been resolved, the Court will examine his claim in the context of habeas corpus because Petitioner is seeking immediate release from confinement based upon the COVID-19 pandemic.[2] Nevertheless, for the reasons set forth below, the Court finds that

---

[1] In his § 2241 petition, Petitioner suggests that he is entitled to release pursuant to Zadvydas because his removal is not reasonably foreseeable. (Doc. No. 1 at 7.) Petitioner, however, presents no evidence to support this assertion, and he appears to abandon his Zadvydas claim in his traverse. Without any facts or evidence beyond conclusory allegations to support his Zadvydas claim, the Court will not grant relief on this ground. Petitioner, however, remains free to file a new § 2241 petition challenging his detention should he remain detained after he has exhausted his administrative remedies and may raise his Zadvydas claim again at that time.

[2] The Third Circuit has concluded that a habeas corpus petition is the proper vehicle for challenges to "the fact or length of confinement." See Tedford v. Hepting, 990 F.2d 745, 748 (3d Cir. 1993) (quoting Preiser v. Rodriguez, 411 U.S 475, 494 (1973)). A habeas petition is also the proper vehicle for challenging the "execution" of such confinement. See Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 241-42 (3d Cir 2005). When a petitioner seeks immediate

11

Case 2:85-cv-04544-DMC-AMD Document 116-16 Filed 07/09/20 Page 169 of 183 Page ID
#:39024
Case 4:20-cv-00706-JEB Document 3-18 Filed 04/09/20 Page 13 of 13

Petitioner has not demonstrated a likelihood of success on the merits for purposes of establishing

entitlement to the requested injunctive relief.[3]  "To establish a likelihood of success on the

merits, a movant must produce sufficient evidence to satisfy the essential elements of the

underlying cause of action."  Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf, 328 F. Supp. 3d

400, 407 (M.D. Pa. 2018) (citing Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980)).  In

---

release from custody, the "sole federal remedy" lies in habeas corpus.  See Preiser, 411 U.S. at
500.
    Respondents maintain that while the relief Petitioner requests may sound in habeas, his
claim regarding unconstitutional conditions of confinement does not.  The Third Circuit has
stated that "a habeas attack on the conditions of confinement" is cognizable "only in extreme
cases."  See Ali v. Gibson, 572 F.2d 971, 975 n.8 (3d Cir. 1978), superseded by statute on other
grounds as stated in Callwood v. Enos, 230 F.3d 627, 633 (3d Cir. 2000).  As Chief Judge
Conner of this Court recently noted, "[b]eyond the Third Circuit, a split has developed as to
whether habeas corpus provides a remedy for a conditions-of-confinement claim that does not
implicate the fact, duration or execution of the petitioner's confinement."  See Camacho Lopez
v. Lowe, No. 3:20-cv-563, 2020 WL 1689874, at *5 (M.D. Pa. Apr. 7, 2020) (citing cases).
"This divide has been borne out in recent weeks, as courts across the country confront numerous
habeas petitions citing the threat posed by the COVID-19 viral pandemic as a basis for
immediate release."  Id.  Chief Judge Conner concluded that "certain extraordinary conditions of
confinement may warrant a habeas remedy."  See id.
    In Camacho-Lopez, Chief Judge Conner concluded that an ICE detainee at PCCF who
had contracted COVID-19 and claimed that staff at PCCF were unable to provide adequate
medical care had sufficiently stated "the extreme case in which habeas relief might be available."
See id. at *6.  He, therefore, permitted the petitioner to proceed via his § 2241 petition.  See id.
This Court has also permitted ICE detainees who sought release based upon an increased risk of
contracting the COVID-19 virus to pursue habeas relief.  See Thakker v. Doll, No. 20-cv-480,
Doc. No. 47 at 5 (M.D. Pa. Mar. 31, 2020).  While Petitioner has not tested positive for COVID-
19, as noted above, he has been placed in quarantine for "possible" COVID-19 exposure.
Accordingly, in light of Petitioner's allegations, as well as the Camacho Lopez and Thakker
decisions, the Court will assume, for purposes of this Memorandum, that Petitioner may pursue
his claims via his § 2241 petition.

[3] The Court recognizes that Petitioner has not explicitly requested injunctive relief in the form of
immediate release because of the COVID-19 pandemic.  In light of Petitioner's motion to
expedite and his challenge to his conditions of confinement based upon COVID-19, however, the
Court concludes that Petitioner's request for release is similar to those presented in the motions
for temporary restraining orders presented to this Court in recent cases.  See Camacho Lopez,
2020 WL 1689874, at *6-9; Hope v. Doll, No. 20-cv-562, Doc. No. 11 at 4-15 (M.D. Pa. Apr. 7,
2020); Thakker, No. 20-cv-480, Doc. No. 47 at 5-25 (M.D. Pa. Mar. 31, 2020).  Thus, the Court
finds it appropriate to discuss the likelihood of Petitioner's success on the merits of his claim.

determining whether such a showing has been made, a court "must examine the legal principles controlling the claim and the potential defenses available to the opposing party." See id. (citing BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000)).

In his motion to expedite, Petitioner asserts "that his right to Due Process under the Fifth Amendment is being violated due to DHS's inability to provide reasonable protection for his health and safety as a result of his detention in a facility, where at least four detainees under the jurisdiction of DHS and four staff members have tested positive for COVID-19, and at least one has been hospitalized with serious illness." (Doc. No. 10 at 2.) The Due Process Clause provides that the federal government shall not deprive any person "of life, liberty, or property, without due process of law." See U.S. CONST. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas, 533 U.S. at 690. "[T]he Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent." Id. at 693. The due process rights of a pretrial detainee "are at least as great as the Eighth Amendment protections available to a convicted prisoner." See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). Civil immigration detainees "are entitled to the same due process protections" as pretrial detainees. See E.D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019) (citing Charles v. Orange Cty., 925 F.3d 73 (2d Cir. May 24, 2019); Chavero-Linares v. Smith, 782 F.3d 1038, 1041 (8th Cir. 2015); Belbachir v. Cty. of McHenry, 726 F.3d 975, 979 (7th Cir. 2013); Porro v. Barnes, 624 F.3d 1322, 1326 (10th Cir. 2010); Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000)).

Petitioner's substantive due process claim may be viewed under the theory of deliberate indifference to serious medical needs. See Jones v. Wolf, No. 20-cv-361, 2020 WL 1643857, at

*3 (W.D.N.Y. Apr. 2, 2020) (addressing an immigration detainee's substantive due process

claims pertaining to COVD-19-related risks under theories of deliberate indifference to serious

medical needs and unconstitutional conditions of confinement). "The Supreme Court has held

that 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and

wanton infliction of pain . . . proscribed by the Eighth Amendment.'" Tate v. Wiggins, No. 19-

1242, 2020 WL 882880, at *2 (3d Cir. 2020) (internal quotations marks omitted) (quoting Estelle

v. Gamble, 429 U.S. 97, 104 (1976)). Such claims asserted by pretrial detainees are evaluated

under the same Eighth Amendment standard. See Natale v. Camden Cty. Corr. Facility, 318

F.3d 575, 581-82 (3d Cir. 2003); see also Bakhtiari v. Madrigal, No. 18-cv-38, 2019 WL

1531861, at *10 (evaluating such a claim asserted by a civil immigration detainee under the same

standard). "In order to establish a violation of [a detainee's] constitutional right to adequate

medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison

officials that indicate deliberate indifference to that need." Natale, 318 F.3d at 582.

Additionally, Petitioner's claim may be viewed under the theory of unconstitutional

conditions of confinement. See Jones, 2020 WL 1643857, at *3 (addressing an immigration

detainee's substantive due process claims pertaining to COVID-19-related risks under theories of

deliberate indifference to serious medical needs and unconstitutional conditions of confinement).

In evaluating whether a pretrial detainee's conditions of confinement violate his substantive due

process rights, "the proper inquiry is whether those conditions amount to punishment of the

detainee." See Bell v. Wolfish, 441 U.S. 520, 535 (1979). "To determine whether challenged

conditions of confinement amount to punishment, [a court must] determine[] whether a condition

of confinement is reasonably related to a legitimate governmental objective." Sharkey, 928 F.3d

at 307 (quoting Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008)). If the Court determines

14

that the condition is not so related, it "may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees <u>qua</u> detainees.'" <u>See</u> <u>id.</u> (quoting <u>Hubbard</u>, 538 F.3d at 232).

Upon review of the instant petition, the parties' arguments, and the applicable law, the Court finds that Petitioner has not demonstrated an entitlement to relief based on his assertion that his health and safety are at risk due to the presence of COVID-19 at PCCF. The Court notes that, in his traverse, Petitioner states that: he "is under a doctor's care for hypertension and high cholesterol"; "[h]e has a history of significant bleeding after a recent hip fracture that required emergency surgery"; "[d]uring his last doctor's visit before he was detained, Petitioner's hemoglobin levels were abnormally low, a sign of anemia, which can affect the immune system"; and that "[h]is doctor ordered further blood testing, colonoscopy, and upper endoscopy, which has not been performed due to his detention." (Doc. No. 9 at 10.) Respondent has stated, however, that "[t]he fact that [it] has taken proactive measures [with respect to COVID-19]— such as cohorting and modified lockdowns, social distancing, increased sanitation measures— indicates that [it] is not deliberately indifferent to the risk of infection." (Doc. No. 14 at 22.) Respondent adds that although Petitioner has reported respiratory issues and a sore throat, "[h]e is being checked at least twice daily and has not exhibited any symptoms that have not been treated." (<u>Id.</u> at 24.) As of April 3, 2020, Petitioner was placed in quarantine for "possible" COVID-19 exposure. (Doc. No. 15 at 3.) His medical records indicate that he has not had a temperature over 98.9 degrees through April 7, 2020. (<u>Id.</u> at 5-6.) Petitioner will remain in quarantine until fourteen (14) days have passed. (<u>Id.</u> at 3.) The Court finds Respondent's representations and exhibits persuasive and sees no reason to question them at this juncture.

Case 2:85-cv-04544-DMG-AGR Document 858-18 Filed 07/08/20 Page 17 of 18 Page ID
Case 4:20-cv-00726-JEB Document 8-1 Filed 04/09/20 Page 16 of 18
#:39028

Moreover, based on the record presently before the Court, the Court cannot conclude that Petitioner has demonstrated a deliberate indifference to a serious medical need. See Camacho Lopez, 2020 WL 1689874, at *7 (finding that the detainee-petitioner who had tested positive for COVID-19 did not demonstrate deliberate indifference where, prior to the detainee's hospitalization, his medical records "establish[ed] that [he] was being regularly monitored and appropriately treated"). Additionally, to the extent that Camacho Lopez is distinguishable from the instant case because in Camacho Lopez, the petitioner already tested positive for COVID-19 and had been hospitalized, while Petitioner in this case has not reported a positive test result, the Court finds that Petitioner is still not entitled to release based on the potential risk of contracting the virus. While the Court is sympathetic to Petitioner's health-related concerns, the Court must conclude that on the basis of the record before it, including Petitioner's specific medical needs, Respondent's response to those specific medical needs, as well as its response to the presence of COVID-19 at PCCF, Petitioner has failed to demonstrate a constitutional violation based on deliberate indifference to his medical needs.[4] Accordingly, the Court finds Petitioner's arguments in favor of release to be without merit.

The Court is mindful that its review raises the specter of disparate results. Like one of the petitioners in Thakker, Petitioner is past the age of forty (40), has some recorded history of

---

[4] Moreover, the Court notes the Third Circuit's recent commentary that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone" should not be viewed as a reason to order release from custody. See United States v. Raia, No. 20-1033, 2020 WL 1647092, at *2 (3d Cir. Apr. 2, 2020). While the Court in Raia considered the issue of release in the context of a motion for compassionate release by a defendant in a criminal case, this Court finds the Third Circuit's discussion persuasive in the case at bar, especially in light of the Court of Appeals' emphasis on the Bureau of Prisons' "extensive and professional efforts to curtail the virus's spread." See id. In a similar vein, as this Court has noted supra, Petitioner's place of detention—PCCF—has taken measures to combat the spread of the virus, specifically with regard to Petitioner. Accordingly, the Court finds that this point also warrants the denial of Petitioner's request.

treated hypertension, and has a self-reported history of high cholesterol.[5]  These conditions may place him at a higher risk of experiencing complications should he contract COVID-19.  See How COVID-19 Spreads, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed Apr. 8, 2020).  Though it may seem axiomatic, this fact does not ipso facto dictate relief from this Court.  The ultimate question before the Court is not whether, on balance, Petitioner's health concerns outweigh the interests of the community in his continued detention.  Rather, the critical question before this Court is whether Petitioner is entitled to relief under the demanding standards of the writ of habeas corpus.  To exercise jurisdiction and empower relief, it must be clear to this Court that Petitioner has established a constitutional violation through deliberate indifference to a serious medical need.  Notwithstanding the state of the entire record in some other case, under the facts now before this Court, it is not plain that PCCF has demonstrated deliberate indifference by failing to take reasonable steps to protect Petitioner from COVID-19 or to monitor and treat his medical symptoms.  As is clear from the differing results in this very district, see Camacho Lopez, 2020 WL 1689874, at *6-9, Thakkar, No. 20-cv-480, Doc. No. 47 (M.D. Pa. Mar. 31, 2020), habeas review is entirely individual.  The success of each petition will depend not only on the circumstances of the petitioner before the Court, but also on a rapidly changing landscape that includes the state of the COVID-19 pandemic, current conditions in ICE facilities, and the evolving response by ICE and facility officials to medical needs.

---

[5] See Thakkar, No. 20-cv-480, Doc. No. 47 at 2-3 (M.D. Pa. Mar. 31, 2020) (noting that some of the petitioners experienced the following conditions: leukemia; high blood pressure and cholesterol; kidney failure; diabetes; a compromised immune system resulting from a prior kidney transplant; and heart issues).

Case 2:85-cv-04544-DMG-AGR Document 858-8 Filed 07/08/20 Page 19 of 18 Page ID
#:39030
Case 4:20-cv-00726-JEB Document 818 Filed 04/08/20 Page 18 of 18

Each individual case requires the careful weighing of the medical needs of the individual against the safety of the community and the enforcement of federal laws. That balancing must occur not on federal habeas review but in the first instance before the immigration judge. This Court trusts that ICE will provide Petitioner the timely bond review to which he is legally and ethically entitled. When the immigration judge conducts this review, she will have available information that this Court does not, including current conditions at detention centers, such as population density, that bears on the risk to detainees, Petitioner's complete medical records, Petitioner's personal history as it informs the assessment of whether he is a flight risk and a danger to the community, and Petitioner's plan for relocation on release and available assurances of reappearance when the pandemic is ended.

## IV.     CONCLUSION

For the foregoing reasons, Petitioner's motion to expedite (Doc. No. 10) will be granted to the extent that this Memorandum serves as expedited review of Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1). The Court, however, will deny Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Doc. No. 1.) This denial, however, will be without prejudice to Petitioner's right to file a new § 2241 petition should he remain detained after he has exhausted his administrate remedies regarding his detention. An appropriate Order follows.

**RESPONDENTS' EXHIBIT 9**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Daniel Mosso Ramirez, and Christopher Njingu,

        Petitioner-plaintiffs

v.

Robert Culley, et al.,

        Respondent-defendants

Case No.: 2:20-cv-00609-JAD-VCF

**Order Denying Motion for Temporary Restraining Order**

[ECF No. 2]

     Daniel Mosso Ramirez and Christopher Njingu filed this 28 U.S.C. § 2241 petition to challenge their detention by Immigration and Customs Enforcement (ICE) at the Henderson Detention Center (HDC) and seek a temporary restraining order for their immediate release. They argue that their continued civil detention pending adjudication of their immigration matters, in light of the global pandemic caused by the COVID-19 virus, violates their due-process rights. I deny the motion because Njingu has recently been released, making his request for relief moot, and Ramirez has demonstrated only a speculative risk of harm.

## Background

     Njingu and Ramirez jointly filed this federal habeas petition on March 31, 2020, to challenge their continued ICE detention at the HDC.[1] Njingu's release[2] moots his request for relief, so I deny the petition and motion as to Njingu based on mootness, and I evaluate the merits of the motion only as to Ramirez.

---

[1] ECF No. 1.

[2] ECF No. 9 (stipulation in which the parties reported that "Njingu was released on parole from ICE detention on April 2, 2020.").

Case 2:85-cv-04544-DMG-AGR-JEB Document 847-1 Filed 07/23/20 Page 177 of 183   Page ID
#:39033
Case 2:20-cv-00609-JAD-VCF   Document 20   Filed 04/09/20   Page 2 of 8

1        Ramirez alleges that he is a 45-year-old citizen of Mexico, who suffers from pre-diabetes,

2  hypertension, and high cholesterol and takes medication to manage these health conditions.[3]  He

3  has been detained by ICE at the HDC since February of this year pending removal proceedings.[4]

4  His detention is based on 8 U.S.C. § 1226(c)(1)(B), which requires the detention of aliens in

5  removal proceedings based on prior drug convictions.[5]

6        Ramirez contends that his health conditions make him particularly vulnerable to severe

7  illness or death if infected by the COVID-19 virus.  He avers generally that the "conditions of

8  immigration detention facilities pose a heightened public health risk for the spread of COVID-

9  19," elaborating that:

> 10       Individuals in immigration detention are not able to practice the
>        proper social distancing and hygiene required to prevent the
> 11     transmission of this disease.  People live in close quarters and are
>        unable to maintain the recommended distance of six feet from
> 12     others.  People share and touch objects used by others. Toilets,
>        sinks, and showers are shared, without disinfection between each
> 13     use.  Food preparation and service is communal with little
>        opportunity for surface disinfection.  Staff arrive and leave on a
> 14     shift basis, with limited ability to adequately screen staff for new,
>        asymptomatic infection.[6]

15

16  He theorizes that ICE is showing a deliberate indifference to his safety in violation of his Fifth

17  Amendment right to reasonable safety by continuing to detain him despite his health

18  vulnerabilities.  Ramirez seeks a writ of habeas corpus, or in the alternative, a temporary

19  restraining order for his "immediate release" from detention.[7]

20

---

21  [3] ECF No. 1 at ¶ 7.

22  [4] ECF No. 1

     [5] ECF No. 14 at 3.

23  [6] ECF No. 1 at 9.

     [7] ECF No. 1 at 4, 19; ECF No. 2.

Case 2:85-cv-04544-DMG-AGR-JEB Document 827-1 Filed 07/23/20 Page 4 of 13   Page ID
#:39034
Case 2:20-cv-00609-JAD-VCF   Document 20   Filed 04/09/20   Page 3 of 8

1 <div align="center">**Discussion**[8]</div>

2        A temporary restraining order is "an extraordinary remedy that may only be awarded

3 upon a clear showing that the plaintiff is entitled to such relief."[9]  The Supreme Court clarified in

4 *Winter v. Natural Resources Defense Council, Inc.* that, to obtain an injunction, the plaintiff

5 "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable

6 injury in the absence of preliminary relief, that the balance of equities tips in his favor, and that

7 an injunction is in the public interest."[10]  The Ninth Circuit also recognizes an additional

8 standard: "if a plaintiff can only show that there are 'serious questions going to the merits'—a

9 lesser showing than likelihood of success on the merits—then a preliminary injunction may still

10 issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter*

11 factors are satisfied."[11]  Because I find that Ramirez's motion falters at the first two prongs of the

12 *Winter* test, I do not reach the third and fourth prongs.

13 **A.      Ramirez has not shown a likelihood of success on the merits of his claim.**

14        "When the State takes a person into its custody and holds him there against his will, the

15 Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

16 _____

17 [8] I note that a habeas petition may not be the proper vehicle for Ramirez to challenge his
conditions of his confinement because "the writ of habeas corpus is limited to attacks upon the
legality or duration of confinement." *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979); 28

18 U.S.C. § 2254(a).  But other courts that have recently considered substantially similar claims
have done so within the habeas context. *See, e.g., Castillo v. Barr*, 2020 WL 1502864 (C.D. Cal.

19 March 31, 2020); *Dawson v. Asher*, 2020 WL 1304557 (W.D. Wash. March 19, 2020).
Respondents raise this concern and also argue that Ramirez lacks Article III standing.  Because I

20 need not address these issues to resolve this motion for temporary restraining order, I leave them
for future consideration.

21 [9] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Stormans, Inc. v. Selecky*,

22 586 F.3d 1109, 1127 (9th Cir. 2009).

[10] *Winter*, 555 U.S. at 20.

23 [11] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance
for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

<div align="center">3</div>

Case 2:85-cv-04544-DWC-AGR-JEB Document 82-9 Filed 07/23/20 Page 5 of 13   Page ID
#:39035
Case 2:20-cv-00609-JAD-VCF   Document 20   Filed 04/09/20   Page 4 of 8

1  and general well-being."[12]  That duty includes providing custodial detainees with "food,

2  clothing, shelter, medical care, and reasonable safety."[13]  Conditions that pose an unreasonable

3  risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual

4  punishment, even if that harm has not yet come to pass.[14]  And because Ramirez is a civil

5  detainee, not a criminal one,[15] the Fifth Amendment's Due Process Clause also guarantees that

6  he will not be subjected to conditions that amount to punishment.[16]

7         Ramirez points out that the Supreme Court has explicitly recognized that the risk of

8  contracting a communicable disease may constitute such an "unsafe, life-threatening condition"

9  that it threatens "reasonable safety."[17]  And the High Court noted in *Helling v. McKinney* that

10  detainees "need not await a tragic event" before they are entitled to a remedy for unsafe

11  conditions.[18]  But the presence of such an unsafe condition at HDC is speculative at this point.

12  While Ramirez alleges that individuals housed at HDC have already been exposed to COVID-

13  19,[19] the declarations that respondents provide with their opposition and answer aver that no

14

15  [12] *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).

    [13] *Id.* at 200.

16  [14] *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney*, 489 U.S. at 200) (The

17  Eighth Amendment requires that "inmates be furnished with the basic human needs, one of
    which is 'reasonable safety.'").

18  [15] *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

19  [16] *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *King v. Cty. of L.A.*, 885 F.3d 548, 556–
    557 (9th Cir. 2018).

20  [17] *Helling*, 509 U.S. 25 at 36.

21  [18] *See id.* at 33–35 (citing *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974) and *Ramos v. Lamm*,
    639 F.2d 559, 572 (10th Cir. 1980) (holding that inmates were entitled to relief under the Eighth
    Amendment when they proved threats to personal safety from exposed electrical wiring,

22  deficient firefighting measures, and the mingling of inmates with serious contagious diseases
    with other prison inmates)); *see also Hutto v. Finney*, 437 U.S. 678, 682–83 (1978) (mingling of

23  inmates with infectious diseases with others).

    [19] ECF No. 2 at 8.

1   HDC inmate, detainee, or employee has tested positive for COVID-19.[20]   Respondents also set

2   forth with particularity the detailed, preventative protocol that they have instituted to protect

3   detainees:

4       a.   Employee Self-Check Stations – Before each shift, all HDC employees are
5           required to check their temperature and answer a series of questions
        related to their health, any prolonged contact with others who are
6           symptomatic of COVID-19, and whether the employee has traveled
        outside of the Las Vegas Valley within the last 14 days of their self-check.
7           Depending on the responses to these questions and the employee's
        temperature, the employee may not be permitted to enter the work area
8           and is restricted from physically coming to work.

9       b.   Staff Personal Protective Equipment ("PPE") – all HDC staff required to
        interact with inmates/detainees have been equipped with proper PPE,
10          including glasses, N95 masks, gowns, and gloves.

11      c.   Inmate/Detainee Pre-screening process – When new inmates/detainees
        arrive at the HDC, a nurse will conduct a pre-screening process at the door
12          of the facility before the new arrivals are permitted to enter.  This pre-
        screening process includes a temperature check, asking the new arrival a
13          series of questions related to COVID-19, and a determination as to
        whether the new arrival should be quarantined.  Asymptomatic arrivals
14          may be quarantined if they have been in contact with others exhibiting
        symptoms consistent with COVID-19.  Once the pre-screening process is
15          completed, new arrivals undergo the HDC's normal medical screening and
        booking process.

16      d.   Cleaning and Sanitation – HDC has implemented daily, increased cleaning
        of inmate/detainee housing and dayroom areas.  HDC has hired a third-
17          party bio-hazard cleaning company to clean housing areas that have been
        utilized by symptomatic quarantined residents.

18
19      e.   Visitation and Programming – The HDC is closed to all visitors.  All in-
        person visits, with the exception of attorney visits, have been cancelled.
        In addition, all programming conducted by volunteers or third parties has
20          been cancelled in order to decrease the number of people entering the
        HDC.  Inmates and detainees are still permitted to use telephones and to
21          write letters to communicate with family or others outside the facility.

22      f.   Education – The City of Henderson has provided its employees with
        various educational materials and resources regarding COVID-19.  In turn,

23

---

[20] ECF No. 14 at 3; ECF No. 12 at 4.

Case 2:85-cv-04544-DMC-AGR-JEB   Document 84-1   Filed 07/13/20   Page 7 of 183   Page ID
#:39037
Case 2:20-cv-00609-JAD-VCF   Document 20   Filed 04/09/20   Page 6 of 8

1           HDC employees have been educating inmates and detainees about the
            importance of social distancing in the dayroom as well as proper hygiene

2           to help curb the spread of COVID-19.

3     g.  Dayroom time and Meal Service – The HDC has implemented a "split
         tier" dayroom and meal service schedule to help with social distancing.

4       This means that the entire population of a given housing unit will not be
       able to use the dayroom at the same time. Instead, the inmates and

5       detainees will be split into two groups resulting in approximately 50%
       fewer inmates in the dayroom and at meal service at a time. In addition to

6       the split tier schedule, the HDC has instituted the following social
       distancing parameters:

7

8          i.    There must be at least one empty phone in between
              inmates/detainees using the phone bank.

9          ii.   Inmates/detainees are not permitted to sit next to one
              another at the tables in the dayroom and must be an arms-

10             length away from other inmates/detainees when sitting in
             chairs that can be moved around the dayroom.

11

12         iii.  Inmates/detainees are expected to maintain six feet of
             separation between themselves, HDC staff, and medical
             personnel.

13

14    h.  Quarantine – HDC, upon recommendation from medical personnel,
         quarantines both symptomatic and asymptomatic inmates/detainees for a
         minimum of 14 days. Quarantined inmates/detainees are seen twice a day

15       by medical personnel and treated and/or monitored depending on
       symptoms, if any.[21]

16

17  With no evidence that HDC detainees are currently being subject to constitutionally unsafe

18  conditions, Ramirez has not established a likelihood of succeeding on the merits of his claim.

19

20

21

22

23  [21] ECF No. 14 at 3–5; ECF No. 12 (Robinson Decl.) at 2–4.

6

**B.     Ramirez has not established that he will suffer irreparable harm absent immediate release.**

Ramirez also has not shown that "irreparable injury is *likely* in the absence of an injunction."[22]  A mere possibility of harm is insufficient to warrant the extraordinary relief of a temporary restraining order.[23]  Respondents have demonstrated that there is currently no evidence of a COVID-19 outbreak at the HDC.  They have also shown with particularity that detailed precautionary measures have been put in place to help protect the health and safety of HDC detainees.  So Ramirez has not established that irreparable injury will result absent his immediate release.  Even if Ramirez had shown that unsafe conditions at HDC have risen to the level of a constitutional violation, he has not demonstrated that the proper remedy for that violation would be his immediate release.  Ramirez tacitly acknowledges this when he states in his motion that "the only available remedy is to reduce levels of detention *unless and until conditions can be brought in line with constitutional standards*." [24]

---

[22] *Winter*, 555 U.S. at 22 (emphasis in the original).

[23] *See id.*  The COVID-19 global pandemic is undisputedly a grave and dynamic situation, and the safety of the public and individuals should be a priority of all sectors of federal, state, and local government.  My ruling here in no way downplays this reality, but the narrow record in this case does not support injunctive relief.  I also recognize that the Central District of California in *Castillo v. Barr*, 2020 WL 1502864, ordered the release of immigration detainees from a facility with no confirmed COVID-19 cases.  However, the record in *Castillo* showed that the Department of Homeland Security's Office of the Inspector General had repeatedly, and as recently as 2018, found that significant and various health and safety risks existed at that particular immigration detention center; personnel were not using personal protective equipment; and no measures had been instituted to prevent a COVID-19 outbreak.  *Castillo*, 2020 WL 1502864, at *1–2.  So *Castillo* is materially distinguishable.

[24] ECF No. 2 at 17 (emphasis added).

1                                      **Conclusion**

2          IT IS THEREFORE ORDERED that the motion for temporary restraining order **[ECF**

3    **No. 2] is DENIED**.

4          IT IS FURTHER ORDERED that **the petition is DENIED as moot as to petitioner-**

5    **plaintiff Christopher Njingu.**

6          IT IS FURTHER ORDERED that Ramirez has until May 11, 2020, to file his reply in

7    support of the petition, if any.

8          Dated: April 9, 2020

9                                                    _____

10                                                  U.S. District Judge Jennifer A. Dorsey

11

12

13

14

15

16

17

18

19

20

21

22

23

8