MICHAEL J. STORTZ (SBN 139836)
mstortz@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
580 California Street, Suite 1500
San Francisco, CA 94104
Telephone:   415-765-9500
Facsimile:    415-765-9501

BRETT M. MANISCO (SBN 318351)
bmanisco@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone:   310.229.1000
Facsimile:    310.229.1001

**REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES**
MANOJ GOVINDAIAH (*Pro Hac Pending*)
manoj.govindaiah@raicestexas.org

Attorneys for Plaintiff-Intervenors
B.L.N., D.F.L.G., and W.B.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY L. FLORES, et al., | Case No. 2:85-cv-04544-DMG-AGRx |
| | [Judge: Hon. Dolly M. Gee] |
| Plaintiffs, | **DECLARATION OF ANDREA MEZA IN SUPPORT OF PROPOSED INTERVENORS' *EX PARTE* APPLICATION FOR LEAVE TO INTERVENE** |
| vs. | |
| EDWIN MEESE, et al., | |
| Defendants. | Date Action Filed:  July 11, 1985 |

I, Andrea Meza declare as follows:

1. I am an attorney and the Director of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). The RAICES Family Detention Services Program serves families in ICE custody at the Karnes County Residential Center (Karnes), in Karnes City, Texas. I have been the program Director since March 2019. Prior to my position as Director, I served as the Associate Director from October 2018-March 2019. From September 2015 to July 2017, I was an Equal Justice Works Fellow and provided direct legal services to families at Karnes. I have been licensed in the State of Texas since November 6, 2015. I make this Declaration in support of the ex parte application of Proposed Plaintiffs-Intervenors B.L.N., D.F.L.G., and W.B. I make this Declaration of my own personal knowledge, and if called, would testify to the matters set forth herein.

2. The staff of the RAICES' Family Detention Services Program conducts legal visitation with *Flores* Class Members and their parents detained at Karnes Monday through Friday, and on some weekends for at least 8, often 10 to 12 hours per day. We provide services to families at Karnes in a universal representation model and estimate that we represent 80 to 95% of detained Class Members and their parents. We also operate a hotline by which clients at Karnes may call us outside of their scheduled legal services meetings with our staff. Thus, our staff is and has been in regular, daily communication with families at Karnes since 2015.

3. In my role as Director of RAICES' family detention services, I regularly collaborate with the directors of the legal service providers (LSP) at the other two family detention centers: Shalyn Fluharty, the Director of Proyecto Dilley which serves families at the South Texas Family Residential Center (Dilley) in Dilley, Texas, and Bridget Cambria, Director of ALDEA – the People's Justice Center which serves families at the Berks Family Residential Center (Berks) in Berks County, Pennsylvania.

4. In 2019, the three LSP teams began to work in close collaboration to raise issues of consistent and ongoing violations of the *Flores* Settlement Agreement (FSA) at

1
DECLARATION OF ANDREA MEZA IN SUPPORT OF PROPOSED INTERVENORS' EX PARTE APPLICATION FOR LEAVE TO INTERVENE

the three family detention centers, including prolonged detention of class members in secure, unlicensed facilities; unsafe and unsanitary conditions such as inadequate medical care; and inadequate education, among others.  Despite multiple efforts to enforce the FSA at the three family detention centers, ICE has been in violation of numerous provisions of the FSA for years.

**Prolonged Detention at the Family Detention Centers and Separation From Parents are Both Harmful to Class Members**

5. Since 2015, I and the team I direct have provided legal services and representation to hundreds of Class Member children detained at Karnes for months as they were detained at Karnes with their parents during the pendency of their immigration proceedings, in apparent violation of several Orders of this Court.

6. In 2018, the RAICES Family Detention Services Program represented approximately two hundred and fifty families – male *Flores* Class members and their fathers - who were reunited at Karnes after having been separated under the Trump Administration's Zero Tolerance policy.  Many of these families were detained for months together at Karnes following their separation.  Based on my experience working with *Flores* Class Members and their parents who experienced both separation and prolonged detention at Karnes, it is my opinion that neither separation from a parent nor prolonged detention at Karnes are in the best interests of Class Members.

7. For example, Class Member children separated from their parents exhibited distrust of their parents, negative changed behavior such as bedwetting and regressive attachment tendencies, and at times, suicidality after their reunification.  There is copious evidence that separation from a parent results in lasting trauma to children, including Class Members.[1]  When asked whether they wanted to separate from their

---

[1] *E.g.*, American Bar Association, Children's Rights Litigation, *Trauma Caused by Separation of Children from Parents*, https://www.americanbar.org/groups/litigation/committees/childrens-rights/trauma-caused-by-separation-of-children-from-parents/ (last visited July 20, 2020); JULIA

children by ICE in May of 2020, and again in a survey by RAICES in July of 2020, no Class Members or their parents indicated that they wished to separate from each other.

8. The Karnes detention center is not a safe or sanitary facility for Class Member children and continues to operate without a license from the State of Texas. The structure of the detention center itself is not safe for children. Karnes was built to detain single adult men, and though it has been painted to appeal to children and playgrounds have been added, the structure is inherently dangerous to Class Member children. For instance, the doors are thick, heavy metal doors. I am aware of multiple children whose fingers have been crushed by the doors to their cells.

9. It has been my overwhelming experience that Class Members detained at Karnes for longer than a week or two develop illness such as cough or digestive problems. Multiple Class Member children have lost weight because they are not served age-appropriate food at Karnes, and mothers have reported to me that they are punished for breastfeeding their Class Member infants and toddlers as they are accustomed to doing.

10. Much documentation exists to demonstrate that there is inadequate medical care for Class Members at the three family detention centers.[2] For instance, Class Members at Karnes do not have regular access to a pediatrician. Even when medical staff make recommendations to improve the health and well-being of Class Members during their time at Karnes, these medical recommendations often go unheeded by staff of The Geo Group, the private company that operates the Karnes detention center. For

---

VALERO, THE UNITED STATES GOVERNMENT KIDNAPPED MY SON (2020), *available at* https://www.raicestexas.org/wp-content/uploads/2020/07/July2020RAICESReport_KarnesMsL.pdf?ms=tw&emci=c18fe06f-d879-ea11-a94c-00155d03b1e8&emdi=81764d91-d879-ea11-a94c-00155d03b1e8

[2] Complaint to the DHS Office of Civil Rights and Civil Liberties, Deliberate Indifference to the Serious Medical Needs of Detained Families and Request for Investigation into the Continued Detention of Medically Fragile Individuals During the COVID-19 Pandemic (July 12, 2020), https://cliniclegal.org/resources/enforcement-and-detention/ongoing-failures-provide-adequate-access-medical-care-family?fbclid=IwAR2vWU0dcEg4suclF-EyQtNCQhdD9CRdgEr9GDh6XHXFxrj6X_uoGla9lYA

example, recommendations for dietary changes are regularly dismissed by GEO cafeteria workers.

11. In response to the COVID-19 pandemic, ICE has taken drastic measures at Karnes that have not resulted in fewer detained persons or staff contracting the dangerous, and often deadly, virus. ICE now requires all families to remain in quarantine isolation for the entirety of their detention at Karnes. In quarantine, Class Member children are required to stay in their cells for all but thirty minutes every day. Nuclear family units are separated such that every Class Member is held separately from one of their parents. The conditions resembling solitary confinement and family separation within the detention center are distressing for Class Members at Karnes.

12. Therefore, based on my experience representing hundreds of Class Members detained at Karnes, prolonged detention in unsafe and unsanitary conditions is not appropriate for Class Members, especially during a global pandemic.

13. As previously mentioned, the vast majority of Class Members and their parents wish to remain with each other. In my experience, there have only been two rare circumstances in which a family inquires about the possibility of separation. Both involve circumstances in which Class Member children are detained with only one parent, and the other parent – nearly always the Class Member's mother, or a very near relative of the Class Member's parent, such as a sibling or adult child, resides in the United States. Only when 1) a Class Member and the parent – usually a father - are experiencing prolonged, often months-long, detention or 2) when a parent has been informed of a deportation date, have parents of Class Members asked RAICES staff whether their child can be released from Karnes into the United States without them.

14. On the rare occasions in which RAICES has inquired with ICE whether a Class Member may be released from Karnes without their detained parent, ICE simply has not responded. In fact, the absence of a mechanism by which a father could allow for his child to be released to the child's step-mother was a contributing factor to the suicide of one of our clients, the father of a Class Member, at Karnes.

15. It is evident that, despite five years of mass family detention, ICE has not been motivated to produce a process by which a parent may elect for a Class Member to be released to a sponsor until the current COVID-19 pandemic. The decision to present a separation or indefinite detention protocol during a pandemic makes either choice inherently coercive as the virus outbreak continues to rage within Karnes. Parents presented with this option who do not wish to separate from their children will be forced to decide between harmful family separation against their true wishes, or to keep their children in a congregate setting amidst an outbreak of the COVID-19 virus.

16. While few parents of Class Members, less than five that I am aware of, have sought information regarding the possibility of release of their child to a non-detained parent or close family member, this will likely not be the case with the population currently detained at Karnes. All families currently at Karnes consist of nuclear family units – a mother, father, and one or more children. Many of them do not have sponsors, much less close family – such as a sibling or adult child – to care for their child or children.[3] The average age of RAICES class member clients is 4 years old. Especially in such circumstances, I find it highly unlikely that parents of Class Members will voluntarily allow for their children to be released without them; however, nor do the parents of Class Members want their children to remain in unsafe conditions at Karnes. Therefore, neither of these options promote the best interests, health, or well-being of Class Member children detained at Karnes.

**Class Counsel has not Advocated for Positions Consistent with the Interests of Class Members Detained at Karnes.**

17. Since the large-scale response to the outbreak of the COVID-19 pandemic, around March 2020, Class Counsel has not advocated for positions raised by the LSPs in the interest of Class Members detained at the three family detention centers.

---

[3] RAICES Family Detention Services team has found sponsors, often shelters, for 100% of client families detained at Karnes who do not have sponsors.

5

DECLARATION OF ANDREA MEZA IN SUPPORT OF PROPOSED INTERVENORS' EX PARTE APPLICATION FOR LEAVE TO INTERVENE

18. On March 23, 2020, lead Class Counsel sent email correspondence to the LSPs regarding action under the *Flores* Settlement Agreement to advocate for the safety of Class Members in ICE custody during the COVID-19 pandemic. At that time, lead Class Counsel included correspondence to the Department of Justice that put forth the option for a parent to "waive" his or her child's *Flores* rights (which would result in indefinite detention in ICE custody) as a step to "reduce the danger of class member infections."

19. Over the ensuing weeks, the LSPs and lead Class Counsel engaged in multiple instances of email and phone correspondence in which the LSP directors voiced concerns regarding separation of Class Members from their parents or waiver of *Flores* rights as the primary options for compliance with the FSA in the midst of the COVID-19 pandemic. Ultimately, lead Class Counsel did include language that Defendants are encouraged to release parents with Class Members pursuant to 8 CFR 1236.3(b)(2) in Plaintiff's proposed order prior to the March 27, 2020 hearing in this case.

20. At the March 27, 2020 hearing, lead Class Counsel put forth waiver as an option for compliance with the FSA over the objections of the LSPs. Between this hearing and the April 24, 2020 hearing in which the same position was put forth, the LSPs and lead Class Counsel engaged in many instances of email and phone correspondence in which the LSPs asked lead Class Counsel to refrain from advocating for the formalization of a "waiver" process during the COVID-19 pandemic.

21. On May 14, 2020, ICE approached all families detained in the three family detention centers and asked them whether they wanted their children released without them or whether they wanted to remain detained with their children – a process often referred to as "binary choice." This Court acknowledged the anguish this action on the part of ICE caused to Class Members and their parents.

22. It was at that time, and remains, the position of the LSPs that: ICE is out of compliance with this Court's multiple orders for prompt release of Class Members; that

the LSPs are in a position to advocate for ICE to release Class Members with their parents pursuant to 8 CFR § 1236.3(b)(2) as ICE has regularly done in its attempts to comply with the FSA since 2015; and that presentation of a "binary choice" between separation or indefinite detention as the only options to comply with the FSA is not appropriate, especially during a global pandemic.

23. Lead Class Counsel's response to ICE's presentation of the separation/indefinite detention "binary choice" was, "Every decision a parent makes is a binary choice." Lead Class Counsel stated that the only two options to ensure ICE's compliance with *Flores* and pursue unity of Class Members with their parents are 1) winning an order for release of parents in another class action or 2) allowing for separation of children and parents, and thereafter seeking release of parents. Lead Class Counsel continues to advocate for separation as the best option for compliance with the FSA rather than holding ICE to its obligations under paragraph 14 of the FSA to release children to their parents, an option that is contemplated and must be considered under 8 CFR § 1236.3(b)(2), especially during the COVID-19 pandemic.

24. Moreover, on multiple occasions, the LSPs urged lead Class Counsel to advocate for ICE to remedy its continued lack of compliance with the FSA and to avoid creating a situation in which separation or "waiver" of *Flores* release rights is the norm.

25. Ultimately, on June 17, 2020, the LSPs decided that we could not ethically advocate for interests of our accompanied Class Member clients through submission of evidence via lead Class Counsel. At that time, we initiated submission of evidence regarding ICE's continued failure to comply with this Court's orders for prompt release of Class Members as *amici curiae*.

26. Since this Court's June 26, 2020 hearing and Order that ICE release all Class Members in its custody detained longer than twenty days, lead Class Counsel continues to advocate for Plaintiffs to engage in prompt finalization of a process to ask parents whether they wish to separate or waiver their children's *Flores* rights as the primary mechanism for Defendant's compliance with the Court's order, despite

protestations from advocates other than the LSPs that such a scenario in the COVID-19 pandemic is not in the best interests of Class Members.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th Day of July, 2020 at San Antonio, Texas.

_____
Andrea Meza