# Exhibit B

# Physicians for Human Rights



# "You Will Never See Your Child Again"

## The Persistent Psychological Effects of Family Separation

February 2020



Exhibit B. Page 7



## Contents

3   Executive Summary
5   Introduction
9   Methodology
11  Findings
25  Legal Framework
31  Conclusion
31  Recommendations
34  Endnotes

*Cover: A Guatemalan mother is reunited with her four-year-old son after they were separated for one month when they crossed into the United States. Photo: Joe Raedle/Getty Images*

## Acknowledgments

This report was written by PHR staff members Hajar Habbach, MA, asylum program coordinator; Kathryn Hampton, MSt, senior asylum officer; and Ranit Mishori, MD, MHS, senior medical advisor. The codebook was developed by PHR Medical Director Michele Heisler MD, MPA and by University of Michigan School of Medicine Assistant Professor Kelly Orringer, MD, Clinical Professor Michelle Riba, MD, MS, and medical student Linda Camaj, MPH. Coding was conducted by Linda Camaj, Hajar Habbach, and Kathryn Hampton.

The report benefitted from review by PHR staff, including DeDe Dunevant, director of communications; Michele Heisler MD, MPA, medical director; Derek Hodel, interim director of programs; Donna McKay, MS, executive director; Michael Payne, advocacy officer and interim advocacy director; and Susannah Sirkin, MEd, director of policy.

The report also benefited from external review by PHR Board Members Lois Whitman, JD, MSW and Gail Saltz, MD, by PHR Advisory Council Member Vincent Iacopino, MD, MPH, and by University of Michigan School of Medicine Assistant Professor Kelly Orringer, MD.

Many thanks to the following PHR Asylum Network members, who conducted evaluations which were used in the report: Phyllis Cohen, PhD; Barbara Eisold, PhD; Nathan Ewigman, PhD, MPH; Karla Fredericks, MD, MPH; Eric Goldsmith, MD; Teyah Hults, LPC; Kirandeep Kaur, DO; Eindra Khin Khin, MD; Frances Lang, LICSW; Stuart Lustig, MD, MPH; Patrick McColloster, MD; Thomas McCoy, LCSW, MDiv; Spyros D. Orfanos, PhD; Katherine Peeler, MD; Kristin Samuelson, PhD; Jeffrey Stovall, MD; Jason Thompson, PhD; Anna Van Meter, PhD; Erin Zahradnik, MD; and Jennifer Zhu, MD; and to the New York University Postdoctoral Program in Psychotherapy and Psychoanalysis Immigration and Human Rights Working Group.

The report was edited and prepared for publication by Claudia Rader, MS, PHR senior communications manager, with assistance from Maya Tessler, PHR communications intern.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          2

Exhibit B, Page 8

# Executive Summary



A new Physicians for Human Rights (PHR) investigation, based on psychological evaluations of asylum-seeking parents and children who were separated by the U.S. government in 2018, found pervasive symptoms and behaviors consistent with trauma; most met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation.

PHR evaluated 17 adults and nine children who had been separated under the policy for an average of 60-69 days; all but one child had been reunited at the time of evaluation. The investigation sought to explore two key questions: 1) What traumatic experiences did these asylum seekers report in their home countries, during their journey to the United States, and during and after their apprehension at the border?; and 2) What were the psychological effects associated with the forced separation of children from their parents and other family members after entry into the United States? The rich and intense narratives of our illustrative cohort help shed light on the experiences of separated families.

Due to targeted acts of violence in their home countries, all parents arrived at the U.S. border having already been exposed to trauma    most often as victims of gang activity    from death threats, physical assault, relatives killed, extortion, sexual assault, or robbery. All parents expressed fear that their child would be harmed or killed if they stayed in their home country. In almost all cases, their children had already faced severe harm before fleeing    gangs drugged, kidnapped, poisoned, and threatened children, including threats of death, violence, or kidnapping, if he  o  hei  a en  did no com l   i h he gang demands. Parents were confident that the journey to the United States would result in protection for their children.

When they arrived in the United States, however, parents reported that immig a ion a   ho i ie  fo cibl    emo  ed child en f om  hei   a en   a m ,   emo ed  a en    hile hei  child en le  , o  im l  di a  ea ed  he child en while their parents were in court rooms or receiving medical care. Almost all reported that immigration authorities failed to provide any explanation as to why they were being separated, where their family members were being sent, and if or how they would be reunited. In addition, the asylum narratives documented instances of four parents who were taunted and mocked by immigration authorities when asking for the whereabouts of their children. Half of the parents interviewed by PHR clinicians reported poor conditions at the detention facilities where they were held, and the children also reported being mistreated or living in poor conditions while detained and while in foster care.

PHR clinicians chronicled that nearly everyone interviewed exhibited symptoms and behaviors consistent with trauma and its effects: being confused and upset,

"You Will Never See Your Child Again":      Physicians for Human Rights        phr.org           3
The Persistent Psychological Effects of
Family Separation

Exhibit B, Page 9

The U.S. g e nmen  ea men  f a l m
eeke  h gh i  lic f famil  e a a i n
c n i e c el, inh man, and deg ading
ea men  and, in all ca e e al a ed b  PHR
e e , c n i e  e.

constantly worried, crying a lot, having sleeping difficulties, not eating well, having nightmares, being preoccupied, having severely depressed moods, overwhelming symptoms of anxiety, and physiological manifestations of panic and de ai ( acing hea , ho ne  of b ea h, and headache ), feeling       e agon  and ho ele ne , feeling emo ional and men al ang i h, and being inc edibl  de onden . The e al a ing clinician  no ed ha  he child en exhibited reactions that included regression in age-appropriate behaviors, crying, not eating, having nightmares and other sleeping difficulties, loss of developmental milestones, as well as clinging to parents and feeling scared following reunification with their parents.

The vast majority of mental health diagnoses given by the evaluating clinicians and depicted in the expert affidavits produced for immigration proceedings were highl  con i en  i h he e a en  and child en  e o  of hei  a ma ic experiences in detention and family separation. At the same time, several clinicians commented on the likelihood that the present symptoms were exacerbated by pre-existing trauma from events and incidents in their home country. Acco ding o PHR  clinicians, most individuals (both adults and children) met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder.



*A two-year-old Honduran girl and her mother are detained near McAllen, Texas before being sent to a Border Patrol processing center for possible separation.*
*Photo: John Moore/Getty Images*

"You Will Never See Your Child Again":   Physicians for Human Rights   phr.org   4
The Persistent Psychological Effects of
Family Separation

Exhibit B, Page 10

PHR e e  no ed ha all he indi iduals they interviewed demonstrated appropriate emotional reactions and did not show signs of exaggerating their plight, and uniformly described the asylum seekers as credible.

Thi d finding o ide e idence of he ad e e h ical and men al health effec linked o he T m admini a ion famil e a a ion olic . In nea l e e ca e enco e ed, PHR e e medical e al a o no ed ha he a ma suffered by the parents and the children warranted further intervention and ongoing therapeutic o , beca e he e en e e ca ing ignifican di e and ongoing f nc ional im ai men . The in e en ion mo f e en l recommended included trauma-focused psychotherapy, removal from detention, and psychiatric medications.

PHR finds that the U.S. go e nmen ea men of a l m eeke h o gh i policy of family separation constitutes cruel, inhuman, and degrading treatment and, in all cases evaluated by PHR experts, rises to the level of torture.

As defined by the United Nations Convention Against Torture,[1] torture is an act 1) which causes severe physical or mental suffering, 2) done intentionally, 3) for the purpose of coercion, punishment, intimidation, or for a discriminatory reason, 4) by a state official or with state consent or acquiescence. In the cases that PHR documented, U.S. officials intentionally carried out actions causing severe pain and suffering, in order to punish, coerce, and intimidate Central American asylum seekers to give up their asylum claims, in a discriminatory manner. Torture and cruel, inhuman, and degrading treatment are violations of human rights and are prohibited under domestic and international law in any and all circumstances.

In addition, PHR concludes that the policy and practice of family separation also constitutes enforced disappearance, which occurs when state agents conceal the fate or whereabouts of a person who is deprived of liberty. In all cases included in the study, there was a period where parents were unaware of their child en whereabouts and were not able to contact them. Government failure to track children and parents, to facilitate parental contact, or to plan for reunification deprived children of protection under the rule of law, because they were deprived of parental oversight and consent for their welfare without due process.

The U.S. government must uphold domestic and international standards by fulfilling its obligations to: provide redress to victims of torture and ill-treatment, including in the form of rehabilitative services; ensure the families of disappeared child en kno he h of hei famil membe he eabo b dedica ing adequate government resources to ensure timely reunification for all separated families, including deported parents; and prosecute U.S. officials who have broken the law.

# Introduction

Reports, beginning in 2018, that the Trump administration was separating young migrant children from their parents, apparently causing severe trauma, led to a nationwide outcry and became a fault line in the national immigration debate. Perspectives differ greatly over how the United States should manage migration flows, particularly when families and young children are involved. These

All  f  he  a en   incl ded in  hi     d  fea ed  ha  hei  child en     ld be ha med    killed if  he   a ed in  hei  h me c  n  .

hardening policy positions are based, on one side, on suspicions about why migrants are coming to the United States with children and skepticism that forced separation of parents and children results in any real harm, and, on the other side, on anger and indignation over immigration policies that are viewed as yet another outrage by a controversial administration. In an increasingly polarized society, evidenced-based opinions on this inflammatory issue are in short supply.

Physicians for Human Rights (PHR) can only speak to the cases we documented. However, what we found was that all of the parents included in this study feared that their children would be harmed or killed if they stayed in their home country. The Trump administration    as part of an effort to discourage migration   set out to separate thousands of migrant children and parents, without any system in place for tracking or reuniting them. Due to opposition from litigators and immigrant rights advocates, the courts halted this policy. The United States continues to separate parents in cases where authorities allege that parents have a criminal history, gang affiliation, or a communicable disease. This means that parents who were accused but not convicted of a crime, have an outdated traffic violation, or are HIV+ are being deprived of custody without an assessment by child welfare professionals. According to the latest numbers provided by Department of Homeland Security, as of December 2019, 1,142 families had been separated after the court injunction.[2] However, the persistent and damaging psychological effects documented by PHR, particularly on children, call out for acknowledgement, accountability, and reparation.

## Background

### Family Separation Was Rare in Previous U.S. Administrations

Trump admini    a ion official  ha  e a g  ed,   hen defending  he go  e  nmen  policy and practice of family separation, that previous administrations used family detention and separation as deterrence methods and that the Trump administration simply drew upon these preexisting policies.[3] In fact, neither the Bush nor Obama administrations employed a policy of widespread family separation to deter migrants from seeking asylum in the United States. The Bush admini    a ion  2005 O  e a ion S  eamline  olic  inc ea ed prosecutions for illegal border crossings, but families were generally kept together in family residential centers.[4] The government formally recognized that, except in cases where there was a proven danger to the child, the Department of Homeland Sec   i   s (DHS) priority was to keep families together.[5]

In 2014, a major demographic shift in immigration patterns occurred from largely single young adult men to unaccompanied minors and families arriving at the southern border to request asylum (a shift known a    he    ge ). In fi  cal year 2013, Customs and Border Protection (CBP) apprehended a total of 14,855 families at the southern border,[6] while in fiscal year 2014, that number spiked to 68,455.[7]  In response to this shift, the Obama administration implemented a much-criticized family detention policy with the aim of deterring the arrival of

other families from Central America and Mexico.[8] Unlike its predecessor, the Obama administration shifted away from family shelters and instead opened four family residential detention centers, three of which are still in operation today and one of which was closed after an internal investigation uncovered dangerous conditions.[9] This policy was markedly different from the practices under the current administration, however, in that the separations occurred only in limited situations: for example, when a mother and child were detained together while the father was sent to a separate facility.[10]

## Family Separation Planned and Tested in El Paso, Texas

From July 2017 to October 2017, the Trump administration began a trial of physically separating children from their parents in El Paso, Texas.[11] Immigration and Customs Enforcement (ICE) and CBP officials viewed the El Paso pilot program as a success and reportedly used the dwindling number of apprehensions to persuade former secretary of homeland security Kirstjen Nielsen to expand the policy to the rest of the southern border.[12]

In fiscal year 2018, the year in which the family separation policy was rolled out, a record number of 107,212 families were apprehended at the southern border.[13] DHS statistics from 2017 show that a large portion of asylum cases referred to the De a men of J ice E ec i e Office fo Immig a ion Re ie e efo a l m seekers from Northern Triangle countries (El Salvador, Guatemala, and Honduras), up to 76,328 from 42,663 in the previous year.[14] The increased flow of migrants from these countries reveals the extreme push factors that cause asylum seekers to flee their home countries and seek refuge in the United States: indiscriminate violence, physical and sexual violence targeting women and children, forced recruitment into gangs, and extortion.[15] Instead of recognizing these regional displacement trends, U.S. government officials portrayed asylum eeke a bad homb e ,[16] m ggle and afficke , MS-13 members, c iminal and ab e ,[17] characterizing parents fleeing with their children as traffickers and gang members fraudulently migrating with children to gain access to the United States.[18] Ho e e , acco ding o DHS o n a i c , in he fi fi e months of fiscal year 2018, the rate of children brought in with and separated from traffickers is statistically insignificant at 0.61 percent of all apprehensions at the border, and rates have generally been recorded as low as 0.1 percent.[19]

Nevertheless, on May 7, 2018, then-attorney general Jeff Sessions announced the na ional ollo of he admini a ion olic and o gh o j if hi ni i e policy by claiming that it targeted criminals violating U.S. law. Yet, challenging this justification, asylum-seeking families presenting at ports of entry were also subjected to arbitrary detention and separation.[20] During the following six weeks, more than 2,814 children who were reclassified as unaccompanied minors and sent to shelters were forcibly separated from their families at the southern border.[21] Nearly all of these children have now been reunited with their families.[22] An internal government watchdog who interviewed clinicians and other staff caring for separated children in shelters during this time reported extreme levels of distress due to separation, including inconsolable crying and self-harm, which staff were unprepared and under-resourced to address.[23] Amidst public outcry, on June 20, 2018, President Trump issued an Executive Order instructing the government to detain families together indefinitely, calling for Congress to end existing federal detention limitations for children which might otherwise be violated by this instruction.[24] The Executive Order failed to address the reunification of the families that had been separated as a result of the policy or to

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation                    Physicians for Human Rights                    phr.org                    7

Exhibit B, Page 13

explicitly halt the separation of parents and children, stating that the go e nmen     olic  had al  a   been  o main ain family unity.

## Family Separation Halted as a Threat to Constitutional Rights

On February 26, 2018, attorneys from the American Civil Liberties Union (ACLU) representing parents who had been separated     some of them deported without their children     filed a federal lawsuit, *Ms. L v. ICE,* to halt any continuing separations, reunify families, and require the government to provide information about how many families had been separated.[25] Six days after President Trump issued his June 20 Executive Order, the United States District Court of the Southern District of California recognized that these cases demonstrate a strong likelihood of a violation of constitutional rights to family integrity. The court stated that the Executive Order was a reactive response to government-created chaos and that it belied due process.[26] On June 26, 2018, the court granted a preliminary injunction and called for the government to halt separations, including those taking place through deportation, to ensure speedy reunification of parents and children who were separated, to facilitate parental contact with children until reunification, and to ensure appropriate coordination between government agencies.

Despite the preliminary injunction, as of this writing, human rights groups continue to document cases of family separation at the southern border.[27] According to government statistics given to the ACLU, at least 1,142 children were separated from their parents after the injunction; while the ACLU asserted that these separations are in defiance of the June 2018 preliminary injunction, a U.S. District Court in San Diego acce  ed  he go e nmen    j   ifica ion fo  he on-going separations.[28] In total, 5,512 children were separated since July 2017.[29] Determining the extent of the responsibility of the U.S. government towards separated and reunited families remains the subject of litigation. On November 6, 2019, a U.S. District Court in the Central District of California issued an injunction which required the federal government to make available mental health screenings and treatment to separated families due to the deliberate indifference of government officials toward the trauma resulting from family separation.[30]



Total Number of Migrant Children Separated from Their Parents
July 2017 to December 2019

5,512
Total children separated

3,106
10 years or older

2,246
Younger than 10 years

160
Age information not available

Source: U.S. Departments of Homeland Security and Health and Human Services, as provided to the American Civil Liberties Union.

© 2020 Physicians for Human Rights

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation                Physicians for Human Rights            phr.org            8

Exhibit B, Page 14



**U.S. Officials Are Still Separating Migrant Children**

From June 2018 to December 2019 alone, 1,142 children were separated from their families. 300 were very young children 5 years and under.

300
0 to 5 years old

294
6 to 9 years old

281
10 to 14 years old

267
15 to 17 years old

Source: U.S. Departments of Homeland Security and Health and Human Services, as provided to the American Civil Liberties Union.

© 2020 Physicians for Human Rights

# Methodology

## PHR Asylum Evaluations and the Istanbul Protocol

For more than 30 years, members of the Physicians for Human Rights (PHR) Asylum Network, comprising 1,700 volunteer health professionals, have conducted forensic evaluations for asylum seekers involved in U.S. immigration proceedings.[31] These evaluations    conducted in accordance with the principles and methods of the international standards of the Istanbul Protocol[32]    are requested by attorneys who identify a need for trained clinicians to document and assess physical and psychological e idence of  hei  clien   acco n  of alleged torture or persecution. The medical-legal affidavits are submitted to the De a men of Homeland Sec  i    Uni ed S a e Ci i en hi  and Immig a ion Se  ice and  he De a men of J    ice  E ec  i e Office for Immigration Review to highlight the degree of consistency between a  l m  eeke    accounts of persecution and their physical signs of injuries and psychological symptoms. Although these evaluations alone cannot determine the legitimacy of asylum claims, they are intended to document any severe physical health and mental health harms experienced by the asylum seeker. Other essential elements needed for the asylum case, such as determining discriminatory intent of persecutors or failure of the state to control persecutors, are not directly addressed in these affidavits. At times, collateral information in the affidavits may be present related to those elements of the criteria for asylum.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation        Physicians for Human Rights        phr.org        9

Exhibit B, Page 15

## Data Collection and Analysis

From July 26, 2018 through August 12, 2019, PHR Asylum Program received 37 requests made by attorneys representing asylum seekers—both adults and children—who were separated from their family members at the U.S. border under the new Trump administration policy. PHR was able to match all 37 were with health professional volunteers in their client local area who conducted in-depth evaluations of these asylum seekers and wrote up their findings in medical-legal affidavits.[33] In addition, PHR sent a team of clinicians to South Texas Family Residential Center in Dilley, Texas to provide forensic evaluations of mothers detained at the facility.

The research team excluded medical affidavits of 11 asylum seekers where the family was separated but the evaluations focused on their asylum case and did not address family separation. We analyzed the remaining 26 affidavits out of the completed 37 evaluations. Clients and attorneys gave consent for the use of de-identified data from these affidavits for research and advocacy. The University of Michigan Institutional Review Board reviewed the research plan and designated it as exempt as defined by Title 45 CRF part 46 provisions for protection of human subjects. During the research design, the decision was made to use data which was gathered as part of the work of the Asylum Program, with client and attorney consent, rather than conducting separate research interviews with families, which could be re-traumatizing. The attorneys reviewed and revised the affidavits with their clients as needed and used the affidavits in their legal cases. Providing pro bono forensic evaluations for clients who contributed data to the study fulfilled an ethical obligation to provide appropriate assistance or referrals to vulnerable populations when conducting research; giving the clients access to their affidavits which are revised in line with their feedback to their attorneys also reflects a commitment to the democratization of knowledge.[34]

The co-investigators qualitatively analyzed data and content from the 26 affidavits, looking for themes and sub-themes. We coded content from the affidavits, as written by the clinicians performing the evaluations and summarizing findings from their interviews with asylum seekers (adults and children), through open coding (creating tentative labels), axial coding (identifying connections among the codes), and selective coding (comparing all the codes to the core question).[35] The co-investigators jointly developed a coding tool after reading the collected affidavits. University of Michigan faculty and students and PHR staff coded the medical-legal affidavits using Dedoose, a qualitative analysis software program, capturing basic demographic information, trauma exposure history, logistics of separation, and medical and mental health outcomes related to the separation.

Members of the research team participated in an intercoder agreement process, where coders independently evaluate the data to check whether they will reach the same conclusions, to ensure best practices for data analysis, and to check the consistency of coding. The research team found that the data reached code saturation by the second intercoder agreement trial, as no new codes were added after that point. The researchers reached meaning saturation by the fourth intercoder agreement, which means that the coders were no longer refining the definitions of the codes.[36] Three members of the research team conducted four intercoder agreement trials in which the researchers coded a transcript independently, then crosschecked their codes with the rest of the team. After four trials, the research team established a 78 percent intercoder reliability agreement. A highly experienced qualitative researcher conducted a peer audit of

the coding. Through an iterative and consensus-based process, the research team revised themes and sub-themes.

## Limitations

This data was not collected for research purposes, rather we were presented with an opportunity to analyze rich content that would enable us to explore and deepen our understanding of the effects of family separation on a select group of individuals with this lived experience. ███████████████████████████████ ███████████████████████████████████████████████████████████ many other separated families.[37]

In addition, the affidavits we reviewed did not capture the experiences of parents who were deported without their children, which means that the findings do not focus on how deportation exacerbated trauma or impeded reunification. No children under the age of six were included in the dataset, so the potentially severe impact of separation on infants and toddlers is not assessed in this study. Most of the families included in this data set were separated for an average of 30-70 days. Families who were separated for much longer may have experienced even greater negative health consequences as a result of the separation. Thus, further study is needed regarding the impact of separation on these populations. Finally, the materials analyzed are narrative reports of clinicians who interviewed survivors and are not direct transcriptions of interviews with the affected individuals. As such, reporting bias is a major limitation.

We shared our findings with the U.S. Department of Homeland Security and requested a response but had not received any as of the date of publication.

# Findings

## Introduction

The affidavits involved 20 family separation cases, comprising a total of 26 individuals, including five parent/child pairs and a husband/wife pair (the husband was separated from their daughter at the U.S. border, the wife migrated afterwards with their son). Nine of the families were from Honduras, five from Guatemala, and five from El Salvador.[38] Of the 26 individuals, 13 were women, four were men, six were boys, and three were girls. Ages of the children ranged from six to 17 (eight out of the nine children were under the age of 10), and, of the adults, from 24 to 45 years old.

|  | Adults age ranges (24-45) | Children age ranges (6-17) | Total |
|---|---|---|---|
| Women/girls | 13 | 3 | 16 |
| Men/boys | 4 | 6 | 10 |
| Total | 17 | 9 | 26 |

Fo he  o e of acc ac ,  o a ion a e aken di ec l f om he clinician expert affidavits. Direct quotations from children and adults are only included if present in  he clinician  e a l a ion.

"You Will Never See Your Child Again":
The Persistent Psychological Effects of
Family Separation

Physicians for Human Rights

phr.org          11

Exhibit B, Page 17

## Families Fled Physical Violence and Death Threats from Gangs

Due to targeted violence in their home countries, parents arrived at the U.S. border with trauma exposure. All parents reported to Physicians for Human Righ (PHR) clinician ha he e e ienced m om ela ed o hei e-migration trauma when they arrived at the border, which was then compounded by the distress and panic they experienced during the separation process. Symptoms which began in their home country, and that they reported continued in the United States, included nightmares, insomnia, intrusive flashbacks, pervasive anxiety, and impairment in carrying out daily activities.

Within the group of families evaluated by PHR experts, death threats were the most common type of persecution experienced, with 15 out of the 17 adults interviewed receiving death threats in their country of origin. Many of the families suffered physical assault (eight), or their friends or relatives were killed (nine). Families also reported to PHR clinicians that they were subjected to extortion (six), sexual assault (five) and robbery (five), as well as two kidnappings and a poisoning case. All but one of the adults reported being subjected to multiple forms of persecution.

Most of the families reported being targeted by gangs or cartels, with 14 out of the 17 adults reporting such targeting. Six families were subjected to domestic violence (two by intimate partners and four by other family members), but four of those six were also victims of gang violence, reinforcing the dominance of persecution by gangs.

Almost all individuals reported being targeted based on their reported personal characteristics and past experiences. The two main trends were having a family member who was a gang target (11) and resisting gang coercion (eight): five adults resisted gang extortion o obbe , one ef ed o be a gi lf iend / e slave of a gang member, and two resisted gang/cartel recruitment. Other reasons for being targeted included: being a farmer or business owner (three), single mother living alone (three), people with relatives working in the United States (three), woman unable to leave a relationship (two), indigenous background (two), sexual violence survivor (two), and member of a minority religion (two). Their accounts indicated that the incidents were not random acts of generalized violence in society, but rather were specific and targeted to each individual based on traits which the individual could not or should not be expected to change.

In terms of efforts to address persecution, 15 of the 17 adults reported attempting different strategies for trying to avoid those who were harming them. The most common strategies were internal relocation, either moving to another city or to another neighborhood (six), or restricting movement and going into hiding (four), often in combination. In four cases, the individuals stated that they did not attempt relocation within their country because their persecutor had contacts nationwide. Other tactics included changing phone numbers and going silent on social media (two), meeting extortion demands (two), seeking safety with family or friends (three), and not resisting a robbery (one). In two cases, the adults had

> All a en e ed PHR clinician ha he
> e eienced m m ela ed hei e-mig a i n
> a ma hen he a i ed a he b de , hich a
> hen c m nded b he di e and anic he
> e eienced d ing he e a a i n ce .

sought to flee to the United States on two previous occasions, between ports of en    . One mo he   e  o ed ha  he  a    ned a a  f om  he U.S. bo de  in April 2018 and was then allowed to cross in May 2018.

Twelve of the 17 adults made reference to local law enforcement in their interviews. Four had filed police reports in their home country: in three cases, police did not investigate and in one case the investigation produced no result. In four cases, the individual did not file a police report, due to the risk of retaliation (two), concerns about corruption (one), and because it would be too emotionally taxing to relive the abuse (one). In another case, a man received death threats for filing a police report. Filing a police report, one asylum- eeke  e   lained, i    like having a noose on  o   neck, beca   e o a e immedia el     lne able  o deadl     retaliation. Gang members tried to recruit a teenager in Honduras as a lookout for police presence and threatened to beat him if he refused. There was one positive example where police effectively intervened in a domestic violence case; however, the same woman was later threatened because a gang thought her police report was about them. Although she had changed her phone number, the gang membe   fo nd he  ne    hone n mbe  and  h ea ened o  c   out her   ong e  beca  e  he  ho gh   he had gone o he  olice. The a  l m  eeke    reported that the police were afraid of the gangs. In one town, the cartel killed several police officers and even dismembered one as a warning. In another, the police arrived at a murder scene near the police station hours after the crime occurred.

## Children Struggle to Recount Persecution Alone

The affida i   of child en ill     a ed  he child en   difficl   in de c ibing  he persecution they and their families faced in their home countries. Due to their level of development and maturity, young children often lack understanding or have difficulty articulating what they know. Separated from their parents, these children would have difficulties accessing asylum due to their lack of knowledge related to the persecution, in spite of the serious danger they face if returned. Critically, out of the nine children evaluated by PHR clinicians, only one, who is 17 years old, was able to narrate the story of the persecution he experienced in his country of origin. The other children were between the ages of six and nine. Even when being evaluated by PHR clinicians who are experts in child psychology, child en  na a i e  e e limi ed: He doe  no kno    h  he and hi  mo he  lef Hondu a . Hi  mo he   a no ha    he b  he did no kno    h ; She did no kno    ha had ha  ened in he oom o   ha  he man did  [  hen he mo he   a a ed in he    e ence]; He i  af aid o e   n o Hond a beca  e   he e a e bad  eo le he e. Clinician  e o ed child en  a ing:  Bad  hing  ha  ened  and  The bad  eo le a e killing good  eo le. I co  ld onl   ake one    mall  o . One  e en-year-old girl would not answer any questions about the traumatic events her family had experienced; the evaluator s a ed,  He participation in the Squiggle Game[39] is one of the more inhibited I have seen in the almost twenty years since I began using this technique, a level of inhibition that is very consistent with high levels of deep- ea ed an ie . Ho e e , once  e ni ed  i h hei  a en , ome child en  acco n  co ld be fle hed o . A expected for her age and level of development, the details she was able to provide   e e  dimen a b  con i en  i h he fa he   e o ; [He a ked] hi mother which room the bad men had put her in, and after she answered he drew hi  mo he  in ha  oom  i h  he bad men holding a g n o he  head.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation             Physicians for Human Rights             phr.org             13

Exhibit B, Page 19

## Parents Decided to Seek Protection for Their Children

All parents expressed fear that their child would be harmed or killed if they stayed in their home country. In almost all cases, their children had already faced severe harm before fleeing    gangs drugged, kidnapped, poisoned, and threatened children with death, violence, or kidnapping if they or their parents did no com l   i h he gang   demand . Child en   e e either direct targets for gang recruitment, or they were threatened in order to coerce their parents. Gangs benefit from underage recruits in their operations, because anti-gang laws have reduced penalties for juvenile offenders.[40] A consistent theme in the interviews was the use of schools as battlegrounds for gang violence. Families were fearful of children being targeted by gangs on the way to school, and most parents did not allow their children to walk to school alone in order to lower their risk of violence. A mo he  f om El Sal ado   i ched he da gh e    chool e e al ime so gang members could not find and kill her. Due to their dependency, children are also more likely to be affected by harm to family members, especially parents, than adults are. One mo he  f om Hond   a  aid, I  a   ca ed  o be killed and lea e m  child en   i ho   a mo he .

Parents were confident that the journey to the United States would result in protection for their children. One father and his wife prioritized their most vulnerable child, deciding that the father would migrate with their youngest daughter first because she was more at risk since she was attending school. Another father decided to go ahead with his son so that he could send money back for travel costs for his wife and newborn daughter to join them. A mother said that she brought her daughter with her because she was convinced that she would be much safer than if she were left behind with relatives in Guatemala. Indeed, previous PHR research describes how children who are left behind when a parent migrates face an increased risk of harm and abuse in their home country.[41]

## Families Were Forcibly Separated at the Border

As mentioned above, all the parents included in this study feared that their children would be harmed or killed if they stayed in their home country. All made the difficult decision to undertake a long and arduous journey to seek asylum in the United States. A father from Honduras recalled traveling by train and foot to reach Mexico and then crossing the Rio Grande by raft to enter the United States.[42] Another mother also reported crossing the Rio Grande by raft and others reported taking buses, in desperation resorting to smugglers to keep their families safe in transit, and traveling through dangerous parts of Mexico.

What awaited these parents at the U.S. border after their journeys was an unexpected, chaotic, and haphazard separation from their children.

Immig a i n a h i ie f cibl em  ed child en f m hei  a en  a m , em ed a en   hile hei child en le ,   im l  di a  ea ed  he child en  hile hei  a en   e e in diffe en h lding cell ecei ing medical ca e.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          14

Exhibit B, Page 20

Nine of the 17 parents reported to PHR clinicians that immigration authorities abruptly separated them from their children and that they were prohibited from saying goodbye or consoling them. Immigration authorities forcibly removed children from their paren  a m , emo ed  a en   hile hei child en le , o simply  disappeared  the children while their parents were in different holding cells or receiving medical care. A mother from El Salvador recalled the  nigh ma e,   a ing   hen office   oke her up at 2 a.m. and interrogated her with her daughter present. They told her she had broken the law and hence she would be arrested. They handcuffed her in front of her daughter and then  oceeded  o ake he  da gh e  o ano he  oom.  A fa he  f om Hond  as, who was separated from his daughter after presenting at a port of entry on the U.S.-Mexico border, reported that the guards at a detention center in Texas physically removed his daughter and he recalls her crying for him as they took her away.

In a few cases, PHR clinicians documented instances of parents being separated from their children while the children slept. A father from Honduras described being   oken   a o nd fo   in he mo ning and old  ha  he had  o go  o co  to see a judge. Up to this point, he had been told he was going to be deported and they would not clarify if his son would be deported with him. He asked if he could wake up his son but was told no because he would be with him again soon after court. He left his son there on  he floo  co e ed  i h an al  min  m blanke .  De  i e being  old ha he  o ld be  e nied  i h hi  on  oon af e  co  , he would not see him again for another 73 days. One mother reported being taken to the hospital to receive medical care for a large cut on her finger. When she was released from the hospital, her two sons were gone, and no one would explain to her where they went.

According to the narratives captured in the affidavits, U.S. immigration authorities separated these families in a haphazard and chaotic manner. No care or concern was given for the families and, in particular, for the children. Immigration authorities did not share contact information or timelines for reunification with any of the separated families in this study. These accounts co obo a e he De a men of Homeland Sec  i  (DHS) Office of In  ec o Gene al  (OIG) e ie  of famil  e a ion nde  he Ze o Tole ance  olic , in which OIG found that DHS provided inconsistent information to asylum seekers traveling with families, which resulted in a chaotic reunification process.[43] They also corroborate a more recent OIG report, which confirmed that DHS lacked the IT capability needed to track and reunite separated families, despite knowing about these deficiencies since November 2017.[44]

## Separated for No Good Reason and Without Due Process



> *I missed m  father. I had no idea  hether he   as ali  e or not.*
> A 17- ea - ld b  f m El Sal ad

Within the group of families evaluated by PHR clinicians, almost all reported that immigration authorities failed to provide any explanation as to why they were being separated, where their family members were being sent, and how they would be reunited. A mother from Honduras told a PHR clinician that while in a

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          15

Exhibit B, Page 21

> *She asked the official   h   her daughter   as being taken a   a   from her. The official reportedl   responded that [her daughter]   as going to be adopted b   an American famil   and that [she]   ould be deported and that she   ould ne   er see her daughter again.*
>
> PHR     ch l gi   de c ibing a m   he f   m El Sal ad

Customs and Border Protection (CBP) processing center, she was informed that she and her son were going to be separated but the only explanation given as to *why* he   e e being   e a a ed   a  ha  he agen   e e im l   follo ing o de  .

In addition, the asylum narratives documented four instances of parents being treated cruelly by immigration authorities when asking for the whereabouts of  hei  child en. A mo he  f om El Sal ado   eco n ed  an in e ac ion   i h a U.S. official in which she asked the official why her daughter was being taken away from her. The official reportedly responded that [her daughter] was going to be adopted by an American family and that [she] would be deported and that she   o ld ne e   ee he  da gh e  again. Ano he  mo he ,  hen asking about her child, e o ed  he office    o ld igno e he , o  ell he  ha  he  a ne e  going  o ee he  da gh e  again, and  ha   he  ho ld lea n o deal  i h i .

Other parents were accused of breaking the law, despite all being asylum seekers, and were told that the separation from their children was punishment for this  c ime.  A mo he  f om G a emala  ho   a  de ained a  he So  h Te a  Famil  Re iden ial Cen e  in Dille , Te a   ecalled  ha ,  hile de ained,  an official yelled at all the women, telling them that their children had been taken away and  he   e e ne e  going  o ge  hem back. Ano he  mo he  f om G a emala recounted immigration authorities using coercive tactics to force her to abandon he  a l m claim. She   e o ed being  old that officers were going to separate her from her daughter unless [she] signed deportation paperwork that was written in English. They also said that they were going to make sure that she   o ld ne e   ee he  da gh e  again.

Despite the government claiming that asylum seekers who enter at a port of entry would be exempt from forcible separation from their children,[45] the recorded accounts show that these same asylum seekers were targeted and then accused of breaking the law. Immigration authorities then used the separation as a method to coerce the asylum seekers to abandon their asylum claims and be subject to deportation. None of the parents in this cohort received any hearing or judicial review to justify the separation. One father was accused by immigration officials of  afficking hi  da gh e  and   a a ked,  How do we know she is really your da gh e , ho  do e kno   o  didn   eal he ? No j   ifica ion  a  gi en fo  the false accusation.

## Families Were Afraid of Never Seeing Each Other Again

Given the minimal information provided to the parents and children as to when they would be reunited, multiple families expressed a fear of never seeing their loved ones again. Four parents reported to PHR clinicians that, while separated, they worried they would never get the chance to see their children again. Two of

> *M  life had no  alue, it felt as if m  bod   as gone.*
> *A m   he f  m El Sal ad   af e being  e a a ed f  m*
> *he   n*

the mothers interviewed by the clinicians expressed feelings of guilt and the  e ce ion ha he  e e bad mo he   fo le ing hei child en be aken f om them. Other parents felt hopeless, desperate to be reunited with their children, as if their life had no value, and shocked that this could happen to them in the United States   a country where they had sought safe haven.

Parents also experienced heightened anxiety and nervousness (nine), low appetite (five), lack of motivation, exhaustion, and an inability to sleep. Parents  e o ed feeling de a a ed,  ha hei mind   e e on o e load, and he could do nothing but think of their children and whether they were safe (four). Multiple parents (four) reported crying and feeling like they were in a  black hole.  T o of he 17  a en  e e ienced ho gh of  icide  hile  e a a ed f om their children.[46] A mother from El Salvador who was separated from her da gh e  de c ibed he  e a a ion a  emo ional   moil  he  he co ld no eat, sleep or have any motivation to do anything productive. She felt she was in a  black hole and lo   ack of  lace and ime. She con em la ed  icide beca  e [ he]  a in  ch emo ional and men al de  ai . Ano he   a en , a fa he  f om Hond  a, old PHR  ha  he only time he ever thought about [suicide] was when he was separated from his son and while watching the TV coverage of all  he de o ed child en  ho  e e  a a ed f om hei  a en .

Unable to articulate the trauma they experienced in the same manner as their  a en , child en  ed im le e m   cha feeling ad and  ca ed a a e l of the separation (four). Children feared that they would never be reunited with their parents and, worse, that their parents were dead (four). One child, a six-year-old from Guatemala, told PHR that she felt abandoned by her mother and  con in ed o  onde   he e he mo he   a and  hen he   o ld  ee each o he again.  The  ame child  aid, E e nigh I  o ld go o bed alone, I  a  ad, and I  o ld c  b m  elf.

## Children Sent Hundreds and Thousands of Miles Away

The families interviewed by PHR clinicians were separated from a minimum of 30 days to more than 90 days. Most of the families were separated from 60 to 69 days. PHR clinicians also interviewed a child who was still separated from his parent at the time of the evaluation. Although this is a shorter amount of time than the median length of separation estimated by the American Civil Liberties Union (ACLU) for all separated families using numbers provided by the government (154 days), the parents in PHR  coho   en  eek  i ho

> *She could not eat, sleep or ha e an  moti ation to*
> *do an thing producti e. She felt she  as in a  black*
> *hole  and lost track of place and time. She*
> *contemplated suicide because [she]  as in such*
> *emotional and mental despair.*
> A PHR clinician de c ibing a m  he f  m El
> Sal ad   h  a  e a a ed f  m he  da gh e

"You Will Never See Your Child Again":
The Persistent Psychological Effects of
Family Separation

Physicians for Human Rights

phr.org          17

Exhibit B, Page 23

> *E er night I  ould go to bed alone, I  as sad, and I  ould cr  to m self.*
> A  i - ea - ld gi l f m G a emala  h  aid  he fel aband ned af e  being  e a a ed f m he m  he

contact with their children and were imprisoned and detained in different parts of the country.[47]

Almost all the families were held in different states during their separation. Five of the 17 parents reported being transferred to several different facilities    from CBP processing centers (known to migrants as *las hieleras* and *la perrera,* or  icebo e  and  he dog  o nd ),  o co n  jail , and  o Immig a ion and Customs Enforcement (ICE) detention centers. Parents in this cohort were held in Arizona, Montana, New Jersey, and Texas. Meanwhile, their children were sent to foster care homes in Kansas, Michigan (two), New York (five), Pennsylvania, South Carolina, and undisclosed states.

The trauma caused by the separation was exacerbated by the minimal or no contact the parents had with their children. Parents reported going several weeks without being allowed to speak to their children. One mother who asked to speak to her nine-year-old on  a gi en a  hone n mbe and  a  old ha  he co ld call ha n mbe  o kee in comm nica ion  i h he  on. She e o  ha  hen she tried calling the number, she di co e ed ha i  a  fake and  a n  e. The three fathers interviewed by PHR clinicians reported being denied contact with their children while in immigration detention. One father who was  e a a ed f om hi  on fo 73 da  en m l i le le e  o ICE in an attempt to loca e hi  on. The o he fa he  e o ed  ing o ha d o con ac hi  on b  no one  a able o gi e him info ma ion abo   he e hi  on  a .

## Families Reported Terrible Detention Conditions

Eight of the 17 parents interviewed by PHR reported poor conditions at the centers where they were held. One mother, held in a detention center with her child  io o e a a ion,  ecalled being mi  ea ed  [and] e o   ha  he asked for water and food for the children and were fed onl  once a da . T o other mothers recalled being handcuffed while being moved from one facility to another. Other parents reported overcrowding, poor quality of food, being forced to sleep on the floor, and cold temperatures inside the facilities. It should be noted that two of the mothers held at the South Texas Family Residential Center in Dilley, Texas told PHR evaluators that they had access to mental health  e ice  and ac i i ie  hile de ained.

Children also reported being mistreated or living in poor conditions while detained and while in foster care. A nine-year-old bo  old hi  mo he  ha  hile he was in detention, he was beaten by the people working in the detention

> *The   ould hit me  ith m  shoes  hen I  as sleeping to tr  and  ake me up.*
> A nine- ea - ld b  f m H nd a , de c ibing  c ndi i n  in immig a i n de en i n

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation                    Physicians for Human Rights                    phr.org                    18

Exhibit B, Page 24

cen e .  The   elled a  him and fo ced him  o ea    [and]  o ld hi  him  i h hi
  hoe  o ake him    .  Simila  o hei  a en , he o he child en e o ed
sleeping on the floor, poor quality of food, overcrowding, and being deprived of
fresh air and sunlight. A clinician related how a six-year-old girl from Guatemala
de c ibed he   ime in fo e ca e (o   ha  he efe ed o a  jail ): D  ing hi
period of time, she slept on the floor. She also described being very hungry. The
only things the children were given to eat, she stated, were apples, cookies, and
bottled water. She described becoming close to some of the children detained
  i h he , b   hen he  ook ho e gi  l a a . She  a ed ha  he  a  ca ed in
jail.  Onl  one child  old PHR  ha  he had access to medical and education
services while in foster care.

## Parents Struggled With Credible Fear Interviews While Separated from Their Children



*In that moment, nothing else mattered.*
Am  he f m G a emala  h   a   e a a ed f m
he   n

Seven of the 17 parents interviewed by PHR clinicians did not pass their credible
fear interview (CFI)   an ini ial  c eening cond c ed b  DHS Uni ed S a e
Citizenship and Immigration Services Asylum Officers    while separated from
their children.[48] A Guatemalan mother reported an inability to concentrate
during her interview with an asylum officer, as she felt worry and fear over her
  on   he eabo  . In ha  momen , no hing el e ma e ed,   he old a PHR
clinician. Another mother who had experienced lack of sleep due to her
 e a a ion f om he   on eco n ed ho  d  ing he in e ie   he mind was
da k. A clinician doc men ing one  a en   a en   a e of mind d ing he  CFI   o e:
 g ief, de ai  and e o  ha  he  o ld ne e  ee he  on again migh  ell ha e
dimini hed he  abili  o  hink en i el .

Multiple medical evaluations commented on ho    he a en  an ie , di  e  ,
and fear of never seeing their children again impaired their ability to concentrate
and recount their persecution in a linear and detailed manner during their CFIs.
In fact, a federal judge  in response to a lawsuit filed by parents separated from
their child(ren) during the CFI process, who failed their CFIs    provided
preliminary approval for a settlement that would allow reunited families to retake
their CFI, thus giving them a second chance at their asylum claim.[49]

## DHS Had No Plan to Implement the Reunification of Families

DHS was unprepared and ill-equipped to handle the reunification of families
after their lengthy separation; although DHS originally planned to separate as
many as 26,000 children,[50] they knew in advance that they did not have the
technological capability to track these cases.[51] Some of the parents interviewed by
PHR clinicians sought assistance from attorneys and non-governmental
organizations when released from detention. Others were given erroneous
information as to when and how they would be reunited. Immigration authorities
told one mother that, upon her release from a prison in Arizona, she would be

E  en af e  e  nifica i n, a  he ime  f he PHR
e   al  a i  n, all familie  e     ed ha  he    ill
ggled  i h he  a ma inflic ed b   he famil
e a a i n   lic .

e  ni ed  i h he child en and gi en a  e mi   o  a in he Uni ed S a e  fo  a year. Instead of being released, she was transferred to a family detention center where she was reunited with her two sons. At the time of her evaluation with PHR, the mother and her two sons were still detained. In addition, ICE escorted one of the fathers to Michigan, claiming that he would be reunited with his son there. Instead he was detained for another 15 days. When he was finally reunited with his son, it had been 73 days since he last saw him. Even after reunification, at the time of the PHR evaluation, all families reported that they still struggled with the trauma inflicted by the family separation policy.

## Reported Symptoms and Psychological and Behavioral Reactions to Family Separation

In children, exposure to trauma can have persistent effects. Such childhood exposures are also known as Adverse Childhood Events, or ACEs.[52] Whether a one-time event or multiple events, trauma can cause helplessness, general fear, worries about safety, and difficulty describing emotions or events. These can manifest as a loss of previously attained developmental or age-appropriate behavioral skills, or through more vague somatic complaints such as headaches, stomach aches, and generalized pain. Children who experienced trauma often have sleeping difficulties and exhibit heightened responses to perceived threats such as a separation from a family member or trusted adult    in the form of crying, being fearful, or clinging to a trusted adult. Aggressive behaviors are also common, as is regression    bed wetting, loss of language, return to thumb sucking, and inability to control bowel movements and urination. Such symptoms were consistently described by the evaluators following family separation, and, in many cases, as not resolving even after reunification. It may take several years and may require rigorous psychological and social support for children to overcome such trauma.

In summarizing the emotional status and reactions of the asylum seekers both to the family separation and at the time of the examination, PHR clinicians chronicled nearly everyone interviewed as exhibiting symptoms and behaviors consistent with trauma and its long-lasting effects: being confused and upset; being constantly worried; frequent crying; having sleeping difficulties; not eating well; having nightmares; being preoccupied; having severely depressed moods, overwhelming symptoms of anxiety, or physiological manifestations of panic and despair (racing heart, sho  ne   of b ea h, and headache ); feeling      e agon , despair, and hopelessness; feeling emotional and mental despair; and being  inc edibl  de   onden .

*It   as a month of desperate sorro   and fear.*
A m   he f m H  nd   a ,   eaking  f he ime  he
a   e a a ed f  m he    n

I ma ake e e al ea and ma e i e ig ch l gical and cial f child en e c me ch a ma.

One mother who had reported meeting with a mental health professional at the detention center following separation from her child reported that they told her ha ha he needed a no medica ion b a he e nifica ion i h he child.

Trauma exposure in adults can manifest physically as well as psychologically, emotionally, and spiritually. Common signs of trauma include lethargy, fatigue, poor concentration, a racing heartbeat, bouts of anxiety, panic attacks, depression, or vague somatic symptoms (e.g., headaches, abdominal pain, gene al ain). The na a i e eco ned b e a a ed a en o PHR clinician are highly consistent with what is commonly observed in people affected by trauma.

The evaluating clinicians noted that the children exhibited reactions that included regression in their age-appropriate behaviors, crying, not eating, having nightmares and other sleeping difficulties, as well as clinging to parents and feeling scared following reunification with their parents. One six-year-old girl from Guatemala who was separated from her father for four months and taken to New York to live with foster families, was reported by a social worker who had een he hile in Ne Yo k o be c ing in he fo e home, diffic l ie ge ing out of the bed in the morning, difficulties sleeping alone, difficulties with attention, refusal to engage in daily activities like brushing her teeth or eating, and aggressive behaviors towards others including biting, kicking, and hitting



*Abner Raul, 10, speaks with his mother on the phone after being reunited with his father in Guatemala City. He was returned to his family months after they were separated in the United States and his parents deported.*
*Photo: John Moore/Getty Images*

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          21

Exhibit B, Page 27

o he  .  The  ocial  o ke  commen ed  ha  he gi l   agg e i e beha io
towards peers seemed to increase following contact with her mother through
video-calling.

One Honduran father recounted that, following reunification and release from
detention, a psychologist came to their apartment four times in an attempt to
 o k  i h hi   a ma i ed on: Each  ime he  on  o ld ef e o coo e a e and
 o ld h o hing a he he a i  . I a  ea hi on a  af aid of  ange ,
afraid they will take him away from his father. When his son gets nervous he will
 ace and  ck hi  h mb.

## Diagnoses Observed and Recorded

The vast majority of mental health diagnoses given by the evaluating clinicians
and depicted in the affidavits were found to be highly consistent with these
 a en  and child en  e o  of hei  a ma ic e  e ience in de en ion and
family separation. At the same time, several clinicians commented on the
likelihood that the present symptoms were exacerbated by pre-
existing trauma from events and incidents in the a l m eeke  home countries.
According to the clinicians, most individuals (both adults and children) met
diagnostic criteria for at least one mental health condition such as post-traumatic
stress disorder (PTSD), major depressive disorder (MDD), or generalized anxiety
disorder (GAD). While several people did not meet all diagnostic criteria for these
conditions, nearly everyone exhibited some hallmark features and symptoms of
these three major conditions. Some of the children were described as exhibiting
symptoms of regression   manifested by behavioral changes, an inability to sleep
independently, clinging to caregivers, and an inability to hold their urine.

## Consistency and Credibility

PHR  e e  ho e al a ed he a en  and he child en no ed ha all he
indi id al  he had in e ie ed and ob e ed had demon  a ed a  o ia e
emotional reactions to  e f l and  a ma ic i a ion , and did no  ho  an
signs of malingering (described in the DSM-V a  the intentional production of
fal e o  g o l e agge a ed  h ical o  chological  oblem  ha a e
motivated by external incentives). Following their in-depth evaluations, often
lasting more than three hours, they uniformly described the asylum seekers in
 e m  ch a c edible hi o ian,  did no  ho  an e idence of malinge ing,
 he hi o  a con i en ,  I find him o be c edible,  con istent throughout
he in e ie  and a  o ia el co ela ed  i h he con en of he con e a ion,
 ho ing no e idence of e agge a ion o dece ion,  o iding an acco n ha
 con i e an en i ele e ec able, na  al and cohe i e  chological o ,
 ha ing no indica ion of e agge a ing o faking  m om , and di  la ed none
of  he ca dinal fea  e of  he malinge ing  a ien .

*She and her son need time and a place in  hich to
reco er emotionall  from the scars of the trauma
the  e perienced upon entering the USA.*
PHR clinician de c ibing a m he f m H nd a
 h a e a a ed f m he  n

"You Will Never See Your Child Again":          Physicians for Human Rights          phr.org          22
The Persistent Psychological Effects of
Family Separation

Exhibit B, Page 28

## The Persistent Psychological Effects of Family Separation

Mental Health Diagnoses of Migrant Parents and Children Separated by U.S. Immigration Policies



Physicians for
Human Rights

### Parents

| Gender | Age | Country of Origin | Duration of Separation | Diagnoses | | |
|--------|-----|-------------------|------------------------|-----------|------------|---------|
| | | | | PTSD | Depression | Anxiety |
| Male † | 36 | El Salvador | 26 to 30 days | — | — | — |
| Female | 30 | Honduras | < 30 days | ● | — | — |
| Female | 28 | El Salvador | 30 days | ● | — | — |
| Female | 26 | Honduras | 40 to 41 days | ● | ● | — |
| Female | ** | Guatemala | 57 days | ● | ● | ● |
| Female | 24 | *** | < 60 days | ● | ● | ● |
| Female | ** | Honduras | 60 days | ● | — | — |
| Female | 27 | Guatemala | 60 days | ● | — | — |
| Female | 39 | Honduras | 60 days | ● | ● | — |
| Male | 40 | El Salvador | 60 days | ● | — | — |
| Female | ** | El Salvador | 66 days | ● | — | — |
| Female | 29 | Guatemala | 71 days | ● | ● | — |
| Female | 45 | El Salvador | 73 days | ● | — | — |
| Male | 32 | Honduras | 73 days | ● | ● | ● |
| Female | 29 | Honduras | < 90 days | ● | ● | ● |
| Female | 24 | Honduras | ≈ 90 days | ● | ● | — |
| * † | 33 | Honduras | N/A | — | — | — |

### Children

| Gender | Age | Country of Origin | Duration of Separation | Diagnoses | | |
|--------|-----|-------------------|------------------------|-----------|------------|---------|
| | | | | PTSD | Depression | Anxiety |
| Female | 7 | El Salvador | 30 days | — | — | ● |
| Male | 8 | Honduras | 40-41 days | ● | ● | ● |
| Male | 8 | Honduras | 44 days | ● | — | — |
| Female | 6 | Guatemala | 51 days | ● | ● | ● |
| Male ‡ | 6 | Guatemala | 60 days | ● | ● | ● |
| Male | 9 | Honduras | 60 days | ● | — | — |
| Male | 17 | El Salvador | 60 days | ● | — | — |
| Female | 6 | Guatemala | 4 months | ● | — | — |
| Male | 8 | Honduras | > 4 months | — | ● | ● |

**Key**
* Gender withheld at attorney's request
** Age withheld at attorney's request
*** Country of origin withheld at attorney's request

† Symptoms suggestive of trauma
‡ Split personality features

© 2020 Physicians for Human Rights

Exhibit B, Page 29

## Clinical Recommendations

In i  all e e  ca enco n e d, PHR  e  e e al a o  no ed ha  he trauma suffered by the parents and the children warranted further intervention and ongoing he a e ic   o , beca  e he e en  e e ca ing  ignifican di  e  and ongoing functional impairment. The interventions most frequently  ecommended incl ded  a ma-foc ed  cho he a , emo al f om detention, and psychiatric medications.

The clinical experts also commented on the risks involved in asylum seekers being returned to their country of origin. They noted that a return to the country of origin would mean worsening symptoms due to a lack of available services, as well as  in one case  d e o e  ning o he i e of he ini ial  a ma .  The specific mental health therapy that (she) requires is not accessible to her in Guatemala. Her sons also need pediatric-specific, trauma-informed therapy that canno be  o ided fo  hem in G a emala,  he clinician no ed.

In many cases, symptoms and distress continued after reunification, prompting  he al a o  o ecommend no onl  he a  b  emo al f om de en ion. He symptoms are expected to continue until she is removed from detention, which is a constant reminder of the trauma of the separation from her sons, and receives appropriate, trauma-foc ed  cho he a . She need  o be in an en i onmen that does not constantly remind her of the trauma of the separation. It is my professional recommendation that she and her sons be released from detention and treated with trauma-foc ed he a  in he U.S..  [She]  o ld al o benefi f om medica ion.  Of a 30-year-old mo he ,  he clinician no ed:  The  e ence of immigration officers is a constant reminder of the trauma she experienced at the hands of immigration officers at the bo de .

The examining clinicians recommended that many of the adults and children receive professional mental health support because, as was stated regarding one of  he child en,  if lef  n ea ed  (he)  o ld be a high i k fo  e psychological and  h ical  oblem . One e e clinician  o e of a i -year-old gi l f om G a emala, ( he) i  in need no onl  of  abili  and  he ongoing  ec  o ided b  he mo he  ca e, b  al o of long-term mental health services to address the terror and sense of abandonment she experienced when forcibly separated from her mother. Such services would be impossible to obtain in G a emala.

Untreated trauma can have chronic and long-lasting effects on both adults and on children and adversely affect their physical health, mental health, and behaviors. Those who experience trauma, especially as children, have higher rates of chronic medical conditions, such as cardiovascular disease, cancer, and premature death. In addition, there is an increased risk of psychiatric disorders such as anxiety, depression, and psychosis, and of detrimental coping behaviors such as smoking and the use of alcohol or drugs. Recovery from trauma is possible but requires psychiatric and behavioral health interventions in the context of strong social and family-mediated support.

> [She] is in need of ... long-term mental health ser ices to address the terror and sense of abandonment she e perienced  hen forcibl  separated from her mother.
> A PHR clinician de c ibing a  i - ea - ld G a emalan gi l

"You Will Never See Your Child Again":
The Persistent Psychological Effects of
Family Separation                    Physicians for Human Rights          phr.org          24

Exhibit B, Page 30

# Legal Framework

## Forced Family Separation as Implemented in the United States Violated Rights

Forced separation of children and parents in the manner described by clients to PHR clinician iola e f ndamen al igh nde U.S. and in e na ional la . Following reunification with their family members, several of these clients have sued the federal government, stating that the practice of forced family separation violated their constitutional rights, as well as their rights under the 1980 Refugee Act.

All persons under U.S. jurisdiction, including non-citizens, are protected by rights under the U.S. constitution, human rights treaties ratified by the United States, and customary international law. All persons have the right to due process under the law,[53] to equal protection under the law without discrimination,[54] to freedom from torture and cruel, inhuman, and degrading treatment,[55] and to protection from arbitrary interference in family integrity.[56] Under international law incorporated into U.S. law, individuals fleeing persecution in other countries have the right to seek asylum in the United States.[57]

The treatment of these families by U.S. officials raises numerous legal issues. Using just one category of human rights violation to describe the forced family separation policy is not adequate to account for the range of abuses it comprises and the harms inflicted; assessing the policy and practice requires application of laws related to multiple categories of violations.

According to the reports described in these medical affidavits, some government officials:

- Took children from parents without due process (no parents examined by PHR clinicians were afforded hearings or judicial review prior to deprivation of their parental rights);
- Did not give parents or children a legitimate or compelling reason (or any reason, in some cases) for the separation;
- Did not disclose the whereabouts of children in a reasonable amount of time;
- Did not facilitate timely contact with children;
- Did not independently ensure reunification of families (families reported that reunification required facilitation by attorneys, civil society organizations, and non-detained family members);
- Told parents that their children would be adopted and that they would not see their children again;
- Used the separation to coerce and intimidate families into signing government forms which would terminate their asylum claims;
- Treated the families in an inhumane manner before and during separation, which exacerbated their trauma; and
- Subjected the families to poor conditions of confinement before and during separation, which exacerbated their trauma.

"You Will Never See Your Child Again":
The Persistent Psychological Effects of
Family Separation

Physicians for Human Rights

phr.org          25

Exhibit B, Page 31

As a result of the forced separation of families, severe harms were inflicted:

- Separation resulted in severe psychological harm and trauma both for parents and children, with ongoing negative impacts documented at the time of the PHR evaluation;
- Separa ion n e fe ed  i h  he  a en   abili   o make hei  ca e d  ing hei  credible fear interviews due to the associated trauma, which made them unable to concentrate and think logically because their immediate and only concern was to be reunited with their children;
- Young children were unable to articulate their persecution claim alone without their parents; and
- Post-reunification, the government failed to provide families with psychosocial services to recover from the trauma of separation.

## Government Cruelty Increased the Severity of Harm

> The g  e nmen  did n   kee  acc  a e  ec  d  f he  e a a ed familie   and ... failed   make ade  a e, an  ,   i i n f  acing and e  nif ing  e a a ed familie .... The na i n  ide im lemen a i n  f hi  lic  in  i ed e   in he familie .

It is clear from internal government oversight reports and ongoing litigation that the government did not keep accurate records of the separated families and did not seek to compile or release existing records to legal counsel until compelled by a court order.[58] The parents evaluated by Physicians for Human Rights (PHR) clinicians could not have known about these circumstances at the time. Therefore, what the parents reported to PHR — that they were denied information about the whereabouts of, contact information for, and eventual reunification process with their children — was not merely happenstance, but was instead the direct result of deliberate inaction on the part of the government, which failed to make adequate, or any, provision for tracing and reunifying separated families. An internal government report confirmed that DHS knew since November 2017 that the department lacked the IT capability needed to track and reunite separated families, yet proceeded to implement the policy anyway.[59] This policy also separated hundreds of preverbal children, thereby, according to the go e nmen   o n ine nal a e  men , endange ing child en   e   igh  o hei  names and identities,[60] a e io   iola ion of child en    igh .[61] Internal documents and emails obtained through a Freedom of Information Act request also demonstrate that DHS officials were warned numerous times by Department of Health and Human Services staff and consultants about the psychological harm caused to children by abrupt forced separation from their parents, including through filing hundreds of significant incident reports.[62]

The policy context also aggravated the severity of harm, as the nationwide implementation of this policy inspired terror in the families. Several parents evaluated by PHR clinicians reported being told by U.S. officials that their children would be adopted by American families. A few mothers reported crying together in groups, after being told by U.S. officials that they would never see their children again; a father described how he contemplated suicide while watching the television news coverage of other families separated across the United States. One mother who was still in Honduras while her husband and

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          26

Exhibit B, Page 32

da gh e   e e e a a e d  aid  he  ho  gh  ha   he had  lo    he  da  ghter and could not eat for days after her husband told her the news.

Forced separation is an ongoing form of harm, as almost all of the family members, both parents and children, reported to PHR that they still fear that they will be separated again by the U.S. go e nmen . The go e nmen   fail  e o keep accurate, or any, records while ramping up implementation of a nationwide policy targeting migrants has greatly contributed to increased harms from the forced family separations, including the risk of children losing their identities, which continue to haunt parents and children until today. This aggravating circumstance has increased the gravity of the violation and the severity of the inflicted harms.

> Se a a i n e  l ed in e e    ch l gical ha m and   a  ma b  h f   a en  and child en…. alm  all   f he fami  membe  , b  h  a en   and child en, e    ed  PHR ha  he   ill fea  ha  he   ill be e a a ed again b  he U.S. g  e nmen .

## U.S. Family Separation Cases Documented by PHR Meet Criteria for Torture

To    e i  defined a   an ac b   hich e e  ain o  ffe ing, he he  h ical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other  e  on ac ing in an official ca  aci  .[63] In other words, torture is an act which 1) causes severe physical or mental suffering, 2) is done intentionally, 3) for the purpose of coercion, punishment, intimidation, or for a discriminatory reason, 4) by a state official or with state consent or acquiescence.

PHR find  ha  he U.S. go e nmen    ea men  of a  l m  eeke   h o   gh i policy of family separation constitutes cruel, inhuman, and degrading treatment and con i  e o   e in all of  he ca e  doc  men ed b  PHR. PHR   e al a ion were conducted according to the principles of the Istanbul Protocol, the UN guidelines for documenting torture. In the cases that PHR documented, U.S. officials intentionally carried out and condoned unlawful actions causing severe pain and suffering, in order to punish, coerce, and intimidate Central American asylum seekers to give up their asylum claims, in a discriminatory manner. Torture and cruel, inhuman, and degrading treatment are violations of human rights and are prohibited under domestic and international law in any and all circumstances. PHR   finding  co  obo a e he a e  men of o he  h man  igh experts who have found that the family separation process as implemented in the United States meets the legal definition of torture.[64]

The International Covenant on Civil and Political Rights prohibits both torture and cruel, inhuman, or degrading treatment or punishment in all circumstances, even during times of national emergency.[65] The Istanbul Protocol, in its upcoming updated edition, states that the determining factor for distinguishing  o   e f om c  el, inh  man, o  deg ading   ea men   ma  be  be  nde   ood o

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          27

Exhibit B, Page 33

be the purpose of the conduct and the powerlessness of the victim, rather than he in en i of he ain o ffe ing inflic ed. [66] In addi ion o he o e o e and ic im a , o he in e na ional bodie ha e con ide ed he e of acts involved, the severity of resulting harm, the official status of the torturer, and whether the harm was related to a lawful sanction.[67]

PHR evidence suggests that 1) the harm was severe, especially when considering the impact on small children, who have a special vulnerability to mental and physical harm; 2) there was clear intentionality related to intimidation and coercion; 3) the practice was carried out by government actors; and 4) cannot be justified by a lawful sanction, since parents were separated who did not cross the border irregularly. All of these elements speak to the classification of U.S immigration enforcement actions in these cases as torture rather than cruel and degrading treatment.

The UN Convention Against Torture imposes the following obligations on states related to both torture and cruel, inhuman, and degrading treatment: to ensure that all government officials are properly trained in the prohibition of torture, to systematically review all policies and practices related to deprivation of liberty in order to prevent torture, to ensure a prompt and impartial investigation of any act of torture, and to protect all complainants and witnesses from retaliation. However, only in the case of torture do states have the legal obligation to prosecute or extradite torturers, to ensure judicial remedies for torture victims, to provide redress and adequate compensation and rehabilitation, and to negate the legality of all statements obtained through torture.[68]

> U.S. fficial in en i nall ca ied and c nd ned nla f l ac i n ca ing e e e ain and ffe ing, in de ni h, c e ce, and in imida e Cen al Ame ican a l m eeke gi e hei a l m claim .

## The U.S. Family Separation Policy Meets Criteria for Enforced Disappearance

In addition, PHR concludes that the U.S. policy and practice of family separation also constitutes enforced disappearance, which is prohibited under international law in all circumstances, including war or public emergencies.[69] Enforced disappearance is defined as any deprivation of liberty by the state where there is concealment of the fate or whereabouts of the disappeared person.[70] In all cases documented by PHR, there was a period where parents were unaware of their child en he eabo , ere not able to contact them and had no assurance of, or timeline for, eventual contact or reunification. Government failure to track children and parents, to facilitate parental contact, or plan for reunification deprived children of protection under the rule of law, because they were deprived of parental oversight and consent for their welfare, without appropriate due process, such as a hearing involving child welfare professionals. Parents who asked U.S. officials about the wellbeing and whereabouts of their children were not given answers for weeks and months at a time. The concealment and lack of contact points to the crime of enforced disappearance.[71] Parents' and children's reasonable fear of permanent disappearance, and experience of temporary disappearance, substantively increased the traumatic nature of the separation event. Even after the June 2018 injunction which prohibited further

"You Will Never See Your Child Again":
The Persistent Psychological Effects of
Family Separation                    Physicians for Human Rights          phr.org          28

Exhibit B, Page 34

separations    ordered the government to provide numbers of separated children and to facilitate reunification, the government did not provide complete information about the extent of the previous and ongoing separations.[72]

The UN Working Group on Enforced or Involuntary Disappearances has expressed concerns about the practices of states which increase the risk of disappearance. Separating families, without informing family members about whereabouts or allowing communication, may amount to temporary disappearances; disappearances, no matter how temporary, should be strenuously avoided.[73] The International Convention for the Protection of All Persons from Enforced Disappearance prohibits any form of deprivation of liberty by agents of the state, followed by concealment of the fate or whereabouts of the person, which place such a person outside the protection of the law.[74] In order to prevent the crime of enforced disappearance, states parties are obligated to guarantee that persons deprived of liberty have contact with their family and legal counsel and to keep accurate records of detainees which shall be promptly available to any judicial or other competent authority, as well as relatives and legal counsel,[75] and with special protections for children, given their special vulnerability in the case of disappearance.[76] Without adequate verification and registration measures and contact with family and legal counsel at each stage in the detention process, migrants run a great risk of becoming a victim of enforced disappearance.[77]

Parents who asked U.S. officials about the wellbeing and the whereabouts of their children were not given answers for weeks and months at a time. The concealment and lack of contact is the crime of enforced disappearance.



*A Honduran father and his six-year-old son, who were separated for 85 days after they crossed into the United States. The father, who was detained in Oklahoma while his son was sent to New York, said it took six weeks from the time of separation before he was able to call his son. Photo: Mario Tama/Getty Images*

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          29

Exhibit B, Page 35

## U.S. Government Actions Were Contrary to Domestic and International Law

Decisions made at the highest levels of government must be discerned from public statements and release of official documents; however, based on reports of PHR clien , e can a e  e o ed ac ion and  a emen b  U.S. officials implementing the policy at the ground level. The actions reported by those interviewed contribute to the understanding of the pattern of conduct under this widespread operational policy.

The U.S. officials operated under the guise of legality while depriving parents and children of their right to family integrity, without due process. Officials exceeded their authority and broke the law by separating parents and children who had sought asylum without due process and without proof that the parents were unfit o a dange o he child, a  ell a b  i hholding info ma ion abo  child en whereabouts and contact information. According to PHR client reports, U.S. officials justified their actions by stating that they were following orders, that the asylum seekers were criminals, and in one case even implying that the father was a trafficker rather than a parent.

The lack of coordination with other agencies can be seen in the response of judges, whose hearings were often the only official point of government contact for parents, since there were no hearings held in relation to deprivation of their parental rights. In one case, a judge told the mother not to ask about the whereabouts of her children. Another judge blamed a mother for not knowing the whereabouts of her child during the separation period, although she had been asking U.S. officials for this information without a response.

Serious psychological harm to children and families was a foreseeable result of Department of Homeland Security implementation of the forced family
 e a a ion  olic . I  a  i hin he go e nmen   o e o  e en  e a a ion through use of alternatives to detention, to reduce the duration of separation through a reunification plan, and to ensure timely information about the wellbeing, whereabouts, and contact information for children and parents by setting up appropriate information and communications channels. Instead, the U.S. government took no reasonable measures to minimize the predictable psychological harms which resulted from its policy to separate parents and children. In many cases, individuals employed by the U.S. government similarly did not take additional measures to prevent these harms.

Government rhetoric was clear that preventing Central American migrants from seeking asylum in the United States was the desired ultimate outcome of the family separation policy.[78]

> P e en ing Cen  al Ame ican mig an  f m  eeking a  l m in he Uni ed S a e   a  he de i ed l ima e  c me f he famil  e a a i n  lic …. [and he] U.S. g e nmen   k n  ea nable mea e  minimi e  he  edic able   ch l gical ha m  hich e l ed f m i  lic  e a a e a en  and child en.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          30

Exhibit B, Page 36

# Conclusion

Thi    d   finding    o ide e idence of the adverse physical and mental health effec    ha   e   l ed f om he T m admini   a ion famil   e a a ion olic and its illegality. The asylum seekers interviewed by PHR clinicians reported symptoms consistent with post-traumatic stress disorder, major depressive disorder, and generalized anxiety disorder. Exacerbating any existing pre-migration trauma, the families in this report, upon arrival to the United States, were subjected to forcible separation and given no explanation by immigration authorities as to why they were separated and when they would be reunited, which led many to believe that they would never see their loved ones again.

The U.S. government must uphold domestic and international standards by fulfilling its obligations to provide redress to victims of torture and ill-treatment, including in the form of rehabilitative services;[79] to ensure the families of di a   ea ed child en kno   he   h of hei famil membe   he eabo   b dedicating adequate government resources to ensure timely reunification for all separated families, including deported parents;[80] and to prosecute U.S. officials who have broken the law.

In addition, the asylum seekers in this study reported inhumane detention conditions and cruel treatment by immigration authorities, providing further e idence of he admini   a ion  di ega d fo he h man digni  of mig an families. While the Bush and Obama administrations introduced deterrence methods and increased family detention, the Trump administration violated several fundamental human rights by separating asylum seeking families and sought to undermine the right to seek asylum. Physicians for Human Rights calls upon the U.S. government to end all enforcement policies, including family separation, that have adverse health effects and restrict the right of people to seek asylum in the United States.

# Recommendations

## To the U.S. Government

The U.S. Administration, Department of Justice, and Department of Homeland Security should:

**Protect families from future violations through reforming policies and practices:**
- Prohibit the separation of families arriving together at the U.S.-Mexico border, except in cases where there has been a rigorous assessment of proven risk of present harm to the child, according to a best interest determination reflecting child protection best practices;
- Fully disclose information about numbers of separated and reunited families, the whereabouts and status of separated parents and children, and best interest determination findings to all family members and their legal counsel, and record this information in official records;

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          31

Exhibit B, Page 37

- Establish appropriate interagency communications and tracking systems for cases where parents and children are separated for lawful reasons in accordance with due process;
- Increase resources for and utilization of alternatives to detention through contracts with nonprofit organizations, such as the previous Family Case Management Program,[81] and prioritize the timely release of children to community settings with referrals to low-cost legal and community resources;
- End detention of children, which is never in their best interest, and abide by federal standards for care of children in custody, including time limitations and licensing requirements determined by the *Flores* Settlement Agreement;[82]
- End family detention, which has been shown to have unacceptably high health risks for children and is harmful to their psychological wellbeing, even when they are held with their parents;
- Ensure humane and adequate conditions of confinement in immigration detention, whether in Customs and Border Protection (CBP) or Immigration and Customs Enforcement facilities, including access to medical screening and treatment, and adequate food, water, and sleeping conditions;
- Fully implement all recommendations of the Department of Homeland Security (DHS) and Department of Health and Human Services Office of Inspector General and increase funding for independent oversight and review;
- Recognize and address displacement trends driven by human rights abuses by ensuring access to asylum in the United States.

**Provide reparations to victims who suffered harm through forced separations:**

- Immediately reunify all families separated by the U.S. government, including a full reconsideration of parents who have allegedly waived reunification, and e edi io l e ie an alleged ed flag ca e i h a trauma-informed lens;
- Establish a recovery fund to provide mental health screenings, psychiatric and behavioral health interventions, and trauma-informed remedial medical and mental health services for separated families, with special consideration for the wellbeing of children;
- Provide redress in monetary compensation for the injuries families suffered resulting from the unlawful conduct of federal officers who intentionally inflicted this emotional distress;
- P o ide ed e in he fo m of a o ne fee and co hich e e incurred in order to address the consequences of forced separation.

**Ensure accountability for rights violated through forced family separations:**

- Acknowledge forced family separation without due process as unlawful and guarantee non-repetition, including through criminal prosecution of government officials who have engaged in unlawful conduct;
- Investigate and ensure accountability for all allegations of verbal and physical abuse in U.S. government custody.

The U.S. Congress should:

**Protect families from rights abuses in the context of border and immigration enforcement:**

- Enact legislation banning family separation and detention;
- Continue to exercise oversight of DHS agencies to halt any further family separations and hold government officials accountable to acknowledge the persistent harms of the family separation practice and to provide reparation to families injured by unlawful government conduct;
- Require DHS to provide information about numbers of separated and reunited families and the whereabouts and status of previously separated parents and children to appropriate Congressional committees and make aggregated data publicly available;
- Codify the minimum child protection standards of the *Flores* Settlement Agreement into law, in order to prevent indefinite detention of children in inhumane conditions;
- Require rigorous independent oversight for any funding related to CBP field operations and immigration detention, especially family and child detention;
- Decriminalize irregular entry, as required by the Refugee Convention, to ensure that administrative penalties for crossing between ports of entry are proportionate;
- Oppose policies that unlawfully limit access to asylum and uphold U.S. law, which establishes the asylum process for those with a credible fear of persecution, as well as the right to not be returned to likely persecution;
- Ratify the UN Convention on the Rights of the Child, signed by the United States in 1995 and ratified by every other country in the world.

**Fund meaningful policy alternatives which are rights-respecting.**

- Increase funding for alternatives to detention programming, contracted with non-profit organizations, that enable families to remain in the community and access basic services while their proceedings are pending;
- Increase funding to add asylum processing capacity by dedicating resources to the Executive Office of Immigration Review for immigration judges and to U.S. Citizenship and Immigration Services for asylum officers.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation    Physicians for Human Rights    phr.org    33

Exhibit B, Page 39

# Endnotes

1 UN Gene al A embl , Con en ion Again To e and O he C el, Inh man o
Deg ading T ea men o P ni hmen , 10 Decembe 1984,
treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-
9&chapter=4&clang=_en.

2 Numbers provided by the U.S. government to the ACLU as of December 2019.

3 The Whi e Ho e, he Uni ed S a e go e nmen , Rema k b P e iden T m and
P e iden Abdel Fa ah Al Si i of he A ab Re blic of Eg Befo e Bila e al Mee ing,
Apr. 9, 2019, whitehouse.gov/briefings-statements/remarks-president-trump-president-
abdel-fattah-al-sisi-arab-republic-egypt-bilateral-meeting/.

4 Uni ed S a e De a men of Homeland Sec i , A Re ie of DHS' Re on ibili ie fo
J enile Alien , Se . 2005, 20, oig.dh .go /a e /Mgm /OIG_05-45_Sep05.pdf#.

5 Ibid., 19.

6 United States Borde Pa ol, U.S. Bo de Pa ol To al Famil Uni A ehen ion b
Month FY 2013 - FY 2018, cb .go / i e /defa l /file /a e /doc men /2019-Mar/bp-
total-monthly-family-units-sector-fy13-fy18.pdf.

7 Ibid.

8 American Immigration Council. Di ided b De ention: Asylum Seeking Families'
E e ience of Se a a ion, A g. 2016,
americanimmigrationcouncil.org/sites/default/files/research/divided_by_detention.pdf.

9 Wil S. H l on, The Shame of Ame ica Famil De en ion Cam , New York Times
Magazine, Feb. 8, 2015, nytimes.com/2015/02/08/magazine/the-shame-of-americas-
family-detention-camps.html.

10 Jeh John on, Jeh John on On Immig a ion and T m , in e ie b Sco Simon,
Weekend Edition, NPR, Jun. 9, 2018,
npr.org/templates/transcript/transcript.php?storyId=618496706.

11 Li a Rio dan Se ille and Hannah Ra le e, T m Admin Ran 'Pilo P og am' fo
Se a a ing Mig an Familie in 2017, NBC News, Jun. 29, 2018,
nbcnews.com/storyline/immigration-border-crisis/trump-admin-ran-pilot-program-
separating-migrant-families-2017-n887616.

12 J lia Ain le , T m admin eighed a ge ing mig an familie , eeding
de o a ion of child en, NBC News, Jan. 17, 2019,
nbcnews.com/politics/immigration/trump-admin-weighed-targeting-migrant-families-
speeding-deportation-children-n958811.

13 Ibid.

14 Uni ed S a e De a men of Homeland Sec i , Ann al Flo Re o : Ref gee and
A lee : 2017, Ma . 2019, 8
dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

15 Tama n Nel on and Haja Habbach, If I en back, I o ld no i e. A l m
Seeke Fleeing Violence in Me ico and Cen al Ame ica, Ph ician fo H man Righ ,
Oct. 9, 2019, 6. phr.org/our-work/resources/asylum-seekers-fleeing-violence-in-mexico-
and-central-america/.

16 Ma he N ba m and Lo i Nel on, T m Th ea en Me ico o e 'Bad Homb e ,'
Politico, Feb. 2, 2017, https://www.politico.com/story/2017/02/trump-threatens-
mexico-over-bad-hombres-234524.

17 Aa on Blake, Ki jen Niel en migh ggle o e lain e a a ing familie a he
bo de , anno a ed, Washington Post, Jun. 19, 2018, washingtonpost.com/news/the-
fix/wp/2018/06/19/kirstjen-nielsen-tries-to-explain-separating-families-at-the-border-
annotated/.

18 Ba Jan en, T m admini a ion anno nce lan ha o ld le i de ain
ndoc men ed child en indefini el , USA Today, Aug. 21, 2019,
usatoday.com/story/news/politics/2019/08/21/trump-administration-proposes-
indefinite-detention-migrant-children/2068163001/.

19 Phili B m , Ho o mi lead i h a i ic , DHS Sec e a Niel en edi ion,
Washington Post, Jun. 18, 2018,

"You Will Never See Your Child Again":
The Persistent Psychological Effects of
Family Separation

Physicians for Human Rights

phr.org                34

Exhibit B, Page 40

washingtonpost.com/news/politics/wp/2018/06/18/how-to-mislead-with-statistics-dhs-secretary-nielsen-edition.

[20] Ms. L v. U.S. Immigration and Custom  Enfo cemen  ( ICE ), 18c  0428 DMS MDD
(S.D. Cal. 2018) at 3,
 aclu.org/legal-document/ms-l-v-ice-order-granting-plaintiffs-motion-classwide-preliminary-injunction.

[21] Ame ican Ci il Libe ie Union, T m ' Famil Se a ion C i i : Ho Yo Can
Hel , Oc . 2, 2018, aclu.org/families-belong-together; E ic Ga , Mo e than 5,400
child en  li a bo de , acco ding o ne  co n , Associated Press, Oct. 25, 2019,
nbcnews.com/news/us-news/more-5-400-children-split-border-according-new-count-n1071791.

[22] Ibid.

[23] United States Department of Health and Human Services, Office of Inspector General,
 Ca e P o ide
Facilities Described Challenges Addressing Mental Health Needs of Children in HHS
C od , Se . 2019, h    ://oig.hh .go /oei/ e o   /oei-09-18-00431.pdf.

[24] The White House, United States government,  Affo ding Cong e  an Opportunity to
Add e  Famil Se a a ion, J n. 20, 2019, whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.

[25] Ms. L, 18cv0428.

[26] Ibid., 13.

[27] Ja mine Ag ile a, E e  hing o Kno Abo The S a  of Famil Se a a ion, Time
Magazine, Sep. 21, 2019, time.com/5678313/trump-administration-family-separation-lawsuits/.; Camilo Montoya-Gal e , The U.S. con in e  o e a a e mig an familie . Fo
one fa he , a mi comm nica ion  o ed co l , CBS News, Dec. 16, 2019,
cbsnews.com/amp/news/family-separation-1134-migrant-families-separated-since-end-of-trump-zero-tolerance-policy-aclu/.

[28] American Civil Liberties Union,  ACLU A k  Federal Court to Halt Unlawful Ongoing
Famil Se a a ion , J l 30, 2019, aclu.org/press-releases/aclu-asks-federal-court-halt-unlawful-ongoing-family-separations.; Camilo Montoya-Gal e , Court refuses to further
 e ic admini a ion' o e o e a a e mig an familie , CBS News, Jan. 13, 2020,
cbsnews.com/news/family-separation-court-refuses-to-further-restrict-administrations-power-to-separate-migrant-families-2020-01-13/.

[29] E ic Ga , Mo e than 5,400 child en  li a bo de , acco ding o ne  co n .

[30] Ms. J.P. v. Sessions, IM-CA-0126, Docket 2:18 (C.D. Cal.),
law360.com/articles/1217455/gov-t-owes-mental-health-care-to-separated-migrant-parents.

[31] PHR  A l m Ne  o ki com  i ed of mo e han 1,700  ol n ee heal h  ofe ional
 including physicians, psychologists, licensed clinical social workers, physician
assistants, and nurse practitioners with varied specialties and subspecialties  located
throughout the United States. Asylum Network members complete a full-day training on
how to document, according to international standards, physical and psychological signs
and sequalae of torture or persecution. Collectively, members of the Asylum Network
conduct more than 600 evaluations of asylum seekers each year.

[32] The Istanbul Protocol is the international standard endorsed by the United Nations to
assess, investigate, and report alleged instances of torture and other cruel, inhuman, and
deg ading  ea men . UN Office of  he High Commi ione fo H man Righ , Man al
on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman
o Deg ading T ea men o P ni hmen ( I anb l P o ocol ), 2004, HR/P/PT/8/Re .1.

[33] A o ne  ed he e al a ion fo diffe en  e of ca e, incl ding he clien
asylum claims, appeals for clients who did not pass their credible fear interviews, and
lawsuits for damages related to family separation.

[34] Ha  h Mande , Wo d f om he hea : e ea ching eo le  o ie , Journal of
Human Rights Practice 2, no. 2 (Jul. 2010): 252 70,
jhrp.oxfordjournals.org/content/2/2/252.full.pdf+html.

[35] Anselm Strauss and Juliet Corbin, Basics of qualitative research: Techniques and
procedures for developing grounded theory, 2nd ed., (Thousand Oaks, CA, US: Sage
P blica ion , Inc., 1998).; Udo Kelle,  Eme gence  . fo cing of em i ical da a? A
crucial  oblem of g o nded heo  econ ide ed, Forum Qualitative Sozialforschung,
6, no. 2 (2005): Art. 27., DOI:10.17169/fqs-6.2.467.

"You Will Never See Your Child Again":          Physicians for Human Rights          phr.org          35
The Persistent Psychological Effects of
Family Separation

Exhibit B, Page 41

36 MM Hennink, BN Kai e , and VC Ma coni, Code a a ion e meaning a a ion: ho man in e ie a e eno gh? *Qualitative Health Research* 27, no. 4 (2017): 591 608, doi: 10.1177/1049732316665344.

37 Geoff Pa ne and Malcom William , Gene ali a ion in ali a i e e ea ch, *Sociology* 39, no. 2 (2005): 295 314, 10.1177/0038038505050540; Mira Crouch and Heather McKenzie, The logic of mall am le in in e ie -ba ed ali a i e e ea ch, *Social Science Information* 45, no. 4 (2006): 483 99, doi: 10.1177/0539018406069584.

38 In one sensitive case of political persecution, the country of origin was redacted.

39 In the Squiggle Game, the clinician makes a squiggle on a piece of paper and the child is encouraged to turn it into a picture, which gradually elicits unconscious material. La ence R. Be ge , The Winnico S iggle Game: A Vehicle fo Comm nica ing i h the School-Aged Child, *Pediatrics* 66, no. 6 (1980): 921-924, pediatrics.aappublications.org/content/66/6/921.

40 S en D dle , El a Pachico, and J an Jo Ma ne , Gang in Hond a , *Insight Crime*, Apr. 21, 2016, bit.ly/2nl8ovo.; UN Human Rights Co ncil, Re o of he S ecial Rapporteur on Extrajudicial, Summary or Arbitrary Executions on his Mission to Hond a a 6, J n. 2017, A/HRC/35/23/Add.l.

41 Kevin Ackerman, Hajar Habbach, Kathryn Hampton, Lynne Rosenberg, Sarah Stoughton, and Joseph Shin, The e I No One He e o P o ec Yo : T a ma Among Child en Fleeing Violence in Cen al Ame ica, Ph ician fo H man Righ , J ne 10, 2019, phr.org/our-work/resources/there-is-no-one-here-to-protect-you/.

42 There have been several reports of migrants drowning in the Rio Grande while attempting to reach the United States. In the summer of 20219, a father and his 23-month-old daughter were found drowned along the river. The tragic death of these asylum seekers highlights the dangerous journey many make to seek safe haven in the Uni ed S a e . Na alie Gall n, Ch i ina Ma o i , and S e e Alma , A Woman Wa ched He H band and Da gh e D o na he Me ican Bo de , Re o Sa , *CNN*, Jun. 27, 2019, cnn.com/2019/06/26/politics/mexico-father-daughter-dead-rio-grande-wednesday/index.html.

43 United States Department of Health and Human Services, Office of Inspector General, S ecial Re ie - Initial Observations Regarding Family Separation Issues Under the Ze o Tole ance Polic , Se . 27, 2018, 12, oig.dh .go / i e /defa l /file /a e /2018-10/OIG-18-84-Sep18.pdf.

44 United States Department of Health and Human Services, Office of the Inspector Gene al, DHS Lacked Technolog Needed o S cce f ll Acco n fo Se a a ed Mig an Familie , No . 25, 2019, oig.dh .go / e o /2020/dh -lacked-technology-needed-successfully-account-separated-migrant-families/oig-20-06-nov19.

45 United States Department of Homeland Sec i , M h : Fac : DHS Ze o-Tolerance Polic , J n. 19, 2018, dhs.gov/news/2018/06/18/myth-vs-fact-dhs-zero-tolerance-policy.

46 In June 2018, a Honduran father committed suicide in a Texas jail after he was separated from his wife and child. Reports mention Customs and Border Patrol physically e aining he di a gh and agi a ed fa he hile hi child a aken f om him. Nick Mi off, A family was separated at the border, and this distraught father took his own life, *Washington Post,* Jun. 9, 2018, washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html

47 Famil Se a a ion b he N mbe , Ame ican Ci il Libe ie Union, Oc . 2, 2018, aclu.org/issues/immigrants-rights/immigrants-rights-and-detention/family-separation. However, for many separations, the ACLU was not provided with the duration of separation.

48 A credible fear interview is an initial screening conducted by the Department of Homeland Sec i Uni ed S a e Ci i en hi and Immig a ion Se ice a l m office . During the screening, asylum officers ask the asylum seeker a series of questions to e abli h if he e i a ignifican o ibili ha he e onden ha been e ec ed o has a well-founded fear of persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion if returned to their country. If an asylum seeker is found to have a credible fear, their case is referred to an immig a ion j dge nde he De a men of J ice E ec i e Office fo Immig a ion Review.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation     Physicians for Human Rights     phr.org     36

Exhibit B, Page 42

United States Department of Homeland Security, United States Citizenship and
Immigration Service, Question & Answer: Credible Fear Screening, Sep. 4, 2009,
uscis.gov/humanitarian/refugees-asylum/asylum/questions-answers-credible-fear-
screening.

[49] Ms. L v. ICE, 3:18-cv-428-DMS (S.D. Cal 2018), Order Granting Preliminary Approval
of Proposed Settlement, muslimadvocates.org/files/2018-10-09-Order-Granting-dckt-
256_0.pdf.

[50] Julia Ainsley and Jacob Soboroff, Trump admin projected it would separate 26,000
migrant kids abroad, DHS watchdog say, NBC News, Nov. 27, 2019,
nbcnews.com/politics/immigration/trump-admin-projected-it-would-separate-26-000-
migrant-kids-n1092571.

[51] Office of Inspector General, DHS Lacked Technology Needed to Successfully Account
for Separated Migrant Families.

[52] Renée O'Leary et. al., Adverse childhood experience and trauma informed care: the
future of health care, Pediatric Research 79 (2016): 227−233,
ncbi.nlm.nih.gov/pubmed/26460523.

[53] US Const., amend. 5.; United Nation General Assembly, International Covenant on
Civil and Political Rights, Dec. 16, 1966, Art. 14 & 16,
ohchr.org/en/professionalinterest/pages/ccpr.aspx.

[54] 14th Amendment, Art 2 ICCPR, CERD.

[55] 8th Amendment, Art 7 ICCPR, CAT.

[56] 4th amendment, Art 17 and 23 ICCPR.

[57] 1980 Refugee Act, 1967 Protocol to the Convention relating to the status of refugees.

[58] Ms. L. v. ICE - Order Granting Plaintiffs' Motion for Classwide Preliminary
Injunction, (American Civil Liberties Union, September 11, 2019),
https://www.aclu.org/legal-document/ms-l-v-ice-order-granting-plaintiffs-motion-
classwide-preliminary-injunction; DHS Lacked Technology Needed to Successfully
Account for Separated Migrant Families, Office of Inspector General, November 25,
2019.

[59] DHS Lacked Technology Needed to Successfully Account for Separated Migrant
Families, Office of Inspector General, November 25, 2019.

[60] DHS OIG report, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-
84-Sep18.pdf.

[61] Art 8 and 9, UN CRC.

[62] Susan Ferris, Eral Reyo Warned Migrant Kid Suffered From Separation,
December 16, 2019, The Center for Public Integrity/ Texas Tribune,
https://publicintegrity.org/inequality-poverty-opportunity/immigration/migrant-
children-family-separations/.

[63] Art 1(1). UN General Assembly, Convention Against Torture and Other Cruel, Inhuman
or Degrading Treatment or Punishment, 10 December 1984, United Nations, Treaty
Series, vol. 1465, p. 85.

[64] Art 1, UN CAT; You don't have an right here: Illegal Pushback, Arbitrary Detention
and Ill Treatment of Asylum-seekers in the United States, Amnesty International, 2018,
accessed at: https://www.amnesty.org/en/latest/research/2018/10/usa-treatment-of-
asylum-seekers-southern-border/; Beth Van Schaak, The Torture of Forcibly Separating
Children from their Parents, Just Security, October 18, 2018,
https://www.justsecurity.org/61138/torture-forcibly-separating-children-parents/;
Redacted GJC et al Brief Amici Curiae, February 2019, https://chrgj.org/wp-
content/uploads/2019/02/Redacted-GJC-et-al-Brief-Amici-Curiae-Feb-2019.pdf.

[65] Article 7, UN General Assembly, International Covenant on Civil and Political Rights,
16 December 1966, United Nations, Treaty Series, vol. 999, p. 171.

[66] Manual on the Effective Investigation and Documentation of Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment ("Istanbul Protocol"), 2020 edition,
submitted to UN Office of the High Commissioner for Human Rights for consideration
for publication.

[67] David Weissbrodt and Cheryl Heilman, Defining Torture and Cruel, Inhuman, and
Degrading Treatment, 29 LAW & INEQ. 343 (2011),
https://scholarship.law.umn.edu/faculty_articles/366.

[68] Christian M. De Vos, Mind the Gap: Power, Pain, and the Difference between
Torture and Inhuman Treatment,

https://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=1206&context=hr brief.

[69] Art 1, UN CED.

[70] Article 2, UN General Assembly, International Convention for the Protection of All Persons from Enforced Disappearance, 20 December 2006.

[71] A/HRC/36/39/Add.2, Report of the Working Group on Enforced or Involuntary Disappearances on enforced disappearances in the context of migration, 28 July 2017.

[72] DHHS OIG report, https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

[73] Re o  he Wo king G o  on Enfo ced o In ol n a  Di a  ea ance on Enfo ced Di a  ea ance in  he Con e  of Mig a ion,  Uni ed Na ion  H man Righ   Co ncil, J l 28, 2017, accessed January 8, 2019, https://reliefweb.int/sites/reliefweb.int/files/resources/G1722672.pdf.

[74] Art 2, UN CED.

[75] Art 17, UN CED.

[76] Art 25, UN CED.

[77] Art 17(3)h, UN CED; Be na d D  haime and And eanne Thiba l ,  P o ec ion of mig an   f om enfo ced di a  ea ance: A h man igh   e  ec i e, In e na ional Review of the Red Cross (2017), 99 (2), 569  587.

[78] See the background section of this report.

[79] Art 14(1), UN CAT.

[80] Art 24, UN CED.

[81] The FCMP was a formal alternative to the Immigration and Customs Enforcement detention program that operated from January 2016 through June 2017, when the Trump administration terminated it.

[82] The *Flores* settlement is a 1997 court-supervised stipulated settlement agreement which is binding on federal agencies regarding the detention, transfer, and release of migrant children.

"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation          Physicians for Human Rights          phr.org          38

Exhibit B, Page 44

**PHR**

Physicians for
Human Rights

phr.org

For more than 30 years, Physicians for Human Rights (PHR) has used science and the uniquely credible voices of medical professionals to document and call attention to severe human rights violations around the world. PHR, which shared in the 1997 Nobel Peace Prize for its work to end the scourge of land mines, uses its investigations and expertise to advocate for persecuted health workers and facilities under attack, prevent torture, document mass atrocities, and hold those who violate human rights accountable.

# Through evidence, change is possible.



Shared in the
Nobel Peace Prize

Exhibit B, Page 45