MICHAEL J. STORTZ (SBN 139836)
mstortz@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
580 California Street, Suite 1500
San Francisco, CA 94104
Telephone:    415-765-9500
Facsimile:    415-765-9501

BRETT M. MANISCO (SBN 318351)
bmanisco@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone:    310.229.1000
Facsimile:    310.229.1001

**THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES**
MANOJ GOVINDAIAH (*Pro Hac Pending*)
manoj.govindaiah@raicestexas.org

Attorneys for Plaintiff-Intervenors
B.L.N., D.F.L.G., and W.B.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY L. FLORES, et al., | Case No. 2:85-cv-04544-DMG-AGRx |
| | [Judge: Hon. Dolly M. Gee] |
| Plaintiffs, | **DECLARATION OF SHALYN FLUHARTY IN SUPPORT OF *EX PARTE* APPLICATION FOR LEAVE TO INTERVENE** |
| vs. | |
| EDWIN MEESE, et al., | |
| Defendants. | Date Action Filed: July 11, 1985 |

I, Shalyn Fluharty declare as follows:

1. I am an attorney licensed by the State of California and the Director of Proyecto Dilley, a project of the Asylum Defense Project. Proyecto Dilley provides free legal services to mothers and children who are detained at the South Texas Family Residential Center ("STFRC" or "Dilley") in Dilley, Texas. I make this Declaration of my own personal knowledge and/or through matters made know to me through my position as Director of Proyecto Dilley, and if called, would testify to the matters set forth herein.

2. Between 2015 and 2020, Proyecto Dilley has provided legal services to more than 55,000 families during their detention at STFRC.

3. Proyecto Dilley has formerly operated as the "CARA Pro Bono Project" and the "Dilley Pro Bono Project." The changes in name reflect changes to the non-profit organizational partners that provide financial support to facilitate the provision of legal services on the ground in Dilley.

*Introduction*

4. It is my opinion that negotiated procedures developed by Class Counsel and the government to implement a family separation policy in the midst of a global pandemic defy the terms of the *Flores* Settlement Agreement, (the "Settlement") place children at great risk of harm, and conflict directly with the Due Process Clause of the Fifth Amendment of the United States Constitution.

5. Representing the rights of all immigrant children is no small feat. The individual circumstances of each child are unique, and the needs of one child often diverge from those of another. I have found, however, three things to be universally true during my work with immigrant children: children long to be free from detention; they want to be safe; and they want to be with their family. The *Flores* Settlement Agreement enshrines these core human rights of family unity, safety, and freedom, and for that, as an advocate for children, I am grateful.

1
DECLARATION OF SHALYN FLUHARTY IN SUPPORT OF *EX PARTE* APPLICATION FOR LEAVE TO INTERVENE

6. The question here, with the "waiver" process, is whether one of the rights deliberately enumerated by the terms of the Settlement may be pitted against another and categorically surrendered. Must Class Members separate from their parents in order to be safe? Must Class Members accept indefinite detention in order to preserve their right to remain in the care and custody of their parent? The Settlement and Constitution resoundingly answer "no."

7. For the hundreds of Class Members I have represented in the past, and the 80 children currently represented by Proyecto Dilley, none of these three rights has greater value over another. The principals of safety, family unity, and freedom are of equal importance to Class Members and have equal contractual weight based upon the Settlement that was fairly negotiated 23 years ago.

8. For this reason, Class Members detained at Dilley seek an opportunity to be heard and a chance to formally participate in the proceedings before the Court. Their participation is necessary to prevent the wholesale compromise of their rights absent full consideration of their interests.

***The Flores Settlement Agreement Has Informed My Legal Practice for More Than Ten Years.***

9. My experience with the *Flores* Settlement Agreement began in law school when I clerked with the Youth Law Center under the supervision of Alice Bussiere, one of the lawyers who negotiated the Settlement. During my time at the Youth Law Center, I reviewed and analyzed reports filed by the government regarding the length of time children spent in custody. Based upon this work, I am familiar with the type of data the government regularly provides to Class Counsel, and now the Special Monitor, regarding the length of detention for immigrant children in government custody and their type of placement.

10. I have participated in *Flores* monitoring visits at processing centers operated by Customs and Border Patrol ("CBP") as a volunteer and have toured the

McAllen CBP Processing Center and the Ursula Central Processing Center warehouse on multiple occasions. Based upon these experiences, I appreciate the type of access *Flores* counsel has as a matter of right to detention facilities that hold children and the unique considerations and challenges children face at the border.

11. Over the years, I have reviewed Office of Refugee Resettlement ("ORR") records for hundreds of individual children, including children who have been held in ORR-operated Residential Treatment Centers, short-term foster care programs, long-term foster care programs, and the Unaccompanied Minors Program. I have participated in formal stakeholder meetings with ORR at the local and headquarters level, attended numerous national conferences on unaccompanied children, and provided trainings regarding unaccompanied children at the local and national level. I have developed an educational game for children in ORR custody to explain the reunification process and its many complexities to children. This work and experience has given me profound insight into the nuances of the reunification process for accompanied children and the tension that exists between protecting children and releasing them from government custody without unnecessary delay.

12. My most meaningful experience with the reunification process for unaccompanied children comes from my experience representing hundreds of these children in ORR custody. Prior to representing detained families, I provided free legal services to unaccompanied children at numerous non-profit organizations funded by ORR through sub-grants to the Vera Institute of Justice. I worked with unaccompanied children who were placed in ORR custody at the Yolo County Juvenile Hall, a secure facility in Woodland, California, for three years. I spent an additional three years representing unaccompanied children who were detained by ORR in shelter and staff secure placements in Chicago, Illinois and Westchester, New York.

*Accompanied Children Who Face Separation From Their Parents Require More Protection Than Unaccompanied Children, Not Less.*

13. It is the totality of this experience that leads me to conclude that accompanied children who face separation from their accompanying parents require *more* protections in the reunification process than accompanied children, not *less.*

14. With few exceptions, the children I represented in ORR custody identified a receiving person prior to their journey to the United States. In other words, unaccompanied children are more likely than not to travel to the United States for protection because there was an adult here who was able and willing to receive them alone and who their parent entrusts with their care. ORR data from fiscal year 2018 shows that 76 percent of released unaccompanied children were reunified to a family member and 47 percent were released to their parent or legal guardian. *See* Congressional Research Serv., R43599, *Unaccompanied Alien Children: An Overview*, at 14 n.62 (Oct. 9, 2019), https://fas.org/sgp/crs/homesec/R43599.pdf (citing unpublished data provided to CRS by U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement, Office of Legislative Affairs, June 26, 2019). The process proposed by ICE and Class Counsel conflicts directly with the guiding process used for unaccompanied children; accompanied children will be categorically *separated* from their parents, not *reunited* with their parents.

15. A very small percentage of my unaccompanied child clients did not have a viable sponsor. As a result, these children were transferred to short- or long-term foster care placements or placed in the Unaccompanied Minors Program. These alternative options for leaving congregate care settings, based upon my understanding of Class Counsel's negotiations with the government, are not available alternatives for accompanied children.

16. Like unaccompanied children, accompanied children arrive to the United States with a pre-identified release plan that has been decided by their parent. Unlike

unaccompanied children, however, a parent's release plan is premised on the presumption that a sponsor will provide food, shelter, and other assistance to the family as a unit while the child's accompanying parent will provide care to the child. This means that many, if not most, of accompanied children have no alternative sponsor options available, other than their accompanying parent.

17. In many circumstances, the accompanied children Proyecto Dilley represents were targeted for harm prior to their departure from their home country. The parent who accompanies the child came to the United States with the child because there is no one in the United States who is appropriate to provide care for the child in the absence of their parent. In other words, the child is accompanied for a reason. Perhaps in some circumstances the parent would have considered sending their child—subsequent to the child's targeting for persecution or torture—to the United States alone. However, this is not an option for the child without an alternative suitable custodian in the United States.

18. Although many of the families Proyecto Dilley represents will be received by family members they know and trust, I have represented many family units who are destined to reside with individuals neither the parent nor their child have ever met. Frequently, these identified sponsors are distant relatives they've never met, friends of a friend, or individuals who the parent met on Facebook who funded their travel. When Proyecto Dilley learns about release plans that seem precarious or concerning, we explore the parent's receptiveness to alternative placement options and partner with shelters who provide care and legal services to asylum-seekers who can receive these families instead. Although our work provides a meaningful safety net to families who may be in danger, to the extent our services or similar services are not available to families forced to make a choice regarding family separation, children could end up released to individuals who have no intention of keeping them safe.

19. Unfortunately, there have been many times when parents we represent inform us subsequent to their release that they are in danger and not safe in the home of

Case 2:85-cv-04544-DMG-AGR   Document 858   Filed 07/20/20   Page 7 of 20   Page ID
#:39270

their sponsor. To the greatest extent possible, we help these mothers identify immediately available alternative housing options to keep their family safe and, in some circumstances, provide assistance by calling the police. In other circumstances, we assist families in moving from the home of one sponsor to the home of another by providing support as they navigate changing their address with the immigration court and ICE to another jurisdiction. Proyecto Dilley's resources have always been limited and narrowly focused on providing support to families during their detention in Dilley. This means many families, upon release, have no support system at all, and not even the support of our project, when they find themselves in harm's way.

20. Generally speaking, an accompanied parent who is placed with a child at a family detention center is presumed to be an appropriate caregiver for the child. I have observed a notable difference between accompanied and unaccompanied children regarding the likelihood that a child has experienced abuse, neglect, or abandonment at the hands of their parent. Family detention centers prohibit, broadly, the placement of parents who have criminal histories at family detention centers. When ICE has reason to believe a parent has a criminal history, or a history that poses a risk to the safety of the child they accompany, the parent and child are separated, generally, prior to their arrival to STFRC. The assumption that a parent who is detained at a family detention facility with their child is a safe and proper caregiver for their child is therefore not only based upon the legal or natural relationship between the child and parent, but also upon the background checks ICE conducts for each parent and the ongoing observations of parents while they care for their children directly at each facility.

21. This is distinct from my experience working with unaccompanied children. In many circumstances, unaccompanied children who come to the United States to join their parent have experienced a significant period of time separated from that parent prior to their arrival in the United States. In other circumstances, as I witnessed during my work with children in secure facilities, the child came into ORR custody after residing in the United States for many years with their parent. In this very small subset

6
DECLARATION OF SHALYN FLUHARTY IN SUPPORT OF *EX PARTE* APPLICATION FOR LEAVE TO INTERVENE

of children, it was not uncommon for the parent with whom the child resided inside the United States to have a history with child protective services or for the child to disclose harm they suffered within the household prior to coming into ORR custody. While ORR works to reunify these children to the greatest extent possible, it simultaneously works to provide parents with access to supportive services to support them in providing care to their children.

22. While seemingly irrelevant, these realities highlight the irony between the ORR family reunification process for unaccompanied children, which works to reunify children with their parents to the greatest extent possible, and ICE's new proposed family separation protocol, which works to separate children from their accompanying parents with no safeguards and no reason. In effect, ICE's family separation paradigm guts the preference for parent-child reunification that was bargained for in paragraph 14 of the Settlement.

23. Prior to my work with Proyecto Dilley, I spent approximately three years working as the Managing Attorney of the Young Center for Immigrant Children's Rights in Harlingen, Texas. The Young Center advocates for the rights and best interests of immigrant children. Young Center attorneys, social works, and bilingual volunteers are directly appointed by ORR to serve as Child Advocates, or guardian *ad litems*. Child Advocates make best interests recommendations on behalf of particularly vulnerable children throughout the child's detention and immigration proceedings. During my time with the Young Center, I worked primarily on behalf of children who were survivors of human trafficking and on behalf of children whose potential release from custody to a sponsor—including to parent sponsors—raised concerns regarding the child's safety and wellbeing. ORR appoints Child Advocates in a very small percentage of cases when an unaccompanied child has unique vulnerabilities including, but not limited to, a history indicative of human trafficking, experiences that indicate that the child's parent may be unfit to receive the child, a disability, or no viable option for sponsorship. I believe all accompanied children for whom parent separation is contemplated should have the

benefit of a Child Advocate who is dedicated to advocating for the child's best interest throughout the process.

24. It is my strong opinion, based upon more than a decade of work with immigrant children, that separating children from their parents with zero safeguards will place children in harm's way. This harm will be further exacerbated by the well-documented realities of trauma and harm children experience upon separation, which I have observed firsthand.

25. The ORR reunification process includes significant safeguards that ICE has no infrastructure to mirror. Prior to the release of an unaccompanied child, the government conducts criminal background and sex-offender registry checks. The identity of the adult who applies to receive a child is confirmed and their relationship is verified. Social workers—both case managers and clinicians—conduct multiple, in-depth interviews with potential sponsors, unaccompanied children, and each child's parent. Phone calls between sponsors and children are observed, analyzed, and documented. ORR works to confirm that a sponsor does not have a record of abusive behavior and ensure that a sponsor is able to provide for the child's physical and mental wellbeing. In many circumstances, ORR collects biometrics (fingerprints) and requires the completion of a home study in advance of a child's release. All release decisions are reviewed by a third-party contractor, GDIT, an ORR-appointed Federal Field Specialist, and in many circumstances, an ORR Headquarters Supervisory official. In other words, prior to the release of *any* unaccompanied child—including children who are going to their parent—the following individuals have participated in the decision-making process regarding the child's release: the child's case manager, the child's clinician, the ORR facility's lead case manager, the ORR's facility's lead clinician, the ORR facility's Program Director, the GDIT Case Coordinator, and the Federal Field Specialist.

26. These procedures are often overly burdensome and create unjustifiable delays in the release process. ORR reunification procedures are far from perfect and I have represented numerous children who languished in detention because of phantom

DECLARATION OF SHALYN FLUHARTY IN SUPPORT OF *EX PARTE* APPLICATION FOR LEAVE TO INTERVENE

allegations that a sponsor was not suitable to provide appropriate care to the child. However, in the case of accompanied children who are separated by the United States government from their parents, these protections, at minimum, are critical.

27. During the last three years, ICE and ORR collaboration has led to additional procedures to verify and report the immigration status of sponsors for the purpose of enforcement operations.[1] This enhanced coordination has led to the arrest of sponsors who sought to provide care to children based upon their lack of immigration status. The use of children in ORR custody as bait to arrest and deport individuals without status in the United States has chilled the release process for unaccompanied children.

28. Currently, when families are released from detention as a family unit to travel to their sponsor's residence, they are dropped off at the bus station or airport by ICE. Presumably, if children are separated and released alone, ICE will either transport the child directly to their sponsor, or the sponsor will be required to travel to Dilley, Texas. It is unknown if ICE will use the sponsorship process for accompanied children to arrest identified sponsors. It is also unknown if ICE will use ICE Deportation Officers, third-party security personnel, or child welfare workers to transport children alone without their parent to a sponsor. These logistics are critical, as children, including infants as young as one year of age could be separated under ICE and Class Counsel's proposed family separation plan. Children this young must travel in the lap of an adult. Will an ICE Deportation Officer be carrying an infant on his or her lap to the infant's final destination?

29. In my experience, ICE has never conducted a suitability assessment of a sponsor for an accompanied child and it is not equipped to do so. ICE is a law

---

[1] *See* Women's Refugee Commission, et al, *Children as Bait: Impacts of the ORR-DHS Information-Sharing Agreement* (March 2019), https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2019-03/Children-as-Bait.pdf; Daniella Silva, *ICE Arrested 170 Immigrants Seeking to Sponsor Migrant Children*, NBC News (Dec. 11, 2018), https://www.nbcnews.com/news/latino/ice-arrested-170-immigrants-seeking-sponsor-migrant-children-n946621

enforcement agency, not a child welfare agency. The difference between ORR and ICE is sharp, and children and their parents feel the distinction. ICE's mission is to deport individuals—including children—regardless of their circumstances and the child's best interests. ORR's mission, on the other hand, is to protect the safety and wellbeing of the children in its care and to ensure, to the greatest extent possible, a child's safety and wellbeing upon release from detention. For example, many of my unaccompanied child clients had trusting relationships with their ORR case manager and clinician that facilitated important disclosures, such as information regarding the child's experiences of past trauma and harm. My accompanied child clients do not have access to anyone they trust who is charged with protecting their safety in the reunification process at the ICE detention centers where they are held. In fact, no one is tasked with reunification duties in family detention centers at all—because it has been ICE's practice to release children and their accompanying parent together. Moreover, all those who work at Dilley report to ICE: CoreCivic employees are ICE-contracted and controlled and medical professionals at the facility are ICE employees. There is an unavoidable tension between caring for children and deporting them that is better navigated for unaccompanied children in ORR custody by ORR's infrastructure and mission. The clear division between the Department of Homeland Security ("DHS") and Department of Health and Human Services that exists for unaccompanied children is missing for accompanied children. Should ICE choose to proceed in establishing a new formal family separation policy, child welfare experts—independent of ICE—must be infused into the process and have the power to make critical decisions to protect children.

30. Another important protection for children that exists in the ORR system and not in the ICE system is access to counsel. Children in ORR custody have the benefit of access to legal services that are funded by the government. No such system exists for accompanied children. Although the Executive Office of Immigration Review operates an Access to Justice program that funds Know Your Rights presentations in many ICE facilities, these services are not funded for families who are detained at

10
DECLARATION OF SHALYN FLUHARTY IN SUPPORT OF *EX PARTE* APPLICATION FOR LEAVE TO INTERVENE

STFRC, even though STFRC is the largest ICE detention facility in the country. The services provided by Proyecto Dilley are funded through small grants and private donations which have dwindled over the past two years while the administration's new attacks on asylum seekers have created a critical need for funding to provide legal services for asylum-seekers who are forced to wait in Mexico. Worse, there is no access to counsel in CBP custody, where I understand family separation conversations will initially occur.

*Proyecto Dilley Observed the Aftermath of ICE's 2018 Family Separation Policy and Its Many Civil Rights Violations.*

31. During the summer of 2018, Proyecto Dilley represented approximately 100 families that were reunited in Dilley subsequent to months of separation. Prior to reunification, mothers were presented with a binary choice: be deported alone, or be deported with your child. The choice was presented to parents by ICE officers in writing using a waiver form developed and agreed upon by class counsel in *Ms. L. v. ICE* and the government.

32. The circumstances upon which this form was presented to parents who were separated from their children as part of the government's Zero Tolerance policy are worth noting. At the time, children had been separated from their parents for months. Many parents did not know where their children were located, who was providing them with care, or how to communicate with them. While separated from their children, parents were subjected to credible fear interviews. Many parents received negative credible fear determinations because during their interview, rather than focusing on the persecution and torture that precipitated their flight to the United States, they instead begged asylum officers to tell them how they could find their children. Children, on the other hand, were treated as unaccompanied children and issued Notices to Appear in removal proceedings. Within this context, many parents selected the choice they believed was necessary to reunify with their child: deportation with their child.

33. When families arrived to Dilley, we quickly learned that none of the mothers or children wanted to be deported; the mothers selected this option only because they saw no other way to reunify with their child. At that time, ICE intended to rapidly deport each family together. Yet every individual who seeks protection from persecution or torture has an international right proscribed by federal law to present their claim of fear and seek asylum. The previously-separated and now-reunited children, however, were never afforded the opportunity to present their claims of fear to an immigration judge or asylum officer. Without written notice, ICE administrative cancelled every child's Notice to Appear in secret while making plans to remove the children from the United States with no process at all.

34. These now-reunified children filed suit in the District of Columbia to defend their right to seek asylum. *See M.M.M. v. Sessions*, 319 F. Supp. 290, 293 (D.D.C. 2018). The children argued that the government's intention to remove them without any process violated their statutory rights. *Id.* The children also argued that as children, they required the presence of their parents in order to present their claims for asylum. *Id.* This is because children cannot meaningfully understand the proceedings against them or testify to the persecution and torture they have experienced and fear absent the assistance of their parents who can speak on their behalf.

35. Simultaneously, formerly separated parents filed suit to challenge the integrity of the credible fear proceedings that resulted in their orders of expedited removal. *Dora v. Sessions*, No. 18-cv-1938-PLF, Doc. 3 (D.D.C. Aug. 17, 2018). In *Dora*, parents argued that the Trump administration wrongfully deprived them of their right to apply for asylum by forcing them through credible fear interviews while they were traumatized and incapable of participating in those interviews. *Id.* As a result of the forced separation from their children, parents were deprived a fair process. *Id.*

36. *M.M.M.* and *Dora* were transferred to the *Ms. L.* court. The three cases combined to result in a global settlement agreement that provided every child with an opportunity to present their claim for asylum and every parent with a new interview. *See*

DECLARATION OF SHALYN FLUHARTY IN SUPPORT OF *EX PARTE* APPLICATION FOR LEAVE TO INTERVENE

Plan to Address the Asylum Claims of Class-Member Parents and Children Who are Physically Present in the United States, *Ms. L.*, No. 3:18-cv-428-DMS, Doc. 220-1 (S.D. Cal. Sept. 12, 2018). Relevant to this Court is the fact that, subsequent to agreement by class counsel and the government in the *Ms. L.* litigation, multiple federal lawsuits ensued to challenge the agreed upon binary choice procedures.

37.   These same due process concerns are relevant to the issues before the Court today. As an attorney representing Class Members, I do not know if separated accompanied children will be issued a Notice to Appear and afforded the statutory protections provided to unaccompanied children, including initial jurisdiction to present their asylum claim to the asylum office. I also do not know if parents will be deported without their children upon separation and if so, how children will present their asylum claims alone, without the presence of their parent.

38.   Three additional variables are strikingly similar between the family separation written binary choice process used in 2018 and the process that is currently contemplated by Class Counsel and the government. These similarities include the use of a written form absent the provision of critical information and access to counsel during coercive circumstances.

39.   During the binary choice process in 2018, parents were deprived of necessary information regarding their legal rights and the rights of their minor children. Parents did not know what would happen to their children if they were deported without them. Parents lacked key information regarding the care their child would receive while in government custody and upon release to a sponsor. They did not know if their child had the opportunity to seek asylum, and if so, the details of the process their child would be afforded. Such is the case here. Parents do not know what will happen to their child upon separation. For example, parents do not know if the government will investigate the home of a sponsor prior to their child's release; if children will be released directly to a sponsor or be transferred first to ORR custody; if sponsors will receive formal rights of guardianship under state law (something that does not happen when

unaccompanied children are released); or how children will be transported—alone—from Dilley to the homes of their designated sponsors. They also do not know if their parental rights will be impacted upon separation from their child, if and how they can choose to have their children returned to them after separation (including through repatriation), or if they will be provided the opportunity to return to the United States to participate in guardianship or child welfare proceedings in-person in relation to their child.

40. The proposed protocol also hinges upon the presentation of a written form, absent the presence and assistance of counsel. Although the binary choice process created by *Ms. L.* class counsel and the government was a process based upon the completion of a form alone, we quickly learned from conversations with our clients that the process was abused by immigration officers. In the fall of 2018, we surveyed 76 mothers who, while separated from their children, were invited by ICE officers to sign a form affecting their rights to be reunified with their children. Over 90 percent of the mothers we surveyed reported that they were not allowed to ask ICE officers any questions about the consequences of signing the form. This was particularly unjust for mothers who could not read the form presented to them, and mothers who spoke rare indigenous languages and who were not presented with a form in their language. More than 75 percent of the mothers we surveyed stated that they did not understand what they were signing. Disturbingly, 67 percent of the mothers reported that ICE intimidated or coerced them into signing the form that affected their rights to reunify with their children. Worse, 30 percent of the mothers surveyed reported that ICE officers threatened that if they did not sign the form, they would never see their children again.

41. The results of our survey were published in a report filed with the DHS's Office of Civil Rights and Civil Liberties that is attached to my declaration as Exhibit A.[2] The report documents numerous civil rights violations that occurred during the

---

[2] Also available at
https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/the_use_of_coercion_by_u.s.

government's use of the negotiated binary choice procedures, including, but not limited to:

- The use of physical and verbal threats, deception, and intimidation by ICE officers to coerce separated parents into signing forms to relinquish their rights to their child;
- ICE officers presenting mothers with pre-completed forms that affected their rights to reunification;
- Actions by CBP officers that subjected parents and children to extreme duress during the separation process, including verbal and physical abuse;
- The use solitary confinement as retaliatory punishment for mothers' ongoing efforts to find their children after separation; and
- Severe physical and emotional distress, depression, and mental health problems experienced by parents as a result of their separation from their children.

42. The circumstances that surrounded the binary choice forms used in 2018 were coercive because, at the time the forms were presented, mothers were separated from their children. Here, parental decision-making is also coercive because children are being held in indefinite detention in congregate care settings during a COVID-19 outbreak.

43. The dangerous conditions in Dilley continue despite the Court's repeated orders that ICE make every effort to comply with CDC guidelines. For example, after the Court's June 26, 2020 Order, on July 2, 2020, the facility held an all-facility Fourth of July celebration. Children and parents played tic-tac-toe and soccer. There were board games, group puzzles, water games, and face painting. Children shared water guns and mothers fell on top of each other when they lost tug-o-war. The day culminated in long lines where mothers and children stood side by side to get a snow cone. Although the

_department_of_homeland_security_officials_against_parents_who_were_forcibly_separated_from_their_children_public_fin_0.pdf.

facility is divided by complexes, during the Fourth of July celebration, families from every complex participated simultaneously in games and activities in the red gym. The ironic Fourth of July celebration at Dilley confirmed what we already know to be true: ICE is unable to ensure the even the basics to keep children safe.

*Proyecto Dilley has Long Observed ICE's Non-Compliance with This Court's Orders and the Flores Settlement Agreement.*

44.     ICE has a long history of ignoring the orders of this Court. Proyecto Dilley has closely tracked ongoing violations of the Settlement at STFRC for years and has repeatedly requested the assistance of Class Counsel in escalating violations of the Settlement.

45.     My work with Proyecto Dilley began in March 2016, and I took over leadership for the project in December 2016. I was living in Dilley on June 27, 2017 when this Court determined that STFRC is a secure facility unlicensed by the state of Texas. Our team quickly mobilized to create capacity to provide support to the families we anticipated would be immediately released, given this Court's determination that Dilley did not comply with the explicit terms of the Settlement. *See* June 27, 2017 Order [Doc # 363]. Instead, ICE continued to bring new families to Dilley.

46.     For years, Proyecto Dilley operated a remote volunteer team that tracked the length of detention for every child represented by the project. The work of this remote team was finally suspended in or around the Fall of 2019 when it became apparent that the data regarding the length of detention for children in Dilley was no longer a persuasive means of deterring the unlawful prolonged detention of children in Dilley by ICE. We resumed this tracking in February 2020 to support a complaint we filed with DHS's Office of Civil Rights and Civil Liberties regarding violations of the Settlement.

47.     A pillar of our work in Dilley is providing access to legal information through regular provision of Know Your Rights presentations. Our introductory Know

Your Rights presentation has regularly included information about the requirements of the Settlement. We inform our clients that their children may not be detained for more than 20 days. Over the past year, ICE has—with few exceptions— detained every family in Dilley for more than 20 day. Because the terms of the Settlement have therefore becoming meaningless, we have eliminated advisals regarding the Settlement from our Know Your Rights presentations.

48. During the last three and a half years, I have participated in ongoing stakeholder meetings with ICE. For many years, Proyecto Dilley met weekly with STFRC's Assistant Field Office Director and ICE counsel. Although during 2017 key ICE stakeholders were aware and generally respectful of the requirements of the Settlement, ICE's refusal to honor its obligations under the Settlement became increasingly emboldened over time. For example, in the Fall of 2018, we had more approximately 100 children who were detained for around four months prior to their release. ICE's position was that these children—the children previously referenced who were separated and subsequently reunified with their mothers—were not eligible for release because their mothers had orders of expedited removal. Indeed, as detailed above, every single mother who was reunited in Dilley received a new credible fear proceeding as a result of the global settlement agreement in *Ms. L.* and every single mother and child was issued a positive credible fear finding subsequent to that new interview. It was not until after the families were issued Notices to Appear as a result of federal litigation that ICE released these families. I repeatedly reminded ICE, both in writing and in person, of its obligation to release children under the Settlement regardless of the status of their immigration court proceeding or the status of their mother's immigration court proceeding, as clarified in this Court's June 27, 2017 Order. ICE's position was that the Settlement provided no presumption of release for these families.

49. ICE leaders in Dilley have regularly stated that the Settlement does not require that children be released within 20 days, does not require efforts, let alone

continuous efforts, to release children, does not require placement in a licensed facility, and does not allow immigration court to have jurisdiction to conduct custody review hearings for children. For example, in one case, I represented a fourteen-year-old girl who, despite being in removal proceedings, was detained in Dilley for more than seven months because her mother had a final order of removal which was pending appeal with the Board of Immigration Appeals and a pending U-visa application based upon severe domestic violence that she reported to the police. In this case, ICE refused to release the child or family. I repeatedly advised ICE of its obligations to consider the release of the child and provided documentary evidence that prolonged detention was impacting the child's mental health such that she had developed suicidal ideations. ICE ignored this information and made no efforts to release the child alone or with her mother. It was not until after the child attempted to hang herself from a shower rod in the bathroom, and a complaint to the DHS Office of Civil Rights and Civil Liberties, that ICE released the child in the care to her mother.

50. I believe the failure to enforce the Settlement's terms over time has led to the present circumstance of near universal indefinite detention in Dilley. As of today, July 20, 2020, 51 children who are currently detained in Dilley have been detained for more than 180 days and one three-year-old child has been detained for 340 days. Indefinite detention is the new norm.

51. A handful of times, a team of volunteers working with Class Counsel have conducted *Flores* monitoring visits to STFRC. In each of these occasions, Class Counsel has failed to reach out to Proyecto Dilley in advance to coordinate the visit. In fact, on most occasions, I learned about the monitoring trips through a third party just days before the visit, or even on the day of the visit itself. In each of these circumstances, our team quickly mobilized to identify children and parents who wanted to speak with Class Counsel. Despite the failure to coordinate with our project in advance, we were able to swiftly provide on the ground support to ensure *Flores* monitors had access to Class Members and critical information. We were never advised how the declarations gathered

from our clients were used, if at all, to defend their right to prompt release, right to placement in a non-secure licensed facility, and right to safe and sanitary conditions.

52. The concerns I present above are by no means an exhaustive list of the issues at stake should the Court proceed in approving a new and permanent family separation policy. I merely hope to convey the delicate intricacies at play that require meaningful consideration by this Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th Day of July, 2020 in San Antonio, Texas.

                    /s/ *Shalyn Fluharty*
                    Shalyn Fluharty