# Exhibit A




August 23, 2018

VIA ELECTRONIC MAIL

Cameron Quinn
Officer for Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

John V. Kelly
Acting Inspector General
Department of Homeland Security
Washington, DC 20528

Re:     **The Use of Coercion by U.S. Department of Homeland Security (DHS) Officials Against Parents Who Were Forcibly Separated From Their Children**

Dear Ms. Quinn and Mr. Kelly,

As partners in the Immigration Justice Campaign, the American Immigration Council ("Council") and the American Immigration Lawyers Association ("AILA") jointly file this complaint on behalf of numerous parents who were separated from their children while in Department of Homeland Security (DHS) custody pursuant to the Trump administration's "zero tolerance" policy, and then subject to extreme duress and coercion while in DHS custody. Over 2,600 minor children were forcibly separated from their parents; at the time of filing of this complaint, an estimated 366 parents remain outside the United States, having been deported without their children, and 565 children remain in government custody, still separated from their parents.[1]

A federal court has determined that the practice of separating children from their parents "shocks the conscience."[2] Medical[3] and psychological[4] experts have repeatedly expressed grave concerns about the deleterious and lasting impact that separation has had—and continues to have—on children and their parents. Republican and Democratic

---

[1] *See* Joint Status Report, Dkt 191 at 2, *Ms. L. v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. Aug. 18, 2018), *available at* https://www.aclu.org/legal-document/ms-l-v-ice-joint-status-report-2.

[2] *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. June 26, 2018) (order granting preliminary injunction).

[3] ACP Objects to Separation of Children from their Parents at Border, American College of Physicians, May 31, 2018, *available at:* https://www.acponline.org/acp-newsroom/acp-objects-to-separation-of-children-from-their-parents-at-border (last accessed August 15, 2018).

[4] Alexander Miller, et al., (2018), *Understanding the mental health consequences of family separation for refugees: Implications for policy and practice*, American Journal of Orthopsychiatry, Vol 88(1) 2018, 26-37, *available at:* http://psycnet.apa.org/doiLanding?doi=10.1037%2Fort0000272.

members of Congress have repeatedly condemned family separation.[5] Further, there are numerous reports of separated children being subject to physical and verbal abuse.[6]

This complaint contains 13 pseudonymized case examples and original testimony from parents who were separated from their children that show a pervasive, illegal practice by DHS officials of coercing mothers and fathers into signing documents they may not have understood. The cases also demonstrate how the trauma of separation and detention creates an environment that is by its very nature coercive and makes it extremely difficult for parents to participate in legal proceedings affecting their rights. The direct consequence of the coercion is that many parents were forced to waive their legal rights, including their right to be reunified with their children.[7]

The cases present powerful evidence of gross violations of due process committed by government officials that place into question the validity and fairness of legal determinations made by U.S. Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) officials, as well as U.S. Citizenship and Immigration Services (USCIS) asylum officers and the Immigration Court. The coercive environment created by family separation was so overpowering as to render many mothers and fathers unable to answer questions or even comprehend the purpose of credible fear interviews or the removal process overall.

Coercion of noncitizens by immigration officials is a direct violation of the U.S. Constitution, federal statute, and regulations.[8] The Immigration and Nationality Act guarantees every person the right to apply for asylum regardless of the manner of entry.[9] ICE and CBP officials cannot lawfully force any person to abandon statutory or constitutional rights.[10] The coercive acts committed by U.S. government officials and the

---

[5] Peter Baker, *Leading Republicans Join Democrats in Pushing Trump to Halt Family Separations*, NY Times (June 17, 2018).

[6] These reports include being deprived of potable water, which compelled some to drink toilet water, and being given expired food. Angelina Chapin, *Drinking Toilet Water, Widespread Abuse: Report Details 'Torture' For Child Detainees*, Huffington Post (July 17, 2018), https://www.huffingtonpost.com/entry/migrant-children-detail-experiences-border-patrol-stations-detention-centers_us_5b4d13ffe4b0de86f485ade8. Many of these children were likely subject to further coercive tactics and duress at the hands of government officials at every stage of their time in government custody. This complaint, however, focuses on the coercion endured by the separated parents, many of whom we continue to advocate for and provide support to in terms of coordinating legal representation.

[7] The ill effects of the "zero tolerance" policy are being exacerbated by the fact that DHS is turning away asylum seekers at the ports of entry, effectively forcing families to cross in between ports of entry to seek asylum in the United States. The Council, AILA, and other organizations submitted an administrative complaint with the Office for Civil Rights and Civil Liberties (CRCL) and the Office of the Inspector General (OIG) in January 2017 regarding the government's systematic denial of entry to asylum seekers at ports of entry on our Southern border. *See* https://www.americanimmigrationcouncil.org/content/us-customs-and-border-protections-systemic-denial-entry-asylum-seekers-ports-entry-us. The Council, along with the Center for Constitutional Rights and Latham and Watkins, LLP, subsequently filed a class action lawsuit last year challenging CBP's unlawful practice of turning away asylum seekers who present themselves at ports of entry along the U.S.-Mexico border. *See* https://www.americanimmigrationcouncil.org/litigation/challenging-customs-and-border-protections-unlawful-practice-turning-away-asylum-seekers.

[8] For example, the accounts below in which speakers of indigenous languages with limited Spanish proficiency were coerced into signing documents while detained in CBP custody likely violates 8 C.F.R. § 235.3(b)(2)(i), which requires that interpretative assistance be provided.

[9] *See generally* 8 U.S.C. § 1182. The right to apply for asylum "may be violated by a pattern or practice that forecloses the opportunity to apply." *Campos v. Nail*, 43 F.3d 1285, 1288 (9th Cir. 1994).

[10] *See, e.g. Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1505 (C.D. Cal. 1988), aff'd sub nom. *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990) (finding that the due process rights of Salvadoran asylum seekers was violated by an INS policy and practice of duress and misrepresentation intended to coerce asylum seekers into abandoning their right to apply for asylum and instead agree to voluntary departure).

**AILA Doc. No. 18082235. (Posted 8/23/18)**

Exhibit A, Page 21

government's creation of a coercive environment prevented separated parents from meaningfully participating in the asylum process.

Together these practices have resulted in not only the tremendous suffering of children and parents who have been kept apart, detained, and subjected to abusive, inhumane treatment, but also the involuntary, forced return of hundreds of people to grave dangers, including risk of death. As a nation we cannot tolerate such abuses in violation of our laws and we urge you to take immediate action to correct the situation.

## KEY FINDINGS

- ICE officers used both physical and verbal threats, deception, and intimidation to coerce multiple separated parents into signing forms relinquishing their rights.
- ICE officers reunified multiple parents with their children, then presented them with pre-completed forms affecting their rights to reunification, and re-separated parents who refused to sign the forms.
- CBP officers subjected separated parents to extreme duress during the separation process, including verbal and physical abuse.
- Detention officers put separated parents in solitary confinement, deprived them of food and water for days, and subjected them to other forms of retaliatory punishment.
- Parents experienced severe physical and emotional distress, depression, and mental health problems from the conditions of detention and separation from their children.
- Government officials and detention facility staff treated parents so cruelly and inhumanely as to compromise their ability to access asylum and other legal relief.
- The trauma of being separated from their children, as well as the coercive environment created by CBP and ICE officers, made it extremely difficult for parents to participate meaningfully during the credible fear interview process, and their proceedings, if any, before the Immigration Judge.
- We surveyed 76 mothers who had been separated from their children and asked by ICE officers to sign a form affecting their rights to be reunified with their children. Over 90% of the mothers reported that they were not allowed to ask about the consequences of signing the form. As a result, less than 25% of mothers expressed that they understood what they were signing. Disturbingly, 67% of mothers reported that ICE intimidated or coerced them prior to having them sign a form affecting their rights to reunification with their children. Worse, 30% reported that ICE officers threatened that if the mother did not sign the form, they would never see their children again.

## BACKGROUND

The Council and AILA have long sought to curb the abuse and coercion of vulnerable populations that arrive at the U.S.-Mexico border seeking humanitarian protection. On December 11, 2017, the Council, AILA, and other immigrant rights organizations filed a complaint with the DHS Office for Civil Rights and Civil Liberties (CRCL) and the Office

of the Inspector General (OIG) presenting grave concerns regarding the separation of asylum-seeking families while in CBP and ICE custody at the U.S.-Mexico border.[11] As family separation drastically expanded in Spring and Summer 2018, the concerns of these organizations have been largely borne out.

On April 6, 2018, the Department of Justice (DOJ) and DHS implemented a "zero tolerance" policy for individuals who crossed the southern border without authorization, which resulted in many asylum-seeking families being prosecuted and parents being separated from their children.[12] After the government separated more than 2,600 families, and amid a growing outcry against the impact of these policies on children and their parents, President Trump issued an executive order on June 20, 2018 which purported to limit family separation.[13]

On June 26, in an ACLU lawsuit challenging the family separation policy, *Ms. L. v. ICE,* U.S. District Court Judge Dana Sabraw held that family separation violated the Due Process Clause of the Fifth Amendment and ordered the administration to reunite all families that the government forcibly separated.[14] Pursuant to the court's decision, the government was ordered to reunite all "eligible" parents by July 26, 2018.[15] Many parents deemed "ineligible" by DHS for reunification remain detained in adult immigration detention facilities, apart from their children. Many other parents are now detained with their children in family detention centers. Whereas an estimated 2,000 families have been reunified, at least 366 parents were deported *without their children.*[16]

Prior to submitting this complaint, our organizations spoke to dozens of parents who had been separated from their children, most of whom reported having been coerced to various degrees by DHS officials. Their stories, detailed below along with information from publicly available sources, demonstrate the ways in which ICE and CBP officials and detention facility guards coerced separated parents into signing forms relinquishing their rights, and the ways in which treatment by DHS officials, and the conditions in which parents have been detained, created a coercive environment which prevented them from meaningfully exercising their rights.

---

[11] *The Separation of Family Members Apprehended by or Found Inadmissible while in U.S. Customs and Border Protection (CBP) Custody at the U.S.-Mexico Border* (Dec. 11, 2017), https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/family_separation_complaint.pdf

[12] Department of Justice, Office of Public Affairs, "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," April 6, 2018, https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry; Under the zero tolerance policy, DHS was directed to refer for criminal prosecution all migrants who crossed the border without authorization, and DOJ was directed to accept as many of these referrals as practicable. Per the new policy, if these migrants arrived with children, the families were separated when the parents were referred for prosecution, and the children were unconventionally designated "unaccompanied alien children" and placed in the custody of the Department of Health and Human Services (HHS) Office of Refugee Resettlement (ORR). The result was a de facto, government-created policy of family separation.

[13] President Donald J. Trump, *Affording Congress an Opportunity to Address Family Separation,* The White House, June 20, 2018, https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.

[14] *Ms. L. v. ICE,* 310 F. Supp. 3d 1133 (S.D. Cal. June 26, 2018) (order granting preliminary injunction).

[15] *Id.* at 1149.

[16] Whereas the ACLU found that at least 366 parents were deported without their children, other sources suggest that the number was far greater. *See* Joint Status Report, Dkt 191 at 2, *Ms. L. v. ICE,* No. 18-cv428-DMS-MDD (S.D. Cal. Aug. 18, 2018), *available at* https://www.aclu.org/legal-document/ms-l-v-ice-joint-status-report-2. Tom Hals & Reade Levinson, *U.S. says 463 migrant parents may have been deported without kids,* Reuters (July 23, 2018).

## DHS Officers Explicitly Coerced Parents into Signing Documentation Relinquishing Their Rights to Reunification.

### *ICE officers coerced parents into signing forms relinquishing their rights to reunify with their children before the reunification process occurred.*

Pursuant to the June 26, 2018 court order in *Ms. L* that halted family separation, ICE was required to reunify all families that were separated, unless ICE determined "that the parent is unfit or presents a danger to the child," or if the parent "affirmatively, knowingly, and voluntarily declines to be reunited with the child."[17] The court further ordered that ICE not deport any parent without their child, unless the parent "affirmatively, knowingly, and voluntarily declines to be reunited."[18]

To facilitate the deportation of individuals with administrative final orders of removal while following this preliminary injunction, ICE drafted a form, initially titled "Separated Parent's Removal Form" (hereinafter "Election Form"), to be given to parents with final orders of removal.[19] With the exception of biographical information, the form was written entirely in English—although a later version of the form offered brief summaries of the options in Spanish.[20] The Election Form offered parents two options—to be deported without their children or to be reunified and deported with their children.[21] Only following negotiations with the ACLU was a third option added allowing parents to indicate that they wanted to speak to an attorney first.[22]

According to affidavits filed by the ACLU in the *Ms. L.* case, in addition to dozens of accounts from detained parents shared directly with us, many parents detained at ICE facilities across the country whom the government claimed had "affirmatively, knowingly, and voluntarily" relinquished their rights to reunification, in fact reported that they had been coerced into signing forms they did not understand in a language they did not speak, or were totally unaware that they had relinquished their right to reunification.[23]

In addition to being coerced, many parents detained nationwide were forced outright to sign the Election Form. Numerous parents in the El Paso area reported that ICE officers demanded that they sign the Election Form and affirmatively abandon their rights to

---

[17] *Ms. L. v. ICE*, 310 F. Supp. 3d at 1149 (order granting preliminary injunction).
[18] *Id.*
[19] *See* Caitlin Dickson, *New ICE form to separated parents: Choose deportation with or without kids*, Yahoo News (July 3, 2018), https://www.yahoo.com/news/new-ice-form-separated-parents-choose-deportation-without-kids-232452897.html.
[20] *Id.* Furthermore, authors interviewed dozens of separated parents who described the different forms that they were coerced into signing by DHS officials.
[21] *Id.* Option 1 stated that parents were "requesting to reunite with my child(ren) for the purpose of repatriation to my country of citizenship." Option 2 stated that parents were "affirmatively, knowingly, and voluntarily requesting to return to my country of citizenship without my minor child(ren) who I understand will remain in the United States to pursue available claims of relief."
[22] *See* Order Granting Plaintiffs' Motion for Temporary Restraining Order, *M.M.M. v. Sessions*, No. 18-cv-1835-DMS-MDD, at 10 (S.D. Cal. August 16, 2018) (describing history and purpose of the election forms), *available at* https://bit.ly/2nTcXOB.
[23] *See* Declaration of Aaron Reichlin-Melnick, Dkt. 153 at Exhibit 44, *Ms. L. v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. July 25, 2018), *available at* https://www.aclu.org/legal-document/ms-l-v-ice-plaintiffs-reply-support-motion-stay-removal (summarizing coercion documented by volunteer attorneys).

Case 2:85-cv-04544-DMG-AGR   Document 858-1   Filed 07/20/20   Page 7 of 29   Page ID
#:39290
**The Use of Coercion by U.S. DHS Officials Against Parents Who Were Forcibly Separated From Their Children**
**American Immigration Council and AILA** | August 23, 2018

reunification.[24] Others at the West Texas Detention Facility reported that after ICE gave a presentation to a group of about 60 separated fathers, on July 11, 2018, they were also forced to sign.[25] In that case, ICE officers told the fathers that they had three options—be removed without their child, be removed with their child, or continue to fight their case for asylum. ICE did not inform parents that they were entitled both to pursue their asylum claims *and* to be reunified with their child.[26]

Similar group presentations reportedly occurred at the Otero County Detention Center. Two fathers reported being brought to a room with about 50 other fathers on July 17, 2018, given "no explanation of the form," with the entire process taking less than five minutes. A third father reported that he was brought to a space normally used as a chapel with 25 to 30 other fathers, and that "he was given a form, that it was not explained to him, and that the entire process lasted no more than three minutes. He said he felt sad and intimidated during this process. He expressed that he believed he had no choice but to sign the form."[27]

Indigenous language speakers, many of whom are unable to read or write in any language, speak neither English nor Spanish, or speak Spanish with limited proficiency, also reported being coerced into signing forms by ICE relinquishing their rights to reunification. One mother, T.C., whose story is included below, speaks primarily Q'eqchi' and only limited Spanish. ICE officers demanded she sign the Election Form and threatened to punish her if she refused. She signed the document, but had no idea what she was signing. Similarly, another father, whose case was highlighted in the *Ms. L.* lawsuit, speaks primarily Akatek and limited Spanish, but was made to sign the Election Form without explanation.[28]

When ICE requires separated parents to sign forms that materially affect their rights without translating those forms into a language that the parents can understand, the rights of the parents are violated.[29]

---

[24] Elise Foley and Roque Planas, *Immigrant Parents Unwittingly Signed Away Right to Reunite with Children, Lawyers Say*, Huffington Post (July 25, 2018), https://www.huffingtonpost.com/entry/immigrant-parents-right-to-reunite_us_5b58f9d0e4b0fd5c73cb6599.

[25] *See id.*; Declaration of Kathryn E. Shepherd, Dkt. 153 at Exhibit 48, ¶ 8, *Ms. L. v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. July 25, 2018).

[26] Declaration of Kathryn E. Shepherd, Dkt. 153, Exhibit 48 at ¶ 8, *Ms. L. v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. July 25, 2018).

[27] *Id.*, Declaration of Luis Cruz, Dkt. 153, Exhibit 44 at ¶¶ 6-9.

[28] *Id.*, Declaration of Aaron Reichlin-Melnick, Dkt. 153, Exhibit 43 at ¶ 8. Two other Mam-speaking fathers mentioned in that case also described being told to sign a paper that they believed would allow them to reunite with their children; both fathers had been identified by the Department of Justice as having relinquished their rights to reunification. *Id.*, Declaration of A.R. Reive, Dkt. 153, Exhibit 45 at ¶ 10-12. One of those fathers, "signed a paper that he thought would allow him to be reunited with his son" but which was not explained to him. *Id.* at ¶ 9. Another Mam-speaking father who "speaks extremely limited Spanish … [and] cannot read or write … signed a document that he thought would allow him to be reunited with his son." *Id* at ¶ 10. He "could not …understand the document because he is illiterate and no interpreter was provided to explain its contents to him in Mam." *Id.*

[29] *See, e.g., United States v. Ramos*, 623 F.3d 672 (9th Cir. 2010) (DHS failure to translate waiver of right to appeal Stipulated Removal determination rendered waiver involuntary); *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1044 (9th Cir. 2012) ("A waiver of rights cannot be found to have been considered or intelligent where there is no evidence that the detainee was first advised of those rights in a language he could understand").

**AILA Doc. No. 18082235. (Posted 8/23/18)**
Exhibit A, Page 25

***Following reunification, ICE officers coerced separated parents into signing pre-
filled relinquishment consent forms.***

Pursuant to a court order in the *Ms. L* case, ICE was directed to reunify all "eligible"
parents with their children by July 26.[30] Given the scale of this operation, a substantial
number of reunifications occurred within the last week before that deadline.[31] During this
process, multiple reports emerged of coercive behavior by ICE officers against
separated parents. These reports are bolstered by a survey of 76 mothers we
conducted; 34% of those surveyed reported that they had been asked to sign pre-
completed forms.

Four parents allege that, on July 25, 2018, ICE officers boarded a bus departing from
the El Paso Processing Center that was filled with reunified parents and their children.[32]
Several parents on that bus—identified in the ACLU's filing as F.G., J.M., C.T., and
F.T.—reported that ICE officials handed out the Election Form to each parent on the
bus.[33] Each form had been pre-completed by ICE, with the box for Option 1, "I want to
be deported with my children," already filled in with a "handwritten check mark."[34]

One father, F.G., reported that "officials told him that while there were three options on
the form, he had to choose Option 1."[35] F.G. refused to sign the form, preferring instead
to select Option 2—to be deported without his child.[36] Another father, J.M., ignored the
pre-written check mark and instead selected Option 2. In response, an ICE officer took
the form away and returned with a new copy, "again with Option 1 pre-selected." When
J.M. again refused to sign the form, the ICE officers "yelled at him in English" and
pressured him in Spanish to sign the form.[37] Two other fathers, C.T. and F.T., confirmed
that ICE had presented the entire bus with pre-selected forms, and F.T. noted that ICE
officers were "visibly and audibly angry when he refused" to select Option 1.[38] All four
fathers recounted that their children were separated from them *a second time* upon their
refusal to sign the forms pre-marked with Option 1, which would have agreed to them
being deported together.

By pre-selecting Option 1 on the Election Form, refusing to permit parents to select any
other option, and screaming at any parent who disagreed, ICE agents violated the due
process rights of these parents.[39] Forcing a parent to sign a pre-selected form does not

---

[30] *Ms. L. v. ICE*, 310 F. Supp. at 1149.
[31] On Wednesday, July 19, the government had only reunited 364 separated children with their parents. *See* Joint Status Report,
Dkt 124 at 2, *Ms. L. v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. July 19, 2018), *available at* https://www.aclu.org/legal-
document/july-19-status-conference-report. The following Wednesday, July 26, 2018, the government had reunified or otherwise
discharged in appropriate circumstances a total of 1,820 children. *See* Joint Status Report, Dkt 159 at 2, *Ms. L. v. ICE*, No. 18-
cv428-DMS-MDD (S.D. Cal. July 26, 2018), *available at* https://www.aclu.org/legal-document/ms-l-v-ice-status-report.
[32] *See* Declaration of Laila Arand, Dkt. 163-1, *Ms. L v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. July 26, 2018).
[33] *Id* at 2.
[34] *Id.*
[35] *Id.*
[36] *Id; see* Note 21, *supra*, for a description of the options.
[37] Declaration of Laila Arand, Dkt. 163-1, *Ms. L v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. July 26, 2018), at 5.
[38] *Id.* at 6.
[39] *See, e.g., Orantes-Hernandez*, 685 F. Supp. at 1494 (coercing vulnerable asylum seekers into relinquishing their rights violates
due process).

Exhibit A, Page 26

comport with due process as it does not allow for an affirmative, knowing, or voluntary decision by the parent.[40]

## DHS Officers Subjected Separated Parents to Extreme Duress and Coercive Environments.

### *CBP officers subjected separated parents to extreme duress during the separation process, including verbal and physical abuse.*

The stories below illustrate how parents were subjected to duress and coercion while in CBP custody. These stories also show the ways in which the coercive environment, established within hours of entry, affected the rights of separated parents throughout their time in DHS custody.[41]

Many parents report that they were subject to a coercive environment by officers during their time in CBP short-term detention facilities, colloquially called *hieleras* ("iceboxes") because of the cold temperatures inside the facilities. The unnecessarily harsh conditions in these facilities have been the subject of detailed reporting, CRCL complaints, and multiple federal lawsuits in the past.[42] Consistent with these previous reports, in the cases cited in this complaint, parents report being given inadequate or spoiled food, being forced to sleep on cold concrete floors and next to toilets, or being unable to sleep as a result of the cramped conditions forcing people to stand, being denied access to feminine hygiene products while menstruating, and suffering because of the cold.[43] While in the *hieleras,* parents also indicated suffering terrible emotional distress from seeing their children crying in separate cells but not being able to speak to them, or not knowing where their children were or whether they were being treated humanely.

Parents—sometimes with their children—were also subjected to coercive environments when detained in facilities colloquially called *perreras* ("dog pounds"), typically facilities with chain-link cells. Parents reported being forced to sleep on the concrete floor for over a week with no bedding, a "horrible stench" caused by the failure to provide access to any hygiene such as showers or toothbrushes, being crowded into cells so tightly that

---

[40] *See Ms. L.*, 310 F. Supp. 3d at 1149 (requiring DHS to reunify all parents "unless the parent affirmatively, knowingly, and voluntarily declines to be reunited").

[41] In a related context, the Supreme Court has repeatedly ruled that subjecting arrested individuals to coercive environments may violate their constitutional rights to due process. *See, e.g., Miller v. Fenton,* 474 U.S. 104, 118 (1985) (discussing the ways in which interrogation of an arrested individual in a "coercive environment" may violate due process and render a confession involuntary).

[42] *See, e.g.,* Guillermo Cantor, *Hieleras (Iceboxes) in the Rio Grande Valley Sector* (2015), *available at* https://www.americanimmigrationcouncil.org/research/hieleras-iceboxes-rio-grande-valley-sector; Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018), *available at* https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells; National Immigrant Justice Center, et. al, *CRCL Complaint, Systematic Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection* (June 11, 2014) (detailing violations of the rights of children held in CBP holding rooms).

[43] Multiple parents reported that CBP provided frozen or near-frozen food. This violates section 4.13 of CBP's 2015 National Standards on Transport, Escort, Detention, and Search ("TEDS policy"), *available at* https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/CBP%20TEDS%20Policy%20Oct2015.pdf ("Food provided must be in edible condition (not frozen, expired or spoiled)").

AILA Doc. No. 18082235. (Posted 8/23/18)
Exhibit A, Page 27

they had to sleep in the bathroom area, continued denial of access to feminine hygiene products, and verbal abuse by CBP officers.[44]

These conditions, combined with the trauma of family separation, created an inordinately coercive and stressful environment which colored the interactions that separated parents had with all immigration officials throughout their time in custody. Parents' first interactions with CBP officials often included officers who used deception to facilitate separating children from their parents. Many parents were falsely told their children would be returned to them after they had gone to federal court to face prosecution for entry-related offenses. Others were given no notice that their child would be taken, returning from interviews with CBP officers only to discover that their child was missing. Some were even forced to witness their wailing child be dragged away by CBP officers.[45]

### *ICE officers and prison guards subjected separated parents to duress and coercion.*

Many separated parents report that ICE officers and prison guards subjected them to duress and coercive environments while in detention that infringed upon their ability to meaningfully avail themselves of their protected right to the asylum process. Many parents reported that ICE officers yelled at and insulted them, used intimidation tactics, such as isolation and denying food, and taunted them with threats that their children already had, or would be, put up for adoption.

The coercive environment of detention after having been separated from a child also created profound psychological trauma to individuals held in ICE detention. One mother, A.R., reported that her mind "went completely blank" while she was detained in the West Texas Detention Facility in Sierra Blanca, Texas. "Even when I tried to pray, the words of the songs I have sung my whole life would not come to me," she stated.[46]

Another mother, C.F., described being held in ICE detention at the Irwin Detention Center in Irwin, Georgia.[47] Being separated from her daughter was "unbearably difficult" for her. She repeatedly begged guards to help her connect with her daughter, leading to ICE officers repeatedly yelling at her to get her to stop. She became so despondent that she contemplated suicide and told a friend she was going to throw herself off the balcony of the detention center.

---

[44] As detailed below, one mother, J.H., was held in CBP "short-term" custody for 12 days without being given the opportunity to bathe; further, despite menstruating so heavily that she frequently bled through her pants, CBP officials denied her access to feminine hygiene products. These conditions directly violate Section 4.11 of CBP's 2015 TEDS policy, *id.*, which requires that detainees be provided "basic personal hygiene items," requires that restrooms must have "access to toiletry items, such as … sanitary napkins," and notes that "Reasonable efforts will be made to provide showers … to detainees who are approaching 72 hours in detention." *See also id.* at § 5.6 ("Reasonable efforts will be made to provide showers, soap, and a clean towel to juveniles who are approaching 48 hours in detention"); *Unknown Parties, et. al., v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *11 (D. Ariz. Nov. 18, 2016) (finding that conditions of confinement in the CBP's Tucson Sector short-term detention facilities, including the failure to provide sufficient access to hygiene, violate the due process clause).

[45] *See also* Jen Kirby, *Migrant in detention says her child was taken away while she breastfed*, Vox (June 12, 2018).

[46] Declaration of A.R., August 6, 2018, on file with authors.

[47] Declaration of C.F., August 16, 2018, on file with authors.

Other parents reported intimidation by ICE officers while detained. One mother, D.P., described how an ICE officer nicknamed "The Deporter" physically intimidated her while trying to get her to sign a voluntary departure form, standing over her menacingly and shouting at her to sign.[48]

D.P.'s experience is particularly troubling, as she was also placed in solitary confinement and subject to starvation by officials at the Port Isabel Detention Center, after she shouted to draw the attention of a visiting official who was touring the facility. Another mother, A.E., was also threatened with solitary confinement while at the Port Isabel Detention Center, for crying frequently and for refusing to eat due to stress and trauma.[49] These stories are shared in greater detail below.

### Stress from family separation and parents' lack of information about the credible fear process prevented many parents from participating meaningfully in the asylum process.

The Constitution, federal statutes, and regulations guarantee asylum-seekers due process and specific procedures to safeguard their access to humanitarian protection and legal relief.[50] Over the past decade, numerous organizations have documented how DHS officials frequently fail to follow these rules and regulations, and in doing so violate domestic and international human rights laws.[51] Unfortunately, when asylum-seekers were subjected to family separation, the trauma of having a child forcibly removed from an asylum-seeking parent created an environment so coercive that parents were unable to participate meaningfully in the asylum process.

During credible fear interviews, separated parents were not informed of the role that asylum officers conducting the credible fear interviews played. Many parents reported not even knowing that the credible fear interview had anything to do with their request for asylum. Most of the separated parents were not told in advance what the purpose of the interview was. For many, the credible fear interview was their most substantial interaction with any immigration official after having been separated from their child. As a result, some parents spent large portions of the interview asking questions about their children and begging to see them. This perception was compounded by the failure of government officials to clarify the purpose of the interviews. Separated parents were not

---

[48] Declaration of D.P., August 5, 2018, on file with authors.

[49] Declaration of A.E., August 6, 2018, on file with authors.

[50] *See, e.g.*, 8 U.S.C. § 1158(a) (providing that any noncitizen "who is physically present in the United States or who arrives in the United States … may apply for asylum"); 8 U.S.C. § 1225(b)(1)(B)(ii) (providing that a noncitizen who expresses a fear of return must be given a credible fear interview); *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress intended to provide asylum applicants . . . are particularly important because an applicant erroneously denied asylum could be subject to death or persecution if forced to return to his or her home country."); U.S. Const. Amend. V (protecting right to due process).

[51] *See, e.g.* American Immigration Council, et. al, *U.S. Customs and Border Protection's Systematic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border* (Jan. 13, 2017) (CRCL/OIG Complaint); U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, 20 (2016) (reporting that despite findings and recommendations in a 2005 study relating to primary inspection, USCIRF observers in 2016 continued to find "examples of non-compliance with required procedures" in CBP inspection interviews); Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border*, 12 (2017), https://www.hopeborder.org/discretion-to-deny-1 (reporting that "it is commonplace for asylum seekers to be placed in expedited removal proceedings and summarily deported . . . despite expressing fear").

AILA Doc. No. 18082235. (Posted 8/23/18)

Exhibit A, Page 29

The Use of Coercion by U.S. DHS Officials Against Parents Who Were Forcibly Separated From Their Children
American Immigration Council and AILA | August 23, 2018

informed ahead of time that the officers had no knowledge of the whereabouts of their children nor authority to make any decisions about reunification.

One parent, D.P., said that she pled with the officer, saying, "I don't want anything, I just want my daughter. Please give me my daughter," something that she "repeated over and over again" while the officer seemingly grew increasingly angry with her.[52] Another parent, C.S., reported that she arrived at her credible fear interview in a state where her "mind was totally gone. I was only able to think about my daughters. I had barely eaten or had anything to drink for a long time because of the stress."[53] She repeatedly asked the interviewer where her children were.

Another mother, M.F., described that she omitted key information relating to her asylum case because she had been separated from her child.[54] She described that she was "scared that if I mentioned anything related to the MS-13 gang threats that my son received, they would take him away from me." She also reported being so preoccupied with her son's welfare during the credible fear interview that her "mind could not focus on anything other than the well-being of my son."

At least some parents, like M.F., also omitted information because they believed that to fully explain their story might prevent them from being reunified with their child. In many cases, parents were misinformed that they were being brought to speak to their child on the phone, only to find themselves—overwhelmed with disappointment—speaking with yet another government official with no knowledge about their children.

Given the psychological and physical duress suffered by parents separated from their children, and their ensuing preoccupation with the whereabouts and well-being of their children, many of the parents were denied any meaningful opportunity to participate in the credible fear process, in violation of the statutory right to apply for asylum.[55]

## Results of the Post-Reunification Survey.[56]

In the weeks leading up to the court's reunification deadline of July 26, 2018, hundreds of parents were reunified with their children and released on parole or through an alternatives to detention program. However, many parents, especially those with final orders of removal, were instead reunified with their children and sent to the South Texas Family Residential Center, a family detention center in Dilley, Texas. During the first three weeks of August 2018, while the parents remained in confinement, staff and

---

[52] Declaration of D.P., August 5, 2018, on file with authors.
[53] Declaration of C.S., August 6, 2018, on file with authors.
[54] Declaration of M.F., August 5, 2018, on file with authors.
[55] See, e.g., Campos, 43 F.3d at 1288. The ways in which the coercive environment affected asylum-seekers' ability to meaningfully participate in the asylum process is particularly troubling given the more than 366 parents who were deported prior to the Ms. L. court's June 26, 2018 order halting the removal of separated parents.
[56] The completed surveys are on file with the authors of this complaint, but to protect the mothers' privacy, the completed surveys have not been included. All quotations included in the "Results of the Post-Reunification Survey" section provided below come from mothers' responses to the question, "Is there anything else that you would like to share?"

volunteers asked 76 mothers to complete a survey regarding their experiences in detention to determine whether they had been subject to coercion.

The responses of the 76 mothers who were interviewed for the purposes of this survey confirmed that widespread coercion took place at the hands of CBP and ICE officials in their respective facilities, preventing parents from making voluntary and/or informed choices about their legal cases or about their custody rights over their children.

Of the 76 mothers surveyed, 58 indicated that they did not understand the government-issued documents presented to them regarding their choices for reunification with their children.[57] Furthermore, at least 12 of the mothers are indigenous language speakers.[58] In 26 cases, mothers were presented with an Election Form that had a pre-selected option to sign regarding their parental rights. While 59 mothers indicated that the option to be reunited with their child prior to deportation was selected on their Election Form, 66 mothers said that if given the choice again, they would choose to stay with their child in the U.S. while fighting their case. All of these mothers indicated that the change in their choice is because they now have a better understanding of their legal rights. Of the 76 mothers, at least 58 did not have an opportunity to speak with their child before being presented with any version of the Election Form that would be used to determine their legal rights over their children, and 23 of the mothers indicated that a version of the Election Form presented to them did not provide an option to consult with an attorney.

Even more troubling, at least 51 of the 76 mothers indicated that they felt pressured or intimidated prior to signing their Election Form. For example, 25 of the mothers indicated they were yelled at; 34 indicated they were not given time to think before signing; and 13 reported that they were threatened with punishment in detention if they did not sign.[59] Most disturbing of all, 23 mothers reported they were threatened that if they did not sign, their children would be adopted or they would never be able to see their children again.[60] Of the 76 mothers surveyed, 48 were presented with the form two or more times, with four mothers being presented with the form as many as five times. Only seven of the 76 mothers indicated they were allowed to ask questions regarding the form's contents before signing.

It is difficult to cross reference the mothers' accounts with the actual Election Forms presented to them because only 14 of the 76 mothers reported being provided with

---

[57] On behalf of an illiterate mother surveyed, a staff member wrote for her, "I don't know how to read and write but it didn't matter to the officials and they took my fingerprints without giving me an explanation about the document."

[58] For the mothers surveyed who speak rare languages as their primary language, such as Mam or Quiche, where interpreters were not available, fellow survey respondents and their children helped translate.

[59] One mother indicated, "They told me that if I didn't sign, they'd leave us detained for two years and that they would punish us. [So] out of fear I signed and I did not understand because I don't speak much Spanish. They treated us like dogs."

[60] One mother wrote, "They required us, one-by-one, to sign.  They said that they would deport us alone or we would not see our kids and if I did not sign they said that my son would be adopted." Another mother indicated that she was given bad legal advice by an immigration official while detained in Laredo, writing, "The chief deportation officer told me that if I asked for asylum I would be imprisoned for nine months to a year and ultimately they wouldn't give it to me.  I asked what would happen to my child and she said he would be detained and then put up for adoption.  She told me that what I could do was to ask to be deported in my [asylum] interview so that I would not lose my child, and if my cousin asked for the child, he would lose his residency, job, house, and they would deport him to his country of origin."

some copies of forms they had signed; 62 of the 76 mothers were not provided any copies of the forms they had signed.

## INDIVIDUAL COMPLAINTS: EXAMPLES OF EXPLICIT COERCION AND COERCIVE BEHAVIOR TOWARDS PARENTS SEPARATED FROM THEIR CHILDREN

The cases below represent only a sample of the cases in which separated families reported that they were subject to coercion by CBP and ICE officers.[61] This coercion was both explicit, in which parents were forced by government officials to take actions contrary to their best interest, and more subtle, inherent in the behaviors and actions of CBP or ICE officers, or those with whom they have subcontracted duties, such as guards. The pervasive nature of this coercive behavior underscores the many ways in which separated families were—and possibly continue to be—subject to agency action that violates policies, laws, and regulations.[62]

1. **Case of D.P.,[63] Honduras, who was separated from her 9-year-old daughter for 47 days, threatened verbally and physically, and placed in retaliatory solitary confinement for ten days without sufficient food or water.**

D.P. and her 9-year-old daughter entered the United States and immediately expressed a fear of return to Honduras, their home country, to a Border Patrol officer. She was detained and sent to the *hielera* along with her daughter.

Shortly after her arrival, CBP officers called D.P. into a room to interview her, without her daughter. A male CBP official interviewed her and then told her to sign some paperwork that she believed were deportation papers. She refused to do so because she was afraid to return to her country. The officer then threatened her and told her that if she did not sign the papers, "I would never see my child again because she was going to be adopted." D.P. began crying, but again refused to sign any papers despite the officer's threats.

When D.P. returned from the interview, her daughter was missing. CBP officers had taken her away. Hysterical, D.P. began "crying like crazy and yelling that I wanted my daughter." In response, CBP officers laughed at her and told her that "if I did not quiet down they would put me in a cell by myself."

D.P. was detained in the *hielera* for about three days. During this time, she reported that she cried constantly, did not eat, and could not sleep. Officers repeatedly yelled at her

---

[61] The authors note that, while this complaint focuses specifically on ways in which ICE and CBP officers subject parents to coercion, there is substantial evidence that children were also the subjects of coercion, abuse, and duress while in ICE and CBP custody, as well as while in the custody of the Office of Refugee Resettlement. While this complaint only details such coercion in passing, the authors recommend that CRCL and OIG conduct an independent review of the ways in which the rights of children were violated during the family separation process.

[62] In addition, the stories detailed below show the ways in which trauma has affected separated parents. Following the survey taken at Dilley, many mothers were referred for psychological evaluations by trained psychologists; all but one mother was diagnosed with Post-traumatic Stress Disorder.

[63] Only initials are used in the public version of this complaint.

to stop crying and to stop asking for her daughter. Her time in the *hielera* was also traumatic because CBP officers refused to provide her with sanitary products even though she was menstruating. "I was also hemorrhaging and bleeding through my pants and was not provided with clothing or feminine hygiene products. I was ashamed and degraded."

D.P. was eventually transferred to the Port Isabel Detention Center, after pleading guilty to improper entry. While detained at Port Isabel, D.P. was repeatedly subject to coercion and abuse. She states that the guards "treated us [mothers] as less than human." D.P. received her credible fear interview more than two weeks after arriving at Port Isabel. The interview was on the phone with an Asylum Officer and an interpreter. She explained how being separated from her child and subjected to the coercive environment at Port Isabel severely compromised her ability to meaningfully participate in the process:

> During the interview … I could not control my emotions, I was only thinking about my daughter. I did not even realize when the officer asked me different questions related to my asylum case. The asylum officer asked me why I left, and I said because I was threatened and beaten, and that is why I left. And when the asylum officer in response required [me] to provide more details, I started to cry. Because I cried a lot, the asylum officer raised his voice again. Instead of providing more details, I started asking where my child was. In response, he said that if I wanted to know where my daughter was, he recommended me to watch the news. I told him I did not have any access to the news. And that is how the interview was ended.

The Asylum Officer found that she did not have a credible fear of persecution. After she was informed of the decision, she was called in to interview with an ICE officer that people called "The Deporter." He demanded that she sign deportation papers and yelled at her when she refused. He became so hostile that she was terrified he would strike her. He physically intimidated her, stood over her, and became red in the face as he demanded she sign the papers.

D.P. had another interaction with this officer in which she refused to sign a voluntary departure form. In response, the officer stated, "Fine, stay in detention for a year waiting for your daughter." He then got very close to her, in a way that made her feel as if he was trying to "physically overwhelm" her, particularly because she was alone with him without any visible cameras in the room.

Even worse, D.P. was subjected to solitary confinement and other retaliation by officials at Port Isabel. When some mothers heard that a "White House representative" was going to visit the detention center, she tried to talk to him. Despite guards telling her she was not supposed to talk to this man, she yelled to the representative "to let him know what was going on." As a result, the man came over and spoke to D.P., and she told him her story. After this person left, officials at the jail punished D.P. by throwing her in

solitary confinement for 10 days and subjecting her to starvation and deprivation of basic human needs.

> The detention officers punished me and the other mothers who disobeyed and spoke with the representative. I was handcuffed and put in solitary confinement for ten days. I was put in a dark room, so I did not know when it was day or night. I was not given food or water for about three days. After about three days I was given bread... I was handcuffed for five days and had to eat and go to the bathroom in this way. They did not give me toilet paper. I felt desperate and depressed.

D.P. was eventually reunified with her daughter pursuant to the court-ordered reunification process. She continues to suffer both physically and mentally, and her daughter has repeated nightmares due to their traumatic experiences in detention. Both mother and daughter were eventually transferred to the South Texas Family Residential Center in Dilley, Texas.

In early August, an immigration judge vacated the asylum officer's negative credible fear finding, allowing her to pursue asylum in removal proceedings. D.P was later released from detention along with her daughter.

2. **Case of C.S., Guatemala, who was separated from her 17-year-old and 15-year-old daughters for 55 days and coerced into signing documents with the threat of having her children taken away from her forever.**

C.S. fled Guatemala along with two daughters after their family was subject to threats, including rape and death threats. The family was apprehended by CBP officers near San Luis, Arizona, after turning themselves in to Border Patrol officers and requesting humanitarian protection. CBP officials then separated her from her daughters and took them to a *hielera*, telling her that she was only going to be separated while she was "punished for coming here." She describes being intimidated by CBP officials during her six-day stay in the *hielera*, during which she was not allowed to speak to her children.

C.S. was eventually transferred to the San Luis Detention Center, then to the Eloy Detention Center, where she was held for approximately seven weeks. She repeatedly tried to contact her children, but was unsuccessful. The extreme duress of being separated from her children appears to have greatly affected her ability to successfully present her case for humanitarian relief. She describes a phone interview with an unknown individual who asked her about her reasons for coming to the United States.

> One day, I was told I had a phone call waiting and that it was from my children. My heart was soaring. I could not wait to hear their voices. However, when I picked up the phone, I was told it was for an interview. I asked if it was an interview with a social worker or to speak with my children. I had no idea that this was an important conversation that affected my immigration case. The man on the phone started asking questions about why I was there, but I kept asking

about my daughters. He told me I would be able to speak with them after. But my mind was totally gone. I was only able to think about my daughters. I had barely eaten or had anything to drink for a long time because of the stress.

Several days later, an ICE official forced C.S. to sign a form without telling her what she was signing and refusing to inform her of the form's purpose despite her repeated requests.

A few days later I was called to speak with ICE. An immigration officer told me to sign a paper if I wanted to see my daughters again. When I asked him what the paper was for he hid it behind his back and said, "It doesn't matter what it says. You are going to sign it anyway." He told me I would never speak to my daughters again if I did not sign it. He told me that because I was not from this country this was not his problem. He just told me over and over that I had to sign it or I would be deported without my daughters and I would never see them again. I bet ICE treats their dogs better than they treated me. Finally, I signed the paper. When I did, the officials let me speak with my daughters.

C.S. was also subject to retaliation after a visit from attorneys. She describes attending a presentation from legal visitors who gave her a "piece of paper telling us that we had rights, and that a lawsuit had been filed to demand that we get our children back." She writes that "[a]fter this, ICE was furious," and that mothers who kept that piece of paper were retaliated against.

The guards turned off our televisions and unplugged the microwave. They didn't let us go outside. But we held on to the fact that the visitors had told us about the national protests. I finally felt like I was not alone.[64]

C.S. was eventually reunited with her daughters through the court-mandated reunification process. ICE officers initially fit her with an ankle monitor and issued release papers. Soon after, she and her daughters were transferred to a family detention center in Dilley, where they remain.

### 3. Case of M.H., Honduras, who was separated from her 13-year-old son for 62 days and subject to verbal abuse and coercion.

M.H. fled Honduras along with her 13-year-old son after receiving death threats. After entering the United States, she was apprehended by immigration officers who told her almost immediately that she would be separated from her son. She was kept separate from him for the next nine days.

---

[64] C.S. explains the retaliation she endured after visiting with attorneys: "After this, ICE was furious. They told us that what 'these visitors' had told us was a lie and that they didn't have to do anything to give us our children. They punished us for having the paper explaining our rights. The guards turned off our televisions and unplugged the microwave. They didn't let us go outside. But we held on to the fact that the visitors had told us about the national protests. I finally felt like I was not alone."

When officers came to take M.H. to federal court to face charges of improper entry, they told her that she would never see her child again. An officer told her, "You are going to be deported, and your son is going to be placed for adoption." She became terrified that her son was going to be put up for adoption, especially after an official repeated that threat after she returned from court.

M.H. was eventually taken to a detention center in Laredo for 13 days, and then was transferred to the La Salle Detention Center in Louisiana. While there, she describes being so despondent that she stopped eating. She was not permitted to go outside, was given no information about her son, and reports that she cried constantly. One guard became so angry at her constant tears that she would bang on the cell window and shout "Shut up you *hija de la madre*" (or son of a bitch).[65] M.H. had her credible fear interview during this period. She was unable to concentrate on the interview because of the stress of being separated from her child.

Eventually, M.H. was transferred to the South Texas Detention Center in Pearsall, Texas. At some point while she was there, her son was rushed to the hospital from the shelter he was being held in and was given an emergency appendectomy. No official informed her that her son had undergone emergency surgery. M.H. did not find out until three days after the fact, when a family member in the United States in contact with her son informed her about the surgery. She was afforded absolutely no opportunity to consent to her son's medical care.

M.H. was subject to at least one more instance of coercion by ICE officers. While detained in Pearsall, ICE officers called her in for a meeting. She describes what happened next:

> ICE called me and said I was going to be deported. I told them, "My son has been operated on and I am not going anywhere without him." I told them I was not going to leave without my son, even if they killed me. An immigration official told me to sign my deportation paper. When I asked to read it, he said "No, you will sign it regardless," and he covered up the text with his hand so that I could not read it. He told me I had to sign on the line no matter what it said. I refused to sign it, because I had to be with my son again.

M.H. was eventually reunified with her son through the court-ordered reunification process. She reports that he wakes up frequently throughout the night with nightmares.

4.  **Case of C.F., Guatemala, who was separated for over one month from her six-year-old daughter who had recently had heart surgery, and who contemplated suicide due to extreme duress while in detention.**

C.F. fled Guatemala along with her six-year-old daughter. She presented herself and her daughter at the Port of Entry between San Luis Río Colorado, Mexico, and San

---

[65] Literally translates as "daughter of the mother," and colloquially translates as "son of a bitch."

Luis, Arizona, and expressed a fear of returning to Guatemala. CBP officials then took them to a detention center where there were "many women with children."

Despite having legally presented herself at a Port of Entry and asked for asylum, CBP officials told her that her 6-year-old daughter would be taken from her and she was going to prison. When she asked them why, CBP officers told her that she "didn't have a right to speak" and that she "had stepped into a country that was not mine." None of this was true; she had committed no crime and was not prosecuted. Nevertheless, C.F. was separated from her daughter.[66]

C.F. describes a traumatic and dangerous separation process for her own daughter and for the other mothers and children detained with her. Because her daughter had recently had heart surgery, she was terrified that high levels of stress could prove physically dangerous to her daughter. She begged CBP officers not to take her daughter, but CBP still separated them.

> The other children were so terrified of being taken from their mothers that they grabbed onto their shirts in fear and would not let go. The immigration officials had to drag them away, putting the children in headlocks and pulling them away from their mothers. I knew that my daughter would be in danger if she were treated that way, so I tried to keep her calm. These were two days of terror.

After C.F. was separated from her daughter, she was transferred to the Irwin Detention Center in Irwin, Georgia. While there, she describes being "sick with fear and sadness." She begged guards and ICE officers to connect her with her daughter. After repeated requests, ICE officers became so frustrated that they yelled at her and told her, "That's enough. Stop it. We are not going to explain this to you." The situation became so desperate that she contemplated suicide and told a friend that she was going to throw herself from the second floor of the detention center. However, thoughts of her daughter prevented her from going through with it.

After more than a month in detention, C.F. was permitted to talk to her daughter. Her daughter described difficult and painful conditions where she was being held, including an older girl who hit her "all the time," and that people would cover her mouth when she cried to stop her.

C.F. was eventually reunited her daughter through the court ordered reunification process. Following reunification, they were both detained at the South Texas Family Residential Center in Dilley, Texas, along with her daughter. Her daughter now suffers

---

[66] On June 18, 2018, DHS Secretary Nielsen stated at a White House press briefing that "D.H.S. is not separating families legitimately seeking asylum at ports of entry." *Kirstjen Nielsen Addresses Families Separation at Border: Full Transcript*, NY Times (June 18, 2018), https://www.nytimes.com/2018/06/18/us/politics/dhs-kirstjen-nielsen-families-separated-border-transcript.html. Despite DHS's repeated claims that families were not separated if they arrived at a port of entry, the *Ms. L.* court found that "the practice of family separation … has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally." *Ms. L*, 310 F. Supp. at 1144; *see also* Paloma Esquivel & Brittny Mejia, *The Trump administration says it's a 'myth' that families that ask for asylum at ports of entry are separated. It happens frequently, records show*, L.A. Times (Jul 1, 2018).

**The Use of Coercion by U.S. DHS Officials Against Parents Who Were Forcibly Separated From Their Children**
**American Immigration Council and AILA** | August 23, 2018

repeated nightmares and often "wakes up crying and tells me that she dreams the men in green uniforms are taking me away from her." While there, an asylum officers found that she had a credible fear of persecution. She was then released from detention along with her daughter, and will seek asylum in non-detained removal proceedings.

5. **Case of M.F., Guatemala, who was separated from her 14-year-old son for 60 days and was unable to meaningfully participate in the asylum process due to duress.**

M.F. is a Guatemalan woman who fled her home country along with her 14-year-old son, who had been subjected to serious threats. After they were apprehended by CBP, they were taken to the *hielera* and immediately separated from each other and put in different cells. M.F. could see her son from her cell, but could not communicate with him. While she was detained in the *hielera*, CBP officers screamed at her and told her that she would never see her child again. She also observed her son's face turning blue from cold and his lips becoming so dry that they came close to bleeding. On her second day in the *hielera*, M.F. was taken to federal court to face criminal charges of improper entry. Upon her return, her son was gone. She describes what happened next:

> When I walked back to the cell, I walked past the cell where my son was being held, and he was no longer there. I became frantic and asked the guard where he went. The guard started screaming and told me that the president was going to take away my child... It felt like an arrow went through my heart.

M.F. was eventually transferred to the Eloy Detention Center. Two days after she arrived, an ICE official presented her with a paper with her son's name on it and told her to sign it. ICE officials did not explain what she was signing. She signed it immediately because she thought it would help her reunite with her son. While in Eloy, M.F. was eventually given a credible fear interview, but could only think about her son.

> I asked the Asylum Officer several times about my son, but she explained that was not something she could help with and she could not control what happened. My mind could not focus on anything other than the well-being of my son. As a result of being separated, I could not focus on the questions. I also was concerned that anything I said would end up hurting my son, so I did not explain that it was MS-13 that was after him.

M.F. was found not to have a credible fear of persecution, a decision she is currently seeking to overturn. She was eventually reunited with her son and transferred to the South Texas Family Residential Center in Dilley, Texas. Her son is "extremely traumatized" by the separation, is always nervous now, and appears "completely different" than before they were separated. In early August, an immigration judge vacated the asylum officer's finding and determined that M.F.'s fear of persecution was credible. She was later released from detention along with her daughter and is seeking asylum.

AILA Doc. No. 18082235. (Posted 8/23/18)      Exhibit A, Page 38

### 6.  Case of J.H., Guatemala, who was separated from her 7-year-old son for 53 days and forced to sleep on a concrete floor for 12 days.

J.H. is a Guatemalan woman who fled her home country with her 7-year-old son to seek asylum in the United States. After crossing the border, they were apprehended and detained. She was sent to a *hielera*, where she was held for three days. When CBP officials separated from her child at the *hielera*, the officials lied to her and told her that her son would only be taken away for a single day. She described the traumatic experience in which officials falsely promised her 7-year-old son would be only removed from her for a short period of time:

> The guard said, "Grab your child, don't make this harder than it is, your child needs to go to the bus." My son started to cry and I began to console him and told him this was only for a short period of time and that I loved him very much. In that moment, I felt as if I was going to die. I could not believe that they were taking my child away. … I said I was scared and didn't want to leave my son, but they promised to give him back the next day, so I tried to be brave and allowed it to happen. They assured me they would return him the next day. My son cried and cried and begged me not to leave him or separate from him. They took me to a bus and told me not to look back at him.

Instead of being reunited with her son, J.H. was taken to a different short-term custody detention, that she called the "dog pound." She was held there for eight days, during which time immigration officials did not permit her to brush her teeth and denied her the ability to shower, despite the fact that she was menstruating. Because of overcrowding, she was forced to sleep on the floor in the area designated as a bathroom. The entire cell had a "horrible stench."

While detained in the "dog pound," J.H. and other mothers were subject to repeated verbal abuse. She frequently broke down in tears as she begged for information about her son, but immigration officials just made fun of her and called her and the other women "crazy women." She notes that "[t]hey would tell us we were annoying old women and that nobody wanted us here, but they were thankful because of us they had a job." She felt treated less than human.

J.H. was eventually transferred to the La Salle detention center, where she was again subject to verbal abuse. When she repeatedly asked guards for information about her son, the guards became frustrated, told her to "stop talking," "don't you talk enough," and eventually called her a "motherfucker."

Like many of the other separated parents, J.H.'s asylum case was negatively affected by the trauma of separation. She had been separated from her son for 30 days at the time of the interview, and she describes being "so upset" that she "could not concentrate, all I could think about was my son." After the asylum officer determined that she did not have a credible fear of persecution, she considered appealing the

decision, but she decided not to because she believed doing so would mean that she would never get her son back.

J.H. was eventually reunited with her son and transferred to the South Texas Family Residential Center in Dilley, Texas. After receiving legal assistance for the first time, she filed an appeal of the negative credible fear determination. In early August, an immigration judge vacated the asylum officer's decision and determined that J.H. had a credible fear of persecution. She was subsequently released from detention.

7. **Case of W.L., Honduras, who remains separated from his 17-year-old son after 100 days, and was forced to sign documents without any explanation of what they said.**

W.L. fled his home country of Honduras with his 17-year-old son to seek asylum in the United States. They were apprehended after crossing the border and brought to a CBP processing facility near McAllen, Texas, where W.L. expressed a fear of return. The next day, he was separated from his son and transferred to another facility. He said, "The security guard told me to hug my son now, because we will be separated, and we won't know when we will see each other again." W.L. was then transferred to the Rio Grande Detention Center, and then after two weeks to the Stewart Detention Center in Lumpkin, Georgia. While detained at Stewart, he described the coercive environment and the duress that he suffered:

> The conditions at Stewart were much worse than in the places I had been before. The guards were very aggressive toward the inmates…One time I saw a detainee on his knees in front of a guard begging for forgiveness. I felt scared and tormented there…

About 15 to 18 days into his detention at Stewart, he was called in by an official to sign documents that were in English, although W.L. only speaks Spanish. He recalls:

> The official had a paper with him and shoved a pen in my hand, and indicated for me to sign it. I did not know what this paper was and was not given any explanation. I signed the paper because I felt I had no choice, no control. The man with the paper seemed angry… After I signed the paper, the man took it and walked away.

About eight days later, W.L. was transferred again to a facility in Fulston, Georgia, then to one in South Texas, and then he was transferred again—for the seventh time within about two months—to Port Isabel. Despite expressing fear of return to his home country upon apprehension, W.L. still has not been provided with a credible fear interview or any other interview with any immigration officer. W.L. indicates, "Last week, a visiting attorney told me that the government thinks that I withdrew my fear claim. I did not know about this before last week."

**AILA Doc. No. 18082235. (Posted 8/23/18)**    Exhibit A, Page 40

Accordingly, W.L. has since submitted a request for a credible fear interview and remains in detention. He has not been reunited with his son, who has since turned 18 and has been released from ORR custody to live with a sponsor.

8. **Case of L.A., Guatemala, who was separated from her 10-year-old daughter for 29 days and subject to duress and coercion.**

L.A. is a Guatemalan woman who fled her home country along with her 10-year-old daughter to seek asylum. She was apprehended by the Border Patrol after crossing the border with her daughter. While detained in the *hielera*, L.A. was subject to verbal abuse from officers who frequently yelled at her. One officer told her that immigrants were coming to this country to "take up their resources" and "live off of their tax money."

The day she was detained, officials told her that they were going to take away her daughter. When she protested, they told her it would only be for a brief period of time while she was in court. After two days, officers came to her cell to take her daughter from her. Her daughter "began to weep uncontrollably and began to beg me not to let them take her." The immigration officials then physically dragged L.A.'s 10-year-old daughter away from her as she wept, and was taken to another cell. This caused L.A. "extreme emotional distress."

Despite officials telling her that she would be reunited with her daughter after she returned from court, when L.A. came back from court two days later, her daughter was nowhere to be found. An officer falsely told her that she would be reunited with her daughter after being transferred to a different detention center.

Once L.A. was eventually transferred to a different detention center, she continued to worry about the fate of her daughter. Within six days after having her daughter forcibly taken from her, she had a credible fear interview. She states that she was "not able to fully tell my story because all I could think about was where my daughter was and if she was okay." After L.A. was found not to have a credible fear of persecution, she chose not to appeal the denial. She describes the ways in which family separation affected her decision not to pursue an appeal:

> Two days after my interview, I was told that I had failed. I took the opportunity while talking with an immigration officer to ask once again where my daughter was, and the officer said, "I don't have that information, and we can't do anything about it." I told the officer I did not want to appeal my case so that I could see my daughter as soon as possible. I thought this would bring my daughter back to me sooner.

L.A. was eventually reunited with her daughter and is currently detained in the South Texas Family Residential Center in Dilley, Texas. Although she and her daughter are finally reunified, L.A. reports being unable to sleep or eat, suffers from constant

headaches, and experiences other residual emotional and physical problems from detention and separation.[67]

L.A. was later released from detention after filing a new appeal of the asylum officer's decision. In early August, an immigration judge vacated the negative credible fear finding. L.A. was released from detention soon after and will pursue her asylum case in removal proceedings.

9. **Case of Y.R., El Salvador, who was separated from her 15-year-old daughter for about 60 days, subjected to verbal abuse and threats, and was unable to focus on anything other than her daughter during the credible fear interview.**

Y.R. is a Salvadoran woman who fled her home country along with her 15-year-old daughter. After she was apprehended crossing the border, they were taken a facility she called a *perrera* (or dog pound), and she was separated from her daughter and placed in a different. The first day she was detained there, during an interview, a CBP official used abusive language and threats and told her that she would be separated from her daughter and that her daughter would be adopted in the United States:

> The officer asked me how old my daughter was and when I told them she is 15, he began yelling at me, [asking] why was I lying. He said that she is older than that and that they would investigate me. The officer continued interrogating me. When I told him I was from El Salvador, he yelled at me that that all people from El Salvador are the biggest liars, that we are worse than those from Guatemala or Honduras, and he again threatened that my child will be put up for adoption.

Y.R. was later transferred to the Laredo Detention Center and two weeks after that to the La Salle Detention Center. For the first month of detention, she received no information about her daughter. She became so despondent that she could not sleep at night and mostly stopped eating. She said that she often "felt dead" and "felt like I could not breathe correctly" because of conditions in the detention center and the uncertainty about her daughter.

Like many of the other mothers, when Y.R. was given a credible fear interview, she was given no notice. She was just placed in a room and handed a phone. Prior to the interview she "had not slept for a full night in a month, had not been eating … felt depressed… [and] could not concentrate at all on what was being asked of me. I could only think of my daughter."

Y.R. was eventually reunited with her daughter more than a month later. She says that her experience "was hell." Following reunification, she was detained, along with her

---

[67] L.A. states: "Being separated from my daughter and knowing nothing about her whereabouts has caused extreme trauma for both me and my daughter. My daughter is so desperate to get out, she always asks me when we're going to be able to leave this center. This trauma has begun to impact our physical health, we are unable to sleep or eat and I constantly have a headache."

daughter, in the South Texas Family Residential Center in Dilley, Texas. In early August, an immigration judge vacated the asylum officer's finding and determined that Y.R. had a credible fear of persecution, allowing her asylum claim to move forward. Both Y.R. and her daughter remain detained.

**10. Case of H.G.A., Honduras, who has been separated from his 17-year-old son for over 76 days and is subject to coercion.**

`H.G.A., a national of Honduras, fled his home country after MS-13 threatened to kill him and his 17-year-old son if his son refused to join the gang. He was apprehended by the Border Patrol and indicated that he wished to seek asylum. CBP officials separated him from his son at the *hielera* and detained him for over a month, during which time he spoke to his son only on three occasions. H.G.A. suffers from what he considers "serious vision problems" that prevent him from being able to read, and he says that, "Because of this the only way that I am confident in what a document says is if someone I trust reads the document to me."

While in detention, H.G.A. was presented twice with forms that immigration officials told him would reunite him with his son. Although the officers read him the form due to his poor vision, he refused to sign because they refused him the opportunity to speak with his son about the form's contents before signing and because he did not trust the officials. "However," both times, he says, "I made sure to tell the officials that I wanted to be reunified."

Nonetheless, despite his refusal to sign any documents, H.G.A. was included in a list of individuals that the government provided during litigation alleging that he relinquished his custody rights and sought to be deported without his son.[68]

At no point in the process was H.G.A. told he could have a lawyer present when considering signing the forms presented to him, and upon learning he was entitled to consult with an attorney, he said, "I do not want to sign anything from the government without a lawyer who can tell me what the form is."

H.G.A. remains detained at the El Paso Processing Center and has not been reunited with his son. In mid-August, an immigration judge overturned a negative credible fear finding and permitted H.G.A.'s claim for asylum to proceed. He is currently in removal proceedings in El Paso.

**11. Case of T.C., Guatemala, who was separated from her 17-year-old daughter, who speaks only limited Spanish and was threatened with two years of jail if she refused to sign a form affecting her rights to reunification.**

T.C. is a Guatemalan woman who fled her home country to seek asylum in the United States. She primarily speaks Q'eqchi' and only speaks limited Spanish. She speaks no

---

[68] *See* Declaration of Susanne Gilliam, Dkt. 153 at Exhibit 52, ¶5, *Ms. L. v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. July 25, 2018).

English and can neither read nor write. CBP officials separated her from her 17-year-old daughter after they crossed the border together. Possibly due to her limited Spanish, neither ICE nor CBP officers have ever given her the opportunity to apply for asylum, despite her fear of returning to her home country.

While detained in the El Paso area, an ICE officer called T.C. into a room and presented her with the Election Form, which was written entirely in English. The ICE officer told her in Spanish that she had to sign the form or else they would put her daughter up for adoption. She did not understand what was happening and so was hesitant at first. ICE officers then told her that if she didn't sign, she would be punished, and that she would be locked up in a jail for two years without her daughter. Out of fear, and afraid that she would never see her daughter again, she signed the form. She describes feeling that she was treated like a dog.

Due to language barriers, T.C. was totally unaware of the contents of the form that ICE officers made her sign. However, unlike many parents, she was provided a copy of the form. Volunteers at the Dilley Pro Bono Project confirmed that it a copy of the Election Form. Until the form was explained to her, she had no idea what she had signed.

T.C. was reunited with her daughter and eventually transferred to the South Texas Family Residential Center in Dilley, Texas. Since being transferred to Dilley, she has requested a credible fear interview with ICE officers on seven different occasions. She has yet to receive one. She remains detained, along with her daughter.

12. **Case of A.E., Guatemala, who was separated from her 5-year-old son for 32 days and threatened with solitary confinement and other coercion, which impacted how she responded during credible fear interview.**

A.E. fled Guatemala along with her 5-year-old son to seek asylum in the United States. They were apprehended near McAllen, Texas, and taken to the *hielera*. A.E. speaks Mam as her first language and is also able to speak Spanish. When she arrived at the facility, a CBP officer told her that her child would be taken from her while she went to court the following Monday. Her 5-year-old son was traumatized by this experience, shouting "Don't leave me *mami*. Don't leave me with immigration. Why are you letting them take me?! Why are you leaving me?" Because she became distraught, officials tried to reassure her, and told her that she would be reunited with her son the day after court. This did not happen.

Following a court proceeding, A.E. was transferred to the Port Isabel Detention Center. Disturbingly, she reports that guards at Port Isabel frequently threatened solitary confinement for mothers who were reacting to the trauma of family separation. A.E. reports that she had lost all appetite due to the stress of her missing son and did not eat. She also cried frequently. In response, guards threatened her and other mothers with solitary confinement.

> They said they would take us to *El Pozo* or "the well" as punishment if we kept crying about our children. … They said I would be punished because I refused to eat in the mornings. … They would tell me that they were going to also put me in *El Pozo*. I did not know what that was. The women told me it was an ice cold room that was dark with no windows.

Like many other mothers, the coercive environment created by family separation affected her credible fear interview. A.E. describes arriving at the interview after days in which she had not eaten or slept well due to worry. "I could not concentrate on anything else [other than my son] because I was extremely concerned about my son and distraught from being separated from him."

During the family reunification process, ICE officers did not adequately explain her rights and coerced her into choosing an option on the Election Form without explaining it to her.

> An officer approached me and said, "Sign here [and] you will get your child back if you return to your country." I was so desperate to know the whereabouts of my son and finally hold him in my arms again that I signed for both of us to be reunited even if it meant going back to Guatemala.

A.E. was eventually reunified with her son and is currently detained at the South Texas Family Residential Center in Dilley, Texas. She has appeared in court five times seeking to overturn the asylum officer's finding that she did not have a credible fear of persecution, but has been unable to present her case yet because of difficulties in obtaining a Mam interpreter.

### 13. Case of A.R., Honduras, who was separated from her 17-year-old daughter for over 35 days and subject to coercion and duress.

A.R. fled Honduras along with an adult daughter, her 17-year-old daughter, and her 4-year-old blind granddaughter after being subject to threats from gangs. They were apprehended after crossing the border near El Paso, Texas, after which her adult daughter and her granddaughter were separated from her and taken to a different location. She was detained along with her younger daughter for six days in the *hielera*.

A.R. was repeatedly yelled at by CBP officers during her time in the *hielera*, including officers taunting her and shouting, "Why did you come here? What are you doing here? You came to a country that is not yours, and now look at you." She was forced to sleep on the concrete floor of the *hielera* for six days, after which CBP officers separated her from her daughter. When her daughter grabbed onto her out of fear and would not let go, CBP officers yelled at her until she let go.

A.R. was then sent to federal jail and prosecuted for illegal entry. After a week in jail, she was transferred to the West Texas Detention Facility in Sierra Blanca, Texas. The

Case 2:85-cv-04544-DMG-AGR   Document 858-1   Filed 07/20/20   Page 28 of 29   Page ID
#:39311
The Use of Coercion by U.S. DHS Officials Against Parents Who Were Forcibly Separated From Their Children
American Immigration Council and AILA | August 23, 2018

trauma of being separated from her daughters and subject to abuse and duress left her in an almost catatonic state:

> While I was detained in Sierra Blanca my mind went completely blank. Even when I tried to pray, the words of the songs I have sung my whole life would not come to me. I feel like my mind is just beginning to come back.

A.R. was eventually reunited with her 17-year-old daughter through the court-ordered reunification process.

## CONCLUSION

The case examples above demonstrate the disturbing ways in which ICE and CBP officers explicitly coerced separated parents, and through abusive tactics and deplorable conditions of confinement created a coercive environment that prevented these parents from meaningfully exercising their rights. Coercive tactics employed against a vulnerable population raises significant legal concerns and threatens the fundamental due process, statutory, and regulatory rights of parents who were separated from their children.

We urge your office to investigate and clarify DHS policy on the use of coercive tactics against parents, and to ensure that ICE and CBP officers are properly trained on the fundamental due process protections to which migrants are entitled. We also urge the following corrective actions:

1. DHS should end any policy that results in the separation of parents from their children, absent truly exceptional circumstances, and require that family unity be the determinative factor in charging and detention decisions.
2. DHS should establish a clear policy requiring that all parents be reunified with their child before being asked to relinquish any legal rights or claims to legal relief.  The policy should also require that parents be given the opportunity to confidentially discuss their options with an attorney, their child, and the child's attorney, if applicable. Upon the parent's request, legal counsel or a representative from a legal assistance organization must be present at the time such waiver or relinquishment of rights is made
3. DHS should announce a clear policy forbidding the use of any tactics that have the effect of pressuring an individual to relinquish or make any decisions affecting their legal case.
4. DHS should investigate all reports of abuse and coercion against parents and their children and discipline any officer found to have violated parent's rights or any applicable provision of law, regulation, or policy.
5. DHS should ensure that all parents who were separated from their children are given a meaningful opportunity to apply for asylum. DHS should immediately release all of these parents from detention (including the use of an alternatives to detention program when necessary) and permit them to present their claim for relief before an Immigration Judge in a non-detained setting following

**The Use of Coercion by U.S. DHS Officials Against Parents Who Were Forcibly Separated From Their Children**
**American Immigration Council and AILA** | August 23, 2018

reunification with their children. DHS should also grant a new credible fear interview to any such parents who were found not to have a credible fear of return. Further, DHS should file a motion to reopen any removal proceedings that resulted in a final order of removal during the period of separation.

6. DHS should ensure that rare and indigenous language speakers are provided interpretation in every interaction with a DHS official. DHS should ensure that all immigration forms are presented in a language the individual can understand, and that all individuals be provided with a copy of the signed form.

7. DHS should investigate widespread violations of CBP's National Standards on Transportation, Escort, Detention, and Search against parents and children held in short-term detention facilities, including the failure to provide basic necessities such as feminine hygiene products, the failure to provide nutritionally-appropriate meals to juveniles, and the failure to provide edible food.

8. DHS should immediately establish a clear policy prohibiting the use of solitary confinement or disciplinary segregation against any detainee. Solitary confinement has been widely condemned by mental health experts and has no place in a civil confinement setting. DHS should investigate each incident of alleged use of solitary confinement against a parent or other individual.

9. DHS should investigate and return on a grant of humanitarian parole to the United States any parent who was separated from their child and deported to their home country without being allowed to reunify with their child or meaningfully participate in the asylum process.

Thank you in advance for your time and consideration. If you have any questions or require additional information, please contact Katie Shepherd, National Advocacy Counsel for the Immigration Justice Campaign, at kshepherd@immcouncil.org or (202) 507-7511 or Greg Chen Director of Government Relations at AILA at gchen@aila.org or (202) 507-7615.

American Immigration Council

American Immigration Lawyers Association

CC:

Ronald D. Vitiello                          Kevin McAleenan
Acting Director                             Commissioner
U.S. Immigration and Customs Enforcement    U.S. Customs and Border Protection
Department of Homeland Security             Department of Homeland Security
Washington, DC 20528                        Washington, DC 20528