ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

*Independent Monitor*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM P. BARR, Attorney General of the United States, *et al.*,<br><br>Defendants. | CASE NO. CV 85-4544-DMG (AGRx)<br><br>**NOTICE OF FILING OF INTERIM REPORT ON THE USE OF TEMPORARY HOUSING FOR MINORS AND FAMILIES UNDER TITLE 42 BY INDEPENDENT MONITOR** |

On October 5, 2018, the Court ordered the appointment of Andrea Sheridan Ordin as Special Master/Independent Monitor ("Monitor") and ordered the Monitor to file formal Reports and Recommendations to the Court. [Doc #494.]

On June 26, 2020, Judge Dolly Gee in her Order [Doc. #833] among other things required:

> "Dr. Paul Wise and the Independent Monitor Andrea Ordin shall continue to provide enhanced monitoring of the care of the minors at the FRCs and shall have ability to (a) request and obtain copies of medical care data and policies; (b) have teleconference or videoconference access to persons most knowledgeable at the FRCs with whom they can discuss the baseline of custodial medical care, health care protocols, and (c) consider protocols for identifying minors who have serious medical conditions that may make them more vulnerable to COVID-19; (d) interview minors with serious medical conditions or, as appropriate, their guardians; and (e) make such recommendations for remedial action that they deem appropriate."

In accordance with the Court's Orders, the Monitor submits the attached Interim Report on the Use of Temporary Housing for Minors and Families under Title 42.

DATED:      July 22, 2020            Respectfully submitted,

Andrea Sheridan Ordin
STRUMWASSER & WOOCHER LLP

By  */s/ Andrea Sheridan Ordin*
        Andrea Sheridan Ordin

*Special Master / Independent Monitor*

2

# CERTIFICATE OF SERVICE

## Case No. CV 85-4544-DMG (AGRx)

I am a citizen of the United States.  My business address is 10940 Wilshire Boulevard, Suite 2000, Los Angeles, California 90024.  I am over the age of 18 years, and not a party to the within action.

I hereby certify that on July 22, 2020, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Central District of California by using the CM/ECF system:

**NOTICE OF FILING OF INTERIM REPORT ON THE USE OF TEMPORARY HOUSING FOR MINORS AND FAMILIES UNDER TITLE 42 BY INDEPENDENT MONITOR**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on July 22, 2020, at Los Angeles, California.


_____*/s/ Jeff Thomson*_____
Jeff Thomson

In the United States District Court

Central District of California – Western Division

JENNY LISETTE FLORES, *et al.*, Plaintiffs,

v.

WILLIAM P. BARR, *et al.*, Defendants.

Case No. CV 85-4544-DMG (AGRx)

Hon. Dolly M. Gee, United States District Judge

**Interim Report on the Use of Temporary Housing**

**for Minors and Families under Title 42**

**by Independent Monitor**

Andrea Sheridan Ordin
Special Master/Independent Monitor
Strumwasser & Woocher LLP
1094 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
(310) 576-1233

**INTRODUCTION**

On June 26, 2020, Judge Dolly Gee in her Order (Doc. 833) among

other things required:

> "Dr. Paul Wise and the Independent Monitor Andrea Ordin shall
> continue to provide enhanced monitoring of the care of the minors
> at the FRCs and shall have ability to (a) request and obtain
> copies of medical care data and policies; (b) have teleconference or
> videoconference access to persons most knowledgeable at the
> FRCs with whom they can discuss the baseline of custodial
> medical care, health care protocols, and (c) consider protocols for
> identifying minors who have serious medical conditions that may
> make them more vulnerable to COVID-19; (d) interview minors
> with serious medical conditions or, as appropriate, their
> guardians; and (e) make such recommendations for remedial
> action that they deem appropriate."

**ACTIVITIES OF THE MONITOR JUNE 27, 2020 - JULY 22, 2020**

On   July 9, 2020, Dr. Paul Wise and the Independent Monitor

conducted teleconferences with ICE Juvenile Coordinator Diane Dougherty

and ICE leadership to discuss, among other things, COVID-19 practices at

Karnes Family Residential Center (Karnes FRC).   In addition, the

Independent Monitor and Dr. Wise engaged in correspondence with Karnes

FRC staff and attorneys from RAICES and Proyecto Dilley.  The Independent

Monitor also took a virtual tour of the facility and conducted video interviews

with several family members on July 14, 2020.  During these interviews, the

Independent Monitor and Dr. Wise spoke with residents housed in the

general population area as well as residents in the quarantine facility,

including a resident with family members who had tested positive for

COVID-19.   In addition to describing their experience at Karnes, some individuals also discussed their experience with temporary hoteling prior to their transfer to the FRC.   Dr. Wise also reviewed documentation of the medical conditions and care of Karnes residents.

The week of July 19, 2020, the Independent Monitor also reviewed and analyzed statistics of FRC residents whose stay exceeded 20 days.

In the course of fulfilling the requirements of the above Monitoring Order, Dr. Wise and the Independent Monitor became aware of the conditions under which both unaccompanied and accompanied minors have been temporarily detained in hotels in McAllen and El Paso, Texas, and Phoenix, Arizona, for periods of two to eleven days, beginning in late-March 2020.   The minors were detained pursuant to a March 21, 2020 Presidential Order under Title 42, Section 265 of the United States Code.

## TITLE 42 EXPULSIONS OF BOTH UNACCOMPANIED AND ACCOMPANIED MINORS INSTITUTED BY THE GOVERNMENT BY REGULATION AND IMPLEMENTING ORDER

As explained on the website of the U.S. Customs and Border Protection (CBP),[1] the statistics on nationwide enforcement encounters in 2020 include a program entitled "Title 42 Expulsions."  As stated:

> "On March 21, 2020 the President, in accordance with Title 42 of the United States Code Section 265, determined that by reason of existence of COVID-19 in Mexico and Canada there is a serious danger of further introduction of COVID-19 into the United States; that prohibition on the introduction of persons or property in whole or in part, from Mexico and Canada is required in the interest of public health."

In response, CBP issued guidance to its agents to implement the order of the Director of the Centers for Disease Control and Prevention (CDC) to prohibit certain persons from the United States who, due to the existence of COVID-19 in countries or places from which persons are traveling, create a serious danger of the introduction of the disease into the United States.

From mid-March through June 30, 2020, the CBP website reports a total of 69,210 U.S. Border Patrol (USBP) expulsions along the Southwest Border and 2,793 Office of Field Operations (OFO) expulsions.  For the same

---

[1] U.S. Customs and Border Protection, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions*, available at https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last accessed July 20, 2020).

time period, 189,937 aliens were apprehended by USBP and 46,601 aliens were declared inadmissible by OFO under Title 8.

**U.S. Border Patrol Southwest Border Enforcement Encounters (Title 42 Expulsions and Title 8 Apprehensions)[2]**

| Enforcement Action | March | April | May | June | FY 20 TD |
|---|---|---|---|---|---|
| Title 42 Expulsions | 6,927 | 14,870 | 19,909 | 27,504 | 69,210 |
| Title 8 Apprehensions | 23,309 | 1,175 | 1,589 | 2,796 | 189,937 |

**Office of Field Operations Southwest Border Enforcement Encounters (Title 42 Expulsions and Title 8 Inadmissible Aliens)[3]**

| Enforcement Action | March | April | May | June | FY 20 TD |
|---|---|---|---|---|---|
| Title 42 Expulsions | 69 | 519 | 851 | 1,354 | 2,793 |
| Title 8 Inadmissible Aliens | 3,993 | 405 | 793 | 858 | 46,601 |

---

[2] U.S. Customs and Border Protection, *U.S. Border Patrol Monthly Enforcement Encounters 2020: Title 42 Expulsions and Title 8 Apprehensions*, available at https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last accessed July 20, 2020).

[3] U.S. Customs and Border Protection, *Office of Field Operations Monthly Enforcement Encounters 2020: Title 42 Expulsions and Title 8 Inadmissible Aliens*, available at https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last accessed July 20, 2020).

Of the total USBP enforcement encounters on the Southwest Border between March and April including Title 42 and Title 8 actions, 6,177 encountered were unaccompanied minors and 6,698 encountered were family units. However, because statistics for the total number of unaccompanied minors and families encountered do not specify whether those encounters involved enforcement actions under Title 42 and Title 8, it is unclear how many of the total number of unaccompanied minors and family units encountered by USBP and OFO were detained under Title 42.

**U.S. Border Patrol Southwest Border Encounters[4]**

| Demographic | March | April | May | June | Total March-June |
|---|---|---|---|---|---|
| Unaccompanied Child | 2,956 | 697 | 960 | 1,564 | 6,177 |
| Family Units[5] | 3,455 | 714 | 971 | 1,558 | 6,698 |

---

[4] U.S. Customs and Border Protection, *U.S. Border Patrol Southwest Border Encounters FY 2020*, available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed July 21, 2020).

[5] "Family Unit" represents the number of *individuals* (either a child under 18 years old, parent, or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.

OFO encounter statistics reported 405 unaccompanied minors and 1,373 family units at the Southwest Border for the same March-June period.[6]

**Office of Field Operations Southwest Border Encounters[7]**

| Demographic | March | April | May | June | Total March-June |
|---|---|---|---|---|---|
| Unaccompanied Child | 247 | 29 | 42 | 87 | 405 |
| Family Units | 1,180 | 22 | 73 | 98 | 1,373 |
| Accompanied Minor Child[8] | 40 | 18 | 30 | 55 | 143 |

It has been claimed that recent enforcement under Title 42 violates the Trafficking Victims Protection Act (TVPRA), 8 U.S.C. Section 1232, and the Administrative Procedure Act, 5 U.S.C. Sections 706 (1) and 706 (2)(A). *J.B.B.C., a Minor, v. Wolf, et al.* 1:20-cv-01509 (D.D.C.).

---

[6] U.S. Customs and Border Protection, *Office of Field Operations Southwest Border Encounters FY 2020*, available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed July 21, 2020).

[7] U.S. Customs and Border Protection, *Office of Field Operations Southwest Border Encounters FY 2020*, available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed July 21, 2020).

[8] "Accompanied Minor Child" represents a child accompanied by a parent or legal guardian and the parent or legal guardian is either a U.S. Citizen, Lawful Permanent Resident, or admissible alien, and the child is determined to be inadmissible.

This Report is not designed to examine any such claim, but will detail
aspects of the temporary housing portion of the Title 42 program that the
Independent Monitor and Dr. Paul Wise believe warrant recommendations
for remedial action under the June 26, 2020 Order of Judge Gee (Doc. 833)
and Order of April 24, 2020 (Doc. 784).

## A. Program Structure

ICE utilizes contracts with MVM, Inc. (MVM) through the Juvenile and
Family Residential Management Unit (JFRMU) to transport and temporarily
house unaccompanied minors and family units pending removal under Title
42.  This program is an extension of regular transportation services for aliens
between custodial settings instituted in 2014.  Initially, the program required
only brief stays in hotels prior to deportation flights, and prolonged stays in
temporary housing were rare occurrences before the implementation of the
Title 42 expulsion protocols.  However, since implementation of the CBP-
issued expulsion protocols, unaccompanied minors and families routinely
spend multiple days temporarily housed in hotels.  The program regularly
uses three hotels in McAllen and El Paso, Texas, and Phoenix, Arizona, but
temporary housing in additional locations can be utilized when necessary.

Once in temporary facilities, contracted "Transportation Specialists"
(Specialists) provide oversight of the minors and families.  Specifications for a
Specialist position includes possession of an associate's degree or a high

school diploma and at least one year of relevant work experience.  All Specialists are required to undergo a background check and training including specific training on COVID-19 precautions and protocols.

Protocols require Specialists work in three rotating shifts so that each minor is accompanied by at least one Specialist at all times.  The protocols also require unaccompanied minors to be within the line of sight of a Specialist at all times.  Minors are separated into rooms by age and gender. Same-gender siblings may reside in adjoining rooms with the connecting door open.  Cross-gender siblings may also reside in adjoining rooms, but the connecting door must remain closed at night.  ICE reserves empty rooms on either side of any room in which detainees are held to create a perimeter that ensures minimal interaction with public hotel guests.  Specialists and all other MVM staff members are required to be dressed in non-identifying, business casual clothing.

Children and families are not usually taken outside during their time in hotels.  Younger children may sometimes play in enclosed pool areas for short supervised periods, but generally, residents have little to no access to recreation.  Minors in temporary housing also lack access to education and therapy/counseling.  Visitation is not permitted, but residents can call or video chat friends, family, and legal counsel upon request.

Deane Dougherty, ICE Juvenile Coordinator, reported to the Independent Monitor that, as of July 16, 2020, the hotel in McAllen, Texas, was housing 22 unaccompanied minors and 21 families, and the hotel in El Paso, Texas was housing 10 unaccompanied minors and no families.  Below are the COVID-19 caseload trends for the Texas counties where the utilized hotels are located:[9]

**Hidalgo County (McAllen)**



---

[9] Data is current as of July 19, 2020, courtesy of The Johns Hopkins Coronavirus Resource Center.

**El Paso County (El Paso)**



## B. Length of Stay

Statistics provided by ICE indicate that, as of June 16, 2020:

- One unaccompanied minor  had been held in a hotel for 11 days.

- The longest length of stay for any family unit was 7 days.

- Six families had been held at a hotel for a 7-day length of time.

*Figure A* depicts a snapshot of data on length of stay in hotels also as of June 16, 2020.  Statistics provided by ICE describe the 14 families and 23 single minors in the hotels on this date.  On average, residents were held in hotels for a period of 4 to 5 days.  Although the program aims to house residents for no more than 72 hours, 61% of single minors and 86% of families exceeded this length of stay, and 57% of all residents remained in hotels for more than 4 days (96 hours).

11

*Figure A*

|  | Average Length of Stay | Longest Length of Stay | >2 Days (48 Hours) | >3 Days (72 Hours) | >4 Days (96 Hours) |
|---|---|---|---|---|---|
| Single Minors | 4.5 Days (109 Hours) | 11 Days (264 Hours) | 74% | 61% | 57% |
| Families | 5.1 Days (123 Hours) | 7 Days (168 Hours) | 86% | 86% | 57% |

## C.  Nutrition and Hygiene

The contract provides for  three hot meals per day.  Snacks including fresh fruit, popcorn, are required.  Specialists use electronic tablets to track "milestones" throughout the day including food intake, bathing, temperature, handwashing, etc.  Rooms are cleaned once per day by hotel staff, and additional cleaning supplies are available in each room.

## D.  Medical System and COVID-19 Protocols

The protocols require that Specialists' temperatures are taken before every shift, and face masks are required at all times.  All children and adults are assigned both a surgical and N95 mask, and gloves and hand sanitizer are made available. Before moving residents from a CBP facility, Specialists take each person's temperature and ask the following questions:

- Are you sick?

- Do you have any body aches?

- Do you have flu-like symptoms?

12

Specialists receive alerts on their tablets throughout the day reminding them to take children's temperatures and make sure they wash their hands. Each hotel has a dedicated room for medical services, and a medical professional from ICE Health Service Corps is required to give each child a basic health screening daily.   Contracted health care providers include registered nurses, advanced practice providers, physicians, pharmacists, and behavioral health professionals are available as needed.  Social distancing is required.

The protocols do not require testing for COVID-19 prior to or upon arrival at a hotel.  Many families and children receive a COVID-19 test in preparation for their deportation flight.  At least one family tested positive for COVID-19 while detained in a hotel in San Antonio, Texas.  According to ICE and MVM, there are no formal protocols in place for housing COVID-19 positive families and minors in hotel settings.

The Independent Monitor and Dr. Paul Wise interviewed the father of a family scheduled for deportation under Title 42, who had been held for at least 8 days in San Antonio, Texas before his wife and daughter tested positive for COVID-19.  The family was then transferred to Karnes FRC and placed in separate quarantines.  In his interview on July 14, 2020, the father stated that Specialists in the hotel wore masks and took his temperature, but he stated he did not see a doctor or receive medical care while at the hotel.

13

His wife and daughter were held in a different room, and although he was told about their elevated temperatures, he said he was not updated on their condition.  He said he was not allowed to leave his room while at the hotel.

**OVERALL ASSESSMENT**

Begun as a relatively small, stop-gap measure to assist in the transfer of children to ICE flights, the temporary housing program has been transformed by the Title 42 expulsion policies into an integral component of the immigration detention system for UACs in U.S. custody.   Program leadership noted in discussions that the hotel settings provided a preferable conditions than the conditions routinely found in CBP facilities or Central Processing Centers (CPC).   Nevertheless, even recognizing the increased amenities of hotels, there are concerns that require scrutiny and remediation:

**(1)**   **Oversight.**   An governmental audit of the hotel facilities is currently underway and ICE expects recommendations shortly.   To date, assessment of the performance of MVM personnel overseeing the UACs housed in hotels has not yet been possible.   However, there appears to be a lack of formal oversight of the performance of the Specialists.   It is not clear that there exists sufficient oversight of the practices, performance, and adequacy of staffing to address an extension of the program to a larger number of locations and an increase in the number of UACs and families placed in any given hotel.

14

(2)    **No limits on facility census or length of stay.**  It remains
unclear whether there are any limits on the number of detainees permitted to
be housed in any given hotel.  The concern is that the allocation of
supervision and medical staff may not be sufficient as the census in the hotel
grows.  Further, the recently-imposed requirement of documenting COVID-19
status prior to deportation has generally extended the hotel length of stay.

(3)    **Medical care**.  ICE Health Services Corps provides medical
oversight of the children and families housed in hotels.  The current medical
protocols may be sufficient if the number of UACs and families is relatively
low, for example less than 20 in any given location.[10]  However, the ability of
the health program to provide appropriate medical oversight would become
inadequate when the number of children and families rises, or residents
begin experiencing COVID-19 symptoms while staying in a hotel.

(4)    **COVID-19 precautions.**  The temporary housing program is
using the recommendations of the CDC as the basis for protective measures
against COVID-19.  A direct assessment of how well the recommended
protocols have been implemented to protect UACs has not yet been possible.
One concern is that hotel employees, including maintenance and

---

[10] As referenced above, the Independent Monitor was informed by the
Juvenile Coordinator that, as of July 16, 2020, the hotel in McAllen currently
housed 22 unaccompanied minors and 21 family units, and the hotel in El
Paso housed 10 unaccompanied minors and no family units.

housekeeping personnel, fall outside MVM or ICE monitoring protocols or MVM supervision.  In addition, the physical plant may not be amenable to social distancing and ongoing monitoring of distancing and mask use (such as via video feeds for monitoring).

(5)   **Tender age UACs.**[11]  There does not seem to be any formal lower age limit for UACs to be housed in hotels.  Consistent or formal care requirements have not been developed regarding the special needs of young children, including hygiene, nutrition, or emotional well-being.  Apart from the good intentions of individual personnel, adequate care demands formal and specialized protocols and oversight to ensure safe and sanitary conditions.  The lack of limits on the number of children placed in hotels and the length of stay only enhance these general concerns.  It is also important to recognize that a detention experience need not require mistreatment to be traumatic for a young child.  Tender age UACs are inherently vulnerable in an extended expulsion process.

(6)   **COVID-19 positive UACs**. There have been family members detained in the temporary housing program who have tested positive for COVID-19.  Virtually all individuals in hotels awaiting ICE deportation

---

[11] While the definition of "tender age" has usually been confined to children less than 13 years of age, the custodial concerns noted in this report advocate for the definition be extended to all children less than 15 years of age.

flights will be tested for COVID-19 prior to deportation to comply with testing requirements imposed by the home countries for returning deportees. These tests are generally administered approximately 4 to 5 days prior to the scheduled flight in order to allow sufficient time for test results to be made available. As noted previously, at least one family was transferred to the Karnes FRC after 2 symptomatic members tested positive for COVID-19. Other families with members who tested positive have remained in the hotel setting. It is not clear what criteria are being used to decide whether a family should stay at a hotel or be transferred to an ICE FRC where they would be isolated in medically supervised areas of the facility. It is also unclear how MVM and ICE could provide appropriate care for UACs who test positive for COVID-19.

## RECOMMENDATION: EXCLUDE ALL UACS FROM THE CURRENT TEMPORARY HOUSING PROGRAM.

The custodial management of UACs requires well-established, formal systems of care and oversight, particularly if UAC time in custody is protracted. These requirements exist regardless of the intentions and qualifications of program staff. The enhanced vulnerability of UACs in immigration custody has long been recognized and requires significant augmentation to safety and security provisions within all detention systems with responsibility for minors. While this recommendation pertains to all UACs, it is particularly directed at UACs below the age of 15 years. The

17

temporary housing program was not constructed to serve as a major detention system to care for large numbers of young children for protracted periods of time.

The challenge of protecting UACs from COVID-19 only underscores the urgent need to exclude UACs from the temporary housing program. Certain elements of the protective protocols can have distinct implications for younger children. For example, isolating a child alone in a hotel room for 10-14 days can have a more harmful emotional impact than that seen in adults. In addition, the need to assist children in custody with bathing, nutrition, play or other essentials may place special burdens on the protective protocols and equipment currently implemented in the hotel program.

It is also likely that at some point, a UAC will test positive for COVID-19. It is unclear what the custodial care of children with COVID-19 will be in a hotel setting, particularly given the minimum 14-day isolation period. While the risk of severe disease is lower for young children and many will be asymptomatic, the risk that many of these children will feel sick is, nevertheless, relatively high. Careful medical monitoring is essential, as is enhanced caretaking for children falling ill. These requirements for care of UACs also require more extensive use of masks and other personal protective equipment (PPE), not to mention special procedures to reduce the risk to MVM and hotel staff.

**CONCLUSION**

In sum, the recommendation of the Independent Monitor and Dr. Wise to exclude UACs from the Temporary Housing Program is based on (1) the formal care and oversight requirements for children in immigration custody for protracted stays; (2) the difficulties inherent in providing strict protective measures for COVID-19 in hotel settings for protracted stays; and (3) the lack of appropriate medical and custodial capabilities to care for children with COVID-19 disease in hotel settings.[12]

---

[12] Recognizing the role of the Independent Monitor is to report on the safety of the minors and not to propose alternatives for the Government, in this case, the Independent Monitor believes there exists a compelling alternative: referral to the Office of Refugee Resettlement (ORR). This recommendation is based on three basic observations: (1) ORR is specifically designed to process and care for younger UACs; (2) ORR facilities are at historically low occupancy; and (3) custodial capabilities in CBP facilities are designed to process and refer UACs, generally within 72 hours of apprehension.