## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, *et. al.*, | ) | Case No.: CV 85-4544-DMG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM BARR, Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## JULY 2020 INTERIM REPORT
## OF JUVENILE COORDINATOR DEANE DOUGHERTY
## <u>SUBMITTED BY IMMIGRATION AND CUSTOMS ENFORCEMENT</u>

As required by the Court in its orders issued on April 24, May 22, and June 26, 2020, U.S. Immigration and Customs Enforcement (ICE) Juvenile Coordinator Deane Dougherty is submitting the following interim report to provide an update on the Class Members in the FRCs over 20 days, status of implementation of COVID-19 guidances, a census of positive COVID-19 cases at the family residential centers (FRCs), and a description of the conditions at two detention facilities holding ICE juvenile detainees.

Due to the constantly evolving nature of the COVID-19 crisis, and the frequency of custody and discharge determinations, the information in this report is current and accurate as of the time of signature, or for the reported data, as of the date or time noted in conjunction with the information provided.

### I.   <u>Making and Recording Individualized Custody Determinations and Census of Minors at FRCs</u>

As of July 21, 2020, there were a total of 182 Class Members at ICE FRCs. The figures below breakdown these Class Members by age and country of origin.





ICE has been making continuous efforts to release Class Members under applicable standards throughout the course of this litigation and, where there are no impediments to removal, those that are subject to final orders of removal are repatriated in accordance with the law. The following graph portrays the book-outs by the FRCs from June 9 to July 21, 2020.



As of July 21, 2020, 100 Class Members have been detained at an FRC 20 days or more. Exhibit A. These individuals, and their accompanying parent(s) or legal guardian(s), may be subject to the *Flores* waiver process about which this Court ordered the parties to meet and confer in its June 26, 2020, Order.  Specifically, this Court ordered the government to proceed with one of two options on or before July 17, 2020: (1) release minors to available suitable sponsors or other available COVID-free non-congregate settings **with the consent of their adult guardians/parents**; or (2) release the minors with their guardians/parents if ICE exercises its discretion to release the adults or another Court orders it to do so.  ICE is not compelled to exercise its discretion to release an alien who is otherwise lawfully subject to detention, and no other court has ordered ICE to release the accompanying parents. Thus, by the plain terms of sections 4(c) and (d), read in conjunction with section 1, of the Court's June 26 Order, compliance with the reporting requirements, in this regard, requires that the government develop *and implement* a process by which it can obtain the consent of a parent/legal guardian for the release of his or her child from custody, or otherwise allow the parent to waive the child's *Flores* release rights.  On July 16, 2020, the Court, upon stipulation by the parties, ordered an extension of the deadline for implementation of the Court's June 26 Order from July 17, 2020, to (and including) July 27, 2020, in order to

finalize and implement the *Flores* waiver process.  Negotiations on this process have not yet completed, thus implementation has not yet occurred.  Therefore, the number of Class Members released pursuant to section 1 of this Court's June 26 Order, or who continue to be detained pursuant to sections 4(c) and (d) of the same Order, is not yet available.  I have discussed this situation with the Special Monitor, who agreed that, for purposes of this report, the agency may provide a general statement indicating the agency did not, and could not, conduct parole reviews while awaiting the outcome of the meet and confer process, and subsequent to implementation of any *Flores* waiver process.  Once the process has been completed and implemented, ICE will provide the information required by sections 1, 4(c), and 4(d) of the Court's June 26 Order, including the number of those Class Members whose parent/legal guardian waived their child's *Flores* rights under paragraph 14 of the FSA, or continue to be detained under the FSA, in its next interim report.  This report does include other information pertaining to those Class Members who have remained in custody longer than 20 days.

As of July 21, 2020, there are: 73 Class Members who remain in custody beyond 20 days due to a final order of removal and are subject to a stay;[1] 16 Class Members who remain in custody beyond 20 days are subject to an expedited removal order and are pending a credible fear interview; and 11 Class Members who remain in custody beyond 20 days, have a final order of removal, are not subject to a stay, and have been manifested for removal within the next couple of weeks, which is the next scheduled repatriation flight to their respective countries of origin. Because this report only provides a snapshot of the category or categories within which these 100 minors currently

---

[1] On July 23, 2020, the Court lifted the administrative stay of removal relevant to *Flores* Class Members.  *D.A.M. v. Barr*, No. 20-1321 (D.D.C. July 23, 2020).  However, petitioners filed an emergency motion for the entry of an administrative stay pending adjudication of their motion for a temporary restraining order relating to a separate claim for relief, and the Court entered a stay of removal.  *D.A.M. v. Barr*, No. 20-1321 (D.D.C. filed July 23, 2020).  Thus, an administrative stay is currently in place.

fall, it is important to note that their circumstances may change for a number of reasons, both within and outside of ICE's control, and at any time, such that they may categorized differently in a future interim report.

## II. Status of ICE's Implementation of COVID-19 Guidances

I have confirmed that the measures described in the declarations and the Juvenile Coordinator's report, previously submitted to this Court, pertaining to the operational changes the FRCs have implemented to mitigate the introduction into, and spread of, COVID-19 are still in effect. ICE is focused on urgently enforcing its existing COVID-19 protocols, particularly in the areas of social distancing, masking and testing. In its July 22, 2020, order rejecting efforts by residents at FRCs to obtain release, the U.S. District Court for the District of Columbia noted that three weeks had passed since this Court's June 26 Order and explained that, during that time, ICE has "taken steps . . . to reduce the risk of a COVID-19 outbreak at the FRCs." *O.M.G. v. Wolf*, 1:20-cv-00786-JEB (D.D.C. July 22, 2020). The Court cited to declarations submitted by ICE officials describing various measures implemented, and adhered to, by ICE, and that were undisputed by petitioners including, but not limited to, temperature checks for all staff, contact tracing, testing all new incoming residents, maximizing social distancing, requiring the use of masks by all staff and residents, quarantining all new arrivals, and screening high risk individuals for possible release. *Id*. at 7-9; *see id*. at 23 ("ICE had adopted many prevention policies since March, most of which it seems to have substantially implemented in practice."). The Court found that ICE's efforts at preventing outbreaks at the FRCs, "whatever ones thinks of them – seem to have yielded a moderate, though undeniable fragile, success," and that "[t]he current status quo at the FRCs . . . offers reasonably good news." *Id*. at 13-14. The Court likewise relied upon the

continued release of many residents from the FRCs.  *Id.* at 7.  The chart below demonstrates that

each FRC continues to operate well below maximum capacity.

| Family Residential Center Occupancy as of 7/21/2020 | | | | | |
|---|---|---|---|---|---|
| Facility | Total # of Beds | # of Beds Occupied | % of Beds Occupied | # of Beds Not Occupied | % of Beds Not Occupied |
| Berks Family Residential Center | 96 | 21 | 22% | 75 | 78% |
| Karnes County Residential Center | 830 | 163 | 20% | 667 | 80% |
| South Texas Family Residential Center | 2,400 | 172 | 7% | 2,228 | 93% |
| **Total** | **3,326** | **356** | **11%** | **2,970** | **89%** |

Another recent state court decision issued after this Court's June 26 Order found that

petitioners' subjective fears regarding the conditions at the Berks FRC (BFRC) were "belie[d]" by

the "uncontroverted evidence . . . demonstrate[ing] that [the BFRC] has taken steps to mitigate the

risk of residents being exposed to or contracting COVID-19."  *C.N., et al. v. Pennsylvania Dep't

of Human Servs.*, No. 268 M.D. 2020, July 7, 2020 Mem. Op. at 27 (Exhibit B).  The state court

rejected many of petitioners' claims, including that no one ever spoke to them regarding COVID-

19, finding the evidence established that the staff at the BFRC met with each family unit to educate

residents about COVID-19 and that the BFRC lacks inadequate space for social distancing, noting

it is a 58,000 sq. ft. facility with three acres of recreation area.  *Id.*  The Court also noted the

enhanced cleaning protocols at the BFRC; the more than adequate availability of medical care;

and the availability of gloves, masks, and access to hand washing.  *Id.* at 27-29.

In addition, at the South Texas FRC (STFRC), mealtimes continue to be staggered and

only one family is seated per table, there continues to only be one family housed per room, and

resident education efforts with respect to masking have increased. STFRC employees found not to

be wearing masks are counseled and repeat offenders face disciplinary action. As previously

reported, all new intakes at STFRC are tested for COVID-19 and must complete a 14-day observation period in quarantine/cohort, regardless of test results, before being released into general population.

At the Karnes County FRC (KCFRC), feeding times have been further adjusted such that only six families in general population may eat in the dining hall at a time. Tables in the dining hall continue to be spaced at least 6 feet apart and only one family is seated per table. Families in quarantine are fed according to the satellite feeding guidelines previously reported. KCFRC continues to require residents and employees to wear a mask while in common areas. As previously reported, all new intakes at KCFRC are tested for COVID-19 and must complete a 14-day observation period in quarantine/cohort, regardless of test results, before being released into general population.

### Report of ICE Facilities Holding Minors and Number of COVID-19 Cases

ICE has been promptly reporting positive COVID-19 cases to the United States District Court for the District of Columbia, which is overseeing *O.M.G. v. Wolf*, and the notices of positive results are subsequently submitted to this Court. As of July 22, 2020, the BFRC has no reported COVID-19 cases by either staff or residents. The following charts describe the number of positive COVID-19 cases at the ICE FRCs as of July 22, 2020.

| COVID-19 Positive Cases at Family Residential Centers as of 7/22/2020 | | | | |
|---|---|---|---|---|
| Facilities | Minor | Adult | Staff | Total |
| Berks Family Residential Center | - | - | - | - |
| Karnes County Residential Center | 23 | 25 | 17 | 65 |
| South Texas Family Residential Center | - | 1 | 19 | 20 |
| Total | 22 | 25 | 15 | 85 |

| COVID-19 Positive Cases of Residents at Family Residential Centers as of 7/22/2020 | | | |
|---|---|---|---|
| Facilities | At Intake | In General Population | Total |
| Berks Family Residential Center | - | - | - |
| Karnes County Residential Center | 45 | 1[2] | 46 |
| South Texas Family Residential Center | 1 | - | 1 |
| **Total** | **46** | **1** | **47** |

| COVID-19 Positive Cases of Residents at Family Residential Centers as of 7/22/2020 | | | | |
|---|---|---|---|---|
| Facilities | Symptomatic[3] | Asymptomatic | Hospitalized | Total |
| Berks Family Residential Center | - | - | - | - |
| Karnes County Residential Center | - | 46 | - | 46 |
| South Texas Family Residential Center | 1 | - | - | 1 |
| **Total** | **1** | **46** | **-** | **47** |

Pursuant to section 4(b)(iv) of this Court's April 24, 2020 Order, the minors who remain housed at the STFRC and KCFRC have not been released or transferred to non-congregate settings for two reasons: (1) because they are either in quarantine or cohorting based on CDC guidance as a result of testing positive for COVID-19[4] or they are a new intake and must undergo a 14-day observation period; and/or (2) because they are housed with their parent or legal guardian and, as

---

[2] Because all immediate family members of this resident, as well as all residents with whom this individual had contact, tested negative for COVID-19, an IHSC medical doctor ordered a second test for the positive resident in order to rule out the possibility of a false positive test result. Results of the second test are expected early during the week of July 27.

[3] Whether an individual is symptomatic or asymptomatic is fluid. This chart represents the conditions of the residents who have tested positive for COVID-19 when the information was collected on July 22, 2020.

[4] There have been no reports of any Class Members in the general population testing positive for COVID-19.

discussed previously, the parties are meeting and conferring to develop a process by which the parent or legal guardian may provide consent to release the minor, but that process is not yet finalized or implemented.

As of July 22, 2020, Cowlitz County Juvenile Detention Center ("Cowlitz") and Northern Oregon Regional Corrections Juvenile Detention Center ("NORCOR") have no reported COVID-19 cases by residents or staff.

### III. Juvenile Detention Facilities

As of July 22, 2020, there are four minors in ICE custody at Cowlitz and NORCOR juvenile detention facilities. These minors do not meet the definition of an unaccompanied alien child because they were previously in the custody of their parent or guardian before being detained by ICE due to their criminal history. The four minors detained by ICE at these two facilities are detained under paragraph 21 of the FSA.

#### A. Cowlitz

Cowlitz has been implementing, and continues to implement, the Centers for Disease Control and Prevention's (CDC) *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*. Additionally, Cowlitz has been provided with Enforcement and Removal Operation's (ERO) Pandemic Response Requirement (PRR) and is complying with the provisions relating to non-dedicated ICE facilities. This includes immediately reporting all confirmed or suspected COVID-19 cases to ERO, and timely notifying the ERO Portland Field Office of any ICE minor who meets the CDC's identified populations potentially at higher risk for serious illness from COVID-19, and/or the subclasses certified in *Fraihat v. ICE*. None of the current minors at Cowlitz have been identified as being at higher risk for serious illness from COVID-19 under either the CDC's guidelines or the *Fraihat* criteria.

In response to COVID-19, Cowlitz has implemented a series of its own increased operational, health/safety, and programmatic changes to address the health and safety of those housed within, or those who work at, the facility. These changes are in areas that include, but are not limited to, screening individuals entering the facility for symptoms of COVID-19, masking, and social distancing, as described below.

Cowlitz screens all new intakes for COVID-19 symptoms. This includes a verbal screening, in a language they understand, to determine if the new intake is experiencing COVID-19 symptoms, as well as a temperature check. If the new intake's temperature exceeds 100 degrees Fahrenheit, Cowlitz will transfer the new intake to the local emergency department or another medical provider for COVID-19 testing. Cowlitz will not accept new intakes who test positive for COVID-19 from contracting entities, like ICE, and requires documentation evidencing negative COVID-19 results before accepting the new intake into the facility.

Minors in general population who exhibit symptoms of COVID-19 will promptly be evaluated by medical staff, and direct contact with other residents and staff will be totally restricted until the minor is seen by the medical staff. Depending on the circumstances, the on-site medical staff will evaluate and treat the minor or arrange to have the minor sent to the local emergency department for care.

Cowlitz has provided minors with a guidance sheet for COVID-19. Additionally, all minors are issued a mask and provided with fitting instructions and a bag within which to store the mask when not in use. Minors are required to wear masks whenever they leave their assigned room. New masks are available to minors at least every Monday or sooner should the mask become broken, soiled, or is otherwise in poor condition. Minors are instructed to social distance from other

residents and staff whenever possible. Cowlitz also ensures minors' ability to wash their hands at will and that surfaces touched throughout the day are cleaned at least once per shift.

Cowlitz staff are instructed to wear masks at all times and to observe social distancing recommendations. Cowlitz has also issued guidance with respect to staff screening and reporting of symptoms, potential exposure, and positive COVID-19 test results. All staff entering the facility are required to self-screen for COVID-19 symptoms and undergo temperature checks upon entering the building. Staff who report at least two COVID-19 related symptoms, or who have a fever of 100.4 degrees Fahrenheit or higher, are sent home.  COVID-19 testing arrangements will be made, and further guidance will be supplied with respect to returning to work.

As of July 24, 2020, ICE is housing three minors at Cowlitz pursuant to paragraph 21 of the FSA. B.B.B. has been detained by ICE since October 18, 2018.  On December 18, 2018, an immigration judge sustained detention with no bond, finding he is a danger to the community based on clear and convincing evidence.  His criminal record reflects a juvenile delinquency adjudication in Maryland in October 2018 for assault in the first degree and wearing/carrying a weapon with intent to injure, because he attempted to kill a victim with a machete.  He was originally charged with a seven-count indictment: conspiracy to commit first degree murder; assault in the first degree; assault in the second degree; reckless endangerment; wearing and carrying a dangerous weapon with intent to injure; and participating in a criminal gang. He is a known member of MS-13. His immigration court case has a long history because he was ordered removed on February 4, 2019, when the Immigration Judge denied in discretion his application to adjust status to lawful permanent residence. On July 31, 2019, the Board of Immigration Appeals sustained his appeal and remanded the case to the immigration court to allow USCIS to adjudicate his asylum application. USCIS was scheduled to interview him on January 14, 2020, but the interview was

cancelled due to inclement weather. ICE contacted USCIS on July 9, 2020, to determine the status of his case, and USCIS indicated they are unable to schedule an asylum interview at this time due to COVID-19.  B.B.B. is scheduled for a master calendar hearing with the Portland Immigration Court on August 6, 2020. Since his detention at Cowlitz, he has had three incident reports, one of which involved assault of another inmate, and two of which related to the MS-13 gang. On January 4, 2020, he assaulted another inmate after the inmate made disparaging comments about the MS-13 gang.  On November 1, 2019, he wrote "MS13" on his keyboard. His criminal act of attempting to kill someone by putting a machete to their neck, his membership in the MS-13 gang, and his assault and gang incidents while in ICE custody show that he continues to be a danger to the community. To date, he has never requested a bond hearing. B.B.B. will turn 18 in November 2020.

J.E.R.M. has been detained by ICE since July 13, 2020.  On September 11, 2018, J.F.R.M was found delinquent in the 323rd District Court of Tarrant County, Texas for violating Texas Penal Code Section 22.021(a)(2)(B), aggravated sexual assault of a minor under age 14.  He was placed on probation, but repeatedly broke the terms of his probation by failing to go to school, testing positive for marijuana, and failing to attend mandatory counseling sessions. On March 18, 2019, he was committed to the state juvenile facility.  To date, he has not requested a bond hearing.  His commission of aggravated sexual assault of a minor under age 14 demonstrates he is a danger to the community, and he is a flight risk because he has a history of failing to obey court orders, as evidenced by his behavior during state court proceedings.  ICE filed his Notice to Appear with the immigration court on July 16, 2020.  A court hearing is not scheduled at this time.  J.E.R.M. will turn 18 in December 2020.

N.Y.C.C. has been detained by ICE since July 4, 2020.  On June 23, 2020, he was convicted by the District Court of Oklahoma County, State of Oklahoma for two felony charges:  (1) Domestic Assault and Battery by Strangulation, in violation of 21 O.S. § 644(J); and (2) Domestic Assault and Battery with a Dangerous Weapon, in violation of 21 O.S.  § 644(D)(1).  He was sentenced to three years' and ten years' imprisonment, respectively, to be served concurrently.  However, his sentence was suspended except as to the first 180 days, and he received credit for time served (154 days).  According to the conviction documents, on January 21, 2020, he assaulted the victim, his girlfriend, by strangling her and cutting her with a box knife.  The violent nature of his assault offense(s) involving the strangulation of his girlfriend demonstrates he is a danger to the community.  He is currently scheduled for an initial immigration hearing in Dallas, TX on March 15, 2023, but ICE filed a motion to change venue to the Portland Immigration Court on July 6, 2020.  To date, he has not requested a bond hearing.  N.Y.C.C. will turn 18 in May 2021.

### B. <u>NORCOR</u>

NORCOR has adopted several written COVID-19 protocols applicable to minors.  These protocols include procedures for the new intakes, personal visits, quarantine for those with and without risk factors or symptoms, and notification procedures for confirmed and suspected COVID-19 cases.  These protocols are attached (Exhibit C).  For example, minors are expected to wear masks at all times when outside of their rooms until they have been at the facility for 14 days.  Staff continue to interact with the youth wherever possible while also abiding by social distancing rules.  Disinfecting procedures have been updated for mealtimes and showering.  To date, NORCOR has not had any confirmed or suspected cases of COVID-19.

As of July 23, 2020, ICE houses one minor at NORCOR pursuant to paragraph 21 of the FSA. K.A.B. has been detained by ICE since May 5, 2020. On May 5, 2020, he pled guilty in the Superior Court of Cobb County, GA, to two adult misdemeanor charges: terroristic threats and simple battery. He was sentenced to 11 months' and 29 days' in jail, respectively. The police report indicates that on March 3, 2020, he threatened the victims on a school bus by stating he would bring a gun to school and "shoot anyone who was talking about him" and his ex-girlfriend. He also texted one victim, stating he would kill him by stabbing him in front of everyone. He is scheduled for a master calendar hearing with the Portland Immigration Court on August 6, 2020. His criminal activity, including making terroristic threats and simple battery, demonstrates that he is a danger to the community. To date, he has not requested a bond hearing. K.A.B. will turn 18 in December 2020.

### IV. Additional Policies and Practices Aimed at Identifying and Protecting Minors from COVID-19

Pursuant to section 4 of the Court's May 22, 2020, Order and section 9 of the Court's June 26, 2020, Order, I can confirm that I facilitated, and participated in, more calls with, among others, Dr. Paul Wise; Ms. Ordin; Dr. Ada Rivera, Deputy Assistant Director of Clinical Services, ICE Health Services Corp (IHSC); and, Dr. Stewart Smith, Assistant Director, IHSC; Juvenile and Family Residential Management Unit (JFRMU) Chief Mellissa Harper; clinical administrators and operational leadership for both Texas FRCs in which Dr. Wise and Ms. Ordin were provided information, relevant to their questions and requests, regarding the baseline of custodial medical care, health care protocols, and COVID-19 prevention practices at the FRCs, as well as protocols for identifying minors with medical conditions making them more vulnerable to COVID-19, and enhanced testing capabilities. Pursuant to Dr. Wise's request, I facilitated interviews with a number of family members detained at the FRCs, during which Dr. Wise and Ms. Ordin were joined by

NGO attorneys.  I also facilitated a live, virtual tour of the KCFRC, conducted by onsite contract and ICE leadership.  At Dr. Wise and Ms. Ordin's request, a meeting was conducted with the ICE Contracting Officer Representative responsible for oversight of the alternative housing program for families and unaccompanied minors, in which the JFRMU Chief and I both participated. Though not requested, a number of documents have been provided to Ms. Ordin, to include a draft inspection report conducted by an independent contractor of a hotel utilized for temporary housing in McAllen, Texas.

As Juvenile Coordinator I will continue to monitor any guidance and developments related to the COVID-19 to ensure the latest practices are implemented at facilities.

Signed on this 24th day of July 2020.

DEANE D DOUGHERTY
Digitally signed by DEANE D DOUGHERTY
Date: 2020.07.24 12:54:06 -04'00'

Deane Dougherty
Juvenile Coordinator

# ATTACHMENT A

| Det Location | A-Number | Last Name | First Name | Country of Citizenship Code | Book-In Date | Birth Date | Age | Age Group | Final Order Date ("as of" 7/18/20) | Case Category |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HAITI | 6/28/2020 | | 1 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | CHILE | 6/30/2020 | | 1 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | CHILE | 6/30/2020 | | 1 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | CHILE | 6/30/2020 | | 1 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 7/1/2020 | | 1 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 3/10/2020 | | 2 | 0 to 5 | 4/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 3/26/2020 | | 2 | 0 to 5 | 4/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | KYRGY | 6/6/2020 | | 2 | 0 to 5 | | [8A] Excludable / Inadmissible - Hearing Not Commenced |
| | | | | CHILE | 6/30/2020 | | 2 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 3/5/2020 | | 3 | 0 to 5 | 6/10/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | DECON | 6/28/2020 | | 3 | 0 to 5 | | [8X] Expedited Removal Terminated due to Credible Fear Finding / NTA Issued |
| | | | | DECON | 6/29/2020 | | 3 | 0 to 5 | | [8X] Expedited Removal Terminated due to Credible Fear Finding / NTA Issued |
| | | | | CHILE | 6/30/2020 | | 3 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 2/24/2020 | | 4 | 0 to 5 | 4/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HAITI | 6/30/2020 | | 4 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | BRAZI | 6/30/2020 | | 4 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HAITI | 6/30/2020 | | 4 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 3/10/2020 | | 5 | 0 to 5 | 4/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | DECON | 6/28/2020 | | 6 | 6 to 13 | | [8X] Expedited Removal Terminated due to Credible Fear Finding / NTA Issued |
| | | | | INDIA | 4/11/2020 | | 7 | 6 to 13 | 5/18/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 2/24/2020 | | 8 | 6 to 13 | 4/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HAITI | 6/30/2020 | | 9 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 4/11/2020 | | 10 | 6 to 13 | 5/18/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HAITI | 6/30/2020 | | 12 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 3/26/2020 | | 13 | 6 to 13 | 4/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ANGOL | 6/29/2020 | | 14 | 14 to 17 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | INDIA | 3/26/2020 | | 16 | 14 to 17 | 4/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ECUAD | 2/28/2020 | | 17 | 14 to 17 | 3/20/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | CHILE | 3/18/2020 | | 1 | 0 to 5 | 3/15/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 9/11/2019 | | 2 | 0 to 5 | 10/17/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 10/5/2019 | | 2 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/9/2020 | | 2 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/9/2020 | | 2 | 0 to 5 | 3/26/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/22/2019 | | 3 | 0 to 5 | 9/18/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/29/2019 | | 3 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/29/2019 | | 3 | 0 to 5 | | [8F] Expedited Removal |
| | | | | HONDU | 9/14/2019 | | 3 | 0 to 5 | 9/30/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 9/14/2019 | | 3 | 0 to 5 | 9/30/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | BRAZI | 10/5/2019 | | 3 | 0 to 5 | 9/30/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | CHILE | 3/11/2020 | | 3 | 0 to 5 | 3/6/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | CHILE | 3/18/2020 | | 3 | 0 to 5 | 3/14/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/31/2019 | | 4 | 0 to 5 | 10/3/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/1/2019 | | 4 | 0 to 5 | 8/30/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 12/17/2019 | | 4 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/4/2020 | | 4 | 0 to 5 | 3/25/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/4/2020 | | 4 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/9/2020 | | 4 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/30/2019 | | 5 | 0 to 5 | 9/19/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 9/28/2019 | | 5 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 10/9/2019 | | 5 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ECUAD | 3/15/2020 | | 5 | 0 to 5 | 3/9/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/4/2020 | | 5 | 0 to 5 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/30/2019 | | 6 | 6 to 13 | 9/23/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/30/2019 | | 6 | 6 to 13 | 9/19/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/14/2019 | | 6 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 9/16/2019 | | 6 | 6 to 13 | 11/4/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ECUAD | 1/19/2020 | | 6 | 6 to 13 | 2/5/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/2/2020 | | 6 | 6 to 13 | 3/11/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/4/2020 | | 6 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/9/2020 | | 6 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/9/2020 | | 6 | 6 to 13 | 3/31/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/30/2019 | | 7 | 6 to 13 | 8/29/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/31/2019 | | 7 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 9/3/2019 | | 7 | 6 to 13 | 9/23/2019 | [8F] Expedited Removal |
| | | | | HONDU | 9/11/2019 | | 7 | 6 to 13 | 10/3/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/4/2020 | | 7 | 6 to 13 | 3/25/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/27/2019 | | 8 | 6 to 13 | 9/18/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/27/2019 | | 8 | 6 to 13 | 9/30/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/29/2019 | | 8 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 9/28/2019 | | 8 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 10/6/2019 | | 8 | 6 to 13 | | [8F] Expedited Removal |
| | | | | ECUAD | 1/19/2020 | | 8 | 6 to 13 | 2/5/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HAITI | 3/5/2020 | | 8 | 6 to 13 | 3/25/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/2/2020 | | 8 | 6 to 13 | 3/11/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/28/2020 | | 8 | 6 to 13 | 11/14/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/27/2019 | | 9 | 6 to 13 | 9/18/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/18/2019 | | 9 | 6 to 13 | 11/4/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 10/19/2019 | | 9 | 6 to 13 | 10/17/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/11/2019 | | 10 | 6 to 13 | 10/17/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 10/8/2019 | | 10 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ECUAD | 1/19/2020 | | 10 | 6 to 13 | 2/5/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HAITI | 3/5/2020 | | 10 | 6 to 13 | 3/25/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/22/2019 | | 11 | 6 to 13 | 9/12/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/22/2019 | | 11 | 6 to 13 | 8/20/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/27/2019 | | 11 | 6 to 13 | 8/26/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HAITI | 3/11/2020 | | 11 | 6 to 13 | 3/6/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 10/6/2019 | | 12 | 6 to 13 | | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/2/2020 | | 12 | 6 to 13 | 3/11/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | NICAR | 8/27/2019 | | 13 | 6 to 13 | 9/30/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ELSAL | 8/31/2019 | | 13 | 6 to 13 | 10/3/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/18/2019 | | 13 | 6 to 13 | 11/4/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 8/30/2019 | | 14 | 14 to 17 | 9/23/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/10/2019 | | 14 | 14 to 17 | 9/9/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 9/26/2019 | | 14 | 14 to 17 | 10/8/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 10/8/2019 | | 14 | 14 to 17 | 12/11/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | GUATE | 4/2/2020 | | 14 | 14 to 17 | 3/11/2020 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 8/29/2019 | | 15 | 14 to 17 | 10/17/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/11/2019 | | 15 | 14 to 17 | 10/3/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | HONDU | 9/18/2019 | | 17 | 14 to 17 | 11/4/2019 | [8G] Expedited Removal - Credible Fear Referral |
| | | | | ECUAD | 2/24/2020 | | 17 | 14 to 17 | 2/23/2020 | [8G] Expedited Removal - Credible Fear Referral |

# ATTACHMENT B

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

C.N., B.L., and minor child B.K.L.N.;   :
J.A.R., E.G.M., and minor child J.G.;   :
M.N., P.M., and minor child H.M.N.;   :
M.C., G.S.C., and minor children   :
G.R.S.C. and N.B.T.; M.E.L., E.O.E.,   :
and minor child J.O.E.,   :
             Petitioners   :
   :
     v.          :    No. 268 M.D. 2020
                    :    Heard:  May 26, 2020
Pennsylvania Department of   :
Human Services,   :
          Respondent   :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                   FILED:  July 7, 2020

On April 23, 2020, C.N., B.L., and minor child B.K.L.N.; J.A.R.,
E.G.M. and minor child J.G.; M.N., P.M. and minor child H.M.N.; M.C., G.S.C. and
minor children G.R.S.C. and N.B.T.; and M.E.L., E.O.E. and minor child J.O.E.
(collectively, Petitioners)[1] filed an Emergency Petition for Issuance of a Writ of

---

[1] On May 19, 2020, Petitioners filed a motion for protective order requesting that their
testimony at trial be shielded from livestream to protect their identities – essentially, that the virtual
courtroom be closed.  They further requested that the Court only use their initials during the
hearing, and that they be permitted to file their full names under seal.  The Court granted this
motion, which was unopposed by the Department of Human Services (Department).  As such,
Petitioners will be referred to throughout this opinion by their initials or as "Petitioners."

Mandamus (Petition) addressed to this Court's original jurisdiction.[2]   Petitioners seek an order directing the Pennsylvania Department of Human Services (Department) to issue an emergency order removing them from the Berks County Residential Center (BCRC) to avoid potential infection during the COVID-19 pandemic.[3]   The Court held a non-jury trial on May 26, 27, and 29, 2020, via WebEx. After review of the record and evidence in this matter, the Court enters a verdict in favor of the Department and against Petitioners.

## **Background**

Petitioners are immigrant parents and their children who are detained at BCRC pending federal immigration proceedings.   BCRC is a two-story, single building congregate care facility, meaning the individuals are housed together with communal sleeping quarters, bathrooms, dining facilities, and recreational areas. BCRC has an Intergovernmental Services Agreement with the federal Immigration and Customs Enforcement Agency (ICE) to provide this residential program.   While

---

[2] Petitioners initially filed an application for extraordinary relief in the Supreme Court of Pennsylvania, under the Court's King's Bench jurisdiction.   *See C.N., et al. v. Pennsylvania Department of Human Services* (Pa., 76 MM 2020).   On April 16, 2020, the Supreme Court issued an order, *per curiam*, denying Petitioners' application without prejudice to file an action in this Court or with the Department of Human Services (Department) itself.   That order further directed that if an action was filed here, the Commonwealth Court "shall establish an expedited schedule for such matter and shall move expeditiously to resolve the matter so as to prevent further potential harm to Petitioners."   (Supreme Ct. April 16, 2020 Order pp. 1-2.)

[3] Along with the Petition, Petitioners simultaneously filed an application for special relief in the nature of an application for peremptory judgment in mandamus.   On May 6, 2020, the Court issued a memorandum and order denying Petitioners' application, noting peremptory judgment was not appropriate as there were genuine issues of material fact.   *See Dusman v. Board of Directors of Chambersburg Area School District*, 113 A.3d 362 (Pa. Cmwlth. 2015).

the Petitioners and other BCRC residents are technically in federal custody, BCRC
itself is licensed and overseen by the Department and subject to its regulations.

Of particular importance here, Department Regulation 20.37 titled
"Emergency removal of residents" (the Regulation or Regulation 20.37), provides
as follows:

> If the Department finds evidence of gross incompetence,
> negligence, misconduct in operating the facility or agency,
> or mistreatment or abuse of clients, likely to constitute an
> immediate and serious danger to the life or health of the
> clients, the Department will take immediate action to
> remove the clients from the facility or agency. If physical
> obstruction is offered to prevent removal of the clients the
> Department will request law enforcement authorities to
> assist in the removal of the clients.

55 Pa. Code § 20.37. An order issued pursuant to this provision is referred to as an
emergency removal order (ERO).

Petitioners assert that conditions at BCRC and the facility's response to
the COVID-19 pandemic rise to the level of necessitating an ERO. Petitioners claim
that COVID-19 presents a severe danger to public health, in particular to individuals
detained in enclosed environments such as BCRC, and that the Department has not
taken adequate action to protect them. They aver:

> Petitioners are at high risk of contracting COVID-19 while
> in custody. Social distancing is not possible in the
> enclosed conditions of the detention center; . . . ICE and
> BCRC personnel are not providing adequate safety
> precautions to prevent detainees from contracting and
> spreading COVID-19; and employees come and go from
> their home and their communities[.] The only viable way
> to protect the children and families at BCRC is for them to
> be removed from the center and released to their sponsors.

3

(Petition ¶ 2) (footnote omitted).  With respect to children, Petitioners note that they play together, touch each other, share toys, put things in their mouths, and cannot be expected to observe the same rules and norms of social distancing that are expected of adults.   Therefore, it is impossible for children in the BCRC's enclosed, communal environment to avoid potential contamination.

Moreover, Petitioners aver that numerous parents and children in the facility are sick with cold-like symptoms, such as coughs, congestion and fever, and that they have observed numerous staff members exhibiting similar symptoms. (Petition ¶ 25.)  Yet when detainees request medicine for their children, it is allegedly not provided for days or weeks, if at all.  Petitioners assert that BCRC lacks the medical infrastructure to address the spread of infectious disease and does not have a pediatrician on staff.  They further claim that they have not been briefed by BCRC staff or ICE on COVID-19 or what precautions they should be taking to prevent the spread of the virus.  Petitioners allege that BCRC has not provided adequate personal protective equipment (PPE); appropriately sized masks for children have not been provided; soap dispensers in the facility are broken; and BCRC is not properly sanitized as it relies on the detained civil population itself to clean the facility.

Petitioners note that the purpose of the Department's regulations is "to protect the health, safety and well-being of children receiving care in a child residential facility through the formulation, application and enforcement of minimum licensing requirements."  55 Pa. Code § 3801.  They assert that the conditions at BCRC, as outlined above, constitute an immediate and serious danger to Petitioners' life or health, triggering the Department's duty to issue an ERO pursuant to Department Regulation 20.37, 55 Pa. Code § 20.37.  Moreover, they assert that BCRC's response to the COVID-19 health crisis – in particular, its failure

4

to adequately protect Petitioners from infection by a highly contagious and deadly disease – has demonstrated its incompetence, negligence, or misconduct in operating the facility.   Because the Department has failed to act on its own given these conditions, Petitioners claim they have no other adequate and appropriate remedy than to seek mandamus.

On April 28, 2020, the Department filed an answer with new matter denying the material allegations in the Petition.  The Department averred that it recently conducted a remote inspection of BCRC during which the licensing technician, Erin Roman, found no evidence of gross incompetence, negligence, or misconduct in the operation of BCRC, or mistreatment or abuse of residents.  In addition, the Department noted that BCRC had policies in place to respond to and mitigate the effects of COVID-19.  As such, the Department concluded there are not circumstances that constitute an immediate and serious danger to the life or health of residents at BCRC; therefore, an ERO was not warranted.

Prior to the start of testimony, this Court heard oral argument on the Department's motion *in limine* seeking to exclude (1) all evidence prior to December 2019, as being outside the relevant timeframe of the allegations in the Petition and, therefore, irrelevant and not probative of Petitioners' claims; (2) the testimony of proposed witness Carol Anne Donohoe, Esquire, as Attorney Donohoe lacks personal knowledge as to the conditions at BCRC from December 2019 onward; (3) the testimony and declaration of proposed witness Bridget Cambria, Esquire, to the extent it relies on inadmissible hearsay; and (4) statements found in newspaper articles, learned treatises, or periodicals as inadmissible hearsay if introduced to establish the truth of the matters asserted.  Following argument, the Court orally

5

denied Respondent's motion *in limine* in its entirety, and issued a formal order to this effect on June 15, 2020.

During trial, Petitioners called the following witnesses: (1) Petitioner B.L.; (2) Petitioner P.M.; (3) Alan Shapiro, M.D.;[4] (4) Attorney Cambria; and (5) Attorney Donohoe. The deposition testimony of Jeanne Parisi, Bureau Director for Human Services Licensing, was also entered into the record, in its entirety, upon stipulation of the parties. The Department called the following witnesses: (1) Erin Roman, a Licensing Technician with the Department; and (2) Diane Edwards, BCRC's Executive Director (Director Edwards).[5]

The Court admitted the following exhibits into evidence at trial without objection or upon stipulation of the parties:

---

[4] In their pretrial statement, Petitioners indicated that they intended to call Dr. Shapiro as an expert witness. While they summarized Dr. Shapiro's potential testimony, Petitioners failed to specify in what areas they intended to qualify Dr. Shapiro as an expert. Moreover, at trial, Petitioners failed to offer Dr. Shapiro as an expert witness, in any area, and there was no stipulation between the parties as to his expert qualifications. *See* Notes of Testimony (N.T.) 156:13-16. Given these facts, the Court cannot consider Dr. Shapiro's expert opinions in this matter.

[5] On April 27, 2020, the County of Berks (County), which operates the BCRC, filed an application seeking leave to intervene in this matter. Following oral argument, the Court issued a Memorandum and Order on April 29, 2020, stating that the County's interests are currently aligned with, and adequately represented by the Department. Therefore, the County's application was denied without prejudice to request leave to intervene in the future if the licensing status of the BCRC changed, or for any other good cause shown. *See* Pa. R.C.P. No. 2329. On the second day of trial, May 27, 2020, the County filed a renewed application for leave to intervene citing concerns over Petitioners' line of questioning of the Department's witnesses, in particular regarding BCRC's licensing status and any potential violations. The Court orally denied the County's renewed application on the record immediately following argument, and issued an order to this effect on June 15, 2020. The Court did permit counsel for the County, Attorney Matthew Connell, to be present and raise objections during the testimony of Director Edwards, in particular to ward against any potential conflict of interest with counsel for the Department.

## Exhibits

**Petitioners' Exhibits:**

| | |
|---|---|
| P-1 | Alan J. Shapiro, M.D. – Curriculum Vitae |
| P-2 | May 21, 2020 deposition transcript of Jeanne Parisi |
| P-4 | Declaration of Erin Roman dated April 28, 2020 |
| P-5 | Video file (5 seconds) |
| P-6 | Video file (9 seconds) |
| P-8 | May 21, 2020 deposition transcript of Erin Roman (page 42 only) |
| P-26 | *O.M.G., et al. v. Wolf*, D.D.C., No. 1:20-cv-00786, Emergency Verified Petition for a Writ of Mandamus and Complaint for Declaratory and Injunctive Relief, filed March 21, 2020 (page 1 only) |
| P-29 | *Flores, et al. v. Barr*, C.Dist. Cal., No. 2:85-cv-04544, April 24, 2020 Order re: Plaintiffs' Motion to Enforce |
| P-36 | Petitioners' Interrogatory Number 18 and Department's Response thereto |

**Department's Exhibits:**

| | |
|---|---|
| R-1 | April 7, 2020 email from Erin Roman to Louis Bisignani and Brian Hazlak |
| R-2 | Email string ending with March 18, 2020 email from Diane Edwards to Brian Hazlak, Erin Roman and David Smith (1 page) |

7

| | |
|---|---|
| R-2-A | Email string ending with March 25, 2020 email from Diane Edwards to Brian Hazlak, Louis Bisignani and Erin Roman (4 pages) |
| R-3 | Email string ending with March 25, 2020 email from Diane Edwards to Erin Roman, Brian Hazlak, Louis Bisignani, and David Smith (1 page) |
| R-4 | Email string ending with March 26, 2020 email from Diane Edwards to Brian Hazlak, Louis Bisignani and Erin Roman (5 pages) |
| R-5 | Email string ending with March 30, 2020 email from Diane Edwards to Erin Roman, Brian Hazlak, Louis Bisignani and David Smith (3 pages) |
| R-6 | Email string ending with March 26, 2020 email from Louis Bisignani to Erin Roman, Brian Hazlak and Jacqulyn Maddon (3 pages) |
| R-7 | Email dated March 30, 2020 from Diane Edwards to Erin Roman with attachments (fire drills) (4 pages) |
| R-8-A Parts 1 & 2, and R-8-B Parts 1 & 2 | Email dated March 31, 2020 from Diane Edwards to Erin Roman and David Smith with attachments (juvenile resident admission files) (58 pages total) |
| R-9-A Parts 1, 2 & 3, and R-9-B Parts 1, 2 & 3 | Email dated March 31, 2020 from Diane Edwards to Erin Roman and David Smith with attachments (additional juvenile resident admission files) (74 pages total) |
| R-10 | Email string ending with March 31, 2020 email from Diane Edwards to Erin Roman |

(3 pages)

| | |
|---|---|
| R-11 | Juvenile Admission Report dated April 6, 2020 (4 pages) |
| R-12 | Email string ending with April 6, 2020 email from Diane Edwards to Erin Roman and Brian Hazlak (3 pages) |
| R-13-A, and R-13-B Parts 1, 2 & 3 | ICE medical records for BCRC child residents (101 pages total) |
| R-14 | Email string ending with April 7, 2020 email from Illecia Benefield to Erin Roman (2 pages) |
| R-15 | ICE COVID-19 Poster in various languages (4 pages) |
| R-17 | Email dated April 14, 2020 from Diane Edwards to Brian Hazlak, Erin Roman, David Smith and Louis Bisignani (2 pages) |
| R-18 | Email string ending with April 22, 2020 email from Diane Edwards to Erin Roman, Brian Hazlak and David Smith (4 pages) |
| R-19 | Email dated May 5, 2020 from Diane Edwards to Erin Roman and Brandon Witmer with attachments (fire drills) (4 pages) |
| R-20 | Juvenile Admission Report dated May 5, 2020 (4 pages) |
| R-21 | Email dated May 5, 2020 from Diane Edwards to Erin Roman and David Smith (1 page) |
| R-22 | Email string ending with May 6, 2020 |

|       | email from Diane Edwards to Erin Roman and David Smith (3 pages) |
|-------|------------------------------------------------------------------|
| R-23  | Erin Roman's inspection report from BCRC May Inspection (7 pages) |
| R-24  | Erin Roman's hand written notes from BCRC May Inspection (2 pages) |

The Court also admitted the following exhibits into evidence over objection:

**Petitioners' Exhibits:**

| P-3                       | Email string between Petitioners' immigration counsel and the Department (15 pages) |
|---------------------------|-------------------------------------------------------------------------------------|
| P-24A, B & C, and P-25B   | ICE medical records for BCRC child residents (127 pages total)                      |

The Court makes the following findings of fact based on the evidence presented throughout the course of the proceedings.

## <u>Findings of Fact</u>

1. Petitioner B.L., a 29-year-old man from Haiti, has been detained at BCRC with his wife, C.N., and their one-year-old son, B.K.L.N., since March 18, 2020. Notes of Testimony (N.T.) 27:24, 28:1-20, 29:13-19.

2. Petitioner P.M., a 37-year-old man from Haiti, has been detained at BCRC with his wife, M.N., and their two-year-old daughter, H.M.N., since March 18, 2020. N.T. 61:6-10, 63:20-25, 64:1-5.

3.   Petitioners B.L. and P.M. both speak Haitian Creole, and both understand some Spanish.  N.T. 31:13-25, 32:4-10, 68:14-22.

4.   Translators and language services are available to BCRC so staff can communicate and discuss issues with residents.  N.T. 490:13-15.

5.   The federal government provides BCRC with at least two contracted language lines for translation services 24 hours a day, 7 days a week.  N.T. 472:5-10.

6.   BCRC employs one individual who can interpret Haitian French, one individual who can interpret Haitian Creole, at least three individuals whose native language is Spanish, and at least nine individuals who can speak conversational Spanish.  N.T. 471:1-13.  These BCRC staff members are on duty at a variety of shifts, dates, and times.  N.T. 471:14-23.

7.   BCRC's is a two-floor facility, N.T. 452:20, with approximately 58,000 square feet.  N.T. 450:15-451:2.

8.   BCRC can accommodate, and is licensed for 96 individuals.  N.T. 452:10-12.

9.   On the last day of trial, May 29, 2020, BCRC's total census was 13 individuals.  N.T. 452:13-15.

10.   BCRC's configuration is in the shape of a "V," with a communal recreational area in the center and two wings that veer off from the central area.  N.T. 452:24-453:7.

11.   Each wing in BCRC's second floor has 8 bedrooms, each of which is over 400 square feet.  N.T. 453:1-3, 450:17-18.  Each bedroom has a private bathroom with a toilet, sink, soap dispenser, and towel dispenser.  N.T. 454:8-11.

12. As of May 29, 2020, each family unit at BCRC had its own bedroom. N.T. 453:8-13.

13. Each wing also has a shower room that consists of six shower stalls – one shower room is designated as a female shower room, the other as a male shower room. N.T. 454:8-14.

14. BCRC provides residents with toothpaste, a toothbrush, combs, shampoo, hand soap, feminine hygiene products, toilet paper, and towels. N.T. 456:8-14. BCRC also provides clean sheets for residents once a week. N.T. 456:14.

15. If a resident does not like the brand or type of hygiene product provided by BCRC, the resident can purchase something different at BCRC's commissary. N.T. 456:15-24.

16. BCRC's program areas where the resident can move about freely include the communal recreational areas, with televisions and kitchenettes; a chapel; a fitness room; a movie area; a classroom wing; an area for legal and social visits; and a dining room. N.T. 450:3-14, 460:20-462:3.

17. BCRC has three to four acres of outdoor space for residents to use for recreational purposes. N.T. 451:7-18, 452:2-17.

18. BCRC cleans for the prevention of all diseases. N.T. 461:13-462:5.

19. Beginning March 18, 2020, BCRC enhanced its preventive cleaning of the facility. Exhibits R-2, P-4 ¶ 15(d); N.T. 463:13-16.

20. BCRC's shelter care counselors conduct most of the cleaning in the facility, including the communal bathrooms, other communal areas, vehicles, outside areas, doorknobs, high-touch areas, telephones, computers, keyboards, and walls. N.T. 462:14-463:10.

21.   BCRC's shelter care counselors are present on the program floors on all shifts, 24 hours a day, 7 days a week.  N.T. 462:17-19.

22.   BCRC staff perform two normal preventative cleanings per shift, six times per day, in addition to disinfecting common areas three or four additional times per day.  Exhibit R-12 at 2.

23.   Residents clean their own private bedrooms, bathrooms, and the shower areas, N.T. 464:4-15, and are responsible to disinfect all children's toys after each use.  Exhibit R-23 at 2.

24.   BCRC provides buckets, mops, and gloves to all staff and residents for cleaning.  N.T. 467:4-15.

25.   BCRC staff do hygiene checks to ensure that the areas the residents are responsible for cleaning are cleaned properly.  N.T. 464:16-20.  If BCRC determines that such an area is not cleaned properly, then BCRC will clean the area, ensuring the resident is present if the area is the resident's bedroom.  N.T. 464:21-465:6.

26.   For cleaning purposes, BCRC uses a disinfectant called Virex and Clorox Anywhere Spray.  N.T. 466:16-25.

27.   BCRC provides Purell wipes and 70 percent alcohol sanitizer for staff and residents.  Exhibit R-23 at 2; N.T. 467:1-3.

28.   BCRC has provided at least 11 wall-mounted and stand-alone hand sanitizer dispensers in the program areas for residents and staff.  N.T. 473:14-21, 473:24-474:6.

29.   BCRC has posted multilingual signs in the facility to encourage frequent handwashing.  N.T. 475:24-476:3.

30.  Before mealtimes, BCRC staff encourages residents to return to their rooms to wash their hands.  N.T. 476:4-8.

31.  BCRC has implemented social distancing requirements in the dining room, bedroom areas, and communal activity areas.  N.T. 468:8-13.

32.  BCRC has posted signage to remind residents about social distancing.  Exhibits R-15, R-23 at 1; N.T. 469:14-15.

33.  One family unit uses the communal showers at a time to maintain social distancing.  N.T. 485:15-21.

34.  Prior to the COVID-19 pandemic, residents all lined up in the dining room for meals.  Residents now enter the dining room as a family unit, one at a time, after the previous family has been served.  Exhibit R-23 at 3, 5; N.T. 488:19-489:2, 490:1-3.

35.  BCRC has removed some tables from the dining room and assigned each family unit to a particular table.  Exhibit R-23 at 5; N.T. 489:5-8, 23-25.

36.  BCRC staff guide the families to their respective tables after they are served food.  Exhibit R-23 at 5; N.T. 489:19-25.

37.  If BCRC staff were to observe residents commingling during meals, then staff would remind the residents to maintain social distancing.  N.T. 490:7-15.

38.  BCRC has interpreters or language services available for when staff counsel and redirect residents to practice social distancing.  N.T. 470:8-19.

39.  If Director Edwards, her supervisors, or staff observed another BCRC staff member not practicing social distancing, then that staff member would be reminded of the CDC guidelines on social distancing.  Exhibit R-23 at 1; N.T. 469:11-470:5, 472:15-18.

14

40.  Beginning April 7, 2020, BCRC provided disposable masks for all residents.  N.T. 477:20-21, 479:15-16.  BCRC residents are given one reusable mask every week, N.T. 477:25-478:3, and they can request and be given new masks or gloves at any time.  Exhibit R-23 at 2; N.T. 478:4-16, 479:20-23.

41.  On April 8, 2020, BCRC received a donation of cloth washable, reusable masks, and every resident received one.  N.T. 477:21-24.

42.  BCRC staff are required to wear a face mask at all times within the facility.  Exhibit R-23 at 2; N.T. 477:17-19.

43.  Since April 7, 2020, BCRC has required staff to wear gloves at all times.  N.T. 482:18-19.

44.  BCRC has 12 glove stations with boxes of gloves throughout the facility, including the common areas.  N.T. 484:12-485:6.

45.  The Immigration Health Services Corps provides on-site general primary care to all residents at BCRC, including mental health, medical care, assessments, and wellness visits.  N.T. 495:3-18, 21-22; 496:3-4.

46.  The Immigration Health Services Corps has over 15 full-time medical staff, including a physician assistant, nurses, and psychologists.  N.T. 496:7-13.

47.  Sick calls are available twice a day for adult residents, and 24 hours a day, 7 days a week for child residents.  Exhibit R-23 at 3.

48.  If a resident were to require hospitalization, BCRC would take that resident to a hospital that has entered into a memorandum of understanding with BCRC to provide care to its residents.  N.T. 496:6-497:11.

49.  Petitioner B.K.L.N. fell and hit his head while at BCRC, and afterward was unable to sleep.  B.L., B.K.L.N.'s father, does not believe his son

15

received appropriate treatment of diagnosis by the medical staff at BCRC.  N.T. 40:16-25, 41:1-3.

50.  Petitioner B.K.L.N. contracted a virus that lead to sores around his mouth and him not being able to eat.  Petitioner B.K.L.N. also had a fever and congestion for three days, and was not tested for COVID-19.  N.T. 37:17-25, 38:1-20.

51.  Petitioner B.L., B.K.L.N.'s father, testified that his family is living in constant fear.  N.T. 38:19-20.

52.  Petitioner P.M.'s two-year-old daughter, Petitioner H.M.N., had a fever while detained at BCRC, and was not tested for COVID-19.  N.T. 74:23-25, 75:1-25.

53.  Director Edwards has been in her position at BCRC since 2013.  N.T. 446:12-18.

54.  Director Edwards oversees all program components of BCRC, including policies, procedures, regulations, and standards.  N.T. 445:24-446:3.

55.  To ensure the program runs properly, Director Edwards takes trips around BCRC to observe what is going on in the facility.  N.T. 472:19-22.

56.  Director Edwards educates herself on the guidance the Centers for Disease Control and Prevention (CDC) has issued regarding COVID-19, and continually checks the CDC's guidance to ensure BCRC is following the updated revisions.  N.T. 457:3-13, 514:24-515:1.

57.  BCRC has trained its staff as to the CDC's COVID-19 guidance and has provided staff with written materials, which the staff must sign-off as having received.  N.T. 458:18-459:12, 515:2-15.

58.  BCRC staff are to adhere to hand hygiene, respiratory hygiene, and cough etiquette as found in the CDC's infection control guidance.  Exhibit R-23 at 2.

59.  BCRC has posted signage with the CDC's COVID-19 guidance for residents to view and read.  N.T. 486:13-17, 515:16-20.  That signage is written in English, Spanish, French, and Creole.  N.T. 515:21-516:5.

60.  BCRC staff had meetings with each family unit to educate the residents about COVID-19.  N.T. 488:4-11, 517:4-10.  During those meetings, a translator or language service was available.  N.T. 486:8-9, 488:12-18.

61.  As of March 18, 2020, BCRC suspended: all new admissions to the facility, Exhibits R-2, P-4 ¶ 15(a), N.T. 494:1-3; all visits to the facility, Exhibits R-2, P-4 ¶ 15(b), R-23 at 2, N.T. 493:12-14; and all field trips, Exhibits R-2, P-4 ¶ 15(c).

62.  BCRC has been screening staff for COVID-19 since the middle of March.  N.T. 491:7-9, 17-18.

63.  Before a staff member enters BCRC, he or she is asked screening questions recommended in the CDC's guidance.  Exhibit R-23 at 2; N.T. 491:7-9. These questions cover symptoms of COVID-19 such as fever, chills, cold and cough, difficulty breathing, and loss of senses of taste and smell.  N.T. 491:17-24.

64.  BCRC revises its screening questions for staff any time the CDC's guidance changes.  N.T. 491:9-10, 24.

65.  If an individual staff member answers "yes" to any of the screening questions, then BCRC will not allow that individual into the program areas and will send the individual home.  N.T. 491:11-13, 492:3-5.

66.   If the individual staff member answers "no" to the screening questions, then the individual's temperature is taken. Exhibit R-23 at 2, N.T. 491:13-14, 492:6-8.

67.   Pursuant to the CDC's guidance, if a staff member has a temperature of 100.4 degrees Fahrenheit or higher, then BCRC will not allow that individual into the program areas and will send the individual home. N.T. 492:6-21.

68.   Every resident is medically screened upon admission to BCRC. N.T. 493:23-24.

69.   Medical staff, who have access to program areas, look for symptoms of COVID-19 in BCRC residents.  N.T. 494:11-18.

70.   Medical staff take the temperatures of BCRC residents every day before lunch.  Exhibit R-23 at 3; N.T. 494:19-21.

71.   Medical staff only allow one family unit in the medical clinic at a time.  Exhibit R-23 at 3.

72.   If a resident presents with symptoms of COVID-19, BCRC will place the resident in quarantine in their bedroom.  N.T. 497:23-498:1.

73.   If a resident tests positive for COVID-19, BCRC will place the resident in medical isolation in a negative pressure room in the Medical Department. N.T. 497:20-22.  The negative pressure room has its own air system.  N.T. 498:2-7.

74.   One staff person at BCRC presented with potential COVID-19-like symptoms, was tested for the virus, and the result was negative.  Exhibits R-16, R-17; N.T. 498:16-23.

75.   Two residents at BCRC – Petitioner J.O.E. and her father – have presented with potential COVID-19-like symptoms, were tested for the virus, and

both residents tested negative.  Exhibits R-2, R-4, R-18; N.T. 498:24-499:4, 521:18-522:7.

76.  If someone in BCRC were suspected of having COVID-19, BCRC would report this to the Department as a critical incident.  N.T. 499:23.

77.  The Department conducts monthly monitoring inspections of BCRC.  N.T. 267:17-24.

78.  Ms. Roman is the Department's Licensing Technician responsible for inspecting BCRC.  N.T. 267:17-24.  She has been conducting monthly inspections of BCRC for approximately four years.  Exhibit P-4 ¶ 7.

79.  As part of their work duties, the Department's Licensing Technicians are responsible for observing whether conditions exist at a facility that would warrant an ERO.  N.T. 264:7-10.

80.  An ERO is considered when a facility licensed by the Department presents imminent health and safety issues that can only be mitigated through the removal of the licensee's residents.  Exhibit P-2 at 28:4-18.

81.  If a Licensing Technician finds conditions that may warrant an ERO, the technician will remain at the facility, contact his or her supervisor, and discuss how to proceed.  N.T. 264:21-25, 265:3-5.

82.  The Department may respond to a licensing violation by requiring the facility to develop a plan of correction to bring it into compliance with the applicable regulations.  Exhibit P-2 at 32:19-33:2; N.T. 266:12-23.

83.  License revocation is a remedy the Department uses for more serious licensing violations.  N.T. 266:24-267:4.

84.   Ms. Roman conducted a remote inspection of BCRC from March 31, 2020 to April 7, 2020 (March/April Inspection).  Exhibit R-3; N.T. 272:11-15, 284:1-8.

85.   The March/April Inspection included a telephone interview with Director Edwards, a visual walk-through of BCRC using the mobile application FaceTime, and a desk review of documents Ms. Roman requested from BCRC and ICE.  N.T. 291:6-13.

86.   During the FaceTime tour of BCRC, Ms. Roman was able to observe hallways, sanitary conditions, common areas, staff stations, and exterior conditions of the building.  N.T. 291:6-292:12.

87.   Director Edwards complied with Ms. Roman's directives while conducting the FaceTime tour of BCRC.  N.T. 292:18-21.

88.   As part of the March/April Inspection, Ms. Roman inspected the following documents:  fire drill records, Exhibit R-7, N.T. 297:24-298:13; child resident intake documents, Exhibits R-8-A, R-8-B, R-9-A, R-9-B, N.T. 303:20-304:23, 305:23-309:11; child resident admission reports, Exhibit R-11, N.T. 310:12-311:9, 311:24-312:1; records of initial physical examinations of child residents, child resident health and safety assessments, and child resident health and safety plans, Exhibits R-13-A, R-13-B, N.T. 313:12-318:1, 319:8-20, 320:6-13.

89.   Ms. Roman's interview of Director Edwards included questions about BCRC's COVID-19 mitigation efforts and policies that were put in place to reduce the likelihood of introducing COVID-19 into the facility.  N.T. 325:23-327:12.

90.   Based on the March/April Inspection, Ms. Roman made the following conclusions:

(a) that BCRC had implemented adequate COVID-19 mitigation policies, N.T. 329:16-25;

(b) that BCRC residents could adequately social distance due to the number of residents and size of the facility, N.T. 330:4-25; and

(c) that there was no evidence to support an ERO, N.T. 332:2-7.

91. On April 7, 2020, Ms. Roman sent an email to her supervisors detailing the findings of her inspection. Exhibit R-1; N.T. 332:15-334:8.

92. Ms. Roman conducted a remote inspection of BCRC on May 6, 2020 (May Inspection). N.T. 272:8-10.

93. On May 6, 2020, BCRC's total resident census was 16 residents – 10 adults and 6 children. Exhibit R-23 at 1.

94. Ms. Roman created a written report of her findings from the May Inspection, including her interviews with BCRC staff, observations during the video review, and summaries of interviews she conducted with BCRC residents. Exhibit R-23; N.T. 347:2-356:6.

95. Ms. Roman again utilized the FaceTime application to conduct remote video observation of the conditions at BCRC for the May Inspection. Exhibit R-23 at 4-5; N.T. 350:10-22.

96. Because residents of BCRC complained after being filmed during the March/April Inspection, Ms. Roman instead utilized the FaceTime application to observe live video from BCRC's surveillance monitors during the May Inspection. Exhibit R-10; N.T. 293:10-17, 350:19-21.

97. Through the May FaceTime tour, Ms. Roman was able to see hand-sanitizer stations, signage relating to COVID-19, and residents washing their hands. Exhibit R-23 at 4-5.

98.     As part of the May Inspection, Ms. Roman reviewed and considered the following documents:  fire drill records, Exhibit R-19, N.T. 342:2-343:4; child resident admissions reports, Exhibit R-20, N.T. 343:5-344:4; the list of residents who were released since the March/April Inspection, Exhibit R-21, N.T. 344:4-23; and emails Director Edwards sent to her regarding a resident's concerns related to COVID-19 and BCRC's response to those concerns, Exhibit R-22, N.T. 344:24-346:25.

99.  Ms. Roman conducted a video conference with Director Edwards as part of the May Inspection, which included the following subjects: BCRC's census; how many staff were working on each shift; whether anyone tested positive for COVID-19; the signs and symptoms that lead to the testing of a resident; whether the residents were compliant with social distancing; how staff communicate with residents; general precautions for COVID-19; screening of staff when they report to work; face masks and other PPE; the cleaning and sanitizing of the facility; visitation policies; and how BCRC was following the CDC's COVID-19 guidance.  Exhibit R-23 at 1-2.

100.   Ms. Roman conducted a telephone interview with BCRC's Medical Department as part of the May Inspection, which included the following subjects: the Medical Department's protocol for monitoring for COVID-19; sick calls; information on a resident child who was tested for COVID-19; whether the Medical Department observed social distancing; PPE; and the mental health of the residents.  Exhibit R-23 at 3-4.

101.   Medical staff reported to Ms. Roman that no resident has requested a sick call with signs or symptoms of COVID-19, and that no resident has

been afebrile since they started taking temperature checks on April 21, 2020. Exhibit
R-23 at 3.

102. As part of the May Inspection, Ms. Roman conducted interviews
with adult residents of BCRC, including the adult Petitioners. Exhibits R-23 at 5-7,
R-24; N.T. 353:20-355:1.

103. During the May Inspection, Ms. Roman utilized either BCRC staff
who speak the residents' native language or a language interpreter service to
communicate with BCRC residents. N.T. 359:25-361:11.

104. Ms. Roman's resident interviews included 13 questions that
specifically addressed the residents' concerns about COVID-19 and BCRC's
mitigation efforts. Exhibit R-23 at 5-6.

105. Ms. Roman took handwritten notes of her questions and the
responses she received during her resident interviews. Exhibit R-24; N.T. 356:7-
358:3.

106. All residents reported to Ms. Roman that they are physically
healthy and have been informed of COVID-19 through information from staff
members, the news, posters on the walls of the facility, and speaking with other
residents. Exhibit R-23 at 6.

107. As for measures to mitigate the spread of COVID-19, residents
described washing hands, wearing a mask, social distancing, using hand sanitizer,
wiping off surfaces and toys, and covering their faces when coughing or sneezing.
Exhibit R-23 at 6.

108. In her May Inspection report, Ms. Roman noted that a few
residents expressed feelings of stress and concern about their families' safety due to

23

COVID-19, particularly if BCRC staff were to become infected. Exhibit R-23 at 6; N.T. 380:4-7, 20-25, 381:1-3, 384:17-25, 385:1-25.

109.   Residents reported that BCRC staff wear face masks and that every family has their own bedroom. Exhibit R-23 at 6.

110.   Residents admitted to Ms. Roman that they do not wear their masks all of the time. Exhibits R-23 at 6, R-24 at 1; N.T. 379:19-22.

111.   Residents stated that they practice social distancing and were able to describe what that term means. Exhibit R-23 at 6.

112.   During the May Inspection, Ms. Roman saw residents closer than six feet apart and residents who were not wearing masks. N.T. 380:1-3, 384:34-35, 385:1-5.

113.   Based on the May Inspection, Ms. Roman made the following conclusions:

(a) that BCRC was being proactive in implementing COVID-19 mitigation measures, N.T. 358:19-359:24;

(b) that BCRC residents were safe and understood COVID-19 safety protocols, *id.*;

(c) that BCRC residents were not in immediate danger or harm due to COVID-19, *id.*;

(d) that there was no evidence to suggest the health and safety of BCRC child residents was at risk, N.T. 361:12-362:7; and

(e) that there was no basis for an ERO. *Id.*

114.   Ms. Roman sent her written monthly inspection report of BCRC to her supervisors. N.T. 355:20-356:6.

24

115.  As of May 29, 2020, the Department had not issued an ERO against BCRC.  N.T. 330:12-14.

## Evidentiary Ruling

The Court SUSTAINS the Department's hearsay objections to the testimony of Attorneys Cambria and Donohoe regarding statements Petitioners made to them about their health and obtaining medical treatment while at BCRC. Petitioners maintain that the hearsay exception in Pennsylvania Rule of Evidence 803(4), Pa. R.E. 803(4), for statements made for medical diagnosis and treatment applies.  However, the Court finds that Petitioners failed to establish that the statements Petitioners made to their immigration counsel, during the course of representation, were made for the purpose of receiving treatment, or that they were necessary and proper for diagnosis and treatment.  *Commonwealth v. Smith*, 681 A.2d 1288, 1291 (Pa. 1996).  Therefore, the Court holds that the exception in Pa. R.E. 803(4) does not apply here and the testimony is excluded as inadmissible hearsay.

## Discussion

Mandamus is an extraordinary remedy that lies only to compel performance of a ministerial act or a mandatory duty by a government official. *Sanders v. Wetzel*, 223 A.3d 735, 739 (Pa. Cmwlth. 2019); *Sinkiewicz v. Susquehanna County Board of Commissioners*, 131 A.3d 541, 546 (Pa. Cmwlth. 2015).  A petitioner seeking mandamus relief must establish that he or she (1) has a clear legal right, (2) the respondent has a corresponding legal duty, and (3) there is no other adequate remedy at law.  *Sanders*, 233 A.3d at 739; *Sinkiewicz*, 131 A.3d

25

at 546.   The purpose of a writ of mandamus is "to enforce rights that have been clearly established.  Mandamus may not be used to establish legal rights or to compel performance of discretionary acts. . . ." *Sanders*, 233 A.3d at 739 (quoting *Tindell v. Department of Corrections*, 87 A.3d 1029, 1034 (Pa. Cmwlth. 2014)).   *See also Mazin v. Bureau of Professional and Occupational Affairs*, 950 A.2d 382 (Pa. Cmwlth. 2008).   Moreover, "[t]he petitioner's right to performance of a mandatory duty must be well-defined, clear and specific; where any doubt exists, mandamus relief will not lie." *Kegerise v. Delgrande*, 183 A.3d 997, 1004 (Pa. 2018) (citation omitted).

Here, Petitioners have failed to prove they have a clear legal right and the Department has a mandatory duty to issue an ERO.  As for the second issue, Petitioners summarily argue that the Department's duty to issue an ERO under Regulation 20.37 is mandatory and leaves no room for discretion.  Their argument centers on the fact that Regulation 20.37 contains the word "will" – that "the Department <u>will</u> take immediate action to remove the clients from the facility or agency."  55 Pa. Code § 20.37 (emphasis added).  Petitioners maintain that use of this affirmative or conditional language constitutes a mandatory duty for the Department to issue an ERO.

However, Petitioners argument ignores the preceding language of Regulation 20.37 which states that an ERO is appropriate "[i]f the Department finds evidence of gross incompetence, negligence, misconduct in operating the facility or agency, or mistreatment or abuse of clients, likely to constitute an immediate and serious danger to the life or health of the clients. . . ." *Id.*  Taken, as it must, in its entirety, the plain language of the Regulation necessarily vests within the Department the discretion to determine if evidence exists that meets the applicable

26

legal standards.  More to the point, whether the conditions at BCRC meet the threshold for issuance of an ERO is a subjective determination within the Department's discretion and expertise.  Mandamus is simply not the appropriate vehicle or remedy as the Department does not have a mandatory duty to issue an ERO.

Even if Regulation 20.37 could be said to impose a mandatory duty on the Department, the Court finds that Petitioners have not demonstrated a clear legal right to an ERO under the circumstances.  Petitioners point to their subjective and unsupported allegations as the basis for claiming that the conditions at BCRC, and the facility's response to the COVID-19 pandemic, demonstrate gross incompetence, negligence, or misconduct likely to constitute an immediate and serious danger to their lives or health.

The uncontroverted evidence belies Petitioners' subjective fears and demonstrates that BCRC has taken steps to mitigate the risk of residents being exposed to or contracting COVID-19.  Specifically, BCRC suspended admissions, visitation and field trips as of March 18, 2020.  Staff has been trained regarding the CDC's COVID-19 guidance and are required to adhere to the CDC's infection control guidance pertaining to hand hygiene, respiratory hygiene, and cough etiquette.  While Petitioners claim no one from BCRC ever spoke to them regarding COVID-19, Director Edwards credibly testified otherwise.  She specifically stated that staff met with each family unit to educate residents about COVID-19, and that a translator or language service was available during those meetings.

Despite Petitioners' allegations to the contrary, BCRC has adequate space for social distancing as it is a 58,000 square foot facility with an additional outdoor recreation area of at least three acres.  While BCRC can accommodate up

27

to 96 residents, it currently only houses 13 residents and each family has its own
bedroom.  Moreover, BCRC has instituted policies that stagger use of the communal
showers and entry to the dining area to avoid families being in contact with one
another.   The ability to adequately social distance exists at BCRC, and it is
incumbent on the residents to follow this practice.

     As for cleaning and PPE, BCRC has significantly enhanced its
preventive cleaning of the facility.  It has also provided at least 11 hand sanitizer
dispensers throughout the facility, for both residents and staff, and residents are
encouraged to wash their hands.  Staff are required to wear face masks and gloves at
all times within the facility, and there are 12 glove stations located throughout
BCRC, including in the common areas.  While residents are typically only provided
one disposable face mask per week, they can request and will be given a new
disposable mask at any time, and they also have been given reusable masks.  Again,
while the record contains evidence that residents do not always practice social
distancing measures or wear their masks, that is inherently by choice and not due to
lack of ability.

     With respect to medical care, there are over 15 full-time medical staff
at BCRC and the facility has developed specific policies for placing a resident in
quarantine if he or she presents symptoms of COVID-19.  In addition, if a resident
tests positive for the virus, he or she will be placed in medical isolation in a negative
pressure room.  Sick calls are available twice a day for adult residents, and are always
available for child residents.  The residents were given a medical examination and
screened upon entry to BCRC, and medical staff takes the temperature of all
residents every day prior to lunch.  BCRC staff has also been screened daily since
March 2020.  Staff are not permitted to enter the facility if they have a fever of 100.4

or higher, or if they fail to appropriately answer any of the daily screening questions they are asked.  No residents or staff have tested positive for COVID-19.

Petitioners B.L. and P.M. both testified regarding the concerns they have regarding being detained at BCRC during the COVID-19 pandemic.  In particular, they expressed their fears about being in an enclosed environment, whether staff might bring the virus into the facility, and what type of care they may receive if they or their family members contract the virus.  The Court does not doubt Petitioners' testimony or the fear they expressed for themselves and their families during this unprecedented time.  However, these subjective concerns do not support the extraordinary remedy requested here, especially in light of the Department's ample evidence regarding BCRC's mitigation efforts.  Given the facts of record, Petitioners simply have not demonstrated a clear right to an ERO.

In the alternative, Petitioners argue that if application of the ERO standard falls within the Department's discretion, the Department's failure to issue an ERO during the COVID-19 pandemic is arbitrary or based on a mistaken view of the law.  Petitioners assert there is no written protocol for issuing an ERO other than Regulation 20.37 itself, and that the Department's decision not to issue an ERO here was made without sufficient information due to its deficient monitoring protocols of BCRC.

Petitioners are correct that mandamus can be appropriate, in certain circumstances, when a discretionary act is involved.  "Where the action sought to be compelled is discretionary, mandamus will not lie to control that discretionary act, . . . but courts will review the exercise of the actor's discretion where it is arbitrary or fraudulently exercised or is based upon a mistaken view of the law."  *Banfield v.*

*Cortes*, 110 A.3d 155, 175 (Pa. 2015) (quoting *Pennsylvania State Association of County Commissioners v. Commonwealth*, 681 A.2d 699, 701-02 (Pa. 1996)).

This narrow application of mandamus is not appropriate in the present case. First, the Department has exercised its discretion and this is not an instance of an agency merely "sitting on its hands" so to speak. Ms. Roman credibly testified regarding her remote inspections of the facility since March of this year, which included interviews with Director Edwards, members of the Medical Department, and Petitioners themselves. She also reviewed extensive documentation and was able to see the facility through use of the FaceTime application. Based upon these inspections, Ms. Roman concluded that the BCRC residents, including Petitioners, were not in immediate danger or harm due to COVID-19, there was no evidence that their health and safety was at risk, and there was no evidence to support an ERO. Ms. Roman relayed her findings and conclusions to her supervisors, and the Department determined that an ERO was not warranted. This is not an instance where the Department has refused to exercise its discretion, and the law is well settled that mandamus is not to be used to control the Department's discretion. *See, e.g., Banfield*; *Sinkiewicz*.

Second, the Court notes the ample evidence provided by the Department demonstrating the mitigation efforts BCRC has implemented to prevent residents from being exposed to COVID-19, as well as the facility's ability to place residents in quarantine or even medical isolation in a negative pressure room if they were to test positive. Given the uncontradicted evidence of record, the Court finds that the Department's decision that an ERO was not warranted is reasonable, and that the Department did not act arbitrarily in exercising its discretion.

## **Conclusion**

Petitioners have failed to prove they have a clear legal right and the Department has a mandatory duty to issue an ERO, two necessary elements for the issuance of a writ of mandamus.  Moreover, the Court finds that the Department acted reasonably in determining that an ERO was not warranted under the circumstances.  Accordingly, the Court finds in favor of the Department and against Petitioners.

_____

Michael H. Wojcik, Judge

31

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

C.N., B.L., and minor child B.K.L.N.;        :
J.A.R., E.G.M., and minor child J.G.;        :
M.N., P.M., and minor child H.M.N.;          :
M.C., G.S.C., and minor children             :
G.R.S.C. and N.B.T., M.E.L., E.O.E.,         :
and minor child J.O.E.,                      :
                          Petitioners        :
                                             :
              v.                             :        No. 268 M.D. 2020
                                             :
Pennsylvania Department of                   :
Human Services,                              :
                          Respondent         :

## O R D E R

NOW, this 7th day of July, 2020, after a non-jury trial in the above-captioned matter, the Court enters a verdict in favor of the Respondent Pennsylvania Department of Human Services and against Petitioners.

_____
Michael H. Wojcik, Judge

Certified from the Record

JUL - 7 2020

And Order Exit

# ATTACHMENT C



**NORCOR**
CORRECTIONS FACILITIES
Wasco-Gilliam-Hood River-Sherman
201 Webber Street
The Dalles, OR 97058
541-298-1576
Fax 541-298-1082

# COVID-19 ICE Notification Procedures
## (as of 07/09/2020)

**In addition to routine notifications as outlined in the NORCOR contract with Immigration and Customs Enforcement (ICE), NORCOR will make the following additional notifications:**

- NORCOR will report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.
- Notify both the ERO Field Office Director (or designee) and Field Medical Coordinator as soon as practicable, but in no case more than twelve hours after identifying any detainee who meets the CDC's identified populations potentially being at higher risk for serious illness from COVID-19, and/or the subclasses certified in Fraihat v. ICE, supra.

**NORCOR**
CORRECTIONS FACILITIES
Wasco-Gilliam-Hood River-Sherman
201 Webber Street
The Dalles, OR 97058
541-298-1576
Fax 541-298-1082

# COVID-19 Intake Procedures
## (as of 4/10/2020)

**The following additional intake procedures are in place until further notice:**

- When a new intake arrives, as soon as restraints are removed and a pat-down search is completed, give the youth a cup of soap and have them wash their hands for 20 seconds at the sink in the booking shower.
- Maintain a distance from the youth of at least six (6) feet as much as possible.
- Take the youth's temperature and record it on the attached questionnaire.  If the youth's temperature is 100.4 or greater, the custody episode will be refused unless it is meets restrictions.
- Have the youth put on a cloth mask.
- Ask the youth the questions on the questionnaire.
- Notify medical staff if youth answer "yes" to any of the questions on the questionnaire.
- If medical staff is contacted, notify Jeff or Dylan immediately – advise them of the questionnaire and the recommendation from medical staff.
- Complete the intake as usual, following medical advice if applicable.
- Place the youth in medical quarantine.  See Medical Quarantine procedures.

Medical Contact:
If during non-covered hours contact PA Craig Danner or the Nurse Supervisor Coleman.



**NORCOR**
CORRECTIONS FACILITIES
Gilliam - Hood River - Sherman – Wasco
Juvenile Detention
211 Webber Road
The Dalles, OR.  97058
(541) 298-1447
Fax (541) 298-1258

# COVID-19 Medical Quarantine Procedures
# (as of 4/10/2020)

**The following additional procedures are in place for youth with <u>no risk factors or symptoms</u> until further notice:**

- All new intakes will be in medical quarantine for a minimum of 72 hours.
- Medical quarantine will be in A wing unless otherwise directed.
- The youth will wear a mask at all times when out of his/her room.
- The youth will be offered regular opportunities to leave his/her room and sit at the wing table.  Staff will interact with the youth whenever possible, maintaining social distancing rules.  Meals will be eaten at the wing table, if the youth chooses to do so.
- Any items given to the youth will be disinfected after used by the youth (i.e. video players).
- Any time a youth is out of his/her room and returns, all high-touch areas outside the room will be disinfected.
- Any time a youth showers, the shower will be disinfected after use.
- If multiple youth are on medical quarantine, as much space as possible shall be kept between the youth's rooms.  The youth will alternate times out of the room at the wing table.
- If the youth is not symptomatic after 72 hours, he/she may be taken off medical quarantine AFTER consulting with medical staff and the Detention Manager.  The youth will continue to wear a cloth mask until they have been here 14 days.

**The following procedures are in place for youth who <u>have risk factors or exhibit symptoms</u>:**

- Staff will wear a mask at any time while interacting with a youth in medical quarantine.
- Meals will be served on paper plates with disposable utensils.  All items used for meals will be discarded after use.
- Follow medical direction for use of other personal protective equipment when dealing with youth
    **\*\*\*Use cloth masks whenever possible to preserve N-95 masks.\*\*\***



# NORCOR
## CORRECTIONS FACILITIES
Gilliam - Hood River - Sherman – Wasco
Juvenile Detention
211 Webber Road
The Dalles, OR.  97058
(541) 298-1447
Fax (541) 298-1258

---

# COVID-19 Visiting Procedures
# (as of 6/25/2020)

All visitors—personal, professional and volunteers—will be subject to the following conditions:

- All visits must be scheduled in advance by calling the facility.
- Personal visits will be non-contact only until further notice.
- Anyone entering the building will be required to wear a mask.  Visitors are encouraged to bring their own mask but will be provided a mask if they don't have one.
- Professional and volunteer visits may be face-to-face as long as six feet of distance can be maintained during the visit.
- All visitors going through Door 1 into the secure area will complete the COVID-19 screening questionnaire and have their temperature taken.  A "yes" answer to any question, and/or a temperature over 100.4 degrees, will result the visit being delayed for a minimum of 72 hours.
- Anyone passing the screening will wear a face mask and wash their hands at the sink in the Admin before entering the facility.
- Personal visits will be limited to a maximum of two people from the same household at a time.
- Detention Staff will clean and disinfect the entire visiting area, specifically emphasizing high touch areas, after each visit.
- Volunteers providing group activities will be provided space to maintain social distance from youth and staff during their visit.
- Detention Staff will clean and disinfect all areas used by volunteers with an emphasis on high touch areas.

**NOTE: A temple thermometer and screening tools are available in the Administration area.  The thermometer must be disinfected with a wipe immediately following use.**