Gretchen Nelson, SBN: 112566
Gabriel S. Barenfeld, SBN: 224146
NELSON & FRAENKEL LLP
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Phone: (213) 622-6469 / Fax: (213) 622-6019
Email: gnelson@nflawfirm.com
Email: gbarenfeld@nflawfirm.com

[Additional counsel listed on signature page]

*Attorneys for Amici and Movant*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM BARR, Attorney General of the United States, *et al.*, <br><br> Defendants. | Case No. 2:85-cv-04544-DMG-AGR <br><br> **EX PARTE APPLICATION FOR LEAVE TO PARTICIPATE AS AMICUS CURIAE** <br> [Submission on the Papers] <br><br> COURTROOM: <br><br> 8C <br> JUDGE: <br><br> Hon. Dolly Gee |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE** that on August 7, 2020 at 11:00 a.m. in Courtroom 8C of the above-titled court, located at United States Courthouse, 350 West 1st Street, Los Angeles, CA, 90012, movants RAICES, Proyecto Dilley, and Aldea - the People's Justice Center ("Aldea") (collectively "*Amici* applicants") will, and hereby do, move for an order permitting them to participate as *amicus curiae*

1

with regard to enforcement of the Court's June 26, 2020 order [Doc. # 833], and to bring to the Court's attention information relevant to the Juvenile Coordinator Reports [Doc. #882], which are currently scheduled to be heard at the status conference on the above-referenced date, time, and location.

This motion is made on the grounds that the Court has inherent authority to allow the participation of an *amicus curiae*. *Amici* applicants' participation as *amicus curiae* is helpful and desirable because it will facilitate a more complete understanding of the issues before the Court. This motion is based on this Notice and Notice of Motion, the accompanying brief of *Amicus Curiae* and supporting declarations, all papers and pleadings on file in this action, and upon such further evidence and argument as may be presented to the Court in connection with the motion.

Pursuant to Local Rule 7-19.1, *Amici* applicants advised counsel for Plaintiffs and counsel for Defendants as to the date and substance of movants' proposed *ex parte* application. Counsel for Plaintiffs did not express an opinion on *Amici* applicants' proposed *ex parte* application. Counsel for Defendants stated the following: "It appears that your proposed filing is not in compliance with the Court's orders both as to timing and the procedures ordered by the Court. The Court's June 26, 2020 Order provides that responses to the Juvenile Coordinator reports were due on July 31, 2020, and required that resolution of any disputed issues be sought before such responses were filed. ECF No. 833 at 5. The Court further stated that 'if the Court determines that relevant facts are being presented to the Court for the first time without having been shared in advance with the opposing side in an effort to achieve resolution, the Court will not address the issue to which those facts pertain.' *Id.* Because you have not complied with these requirements, it appears that your intended filing is in violation of the Court's Order, and the government therefore opposes it on that basis and takes the position that the Court should decline to address the issues to which your late-filed submission pertains. The government reserves the

1  right to submit further objections once it has the chance to review the substance of
2  your filing."

3  **Authority to Accept *Amici* Briefing**

4  A "district court has broad discretion to appoint *amicus curiae*." *Hoptowit v.*
5  *Ray,* 682 F.2d 1237, 1260 (9th Cir. 1982)*, abrogated on other grounds by Sandin v.*
6  *Conner,* 515 U.S. 472 (1995). The "classic role" of *amici curiae* is "assisting in a
7  case of general public interest, supplementing the efforts of counsel, and drawing the
8  court's attention to law that escaped consideration." *Miller-Wohl Co., Inc. v. Comm'r*
9  *of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982). "District courts frequently
10  welcome *amicus* briefs from nonparties concerning legal issues that have potential
11  ramifications beyond the parties directly involved or if the amicus has 'unique
12  information or perspective that can help the court beyond the help that the lawyers
13  for the parties are able to provide.'" *Safari Club Intern. v. Harris*, No. 2:14-cv-01856-
14  GEB-AC, 2015 WL 1255491, at *1 (E.D. Cal. Jan. 14, 2015) (*citing NGV Gaming,*
15  *Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005));
16  *see also California v. U.S. Dep't of Labor*, No. 2:13-cv-02069-KJM-DAD, 2014 WL
17  12691095, at *1 (E.D. Cal. Jan. 14, 2014) (leave to file *amicus* brief granted where
18  case implicated constitutional issues and therefore had "potential ramifications
19  beyond the parties directly involved"). "The touchstone is whether the *amicus* is
20  'helpful,' and there is no requirement 'that *amici* must be totally disinterested.'"
21  *California v. U.S. Dept. of Labor*,2014 WL 12691095, at *1 (citing *Hoptowit*, 682
22  F.2d at 1260). This Court therefore has authority to permit *Amici* applicants to
23  participate as *amicus curiae*, and grant leave to file the attached brief.

24  *Amici* applicants are three legal service providers that represent families
25  (parents and children) that are detained by Immigration and Customs Enforcement
26  ("ICE"). *Amici* applicants bring unique information and perspective to the issues
27  currently before the Court and should be granted leave to submit a brief on those
28  important issues. *See* Decision on Application for *Ex Parte* Intervention [Doc. # 896]

1    (noting that "[t]he legal service providers may continue to file *amici curiae* and

2    present much-needed facts and legal arguments before the Court"). *See Missouri v.*

3    *Harris*, No. 2:14-cv-00341-KJM-KJN, 2014 WL 2987284, at *2 (E.D. Cal. Jul. 1,

4    2014) ("An *amicus* brief should normally be allowed when, among other

5    considerations, the *amicus* has unique information or perspective that can help the

6    Court beyond the help that the lawyers for the parties are able to provide.") (internal

7    citation omitted). *Amici* applicants reviewed the ICE Juvenile Coordinator's July 24,

8    2020 Report (the "JC Report") and identified areas of oversight and material factual

9    misrepresentations. The *amicus* submission will provide factual clarifications *Amici*

10   applicants are uniquely positioned to provide. Ultimately, *Amici* applicants' *amicus*

11   submission will offer context and facts that clarify the current reality at the family

12   detention centers and ICE's ongoing disregard for its obligations under the *Flores*

13   Settlement Agreement.

14          Accordingly, for the reasons set forth herein, the Court should grant leave for

15   *Amici* applicants to submit an *amicus* brief.

16                              **Interest of *Amici* Applicants**

17   **Refugee and Immigrant Center for Education and Legal Services**

18          The Refugee and Immigrant Center for Education and Legal Services is a

19   501(c)(3) non-profit legal and social services agency based in San Antonio, Texas,

20   that defends the rights of immigrants and refugees, empowers individuals, families,

21   and communities, and advocates for their liberty and justice. RAICES' Family

22   Detention Services program ("RAICES") provides *pro bono* legal services for non-

23   citizen asylum seekers detained at the Karnes Family Residential Center ("Karnes")

24   in Karnes City, Texas through a model of universal representation. The population

25   served by RAICES at Karnes is family units comprised of *Flores* Class Member

26   children and their accompanying parents—who are not class members. The scope of

27   RAICES' legal services generally includes know your rights presentations and

28   advisals, legal representation in expedited removal proceedings, and advocacy on

                                              4

behalf of the parents and children.

**Proyecto Dilley**

Proyecto Dilley (formerly known as the "CARA Pro Bono Project" and "Dilley Pro Bono Project") provides free legal services to asylum-seeking mothers and children who are detained at the South Texas Family Residential Center ("STFRC" or "Dilley") in Dilley, Texas through a volunteer-based model providing universal representation. Since December 2014, Proyecto Dilley has represented more than 99 percent of the families detained at STFRC.

**Aldea - The People's Justice Center**

Aldea was formed, in part, as a response to the continued detention of mothers, fathers, and children at the Berks County Residential Center ("Berks"), an immigrant detention center in Leesport, Pennsylvania that holds asylum seeking families. Aldea's attorneys have represented detained families at Berks for nearly four years and offers universal representation for every family detained in Pennsylvania. Since 2016, Aldea has represented thousands of families who were detained in Berks and currently represents 100 percent of all families detained in Berks. It is Aldea's mission to ensure that no parent and child detained at Berks is forced to navigate the complex immigration process alone.

**RAICES, Proyecto Dilley, and Aldea**

This case is of critical concern to the *Amici* applicants in light of their longstanding commitment to asylum-seekers and their advocacy on behalf of detained families, including detained children, in particular. The *Amici* applicants seek to protect the rights of immigrant children in accordance with the language and intent of the *Flores* Settlement.

### Conclusion

For the foregoing reasons, this Court should grant *Amici* applicants leave to file the accompanying *Amicus* Brief and declarations.

1    Respectfully Submitted,

2

3    DATED: August 6, 2020        NELSON & FRAENKEL LLP

4                              /s/ Gabriel S. Barenfeld

5                              Gretchen Nelson, SBN: 112566
                             Gabriel S. Barenfeld, SBN: 224146

6                              601 So. Figueroa Street, Suite 2050
                             Los Angeles, CA  90017

7                              Tel:  (213) 622-6469
                             Fax:  (213) 622-6019

8                              Email:  gnelson@nflawfirm.com;

9                              gbarenfeld@nflawfirm.com

10

11                             ANDREA MEZA, Esq.
                            Director of Family Detention Services

12                             RAICES
                            2511 N Loop 1604 W, Suite 201

13                             San Antonio, Texas 78258
                            Andrea.Meza@raicestexas.org

14                             (*Pro Hac Vice* admission pending)

15

16                             SHALYN FLUHARTY, Esq.
                            Director

17                             Proyecto Dilley
                            Shay@caraprobono.org

18                             (Pro Hac Vice admission pending)

19

20                             BRIDGET CAMBRIA, Esq.
                            Executive Director

21                             ALDEA - The People's Justice Center
                            532 Walnut St.

22                             Reading, PA 19601
                            bridget@aldeapjc.org

23                             (Pro Hac Vice admission pending)

24                             *Attorneys for Amici*

25

26

27

28

1   Gretchen Nelson, SBN: 112566
2   Gabriel S. Barenfeld, SBN: 224146
    NELSON & FRAENKEL LLP
3   601 So. Figueroa Street, Suite 2050
4   Los Angeles, CA  90017
    Phone:  (213) 622-6469 / Fax:  (213) 622-6019
5   Email:  gnelson@nflawfirm.com
6   Email:  gbarenfeld@nflawfirm.com

7   [Additional counsel listed on signature page]

8   *Attorneys for Amici and Movant*

9                    UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11                        WESTERN DIVISION

12

13   JENNY LISETTE FLORES, *et al.*,       Case No. 2:85-cv-04544-DMG-AGR

14        Plaintiffs,

15             v.                          **[PROPOSED] AMICUS BRIEF**

16   WILLIAM BARR, Attorney General of
     the United States, *et al.*,
17                                         COURTROOM:
          Defendants.
18                                         8C
                                           JUDGE:
19

20                                         Hon. Dolly Gee

21

22

23

24

25

26

27

28

                                    i

# TABLE OF CONTENTS

I.    Introduction ......................................................................... 1

II.   Summary of Argument ........................................................ 2

III.  Argument............................................................................. 4

      A.   ICE continues to fail to conduct individualized custody determinations or make and record continuous efforts at prompt release. ................................. 4

           i.   ICE continues to rely on blanket factors rejected by this Court to justify prolonged detention. ..................................................................... 4

           ii.  ICE has failed to make and record any efforts to release Class Members who are plaintiffs in D.A.M. v. Barr since its June 10, 2020 Interim Report, despite additional evidence that removal of said Class Members is not imminent............................ 8

           iii. ICE has failed to individually assess Class Members with COVID-19 risk factors as identified by the CDC for release and continues to detain minors in conditions this Court has deemed unsafe and unsanitary. ................................... 10

      B.   ICE's refusal to establish procedures and infrastructure to implement a Know-Your-Rights protocol  does not justify ICE's failure to (1) make and record efforts to release children from detention, (2) explain why each child detained over 20 days remains detained, and (3) release children without unnecessary delay. ................................. 12

           i.   Defendants' refusal to establish a Know-Your-Rights protocol and release infrastructure does not excuse its failure to comply with the terms of the FSA and this Court's orders............................... 12

           ii.  Although Defendants argue that they are exempt from reporting individualized reasons for the ongoing detention of Class Members who have been detained for more than 20 days until a KYR protocol is proposed and approved by the court, ICE continues to use the same process it utilized in mid-May with newly placed Class Members at FRCs. .................................... 15

      C.   COVID-19 outbreaks continue to grow at Karnes and Dilley because ICE fails to do the "basics," thereby keeping Class Members at significant risk of harm. ......................................................................... 17

           i.   ICE's continued intake of families at the FRCs

i

and its quarantine practices exacerbate the unsafe and unsanitary conditions for Class Members in ICE custody.................................................. 18

    ii. Six weeks after this Court's June 26, 2020 Order, ICE is still failing to properly implement "basic" public health measures at the FRCs. ............ 20

        1. Social Distancing...................................................... 20

        2. Masking and PPE ...................................................... 20

        3. Testing ...................................................................... 21

        4. Contact Tracing ....................................................... 22

IV.    Conclusion ........................................................................ 23

23

## I. __Introduction__

The Refugee and Immigrant Center for Education and Legal Services ("RAICES"), Proyecto Dilley, and Aldea - the People's Justice Center ("Aldea") (collectively, "*Amici*") file this brief as *amici curiae* in accordance with the Court's June 26, 2020 Order [Doc. # 833], and to bring to the Court's attention information relevant to the July 24, 2020 ICE Juvenile Coordinator Report ("JC Report"). [Doc. # 882-1]. *Amici* provide direct legal services to families detained at the three family detention centers: the Karnes County Family Residential Center ("Karnes"), South Texas Family Residential Center ("STFRC" or "Dilley"), and the Berks County Residential Center ("Berks").

The matters before the Court are highly fact specific. In order to accurately assess Defendants' compliance with the terms of the *Flores* Settlement Agreement (the "Agreement" or "FSA"), the Court ordered the ICE Juvenile Coordinator to file an Interim Report on July 24, 2020 and set specific requirements for the report in its April 24, May 22, and June 26, 2020 Orders. *Flores v. Barr*, 2:85-cv-4544-DMG-AGR (C.D. Cal. Apr. 24, 2020) ("April 24, 2020 Order") [Doc. # 784]; *Flores*, 2:85-cv-4544-DMG-AGR (C.D. Cal. May 22, 2020) ("May 22, 2020 Order") [Doc. # 799]; June 26, 2020 Order [Doc. # 833]. Similar to the interim reports filed by the ICE Juvenile Coordinator on May 15, 2020 [Doc. #788-1], and June 10, 2020 [Doc. # 813-1], the July 24, 2020 JC Report fails to respond to issues explicitly directed by the Court. *See* Br. of *Amicus Curiae* Aldea, Proyecto Dilley, and RAICES (June 25,

1

2020) [Doc. # 831] (noting deficiencies in ICE's June 2020 Interim JC Report). In particular, Defendants again have not provided specific *individualized* reasons for why each Class Member remains detained beyond 20 days and information regarding "policies and/or practices aimed at identifying and protecting minors who are at heightened risk of serious illness or death should they contract COVID-19." June 26, 2020 Order [Doc. # 833]. Absent this information, the Court cannot determine whether ICE is conducting continuous, individualized custody determinations and whether detention conditions are safe and sanitary as required by the FSA.

The issues presented by Plaintiffs and Defendants in the joint response to the JC Report on July 31, 2020  [Doc. #898] and the Joint Status report on August 5, 2020 [Doc. # 905] magnify the Court's time-sensitive need for full and complete information regarding the detention conditions Class Members face at each Family Residential Center ("FRC"). *Amici* seek to assist the Court by providing additional facts and legal arguments regarding Defendants' ongoing non-compliance with the terms of the Agreement and this Court's orders. *Amici*'s unique perspective as on-the-ground observers and legal services providers are not provided to the Court by either party. *Amici* applicants present first-hand reports from Class Members and their parents to provide the Court with material and otherwise unavailable information.

## II.   <u>Summary of Argument</u>

On April 24, 2020, the Court ordered the ICE Juvenile Coordinator to submit

2

interim written reports during the COVID-19 pandemic. [Doc. # 784]. In addition to reporting on compliance with guidelines from the Centers for Disease Control and Prevention ("CDC") for detention facilities, the Court order also directed the Juvenile Coordinator to report on the measures taken to expedite the release of Class Members to suitable custodians during the COVID-19 health emergency, whether ICE is making and recording individualized release determinations and redeterminations for each Class Member held in the FRCs, and the specific reasons children at FRCs remain detained for more than 20 days. April 24, 2020 Order, at 20–21 [Doc # 784].

Since this Court's April 24 order, the Court has continued to require regular Juvenile Coordinator reports. Most recently, on July 24, 2020 the ICE Juvenile Coordinator filed its current interim report with the Court. [Doc. 882]. *Amici*—the direct service providers to *Flores* Class Members detained by ICE at the FRCs— have closely reviewed the Juvenile Coordinator's Report.

The Juvenile Coordinator's submission is non-responsive to the Court's April 24, 2020 [Doc. 784], May 22, 2020 [Doc. 799], and June 26, 2020 [Doc. 833] Orders. As detailed below, the report is inaccurate and incomplete in material ways. Critically, rather than providing FSA-compliant reasons to justify the prolonged detention of Class Members, the Juvenile Coordinator's Report blames the failure to release Class Members on the parties' inability to agree on a know-your-rights ("KYR") protocol.

ICE continues to show lack of compliance with Paragraph 18 of the FSA,

3

which requires Defendants to "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." *Flores Agreement*, at ¶ 18 [Doc. # 101].

ICE's continued failure to comply with the FSA, especially while ICE continues to hold *Flores* Class Members in congregate settings in the midst of a global pandemic, is egregious and requires this Court's intervention.

## III.   Argument

### A. ICE continues to fail to conduct individualized custody determinations or make and record continuous efforts at prompt release.

There are currently at least 121 Class Members detained at the three FRCs: 7 at Berks, 36 at Karnes; and 78 at Dilley. The majority of these Class Members—a total of 111 children—have been detained over twenty days. Many of these Class Members are approaching a year in detention; this month, 23 children currently detained at Dilley will have spent one year in detention, and the average length of detention is 248 days.

> *i.   ICE continues to rely on blanket factors rejected by this Court to justify prolonged detention.*

The only Agreement-compliant explanation for detaining a Class Member beyond five days is that the Class Member is a danger to the community or a flight risk. FSA, ¶ 14. The JC Report does not assert that any Class Member is a danger to the community or a flight risk. Rather, Defendants rely on blanket factors, including

4

immigration case status,[1] federal court stays, and the alleged lack of designation of a suitable sponsor to justify the detention of Class Members during a global pandemic.

This Court has repeatedly required ICE to demonstrate its compliance with the Agreement's requirements to conduct individualized custody determinations for Class Members and to "make and record" continuous efforts towards release. FSA ¶¶ 14, 18; April 24, 2020 Order, at 20–21 [Doc. # 784]; May 22, 2020 Order, at 3 [Doc. # 799]; June 26, 2020 Order, at 5 [Doc. # 833]. Once again ignoring the Court's orders, the JC Report submits simply that 73 Class Members remain detained because they are subject to a stay of removal; 16 Class Members remain detained because they are pending a credible fear interview; and 11 Class Members remain detained because—according to ICE—they have valid removal orders and are subject to imminent deportation. JC Report at 4 [Doc. #882-1].

This Court has repeatedly condemned ICE's use of immigration case status to justify the detention of Class Members. *See* June 26, 2020 Order, at 5 [Doc. 833] ("[C]ursory explanations such as 'In custody—pending IJ hearing/decision,' 'pending USCIS response,' 'plaintiff in a pending lawsuit,' or any other justification that the Court has already rejected...shall not be acceptable explanations."). That language is precisely what this Court criticized in both its April 24 and May 22

---

[1] A great number of Class Members no longer have final orders of removal due to the vacatur of the asylum "Transit Ban" which was determined to bar them from relief. *See Capital Area Immigrants' Rights Coalition v. Trump*, 2020 U.S. Dist. LEXIS 114421 (D.D.C. June 30, 2020).

orders. April 24, 2020 Order [Doc. 784]; May 22, 2020 Order [Doc. 779]. Nonetheless, ICE continues to inform the Court that Class Members remain detained categorically based upon the posture of their immigration case. Exhibit A (Declaration of Andrea Meza), at ¶¶ 5-7; Exhibit B (Declaration of Bridget Cambria), at ¶¶ 9–14. In fact, in one recent response to an inquiry regarding the detention of Class Members beyond 20 days, sent July 27, 2020, ICE specifically explained the Class Member's detention by stating that he was "currently pending IJ review." [Doc. #363].

Defendants also attempt to justify the indefinite detention of Class Members based upon a Class Members' lack of designation of a sponsor other than their detained parent. More specifically, Defendants assert a Class Member's refusal to separate from their parents creates a valid justification for detention under the Agreement. It does not. Class Members did not negotiate an Agreement that requires them to choose between freedom from harmful detention conditions and family unity; Class Members negotiated a legally binding contract that provides them with the right to be with their parents in the first instance and the right to be released from detention. FSA ¶¶ 11, 19. The maintenance of family unity of Class Members, who are minors, and their parents, cannot be deemed a "waiver" of their right to release under the Agreement.[2]   Defendants cannot excuse their non-compliance by righteously, but

---

[2] "[A] 'waiver' in the strictest sense of that word, [...] is, an 'intentional relinquishment of a known right.'" R. Anson, Principles of the Law of Contract 419 (Arthur L. Corbin ed., 3d Am. ed. 1919),

1   falsely, asserting its interest in preserving family unity.

2
3           Defendants' attempt to justify detention of Class Members based solely upon
4   Class Members' refusal to separate from their parent defies Defendants' obligations
5   under 8 C.F.R. § 1236.3.  This regulation requires ICE to assess whether an adult
6   should be released from ICE custody to effectuate the release of a child from custody.
7
8   ICE "shall" consider the release of a child's potential adult sponsor on a case-by-case
9   basis. 8 C.F.R. § 1236.3. While ICE maintains broad discretion to release a parent or
10  other potential adult sponsor from ICE custody or not, 8 C.F.R. § 1236.3 makes clear
11  that ICE's duty to conduct individualized release assessments for children includes
12
13  the obligation to consider a parent for release. Read together, Defendants' obligations
14  under the Agreement and 8 C.F.R. § 1236.3 require ICE to document the reasons it
15  will or will not exercise its discretion to release a parent in order to effectuate the
16  release of a child. Here, ICE has submitted zero evidence that it has considered on an
17
18  individualized case-by-case basis whether Class Members may be released to their
19  detained parents, and if not, why not.
20
21          As Justice Scalia recognized when the Supreme Court analyzed 8 C.F.R.
22
23
    _____
24  *quoted in* Black's Law Dictionary, 1813 (10th ed. 2014). "There are ... two basic rationales that
25  courts employ in deciding waiver cases: the 'voluntary' and 'knowing' framework used in criminal
    law, and the contractual framework used in civil law." Edward L. Rubin, Toward a General
26  Theory of Waiver, 28 UCLA L. Rev. 478, 528 at note 1 (1981). Should the Court consider any
    KYR protocol that indicates that lack of consent to separate operates as a waiver of the Class
27  Members' rights under the Agreement, amici respectfully request the opportunity to fully brief
    the issues of whether any purported consent or "waiver" can be "knowing" or "voluntary" under
28  the circumstances of the pandemic.

§ 1236.3 (then 8 C.F.R. § 242.24), the Defendants' responsibility to "assure itself that someone will care for" children that they release from their custody "is easily done when the juvenile's parents have also been detained and the family can be released together." *Reno v. Flores*, 507 U.S. 292, 295 (1993). ICE has submitted no evidence in the JC Report to satisfy this Court's requirements to continuously seek the release of Class Members in ICE custody, and the evidence provided by *Amici* demonstrates ICE's ongoing disregard of the Court's prior orders, the Agreement, and 8 C.F.R. § 1236.3.

> ii. *ICE has failed to make and record any efforts to release Class Members who are plaintiffs in* D.A.M. v. Barr *since its June 10, 2020 Interim Report, despite additional evidence that removal of said Class Members is not imminent.*

Seventy-one Class Members are plaintiffs in *D.A.M. v. Barr* and have the benefit of a stay of removal issued by Judge Christopher R. Cooper of the District Court of the District of Columbia. *D.A.M. v. Barr*, No. 1:20-cv-1321-CRC (D.D.C. July 23, 2020). These Class Members have been detained, on average, for 275 days. By August 22, 2020, ten *D.A.M.*-plaintiff Class Members will be detained for one full year.

Since the June 10, 2020 JC Report, litigation developments indicate that this subsection of Class Members is significantly less likely to be removed from the United States imminently, if at all. These developments—detailed *infra*—highlight Defendants' failure to conduct individualized release assessments: despite a material

8

change in the likelihood of removal for each *D.A.M.*-plaintiff Class Member, the JC Report indicates yet again that Class Members have final orders of removal and their removal is imminent. This is false. The removal of *D.A.M.*-plaintiff Class Members is not imminent because these Class Members, and their parents, no longer have final orders of removal at all.

On July 16, 2019, the Departments of Justice and Homeland Security jointly promulgated the Safe Third Country Transit Ban ("Transit Ban"), 8 C.F.R. § 208.13(c)(4), which rendered asylum-seeking families at the southern border categorically ineligible for asylum with few exceptions. *See* 84 Fed. Reg. at 33,835. The Transit Ban further provided that asylum seeking families barred from asylum under 8 C.F.R. § 208.13(c)(4) are automatically and conclusively determined not to have a "credible fear" of persecution in their home countries. *See* 8 C.F.R. § 208.30(e)(5)(iii). Approximately 60 percent of all Class Members who remain detained at the FRCs were subjected to the Transit Ban and have negative credible fear determinations based solely upon the application of 8 C.F.R. § 208.13(c)(4).

On June 30, 2020, Judge Timothy J. Kelly of the District Court for the District of Columbia entered a final Order vacating the Transit Ban, holding that the government "unlawfully promulgated the Rule without complying with the APA's notice-and-comment requirements, because neither the 'good cause' nor the 'foreign affairs function' exceptions are satisfied on the record here." *Capital Area*

*Immigrants' Rights Coalition v. Trump*, 1:19-cv-02117-TJK, 2020 WL 3542481, at

*1 (D.D.C. June 30, 2020). "Having found that the Rule was enacted unlawfully, the

Court sees no reason why it should not be vacated." *Id*. Just a few days later, in *East*

*Bay Sanctuary Covenant v. Barr*, the Ninth Circuit Court of Appeals, relying on

different grounds, similarly concluded that the Transit Ban is unlawful. *E. Bay*

*Sanctuary Covenant v. Barr*, Nos. 19-16487, 19-16773 (9th Cir. July 6, 2020).

Vacatur of the Transit Ban means the unlawfully-enacted regulation that resulted in

the purported final orders of removal for *D.A.M.*-plaintiff Class Members "has no

'force or effect of law' and therefore is void *ab initio*." *United States v. Goodner*

*Bros. Aircraft, Inc*., 966 F.2d 380, 384 (8th Cir. 1992) (citing *Chrysler Corp. v.*

*Brown*, 441 U.S. 281, 313, (1979)). Accordingly, all Class Members who were

subjected to the Transit Ban have no order of removal at all, and instead, are due a

*de novo* credible fear interview under the lawful standard.

>    iii.  *ICE has failed to individually assess Class Members with*
>          *COVID-19 risk factors as identified by the CDC for release and*
>          *continues to detain minors in conditions this Court has deemed*
>          *unsafe and unsanitary.*

ICE continues to detain Class Members with COVID-19 risk factors as

identified by the Centers for Disease Control and Prevention (CDC)[3] in conditions

---

[3] *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited August 6, 2020).

that this Court has deemed unsafe and unsanitary while failing to individually assess their continued detention, in violation of the FSA. *See* June 2020 Order, at 3, 4 [Doc. # 833], Exhibit A (Meza Decl.), at ¶ 19 (describing that the floor in a baby's room had not been mopped for 11 days). The CDC specifically lists asthma, respiratory conditions, and high blood pressure among conditions that might increase the risk for severe illness from COVID-19 for individuals of all ages, and also advises that children who have "medical complexity, who have neurologic, genetic, metabolic conditions, or who have congenital heart disease" are at an increased risk for "severe illness from COVID-19 compared to other children."[4]

Among those detained beyond twenty days with risk factors and vulnerabilities are a number of children under the age of two, a three-month-old infant, a child suffering from chronic bronchitis, a one-year-old who suffered from neonatal asphyxia, children with asthma, children with viral stomatitis, and children with heart murmurs. Exhibit A (Meza Decl.), at ¶¶ 10–14; Exhibit C (Declaration of Shalyn Fluharty), at ¶ 7. The conditions at the FRCs have exacerbated Class Members' medical issues. *See* Exhibit D (Declaration of C.M.), at ¶ 13; Exhibit E (Declaration of S.J.A.); Exhibit P (Declaration of L.G.); Exhibit Q (Declaration of M.E.F.), at ¶¶ 22-24. Indeed, this Court has already determined that the conditions at the FRCs do not comply with the FSA's safe and sanitary and medical care requirements. *See*

---

[4] *Id.*

April 24, 2020 Order, at 6 [Doc. # 784].

Parents of Class Members report having received information from ICE stating that it cannot detain individuals with certain enumerated medical conditions or risk factors. *See* Ex. D (C.M. Decl.), at ¶¶ 2, 3. ICE continues to detain those Class Members even when they have disclosed their risk factors to ICE and ICE has apparently acknowledged that its policy is not to detain such individuals. *Id*. ICE has not provided custody determinations based upon a Class Member's medical conditions.[5] *See* Ex. D (C.M. Decl.), Ex. A (Meza Decl.), at ¶¶ 10–14, Ex. Q (M.E.F. Decl.), at ¶¶ 32-33. Evidence of custody review based on egregious medical conditions is notably absent from the JC Report, as is Defendant's continued failure to file copies of the policies and practices it employs to identify and protect minors who are at heightened risk of serious illness or death should they contract COVID-19.

**B. ICE's refusal to establish procedures and infrastructure to implement a Know-Your-Rights protocol[6] does not justify ICE's failure to (1) make and record efforts to release children from detention, (2) explain why each child detained over 20 days remains detained, and (3) release children without unnecessary delay.**

      *i. Defendants' refusal to establish a Know-Your-Rights protocol and release infrastructure does not excuse its failure to comply with the terms of the FSA and this Court's orders.*

---

[5] *See also Fraihat v. ICE*, No.5:19-cv-1546-JBG, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020).

[6] As the Court used the term "know-your-rights protocol" in its July 25, 2020 Order [Doc. 887], *Amici* adopt that term here. In *Amici's* prior *amicus* brief, *Amici* used the term "waiver" [Doc. 831]; however, both terms refer to the same process.

In 2017, Defendant ICE argued it was not required to release children because, in part, it lacked an infrastructure analogous to that of the Office of Refugee Resettlement to release children to non-parent sponsors. *See Flores v. Sessions*, 394 F. Supp. 1041, 1067–68 (C.D. Cal. 2017) [Doc. # 363].  Defendants have therefore been aware of their responsibility to develop some protocol to advise Class Members and their detained parents of their rights under the Agreement, and to create associated infrastructure to allow the release of children to a non-parent/guardian custodian in accordance with Paragraphs 14, 15, and 17 of the Agreement, since at least June 27, 2017. *See id.* at 1067–68.

Specifically, in 2017 the Court found that Defendants, "[b]y failing to conduct suitability analyses of non-parent/guardian custodians seeking custody of class members," had "essentially concede[d]" their violations, and held that the "Defendants are not absolved of their contractual obligation to make and record efforts to release," either by the terms of the statutory provisions governing expedited removal, or by any "purported lack of institutional resources" to screen potential custodians. *Id.* at 1068.  This Court's June 26, 2020 Order similarly reiterates this imperative. June 26, 2020 Order, at 5 [Doc. # 833]. Defendants now claim that in order to comply with the Juvenile Coordinator's reporting requirements, they "must develop *and implement* a process by which it can obtain the consent of a parent/legal guardian for the release of his or her child from custody, or otherwise allow the parent

to waive the child's *Flores* release rights." JC Report, at 3 [Doc. # 882-1]. This Court

has already rejected ICE's argument that its "lack of institutional resources to screen"

non-parent/guardian custodians should excuse its failure to "make and record efforts

to release children." *Flores*, 394 F. Supp. 3d at 1068.

As

Defendants correctly point out, it would take a significant amount of time to create a

system that fully complies with all of the requirements of the Agreement. The

Supreme Court also already addressed the government's concerns, which Defendants

continue to express, that "the Service . . . lacks the "expertise," and is not "qualified,"

to do individualized child-placement studies." *Reno*, 507 U.S. 292, 312 (1993). The

Supreme Court found that, given the order of preference for the release of minors,

beginning with "parents, whom our society and this Court's jurisprudence have

always presumed to be the preferred and primary custodians of their minor children"

and including a provision for the simultaneous release of parents from custody "on a

case-by-case basis," the government's normal practice of "keep[ing] legal custody of

the juvenile, plac[ing] him in a government-supervised and state-licensed shelter-

care facility, and continu[ing] searching for a relative or guardian" is sufficient to

avoid requiring "expenditure of administrative effort and resources that the Service

is unwilling to commit" in order "to give custody to strangers." *Reno*, 507 U.S. at

310–12.

In the three years since the Court advised Defendants that they were in

violation of the Agreement by failing to have such a system in place, Defendants have been unable and unwilling to complete even the first step of creating such a system: filing a proposal with the Court. Given Defendants' failure to develop a process in accordance with the Court's conclusions over the last three years, they should not now claim that the lack of a process justifies their refusal to perform individualized assessments of custody determinations. *See Flores v. Barr*, 2:85-cv-4544-DMG-AGR, at 2 (July 25, 2020) ("July 25, 2020 Order") ("[A]s the Court's June 26, 2020 Order indicates, the ICE Juvenile Coordinator can articulate individualized reasons to retain custody over Class Members that the Court will evaluate.") [Doc. # 887]. As the Court recently reminded Defendants for the umpteenth time, "nothing in the Court's prior orders precludes ICE from continuing to promptly release eligible Class Members, *as required under the FSA and as this Court has ordered time and again*." *Id.* (emphasis added). Allowing Defendants to use this excuse would essentially place Class Members in a legal Catch-22 during a global pandemic, whereby they cannot be released until after a process has been established, but the government nevertheless is unable to establish said process. Such an allowance would essentially nullify Class Members' right to release under the Agreement and this Court should reject it, as it has before.

        ii. *Although Defendants argue that they are exempt from reporting individualized reasons for the ongoing detention of Class Members who have been detained for more than 20 days until a KYR protocol is proposed and approved by the court, ICE*

> *continues to use the same process it utilized in mid-May with newly placed Class Members at FRCs.*

The JC Report states that, given Defendants' understanding that the development and implementation of a "*Flores* waiver process" is necessary for compliance with her Court-ordered reporting requirements, she "discussed this situation with the Special Monitor, who agreed that, for purposes of this report, the agency may provide a general statement indicating the agency did not, and could not, conduct parole reviews while awaiting the outcome of the meet and confer process, and subsequent to implementation of any Flores waiver process." JC Report, at 4 [Doc. # 882-1]. However, Defendants' recently-expressed position that they "will not voluntarily agree to any protocol" would eliminate ICE's own excuse for their delay. Joint Status Report, at 6 [Doc. # 902]. While the Juvenile Coordinator's interpretation of the Court's June 26, 2020 Order and subsequent conversations with the Special Monitor may have been made in good faith, Defendants' handling of newly-placed FRC Class Members bely their understanding that a "*Flores* waiver process" is necessary for them to make and record ongoing release efforts.[7]

Specifically and as detailed in attached declarations, ICE has approached newly-placed families and followed the same methods it used in May of this year in an attempt to facilitate family separation. All of the families known to *Amici* who

---

[7] A single, five-minute, conversation immediately upon a family's arrival using the *Flores* parole form does not equate to documented, ongoing efforts towards release.

16

have been approached have been required to have these conversations before they
have the opportunity for a credible fear interview, before they can even know the
likelihood that they, and their children, will ultimately be deported, and before they
have an opportunity[8] to communicate with counsel. *See* Exhibit C (C.M. Decl.);
Exhibit F (Declaration of T.T.P.), at ¶¶ 25–27; Exhibit G (Declaration of A.C.).
Parents report that at the time they were approached regarding separating from their
children, they were scared, disoriented, and confused; dealing with the side effects
of new vaccinations or medical treatments; and that questions included asking
mothers whether their children are breastfeeding. *See* Ex. C (C.M. Decl.); Ex. F
(T.T.P. Decl.), at ¶¶ 25–27; Ex. G (A.C. Decl.); Exhibit H (G.P. Decl.), at ¶¶ 35–36.

> ### C. COVID-19 outbreaks continue to grow at Karnes and Dilley because ICE fails to do the "basics," thereby keeping Class Members at significant risk of harm.

As this Court has noted since *April*, there are "significant concerns . . . about
each FRC's ability to provide safe and sanitary conditions." April 24, 2020 Order, at
6 [Doc. # 784]; *see also* May 22, 220 Order [Doc. #799]; Interim Report on COVID-
19 by Independent Monitor (June 25, 2020) [Doc. #827]. This Court rightfully
recognized the lack of proper precautions amid the pandemic stating, "[t]he FCs are
'on fire' and there is no more time for half measures." June 26, 2020 Order, at 2 [Doc.

---

[8] As has been previously noted to this Court, ICE's quarantining/cohorting procedures significantly prevent Amici from initiating legal representation with families, including sick families, at the FRCs. *See* Ex. C (Fluharty Decl.), at ¶ 3; Ex. A (Meza Decl.), at ¶ 23. Despite repeated attempts to address the issue with ICE at the local level, Proyecto Dilley and RAICES still face significant challenges in communicating with newly arrived families that are placed in quarantine. *See* Ex. A (Meza Decl.), at ¶ 23.

# 833].

In the intervening six weeks, ICE has taken steps which have only heightened the risk for the many children and parents that remain detained. The increase in COVID-19 positive cases, the influx of new arrivals, ineffective cohorting/quarantining procedures, and continued deficient implementation of the "basics" ("social distancing, masking, and testing") and contact-tracing processes, are turning the FRCs into an inferno.

   i. *ICE's continued intake of families at the FRCs and its quarantine practices exacerbate the unsafe and unsanitary conditions for Class Members in ICE custody.*

There are at least 130 staff and detained individuals who have tested positive at the FRCs.[9] Through ongoing reporting requirements in *O.M.G. v. Barr*, Defendants have confirmed in writing that at least 75 cases of detained individuals and 55 cases of staff at Karnes and Dilley that have tested positive for COVID-19 since mid-June 2020.

Rather than work to decrease the number of individuals at the FRCs during a pandemic, ICE has instead significantly increased the number of new families transported to FRCs since the June 10, 2020 JC Report. Not only has this served to

---

[9] The count of at least 130 detained individuals and staff testing positive is a cumulative total based on the following notices filed in *O.M.G v. Wolf*, No. 1:20-cv-786-JEB (D.D.C. June 25, 2020): Doc. # 69 (June 26, 2020), Doc. # 70 (June 28, 2020), Doc. # 73 (June 29, 2020), Doc. # 75 (July 1, 2020), Doc. # 77 (July 2, 2020), Doc. # 79 (July 5, 2020), Doc. # 80 (July 7, 2020), Doc. # 81 (July 9, 2020), Doc. # 82 (July  9, 2020), Doc. # 86 (July 12, 2020), Doc. # 90 (July 15, 2020), Doc. # 93 (July 18, 2020), Doc. # 95 (July 20, 2020), Doc # 97 (July 22, 2020), Doc. #104 (July 24, 2020), Doc. # 105 (July 27, 2020), Doc. #108 (July 29, 2020), Doc. #110 (Aug. 3, 2020), and Doc. # 111 (Aug. 4, 2020).

increase the total population at each detention center, but it has also been another source of continued introduction of COVID-19 into these fragile environments.  Last week, for example, ICE brought 40 new individuals to Karnes on July 26, 2020. *See O.M.G.*, No. 1:20-cv-786-JEB, Doc. # 110 (D.D.C. Aug. 3, 2020).

A significant portion of the individuals detained at the FRCs who test positive for COVID-19 are individuals who test positive for COVID-19 upon arrival at the FRCs, though at least one family contracted COVID-19 after months of detention at Karnes, and a mother at Dilley tested positive after two weeks at Dilley. *See, e.g.*, *id.* (reporting that 14 "new intakes" at Karnes tested positive for COVID-19 on July 26, 2020); Exhibit I (Declaration of O.M.M.), at ¶¶ 9–10. Due to ICE's problematic cohorting, quarantining, and contact-tracing practices, the risk of infection increases for all individuals across the facility with every new case that is introduced to the FRC. *See* Section III.D.3, III.D.4, *infra*.

When a family is placed in quarantine or medical isolation at one of the FRCs, the end result is near-solitary confinement for the family. *See* Exhibit J (Declaration of S.M.C.), at ¶¶ 7–9, 14; Ex. I (O.M.M. Decl.); Ex. A (Meza Decl.), at ¶ 22; Ex. B (Cambria Decl.), at ¶¶ 18–25; Ex. C (Fluharty Decl.), at ¶¶ 19–22; Ex. Q (M.E.F. Decl.), at ¶¶ 25-31. These often-arbitrary periods of heightened confinement reduce, and at times altogether limit, Class Members' access to Agreement-required services, including education, individual counseling sessions, outdoor and structured "recreation and leisure time." *See* FSA, Ex. 1, § A(4)–(6); *see also* Ex. F (T.T. P.

19

Decl.); Ex. I (O.M. Decl.). One mother described having to choose between eating and taking her children to the gymnasium for their scheduled hour of free time. Ex. J (S.M.C. Decl.), at ¶ 9.

ii. *Six weeks after this Court's June 26, 2020 Order, ICE is still failing to properly implement "basic" public health measures at the FRCs.*

1. <u>Social Distancing</u>

Social distancing has been, and continues to be, a problem at the FRCs. *See, e.g.*, Interim Report on COVID-19 by Independent Monitor (June 25, 2020) [Doc. # 827]. Detained families are repeatedly in close contact with other individuals in places like communal bathrooms, playgrounds, and the cafeteria, and young children repeatedly come into contact with other children—at times when their masks have fallen out of place. *See* Exhibit K (Declaration of S.L.R.), at ¶¶ 8, 10, 11; Ex. H (G.P. Decl.), at ¶¶ 25–31. From reckless events like the facility-wide Fourth of July celebration at Dilley on July 2, 2020, *see* Declaration of Shalyn Fluharty, at ¶ 43 [Doc. # 858]; Exhibit L (Declaration of D.A.M.), to the continued impossibility of maintaining social distancing among young children, *see* Exhibit M (Declaration of G.S.C.), at ¶ 30; Ex. K (S.L.R. Decl.), at ¶ 11; Ex. A (Meza Decl.), at ¶ 16, the truth of the matter remains that congregate settings like the FRCs are not suited to social distancing.[10]

---

[10]   *See, e.g.*, Letter from Drs. Allen & Rich to Congress (Mar. 19, 2020), https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-

## 2.  Masking and PPE

Masking and appropriate use of PPE also continue to be a persistent problem at the FRCs. Despite the significant issues with mask use identified by the Independent Monitor in her June 25, 2020 report, masks continue to be inconsistently worn by staff. *See* Interim Report on COVID-19 by Independent Monitor (June 25, 2020) [Doc. # 827]; Ex. C (Fluharty Decl.), at ¶ 10; Ex. K (S.L.R. Decl.), at ¶ 9. The use of gloves by detention staff continue to be minimal and sporadic as well. *See* Ex. C (Fluharty Decl.), at ¶ 10 (reporting that the majority of surveyed mothers had observed at least one staff person at Dilley not wearing gloves when interacting with detained families); Exhibit N (Declaration of M.N.), at ¶ 23 (noting how the only staff at Berks who wear gloves are those who serve food).

Of course, the practical reality remains that many Class Members—particularly younger children—either cannot wear masks or struggle to wear them even when necessary. *See, e.g.*, Exhibit O (Declaration of B.L.), at ¶¶ 20–21; Ex. C (Fluharty Decl.), at ¶ 10 (describing that in a survey of 36 mothers detained at Dilley, 100 percent of them reported that their children had difficulty wearing their mask); Ex. A (Meza Decl.), at ¶ 16.

## 3.  Testing

ICE's failure to conduct appropriate and routine COVID-19 tests of the

---

Congress.pdf.

individuals detained at the FRCs is yet another deficiency that this Court has previously identified and that continues to remain unaddressed. *See* June 26, 2020 Order, at 3 [Doc. # 833]. This lack of consistent testing could very well mean that the spread of COVID-19 at the detention centers is much more severe than is currently reported. *See* Decl. of Dr. Catherine Troisi, at ¶ 22 [Doc. # 857].

In general, COVID-19 tests are conducted upon intake, when an individual is taken off-site, and, at times, prior to release. *See* Ex. C (Fluharty Decl.), at ¶¶ 14–18; Ex. I (O.M.M. Decl.), at ¶¶ 2, 9; Ex. F (T.T.P. Decl.), at ¶ 5. Therefore, for Class Members and their parents that have been detained at the FRCs for several months, the *only* testing for COVID-19 they have received was the "saturation" testing that was conducted over a month ago in June 2020. *See, e.g.*, Ex. K (S.L.R. Decl.), at ¶ 6 (noting how the family has been detained since September 2019 but was only tested for COVID-19 once, in June 2020); Ex. O (B.L. Decl.), at ¶ 13. Testing must be done on a more frequent basis in order to protect the lives of Class Members and their parents.

### 4. Contact Tracing

ICE's efforts at contact tracing are inconsistent, if such efforts are conducted at all. For example, *Amici* are not aware of any contact tracing being conducted at Dilley for the mother who tested positive after being released from quarantine. Also troubling is the government's unexplained reference to an employee at Dilley testing positive for COVID-19 after being "exposed to COVID-19 positive residents on July

22

3, 2020." *O.M.G.*, No. 1:20-cv-786-JEC, Doc. # 95 (D.D.C. July 20, 2020). *Amici* are not aware of any follow up or contact tracing conducted for the "COVID-19 positive residents" with whom the employee came into contact, and the government did not report a positive test result for any person detained in Dilley before, or after, this time.

## IV.   Conclusion

ICE continues to violate the FSA and prolong the detention of *Flores* Class Members, despite its obligations under the FSA and this Court's prior orders. ICE has continued to fail to conduct meaningful custody reviews of Class Members, particularly those at heightened risk during a pandemic. These deficiencies are all the more critical while the COVID-19 pandemic rages through the FRCs.

Dated August 6, 2020

Respectfully Submitted,

ANDREA MEZA, esq.
Director of Family Detention Services
 /s/ Gabriel S. Barenfeld                    RAICES
Gretchen M. Nelson                           2511 N Loop 1604 W, Suite 201
Gabriel Barenfeld                            San Antonio, Texas 78258
Nelson & Fraenkel LLP                        Andrea.Meza@raicestexas.org
601 So. Figueroa Street                      (*Pro Hac Vice* admission forthcoming)
Suite 2050
Los Angeles, California 90017


SHALYN FLUHARTY, esq.                        BRIDGET CAMBRIA, Esq.
Director                                     Executive Director
Proyecto Dilley                              ALDEA - The People's Justice Center
Shay@caraprobono.org                         532 Walnut St.

1    (*Pro Hac Vice* admission forthcoming)    Reading, PA 19601

2                                             bridget@aldeapjc.org

3                                             (*Pro Hac Vice* admission forthcoming)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**SUPPLEMENTAL DECLARATION OF ANDREA MEZA**

I, Andrea Meza, swearing under penalties of perjury, make the following declaration:

1. I previously submitted a declaration to the Court in this matter.  I now submit this supplemental sworn declaration.  The facts set forth below are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. My name is Andrea Meza and I am an attorney and the Director of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES").  I have been the program Director since March 2019.  Prior to my position as Director I served as the Associate Director from October 2018-March 2019. From September 2015 to July 2017 I was an Equal Justice Work Fellow and provided direct legal services to families at Karnes. I have been licensed in the state of Texas since November 6, 2015.

3. ICE currently detains 36 Class Members who are clients of RAICES at Karnes. Twenty-nine Class Members have been detained for over 20 days, and the average length of detention is 28 days.  The average age of children at Karnes is 5 years old.  There are 11 infants detained at Karnes, and twenty-four children 5 years old or younger.

**ICE continues to fail to conduct individualized custody determinations for *Flores* Class Members.**

4. In a  declaration previously submitted to this court, dated May 21, 2020, I outlined ICE's continued failure to conduct individualized custody determinations for *Flores* Class Members at Karnes.  Despite this court's multiple orders that ICE make and record prompt and continuous efforts to release Flores Class Members without unnecessary delay, little has changed regarding ICE's ongoing failure to individually review custody for Class Members.  The little information ICE has provided RAICES regarding its custody determinations for our minor clients indicates that custody is evaluated based on immigration case status and apparent implementation of a "binary choice" scheme, both

of which this Court has roundly criticized.  ICE's failure to abide by this Court's orders is characterized by the agency's omissions as much as their bad actions.  Namely, ICE has failed to release children with medical conditions that would strongly favor their placement outside of a congregate setting suffering an outbreak of COVID-19.

> *ICE's custody determinations for Flores Class Members appear to be based on immigration case status, in violation of this Court's previous orders.*

5.   In this Court's April 24, 2020 order, the Court found ICE in violation of paragraphs 14 and 18 of the Flores Settlement Agreement, as well as the Court's June 27, 2017 Order, due to its reliance on immigration case status, such as "pending IJ hearing/decision" or "pending USCIS response" as justification for detention beyond twenty days.   Indeed, this Court cited the declaration of RAICES attorney Javier Hidalgo who stated that ICE regularly failed to respond to e-mail correspondence from RAICES attorneys requesting individualized custody determinations for Flores Class Members.  RAICES continues to send such inquiries to ICE as part of our regular practice.

6.   RAICES has sent approximately 25 e-mail inquiries to ICE regarding detention of Flores class members beyond 20 days since June 26, 2020.  ICE has responded to three of these inquiries.  In response to an email requesting information on release for a family detained more than 20 days, an ICE officer responded with the following:

> Good afternoon, with regard to Mr. [A.L.] (A# XXX-XXX-974), and his family: [J.G.] (A# XXX-XXX-975),   and [C.L.G.] (A# XXX-XXX-976), this FAMU received a negative fear finding from USCIS and is currently pending IJ review. (redacted).

7.   Though this response is minimally elucidating, it appears to evidence that ICE is justifying continued detention of a *Flores* Class Member based on immigration case status.  Similarly, in response to a parole request filed for a Class Member detained for 32 days with her parents, ICE responded, "your clients are on removal proceeding after the Reconsideration was denied on 07/27/2020." These examples illustrate that at least in

some cases, ICE's primary, if not only reason for detention of Class Members beyond twenty days is the status of their immigration case.

*ICE appears to be implementing "binary choice" at Karnes intake*

8.  In its May 22, 2020 Order, this court previously found that interactions in which ICE asked parents of class members whether they wanted their children released alone "caused confusion and unnecessary emotional upheaval and did not appear to serve the agency's legitimate purpose of making continuous individualized inquiries regarding efforts to release minors." May 22, 2020 Order [Doc. # 799].  In spite of the Court's admonition of ICE for the manner in which it asked parents whether they chose to waive the *Flores* rights of their child(ren) and consent to family separation, ICE has now incorporated this very question into its intake procedure for families at Karnes.

9.  Multiple RAICES clients report that upon their arrival at Karnes, officers asked them a series of questions and instructed them to sign forms in English.  Since at least July 15, 2020, clients have reported that this intake questioning has included a question whether parents consent to release of their child to a sponsor without their parents after twenty days.  No parent that RAICES represents indicated that they elected to allow their children to be released without them. RAICES has requested ICE to provide copies of these intake forms for four families since June 26, 2020. As of the time of this filing, ICE has failed to produce them.

*ICE's continued detention of Flores Class Members with risk factors for COVID-19 indicates a lack of individualized custody determinations.*

10. Though the Court has repeatedly ordered ICE to make and record efforts to promptly release Class Members without unnecessary delay, particularly in light of the COVID-19 pandemic, ICE's continued detention of children with risk factors for COVID-19 indicates that ICE has not taken its obligation to make individualized custody determinations seriously.

11. Infants and babies have been shown to suffer more severe illness if they contract COVID-19.[1]  Despite this risk, at least 11 infants one year of age or younger are currently detained at Karnes for an average of 28 days.  Two babies have been detained for 41 days.  Many of these children were detained in CBP custody or in hotels for weeks before their arrival at Karnes.

12. A family detained over two months at Karnes with a fifteen month old baby was detained for an additional eleven days after the family's negative credible fear determination was vacated by an immigration judge.  There was no indication that ICE had reviewed the custody situation of the three Class Members in the family until the family's RAICES attorney inquired with ICE about the family's detention a week after the hearing.

13. One three month old infant was detained for approximately one month with his mother, father, and three siblings in a hotel prior to the family's arrival at Karnes.  The family's six year old child suffers from a heart murmur.  Multiple members of this family, including Class Members, contracted COVID-19 after unwanted contact with an ICE contractor at the hotel where they were detained.  The three month old's mother has a food allergy that has not been accommodated, and his mother's breast milk supply has been diminished because of her lack of food.  This family has not been provided information in a language that they understand about custody decisions or why their family, including four Flores Class Members, continues to be detained despite their delicate medical situation.

14. In another case, a one year old baby with asphyxia was detained at Karnes for 25 days before she was taken to the hospital because of difficulty breathing.  When she was repeatedly vomiting, the Karnes medical staff instructed her mother to have her child vomit on herself, then bring the vomit to the medical center to be tested.  When the baby was finally hospitalized after losing consciousness while breastfeeding, her father was not permitted to go enter the hospital with the child and the child's mother.  Though this

---

[1] *COVID-19 (coronavirus) in babies and children*, Mayo Clinic, July 21, 2020, https://www.mayoclinic.org/coronavirus-in-babies-and-children/art-20484405#:~:text=Although%20rare%2C%20children%20under%20age,issues%20with%20respiratory%20virus%20infections.

family was taken off-site to a hospital where they risked additional exposure to COVID-19, they were deported five days later.  It is unclear why ICE exercised its discretion in favor of detention of an infant with a serious, chronic respiratory illness for thirty days in a detention center with an outbreak of COVID-19.

15. Similarly, ICE chose to detain a six year old with asthma at Karnes for approximately ten days.  The fact that this Class Member was released after a little more than a week, while other class members with similar health risks remain detained for a month or more is indicative of the arbitrary nature of ICE's custody determinations.  In no case has RAICES, or a Class Member, been provided a detailed, specific, individualized explanation for their detention or release.

**ICE continues to fail to ensure that the "basics" of COVID-19 guidelines and the FSA requirements for safe and sanitary conditions are implemented at Karnes.**

*Conditions at Karnes continue to be unsanitary for Flores Class Members.*

16. Families at Karnes are now tested for COVID-19.  However, ICE and GEO do not communicate results of the COVID-19 tests to families.  Out of 15 families surveyed regarding the implementation of the CDC guidelines at Karnes, 11 families informed RAICES that they were not provided results of their COVID-19 tests.

17. Some families also describe the impossibility of social distancing at Karnes because GEO staff deliver food and do checks in their rooms every forty-five minutes - frequently entering without knocking.  Parents also describe the difficulty in keeping a face mask on young children.  Regarding the face masks for his young children, one father said, "It's not easy. My wife has to take care of the children and it is not easy for her. But it is the law so we must follow it."

18. One father reported that he was unable to clean his room because he was scheduled for an interview with the asylum office during the time when cleaning supplies are distributed. When his interview was over, he asked for access to cleaning supplies and was told that "it was too late in the day to deliver the disinfectant."  This father also reported that water

is limited and that families must ask for access to potable drinking water, and that he only

had two shirts to wear during the entirety of his detention at Karnes.

19. Another mother reported that her infant only has one set of clothing.  When the clothing

is washed, the baby has to stay in a diaper and it is cold.  This mother reports that the

diapers are low quality and they leak a lot, so her baby's clothes are often stained and

soiled with feces and urine.  She was only able to wash her child's clothing once per day.

20. Additionally, a mother reported that after 11 days in detention, the floor of her cell was

mopped for the first time.  Prior to this initial cleaning, this mother kept her twelve month

old baby in the crib in their cell because the floor was too dirty for the baby to crawl and

play on.

> *Conditions at Karnes prohibit Class Members from access to accommodations*
> *called for in the FSA.*

21. When families arrive to Karnes, they are kept in quarantine isolation for two weeks.

During this time, families are effectively held in solitary confinement.  Mothers and

fathers are separated, and children are arbitrarily separated between the two parents.

During quarantine, children are permitted to leave their cells for only thirty minutes per

day.  They do not have access to recreational activities as outlined in the FSA.

Furthermore, they do not have access to adequate, if any, educational materials during

their solitary quarantine confinement.

22. In addition, access to counsel is minimal at best.  During quarantine most families are not

able to access RAICES' free legal services.  Phones available in the cells in which

families are detained are notoriously non-functional.  It appears that most days ICE has

two cell phones and one iPad available for remote legal visitation.  Because most families

speak Haitian Creole or a diverse variety of languages of the African continent, RAICES

staff must speak with them using interpreters.  Thus, client meetings take twice as long as

they would for a Spanish or English speaker, and the lack of technology for remote legal

visitation has an even greater negative impact.  Of great concern, RAICES staff often

observe GEO and other officers speaking to detained families in Spanish even though the family does not speak Spanish.  It is unclear how frequently GEO and ICE make use of interpreters to speak to families at Karnes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 6, 2020

San Antonio, Texas

_____
Andrea Meza, Esq.
Director, Family Detention Services
RAICES
Andrea.Meza@raicestexas.org

# EXHIBIT B

## DECLARATION OF BRIDGET CAMBRIA, ESQ.

I, Bridget Cambria, declare and say as follows:

1.   My name is Bridget Cambria, Esq. and I am an attorney with, and the Executive Director of, Aldea – The People's Justice Center ("Aldea"), a non-profit located in Reading, Pennsylvania in the County of Berks. Our organization, Aldea, offers universal representation to families detained at the Berks County Residential Center in Leesport, Pennsylvania. In the last five years, we have represented more than one thousand parents and children who have been detained in family detention in the Berks County Residential Center ("BCRC").

2.   I previously filed declarations in *Flores* with respect to the detention of families during the COVID-19 pandemic. I am now providing this supplementary declaration to update the Court concerning the detention of families in the BCRC since my last filed declaration.

3.   Notably, as of August 5, 2020, the government has reported 121 cases of COVID-19 in Family Residential Centers in the United States that include parents, children and employees.

4.   Aldea continues to represent families who are detained in the BCRC during COVID-19. At present there are, at minimum, five families detained at the BCRC who are permitted in the general population. It is unknown to Aldea how many families remain in quarantine at this time.

**Current Population at Berks:**

5.   Of the families who are currently known to be detained at the BCRC, four of the families are Haitian nationals and speak Haitian Creole. One family is Vietnamese in nationality and language. The Vietnamese family is currently separated within the BCRC by rooms, with a father placed in the general population and a mother and her child in quarantine for more than 20 days.

6.   *Flores* class members currently at Berks consist of: B.K.L. N., an infant boy detained 148 days who turns 2 years old this week; H.B.M.N., a 3 year old girl detained 148 days; G.R.S.C., a girl detained 156 days; G.P., an 8 year old girl detained 36 days; L.P.T.N., an 8 year old detained 27 days; N.Y.B.T., an 11 year old girl detained 156 days; and J.P., a 13 year old boy detained 36 days.

7.   L.P.T.N. celebrated his eighth birthday at the BCRC this past month in quarantine isolation with his mom and separated from his father within the BCRC.

8.   G.R.S.C. celebrated her third birthday in detention this month following more

than 150 days of detention.

**Class members being detained held outside permitted timeframes:**

9.      Delays in the prompt release of class members from the BCRC, and FRCs at large, are due to ICE's reliance, solely, on one's immigration status to determine custody.

10.    Families in Berks who are under 100 days of detention are awaiting a protracted credible fear process that is affected by detention issues, administrative issues, quarantine issues, and they have not completed their fear proceedings as ICE is requiring prior to any re-custody determination for class members.

11.    The class members and their families who remain detained indefinitely (100 plus days and counting) within the BCRC are those families who challenged their asylum procedures and removal process in federal court. Specifically, these families were subjected to the unlawful, and now vacated, Transit Ban and the unlawful policies that followed its implementation. *See Capital Area Immigrants' Rights Coalition (CAIR) v. Trump*, Civil Action Nos. 19-2117 & 19-2530 (TJK), ECF 72 (D.D.C. June 30, 2020).

12.    The families are beneficiaries of stays of removal by a federal court pending adjudication of temporary and permanent relief before the District Court for the District of Columbia to determine the process owed to these families now that the process under which they have been held has been vacated.

13.    These litigation concerns affect three of the families detained at the BCRC, each family who has been detained at or more than 150 days. In each case, a federal court stay applies and removal from the United States is not foreseeable in the near future.

14.    Each of the class members subject to court-ordered stays of removal, through their parents as well as counsel, has provided ICE with the information of the sponsor to receive the family. Additionally, each family has requested a parole determination by ICE which has been pending without decision since May of 2020. No family has received a custody review nor a document explaining the reasons for their continued detention. Regardless of whether ICE considers each family in post-order custody or pre-order custody, given their invalid orders of removal, each parent and child has a right to know the reasons for their continued detention and to be free from decisions on their custody that are arbitrary or capricious or retaliatory in nature.

**Testing at the BCRC**

15.    In meeting with class members and their families at Berks, each person expressed fears of COVID-19 and feeling like that have a lack of control over

their bodies and a lack of ability to protect themselves and their children.

16.     Families expressed that they would feel safer if there was consistent and regular
        saturation testing of the facility, including families and detention staff.

17.     Saturation testing has only occurred on one occasion, on or about June 23,
        2020. Since that time, testing of families at the BCRC has only occurred when a
        person is taken off-site for a medical procedure or, most recently, upon intake
        into the facility. Neither families within the BCRC, nor counsel or members of
        the community have any knowledge or understanding of any testing
        requirements of the facility staff or federal staff who are present on site at the
        FRCs.

**Quarantine at the BCRC**

18.     Multiple families have been placed in quarantines in the BCRC. Quarantine
        within an FRC is akin to solitary confinement. Families are kept in one room
        and not permitted access to free movement in the facility nor permitted access
        to outside areas of the facility to walk or participate in exercise.

19.     Quarantines are utilized for those persons who are newly admitted to the BCRC
        and any family who is taken off-site for medical care. This makes families
        hesitant to report medical concerns out of fear or being told that they will be
        placed into quarantine.

20.     No family has been tested since my previous declarations solely due to
        reporting COVID-19 symptoms.

21.     Quarantines for families have ranged from 14 days to more than 20 days.

22.     Even when a person's COVID-19 test is returned negative, the person or family
        is required to remain in quarantine for the duration of the quarantine period.
        This was explained to a mother as due to the incubation period of COVID-19.
        However, no additional test nor negative test result is required to be conducted
        to be taken out of quarantine.

23.     Unlike parents and children who need to avail themselves of necessary medical
        procedures, quarantines are not required for ICE or detention staff who
        accompany those families to off-site medical providers and return to the
        facility.

24.     During quarantine, families are not permitted to leave their room, except when
        given permission to shower. Families who are in quarantine are separated,
        meaning if two parents are detained, one parent remains detained with their
        children and the other parent is separately detained in another room without
        contact with their spouse or child.

25.     During quarantine, a child is not permitted access to exercise or any activity outside of the quarantine room. Families have reported having access only to television and picture books. One person indicated they were permitted tools to paint.

26.     Access to communications in quarantine are problematic. New arrivals to the facility have indicated they are not aware of the right to talk with counsel while in quarantine and are not directed to a list of legal services in a language they understand. All attorney lists provided to new arrivals in Berks are only provided in the English language, which no parent can read.

27.     Lack of access to counsel is increasingly problematic in that ICE has conducted legal proceedings against detained families and class members while in quarantine.

**PPE/Social Distancing within the BCRC**

28.     All families in the BCRC upon interview have expressed that they believe social distancing is impossible in the BCRC. The only time families believe social distancing is possible is if they remain in their bedroom, only.

29.     Each family expressed continuing concerns with their children's ability to socially distance. They expressed that their children, especially young children, can not adhere to a rule to remain 6 feet apart from other children given the nature of children to want to play. Also, families expressed that because they have access only to a few common areas, most families are within common areas at the same time during the day so that they can actually be together as a family.

30.     Masks are provided to families at a minimum every 7 days, on Tuesdays. They are provided paper masks, like those provided by a hospital. Within the last two weeks, some families finally report an understanding that they can request a new mask if they need one. However, two families still believe they can only receive a mask once a week.

31.     As of two weeks ago, families report that the BCRC is requiring mask usage at all times when a person is outside of their bedroom. This means that all parents and children are required to wear a mask in all common areas of the facility. Parents report that this is a difficult rule for children to adhere to.

32.     One parent reported that their child was allergic to the paper mask provided to her son and that she had not received a cloth mask for her son. Should a cloth mask not be provided promptly, undersigned counsel will be providing one for him.

33.    The families report that staff within the BCRC are properly wearing masks at
       all times.

34.    Glove usage in the facility is still limited to when families are served food or
       when the families are cleaning the facility. The families still report that they are
       responsible for the majority of the cleaning, but are unaware whether facility
       staff cleans when they are sleeping.

35.    Despite strides in the availability of PPE and education to the families
       concerning COVID-19, their continued unnecessary detention poses a risk to
       class members as well as their parents where alternatives to detention are
       permitted and encouraged.


**ICE's Continued Failures to Comply with the Settlement and Continued Questioning by
ICE Regarding Separation**

36.    Following the May 13th and 14th incidents wherein ICE officers questioned all
       detainees in FRCs whether they wanted to separate from their child in detention
       and to send their child in detention to a sponsor, each family that we talked to in
       the FRCs expressed a fear of being separated from their child.

37.    Questions to families including asking parents of young infants, aged 1, 2, and
       3, i.e. tender age children, to be released to a sponsor.

38.    However, ICE has not ceased its practice of requesting a parent to choose to
       send their child to a sponsor while the accompanying parent remains in
       detention.

39.    Each new family to the BCRC has reported that ICE is asking them to sign a
       paper which would permit the child to separate from their parent and be placed
       with a sponsor. No family at intake agreed to separate from their child.

40.    Each family who was asked to separate indicated that the questioning was
       shocking and destabilizing for the parents, and that each parent was in poor
       conditions at the time. One mother reported being under terrible pressure and in
       poor medical condition when asked. She recalled being disoriented and
       extremely upset, and crying. She reported that ICE approached her on two
       occasions asking these questions and that she was told to contact ICE when she
       was ready to "let her kids go with someone else."

41.    Another mother reported being "sad, devastated, scared" and that she did not
       even know where she was when asked to send her son to a sponsor so that she
       could be transferred to another jail. The only response she could say was that,
       "he is our son."

42.     These remain the only efforts ICE has made to comply with the orders of the
        *Flores* Court.

43.     As stated above, each family has consistently provided sponsor information to
        Immigration and has formally requested parole with Immigration for their
        families. ICE has failed to provide parole determinations for each family
        detained at the FRC, and has failed to explain why their continued detention
        without reason is not arbitrary and capricious.

**Conclusions:**

44.     At this moment, the government remains in substantial noncompliance with
        the Settlement. They continue to detain children in secure, unlicensed facilities
        which are not safe or sanitary. They continue to do so during a pandemic.
        They have shirked on their responsibilities to comply with countless orders
        issued by this Court, and have in turn required children to languish in
        detention during their substantial noncompliance rather than address the issues
        which threaten the lives of the children in their custody during a pandemic.


I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct pursuant to 28 U.S.C. § 1746.


Date: August 5, 2020                    _____

                                        Bridget Cambria, Esq.

# EXHIBIT C

**AUGUST 6, 2020 SUPPLEMENTAL DECLARATION OF SHALYN FLUHARTY**

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.  I submit this declaration to provide the Court with additional information relevant to the
    Juvenile Coordinator's July 24, 2020 Interim Report. I have previously filed numerous
    declarations in this matter. The facts presented in those declarations remain true and
    correct. The facts contained in this declaration are based on my personal knowledge, and
    I can testify competently to them if called upon to do so.

2.  In an effort to determine the current reality for Class Members who are detained at the
    South Texas Family Residential Center ("STFRC") in Dilley, Texas, on July 30 and July
    31, 2020 Proyecto Dilley conducted a scripted, 45-minute telephonic interview with 36
    families detained at STFRC. The sample size of 36 interviewed families represents 58
    percent of the 62 total families who were represented by Proyecto Dilley and detained on
    July 30 and July 31, 2020. The results of the survey are detailed herein.

3.  As of August 6, 2020, there are at least 78 Class Members detained at STFRC. As I have
    repeatedly noted, ICE's quarantining/cohorting procedures have significantly reduced
    Class Members and their parents' ability to access counsel. Therefore, there have been,
    and there may currently be, individuals detained at Dilley with whom Proyecto Dilley has
    been unable to get in contact with.

4.  75 of the 78 Class Members who have worked with Proyecto Dilley have been detained
    for more than 20 days. Many of these Class Members are quickly approaching a full year
    in detention. Two Class Members—a three-year-old girl and an eleven-year-old boy—
    have been detained for 357 days. There are 46 Class Members at Dilley that have been
    detained for more than 300 days. These children are as young as two years old. Four
    children have been detained between 206 and 296 days, and 18 children have been
    detained between 141 and 168 days. The remaining Class Members have been detained
    between seven and 38 days.

5.  Of the 36 mothers surveyed, 35 of them confirmed that their sponsors have been
    contacted at least once by ICE. Some mothers reported that their sponsors had been
    called by ICE once to confirm their information; other mothers said their sponsors had
    been called three or four times to confirm that they were able to sponsor the family. 33 of
    the mothers surveyed reported that their sponsors had been called recently—once or
    twice within the last two to three weeks.

6.  Of the mothers surveyed, one mother informed Proyecto Dilley that she had been asked
    about releasing her child—a one-year-old infant—to her sponsor without her. The mother

reported that this occurred when the was processed for entry into STFRC. None of the other families surveyed reported that they had been asked about releasing their child to a sponsor since the May 2020 meeting in which all detained mothers were asked about separating from their children.

7. 15 mothers reported that their child or children have medical issues, ranging from ovarian cysts, to severe trauma, to heart murmurs, to respiratory issues.

***Conditions continue to be unsafe and unsanitary at STFRC because the facility cannot facilitate social distancing, adequate hygiene and sanitation, or appropriate masking.***

8. Most, if not all, of Proyecto Dilley's clients have expressed increasing concern about their risk of contracting COVID-19 while they remain detained at STFRC.

9. Three mothers recently reported to Proyecto Dilley staff that they or their children have seen worms in their food.

10. Our survey revealed the following regarding PPE:

- All mothers surveyed reported that they had masks. Ten mothers reported they each had one mask and 21 reported they had two masks. Almost all mothers similarly reported that they had at least one mask for their child.

- Eighteen mothers said they were not given replacements for their masks when needed; the other eighteen mothers responded that they had received replacement masks. Many women reported that they are using cloth masks sewn by the mothers at the detention center and that they are well-worn from frequent washing.

- The majority of mothers—23 of them (or 64 percent)—reported that they were never given instructions on how to wear their mask, and 16 mothers (44 percent) reported that they were never given instructions on when they were required to wear their masks. Twelve mothers reported that they did receive instructions on how to wear their mask, and eighteen mothers reported receiving instruction on when they were required to wear them. These instructions have come in the form of written notices when masks were handed out, one-on-one conversations with guards, or posted notices.

- Every single one of the mothers surveyed reported that at least one of their children (typically the younger ones) had difficulty wearing their mask. Many mothers expressed the impossibility of their young child continuously wearing the mask. Mothers reported having to remind their child to put on or fix their mask anywhere from 3 times a day to 25 times in an hour.

- Nineteen mothers (53 percent) reported that they had seen *at least* one employee at the detention center not wear their mask in the past week. One mother reported that one guard in her hallway rarely wears a mask and another reported that she has repeatedly observed one employee enter the cafeteria without a mask. Several mothers indicated that they have observed several staff members not wearing their mask in the gymnasium or wearing their mask down by their chin.

- Twelve mothers (33 percent) reported that they had observed between *one and five* detention center staff not wearing a mask in the past week. An additional three mothers reported seeing between *6 and 10* detention center staff not wearing a mask in the past week; one mother reported seeing between *11 and 15* staff not wearing a mask, and two reported seeing *over 15* staff not wearing their mask in the past week.

- Twenty-five mothers reported that they had observed at least one staff person not wearing gloves in the past week, and specifically, that they were required to give their facility-issued ID card to a guard who was not wearing gloves. These interactions took place in the cafeteria, gymnasium, and the commissary store. 26 mothers (72 percent) reported that detention center staff touched their ID cards at least once a day; several other mothers reported that guards touched their ID cards over five times a day.

- Fifteen mothers (41 percent) reported seeing at least one detention center employee not using gloves in the cafeteria in the last week. Mothers described these staff as those who scanned their ID cards and the janitorial staff.

11. Of the 36 mothers surveyed, nine of them arrived in STFRC during the COVID-19 pandemic—between April and July 2020. Of these nine families, five reported that they were transported to Dilley with anywhere from seven to twelve other individuals. Two of those mothers noted that not everyone on the bus was wearing a mask during their transportation to Dilley. One mother noted that the families with whom she was transported were sitting close together.

12. Social distancing also remains a challenge at the detention center.

- The declaration of D.A.M., which is concurrently filed with the Court, details a recent all-facility event that occurred on July 2, 2020 in which social distancing was suspended for the day to celebrate the Fourth of July.

- In the survey, 28 mothers (78 percent) reported that they had been in a room with more than 15 individuals at least once in the last week. Eight mothers reported they had been in a room with more than 15 individuals between 1 and 5 times in the last week; two reported such interactions occurring between 6 and 10 times in

the last week; five mothers reported this occurred between 11 and 15 times in the
last week; and 13 mothers reported that happened over 15 times in the last week.
Mothers reported these large group gatherings occurred in the dining area,
gymnasium, playground, and library.

- A majority of mothers (27 mothers, or 75 percent) also reported coming into
contact with someone not in their family at least once in the last two weeks while
using the communal bathrooms. Most families reported that this occurred on a
daily basis.

- 27 mothers reported being less than six feet away from an individual not in their
family at least once in the past week. 12 mothers reported between 1 and 5 such
interactions; 6 reported between 6 and 10 such interactions; and 9 reported over
15 such interactions.

- As is to be expected, 25 mothers (69 percent) reported observing their child come
into physical contact with another child, such as hugging or touching them.
Mothers reported that this can occur anywhere from once a day to over 20 times a
day. Mothers reported that these physical interactions occurred in the cafeteria,
gymnasium, outside playground, the daycare, library, in the hallways, and almost
anywhere where children—especially young children—come into contact with
one another.

13. Access to appropriate cleaning supplies continues to be a challenge for families detained
at STFRC.

- 24 mothers (67 percent) reported that they were not able to use disinfectant to
clean their room in the last week. Eight of them reported they had asked for
disinfectant and had been denied. Other mothers reported that they didn't ask
because they were treated rudely the last time they had asked; because they had
previously been denied requests for disinfectant; or because they believed they
wouldn't be provided with disinfectant.

- Nine mothers reported that they had not seen detention center staff disinfect
common areas, such as the playground, at all in the past week. Fourteen mothers
reported seeing staff disinfect such areas once, six mothers reported such cleaning
occurred at least twice, and two mothers reported such cleaning occurred more
than three times in the last week.

- 18 mothers (50 percent) disclosed that they had tried to wash their hands at least
once in the past week and discovered that there was no hand soap available.
Mothers reported that this occurred anywhere from once to over ten times in the
past week. One mother reported that it took two hours for soap to be replenished

in her bathroom, and that the communal bathroom in her hallway rarely has soap.
Another mother reported that it took three days for the soap dispenser in her
bathroom to be refilled.

- Similarly, 14 mothers reported that they tried to use hand sanitizer at least once in
the past week and found the dispenser to be empty. This occurred between one
and over ten times in the past week, with six mothers reporting that they had tried
to use hand sanitizer over ten times and had been unable to.

***ICE's inability to conduct appropriate and continuous testing and contact tracing has and
continues to place families at risk of contagion of COVID-19.***

14. ICE's attempts to contain COVID-19 at STFRC have failed. As detailed in the
declaration of O.M.M., which is concurrently filed with the Court, at least one family
arrived to STFRC uninfected by COVID-19 and became infected while detained.

15. In addition, the testing regimen at STFRC remains woefully inadequate. As previously
reported, ICE has conducted facility-wide saturation testing only one time in June 2020
and the majority of detained families were required to self-administer their own tests. 33
mothers (or 91.6 percent) report being tested for COVID-19 only once during their
detention at STFRC.

16. The three mothers surveyed that arrived to STFRC in mid-to-late-July 2020 reported that
they had also only been tested one time upon their arrival to the detention center.

17. Of the 36 mothers surveyed, 29 (or 80 percent) reported never receiving their COVID-19
results.

18. Despite the fact that more and more guards and at least two detained individuals have
tested positive for COVID-19 at STFRC, ICE has failed to implement any consistent
tracking and monitoring of individuals and symptoms.  30 of the 36 mothers surveyed
reported that neither they nor their child's temperature has been taken in the past week.
Of the remaining six mothers, four of them reported that they or their child's temperature
had been taken at least once in the past week, but because the mother had affirmatively
sought medical attention.  And 35 of the 36 mothers surveyed (97 percent) noted that in
the past week, no staff had asked them if they or their children had any COVID-19
symptoms.

*ICE's attempts to quarantine families have placed Class Members in conditions akin to
solitary confinement.*

19. ICE's purported policy is to place in quarantine for 14 days any family who (1) is newly
    arrived to STFRC; (2) is taken off-site for treatment and then returned to STFRC; or (3)
    is determined to have come into contact with an infected individual.

20. Of the 36 families surveyed, five of them reported being placed in quarantine at some
    point. Their responses show that the timing and length of quarantine is inconsistent.
    Three families reported that they were quarantined upon arrival to STFRC. Another
    mother reported that she was placed into quarantine because she was told she came into
    contact with a STFRC employee who had tested positive for COVID-19. She was kept in
    quarantine for approximately nine days. Another mother was placed in quarantine in June
    because she came into contact with an infected guard who was quarantined for 7 to 8
    days.

21. Three of those five surveyed families said they were not able to talk to anyone while in
    quarantine. All five families who were quarantined reported that their meals were brought
    to their rooms, and four of those five families also reported that they were not allowed to
    go outside with their children.

22. Three of the five mothers who had been quarantined reported that their children were not
    provided with alternative exercises or playing activities while in quarantine. Another
    mother reported that her child had been given crayons, but that later they were taken
    away and her child was left to play with juice bottles. All five mothers reported that their
    child was not—and for several families currently in quarantine, is not—provided
    educational materials for her themselves.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed in San Antonio, Texas on August 6, 2020.


_____
Shalyn Fluharty

6

# EXHIBIT D

**Declaration of C.M.**

Pursuant to 28 U.S.C. § 1746 and subject to penalty of perjury, I declare that the following is true and correct:

1.  My name is C.M. I am 30 years old and from Haiti and currently detained in ICE custody at the Karnes County Residential Center with my 31 year old wife, G.D. We are detained along with our five year old daughter, N.M.M., and our two year old daughter, W.S.M.D.

2.  We entered the United States seeking asylum on July 3, 2020. We were taken into custody by DHS the same day. We were transferred to Karnes on July 12, 2020.

3.  When we first arrived at Karnes, on July 12, 2020, officers in blue uniforms went through various documents with us. They spoke to us using a Haitian Creole interpreter. My wife and I were sitting together throughout the whole process.

4.  The officers in blue uniforms told us that the process we were in could take anywhere from 20 days up to one month. They stated that for that reason, they were giving us an opportunity. They said that they could give us a paper to sign, and that if we signed, our children would be liberated and no longer be with us. They did not specify where the children would go. They said that the alternative choice was to keep my children with me at the detention center throughout the whole process.

5.  My wife and I immediately told them, "no, these are our children." We told them that we would not hand our children over to anybody else without us being there. They just asked us the question and we gave our response, they did not tell us that we could have time to consult with each other before giving a response. They did not give us an option to change our minds about this decision at a later date. I had not yet spoken to an attorney at that point, and it was not until afterwards that I received a list of attorneys to call for legal assistance.

6.  They gave me a paper to sign right after I said no to releasing my children alone. I do not know what that paper said, it was in English as was everything else they made me sign. They did not give me a chance to review the document. Regardless, I would not have been able to read it because I do not speak English. They just had me sign everything anyway. I just went along with signing what they told me to sign.

7.  When ICE asked us about releasing our children alone, I thought about how I do not know what will happen to them if my wife and I are deported while they stay

1

here. We do have a sponsor to receive our family, but we do not have an
arrangement for our sponsor to raise our children.

8.  I think that what they suggested to us is not a decision any family could be
satisfied with. If ICE is only releasing part of the family, that means they are not
actually releasing the family. We are a family and we have to be together.

9.  Some children are more attached to their mother, some are more attached to their
father. My youngest child is really attached to me. At Karnes, we were initially
only given 30 minutes together each day. After two weeks, that has increased to
2-3 hours each day. Every day, when our visit hours are done, my daughter is
suffering and crying. I know my daughter would suffer even worse what she
already does if I had to permanently separate from my children by agreeing to
release them to a sponsor, like I was asked.

10. The children are suffering on many levels. For example, in addition to the fact
that I have limited time with my children, the food here is not the food that we are
used to so they do not eat. Separating from our children on top of all of this would
only compound their suffering even further.

11. Additionally, that same day that we arrived, on July 12, 2020, they gave us a
document that said that certain people cannot remain detained. It listed people
over 55, pregnant women, and also people who suffer from a list of illnesses,
including high blood pressure and chronic bronchitis.

12. Despite the fact that my wife suffers from high blood pressure and anemia and my
younger daughter suffers from chronic bronchitis, they have kept us detained.

13.  My daughter's condition caused her to be hospitalized in 2019. Her symptoms
include fevers often during the night time, and coughing every night. These
symptoms are exacerbated based on where she is living. The doctor told us that
she should not be in any place where it is very cold or where there is a lot of dust.
It is very cold where we are in the detention center.

14. Even though they gave us paperwork stating that they cannot keep people
detained for this reason, they have not told us we would be released at any point
nor have they explained why they are keeping us detained.

15. We disclosed our medical conditions to the staff at the detention center as soon as
we arrived at Karnes, on July 12, 2020. The officers in blue uniforms asked us if
we had any medical conditions and we told them about my wife's anemia and
high blood pressure, and our daughter's chronic bronchitis. They were not using

2

an interpreter at the time, so we were explaining these conditions in Spanish. We also disclosed these conditions when the doctor tested us for COVID-19.

16. They are aware that my wife has high blood pressure. They are also aware that my wife does not have her medication for her high blood pressure because the officials took it from her at the first detention center. They never explained to my wife why they were taking her medication from her.

17. I know that medical care here at Karnes is not sufficient. I know this because, in addition to everything else, my wife developed an infection at the first detention center before arriving at Karnes, because we were not allowed to shower there. The infection has caused my wife to have abdominal pain and yellow discharge. When she told the nurses at Karnes about this, they just gave her a pill. That pill has not resolved her symptoms.

18. Since my family has been at Karnes, we have never received an explanation as to why we are being detained.

**Declaration of Laila Ayub**

I, Laila Ayub, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.     I am an Attorney with the Refugee and Immigrant Center for Education and Legal Services (RAICES), where I have worked since September 23, 2019.  I am an attorney licensed to practice in the District of Columbia.

2.     On August 4, 2020, I spoke with C.M. by telephone through a certified interpreter, code: MAPA, who is certified to interpret in the English and Haitian Creole languages.  During the telephone call I read the entirety of the "Declaration of C.M." in English, and MAPA translated the entirety of the declaration into Haitian Creole.  I swear under the penalty of perjury that C.M. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Laila Ayub

Executed August 4, 2020 in San Antonio, Texas.

# EXHIBIT E

**Declaration of S.J.A.**

1. My name is S.J.A. I fled Guatemala to seek asylum in the United States with my eight-year-old son, W.A.A. We are currently detained at the South Texas Family Residential Center, where we have been detained for 314 days.

2. W.A.A. and I have been suffering for many months while in detention, and we have not received the medical care that we need.  Very soon after we arrived in the detention center in October 2019, W.A.A. developed a cold.  I took him to the clinic at the detention center approximately three times in October 2019, when he had a cough, a fever, and a cold.  The staff gave him acetaminophen and told me to give him water.

3. But W.A.A.'s cold didn't go away.  In November 2019, W.A.A.'s cough worsened, and he began to tell me that his chest hurt and that it was hard for him to breathe.  I took him again to the clinic and told the doctors that my son was having a hard time breathing. They prescribed him water for treatment. I took him about three times in a row, but each time, they told me the same thing.

4. W.A.A. continued coughing and having trouble breathing through December 2019. Around the beginning of December 2019, one night, he had a high fever and he said his chest really hurt.  Then his lips turned blue.  I ran to the nearby guard and told them my son was turning blue and that he couldn't breathe.  They rushed my son to the clinic.  A doctor took his blood pressure and rushed to put an oxygen mask on him.  They called an ambulance, and they took us to San Antonio.  We spent all night in the hospital.  The doctor there told me that my son was having an asthma attack.

5. When we were brought back to the detention center, the people in the clinic told me to use Vick's Vaporub on my son.  That was all they gave me, even though he still struggled to breathe.

6. W.A.A. still has a hard time breathing. He often tells me his chest hurts and it is hard for him to breathe when he walks.  Sometimes he will say, "Mom, I can't stand this pain in my lungs," or "I feel so tired, it's hard to breathe in air."

7. Towards the end of April, W.A.A. started suffering from stomachaches, nausea, and vomiting. It got so bad that about two months ago, he vomited three times a day for three to four days. He also started suffering from diarrhea at that time. I went to the clinic to ask for help.  The doctor told me my son was dehydrated and suggested that I buy him some liquids at the commissary store. The doctor said it was just a virus, but I find that strange because it lasted two months.

8.  Yesterday, I brought W.A.A. to the clinic because he has been experiencing pain in his penis, especially when urinating, for four days. The doctors took a urine sample, and the nurse said she was worried that it was so yellow. They gave him acetaminophen and told him to drink more water.

9.  It was very scary to see my son turn blue and struggle to breathe. It is always scary as a mother to see your child gasping for air, but especially now with the danger of coronavirus, I worry that if he gets infected with the coronavirus, he could be in a lot of danger.

10. Even though my son had an asthma attack so severe that he required hospitalization in December 2019, my son has never been evaluated or treated for asthma by medical staff at the detention center.  I have informed medical staff that hospital staff determined my son had an asthma attack and that he still struggles to breathe.  My concerns have been dismissed.  I do not know if my son's hospital records were ever provided to the facility, and do not know how to request them on my own because I do not know what hospital I was taken to.

11. As more and more guards become infected with the coronavirus at the detention center, I become more and more afraid that my son is at serious risk. I have heard that people with asthma and breathing problems are more in danger if they contract the coronavirus, but no one has ever tried to identify if my son is at high risk or do anything to protect him, given his breathing difficulties.

### Declaration of Mackenzie Levy

I, Mackenzie Levy, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am a legal assistant and Family Separation Coordinator with Proyecto Dilley, where I have worked since August 2018.

2. I am fluent in the Spanish and English languages.

3. On August 6, 2020, I spoke with S.J.A. by telephone. Given the COVID-19 pandemic, I was unable to enter the South Texas Family Residential Center to meet with S.J.A. in-person.

4. During my telephone call with S.J.A, I read the entirety of the "Declaration of S.J.A" in Spanish.

5. I swear under the penalty of perjury that S.J.A confirmed that the information contained in the declaration is true and correct.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed August 6, 2020 in San Antonio, Texas.




_____

Mackenzie Levy

# EXHIBIT F

## SWORN STATEMENT OF T.T.P.

I, T.T.P., hereby swear and attest, under the penalties of perjury, that the following is true and correct to the best of my knowledge:

**Initial Intakes**

1.  I arrived at Berks County Residential Center on July 13, 2020, with my husband and eight-year-old son.

2.  We requested protection at the United States and Mexican Border. We were detained for three days before being brought to Berks.  From the border, we were taken to Berks by two female officers and one male officer.  These officers stayed with us the whole journey. They were wearing masks, but there was no way to practice social distancing.

**Medical Conditions**

3.  When we arrived at Berks, I was very disoriented, mentally, and physically. My husband – right after getting a TB shot – started developing a severe respiratory reaction to the shot. His reaction was so severe that he had to be taken to the hospital outside the facility to conduct X-rays. The doctors believed that something was wrong with his lungs.

4.  Since we have arrived at Berks, my son has had nose bleeds issues. He has been getting nose bleeds every single day. We don't know what is causing him to have daily nosebleeds.

**Testing for COVID-19**

5.  We were each tested two times for COVID-19.  The first was when we arrived at the facility. The second was a week later, after my husband was taken to a hospital outside.

6.  At Berks, we have been separated as a family the entire time we have been detained.  My husband is in one room, and my son and I are in another room. We were placed in two rooms on the opposite side of each other. We could see each other through the window in the door, but we could not talk to each other. I am recently able to speak to my husband since he finally got out of quarantine. Now we can speak through the glass window of my room.

7.  The only time my son and I were physically together with my husband was when we were taken to a doctor's appointment together about ten days after our arrival. This appointment was after my husband got discharged from the hospital. The Staff told me that they believed my son and I might have been exposed to COVID-19 from to my husband – because he had gone to the hospital and then we had an appointment together. That is why we had to be tested again.

8. As of today, my son and I are still in quarantine, even though more than 14 days have passed, and my husband is no longer in quarantine.

9. Ten days after the first time they tested us for COVID-19, they told us the test results were negative.  But I still have not received the results from the second time that my son and I were tested. I was just told by medical staff that we might be released to the general population sometime in August.  I don't know what this means since it is already August 4th and we have remained in quarantine for 22 days already.

**Quarantine**

10. Even though we are separated from my husband, and in quarantine, we are still being required to undergo legal proceedings. We had our asylum proceedings and fear interview with immigration less than 48 hours upon our arrival at the detention center.  We had this interview while we were separated in quarantine.  We received our results a few days after, which was negative, and then had a hearing in front of the Immigration Judge.  All of this happened while we were in separate rooms in quarantine. I could not see the judge. I could only hear a male voice over the video. I don't know what happened in his hearing.

11. When we first arrived here at Berks immigration gave us some papers. Apparently between those English written papers there was a list of attorneys. But we didn't know because we don't speak English and the staff only talk to us using body language.  No one spoke to us in our language.

12. The first person who told us we had the right to speak to an attorney was the judge that we went before about a week ago.

13. I barely remember the first days of my arrival. And we have not been allowed to go outside of the room.

14. The only thing I have inside the room is a TV and some English books that only have pictures. There are no educational books at all for my son.

15. My son just watches TV the whole day. He is eight years old.  This is not good for him to have nothing to do except watch hours of TV.

16. There is no exercise equipment for us to work out or even do anything but sit in this room. And have done so for 22 days. We have not been permitted outside.

**PPE**

17. We are given a mask every Tuesday.

18. For the first ten days that we were detained, the Staff told us to wear the mask all the time, even though we were alone in our quarantine room.  After ten days, when we were told that our results were negative, they staff told us that we could finally take off our mask inside the room.

19. The staff here cannot talk to us. There is no one who speaks our language.  All they do to communicate is use body language, like putting the mask on themselves to demonstrate what they want us to do.

20. The guards do not wear gloves unless they have to, like when they serve us food.

**Social Distancing**

21. My son and I have not gotten out of the quarantine since we arrive in early July. We have been in this room for 22 days now.  We have not met or talked to anyone else. I don't know how social distancing works in this detention center because I have never been out of isolation in the 22 days that I have been here.

**Cleaning Supplies**

22.  The staff here gives me cleaning products to clean our room.  But I do not receive cleaning products to clean our room every day – sometimes they provide the cleaning products once every two days and sometimes it is five days before we get cleaning products again.

23. Since we cannot talk to the detention staff, and my only way of communicate with them is through body language, it is very hard to ask for things that we want or need, such as when we might get more cleaning products.  If I need something, I point out to it or draw it with a picture on paper.

**ICE's effort to Release**

24. I provided immigration with the name and information of my sponsor, where my family would go if we were released from Berks. I am not sure if ICE ever talked to my family because the one time I was able to talk to my family, they did not mention anything about ICE calling them.

25. The first day that we arrived at Berks, ICE came to talk to my husband and me about separating our child from us and sending him to our relatives in the U.S. while we go to another prison for the duration of our immigration process.

26. Everything is so blurry for me because I was sad, devastated, scared, and did not know where we were. I just remember that immigration had some papers that my husband had to sign.

27. I was only able to tell the officers that he is our child, and he needs to stay with us.


Date:   08/04/2020                                    /s/ T.T.P.

## DECLARATION OF BRIDGET CAMBRIA

I, Bridget Cambria, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am an attorney with Aldea- The People's Justice Center;
2. I obtained the foregoing declaration by telephone and utilized a telephonic language line interpreter in the Vietnamese language on August 4, 2020;
3. I am not permitted to enter the Berks County Residential Center to meet with the client in person because of the COVID-19 pandemic and the current operating ruled of the facility which have banned in person legal visitation;
4. During my telephone call with T.T.P. she confirmed that the information contained in the foregoing is correct to the best of her knowledge and belief.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.


Executed August 4, 2020 in Reading, Pennsylvania

Bridget Cambria, Esq.

# EXHIBIT G

**Declaration of A.C.**

1. My name is A.C. I am seeking asylum in the United States with my one-year-old baby girl, E.R.

2. I was detained by Border Patrol on approximately July 20, 2020. The Border Patrol officers took me to a really cold building called the "hielera," and we were there for three days. I could never tell if it was day or night, and they gave me a mattress for my daughter and I to sleep on. The food was horrible; they gave us raw tacos. The lights were never turned off, so we could not sleep. It was very bad.

3. I arrived with my daughter to the South Texas Family Residential Center in Dilley, Texas on July 24, 2020 in the afternoon with the driver and a guard; no other families arrived with us. After I got out of the car, I was taken to a building where I sat at a desk with an immigration official.

4. There, an ICE officer asked me if my daughter was still breastfeeding, and I told him no.

5. He then asked me, "Do you prefer that your daughter go directly to your family and you go to another detention center? Or do you want to stay here with your daughter? If you stay here, you will be with your daughter the whole time, but if your daughter leaves, we will transfer you to another detention center."

6. He told me if I wanted my daughter to be with my family, my family would have to come to Texas pick her up. He didn't tell me when I would see my daughter again or give me any other explanation.

7. I was not offered a phone call when I first arrived at the detention center, or after the man asked me the question. I was not told I could call someone before making a decision. I thought I had to make a decision right away. I hadn't even had time to talk with a lawyer yet.

8. I did not understand why I was being asked this question. I was stunned. My daughter is a baby—just over a year old. The person that is my sponsor in the United States is my partner's uncle. He has agreed to welcome us and support us into his home, but I cannot imagine sending my baby to him alone.

9. The officer then gave me a piece of paper and told me to sign if I didn't want to be separated from my daughter.  I was scared, so I signed right away.

## Declaration of Natalie Lerner

I, Natalie Lerner, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.    I am a Paralegal with Proyecto Dilley, where I have worked since January 2020.

2.    I am fluent in the Spanish and English languages.

3.    On August 6, 2020, I spoke with A.C. by telephone. Because I am located in San
      Antonio, and A.C. is in Arizona, I was unable to meet with A.C. in person.

4.    During my telephone call with A.C, I read the entirety of the "Declaration of A.C." in
      Spanish.

5.    I swear under the penalty of perjury that A.C. confirmed that the information
      contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed August 6, 2020 in San Antonio, Texas.

Natalie Lerner

# EXHIBIT H

## <u>SWORN STATEMENT OF G.P.</u>

I, G.P., hereby swear and attest, under the penalties of perjury, that the following is true and correct to the best of my knowledge:

**Initial Intakes**

1. I arrived to the United States by boat with my two children – my 13-year-old son and my eight-year-old daughter.  We fled our country because my life and my children's lives were in danger. We believed we would be killed.

2. Immigration in Florida detained us and took us to a detention center. From there, three officers took us on a commercial plane, with other passengers, from Miami to Philadelphia.

3. Two of the officers we are sitting behind us and one ahead of us. There was no way to respect social distancing on the plane.  Especially inside the van from the Philadelphia airport to the Berks County Residential Center, we were all sitting next to each other.

**Medical Conditions**

4. When I arrived at Berks County Residential Center with my family, I was extremely sick from the journey the United States.

5. During the initial medical check-in at Berks, I was given a TB shot.  I showed a terrible allergic reaction and had to be taken to a hospital outside the facility.

6. My daughter also had some urinary infection, which was prescribed medication by the medical staff.

7. I continue to suffer severely from the trip and have asked for assistance from the medical providers. They are considering whether to send me to a specialist.

**Testing for COVID-19**

8. They tested my children for COVID-19 upon our arrival at Berks, and they tested me one more time a week after we were in quarantine.

9. A nurse performed the test using an applicator and putting it in our nose.

10. We were not given the results until 18 days after we arrived.

11. The reason that they had to retest me was because I was severely sick when I arrived at Berks, and due to the reaction to the TB shot I had be taken to a hospital to have X-rays done of my chest and lungs.

**Quarantine**

12. We were placed in quarantine upon our arrival at Berks. Initially, immigration told us that our quarantine would be only 14 days, but they kept us in quarantine for an extra four days. They didn't tell us why we had to stay in quarantine longer.

13. All I could do was to pray to get out of our quarantine room soon. It was horrifying.

14. During quarantine, I was only allowed to speak to staff when I needed something. The only way to communicate with the staff was for me to knock on the door of the room and if staff were close by, they would come over.

15. I only spoke to my relatives once during the quarantine.

16. During the 18 days that we were in quarantine, no one told me I have the right to speak to an attorney.

17. We were not allowed to leave the room except when we were allowed time to shower.

18. My 13-year-old and my 8-year-old kids were stuck with me inside the small room, with no educational or alternative exercise activity. The only things they had access were a TV and some English books.

19. Besides the initial check-in, my kids did not have a chance to speak to a doctor regularly while we were in quarantine. Our only interaction with the medical staff was when they would come to take our temperature and give us our medications.

**PPE**

20. The staff told us that we must wear the masks everywhere except when we are in our room.

21. My son is allergic to the surgical face masks that they give us every day. He has been asking for a cloth mask, but none has been provided. So he is forced to wear the disposable mask all day, even though he is allergic to it.

22. My little daughter has difficulty keeping the mask on. Once every couple of hours, we must remind her to put it back on, especially when she is playing with other kids. It is very difficult for the children to keep masks on all day long and they often take them off or forget to put their masks on.

23. We have to hand our ID card to the staff whenever we need something like a nail clipper. While exchanging our ID, the team never wears gloves.

24. The only staff who wears gloves are the staff that serve us food.

**Social Distancing**

25. Nobody can stay 6 feet from each other in this place.  It is impossible.

26. There are only a few places that we can be in this facility.  If we are not in our rooms, we are usually in a group of more than ten people.

27. On average, during the day, I have to be in a room with more than 15 people, more than ten times.

28. We all, residents and staff, eat together at the same time in the same room. Usually, there are around 20 people in one small cafeteria.

29. The kids all play together in the same playground.

30. The kids hug each and touch each other all the time. The kids play with the toys together and touch the same toy over and over again.

31. We all watch TV together, residents and staff, in the same room.  It is not very big for as many of us as there are and there is no way to really socially distance.

**Cleaning Supplies**

32. At Berks, the Residents are responsible for cleaning the facility.  We clean the majority of the area in the facility.   We clean one time per day and are given cleaning products to clean with only during the times we are assigned to clean.

33. I don't know if staff disinfect the bathrooms after they are used all day, because I have never seen them doing so.

**ICE's effort to release**

34. ICE never spoke to my sponsor, even though I have provided the name and contact information of our sponsor where we would go if we were released from Berks.

35. ICE talked to me about separating me from my kids. The first day that we arrived, during our intake, I was signing our check-in forms for myself, and my son was signing for himself.  I was told that I had to go downstairs in order to sign my daughter's papers.  That is when ICE showed up in our room. ICE told me I could release my children to my U.S. sponsor, and I would go to jail pending our immigration process.

36. I was very weak, because we got to Miami in a boat, and then flew to PA, I was barely conscious. ICE showed me two papers and asked me to sign them. I started crying, so they left, telling me to contact them when I'm ready to let my kids go with someone else.

37. Then again, last week, ICE asked me to sign the same papers again, which were in English and not my native language, in order to give up my children.

38. I couldn't handle the pressure, and I started crying again. ICE did not explain what these papers were. I don't remember what ICE did or didn't tell me, because I was very disoriented and extremely upset about being asked to separate from my children. ICE told me they would be back once again when I'm ready.

Date:   08/03/2020                               /s/ G.P.

### DECLARATION OF BRIDGET CAMBRIA

I, Bridget Cambria, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am an attorney with Aldea- The People's Justice Center;
2. I obtained the foregoing declaration by telephone and utilized a telephonic language line interpreter in the Haitian Creole language on August 3, 2020;
3. I am not permitted to enter the Berks County Residential Center to meet with the client in person because of the COVID-19 pandemic and the current operating ruled of the facility which have banned in person legal visitation;
4. During my telephone call with G.P., she confirmed that the information contained in the foregoing is correct to the best of her knowledge and belief.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed August 3, 2020 in Reading, Pennsylvania

Bridget Cambria, Esq.

# EXHIBIT I

**Declaration of O.M.M.**

1. My name is O.M.M. I fled the Democratic Republic of the Congo to seek asylum in the United States with my three children: M.K., who is fifteen years old, C.K., who is ten years old, and E.K., who is six years old. We have been detained for 31 days.

2. My children and I were brought to the South Texas Family Residential Center on July 18, 2020.  When we first arrived here, a nurse tested us all for COVID-19. No one ever told me what our test results were, but my lawyers said that ICE told them I had tested negative.

3. After we went through the entry process here and were tested for COVID-19, my children and I were taken to a room for quarantine, where we were held for approximately 15 days.

4. My children and I spent most of our time in that quarantine unit inside the room. Sometimes, we would be brought outside for one hour, always watched by the guards, and then brought back inside. Besides that one hour, the only time we left our room was to go to the bathroom. My kids were given coloring books; even my 15 year old only had princess coloring books to keep her occupied. They all got bored very easily, and kept asking me when they would get out and why they had to be inside for so long.

5. Since none of the guards in that building spoke Lingala, I would often try to speak with them in Spanish or using hand signals. For important matters, the guards would sometimes call a phone interpreter who speaks Lingala.

6. While we were in quarantine, I had my interview with the asylum office, and I was told I got a positive decision and would be released.  I was so happy that my children and I were going to be free soon.

7. On Sunday, August 2, 2020, the guards came to my room and took my children and me to a different room in the "regular" part of the detention center, where we didn't have to be in quarantine anymore.  My kids were so excited that they weren't going to have to spend all day in the room.

8. Later that same day, maybe an hour or so after we had been moved to the new room, the guards found us again. They told me that we had to move back to the room we had been in while we were in quarantine. They didn't tell me why we had to move back into quarantine.

9. The next day, on Monday, August 3, 2020, our family was tested again for COVID-19.  I asked, but no one told me why we were being tested again for COVID-19. I think it was because we would soon be released from the center.

1

10. A few hours after we were tested again, a doctor came to our room. She told us that I had tested positive for COVID-19, but that my kids had tested negative.  She told me I would have to be in quarantine for 14 days, even though I do not have any symptoms.

11. The doctor also told me that because I have COVID-19, ICE was going to separate me from my children.  My children and I all immediately started to cry.  I was terrified—I never want to be separated from my children, and my children didn't want to be separated from me. We are very close, and we do everything together. I begged the doctor not to separate us.

12. Some guards took my children and me to a completely different building and put us in two small rooms across from each other.  Each room only has two beds. My children were sobbing when the nurses told us we would have to be here for fourteen days.  The nurses put my six-year-old daughter, E.K., and me in one room, and my ten-year-old son, C.K., and fifteen-year-old daughter, M.K. in the other room across the hall from us.  They told me that I would get to spend two nights with each child, starting with my six-year-old, E.K.

13. That was three days ago, but the staff has not moved E.K. out of my room. Instead, yesterday, my ten-year-old, C.K., joined E.K. in my room. I didn't know he was going to move into the room; C.K. explained that he had asked a nurse, and she had called her boss, who said it was okay. But my fifteen-year-old, M.K. was very upset at being left alone in the room by herself, so C.K. moved back to join her.

14. With just E.K. and I in my room, I can only see my older children if we are both standing at the doors to our rooms. We look through the small window in each of our doors and wave to each other.  The only way I can communicate with my children when we are in our rooms is by signing messages to them through the door window.  How am I supposed to be a mother to my children if I can't talk to them? Often at night I start to worry about my children, and I get up to look at them through the window, but when they are in their beds I can't see them. I just hope that nothing bad will happen to them.

15. My children and I spent most of the rest of Monday crying.  I had to stand at the door so I could make gestures to communicate with them.  Through the little window, I signaled to them that they should sleep and pray. This morning, my 10-year-old signed to me that he was having ear pain. He pointed to his ear and mouthed the word, 'pain' in Lingala. I went to pray for him, and when I went back to the window, he was not in the window in his room.

16. The room I am in now is very, very small.  There are two beds in this room, but the room is so small that during the day, I have to move one of the beds under the other.  The lower bed has wheels, which helps me move it, but also makes it unsteady. Whenever someone sits down on the bed, the bed moves. Twice, E.K. has hit his head on the wall when the

bed moved; another time, he hit his head on the metal headboards because he was thrown off balance. I have also had trouble getting out of the room without hurting myself when both beds are set up.

17. There's also a table, a TV, a toilet, a sink, and a shower.  There is no window in the room, other than the small window on the door. There's no door in between the bathroom area and the rest of the room.  The only separation between the bathroom "area" and the rest of the room is a curtain.  If I do not pull the curtain when I use the bathroom, anyone walking by in the hallway would be able to see me through the window in the door to my room. I have felt embarrassed when I have had to make bowel movements in front of my child.

18. I don't know if the room where my other children are is like my room, since I haven't been able to see inside it.

19. My children and I are only allowed to leave our room once a day, to spend a couple minutes outside.  On Monday, we were allowed to sit on a bench outside the building where our rooms were located, but it was the middle of the afternoon, and it was way too hot for us to be outside. The kids complained about the heat, and there was nowhere to get water, so we were not outside for very long. I was sad because this was the only opportunity I had to speak to my children all day, but I did not want them suffering in the heat. On Tuesday, we were not given the opportunity to go outside. Yesterday, Wednesday, the kids played outside a little bit but were soon thirsty and asking for water. I asked the guard who was watching us, and she said if we wanted water we would have to go back inside.

20. Aside from the one hour we are permitted to go outside each day, my children and I have to remain in our small rooms.  There isn't much my children have been given to occupy themselves; just a coloring book and small toys. They haven't been given any homework or educational activities for as long as we have been detained in this place.

21. I am very worried about what might happen to me and my children. I have high blood pressure and I used to take medication to control it. The doctors here have given me medicine to help control my high blood pressure, but I do not know if it is the same medication I took before. Before we were brought to this detention center, we were held in a really cold building for 11 days.  My blood pressure got so high the first day we were there that I had to be taken to the hospital.  I don't know where this hospital was, but I was sent to the hospital for hours at a time on and off for three days.

22. I am scared that something could happen to me, and then my children would be left without their mother.  I pray every day that God will protect us and help us be free soon.

3

### Declaration of Mackenzie Levy

I, Mackenzie Levy, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.    I am a legal assistant and Family Separation Coordinator with Proyecto Dilley, where I have worked since August 2018.

2.    On August 6, 2020, I spoke with O.M.M. by telephone. Given the COVID-19 pandemic and O.M.M.'s placement in medical isolation, I am unable to enter the South Texas Family Residential Center to meet with O.M.M. in person.

3.    During my telephone call with O.M.M., I read the entirety of the "Declaration of O.M.M." in English to a certified Lingala interpreter, who then translated what I said into Lingala.

4.    I swear under the penalty of perjury that O.M.M. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed August 6, 2020 in San Antonio, Texas.


Mackenzie Levy

# EXHIBIT J

**Declaration of S.M.C.**

1. My name is S.M.C.  I fled Guatemala to seek asylum in the United States with my seven-year-old daughter, D.A.S., and my four-year-old son, A.M.M.  We have been detained for 144 days at the South Texas Family Residential Center in Dilley, Texas. Before being taken to Dilley, we were detained for 22 days in 2 different places along the U.S.-Mexico border.

2. When my children and I first arrived at Dilley in April 2020, we were not placed in quarantine.  Instead, we were given a room in the Brown complex.  At that time we could move around the detention center somewhat freely.  We were allotted time to go to the library, to go outside, to eat in the dining hall, to see other families, and to go to the playground.

3. My son A.M.M. is developmentally delayed. Even though A.M.M. is four years old, he struggles to speak. Around June 2020, A.M.M. and I were taken to San Antonio for a medical appointment related to his disability.

4. Shortly before the first appointment, I was informed my seven-year-old daughter was not allowed to come with us and was required to stay at the detention center alone, in the care of guards who work for the facility, when A.M.M. and I went to his medical appointment. I asked the guard who was going to bring her to daycare why D.A.S. can't come with me. The guard said it was because of the coronavirus, that D.A.S. can't come with us because she could be infected. I thought this was weird because A.M.M. and I still live with D.A.S. when we get back from the hospital, so if we got infected at the hospital, she would probably catch the virus too.

5. Now that my children and I are living in quarantine, when A.M.M. and I go to the hospital, D.A.S. stays in our room, with a guard in the room with her, watching her. It takes about four hours total to bring A.M.M. to his medical appointments and back, and I worry a lot because D.A.S. is small, and she tells me she wants to be with us. I don't like having to leave her alone with a guard because she gets very anxious being apart from us. The last time we were brought to the hospital, D.A.S. started to cry and said she didn't want to live anymore because I didn't love her because I left her with the guard. She expressed that whenever A.M.M. and I left her alone in the detention center, she thought that we were leaving her forever and were never going to come back. I felt terrible that day.

6. When we came back that first afternoon from San Antonio, my children and I were moved to the Blue complex, where we were placed in "quarantine." I asked why, when the officers who went to the hospital with us weren't being quarantined; they went back

to their positions at the daycare and other parts of the center. The guard who was with me said, "you will stay in quarantine to prevent getting sick."

7. Life in quarantine is very difficult, especially with two young kids.  The three of us are in the room by ourselves, and that is where we spend most of our time.  We are only allowed to leave our room to go to the near-by playroom, and to the gym for one hour.  We are not allowed to go outside.

8. My children are allowed to go to the nearby playroom, but they are not allowed to play with any children or see anyone else.  My children get very lonely and they miss their friends.

9. We spend approximately two hours a day not in our room when in quarantine.  We are allotted one hour in the gym a day.  When we go, we are the only family there.  However, we don't get to decide when to go.  There is a set schedule for when we are allowed to go to the gym, so if we don't go during our assigned time, we miss our opportunity to go that day.  For example, one day last week, our assigned time to go to the gym was during our lunch time.  So we had to choose—eat or leave our room.  On that day, my children didn't get to go to the gym.

10. After A.M.M.'s first medical appointment, we were placed in quarantine for approximately 16 days.  Then we were moved back to the Red complex, out of quarantine, for approximately 8 to 10 days before my son was scheduled for another medical appointment in San Antonio, in late June 2020.

11. When we returned from my son's June medical appointment, we were again placed in quarantine. This time, we were quarantined in the Brown complex, where we have been ever since.

12. My son has had approximately six medical appointments in San Antonio because of his disability.  Each time my son has an appointment, I go with him to San Antonio.  The very first time we were taken to San Antonio, in June 2020, both my son and I were tested for COVID-19 when we were brought back to the detention center.  But since that first appointment, we have never again been tested for COVID-19.  Instead, when we come back from the appointment in San Antonio, our temperatures are checked.  Regardless of our temperature reading, we are placed in quarantine.

13. We were originally told we were only going to be in quarantine for 14 days.  But since we have had to be in quarantine after every single medical appointment scheduled for my son, we have been in quarantine almost every day since June, with the exception of the 8-10 days we were allowed back out of quarantine after our first medical appointment. I think we've been in quarantine for about 45 days in total, all combined.

14. My children are becoming more and more desperate. They just want to be free.  My
daughter is counting the days we've been in quarantine.  She just wants to go outside and
play with children her own age.  My son is desperate to play outside.  He begs me to let
him go outside. He cries and screams when I tell him he can't.

15. Sometimes I am consumed by feelings of desperation.  I see my children crying, losing
their minds because they've been confined to a jail and it breaks my heart.

### Declaration of Mackenzie Levy

I, Mackenzie Levy, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am a legal assistant and Family Separation Coordinator with Proyecto Dilley, where I have worked since August 2018.

2. I am fluent in the Spanish and English languages.

3. On August 6, 2020, I spoke with S.M.C. by telephone. Given the COVID-19 pandemic, I was unable to enter the South Texas Family Residential Center to meet with S.M.C. in-person.

4. During my telephone call with S.M.C., I read the entirety of the "Declaration of S.M.C." in Spanish.

5. I swear under the penalty of perjury that S.M.C. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed August 6, 2020 in San Antonio, Texas.

Mackenzie Levy

# EXHIBIT K

**Declaration of S.L.R.**

1. My name is S.L.R. I fled Honduras to seek asylum in the United States with my three-year-old son, A.V.L.  We have been detained here for 329 days.

2. I continue to be detained at the South Texas Family Residential Center with my son while the coronavirus spreads all around us.  I am afraid that it is only a matter of time before my son and I get sick here.

3. Most of the time, we get notices when a guard tests positive for COVID-19, though I believe there are times when we don't get notified.  There are two different notices that they provide.  The first notice simply informs you that someone who is detained in the facility, or someone who works in the facility, has tested positive for COVID-19.  The second version of the notice informs you, specifically, have been exposed to a person that tested positive.

4. I have received at least 18 notices that someone at the facility has tested positive for COVID-19.  The last notice I received was on Friday, July 31.  I received two notices that day.  The first notice said another guard had tested positive for COVID-19.  The second notice said that a "resident" tested positive for COVID-19 that day and that her last day of exposure to others in the facility was the same day, July 31.

5. Even though more and more guards test positive for COVID-19 every week, most of the families here, including me, have only been tested once for COVID-19.  In the middle of June, everyone in the facility was instructed to test themselves for COVID-19 using a nasal swab provided by the medical unit.  I didn't want to test myself or my son because I was afraid I would not conduct the test correctly.  The nurses said that the test wasn't hard and that I had to conduct myself because did not want to get contaminated by me.  That made me feel awful and scared.  No one ever told me the results of the exam.

6. I haven't had a COVID-19 test since June, and no one is making sure that we're not getting sick.  In the last week, no one has checked my or my son's temperature, and no one has asked if we have any symptoms.

7. I am trying to do everything I can to protect my son, but it is impossible to do in detention.  My son and I were each given two masks over two months ago.  If we need a replacement, we can ask one of the guards, but many times they tell us they do not have a replacement.

8. When we were given the masks, no one explained to us when or how we were supposed to wear it.  I keep my mask on whenever I am with other people, but it is very difficult for my son to do so.  He's only three years old, and his mask falls off or he takes it off very

often.  I have to remind him to put his mask back on approximately fifteen times each hour that we are outside of our rooms.

9.  I also still see some guards walking around without masks.  Last week, I saw some guards walking down the hallway without a mask, and this morning I saw another guard without a mask.  The guards here also rarely wear gloves.  The employees who serve our food in the cafeteria often don't wear gloves either.  And even after some employees finish eating, they leave their masks off as they sit at the table and talk with one another.

10.  Even though I know we need to social distance, I am often in rooms with a lot of people, and every day, several times a day, I am less than six feet away from someone else.  When we are lining up to go to the cafeteria, we must wait in line with about forty other people.  We are frequently in big groups in the playground and the gym as well.  And most of the time when I go to the communal bathroom for our living complex, there are other people there as well.

11.  It's especially hard for my son to keep a safe distance from other people.  He's just a little boy.  He's very energetic, wants to run around, play with his friends, and just generally be a little boy.  He gets to be outside of our room for about three hours a day, and during that time he's playing, running, and coming into physical contact with other children.  He needs this time to be free, but I am worried that he could be coming into contact with the coronavirus.

12.  Even after all these months, there are still times when I go to wash my hands and find that there is no soap.  This happened to me a couple times in the last week.  It took about four or five hours for a soap dispenser in my hallway to be refilled.  In the bathroom that I have to use in my hallway, there is rarely any soap, and the dispenser is never refilled.  There's no hand sanitizer there either.  I also have only seen staff clean the bathroom approximately once per day, but I don't see them using disinfectant.

13.  My son and I have been here for so long.  I just want to be free with my son so we can shelter in place and be safe with our family.  I think it is cruel that we have been kept in here for so long and I am so scared of what is going to happen to us.

## Declaration of Stephanie M. Alvarez-Jones

I, Stephanie M. Alvarez-Jones, hereby declare under penalty of perjury as prescribed in 28

U.S.C. § 1746:

1.      I am a Staff Attorney and Justice Catalyst Fellow with Proyecto Dilley, where I have worked since September 2019.  I am an attorney licensed to practice in the State of New Jersey.

2.      I am fluent in the Spanish and English languages.

3.      On August 6, 2020, I spoke with S.L.R. by telephone. Given the COVID-19 pandemic I am unable to enter the South Texas Family Residential Center to meet with S.L.R. in-person.

4.      During my telephone call with S.L.R., I read the entirety of the "Declaration of S.L.R." in Spanish.

5.      I swear under the penalty of perjury that S.L.R. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed August 6, 2020 in San Antonio, Texas.

Stephanie M. Alvarez Jones

# EXHIBIT L

**Declaration of D.A.M.**

1. My name is D.A.M. I fled Honduras to seek asylum in the United States with my 7-year-old son, Y.H.A. We are currently detained in the South Texas Family Residential Center, where we have been for 299 days.

2. I write to tell the court about a large communal celebration that took place in Dilley on Thursday, July 2, 2020 to celebrate Independence Day.

3. In the morning we were separated by complex to play games. Up to 20 families gathered together in each complex. Y.H.A. and I, and the other families from the green complex, started the day off with games in the green gym. While the green complex families played in the green gym, the families from the red and yellow complexes were in the crochet gym, and then we switched.

4. In the green gym, there was a giant game of tic tac toe that the kids played on the cement floor. There were soccer games and potato sack races. The lines to play each game in the green gym sometimes held up to 8 people, people were not spaced six feet apart.

5. We played tug of war on the volleyball court in teams of moms against the kids. We were all close together, one behind another, to pull the rope. When one of us fell down, we all fell down on top of each other.

6. There was an assortment of activities in the crochet gym, including board games, drawing, puzzles, and face painting.  The tables at each activity had assignments about where to sit in order to socially distance, but they were almost completely ignored because everyone wanted company during the activities. Those who were coloring would borrow from other groups' boxes of markers until they were all mixed up. While we used markers and puzzle pieces, they were not cleaned between uses.

7. The person offered face painting did not wear gloves.

8. After the two rounds in the green and crochet gyms, everyone from all of the complexes was brought together into the red gym for water games.  We divided into four groups of about 40 people, but without consideration for complexes; everyone got mixed together within the groups. Each group rotated through various water activities, but after they separated us for the first games, we were just allowed to go wherever we wanted.

9. Y.H.A. and I started off with water balloon hot potato.  There were about 30 of us playing the game. We stood in a circle passing around water balloons. We started off very close to each other, almost touching, then spread out as the game went on.

10. For the water gun fights, we all had to wait in line to turn in our ID cards in exchange for water guns. The guards in charge of handling our ID cards guards did not wear gloves. After the first group of 40 returned the water guns at the end of the activity, the guards wiped them down with disinfectant towels before giving them to the second group. But every time the guns ran out of water we had to turn the guns back in to the guards to be refilled, and the guards would take the empty gun and hand you a different gun that was already filled with water, without taking time to

1

clean those guns before passing them along to someone else. So it was as if all of the moms and kids were exchanging their water guns with each other; my son used four different water guns over the course of the 20 minute-long activity. Some of the games that we played ended with the guards giving out prizes like candy to the children and mothers who played, and the guards did not wear gloves when they handed out these prizes.

11. All the guards at the activities had masks but no gloves, and many people pulled their masks down because of the afternoon heat. Almost none of the children wore masks, and I saw many of the moms take theirs off too; some guards pulled theirs down as well. I saw some of them take down their masks and then forget to pull them back up for a while. We were all sweating and many people were breathing heavily in the heat.

12. In between games, we congregated in groups of up to 8 people squeezed together at shaded tables to rest, everyone from different complexes mixed together.

13. I was very reluctant to participate in these activities given how scared I am of catching coronavirus and how little social distancing there was. But my son has been so depressed and he was so excited to play with his friends. My son has not opportunities for fun in detention. It was nice to forget about the pandemic for a day and pretend it did not exist.

14. On July 3rd, the day after the celebration, I received a notice stating that a new guard tested positive for COVID-19 and was last in the facility on July 1st.

2

**Declaration of Rosalie Miller**

I, Rosalie Miller, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am a legal assistant with Proyecto Dilley, where I have worked since November 2019.

2. I am fluent in the Spanish and English languages.

3. On August 6, 2020, I spoke with D.A.M. by telephone. Given the COVID-19 pandemic, I was unable to enter the South Texas Family Residential Center to meet with D.A.M. in-person.

4. During my telephone call D.A.M., I read the entirety of the "Declaration of D.A.M." in Spanish.

5. I swear under the penalty of perjury that D.A.M. confirmed that the information contained in the declaration is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed August 6, 2020 in San Antonio, Texas.

Rosalie Miller

3

# EXHIBIT M

## <u>SWORN STATEMENT OF G. S. C.</u>

I, G.S.C., hereby swear and attest, under the penalties of perjury, that the following is true and correct to the best of my knowledge:

**Initial Intake**

1. We arrived at Berks County Residential Center on March 11, 2020. I came with my wife and my two children – ages 11 and 3.  It has been close to five months that me, my wife and my two children have been detained at this facility.

2. Before coming to Berks, we were detained in another facility in southern California for two days, and then we were transferred to a facility in Los Angeles for six days. In this facility, there were 26 people in one room, with so many others coming and going. There was no room to breathe with so many people together, so they moved us to the facility where we are now.

3. Immigration officers, two female and one male, took us from Los Angeles to San Diego in a car. We then flew on a commercial flight to Dallas, Texas. And from there, we got on another America airline plane to go to Philadelphia.

4. During the whole trip, no one was wearing a mask, and there was no way to respect social distancing because all of us were sitting next to each other, including with the officers.

5. After we arrived, they put us with the general population at Berks from the first day.

**Medical Conditions**

6. My children have bumps growing around their mouths and inside their throats. The doctor here told me that there is a virus going on inside the facility. Two other infants here have been struggling with fevers.

7. I have seen a psychologist because I started having anxiety issues since being detained here. I have been experiencing episodes of panic attacks. The doctor prescribed some medication to be able to help me sleep after my attorney submitted a medical request for me to have an appointment with him.

8. My mental health issues started right after I learned of the negative decision on our asylum request. I felt so much pressure in my heart and guilt of not being able to care for my wife and children and provide them any safety that I lost my ability to sleep. There would be nights that I couldn't fall asleep at all.

9. I had a rush of thoughts and emotions that I couldn't control. I thought about hurting myself. I thought about killing myself, but then my children came before my eyes. I

wanted this mental pain to go away, but I am a Christian and I did not carry through
with hurting myself because I believe that God doesn't approve for it.

10. But I have continued to struggle.  I can no longer eat.

11. I started hearing voices, people calling my names like when the staff will call me to
talk to immigration or my attorney.  But whenever I would go and ask the staff who
called me, they would tell me no one had called me.  This happened to me again and
again. The voice I hear belongs to a female. It felt very vivid. I definitely could hear
her calling me and talking to me.

12. I lost my concentration. I can't keep track of what I am trying to talk about, even in the
moment. I get lost in my head that I feel I want to take my head out.

13. The doctor gave me some medication. It would numb my thoughts and make me able
to fall asleep for 3 to 4 hours at night. Then I would wake up and I see that I'm still in
prison with my children, and I'm about to be deported to where I fear the most.

14. I feel hopeless. I want these voices to go away. They only go away when I take
medications, but as of two months ago, the doctors stopped refilling my prescriptions.
I don't know why they stopped giving me this medication.

15. My wife has also been diagnosed with PTSD.  She needs to see a specialist, but we
can't go to one. I can't provide this to her since we are in prison.

## Testing for COVID-19

16. In all the time that we have been detained here, we have only been tested once for
COVID-19. A nurse performed the test. I had to hold my child tight so she would not
feel the pain.

17. We were given the results three days later, which was negative.

18. Unlike before, they do check our temperature every day.

19. We are never asked whether we or our children have any COVID-19 symptoms.

## Quarantine

20. We were never placed under quarantine since we have been here. But on June 23rd, we
were told that they planned to separate my wife and children from me, that they would
have to quarantine us in our rooms because Immigration was bringing new people to
the facility.

**PPE**

21. In the past, the staff would give us one surgical mask a week, but recently they have been giving us one paper masks every day.

22. In the beginning, the staff instructed us to put the mask on with white side outside, then two weeks ago, the staff told us no, to put the blue side on the outside. We don't know why they don't know how to wear a mask.

23. My youngest daughter has significant problems with wearing the mask. She is only three. She feels suffocated. She takes it off, especially when she is playing with other kids. The staff tells us to wear it everywhere, all day long, except inside our bedrooms, but my daughter doesn't comprehend these instructions. Every time she takes it off, and we put the mask back on her face she takes the mask and tears it apart.

24. I cannot tell you how many times I have told her to put her mask on throughout the day. It's a daily struggle for us. She takes it off because she is just little and doesn't understand why she has to wear mask. When she takes it off, the staff blames us for not taking care of her.

25. The only staff who wear gloves are the ones who serve us food. The rest of the staff don't wear them. Throughout the day, we have to hand our ID cards to the staff for different reasons. When we exchange the ID card, none of us wears gloves.

**Social Distancing**

26. It is impossible to social distance here. The only time we can do social distancing is when we are sleeping.

27. We are in a group of more than 10-15 people all the time throughout the day, except when we are in our rooms. But my wife and children are in one room and I am in another. I am not allowed in their room or they in mine. So if we want to spend time together as a family, we have to be in the group areas where all the other families are doing the same thing, spending time together.

28. These large groups of people mostly happen in the cafeteria, lobby, playground, and the common area where the TV is, and during the food hours.

29. During mealtimes, there are between 20 to 30 people in one room inside the cafeteria. While we are eating, no one wears a mask. The families and the staff all eat together during mealtimes.

30. Our kids also play with each other all day long, often without wearing any mask. As I explained, a lot of the children are younger and they have a hard time keeping the masks on. None of us have gloves to wear. The children hug. They share their toys. They

are being kids doing what children do. They don't understand the danger of being in close contact with each other.

**Cleaning Supplies**

31.  Residents do the cleaning at Berks. We clean every day, for one dollar a day.  We are giving cleaning products only during the times we are assigned to clean.

32. I have never seen the staff to do the cleaning in all the months that I have been here.

**ICE'S effort to Release**

33. ICE has never called our sponsor regarding anything. We have always provided our Sponsor's name and contact information.

34. In May, Immigration came and talked to my wife and me about separating us from our kids.  Our children would be sent to our sponsor and we would go to another prison. We told Immigration we did not want to be separated.


Date:   08/03/2020                                    /s/ G.S.C.__            _____

## DECLARATION OF BRIDGET CAMBRIA

I, Bridget Cambria, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.  I am an attorney with Aldea- The People's Justice Center;
2.  I obtained the foregoing declaration by telephone and utilized a telephonic language line interpreter in the Haitian Creole language on August 3, 2020;
3.  I am not permitted to enter the Berks County Residential Center to meet with the client in person because of the COVID-19 pandemic and the current operating ruled of the facility which have banned in person legal visitation;
4.  During my telephone call with G.S.C., he confirmed that the information contained in the foregoing is correct to the best of his knowledge and belief.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.


Executed August 3, 2020 in Reading, Pennsylvania

Bridget Cambria, Esq.

# EXHIBIT N

**SWORN STATEMENT BY M.N.**

I, M. N., hereby swear and attest, under the penalties of perjury, that the following is true and correct to the best of my knowledge:

**Initial Intake**

1. I arrived at the Berks County Residential Center on March 18, 2020. In total since arriving in the United States, we have been detained for 146 days.

2. I arrived to the United States with my husband and 2 year old child.  Before we were at Berks, we were detained in some facility for over a week. I was separated from my husband. I was in a room with 20 or more people. There were so many people coming and going from the room all of the time.

3. The officers that were transferring us from the border to Pennsylvania were not wearing any mask. When we arrived at Berks, they did not isolate us.  At the time that we arrived at Berks, there were many people at Berks. We were just given an ID badge and put in rooms next to other families.

**Medical Condition**

4. The staff has never asked us if we have any COVID-19's symptoms. Even when we had difficulty breathing, and we went to check with the doctor, the doctor said it was nothing.

5. My daughter has had rashes all over her neck and back, she has been feverish for quite a while, and she keeps getting sores/blisters on her mouth and lips.  Because of these soars and blisters she does not want to eat or drink and they hurt her.

6. I myself am extremely sick. It's been more than a month and a half that I am not able to sit, lay down or walk properly, because of the pain I feel in my breast, chest, and back. It took weeks of me being in excruciating pain, to the point that I was constantly in tears before a doctor would even see me.  When they did finally examine me, the doctors found a lump, a mass inside my breast.  Since then, I have been in and out of the hospital. The doctors don't tell me what is wrong with me. They only tell me that this lump is because of the stress. How is it that the stress has caused a physical lump in my breast? I am very worried that this lump is something serious and it is not being properly treated.

7. Recently, I also have developed stomach issues because of the amount of Ibuprofen that the medical staff is giving to me.  I am given up to 6 pills a day, but the pain doesn't go away. I am constantly in tears due to the severe pain.  I can't do even normal activities, everything causing me extreme pain.

8. I've started losing my hair.  I'm afraid the mass is something terrible, but the medical staff does not do the biopsy to tell me what this mass is and whether or not it is dangerous for my life.

9. I have a three-year-old daughter; she stays with me; I can barely provide for her due to my pain. All I can do is pray the pain would go away.  Even though my husband is here with us, she is not allowed to stay in his room and he can only care for her when we are not in our rooms. He was only allowed to stay with her later when I was in quarantine.

**Testing for COVID-19**

10. I was tested for COVID-19 two times. My husband and my child were only tested once. The first time they tested me was on June 23, 2020, when they gathered all of us in the yard and tested all of us who were detained. The second time was after I had to go to the hospital for the lump and mass in my breast.

11. The staff didn't use to, but recently they have started taking our temperatures every day.

12. I would feel safer if we were all tested for COVID-19 more often.

**Quarantine**

13. I was placed under quarantine for 15 days, starting on July 2, 2020. I was quarantined because the doctors at Berks finally took me to a hospital in order to have a mammogram after the Berks doctors find a lump in my breast.   I was, and still am, in excruciating pain in my chest, breast, and back.

14. I was kept in quarantine for 15 days, even though I was told after four days that my COVID-19 test was negative.  The time that I was in quarantine was difficult for my child and me because she is overly attached to me. I specifically asked Berks staff to put me in another room, not our regular bedroom, so my child would not keep running toward the room, expecting to see me.

15. I was not tested again at the end of my quarantine. I was told that the reason I had to remain in quarantine after a negative test was because the incubation period for the virus is 14 days. I don't know why they didn't test me again at the end of quarantine to make sure I was not asymptomatic.

16. I was not allowed to talk to anyone; the only way I would see my husband was through the window. I couldn't even make any phone calls to family or my attorney.

17. I was only allowed to leave the room to take a shower. The shower was close to the place I was staying, and the staff would stop me from stepping even one foot further than the shower room.

18. In the beginning, the staff would not let me see my daughter, even through the window, but my daughter had some episodes of breakdowns. She would not play anymore and cried a lot. She is just a small toddler.  Because of her emotional distress, they finally allowed her to see me through the glass window.

19. There was nothing to do while I was quarantined. All I could do was watch TV, paint, and sleep.  I was not permitted to go outside or exercise.

**PPE**

20. At first, the staff used to give us a paper mask every seven days, but now, they provide it to us once a day if we ask for one. This change happened a little over a week ago when I was in quarantine.

21. The staff have now told us that there is a penalty for not wearing a mask, even if we want to take if off just to take a deep breath. If we do, the staff told us that they're going to write this violation in our file.  We have asked what they would write about, but the staff has not given us any answer.

22. We must wear a mask all the time except when we are in our rooms. This is very difficult for my three-year-old to wear a mask all day long.

23. The Staff still doesn't wear gloves except those who serve us meals.

**Social Distancing**

24. It's impossible to keep 6 feet away from each other at Berks. When they have an announcement, they will put everyone all together in a room like the cafeteria or the common room.

25. During mealtimes, there are approximately about 20 people, staff and residents in the cafeteria together.

26. It is not even possible to count the times my child is in close physical contact with another child.  Most of the children here are very young and it is impossible to keep them from playing with each other.  They share toys and are always in close physical contact.

**Cleaning Supplies**

27. Here, the Residents clean our rooms and also the common areas. I personally have never seen a staff cleaning; maybe they clean it when we are sleeping.

**ICE's effort to Release**

28. The only time that ICE has spoken to our relatives was in March when we first arrived. It was only to get information about their address. Otherwise, ICE has not talked to our sponsors during these past five months.

29. In May, Immigration officials came and asked us about whether we wanted to separate from our child. We were upset and terrified of losing our baby. We told Immigration very clearly that, no, we wanted to remain together. Our daughter is so little.


Date:   08/03/2020                              /s/ M. N._____ _____

## DECLARATION OF BRIDGET CAMBRIA

I, Bridget Cambria, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am an attorney with Aldea- The People's Justice Center;
2. I obtained the foregoing declaration by telephone and utilized a telephonic language line interpreter in the Haitian Creole language on August 3, 2020;
3. I am not permitted to enter the Berks County Residential Center to meet with the client in person because of the COVID-19 pandemic and the current operating ruled of the facility which have banned in person legal visitation;
4. During my telephone call with M.N., she confirmed that the information contained in the foregoing is correct to the best of her knowledge and belief.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.


Executed August 3, 2020 in Reading, Pennsylvania

Bridget Cambria, Esq.

# EXHIBIT O

<u>**SWORN STATEMENT OF B.L.**</u>

I, B.L., hereby swear and attest, under the penalties of perjury, that the following is true and correct to the best of my knowledge:

**Initial Intakes**

1. I arrived at the Berks County Residential Center on March 17, 2020, with my wife and our 19-month-old child.  It has now been 139 days since we have been detained at Berks.

2. When we first entered the United States, we were held in San Diego for seven days. There were so many people in that prison. There were more than 20 people in one room. I was separated from my wife and my child.

3. From California, Immigration took us on a full bus to the airport.  They put us on a commercial flight, American Airlines, to Texas, and then we had to transfer planes to another flight to Philadelphia. From the Philadelphia airport, we were brought to Berks by bus.

4. Three immigration officers brought us from California to Berks, two men, and one woman.  The two male officers told us they were taking us to be released to our families, but that was a lie.  They took us to another detention center, Berks.

5. During the whole trip from California to Pennsylvania, no one was wearing masks or gloves.  There was no social distancing.  One officer was sitting behind us, one in front of us and one on the opposite row of the plane.  During the car ride, we were all sitting right next to each other.

6. The only time that one of the male officers wore a mask was when my child became so sick that my baby started vomiting. That's when the driver took his mask and put it on his face.

7. After doing our initial medical intake at Berks, we were placed with the rest of the families. At that time, there were many families detained in this small building with us.

**Medical Condition**

8. Beginning around April 14, 2020, my child developed a fever since which lasted several days.  The medical staff did give him some medication, but I do not know what the medication was because the doctor did not explain what is wrong with him or what he prescribed for him. My son also has bumps all over his mouth. The doctor told me there is a virus going around this facility. The bumps initially went away, but they came back again two weeks ago.

9. My son also has had an infection for two weeks now.  He has a fever on and off again.

10. There was an incident between children. My son was playing together with another child who is detained here with us.  One of the kids accidentally hit my son in the eye. Now he has blood in his eye.

11. I, myself, have a couple of bumps on my head that are causing me to have headaches and pain.  I can't sleep due to this pain.  The doctor here has only told me I may need surgery to remove them.

12. My wife has become very depressed since we have been detained here.  She cries all the time, every day.  The attorney has referred her to the psychologist on site, but he has not helped her.

## Testing for COVID-19

13. The only time that we have been tested for COVID-19 since we have been detained here was on June 23, 2020. That day, we were all gathered in the yard. The medical staff were wearing suits like an astronaut and they put an applicator into our noses.

14. Four days later, we were told our results were negative.

15. Recently, they began to check our temperature once a day.

16. None of the staff has asked us whether our child or we have any symptoms of COVID-19. Even though my child had been feverish for weeks, we were only tested for COVID-19 on until June 23, 2020.

## Quarantine

17. My family and I have not been placed under quarantine at any time since March 18, 2020, when we arrived at Berks.  But around June 23, we were told that each of us would be quarantined in our room.  I have to stay and sleep in one room while my wife and child stay and sleep in a separate room.  So far, we have not been quarantined separately in our rooms.

18. Even from the moment we arrived from the southern border, we were never quarantined.  We were always kept with many people in general population.

## PPE

19. About two months ago, Berks started giving us one disposable mask every seven days. They recently changed that policy to now allow us a new disposable mask every day.

20.  But regardless of how many times they provide us with a mask, my son is too little to wear the mask.  My baby is only two and a half years old.  He won't wear a mask. And

actually the doctor inside the facility told me that it is dangerous to put a mask on a baby as young as him because he might develop respiratory issues.  This is very scary for me and my wife because our son cannot even use the protection of a mask.

21. Unlike before, we are now required to wear our masks all day long, except when we are in our room.  My son will barely wear his mask for 30 minutes.  He is constantly taking it off and I have to put it on him again and again.  I am not allowed in my wife and son's room so we cannot spend time together unless we are with all the other families in the resident areas.  And it is also very difficult for my little son to stay in one small room all day.  But we cannot get him to wear the mask.  We are in a very hard place and do not know how to protect our son in this situation.

22. We eat all our meals together with other families here and with the staff.  We eat at the same time, in the same room.  While we are eating, no one is wearing a mask, including the staff.

23. The only staff who wears gloves are the three staff who work in the kitchen and serve us food.  Besides that, none of the staff wear gloves in the facility.

**Social Distancing**

24. There is no social distancing in this center. All the kids play together. They are constantly in close physical contact with each other.

25. Parents are all in the common area where the TV is and usually about 14 residents plus 3 to 4 staff watch TV; or in the cafeteria, where more than 20 people eat at the same time.

26. On average, I experience being in a room with more than 15 people for 11 to 15 times a week. It is not even possible to think about being 6 feet away from another person.

27. Our kids have been here for so long that they have used to seeing familiar faces between staff, so when they see a familiar face, they want to go and hug them. I have told my kid so many times not to hug the staff, but he is two years and a half, he doesn't understand.

**Cleaning supplies**

28. To this day, residents are the primary source of cleaning the facility, from our rooms to the cafeteria, playground, common areas, and showers.

29. I have seen that staff some nights spray a cleaner on toys.

**ICE'S effort to release**

30. To my knowledge, ICE has never contacted our family sponsors outside the facility.

31. Since the incident in May 2020, where they asked me to separate my two-year-old son
from me, ICE has not brought up this matter again with us. My wife and I told the ICE
officials we would not separate from our infant child.

Date:   08/03/2020                              /s/ B.L.                   _____

**DECLARATION OF BRIDGET CAMBRIA**

I, Bridget Cambria, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I am an attorney with Aldea- The People's Justice Center;
2. I obtained the foregoing declaration by telephone and utilized a telephonic language
line interpreter in the Haitian Creole language on August 3, 2020;
3. I am not permitted to enter the Berks County Residential Center to meet with the client
in person because of the COVID-19 pandemic and the current operating ruled of the
facility which have banned in person legal visitation;
4. During my telephone call with B.L., he confirmed that the information contained in the
foregoing is correct to the best of his knowledge and belief.

I declare under penalty of perjury under the laws of the United States of America that the
forgoing is true and correct.

Executed August 3, 2020 in Reading, Pennsylvania

Bridget Cambria, Esq.

# EXHIBIT P

**DECLARATION OF** ███████████, **A** ███████████

I, ███████████, declare under penalty of perjury that the following is true and correct to the best
of my knowledge and recollection.



1. My name is ███████████, A ███████████. I was born ███████████ in ███████████, I
   am detained with my husband, ███████████, A ███████████, born in ███████████,
   and our 13-month-old daughter, ███████████, ███████████, born
   on ███████████ in ███████████. We have been imprisoned in Karnes family detention
   center ("Karnes") since July 10, 2020.

2. We came to the U.S. to seek asylum. We fled ████ because a group of criminals in the
   ████ government are trying to kill my family. I never imagined that my family and I
   would be detained upon arriving here.

## MY 13-MONTH-OLD DAUGHTER HAS A SEVERE RESPIRATORY CONDITION

3. My daughter ████ was born with the umbilical cord wrapped around her neck. The
   doctors said she had grave asphyxia within the womb. The doctors stated that if she had
   not been born when she was, she would have died in the womb. They said if she had
   spent even another minute inside, she would have died. I have the documents with me
   explaining her full condition and diagnosis.

4. After I delivered her, the doctors took her to a different hospital because she required
   specialized treatment. I did not get to see her for two days because they took her to that
   special hospital. When I got to that hospital to see my daughter, the doctors told me that
   the prospects for my daughter were very low.

5. They removed all of my baby's hair and put her on a machine. My baby spent 8 days on
   oxygen and intensive care. Even when the baby came home, she had to go to the doctor
   for regular follow up appointments. I had to take her every month, but most of the time I
   would take her even earlier than her next appointment. She would regularly meet with a
   neurologist, a nephrologist, and a pediatrician.

6. In February 2020, my daughter was supposed to take the baby back to the hospital but my
   family had made the choice at that point to flee ████. As a result, my daughter has been
   without the medical exams that she requires. When they took her to the daughter to get
   medical exams in Mexico, they said that they are only accepting patients whose
   conditions are at an emergency level, so they would not take their daughter for medical
   exams.

**I NOTIFIED THE OFFICERS AT KARNES OF MY DAUGHTER'S CONDITION AND NEED TO SEE A SPECIALIST, BUT THEY DID NOT HEED MY CONCERN**

7. My daughter has been sick throughout our detention. When my family and I first arrived at Karnes in early July, my husband and I disclosed all our daughter's medical issues to the prison officers who did intake with us. We explained that she needed to see a specialist, that she would regularly see a neurologist, nephrologist, and pediatrician prior to being detained. I showed them her medical records and explained that my daughter needed tests as the paperwork showed.  The officers could not read them at the time as the records are in Spanish due to our time in ▉, but they took copies of them and promised that a Spanish speaking doctor would review them and would meet with us the next day to see what our daughter needed.

8. The next day, nothing happened. As new intakes into the detention center, my daughter and I were held in medical isolation at first due to the ongoing coronavirus pandemic, so guards would regularly check on us as is standard practice for families in medical isolation. Because I was with my daughter the whole time, to my knowledge the doctor never came to follow up with us as I was told they would. And if they did, I as the baby's mother was not communicated to about it at all. If a doctor had come, they should have spoken to me. Because I was never spoken to, I do not believe a doctor ever actually followed up with us that next day.

9. We were not given any more information about what was going on with my daughter's health. Because we are in prison, I did not speak up about the lack of follow up in my first weeks in the detention center. I did not know that I had the right to follow up about receiving the medical care that my daughter needs.

**MY BABY CANNOT STOMACH THE FOOD HERE IN KARNES AND SHE IS NOT GIVEN A SPECIAL DIET DESPITE HER AGE**

10. Before being detained, I would blend food together for the baby that was more natural and easier for her to eat. I would also usually give the baby natural juice. Here in Karnes, we do not have access to either of those things. At first, the officers would give me the same food for me, an adult woman, as they would give me for our 13-month-old daughter.

11. Because my husband and I are in prison, we were reluctant to ask for different food as we are not the ones paying for our food. We did not know that we have a right to food that we can stomach until we spoke to the attorneys at RAICES.

12. After learning of our rights, I tried to speak to one of the officers about how my daughter could not stomach the adult food at Karnes, but they could not understand me because I speak Haitian Creole. They sent me to the medical center at Karnes.

13. At the medical center, I explained that my baby is very young and needed baby food. Since then, I have been receiving Gerber baby food for ▮▮▮▮. She still does not eat it though. I do not remember exactly when we began receiving the Gerber food during our detention, as the days blend together.

14. Now, my daughter just cries. She still does not eat the food.

**MY DAUGHTER BEGAN VOMITTING AND THE KARNES OFFICERS INSISTED THAT SHE WAS FINE**

15. On Wednesday, July 29th, 2020, my daughter began dry heaving and shaking. She then vomited. The vomit was a light beige color. I went to the medical center in Karnes and asked for help. The detention center medical staff gave her an IV with saline. They told me that there was no doctor at Karnes at the time, but that there would be the next day. They told me that she was fine and sent us back to our room.

**MY DAUGHTER VOMITTED AGAIN AND THE OFFICERS AT KARNES AGAIN INSISTED THAT SHE WAS FINE**

16. On Thursday, July 30th, 2020, the medical staff brought an IV with saline in it to my daughter and my room around 7:00 or 8:00 in the morning. Around mid-day, my husband, daughter, and I were eating in the lunchroom, and my daughter threw up again. The vomit was a beige color again.

17. My husband ▮▮▮▮ was called by our attorneys at the time, so my daughter and I went to the medical center alone. The medical staff told me to let the vomit fall on clothes so that I could bring the vomit back and they could check it next time my daughter threw up. I told the nurse I did not understand how the child was breathing, that her breathing was off. The medical staff again insisted that the child was okay.

**SHORTLY AFTER THE OFFICERS AT KARNES TOLD ME MY DAUGHTER WAS FINE, SHE FAINTED**

18. I took my daughter back to our room, and I tried to get her to eat about three spoons of Gerber even though she still would not accept the food. I then tried to breastfeed her, as I was desperate for her to get some food in her amidst all the vomiting.

19. While I was breastfeeding her, she fainted in my arms. I immediately brought her to the medical center. The staff called for an ambulance. I remember crying, waiting to find out what was happening to my daughter.

**I DID NOT HAVE ACCESS TO AN INTERPRETER THROUGHOUT MY DAUGHTER'S HOSPITALIZATION, SO I COULD NOT ADVOCATE FOR HER AS A MOTHER SHOULD**

20. While I was waiting for the ambulance, I asked the medical staff if I could go get my daughter's medical records from my room. The staff did not understand me, as they did not have an interpreter and I speak Haitian Creole.

21. After a few minutes, my husband ████ joined us. The staff had not told him what was going on. Instead, one of the other detained fathers let him know that they had seen me rushing with the baby in the medical center, so he came running to see what was going on.

22. Once ████ was with me, with his help we asked the officers in my husband's limited Spanish if we could go get our daughter's medical records while we waited for the ambulance. The staff said no, it's not important. They assured us that they would explain everything.

23. While the ambulance was on the way, my daughter started to move her hands. I do not know how long she was unconscious for. I was very startled by the whole situation.

24. The officers told us in Spanish that if I did not calm down, they might not allow me into the hospital with my daughter. I did not understand them telling me this, but my husband is able to understand some Spanish, so he translated this into Haitian Creole for me.

25. Finally, the ambulance arrived. The Karnes medical officers then told us that my husband could not come with to the hospital. They again did not use an interpreter to explain this in our language of Haitian Creole, so my husband was put in the position of having to explain to me what they were saying. This separation was extremely upsetting for my husband, as he also wanted to be there as a father and husband.

26. My daughter threw up again as we were entering the ambulance. The ambulance driver did not speak to me at all in a language I can understand. They just gave me a piece of paper to wipe the vomit off the baby. I did not have access to an interpreter, and I do not speak English, so I was not able to ask the ambulance staff what was going on.

27. Around ten minutes later, we arrived at the hospital. The doctors did some tests on my daughter and gave me a bottle for her. I do not know for sure what tests they performed on her because there was no interpretation in my language.

28. It was difficult and scary being with my baby in the hospital during the coronavirus pandemic. She is too young to understand why a mask is important, and anytime my husband and I try to put one on her she takes it off. In the hospital, she still would not wear one. I am scared she could have been exposed to the coronavirus.

29. At the hospital, two prison guards from Karnes joined my daughter and me. They were wearing blue and beige-colored uniforms, like the prison guards in Karnes. The doctors primarily spoke to these two officers. They spoke to me, too, but I did not understand because there was no interpretation and they spoke in English.

30. A few hours later, the prison guards brought me and my daughter back to Karnes. I was never able to speak to the doctors at the hospital with an interpreter about my baby's health. They made me sign some paperwork at the hospital and then gave an envelope with paperwork to the prison guards, all without an interpreter. Then, my daughter and I were transported back to Karnes in a private car with the Karnes prison guards.

**MY DAUGHTER STILL HAS NOT RECEIVED THE CARE SHE NEEDS**

31. When we arrived back at Karnes, my daughter and I were placed in medical isolation at Karnes. We stayed in medical isolation from Thursday through Saturday, July 30th through August 1st.

32. Once we were back in Karnes, the staff tested my daughter and I for coronavirus on Thursday. On Friday, July 31st, the medical staff gave me a form to sign that was all in English. They did not explain what it said.

33. Later on Friday, the nurse came around to check my daughter's temperature. I tried to ask the nurse what was going on with my daughter's health, but she did not understand me due to the lack of interpreter. She called an interpreter and told me that the baby was okay, but she had a fever. Even though I was finally able to speak to someone on the

medical staff with an interpreter, she did not tell me anymore than that about what was happening to my baby's health.

34. While we had the interpreter on the phone, I told the nurse that I wanted to see a specialist. She told me that the pediatrician would be in on Tuesday, August 4th and she gave me an appointment. She did not give me a specific time for the appointment; I was just told that when the pediatrician got here, they would call me. I told her that my daughter needed to see a neurologist, as she always has. The nurse told me to "just wait to see the pediatrician, and then we can discuss seeing a neurologist at that time."

35. For Thursday evening and Friday during the day, I was not able to speak to my husband and he remained in the dark about whether or not our daughter was okay because we were still detained separately. Finally, on Friday night the officers brought me a tablet, but it was on 10% charge. I was finally able to let my husband know everything that had happened since we were separated, but the tablet died shortly after we connected so we were not able to speak for very long. My husband told me that he had asked to speak to me earlier in the day, but the officers ignored his request and just responded to him in English with "I'm sorry." My husband also told me that he had asked about the results of my daughter and my coronavirus tests, and that they had come back as negative.

36. On Saturday, August 1st, my daughter and I were moved to a cell in the general population area of the detention center. Then, about half an hour later the guards moved us to another cell. I am not sure why they moved us more than once and the officers did not explain what was going on.

37. Later on Saturday, I saw my husband sitting alone in the yard of the detention center. I asked the guard if I could visit with him, and I was finally able to let him see in person that our daughter was okay. Our baby ran to him. She was very happy to see him after the separation.

38. My daughter and I run a risk of having been exposed to the coronavirus due to being transferred to the hospital, but we were only kept in medical isolation for three days after getting back from the hospital. I know that we have since been tested for the virus, but it is possible to get a false negative. We are now detained with the general population at Karnes, and we can associate with other detained families and detention center staff.

39. The medical staff tested my daughter and me for coronavirus again last night, August 2nd. I have not been informed of the results yet.

40. To this date, I still have not received a full explanation of what happened or of how my
    daughter's health is in my own language. We need to have a specialist for our daughter,
    and up until today we have not been able to get one here in Karnes.

41. Ever since I arrived to Karnes, I have been asking for my daughter to be able to see a
    specialist. I do not feel I can rely on the medical staff for help because we still have not
    gotten to see a specialist despite their promises. I do not know if I can rely on the medical
    care in Karnes after everything that has happened. What happens in the meeting with the
    doctor on Tuesday will inform how I feel. If they do not help us again, I will know for
    sure that I cannot trust the medical care here.

42. I am very concerned about the lack of medical care here in Karnes. Please free my family
    and me so that we may get the medical care our baby needs outside of detention.

## <u>CERTIFICATE OF INTERPRETATION</u>

I, Julia Valero, certify that I speak English and read the foregoing in the English language to Julie, a certified telephonic interpreter in the English and Haitian Creole languages. The interpreter read the foregoing in the Haitian Creole language to ███████ before the declarant signed it.


<u>/s/ Julia Valero</u>                                                      <u>08/03/2020</u>
Signature                                                            Date

2511 Texas 1604 Loop, #201
<u>San Antonio, TX 78258</u>
Interpreter Address

<u>855-571-8342</u>
Interpreter Telephone

# EXHIBIT Q

**Declaration of M.E.F.**

Pursuant to 28 U.S.C. § 1746 and subject to penalty of perjury, I declare that the following is true and correct:

1. My name is M.E.F., A# 213-483-440. I am 38 years old and from Haiti and currently detained in ICE custody at the Karnes County Residential Center with my 37 year old husband, F.E., and our four children, eight year old H.R.E., 5 year old H.B.E., 21 month old M.M.E., and three month old B.F.E.

**My family and I contracted COVID-19 during the month we were kept in a hotel and our medical needs were ignored.**

2. I have a gluten allergy and my second oldest child has a heart murmur that developed after he had pneumonia. I also gave birth in April and am still recovering from that, and caring for my infant. I breastfeed my three-month-old baby.

3. I entered the country with my family on June 26, 2020 at Ciudad Acuna, around midnight. CBP took us to the hielera for the first night. The first person that received us when we arrived at the hielera was a doctor. The doctor conducted many medical exams. He took our temperature, our weight, and asked about everyone's health history. The facility was like a detention center. At about 11 am that day, they came and took us to a tent area. From there, they took us to a hotel at about 3 or 4 in the afternoon. At the CBP detention facility, they gave us masks so my husband, children and I had masks. I had hand sanitizer of my own, I don't know if other families had hand sanitizer. They did not give us gloves.

4. There were three other families transferred with us to the hotel at the same time. There were many other migrant families at the hotel as well, who were transferred separately from us. The drive to the hotel was very long, we were driving all afternoon into the night.

5. I felt really tired and weak when I arrived at the hotel. I cried a lot. I was very scared because I did not know what to expect.

6. The guards and staff at the hotel did not identify themselves, we could not see their identification cards. There were two people following us and watching us. When I tried to ask them questions, they told me they were only there to bring us to the hotel and there was no other information they could give us.

1

7. My 5-year-old son, H.B.E., suffers from a heart murmur and was very weak and tired. When he feels this way, he always tells me, "I'm tired." His behavior changes and he can no longer play or walk around. His lips turned purple. When I first arrived at the hotel, I asked the guards at the hotel to examine him but they said that ICE does not do that. They refused to take him to the hospital.

8. For the first ten days at the hotel, there were guards who would stand in our rooms 24 hours a day. The guard who had the morning shift was consistently the same guard, but the one at night would change every day. Those guards checked our temperature about every 30 minutes throughout the day, and if we have a fever they would give us medicine. I am not sure if they were medical professionals or not because they did not identify themselves. They did not offer any other medical treatment.

**I believe my family contracted COVID-19 from a government contractor while we were detained at a hotel**

9. One night, at about midnight, the guard in our room removed her mask to speak to my children. My daughter was laying in a crib. I held my three-month-old baby with me on one bed. My two older sons were in the other bed. My husband usually slept with them, but on this night he had laid down something on the floor so that he could sleep there, because the bed was cramped. The woman got into the bed and laid down next to my two sons for about ten minutes, she was pretending to sleep with them as if she was helping them go to sleep. After about ten minutes, she got back up and placed her mask back on. I felt very uncomfortable with this, because I do not know her, but there was nothing I could do about it because we were being detained. I was so worried that I could not sleep that night. I kept asking the woman if her boss knew that she was in our room. She said yes, and there was nothing else that I could do.

10. The woman identified herself as ICE and started asking us questions that night about why we left our country. I was crying a lot. She asked me about why I did not stay in Mexico. She told me I was going to go to court in this hotel room, and that when I go to court I would need to clean the room. However, I do not know why she said this because they never gave us cleaning supplies.

11. I answered this woman's questions because I thought that she was from ICE, but it turns out that she was actually working for ICE as a contractor. We found out about this because about two or three days after this incident, my son developed a

2

fever. His fever went down after a few hours, but the next day they took him to the hospital to get tested for COVID-19. My son and my husband went to the hospital, while I stayed back with my other three children. The same woman identifying as ICE, who had laid in my children's bed accompanied my husband and son to the hospital. When they were at the hospital, that woman told the staff there that she was ICE. The staff asked her to produce identification to show that she is ICE. She then explained that she had no ICE identification, and was instead a contractor.

12. My husband said that the woman would not leave his side in the hospital. No matter what we do when we are at the hospital, these guards ask to be next to us. I have even had an officer ask to be in the room when taking a urine test.

13. Because this woman was the only one who removed her mask and came close to my children, I believe that she spread COVID-19 to my family.

14. We were tested for COVID-19 for the first time a few days after this incident. At this point, 10 days had passed since we first entered the United States. My oldest son and my three-month-old baby tested positive, but the rest of the family tested negative. We tried to ask them why they were testing us but every time we asked them questions, they told us that they could not give us any information. They gave us our COVID-19 test results verbally. I told the nurse who gave the results to us verbally that I did not believe it and wanted to see the physical results. They still did not give us a copy of our test results. I thought they would separate us into different living arrangements when we had started to test positive.

15. Even after my two children tested positive for COVID-19, they kept me, my husband, and our four children in one hotel room. The room was always cold. I remember that after my son developed a fever, the temperature in the room was set to 67 degrees. The guards told us that the temperature should be kept cold because it helps to prevent the virus from spreading. We were not permitted to change the temperature, it was the guards that had to do so.

16. They tested us again for COVID-19 15 days after the first test. They gave us verbal results.  At that time, I tested positive, as did my daughter and my three-month-old baby. My husband and three sons tested negative. Again, they gave us our results verbally.

17. When I received those positive test results, the guards started to try to make us move into separate living spaces. My husband refused, because at that point we

3

had already spent a long time with each other and family members had already tested positive. We did not want them to separate us.

18. There was a protest at the hotel one day. I opened the door that day and saw a man in a blue marine uniform, and he was holding a big gun. His uniforms said, "Commander Eli."

19. My gluten allergy was not accommodated at the hotel. The first day that we arrived, they served us pizza. I told them that I had an allergy to gluten and I could not eat that. Regardless, they always served us bread products for every meal. For three days in a row, I did not eat at all because of this. I called my family and told them, I felt like I will die from hunger. I felt so tired and weak that I asked them to take me to a hospital. They finally agreed to take me. They took me to a hospital once, and a second time they took me to a clinic.

20. This has a lot of impact on me because I feel weak and lightheaded and I have to breastfeed my baby. I still have some milk, but because I had not been eating, I have not had the nutrition that I need for the milk to be substantial for the baby.

21. We spent about one month at the hotel. I was worried we would be deported. I explained to the guards that I was afraid to go to my home country. I had to simply trust that they would take me somewhere other than to my deportation. They put us on a small bus with two other families and transferred us to Karnes.

**My son H.B.E., who suffers from a heart murmur has been detained at Karnes for 11 days with COVID-19 and without medical care**

22. At Karnes, the doctor examined my son and told me that he needs to see a cardiologist, a specialist. That doctor also told me that my son has the coronavirus. I was so worried because I know that because of his heart murmur, my son is very vulnerable with COVID-19.  My son has not been able to see a cardiologist since arriving to the United States even though the doctor at Karnes recommended that he see a specialist.

23. I am also afraid for my son because the doctor that diagnosed him in Mexico told us that he should not be losing weight, and that he needs to eat very well so that he does not become weak. Because I am detained I cannot feed him properly. He barely even tastes his food here. I am afraid that he will lose too much weight while he is detained.

4

24. GEO often serves large salads with hot peppers on top. I get very upset about this because I worry about how the spicy food might worsen my son's heart condition.

**At Karnes my family is separated even though my husband and I both tested positive for COVID-19 and I am struggling to care for my three month old infant and my 21 month old baby without my husband's support.**

25. On the first day that we arrived at Karnes, they tested us for COVID-19 again. They have never given me my results, but they told my husband verbally that both him and I tested positive for COVID-19 and that all of our children tested negative. The children have not had fevers or any other symptoms since being here.

26. Here at Karnes, I am in a room with my two younger children. My husband is in another room on a different floor with my two older children. My children are not allowed to leave the room at all. Me and my two younger children are unable to see my husband and my two older children. The guards used to give my children 30 minutes a day to see their father on the tablet, but now they only give 15 minutes a day. They told us that the reason why it is through a tablet only is because my husband and I have tested positive for COVID-19.  It makes no sense to me why I cannot be in the same room as my husband so that our children can receive care from both of us if we both tested positive for COVID-19.

27. My daughter used to sleep with her father always, so it is very difficult for her to be unable to see him. She cried for her dad every night when we first got here. She also has not been eating and I think it is because she is sad about missing her father.

28. It is very difficult for me to care for my two younger children alone. My baby wakes up and needs to be cared for, and my 21-month-old daughter is also very young and needs a lot of care. I wish that my husband could help care for my daughter but he cannot because we are in different rooms.

29. My older sons have also told me that they miss me. They have always been with me and we are always together. They usually are the ones to make our family laugh together, so it has been very hard for us to be apart. The officers at the detention center did not tell us when we will be able to see each other and leave our rooms.

30. I usually give my 21-month-old daughter Similac-brand mixed with a formula like Nido. The milk that they give me here to feed my daughter is regular milk

that comes in a blue box. There is no hand sanitizer here, but I try to wash my hands often and take as many precautions as possible when I am with my children. This milk has affected my daughter badly. She is not used to digesting regular milk and it has caused her some intestinal issues. I told someone at the medical center about this and they said they would pass a note along but I have not yet received a different type of milk for her.

31. I know that I need to be free from detention so that I can properly take care of my family, especially because I have a three-month-old baby and children with medical conditions.

**ICE has not explained why they are detaining my family**

32. It seems that ICE has been deporting mostly Haitian families. They told us that they were deporting people because of the Coronavirus. They said that it has to do with a deal that the government of the United States has with the government of Haiti to deport people rapidly.

33. Since arriving at Karnes, ICE has not explained to me why they are detaining me or my children. I have asked ICE when my family will be released from detention, and they told me, "speak to your lawyers, they understand the whole process." My lawyers informed me of the legal process in detention, but I understand that it is ICE who decides how long my children will be detained and whether my children will be released with me. ICE has provided me no explanation for why they cannot release my children.

**Declaration of Laila Ayub**

I, Laila Ayub, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      I am an Attorney with the Refugee and Immigrant Center for Education and Legal Services (RAICES), where I have worked since September 23, 2019.  I am an attorney licensed to practice in the District of Columbia.

2.      On August 5, 2020, I spoke with M.E.F. by telephone through a certified interpreter, code: HCGC,  who is certified to interpret in the English and Haitian Creole languages.  During the telephone call I read the entirety of the "Declaration of M.E.F." in English, and interpreter HCGC translated the entirety of the declaration into Haitian Creole.  I swear under the penalty of perjury that M.E.F. confirmed that the information contained in the declaration is true and correct.

6

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s Laila Ayub

Executed August 5, 2020 in San Antonio, Texas.