CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.* ,<br><br>        Plaintiffs,<br>- vs -<br><br>WILLIAM BARR, Attorney General of<br>the United States, *et al.*,<br><br>        Defendants. | Case No. CV 85-4544-RJK(Px)<br><br>NOTICE OF MOTION AND MOTION<br>TO ENFORCE SETTLEMENT OF CLASS<br>ACTION; MEMORANDUM IN SUPPORT OF<br>MOTION.<br>Hearing: September 4, 2020<br>Time: 11:00 A.M.<br><br>Judge: Hon. Dolly Gee |

/ / /

*Listing of Plaintiffs' counsel continued*

USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing (Cal. Bar No. 61513)
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu


LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum (Cal. Bar No. 98634)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500


/ / /

To defendants and their attorneys of record:

PLEASE TAKE NOTICE that on September 4, 2020, at 11:00 A.M., or as soon thereafter as counsel may be heard, plaintiffs will and do hereby move the Court for an order requiring Defendants to comply with the Settlement filed herein on January 17, 1997, and approved by this Court on January 28, 1997 ("Settlement").

This motion is based upon the annexed memorandum of points and authorities and upon all other matters of record herein, and is brought following a meeting of counsel pursuant to Local Rule 7-3 and ¶ 37 of the Settlement on October 30, 2014.[1]

Dated: August 14, 2020.                    Respectfully submitted,

                                           CENTER FOR HUMAN RIGHTS &
                                           CONSTITUTIONAL LAW
                                           Peter A. Schey
                                           Carlos Holguín

                                           USF SCHOOL OF LAW
                                           IMMIGRATION CLINIC
                                           Bill Ong Hing

                                           LA RAZA CENTRO LEGAL, INC.
                                           Stephen Rosenbaum


                                           _____Peter Schey_____

                                           Attorneys for plaintiffs

/ / /

---

[1] This motion is made following several conferences of counsel pursuant to this Court's Orders and L.R. 7-3. Following various conferences at which agreement was almost reached, Defendants withdrew from the process stating that they would not agree to provide detained parents with a notice of advisals or adopt procedures aimed at the release of Class Members. Joint Status Report at 6. [Doc. # 902].

1

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org
        pschey@centerforhumanrights.org

2

3

4

5

6

7

8

*Attorneys for plaintiffs (listing continues on following page)*

9

UNITED STATES DISTRICT COURT

10

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12

13

JENNY LISETTE FLORES, *et al.* ,

14

            Plaintiffs,

15

- vs -

16

WILLIAM BARR, Attorney General of the United States, *et al.*,

17

18

            Defendants.

19

Case No. CV 85-4544-RJK(Px)

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION.

Hearing: September 4, 2020
Time: 11:00 A.M.

Judge: Hon. Dolly Gee

20

21

22

/ / /

23

24

25

26

27

28

*Listing of Plaintiffs' counsel continued*


USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing (Cal. Bar No. 61513)
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu


LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum (Cal. Bar No. 98634)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500


        / / /

TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.   THIS COURT HAS JURISDICTION TO ENFORCE THE SETTLEMENT
AS A CONTRACT AND CONSENT DECREE........................................................4

III.     ARGUMENT ............................................................................................6

A. ICE'S HISTORY OF FAILING TO PROVIDE ADVISALS TO PARENTS REGARDING THEIR
CHILDREN'S RELEASE RIGHTS OR TO ADOPT RELEASE PROCEDURES BREACHES THE
SETTLEMENT'S MANDATE THAT DEFENDANTS MINIMIZE THE DETENTION OF
CHILDREN. ....................................................................................................6

1.     Relevant terms of the FSA ...............................................................7

2.     Relevant prior Court Orders............................................................8

3.     Requiring adoption of an advisal of rights and procedures to release Class
Members would be consistent with and not modify the terms of the FSA ..............15

4.     The detention of minors in secure facilities is detrimental to child welfare and
may place the detained children at significant risk of serious harm......................22

B. ICE'S HISTORY OF FAILING TO COMPLY WITH THE FSA AND THIS COURT'S PRIOR
ORDERS WARRANTS A FINDING OF CONTEMPT ..........................................24

1.     This Court may impose sanctions to coerce Defendants' compliance with the
Settlement.................................................................................................25

2.     Plaintiffs have met their burden of proof by demonstrating Defendants'
repeated non-compliance by clear and convincing evidence. ...............................26

3.     Upon a finding of contempt, this court may impose extracontractual remedies
to ensure compliance with the settlement. .............................................................28

IV.     CONCLUSION..........................................................................................29

TABLE OF AUTHORITIES

**Cases**

*Adams v. Johns-Manville Corp.*, 876 F.2d 702 (9th Cir. 1989) ....................................25

*Badie v. Bank of Am.*, 67 Cal. App. 4th 779 (1998) ...........................................................6

*Bank of the West v. Superior Court*, 2 Cal. 4th 1254 (1998)...........................................6

*Brewer v. Williams*, 430 U.S. 387 (1977)............................................................................4

*Chung v. Park*, 377 F.Supp. 524 (M.D. Pa.), *affirmed* 514 F.2d 382 (3rd Cir.), *cert. denied*, 423 U.S. 948 (1985). ..........................................................................................10

*City of Las Vegas v. Clark County*, 755 F.2d 697 (9th Cir. 1985) ................................6

*Crestview Cemetery Assn. v. Dieden*, 54 Cal. 2d 744 (1960).........................................6

*Dacanay v. Mendoza*, 573 F.2d 1075 (9th Cir. 1978) .......................................................5

*Edwards v. Arizona*, 451 U.S. 477 (1981) ..........................................................................4

*Fare v. Michael C.*, 442 U.S. 707 (1979) ...........................................................................4

*Faretta v. California*, 422 U.S. 806 (1975) ........................................................................4

*Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.,* 362 F.3d 1204 (9th Cir. 2004)..........5

*Flanegan v. Arizona*, 143 F.3d 540 (9th Cir. 1998) .........................................................5

*Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019) ..........................................................21, 22

*Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988)........................................................1

*Flores v. Meese*, 934 F.2d 991 (9th Cir. 1990)..................................................................1

*Flores v. Meese*, 942 F.2d 1352 (9th Cir. 1992) (en banc)...............................................1

*Formigili Corp. v. William Fox*, 348 F.Supp. 629 (E.D. Pa. 1972)..............................10

*Frew v. Hawkins*, 540 U.S. 431 (2004) .............................................................................26

*Fuentes v. Shevin*, 407 U.S. 67, 95 (1972) .........................................................................4

*Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995).................................................................21

*Gates v. Shinn*, 98 F.3d 463 (9th Cir. 1996)............................................................5, 28

*General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376 (9th Cir. 1986)........................28

*Gifford v. Heckler,* 741 F.2d 263 (9th Cir. 1984)..........................................................27

*Gon v. First State Ins. Co.*, 871 F.2d 863 (9th Cir. 1989) ............................................16

*Hook v. Arizona Dept. of Corrections*, 107 F.3d 1397 (9th Cir. 1997) .........................27

*Hutto v. Finney*, 437 U.S. 678 (1978) .....................................................................26, 28

*In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361 (9th Cir. 1987) .......26, 27, 28

*In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020 (2d Cir. 1992) ............................................................................................................................5

*Johnson v Zerbst,* 304 US 458 (1938) .........................................................................3, 4

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ..........................................................25

*Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989).................6

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ...............................5

*Labor/Community Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115 (9th Cir. 2009) ..................................................................................................................26

*Morales Feliciano v. Rullan*, 303 F.3d 1 (1st Cir. 2002) ..............................................21

*Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. June 26, 2018)...................................15

*N.L.R.B. v. James Troutman & Assocs.*, No. 86-7738, 1994 WL 397338 (9th Cir. Jan. 7, 1994) .....................................................................................................................27

*National Labor Relations Board v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612 (9th Cir. 1973)..............................................................................................................27

*Nehmer v. U.S. Dept. of Veteran Affairs*, 494 F.3d 846 (9th Cir. 2007) ......................26

*North Carolina v. Butler*, 441 U.S. 369 (1979)..............................................................4

*O.M.G v. Wolf*, No. 1:20-cv-786-JEB (D.D.C. June 25, 2020)....................................24

*O'Neil v. Bunge Corp.*, 365 F.3d 820 (9th Cir. 2004) ....................................................5

*Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930 (N.D. Cal. 2011) ....................6

Public Serv. Co. of Colorado v. Batt, 67 F.3d 234 (9th Cir.1995) ...............................22

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................................1, 25

*Rouser v. White*, 825 F.3d 1076 (9th Cir. 2016)............................................................17

*SEC v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) ..............................................................28

*Sekaquaptewa v. MacDonald*, 544 F.2d 396 (9th Cir. 1976), *cert. denied*, 430 U.S. 931
     (1977) ........................................................................................................................26, 27

*Shuffler v. Heritage Bank*, 720 F.2d 1141 (9th Cir. 1983) ....................................26, 28

Stone v. City and County of San Francisco, 968 F.2d 850 (9th Cir. 1992).............16, 28

*Thompson v. Enomoto*, 915 F.2d 1383 (9th Cir. 1990) .............................................5, 21

*U.S. v. Bryan*, 339 U.S. 323 (1950) ...............................................................................26

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853 (9th Cir. 1992) .5

*United Mine Workers*, 330 U.S. 258 (1947)...................................................................28

*United States v. 1.377 Acres of Land*, 352 F.3d 1259 (9th Cir. 2003) .........................22

*United States v. Ayres,* 166 F.3d 991 (9th Cir. 1999)...............................................26, 27

*United States v. Drollinger*, 80 F.3d 389 (9th Cir. 1996)..............................................27

*Wells Benz, Inc. v. U.S. for Use of Mercury Elec. Co.*, 333 F.2d 89 (9th Cir. 1964) ....17

*Winet v. Price*, 4 Cal. App. 4th 1159 (1992) ...................................................................5

**Statutes**

Homeland Security Act, Pub. L. 107-296 (H.R. 5005) ....................................................1

**Regulations**

8 C.F.R. § 1236.3(b) (2014) ............................................................................................9

**Other Authorities**

Cal. Civ. Code § 1636. ......................................................................................................5

1
2

Cal. Civ. Code § 1641 ................................................................6

Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, *et seq.* .........................16

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Introduction.

This motion for a proper advisal of rights and reasonable steps to implement Class Members' release seeks no more than enforcement of the unambiguous terms of the Agreement itself and the Court's exercise of its authority to enforce its own Orders. *See Jeff D. v. Kempthorne*, 365 F.3d 844, 853 (9th Cir. 2004) ("Once the decree was entered, the district court retained jurisdiction to enforce it[.]"); *Flores* Settlement Agreement ("FSA") at ¶ 37; October 5, 2018 Order Appointing Special Master/Independent Monitor at ¶ E.4 [Doc. # 494].

As the Court is well aware, this case stems from a July 11, 1985 lawsuit filed on behalf of a class of minors detained by U.S. immigration authorities. [Doc.# 1.] After considerable litigation, the parties negotiated a class-wide Settlement; it was entered by the district court as a consent decree on January 28, 1997.[2] The Agreement remains in effect today.[3]

The FSA "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." *Id.* at ¶ 9.[4] The FSA requires immigration agencies

---

[2] Opinions in this action preceding the Settlement include *Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988); *Flores v. Meese*, 934 F.2d 991 (9th Cir. 1990); *Flores v. Meese*, 942 F.2d 1352 (9th Cir. 1992) (en banc); and *Reno v. Flores*, 507 U.S. 292; 113 S.Ct. 1439; 123 L.Ed.2d 1 (1993).

[3] The Agreement included a specified termination date, but in 2001 the parties stipulated to extend the Agreement until "45 days following defendants' publication of final regulations implementing this Agreement." The government has issued regulations and has sought to terminate the FSA. [Doc. # 668]. This Court denied the Government's motion to terminate the FSA and enjoined implementation of Defendants' regulations. [Doc. # 688]. Defendants appealed and the appeal remains pending. *Flores v. Barr*, Case No. No. 19-56326 (9th Cir. filed Nov. 15, 2019).

[4] The Settlement bound the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office." Settlement ¶ 1. In 2002, the Homeland Security Act, Pub. L. 107-296 (H.R. 5005) ("HSA"), dissolved the former Immigration and Naturalization Service ("INS") and transferred its functions to the Department of Homeland Security ("DHS") and its subordinate agencies, including. 6 U.S.C. § 279. The HSA included "savings" provisions providing, *inter alia*, that the Settlement remains in effect as to successor agencies. HSA §§ 462(f)(2), 1512(a)(1),

- 1 -

to hold minors in their custody "in facilities that are safe and sanitary." *Id*. at ¶ 12A. The FSA also requires that the government treat minors in its custody "with dignity, respect, and special concern for their particular vulnerability as minors." *Id*. at ¶ 11.

Under paragraph 12A of the Agreement, "[f]ollowing arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors."

Paragraphs 14 and 18 require the release of minors who are not. flight risks or a danger to themselve sdor others. Paragraphs 15 and 16 require Defendants to take certain steps to assess whether designated sponsors are suitable and will produce Class Members for future proceedings.

Beginning in the summer of 2014, in response to a "surge" of Central Americans arriving at the U.S.-Mexico border, ICE adopted a blanket policy to detain all female-headed families—including children—in secure, unlicensed facilities for the duration of the proceedings that determine whether the family is entitled to remain in the United States. Motion to Enforce at 2 [Doc. 100]; *see also* Ps' First Set, Exh. 9 ("U.S. Immigration & Customs Enforcement, News Release, November 18, 2014").[5]

Plaintiffs Jenny Flores and other class members filed a motion to enforce the FSA on February 2, 2015. [Doc. # 100]. On February 27, 2015, Defendants filed a motion to amend the Agreement to *exclude* accompanied minors from the rights

---

1512. Defendants acknowledge that the Settlement binds DHS. *See, e.g.*, Report to Congress on the DHS Office for Civil Rights and Civil Liberties (2007), at 20, www.dhs.gov/xlibrary/assets/crcl-fy07annualreport.pdf (checked Aug. 13, 2020).

[5] "Prior to June 2014, ICE's general practice was to release children … upon a determination that those individuals were not a significant flight risk or danger to the public. Generally, delays in releasing children … were not significant. … Since June [2014], ICE has begun detaining all Central American [children] without the possibility of release on bond, recognizance, supervision or parole if it believes that those families arrived in the United States as part of the 'surge' or unauthorized entrants—mostly children—that purportedly began in the summer of 2014." Declaration of Bridget Cambria, November 7, 2014, Exhibit 10 ("Cambria") ¶¶ 3-5. [Doc. # 101-3 at 62].

conferred by the FSA. [Doc. # 120]. A hearing on the motions was held on April 24, 2015. *See* Order Re Plaintiffs' Motion to Enforce Settlement of Class Action and Defendants' Motion to Amend Settlement Agreement (July 24, 2015) at 1 ("July 2015 Order"). [Doc. # 177]. In summary, the Court largely granted Plaintiffs' motion to enforce and denied Defendants' motion to terminate the rights of accompanied Class Members. *Id*. at 24-25.

As Plaintiffs have previously pointed out, after this Court issued its July 2015 Order finding Defendants in violation of Paragraph 14 of the FSA, the previous administration achieved substantial compliance with the FSA by having a ninety to ninety-five percent (90-95%) credible fear approval rate, and promptly releasing Class Members with their parents found to possess a credible fear of persecution if returned to their home countries. Joint Status Report (August 5, 2020) at n. 2. [Doc. # 902]. That approach to compliance no longer exists, as the credible fear approval rate has now dropped to about ten percent (10%) as a result of the current Administration substantially restricting its asylum policies. *Id*.

However, Defendants have taken no steps to replace their high credible fear approval rate as a way to comply with the FSA's release rights of all Class Members, including those accompanied and detained with a parent. Defendants concede that today no accompanied Class Members are being released pursuant to the FSA.

Defendants do not contest that they provide no advisals to detained parents about their children's FSA rights other possibly than Form I-770, which does not describe Class Member's FSA rights. Advisals are necessary to ensure that Class Members and their caregiving parents are making informed and intelligent decisions regarding release, sponsorship, legal representation, and the potential waiver thereof. A waiver is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v Zerbst,* 304 US 458, 464 (1938) (internal quotation marks omitted). For example, "[i]t is reasonably clear under [the Supreme Court's] cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*,

451 U.S. 477, 482–83 (1981), *citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), *Faretta v. California*, 422 U.S. 806, 835 (1975), *North Carolina v. Butler*, 441 U.S. 369 (1979), *Brewer v. Williams*, 430 U.S. 387, 404 (1977), and *Fare v. Michael C.*, 442 U.S. 707, 724–725 (1979).

"[I]n the civil no less than the criminal area, courts indulge every reasonable presumption against waiver." *Fuentes v. Shevin*, 407 U.S. 67, 95, 92 n. 31 (1972) (internal quotation marks and citation omitted). The Supreme Court has explained that courts must make fact-specific determinations of whether rights were knowingly and intelligently waived, based on "particular facts and circumstances surrounding that case, including the background, experience, and conduct" of the waiving party. *Johnson*, 304 US at 464. Here, due to differentials in power between ICE officials and detained parents, detention-related trauma, and language differences, provision of the advisals to Class Members and their caregiving parents in the recipients' language of choice is the best method of ensuring knowing and intelligent exercises or waivers of *Flores* rights.

Rather than provide advisals of rights to implement the FSA, Defendants prefer to keep parents in the dark about their children's rights. Moreover, even if a parent believes it is in their child's best interrest to be released, it appears ICE has no procedures in place to assess potential sponsors identified by a parent or to effect the prompt release of a minor to a designated sponsor. This motion seeks an Order remedying these violations of the FSA. To the extent compliance with this Court's prior Orders may provide a binary choice for parents, the difficult choice they may face is brought about by Defendants' heartless and largely irrational unwillingness to release parents with their children, regardless whether the parents are flight risks or a danger.

II.   THIS COURT HAS JURISDICTION TO ENFORCE THE SETTLEMENT AS A CONTRACT AND CONSENT DECREE.

The parties and this Court have long acknowledged that the FSA is a consent decree, and "a consent decree is 'no more than a settlement that contains an

injunction[.]'" *Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.,* 362 F.3d 1204, 1218 (9th Cir. 2004) (*quoting In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1025 (2d Cir. 1992); *see also Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996) ("[W]hen a decree commands or prohibits conduct, it is called an injunction."). Thus, Plaintiffs already have obtained a judicially-enforceable permanent injunction in the form of the FSA itself.

This Court has the inherent power to enforce the terms of the Agreement because, with certain exceptions not relevant here, the Agreement "provides for the enforcement, in this District Court, of the provisions of this Agreement . . ." *See* FSA ¶ 37; Ps' First Set, Exh. 2 ("Order Approving Settlement of Class Action, January 28, 1997") (Doc. #101 at 54); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978).[6] "[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)).

"Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts use contract principles, specifically the contract law of the situs state. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990). Under California law, a court must interpret a contract with the goal of giving effect to the mutual intention of the parties as it existed at the time of contracting. Cal. Civ. Code § 1636.

"It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 (1992). Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible'

---

6 "Such a basis for jurisdiction may be furnished by separate provision … or by incorporating the terms of the settlement agreement in the order." *Flanegan v. Arizona*, 143 F.3d 540, 544 (9th Cir. 1998).

to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798 (1998). Where the contract is clear, the plain language of the contract governs. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264, (1998).[7]

The Court must construe the contract as a whole, being sure "to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) (quoting Cal. Civ. Code § 1641) (internal quotation marks omitted).[8] When necessary, a court can look to the subsequent conduct of the parties as evidence of their intent. *See Crestview Cemetery Assn. v. Dieden*, 54 Cal. 2d 744, 754 (1960).

III.  ARGUMENT

A  **ICE's history of failing to provide advisals to parents regarding their children's release rights or to adopt release procedures breaches the Settlement's mandate that Defendants minimize the detention of children.**

As Plaintiffs argued in 2015, Defendants' no-release policy—"*i.e.*, the policy of detaining … children[ ] for as long as it takes to determine whether they are entitled to remain in the United States"—violates material provisions of the Agreement. July 2015 Order at 4. Today, Defendants failure to advise parents about their children's FSA rights and failure to adopt procedures to vet potential sponsors and release children to them again effectively amounts to a no-release policy that violates several provisions of the FSA.

---

[7] Whether enforced as a contract or consent decree, the Court's task is largely the same. *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) ("A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles."). With limited exceptions, "federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party." *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989).

[8] "Courts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless." *Pinel*, 814 F. Supp. 2d at 943.

- 6 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1.      Relevant terms of the FSA**

In Part VI of the Settlement, "General Policy Favoring Release," Defendants acknowledged that detention is detrimental to children and agreed to release a children "*without unnecessary delay*" whenever continued "detention of the minor is not required either [1] to secure his or her timely appearance before the INS or the immigration court, or [2] to ensure the minor's safety or that of others …" FSA ¶ 14 (emphasis added). The FSA requires Defendants to take affirmative steps to locate qualified custodians for detained children and to release them promptly: "Upon taking a minor into custody, the INS … *shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor* ... Such efforts at family reunification shall continue so long as the minor is in INS custody." FSA ¶ 18 (emphasis added).[9]

Paragraph 12.A states, "[w]henever the [Defendants] take[ ] a minor into custody, [they] shall expeditiously process the minor and *shall provide the minor with a notice of rights*, including the right to a bond redetermination hearing if applicable." (Emphasis added). In addition, "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the

---

[9] The FSA directs Defendants to release detained Class Members "in order of preference to —
        A. a parent;
        B. a legal guardian;
        C. an adult relative (brother, sister, aunt, uncle, or grandparent);
        D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;
        E. a licensed program willing to accept legal custody; or
        F. an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility."
FSA ¶ 14.

minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing." Paragraph 12.A.

Paragraph 24.B states, "[a]ny minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit l attached hereto, may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1."

Paragraph 12.C states, "[i]n order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility."

Paragraph 24.D states, "[t]he INS shall promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor)."

Paragraph 29 states, "[o]n a semi-annual basis … the INS shall provide to Plaintiffs' [class] counsel … each INS policy or instruction issued to INS employees regarding the implementation of this Agreement." Defendants have provided class counsel with *no* such policies or instructions. *See* Exhibit A, Declaration of Peter Schey.

## 2.    Relevant prior Court Orders

At a hearing conducted on April 24, 2015, the parties and the Court agreed that a parent could exercise or waive their child's release rights under the FSA.

Following a hearing on Plaintiffs' motion to enforce and Defendants' motion to terminate the rights of accompanied Class Members, the Court found that "[t]he facts presented by Plaintiffs … show that prior to their motion to enforce, Defendants routinely failed to proceed as expeditiously as possible to place accompanied minors, and in some instances, may still be unnecessarily dragging their feet now." Order re

Response to Order to Show Cause at 11 August 21, 2015). Doc. # 189. Even if a parent remained detained, "in order to effectuate the least restrictive form of detention for the child, Defendants must follow an order of preference for the minor's release to an available adult [not in detention] under Paragraph 14 of the Agreement." *Id*. n. 5. "In sum, Defendants have offered no credible reason why they cannot comply with the INA while simultaneously adhering to the Agreement's proscription against holding children for prolonged periods in secure, unlicensed facilities." *Id*. at 12.

At that time, Philip Miller, ICE's Assistant Director of Field Operations, asserted that "the high probability of a prompt release, coupled with the likelihood of low or no bond," was among the reasons Central Americans coming to the United States. Exhibit 8, Declaration of Philip Miller ¶¶ 11-12 [Doc. # 101-3 at 11]. Miller contended that "implementation of a 'no bond' or 'high bond' policy would significantly reduce the unlawful mass migration of Guatemalans, Hondurans and Salvadoran (sic)."[10] In response to these arguments, this Court held that "even

---

[10] Traci Lembke, ICE's Assistant Director over Investigative Programs, similarly declared, "Illegal migrants to the United States who are released on a minimal bond become part of 'active migration networks,'… which in turn likely encourages further illegal migration into the United States." Exhibit 8, Declaration of Traci Lembke ¶ 14 [Doc.# 101-3 at 14]. This is weak justification for stripping children of their rights under the Settlement. First, ICE's policy encourages mothers and children to enter separately. Children apprehended alone or with anyone other a mother—whether smuggler, human trafficker, or complete stranger—remain eligible for release, just as they were prior to the advent of the 2014 detention policy. The no-release policy thus promoted family disintegration, not unity. Second, ICE did not need to detain families to keep them together. Nothing prevented ICE from releasing mothers and children together in accordance with actual equities. *See* 8 C.F.R. § 1236.3(b) (2014) ("(2) If an individual specified in paragraphs (b)(1)(i) through (iii) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, *simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis*." (Emphasis added.) Third, as discussed *infra*, any Class Member or Class Member's parent may waive his or her rights under the Settlement and thereby remain detained in lieu of separating from his or her parent. *Formigili Corp. v. William Fox*, 348 F.Supp. 629 (E.D. Pa. 1972) ("it is an established principal of contract law

- 9 -

assuming the dubious proposition that the Court can consider a policy argument to alter the terms of the Parties' Agreement, the Court is not persuaded by the evidence presented in support of Defendants' policy argument." July 2015 Order at 11.[11]

In its June 27, 2017 Order Re Plaintiffs' Motion to Enforce and Appoint a Special Monitor ("June 2017 Order") [Doc. # 363], this Court again held that "the *Flores* Agreement creates an affirmative obligation on the part of Defendants to individually assess each class members' release …" *Id*. at 25. And even if a parent decided to remain in custody, "the expedited removal statute does not excuse Defendants from the commitment they made in the *Flores* Agreement to make and record efforts to release minors in ICE custody, even if the minor or her parent is in expedited removal (i.e., awaiting a credible fear determination)." June 2017 Order at 26.

In 2017 Defendants argued that ICE lacks the "institutional capacity or resources to assess whether an adult (other than a parent or guardian) seeking custody of a minor already detained with a parent is a suitable custodian who will house the minor in a suitable home environment." Declaration of Jon Gurule, Assistant Director of Field Operations for Enforcement and Removal Operations for ICE ("Gurule Decl.") ¶ 16 [Doc. # 217-1]. Gurule also stated that "ICE is not authorized to expend resources to conduct suitability analyses, and any resources devoted to such endeavors would no longer be available to process families as expeditiously as possible through [family residential centers]." *Id*. ¶ 16.

In response this Court held that "[t]his failure to assess non-parent/guardian custodians flies in the face of the *Flores* Agreement." June 2017 Order at 26. This failure appears to continue to this day.

---

that one may waive any provision in the contract which has been established for his benefit."); *accord Chung v. Park*, 377 F.Supp. 524 (M.D. Pa.), *affirmed* 514 F.2d 382 (3rd Cir.), *cert. denied*, 423 U.S. 948 (1985).

[11] As it does now, ICE defended its no-release policy as a humanitarian measure "to maintain family unity as families await the outcome of immigration hearings or return to their home countries." Exhibit 9. [Doc. # 101-3 at 60]

To "effectuate" the release provisions of Paragraph 14, Paragraph 17 provides that a "positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14." June 2017 Order at n. 20. This assessment may include investigating the adult custodian's living conditions, verifying the adult's identity, and consideration of the minor's wishes and concerns. FSA ¶¶ 15-17.

Paragraph 15 of the FSA requires that Defendants obtain from proposed custodians executed agreements to, among other things, "provide for the minor's physical, mental, and financial well-being." FSA ¶ 15. "By failing to conduct suitability analyses of non-parent/guardian custodians seeking custody of class members, Defendants essentially concede to violating the Agreement." June 2017 Order at 27.

The purported lack of institutional resources to screen "is no excuse for non-performance." *Id.* "Defendants entered into the *Flores* Agreement and now they do not want to perform—but want this Court to bless the breach. That is not how contracts work." *Id*. In light of Defendants' own evidence that they were not substantially complying with Paragraph 14 (and the related paragraphs involving release of minors to custodians), the Court granted Plaintiffs' motion to enforce. *Id*.[12]

In April 2020, this Court held "[b]ecause ICE has not submitted evidence of individualized release assessments for Class Members awaiting asylum decisions, much less evidence that ICE makes and records individual assessments in a prompt and continuous manner, the Court finds ICE in violation of the FSA's Paragraph 18 (as well as the Court's prior June 27, 2017 Order) with regard to Class Members in expedited removal proceedings who are 'pending IJ hearing/decision' or 'pending USCIS response.'" Order Re Plaintiffs' Motion to Enforce (April 24, 2020) at 16 ("April 2020 Order"). [Doc. # 784.] "Because unnecessary delay has resulted from this

---

[12] "Plaintiffs' motion to enforce Paragraphs 14, 18, 19, and 23 of the Agreement on the issue of whether Defendants are making and recording continuous efforts to release class members or place them in nonsecure, licensed facilities in accordance with the Agreement is GRANTED." June 2017 Order at 34.

1    apparent failure to make individualized parole assessments, ICE is also in violation of

2    Paragraph 14." *Id*.[13]

3           Moving to the present situation, in response to the ICE Juvenile Coordinator's

4    Interim Report filed on May 15, 2020 ("May 2020 Juv. Coord. Report") [Doc. # 788],

5    on May 20, 2020, Plaintiffs filed their Response to Defendants' Notice of Filing of Ice

6    Juvenile Coordinator Report identifying deficiencies and raising concerns about

7    Defendants' compliance with the FSA, CDC Guidance, and Court orders. ("May 2020

8    Plaintiffs' Response to Juv. Coord. Report") [Doc. # 796]). Plaintiffs detailed:

9           On the issue of prompt release, the ICE Juvenile Coordinator's Report [Doc.#
10          788-1] concedes that ICE continues to evaluate Class Members for release

11          based on a "Parole Worksheet" that on its face is materially inconsistent with

12          the plain language of the FSA, and the agency's purported securing of parents'
            waivers of their children's right to release under the FSA was obtained [on or
13
            about May 15, 2020] …
14
            • without notice to parents' and Class Members' counsel of record,
15
            • without parents or Class Members having any opportunity to consult with
16
              their counsel of record,
17
            • without counsel of record for Class Members and parents being present,
18
            • without providing parents or Class Members with an oral or written notice of
19
              Class Members' rights under the FSA,
20
            • without providing parents or Class Members with a notice of Class Members'
21
              rights in a language parents or Class Members understood,
22
            • without advising parents or Class Members that any decision they made to
23
              have a Class Member released could be reversed prior to the Class Member
24
              actually being released,
25

26   13 "[ICE's] cursory evidentiary showings of those assessments raise serious concerns
     that ICE is not adequately assessing minors' flight risk, according to the FSA's general
27   policy favoring release, or communicating with parents about the option of waiver of
28   rights." April 2020 Order at 18.

                                          - 12 -

> • without explaining what steps ICE would take, if any, to assess the ability of
> designated sponsors to safely care for released Class Members, and
>
> • without advising parents that they could apply for parole so they could
> possibly be released with their child under 8 CFR 212.5(b)(3)(ii).
>
> Thus, any purported "waivers" of Class Members' FSA rights ICE obtained
> were hardly "proper waiver[s] of Flores rights," nor were they "affirmative,
> knowing, and voluntary" waivers of the parents' right to be detained with their
> children. April 24, 2020 Order at 15 n. 6 and 18.

*Id*. at 4.[14]

The Court held a status conference on May 22, 2020. The Court found that "[t]he ICE report continues to show lack of compliance with Paragraph 18 of the FSA, which requires Defendants to 'make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor.'" Order Re Updated Juvenile Coordinator Reports (May 22, 2020) at 2 ("May 2020 Order"), *quoting Flores* Agreement at ¶ 18 [Doc. # 101]; Doc. # 799].[15]

Moreover, the Court found that ICE "did not seek or obtain formal waivers from detained parents of their children's *Flores* rights during ICE officers' conversations with detained parents on or about May 15, 2020, [and] those conversations caused confusion and unnecessary emotional upheaval and did not appear to serve the

---

[14] It appears ICE continues to "cause[ ] confusion and unnecessary emotional upheaval" by approaching newly-placed families and following the same methods it used in May 2020. *See* Ex. D (C.M. Decl.) [Doc. # 903 at 54]; Ex. F (T.T.P. Decl.) [Doc. # 903 at 64], at ¶¶ 25–27; Ex. G (A.C. Decl.) [Doc. # 903 at 69]; Exhibit H (G.P. Decl.) [Doc. # 903 at 72], at ¶¶ 35–36.

[15] The Court further found that the information submitted by ICE "continues to show cursory explanations for denying minors release under the FSA, including vague categories such as 'USCIS/IJ Review,' which the Court previously criticized. May 2020 Order at 2, *citing* April 24, 2020 Order at 14–18. The Report "fail[ed] to show how ICE has cured the deficiencies already identified by the Court in its April 24, 2020 Order." *Id*.

agency's legitimate purpose of making continuous individualized inquiries regarding efforts to release minors." *Id*. (emphasis added).

The Court then Ordered as follows:

The parties shall meet and confer regarding the adoption and implementation of proper written advisals and other protocols to inform detained guardians about minors' rights under the FSA and obtain information regarding available sponsors. The parties shall file a joint status report as to their efforts by June 15, 2020.

*Id*. at 3 (emphasis added).

On June 26, 2020, the Court ordered the parties to continue to meet and confer regarding "the adoption and implementation of proper written advisals and other protocols to inform detained guardians/parents about minors' rights under the FSA and obtain information regarding, and procedures for placement with, available and suitable sponsors," and to provide a joint status report regarding these efforts no later than July 8, 2020. June 2020 Order ¶ 6 (emphasis added). [Doc. # 833]. The parties did so. [Doc. # 846].[16]

However, despite reaching agreement on virtually every aspect of an advisal of rights and procedures for placement of Class Members with available and suitable sponsors, *see* Declaration of Class Counsel Peter Schey re Joint Status Report [Doc. 905], shortly thereafter Defendants engaged in a *volte face*, refused to continue to meet and confer, and objected "to the implementation of *any* protocol that would potentially provide for the separation of a parent and child who are currently housed together in an

---

[16] The Court also ordered that "[b]y July 17, 2020, ICE shall transfer Class Members who have resided at the FRCs for more than 20 days to non-congregate settings through one of two means: (1) releasing minors to available suitable sponsors or other available COVID-free non-congregate settings with the consent of their adult guardians/parents; or (2) releasing the minors with their guardians/parents if ICE exercises its discretion to release the adults or another Court finds that the conditions at these facilities warrant the transfer of the adults to non-congregate settings." *Id*. at 4. Defendants failed to comply with this Order.

- 14 -

1    ICE family residential center (FRC)." Joint Status Report at 6 (emphasis added). [Doc.

2    # 902].[17]

3          In response, on August 7, 2020, this Court issued an Order stating in relevant

4    part: "The Court therefore will proceed to impose a remedy for Defendants' past and

5    ongoing violations of Paragraphs 12, 14, and 18 of the FSA. *See* June 27, 2017 Order

6    at 27, 31 (finding violations of Paragraphs 12A, 14, 18) [Doc. # 363]; April 24, 2020

7    Order at 6, 16, 18 (finding such violations); June 26, 2020 Order at 3 ('ICE's

8    compliance with Paragraphs 12, 14, and 18 of the FSA remains at issue.')." Order re

9    August 7, 2020 Status Conference at 2. [Doc.# 914].

10         As permitted by the Court, Plaintiffs now file this motion "for the

11   implementation of a proposed remedy for findings of breach relating to ICE's failure to

12   release Class Members without unnecessary delay and to make and record continuous

13   efforts to release Class Members." *Id*. at 3.

14   **3.    Requiring adoption of an advisal of rights and procedures to release Class
           Members would be consistent with and not modify the terms of the FSA**

15         Defendants' failure to advise parents about Class Members' FSA rights or to

16   adopt procedures aimed at the prompt release of Class Members when a parent

17   believes it would be in their child's best interest to be released clearly frustrates and

18   makes meaningless the rights the FSA extends to Class Members. It also violates the

19   numerous Court Orders discussed *supra*.

---

[17] Despite the terms of the FSA and this Court's prior Orders, "Defendants will not voluntarily agree to any protocol that would potentially provide for the separation of a parent and child who are currently housed together in an ICE FRC." *Id*. However, as this Court made clear since 2015, parents may assert or waive their children's *Flores* rights. *See, e.g.,* July 9, 2018 Order at 6 [Doc. # 455]. Defendants have been enjoined in separate class action litigation from separating class member parents from their children, absent an affirmative, knowing, and voluntary waiver of the parent's right to be detained with their children at an ICE FRC. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. June 26, 2018).

Plaintiffs are filing concurrently herewith as Exhibit B a proposed advisal of rights and as Exhibit C a proposed protocol, each providing a reasonable interpretation rather than a substantial modification of the terms of the FSA.

An Order clarifies, rather than modifies, an existing injunction where it does not "substantially change[] the terms and force of the injunction." *Gon v. First State Ins. Co.,* 871 F.2d 863, 866 (9th Cir. 1989), nor "change the underlying legal relationship between the parties." *Stone v. City and County of San Francisco,* 968 F.2d 850, 859 (9th Cir. 1992) (holding an order that "expanded . . . authority to comply with [a] consent decree" by providing Sheriff with power to release inmates after they served 50% of their sentences did not "alter the nature or scope" of the original agreement and thus did not modify consent decree).

As this Court has already pointed out (*see* August 7, 2020, Order at 2 [Doc. # 914], Paragraph 12.A of the FSA states that "[w]henever the [Defendants] take[ ] a minor into custody, [they] shall expeditiously … provide the minor with a notice of rights ..."[18] The only reasonable interpretation of this language is that Defendants are obligated to provide all detained Class Members or, if accompanied, their parents, with an advisal regarding their rights *under the FSA* rather than the totality of their rights under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, *et seq.*

---

[18] In addition to Paragraph 12.A's requirement that Defendants provide a general advisal of rights, the FSA also requires certain specific advisals. Paragraph 12.C states that "[i]n order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium .security facility." Paragraph 24.D states that "[t]he INS shall promptly provide each minor not released with (a) INS Form 1-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor)." The Form I-770 simply advises those to whom it is given that they have a right to "use. a telephone" to call a relative or friend, to be "represented by an attorney," and to "a hearing before an Immigration Judge." It says nothing about the range of FSA rights Class Members possess.

"Like terms in a contract, *distinct provisions of consent decrees are independent obligations, each of which must be satisfied before there can be a finding of substantial compliance.*" *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016) (emphasis added). "Substantial compliance" means more than "taking significant steps toward compliance" with a consent decree. *Id*. at 1082. In California, "a party is deemed to have substantially complied with an obligation only where any deviation is 'unintentional and so minor or trivial as not substantially to defeat the object which the parties intend to accomplish.'" *Id*. (*quoting Wells Benz, Inc. v. U.S. for Use of Mercury Elec. Co*., 333 F.2d 89, 92 (9th Cir. 1964) (citation and some quotation marks omitted)). "Deviations [from the terms of decree] are permitted so long as they don't defeat the object of the decree." *Id*. (citation omitted).

In this case, Paragraph 12.A's requirement that whenever Defendants take a minor into custody, they "shall" expeditiously provide the minor "with a notice of rights" is clearly a "distinct provision[ ]" of the consent decree that creates an "independent obligation[ ]" that must be satisfied before there can be a finding of substantial compliance. *Rouser v. White, supra*, 825 F.3d at 1081. It compliments the Agreement's requirement that Defendants treat "minors in its custody with dignity, respect, and special concern for their particular vulnerability as minors." *Id*. at ¶ 11.

Keeping Class Members and their accompanying caregiver parents in the dark about the children's FSA rights also does nothing to implement Defendants' obligation to treat Class Members with special concern due to their particular vulnerability as minors, nor treat them with dignity and respect.

Exhibit 1 to the FSA describes the requirements of licensed programs for the detention of all minors not flight risks or a danger. With limited exceptions, the FSA "describes the standards required of licensed programs. Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space

available, or within five days in all other cases." FSA at Exhibit 2 Para. (h).[19]

Exhibit 2 provides instructions "to advise Service officers of INS policy regarding the way in which minors in INS custody are processed, housed and released. These instructions are applicable nationwide and supersede all prior inconsistent instructions regarding minors." *Id*. at 1. In the FSA, the parties agreed that "the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles," and these instructions "shall" include, but may not be limited to, "the provisions summarizing the terms of this Agreement, attached hereto as Exhibit 2." FSA ¶ 9.

There is no evidence that Defendants' current agents and supervisors at the family detention facilities have been provided Exhibits 1 and 2 to the FSA or instructed to implement the terms therein. Instead, at least as of 2017, Defendants were arguing that ICE lacks the "institutional capacity or resources to assess whether an adult (other than a parent or guardian) seeking custody of a minor already detained with a parent is a suitable custodian who will house the minor in a suitable home environment." Gurule Decl. ¶ 16 [Doc. # 217-1]. This Court held that "[t]his failure to assess non-parent/guardian custodians flies in the face of the *Flores* Agreement." June 2017 Order at 26. The parties to the FSA would not have agreed to various time-tables for accomplishing required steps if Defendants could then operate without procedures even to vet designated relatives as required by Paragraphs 15-16.

The Agreement itself requires Defendants to take a range of concrete steps if a parent decides it is in their child's best interest to be released. Paragraph 18, for example, states that "the INS, or the licensed program in which the minor is placed, *shall* make and record the prompt and continuous efforts *on its part* toward family

---

[19] The FSA also provides that "[t]he INS shall make reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended, such as southern California, southeast Texas, southern Florida and the northeast corridor." FSA ¶ 6. There is no evidence that Defendants have made any such efforts and they are therefore not in substantial compliance with this term of the FSA.

reunification and the release of the minor pursuant to Paragraph 14 above." FSA ¶ 18 (emphasis added). Paragraph 19 states that in any case in which the Defendants do not release a minor pursuant to Paragraph 14, "such minor *shall* be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier." *Id*. (emphasis added). Paragraph 15 requires ICE to secure an Affidavit of Support (Form 1-134) and an agreement from a designated sponsor to provide for the minor's physical, mental, and financial well-being. In Paragraph 14 Defendants agreed that they would determine whether the detention of a minor is required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety. In the event a child is not a flight risk or danger, Defendants agreed they "shall release a minor from [their] custody without unnecessary delay" to sponsors in the order of preference listed in Paragraph 14. These provisions of the FSA, taken together with the FSA's Exhibit 2's detailed instructions, make clear Defendants are absolutely required to make and record several steps to implement Class Members' rights under the FSA.

Defendants' failure to adhere to the procedures set forth in the text of the FSA and in Exhibits 1 and 2, or to provide a proper advisal of rights, are not deviations from the FSA's terms that are either unintentional or so minor or trivial as not substantially to defeat the objects which the parties intended to accomplish. The objectives the parties intended to accomplish were that Class Members and their accompanying parents are made aware of the rights minors possess under the FSA so that those rights may be exercised, and that Defendants adhere to the requirements set forth in the FSA and its Exhibits such that the exercise of those rights may occur.

Had defendants not wished to advise detained Class Members of their rights under the FSA, they should not have agreed to do so in Paragraph 12.A. If they did not wish to detain minors in licensed facilities or to adopt procedures to effect the release of minors, they should not have agreed to terms included in the FSA that obviously require Defendants to take certain steps to house minors in licensed facilities, to

promptly assess minors for release, and when appropriate to release them without unnecessary delay.

To the extent some provisions in the proposed advisals and protocols are not required by the text of the FSA, they are reasonable and logical interpretations of the FSA. For example, Defendants may argue the FSA does not address in detail how a minor to be released should be transferred to the custody of an approved caregiver.[20] The proposed advisal and protocol provide that ICE may transport the minor to the approved sponsor or a parent may designate someone to transport the child to the approved sponsor. Or Defendants may also argue that Paragraph 12.A requires an advisal but does not state what the advisal should include.

In the past, this Court has found Defendants failed to comply with the FSA and required specific steps that, while not explicitly listed in the FSA, were reasonable interpretations of the language therein; put otherwise, the Court has elaborated measures that Defendants would always have needed to take to achieve compliance. *See Flores v. Barr*, 934 F.3d 910, 915 (9th Cir. 2019) (affirming this Court's itemization of specific prerequisites to Defendants' compliance with the FSA, including some not explicitly mentioned therein). In *Flores*, the Court of Appeals held that "although the Agreement makes no mention of the words 'soap,' 'towels,' 'showers,' 'dry clothing,' or 'toothbrushes,' ... these hygiene products fall within the rubric of the Agreement's language requiring 'safe and sanitary' conditions," and that although "the word 'sleep' does not appear in the Agreement, ... whether Defendants have set up conditions that allow class members to sleep in the [Border Patrol] facilities is relevant to the issue of whether they have acted in a manner that is consistent with 'the INS's concern for the particular vulnerability of minors' as well as

---

[20] FSA Exhibit 2(k) states when a minor is to be released, "the INS will assist him or her in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released."

the Agreement's 'safe and sanitary' requirement." *Id.* at 914.[21] This Court therefore "properly construed the Agreement as requiring such conditions rather than allowing the government to decide whether to provide them." *Id.*

Like the FSA's provisions that facilities be "safe and sanitary and ... consistent with the INS's concern for the particular vulnerability of minors," paragraph 12A's requirement that "[w]henever the [Defendants] take[ ] a minor into custody, [they] shall expeditiously … provide the minor with a notice of rights" has "independent force and can be interpreted and enforced without thereby modifying the Agreement." *See Flores*, 934 F.3d at 915; *see also Gates v. Gomez*, 60 F.3d 525, 531 (9th Cir. 1995) (holding district court's restriction on the use of 37mm guns based on a consent decree addressing acceptable treatments for mentally ill prisoners was "a reasonable interpretation of the decree"); *Thompson v. Enomoto*, 815 F.2d at 1327 (where a consent decree "implicitly contemplates appointment of a master by retaining authority to 'establish procedures' for its compliance," a post-judgment order of reference may lay out duties and powers for a master including the power to investigate by interviewing, attending meetings, obtaining documents, and convening hearings without modifying the consent decree); *Morales Feliciano v. Rullan*, 303 F.3d 1, 8–10 (1st Cir. 2002) (interpreting *Thompson v. Enomoto* to conclude that "the assignment of specific duties" is "simply another way of expressing what is reasonably to be expected from [a] stipulated promise of full cooperation.").

Defendants failure to adopt procedures to "obtain information regarding, and procedures for placement with, available and suitable sponsors" (June 2020 Order ¶ 6), also fails to comply with the FSA: When the parties agreed that Class Members would be entitled to prompt release—unless a flight risk, or danger, or a designated sponsor is

---

21 These determinations "reflect a commonsense understanding of what the [FSA] language requires," as "[a]ssuring that children eat enough edible food, drink clean water, are housed in hygienic facilities with sanitary bathrooms, have soap and toothpaste, and are not sleep-deprived are without doubt essential to the children's safety." *Id.* at 916.

unfit to care safely for the minor—they clearly intended for Defendants to *adopt actual procedures* Defendants would follow to assess a Class Member's eligibility for release. Without procedures to follow, the rights in the FSA are entirely ethereal and ineffective. Such a "cramped" understanding of the FSA would be "untenable." *See Flores*, 934 F.3d at 915.

The parties to the FSA did not "include[ ] gratuitous standards that have no practical impact." *Id. citing United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003) ("Courts interpreting the language of contracts 'should give effect to every provision,' and 'an interpretation which renders part of the instrument to be surplusage should be avoided.'"); *see also Public Serv. Co. of Colorado v. Batt*, 67 F.3d 234, 237 (9th Cir. 1995) ("The government's interpretation of the December 1993 agreement would permit the government to end the injunction by the publication of *any* [Environmental Impact Statement], however flawed, and the issuance of a record of decision based upon it. We reject a reading that would leave the injunction that toothless.").

## 4.   The detention of minors in secure facilities is detrimental to child welfare and may place the detained children at significant risk of serious harm

The detention of minors with unrelated adults in secure facilities tat are not licensed for the dependent children is "detrimental to child welfare and [may] place[] the detained children at grave risk of serious harm." Berger Decl. ¶16. [Doc. # 101-8 at 7].[22] As the Court of Appeals recently noted, "assuring 'safe and sanitary' conditions includes protecting children from developing short- or long-term illnesses as well as

---

[22] Dr. Luis Zayas, a licensed psychologist and Dean of the School of Social Work at the University of Texas at Austin, visited the Karnes detention facility in August 2014. Declaration of Dr. Luis Zayas, December 10, 2014, Exhibit 24 ("Zayas Decl.") at ¶¶1-6. [Doc. # 101-7 at 21]. Dr. Zayas declared that "[t]he medical and psychiatric literature has shown that incarceration of children, even in such circumstances as living with their mothers in detention, has long-lasting psychological, developmental, and physical effects." Zayas Decl. ¶9. After interviewing detainees at Karnes, Dr. Zayas concluded that "children [at Karnes] are suffering emotional and other harms as a result of being detained." *Id*. ¶10.

protecting them from accidental or intentional injury." *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019). More recently, while Defendants' declarations paint a picture of sanitary, social-distance-compliant, and medically appropriate facilities, this picture is "tarnished by declarations of detainees and their legal services providers showing that ICE's directives are not being properly implemented." April 20, 2020 Order at 5. [Doc. # 784].[23]

As of June, 2020, although progress had been made, "the Court [was] not surprised that COVID-19 has arrived at … the FRCs … facilities, as health professionals have warned all along that individuals living in congregate settings are more vulnerable to the virus." June 2020 Order at 2. [Doc. # 833.] As of June 25, 2020, at least 11 people detained at Karnes FRC had been diagnosed with COVID-19. *Id.* citing Independent Monitor's Interim Report at 10. [Doc. # 827]. Four employees at Dilley already had tested positive. *Id.* at 9.[24] The FRCs are "on fire" and there is no more time for half measures. *Id.* There is also no more time for Defendants to continue their refusal to comply with the basic terms of the FSA.[25]

---

[23] *See, e.g.*, Pls.' Second Reply, Ex. KK (L.O.R. Decl.) at ¶¶ 9, 19–20, 23 [Doc. # 774-33]; id., Ex. LLL (A.M.P. Decl.) at ¶¶ 7–8 [Doc. # 774-66]; Ex. NNN (N.V.G. Decl.) at ¶¶ 3–5 [Doc. # 774-68]; id., Ex. W (B.L. Decl.) at ¶¶ 5, 9, 16–18, 20–22 [Doc. # 774-25]. Detainees at Dilley also report difficulty maintaining social distance. *See, e.g., id.,* Ex. XX (I.P.F.L. Decl.) at ¶ 23 [Doc. # 774-52]. One detainee at Berks described that the only available hand soap leaves rashes and bumps and reported begging the staff to change the soap. *Id.*, Ex. W (B.L. Decl.) at ¶ 20 [Doc. # 774-25]. Surveys conducted by legal service providers at Dilley and Karnes in April corroborated individual detainees' accounts of uneven or failed implementation of COVID-19 policies. *See id.*, Ex. BB (Fluharty Third Decl.) at ¶¶ 37–46 [Doc. # 774-30]; *id.*, Ex. HHH (Meza Decl.) at ¶ 9 [Doc. # 774-62].

[24] The recent increases in COVID-19 infection rates in the counties in which Karnes and Dilley are located give the Independent Monitor, Dr. Wise, and the Court even more cause for concern. *Id.*

[25] According to *amici*, as of early August 2020, "ICE continues to detain those Class Members even when they have disclosed their risk factors to ICE and ICE has apparently acknowledged that its policy is not to detain such individuals." Amicus Brief at 12 [Doc. # 903.] and ICE has not provided custody determinations based upon

1

2

There are now reportedly at least 130 staff and detained individuals who have
tested positive for COVID-19 at the FRCs.[26]

3

4

5

6

7

While neither the Court nor the parties know how many parents may believe it is
in their child's best interest to be released, the FSA does not permit Defendants to
eliminate accompanied children's rights under the FSA by failing to inform parents
about their children's rights *and* having no procedures in place to release minors if
that's what a parent believes is in her child's best interest.

8

9

**B.    ICE's history of failing to comply with the FSA and this Court's prior
       Orders warrants a finding of Contempt**

10

11

12

13

Whether or not the Court concludes that the relief sought would modify the
terms of the FSA rather than reasonably interpret and implement them, a finding that
Defendants are in civil contempt is warranted. Such a finding allows the Court to grant
more robust relief in order to ensure FSA compliance.

14

15

16

Defendants have been aware of their responsibility to develop some protocol to
advise Class Members and their detained parents of their rights under the Agreement,
and to create associated infrastructure to allow the release of children to a designated
sponsor in accordance with the FSA Paragraphs 14-18 since at least June 27, 2017.

17

18

19

20

In its June 2017 Order, the Court found that "[b]y failing to conduct suitability
analyses of non-parent/guardian custodians seeking custody of class members,"
Defendants had "essentially concede[d]" their violations, and held that the "Defendants

21

22

a Class Member's medical conditions. *Id., citing* Ex. D (C.M. Decl.), Ex. A (Meza
Decl.), at ¶¶ 10–14, Ex. Q (M.E.F. Decl.), at ¶¶ 32-33.

23

24

25

26

27

28

[26] The count of at least 130 detained individuals and staff testing positive is a
cumulative total based on the following notices filed in *O.M.G v. Wolf*, No. 1:20-cv-
786-JEB (D.D.C. June 25, 2020): Doc. # 69 (June 26, 2020), Doc. # 70 (June 28,
2020), Doc. # 73 (June 29, 2020), Doc. # 75 (July 1, 2020), Doc. # 77 (July 2, 2020),
Doc. # 79 (July 5, 2020), Doc. # 80 (July 7, 2020), Doc. # 81 (July 9, 2020), Doc. # 82
(July 9, 2020), Doc. # 86 (July 12, 2020), Doc. # 90 (July 15, 2020), Doc. # 93 (July
18, 2020), Doc. # 95 (July 20, 2020), Doc # 97 (July 22, 2020), Doc. #104 (July 24,
2020), Doc. # 105 (July 27, 2020), Doc. #108 (July 29, 2020), Doc. #110 (Aug. 3,
2020), and Doc. # 111 (Aug. 4, 2020).

are not absolved of their contractual obligation to make and record efforts to release," either by the terms of the statutory provisions governing expedited removal, or by any "purported lack of institutional resources" to screen potential custodians. June 2017 Order at 27; *see also* June 26, 2020 Order, at 5. [Doc. # 833].[27]

Defendants most recently claim that in order to comply with the FSA and the Juvenile Coordinator's reporting requirements, they "must develop and implement a process by which [ICE] can obtain the consent of a parent/legal guardian for the release of his or her child from custody, or otherwise allow the parent to waive the child's *Flores* release rights." JC Report, at 3. [Doc. # 882-1]. This Court then reminded Defendants, "nothing in the Court's prior orders precludes ICE from continuing to promptly release eligible Class Members, as required under the FSA and *as this Court has ordered time and again*." July 2020 Order at 2 (emphasis added). [Doc. # 887.] Yet Defendants persist that they "will not voluntarily agree to any protocol" addressing Class Members' release rights under the FSA. Joint Status Report at 6. [Doc. # 902].

**1.      This Court may impose sanctions to coerce Defendants' compliance with the Settlement**

"[A] motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract." *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989). In contrast, a contempt motion seeks more expansive relief to "coerce*"

---

[27] Indeed, as long ago as 1993, the Supreme Court in this case noted that given the order of preference for the release of minors, beginning with "parents, whom our society and this Court's jurisprudence have always presumed to be the preferred and primary custodians of their minor children," and regulations that permit simultaneous release of parents with their children from custody "on a case-by-case basis," Defendants' practice of "keep[ing] legal custody of the juvenile, plac[ing] him in a government-supervised and state-licensed shelter-care facility, and continu[ing] searching for a relative or guardian" is sufficient to avoid requiring "expenditure of administrative effort and resources that the Service is unwilling to commit" in order "to give custody to strangers." *Reno v. Flores*, 507 U.S. 292, 310-12 (1993).

compliance with a court order …" *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016).

"Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, that decree may be enforced." *Frew v. Hawkins*, 540 U.S. 431, 432 (2004); *Nehmer v. U.S. Dept. of Veteran Affairs*, 494 F.3d 846, 860 (9th Cir. 2007). Unlike a contract or a private out-of-court settlement, the FSA is a court order that may be enforced upon a finding of civil contempt. *See Hutto v. Finney*, 437 U.S. 678, 690 (1978); *U.S. v. Bryan*, 339 U.S. 323, 330-31 (1950); *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987).

Simply stated, ""[a] court has power to adjudge in civil contempt any person who willfully disobeys a specific and definite order requiring him to do or to refrain from doing an act." *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir. 1983) (citations omitted). A party "fails to act as ordered by the court when he fails to take 'all the reasonable steps within [his] power to ensure compliance with the [court's] order[ ].'" *Id*. at 1146-47, *quoting Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976), *cert. denied*, 430 U.S. 931 (1977).[28]

**2.**  **Plaintiffs have met their burden of proof by demonstrating Defendants' repeated non-compliance by clear and convincing evidence.**

The plaintiff in a civil contempt proceeding has the initial burden of proof to demonstrate that the defendant failed to take all the reasonable steps within its power to ensure compliance with the settlement and court's orders by clear and convincing evidence. *United States v. Ayres,* 166 F.3d 991, 995 (9th Cir. 1999); *See Labor/Community Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009).

---

[28] Civil contempt proceedings are non-punitive, so "civil contempt may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *United States v. Ayres,* 166 F.3d 991, 995 (9th Cir. 1999) (citation and internal quotation marks omitted).

Here, Plaintiffs easily meet that burden for the myriad reasons discussed above. In its June 27, 2017 Order, this Court already determined the Defendants have committed ongoing violations of Paragraphs 12, 14, and 18 of the FSA. Once a party shows noncompliance with terms of the settlement, the burden shifts to the other party. *United States v. Ayres,* 166 F.3d 991, 995 (9th Cir. 1999).[29]

At bottom, *"[a]bility to comply is the crucial inquiry ..." United States v. Drollinger*, 80 F.3d 389, 393 (9th Cir. 1996) (emphasis added). Defendants can only meet their burden by showing they took "all the reasonable steps within [their] power to ensure compliance" with the FSA, and that their failure to comply was due to circumstances beyond their control. *Hook v. Arizona Dept. of Corrections*, 107 F.3d 1397, 1403 (9th Cir. 1997), *citing Sekaquaptewa v. MacDonald,* 544 F.2d 396, 403-04 (9th Cir. 1976), *cert. denied,* 430 U.S. 931 (1977).

Defendants must demonstrate they were "energetic in attempting to accomplish what was ordered." *NLRB v. James Troutman & Assoc.*, 1994 WL 397338 at *5 (9th Cir. 1994).

In deciding whether Defendants have shown they took all the reasonable steps within their power to ensure compliance with the FSA and prior Orders, and that their failure to comply was due to circumstances beyond their control, the district court "has wide latitude in determining whether there has been contemptuous defiance of its order[s]." *Gifford v. Heckler,* 741 F.2d 263, 266 (9th Cir. 1984). Here, Defendants offer nothing except abject disdain for the FSA to justify non-compliance. Defendants may not like that some parents may decide to seek the release of their children, but good intentions, whether or not contrived, are not a basis to violate the FSA *and*

---

29 To satisfy their burden, a defendant must show "categorically and in detail" why they were unable to comply. *N.L.R.B. v. James Troutman & Assocs.*, No. 86-7738, 1994 WL 397338, at *5 (9th Cir. Jan. 7, 1994) (citation omitted); *see also In re Crystal Palace*, 817 F.2d at 1365 ("a party can escape contempt by showing that he is unable to comply"). The party seeking a contempt Order "does not have the burden of showing that the respondent has the capacity to comply." *National Labor Relations Board v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

1    numerous Court Orders. "Intent[ions] [are] irrelevant to a finding of civil contempt

2    and, therefore, good faith is not a defense." *Stone v. City and County of San Francisco*,

3    968 F.2d 850, 856 (9th Cir. 1992); *see also In re Crystal Palace*, 817 F.2d at 1365

4    (defendant's proffered good faith defense to a contempt action "has no basis in law").

5        Defendants' violations of the FSA's terms are plain and virtually conceded to.

6    Accordingly, Defendants should be held in contempt, allowing the court to provide

7    extracontractual remedial measures should it believe Plaintiffs' proposed advisals and

8    protocol would modify rather than reasonably interpret the terms of the FSA.

9    **3.**    **Upon a finding of contempt, this court may impose extracontractual remedies**

10            **to ensure compliance with the settlement.**

11        "Where a finding of contempt has been made, the court may exercise its broad

12    equitable remedial powers . . ." *Gates v. Shinn*, 98 F.3d 463, 466 (9th Cir. 1996). The

13    authority to create an appropriate remedy "derives from the inherent power of a court

14    of equity to fashion effective relief." *SEC v. Hickey*, 322 F.3d 1123 (9th Cir.

15    2003), *opinion amended on denial of reh'g sub nom. Sec. & Exch. Comm'n v. Hickey*,

16    335 F.3d 834 (9th Cir. 2003).

17        "[I]n determining how large a coercive sanction should be the court should

18    consider the 'character and magnitude of the harm threatened by continued contumacy,

19    and the probable effectiveness of any suggested sanction.'" *General Signal Corp. v.*

20    *Donallco, Inc.*, 787 F.2d 1376, (9th Cir. 1986), *quoting United Mine Workers*, 330 U.S.

21    258, 304 (1947). *See also Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146-47 (9th Cir.

22    1983) (same).

23        In creating a remedy, the court may certainly consider that it has "given the

24    [Defendants] repeated opportunities to remedy" their violations in the past. *Hutto v.*

25    *Finney*, 437 U.S. 678, 687 (1978).

26        Defendants have failed to comply with the FSA and offered scant justification.

27    Given the long and unhappy history of the Plaintiffs' and the Court's efforts to bring

28    Defendants into compliance, the Court clearly is authorized to order Defendants to

    issue a notice of rights to detained parents and adopt proper procedures to release any

1   child whose parent believes it is in their child's best interest to be released to family

2   members residing here.

3   IV.   CONCLUSION

4          For the foregoing reasons, Plaintiffs respectfully request that this Court grant

5   this motion and enter an Order in the form lodged concurrently herewith.

6

7   Dated: August 14, 2020.                    Respectfully submitted,
                                                CENTER FOR HUMAN RIGHTS &
8                                               CONSTITUTIONAL LAW
                                                Peter A. Schey
9                                               Carlos Holguín

10

11                                              USF SCHOOL OF LAW
                                                IMMIGRATION CLINIC
12                                              Bill Ong Hing

13                                              LA RAZA CENTRO LEGAL, INC.
                                                Stephen Rosenbaum
14

15

16

17                                              _____*Peter Schey*_____
                                                Peter Schey
18                                              One of the Attorneys for Plaintiffs

19   / / /

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2020, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Peter Schey*

Peter A. Schey

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW

*Class Counsel for Plaintiffs*