CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (Cal. Bar No. 208741)
Neha Desai (Cal. RLSA No. 803161)
Poonam Juneja (Cal. Bar No. 300848)
Freya Pitts (Cal. Bar No. 295878)
1212 Broadway, Suite 600 Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | No. CV 85-4544-DMG-AGRx |
| Plaintiffs, | MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT RE "TITLE 42" CLASS MEMBERS |
| v. | |
| WILLIAM BARR, Attorney General of the United States, *et al.*, | Hearing: Sept. 4, 2020<br>Time: 11:00 a.m.<br>Hon. Dolly M. Gee |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   BACKGROUND TO THE COVID-19 BORDER CLOSURE ..............................2

III.  THE SETTLEMENT SQUARELY BINDS HHS AND DHS. ...........................4

      A.   Congress has charged HHS with the former-INS's responsibilities for the
      proper placement and treatment of all unaccompanied children in federal
      custody. ....................................................................................................6

      B.   DHS exerts complete control over the physical and legal custody of
      children designated for Title 42 expulsion. ..........................................8

      C.   Defendants lack any rational basis for denying identically situated
      unaccompanied children the Settlement's protections. .......................13

IV.   DETAINING CHILDREN AT HOTELS AND OTHER UNLICENSED PLACEMENTS
BLATANTLY VIOLATES THE SETTLEMENT...................................................13

      A.   Class members have been detained in hotels and other unlicensed
      placements for prolonged periods of time. ..........................................14

      B.   Class members are harmed by prolonged detention in hotels and other
      unlicensed placements. .........................................................................17

V.    CONCLUSION ......................................................................................21

i

# TABLE OF AUTHORITIES

## Cases

*Bank of the West v. Superior Court* 2 Cal. 4th 1254 (1998)......................................5

*Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978) .....................................5

*Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019) ........................................................5, 7

*Flores v. Barr*, 407 F. Supp. 3d 909 (C.D. Cal. 2019) ...........................................18

*Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015) ..............................5, 7, 18

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) .......................................................5

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ..................................................13

*Francis v. Immigr. Naturalization Serv.*, 532 F.2d 268 (2d Cir. 1976)...................13

*INS v. St. Cyr*, 533 U.S. 289 (2001) .....................................................................13

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994)...........................5

*Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006)........................................13

*United States v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) .....................................5

## Statutes and Regulations

42 C.F.R. § 71.40........................................................................................8

85 Fed. Reg. 17,060...............................................................................2, 8, 9

85 Fed. Reg. 22,424.....................................................................................2

85 Fed. Reg. 31,503.....................................................................................3

6 U.S.C. § 279 .............................................................................................6

8 U.S.C. § 1232 ....................................................................................7, 8, 14

42 U.S.C. § 265…………………………………………………………… 2, 6

42 U.S.C. § 268…………………………………………………………… 2, 6

Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135...........................6

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 110 Pub. L. 457, 122 Stat. 5044 ...............................................................6

1

2   **Other Authorities**

3   C-SPAN, Senate Hearing on Customs and Border Protection Oversight, June 25,
4       2020, www.c-span.org/video/?473378-1/senate-hearing-customs-border-
        protection-oversight (statement of Mark Morgan, Cmm'r, Customs and Border
5       Protection at 00:54:51) ...........................................................................................3

6   *Flores v. Johnson*, 212 F. Supp. 3d 864, 869-70 (C.D. Cal. 2015) .................5, 7, 18

7   Hamed Aleaziz, *"I Felt Alone": The Story Of How An Immigrant Teenager Fought
8       To Stay In The US While Under Guard In A Texas Hotel*, BUZZFEED, July 24,
        2020, https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-teenager-
9       successfully-fights-to-stay-in-us..........................................................................20

10
11  Sally Goza, *AAP Statement on Media Reports of Immigrant Children Being
        Detained in Hotels*, Am. Acad. Pediatrics, July 23, 2020,
12      https://services.aap.org/en/news-room/news-releases/aap/2020/aap-statement-on-
        media-reports-of-immigrant-children-being-detained-in-hotels/ ........................20
13

14  U.S. Customs & Border Protection, *COVID-19 Capio Memo*,
        https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html..9
15

16  U.S. Dep't Homeland Security, *Testimony of Mark A. Morgan, Chief Operating
        Officer and Senior Official Performing the Duties of the Commissioner U.S.
17      Customs and Border Protection, Before the U.S. Senate Committee on Homeland
        Security and Governmental Affairs*, June 25, 2020,
18      www.hsgac.senate.gov/imo/media/doc/Testimony-Morgan-2020-06-25-
19      REVISED.pdf .......................................................................................................10

20

21

22

23

24

25

26

27

28

I.   INTRODUCTION

The class-wide Settlement in this action protects "all minors who are detained in the legal custody of the INS" and expressly binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office." Exs. in Support of Motion to Enforce Settlement, February 3, 2015 [Doc. # 101], Ex. 1 ("Settlement"), ¶¶ 1, 10.

The Settlement sets standards for the placement and release of detained immigrant and asylum-seeking children, and generally requires Defendants Department of Homeland Security ("DHS") and the U.S. Department of Health and Human Services ("HHS") to minimize the detention of children. *Id*. ¶ 14. The Settlement further provides that for howsoever long Defendants do detain children, they must, except in exceptional circumstances, place them in non-secure facilities holding a state license to care for dependent minors. *Id*. ¶ 19.

Defendants do not deny that they are detaining children as young as three, four and five years old in hotels and other unlicensed placements for weeks at a time before summarily expelling them pursuant to the COVID-19 border closure order. Defendants excuse this prima facie violation of Settlement ¶¶ 12A and 19 by arguing that (1) unaccompanied children designated for Title 42 expulsion are not in "immigration" custody, but are instead in the "legal custody" of HHS and its subordinate entity, the Centers for Disease Control and Prevention ("CDC"); and (2) even if the Settlement does cover Title 42 unaccompanied children, Defendants may lawfully place them in hotels and other irregular, uninspected, and unlicensed facilities while Defendants arrange for their summary explusion.

Neither of Defendants' arguments has any merit. First, the Settlement binds HHS and requires that HHS and DHS house children in proper facilities, whether they are detained pursuant to Title 8, Title 42, or any other statutory framework; second, the Settlement requires that HHS and DHS do so as expeditiously as possible. It falls to this Court, again, to remedy Defendants' violations of the

1

Settlement. It should accordingly hold that children detained subject to Title 42 are *Flores* class members and order Defendants to place such children in licensed facilities as expeditiously as possible, as Settlement ¶¶ 12A and 19 direct.

II.      BACKGROUND TO THE COVID-19 BORDER CLOSURE

On March 21, 2020, President Trump announced that the CDC would issue an order closing the northern and southern land borders of the United States as a means of preventing the introduction of COVID-19. The CDC based its resulting order principally on 42 U.S.C. §§ 265 and 268 ("Title 42"), statutes Congress last visited in 1944 and 1953[1], respectively; that is, more than 50 years before the Settlement and more than 60 years before Congress enacted the TVPRA. *See* Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (Mar. 26, 2020) (effective March 20, 2020) ("Closure Order").

Neither the Closure Order nor its accompanying regulations categorically exempt accompanied or unaccompanied minors from its directive that CBP and ICE interdict and summarily expel non-citizens who attempt to cross into the United States over a land border. *Id.* Initially in place for 30 days, on April 22, 2020, the Administration extended the Closure Order for another 30 days and then, on May 26, 2020, extended it indefinitely. Extension of Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective April 20, 2020); Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 31,503 (May 26, 2020) (effective May 21, 2020).[2]

_____

[1] *See* Act July 1, 1944, ch 373, Title III, § 362, 58 Stat. 704; 1953 Reorg. Plan No. 1, §§ 5, 8, 67 Stat. 631.

[2] The results of the Closure Order have been dramatic: in March, 2020, ORR took custody of 1,852 children; in April, 62; in May, 39; and in June, 61. *See* Ex. G, Declaration of Melissa Adamson ¶¶ 4-8 ("Adamson Decl."). As of July 22, 2020,

On July 14, 2020, Plaintiffs requested that Defendants meet and confer regarding their "[f]ailure to tranfer class member designated for 'Title 42 Return' to licensed placements as expeditiously as possible" in violation of Settlement ¶¶ 12A and 19. *See* Pls' Response at 3 and Ex. A. Plaintiffs advised that DHS's April 2020 ¶ 29 data report included 29 children listed as "Title 42 Return" whom Defendants had "detained for three or more days in unlicensed placements such as hotels, hold rooms, and MVM transport facilities." *Id*., Ex. A at 2.

On July 22, 2020, the Independent Monitor filed her Interim Report alerting the Court to Defendants' using unlicensed "temporary housing" to detain unaccompanied children and families with children. *See* Interim Report on the Use of Temporary Housing for Minors and Families under Title 42 by Independent Monitor, July 22, 2020 [Doc. # 873] ("Interim Report"). The Interim Report noted several concerns with this "temporary housing" practice, including (1) "lack of formal oversight"; (2) "[n]o limits on facility census or length of stay"; (3) no

ORR had only 823 children in its custody, amounting to a mere six percent of its available beds in licensed shelters. ORR Juvenile Coordinator Interim Report, July 24, 2020 [Doc. # 882-2] ("ORR Report") at 2 (98 percent of ORR shelter beds unoccupied (10,491 available beds) as of July 22, 2020). Data reports Defendants produced pursuant to Settlement ¶ 29, however, disclosed that they were detaining a growing number of unaccompanied children pending Title 42 expulsion in hotels, "hold rooms," and "MVM Transport"; that such children were spending weeks in such irregular placements, and that many children detained in hotels are very young. *See* Pls' Response to Objections to Independent Monitor's Interim Report re Temporary Housing for Minors and Families Under Title 42, July 25, 2020 [Doc. # 889] ("Pls' Response"), Ex. C (Declaration of Melissa Adamson, July 25, 2020 (attaching summary of ¶ 29 data reports for April, May and June 2020)). On June 25, 2020, DHS Acting Commissioner Morgan testified that over 2,000 UACs have been detained and summarily expelled pursuant to Title 42, while 300 have been processed as Title 8. C-SPAN, *Senate Hearing on Customs and Border Protection Oversight*, June 25, 2020, www.c-span.org/video/?473378-1/senate-hearing-customs-border-protection-oversight (statement of Mark Morgan, Cmm'r, U.S. Customs and Border Protection at 00:54:51).

"formal lower age limit for UACs to be housed in hotels"; and (4) potentially inadequate medical care and measures to prevent "hotelled" children from contracting COVID-19 disease. *Id.* at 14-17.

On July 25, 2020, the Court ordered the Parties to "meet and confer regarding the issues with 'hoteling' raised in the Monitor's Interim Report . . . and provide a status update on their efforts to resolve those issues at the August 7, 2020 hearing in this matter." Order re Defs' Ex Parte Application to Stay, July 25, 2020 [Doc. # 887] at 3. In this order, the Court stated that the Independent Monitor's "[m]onitoring of the possible hoteling issue" arose under court authorization pursuant to the April 24, 2020 and June 26, 2020 orders. *Id.*

On July 27, 2020, the Parties and the Independent Monitor met and conferred. Plaintiffs thereafter filed a report informing the Court of Defendants' position that the Settlement does not cover unaccompanied children designated for expulsion pursuant to the Closure Order. Pls' Report on Parties' Conference re "Title 42" Class Members, July 29, 2020 [Doc. # 897] ("Pls' Report").[3]

On August 7, 2020, the Court found "Title 42 hotelling" to arise outside the scope of prior motions to enforce and set an expedited briefing schedule for a new motion to enforce on the "hotelling" issue. *See* Order re August 7, 2020 Status Conference, August 7, 2020 [Doc. # 912] ("Aug. 7 Order") at 3-4. In response to the Court's Aug. 7 Order, Plaintiffs file this Motion to Enforce.

III.   THE SETTLEMENT SQUARELY BINDS HHS AND DHS.

This Court has repeatedly affirmed its jurisdiction to enforce the Settlement

---

[3] Defendants subsequently filed a response to Plaintiffs' report confirming their view that the Settlement does not protect unaccompanied children designated for Title 42 expulsion. Defs' Response to Plaintiffs' Report on Parties' Conference re "Title 42" Class Members, August 4, 2020 [Doc. # 900] ("Defs' Response"). Plaintiffs thereafter filed a reply rebutting Defendants' response. Pls' Reply to Defendants' Response to Report re "Title 42" Class Members, August 6, 2020 [Doc. # 906] ("Pls' Reply").

and set out the principles for doing so. *See, e.g.*, *Flores v. Johnson*, 212 F. Supp. 3d 864, 869-70 (C.D. Cal. 2015) (citing Settlement ¶ 37; *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978)).

"The Settlement is a consent decree, which, 'like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree.'" *See Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016) (quoting *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005)); Defs' Aug. 4 Response at 4-5 (same quotation). "Where the contract is clear, the plain language of the contract governs." *Flores v. Johnson*, 212 F. Supp. 3d at 870 (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1998)), *aff'd in relevant part*, *Flores v. Lynch*, 828 F.3d 898.[4]

The Settlement protects all minors detained in Defendants' "legal custody." *Flores v. Lynch*, 828 F. 3d at 905. "Although the Agreement's terms refer to 'INS,' the Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security and the Department of Health and Human Services." *Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019).

Defendants' efforts to carve out children DHS designates for Title 42 expulsion is not the first time they have sought to shrink the Settlement's class definition to their preferences. Beginning in 2014, Defendants repeatedly argued that *accompanied* children are beyond the Settlement's protections; that argument repeatedly failed. *See Flores v. Lynch*, 828 F.3d at 905 ("We agree with the district court that '[t]he plain language of the Agreement clearly encompasses accompanied minors.'").

---

[4] The governing evidentiary standard on a motion to enforce the Settlement is a preponderance of the evidence. *See, e.g.,* Order re Pls' Motion to Enforce and Appoint a Special Monitor, June 27, 2017 [Doc. # 363] at 4.

Defendants once again seek to narrow the Settlement's coverage by designating children for expulsion pursuant to Title 42. This Court should reject Defendants' latest attempt to evade their well-established obligation to provide children a safe, sanitary, and licensed placement for howsoever long they remain in federal custody.

### A.   Congress has charged HHS with the former-INS's responsibilities for the proper placement and treatment of all unaccompanied children in federal custody.

Defendants' first argument for carving out unaccompanied children designated for Title 42 expulsion from the Settlement is that such children are not in DHS or immigration-related custody, but rather in HHS's custody pursuant to 42 U.S.C. §§ 265 and 268, and the Closure Order. The short answer to Defendants' point is that whether unaccompanied children designated for expulsion under Title 42 are in the legal custody of the HHS or DHS is irrelevant. The Settlement protects "all minors who are detained in the legal custody of the INS," and binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or *successors in office*." Settlement ¶¶ 1, 10 (emphasis added).

The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, codified in pertinent part at 6 U.S.C. § 279 ("HSA"), transferred responsibility for "the care of unaccompanied alien children" to "the Director of the Office of Refugee Resettlement of the Department of Health and Human Services . . . ." 6 U.S.C. § 279(a).

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 110 Pub. L. 457, 122 Stat. 5044, codified in pertinent part at 8 U.S.C. § 1232 ("TVPRA"), later specified that "the care and custody of all unaccompanied alien children, *including responsibility for their detention*, where appropriate, shall be the responsibility of *the Secretary of Health and Human*

6

*Services.*" 8 U.S.C. § 1232(b)(1) (emphasis added). The TVPRA specifically charges HHS with responsibility for a child's placement. *See* 8 U.S.C. § 1232(c)(2)(A) ("Subject to section 279(b)(2) of title 6, an unaccompanied alien child *in the custody of the Secretary of Health and Human Services* shall be promptly placed in the least restrictive setting that is in the best interest of the child.") (emphasis added); *see also* § 1232(c)(3)(A) ("[A]n unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."); § 1232(c)(3)(B) ("Before placing the child with an individual, the Secretary of Health and Human Services shall determine whether a home study is first necessary.").

Inasmuch as the former INS had responsibility for placing class members in appropriate facilities prior to the TVPRA, Settlement ¶¶ 12A and 19, it is clear that HHS is the INS's successor regarding the *placement and care* of unaccompanied children.[5] *See Flores v. Barr*, 934 F.3d at 912 n.2 ("[T]he Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security and the Department of Health and Human Services"); *Flores v. Johnson*, 212 F. Supp. 3d at 885 (after an unaccompanied child is transferred from CBP to HHS custody, "it is then HHS's responsibility to comply with the provisions" of the Settlement governing transfer to a licensed program and release to sponsors).[6]

---

[5] There is no serious question that unaccompanied children designated for expulsion under Title 42 are unaccompanied children. *See* 8 U.S.C. § 1232(g); 6 U.S.C. § 279(g)(2).

[6] Defendants themselves have repeatedly acknowledged HHS's responsibility for the care and custody of class members. *E.g.*, Defs' Notice of Termination of *Flores* Settlement Agreement [Doc. # 639] at 33 ("HHS is statutorily charged with custody of unaccompanied minors"); *id.* at 47 (noting that HHS is bound by the Agreement); *id.* at 53-54 (acknowledging that both the HSA and TVPRA transferred responsibility for the care and custody of unaccompanied children to HHS).

In sum, HHS is the former INS's successor insofar as the legal custody of unaccompanied children is concerned. Nor is HHS's responsibility for the proper placement of unaccompanied children confined to those whom DHS detains pursuant to Title 8. To the contrary, it provides, "Except in the case of exceptional circumstances, *any* department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3) (emphasis added).

Even assuming, as Defendants contend, that "the individuals subject to [Title 42 detention] processes are in the legal custody of HHS" pursuant to Title 42, Defs' Response at 8, such children would remain class members entitled to a safe, sanitary, and licensed placement.

**B.    DHS exerts complete control over the physical and legal custody of children designated for Title 42 expulsion.**

Even assuming, arguendo, that the Settlement were not to cover unaccompanied children in HHS custody, the fact would remain that DHS, and not HHS, exerts plenary authority to detain "hotelled" children, to designate them, or not, for Title 42 expulsion, and to determine where they will be placed for howsoever long they remain in federal custody. DHS's authority is evident from the plain text of the Closure Orders, DHS's own implementation of the Title 42 process, and the facts on the ground.

First, the relevant orders and regulations demonstrate that DHS has custody over unaccompanied children designated for Title 42 expulsion. Although CDC issued the Closure Order, DHS enjoys discretion to decide how it will coordinate carrying out the order. *See* 42 C.F.R. § 71.40(d)(2). The Closure Order itself acknowledges that CBP, and not CDC, "developed an operational plan for implementing the order." 85 Fed. Reg. at 17,067.

The Closure Order also cedes to DHS discretion to exempt noncitizens from Title 42 expulsion "based on the totality of the circumstances." 85 Fed. Reg. at 17,061. The Closure Order contains no standards or procedures DHS must follow in exercising that discretion. *See id.* Instead, it provides that DHS "customs" officers may, in their discretion, determine that a noncitizen "should be excepted [from the Closure Order] based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." 85 Fed. Reg. at 17,061. The Closure Order itself establishes that for all legal and practical purposes, *DHS* is the agency charged with maintaining custody over unaccompanied children designated for Title 42 expulsion, not CDC.[7]

Second, news reports have published CBP implementation guidance, called the "Operation Capio" memo ("Capio Memo").[8] The Capio Memo makes clear that DHS, including CBP, is the agency responsible for apprehending noncitizens subject to Title 42 expulsion, and is also responsible for their detention while they await expulsion. The Capio Memo similarly contemplates that CBP officers can make case-by-case decisions to take noncitizens out of the Title 42 process and instead "process [them] under existing statutory authorities" under Title 8. Capio Memo at 2. The Capio Memo states that "[t]he authority to make this determination resides with the Chief Patrol Agent." *Id*. Nowhere does the Capio Memo say that

---

[7] And while Defendants have previously cited various passages from the CDC orders that state that DHS is responsible for "implement[ing]" its orders, those passages merely confirm DHS's significant legal and material role in overseeing Title 42 expulsions. They do not stand for the proposition that CDC is the legal custodian of *Flores* class members.

[8] U.S. Customs & Border Protection, *COVID-19 Capio Memo*, https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html ("Capio Memo").

CDC officers have any role in these determinations, nor any custodial role over those subject to expulsion.[9]

Third, DHS's own data reports, the Independent Monitor's Interim Report, and the experiences of lawyers who have represented unaccompanied children subject to Title 42 expulsion confirm that DHS exercises plenary authority to "reclassify" children as Title 8 at any point during the child's detention. As DHS April, May, and June ¶ 29 reports show, DHS readily transfers Title 42 children between CBP, ICE and ORR custody in accordance with criteria known only to themselves. *See* Pls' Response at 5 and Ex. C.[10] Children's legal services providers report having persuaded CBP and ICE to transform Title 42 to Title 8 children, whom the DHS agencies then dutifully send off to licensed ORR placement. Again, Defendants alone know if any actual principal accounts for such caprice, but legal service providers note that Defendants' decision to abandon their Title 42 charade in individual cases does not appear to be based on any reasoning other than the fact that the child has someone advocating on their behalf. One attorney states:

> Indeed, since a stay of removal was entered for one of our clients on June 24, in *J.B.B.C. v. Wolf*, every time we have contacted the government about a specific child who had not yet been removed, the government has removed that child from the Title 42 Process. As of July 24, 2020, the U.S.

---

[9] The only passing reference to HHS officers is in a section stating that "ICE/ERO will take custody of any subject cleared by HHS or other appropriate personnel..." Capio Memo at 3. And even that reference clearly states that ICE/ERO is the agency that has custody, not HHS.

[10] Acting Commissioner Morgan has testified that *CBP, and not CDC,* exercises discretion "case-by-case" to "exempt any alien from the CDC Order on a humanitarian basis." U.S. Dep't Homeland Security, *Testimony of Mark A. Morgan, Chief Operating Officer and Senior Official Performing the Duties of the Commissioner U.S. Customs and Border Protection, Before the U.S. Senate Committee on Homeland Security and Governmental Affairs*, June 25, 2020, at 3, www.hsgac.senate.gov/imo/media/doc/Testimony-Morgan-2020-06-25-REVISED.pdf ("Morgan Testimony").

government has transferred at least 18 unaccompanied children out of the Title 42 process and into ORR care as a direct result of our efforts. Pls' Report, Ex. B (Declaration of Daniel Galindo), at ¶¶ 5-6; *see also*, Ex. C, Declaration of Jennifer Nagda ¶ 32 ("Nagda Decl.") ("We are not aware of any reason for the children's 're-designation' other than our efforts to notify DHS that we were aware of the children's presence in DHS custody.").

Once they have transformed a Title 42 unaccompanied child into a Title 8 unaccompanied child, DHS typically transfer the child to a licensed ORR shelter and give them full opportunity to seek asylum and otherwise contest removal. For example, DHS's June ¶ 29 report notes that 16-year-old B.B.C. "was reporcessed [sic] from a T42 to T8" and then "placed in ORR Custody pending Immigration Hearing." Adamson Decl. at ¶ 10. During his stint in Title 42 custody, B.B.C was first detained at a hotel for four days, sent to a different hotel for one day, returned back to the original hotel for 19 days, and finally transferred to a licensed ORR placement on the day DHS "reprocessed" him from Title 42 to Title 8. *Id.*; *see also* Morgan Testimony, *supra*, at 3 (Acting CBP Commissioner testifies that unaccompanied children whom CBP undesignates for Title 42 removal are "processed as unaccompanied alien children under our Title 8 authorities and will be transferred to the custody of HHS's Office of Refugee Resettlement (ORR).").

Children's legal services providers confirm that DHS is clearly calling the shots with regard to Title 42 custodial decisions. When lawyers intervene, DHS nearly always transforms Title 42 children into Title 8 children. *See* Ex. B, Declaration of Maria Odom ¶ 19 ("Odom Decl.") ("In almost every case, our intervention has succeeded in officials reprocessing the children under Title 8, rather than Title 42, meaning that the child is transferred to ORR custody instead of being placed on a flight for removal."); Ex. F, Declaration of Daniel Galindo ¶¶ 3-4 ("Galindo Decl.") ("As of August 13, 2020, the U.S. government has transferred at least 44 unaccompanied children out of the Title 42 process and into ORR care as a

result of our efforts. Additionally, we have identified to the U.S. government at least 17 families (adults with children) who we understood were in the Title 42 process. The government subsequently informed us that those families would be processed under Title 8."); Nagda Decl. ¶¶ 32-33 (describing success in advocating for specific children to be transferred from Title 42 to Title 8); Ex. A, Declaration of Karla Marisol Vargas ¶¶ 16-21 ("Vargas Decl."). "Hotelled" children's legal services providers communicate solely with DHS officials regarding re-classifying clients from Title 42 to Title 8. *See id.*; *see also* Odom Decl. Attachment B (Email correspondence from ICE Deportation Officer stating that a child "will be placed in title 8 proceedings and placed in ORR care as soon as his case is reprocessed.") and ¶ 24 ("This correspondence demonstrates that it is ICE and CBP, not CDC, making decisions as to how a child will be processed.").[11]

Multiple legal services providers confirm that the CDC is wholly uninvolved in DHS's decisions to classify their clients as Title 42 children or to re-classify them as Title 8 children. Vargas Decl. ¶ 17 ("We are not aware of any role that the CDC has played in cases involving Title 42 children."); Nagda Decl. ¶ 33 (same); Odom Decl. ¶ 20 (same); Ex. D, Declaration of Andrew Seaton ¶ 16 ("Seaton Decl.") (same). In fact, legal services providers report never having interacted with a single CDC representative in the course of representing children designated for Title 42 expulsion. *See* Nagda Decl. ¶ 33; Seaton Decl. ¶ 16.

In sum, DHS exercises complete control over the designation, re-designation, detention, and placement of unaccompanied children. There is neither rhyme nor

---

[11] Legal services providers and advocates report needing to contact multiple officials within DHS in order to locate and advocate for children designated as Title 42. *See* Nagda Decl. ¶ 30 (describing efforts to contact multiple CBP and ICE officials to locate each child); Ex. E, Declaration of Linda Corchado ¶ 8 ("Corchado Decl.") (same); Vargas Decl. ¶¶ 17, 19, 21 (same); Odom Decl. ¶¶ 20-24 (same); Seaton Decl. ¶¶ 6-16 (same).

reason apparent to whether DHS chooses to "hotel" a child or place him or her in a licensed facility as the Settlement commands.

### C.   Defendants lack any rational basis for denying identically situated unaccompanied children the Settlement's protections.

Even were the Settlement's covering "hotelled" children at all doubtful, the doctrine of constitutional avoidance would counsel resolving any such doubt in favor of requiring Defendants to comply with the Settlement's licensed placement provisions. Indeed, construing the Settlement otherwise would raise substantial equal protection concerns, running afoul of the axiom of constitutional avoidance. *See* Order re Plaintiffs' Motion to Enforce, Jan. 20, 2017 [Doc. # 318], at 7, *aff'd, Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ("Under the canon of constitutional avoidance, if it is 'fairly possible' for a court to interpret a statute in a way that avoids raising serious constitutional problems, it must do so. *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006) (citing *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001)).").

Distinctions between classes of immigrants "must be reasonable not arbitrary and must rest upon some ground of difference having *a fair and substantial relation to the object of the legislation*, ..." *Francis v. Immigr. Naturalization Serv.*, 532 F.2d 268, 272 (2d Cir. 1976) (emphasis added). Here, the fortuity of whether Defendants designate an unaccompanied minor for Title 42 expulsion bears no rational relationship to placing them for days or weeks in unlicensed and uninspected hotels, "hold rooms," or "MVM transport" facilities. This Court's construing the Settlement to condone such arbitrarily disparate treatment would needlessly raise substantial questions of equal protection and should accordingly be avoided.

IV.   DETAINING CHILDREN AT HOTELS AND OTHER UNLICENSED PLACEMENTS BLATANTLY VIOLATES THE SETTLEMENT.

The Settlement requires Defendants to place all children in their custody in

safe, sanitary, and licensed facilities. Settlement ¶¶ 10, 12, 19. Absent an "influx," Settlement ¶ 12 generally requires Defendants to transfer a minor to a non-secure licensed placement within three days. In the event of influx, transfer must occur "as expeditiously as possible." Settlement ¶ 12A3. Given the high vacancy rate at licensed ORR shelters, there is simply no reason Defendants should not provide all children in immigration custody with a licensed placement within three days.[12]

### A.     Class members have been detained in hotels and other unlicensed placements for prolonged periods of time.

Nevertheless, Defendants' own data reports confirm they are simply not providng class members licensed placement "as expeditiously as possible." The reports instead establish that Defendants have detained over 200 children designated for Title 42 expulsion in hotels and other unlicensed placements during April, May, and June of 2020, and that the rate at which they are placing children in such unlicensed placements only appears to be growing.[13] *See* Pls' Response at 5, Ex. C. The number of children that Defendants are detaining in hotels and unlicensed placements has increased rapidly each month. *Id*. Many of these

---

[12] Similarly, the TVPRA requires all federal agencies to transfer the custody of unaccompanied minors to "the Secretary of Health and Human Services not later than 72 hours. . . ," who must then "promptly" place them "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(b)(3), (c)(2)(A).

[13] Mindful of the Court's directive that "[b]riefing on a motion to enforce regarding the Title 42 hotelling issue shall be accompanied by data regarding, inter alia, how many minors are affected, whether they are accompanied or unaccompanied, the minors' ages, and where they were hotelled," Aug. 7 Order at 4, Plaintiffs wrote Defendants on August 10, 2020, to request that they produce ¶ 29 reports for July such that Plaintiffs could provide the Court with the information it requested in the instant filing. On August 12, 2020, Defendants' counsel advised, "The data teams are working on getting the monthly reporting as quickly as possible and I will send as soon as I have them but I do not think they can expedite the production at this stage." Ex. H, Email Correspondence, Aug. 12, 2020. On August 14, 2020, at 2:17 p.m., Defendants forwarded their July reports, but Plaintiffs have had insufficient time to analyze the July data appearing therein. Plaintiffs will apprise the Court of the results of their analysis of this data in their reply brief.

children are very young, and as the Interim Report notes, "inherently vulnerable in an extended expulsion process." Interim Report at 16.[14]

Defendants' characterizing their "hotelling" children for "brief period[s]" only, Defs' Response at 3 n.1, does not square with their own data or with the Independent Monitor's report. *See* Pls' Response, Ex. C; Interim Report at 8 ("[S]ince implementation of the CBP-issued expulsion protocols, unaccompanied minors and families routinely spend multiple days temporarily housed in hotels.").

According to Defendants' data, in April, they detained 29 Title 42 children for three to ten days in unlicensed hotels, hold rooms, and MVM transport facilities. Pls' Response, Ex. C at 1. In May, that number more than doubled to 71, and Defendants held some of these children in unlicensed placement for over two weeks. *Id*. at 2-3 (indicating that Defendants held 7-year-old J.E.L. and 1-year-old M.E.L., likely siblings, in a hotel for 15 days, then in an unlicensed MVM transport facility for one day, before finally expelling them).

In June, the number of children detained in unlicensed placements increased

---

[14] Defendants' ¶ 29 data reports also reveal that they have detained multiple unaccompanied children in unlicensed hotels, ICE hold rooms, and MVM transport facilities for prolonged periods after removing them from licensed ORR placement. *See* Pls' Response at 5-6 ("In May, ICE detained eight unaccompanied children in hotels after ORR had removed them from licensed placements.

Of these children, two were held for eight days, one for 10 days, another for 11 days, and three for 12 days. . . . This pattern continued into June, during which Defendants removed 10 children from licensed ORR placements and dispatched them to hotels, MVM transport, or ICE field offices."); *see also* Nagda Decl. ¶¶ 37-41 (detailing experiences of unaccompanied children removed from licensed ORR placements and held in hotels by ICE officials prior to removal, including a girl under 9 years old detained for seven nights in a hotel with strangers).

During the Parties' July 27, 2020 conference, Defendants agreed this should not be happening and agreed to take unspecified corrective steps. Defendants declined to disclose to Plaintiffs what steps they would take or when they would take them but did agree to share that information with the Independent Monitor.

again: Defendants detained 120 Title 42 children in hotels and unlicensed

placements before expelling them. *See id*. at 5-6. Approximately 80 percent of

these children were detained for between 4 and 19 days. *Id*. Defendants also

continued to detain very young children in hotels and others unlicensed facilities

for extended periods, including —

- 5-year-old D.J.S., held at a hotel for 19 days.
- 4-year-old B.P.B., held at a hotel for 14 days.
- 6-year-old S.V., held at a hotel for 13 days.
- 9-year-old N.P.J. and 8 month old H.P.J., likely siblings, held at a hotel for 12 days.

*Id*. at 6.

At the close of the June reporting period (June 30, 2020), Defendants were still detaining another 20 children in hotels, including —

- 2-month-old B.E.F., 1-year-old M.E., 5-year-old H.E., and 8-year-old H.E., likely siblings, whom Defendants had already held at a hotel for three days.
- 13-year-old J.M.A., whom Defendants had already held at a hotel for six days.

*Id*. at 6-7; Adamson Decl. ¶¶ 11-12.

The unambiguous command of the Settlement is that Defendants promptly provide children safe and proper placement. The Settlement requires Defendants to treat "all minors in [their] custody with dignity, respect and special concern for their particular vulnerability as minors." Settlement ¶ 11. Defendants own data confirms they are detaining childen designated for Title 42 expulsion, some for prolonged periods, in hotels and other unlicensed facilities. This practice constitutes a clear violation of Settlement ¶¶ 12A and 19 and harms vulnerable children whom Congress has assiduously sought to protect.

**B.     Class members are harmed by prolonged detention in hotels and other unlicensed placements.**

In contrast to licensed, regularly monitored facilities, the treatment and conditions children experience in hotels and other unlicensed placements is largely shrouded in secrecy. DHS holds children all but incommunicado, denying Plaintiffs' counsel access to "hotelled" children in violation of Settlement ¶¶ 32 and 33.

Legal services providers are often unaware of unaccompanied children detained under Title 42 until a parent or family member calls, desperate for help in locating their child. Odom Decl. ¶¶ 17-18; Corchado Decl. ¶ 7; Nagda Decl. ¶¶ 27, 29. As one attorney notes:

> Having not heard from their children in days or weeks, [families] fear whether their children are even alive. Although these children are in DHS custody, DHS provides no notice to the children's families that it has their children. In the few cases where DHS did notify the families of their children's apprehension, DHS provided no information about the child's location and did not allow the child to speak with their family.

Vargas Decl. ¶ 14.

Once legal services providers do learn of a child being held in a hotel or other unlicensed facility, they report extreme difficulty in locating the child. *See* Vargas Decl. ¶ 25; Odom Decl. ¶ 21; Corchado Decl. ¶ 5. Defendants refuse to issue "Alien Registration Numbers," or "A-Numbers," to children detained under Title 42, which only compounds the difficulty legal services providers experience in locating and assisting such children. *See* Corchado Decl. ¶ 8; Odom Decl. ¶ 22; Nagda Decl. ¶ 28.

Even when they succeed in identifying and locating Title 42 children, legal services providers report that DHS obstructs them from seeing and representing them. For example, on July 23, 2020, "[u]nidentified men, who appeared to be

17

contractors of DHS" physically blocked attorneys from the Texas Civil Rights Project from offering legal assistance to minor class members detained at the Hampton Inn in McAllen, Texas. Vargas Decl. ¶ 22. Legal services providers report that children detained in hotels are not told that they have the right to speak to a lawyer and not permitted phone calls to attorneys. *See* Odom Decl. ¶ 27 ("The secrecy around the process prevents meaningful access to a lawyer: children have reported to KIND attorneys that while they were held in hotels or other unlicensed placements subject to Title 42, they were not told that they had a right to speak to a lawyer."); Vargas Decl ¶ 23 ("Our understanding is that the children are not permitted to make phone calls other than those authorized to relatives by DHS . . . ."). In short, DHS does everything in its power to ensure that "hotelled" children never see a lawyer. *See* Corchado Decl. ¶ 11 ("[T]here were delays of several days before children were able to speak to a lawyer, because DHS limited the phone calls that a child could make to family, which necessarily delays either the child or family being able to learn about legal assistance and reach out to any lawyer.").

Despite DHS's determination to conceal the treatment and conditions children experience in hotels and other irregular placements, there is little doubt that licensed ORR placement differs qualitatively from unlicensed DHS placement. Licensed placements must "comply with all applicable state child welfare laws and regulations" and be "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . ." Settlement Ex. 1, ¶ 6. As this Court has held, "[t]he purpose of the [Settlement's] licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an *independent* child welfare agency." *Flores v. Barr*, 407 F. Supp. 3d 909, 919 (C.D. Cal. 2019)  (quoting *Flores v. Johnson*, 212 F. Supp. 3d 864, 879 (C.D. Cal. 2015).

Licensed programs must provide children with, among other services, an individualized needs assessment, educational services appropriate for the child's

level of development, appropriate routine medical and dental care, legal services information and orientation, a minimum of two hours of recreation per day, weekly individual and group counseling sessions, and visitation and contact with family members. Settlement Ex. 1. The Settlement also requires that Defendants permit Plaintiffs' counsel access to class members such that the treatment and conditions they experience may be monitored, *id*. at ¶¶ 32A, 33, something Defendants have indicated they will not permit with respect to children placed in hotels and other unlicensed placements.

In addition to being unlicensed and unmonitored, the conditions and treatment children experience during "hotelling" do not and could not meet the Settlement' requirements for safe and appropriate placement. As noted in the Interim Report, "hotelled" children are rarely permitted outdoor recreation, nor does DHS provide them education or counseling. Interim Report at 9.[15]

Children and families detained in hotels are constantly surveiled by contracted "Transportation Specialists," who are not required to have experience or training in caring for children. Interim Report at 8-9. In addition, "there appears to be a lack of formal oversight of the performance of [such] Specialists." *Id*. at 14. The lack of licensed childcare professionals as well as absence of any meaningful oversight exposes already vulnerable children to "high risks" of harm. *See* Odom Decl. ¶ 30; Nagda Decl. ¶ 45 ("When children are secreted in private rooms, with only a single adult or a small group of adults who are not experts in child welfare or child development watching over them, they are at heightened risk of improper treatment, including physical or sexual abuse.")

Defendants are detaining very young children in such conditions, some for up to three weeks. *See* Pls' Response, Ex. C. As the Monitor notes, Defendants

---

[15] Defendants have denied Plaintiffs' counsel access to class members who are being "hotelled," and Plaintiffs are therefore unable to provide additional evidence of Settlement violations.

place no limit on the number of children detained in hotels, Interim Report at 16,
and especially young children appear to endure unusually long stints in these
irregular placements. *See* Pls' Response, Ex. C. There "does not seem to be any
formal lower age limit for UACs to be housed in hotels" and it is "important to
recognize that a detention experience need not require mistreatment to be
traumatic for a young child." Interim Report at 16.

The American Academy of Pediatrics has stated that Defendants' practice
of detaining children in hotels is "traumatizing" for vulnerable immigrant
children.[16] Children have felt "confus[ed] and terrif[ied]" by their transfers
between CBP processing centers and hotels, and in at least one instance, "the
trauma [a] child endured as a trafficking victim was compounded by DHS's
treatment of the child and her placement in Title 42 proceedings." Vargas Decl. ¶¶
19-20. J.B.B.C., a 16-year-old boy detained for weeks a hotel in El Paso, stated "I
felt locked up. I felt alone and isolated . . . I didn't know what time of day it was. I
didn't know what day it was. I felt utterly disconnected from society. I just felt
anxiety and depression."[17] As an attorney from the Texas Civil Rights Project
articulated:

> The harm that children experience under this Title 42 process is
> profound and multi-faceted. Amongst other things, children are being
> denied their right to licensed placements under *Flores*, the ability to be

---

[16] Sally Goza, *AAP Statement on Media Reports of Immigrant Children Being
Detained in Hotels*, Am. Acad. Pediatrics, July 23, 2020,
https://services.aap.org/en/news-room/news-releases/aap/2020/aap-statement-on-
media-reports-of-immigrant-children-being-detained-in-hotels/ ("This practice is
traumatizing to children who have already endured so much, who are not old
enough to have made their own decisions about how to arrive at our border, and
who cannot communicate their fears and needs.").

[17] Hamed Aleaziz, *"I Felt Alone": The Story Of How An Immigrant Teenager
Fought To Stay In The US While Under Guard In A Texas Hotel*, BUZZFEED, July
24, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-
teenager-successfully-fights-to-stay-in-us.

located by their family through the immigration detention tracker, access to attorneys, and the ability to apply for asylum. The far-reaching and potentially life altering implications of this harm cannot be overstated.

Vargas Decl. ¶ 27.

There is no justification for exposing vulnerable children to unlicensed and unmonitored detention in hotels and other settings, regardless of the statutory justification for their detention, particularly because as of July 22 Defendants had access to over 10,000 vacant beds in licensed ORR facilities. *See* ORR Report at 2; *see also* Nagda Decl. ¶ 46 ("The children we have come into contact with who were held in hotels . . . were held in parts of the country where ORR operates state-licensed facilities and which at this time we believe to be well under capacity and able to house children with appropriate protections in place.") Defendants should not be detaining children in hotels or other unlicensed placements for any longer than 72 hours, and certainly not for weeks on end.

V.   CONCLUSION

The Settlement plainly protects all children in DHS's *and* HHS's legal custody and clearly forecloses Defendants' unlicensed, unregulated, and uninspected "hotelling" practices. Plaintiffs respectfully request that the Court grant this motion and order Defendants to comply with the Settlement with respect to placement and monitoring of class members designated for Title 42 expulsion.[18]

///

///

///

///

---

[18] Plaintiffs will separately move the Court to award them attorney's fees and costs incurred in the prosecution of this motion.

21

Dated: August 14, 2020

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Carlos R. Holguín

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch
Neha Desai
Poonam Juneja
Freya Pitts


*/s/* Carlos Holguín
Carlos Holguín
*One of the Attorneys for Plaintiffs*