# EXHIBIT C

I, Jennifer Nagda, declare as follows:

1. This declaration is based on my personal knowledge, except as to those matters based on information and belief, which I believe to be true. If called to testify in this case, I would testify competently about these facts.

**Experience/Qualifications**

2. I am the Policy Director for the Young Center for Immigrant Children's Rights (hereinafter "Young Center.") I have worked for the Young Center in various roles for nearly 12 years.

3. The Young Center is a registered 501(c)(3) organization based in Chicago with programs in seven additional locations including: Harlingen, Texas; Houston, Texas; San Antonio, Texas; Phoenix, Arizona; Los Angeles, California; Washington, D.C.; and New York, New York.

4. The Young Center was created in 2004 as a pilot project of the federal Office of Refugee Resettlement, Department of Health and Human Services (hereinafter "ORR") to create a program to provide best interests guardians *ad litem*— Child Advocates—for trafficking victims and other vulnerable unaccompanied children. Young Center attorneys and social workers are appointed as Child Advocates alongside trained, bilingual volunteers.

5. The role of the Child Advocate is to advocate for the best interests of the child. Child Advocates identify a child's best interests by considering the child's expressed wishes, safety, right to family integrity, liberty, developmental needs and identity. These "best interests factors" are well-established in the child welfare laws of all 50 states and in international law including the Convention on the Rights of the Child.

6. As the Child Advocate, we submit best interests recommendations on behalf of unaccompanied children in government custody to federal agencies including the

Executive Office for Immigration Review within the Department of Justice, Immigration and Customs Enforcement within the Department of Homeland Security, and ORR. Child Advocates' recommendations are grounded in federal and domestic best interests law.

7. As specified in the Trafficking Victims Protection Reauthorization Act (TVPRA), child trafficking victims and other vulnerable unaccompanied children may be appointed an independent Child Advocate. The most vulnerable children in ORR custody include but are not limited to young children (infants, toddlers, pre-verbal and elementary school-aged children), children facing protracted stays in ORR custody, children with disabilities, mental health concerns, or other illnesses, children who have been separated from their parents, children at risk of turning 18 in government custody, and children who fear returning to their countries of origin.

8. Since its founding, the Young Center has served as independent Child Advocate for thousands of children in government custody. We are the only organization authorized by ORR to serve in that capacity.

**Protections to Ensure the Safety of Immigrant Children While in HHS/ORR Custody and in the Community**

9. When a child under the age of 18 arrives at the border without a parent or legal guardian and without evidence of legal status in the United States, that child is designated an unaccompanied child pursuant to 6 U.S.C. § 279(g) and transferred to the Office of Refugee Resettlement.

10. The Young Center has been appointed to thousands of children designated as unaccompanied children by DHS officials and transferred to the Office of Refugee Resettlement.

11. All children in ORR custody, with the exception of children temporarily placed in so-called "influx" facilities, are held in state-licensed facilities contracted by ORR to care for children (ORR-contracted, state-licensed facilities). States not only

approve the opening of these facilities in a manner consistent with state child welfare laws but have the ability to enter and inspect the facilities to ensure compliance with child protection laws.

12. These ORR-contracted, state-licensed facilities are also subject to the Prison Rape Elimination Act (PREA), which is intended to prevent, detect and respond to sexual abuse and sexual harassment. Among other measures, ORR-contracted facilities must provide children with access to phones and other mechanisms to report instances of abuse and harm.

13. Staff who work in ORR-contracted, state-licensed facilities are bound by "mandatory reporter" laws, which—very generally summarized—impose sanctions for failing to report reasonable concerns that a child has been abused or neglected or whose safety or well-being is in danger. Moreover, many staff in these facilities are professionals bound by independent ethical obligations to report concerns of abuse, neglect or danger to the child's safety and well-being.

14. While in ORR custody, children are screened to evaluate their physical and mental health; this is to ensure that the facility is able to provide appropriate care for the child. The children are also screened to assess their linguistic and educational background, and to identify needed services.

15. While in ORR custody, children must be provided with medical care, nutritious meals, education, access to religious services, access to lawyers, time for outdoor recreation and activities, and all other services identified in the Flores Settlement Agreement, the TVPRA, and as required by the state child welfare agencies that license the facilities.

16. ORR also develops safety plans for each child in its custody, including but not limited to emergency situations such as evacuations, medical emergencies, and disease outbreaks. (ORR Policy 3.3.3.)

17. While in ORR custody, children are screened to determine whether they are victims of human trafficking, exploitation, abuse and persecution. (*See, e.g.*, ORR

Declaration of Jennifer Nagda

3

Policy 3.3.3.) That information is critical in evaluating how or whether the child can be safely repatriated if they ask to return or are ordered removed.

18. Once in ORR custody, unaccompanied children are able to seek reunification with parents, family members or other adults with whom they have an established relationship. Those individuals are known as sponsors.

19. In order for children to be released to those individuals, the sponsor must provide proof of their identity, their address, and their relationship to the child they wish to sponsor. They must also submit proof of the identity of other adults in the home. (ORR Policy 2.2.4.)

20. Sponsors are also subjected to background checks, including a public records background check of criminal history and sex offender registry databases. With the exception of most parents and most immediate relatives, sponsors must submit to fingerprint background checks processed by federal agencies. Sponsors may also be required to submit to background checks through state child abuse and neglect registries. (ORR Policy 2.2.5)

21. Before a child is released to a sponsor, ORR evaluates whether the sponsor is able to care for the child, considering the child's individual needs, strengths, risk factors and relationship to the sponsor. (ORR Policy 2.4.)

22. The standards described in paragraphs 11-22 apply even if the child will spend just one day with the sponsor before turning 18. In other words, sponsors who wish to take custody of a young person who will be a child for just one day, including providing food and shelter for the young person in a private space, must meet all of these standards.

**Standards for Federally Appointed Child Advocates**

23. Young Center Child Advocates are appointed to child trafficking victims and other vulnerable, unaccompanied children pursuant to 8 U.S.C. § 1232(c).

24. To be appointed to individual children, Child Advocates must undergo a rigorous series of checks. These include: an application, individual screening, and personal observation; state and FBI criminal background checks; a child abuse and neglect (CAN) registry check for every state where the Child Advocate has resided in the last five years; a two-day, intensive training focused on unaccompanied children; and positive personal and professional references.

25. Even after a Child Advocate passes these checks and is appointed to an individual child, their visits with children take place in spaces where the child and the Child Advocate can be observed by others.

26. Child Advocates never meet with children in bedrooms or other spaces hidden from public view or observation. In many ORR facilities, the rooms where Child Advocates and children meet are monitored by video cameras. Child Advocates meet with children in rooms where there are windows, doors with glass, or in rooms where the door is left open. This is done to protect the child's safety and to protect the Child Advocate from unfounded accusations of improper conduct.

**Children Held in DHS Custody In Border Region Hotels are Unable to Access Independent Child Advocates**

27. On multiple occasions in July and August 2020, Young Center Child Advocates have been contacted by family members of children detained in hotels after reaching the U.S. border.

28. These children were not designated as "unaccompanied" despite meeting the definition set forth in 6 U.S.C. § 279(g). They were not assigned A#s, which means that there was no way to track them through the immigration court system, or to identify them if there was any confusion regarding their name or date of birth. DHS did not alert the Young Center to their presence or recommend the appointment of a Child Advocate for any of these children.

Declaration of Jennifer Nagda

5

29. We only learned that these children were being held by ICE in hotels because of family members who reached out to organizations, including the Young Center, for help. The family members who reached out to us were extremely and concerned for the safety of these children.

30. In the absence of any system to track these children, Young Center Child Advocates must contact as many DHS officials as possible to try to determine the whereabouts of the children using only their names, and when known, ages. DHS has no designated point of contact, and we frequently reach out to multiple CBP and ICE officials when trying to locate each child.

31. In these cases, DHS officials have advised us that the children were not in the custody of ORR or a state child welfare agency but were instead in the custody of DHS officials or private entities working at the direction of DHS: specifically, the private security contractor known as "MVM."

32. In certain cases, we were able to confirm a child's presence in DHS custody in a hotel, after which the children were re-designated as "unaccompanied," assigned an A#, and transferred out of DHS custody to ORR custody. We are not aware of any reason for the children's "re-designation" other than our efforts to notify DHS that we were aware of the child's presence in DHS custody. We are not aware of any effort by DHS or the Centers for Disease Control and Prevention (CDC) to test these children for COVID-19 prior to their transfer to ORR custody.

33. To the best of our knowledge and belief, the CDC has not been involved in any decision to designate children under Title 42 or to re-designate children as unaccompanied under Title 8 after they were originally designated as Title 42. It is our understanding that these designation and re-designation decisions are made by DHS officials. Throughout the multiple cases referenced in this declaration, we have never interacted with a CDC representative in any capacity, including when attempting to locate a child or advocating to re-designate children from Title 42 to Title 8.

Declaration of Jennifer Nagda

6

34. In other cases, DHS advised us that the children we inquired about had already been "expelled" from the United States. In those cases, it has been nearly impossible to locate the children. Without an A#, and without a repatriation plan put in place by an immigration judge's grant of voluntary departure or order of removal, we have no way of knowing where a child was sent upon "expulsion"—whether they were walked to the middle of a bridge at the U.S.-Mexico border, whether they were placed on a plane, and whether an official in the receiving country took custody of, processed, or detained or jailed the child.

35. At this time, the Young Center is still unable to confirm the whereabouts of two sisters, ages 15 and 12, who came to a port of entry seeking protection on August 8, 2020, and who were expelled to Mexico despite being El Salvadoran. Officials from both the United States and Mexican governments have been unable to tell us where the girls are, whether they are safe, or provide us with an identification number or repatriation itinerary that would allow us to find the children. Instead, we are contacting non-governmental organizations throughout Mexico and Central America who might have encountered the girls.

36. In our 16 years of work as Child Advocate, we have observed that children arriving at the border are held in DHS (CBP) custody before their release to the community, their transfer to ORR custody if unaccompanied, or their transfer to ICE facilities if accompanied or if determined to be 18 or older. We are not aware of situations in which children have been transferred to or held in other private spaces such as hotels.

**Unaccompanied Children Awaiting Repatriation under the TVPRA Discovered in DHS Custody in Hotels**

37. Young Center Child Advocates also learned of a different group of children held in hotels while in ICE custody—not children arriving at the border, but children taken from ORR custody to be repatriated to their countries of origin. These

Declaration of Jennifer Nagda

7

unaccompanied children were returning to home country pursuant to grants of voluntary departure or orders of removal issued by immigration judges, unlike the children held in hotels immediately after arriving at the U.S. border.

38. In the case of unaccompanied children, Young Center Child Advocates were only able to confirm the children's location in hotels by speaking directly with ICE officials who were coordinating the children's return to home country. We do not know if the children were able to speak with their attorneys during this time.

39. In our communication with ICE, ICE officials insisted the unaccompanied children returning to home country were fine because the agency provided food and made it as comfortable as possible for the children. However, the agency could not or would not disclose how many children were held in each room; how many adults were in the same room; whether those adults stayed in the room over night; whether those adults permitted the children to use the bathroom privately; or the ages and genders of both the children and adults in hotel rooms.

40. In one case, a girl younger than nine years old who was awaiting repatriation spent seven nights in a hotel room with adults who were strangers to her. For more than six days, her precise location was unknown to her appointed Child Advocate, her attorney, or the ORR-contracted facility staff who had cared for the child for months. We still do not know which adults from ICE or its contractor (MVM) were in the hotel room with the child, whether they were in the room with the child as she slept, and whether she was ever left in the custody of a single adult in a hotel room. This situation was harmful to the child, who could have remained in a licensed ORR placement where she had developed trusting relationships with trained, child welfare staff over many months.

41. In another case, a Child Advocate was alarmed to learn that an unaccompanied child returning to home country pursuant to a removal order did not know where he was other than in a room, did not know the adults who took him to the hotel room, or what their role was.

**Dangers of Holding Children in Private Locations with Unknown Adults**

42. It is in children's best interests to be in the custody of family; when that is not possible, to be in the custody of authorities licensed to provide child welfare services.

43. If children must be in government custody, it is in their best interests to be in the custody of ORR, whose contracted facilities are subject to state child welfare laws and policies.

44. It is not in children's best interests to be held by DHS in hotel rooms—generally understood to be a room with one or two beds and an adjacent bathroom—with adults who are law enforcement officials, or who are contracted by law enforcement officials.

45. When children are secreted in private rooms, with only a single adult or a small group of adults who are not experts in child welfare or child development watching over them, they are at heightened risk of improper treatment, including physical or sexual abuse. As far as we know, there are no cameras in these rooms, no publicly-available guidelines for adults' presence in these rooms, no access to phones to register PREA complaints, no spot inspections from state child welfare officials, and no access by Child Advocates or attorneys—in essence none of the mandated protections in place in ORR-contracted, state-licensed facilities.

46. The children we have come into contact with who were held in hotels, whether after arriving at the border or after receiving an order to repatriate from an immigration judge, were held in parts of the country where ORR operates state-licensed facilities and which at this time we believe to be well under capacity and able to house children with appropriate protections in place.

Declaration of Jennifer Nagda

9

47. I declare under penalty of perjury that the foregoing is true and correct. Executed on August 14, 2020 in Bala Cynwyd, Pennsylvania.

_____
Jennifer Nagda