# EXHIBIT E

## DECLARATION OF LINDA CORCHADO

I, Linda Corchado, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge.

1. I am an attorney licensed to practice law in New York. Since May 2019, I have been the Legal Director at Las Americas Immigrant Advocacy Center ("Las Americas"). I engage in direct representation of noncitizen clients and also supervise attorneys and other staff at Las Americas who represent individuals detained during immigration proceedings.

2. I have been practicing law since 2014. Prior to joining Las Americas, I worked as a private immigration attorney for four years.

3. I make this declaration based on my personal experience working with noncitizen unaccompanied children subject to the Title 42 process since the process came into effect in March 2020.

4. Our office regularly provides legal services and other assistance to low-income refugees and asylum seekers in CBP and ICE custody. In the past, before the government began expelling people by using its Title 42 process, our office was often able to find our clients relatively quickly once we received a referral. For example, with a name and A-number, or name and country of origin, we could typically confirm the person's location within approximately five minutes using a ICE locator website. Even when we had less information or the client had not yet shown up in the locator website, delays in finding a client were much smaller than they are under Title 42.

5. Since the CDC order went into effect in March 2020, it has been extremely difficult to find unaccompanied children before they are deported under Title 42. These children are only in the United States for a few days, and sometimes just a few hours, before being summarily deported. Without a quick and effective way to find such children, they will be removed without an attorney having been able to find and talk to them.

6. I have recently represented four children who were subject to the Title 42 Process who were still in the United States at the time my office heard of them. All of them were facing imminent deportation, and it required significant resources to intervene in their cases.

7. For example, in June 2020, I represented an unaccompanied minor who fled to the United States to seek safety and to reunite with this father, who lives here. He was a 16-year-old boy from Honduras fleeing persecution. I was made aware of this minor only because our office happened to receive a phone call from his father seeking assistance in stopping his son's deportation. By the point that we heard about this case, the child was in an unknown hotel in Phoenix awaiting deportation. The minor could not tell me exactly where he was detained because he had no way to know.

1

8.  DHS was not forthcoming with information about the child. To locate the child, I could only provide DHS officials with my client's date of birth since DHS does not assign A numbers to people subjected to the Title 42 Process. I have also found that immigration officials sometimes have conflicting information among agencies about who has custody of a child — for example, a child could be under the custody of the CBP port director at a U.S.-Mexico port of entry, a child could be under CBP custody at a CBP station or can be under ICE custody while the child is in a hotel. Throughout the process of locating a child, I have to go through these three different entities in order to pinpoint to whom I should direct my questions and requests to about my client's case. I have had to make multiple inquiries to DHS agencies, and have had multiple conversations with a child's family members to get more details, in order to get DHS to confirm they have the child and to sort out which agency has custody. This is a much slower and more labor-intensive effort to find a child than was the case before the government began expelling people under Title 42.

9.  The 16-year-old boy referenced above was scheduled to be taken from the hotel and removed on a flight within hours. Had I not been able to locate my client in the brief window when he was in the country, I would have been unable to help him. I referred his case to the ACLU, which brought a federal lawsuit on his behalf. After a federal judge issued a preliminary injunction against his deportation, the government voluntarily transferred him out of the Title 42 process and into regular immigration proceedings.

10. In late June and through July, I heard of three other cases of children subject to the Title 42 Process. One was a 16-year-old Honduran boy, another was a 17-year-old Nicaraguan girl, and the third was a 13-year-old Guatemalan boy. All three had various claims for humanitarian relief, and followed the same general pattern as above—they were all set for imminent deportation at the time their cases found their way to my office. Fortunately, through a combination of my intervention and the ACLU's work, I successfully advocated for their referral to ORR custody and averted their deportation.

11. However, each case required substantial time and effort on an emergency basis, as I had to move very quickly to gather information about the child's case from the child and family members, advocate with DHS to allow me phone contact with the child, and work with other lawyers to stop the child's deportation. In the cases I found, there were delays of several days before children were able to speak to a lawyer, because DHS limited the phone calls that a child could make to family, which necessarily delays either the child or family being able to learn about legal assistance and reach out to any lawyer. I estimate that for each child, I spent approximately six to twelve hours over the course of two or three days before getting confirmation the child would not be deported.

12. We also insist to the government that clients be given a type of screening for Convention Against Torture ("CAT") claims that the government is sometimes providing under its Title 42 process. It's important that we help the client prepare for that screening and go over their rights. When I was able to get the government to do a CAT screening for one client, I was only able to conduct a very brief and basic preparation while my client was

in CBP custody. Given his vulnerabilities as a minor, and given the fact that his parents knew more about the facts surrounding his persecution and fear of torture than he did, my effort was largely fruitless. To make matters worse, my client had never gone to school, could not read or write and had a very basic understanding of the Spanish language, even though it was the only language he understood. I requested to be present at his interview, and flagged these vulnerabilities to USCIS, my requests to be present were ignored and my client was forced to proceed without an attorney.

13. For another client, I was never notified by DHS that he would undergo a CAT screening. My first conversation with him was in a van where the call was not confidential, so I had to quickly end the call until he reached a hotel in El Paso where he could speak with me. However, upon arriving at the hotel, he was told that he must undergo an interview with an officer, he was not told by any immigration official or ICE contractor that he could access an attorney during the interview or that he could postpone the interview. He didn't even understand what the interview was for.

14. Preparing for a client's fear screening interview can be an extensive process, because asylum seekers have no knowledge of the U.S. immigration system and do not know how to respond to questions. Thus, access to potential clients is vital. Asylum seekers are particularly vulnerable: they have fled dangers in their home country and made a harrowing journey all the way to the United States border by themselves, often being exploited and harmed along the way. My staff and I work to establish the trusting relationship necessary to solicit all of the necessary information for them to be able to present their fear claims.

15. Such preparation is especially critical for minors, for several reasons. Minors are frequently less likely to understand their rights and often have greater difficulty conveying a coherent factual narrative. Minors will also not know the full story behind their persecution because adults will often shield them from the worst aspects of their situation. Speaking at length with the minor's family members and investigating the facts is therefore critical, because I often cannot rely on the minor's testimony alone to support his claims of fear.

I declare under penalty of perjury, under the laws of the United States of America and Texas, that the foregoing is true and correct to the best of my knowledge.

Executed and dated: July 24, 2020, in El Paso, Texas, United States.

Signature: _____
Linda Corchado

3