ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsel
 Tel:  (202) 532-4824
 Fax:  (202) 305-7000
 Email:  Sarah.B.Fabian@usdoj.gov

     *Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE, ECF NO. 920** |
| WILLIAM P. BARR, Attorney General of the United States; *et al.*, | |
| Defendants. | |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     BACKGROUND ...................................................................................2

  a.  Applicable Law....................................................................................2

  b.  Custody Incident to the Title 42 Processes ...........................................5

  c.  Plaintiffs' Motion to Enforce to Enforce...............................................7

III.    ARGUMENT.........................................................................................9

  a.  This Court Lacks Jurisdiction Over Plaintiffs' Motion........................9

  b.  The Use of Hotels to Hold Minors Incident to Processing
      Them Under the CDC's Title 42 Processes Does not
      Violate the Agreement ...................................................................... 17

      i.    The minors are being processed and Returned as
            Expeditiously as Possible in Accordance With the
            CDC Order .......................................................................... 17

      ii.   The Conditions of Custody Are Safe and Sanitary ................. 20

IV.     CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................ 16

*Flores v. Barr*,
407 F. Supp. 3d 909 (C.D. Cal. 2019)................................................ 10

*Gao v. Jenifer*,
185 F.3d 548 (6th Cir. 1999)....................................................... 10

*Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*,
523 F. Supp. 2d 1113 (C.D. Cal. 2007)............................................. 16

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ............................................................ 12, 16

*Orr v. Bank of America*, NT & SA,
285 F.3d 764 (9th Cir. 2002)....................................................... 21

*Reno v. Flores*,
507 U.S. 292 (1993) ................................................................ 11

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ................................................................. 9

*Wang v. Chinese Daily News, Inc.*,
231 F.R.D. 602 (C.D. Cal. 2005) .................................................. 21

## STATE CASES

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
109 Cal. App. 4th 944 (Cal. Ct. App. 2003) ........................................ 9

## STATUTES

6 U.S.C. § 202 ............................................................................................ 12

6 U.S.C. § 203 ............................................................................................ 12

6 U.S.C. § 279 ............................................................................................ 12

6 U.S.C. § 552 ............................................................................................ 12

8 U.S.C. § 1232 .......................................................................................... 12

8 U.S.C. § 1225 ..................................................................................... 11, 12

8 U.S.C. § 1226 ..................................................................................... 11, 12

8 U.S.C. § 1232 ..................................................................................... 11, 12

8 U.S.C. § 1225 ..................................................................................... 11, 12

8 U.S.C. § 1232(c)(2)(A) ............................................................................. 8

8 U.S.C. § 1232(c)(3)(A) ............................................................................. 8

8 U.S.C. § 1232(c)(3)(B) ............................................................................. 8

8 U.S.C. § 1252 ..................................................................................... 11, 12

42 U.S.C. § 265 ..................................................................................... *passim*

42 U.S.C. § 268 ................................................................................ 3, 12, 18

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 STAT. 2135 (Nov 25,
2002 ........................................................................................................... 12

## STATE STATUTES

Cal Civ. Code §1636 .................................................................................. 10

# RULES

Fed. R. Civ. P. 56 ................................................................................................... 21

Fed. R. Civ. P. 56(c)(4) ........................................................................................ 21

Fed. R. Evid. 601 .................................................................................................. 21

Fed. R. Evid. 602 .................................................................................................. 21

Fed. R. Evid. 701 .................................................................................................. 21

Fed. R. Evid. 801 .................................................................................................. 21

Fed. R. Evid. 802 .................................................................................................. 21

# OTHER AUTHORITIES

Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503 (May 26, 2020) ..................................................................................................................... 3

Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 22, 2020) ................... 2

Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020) ................... 2

## I.   **INTRODUCTION**

On August 14, 2020, Plaintiffs filed a motion to enforce the *Flores* Settlement Agreement ("Agreement"), ECF No. 920, alleging that the government's custody of minors incident to its implementation of emergency public health order issued by the Centers for Disease Control and Prevention ("CDC") in response to the COVID-19 pandemic violates the Agreement. The relief Plaintiffs ask the Court to order would not enforce the Agreement as it was ever agreed to by the parties, but instead would obstruct the implementation of CDC's public-health order by requiring that all minors held under the authority of this order be treated as if they were in immigration custody. The Court should decline to order the requested relief, and Plaintiffs' motion should be denied.

First, the Court lacks jurisdiction over Plaintiffs' claims because minors in custody incident to CDC's public-health order are not in the "legal custody of the [Immigration and Naturalization Service ("INS")]" under the Agreement. *See* Agreement ¶ 10. When the Agreement was signed in 1997, the only INS custody was immigration custody under Title 8 of the United States Code. Nothing in the four corners of the Agreement reflects any meeting of the minds anticipating that more than two decades later the Agreement would apply to custody incident to an emergency public-health order from CDC under Title 42 of the United States Code during this—or any future—global pandemic. Because minors held under the authority of the CDC order are not within the class of minors who are subject to the Agreement, this Court does not have jurisdiction over the claims in Plaintiffs' motion, and the motion therefore should be denied on that basis alone.

Second, even if the Court concludes that the Agreement applies to custody incident to the CDC public-health order, it should still conclude that the government's use of hotel rooms to temporarily house minors complies with the

Agreement. If the parties anticipated that the Agreement would apply to custody under Title 42, then they must have intended the Agreement to allow custody that is consistent with the purposes of that statute, namely, to suspend the introduction of persons into the United States when such introduction would create a serious danger of introducing a communicable disease. Therefore, the Agreement cannot be read to require that the government allow such introduction by placing minors into state-licensed facilities. Rather, the Agreement plainly would permit custody for a brief period while facilitating the return of minors to their home countries as expeditiously as possible as required by the CDC public-health order. The use of hotels for this purpose, which permit compliance with CDC guidance and enable the provision of amenities that this Court has ruled are required under Paragraph 12.A of the Agreement, does not violate the Agreement. Accordingly, Plaintiffs' motion lacks merit and should be denied.

## II.   BACKGROUND

### a.   Applicable Law

The United States has been grappling with the public-health effects of the COVID-19 pandemic throughout 2020. As part of the federal government's response, CDC issued a public-health order—later amended and extended—pursuant to its authority under 42 U.S.C. § 265. Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020); Extension of Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 22, 2020); Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503 (May 26, 2020). Enacted in 1944 as part of the Public Health Service Act, Section 265 provides:

> Whenever the Surgeon General[1] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose

42 U.S.C. § 265.

In the most recent extension of the Order, the CDC Director determined that:

> there remains a serious risk to the public health that COVID-19 will continue to spread to unaffected communities within the United States, or further burden already affected areas. At this critical juncture, it would be counterproductive to undermine ongoing public health efforts by relaxing restrictions on the introduction of covered aliens who pose a risk of further introducing COVID-19 into the United States.

---

[1] The statute assigns this authority to the Surgeon General of the Public Health Service. Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General and other officers of the Public Health Service and of all agencies of or in the Public Health Service to the Secretary of Health, Education, and Welfare, now the Secretary of Health and Human Services, 31 FR 8855-01, 80 Stat. 1610 (June 25, 1966), *see also* Pub. L. No. 96-88, 509(b), October 17, 1979, 93 Stat. 695 (codified at 20 U.S.C. 3508(b)). Although the Office of the Surgeon General was re-established in 1987, the Secretary of HHS has retained the authorities previously held by the Surgeon General.  Sections 361 through 369 of the PHS Act (42 U.S.C. §§ 264-272) have been delegated from the HHS Secretary to the CDC Director.

85 Fed. Reg. at 31505. CDC has further determined that the processes instituted under this order have "significantly mitigated the specific public health risk identified in the initial Order." *Id.*

Title 42 also provides that "[i]t shall be the duty of the customs officers[2] and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations." 42 U.S.C. § 268. In line with that provision, in issuing the emergency order CDC asked customs officers of the U.S. Department of Homeland Security ("DHS") to assist in implementing the necessary processes under the order:

> I consulted with DHS before I issued this order, and requested that DHS implement this order because CDC does not have the capability, resources, or personnel needed to do so. As part of the consultation, [U.S. Customs and Border Protection ("CBP")] developed an operational plan for implementing the order. Accordingly, DHS will, where necessary, use repatriation flights to move covered aliens on a space-available basis, as authorized by law. The plan is generally consistent with the language of this order directing that covered aliens spend as little time in congregate settings as practicable under the circumstances. In my view, it is also the only viable alternative for implementing the order; CDC's other public health tools are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States.

---

[2] The terms "officer of the customs" and "customs officer" are defined by statute to mean, "any officer of the United States Customs Service of the Treasury Department (also hereinafter referred to as the "Customs Service") or any commissioned, warrant, or petty officer of the Coast Guard, or any agent or other person, including foreign law enforcement officers, authorized by law or designated by the Secretary of the Treasury to perform any duties of an officer of the Customs Service." 19 U.S.C. 1401(i). The Homeland Security Act later transferred to the Secretary of Homeland Security all "the functions, personnel, assets, and liabilities of . . . the United States Customs Service of the Department of the Treasury, including the functions of the Secretary of the Treasury relating thereto . . . [,]" 6 U.S.C. 203(1).

85 Fed. Reg. at 17067.

      b.  <u>Title 42 Processes and Custody Incident to Those Processes</u>

      The CDC Order generally applies to aliens traveling from Canada or Mexico who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry or Border Patrol station, unless the alien falls within a designated exception. When processing an alien under the CDC Order, CBP makes every effort to immediately expel covered aliens to their country of last transit. When such return is not possible, the U.S. Government makes every attempt to return these individuals to their country of origin as expeditiously as possible. *See* U.S. Dep't Homeland Security, Testimony of Mark A. Morgan, Chief Operating Officer and Senior Official Performing the Duties of the Commissioner U.S. Customs and Border Protection, Before the U.S. Senate Committee on Homeland Security and Governmental Affairs, June 25, 2020, at 3, *available at* https://www.hsgac.senate.gov/imo/media/doc/Testimony-Morgan-2020-06-25-REVISED.pdf; *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions,* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics. An expulsion under Title 42 is not based on an individual's immigration status, and is not an enforcement action under Title 8. *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions,* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics.

      Under the CDC Order, a customs officer, with approval from a supervisor, may determine that the Order does not apply to persons who should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. On a case-by-case basis, such as when it is not possible to return a minor

to his or her home country, or an agent or officer suspects trafficking or sees signs of illness, CBP may, based on humanitarian concerns, except a minor from the CDC order. *See* June 25, 2020 Testimony of Mark A. Morgan, at 3.

Minors and family groups slated for expulsion pursuant to Title 42 are housed in hotels. *See* Declaration of Melissa Harper ¶ 2, attached hereto as Defs.' Ex. A. The housing of minors and family groups is accomplished through a contract with MVM Inc, (MVM), a company specializing in the transportation and care of this vulnerable population. *Id.* ¶¶ 2 and 3. MVM hires specialist who interact with and care for minors and family groups/units while they are in the hotel. *Id.* ¶ 3.

Upon being transferred to a hotel, each minor receives a backpack with a gender and age specific hygiene kit (a kit may include a toothbrush, toothpaste, comb/brush, body soap, shampoo, deodorant, lip balm, and feminine hygiene products), clothing and shoes, and any toys/books issued to them. *Id.* ¶ 13, 14, 15.. *Id.* Families may also be provided diapers, wipes, diaper rash ointment, formula, bottles, pacifiers, and/or baby blankets. *Id.*

All hotel rooms have showers and minors are reminded to bathe daily. *Id.* ¶ 17. Minors have access to nutritious food and clean drinking water while they are in the hotels. *Id.* ¶ 16. Snacks and water are available at all times during transport, and snacks, water, juice, milk, and fruit are available at the hotel at all times. *Id*. The minors are served three hot meals per day. *Id*. Medical care and daily medical screenings are provided to minors while housed at the hotels by a medical professional from the ICE Health Services Corps ("IHSC")—usually a registered nurse or advanced practice provider. *Id.* ¶ 20. Urgent care centers or local emergency rooms are also used in the event of a medical emergency. *Id*.

The government has also taken steps to protect the health and safety of minors in the hotels related to the COVID-19 pandemic in accordance with

6

appropriate CDC guidance. Harper Decl. ¶¶ 17, 18, 19(a)-(f). Minors are housed in individual rooms with closed doors, receive temperature checks every four hours, are required to wear face masks at all times except when eating or drinking, and are encouraged to wash their hands regularly. *Id.* Personal protective equipment, namely, masks, gloves, hand sanitizer, and cleaning wipes, are available. *Id.* ¶ 18. Sanitizing of the flat surfaces and commonly touched areas in the hotel room is conducted throughout the day pursuant to a regular schedule. *Id.*

      c.  <u>Plaintiffs' Motion to Enforce</u>

      Plaintiffs filed this motion on August 14, 2020, Mot., ECF No. 920; Memo, ECF No. 920-1, seeking to undermine the government's public-health efforts in response to COVID-19 by arguing that the government's use of hotel rooms to house minors who are being returned to their home countries in accordance with the CDC's order violates the Agreement. Plaintiffs first argue that the Agreement applies to this type of custody because CDC is part of HHS, and HHS is bound by the Agreement. Plaintiffs rely on the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which, Plaintiffs argue, charges HHS with responsibility for the placement of single minors.[3] *See* ECF No. 920-1 at 6-8 (citing 8 U.S.C. §§ 1232(c)(2)(A), 1232(c)(3)(A), 1232(c)(3)(B)). In short, Plaintiffs contend, "HHS is the former INS's successor insofar as the legal custody

---

[3] Plaintiffs do not specify whether their arguments pertain only to unaccompanied minors, or whether they are arguing that the Agreement prohibits the use of hotel rooms to house all minors—including those who are accompanied by their parents. In failing to so specify, Plaintiffs also fail to address whether their argument with regard to the placement of minors into licensed facilities should apply equally to both accompanied and unaccompanied minors, and fail to address the impact of this Court's prior orders with regard to the placement of accompanied minors on their argument.

of unaccompanied children is concerned." *Id.* at 8. Plaintiffs then argue that, in any event, the Agreement applies because it is DHS and not HHS that actually exercises custody over the minors in custody incident to these Title 42 processes. This argument is based on Plaintiffs' belief that DHS has discretion over the manner in which it implements and carries out the CDC's order and that DHS actually exercises authority over decisions related to the implementation of the order. *Id.* at 8-13. Finally, Plaintiffs argue that even if the Agreement does not apply to these minors, the Court should exercise jurisdiction over their claims and rule that the Agreement applies under the doctrine of constitutional avoidance. *Id.* at 13.

On the merits, Plaintiffs contend that the use of hotels violates Paragraphs 10, 12, and 19 of the Agreement, because the government is required to transfer these minors to a licensed placement within three days. *See id.* at 13-14. Plaintiffs argue first that the government's practices violate the Agreement because minors have been held in hotels for "prolonged" periods of time. *Id.* at 14-16. Plaintiffs further argue that custody in hotels harms minors because they are denied access to counsel, and because conditions at the hotels do not comply with Exhibit 1 of the Agreement which governs licensed facilities. *Id.* at 17-21. Plaintiffs' proposed order would have the Court order that all minors in the Title 42 program are *Flores* class members, require that the government provide *Flores* counsel with access to interview those minors, and require the government to "place all unaccompanied class member children detained pursuant to Title 42 as expeditiously as possible in licensed facilities" and to "generally make a licensed placement available to such class members within 72 hours of arrest or apprehension." Proposed Order, ECF No. 920-10.

### III.   **ARGUMENT**

#### a.  This Court Lacks Jurisdiction Over Plaintiffs' Motion

This Court should deny Plaintiffs' motion because the Agreement does not apply to the government's implementation of the CDC's Title 42 order. The Agreement applies to minors in the "legal custody of the INS," Agreement ¶ 10, as that term was intended by the parties when the Agreement was signed in 1997. That means it applies to minors who are in immigration custody under the authority of Title 8 of the United Sates Code. The Agreement does not encompass, was not intended to encompass, and did not even anticipate custody incident to this present-day public health order detailing processes to be carried out under Title 42.

This Court has recognized that "[t]he *Flores* Agreement is a binding contract and a consent decree"; "[i]t is a creature of the parties' own contractual agreements and is analyzed as a contract for purposes of enforcement." *Flores v. Barr*, 407 F. Supp. 3d 909, 931 (C.D. Cal. 2019). Like a contract, a consent decree "must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). The "basic goal of contract interpretation" is to give effect to the parties' mutual intent "at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,* 109 Cal. App. 4th 944, 955 (Cal. Ct. App. 2003) (citing Cal. Civ. Code § 1636).

Under these principles, the Agreement does not apply here. By its plain terms, the Agreement applies only to those minors in "the legal custody of the INS." Agreement ¶¶ 4, 10. The Agreement does not expressly define "legal custody," but it does recognize a critical distinction between *legal custody* and *physical custody*. The Agreement provides for the INS in some instances to place a minor in the *physical custody* of a licensed program (and thus outside the physical

custody of the INS), but the Agreement specifies that the minor remains in the *legal custody* of the INS. Agreement ¶ 19; *see also Gao v. Jenifer*, 185 F.3d 548, 551 (6th Cir. 1999) (explaining that the INS's contracts with these third-party programs explicitly state that the INS retains legal custody while the programs have physical custody). While a minor is in the physical custody of a licensed program, the INS retains the sole authority to transfer and release the minor (except that the licensed program can transfer *physical custody* in emergencies). Agreement ¶ 19. Thus, as Paragraph 19 makes clear, under the Agreement the "legal custody of the INS" means custody at the direction of the INS under relevant the immigration laws, which grants the INS the authority over the detention or release of the minor. *Id.*

The custody authority addressed by the Agreement has always been understood as immigration-custody authority under Title 8—both when the Agreement was signed and today. The Agreement makes clear that the parties were addressing and settling specific issues related to custody by the INS incident to immigration proceedings, under the applicable law governing that custody. *See, e.g.*, Agreement ¶¶ 11 ("The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others."); 14 ("Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court . . ."); 24.A (providing for bond hearings before an immigration judge for minors "in deportation proceedings").

When the Agreement was signed in January 1997, the INS's legal authority to detain minors was found within Title 8. *See* 8 U.S.C. §§ 1225, 1252 (1995); *see also Reno v. Flores*, 507 U.S. 292, 294-95 n.1 (1993). Such detention was incident

to immigration deportation and exclusion proceedings, the authority for which was also detailed in Title 8. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1252(b) (1995). The authority for immigration proceedings, as well as the authority to hold alien minors in immigration custody, remains in Title 8 today. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1232. The successors of the INS that carry out these immigration functions today—including immigration custody—are CBP, U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services, all of which are part of DHS, as well as the HHS, Office of Refugee Resettlement ("ORR") for unaccompanied alien children. *See* Homeland Security Act of 2002 §§ 402, 462, 1512, Pub. L. No. 107-296, 116 Stat. 2135 (codified at 6 U.S.C. §§ 202, 279, 552); TVPRA, 8 U.S.C. § 1232.

By contrast, the sections of Title 42 being applied here are not immigration statutes or even custody statutes, and the purview of the authorities these sections provide is not limited to aliens. Rather, it provides broad authority to CDC to take action to respond to dangerous public health emergencies. The role of DHS in the Title 42 process is authorized by 42 U.S.C. § 268, which provides that "[i]t shall be the duty of the *customs officers* and of *Coast Guard officers* to aid in the enforcement of quarantine rules and regulations . . . ." (emphasis added). Notably, while today DHS is authorized to implement the CDC's order because CBP and the Coast Guard have been moved under the umbrella of the DHS,[4] the INS would not have had such authority at the time the Agreement was executed because the Coast Guard and the customs officers were part of the Treasury Department, and not the INS, in 1997. The Flores Agreement did not cover the Treasury Department

_____

[4] As noted above, those authorities were transferred to DHS in the Homeland Security Act. 6 U.S.C. § 203.

when it was executed. And DHS's role in these processes and custody incident to these processes arises from authority provided by this public health statute, not under any immigration statute. CDC, under whose authority this Title 42 custody occurs, is not a successor to the INS, and custody incident to the CDC order is different from the Title 8 immigration custody that the Agreement governs. Individuals processed under Title 42 are not processed for immigration enforcement actions.

The Agreement also "should be read to give effect to all of its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). Section 265 was enacted in 1944, but the parties made no mention of it in the Agreement, nor do any of the terms of the Agreement refer or directly relate to custody for public health purposes. Section 265 plainly authorizes the CDC Director to "prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose." 42 U.S.C. § 265. Transferring minors to facilities "licensed by an appropriate State agency," Agreement ¶ 6, would require that the individuals transferred to such facilities would be "introduced" to the United States. Moreover, the Agreement's treatment of such custody makes clear that the Agreement's focus is to provide guidelines to govern longer-term immigration custody. Had the parties intended the Agreement to apply to the emergency public-health-related custody at issue here, they would have had to address this inconsistency between the Agreement's plain focus on longer term immigration custody, and the short-term purposes of section 265, but they did not. Nothing in the text of the Agreement suggests that the parties intended it to govern—or anticipated that it would govern—any emergency procedures implemented by

CDC under 42 U.S.C. § 265, or any brief incidental periods of custody necessary to implement these procedures.

All three of Plaintiffs' arguments urging the Court to apply the Agreement to custody incident to the CDC's Title 42 order fail. First, Plaintiffs argue that custody under CDC authority for public-health purposes should be covered by the Agreement by contending that the TVPRA provides a basis to find that HHS—and not just its sub-agency ORR—should be considered a successor agency under the Agreement, and thus covered by the Agreement's terms. *See* Mem. 6-8. That interpretation of succession is flawed, and ignores the principle requiring this Court to consider the original intent of the parties. References to the Secretary of HHS in the 2008 TVPRA should not be used to broaden the scope of the parties' intent and understanding in 1997.

This is all the more true because such a broad reading of this successions principle could lead to absurd results by allowing the Agreement to potentially apply to other—currently unanticipated—public-health-related custodial situations, entirely unrelated to immigration or to the original purposes of the Agreement.  For example, CDC has broad authority to quarantine persons entering into the U.S., *see* 42 C.F.R. Part 71, or persons moving or about to move from State to State, *see* 42 C.F.R. Part 70. Earlier this year CDC quarantined hundreds of U.S. citizens repatriated from either Wuhan, Hubei Province, China, or the Diamond Princess cruise ship for 14 days.[5] CDC's regulations also would permit a person to

---

[5] CDC Issues Federal Quarantine Order to Repatriated U.S. Citizens at March Air Reserve Base (Jan. 31. 2020), *available at* https://www.cdc.gov/media/releases/2020/s0131-federal-quarantine-march-air-reserve-base.html; Diamond Princess Repatriation (Feb. 15, 2020), *available at* https://www.cdc.gov/media/releases/2020/s0215-Diamond-Princess-Repatriation.html.

be quarantined for longer time periods if necessary to prevent the spread of the communicable disease. *Cf.* https://www.cdc.gov/dotw/ebola/index.html (noting that Ebola has an incubation period of up to 21 days). Under Plaintiffs' reading, CDC could not prevent a minor from being introduced to the United States for the duration of the Ebola incubation period even if CDC has reason to believe the minor is infected with or has been exposed to Ebola. A future novel communicable disease could have an even longer incubation period, or raise other as-of-yet unanticipated public health concerns. The Court should not embrace a reading of the Agreement's scope that would impact CDC's ability to respond to such situations, and that thus would have potential implications well beyond the current situation. This is particularly true where Plaintiffs' argument regarding the scope of the Agreement is so plainly divorced from the intent of the parties and the meaning of the terms they used in the Agreement.

Second, Plaintiffs' argument that DHS exercises control over decisions related to minors in Title 42 processes, Mem. 8-13, is irrelevant to the legal question here. The relevant question under the Agreement is the intent of the parties in using the term "legal custody of the INS" to define the scope of the Agreement. As discussed above, that term looks to the source of legal authority to hold the child.  The custody at issue here—and the decisions that must be made by DHS to implement this custody—falls under the authority of the Title 42 public-health provisions, and not DHS's immigration custody authorities. There is no reasonable argument that, when the Agreement was signed, the parties anticipated that 23 years later there would be a global pandemic, and that some of the legal-successor agencies to the INS would, by mere coincidence, be charged with implementing emergency procedures on behalf of the CDC Director under 42 U.S.C. § 265— which at the time were functions assigned to HHS and executed with the assistance

of the Treasury Department—so that the Agreement would be expected to govern custody incident to those procedures. In short, there is no basis for concluding that, when entering into the Agreement, the parties in any way considered that INS or successor agency resources could ever implement CDC legal authorities, because in 1997 the INS could not do so.

Third, the Plaintiffs' references to the principles of constitutional avoidance and equal protection are misplaced. Plaintiffs argue that "[e]ven were the Settlement's covering 'hotelled' children at all doubtful, the doctrine of constitutional avoidance would counsel resolving any such doubt in favor of requiring Defendants to comply with the Settlement's licensed placement provisions." Mem. 13. They add that "construing the Settlement otherwise would raise substantial equal protection concerns, running afoul of the axiom of constitutional avoidance." *Id*. This is just an argument seeking to avoid the plain import of the Agreement. The issue before the Court is whether custody incident to the CDC's public-health order can reasonably be construed to be "legal custody of the INS" under the Agreement. The answer is no, and constitutional avoidance does not help Plaintiffs. As this Court has emphasized, "Plaintiffs are entitled to only such relief as is explicitly or implicitly authorized by the Flores Agreement." ECF No 470, at 3. The Court held that the "vindication of a constitutional right is not coterminous with the enforcement of a contractual provision," explaining that "[w]hatever the merits of this claim, it has no place in a motion to enforce the consent decree." *Id*. at 5. Applying this logic here, Plaintiffs cannot have this Court review their *Flores* claims simply because Plaintiffs believe that there may be constitutional issues with the government's conduct, identified only by vague

reference to equal-protection principles. Such allegations are unrelated, and must be brought elsewhere.[6]

Plaintiffs also fail to explain how the doctrine of constitutional avoidance is implicated by their motion to enforce the Agreement. "The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts. We know of no precedent for applying it to limit the scope of authorized executive action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (internal citation omitted). Here the text of text of Title 42 is clear, and Plaintiffs do not argue otherwise. The Court is not being asked to interpret Title 42, but rather it is being asked to interpret a settlement agreement. The doctrine of constitutional avoidance has no application here.

For all of the reasons discussed above, Plaintiffs have not established any reason why this Court has jurisdiction over the claims in their motion.  Nothing in the Agreement can be read to anticipate the unique needs or situations that might arise as part of any need to implement procedures under 42 U.S.C. § 265, including any custody that might occur incident thereto—such as a quarantine and exclusion process designed to prevent the transmission of a global pandemic. "[T]he courts do not make contracts for the parties." *Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1123 (C.D. Cal. 2007) (citation and internal quotations omitted). The Court should not reinterpret the Agreement to govern processes, procedures, or custody which the parties never considered, and to which the parties never anticipated it would apply.

---

[6] *See P.J.E.S. v. Wolf,* Case No. 1:20-cv-02245-EGS (D.D.C.).

b. <u>The Use of Hotels to Hold Minors Incident to Processing Them Under CDC's Title 42 Orders Does Not Violate the Agreement.</u>

Even if the Agreement did govern custody under the CDC's public-health order (and it does not), the use of hotels to hold minors while they are processed and returned under the CDC's Title 42 order does not violate the Agreement.

        i.   *The Minors Are Being Processed and Returned in Accordance With the CDC Order as Expeditiously as Possible.*

Paragraph 12.A of the Agreement governs the custody at issue here, and allows the government to hold minors in unlicensed facilities following arrest and prior to return under the CDC order so long as the return occurs "as expeditiously as possible." *See* Agreement ¶ 12.A. Plaintiffs' argument that the Agreement requires the government to transfer these minors subject to Title 42 processes to licensed placements within three days, *see* Mem. 13-16, lacks merit.[7]

The Court should not read the Agreement in a manner that would render it inconsistent with—and in violation of—42 U.S.C. § 265. Section 265 was enacted in 1944, long before the Agreement was signed. CDC has exercised its lawful authority under that statute and, consistent with its authorities, *see* 42 U.S.C. § 268, has requested that DHS implement processes to carry out its order. *See* 85 Fed.

---

[7] Plaintiffs' repeated references to the Agreement's three-day transfer requirement are incorrect at the outset because, as this Court has recognized, the Agreement's "influx" provision is in effect, and thus release or transfer is required to occur "as expeditiously as possible," rather than within the three day timeframe cited by Plaintiffs. *See* ECF No. 189 at 10 (citing Agreement ¶¶ 12.A, 12.B, 19). Likewise, Paragraph 12.A of the Agreement also provides for transfer "as expeditiously as possible" in cases of an "emergency," which Paragraph 12.B then defines to include "medical emergencies (e.g., a chicken pox epidemic among a group of minors)." This provision would also govern the current situation and overcome any requirement of transfer within three days.

Reg. at 17067. The statute empowers CDC to "prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose." 42 U.S.C. § 265. Therefore, in accordance with the CDC's order, DHS makes every effort to expel individuals who are processed under Title 42 to their country of transit or country or origin as expeditiously as possible.

Plaintiffs ask this Court to read the Agreement to require that minors in custody under section 265 must be transferred to licensed facilities within and throughout the United States within three days. Reading the Agreement in this manner would erroneously render the Agreement inconsistent with, and in violation of, 42 U.S.C. § 265. In entering into the Agreement, the parties represented "that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law." Agreement ¶ 41. If the parties are presumed to have anticipated that the Agreement covered custody under this statute, then the parties also presumably were aware that the purpose of Section 265 is to empower CDC to prevent the introduction of persons into the United States in response to dangers to public health. Therefore, the parties could not have entered into an Agreement that would require the introduction of minors into the United States by mandating that even when subject to processes under Title 42 they must be held in State-licensed congregate care facilities throughout the United States—facilities that Plaintiffs themselves have argued increase the risks of COVID-19 transmission. *See* ECF No. 733-1. This Court should not adopt a

reading of the Agreement that would require the introduction of persons into the United States in violation of the plain terms of Section 265.[8]

It also stands to reason that if the Court concludes that the parties intended the Agreement to govern custody incident to processes implementing 42 U.S.C. § 265, then the Agreement must permit the implementation of processes that are consistent with Section 265 and its aims of preventing the introduction of individuals into the United States. DHS makes every effort to hold individuals processed under Title 42 for the shortest period of time possible, and the use of hotels is an important part of the overall processes that DHS has implemented in a manner that is consistent with the statute and its purposes. *See* Harper Decl. ¶¶ 4, 23. Hotels allow for safe and sanitary custody, as well as the quick and efficient return of individuals to their home countries without their introduction into the United States. *Id.* ¶¶ 4-20, 23. Thus, contrary to Plaintiffs' assertions, the use of hotels prior to return as opposed to transferring all minors to licensed facilities is not in and of itself a violation of the Agreement's terms.

---

[8] The Court also should not evaluate the Title 42 processes in a vacuum, but should consider the significant downstream consequences of any order requiring that all single minors be transferred to ORR custody, or all accompanied minors be transferred to an ICE FRC. The Court has evaluated ORR's existing COVID-19 protocols, and has credited the declaration of Dr. Amanda Cohn, CDC, *see Lucas R. v. Azaz*, No. 2:18-cv-5741 (C.D. Cal.), Dkt. No. 230-11, ¶ 23, which made clear that ORR's COVID-19 robust mitigation and containment strategy was premised on the historically low capacity of ORR facilities and the relatively static nature of the ORR population, *which is a direct result of the current CDC Orders*. Likewise, the Court has recognized that "ICE's efforts at preventing outbreaks at the FRC seems to have yielded a moderate though undeniably fragile success." Aug. 7, 2020 Hearing Tr., at 12:9-11. Any order from this court that significantly disrupts the currently low numbers of UACs in ORR care, or the number of families transferred to the ICE FRCs, will undermine existing COVID-19 protections at those facilities.

Processing under Title 42, as well as ICE's use of hotels to hold minors pending their return, also fits within this Court's understanding of Paragraph 12.A and what constitutes "as expeditiously as possible." In 2015, this Court recognized that "[a]t a given time and under extenuating circumstances" so long as ICE was acting "in good faith and in the exercise of due diligence" 20 days might appropriately be "as expeditiously as possible" for the purpose of processing families subject to credible- and reasonable-fear proceedings. ECF No. 189 at 10. The length of time that minors at issue here spent in hotels generally falls well within this timeframe. *See* Harper Decl. ¶ 23. Plaintiffs contend that the time periods of custody are "prolonged," Mem. 14-16, but make no attempt to explain how DHS is failing to conduct the processes under Title 42 as "expeditiously as possible" given the mandate of the statute and the public-health ends of the CDC's order.[9] The Court therefore should conclude that DHS is in good faith implementing the Title 42 processes and returning minors as expeditiously as possible in accordance with the purposes of that statute, and thus the time periods at issue do not violate the Agreement's transfer requirements.

   ii. *The Conditions of Custody Are Safe and Sanitary.*

As discussed above, if the Agreement somehow applies to custody during these Title 42 processes, the provision of the Agreement that would govern such

---

[9] To the extent that Plaintiffs appear to base their claim of prolonged custody on a suggestion that the government is housing very young minors in hotels alone, *see* Mem. 16, their assertion appears to be based on an incorrect reading of the data. In fact, the data reflects that minors under the age of 10 held at hotels pending their return under the Title 42 process have all been accompanied by a family member. Harper Decl. ¶ 22. Defendants also note that, as discussed above, CBP may, based on humanitarian concerns, except a minor from the CDC order. *See* Supra Section II.b (discussing the June 25, 2020 Testimony of Mark A. Morgan, at 3).

custody is Paragraph 12.A. Plaintiffs argue that "the conditions and treatment children experience during 'hotelling' do not and could not meet the Settlement's requirements for safe and appropriate placement." Mem. 19. But Plaintiffs are wrong, and their argument is incorrectly based on the contention that the Agreement mandates that the government transfer these minors to licensed placements. Plaintiffs make no showing that the use of hotels to house minors violates the applicable conditions requirements contained in Paragraph 12.A of the Agreement. Indeed, Plaintiffs provide no evidence to show that conditions are not safe and sanitary, as is their burden.[10]

_____

[10] Defendants object to five of the declarations submitted in support of Plaintiffs' August 14, 2020 Motion to Enforce Preliminary Injunction Re: Title 42. Specifically, Defendants object to Pls.' Ex. A, Declaration of Karla Marisol Vargas, ECF No. 920-2; Pls.' Ex. B, Declaration of Maria Odom, ECF No. 920-3; Pls.' Ex. C, Declaration of Jennifer Nagda, ECF No. 920-4; Pls.' Ex. E, Declaration of Linda Corchado, ECF No. 920-6; Pls.' Ex. G, Declaration of Melissa Adamson, ECF No. 920-8. These declarations should be excluded in whole, or in part, because the declarants lack personal knowledge under Rule 602 of the Federal Rules of Evidence (Rule 602), and thus for to make up for their lack of personal knowledge, most of the declarations rely on inadmissible hearsay or speculation. *See Orr v. Bank of America*, NT & SA, 285 F.3d 764, 773–74 (9th Cir. 2002) (Evidence submitted to the Court on motion practice must meet all requirements for admissibility if offered at the time of trial.). The Court should exclude these declarations because the declarants fail to lay a proper foundation as to the source of their knowledge and likewise fail to demonstrate they have personal knowledge of the statements in the declarations. *See* Fed. R. Evid. 602. Instead, these declarations appear to be made on the collective behalf of the organization that employs each declarant. Declarations based on another person's personal knowledge or experience are inadmissible because they rely on either hearsay or speculation. *See* Fed. R. Civ. P. 56 (c)(4); Fed. R. Evid. 801–802; Fed. R. Evid. 601–602; Fed. R. Evid. 701. Because the declarations in Plaintiffs' Exhibits A-C, E, and G fail to lay a foundation as to the source of knowledge and do not rely on

Paragraph 12.A requires that "[f]ollowing arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." Agreement ¶ 12.A. The Agreement also further requires the government to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor." *Id.* The Court has interpreted Paragraph 12.A's "safe and sanitary" language to require adequate access to food, access to clean drinking water, adequate sleeping conditions, and access to adequate hygiene. *See* ECF No. 363 at  7-18.  Because DHS's use of hotels to hold minors while carrying out expulsions under Title 42 meet all of these standards, Defendants are not in violation of the Agreement.

Minors and family groups slated for expulsion pursuant to Title 42 are housed in hotels where they remain in their rooms, but where they have continual access to all the amenities of a typical hotel room. Harper Dec. ¶¶ 6, 9, 12, 17. The housing of minors and family groups in hotels is accomplished through a contract with MVM Inc., a company specializing in the transportation and care of this vulnerable population. *Id.*  ¶¶ 2 and 3. MVM has management on site at the hotels and additional levels of management that drop by the hotels at random times to monitor compliance. *Id.* ¶ 5. MVM hires specialists who interact and care for

_____

personal knowledge but, instead, on hearsay or other inadmissible evidence, these declarations should be precluded from evidence. *See, e.g., Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 615 (C.D. Cal. 2005).

minors and family groups/units while in the hotel. *Id.* ¶¶ 3, 6. There are, at minimum, two specialists assigned to monitor each room. *Id.* ¶ 6. Each minor has their own bed; therefore, room configuration determines the number of minors in a room, and a specialist must remain inside the rooms within the line-of-sight of the minors or family members. *Id.* Additionally, MVM quality control compliance specialists are on site at the hotels to ensure compliance with the contract. *Id.* ¶ 5.

The hotel rooms being used by MVM meet the Agreement's "safe and sanitary" requirements as interpreted by this Court. Specifically, hotel beds allow for sleep and temperature controls allow for adequate temperatures as needed. *Id.* ¶¶ 6, 9, 12, 17. Minors also have access to adequate hygiene, both from the hotel amenities themselves, and from additional amenities provided by the government. Initially, upon being transferred to a hotel, each minor receives a backpack with a hygiene kit, clothing and shoes, and any toys/books issued to them. *Id.* ¶¶ 13, 14, 15. The kits are gender and age specific. *Id.* ¶ 13. A kit includes a toothbrush, toothpaste, comb/brush, body soap, shampoo, deodorant, lip balm, and feminine hygiene products (if female minor over 10). *Id.* Additionally, depending on the age(s) and composition of the family group, diapers, wipes, diaper rash ointment, formula, bottles, pacifiers, and baby blankets are provided. *Id.* Moreover, all hotel rooms have showers and minors are reminded to bathe daily. *Id.* ¶ 17.

Minors also have access to adequate and nutritious food and clean drinking water while they are in the hotels. *Id.* ¶ 16. Snacks and water are available at all times during transport, and at the hotels, snacks, water, juice, milk, and fruit are available at available at all times. *Id.* The minors are served three hot meals per day. *Id.* These meals are catered from various local area restaurants and include entrees and sides that are designed to meet nutritional standards as is required in the MVM contract. *Id.*

Medical care also is provided to minors while housed at the hotels. A medical professional from the IHSC is on-site at the hotels to check the health of both minors and family members housed at the hotel. *Id.* ¶ 20. The medical professional is usually a registered nurse or advanced practice provider. *Id*. Each day, all minors and family members are seen by and screened for any medical issues by the on-site IHSC medical professional. *Id*. Urgent care centers or local emergency rooms are also used in the event of a medical emergency. *Id*.

The government has also taken steps to protect the health and safety of minors in the hotels related to the COVID-19 pandemic in accordance with appropriate guidance. *Id.* ¶¶ 17, 18, 19(a)-(f). IHSC follows guidance issued by CDC to safeguard those in its custody and care. *Id*. Minors are housed in individual rooms with closed doors, in which they have access to private sleeping, eating, and bathing facilities. *Id*. Each day, all minors and family members are seen by and screened for any medical issues by the on-site IHSC medical professional. *Id.* ¶ 20. Minors also receive temperature checks every four hours. *Id*. In addition, minors are required to wear face masks at all times except when eating or drinking. *Id*. Hand washing is required and encouraged regularly. *Id*. Signs showing proper hand-washing procedures are posted in the hotel rooms. *Id.* Personal protective equipment, namely, masks, gloves, hand sanitizer, and cleaning wipes, are available. *Id.* ¶ 18. Sanitizing of the flat surfaces and commonly touched areas in the hotel room is conducted throughout the day pursuant to a regular schedule. *Id.* Additionally, games, books, toys, remote controls, and video game controllers are wiped clean with sanitizer regularly throughout the day. *Id.* The infection control protocols the government utilizes when housing minors hotels is consistent with relevant CDC guidance. *Id.* ¶¶ 19(a)-(f).

24

Contrary to Plaintiffs' assertions, Mem. 18, and although not required by Paragraph 12.A, minors also have telephonic access to family members and to counsel while housed in the hotels. Every minor or family group is given a minimum of one phone call a day. *Id.* ¶ 21. They can call any family member, domestic or international. *Id.* Additional phone calls are granted upon request without limitations. *Id.* If an attorney has a Form G-28 on file, or if a request for an attorney call is relayed to ICE or MVM, the call is scheduled and facilitated as soon as possible. *Id.*

For all of the above reasons, the use of hotels meets, and even exceeds, the requirements of Paragraph 12.A that minors be held in "safe and sanitary" conditions. Plaintiffs' disagreement, and unfounded assertion that minors must be transferred to licensed placements, fails to take the reality of these conditions into account, and instead appears to reflect nothing more than their general disagreement with the Title 42 processes themselves. To the extent that Plaintiffs' complaints are based solely on the use of unlicensed facilities to house minors during this time period, they ignore the purposes of Title 42 and CDC's order, as discussed above. Because Plaintiffs have not shown that the conditions in these hotels violate the Agreement, their Motion should be denied.

## IV.   CONCLUSION

For all of the above reasons, Plaintiffs' Motion to Enforce the Agreement should be denied.

DATED: August 21, 2020                   Respectfully submitted,

                                         ETHAN P. DAVIS
                                         Acting Assistant Attorney General

                                         AUGUST E. FLENTJE
                                         Special Counsel to the Assistant Attorney
                                         General

                                         WILLIAM C. PEACHEY
                                         Director, District Court Section
                                         Office of Immigration Litigation

                                         WILLIAM C. SILVIS
                                         Assistant Director, District Court Section
                                         Office of Immigration Litigation

                                         */s/ Sarah B. Fabian*
                                         SARAH B. FABIAN
                                         NICOLE N. MURLEY
                                         Senior Litigation Counsel
                                         Office of Immigration Litigation
                                         District Court Section
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, D.C. 20044
                                         Tel: (202) 532-4824
                                         Fax: (202) 305-7000
                                         Email: sarah.b.fabian@usdoj.gov

                                         *Attorneys for Defendants*

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2020, I served the foregoing pleading and attachments on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants