# *O.M.G. v. Wolf*

# FILINGS

# IN THE UNITED STATES DISTRICT COURT
# FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*; | Case No. 1:20-cv00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF UPDATE IN PANDEMIC RESPONSE REQUIREMENTS** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | |
| *Respondents*. | The Honorable James E. Boasberg |

Respondents hereby notify the Court that on July 28, 2020, U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations, issued an updated version of its COVID-19 Pandemic Response Requirements ("PRR"). This updated guidance identifies additional populations potentially at higher risk for serious illness from COVID-19. The PRR also provides updated guidance on: personal protective equipment (PPE); hygiene practices; the transportation of detainees with confirmed or suspected cases of COVID-19; it includes direct reference to CDC guidance for individuals in medical isolation in detention facilities; and includes an updated testing section based on recently released CDC guidance. The updated PRR can be found at https://www.ice.gov/coronavirus/prr, and it is attached hereto as Exhibit 1.

RESPECTFULLY SUBMITTED this 28th day of July 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW
Washington, DC 20530
Telephone: (202) 252-2506

Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Defendants*





# ERO

## U.S. Immigration and Customs Enforcement Enforcement and Removal Operations

COVID-19 Pandemic Response Requirements



ERO COVID-19 Pandemic Response Requirements (Version 3.0, July 28, 2020)

# Table of Contents

SUMMARY OF CHANGES .................................................................................................... 3

PURPOSE AND SCOPE ...................................................................................................... 5

INTRODUCTION ................................................................................................................ 5

OBJECTIVES ...................................................................................................................... 6

COMPLIANCE MEASURES ................................................................................................ 7

CONCEPT OF OPERATIONS ............................................................................................ 8

    DEDICATED ICE DETENTION FACILITIES ................................................................ 8

    NON-DEDICATED ICE DETENTION FACILITIES ...................................................... 10

    ALL FACILITIES HOUSING ICE DETAINEES ........................................................... 12

        PREPAREDNESS ...................................................................................................... 12

        PREVENTION ........................................................................................................... 18

        MANAGEMENT ........................................................................................................ 21

        TESTING ................................................................................................................... 25

ATTACHMENTS ................................................................................................................. 27

# Summary of Changes

| Explanation of Change | Section | Page |
|---|---|---|
| • <u>Addition</u>: The ERO PRR identifies additional populations potentially at higher risk for serious illness from COVID-19 (e.g., cerebrovascular disease, thalassemia). | Concept of Operations: Dedicated ICE Detention Facilities & Non-Dedicated ICE Detention Facilities | 11-14 |
| • <u>Addition</u>: Providers should follow guidance from the Equal Opportunity Employment Commission (EEOC) when offering testing to staff. | Preparedness | 16 |
| • <u>Addition</u>: Providers must ensure that both detainees and staff are trained in how to don, doff and dispose of personal protective equipment. | Preparedness | 16 |
| • <u>Addition</u>: Cloth facing coverings must be provided at no cost to detainees. | Preparedness | 18 |
| • <u>Addition</u>: The ERO PRR identifies contraindications for wearing cloth face coverings. | Preparedness | 18 |
| • <u>Addition</u>: The ERO PRR establishes that liquid or foam soap is preferred to bar soap. | Preparedness | 18 |
| • <u>Addition</u>: When possible, providers should inform potential visitors before they travel of what they should expect regarding COVID-19 screening. | Preparedness | 19 |
| • <u>Addition</u>: Prior to release from custody, detainees should be provided with COVID-19 prevention information, hand hygiene supplies, and cloth face coverings. | Preparedness | 19 |
| • <u>Addition</u>: Providers should consider establishing an on-site laundry option for staff so that they can change out of their uniform, launder them at the facility, and wear street clothes and shoes home. | Preparedness | 23 |

| | | |
|---|---|---|
| • <u>Addition</u>: Providers should consider testing all newly detained persons before they are placed in general population. | Prevention | 25 |
| • <u>Addition</u>: The ERO PRR now suspends transfers of both ICE and non-ICE detainee populations, with six exceptions. | Prevention | 26 |
| • <u>Addition</u>: When necessary to transport individuals with confirmed or suspected COVID-19, if the vehicle is not equipped with emergency medical service (EMS) features, at a minimum, drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open. | Prevention | 26 |
| • <u>Addition</u>: If group activities are discontinued, it is important to identify alternative forms of activity to support the mental health of detainees. | Prevention | 27 |
| • <u>Addition</u>: Direct reference to CDC guidance on individuals in medical isolation in detention facilities. | Management | 22 |
| • <u>Update</u>: The ERO PRR updates criteria for discontinuation of transmission-based precautions for symptom-based strategy, test-based strategy, and time-based strategy. | Management | 24 |
| • <u>Addition</u>: Testing section based on recently released CDC guidance: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html | Testing | 25 |

**PURPOSE AND SCOPE**

The U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Coronavirus Disease 2019 (COVID-19) Pandemic Response Requirements (PRR) sets forth expectations and assists ICE detention facility operators in sustaining detention operations while mitigating risk to the safety and wellbeing of detainees, staff, contractors, visitors, and stakeholders due to COVID-19. The ERO PRR builds upon previously issued guidance and sets forth specific mandatory requirements to be adopted by all detention facilities, as well as recommended best practices, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis[1]. The ERO PRR has been developed in consultation with the Centers for Disease Control and Prevention (CDC) and is a dynamic document that will be updated as additional/revised information and best practices become available.

**INTRODUCTION**

As the CDC has explained:

> COVID-19 is a communicable disease caused by a novel (new) coronavirus, SARS- CoV-2, and was first identified as the cause of an outbreak of respiratory illness that began in Wuhan Hubei Province, People's Republic of China (China).

> COVID-19 appears to spread easily and sustainably within communities. The virus is thought to transfer primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes; it may transfer through contact with surfaces or objects contaminated with these droplets. There is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms. The ease of transmission presents a risk of a surge in hospitalizations for COVID- 19, which would reduce available hospital capacity. Such a surge has been identified as a likely contributing factor to the high mortality rate for COVID-19 cases in Italy and China.

> Symptoms include fever, cough, and shortness of breath, and typically appear two to fourteen days after exposure. Manifestations of severe disease include severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock, and multi-

---

[1] On April 20, 2020, the U.S. District Court for the Central District of California issued a preliminary injunction requiring that ICE "issue a performance standard or a supplement to their Pandemic Response Requirements … defining the minimum acceptable detention conditions for detainees with risk factors." Fraihat v. ICE, --- F.Supp.3d ---, 2020 WL 1932570, *29 (C.D. Cal. Apr. 20, 2020). The ERO PRR has accordingly been updated to define the "minimum acceptable detention conditions for detainees with risk factors."

organ failure. According to the World Health Organization, approximately 3.4 percent of reported COVID-19 cases have resulted in death globally. This mortality rate is higher among older adults or those with compromised immune systems. Older adults and people who have severe chronic medical conditions like heart, lung, or kidney disease are also at higher risk for more serious COVID-19 illness. Early data suggest older people are twice as likely to have serious COVID-19 illness.

Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020) (internal citations omitted).

Additionally, other symptoms may include chills, muscle pain, sore throat, and new loss of taste or smell.[2] Given the seriousness and pervasiveness of COVID-19, ICE is taking necessary and prompt measures. ICE is providing guidance on the minimum measures required for facilities housing ICE detainees to implement to ensure consistent practices throughout its detention operations and the provision of medical care across the full spectrum of detention facilities to mitigate the spread of COVID-19. The ICE detention standards applicable to all facilities housing ICE detainees have long required that each such facility have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, treatment, and education. Those requirements include reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.[3]

The Performance-Based National Detention Standards (PBNDS) 2008 and 2011 both require facilities to "comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting requirements."[4] The 2019 National Detention Standards (NDS) similarly require "collaboration with local or state health departments in accordance with state and local laws and recommendations." [5] The measures set forth in the ERO PRR allow ICE personnel and detention providers to properly discharge their obligations under those standards in light of the unique challenges posed by COVID-19.

**OBJECTIVES**

The ERO PRR is designed to establish requirements, as well as best practices, for all detention facilities housing ICE detainees to follow during the COVID-19 pandemic. Consistent with ICE detention standards, all facilities housing ICE detainees are required to

---

[2] See, e.g., Attachment B, Centers for Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited July 19, 2020).
[3] See, e.g., Attachment C, ICE National Detention Standards 2019 (NDS), Standard 4.3, Medical Care, at II.D.2 (p. 114), https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf; Attachment D, 2011 ICE Performance-Based National Detention Standards (PBNDS), Revised 2016, Standard 4.3, Part V.C.1 (p. 261), https://www.ice.gov/doclib/detention- standards/2011/4-3.pdf; Attachment E, 2008 ICE PBNDS, Medical Care, V.C.1 (pp. 5-6), https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf.
[4] Performance-Based National Detention Standards (PBNDS) 2008 and 2011, Medical Care 4.3, (C.) Communicable Disease and Infection Control, p. 261-262.
[5] The 2019 National Detention Standards (NDS), Medical Care 4.3, (II.)(D.)(2.) Infectious and Communicable Diseases, p.114.

have a COVID-19 mitigation plan that meets the following four objectives:

> To protect employees, contractors, detainees, visitors, and stakeholders from exposure to the virus;

> To maintain essential functions and services at the facility throughout the pendency of the pandemic;

> To reduce movement and limit interaction of detainees with others outside their assigned housing units, as well as staff and others, and to promote social distancing within housing units; and

> To establish the means to monitor, cohort, quarantine, and isolate the sick from the well.[6]

## COMPLIANCE MEASURES

To ensure that detention facilities comply with the detention requirements set forth in the ERO PRR, ICE will conduct bi-weekly spot checks at over 72-hour ICE detention facilities during the COVID-19 pandemic. Upon identification of a deficiency, ICE will provide written notice to the facility and allow seven business days for submission of a corrective action plan to ICE for approval. Life/safety issues identified by ICE will be corrected during the COVID-19 spot checks, if possible, or the facility will be required to submit a corrective action plan within three business days.

> For dedicated ICE detention facilities, which operate under Quality Assurance Surveillance Plans, ICE will issue a Contract Discrepancy Report (CDR), which may include contract sanctions, for failure to bring the facility into compliance with the minimum requirements of the ERO PRR within the ICE-approved timeframe. The CDR may become a part of the supporting documentation for contract payment deductions, fixed fee deductions, award fee nonpayment, or other contractual actions deemed necessary by the Contracting Officer. If the detention facility continues to have deficiencies despite the issuance of CDRs, ICE may seek to terminate the contract and/or decline to renew the contract.

> For non-dedicated ICE detention facilities that fail to meet the minimum requirements of the ERO PRR, ICE will issue a Notice of Intent indicating that the intergovernmental service agreement is in jeopardy due to non-compliance with the ERO PRR and may take appropriate action, including removing its detention population from the facility or reducing its detention population at the facility on a temporary or permanent basis, depending on the nature of the non- compliance.

---

[6] A *cohort* is a group of persons with a similar condition grouped or housed together for observation over a period of time. Isolation and quarantine are public health practices used to protect the public from exposure to individuals who have or may have a contagious disease. For purposes of this document, and as defined by the CDC, *quarantine* is the separation of a person or group of people reasonably believed to have been exposed to a communicable disease but not yet symptomatic, from others who have not been exposed, to prevent the possible spread of the communicable disease. For purposes of this document, and as defined by the CDC, *isolation* is the separation of a person or group of people known or reasonably believed to be infected with a communicable disease and potentially infectious from others to prevent the spread of the communicable disease.

## CONCEPT OF OPERATIONS

The ERO PRR is intended for use across ICE's entire detention network, applying to all facilities housing ICE detainees, including ICE-owned Service Processing Centers, facilities operated by private vendors, and facilities operated by local government agencies that have mixed populations of which ICE detainees comprise only a small fraction.

---

DEDICATED ICE DETENTION FACILITIES

---

All dedicated ICE detention facilities[7] must:

➢ Comply with the provisions of their relevant ICE contract or service agreement.

➢ Comply with the ICE national detention standards applicable to the facility, generally PBNDS 2011.

➢ Comply with the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Attachment F).

➢ Follow ICE's March 27, 2020 Memorandum to Detention Wardens and Superintendents on COVID-19 Action Plan Revision 1, and subsequent updates (Attachment G).

➢ Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.

➢ Evaluate all new intakes within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC as potentially being at higher risk for serious illness from COVID-19 and/or the subclasses certified in *Fraihat v. ICE*, --- F. Supp. 3d ---, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020), and notify both the local ERO Field Office Director (or designee) and the Field Medical Coordinator as soon as practicable, but in no case more than twelve hours of determining whether the detainee meets the criteria. These populations and subclasses include:
- Older Adults (55 plus);

- People who are pregnant;

- People of all ages with chronic health conditions, including:

---

[7] Dedicated ICE detention facilities are facilities that house only ICE detainees. Dedicated ICE detention facilities may be ICE-owned Service Processing Centers, privately owned Contract Detention Facilities, or facilities operated by state or local governments that hold no other detention populations except ICE detainees.

- o Cancer;

- o Chronic kidney disease;

- o COPD (chronic obstructive pulmonary disease);

- o Immunocompromised state (weakened immune system) from solid organ transplant);

- o Obesity (body mass index [BMI] of 30 or higher);

- o Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;

- o Sickle cell disease;

- o Type 2 diabetes mellitus;

- o Asthma (moderate-to-severe);

- o Cerebrovascular disease (affects blood vessels and blood supply to the brain);

- o Cystic fibrosis;

- o Hypertension or high blood pressure;

- o Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines;

- o Neurologic conditions, such as dementia;

- o Liver disease;

- o Pulmonary fibrosis (having damaged or scarred lung tissues);

- o Smoking (current and former);

- o Thalassemia (a type of blood disorder);

- o Type 1 diabetes mellitus.

- People of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

- Severe psychiatric illness (including Psychotic Disorder, Bipolar Disorder,

Schizophrenia or Schizoaffective Disorder, Major Depressive Disorder with Psychotic Features, Dementia and/or a Neurocognitive Disorder, or Intellectual Development Disorder (moderate, severe, or profound));Individuals of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

➢ Detainees, or anyone on the behalf of the detainee who claims the detainee meets the criteria who claim or are suspected to meet the criteria should be evaluated within five days of making the claim.

➢ Upon evaluation, both the local ERO Field Office Director (or designee) and the Field Medical Coordinator must be notified as soon as practicable, but in no case more than twelve hours after the evaluation has occurred, as to whether the detainee meets the criteria.

➢ Notification shall be made via email from the facility's Health Services Administrator (HSA) (or equivalent) and contain the following subject line for ease of identification: "Notification of COVID-19 High Risk Detainee (A-Number)." At a minimum, the HSA email message will provide the following information:

- Detainee name;

- Detention location;

- Current medical issues and medications currently prescribed;

- Facility medical Point of Contact (POC) and phone number.

---

### NON-DEDICATED ICE DETENTION FACILITIES

---

All non-dedicated ICE detention facilities and local jails housing ICE detainees must:

➢ Comply with the provisions of their relevant ICE contract or service agreement.

➢ Comply with the ICE national detention standards applicable to the facility, generally PBNDS 2011.

➢ Comply with the CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*.

➢ Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.

➢ Notify both the ERO Field Office Director (or designee) and Field Medical Coordinator as soon as practicable, but in no case more than twelve hours after identifying any detainee who meets the CDC's identified populations potentially being at higher risk for serious illness from COVID-19 and/or the subclasses certified in *Fraihat v. ICE, supra*. These populations and subclasses include:

- People who are pregnant;

- People of all ages with chronic health conditions, including:
  o Cancer;

  o Chronic kidney disease;

  o COPD (chronic obstructive pulmonary disease);

  o Immunocompromised state (weakened immune system) from solid organ transplant;

  o Obesity (body mass index [BMI] of 30 or higher);

  o Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;

  o Sickle cell disease;

  o Type 2 diabetes mellitus;

  o Asthma (moderate-to-severe);

  o Cerebrovascular disease (affects blood vessels and blood supply to the brain);

  o Cystic fibrosis;

  o Hypertension or high blood pressure;

  o Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines;

  o Neurologic conditions, such as dementia;

  o Liver disease;

  o Pulmonary fibrosis (having damaged or scarred lung tissues);

  o Smoking;

o   Thalassemia (a type of blood disorder);

o   Type 1 diabetes mellitus.

- People of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

➢ Notification should be made via email from the facility's HSA (or equivalent) and should contain the following subject line for ease of identification: "Notification of COVID-19 High Risk Detainee (A-Number)." Other standardized means of communicating this information to ICE, as established by agreement between the local ERO Field Office Director (or designee) and the Warden or Superintendent, are acceptable. At a minimum the HSA communication to ICE will provide the following information:

- Detainee name;

- Detention location;

- Current medical issues and medications currently prescribed;

- Facility medical POC and phone number.

---

## ALL FACILITIES HOUSING ICE DETAINEES

---

In addition to the specific measures listed above, all detention facilities housing ICE detainees must also comply with the following:

## PREPAREDNESS

Administrators should plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and detainees about these preparations and how they may temporarily alter daily life.

➢ Develop information-sharing systems with partners.

- Identify points of contact in relevant state, local, tribal, and/or territorial public health department before cases develop.

- Communicate with other correctional and detention facilities in the same geographic area to share information including disease surveillance and

absenteeism patterns among staff.

➢ Review existing pandemic, influenza, all-hazards, and disaster plans, and revise for COVID-19, and ensure that they meet the requirements of ICE's detention standards.

➢ Offer the seasonal influenza vaccine to all detained persons (existing populations and new intakes) and staff throughout the influenza season, where possible.

➢ Staffing:

- Review sick leave policies to ensure that staff can stay home when sick and determine which officials will have the authority to send symptomatic staff home. Staff who report for work with symptoms of COVID-19 must be sent home and advised to follow CDC-recommended steps for persons exhibiting COVID-19 symptoms.

- Staff who test positive for COVID-19 must inform their workplace and personal contacts immediately. If a staff member has a confirmed COVID-19 infection, the relevant employers will inform other staff of their possible exposure to COVID-19 in the workplace consistent with any legal limitations on the sharing of such information. Exposed employees must then self-monitor for symptoms (e.g., fever, cough, or shortness of breath).

- Identify staff whose duties would allow them to work from home in order to promote social distancing and further reduce the risk of COVID-19 transmission.

- Determine minimum levels of staff in all categories required for the facility to function safely.

- Follow the Public Health Recommendations for Community-Related Exposure.[8]

- Follow guidance from the Equal Employment Opportunity Commission, available here, when offering testing to staff. Any time a positive test result is identified, ensure that the individual is rapidly notified, connected with appropriate medical care, and advised how to self-isolate.

➢ Supplies:

- Ensure that sufficient stocks of hygiene supplies (soap, hand sanitizer, tissues); personal protective equipment (PPE) including facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls; and medical supplies (consistent with the

---

[8] Attachment H, Centers of Disease Control and Prevention, Public Health Guidance for Community-Related Exposure, https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited July 19, 2020).

healthcare capabilities of the facility) are on hand and there is a plan in place to restock as needed if COVID-19 transmission occurs within the facility.

- Note that shortages of N95 respirators are anticipated during the COVID-19 response. Based on local and regional situational analysis of PPE supplies, face masks should be used when the supply chain of N95 respirators cannot meet the demand.

- Follow COVID-19: Optimizing Supply of PPE and Other Equipment.[9]

- Ensure that staff and detainees are trained to don, doff, and dispose of PPE they will need to use while performing duties within the scope of their responsibilities.

- Soiled PPE items should be disposed in leak-proof plastic bags that are tied at the top and not re-opened. Bags can be disposed of in the regular solid waste stream.

- Cloth face coverings should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19. Cloth face masks should:

    o Fit snugly but comfortably against the side of the face be secured with ties or ear loops where possible or securely tied;

    o Include multiple layers of fabric;

    o Allow for breathing without restriction;

    o Be able to be laundered and machine dried without damage or change to shape;

    o Be provided at no cost to detainees.

- Cloth face coverings are contraindicated for children under two years of age, anyone who has trouble breathing, is unconscious, incapacitated or otherwise unable to remove the mask without assistance.

➢ Hygiene:

- Reinforce healthy hygiene practices, and provide and restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).

---

[9] Attachment I, Centers for Disease Control and Prevention, Optimizing Supply of PPE and Other Equipment during Shortages, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited July 20, 2020).

- Require all persons within the facility to cover their mouths and noses with their elbows (or ideally with a tissue) rather than with their hands when they cough or sneeze, and to throw all tissues in the trash immediately after use.

- Provide detainees and staff no-cost access to tissues and no-touch receptacles for disposal.
- Require all persons within the facility to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing their noses; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

- Provide detainees and staff no-cost, unlimited access to supplies for hand cleansing, including liquid or foam soap, running water, hand drying machines or disposable paper towels, and no-touch trash receptacles. If bar soap is used, ensure that it is does not irritate the skin as this would discourage frequent hand washing and ensure that individuals are not sharing bars of soap.

- Provide alcohol-based hand sanitizer with at least 60 percent alcohol where permissible based on security restrictions.

- Require all persons within the facility to avoid touching their eyes, noses, or mouths without cleaning their hands first.

- If possible, inform potential visitors, including inspectors and auditors, before they travel to the facility that they should expect to be screened for COVID-19 and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

- Post signage throughout the facility reminding detained persons and staff to practice good hand hygiene and cough etiquette (printable materials for community-based settings can be found on the CDC website). Signage must be in English and Spanish, as well as any other common languages for the detainee population at the facility.

- Prohibit sharing of eating utensils, dishes, and cups.

- Prohibit non-essential personal contact such as handshakes, hugs, and high-fives.

➢ Provide individuals about to be released from ICE custody with COVID-19 prevention information, hand hygiene supplies, and cloth face coverings.

➢ Cleaning/Disinfecting Practices:

- Adhere to CDC recommendations for cleaning and disinfection during the

COVID-19 response.[10]

- Several times a day using household cleaners and Environmental Protection Agency-registered disinfectants, clean and disinfect surfaces and objects that are frequently touched, especially in common areas (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment). The EPA's list of certified cleaning products is located here.

- Staff should clean shared equipment several times per day and on a conclusion-of-use basis (e.g., radios, service weapons, keys, handcuffs).

- Ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.

- Facility leadership will ensure that there is adequate oversight and supervision of all individuals responsible for cleaning and disinfecting these areas.

### *CDC Recommended Cleaning Tips*

➢ Hard (Non-porous) Surfaces:

- If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

- For disinfection, most common EPA-registered household disinfectants should be effective.

  o A list of products that are EPA-approved for use against the virus that causes COVID-19 is available here. Follow the manufacturer's instructions for all cleaning and disinfection products for concentration, application, method, contact time, etc.

  o Additionally, diluted household bleach solutions (at least 1000 ppm sodium hypochlorite) can be used if appropriate for the surface. Follow manufacturer's instructions for application, ensuring a contact time of at least one minute and allowing proper ventilation during and after application. Check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted.

    ▪ Prepare a bleach solution by mixing:

      - 5 tablespoons (1/3 cup) bleach per gallon of water; or

---

[10] Attachment J, Centers for Disease Control and Prevention, Cleaning and Disinfection for Community Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited June 21 2020).

- 4 teaspoons bleach per quart of water.

➢ Soft (Porous) Surfaces:

- For soft (porous) surfaces, such as carpeted floor, rugs, and drapes, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

  o If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

  o Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and that are suitable for porous surfaces.[11]

➢ Electronics:

- For electronics such as tablets, touch screens, keyboards, remote controls, and ATM machines, remove visible contamination if present.

  o Follow the manufacturer's instructions for all cleaning and disinfection products.

  o Consider use of wipeable covers for electronics.

  o If no manufacturer guidance is available, consider the use of alcohol-based wipes or sprays containing at least 70 percent alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

➢ Linens, Clothing, and Other Items That Go in the Laundry:

- In order to minimize the possibility of dispersing virus through the air, do not shake dirty laundry.

- Wash items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely. Dirty laundry that has been in contact with an ill person can be washed with other people's items.

- Clean and disinfect hampers or other carts for transporting laundry according to guidance above for hard or soft surfaces.

- Consider establishing an on-site laundry option for staff so that they can change out of their uniform, launder them at the facility, and wear street clothes and shoes home. If on-site laundry for staff is not feasible, encourage them to change clothes

---

[11] Attachment K, U.S. Environmental Protection Agency, *List N: Disinfectants for Use Against SARS-CoV-2*, https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2 (last visited July 19, 2020).

before they leave the work site, and provide a location for them to do so.

**PREVENTION**

Detention facilities can prevent the introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission:

➢ Perform pre-intake screening for all staff and new entrants for COVID-19 symptoms.

➢ Screening should take place before staff and new intakes enter the facility or just inside the facility, where practicable. For new admissions, this should occur before beginning the intake process, in order to identify and immediately isolate any detainee with symptoms before the individual comingles with others or is placed in the general population. This should include temperature screening of all staff and new entrants as well as a verbal symptoms check.

- Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions based on Interim Guidance: Managing COVID-19 in Correctional/Detention Facilities:

  o Today or in the past 24 hours, have you had any of the following symptoms:
    ▪ Fever, felt feverish, or had chills?

    ▪ Cough?

    ▪ Difficulty breathing?

    ▪ Chills?

    ▪ Muscle pain?

    ▪ Sore throat?

    ▪ New loss of taste or smell?

  o In the past fourteen days, have you had contact with a person known to be infected with COVID-19 where you were not wearing the recommended proper PPE?

- If staff have symptoms of COVID-19 (e.g., fever, cough, shortness of breath),

they must be denied access to the facility.

- If any new intake has symptoms of COVID-19:

  o Require the individual to wear a face mask;

  o Ensure that staff interacting with the symptomatic individual wears recommended PPE;

  o Isolate the individual and refer to healthcare staff for further evaluation;

  o Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective isolation and necessary medical care;

- If an individual is a close contact of a known COVID-19 case or has traveled to an affected area, but has no COVID-19 symptoms, quarantine the individual and monitor for symptoms two times per day for fourteen days.

➢ Consider testing all newly detained persons before they join the rest of the population in the detention facility. For further information, refer to the TESTING section below and CDC Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities, available here: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html

➢ Visitation:

- During suspended (social) or modified (legal) visitation programs, the facilities should provide access to virtual visitation options where available. When not possible, verbally screen all visitors on entry for symptoms of COVID-19 and perform temperature checks, when possible. ICE continues to explore opportunities to enhance attorney access while legal visits are being impacted. For facilities at which immigration hearings are conducted or where detainees are otherwise held who have cases pending immigration proceedings, this may include:

  o Adding all immigration attorneys of record to the Talton Pro-bono platform;

  o Requiring facilities to establish a process for detainees/attorneys to schedule appointments and facilitate the calls;

  o Leveraging technology (e.g., tablets, smartphones) to facilitate attorney/client communication;

  o Working with the various detention contractors and telephone service providers to ensure that all detainees receive some number of free calls per week.

- Communicate with the public about any changes to facility operations, including visitation programs. Facilities are encouraged to prohibit or, at a minimum, significantly adopt restricted visitation programs. Facilities are required to suspend all volunteer work program (VWP) assignments for detainees assigned to food service and other VWP assignments, where applicable, that require individuals to interact with each other at distances of less than six feet. Any detainee participating in a VWP assignment is required to wear appropriate PPE for the position at all times (e.g., disposable gloves, masks, goggles). Detainees in isolation or quarantine may not be assigned to a VWP detail.

➢ Where possible, limit transfers of detained non-ICE populations to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, to facilitate release or removal, or to prevent overcrowding. ⌨When necessary to transport individuals with confirmed or suspected COVID-19, if the vehicle is not equipped with emergency medical service (EMS) features, at a minimum, drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open.

➢ Consider suspending work release programs for inmates at shared facilities to reduce overall risk of introduction and transmission of COVID-19 into the facility.

➢ Require all staff (both medical and correctional) to wear PPE when encountering or interacting with any ICE detainee at a distance of less than six feet.

➢ Required PPE should always be worn by staff, even if separated by a distance of six feet or more, if the individual appears feverish or ill and/or with respiratory symptoms while interviewing, escorting, or interacting in other ways.

➢ Additional Measures to Facilitate Social Distancing:

  o Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement the following measures to the extent practicable. Efforts should be made to reduce the population to approximately 75 percent of capacity.

  o Where detainee populations are such that cells are available, to the extent possible, house detainees in individual rooms.

  o Recommend that detainees sharing sleeping quarters sleep "head-to-foot."

  o Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.

  o Staff and detainees should be directed to avoid congregating in groups of

ten or more, employing social distancing strategies at all times.

- o Whenever possible, all staff and detainees should maintain a distance of six feet from one another.

- o If practicable, beds in housing units should be rearranged to allow for six feet of distance between the faces of detainees.

- If group activities are discontinued, it is important to identify alternative forms of activity to support the mental health of detainees.

## MANAGEMENT

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), facilities shall begin implementing management strategies while test results are pending. Essential management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

*ICE Custody Review for Potentially High-Risk Detainees*

Upon being informed of a detainee who may potentially be at higher risk for serious illness from exposure to COVID-19, ERO will review the case to determine whether continued detention is appropriate.[12] ICE will make such custody determinations on a case-by-case basis, pursuant to the applicable legal standards, with due consideration of the public health considerations implicated.

- ➢ Considerable effort should be made to quarantine all new entrants for fourteen days before they enter the general population.

- ➢ To do this, facilities should consider cohorting daily intakes; two days of new intakes, or multiple days of new intakes, in designated areas prior to placement into the general population. Given significant variations among facilities, cohorting options and capabilities will differ across ICE's detention network. ICE encourages all facilities to adopt the most effective cohorting methods practicable based on the individual facility characteristics, taking into account the number of new intakes anticipated per day.

- ➢ For suspected or confirmed COVID-19 cases:
  - Isolate the individual immediately in a separate environment from other individuals. Facilities should make every possible effort to isolate persons individually. Each isolated individual should be assigned his or her own housing space and bathroom where possible. Isolating ill detainees as a group should only be practiced if there are no other available options.

---

[12] Attachment L, Assistant Director Peter Berg, Enforcement and Removal Operations, Updated Guidance: COVID-19 Detained Docket Review (Apr. 4, 2020).

- If single isolation rooms are unavailable, individuals with laboratory-confirmed COVID-19 should be isolated together as a cohort separate from other detainees, including those with pending tests. Ill detainees that are pending testing or are waiting for test results should be isolated together as a group separate from laboratory-confirmed COVID-19 cases and other detainees. Confirmed COVID-19 cases should not be cohorted with suspected cases or case contacts.

- Housing should maintain separation of groups by common criteria (e.g., COVID-19 test results positive, febrile or symptomatic pending testing or results, asymptomatic/exposed).

- Ensure that the individual is always wearing a face mask (if it does not restrict breathing) when outside of the isolation space, and whenever another individual enters the isolation room. If wearing masks will negatively impact breathing, facilities should ensure caregivers are aware of that fact and implement restrictions on contact as appropriate during isolation (e.g., increased social distancing, PPE use by people who enter space, moving and handling people separately, increased cleaning, etc.). Masks should be changed at least daily, and when visibly soiled or wet.

- In the event that a facility requires more isolation beds for detainees, ICE must be promptly notified so that transfers to other facilities, transfers to hospitals, or releases can be coordinated immediately. Until such time as the transfer or release is arranged, the facility must be especially mindful of cases that are at higher risk of severe illness from COVID-19. Ideally, symptomatic detainees should not be isolated with other individuals. If isolating of symptomatic COVID-positive detainees as a group is unavoidable, make all possible accommodations until transfer occurs to prevent transmission of other infectious diseases to the higher-risk individual (e.g., allocate more space for a higher-risk individual within a shared isolation room).

- Review the CDC's preferred method of medically isolating COVID-19 cases here, depending on the space available in a particular facility. In order of preference, individuals under medical isolation should be housed:

  o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully.

  o Separately, in single cells with solid walls but without solid doors.

  o As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.

  o As a cohort, in a large, well-ventilated cell with solid walls but without a

solid door. Employ social distancing strategies related to housing in the Prevention section above.

o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.

- When detainees must be housed in the spaces used for administrative segregation or solitary confinement, ensure that medical isolation is *operationally* distinct, even if the same housing spaces are used for both. For example:

o Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.

o Make efforts to provide similar access to radio, TV, reading materials, personal property, and commissary as would be available in individuals' regular housing units.

o Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.

o Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

- Maintain isolation until all the CDC criteria have been met. The decision to discontinue Transmission-Based Precautions should be made using a test-based strategy, a symptom-based strategy, or a time-based strategy.[13] Detainees that meet criteria for discontinuation of transmission-based precautions can be housed in general population. The two groups defined by CDC are detainees who tested positive but did not develop symptoms of COVID-19 and detainees who tested positive and were symptomatic.

- **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

---

[13] *See* Attachment M, Centers for Disease Control and Prevention, *Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html (last visited July 19, 2020).

- Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility. See Infection Control and Clinical Care sections for additional details.

- Serve meals inside the medical isolation space.

- Exclude the individual from all group activities.

- Assign the isolated individual(s) a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.

- **Ensure that the individual is wearing a cloth face covering if they must leave the medical isolation space for any reason, and whenever another individual enters.** Provide clean masks as needed. Masks should be washed routinely and changed when visibly soiled or wet.

- Detainees with COVID-19 (positive test result) who reported symptoms consistent with COVID-19 may discontinue isolation under the following conditions:

  - At least 10 days have passed since symptom onset and;

  - At least 24 hours have passed since resolution of fever without the use of fever-reducing medications and;

  - Other symptoms have improved.

  - A limited number of persons with severe illness may produce replication-competent virus beyond 10 days, that may warrant extending duration of isolation for up to 20 days after symptom onset. Consider consultation with infection control experts. See Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim CDC Guidance). Such patients are generally considered to have required hospitalization.

- Detainees infected with SARS-CoV-2 (positive test result) who never develop COVID-19 symptoms may discontinue isolation and other precautions 10 days after the date of their first positive RT-PCR test for SARS-CoV-2 RNA.

- RT-PCR testing for detection of SARS-CoV-2 RNA for discontinuing isolation could be considered for detainees who are severely immunocompromised, in consultation with infectious disease experts.

  - For all others, a test-based strategy is no longer recommended

except to discontinue isolation or other precautions earlier than would occur under the symptom-based strategy outlined above.

o The test-based strategy for severely compromised detainees requires negative results using RT-PCR for detection of SARS-CoV-2 RNA under an FDA Emergency Use Authorization (EUA) for COVID-19 from at least two consecutive respiratory specimens collected ≥24 hours apart (total of two negative specimens) (see CDC Interim Guidelines for Collecting, Handling, and Testing Clinical Specimens from Persons for Coronavirus Disease).

o All test results should be final before isolation is ended

- Meals should be provided to COVID-19 cases in their isolation rooms. Isolated cases should throw disposable food service items in the trash in their isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items must clean their hands after removing gloves.

- Laundry from a COVID-19 case can be washed with another individuals' laundry.

o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard gloves after each use, and clean their hands after handling.

o Do not shake dirty laundry. This will minimize the possibility of dispersing the virus through the air.

o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that either is disposable or can be laundered.

**TESTING**

➢ Consistent with CDC recommendations, facilities "considering diagnostic testing of people with possible COVID-19 should continue to work with their local and state health departments to coordinate testing through public health laboratories, or work with commercial or clinical laboratories using diagnostic tests authorized for emergency use by the U.S. Food and Drug Administration."[14] Before testing large numbers of asymptomatic individuals without known or suspected exposure, facility leadership

---

[14] Attachment O, Centers of Disease Control and Prevention, Overview of Testing for SARS-CoV-2, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited June 21, 2020July 19, 2020).

should have a plan in place for how they will modify operations based on test results. CDC recommendations on planning for facility wide testing may be found here: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html.

- CDC recommends SARS-CoV-2 testing with viral tests (i.e., nucleic acid or antigen tests) for:

    o  Individuals with signs or symptoms consistent with COVID-19;

    o  Asymptomatic individuals with recent known or suspected exposure to SARS-CoV-2 to control transmission;

    o  Asymptomatic individuals without known or suspected exposure to SARS-CoV-2 for early identification in special settings;

    o  Individuals being tested to determine resolution of infection (i.e., test-based strategy for Discontinuation of Transmission-based Precautions, HCP Return to Work, and Discontinuation of Home Isolation);

    o  Individuals being tested for purposes of public health surveillance for SARS-CoV-2.

- CDC recommends using authorized nucleic acid or antigen detection assays that have received an FDA EUA to test persons **with** symptoms when there is a concern of potential COVID-19.

- Testing is recommended for all close contacts of persons with SARS-CoV-2 infection. In some settings, broader testing, beyond close contacts, is recommended as a part of a strategy to control transmission of SARS-CoV-2. Expanded testing might include testing of individuals on the same unit or shift as someone with SARS-CoV-2 infection, or even testing all individuals within a shared setting (e.g., facility-wide testing). In areas where testing resources are limited, CDC has established a testing hierarchy for close contacts, which can be found here: https://www.cdc.gov/coronavirus/2019-ncov/downloads/case-investigation-contact-tracing.pdf.

- CDC does not currently recommend using antibody testing as the sole basis for diagnosis of acute infection, and antibody tests are not authorized by FDA for such diagnostic purposes. For the most current information on CDC recommendations for antibody testing, please go to: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html; https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antibody-tests.html.

- For the most current CDC recommendations for viral testing and specimen collection, please go to: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html; https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html.

## ATTACHMENTS

| ATTACHMENT LETTER | DOCUMENT NAME AND CITATION |
|---|---|
| A | U.S. Immigration and Customs Enforcement, *Updated ICE statement on COVID-19* (Mar. 18, 2020), https://www.ice.gov/news/releases/updated- ice-statement-covid-19. |
| B | Centers of Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited July 19, 2020). |
| C | ICE National Detention Standards 2019, Standard 4.3, Medical Care, https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf. |
| D | 2011 ICE Performance-Based National Detention Standards, Revised 2016, Standard 4.3, https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf. |
| E | 2008 ICE Performance-Based National Detention Standards, Standard 4-22, Medical Care, https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf. |
| F | Centers of Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* ( July 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html  (last visited July 19, 2020). |
| G | Memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, *Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27, 2020). |
| H | Centers of Disease Control and Prevention, *Public Health Guidance for Community-Related Exposure*, https://www.cdc.gov/coronavirus/2019-ncov/php/public- health-recommendations.html (last visited July 19, 2020). |
| I | Centers for Disease Control and Prevention, *Optimizing  Supply of PPE and Other Equipment during Shortages*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited July 20, 2020). |

| ATTACHMENT LETTER | DOCUMENT NAME AND CITATION |
|---|---|
| J | Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited July 19, 2020). |
| K | U.S. Environmental Protection Agency, *List N: Disinfectants for Use Against SARS-CoV-2*, https://www.epa.gov/pesticide-registration/list-n-disinfectants- use-against-sars-cov-2 (last visited July 19, 2020). |
| L | Assistant Director Peter Berg, Enforcement and Removal Operations, *Updated Guidance: COVID-19 Detained Docket Review* (Apr. 4, 2020). |
| M | Centers for Disease Control and Prevention, *Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html (last visited July 19, 2020) |
| N | Centers of Disease Control and Prevention, *Interim Guidelines for Collecting, Handling, and Testing Clinical Specimens for COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/lab/guidelines-clinical-specimens.html (last visited July 19, 2020) |
| O | Centers of Disease Control and Prevention, *Overview of Testing for SARS-CoV-2*, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited July 19, 2020) |
| P | Centers of Disease Control and Prevention, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last visited July 22, 2020) |

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

O.M.G., *et al.*;

                *Petitioners*,

v.

Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*,

                *Respondents*.

Case No. 1:20-cv00786-JEB

**NOTICE OF COVID-19 POSITIVE CASES**

The Honorable James E. Boasberg

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees in the Family Residential Center ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 105. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I.      Karnes County Family Residential Center ("Karnes FRC")

<u>Employee 1</u>: Employee 1 is a resident advisor, who tested at an off-site facility on July 27, 2020, due to having symptoms. On the same day, the results came back positive. Employee 1 was last at Karnes on July 27, 2020. Contact tracing is underway, and those identified will be notified. If residents are identified as having exposure as defined by the CDC guidelines, then they will be placed in a cohort for medical observation for 14 days. If a resident becomes symptomatic during that time, a test will be conducted. Employee 1 is and will remain in quarantine for 10 days from the date of the positive result, after which time Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

<u>Employee 2</u>: Employee 2 is a recreation specialist, who tested at an off-site facility on July 27, 2020, due to having symptoms. On the same day, the results came back positive. Employee 1 was last at Karnes on July 27, 2020. Contact tracing is underway, and those

identified will be notified. If residents are identified as having exposure as defined by the CDC guidelines, then they will be placed in a cohort for medical observation for 14 days. If a resident becomes symptomatic during that time, a test will be conducted. Employee 2 is and will remain in quarantine for 10 days from the date of the positive result, after which time Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 3: Employee 3 is a resident advisor, who tested at an off-site facility on July 27, 2020, due to having symptoms. On the same day, the results came back positive. Employee 3 was last at Karnes on July 27, 2020. Contact tracing is underway, and those identified will be notified. If residents are identified as having exposure as defined by the CDC guidelines, then they will be placed in a cohort for medical observation for 14 days. If a resident becomes symptomatic during that time, a test will be conducted. Employee 3 is and will remain in quarantine for 10 days from the date of the positive result, after which time Employee 3 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 4: Employee 4 is a mental health case worker, who tested at an off-site facility on July 25, 2020, due to having symptoms. On July 28, 2020, the results came back positive. Employee 4 was last at Karnes on July 24, 2020. Contact tracing is not required due to employee not having been at Karnes FRC for more than two days prior to the positive result. Employee 4 is and will remain in quarantine for 10 days from the date of the positive result, after which time Employee 4 has been directed to contact Human Resources for further guidance before reporting to work.

**II. South Texas Family Residential Center ("Dilley FRC")**

Employee 1: Employee 1 is a resident supervisor, who initially tested at an off-site facility on July 24, 2020, due to having symptoms. The results came back negative. On July 28, 2020, Employee 1 re-tested due to worsening symptoms. On the same day, the results came back positive. Employee 1 was last at Dilley on July 28, 2020. Contact tracing is underway,

and those identified will be notified. If residents are identified as having exposure as defined by the CDC guidelines, then they will be placed in a separate neighborhood for medical observation for 14 days. If a resident becomes symptomatic during that time, a test will be conducted.  Employee 1 is and will remain in quarantine for 14 days from the date of the positive result.

Respondents will appraise the Court of any further developments as it receives them from ICE.

RESPECTFULLY SUBMITTED this 29th day of July 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW
Washington, DC 20530
Telephone:  (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*; <br><br> *Petitioners*, <br><br> v. <br><br> Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, <br><br> *Respondents*. | Case No. 1:20-cv00786-JEB <br><br> **NOTICE OF COVID-19 POSITIVE CASES** <br><br> The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees and new intakes in the Family Residential Center ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 109. U.S. Immigration and Customs Enforcement reiterates and informs the Department of Justice that it is following the contact tracing guidelines as described in the previous declarations, ECF No. 82-2 ¶¶ 4,6-7 and ECF No. 82-3 ¶¶ 4-5, 7-11, consistent with the Center for Disease Control ("CDC") guidelines found at https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/overview.html and of the following positive cases:

### I.       Karnes County Family Residential Center ("Karnes FRC")

Fourteen (14) New Intakes:  On July 26, 2020 a group of 40 new intakes arrived at Karnes FRC. All 40 new intakes were placed in a cohort in a dedicated neighborhood within Karnes. New intakes were placed in separate rooms depending on family composition. All 40 new intakes were tested on July 27, 2020, due to the individuals being new arrivals at Karnes. On July 30, 2020, the test results for 14 of 40 the new intakes came back positive. All 14 new intakes with positive results are asymptomatic. If family composition allows, positive new intakes are housed with positive family members, while family members with negative results

are housed with other family members with negative results. If an individual who tested positive develops symptoms, they will be moved to a negative pressure room in the medical wing of the facility. The group of 40 has been placed in quarantine until August 9, 2020. At this time, none of the 14 new intakes who tested positive have required treatment at an outside medical facility and they are all being monitored and assessed twice per day.

Employee 1: Employee 1 is a resident advisor, who tested at an off-site facility on July 30, 2020, due to having symptoms. On the same day, the results came back positive. Employee 1 was last at Karnes on July 30, 2020. Contact tracing showed that Employee 1 did not have close contact with other employees or residents. Employee 1 is and will remain in quarantine for 10 days from the date of the positive result, after which time Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 2: Employee 2 is a resident advisor, who tested at an off-site facility on July 30, 2020, due to having symptoms. On the same day, the results came back positive. Employee 1 was last at Karnes on July 30, 2020. Contact tracing showed that Employee 2 did not have close contact with other employees or residents. Employee 2 is and will remain in quarantine for 10 days from the date of the positive result, after which time Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 3: Employee 3 is a recreation specialist, who tested at an off-site facility on July 29, 2020, due to having symptoms. On the same day, the results came back positive. Employee 3 was last at Karnes on July 29, 2020. Contact tracing showed that Employee 3 did not have close contact with staff or residents. Employee 3 is and will remain in quarantine for 10 days from the date of the positive result, after which time Employee 3 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 4: Employee 4 is a resident advisor, who tested at an off-site facility on July 28, 2020, due to having symptoms. On the same day, the results came back positive. Contact

tracing showed that Employee 4 had contact with two employee. Employee 4 was last at Karnes on July 28, 2020. Human Resources notified the exposed co-workers with instructions on steps to follow.  The exposed co-workers will be have their temperatures checked twice per shift for 10 days and must report any symptoms to Human Resources.

Employee 5: Employee 5 is a resident advisor, who tested at an off-site facility on July 28, 2020, due to having symptoms. On the same day, the results came back positive. Contact tracing showed that Employee 4 had contact with two employee. Employee 4 was last at Karnes on July 27, 2020. Human Resources notified the exposed co-workers with instructions on steps to follow.  The exposed co-workers will be have their temperatures checked twice per shift for 10 days and must report any symptoms to Human Resources.

**II. South Texas Family Residential Center ("Dilley FRC")**

New Intake 1: New Intake 1 was tested at Dilley on July 28, 2020, as part of the new intake process. On July 30, 2020, the results returned positive. New Intake 1 is asymptomatic, and being closely monitored. New Intake 1 is and will remain in quarantine for 14, until cleared by a medical doctor.

Employee 1: Employee 4 is a chaplain, who tested at an off-site facility on July 28, 2020, due to having symptoms. That same day, the results came back positive. Employee 1 was last at Dilley on July 26, 2020. Contact tracing is underway. Employee 1 is and will remain in quarantine for 14 days and until cleared by a medical doctor.

Employee 2: Employee 2 is a resident supervisor, who tested at an off-site facility on July 25, 2020, due to having symptoms. On July 28, 2020, the results came back positive. Employee 2 was last at Dilley on July 21, 2020. Contact tracing is currently underway. Employee 2 is and will remain in quarantine for 14 days from the date of testing and until cleared by a medical doctor.

Respondents will appraise the Court of any further developments as it receives them from ICE.

RESPECTFULLY SUBMITTED this 3rd day of August 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW
Washington, DC 20530
Telephone:  (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
ELIANIS PEREZ
Assistant Director

s/  *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*; | Case No. 1:20-cv00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | The Honorable James E. Boasberg |
| *Respondents*. | |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees and new intakes in the Family Residential Center ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 110. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

### I.        Karnes County Family Residential Center ("Karnes FRC")

Three (3) New Intakes:  On July 29, 2020, a group of 4 new intakes arrived at Karnes FRC. All 4 new intakes were placed in a cohort in a dedicated neighborhood within Karnes. All 4 new intakes were tested on July 29, 2020, due to the individuals being new arrivals at Karnes. On August 1, 2020, the test results for 3 of the 4 new intakes came back positive. All 3 new intakes with positive results are asymptomatic. The new intakes have been placed in quarantine until August 12, 2020. At this time, none of the 3 new intakes who tested positive have required treatment at an outside medical facility and they are all being monitored and assessed twice per day.

### II. South Texas Family Residential Center ("Dilley FRC")

New Intake 1: New Intake 1 was tested at Dilley on August 3, 2020, as part of the new intake process. On the same day, the results returned positive. New Intake 1 is asymptomatic,

and being closely monitored. New Intake 1 is and will remain in quarantine for 14 days, until cleared by a medical doctor.

Employee 1: Employee 1 is a supervisory detention and deportation officer, who tested at an off-site facility on August 1, 2020, due to having symptoms. On August 3, 2020, the results came back positive. Employee 1 was last at Dilley on July 24, 2020. Contact tracing showed that Employee 1 did not have direct contact with any residents, and that Employee 1 wore PPE. Employee 1's work areas are currently being disinfected. Employee 1 is and will remain in quarantine for 14 days and until cleared by a medical doctor.

Respondents will appraise the Court of any further developments as it receives them.

RESPECTFULLY SUBMITTED this 4th day of August, 2020.

<div style="margin-left:40%">

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW, Washington, DC 20530
Telephone: (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation - DCS
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Defendants*

</div>

# IN THE UNITED STATES DISTRICT COURT
# FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*; | Case No. 1:20-cv00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | The Honorable James E. Boasberg |
| *Respondents*. | |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees at the Family Residential Center ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 111. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I.       Karnes County Family Residential Center ("Karnes FRC")

Employee 1: Employee 1 is a resident advisor, who tested at an off-site facility on August 2, 2020, due to having symptoms. On the same day, the results came back positive. Employee 1 was last at Karnes on July 31, 2020. Contact tracing showed that Employee had contact with two other employees. Human Resources notified the exposed employees with guidance on the steps to take. The exposed employees will have his/her temperature checked twice per shift for 10 days and are required to report any symptoms to Human Resources. Employee 1 is and will remain in quarantine for 10 days from August 2, 2020, and must contact Human Resources for further guidance before reporting to work.

Employee 2: Employee 2 is a resident advisor, who tested at an off-site facility on July 31, 2020, due to having symptoms. On August 3, 2020, the results came back positive. Employee 2 was last at Karnes on July 24, 2020. Contact tracing showed that Employee 2 did

not have close contact with others. Employee 2 is and will remain in quarantine for 10 days from August 3, 2020, and, after that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting work.

Employee 3: Employee 3 is a resident advisor, who tested at an off-site facility on July 31, 2020, due to having symptoms. On August 3, 2020, the results came back positive. Employee 3 was last at Karnes on March 31, 2020, and has not had contact with staff or residents since that date. Employee 3 is and will remain in quarantine for 10 days from August 3, 2020, and after that time Employee 3 has been directed to contact Human Resources for further guidance before reporting work.

Employee 4: Employee 4 is a resident advisor, who tested at an off-site facility on July 31, 2020, due to having symptoms. On August 3, 2020, the results came back positive. Employee 4 was last at Karnes on July 29, 2020, and did not have close contact with staff or residents. Employee 4 is and will remain in quarantine for 10 days from August 3, 2020, and, after that time, Employee 4 has been directed to contact Human Resources for further guidance before reporting work.

Respondents will appraise the Court of any further developments as it receives them.

RESPECTFULLY SUBMITTED this 6th day of August, 2020.

> MICHAEL R. SHERWIN
> Acting United States Attorney
> District of Columbia
> DANIEL VAN HORN
> Assistant U.S. Attorney
> 555 4th St. NW, Washington, DC 20530
> Telephone:  (202) 252-2506
> Email: Daniel.VanHorn@usdoj.gov
>
> ETHAN P. DAVIS
> Acting Assistant Attorney General
> Civil Division
> WILLIAM C. PEACHEY
> Director

Office of Immigration Litigation - DCS
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | Case No. 1:20-cv00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | The Honorable James E. Boasberg |
| *Respondents*. | |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees at the Family Residential Centers ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 112. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I.     Karnes County Family Residential Center ("Karnes FRC")

<u>Employee 1</u>: Employee 1 is an intake resident advisor, who tested at an off-site facility on August 8, 2020, due to having symptoms. On August 10, 2020, the results came back positive. Employee 1 was last at Karnes on August 4, 2020. Employee 1 is and will remain in quarantine for 10 days from August 10, 2020, and must contact Human Resources for further guidance before reporting to work.

<u>Employee 2</u>: Employee 2 is an intake resident advisor, who tested at an off-site facility on August 9, 2020, due to failing the screening prior to her shift. On August 10, 2020, the results came back positive. Employee 2 was last at Karnes on August 7, 2020. Contact tracing showed that Employee 2 did not have close contact with others. Employee 2 is and will remain in quarantine for 10 days from August 10, 2020, and, after that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

## II.     South Texas Family Residential Center ("Dilley FRC")

Employee 1: Employee 1 is a resident supervisor, who tested at an off-site facility on August 10, 2020, due to having been exposed to a positive relative. On August 11, 2020, the results came back positive. Employee 1 was last at Dilley on August 4, 2020. Contact tracing will not be conducted because Employee 1 was not present at Dilley for over a week before the positive results. Employee 1 is and will remain in quarantine for 14 days from August 10, 2020, and until cleared by a medical doctor. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

Respondents will apprise the Court of any further developments as they receive them.

RESPECTFULLY SUBMITTED this 13th day of August, 2020.

<div align="right">

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW, Washington, DC 20530
Telephone:  (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation - DCS
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Respondents*

</div>

# IN THE UNITED STATES DISTRICT COURT
# FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | Case No. 1:20-cv00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | The Honorable James E. Boasberg |
| *Respondents*. | |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees at the Family Residential Centers ("FRCs") have tested positive for COVID-19, since the last notice. ECF No. 117. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I. Karnes County Family Residential Center ("Karnes FRC")

<u>Employee 1</u>: Employee 1 is a cook, who tested at an off-site facility on August 13, 2020, due to having symptoms. On August 13, 2020, the results came back positive. Employee 1 was last at Karnes on August 13, 2020. Contact tracing showed that Employee 1 was in contact with 3 other employees. The contact tracing protocols described in the July 29 and August 3, 2020 notices, ECF Nos. 108 and 110, will be implemented. Employee 1 is and will remain in quarantine for 10 days from August 13, 2020, and must contact Human Resources for further guidance before reporting to work.

<u>Employee 2</u>: Employee 2 is a resident advisor, who tested at an off-site facility on August 13, 2020, due to her personal doctor requesting a test before any in-office visit. On August 14, 2020, the results came back positive. Employee 2 was last at Karnes on August 13, 2020. Contact tracing showed that Employee 2 had contact with two other employees. The

contact tracing protocols described in the July 29 and August 3, 2020 notices, ECF Nos. 108

and 110, will be implemented. Employee 2 is and will remain in quarantine for 10 days from

August 14, 2020, and, after that time, Employee 2 has been directed to contact Human

Resources for further guidance before reporting work.

## II.       South Texas Family Residential Center ("Dilley FRC")

<u>Employee 1</u>: Employee 1 is a resident supervisor, who tested at an off-site facility on

August 13, 2020, due to having been exposed to a positive relative. On August 14, 2020, the

results came back positive. Employee 1 was last at Dilley on August 10, 2020. Contact tracing

will be conducted for August 10, 2020, and the preceding 48 hour period. If any exposure is

identified, the protocols for contact exposure previously described in ECF No. 108 will be

implemented. Employee 1 is and will remain in quarantine for 14 days from August 13, 2020,

and until cleared by a medical doctor. After that time, Employee 1 has been directed to contact

Human Resources for further guidance before reporting to work.

Respondents will apprise the Court of any further developments as they receive them.

RESPECTFULLY SUBMITTED this 14th day of August, 2020.

> MICHAEL R. SHERWIN
> Acting United States Attorney
> District of Columbia
> DANIEL VAN HORN
> Assistant U.S. Attorney
> 555 4th St. NW, Washington, DC 20530
> Telephone:  (202) 252-2506
> Email: Daniel.VanHorn@usdoj.gov
>
> ETHAN P. DAVIS
> Acting Assistant Attorney General
> Civil Division
> WILLIAM C. PEACHEY
> Director
> Office of Immigration Litigation - DCS
> ELIANIS PEREZ
> Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Respondents*

# IN THE UNITED STATES DISTRICT COURT
# FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*,<br><br>                          *Petitioners*,<br><br>v.<br><br>Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*,<br><br>                          *Respondents*. | Case No. 1:20-cv00786-JEB<br><br>**NOTICE OF COVID-19 POSITIVE CASES**<br><br>The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that additional employees at a Family Residential Centers ("FRC") has tested positive for COVID-19, since the last notice. ECF No. 118. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

**I.        South Texas Family Residential Center ("Dilley FRC")**

Employee 1: Employee 1 is a shift supervisor, who tested at an off-site facility on August 14, 2020, due to having symptoms. That same day, the results came back positive. Employee 1 was last at Dilley on August 12, 2020. Contact tracing will be conducted for August 11 and 12, 2020. If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented. Employee 1 is and will remain in quarantine for 14 days from August 14, 2020, and until cleared by a medical doctor. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

        //

Respondents will apprise the Court of any further developments as they receive them.

RESPECTFULLY SUBMITTED this 17th day of August, 2020.

        MICHAEL R. SHERWIN
        Acting United States Attorney
        District of Columbia
        DANIEL VAN HORN
        Assistant U.S. Attorney
        555 4th St. NW, Washington, DC 20530
        Telephone:  (202) 252-2506
        Email: Daniel.VanHorn@usdoj.gov

        ETHAN P. DAVIS
        Acting Assistant Attorney General
        Civil Division
        WILLIAM C. PEACHEY
        Director
        Office of Immigration Litigation - DCS
        ELIANIS PEREZ
        Assistant Director

        s/ *Vanessa Molina*
        VANESSA MOLINA
        Trial Attorney
        P.O. Box 868, Ben Franklin Station
        Washington, DC 20044
        Telephone: (202) 532-4413
        Email: Vanessa.Molina@usdoj.gov

        *Attorneys for Respondents*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*,<br><br>  *Petitioners*,<br><br>v.<br><br>Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*,<br><br>  *Respondents*. | Case No. 1:20-cv-00786-JEB<br><br>**NOTICE OF COVID-19 POSITIVE CASES**<br><br>The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that, since the last notice, two additional employees and one resident at the Family Residential Centers ("FRC") have tested positive for COVID-19. ECF No. 119. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I.  Karnes County Family Residential Center ("Karnes FRC")

<u>Employee 1</u>: Employee 1 is a banking accounts clerk, who was tested at an off-site facility on August 17, 2020, due to prior exposure outside the facility to an individual who received a positive test result earlier that day. That same day, the results came back positive. Employee 1 was last at Karnes on August 17, 2020, for approximately one hour.  Contact tracing will not be conducted because Employee 1 had no contact with any employees or residents at the facility on August 17, 2020, and was not present at Karnes for 48 hours prior. Employee 1 is and will remain in quarantine for 14 days from August 17, 2020. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 2: Employee 2 is a resident advisor, who was tested at an off-site facility on August 14, 2020, due to having COVID-19 symptoms.  On August 16, 2020, the results came back positive.  Employee 2 was last at Karnes on August 14, 2020.  Contact tracing was conducted for the 48 hours before Employee 2 tested positive and revealed that Employee 2 was in contact with one employee on August 14, 2020. Employee 2 is and will remain in quarantine for 14 days from August 16, 2020. After that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.  Human Resources notified the exposed co-worker with instructions on steps to follow.  The exposed co-worker began quarantining on August 15, 2020, and will not return to work until August 30, 2020. Upon the exposed co-worker's return to work, they must report any symptoms to Human Resources.

## II.      South Texas Family Residential Center ("Dilley FRC")

New Intake 1: New Intake 1 was tested at Dilley on August 15, 2020, as part of the new intake process. On August 18, 2020, the results came back positive. New Intake 1 is asymptomatic, and being closely monitored in the medical housing unit. Contact tracing is currently underway. New Intake 1 is and will remain in quarantine for a currently undetermined amount of time, pending assessment, though it is projected New Intake 1 will complete quarantine on September 2, 2020. At this time, New Intake 1 has not required treatment at an outside hospital or medical facility.

Respondents will apprise the Court of any further developments as they receive them.

RESPECTFULLY SUBMITTED this 19th day of August, 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW, Washington, DC 20530

Telephone:  (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation - DCS
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Respondents*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, <br><br> *Petitioners*, <br><br> v. <br><br> Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, <br><br> *Respondents*. | Case No. 1:20-cv-00786-JEB <br><br> **NOTICE OF COVID-19 POSITIVE CASES** <br><br> The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 minute order, Respondents hereby notify the Court that, since the last notice, one additional employee and one resident at the Family Residential Centers ("FRC") have tested positive for COVID-19. ECF No. 119. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I.     South Texas Family Residential Center ("Dilley FRC")

<u>Employee 1</u>: Employee 1 is a resident supervisor, who was tested at an off-site facility on August 18, 2020, due to having COVID-19 symptoms. That same day, the results came back positive. Employee 1 was last at Dilley during an overnight shift from approximately 10:00 P.M. on August 13, 2020, until approximately 6:00 A.M. on August 14, 2020, and used PPE and a mask while on duty.  Contact tracing is currently being conducted for August 13, 2020, as Employee 1 was not present at Dilley for 48 hours prior.  If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented. Employee 1 is and will remain in quarantine for 14 days from August 18, 2020, and until cleared by a medical doctor. After that time, Employee 1 has been directed to contact Human

Resources for further guidance and provide medical clearance from a doctor before reporting to work.

## II.     Karnes County Family Residential Center ("Karnes FRC")

New Intake 1: New Intake 1 was tested at Karnes on August 16, 2020, as part of the new intake process. On August 19, 2020, the results came back positive. New Intake 1 is asymptomatic, and being closely monitored. New Intake 1 is and will remain in quarantine for 14 days from August 19, 2020, and will be released at that time if they remain asymptomatic. At this time, New Intake 1 has not required treatment at an outside hospital or medical facility. All new intakes who arrived at the facility with New Intake 1 and remain asymptomatic are and will remain in cohort for 14 days from August 19, 2020, and will be monitored and assessed for signs and symptoms of COVID-19 once per day.

Respondents will apprise the Court of any further developments as they receive them.

RESPECTFULLY SUBMITTED this 20th day of August, 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW, Washington, DC 20530
Telephone: (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation - DCS
ELIANIS PEREZ
Assistant Director

s/  *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Respondents*