WILKINSON WALSH LLP
Xiao Wang (SBN 301279)
Caitlin G. Callahan (*pro hac vice* pending)
xwang@wilkinsonwalsh.com
ccallahan@wilkinsonwalsh.com
2001 M Street NW, 10th Floor
Washington, D.C. 20036
Telephone:   (202) 847-4000
Facsimile:   (202) 847-4005

Jeremy S. Barber (*pro hac vice* pending)
Chanakya A. Sethi (*pro hac vice* pending)
jbarber@wilkinsonwalsh.com
csethi@wilkinsonwalsh.com
130 W. 42nd Street, 24th Floor
New York, NY 10036
Telephone:   (929) 264-7765
Facsimile:   (202) 847-4005

Rahul R.A. Hari (SBN 313528)
rhari@wilkinsonwalsh.com
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
Telephone:   (424) 291-9655
Facsimile:   (202) 847-4005

*Attorneys for Amnesty International USA
and Human Rights Watch*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY L. FLORES, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>WILLIAM P. BARR,<br>Attorney General, et al.,<br><br>               Defendants. | Case No. CV-85-4544 DMG (AGRx)<br><br>**PROPOSED BRIEF OF AMICI CURIAE AMNESTY INTERNATIONAL USA AND HUMAN RIGHTS WATCH IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE FSA** |

# TABLE OF CONTENTS

STATEMENT OF INTEREST ........................................................................ 1

I.      INTRODUCTION ............................................................................. 2

II.     ARGUMENT ..................................................................................... 5

        A.      The FSA Requires The Government To Promote The Best
                Interests of The Child.......................................................... 5

        B.      Neither Detention Nor Separation Is in The Best Interests of
                The Child................................................................................ 6

        C.      The Court May Consider Procedures and Practices To
                Supplement Those Recommended by Plaintiffs. ................. 8

III.    CONCLUSION ............................................................................. 13

i

# TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*Doi v. Halekulani Corp.*,
276 F.3d 1131 (9th Cir. 2002)...................................................................9

*Flores v. Barr*,
934 F.3d 910 (9th Cir. 2019)....................................................................5

*Flores v. Lynch*,
828 F.3d 898 (9th Cir. 2016)................................................................2, 10

*O.M.G. v. Wolf*,
2020 WL 4201635 (D.D.C. July 22, 2020)........................................2, 3

*Orantes-Hernández v. Meese*,
685 F. Supp. 1488 (C.D. Cal. 1988) ..................................................10, 11

*Orantes-Hernández v. Smith*,
541 F. Supp. 351 (C.D. Cal. 1982) ......................................................11

*Roper v. Simmons*,
543 U.S. 551 (2005) ..............................................................................6


**Statutes**

8 U.S.C. § 1101(a)(27)(J) .......................................................................5

8 U.S.C. § 1182(d)(5)(A)........................................................................10

8 U.S.C. § 1226(a)(2)(A) ........................................................................10

Cal. Welf. & Inst. Code § 16000(a)..........................................................7

Cal. Welf. & Inst. Code § 16000(b) .........................................................7


**Regulations**

8 C.F.R. § 1236.3(b)(2) .........................................................................10


**Other Authorities**

Amnesty International, *Amnesty International USA and 100+
Organizations Call on ICE to Free Families Together*
(July 17, 2020) ........................................................................................3

Amnesty International, *Family Separation 2.0: "You Aren't
Going to Separate Me From My Only Child"* (2020) ..........................11

Amnesty International, *No Home for Children* (2019) ...........................5

Cynthia P. Cohen, *Role of the U.S. in Drafting the Convention
on the Rights of the Child: Creating A New World For
Children,* 4 Loy. Poverty L.J. 9 (1998) .................................................6

Hajar Habbach, Physicians for Human Rights, *"You Will Never
See Your Child Again": The Persistent Psychological Effects
of Family Separation* (Feb. 25, 2020)....................................................8

ii

Human Rights Watch, *In the Freezer:  Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018) ..............................................................................................11

Immigration and Naturalization Serv., *Guidelines for Children's Asylum Claims* (Dec. 10, 1998) ...................................5

Letter from Scott A. Allen to the Hon. Bennie Thompson, (July 14, 2020), ...........................................................................8

Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion OC-21/14, Inter-Am. Ct. H.R. (ser. A) No. 21 (Aug. 19, 2014) .........................................................................7

U.N. Comm'n on Migrant Workers & U.N. Comm'n on the Rights of the Child, Doc. CMW/C/GC/4-CRC/C/GC/23 (Nov. 16, 2017) .........................................................................6

U.N. Convention on the Rights of the Child, Nov. 20, 1989, 1577 U.N.T.S. 3 ..............................................6, 7, 8

U.N. High Comm'r for Refugees, *UNHCR's Position Regarding the Detention of Refugee and Migrant Children in the Migration Context* (Jan. 2017) ............................................7

U.N. Working Grp. on Arbitrary Det., Rev'd Delib. No. 5,U.N. Human Rights Council, Rep. of the Working Grp. on Arbitrary Det., U.N. Doc. A/HRC/39/45, annex (July 2, 2018) .........................................................................6

U.S. Children's Bureau, *Determining the Best Interests of the Child* (Mar. 2016)......................................................................7

Women's Refugee Commission, *The Family Case Management Program: Why Case Management Can and Must Be Part of the U.S. Approach to Immigration* (June 13, 2019)............................9

# STATEMENT OF INTEREST

Amici Amnesty International USA and Human Rights Watch are leading non-partisan, non-profit international human rights organizations.[1]  Amici have substantial expertise in the rights of asylum-seekers and migrants, including the rights of children detained by U.S. immigration authorities.  They have documented the dangers faced by persons displaced by conflict and crisis; investigated allegations of human rights abuses against immigrants and asylum-seekers, including in the United States; and advocated before governments for changes to laws, policies, and practices that infringe upon their rights.

Amici submit this brief in support of Plaintiffs' motion to enforce the *Flores* Settlement Agreement ("FSA").  Dkt. No. 919.  As organizations with expertise in international and domestic human rights standards, as well as the circumstances Class Members and their families face in detention, amici aim to provide an additional perspective as the Court determines how best to enforce the commitments the government has made in the FSA.  Amici also propose additional substantive and procedural measures to ensure that the best interests of the child are protected as part of any "Know Your Rights" ("KYR") advisal and release procedure that may be ordered by the Court.[2]

---

[1] Counsel for the government and Plaintiffs have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No persons other than the amici or their counsel made a monetary contribution to this brief's preparation or submission.

[2] The "KYR advisal" refers to the dissemination of information to Class Members and their families about the rights enshrined in the FSA.  The "release procedure" refers to the families' decision and accompanying procedure that the government must follow to release children from detention.

## I.      INTRODUCTION

Under the FSA, the government has committed to provide "critical protections . . . to minors in DHS and HHS custody."  In Chambers Order (Sept. 27, 2019), Dkt. No. 688 at 20.  The bedrock principle underlying this commitment is that "*[the] best interests [of the child] should be paramount*" at every step of the government's implementation of its commitments.  In Chambers Order (July 9, 2018), Dkt. No. 455 at 7 ("July 9, 2018 Order") (emphasis added).  But throughout this litigation, the government has categorically failed to honor this principle, and indeed seems bent on sabotaging it.

Most recently, in the midst of the COVID-19 pandemic, this Court observed "*two* means" by which the government could proceed within the framework of the FSA: (1) release *and* family unity, and (2) detention *or* family separation.  *See* In Chambers Order (June 26, 2020), Dkt. No. 833 at 3–4, ¶ 1 ("June 26, 2020 Order") (emphasis added).  In comparing these options, Plaintiffs and amici agree:  The government "*should* promptly release families together" to promote the best interests of the migrant children in the government's custody.  Pl. Response to Ex Parte Application Re Intervention, Dkt. No. 876 at 8.  The release of children with their parents is both consistent with the FSA and falls squarely within the government's authority. *See* July 9, 2018 Order at 5 ("Absolutely nothing prevents Defendants from reconsidering their current blanket policy of family detention and reinstating prosecutorial discretion."); *Flores v. Lynch*, 828 F.3d 898, 908 (9th Cir. 2016) (noting that the government has "generally releas[ed] parents who were not flight or safety risks" together with their children).

Confronted with these options, the government has chosen the path most destructive to a child's best interests.  As this Court and others have noted, it is the government—not the children, nor the parents, nor Plaintiffs' counsel—that initially forced parents to choose between "handing over their children, in some cases to potentially unsuitable guardians, and keeping them" in detention facilities, *O.M.G. v.*

2

*Wolf*, 2020 WL 4201635, at *12 (D.D.C. July 22, 2020), that are "on fire," June 26, 2020 Order at 2. But apparently unwilling to take responsibility for a dilemma of its own making, the government now appears to backslide even further, compelling Class Members into *de facto* waivers of their FSA rights, resulting in the prospect of indefinite detention in the midst of a global pandemic. *See* Opp. to Mot. to Enforce, Dkt. No. 923 at 17.

To be clear: Both of these options—separation or continued detention—are harmful to the best interests of the child. As amici have argued elsewhere, a process that results in such a binary "choice" is no choice at all. *See* Amnesty International, *Amnesty International USA and 100+ Organizations Call on ICE to Free Families Together* (July 17, 2020), https://perma.cc/F6JH-EESC. And it should go without saying that amici strongly oppose the government's latest efforts to categorically waive Class Members' FSA rights. *See* In Chambers Order (June 27, 2017), Dkt. No. 363 at 27 ("Defendants entered into the *Flores* Agreement and now they do not want to perform—but want this Court to bless the breach. That is not how contracts work.").

Nevertheless, amici are mindful that the Court has decided "to impose a remedy for Defendants' past and ongoing violations of Paragraphs 12, 14, and 18 of the FSA," In Chambers Order (Aug. 7, 2020), Dkt. No. 914 at 2, and that the Court has expressed a preference for "appropriate written advisals of rights and a know-your-rights procedure that will meet Court approval and ensure greatest compliance with the FSA," In Chambers Order (July 29, 2020), Dkt. No. 896 at 4. In light of this complex and difficult posture, amici file this brief to support Plaintiffs' motion to enforce the FSA, while also offering additional measures that the Court should consider in protecting Class Members' rights under the FSA.

*First*, the government should be held accountable for its contractual obligations to ensure family unity. Legal and medical experts all agree that separating children from their families is contrary to the best interests of the child and can cause

irreparable trauma.  It is critical, therefore, that the government explain why it refuses to exercise its discretion to release parents with their children from custody during the on-going COVID-19 pandemic.  Doing so is fully consistent with the government's contractual commitment to "make and record" all efforts to ensure family unity. *See* FSA, Dkt. No. 101 ¶ 18.  Yet as the Court has repeatedly observed, the government has failed to make "individualized determinations" for its parole decisions.  Requiring the government to document its justifications for not releasing Class Members' families will ensure that the government fulfills its obligation to make individualized parole decisions.

*Second*, if parents are forced to decide whether to waive their child's FSA rights in light of the government's refusal to release families together, any KYR advisal and release procedure should include certain substantive and procedural measures that address known shortcomings in how ICE has previously provided information to detained individuals.  Specifically:  A KYR advisal should encompass all rights under the FSA.  Legal service providers, who are already working with families in various detention centers, should be asked to contribute and weigh in on the KYR advisal and release procedure.  The KYR advisal dissemination efforts, moreover, should extend beyond the government merely providing a written advisal to Class Members.  Class Members' rights under the FSA should be communicated by prominently-displayed posters in all facilities where Class Members are detained, and KYR presentations should be conducted by legal services providers, other service providers, or relevant NGOs with expertise in the issues, either by live video or in-person, in a language that parents can understand, and with an opportunity for Q&A.  Finally, a third-party expert should conduct an independent and individualized evaluation of the best interests of each child; this expert should discuss all findings and implications with the child, the parents, other family members, and relevant stakeholders.

4

To be sure, these measures cannot cure the inherently coercive nature of any potential binary "choice" put before Class Members and their families. But they would, at a minimum, provide parents with valuable information that—as discussed below—the government has time and again failed to provide. The parties and the Court need to get this process right. Otherwise, the damage to children and their families caused by haphazard measures would be significant and irreparable.

## II.    ARGUMENT

### A.    The FSA Requires The Government To Promote The Best Interests of The Child.

The FSA codifies the fundamental understanding that the government must act in the best interests of the child. It recognizes, for instance, that the government must treat "all minors in its custody with dignity, respect and *special concern for their particular vulnerability as minors*." FSA ¶ 11 (emphasis added). Children should be held "in the least restrictive setting appropriate to the minor's age and special needs." *Id.* Other parts of the FSA require that "safe and sanitary" conditions be provided because of the government's "concern for the particular vulnerability of minors." *Id.* ¶ 12.A. Taken together, these provisions mean that "[the] best interests [of the child] should be paramount." July 9, 2018 Order at 7; *see also Flores v. Barr*, 934 F.3d 910, 915 (9th Cir. 2019) (rejecting a "cramped understanding" of the FSA's terms as "untenable").

This standard is fully consistent with the standards set forth under both U.S. and international law. All fifty states, the District of Columbia, and U.S. territories require courts and other legal stakeholders to consider the child's best interests when making decisions about the child's custody. *See* Amnesty International, *No Home for Children* at 15–16 (2019), https://perma.cc/2GG3-Y2F4. The standard has also been incorporated into federal immigration law and policy. *See, e.g.*, 8 U.S.C. § 1101(a)(27)(J) (incorporating a best-interests findings into eligibility standards for special immigrant juveniles); Immigration and Naturalization Service, *Guidelines*

*for Children's Asylum Claims* at 2, 6, 9 (Dec. 10, 1998), https://perma.cc/WU9Z-G2V7 (applying "the internationally recognized 'best interests of the child' principle" to interview procedures for child asylum seekers).   Drawing on U.S. jurisprudence, the U.N. Convention on the Rights of the Child explicitly states that, "[i]n *all actions* concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration."   United Nations Convention on the Rights of the Child art. 3, Nov. 20, 1989, 1577 U.N.T.S. 3 ("CRC") (emphasis added).[3]

## B.   Neither Detention Nor Separation Is in The Best Interests of The Child.

Applying the best interests standard to the circumstances here leads to an ineluctable conclusion:  Neither detention *nor* family separation is in the best interests of a child in the government's custody.

It is well-established that detention is *never* in the best interests of a child. The United Nations, for example, has stated that "[t]he deprivation of liberty of an asylum-seeking, refugee, stateless or migrant child, including unaccompanied or separated children, is prohibited."   U.N. Working Grp. on Arbitrary Detention, Rev'd Delib. No. 5, ¶ 11 in U.N. Human Rights Council, Rep. of the Working Grp. on Arbitrary Detention, U.N. Doc. A/HRC/39/45, annex (July 2, 2018); *see also* U.N. Comm'n on Migrant Workers & U.N. Comm'n on the Rights of the Child, Joint General Comment No. 4 (Comm'n on Migrant Workers) and No. 23 (Comm'n

---

[3] The United States signed the CRC in 1995, though it is the only member of the United Nations that has not yet ratified it, despite playing a leading role in its drafting.  *See* Cynthia Price Cohen, *Role of the United States in Drafting the Convention on the Rights of the Child:  Creating A New World For Children*, 4 Loy. Poverty L.J. 9 (1998).  Nonetheless, as a signatory, the United States remains obligated under customary international law to refrain from acts that would defeat the objects and purposes of the treaty.  Consonant with this obligation, courts—including the Supreme Court—have looked to the CRC's standards as instructive.  *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 576 (2005) (citing CRC's prohibition on juvenile capital punishment as persuasive authority despite lack of U.S. ratification).

on the Rights of the Child) on State Obligations Regarding the Human Rights of Children in the Context of International Migration in Countries of Origin, Transit, Destination, and Return, ¶ 5, U.N. Doc. CMW/C/GC/4-CRC/C/GC/23 (Nov. 16, 2017) ("Every child, at all times, has a fundamental right to liberty and freedom from immigration detention.").  Likewise, the Inter-American Court of Human Rights has held that "deprivation of liberty of a child" based "exclusively on migratory reasons" can "never be understood as a measure that responds to the child's best interest." Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection ¶ 154, Advisory Opinion OC-21/14, Inter-Am. Ct. H.R. (ser. A) No. 21 (Aug. 19, 2014), https://perma.cc/4R2Q-MVEJ.[4]  Further, the U.N. High Commissioner for Refugees has declared "that *children should not be detained* for immigration related purposes, irrespective of their legal/migratory status or that of their parents," because "*detention is never in their best interests*."   U.N. High Comm'r for Refugees, *UNHCR's Position Regarding the Detention of Refugee and Migrant Children in the Migration Context* (Jan. 2017) (emphasis in original).

Nor can separating a child from their parents be in the child's best interests, absent a finding of abuse or neglect.  California law, for example, recommends that "all children live with a committed, permanent, and nurturing family," and to "preserve and strengthen a child's family ties whenever possible."  Cal. Welf. & Inst. Code §§ 16000(a), (b).  More than half of the other states likewise recognize "[t]he importance of family integrity and preference for avoiding removal of the child." U.S. Children's Bureau, *Determining the Best Interests of the Child* at 2 (Mar. 2016), https://perma.cc/6WJ2-ZLWQ.

International legal authorities lend further support.  The CRC, for example, requires "[p]arties [to] ensure that a child shall not be separated from his or her

---

[4] The Inter-American Court of Human Rights' Advisory Opinion OC-21/14 interprets the American Convention on Human Rights, which the United States has signed, but not ratified.

parents against their will, except when competent authorities subject to judicial review determine . . . that such separation is necessary for the best interests of the child." Art. 9 § 1; *see also id.* art. 8 § 1 ("States Parties undertake to respect the right of the child to preserve his or her … family relations as recognized by law without unlawful interference.").[5]

These conclusions are firmly supported by medical science.  Indeed, the Department of Homeland Security's *own* medical experts have stated that "[a] policy of separation will exacerbate the physical and mental trauma to detained families who know they are unable to protect themselves from the deadly, rapidly spreading pandemic."  Letter from Scott A. Allen, et al. to the Hon. Bennie Thompson, et al. at 2 (July 14, 2020), https://perma.cc/6BUY-KFM6.  Hence, "the release of children and parents who do not pose an immediate risk to public safety is the best policy to minimize potential harm to detainees' physical and mental health.  But they must be released together to avoid the harm that … would result from separation."  *Id.* at 5; *see also* Hajar Habbach et al., Physicians for Human Rights, *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation* (Feb. 25, 2020), https://perma.cc/K32H-7WKW (finding that the "U.S. government's treatment of asylum seekers through its policy of family separation . . . constitutes torture").

## C. The Court May Consider Procedures and Practices To Supplement Those Recommended by Plaintiffs.

Consistent with the foregoing consensus regarding the best interests of the child, the FSA itself expressly codifies a "general policy" requiring the government to "release a minor from its custody without unnecessary delay."  FSA ¶ 14.  It further establishes a preference that the minor be released to a parent or legal guardian, and requires "prompt and continuous efforts . . . toward family reunification."  *Id.*

---

[5] *See supra* n.3.

¶ 18.  And it explicitly contemplates a duty of the government to "make and record" such efforts.  *Id.*

These clear commitments—which the government negotiated and willingly agreed to—should lead the government to take the only action that is consistent with the best interests of the child:  releasing children together with their parents.  Yet after months of foot-dragging, the government's latest filing makes clear that it has no interest in implementing this common-sense solution.  The government should not be permitted to force Class Members into *de facto* waivers of their FSA rights, resulting in indefinite detention amidst a global pandemic.

Thus, as the Court proceeds with a KYR advisal and any accompanying release procedure, it should do so on terms that protect and promote the best interests of the child.  Amici respectfully urge the Court to adopt, at a minimum, the following steps, which lie within the Court's powers to provide "such relief as is explicitly or implicitly authorized by the *Flores* Agreement."  In Chambers Order (July 30, 2018), Dkt. No. 470 at 3; *see also Doi v. Halekulani Corp.*, 276 F.3d 1131, 1136 (9th Cir. 2002) (recognizing substantial discretion in enforcing settlement agreement).

*First*, the government should document on individual parole worksheets all efforts to release parents with their children.  These efforts should be in good faith.  As such, they should consider whether the government's interest in ensuring compliance with immigration adjudications is adequately satisfied by alternatives to detention, including supervised release and case management programs.  *See, e.g.*, Women's Refugee Commission, *The Family Case Management Program:  Why Case Management Can and Must Be Part of the U.S. Approach to Immigration* (June 13, 2019), https://perma.cc/J5NE-X6AT.  This documentation should include explanations behind case-specific determinations and the ultimate justifications for non-release.  Given that the government-created binary "choice" provides no option that promotes the best interests of the child, it is critical that the government explain why

9

it refuses to exercise its discretion to release parents with their children from custody during the ongoing COVID-19 pandemic.

This documentation is especially necessary in light of this Court's repeated observations of the government's non-compliance with its obligation under the FSA to make "*individualized* determinations" for its parole decisions. *See* In Chambers Order (Mar. 28, 2020), Dkt. No. 740 at 10 (emphasis in original); *see also* In Chambers Order (Apr. 24, 2020), Dkt. No. 784 at 15–18 (finding ICE in violation of paragraphs 14 and 18 for failing to make individualized parole assessments and for the consequent unnecessary delay created); In Chambers Order (May 22, 2020), Dkt. No. 799 ("May 2020 Order") (finding ICE in violation of paragraph 18 because it "show[ed only] cursory explanations for denying minors release under the FSA").

Requiring the government to provide individualized and detailed explanations as to why Class Members' parents may not be released with their children respects the presumption—embedded in federal law and the FSA—for family unity, and holds the government accountable for explaining its choice to deviate from that presumption. The government's own regulations provide that it "*shall* . . . evaluate[]" the "simultaneous release of the juvenile and the parent, legal guardian, or adult relative." 8 C.F.R. § 1236.3(b)(2) (emphasis added); *see also* 8 U.S.C. § 1226(a)(2)(A) (discretionary authority to release certain non-citizens on bond); 8 U.S.C. § 1182(d)(5)(A) (discretionary authority to parole certain non-citizens). And the government has voluntarily contracted to "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." FSA ¶ 18.[6]

*Second*, any KYR advisal should bear in mind the government's history of coercion and its abysmal track record of informing families of their rights. In

---

[6] To be sure, parents possess no rights under the FSA. *See Flores*, 828 F.3d at 909. But requiring such an explanation provides no contractual right *to parents*—it merely secures the rights *of the child* to family unity and helps preserve the child's best interests. It is thus squarely within this Court's authority under the FSA.

*Orantes-Hernández v. Meese,* for instance, the government "engaged in a pattern and practice of summarily removing Salvadorans from this country by obtaining their signatures on the voluntary departure form through intimidation, threats, and misrepresentation."  685 F. Supp. 1488, 1504–06 (C.D. Cal. 1988).  As one of several remedies, the *Orantes-Hernández* court ordered the government to inform class members of their rights to apply for asylum, to request a deportation hearing, and to be represented by an attorney—all measures to ensure meaningful notice.  *See id.* at 1511–13; *see also Orantes-Hernández v. Smith*, 541 F. Supp. 351, 374–78 (C.D. Cal. 1982) (requiring adequate "procedures and protections" to any class member "who departs voluntarily").

Amici have also documented the government's coercive practices elsewhere. *See* Human Rights Watch, *In the Freezer:  Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018), https://perma.cc/SD2Q-EAFS.  Many women detained in immigration holding cells along or near the border with Mexico, for example, "reported that they were told to sign documents in English, a language they did not understand, under circumstances in which they did not believe they could refuse."  *Id.* at 31.

And in this matter, when the government approached parents in May 2020 about releasing their children separately from residential centers to sponsors, it did not provide additional explanation or confirmation of understanding of Class Members' rights under the FSA.  *See, e.g.*, May 2020 Order at 3 (ordering parties to "meet and confer regarding the adoption and implementation of proper written advisals"); Pls. Response to ICE Report, Dkt. No. 824 at 9–12 (collecting examples of ICE seeking waivers from parents without counsel, without providing notice of children's rights under the FSA, and without advising parents that they could seek parole so they could be released with their children); Amnesty International, *Family Separation 2.0:  "You Aren't Going to Separate Me From My Only Child."* (2020), https://perma.cc/JG2V-6ZYD.

A robust KYR advisal should be put in place to correct these abusive practices and provide families with a sufficient understanding of their rights.  The advisal should encompass *all* of the rights provided in the FSA.  And the parties should consult with legal service providers, other service providers, and relevant NGOs, who are already working with families in various detention centers, on the content of the KYR advisal and its associated dissemination plan to ensure that families are given accurate information in a format they understand.

With respect to the dissemination plan, the Court should order that the government provide the written advisal to all Class Members in all custody and detention locations.  Dissemination efforts should extend beyond mere written notice.  The Court should order the government to provide guaranteed and regular access for detained Class Members to attend KYR presentations.  Those presentations should be conducted by legal service providers, other service providers, or NGOs with expertise in the issues, who can explain Class Members' rights in the KYR advisal by live video or in-person, in a language that parents can understand, and with an opportunity for Q&A.  The Court should also order the parties to develop posters in consultation with legal service providers, other service providers, and NGOs with expertise in civil rights, immigration, and asylum issues.  The government should prominently display such posters in all facilities where Class Members are detained, thereby disseminating knowledge of these rights to Class Members, and also to facility staff and ICE officers.

Finally, if families are coerced into making a binary "choice," amici urge that any release procedure include an independent evaluation of the best interests of each child conducted by a third-party expert.  Families have been placed in an impossible position:  continue to keep their children detained with them and risk COVID-19 infection or separate themselves from their children with the looming uncertainty of the pandemic and the potential long-term damage to the children that may result from that separation.   A third-party expert will provide an important, neutral

12

assessment and a critical check on a process defined by lopsided power dynamics. That expert will be an advocate for the best interests of the child, which should be—and *must* be, under the FSA—a central consideration for the parties moving forward.

## III.   CONCLUSION

The government has failed to protect the best interests of the child, as it is explicitly required to do under the FSA.  This failure was entirely avoidable.  The government has the authority to release families together.  The government has not chosen that humane option, and instead now seeks to impose *de facto* waivers of Class Members' rights under the FSA.

While amici continue to urge the government to exercise its authority to release families together, so long as the government needlessly pursues a path designed to inflict suffering and harm, amici urge the Court to do everything within its power to safeguard the child's best interests—and, at least, to mitigate the worst harms flowing from the government's policies.

Those procedures should include, at minimum:  requiring the government to document on parole worksheets all efforts to release parents with their children and specific rationale for refusing to release families together; involving legal service providers, other service providers, and relevant NGOs in crafting the KYR advisal content and dissemination plans; requiring dissemination of the KYR advisal through multiple methods, including presentations to families by legal services providers, other service providers, or NGOs with expertise in the issues; and mandating an independent best interest evaluation by a third-party expert before parents waive their children's rights to family unity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

Dated:  August 28, 2020

WILKINSON WALSH LLP

By:  /s/ Xiao Wang

WILKINSON WALSH LLP
Xiao Wang (SBN 301279)
Caitlin G. Callahan (*pro hac vice* pending)
xwang@wilkinsonwalsh.com
ccallahan@wilkinsonwalsh.com
2001 M Street NW, 10th Floor
Washington, D.C. 20036
Telephone:  (202) 847-4000
Facsimile:   (202) 847-4005

Jeremy S. Barber (*pro hac vice* pending)
Chanakya A. Sethi (*pro hac vice* pending)
jbarber@wilkinsonwalsh.com
csethi@wilkinsonwalsh.com
130 W. 42nd Street, 24th Floor
New York, NY 10036
Telephone:   (929) 264-7765
Facsimile:   (202) 847-4005

Rahul R.A. Hari (SBN 313528)
rhari@wilkinsonwalsh.com
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
Telephone:   (424) 291-9655
Facsimile:   (202) 847-4005

*Attorneys for Amnesty International USA
and Human Rights Watch*