Bridget Cambria, Esq.
Executive Director
ALDEA - The People's Justice Center
532 Walnut St.
Reading, PA 19601
bridget.cambria@cambriaklinelaw.com
(Admitted *Pro Hac Vice*)

Manoj Govindaiah, Esq.
Director of Litigation
RAICES
802 Kentucky Ave
San Antonio, Texas 78201
manoj.govindaiah@raicestexas.org
(Admitted *Pro Hac Vice*)

Gretchen M. Nelson (SBN 112566)
Gabriel S. Barenfeld (SBN 224146)
NELSON & FRAENKEL, LLP
601 S. Figueroa Street, Suite 2050
Los Angeles, CA 90017
gnelson@nflawfirm.com
gbarenfeld@nflawfirm.com

*Attorneys for Amici*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| Jenny Lisette Flores., *et al.*, Plaintiffs,<br><br>v.<br><br>William Barr, Attorney General of the United States, *et al.*, Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br><u>CLASS ACTION</u><br><br>***Amicus* Brief**<br><br>Hearing Date: September 4, 2020<br>Time:    11:00 a.m.<br>Courtroom:  8c |

# **TABLE OF CONTENTS**

**I.      Introduction**..............................................................................................1

**II.     Summary of Argument** ........................................................................2

**III.    *Amici Curiae's* Proposed Remedies** ................................................2

**A.      Defendants Should Be Required to Immediately and Continuously Make and Record Specific Efforts to Release Accompanied Class Members from Custody.**...................................................................................................................3

**B.      Order ICE to Ensure that All Class Members in Custody are Detained in FSA-Compliant Facilities by or before September 11, 2020.**.................................9

1.      When in DHS custody, minors must be detained in non-secure, licensed facilities. ...............................................................................................................9

2.      Any facility in which Class Members are detained must be "safe and sanitary." ..............................................................................................................11

3.      The Court should order the Government to place every child in DHS custody in a licensed, non-secure facility by September 11, 2020, or a date set by the Court. .................................................................................................................12

**C.      Order the Government to distribute a Notice of Rights to Class Members, establish a reporting hotline, increase ICE officer training, and provide sworn testimony to bolster information-sharing regarding noncompliance with the Court, Independent Monitor, and public at-large.** ......12

**IV.     Based Upon Defendants' Ongoing Non-Compliance with the Terms of the FSA, This Court Can Use Its Contempt and other Remedial Powers to Enforce the Above-Suggested Remedies as well as to Order Additional Remedies in Contract.**....................................................................................................16

**A.      The Government's Repeated and Continuing Violations of its Basic Legal Obligations Gives the Court Reason to Invoke its Contempt Authority and to Fashion Remedies Accordingly.** ...........................................................................16

**B.      Order Compensation and Equitable Relief to Class Members Whose Rights have been Violated** ............................................................................................18

**C.      Order Specific Performance for the Government's Breaches of the FSA in Order to Bring it into Compliance.** ..............................................................................19

**V.      *Amicus Curiae's* Response to Class Counsel's Proposed Remedy** ..............20

**A.      Plaintiff's Proposed Waiver Constitutes an Improper Modification of the FSA.** ...........................................................................................................................20

**B.      Class Counsel's Proposed Waiver Conflicts With Contract Law and the Preliminary Injunction in *Ms. L.*** ............................................................................23

**VI.     *Amicus Curiae's* Response to the Government** ..................................25

**VII.    Conclusion** ...........................................................................................28

i

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Broderick v. Donaldson*, 437 F.3d 1226 (D.C. Cir. 2006) ........................................ 16

*Capital Area Immigrants' Rights (CAIR) Coalition v. Trump*, Case No.
1:19-cv-2117-TJK, Doc. 72 (D.D.C. June 30, 2020) ...................................... 11

4

5

*Flores v. Barr*, 407 F. Supp. 3d 909 (C.D. Cal. 2019) ................................................ 27

*Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015) ........................ 9, 10, 12, 17

6

*Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015) ............................................ 10

7

*Flores v. Lynch*, 392 F. Supp. 3d 1144 (C.D. Cal. 2017) .......................................... 27

8

Flores v. Lynch, 828 F. Supp. 3d 898 (9th Cir. 2016) ....................................... passim

*Flores v. Sessions*, 394 F. Supp. 3d 1041 (C.D. Cal. 2017) ............................... passim

9

*Flores v. Sessions,* 862 F.3d 863 (9th Cir. 2017) ..................................................... 21

10

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ............................................................... 23, 24

11

*General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376 (9th Cir. 1986) ............ 16, 17

*Gray v. Zurich Ins. Co.*, 419 P.2d 168 (1966) .......................................................... 24

12

*I.A. v. Barr*, Case No. 1:19-cv-2530, Doc. 55 (TJK) (D.D.C. June 30,
2020) ......................................................................................................... 11

13

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693
(9th Cir. 1993) ........................................................................................... 17

14

*Jennings v. Rodriguez*, 138 S. Ct. 830, 200 L. Ed. 2d 122 (2018) ........................... 27

15

*Ms. L. v. United States Immigration & Customs Enf't ("ICE")*, 310 F.
Supp. 3d 1133 (S.D. Cal. 2018) .............................................................. passim

16

*National Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255 (2d Cir. 1977) ................... 24

17

*Norcia v. Samsung Telecomm. Am., LLC,* 845 F.3d 1279 (9th Cir. 2017) .............. 22

18

*O.M.G. v. Wolf*, No. 1:20-cv-786-JEB (D.D.C. Mar. 21, 2020) ................................ 1

19

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation
v. California*, 813 F.3d 1155 (9th Cir. 2015) ............................................... 19

20

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ................. 17

21

*Reno v. Flores*, 507 U.S. 292 (1993) ....................................................................... 26

*Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015) ............................................. 27

22

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) ............................ 21, 22

23

*Sekaquaptewa v. MacDonald*, 544 F.2d 396 (9th Cir. 1976) ................................... 17

24

*Stone v. City & Cty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992) ............... 16, 17

*TNT Marketing, Inc. v. Agresti*, 796 F. 2d 276 (9th Cir. 1986) ............................... 18

25

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-
1178-MJP, 2016 U.S. Dist. LEXIS 88259, at *2–3 (W.D. Wash.
July 7, 2016) ........................................................................................ 16, 17

26

*Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441 (1963) ........................................... 27

27

*United States v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) ..................................... 21

28

*United States v. Gov't of Guam*, No. 02-00022, 2009 U.S. Dist. LEXIS
  129281, at *3-6 (D. Guam Mar. 20, 2009) ...................................... 16

*United States v. Mountain Village*, 424 F.Supp. 822 (D. Mass. 1976) .................... 23

*United States v. Paradise*, 480 U.S. 149 (1987) .................................. 19, 20

*United States v. Wynn*, 528 F.2d 1048 (5th Cir. 1976) ............................. 23

## STATUTES

8 C.F.R. § 1236.3 ........................................................... 7, 8, 9, 26

8 C.F.R. § 242.24 ............................................................... 8

Restatement (Second) of Contracts § 357 ................................. 19

## REGULATIONS

Detention and Release of Juveniles, 53 Fed. Reg. 17449, 17450 (May 17,
  1988) ...................................................................... 8

iii

## I.     **Introduction**

The Government has long failed to comply with the terms of the *Flores* Settlement Agreement ("FSA" or the "Agreement") and this Court's orders. ICE has detained Class Members for months or years at a time in unsafe, unsanitary, secure and unlicensed facilities, and failed to make documented efforts to release children, and now has done so during a pandemic.

There are more than 110 Class Members currently detained in non-compliant Family Residential Centers ("FRCs").[1] Class members remain detained by ICE for indefinite periods of time during the COVID-19 pandemic with no efforts by the Government to cure this clear breach of their duties under the Agreement. ICE's continuing failure to promptly make and record efforts to release accompanied Class Members and honor the presumption of release policy violates Paragraphs 12, 14, and 18 of the FSA and directly harms Class Members. *See, e.g.*, *Flores v. Barr*, No. 2:85-cv-4544 (DMG) (C.D. Cal. June 26, 2020) ("June 26, 2020 Order") [Doc. #833]. Class Members have arrived to FRCs with COVID-19 and contracted COVID-19 while detained in the FRCs[2] as a direct result of ICE's inaction and failure to release them from unsafe and unsanitary conditions. As evidence of the Government's noncompliance and lack of effort, numerous young children have now surpassed one

_____

[1] Of these 110 Class Members, 22 have been detained over a year; 24 have been detained between 300 and 365 days; and 19 have been detained between 100 and 300 days. In total, 94 children have been detained for more than twenty days. These numbers reflect Class Members known to *Amici* organizations, and may not represent the complete number of Class Members detained at the FRCs due to ongoing and persistent access-to-counsel issues. *See* Amicus Br. (Aug. 6, 2020) [Doc. # 903] (Declaration of Andrea Meza; Declaration of Bridget Cambria).

[2] *See* August 2020 Interim Report of Juvenile Coordinator, at 5 [Doc .# 932]. ICE's failure to provide safe conditions has continuously harmed children during COVID-19, not to mention their parents, detention staff within FRCs and the community at large. See also Amicus Br. at 27–28 (Aug. 6, 2020) [Doc. # 903] (summarizing reports of COVID-19 at the FRCs reported by the Government in *O.M.G. v. Wolf*, No. 1:20-cv-786-JEB (D.D.C. Mar. 21, 2020)).

1   year of detention during the most dangerous pandemic in more than 100 years.

2       On August 7, 2020, this Court determined that it must "impose a remedy for

3   Defendants' past and ongoing violations of Paragraphs 12, 14, and 18" of the *Flores*

4   Settlement Agreement ("FSA" or "Agreement"). *Flores v. Barr*, No. 2:85-cv-4544

5   (DMG), at *2 (C.D. Cal. Aug. 7, 2020) ("August 7, 2020 Order") [Doc. # 912]. *Amici*

6   *Curiae*, counsel for individual Class Members and their accompanying parents, agree

7   with the Court's determination and submit the below arguments in support of effective

8   remedies for the Government's continuing noncompliance, which include alternatives

9   to the remedy proposed by Class Counsel and reject the *de facto* indefinite detention

10  urged by the Government.

11  **II.   <u>Summary of Argument</u>**

12      *Amici* propose that the Government be required to: 1) immediately make and

13  record specific efforts to release accompanied Class Members; 2) transfer all Class

14  Members to FSA-compliant facilities by September 11, 2020, or by another specific

15  date set by this Court; and 3) establish procedures to ensure that Class Members are

16  noticed of their rights under the Agreement and have opportunity to consult with

17  counsel. These remedies would move the Government towards compliance in the

18  future; however, in order to address the harm that has already been incurred by Class

19  Members as a result of past noncompliance and to prevent future breach of the

20  Agreement, it is appropriate that the Court hold the Government in contempt and order

21  reasonable compensation and equitable relief for Class Members. Finally, Class

22  Counsel's and the Government's proposals are not responsive to the Government's

23  violations and are inadequate to ensure the necessary change in the Government's

24  conduct.

25  **III.   <u>*Amici Curiae'*s Proposed Remedies</u>**

26      In response to this Court's August 7, 2020 Order [Doc. # 912], *Amici* respectfully

27  submit additional and alternative proposed remedies to bring Defendants into

28  compliance with Paragraphs 12, 14 and 18 of the FSA. As an initial matter, *Amici*

recommend that ICE be enjoined from detaining any Class Member in any FRC until it satisfies the Court that it has come into compliance with the terms of the Agreement. In the alternative, *Amici* urge the Court to consider remedies that (1) require ICE to meaningfully make and record specific documented efforts towards release; (2) immediately require that the detention of any Class Members be in FSA-compliant facilities that are non-secure, licensed, and safe and sanitary; and (3) bolster reporting mechanisms to increase transparency into the Government's noncompliance. Further below, *Amici* ask this Court to utilize its contempt authority to enforce and compel compliance.

### A. Defendants Should Be Required to Immediately and Continuously Make and Record Specific Efforts to Release Accompanied Class Members from Custody.

This Court has repeatedly instructed the Government to comply with Paragraph 14 and 18 of the *Flores* Agreement by making and recording individualized determinations regarding custody. They were ordered to do so without delay and with *deliberate speed*. The Government has not complied and has informed the Court they will not comply. *See, e.g.*, *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1065 (C.D. Cal. 2017) (granting Plaintiffs' motion to enforce "the Agreement on the issue of whether Defendants are making and recording continuous efforts to release Class Members or place them in non-secure, licensed facilities," dismissing ICE's purported concerns about resources and stating "[d]efendants entered into the *Flores* Agreement and now they do not want to perform—but want this Court to bless the breach. That is not how contracts work"); *Flores v. Barr*, No. 85-4544-DMG (AGRx), at *10 (C.D. Cal. Mar. 28, 2020) ("March 28, 2020 Order") (ordering the government to "comply with the unambiguous charge of the [*Flores* Agreement] to make individualized determinations regarding a minor's flight risk rather than blanket determinations") [Doc. # 740]; *Flores v. Barr*, No. 2:85-cv-4544 (DMG), at *15 (C.D. Cal. Apr. 24, 2020) ("April 24, 2020

Order") [Doc. # 784]; June 26, 2020 Order (noting ICE's compliance regarding individualized determination remained at issue) [Doc. # 833].

The Government has not provided evidence that it has made and recorded individualized efforts to release Class Members detained at the FRCs. FSA ¶ 18. The Court can bring the Government into compliance with Paragraphs 14 and 18 by stating the specific information the Government is required to include when making and recording its efforts to release Class Members, including detailed information regarding its decisions to approve or deny Class Members' request to be released to their parent-sponsor.

The Government has argued that it is not required to provide the Court with information regarding accompanied Class Members' parents when making and recording efforts towards release because parents do not have release rights under the FSA. *See, e.g.*, Defs.' Opp. to Mot. to Enforce Settlement of Class Action ECF. No. 919 [Doc. # 923]. This straw-man argument conflates process with outcome; while the Government is not required to release parents, it is required to conduct individualized assessments. A parent's detention does not impede the Government's ability to document whether the detained parent is an appropriate and available sponsor for a Class Member, and to support its conclusions with a reasoned explanation. Class Members are entitled to this process under the Agreement. While the Court should not be required to micromanage the Government, given the history of this litigation, a direct order mandating the specific information that the Government must make and record under Paragraphs 14 and 18 will assist the Court in evaluating its compliance.

Indeed, ORR's standard practice of documenting efforts to release unaccompanied Class Members regardless of their relationship to a proposed sponsor, as required by Paragraphs 14 and 18 of the FSA, confirms both that the Government agrees that it must make and record efforts towards release in *every* case and that doing so is possible—even when a potential sponsor is a detained parent. Office of Refugee Resettlement, Children Entering the United States Unaccompanied, Section 2, Safe and

Timely Release from ORR Care (Jan. 30, 2015).[3]

In light of the Court's determination that, unlike ICE, ORR is in substantial compliance with paragraphs 14 and 18 of the Agreement, it can and should direct ICE to make and record similar—if not identical—efforts to release accompanied Class Members. A review of the procedures used by ORR to comply with Paragraphs 14 and 18 of the Agreement makes clear that the detention status of a Class Member's potential parent-sponsor creates no impediment to the Government's ability to make and record efforts towards release. When ORR discovers that a child's preferred sponsor is in government custody, the child's Case Manager gathers corroborating and clarifying information about the nature of the parent's detention by searching the online ICE Detainee Locator, securing court records, and engaging in ongoing conversations with attorneys who represent the parent and/or child and the parent's Deportation Officer[4] or Probation Officer.[5] *Id.* In other words, whenever at first glance a parent is seemingly

_____

[3] Available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#foot1.

[4] ICE policy mandates that Deportation Officers and engage in critical information sharing, and "disclose all relevant information contained in [Enforce Alien Removal Module] that may assist the case worker in conducting reunification." In other words, ICE officers are required to provide specific information to ORR Case Managers regarding potential sponsors in ICE custody so that ORR Case Managers may document that information when making and recording efforts to reunify a child. Immigration and Customs Enf't, Juvenile and Family Residential Management Unit Field Office Juvenile Coordinator Handbook, at 45 (Sept. 2017).

[5] *Amici* have seen these practices—and their success—in action. Proyecto Dilley has represented numerous separated families in which a mother was detained with one child at Dilley while another child was placed in ORR custody. In many of these cases, ORR determined that the separated child's release to their mother was in the child's best interest. Subsequently, ORR and ICE worked together to facilitate the "joint release" of the child in ORR custody and the family unit detained at Dilley, releasing the entire family simultaneously. Proyecto Dilley has also represented mothers who were separated from their child based upon the mothers' criminal history. In these cases, ORR made a formal recommendation regarding whether the child's reunification with their parent was in the child's

"unavailable" to provide care to a Class Member due to the parent's detention, ORR nonetheless proceeds in fact-gathering, documenting its findings, and making efforts to release the child to the parent in the first instance, as required by paragraph 14 of FSA.[6] *Id.*

ORR has undertaken these procedures because the FSA requires it. Paragraph 18 of the FSA states this obligation in clear terms. The FSA leaves no room for equivocation or excuse about individualized determinations regarding release. ICE has no discretion to refuse to undertake simultaneous efforts at family reunification *and* the release of Class Members. It has the duty, authority, and ability to comply with Paragraphs 12, 14 and 18 of the FSA for every detained minor, whether accompanied or unaccompanied.

The Court can order the Government to provide, on an ongoing basis, a *detailed*, reasoned, *written explanation* for why, in its discretion, after considering *all relevant information*, it has concluded that a Class Member cannot be released from ICE custody with their accompanying parent. The Court's order can specify reporting requirements that parallel the documentation regularly provided by ORR and order ICE to submit ongoing proof of its progress to the Court. While ICE may not have the infrastructure to immediately make and record efforts as required on its own, ICE has the ability to contract a licensed program (like one currently contracted by ORR) in order to immediately bring itself into compliance.

*Amici* recognize that this remedy will not result in the immediate release of all accompanied children. Nonetheless, should the Court order ICE to provide full and

---

best interest and provided that recommendation directly to ICE at ICE's request. In particularly complicated cases, ORR has referred a separated child's case to an independent Child Advocate for the issuance of a best-interests recommendation related to the child's potential reunification to their parent. In each of these circumstances, ORR has evaluated the child's potential release to their detained parent in the first instance and documented ongoing efforts towards release.

[6] This decision takes place subsequent to formal weekly "staffing" of the child's case by the child's case manager, clinician, and case coordinator.

complete information regarding the decision making process, with detailed and individualized consideration for each Class Member and their factual and familial situation, the Court and Independent Monitor will have clarity regarding why each Class Member remains in custody, the ability to engage with ICE about specific policies and practices of concern, and the ability to move ICE towards greater compliance with Paragraphs 14 and 18 of the Agreement.

Such a reporting requirement adds no new burden to the Government as the Government is *already* required to gather and document this information independent of the Agreement itself. According to Melissa Harper, the Chief of ICE's JFRMU, ICE "individually evaluate[s] for risk of flight to determine whether continued detention is necessary or whether release is a viable option." April 24, 2020 Order [Doc. # 784]. The details of ICE's release decision-making process pursuant to its parole authority can therefore quickly be incorporated into a child's file regarding efforts to release the child with no substantial additional agency burden. It is imperative that ICE provide this transparency to the court for each detained child.

The Government is also required to evaluate a parent's release from custody under 8 C.F.R. § 1236.3, which requires the Government to balance any interest it has in detaining an adult non-citizen with the need to expeditiously release a child from detention.[7] The regulation provides *detained children* with the right to have their parent, legal guardian, or adult relative meaningfully considered for release from detention with special consideration for their status as a juvenile in detention. Like the FSA, 8 C.F.R. § 1236.3 does not mandate that a parent be released from detention. Rather, the regulation requires that whenever the Government is unable to locate a parent, legal guardian, or adult relative who is able to accept custody of a detained child, the

---

[7] Contrary to Defendants' assertion, 8 C.F.R. § 1236.3, by its own terms, *requires* the government to *consider* the release of the child with their detained parent. This is a right of the child, and not of the parent, to ensure the care of the child upon release. *See* Defs' Br. in Opp. to Pls.' Mot. to Enforce [Doc. # 923].

government "shall" evaluate "the simultaneous release of the juvenile and the parent" on a "discretionary case-by-case basis." 8 C.F.R. § 1236.3(b)(2).

The history of 8 C.F.R. § 1236.3 is useful in understanding the regulation's purpose and the Government's long-standing preference towards releasing family units together in an effort towards ensuring family integrity. In 1988, the Immigration and Naturalization Service promulgated the first iteration of what is now 8 C.F.R. § 1236.3(b), as 8 C.F.R. § 242.24. *See* Detention and Release of Juveniles, 53 Fed. Reg. 17449, 17450 (May 17, 1988). The regulation served to balance the Government's "concern for the welfare of the juvenile[s]" in its custody, with its lack of "expertise" and "resources to conduct home studies for placement of each juvenile released." *Id.* The Government emphasized that "reunification of the juvenile with his or her family is the best interest of all concerned," and for that reason the regulation provides "that the minor 'shall' be released to a parent, legal guardian or adult relative." *Id.* "[R]eunification," the Government stressed, "represents Service policy, with detention being the exception." *Id.*

This provision provides a regulatory right *to Class Members*, not to detained adults. 8 C.F.R. § 1236.3. This is clear from the plain language of the regulation. The title of the regulation, "Detention and Release of Juveniles," indicates that the benefits provided by the regulation flow to juveniles with the purpose of facilitating their release from detention. This regulation therefore augments the Government's regular parole authority and duties under the FSA, requiring ICE to conduct a unique release analysis for detained parents whose children will remain detained absent their release. Here, where the Government has stated its position that it will not pursue a child's release to a non-parent sponsor, non-parents are categorically unavailable, requiring the Government to pursue a child-focused discretionary release review process on behalf of every Class Member by considering the release of their parents.

The Government's failure to comply with the FSA, the regulations, and this Court's orders causes significant harm to Class Members.  At minimum, 8 C.F.R. §

8

1236.3 and the FSA require the Government to consider and document facts like those presented in the case of A.M.M., a non-verbal four-year-old boy with developmental delays. A.M.M. has been detained, as of the date of this filing, for 165 days and has greatly deteriorated in ICE custody. *See* Exhibit A (Declaration of S.M.C., A.M.M.'s mother). A.M.M.'s mother has no criminal history and has never failed to appear before an immigration judge or officer. *Id.* Pursuant to Paragraph 18 of the Agreement and 8 C.F.R. § 1236.3, this information, at minimum, should have been included in ICE's written documentation regarding its efforts to release A.M.M. and ongoing decision not to do so over the course of the past four months. This is just one example of the Government's failure to include in each and every determination an individualized and timely assessment based on relevant facts.  A child's disability and deterioration in detention over time (and the role of a parent to care for a child with a disability) should play a part in the agency's determination to continue detention.

Ultimately, ordering the Government to detail information regarding release assessments made for accompanied Class Members in relation to discretionary release assessments made for their parents is necessary to document its compliance with their duty to make and record efforts towards the release of Class Members. *See* FSA ¶ 18. It will also further empower the ICE Juvenile Coordinator to monitor ICE's understanding of the terms of the Agreement, and their application in practice.

## B. Order ICE to Ensure that All Class Members in Custody are Detained in FSA-Compliant Facilities by or before September 11, 2020.

### 1. When in DHS custody, minors must be detained in non-secure, licensed facilities.

During any period of detention, ICE is required to keep children in custody in non-secure and licensed facilities. FSA ¶ 14, 19; *Flores v. Johnson*, 212 F. Supp. 3d 864, 877 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016). As the Ninth Circuit has acknowledged, "[t]he [*Flores*] Settlement creates

9

a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards." *Flores*, 828 F.3d at 901. Paragraph 19 of the FSA provides that if ICE does not release a minor in accordance with Paragraph 14—which asserts and outlines the general policy favoring release of the minor—then the minor shall be placed *temporarily* in a licensed program until release can be completed in accordance with Paragraph 14.

This Court has held repeatedly that the FRCs are secure, unlicensed facilities.[8] *See Flores*, 394 F. Supp. 3d at 1070; *Flores*, 212 F. Supp. 3d at 879. In 2017, this Court found that ICE had breached its contractual obligation to hold Class Members in non-secure, licensed facilities and granted Class Members' motion to enforce the Agreement and required Class Members be detained in non-secure, licensed facilities. *Flores*, 394 F. Supp. 3d at 1069–70. The secure and unlicensed nature of the FRCs has not changed since this Court last considered their status, and both then and now, the Government was in "substantial non-compliance with Paragraph[] 12A" of the FSA due to its prolonged detention of Class Members in FRCs. *See Flores*, 394 F. Supp. 3d at 1069–70 ("The fact that the family residential centers cannot be licensed by an appropriate state agency simply means that, under the [Flores] Agreement, class members cannot be housed in these facilities." (quoting *Flores v. Johnson*, 212 F. Supp. 3d at 877)).

The Agreement contains no exception for accompanied children that sanctions their detention in secure, unlicensed facilities save the three-to-five day processing period. FSA ¶¶ 12.A, 14; *Flores v. Lynch*, 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015). Despite this Court's findings and the Agreement's clear application to "all minors in [DHS] custody," the Government seeks to treat accompanied minors (as well as those subject to hoteling) differently than unaccompanied minors by failing to detain them in FSA-compliant facilities. FSA ¶ 10; *Flores*, 212 F. Supp. 3d at 872, *affirmed in relevant part by Flores,* 828 F.3d 898. Detention of families in ICE custody is discretionary, and

---

[8] Moreover, "Defendants [did] not dispute" the unlicensed nature of the FRCs. *Flores*, 394 F. Supp. 3d at 1069.

in the absence of licensed facilities the burden is on ICE to use its discretion and authority to comply with the FSA.

Immigration case status, including a final order of removal, does not absolve ICE of its burden to provide a licensed, non-secure facility for minors in custody and to seek release of minors without unnecessary delay. April 24, 2020 Order (explaining that the existence of a final order of removal cannot be the dispositive factor in determining whether to release or transfer a Class Member) [Doc. #784]; *see also Flores*, 394 F. Supp. 3d at 1065–67. This is especially the case where the order is unenforceable in light of a court-ordered stay of removal or an inability to remove a child in a definitive period of time.[9] Accordingly, the 110 children currently detained in the FRCs—many of whom have unenforceable and unexecutable non-final orders of removal[10]—are not excepted from the FSA's requirement that they be detained in non-secure, licensed facilities.

> ## 2. Any facility in which Class Members are detained must be "safe and sanitary."

In April, this Court once again determined that Defendants were in violation of Paragraph 12 of the FSA by detaining Class Members in facilities that were not "safe and sanitary," particularly given the conditions at these facilities during the COVID-19 pandemic. April 24, 2020 Order at 5-6 [Doc. # 784]; *see also* June 26, 2020 Order

---

[9] For example, ICE regularly states that removal of a Class Member will occur on "then next flight," when in fact that child is subject to a stay of removal and will not, in fact, be removed on the next flight. *See* Amicus Br. at 13 [Doc. # 826].

[10] The negative credible fear determination that many of these Class Members were issued relied upon the interim final rule entitled "Asylum Eligibility and Procedural Modifications" (also known as the "Safe Third Country Transit Ban") that has since been vacated and found unlawful as promulgated. *See Capital Area Immigrants' Rights (CAIR) Coalition v. Trump*, Case No. 1:19-cv-2117-TJK, Doc. 72 (D.D.C. June 30, 2020); *I.A. v. Barr*, Case No. 1:19-cv-2530, Doc. 55 (TJK) (D.D.C. June 30, 2020). Accordingly, these Class Members' final removal orders are void as they were based upon an unlawful regulation, and are subsequently non-executable.

1 ("ICE's compliance with Paragraphs 12, 14, and 18 of the FSA remains at issue.") [Doc.

2 # 833]. Class Members remain detained in unsafe and unsanitary conditions during a

3 pandemic in defiance of the FSA and numerous Court orders. *See, e.g.*, Amicus Br. at

4 26 (describing the worsening COVID-19 outbreak in and around the FRCs) [Doc. #

5 903]; Interim Report on COVID-19 by Independent Monitor [Doc. # 827].

3. <u>The Court should order the Government to place every child in DHS custody in a licensed, non-secure facility by September 11, 2020, or a date set by the Court.</u>

10     Every day Class Members remain detained at Berks, Karnes, and Dilley is

11 another day Defendants' violate Paragraphs 14 and 19 of the FSA and this Courts'

12 Orders. ICE cannot detain Class Members indefinitely in secure, unlicensed facilities

13 that are non-compliant with the FSA. *Flores*, 212 F. Supp. 3d at 877; *Flores*, 828 F.3d

14 at 901 (9th Cir. 2016); *see also* FSA ¶ 14, 19.

15     *Amici's* proposed remedy for this breach is straightforward and one this Court

16 has suggested before: Class Members cannot be detained at the FRCs, and the

17 Government therefore has until September 11, 2020, or another date certain, to provide

18 a facility compliant with the FSA for any Class Member who remains in custody. *See*

19 *Flores*, 394 F. Supp. 3d at 1069–70. To allow Class Members to remain in the secure

20 and unlicensed FRCs would only perpetuate the violations this Court seeks to cure.

21 August 7, 2020 Order [Doc. # 912].

**C. Order the Government to distribute a Notice of Rights to Class Members, establish a reporting hotline, increase ICE officer training, and provide sworn testimony to bolster information-sharing regarding noncompliance with the Court, Independent Monitor, and public at-large.**

26     In 2017, this Court provided the Government with clear direction regarding its

27 contractual obligations to accompanied Class Members. As highlighted in Defendants'

August 21, 2020 Reply brief, the Government's failure to comply with the Agreement and this Court's orders between the summer of 2017 and the end of March, 2020 remained unknown to the Independent Monitor and Court until a motion to enforce initiated the present litigation. [Doc. # 923]. The Court and Independent Monitor's delayed awareness of the Government's noncompliance reflects the need to augment reporting mechanisms regarding the Government's noncompliance with the terms of the Agreement.

To rectify the Government's ongoing failures to honor the terms of the Agreement, the Court should order the establishment of infrastructure to facilitate timely information-sharing regarding violations of the Agreement to the Court, Independent Monitor, and public at-large. Because sunlight is the best disinfectant, *Amici* recommend that the Court consider multiple remedies to increase transparency regarding the Government's progress towards compliance. Together, *Amici* believe the below remedies would induce the Defendants to obey the Court's Orders.

### 1. Provide Class Members a Notice of Rights

Paragraph 12A of the FSA requires the Government to give Class Members notice of their rights. *See* FSA ¶ 12 ("Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights..."). The first step in empowering Class Members and their accompanying parents to report noncompliance with the Agreement is mandating that Class Members are informed, globally, of their rights under the terms of the Agreement. And any recital of Class Members' rights must also be accompanied by a list of the Government's obligations, so that each individual Class Member, and their parent or guardian, is aware that their rights have been violated.

*Amici* respectfully submit the attached draft "Notice of Rights" with citations to the paragraphs of the FSA from which the right arises as requested by the Court. *See* Exhibit B (Draft Notice of Rights). *Amici* propose, as part of the remedy ordered by the

Court, that the Government be ordered to distribute a Notice of Rights to Class Members and their accompanying parents. This notice should be further developed and finalized through ongoing meet and confers with Class Counsel and Defendant's, and distributed in conjunction with the following safeguards for Class Members:

- Distribution of a facility-specific list of free legal services;[11]
- Access to free and confidential legal calls;[12]
- Attorney access to facility spaces that allow for confidential large group legal meetings with permission to use a microphone, video screen, projector, and laptop;[13] and
- Access to video-conference legal visitation.[14]
- Provision of the daily census of detained Class Members to the legal service providers at the FRCs so that they may ensure that Class Members in quarantine who currently face issues of access to counsel are oriented regarding their rights under the FSA.[15]

While the development of a Notice of Rights and protocol for advising Class Members at the FRCs of their rights is a positive step in the right direction, the only noncompliance with the FSA that it cures is the Government's 23 years of failure to provide Class Members with notice of their rights pursuant to Paragraph 12A of the

---

[11] *Amici* note that the Executive Office of Immigration Review has not developed a free legal service provider list for individuals who are detained at Karnes, Dilley, and Berks and that DHS currently provides Class Members with EOIR free legal service provider lists for other detention facilities.

[12] Telephones with abysmally poor service, resulting in frequently inaudible phone calls, are available for use at Karnes.

[13] Specifically, at the South Texas Family Residential Center, Amici seek access to the chapel when the facility operates at higher capacity.

[14] Minimal and sporadically available video-conferencing technology is provided for use at Karnes and Berks, but not at Dilley.

[15] A daily census of detainees is regularly provided to non-profit agencies who provide free Legal Orientation Programming at other ICE detention facilities.

Agreement. It does not address the Government's myriad violations of its other substantive obligations under the FSA that have brought the parties to this point. Such notice, then, is not and cannot be the sole resolution to the dilemma now faced by the Court.

## 2. Establish a Toll-Free, Government-Operated Reporting Hotline

The Court should order the Government to establish a toll-free hotline where Class Members, their accompanying parents, attorneys, and facility staff may report alleged violations of the Agreement. Hotline reports should trigger, in every case, the following actions: (1) ICE investigation into the allegation; (2) automatic referral of the report to the Office of the Inspector General; (3) a written report summary, to be provided to the reporter and counsel with a trackable report number; and (4) a monthly summary report of all filed reports, filed with the Court and the Independent Monitor.

## 3. Require Training for ICE Deportation Officers and Establish a Standing Protocol for ICE employees to Request Technical Assistance

Defendant's ongoing noncompliance with Paragraphs 12, 14, and 18 of the FSA makes clear that ICE officers require additional training and support to materialize compliance. ICE should be required to develop a formal training for ICE Deportation Officers and ICE personnel who work with Class Members at the FRCs. The training should be mandatory and developed with the input and direction of all parties.

## 4. Require Sworn Oral Testimony of ICE Officials Responsible for Noncompliance

Paragraph 19 of the Agreement affords Plaintiffs' counsel "the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement. Plaintiff's Counsel has advised the Court that Defendants have refused to comply with numerous provisions detailed in the

Agreement, which provides for ongoing monitoring of compliance through reporting requirements. Public awareness creates government accountability. We recommend the Court order that ICE officials whom the Court deems responsible for noncompliance with the Agreement, beginning immediately and continuing at regular intervals while violations continue, provide sworn, live, and oral testimony, before the Court or through depositions, with opportunity for questioning by Class Counsel and Class Members or their counsel of record.

**IV.** **Based Upon Defendants' Ongoing Non-Compliance with the Terms of the FSA, This Court Can Use Its Contempt and other Remedial Powers to Enforce the Above-Suggested Remedies as well as to Order Additional Remedies in Contract.**

> **A. The Government's Repeated and Continuing Violations of its Basic Legal Obligations Gives the Court Reason to Invoke its Contempt Authority and to Fashion Remedies Accordingly.**

This Court has the inherent power to command obedience to its orders by holding parties who flout those orders in contempt. *See General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379-80 (9th Cir. 1986). Indeed, the civil contempt power "is essential to . . . the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006). That the party refusing to comply with the Court's order happens to be a government agency does not weaken this Court's power. *See, e.g.*, *United States v. Gov't of Guam*, No. 02-00022, 2009 U.S. Dist. LEXIS 129281, at *3-6 (D. Guam Mar. 20, 2009) (holding Government of Guam in contempt and requiring payment of "coercive sanctions" when Government failed to comply with Court's previous orders requiring payment for cleanup of hazardous waste site); *Stone v. City & Cty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992) (affirming finding of contempt against City and County of San Francisco for failing to comply with provisions of consent decree governing population levels at one of the City's jails); *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2016 U.S. Dist.

16

LEXIS 88259, at *2–3, *30 (W.D. Wash. July 7, 2016) (holding defendants, including the Washington State Department of Social and Health Services, in contempt for failing to take "all reasonable steps" "to provide timely services" to the "most vulnerable citizens" in the mental health system, "[d]espite the allocation of tens of millions of dollars," and "impos[ing] monetary sanctions in order to compel compliance with its orders").

"Before holding a party in civil contempt, a court must make two findings: (1) the party must have disobeyed a 'specific and definite court order,' and (2) the party must have 'fail[ed] to take all reasonable steps within [its] power to comply.'" *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). Both prongs are satisfied here.

This Court's orders are "specific and definite." This Court has reiterated time and again what the Agreement requires of Defendants and which actions (or failures to act) have perpetuated violations of the Agreement. *See, e.g.*, April 24, 2020 Order [Doc. # 784]; *Flores*, 394 F. Supp. 3d at 1069–70; *Flores*, 212 F. Supp. 3d at 877. In particular, as explained in Section III, *supra*, this Court has repeatedly instructed the Government to comply with Paragraphs 12, 14, and 18 of the Agreement.

The Government has failed to take "every reasonable step" to comply because it has made "little conscientious effort" to do so. *Stone*, 968 F.2d at 857 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976)). This Court already has found, on multiple occasions, that the Government has taken no steps or entirely inadequate steps to comply with this Court's Orders. Since the Government persists in ignoring its Orders, the Court should hold the Government in contempt and impose an accompanying, coercive sanction. *Gen. Signal Corp.*, 787 F.2d at 1380 ("Sanctions for civil contempt may be imposed to coerce obedience to a court order"); *Trueblood*, 2016 U.S. Dist. LEXIS 88259, at *27 (imposing monetary sanctions for the purpose of compelling compliance).

### B. Order Compensation and Equitable Relief to Class Members Whose Rights have been Violated

This Court has the power, in light of the Government's breach, to order compensation and other equitable relief as redress for the resulting harm to Class Members. *TNT Marketing, Inc. v. Agresti*, 796 F. 2d 276, 287 (9th Cir. 1986) ("The district court's enforcement power included authority to award damages for failure to comply with the settlement agreement."). Given that violations of Class Members' rights under the Settlement—and in particular the rights currently at issue before this Court—result in mental and physical harm and suffering[16] which does not cease when the violation terminates, compensation which directly addresses the harm to Class Members and provides for Class Members' ongoing recovery following release from detention is appropriate. *Amici* therefore propose the following remedies for the Court's consideration:

- Mental health services following Class Members' release from detention, at Government expense, for any Class Member who has been detained for more than 20 days;

---

[16] The physical and psychological harm caused by detention has been well documented by experts.  *See, e.g.*, American Immigration Lawyers Association, AILA Doc. 15062537 (June 25, 2015), https://www.aila.org/advo-media/press-releases/2015/impact-family-detention-mental-health/complaint-crcl; Report of the ICE Advisory Committee on Family Residential Centers, (Oct. 7, 2016), bit.ly/39BTHLg; Physicians for Human Rights, T*he Impact of Immigration Detention on Migrant Mental Health*, PHR Issue Brief (Oct. 2018), https://go.aws/2SbHh74; Physicians for Human Rights, Letter to Sec. Kirstjen Nielsen Regarding the Detention of Infants (Feb. 2019), https://www.aila.org/infonet/complaint-urges-immediate-release-of-infants; American Academy of Pediatrics, *Recommendations for Preventive Pediatric Health Care* (March 2019), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf; American Academy of Pediatrics, *Pediatrics*, "Detention of Immigrant Children," (March 2017), https://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483 (expert consensus has concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children).

- Automatic enrollment in a state-operated public or charter school for all children who are detained 20 days to ensure children are afforded a full-school day, educational field trips, grade-level curriculum that bears transferable credit, language services, an individualized education program when appropriate, formal transcripts, and registration for state and federal standardized testing;

- Compensatory damages for violations of the FSA, to be paid into a trust established on behalf of affected Class Members, equal to the daily cost of detention per Class Member or another amount deemed appropriate by the Court, for each day a Class Member is detained beyond 20 days absent a Court-approved sworn statement from the ICE Juvenile Coordinator documenting the reasons a child is a flight risk or danger;[17] and

- Weekly COVID-19 saturation testing for all individuals detained at FRCs and all facility and Government staff who work there.[18]

### C. Order Specific Performance for the Government's Breaches of the FSA in Order to Bring it into Compliance.

This Court also has the authority to order specific performance of the FSA under long-settled common law contractual principles in light of the Government's breach, as well as to craft other equitable relief to remedy the harm caused by the Government's breach and resulting violations of Class Members' rights. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1167 (9th Cir. 2015) ("Specific performance is a remedy associated with breach of contract.") (citing Restatement (Second) of Contracts § 357); *see also United States v. Paradise*,

---

[17] If the Court finds that payment in compensation is not appropriate in this matter, the Court may in the alternative order such payment as punitive damages for the Defendants' ongoing violations of the Agreement.

[18] Centers for Disease Control and Prevention, *Testing Guidelines for Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html (last updated July 21, 2020).

480 U.S. 149 (1987) (affirmative action order was appropriate because it was tailored to remedy noncompliance with consent decree causing specific rights violation). Where, as here, monetary damages are not by themselves adequate to address the Government's past and ongoing failure to place Class Members in FSA-compliant facilities and make and record efforts at their release, as required by Paragraphs 12, 14, and 18, an order in equity is appropriate and necessary.

## V.   *Amicus Curiae*'s Response to Class Counsel's Proposed Remedy

Class Counsel's proposed remedy requires Class Members to elect between their contractual, bargained for rights to (1) safe and sanitary conditions, (2) placement in unsecure, licensed facilities, (3) a presumption of release from detention, and (4) reunification to their parent in the first instance. The rights afforded to Class Members by the Agreement do not require children to pick and choose—the Government has promised to provide each and every right detailed in the FSA. Class Counsel seeks Court approval of a mechanism that mandates Class Members relinquish one right in order to receive the benefit of another. In direct conflict with the terms and spirit of the Agreement, this remedy gives Defendants permission to indefinitely detain Class Members or separate them from their parents.

The Government has the ability and duty to meet all its obligations. If it chooses not to perform, the remedy for its refusal to act is contempt, not the gratuitous get-out-of-jail-free card proposed by Class Counsel. For this reason, as detailed below, Class Counsel's proposed remedy creates an improper modification of the FSA that conflicts with contract law and the preliminary injunction order in *Ms. L. v. United States Immigration & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

### A. Plaintiff's Proposed Waiver Constitutes an Improper Modification of the FSA.

Class Counsel proffers a "Know Your Rights" protocol that imposes a new condition outside the four corners of the FSA with regard to Class Members detained at

the FRCs—consent to separate from their accompanying parents—and states that if such consent is not given, their right to release under the FSA is essentially waived. Rather than merely giving notice to Class Members of their rights under the FSA, the proposed advisal and protocol would dramatically curtail the rights bargained for by Class Members, who would assuredly object to the proposed modification should this matter proceed to a fairness hearing. However, as proposed by Class Counsel, any such modification would be both procedurally improper and contrary to law.

As this Court and the Ninth Circuit have recognized many times, the FSA is a consent decree that, as a final judgment of this Court, may be modified only through a motion for relief from the judgment under Rule 60(b). *See Flores v. Sessions,* 862 F.3d 863, 874 (9th Cir. 2017) (citing *Flores,* 828 F.3d at 909). No such motion is currently pending before the Court. Indeed, the Court's request was that the parties develop a protocol to notice Class Members of their rights under the FSA—not to alter the rights that the FSA provides.

Nor would the standards for modification of the FSA be met here. That it may no longer be convenient for the parties to adhere to the terms of a consent decree is insufficient to justify modification; instead, a party seeking modification of a consent decree must initially show "a significant change either in factual conditions or the law." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992); *see also United States v. Asarco Inc.*, 430 F.3d 972, 979–82 (9th Cir. 2005) (explaining that *Rufo* applies "to all petitions brought under [Federal Rule of Civil Procedure] 60(b)(5)" to modify consent decrees). The requirements here are significant; as the Ninth Circuit has already held and reiterated in denying modification in this very litigation, "[a] party seeking to alter the terms of a consent decree 'bears the burden of establishing that a significant change in circumstances warrants revision of the decree.'" *Flores,* 828 F.3d at 909 (quoting *Rufo*, 502 U.S. at 383).

The Government's intentional and deliberate failure to comply with the Agreement, demonstrating its routine disregard of its obligations under the FSA even

21

after multiple orders of this Court over a period of five years spanning two administrations, does not constitute a significant change in circumstances such that the Court should modify the FSA to excuse its noncompliance. Nor may any modification of the original agreement be properly achieved through adding a new precondition (consent to separate) to a notice of rights in order for Class Members to retain the relief they were already guaranteed by the FSA.

Also, there has not been any change in law that would warrant the bold revision to the FSA that Class Counsel now proposes. The current Administration's alterations to asylum policy and practice, with no change in the underlying statute or relevant regulations, in order to issue negative credible fear determinations to the majority of asylum-seekers do not constitute a significant change in law justifying modification. "When the basis for modification is a change in law, the moving party must establish that the provision it seeks to modify has become 'impermissible.'" *Flores,* 828 F.3d at 909–10 (quoting *Rufo,* 502 U.S. at 388). That standard is simply not met on these facts. Further, any waiver of Class Members' rights under the FSA would require their informed, knowing and voluntary consent, yet the advisal's core premise is that Class Members may consent to waive their rights to release through silence. *See* Pls.'s Mot. to Enforce Settlement of Class Action, Exhibit B [Doc. # 919-2] ("*You are not required to make any decisions.* If you do not make any decisions, your child(ren) may lawfully continue to be detained together with you."). The law is clear that as a general rule, "silence or inaction does not constitute consent acceptance of an offer." *Norcia v. Samsung Telecomm. Am., LLC,* 845 F.3d 1279, 1284 (9th Cir. 2017) (quotations and citations omitted). This bedrock principle of contract law has remained unchanged over the years since the FSA was entered as a consent decree of this Court.

This Court has found that the Government is in breach of multiple provisions of the FSA. August 7, 2020 Order [Doc. # 912]. Rather than presenting a solution to the Court in which Class Members may exercise the rights currently being violated by the Government, Class Counsel's proposed protocol would *legitimize* the Government's

22

1   unlawful actions after the fact (via a new extracontractual condition) in a manner

2   adverse to the interests of Class Members.

3   **B. Class Counsel's Proposed Waiver Conflicts With Contract Law and the Preliminary Injunction in *Ms. L.***

4

5   Class Counsel's proposed waiver of *Flores* rights based on a Class Member's

6   failure to consent to separate from their parent does not hold up under the basic

7   principles of contract law. Class Members have the contractual, bargained-for right to

8   (1) safe and sanitary conditions, in (2) *Flores*-compliant unsecure, licensed facilities,

9   and (3) release without needless delay. FSA ¶¶ 12, 14, 18 and 19. Class Members also

10  have a constitutional right to family unity. *Ms. L.*, 310 F. Supp. 3d at 1149–50. Class

11  Members' rights are not "pick and choose"—the Government has the legal obligation

12  to comply with all terms of the FSA *as well as* its constitutional obligations. The

13  government has had almost three decades to provide safe and sanitary, unsecure,

14  licensed facilities. It has chosen not to do so (despite being ordered by this Court on

15  multiple occasions to comply) and has offered no justification for its continued non-

16  compliance.

17  In this case, the parties are of grossly unequal bargaining power, and Class

18  Members would only be giving up relief that they previously bargained for in any

19  "consent" to separate or from any waiver of *Flores* rights. As Class Counsel has pointed

20  out repeatedly, the FSA is a contract, and waiver of rights is always possible under

21  contract law. However, factors to consider in determining the validity of a purported

22  contractual waiver include the clarity of the contractual language itself, the relative

23  bargaining power of the parties, whether the waiving party received a benefit, and the

24  party's ability to understand the provisions of the contract. *United States v. Mountain*

25  *Village*, 424 F.Supp. 822, 825 (D. Mass. 1976) (citing *United States v. Wynn*, 528 F.2d

26  1048, 1050 (5th Cir. 1976)). Where one or more of those factors are not present, courts

27  have routinely found purported "waivers" to be invalid. *See, e.g., Fuentes v. Shevin*, 407

28

23

U.S. 67, 95 (1972) (invalid waiver where waiver not bargained over, unequal bargaining power, contract of adhesion, and "fine print . . . relied upon as a waiver of constitutional rights"); *National Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977) (no waiver where unequal bargaining power); *Gray v. Zurich Ins. Co.*, 419 P.2d 168 (1966); *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441 (1963).

To require consent to separate in a detention setting (highlighting the gross inequality of the parties) in order to protect Class Members who are children from exposure to COVID-19 during a pandemic requires Class Members to sacrifice two of their bargained-for rights under the FSA in order to avoid separation from their parent: (1) the right to safe and sanitary conditions in *Flores*-compliant facilities; and (2) the right to release without unnecessary delay. Refusal to "consent" to separate means that Class Members in effect waive both rights under Class Counsel's proposed protocol as they remain detained in unsafe facilities rife with COVID-19. And any "choice" between one of two rights that Class Members already have under the agreement or losing both rights is *per se* not a benefit.

Class Counsel's proposed waiver is also incompatible with the Government's obligations under the preliminary injunction in the *Ms. L.* litigation. The Government is currently enjoined, in relevant part, from detaining accompanied *Flores* Class Members without and apart from their parents, absent a determination that the parent is unfit or presents a danger to the child, unless the parent "affirmatively, knowingly, and voluntarily" declines to be reunited with the child in DHS custody. *See Ms. L.*, 310 F. Supp. 3d at 1149–50. The injunction further provides that if the Government chooses to release the parents, they may not continue to detain accompanied *Flores* Class Members and must release them to their parents' custody unless there is a determination that the parent is unfit or presents a danger to the child, or the parent "affirmatively, knowingly, and voluntarily declines" to be reunited with the child, and that the Government is prohibited from removing parents without their children unless the parent "affirmatively, knowingly, and voluntarily" declines to be reunited with the child

24

1  prior to the parent's deportation, or there is a determination that the parent is unfit or

2  presents a danger to the child. *See id.* at 1150.

3       As noted above, Class Counsel's proposal states that failure to "consent" to

4  separate would render continued detention of Class Members with their accompanying

5  parents lawful. Silence is not "affirmative." "Consent" to separate cannot be

6  "voluntary" if the only alternative is exposure of the Class Member to COVID-19 in an

7  FSA non-compliant facility; nor can it be "knowing" without information regarding the

8  full legal consequences of that separation. Notably, Class Counsel's proposal indicates

9  that the consent to separate can be given or withdrawn only while Class Members

10  remain with their accompanying parents; there is no information whatsoever given

11  regarding the long-term legal consequences of that separation.

12       Finally, *Amici* note that the "binary choice" forced upon Class Members by the

13  Government's ongoing violations (to either separate from their accompanying parents

14  or risk exposure to a deadly virus), if adopted, would cause this Court to become the

15  first court in the United States to place its imprimatur of approval on the current

16  Administration's policy (enjoined in *Ms. L.* and disingenuously decried by the

17  Government in its opposition) of family separation.

18  **VI.   *Amicus Curiae*'s Response to the Government**

19       Unsurprisingly, the Government has offered the Court no solution for its own

20  deliberate and continuing breach of its obligations under the FSA. *See* Defs.' Opp. to

21  Mot. to Enforce Settlement of Class Action ECF. No. 919 [Doc. # 923]. To the extent

22  that the Government argues that the "binary choice" protocol presented as a solution by

23  Class Counsel is neither lawful pursuant to the preliminary injunction in *Ms. L.* litigation

24  nor viable, nor is it provided for in the FSA, *Amici* agree. *See generally, id.* However,

25  the Government's evinced intent to do nothing, and to continue to detain Class Members

26  indefinitely in secure, unlicensed facilities that fail to meet the minimum standards of

27  the FSA—particularly during a pandemic cannot be the alternative.

28       The Government's position that there is nothing that addresses "what to do when

the child is already in custody with a parent" is simply incorrect as a matter of law. *Id.* at 7 (citation omitted). There is a clear mandate under 8 C.F.R. § 1236.3, as described above, that the Government must, at a minimum, evaluate whether release of the Class Member with the detained parent is viable. *See supra* Section III.A. This clear and commonsense solution was recognized at the inception of this consent decree. *Reno v. Flores*, 507 U.S. 292, 310 (1993). The absence of compliance speaks for itself, despite the Government's protestations to the contrary. "ICE evaluates all families for release together in the first instance, but in situations where ICE determines that release of the parent is not appropriate, continued custody of children with their parents is appropriate and consistent with the Agreement." *See* Defs.' Opp. to Mot. to Enforce Settlement of Class Action ECF. No. 919, at 1 [Doc. #923].

The Government's *de facto* position that it should be permitted to indefinitely detain Class Members along with their accompanying parents is not a new one, and the Court has already rejected it repeatedly.  Most recently, the Court stated:

> But the Court reminds Defendants—yet again—that "hold[ing] minors in indefinite detention in unlicensed facilities, . . . constitute[s] a fundamental and material breach of the parties' Agreement." *Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 U.S. Dist. LEXIS 232395, 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018). ICE therefore must still comply with the Agreement's requirement to release minors without unnecessary delay and "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." Agreement ¶¶ 12, 14. And, "[t]o be clear, the Court will not dictate how Defendants must exercise their discretion to parole or release minors in every single case—instead, the Court will order Defendants to comply with the unambiguous charge of the *Flores* Agreement to make *individualized* determinations regarding a minor's flight risk rather than blanket determinations. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1067 (C.D. Cal. 2017).

*See* March 28, 2020 Order, at *10 [Doc. # 740]. Yet the Government has defied multiple orders of this Court to make and record such individualized determinations.

This Court has rejected, on multiple occasions, the Government's attempts to indefinitely detain Class Members. This Court further previously rejected the Government's request to deny Class Members bond hearings pursuant to Paragraph 24A, and rejected the Government's attempts "to construe the TVPRA in a way that could result in the indefinite detention of unaccompanied children without the due process protection offered to adult detainees through a bond hearing." *See Flores v. Lynch*, 392 F. Supp. 3d 1144, 1151 (C.D. Cal. 2017) (citing *Rodriguez v. Robbins*, 804 F.3d 1060, 1081–84 (9th Cir. 2015) (adults in immigration custody may not be subjected to prolonged detention without a bond hearing), *reversed by Jennings v. Rodriguez*, 138 S. Ct. 830, 200 L. Ed. 2d 122 (2018).

The Court also rejected the Government's efforts to gut Class Members' rights under the FSA and codify prolonged detention in 2019, when the Government proposed new regulations attempting to replace the Agreement. *See Flores*, 407 F. Supp. 3d 909. Given DHS's "doubling down" on their intent to establish prolonged detention "in order to avoid the need to separate or release families in these circumstances," this Court determined the new regulation is "inconsistent with one of the primary goals of the *Flores* Agreement, which is to instate a general policy favoring release and expeditiously place minors 'in the least restrictive setting appropriate to the minor's age and special needs.'" *Id.* at 918 (citing FSA ¶¶ 11, 12, 14).

Counsel for the Government stated quite plainly to the Court that it had nothing further to offer in negotiations with Class Counsel regarding a remedy to address its continuing breaches of its obligations under the FSA, and that it would be best if the Court constructed and ordered a remedy. As the Government proffers no solution to the Court, *Amici* has nothing further upon which to comment, other than to reiterate the remedies outlined in Sections III and IV, above.

27

## VII.  **Conclusion**

The Government's substantial and harmful past and ongoing failure to comply with Paragraphs 12, 14, and 18 of the FSA merit remedies from this Court based both on its authority to enforce a contract as well as its power to resolve violations of Class Members' legal rights. The proposed remedies outlined above are specific to remedy the Government's violations, are within the Court's power to enforce the FSA, and are reasonable and appropriate to redress and prevent future violations and harm to Class Members.

DATED: August 28, 2020                 NELSON & FRAENKEL LLP

                                       /s/ *Gabriel S. Barenfeld*
                                          Gabriel S. Barenfeld


                                       Manoj Govindaiah, Esq.
                                       Director    of    Family    Detention
                                       Services
                                       RAICES
                                       (Admitted *Pro Hac Vice* )


                                       Bridget Cambria, Esq.
                                       Executive Director
                                       ALDEA - The People's Justice
                                       Center
                                       (Admitted *Pro Hac Vice*)

                                       *Attorneys for Amici*