Bridget Cambria, Esq.
Executive Director
ALDEA - The People's Justice Center
532 Walnut St.
Reading, PA 19601
bridget.cambria@cambriaklinelaw.com
(Admitted *Pro Hac Vice*)

Manoj Govindaiah, Esq.
Director of Litigation
RAICES
802 Kentucky Ave
San Antonio, Texas 78201
manoj.govindaiah@raicestexas.org
(Admitted *Pro Hac Vice*)

Gretchen M. Nelson (SBN 112566)
Gabriel S. Barenfeld (SBN 224146)
NELSON & FRAENKEL, LLP
601 S. Figueroa Street, Suite 2050
Los Angeles, CA 90017
gnelson@nflawfirm.com
gbarenfeld@nflawfirm.com

*Attorneys for Amici*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | Case No. CV-85-4544-DMG |
| Plaintiffs, | CLASS ACTION |
| v. | |
| WILLIAM P. BARR, Attorney General of the United States, *et al.*, | RESPONSE BRIEF OF *AMICI CURIAE* TO THE AUGUST 2020 INTERIM REPORT OF THE IMMIGRATION AND CUSTOMS ENFORCEMENT JUVENILE COORDINATOR |
| Defendants. | |
| | Judge: Hon. Dolly M. Gee |

1

# **TABLE OF CONTENTS**

2

I.     Introduction……………………………………………………………1

II.    Summary of Argument……………………………………………...2

III.   The JC Report is incomplete and non-responsive to the Court's
Instructions for Issues to Be Addressed in ICE's Interim JC
Reports……………………………………………………………3

      A. The JC Report is non-responsive to the Court's August 7, 2020
Order………………………………………………………....3

      B. The JC Report fails to provide critical information requested by
the Court in its April 24, 2020 Order……………………………3

      C. The JC Report fails to include information required by
Paragraph 28A of the FSA……………………………………7

IV.   The JC Report Contains Deficiencies that Have Plagued Prior JC
Reports that Remain Unaddressed…………………………………...8

      A. The JC Report Again Indicates Incomplete Efforts to Make and
Record Efforts to Release Class Members Pursuant to Paragraph
18 of the FSA and This Court's Orders…………………………9

         1. The JC Report fails to provide "specific explanations for the
continued detention of each minor detained at an FRC beyond 20
days."…………………………………………………………..10

         2. The JC Report fails to include explanations of why ICE's
discretion is not being exercised to release the Class Member
along with their accompanying parent, as is required by the FSA
and related regulations……………………………………...11

         3. The JC Report fails to explain the ongoing nature of Class
Members' required individualized assessments………………12

         4. The JC Report fails to include specific information regarding
Class Members' determinations of flight risk or danger to
themselves or others……………………………………...13

      B. The JC report again fails to explain ICE's "measures . . . to
expedite the release of Class Members to suitable custodians
during the COVID-19 health emergency."……………………...14

      C. The JC Report once again mischaracterizes the immigration
status of multiple Class Members and falsely indicates that
removal is imminent for Class Members, when it is not………..18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D. The JC Report yet again fails to confirm critical information regarding COVID-19 testing procedures and room allocation policies at each FRC…………………………………………………20**

**V.     CONCLUSION…………………………………………………………..22**

# TABLE OF AUTHORITIES

## Cases

*Capital Area Immigrants' Rights (CAIR) Coalition v. Trump*, No. 1:19-cv-2117-TJK, Doc. 72 (D.D.C. June 30, 2020)..................................................................*18, 19*

*Flores v. Barr*, No. 2:85-cv-4544 (DMG) (C.D. Cal. Apr. 24, 2020) ................*passim*

*Flores v. Barr*, No. 2:85-cv-4544 (DMG) (C.D. Cal. May 22, 2020) ........................11

*Flores v. Barr*, No. 2:85-cv-4544 (DMG) (C.D. Cal. June 26, 2020) ...............*passim*

*Flores v. Barr*, No. 2:85-cv-4544 (DMG) (C.D. Cal. Aug. 7, 2020)............1, 3, 9, 10

*I.A. v. Barr,* No. 1:19-cv-2530, Doc. 55 (TJK) (D.D.C. June 30, 2020)....................*19*

*O.M.G v. Wolf*, No. 1:20-cv-786-JEB (D.D.C. June 25, 2020)............................16, 20

## Statutes

INA § 212(d)(5)(A) ........................................................................................................ 6

## Regulations

8 C.F.R. § 1236.3(b)(2)...............................................................................................12

## Other Authorities

Centers for Disease Control and Prevention, *Testing Guidelines for Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html (last updated July 21, 2020) ........................................................................................ 4, 21

**RESPONSE BRIEF OF *AMICI CURIAE* TO THE AUGUST 2020 INTERIM REPORT OF
THE IMMIGRATION AND CUSTOMS ENFORCEMENT JUVENILE COORDINATOR**

## I.      Introduction

The ICE Juvenile Coordinator ("JC") filed an interim report on August 24,
2020 (the "JC Report") in response to the Court's April 24, 2020 and August 7, 2020
Orders. *See Flores v. Barr*, No. 2:85-cv-4544 (DMG) (C.D. Cal. Apr. 24, 2020)
("April 24, 2020 Order") [Doc. # 784]; *Flores*, No. 2:85-cv-4544 (DMG) (C.D. Cal.
Aug. 7, 2020) ("August 7, 2020 Order") [Doc. # 932]. On August 27, 2020,
Government counsel initiated contact with *Amici*—Aldea - The People's Justice
Center, RAICES, and Proyecto Dilley—and Class Counsel in an effort to meet and
confer regarding any disputes between the parties related to the JC Report.  *Amici*
invited Government counsel to schedule a telephonic meet and confer, and provided
Government counsel with a written summary of its primary concerns with the JC
Report so that government counsel had an opportunity to discuss *Amici's* concerns
with ICE. Government counsel subsequently responded to *Amici*'s concerns in
writing, informed *Amici* that she was not available to meet and confer telephonically,
and that she would object to any submissions filed by *Amici* in response to the JC
Report because efforts to meet and confer did not begin until August 27, 2020 and
were initiated by the Government.

Below, *Amici* address the Juvenile Coordinator's August 24, 2020 Report and
document the response provided by Government counsel to each of *Amici*'s concerns

via electronic correspondence. As of today, August 28, 2020, no resolution to the issues presented has been secured.

## II.    Summary of Argument

Nothing in *Amici's* brief regarding the August 24, 2020 JC Report will surprise the Court. The JC Report is marred with the same errors this Court has repeatedly sought to correct. It is incomplete and non-responsive to this Court's August 7, 2020 and April 24, 2020 Orders, and the reporting requirements of the Agreement itself. It confirms that Defendants continue to ignore its obligation to make and record efforts to release Class Members; Class Member individual summaries include no personalized information, no information regarding why a child's proposed parent-sponsor has been denied discretionary release, and no information regarding danger or risk of flight. The JC Report also fails to indicate even a single procedure that ICE has employed to expedite Class Members release from custody. Although this Court has previously found that FRCs are failing at the "basics" to ensure safe and sanitary conditions during the COVID-19 pandemic, ICE has yet to establish regular saturation testing as recommended by the Centers for Disease Control ("CDC") and has failed to confirm that families held in FRCs continue to be housed in individual dormitories to ensure social distancing. Lastly, the JC Report once again mischaracterizes the status of Class Members' immigration proceedings.

In sum, the JC Report fails to provide this Court with critical information relevant to ICE compliance and reveals yet again, through the absence of information,

that the Government has made no progress towards compliance since the last JC Report.

**III.    The JC Report is incomplete and non-responsive to the Court's Instructions for Issues to Be Addressed in ICE's Interim JC Reports.**

> **A. The JC Report is non-responsive to the Court's August 7, 2020 Order.**

The Court's August 7, 2020 Order instructed the JC to file an interim report detailing "*specific* explanations for the continued detention of each minor detained at an FRC beyond 20 days." August 7, 2020 Order, at *5 (emphasis in original) [Doc. # 912]. As detailed below*, Amici* assert that the JC report fails to document specific explanations for why 110 Class Members[1] remain detained in FRCs.

> **B. The JC Report fails to provide critical information requested by the Court in its April 24, 2020 Order.**

The Court's April 24, 2020 Order ordered the ICE JC to address four separate categories of information in her ongoing reports. April 24, 2020 Order, at *20–21 [Doc. # 784]. First, the Court directed the JC to report on the "[m]easures taken to expedite the release of Class Members to suitable custodians during the COVID-19 health emergency, including whether ICE is making individualized release determinations and redeterminations for each Class Member remaining in custody at FRCs longer than 20 days" and the specific reason therefore. *Id.* As detailed *infra,*

---

[1] This figure represents the number of Class Members indicated by the JC Report, and does not reflect the changes in population at the FRCs that may have occurred since August 24, 2020. JC Report at 2 [Doc. # 932-1]

ICE has failed to provide this information. The information provided by the JC regarding the reasons Class Members remain in custody reflects an identical cut and paste explanation for 71 of 83 individual Class Members reflected in Attachment A to the JC Report and the information provided to the Court is more or less identical to the information previously provided to the Court by the JC on May 15, 2020 [Doc. # 788-1], June 10, 2020 [Doc. # 813-1], and July 24, 2020 [Doc. # 882-1]. *See* August 24, 2020 JC Report [Doc. # 932-1].

Second, the JC was ordered to report on the "status of ICE's implementation of its COVID-19 guidances," and "[i]dentify the location of any ICE facility that has had any individual, whether detainee or staff member, test positive for COVID-19, and provide a status report and census of those infected at that facility during the reporting period." April 24, 2020 Order, at *21 [Doc. # 784]. The JC Report fails to clarify how, if at all, COVID-19 policies and practices at each FRC have changed since the JC's July 24, 2020 report. While the JC has provided numbers related to COVID infection at each facility, *Amici* question the reliability of these numbers based upon ICE's failure to conduct saturation testing since June 23 and 24, 2020 as recommended by the CDC for congregate care facilities.[2] *See* Interim Report on

---

[2] *See* Centers for Disease Control and Prevention, *Testing Guidelines for Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html (last updated July 21, 2020) (recommending "expanded viral testing of all residents in the nursing home if there is an outbreak in the facility").
.

COVID-19 by Independent Monitor (June 25, 2020) [Doc. # 827]. To the extent the JC report identifies the number of individuals who are currently detained at the FRCs who have tested positive for COVID-19, that information is insufficient to satisfy the Court's order to provide a "census of those infected at the facility." April 24, 2020 Order, at *21 [Doc. # 784]. The JC Report further fails to explain whether the individual detained in Dilley indicated as symptomatic by ICE is a child or a parent and provide a "status report" on that individual, including information such as where they are being treated, and, if the individual is an adult, who is caring for the child while the mother is sick. *See* JC Report at 5–6 [Doc. # 832-1].

Third, the JC was ordered to report the "specific reasons" Class Members detained in a congregate care facility with reported COVID-19 positive tests "have not been released or transferred to a non-congregate setting." April 24, 2020 Order, at *21 [Doc. # 784]. There are confirmed positive tests at both the Dilley and Karnes FRCs, and the JC offers no explanation for why the Class Members detained in each facility have not been transferred to a non-congregate setting. The JC Report reiterates the same explanation provided in the July 2020 Interim Report: Class Members remain detained in COVID-19-infested facilities because (1) "they are either in quarantine or cohorting based on CDC guidance as a result of testing positive for COVID-19" or (2) they are detained with their parent "whose release is not appropriate." JC Report at 5–6 [Doc. # 932-1]; *see also* July 2020 JC Report at 8–9 [Doc. # 882-1]. These explanations are non-responsive to the Court's ask. First, as

explained further in Section IV.B below, the fact that an individual must be quarantined or cohorted *does not* require them to remain in ICE custody. Second, while the JC Report argues that the waiver protocol before the Court explains the failure to provide the Court with additional information, this explanation is insufficient because: (1) ICE is the reason no protocol currently exists; (2) ICE can detain parents and children together in non-congregate care settings; and (3) ICE can *always* exercise its discretion under Section 212(d)(5)(A) of the Immigration and Nationality Act to release families together—which *Amici* contend is particularly warranted during the humanitarian crisis presented by the COVID-19 pandemic.

Lastly, the Court ordered the JC to "[d]escribe any policies and/or practices aimed at identifying and protecting minors who are at heightened risk of serious illness or death should they contract COVID-19." April 24, 2020 Order, at *21 [Doc. # 784]. This JC Report, like the prior one, was also non-responsive to this question. *See* July 2020 JC Report [Doc. # 882-1]; *Amicus Br.* at 10–11 (Aug. 6, 2020) (describing same deficiency in the July 2020 JC Report). *Amici* assert information provided by the JC should have included, but not been limited to:

- Details regarding how medical staff evaluate whether a child or accompanying parent is at heightened risk of serious illness or death should they contract COVID-19;
- How medical staff monitor the health status of individuals who are determined to be particularly vulnerable to COVID-19 over time;
- What additional housing, scheduling, testing, evaluation, or quarantining procedures ICE utilizes to provide extra protections to

individuals with medical conditions that make them vulnerable to
COVID-19; and

- How medical assessments and findings are provided to and considered
by ICE to facilitate ongoing release determinations.

None of this information was provided in this iteration of the JC's report, and

it should have been, per this Court's prior order.

## C. The JC Report fails to include information required by Paragraph 28A of the FSA.

Paragraph 28A of the Agreement requires the Juvenile Coordinator to report

statistical information, including: (1) a minor's name, date of birth, and country of

birth, (2) the date a minor was placed in custody, (3) the date a minor was placed,

removed or released, (4) to whom and where a minor was placed, transferred,

removed or released, (5) a minor's immigration status, and (6) a minor's hearing

dates. In addition, the Juvenile Coordinator is required to report information

regarding the reasons a minor has been placed in a medium security facility. The JC's

Report does not include the following pieces of information, as required[3]:

1. Date a minor was placed in custody, as relevant to the total number of
days each Class Member has been detained;
2. Date a minor was placed, removed, or released, which is necessary for
the Court to determine whether the amount of time each child has spent

---

[3] Although Paragraphs 28A and 29 of the FSA require reporting on a semi-annual
basis, the Court has ordered reporting with additional frequency and these data points
should therefore be included in the JC's interim reports. To the extent the Government
argues, or Court believes, these statistics were not mandated by the Court's recent
Orders, *Amici* suggest the Court consider making these additional pieces of
information required in future interim reports.

in custody prior to release or removal reflects compliance with the Agreement;

3. With whom and where a minor was placed, transferred, removed, or released, information that will aid the Court in monitoring whether ICE has, or will, separate Class Members from their parents and place them with other adult sponsors;

4. A minor's immigration status, which is relevant to the Court's ongoing assessment of whether ICE continues to base its release determinations on a child's immigration status;

5. A minor's hearing dates, if any, which would inform the Court regarding whether a minor's "immigration proceedings are concluded" as relevant to Paragraph 19 of the Agreement; and

6. The reasons for placing each minor in a secure facility[4], reasons the government is required to explain to every Class Member in writing pursuant to Paragraph 24C of the Agreement, and has failed to do.

## IV.   The JC Report Contains Deficiencies that Have Plagued Prior JC Reports that Remain Unaddressed.

While the JC Report remains unresponsive to various provisions of this Court's prior orders, of particular concern to *Amici* is the JC Report's failure—yet again—to indicate that ICE is appropriately "making and recording" efforts to release Class Members; making efforts to release Class Members during the COVID-19 pandemic; correct mischaracterizations of Class Members' immigration status; and describe steps taken at the FRCs to address the spread of COVID-19. *Amici* have previously alerted the Court as to these deficiencies in their prior *amicus* filings in response to the June and July 2020 ICE JC Reports. *See* Amicus Br. (June 25, 2020) [Doc. #

---

[4] All determinations to place a minor in a secure facility must be reviewed and approved by the regional Juvenile Coordinator. FSA ¶ 23.

826]; Amicus Br. (August 6, 2020) [Doc. # 903].

**A. The JC Report Again Indicates Incomplete Efforts to Make and Record Efforts to Release Class Members Pursuant to Paragraph 18 of the FSA and This Court's Orders.**

*Amici* raised this concern to Government counsel. In response to this concern, Government counsel indicated that "It is not clear what *Amici* are asking Defendants to do here. Please identify precisely what you are asking Defendants to do with regard to this concern." Government counsel also stated that "Parents are not Class Members and are not covered under the FSA. If you contend that Defendants are required to report this information in conjunction with the *Flores* litigation please explain the basis for your contention."

As detailed in *Amici*'s concurrently filed August 28, 2020 brief addressing proposed remedies, *Amici* urge the Government to make and record efforts towards release that provide *specific* explanations as to why Class Members remain in custody—as is its obligation under the *Flores* Settlement Agreement ("FSA" or "Agreement"). *See* FSA ¶ 18. Every day, the Government makes and records efforts to expeditiously release unaccompanied children from the care and custody of the Office of Refugee Resettlement ("ORR"). *See, e.g.*, ORR Juvenile Coordinator Report (July 1, 2020) [Doc. # 837-3]. The Court has expressed no qualms with the procedure for reunification described in the ORR Juvenile Coordinator's Annual Report. *See* August 7, 2020 Order (raising no issues with ORR's process and

9

requesting only explanations for delays in fingerprinting and home studies for Class

Members in ORR custody). The Government therefore has multiple examples of the

type of information that is necessary and appropriate to provide the court when

documenting why Class Members remain detained.

> 1. The JC Report fails to provide "specific explanations for the
> continued detention of each minor detained at an FRC beyond 20
> days."

As *Amici* have previously raised, the Government continues to be deficient in

its obligations under Paragraphs 14 and 18 of the FSA. As previously noted,

Attachment A to the JC Report contains primarily cut and paste explanations for each

Class Members' continued custody. *See* JC Report [Doc. # 932-1].[5] ICE is required

to provide specific, *individualized* determinations for why each minor remains in ICE

custody. *See* August 7, 2020 Order [Doc. # 912]; *Flores*, No. 2:85-cv-4544 (DMG)

(C.D. Cal. June 26, 2020) ("June 26, 2020 Order"). The generic explanation provided

for each Class Member simply does not meet the requirements set by the FSA:

> This minor may be eligible for individual release if the
> parent designates a caregiver to whom the minor can be
> released. As of today, a parent has not designated a
> caregiver or requested that the minor be released
> separately from her or him. ICE will determine the minor's
> eligibility for release with the consent of a parent or
> guardian in accordance with any future order or decision
> issued by the court. The minor has final order of removal
> but cannot be removed at this time because the

---

[5] To the extent that more expansive explanations were provided in Exhibit A to the
JC Report, those explanations are not available to *Amici*, despite each organization
being immigration counsel for Class Members at Berks, Dilley, and Karnes.

minor/family unit is subject to an administrative stay of removal issued by the U S. District Court for the District of Columbia on 07/23/20 in D A.M. v. Barr.

JC Report, Attachment A [Doc. # 932-1].

As *Amici* have previously stated, ICE has credited the parents' failure to separate from their child as the reason for Class Members' continued detention. *See* Amicus Br. at 8 (June 25, 2020) [Doc. # 826]. The blanket explanations included in the JC Report are not sufficient justifications for each child's continued detention, which must instead be *specific*, *individualized*, and related to the criteria in Paragraph 14 of the FSA. *See* April 24, 2020 Order, at *20–21 [Doc. # 784]; *Flores*, No. 2:85-cv-4544 (DMG), at *3 (C.D. Cal. May 22, 2020) [Doc. # 799]; June 26, 2020 Order, at *5 [Doc. # 833].

> 2.  <u>The JC Report fails to include explanations of why ICE's discretion is not being exercised to release the Class Member along with their accompanying parent, as is required by the FSA and related regulations.</u>

As more thoroughly explained in *Amici*'s concurrently filed brief addressing this Court's call for proposed remedies to the Government's breach of the FSA, the Government has failed to comply with the mandate in Paragraph 18 of the FSA to "make and record" efforts to release Class Members. Although the Government contends that it does not need to consider the release of the accompanying parent when evaluating the release of a Class Member, this position is inconsistent with the FSA's inherent focus on family unity and the Government's concurrent obligations

11

to comply with 8 C.F.R. § 1236.3. *See* Defs.' Opp. to Mot. to Enforce Settlement of Class Action ECF. No. 919 [Doc. # 923].

The *Flores* Settlement Agreement is a legally binding contract that enshrines a Class Member's right to family unity, prompt release, and the opportunity to be released to and with their parents in the first instance. FSA ¶¶ 11, 19. The JC Report's failure to include any determination as to whether a Class Member *could* be released to their accompanying parent, and if not why not, flies in the face of the Government's mandatory duties to "make and record" efforts at release under the FSA and to consider release to a parent—*even if that parent is detained*—under 8 C.F.R. § 1236.3.

   3. <u>The JC Report fails to explain the ongoing nature of Class Members' required individualized assessments.</u>

Each ICE JC interim report has included cursory information regarding the reasons for each Class Members' detention at an FRC beyond 20 days. However, the JC Report—in this iteration or in prior iterations—fails to describe the frequency with which each Class Member's custody is being reevaluated. Paragraph 18 of the Agreement requires the Government to engage in "prompt and *continuous* efforts . . . towards family reunification and the release of the minor." (emphasis added). To the extent to which the Government is in fact compliant with this directive remains unknown, though based upon the similar and repetitive nature of ICE's justifications for each Class Members' continued detention, *Amici* question whether the

Government is at all consistently evaluating Class Members for release and continually collecting and considering new information relevant to the decision to prolong a child's detention, such as their physical and mental health or the physical and mental health of their parent (which would impact the parent's ability to care for their child in custody).

4. The JC Report fails to include specific information regarding Class Members' determinations of flight risk or danger to themselves or others.

Once again, the JC Report fails to appropriately determine whether or not individual Class Members are flight risks or dangers to the community, as required by Paragraph 14 of the FSA. *See also* Amicus Br. at 5, 11 (June 25, 2020) (explaining that incorrect determinations that a minor will be removed on the "next flight" or their involvement in federal litigation were improper bases on which to qualify a child as a "flight risk") [Doc. # 826]; Amicus Br. at 4–6 (Aug. 6, 2020) (explaining the July 2020's deficiency with regards to providing specific explanations for a Class Members' determination of flight risk or danger) [Doc. # 903].

Release information included in the JC Report also indicates that the Government continues to use Class Members' immigration status as the primary basis for detention or release determinations. As highlighted further below, *Amici*'s internal tracking reflects what the JC Report does not: that the releases included in the reporting period were consistent with ICE's continued policy of releasing Class

Members only when they were in certain procedural postures. The Government's failure to conduct individualized analyses as to Class Members' flight risk or danger to the community pursuant to Paragraph 14 of the FSA flies in the face of this Court's prior orders requiring ICE to provide *individualized* determinations for each Class Member that do not merely categorize them under broad categories such as "pending IJ hearing/decision," "participants in class litigation," or "pending USCIS response." April 24, 2020 Order, at *18 [Doc. # 784]. Although the words in the JC Report's explanations may have been modified, the stagnant nature of Class Members' detention and ICE's failure to include unique information specific to each Class Member indicates that the Government does, in fact, continue to inadequately "assess minors' flight risk, according to the FSA's general policy favoring release." *Id.* And it bears repeating that this Court has been clear that "a final order of deportation *cannot be the dispositive consideration* if removal is not 'imminent' . . . and there are no other indicia of a minor's flight risk." *Id.* (citing FSA ¶ 14) (emphasis added).

> **B. The JC report again fails to explain ICE's "measures . . . to expedite the release of Class Members to suitable custodians during the COVID-19 health emergency."**

When this concern was raised to the Government, government counsel stated: "It is not clear what *Amici* are asking Defendants to do here. Please identify precisely what you are asking Defendants to do with regard to this concern."

This Court ordered the government to "expedite" release of all Class Members

during the COVID-19 pandemic. June 26, 2020 Order [Doc. # 833]; April 24, 2020 Order at *18 (ordering the Government to "make every effort to promptly and safely release Class Members"). In other words, ICE has been ordered to move *as quickly as possible* in releasing Class Members to ensure their safety from congregate care facilities, indicating a sense of urgency and a heightened burden to release Class Members promptly. Instead, the government has (1) established a mandatory 14-day detention policy for all Class Members and (2) continued to maintain a release policy premised almost exclusively on the procedural posture of Class Member's immigration status. *See* April 24, 2020 Order, at *18 (finding the Government's broad categorizations of a Class Members' procedural posture insufficient to explain their continued detention).

Based upon *Amici*'s observations and work with Class Members at the FRCs, no efforts have been made to expedite the release of Class Members. Indeed, the JC Report fails to identify a single new mechanism ICE has put in place to expedite release for children. As of this filing, 78 children that *Amici* are tracking have been detained over 20 days. Of those children, 2 have been detained between 20 and 100 days; 20 have been detained between 101 and 200 days; 3 have been detained between 201 and 300 days; and a staggering 46 have been detained for *more than 300 days.*[6]

---

[6] *Amici* do not have the benefit of complete data due to persistent access to counsel issues at the FRCs, therefore full numbers are known only to ICE.

15

Rather than expediting release for Class Members, the Government has done the exact opposite—establishing a new mandatory detention policy that requires that any family placed at an FRC be placed in quarantine, and not released, for 14 days. JC Report at 5–6 [Doc. # 932-1]. The sole justifications for detention of Class Members under the FSA are flight risk and danger. FSA ¶ 14. As this Court has found, the "house is on fire" at the FRCs, and detaining children there is akin to leaving them in a burning building. June 26, 2020 Order, at *2 [Doc. # 833]. Since the Court's June 26, 2020 finding, the situation has only deteriorated at the FRCs, with now more than 130 reported positive cases of COVID-19 among staff and detained parents and children at the FRCs.[7]

Detention exacerbates the risk of contagion for Class Members and is not necessary to keep Class Members or the community protected from COVID-19. As ICE is aware, the City of San Antonio and numerous NGO's have worked together to create safe, private locations for families to quarantine with access to medical, food, clothing, and other necessities in San Antonio. The hotel rooms and Airbnb's contracted for this purpose provide families with an opportunity to quarantine alone, if needed, free from detention. ICE's mandatory detention policy is counterproductive to keeping Class Members safe, and the exact opposite of what

---

[7] *See* Amicus Br. at 27–28 (Aug. 6, 2020) [Doc. # 903] (summarizing reports of COVID-19 at the FRCs reported by the Government in *O.M.G. v. Wolf*, No. 1:20-cv-786-JEB (D.D.C. Mar. 21, 2020)).

this court has ordered—that children be released "with all deliberate speed." June 26, 2020 Order, at *4 [Doc. # 833].

The Government also continues to use Class Members' immigration status as the guiding factor for release determinations. The JC Report indicates that since July 22, 2020, 126 children have been released from custody into the United States, 21 children have been removed, and 3 children have been returned under Title 42 proceedings. JC Report at 2–3 [Doc. # 932-1]. ICE offers these statistics as proof that ICE is expeditiously releasing children, and doing so in accordance with the Court's orders.

*Amici* disagree with the rosy picture the Government attempts to paint, and remind ICE of its obligations to provide the Court with additional clarifying data in future reports regarding: (1) the procedural posture of each Class Member upon release from detention, (2) the exact number of days each child has been in custody moving forward, and (3) the facility at which each Class Member is detained. *See* FSA ¶ 28A. Absent this additional data, the Court cannot determine whether or not the Government is expeditiously releasing Class Members consistent with its duty to release Class Members "with all deliberate speed" or merely releasing Class Members based on the status of their immigration proceedings. See June 26, 2020 Order, at *4 [Doc. # 833]

**C. The JC Report once again mischaracterizes the immigration status
of multiple Class Members and falsely indicates that removal is
imminent for Class Members, when it is not.**

When raised to Government counsel, counsel responded: "Defendants
disagree with your statement. The ER orders for the Petitioners in *D.A.M.* are final
orders. It is not clear what *Amici* are asking Defendants to do here. Please identify
precisely what you are asking Defendants to do with regard to this concern. Please
also explain whether it is your contention that any of these minors is requesting to be
released separately from his or her parent."

The ICE JC report indicates that 71 Class Members are detained because they
have a final order of removal, when they, in fact, do not. JC Report, Attachment A
[Doc. # 932-1]. These specific Class Members were issued negative credible fear
determinations—a prerequisite for an expedited order of removal becoming final—
based upon the Safe Third Country Transit Bar. In *CAIR Coalition v. Trump*, Judge
Kelly vacated the STCTB regulation in its entirety as it was unlawfully promulgated
in violation of the Administrative Procedure Act, specifically denying the
Government's requests for remand without vacatur, a stay of vacatur and  limitation
of relief to the Plaintiffs in that case. *Capital Area Immigrants' Rights (CAIR)
Coalition v. Trump*, No. 1:19-cv-2117-TJK, Doc. 72 (D.D.C. June 30, 2020); *I.A. v.
Barr*, No. 1:19-cv-2530, Doc. 55 (TJK) (D.D.C. June 30, 2020). As a result, both the
negative credible fear determinations issued to each Class Member and the

subsequent affirmance by the Immigration Judge in each case are based upon an incorrect (and far more difficult to meet) legal standard and the orders of expedited removal themselves are void. *Amici* argue that by operation of law each Class Member has been returned to the *status quo ante* and does not have a final order of expedited removal, ICE lacks legal authority to remove any of these Class Members absent the legal process to which they were originally entitled (a new credible fear interview under the correct legal standard followed by a credible review proceeding before an Immigration Judge if the finding is negative), and removal of each Class Member is therefore not imminent.

These arguments form the basis of the litigation currently pending before Judge Christopher R. Cooper of the District Court for the District of Columbia in *D.A.M. v. Barr*. *D.A.M. v. Barr*, No. 1:20-cv-1321, ECF 26 (D.D.C. July 9, 2020). Although ICE disagrees with *Amici's* position here, *Amici* assert that ICE nonetheless has an obligation to provide more information regarding the imminence of each Class Member's removal in its report to the Court and that a simple statement that "The minor has final order of removal but cannot be removed at this time because the minor/family unit is subject to an administrative stay of removal issued by the U.S. District Court for the District of Columbia on 7/23/20 in *D.A.M. v. Barr*" is misleading, inaccurate, and insufficient for the Court to ascertain whether the government's explanation sufficiently justifies detention. As this Court has already explained, participation in litigation alone *cannot* be the only justification for a Class

Member's detention. April 24, 2020 Order, at *18 [Doc. # 784].

> ### D. The JC Report yet again fails to confirm critical information regarding COVID-19 testing procedures and room allocation policies at each FRC.

In response to the above concern raised by *Amici*, Government counsel replied: "It is not clear what Amici are asking Defendants to do here. Please identify precisely what you are asking Defendants to do with regard to this concern" and "[p]lease provide specific facts (as opposed to rumors) about which you are requesting a response." The statistics clarify that the FRCs remain unsafe and sanitary. Since the inception of this motion to enforce, 76 detained individuals (including at least 2 Class Members currently detained at Dilley)[8] and 70 workers at FRCs have tested positive for COVID-19.[9] This data is not reliable because ICE continues to fail in its duty to conduct ongoing meaningful COVID-19 testing at each facility.   *Amici* assert

---

[8] *See* JC Report, at 5 [Doc. # 932-1].

[9] As previously noted, this information is a result of the COVID-19 positive disclosures required in *O.M.G v. Wolf*, No. 1:20-cv-786-JEB (D.D.C. June 25, 2020): Doc. # 69 (June 26, 2020), Doc. # 70 (June 28, 2020), Doc. # 73 (June 29, 2020), Doc. # 75 (July 1, 2020), Doc. # 77 (July 2, 2020), Doc. # 79 (July 5, 2020), Doc. # 80 (July 7, 2020), Doc. # 81 (July 9, 2020), Doc. # 82 (July 9, 2020), Doc. # 86 (July 12, 2020), Doc. # 90 (July 15, 2020), Doc. # 93 (July 18, 2020), Doc. # 95 (July 20, 2020), Doc # 97 (July 22, 2020), Doc. #104 (July 24, 2020), Doc. # 105 (July 27, 2020), Doc. #108 (July 29, 2020), Doc. #110 (Aug. 3, 2020), Doc. # 111 (Aug. 4, 2020), Doc. # 112 (Aug. 6, 2020), Doc. # 117 (Aug. 13, 2020), Doc. # 118 (Aug. 14, 2020), Doc. # 119 (Aug. 17, 2020), and Doc. # 120 (Aug. 9, 2020). The true number of how many individual children and adults have tested positive for COVID-19 is unknown, however, because many notices simply identify the COVID-19 positive individual as a "new resident," and do not indicate whether that individual is a child or an adult.

saturation testing is needed and required under CDC guidelines—and is even suggested by ICE's own guidelines.[10] The JC report fails to clarify testing procedures at each facility, one of the basics this Court has repeatedly requested information about.

Furthermore, *Amici* wish to confirm ICE's current and future plan regarding room allocation and placement at each FRC. ICE has previously reported that all families detained at FRCs are placed in their own individual room. July 2020 ICE JC Report at 6 [Doc. # 882-1]. *Amici* asked the government to confirm whether ICE has or intends to change its placement procedures by increasing the number of families placed in each room. This question was premised upon (1) the ICE JC's failure to mention any information regarding room distribution in her interim report, and (2) statements made by individuals who are detained at Dilley that more families are arriving and could be required to cohabit in the future. Government counsel did not respond to this question, and instead responded, "Please provide specific facts (as

---

[10] The ERO COVID-19 Pandemic Response Requirements included in the JC Report supports more rigorous testing: "Testing is recommended for all close contacts of persons with SARS-CoV-2 infection. In some settings, *broader testing, beyond close contacts, is recommended as a part of a strategy to control transmission of SARS-CoV-2.* Expanded testing might include testing of individuals on the same unit or shift as someone with SARS-CoV-2 infection, or even testing all individuals within a shared setting (e.g., facility-wide testing)."  JC Report, Attachment B (emphasis added) [Doc. # 932-1]. *See also* Centers for Disease Control and Prevention, *Testing Guidelines for Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html (last updated July 21, 2020) (recommending "expended viral testing of all residents in the nursing home if there is an outbreak in the facility").

opposed to rumors) about which you are requesting a response."

## V.    Conclusion

Once again, the Government has presented the Court with a JC report that is incomplete, inaccurate, and fails to provide the Court with the information it has requested. The information in the JC Report makes clear that the Government continues to renege on its obligations under the Agreement and this Court's orders, and that it has moved slowly—if at all—towards promptly releasing Class Members and protecting them from the COVID-19 outbreak within the FRCs.

DATED: August 28, 2020            NELSON & FRAENKEL LLP

/s/ *Gabriel S. Barenfeld*
        Gabriel S. Barenfeld


Manoj Govindaiah, Esq.
Director of Family Detention Services
RAICES
(Admitted *Pro Hac Vice* )


Bridget Cambria, Esq.
Executive Director
ALDEA - The People's Justice Center
(Admitted *Pro Hac Vice*)

*Attorneys for Amici*

22