CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (Cal. Bar No. 208741)
Neha Desai (Cal. RLSA No. 803161)
Poonam Juneja (Cal. Bar No. 300848)
Freya Pitts (Cal. Bar No. 295878)
Melissa Adamson (Cal. Bar No. 319201)
1212 Broadway, Suite 600 Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM BARR, Attorney General of the United States, *et al.*,<br><br>Defendants. | No. CV 85-4544-DMG-AGRx<br><br>REPLY TO OPPOSITION TO MOTION TO ENFORCE SETTLEMENT RE "TITLE 42" CLASS MEMBERS<br><br>Hearing: Sept. 4, 2020<br>Time: 11:00 a.m.<br>Hon. Dolly M. Gee |

TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.   CHILDREN DESIGNATED FOR TITLE 42 DETENTION ARE ENTITLED TO THE SETTLEMENT'S PROTECTIONS. .......................................................................2

   A.   DHS has plenary decision-making authority over children ostensibly detained under Title 42 and, therefore, they are in DHS's "legal custody." .........2

   B.   All unaccompanied children in HHS custody are members of the class. .....5

III.   CONGRESS HAS PRESERVED THE SETTLEMENT INVIOLATE, AND NOTHING PREVENTS DEFENDANTS FROM COMPLYING WITH THEIR AGREEMENT WHILE CARRYING OUT THE CLOSURE ORDER. .......................................................................6

   A.   Nothing in Title 42 or the Closure Order requires the Court to ignore Congress's solicitude for Plaintiff children. ...........................................................6

   B.   Defendants fail to show how the Closure Order prevents them from affording children prompt, licensed placement. ....................................................9

IV.   ANY AMBIGUITY IN THE SETTLEMENT CAN AND SHOULD BE RESOLVED IN FAVOR OF REQUIRING DEFENDANTS TO PLACE CHILDREN EXPEDITIOUSLY IN LICENSED FACILITIES. ....................................................................................................12

   A.   The Settlement nowhere suggests Defendants should have free rein to deny children licensed placement by facile designation. .............................................12

   B.   The Settlement should not be construed to deny identically situated children proper placement. ...................................................................................15

V.   PLAINTIFFS HAVE MORE THAN CARRIED THEIR BURDEN OF PROVING THAT DEFENDANTS ARE DETAINING CHILDREN IN UNLICENSED PLACEMENTS IN VIOLATION OF THE SETTLEMENT ....................................................................................16

   A.   The uncontroverted evidence establishes that Defendants are failing to transfer children to licensed placements as expeditiously as possible. ...............17

   B.   Defendants have concealed the conditions and treatment class members experience during unlicensed placement from class counsel, children's individual counsel, and the Independent Monitor. ...........................................................19

VI.   CONCLUSION. ..................................................................................21

i

TABLE OF AUTHORITIES

**Cases**

*City of San Diego v. Rider*, 47 Cal. App. 4th 1473 (1996).......................................16

*Connecticut Nat'l Bank v. Germain,* 503 U.S. 249 (1992).........................................8

*FDA v. Brown & Williamson Tobacco Corp*, 529 U.S. 120 (2000)..........................8

*Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019) ...........................................................5

*Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015) ..............................5, 6, 19

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ...............................................6, 10, 14

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ......................................5, 6, 7, 14

*In re Jennifer R.*, 17 Cal. Rptr. 2d 759 (Ct. App. 1993) .........................................3

*J.B.B.C. v. Wolf*, No. 1:20-cv-01509-CJN (D.D.C. June 24, 2020) ................8, 9, 11

*Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989)...........14

*Lucas R. v. Azar et al.*, No CV18-05741-DMG (C.D. Cal. Mar. 27, 2020).............16

*Morton v. Mancari*, 417 U.S. 535 (1974)................................................................8

**Statutes and Regulations**

42 C.F.R. § 71.37............................................................................................7

42 C.F.R. § 71.40.......................................................................................8, 11

85 Fed. Reg. 17,060..........................................................................................1

85 Fed. Reg. 31,503..................................................................................3, 5, 6

6 U.S.C. § 279. ...............................................................................................18

8 U.S.C. § 1232 .......................................................................................... passim

21 U.S.C. § 387 ................................................................................................8

42 U.S.C. § 264 .............................................................................................7, 8

42 U.S.C. § 265 .........................................................................................7, 8, 14

**Other Authorities**

2 CORBIN ON CONTRACTS 142 (rev. ed. 1995)........................................................14

C-SPAN, *Senate Hearing on Customs and Border Protection Oversight*, June 25, 2020, www.c-span.org/video/?473378-1/senate-hearing-customs-border-protection-oversight (00:54:25)..............................................................................13

Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health Schools, Medical Schools, Hospitals, and Other U.S. Institutions, May 18, 2020, www.publichealth.columbia.edu/public-health-now/news/public-health-experts-urge-us-officials-withdraw-order-enabling-mass-expulsion-asylum-seekers ........................................................................................................13

RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981)........................................14

U.S. Customs & Border Protection, *Southwest Border Migration FY 2020, U.S. Border Patrol Southwest Border Encounters FY 2020*, www.cbp.gov/newsroom/stats/sw-border-migration (last modified August 6, 2020)..............................................................................................................9, 10

## I.   INTRODUCTION

Opposing the instant motion, Defendants wholly fail to counter Plaintiffs' showing that —

- Defendants regularly detain children in hotels and hold rooms for weeks despite having thousands of vacant beds in licensed facilities;

- Hotels and hold rooms in which the Department of Homeland Security ("DHS") places children during Title 42 detention are not licensed, not inspected by independent child welfare agencies, not open to children's individual legal counsel, not open to class counsel, and apparently closed even to the Independent Monitor;

- DHS exercises unbridled discretion to classify children for Title 42 detention, and to re-classify them for Title 8 detention, without regard to any discernable public health purpose; and

- DHS—and not the Department of Health and Human Services ("HHS") or the Centers for Disease Control and Prevention ("CDC")—also exercises plenary decision-making authority over the placement of children designated for Title 42 detention.

Further, Defendants' opposition is entirely unpersuasive because, as used in the settlement approved by this Court on January 28, 1997 ("Settlement"), the federal agency with "legal custody" of a child is the agency that has decision-making authority over their placement regardless of the statute alleged to authorize their detention.  Here, that agency is DHS.

In candor, the Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists ("Closure Order") itself appears to be more of an end-run around protections Congress has conferred on immigrants and asylum-seekers in general, and non-citizen children in particular, than a rational measure to protect public health.  85 Fed. Reg. 17,060 (March 20,

1

2020).  Yet however inhumane, unnecessary and unlawful it may be, the instant
motion does not call upon the Court to decide whether the Closure Order violates
Title 8.

Rather, it here suffices that the Court should respect Congress's
unmistakable solicitude for the safety and well-being of immigrant and asylum-
seeking children for howsoever long they are in federal custody.  There simply is
no conflict, much less an irreconcilable one, between Title 42 and the Closure
Order, on the one hand, and Defendants' affording vulnerable children prompt
licensed placement, on the other.

The Court should respect Congress's wishes.  It should grant the instant
motion and require Defendants to transfer children they designate for Title 42
detention to licensed placements without unnecessary delay.

## II.   CHILDREN DESIGNATED FOR TITLE 42 DETENTION ARE ENTITLED TO THE SETTLEMENT'S PROTECTIONS.

### A.   DHS has plenary decision-making authority over children ostensibly detained under Title 42 and, therefore, they are in DHS's "legal custody."

The Settlement protects "all minors who are detained in the legal custody of
the INS."  Settlement ¶ 10.  It is undisputed that this includes children in the legal
custody of DHS and its component entities Customs and Border Protection
("CBP") and Immigration and Customs Enforcement ("ICE").  *See* Defs'
Response in Opposition to Pls' Motion to Enforce [Doc. # 925] ("Defs' Opp.") at
11.  The uncontroverted facts establish that children designated for Title 42
detention remain in DHS's legal custody regardless of the nominal statutory
authority for their detention.

The Settlement uses the term "legal custody" to refer to the entity with
decision-making power over a child's placement and transfer: the INS.  Settlement
¶ 19 ("All minors placed in such a licensed program remain in the legal custody of

2

the INS and may only be transferred or released under the authority of the INS."). According to Defendants, "Paragraph 19 makes clear the parties' agreement that the 'legal custody of the INS' means custody at the direction of the INS, where the INS retains the authority to authorize continued detention or release of the minor." Defs' Response to Pls' Report on Parties' Conference re "Title 42" Class Members [Doc. # 900] at 5.  Defendants also acknowledge that when the parties entered into the Settlement the "distinction between legal custody and physical custody was clearly understood in California," with "legal custody" referring to "the power to make major decisions affecting the life of the child."  *Id.* at 5-6 n.2 (citing *In re Jennifer R.*, 17 Cal. Rptr. 2d 759, 763 (Ct. App. 1993)).[1]

There is no question that DHS exercises authority over all major decisions affecting children detained pursuant to Title 42, including initial designation, transfer, placement, and care.  DHS exercises unfettered authority to reclassify children under Title 8 at any point during their detention.  *See* Pls' Motion to Enforce Settlement Re "Title 42" Class Members [Doc. # 920-1] ("Mot. to Enforce") at 8-13; Declaration of Maria Odom ("Odom Decl.") [Doc. # 920-3] ¶¶ 19-20; Ex. A, Declaration of Melissa Adamson, Ex. 1, Title 42 Data Summary ("Data Summary") at 12-13, 17-18 (DHS July ¶ 29 report lists 37 accompanied and nine unaccompanied children "reprocessed" from Title 42 to Title 8 and thereafter released or transferred to licensed placement or family detention

---

[1] Defendants offer no support for their assertion that the term "legal custody" refers "to the source of legal authority to hold the child."  Defs' Opp. [Doc. # 925] at 14. The Settlement nowhere limits its coverage to children taken into custody under any particular statute, and, as Defendants concede, the *only* children DHS detains under the Closure Order are those whom it would otherwise take into custody in enforcing Title 8.  *See* Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 31,503, 31,507 (May 26, 2020) (defining "covered alien" and exempting, among others, U.S. citizens, green card holders, and individuals with valid travel documents).

center).[2]  Defendants' July report also indicates that DHS freely transferred children between hotels, other unlicensed placements, licensed ORR placements, and ICE Family Residential Centers before expelling them pursuant to Title 42. Data Summary at 12-19.[3]

DHS likewise retains plenary decision-making authority over children they place in MVM Transport's physical custody.  Mellissa Harper, Chief of the Juvenile and Family Residential Management Unit (JFRMU) within ICE Enforcement and Removal Operations (ERO), declares that "JFRMU addresses issues confronting unaccompanied alien children (UAC) and alien family groups *who come into ERO custody*" "includ[ing] oversight of the housing of minors and family groups/units in hotels" through a contract with MVM.  Harper Decl. [Doc. # 925-1] ¶¶ 1-2 (emphasis added); *see also id.* at ¶ 11 (ICE "oversees all aspects of the operations" of hotel placements).

By contrast, there is no indication that the CDC plays any role in decisions

---

[2] DHS detained at least 23 of the 37 accompanied children it "reprocessed" from Title 42 to Title 8 for more than six days in hotels or other unlicensed facilities before releasing or transferring them to family detention centers.  Data Summary at 17-18.  DHS detained at least three unaccompanied children for six days in a hotel or other unlicensed placement before reprocessing and transferring them to licensed ORR placement.  *Id*. at 12-13.

[3] For example, ICE detained some accompanied children at hotels or other unlicensed placements, before sending them to Karnes Family Residential Center ("Karnes"), whereas others have been transferred directly to Karnes and then expelled under Title 42.  Data Summary at 15-16.

DHS appears to have placed at least one child in ORR custody, only to then transfer him to a hotel prior to Title 42 expulsion. *Id.* at 13. DHS initially detained two others in hotels and then transferred them to ORR custody. Both were still reported as "T42 awaiting expulsion" in the July report.  *Id.*

regarding the classification, placement, or care of children.[4]  *See* Mot. to Enforce at 8-13.  The Closure Order covers *only* persons whom DHS would otherwise detain under Title 8 and nowhere hints that CDC will assume legal custody of any individual.  *See* Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 31,503, 31,507 (May 26, 2020) (order applies to "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station").  To the contrary, the Closure Order expressly contemplates that critical decision-making authority in individual cases will remain with DHS.  *See id.* (customs officers can except individuals from the order "based on the totality of the circumstances").

> ## B.     All unaccompanied children in HHS custody are members of the class.

As Plaintiffs established in their opening brief, it is also clear that even were unaccompanied children designated under Title 42 in HHS's, rather than DHS's, "legal custody," they would nonetheless remain class members.  The Trafficking Victims Protection Reauthorization Act (TVPRA) assigns "the care and custody of all unaccompanied alien children, including the responsibility for their detention," to the Secretary of Health and Human Services ("HHS").  8 U.S.C. § 1232(b)(1).  Congress has therefore made HHS the INS's successor for purposes of the detention and placement of unaccompanied class members.  *See Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019); *Flores v. Johnson*, 212 F.

---

[4] Even assuming, arguendo, the CDC were to have some role with regard to the treatment of children subject to the Closure Order, DHS's decision-making authority means it would retain legal custody nonetheless. *See Flores v. Sessions*, 862 F.3d 863, 877 (9th Cir. 2017) (noting that "both the HSA and TVPRA provide [] for a degree of cooperation between ORR and outside agencies" with regard to the treatment of unaccompanied minors).

1 | Supp. 3d 864, 885 (C.D. Cal. 2015).

2 |     Defendants' answer—that holding HHS as the INS's successor would lead

3 | to "absurd results," including the quarantine of U.S. citizens, Defs' Opp. at 13-14,

4 | is meritless. First, the TVPRA charges HHS with the former INS's responsibilities

5 | *only* with respect to the placement and release of "unaccompanied alien children."

6 | § 1232(b)(1).  The TVPRA was "intended to address the unique vulnerability of

7 | minors who enter this country unaccompanied, and to improve the treatment of

8 | such children while in government custody." *Flores v. Sessions*, 862 F.3d at 881.

9 | These children are indisputably among the Settlement's intended class members.

10 | *See id.* at 866; *Flores v. Lynch*, 828 F.3d 898, 907 (9th Cir. 2016).

11 |     Second, as has been seen, the Closure Order applies only to non-citizens

12 | whom DHS would otherwise detain pursuant to Title 8.  85 Fed. Reg. at 31,507.

13 | Holding HHS to its obligations under the Settlement does not broaden the class

14 | definition and is consistent with the parties' intent to provide "minimum standards

15 | for the detention, housing, and release of non-citizen juveniles who are detained

16 | by the government." *Flores v. Sessions*, 862 F.3d at 866.

17 |

18 | III.   CONGRESS HAS PRESERVED THE SETTLEMENT INVIOLATE, AND NOTHING

19 |        PREVENTS DEFENDANTS FROM COMPLYING WITH THEIR AGREEMENT WHILE
       CARRYING OUT THE CLOSURE ORDER.

20 |

21 |     A.   **Nothing in Title 42 or the Closure Order requires the Court to
ignore Congress's solicitude for Plaintiff children.**

22 |     Underlying the whole of Defendants' opposition is a flawed assumption

23 | that providing children appropriate placement and carrying out the Closure Order

24 | are zero-sum propositions: that is, there is some irreconcilable conflict that

25 | prevents doing both.  Defendants never identify any such conflict, because there is

26 | none.

27 |     The TVPRA both (1) preserves the Settlement; and (2) directs *all* federal

28 | agencies to transfer the custody of unaccompanied minors to "the Secretary of

Health and Human Services not later than 72 hours. . . ,” who must then "promptly" place them "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(b)(3), (c)(2)(A). Congress's objective in enacting the TVPRA is unmistakable: the federal government must treat immigrant and asylum-seeking children with compassion and care, just as the Settlement requires. *See Flores v. Sessions*, 862 F.3d at 881.

In contrast, 42 U.S.C. § 265 does not mention detention at all. The CDC's statutory authority to detain is found at 42 U.S.C. § 264(b), a statute that pre-dates the TVPRA by some six decades. It provides in pertinent part:

> Regulations prescribed under this section shall not provide for the apprehension, detention, or conditional release of individuals except for the purpose of preventing the introduction, transmission, or spread of such communicable diseases as may be specified from time to time in Executive orders of the President upon the recommendation of the Secretary, in consultation with the Surgeon General.

*Id.*

The "regulation[] prescribed under this section," 42 C.F.R. § 71.37, posits detailed procedures the CDC must follow when quarantining, isolating, or releasing individuals conditionally:

> A Federal order authorizing quarantine, isolation, or conditional release shall be in writing, signed by the Director, and contain the following information: . . . (4) An explanation that the Federal order will be reassessed no later than 72 hours after it has been served and an explanation of the medical review of the Federal order pursuant to this part, including the right to request a medical review, present witnesses and testimony at the medical review, and to be represented at the medical review by either an advocate (e.g., an attorney, family member, or physician) at the individual's own expense, or, if indigent, to have representatives appointed at the government's expense . . ..

The procedures Defendants follow in detaining children pursuant to the Closure

Order do not appear at all related to § 264 or its implementing regulations.  The sole regulation the CDC appears to have promulgated specifically to implement the Closure Order, 42 C.F.R. § 71.40, never mentions "apprehension," "detention" or "custody" at all.

Defendants' expansive reading of their detention powers under 42 U.S.C. § 265 offers no reason to ignore Congress's having preserved the Settlement many decades after it last addressed this provision in 1944.  *FDA v. Brown & Williamson Tobacco Corp*, 529 U.S. 120, 143 (2000), *superseded on other grounds by statute*, 21 U.S.C. § 387a ("[A] specific policy embodied in a later federal statute should control our construction of the earlier statute, even though it has not been expressly amended.") (internal quotation marks and alterations omitted)).

In *Morton v. Mancari*, 417 U.S. 535 (1974), the Supreme Court held, "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to *regard each as effective*."  *Id*. at 551 (emphasis added); *see also Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, . . .  a court must give effect to both.").

In *J.B.B.C. v. Wolf*, the court applied this principle to preliminarily enjoin Defendants against summarily expelling a child pursuant to Title 42, a practice that unavoidably conflicts with the TVPRA.[5]  *See* Transcript of Telephonic

---

[5] 8 U.S.C. § 1232(a)(5)(D) provides, "Any unaccompanied alien child sought to be removed by the Department of Homeland Security, except for an unaccompanied alien child from a contiguous country . . . shall be— (i) placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. 1229a);. . ."

Motion Hearing, No. 1:20-cv-01509-CJN, ECF No. 39 (D.D.C. June 24, 2020) [previously filed as Doc. # 897-2].  The court held, "Even if the power to remove were read by [42 U.S.C.] section 265, the plaintiff has likelihood of success because the provision, in the Court's view, *should be harmonized, to the maximum extent possible, with immigration statutes . . . that grant special protections to minors . . .*"  *Id.* at 50 (emphasis added).

The Settlement clearly regulates how Defendants must treat children while these children are in their custody.  If the court in *J.B.B.C.* enjoined Defendants to observe the special protections Congress has conferred on Plaintiff children*,* this Court should do no less: it should order Defendants to observe the protections the Settlement confers and Congress preserved in the Homeland Security Act and the TVPRA.

## B. Defendants fail to show how the Closure Order prevents them from affording children prompt, licensed placement.

Defendants' affording children licensed placement would not impede their carrying out the Closure Order.  First, Defendants detain a relatively small percentage of children pursuant to Title 42 for longer than 72 hours.  Defendants' data show that between March and July, CBP "encountered" over 8,600 UACs and some 8,700 family units at the Southwest border.  *See* U.S. Customs & Border Protection, *Southwest Border Migration FY 2020, U.S. Border Patrol Southwest Border Encounters FY 2020*, www.cbp.gov/newsroom/stats/sw-border-migration (last modified August 6, 2020); *see also id.* ("Beginning in March FY20, USBP Encounters statistics include both Title 8 Apprehensions and Title 42 Expulsions.").

Over approximately the same period, Defendants report detaining 510 children pursuant to Title 42 for 72 hours or more.  Data Summary at 6-7; *see*

Attachment A.[6]  Of the 577 unaccompanied children Defendants held in hotels, 436 were detained for three or more days.  *Id*.  These children total 5 percent of all unaccompanied children Defendants "encountered" at the Southwest border.[7] Clearly, there is nothing limiting Defendants from providing children detained over 72 hours a licensed placement.[8]

Second, Defendants' argument that providing children a licensed placement would "introduce" them into the United States, *see, e.g.*, Defs' Opp. at 12, is devoid of merit.  Defendants cannot seriously deny that children detained in hotels

---

[6] This number derives from Attachment A [Doc. # 927] to Exhibit 1 (Declaration of Mellissa Harper) [Doc. # 925-1].  As the Data Summary explains, it is an open question whether the data included in Defendants' Attachment A or ¶ 29 are fully accurate.  Data Summary at 1-5.  The Independent Monitor's report expressed similar concerns regarding inconsistencies in the data provided in Defendants' Attachment A and the monthly *Flores* reports.  *See* Interim Report on the Use of Temporary Housing for Minors and Families under Title 42 by Independent Monitor and Dr. Paul Wise, August 26, 2020 [Doc # 938] ("Aug. Interim Report") at 11 n.9.

[7] It is not possible to calculate this percentage for accompanied children, as the CBP data does not distinguish between children and adults when reporting Family Unit numbers.  *See* CBP, *Southwest Border Migration FY 2020*, https://www.cbp.gov/newsroom/stats/sw-border-migration ("Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol.").

[8] Defendants complain that Plaintiffs fail to state whether unaccompanied children only, or both accompanied and unaccompanied children, are entitled to licensed placement as Settlement ¶ 12 directs.  Defs' Opp. at n.3.

The short answer is that the TVPRA preserves the Settlement in whole, and the agreement protects *both* accompanied and unaccompanied children. *Flores v. Lynch*, 828 F.3d at 901.

As this Court has remarked, however, Defendants have elected to force families to separate if they wish to avail themselves of their Settlement rights.  As a practical matter, the primary beneficiaries of requiring Defendants to afford class members prompt licensed placement will be unaccompanied class members.

in McAllen, El Paso, San Antonio, or Phoenix are *already* in the United States.
Nor do Defendants deny that they have hundreds of empty licensed beds at their
disposal in or near these very same cities.

Defendants never explain how placing a child in a licensed facility would
introduce a child into the United States any more than does their detaining them
for weeks in unlicensed and unmonitored hotels or MVM transport facilities,
where they have daily contact with multiple MVM, medical, and ICE personnel.[9]
*See* Harper Decl. ¶¶ 6-9, 19-20; *J.B.B.C.* Hearing Tr. at 49-50 ("In my view, the
plaintiff is likely to succeed on the question of whether 42 U.S.C. 265 grants the
director of the CDC the power the government articulates here" because "the
statute authorizes the director of the CDC to prohibit the introduction of persons . .
. .  There's a serious question about whether that power includes the power also to
remove or exclude *persons who are already present in the United States*."
(emphasis added)).[10]

Insofar as placement is concerned, Defendants fail to demonstrate how their
complying with the Settlement impedes their ability to execute the Closure Order.
Resolving the question sub judice is accordingly straightforward: because there is

---

[9] Defendants also admit that they introduce hotelled children into urgent care
centers and local emergency rooms if emergency or behavioral health services are
needed.  *See* Harper Decl. ¶ 20.

[10] The CDC has interpreted "introduction into the United States of persons from a
foreign country" to mean "movement of a person from a foreign country . . . into
the United States so as to bring the person into contact with persons in the United
States, or so as to cause the contamination of property in the United States, in a
manner that the Director determines to present a risk of transmission of a
communicable disease to persons or property, even if the communicable disease has
already been introduced, transmitted, or is spreading within the United States." 42
C.F.R. § 71.40(b)(1).  Assuming, arguendo, the CDC has correctly construed what
it means to introduce them into the United States, Defendants have the Plaintiff
children in their custody, and whether they are detained in a licensed facility or a
hotel, they are in "contact with persons in the United States."

no conflict between Defendants' executing the Closure Order and their providing children a licensed placement, the Court should give effect to Congress's having protected and preserved class members' Settlement rights, including their right to licensed placement.

IV.   ANY AMBIGUITY IN THE SETTLEMENT CAN AND SHOULD BE RESOLVED IN FAVOR OF REQUIRING DEFENDANTS TO PLACE CHILDREN EXPEDITIOUSLY IN LICENSED FACILITIES.

### A.   The Settlement nowhere suggests Defendants should have free rein to deny children licensed placement by facile designation.

Defendants next argue that despite the Settlement's expressly binding the INS's successors and Congress's having expressly named HHS as that successor with respect to custody and placement of unaccompanied class members, they are free to treat children howsoever they wish because the parties never intended the Settlement to apply to children DHS purports to detain pursuant to Title 42. *E.g.,* Defs' Opp. at 12-13. Defendants' argument is meritless. The parties *intended* to protect immigrant and asylum-seeking children from inappropriate, unmonitored, and unlicensed placement; they did *not* intend that Defendants have license to evade that obligation by arbitrarily branding or un-branding children as threats to public health.

In their opening brief, Plaintiffs explained that CBP and ICE *choose* to designate children under Title 8 or Title 42 detainees without much, if any, apparent regard for public health. Mot. to Enforce at 10-12. The Independent Monitor observed that "there appears to be no formal policy regarding the procedures" for unaccompanied children who test positive for Covid-19 and two of three unaccompanied children who "tested positive for Covid-19 while in the custody of ICE at a hotel" were transferred to ORR custody. Interim Report on the Use of Temporary Housing for Minors and Families under Title 42 by Independent Monitor and Dr. Paul Wise, August 26, 2020 [Doc # 938] ("Aug.

12

Interim Report") at 16-17.[11]

The Settlement, however, squarely places Defendants under a *mandatory* duty to afford the general population of detained children prompt placement in licensed, non-secure facilities.  Settlement ¶ 12.A ("[T]he INS *shall* place all minors pursuant to Paragraph 19 as expeditiously as possible. . ." (emphasis added)); *see also* Settlement ¶ 41 ("The undersigned . . . warrant that upon

---

[11] Defendants admit that CBP exempts children from the Closure Order based on ill-defined "humanitarian concerns," including when an officer "sees signs of illness."  *See* Defs' Opp. at 5-6, 20 n.9.  It appears that the majority, if not the only, children Defendants actually expel under the Closure Order are those who do not have COVID, while those who test positive are sometimes "introduced" into facilities holding Title 8 detainees.  *See* Interim Report on the Use of Temporary Housing for Minors and Families Under Title 42 by Independent Monitor, July 22, 2020 [Doc # 873] ("July Interim Report") at 17 ("[A]t least one family was transferred to the Karnes FRC after 2 symptomatic members tested positive for COVID-19.").  Expelling the healthy while admitting the infected is certainly a curious approach to protecting public health.

But to speak straight from the shoulder, it is increasingly evident that the Closure Order is a legal and factual subterfuge for the unlawful expulsion of immigrant and asylum-seeking children.  *See, e.g.,* Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health Schools, Medical Schools, Hospitals, and Other U.S. Institutions, May 18, 2020, www.publichealth.columbia.edu/public-health-now/news/public-health-experts-urge-us-officials-withdraw-order-enabling-mass-expulsion-asylum-seekers ("The nation's public health laws should not be used as a pretext for overriding humanitarian laws and treaties that provide life-saving protections to refugees seeking asylum and unaccompanied children. . . . *Despite its public health pretext, the CDC order fails to further public health and disregards alternative measures that can protect public health while preserving access to asylum and other protection*." (emphasis added)).

Nor is there any doubt the stratagem is succeeding in abrogating asylum protections by other means.  *See* C-SPAN, *Senate Hearing on Customs and Border Protection Oversight*, June 25, 2020, www.c-span.org/video/?473378-1/senate-hearing-customs-border-protection-oversight (00:54:25) (CBP Acting Commissioner Morgan testifies that his agency has summarily expelled 2,000 unaccompanied children while processing only some 300 as Title 8 directs).

execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.").

Nothing in the Settlement hints that DHS should be at liberty to evade that obligation by mere incantation: that is, by arbitrarily designating one or another child for Title 42 detention.  Ceding Defendants such a prerogative would, of course, render the Settlement illusory, a result settled canons of contract interpretation categorically condemn.  2 CORBIN ON CONTRACTS 142 (rev. ed. 1995) ("An illusory promise is one containing words 'in promissory form that promise nothing'"); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part . . . of no effect"); *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) ("Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory.") (quotation marks omitted).[12]

---

[12] Defendants dramatically oversimplify the law in arguing that what the parties anticipated when they entered into the Settlement—and only what they then anticipated—strictly cabins the Settlement.  *E.g.,* Defs' Opp. at 13.

For example, in 1997 the parties had no inkling Congress would dissolve the INS in 2002 or enact the TVPRA in 2008, yet the Settlement remains binding on HHS and DHS.  *Flores v. Sessions*, 862 F.3d at 870-71.  That the parties did not anticipate the current pandemic or, to speak plainly, Defendants' seizing upon a public health emergency to adopt a novel interpretation of 42 U.S.C. § 265 and deny non-citizen children the Settlement's protections, is of no moment.  *See Flores v. Lynch,* 828 F.3d at 906 ("[T]hat the parties gave inadequate attention to some potential problems of accompanied minors does not mean that the Settlement does not apply to them.").  Children whom Defendants select for Title 42 expulsion are just as needful of proper placement as those they openly detain under Title 8.  *Id.* at 907 ("The government has not explained why the detention claims class would exclude accompanied minors; minors who arrive with their parents are as desirous of

**B.  The Settlement should not be construed to deny identically situated children proper placement.**

Nor is Defendants' picking and choosing children for licensed or unlicensed placement minimally rational.  In the opening brief, Plaintiffs argued that, should the Court detect any ambiguity in the Settlement, it should construe the Settlement as protecting children irrespective of whether Defendants choose to designate them for Title 42 or Title 8 detention.  Mot. to Enforce at 13. The Court would thereby avoid serious constitutional questions regarding equal protection that would arise from Defendants' treating *identically* situated children differently.  *Id.*

In opposing the instant motion, Defendants fail to explain how a child whom they elect to brand "Title 42" is any less deserving of prompt licensed placement, or any more likely to threaten public health, than one they decide to detain pursuant to Title 8.  Indeed, Defendants nowhere deny that they regularly shift the nominal basis for detaining a child from Title 42 to Title 8 for little or no reason.

Instead, Defendants argue that the "Court is not being asked to interpret Title 42, but rather it is being asked to interpret a settlement agreement.  The doctrine of constitutional avoidance has no application here."  Defs' Opp. at 16. Whether Title 42 necessarily conflicts with the TVPRA's savings clause and, a fortiori, the Settlement, is among the questions sub judice.  Assuming, arguendo, Defendants were to succeed in conjuring up some irreconcilable conflict between Title 42 and the Settlement, the doctrine of constitutional avoidance would mitigate in favor of harmonizing Title 42 with Congress's subsequent directives (1) that the Settlement should endure, and (2) that all federal agencies must

education and recreation, and as averse to strip searches, as those who come alone.").

transfer unaccompanied children to HHS within 72 hours.[13]  *See* 8 U.S.C. 1232(b)(3), (c)(2)(A).

In sum, whether viewed as a question of statutory construction, contractual interpretation, or both, the result is the same: Defendants have no rational basis for denying children proper placement by dint of the label they choose to fasten upon them.  Both Title 42 and the Settlement should therefore be construed such that Defendants are required to afford identically situated children prompt, licensed placement.

V.   PLAINTIFFS HAVE MORE THAN CARRIED THEIR BURDEN OF PROVING THAT DEFENDANTS ARE DETAINING CHILDREN IN UNLICENSED PLACEMENTS IN VIOLATION OF THE SETTLEMENT.

Defendants do not deny they are detaining children in unlicensed facilities, in some cases for weeks at a time.  Nor do Defendants counter Plaintiffs' evidence that they deny children detained in unlicensed facilities access to counsel, education, and recreation.[14]  Finally, Defendants nowhere deny (i) that no state

---

[13] In any event, the doctrine of constitutional avoidance is applicable to interpreting contracts.  *E.g., City of San Diego v. Rider*, 47 Cal. App. 4th 1473, 1490 (1996) ("As a contract, the lease must receive such an interpretation as will make it lawful . . . if it can be done without violating the intention of the parties. Here the facility lease itself provides the city and agency intended the lease be carried out in a lawful *and constitutional* fashion." (emphasis added) (internal quotation marks and citations omitted)).

[14] Defendants do not deny barring individual legal counsel's or class counsel's access to "hotelled" children while guilefully impugning the evidence children's legal services providers are able to supply.  The Court has rebuffed similarly sharp practices in the past, and it should do so here again.  *See e.g.*, Transcript of Video Proceedings at 16, *Lucas R. v. Azar et al.*, No CV18-05741-DMG (Mar. 27, 2020) [previously filed as Doc. # 774-71] ("I cannot tell the plaintiffs to come up with data that they don't have because you won't give it to them.").  In any event, the declarations supporting the instant motion are clearly admissible: the declarants provide direct legal services to the children at issue and have experienced first-hand Defendants' concerted efforts to hold "hotelled" children all but incommunicado.

16

child welfare licensing official monitors the conditions and treatment children experience during unlicensed placement,[15] (ii) that they are blocking Plaintiffs' counsel's access to children detained in unlicensed facilities notwithstanding Settlement ¶¶ 32 and 33, or (iii) that not even the Independent Monitor has been provided access to class members or the ability to independently assess detainee experiences.  *See* Aug. Interim Report at 15.

## A. The uncontroverted evidence establishes that Defendants are failing to transfer children to licensed placements as expeditiously as possible.

In their opening brief, Plaintiffs explained that absent an "influx," Settlement ¶ 12 generally requires Defendants to transfer a minor to a non-secure licensed placement within three days, but that even during an influx, the agreement requires licensed placement "as expeditiously as possible."  Settlement ¶ 12A3.

Defendants do not deny that their licensed shelters are now nearly empty. Under prevailing circumstances, Defendants' transferring children to licensed

---

[15] Defendants expect Plaintiffs and the Court to ignore the independent state monitoring protections of the Settlement and instead to rely on ICE's "[u]nannounced virtual inspections" to verify the conditions these children are kept in.  Harper Decl. ¶ 12.  This type of self-monitoring has already been rejected by this Court once before and should not now be deemed sufficient independent monitoring to ensure compliance with the Settlement.  *See* Order re Pls' Mot to Enforce Settlement [516] and Defs' Notice of Termination and Mot in the Alternative to Terminate the Flores Settlement Agreement [639] at 9, [Doc. # 688] ("Therefore, this new regulatory definition of 'licensed facility' would effectively authorize DHS to place class members in ICE detention facilities that are not monitored by state authorities, but are instead audited by entities handpicked by DHS… .  This is more than a minor or formalistic deviation from the provisions of the Flores Agreement, as '[t]he purpose of the licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an *independent* child welfare agency.'").

placement after three days is entirely "possible," and Defendants offer no evidence to the contrary.[16]  Defendants' latest ¶ 29 report and Attachment A to their Opposition also confirm that DHS is *not* transferring class members to licensed placements as expeditiously as possible.[17]

The most Defendants muster in opposition is that children's "average lengths of stay" in irregular facilities are short.  *See* Harper Decl. ¶ 23.  This says nothing about the many children whom DHS has detained for 10, 15, 20, or 25 days or more in unlicensed placements.  Data Summary at 6-7, 9-19.  In July, DHS detained at least 13 accompanied and eight unaccompanied children in hotels for two weeks or more, including two unaccompanied children whom it detained in hotels for 28 days.  *Id*. at 6-7, 10-12, 14-18.  Once again, Defendants' own data confirm they are violating the Settlement's command that they provide children safe and proper placement as expeditiously as possible.

---

[16] Similarly, the TVPRA requires all federal agencies to transfer the custody of unaccompanied minors to "the Secretary of Health and Human Services not later than 72 hours. . . ," who must then "promptly" place them "in the least restrictive setting that is in the best interest of the child."  8 U.S.C. §§ 1232(b)(3). Defendants use the term "single minor."  To the extent this term is used to imply that these children fall outside the protections granted by Congress to unaccompanied children, this usage is inconsistent with statute.  *See* 6 U.S.C. § 279(g)(2).

[17] Defendants argue they may delay 20 days before transferring children to a licensed placement without violating the Settlement's requirement that transfer occur "as expeditiously as possible."  Defs' Opp. at 20.

Defendants' attempt to analogize delay in licensed placement while ORR facilities are nearly vacant to delays in releasing accompanied children during the 2015 "surge" in family detention is deeply and obviously flawed.  *See* Order re Response to Order to Show Cause [Doc # 189] at 10 n.7 ("Paragraph 12A requires that Defendants 'place all minors pursuant to Paragraph 19 as expeditiously as possible' in 'the event of an emergency or influx of minors into the United States.' This language, on its face, gives Defendants some latitude, *provided it is exercised reasonably and in good faith, to deal with emergency situations*.") (emphasis added).

**B.** **Defendants have concealed the conditions and treatment class members experience during unlicensed placement from class counsel, children's individual counsel, and the Independent Monitor.**

The Settlement's requirement that children be placed in licensed facilities ensures that children in immigration custody are in placements that "comply with all applicable state child welfare laws and regulations" and are "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . ." Settlement Ex. 1, ¶ 6. As this Court has observed, the agreement's licensing requirement ensures that Defendants' facilities are regularly inspected by independent state child welfare authorities. *Flores v. Johnson*, 212 F. Supp. 3d 864, 879 (C.D. Cal. 2015), (independent oversight "the animating concern of the Agreement's licensing requirement")).

Defendants do not deny that hotels and MVM hold rooms are unlicensed, and their failure to transfer children to licensed placement as expeditiously as possible is a per se breach of the Settlement.

Instead, Defendants argue that the Court should trust that they are supplying "hotelled" children the basics: clothing, food, a bed and a shower.[18] Yet even taking Defendants' rosy portrayal at face value, the Settlement requires them to provide children far more than just food and basic sanitation. The uncontroverted evidence shows that children in unlicensed placements lack adequate access to legal counsel, to a needs assessment, including identification of special needs, to recreation, to an educational assessment and educational services, to leisure time activities apart from television, to mental health and family reunification services,

---

[18] There is no mention of what steps Defendants take to ensure safe and sanitary conditions when children are detained in other unlicensed placements listed in the monthly *Flores* data reports that are not hotels, such as hold rooms, "MVM Transport," or "MVN Transportation." *See* Data Summary at 11-19 (listing examples of children held by "MVM Transport" and "MVN Transportation").

19

all of which licensed placements must supply.  Settlement Ex. 1.[19]  *See e.g.* Aug.
Interim Report at 15 (The current "hotelling" of unaccompanied minors "is not
fully responsive to the safe and sanitary requirements of young children.").

Defendants fail as well to offer any evidence casting doubt on the
Independent Monitor's finding that "hotelled" children are rarely permitted
outdoor recreation, education, or counseling.  July Interim Report at 9.  The
August Report of the Independent Monitor similarly did not find evidence of the
provision of recreation, education, or counseling.  *See* Aug. Interim Report.  The
Independent Monitor has made clear the current system of detaining
unaccompanied minors in unlicensed facilities "is not a system of care for children
of different ages and developmental stages."  *Id*. at 17.  Adequate custodial care
requires "specialized custodial elements, continuous oversight, and specialized
training of relevant personnel."  *Id.*  Moreover, Defendants have no formal age
limit policy regarding which unaccompanied children are "too young" to be held
in unlicensed facilities and there is no apparent limit to the length of stay for
unaccompanied children in unlicensed placements.  *Id.* at 16.  Instead of meeting
their clear legal obligation, Defendants are improperly detaining unaccompanied
children for long periods of time in unlicensed facilities.

Defendants claim that children detained in hotels and other unlicensed
placements have "telephonic access . . . to counsel while housed in the hotels"
because each minor "is given a minimum of one phone call a day."  Defs' Opp. at
25.  Defendants fail to explain how a child is supposed to locate a lawyer when
pro bono legal services providers have been ejected from hotels, when they insist
a lawyer must have entered an appearance for a child before he or she will be
allowed to call her lawyer, and when few lawyers will appear for a client whose

---

[19] According to Defendants, the only "behavioral health" services "hotelled"
children receive is a trip to the emergency room when necessary.  Harper Decl. ¶
20.

location they do not know and whom they have never previously been permitted to interview.  *See* Mot. to Enforce at 17-18 (families often do not know where Defendants are detaining their children and cannot reasonably be expected to retain counsel, let alone obtain a signed Form G-28; legal service providers report extreme difficulty locating "hotelled" children because Defendants obstruct access).[20]

As of August 14, 2020, Defendants had access to over 12,000 vacant beds in licensed facilities.  ORR Juvenile Coordinator Interim Report, Aug. 24, 2020 [Doc. # 932-2] at 2.  There is no excuse for leaving vulnerable children in unlicensed and unmonitored facilities while licensed beds sit vacant —at taxpayer expense.

VI.   CONCLUSION.

For the foregoing reasons, the Court should grant this motion and order Defendants to comply with the Settlement with respect to placement and monitoring of class members designated for Title 42 expulsion.

---

[20] The importance of children's having meaningful access to counsel is hard to overstate.  Without a lawyer, children's ability to oppose summary Title 42 expulsion is nil, whereas DHS nearly always transforms Title 42 children into Title 8 children once counsel enters an appearance.  *See* Odom Decl. at ¶ 19; Ex. F to Mot. to Enforce, Declaration of Daniel Galindo ¶¶ 3-4 ("Galindo Decl.").

Dated: August 28, 2020   CENTER FOR HUMAN RIGHTS AND
            CONSTITUTIONAL LAW
            Carlos R. Holguín

            NATIONAL CENTER FOR YOUTH LAW
            Leecia Welch
            Neha Desai
            Poonam Juneja
            Freya Pitts
            Melissa Adamson


             /s/ *Carlos Holguín*
            Carlos Holguín
            *One of the Attorneys for Plaintiffs*

22