UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. William P. Barr, et al.*** | Page | 1 of 18 |
|---|---|---|---|

Present: The Honorable   **DOLLY M. GEE, UNITED STATES DISTRICT JUDGE**

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AS TO "TITLE 42" CLASS MEMBERS [920]**

## I.
## INTRODUCTION

On August 14, 2020, Plaintiffs filed a motion to enforce the *Flores* Settlement Agreement ("FSA" or "Agreement") with respect to Class Members detained in hotels pending expulsion pursuant to 42 U.S.C. section 265 ("Title 42"). [Doc. # 920.] In particular, Plaintiffs argue that (1) minors detained by the Department of Homeland Security ("DHS") under the direction of a Title 42 order by the Centers for Disease Control and Prevention ("CDC") are Class Members within the scope of the *Flores* Agreement, and (2) holding such Class Members in unlicensed hotels for prolonged periods violates the Agreement. Plaintiffs therefore ask the Court to order DHS to stop detaining minors in hotels and to comply with the Agreement with respect to the placement of Class Members. Defendants maintain that the Court lacks jurisdiction to issue such an order because these minors are not Class Members, and in any event, detaining them in hotels does not violate the Agreement. The motion has been fully briefed. [Doc. ## 925, 960.] The Court held a hearing on the motion on September 4, 2020.

Having duly considered the parties' written submissions and oral argument, the Court **GRANTS** Plaintiffs' Motion to Enforce for the reasons stated below. The Court has jurisdiction over this matter and orders DHS to end its practice of detaining Class Members in hotels. DHS cannot evade its obligations under the *Flores* Agreement by hiding behind a different statute while exercising unfettered discretion over the minors within its care.

## II.
## BACKGROUND

On January 28, 1997, this Court approved the *Flores* Agreement—a class action settlement—between Plaintiffs and the federal government. *See Flores v. Sessions*, 862 F.3d

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 2 of 18 |

863, 866 (9th Cir. 2017). At the time, the Immigration and Naturalization Service ("INS") was the primary agency tasked with enforcing the nation's immigration laws, principally the Immigration and Nationality Act, also known as Title 8. It was the INS's conduct that was at issue in the *Flores* litigation, as memorialized in the Agreement's class definition: "All minors who are detained in the legal custody of the INS." FSA at ¶ 10 [Doc. # 101].

In 2002, Congress passed the Homeland Security Act, which abolished the INS and transferred its functions to various agencies within the newly created DHS, as well as to the Office of Refugee Resettlement ("ORR"), an agency within the Department of Health and Human Services ("HHS"). 6 U.S.C. §§ 251, 279, 291. Also transferred to DHS were the functions of the former U.S. Customs Service, which had been a part of the Treasury Department. *Id.* at § 203(1). The immigration and customs security and enforcement-related functions were comingled and vested into two agencies within DHS: Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"). *See* 6 U.S.C. § 211; *id.* at § 252 (establishing the Bureau of Border Security); H.R. Doc. No. 108-32, at 1 (renaming the Bureau of Border Security the "Bureau of Immigration and Customs Enforcement").

The *Flores* Agreement is binding upon the named Defendants and their "agents, employees, contractors and/or successors in office." FSA at ¶ 1. Consequently, after the reorganization of the INS, its "obligations under the Agreement now apply to the Department of Homeland Security and the Department of Health and Human Services." *Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019).

On March 20, 2020, CDC, a subagency of HHS, issued an order closing the United States' borders with Mexico and Canada to certain persons in response to the COVID-19 pandemic. *See* Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (Mar. 26, 2020) (effective March 20, 2020) ("Closure Order"). The Closure Order called for covered persons to be removed from the United States and returned to their country of origin, or another practicable location, as rapidly as possible. *Id.* at 17,067. It applied to "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada and Mexico," and exempted U.S. citizens, permanent residents, and those with valid travel documents or subject to the visa waiver program, among others. *Id.* at 17,061. The Closure Order was issued pursuant to HHS's authority under 42 U.S.C. sections 265 and 268. Enacted in 1944, the relevant section of Title 42 states:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 3 of 18 |

> Whenever [the Secretary of HHS] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [Secretary], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265. The Closure Order noted the "serious danger" of COVID-19 entering the United States through land Ports of Entry and Border Patrol Stations operated by CBP. 85 Fed. Reg. at 17,061. The Order "requested that DHS implement this order because CDC does not have the capability, resources, or personnel needed to do so." *Id.* at 17,067. The Closure Order has since been extended twice, the second time indefinitely. *See* Extension of Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective April 20, 2020); Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries where a Communicable Disease Exists, 85 Fed. Reg. 31,503 (May 26, 2020) (effective May 21, 2020).

On July 22, 2020, the Independent Monitor, Andrea Ordin, and Special Expert, Dr. Paul H. Wise, filed an Interim Report on the Use of Temporary Housing for Minors and Families Under Title 42 ("July 22 Interim Report") [Doc. # 873], alerting the Court to DHS's practice of using hotels to temporarily house accompanied and unaccompanied minors pending their expulsion under Title 42, routinely for multiple days. *Id.* at 11.[1] On August 7, 2020, the Court determined the issue of "hoteling" to be beyond the scope of prior briefing and ordered the Plaintiffs to file a motion to enforce on an expedited briefing schedule. [Doc. # 914.] In the same Order, the Court directed the Independent Monitor to continue observing and reporting on Title 42 hoteling. On August 26, 2020, the Monitor filed another Interim Report, finding that 25 hotels across three states have been used to house 660 minors between the ages of 10 and 17, 577 of whom were unaccompanied. August 26 Interim Report at 12, 15 [Doc. # 938]. Of the unaccompanied minors, 126 (26%) were under 15 years of age. *Id.* at 15. On average, minors are housed in hotels for just under five days, though 25% have been held for more than 10 days,

---

[1] All page references herein are to page numbers inserted by the CM/ECF system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 4 of 18 |

with a maximum stay of 28 days. *Id.* at 16; Supplemental Harper Decl. at ¶ 6 [Doc. # 970].[2] The hoteling program is operated by ICE and its contractor, MVM, Inc. ("MVM"). July 22 Interim Report at 11. It has rapidly expanded since the Closure Order was first issued, becoming a full-scale detention operation for minors and families immediately preceding their expulsion under Title 42. *See id.*; August 26 Interim Report at 12. The Independent Monitor recommended that unaccompanied minors be excluded from the hoteling program, finding there to be "no assurance that the [hoteling program] can provide adequate custodial care for single minors." August 26 Interim Report at 21.[3]

### III.
### LEGAL STANDARD

The Court incorporates the legal standard for motions to enforce articulated in its July 24, 2015 and June 27, 2017 Orders and need not repeat it here. *See Flores v. Johnson*, 212 F. Supp. 3d 864, 869–70 (C.D. Cal. 2015); *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1048–50 (C.D. Cal. 2017).

### IV.
### DISCUSSION

As a preliminary matter, the Court makes clear what is *not* at issue in this case—the validity of Title 42 expulsions. Much as an examination of the legal underpinning of the Migrant Protection Protocols ("MPP"), also known as the "Remain in Mexico" policy, is outside the purview of the *Flores* Agreement, so too is Defendants' policy of expelling minors pursuant to Title 42. *See* April 24, 2020 Order at 13 [Doc. # 784].

---

[2] Statistics on the length of minors' stays in hotels, cited herein, may contain slight inaccuracies due to Defendants' late filing of corrected data. *See* Supplemental Harper Decl.; Corrected Attachment A to Opp. (under seal) [Doc. # 972]. The corrections to the data are not material to any of the Court's conclusions.

[3] Defendants object to the Independent Monitor's Reports, claiming that the Monitor's recommendations hold Defendants to a standard not found in the *Flores* Agreement. [Doc. # 967.] The Monitor found that "the [hoteling program] is not fully responsive to the safe and sanitary requirements of young children." August 26 Interim Report at 19. The "safe and sanitary" requirement is directly found in the *Flores* Agreement, as is the requirement for conditions that "are consistent with the [] concern for the particular vulnerability of minors." FSA at ¶ 12.A. The Monitor's conclusions stem from the well-established definition of "safe and sanitary." *See Flores v. Barr*, 934 F.3d at 916 n.6 ("'safe and sanitary' conditions includes protecting children from developing short- or long-term illnesses as well as protecting them from accidental or intentional injury"); Part IV.B.2, *infra*. The Court therefore **OVERRULES** Defendants' objections.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 5 of 18 |

The sole focus of the Court is Defendants' treatment of minors within their "legal custody" and whether it comports with the requirements of the *Flores* Agreement. The Court considers first the threshold question of whether minors in Title 42 custody are *Flores* Class Members.

### A.    Jurisdiction Over Minors Detained Under Title 42

The *Flores* Agreement provides protections to its Class Members, who are defined as "[a]ll minors who are detained in the legal custody of the INS." FSA at ¶ 10. Whether minors detained under Title 42 are Class Members therefore depends on who has legal custody over them, and whether that entity is a successor to the INS. The question turns on the definition of "legal custody" as contemplated by the Agreement.

#### 1.    The Meaning of "Legal Custody" Under the *Flores* Agreement

When interpreting the language of a contract, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. The *Flores* Agreement discusses "custody" and "legal custody" throughout. Unless detention is necessary to "ensure the minor's safety or that of others," Paragraph 14 instructs the INS to "release a minor from its custody" to, in order of preference, a parent, legal guardian, adult relative, an adult designated by a parent or legal guardian "as willing to care for the minor's well-being," "a licensed program willing to accept custody," or to an adult or entity "seeking custody" when there is no other alternative. Paragraph 15 provides that, prior to a minor being "released from INS custody," the accepting custodian must agree to "provide for the minor's physical, mental, and financial well-being." Under Paragraph 16, if the accepting custodian fails to abide by this agreement, the INS "may terminate the custody arrangements and assume legal custody" of the minor. Paragraph 19 provides that, in the event a minor is not released, "the minor shall remain in INS custody." In such situations, the minor shall be placed in a licensed program, but "[a]ll minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS."

In this context, the definition of "legal custody" is unambiguous. Each use of "custody" or "legal custody" connotes the ability to provide care and supervision for the child. The Agreement discusses the transfer of "custody" from the INS to parents or other private adults or entities, and it requires the transferee custodian to agree to provide for the minor's well-being. It also provides for the ability of the INS to transfer physical possession while retaining "legal custody," in which case only the INS can authorize further transfer or release. The use of the

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 6 of 18 |

word "legal" is telling.  The Agreement employs the formal meaning of "legal custody," derived from family law, signifying the right and responsibility to care for the well-being of the child and make decisions on the child's behalf.  *See* Black's Law Dictionary (11th ed. 2019) (defining "legal custody" as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare"); Cal. Fam. Code §§ 3003, 3006 (defining "legal custody" as "the right and the responsibility to make the decisions relating to the health, education, and welfare of a child"); *see also In re Jennifer R.*, 14 Cal. App. 4th 704, 710 (1993) (recognizing legal custody as the ability to make "major decisions that are going to effect [sic] the life of the child").

### 2. "Legal Custody" Under Title 42 Procedures

With this understanding in mind, there is no doubt that DHS maintains legal custody of minors subject to Title 42 expulsion.  From the moment they are first apprehended until they are released or expelled, DHS has the authority to make decisions relating to the welfare and legal status of the children.

DHS agents have near complete control over whether, when, and how they apprehend individuals under Title 42.  The Closure Order delegated to CBP the responsibility to execute its directives, and noted that CBP had already "developed an operational plan" for its implementation.  85 Fed. Reg. at 17,067.  Based on CBP's internal guidance memo on the Closure Order, titled "Operation Capio," Border Patrol agents are tasked with apprehending persons under the Closure Order and "may rely on their training and expertise in detecting, apprehending, and determining whether persons are subject to the CDC order."  U.S. Customs & Border Protection, *COVID-19 Capio Memo*, https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html ("Capio Memo") at 1.[4]  The Closure Order also grants DHS the discretion to exempt certain covered individuals "based on the totality of the circumstances," although they "shall consult with CDC" regarding these individualized exceptions.  85 Fed. Reg. at 17,061.

DHS also appears to exercise unilateral discretion over whether detained minors remain within the Title 42 expulsion process or are transferred into Title 8 proceedings, such as removal proceedings under 8 U.S.C. section 1229(a).  The Capio Memo provides that when an individual is "determined to no longer be amenable" to Title 42 expulsion, they are to be processed under Title 8.  Only the "Chief Patrol Agent" of CBP can sign off on such a decision.  Capio Memo at

---

[4] The Capio Memo is an internal document published by the press and cited by Plaintiffs, but Defendants do not dispute its authenticity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 7 of 18 |

2. There is no procedure for CDC to review or approve that decision. Moreover, multiple legal services providers attest that DHS summarily re-designates minors from Title 42 to Title 8 custody, with no explanation given, and perhaps for no other reason than that counsel has appeared to advocate on the child's behalf. *See* Nagda Decl. at ¶ 32 [Doc. # 920-4] ("We are not aware of any reason for the children's 're-designation' other than our efforts to notify DHS that we were aware of the child's presence in DHS custody."); Galindo Decl. at ¶ 5 [Doc. # 897-3] ("[E]very time we have contacted the government about a specific child who had not yet been removed, the government has removed that child from the Title 42 Process."); Odom Decl. at ¶ 19 [Doc. # 920-3] ("In almost every case, our intervention has succeeded in officials reprocessing the children under Title 8, rather than Title 42[.]"); Galindo Decl. at ¶ 3 [Doc. # 920-7] ("As of August 13, 2020, the U.S. government has transferred at least 44 unaccompanied children out of the Title 42 process and into ORR care as a result of our efforts.").[5] CDC appears to have no role in this process. *See* Nagda Decl. at ¶ 33 ("[W]e have never interacted with a CDC representative in any capacity[.]"); Seaton Decl. at ¶ 16 [Doc. # 920-5] ("I did not interact or communicate with any representatives from the CDC during my representation of [a minor in Title 42 custody]."). In July 2020, 46 minors were reprocessed from Title 42 to Title 8 custody. *See* Adamson Decl., Ex. 1, Title 42 Data Summary ("July Data Summary") at 20, 25 [Doc. # 960-1].

DHS also has complete control over where and under what conditions to detain minors under Title 42, including over the decision to house them in hotels. The hoteling operation is managed by the Juvenile and Family Residential Management Unit of ICE, which has hired a contractor to run the facilities on the ground, though ICE "oversees all aspects of the operations." *See* Harper Decl. at ¶¶ 1–3, 11 [Doc. # 925-1]. CDC appears to have no role in the process. *See id.* ICE feeds, clothes, and provides for the hygiene of the minors, with apparently no input from CDC. S*ee id.* at ¶¶ 13–18. ICE even handles medical care for the minors, *see id.* at ¶ 20, notwithstanding CDC and HHS's expertise in the field. In other words, DHS maintains "the right and the responsibility to make the decisions relating to the health, education, and welfare of [the] child." Cal. Fam. Code §§ 3003, 3006 (definition of legal custody in the family law context).

Finally, DHS has wide discretion to determine when and whether minors held under Title 42 leave their custody. According to the Independent Monitor, the amount of time minors spend in hotels under Title 42 custody varies widely, with no apparent methodology and no formal

---

[5] Defendants object to many of Plaintiffs' declarations for lack of personal knowledge. Opp. at 26 n.10 [Doc. # 925]. To the extent that Plaintiffs' declarants offer hearsay testimony on behalf of others in their organizations, any defect as to this testimony can be easily remedied if a full evidentiary hearing is requested and deemed necessary. The Court therefore provisionally **OVERRULES** Defendants' evidentiary objections.

Case 2:85-cv-04544-DMG-AGR Document 976 Filed 09/04/20 Page 8 of 18 Page ID #:41046

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 8 of 18 |
|---|---|---|---|

limits on the length of stays. August 26 Interim Report at 16–19. There is no indication that CDC plays any role in deciding when minors' custody with DHS ends and they are ultimately expelled from the country. DHS retains plenary authority to make this "major decision" affecting the child's life. *See In re Jennifer R.*, 14 Cal. App. 4th at 710.

Defendants do not dispute the degree of control DHS exercises over the minors. Opp. at 19–20 [Doc. # 925]. They also rightly recognize that the Agreement contemplates a definition of "legal custody" distinct from physical custody, even pointing to state family law authorities on the meaning of legal custody. *Id.* at 14–15; Defs.' Response to Pls.' Report on Parties' Conference re "Title 42" Class Members at 5–6 n.2 [Doc. # 900]. But they then insist that legal custody refers to "the source of legal authority to hold the child," irrespective of who actually controls the child's life, and that therefore legal custody belongs to CDC. Opp. at 19. Neither the law nor the *Flores* Agreement employs the term "legal custody" in such a cabined manner.

Defendants point to Paragraph 19, which provides for the INS to hand over physical custody to a licensed program while retaining legal custody, as evidence that CDC too can maintain legal custody even while delegating physical custody to DHS. But Paragraph 19 specifically reserves for the INS the sole authority to release or transfer the minor, as is consistent with the authority inherent in having legal custody. Licensed programs also have a host of minimum standards by which they must abide. *See* FSA, Ex. 1. By contrast, CDC does not appear to have any voice in the child's future legal status or physical placement, whereas DHS has free rein. Even if the Court assumes for the sake of argument that the CDC maintains some form of legal custody as the source of the detention authority, that does not foreclose DHS from having legal custody by virtue of its unbridled authority to take actions and make decisions relating to the minor. *See* Cal. Fam. Code § 3003 (recognizing joint legal custody).

Defendants argue that the Agreement was only ever intended to apply to minors held under Title 8, and that the parties could never have anticipated that DHS would, "by mere coincidence," be tasked with implementing a CDC order under Title 42. Opp. at 19. But nowhere in the Agreement is Title 8 or any other authorizing statute mentioned.[6] The words "pursuant to Title 8" or the like are conspicuously absent from the class definition. The Agreement did not restrict itself to any particular statutory framework, though it easily could

---

[6] Passing references are made to certain procedures and institutions under Title 8, such as immigration courts and bond hearings. *See, e.g.*, FSA at ¶ 14 ("Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court . . . ."); ¶ 12.A ("Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing, *if applicable*.") (emphasis added). But these references do not imply that custody must be *exclusively* pursuant to Title 8 proceedings.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 9 of 18 |

have done so. The Court will not insert such a limitation into the Agreement when the plain meaning is evident. Indeed, it very well may be unprecedented and unanticipated for DHS to detain minors pursuant to Title 42. *Cf. Flores v. Lynch*, 828 F.3d 898, 906 (9th Cir. 2016) ("[I]t is apparent that this agreement did not anticipate the current emphasis on family detention. . . . Nonetheless, the *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.") (quoting *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) (alteration in original)). But what the parties very much did anticipate is that when the successors to the INS held minors in their legal custody—whether "by mere coincidence" or not—the Agreement would apply.

Defendants also point to the purported statutory authority under which DHS implements Title 42, providing that "[i]t shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations." 42 U.S.C. § 268. Defendants argue that "customs officers" were not a part of the old INS, and so even though they are subsumed by DHS now, in this capacity DHS is not a successor to the INS. This argument *might* hold some water *if* the officials enforcing the Closure Order and detaining minors in their legal custody were truly customs officers operating separate and apart from immigration authorities. But that is not the case. The Capio Memo specifically tasks the U.S. Border Patrol—which was a part of the INS, *see* 6 U.S.C. § 251(1)—with apprehending persons under the Closure Order and determining their eligibility for Title 42 processes. Capio Memo at 1; *see also* Odom Decl., Ex. B at 17 (correspondence between legal service provider and Border Patrol agent regarding the custody of minor in Title 42 proceedings). Upon entering the Title 42 procedure, minors are placed into the "custody" of the Enforcement and Removal Operations ("ERO") division of ICE, which runs the hoteling operation. Harper Decl. at ¶¶ 1–2. This same division takes custody of individuals when they are processed under Title 8. *See* Capio Memo at 3 ("ICE/ERO will take custody . . . and follow established procedures under Title 8 or Title 42 as applicable."). Defendants' declarant, an ERO official who testifies to overseeing minors' custody under Title 42, has appeared in this case before, testifying to her management of ICE Family Residential Centers ("FRCs"). *See* Decl. of Mellissa Harper at ¶ 1 [Doc. # 746-12]. In fact, at least 21 children held under Title 42 were at one point transferred to an FRC or ORR facility, where presumably they were overseen by the same staff managing those held there under Title 8. *See* July Data Summary at 21–23.

By its terms, the Closure Order applies only to persons "who would otherwise be introduced into a congregate setting in a land Port of Entry (POE) or Border Patrol station"—in other words, to those who would otherwise enter into Title 8 proceedings. 85 Fed. Reg. at 17,061. And as discussed above, the officials with custody of the minors maintain plenary authority to transfer them from Title 42 to Title 8 proceedings. There is no question that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 10 of 18 |

immigration authorities of the United States are detaining the minors in their legal custody. These authorities are clearly the successors to the INS and so are squarely bound by the *Flores* Agreement, regardless of what statute they purport to be acting under. *See Flores v. Sessions*, 862 F.3d at 879 ("The government remains bound by its bargain in the *Flores* Settlement, regardless of which agency may now be charged with caring for unaccompanied minors. The acronyms have changed, but the effect remains the same."). A contrary result would be to endorse a shell game.

### 3. Reconciling the *Flores* Agreement with Title 42 Requirements

Defendants also maintain that the *Flores* Agreement cannot be interpreted in such way as to conflict with the requirements of Title 42. In particular, they argue that placing minors in licensed programs would necessitate their "introduction" into the United States, which Title 42 specifically prohibits. Opp. at 17. But there is no reason why sending minors to licensed facilities would "introduce" them into the United States any more than putting them up in hotels in Phoenix, Houston, and San Antonio already has. *See* August 26 Interim Report at 13. Indeed, to the extent that Title 42 is meant to protect against the introduction of infectious diseases, Defendants have failed to demonstrate how hotels, which are otherwise open to the public and have unlicensed staff coming in and out, located in areas with high incidence of COVID-19, are any better for protecting public health than licensed facilities would be. *See id.* at 13–14; *see also* Part IV.B.2, *infra*. Moreover, in 2008—after both Title 42 and the *Flores* Agreement were implemented—Congress passed the Trafficking Victims Protection Reauthorization Act ("TVPRA"), which codified many of the same protections that the *Flores* Agreement guarantees to unaccompanied minors, including the requirement for *any* agency to transfer unaccompanied minors to ORR within three days. *See Flores v. Sessions*, 862 F.3d at 880–81; *see also* 8 U.S.C. § 1232(b)(3).[7] If Title 42 precludes compliance with the *Flores* Agreement requirement to place minors in licensed programs, then it would also preclude compliance with the TVPRA. The Court need not force a construction that would render the Agreement and the TVPRA incompatible with Title 42 when a perfectly reasonable interpretation that harmonizes them is available. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable

---

[7] Section 1232(b)(3) states unambiguously:

> Except in the case of exceptional circumstances, **any** department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.

8 U.S.C. § 1232(b)(3) (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
| Title | ***Jenny L. Flores, et al. v. William P. Barr, et al.*** | Page | 11 of 18 |

of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

Defendants also argue that the *Flores* Agreement was intended to address "longer term immigration custody," making it at odds with the "short-term purposes" of Title 42. Opp. at 17. First, the Court questions Defendants' premise—the Agreement very much accounted for the short term, requiring the INS to place a minor within three days or as expeditiously as possible, and specifically setting requirements for safe and sanitary conditions in the interim period when the INS holds minors in detention. Agreement at ¶ 12.A; *see also* July 24, 2015 Order, 212 F. Supp. 3d at 880–82 (applying Paragraph 12 to short-term holding cells at Border Patrol stations). If Title 42 were solely a short-term framework, then it would not result in minors being held for as many as 28 days. But even if this analysis has some value, the two remain perfectly reconcilable. So long as Title 42 procedures remain sufficiently brief so as not to lead to minors' prolonged detention, then Defendants do not have to worry about the *Flores* Agreement. This was true, for example, when hoteling was used in the past for a day or two preceding long-distance deportation flights or to accommodate unexpected flight cancellations or delays. *See* July 22 Interim Report at 11. But if the process results in detention for any real amount of time, as is clearly the case here, then the Agreement's protections are triggered.

Moreover, DHS has already held at least some minors subject to Title 42 in licensed ORR facilities. In July alone, two children were held in ORR custody while awaiting expulsion under Title 42, and at least one child was transferred from an ORR facility to a hotel before being expelled under Title 42. *See* July Data Summary at 21. Two minors were even transferred from hotels to ORR *after testing positive for COVID-19*. *See* August 26 Interim Report at 20. If transferring covered minors to licensed facilities were truly an affront to Title 42, then DHS has already violated the law several times over.[8]

**B.    Title 42 Custody's Compliance with the *Flores* Agreement**

Having determined that the Court has jurisdiction to hear Plaintiffs' complaints, the Court now turns to the merits of the motion to enforce. Plaintiffs raise a number of ways in which the Title 42 hoteling operation purportedly violates the *Flores* Agreement.

---

[8] Because the Court finds that DHS unquestionably has legal custody of the minors within the meaning of the *Flores* Agreement, it need not address whether CDC, if it too has legal custody, would be considered a successor in interest to the INS.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
| Title | ***Jenny L. Flores, et al. v. William P. Barr, et al.*** | Page | 12 of 18 |

### 1. Placement in a Licensed Program

The *Flores* Agreement requires that, if there is no qualified adult or entity that can take custody, DHS must transfer the minor to a "licensed program" within three days of their arrest— or, in cases of an "emergency or influx," "as expeditiously as possible." FSA at ¶¶ 12, 19. Licensed programs are those that are "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children." *Id.* at ¶ 6.

There is no dispute that hoteling is not a licensed program. DHS's contractor, MVM, is not licensed by a state agency to provide care for children. The hoteling also does not meet a number of requirements of licensed programs under the Agreement, including providing an individualized needs assessment, educational services, daily outdoor activity, and counseling sessions, among others. *Id.*, Ex. 1 at ¶¶ A.3–7; July 22 Interim Report at 12. Rather, Defendants argue that hotel stays are only short-term, and minors are removed from the placement as expeditiously as possible under the circumstances required by the Title 42 process. Opp. at 22–25.

On average, children spend approximately five days in hotels. August 26 Interim Report at 16. Over three-quarters of minors stay for three days or more. July Data Summary at 14–15. The Court acknowledges that the COVID-19 pandemic presents an "emergency" situation that could slow down the rate of placements. Care would have to be taken not to group too many children together in close quarters, and this may cause transportation delays. Nonetheless, Defendants fail to show how diverting children to hotels, rather than immediately sending them to licensed facilities in the same region with ample accommodations, in any way expedites the process. Instead, they again argue that doing so would controvert Title 42 by "introducing" minors into the United States. Opp. at 23–24. As discussed above, sending children to licensed facilities is no more an "introduction" than sending them to hotels is. In fact, the reverse is true given that hotels are public accommodations open to all manner of guests.

Moreover, this Court has previously relaxed the three-day transfer requirement when Defendants acted "in good faith and in the exercise of due diligence" to expeditiously transfer minors to licensed programs. August 21, 2015 Order, 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015). Here, hoteling is *not* part of a good faith effort towards placing children in licensed programs. It would be one thing if hoteling served as a temporary stopgap in the process of cautiously sending children to licensed facilities with all deliberate speed given the extenuating circumstances of the pandemic. But that is not what the hotel placements are for. Hoteling has *fully replaced* licensed programs for minors in Title 42 custody for the period prior to expulsion. *See* July 22 Interim Report at 17; July Data Summary at 17, 19, 21 (only 3 out of 197

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 13 of 18 |
|---|---|---|---|

unaccompanied hotelled children were transferred from the hotel to ORR while remaining in Title 42 custody). Significantly, ORR shelters were 97% vacant as of August 22, 2020, with a capacity of over *10,000* beds. August 24, 2020 ORR Juvenile Coordinator Report at 3 [Doc. # 932-2]. All 197 unaccompanied minors hotelled in July could have been sent to ORR without making a dent in the facilities' capacity—making Defendants' claim that hoteling is necessary to alleviate an emergency ring especially hollow. Meanwhile, as discussed further below, hoteling presents particular vulnerabilities to COVID-19. *See* Part IV.B.2, *infra*. Defendants cannot seriously argue in good faith that flouting their contractual obligation to place minors in licensed programs is necessary to mitigate the spread of COVID-19. Therefore, the Court finds Defendants have materially breached their duty under Paragraphs 12 and 19 to place minors in licensed facilities as expeditiously as possible.

### 2. Safe and Sanitary Conditions

Paragraph 12.A of the *Flores* Agreement also requires that, immediately following arrest, DHS shall hold minors in conditions that are "safe and sanitary" and that recognize "the particular vulnerability of minors." These requirements include "protecting children from developing short- or long-term illnesses as well as protecting them from accidental or intentional injury." *Flores v. Barr*, 934 F.3d at 916 n.6. They do not incorporate specific standards nor are they limited to the other enumerated requirements of Paragraph 12. *Id.* at 916. Rather, they encompass those safeguards that "reflect a commonsense understanding" of what safe and sanitary conditions, with concern for the particular vulnerability of minors, require. *Id.*

According to Defendants, upon leaving CBP stations, minors or their family members are given an age- and gender-appropriate travel kit that includes basic hygiene items such as soap, shampoo, a toothbrush, toothpaste, deodorant, and feminine hygiene products. Harper Decl. at ¶ 13. In the hotel rooms, they receive clothes, beds, a backpack, snacks, water, three hot meals a day, and showers. *Id.* at ¶¶ 14–16. The rooms are cleaned regularly. *Id.* at ¶ 18. The hotels appear to be mainstream chains that offer mid-tier accommodations. August 26 Interim Report at 19. The Court appreciates these efforts and finds that they are generally sanitary under normal circumstances.

But that does not end the inquiry. The detention must also be "safe," keeping in mind the "particular vulnerability of minors." *See Flores v. Barr*, 934 F.3d at 915 ("Courts interpreting the language of contracts should give effect to every provision, and an interpretation which renders part of the instrument to be surplusage should be avoided.") (quoting *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003)) (internal quotation marks omitted). Each minor is overseen by an MVM "Transportation Specialist," who remains inside the room

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 14 of 18 |

and within the line-of-sight of the child or family members at all times in order "to safeguard the minors and family groups/units." Harper Decl. at ¶¶ 6–7. These Transportation Specialists are required to have a high school diploma and three years of experience "in a field related to law, social work, detention, corrections, or similar occupational area" (or two years of experience, if they have an associate degree). *Id.* at ¶ 3. The Specialists are employed by ICE's contractor, MVM, about which Defendants provide little information other than that it is "a company specializing in the transportation and care of this vulnerable population." *Id.* at ¶ 2. "Most" Specialists are native Spanish speakers, and they "interact" with unaccompanied minors by "playing board or video games or watching television and movies (chosen by the minor) in order to keep them comfortable, engaged, and at ease." *Id.* at ¶¶ 9–10.

The Independent Monitor and Dr. Wise have raised concerns with this lack of qualified, specialized supervision, especially for younger, unaccompanied children. August 26 Interim Report at 19–20; July 22 Interim Report at 17, 19. The Court agrees. Children as young as 10 are left alone with an adult who has no qualifications or training in childcare. Defendants offer no formal protocols for how MVM Specialists are to adequately care for unaccompanied minors, other than vague assurances that they "interact" with the children by playing games or turning on the TV. There appear to be no separate standards for how 10-year-olds are cared for compared to 17-year-olds, despite the significant developmental differences and "particular vulnerability" of younger children. *See* July 22 Interim Report at 19 ("It is also important to recognize that a detention experience need not require mistreatment to be traumatic for a young child."). Put simply, Defendants' purported "list of amenities is not a system of care for children of different ages and developmental stages." August 26 Interim Report at 21.[9]

Moreover, oversight of the hoteling program is vague and minimal. MVM "quality control compliance specialists" are on site, but Defendants give no indication as to whether they have formal qualifications or follow specific procedures. *See* Harper Decl. at ¶ 5. ICE personnel are physically present at one hotel, and "regularly visit" the others "to ensure compliance," but again, Defendants provide no information about their qualifications or procedures—or indeed, even what "compliance" looks like. *See id.* at ¶ 11. The only "independent" oversight consists of ICE's contractor conducting "virtual" inspections, which have occurred in all three cities but not necessarily in all hotels. Defendants do not provide any details as to these inspections. *See id.* at ¶ 12.

---

[9] While the words "system of care" do not appear in the *Flores* Agreement, the phrase has similar connotations to concepts that *are* in the Agreement, such as "setting appropriate to the minor's age and special needs," "special concern for their particular vulnerability as minors," and "safe." FSA at ¶¶ 11–12.A.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 15 of 18 |

The Court finds that these conditions are not adequately safe and do not sufficiently account for the vulnerability of unaccompanied minors in detention.

Additionally, this Court has previously held that "safe and sanitary" conditions require measures to prevent the spread of COVID-19. *See* April 24, 2020 Order at 4–5 [Doc. # 784]. ICE provides masks, gloves, hand sanitizer, and cleaning wipes, and surfaces are regularly sanitized and wiped. Harper Decl. at ¶ 18. Transportation Specialists regularly have their temperatures taken and respond to COVID-19 related questions prior to beginning their shift, and children also have their temperatures taken daily. *Id.* at ¶ 19; July 22 Interim Report at 16. Medical professionals are on site and conduct daily screenings. Harper Decl. at ¶ 20.

On the other hand, detainees and MVM staff are not regularly tested for COVID-19, except before detainees depart the country. July 22 Interim Report at 16. The hotel staff, including housekeeping and others who may enter the rooms, fall outside of any protective measures. *Id.* at 18–19. The hotels are open to the public and located in cities such as McAllen, El Paso, Phoenix, Houston, and San Antonio, which have all experienced high rates of local COVID-19 transmission. *See id.* at 13–14; August 26 Interim Report at 13–14. Hotels in general have a high-turnover population of travelers, a group at high risk of transmitting COVID-19. Many of the hotels are located adjacent to airports. *See* July Data Summary at 16. Also, ICE and MVM have no specific protocols in place for when minors or family members test positive for COVID-19. *See* July 22 Interim Report at 19–20; August 26 Interim Report at 20–21. Some individuals at hotels who tested positive were transferred to ORR or FRCs, while others remained quarantined at the hotel. *Id.*

On balance, the Court finds that the hotel program is not safe with respect to preventing minors from contracting COVID-19 or providing the type of care and supervision suitable for unaccompanied minors.

### 3. Access to Counsel

Plaintiffs raise particular concern with the inability of counsel to discover, locate, and contact minors detained in hotels. Mot. at 21–22. Defendants provided no notice to Plaintiffs' counsel that minors were being held in hotels—lawyers only discovered the program when family members called to seek help. *See* Vargas Decl. at ¶ 14 [Doc. # 920-2]; Odom Decl. at ¶¶ 17–18; Nagda Decl. at ¶ 29; Corchado Decl. at ¶ 7 [Doc. # 920-6]. Legal services providers attest that they face unusual difficulty locating children within Title 42 custody, and DHS officials often are unable to provide accurate information as to where a child is at any given moment. *See* Corchado Decl. at ¶ 8 ("I have also found that immigration officials sometimes

Case 2:85-cv-04544-DMG-AGR   Document 976   Filed 09/04/20   Page 16 of 18   Page ID #:41054

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 16 of 18 |
|---|---|---|---|

have conflicting information among agencies about who has custody of a child."); Nagda Decl. at ¶ 30 ("DHS has no designated point of contact, and we frequently reach out to multiple CBP and ICE officials when trying to locate each child."); Odom Decl. at ¶ 23 ("These contacts may involve repeated emails and telephone calls to CBP facilities and our known points of contact in CBP and ICE."). When attorneys were able to locate a child, ICE physically prevented them from entering the hotel. Vargas Decl. at ¶ 22 ("Unidentified men, who appeared to be contractors of DHS, refused to permit [Texas Civil Rights Project] attorneys to offer any legal services to these children."). ICE has also limited children's ability to speak to attorneys by phone. Corchado Decl. at ¶ 11 ("[T]here were delays of several days before children were able to speak to a lawyer, because DHS limited the phone calls that a child could make to family, which necessarily delays either the child or family being able to learn about legal assistance and reach out to any lawyer."); Odom Decl. at ¶ 27 ("[C]hildren have reported to [Kids in Need of Defense] attorneys that while they were held in hotels or other unlicensed placements subject to Title 42, they were not told that they had a right to speak to a lawyer.").

Paragraph 32 of the *Flores* Agreement entitles Plaintiffs' counsel to visits with Class Members, even though the attorneys may not have the names of the minors in custody. Defendants do not dispute any of Plaintiffs' accounts, but simply offer that minors are provided "a minimum of one phone call a day," with additional phone calls allowed "upon request." Harper Decl. at ¶ 21. If an attorney has a notice of appearance on record, or if a minor requests an attorney call, "the call is scheduled and facilitated as soon as possible." *Id.*

As the legal services providers' experiences demonstrate, this process is woefully inadequate and not substantially compliant with Paragraph 32. The Agreement contemplates attorneys having near-unfettered access to minors in custody, provided they meet certain well-established protocols. DHS instead puts the entire onus on the minor to seek out counsel, requiring children to have the wherewithal to put their one phone call a day towards retaining a lawyer. This is exactly the scenario the *Flores* Agreement intended to avoid. Paragraph 32 is straightforward in requiring that Plaintiffs' counsel be allowed to access the facilities and contact the minors, even if they do not yet know the identity of a specific minor.

## V.
## CONCLUSION

Since March 2020, Title 42 has largely replaced the Title 8 framework at the southwest border. *See* August 26 Interim Report at 9–10 (showing sharp increase in Title 42 expulsions correlating with decline in Title 8 apprehensions). This Court is sensitive to the exigencies created by COVID-19 and recognizes that the pandemic may require temporary, emergency

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 17 of 18 |
|---|---|---|---|

modifications to the immigration system to enhance public safety. But that is no excuse for DHS to skirt the fundamental humanitarian protections that the *Flores* Agreement guarantees for minors in their custody, especially when there is no persuasive evidence that hoteling is safer than licensed facilities. While the legality of the Closure Order generally is beyond the scope of this Court's jurisdiction, the Court *is* obligated to ensure that minors in DHS custody are not left in a legal no-man's land, where no enforceable standards apply. Defendants may not exploit Title 42 to send children in their legal custody "off into the night." *Flores v. Sessions*, 862 F.3d at 878 n.17 (quoting *Reno v. Flores*, 507 U.S. 292, 295 (1993)).

In light of the foregoing, Plaintiffs' motion to enforce the *Flores* Agreement is **GRANTED**. The Court hereby **ORDERS** as follows:

1. All minors detained in the legal custody of DHS or ORR pursuant to Title 42 are Class Members as defined by Paragraph 10 of the *Flores* Agreement. Defendants shall comply with the Agreement with respect to such minors to the same degree as any other minors held in their custody.

2. Implementation of this Order shall be stayed until **September 8, 2020.** DHS shall cease placing minors at hotels by no later than **September 15, 2020**. Consistent with past practice, exceptions may be made for one to two-night stays while in transit or prior to flights, if minors are traveling longer distances, or due to unexpected flight delays. If other exigent circumstances arise that necessitate future hotel placements, Defendants shall immediately alert Plaintiffs and the Independent Monitor, providing good cause for why such unlicensed placements are necessary.

3. Except as provided in Paragraph 12.A of the *Flores* Agreement, DHS shall transfer all minors—both accompanied and unaccompanied—currently held in hotels to licensed facilities as defined in Paragraph 6 as expeditiously as possible.[10] Under Paragraph 12.A, if a bed in a licensed facility is immediately available, DHS shall generally make a licensed placement of class members within 72 hours of arrest or apprehension.

4. Plaintiffs' counsel shall be permitted to visit any facility where minors in Title 42 custody are held, and to meet with any minor held in Title 42 custody, in accordance

---

[10] The Court notes that while FRCs, where accompanied minors are likely to be placed as a practical matter, may be unlicensed facilities because they are secure, they at least have well-established standards of care and oversight in common with licensed facilities.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | September 4, 2020 |
| Title | *Jenny L. Flores, et al. v. William P. Barr, et al.* | Page | 18 of 18 |

with Paragraphs 32 and 33 of the *Flores* Agreement, with limitations to account for social distancing as necessary.

5. The Independent Monitor, Andrea Ordin, and Special Expert, Dr. Paul Wise, may in the exercise of their monitoring duties conduct investigations, interviews, and site visits with respect to any minors held in Title 42 custody and any facilities where minors in Title 42 custody are held, pursuant to Ms. Ordin's authority under the Court's October 5, 2018 Order [Doc. # 494] and to ensure compliance with this Order.

6. The ICE and ORR Juvenile Coordinators shall maintain records and statistical information on minors held in Title 42 custody pursuant to Paragraph 28A, and shall monitor compliance with the Agreement with respect to any minors held in Title 42 custody pursuant to Paragraph 29. The Juvenile Coordinators shall file their next interim report by **October 2, 2020** and include an update regarding the number of minors held in Title 42 custody and the status of compliance with this Order, along with the other topics specified in the Court's Order regarding Plaintiffs' Motion to Enforce [Doc. # 919] for a Notice of Rights.

7. Plaintiffs and Defendants may file a **joint** response by **October 9, 2020** to the Juvenile Coordinators' reports after having met and conferred regarding areas of dispute and attempted to achieve resolution.

8. The Court shall hold a further telephonic or video status conference on **October 16, 2020 at 11:00 a.m.** to discuss compliance with the Court's Orders.

**IT IS SO ORDERED**.