CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.email

NATIONAL CENTER FOR YOUTH LAW
Leecia Welch (Cal. Bar No. 208741)
Neha Desai (Cal. RLSA No. 803161)
Poonam Juneja (Cal. Bar No. 300848)
Freya Pitts (Cal. Bar No. 295878)
Melissa Adamson (Cal. Bar No. 319201)
1212 Broadway, Suite 600 Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | No. CV 85-4544-DMG-AGRx |
| Plaintiffs, | OPPOSITION TO EX PARTE APPLICATION TO STAY ORDER, ECF NO. 976 |
| v. | |
| WILLIAM BARR, Attorney General of the United States, *et al.*, | Hearing Date: None Time: N/A Hon. Dolly M. Gee |
| Defendants. | |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1

II.  LEGAL STANDARD ........................................................................ 3

III. DEFENDANTS FAIL TO DEMONSTRATE IRREPARABLE INJURY ABSENT A STAY. ............................................................................. 4

IV. DEFENDANTS FAIL TO DEMONSTRATE LIKELIHOOD OF SUCCESS ON THE MERITS. ............................................................................ 10

   A.   THE SETTLEMENT PROTECTS CHILDREN DESIGNATED FOR EXPULSION UNDER TITLE 42 BECAUSE THEY ARE IN DHS'S LEGAL CUSTODY AND WHOLLY UNDER DHS CONTROL. ...................................................................... 11

   B.   DEFENDANTS COULD SIMULTANEOUSLY COMPLY WITH THE SETTLEMENT, THE TVPRA'S PLACEMENT PROVISIONS, AND TITLE 42. ...................................... 13

   C.   DEFENDANTS ARE NOT PLACING CHILDREN IN LICENSED FACILITIES AS EXPEDITIOUSLY AS POSSIBLE. .................................................... 14

V.   A STAY WOULD HARM HUNDREDS OF CHILDREN RELEGATED TO UNLICENSED AND UNMONITORED PLACEMENTS. ..................................... 15

VI. IMMEDIATE ENFORCEMENT OF THE SETTLEMENT SERVES THE PUBLIC INTEREST .......................................................................... 19

VII.  CONCLUSION ................................................................................ 20

i

# TABLE OF AUTHORITIES

**Cases**

*Doe # 1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020) ……………………………… 4, 6

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) .... 1, 4, 10, 20

*Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015) ...................................... 14

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ........................................... 11, 13, 14

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ………………………… 12, 14, 19

*Greisen v. Hanken*, 925 F.3d 1097 (9th Cir. 2019) ................................................ 15

*In re Jennifer R.*, 17 Cal. Rptr. 2d 759 (Ct. App. 1993) ......................................... 12

*Lowry v. Barnhart*, 329 F.3d 1019 (9th Cir. 2003) ............................................... 15

*Morton v. Mancari*, 417 U.S. 535 (1974) .............................................................. 14

*Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846 (9th Cir. 2007) ............... 11

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................... 3, 4

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ...................................................... 19

*Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) ................................................. 16

*Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010) ................................................ 16

*United States v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) .................................... 11

**Statutes and Regulations**

6 U.S.C. § 279 ......................................................................................................... 14

8 U.S.C. § 1232 ....................................................................... 2, 12, 14, 15, 19

42 U.S.C. § 265 ……………………………………………………………… 13, 19

Amendment and Extension of Order Suspending Introduction of Certain Persons
  from Countries where a Communicable Disease Exists, 85 Fed. Reg. 31,503
  (May 26, 2020) ................................................................................................ 7, 13

Cal. Fam. Code § 3003 ............................................................................................ 11

Cal. Fam. Code § 3006 ............................................................................................ 11

**Rules**

C.D. Cal. R. 7-18 ...................................................................................................... 1

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)................................................................11

Hamed Aleaziz, *"I Felt Alone": The Story Of How An Immigrant Teenager Fought
To Stay In The US While Under Guard In A Texas Hotel*, BUZZFEED, July 24,
2020, https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-teenager-
successfully-fights-to-stay-in-us............................................................................18

ORR Policy Guide § 1.2.2 ........................................................................................5

Sally Goza, *AAP Statement on Media Reports of Immigrant Children Being
Detained in Hotels*, Am. Acad. Pediatrics, July 23, 2020,
https://services.aap.org/en/news-room/news-releases/aap/2020/aap-statement-on-
media-reports-of-immigrant-children-being-detained-in-hotels/ ........................17

## I.   INTRODUCTION

The Court should not stay its order enforcing the Setttlement on behalf of class members DHS purports to detain pursuant to Title 42 unless Defendants carry their burden of establishing the following: (1) they are strongly likely to succeed on the merits of their appeal; (2) they will be irreparably injured absent a stay; (3) hoteled children will not be substantially injured should a stay issue; and (4) a stay is the public interest.  *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 769-70 (9th Cir. 2018).  Defendants fail on all counts.

To begin, Defendants' instant application does little more than repeat the legal arguments this Court considered and rejected in granting enforcement of the Settlement on behalf of hoteled children.  While Defendants obviously disagree with the Court's legal analysis, they fail to identify any principle of law that has changed or that the Court failed to consider in issuing its enforcement order.  *Cf.* C.D. Cal. R. 7-18 (providing for reconsideration based on "the emergence of new material facts or a change of law occurring after the time of such decision" or "a manifest showing of a failure to consider material facts presented to the Court before such decision").

Yet even assuming, arguendo, that Defendants were likely to prevail on appeal, their instant application would founder with respect to the remaining three requirements for a stay.  In an attempt to show they would be irreparably injured absent a stay, Defendants offer an improbable amalgam of factual propositions.  On the one hand, they assert that "the ORR system would likely come under significant stress if ORR were to begin to receive on a regular basis approximately 75 to 100 referrals of UAC per week." Supplemental Declaration of Jallyn Sualog, September 17, 2020, ¶ 9 [Doc. # 985-1 at 118] ("Sept. 17 Sualog Decl.").  On the other, they report that between September 11 and September 13, DHS chose to "except" 155 children from Title 42 detention and "referred them to HHS."

1

Declaration of A. Porvaznik, September 17, 2020, ¶ 5 [Doc. # 985-1 at 12-13] ("Porvaznik Decl."). Defendants ask the Court to conclude that complying with the enforcement order would therefore overwhelm ORR's ability to absorb children into its network of licensed placements while keeping them and the general public safe from COVID-19. Defendants' factual argument is flawed for several reasons.

First, Defendants nowhere disclose, much less explain, the criteria DHS uses to select children for transfer to ORR. The Settlement, of course, posits a clear, legal standard predicated on the time a child spends in federal custody and the requirement that a child be transferred to a licensed placement. Defendants' stay application boils down to a demand that DHS have unfettered license to decide which children it wishes to transfer to ORR, according to undisclosed criteria of its own choosing. DHS's decision to flout the Settlement's express and binding criteria is all the more unlawful given that Congress embraced it both in the TVPRA's savings clause and in requiring that all federal agencies transfer UACs to HHS within 72 hours for prompt placement in the least restrictive setting consistent with their best interests. 8 U.S.C. §§ 1232(b)(3), (c)(2)(A).

Second, Defendants' prognostication of an overwhelmed ORR, struggling to find safe, licensed placements lacks any credibility when reviewed in the context of Defendants' subsequent actions and this Court's actual order. The provision of the Court's order requiring that DHS cease placing minors in hotels was administratively stayed before it went into effect. Defendants themselves have therefore *elected* to send ORR children weekly, despite the "significant stress" it would purportedly experience if ORR received as few as 75-100 such children per week. As far as can be determined from Defendants' factual showing, meanwhile, ORR's sky has yet to fall.

More importantly, nothing in this Court's order requires Defendants to send

2

more children to ORR or ICE facilities than they can safely accommodate. Rather, the order plainly states that, "If other exigent circumstances arise that necessitate future hotel placements, Defendants shall immediately alert Plaintiffs and the Independent Monitor, providing good cause for why such unlicensed placements are necessary." Order re Plaintiffs' Motion to Enforce Settlement as to "Title 42" Class Members at 17 ¶ 2 [Doc. # 976] ("Sept. 4 Order"). In short, the Court's order allows Defendants ample latitude to deny children licensed placement *if they have good cause to do so*, but that is not the same as granting them carte blanche to disregard the Settlement whenever they wish.

Defendants have accordingly failed to establish either that they will be irreparably injured absent a stay or that detaining children in hotels, rather than licensed facilities, would prevent or slow the spread of COVID-19. Defendants have likewise failed to establish a likelihood of succeeding on the merits of their appeal. Nor have Defendants rebutted the Independent Monitor's and Plaintiffs' evidence that children will suffer substantial and concrete harm if they are denied the Settlement's protections pending appeal. And they certainly have not demonstrated that the perpetuation of their haphazard, opaque, and dangerous practices would be in the public interest. A stay should be denied.

## II.   LEGAL STANDARD

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal citations and quotation marks omitted). The Court's "analysis is guided by four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where

the public interest lies.'"  *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 769-70 (9th Cir. 2018) (quoting *Nken*, 556 U.S. at 433-34).  "'The first two factors . . . are the most critical,' and the 'mere possibility' of success or irreparable injury is insufficient to satisfy them."  *Id.* at 770 (quoting *Nken*, 556 U.S. at 434); *see also Doe # 1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) ("We consider the last two factors if the first two factors are satisfied.").

As the party seeking the stay, Defendants bear the "burden of showing that the circumstances justify an exercise of [the Court's] discretion" to grant a stay. *Nken*, 556 U.S. at 434.  Defendants' burden to show irreparable harm cannot be satisfied with "conclusory factual assertions and speculative arguments that are unsupported in the record."  *Doe # 1*, 957 F.3d at 1059-60. As discussed below, Defendants clearly fail to meet this burden.

### III.   DEFENDANTS FAIL TO DEMONSTRATE IRREPARABLE INJURY ABSENT A STAY.

Defendants do not meet their burden of demonstrating that "irreparable injury is likely to occur during the period before the appeal is decided."  *Doe # 1*, 957 F.3d at 1059; *see also Nken*, 556 U.S. at 434 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second factor.").  This failure is fatal to the application for a stay.

First, Defendants mischaracterize the Court's order.  Defendants are not required to transfer all children held pursuant to Title 42 to congregate care—the order clearly requires transfer to *licensed facilities* and makes exceptions for short hotel stays.  Sept. 4 Order at 17-18.  Further, the order specifically contemplates that "exigent circumstances [may] arise that necessitate future hotel placements."  *Id.* at 17.  In that event, Defendants are to "immediately alert Plaintiffs and the Independent Monitor, providing good cause for why such unlicensed placements are necessary."  *Id.*  Defendants, notwithstanding their claims of irreparable harm, have made no effort to avail themselves of this provision. Defendants have instead

4

chosen to "except" at least 155 children from Title 42 detention between September 11 and September 13, whom DHS thereafter "referred . . . to HHS." Porvaznik Decl. ¶ 5. Defendants have not explained their criteria for excepting children or provided any reason why children who spend over three days in custody cannot be prioritized for licensed placement, as required by both the Settlement and the TVPRA.

Additionally, the Court's order does not require or permit that children be held in CBP facilities instead of hotels. *Cf.* Declaration of Raul L. Ortiz, September 11, 2020, ¶¶ 8-10 [Doc. # 985-1 at 2] ("Ortiz Decl.") (stating that "increased numbers of minors are likely to spend longer time in USBP facilities"). Neither hotels nor CBP facilities are licensed placements, and children must be transferred out of both as expeditiously as possible.

Defendants are also free to place unaccompanied children in licensed foster care placements, of which they have many and which are not congregate care. *See* Sept. 17 Sualog Decl. ¶ 14 [Doc. # 985-1 at 119] (ORR has "approximately 1900 TFC beds as of September 16, 2020"); ORR Juvenile Coordinator Report, August 24, 2020, at 2 [Doc. # 932-2] ("Aug. JuvCo Report") (noting ORR's transitional foster care beds are 95% vacant, with 1,903 transitional foster care beds available). ORR's assertions regarding which referrals "*could* prove too risky for foster parents to accept" indicate that ORR has not in fact attempted to secure such placements for children designated under Title 42. *See* Sept. 17 Sualog Decl. ¶ 16-17 [Doc. # 985-1 at 120] (emphasis added).[1] Further, even if ORR has experienced "a drop in

---

[1] The assertion that such beds are "reserved" for "children under the age of 12, pregnant and parenting teens, children with disabilities and/or sibling groups" is inconsistent with the ORR Policy Guide, which merely states that "ORR gives priority" to these groups. *Compare* Sept. 17 Sualog Decl. ¶ 14 [Doc. # 985-1 at 119], *with* ORR Policy Guide § 1.2.2, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.2.2. Even assuming that foster care beds are primarily

available foster families," *id.* ¶ 17, its transitional foster care program remains
mostly empty, Aug. JuvCo Report at 2.

Second, Defendants improperly rely on the *speculative* harm of transferring
children to licensed facilities. *See Doe # 1*, 957 F.3d at 1059-60 ("conclusory
factual assertions and speculative arguments" insufficient to warrant stay).
Defendants' speculative harm relies on a false premise: *i.e.*, that the Court's order
requires them to place *all* children designated for Title 42 expulsion in congregate
care facilities. *See* Defs' Ex Parte Application to Stay at 8 [Doc. # 976] ("App. to
Stay") (wrongly stating "the Court's Order now requires that all minors and
families who would have been held in individual rooms in a hotel . . . must now
instead be placed into congregate settings with ICE or ORR." (emphasis added));
Declaration of Russell Hott, Sept. 10, 2020, ¶ 7 ("Hott Decl.") (wrongly assuming
"*all family units subject to Title 42* must be housed at FRCs . . ." (emphasis
added)); Declaration of Raul L. Ortiz, Sept. 11, 2020 ("Ortiz Decl.") ¶ 7 (wrongly
assuming "that the court's order prohibits ICE from holding *any minor processed
under the CDC Order* in hotels pending their return" (emphasis added)).

Defendants next argue that implementing the Court's order risks "unchecked
introduction of COVID-19 into the United States." Defs.' Ex Parte Application to
Stay ("App. to Stay") at 6. But they have again "failed to demonstrate how hotels,
which are otherwise open to the public and have unlicensed staff coming in and out,
located in areas with high incidence of COVID-19, are any better for protecting

---

for younger children, ORR has not explained why such placements are not being
utilized for this population. *Cf.* Sept. 17 Sualog Decl. ¶ 9 [Doc. # 985-1 at 118]
(asserting that "factors outside of ORR's control—such as a material shift in the
demographics of UAC towards younger children, which would limit the number of
licensed facilities capable of caring for such children—would likely worsen the
situation").

public health than licensed facilities would be."[2]  Sept. 4 Order at 10; *see also id.* at
12, 15; Interim Report of Independent Monitor and Dr. Paul Wise, August 26,
2020, at 16-17 [Doc. # 938] ("Aug. Interim Report") at 16-17 (Independent Monitor
reports DHS lacks formal protocols for managing COVID-19 at hotels); Interim
Report of Independent Monitor, July 22, 2020, at 9, 12, 18 [Doc. # 873] ("July
Interim Report") at 9, 12, 18 (MVM staff work in three rotating shifts, assist
children with bathing, nutrition, and play; hotel staff clean children's rooms once
per day); Declaration of Mellissa Harper, August 21, 2020, ¶ 19 [Doc. # 925-1]
("Aug. 21 Harper Decl.") (MVM staff work in shifts).

Despite Defendants' emphasis on the judgments of public health officials, the
Order Suspending Introduction of Certain Persons from Countries where a
Communicable Disease Exists ("Closure Order") does not address ORR or
Immigration and Customs Enforcement ("ICE") facilities.  *See* Amendment and
Extension of Order Suspending Introduction of Certain Persons from Countries
where a Communicable Disease Exists, 85 Fed. Reg. 31,503, 31,507 (May 26,
2020).  Nor does the Closure Order address the safety of hotel detention.  *Id.*  The
factual findings in the Closure Order are specific to concerns regarding
implementation of screening, isolation, and social distancing practices at Customs
and Border Protection ("CBP") holding facilities.  *Id.*[3]  Notably, none of

---

[2] Moreover, Defendants have failed to explain how placement in CBP congregate
care prior to placement in hotels is somehow safer than transfers from CBP to
licensed facilities.  In July, there were 41 children who spent three or more days in
CBP custody prior to their transfer to ICE Custody.  *See* Declaration of Melissa
Adamson, "Ex. 1 Title 42 Data Summary," Aug. 28, 2020, at 19-20 [Doc. # 960-1
at 27-28] ("Adamson Decl. Data Summary").
[3] The CDC extended the Closure Order to coastal Ports of Entry (POE) and Border
Patrol stations only after finding that such facilities are "substantially similar in all
respects relevant to the public health analysis" to land-based stations.  85 Fed. Reg.
at 31,507.

Defendants' declarants in support of its application are public health officials or are from the CDC.

Defendants have repeatedly asserted that ORR could safely detain children in congregate facilities during the pandemic when it was operating at 30% capacity.[4] *See, e.g.*, Declaration of Jallyn Sualog, March 27, 2020, ¶¶ 15-31 [Doc. # 736-1] ("March 27 Sualog Decl."). As of August 22, 2020, ORR's congregate shelters were *97%* empty. *See* Aug. JuvCo Report at 2. As of September 8, 2020, there were only 515 children in ORR congregate settings and 139 children in transitional foster care. Declaration of Jallyn Sualog, Sept. 11, 2020, ¶ 42 [Doc. # 985-1 at 138] ("Sept. 11 Sualog Decl.").

Defendants have also represented that ORR has the ability to test and quarantine children, even when detaining far more children in congregate settings than it is detaining now. *See* March 27 Sualog Decl. ¶¶ 13-31, 42 (ORR had 3,600 minors in care, or 28% occupancy, is highly "experience[d] with the identification, mitigation, and treatment of contagious diseases," and has implemented "rigorous" COVID-19 protocols in shelters); *id.* ¶ 13 (ORR "ha[d] additional capacity and more opportunity to ensure social distancing and isolation within the care provider network."); Declaration of Dr. Amanda Cohn, March 27, 2020, ¶¶ 23, 26 [Doc. # 736-11] ("Cohn Decl.") ("ORR ha[d] adequate space within its facilities to isolate

---

[4] Defendants criticize Plaintiffs for opposing extended hotel placement given Plaintiffs discouraging the use of congregate care placements during the COVID-19 pandemic. *See* App. to Stay at 7. Plaintiffs' positions are consistent. Plaintiffs remain concerned about potential risks of congregate care placement and the psychological harm of isolation during the pandemic, which is why Plaintiffs encourage Defendants to utilize the non-congregate placement options available. *See* Plfs' Reply to Defs' Opp. to Ex Parte Temp. Restraining Order and Order to Show Cause re Preliminary Injunction at 27, 28 [Doc. # 759]. However, *unlicensed* and *unmonitored* placement which Defendants have not demonstrated is measurably safer than congregate care placement is not a solution and moreover violates class members' right to licensed placement under the Settlement.

8

any UAC suspected of or confirmed to be infected with COVID-19, given that the ORR network of grantee care-provider facilities is currently operating at approximately 30% capacity . . . UAC[s] in ORR care are not at any significantly increased risk from COVID-19.").  The Court's finding that ORR appeared in substantial compliance with CDC guidelines in part because it was operating significantly below maximum capacity was similarly issued at a time when ORR was at approximately 30% capacity.  *See* Order re Plaintiffs' *Ex Parte* Application for Restraining Order and Order to Show Cause re Preliminary Injunction [733], March 28, 2020, at 7 [Doc. # 740] (citing March 27 Sualog Decl.).

ORR now claims that its representations regarding the safety of congregate care made in March 2020 were made, "before all of ORR's current COVID-19 protocols were in place, and thus did not account for the capacity that ORR must hold in reserve in order to properly stage incoming UAC."  Sept. 17 Sualog Decl. ¶ 7 [Doc. # 985-1 at 118].  However, ORR offers no information as to what overall capacity it can safely withstand while still implementing "current COVID-19 protocols" and therefore the alleged harm is speculative, at best.  *Id*. at ¶ 8 ("This process … *has the potential* to create a bottleneck *if a sufficient number* of incoming UAC need to be placed in quarantine/isolation.") (emphasis added).

Accordingly, Defendants' claim that "ORR is already at its functional intake capacity," Sept. 11 Sualog Decl ¶ 44, strains credulity.  Of the 577 unaccompanied children Defendants report having detained in hotels from mid-April to July, it held 436 children for three or more days.  *See* Adamson Decl. Data Summary at 6 [Doc. # 960-1 at 14].  This is a number that ORR could easily accommodate over four months.  With 13,373 shelter and foster home beds, ORR could accommodate some 4,000 children before exceeding the 30% occupancy rate it has repeatedly represented as safe.  And as of September 8, there were 1,097 children in ORR custody.  Sept. 11 Sualog Decl. ¶ 42; *see also* Aug. JuvCo Report at 2 (as of August 22, ORR had a total of 10,735 shelter beds, 2,004 transitional foster care beds, and

9

634 long-term foster care beds).  If an actual bottleneck occurs and ORR is unable to safely admit additional children, Defendants can inform Plaintiffs and the Independent Monitor as provided in paragraph 2 of the Court's order and seek any necessary relief.  Sept. 4 Order at 17.

Given the vast number of vacant licensed beds at Defendants' disposal, their prior assurances that housing children in dramatically depopulated facilities is safe notwithstanding the pandemic, and the provisions the Court has already made for "exigent circumstances," Defendants' instant claims of "irreparable harm" fall short.  As the Court found, "[a]ll 197 unaccompanied minors hotelled in July could have been sent to ORR without making a dent in the facilities' capacity—making Defendants' claim that hoteling is necessary to alleviate an emergency ring especially hollow."  Sept. 4 Order at 13.

Finally, DHS is itself transferring children, ostensibly detained under Title 42, to ORR and ICE residential facilities, including some who *test positive for COVID-19*.  Sept. 4 Order at 11; July Interim Report at 17; Porvaznik Decl. ¶ 5.  DHS officials, not public health officials, make these determinations.  Sept. 4 Order at 6-7.  Given these uncontroverted facts, Defendants have wholly failed to demonstrate that it would be irreparably injured absent a stay.  *East Bay Sanctuary Covenant*, 932 F.3d at 778 (noting "evidence in the record suggesting that the Government itself is undermining its own goal of channeling asylum-seekers to lawful entry by turning them away upon their arrival at our ports of entry").

## IV.  DEFENDANTS FAIL TO DEMONSTRATE LIKELIHOOD OF SUCCESS ON THE MERITS.

"The Settlement is a consent decree, which, 'like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree.'"  *Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016) (quoting *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005)); *see also Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007) ("[I]f

the plain language of a consent decree is clear, we need not evaluate any extrinsic

evidence to ascertain the true intent of the parties.").  Defendants' detaining

children in hotels for extended periods in lieu of licensed placement is a clear-cut

violation of the Settlement.  Defendants' legal arguments to the contrary have

already been considered and rejected by this Court in granting enforcement of the

Settlement on behalf of hoteled children.

### A. The Settlement protects children designated for expulsion under Title 42 because they are in DHS's legal custody and wholly under DHS control.

The Settlement covers "all minors who are detained in the legal custody of

the INS." *Flores v. Lynch*, 828 F.3d 898, 902 (9th Cir. 2016) (quoting Settlement

¶ 10).  The Ninth Circuit has made clear that the plain language of the Settlement

protects *all* minors in the legal custody of the successors of the Immigration and

Naturalization Service ("INS").  *Id*. at 905-06, 910.

"DHS unquestionably has legal custody of the minors within the meaning of

the *Flores* Agreement."  Sept. 4 Order at 11 n.8.  The Settlement uses "legal

custody" as that term is used in family law: that is, as referring to the entity with

decision-making authority over a child's life.  *See* Sept. 4 Order at 6 (citing Black's

Law Dictionary (11th ed. 2019); Cal. Fam. Code §§ 3003, 3006). This is consistent

with how the term is used throughout the Settlement.  *See* Sept. 4 Order at 5-6

(citing Settlement ¶¶ 14-16, 19).[5]

---

[5] Defendants also acknowledged that when the parties entered into the Settlement
the "distinction between legal custody and physical custody was clearly understood
in California," with "legal custody" referring to "the power to make major decisions
affecting the life of the child."  Defs' Response to Pls' Report on Parties'
Conference re "Title 42" Class Members, at 5-6 n.2 [Doc. # 900] (citing *In re
Jennifer R.*, 17 Cal. Rptr. 2d 759, 763 (Ct. App. 1993)).

Defendants do not contest the Court's finding that DHS exercises plenary decision-making power over children it purports to detain under Title 42, including control over their apprehension, detention, medical care, release, and even the choice whether to expel children under Title 42 or process them under Title 8.  *See* Sept. 4 Order at 6-8; *see also* Aug. 21 Harper Decl. ¶¶ 1-2, 11, 13-20; Hott Decl. ¶ 12.  This is precisely the decision-making authority the INS exercised under the Settlement.  *See* Settlement ¶¶ 19-20.  The CDC, by contrast, plays no discernable role in DHS's control over children nominally detained under Title 42.  *See* Sept. 4 Order at 6-8.[6]

Defendants again fail to offer *any* citation for their assertion that the term "legal custody" refers to the source of the former INS's legal authority. App. to Stay at 11-12.  Defendants' argument is not improved by repetition.  The Settlement nowhere limits its coverage to children taken into custody under Title 8.  *See* Sept. 4 Order at 8-9.  Congress has provided that the Settlement remain binding even as it has itself enlarged the legal framework governing Defendants' detention of non-citizen children.  *See Flores v. Sessions*, 862 F.3d 863, 870-871, 879 (9th Cir. 2017) (holding that the Homeland Security Act ("HSA") and the TVPRA preserved the Settlement).

---

[6] Even if children were in the Department of Health and Human Services's ("HHS") legal custody through the CDC, unaccompanied non-citizen children would still be class members because the TVPRA transferred responsibility for the care and custody of unaccompanied children to HHS and HHS is bound by the Settlement. *See Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019); 8 U.S.C. §§ 1232(b)(1), (c)(2)(A), (c)(3); Pls.' Memorandum in Support of Motion to Enforce at 6-8 [Doc. # 920-1].

Even were the statutory authority for detention relevant, the Closure Order covers *only* non-citizens whom DHS would otherwise detain under Title 8.  *See* 85 Fed. Reg. at 31,507 (defining "covered alien" to include "[p]ersons . . . who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station" and excluding, among others, U.S. citizens, green card holders, and individuals with valid travel documents); *see also* Sept. 4 Order at 9 (describing role of CBP and ICE in detention of minors under Closure Order).  The Order nowhere intimates that the CDC will assume legal custody of anyone.[7]

## B. Defendants could simultaneously comply with the Settlement, the TVPRA's placement provisions, and Title 42.

Defendants' application is premised on the same flawed assumption asserted previously that providing children appropriate placement and carrying out the Closure Order are zero-sum propositions.  Despite multiple opportunities to do so, Defendants have failed to show how a licensed placement "introduces" a child into the United States under 42 U.S.C. § 265 any more than detaining them in a hotel open to the general public does.  Sept. 4 Order at 10, 12.

Nor is there any conflict between providing children licensed placement and the Closure Order, which is concerned with CBP facilities and mentions neither ORR nor ICE residential facilities.  *See* 85 Fed. Reg. at 31,507.  By all indications from the CDC, ORR is far better able to screen and isolate children exposed to COVID-19 than CBP.  *Compare* Cohn Decl. ¶¶ 8, 20, 23, 26-27, *with* 85 Fed. Reg. at 31,507.  That Defendants summarily expel children before they have time to comply with the Settlement's release provisions does not mean that children are not

---

[7] Notably, neither 42 U.S.C. § 265 nor its implementing regulation, 42 C.F.R. § 71.40, includes any reference to "detention" or "custody."  That the parties did not specifically anticipate Defendants' novel interpretation of 42 U.S.C. § 265 to justify the detention of non-citizen children pending expulsion does not mean that class members lack protection under the Settlement.  *See Flores v. Lynch*, 828 F.3d at 906.

13

1   class members.  *See Flores v. Johnson*, 212 F. Supp. 3d 864, 884-85 (C.D. Cal.

2   2015) (rejecting argument that TVPRA conflicts with the Agreement because CBP

3   cannot release children to sponsors).

4        The DHS "hoteling" practice, by contrast, plainly conflicts with the TVPRA,

5   which both (1) preserves the Settlement; and (2) directs *all* federal agencies to

6   transfer the custody of unaccompanied minors to "the Secretary of Health and

7   Human Services not later than 72 hours . . . ," who must then "promptly" place

8   them "in the least restrictive setting that is in the best interest of the child."  8

9   U.S.C. §§ 1232(b)(3), (c)(2)(A); *see also Flores v. Sessions*, 862 F.3d at 871

10  (TVPRA preserved and "partially codified the Settlement by creating statutory

11  standards for the treatment of unaccompanied minors" (quoting *Flores v. Lynch*,

12  828 F.3d at 904)). Defendants have not disputed that unaccompanied children

13  designated under Title 42 meet the statutory definition of an "unaccompanied alien

14  child." *See* 6 U.S.C. § 279(g)(2).

15       Defendants also fail to address the Court's holding that detention in hotels

16  conflicts with the TVPRA.  *See* Sept. 4 Order at 10.  "The Court need not force a

17  construction that would render the Agreement and the TVPRA incompatible with

18  Title 42 when a perfectly reasonable interpretation that harmonizes them is

19  available."  *Id.* at 10 (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

20      **C. Defendants are not placing children in licensed facilities as
21         expeditiously as possible.**

22       The Settlement requires that children be placed in a non-secure facility with a

23  state license to care for dependent children within 72 hours or, in the case of an

24  "emergency or influx," "as expeditiously as possible."  Sept. 4 Order at 12;

25  Settlement ¶¶ 6, 12.A, 19.  Although "the COVID-19 pandemic presents an

26  'emergency' situation that could slow down the rate of placements," the Court

27

28

14

1  correctly found that Defendants make no effort at all to transfer Title 42 children to

2  licensed placements.  Sept. 4 Order at 12-13.[8]

3  Defendants never argued in their opposition to the motion to enforce why

4  they should have any difficulty transferring children to licensed placements within

5  three days.[9]  *See* Defs' Opp. to Mot. to Enforce [Doc. # 925].  Although Defendants

6  alluded in a footnote to potential "downstream consequences" of an order requiring

7  licensed placement, they cited as support a CDC declaration from March 2020

8  attesting that ORR "has adequate space within its facilities to isolate any UAC

9  suspected of or confirmed to be infected with COVID-19" because it is "operating

10 at approximately 30% capacity." Defs' Opp. at 19 n.8; Cohn Decl. ¶ 23.  Given that

11 ORR shelters were operating at 3% capacity as of August 22, 2020, with over

12 10,000 vacant beds, the CDC's declaration posits no obstacle whatsoever to

13 licensed placement, but instead confirmed that Defendants could afford Title 42

14 children they detain more than three days licensed placement as the Settlement and

15 the TVPRA require.  *See* Sept. 4 Order at 13.

16
17 **V.    A STAY WOULD HARM HUNDREDS OF CHILDREN RELEGATED TO UNLICENSED AND UNMONITORED PLACEMENTS.**

18 Both the Independent Monitor's reports and Plaintiffs' evidence establish

19 that children will suffer irreparably if DHS continues to detain them for days or

20 weeks in unlicensed and unmonitored hotel rooms where they are denied basic

21 protections the Settlement requires.  *See* Sept. 4 Order at 12, 15-16; Settlement ¶¶

22

---

23 [8] Defendants' assertion that the Court "ignor[ed]" paragraph 12 and disregarded its

24 prior rulings providing additional time for transfer is plainly inconsistent with the record.  App. to Stay at 14-15; *see* Sept. 4 Order at 12-13. Further, the Court's order

25 is consistent with the requirements of both the Settlement and the TVPRA. 8 U.S.C. § 1232(b)(3).

26 [9] For purposes of evaluating the application for stay, the Court need not consider

27 any new evidence or arguments because they are not relevant to Defendants' likelihood of success on the merits.  *See Greisen v. Hanken,* 925 F.3d 1097, 1115

28 (9th Cir. 2019); *Lowry v. Barnhart,* 329 F.3d 1019, 1024-26 (9th Cir. 2003).

12, 19, 32, Ex. 1 A.3-7.  It is undisputed that unaccompanied children have been held in hotel rooms for 28 days, and Defendants' corrected data submission indicates that accompanied children have been held in hotel rooms for up to 38 days.  *See* Supplemental Declaration of Mellissa Harper, Attachment A, at 7 (under seal) [Doc. # 972-1] (minors S.V. and A.P.V., both under 10 years of age, listed as detained at a hotel from 6/9/2020 to 7/17/2020); Sept. 4 Order at 3-4; Aug. Interim Report at 12.  At least 33 unaccompanied children were held for over 10 days. *See* Aug. Interim Report at 12.

Defendants do not contest that detention in hotels "does not meet a number of requirements of licensed programs under the Agreement, including providing an individualized needs assessment, education services, daily outdoor activity, and counseling sessions, among others."  Sept. 4 Order at 12; *see also* July Interim Report at 9 ("Children and families are not usually taken outside during their time in hotels.").  The Ninth Circuit has recognized the importance of access to outdoor recreation even for adults.  *See Thomas v. Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010) ("For over thirty years, we have emphasized that 'some form of regular outdoor exercise is extremely important to the psychological and physical well–being of the inmates.'" (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979))).  Children are even more vulnerable to psychological harm.  *See* July Interim Report at 18 ("[I]solating a child alone in a hotel room for 10-14 days can have a more harmful emotional impact than that seen in adults.").

Further, "Children as young as 10 are left alone with an adult who has no qualifications or training in childcare," "[t]here appear to be no separate standards for how 10-year-olds are cared for compared to 17-year-olds," and "oversight of the hoteling program is vague and minimal."  Sept. 4 Order at 14.  Children and families detained in hotels are constantly surveilled by contracted "Transportation Specialists" who, by Defendants' own admission, have had a mere 16 hours of training that is meant to cover 15 different topics ranging from "self-defense" and

16

"child development" to "ethics and authority" and "bloodborne pathogens and respiratory viruses . . . ."  Hott Decl. ¶ 12.  Defendants describe these contractors as "specializing in the transportation and care of this vulnerable population" but it is evident from the statement of work Defendants cite to that MVM, Inc. is expected to provide *transportation services* not provide for the care and welfare of unaccompanied minor children in hotel rooms for weeks at a time.  *See* Declaration of Mellissa Harper, September 17, 2020, ¶ 3 [Doc. # 985-1 at 23] ("Sept. 17 Harper Decl."); *id.* at Att. A at 67 § 3.a.iii [Doc. # 985-1 at 35] ("In limited cases, overnight housing may be required.").[10]

The American Academy of Pediatrics has stated that Defendants' practice of detaining children in hotels is "traumatizing" for vulnerable immigrant children.[11] Children have felt "confus[ed] and terrif[ied]" by their transfers between CBP processing centers and hotels, and in at least one instance, "the trauma [a] child endured as a trafficking victim was compounded by DHS's treatment of the child and her placement in Title 42 proceedings."  Declaration of Karla Marisol Vargas, August 13, 2020, ¶¶ 19-20 [Doc. # 920-2].  "Children are frequently moved from facility to facility without warning, and without being told their location," "these

---

[10] The statement of work cited by Defendants includes three small subparagraphs related to "hotel rooms" and appears to contemplate only very short hotel stays. *See* Sept. 17 Harper Decl. Att. A at 68 § 3.c [Doc. # 985-1 at 36] ("If a UAC is temporarily housed at a hotel awaiting custody determination or placement, he or she shall be allowed to take a change of clothing, personal hygiene items, and female sanitary products (as needed), in order to shower and dress for the following day, and subsequently, until departure from the hotel.").

[11] Sally Goza, *AAP Statement on Media Reports of Immigrant Children Being Detained in Hotels*, Am. Acad. Pediatrics, July 23, 2020, https://services.aap.org/en/news-room/news-releases/aap/2020/aap-statement-on-media-reports-of-immigrant-children-being-detained-in-hotels/ ("This practice is traumatizing to children who have already endured so much, who are not old enough to have made their own decisions about how to arrive at our border, and who cannot communicate their fears and needs.").

frequent transfers, without notice or explanation, cause the children to feel scared and anxious," and children report "feeling anxious and worried about seeing other children leaving the facilities and not knowing what happened to them." Ex. 1, Declaration of Taylor Levy, August 20, 2020, ¶ 7 ("Levy Decl."). According to one news report, J.B.B.C., a 16-year-old boy detained for weeks a hotel in El Paso, stated "I felt locked up. I felt alone and isolated . . . I didn't know what time of day it was. I didn't know what day it was. I felt utterly disconnected from society. I just felt anxiety and depression."[12] An unaccompanied 17-year-old girl, held for over 15 nights at a hotel before she was transferred to a licensed ORR placement, told her attorney that she was "rarely allowed outside of her room," lacked "any schooling or ability to attend religious services," and felt "isolated and anxious while she was detained in a hotel room" by unknown adults who "watched her at all times." Levy Decl. ¶ 9.

Compounding the foregoing is that DHS holds children in hotels virtually incommunicado, denying them meaningful access to counsel in violation of paragraph 32 of the Settlement.[13] Children's lawyers and families report having to overcome immense obstacles even to discover their whereabouts. Sept. 4 Order at 15-16 (citing Corchado Decl. ¶¶ 8, 11; Nagda Decl. ¶ 30; Odom Decl. ¶¶ 23, 27; Vargas Decl. ¶ 22); *see also* Levy Decl. ¶ 8 ("Children's relatives have told me that

---

[12] Hamed Aleaziz, *"I Felt Alone": The Story Of How An Immigrant Teenager Fought To Stay In The US While Under Guard In A Texas Hotel*, BUZZFEED, July 24, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-teenager-successfully-fights-to-stay-in-us.

[13] Per Defendants' own contract, MVM, Inc. exercises unrestricted control over children and families' access to counsel. *See* Sept. 17 Harper Decl., Att. A at 84 [Dkt. 985-1 at 52] ("Legal Counsel 1. The Contractor *may allow* official legal counsel retained by any UAC or family member or a family into the Contractor office waiting area, provided they are not soliciting for business or causing a disruption. 2. The Contractor *shall not permit legal counsel to attend face-to-face meetings* between a UAC or family, while in transit." (emphasis added)).

even when the child calls them, DHS officers/contractors stay on the line during the phone calls and often prevent the child from disclosing information that would indicate their current location."); *see also id.* ¶ 9 (child was warned by officials that she would no longer be allowed to call her mother if she told her mother the name of the hotel where she was detained).

Staying the enforcement order would cut off Plaintiffs' counsel and the Independent Monitor's ability to monitor the treatment and conditions children experience during Title 42 detention, leaving both to the unbridled discretion of DHS and its unlicensed MVM contractor.[14]  With little or no access to counsel, children have no ability to defend themselves.  The few Title 42 children who have managed to secure the assistance of counsel, by contrast, have often succeeded in having DHS re-designate them as Title 8 detainees, whereupon they are promptly transferred to licensed facilities.  *See* Sept. 4 Order at 7.

## VI.   IMMEDIATE ENFORCEMENT OF THE SETTLEMENT SERVES THE PUBLIC INTEREST.

In 2008, some six decades after last visiting 42 U.S.C. § 265, Congress incorporated into federal law the public's interest in ensuring that children are housed in safe and appropriate facilities through the TVPRA.  *See* 8 U.S.C. § 1232; *see also Prince v. Massachusetts*, 321 U.S. 158, 165 (1944) (emphasizing "the interests of society to protect the welfare of children"); *Flores v. Sessions*, 862 F.3d at 881 ("[T]he HSA and TVPRA were intended to address the unique vulnerability of minors who enter this country unaccompanied, and to improve the treatment of such children while in government custody.").  Permitting Defendants to circumvent the Settlement and the TVPRA is contrary to the public's "interest in ensuring that statutes enacted by their representatives are not imperiled by

---

[14] Virtual inspections by independent contractors of Defendants' choosing are not sufficient to meet the requirements of the Settlement.  *Compare* App. to Stay at 4-5, *with* Settlement ¶¶ 32A, 33.

19

1  executive fiat." *East Bay Sanctuary Covenant*, 932 F.3d at 779 (internal citations

2  and alterations omitted).

3  **VII.  CONCLUSION**

4      For the foregoing reasons, Defendants' application for a stay should be

5  denied.[15]

6

7

8  Dated: September 18, 2020      CENTER FOR HUMAN RIGHTS AND
                                  CONSTITUTIONAL LAW
9                                 Carlos R. Holguín

10                                NATIONAL CENTER FOR YOUTH LAW
11                                Leecia Welch
                                  Neha Desai
12                                Poonam Juneja
13                                Freya Pitts
                                  Melissa Adamson
14

15

16                                */s/* Carlos Holguín
                                  Carlos Holguín
17                                *One of the Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25  [15] To the extent the Court is inclined to grant Defendants' motion, it should stay no
26  more than paragraphs 2 and 3 of the Order, such that monitoring of children held in
    hotels may proceed.  Nothing in Defendants' motion suggests they would suffer
27  irreparably should monitoring proceed pending disposition of their instant appeal.

28