WILKINSON WALSH LLP
Xiao Wang (SBN 301279)
Caitlin G. Callahan (*pro hac vice*)
xwang@wilkinsonwalsh.com
ccallahan@wilkinsonwalsh.com
2001 M Street NW, 10th Floor
Washington, D.C. 20036
Telephone:   (202) 847-4000
Facsimile:   (202) 847-4005

Jeremy S. Barber (*pro hac vice*)
Chanakya A. Sethi (*pro hac vice*)
jbarber@wilkinsonwalsh.com
csethi@wilkinsonwalsh.com
130 W. 42nd Street, 24th Floor
New York, NY 10036
Telephone:   (929) 264-7765
Facsimile:   (202) 847-4005

Rahul R.A. Hari (SBN 313528)
rhari@wilkinsonwalsh.com
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
Telephone:   (424) 291-9655
Facsimile:   (202) 847-4005

*Attorneys for Amici Amnesty International USA
and Human Rights Watch*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY L. FLORES, et al.,<br><br>                    Plaintiffs,<br><br>     v.<br><br>WILLIAM P. BARR,<br>Attorney General, et al.,<br><br>                    Defendants. | Case No. CV-85-4544 DMG (AGRx)<br><br>**COMMENTS OF AMICI AMNESTY INTERNATIONAL USA, HUMAN RIGHTS WATCH, AND LEGAL SERVICE PROVIDERS REGARDING DEFENDANTS' DRAFT DIRECTIVE ON IMPLEMENTATION OF THE NOTICE OF RIGHTS** |

Pursuant to the Court's Order of October 19, 2020, Dkt. No. 1009, Amici Amnesty International USA and Human Rights Watch (collectively, "Amici Human Rights Organizations") and Amici Legal Service Providers ("Amici LSPs") respectfully provide the following comments for the Court's consideration concerning Defendants' draft Directive on the implementation of the Notice of Rights, Dkt. No. 1007-2 (Oct. 16, 2020) (the "Draft Directive"):

## I.    COMMENTS OF AMICI HUMAN RIGHTS ORGANIZATIONS

Amici Human Rights Organizations appreciate the opportunity to provide their comments on the Draft Directive.[1]  Amici have met and conferred with Plaintiffs' counsel and seek here to provide supplemental comments that highlight their principal concerns with the Draft Directive.

In offering these comments, Amici are cognizant that the Draft Directive must be "consistent with Paragraph 29 and Exhibit 2 of the FSA, as well as this [Court's September 18, 2020 Opinion]."  *See* In Chambers Opinion, Dkt. No. 987, at 10 ("9/18 Op.").  Amici also "keep[] in mind that any remedies requested of the Court must fall within the scope of the FSA's terms and the Court's powers."  *Id.* at 11–12.[2]  To the extent the Court concludes that any of the following comments implicate

---

[1] As Plaintiffs note, we have not received copies of the Caregiver Questionnaire or Caregiver Custody Agreement referenced in the Draft Directive.

[2] Nevertheless, Amici are compelled to note the disingenuous framing of the Draft Directive as a document that seeks to "Maintain[] Family Unity."  That is nonsense. This is not a directive that promotes family unity.  It is a directive that promotes harmful prolonged detention, which is categorically at odds with a child's best interests.  *See* Human Rights Org. Br. at 6–7, Dkt. No. 961 (Aug. 31, 2020).  As this Court and others have noted, it is *the government* that has sought a path fundamentally destructive of a child's best interests by keeping families together through prolonged detention.  *See* 9/18 Op. at 1; *O.M.G. v. Wolf*, 2020 WL 4201635, at *12 (D.D.C. July 22, 2020).  The government has ample discretion to release families together, which would uphold family unity *and* the best interests of the child, but has refused to exercise it.  *See* Human Rights Org. Br. at 2–3.  Thus, the document is more aptly described as "Maintaining Family Detention."

1

issues beyond its remedial powers under the *Flores* agreement, Amici, like the Court, hope that "the parties [can] work together" to act on these concerns and thereby mitigate at least some of the harms flowing from the government's position and past practices, recognizing that "[the] best interests [of the child] should be paramount." 9/18 Op. at 12; In Chambers Order (July 9, 2018), Dkt. No. 455, at 7.

## A.  Notice of Rights (§ 5.1)

- Amici have previously urged that "Class Members' rights under the FSA should be communicated by prominently-displayed posters in all facilities where Class Members are detained, and KYR presentations should be conducted by legal services providers, other service providers, or relevant NGOs with expertise in the issues, either by live video or in-person, in a language that parents can understand, and with an opportunity for Q&A." Human Rights Org. Br. at 4, Dkt. No. 961 (Aug. 31, 2020); *see also id.* at 12. Plaintiffs have since endorsed these proposals. *See* Joint Status Report at 2, Dkt. No. 1002 (Oct. 9, 2020) ("10/9 Status Report"). The Draft Directive does not reflect these procedures, and Amici urge their inclusion to ensure meaningful protection of Paragraph 12.A's assurance that all Class Members will be informed of their rights under the *Flores* agreement.

- Paragraph 12.A of the *Flores* agreement does not limit dissemination of the Notice of Rights to Class Members detained in Family Residential Centers (FRCs). Thus, Amici, together with Plaintiffs, seek to ensure that the Notice of Rights will be disseminated to Class Members wherever they are under the care and custody of ICE, including FRCs, other ICE facilities, and hotels.

- The government's accompanying declaration notes multiple languages in which the Notice of Rights will be translated. *See* Harper Decl. ¶ 4, Dkt. No. 1007-03 (Oct. 16, 2020). Although the Draft Directives do not formalize a procedure for translation to accommodate languages outside of this list, Amici note that the Draft Directive does commit to providing the Notice of Rights "in a language that the parents or legal guardians understand" (§ 5.1). Thus, Amici understand that the

2

government has undertaken to regularly update its translations, as necessary, to reflect the language needs of detained Class Members and their families.

## B.   Initial Custody Determination (§ 5.2)

The Court has previously noted the need for "stricter compliance with Paragraphs 14 and 18," 9/18 Op. at 5, which includes the obligation to "make and record the prompt and continuous efforts on its part toward family reunification the release of the minor," FSA ¶ 18.  The Draft Directive appears largely silent on this obligation to document the government's efforts to fulfil its Paragraph 18 commitment.  Thus, pursuant to the remedy advanced by Amici and Plaintiffs, "the government should document on individual Class Members' parole worksheets all efforts to release parents with their children."  10/9 Status Report at 3; *see also* Human Rights Org. Br. at 9–10.

## C.   Parent or Legal Guardian Rights Regarding Accompanying Children (§ 5.3)

The Draft Directive proposes that a parent or legal guardian "may speak with a lawyer, a legal representative, family member, friend, social worker, or other individual of their choice."  § 5.3(2).  Pursuant to the remedy advanced by Amici and Plaintiffs, "Class Members should have access to consult with a child welfare expert to discuss issues relating to release versus remaining detained with a parent."  10/9 Status Report at 2; *see also* Human Rights Org. Br. at 12.

For purposes of § 5.3(2), Amici understand "social worker" to include a child welfare expert but wish to clarify that access to a child welfare expert should be separate from and in addition to the opportunity to consult with others enumerated in the Draft Directive.  That is, a parent or guardian's choice to speak to an attorney (for example) should *not* deprive them of an opportunity to consult with a child welfare expert.  The opportunity for consultation with a child welfare expert flows from the *Flores* agreement's requirement that suitability assessments for sponsors should "take into consideration the wishes and concerns of the minor." ¶ 17.  The expertise

of a child welfare expert may help children comprehend their situation and clarify their "wishes and concerns."[3]

### D.   Caregiver Vetting and Assessment (§ 5.4)

The *Flores* agreement recognizes the government is to carry out a "suitability assessment," *see* ¶ 17, and the Draft Directive identifies certain procedures associated with such an assessment, *see* § 5.4.  Amici offer the following questions for the parties' and Court's consideration in connection with such an assessment:

- Will the immigration status of a potential sponsor or their household members be considered in the Caregiver Custody Questionnaire?  Amici note that inquiry into the immigration status of the proposed sponsor and those living in their home will significantly discourage parents and legal guardians from recommending a sponsor.  Moreover, such an inquiry has little relevance to whether the proposed sponsor can provide a safe home for the Class Member, but it exposes the sponsor and those living with them to the threat of immigration enforcement—and thus negates the potential for the Class Members' release from detention.

- Who will be administering the Questionnaire and what procedures will be in place to regulate access to information regarding sponsors?  Given the 2018 Memorandum of Agreement between the Office of Refugee Resettlement and ICE to share background information on sponsors and members of sponsors' households, and the subsequent immigration enforcement against those sponsors and household

---

[3] Although Amici's proposal is grounded in the *Flores* agreement, we note that consideration of the child's wishes is an accepted best practice and international norm. *See, e.g.*, ABA Committee on Immigration, *Standards For the Custody, Placement and Care; Legal Representation; And Adjudication of Unaccompanied Alien Children In the United States* (2004), at III.D.2 ("A determination of the best interests of the Child shall take into account … the Child's expressed interests."), *available at* https://perma.cc/Y9JP-EAFP; U.N. High Commissioner for Refugees, *A Framework for the Protection of Children* (2012), at 28 (in order to act in a child's best interests, the child's views must be given "due weight in accordance with their age and level of maturity").

members based on that information collection, Amici are gravely concerned about this process and lack of safeguards to ensure no similar occurrence happens in this context.[4]  We would strongly urge policy guidance or a memorandum of agreement that would ensure no information obtained through this vetting process will be used for immigration enforcement by ICE and that any such information will be used solely to ensure that sponsors are suitable for children.  Amici are concerned about the potential collection and storage of biographic, biometric, and other information from sponsors and their family and household members, given that this information is generally transmitted and shared across a sweeping array of databases that can expose sponsors and their family and household members to risk of immigration enforcement.  Moreover, Amici would urge that information collection be limited to potential sponsors for the sole purpose of determining suitability for caregiving; that any data collected in the vetting process is to be strictly firewalled; and that sponsors can access legal recourse if their information is improperly shared for immigration enforcement purposes.

- How will the Questionnaire take account of the "wishes and concerns" of the Class Member, as required by Paragraph 17?  If not, how will the "wishes and concerns" of the Class Member be ascertained and memorialized?

- Will there be an opportunity for Plaintiff's counsel and Amici to review and comment on the Caregiver Questionnaire and Caregiver Custody Agreement?

---

[4] *See* Amnesty International USA, *No Home for Children: End the Contract to Operate the Homestead 'Temporary Emergency' Facility* (Oct. 18, 2019), *available at* https://perma.cc/XN6S-9DLG; Memorandum of Agreement Among the Office of Refugee Resettlement of the U.S. Department of Health & Human Services and U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection of the U.S. Department of Homeland Security Regarding Consultation and Information Sharing in Unaccompanied Alien Children Matters, *available at* https://perma.cc/LX6S-YRQZ; National Center for Youth Law, Center for Human Rights and Constitutional Law, and the University of California Davis School of Law Immigration Clinic, *The Flores Settlement Agreement & Unaccompanied Children in Federal Custody* (Feb. 2019), *available at* https://perma.cc/7DUS-QXCB.

5

If the Court believes that Amici's participation has been helpful, Amici would appreciate the opportunity to do so.

## II.    COMMENTS OF LSP AMICI

LSP Amici's response to Defendants' Draft Directive is necessarily limited to the directive submitted to the Court, which references numerous additional documents that have not been provided for review.

As an initial matter, the Draft Directive as drafted is beyond the scope of a Notice of Rights and appears designed to remediate the harm done to families and children under previous government policies such as "Zero Tolerance," rather than to provide a useful advisal of rights of children under the FSA. Further, the Defendants' assertion that the FSA does not require that children receive a written notice of rights in Footnote 1 overlooks explicit language included in the FSA. In 1997, the Defendants, operating as legacy INS, signed the Agreement promising that "[w]henever the INS takes a minor into custody, it … shall provide the minor with a notice of rights." The government's obligations are not new. The government is and has always been mandated to provide children in its custody a notice of their rights under the FSA.

The FSA seeks to preserve family unity and establishes a clear presumption that Class Members' will be expeditiously released from detention. FSA ¶¶ 12, 14. The FSA's terms therefore support a policy that favors prompt release of Class Members. As the Court has previously noted, it is the government's refusal to exercise its discretion to release families together that has precipitated the current violations of the FSA in conflict with the spirit and purpose of the Settlement. LSP Amici reiterate their position that detaining families together indefinitely is not consistent with law; Class Members have a right to release from detention under the FSA.

With this context in mind, LSP Amici respond to Defendants' Draft Directive as follows:

6

(1)     FSA ¶ 12A requires that children be released from secure and unlicensed detention "without unnecessary delay," which has been interpreted to mean within 20 days of entering custody. Given the proposed procedures listed in the Draft Directive at ¶¶ 2, 2.1, 2.2, and 5.4, it is unclear how the government intends to meet its mandatory obligations to Class Members under ¶ 12A of the FSA.

(2)     The framing of Draft Directive ¶ 2.1 ("[w]hen [ICE] determine[s] that the detention of an FSA Class Member is not required…") is contrary to the FSA's "General Policy Favoring Release," and in conflict with ¶¶ 12, 14, and 21. Further, LSP Amici believe the Notice of Rights must be provided to all Class Members (children) in addition to their parents, and legal guardians.

(3)     ¶ 3.2 of the Draft Directive incorporates and defines the term "caregiver." The use of this term, and not the term sponsor, is confusing given Defendants' historical use of the term "sponsor" reference to release determinations for Class Members. Further, LSP Amici recommend that all terms and procedures established in the Office of Refugee Resettlement's Policy Guide for Unaccompanied Children serve as a reference for accompanied children.

(4)     ¶ 3.7 of the Draft Directive alters the FSA's definition of "Class Member" by requiring that a child be "detained for immigration purposes," in conflict with ¶ 10 of the FSA which defines Class Members as "All minors who are detained in the legal custody of the INS."

(5)     The Draft Directive fails to define the term "suitability assessment." ¶ 4.4(4) of the Draft Directive entrusts the Deportation Officer with making suitability assessments. Deportation Officers are not child welfare experts and lack experience and training to assess the suitability of proposed sponsors. ¶ 5.4(1) reiterates that Deportation Officers, under the Draft Directive, are tasked with assessing the "ability of the caregivers to safely care for the class member." LSP Amici reiterate that ICE lacks necessary qualifications to play this role. ¶ 5.4(2) clarifies the inherent conflict in vesting Deportation Officers with child welfare determinations;

the immigration status of all individuals who reside within a household is irrelevant to whether a sponsor is able to safely care for a Class Member.

(6)　　The government's reporting responsibilities, in addition to those laid out in ¶¶ 4.2(d) and 4.4 of the Draft Directive, require specifically that the government "make and record the prompt and continuous efforts on its part towards ... the release of the minor." FSA ¶ 18.

(7)　　¶ 4.3 states ERO Supervisors will be responsible for reviewing requests and making "recommendations." The Draft Directive fails to clarify the purpose or scope of these recommendations.

(8)　　The government's proposal at ¶ 5.1 to provide a renewed Notice of Rights at 90-day intervals to families in custody appears to presume that Class Members will be subjected to long-term detention in secure and/or unlicensed facilities, which again, is in conflict with the FSA's "General Policy Favoring Release" of minors.

(9)　　The EOIR List of Pro Bono Legal Service Providers currently provided to Class Members includes contact information for free providers who represent individuals before designated immigration courts. These lists fail to provide Class Members detained at FRCs with notice that free legal services are available to them because currently available EOIR lists do not include a list specific to any FRC. The lists currently provided to Class Members are therefore insufficient to facilitate access to counsel because they do not include providers who are available within the jurisdictions in which each Class Member is detained.  This reality is exacerbated by current COVID-19 quarantine procedures at each FRC.

(10)　While the government is correct to acknowledge the likelihood of coercive tactics in the Draft Directive at ¶ 5.1(2), it is unclear how they will address coercive situations if and when they arise and how Class Members and their parents may report allegations of coercion.

8

(11)   The Draft Directive's reference to "normal and applicable custody determination procedures … as set out by the applicable statutes and regulations" at ¶ 5.2 conflicts with the government's release obligations and procedures under the FSA. Insomuch as this Draft Directive exceeds the scope of a Notice of Rights, provisions discussing the government's responsibilities and discretion with regard to Class Members' parents are not appropriately addressed in this Draft Directive. To the extent that this provision conflicts with the FSA as per Class Members, the FSA controls.

(12)   ¶ 5.3 of the Draft Directive provides that "class members will remain detained with their accompanying parents or legal guardians absent a knowingly and voluntarily affirmative request that the FSA Class Member be released to a caregiver and an order for such release from the Flores court." This provision is completely at odds with the government's affirmative duties under ¶¶ 12A, 14, and 18 of the FSA. As the Court has determined, a parent or legal guardian's silence regarding the separate release of an accompanying child does not constitute a waiver of rights under the FSA.

(13)   The Draft Directive lacks any procedures or guidance to facilitate the reunification of Class Members and parents who, subsequent to separation, seek reunification.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

Dated:  October 21, 2020

By: /s/ Chanakya A. Sethi

WILKINSON WALSH LLP
Xiao Wang (SBN 301279)
Caitlin G. Callahan (*pro hac vice*)
xwang@wilkinsonwalsh.com
ccallahan@wilkinsonwalsh.com
2001 M Street NW, 10th Floor
Washington, D.C. 20036
Telephone:  (202) 847-4000
Facsimile:   (202) 847-4005

Jeremy S. Barber (*pro hac vice*)
Chanakya A. Sethi (*pro hac vice*)
jbarber@wilkinsonwalsh.com
csethi@wilkinsonwalsh.com
130 W. 42nd Street, 24th Floor
New York, NY 10036
Telephone:   (929) 264-7765
Facsimile:   (202) 847-4005

Rahul R.A. Hari (SBN 313528)
rhari@wilkinsonwalsh.com
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
Telephone:   (424) 291-9655
Facsimile:   (202) 847-4005

*Attorneys for Amici Amnesty International USA and Human Rights Watch*

By: /s/ Bridget Cambria (with permission)

ALDEA – THE PEOPLE'S
JUSTICE CENTER
Bridget Cambria (*pro hac vice*)
bridget@aldeapjc.org
532 Walnut Street
Reading, PA 19601
Telephone:   (484) 877-8002

*Attorney for Amici Legal Service Providers*

10

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on October 21, 2020, I served the foregoing pleading on

3  all counsel of record by means of the District Clerk's CM/ECF electronic filing sys-

4  tem.

5                                                 /s/ Chanakya A. Sethi
                                                  Chanakya A. Sethi (*pro hac vice*)
6                                                 WILKINSON WALSH LLP
                                                  130 W. 42nd Street, 24th Floor
7                                                 New York, NY 10036

8                                                 *Attorney for Amici Amnesty International
                                                  USA and Human Rights Watch*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28