# Exhibit 1

**Declaration of D. Paloma Norris-York**

I, D. Paloma Norris-York, declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about the following facts.

2. I am an attorney with Immigrant Defense Oregon of Metropolitan Public Defender, located in Portland, Oregon. I am a member of the Oregon State Bar (OSB #965680). This declaration describes my experiences and observations representing B.B.B., as well as representing and consulting with others detained by ICE at the Cowlitz County Juvenile Detention Center ("Cowlitz").

3. I represent B.B.B. before USCIS and the Immigration Court. His 18th birthday is on November 15, 2020. After arriving in the United States, B.B.B. was released on July 24, 2014 into the care of his mother.

4. He was detained by ICE on October 18, 2018 and transferred to Cowlitz on June 3, 2019.

5. On April 14, 2020, I sent an email to ICE requesting release of B.B.B. to which I attached a six-page letter detailing why he was not a flight risk or danger, and a declaration of his mother, Marta Eugenia Boj Rosales, stating: "We have space and a bed for Brandon in our home and hope he can rejoin the family soon. I will provide for all of his needs here, including food, shelter, and enrolling him in school once schools reopen." Exh A attached hereto at ¶ 5 ("Rosales Decl."). It stated further that: "I will make sure Brandon attends all of his hearings with the Immigration Court. I will also make sure he attends any check-ins with ICE and updates his address with the court and ICE if we were to move." *Id*. at ¶ 7.

6. On April, 17, 2020, I received the an email response from ICE Deportation Officer Dan Peterson stating in part:

   > The request for release was reviewed and considered; however, given the minor's criminal background, he appears to be a flight risk and threat to public safety. On March 01, 2017, the subject was arrested by the Frederick Police Department on a Grand Jury Indictment Circuit Court Arrest Warrant for the charges of Conspiracy First Degree Murder, Assault First Degree, Conspiracy Assault First Degree, Assault Second Degree, Reckless Endangerment, Dangerous Weapon: Wear and Carry with Intent to Injure, and Participate Criminal Gang. On January 22, 2018, the subject's criminal case was remanded to the Juvenile Court. The subject was determined delinquent of 1st Degree Assault and Use of a Weapon. The minor has several detention facility write-ups, most recently for verbal assault. The minor meets the criteria for secure custody; which is listed under paragraph 21 of the Flores Settlement Agreement. JFRMU reviewed the case and also concurred with these

findings. The minor's release and reunification would pose a significant threat to society; therefore, he will not be released for reunification at this time. The minor's attorney can request a bond hearing before an immigration judge, and they may request release at that time.

7. Brandon's mother continues to be ready to provide for him and states that "[n]obody from ICE or immigration has called me to ask if we have a home ready for Brandon to come to when he is released." Exhibit B attached hereto at ¶ 10 ("Rosales November 2020 Decl."). His older brother and legal guardian, Nelson Ariel Boj, also declares that

> [n]obody from ICE or immigration has called me to ask if I have a home ready for Brandon to come to when he is released. I have received no letter or phone call from ICE about Brandon. He can live with me, and would have his own bedroom. I committed to providing for the physical, mental, and financial well-being of Brandon. There is less gang presence now than before. Before it was not safe to be out in the streets. I know Brandon could stay safe and away from the gangs now. I would keep him safe from COVID-19 by washing hands often, staying at home, and wearing a mask when he needs to go out. If we have symptoms of COVID-19, then we will go to a doctor. I can ensure that Brandon attends all of his hearings in Immigration Court he did for all of his hearings in the past. If we move, we will be sure to notify the Immigration Court within five days. I can ensure that Brandon attends all meetings with USCIS and ICE.

Exhibit C attached hereto at ¶ ¶ 5-9 ("N.A.B. November 2020 Decl.").

8. On October 2, 2020, I filed a Motion for Bond Redetermination on behalf of B.B.B. that requested a bond hearing. Exhibit D attached hereto ("Bond Motion"). On October 29, 2020, I received the Immigration Courts written decision dated October 23, 2020, denying the Motion for Bond Redetermination. Exhibit E attached ("2020 Bond Denial"). The decision states, "[b]ecause the Court does not find that B.B.B. demonstrated a material change in circumstances, the IJ refused to grant B.B.B. a bond hearing." *Id*. at p.3. I plan to appeal that decision on B.B.B.'s behalf. My understanding based on my own experience and hearing from other immigration attorneys is that the appeal process usually takes 5-6 months. If the BIA does remand for the Immigration Judge to explain the reasoning behind his decision, then we would appeal that decision.

9. The declaration of potential sponsor Patricia Fink was submitted with the Bond Motion and states: "We want to provide housing, food, clothing, and other necessities for Brandon Eusebio Bernardino Boj upon being released from detention. Additionally, we want to provide him with a physically and emotionally safe and supportive family environment." Exhibit F attached hereto at ¶ 2 ("P.F. Sept. Decl"). In a separate declaration, Ms. Fink states: "We are committed to providing for the physical, mental, and financial well-being of Brandon Bernardino Boj. We live in a home with three bedrooms and one and a half bathrooms. Brandon will have his own bedroom. Our home is in a safe, residential neighborhood." Exhibit G attached at ¶ 3-4 ("P.F.

Nov. Decl"). Ms. Fink has informed me by telephone that ICE has not contacted her regarding B.B.B.

10. A comprehensive, 19-page psychological evaluation of B.B.B. by Dr. Amy Cohen, PhD was submitted as an exhibit to the Bond Motion. Exh ? attached hereto ("Psych Eval"). The Psych Eval is dated Sept. 21, 2020 and was based on both her review of numerous records and 5.5 hours of interviewing B.B.B.. Exh H at pp. 4, 19.

11. Dr. Cohen's "area of expertise is the impact of both juvenile and immigration detention on youth, especially those with histories of trauma. [She] served as lead psychiatrist at Alameda County Juvenile Hall in California for approximately 2 years and, during that time, served a population of up to 200 incarcerated youth, many of them verifiably gang affiliated. [She] also ran a consultation service for Superior Court judges presiding over juvenile cases." Exhibit H at p. 1.

12. Dr. Cohen concluded: "The government has deemed [B.B.B.] 'too dangerous' to be released despite the few incidents in which he has engaged and which have all represented low-risk, impulsive behavior typical of adolescents with similar histories. If adjudicated in a juvenile (or criminal) court, he would never receive such a sentence for these behaviors. In a myriad of ways, [B.B.B.] has demonstrated his commitment to work on the issues of anger and frustration which followed a difficult childhood of trauma, betrayal, loss, and the sort of isolation and deprivation that these years of incarceration have inflicted on him. His ability to manage his feelings has demonstrably and impressively improved. He demonstrates absolutely no signs of psychopathy or sociopathy suggesting an underlying constitutional dangerousness. The label of 'gang affiliation' appears to represent 'guilt by association' and is not supported by data, including his comportment over the course of his incarceration." Exhibit H at p. 2.

13. On October 18, 2018, the Circuit Court for Frederick County Maryland sitting as a juvenile court entered an "Order of Probation" stating that "the Respondent has been found to have committed the delinquent act(s) of: (1) Ct#1 – First Degree Assault (2) Ct#2 Wear and Carry Weapon with Intent to Injure . . . and the Court has determined that the Respondent should be placed on probation[.]" Exhibit I attached hereto ("Probation Order").

14. Regarding the single incident of juvenile delinquency B.B.B. committed in February of 2017, when he was 14, Dr. Cohen's Evaluation provides the following context: "One day in the late winter of 2017, B was walking through a park when he found himself surrounded by members of Mara 18, Kevin amongst them. Kevin carried a baseball bat while the others had BB guns. While the others trained their guns on B , Kevin attacked with the baseball bat, fracturing B 's arm as he attempted to protect his head and face from Kevin's blows. Taken to the hospital, B was told that he must keep his arm in a cast for 6 weeks. B did not go to the police. Edwin felt they must personally retaliate against those who had attacked him. If not - Edwin warned -

they would be seen as weak. B - and perhaps other members of the family - would be attacked again, and Edwin would lose face with those in MS-13. B resisted his brother's pressure to retaliate but ultimately agreed to join him. On February 10, 2017, Edwin brought a BB gun and B pocketed a machete that he'd never before carried." Exh H at p. 6.

15. Dr. Cohen's expert opinion based on watching a video of most of the assault is that: "Of note is that - more than anything - this resembles a fist fight rendered unfair only because it was two boys against one. However, it appears in the video that [B.B.B.] barely participates and that it is actually his brother who principally pummels Kevin while [B.B.B.] stands at a distance. The machete is clearly tucked between [B.B.B.]'s legs in a manner that is far more likely to injure [B.B.B.] than Kevin. It is also evident in the video that [B.B.B.] could easily have brandished and used that machete had he wished to truly hurt Kevin. In short, the video substantiates what Brandon has consistently related regarding this incident: that he was deeply ambivalent, not prone to violence, and that his intention was really to 'scare' Kevin, and never to truly hurt him. Of note is that, at the end, all parties walk away on their own steam without any obvious serious injuries." Exhibit H at p. 7. A link to the video was submitted to the Immigration Court with the Bond Motion.

16. Maryland law states "a court record pertaining a child is confidential and its contents may not be divulged by subpoena or otherwise, except by order of the court upon good cause shown or as otherwise provided in S 7-303 of the Education Article." MD. Code, Cts. & Jud. Proc. S 3-8A-27(b)(1). ICE has never demonstrated that it obtained records of the juvenile case through the required court order. Regarding police documents, Maryland law states "a police record concerning a child is confidential and shall be maintained separate from those of adults. Its contents may not be divulged by subpoena or otherwise, except by order of the court upon good cause shown or as otherwise provided in S 7-303 of the Education Article." MD. Code, Cts. & Jud. Proc. S 3-8A-27(a)(1). Furthermore, documents that are part of the record of a Maryland juvenile proceeding are "not admissible against a child in any other proceeding in any other court, except in a criminal proceeding where the child is charged with perjury and the evidence is relevant to that charge and is otherwise admissible." MD. Code, Cts.& Jud. Proc. S 3-8A-23(c).

17. A three-page, unsigned psychological evaluation of B.B.B., dated Nov. 29, 2018, was performed by Rocco Manfredi, MD. and relied upon by ICE and the Immigration Judge in B.B.B.'s 2018 bond hearing. The evaluation contains the entirely erroneous statement that "[B.B.B.]'s legal history began last year when he was arrested for attempted murder. That is, he hacked a man with a machete." The video of the incident I have reviewed and the charge sustained by the juvenile court make absolutely clear that B.B.B. was not arrested for "attempted murder" and never "hacked a man with a machete." The indictment does not contain a charge of attempted murder and video evidence shows the victim appearing unharmed and not bleeding from being hacked as he walks away from the fight.

18. DHS submitted as evidence, a "gang card" from the Frederick, Maryland police. The list of "validation criteria requires at least two for gang member" and checks off the following boxes: "Individual Has Been Identified As A Gang Member *By An Untested Source* . . . Individual Has Been Seen Displaying Gang Hand Signs, Possesses Symbol, Logos, Graffiti, Documents (must be described) . . . Individual Associates With Validated Gang Members, Individual Arrested with Validated Gang Member." According to the arrest report, the associate he was stopped in the presence of and with whom he was arrested was his brother, "[s]ubject [B.B.B.] was stopped and identified with his brother (validated MS-13)" and "[s]ubject [B.B.B.] was arrested with his brother" – neither entry mentions the presence of any other MS-13 members, only his brother. The criteria of "being seen" displaying a hand signal does not have any description as required. It states "[t]here were numerous MS-13 related images in the cellular phone to include the below displayed images." None are displayed.

19. During B.B.B.'s 7.5 months in ICE custody at Abraxas Academy, a teacher states as follows: "my belief is that he is a good hearted kid with a solid moral compass. . . . He is compassionate towards others, especially after he has formed a bond. I developed a strong bond with Brandon as he was there for almost one year. At the end of his time there, he was the only boy in ICE detention left at Abraxas. . . . I believe 100% that he was provoked into fighting the staff because they were taunting him." Exhibit J attached hereto ("Letter from Rebecca Mogul"). This letter was submitted with the 2020 Bond Motion.

20. Dr. Cohen stated that "[i]t is notable that all of [BBB]'s episodes of poor behavior have been entirely normative for youth of his age, history of deprivation and poverty, exposure to what it means to be disrespected and how to counter this. Over the course of my work as the lead psychiatrist at a Juvenile Hall in Alameda County, California, I witnessed many, many instances of kids "losing it" from a toxic combination of traumatic histories, inadequate treatment, lack of good role modeling, hopelessness for their future, and the incarceration which itself often underscored their experience of hopelessness. Using one's fists in these situations would never have resulted in long term incarceration for these youth, and certainly not in a permanent designation of "dangerousness". [BBB] is not a boy who has ever engaged in violence with a weapon (despite having carried one to his assignation with Kevin) and has lashed out impulsively in a manner wholly consistent with his history, age, isolation, protracted detention. His capacity to now manage more successfully his impulsivity is likely a matter of increased brain maturity mixed with a strong determination to do well and have a real future and healthy life for himself." Psych Eval Exh H at p. 15.

21. A letter from Cowlitz staff person submitted with the Bond Motion states: "[BBB] has been here approximately 458 days and the majority of the time he has been level 4 status. I praise him for being able to maintain a positive mindset while he fights his case. [BBB] has only 1 major infraction during his time. This is amazing for how long he has been here. Brandon has always been very respectful to staff and peers." Exhibit K attached hereto.

22. A letter from the Cowlitz Care Coodinator submitted with the Bond Motion states: "[B.B.B.] has always been great to work with and has treated me with great respect. Over the several months that he has been here, he has always offered to help interpret for me when dealing with Hispanic youth for a quick question. He has been a sort of big brother to new kids in detention and has been respectful to them … [B.B.B] has been here 15 months and has strived to do his very best and help where he can. He has had a few hiccups but has always rebounded to get back to level 4 privilege status which is the highest status. I have seen him grow as a leader during his time here and he will soon be turning 18 and venturing off into adulthood. I wish him the best!!!!" Exhibit L attached hereto .

23. The Cowlitz chaplain stated that B.B.B. "has shown to be very faithful and mature young man who is actively involved and shows to be a positive influence on other person." Exh M attached hereto ("Letter from Chaplain Rick Terrazas"). And the Cowlitz teacher said that B.B.B. "has only two documented times when he was removed from class due to behavior. Most of the time he has been able to pull it together or take a break and calm down before coming back to class. As a general rule, however, he conducts him self very well in class (other than being off task quietly). Given that he has now been in our facility for 459 days, he has done quite well." Exhibit N attached hereto.

24. Patricia Fink who wants to sponsor B.B.B. shared: "We have spent more than seven hours talking with [BBB] twice a week for the past six weeks via video conferencing and phone calls. We have enjoyed getting to hear about his interests and what he looks forward to doing once he is released. I have gotten to know him well and believe he has changed tremendously since he did his act of delinquency. The fact that he only lost control and struck a peer one time during his 17 months in the detention center here in Washington is commendable given the solitary confinement he experiences, zero time outside, and often less than an hour of or no exercise time each day. He truly is committed to a non-violent future and avoiding any gang contact. We will support the positive endeavors he will engage in here in our community." P.F. Nov. Decl. Exh G at ¶ 10.

25. The 19-year old son of Patricia Fink has become a mentor to B.B.B. and shared: "I have spent more than seven hours talking with [BBB] twice a week for the past six weeks via video conferencing and phone calls. He and I share many similar interests and we have formed a strong bond already. We are especially looking forward to playing soccer and fly fishing together outside. [BBB] has written to me that he is excited to have an older brother who can give him good advice and help with his studies and improving his already good English. I am committed to assisting [BBB] with his studies, introducing and integrating him into our welcoming community, and providing any opportunities for his growth that he wishes to endeavor upon; in short, I will be a mentor to [BBB]. I have had the opportunity to speak with [BBB] about his past and viewed the video of the incident which led to his detention in Maryland. All my interactions with [BBB] and everything I have encountered has incontrovertibly indicated to me that [BBB] is demonstrably changed and is committed to non-violence, despite the great hurdles presented by the harsh conditions of incarceration. I believe

he is committed to becoming a lawful permanent resident and being a positive member of our community. Exhibit O attached hereto.

I declare under penalty that the foregoing is true and correct. Executed this 4th day of November, 2020, in Portland, State of Oregon.

_____
D. Paloma Norris-York