CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>            Plaintiffs,<br><br>        v.<br><br>WILLIAM P. BARR, Attorney General<br>of the United States; *et al.,*<br><br>            Defendants. | Case No. CV 85-4544-DMG<br><br>**EXHIBITS A-O TO EXHIBIT 1 (DECLARATION OF PALOMA NORRIS-YORK) IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO LIFT RESTRICTIONS IN PARAGRAPH 4.E OF THE JUNE 26, 2020 ORDER, ECF NO. 833[1]**<br><br>Requested Hearing: November 13, 2020 9:30 AM<br><br>[HON. DOLLY M. GEE] |

---

[1] As done in previous pleadings, Plaintiffs have redacted the name, date of birth, and ICE "A" number of Class Member B.B.B. Plaintiffs have also redacted the surnames of B.B.B.'s brother and mother. Defendants are in possession of this information from previous filings in this case and filings in B.B.B.'s administrative case.

# Exhibit A

**Declaration of Marta Eugenia B█████**

1. My name is Marta Eugenia B████. B█████████ is my son.

2. My phone number is ██████████.

3. My home address is 113 Stonegate Drive, Frederick, MD 21702.

4. I am married to Francisco A███, a U.S. citizen and B█████'s step-father. My husband would like to submit a Petition for Alien Relative for B████.

5. We have space and a bed for B█████ in our home and hope he can rejoin the family soon. I will provide for all of his needs here, including food, shelter, and enrolling him in school once schools reopen.

6. We are able to pay a bond, if necessary, for B█████'s release.

7. I will make sure B█████ attends all of his hearings with the Immigration Court. I will also make sure he attends any check-ins with ICE and updates his address with the court and ICE if we were to move. I will find an attorney for B█████s Immigration Court proceedings.

8. This declaration was read to me in Spanish over the phone on April 5, 2020 and I confirmed that everything in this declaration is correct.

Marta Eugenia B█████

---

Certificate of Translation

I, D. Paloma Norris-York, swear that I am fluent in Spanish and English and that I read the above declaration to Marta Eugenia B█████ translated into Spanish to the best of my abilities and she confirmed that it was correct. Due to the declarant's limited resources and Covid-19, she was unable to sign this declaration.

_____          4/8/2020
Signature                        Date

002

# Exhibit B

**Declaration of Marta Eugenia B█ R██████**

I, Marta Eugenia B█ R██████ declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about the following facts.

2. My name is Marta Eugenia B█ R██████. B███████ B████████ B█ is my son. His birthdate is November ██████.

3. He is currently detained by ICE at the Cowlitz County Juvenile Detention Center in Washington State.

4. My phone number is ████████████. I live in Frederick, Maryland with my husband, Francisco A█████. My husband is a U.S. citizen and plans to submit a Petition for Alien Relative for B██████. My husband is retired and receives $700 each month in retirement. I earn about $1,400 a month.

5. When B██████ was 14, my life was difficult because I had cancer still, and was a single working mother two jobs. I had a hard time supervising B██████ and his brother. B██████ was a good boy. His brother was a problem. His brother got involved with a gang but B██████ did not.

6. Before February 2017, B██████ had no criminal record and had not violated the law. For his crime, he spent about 19 months in custody in Maryland and then, in a court hearing on October 18, 2018, a judge released him to come home but he was taken by ICE while he was still in the courthouse. He finished his probation in March of this year. I have spoken with Brandon about what he did and I know he feels badly about following his brother and going to the fight. I know he is committed to not spending any time with any gang member or breaking the law in any way.

7. While B██████ was in ICE detention at Abraxas Academy, I was able to make the two-hour trip to visit him a few times. While he has been at the Cowlitz County Juvenile Detention Center, I have been unable to visit him. I cannot send him gifts because he is limited to having only chapstick and a deck of playing cards in his cell.

8. The immigration attorney I found for him continued representing him when he was at Abraxas Academy but had to stop working on his case because of the distance to Washington State.

9. While B██████ has been at Cowlitz, he has been very sad. Since the pandemic started, he has been scared about getting COVID-19 or me getting it and dying because of my cancer.

10. Nobody from ICE or immigration has called me to ask if we have a home ready for B██████ to come to when he is released. Nobody from ICE has called me about B██████.

11. He can live with us, and would have his own bedroom. We are committed to providing for the physical, mental, and financial well-being of B██████. We would keep him safe from COVID-19 by washing hands often, staying at home, and wearing a mask when he needs to go out. If anyone in our home has symptoms of COVID-19 we will go to a doctor.

12. I can ensure that B██████ attends all of his hearings in Immigration Court as I did for all of his hearings in the past. If we move, we will be sure to notify the Immigration Court within five days. I can ensure that B██████ attends all meetings with USCIS and ICE.

I declare under penalty of perjury that the foregoing was read to me in Spanish and is true and correct. Executed on this 3rd day of November, 2020, in Fredrick, Maryland.

_Marta Eugenia_ ███████

Marta Eugenia B█R████

---

**Certificate of Translation**

I, D. Paloma Norris-York, swear that the foregoing was prepared by me based on the oral statements of Marta Eugenia B█R████, that I am fluent in Spanish and English and that I read the above declaration to Marta Eugenia B█R████ translated into Spanish to the best of my abilities and she confirmed that it was correct.

_____        11/03/2020
D. Paloma Norris-York                              Date

005

# Exhibit C

**Declaration of Nelson Ariel B█**

I, Nelson Ariel B█, declare as follows:

1. This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about the following facts.

2. My name is Nelson Ariel B█. B████ B███████ B█ is my younger brother. His birthdate is ███████████ On December 15, 2015, the Circuit Court for Frederick County Maryland appointed me as B██████'s guardian. I was appointed as guardian at that time because our mother was being treated for cancer. I continue to be his guardian.

3. He is currently detained by ICE at the Cowlitz County Juvenile Detention Center, in Washington State.

4. My phone number is ██████████. I live by myself in a two-bedroom apartment in Frederick, Maryland. I earn about $4,000 a month.

5. Nobody from ICE or immigration has called me to ask if I have a home ready for B█████ to come to when he is released. I have received no letter or phone call from ICE about B█████.

6. He can live with me, and would have his own bedroom. I committed to providing for the physical, mental, and financial well-being of B█████.

7. There is less gang presence now than before. Before it was not safe to be out in the streets. I know B█████ could stay safe and away from the gangs now.

8. I would keep him safe from COVID-19 by washing hands often, staying at home, and wearing a mask when he needs to go out. If we have symptoms of COVID-19, then we will go to a doctor.

9. I can ensure that B█████ attends all of his hearings in Immigration Court he did for all of his hearings in the past. If we move, we will be sure to notify the Immigration Court within five days. I can ensure that B█████ attends all meetings with USCIS and ICE.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 3rd day of November, 2020, in Fredrick, Maryland.



Nelson Ariel B█

# Exhibit D

D. Paloma Norris-York                                          **DETAINED**
Metropolitan Public Defender
630 SW 5th Ave. Suite 500
Portland, OR 97204
Google Phone (541)623-0585

Attorney for Respondent

## UNITED STATES DEPARTMENT OF JUSTICE

Executive Office for Immigration Review

Office of the Immigration Judge

Portland, Oregon

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | IN REMOVAL PROCEEDINGS |
| B█████████████████████ | ) | File No.: A ████████ |
| | ) | |
| Respondent | ) | IJ: Richard Zanfardino |
| | ) | MCH: November 5, 2020, 1:00pm |
| _____ | ) | |

**RESPONDENT'S MOTION FOR BOND REDETERMINATION**

UNITED STATES DEPARTMENT OF JUSTICE
Executive Office for Immigration Review
Office of the Immigration Judge
Portland, Oregon

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | IN REMOVAL PROCEEDINGS |
| B▇▇▇▇▇▇▇▇▇▇▇▇ | ) | File No.: A ▇▇▇▇▇▇ |
| | ) | |

## RESPONDENT'S MOTION FOR BOND REDETERMINATION

The Respondent, B▇▇▇▇▇▇▇▇▇▇ through undersigned counsel, submits

the following in support of his motion and requests that an Immigration Judge secure his release

from custody pursuant to 8 C.F.R. §1003.19 and 8 C.F.R. § 1236.3. Respondent requests that he

be released on recognizance or released on non-monetary conditional parole; alternatively, he

requests that any bond set, be set in the lowest amount of $1,500.

Respondent is currently detained with no bond by U.S. Immigration and Customs

Enforcement (ICE) at the Cowlitz County Juvenile Detention Center.

In support of his motion, Respondent, through undersigned counsel, asserts the following:

1. Respondent was taken into custody by ICE on October 18, 2018 upon successfully

   completing his sentence in Maryland state juvenile detention. Currently, he is being held

   at the Cowlitz County Juvenile Detention Center in Longview, Washington where he has

   been since June 3, 2019.

2. The BIA has repeatedly held that the Government should not detain an alien except on a

   finding that she is dangerous or is a poor bail risk. *Matter of Andrade*, 19 I&N Dec. 488

   (BIA 1987), citing *Matter of Patel*, 15 I&N Dec. 66 (BIA 1976); *see Matter of Guerra*, 24

   I&N Dec. 37, 38-40 (BIA 2006); *see also Carlson v. Landon*, 243 U.S. 524 (1952).

3. It is the statutory duty of an Immigration Judge to decide whether the alien should be released and, if so, to "determine the amount of bond, *if any*, under which the Respondent may be released." 8 C.F.R. § 1236.1(d)(1) (emphasis added); *see Rivera v. Holder*, 307 F.R.D. 539, 553 (W.D. Wash. 2015) (Immigration judges possess authority to order release not subject to a monetary bond.). "The determination of the Immigration Judge as to custody status or bond may be based upon any information that is available to the Immigration Judge or that is presented to him or her by the alien or the Service." 8 C.F.R. § 1003.19. This includes information regarding the alien's status as an indigent person. *See Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017) (affirming District Court's consideration of ability to pay and alternative forms of conditional release in a determination of bond proceeding).

4. In this case, Respondent should be released on his own recognizance, released on conditional parole, or released on a $1,500 bond because he does not pose a flight risk, he is not a danger to the community, and he is an indigent teenager. Further bases for release are 1) the length of his ICE detention and the impossibility of an USCIS interview in the foreseeable future, and 2) the risk to his mental and physical health of continued, indefinite detention and transfer to adult detention, including two weeks of quarantine, given both his depression and COVID-19.

WHEREFORE, Respondent respectfully requests that Your Honor schedule a bond hearing in the next three weeks. Undersigned counsel is unavailable the week of October 26-29. Respondent's testimony is expected to take two hours, including Spanish interpretation. Respondent requests that an audio recording of the hearing be made.

# Exhibit E

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
1220 SW 3RD AVENUE, SUITE 500
PORTLAND, OR  97204


Metropolitan Public Defender
Norris-York, D Paloma A
630 SW Fifth Ave, Suite 500
Portland, OR  97204

In the matter of              File A ▮▮▮▮▮▮       DATE: Oct 26, 2020
B▮▮▮▮▮-B▮▮, B▮▮▮▮▮

\_\_  Unable to forward - No address provided.

✓  Attached is a copy of the decision of the Immigration Judge. This decision
   is final unless an appeal is filed with the Board of Immigration Appeals
   within 30 calendar days of the date of the mailing of this written decision.
   See the enclosed forms and instructions for properly preparing your appeal.
   Your notice of appeal, attached documents, and fee or fee waiver request
   must be mailed to:    Board of Immigration Appeals
                         Office of the Clerk
                         5107 Leesburg Pike, Suite 2000
                         Falls Church, VA 22041

\_\_  Attached is a copy of the decision of the immigration judge as the result
   of your Failure to Appear at your scheduled deportation or removal hearing.
   This decision is final unless a Motion to Reopen is filed in accordance
   with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. §
   1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. §
   1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your
   motion must be filed with this court:
                         IMMIGRATION COURT
                         1220 SW 3RD AVENUE, SUITE 500
                         PORTLAND, OR  97204

\_\_  Attached is a copy of the decision of the immigration judge relating to a
   Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. §
   1208.31(g)(1), no administrative appeal is available. However, you may file
   a petition for review within 30 days with the appropriate Circuit Court of
   Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.

\_\_  Attached is a copy of the decision of the immigration judge relating to a
   Credible Fear Review. This is a final order. No appeal is available.

\_\_  Other: _____


                              _____
                              COURT CLERK
                              IMMIGRATION COURT                    FF

   cc: OFFICE OF CHIEF COUNSEL
       1220 SW 3RD AVE., SUITE 300
       PORTLAND, OR,  97204

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
PORTLAND, OREGON


File:  A███████████                         Date:   October 23, 2020

In the Matter of

                                      )
B███████ B███████████ -B███           )
                                      )        IN REMOVAL
                                      )        PROCEEDINGS
   RESPONDENT                         )


ON BEHALF OF RESPONDENT:   D. Paloma Norris-York, Esq.

ON BEHALF OF DHS:   Gina Emanuel, Assistant Chief Counsel

### ORDER ON MOTIONS RELATED TO BOND REDETERMINATION

The Respondent is a detained juvenile who previously requested a release
bond.  That request was denied by a different Immigration Judge on December
18, 2018.  The trier of fact found that the Respondent was both a danger to the
community and a flight risk.  No reviewing authority overturned those findings.

This Court is in receipt of Respondent's motion for a bond
redetermination (filed October 2, 2020), as well as Respondent's motion for a
non-telephonic hearing on the bond redetermination (filed October 13, 2020).
The Court has carefully reviewed the entirety of Respondent's submissions.  In
response to Respondent's motions, the Department of Homeland Security
("DHS") filed two pleadings:  (1) an evidence packet regarding Respondent's
criminal history, along with his subsequent behavior while in juvenile custody,
and (2) an opposition to Respondent's motion for a bond redetermination.  The
DHS respectively filed those pleadings on October 14 & 15, 2020, and the
Court reviewed the entirety of those documents.  The Court likewise thoroughly
considered Respondent's reply to the DHS pleadings, filed October 21, 2020.
Respondent also filed a subpoena request on September 30, 2020; the DHS
filed an opposition to that request on October 16, 2020.

Upon review of the various filings, and having considered the requests,
the Court concludes that the DHS is correct in its assertion that Respondent
has failed to establish materially changed circumstances since the prior

Immigration Judge Order
October 23, 2020

Immigration Judge's denial of a release/surety bond, sufficient to warrant a
bond redetermination. The Court agrees with the DHS that Respondent has
not articulated a sufficient basis under the applicable regulations to
demonstrate that a second bond hearing is warranted under the facts and
circumstances of this case. The Court reaches this conclusion even taking into
account the unique nature of the global COVID-19 pandemic faced by virtually
all residents of the United States.

Because the Court does not find that Respondent has demonstrated a
material change in circumstances, it need not address DHS arguments
asserting that Respondent's behavior during his time in custody further
substantiates that he is a danger to the community and a flight risk. The
evidence of Respondent's actions subsequent to the prior Immigration Judge's
findings would only be probative had the Court concluded that there has been
a material change in circumstances. But, as noted above, the Court instead
agrees with DHS arguments that Respondent has not demonstrated a material
change warranting a second custody determination. The Respondent's request
for a subpoena is likewise denied, as the Court again agrees with the
arguments articulated by the DHS that the issuance of a subpoena is not
warranted.

Accordingly, the following orders will be entered:

Respondent's subpoena request is **DENIED**.

Respondent's motion for a bond redetermination is **DENIED**.

Respondent's motion for a non-telephonic custody redetermination
hearing is **DENIED** as moot.

Richard Zanfardino
United States Immigration Judge

# Exhibit F

## Declaration of Patricia Fink

I, Patricia Frances Fink, declare as follows:

1. This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about the following facts.

2. We want to provide housing, food, clothing, and other necessities for B████ ████ B████ B█ upon being released from detention. Additionally, we want to provide him with a physically and emotionally safe and supportive family environment.

3. We understand that it is the desire of B████'s mother that he live with us in order to have a fresh start in a safe community where he can focus on his education and, eventually, get a job. We wish to provide a comfortable educational environment with the supplies and support he needs to peruse his education and can help him to find a job.

4. I am a United States Citizen living in White Salmon, Washington with my 19-year old son, Hans Peter Fink . We live in a ranch style house with three bedrooms and one and a half bathrooms in a safe residential neighborhood which is an economically, politically, and ethnically diverse and integrated community that borders on natural parks. We have lived in this home since last year after we moved from Portland where my son Peter was finishing up high school. My son Peter attended University of Washington (UW) in Seattle this past year but came home in March due to COVID-19.  He is currently enrolled in online classes with UW from home and is ready, willing and able to  help B████ get adjusted and acclimated to our home, his new school and the broader community. I work as the executive director of a smaller public transit agency in Hood River, OR and make enough to support myself, my son, and B████.

017

5.  My son is fluent in Spanish and I speak a fair amount. There is a large Hispanic population in the agricultural area where we live, and just across the Columbia River in Hood River, Oregon there are numerous Hispanic oriented businesses and organizations. We are involved in our community and look forward to sharing it with B███.

6.  We understand that B████ had a rough childhood in Guatemala and that his brother living there has been involved with MS-13. We know about the assault where he had a machete that led to him doing time in Maryland juvenile detention before he was detained by ICE. We understand that he is on medication for depression and we will support him accessing services for his continued treatment.

7.  We have spoken with B████ via video conferencing a couple of times and plan to continue talking with him at least once a week. We have enjoyed getting to hear about his interests and what he looks forward to doing once he is released.

8.  I can ensure that B████ attends all of his hearings in Portland Immigration Court.

9.  My family has been following strict health protocols to protect ourselves from exposure to COVID 19. We will keep B███ safe from COVID 19 by continuing our actions of limiting interactions with people outside our family, wearing masks when around others, and frequent hand washing. If he or any family member shows signs of COVID 19 we will seek immediate testing and any appropriate medical care.

10. We are hopeful that we will have the chance to help him be safe as he waits for his immigration applications go through the process. If the Judge has any questions, I can be reached by telephone at (503) 793-1256.

Under penalty of perjury of the laws of the United States, I declare that the following is true

_____                    9/15/2020
Signature                                    Date

# Exhibit G

## Declaration of Patricia Fink

I, Patricia Frances Fink, declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about the following facts.

2. I am a United States Citizen living in White Salmon, Washington with my 19-year old son, Hans Peter Fink ("Peter").

3. We are committed to providing for the physical, mental, and financial well-being of B██████ B███████ B██.

4. We live in a home with three bedrooms and one and a half bathrooms. B██████ will have his own bedroom. Our home is in a safe, residential neighborhood.

5. I work as the executive director of a public transportation agency in Hood River, Oregon, and earn $██0,000 annually. I have the flexibility to work from home and can supervise B█████ when he is not in school. My Affidavit of Support, Form I-134, accompanies this declaration.

6. We want to provide housing, food, clothing, and other necessities for B██████ upon being released from detention. Additionally, we want to provide him with a physically and emotionally safe and supportive family environment. We understand that he is on medication for depression and we will support him accessing services for his continued treatment. Both B█████ and his mother, Marta Eugenia Boj Rosales, desire that B█████ live with us.

7. I can ensure that B██████ attends all of his hearings in Portland Immigration Court and all of his appointments with his immigration attorney, Paloma Norris-York.

8. My son, Peter, is a student at the University of Washington in Seattle, where he currently has a 4.0 GPA. He also is Eagle Scout, having completed the necessary requirements in May 2019. He will be living at home for most of the 2020-2021 school year, studying remotely. Peter is fluent in Spanish and I speak a fair amount.

9. We understand that B██████ had a rough childhood in Guatemala and that his brother living there has been involved with MS-13. We have seen a video of the February 2017 fight they were in that led to B██████ doing time in Maryland juvenile detention before he was detained by ICE moments after a Maryland juvenile judge released him from custody to return to living in his community.

10. We have spent more than seven hours talking with B██████ twice a week for the past six weeks via video conferencing and phone calls. We have enjoyed getting to hear about his interests and

what he looks forward to doing once he is released. I have gotten to know him well and believe he has changed tremendously since he did his act of delinquency. The fact that he only lost control and struck a peer one time during his 17 months in the detention center here in Washington is commendable given the solitary confinement he experiences, zero time outside, and often less than an hour of or no exercise time each day. He truly is committed to a non-violent future and avoiding any gang contact. We will support the positive endeavors he will engage in here in our community.

11. My family has been following strict health protocols to protect ourselves from exposure to COVID 19. We will keep B█████safe from COVID 19 by continuing our actions of limiting interactions with people outside our family, wearing masks when around others, and frequent hand washing. If he or any family member shows signs of COVID 19 we will seek immediate testing and any appropriate medical care.

12. We are hopeful that we will have the chance to help him be safe as he waits for his immigration applications go through the process. If the Judge has any questions, I can be reached by telephone at (503) 793-1256.

Under penalty of perjury of the laws of the United States, I declare that the following is true

_____                    10/31/2020
Signature                                          Date

023

# Exhibit H

# Amy J Cohen MD

815 North Harper Avenue
Los Angeles, California 90046
(339) 223-0695
amy@everylastone.org

## **PSYCHIATRIC EVALUATION**

**NAME:** B█████████ B█████████ B█

**Date of birth:** ████████████

**Age:** 17 10/12

**Alien number:** ████████████

## QUALIFICATIONS

My name is Dr. Amy J. Cohen.  I am licensed to practice medicine in the state of California.  I received my medical degree with honors from the Perelman University of Pennsylvania School of Medicine and completed my medical internship, psychiatric residency, and child fellowship training at Harvard Medical School.  I am a Child Psychiatrist with over 30 years of experience working with traumatized populations of children and adults, most recently those seeking asylum from Central American countries and placed in American detention programs, including MPP, ORR facilities, and ICE facilities.  I have published articles on the impact of trauma on children fleeing violence in these countries and those separated from parents.  I have reviewed the scholarly and research literature on effects of trauma on the mental and physical health of asylum-seeking and other children.  I have testified about the impact of current immigration policies on child health before the Senate of the United States.  I serve as a principal mental health consultant to Flores Settlement Agreement counsel and in that role have had the opportunity to interview and examine many children within immigration detention systems.

Also within my area of expertise is the impact of both juvenile and immigration detention on youth, especially those with histories of trauma.  I served as lead psychiatrist at Alameda County Juvenile Hall in California for approximately 2 years and, during that time, served a population of up to 200 incarcerated youth, many of them verifiably gang affiliated.  I also ran a consultation service for Superior Court judges presiding over juvenile cases.  I have served as a trauma expert on a California

1

State probation board examining and dispersing grants to programs offering alternatives to youth incarceration.

I serve as the Executive Director of an organization called Every. Last. One. We have partnerships with government and non-governmental organizations in the countries of the Northern Triangle of Central America and in Mexico. Among our many other services, my organization provides carefully screened sponsors for children in immigration detention who do not have the ability to be released to family members. I am fluent in material pertaining to the presence and impact of gang activity on children, youth, and families in Central America, particularly in Honduras and Guatemala. I have interviewed over 100 asylum-seekers from these areas whose lives have been impacted by gang activity, have visited Honduras gathering information on gang activity, have read extensively on the issue, and have discussed this topic with many of our partner organizations in Central America.

## CASE SUMMARY/DIAGNOSES/RECOMMENDATIONS

B█████ █████ B███████ B█ is a 17 10/12 year old Guatemalan youth who has been in various forms of continuous detention since March of 2017, and currently resides at Cowlitz County Juvenile Detention Center in Washington State, where he is a detainee of Immigration and Customs Enforcement ("ICE"). Although the State of Maryland deemed B██████ safe and ready to be released into the community following 1.5 years in youth detention with programming, he was, on the day of that release, picked up by ICE and has been continuously incarcerated - with no programming - since that time, despite no further crimes or behavior warranting a sentence of this sort. The government has deemed B██████ "too dangerous" to be released despite the few incidents in which he has engaged and which have all represented low-risk, impulsive behavior typical of adolescents with similar histories. If adjudicated in a juvenile (or criminal) court, he would never receive such a sentence for these behaviors. In a myriad of ways, B██████ has demonstrated his commitment to work on the issues of anger and frustration which followed a difficult childhood of trauma, betrayal, loss, and the sort of isolation and deprivation that these years of incarceration have inflicted on him. His ability to manage his feelings has demonstrably and impressively improved. He demonstrates absolutely no signs of psychopathy or sociopathy suggesting an underlying constitutional dangerousness. The label of "gang affiliation" appears to represent "guilt by association" and is not supported by data, including his comportment over the course of his incarceration.

2

B█████'s current Diagnoses include the following:

      Posttraumatic Stress Disorder, chronic, without dissociation

      Major Depressive Disorder, Moderately severe

      Adjustment disorder with depressive and anxious features

      Rule out Attention Deficit Hyperactivity Disorder, inattentive type

It is highly recommended that B██████ be released from Cowlitz as soon as possible. This setting is harmful to not only his psychological but also his physiological well-being and fails to meet many of the standards for safe and secure care for children and youth in government immigration custody. He should be released into a setting which can enable him to catch up on the many developmental tasks of which he's been deprived over the course of, especially, the last two years. This includes academic as well as general life-education, self-regulation, socialization, membership in a family unit and community setting. He would be best placed away from proximity to all prior traumatic affiliations, ideally on the west coast. He would do best within a family setting where he can receive consistent kindness and nurturance appropriate to a teenager. He requires ongoing therapy to assist him with reinforcing and expanding his coping skills, understanding and embracing his own identity and history, and developing goals which are both positive and realistic. He would also benefit from a mentorship by an older male in, perhaps a community program. This mentor would ideally be male and Latino, and have a good understanding of the dynamics and pressures attending to those raised in gang-infested communities.

## INTRODUCTION

B████████████ B█████████ B██ ("B████████") is a 17 year, 10 month old Guatemalan youth, currently in ICE detention at the Cowlitz County Juvenile Detention Center in Longview, Washington. He has resided there since June of 2019 when he was transferred from the Abraxas Academy (ICE detention program) in Morgantown, Pennsylvania. B██████ has been continuously incarcerated, in one form or another for 3½ years, since March 1, 2017, when he was taken initially into adult, and then into juvenile custody to serve time for first degree assault and carrying a dangerous weapon with intent to injure. He was paroled and due to be placed on GPS monitoring on October 18, 2018 when he was taken into ICE custody and detained at Abraxas Academy. He

remained at Abraxas until June, 2019 when he was transferred to Cowlitz.  This report has been requested by B██████'s attorneys for the purpose of assessing his psychological status, including his current level of dangerousness if released into the community.

For the purpose of evaluation, I initially met with B██████ via computer video for 3.5 hours on July 27th, 2020.  A second interview was conducted on July 29th for approximately 2 hours. Present on both calls was a Spanish to English interpreter.  To assist with my evaluation, I have been provided extensive written materials which I have reviewed, including B██████'s original charging documents, reports from Abraxas (including social worker and psychiatrist report), letters from various of B██████'s teachers and contacts both at Abraxas and at Cowlitz, and incident reports from both Abraxas and Cowlitz.  Of note is that no psychological or psychiatric evaluation appears to be available from B██████'s time in Cowlitz.

B██████ is currently on psychotropic medication: Hydroxyzine 50 mg by mouth in the morning and at bedtime.  Hydroxyzine is an antihistamine most commonly used to treat the itching associated with allergies but sometimes prescribed for anxiety due to its sedating/calming effects.  It is relatively short acting.  He is taking no other medication and reports that, so far as he is aware, he has not seen or been evaluated by a psychiatrist since coming to Cowlitz.

## LIFE IN GUATEMALA

B██████ was raised by his maternal grandparents, with whom he was left at about age 3, when his mother departed for the United States with his older half-brother, Nelson.   He has no early memories of his mother, did not have contact with her during his early childhood and was told that his father had died when he was about 3 months old.  He spent his early years believing that his grandparents were his parents.

B██████ has described his life in Guatemala as very difficult.  The family was poor with many mouths to feed - 5 cousins, B██████, his sister, his brother, Edwin (2 years older) and his uncle, Jose Victor - and never enough food and clothing.  B██████ reports that both of his grandparents were verbally and physically abusive toward him and the other children on a daily basis, mocking them, calling them names, beating them to the point of leaving bruises and bloody cuts, forcing them to kneel for hours on corn kernels.  B██████ had few friends and was taken under the wing of his big brother, Edwin and his Uncle Jose Victor, about 11 years his senior.

4

At some point around age 7 or 8 B███████ recalls that he was put on the phone with a strange woman, told by his grandmother that he had to speak with her.  Afterwards, his grandmother told him that this was his mother on the phone and B██████, confused, recalls asking, "how many mothers do I have?"  Only then was he told that the man and woman he'd regarded as his parents were actually his grandparents and that his mother was a woman he didn't know who lived in a country far away.  He reports that he was very upset and angry.  He became resentful and rebellious.

Through my work with NGOs in Guatemala, I have been informed on multiple occasions that the area in which B██████ and his family lived has been the target of gang activity for many years.  In our interview, B██████ shared that, although young, he was aware of the violence, of the need to be always careful, of hearing gunshots on the street.  He reports that this made him afraid of "the bad people", as he thought of them.  He says that, even as a small boy, he knew that he wanted to grow up to be "a good person", which was important to him.

At some point, B██████ was told that his mother wished to bring him and Edwin to the United States to live with her.  He arrived at around age 11, having walked through Mexico for about a month, often through frightening terrain.  Edwin was 14 at the time and seemed far older.  B███████ relied on him to protect and care for him.  Shortly after arriving in the United States, B██████ learned that the girl he had regarded as his girlfriend in Guatemala had become ill and died.  He reports having felt profoundly sad about this and continuing to grieve her to this day.

## LIFE IN THE UNITED STATES

B██████ says that life in the United States was difficult.  His mother was living with a partner he'd never met and with his elder half-brother, Nelson, who was somewhat hostile to him.  She was diagnosed with cancer, was ill and in treatment.   B██████ and Edwin knew no one and so spent much of their time with their uncle, Jose Victor, who had arrived before them, had lived with B█████'s mother, and was now associating with members of MS-13.  B██████ admits that he spent some of his time in the company of MS-13 members, as he often tagged along with Edwin, and these were the boys with whom his brother hung out.

Ultimately, Edwin too would join MS-13 but he and Jose Victor were determined to keep B███████ away from this life. B██████ reports that his uncle and brother blocked all attempts of fellow gang-

5

members to recruit him.  They told him that this was not the life for him - that it was dangerous and
violent and that they believed that B███████ was intelligent and destined for better things.  B███████
says he trusted their advice and persisted in his wish to do something "good" with his life..  He
resisted the resulting harassment and pressures from MS-13 members to join.

B███████ did make one friend - Kevin - who he knew to be an MS-13 member, as were so many of
the Latino boys in his neighborhood.  He felt that his friendship with Kevin was distinct from
Kevin's gang membership.  B███████ began dating Kevin's sister, Joselin. So the events that were to
follow were a shock to him.

At some point, for reasons unknown, Kevin had decided to leave MS-13 and to instead join the rival
gang of Mara 18. While Kevin knew that B███████ was not gang affiliated, Edwin's affiliation was
enough to have made B███████ a target.  Also of note is that, at the time, B███████ had grown taller
and his appearance was almost identical to his brother's.  They often shared clothes and many people
said they looked like twins.  It is unclear whether others (both gang members and the police) may
have mistaken the two for each other.

One day in the late winter of 2017,  B███████ was walking through a park when he found himself
surrounded by members of Mara 18, Kevin amongst them.  Kevin carried a baseball bat while the
others had BB guns.  While the others trained their guns on B███████, Kevin attacked with the
baseball bat, fracturing B███████'s arm as he attempted to protect his head and face from Kevin's
blows.  Taken to the hospital, B███████ was told that he must keep his arm in a cast for 6 weeks.

B███████ did not go to the police.  Edwin felt they must personally retaliate against those who had
attacked him.  If not - Edwin warned - they would be seen as weak.  B███████ - and perhaps other
members of the family -  would be attacked again, and Edwin would lose face with those in MS-13.
B███████ resisted his brother's pressure to retaliate but ultimately agreed to join him.  On February
10, 2017, Edwin brought a BB gun and B███████ pocketed a machete that he'd never before carried.
They set off for a school bus stop where they knew Kevin would be arriving.

B███████ has consistently maintained that his only purpose in joining his brother in attacking Kevin
was to show loyalty to his brother and to prevent further attacks by demonstrating to both MS-13
and Mara-18 that he would not tolerate being harassed.  He is emphatic when he states that he did

6

not wish to seriously hurt Kevin, but just to scare him and send this message. For this reason, he did not use the machete that he had brought, but rather held it in one hand, away from Kevin, while striking him with the fist of the other hand. Despite all that had transpired, B████ says that he continued to care for Kevin, that he felt badly, guilty even, when pummeling him. He also didn't wish to upset Kevin's sister, Jocelin, who was now B████'s girlfriend. He states that - had he wished to truly harm Kevin - it would have been a simple thing to use the machete to do so, and that this was never an option for him.

I have now viewed a partial video of the attack on Kevin, from what appears to be a few minutes into it until its completion. Of note is that - more than anything - this resembles a fist fight rendered unfair only because it was two boys against one. However, it appears in the video that B████ barely participates and that it is actually his brother who principally pummels Kevin while B████ stands at a distance. The machete is clearly tucked between B████'s legs in a manner that is far more likely to injure B████ than Kevin. It is also evident in the video that B████ could easily have brandished and used that machete had he wished to truly hurt Kevin. In short, the video substantiates what B████ has consistently related regarding this incident: that he was deeply ambivalent, not prone to violence, and that his intention was really to "scare" Kevin, and never to truly hurt him. Of note is that, at the end, all parties walk away on their own steam without any obvious serious injuries.

## INDICTMENT, ULTIMATE CHARGES AND JUVENILE DETENTION

B████ and his brother were arrested on the day of the attack. He was taken initially into the custody of the police and then released to his mother. On March1, 2017, at age 14, he was taken into adult custody where he remained until his transfer to juvenile detention in January of 2018. While the initial indictment included an array of charges, ultimately B████ stipulated to and served time for two charges: first degree assault, and carrying a dangerous weapon with intent to injure. Once transferred to juvenile detention, B████ would remain there until probation was granted on October 18th, 2018. In all, B████ would serve nearly 19 months for the attack on Kevin.

Meanwhile, both his brother, Edwin, and his uncle Jose Victor were deported to Guatemala.

7

031

B██████'s juvenile detention time was spent at The Victor Cullen Center in Sabillasville, Maryland. He describes this as a valuable placement for him, one in which he feels he received a great deal of support which taught him how to far better recognize and manage his emotions.  He was diagnosed with Major Depression, Attention Deficit Hyperactivity Disorder, and Insomnia and received medication to treat all of these mental health issues.  He took yoga classes and learned meditation techniques to help him to manage more successfully his moments of anger or frustration.  He had weekly therapy sessions conducted in Spanish, which he found very useful.  For the first time he was given an opportunity to reflect on and process all that had transpired in his life and to begin to envision a future away from and very different than that of his brother and uncle.

In addition, at Victor Cullen, B██████ discovered a love for learning and found that he could be a good and productive student.  At times he was rewarded for being the "student of the week".  He felt a sense of pride in his growth and accomplishments and looked forward to putting them into practice once he was released into the community.  This was due to happen on October 18th.

## ICE DETENTION - ABRAXAS AND COWLITZ

On the day of his release from Victor Cullen, B██████ was on his way to the GPS monitoring office to be fitted with an ankle monitor when he was stopped and taken into ICE custody.  This began what would be additional years of detention. At this point, B██████ has now spent more time in locked detention in the United States - nearly all of his adolescence - than he has living in circumstances that would more normally support the healthy development of an adolescent boy.

His first ICE placement was at the Abraxas Academy in Morgantown, Pennsylvania.  While Abraxas is advertised as a "treatment facility" for (generally multiply) offending youth, the youth in ICE detention were not exposed to the rich array of programming otherwise available to Abraxas residents and which had been so helpful to B██████ at Victor Cullen.  While B██████ had weekly appointments with the psychiatrist, these were uniformly conducted in English, in which B██████ was not fluent.  As a consequence, the sessions were short - generally no more than 5 to 10 minutes - and B██████ spoke little.

He reported to staff that he was not receiving the medication which he felt had helped him while at Victor Cullen.  About 6 weeks after his arrival at Abraxas he was evaluated by the psychiatrist there. Of significant note is that many aspects of B██████'s history in Dr. Manfredi's subsequent report

8

are inaccurate.  This includes his charging and detention history, such as the claim that B████ had "hacked a man with a machete" (which he had not done) and was consequently arrested for attempted murder.  However, he did diagnose B████ with an "unspecified mood disorder" and a rule out of Attention Deficit Hyperactivity Disorder ("ADHD").  He re-prescribed Prozac 20 mg daily (a small dose) for depression and Trazodone 100 mg at bedtime for sleep.  He discontinued B████'s medication for ADHD.  Subsequently, it is reported, Trazodone was removed from the pharmacy at Abraxas and was replaced with Hydroxyzine, a less effective sleep aid.  There is no indication that in the subsequent 7 months of B████'s stay at Abraxas he was ever again evaluated for the efficacy of his medication.

As time passed with little programming and increasing isolation without hope of release, B████'s mood began to plummet and he felt that the medications were no longer as helpful as they'd been.

Few youth occupied ICE beds while B████ was at Abraxas and so there were few other youth with whom he could socialize, as detained American youth generally spoke no Spanish and were kept there for only a week or two before they were released.  B████ reports that many American youth were hostile toward the ICE detainees and that one guard hit him in the stomach and was removed from the program as a consequence.  For 3 straight months, B████ was the only youth detained by ICE at Abraxas.  He felt isolated, increasingly depressed, and lonely.  He was confused and frustrated by the sense that he was being forced to serve yet another sentence for a crime he'd committed nearly two years earlier, despite having made progress and evolved healthy personal goals while at Victor Cullen.  He was no longer the 14 year old who'd committed those crimes, was no longer in touch with his brother or uncle, had no interest in gang activity, but was being deemed too "dangerous" to move into a real life.  There was no one with whom he could really talk, other than a single teacher with whom he formed a bond.  There was no real therapy, no classes to reinforce skills for dealing with his growing depression, and the frustration and hopelessness that came with it.

B████ admits that he got into trouble at times when this frustration would overtake him.  He wished he'd had the yoga or meditation classes to help him to manage this.  At times he would lash out towards peers with words or his fist.  B████ says that he now regrets this behavior, that he appreciates that this was not a mature or constructive way to manage his anger and frustration or conflicts which inevitably arose in such a setting.

Ultimately, in June of 2019, left entirely alone with no other ICE kids with whom to socialize or identify, B███████ had an incident at Abraxas.  Of note is that a letter from his then-teacher, who had seen him just before this incident, indicates her belief that B███████'s subsequent outburst was actually provoked by a guard.  B███████ described the incident to me in the following way:  He says that he had been gifted some Doritos - a very rare treat that he was looking forward to enjoying, but was not technically permitted.  One of the guards - from whom he'd experienced hostility on previous occasions - had suddenly demanded that B███████ be searched, claiming that he was looking for "gang cards".  While B███████ denies that he'd ever had such cards, he knew that, if the coveted Doritos were discovered, he would not only be forced to relinquish them but would also be dropped a level.  He insisted that he didn't have these cards but reports that the guard "came at me" anyway.  B███████ lashed out, striking the guard in the face.

Shortly thereafter he was transferred to Cowlitz.  Despite having to pay $200 for transportation, B███████'s mother had visited him as often as she could at Abraxas.  His move to across the country to Cowlitz meant that these rare, comforting visits would end.  He has not seen his mother, nor any other family, since June of 2019.  Since his detention, his mother has met and married a man who B███████ has not been able to meet.  The move also meant that B███████ missed his scheduled USCIS interview (scheduled for 10 days after his transfer) and, due to the distance, he was forced to relinquish the attorney who had been with him from the beginning.

B███████ describes life at Cowlitz as tedious, with long unscheduled hours with nothing at all to do.  There is no programming, there are no groups.  Other than departing the facility for outside appointments, the youth are given NO outside recreation or other time.  With the increased restrictions imposed by the pandemic, school time is sometimes limited to 1.5 hours per day, never more than 3 hours per day.  Much of the remainder of his time is spent locked into a solitary cell.  This includes meals.  Inside recreation is limited to 30 minute visits to the gym, often no more than twice per week.

B███████'s cell, like all the cells, is solitary, and he is permitted to have only one deck of cards, two photos, two books and a bible.  As the library has only about 10 books in Spanish, B███████ reports that he has read them multiple times just to pass the time.  B███████ likes to read, but he is not permitted to receive books as a gift.  Mostly, he sleeps.  There is one guard who he likes and converses with but no one else who has formed a relationship with him or who seems to care about

10

him.  He struggles to talk with his mother, as he can only call her late in the evening, after she has finished work, when she is generally exhausted.  Her shifting work schedule means that sometimes he cannot reach her at all.

Time on the unit is spent in a single day room, where social distancing now means that youth must sit at separate tables.  There is a television on, but it is perpetually tuned to English-language programs, as county youth detainees have complained about Spanish programs and no compromise or concessions are demanded by the guards.

Like the other ICE detainees, B█████ must clean the bathrooms each day if he is to remain on the highest designation reflecting good behavior.  He is not paid for this work, but will be dropped a level (losing both privileges as well as his now excellent record of behavior) if he fails to do it.  All the boys are aware that they will be denied release without remaining on the highest level (Level 4) and so that failure to clean the facility bathrooms could mean denial of release.

B█████ has had two noteworthy incidents of behavioral issues at Cowlitz.  The first, in November of 2019, involved his having written "MS-13" on his computer keyboard.  While he initially denied that he'd done this - claiming that it had been done by the resident before him - he ultimately admitted that he had.  He states that he was told by other residents who were validated MS-13 members at Cowlitz that he must do this, and was fearful of the consequences if he did not.  He knew that reporting that this pressure had been the source of the infraction could get him seriously injured or worse by those boys.  This conforms with my professional experience of reports by other youth inside such facilities: that those without gang affiliation are often compelled by validated gang members to show loyalty or face dire consequences.  And that those consequences will be far worse should they report the source of their infraction and get those gang members into trouble.

B█████'s second incident occurred in January of 2020 with a friend of his, the only other ICE detainee at Cowlitz at the time.  Both boys report that they had spent the night before kept awake by constant taunting, insults to their mothers, and banging on the walls by a group of the American youth inmates, and that this went on for hours.  Cowlitz reports confirm that there were insults and harassment.  While three of the boys who'd engaged in this behavior had been punished with restrictions, the fourth was permitted to be out and was at lunch.  Exhausted and angry after having been kept awake the night before, B█████ and his friend initiated a fist fight with this fourth boy.

11

B███ states that after this January incident his efforts to improve his manner of coping with frustration redoubled.  While he has since faced other incidents reflecting what he feels to be unfairness or taunting by other boys, he has returned to his use of breathing techniques, yoga, singing, reading his bible, and general relaxation and sleep to manage what is a very difficult and empty existence.

Over this time, B████'s attorneys state that he has repeatedly asked that he be offered release to a location distant from his mother's Maryland home.  While he would like to see her, he fears that he will again be the target of violence from the gangs residing there.  He states that he fears for his life should he return there or to Guatemala.  He has no wish to engage in gang activity, wants to move into a healthy and productive adult life, and fears that efforts to retaliate or recruit him will endanger both his well-being and his future.

Over the past weeks my organization has located a family currently living in Washington State who are committed to sponsoring and supporting B████ in all efforts to manage his traumatic past, the issues he has faced, and the life he envisions and wishes for himself.  He and this family have met several times on computer video and continue to dialogue authentically about any concerns that he or they might have.  Of note - and consistent with my considerable experience with other detained children offered the tangible hope of release through such meetings - B████'s attorneys report that his spirits have been much improved and his obsessional questioning about his court date has stopped.

## MENTAL STATUS EXAM

Appearance/Behavior:  B████ presented as a quiet, well-groomed, normally developed 17 year old wearing detention garb.  He appeared somewhat shy or anxious at first, making little eye contact, but as he relaxed his demeanor changed and he was more direct and forthcoming, showing a broader range of emotion and appearing to look more directly into the computer.  He was fully cooperative during the interview, appearing to answer all questions truthfully, if, perhaps, partially.

Speech: B████ spoke through a Spanish-English interpreter, although it was evident that he at least understood a great deal of English.  This is common with those who are only partially bilingual, especially in the context of such an interview, where emotionally loaded questions are

036

asked.  The capacity to speak in one's native language makes answering such questions thoroughly much easier for those for whom English is not their native language.  There was no tangentiality. Speech was normal in rate with some reduced modulation.  He often needed to be reminded to speak up and into the microphone.  Difficulty hearing him may have partially been a function of the technology

Thought: B███████ showed no evidence of psychotic process or content.  Thought process appeared coherent and appropriate to topic.  He admitted to episodic flashbacks to various traumatic incidents in his life, including hearing that his grandparents were not his parents, violence that he witnessed from a distance as a child in Guatemala, the beating by Kevin with guns pointed at hm by others in Maryland.  He reports obsessional worry about his future, fear over his safety in Maryland or Guatemala, and a deep wish to be released from detention "so I can do something good with my life".  He reports periods of hopelessness to which he responds by reading his bible and singing positive songs to himself, both of which he states are helpful to him.  While he has flashes of suicidal ideation during moments of hopelessness, these are not accompanied by intent or plan.  He denies any thought, intent, or plan to harm others.

Affect: B██████'s affect was constricted and while he was able to flash a smile at moments, he appeared often sad and somewhat anxious.  He denied the overwhelming moments of anger or frustration that had impelled impulsive behaviors in the past, stating that he is now better to see them coming and to intervene with exercises which reduce their intensity.

Mood: "OK".  B██████ says he last remembers being "happy" when he was at Victor Cullen.  He doesn't know if this is due to the medication he received there or to the skills he was learning and the overall supportive and positive environment there.  He admits to feeling depressed and bored very often and spending as much time as possible sleeping to escape the boredom.

Movements: B██████'s legs were noted to be somewhat restless, but there were no truly abnormal movements.  No tics.

Cognition: B██████ did appear to have some difficulty maintaining focus and concentration.  For example, he often needed reminders to speak into the microphone, which appeared to be the

function of "forgetting" rather than any lack of cooperation.  He appeared to be of average to above average intelligence.

Insight: Given the relative paucity of psychological treatment he's received, B███████'s insight appeared to be quite good.  While he may not have been able to make connections between some of his feelings and issues in his past, he was very aware of his past tendency to respond impulsively and in somewhat destructive ways when triggered to feel frustration or anger.  He appeared to take responsibility and be actively working to manage his emotions more successfully.

Judgment:  At present, and for the past 9 months, B██████'s judgement appears to be excellent, especially given the level of tedium and stress he has experienced in detention.  He has determined to stay out of trouble, to manage his responses to provocation with greater equanimity, and to do all that he must do to sustain the best possible behavior in his current setting.  That he has succeeded and received no incident reports since January is a testimonial to his good judgment.

## DISCUSSION

B████████ B████████ B██ is a 17 10/12 year old Guatemalan youth who has been in continuous detention since March of 2017, when he engaged in an episode of violence directed toward another youth who, he reports, had attacked him earlier with force which could have killed him if applied to his head, but which broke his arm when he lifted it to protect himself.  This incident was planned and encouraged by his older brother who was a validated gang member and lived with the rules governing life in gang-dominated areas: retaliate against violence directed to you or face the consequences in the form of additional violence and loss of respect from one's peers.  While B█████ carried a machete with him and certainly could have used it to seriously harm Kevin, there is no evidence of any machete injury, and B█████ has all along maintained that he had no intention of using it to do anything other than frighten Kevin.  He insists that he chose to hurt Kevin only with his fists, despite Kevin having used potentially lethal force on B█████ with the baseball bat.

Having interviewed more than 100 people who have been targets of gang violence in Central America, examined the literature about these gangs, and interviewed those in Honduras who have first hand knowledge of their operations, I have a professional understanding of how they operate.  The gangs of Central America are very different than those of the United States.  They tend to

14

038

operate more as criminal corporations, with children at the very bottom of the worker paradigm. The lines are often blurred between corrupt officials/police and these criminal enterprises and uniformly people are at greater danger if they report crimes to the police than if they stay quiet and flee.  For children without parents with the means and will to protect them, they are on their own in this dangerous world.  Those who resist the efforts of gangs to recruit them - even very young children - are often found in the town square with their throats cut as a warning to others.

B█████ was fortunate in that the gang membership of his uncle and older brother enabled him to resist such membership without the consequences which would ordinarily have followed such resistance.  He described to me that he had seen the control held by cartels over children and others who worked for them and the terrible violence.  This has left him with chronic anxiety and specific fear regarding any personal proximity to gang members, along with episodes of flashbacks to the attack carried out on him.

B█████ shows no signs of psychopathy whatsoever.  It is clear that this violence often troubled him deeply.

It is notable that all of B█████'s episodes of poor behavior have been entirely normative for youth of his age, history of deprivation and poverty, exposure to what it means to be disrespected and how to counter this.  Over the course of my work as the lead psychiatrist at a Juvenile Hall in Alameda County, California, I witnessed many, many instances of kids "losing it" from a toxic combination of traumatic histories, inadequate treatment, lack of good role modeling, hopelessness for their future, and the incarceration which itself often underscored their experience of hopelessness.  Using one's fists in these situations would never have resulted in long term incarceration for these youth, and certainly not in a permanent designation of "dangerousness". B█████ is not a boy who has ever engaged in violence with a weapon (despite having carried one to his assignation with Kevin) and has lashed out impulsively in a manner wholly consistent with his history, age, isolation, protracted detention.  His capacity to now manage more successfully his impulsivity is likely a matter of increased brain maturity mixed with a strong determination to do well and have a real future and healthy life for himself.

In my professional medical opinion, the circumstances of incarceration of ICE youth at Cowlitz are dangerous for those who are placed there. Physiologically, the complete absence of exposure to

sunshine undoubtedly diminishes Vitamin D levels (which are never tested), resulting not only in impaired calcium absorption and bone development, but also in problems with depression and mood modulation.  The lack of fresh air and sunshine also renders these youth more at risk of contracting infectious illnesses, such as COVID.  Children need exercise and exposure to the outdoors to grow.  Both girls and boys - but boys in particular - require DAILY opportunities to find healthy outlets for their energy.  In addition, their bodies require regular exercise not only to advance bone and muscular growth, but also to enable cardiovascular health.  Both the psychological and the physiological health of this boy has been imperiled by the conditions of his detention.

Solitary cells are demonstrated to be psychologically (and likely physiologically) damaging for all youth with histories of trauma.  The chronic anxiety these children endure is significantly worsened while locked into a small space for hours, forced to endure their memories and fears without respite or distraction or even just the comforting company of others.  Given that his anti-depressant was abruptly stopped (for no apparent reason and without any evaluation from a psychiatrist evident from Cowlitz), it is remarkable that B██████ has, amongst all of these factors, managed to sustain himself with such forbearance.  It is no wonder that he spends as much time as he can sleeping.

I do believe that B██████ is clinically depressed and likely has been for these past nearly 3 ½ years of incarceration.  Due to their high metabolic rates, adolescents - especially adolescent boys - generally required a higher dose of psychotropic medication than do adults to achieve full efficacy.  Further, they often require higher doses of medication as they grow and in response to increased stressors.  B██████'s Prozac was begun on the smallest of therapeutic doses.  Both his body weight and his stressors have significantly increased since that time.  He could definitely benefit from a re-trial of medication.  However, most of all, he needs two sorts of therapeutic treatment:  a Spanish-speaking therapist familiar with the issues of youth from this sort of population and a "mentor", ideally Latino, who could serve as a strong male role-model to help B██████ further develop his sense of self and who understands the kind of cultural and familial pressures from which B██████ has come and which have propelled the issues he's had in the past.

I also feel that B██████ may well have ADHD of an inattentive type.  His pleasure and success in school in Victor Cullen - while he was on stimulant medication - strongly suggests that historic problems with school may well have been grounded, in part, in problems with focus and concentration.  Boys, especially, with inattentive type ADHD, tend to be under diagnosed and can

16

benefit educationally, socially, personally and interpersonally from the proper medication.  In any event, there appears to have been no appropriate evaluation for ADHD done since B███████'s departure from Victor Cullen.  At the very least, this should be undertaken.

The experience of this traumatized youth over the period of, particularly, the last approximately 2 years, has been one of, at best, severe deprivation.  This is a time when the brain and body's needs for growth are not only nutritional but also physical, social, educational, familial.  During this time, B██████ has been deprived of anything approaching adequate conditions to meet his cognitive, physiological and psychological needs for growth.  It is remarkable that he has managed so much on his own, especially given his history of trauma.

There is nothing to indicate at this time that B██████ represents a danger to others.  If his current circumstances have not provoked more dangerous behavior than outbursts with his fists, a real life in which he is exposed to the conditions needed to grow and thrive - and in which he has even more reason to continue to manage in healthy ways any negative impulses or feelings - is very unlikely to provoke dangerous behavior.  He has no history suggesting any psychopathy or real sociopathy.  He has never engaged in a myriad of criminal behaviors one sees in youth with his history.

Further, B██████'s behavior is not consistent with that of youth who are truly gang-affiliated.  Such youth almost invariably carry and cling to the stigmata of their gangs, especially in high-stress settings like incarceration, where the shame of powerlessness can be offset by a kind of bravado offered by such an affiliation.  This affiliation represents, for gang members, a kind of "substitute family" which helps to offset anxiety and isolation.  In my years of working with incarcerated youth, I have never seen a single gang member who failed to use that affiliation as a coping mechanism through even short periods of detention, often with an aggression meant to warn off others and to elevate their own status amongst peers.  B██████ has demonstrated no such behavior whatsoever.  His outbursts have been just that:  the outbursts of a distressed and frustrated teen and not the more strategic actions of a menacing presence.

B██████ certainly needs psychological supports to help him to continue to develop strategies for managing his responses to past trauma and to grow past the wounds that this trauma - combined with his protracted incarceration - has no doubt inflicted on his sense of self.  But B██████ needs the simple things that all healthy growing adolescents and young adults need: loving relationships

17

with appropriate boundaries, consistent positive role models, educational resources, positive
stimulation in the form of healthy social relationships, community engagement, and discovery/
development of his own interests and talents.  He has been entirely deprived of these things for
most of his adolescence and this has likely resulted in both psychological and physiological cost to
him.

Should B███████ fail to acquire these sources of nurturance - should his detention continue or he be
deported back to Guatemala - it is my firm belief that this system would have inflicted on him
irreversible injury.  He is begging for a life with possibility and away from gangs.  He has shown his
strong motivation to learn the tools he needs to deal constructively with conflict.  He appears
amenable to treatment for his past trauma and his ongoing symptoms of depression and, possibly,
ADHD.  In my professional opinion, if given these opportunities and permitted to reside away from
a life that holds nothing but danger for him, he does not represent a danger to others.

## RECOMMENDATIONS

1. B███████ should be released as soon as possible, ideally into a family/home setting far from
   Maryland and from the location of his last encounters with violent peers

2. B███████ requires an evaluation and ongoing supervision by a psychiatrist who can monitor his
   medication and make adjustments as necessary

3. He should engage in at least weekly therapy, if possible, with a Spanish speaking therapist who
   has experience with youth with B███████'s history and background.

4. B███████ would benefit from community services which offer groups in skills such as yoga and
   mindfulness meditation, which he has used and found helpful in the past

5. A male mentor would be enormously helpful to B███████, ideally a Latino male with
   considerable experience working with those exposed to gang activity.  My organization is likely
   able to help locate such an individual.

6. B███████ should be enrolled in a school program as soon as possible to address the deficits that
   these years have inflicted and to assist him in meeting his goal of gaining a GED and, perhaps,
   attending college

7. B███████'s love of reading should be rewarded with as much access to a variety of books - at
   least initially in Spanish - as possible.  Understanding the constraints of safety during the
   pandemic, if possible, he should be able to visit a local library.  If this is not possible, he should
   be permitted to access a virtual library so that he can satiate his hunger for reading on line.

18

8. B████ requires a good and complete physical exam with a full panel of laboratory studies.

9. B████ has repeatedly spoken of his love of the game of soccer and his wish to play.  He would benefit in a variety of ways from finding a peer soccer group which he could join.

Under penalty of perjury I swear that the foregoing is true to the best of my personal knowledge. Signed this 21st day of September, 2020

Amy J. Cohen M.D.

19

# Exhibit I

IN THE CIRCUIT COURT FOR FREDERICK COUNTY, MARYLAND
SITTING AS A JUVENILE COURT

IN THE MATTER OF:

B▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆     CASE NO.:   J– ▆▆▆▆▆

DOB: ▆▆▆▆▆▆▆▆
Respondent

## ORDER OF PROBATION

WHEREAS the Respondent has been found to have committed the delinquent act(s) of:
(1) Ct#1- First Degree Assault     (2) Ct#2 Wear Carry Weapon with Intent to Injure
(3)_____     and the Court has determined that the Respondent should be placed
on probation, and

☐ The Respondent having waived notice pursuant to Md. Rule 11-110(c) (5-day waiver), it is

ORDERED this 18th day of October , 20 18 by the Circuit Court for Frederick
County, Maryland, sitting as a Juvenile Court, that the Respondent is adjudged a delinquent child and is hereby placed on
probation, effective immediately, subject to the following conditions:

☑ Under the supervision of the Department of Juvenile Services (DJS).
☐ Without the supervision of the Department of Juvenile Services (DJS).

1. Report to your Probation Counselor as directed and follow his/her lawful instructions;
2. Appear in Court when notified to do so;
3. Permit your Probation Counselor to visit your home;
4. Notify your Probation Counselor at once if arrested;
5. Attend school regularly without any unexcused absences, suspensions or tardiness;
6. Obtain permission from your Probation Counselor before:
   a. Changing your home address;
   b. Withdrawing from school;     **to include no possession of any machete or knife
   c. Changing your job;     of any kind, nor any look-alike gun or weapon;
   d. Leaving the State of Maryland for a week or more for any reason;
   e. Owning, possessing, using or having in his/her control any dangerous weapon or firearm of any description.**
7. Obey all laws;
8. Shall not illegally possess, use or sell any alcoholic beverage, controlled dangerous substance or related paraphernalia, or knowingly associate with those who do.

Also, subject to the further Order of this Court and to the following special conditions:
☑ Shall not knowingly associate with any gang members, nor engage in any gang related activities or possession gang-
☑ Remain drug/alcohol free with random testing at his/her or his/her parents expense. related markings or items.
☑ Submit to a drug/alcohol assessment and follow any and all recommendations, if recommended.
☑ No contact with the victim(s) Known 18th Street Members and Known HS13 Members and Kevin Orellana
☐ Complete _____ hours of community service on precise schedule as determined by DJS. ~~All exception Boy Jacob~~
☑ Participate in ☑individual ☑family counseling, and follow recommendations of counselors.
☑ Curfew of 7 p.m. on school nights and 7 p.m. on non-school nights with authorization for DJS ▆▆
   in their discretion _____ to modify after _____ days.
☐ Pursue GED.
☐ Undergo a psychological/psychiatric evaluation and follow any and all recommendations.
☑ Obey all house rules.
☐ Write letter(s) of apology to the victim(s).
☑ Seek and maintain part-time/full-time employment.
☐ Attend _____ AA/NA meetings per week.
☐ Obtain a sponsor within 30 days.
☑ Take medication as prescribed, and follow up with psychiatric appointments and services.
☐ Pay restitution in the amount of $_____ to _____ , joint and
   several with _____ through the DJS on a precise schedule to be determined by DJS.
☑ Participate in any and all programs as recommended by the DJS, to include, but not be limited to, the following:
   ☐ Satisfactorily complete the Youthful Offenders program.
   ☐ Attend the Crime Awareness Program.
   ☐ Participate in out-patient drug/alcohol counseling and follow any and all recommendations.
   ☑ participate in in-home family intervention program and follow recommendations _____
   ☑ comply with GPS monitoring while under separate order. _____
   ☑ participate with community programs that offer Latino youth services. _____
   ☑ Attend a Review Hearing on January 17, 2019 @ 8:30

☑ IT IS FURTHER ORDERED that the respondent's commitment be rescinded this date.
☐ IT IS FURTHER ORDERED that jurisdiction/supervision of this case be transferred to _____ County.

EXCEPTIONS WAIVED   ☐ YES   ☐ NO

_____     JUDGE, Circuit Court for Frederick County
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆     This is a proper order to be passed by this Court.
Signature of Respondent

_____
Master, Circuit Court for Frederick County

Distribution: File, SAO, OPD, DIS

10

045

# Exhibit
# J

September 10, 2020

Dear Judge,

My name is Rebecca Mogel. I am a certified Special Education Teacher and have been working in this field for over 30 years. B█████ is only student I have ever written a letter on behalf of in all of my 30-year career. Because of the length of time that I have known B█████, my belief is that he is a good hearted kid with a solid moral compass.

I met B█████ in 2018 while teaching at Abraxas Academy in Morgantown, PA. He was housed in the detention unit rather than the treatment unit because that was their policy in regards to ICE detainees. His Educational Programing was more intense than his peers in the detention unit as their average length of stay was 2- 3 weeks. He is a hard worker and helped me in my classroom whenever I asked and ALWAYS accepted "no" as an answer without arguing. He completed all work that I assigned (of course sometimes he complained a little).

While there was a language barrier, I knew when I met him that he deserved a chance. I learned that B█████ has many layers. When I met him, he seemed so quiet, sad and withdrawn. It was obvious that all he wanted was to be cared about. I believe he has a difficult time trusting people because he has been let down so many times, by many people. I believe not having his Mom in his life has probably affected him the most. He is compassionate towards others, especially after he has formed a bond. I developed a strong bond with B█████ as he was there for almost one year. At the end of his time there, he was the only boy in ICE detention left at Abraxas.

B█████ interacted well with staff members he trusted. With those staff he didn't know as well, he was respectful but didn't engage in daily conversation with them. As we all know, in this field there are adults that come down very hard on kids who take one step out of line. I believe that is what happened in the incident that occurred a little bit before he left Abraxas. Right before the incident, he was in my classroom getting his math assignment to take to his room. He was calm & happy. I remember just before he left my room that we talked about the fact that he didn't feel that staff was fair to him.  He was called to line up and I asked them to give him a minute. They yelled again and he took his homework to join the line in the hallway. Seconds later, I heard commotion and when I looked in the hallway B█████ was being restrained. I entered the hallway and was told to walk away and that B█████ was being restrained because he attacked a staff. I believe 100% that he was provoked into fighting the staff because they were taunting him.

I know about the division of Church and State but I will be honest and explain something that I did to help him that I felt was in his best interest. When he came to Abraxas he asked me religious questions, specifically about heaven and hell. We talked a lot. After I knew him for approximately a month, he requested The Bible. I got him a Spanish Version, which he read every night.

I have continued to be a part of B█████'s life. I speak with him when his case manager or someone else that is authorized to do so calls. My most recent call from him was in August. He desperately wants a chance to stay in the US, get a job and build a life here. Genuinely from my heart, I strongly believe he deserves a chance. He was never given the chances and opportunities

that other kids get because of his family situation. Recently, I spoke with the Washington family who B█████ will go to live with if he is released. They called me to learn more about B█████ and I shared honestly about his past and the potential I see in him. This family seems ready to open their home and their hearts to this special boy and provide him with the positive role models he is eager to have in his life.

I am hoping that reading this letter will help you understand a little more about B█████ and I pray that you take this letter into consideration, trusting my judgment as I am confident that he will be a productive member of society here in the US.

Please contact me with any questions.

Sincerely,

Rebecca Mogel
Special Education Teacher
(610) 306-8109
beckymogel@yahoo.com

# Exhibit K

**Paloma Norris-York**

| | |
|---|---|
| **From:** | Shipley, Dan <ShipleyD@co.cowlitz.wa.us> |
| **Sent:** | Friday, September 4, 2020 12:15 PM |
| **To:** | Paloma Norris-York |
| **Subject:** | re: B███████ |

Paloma Norris-York, B███████ asked if I would send you an email in regards to his behavior during his stay here at Cowlitz County County Detention. B███████ has been here approximately 458 days and the majority of the time he has been level 4 status. I praise him for being able to maintain a positive mindset while he fights his case. B███████ has only 1 major infraction during his time. This is amazing for how long he has been here. B███████ has always been very respectful to staff and peers.

# Exhibit L



# SUPERIOR COURT *of* WASHINGTON
## Cowlitz County

(360) 577-3085   Fax (360) 414-5506
Deaf Relay Service TTY (800) 883-6388 or 711

Hall of Justice - 312 SW First Avenue - Kelso, WA 98626

**JUDGES**
*Gary B. Bashor, Presiding*
*Michael H. Evans*
*Stephen M. Warning*
*Marilyn K. Haan*
*Patricia M. Fassett*

**COURT COMMISSIONER**
*Tierra A. Busby*

**COURT ADMINISTRATOR**
*Chadwick M. Connors*

**ADMINISTRATIVE DEPUTIES**
*Danyel M. Paul, Lead*
*Leah D. Iverson*
*Michelle L. Honey*
*Bre Braaten*
*Emily A. Harvey*

September 11, 2020

Re: B██████████

To Whom It May Concern,

I am writing in regards to B█████ who I have worked with here at Cowlitz County Youth Services since June 3, 2019.  B█████ has always been great to work with and has treated me with great respect.  Over the several months that he has been here, he has always offered to help interpret for me when dealing with Hispanic youth for a quick question.  He has also been a sort of big brother to new kids in detention and has been respectful to them.

B█████ has been here 15 months and has strived to do his very best and help where he can.  He has had a few hiccups but has always rebounded to get back to level 4 privilege status which is the highest status.  I have seen him grow as a leader during his time here and he will soon be turning 18 and venturing off in to adulthood.  I wish him the best!!!!

Sincerely,

*Jon London MS CMHS*

Jon London MS CMHS
Juvenile Care Clinician
Cowlitz County Youth Services
1725 First Avenue
Longview, WA 98632
(360) 577-3100 x8206

# Exhibit M

October 21, 2019

To whom it may concern,

This letter is meant for a letter of recommendation for B█████████who participates in weekly church services while at Cowlitz County Juvenile Detention Center, He has shown to be very faithful and mature young man who is actively involved and shows to be a positive influence on other peers. He has shown good character over a long period of time.

Please consider this letter in any decisions that are made concerning B█████████.

Sincerely,

Rick Terrazas, Chaplain
Rock of Ages Ministries
Juvenile Ministry Coordinator
PO Box 112
Fairview OR 97024

# Exhibit N

# Exhibit O

**Declaration of Hans Peter Fink**

I, Hans Peter Fink, declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about the following facts.

2. I am a 19-year old United States Citizen living in White Salmon, Washington with my mother, Patricia Fink.

3. I am a student at the University of Washington in Seattle. I will be living at home for most of the 2020-2021 school year, studying remotely.

4. I am committed to helping my mother provide for the physical, mental, and financial well-being of B████████████████.

5. I have spent more than seven hours talking with B██████ twice a week for the past six weeks via video conferencing and phone calls. He and I share many similar interests and we have formed a strong bond already. We are especially looking forward to playing soccer and fly fishing together outside. B██████ has written to me that he is excited to have an older brother who can give him good advice and help with his studies and improving his already good English. I am committed to assisting B██████ with his studies, introducing and integrating him into our welcoming community, and providing any opportunities for his growth that he wishes to endeavor upon; in short, I will be a mentor to B██████. I have had the opportunity to speak with B██████ about his past and viewed the video of the incident which led to his detention in Maryland. All my interactions with B██████ and everything I have encountered has incontrovertibly indicated to me that B██████ is demonstrably changed and is committed to non-violence, despite the great hurdles presented by the harsh conditions of incarceration. I believe he is committed to becoming a lawful permanent resident and being a positive member of our community.

6. I am following strict health protocols to protect myself from exposure to COVID 19 and am being regularly tested by the University in-line with their guidelines. We will keep B██████ safe from COVID 19 by continuing our actions of limiting interactions with people outside our family, wearing masks when around others, and frequent hand washing.

7. We are hopeful that we will have the chance to help him be safe as he waits for his immigration applications go through the process.

Under penalty of perjury of the laws of the United States, I declare that the following is true

_____                    _____11/2/2020_____

Signature                                                                  Date

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 5, 2020, I served the foregoing pleading on

all counsel of record by means of the District Clerk's CM/ECF electronic filing

system.

<div align="center" style="text-align:left; margin-left:50%">

<u>/s/ *Peter Schey*</u>

Peter A. Schey

CENTER FOR HUMAN RIGHTS &

CONSTITUTIONAL LAW

*Class Counsel for Plaintiffs*

</div>

1