CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM P. BARR, Attorney General of the United States; *et al.,*<br><br>Defendants. | Case No. CV 85-4544-DMG<br><br>**EXHIBIT A TO JOINT STATUS REPORT RE MOTION TO LIFT RESTRICTIONS IN PARAGRAPH 4.E OF THE JUNE 26, 2020 ORDER, ECF NO. 833**<br><br>Requested Hearing: November 13, 2020 9:30 AM<br><br>[HON. DOLLY M. GEE] |

/ / /

*Plaintiffs' counsel continued*:


USF SCHOOL OF LAW IMMIGRATION CLINIC
Bill Ong Hing (Cal. Bar No. 61513)
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu


LA RAZA CENTRO LEGAL, INC.
Stephen Rosenbaum (Cal. Bar No. 98634)
474 Valencia Street, #295
San Francisco, CA 94103
Telephone: (415) 575-3500
Email: srosenbaum@law.berkeley.edu


/ / /

# EXHIBIT A



**CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW**

256 SOUTH OCCIDENTAL BOULEVARD

LOS ANGELES, CA 90057

Telephone:  (213) 388-8693

Facsimile:  (213) 386-9484

www.centerforhumanrights.org

November 10, 2020

*Via email*
Sarah Fabian
United States Department of Justice
Office of Immigration Litigation – District Court Section
Post Office Box 868
Ben Franklin Station
Washington, D.C.  20044-0868

Re:     *Flores v. Barr,* Case No. CV 85-4544-DMG-AGRx
Defendant's Motion To Terminate Transfer Restriction In Paragraph 4.E of the June 26, 2020 Order,

Dear Sarah,

As we discussed today, here is a link to the fight that Class Member BBB was involved in several years ago when he was fourteen years old. https://bit.ly/2HJ5ezO

The "victim" of this fight had earlier beaten BBB with a baseball bat causing him to be hospitalized and a cast put on his arm. BBB's brother later encouraged BBB to teach the young man who had attacked BBB a lesson. Rather than involving an "attempted murder," as ICE argued at BBB's first bond hearing in 2018, the video shows the following:

The video is about one minute and thirty seconds long.
It first shows BBB and his older brother with their arms around the victim.
At no time does BBB strike the victim.
BBB is holding a machete between his knees with the blade pointing behind him and away from the victim.
No punches or kicks are exchanged.
BBB his brother and the victim are standing up.
At the 44 second mark the victim is clearly pushed to the ground *by BBB's brother.*
*BBB is standing about ten feet away.*
When the victim falls to the ground, BBBs brother, who is wearing sneakers, kicks him four times and punches him twice. *BBB neither punches nor kicks the victim.*
BBB once approaches the victim and appears to touch him for about a second but obviously does not punch or kick or injure him in any way.
At about the 50 second mark, BBBs brother walks away.

William C. Silvis                                                                                    Page 2
*Flores v. Barr*
November 10, 2020

> *At about the 55 second mark the victim gets up, puts on his backpack, and walks away with his friends. He shows no signs of being injured, and is not bleeding or limping.* He simply puts on his backpack and walks away with his friends.

This is a far cry from the "attempted murder" ICE argued before the IJ in 2018 when ICE secured a decision that BBB should not be released because of his "dangerousness." The IJ's 2018 bond decision does not explain the basis for the decision not to release BBB other than saying he is a danger. Last month, an IJ refused to grant BBB a new bond hearing stating that there are no new circumstances that justify a new bond hearing.

We understand there was a recent incident in which BBB allegedly tossed a TV remote control and spat at a guard. His deportation hearing is indefinitely postponed because USCIS has indefinitely postponed all asylum interviews. He is only one of two minors being held indefinity by ICE after all other minors have been released. He is obviously reacting to about three years of detention with no end in sight, no real understanding why he did not get a new bond hearing last month, no. real understanding why his immigration case is at a standstill, and a sense of hopelessness and extreme frustration.

I have attached a declaration executed by Francis Guzman dated November 9, 2020, and his curriculum vitae. Mr. Guzman serves as the Director of the Youth Justice Initiative at the National Center for Youth Law, where he has worked for over eight years. He has a Bachelor of Arts degree from the University of California, Berkeley, and graduated from the University of California, Los Angeles School of Law in 2012.  His research and practice are focused on the juvenile and criminal justice systems, specifically addressing adolescent development, exposure to trauma, youth sentencing, rehabilitation, and gangs. Since 2012, he has worked with approximately 10,000 youth involved in the juvenile or criminal justice systems, in California and nationally, in community and institutional settings. He has conducted and led rehabilitative workshops on topics such as socio-emotional growth, trauma and healing, heathy communication and relationships. As such, he has worked with approximately 6,000 youthful offenders at California state prisons, including Pelican Bay State Prison's Security Housing Units (SHU), providing rehabilitation, personal development and mentoring services.

Mr. Guzman is a mentor to BBB. He met with him for an hour each week via video conferencing. They met four times in the month of October 2020 and once so far this month. In the many hours they have spent together, Mr.  Guzman reports he and BBB have talked about a variety of topics, including growing up in a neighborhood with gangs, how to avoid gangs, BBB's act of juvenile delinquency, his conduct in detention, his strong desire to live with his sponsor family with whom he feels a strong connection, and his fear of going to adult ICE detention.

Mr. Guzman and BBB have talked about the two times he acted out physically in his 17 months at Cowlitz, including a recent incident. Mr. Guzman reports that BBB is proud of how he has conducted himself, in general, during a stressful time of indefinite incarceration during a pandemic, and he regrets his actions on those two occasions. He states that

William C. Silvis                                                                        Page 3
*Flores v. Barr*
November 10, 2020

[t]hroughout the month of October [BBB] eagerly awaited a bond hearing date and for
weeks was told it could be occur any day. The waiting was difficult for BBB, especially
because he also was facing the prospect of being sent to an adult detention center on his
birthday and starting two weeks of quarantining alone. He explained to me that it was
partly due to that additional stress that he acted out uncharacteristically.

Based on my vast experience with youth in the criminal justice system, I believe BBB
will not engage in criminal activity if released. In my opinion, he will not associate with
any gang member or harm anybody in his community. His very few acts of misconduct
during his lengthy incarceration were predominantly due to the circumstances and
conditions of his imprisonment and not because he is a violent person.

I will continue to mentor him. I commit to helping BBB while he is incarcerated and after
his release. Specifically, my support will include, but is not limited to, the following:
• Weekly Check-ins: continue to meet for an hour weekly with BBB via Zoom
conferencing …;
• Re-entry Support Services: upon release, provide BBB with assistance in identifying
pro-social activities, re-entry support services, and other opportunities and supports in his
area; and
• Mentorship and Guidance: serve as life coach to BBB, providing him with emotional
support, advice, counseling, and assistance with overcoming challenges and navigating
unfamiliar environments, including remaining available 24-hours a day.

*Id.* ¶¶ 11-4.

It is also worth noting that other factors mitigate against BBB's dangerousness and/or in
favor of release:

•       BBB's mother is now married to a U.S. citizen and has a stable living situation
and would like BBB to live with her and her husband.

•       BBB's older brother with whom he was involved with the fight several years ago
has left the country.

•       Another older brother lives close to the mother's house and is married with three
children and is ready to support BBB in any way needed and has also offered that BBB may
reside with him.

•       BBB is facing indefinite detention because USCIS is not scheduling any asylum
interviews and his deportation hearing is postponed until he has had an asylum interview and
USCIS has made a preliminary determination whether he should be granted asylum.

I have also attached a corrected declaration executed by Paloma Norris-York, BBB's
immigration counsel. Her declaration was filed with Plaintiffs' ex parte application. [Doc.#
1017-1.] She has corrected a sentence in Paragraph 8 to read: "The immigration judge declined
to conduct a hearing. The decision states, '[b]ecause the Court does not find that B.B.B.

William C. Silvis                                                                              Page 4
*Flores v. Barr*
November 10, 2020

demonstrated a material change in circumstances, it need not address the DHS arguments asserting that . . . he is a danger to the community and a flight risk.'" Her filed declaration state BBB was denied a bond hearing "[b]ecause the Court does not find that B.B.B. demonstrated a material change in circumstances, the IJ refused to grant B.B.B. a bond hearing."

Proposal for ICE consideration for release of BBB with conditions:

1. To address any concerns that BBB may be a flight risk, release him with a GPS ankle bracelet as ICE routinely does when detainees are released;

2. Require that for three months following release BBB continue with weekly counseling conferences with Mr. Francis Guzman, as Mr. Guzman offers in his sworn declaration;

3. Require that upon release BBB reside with his mother and inform ICE of any proposed change of address;

4. Require that for three months following release BBB attend weekly psycho-therapy sessions with a qualified therapist who will be instructed by Class Counsel to notify wither Class Counsel and/or ICE should BBB fail to appear for any scheduled therapy session.

Sincerely,

Peter A. Schey
Center for Human Rights and
Constitutional Law

ccs:    Andrea Sheridan Ordin, Flores Special Master
        Paloma Norris-York

## Declaration of Francis "Frankie" Guzman

I, Francis "Frankie" Guzman, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

1. My name is Francis "Frankie" Guzman, Esq. I currently serve as the Director of the Youth Justice Initiative at the National Center for Youth Law, where I have worked for over eight years. I have a Bachelor of Arts degree from the University of California, Berkeley, and I graduated from the University of California, Los Angeles School of Law in 2012.

2. My research and practice are focused on the juvenile and criminal justice systems, specifically addressing adolescent development, exposure to trauma, youth sentencing, rehabilitation, and gangs.

3. A significant part of my knowledge and expertise in adolescent development, exposure to trauma, youth sentencing, rehabilitation, and gangs stems from my personal experiences. As youth, I was gang and justice system-involved. At age 15, I was arrested for armed robbery and committed to the California Youth Authority where I served a total six years on that offense.

4. Since 2012, I have worked with approximately 10,000 youth involved in the juvenile or criminal justice systems, in California and nationally, in community and institutional settings. A significant majority of these youth were involved with gangs or lived in communities impacted by gangs, and were youth of color – particularly African-American or Latino youth. This figure includes the activities below:

   Nationally, I regularly visit local courts and juvenile facilities to work with justice system administrators and system-involved youth to learn about and promote rehabilitative best practices. I often present youth and system administrators on effective strategies to address trauma, gangs, and rehabilitation. As such, I have worked with approximately 1,000 youth in juvenile halls, youth prisons, and community centers across the country, including Seattle, WA; Houston, TX; Portland, ME; and throughout California, providing personal development and mentoring services.

   I regularly work with the California Department of Corrections and Rehabilitation's Division of Adult Institutions and Division of Juvenile Facilities to improve rehabilitation for youthful offenders. I conduct and lead rehabilitative workshops on topics such as socio-emotional growth, trauma and healing, heathy communication and relationships. As such, I have worked with approximately 6,000 youthful offenders at California state prisons, including Pelican Bay State Prison's Security Housing Units (SHU), providing rehabilitation, personal development and mentoring services.

   I regularly work with probation departments in California, including Alameda, Los Angeles, Santa Clara, Santa Cruz, and Ventura Counties, to assist the implementation of evidence-based rehabilitative services for youth that support the health of systems-

1

impacted youth and increase public safety. I often present to youth on effective strategies
to address trauma, gangs, and rehabilitation. As such, I have worked with approximately
2,000 youth in probation camps, ranches and juvenile halls in counties across California,
providing rehabilitation, personal development and mentoring services.

I also regularly work with community-based organizations working to address the health
needs of at-risk, incarcerated, and formerly incarcerated youth. I lead workshops for
youth on effective strategies to address trauma, gang involvement, and positive
development. As such, I have worked with approximately 2,000 youth in community
spaces in California, including Alameda, Los Angeles, Monterey, Orange, Riverside, San
Diego, San Joaquin, Santa Clara, Santa Cruz, and Ventura Counties.

5. Additionally, my work in the area of youth rehabilitation requires me to review existing
   related scientific peer-reviewed research, stay up-to-date on newly published research,
   and regularly engage and work with national leaders in developmental and neuro sciences
   and rehabilitative best practices, including Elizabeth Cauffman and Thomas Grisso.

6. I have lent my expertise on these subjects to a number of stakeholders in the California
   legal system and beyond, including presentations to the California Senate and Assembly,
   Judicial Council of California, California Department of Corrections and Rehabilitation –
   Division of Juvenile Justice, California Child Welfare Council, and maintain partnerships
   with local juvenile courts and probation departments.

7. I present at national and international conferences on issues related to juvenile justice, I
   have presented at youth prisons throughout the United States and in Australia, and I
   speak at California Judicial Council new judicial officer trainings twice a year.

8. I have served as an expert witness in a dozen juvenile transfer cases before California
   Superior Courts and one case in Federal Immigration Court.

9. I am a mentor to BBB, who is detained by ICE in the Cowlitz County Juvenile Detention
   Center ("Cowlitz") in Longview, Washington. I meet with him for an hour each week via
   video conferencing. We met four times in the month of October 2020 and once so far this
   month.

10. In the many hours we have spent together, we have talked about a variety of topics,
    including: growing up in a neighborhood with gangs, how to avoid gangs, his act of
    juvenile delinquency, his conduct in detention, his strong desire to live with his sponsor
    family with whom he feels a strong connection, and his fear of going to adult ICE
    detention. Additionally, I have given him advice such as how to remain calm, even when
    people are bothering him.

11. We have talked about the two times he acted out physically in his 17 months at Cowlitz,
    including a recent incident. He is proud of how he has conducted himself, in general,
    during a stressful time of indefinite incarceration during a pandemic, and he regrets his
    actions on those two occasions. Throughout the month of October he eagerly awaited a
    bond hearing date and for weeks was told it could be occur any day. The waiting was

difficult for BBB, especially because he also was facing the prospect of being sent to an adult detention center on his birthday and starting two weeks of quarantining alone. He explained to me that it was partly due to that additional stress that he acted out uncharacteristically.

12. Based on my vast experience with youth in the criminal justice system, I believe BBB will not engage in criminal activity if released. In my opinion, he will not associate with any gang member or harm anybody in his community. His very few acts of misconduct during his lengthy incarceration were predominantly due to the circumstances and conditions of his imprisonment and not because he is a violent person.

13. He has a strong support system that will provide him with the emotional and psychological support he needs to recover from his past, including the three and a half years he has served for assault and carrying a weapon in a single act of juvenile delinquency in which nobody was injured. He has the support of his sponsor family, including a 19-year old university student who is a brother-like mentor to BBB. I know he wants to continue his immigration case and he has the support to make that happen.

14. I will continue to mentor him. I commit to helping BBB while he is incarcerated and after his release. Specifically, my support will include, but is not limited to, the following:
   • Weekly Check-ins: continue to meet for an hour weekly with BBB via Zoom conferencing on during his current incarceration;
   • Re-entry Support Services: upon release, provide BBB with assistance in identifying pro-social activities, re-entry support services, and other opportunities and supports in his area; and
   • Mentorship and Guidance: serve as life coach to BBB, providing him with emotional support, advice, counseling, and assistance with overcoming challenges and navigating unfamiliar environments, including remaining available 24-hours a day.

15. If the Judge would like to hear more from me, I can be reached by phone at (805) 218-5837 or by email at fguzman@youthlaw.org.

Under penalty of perjury of the laws of the United States, I declare that the following is true. Executed on this 9th day of November 2020 in Oakland, California:


_____
Francis "Frankie" Guzman
California SBN 289032

3

# Curriculum Vitae of
# Francis ("Frankie") Guzman, J.D.

**385 Palm Avenue #8A, Oakland, CA 94610 • (805) 218-5837 • francisvguzman@gmail.com**

## OVERVIEW: PRINCIPAL PROFESSIONAL SPECIALISMS

I am a youth justice policy attorney at the National Center for Youth Law ("NCYL") based in Oakland, California. My work is focused on advancing evidence-informed policies and practices shown to improve youth outcomes, reduce recidivism, and improve public health and safety. Primary activities include conducting research on developmental science and effective prevention, intervention, and reentry services for youth up to age 25; partnering with state policymakers to develop policies and revenue streams; engaging in broad communications and education to increase public understanding and support for improvements to youth justice systems; collaborating with state and local system administrators, community stakeholders, and systems-involved youth to develop, pass, and implement reforms; educating and mentoring system-involved youth in community and carceral settings; and building capacity of system-involved youth and system-impacted communities to improve youth justice policies, practices, and rehabilitative opportunities for youth.

## PAST & PRESENT POSITIONS

National Center for Youth Law, 2012 – Present
  Director, Youth Justice Initiative, 2017 – Present
  Staff Attorney, 2014 – 2016
  Soros Justice Fellow, 2012 – 2014

Alameda County Public Defender's Office, Juvenile Unit, 2015 – 2017
  *Volunteer* Defense Attorney (Two days per week)

## EDUCATION

University of California at Los Angeles School of Law, Los Angeles, CA
  J.D. degree, 2012
  Specialization: Public Interest Law and Policy

University of California at Berkeley, Berkeley, CA
  B.A. degree, 2007
  Major: English

Ford School of Public Policy, University of Michigan, Ann Arbor, MI
  Junior Summer Institute, 2006
  Focus: Public Policy and International Affairs

## SYSTEM STAKEHOLDER PARTNERSHIPS

California Complete Count Committee, Census 2020, Sacramento, CA, October 2019 – Present

Department of Youth and Community Restoration Committee, Child Welfare Council, Sacramento, CA, October 2019 – Present

Santa Clara Youth Justice Initiative, Juvenile Court–Superior Court of Santa Clara County, Santa Clara County, CA, January 2018 – Present

Emerging Adult Justice Learning Community, Columbia University Justice Lab, Columbia School of Social Work, New York, NY, Spring 2017 – Present

Senate Bill 260 & 261 (Youth Offender Parole Hearings) Implementation Committee, California Department of Corrections and Rehabilitation, California, 2014 – Present

Youth Mentor and Motivational Speaker, California Department of Corrections and Rehabilitation-Division of Juvenile Facilities, Stockton and Ventura, CA, 2013 – Present

Direct File & Transfer Hearing Committee, Santa Clara County Juvenile Court, San Jose, CA, 2015 – 2019

Executive Steering Committee, Proposition 47/Assembly Bill No. 1056 Recidivism Reduction Fund, Board of State and Community Corrections, Sacramento, CA, 2016 – 2017

Executive Steering Committee, Assembly Bill No. 1837 Social Innovation Financing Program Recidivism Reduction Fund, Board of State and Community Corrections, Sacramento, CA, 2015 – 2016

Juvenile Justice Task Force, Los Angeles County Juvenile Court, Los Angeles, CA, 2015 – 2016

Community Advisory Board, Alameda County Community Corrections Partnership – Executive Steering Committee for AB 109 Realignment, Alameda County, CA, 2014 – 2016


## ORGANIZATIONAL & PROFESSIONAL LEADERSHIP

Board Member, Pacific Juvenile Defender Center, California, 2020 – Present

Co-Director & Co-Founder, California System Involved Bar Association, California, 2019 – Present

Board of Directors, California LAW (Leadership Access Workforce), California, 2015 – Present

Advisory Board, Impact Justice, Oakland, California, 2015 – Present

Board of Directors, *UnCommon* Law, Oakland, California, 2015 – Present

Member, Steering Committee, California Alliance for Youth and Community Justice, California, 2013 – Present

Board of Directors, Communities United for Restorative Youth Justice, Oakland, California, 2013 – 2019

Co-Chair, Safety & Justice Policy Workgroup, Alliance for Boys and Men of Color, California, 2013 – 2018

Advisory Board, Juvenile Justice Behavioral Health Statewide Collaborative, Sacramento, California, 2014 – 2016

Board of Directors, Legal Services for Children, San Francisco, California, 2013 – 2016

## RESEARCH, PUBLICATIONS, & EDITORIAL ROLES

Guzman, F., Ridolfi, L., Washburn, M. (November 2017).  "Youth Prosecuted as Adults in California: Addressing Racial, Ethnic, and Geographic Disparities After the Repeal of Direct File." Available at: https://youthlaw.org/publication/youth-prosecuted-adults-california.

Harris, C., Ortenburger, M., Santiago, *et. al.* (Feb. 2017). "Juvenile InJustice: Charging Youth as Adults is Ineffective, Biased, and Harmful," Full Report. Human Impact Partners. (F. Guzman, *et. al*. eds.) Available at: http://www.humanimpact.org.

Guzman, F., Ridolfi, L., Washburn, M. (Oct. 2016).  "The Prosecution of Youth as Adults in California: A 2015 Update." Available at: https://youthlaw.org.

Guzman, F., Ridolfi, L., Washburn, M. (Mar. 2016). "The Prosecution of Youth as Adults: A County-Level Analysis of Prosecutors' Use of Direct File in California and its Disproportionate Impact on Youth of Color." Available at: https://youthlaw.org.

Guzman, F. (Feb. 10, 2016). "LWOP Ruling Particularly Important in California." The California Daily Journal. Available at: https://dailyjournal.com.

Guzman, F., Lee, A. (Oct. 15, 2015). "Juvenile Life Sentences Were Always Cruel and Unusual." The California Daily Journal. Available at: https://dailyjournal.com.

Guzman, F. (Apr. 2015). "Unfettered Discretion, Negative Outcomes, and No Oversight: California's Need for Data Collection on Juveniles Prosecuted as Adults." Youth Law News. Available at: https://youthlaw.org.

## STAKEHOLDER PRESENTATIONS & KEYNOTE ADDRESSES

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education & Research, Judicial Council of California, Sacramento, CA, December 4, 2019.

*Juvenile Justice Reform in 2019: Re-imagining How We Respond to Delinquency*. Panel

Presentation, Roundtable on Improving Justice System Responses to Achieve Better Outcomes for Youth, National Governors' Association, San Diego, CA, November 7, 2019.

*The Consequences of Juvenile Justice System Involvement on the Health and Well-Being of Adolescents, Families, and Communities of Color*. Keynote Address, Roundtable on the Promotion of Health Equity of National Academies of Sciences, Engineering, and Medicine, Northern Arizona University, Flagstaff, AZ, September 26, 2019.

*Supporting Positive Youth Development: Insights from a Former 'At-Risk' Youth, Now a Youth Justice Attorney*. Keynote Address, California Association of Youth Courts Summit, University of Redlands, Redlands, CA, June 28, 2019.

*Reimagining the Justice System's Approach to Violent Crime: Paper Release Event*. Panel Presentation, Emerging Adult Justice Learning Community, Columbia University Justice Lab, The Penn Club, New York, NY, May 30, 2019.

*California Youth Justice Initiative.* Presentation, San Diego County Juvenile Justice Collaborative, San Diego County Juvenile Court, San Diego, CA, May 24, 2019.

*Supporting positive youth development: Insights from a former 'at-risk' youth, now a Youth Justice Attorney.* Presentation, Melbourne Youth Justice Centre, Department of Justice and Regulation Youth Justice Service, Parkville, VIC (AUS), May 6, 2019.

*Supporting Positive Youth Development: Insights from a Former 'At-Risk' Youth, Now a Youth Justice Attorney*. Keynote Address, 3rd Australasian Youth Justice Conference 2019, Australasian Juvenile Justice Administrators, Juvenile Justice New South Wales, Australian Institute of Criminology, Sydney, NSW (AUS), April 30, 2019.

*Fostering Success Fund.* Proponents Panel, California Senate Budget Subcommittee Hearing, California State Capitol, Sacramento, CA, April 4, 2019.

*Grant Writing and Program Expansion for Juvenile Offices*. Workshop Presentation, Bay Area Juvenile Defenders Conference, Berkeley Law School, Berkeley, CA, March 9, 2019.

*Supporting Positive Youth Development: Insights from a Former 'At-Risk' Youth, Now a Youth Justice Attorney*. Keynote Address, 32nd Annual Research & Policy Conference on Child, Adolescent, and Young Adult Behavioral Health, Department of Child and Family Studies, University of South Florida College of Behavioral and Community Sciences, Tampa, FL, Mar. 5, 2019.

*Youth Reinvestment Educational Summit*. Educational Briefing, California State Legislature, California State Capitol, Sacramento, CA, February 25, 2019.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education & Research, Judicial Council of California, San Francisco, CA, February 5, 2019.

*Recommendations on Governor Newsom's Proposal to Move DJJ to HHS*. Presentation, CA

Governor Newsom's Cabinet, Dept. of Finance, Dept. of Health and Human Services, and Division of Juvenile Justice, California State Capitol. Sacramento, CA, February 21, 2019.

*Dealing with Youth that Commit Serious and Violent Offenses.* Workshop Presentation, Annie E. Casey Foundation Deep-End Convening, Los Angeles, CA, January 31, 2019.

*Youth Reinvestment Funds for California's Most Vulnerable Youth Populations*. Presentation, Child Welfare Policy Roundtable, California State Capitol. Sacramento, CA, December 7, 2018.

*Strengthening Pathways to Higher Education and Careers: For Students Who Were Incarcerated in Their Youth.* Workshop Presentation, National Youth Employment Coalition Forum 2018, Washington, DC, December 4, 2018.

*Building a Movement for Youth Development and Diversion*. Workshop Presentation, Coalition for Juvenile Justice 2018 DMC Conference, Baltimore, MD, November 28, 2018.

*California's Youth Reinvestment Funds and the Future of Juvenile Justice in CA*. Presentation, Chief Probation Officers of California Quarterly Convening, San Diego, CA, Sept. 18, 2018.

*Roundtable on Law School and Bar Admission for People with Criminal Records*. Panel Presentation, Stanford Criminal Justice Center and Stanford Center on the Legal Profession, Stanford Law School, Stanford, CA, April 26-27, 2018.

*Senate Bill 1391: Juvenile: Fitness for Juvenile Court.* Proponents Panel, California Senate Public Safety Committee, State Capitol, Sacramento, CA, April 3, 2018.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education & Research, Judicial Council of California, San Francisco, CA, February 27, 2018.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education & Research, Judicial Council of California, San Francisco, CA, Oct. 31, 2017.

*Trauma, Crime, and Public Safety.* Keynote Address, Delaware Juvenile Justice Summit, Delaware Criminal Justice Council, Wilmington, DE, September 29, 2017.

*Proposition 57: Status of CDCR Regulations*. Proponents Panel, California Legislature Joint Public Safety Committees Informational Hearing, State Capitol, Sacramento, CA, August 22, 2017.

*Understanding Gangs and Complex Trauma from a Developmental Framework*. Gang Intervention Training, California Department of Corrections and Rehabilitation–Division of Juvenile Facilities, Elk Grove, CA, July 24, 2017.

*Call to Action and Concluding Remarks*. Keynote Address, Reimagining Justice Conference, Office of Governor Dannel P. Malloy, Hartford, CT, June 15, 2017.

*Trauma, Vulnerable Youth, and Public Health*. Presentation, Secretary's Advisory Council on
Youth Justice, Wisconsin Department of Children and Families, Madison, WI, May 3,
2017.

*Building a Framework for Positive Youth Development.* Keynote Address, Wisconsin Youth
Services Conference, Wisconsin, Dells, May 2, 2017.

*Senate Bill 312: Juveniles: Sealing of Records.* Proponents Panel, California Senate Public
Safety Committee, State Capitol, Sacramento, CA, April 25, 2017.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs
and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education &
Research, Judicial Council of California, Sacramento, CA, February 28, 2017.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs
and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education &
Research, Judicial Council of California, San Francisco, CA, November 15, 2016.

*Meeting the Behavioral Health Needs of Justice-Involved Youth of Color*. Panel Presentation, All
Member Meeting, County Behavioral Health Directors Association of California,
Sacramento, CA, Oct. 13, 2016.

*Proposition 57: An Emphasis on Youth and Rehabilitation*. Panel Presentation, Children's
Advocates' Roundtable, Office of the Attorney General, Sacramento, CA, September 23,
2016.

*Proposition 57: PSRA of 2016.* Proponents Panel, California Legislature Joint Public Safety
Committees Informational Hearing, State Capitol, Sacramento, CA, June 8, 2016.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs
and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education &
Research, Judicial Council of California, San Francisco, CA, March 8, 2016.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs
and Serious Crime*. Gang Intervention Training, Alameda County Probation Department,
Oakland, CA Nov. 19, 2015.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs
and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education &
Research, Judicial Council of California, Sacramento, CA, March 18, 2016.

*Addressing Youth in Gangs with a Developmental Approach*. Gang Intervention Training,
Juvenile Services, Alameda County Probation Department, San Leandro, CA, November
19, 2015.

*Senate Bill 382: Judicial Guidance on Juvenile Fitness Criteria.* Proponents Panel, California
Senate Public Safety Committee, State Capitol, Sacramento, CA, June 30, 2015.

*Socio-Economic Bias: The Disproportionate Use of Harsh Punishments on Youth of Color*.
Juvenile Delinquency Presentation, New Mexico Judicial Conclave, Santa Fe, NM, June
4, 2015.

*School to Prison Pipeline: Stop the Cycle Through Building Community Programs focusing on Youth Development*. Panel Presentation, 2nd Annual Juvenile Justice Roundtable, California Institute for Behavioral Health Solutions, Sacramento, CA, May 14, 2015.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education & Research, Judicial Council of California, Sacramento, CA, Feb. 23. 2015.

*SB 260: Youth Offender Parole Hearings.* Proponents Panel, California Senate Public Safety Committee, State Capitol, Sacramento, CA, May 23, 2014.

*Supporting Positive Youth Development: A Developmental Approach to Dealing with Gangs and Serious Crime*. Juvenile Delinquency Orientation, Center for Judicial Education & Research, Judicial Council of California, Sacramento, CA, Jan. 6, 2014.

*The Challenge of Youth Violence: State Policies and Local Action*. Capitol Briefing, California Program on Access to Care (CPAC), Sacramento, CA. Sept. 25, 2013.

*Turning the Curve on Youth Violence: Acting on What Works*. Panel Presentation, Criminal Justice Council of Santa Cruz County, Santa Cruz, CA, August 16, 2013.


## AWARDS & ACCOLADES

*70 Most Inspiring & Trailblazing Alumni in 70 Years*, UCLA Law Magazine, Fall 2019

*2019 Natalie S. Bimel Award*, Annie E. Casey Foundation, Seattle, WA, October 2019

*Leadership Award,* Juvenile Law Center, Philadelphia, PA, May 2018

*Certificate of Recognition*, Assemblymember Rob Bonta, California State Assembly 18th District, November 2016

*Soros Justice Fellowship*, Open Society Institute, New York City, NY, September 2012

*Outstanding Achievement Award*, Chief Deputy Secretary Bernard Warner, California Department of Corrections and Rehabilitation–Division of Juvenile Justice, Sept. 2007


## CONTINUING LEGAL & PROFESSIONAL EDUCATION

*Treating Trauma in Children: Using Trauma Focused- Cognitive Behavior Therapy*, Los Angeles, CA, Spring 2019; Vickie Beck, Advanced Practice Registered Nurse- Board Certified, Kennedy Krieger Institute's Center for Child and Family Traumatic Stress.

*Trauma-Informed Care for Professionals Working with Youth*, Online Training, Spring 2017 Dr. Sam Himelstein, Psychologist & Psychotherapist, Center for Adolescent Studies, Inc.

*Adolescent Brain Development at the Transfer Hearing*, Los Angeles, CA, Spring 2013 – 2017

Dr. Antoinette Kavanaugh, Forensic Clinical Psychologist and Lecturer, Feinberg School of Medicine, Northwestern University.

*Transfer Evaluations with Focus on Gang Involved Youth*, Los Angeles, CA, Spring 2013 – 2017
Dr. Rahn Minagawa, Forensic Psychologist, Forensic Psych Consultants.

*Adolescent Brain Development and the Juvenile Justice System*, Sacramento, CA, Fall 2015
Dr. Elizabeth Cauffman, Professor, Department of Psychology & Social Behavior, School of Education, School of Law, University of California at Irvine.

*Juvenile Training Immersion Program*, National Juvenile Defender Center, Georgetown University Law Center, Washington, DC, June 2014.

**Declaration of D. Paloma Norris-York**

I, D. Paloma Norris-York, declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about the following facts.

2. I am an attorney with Immigrant Defense Oregon of Metropolitan Public Defender, located in Portland, Oregon. I am a member of the Oregon State Bar (OSB #965680). This declaration describes my experiences and observations representing B.B.B., as well as representing and consulting with others detained by ICE at the Cowlitz County Juvenile Detention Center ("Cowlitz").

3. I represent B.B.B. before USCIS and the Immigration Court. His 18th birthday is on November 15, 2020. After arriving in the United States, B.B.B. was released on July 24, 2014 into the care of his mother.

4. He was detained by ICE on October 18, 2018 and transferred to Cowlitz on June 3, 2019.

5. On April 14, 2020, I sent an email to ICE requesting release of B.B.B. to which I attached a six-page letter detailing why he was not a flight risk or danger, and a declaration of his mother, Marta Eugenia B- Rosales, stating: "We have space and a bed for B.B.B. in our home and hope he can rejoin the family soon. I will provide for all of his needs here, including food, shelter, and enrolling him in school once schools reopen." Exh A attached hereto at ¶ 5 ("Rosales Decl."). It stated further that: "I will make sure B.B.B. attends all of his hearings with the Immigration Court. I will also make sure he attends any check-ins with ICE and updates his address with the court and ICE if we were to move." *Id*. at ¶ 7.

6. On April, 17, 2020, I received the an email response from ICE Deportation Officer Dan Peterson stating in part:

> The request for release was reviewed and considered; however, given the minor's criminal background, he appears to be a flight risk and threat to public safety. On March 01, 2017, the subject was arrested by the Frederick Police Department on a Grand Jury Indictment Circuit Court Arrest Warrant for the charges of Conspiracy First Degree Murder, Assault First Degree, Conspiracy Assault First Degree, Assault Second Degree, Reckless Endangerment, Dangerous Weapon: Wear and Carry with Intent to Injure, and Participate Criminal Gang. On January 22, 2018, the subject's criminal case was remanded to the Juvenile Court. The subject was determined delinquent of 1st Degree Assault and Use of a Weapon. The minor has several detention facility write-ups, most recently for verbal assault. The minor meets the criteria for secure custody; which is listed under paragraph 21 of the Flores Settlement Agreement. JFRMU reviewed the case and also concurred with these

findings. The minor's release and reunification would pose a significant threat to society; therefore, he will not be released for reunification at this time. The minor's attorney can request a bond hearing before an immigration judge, and they may request release at that time.

7. B.B.B.'s mother continues to be ready to provide for him and states that "[n]obody from ICE or immigration has called me to ask if we have a home ready for B.B.B. to come to when he is released." Exhibit B attached hereto at ¶ 10 ("Rosales November 2020 Decl."). His older brother and legal guardian, Nelson Ariel B-, also declares that

> [n]obody from ICE or immigration has called me to ask if I have a home ready for B.B.B. to come to when he is released. I have received no letter or phone call from ICE about B.B.B.. He can live with me, and would have his own bedroom. I am committed to providing for the physical, mental, and emotional well-being of B.B.B.. There is less gang presence now than before. Before it was not safe to be out in the streets. I know B.B.B. could stay safe and away from the gangs now. I would keep him safe from COVID-19 by washing hands often, staying at home, and wearing a mask when he needs to go out. If we have symptoms of COVID-19, then we will go to a doctor. I can ensure that B.B.B. attends all of his hearings in Immigration Court he did for all of his hearings in the past. If we move, we will be sure to notify the Immigration Court within five days. I can ensure that B.B.B. attends all meetings with USCIS and ICE.

Exhibit C attached hereto at ¶ ¶ 5-9 ("N.A.B. November 2020 Decl.").

8. On October 2, 2020, I filed a Motion for Bond Redetermination on behalf of B.B.B. that requested a bond hearing. Exhibit D attached hereto ("Bond Motion"). On October 29, 2020, I received the Immigration Court's written decision, dated October 23, 2020, denying the Motion for Bond Redetermination. Exhibit E attached ("2020 Bond Denial"). The immigration judge declined to conduct a hearing. The decision states, "[b]ecause the Court does not find that B.B.B. demonstrated a material change in circumstances, it need not address the DHS arguments asserting that . . . he is a danger to the community and a flight risk." *Id*. at p.3. I plan to appeal that decision on B.B.B.'s behalf. My understanding based on my own experience and hearing from other immigration attorneys is that the appeal process usually takes 5-6 months. If the BIA does remand for the immigration judge to explain the reasoning behind his decision, then we would appeal that decision.

9. The declaration of potential sponsor Patricia Fink was submitted with the Bond Motion and states: "We want to provide housing, food, clothing, and other necessities for B.B.B. upon being released from detention. Additionally, we want to provide him with a physically and emotionally safe and supportive family environment." Exhibit F attached hereto at ¶ 2 ("P.F. Sept. Decl"). In a separate declaration, Ms. Fink states: "We are committed to providing for the physical, mental, and financial well-being of B.B.B.. We live in a home with three bedrooms and one and a half bathrooms. B.B.B. will have his own bedroom. Our home is in a safe, residential neighborhood." Exhibit G attached at ¶ 3-4 ("P.F. Nov. Decl"). Ms. Fink has informed me by telephone that ICE has not contacted her regarding B.B.B..

10. A comprehensive, 19-page psychological evaluation of B.B.B. by Dr. Amy Cohen, M.D. was submitted as an exhibit to the Bond Motion. Exh H attached hereto ("Psych Eval"). The Psychological Evaluation is dated Sept. 21, 2020 and was based on both her review of numerous records and 5.5 hours of interviewing B.B.B.. Exh H at pp. 4, 19.

11. Dr. Cohen's "area of expertise is the impact of both juvenile and immigration detention on youth, especially those with histories of trauma. [She] served as lead psychiatrist at Alameda County Juvenile Hall in California for approximately 2 years and, during that time, served a population of up to 200 incarcerated youth, many of them verifiably gang affiliated. [She] also ran a consultation service for Superior Court judges presiding over juvenile cases." Exhibit H at p. 1.

12. Dr. Cohen concluded: "The government has deemed [B.B.B.] 'too dangerous' to be released despite the few incidents in which he has engaged and which have all represented low-risk, impulsive behavior typical of adolescents with similar histories. If adjudicated in a juvenile (or criminal) court, he would never receive such a sentence for these behaviors. In a myriad of ways, [B.B.B.]  has demonstrated his commitment to work on the issues of anger and frustration which followed a difficult childhood of trauma, betrayal, loss, and the sort of isolation and deprivation that these years of incarceration have inflicted on him. His ability to manage his feelings has demonstrably and impressively improved. He demonstrates absolutely no signs of psychopathy or sociopathy suggesting an underlying constitutional dangerousness. The label of 'gang affiliation' appears to represent 'guilt by association' and is not supported by data, including his comportment over the course of his incarceration." Exhibit H at p. 2.

13. On October 18, 2018, the Circuit Court for Frederick County Maryland sitting as a juvenile court entered an "Order of Probation" stating that "the Respondent has been found to have committed the delinquent act(s) of: (1) Ct#1 – First Degree Assault (2) Ct#2 Wear and Carry Weapon with Intent to Injure . . . and the Court has determined that the Respondent should be placed on probation[.]" Exhibit I attached hereto ("Probation Order").

14. Regarding the single incident of juvenile delinquency B.B.B. committed in February of 2017, when he was 14, Dr. Cohen's Evaluation provides the following context: "One day in the late winter of 2017, B was walking through a park when he found himself surrounded by members of Mara 18, Kevin amongst them. Kevin carried a baseball bat while the others had BB guns. While the others trained their guns on B , Kevin attacked with the baseball bat, fracturing B 's arm as he attempted to protect his head and face from Kevin's blows. Taken to the hospital, B was told that he must keep his arm in a cast for 6 weeks. B did not go to the police. Edwin felt they must personally retaliate against those who had attacked him. If not - Edwin warned - they would be seen as weak. B - and perhaps other members of the family - would be attacked again, and Edwin would lose face with those in MS-13. B resisted his brother's pressure to

retaliate but ultimately agreed to join him. On February 10, 2017, Edwin brought a BB gun and B pocketed a machete that he'd never before carried." Exh H at p. 6.

15. Dr. Cohen's expert opinion based on watching a video of most of the assault is that: "Of note is that - more than anything - this resembles a fist fight rendered unfair only because it was two boys against one. However, it appears in the video that [B.B.B.] barely participates and that it is actually his brother who principally pummels Kevin while [B.B.B.] stands at a distance. The machete is clearly tucked between [B.B.B.]'s legs in a manner that is far more likely to injure [B.B.B.] than Kevin. It is also evident in the video that [B.B.B.] could easily have brandished and used that machete had he wished to truly hurt Kevin. In short, the video substantiates what B.B.B. has consistently related regarding this incident: that he was deeply ambivalent, not prone to violence, and that his intention was really to 'scare' Kevin, and never to truly hurt him. Of note is that, at the end, all parties walk away on their own steam without any obvious serious injuries." Exhibit H at p. 7. A link to the video was submitted to the Immigration Court with the Bond Motion.

16. Maryland law states "a court record pertaining a child is confidential and its contents may not be divulged by subpoena or otherwise, except by order of the court upon good cause shown or as otherwise provided in S 7-303 of the Education Article." MD. Code, Cts. & Jud. Proc. S 3-8A-27(b)(1). ICE has never demonstrated that it obtained records of the juvenile case through the required court order. Regarding police documents, Maryland law states "a police record concerning a child is confidential and shall be maintained separate from those of adults. Its contents may not be divulged by subpoena or otherwise, except by order of the court upon good cause shown or as otherwise provided in S 7-303 of the Education Article." MD. Code, Cts. & Jud. Proc. S 3-8A-27(a)(1). Furthermore, documents that are part of the record of a Maryland juvenile proceeding are "not admissible against a child in any other proceeding in any other court, except in a criminal proceeding where the child is charged with perjury and the evidence is relevant to that charge and is otherwise admissible." MD. Code, Cts.& Jud. Proc. S 3-8A-23(c).

17. A three-page, unsigned psychological evaluation of B.B.B., dated Nov. 29, 2018, was performed by Rocco Manfredi, M.D. and relied upon by ICE and the Immigration Judge in B.B.B.'s 2018 bond hearing. The evaluation contains the entirely erroneous statement that "[B.B.B.]'s legal history began last year when he was arrested for attempted murder. That is, he hacked a man with a machete." The video of the incident I have reviewed and the charges sustained by the juvenile court make absolutely clear that B.B.B. was not arrested for "attempted murder" and never "hacked a man with a machete." The indictment does not contain a charge of attempted murder and video evidence shows the victim appearing unharmed and not bleeding from being hacked as he walks away from the fight.

18. DHS submitted as evidence, a "gang card" from the Frederick, Maryland police. The list of "validation criteria requires at least two for gang member" and checks off the following boxes: "Individual Has Been Identified As A Gang Member *By An Untested Source* . . . Individual Has Been Seen Displaying Gang Hand Signs, Possesses Symbol, Logos,  Graffiti, Documents (must be described) . . . Individual Associates With Validated Gang Members, Individual Arrested with Validated Gang Member." According to the report, the associate he was stopped in the presence of and with whom he was arrested was his brother, "[s]ubject [B.B.B.] was stopped and identified with his brother (validated MS-13)" and "[s]ubject [B.B.B.] was arrested with his brother" – neither entry mentions the presence of any other MS-13 members, only his brother. The criteria of "being seen" displaying a hand sign, symbol, etc. does not have any description as required. It states "[t]here were numerous MS-13 related images in the cellular phone to include the below displayed images." None are displayed.

19. Regarding B.B.B.'s 7.5 months in ICE custody at Abraxas Academy, a teacher states as follows: "my belief is that he is a good hearted kid with a solid moral compass. . . . He is compassionate towards others, especially after he has formed a bond. I developed a strong bond with B.B.B. as he was there for almost one year. At the end of his time there, he was the only boy in ICE detention left at Abraxas. . . .  I believe 100% that he was provoked into fighting the staff because they were taunting him." Exhibit J attached hereto ("Letter from Rebecca Mogul"). This letter was submitted with the 2020 Bond Motion.

20. Dr. Cohen stated that "[i]t is notable that all of [BBB]'s episodes of poor behavior have been entirely normative for youth of his age, history of deprivation and poverty, exposure to what it means to be disrespected and how to counter this. Over the course of my work as the lead psychiatrist at a Juvenile Hall in Alameda County, California, I witnessed many, many instances of kids "losing it" from a toxic combination of traumatic histories, inadequate treatment, lack of good role modeling, hopelessness for their future, and the incarceration which itself often underscored their experience of hopelessness. Using one's fists in these situations would never have resulted in long term incarceration for these youth, and certainly not in a permanent designation of "dangerousness". [BBB] is not a boy who has ever engaged in violence with a weapon (despite having carried one to his assignation with Kevin) and has lashed out impulsively in a manner wholly consistent with his history, age, isolation, protracted detention. His capacity to now manage more successfully his impulsivity is likely a matter of increased brain maturity mixed with a strong determination to do well and have a real future and healthy life for himself." Psych Eval Exh H at p. 15.

21. A letter from a Cowlitz staff person submitted with the Bond Motion states: "[BBB] has been here approximately 458 days and the majority of the time he has been level 4 status. I praise him for being able to maintain a positive mindset while he fights his case. [BBB] has only 1 major infraction during his time. This is amazing for how long he has been here. B.B.B. has always been very respectful to staff and peers." Exhibit K attached hereto.

22. A letter from the Cowlitz Care Coodinator submitted with the Bond Motion states: "[B.B.B.] has always been great to work with and has treated me with great respect. Over the several months that he has been here, he has always offered to help interpret for me when dealing with Hispanic youth for a quick question. He has been a sort of big brother to new kids in detention and has been respectful to them … [B.B.B] has been here 15 months and has strived to do his very best and help where he can. He has had a few hiccups but has always rebounded to get back to level 4 privilege status which is the highest status. I have seen him grow as a leader during his time here and he will soon be turning 18 and venturing off into adulthood. I wish him the best!!!!" Exhibit L attached hereto .

23. The Cowlitz chaplain stated that B.B.B. "has shown to be very faithful and mature young man who is actively involved and shows to be a positive influence on other person." Exh M attached hereto ("Letter from Chaplain Rick Terrazas"). And the Cowlitz teacher said that B.B.B. "has only two documented times when he was removed from class due to behavior. Most of the time he has been able to pull it together or take a break and calm down before coming back to class. As a general rule, however, he conducts him self very well in class (other than being off task quietly). Given that he has now been in our facility for 459 days, he has done quite well." Exhibit N attached hereto.

24. Patricia Fink who wants to sponsor B.B.B. shared: "We have spent more than seven hours talking with [BBB] twice a week for the past six weeks via video conferencing and phone calls. We have enjoyed getting to hear about his interests and what he looks forward to doing once he is released. I have gotten to know him well and believe he has changed tremendously since he did his act of delinquency. The fact that he only lost control and struck a peer one time during his 17 months in the detention center here in Washington is commendable given the solitary confinement he experiences, zero time outside, and often less than an hour of or no exercise time each day. He truly is committed to a non-violent future and avoiding any gang contact. We will support the positive endeavors he will engage in here in our community." P.F. Nov. Decl. Exh G at ¶ 10.

25. The 19-year old son of Patricia Fink has become a mentor to B.B.B. and shared: "I have spent more than seven hours talking with [BBB] twice a week for the past six weeks via video conferencing and phone calls. He and I share many similar interests and we have formed a strong bond already. We are especially looking forward to playing soccer and fly fishing together outside. [BBB] has written to me that he is excited to have an older brother who can give him good advice and help with his studies and improving his already good English. I am committed to assisting [BBB] with his studies, introducing and integrating him into our welcoming community, and providing any opportunities for his growth that he wishes to endeavor upon; in short, I will be a mentor to [BBB]. I have had the opportunity to speak with [BBB] about his past and viewed the video of the incident which led to his detention in Maryland. All my interactions with [BBB] and everything I have encountered has incontrovertibly indicated to me that [BBB] is demonstrably changed and is committed to non-violence, despite the great hurdles presented by the harsh conditions of incarceration. I believe

he is committed to becoming a lawful permanent resident and being a positive member of our community. Exhibit O attached hereto.

I declare under penalty that the foregoing is true and correct. I executed this corrected declaration this 6th day of November, 2020, in Portland, State of Oregon.

_____
D. Paloma Norris-York

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2020, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

<div align="center" style="text-align:left; margin-left:50%;">

/s/ *Peter Schey*
Peter A. Schey
CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
*Class Counsel for Plaintiffs*

</div>