# *O.M.G. v. Wolf*

# FILINGS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | Case No. 1:20-cv-00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | |
| *Respondents*. | The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 and September 9, 2020 minute orders, Respondents hereby notify the Court that, since the last notice (ECF No. 144), one (1) new intake and one (1) employee at the Karnes County Family Residential Center ("Karnes FRC"), and two (2) employees and three (3) new intakes at the South Texas Family Residential Center ("Dilley FRC"), have tested positive for COVID-19. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

### I.      Karnes County Family Residential Center ("Karnes FRC")

New Intake 1: New Intake 1 was tested at Karnes FRC on October 19, 2020, as part of the new intake process. On October 23, 2020, the results came back positive. New Intake 1 is asymptomatic, and being closely monitored. New Intake 1 is and will remain in quarantine for 14 days from the date of the positive test result, and, if New Intake 1 remains asymptomatic, will complete quarantine on November 7, 2020. At this time, New Intake 1 has not required treatment at an outside hospital or medical facility. All new intakes who arrived at the facility with New Intake 1, and remain asymptomatic, are and will remain in cohort for 14 days from their arrival at Karnes FRC on October 16, 2020, until October 31, 2020, and will be monitored and assessed for

signs and symptoms of COVID-19 once per day.

Employee 1: Employee 1 is a cook, who tested at an off-site hospital on October 23, 2020, after being admitted to a hospital for a health condition unrelated to COVID-19. That same day, the results came back positive. At this time, Employee 1 has not required treatment at a hospital or medical facility for COVID-19. Employee 1 was last at Karnes FRC on October 20, 2020. Contact tracing will not be conducted as Employee 1 was not present at Karnes FRC for 48-hours prior to testing positive. Employee 1 is and will remain in quarantine for 14 days from the date of the positive test result, until November 7, 2020. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

**II.     South Texas Family Residential Center ("Dilley FRC")**

Employee 1: Employee 1 is a resident supervisor, who tested at an off-site facility on October 25, 2020, due to experiencing symptoms. That same day, the results came back positive. At this time, Employee 1 has not required treatment at a hospital or medical facility. Employee 1 was last at Dilley FRC on October 22, 2020. Contact tracing will not be conducted as Employee 1 was not present at Dilley FRC for 48-hours prior to exhibiting symptoms and testing positive. Employee 1 is and will remain in quarantine for 14 days from the date of the positive test result, until November 9, 2020. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 2: Employee 2 is a resident supervisor, who tested at an off-site facility on October 26, 2020, due to experiencing symptoms. On October 29, 2020, the results came back positive. At this time, Employee 2 has not required treatment at a hospital or medical facility. Employee 2 was last at Dilley FRC on October 24, 2020. Contact tracing is currently being conducted for October 23 and 4, 2020. If any exposure is identified, the protocols for contact

exposure previously described in ECF No. 108 will be implemented. Employee 2 is and will remain in quarantine for 14 days from the date of the positive test result, until November 13, 2020. After that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

New Intake 1: New Intake 1 was tested at Dilley FRC on October 24, 2020, as part of the new intake process. On October 28, 2020, the results came back positive. New Intake 1 is asymptomatic, and being closely monitored. New Intake 1 is and will remain in quarantine for 14 days from the date of the positive test result, and, if New Intake 1 remains asymptomatic, will complete quarantine on November 12, 2020. At this time, New Intake 1 has not required treatment at an outside hospital or medical facility. All new intakes who arrived at the facility with New Intake 1 and remain asymptomatic are and will remain in cohort for 14 days from their arrival at Dilley FRC on October 24, 2020, until November 8, 2020, and will be monitored and assessed for signs and symptoms of COVID-19 once per day.

New Intake 2: New Intake 2 was tested at Dilley FRC on October 24, 2020, as part of the new intake process. On October 28, 2020, the results came back positive. New Intake 2 is asymptomatic, and being closely monitored. New Intake 2 is and will remain in quarantine for 14 days from the date of the positive test result, and, if New Intake 2 remains asymptomatic, will complete quarantine on November 12, 2020. At this time, New Intake 2 has not required treatment at an outside hospital or medical facility. All new intakes who arrived at the facility with New Intake 2 and remain asymptomatic are and will remain in cohort for 14 days from their arrival at Dilley FRC on October 24, 2020, until November 8, 2020, and will be monitored and assessed for signs and symptoms of COVID-19 once per day.

New Intake 3: New Intake 3 was tested at Dilley FRC on October 24, 2020, as part of the

new intake process. On October 28, 2020, the results came back positive. New Intake 3 is asymptomatic, and being closely monitored. New Intake 3 is and will remain in quarantine for 14 days from the date of the positive test result, and, if New Intake 3 remains asymptomatic, will complete quarantine on November 12, 2020. At this time, New Intake 3 has not required treatment at an outside hospital or medical facility. All new intakes who arrived at the facility with New Intake 3 and remain asymptomatic are and will remain in cohort for 14 days from their arrival at Dilley FRC on October 24, 2020, until November 8, 2020, and will be monitored and assessed for signs and symptoms of COVID-19 once per day.

      RESPECTFULLY SUBMITTED this 30th day of October, 2020.

                MICHAEL R. SHERWIN
                Acting United States Attorney
                District of Columbia

                DANIEL VAN HORN
                Assistant U.S. Attorney
                555 4th St. NW, Washington, DC 20530
                Telephone: (202) 252-2506
                Email: Daniel.VanHorn@usdoj.gov

                JEFFREY BOSSERT CLARK
                Acting Assistant Attorney General
                Civil Division

                WILLIAM C. PEACHEY
                Director
                Office of Immigration Litigation
                District Court Section

                ELIANIS PEREZ
                Assistant Director

                *s/  Jordan K. Hummel*
                JORDAN K. HUMMEL
                Trial Attorney
                Office of Immigration Litigation - DCS
                P.O. Box 868, Ben Franklin Station
                Washington, DC 20044

Telephone: (202) 598-8715
Email: jordan.hummel@usdoj.gov

*Attorneys for Respondents*

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

O.M.G., *et al.*,

        *Petitioners*,

v.

Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*,

        *Respondents*.

Case No. 1:20-cv00786-JEB

**NOTICE OF UPDATE IN PANDEMIC RESPONSE REQUIREMENTS**

The Honorable James E. Boasberg

Respondents hereby notify the Court that on October 27, 2020, U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations, issued an updated version of its COVID-19 Pandemic Response Requirements ("PRR"). The updated PRR is attached hereto as Exhibit 1. This updated guidance explains that a cohort, quarantine, and medical isolation must be operationally distinct from administrative or disciplinary segregation, or any form of punitive housing. *See* Exhibit 1 at pp. 3, 8. The PRR also provides updated guidance or clarification on: severe psychiatric illnesses that make it difficult for the individual to participate in their own care, make it unlikely that the individual will express symptoms, or that increase the risk of complications from the virus; notifications to counsel regarding populations at higher risk or the subclasses certified in *Fraihat v. ICE*; discontinued transfer policies and the limited exceptions; prohibition of extended lockdowns as a means of COVID-19 prevention; and mandatory testing within 12 hours of arrival at an ICE facility. *See* Exhibit 1 at pp. 3-4. The updated PRR is found at https://www.ice.gov/coronavirus/prr.

    Respondents also submit updated census numbers denoting the population at each of the three Family Residential Centers ("FRCs"), as of November 2, 2020.

The capacity at the Dilley FRC is 2,400. ECF No. 39. As of today, there are 199 residents.

The capacity at the Karnes FRC is 839. ECF No. 39. As of today, there are 33 residents.

The capacity at the Berks FRC is 96. ECF No. 30. As of today, there are 16 residents.

RESPECTFULLY SUBMITTED this 2nd day of November, 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia
DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW
Washington, DC 20530
Telephone: (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
ELIANIS PEREZ
Assistant Director

s/ *Vanessa Molina*
VANESSA MOLINA
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4413
Email: Vanessa.Molina@usdoj.gov

*Attorneys for Respondents*





# ERO

## U.S. Immigration and Customs Enforcement Enforcement and Removal Operations

COVID-19 Pandemic Response Requirements



ERO COVID-19 Pandemic Response Requirements (Version 5.0, October 27, 2020)

# Table of Contents

SUMMARY OF CHANGES ........................................................................................................ 3

PURPOSE AND SCOPE ......................................................................................................... 5

INTRODUCTION ................................................................................................................... 5

OBJECTIVES .......................................................................................................................... 6

COMPLIANCE MEASURES .................................................................................................7

CONCEPT OF OPERATIONS .............................................................................................. 8

   DEDICATED ICE DETENTION FACILITIES ................................................................. 8

   NON-DEDICATED ICE DETENTION FACILITIES ..................................................... 10

   ALL FACILITIES HOUSING ICE DETAINEES .......................................................... 12

      PREPAREDNESS ........................................................................................................ 12

      PREVENTION ............................................................................................................. 17

      MANAGEMENT .......................................................................................................... 21

      TESTING ...................................................................................................................... 25

ATTACHMENTS ................................................................................................................. 27

## Summary of Changes

| Explanation of Change | Section | Page |
|---|---|---|
| • <u>Addition:</u> Footnote 6; A cohort, quarantine, and medical isolation must be operationally distinct from administrative or disciplinary segregation, or any punitive form of housing. | Objectives | 8 |
| • <u>Clarification</u>: Severe psychiatric illness has been further defined to include psychiatric illnesses that make it difficult for the individual to participate in their own care, that make it unlikely the individual will express symptoms, or that increase the risk of complications from the virus. | Concept of Operations | 11, 13 |
| • <u>Addition</u>: In addition to notifying the local ERO Field Office Director (or designee) and the Field Medical Coordinator that a new detainee admission falls within the populations identified as potentially being at higher risk for serious illness from COVID-19 and/or the subclasses certified in *Fraihat v. ICE*, notification must also be made to the detainee and his or her counsel as soon as practicable, but within twelve hours. | Concept of Operations | 11 |
| • <u>Addition</u>: Requirement to evaluate all new admissions within 5 days of entering ICE custody to determine whether the detainees fall within the populations identified as potentially at higher risk for serious illness from COVID-19 also applies to non-dedicated ICE detention facilities. | Concept of Operations | 12 |
| • <u>Addition:</u> Section on the handling of detainees who fall into a high risk (vulnerable) populations category. | Standards for High Risk (Vulnerable) Populations | 14-22 |
| • <u>Addition:</u> Safe cleaning products must be used in the quantities and in a manner as indicated on the manufacture's product label. | Preparedness | 26 |
| • <u>Addition:</u> Facilities shall report confirmed or suspected cases of detainees suffering adverse reactions to cleaning supplies or chemicals to the local ERO Field Office Director (or designee) and Field Medical Coordinator. ICE will promptly investigate and redress reports of adverse reactions | Preparedness | 27 |

| | | | |
|---|---|---|---|
| | to harsh cleaning products or chemical sprays. | | |
| • | <u>Update:</u> Transfers of ICE detainees and non-ICE detained populations to and from other jurisdictions and facilities are discontinued unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding. Detainee transfers for any other reason require justification and pre-approval from the local ERO Field Office Director. Detainee transfers must have cleared quarantine protocols and be cleared by ICE Health Services Corps. | Prevention | 26 |
| • | <u>Addition:</u> Extended lockdowns must not be used as a means of COVID-19 prevention. | Prevention | 27 |
| • | <u>Addition/Clarification:</u> When detainees have to be housed in the spaces used for administrative or disciplinary segregation, facilities must ensure that medical isolation is **_operationally_** distinct from administrative or disciplinary segregation, or any punitive form of housing. Detainees in medical isolation must be provided access to books, television, recreation and to telephones to the fullest extent possible. | Management | 30 |
| • | <u>Addition:</u> All new arrivals to ICE detention facilities require COVID-19 testing within 12 hours of arrival. Collection timeframe may extend to 24 hours if facility collection logistics require additional time. | Management | 29 |
| • | <u>Addition:</u> All new arrivals to ICE detention facilities require COVID-19 testing within 12 hours of arrival. Collection timeframe may extend to 24 hours if facility collection logistics require additional time. Testing of all new admissions before they join the rest of the population in the facility, and housing them individually or in cohorts while test results are pending help prevent potential transmission. | Testing | 33 |

## PURPOSE AND SCOPE

The U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Coronavirus Disease 2019 (COVID-19) Pandemic Response Requirements (PRR) sets forth expectations and assists ICE detention facility operators in sustaining detention operations while mitigating risk to the safety and wellbeing of detainees, staff, contractors, visitors, and stakeholders due to COVID-19. The ERO PRR builds upon previously issued guidance and sets forth specific mandatory requirements to be adopted by all detention facilities, as well as recommended best practices, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis[1]. The ERO PRR has been developed in consultation with the Centers for Disease Control and Prevention (CDC) and is a dynamic document that will be updated as additional/revised information and best practices become available.

## INTRODUCTION

As the CDC has explained:

> COVID-19 is a communicable disease caused by a novel (new) coronavirus, SARS- CoV-2, and was first identified as the cause of an outbreak of respiratory illness that began in Wuhan Hubei Province, People's Republic of China (China).

> COVID-19 appears to spread easily and sustainably within communities. The virus is thought to transfer primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes; it may transfer through contact with surfaces or objects contaminated with these droplets. There is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms. The ease of transmission presents a risk of a surge in hospitalizations for COVID- 19, which would reduce available hospital capacity. Such a surge has been identified as a likely contributing factor to the high mortality rate for COVID-19 cases in Italy and China.

> Symptoms include fever, cough, and shortness of breath, and typically appear two to fourteen days after exposure. Manifestations of severe disease include severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock, and multi-organ failure. According to the World Health Organization, approximately 3.4

---

[1] On April 20, 2020, the U.S. District Court for the Central District of California issued a preliminary injunction requiring that ICE "issue a performance standard or a supplement to their Pandemic Response Requirements … defining the minimum acceptable detention conditions for detainees with risk factors." *Fraihat v. ICE*, --- F.Supp.3d ---, 2020 WL 1932570, *29 (C.D. Cal. Apr. 20, 2020). The ERO PRR has accordingly been updated to define the "minimum acceptable detention conditions for detainees with risk factors."

percent of reported COVID-19 cases have resulted in death globally. This mortality rate is higher among older adults or those with compromised immune systems. Older adults and people who have severe chronic medical conditions like heart, lung, or kidney disease are also at higher risk for more serious COVID-19 illness. Early data suggest older people are twice as likely to have serious COVID-19 illness.

Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020) (internal citations omitted).

Additionally, other symptoms may include fatigue, headache, chills, muscle pain, sore throat, new loss of taste or smell, nausea or vomiting, and diarrhea.[2] Given the seriousness and pervasiveness of COVID-19, ICE is taking necessary and prompt measures. ICE is providing guidance on the minimum measures required for facilities housing ICE detainees to implement to ensure consistent practices throughout its detention operations and the provision of medical care across the full spectrum of detention facilities to mitigate the spread of COVID-19. The ICE detention standards applicable to all facilities housing ICE detainees have long required that each such facility have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, treatment, and education. Those requirements include reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.[3]

The Performance-Based National Detention Standards (PBNDS) 2008 and 2011 both require facilities to "comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting requirements."[4] The 2019 National Detention Standards (NDS) similarly require "collaboration with local or state health departments in accordance with state and local laws and recommendations." [5] The measures set forth in the ERO PRR allow ICE personnel and detention providers to properly discharge their obligations under those standards in light of the unique challenges posed by COVID-19.

**OBJECTIVES**

The ERO PRR is designed to establish requirements, as well as best practices, for all detention facilities housing ICE detainees to follow during the COVID-19 pandemic. Consistent with ICE detention standards, all facilities housing ICE detainees are required to have a COVID-19 mitigation plan that meets the following four objectives:

---

[2] *See, e.g.,* Attachment B, Centers of Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited October 15, 2020).
[3] *See, e.g.,* Attachment C, ICE National Detention Standards 2019 (NDS), Standard 4.3, Medical Care, at II.D.2 (p. 114), https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf; Attachment D, 2011 ICE Performance-Based National Detention Standards (PBNDS), Revised 2016, Standard 4.3, Part V.C.1 (p. 261), https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf; Attachment E, 2008 ICE PBNDS, Standard 4-22, Medical Care, V.C.1 (pp. 5-6), https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf.
[4] Performance-Based National Detention Standards (PBNDS) 2008 and 2011, Medical Care 4.3, (C.) Communicable Disease and Infection Control, p. 261-262.
[5] The 2019 National Detention Standards (NDS), Medical Care 4.3, (II.)(D.)(2.) Infectious and Communicable Diseases, p.114.

➢ To protect employees, contractors, detainees, visitors, and stakeholders from exposure to the virus;

➢ To maintain essential functions and services at the facility throughout the pendency of the pandemic;

➢ To reduce movement and limit interaction of detainees with others outside their assigned housing units, as well as staff and others, and to promote social distancing within housing units; and

➢ To establish the means to monitor, cohort, quarantine, and isolate the sick from the well.[6]

## COMPLIANCE MEASURES

To ensure that detention facilities comply with the detention requirements set forth in the ERO PRR, ICE federal compliance personnel will conduct onsite in-person monthly spot checks at over 72-hour ICE detention facilities during the COVID-19 pandemic[7]. Upon identification of a deficiency, ICE will provide written notice to the facility and allow seven business days for submission of a corrective action plan to ICE for approval. Life/safety issues identified by ICE will be corrected during the COVID-19 spot checks, if possible, or the facility will be required to submit a corrective action plan, within three business days.

➢ For dedicated ICE detention facilities, which operate under Quality Assurance Surveillance Plans, ICE will issue a Contract Discrepancy Report (CDR), which may include contract sanctions, for failure to bring the facility into compliance with the minimum requirements of the ERO PRR within the ICE-approved timeframe. The CDR may become a part of the supporting documentation for contract payment deductions, fixed fee deductions, award fee nonpayment, or other contractual actions deemed necessary by the Contracting Officer. If the detention facility continues to have deficiencies despite the issuance of CDRs, ICE may seek to terminate the contract and/or decline to renew the contract.

➢ For non-dedicated ICE detention facilities that fail to meet the minimum requirements of the ERO PRR, ICE will issue a Notice of Intent indicating that the intergovernmental service agreement is in jeopardy due to non-compliance with the ERO PRR and may take appropriate action, including removing its

---

[6] A *cohort* is a group of persons with a similar condition grouped or housed together for observation over a period of time. Isolation and quarantine are public health practices used to protect the public from exposure to individuals who have or may have a contagious disease. Cohorting, quarantining, and holding in medical isolation must be operationally distinct from administrative or disciplinary segregation, or any punitive form of housing insofar as cells and units for those forms of segregation may be used but detainees are provided access to TV, reading materials, recreation and telephones to the fullest extent possible. For purposes of this document, and as defined by the CDC, *quarantine* is the separation of a person or group of people reasonably believed to have been exposed to a communicable disease but not yet symptomatic, from others who have not been exposed, to prevent the possible spread of the communicable disease. For purposes of this document, and as defined by the CDC, *isolation* is the separation of a person or group of people known or reasonably believed to be infected with a communicable disease and potentially infectious from others to prevent the spread of the communicable disease.
[7] A *spot check* is an in-person visit to a detention facility by an ICE Detention Service Manager (DSM) or Detention Standards Compliance Officer (DSCO) for the purpose of assessing whether the facility is complying with the requirements of the ERO PRR. DSMs and DSCOs review policies, logs and records; observe facility operations; speak with facility staff and detainees; and complete a standardized form to note observations and findings.

detention population from the facility or reducing its detention population at the facility on a temporary or permanent basis, depending on the nature of the non- compliance.

## CONCEPT OF OPERATIONS

The ERO PRR is intended for use across ICE's entire detention network, applying to all facilities housing ICE detainees, including ICE-owned Service Processing Centers, facilities operated by private vendors, and facilities operated by local government agencies that have mixed populations of which ICE detainees comprise only a small fraction.

### DEDICATED ICE DETENTION FACILITIES

All dedicated ICE detention facilities[8] <u>must</u>:

> ➢ Comply with the provisions of their relevant ICE contract or service agreement.

> ➢ Comply with the ICE national detention standards applicable to the facility, generally PBNDS 2011.

> ➢ Comply with the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.*(Attachment F).

> ➢ Follow ICE's March 27, 2020 Memorandum to Detention Wardens and Superintendents on COVID-19 Action Plan Revision 1, and subsequent updates (Attachment G).

> ➢ Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.

> ➢ Evaluate all new admissions within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC as potentially being at higher risk for serious illness from COVID-19 and/or the subclasses certified in *Fraihat v. ICE*, --- F. Supp. 3d ---, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020), and notify the local ERO Field Office Director (or designee) and the Field Medical Coordinator, as well as the detainee and his or her counsel, as soon as practicable, but in no case more than twelve hours of determining whether the detainee meets the criteria. These populations and subclasses include:

  - Older Adults (55 plus);

---

[8] Dedicated ICE detention facilities are facilities that house only ICE detainees. Dedicated ICE detention facilities may be ICE-owned Service Processing Centers, privately owned Contract Detention Facilities, or facilities operated by state or local governments that hold no other detention populations except ICE detainees.

- People who are pregnant;

- People of all ages with chronic health conditions, including:
  - Cancer;

  - Chronic kidney disease;

  - COPD (chronic obstructive pulmonary disease);

  - Immunocompromised state (weakened immune system) from solid organ transplant);

  - Obesity (body mass index [BMI] of 30 or higher);

  - Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;

  - Sickle cell disease;

  - Type 2 diabetes mellitus;

  - Asthma (moderate-to-severe);

  - Cerebrovascular disease (affects blood vessels and blood supply to the brain);

  - Cystic fibrosis;

  - Hypertension or high blood pressure;

  - Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines;

  - Neurologic conditions, such as dementia;

  - Liver disease;

  - Pulmonary fibrosis (having damaged or scarred lung tissues);

  - Smoking (current and former);

  - Thalassemia (a type of blood disorder);

  - Type 1 diabetes mellitus.

- People of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical

or mental impairment that substantially limits a major life activity.

- Severe psychiatric illness, including Psychotic Disorder, Bipolar Disorder, Schizophrenia or Schizoaffective Disorder, Major Depressive Disorder with Psychotic Features, Dementia and/or a Neurocognitive Disorder, or Intellectual Development Disorder (moderate, severe, or profound or that make it difficult for the individual to participate in their own care, that make it unlikely the individual will express symptoms, or that increase the risk of complications from the virus.) Individuals of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

➤ Detainees who claim, or anyone claims on behalf of the detainee that the detainee meets the above criteria or are suspected to meet the criteria must be evaluated within five days of making the claim.

➤ Upon evaluation, the local ERO Field Office Director (or designee), the Field Medical Coordinator, and the detainee and his or her counsel must be notified as soon as practicable, but in no case more than twelve hours after the evaluation has occurred, as to whether the detainee meets the criteria.

➤ Notification shall be made via email from the facility's Health Services Administrator (HSA) (or equivalent) and contain the following subject line for ease of identification: "Notification of COVID-19 High Risk Detainee (A-Number)." At a minimum, the HSA email message will provide the following information:

- Detainee name;

- Detention location;

- Current medical issues and medications currently prescribed;

- Facility medical Point of Contact (POC) and phone number.

## NON-DEDICATED ICE DETENTION FACILITIES

All non-dedicated ICE detention facilities and local jails housing ICE detainees must:

➤ Comply with the provisions of their relevant ICE contract or service agreement.

➤ Comply with the ICE national detention standards applicable to the facility, generally PBNDS 2011.

➤ Comply with the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention*

*Facilities*.

➢ Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.

➢ Evaluate all new admissions within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC as potentially being at higher risk for serious illness from COVID-19 and/or the subclasses certified in *Fraihat v. ICE*, --- F. Supp. 3d ---, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020), and notify both the ERO Field Office Director (or designee) and Field Medical Coordinator, as well as the detainee and his or her counsel, as soon as practicable, but
in no case more than twelve hours after identifying any detainee who meets the CDC's identified populations potentially being at higher risk for serious illness from COVID-19 and/or falls under any of the categories enumerated below:

- Older Adults (55 plus);

- People who are pregnant;

- People of all ages with chronic health conditions, including:
  o Cancer;

  o Chronic kidney disease;

  o COPD (chronic obstructive pulmonary disease);

  o Immunocompromised state (weakened immune system) from solid organ transplant;

  o Obesity (body mass index [BMI] of 30 or higher);

  o Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;

  o Sickle cell disease;

  o Type 2 diabetes mellitus;

  o Asthma (moderate-to-severe);

  o Cerebrovascular disease (affects blood vessels and blood supply to the brain);

  o Cystic fibrosis;

  o Hypertension or high blood pressure;

       o  Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines;

       o  Neurologic conditions, such as dementia;

       o  Liver disease;

       o  Pulmonary fibrosis (having damaged or scarred lung tissues);

       o  Smoking;

       o  Thalassemia (a type of blood disorder);

       o  Type 1 diabetes mellitus.

- People of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

- Severe psychiatric illness, including Psychotic Disorder, Bipolar Disorder, Schizophrenia or Schizoaffective Disorder, Major Depressive Disorder with Psychotic Features, Dementia and/or a Neurocognitive Disorder, or Intellectual Development Disorder (moderate, severe, or profound or that make it difficult for the individual to participate in their own care, that make it unlikely the individual will express symptoms, or that increase the risk of complications from the virus.));Individuals of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

➢ Detainees who claim or are being claimed by anyone on their behalf to meet the above criteria or are suspected to meet the criteria must be evaluated within five days of making the claim.

➢ Upon evaluation, both the local ERO Field Office Director (or designee), the Field Medical Coordinator, and the detainee and his or her counsel must be notified as soon as practicable, but in no case more than twelve hours after the evaluation has occurred, as to whether the detainee meets the criteria.

➢ Notification must be made via email from the facility's HSA (or equivalent) and must contain the following subject line for ease of identification: "Notification of COVID-19 High Risk Detainee (A-Number)." Other standardized means of communicating this information to ICE, as established by agreement between the local ERO Field Office Director (or designee) and the Warden or Superintendent, are acceptable. At a minimum the HSA communication to ICE will provide the following information:

- Detainee name;

- Detention location;

- Current medical issues and medications currently prescribed;

- Facility medical POC and phone number.

---

ALL FACILITIES HOUSING ICE DETAINEES

---

In addition to the specific measures listed above, all detention facilities housing ICE detainees must also comply with the following:

**STANDARDS FOR HIGH RISK (VULNERABLE) POPULATIONS**

**Healthcare:**
As indicated above, the CDC and the court order in *Fraihat v. ICE*, --- F. Supp. 3d ---, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020), define certain high risk (vulnerable) populations that are at increased risk of severe illness from COVID-19. These conditions include the elderly (See CDC Guidance for Older Adults) and medically vulnerable individuals. (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html).

High risk (vulnerable) detainees must be provided the following services for identification, testing and screening as described below:

*Identification*
All new admissions must be evaluated within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC and/or by the *Fraihat* court's order as potentially being at higher risk for serious illness, and the local ERO Field Office Director (or designee) and the Field Medical Coordinator must be notified within twelve hours of the determination whether the detainee meets the criteria.

Detainee medical information and files on arrival might be incomplete. A detainee or his/her counsel may request and should be promptly provided with a copy of the medical file and may supplement medical records at any time during detention. Requests for inclusion of these files in the detainee's medical records, are submitted to the facility medical staff through a local operating procedure (LOP) established by that facility. The facility medical staff shall review newly submitted records within five days of receipt and inform the detainee and his or her counsel of the result of the review. The communication process is included in the facility's LOP.

*Testing*

- High risk (vulnerable) detainees will receive COVID-19 services including:
  - Testing upon intake to an ICE facility;
  - Testing as directed by medical personnel based on CDC requirements and clinical presentation of COVID-19 related illness;
  - Testing upon release as dictated by the requirements of the receiving country of record or other transfer/removal/release requirements.
  - Testing upon release to the community or transfer to another detention facility;
  - Detainees who test positive will be isolated as described in the PRR until medically cleared in accordance to CDC guidelines;
  - High risk (vulnerable) detainees who have a documented positive COVID-19 test within the last three months and were cleared in accordance to CDC guidelines do not need to be retested on a weekly basis;
  - High risk (vulnerable) detainees who test positive within 3 months of their original positive COVID-19 test, cleared isolation precautions, and who remain asymptomatic do not need to be isolated or quarantined due to recurrent or persistent positive results.

### *Screening*

- High risk (vulnerable) detainees must receive all normally prescribed screening for COVID-19 including:
  - Temperature screening and verbal screening for symptoms of COVID-19 and contacts with COVID-19 cases of all new entrants.
  - Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases must include the following questions based on the CDC Interim Guidance: Managing COVID-19 in Correctional/Detention Facilities:
    - Today or in the past 24 hours, have you had any of the following symptoms:
    - Fever, felt feverish, or had chills?
    - Cough?
    - Difficulty breathing?
    - Chills?
    - Muscle pain?
    - Sore throat?
    - New loss of taste or smell?
    - In the past fourteen days, have you had contact with a person known to be infected with COVID-19 where you were not wearing the recommended proper PPE?

- This temperature and verbal screening of high risk (vulnerable) detainees will be conducted twice daily during detention utilizing a structured screening tool and be documented in the facility's records.

➢ **Minimum Care and Hospitalization**

- All detainees are provided medical care as described within the PRR.
- Detention facilities must follow the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention*

*Facilities*, updated here on October 7, 2020, and *Clinical Care for Individuals with COVID-19*, updated here on September 10, 2020, for care recommendations.

➢ **Asymptomatic COVID-19 Positive**

A nurse or medical provider must verify the absence of COVID-19 symptoms. If asymptomatic:

- Educate the detainee on symptoms of COVID-19 infection and instruct detainees to report if they have any symptoms to medical staff at sick call or to the custody officer (who will notify medical staff)
- Perform daily sick call rounds
- Obtain daily vital signs to include pulse oximetry.

Have the detainee complete the 10-day isolation period and fulfill criteria required to release from isolation.

➢ **Symptomatic COVID-19 Positive**

If a detainee is noted to have symptoms of COVID-19, the following care elements are advised:

- A medical provider will perform initial evaluation to determine their care plan and housing placement.
- Nurse or medical provider assessment will be performed daily.
- Vital signs will be performed more frequently as ordered by the medical provider to include pulse oximetry for detainees with medical conditions that place them at higher risk for complications of COVID-19 infection and those detainees manifesting more severe symptoms.

Have the detainee complete the 10-day isolation period until criteria required to release from isolation has been met. A detainee who was severely ill with COVID-19 or who has a severely weakened immune system (immunocompromised) due to a health condition or medication may require a longer period of isolation (up to 20 days) and may require testing to determine when the detainee can be released from isolation.

COVID-19 Positive detainees determined to be at high-risk of complications from COVID-19 or more severely affected symptomatic detainees may require a higher level of monitoring or care and should be housed in the medical housing unit or infirmary area of the facility or, if unavailable, hospitalized as detailed below.

➢ **Hospitalized COVID-19 Positive**

Detainees who require a higher level of care than can be safely provided at the detention facility must be referred to community medical resources when needed. Facility staff will defer medical care management decisions to the off-site medical provider caring for the detainee.

The following information is taken from the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities:*

➢ **Medical Isolation of Individuals with Confirmed or Suspected COVID-19**

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective medical isolation, must local public health options to ensure that individuals with confirmed or suspected COVID-19 will be appropriately isolated, evaluated, tested, and given care.

As soon as an individual develops symptoms of COVID-19 or tests positive for SARS-CoV-2, the individual must be provided with a face mask, if not already wearing one and if it can be worn safely, and immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated.

Ensure that medical isolation for COVID-19 is distinct from administrative or disciplinary segregation. Due to limited housing units within many correctional facilities, individuals may be medically isolated in spaces used for administrative or disciplinary segregation, however medical isolation shall be operationally distinct from administrative or disciplinary segregation to provide access to programs and services to the fullest extent possible as clinically permitted. For example:

- Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.
- Make efforts to provide access to radio, television, reading materials, personal property, telephones, recreation, and commissary to the fullest extent possible.
- Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.
- Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

Keep the individual's movement outside the medical isolation space to a clinically necessary minimum.

- Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility.
- Serve meals inside the medical isolation space.
- Refrain from group activities.

Assign isolated individual(s) to dedicated bathrooms with regular access to restrooms and showers. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation with an approved cleaning solution used in the strength and in a manner as recommended by the product label. Ensure that the individual is wearing a face mask if they must leave the medical isolation space for any reason, and whenever another individual enters. Provide clean face masks as needed. Face masks must be washed routinely and changed when visibly soiled or wet.

If the facility is housing individuals with confirmed COVID-19 as a cohort:

- Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, or with close contacts of individuals with confirmed or suspected COVID-19.
- Do not house individuals with undiagnosed respiratory infection (who do not meet the criteria of suspected COVID-19) with individuals with suspected COVID-19.
- Ensure that cohorted groups of people with confirmed COVID-19 wear face masks whenever anyone (including staff) enters the isolation space. (Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a face mask.)
- Designate space for cohort medical isolation in a manner that reduces the chance of cross-contamination across different parts of the facility.

If the facility is housing individuals with confirmed COVID-19 as a cohort, use a well-ventilated room with solid walls and a solid door that closes fully.

If possible, limit medical transfers to another facility or within the facility to those necessary for care. See *Transporting Individuals with Confirmed and Suspected COVID-19 and Quarantined Close Contacts* section for safe transport guidance.

Staff assignments to medical isolation should remain as consistent as possible with limited movements to other parts of the facility. Staff shall wear recommended PPE as appropriate for their level of contact with the individual under medical isolation.

Staff shall ensure that they change PPE when leaving the isolation space to prevent cross contamination. If PPE supplies necessitate reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE. Ensure that staff are trained in infection control practices, including use of recommended PPE.

Minimize transfer of individuals with confirmed or suspected COVID-19 between spaces within the facility.

Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle. Instruct them to:

- Cover their mouth and nose with a tissue when they cough or sneeze.
- Dispose of used tissues immediately in the lined trash receptacle.

Wash hands immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

Maintain medical isolation until the most current CDC criteria for discontinuing home-based isolation have been met. These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available.

- CDC's recommended strategy for release from home-based isolation can be found in

the *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings Interim Guidance*.

- Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
- If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria found here.

➢ **Clinical Care for Individuals with COVID-19**

Facilities must ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.

- If a facility is not able to provide such evaluation and treatment, a plan must be in place to safely transfer the individual to another facility or local hospital (including notifying the facility/hospital in advance). *See* Transport section. The initial medical evaluation must determine whether a symptomatic individual is at increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions, including chronic kidney disease, serious heart conditions, and Type-2 diabetes. *See* CDC's website for a complete list and check regularly for updates as more data become available to inform this issue.
- Based on available information, pregnant people seem to have the same risk of COVID-19 as adults who are not pregnant. However, much remains unknown about the risks of COVID-19 to the pregnant person, the pregnancy, and the unborn child. Prenatal and postnatal care is important for all pregnant individuals, including those who are detained. Visit the CDC website for more information on pregnancy and breastfeeding in the context of COVID-19.

Staff evaluating and providing care for individuals with confirmed or suspected COVID-19 must follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.

Healthcare staff must evaluate persons with COVID-19 symptoms and those who are close contacts of someone with COVID-19 in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the individual being evaluated is wearing a face mask.

- If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.

Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza). However, presence of another illness such as influenza does not rule out COVID-19.

When evaluating and treating persons with symptoms of COVID-19 who do not speak English, use a language line or provide a trained interpreter.

Additionally, ICE will make custody determinations on a case-by-case basis, pursuant to applicable legal standards, while giving due consideration to the public health and each individual's health risk and other factors. The custody review must determine if a continued detention is appropriate regardless of a detainee's mandatory detention status given the current COVID-19 pandemic.

**Custody Determinations:**

- For those cases identified as meeting any of the subclass criteria, the Field Office Director must validate the cases with assistance from the Field Medical Coordinator (FMC) and/or facility medical staff to ensure the conditions listed are still present and complete a custody review.
- **All detainees age 55 and older** must be identified, tracked, and have a custody review completed in a timely manner.
- **All *new* detainees age 55 and older** who are identified as meeting any of the subclass criteria must have a custody review completed within **5 days** of entering ICE custody.
- Detainees age 55 and older, or pregnant, that are otherwise healthy and have none of the disabilities listed in Subclass Two, are only members of Subclass One. Therefore, **only** the RF1 alert code (RF1 – COVID-19 Risk Factor –Subclass One) should be assigned to the case in EARM.
- All detainees determined to have any of the disabilities listed in Subclass Two should be assigned BOTH the RF1 and RF2 alert codes (RF2 – COVID-19 Risk Factor—Subclass Two) in EARM.
- **Alert codes must stay in EARM for tracking.** They should not be removed by the Field.
  - **Important:** Class member information is being provided to the plaintiffs in this case. Removing the alert codes compromises future reporting and the integrity of our data quality.
- Class membership continues upon any release from custody, so the alert codes should not be removed upon release.
- The custody review must consider for the appropriateness of detention given the current COVID-19 pandemic; therefore, the COVID-19 Special Class code in EARM has been disabled/retired and should not be used.
  - Cases are now tracked using one or both of the **RF1 – COVID-19 Risk Factor –Subclass One** and **RF2 – COVID-19 Risk Factor—Subclass Two** alert codes only.
- When making a custody re-determination for a *Fraihat* subclass member, the SDDO shall ensure that the presence of a Risk Factor is given significant weight. Only in rare cases should a *Fraihat* subclass member not subject to mandatory detention remain detained, and as previously instructed in the ongoing docket review, a justification for continued detention is required. *Fraihat* subclass members subject to INA § 236(c) mandatory detention must also receive custody determinations. The SDDO must not apply the Docket Review Guidance rule against release of aliens detained pursuant to INA § 236(c) detainees so inflexibly that none of the *Fraihat* subclass members are released. Although traditional factors, such as danger to the community and risk of flight, may be considered, under the terms of the PI, aliens subject to detention pursuant to INA § 236(c) should continue to be detained only after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency. Blanket or cursory denials do not comply with the court's requirement that ERO make individualized determinations. *Fraihat* subclass members that are released should be enrolled into a GPS program when possible.

In addition to the specific measures listed above, all detention facilities housing ICE detainees <u>must also</u> comply with the following:

**PREPAREDNESS**

Administrators should plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and detainees about these preparations and how they may temporarily alter daily life.

> ➢ Develop information-sharing systems with partners.
>
>> • Identify points of contact in relevant state, local, tribal, and/or territorial public health department before cases develop.
>>
>> • Communicate with other correctional and detention facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
>
> ➢ Review existing pandemic, influenza, all-hazards, and disaster plans, and revise for COVID-19, and ensure that they meet the requirements of ICE's detention standards.
>
> ➢ Offer the seasonal influenza vaccine to all detained persons (existing populations and new admissions) and staff throughout the influenza season, where possible.
>
> ➢ Staffing:
>
>> • Review sick leave policies to ensure that staff can stay home when sick and determine which officials will have the authority to send symptomatic staff home. Staff who report for work with symptoms of COVID-19 must be sent home and advised to follow CDC-recommended steps for persons exhibiting COVID-19 symptoms.
>>
>> • Management should consider requiring asymptomatic staff who have been identified as close contacts of a confirmed COVID-19 case to home quarantine to the maximum extent possible, while understanding the need to maintain adequate staffing levels of critical workers. Workers in critical infrastructure sectors (including correctional and detention facilities) may be permitted to work if they remain asymptomatic after a potential exposure to SARS-CoV-2, provided that worker infection prevention recommendations and controls are implemented, including requiring the staff member to wear a face mask (unless contraindicated) at all times while in the workplace for 14 days after the last exposure (if not already wearing one due to universal use of face masks). If the exposed staff members test positive, they should follow local health department and health care provider instructions regarding home isolation.
>>
>> • Staff who test positive for COVID-19 must inform their workplace and personal contacts immediately. If a staff member has a confirmed COVID-19 infection, the relevant employers will inform other staff of their possible

exposure to COVID-19 in the workplace consistent with any legal limitations
on the sharing of such information. Exposed employees must then self-
monitor for symptoms (e.g., fever, cough, or shortness of breath).

- Identify staff whose duties would allow them to work from home in order to
promote social distancing and further reduce the risk of COVID-19
transmission.

- Determine minimum levels of staff in all categories required for the facility to
function safely.

- Follow the Public Health Recommendations for Community-Related
Exposure.[9]

- Follow guidance from the Equal Employment Opportunity Commission,
available here, when offering testing to staff. Any time a positive test result
is identified, ensure that the individual is rapidly notified, connected with
appropriate medical care, and advised how to self-isolate.

➢ Supplies:

- Ensure that sufficient stocks of hygiene supplies (soap, hand sanitizer,
tissues); personal protective equipment (PPE) including facemasks, N95
respirators, eye protection, disposable medical gloves, and disposable
gowns/one-piece coveralls; and medical supplies (consistent with the
healthcare capabilities of the facility) are on hand and there is a plan in place
to restock as needed if COVID-19 transmission occurs within the facility.

- Note that shortages of N95 respirators are anticipated during the COVID-19
response. Based on local and regional situational analysis of PPE supplies,
face masks should be used when the supply chain of N95 respirators cannot
meet the demand.

- Follow COVID-19: Optimizing Supply of PPE and Other Equipment.[10]

- Ensure that staff and detainees are trained to don, doff, and dispose of PPE
they will need to use while performing duties within the scope of their
responsibilities.

- Soiled PPE items should be disposed in leak-proof plastic bags that are tied at
the top and not re-opened. Bags can be disposed of in the regular solid waste
stream.

- Cloth face masks should be worn by detainees and staff (when PPE

---

[9] Attachment H, Centers of Disease Control and Prevention, *Public Health Guidance for Community-Related Exposure*,
https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited October 15, 2020).
[10] Attachment I, Centers for Disease Control and Prevention, *Optimizing Personal Protective Equipment (PPE) Supplies*,
https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited October 15, 2020).

supply is limited) to help slow the spread of COVID-19. Cloth face masks should:

- o Fit snugly but comfortably against the side of the face be secured with ties or ear loops where possible or securely tied;

- o Include multiple layers of fabric;

- o Allow for breathing without restriction;

- o Be able to be laundered and machine dried without damage or change to shape;

- o Be provided at no cost to detainees.

- Cloth face masks are contraindicated for children under two years of age, anyone who has trouble breathing, is unconscious, incapacitated or otherwise unable to remove the mask without assistance.

➤ Hygiene:

- Reinforce healthy hygiene practices, and provide and restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).

- Require all persons within the facility to cover their mouths and noses with their elbows (or ideally with a tissue) rather than with their hands when they cough or sneeze, and to throw all tissues in the trash immediately after use.

- Provide detainees and staff no-cost access to tissues and no-touch receptacles for disposal.

- Require all persons within the facility to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing their noses; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

- Provide detainees and staff no-cost, unlimited access to supplies for hand cleansing, including liquid or foam soap, running water, hand drying machines or disposable paper towels, and no-touch trash receptacles. If bar soap is used, ensure that it is does not irritate the skin as this would discourage frequent hand washing and ensure that individuals are not sharing bars of soap.

- Provide alcohol-based hand sanitizer with at least 60 percent alcohol where permissible based on security restrictions.

- Require all persons within the facility to avoid touching their eyes, noses, or

*ERO COVID-19 Pandemic Response Requirements* (Version 5.0, October 27, 2020)    22

mouths without cleaning their hands first.

- If possible, inform potential visitors, including inspectors and auditors, before they travel to the facility that they should expect to be screened for COVID-19 and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

- Post signage throughout the facility reminding detained persons and staff to practice good hand hygiene and cough etiquette (printable materials for community-based settings can be found on the CDC website). Signage must be in English and Spanish, as well as any other common languages for the detainee population at the facility.

- Prohibit sharing of eating utensils, dishes, and cups.

- Prohibit non-essential personal contact such as handshakes, hugs, and high-fives.

➢ Provide individuals about to be released from ICE custody with COVID-19 prevention information, hand hygiene supplies, and  face masks.

➢ Cleaning/Disinfecting Practices:

- Facilities must adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response.[11]

- All  cleaning and disinfecting materials must be stored in secure areas, in their original containers, and with the manufacturer's label intact on each container.

- Safe cleaning products must be used in the quantities and in a manner as indicated on the manufacturer's product label.

- Several times a day using household cleaners and Environmental Protection Agency-registered disinfectants, clean and disinfect surfaces and objects that are frequently touched, especially in common areas (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment). The EPA's list of certified cleaning products is located here.

- Staff should clean shared equipment several times per day and on a conclusion-of-use basis (e.g., radios, service weapons, keys, handcuffs).

- The facility designee for environmental health is responsible for ensuring that cleaning supplies and frequency of cleaning schedule are sufficient to maintain a high level of sanitation within housing areas without negatively impacting the health of detainees or staff.

---

[11] Attachment J, Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited October 15, 2020).

- Ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.

- Facility leadership will ensure that there is adequate oversight and supervision of all individuals responsible for cleaning and disinfecting these areas.

- Facilities shall report confirmed or suspected cases of detainees suffering adverse reactions to cleaning supplies or chemicals to the local ERO Field Office Director (or designee) and Field Medical Coordinator. ICE will promptly investigate reports of adverse reactions to cleaning supplies or chemicals used for disinfection of COVID-19.

### *CDC Recommended Cleaning Tips*

➤ Hard (Non-porous) Surfaces:

- If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

- For disinfection, most common EPA-registered household disinfectants should be effective.

  o A list of products that are EPA-approved for use against the virus that causes COVID-19 is available here. Follow the manufacturer's instructions for all cleaning and disinfection products for concentration, application, method, contact time, etc.

  o Additionally, diluted household bleach solutions (at least 1000 ppm sodium hypochlorite) can be used if appropriate for the surface. Follow manufacturer's instructions for application, ensuring a contact time of at least one minute and allowing proper ventilation during and after application. Check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted.

    ▪ Prepare a bleach solution by mixing:

      - 5 tablespoons (1/3 cup) bleach per gallon of water; or

      - 4 teaspoons bleach per quart of water.

➤ Soft (Porous) Surfaces:

- For soft (porous) surfaces, such as carpeted floor, rugs, and drapes, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

   o If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

   o Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and that are suitable for porous surfaces.[12]

 ➢ Electronics:

  • For electronics such as tablets, touch screens, keyboards, remote controls, and ATM machines, remove visible contamination if present.

   o Follow the manufacturer's instructions for all cleaning and disinfection products.

   o Consider use of wipeable covers for electronics.

   o If no manufacturer guidance is available, consider the use of alcohol-based wipes or sprays containing at least 70 percent alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

 ➢ Linens, Clothing, and Other Items That Go in the Laundry:

  • In order to minimize the possibility of dispersing virus through the air, do not shake dirty laundry.

  • Wash items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely. Dirty laundry that has been in contact with an ill person can be washed with other people's items.

  • Clean and disinfect hampers or other carts for transporting laundry according to guidance above for hard or soft surfaces.

  • Consider establishing an on-site laundry option for staff so that they can change out of their uniform, launder them at the facility, and wear street clothes and shoes home. If on-site laundry for staff is not feasible, encourage them to change clothes before they leave the work site, and provide a location for them to do so.

## PREVENTION

Detention facilities can mitigate the introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing

---

[12] Attachment K, U.S. Environmental Protection Agency, *List N: Disinfectants for Coronavirus (COVID-19)*, https://www.epa.gov/pesticide-registration/list-n-disinfectants-coronavirus-covid-19 (last visited October 15, 2020).

strategies. Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission:

> ➤ Perform pre-intake screening for all staff and new entrants for COVID-19 symptoms.

> ➤ Screening should take place before staff and new admissions enter the facility or just inside the facility, where practicable. For new admissions, this should occur before beginning the intake process, in order to identify and immediately isolate any detainee with symptoms before the individual comingles with others or is placed in the general population. This should include temperature screening of all staff and new entrants as well as a verbal symptoms check.

> - Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions based on the CDC Interim Guidance: Managing COVID-19 in Correctional/Detention Facilities:

> o Today or in the past 24 hours, have you had any of the following symptoms:

> ▪ Fever, felt feverish, or had chills?

> ▪ Cough?

> ▪ Difficulty breathing?

> ▪ Chills?

> ▪ Muscle pain?

> ▪ Sore throat?

> ▪ New loss of taste or smell?

> o In the past fourteen days, have you had contact with a person known to be infected with COVID-19 where you were not wearing the recommended proper PPE?

> - If staff have symptoms of COVID-19 (e.g., fever, cough, shortness of breath), they must be denied access to the facility.

> - If any new intake has symptoms of COVID-19:

> o Require the individual to wear a face mask;

> o Ensure that staff interacting with the symptomatic individual wears recommended PPE;

o Isolate the individual and refer to healthcare staff for further evaluation;

o Facilities without onsite healthcare staff must contact their state, local, tribal, and/or territorial health department to coordinate effective isolation and necessary medical care;

- If an individual is a close contact of a known COVID-19 case or has traveled to an affected area, but has no COVID-19 symptoms, quarantine the individual and monitor for symptoms two times per day for fourteen days.

➢ Consider testing all newly detained persons before they join the rest of the population in the detention facility. For further information, refer to the TESTING section below and CDC Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities, available here.

➢ Visitation:

- During suspended (social) or modified (legal) visitation programs, the facilities should provide access to virtual visitation options where available. When not possible, verbally screen all visitors on entry for symptoms of COVID-19 and perform temperature checks, when possible. ICE continues to explore opportunities to enhance attorney access while legal visits are being impacted. For facilities at which immigration hearings are conducted or where detainees are otherwise held who have cases pending immigration proceedings, this may include:

  o Requiring facilities to establish a process for detainees/attorneys to schedule appointments and facilitate the calls;

  o Leveraging available technology (e.g., tablets, smartphones, phones, VTC) to facilitate attorney/client communication;

  o Working with the various detention contractors and telephone service providers to ensure that all detainees receive some number of free calls per week.

- Communicate with the public about any changes to facility operations, including visitation programs. Facilities are encouraged to prohibit or, at a minimum, significantly adopt restricted visitation programs. Facilities are required to suspend all volunteer work program (VWP) assignments for detainees assigned to food service and other VWP assignments, where applicable, that require individuals to interact with each other at distances of less than six feet. Any detainee participating in a VWP assignment is required to wear appropriate PPE for the position at all times (e.g., disposable gloves, masks, goggles). Detainees in isolation or quarantine may not be assigned to a VWP detail.

➢ Transfers of ICE detainees and non-ICE detained populations to and from other jurisdictions and facilities are discontinued unless necessary for medical evaluation,

medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding.

- Detainee transfers for any other reason require pre-approval from the local ERO Field Office Director.
- All detainees who are transferred, removed or released must be cleared medically in accordance with ERO guidelines.

➢ When necessary to transport individuals with confirmed or suspected COVID-19, if the vehicle is not equipped with emergency medical service (EMS) features, at a minimum, drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open. Everyone in the vehicle must wear a mask.

➢ Consider suspending work release programs for inmates at shared facilities to reduce overall risk of introduction and transmission of COVID-19 into the facility.

➢ Require all staff (both medical and correctional) to wear PPE when encountering or interacting with any ICE detainee at a distance of less than six feet.

➢ Required PPE should always be worn by staff, even if separated by a distance of six feet or more, if the individual appears feverish or ill and/or with respiratory symptoms while interviewing, escorting, or interacting in other ways.

➢ Additional Measures to Facilitate Social Distancing:

- o  Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement the following measures to the extent practicable. Efforts should be made to reduce the population to approximately 75 percent of capacity.

- o  Where detainee populations are such that cells are available, to the extent possible, house detainees in individual rooms.

- o  Recommend that detainees sharing sleeping quarters sleep "head-to-foot."

- o  Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.

- o  Staff and detainees should be directed to avoid congregating in groups of ten or more, employing social distancing strategies at all times.

- o  Whenever possible, all staff and detainees should maintain a distance of six feet from one another.

- o  If practicable, beds in housing units should be rearranged to allow for six feet of distance between the faces of detainees.

- If group activities are discontinued, it is important to identify alternative forms of activity to support the mental health of detainees

- Extended lockdowns must **not** be used as a means of COVID-19 prevention.

## MANAGEMENT

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), facilities shall begin implementing management strategies while test results are pending. Essential management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

*ICE Custody Review for Potentially High-Risk Detainees*

Upon being informed of a detainee who may potentially be at higher risk for serious illness from exposure to COVID-19, ERO will review the case to determine whether continued detention is appropriate. ICE will make such custody determinations on a case-by-case basis, pursuant to the applicable legal standards, with due consideration of the public health considerations implicated.

➢ Considerable effort should be made to quarantine all new admissions and test all new intakes upon arrival.

➢ To do this, facilities should consider cohorting daily admissions; two days of new admissions, or multiple days of new admissions, in designated areas prior to placement into the general population. Given significant variations among facilities, cohorting options and capabilities will differ across ICE's detention network. ICE encourages all facilities to adopt the most effective cohorting methods practicable based on the individual facility characteristics, taking into account the number of new admissions anticipated per day.

➢ Based on the results of testing and clinical evaluation, detainees at intake should be separated into multiple groups: Detains who tested negative and have no symptoms, detainees who test positive but have no symptoms, and detainees who either test positive for COVID-19 and have symptoms or are diagnosed with COVID-19 based on symptoms.

➢ All new arrivals to ICE detention facilities require COVID-19 testing within 12 hours of arrival. Collection timeframe may extend to 24 hours if facility collection logistics require additional time.

➢ Detainees pending test results who are asymptomatic should be placed in a routine intake quarantine. Detainees pending test results who are symptomatic should be placed in isolation. Detainees who test negative during the intake process will complete the routine 14-day quarantine prior to release to general population

➢ Detainee who test positive during the intake process can be released from isolation

when they meet the criteria for discontinuing isolation described below using either a time-based strategy or symptom-based strategy.

➢ For suspected or confirmed COVID-19 cases:
- Isolate the individual immediately in a separate environment from other individuals. Facilities should make every possible effort to isolate persons individually. Each isolated individual should be assigned his or her own housing space and bathroom where possible. Isolating ill detainees as a group should only be practiced if there are no other available options.
- If single isolation rooms are unavailable, individuals with laboratory-confirmed COVID-19 should be isolated together as a cohort separate from other detainees, including those with pending tests. Febrile detainees who are pending testing or are waiting for test results should be isolated together as a group separate from laboratory-confirmed COVID-19 cases and other detainees. Confirmed COVID-19 cases should not be cohorted with suspected cases or case contacts.

- Housing should maintain separation of groups by common criteria (e.g., COVID-19 test results positive, febrile or symptomatic pending testing or results, asymptomatic/exposed).

- Ensure that the individual is always wearing a face mask (if it does not restrict breathing) when outside of the isolation space, and whenever another individual enters the isolation room. If wearing masks will negatively impact breathing, facilities should ensure caregivers are aware of that fact and implement restrictions on contact as appropriate during isolation (e.g., increased social distancing, PPE use by people who enter space, moving and handling people separately, increased cleaning, etc.). Masks should be changed at least daily, and when visibly soiled or wet.

- In the event that a facility requires more isolation beds for detainees, ICE must be promptly notified so that transfers to other facilities, transfers to hospitals, or releases can be coordinated immediately. Until such time as the transfer or release is arranged, the facility must be especially mindful of cases that are at higher risk of severe illness from COVID-19. Ideally, symptomatic detainees should not be isolated with other individuals. If isolating of symptomatic COVID-positive detainees as a group is unavoidable, make all possible accommodations until transfer occurs to prevent transmission of other infectious diseases to the higher-risk individual (e.g., allocate more space for a higher-risk individual within a shared isolation room).

- Review the CDC's preferred method of medically isolating COVID-19 cases here, depending on the space available in a particular facility. In order of preference, individuals under medical isolation should be housed:

  o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully.

o Separately, in single cells with solid walls but without solid doors.

o As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.

o As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.

o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.

- When detainees must be housed in the spaces used for administrative segregation or solitary confinement, ensure that medical isolation is *operationally* distinct from administrative or disciplinary segregation, or any punitive form of housing, even if the same housing spaces are used for both. For example:

  o Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.

  o Ensure that detainees are provided similar access to radio, television, reading materials, personal property, telephone, recreation and commissary to the fullest extent possible.

  o Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.

  o Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

- **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

  o Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility. See Infection Control and Clinical Care sections for additional details.

  o Serve meals inside the medical isolation space.

  o Exclude the individual from all group activities.

- o Assign the isolated individual(s) a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.

- Meals should be provided to COVID-19 cases in their isolation rooms. Isolated cases should throw disposable food service items in the trash in their isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items must clean their hands after removing gloves.

- Laundry from a COVID-19 case can be washed with another individuals' laundry.

  - o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard gloves after each use, and clean their hands after handling.

  - o Do not shake dirty laundry. This will minimize the possibility of dispersing the virus through the air.

  - o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

  - o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that either is disposable or can be laundered.

- **Ensure that the individual is wearing a face mask if they must leave the medical isolation space for any reason, and whenever another individual enters.** Provide clean masks as needed. Masks should be washed routinely and changed when visibly soiled or wet.

- **Maintain isolation until all the CDC criteria have been met.** These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available. Monitor the sites linked below regularly for updates. This content will not be outlined explicitly in this document due to the rapid pace of change.

  - o CDC's recommended strategy for release from home-based isolation can be found in the *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings Interim Guidance*.
  - o Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
  - o If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria

found here.

**TESTING**

➢ With the increased availability of testing supplies and the increased understanding of the epidemiology of COVID-19 transmission, expanded testing strategies are a critical tool in the prevention and management of COVID-19 infections. This is especially true in congregate settings such as detention facilities.

- All new admissions to ICE detention facilities require COVID-19 testing within 12 hours of arrival. Collection timeframe may extend to 24 hours if facility collection logistics require additional time.
- Testing of all new admissions before they join the rest of the population in the facility, and housing them individually or in cohorts while test results are pending help prevent potential transmission.

➢ Consistent with CDC recommendations, facilities "considering diagnostic testing of people with possible COVID-19 should continue to work with their local and state health departments to coordinate testing through public health laboratories, or work with commercial or clinical laboratories using diagnostic tests authorized for emergency use by the U.S. Food and Drug Administration."[15] Before testing large numbers of asymptomatic individuals without known or suspected exposure, facility leadership should have a plan in place for how they will modify operations based on test results. In addition, COVID-19 testing can be utilized at any time during detention to detect new cases of COVID-19, confirm detainee diagnosis, or in conjunction with other public health actions to control outbreaks of COVID-19. CDC recommendations on planning for facility wide testing may be found here.

- CDC recommends SARS-CoV-2 testing with viral tests (i.e., nucleic acid or antigen tests) for:

  o Individuals with signs or symptoms consistent with COVID-19;

  o Asymptomatic individuals with recent known or suspected exposure to SARS-CoV-2 to control transmission;

    ▪ To prevent continued transmission of the virus within a quarantined cohort, retesting those who originally tested negative every 3 to 7 days could be considered, until no new cases are identified for 14 days after the most recent positive result. The specific re-testing interval that a facility chooses could be based on the stage of the ongoing outbreak, the availability of testing supplies and capacity of staff to perform repeat testing, financial resources, the capacity of contract laboratories that will be performing the tests, and the expected wait time for test results.

  o Asymptomatic individuals without known or suspected exposure to SARS-CoV-2 for early identification in special settings;

---

[15] Attachment O, Centers of Disease Control and Prevention, *Overview of Testing for SARS-CoV-2 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited October 15, 2020).

- While not mandated, the CDC recommends facilities consider quarantine before release or transfer of asymptomatic individuals without known or suspected exposure to COVID-19 when appropriate based on detainee history.
- Detainees who previously tested positive for COVID-19 and were medically cleared could continue to test positive for a significant period of time.

- Individuals being tested to determine resolution of infection (i.e., test-based strategy for Discontinuation of Transmission-based Precautions, HCP Return to Work, and Discontinuation of Home Isolation);

- Individuals being tested for purposes of public health surveillance for SARS-CoV-2.

- CDC recommends using authorized nucleic acid or antigen detection assays that have received an FDA EUA to test persons **with** symptoms when there is a concern of potential COVID-19.

- Testing is recommended for all close contacts of persons with SARS-CoV-2 infection. In some settings, broader testing, beyond close contacts, is recommended as a part of a strategy to control transmission of SARS-CoV-2. Expanded testing might include testing of individuals on the same unit or shift as someone with SARS-CoV-2 infection, or even testing all individuals within a shared setting (e.g., facility-wide testing). In areas where testing resources are limited, CDC has established a testing hierarchy for close contacts, which can be found here:

- CDC does not currently recommend using antibody testing as the sole basis for diagnosis of acute infection, and antibody tests are not authorized by FDA for such diagnostic purposes. For the most current information on CDC recommendations for antibody testing, please see Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities and Using Antibody Tests for COVID-19.

- For the most current CDC recommendations for viral testing and specimen collection, please see Overview of Testing for SARS-CoV-2 (COVID-19).

**ATTACHMENTS**

| ATTACHMENT LETTER | DOCUMENT NAME AND CITATION |
|---|---|
| A | U.S. Immigration and Customs Enforcement, *Updated ICE statement on COVID-19* (Mar. 18, 2020), https://www.ice.gov/news/releases/updated- ice-statement-covid-19. |
| B | Centers of Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited October 15, 2020). |
| C | ICE National Detention Standards 2019, Standard 4.3, Medical Care, https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf. |
| D | 2011 ICE Performance-Based National Detention Standards, Revised 2016, Standard 4.3, https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf. |
| E | 2008 ICE Performance-Based National Detention Standards, Standard 4-22, Medical Care, https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf. |
| F | Centers of Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* ( July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html  (last visited October 15, 2020). |
| G | Memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, *Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27, 2020). |
| H | Centers of Disease Control and Prevention, *Public Health Guidance for Community-Related Exposure*, https://www.cdc.gov/coronavirus/2019-ncov/php/public- health-recommendations.html (last visited October 15, 2020). |
| I | Centers for Disease Control and Prevention, *Optimizing  Supply of PPE and Other Equipment during Shortages*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited October 15, 2020). |

| ATTACHMENT LETTER | DOCUMENT NAME AND CITATION |
|---|---|
| J | Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited  October 15, 2020). |
| K | U.S. Environmental Protection Agency, *List N: Disinfectants for Use Against SARS-CoV-2*, https://www.epa.gov/pesticide-registration/list-n-disinfectants- use-against-sars-cov-2 (last visited  October 15, 2020). |
| L | Assistant Director Peter Berg, Enforcement and Removal Operations, *Updated Guidance: COVID-19 Detained Docket Review* (Apr. 4, 2020). |
| M | Centers for Disease Control and Prevention, *Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html (last visited October 15, 2020) |
| N | Centers of Disease Control and Prevention, *Interim Guidelines for Collecting, Handling, and Testing Clinical Specimens for COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/lab/guidelines-clinical-specimens.html (last visited August 28, 2020) |
| O | Centers of Disease Control and Prevention, *Overview of Testing for SARS-CoV-2*, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited August 28, 2020) |
| P | Centers of Disease Control and Prevention, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last visited October 15, 2020) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*,<br><br>   *Petitioners*,<br><br>v.<br><br>Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*,<br><br>   *Respondents*. | Case No. 1:20-cv-00786-JEB<br><br>**NOTICE OF COVID-19 POSITIVE CASES**<br><br>The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 and September 9, 2020 minute orders, Respondents hereby notify the Court that, since the last notice (ECF No. 145), two (2) employees at the Karnes County Family Residential Center ("Karnes FRC"), and two (2) employees at the South Texas Family Residential Center ("Dilley FRC"), have tested positive for COVID-19. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I. Karnes County Family Residential Center ("Karnes FRC")

<u>Employee 1</u>: Employee 1 is a mission support specialist, who tested at an off-site facility on November 2, 2020, due to contact with an individual who tested positive for COVID-19. That same day, the results came back positive. At this time, Employee 1 has not required treatment at a hospital or medical facility. Employee 1 was last at Karnes FRC on November 1, 2020. Contact tracing was conducted for the dates between October 29, 2020, and November 2, 2020, and revealed that Employee 1 was in contact with one co-worker. Human Resources notified the exposed co-worker with instructions on steps to follow. The exposed co-worker is and will be required to self-quarantine for 14 days and is asked to report any symptoms to the Human Resources Department. Employee 1 is and will remain in quarantine for 14 days from the date of

the positive test result, until November 17, 2020. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 2: Employee 2 is a deportation officer, who tested at an off-site facility on October 24, 2020, due to contact with an individual who tested positive for COVID-19. That same day, the results came back negative and Employee 2 was placed on telework status. On October 26, 2020, Employee 2 tested again at an off-site facility, due to continued contact with an individual who tested positive for COVID-19. That same day, the results came back positive. Employee 2 reported the positive test results to Karnes FRC on November 4, 2020. At this time, Employee 2 has not required treatment at a hospital or medical facility. Employee 2 was last at Karnes FRC on October 24, 2020. Contact tracing was conducted for October 22, 23, and 24, 2020, and revealed that Employee 2 did not have close contact with other employees or residents. Employee 2 is and will remain in quarantine for 14 days from the date of the positive test result, until November 11, 2020. After that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

## II.     South Texas Family Residential Center ("Dilley FRC")

Employee 1: Employee 1 is a target maintenance technician, who tested at an off-site facility on November 2, 2020, due to experiencing symptoms. On November 4, 2020, the results came back positive. At this time, Employee 1 has not required treatment at a hospital or medical facility. Employee 1 was last at Dilley FRC on November 1, 2020. Contact tracing is currently being conducted for October 30 and 31, and November 1, 2020. If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented. Employee 1 is and will remain in quarantine for 14 days from the date of the positive test result, until November 19, 2020. After that time, Employee 1 has been directed to contact Human Resources

for further guidance before reporting to work.

Employee 2: Employee 2 is a psychologist, who tested at an off-site facility on November 5, 2020, due to experiencing symptoms. That same day, the results came back positive. At this time, Employee 2 has not required treatment at a hospital or medical facility. Employee 2 was last at Dilley FRC on November 4, 2020. Contact tracing was conducted for November 2, 3, and 4, 2020, and revealed that Employee 2 did not have close contact with other employees or residents. Employee 2 is and will remain in quarantine for 14 days from the date of the positive test result, until November 20, 2020. After that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

RESPECTFULLY SUBMITTED this 6th day of November, 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia

DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW, Washington, DC 20530
Telephone: (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section

ELIANIS PEREZ
Assistant Director

s/ *Jordan K. Hummel*
JORDAN K. HUMMEL
Trial Attorney
Office of Immigration Litigation - DCS

P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-8715
Email: jordan.hummel@usdoj.gov

*Attorneys for Respondents*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | Case No. 1:20-cv-00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | |
| *Respondents*. | The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 and September 9, 2020 minute orders, Respondents hereby notify the Court that, since the last notice (ECF No. 147), two (2) employees and one (1) resident at the South Texas Family Residential Center ("Dilley FRC"), and one (1) employee at the Berks Family Residential Center ("Berks FRC"), have tested positive for COVID-19. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I.     South Texas Family Residential Center ("Dilley FRC")

Employee 1: Employee 1 is a resident supervisor, who tested at an off-site facility on November 5, 2020, due to experiencing symptoms. On November 6, 2020, the results came back positive. At this time, Employee 1 has not required treatment at a hospital or medical facility. Employee 1 was last at Dilley FRC on November 4, 2020. Contact tracing is currently being conducted for November 4, 2020, as Employee 1 was not present at Dilley FRC for the 48 hours prior to their last shift. If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented. Employee 1 is and will remain in quarantine for 14 days from the date of the positive test result, until November 21, 2020. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

<u>Employee 2</u>: Employee 2 is a resident supervisor, who tested at an off-site facility on November 7, 2020, due to experiencing symptoms. On November 10, 2020, the results came back positive. At this time, Employee 2 has not required treatment at a hospital or medical facility. Employee 2 was last at Dilley FRC on November 3, 2020. Contact tracing is currently being conducted for November 1, 2, and 3, 2020. If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented. Employee 2 is and will remain in quarantine for 14 days from the date of the positive test result, until November 25, 2020. After that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

<u>Resident 1</u>: Resident 1 arrived at Dilley FRC on October 24, 2020, and was tested as part of the new intake program.  On October 27, 2020, the results of that test came back negative. Following the procedures applicable to all new intakes, Resident 1 began a 14-day cohort, projected to be completed on November 8, 2020.  On November 5, 2020, Resident 1 reported experiencing symptoms and was tested a second time at Dilley FRC.  Accordingly, Resident 1's cohort was extended. On November 9, 2020, the results came back negative. The next day, November 10, 2020, Resident 1 was admitted to a local hospital for a health condition unrelated to COVID-19 and was tested a third time.  On November 11, 2020, the results came back positive. Resident 1 remains at the hospital and will remain in quarantine for 14 days from the date of the positive test result, until November 26, 2020, or as directed by the hospital. All new intakes who arrived at the facility with Resident 1 on October 24, 2020, and remained asymptomatic remained in cohort for 14 days from their date of arrival, until November 8, 2020, and were monitored and assessed for signs and symptoms of COVID-19 once per day. Additionally, contact tracing will be conducted for all dates between November 3, 2020 (48 hours before Resident 1 reported

experiencing symptoms), and November 10, 2020 (the date Resident 1 was admitted to a local hospital). If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented.

## II.     Berks Family Residential Center ("Berks FRC")

Employee 1: Employee 1 is a behavioral health provider, who tested at an off-site facility on November 4, 2020, due to experiencing symptoms. On November 6, 2020, the results came back positive. At this time, Employee 1 has not required treatment at a hospital or medical facility. Employee 1 was last at Berks FRC on November 2, 2020. Contact tracing was conducted for the last two dates Employee 1 was present at Berks FRC, October 28, 2020, and November 2, 2020, and revealed that Employee 1 had no close contact with co-workers or residents. Employee 1 is and will remain in quarantine for 14 days from the date of the positive test result, until November 21, 2020. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

RESPECTFULLY SUBMITTED this 13th day of November, 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia

DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW, Washington, DC 20530
Telephone: (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section

ELIANIS PEREZ
Assistant Director

s/ *Jordan K. Hummel*
JORDAN K. HUMMEL
Trial Attorney
Office of Immigration Litigation - DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-8715
Email: jordan.hummel@usdoj.gov

*Attorneys for Respondents*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.M.G., *et al.*, | Case No. 1:20-cv-00786-JEB |
| *Petitioners*, | |
| v. | **NOTICE OF COVID-19 POSITIVE CASES** |
| Chad WOLF, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, | |
| *Respondents*. | The Honorable James E. Boasberg |

Pursuant to the June 25, 2020 and September 9, 2020 minute orders, Respondents hereby notify the Court that, since the last notice (ECF No. 148), two (2) employees at the South Texas Family Residential Center ("Dilley FRC") have tested positive for COVID-19. U.S. Immigration and Customs Enforcement informs the Department of Justice of the following:

## I.      South Texas Family Residential Center ("Dilley FRC")

Employee 1: Employee 1 is a resident supervisor, who tested at a local hospital on November 11, 2020, upon admission for a health condition unrelated to COVID-19. That same day, the results came back positive. Employee 1 was last at Dilley FRC on November 9, 2020. Contact tracing is currently being conducted for November 9, 2020, the only date Employee 1 was present at Dilley FRC in the 48 hours before the onset of symptoms and/or positive test result. If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented. Employee 1 is and will remain in quarantine for 14 days from the date of the positive test result, until November 26, 2020. After that time, Employee 1 has been directed to contact Human Resources for further guidance before reporting to work.

Employee 2: Employee 2 is an operations manager, who tested at an off-site facility on

November 17, 2020, due to experiencing symptoms beginning on November 14, 2020. That same day, the results came back positive. At this time, Employee 2 has not required treatment at a hospital or medical facility. Employee 2 was last at Dilley FRC on November 13, 2020. Contact tracing is currently being conducted for the 48 hours prior to Employee 2 experiencing symptoms, including November 12 and 13, 2020. If any exposure is identified, the protocols for contact exposure previously described in ECF No. 108 will be implemented. Employee 2 is and will remain in quarantine for 14 days from the date of the positive test result, until December 2, 2020. After that time, Employee 2 has been directed to contact Human Resources for further guidance before reporting to work.

     RESPECTFULLY SUBMITTED this 20th day of November, 2020.

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia

DANIEL VAN HORN
Assistant U.S. Attorney
555 4th St. NW, Washington, DC 20530
Telephone: (202) 252-2506
Email: Daniel.VanHorn@usdoj.gov

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section

ELIANIS PEREZ
Assistant Director

s/ *Jordan K. Hummel*
JORDAN K. HUMMEL
Trial Attorney
Office of Immigration Litigation - DCS

P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-8715
Email: jordan.hummel@usdoj.gov

*Attorneys for Respondents*