**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JENNY LISETTE FLORES, *Plaintiff-Appellee*, v. JEFFREY A. ROSEN, Acting Attorney General; CHAD F. WOLF; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION, *Defendants-Appellants.* | No. 19-56326<br>D.C. No. 2:85-cv-04544-DMG-AGR<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted May 19, 2020
San Francisco, California

Filed December 29, 2020

Before: William A. Fletcher, Marsha S. Berzon, and Milan D. Smith, Jr.,* Circuit Judges.

Opinion by Judge Berzon

**SUMMARY****

**Immigration**

In an action involving the *Flores* Agreement, a 1997 settlement agreement between the United States and a class of all minors subject to immigration detention ("the Agreement"), the panel affirmed in part and reversed in part a district court order enjoining regulations represented as implementing the Agreement, and affirmed the district court's denial of the government's motion to terminate the Agreement.

By the Agreement's terms, it terminates after the "publication of final regulations implementing this Agreement." In 2019, the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS") issued a final rule entitled "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children ("Final Rule"), which

* Pursuant to Ninth Circuit General Order 3.2.h, Judge M. Smith, Jr. was drawn by lot to replace Judge Tashima, who has recused himself. Judge M. Smith, Jr. has reviewed the record and briefs in this case and listened to the oral argument before the prior panel.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

comprises two sets of regulations: one issued by DHS and one by HHS. The district court entered a permanent injunction enjoining enforcement of the Final Rule in its entirety.

As to the HHS regulations relating to unaccompanied minors, the panel held that the provisions are generally consistent with the Agreement, and may take effect, with two exceptions. First, the panel concluded that the provision allowing the Office of Refugee Resettlement ("ORR") to place an unaccompanied minor in a secure facility (*e.g.*, a state or county juvenile detention facility) if the minor is "otherwise a danger to self or others" is inconsistent with the Agreement. The panel explained that the relevant statutory provision states that a minor shall not be placed in a secure facility "*absent* a determination that the child poses a danger to self or others," not that ORR may place a minor in a secure facility whenever it makes that determination. Second, the panel concluded that the portion of the bond hearing regulations providing a hearing to unaccompanied minors held in secure or staff-secure placements *only if* they request one is inconsistent with the Agreement, which provides unambiguously for a bond hearing "unless the minor indicates . . . that he or she refuses such a hearing."

Although the panel held that the majority of the HHS regulations may take effect, it also held that the district court did not abuse its discretion in declining to terminate the portions of the Agreement covered by those regulations, noting that the government moved to terminate the Agreement in full, not to modify or terminate it in part.

As to the DHS regulations regarding initial apprehension, processing, and custody of both unaccompanied and accompanied minors, the panel held that some of the provisions are consistent with the Agreement

and may take effect: namely, the provisions regarding transfer of unaccompanied minors from DHS to HHS and those regarding DHS custodial care immediately following apprehension.

However, the panel held that the remaining regulations relating to accompanied minors depart from the Agreement in two principal, related ways: (1) they limit the circumstances in which accompanied minors may be released, and (2) they provide for the detention of families together in facilities licensed not by states but by Immigration and Customs Enforcement itself. The panel explained that these departures undermine the Agreement's core "presumption in favor of releasing minors" and its requirement that those not released be placed in "licensed, non-secure facilities that meet certain standards." Explaining that these regulations dramatically increase the likelihood that accompanied minors will remain in government detention indefinitely, the panel observed that effecting this change was one of the principal features of the Final Rule, and that the government strongly disagrees with the court's holding in *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ("*Flores I*"), that the Agreement encompasses accompanied minors.

Because the panel concluded that the differences between the regulations and the Agreement are substantial and affect the central protections afforded by the Agreement, the panel rejected the government's argument that the Agreement terminated by its own terms.

Finally, the panel held that the district court did not abuse its discretion in denying the government's motion to terminate the Agreement as to accompanied minors, as the government had not demonstrated that changed circumstances justified termination. First, the panel rejected

the government's contention that, by codifying the
Agreement's protections for unaccompanied minors,
Congress had signaled it was leaving the treatment of
accompanied minors to DHS's discretion.    The panel
explained that it had already held to the contrary in *Flores I*,
where the court determined that the creation of statutory
rights for *unaccompanied* minors does not make application
of the Agreement to *accompanied* minors impermissible.

Second, addressing the government's contention that the
Final Rule is a fundamental change in law justifying
termination of the Agreement, the panel rejected the notion
that the executive branch can unilaterally create the change
that it then offers as the reason it should be excused from
compliance.     Although the Agreement contemplates
termination upon the promulgation of *consistent* regulations,
the panel explained it does not follow that the executive
branch could bring about termination through the
promulgation of *inconsistent* regulations.

Third, the panel rejected the government's argument that
an unprecedented increase in family migration warrants
termination of the Agreement.   The government has three
primary options when DHS encounters an accompanied
minor: (1) release all family members, (2) detain the
parent(s) or legal guardian(s) and release the minor to a
parent or legal guardian, or transfer the minor to HHS as an
unaccompanied minor, or (3) detain the family together at an
appropriate family detention center.  The panel observed that
the government prefers the third option, but that the
Agreement flatly precludes that approach.    The panel
explained that, if the only problem were a lack of licensed
facilities to hold accompanied minors, then modification of
the Agreement might be warranted, but the government
sought a much more comprehensive change by jettisoning

the Agreement's release mandate for accompanied minors except in narrow circumstances.

Even if the government has legitimate justifications for detaining adults, the panel concluded that it had not shown why it must also detain accompanying minors. The panel noted that the Final Rule suggests disingenuously that family separation is not preferable because it has generated significant litigation. The panel explained that the litigation cited relates to *forcibly* separating parents and children, but that nothing in the Agreement requires the government to take children against their parents' will. Instead, the Agreement provides for the release of a minor to certain adult relatives and, if none of those relatives are available, provides a mechanism for parents to designate another individual or entity.

Fourth, the panel rejected the government's contention that flaws in the certified class of Plaintiffs constitute changed circumstances warranting termination of the Agreement. Observing that *Flores I* held that the government waived its ability to challenge the class certification when it settled the case and did not timely appeal the final judgment, the panel explained that the government cited no authority supporting its suggestion that the evolution of class certification standards warrants termination, particularly when the government has never moved to decertify or modify the class.

**COUNSEL**

August E. Flentje (argued), Special Counsel to the Assistant Attorney General; Sarah B. Fabian, Senior Litigation Counsel; William C. Silvis, Assistant Director; Jeffrey Robins, Deputy Director; William C. Peachey, Director; Joseph Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Carlos R. Holguin (argued) and Peter A. Schey, Center for Human Rights & Constitutional Law, Los Angeles, California; Holly S. Cooper, Co-Director, Immigration Law Clinic, University of California Davis School of Law, Davis, California; Leecia Welch, Neha Desai, Poonam Juneja, and Freya Pitts, National Center for Youth Law, Oakland, California; Kevin Askew, Orrick Herrington & Sutcliffe LLP, Los Angeles, California; for Plaintiff-Appellee.

Elizabeth B. Wydra, Brianne J. Gorod, and Dayna J. Zolle, Constitutional Accountability Center, Washington, D.C., for Amici Curiae Members of Congress.

James H. Hulme, Arent Fox LLP, Washington, D.C.; David L. Dubrow and Melissa Trenk, Arent Fox LLP, New York, New York; Justin A. Goldberg, Arent Fox LLP, Los Angeles, California; for Amici Curiae American Pediatric Association, American Pediatric Society, American Academy of Child and Adolescent Psychiatry, American Academy of Pediatrics, American Academy of Pediatrics California Chapter, American Academy of Pediatrics Pennsylvania Chapter, American Academy of Pediatrics Texas Chapter, American Association for Psychoanalysis in Clinical Social Work, American Medical Association,

American Professional Society on the Abuse of
Children, American Psychiatric Association, American
Psychoanalytic Association, Association of Medical
School Pediatric Department Chairs, California Medical
Association, California Psychiatric Association, Center for
Law and Social Policy, Center for Youth Wellness,
Children's Defense Fund, Doctors for America, Lutheran
Immigration and Refugee Service, March of Dimes,
National Association of Pediatric Nurse Practitioners,
National Association of Social Workers, National Education
Association, Society for Pediatric Research, Women's
Refugee Commission, First Focus On Children, Save The
Children Action Network Inc., Save The Children US,
United States Fund for UNICEF, and Zero To Three.

Amanda Aikman, Jennifer K. Brown, and Natasha Greer
Menell, Morrison & Foerster LLP, New York, New York,
for Amici Curiae Interfaith Group of 40 Religious and
Interreligious Organizations.

Alexis Coll-Very, Redwood City, California; Molly L.
Leiwant, New York, New York; Wendy Wylegala, Kids in
Need of Defense, New York, New York; for Amici Curiae
Kids in Need of Defense, Capital Area Immigrants' Rights
Coalition, Catholic Legal Immigration Network Inc.,
Florence Immigrant and Refugee Rights Project, Immigrant
Children Advocates' Relief Efforts, International Rescue
Committee, Legal Services for Children, National
Immigrant Justice Center, Northwest Immigrant Rights
Project, Public Counsel, and Young Center for Immigrant
Children's Rights.

Sarah P. Alexander, Constantine Cannon LLP, San
Francisco, California, for Amici Curiae Human Rights
Watch and Amnesty International USA.

Aaron X. Fellmeth, Arizona State University, Sandra Day O'Connor College of Law, Phoenix, Arizona; W. Warren H. Binford, Willamette University College of Law, Salem, Oregon; Blaine I. Green and Erica Turcios Yader, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California; Michael Garcia Bochenek, New York, New York; Stella Burch Elias, University of Iowa College of Law, Iowa City, Iowa; Ian M. Kysel, Cornell Law School, Ithaca, New York; for Amici Curiae Legal Scholars and Nongovernmental Organizations.

Joseph P. Lombardo, Sara T. Ghadiri, and Eric S. Silvestri, Chapman and Cutler LLP, Chicago, Illinois, for Amici Curiae Children's Advocacy Organizations.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Sarah E. Belton, Supervising Deputy Attorney General; Virginia Corrigan, Rebekah A. Fretz, Vilma Palma Solana, and Julia Harumi Mass, Deputy Attorneys General; California Department of Justice, Oakland, California; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Kwame Raoul, Attorney General, Chicago, Illinois; Aaron M. Frey, Attorney General, Augusta, Maine; Brian E. Frosh, Attorney General, Baltimore, Maryland; Maura Healey, Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General, Lansing, Michigan; Keith Ellison, Attorney General, St. Paul, Minnesota; Aaron D. Ford, Attorney General, Carson City, Nevada; Gurbir S. Grewal, Attorney General, Trenton, New Jersey, Hector Balderas, Attorney General, Santa Fe, New Mexico; Letitia James, Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Josh Shapiro, Attorney

General, Harrisburg, Pennsylvania; Peter F. Neronha, Attorney General, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, Montpelier, Vermont; Mark R. Herring, Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General, Olympia, Washington; Karl A. Racine, Attorney General, Washington, D.C.; for Amici Curiae States of California, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia.

Michael N. Feuer, City Attorney; Kathleen Kenealy, Valerie L. Flores, Michael Dundas, and Danielle L. Goldstein, Attorneys; Office of the City Attorney, Los Angeles, California; Donna R. Ziegler, County Counsel, Oakland, California; Craig Labadie, City Attorney, Albany, California; Esteban A. Aguilar Jr., City Attorney, Albuquerque, New Mexico; Joanna C. Anderson, City Attorney, Alexandria, Virginia; Nina R. Hickson, City Attorney, Atlanta, Georgia; Anne L. Morgan, City Attorney, Austin, Texas; Andre M. Davis, City Solicitor, Baltimore, Maryland; Farimah F. Brown, City Attorney, Berkeley, California; Eugene O’Flaherty, Corporation Counsel, Boston, Massachusetts; Nancy E. Glowa, City Solicitor, Cambridge, Massachusetts; Mark A. Flessner, Corporation Counsel, and Benna Ruth Solomon, Deputy Corporation Counsel, Chicago, Illinois; William R. Hanna, Director of Law, Cleveland Heights, Ohio; Zach Klein, City Attorney, Columbus, Ohio; Sharon L. Anderson, County Counsel, Martinez, California; Jessica M. Scheller, Assistant State’s Attorney, Chicago, Illinois; Heather M. Minner, City Attorney, Cupertino, California; Ronald C. Lewis, City Attorney, Houston, Texas; Charles Parkin, City Attorney,

Long Beach California; Margaret L. Carter, O'Melveny &
Myers LLP, Los Angeles, California; Michael P. May, City
Attorney, Madison, Wisconsin; Leslie J. Girard, County
Counsel, Salinas, California; James E. Johnson, Corporation
Counsel, New York, New York; Barbara J. Parker, City
Attorney, Oakland, California; Marcel S. Pratt, City
Solicitor, Philadelphia, Pennsylvania; Cris Meyer, City
Attorney, Phoenix, Arizona; Yvonne S. Hilton, City
Solicitor, Pittsburgh, Pennsylvania; Tracy P. Reeve, City
Attorney, Portland, Oregon; Jeffrey Dana, City Solicitor,
Providence, Rhode Island; Susan Alcala Wood, City
Attorney, Sacramento, California; Dennis J. Herrera, City
Attorney, San Francisco, California; Richard Doyle, City
Attorney, San Jose, California; James R. Williams, County
Counsel, San Jose, California; Dana McRae, County
Counsel, Santa Cruz, California; Peter S. Holmes, City
Attorney, Seattle, Washington; Francis X. Wright Jr., City
Solicitor, Somerville, Massachusetts; Michael Jenkins, City
Attorney, Best Best & Krieger LLP, Manhattan Beach,
California; for Amici Curiae 37 Cities and Counties.

---

## OPINION

BERZON, Circuit Judge:

We consider again the consent decree incorporating the
*Flores* Agreement, a 1997 settlement agreement between the
United States and a class of all minors subject to immigration
detention ("the Agreement"). The Agreement established
nationwide standards for the "detention, release, and
treatment of minors" by U.S. immigration authorities.
Agreement ¶ 9. By the Agreement's own terms, it terminates
after the government's "publication of final regulations

implementing this Agreement." *Id.* ¶ 40 (as modified by Stipulation, Dec. 7, 2001).

In 2019, the government issued final regulations represented as implementing, and thus terminating, the Agreement. The new regulations largely mirror the Agreement's protections for unaccompanied minors, but they significantly reduce the limits on detention for minors taken into custody with a family member or guardian ("accompanied minors"). The district court concluded that the new regulations, on the whole, were inconsistent with the Agreement. It enjoined the regulations from taking effect and denied the government's motion to terminate the Agreement.

We hold that the provisions of the new regulations relating to unaccompanied minors are generally consistent with the Agreement and may take effect, with two exceptions. Additionally, some of the regulations regarding initial detention and custody of both unaccompanied and accompanied minors are consistent with the Agreement and may take effect.

The remaining new regulations relating to accompanied minors depart from the Agreement in several important ways. We therefore affirm the district court's order enjoining those regulations. Additionally, the district court correctly concluded that the Agreement was not terminated by the adoption of the regulations. Finally, the district court did not abuse its discretion in denying the government's motion to terminate the Agreement, as the government has not demonstrated that changed circumstances, such as an increase in family migration, justify terminating the Agreement's protections.

## I.

### A. The *Flores* Agreement

This case stems from a 1985 lawsuit filed on behalf of a class of minors detained by U.S. immigration authorities. After considerable litigation, the parties negotiated the Agreement, entered by the district court as a consent decree in January 1997. The Agreement applies to "[a]ll minors who are detained in the legal custody of the INS," Agreement ¶ 10, and so covers both unaccompanied and accompanied minors, *Flores v. Lynch*, 828 F.3d 898, 905–08 (9th Cir. 2016) ("*Flores I*").[1] It "creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards." *Flores I*, 828 F.3d at 901.

The Agreement anticipated that its terms would be adopted into regulations. Paragraph 9 specifies that "[w]ithin 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation" and that "[t]he final regulations shall not be inconsistent with the terms of this Agreement." Agreement ¶ 9. Paragraph 40 of the Agreement originally included a termination date, but in 2001 the parties stipulated to extend the Agreement. As modified, paragraph 40 provides that "[a]ll terms of this agreement shall terminate *45 days following defendants' publication of final regulations implementing this Agreement*." The government

[1] Although the Agreement refers to "INS," the Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS"). *See Flores v. Sessions*, 862 F.3d 863, 870 (9th Cir. 2017) ("*Flores II*").

did not publish final regulations intended to implement the Agreement until August 2019.

The Agreement imposes several substantive requirements on the government's detention of minors. It requires the government to "hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors" and to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs." Agreement ¶¶ 11, 12A. Ordinarily, within three days after apprehending and detaining a minor, the government must choose between two options for placing the minor. *Id.* ¶ 12A. The first option, discussed in paragraph 14, is releasing the minor to a parent, legal guardian, adult relative, or another "capable and willing" designated adult or entity. Release is mandatory if the minor presents neither a flight nor a safety risk and a qualified custodian is available. Alternatively, under paragraph 19, the minor may be placed in a facility "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children." *Id.* ¶ 6. Licensed facilities must be "non-secure as required under state law." *Id.*

There are some exceptions to the Agreement's placement and time requirements. For instance, a minor may be placed in a secure juvenile detention facility under paragraph 21 in limited circumstances, such as when the minor has been charged with a crime. *Id.* ¶¶ 12A(1), 21. And "in the event of an emergency or influx of minors into the United States," the requirement that minors be placed within three days is relaxed, provided that "the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible." *Id.* ¶ 12A(3). An "influx of minors" occurs if

"more than 130 minors" are awaiting placement in a non-secure licensed facility under paragraph 19. *Id.* ¶ 12B.

Finally, the Agreement mandates that a minor in deportation proceedings who is not released is entitled to a bond hearing before an immigration judge, "unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing." *Id.* ¶ 24A.

**B. Subsequent developments**

The INS published a proposed rule in 1998, stating that the "substantive terms of the settlement form the basis for the proposed rule." 63 Fed. Reg. 39,759, 39,759 (1998). In January 2002, shortly after the Agreement was extended, the INS announced it was "reopening the comment period" and particularly sought "comments that relate to issues that have come to the public's attention since the close of the original comment period in 1998." 67 Fed. Reg. 1670, 1670 (2002). That rulemaking process did not result in a final rule.

In 2002, Congress passed the Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135, which abolished INS and transferred most immigration functions to the newly formed DHS, which houses Immigration and Customs Enforcement ("ICE"). 6 U.S.C. §§ 111, 251, 291. But the Act assigned responsibility for the care of "unaccompanied alien children who are in Federal custody by reason of their immigration status" to the Office of Refugee Resettlement ("ORR"), housed within HHS. *Id.* § 279(a), (b)(1)(A).

In 2008, Congress elaborated on ORR's duties relating to the care and custody of unaccompanied children in the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Pub. L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232). The

TVPRA "partially codified the [*Flores* Agreement] by creating statutory standards for the treatment of unaccompanied minors." *Flores I*, 828 F.3d at 904.

**C. *Flores I & II***

Before September 11, 2001, "families apprehended for entering the United States illegally were most often released rather than detained because of a limited amount of family bed space; families who were detained had to be housed separately, splitting up parents and children." *Id.* at 903 (internal quotation marks omitted). After 2001, immigration policy changed, "with more restrictive immigration controls, tougher enforcement, and broader expedited removal of [inadmissible] aliens, which made the automatic release of families problematic." *Id.* (internal quotation marks omitted). Nonetheless, until 2014, ICE "generally releas[ed] parents who were not flight or safety risks." *Id.* at 908.

In 2014, ICE responded to a surge of migrating families from Central America by opening new family detention centers in Texas, which it operated under internal standards that did not comply with the Agreement. *Id.* at 904. (ICE also operated a state-licensed family detention center in Pennsylvania. *Id.* at 903.) Plaintiffs moved to enforce the Agreement, arguing both that ICE was violating its terms by holding minors in secure, unlicensed facilities, and that the Agreement required ICE to release a minor's accompanying parent, absent a flight or safety risk. *Id.* at 905. The government responded that the Agreement did not apply to accompanied minors, *id.*, and that even if it did, the Agreement should be modified to exclude them from coverage, given "the surge in family units" crossing the southwest border and the passage of the Homeland Security Act and the TVPRA, *id.* at 909–10.

*Flores I* held that the plain language of the Agreement covers accompanied minors but that the Agreement does not require the government to release parents. *Id.* at 905, 908. Importantly, the Agreement's applicability to accompanied minors does not mean that detained parents and their children must be separated. If the government does not release parents, the parents have a choice, albeit a difficult one: they may choose to exercise their children's right to release under the Agreement, provided a suitable sponsor is available, or they may waive their children's rights and keep their children with them.

*Flores I* also rejected the government's motion to modify the Agreement. *Id.* at 909–10. We held that the government had not shown that the surge in family migration was unanticipated, and even if it was, modifying the Agreement to exempt accompanied minors was not a "'suitably tailored' response." *Id.* at 910 (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992)). We also held that the Homeland Security Act and the TVPRA did not make application of the Agreement to accompanied minors "impermissible." *Id.*

A year later, we held that nothing in the Homeland Security Act or the TVPRA excused the government from providing detained, unaccompanied minors with bond hearings as required by the Agreement. *Flores II*, 862 F.3d at 881. We observed that "[t]he bond hearing under Paragraph 24A is a fundamental protection guaranteed to unaccompanied minors under the *Flores* Settlement" and that it "provide[s] minors with meaningful rights and practical benefits." *Id.* at 867.

**D. The Final Rule**

In August 2019, DHS and HHS jointly issued a final rule entitled "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children." 84 Fed. Reg. 44,392 (Aug. 23, 2019) ("Final Rule"). According to the rule's preamble, the agencies' intention was to implement the *Flores* Agreement "in a manner that is workable in light of subsequent statutory, factual, and operational changes." *Id.* at 44,392. The Final Rule comprises two sets of regulations: one issued by DHS and the other by HHS. The DHS regulations address the apprehension and processing of both unaccompanied and accompanied minors, as well as the care and custody of accompanied minors. *See id.* at 44,525–30 (codified at 8 C.F.R. §§ 212.5, 236.3). The HHS regulations address only the care and custody of unaccompanied minors. *See id.* at 44,530–35 (codified at 45 C.F.R. pt. 410). The DHS regulations provide that after DHS apprehends unaccompanied minors, it ordinarily transfers them to the custody of HHS.[2] *Id.* at 44,526 (codified at 8 C.F.R. § 236.3(f)).

While the HHS regulations generally track the Agreement with respect to the treatment of unaccompanied minors, the DHS regulations applicable to the care and custody of accompanied minors, by design, depart significantly from the Agreement. The Final Rule explains at the outset that the Agreement's "application to accompanied minors has created a series of operational difficulties for DHS, most notably with respect to a state-

[2] Under the TVPRA, children from contiguous countries may in some circumstances be returned to those countries instead of being transferred to the custody of HHS. *See* 8 U.S.C. § 1232(a)(2).

licensing requirement for an ICE Family Residential Center . . . in which such parents/legal guardians may be housed together with their children during immigration proceedings." 84 Fed. Reg. at 44,393. Although the Agreement requires that minors who are not released must be transferred to a state-licensed program unless one of the limited criteria permitting secure detention is satisfied, *see supra* p. 14–15, only two states license facilities in which adults and children are housed together, *see* 84 Fed. Reg. at 44,394, 44,419. The DHS regulations both limit the circumstances under which accompanied minors may be released and "create[] an alternative to the existing licensed program requirement for ICE family residential centers," allowing ICE to operate family detention centers under internal standards, without state oversight. *Id.* at 44,392; *see id.* at 44,394.

**E. The district court's order**

After the government initially proposed the regulations in 2018 and before they were final, Plaintiffs filed a motion to enforce the Agreement, arguing that the proposed regulations amounted to an anticipatory breach and seeking to enjoin the government from implementing them. The district court deferred consideration of Plaintiffs' motion until the regulations became final. After the government issued its Final Rule, it filed a notice of termination of the Agreement—asserting that the Agreement expired by its own terms following publication of the Final Rule—and a motion in the alternative to terminate the Agreement under Rule 60(b) of the Federal Rules of Civil Procedure.

In September 2019, about a month before the Final Rule was to take effect, the district court granted Plaintiffs' motion to enforce and denied the government's motion to terminate. The district court concluded that the Final Rule

did not terminate the Agreement because it was inconsistent with the Agreement and therefore did not "implement[]" it as required by paragraph 40's termination clause. The district court also declined to terminate the Agreement under Rule 60(b) because, it held, the government had not demonstrated that changed circumstances warranted termination. In granting relief to Plaintiffs, the district court reasoned that the Agreement by its own terms precluded implementation of the Final Rule, as the Agreement provided that the regulations "shall not be inconsistent" with it. Agreement ¶ 9. The district court entered a permanent injunction enjoining enforcement of the Final Rule in its entirety, denying the government's request to "sever the new regulations into valid and invalid portions."

## II.

The district court's interpretation of the Agreement is reviewed *de novo*. *Flores I*, 828 F.3d at 905. Decisions on "[m]otions for relief from judgment under Rule 60(b) are reviewed for abuse of discretion." *United States v. Asarco Inc.*, 430 F.3d 972, 978 (9th Cir. 2005).

### A. The HHS regulations

We begin with the HHS regulations applicable to unaccompanied minors. The regulations largely parallel the Agreement with respect to unaccompanied minors' placement and care. For example, both the regulations and the Agreement direct the release of minors "without unnecessary delay," unless continued custody is necessary to ensure the minor's safety or the safety of others or to secure the minor's timely appearance before DHS or the immigration courts. *Compare* 84 Fed. Reg. at 44,532 (codified at 45 C.F.R. § 410.301(a)), *with* Agreement ¶ 14. Both provide the same ranked list of potential custodians to

whom a minor may be released, including a parent; legal guardian; other adult relative; an adult or entity designated by a parent or legal guardian; a licensed program willing to accept legal custody; or, in the absence of a likely alternative to long-term custody, another adult or entity seeking custody. *Compare* 84 Fed. Reg. at 44,532–33 (codified at 45 C.F.R. § 410.301(b)), *with* Agreement ¶ 14. And both direct that minors who remain in the government's custody—either because they present a safety or flight risk, or because a suitable custodian has not yet been found—must ordinarily be placed promptly in a "licensed program." *Compare* 84 Fed. Reg. at 44,531, 44,533 (codified at 45 C.F.R. §§ 410.202, .302), *with* Agreement ¶¶ 12.A, 19. The regulations and the Agreement provide the same definition of and standards for licensed programs. *Compare* 84 Fed. Reg. at 44,530, 44,533–34 (codified at 45 C.F.R. §§ 410.101, .402), *with* Agreement ¶ 6 & Ex. 1.

Despite the evident consistency between the Agreement and several provisions of the HHS regulations, the district court enjoined the regulations in their entirety. The district court found fault with three aspects of the HHS regulations: (1) their replacement of the Agreement's mandatory language with purportedly nonmandatory language; (2) their provisions for placing a minor in a secure facility; and (3) their provisions for bond hearings. We address each issue in turn.

**1. Mandatory language**

The district court held that the HHS regulations were inconsistent with the Agreement because the regulations use descriptive, not mandatory, language. For example, while the Agreement requires that minors not released "*shall be placed* temporarily in a licensed program" whose homes and facilities "*shall* be non-secure as required under state law,"

Agreement ¶¶ 6, 19 (emphasis added), the regulations state that "ORR *places* [unaccompanied minors] into a licensed program" and that "ORR *places* each [minor] in the least restrictive setting that is in the best interest of the child and appropriate to the [minor's] age and special needs," 84 Fed. Reg. at 44,531 (codified at 45 C.F.R. §§ 410.201(a), 410.202) (emphasis added). The government asserts on appeal that "the use of the present tense in this and other provisions does not render these provisions optional; they are mandatory." We will hold the government to its word. HHS and ORR are bound by and must comply with the descriptive language in the HHS regulations as equivalent to the mandatory requirements in the Agreement. So interpreted, the descriptive language in the regulations is consistent with the Agreement.

**2. Placement in a secure facility**

The Agreement provides that a minor may be held in a secure facility, such as a state or county juvenile detention facility, in five circumstances. Agreement ¶ 21. To summarize (although the actual circumstances are somewhat more extensive), the government may opt for secure placement whenever it determines that a minor (1) has been charged with a crime or is the subject of delinquency proceedings; (2) has committed or threatened to commit violence while in government custody; (3) has engaged in "unacceptably disruptive" conduct, such as drug or alcohol abuse, while in a licensed program; (4) is an escape-risk; or (5) must be held in a secure facility for the minor's own safety, such as when the government has reason to believe a particular minor may be abducted by a smuggler. *See id.*

In the TVPRA, Congress directed that an unaccompanied minor "shall not be placed in a secure facility absent a determination that the child poses a danger

to self or others or has been charged with having committed a criminal offense." 8 U.S.C. § 1232(c)(2)(A). The HHS regulations incorporate this statutory standard. *See* 84 Fed. Reg. at 44,531–32 (codified at 45 C.F.R. § 410.203). Like the Agreement, the regulations allow placement in a secure facility in five circumstances, the first three of which are nearly identical to the first three circumstances listed in the Agreement. The regulations add to the first and third circumstances a required finding that the minor "poses a danger to self or others." *Id.* (codified at 45 C.F.R. § 410.203(a)(1), (3)). Neither the district court nor Plaintiffs take issue with this addition.

The HHS regulations dispense with the fourth and fifth circumstances in the Agreement that permit placement in secure facilities. In their place, the regulations substitute two additional circumstances in which a minor may be placed in a secure facility: "(4) For purposes of placement in a secure residential treatment center[] . . . , if a licensed psychologist or psychiatrist determines that the [minor] poses a risk of harm to self or others; or (5) [if the minor] [i]s otherwise a danger to self or others." *Id.* at 44,532 (codified at 45 C.F.R. § 410.203(a)(4), (5)). The fourth circumstance is consistent with the district court's interpretation of the Agreement in a 2018 order, and again, neither the district court nor Plaintiffs challenge it. *See Flores v. Sessions*, No. CV 85-4544, 2018 WL 10162328, at *10–11 (C.D. Cal. July 30, 2018).

The district court held that the fifth circumstance—which allows placement of a minor in a secure facility upon an agency determination that the minor is "otherwise a danger to self or others"—is a "significant deviation" from the Agreement. The government insists that "this standard comes directly from the TVPRA" and "implements Paragraph 21" of the Agreement. Additionally, the

government points to the assurance, later in the same section
of the HHS regulations, that "[n]otwithstanding ORR's
ability . . . to place [unaccompanied minors] who are
'otherwise a danger to self or others' in secure placements,
the provision in this section does not abrogate any
requirements to place [unaccompanied minors] in the least
restrictive setting appropriate to their age and special needs."
84 Fed. Reg. at 44,532 (codified at 45 C.F.R. § 410.203(d)).

We agree with the district court that nothing in the
TVPRA requires the fifth, catchall circumstance in the HHS
regulations and that the catchall provision is inconsistent
with the Agreement. The TVPRA states that a minor shall
not be placed in a secure facility "*absent* a determination that
the child poses a danger to self or others," 8 U.S.C.
§ 1232(c)(2)(A) (emphasis added), not that ORR may place
a minor in a secure facility whenever it makes that
determination. As the district court explained, the
government in the Agreement committed to limit the
circumstances under which secure detention would be
permitted to those specifically enumerated in paragraph 21
of the Agreement. By adding a catchall provision, the HHS
regulations broaden the circumstances in which a minor may
be placed in a secure facility and are therefore inconsistent
with the Agreement.

The government's assurance that it will comply with its
obligation to place minors in the least restrictive setting
appropriate does not affect that conclusion, as it would not
prevent the government from relying on the catchall
provision as a ground for the determination that a child's
least restrictive setting is a secure facility. Nor is the
inconsistency between the regulations and the Agreement
required by the TVPRA, as the government can comply with
both the TVPRA and the Agreement by abiding by the

Case 2:85-cv-04544-DMG-AGR Document 1055 Filed 12/29/20 Page 25 of 72 Page ID #:42383

Agreement's limitations. *See Flores II*, 862 F.3d at 874. We therefore conclude that the catchall provision, 45 C.F.R. § 410.203(a)(5), is inconsistent with the Agreement and may not take effect.

### 3. Bond hearings

The Agreement provides that a "minor in deportation proceedings" who is kept in government custody "shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing."[3] Agreement ¶ 24A. "The bond hearing under Paragraph 24A is a fundamental protection guaranteed to unaccompanied minors under the *Flores* Settlement." *Flores II*, 862 F.3d at 867. That is so even though "a favorable finding in a hearing under Paragraph 24A does not entitle minors to release." *Id.* Release is not guaranteed upon a finding by the immigration judge "that the form of detention ORR has imposed is improper" because "the government must still identify a safe and secure placement into which the child can be released." *Id.* Nonetheless, a bond hearing "does provide minors with meaningful rights and practical benefits." *Id.* Without one, minors "have no meaningful forum in which to challenge ORR's decisions regarding their detention or even to

[3] "Administrative removal proceedings to determine a non-citizen's right to remain in the United States [are] re-designated as 'removal' rather than 'deportation' under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996)." *Flores II*, 862 F.3d at 869 n.5. We "therefore treat[] 'deportation proceedings' as addressed in the [Agreement] to be the equivalent of the 'removal proceedings' that take place under the current statutory framework." *Id.*

discover why those decisions have been made." *Id.* at 867–68.

Like the Agreement, the HHS regulations provide unaccompanied minors held in government custody with an opportunity for a bond hearing, but the hearing is before an HHS adjudicator instead of an immigration judge. *See* 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810). Under the regulations, an unaccompanied minor "may *request* that an independent hearing officer employed by HHS determine . . . whether the [minor] would present a risk of danger to the community or risk of flight if released." *Id.* (codified at 45 C.F.R. § 410.810(a)) (emphasis added). The preamble to the Final Rule explains that the regulations are intended to "afford the same type of hearing paragraph 24(A) calls for, while recognizing the transfer of responsibility of care and custody of [unaccompanied minors] from the former INS to HHS ORR. . . . The idea was to provide essentially the same substantive protections as immigration court custody hearings, but through a neutral adjudicator at HHS rather than DOJ." *Id.* at 44,476.

The district court rejected the HHS hearing regulations as inconsistent with the Agreement. The court reasoned that the regulations depart from the Agreement by (1) shifting bond redetermination hearings "away from independent immigration judges" and (2) transforming the hearings "into an opt-in rather than opt-out right." The district court concluded that these differences "would effectively abrogate" the Agreement's guarantee of a bond hearing. We disagree with the district court as to the first inconsistency it perceived and agree, in part, as to the second.

The regulations' provision for a hearing before "an independent hearing officer employed by HHS," rather than an immigration judge, is not a material departure from the

Agreement. 84 Fed. Reg. at 44,535 (codified at 45 C.F.R.
§ 410.810(a)). When the Agreement was signed, it applied
to minors "detained in the legal custody of the INS."
Agreement ¶ 10. The INS, like the Executive Office for
Immigration Review—the agency employing immigration
judges—was housed in the Department of Justice. *See*
84 Fed. Reg. at 44,479. As a consequence of Congress's
assigning responsibility for unaccompanied minors to HHS
in the Homeland Security Act and the TVPRA, HHS is the
INS's successor agency for purposes of the Agreement's
provisions relating to the care and custody of
unaccompanied minors. That reassignment of responsibility
attenuated the connection between immigration judges and
the government's custody determinations for those minors.
Shifting bond redetermination hearings for unaccompanied
minors from immigration judges, adjudicators employed by
the Justice Department, to independent adjudicators
employed by HHS is a permissible interpretation of the
Agreement, so long as the shift does not diminish the due
process rights the Agreement guarantees.

We conclude it does not. *Flores II* identified the critical
due process rights afforded by a bond hearing under the
Agreement: (a) the "right to be represented by counsel";
(b) the "right to make an oral statement"; (c) the right to
"examine and rebut the government's evidence"; (d) the
right to "create an evidentiary record"; (e) the right "to have
the merits of [the minor's] detention assessed by an
independent" adjudicator; and (f) the right to appeal the
adjudicator's decision. 862 F.3d at 867–68, 879. The
government asserts that the HHS regulations guarantee the
very protections identified in *Flores II*. *See* 84 Fed. Reg. at
44,478. Consistent with the government's commitment, we
interpret the regulations as requiring the government to
provide these protections. *See id.* at 44,535 (codified at

45 C.F.R. § 410.810(c) (right to representation by counsel; right to present oral and written evidence), (b) (requiring HHS to present evidence "support[ing] its determination" that a minor "would pose a danger or flight risk if discharged" and allowing the minor an opportunity to "show that he or she will not be a danger to the community or flight risk if released"), (a) (right to a "written decision" by an "independent hearing officer"), (e) (right to appeal the hearing officer's decision to the Assistant Secretary of the Administration for Children and Families)).

The right we recognized in *Flores II* to an independent assessment of custody determinations was not the right to have those determinations reviewed by an immigration judge in particular, but the right to have such determinations reviewed by an adjudicator "independent" from the entity making the determinations. 862 F.3d at 867. The regulations guarantee a hearing before an "independent" hearing officer. 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810(a)); *see id.* at 44,479. Neither Plaintiffs nor the district court explains why independent hearing officers employed by HHS would not be as competent to make custody determinations as immigration judges, who are employed by the Justice Department and are subject to supervision by the Attorney General.[4] As explained in the preamble to the Final Rule, the government anticipates that the independent

[4] *See, e.g.*, Memorandum from the U.S. Attorney General to the Executive Office for Immigration Review, Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest (Dec. 5, 2017), available at https://www.justice.gov/eoir/file/1041196/download; Memorandum from Director, Executive Office for Immigration Review, to the Office of the Chief Immigration Judge et al., Case Priorities and Immigration Court Performance Measures (Jan. 17, 2018), available at https://www.justice.gov/eoir/page/file/1026721/download.

hearing office established by HHS to conduct hearings under
the regulations will "accrue specialized expertise and at least
in theory be able to make adjudications more quickly and
effectively than immigration judges who remain largely
unfamiliar with ORR policies and practices." *Id.* at 44,483.
We conclude that the regulations' provision for a hearing
before an "independent hearing officer employed by HHS"
is consistent with the Agreement.

We agree with the district court, however, that the
distinction between the Agreement's opt-out process for
obtaining a bond hearing and the regulations' opt-in process
is significant for some unaccompanied minors. The text of
the Agreement provides unambiguously for a bond hearing
"unless the minor indicates on the Notice of Custody
Determination form that he or she refuses such a hearing."
Agreement ¶ 24.A. Under the regulations, in contrast, a
minor, the minor's legal representative, or the minor's parent
or legal guardian "may request" a hearing. 84 Fed. Reg.
at 44,535 (codified at 45 C.F.R. § 410.810(a)).

The government maintains that the difference is
immaterial in practice. The preamble to the Final Rule
explains that HHS has not automatically instituted a bond
redetermination hearing for every unaccompanied minor in
custody who does not affirmatively refuse one. *Id.* at 44,478.
Instead, the agency gives every such minor "the opportunity
to request a bond hearing." *Id.* Most unaccompanied minors
in ORR custody are placed in shelters or group homes
because ORR has determined that these minors do not
present a safety or flight risk. *See id.* at 44,477. These minors
remain in custody only because a suitable custodian has not
yet been found. *See id.* at 44,533 (codified at 45 C.F.R.
§ 410.302(a)). Unaccompanied minors in these placements
are entitled to request a bond hearing, *see id.* at 44,480, but

if they do, ORR typically stipulates that "it does not consider the children to be dangerous or flight risks," *id.* at 44,477, 44,480. As to these minors, we agree that the distinction between an opt-out and an opt-in right to a hearing is immaterial. The stipulations fulfill the purpose of the bond hearings for these minors, as the bond hearings do not decide anything beyond whether the minors present a safety or flight risk. *See supra* pp. 25–26. Automatically holding bond hearings, notwithstanding the stipulations, would be pointless.

The situation is different for unaccompanied minors placed in secure or staff-secure facilities, however.[5] The regulations provide that unaccompanied minors "placed in secure or staff secure facilities" will receive notice of their right to request a bond hearing and may use a form provided to them to request one.[6] 84 Fed. Reg. at 44,535 (codified at 45 C.F.R. § 410.810(a)(2)). All minors in ORR custody must also be provided with a list of free legal services providers. *Id.* (codified at 45 C.F.R. § 410.801(b)(1)). Additionally, the regulations permit a minor's legal representative, parent, or legal guardian to request a hearing. *Id.* (codified at 45 C.F.R. § 410.810(a)(1)).

The government represents that these provisions "mirror[] current practice." 84 Fed. Reg. at 44,478. As to unaccompanied minors held in secure or staff-secure

[5] If a minor presents a flight risk, ORR may place the minor in a "staff secure" facility, which is a licensed program with "stricter security measures, such as intensive staff supervision . . . to control problem behavior and to prevent escape." 84 Fed. Reg. at 44,531 (codified at 45 C.F.R. § 410.101).

[6] "For purposes of 810 hearings, HHS plans to treat [residential treatment centers] as secure facilities." 84 Fed. Reg. at 44,480.

placements, however, for whom the bond hearing is a "fundamental protection," *Flores II*, 862 F.3d at 867, current practice does not supersede the plain language of the Agreement. The opt-out process is a "meaningful" procedural right for these minors. *Flores II*, 862 F.3d at 867. The government has apparently disregarded that right in practice, but it does not follow that we can sanction that disregard.

We conclude that the HHS hearing regulations are consistent with the Agreement except to the extent that they require unaccompanied minors held in secure or staff-secure placements to request a hearing, rather than providing a hearing to those minors automatically unless they refuse one.

* * *

In sum, the HHS regulations are largely consistent with the Agreement, with the exceptions we have detailed. The district court erred in enjoining the HHS regulations in their entirety, as there is no legal justification for enjoining the consistent regulations. The Agreement forbids only "inconsistent" regulations, Agreement ¶ 9, and the Final Rule provides that the regulations are severable: "To the extent that any portion of this final rule is declared invalid by a court, the Departments intend for all other parts of the final rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect," 84 Fed. Reg. at 44,408; *see MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).

The HHS regulations may therefore take effect, with two exceptions. First, the broad provision allowing ORR to place an unaccompanied minor in a secure facility if the minor is "otherwise a danger to self or others," 45 C.F.R.

§ 410.203(a)(5), is inconsistent with the Agreement and may not take effect. Second, the portion of the hearing regulations providing a hearing to unaccompanied minors held in secure or staff-secure placements only if they request one, *see id.* § 410.810(a), may not take effect. As to these minors, HHS must implement paragraph 24.A of the Agreement as written and provide a hearing unless one is refused.[7]

Although we hold that the majority of the HHS regulations may take effect, we also hold that the district court did not abuse its discretion in declining to terminate those portions of the Agreement covered by the HHS regulations. The government moved the district court to terminate the Agreement in full, not to modify it or terminate it in part. The Agreement therefore remains in effect, notwithstanding the overlapping HHS regulations. If the government wishes to move to terminate those portions of the Agreement covered by the valid portions of the HHS regulations, it may do so.

**B. The DHS regulations**

**1. Initial apprehension and processing of both unaccompanied and accompanied minors**

As noted above, the DHS regulations address the apprehension and processing of both unaccompanied and accompanied minors, as well as the care and custody of accompanied minors. *See* 84 Fed. Reg. at 44,525–30 (codified at 8 C.F.R. §§ 212.5, 236.3). The government

[7] To be clear, we do not invalidate 45 C.F.R. § 410.810(a) to the extent that it provides unaccompanied minors with the right to have "an independent hearing officer employed by HHS determine, through a written decision, whether the [minor] would present a risk of danger to the community or risk of flight if released."

contends that some of the provisions relating to the initial apprehension and processing of minors mirror the Agreement and should be allowed to take effect. Specifically, the government points to 8 C.F.R. § 236.3(f), regarding the transfer of unaccompanied minors from DHS to HHS, and 8 C.F.R. § 236.3(g)(2), regarding DHS custodial care immediately following apprehension. We agree that these provisions are consistent with the Agreement and may take effect. *Compare* 84 Fed. Reg. at 44,526–27 (codified at 8 C.F.R. § 236.3(f), (g)(2)), *with* Agreement ¶¶ 11, 12A, 25.

#### 2. Care and custody of accompanied minors

The DHS regulations relating to the care and placement of accompanied minors differ substantially from the Agreement in two principal, related ways: (1) they limit the circumstances in which accompanied minors may be released, and (2) they provide for the detention of families together in facilities licensed not by states but by ICE itself. These departures undermine the Agreement's core "presumption in favor of releasing minors," and its requirement that those not released be placed in "licensed, non-secure facilities that meet certain standards." *Flores I*, 828 F.3d at 901.

Acknowledging that the DHS regulations are inconsistent with the Agreement as we have interpreted it, the government maintains that circumstances have changed, and "applying [the Agreement] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The government asserts

that the district court therefore abused its discretion in declining to terminate the Agreement.[8]

We first describe the inconsistencies between the DHS regulations and the Agreement, and then address the government's changed circumstances arguments

**a. Release of accompanied minors**

Paragraphs 14 and 18 of the Agreement require the prompt release of minors from government custody. The Agreement provides that unless detention is "required either to secure [a minor's] timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay" to a ranked list of six potential custodians, including family members and other designated adults or entities. Agreement ¶ 14. If a minor is not released, the INS "shall make and record the prompt and continuous efforts on its part toward . . . the release of the minor pursuant to Paragraph 14," and those efforts "shall continue so long as the minor is in INS custody." Agreement ¶ 18.

Although DHS's new regulations also state that "DHS will make and record prompt and continuous efforts on its part toward the release of [a] minor who is not [an unaccompanied minor]," 84 Fed. Reg. at 44,529 (codified at 8 C.F.R. § 236.3(j)(1)), several provisions of the regulations

[8] The government argues in the alternative that the Agreement terminated by its own terms because the regulations are consistent with the Agreement "except for a few minor differences." Because we conclude that the differences are substantial and affect the central protections afforded by the Agreement, we reject the government's argument that the Agreement terminated by its own terms.

work together to reduce the circumstances in which
accompanied minors are released.

First, the regulations provide for mandatory detention of
accompanied minors in expedited removal proceedings,
unless release is "required to meet a medical emergency or
. . . necessary for a legitimate law enforcement objective."
*See id.* at 44,525, 44,529 (codified at 8 C.F.R. §§ 212.5,
236.3(j)(2)) (applying parole standard in 8 C.F.R.
§§ 235.3(b)(2)(ii), (b)(4)(ii)). Under the Immigration and
Nationality Act ("the Act"), DHS is authorized to expedite
the removal of certain inadmissible individuals "without
further hearing or review unless" they indicate "either an
intention to apply for asylum . . . or a fear of persecution."
8 U.S.C. § 1225(b)(1)(A)(i). The government maintains that
DHS's new parole standard for accompanied minors in
expedited removal proceedings is "consistent with" the Act,
which provides generally that individuals in such
proceedings "shall be detained pending a final determination
of credible fear of persecution and, if found not to have such
a fear, until removed." *Id.* § 1225(b)(1)(B)(iii)(IV).

As we have recognized, however, the Act's "expedited
removal [process] does *not* require mandatory detention for
minors." *Flores v. Barr*, 934 F.3d 910, 917 (9th Cir. 2019).
"[E]ven for noncitizens in expedited removal, 'the Attorney
General may . . . in his discretion parole into the United
States temporarily' any noncitizen applying for admission
'under such conditions as he may prescribe.'" *Id.* (quoting
8 U.S.C. § 1182(d)(5)(A)). We therefore upheld as
consistent with the Act, and with DHS's prior regulations
implementing the Act, the district court's previous
conclusion that the Agreement "requires the government to
consider releasing [minors] subject to expedited removal."
*Id.* at 916. Specifically, the district court held that the

"Agreement creates an affirmative obligation on the part of
[DHS] to individually assess each [minor's] release . . . in
cases involving minors in expedited removal." *Flores v.
Sessions*, 394 F. Supp. 3d 1041, 1066 (C.D. Cal. 2017). That
individualized assessment should consider, for example,
whether the minor presents a flight risk and whether a
suitable custodian is available. *See id.* at 1065–68. By
making parole categorically unavailable to accompanied
minors in expedited removal proceedings, except in the case
of a medical emergency or a law enforcement request, the
new parole standard undermines the Agreement's release
mandate.

Second, in keeping with the decision not to make parole
available to accompanied minors in expedited removal
proceedings, the DHS regulations also deny bond hearings
to these same minors. 84 Fed. Reg. at 44,529 (codified at
8 C.F.R. § 236.3(m)); *see id.* at 44,394–95. As discussed
above, the right to have an independent adjudicator review
the government's custody determinations is "a fundamental
protection" afforded by the Agreement. *Flores II*, 862 F.3d
at 867. Although *Flores II* addressed only unaccompanied
minors, as the government in that case did "not contest that
accompanied minors remain entitled to bond hearings," *id.*
at 881 n.20, the Agreement provides that minors are entitled
to "a bond redetermination hearing . . . in *every* case,"
Agreement ¶ 24.A (emphasis added). The DHS regulations'
denial of bond hearings to accompanied minors in expedited
removal proceedings is inconsistent with the Agreement.

Finally, for accompanied minors in standard removal
proceedings, the new DHS regulations shrink the pool of
potential custodians to whom DHS is required to release a
minor who does not present a safety or flight risk. As noted
above, the Agreement requires release to one of a ranked list

of six possible custodians, including (1) a parent; (2) a legal guardian; (3) another adult relative; (4) an adult or entity designated by a parent or legal guardian; (5) a licensed program willing to accept legal custody; or, (6) in the absence of a likely alternative to long-term custody, another adult or entity seeking custody. Agreement ¶ 14. The DHS regulations, in contrast, require release only to a parent or a legal guardian. 84 Fed. Reg. at 44,529 (codified at 8 C.F.R. § 236.3(j)(5)(i)). Release to another adult relative is not "preclude[d]" by the regulations but would occur only in the "unreviewable discretion of DHS." *Id.* The remaining three options for possible custodians listed in the Agreement do not appear at all in the regulations. As a result, if an entire family is in detention and DHS declines to release an adult relative, then release of an accompanied minor is not an option, in stark contrast to the Agreement's release mandate.

**b. Licensed facilities**

The Agreement mandates that a minor who is not released "shall be placed temporarily in a licensed program until such time as release can be effected . . . or until the minor's immigration proceedings are concluded, whichever occurs earlier." Agreement ¶ 19. A "licensed program" is one "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children," and its facilities "shall be non-secure as required under state law." *Id.* ¶ 6.

In contrast, the DHS regulations define a licensed facility as "an ICE detention facility that is licensed by the state, county, or municipality in which it is located, if such a licensing process exists." 84 Fed. Reg. at 44,526 (codified at 8 C.F.R. § 236.3(b)(9)). But if a "licensing process for the detention of minors accompanied by a parent or legal guardian is not available . . . , DHS shall employ an entity

outside of DHS that has relevant audit experience to ensure
compliance with the family residential standards established
by ICE." *Id.* The minimum standards set forth in the
regulations match the standards for licensed programs
prescribed by the Agreement. *Compare id.* at 44,528–29
(codified at 8 C.F.R. § 236.3(*i*)(4)), *with* Agreement ¶ 6 &
Ex. 1.

"[M]ost States do not offer a licensing program for
family unit detention"; currently, only Texas and
Pennsylvania do. 84 Fed. Reg. at 44,394, 44,419. The
regulations' revised definition of "licensed facility" thus
greatly expands DHS's ability to detain minors with their
accompanying adults.

Notably, the regulations expressly define a licensed
facility as a "detention facility," as opposed to the group
homes contemplated by the Agreement. *Compare id.*
at 44,526 (codified at 8 C.F.R. § 236.3(b)(9)), *with*
Agreement ¶ 6. The HHS regulations applicable to
unaccompanied minors highlight the DHS regulations'
departure from the Agreement; the former explain that a
licensed program is "usually . . . an open setting, such as a
foster or group home, and not [a] detention facilit[y]."
84 Fed. Reg. at 44,535 (codified at 45 C.F.R.
§ 410.801(b)(2)).

In keeping with the DHS regulations' conception of a
licensed facility as a detention facility, the regulations offer
the following definition of "non-secure," in the event that
state law does not define that term: "a DHS facility shall be
deemed non-secure if egress from a portion of the facility's
building is not prohibited through internal locks within the
building or exterior locks and egress from the facility's
premises is not prohibited through secure fencing around the
perimeter of the building." *Id.* at 44,526 (codified at 8 C.F.R.

§ 236.3(b)(11)). As Plaintiffs point out, this definition is broad enough to cover a facility that prohibits egress from its detention area through internal locks but has an unlocked reception area on the public side of a sally gate. Although the district court previously found that ICE's family residential center in Karnes, Texas, is a secure facility, *see Flores v. Johnson*, 212 F. Supp. 3d 864, 879 (C.D. Cal. 2015), the government "maintains that its [family residential centers] have been and continue to be non-secure," 84 Fed. Reg. at 44,443.[9]

We might conclude that the regulations regarding licensed facilities were consistent with the Agreement if they simply allowed for the licensing of shelters or group homes, similar to those contemplated by the Agreement, that permitted the placement of parents and children together. But that is not what the regulations do. The government's intent is not to place families together in "an open setting," *id.* at 44,535 (codified at 45 C.F.R. § 410.801(b)(2)), but to "detain" them together for "enforcement" purposes, *id.* at 44,398, as discussed further below. We therefore conclude that the new regulations regarding licensed facilities are inconsistent with the Agreement.

**c. Changed circumstances**

Together, the DHS regulations regarding the release of accompanied minors and the revised definition of "licensed facility" dramatically increase the likelihood that accompanied minors will remain in government detention indefinitely, instead of being released while their immigration proceedings are pending or housed in

[9] DHS has committed to adding "additional points of egress" to the Karnes facility. *Id.*

nonsecure, licensed facilities. Effecting this change was one of the principal features of the Final Rule. The government "strongly disagrees" with our holding in *Flores I* that "the plain language of the Agreement clearly encompasses accompanied minors," 828 F.3d at 905 (cleaned up); 84 Fed. Reg. at 44,393, and "maintains that the terms of the [Agreement] were intended to apply only to those alien children in custody who are unaccompanied," 84 Fed. Reg at 44,402. The preamble to the Final Rule explains that "by modifying the literal text of the [Agreement] (to the extent it has been interpreted to apply to accompanied minors) . . . to reflect and respond to intervening statutory and operational changes, DHS ensures that it retains discretion to detain families . . . to meet its enforcement needs." *Id.* at 44,398.

The government contends that the legal and factual changes that guided its development of the Final Rule also justify termination of the Agreement under Rule 60(b)(5).[10] When the government seeks to modify or terminate a consent decree based on changed circumstances, it "must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (citation omitted) (quoting *Agostini v. Felton*, 521 U.S. 203,

[10] We have already addressed the government's request to terminate the Agreement with respect to unaccompanied minors. *See supra* p. 32. Here we address the government's request to terminate the Agreement based on changes relating to accompanied minors.

215 (1997)). *Rufo*'s standard is "flexible" because consent decrees in "institutional reform litigation . . . reach beyond the parties involved directly in the suit" and affect the "public's right to the sound and efficient operation of its institutions." 502 U.S. at 381 (cleaned up).

The government asserts that four changes justify termination of the Agreement: (1) legislative changes, (2) the Final Rule itself, (3) major shifts in migration patterns, and (4) flaws in the certified class. We address each in turn.

**i. Legislative changes**

The government contends that the Homeland Security Act and the TVPRA significantly changed the legal landscape, warranting termination of the Agreement. A change in law may justify modifying or terminating a consent decree if the new law makes complying with the consent decree "impermissible," or, on the other hand, if it "make[s] legal what the decree was designed to prevent." *Rufo*, 502 U.S. at 388.

The government maintains that by codifying the Agreement's protections for unaccompanied minors, Congress signaled it was leaving the treatment of accompanied minors to DHS's discretion. But we have already held to the contrary. *Flores I* determined that the "creation of statutory rights for *unaccompanied* minors does not make application of the [Agreement] to *accompanied* minors 'impermissible.'" 828 F.3d at 910. As the government does not otherwise argue that the statutes "make legal what the decree was designed to prevent," *Rufo*, 502 U.S. at 388, it has not demonstrated that the Homeland Security Act and the TVPRA effected legal changes warranting termination of the Agreement.

**ii. The Final Rule**

The government contends that the Final Rule is a "fundamental change in law implementing the [Act] as well as the goals of the Agreement," justifying termination of the Agreement under Rule 60(b). We reject the notion that the executive branch of the government can unilaterally create the change in law that it then offers as the reason it should be excused from compliance with a consent decree. *See Nehmer v. U.S. Dep't of Veterans Aff.*, 494 F.3d 846, 860 (9th Cir. 2007) (rejecting an agency's attempt to avoid complying with a consent decree by issuing a regulation reinterpreting the decree). Although the Agreement itself contemplates termination upon the promulgation of *consistent* regulations, it certainly does not follow that the executive branch retained the power to bring about termination through the promulgation of *inconsistent* regulations. The Final Rule is not a significant change warranting termination of the Agreement.

**iii. Shifts in migration patterns**

The crux of the government's changed circumstances argument is that an unprecedented increase in the number of minors arriving annually at U.S. borders warrants termination of the Agreement. According to the government, "irregular family migration" has increased by 33 times since 2013, and in 2019, more than 500,000 people traveling as families reached the southwest border. A change in facts may warrant modification of a consent decree "when changed factual conditions make compliance with the decree substantially more onerous," the "decree proves to be unworkable because of unforeseen obstacles," or "enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384.

The government contends that the increase in family migration, combined with the requirements of the Agreement, has created practical problems for DHS. The Final Rule explains that when DHS encounters a removable adult traveling with his or her removable child, the government has

> three primary options for purposes of immigration custody: (1) Release all family members into the United States; (2) detain the parent(s) or legal guardian(s) and either release the juvenile to another parent or legal guardian or transfer the juvenile to HHS as [an unaccompanied minor]; or (3) detain the family unit together as a family by placing them at an appropriate [family detention center] during their immigration proceedings.

84 Fed. Reg. at 44,403. The government views the first option as problematic, both because it creates incentives for bringing children on the dangerous journey to cross the border and because many families released into the United States fail to appear for their removal proceedings. *Id.* at 44,403, 44,405. The second option, the government says, "should be avoided when possible, and has generated significant litigation." *Id.* at 44,403.

The government prefers the third option. *See id.* at 44,403. But the Agreement flatly precludes that approach. The Agreement requires DHS (1) to release rather than detain minors who do not present a safety or flight risk, as long as a suitable custodian is available, and (2) to place minors who are not released in a non-secure, state-licensed facility. As noted above, most states do not license facilities for holding families together, which has "severely limited"

the government's "ability to maintain detention of families
together." *Id.* at 44,405.

Again, if the only problem were a lack of licensed
facilities to hold accompanied minors who could not be
released, either because they presented a safety or flight risk
or because a suitable custodian was not available, then
modification of the Agreement would perhaps be warranted.
As the district court has observed, it may sometimes be "in
the best interests of an accompanied minor to remain with a
parent who is in detention." *Flores v. Sessions*, 394 F. Supp.
3d at 1067. We have recognized that the Agreement "gave
inadequate attention" to the "housing of family units."
*Flores I*, 828 F.3d at 906. To the extent the Agreement
precludes keeping parents and children together based solely
on a lack of state licensing schemes that the parties to the
Agreement may not have anticipated, then an appropriate
modification of the Agreement, permitting placement in
non-state-licensed facilities meeting specified standards,
might be justified.

But the government seeks a much more comprehensive
change. The DHS regulations jettison the Agreement's
release mandate for accompanied minors except in narrow
circumstances. The government has not convincingly
explained why the increase in families arriving at the
southwest border requires DHS to detain instead of releasing
accompanied minors. As we held in *Flores I*, "even if the
parties did not anticipate an influx of this size, we cannot
fathom how a 'suitably tailored' response to the change in
circumstances would be to exempt an entire category of
migrants from the [Agreement], as opposed to, say, relaxing
certain requirements applicable to all migrants." 828 F.3d at
910 (quoting *Rufo*, 502 U.S. at 383). The Final Rule takes
precisely the approach *Flores I* rejected: it retains the release

mandate for unaccompanied minors and largely erases it for accompanied minors.

Although the Final Rule suggests the government must detain families to ensure they appear for their immigration hearings, the record casts doubt on that contention. Public comments on the Final Rule highlighted the success of DHS's Family Case Management Program, "an alternative to detention that use[d] case managers to ensure participants compl[ied] with immigration obligations, such as check-ins with [ICE] and attendance at immigration court hearings, while allowing them to remain in their community as they move[d] through immigration proceedings." DHS Office of Inspector General, Rep. No. OIG–18–22, U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract 2 (2017), available at https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-22-Nov17.pdf (cited at 84 Fed. Reg. at 44,487 n.58). "[P]articipants in the [Family Case Management Program] had a 100 percent attendance record at court hearings and a 99 percent rate of check-ins and appointments with ICE." 84 Fed. Reg. at 44,487. The Final Rule explains that the program was discontinued in 2017 for cost reasons, while acknowledging that the program was generally less expensive than detention. *Id.* at 44,488.

Even if the government has legitimate justifications for detaining adults, it has not shown why it must also detain accompanying minors. For example, the government could detain parents but release their children to another available relative. The Final Rule suggests disingenuously that family separation "has generated significant litigation," 84 Fed. Reg. at 44,403, but the litigation it cites relates to the government's recent practice of *forcibly* separating parents and children, *see Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1154

(S.D. Cal. 2018). Nothing in the Agreement requires the government to take children from their parents against the parents' will. The Agreement provides for the release of a minor to an adult "brother, sister, aunt, uncle, or grandparent" and, if none of those relatives are available, provides a mechanism for parents to "designate" another "adult individual or entity . . . as capable and willing to care for the minor's well-being." Agreement ¶ 14C and D. Of course, parents can waive their children's right to release under the Agreement. *See supra* p. 17.

The government has failed to demonstrate that the recent increase in family migration has made complying with the Agreement's release mandate for accompanied minors "substantially more onerous," "unworkable," or "detrimental to the public interest." *Rufo*, 502 U.S. at 384.

**iv. The certified class**

Finally, the government contends there are three flaws in the certified class of Plaintiffs that constitute changed circumstances warranting termination of the Agreement: (1) the class is "too unwieldy for management in a single litigation"; (2) the class includes accompanied minors but not their parents; and (3) one of Plaintiffs' counsel has a conflict of interest because he operates a shelter for migrant youth, including minors released under the Agreement.

*Flores I* held that "the government waived its ability to challenge the class certification when it settled the case and did not timely appeal the final judgment." 828 F.3d at 908. The government contends that the standards for class certification have changed and would preclude certification of the same class today. But the government cites no authority supporting its suggestion that the evolution of Rule 23 standards warrants termination of a consent decree

concerning a previously certified class, particularly when the government has never moved to decertify or modify the class. The government has not carried its burden to establish that the supposed flaws in the certified class constitute a significant change warranting termination of the Agreement.

We are mindful of the reality that under certain circumstances, it will be appropriate to amend or terminate long-running consent decrees. *See Horne*, 557 U.S. at 447–49. But the government has not shown that the district court abused its discretion in denying termination in this instance.[11]

## III.

The HHS regulations, as we have interpreted them, are consistent with the Agreement and may take effect, with the exception of 45 C.F.R. § 410.203(a)(5) and § 410.810(a) to the extent it provides a bond hearing to unaccompanied minors held in secure or staff-secure placements only if they request one. Some of the DHS regulations regarding initial apprehension and detention, specifically 8 C.F.R. § 236.3(f) and (g)(2), are consistent with the Agreement and may take effect. The remaining DHS regulations are inconsistent with the Agreement, and the district court properly enjoined them and the inconsistent HHS regulations from taking effect. Additionally, the district court did not abuse its discretion in denying the government's motion to terminate the

[11] The government also argues that the district court should have terminated the Agreement because the government has "substantially complied" with it. *See Jeff D. v. Otter*, 643 F.3d 278, 283–84 (9th Cir. 2011). The significant inconsistencies between the DHS regulations and the Agreement detailed in this opinion preclude a finding of substantial compliance.

Agreement.[12] The judgment of the district court is therefore **AFFIRMED in part and REVERSED in part.**

[12] As noted *supra* p. 32, the government may move to terminate those parts of the Agreement that are covered by the valid portions of the HHS regulations. Any motion to terminate the Agreement in part would have to take into account our holding in *Flores I* that the Agreement protects both unaccompanied and accompanied minors. *See* 828 F.3d at 905–08.



# Office of the Attorney General

Washington, D.C. 20530

December 5, 2017

MEMORANDUM FOR THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

FROM: THE ATTORNEY GENERAL

SUBJECT: Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest

Our primary mission at the Department of Justice—as reflected in the first clause of our mission statement—is to "enforce the law and defend the interests of the United States according to the law." Under my delegated authority, you, the men and women of the Executive Office for Immigration Review (EOIR), accomplish this objective by adjudicating immigration cases and interpreting and administering the immigration laws. Together, we have made significant progress since the beginning of the Trump Administration, but we want to build on this success to enshrine what the law contemplates and what the people desire—an end to unlawfulness in our immigration system.

We have brought on 50 new immigration judges since January 20, and expect to add over 60 more in the next six months. We surged resources to the border at the direction of the President—and completed approximately 2,800 more cases than we were projected to have otherwise completed. We are actively developing a long overdue e-filing system to pilot in mid-2018. Initial case completions rose in FY 2017 to the highest level since FY 2012. In accordance with the law, we are prioritizing the completion of cases and developing performance measures to ensure that EOIR's mission of fairly, expeditiously, and uniformly administering the immigration laws is fulfilled.

cited in Flores v. Rosen No. 19-56326 archived on December 22, 2020

But as you know, tremendous challenges lie before us. There are approximately 650,000 cases pending before the immigration courts. Although we showed signs of leveling off the increase in the non-detained portion of the backlog at the end of FY 2017, we nevertheless face a steady stream of criticism that we are overwhelmed and that the backlog is intractable. I strongly disagree—this challenge is not insurmountable, but it does require a concerted effort to address it.

While we continue to hire additional immigration judges and support personnel to address these challenges, we must all work to identify and adopt—consistent with the law—additional procedures and techniques that will increase productivity, enhance efficiencies, and ensure the timely and proper administration of justice. Whether you are an immigration judge who has a unique way to better handle dockets, or an administrative assistant who has a better process for handling the distribution of files in the office, we can all contribute something to improve the system. I, too, anticipate clarifying certain legal matters in the near future that will remove recurring impediments to judicial economy and the timely administration of justice.

It is imperative that we all recognize our extraordinary role in ensuring the faithful application of our duly enacted immigration laws while simultaneously ensuring the timely and

Memorandum from the Attorney General
Subject: Renewing Our Commitment to the Timely
and Efficient Adjudication of Immigration Cases to Serve the National Interest Page 2

impartial administration of justice. Indeed, the manner in which cases are adjudicated has a direct impact on the sovereign interests of our nation. It not only affects the flow of illegal entries into the United States and the number of visa overstays, but also our national security, public safety, and the employment prospects and wages of the American people. It also furthers the national interest by ensuring that meritorious cases receive timely consideration while baseless cases are concluded expeditiously.

To that end, I expect you to ensure that the adjudication of immigration cases serves the national interest by supporting and adhering to the following principles:

- The immigration courts, the Board of Immigration Appeals, and the Office of the Chief Administrative Hearing Officer within EOIR are responsible for adjudicating cases and administering the immigration laws. We serve the national interest by applying those laws as enacted, irrespective of our personal policy preferences.
- The timely and efficient conclusion of cases serves the national interest. Unwarranted delays and delayed decision making do not. The ultimate disposition for each case in which an alien's removability has been established must be either a removal order or a grant of relief or protection from removal provided for under our immigration laws, as appropriate and consistent with applicable law.
- Meritless cases or motions pending before the immigration courts or the Board of Immigration Appeals should be promptly resolved consistent with applicable law.
- The efficient and timely completion of cases and motions before EOIR is aided by the use of performance measures to ensure that EOIR adjudicates cases fairly, expeditiously, and uniformly in accordance with its mission.
- The attempted perpetration of fraud upon the United States government in our immigration court system can lead to delays, inefficiencies, and the improper provision of immigration benefits. Therefore, any and all suspected instances of fraud should be promptly documented and reported to EOIR management, and any other agency with an interest in the identification of and response to such fraud (including the appropriate state bar(s) in cases of attorney misconduct), consistent with applicable law.

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

I expect all of you will carry out these principles capably and professionally in performing your duties, including in the preparation, adjudication, and completion of pending cases. Further, I am confident that, together, we will uphold the mission of the Department of Justice, we will maintain respect for the rule of law, and we will serve the national interest by ensuring the timely administration of justice in immigration proceedings.

This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. The Deputy Attorney General or the Director of EOIR may issue further guidance, as appropriate, to ensure the achievement of the principles set forth in this memorandum.

U.S. Department of Justice

Executive Office for Immigration Review

*Office of the Director*

*5107 Leesburg Pike, Suite 2600*
*Falls Church, Virginia 22041*

Director

January 17, 2018

MEMORANDUM TO: The Office of the Chief Immigration Judge
All Immigration Judges
All Court Administrators
All Immigration Court Staff

FROM: James R. McHenry III JM
Director

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

SUBJECT: Case Priorities and Immigration Court Performance Measures

This memorandum is effective immediately, applies prospectively to all new cases filed and to all immigration court cases reopened, recalendared, or remanded, and serves to rescind the January 31, 2017, memorandum entitled "Case Processing Priorities" and all other prior memoranda establishing case processing or docketing priorities.

## I. Background

On December 6, 2017, the Attorney General issued a memorandum to all Executive Office for Immigration Review (EOIR) employees outlining several principles to follow to ensure that the adjudication of immigration court cases serves the national interest. It also provided that the Director of EOIR may issue further guidance to ensure the achievement of those principles. Pursuant to 8 C.F.R. § 1003.0(b)(1)(ii) and (iv), the EOIR Director has the authority to "[d]irect the conduct of all EOIR employees to ensure the efficient disposition of all pending cases, including the power, in his discretion, to set priorities or time frames for the resolution of cases and otherwise to manage the docket of matters to be decided by the immigration judges" and to "[e]valuate the performance of the Office of the Chief Immigration Judge (OCIJ) and take corrective action where needed."

Accordingly, pursuant to that authority and in accordance with the Attorney General's principles, this memorandum lays out EOIR's specific priorities and goals in the adjudication of immigration court cases.

## II. Case Prioritization

EOIR has always designated detained cases as priorities for completion. In 2014, EOIR began designating other types of "priority" cases for docketing and processing purposes, and those priority designations have been subsequently modified three times—most recently on January 31, 2017.

The repeated changes in case prioritization have caused confusion and created difficulty in comparing and tracking case data over time. But, most importantly, the frequent shifting priority designations did not enhance docket efficiency. Not only were cases repeatedly moved to accommodate new priorities without a clear plan for resolving both the new and older cases, but also the designations did not adequately stress the importance of completing all cases in a timely manner.

For example, less than 10% of cases currently pending meet the definition of "priority" outlined in the January 31, 2017, memorandum—a statistic that conveys a potentially mistaken impression regarding the importance of completing the other 600,000-plus pending cases that do not bear a "priority" designation.

cited in Flores v. Rosen No. 19-56326 archived on December 22, 2020

Accordingly, to address concerns and confusion, it is appropriate to clarify EOIR's priorities and goals to ensure that the adjudication of cases serves the national interest consistent with the principles outlined by the Attorney General.

All cases involving individuals in detention or custody, regardless of the custodian, are priorities for completion.[1] Likewise, cases subject to a statutory or regulatory deadline, cases subject to a federal court-ordered deadline, and cases otherwise subject to an established benchmark for completion, including those listed in Appendix A, are also priorities. As developments warrant, other priority designations may be established as appropriate, and other categories of cases may be tracked regardless of whether they reflect a priority designation.

The designation of a category of cases as priority is an indication of an expectation that such cases should be completed expeditiously and without undue delay consistent with due process. Because the designations outlined in this memorandum apply prospectively, it is not intended to require the rescheduling of currently-docketed cases. The designation of priority cases is also not intended to diminish or reduce the significance of other cases. Indeed, the timely completion of *all* cases consistent with due process remains a matter of the utmost importance for the agency. Finally, the designation of a case as a priority is not intended to limit the discretion afforded an immigration judge under applicable law, nor is it intended to mandate a specific outcome in any particular case.

[1] Cases of aliens in the custody of the Department of Homeland Security and aliens in the care and custody of the Department of Health and Human Services who do not have a sponsor identified were priorities under prior policy and remain so under this new policy.

### III. Immigration Court Benchmarks and Performance Metrics

Apart from designated case priorities, EOIR's case processing has also involved other types of evaluative measures over time, such as statutory or regulatory deadlines for the completion of certain types of cases, including under the Immigration and Nationality Act (INA), the Government Performance and Results Act (GPRA) of 1993, and the GPRA Modernization Act of 2010. Although these case completion goals have not previously denoted case priorities *per se*, they do serve as indicators of the importance of completing certain classes of cases in a timely manner.

Historically, EOIR also utilized case completion measures for non-detained cases from FY 2002 to FY 2009, but it eliminated those measures in FY 2010, leading to confusion regarding the extent to which the timely completion of non-detained cases was perceived as a priority for the agency. The abolition of non-detained case completion benchmarks was also subsequently criticized by both the Department of Justice (DOJ) Office of Inspector General and the Government Accountability Office, both of whom recommended that EOIR reinstate goals for the completion of non-detained cases. In 2016 and 2017, the House Committee on Appropriations also directed EOIR to establish a goal that the median length of detained cases be no longer than 60 days and the median length of non-detained cases be no longer than 365 days.

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

Although EOIR has previously stated that case completion goals are statements of agency priorities and has tracked performance relative to those goals, it has not expressly designated cases subject to such measures as priorities, unless they happened to fall into another category that was a priority (*e.g.* detained cases). This has led to even further confusion regarding the interaction between case priorities and case resolution goals, especially because the overwhelming majority of pending cases in recent years were neither designated as a priority nor subject to a performance goal.

Almost every trial court system utilizes performance measures or case completion metrics to ensure that it is operating efficiently and appropriately. Some of these are established by statute or regulation whereas others are set by policy; nevertheless, trial court performance measures are an essential and widely-recognized tool for ensuring healthy and effective court operations.

In the federal system, for example, the Civil Justice Reform Act of 1990 requires semiannual reporting of the number of certain types of civil cases and motions pending beyond a particular date with the intent of reducing litigation delays in federal district courts. Many administrative adjudicatory systems also feature case processing time standards, either by statute,

regulation, or policy.[2] At the state level, most states have adopted court case processing time standards, many of which follow model standards approved by the American Bar Association (ABA).[3]

In fact, over 25 years ago, the ABA recognized the importance of establishing court performance standards to ensure effective case management and to avoid undue delay; in doing so, it outlined seven essential elements for managing cases, including several that are now being implemented by EOIR such as "[p]romulgation and monitoring of time and clearance standards for the overall disposition of cases," "[a]doption of a trial-setting policy which schedules a sufficient number of cases to ensure efficient use of judge time while minimizing resettings caused by overscheduling," "[c]ommencement of trials on the original date scheduled with adequate advance notice," and "[a] firm, consistent policy for minimizing continuances."[4] In short, court performance measures and case completion goals are common, well-established, and necessary mechanisms for evaluating how well a court is functioning at performing its core role of adjudicating cases.

EOIR is no exception to the rule that court performance measures are a necessary accountability tool to ensure that a court is operating at peak efficiency, nor is there anything novel or unique about applying performance measures to EOIR's immigration courts.[5] Rather, a review of such measures is vital to ensure that the immigration court system is performing strongly, that EOIR is adjudicating cases fairly, expeditiously, and uniformly consistent with its mission, and that it is addressing its pending caseload in support of the principles established by the Attorney General.

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

Accordingly, to ensure that EOIR is meeting these goals, the court-based performance measures outlined in Appendix A to this memorandum will be tracked by EOIR, and court

---

[2] *See, e.g.*, 42 U.S.C. § 1395ff (establishing hearing deadlines for cases before administrative law judges at the Department of Health and Human Services); Fed. Energy Regulatory Comm'n, Summary of Procedural Time Standards for Hearing Cases, https://www.ferc.gov/legal/admin-lit/time-sum.asp (last updated Mar. 10, 2017) (outlining time standards for administrative law judges hearing cases at the Federal Energy Regulatory Commission).

[3] *See Case Processing Time Standards*, Nat'l Ctr. for State Courts, http://www.ncsc.org/cpts (last visited January 9, 2018); *Model Time Standards for State Trial Courts* (Nat'l Ctr. for State Courts 2011), http://www.ncsc.org/Services-and-Experts/Technology-tools/~/media/Files/PDF/CourtMD/Model-Time-Standards-for-State-Trial-Courts.ashx.

[4] *See* Judicial Admin. Div., Am. Bar Ass'n, *Standards Relating to Trial Courts* § 2.51 (vol. II 1992), *available at* https://www.americanbar.org/content/dam/aba/migrated/divisions/Judicial/MO/MemberDocuments/trialcourtstandards.authcheckdam.pdf.

[5] EOIR's other adjudicatory components, the Board of Immigration Appeals and the Office of the Chief Administrative Hearing Office, are also subject to performance measures.

performance in meeting them will be regularly audited. These goals are intended to help determine which courts are operating in a healthy and efficient manner, and which courts may be in need of more specialized attention in the form of additional resources, training, court management, creative thinking and planning, and/or other action as appropriate.

As published here in Appendix A, these court-based goals are not intended to apply specifically to any individual employee; rather, these goals apply to the court as a whole, and all court employees accordingly share responsibility for working together to successfully meet them.[6]

OCIJ will provide additional "not-to-exceed" guidelines for each goal, as appropriate. Further, some cases may be subject to more than one goal. EOIR will also track the clearance rate (the ratio of new cases filed to cases completed) and the age of existing cases at each court and may announce future goals for those statistics at a later date.

Many of these measures derive from statutory or regulatory mandates, including the INA; others derive from EOIR's goals developed under GPRA. Still others, such as a goal of ensuring file completion and accuracy, are simply reflections of the standard that a professional administrative court system should endeavor to attain. Although many of these goals have already existed for several years at EOIR, their current designation clarifies that cases subject to a goal should be considered priority cases and reiterates that the goals themselves reflect considered policy judgments regarding optimal court performance and functioning that EOIR's immigration courts should strive to achieve.

cited in Flores v. Rosen No. 19-56326 archived on December 22, 2020

EOIR is already meeting, or close to meeting, some of these goals; for instance, the median length of time a detained case is pending at the immigration court level is currently less than 60 days. For other goals, they may appear merely aspirational at first, and the agency is cognizant that it may take time for them to be fully realized. Nevertheless, as a professional administrative court system within the DOJ exercising the Attorney General's delegated authority, EOIR should strive to become the preeminent administrative adjudicatory agency in the federal government and to fulfill its mission at the highest level possible. Further, by making you aware of these goals, you can begin thinking about how, with these goals in mind, EOIR's day-to-day activities can be streamlined to improve efficiency while maintaining due process. Moreover, there is no doubt that as the agency puts into place additional resources, training, and

[6] In autumn 2017, following collective bargaining, EOIR and the National Association of Immigration Judges jointly agreed to remove language from Article 22 of their labor agreement that had limited EOIR's ability to measure and evaluate immigration judge performance. Although many of the policy considerations relevant for setting court performance goals are also relevant for setting performance metrics for individual immigration judges, especially regarding goals that have existed in some form at EOIR already for several years, the implementation of those metrics specifically for immigration judges is subject to an ongoing process and is beyond the scope of this memorandum.

more efficient processes, you will continue impress with your dedication to our mission. As the Attorney General indicated, every employee at EOIR can contribute something to improve the system, and your creative suggestions regarding more effective case management are welcome.

## IV. Conclusion

Thank you for your dedication and professionalism as we work together as a team to ensure that the adjudication of immigration court cases serves the national interest in accordance with the principles outlined by the Attorney General.

Please contact your Assistant Chief Immigration Judge with any questions you may have concerning this memorandum.

This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing in this memorandum should be construed as mandating a particular outcome in any specific case.

Attachment

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

## APPENDIX A

## IMMIGRATION COURT PERFORMANCE MEASURES

1. Eighty-five percent (85%) of all non-status[7] detained removal[8] cases should be completed[9] within 60 days of filing of the Notice to Appear (NTA), reopening or recalendaring of the case, remand from the Board of Immigration Appeals (BIA), or notification of detention.

2. Eighty-five percent (85%) of all non-status non-detained removal cases should be completed within 365 days (1 year) of filing of the NTA, reopening or recalendaring of the case, remand from the BIA, or notification of release from custody.

3. Eight-five percent (85%) of all motions should be adjudicated within 40 days of filing.

4. Ninety percent (90%) of all custody redeterminations should be completed within 14 days of the request for redetermination.

5. Ninety-five percent (95%) of all hearings should be completed on the initial scheduled individual merits hearing date.

6. One hundred percent (100%) of all credible fear reviews should be completed within seven (7) days of the initial determination by an asylum officer that an alien does not have a credible fear of persecution. *See* INA § 235(b)(1)(B)(iii)(III). One hundred percent (100%) of all reasonable fear reviews should be completed within 10 days of the filing of the negative reasonable fear determination as reflected in Form I-863. *See* 8 C.F.R. § 1208.31(g).

No. 19-56326 cited in Flores v. Rosen archived on December 22, 2020

7. One hundred percent (100%) of all expedited asylum cases should be completed within the statutory deadline and consistent with established EOIR policy. *See* INA 208(d)(5)(A)(iii); OPPM 13-02.

8. Eighty-five percent (85%) of all Institutional Hearing Program (IHP) removal cases should be completed prior to the alien's release from detention by the IHP custodian.

9. One hundred percent (100%) of all electronic and paper records should be accurate and complete.

---

[7] A status case is (1) one in which an immigration judge is required to continue the case pursuant to binding authority in order to await the adjudication of an application or petition by U.S. Citizenship and Immigration Services, (2) one in which the immigration judge is required to reserve a decision rather than completing the case pursuant to law or policy, or (3) one which is subject to a deadline established by a federal court order.

[8] A "removal" case includes a case in removal proceedings, in addition to any reopened, recalendared, or remanded cases in exclusion or deportation proceedings.

[9] A completed removal case is one in which a final decision has been rendered concluding the case at the immigration court level and encompasses an order of removal, an order of voluntary departure, an order terminating proceedings, or an order granting protection or relief from removal. For other types of cases, a completed case is one in which a final decision has been rendered appropriate for the specific type of case proceeding.

OFFICE OF INSPECTOR GENERAL

# U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted)

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

Homeland Security

November 30, 2017

OIG-18-22

~~FOR OFFICIAL USE ONLY~~

# DHS OIG HIGHLIGHTS

## *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract*

**November 30, 2017**

## Why We Did This Audit

Representative Raúl M. Grijalva requested that we review U.S. Immigration and Customs Enforcement's (ICE) decision to award GEO Care, LLC a contract to establish a Family Case Management Program (FCMP). We sought to determine whether ICE awarded the FCMP contract in accordance with laws, regulations, and guidance. We also conducted a limited review of post-award contract modifications.

## What We Recommend

We did not make any recommendations in this report.

**For Further Information:**
Contact our Office of Public Affairs at (202) 254-4100, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

FCMP is an alternative to detention that uses case managers to ensure participants comply with their release conditions, such as attending court hearings, while allowing them to remain in their community as they move through immigration proceedings. In September 2015, ICE awarded the first contracts for case management services in five cities to GEO Care, LLC, a subsidiary of The GEO Group, Inc.

We determined that ICE properly awarded FCMP contracts. Specifically, ICE complied with Federal requirements for open competition; evaluated each vendor's proposal based on technical capabilities, past performance, and price; and supported its determination that GEO Care's proposals represented the best value for the Government.

Price was the determining factor in this acquisition, which is consistent with the evaluation methodology established in ICE's request for proposals.

Losing bidders' pricing was redacted from the report to protect proprietary information pursuant to FAR 3.104-4.

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

~~FOR OFFICIAL USE ONLY~~

**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

NOV 30 2107

MEMORANDUM FOR: Matthew Albence
Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

Bill Weinberg
Chief Acquisition Officer
U.S. Immigration and Customs Enforcement

FROM: John E. McCoy II
Acting Assistant Inspector General for Audits

SUBJECT: *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract*

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

Attached for your information is our final report, *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract.* ICE provided technical comments, which we incorporated into the report as appropriate. The report contains no recommendations.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post a redacted version of the report on our website.

You may call me with any questions, or your staff may contact Donald Bumgardner, Deputy Assistant Inspector General for Audits, at (202) 254-4100.

Attachment

~~FOR OFFICIAL USE ONLY~~

## Background

The Family Case Management Program (FCMP) is an alternative to detention that uses case managers to ensure participants comply with immigration obligations, such as check-ins with U.S. Immigration and Customs Enforcement (ICE) and attendance at immigration court hearings, while allowing them to remain in their community as they move through immigration proceedings. FCMP facilitates access to holistic community-based services tailored to each family's needs, including:

- orientation and education about participants' rights and responsibilities;
- individualized family service plans;
- assistance with transportation logistics; and
- safe repatriation and reintegration planning for participants who are returning to their home countries.

In September 2015, ICE awarded five indefinite delivery indefinite quantity (IDIQ)[1] contracts to establish the Family Case Management Program. The contracts were awarded to GEO Care, LLC (GEO Care), a division of The GEO Group, Inc. The GEO Group is a provider of correctional, detention, and community re-entry services, which operates several detention centers under separate ICE contracts.

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

During the early stages of the acquisition, ICE Enforcement and Removal Operations planned to enroll a maximum of 1,500 families (300 families per location) in each of five targeted metropolitan locations: Baltimore, MD/Washington, DC; Los Angeles, CA; New York City, NY/Newark, NJ; Miami, FL; and Chicago, IL. Enforcement Removal Operations later modified the contract to reflect the maximum enrollment of 800 families in total, approximately 160 families in each of the five locations.

We initiated this audit at the request of Representative Raúl M. Grijalva, who was concerned that the FCMP contract may have been improperly awarded to GEO Care. This report presents the results of our audit, which we conducted to determine whether ICE awarded the FCMP contracts in accordance with laws, regulations, and guidance.

[1] According to the Federal Acquisition Regulation (FAR), an indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders for individual requirements. See 48 CFR 16.504.



## Results of Audit

ICE properly awarded the FCMP contracts and complied with applicable laws, regulations, and guidance during the acquisition process. Specifically, ICE promoted open vendor competition during the family case management services solicitation process by publicly issuing notices and requests for proposals (RFP). In addition, ICE evaluated vendor proposals in accordance with established criteria and selected the vendor based on a comparative evaluation of proposals, which were adequately documented in the contract file.

Solicitation and RFP

ICE's Office of Acquisition Management adequately promoted vendor competition by publicly posting solicitations and allowing sufficient response time. ICE posted pre-solicitation notices on February 4, 2015, and 15 days later it issued five RFPs[2] for the provision of family case management services in the following metropolitan locations: Baltimore, MD/Washington, DC; Los Angeles, CA; New York City, NY/Newark, NJ; Miami, FL; and Chicago, IL. Four vendors submitted proposals: GEO Care; Lutheran Immigration and Refugee Service (LIRS); MVM, Inc.; and Baptist Child Family Services. Each vendor had prior experience in providing services either for immigrants or for non-profit organizations.

cited in Flores v. Rosen No. 19-56326 archived on December 22, 2020

Evaluation of Vendor Proposals and Selection

ICE evaluated the vendor proposals according to applicable guidelines and regulations.[3] ICE established two separate committees that independently evaluated each vendor proposal (see appendix A for evaluation factors and ratings). One committee evaluated the proposals for technical and management capabilities without any knowledge of the proposed cost or vendors' past performance. The other committee reviewed only the vendors' past performance and the cost proposals. ICE's ultimate goal was to select a vendor that represented the overall best value for the Government.

LIRS received the highest technical rating (excellent), as well as the highest rating for past performance (substantial confidence). According to the evaluation committee reports, the LIRS proposal demonstrated "excellent"

---

[2] The RFP included information such as the instructions, the Government's requirement based on statement of objectives, seven evaluation factors, and the evaluation methodology. Vendors were required to submit their proposals in three volumes with each volume relating to a specific evaluation factor(s) as shown in appendix A.

[3] FAR, 48 C.F.R. part 15.



capabilities in the areas of case management and had established community ties.

GEO Care received the second highest technical rating of "good" and the highest rating of "substantial confidence" for past performance. The evaluation committee concluded that GEO Care demonstrated case management capability through its work experience from other contracts and "clearly demonstrated that it has the resources to take on a project of this size, scope and complexity." According to the committee report, GEO Care's Quality Control Plan helped mitigate the committee's concerns about GEO Care's limited experience in the field of social services.

ICE fully documented the independent government cost estimate for the acquisition of family case management services, as required by the *Homeland Security Acquisition Manual*. The independent government cost estimate determined a cost of $17.3 million per location and $86.7 million for all five locations for the full performance period. As shown in table 1, all the vendors' proposals were less than the independent government cost estimate, except for LIRS, which was [redacted][4] million more than the independent government cost estimate.

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

As required by FAR 15.304 and 15.305, ICE's evaluation of proposals included a documented review of a cost price analysis to establish price reasonableness. ICE compared the prices proposed by GEO Care, LIRS, MVM, and Baptist Child Family Services for all five program location sites for the full period of performance. Although Baptist Child Family Services proposed the lowest price of [redacted] million, it was ineligible for the award because its technical proposal was rated "unacceptable." Of the remaining vendors, GEO Care was priced the lowest at $72.7 million, followed by MVM at [redacted] million, and LIRS at [redacted] million.

**Table 1. Vendor Evaluation Ratings and Proposed Price**

| Vendor | Technical Rating | Past Performance | Price for Full Performance Period *(in millions)* |
|---|---|---|---|
| LIRS | Excellent | Substantial confidence | [redacted] |
| GEO Care | Good | Substantial confidence | $72.7 |
| MVM | Acceptable | Satisfactory confidence | [redacted] |
| BCFS | Unacceptable | Satisfactory confidence | [redacted] |

*Source:* ICE

[4] Losing bidders' pricing was redacted to protect proprietary information pursuant to FAR 3.104-4.

Price was the determining factor in this acquisition, which is consistent with the evaluation methodology established in the RFP. Although LIRS received a technical rating of "excellent," its price proposal was ██ percent more than GEO Care's, which was the second highest rated proposal and the lowest priced. According to the RFP, the combination of technical capability and past performance "are more important than price.... However, the Government will not make an award at a significantly higher overall cost to the Government to achieve only slightly superior technical capability." As such, ICE could not justify the substantially higher proposal cost over a slightly higher technical rating.

ICE's Office of Acquisition Management documented its determination that GEO Care's proposals represented the best value for the government. On September 16, 2015, ICE awarded all five IDIQ contracts in the amount of $72.7 million to GEO Care to establish the FCMP. Each contract has a total potential performance period of 5 years and 6 months.

Contract Modifications

We reviewed five contract modifications that occurred between November 2015 and May 2016, which were properly documented and justified. Reasons for the contract modifications included:

cited in Flores v. Rosen No. 19-56326 archived on December 22, 2020

- incorporation of a 5 percent discount offered by GEO Care if the company was awarded four or more of the contracts, which decreased the contract price by $3.6 million to $69.1 million;
- a change in the maximum number of participants to be enrolled; and
- accommodation for community-based organization subcontractor participation. (ICE directed GEO Care to partner with various community-based organizations to maximize local faith-based provider participation in FCMP services.)

Program Costs and Performance Metrics

As of March 30, 2017, ICE reported that it expended $17.5 million in program costs to enroll 781 active participants in FCMP across all five locations. According to ICE, overall program compliance for all five regions is an average of 99 percent for ICE check-ins and appointments, as well as 100 percent attendance at court hearings. Since the inception of FCMP, 23 out of 954 participants (2 percent) were reported as absconders.

~~FOR OFFICIAL USE ONLY~~

## Objective, Scope, and Methodology

We conducted this audit to determine whether ICE awarded the FCMP contract in accordance with laws, regulations, and guidance.

To accomplish our objective we reviewed laws, regulations, and guidance applicable to the contract pre-award and award processes. We interviewed ICE personnel from Enforcement and Removal Operations and the Office of Acquisition Management to obtain an understanding of the program and the acquisition process for the FCMP. In addition, we reviewed contract file documentation, including acquisition planning documents, contract solicitations, vendor requests for proposals, and ICE evaluation reports to determine whether contract pre-award and award procedures were conducted in accordance with laws, regulations, and guidance. We also conducted a limited review of post-award contract modifications and performance metrics. We did not rely on computer-processed data to materially support findings, conclusions, or recommendations in this report.

We conducted this performance audit between January 2016 and April 2017 pursuant to the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based upon our audit objective.

cited in Flores v. Rosen No. 19-56326 archived on December 22, 2020

Office of Audits major contributors to this report are: Lisa Vonder Haar, Audit Director; Modupe Ogunduyile, Audit Manager; Gloria Medina-Ortiz, Auditor-in-Charge; Garrick Greer, Auditor; Jason Kim, Auditor; Nedra Rucker, Auditor; Kevin Dolloson, Communications Analyst; and Jeffrey Wilson, Independent Referencer.

~~FOR OFFICIAL USE ONLY~~



FOR OFFICIAL USE ONLY

OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix A
## Evaluation Factors and Ratings

**Exhibit 1. Proposals by Volume and Evaluation Factors**

| Volume | Evaluation Factors |
|---|---|
| **I. Demonstrated Technical/ Management Capabilities Proposal** | 1. Performance work statement |
| | 2. Key personnel and staffing plan |
| | 3. Corporate experience |
| | 4. Quality control plan |
| | 5. Management plan |
| **II. Past Performance** | 6. Past performance |
| **III. Price/Cost Proposal** | 7. Price |

*Source:* ICE

**Exhibit 2. Proposal Ratings for Technical and Past Performance**

| Volume I Technical | Volume II Past Performance |
|---|---|
| Excellent | Substantial confidence |
| Good | Satisfactory confidence |
| Acceptable | Limited confidence |
| Marginal | No confidence |
| Unacceptable | Unknown confidence (Neutral) |

*Source:* ICE

cited in Flores v. Rosen No. 19-56326 archived on December 22, 2020

www.oig.dhs.gov 7 OIG-18-22

FOR OFFICIAL USE ONLY



~~FOR OFFICIAL USE ONLY~~
OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix B
## Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Audit Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees
Raúl M. Grijalva, U.S. House of Representatives

cited in Flores v. Rosen
No. 19-56326 archived on December 22, 2020

*www.oig.dhs.gov* 8 OIG-18-22
~~FOR OFFICIAL USE ONLY~~

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov. Follow us on Twitter at: @dhsoig.

No. 19-56326 archived on December 22, 2020
cited in Flores v. Rosen

## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

**United States Court of Appeals for the Ninth Circuit**

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

**Information Regarding Judgment and Post-Judgment Proceedings**

**Judgment**

- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**

- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1) A. Purpose (Panel Rehearing):**

- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B. Purpose (Rehearing En Banc)**

- A party should seek en banc rehearing only if one or more of the following grounds exist:

- Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
- The proceeding involves a question of exceptional importance; or
- The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2) Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-2.

**(3) Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4) Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**

- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

**Attorneys Fees**

- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**

- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**

- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature** **Date**

*(use* "s/[typed name]" *to sign electronically-filed documents)*

| **COST TAXABLE** | **REQUESTED** *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| | | | **TOTAL:** | $ |

***Example:** *Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov