# JANUARY 15, 2021
# CBP JUVENILE
# COORDINATOR REPORT



1300 Pennsylvania Avenue NW
Washington, DC 20229

**U.S. Customs and Border Protection**

January 15, 2021

MEMORANDUM FOR:   The Honorable Judge Gee
District Judge
U.S. District Court, Central District of California

FROM:   Henry A. Moak, Jr.
Chief Accountability Officer
U.S. Customs and Border Protection

1/15/2021

X _____

Signed by: HENRY A MOAK JR

SUBJECT:   CBP Juvenile Coordinator Interim Report

On December 4, 2020, this Court ordered the U.S. Customs and Border Protection (CBP) Juvenile Coordinator to file an interim report "providing a census of Class Members in CBP custody, describing COVID-19 guidances, and specifically addressing whether the conditions at the Weslaco Border Patrol Station [(WSL)] are safe and sanitary under [Flores Settlement Agreement (FSA)] Paragraph 12." The CBP Juvenile Coordinator submits the following report in response to this Court's December 4, 2020 Order. This report does not reflect all FSA monitoring activities conducted since filing the 2020 CBP Juvenile Coordinator report. A comprehensive account of FSA monitoring across the Southwest Border will be included in the annual CBP Juvenile Coordinator report to be filed on July 1, 2021. Based on my review of COVID-19 guidance issued and my team's observations of its implementation, I believe WSL was substantially compliant with the FSA, specifically the safe and sanitary conditions under FSA Paragraph 12.

Background

CBP continues to assist the Centers for Disease Control and Prevention (CDC) in enforcing its *Order Suspending Introduction Of Persons From A Country Where A Communicable Disease Exists* (March 20, 2020) as amended and extended.[1] On November 18, 2020, the U.S. District Court for the District of Columbia issued a preliminary injunction prohibiting the U.S. Department of Homeland Security (DHS) from expelling any minor in the U.S. pursuant to the CDC Order who would otherwise be an unaccompanied alien child (UAC) under Title 8.[2] As of the filing date of this report, the government may still expel single adults and family units in the United States traveling from Canada or Mexico (regardless of their country of origin) who would

---

[1] *See,* 85 Fed. Reg. 16567 (Mar. 24, 2020).
[2] *See, P.J.E.S. v. Wolf, et al., No. 1:20-cv-02245* (D.D.C. Nov. 18, 2020). *See also,* 6 U.S.C. § 297(g)(2) (defining unaccompanied alien child as a child who: (a) has no legal status in the U.S.; (b) has not attained 18 years of age; and (c) does not have a parent or legal guardian in the U.S. or whose parent or legal guardian is not able to provide care and physical custody).

CBP Juvenile Coordinator Interim Report
Page 2

otherwise be held in ports of entry or U.S. Border Patrol (USBP) stations for immigration processing.

Since filing my 2020 annual report, the USBP Rio Grande Valley (RGV) Sector has adapted to new operational tempos related to reduced numbers of individuals in custody and long-scheduled renovations of certain facilities. RGV Sector completed demobilizing the soft-sided facility in Donna, Texas in May 2020, and in September 2020, suspended operations at the Central Processing Center-Ursula (CPC-Ursula) in McAllen, Texas in order to complete renovations at the latter facility. As a result, WSL is currently operating as the primary processing hub for both UACs and family units apprehended in RGV Sector.

On November 18, 2020, Plaintiffs interviewed three class members in WSL and submitted declarations that included statements alleging lack of social distancing, crowded hold rooms, cold temperatures, no soap or hand sanitizer available for handwashing, limited or no facemasks provided to individuals in custody, and personnel not wearing facemasks inside the holding area. In response, I directed the Juvenile Coordinator's Office (JCO) to conduct inspections in the RGV Sector, and advise me of their findings. The results of the JCO inspection specifically related to WSL and the station's implementation of COVID-19 guidance are included in this report.

<u>Census of Class Members in Custody</u>

From October 1, 2020 through December 31, 2020, USBP reported 207,968 encounters along the Southwest land border, which is considerably higher than the encounters reported in Fiscal Year (FY) 2020 for the same period.[3] However, in FY2021 to date, the overwhelming majority of these encounters were with single adults.[4] USBP encounters with UACs and family units accounted for only 13% of all December 2020 enforcement encounters.[5] By comparison, in May 2019, the height of the 2019 surge, UAC and family units accounted for 72% of USBP Southwest land border enforcement encounters.[6] In RGV Sector specifically, there were 5,184 UAC enforcement encounters and 4,275 family unit enforcement encounters from October 1 to December 31, 2020.[7] These encounters represent a 55% increase in UAC enforcement encounters and a 35% decrease in family unit enforcement encounters compared to the same period in FY2020.[8]

---

[3] *See, Southwest Land Border Encounters,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters, (last visited January 14, 2021).
[4] *Id.*
[5] *Id.*
[6] *Id. See also, Stats and Summaries,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/media-resources/stats, (last visited January 15, 2021).
[7] *See, U.S. Border Patrol Southwest Border Apprehensions by Sector,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters/usbp-sw-border-apprehensions, (last visited January 14, 2021).
[8] *Id.*

CBP Juvenile Coordinator Interim Report
Page 3

For all USBP facilities along the Southwest Border, maximum facility capacity is approximately 11,200.[9]  Maximum facility capacity assumes a homogenous population and full operating status at all facilities.[10]  The actual holding capacity along the Southwest Border, and more specifically by facility, is constantly changing based on the characteristics of the in-custody population.[11] For example, a facility's actual holding capacity may change based on the demographics and genders of individuals in custody to ensure the safety of all individuals in custody.[12]  In December 2020, there was an average daily population of 634 individuals in USBP custody along the Southwest Border.[13]  The average daily population of individuals in RGV Sector was 120 in December 2020.[14]

To address COVID-19 concerns, to the maximum extent operationally feasible, CBP has a current targeted holding capacity of 25% of a facility's normal operational capacity.  This target was developed for CBP planning purposes, taking into account COVID-19 considerations and precautions to minimize exposure risk as well as account for additional space requirements for social distancing and isolation/quarantine requirements.  In facilities where class members are held, it is not always operationally feasible to stay below the 25% target, and there have been instances where class members were held in facilities with an in-custody population above this target.  In these circumstances, CBP still makes every effort to minimize the risk of exposure, including wearing appropriate Personal Protective Equipment (PPE), distributing surgical facemasks to individuals in custody, and following CDC social distancing recommendations.

COVID-19 Guidance

CBP is committed to protecting the health of individuals in its custody and its workforce.  As the pandemic unfolds, CBP continues to monitor on-the-ground conditions and respond accordingly to balance mission requirements and health considerations.  CBP has coordinated closely and regularly with the CDC regarding COVID-19 guidance since the onset of the pandemic and continues to update, refine, and enhance guidance as appropriate.  As with any dynamic operating environment, flexibility is crucial.  CBP has issued agency-wide COVID-19 guidance, which establishes general guidelines.  Sector and station leadership implement these guidelines consistent with their unique situational demands.

The CBP COVID Toolkit, developed by the CBP Chief Medical Officer and CBP Office of Human Resource Management/Occupational Safety and Health Division (OSH), in consultation with DHS Headquarters and the CDC, contains extensive guidance regarding COVID-19 practices, including COVID exposure risk assessment (contact tracing), isolation/quarantine guidance, and return-to-work guidance.  The CBP Chief Medical Officer also engages regularly and directly with operational and medical leadership along the border regarding optimization of COVID-19 practices.

---

[9] *See, Custody and Transfer Statistics FY2021,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, (last visited January 14, 2021).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

CBP Juvenile Coordinator Interim Report
Page 4

The CBP Job Hazard Analysis (JHA) is included in the CBP COVID Toolkit.  The JHA was
developed under the direction of the CBP Chief Medical Officer and OSH, and focuses on CBP-
wide job-task specific COVID exposure risk and PPE guidance.  The JHA outlines the
recommended or required PPE all CBP personnel must wear during specific job-tasks.
Depending on the situation, PPE required or recommended by the JHA may include any
combination of the following items: nitrile gloves, N-95 respirator, protective outer garments,
gowns, shoe coverings, face shields, or non-vented goggles.  Per the JHA, USBP agents must
wear an N-95 respirator when they are within six feet of anyone, gloves when touching
potentially contaminated surfaces, and goggles or a face shield during any increased risk
situations.  In addition, agents must wear a face covering or surgical facemask if further than six
feet but still in contact with individuals in custody or personnel.

In addition to the CBP-wide guidance, USBP issued field guidance reiterating the JHA
requirements related to PPE and requiring agents to distribute PPE to individuals in custody as
appropriate.  Furthermore, the guidance requires agents to use only designated transport units
equipped with appropriate PPE and sanitized per sector protocol.  Additionally, USBP issued
two COVID-19 checklists to facilitate contract tracing after a known exposure.  Both have
specific steps for supervisors and employees, depending on their responsibilities, to notify any
individuals in custody of their potential exposure.  Moreover, the medical checks conducted by
contracted medical professionals or local health facilities for all juveniles entering USBP
custody, described in my last report, now include targeted COVID-19 questions in addition to the
standard medical questions.  All juveniles receive an initial medical check, which includes a
temperature check and COVID-19 questions as well as standard medical questions.  Any
juveniles needing further diagnosis and treatment are referred to the local health system as
needed.

Specific to RGV Sector, Sector leadership issued the "Revised Rio Grande Valley Sector
Guidelines for COVID-19 Spread Mitigation in the Workplace" memorandum on September 9,
2020 to re-emphasize existing CBP guidance and update Sector-specific requirements.  This
memorandum specifically requires agents to wear an N-95 respirator when processing,
transporting, arresting, or performing any other duty that may require an agent to be in close
and/or prolonged proximity to individuals in custody.  It also requires that any individual in
custody with known or potential COVID-19 receive a surgical facemask.  While this
memorandum specifically requires surgical facemasks for individuals in custody who are known
or suspected of being positive for COVID-19, the current practice is to assume that any person in
custody has potential COVID-19 exposure or infection and provide surgical facemasks.  At
WSL, JCO observed that surgical facemasks were provided to all individuals entering the
facility.  The juveniles my team interviewed confirmed that agents provided facemasks following
apprehension in the field and that they had received new facemasks throughout their time in
custody.

Weslaco Station (WSL)

On December 1, 2020 at 9:00 AM, JCO conducted an announced inspection at WSL.  At the
time of the inspection, there were 51 juveniles onsite, 49 UACs and two accompanied alien

CBP Juvenile Coordinator Interim Report
Page 5

children (AAC).  WSL was operating below its targeted COVID-19 holding capacity of 25% of
the station's total capacity.

Juveniles were in 11 hold rooms, and JCO inspected each one.  All hold rooms had functioning
toilets with toilet paper and functioning sinks with soap.  One hold room had a malfunctioning
sink; however, there were two other functioning sinks available in that hold room, and a work
order had been submitted for the malfunctioning sink.  The hold rooms and processing area were
clean, and no sanitary issues were observed.  Each hold room had a five-gallon water jug and
cups available for drinking.  All hold rooms measured within the temperature range of 66 to 80
degrees Fahrenheit.  JCO observed a separate designated caregiver area, where the younger
juveniles could play.  Contracted caregivers were onsite, and JCO confirmed they worked seven
days a week.

JCO observed the food and supplies available for agents to provide to juveniles.  An agent
explained that a food services contractor prepared and distributed meals three times a day.  Baby
formula, cookies, crackers, Pedialyte, milk, and juice were available and within the expiration
date.  Diapers, baby wipes, body soap, toothbrushes and toothpaste, shampoo, deodorant, and
feminine hygiene products were also available.  JCO observed various types of clothing available
in multiple sizes for juveniles and adults.

JCO pulled a sample of six juveniles currently onsite and reviewed their custody logs.  All six
custody logs recorded receipt of a new surgical facemask mask.  All six juveniles' custody logs
recorded showers, clean clothes, and dental hygiene products provided.  While five of the
custody logs recorded welfare checks at regular intervals, showing adequate supervision to
protect the juvenile from others, one had a four-hour gap around dinnertime.  Although there was
a gap in recordation, JCO observed agents moving through the processing area and caregivers
onsite engaging with juveniles to provide consistent supervision.  Three of the custody logs did
not record that a mat and Mylar blanket had been provided, although JCO observed that all
juveniles had both.  While no juveniles were receiving medical care while JCO was onsite, all
had the required medical checks recorded in their custody logs.

Throughout the inspection, my team paid special attention to how WSL implemented COVID-19
guidance and the measures taken to prevent the spread of COVID-19.  JCO observed juveniles
arriving to the station through the sally port.  As the juveniles exited the vehicle, JCO observed
that they were wearing surgical masks.  In the sally port, medical contractors stood by to conduct
medical checks and provide a new surgical facemask.  Medical contractors asked specific
questions from a COVID-19 questionnaire and completed the standard medical check, which
included taking the juvenile's temperature.  Medical contractors informed JCO that juveniles
with possible COVID-19 symptoms remained in the sally port until being transported to a local
hospital for further evaluation.  If the hospital determined the juvenile was positive for COVID-
19 or another contagious disease, the juvenile was taken to a different station for isolation.  At
the time of this inspection, Brownsville Station was designated as the medical isolation station.
If the juveniles did not have possible COVID-19 symptoms, they received a more detailed
medical check before entering the facility.

CBP Juvenile Coordinator Interim Report
Page 6

The Acting Watch Commander ((A) WC) informed JCO that agents provided surgical facemasks to juveniles upon apprehension and these surgical facemasks were routinely replaced throughout juveniles' time in custody.  When briefing the WSL Acting Patrol Agent in Charge ((A) PAIC) after leaving RGV Sector, the (A) PAIC informed JCO that agents typically provided extra facemasks to families with young children each time facemasks were replaced because agents recognized younger children were more likely to drop the facemask or get it dirty before it was replaced next.  Moreover, JCO observed caregivers handing out surgical facemasks at the time that juveniles received a shower, which reflected new COVID-19 protocols.  The (A) WC informed JCO that on November 25, 2020, RGV Sector instructed WSL to have only six individuals shower at a single time to decrease the number of individuals queueing for a shower. JCO observed this practice at the time of the inspection.  Moreover, JCO observed soap dispensers filled with soap in all hold rooms at WSL.  JCO later learned that by the end of December, RGV Sector had installed soap dispensers in all hold rooms Sector-wide.  JCO observed that surgical facemasks and gloves were stored on the exterior side of all hold room doors.  My team observed agents wearing N-95s respirators at all times in the processing area and when interacting with individuals in custody.

JCO leveraged video conferencing technology to interview juveniles while onsite.  The same team members who interviewed all juveniles during the 2020 reporting period continued the same general process of interviewing juveniles who volunteered to speak about their time in CBP custody.  One team member onsite facilitated the interview process and solicited volunteers.  The second team member, fluent in Spanish, used a video conferencing platform to interview juveniles and translate for the onsite team member.  JCO conducted the interviews with the juveniles in a room separate from any agents or other individuals in custody.  Both juveniles and the onsite team member wore facemasks and maintained, as best as possible, social distancing throughout the interview.

First, JCO interviewed C.T.S., a 15-year-old UAC female from Guatemala.  At the time of the interview, C.T.S. had been in CBP custody for approximately 12 hours.  C.T.S. explained that apprehending agents treated her with respect and provided a facemask for her to wear before she was transported to a station.  At the first station she arrived at, C.T.S. explained that medical professionals took her temperature in the sally port and gave her a new facemask to wear.  After, C.T.S. explained that she was brought inside the station for a medical check and processing. Custodial records noted that a medical check was completed when C.T.S. arrived at Rio Grande City Station.  After the medical check, C.T.S. informed JCO she received a blue wristband, which the onsite interviewer observed on her wrist.  After initial processing and fingerprinting was complete, C.T.S. told JCO she was placed in a hold room where there were approximately 25 individuals, including adult females with children.  C.T.S. informed JCO that all individuals in the hold room were wearing facemasks and that there was space between them.  Inside the hold room, C.T.S. confirmed there was a functioning toilet with toilet paper and a functioning sink with soap.  She also confirmed that there was a five-gallon water jug with cups.  C.T.S. stated the hold room temperature fluctuated, indicating sometimes it felt hot and sometimes it felt cold.  C.T.S. estimated she was in this hold room for a half hour before she was transferred to WSL.

CBP Juvenile Coordinator Interim Report
Page 7

When she arrived at WSL, C.T.S. explained medical professionals also took her temperature in the sally port and gave her a new facemask.  C.T.S. then explained the medical professionals conducted another medical check inside the station and gave her another blue wristband after it was complete.  The JCO interviewer onsite observed C.T.S. was wearing two blue wristbands at the time of the interview.  Next, C.T.S. explained that she received water, an apple, juice, and crackers.  C.T.S. also stated she received a Mylar blanket and mat when she was placed in the WSL hold room with approximately 8 or 9 female juveniles who were all wearing facemasks.  C.T.S. confirmed that this hold room also had a functioning toilet with toilet paper, a functioning sink with soap, and a five-gallon water jug with paper cups.  Like at the first station, C.T.S. explained that the temperature in the WSL hold room also fluctuated between "hot" and "cold," but that she was still able to sleep.  C.T.S. told JCO that the lights were not dimmed overnight.  C.T.S. explained that the next morning, the day of the interview, she and the female juveniles in her hold room all woke up by themselves without anyone waking them up.

Next, she explained that she received breakfast, which included a warm egg and bean burrito, an apple, crackers, milk, and bottled water.  C.T.S. told JCO that she ate breakfast, and it did not hurt her stomach.  Custodial records noted that she was provided a hot breakfast and a new mask.  After breakfast, C.T.S. stated she showered and brushed her teeth.  She explained that caregivers facilitated the shower process and gave clear instructions about the hygiene items available and where to put her dirty clothes so that they could be washed and returned to her.  At the time of the interview, C.T.S. was wearing a T-shirt and sweatpants she received before her shower and her own jacket over top of the T-shirt.  C.T.S. told JCO the shower trailer was warm and that she was not rushed during the shower process.  C.T.S. also told JCO that she received a new facemask before she took her shower.  After showering, C.T.S. stated she returned to the hold room.  Custodial records noted that she was provided with a shower, bodily cleansing product, dental hygiene product, feminine hygiene product, and clean clothing.  She stated she moved to a different hold room before the interview because the one she was in was being cleaned.  When she moved to the new hold room, C.T.S. stated she received a new Mylar blanket and mat.  C.T.S. told JCO she and the other female juveniles in her hold room had been watching cartoons.  She also told JCO she had not been hungry and that she had been treated with respect throughout her time in CBP custody.  Before ending the interview, JCO reminded C.T.S. that medical professionals were available onsite if needed, and that she could ask for food, snacks, and hygiene items.  Custodial records noted that she was shown the UAC video.  Custodial records also noted that she received a hot lunch and that, later that afternoon, she was transported to a U.S. Health and Human Services, Office of Refugee and Resettlement (HHS/ORR) facility.

Next, JCO interviewed E.R.A., a 17-year-old UAC male from Guatemala.  At the time of the interview, E.R.A. had also been in CBP custody for approximately 12 hours.  E.R.A. told JCO that the apprehending agent was respectful, offered him water to drink, and gave him a facemask to wear.  Like C.T.S., E.R.A. explained he was then transported to a station where medical professionals took his temperature in the sally port before he entered the station for a medical check.  During the medical check, the medical professional asked E.R.A. if he was hungry and gave him water and crackers.  After the medical check, E.R.A. received a blue wristband, which the onsite JCO interviewer observed him wearing.  This medical check was not recorded in his custody log.  E.R.A. explained that he then completed initial processing, which included fingerprinting, before he was placed in a hold room with one other male juvenile, who was also

CBP Juvenile Coordinator Interim Report
Page 8

wearing a facemask.  E.R.A. confirmed there was a functioning toilet, a functioning sink with
soap, and a five-gallon water jug with cups.  E.R.A. explained he was in the hold room very
briefly before being transferred to WSL.

Upon arriving at WSL, E.R.A. explained that medical professionals took his temperature in the
sally port and he received a new facemask.  Then, medical professionals completed a medical
check inside the station.  After this medical check, E.R.A. also received a blue wristband.  The
onsite JCO interviewer observed he was wearing both wristbands at the time of the interview.
This medical check was recorded in E.R.A.'s custody log.  After the medical check, E.R.A.
stated he was assigned a hold room, and received a mat and Mylar blanket.  E.R.A. also told JCO
he was given an apple, crackers, milk, and water.  Custodial records noted that he was provided
with snacks, bodily cleansing product, dental hygiene product, a mat, and a Mylar blanket.
E.R.A. stated that he shared the hold room with the same juvenile that was in his hold room at
the first station.  He confirmed this hold room also had a functioning toilet with toilet paper, a
functioning sink with soap, and a five-gallon water jug with cups.  E.R.A. said the hold room
was cold, but "not too bad."  E.R.A. told JCO he had been able to sleep, but not well because he
was nervous about being in custody.  When JCO asked whether there was anything specifically
making him nervous, he explained it was the new environment and the fact that he had never
been in CBP custody before.  E.R.A. stated the lights were on overnight.  E.R.A. explained that,
the next day, someone opened the hold room door and said, "Wake up," before handing out
breakfast, which included a warm burrito, apple, cookies, milk, juice, and bottled water.
Custodial records noted that he was provided a hot breakfast and a new mask.  After breakfast,
E.R.A. told JCO he took a nap on his mat before he showered and brushed his teeth.  E.R.A.
explained there were two male caregivers giving instructions in Spanish about the shower
process, including instructions about clean towels, clean clothes, and soap.  E.R.A. stated he
received clean clothes to wear while his clothes were laundered.  At the time of the interview,
E.R.A. was wearing the clothes provided by the station and his own jacket.  Custodial records
noted that he was provided with a shower, bodily cleansing product, dental hygiene product, and
clean clothing.  Prior to the interview, E.R.A. also told JCO he received lunch, which included a
warm burrito, two single-serving boxes of cereal, an apple, juice, and bottled water.  Custodial
records noted that he received a hot lunch.  E.R.A. stated he received a new facemask before the
interview.  He informed JCO it was the third facemask he received while in CBP custody.
Before ending the interview JCO reminded E.R.A. that medical professionals were available
onsite if needed, and that he could ask for food, snacks, and hygiene items.  Custodial records
noted that he was shown the UAC video.  Custodial records also noted that, later that afternoon,
he was transported to a HHS/ORR facility.

Based on JCO's inspection, I believe WSL was substantially compliant with the FSA, and more
specifically, conditions were safe and sanitary as articulated under Paragraph 12A of the FSA.
WSL was operating below the targeted 25% COVID-19 capacity during the inspection.
Furthermore, JCO discussed with the (A) WC the safety measures implemented in response to
COVID-19.  JCO's observations and interviews with juveniles demonstrated WSL followed
these enhanced safety measures, including agents wearing N-95 respirators in the processing
areas and while interacting with individuals in custody, temperature screenings conducted in the
sally port, routine distribution of surgical facemasks for individuals in custody, and soap for
handwashing available in all hold rooms.

CBP Juvenile Coordinator Interim Report
Page 9

The current operating environment, amidst the COVID-19 pandemic, places increased demands on CBP and adds additional variables to its comprehensive border security mission.  USBP must accept and maintain custody of individuals until they can be transferred to another agency regardless of facility capacity.  CBP generally relies on its inter-agency partners to transfer juveniles out of its custody.  This coordination and expeditious transfer of juveniles out of CBP custody is even more critical during this period of reduced capacity to facilitate social distancing and prevent the spread of COVID-19.  CBP recognizes this unique challenge as well as its responsibilities under the FSA to ensure safe and sanitary conditions for all juveniles in its custody.  The Agency will continue to monitor on-the-ground conditions and adjust accordingly to minimize risk of COVID-19 exposure and protect the health of all individuals in custody.

# JANUARY 15, 2010 ORR JUVENILE COORDINATOR REPORT

**ORR JUVENILE COORDINATOR INTERIM REPORT**

**January 15, 2021**

**Aurora Miranda-Maese, ORR Juvenile Coordinator**

## Introduction

On April 24, 2020, The Honorable Dolly M. Gee of The United States District Court for the Central District of California held a third hearing on the Motion for Temporary Restraining Order on Jenny L. Flores, et al. v. William P. Barr, et al., directing the undersigned designated as the Office of Refugee Resettlement (ORR), Juvenile Coordinator, Aurora Miranda-Maese, to file an Interim Report monthly during the pendency of the national health emergency related to the COVID-19 pandemic. ORR updated reports have continued to be filed as ordered, with the last report submitted by the undersigned on November 16, 2020. On September 4, 2020, a Status Conference was held at which time implementation of the Order was stayed until September 8, 2020, and hoteling of minors was ordered to cease by no later than September 15, 2020. The Order directs that the Department of Homeland Security (DHS) shall transfer all minors, both accompanied and unaccompanied, currently held in hotels to licensed facilities as expeditiously as possible.

Subsequent to the Court Order dated April 24, 2020, the undersigned continued in collaboration with the workgroup to assist in obtaining the data from all congregate care shelters and transitional foster care nationwide, on issues as they pertain to the six Court-ordered topics and the additional requirements as noted above. Under the Juvenile Coordinator, this workgroup has continued using the same methodology to collect data with questionnaires requesting specific information as they pertain to all Court Orders. In addition, the Court Order dated August 7, 2020 directed the ORR Juvenile Coordinator to expand the requirements of the April 24, 2020 Order by detailing the reasons that release is delayed due to unavailable fingerprinting services or an inability to complete the home study for each minor, which has continued up through this report.

At the status conference hearing on December 4, 2020, the Court ordered the Immigration and Customs Enforcement (ICE) and ORR Juvenile Coordinators shall file their next interim reports by January 15, 2021, covering the topics listed in the April 24, 2020 Order and compliance with the Court's Order regarding minors held under Title 42 authority. The Juvenile Coordinator has not been informed of any minors currently being held in ORR custody under Title 42. The ORR Juvenile Coordinator shall also provide the following:

- The names and locations of ORR facilities where any Class Member has contracted COVID-19 while already housed at the facility, rather than being diagnosed with COVID-19 at intake;

- A more complete description of the status of those in ORR custody pursuant to the MPP;

- Updates on ORR's plans to expand capacity during the pandemic when necessary;

- Descriptions of ORR's COVID-19 plans in light of any recent updates to CDC guidelines and the start of vaccine distribution; and

1

- A census and explanation of the Class Members detained in "out-of-network" facilities such as those detained at Nexus Children's Hospital

During this reporting period, which covers November 16, 2020 to January 12, 2021, approximately 3,156 cases were reviewed individually. In the same reporting period, approximately 4,706 minors were admitted to ORR facilities, resulting in continued significant increase in the ORR census. The workgroup continued to collaborate with ORR grantee staff, Federal Field Specialists (FFS), and other ORR staff members to obtain the information needed from the ORR network.

Figure 1 below provides ORR's census information and discharges for the last six months, beginning July 14, 2020 to January 13, 2021. Also listed below is Figure 2, which details ORR's total bed capacity by residence type as of January 13, 2021.

*Figure 1: Referrals to ORR Census from July 14, 2020 to January 13, 2021*



*Figure 2: ORR Census & Discharges from July 13, 2020 to January 13, 2021[1]*



---

[1] The census reflected in Figure 2 is a snapshot of the minors in care from July 13, 2020 – January 13, 2021, in addition to the daily discharges.

*Figure 3: ORR Bed Capacity by Residence Type as of January 13, 2021[2]*

| ORR Program Type | Total Beds | # of Beds Occupied (% of total beds) | # of Beds Not Occupied (% of total beds) |
|---|---|---|---|
| Shelter | 5,670 | 2,532 45% | 3,138 55% |
| Staff Secure | 110 | 11 10% | 99 90% |
| Secure | 24 | 5 21% | 19 79% |
| RTC | 40 | 8 20% | 32 80% |
| TFC | 909 | 600 66% | 309 34% |
| LTFC | 581 | 296 51% | 285 49% |
| *TOTAL* | *7,334* | *3,452* | *3,882* |

## Plans to Expand Capacity

ORR has been actively responding to the fluid nature of the COVID-19 pandemic by:

- Mandating various testing and treatment protocols in its shelters (i.e. once-daily temperature check of minors and screening of visitors, medical isolation, etc.);
- Issuing stop placements in locations with high infection rates; and
- Limiting long-distance travel by assigning minors to shelters closest to their area of apprehension.

Furthermore, ORR has implemented a flexible cohorting strategy, which maximizes the capacity in shelters along the Southwest Border. Following a quarantine or isolation period, minors initially staged along the Southwest Border are transferred to interior shelters or prioritized for discharge where possible.

ORR actively monitors bed capacity and continuously adjusts placement and transfer strategies while prioritizing discharges where possible. An Incident Action Plan is developed weekly to coordinate efforts to fully utilize existing shelter capacity across the ORR shelter network.

ORR's current permanent licensed capacity is constrained by the increase of minors referred to ORR who are COVID-19 exposed or COVID-19 positive upon admission. Capacity at these licensed facilities are

---

[2] The census for minors in ORR custody constantly fluctuate as children are admitted, transferred, and discharged at all times of each day. Therefore, the census reflected in Figure 3 is a snapshot of the capacity at the exact time that the review was conducted. Furthermore, ORR is constantly reassessing bed capacity as circumstances regarding the COVID-19 pandemic and increasing number of minors requiring quarantine or medical isolation are referred to ORR. This chart reflects ORR's reassessed capacity on the morning of January 13, 2021, which may change as new developments arise.

further strained by ORR's efforts to adhere to the physical and social distancing guidelines from federal, state and local health authorities.

Care provider programs are also implementing prudent staffing models in adherence with guidance from the CDC, state and local authorities and their own organization policies in order to limit exposure risk for their employees.  As a result, programs are not able to meet ORR and state-licensing mandated staffing supervision, which further reduces the maximum capacity each program can accommodate.

At this time, ORR does not foresee accommodating a large increase in capacity is possible due to limitations related to COVID-19. A majority of ORR facilities are struggling with staffing shortages and are having a hard time filling positions.  Programs are reporting difficulties with hiring staff due to a decreased response to job postings and in finding qualified applicants for positions posted. Also, some potential candidates are not continuing with the hiring process, citing fears of contracting COVID-19.

In addition, ORR facilities are experiencing difficulties with staff retention. Programs have reported challenges with an inability to hire and retain employees who are often faced with caretaker responsibilities within their own homes and concerns that potential employees may have working in a congregate setting, which may put them at risk for exposure.  Other reasons cited include: low morale, the inability to telework, working additional hours due to coverage needs, delays with State licensing to complete the clearance process, and concerns regarding travel during the pandemic. ORR has been working with programs to identify strategies to mitigate staffing challenges where possible.

## Minors Residing Long-term in Non-ORR Facilities

Currently, ORR has one minor placed in an out-of-network (OON) residential treatment center. This minor recently secured a placement in an ORR in-network residential treatment center and will be physically transferred there within this week. A second minor, who is placed at a transitional foster care program, is also receiving care at a psychiatric hospital.

Two minors with complex medical needs are residing in a long-term medical facility. Both minors have remained at the hospital since their referral to ORR and have never physically resided at an ORR facility.

All minors residing at non-ORR facilities but in ORR custody have been included the Juvenile Coordinator's Interim Report since they began in accordance with April 24, 2020 Court Order. The details of this report include consideration of the four minors mentioned above.

4

This report provides updates to the six topics ordered to be covered by the Juvenile Coordinator, which follows below:

I.   Measures taken to expedite the release of Class Members to suitable custodians during the COVID-19 health emergency, including the status of fingerprinting and home study policies and practices, in compliance with this Order, and provide census data as to any minors who remain in custody due to lack of fingerprinting or home studies.

## Fingerprinting Policies and Practices

Per a prior Court Order, ORR amended its fingerprinting procedures on July 21, 2020 (attached in previous Juvenile Coordinator Report dated July 24, 2020).

As of January 14, 2021, all ORR digital fingerprinting sites are operational.

Fingerprinting services are among the initial criteria initiated in the family reunification process. In cases where fingerprinting is not immediately available but other reunification requirements are still pending, case managers continue to search for alternative locations within a reasonable distance and continue to communicate with the persons regarding their options. Where no reasonable alternative fingerprinting options are available and fingerprinting is the only requirement delaying release, ORR determines whether provisional release is appropriate.  As of January 4, 2021, there were no minors in ORR care whose release was delayed because COVID-19 closures made fingerprinting services unavailable to sponsors.

## Home Study Policies and Practices

ORR issued Home Study Practice Guidance due to COVID-19 on May 6, 2020 (attached in a previous Juvenile Coordinator Report dated June 8, 2020).  ORR is in alignment with the many states that have imposed restrictions on movement or shelter-in-place orders for residents due to the COVID-19 pandemic. It remains paramount that minors are released to a safe and healthy environment with a sponsor who is able to meet their needs.  It is also important to protect the staff who conduct home studies and assure they feel safe and supported during this time as well.

ORR's home study providers are to follow their respective state's official guidance on conducting home visits/home studies for domestic minors.  ORR honors the state's guidance until further notice is provided to the shelter network from ORR.  If no official state guidance has been issued on conducting home studies during the COVID-19 pandemic or if states require that the home visit be conducted in person, ORR home study providers can seek a waiver of the in-person home visit via the Federal Field Specialist (FFS) for that region.  ORR continues to assess on an individual basis if a virtual home visit should take place in lieu of the in-person contact.

Home study reports must still be submitted within 10 business days of the receipt of the home study referral, and documentation is made in the minor's file as to which method was used to conduct the home study. As of January 4, 2021, there were no minors in ORR custody with home study delays due to COVID-19.

II.  Identify the location of any ORR facility that has had any individual, whether minor or staff member, test positive for COVID-19, and provide a status report and census of those infected at that facility during the reporting period.

Under the Juvenile Coordinator, the workgroup has continued to survey the ORR network regarding the census of minors who tested positive for COVID-19. Additionally, follow up was conducted with the Division of Health for Unaccompanied Children (DHUC) to address the status of those infected to determine whether any minors remained in isolation, quarantine or had been medically cleared.  Figure 3 below provides the census data for the minors diagnosed with COVID-19 as of January 13, 2021.

*Figure 3: Positive COVID-19 Minors Census Data as of January 13, 2021[3]*

| Program Name and Location | Positive COVID-19 Minors Upon ORR Admission | Positive COVID-19 Minors Acquired in ORR care | Positive COVID-19 Minors (source under investigation) |
|---|---|---|---|
| (TX) | 1 | | |
| (TX) | 5 | | |
| (TX) | 1 | 5 | 4 |
| (NY) | | | 1 |
| (NY) | | 2 | |
| (TX) | 1 | | |
| (TX) | 3 | | |
| (TX) | 1 | | |
| (TX) | 1 | | |
| (MI) | | 1 | |
| (TX) | 5 | | |
| (TX) | 1 | | |
| (AZ) | 4 | | |
| (TX) | 3 | | |
| (AZ) | 1 | | |
| (AZ) | 1 | | |
| (TX) | 1 | | |
| (TX) | 3 | | |
| (TX) | 1 | | |
| (TX) | 1 | | |
| (AZ) | 1 | | |
| (AZ) | 1 | | |
| (AZ) | 3 | | |
| (TX) | 2 | | |

---

[3]Figure 3 is a result of the data gathered by the workgroup as it pertains to positive COVID-19 cases of minors throughout the shelter network. This information reflects the status as of January 13, 2021.

As of January 13, 2021, there are a total of 54 minors in ORR custody who have been diagnosed with
COVID-19 who are currently in medical isolation. Forty-one (41) of these minors were diagnosed with
COVID-19 prior to placement in ORR facilities, and eight (8) minors acquired COVID-19 while in ORR
facilities.

As previously mentioned, ORR places minors newly referred along the Southwest Border into shelters
local to the site of referral. As a precaution, ORR now recommends these new referrals be quarantined
for 14 days from the day of admission to ORR, referred to as 'routine intake quarantine'. Minors in such
quarantine are tested at least twice for COVID-19, once shortly after admission and again prior to release
from quarantine.

ORR does not require that staff disclose their private medical information as it relates to COVID-19;
however, some staff voluntarily reported this information. Since collecting information, ORR has been
notified of 1, 145 (cumulative) personnel with positive COVID-19 test results as of January 12, 2021. Staff
with suspected exposure to or positive COVID-19 test results are required to quarantine for at least 14
days. Furthermore, the exposed or infected staff are not permitted to have any contact with minors or
other staff at the shelters until their quarantine has ended.

As a reminder, DHUC does not collect information about individual staff member's quarantine or isolation
status to avoid obtaining or asking for any protected health information that DHUC does not have the
legal authority to collect. Additionally, DHUC does not have public health jurisdiction over adult staff
members; this falls to state and local health agencies.

At this time, care provider program staff who are eligible for the COVID-19 vaccine based on the CDC's
Advisory Committee on Immunization Practices (ACIP) recommendations and the recommendations of
their state and local jurisdictions may opt to receive the vaccine.

## COVID-19 Vaccination Planning

ORR follows ACIP vaccine recommendations and guidelines for minors in ORR care, and this includes
phased recommendations for the COVID-19 vaccine distribution. While supply is limited, allocation of
COVID-19 vaccines is determined by the care provider's state and local jurisdictions.

As of December 20, 2020, ACIP recommends persons aged 16–17 years with high-risk medical conditions
be included in Phase 1c of COVID-19 vaccination distribution (after Phases 1a and 1b, which include health
care personnel, long-term care facility residents, frontline essential workers, and persons aged ≥75 years).
Persons aged 16–17 years without high-risk medical conditions are recommended to receive the COVID-
19 vaccine during Phase 2, along with all persons ≥16 years not previously recommended for vaccination.
As of December 18, 2020, only the Pfizer-BioNTech COVID-19 vaccine is authorized for use in persons aged
16–17 years.

ORR continues to closely monitor the development of ACIP recommendations and vaccine prioritization
for COVID-19 vaccines, and to develop guidance specific to the COVID-19 epidemiology and operational
complexities of the UAC Program.

III.   With respect to minors placed at congregate facilities in which either a minor or staff
       member has tested positive for COVID-19, identify the specific reason the minors
       located there have not been released or transferred to a non-congregate setting.

For all the ORR network, transfers out of congregate care were not pursued due to the risk of potentially
spreading or catching COVID-19 during the transfer process.   While the occupancy rate continues to
increase at congregate shelters, their ability to isolate those minors who have tested positive remains
paramount. ORR issued revised field guidance dated July 16, 2020 with regard to COVID-19 (attached in
previous Juvenile Coordinator Report dated July 24, 2020).

ORR's policies require the release of minors to sponsors in a manner that promotes public safety, which
includes concerns related to public health. The field guidance and ORR Policy Guide Section 3.4.8 Medical
Clearance Prior to Release or Transfer, states:

 *"Unaccompanied alien children who have serious physical or mental health issues or have had exposure
to a communicable disease may not be transferred or moved until they have been medically cleared by a
physician or ORR is consulted….*

*Children who are infectious with communicable diseases of public health concern, which have potential to
cause outbreaks, will not be released from ORR care until they are non-infectious."*

IV.   Describe any policies and/or practices aimed at identifying and protecting minors who
      are at heightened risk of serious illness or death should they contract COVID-19.

Each ORR facility has a unique process for staffing medical care for the individualized needs of the minors
in care.   Some directly hire licensed independent practitioners (e.g., pediatricians, family medicine
physicians, pediatric nurse practitioners, registered nurses) who operate in clinics physically located at
the facility, while some contract with community healthcare providers who either visit the facility or
evaluate the minors in their clinics.   Each care provider has an established network of healthcare
providers, including specialists, emergency care services, mental health practitioners, and dental
providers. Care providers are required to maintain state licensing and adhere to licensing requirements,
including staffing requirements.

Each child in ORR care has an initial intake assessment within 24 hours of the minor's admission to a care
provider facility, to obtain information about the minor, including whether there are any immediate
medical and mental health concerns.   Minors who are ill on arrival will receive prompt attention and
medical care.

Each minor also receives an initial medical examination (IME) by a licensed primary care provider (e.g.,
physician, physician assistant, or nurse practitioner) within two business days of admission into ORR
custody.   The IME is based on a well-child examination, adapted for the unaccompanied children
population with consideration of screening recommendations from the American Academy of Pediatrics,
the Centers for Disease Control and Prevention (CDC), and the U.S. Preventive Services Task Force
(USPSTF).

The purposes of the IME are to assess general health, administer vaccinations in keeping with U.S. standards, identify health conditions that require further attention, and detect contagious diseases, such as influenza or tuberculosis.  If a vaccination record is not located or a minor is not up to date, the minor receives all vaccinations recommended by the ACIP catch-up schedule and approved by the CDC, including seasonal influenza vaccine.

ORR's DHUC staff and ORR care providers routinely track and discuss children with existing medical conditions, including children with conditions that put them at increased risk of infection or could result in possible medical complications if infected. As part of these discussions, facilities caring for children with complex medical needs have been directed to:

- Maintain close contact with general and specialty medical providers of children with complex medical needs and identify plans for continued care (e.g. utilization of telehealth services) in the event of office closures and other barriers to care during the pandemic.

- Create a safety plan for when a child might require in-person medical evaluation, such as in an outpatient clinic or at an emergency room.

- Ensure children have an adequate and ongoing supply of prescription medications.

- Continue to follow recommendations about infection prevention, including for respiratory diseases such as influenza and COVID-19, from medical providers overseeing the care of children with complex health needs.

On September 21, 2020, ORR medical staff met with Dr. Paul Wise, as well as the Juvenile Coordinator and the Special Master, Andrea Ordin, in order to discuss the issue of protecting minors in this population.

V.  Explain whether the medical professionals at ORR are making expeditious individual assessments about a Class Member's eligibility for release when a Class Member has been exposed to COVID-19 or has a sponsor whose household has a confirmed case of COVID-19, and provide the average time in which such individual assessments take place during the reporting period.

As of January 4, 2021, there were seventeen minors whose release was delayed due to a positive COVID-19 diagnosis, as they complete their isolation protocols. Additionally, there were twenty-nine minors whose release was delayed due to being in medical quarantine because of exposure to COVID-19. Quarantine recommendations for minors who have been exposed to a confirmed COVID-19 case are made in collaboration with the local public health authority.

In accordance with the revised ORR field guidance, if a sponsor or a member of the sponsor's household has a suspected or confirmed COVID- 19 infection, ORR postpones release until a medical or public health professional determines it is safe to release the minor to the sponsor's household.

VI.   Explain whether ORR is making individualized assessments regarding its ability to release minors subject to removal orders under the MPP, including census data and reasons for non-release.

As of January 12, 2021, there were 35 minors in ORR custody who were identified as previously enrolled in MPP.  Four of those minors were released by the time this report was written. Currently, there are 18 minors who are engaged in the family reunification process, but it is not complete.  The remaining 13 minors are residing in Long Term Foster Care (LTFC).  The Juvenile Coordinator did not identify any cases from the reporting period where a minor enrolled in MPP received a removal order and were denied release based on that order.

## Summary

The undersigned respectfully submits this report to the Court pursuant to the Court Order dated December 4, 2020.  The undersigned will continue to work independently and with the Special Master and will continue to file interim reports per the Court's directive to monitor facilities to assure adherence to CDC-compliant and ORR guidelines are maintained.