1
2
3
4

ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

5

*Independent Monitor*

6

7

# UNITED STATES DISTRICT COURT

8

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10
11
12
13
14
15
16
17
18
19

JENNY LISETTE FLORES, *et al*.,

Plaintiffs,

v.

MERRICK B. GARLAND,
Attorney General of the United
States, *et al*.,

Defendants.

CASE NO. CV 85-4544-DMG (AGRx)

**NOTICE OF FILING OF INTERIM REPORT ON DEFENDANTS' RESPONSE TO JANUARY-MARCH INFLUX BY INDEPENDENT MONITOR AND DR. PAUL WISE**

20
21
22
23
24
25
26
27
28

On March 19, 2021, Judge Dolly M. Gee ordered Special Expert Dr. Paul Wise ("Special Expert") and the Special Master/Independent Monitor Andrea Ordin ("Monitor")  to "monitor the conditions at CBP facilities that process minors, ORR 'Emergency Intake Sites,' and any other new sites under any Defendant's control that care for Class Members." [Doc. # 1098.] The Court ordered the Special Expert and the Monitor to file their next interim report with the Court on April 2, 2021. [Docs. # 1098, 1102.]

The Court's March 19, 2021 Order also required the Special Expert and Monitor to deliver a draft interim report and recommendations to the parties before the report is filed. [Doc. # 1098.] The Monitor provided all parties copies of the interim report and recommendations and solicited feedback.

In accordance with the Court's Orders, the Monitor submits the attached Interim Report on the Defendants' Response to the January – March Influx.

DATED:      April 2, 2021            Respectfully submitted,

Andrea Sheridan Ordin
STRUMWASSER & WOOCHER LLP

By    /s/ Andrea Sheridan Ordin
       Andrea Sheridan Ordin

*Special Master / Independent Monitor*

**CERTIFICATE OF SERVICE**

Case No. CV 85-4544- DMG (AGRx)

I am a citizen of the United States. My business address is 10940 Wilshire Boulevard, Suite 2000, Los Angeles, California 90024. I am over the age of 18 years, and not a party to the within action.

I hereby certify that on April 2, 2021, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Eastern District of California by using the CM/ECF system:

**NOTICE OF FILING OF INTERIM REPORT ON DEFENDANTS' RESPONSE TO JANUARY-MARCH INFLUX BY INDEPENDENT MONITOR AND DR. PAUL WISE**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on April 2, 2021 at Los Angeles, California.

Jeff Thomson

In the United States District Court

Central District of California – Western Division

JENNY LISETTE FLORES, *et al.*, Plaintiffs,

v.

MERRICK B. GARLAND, *et al.*, Defendants.

Case No. CV 85-4544-DMG (AGRx)ss

Hon. Dolly M. Gee, United States District Judge

## **Defendants' Response to January - March Influx**

**Interim Report and Recommendations by Independent Monitor**

**and Special Expert Dr. Paul H. Wise**

Andrea Sheridan Ordin
Special Master/Independent Monitor
Strumwasser & Woocher LLP
1094 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
(310) 576-1233

## INTRODUCTION

The Special Master/Independent Monitor ("Monitor") and Special Expert Dr. Paul H. Wise provide this Report on Defendants' Response to January - March Influx pursuant to the Court's March 19, 2021 Order requiring that Dr. Wise and Monitor Ordin continue to provide enhanced monitoring of U.S. Customs and Border Protection ("CBP"), Office of Refugee Resettlement ("ORR"), and U.S. Immigration and Customs Enforcement ("ICE") facilities. [Doc. #1098].

The detailed and helpful March Juvenile Coordinator Reports have assisted the Monitor and Dr. Wise in their assessments. The fast moving events of the last four weeks warrant that this Report focus on the profound overcrowding in CBP and ORR facilities. This Report offers no analysis of the impacts of the recent surge in family units and unaccompanied minors on ICE capacity. As noted in Section II.C of this Report, the Monitor and Dr. Wise intend to draft a separate Interim Report to focus on the family detention posture at ICE Family Residential Centers and any use of alternative facilities by ICE.

The March Juvenile Coordinator Reports document dramatic surges of unaccompanied minors and families seeking entry at the border during January and portions of February 2021, surges which have resulted in extreme pressures on immigration authorities. These surges accelerated in late February and throughout March.

In addition to receiving regular reports from the respective agencies, over the last two months, the Monitor and Dr. Wise met regularly with the Juvenile Coordinators, Plaintiffs, advocates, and

personnel from the various Non-Government Organizations ("NGOs") providing services to the minors and families. This report will attempt to paint a picture of this "influx," as defined in the *Flores* Settlement Agreement ("FSA") [Doc. #101], on CBP and ORR, two major components of the complex United States immigration system. The observations in this report are based on visits by Dr. Wise to Border Patrol facilities in the Rio Grande Valley ("RGV") Sector between March 7-9, 2021, including the Texas Donna Centralized Processing Center ("Donna I"), as well as other Border Patrol stations receiving families with young children and Unaccompanied Alien Children ("UACs"). In addition, Dr. Wise visited the ORR Emergency Intake Site in Midland, Texas on March 18, 2021 and the ORR Emergency Intake Site at the Kay Bailey Hutchison Convention Center in Dallas, Texas on March 19, 2021. His monitoring included discussions with site management from the Federal Emergency Management Agency ("FEMA"), ORR, and other government agencies, such as the Center for Disease Control and Prevention ("CDC"), as well as with minors being held in the two Emergency Intake Sites.

## I.   SUMMARY

During fiscal year 2021 beginning October 2020, a growing number of migrants have been arriving at the U.S.-Mexico border, including a growing influx of children arriving without their parents or eligible family members. As of March 3, 2021, CBP has reported 70,273 encounters

with Unaccompanied Children ("UAC") and Family Units ("FMUA")
along the Southwest Border during the 2021 fiscal year.[1]

As previous filings have documented, ORR's ability to accept
transfers of UACs from CBP custody has proven too limited. Prior to
February and March 2021, the number of UAC transfers from CBP
custody in the RGV sector approximated 50-75 per day, not 250-275 per
day, and certainly not daily counts of the 500 or 600 UACs reported to
the Monitor during the week of March 22, 2021.

The result is severe overcrowding in the RGV sector, and it is the
single most important issue that this monitoring program must assess.
Virtually all the custodial and medical provisions essential to adequate
detention conditions are threatened by levels of occupancy that exceed
the physical space required to maintain safe, sanitary, and humane
conditions. CDC-recommended physical distancing precautions to
mitigate the spread of COVID-19 have, out of necessity, been set aside
and still, CBP facilities—which are not appropriate for minors, in any
event—have been stretched beyond thin.

---

[1] This Report is not intended to analyze the comparative gravity of this influx or its causes,
but to report on the response of the various government agencies as they care for the
accompanied and unaccompanied minor class members of *Flores*. A historical view of
apprehensions without expulsions can be found on the following CBP websites.

Official CBP apprehension/encounter statistics for FY2014 - FY2016:
https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016
Official CBP apprehension/encounter statistics for FY2017:
https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017
Official CBP apprehension/encounter statistics for FY2018 - 2021 FYTD:
https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

The current levels of minors entering CBP have required an unprecedented response, including large-scale transfers across sectors and the rapid development of new kinds of emergency holding facilities that have never been used to hold UACs before. To expand capacity to meet the influx, ORR has also brought new facilities online, and has plans to open even more. ORR has added multiple "Emergency Intake Sites" in Texas (Midland, Dallas, San Antonio, Houston) as well as San Diego, California. Emergency Intake Sites provide ORR with needed capacity to accept children from CBP into its care where they can be safely processed, cared for, and either released to a sponsor or transferred to an appropriate ORR shelter for longer-term care.

ORR has also reactivated "Temporary Influx Care Facilities," in Carrizo Springs, Texas, and has announced plans to open another in Pecos, Texas. Influx Care Facilities differ from Emergency Intake Sites because, though they are designed for temporary use, historically Influx Care Facilities must provide a host of minimum services, including educational services, recreational opportunities, counseling, and access to legal services.[2]

---

[2] *See* Policies for Influx Care Facilities, Section 7.5.1:
https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied-section-7

## II.    ANALYSIS OF GOVERNMENTAL RESPONSE

### A. <u>U.S. Customs and Border Protection</u>

#### 1. CBP Reports Massive Increases in Encounters with Unaccompanied Children and Families

Though the CBP Juvenile Coordinator's March 5, 2021 Interim Report notes a modest 6% increase in all migrant encounters between December 2020 and January 2021, January 2021 had the highest number of encounters with the most vulnerable population, unaccompanied children, since July 2019. [Doc. #1084-1].

Specifically in the RGV Sector, CBP saw a 25% increase in UAC encounters, and a 30% increase in encounters with FMUAs between December 2020 and January 2021. [Doc. #1084-1].

CBP's February 2021 apprehension statistics confirm an even larger jump, with FMUA encounters up in February over January figures by 164% and encounters with UAC up 61% for that same period. Based on reported daily counts, it is anticipated that March data—which has not yet been officially released—will show a significant increase over the 9,457 UACs encountered in February 2021. *Figure A* describes CBP border encounters by demographic from December 2020 through February 2021, describing the percentage change during that three-month period.

| CBP SOUTHWEST BORDER ENCOUNTERS BY DEMOGRAPHIC | | | |
|---|---|---|---|
| | Dec. 2020 | Jan. 2021 | Feb. 2021 | Percent Change from Dec. 2020 to Jan. 2021 |
| UAC / Single Minors | 4,993 | 5,858 | 9,457 | +89.4% |
| FMUA | 4,404 | 7,294 | 19,246 | +337.0% |
| **Total** | **9,397** | **13,152** | **28,703** | **+205.4%** |

*Figure A*[3]

*Note: FMUA apprehension statistics may not accurately reflect the number of FMUA processed for release.*[4]

## 2. CBP Facilities are Overcrowded Because of Surging Apprehensions and Entries and the Lack of Capacity of Other Agencies to Receive Migrants

As prior ORR Juvenile Coordinator Reports and leadership have reported to the Court, ORR's ability to accept transfers of UACs from CBP custody has proven far too limited to accommodate the rising number of UAC apprehensions during a time of COVID-19. The surge in UAC and family apprehensions and the inability to transfer UACs to ORR has resulted in profound overcrowding in CBP facilities in the RGV sector.

---

[3] *See* CBP Southwest Border Encounter Statistics, available at
https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[4] FMUA actually processed or released into the United States may be a lower figure because CBP may expel families with older children under Title 42.

### 3. Census of Class Members in CBP Custody in the Rio Grande Valley Sector

The Monitor has also received more recent updates from CBP regarding the number of UACs in custody. As of March 30, 2021, the numbers of UACs in CBP custody in the RGV sector were still trending above 3,000. On March 30, 2021, approximately 2,500 minors had been in custody for over 72 hours. A large number of minors in the RGV sector have resided in CBP custody in Donna I or Border Patrol Stations for as many as several weeks. The minors have been detained primarily in the temporary Donna I facility, described further below.

### 4. The Donna I Facility

Donna I was opened in February in Donna, Texas to serve as the functional Centralized Processing Center ("CPC") for UACs and families after the longstanding CPC at Ursula Avenue in McAllen was closed for renovation last fall. Donna I is a soft-sided facility, which was upgraded from the design of previous soft-sided facilities to better accommodate UACs and families. As Dr. Wise observed at the Donna I facility during his March visit, the facility is divided into eight individual pods which are divided into smaller units using clear vinyl for the purpose of social distancing.

Since March 7, 2021, occupancy of Donna I has ranged from approximately 2,200-4,500 individuals. More than 3,000 UACs are housed there as of March 30, more than 500 of which are under the age of 12. Pre-COVID-19, the maximum occupancy of the Donna I facility

was originally announced to be 1,000. Under the COVID-19 precautions, the current capacity recommendation is 500.

As a substitution for detention of minors and their families in Border Patrol Stations, the reopening of Donna I is a welcome addition to the facilities available. However, the size of the facility is patently inadequate to deal with the continuing surge. Though there is capacity to add facilities (Donna II or Donna III), plans for these expansions have not yet been finalized.

### 5. How Overcrowding Impacts Custodial and Medical Care at CBP Facilities

Based on the examination by Dr. Wise of the Donna I facility, as well as other CBP stations receiving families with young children, discussions with site management, and interviews with minors being held in these facilities, Dr. Wise evaluated the impacts of overcrowding:

- **The most profound impact has been the marked reduction in the space afforded each individual child.**

While the number of children placed in each of the holding units has varied over the last month, the recent increase in UACs and families at the Donna I facility has surpassed appropriate occupancy levels and, on certain days, reaches the point that no space remains between sleeping mats. The open spaces designed for walking, reading, or play are also fully occupied by mats. The showers designed for an occupancy of 1,000 are occupied all day, with some children reporting that they did not receive showers for days at a time. Recreation time is attempted during the time individual pods are being cleaned, but the

length of time and supervision of the minors varies significantly depending upon the census.

- **The impact of overcrowding on the provision of essential humanitarian services, however, has been mitigated significantly by the systematic improvements in custodial care that CBP has instituted over the past year.**

The implementation of contracted meal catering services that can respond rapidly to increased numbers of detainees has proven critical to meeting the recent surge in demand. Supplies of water, fruit, and snacks remain plentiful. The availability of infant formula, diapers, and related materials have also generally proven adequate.

- **CBP's recent implementation of a formal, multi-layered medical system for detained children and families has proven to be essential in responding to humanitarian challenges of the influx.**

Contracted medical teams comprised of a nurse practitioner or physician assistant, medical assistants, and emergency medical technicians have been deployed in most Border Patrol stations on a 24/7 basis. The Donna I facility has had two such teams in place since its re-opening. These teams are responsible for performing a variety of tasks, including (1) health intake interviews to screen for any symptoms, acute or medical conditions, medication use, and transmissible skin disorders, such as scabies or lice; (2) more complete medical assessments of all minors detained in the facility; (3) diagnosis and provision of any required medications for an acute disorder (e.g., urinary tract infection) or chronic condition (e.g., diabetes); (4) ongoing surveillance for any medical conditions emerging while in custody; and

10

(5) exit health interviews to screen for any condition that would preclude transfer to ORR or other agencies, deportation, or release.

At any time, these medical teams have the ability and responsibility to refer patients to local medical facilities for more advanced diagnostic or therapeutic intervention. In addition, pediatricians and family physicians have been employed to help develop these clinical protocols and to provide clinical consultative backup for the deployed medical teams regarding patient management.

- **While the CBP medical system has proven to be a critical component of the humanitarian response, the number of deployed medical teams has not kept pace with the rapidly growing demand for health services.**

Performing the responsibilities listed above for several thousand migrant children is difficult enough. However, this task is exacerbated by the fact that minors generally present to the facility in large groups, at times numbering close to 200, thereby placing an immediate and at times overwhelming demand for health intake interviews, screenings, and medical assessments. Moreover, CBP's reliance on transferring large numbers of UACs and families to other stations, other sectors, and the newly-developed Emergency Intake Sites generates an urgent need for exit health interviews to screen for any conditions and the preparation of any medications and documentation needed for patients requiring follow-up care in their new location.

The scale and dynamic character of the Donna I facility population has placed an unsustainable burden on the currently deployed medical teams. In response, the Donna I facility has recently

11

received 2 additional medical teams from the U.S. Public Health Service. These personnel have supplemented the contracted CBP medical teams and are helping to provide a medical presence in the units where minors are housed. This is an important capability and should be sustained, particularly during a period of increased influx.

- **Overcrowding has exacerbated the shortage of specialized "caregivers" available to meet the needs of young children in custody.**

Over the past year, as previously reported, CBP has instituted a program to place personnel with daycare or other relevant child-focused experience in facilities holding families and UACs. The principal responsibilities of these "caregivers" includes assisting young children with bathing and other hygiene-related activities and providing supervisory care for toddler and other tender age UACs. It was also envisioned that the caregivers could supervise child-friendly activities in the holding pods, and assist the children with their telephone calls.

During Dr. Wise's visit to Donna I at the beginning of March 2021, there were more than 500 UACs below the age of 12 who had been at the facility for more than a week. Under these circumstances, the current caregiver staffing at the Donna I facility is profoundly inadequate. The available caregivers have had to focus their attention only on the highest priority children, particularly very young UACs and children with special health care or custodial needs. Given present staffing levels and the number of minors in the facilities, such assistance cannot be accomplished.

### 6. Overcrowding Has Undermined CBP's Ability to Implement CDC Recommendations for COVID-19 Prevention

CDC recommendations for congregate care facilities emphasize physical distancing, cohorting or quarantining of individuals testing positive, the use of masks, enhanced hand hygiene, and cleaning protocols. During his visits to Border Patrol facilities in the RGV sector between March 7-9, 2021, Dr. Wise observed that mandatory mask use by detainees and CBP staff remains in place. Detained children and families are provided masks upon apprehension and replacements are made available daily or upon request. Hand sanitizer and washing facilities are also available.

However, no routine testing for COVID-19 has been implemented in CBP facilities. Detainees with symptoms potentially related to COVID-19 are referred to local health facilities for testing and appropriate medical management. Routine testing by local authorities or organizations has been implemented in certain locations upon family release. UACs are routinely tested upon entry into ORR facilities.

The overcrowded conditions in CBP facilities have also made it functionally impossible to maintain physical distancing requirements on detained children and families. The lack of physical space precludes adequately isolating cohorts of children in different housing pods or in the use of bathing and bathroom facilities.

13

B. **Office of Refugee Resettlement**

### 1.  In February, ORR Reports It is Near Capacity

On February 28, 2021, ORR reported a total permanent capacity of 8,483 beds, which did not include Emergency Intake Sites and Influx Care Facilities. As of that date, 90% of these beds were occupied. [Doc. #1084-1]. Covering a period from January 13, 2021 to February 28, 2021, the ORR Juvenile Coordinator's March Report states the agency admitted 10,747 minors and discharged 5,425 minors.

### 2.  Transfers of UACs to Multiple New Facilities to Reduce Numbers of Minors in Overcrowded CBP Facilities

In the past month, ORR has taken significant steps to reduce overcrowding. These steps include opening multiple Emergency Intake Sites, re-activating temporary Influx Care Facilities, revising COVID-19 mitigation measures, and implementing new protocols and guidance for the expedited release of certain minors.

Until the expansion of custodial capacity has been accomplished, the priorities for determining which minors will be transferring from CBP custody into ORR facilities merit close further attention to identify and clarify the complex placement decisions. From a medical perspective, the time spent in CBP custody is an important consideration. However, transfer decisions and priorities should also weigh the relative vulnerabilities of very young children and those with special needs.

14

### 3. Emergency Intake Sites

As described by ORR, newly-opened and proposed "Emergency Intake Sites" (formerly known as "Decompression Sites") are designed to ensure that children are moved to a safer and less crowded environment while all efforts will be made to safely release children to family, sponsors, or transfer them to other available ORR capacity (i.e., licensed shelter or influx facility) as quickly as possible. Primarily staffed by FEMA and affiliated organizations, including the Red Cross, these Emergency Intake Sites are designed to integrate FEMA disaster response capabilities into ORR's response to the current influx.

Though these Emergency Intake Sites provide a standard of care higher than what is possible at CBP facilities, they are not an alternative to permanent licensed facilities or temporary influx facilities like Carrizo Springs. ORR is working with FEMA, the American Red Cross, the HHS Office of the Assistant Secretary for Preparedness and Response, the U.S. Public Health Service Commissioned Corps, and private contractors to provide "wraparound" services, including the provision of clean and comfortable sleeping quarters, personal hygiene facilities, catering, laundry services, camp management, recreation and more at these sites. However, the quality and scope of these services, including medical care, will need to be continuously assessed with particular regard to the care of children with elevated risks and those who have tested positive for COVID-19 prior to transfer from CBP.

- **EIS Midland, Texas**

On March 14, 2021, ORR opened its first Emergency Intake Site in Midland, Texas. Located at a former camp for oil field workers, the Midland Emergency Intake Site can house up to 700 UACs.

- **EIS Kay Bailey Hutchison Convention Center, Dallas, Texas**

As reported by ORR, this facility opened on March 17, 2021. Most of the residents are teenage boys seeking asylum. Like the Midland site, this site was designed to provide a safer and less crowded environment in which to briefly house UACs pending release or transfer to an appropriate ORR shelter for longer-term care. The Dallas Emergency Intake Site has an approximate capacity of 2,300.

- **EIS San Diego Convention Center, San Diego, California**

On March 27, 2021, ORR opened another Emergency Intake Site at the San Diego Convention Center in San Diego, California. This site has the capacity to house up to 1,400 girls between the ages of 13 and 17. The facility is separated into pods of 50 minors in order to facilitate social distancing. The average length of stay for minors housed here is anticipated to be 30-35 days.

ORR estimates that the site will be used for approximately three months, through June 2021. Conventions are scheduled to be hosted at this location beginning in early August, so HHS must be completely out of the Convention Center by July 2021.

- **EIS Freeman Expo Center, San Antonio, Texas**

A fourth Emergency Intake Site at the Freeman Expo Center in San Antonio, Texas began receiving minors on March 30, 2021. This facility will house only teen boys. The San Antonio Emergency Intake Site will have a capacity of 2,400 minors.

- **EIS Joint Base San Antonio-Lackland, Texas**

On March 24, 2021, the Defense Department announced it had approved a request to house UACs in a vacant dormitory on Joint Base San Antonio-Lackland.

- **EIS Fort Bliss, Texas**

On March 24, 2021, the Defense Department announced it would construct temporary housing for UACs on an area of land on Fort Bliss, Texas. The Defense Department reports that HHS will maintain custody and responsibility for the well-being and support for these children at all times on the installation. On March 30, around 500 boys, aged 13-17, arrived at the facility.

- **EIS Houston, Texas**

Children will begin arriving at a new Emergency Intake Site located at the National Association of Christian Churches site in Houston, Texas on Friday, April 2, 2021.

### 4. Observations of Dr. Wise, Special Expert, On Conditions at Two Emergency Intake Sites

As noted earlier, Dr. Wise visited the two currently operating facilities in Midland, Texas on March 18, 2021 and Dallas, Texas on March 19, 2021. However, much is still unknown about the standard of care that will be provided at proposed Emergency Intake Sites. The

17

Monitor has received some reports characterizing Emergency Intake Sites as only short-term emergency housing solutions providing a "crisis standard of care" higher than the standard of care possible in CBP facilities, but are not designed to be alternatives to ORR permanent licensed beds or influx sites like Carrizo Springs. Other descriptions of proposed Emergency Intake Sites estimate minors could spend between 30-35 days there, and describe plans to provide some recreational opportunities for minors, but no access to legal services and education. The descriptions of the various Emergency Intake Sites do not include ORR's plans for professional staff support for case management or the medical capabilities on site.

Based on his review of two facilities, discussions with government agencies, and minors currently residing in these facilities, Dr. Wise made the following observations:

- **Based on Dr. Wise's observations in mid-March in mid-March, both the Midland and Dallas facilities are providing physical security, food, clothing, sanitation, and medical care.**

However, the distinct physical characteristics of the Midland, Texas EIS and the Dallas, Texas EIS generate different custodial challenges. The challenge facing the Dallas, Texas Emergency Intake Site is to enhance the nature and depth of services to the level of ORR standards within a structure built primarily for disaster relief.

- **All children transferred to the Emergency Intake Sites are being tested for COVID-19 infection prior to transfer.**

Personnel from the ICE Health Service Corps are conducting rapid tests just prior to the minors boarding buses for transfer to the

18

Emergency Intake Sites. Children testing positive are transported separately from those with negative tests and are isolated upon entry to the Emergency Intake Site. The rapid tests are considered useful to assess large groups relatively quickly; however, they are most reliable for individuals who are having symptoms associated with COVID-19. With large numbers of asymptomatic children being tested, it is likely that some tests will return "false negative" results, meaning that some asymptomatic cases of COVID-19 will be missed. Therefore, the use of masks and other precautions are warranted even among those groups who have tested negative prior to transfer.

- **The Midland, Texas and Dallas, Texas Emergency Intake Sites are modifying recommended procedures to address COVID-19 in their facilities.**

The physical layouts of the Midland, Texas and the Dallas Convention Center sites are profoundly different, thereby requiring specific adjustments in how CDC COVID-19 recommendations are to be implemented. The Midland site primarily houses minors in single rooms, many with individual bathrooms. Meals were provided in the assigned rooms.

The Midland, Texas site has received several dozen minors who had tested positive prior to boarding buses from CBP facilities. The rooms for children who had tested positive were segregated and co-located within one area of the facility. Some of the children were symptomatic with fever and other common COVID-19 problems. Even though COVID-19 in adolescents is generally relatively benign,

symptomatic children require enhanced medical supervision and
management.

As of March 19, 2021, the Dallas Convention Center site was only
receiving minors who had tested negative prior to transfer from CBP
facilities. The Dallas Convention Center site has implemented efforts to
cohort arriving groups of minors within different areas of the main
convention hall which is being used as the common dormitory for all
minors in custody. However, the reliance on shared bathrooms and the
use of common areas for what will be large numbers of minors will
likely make disciplined physical spacing and cohorting increasingly
difficult. This in turn, will make other elements of COVID-19 control,
such as the use of masks and the continued exclusion of minors who
have tested positive, central preventive requirements in the Dallas
Convention site.

### 5.  Influx Care Facilities ("ICFs")

When its standard network is at or near capacity, ORR has
historically utilized "influx" shelters to temporarily accommodate
additional children being referred to its care. Services provided include
suitable living accommodations, appropriate food, clothing, and
personal grooming items, routine medical and dental care, case
management services, educational and recreational opportunities, and
a complete medical examination as expeditiously as possible. Though
the Monitor and Special Expert have not yet toured the ICFs to monitor
compliance with these standards, descriptions of these facilities
provided by ORR are set out below.

- **ICF Carrizo Springs, Texas.**

On February 22, 2021, ORR reopened the Carrizo Springs temporary Influx Care Facility. ORR services at Carrizo Springs will include medical, case management, educational, recreational, and legal services to minors on site.[5] As described, the facility can accommodate up to 1,008 UACs in existing hard-sided structures. It has been announced that ORR has opened a second facility at Carrizo Springs, raising the estimated combined capacity by several hundred. BCFS Health and Human Services' Emergency Management Division (EMD) operates all components of shelter operations at the facility.

- **ICF Target Lodge Pecos North, Pecos, Texas.**

On March 24, 2021, ORR notified the Monitor that it would be opening a new temporary Influx Care Facility in Pecos, Texas. The permanent hard-sided structure is expected to accommodate approximately 500 minors. Additional soft-sided structures can be available to expand capacity at this location to up to 2,000 minors. This site is tentatively scheduled to open the first week of April 2021.

6. **ORR has Revised COVID-19 Occupancy Restrictions, Intake Procedures, and Protocols for Expedited Release to Increase ORR Capacity to Deal with the Current Influx**

The urgent need to transfer children from CBP facilities resulted in widespread efforts to rapidly increase the holding capacities of the ORR shelter systems. The previously mandated occupancy reductions

---

[5] *See* https://www.hhs.gov/programs/social-services/unaccompanied-children/carrizo-springs-temporary-influx-facility-update.html.

imposed to curtail the spread of COVID-19 are no longer in effect. This
action was supported by new CDC guidance emphasizing both the need
to move children out of CBP custody as rapidly as possible and the
continued importance of other COVID-19 precautions, such as the
disciplined use of masks and testing protocols. UACs are routinely
tested upon entry into ORR facilities, as are any families referred to
ICE Family Residential Centers.

Regarding intake procedures for newly-admitted UACs, ORR
released updated field guidance on COVID-19 on March 23, 2021. This
guidance specifies the circumstances under which minors should be
cohorted, quarantined, or medically isolated. Furthermore, the revised
guidance allows for flexibility on the length of quarantine periods in
accordance with evolving CDC recommendations (e.g., 7, 10, or 14
days). Specific protocols are described for each of four scenarios: minors
with no symptoms and no known exposure, minors with no symptoms
and known exposure, minors with suspected COVID-19, and minors
with confirmed COVID-19. The revised guidance is aimed to ensure
safe COVID-19 practices while encouraging maximum efficiency with
regard to expeditious release.

Further, ORR released new field guidance on expedited release
for Category 1 cases on March 22, 2021, also designed to accelerate the
release process. In order to be eligible for expedited release, Category 1
minors must not be especially vulnerable, otherwise subject to a
mandatory TVPRA home study, or show any red flags related to abuse
or neglect. Under this new guidance, Case Managers may make release

22

recommendations based on modified standard release requirements without sending the case for third party review by a Case Coordinator. Case Managers send their recommendations directly to the ORR Federal Field Specialist who makes the final release decision. This protocol was designed to reduce the time spent by minors in ORR care prior to release and increase capacity at ORR facilities.

### C. <u>Immigration and Customs Enforcement</u>

Unlike the facilities of CBP and ORR, the FRCs are currently operating well below capacity amidst ICE's revision to its family detention posture at the FRCs and its broader repurposing of the physical facilities to meet operational needs. All families have been released from Berks County FRC, and ICE is considering transitioning Berks to an adult facility that will no longer hold family units. The South Texas and Karnes County FRCs are in the process of transitioning to short-term facilities that will house family units for no more than 72 hours. [Doc. #1084-1]. The Monitor and Dr. Wise intend to draft a separate Interim Report to focus on the family detention posture at Karnes FRC and Dilley FRC once ICE has finalized its new policies and procedures. That Report will include updates on capacity and length of stay at facilities and will discuss access to Legal Services Providers, COVID-19 safety protocols, and any use of hotels by ICE.

## III. FINDINGS AND RECOMMENDATIONS

**The numbers of apprehended UACs have far exceeded the safe occupancy limits of CBP detention facilities.** As detailed in

23

the prior sections of this report, overcrowding creates an unsafe environment for children and undermines recommended COVID-19 distancing precautions. That basic nutrition, sanitation, and medical requirements have continued to be met reflects the extraordinary efforts CBP has made to address the current custodial challenges. However, this level of overcrowding is not sustainable and must be addressed by a dramatic expansion of alternative custodial capacity.

**The reopening of temporary Influx Care Facilities intended to operate under the standards described by the Department of Health and Human Services is a welcome development in reducing the overcrowded environment. The rapid development of the Emergency Intake Sites also represents a constructive strategy to move children out of CBP custody while ORR shelter capacity remains inadequate.** However, the number of Emergency Intake Sites locations, their diverse physical layouts, the involvement of multiple government agencies, and the large numbers of children to be housed in these facilities, all underscore the need for strong, pragmatic custodial and medical standards specific to those facilities, as well as an appropriately skilled work-force. The most important of these standards and custodial considerations for the currently planned temporary Influx Care Facilities, Emergency Intake Sites, and any other non-traditional holding locations are identified below.

### 1.  Finding One: Standards for Emergency Intake Sites

The Emergency Intake Sites represent a constructive means of temporarily compensating for the limited capacity of the ORR shelter system. The current ORR standards for children in permanent shelters are well defined and embrace the *Flores* safe and sanitary standard.

However, during this time of rapid influx of children, it is not yet clear what systems of care have been developed to ensure the well-being of children housed in these new temporary Emergency Intake Sites.

### ❖ Recommendation: Standards for Emergency Intake Sites

Prioritize the development of custodial, medical, and processing standards specific to Emergency Intake Sites that safeguard the health, safety, and well-being of minors in the Emergency Intake Sites and Influx Care Facilities.

### 2.  Finding Two: Case Management at Emergency Intake Sites

Dedicated case management personnel at the Emergency Intake Sites and temporary Influx Care Facilities are critical to expeditious reunification with family or sponsors and to ensure safe housing for the minors. At the Emergency Intake Sites, the current commitments of volunteers from the Red Cross and other nonprofits is inspirational, but a dedicated professional workforce with training and experience in child welfare practices is necessary.

❖ **Recommendation: Case Management at Emergency
  Intake Sites**

Provide adequate professional case management services onsite
at Emergency Intake Sites in order to facilitate rapid reunification with
family or sponsors.

### 3. Finding Three: Role of ORR Juvenile Coordinator

Internal monitoring by the ORR Juvenile Coordinator has been a
key to ensuring enforcement of the *Flores* standards during the past
year. During this time, while the standards for length-of-stay,
occupancy, availability of legal services and other medical and custodial
services remain in development, enhanced internal monitoring by the
Juvenile Coordinator is critical.

Without focused attention on conditions, population size, length-
of-stay, and available medical care at these new temporary facilities,
emerging gaps in care may go unnoticed.

❖ **Recommendation: Role of ORR Juvenile Coordinator**

Consider enhancing the Juvenile Coordinator role to include
additional personnel dedicated to internal monitoring of the Emergency
Intake Sites and Temporary Influx Care Facilities.

### 4. Finding Four: Role of the Special Expert

Currently, most elements of custodial care for detained minors
are regularly assessed by the CBP, ICE, and ORR Juvenile
Coordinators. Their findings and requisite supporting data are reported
to the Independent Monitor and the Court. However, these regular
assessments, while extremely useful, do not generally address medical

considerations or data, including children with special needs, patterns
of referral to external health facilities, or sentinel medical events (eg.
admission to hospital ICUs). Additional contracted medical experts are
necessary to perform that function adequately given the large number
of additional temporary facilities located thousands of miles apart.

❖ **Recommendation: Role of the Special Expert**

Consider temporary utilization of additional medical experts to
monitor medical capabilities of the emerging temporary facilities.

### 5. Finding Five: Medical Capabilities

The epidemiology of large numbers suggests that serious medical
events—even if relatively rare—will occur with sufficient frequency to
warrant focused attention. ICE, HHS, CBP, and FEMA all have
substantial medical systems, each built to meet the special
responsibilities of their mandated purview. These medical capabilities
are designed to maintain the health of children as well as to provide an
ultimate safety net for the prevention of serious medical conditions
while in custody.

❖ **Recommendation: Medical Capabilities**

Implementation of new medical capabilities in Emergency Intake
Sites to transition care from a FEMA disaster posture to the more
child-focused systems of ORR and provide high quality medical services
for the many children who have tested positive for COVID-19 in the
EISs.

### 6.  Finding Six: Interagency Coordination of Medical Systems and Quality Assurance Mechanisms

As noted in the report, CBP's implementation of a formal multi-layered medical system for detained children and families has been a strength in meeting the surging need. However, the surge in UACs entering custodial systems is placing new stress on the mechanisms by which the respective medical systems interact, the "seams" that stitch together the care provided by each of the responsible medical systems.

The unprecedented number of children entering these systems generates an unprecedented requirement for coordination. There is a need to coordinate the quality assurance mechanisms and monitoring of medical care across the engaged medical systems. The need for enhanced coordination among the agencies relates to all aspects of custodial protection, but coordination of the medical systems deserves renewed attention in that it provides the ultimate capacity to prevent medical harm and death for the children.

### ❖ Recommendation: Interagency Coordination of Medical Systems and Quality Assurance Mechanisms

Consider developing a new and robust system of interagency coordination of medical systems and quality assurance mechanisms.