# APRIL 9, 2021
# ICE JUVENILE
# COORDINATOR REPORT

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, *et. al*., | ) | Case No.: CV 85-4544-DMG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERRICK GARLAND, | ) | |
| Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## APRIL 2021 INTERIM REPORT
## OF JUVENILE COORDINATOR DEANE DOUGHERTY
## <u>SUBMITTED BY IMMIGRATION AND CUSTOMS ENFORCEMENT</u>

As required by the Court in its order issued on March 19, 2021, U.S. Immigration and Customs Enforcement (ICE) Juvenile Coordinator Deane Dougherty is submitting the following interim report to provide an update on the Class Members in ICE facilities over 20 days, status of implementation of COVID-19 guidances, a census of positive COVID-19 cases at ICE facilities, the status of compliance with respect to minors held in Title 42 custody, and a description of Class Members' access to counsel at ICE facilities.

Due to the constantly evolving nature of the COVID-19 crisis, and the frequency of custody and discharge determinations, the information in this report is current and accurate as of the time of signature, or for the reported data, as of the date or time noted in conjunction with the information provided.

## I.  <u>Making and Recording Individualized Custody Determinations and Census of Minors at FRCs</u>

As stated in my last interim report, ICE is revising its current family detention posture to allow for a broader repurposing of the physical facilities to better meet operational needs. As of February 26, 2021, all families had been released from the Berks Family Residential Center and there have been no families housed there since. Currently, the South Texas FRC (STFRC) and Karnes FRC (KCFRC) are being used as short-term processing centers for family units, with the goal of releasing families within 72 hours. Release within the 72-hour window, however, is contingent upon securing timely travel arrangements with the family's sponsor. COVID-19 positive cases also impact ICE's ability to process and release a family within 72 hours.

On April 2, 2021, there were 612 Class Members at the ICE FRCs in Texas, three (3) in hotels, and one (1) in a secure juvenile detention facility, for a total of 616 Class Members in ICE custody. The figures below breakdown these Class Members by age and country of origin.





ICE is making continuous efforts to release Class Members without unnecessary delay in accordance with paragraphs 14 and 18. The speed by which Class Members and their accompanying parent(s) or legal guardian(s) are being processed and released from ICE custody has increased significantly. The graph below portrays the number of book-outs of Class Members from ICE facilities[1] between February 27, 2021 and April 2, 2021. All 1,859 Class Members booked out of an ICE facility during this reporting period were released into the interior of the United States.[2] There were no Class Members removed from the United States and no Class Members returned to their country of origin pursuant to Title 42 authorities[3] from ICE facilities.

---

[1] For purposes of this report, "ICE facilities" include FRCs, hotels, and secure juvenile detention facilities.

[2] During this reporting period, three (3) Class Members were booked out of an ICE facility, transferred to another location, and released that same day.

[3] In the March 5, 2021 ICE Interim Report, it was reported that there were 68 Class Members booked out of an FRC and expelled pursuant to Title 42 authorities between January 9, 2021 and February 22, 2021. ECF 1084-1 at 3. Due to incorrect book-out dates, six (6) Class Members' cases were missing from that number. Therefore, the total number of Class Members booked out of an ICE FRC and expelled pursuant to Title 42 authorities between January 9, 2021 and February 22, 2021 is 74. These six (6) cases were, however, included in the Title 42 reporting in section IV of the March 5, 2021 report, so that number remains 133. *Id.* at 7.



On April 2, 2021, there were eleven (11) Class Members who had been detained at an ICE facility twenty (20) days or more. Exhibit A. Ten (10) of the eleven (11) Class Members have been in custody over twenty (20) days due to quarantine following a positive COVID-19 test pertaining to either themselves or an accompanying family member, or while awaiting tuberculous test results, and have been or will be released upon completion of the U.S. Centers for Disease Control & Prevention (CDC) recommended quarantine period relevant to the disease diagnosed. The other Class Member is being held in secure detention pursuant to paragraph 21A. I have reviewed the data provided in Exhibit A, and it has been shared with the Special Monitor, as required by the March 19, 2021, Order.

## II.  Status of ICE's Implementation of COVID-19 Guidances

ICE facilities continue to follow the COVID-19 mitigation practices set forth in ICE's Enforcement and Removal Operations COVID-19 Pandemic Response Requirements (PRR). On March 16, 2021, the ERO PRR was updated.[4] Exhibit B. As has been the case since the beginning of the pandemic, ICE FRCs continue to operate below maximum capacity, as demonstrated in the chart below.

---

[4] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf

| Family Residential Center Occupancy 4/2/2021 | | | | | |
|---|---|---|---|---|---|
| Facility | Total # of Beds | # of Beds Occupied | % of Beds Occupied | # of Beds Not Occupied | % of Beds Not Occupied |
| Berks Family Residential Center | 96 | - | 0% | 96 | 100% |
| Karnes County Residential Center | 830 | 234 | 28% | 596 | 72% |
| South Texas Family Residential Center | 2,400 | 987 | 41% | 1,413 | 59% |
| Total | 3,326 | 1,221 | 37% | 2,105 | 63% |

I am actively monitoring the Department of Homeland Security and ICE guidance with respect to distributing the COVID-19 vaccination. Due to the limited initial vaccine doses, vaccinations have begun for law enforcement officers in prioritized phases and in accordance with CDC recommendations and in partnership with the Veterans Health Administration as well as local community health departments. One of these prioritized locations is the San Antonio Field Office, in which both KCFRC and STFRC are located. Please note that the vaccination program is voluntary for ICE personnel. I will update this Court when more information about the vaccination initiative for residents becomes available.

### III.  Report of ICE Facilities Holding Minors and Number of COVID-19 Cases

Pursuant to section 3(b)(ii) of this Court's March 19, 2021 Order, and section 4(b)(iii) of this Court's April 24, 2020 Order, the following charts describe the number of positive COVID-19 cases at ICE facilities as of April 2, 2021.

| Current COVID-19 Positive Cases of FAMU Individuals in ICE Facilities on 4/2/2021 | | | | |
|---|---|---|---|---|
| Facilities | Minor | Adult | Staff | Total |
| Berks Family Residential Center | - | - | - | - |
| Karnes County Residential Center | 42 | 36 | 2 | 80 |
| South Texas Family Residential Center | 26 | 59 | - | 85 |
| Hotels | - | - | - | - |
| Secure Juvenile Detention Facilities | - | - | - | - |
| Total | 68 | 95 | 2 | 165 |

| Cummulative COVID-19 Positive Cases of FAMU Individuals in ICE Facilities as of 4/2/2021 | | | | |
|---|---|---|---|---|
| Facilities | Minor | Adult | Staff | Total |
| Berks Family Residential Center | 2 | 4 | 10 | 16 |
| Karnes County Residential Center | 88 | 150 | 107 | 345 |
| South Texas Family Residential Center | 117 | 190 | 137 | 444 |
| Hotels | 8 | 10 | - | 18 |
| Secure Juvenile Detention Facilities | - | - | - | - |
| Total | 215 | 354 | 254 | 823 |

| Cummulative COVID-19 Positive Cases of FAMU Individuals in ICE Facilities as of 4/2/2021 | | | |
|---|---|---|---|
| Facilities | Prior to Intake | After Intake | Total |
| Berks Family Residential Center | 6 | - | 6 |
| Karnes County Residential Center | 217 | 21 | 238 |
| South Texas Family Residential Center | 269 | 38 | 307 |
| Hotels | 15 | 3 | 18 |
| Secure Juvenile Detention Facilities | - | - | - |
| Total | 507 | 62 | 569 |

| Cummulative COVID-19 Positive Cases of FAMU Individuals Hospitalized as of 4/2/2021 | |
|---|---|
| Facilities | Hospitalized |
| Berks Family Residential Center | - |
| Karnes County Residential Center | - |
| South Texas Family Residential Center | 1 |
| Hotels | - |
| Secure Juvenile Detention Facilities | - |
| Total | 1 |

Pursuant to section 4(b)(iv) of this Court's April 24, 2020 Order, the Class Members housed in a facility in which either a detainee or staff member have tested positive for COVID-19 have not been released or transferred to non-congregate settings because they are either in quarantine based on CDC guidance as a result of testing positive, or having an accompanying family member who tested positive, for COVID-19; and will be released as a family unit upon testing negative for COVID-19 and coordinating travel arrangements with their sponsor.

## IV. Title 42 Compliance

Pursuant to section 6 of the Court's September 4, 2020 Order, ordering that the government maintain records and statistical information on minors held in Title 42 custody, including an update regarding the number of minors held in Title 42 custody, and to monitor compliance with the *Flores* Settlement Agreement (FSA) with respect to minors held in Title 42 custody, I can confirm that ICE includes minors temporarily housed by ICE pursuant to Title 42 authorities over 72 hours pending expulsion in its monthly Paragraph 28A reporting shared with Plaintiffs' counsel.

Between February 23, 2021, and March 29, 2021, ICE did not house any Class Members pending expulsion under Title 42 processes at an ICE facility.

### IIV. Class Members' Access to Counsel at ICE Facilities

In the Joint Status Report filed on March 26, 2021, ICE provided a description of Class Members' access to counsel at STFRC and KCFRC. Pursuant to section 3(b)(iii) of this Court's March 19, 2021 Order, the following is a summary of Class Members' access to counsel at ICE facilities, to the extent the information and/or facilities were not included in the March 26, 2021 filing.

ICE meets its obligations under the FSA with respect to access to counsel. Class Members transferred to ICE for housing are served with the documents set forth in paragraph 24D of the FSA. In accordance with paragraph 32 of the FSA, Class Members have access to counsel in several ways. While in custody, Class Members have unlimited access to free, confidential phone calls with counsel or legal service providers. In-person visits may also be arranged, subject to applicable COVID-19 and facility-specific procedures. Due to the mitigation efforts implemented by ICE to prevent the introduction of or spread of COVID-19 in facilities housing Class Members, ICE has supplemented Class Members' access to counsel and legal service providers with video-teleconferencing (VTC) technology, additional phone lines, and/or extended attorney-client access hours.

Beyond complying with the access to counsel requirements set forth in the FSA, ICE provides Class Members with additional opportunities to learn about and meet with counsel and local legal service providers. This may include showing Know Your Rights video presentations, VTC presentations and meetings (small group or individualized) with legal service providers, placing posters or written materials about legal services in residential suites or other communal

areas, adding information flyers about legal service providers in Class Members' intake packets, and daily sign-up sheets to meet with counsel.

- KCFRC. Karnes implemented video-teleconference (VTC) capabilities with one of the legal service providers on-site. Class Members now have access to twice daily VTC group meetings a legal service provider, which are conducted in a large space that can accommodate up to twenty (20) people at a time. Immediately following these group presentations, Class Members or their accompanying parent/legal guardian is given the opportunity to sign up for individual meetings with representatives from the legal service provider.

- STFRC. Similar to KCFRC, Class Members at STFRC receive informational flyers from local legal service providers.

- Hotels. As is required by paragraph 24D of the FSA, Class Members are served with INS Form I-770, a copy of Exhibit 6 (right to judicial review), and the list of free legal services available in the area. While at the hotel, the Class Members and their accompanying parent/legal guardians have access to unlimited free and confidential phone calls to counsel and/or legal service providers, and staff are available to facilitate such phones calls, if requested.

- Secure Juvenile Detention. As is required by paragraph 24D of the FSA, Class Members are served with INS Form I-770, a copy of Exhibit 6 (right to judicial review), and the list of free legal services available in the area. Once intake processing is complete, the Class Member is given the opportunity to contact his or her parent or legal guardian as well as an attorney or any other legal service provider. While there are designated days of the week for Class Members to communicate with counsel—whether by phone or in-person (subject

to COVID-19 and facility guidelines)—Class Members are able to communicate with counsel outside those designated days upon request.

As noted in Section I, STFRC and KCFRC are transitioning to under-72-hour family facilities. This pertains to the use of hotels, as well. The primary goal for the temporary stays in custody is to achieve release after providing the family units the minimum amount of time it takes to obtain medical clearance for release and coordinate and secure travel arrangements to their next and/or final destinations. The combination of the short-term stay in custody and focus on coordinating release with sponsors appears to have impacted the number of Class Members and their parents or legal guardians who take advantage of the legal services available at these facilities. The shorter stay in custody does not impact the amount of information or access to legal providers available to Class Members and their parents and legal guardians.

ICE has also contracted with Endeavors, a non-profit organization that, among other services, provides direct care and migrant services across the United States. Endeavors is expected to begin operating seven hotels in Texas and Arizona to house non-citizen families once processed by CBP and ICE; the expected length of stay is up to 72 hours. Endeavors has served migrants since 2012 and provides direct care and case management. Three hotels are expected to commence operations on April 9, 2021, with the latter four opening on April 30, 2021. The hotels will have oversight by both the Phoenix and San Antonio ICE ERO offices as well as JFRMU and are subject to the Family Residential Standards. The seven hotels will have a total capacity of approximately 1,200 beds.

Signed on this 9th day of April 2021.

DEANE D DOUGHERTY

Digitally signed by DEANE D DOUGHERTY
Date: 2021.04.09 16:50:28 -04'00'

Deane Dougherty
ICE Juvenile Coordinator

# ATTACHMENT A
# TO APRIL 9, 2021 ICE JUVENILE COORDINATOR REPORT

| Det Location | A-Number | Subject ID | Last Name | First Name | Country of Citizenship Code | Book-In Date | Birth Date | Age | Age Group | Case Category | Specific explanation for detention 20+ Days |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | HONDURAS | 3/13/2021 | | 2 | 0 to 5 | [8A] Excludable / Inadmissible - Hearing Not Commenced | On 4/2/2021, minor/family unit was placed on Medical Hold for observation, pending Tuberculosis test results. The minor/family unit will be released on NTA/OREC upon receipt of travel arrangements from sponsor. Anticipated release date: 4/8/2021. |
| | | | | | HONDURAS | 3/13/2021 | | 3 | 0 to 5 | [8A] Excludable / Inadmissible - Hearing Not Commenced | On 3/20/2021, the minor/family unit tested positive for COVID-19 and were placed in quarantine. Minor/family unit cleared by medical for travel and were released on NTA/OREC on 4/4/2021. |
| | | | | | HONDURAS | 3/8/2021 | | 3 | 0 to 5 | [8A] Excludable / Inadmissible - Hearing Not Commenced | On 3/8/2021, the minor/family unit tested positive for COVID-19 and were placed in quarantine. Minor/family unit cleared by medical for travel and were released on NTA/OREC on 4/5/2021. |
| | | | | | HONDURAS | 3/9/2021 | | 4 | 0 to 5 | [8A] Excludable / Inadmissible - Hearing Not Commenced | The minor/family unit was scheduled for release on 3/27/2021, but tested positive for COVID-19 and were placed in quarantine. Minor/family unit will be released on NTA/OREC upon receipt of travel arrangements from sponsor. Anticipated release date: 4/8/2021. |
| | | | | | HONDURAS | 3/13/2021 | | 4 | 0 to 5 | [8A] Excludable / Inadmissible - Hearing Not Commenced | On 3/14/2021, the minor/family unit tested positive for COVID-19 and were placed on quarantine. Minor/family unit cleared by medical for travel and were released on NTA/OREC on 4/3/2021. |
| | | | | | HONDURAS | 3/13/2021 | | 5 | 0 to 5 | [8A] Excludable / Inadmissible - Hearing Not Commenced | On 3/14/2021, parent ████████ tested positive for COVID-19 and the family unit was placed in quarantine. Minor/family unit will be released on NTA/OREC upon medical clearance and receipt of travel arrangements from sponsor. Anticipated released date: 04/06/2021. |
| | | | | | ROMANIA | 3/10/2021 | | 5 | 0 to 5 | [8A] Excludable / Inadmissible - Hearing Not Commenced | The minor/family unit were scheduled for release on 3/23/2021. However, parent ████████ tested positive for COVID-19 and family unit was placed in quarantine. Minor/family unit was released on NTA/OREC on 4/4/2021. |
| | | | | | HONDURAS | 3/13/2021 | | 6 | 6 to 13 | [8A] Excludable / Inadmissible - Hearing Not Commenced | On 3/14/2021, parent ████████ tested positive for COVID-19 and the family unit was placed in quarantine. Minor/family unit will be released on NTA/OREC upon medical clearance and receipt of travel arrangements from sponsor. Anticipated released date: 04/06/2021. |
| | | | | | ROMANIA | 3/10/2021 | | 8 | 6 to 13 | [8A] Excludable / Inadmissible - Hearing Not Commenced | The minor/family unit were scheduled for release on 3/23/2021. However, parent ████████ tested positive for COVID-19 and family unit was placed in quarantine. Minor/family unit was released on NTA/OREC on 4/4/2021. |
| | | | | | HONDURAS | 3/9/2021 | | 10 | 6 to 13 | [8A] Excludable / Inadmissible - Hearing Not Commenced | The minor/family unit was scheduled for release on 3/16/2021, but ████████ tested positive for COVID-19 before release and the family unit was placed in quarantine. On 3/27/2021, the minor tested positive for COVID-19 before second scheduled release and release was cancelled once again as the family unit was quarantined for a second time. Minor/family unit will be released upon medical clearance and new travel arrangements from sponsor. |
| | | | | | EL SALVADOR | 9/3/2020 | | 16 | 14 to 17 | [8B] Excludable / Inadmissible - Under Adjudication by IJ | Minor was first encountered by CBP as part of a family unit at the Southwest border in January 2017 and was released with his mother. Accompanied minor was then arrested by the Upper Darby Police Department (PA) on 02/22/2018 for the criminal charges of terroristic threats, harassment, possession of an instrument of crime, unlawful possession of a weapon on school property and recklessly endangering another person. Charges were adjudicated delinquent. Minor was arrested by the Upper Darby Police Department (PA) on 10/01/2019 for the criminal charge of possession of a weapon on school property. Charge was adjudicated delinquent. Minor was arrested by the Upper Darby Police Department (PA) on 08/12/2020 pursuant to an active warrant for terroristic threats and harassment. Minor was convicted of the criminal offense of harassment and sentenced to six months' probation. Minor was taken into ICE custody and placed into secure detention on 09/03/2020. After multiple continuances, a bond hearing was held before an IJ on 02/19/2021. IJ denied release on 02/19/2021, finding that the minor failed to meet his burden to demonstrate he does not pose a danger to the community, reasoning that the evidence suggests he has been and continues to be an active gang member (including numerous MS-13 tattoos, including highly visible tattoos on his face, neck, and knuckles); he has engaged in behavior that involves threats of harm or death to different individuals; he possessed weapons at school on two different occasions; pressured other juveniles to sell narcotics; and was arrested after completing juvenile probation following his first juvenile adjudication, suggesting he has not been rehabilitated and continues to pose a danger to the community, which cannot be mitigated by bond, or community/family ties. Minor appealed IJ bond decision to BIA, which is pending. |

# ATTACHMENT B
# TO APRIL 9, 2021 ICE JUVENILE
# COORDINATOR REPORT



 # **ERO**

# **U.S. Immigration and Customs Enforcement Enforcement and Removal Operations**

COVID-19 Pandemic Response Requirements



ERO COVID-19 Pandemic Response Requirements (Version 6.0, March 16, 2021)

# Table of Contents

SUMMARY OF CHANGES…………………………………………………………………3

PURPOSE AND SCOPE…………………………………………………………………..8

INTRODUCTION………………………………………………………………………8

OBJECTIVES………………………………………………………………………....9

COMPLIANCE MEASURES………………………………………………………….…10

CONCEPT OF OPERATIONS……………………………………………………………11

   DEDICATED ICE DETENTION FACILITIES…………………………………………....11

   NON-DEDICATED ICE DETENTION FACILITIES…………………………………………14

   ALL FACILITIES HOUSING ICE DETAINEES……………………………………………....16

      PREPAREDNESS………………………………………………………………....26

      PREVENTION……………………………………………………………………...32

      MANAGEMENT………………………………………………………………….35

      TESTING………………………………………………………………………….39

   ATTACHMENTS……………………………………………………………………42

*ERO COVID-19 Pandemic Response Requirements* (Version 6.0, March 16, 2021)

# Summary of Changes

| Explanation of Change | Section | Page |
|---|---|---|
| • Clarification: Report all confirmed and suspected COVID-19 cases immediately to the Deputy Field Office Director (or designee), in addition to the ERO Field Office Director (or designee), Field Medical Coordinator, and local health department. | Concept of Operations | 13, 18 |
| • Addition: The list of populations and subclasses at increased risk for severe illness from COVID-19 is updated to add persons with Down Syndrome and overweight, defined as a BMI more than 25 but less than 30. Added the CDC definition of severe illness from COVID-19 defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death. | Concept of Operations | 14-18 |
| • Clarification: Notify the Deputy Field Office Director (or designee), in addition to the ERO Field Office Director (or designee), the Field Medical Coordinator, and the detainee and his or her counsel, as soon as practicable, but in no case more than twelve hours after the evaluation has occurred, as to whether the detainee meets the criteria for increased risk for severe illness from COVID-19. | Concept of Operations | 13, 16, 20, 22, 25 |
| • Clarification: "Notification of COVID-19 Increased Risk Detainee (A-Number)" shall be made available by the facility's Health Services Administrator (HSA) or equivalent to the local ERO Officer in Charge, Clinical Director, and Nurse Manager. | Concept of Operations | 16, 20 |
| • Clarification: The local ERO field office will advise the detainee or detainee's counsel of the result of the review to determine whether the detainee falls within the populations identified by the CDC and/or by the *Fraihat* court's order as being at increased risk for severe illness from COVID-19. | Various | 13, 17, 19, 21, 24 |
| • Clarification: The list of COVID-19 testing services that detainees will receive separates *removal* from other types of *release* for greater clarity. | Standards for Increased Risk Populations: Testing | 23 |
| • Addition: For COVID-19 screening, a fever is defined as 100.4 degrees Fahrenheit or higher. | Standards for Increased Risk Populations: | 24, 26 |

| | | |
|---|---|---|
| | Screening | |
| • Addition: Close contact is defined as being within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated. | Standards for Increased Risk Populations: Screening | 24, 26 |
| • Update: The questions for verbal screening for symptoms of COVID-19 and close contact with COVID-19 cases are updated based on the CDC Interim Guidance. | Standards for Increased Risk Populations: Screening | 24, 26, 39 |
| • Addition: The temperature and verbal screening of increased risk detainees will be conducted twice daily during detention utilizing the structured screening tool developed by IHSC and will be entered into the *Fraihat* Compliance System platform by the Field Medical Coordinator or IHSC facility medical staff. | Standards for Increased Risk Populations: Screening | 25 |
| • Addition: Detention facility custody staff may assist their medical staff with *Fraihat* subclass twice-daily temperature and COVID-19 symptom monitoring. Each facility's ERO Field Operations, medical, and custody components should discuss whether such assistance may be possible at their facility. <br><br> • Documentation on the IHSC *Fraihat* Compliance System spreadsheet must be completed by medical staff using the latest version of the IHSC *Fraihat* Compliance System spreadsheet. At non-IHSC-staffed facilities, the detention facility medical staff must transmit the spreadsheet to the Field Medical Coordinator weekly as directed. | Standards for Increased Risk Populations: Screening | 25 |
| • Reiteration: Any increased risk detainee who has tested positive for COVID-19 requires twice daily temperature and COVID-19 symptom screening. | Standards for Increased Risk Populations: Screening | 25 |
| • Addition: A detainee with a fever or positive COVID-19 symptom screening shall be referred to a medical provider for further evaluation for COVID-19 infection. | Standards for Increased Risk Populations: | 25, 27 |

4

| | | |
|---|---|---|
| Appropriate PPE and isolation procedures must be utilized as necessary | Screening | |
| • Reiteration/Clarification: All *Fraihat* requirements apply to all detainees in over 72-hour facilities.<br>• Individuals being held under Title 42 authority are subject to the *Fraihat* court order and must be identified, reported, and monitored as such. | Applicability of Standards to Increased Risk Populations | 25 |
| • Addition: Dedicated staging facilities, under 72-hour facilities, and facilities that have a temporary or usual staging aspect to their mission are <u>not</u> subject to *Fraihat* identification, reporting, and twice daily symptom and temperature monitoring requirements for subclass members being processed for staging purposes as long as the detainee remains there for less than 72 hours. "If the detainee exceeds the 72-hour staging period, *Fraihat* identification, reporting, and twice daily symptom and temperature monitoring requirements must begin for subclass members." | Applicability of Standards to Increased Risk Populations | 25 |
| • Addition: The ERO PRR has added a section on Applicability of Standards to Increased Risk Populations | Applicability of Standards to Increased Risk Populations | 25 |
| • Addition: The ERO PRR has added a section on Standards for All Populations. | Standards for All Populations | 25 |
| • Addition: Detainees shall be tested as described in the ERO PRR regardless of *Fraihat* class membership, facility type, Title 42 status, or other conditions. The only exceptions are testing upon removal if required by the country to which the detainee is being removed to; and detainees who test positive within 3 months of their original positive COVID-19 test, cleared isolation precautions, and who remain asymptomatic do not need to be isolated or quarantined due to recurrent or persistent positive results. | Standards for All Populations | 26 |

*ERO COVID-19 Pandemic Response Requirements* (Version 6.0, March 16, 2021)

| | | |
|---|---|---|
| • Addition: Daily vital signs for asymptomatic COVID-19 <u>positive individual include blood pressure, pulse, respiratory rate, temperature,</u> and pulse oximetry. | Standards for All Populations | 27 |
| • Addition: If a point of care/rapid COVID-19 test is utilized, the result must be confirmed with a laboratory-based COVID-19 test. | Standards for All Populations | 29 |
| • Addition: The ERO PRR has added a section on COVID-19 vaccine. | COVID-19 Vaccine | 31 |
| • Clarification: For those cases identified as meeting any of the subclass criteria, when making custody determinations, the Field Office Director or Deputy Field Director must validate the cases with assistance from the Field Medical Coordinator and/or facility medical staff to ensure the conditions listed are still present and complete a custody review. | Custody Determination | 31 |
| • Clarification: Reference to "non-ICE detained populations" has been removed from the following statement as ICE has no authority to control the movement of individuals in the custody of other agencies: "Transfers of ICE detainees and non-ICE detained populations to and from other jurisdictions and facilities are discontinued unless necessary for medical evaluation,  isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding." | Prevention | 40 |
| • Addition: The Facility Administrator will determine the designated areas where new admissions will be held pending admission test results and any additional cohorting necessary if detainees are positive. | Management | 42 |
| • Addition: If the timeframe for COVID-19 testing of new admissions will exceed 12 hours of arrival, the facility's medical provider shall notify the Facility Administrator as soon as possible. | Management & Testing | 42, 47 |
| • Addition: The CDC recommends that before release from quarantine, all detained individuals quarantined as <u>close contacts</u> of someone with COVID-19 (whether quarantined individually or as a cohort) should be re-tested at the end of the 14-day quarantine period, before | Testing | 48 |

| quarantine precautions are lifted and before persons return to general housing areas. This can prevent transmission to others outside of quarantine in the event that an infection was not detected earlier in the quarantine period. | | |
|---|---|---|

**PURPOSE AND SCOPE**

The U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Coronavirus Disease 2019 (COVID-19) Pandemic Response Requirements (PRR) sets forth expectations and assists ICE detention facility operators in sustaining detention operations while mitigating risk to the safety and wellbeing of detainees, staff, contractors, visitors, and stakeholders due to COVID-19. The ERO PRR builds upon previously issued guidance and sets forth specific mandatory requirements to be adopted by <u>all</u> detention facilities, as well as recommended best practices, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis.[1] The ERO PRR has been developed in consultation with the Centers for Disease Control and Prevention (CDC) and is a dynamic document that will be updated as additional/revised information and best practices become available.

**INTRODUCTION**

As the CDC has explained:

> COVID-19 is a communicable disease caused by a novel (new) coronavirus, SARS-CoV-2, and was first identified as the cause of an outbreak of respiratory illness that began in Wuhan Hubei Province, People's Republic of China (China).

> COVID-19 appears to spread easily and sustainably within communities. The virus is thought to transfer primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes; it may transfer through contact with surfaces or objects contaminated with these droplets. There is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms. The ease of transmission presents a risk of a surge in hospitalizations for COVID-19, which would reduce available hospital capacity. Such a surge has been identified as a likely contributing factor to the high mortality rate for COVID-19 cases in Italy and China.

> Symptoms include fever, cough, and shortness of breath, and typically appear two to fourteen days after exposure. Manifestations of severe disease include severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock, and multi-organ failure. According to the World Health Organization, approximately 2.2

---

[1] On April 20, 2020, the U.S. District Court for the Central District of California issued a preliminary injunction requiring that ICE "issue a performance standard or a supplement to their Pandemic Response Requirements … defining the minimum acceptable detention conditions for detainees with risk factors." *Fraihat v. ICE*, 445 F.Supp.3d 709, 751, (C.D. Cal. 2020). The ERO PRR has accordingly been updated to define the "minimum acceptable detention conditions for detainees with risk factors."

8

percent of reported COVID-19 cases have resulted in death globally. This mortality rate is higher among older adults or those with compromised immune systems. Older adults and people who have severe chronic medical conditions like heart, lung, or kidney disease are also at increased risk for more severe COVID-19 illness. Early data suggest older people are twice as likely to have severe COVID-19 illness.

Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020) (internal citations omitted).

Additionally, other symptoms may include fatigue, headache, chills, muscle pain, sore throat, new loss of taste or smell, nausea or vomiting, and diarrhea.[2] Given the seriousness and pervasiveness of COVID-19, ICE is taking necessary and prompt measures. ICE is providing guidance on the minimum measures required for facilities housing ICE detainees to implement to ensure consistent practices throughout its detention operations and the provision of medical care across the full spectrum of detention facilities to mitigate the spread of COVID-19. The ICE detention standards applicable to all facilities housing ICE detainees have long required that each such facility have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, treatment, and education. Those requirements include reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.[3]

The Performance-Based National Detention Standards (PBNDS) 2008 and 201 both require facilities to "comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting requirements."[4] The 2019 National Detention Standards (NDS) similarly require "collaboration with local or state health departments in accordance with state and local laws and recommendations."[5] The measures set forth in the ERO PRR allow ICE personnel and detention providers to properly discharge their obligations under those standards in light of the unique challenges posed by COVID-19.

**OBJECTIVES**

The ERO PRR is designed to establish requirements, as well as best practices, for all detention facilities housing ICE detainees to follow during the COVID-19 pandemic. Consistent with ICE detention standards, all facilities housing ICE detainees are required to have a COVID-19 mitigation plan that meets the following four objectives:

---

[2] *See, e.g.,* Attachment B, Centers of Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited February 26, 2021).
[3] *See, e.g.,* Attachment C, ICE National Detention Standards 2019 (NDS), Standard 4.3, Medical Care, at II.D.2 (p. 114), https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf; Attachment D, 2011 ICE Performance-Based National Detention Standards (PBNDS), Revised 2016, Standard 4.3, Part V.C.1 (p. 261), https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf; Attachment E, 2008 ICE PBNDS, Standard 4-22, Medical Care, V.C.1 (pp. 5-6), https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf.
[4] Performance-Based National Detention Standards (PBNDS) 2008 and 2011, Medical Care 4.3, (C.) Communicable Disease and Infection Control, p. 261-262.
[5] The 2019 National Detention Standards (NDS), Medical Care 4.3, (II.)(D.)(2.) Infectious and Communicable Diseases, p.114.

➤ To protect employees, contractors, detainees, visitors, and stakeholders from exposure to the virus;

➤ To maintain essential functions and services at the facility throughout the pendency of the pandemic;

➤ To reduce movement and limit interaction of detainees with others outside their assigned housing units, as well as staff and others, and to promote social distancing within housing units; and

➤ To establish the means to monitor, cohort, quarantine, and isolate the sick from the well.[6]

**COMPLIANCE MEASURES**

To ensure that detention facilities comply with the detention requirements set forth in the ERO PRR, ICE federal compliance personnel will conduct onsite, in-person monthly spot checks at over 72-hour ICE detention facilities during the COVID-19 pandemic.[7] Upon identification of a deficiency, ICE will provide written notice to the facility and allow seven business days for submission of a corrective action plan to ICE for approval. Life/safety issues identified by ICE will be corrected during the COVID-19 spot checks, if possible, or the facility will be required to submit a corrective action plan within three business days.

➤ For dedicated ICE detention facilities, which operate under Quality Assurance Surveillance Plans, ICE will issue a Contract Discrepancy Report (CDR), which may include contract sanctions, for failure to bring the facility into compliance with the minimum requirements of the ERO PRR within the ICE-approved timeframe. The CDR may become part of the supporting documentation for contract payment deductions, fixed fee deductions, award fee nonpayment, or other contractual actions deemed necessary by the Contracting Officer. If the detention facility continues to have deficiencies despite the issuance of CDRs, ICE may seek to terminate the contract and/or decline to renew the contract.

➤ For non-dedicated ICE detention facilities that fail to meet the minimum requirements of the ERO PRR, ICE will issue a Notice of Intent indicating that the intergovernmental service agreement is in jeopardy due to non-compliance with the ERO PRR and ICE may take appropriate action, including removing

---

[6] A *cohort* is a group of persons with a similar condition grouped or housed together for observation over a period of time. Isolation and quarantine are public health practices used to protect the public from exposure to individuals who have or may have a contagious disease. Cohorting, quarantining, and holding in medical isolation is not punitive in nature and must be operationally distinct from administrative or disciplinary segregation, insofar as cells and units for those forms of segregation may be used, but detainees are provided access to TV, reading materials, recreation and telephones to the fullest extent possible. For purposes of this document, and as defined by the CDC, *quarantine* is the separation of a person or group of people reasonably believed to have been exposed to a communicable disease but not yet symptomatic, from others who have not been exposed, to prevent the possible spread of the communicable disease. For purposes of this document, and as defined by the CDC, *isolation* is the separation of a person or group of people known or reasonably believed to

[7] A *spot check* is an in-person visit to a detention facility by an ICE Detention Service Manager (DSM) or Detention Standards Compliance Officer (DSCO) for the purpose of assessing whether the facility is complying with the requirements of the ERO PRR. DSMs and DSCOs review policies, logs and records; observe facility operations; speak with facility staff and detainees; and complete a standardized form to note observations and findings.

*ERO COVID-19 Pandemic Response Requirements* (Version 6.0, March 16, 2021)

its detention population from the facility or reducing its detention population at the facility on a temporary or permanent basis, depending on the nature of the non-compliance.

## CONCEPT OF OPERATIONS

The ERO PRR is intended for use across ICE's entire detention network, applying to all facilities housing ICE detainees, including ICE-owned Service Processing Centers, facilities operated by private vendors and facilities operated by local government agencies that have mixed populations of which ICE detainees comprise only a small fraction.

---

### DEDICATED ICE DETENTION FACILITIES

---

All dedicated ICE detention facilities[8] must:

> ➢ Comply with the provisions of their relevant ICE contract or service agreement.

> ➢ Comply with the ICE national detention standards applicable to the facility according to the contract, generally PBNDS 2011.

> ➢ Comply with the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.*(Attachment F).

> ➢ Follow ICE's March 27, 2020 Memorandum to Detention Wardens and Superintendents on COVID-19 Action Plan Revision 1, and subsequent updates (Attachment G).

> ➢ Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director and Deputy Field Office Director (or their designees), Field Medical Coordinator, and local health department immediately.

> ➢ Evaluate all new admissions within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC as being at increased risk for severe illness[9] from COVID-19 and/or the subclasses certified in *Fraihat v. ICE*,445 F. Supp. 3d 709 (C.D. Cal.  2020), and notify the local ERO Field Office Director and Deputy Field Office Director (or their designees) and the Field Medical Coordinator, as well as the detainee, as soon as practicable, but in no case more than twelve hours of determining whether the detainee meets the criteria. The local ERO Field Office will notify the detainee's counsel. These populations and subclasses include:

---

[8] Dedicated ICE detention facilities are facilities that house only ICE detainees. Dedicated ICE detention facilities may be ICE-owned Service Processing Centers, privately owned Contract Detention Facilities, or facilities operated by state or local governments that hold no other detention populations except ICE detainees.
[9] Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death. Adults of any age with the following conditions are at increased risk of severe illness from the virus that causes COVID-19:

*ERO COVID-19 Pandemic Response Requirements* (Version 6.0, March 16, 2021)

- Older Adults (55 and over);
- People who are pregnant;

- People of all ages with chronic health conditions, including:
    o Cancer;

    o Chronic kidney disease;

    o COPD (chronic obstructive pulmonary disease);

    o Down syndrome;

    o Immunocompromised state (weakened immune system) from solid organ transplant);

    o Overweight (body mass index (BMI) > 25 but less than 30) and Obesity (BMI of 30 or higher);

    o Heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;

    o Sickle cell disease;

    o Type 2 diabetes mellitus;

    o Asthma;

    o Cerebrovascular disease (affects blood vessels and blood supply to the brain);

    o Cystic fibrosis;

    o Hypertension or high blood pressure;

    o Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines;

    o Neurologic conditions, such as dementia;

    o Liver disease;

    o Pulmonary fibrosis (having damaged or scarred lung tissues);

    o Smoking (current and former);

    o Thalassemia (a type of blood disorder);

     o Type 1 diabetes mellitus.

  &bull; People of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

  &bull; Severe psychiatric illness, including Psychotic Disorder, Bipolar Disorder, Schizophrenia or Schizoaffective Disorder, Major Depressive Disorder with Psychotic Features, Dementia and/or a Neurocognitive Disorder, or Intellectual Development Disorder (moderate, severe, or profound or that make it difficult for the individual to participate in their own care, that make it unlikely the individual will express symptoms, or that increase the risk of complications from the virus.) Individuals of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

➢ Detainees who claim or on whose behalf a claim is made by an attorney, family member, or other advocate that the detainees meet the above criteria or are suspected to meet the criteria must be evaluated by the medical staff for presence of the risk factors within five days of making the claim.

➢ Upon evaluation, the local ERO Field Office Director and Deputy Field Office Director (or their designees), the Field Medical Coordinator, and the detainee  must be notified as soon as practicable, but in no case more than twelve hours after the evaluation has occurred, as to whether the detainee meets the criteria. The local ERO Field Office will notify the detainee's counsel.

➢ Notification shall be made, via email, from the facility's Health Services Administrator (HSA) (or equivalent) to the local ERO Officer in Charge, Clinical Director and Nurse Manager, and contain the following subject line for ease of identification: "Notification of COVID-19 Increased Risk Detainee (A- Number)." At a minimum, the HSA email message will provide the following information:

  &bull; Detainee name;

  &bull; Detention location;

  &bull; Current medical issues and medications currently prescribed;

  &bull; Facility medical Point of Contact (POC) and phone number.

---

### NON-DEDICATED ICE DETENTION FACILITIES

---

All non-dedicated ICE detention facilities and local jails housing ICE detainees <u>must</u>:

➢ Comply with the provisions of their relevant ICE contract or service agreement.

➢ Comply with the ICE national detention standards applicable to the facility according to the contract, generally <u>PBNDS 2011</u>.

➢ Comply with the <u>CDC's</u> *<u>Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities</u>*.

➢ Report all confirmed and suspected COVID-19 cases to the local ERO Field Office Director and Deputy Field Office Director (or their designees), Field Medical Coordinator, and local health department immediately.

➢ Evaluate all new admissions within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC as being at increased risk for severe illness from COVID-19 and/or the subclasses certified in *Fraihat v. ICE*, 445 F. Supp. 3d 709 (C.D. Cal. 2020), and notify both the ERO Field Office Director and Deputy Field Office Director (or their designees) and Field Medical Coordinator, as well as the detainee, as soon as practicable, but in no case more than twelve hours after identifying any detainee who meets the CDC's identified populations being at increased risk for severe illness from COVID-19 and/or falls under any of the categories enumerated below. The local ERO Field Office will notify the detainee's counsel:

- Older Adults (55 and over);

- People who are pregnant;

- People of all ages with chronic health conditions, including:
  - o Cancer;

  - o Chronic kidney disease;

  - o COPD (chronic obstructive pulmonary disease);

  - o Down syndrome;

  - o Immunocompromised state (weakened immune system) from solid organ transplant;

  - o Overweight (BMI > 25 but less than 30) and obesity (BMI of 30or higher);

14

  o Heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;

  o Sickle cell disease;

  o Type 2 diabetes mellitus;

  o Asthma;

  o Cerebrovascular disease (affects blood vessels and blood supply to the brain);

  o Cystic fibrosis;

  o Hypertension or high blood pressure;

  o Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines;

  o Neurologic conditions, such as dementia;

  o Liver disease;

  o Pulmonary fibrosis (having damaged or scarred lung tissues);

  o Smoking (current and former);

  o Thalassemia (a type of blood disorder);

  o Type 1 diabetes mellitus.

- People of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

- Severe psychiatric illness, including Psychotic Disorder, Bipolar Disorder, Schizophrenia or Schizoaffective Disorder, Major Depressive Disorder with Psychotic Features, Dementia and/or a Neurocognitive Disorder, or Intellectual Development Disorder (moderate, severe, or profound or that make it difficult for the individual to participate in their own care, that make it unlikely the individual will express symptoms, or that increase the risk of complications from the virus.)); Individuals of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activities or who has a record of physical or mental impairment that substantially limits a major life activity.

*ERO COVID-19 Pandemic Response Requirements* (Version 6.0, March 16, 2021)

➢ Detainees who claim or on whose behalf a claim is made by an attorney, family member, or other advocate  that the detainee meets the above criteria or are suspected to meet the criteria must be evaluated by the medical staff for presence of the risk factors within five days of making the claim.

➢ Upon evaluation, both the local ERO Field Office Director and Deputy Field Office Director (or their designees), the Field Medical Coordinator, and the detainee must be notified as soon as practicable, but in no case more than twelve hours after the evaluation has occurred, as to whether the detainee meets the criteria. The local ERO Field Office will notify the detainee's counsel.

➢ Notification must be made via email from the facility's HSA, or equivalent, to the local ERO Officer in Charge, Clinical Director and Nurse Manager, and must contain the following subject line for ease of identification: "Notification of COVID-19 Increased Risk Detainee (A-Number)." Other standardized means of communicating this information to ICE, as established by agreement between the local ERO Field Office Director and Deputy Field Office Director (or their designees) and the Warden or Superintendent, are acceptable. At a minimum the HSA communication to ICE will provide the following information:

- Detainee name;

- Detention location;

- Current medical issues and medications currently prescribed;

- Facility medical POC and phone number.

As indicated above, the CDC and the court order in Fraihat v. ICE, 445F. Supp. 3d 709, (C.D. Cal. , 2020), define certain  populations that are at increased risk of severe illness from COVID-19. These conditions include the elderly (see CDC Guidance for Older Adults) and individuals with certain medical conditions (see CDC Guidance for People with Certain Medical Conditions).

---

## ALL FACILITIES HOUSING ICE DETAINEES

---

In addition to the specific measures listed above, all detention facilities housing ICE detainees must comply with the following:

## STANDARDS FOR INCREASED RISK POPULATIONS

### *Applicability*
The *Fraihat* court order requirements apply to all detainees in ICE custody. Individuals being held under Title 42 authority, who are housed in ICE facilities, are also subject to *Fraihat* requirements and must be identified, reported, and monitored as such…

Dedicated staging facilities, under 72-hour facilities, and facilities that have a

temporary or usual staging aspect to their mission are required to comply with *Fraihat* identification, reporting, and twice daily symptom and temperature monitoring requirements  as long as a detainee remains in such facility for a period over 72 hours.

☐       If the detainee exceeds the 72-hour staging period, *Fraihat* identification, reporting, and twice daily symptom and temperature monitoring requirements (as described in detail below) must begin for subclass members.

☐       Detainees held in staging status must be housed separately from other detainees at the facility.

Increased risk detainees must be provided the following services for identification, testing and screening as described below:

### *Identification*

All new admissions must be evaluated within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC and/or by the *Fraihat* court's order as being at increased risk for severe illness, and the local ERO Field Office Director and Deputy Field Office Director (or their designees) and the Field Medical Coordinator must be notified within twelve hours of the determination whether the detainee meets the criteria.

Detainee medical information and files on arrival might be incomplete. A detainee or his/her counsel may request and should be promptly provided with a copy of the medical file and may supplement medical records at any time during detention. Requests for inclusion of these files in the detainee's medical records, are submitted to the facility medical staff through a local operating procedure (LOP) established by that facility. The facility medical staff shall review newly submitted records within five days of receipt and inform the detainee and local ERO of the result of the review. The communication process is included in the facility's LOP. The local ERO Field Office will inform the detainee's counsel of the result of the review.

### *Testing for COVID-19*

- Testing all new admissions upon intake to an ICE facility;
- Testing as directed by medical personnel based on CDC requirements and clinical presentation of COVID-19 related illness;
- Testing upon removal as dictated by the requirements of the receiving country of record;
- Testing upon release to the community or transfer to another detention facility;
- Detainees who test positive will be isolated as described in the PRR until medically cleared in accordance to CDC guidelines; a detainee who is still considered to be infectious may be released from custody in accordance with guidance under the section entitled Considerations For Detainee Release in the memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, *Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27, ;
- Increased risk detainees who have a documented positive COVID-19 test within the last three months and were cleared in accordance to CDC guidelines do not need to be retested. ;
- Detainees who test positive within 3 months of their original positive COVID-19 test; and cleared isolation precautions, and who remain asymptomatic do not need to be isolated or quarantined due to recurrent or persistent positive results.

### *Screening for COVID-19*

*ERO COVID-19 Pandemic Response Requirements* (Version 6.0, March 16, 2021)

- Increased risk detainees must receive all normally prescribed screening for COVID-19 including:
  - Temperature screening and verbal screening for symptoms of COVID-19 and contacts with COVID-19 cases of all new entrants.
    - A fever is considered 100.4 degrees Fahrenheit or higher.
  - Verbal screening for symptoms of COVID-19 and close contact with COVID-19 cases must include the following questions based on the CDC Interim Guidance: Managing COVID-19 in Correctional/Detention Facilities:

    *Have you had any of the following symptoms:*
    - Fever, felt feverish, or had chills?
    - Cough?
    - Shortness of breath or difficulty breathing?
    - Fatigue?
    - Muscle or body ache?
    - Headache?
    - Sore throat?
    - New loss of taste or smell?
    - Congestion or runny nose?
    - Nausea, vomiting or diarrhea?
    - In the past fourteen days, have you had close contact with a person known to be infected with COVID-19 where you were not wearing the recommended proper PPE? [Close contact is defined as being within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period* starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated.]
- A detainee with a fever (temperature of 100.4 degrees Fahrenheit or higher) or positive COVID-19 symptom screening will be referred to a medical provider for further evaluation for COVID-19 infection. Appropriate PPE and isolation procedures must be utilized as necessary.
- This temperature and verbal screening of increased risk detainees will be conducted twice daily during detention utilizing the structured screening tool developed by IHSC and will be entered into the *Fraihat* Compliance System platform by the FMC or IHSC facility medical staff.
- Detention facility custody staff may assist their medical staff with *Fraihat* subclass twice daily temperature and COVID-19 symptom monitoring. Each facility's ERO Field Operations, medical, and custody components should discuss whether such assistance may be possible at their facility. Documentation on the IHSC *Fraihat* Compliance System spreadsheet must be completed by the medical staff.
  - Documentation must be completed on the latest version of the IHSC *Fraihat* Compliance System spreadsheet. For non-IHSC-staffed facilities, the detention facility medical staff must transmit the spreadsheet to the FMC weekly as directed.
- Any increased risk detainee who has tested positive for COVID-19 still requires twice daily temperature and COVID-19 symptom screening.

18

**STANDARDS FOR ALL POPULATIONS**

*Identification*

All new admissions must be evaluated within five days of entering ICE custody to determine whether the detainees fall within the populations identified by the CDC and/or by the *Fraihat* court's order as being at increased risk for severe illness, and the local ERO Field Office Director and Deputy Field Office Director (or their designees) and the Field Medical Coordinator must be notified within twelve hours of the determination whether the detainee meets the criteria. (See above)

Detainees will be tested as described regardless of *Fraihat* status, facility type, Title 42 status, or other conditions.  The only exceptions to this are:
- Testing upon removal only if required by the country to which the detainee is being removed;
- Detainees who test positive within three months of their original positive COVID-19 test, cleared isolation precautions, and who remain asymptomatic do not need to be isolated or quarantined due to recurrent or persistent positive results.

*Testing for COVID-19*
- All detainees will receive COVID-19 services including:
  - Testing upon intake to any ICE facility;
  - Testing as directed by medical personnel based on CDC requirements and clinical presentation of COVID-19 related illness;
  - Testing upon removal as dictated by the requirements of the receiving country of record;
  - Testing upon transfer/release from ICE facilities.
  - Detainees who test positive will be isolated as described in the PRR until medically cleared in accordance to CDC guidelines; a detainee who is still considered to be infectious may be released from custody in accordance with guidance under the section entitled Considerations For Detainee Release in the m[emorandum from Executive Associate Director Enrique Lucero,](Enforcement and Removal Operations, *Memorandum on* *Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27, 2020).
  - Detainees who test positive within 3 months of their original positive COVID-19 test, cleared isolation precautions, and who remain asymptomatic do not need to be isolated or quarantined due to recurrent or persistent positive results.

*Screening for COVID-19*
- Detainees will be screened upon intake at all ICE facilities for COVID-19 including:
  - Temperature screening and verbal screening for symptoms of COVID-19 and contacts with COVID-19 cases.
    - A fever is considered 100.4 degrees Fahrenheit or higher.
  - Verbal screening for symptoms of COVID-19 and close contact with COVID-19 cases must include the following questions based on the CDC Interim Guidance: Managing COVID-19 in Correctional/Detention Facilities: *Today or in the past 24 hours, have you had any of the following symptoms:*

19

- ▪ Fever, felt feverish, or had chills?
- ▪ Cough?
- ▪ Shortness of breath or difficulty breathing?
- ▪ Fatigue?
- ▪ Muscle or body ache?
- ▪ Headache?
- ▪ Sore throat?
- ▪ New loss of taste or smell?
- ▪ Congestion or runny nose?
- ▪ Nausea, vomiting or diarrhea?
- ▪ In the past fourteen days, have you had close contact with a person known to be infected with COVID-19 where you were not wearing the recommended proper PPE? [Close contact is defined as being within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period* starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated.]

- A detainee with a fever or positive COVID-19 symptom screening will be referred to a medical provider for further evaluation for COVID-19 infection. Appropriate PPE and isolation procedures must be utilized as necessary.

➢ **Medical Care and Hospitalization**
- At a minimum:
  - All detainees are to be provided medical care as described within the PRR.
  - Detention facilities must follow the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, updated here on December 3, 2020, and the Clinical Care of Individuals with COVID-19, updated here on December 8, 2020, for care recommendations.

➢ **Asymptomatic COVID-19 Positive**

A nurse or medical provider must verify the absence of COVID-19 symptoms. If asymptomatic:

- Educate the detainee on symptoms of COVID-19 infection and instruct detainees to report if they have any symptoms to medical staff at sick call or to the custody officer (who will notify medical staff).
- Perform daily sick call rounds.
- Obtain daily vital signs to include blood pressure, pulse, respiratory rate, temperature, and pulse oximetry.

Have the detainee complete the 10-day isolation period and fulfill criteria required to release from isolation.

➢ **Symptomatic COVID-19 Positive**

If a detainee is noted to have symptoms of COVID-19, the following care elements are advised:

- A medical provider will perform initial evaluation to determine their care and treatment plan and housing placement.
- Nurse or medical provider assessment will be performed daily.
- Vital signs will be performed more frequently as ordered by the medical provider to include pulse oximetry for detainees with medical conditions that place them at increased risk for complications of COVID-19 infection and those detainees manifesting more severe symptoms.

Have the detainee complete the 10-day isolation period until criteria required to release from isolation has been met. A detainee who was severely ill with COVID-19 or who has a severely weakened immune system (immunocompromised) due to a health condition or medication may require a longer period of isolation (up to 20 days) and may require consultation with infectious disease specialists and testing to determine when the detainee can be released from isolation.

COVID-19 Positive detainees determined to be at increased-risk of complications from COVID- 19 or more severely affected symptomatic detainees may require a higher level of monitoring or care and should be housed in the medical housing unit or infirmary area of the facility or, if unavailable, hospitalized as detailed below.

➢ **Hospitalized COVID-19 Positive**

Detainees who require a higher level of care than can be safely provided at the detention facility must be referred to community medical resources when needed. Facility staff will defer medical care management decisions to the off-site medical provider caring for the detainee.

The following information is taken from the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities:*

➢ **Medical Isolation of Individuals with Confirmed or Suspected COVID-19**

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective medical isolation, must follow local public health options to ensure that individuals with confirmed or suspected COVID-19 will be appropriately isolated, evaluated, tested, and given care.

As soon as an individual develops symptoms of COVID-19 or tests positive for SARS-CoV-2, the individual must be provided with a face mask, if not already wearing one and provided that it can be worn safely, and immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated.

Ensure that medical isolation for COVID-19 is distinct from administrative or disciplinary segregation. Due to limited housing units within many correctional facilities, individuals

may be medically isolated in spaces used for administrative or disciplinary segregation, however medical isolation shall be operationally distinct from administrative or disciplinary segregation to provide access to programs and services to the fullest extent possible as clinically permitted. For example:

- Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.
- Make efforts to provide access to radio, television, reading materials, personal property, telephones, recreation, and commissary to the fullest extent possible.
- Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.
- Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

**Keep the individual's movement outside the medical isolation space to a clinically necessary minimum.**

- Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility.
- Serve meals inside the medical isolation space.
- Refrain from group activities.

Assign isolated individual(s) to dedicated bathrooms with regular access to restrooms and showers. Housekeeping staff should clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation with an approved cleaning solution used in the strength and in a manner as recommended by the product label. Ensure that the individual is wearing a face mask if they must leave the medical isolation space for any reason, and whenever another individual enters. Provide clean face masks as needed. Face masks must be washed daily and changed when visibly soiled or wet.

If the facility is housing individuals with confirmed COVID-19 as a cohort:

- Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. If an antigen or antibody test is utilized, negative results must be confirmed with a molecular, PCR based assay. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, or with close contacts of individuals with confirmed or suspected COVID-19.
- Do not house individuals with undiagnosed respiratory infection (who do not meet the criteria of suspected COVID-19) with individuals with suspected COVID-19.
- Ensure that cohorted groups of people with confirmed COVID-19 wear face masks whenever anyone (including staff) enters the isolation space. (Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a face mask.)
- Designate space for cohort medical isolation in a manner that reduces the chance of cross-contamination across different parts of the facility.

If the facility is housing individuals with confirmed COVID-19 as a cohort, use a well-ventilated room with solid walls and a solid door that closes fully.

If possible, limit medical transfers to another facility or within the facility to those necessary for care. See *Transporting Individuals with Confirmed and Suspected COVID-19 and Quarantined Close Contacts* section for safe transport guidance.

Staff assignments to medical isolation should remain as consistent as possible with limited movements to other parts of the facility. Staff shall wear recommended PPE as appropriate for their level of contact with the individual under medical isolation.

Staff shall ensure that they change PPE when leaving the isolation space to prevent cross contamination. If PPE supplies necessitate reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE. Ensure that staff are trained in infection control practices, including use of recommended PPE.

Minimize transfer of individuals with confirmed or suspected COVID-19 between spaces within the facility.

Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle. Instruct them to:

- Cover their mouth and nose with a tissue when they cough or sneeze.
- Dispose of used tissues immediately in the lined trash receptacle.

Wash hands immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

Maintain medical isolation until the most current CDC criteria for discontinuing home-based isolation have been met. These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available.

- CDC's recommended strategy for release from-non-medical care based isolation can be found in the *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings Interim Guidance*.
- Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
- If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria found here.

➢ **Clinical Care for Individuals with COVID-19**

Facilities must ensure that detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.

- If a facility is not able to provide such evaluation and treatment, a plan must be in place to safely transfer the individual to another facility or local hospital (including notifying the facility/hospital in advance). *See* Transport section. The initial medical evaluation must determine whether a symptomatic individual is at increased risk for

severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions, including chronic kidney disease, serious heart conditions, and Type-2 diabetes. *See* the *Fraihat* and CDC combined list in this PRR and the CDC's website for a list and check the PRR and CDC regularly for updates as more data become available to inform this issue.

- Much remains unknown about the risks of COVID-19 to the pregnant person, the pregnancy, and the unborn child. Prenatal and postnatal care is important for all pregnant individuals, including those who are detained. Visit the CDC website for more information on pregnancy and breastfeeding in the context of COVID-19.

Staff evaluating and providing care for individuals with confirmed or suspected COVID-19 must follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.

Healthcare staff must evaluate persons with COVID-19 symptoms and those who are close contacts of someone with COVID-19 in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the individual being evaluated is wearing a face mask.

- If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.

Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza). However, presence of another illness such as influenza does not rule out COVID-19.

When evaluating and treating persons with symptoms of COVID-19 who do not speak English, use a language line or provide a trained interpreter.

In addition to the specific measures listed above, all detention facilities housing ICE detainees must also comply with the following guidance found in the *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*.

## COVID-19 VACCINE

While ICE cannot force individuals in detention to be vaccinated, all detention facilities are responsible for ensuring their ICE detainees are **offered** the COVID vaccine in accordance with state priorities and guidance.  Detention facility staff should contact their state's COVID-19 vaccine resource (i.e., state or county department of health) to obtain vaccine. The process to register to obtain the vaccine may involve several steps, and each state health authority will likely require detainee demographic reporting for those detainees who are vaccinated. Please reference the CDC COVID-19 Vaccine FAQs in Correctional and Detention Centers for additional information.

Non-IHSC-staffed detention facilities must notify the field medical coordinator (FMC) for  their facility once COVID-19 vaccination begins at the facility to help keep ICE abreast of detainee vaccine access.

Detention facilities may choose to utilize the IHSC COVID-19 Vaccine Consent/Declination Form to document whether a detainee accepts or declines the vaccine.  See Attachment Q for English and Spanish versions of this form. Where practicable, provisions for written translation of the form shall be made for other significant segments of the population with limited English proficiency.  Oral interpretation or assistance shall be provided to any detainee who speaks another language in which the written material has not been translated or who is illiterate.

For frequently asked questions about COVID-19 vaccination in correctional and detention facilities, please see the CDC's COVID-19 Vaccine FAQs in Correctional and Detention Centers found here.

### Custody Determinations:

- For those cases identified as meeting any of the subclass criteria, the Field Office Director must validate the cases with assistance from the Field Medical Coordinator (FMC) and/or facility medical staff to ensure the conditions listed are still present and complete a custody review.
- **All detainees age 55 and older** must be identified, tracked, and have a custody review completed in a timely manner.
- **All _new_ detainees age 55 and older** who are identified as meeting any of the subclass criteria must have a custody review completed within **5 days** of entering ICE custody.
- Detainees age 55 and older, or pregnant, that are otherwise healthy and have none of the disabilities listed in Subclass Two, are only members of Subclass One. Therefore, **only** the RF1 alert code (RF1 – COVID-19 Risk Factor –Subclass One) should be assigned to the case in EARM.
- All detainees determined to have any of the disabilities listed in Subclass Two should be assigned BOTH the RF1 and RF2 alert codes (RF2 – COVID-19 Risk Factor—Subclass Two) in EARM.
- **Alert codes must stay in EARM for tracking.** They should not be removed by the Field.
  - **Important:** Class member information is being provided to the plaintiffs in this case. Removing the alert codes compromises future reporting and the integrity of our data quality.
- Class membership continues upon any release from custody, so the alert codes should not be removed upon release.
- The custody review must consider for the appropriateness of detention given the current COVID-19 pandemic; therefore, the COVID-19 Special Class code in EARM has been disabled/retired and should not be used.
  - Cases are now tracked using one or both of the **RF1 – COVID-19 Risk Factor –Subclass One** and **RF2 – COVID-19 Risk Factor—Subclass Two** alert codes only.
- When making a custody re-determination for a _Fraihat_ subclass member, the SDDO shall ensure that the presence of a Risk Factor is given significant weight. Only in rare cases should a _Fraihat_ subclass member not subject to mandatory detention remain detained, and as previously instructed in the ongoing docket review, a justification for continued detention is required. _Fraihat_ subclass members subject to INA § 236(c) mandatory detention must also receive custody determinations. The SDDO must not apply the Docket Review Guidance rule against release of aliens detained pursuant to INA § 236(c) detainees so inflexibly that none of the _Fraihat_ subclass members are released. Although traditional factors, such as danger to the community and risk of flight, may be considered, under the terms of the PI, aliens subject to detention pursuant to INA § 236(c) should continue to be detained only after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency. Blanket or cursory denials do not comply with the court's requirement that ERO make individualized determinations. _Fraihat_ subclass members that are released should be enrolled into a GPS program when possible.

25

In addition to the specific measures listed above, all detention facilities housing ICE detainees <u>must also</u> comply with the following:

## PREPAREDNESS

Administrators should plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and detainees about these preparations and how they may temporarily alter daily life.

➢ Develop information-sharing systems with partners.

- Identify points of contact in relevant state, local, tribal, and/or territorial public health department before cases develop.

- Communicate with other correctional and detention facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.

➢ Review existing pandemic, influenza, all-hazards, and disaster plans, and revise for COVID-19, and ensure that they meet the requirements of ICE's detention standards.

➢ Offer the seasonal influenza vaccine to all detained persons (existing populations and new admissions) and staff throughout the influenza season, where possible.

➢ Staffing:

- Review sick leave policies to ensure that staff can stay home when sick and determine which officials will have the authority to send symptomatic staff home. Staff who report for work with symptoms of COVID-19 must be sent home and advised to follow CDC-recommended steps for persons exhibiting COVID-19 symptoms.

- Management should consider requiring asymptomatic staff who have been identified as close contacts of a confirmed COVID-19 case to home quarantine to the maximum extent possible, while understanding the need to maintain adequate staffing levels of critical workers. Workers in critical infrastructure sectors (including correctional and detention facilities) may be permitted to work if they remain asymptomatic after a potential exposure to SARS-CoV-2, provided that worker infection prevention recommendations and controls are implemented, including requiring the staff member to wear a face mask (unless contraindicated) at all times while in the workplace for 14 days after the last exposure (if not already wearing one due to universal use of face masks). If the exposed staff members test positive, they should follow local health department and health care provider instructions

26

regarding home isolation.

- Staff who test positive for COVID-19 must inform their workplace and personal contacts immediately. If a staff member has a confirmed COVID-19 infection, the relevant employers will inform other staff of their possible exposure to COVID-19 in the workplace consistent with any legal limitations on the sharing of such information. Exposed employees must then self- monitor for symptoms (e.g., fever, cough, or shortness of breath).

- Identify staff whose duties would allow them to work from home in order to promote social distancing and further reduce the risk of COVID-19 transmission.

- Determine minimum levels of staff in all categories required for the facility to function safely.

- Follow the Public Health Recommendations for Community-Related Exposure.[10]

- Follow guidance from the Equal Employment Opportunity Commission, available here, when offering testing to staff. Any time a positive test result is identified, ensure that the individual is rapidly notified, connected with appropriate medical care, and advised how to self-isolate.

➢ Supplies:

- Ensure that sufficient stocks of hygiene supplies (soap, hand sanitizer, tissues); personal protective equipment (PPE) including facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls; and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and there is a plan in place to restock as needed if COVID-19 transmission occurs within the facility.

- Note that shortages of N95 respirators are anticipated during the COVID-19 response. Based on local and regional situational analysis of PPE supplies, face masks should be used when the supply chain of N95 respirators cannot meet the demand.

- Follow COVID-19: Optimizing Supply of PPE and Other Equipment.[11]

- Ensure that staff and detainees are trained to don, doff, and dispose of PPE they will need to use while performing duties within the scope of their responsibilities.

---

[10] Attachment H, Centers of Disease Control and Prevention, *Public Health Guidance for Community-Related Exposure*, https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited October 15, 2020).
[11] Attachment I, Centers for Disease Control and Prevention, *Optimizing Personal Protective Equipment (PPE) Supplies*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited October 15, 2020).

- If a detainee refuses to wear a mask or other appropriate PPE.

- Soiled PPE items should be disposed in leak-proof plastic bags that are tied at the top and not re-opened. Bags can be disposed of in the regular solid waste stream.

- Cloth face masks should be worn over the nose and mouth by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19. Cloth face masks should:

  o Fit snugly but comfortably against the side of the face be secured with ties or ear loops where possible or securely tied;

  o Include multiple layers of fabric;

  o Allow for breathing without restriction;

  o Be able to be laundered and machine dried without damage or change to shape;

  o Be provided at no cost to detainees.

- Cloth face masks are contraindicated for children under two years of age, anyone who has trouble breathing, is unconscious, incapacitated or otherwise unable to remove the mask without assistance.

➢ Hygiene:

- Reinforce healthy hygiene practices, and provide and restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).

- Require all persons within the facility to cover their mouths and noses with their elbows (or ideally with a tissue) rather than with their hands when they cough or sneeze, and to throw all tissues in the trash immediately after use.

- Provide detainees and staff no-cost access to tissues and no-touch receptacles for disposal.

- Require all persons within the facility to maintain good hand hygiene by regularly washing their hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing their noses; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

- Provide detainees and staff no-cost, unlimited access to supplies for hand

cleansing, including liquid or foam soap, running water, hand drying machines or disposable paper towels, and no-touch trash receptacles. If bar soap is used, ensure that it is does not irritate the skin as this would discourage frequent hand washing and ensure that individuals are not sharing bars of soap.

- Where handwashing, water and soap are not available, provide alcohol-based hand sanitizer with at least 60 percent alcohol where permissible based on security restrictions and as applicable to the ICE national detention standards applicable to the facility, generally PBNDS 2011.

- Require all persons within the facility to avoid touching their eyes, noses, or mouths without cleaning their hands first.

- If possible, inform potential visitors, including inspectors and auditors, before they travel to the facility that they should expect to be screened for COVID-19 and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

- Post signage throughout the facility reminding detained persons and staff to practice good hand hygiene and cough etiquette (printable materials for community-based settings can be found on the CDC website). Signage must be in English and Spanish, as well as any other common languages for the detainee population at the facility.

- Prohibit sharing of eating utensils, dishes, and cups.

- Prohibit non-essential personal contact such as handshakes, hugs, and high- fives.

➢ Provide individuals about to be released from ICE custody with COVID-19 prevention information, hand hygiene supplies, and face masks.

➢ Cleaning/Disinfecting Practices:

- Facilities must adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response.[12]

- All cleaning and disinfecting materials must be stored in secure areas, in their original containers, and with the manufacturer's label intact on each container.

- Safe cleaning products must be used in the quantities and in a manner as indicated on the manufacturer's product label.

---

[12] Attachment J, Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited October 15, 2020).

- Several times a day using household cleaners and Environmental Protection Agency-registered disinfectants, clean and disinfect surfaces and objects that are frequently touched, especially in common areas (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment). The EPA's list of certified cleaning products is located here.

- Staff should clean shared equipment several times per day and on a conclusion-of-use basis (e.g., radios, service weapons, keys, handcuffs).

- The facility designee for environmental health is responsible for ensuring that cleaning supplies and frequency of cleaning schedule are sufficient to maintain a high level of sanitation within housing areas without negatively impacting the health of detainees or staff.

- Ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.

- Facility leadership will ensure that there is adequate oversight and supervision of all individuals responsible for cleaning and disinfecting these areas.

- Facilities shall report confirmed or suspected cases of detainees suffering adverse reactions to cleaning supplies or chemicals to the local ERO Field Office Director and Deputy Field Office Director (or their designees) and Field Medical Coordinator. ICE will promptly investigate reports of adverse reactions to cleaning supplies or chemicals used for disinfection of COVID-19.

### *CDC Recommended Cleaning Tips*

➢ Hard (Non-porous) Surfaces:

- If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

- For disinfection, most common EPA-registered household disinfectants should be effective.

  o A list of products that are EPA-approved for use against the virus that causes COVID-19 is available here. Follow the manufacturer's instructions for all cleaning and disinfection products for concentration, application, method, contact time, etc.

  o Additionally, diluted household bleach solutions (at least 1000 ppm sodium hypochlorite) can be used if appropriate

30

for the surface. Follow manufacturer's instructions for application, ensuring a contact time of at least one minute and allowing proper ventilation during and after application. Check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted.

- ▪ Prepare a bleach solution by mixing:

  - 5 tablespoons (1/3 cup) bleach per gallon of water; or

  - 4 teaspoons bleach per quart of water.

➢ Soft (Porous) Surfaces:

- For soft (porous) surfaces, such as carpeted floor, rugs, and drapes, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

  - o If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

  - o Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and that are suitable for porous surfaces.[13]

➢ Electronics:

- For electronics such as tablets, touch screens, keyboards, remote controls, and ATM machines, remove visible contamination if present.

  - o Follow the manufacturer's instructions for all cleaning and disinfection products.

  - o Consider use of wipeable covers for electronics.

  - o If no manufacturer guidance is available, consider the use of alcohol-based wipes or sprays containing at least 70 percent alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

➢ Linens, Clothing, and Other Items That Go in the Laundry:

---

[13] Attachment K, U.S. Environmental Protection Agency, *List N: Disinfectants for Coronavirus (COVID-19)*, https://www.epa.gov/pesticide-registration/list-n-disinfectants-coronavirus-covid-19 (last visited October 15, 2020).

- In order to minimize the possibility of dispersing virus through the air, do
  not shake dirty laundry.

- Wash items as appropriate in accordance with the manufacturer's
  instructions. If possible, launder items using the warmest appropriate
  water setting for the items and dry items completely. Dirty laundry that
  has been in contact with an ill person can be washed with other people's
  items.

- Clean and disinfect hampers or other carts for transporting laundry
  according to guidance above for hard or soft surfaces.

- Consider establishing an on-site laundry option for staff so that they can change
  out of their uniform, launder them at the facility, and wear street clothes and
  shoes home. If on-site laundry for staff is not feasible, encourage them to
  change clothes before they leave the work site, and provide a location for them
  to do so.

## PREVENTION

Detention facilities can mitigate the introduction of COVID-19 from the community and
reduce transmission if it is already inside by reinforcing good hygiene practices among
detained persons, staff, and visitors (including increasing access to soap and paper towels),
intensifying cleaning/disinfection practices, and implementing social distancing strategies.
Because many individuals infected with COVID-19 do not display symptoms, the virus could
be present in facilities before cases are identified. Both good hygiene practices and social
distancing are critical in preventing further transmission:

- ➢ Perform pre-intake temperature and screening for new entrants for
  COVID-19 symptoms.

- ➢ Screening should take place before staff and new admissions enter the facility or just
  inside the facility, where practicable. For new admissions, this should occur before
  beginning the intake process, in order to identify and immediately isolate any
  detainee with symptoms before the individual comingles with others or is placed in
  the general population. This should include temperature screening of all staff and
  new entrants as well as a verbal symptoms check.

  - A fever is considered a temperature of 100.4 degrees Fahrenheit or
    higher.

  - Verbal screening for symptoms of COVID-19 and close contact with
    COVID-19 cases should include the following questions based on the
    CDC Interim Guidance: Managing COVID-19 in
    Correctional/Detention Facilities:

  - Today or in the past 24 hours, have you had any of the following
    symptoms:

    - Fever, felt feverish, or had chills?

32

- Cough?
- Shortness of breath or difficulty breathing?
- Fatigue?
- Muscle or body ache?
- Headache?
- Sore throat?
- New loss of taste or smell?
- Congestion or runny nose?
- Nausea, vomiting or diarrhea?
- In the past fourteen days, have you had close contact with a person known to be infected with COVID-19 where you were not wearing the recommended proper PPE? [Close contact is defined as being within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated].

- If staff have symptoms of COVID-19 (e.g., fever, cough, shortness of breath), they must be denied access to the facility.

- If any new intake has symptoms of COVID-19:

  o Request the individual to wear a face mask.;

  o Ensure that staff interacting with the symptomatic individual wears recommended PPE;

  o Isolate the individual and refer to healthcare staff for further evaluation;

  o Facilities without onsite healthcare staff must contact their state, local, tribal, and/or territorial health department to coordinate effective isolation and necessary medical care;

- If an individual is a close contact of a known COVID-19 case or has traveled to an affected area, but has no COVID-19 symptoms, quarantine the individual and monitor for symptoms two times per day for fourteen days.

➢ Test all newly detained persons before they join the rest of the population in the detention facility. For further information, refer to the TESTING section below and CDC Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities, available here.

➢ Visitation:

- During suspended (social) or modified (legal) visitation programs, the facilities should provide access to virtual visitation options where available. When not possible, verbally screen all visitors on entry for symptoms of COVID-19 and perform temperature checks, when possible. ICE continues to explore opportunities to enhance attorney access while legal visits are being impacted. For facilities at which immigration hearings are conducted or where detainees are otherwise held who have cases pending immigration proceedings, this may include:

  o Requiring facilities to establish a process for detainees/attorneys to schedule appointments and facilitate the calls;

  o Leveraging available technology (e.g., tablets, smartphones, phones, VTC) to facilitate attorney/client communication;

  o Working with the various detention contractors and telephone service providers to ensure that all detainees receive some number of free calls per week.

- Communicate with the public about any changes to facility operations, including visitation programs. Facilities are encouraged to prohibit or, at a minimum, significantly adopt restricted visitation programs. Facilities are required to suspend all volunteer work program (VWP) assignments for detainees assigned to food service and other VWP assignments, where applicable, that require individuals to interact with each other at distances of less than six feet. Any detainee participating in a VWP assignment is required to wear appropriate PPE for the position at all times (e.g., disposable gloves, masks, goggles). Detainees in isolation or quarantine may not be assigned to a VWP detail.

➢ Transfers of ICE detainees are discontinued unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding.
  - Detainee transfers for any other reason require pre-approval from the local ERO Field Office Director.
  - All detainees who are transferred, removed or released must be cleared medically in accordance with ERO guidelines.

➢ When necessary to transport individuals with confirmed or suspected COVID-19, if the vehicle is not equipped with emergency medical service (EMS) features, at a minimum, drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open. Everyone in the vehicle must wear a mask.

➢ Require all staff (both medical and correctional) to wear PPE when encountering or interacting with any ICE detainee at a distance of less than six feet.

➢ Required PPE should always be worn by staff, even if separated by a distance of six feet or more, if the individual appears feverish or ill and/or with respiratory symptoms while interviewing, escorting, or interacting in other ways.

*ERO COVID-19 Pandemic Response Requirements* (Version 6.0, March 16, 2021)

➢ Additional Measures to Facilitate Social Distancing:

- Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement the following measures to the extent practicable.

  o Efforts should be made to reduce the population to approximately 75 percent of capacity.

  o Where detainee populations are such that cells are available, to the extent possible, house detainees in individual rooms.

  o Recommend that detainees sharing sleeping quarters sleep "head-to-foot."

  o Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.

  o Staff and detainees should be directed to avoid congregating in groups of ten or more, employing social distancing strategies at all times.

  o Whenever possible, all staff and detainees should maintain a distance of six feet from one another.

  o If practicable, beds in housing units should be rearranged to allow for six feet of distance between the faces of detainees.

- If group activities are discontinued, it is important to identify alternative forms of activity to support the mental health of detainees

- Extended lockdowns must **not** be used as a means of COVID-19 prevention.

## MANAGEMENT

If there has been a suspected COVID-19 case inside the facility (among detained persons, staff, or visitors who have recently been inside), facilities shall begin implementing management strategies while test results are pending. Essential management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

*ICE Custody Review for Potentially Increased-Risk Detainees*

Upon being informed of a detainee is at increased risk for severe illness from exposure to COVID-19, ERO will review the case to determine whether continued detention is appropriate. ICE will make such custody determinations on a case-by-case basis, pursuant to the applicable legal standards, with due consideration of the public health considerations implicated.

➢ All new admissions will be tested, screened, and isolated as described in the above sections upon arrival.

➢ To do this, facilities should consider cohorting daily admissions; two days of new admissions, or multiple days of new admissions, in designated areas prior to placement into the general population. The Facility Administrator will determine the designated areas where new admissions will be held pending admission test results and any additional cohorting necessary if detainees are positive and those with direct contact to laboratory confirmed positives. Given significant variations among facilities, cohorting options and capabilities will differ across ICE's detention network. ICE encourages all facilities to adopt the most effective cohorting methods practicable based on the individual facility characteristics, taking into account the number of new admissions anticipated per day.

➢ Based on the results of testing and clinical evaluation, detainees at intake should be separated into multiple groups: Detains who tested negative and have no symptoms, detainees who test positive but have no symptoms, and detainees who either test positive for COVID-19 and have symptoms or are diagnosed with COVID-19 based on symptoms.

➢ All new arrivals to ICE detention facilities require COVID-19 testing within 12 hours of arrival. Collection timeframe may extend to 24 hours if facility collection logistics require additional time. When additional time is required, the facility's medical provider shall notify the Facility Administrator as soon as possible.

➢ Detainees pending test results who are asymptomatic should be placed in a routine intake quarantine. Detainees pending test results who are symptomatic should be placed in isolation. Detainees who test negative during the intake process will complete the routine 14-day quarantine prior to release to general population

➢ Detainee who test positive during the intake process should be isolated and can be released from isolation

when they meet the criteria for discontinuing isolation described below using either a time-based strategy or symptom-based strategy.

➢ For suspected or confirmed COVID-19 cases:

- Isolate the individual immediately in a separate environment from other individuals. Facilities should make every possible effort to isolate persons individually. Each isolated individual should be assigned his or her own housing space and bathroom where possible. Isolating ill detainees as a group should only be practiced if there are no other available options.

- If single isolation rooms are unavailable, individuals with laboratory-confirmed COVID-19 should be isolated together as a cohort separate from other detainees, including those with pending tests. Febrile detainees who are pending testing or are waiting for test results should be isolated together as a group separate from laboratory-confirmed COVID-19 cases and other detainees. Confirmed COVID-19 cases should not be cohorted

36

with suspected cases or case contacts.

- Housing should maintain separation of groups by common criteria (e.g., COVID-19 test results positive, febrile or symptomatic pending testing or results, asymptomatic/exposed).

- Ensure that the individual is always wearing a face mask (if it does not restrict breathing) when outside of the isolation space, and whenever another individual enters the isolation room. If wearing masks will negatively impact breathing, facilities should ensure caregivers are aware of that fact and implement restrictions on contact as appropriate during isolation (e.g., increased social distancing, PPE use by people who enter space, moving and handling people separately, increased cleaning, etc.). Masks should be changed at least daily, and when visibly soiled or wet.

- In the event that a facility requires more isolation beds for detainees, ICE must be promptly notified so that transfers to other facilities, transfers to hospitals, or releases can be coordinated immediately. Until such time as the transfer or release is arranged, the facility must be especially mindful of cases that are at increased risk of severe illness from COVID-19. Ideally, symptomatic detainees should not be isolated with other individuals. If isolating of symptomatic COVID-positive detainees as a group is unavoidable, make all possible accommodations until transfer occurs to prevent transmission of other infectious diseases to the increased-risk individual (e.g., allocate more space for a increased-risk individual within a shared isolation room).

- Review the CDC's preferred method of medically isolating COVID-19 cases here, depending on the space available in a particular facility. In order of preference, individuals under medical isolation should be housed:

  - Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

  - Separately, in single cells with solid walls but without solid doors.

  - As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.

  - As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.

  - As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort

arrangement in the context of COVID-19.)

- o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.

- When detainees must be housed in the spaces used for administrative segregation ensure that medical isolation, which is not punitive in nature, is **operationally** distinct from administrative or disciplinary segregation, even if the same housing spaces are used for both. For example:

  - o Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.

  - o Ensure that detainees are provided similar access to radio, television, reading materials, personal property, telephone, recreation and commissary to the fullest extent possible.

  - o Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.

  - o Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

- **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

  - o Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility. See Infection Control and Clinical Care sections for additional details.

  - o Serve meals inside the medical isolation space.

  - o Exclude the individual from all group activities.

  - o Assign the isolated individual(s) a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.

- Meals should be provided to COVID-19 cases in their isolation rooms. Isolated cases should throw disposable food service items in the trash in their isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items must clean their hands after removing gloves.

- Laundry from a COVID-19 case can be washed with another individuals' laundry.

> o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard gloves after each use, and clean their hands after handling.
>
> o Do not shake dirty laundry. This will minimize the possibility of dispersing the virus through the air.
>
> o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
>
> o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that either is disposable or can be laundered.

- **Ensure that the individual is wearing a face mask if they must leave the medical isolation space for any reason, and whenever another individual enters.** Provide clean masks as needed. Masks should be washed routinely and changed when visibly soiled or wet.

- **Maintain isolation until all the CDC criteria have been met.** These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available. Monitor the sites linked below regularly for updates. This content will not be outlined explicitly in this document due to the rapid pace of change.

  > o CDC's recommended strategy for release from home-based isolation can be found in the *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings Interim Guidance*.
  > o Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
  > o If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria found here.

### TESTING

➤ With the increased availability of testing supplies and the increased understanding of the epidemiology of COVID-19 transmission, expanded testing strategies are a critical tool in the prevention and management of COVID-19 infections. This is especially true in congregate settings such as detention facilities.

- All new admissions to ICE detention facilities require COVID-19 testing within 12 hours of arrival. Collection timeframe may extend to 24 hours if facility collection logistics require additional time. When additional time is required, the facility's medical provider shall notify the Facility Administrator as soon as possible.

- Testing of all new admissions before they join the rest of the

39

population in the facility, and housing them individually or in cohorts while test results are pending help prevent potential transmission.

➢ Consistent with CDC recommendations, facilities "considering diagnostic testing of people with possible COVID-19 should continue to work with their local and state health departments to coordinate testing through public health laboratories, or work with commercial or clinical laboratories using diagnostic tests authorized for emergency use by the U.S. Food and Drug Administration."[14] Before testing large numbers of asymptomatic individuals without known or suspected exposure, facility leadership should have a plan in place for how they will modify operations based on test results. In addition, COVID-19 testing can be utilized at any time during detention to detect new cases of COVID-19, confirm detainee diagnosis, or in conjunction with other public health actions to control outbreaks of COVID-19. CDC recommendations on planning for facility wide testing may be found here.

- CDC recommends SARS-CoV-2 testing with viral tests (i.e., nucleic acid or antigen tests) for:

  o Individuals with signs or symptoms consistent with COVID-19;

  o Asymptomatic individuals with recent known or suspected exposure to SARS-CoV-2 to control transmission;

    ▪ To prevent continued transmission of the virus within a quarantined cohort, retesting those who originally tested negative every 3 to 7 days could be considered, until no new cases are identified for 14 days after the most recent positive result. The specific re-testing interval that a facility chooses could be based on the stage of the ongoing outbreak, the availability of testing supplies and capacity of staff to perform repeat testing, financial resources, the capacity of contract laboratories that will be performing the tests, and the expected wait time for test results.

  o Asymptomatic individuals without known or suspected exposure to SARS-CoV-2 for early identification in special settings;

    ▪ While not mandated, the CDC recommends facilities consider quarantine before release or transfer of asymptomatic individuals without known or suspected exposure to COVID-19 when appropriate based on detainee history.

    ▪ Detainees who previously tested positive for COVID-19 and were medically cleared could continue to test positive for a significant period of time.

  o Individuals being tested to determine resolution of infection (i.e., test-based

---

[14] Attachment O, Centers of Disease Control and Prevention, *Overview of Testing for SARS-CoV-2 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited October 15, 2020).

strategy for Discontinuation of Transmission-based Precautions, HCP Return to Work, and Discontinuation of Home Isolation);

- o Individuals being tested for purposes of public health surveillance for SARS-CoV-2.

- CDC recommends using authorized nucleic acid or antigen detection assays that have received an FDA EUA to test persons **with** symptoms when there is a concern of potential COVID-19.

- Testing is recommended for all close contacts of persons with SARS-CoV-2 infection. In some settings, broader testing, beyond close contacts, is recommended as a part of a strategy to control transmission of SARS-CoV-2. Expanded testing might include testing of individuals on the same unit or shift as someone with SARS-CoV-2 infection, or even testing all individuals within a shared setting (e.g., facility-wide testing). In areas where testing resources are limited, CDC has established a testing hierarchy for close contacts, which can be found here:

- The CDC recommends that before release from quarantine, all detainees quarantined as close contacts of someone with COVID-19 (whether quarantined individually or as a cohort) should be re-tested at the end of the 14-day quarantine period, before quarantine precautions are lifted and before persons return to general housing areas. This can prevent transmission to others outside of quarantine in the event that an infection was not detected earlier in the quarantine period.

- CDC does not currently recommend using antibody testing as the sole basis for diagnosis of acute infection, and antibody tests are not authorized by FDA for such diagnostic purposes. For the most current information on CDC recommendations for antibody testing, please see Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities and Using Antibody Tests for COVID-19. For the most current CDC recommendations for viral testing and specimen collection, please see Overview of Testing for SARS-CoV-2 (COVID-19).

**ATTACHMENTS**

| ATTACHMENT LETTER | DOCUMENT NAME AND CITATION |
|---|---|
| A | U.S. Immigration and Customs Enforcement, *Updated ICE statement on COVID-19* (Mar. 18, 2020), https://www.ice.gov/news/releases/updated- ice-statement-covid-19. |
| B | Centers of Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited  February 26, 2021). |
| C | ICE National Detention Standards 2019, Standard 4.3, Medical Care, https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf. |
| D | 2011 ICE Performance-Based National Detention Standards, Revised 2016, Standard 4.3, https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf. |
| E | 2008 ICE Performance-Based National Detention Standards, Standard 4-22, Medical Care, https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf. |
| F | Centers of Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* ( July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited February 26, 2021). |
| G | Memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, *Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27, 2020). |
| H | Centers of Disease Control and Prevention, *Public Health Guidance for Community-Related Exposure*, https://www.cdc.gov/coronavirus/2019-ncov/php/public- health-recommendations.html (last visited February 26, 2021). |
| I | Centers for Disease Control and Prevention, *Optimizing Supply of PPE and Other Equipment during Shortages*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited February 26, 2021). |

42

| ATTACHMENT LETTER | DOCUMENT NAME AND CITATION |
|---|---|
| J | Centers for Disease Control and Prevention, *Cleaning and Disinfection for Community Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited February 26, 2021). |
| K | U.S. Environmental Protection Agency, *List N: Disinfectants for Use Against SARS-CoV-2*, https://www.epa.gov/pesticide-registration/list-n-disinfectants- use-against-sars-cov-2 (last visited February 26, 2021). |
| L | Assistant Director Peter Berg, Enforcement and Removal Operations, *Updated Guidance: COVID-19 Detained Docket Review* (Apr. 4, 2020). |
| M | Centers for Disease Control and Prevention, *Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html (last visited February 26, 2021) |
| N | Centers of Disease Control and Prevention, *Interim Guidelines for Collecting, Handling, and Testing Clinical Specimens for COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/lab/guidelines-clinical-specimens.html (last visited February 25, 2021) |
| O | Centers of Disease Control and Prevention, *Overview of Testing for SARS-CoV-2*, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited February 25, 2021) |
| P | Centers of Disease Control and Prevention, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last visited February 26, 2021) |
| Q | *ICE Health Service Corps COVID-19 Vaccine Consent/Declination Form English and Spanish*, https://icegov.sharepoint.com/sites/ihsc/rimu/ApprovedForms/Forms/AllItems.aspx |

43