BRIAN BOYNTON
Acting Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsels
FIZZA BATOOL
Trial Attorney
    Tel: (202) 616-4863
    Fax: (202) 305-7000
    Email: fizza.batool2@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, Attorney General of the United States; *et al.*,<br><br>    Defendants. | Case No. CV 85-4544-DMG<br><br>**Defendants' Response and Objections to the Independent Monitor's "Interim Report on Defendants' Response to January – March Influx" (ECF No. 1103)** |

## I. INTRODUCTION

On April 2, 2021 the Special Master/Independent Monitor ("Monitor") and Dr. Paul Wise filed their "Interim Report on Defendants' Response to January – March Influx" (ECF No. 1103) ("Interim Report"). The Court ordered that the parties may file responses to the Interim Report on or before April 9, 2021. ECF No. 1102. In accordance with the Court's order, Defendants submit below their responses and objections to the Interim Report.[1]

## II. BACKGROUND

### a. Duties of the Monitor

On October 5, 2018, this Court appointed the Monitor and detailed the scope of her monitoring duties and authorities in the Monitoring Order (ECF No. 494). The Monitor is tasked with monitoring compliance with certain orders of the Court, resolving issues between the parties related to compliance with those orders, making findings of fact and preparing formal Reports and Recommendations to the Court regarding monitoring and compliance with the Court's orders, and advising and updating the Court on the status of Defendants' compliance with the Court's orders. *Id.* at 6-7. The Monitoring Order also adopts and incorporates the review provisions and timelines set forth in Federal Rule of Civil Procedure 53(f). *Id.* at 23.

The Monitoring Order requires that "[w]ithin 90 days after the Effective Date, and every 90 days thereafter through the end of the Term, the Monitor shall file on the case docket a Report and Recommendation regarding Defendants' substantial compliance with the June 27, 2017 and July 30, 2018 Orders, or other Court orders issued during the Term, as well as any recommendations for steps necessary to remedy any non-compliance." *Id.* at 21. The Monitor filed the First Report on March 6, 2019 (ECF No. 528), and the Second Report on August 19, 2019 (ECF No. 625). No other Reports have been filed pursuant to this provision of the Monitoring Order.

---

[1] For the Court's awareness and for consistency purposes, the page number citations to the Monitoring Order and Interim Report correspond to the PDF pagination of the filed documents. ECF Nos. 494; 1103.

The Monitoring Order further provides that:

> During the course of her monitoring duties, if the Monitor discovers potential breaches of the Flores Agreement that are beyond the scope of the June 27, 2017, July 27, 2018, or July 30, 2018 Orders, she shall bring them to the Court's and the Parties' attention. The Court, in its discretion, may authorize the Monitor to investigate the potential breaches, request briefing from the Parties thereon, hold hearings or mediation relating thereto, and issue a Report and Recommendation thereon to the Court if the matter cannot be resolved through mediation.

*Id.* at 7. The Monitor also may file an Interim Report and Recommendation, "if the Monitor has a good faith basis to believe that there is a significant violation of the Court's Orders that cannot reasonably be addressed through a Report and Recommendation due to its exigency." *Id.* at 22-23. An Interim Report should include "any recommendations for steps necessary to improve Defendants' compliance and the reason for the urgency," and "[p]rior to filing the Interim Report and Recommendation, the Monitor shall afford the Parties a reasonable opportunity to be heard and to expeditiously cure any violation." *Id.* at 23.

On April 23, 2020, the Monitor filed a "Response Containing Further Information" relating to the Monitor's monitoring duties (ECF No. 780). On June 25, 2020, the Monitor filed an Interim Report (ECF No. 827) regarding monitoring conducted based on the Court's May 22, 2020 order (ECF No. 799). The Monitor also filed two Interim Reports on July 22, 2020 (ECF No. 873) and August 26, 2020 (ECF No. 938), regarding the government's use of hotels to house minors being expelled under Title 42.

b. **Summary of the Monitor's Recent Report**

Most recently, on April 2, 2021, the Monitor filed an "Interim Report on Defendants' Response to January – March Influx" (ECF No. 1103). The Interim Report "attempt[s] to paint a picture of this 'influx,' as defined in the [Agreement], on [U.S. Customs and Border Protection ("CBP")] and [U.S. Department of Health

and Human Services ("HHS") – Office of Refugee Resettlement ("ORR")], two major components of the complex United States immigration system." *See* Interim Report at 6. To this end, the Interim Report issued six findings and six general policy recommendations in response to those findings.

First, the Interim Report finds that "Emergency Intake Sites represent a constructive means of temporarily compensating for the limited capacity of the ORR shelter system." *See id*. at 28. The Interim Report finds that current ORR standards for children in permanent shelters comply with the *Flores* safe and sanitary standards. As for the Emergency Intake Sites, the Interim Report states that "ORR is working with FEMA, the American Red Cross, the HHS Office of the Assistant Secretary for Preparedness and Response, the U.S. Public Health Service Commissioned Corps, and private contractors to provide 'wraparound' services, including the provision of clean and comfortable sleeping quarters, personal hygiene facilities, catering, laundry services, camp management, recreation and more at these sites." *Id*. at 18. However, the Interim Report states that "the quality and scope of these services, including medical care" needs to be continuously assessed, especially as to the care of children with elevated risk factors and "those who have tested positive for COVID-19 prior to transfer from CBP." *Id*. Due to the existing influx, the Interim Report generally recommends that the government should "[p]rioritize the development of custodial, medical, and processing standards specific to Emergency Intake Sites that safeguard the health, safety, and well-being of minors in the Emergency Intake Sites and Influx Care Facilities." *Id*. at 28.

Second, the Interim Report finds that "[d]edicated case management personnel at the Emergency Intake Sites and temporary Influx Care Facilities are critical to expeditious reunification with family or sponsors and to ensure safe housing for the minors." *Id*.  As previously discussed, the Interim Report indicates that ORR is working with the American Red Cross and other organizations at the Emergency Intake Sites. The Interim Report notes that "descriptions of the various

Emergency Intake Sites do not include ORR's plans for professional staff support for case management," but affirms that these sites "provide a standard of care higher than what is possible at CBP facilities." *Id*. at 18, 21. Nonetheless, the Interim Report recommends "adequate professional case management services onsite at Emergency Intake Sites in order to facilitate rapid reunification with family or sponsors," instead of volunteers from the Red Cross and other nonprofits. *Id*. at 28-29.

Third, the Interim Report finds that "[i]nternal monitoring by the ORR Juvenile Coordinator has been a key to ensuring enforcement of the *Flores* standards." *Id*. at 29. The Interim Report specifically focuses on the development of Emergency Intake Sites and these sites' location, diverse layouts, the involvement of multiple government agencies, and the large numbers of children to be housed in these facilities to make a general finding of a "need for strong, pragmatic custodial and medical standards specific to those facilities, as well as an appropriately skilled work-force." *Id*. at 27. The Interim Report acknowledges that "the standards for length-of-stay, occupancy, availability of legal services and other medical and custodial services remain in development…" *Id*. Nonetheless, the Interim Report then recommends enhancing the Juvenile Coordinator role to include additional personnel dedicated to internal monitoring of the Emergency Intake Sites and Temporary Influx Care Facilities in order to focus attention on conditions, population size, length-of-stay, and available medical care at these new temporary facilities. *Id*.

Fourth, the Interim Report states that while regular assessments by the CBP, ICE, and ORR Juvenile Coordinators reported to the Monitor and the Court are "extremely useful," they "do not generally address medical considerations or data, including children with special needs, patterns of referral to external health facilities, or sentinel medical events (e.g. admission to hospital ICUs)." *Id*. at 29-30. This finding does not discuss the existing network of medical experts who work with ORR and CBP on the development of these facilities. However, the Interim Report

finds that "[a]dditional contracted medical experts are necessary to perform that function adequately given the large number of additional temporary facilities located thousands of miles apart." *Id*. at 30. To that end, the Interim Report recommends "temporary utilization of additional medical experts to monitor medical capabilities of the emerging temporary facilities." *Id*.

Fifth, the Interim Report speculates that given the influx, serious medical events will occur more frequently to warrant focused attention. *Id*. The Interim Report acknowledges that ICE, HHS, CBP, and FEMA "all have substantial medical systems" to meet the special responsibilities of their mandated purview, and their medical capabilities are "designed to maintain the health of children as well as to provide an ultimate safety net for the prevention of serious medical conditions while in custody." *Id*. at 30. The Interim Report indicates that "much is still unknown about the standard of care that will be provided at proposed Emergency Intake Sites," and it does not provide an assessment of the medical capabilities on site, but again affirms that these sites "provide a standard of care higher than what is possible at CBP facilities." *Id*. at 18, 20. Nonetheless, the Interim Report recommends "[i]mplementation of new medical capabilities in Emergency Intake Sites to transition care from a FEMA disaster posture to the more child-focused systems of ORR and provide high quality medical services for the many children who have tested positive for COVID-19 in the EISs." *Id*. at 30.

Finally, the Interim Report finds that given the surge of UACs entering custodial systems, there is a need for coordination across the engaged medical systems. *Id*. at 31. The Interim Report notes that "CBP's recent implementation of a formal, multi-layered medical system for detained children and families has proven to be essential in responding to humanitarian challenges of the influx." *Id*. at 13. CBP contracted medical teams are responsible for performing a variety of tasks and emergency medical technicians have been deployed in most Border Patrol stations on a 24/7 basis. *See id*. at 13-14. The Interim Report indicates that the Donna I

facility has had two medical teams in place since its re-opening and in response to the influx, the Donna I facility has received two additional medical teams from the U.S. Public Health Service to supplement the contracted CBP medical teams. However, the Interim Report finds that coordination among the agencies of the medical systems deserves renewed attention in order to prevent medical harm or worse to children. Accordingly, the Interim Report recommends "developing a new and robust system of interagency coordination of medical systems and quality assurance mechanisms." *Id*.

III. **RESPONSES AND OBJECTIONS TO THE INTERIM REPORT**

    a. <u>Defendants respectfully provide the following factual responses to findings and recommendations contained in the Interim Report.</u>

        i. <u>CBP Response</u>

Defendants note the Interim Report's reference (at pages 6-7) that, as of March 3, 2021, CBP had reported 70,273 encounters with unaccompanied children and family units along the Southwest Border during fiscal year 2021 (through February 2021). CBP has since then released updated fiscal year 2021 data. CBP data reflects that, as of April 3, 2021, CBP had encountered 70,301 unaccompanied children and family units in fiscal year 2021 (through February 2021). As of April 3, 2021, CBP has encountered 142,544 unaccompanied children and family units in fiscal year 2021 (through March 2021). *See* <u>https://www.cbp.gov/newsroom/stats/ southwest-land-border-encounters</u>.

Defendants also note that, to the extent any of the data in the Interim Report includes "accompanied minors" in the calculation of family units, such calculations are inaccurate. "Accompanied Minor Child represents a child accompanied by a parent or legal guardian and the parent or legal guardian is either a U.S. Citizen, Lawful Permanent Resident, or admissible alien, and the child is determined to be inadmissible." *See* <u>https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.</u>

    ii. ORR Response

 ORR's responses to the recommendations in the Interim Report are attached hereto. *See* Declaration of Cindy Huang (Huang Decl.). ORR currently is engaged in efforts to rapidly expand its capacity and revamp policies and procedures to ensure that unaccompanied children spend as little time in CBP custody as possible, and are released to a parent or suitable sponsor as quickly as possible. These efforts remain ongoing, and ORR is committed to keeping the Independent Monitor, Dr. Wise, and the Court apprised of these efforts. *See id*. ¶ 10.

 Emergency Intake Sites are novel, temporary emergency sites implemented to address the number of children arriving at the southern border. *Id*. ¶ 13. As a general matter, ORR agrees that Influx Care Facilities are preferable to Emergency Intake Sites, and that licensed shelters are preferable to unlicensed facilities, however, all of these settings are preferable to CBP custody. *Id*. ¶ 11. ORR emphasizes the paramount importance of transferring unaccompanied children out of CBP custody as quickly as possible. *Id*.

 To that end, ORR is developing policies to standardize services at Emergency Intake Sites, and these policies are currently undergoing an expedited clearance process, which will be shared with the Independent Monitor and Dr. Wise as soon as they are finalized. *Id*. ¶ 13. Policies related to Influx Care Facilities have been developed and are found in Section 7 of the ORR Policy Guide, which is available online. *See* https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied-section-7#7.2. In addition, ORR has case management services at all Emergency Intake Sites that opened in March, and is ramping up case management services at sites that opened in April in order to rapidly reunify unaccompanied children with their parents, legal guardians and close relatives. *Id*. ¶ 14. ORR's Division of Health for Unaccompanied Children is comprised of physicians, epidemiologists, and mental health professionals who operate in close consultation with the CDC and medical service providers at the Emergency Intake

Sites. *Id*. at ¶ 16. Currently, all operational Emergency Intake Sites have medical services in place and there are medical isolation areas set aside for COVID-positive unaccompanied children at all but one Emergency Intake Site in operation (where ORR is rapidly working to create a COVID-positive isolation area). *Id*. at ¶ 17. ORR also is ensuring the provision of medical services with the support from deployed U.S. Public Health Services Officers, while CDC is providing consultation on public health efforts. *Id*. As such, ORR remains committed to ensuring the safety and wellbeing of unaccompanied children throughout this process.

      b. <u>Defendants respectfully object to the Interim Report because it does not follow proper procedure and provides generalized policy recommendations for Defendants that are not tied to the terms of the Agreement or Defendants' compliance therewith.</u>

The Monitor is charged with monitoring Defendants' compliance with the Agreement, as interpreted by certain orders of this Court. *See* Monitoring Order at 6. "The Monitor shall have no authority to intervene in or direct Defendants' activities." *Id.* at 9. The Monitoring Order provides for Reports and Interim Reports to be filed in specific circumstances, none of which is present here. Additionally, the Interim Report goes beyond the scope of the Monitor's duties because it does not address compliance with the Agreement, but instead provides generalized policy recommendations for Defendants that are not required by—or tied to—the Agreement's terms.

      First, the Monitoring Order provides that an Interim Report should be filed in circumstances where the Monitor has "a good faith basis to believe that there is a significant violation of the Court's Orders that cannot reasonably be addressed through a Report and Recommendation due to its exigency." Monitoring Order at 22-23. The Interim Report does not explain how or why this standard is met at this time, so it is not possible to gauge whether the Interim Report is appropriate or necessary at this time. While the Interim Report states that it is filed pursuant to the Court's order that the Monitor should continue to monitor CBP, ORR, and ICE

facilities (ECF No. 1103 at 5 (citing ECF No. 1098)), in substance it serves more as a summation of the current state of operations, without identifying the portions of the Agreement that are being monitored or the standards being considered to address Defendants' compliance or lack thereof. Indeed, in many ways, the Interim Report appears to find Defendants in compliance with aspects of the Agreement, finding "that basic nutrition, sanitation, and medical requirements have continued to be met reflects the extraordinary efforts CBP has made to address the current custodial challenges[,]" *see* Interim Report at 27, and that "[t]he reopening of temporary Influx Care Facilities intended to operate under the standards described by the Department of Health and Human Services is a welcome development in reducing the overcrowded environment. The rapid development of the Emergency Intake Sites also represents a constructive strategy to move children out of CBP custody while ORR shelter capacity remains inadequate." *Id.* Because the purpose of the Interim Report and the authority for its filing is unclear, Defendants would, at a minimum, respectfully object to the Court's adoption of any findings or recommendations in the Interim Report without following the requirements of Rule 53(f).

Second, the Interim Report does not tie its findings and recommendations to any assessment of Defendants' compliance with the Agreement, but rather it provides generalized policy recommendations for Defendants that do not appear to be clearly tied to the Agreement's terms. Notably, the Agreement is referenced only one time in the Interim Report, to provide a definition of "influx." *See* Interim Report at 6. None of the six findings and recommendations is specifically tied to any provision of the Agreement, and thus Defendants respectfully object to the findings and recommendations contained in the Interim Report being raised in the context of this litigation to the extent they are tied to generalized policy aims and not the terms of the Agreement. In addition to following the requirements of Federal Rule of Civil Procedure 53(f), the Court should also decline to consider findings and recommendations in the Interim Report that go beyond the scope of the *Flores*

Settlement Agreement, as this litigation is not the appropriate forum for addressing the implementation of more generalized policy goals.

The first recommendation is to "[p]rioritize the development of custodial, medical, and processing standards specific to Emergency Intake Sites that safeguard the health, safety, and well-being of minors in the Emergency Intake Sites and Influx Care Facilities." *Id*. at 28. The Interim Report affirms that "current ORR standards for children in permanent shelters are well defined and embrace the *Flores* safe and sanitary standard." *Id*. The Interim Report also acknowledges that the Monitor is unaware "what systems of care have been developed to ensure the wellbeing of children housed in these new temporary Emergency Intake Sites." *Id*. at 28; *see also* Huang Decl., ¶ 13 (noting that ORR is developing policies to standardize services at Emergency Intake facilities, and these policies are currently undergoing an expedited clearance process, which will be shared with the Independent Monitor and Dr. Wise as soon as they are finalized.  Policies related to Influx Care Facilities are developed and found in Section 7 of the ORR Policy Guide, which is available online). The Interim Report does not detail what requirements of the Agreement would be met through this recommendation, nor does it explain what, specifically, Defendants need to do to meet any specific requirements of the Agreement that may be at issue with regard to this recommendation, as opposed to more general policy aims.

The second recommendation is to provide "adequate professional case management services onsite at Emergency Intake Sites in order to facilitate rapid reunification with family or sponsors." Interim Report at 28-29. While release without unnecessary delay is a requirement of the Agreement, Agreement ¶ 14, the Interim Report does not explain precisely what Defendants are doing that does not meet it. Instead, the Interim Report commends the dedication of volunteers from the Red Cross and other nonprofit organizations, but then recommends "adequate professional case management services onsite…" without providing a reasoned

explanation as to how or why the former method does not accomplish the Agreement's objectives, or why the recommended method is necessary to meet the requirements of the Agreement. *Id*. at 28-29. As discussed above, ORR does in fact have case management services at all Emergency Intake Sites that opened in March, and is ramping up case management services at sites that opened in April in order to rapidly reunify unaccompanied children with their parents, legal guardians and close relatives. *See* Huang Decl., ¶ 14. Thus, even if case management services are required to meet the terms of the Agreement, ORR is in compliance.

The third recommendation is to enhance the ORR Juvenile Coordinator's role to include additional personnel dedicated to internal monitoring of the Emergency Intake Sites and Temporary Influx Care Facilities in order to focus attention on conditions, population size, length-of-stay, and available medical care at these new temporary facilities. *Id*. at 29. The role of the Juvenile Coordinator is specifically delineated in the Agreement, and the Interim Report does not explain how this recommendation, which would greatly expand the role of the Juvenile Coordinator and the burdens involved in his or her role, meets any requirement of the Agreement or is necessary to comply with the Agreement's specific terms. *See also* Huang Decl. ¶ 15. While enhancing the role of the Juvenile Coordinator may be beneficial as a matter of general policy, the Interim Report does not explain how the narrow terms of the Agreement would require changes to the Juvenile Coordinator's activities in the broad manner recommended in the Interim Report.

The fourth recommendation is to provide "temporary utilization of additional medical experts to monitor medical capabilities of the emerging temporary facilities." Interim Report at 30. The Interim Report affirms that regular assessments by the CBP, ICE, and ORR Juvenile Coordinators reported to the Monitor and the Court are "extremely useful." *Id*. at 29. To the extent that the reports of the Juvenile Coordinators do not address specific medical considerations or data, Defendants respectfully note that the Agreement does not contain any such obligation.

Moreover, the Interim Report once again does not explain why or how Defendants are required by the terms of the Agreement to conduct or provide such assessments. *See also* Huang Decl., ¶ 16 (noting that ORR's Division of Health for Unaccompanied Children is already comprised of physicians, epidemiologists, and mental health professionals who operate in close consultation with the CDC and medical service providers at the Emergency Intake Sites). In the absence of any such explanation, this recommendation would appear to go beyond the narrow terms of what is required by the Agreement.

The fifth recommendation is "[i]mplementation of new medical capabilities in Emergency Intake Sites to transition care from a FEMA disaster posture to the more child-focused systems of ORR and provide high quality medical services for the many children who have tested positive for COVID-19 in the EISs." Interim Report at 30. As above, even if this recommendation reflects a laudable policy goal, the Interim Report does not tie it to any term of the Agreement. This litigation—and the Monitor's role therein—addresses only the government's compliance with the Agreement, and not more general policy or operational goals that, while they may be helpful for the agency to consider, go beyond the Agreement's plain terms. *See also* Huang Decl., ¶¶ 17-19 (explaining that Emergency Intake Sites are temporary emergency sites that provide a "crisis standard of care" and noting that the Interim Report does not identify any specific medical services unavailable at these sites). Thus, Defendants respectfully object to this recommendation in the context of this litigation.

Finally, the sixth recommendation is to develop "a new and robust system of interagency coordination of medical systems and quality assurance mechanisms." Interim Report at 31. As above, the Interim Report does not explain how this generalized policy recommendation ties back to any specific provision of the Agreement, or is plainly required by the Agreement's terms. *See also* Huang Decl., ¶ 20 (noting the existing interagency coordination efforts already in place). Without

more, this recommendation too is not properly made in the context of monitoring compliance with the Agreement.

While many of the recommendations contained in the Interim Report may contain useful commentary, and reflect laudable policy goals, Defendants respectfully object to their consideration in this context because the vast majority of findings of fact and recommendations in the Interim Report are not tied to—and go well beyond—the plain terms of the Agreement. In that sense, the Interim Report attempts "to intervene in or direct Defendants' activities," rather than provide recommendations for compliance with the Agreement, in contravention to the Monitoring Order. Monitoring Order at 9. Thus, Defendants respectfully object to the broad scope of findings and recommendations contained in the Interim Report.

## IV. CONCLUSION

For all of the above reasons, Defendants ask the Court not to adopt the broad policy recommendations issued in the Interim Report. While the findings and recommendations in the Interim Report may contain useful commentary, and reflect laudable policy goals, they are not specifically tied to any provision of the Agreement, but rather extend beyond the scope of the Agreement's terms into areas of policy that fall outside of the Monitor's mandate. If the Court intends to consider or adopt any portion of the Interim Report, Defendants respectfully ask that the Court follow the procedures required by the Monitoring Order and Federal Rule of Civil Procedure 53(f) before doing so.

DATED: April 9, 2021          Respectfully submitted,

BRIAN BOYNTON
Acting Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
NICOLE N. MURLEY
Senior Litigation Counsels

*/s/ Fizza Batool*
FIZZA BATOOL
Trial Attorney
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-4863
Fax: (202) 305-7000
Email: fizza.batool2@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2021, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Fizza Batool*
FIZZA BATOOL
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants