UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MERRICK B. GARLAND, Attorney General of the United States, *et al.*, <br><br> Defendants. | Case No.: 2:85-cv-04544-DMG |

# DECLARATION OF CINDY HUANG, DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

I, Cindy Huang, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.   I am the Director of the Office of Refugee Resettlement ("ORR") in the Administration for Children and Families ("ACF") at the U.S. Department of Health and Human Services ("HHS").

2.   I have held the position of Director since March 2021.

3.   Prior to joining ORR, I was the vice president of strategic outreach at Refugees International, where I led efforts to expand support for improved protection and outcomes for displaced people.

4.   As a senior executive in government and nonprofit sectors, I led policy and programmatic initiatives to deliver innovative solutions and major improvements in service delivery for vulnerable populations. As the deputy vice president for sector operations at the Millennium Challenge Corporation, I was responsible for the strategic direction and technical

1

oversight of a $2 billion program portfolio to reduce poverty and advance gender and social inclusion in developing countries.  While at the State Department, I managed the interagency team that designed and implemented Feed the Future, the U.S. Government's global hunger and food security initiative, and served as the director of policy in the Bureau of Conflict and Stabilization Operations.

5.  I also co-directed the program on migration, displacement, and humanitarian policy at the Center for Global Development where I led projects focused on supporting Syrian and Rohingya refugees and their host communities, and worked for Doctors without Borders in Kenya, Nigeria, and South Sudan.

6.  I hold a Ph.D. in sociocultural anthropology from the University of California, Berkeley, a Master in Public Affairs from the Princeton School of Public and International Affairs, and a B.A. in ethics, politics, and economics from Yale University.

7.  As the Director of ORR, I have responsibility for the oversight of the Unaccompanied Alien Children ("UC") program, including all aspects of operations, planning and logistics, medical services, and monitoring.  My job duties include the formulation and implementation of ORR's response to the ongoing surge at the Southern border, including the establishment of temporary Emergency Intake Sites ("EIS") and Influx Care Facilities ("ICF"), as well as the modification of ORR's policies and procedures to better address the exigencies of this unprecedented situation.

8.  My testimony in this declaration is based upon the personal knowledge gained through the performance of my duties, and information obtained from records and systems maintained by ORR in the regular course of performing my job duties.

9. I submit this declaration in order to provide ORR's response to the findings and recommendations of the April 2, 2021 Interim Report of the Independent Monitor and Dr. Paul Wise regarding Defendants' response to the January-March Influx. Dkt. No. 1103.

10. As an initial matter, it is important to understand that the current influx is not limited to the January-March time period, but is an ongoing challenge that will likely increase in severity in the coming weeks and months. Accordingly, ORR is engaged in an unprecedented effort to rapidly expand its capacity and revamp policies and procedures to ensure that UC spend as little time in the custody of U.S. Customs and Border Patrol ("CBP") as possible, and are released to a parent or suitable sponsor as quickly as possible. These efforts remain ongoing, and ORR is committed to keeping the Independent Monitor, Dr. Wise, and the Court apprised of these efforts.

11. ORR appreciates the Interim Report's acknowledgement that the U.S. Government is dealing with an unprecedented number of UC apprehended at the border and that ORR has vastly expanded its capacity in a short amount of time. As a general matter, ORR agrees that ICFs are preferable to EISs, and that licensed shelters are preferable to unlicensed facilities. Despite the differences between these various types of facilities, however, all of these settings are preferable to CBP custody and it is of paramount importance that UC are transferred out of CBP custody as quickly as possible.

12. ORR also appreciates the Interim Report's determination that all of the EIS facilities visited by Dr. Wise "are providing physical security, food, clothing, sanitation, and medical care." Dkt. No. 1103, p.18.

13. Regarding the Interim Report's first recommendation that ORR prioritize the development of custodial, medical, and processing standards that safeguard the health, safety, and

well-being of minors at EISs and ICFs, it should be noted that EISs are novel temporary facilities implemented with urgency to address the historic number of children arriving at the border. Given the significant overcrowding at CBP facilities, immediate implementation of EIS facilities was viewed as critical to ensuring the welfare of UC and was prioritized over the development of nuanced policies governing these sites. However, ORR has been working diligently to develop policies standardizing services at EIS facilities, and these forthcoming policies are currently undergoing an expedited clearance process. ORR will share these policies with the Independent Monitor and Dr. Wise as soon as they are finalized. Robust policies relating to ICFs have already been developed and are found in Section 7 of the ORR Policy Guide, which is available online.[1]

14. The Interim Report's second recommendation—that ORR provide adequate professional case management services onsite at EISs in order to facilitate rapid unification with family or sponsors—is a top priority for ORR. ORR approached the implementation of EIS facilities in two phases. ORR first focused on ensuring that EISs offered basic life-sustaining services to allow as many UC as possible to be removed from CBP custody as quickly as possible, before focusing on case management services. Case management services are essential to ORR's recently expedited release initiative, which seeks to rapidly reunify UC with their parents, legal guardians and close relatives (i.e., Category 1 and Category 2A sponsors). Currently, ORR has case management services at all EISs that opened in March, and is ramping up case management services at EISs that opened in April.

15. Regarding the Interim Report's third recommendation that ORR consider enhancing the Juvenile Coordinator role to include additional personnel dedicated to internal

---

[1] ORR Guide, § 7: Policies for Influx Care Facilities, https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied-section-7#7.2.

monitoring of EISs and ICFs, ORR's Juvenile Coordinator already serves an integrated role in ORR's operation and coordination of EISs and ICFs. ORR's Juvenile Coordinator participates in daily coordination calls that include a broad range of participants and stakeholders in the UC Program, including the Division of Planning and Logistics, Division of Health for Unaccompanied Children, Division of Unaccompanied Children Operations (i.e., Intakes Team, Support Services Team, Project Officers Team, and Federal Field Staff Team), Division of Policy and Procedures, and the Compliance and Monitoring Team. Staff serving as points of contact at each EIS and ICF provide direct updates at these daily meetings. Additionally, the Juvenile Coordinator is directly supported by members of the Division of Policy and Procedures, who are themselves involved in several efforts to coordinate services for UC.

16.     Regarding the Interim Report's fourth recommendation that ORR consider temporary utilization of additional medical experts to monitor medical capabilities of EISs, ORR's Division of Health for Unaccompanied Children is a robust team composed of physicians, epidemiologists, and mental health professionals. They operate in close consultation with the CDC and medical service providers at EISs. In addition, they participate on teams responsible for coordinating EIS implementation and services multiple times throughout the day. Accordingly, ORR does not presently intend to utilize additional medical experts to engage in monitoring activities.

17.     Regarding the Interim Report's fifth recommendation that ORR transition from a FEMA disaster-relief posture to ORR's child-focused system and provide high quality medical services for COVID-19 positive UC in EISs, it should be noted that all operational EIS currently have medical services in place and there are medical isolation areas set aside for COVID-positive UC at all but one EIS currently in operation. In this site, ORR is rapidly working to create a

COVID-positive isolation area. ORR is ensuring the provision of medical services with the support from deployed U.S. Public Health Services Officers, while CDC is providing consultation on public health efforts. In addition, ORR has secured contracts for the provision of medical services at several EISs.

18.   Each child placed into an EIS facility will receive a modified health assessment, to include medical history, physical examination, and symptom-based screenings. Additionally, children will receive, at a minimum, MMR and varicella vaccinations. EIS facilities have been directed to implement COVID-19 testing upon intake and for any child who develops symptoms after intake. Depending on available resources at a given EIS facility, rapid tests and/or PCR tests may be used, and more frequent testing algorithms may be implemented. CDC has been advising EISs locally during this Influx period.

19.   However, ORR does not believe it will be feasible to replicate the full panoply of medical capabilities available in an ICF or shelter setting. EIS are by definition temporary emergency sites, and are focused on providing a crisis standard of care until UC can be transferred to a better-resourced setting, like an ICF or licensed shelter (or, ideally, released to a parent or sponsor). Requiring EISs to match the medical capabilities of ICFs would make it nearly impossible to establish EISs quickly enough to meaningfully decompress overcrowded CBP facilities. ORR notes that the Interim Report does not identify any specific medical services that are not available at EIS facilities and welcomes further clarification from the Independent Monitor and Dr. Wise regarding specific medical services they believe should be, but are not currently, provided at EIS facilities.

20.   Regarding the Interim Report's sixth recommendation that ORR develop a new and robust system of interagency coordination of medical systems and quality assurance mechanisms,

6

ORR is already working to enhance coordination between the various stakeholders involved in the surge response, including the provision of medical care to UC. Several interagency teleconferences occur on a daily basis, which cover coordination of medical services. Among these daily calls are meetings focused on the overall staff and services at all EISs, as well as separate calls focused on each individual EIS. There is also an interagency coordination effort that tracks the movement of UC from DHS facilities to placement at ORR facilities and briefings for leadership at various branches of HHS and DHS. Among the participants on each of these calls are representatives from FEMA, USCIS, DHS, HHS, ACF, and ORR. While ORR remains committed to improving interagency coordination as described above, the creation of a "new and robust system" would be a substantial undertaking under the best of circumstances, and likely will not be feasible given the pace of operations necessary to respond to the dual challenges of the influx and pandemic.

21. ORR remains committed to ensuring the safety and wellbeing of UC, and will continue to strive to improve all aspects of the ongoing response to the unprecedented situation at the Southern border.

Executed on April 9, 2021.

_____
Cindy Huang