# EXHIBIT G

Rob Bonta
Attorney General of California
Michael L. Newman
Senior Assistant Attorney General
Sarah E. Belton
Supervising Deputy Attorney General
Virginia Corrigan (SBN 292035)
Rebekah A. Fretz (SBN 300478)
Vilma Palma-Solana (SBN 267992)
Julia Harumi Mass (SBN 189649)
Deputy Attorney General
State Bar No. 189649
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-3300
  Fax:  (510) 622-2270
  E-mail:  Julia.Mass@doj.ca.gov

*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **State of California, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**Alejandro Mayorkas,** in his official capacity as Secretary of Homeland Security, **et al.,**<br><br>Defendants. | 2:19-cv-07390-DMG (AGRx)<br><br>**DECLARATION OF CARLOS HOLGUÍN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  July 23, 2021<br>Time:  10:00 a.m.<br>Courtroom:  8C<br>Judge:  Dolly M. Gee<br>Trial Date:  N/A<br>Action Filed: August 26, 2019 |

DECLARATION OF CARLOS HOLGUÍN

I, Carlos Holguín, declare as follows:

1.     I am a resident of the State of California and I am over the age of 18.  I execute this declaration based on my personal knowledge, except as to those matters based on information and belief, which I believe to be true. If called to testify in this case, I would testify competently about these facts.

2.     I am General Counsel at the Center for Human Rights & Constitutional Law and one of the attorneys for the plaintiff class in *Flores v. Garland*, No. 2:85-cv-04544-DMG-AGR (C.D. Cal.). I was class counsel in *Flores* when a settlement was approved in 1997, and have continued to represent the class members the settlement protects to this day. As part of monitoring compliance with the settlement, I have frequently visited various facilities in which the Office of Refugee Resettlement (ORR) detains class members and have interviewed dozens of children regarding the treatment and conditions they experience during immigration-related detention.

3.     On March 30, 2021, *Flores* co-counsel and I toured and interviewed class members detained at ORR's "emergency intake site" (EIS) in Midland, Texas. On June 3 and 4, 2021, co-counsel and I, along with Plaintiffs' mental health expert toured and interviewed *Flores* class members detained at ORR's Fort Bliss EIS near El Paso, Texas. *Flores* co-counsel have also conducted monitoring visits and interviewed over one hundred children detained at EISs, including the Dimmit EIS in Carrizo Springs, Texas, the Freeman Expo Center EIS in San Antonio, Texas, the Kay Bailey Hutchinson Convention Center EIS in Dallas, Texas, the Lackland Air Force Base EIS in Lackland, Texas, the Long Beach Convention Center EIS in Long Beach, California, the Pecos EIS in Pecos, Texas, and the Starr Commonwealth EIS in Albion, Michigan.  *Flores* class counsel has also visited and interviewed children at the Carrizo Springs Temporary Influx Shelter in Carrizo Springs, Texas.

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

**Background**

4.      On information and belief, in 2020, the Trump administration adopted a policy of summarily expelling asylum seekers, including unaccompanied children pursuant to Title 42 of the United States Code, ostensibly to protect public health during the COVID-19 pandemic. This policy led to a dramatic decline in the population of children in ORR custody. Many of these children were returned to the same dangerous conditions in their home countries that led them to flee to the United States in the first place. Others waited in dangerous conditions in Mexico hoping for a chance to enter the United States.

5.      In November 2020, a federal judge enjoined the summary expulsion of unaccompanied children under Title 42 of the United States Code. *See P.J.E.S. v. Wolf*, No. 20-cv-2245, 2020 WL 6770508 (D.D.C. Nov. 18, 2020), stayed pending appeal, *P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021). On information and belief, as a result, a pool of unaccompanied children who had previously been denied refuge in the United States were able to seek asylum at the U.S.-Mexico border, whereupon they were transferred to ORR custody, as the Trafficking Victims Protection Reauthorization Act of 2008 directs, pending adjudication of their asylum claims.

6.      In November 2020, the so-called "Northern Triangle" of Central America—comprising El Salvador, Honduras, and Guatemala—suffered two devastating hurricanes, Hurricane Eta and Hurricane Iota, which, on information and belief, further impoverished a region already reeling from the COVID-19 pandemic and endemic violence. In addition, the number of children entering the United States historically increases in the spring when travel across the desert of northern Mexico is less arduous. The foregoing "push factors" combined with this seasonal variation to increase the numbers of children placed in ORR custody pending adjudication of their claims for refuge in the United States.

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

7. The *Flores* settlement requires that federal authorities place children in facilities holding a state license to care for dependent, as opposed to delinquent, children within three days of entering immigration-related custody, or as expeditiously as possible in the event of an emergency or influx. *See Flores* Settlement ¶ 12.A. Despite the predictable increased need for ORR shelter beds, ORR has not sufficiently increased its licensed capacity to accommodate the increased number of children in its custody.

8. Instead, in the past, ORR has relied on unlicensed influx care facilities (ICF) to house unaccompanied children it could not accommodate in licensed facilities. This year, ORR resorted to using a new type of facility, the EIS, for the first time. Unlike ICFs, when ORR began operating EISs, it had no established standards for the treatment and conditions class members would experience in EISs. Reports of mistreatment and substandard conditions at EISs quickly ensued, prompting counsel to increase efforts to monitor compliance with the *Flores* settlement.

**Emergency Intake Sites Overview**

9. According to ORR guidance, EIS facilities "are designed for mass care with basic standards to meet immediate sheltering needs of unaccompanied children." Exhibit (Ex.) A, Office of Refugee Resettlement, ORR Field Guidance # 13, Emergency Intake Sites (EIS) Instructions and Standards at 1, April 30, 2021 (ORR EIS Instructions and Standards). Although these facilities are not intended for long-term use, ORR's Juvenile Coordinator reported that as of May 31, 2021, 2,177 children had spent 41 days or longer in an EIS, and an additional 2,622 children had spent between 21 and 40 days in an EIS. Ex. B, ORR Juvenile Coordinator Report at 4, 7, *Flores v. Garland*, No. 2:85-cv-04544-DMG-AGR (C.D. Cal. June 4, 2021) [Doc. #1124-2].

10. EISs have lower standards of care than ICFs and provide children few of the services they receive in licensed facilities or even in ICFs. For example,

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

under ORR policy, ICFs must provide children with an individualized needs assessment, educational services in a structured classroom setting Monday through Friday, daily outdoor activity, structured leisure time activities, regular individual and group counseling, access to religious services, and a reasonable right to privacy. *See* Ex. C, ORR Policy Guide 7.5.1. Licensed facilities, of course, must meet state requirements for care of dependent children, which are typically much more exacting than ORR's ICF guidelines. EISs, by contrast, merely aspire to "seek to provide" some of these services "to the extent practicable." Ex. A, ORR EIS Instructions and Standards at 3.

11.     During site visits by *Flores* counsel to EISs, children nearly uniformly report that such facilities provide them little, if any, education or outdoor recreation, leaving children with little to do except sit on their cots all day for weeks at a time. During my visit to the Fort Bliss EIS—ORR's largest EIS—children reported receiving minimal instruction in English as a second language only, and that what instruction they do receive takes place in immense and noisy tents housing approximately 300 to 600 other children. Some EIS facilities, including the Kay Bailey Hutchinson Convention Center, did not provide children *any* access to outdoor recreation. *See* Ex. D, Declaration of Leecia Welch ¶ 38. According to U.S. Government census data provided to *Flores* counsel, ORR detained over 300 children at the Kay Bailey Hutchinson Convention Center for 50 days or longer.

12.     Several EISs have the capacity to detain thousands of children at a time.  For example, when I visited Ft. Bliss there were over 3,100 children detained at the facility.  Although ORR aspires to have a 1:15 youth care worker to child ratio at EIS facilities, Ex. A, at 5 (ORR EIS Instructions and Standards), children I interviewed at Ft. Bliss reported feeling isolated.

13.     I have also observed that children at EIS facilities often lack minimal privacy. At Fort Bliss, I observed approximately 300 to 600 children living in a single tent. The children sleep in tightly spaced bunk cots. There is not enough

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

room for the child in the bottom bunk to sit up. Similarly, at the Dallas Convention Center, *Flores* counsel observed that thousands of children slept on cots in one large conference room. See Ex. D, Declaration of Leecia Welch ¶ 26.

14.     Children at some EIS facilities, the Fort Bliss EIS for example, have also reported to me receiving undercooked food, being permitted to speak with their family members only twice weekly for ten minutes per session, having no opportunity to visit with their parents or other family members, and no access to legal services apart from a generalized "know your rights" presentation.

15.     As best as *Flores* counsel are able to determine, ORR places some children directly in licensed facilities, while others are sent to EISs, according to no discernable criteria. Some children sent to EISs report experiencing serious and, as best *Flores* counsel is able to determine, needless, arbitrary delays in being reunited with their families.

16.     In my opinion, part of the explanation for some children experiencing protracted detention in EISs is that ORR does not require that an EIS have case management services in place when it opens, or by any time certain after it begins receiving children. Ex. A, ORR Instructions and Standards at 4. ORR has recently reported that case management services are now in place in every EIS, but admits that some such facilities are still in the process of ramping up case management. Ex. B, ORR Juvenile Coordinator Report at 9, *Flores v. Garland*, No. 2:85-cv-04544-DMG-AGR (C.D. Cal. June 4, 2021) [Doc. #1124-2]. During site visits, some children at EIS facilities repeatedly report having spent weeks and sometimes over a month before meeting with a case manager. Children's parents and other prospective custodians have also reported to me not having been contacted by a case manager for extended periods and that they are bewildered as to why their children have not been released.

//

//

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

**Emergency Intake Sites – Population Data**

17.     Pursuant to Paragraphs 28 and 29 of the *Flores* settlement, ORR provides *Flores* class counsel with statistical reports on all children in its custody. Among other things, these reports identify class members, indicate the name and type of facility in which they are detained, and provide the date on which each child came into ORR custody.

18.     According to the reports to *Flores* class counsel that ORR makes pursuant to Paragraphs 28 and 29 of the *Flores* settlement, as of May 14, 2021, there were 20,321 children in ORR custody. Of these, 11,780, or 58 percent, were in EISs. An additional 3 percent were held in the Carrizo Springs ICF.

19.     As of May 14, 2021, 12 EISs and the Carrizo Springs ICF held the following numbers of *Flores* class members:

| Facility | Population Total |
|---|---|
| Carrizo Springs – ICF | 672 |
| Delphi – EIS | 1,314 |
| Dimmit – EIS | 339 |
| Freeman Expo Center – EIS | 718 |
| Ft. Bliss – EIS | 4,565 |
| Kay Bailey Hutchinson Convention Center – EIS | 512 |
| Lackland Air Force Base – EIS | 370 |
| Long Beach Convention Center – EIS | 672 |
| Midland – EIS | 322 |
| Pecos Children's Center – EIS | 1,314 |
| Pomona Fairplex – EIS | 452 |
| San Diego Convention Center – EIS | 1,104 |
| Starr Commonwealth – EIS | 98 |

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

20.     According to HHS reports, ORR also operated EISs at NACC Houston in Houston, Texas, and the Pennsylvania International Academy in Erie, Pennsylvania, but NACC Houston closed on April 17, 2021 and Pennsylvania International Academy closed on April 23, 2021. Ex. E, Administration for Children and Families, Pomona Emergency Intake Site, May 1, 2021. At or around the closure of NACC Houston, according to *Flores* data reports, 40 children were released, nine children aged out of custody, and 432 children were transferred out of this facility. At or around the closure of Pennsylvania International Academy according to *Flores* data reports, one child was released and 145 were transferred to other locations. The ORR Juvenile Coordinator's report indicates that the Kay Bailey Hutchinson Convention Center EIS and the Freeman Expo Center EIS have also since closed.

21.     On June 4, 2021, ORR's Juvenile Coordinator reported that as of May 31, 2021, there were 8,368 children in EISs and 571 children in ICFs out of a total of 17,418 children in ORR custody. According to this report, the population of children in EISs accounts for 48 percent of ORR's total detainee population.

**Tender Age Children in EIS Placement**

22.     As of May 14, 2021, children held at EIS facilities ranged in age from four to 18 years old. Tender-age children, defined by ORR as children under 13 years of age, have been placed at the Long Beach Convention Center EIS, the Midland EIS, the Pomona Fairplex EIS, the San Diego Convention Center EIS, the Starr Commonwealth EIS, and the Pennsylvania International Academy EIS.  On May 1, 2021, ORR announced that the Pomona Fairplex EIS, with a potential capacity of 2,500, would hold children as young as two years old.  Ex. E.

23.     *Flores* counsel conducted a site visit at the Long Beach Convention Center EIS on May 25 and 26, 2021. Immediately prior to this visit, the U.S. Government provided *Flores* counsel a census of children then placed at this facility. Children at the facility ranged in age from five to 17 years old. As of May

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

24, 2021, of the 221 children placed at this EIS, 177 had been there for 20 days or longer, among them, five- and six-year-olds who appear to have each spent over a month at this EIS.

24. *Flores* counsel also visited the Starr Commonwealth EIS on May 12 and 13, 2021. Prior to the visit, the U.S. Government provided *Flores* counsel a census of children placed at this facility, which reported 128 children placed at this facility, ranging in age from five to 17 years. As of May 11, 2021, 80 children had spent 29 days at Starr Commonwealth, including children as young as five years old. Children at Starr Commonwealth reported to *Flores* counsel that they sometimes have difficulty communicating with staff because some staff do not speak Spanish. Additionally, children reported incidents of fighting and observing bullying of younger children.

### Fort Bliss Emergency Intake Site

25. On June 3 and 4, 2021, I visited the Fort Bliss EIS in El Paso, Texas. Prior to this visit, the U.S. Government provided *Flores* counsel a census of children placed at Fort Bliss. According to this census, 3,151 children were placed at Fort Bliss as of June 2, 2021. These children ranged from 13 to 17 years of age. Of these, 122 had been detained at Fort Bliss for 60 or more days, and 16 children had been at Fort Bliss since the EIS opened on March 30, 2021.

26. The Fort Bliss EIS comprises numerous large tents set up on a military base. I observed the intake tent, the medical tent, the case management tent, the residential tents, and the cafeteria tent. Hundreds of children are housed in the residential tents, where they sleep on closely spaced bunk cots. Children have little or no privacy in these communal tents. The tents are separated by gender; LGBTQ minors are commingled into the general detainee population.

27. Children are generally prohibited from leaving their assigned tents. When they are allowed to leave their tents, they do so in long, single file lines. Children report being taken outdoors for recreation for about an hour daily, and

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

receiving instruction in English as a second language for perhaps an hour and a half on weekdays, but having have little else to do during the day.

28. Children reported being allowed to telephone their families twice weekly, for ten minutes each time they are permitted to use the telephone. They further report having to make calls from their assigned tents, where facility personnel bring in a number of telephones on the tent's assigned telephone days. As a result, children have little or no privacy during these brief calls to their family.

29. Children reported having little or no access to legal services apart from attending a "know your rights" presentation. As best I recall, no child reported having received a list of free legal services or having spoken directly to a lawyer prior to the *Flores* monitoring visit.

30. The stressor children most frequently reported at Fort Bliss was not knowing how long they would remain separated from loved ones. The children I spoke to appeared visibly distressed when recounting how they felt seeing more and more of the children with whom they had arrived at Fort Bliss released, leaving them to wonder whether they had simply fallen through the cracks and been forgotten. Some children reported having sought out counseling to help them cope with detention-triggered "tristeza," or sadness, but that such counseling afforded them only marginal relief.

**Midland Emergency Intake Site**

31. On March 30, 2021, I and co-counsel visited the Midland Emergency Intake Site in Midland, Texas. Prior to this visit, the U.S. Government provided *Flores* counsel a census of children placed at Midland. At the time of the visit, there were approximately 590 children at this facility. All were boys between the ages of 14 and 17 years old.

32. We were provided a tour of the facility. The Midland site was previously used as a "man camp" for temporary oil field workers. The children are housed in trailers that are divided into individual rooms and bathrooms, with a

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

common wooden deck area. Children ate their meals in their individual trailers. The facility also had a large white tent for activities. Although we were told by staff that children receive regular classroom instruction and activities, children reported no or very limited educational instruction and inconsistent access to recreation. Children at Midland did report having adequate privacy and access to the outdoors.

33.     As was the case at Fort Bliss, however, no child at Midland reported to me having received a list of free legal services or having spoken to a lawyer prior to speaking with me.

34.     As at Fort Bliss, the children I interviewed at the Midland EIS were generally uncertain as to how long they would remain detained. Some reported having been told that they would be reunited with family within 10 days, but that they had been detained longer than that with no end in sight. Many had not yet met with a case manager despite being at Midland for over two weeks.

35.     Children detained at Midland reported limited and inconsistent access to phone calls, with some children reporting two ten-minute phone calls over the course of two weeks, and others reporting only one ten-minute call. Some also reported having been permitted to telephone their family members for the first time only the day prior to our monitoring visit.

**Summary**

36.     Based on nearly 24 years of observing the treatment and conditions children experience during immigration-related custody, it is my opinion that extended detention in "industrial"-scale detention facilities such as Fort Bliss is inherently inimical to children's well-being. The absence of mandatory standards prescribing the minimum conditions and treatment of children in such facilities— and the absence of periodic and structured inspections by state child welfare agencies to verify compliance with those standards—commits children's treatment to the luck of the draw: those placed at smaller EISs or who draw competent case managers stand good odds of being promptly reunited with their parents or other

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

family. Those consigned to large, impersonal detention camps such as Fort Bliss or who draw indifferent or overworked case managers must endure prolonged detention without education, recreation, structure, contact with family, legal assistance, or emotional support.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10th day of June, 2021 at Santa Clarita, California.

_____
Carlos Holguín

Declaration of Carlos Holguín in Support of Motion for Preliminary Injunction, Case No. 19-07390

# EXHIBIT A



ADMINISTRATION FOR
# CHILDREN & FAMILIES
Office of Refugee Resettlement | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

**FIELD GUIDANCE – April 30, 2021**

**RE: ORR Field Guidance #13, Emergency Intake Sites (EIS) Instructions and Standards**

<u>GUIDANCE</u>

ORR is issuing this field guidance to clarify the applicable standards for ORR Emergency Intake Sites (EIS), due to their emergency and temporary nature. This Field Guidance supersedes Field Guidance #12, published on April 9, 2021, and any previous guidance related to EIS standards.

## 1. Overview

In the event of a severe shortage of standard state-licensed facilities and influx care facilities, ORR may open non-state licensed Emergency Intake Sites (EIS).

A severe shortage occurs when ORR is unable to accept referrals of children for placement in state-licensed facilities and influx care facilities that result or would result in unaccompanied children remaining in DHS custody for over 72-hours without a placement designation due to shortages of available non-EIS ORR bed capacity. In such instances, ORR may place children in EIS facilities.

EIS facilities are designed for mass care with basic standards to meet immediate sheltering needs of unaccompanied children. HHS implements the standards of care used for children in an emergency response setting. EIS are not designed or intended to provide the full range of services available at traditional ORR care provider facilities or even Influx Care Facilities.

EIS are designed as short-term, stop-gap facilities opened for a limited period of time (generally under 6 months) to decompress dangerous overcrowding at DHS-run facilities. EIS may have site-specific requirements and services available may vary by site. A facility may transition from an EIS to an Influx Care Facility upon designation by ORR, provided services and sufficient staffing are available. See **ORR Policy 7.1 Overview**.

## 2. Placement in an Emergency Intake Site

To the extent feasible, ORR endeavors to follow placement criteria required of Influx Care Facilities, see **ORR Policy 7.2.1 Criteria for Placement**. Generally, placement in an EIS is reserved for direct border placements, or transfers from other EIS facilities or Influx Care Facilities. The ability to distinguish the criteria in **ORR Policy 7.2.1 Criteria for Placement** may be impracticable or impossible, as information regarding the child may be incomplete or

unknown by DHS. However, medically fragile children (e.g., children with acute needs that cannot be met at an EIS) or children who otherwise require close supervision (i.e., those eligible for placement in a staff-secure, secure, or RTC facility) are not eligible for placement in an EIS.

**3. Placement of Tender Age Children in an Emergency Intake Site**

ORR may place tender age children in EIS facilities, on a site by site basis, upon a determination by the Assistant Secretary for the Administration for Children and Families, based on a recommendation by ORR that placing tender age children in such a facility is safe and in the best interest of the children.

To account for the vulnerability and special needs of young children, EIS facilities accepting tender age children must meet the following standards:

- Make concerted efforts to ramp up services to meet minimum standards of an influx care facility, either in part or in whole, whenever practicable. See **ORR Policy 7.5.1 Influx Care Facility Minimum Services** and **7.5.2 Influx Care Facility Medical Services.**
- Maintain the tender age staffing ratios outlined in paragraph 5 of this guidance**.**
- Maintain age appropriate services and boundaries between tender age children and older youth.

In addition, ORR will make efforts to expedite release of tender age children from EIS facilities.

**4. Services**
EIS meet basic standards of care as outlined in this section, but should, to the extent practicable, ramp up services to meet minimum standards of an influx care facility. See **ORR Policy 7.5.1 Influx Care Facility Minimum Services** and **7.5.2 Influx Care Facility Medical Services.**

**a. Basic Standards for Emergency Intake Sites**
EIS must take the following actions in order to provide basic standards of care:

- Maintain facilities that are safe and sanitary;

- Provide access to toilets, sinks, and showers;

- Provide drinking water and food;

- Maintain adequate temperature control and ventilation;

- Provide adequate supervision (see paragraph 5 below);

- Provide same gender supervision for any area where unaccompanied children regularly undress, including restrooms and showers;

2

- Provide unaccompanied children with appropriate clothing and personal grooming items;

- Separate unaccompanied children who are subsequently found to have past criminal/juvenile history and/or who exhibit behavior that presents a danger to themselves or to others from other unaccompanied children;

- Adhere to a zero tolerance policy towards sexual abuse, sexual harassment, and inappropriate sexual behavior;

- Establish reporting on significant incident and sexual abuse allegations and follow-up procedures consistent with ORR's policies and reporting guidance;

- Allow reasonable access to legal services providers, unaccompanied children's attorneys of record, and child advocates that have provided proper documentation, subject to time, place, and public health restrictions;

- Provide legal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation.  (see **Legal Resource Guide for Unaccompanied Children**);

- Allow access to religious services, if available;

- Provide access to emergency clinical services;

- Comply with reporting requirements as specified by ORR in consultation with providers;

- Provide children the right to be free from discrimination on the basis of gender, race, religion, national origin, or sexual orientation; and

- Keep children free from any cruel, harsh, unnecessary, demeaning, or humiliating punishment.

As soon as possible and to the extent practicable, EIS should seek to provide the following services:

- Case management services for safe and timely release;

- A reasonable access to privacy, which includes the opportunity for all children to: wear their own clothes, as appropriate; retain a space for storage of personal belongings; talk privately on the phone, as appropriate; visit privately with guests, as appropriate; and receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband;

- An in-person Know Your Rights presentation by a legal service provider (see sub-paragraph (d) below);

- Educational services; and

- Daily Recreational/Leisure time that includes one hour of large muscle activity and one hour of structured leisure time activities.

**b. Medical Services**

EIS facilities provide access to emergency health care.  Additional health services are site specific and may include a limited initial medical exam (IME) (see **ORR Policy 3.4.2 Initial Medical Examination**), although such exams may not take place within 2 business days; they will take place as soon as arrangements can be made.  For those children who receive limited initial medical exams, which may vary depending on the sites, the child will either receive a comprehensive IME at a later point, at a facility capable of providing the exam, or after release to their sponsor.[1]

To the extent feasible, ORR ensures there are staff who can render first aid; assess whether a child requires immediate medical attention due to acute medical distress; clear obstructed airways; administer ephedrine pens if needed.
Children determined to have a communicable disease are segregated from other children as appropriate.

**c. Case Management**

Case management services are established either at the time of an EIS stand-up or as soon as reasonable under the circumstances.  Case management services at EIS facilities are primarily focused on family reunification services in order to release a child without unnecessary delay to a sponsor (following the policies identified in **ORR Policy Guide Section 2**) and may be conducted to the extent feasible remotely.  Additionally, case management services include processing children placed at an EIS for transfer to an ORR facility with more comprehensive services (either an influx care facility or traditional state-licensed program) capable of providing for the child's individual needs.  Case management at EIS may be conducted by volunteers.

**d. Legal Service Information**

ORR provides legal service information to unaccompanied children placed at an EIS.

ORR provides children access to attorneys and may to the extent practicable fund legal service providers to deliver know your rights (KYR) presentations and screen children for potential legal immigration relief.  Although private meeting space may be restricted by the physical plant of

---

[1] The child's sponsor is provided information regarding the health services the child received at the EIS, and as a condition of release is required to ensure a comprehensive IME is performed with a community provider, if such an exam was not completed in ORR custody.

the EIS, to the extent feasible, ORR makes available space for children to meet privately with attorneys.

If a child is not able to receive a KYR and/or legal screening while placed at an EIS, ORR may notify a legal service provider after the child's release, to provide post-release legal services.

**5. Staffing**

EIS may be staffed by volunteers from NGOs, federal staff, ORR contractors, and grantees (including staff from other ORR care providers or non-care providers).

**a. Staffing Ratios**

EIS are subject to the following minimum staffing ratios:

- **Youth Care Workers:** Minimum of 1 youth care worker to every 15 children aged 13 years and over (1:15); a minimum of 1 youth care worker to every 8 tender age children aged 6-12 years old (1:8), and a minimum of 1 youth care worker to every 4 tender age children aged 0-5 years old (1:4).

The following additional staff and staffing ratios for those positions should be maintained at any EIS operating longer than 20 days. Additionally, case managers and mental health clinicians may provide services remotely or on site:

- **Childcare Team Lead:** Minimum of 1 childcare team lead to every 60 children (1:60). EIS should make efforts to staff up to a minimum of 1 childcare team lead to every 30 children as resources allow (1:30).
- **Childcare Shift Supervisor:** Minimum of 1 supervisor to 5 childcare team workers per shift (1:5).
- **Child Welfare Program Leads/Coordinators:** Minimum of 2 child welfare program leads/coordinators per site, including at least 1 per shift at all times, to implement guidance for their EIS site.
- **Case Managers:** Minimum of 1 case manager to every 8 children (1:8).
- **Mental Health Clinicians:** Minimum of 1 mental health clinician to every 50 children (1:50).

Please note that the above staffing ratios are only minimum staffing ratios and that EIS should staff up to higher than the minimum ratios if resources and hiring allow for higher levels of supervision (for example, staffing up to ratios at Influx Care Facilities as outlined by **ORR Policy 7.7 Influx Care Facility Staffing Levels**).

These minimum standards may be modified on an exceptional basis and for short periods of time, within the first 20 days of EIS operations or in the event of a sudden increase in referrals, as directed by ORR. Approval for a decrease in staffing-to-child ratios are made in consultation

with ORR personnel at EIS sites, and with consideration for ages and of the children and the physical layout of the site. Staffing ratios may be adjusted to meet the unique physical layout of an EIS on a case by case basis.

### b. Background Checks for Staff

Only EIS federal personnel, or personnel who have been cleared through a fingerprint-based, federal background check, are permitted to supervise direct care staff.  Staff and volunteers who provide direct care must pass public record criminal background checks for deployment at EIS.  ORR will ensure receipt of background checks required of influx care facilities for EIS staff within 30 days of an EIS opening. Staff and volunteers who provide direct care may not have unsupervised contact with unaccompanied children until all background checks have been completed. ORR may waive or modify background check requirements on a facility to facility basis.

### c. Incident Commander

During the operation of an EIS while children are on site, ORR will have staffed an incident commander who is a federal employee to oversee operation of the facility.  The incident commander is responsible for the facility, operations, and custodial care of the children.

If you have any questions regarding these policies, please contact UCPolicy@acf.hhs.gov.

# EXHIBIT B

# JUNE 4, 2021
# ORR JUVENILE
# COORDINATOR REPORT

**ORR JUVENILE COORDINATOR INTERIM REPORT**

**June 4, 2021**

**Aurora Miranda-Maese, ORR Juvenile Coordinator**

## Introduction

In accordance with the April 24, 2020 Order, issued by The Honorable Dolly M. Gee of The United States District Court for the Central District of California, the undersigned ORR Juvenile Coordinator, Aurora Miranda-Maese, has filed monthly reports during the pendency of the national health emergency related to the COVID-19 pandemic. The reports addressed the six Court ordered topics and additional requirements as directed by the Court. At the May 7, 2021 status hearing, the Court issued a new order, which modified the ORR Juvenile Coordinator's report to include topics detailed by the Court below. This report, which covers the period from April 8, 2021 to May 31, 2021, provides details on the following topics as ordered by the Court:

- Whether the Juvenile Coordinator has adequate personnel or other capacity to provide detailed monitoring of new or expanded facilities.

- The census of minors in each of the agency's facilities.

- Updates on ORR's plans, if any, to expand capacity, particularly of licensed shelter beds.

- The average length of stay for minors in the agency's facilities.

- Census of minors in an EIS for more than 20 days and those minors' length of stay.

- Updates on ORR's plans to improve case management and expedite release of minors.

- Updates on ORR's plans, if any, with respect to long-term use of EIS' and processes to transfer minors from EIS' into licensed facilities, if release to a sponsor is not feasible.

- Case management services at each facility.

- Minors' access to counsel in general, and to the Legal Services Providers Amici Curiae in particular.

- The number of minors currently testing positive for COVID-19.

- Updates on ORR policies regarding the use of EIS', including policies and procedures to address COVID-19.

*Whether the Juvenile Coordinator has adequate personnel or other capacity to provide detailed monitoring of new or expanded facilities.*

Information for this report is derived from a cross-section of personnel in the ORR Unaccompanied Children Program. The Juvenile Coordinator consulted with and participated in daily coordination meetings with several ORR teams including: Division for Planning and Logistics, Division of Health for Unaccompanied Children, Division for Unaccompanied Children Operations, Division of Policy and

Procedures, Compliance and Monitoring Team, and the Data and Systems Team. Additionally, the Juvenile Coordinator met with ORR Federal Field Staff and various points of contacts overseeing operations at licensed shelters, Emergency Intake Sites, and an Influx Care Facility to provide the Court with the requested information noted above. The Juvenile Coordinator also arranged for site visits to every operational EIS in Texas, which will occur from June 1 to June 11, 2021.

## ORR Capacity

As of May 31, 2021, ORR has 17,424 minors in custody, which demonstrates a significant decrease from the height of over 23,000 minors in care during the course of the current reporting period. During the current reporting period, ORR received referrals for approximately 24,112 minors and discharged approximately 26,255 minors.

Figure 1 below provides information regarding the increase in ORR referrals and discharges for the last six months, beginning December 1, 2020 to May 31, 2021.

*Figure 1: ORR Referrals and Discharges from December 1, 2020 to May 31, 2021*



The census of minors in each of the agency's facilities.

Figure 2 below summarizes ORR's bed capacity as of May 31, 2021. This information is dynamic as ORR is aggressively pursuing efforts to increase bed capacity. Therefore, it is likely that the information depicted in the figure below changed very soon after it was produced.

*Figure 2: ORR Bed Occupancy by Residence Type as of May 31, 2021[1]*

| ORR Program Type | Total Beds | # of Beds Occupied | # of Beds Not Occupied |
|---|---|---|---|
| Shelter | 7,820 | 7,224 92% | 596 8% |
| Staff Secure | 105 | 41 39% | 64 61% |
| Secure | 22 | 7 32% | 15 68% |
| RTC | 53 | 8 15% | 45 85% |
| TFC | 1408 | 935 66% | 473 34% |
| LTFC | 463 | 264 57% | 199 43% |
| Influx Care Facility | 813 | 571 70% | 242 30% |
| Emergency Intake Site | 18274 | 8368 46% | 9906 54% |
| *TOTAL* | *28,958* | *17,418* 60% | *11,540* 40% |

Figure 3 below provides a depiction of capacity by facility type. A larger proportion of more restrictive facilities (i.e. secure, staff secure, and RTC) are not occupied as most minors do not meet the criteria for placement at those facilities. Regarding TFC and LTFC, ORR strives to place minors with families that are willing to accept them from the border. Where families and/or foster care programs have declined to accept minors directly from the border, ORR attempts to free border placement beds by transferring longer residing minors to those foster care placements as appropriate. In some cases, a foster care home may have specifications for the demographics able to reside with them (i.e. parenting teens, tender aged children, and special needs).

---

[1]The census for minors in ORR custody constantly fluctuate as children are admitted, transferred, and discharged at all times of each day. Therefore, the census reflected in Figure 2 and Figure 3 is a snapshot of the capacity at the exact time that the review was conducted. Furthermore, ORR is constantly reassessing bed capacity as circumstances regarding the COVID-19 pandemic and increasing number of minors requiring quarantine or medical isolation are referred to ORR. This chart reflects ORR's reassessed capacity on the morning of May 31, 2021.



*Figure 3: ORR Bed Occupancy by Residence Type as of May 31, 2021*[1]

Updates on ORR's plans, if any, to expand capacity, particularly of licensed shelter beds.

ORR's current permanent licensed capacity is constrained by the unprecedented increase of minors referred to ORR. Recognizing that most of these licensed facilities are near full capacity, ORR is reviewing new proposals offering additional licensed programs. In addition, current programs are exploring additional licensed facilities within their companies. Despite these assertive and ongoing efforts to increase licensed bed capacity, the current influx levels have necessitated the need for ORR to open non-state licensed Influx Care Facilities (ICF) and continue implementing Emergency Intake Site (EIS) facilities.

The EIS facilities are part of a multi-pronged approach to absorb the current surge. EIS facilities are intended to be short-term/temporary facilities (generally, under a 6-month period). EIS facilities are designed for mass care and offer basic standards of care for minors such as providing clean and comfortable sleeping quarters, meals, toiletries, laundry, and access to medical services. A COVID-19 health screening protocol for all minors is implemented to follow CDC guidelines for preventing and controlling communicable diseases. For minors diagnosed with COVID-19, EIS facilities either have established medical isolation areas or are designated for only minors that test negative for COVID-19. In addition to medical and mental health services, case management and legal services are available for all sites that were opened. Furthermore, many of these sites have either implemented or are in the process of implementing educational and recreational services as well. Figure 4 below provides details on capacity and placements at EIS and ICF.

*Figure 4: ORR Emergency Intake Sites and Influx Care Facility Operational as of May 31, 2021[2]*

| Facility Name (Location) | Total Beds | Beds Occupied | Beds Not Occupied |
|---|---|---|---|
| TX) | 813 | 571 | 242 |
| TX) | 1430 | 780 | 650 |
| TX) | 440 | 258 | 182 |
| TX) | 10000 | 3495 | 6505 |
| TX) | 372 | 187 | 185 |
| CA) | 772 | 206 | 566 |
| TX) | 607 | 328 | 279 |
| TX) | 1957 | 1617 | 340 |
| CA) | 1100 | 534 | 566 |
| CA) | 1450 | 817 | 633 |
| MI) | 146 | 146 | 0 |
| *Totals* | *18,274* | *8,368* | *9,906* |

In addition, ORR is working to safely increase capacity in its permanent/licensed network by implementing CDC COVID-19 guidance and using ICF with the same standards of care as ORR's permanent/licensed network. Simultaneously, ORR is continuing to aggressively move toward the long-term goal of acquiring enough state-licensed beds in our care provider network to reduce the need in the future for ICF or EIS.

Care provider programs continue implementing prudent staffing models in adherence with guidance from the CDC, state and local authorities and their own organizational policies in order to limit exposure risk for their employees. As a result, programs are not able to meet ORR and state-licensing mandated staffing supervision, which further reduces the maximum capacity each program can accommodate.

Some of ORR facilities are struggling with staffing shortages and are having a hard time filling positions. Programs are reporting difficulties with hiring staff due to a decreased response to job postings and in finding qualified applicants for positions posted. Also, some potential candidates are not continuing with the hiring process, citing fears of contracting COVID-19.

In addition, ORR facilities are experiencing difficulties with staff retention. Programs have reported challenges with an inability to hire and retain employees who are often faced with caretaker responsibilities within their own homes and concerns that potential employees may have working in a congregate setting, which may put them at risk for exposure. Other reasons cited include: low morale, the inability to telework, working additional hours due to coverage needs, delays with State licensing to complete the clearance process, and concerns regarding travel during the pandemic. ORR has been working with programs to identify strategies to mitigate staffing challenges where possible.

To offset staffing shortages, several federal staff from diverse areas of the federal government have volunteered to assist in ORR's effort to serve minors. Currently, volunteers include personnel from U.S.

---

[2]The information reflected in Figure 4 represents ORR's EIS facilities that are operational as of May 31, 2021. Omitted from this chart are the four EIS that closed during the reporting period. The closed EIS are: Freeman Expo Center (San Antonio, TX), Kay Bailey Hutchinson Convention Center (Dallas, TX), NACC Houston (Houston, TX), and PIA (Erie, PA).

Public Health Service, various programs in Health and Human Services, and the Department of Homeland Security. A solicitation for volunteers was also recently sent to the Department of Justice.

## Placement & Release of Minors in ORR Custody

As depicted in Figures 1 to 3 above, ORR has experienced an insurmountable number of minors arriving at the border. Their arrival in historically high numbers coincide with the nation's efforts to control the spread of COVID-19, which is also a priority for ORR facilities. From March 2020 until March 2021, ORR and its care provider network operated with a reduced bed capacity in accordance with social distancing guidelines from the CDC, and public health officials. On March 5, 2021, ORR issued guidelines in consultation with CDC, which urged facilities to expand bed capacity as much as possible and provided additional instructions for safeguarding against COVID-19. However, increasing bed capacity at a sufficient speed to match the extremely high numbers of minors arriving at the border remains a challenge. ORR received 17,335 referrals in April, and 11,840 referrals in May. Despite ORR's aggressive efforts to timely place the minors in ORR facilities, the number of children arriving at the border is outpacing the speed at which ORR can secure additional beds and staff. However, ORR's efforts has significantly reduced the delays in transferring minors from CBP to ORR custody, with placement now occurring within 72 hours of apprehension by CBP.

### The average length of stay for minors in the agency's facilities

Over the past six months (December 2020 to May 2021), ORR's assertive efforts to release minors has resulted in a steady decline in the average amount of time that minors remain in ORR custody. This measure of time that a minor remains in ORR custody is known as the length of care. As detailed in Figure 6 below, ORR's efforts have maintained the steady decline in average length of care despite the significant increase in the number of minors in ORR custody.

*Figure 5: Average Length of Care for Minors in ORR Custody*



|  | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 |
|---|---|---|---|---|---|---|---|---|
| Length of Care | 51 | 43 | 44 | 42 | 37 | 35 | 31 | 35 |

Census of minors in an EIS for more than 20 days and those minors' length of stay.

As of May 31, 2021, ORR had a cumulative total of 4,799 minors in EIS with length of stay (LOS) of over 20 days. This includes 2,622 whose LOS is between 21 and 40 days. It also includes 2,177 minors whose LOS is 41 days or higher, with the highest LOS being 66 days. Figure 6 below provides a breakdown of LOS for each EIS.

*Figure 6: Census and length of stay of minors in an EIS for more than 20 days as of May 31, 2021*

| EIS Program Name | # of Minors with LOS of 21-40 days | # of Minors with LOS of 41 days or more |
|---|---|---|
| ▇ | 67 | 649 |
| ▇ | 61 | 56 |
| ▇ | 1,401 | 762 |
| ▇ | 53 | 97 |
| ▇▇▇▇▇ | 75 | 0 |
| ▇▇ | 58 | 70 |
| ▇ | 343 | 344 |
| ▇▇▇ | 189 | 0 |
| ▇▇▇▇ | 373 | 195 |
| ▇▇▇ | 2 | 4 |

Updates on ORR's plans to improve case management and expedite release of minors.

On March 22, 2021, ORR issued guidance for the expedited release of eligible Category 1 cases (see attached ORR Field Guidance #10, Expedited Release for Eligible Category One Cases). ORR has prepared this field guidance to best serve minors in ORR custody who have parents or other potential Category 1 sponsors in the United States. Based on this guidance, a minor may be released on an expedited basis to their sponsor provided that the following conditions are met:

- If the child is screened and determined not to be especially vulnerable;

- If the child is not subject to a mandatory TVPRA home study; and

- If there are no other red flags present in the case (i.e. abuse or neglect)

In cases where expedited release is appropriate, ORR authorizes care providers to pay for the sponsor's travel to the ORR care provider facility to pick up the minor and complete paperwork at the facility (if allowed). Travel arrangements should be made as soon as it appears that the minor's release is viable.

Additionally, ORR issued further guidance on May 14, 2021 for the expedited release of eligible minors (see attached ORR Field Guidance #15, Release of Eligible Non-Sibling, Closely Related Children to a Category 1 or Category 2A Sponsor). ORR prioritizes the placement of minors with parents, legal guardians, and close relatives who are available to provide custody in the United States. To that end, ORR instituted a revised policy for groups of closely related minors, which allows for the following:

- Expedited Release Procedures for Eligible Category 1 Cases to apply to a related child for whom the same sponsor serves as a Category 2 sponsor; and

- Category 2A background check requirements to apply to a related child for whom the same sponsor serves as a Category 2B sponsor

Under this policy, certain minors will be released to their parents or legal guardians (or Category 2A sponsors) using specialized procedures that modify standard release requirements under the ORR Policy Guide. In recognition of operational flexibilities that may require additional follow up, this Field Guidance may be further modified by ORR.

Updates on ORR's plans, if any, with respect to long-term use of EIS' and processes to transfer minors from EIS' into licensed facilities, if release to a sponsor is not feasible.

In response to the influx of minors arriving at the border, ORR dedicated its immediate focus to addressing the placement delays from CBP custody to ORR custody. Now that placement delays are reduced, ORR is shifting focus to addressing minors with lengthy LOS at EIS and licensed facilities. These efforts include continuing assessments of methods of expediting release, transfer of minors to licensed facilities when release is not imminent and encouraging the expansion of licensed care facilities. ORR's efforts are flexible and dynamic as the situation requires readjustments in real time as new concerns emerge and issues change.

In addition, ORR is working with other agencies, establishing collaborative relationships with Customs and Border Patrol (CBP) and the Federal Emergency Management Agency (FEMA) to ensure that unaccompanied migrant minors are safe and unified with family members or other suitable sponsors as quickly and safely as possible. ORR is working closely with FEMA and other federal partners to establish EIS facilities and engage service providers. Services will be provided by a combination of the American Red Cross, Federal staff, including teams from the HHS Office of the Assistant Secretary for Preparedness and Response and the U.S. Public Health Service Commissioned Corps, and various contractors.

## Case Management & Access to Counsel at EIS

Case management services at each facility

ORR submitted Standard Operating Procedures (SOP) to delineate the documentation and implementation of onsite and virtual case management procedures to execute the safe and timely discharge or transfer of minors from ORR EIS facilities.

In response to the current shortage of available beds in the ORR network of Licensed Care Providers for minors, EIS facilities have been established to ensure minors are not in a Border Patrol station for more than 72 hours. EIS Case Management teams, including onsite and/or virtual roles, are being built to help ORR meet its mission to safely release minors to a vetted Sponsor or safely transfer minors without unnecessary delay.

In situations where virtual and onsite Case Managers are working collaboratively on unification cases, every effort should be made to allow the virtual and the onsite Case Manager to work directly with each

other to best coordinate Case Management services to minors and Sponsors. Case Management teams should possess experience in all aspects of Case Management services for minors, as well as Child Welfare experience.

The Juvenile Coordinator met remotely with all the EIS facility site leads to ensure case management services are being provided to the minors in care.  Currently, all EIS facilities have case management services in place. Some EIS facilities have developed robust Case Management Services while others continue to ramp up their services.

### Access to Counsel

As a general matter, minors in ORR custody have access to counsel at their request. Section 3.3.10 of the ORR Policy Guide requires that minors have unlimited telephone access to attorneys representing them. Section 3.3. of the ORR Policy Guide also requires that minors receive legal services information, including a Legal Resource Guide and list of local pro bono legal service providers upon admission to ORR programs. This requirement applies to licensed facilities, Influx Care Facilities (ICF) and Emergency Intake Sites (EIS).

ORR funds access to legal counsel for minors on their immigration related cases through three mechanisms: 1) provision of Know Your Rights (KYR) presentations; 2) a legal consultation which screens minors for immigration related remedies; and 3) either direct representation or court assistance on immigration related matters. The decision whether to proceed with representation or court assistance on immigration related matters is at the discretion of the attorney and the minor. Additionally, ORR continues funding for direct representation for some minors after their release from ORR custody.

A legal service provider is assigned to every ORR facility, including ICF and EIS, for the purpose of carrying out these duties. At the EIS, priority is given to conducting KYR presentations and assisting minors with immediate immigration related needs through legal screening and direct representation/court assistance. Some EIS also offer drop-in office hours for minors to speak with them at will. Legal service providers have space at each EIS to conduct their services on multiple days, and in some cases, every day of the week. As of May 23, 2021, ORR funded the following services at EIS:

- KYR presentations to over 14,500 minors;

- Legal screening for over 250 minors; and

- Over 1,800 hours of drop-in legal services

In addition, ORR provides minors referrals to local legal service providers upon their release from ORR custody. Minors also receive additional KYR and legal screening from ORR funded legal services providers upon their transfer within the ORR care provider network.

ORR also provides our funded legal services contractor information on all minors released from ORR custody (licensed facilities, ICF, and EIS) so that their sub-contracted legal service providers may offer KYR presentations and legal screening to minors released from ORR custody prior to receiving those services.

## COVID-19 in ORR Facilities

As of May 23, 2021, there are a total of 151 minors in ORR custody in licensed shelters who have been diagnosed with COVID-19 and who are currently in medical isolation. One hundred and seventeen (117) of these minors were diagnosed with COVID-19 either prior to placement in ORR facilities or during the initial intake period (first 14 days), and thirty-four (34) minors likely acquired COVID-19 while in ORR facilities (more than 14 days after arrival). Minors who test positive for SARS-CoV-2 more than 14 days (the maximum incubation period for SARS-CoV-2) after being admitted to ORR care were likely infected while in ORR care, through contact with infected staff members or other minors, or in community settings within the facility or medical office visits. It is often not possible to determine the exact timing and source of infection because many minors are asymptomatic and because a person who has recovered from COVID-19 may continue to have a positive test result for several weeks after illness.

ORR usually places minors newly referred along the Southwest Border into shelters local to the site of referral. On March 13, 2021, ORR issued guidance (COVID-19: Interim Guidance for Shortening Quarantine Duration and Increasing Testing for ORR Facilities) that now recommends minors be quarantined for seven days. Minors are released from quarantine if they remain asymptomatic and test negative both on entry to the program and within 48 hours before the end of their quarantine period. To decrease overcrowding at CBP facilities, shortening the quarantine period to seven days with a negative test result is advised based on CDC recommendations at all ORR facilities.

According to the revised ORR guidance issued on March 13, 2021, contact tracing should begin immediately if anyone tests positive for COVID-19. Minors who test positive for COVID-19 will be isolated until they meet the criteria to discontinue isolation. Minors exposed to COVID-19 shall be quarantined for seven days and tested by the 5th, 6th or 7th day of their quarantine. Minors will be released from quarantine upon receiving a negative test result.

Minors in such quarantine are tested at least twice for COVID-19, once shortly after admission and again prior to release from quarantine. In the last year, more than 92,000 COVID-19 viral tests have been completed for the unaccompanied minors in ORR's program.

ORR does not require that staff disclose their private medical information as it relates to COVID-19; however, some staff voluntarily reported this information. Since collecting information, ORR has been notified of 1,543 (cumulative) personnel with positive COVID-19 test results as of May 20, 2021. Staff with positive COVID-19 test results are required to medically isolate for at least 10 days. Staff with suspected exposure to COVID-19 are required to quarantine for 14 days, or for the time period recommended by the local health department. Furthermore, the exposed or infected staff are not permitted to have any contact with minors or other staff at the shelters until their quarantine or medical isolation periods, respectively, have ended.

At this time, care provider program staff who are eligible for the COVID-19 vaccine based on the CDC's Advisory Committee on Immunization Practices (ACIP) recommendations and the recommendations of their state and local jurisdictions may opt to receive the vaccine, which is now more readily available to adults.

The number of minors currently testing positive for COVID-19.

The Juvenile Coordinator consulted with the Division of Health for Unaccompanied Children (DHUC) to determine the likely source of infection for minors who were diagnosed with COVID-19 and are currently in medical isolation.  Figure 7 below provides the census data for these minors as of May 23, 2021.

*Figure 7: Positive COVID-19 Minors in Medical Isolation as of May 23, 2021[3]*

| Program Name (Location) | Bed Capacity | Beds Occupied | Positive Minors During initial intake period | Positive Minors Likely acquired in ORR care |
|---|---|---|---|---|
| ██████████ (AZ) | 15 | 15 | 3 | 0 |
| ██████ (TX) | 119 | 119 | 3 | 0 |
| ██████ (TX) | 56 | 40 | 2 | 0 |
| ██████ (TX) | 286 | 256 | 1 | 1 |
| ████████ (TX) | 33 | 33 | 2 | 0 |
| ████████ (TX) | 74 | 54 | 0 | 1 |
| ████████ (MD) | 29 | 22 | 1 | 0 |
| █████ (TX) | 77 | 76 | 2 | 0 |
| ███████ (NY) | 15 | 14 | 1 | 0 |
| ██████████ (TX) | 60 | 60 | 7 | 0 |
| ███████ (TX) | 39 | 39 | 1 | 0 |
| ███████ (TX) | 327 | 159 | 6 | 0 |
| ████████ (TX) | 185 | 111 | 3 | 6 |
| ████████ (TX) | 455 | 423 | 6 | 0 |
| ██████ (TX) | 104 | 94 | 2 | 0 |
| █████ (TX) | 57 | 53 | 2 | 0 |
| ██████ (CA) | 100 | 88 | 1 | 0 |
| █████████ (TX) | 69 | 65 | 2 | 0 |
| ██████ (FL) | 46 | 44 | 2 | 0 |
| █████ (IL) | 107 | 106 | 0 | 10 |
| ██████ (PA) | 40 | 31 | 0 | 1 |
| ███ (PA) | 36 | 36 | 0 | 1 |
| ████████ (TN) | 66 | 64 | 2 | 0 |
| █████ (FL) | 27 | 27 | 2 | 0 |
| █████████ (IL) | 21 | 21 | 2 | 0 |
| ███████ (OR) | 3 | 3 | 1 | 0 |

[3]Figure 7 is a result of the data gathered by the ORR Juvenile Coordinator in consultation with DHUC as it pertains to minors diagnosed with and currently isolated for COVID-19 throughout the permanent shelter network. This information reflects the status as of May 23, 2021. In addition, the bed capacity and census for each shelter is a snapshot in time as this information is constantly changing as developments arise.

| Program Name (Location) | Bed Capacity | Beds Occupied | Positive Minors During initial intake period | Positive Minors Likely acquired in ORR care |
|---|---|---|---|---|
| ████ (AZ) | 48 | 48 | 1 | 1 |
| ████ (TX) | 138 | 110 | 4 | 0 |
| ████ (TX) | 64 | 47 | 5 | 0 |
| ████ (TX) | 19 | 19 | 1 | 0 |
| ████ (TX) | 39 | 37 | 4 | 1 |
| ████ (AZ) | 69 | 69 | 0 | 2 |
| ████ (TX) | 136 | 129 | 0 | 3 |
| ████ (TX) | 900 | 900 | 0 | 3 |
| ████ (TX) | 200 | 143 | 0 | 1 |
| ████ (TX) | 58 | 18 | 0 | 1 |
| ████ (TX) | 323 | 296 | 14 | 1 |
| ████ (AZ) | 175 | 174 | 2 | 0 |
| ████ (AZ) | 41 | 41 | 1 | 0 |
| ████ (AZ) | 105 | 90 | 1 | 0 |
| ████ (AZ) | 181 | 181 | 1 | 0 |
| ████ (TX) | 126 | 116 | 11 | 0 |
| ████ (TX) | 137 | 111 | 5 | 0 |
| ████ (TX) | 38 | 28 | 2 | 0 |
| ████ (TX) | 120 | 104 | 2 | 0 |
| ████ (AZ) | 105 | 105 | 3 | 0 |
| ████ (AZ) | 148 | 148 | 1 | 0 |
| ████ (TX) | 40 | 40 | 3 | 0 |
| ████ (FL) | 16 | 16 | 1 | 0 |
| ████ (FL) | 75 | 75 | 0 | 1 |
| ████ (VA) | 87 | 87 | 1 | 0 |
| *Total* | - | - | *117* | *34* |

A COVID-19 health screening protocol for all minors is implemented to follow CDC guidelines for preventing and controlling communicable diseases. For minors diagnosed with COVID-19, EIS facilities either have established medical isolation areas or are designated for only minors that test negative for COVID-19. In addition to medical and mental health services, case management and legal services are available for all sites that were opened. Figure 8 below provides details on minors placed in EIS with a positive COVID-19 diagnosis.

*Figure 8: Positive COVID-19 Minors in Medical Isolation as of May 23, 2021[4]*

| ICF/EIS Name (Location) | Bed Capacity | Beds Occupied | Positive Minors |
|---|---|---|---|
| ███████ (TX) | 830 | 622 | 34 |
| ████ (TX) | 1344 | 1091 | 18 |
| ████ (TX) | 10000 | 4324 | 79 |
| ████ (TX) | 372 | 306 | 2 |
| █████ (CA) | 726 | 221 | 6 |
| ████ (TX) | 606 | 317 | 9 |
| ████ (TX) | 1970 | 1541 | 95 |
| ████ (CA) | 975 | 510 | 7 |
| █████ (CA) | 1450 | 879 | 39 |
| ██████ (MI) | 189 | 49 | 0 |
| *Total* | - | - | *289* |

Updates on ORR policies regarding the use of EIS', including policies and procedures to address COVID-19

The CDC and the Southwest Border Migrant Health Task Force (SWBMHTF) is providing technical support and guidance to Emergency Intake Sites (EIS) on COVID-19 and communicable disease prevention and control. The ORR Division of Health for Unaccompanied Children (DHUC) meets with SWBMHTF several times a week to discuss ongoing guidance, developments and to troubleshoot site-specific issues that arise.

SWBMHTF currently recommends the following COVID-19 testing protocol for minors at EIS facilities. Specific protocols are adapted to each EIS as necessary to work within any resource constraints. Prior to a minor being transported to an EIS they are tested for COVID-19. On day 3, and days 5, 6, and 7 minors are tested utilizing the rapid antigen test and are tested every three days thereafter. Also, a minor is immediately tested if symptoms of COVID-19 are developed.

Minors are required to quarantine for the first 7 days after admission to an EIS and can be released from quarantine on the morning of day 8 if they remained asymptomatic and had a negative COVID-19 test in the 48 hours prior. Minors that test positive for COVID-19 are required to be isolated for 10 days from the date the positive test was collected, or 10 days from the date of symptom onset if symptomatic.

---

[4]Figure 8 are the results of the data gathered by the ORR Juvenile Coordinator in consultation with DHUC as it pertains to minors diagnosed with and currently isolated for COVID-19 throughout ORR ICF and EIS facilities. This information reflects the status as of May 23, 2021. In addition, the bed capacity and census for each shelter is a snapshot in time as this information is constantly changing as developments arise.

EIS facilities are required to report positive and negative COVID-19 rapid antigen test results to the local health department. CDC SWBMHTF collects aggregate, non-identifiable positive COVID-19 test results for each EIS and reports them to ORR. EIS facilities are also required to complete the "Emergency Intake Site (EIS) Discharge and Transfer Record of Public Health and Medical Information" form for all minors discharged from an EIS. This form accompanies the minor to their final destination to ensure medical services are complete and not duplicated.

Medical contractors provide public health and medical care at each EIS facility. The specific contractor at each facility varies. Medical contractors are required to adhere to all of the above requirements.

### ORR's COVID-19 plans on vaccine distribution

On March 2, 2021, the President announced that he is directing all states to prioritize school staff and childcare workers for COVID-19 vaccination, and is encouraging them to get teachers, school staff, and workers in childcare programs their first shot by the end of March. The Department of Health and Human Services has determined that staff in organizations caring for minors through the Unaccompanied Refugee Minors (URM) Program and Unaccompanied Children (UC) Care Provider Organizations are eligible for vaccination through this directive as childcare workers.

On May 12, 2021, ACIP made an interim recommendation for use of the Pfizer-BioNTech COVID-19 vaccine in adolescents aged 12–15 years for the prevention of COVID-19. The Pfizer-BioNTech COVID-19 vaccine had previously been authorized for use in persons aged 16 years and older. Additionally, the Pfizer-BioNTech COVID-19 vaccine may now be co-administered with other childhood vaccines. Given the recommendation for expanded use, ORR is currently reviewing plans and guidance for administering COVID-19 vaccine to minors in care.

A small number of minors in ORR care have already been vaccinated under interim guidance (e.g., minors with high-risk conditions, Cat 3's and 4's with parental/sponsor consent, etc.). ORR plans to provide expanded access to COVID-19 vaccinations to eligible minors in care to the greatest extent possible, per CDC guidance. ORR is currently collaborating with interagency and state partners to finalize implementation plans in state-licensed shelters, Influx Care Facilities and Emergency Intake Sites.

### Summary

The undersigned respectfully submits this report to the Court pursuant to the Court Order dated May 7, 2021. The undersigned will continue to work independently and with the Special Master and will continue to file interim reports per the Court's directive to monitor facilities to assure compliance with CDC guidance and adherence to ORR guidelines.

# EXHIBIT C

# 7.5.1 Influx Care Facility Minimum Services

Influx care facilities must provide the following minimum services for each UAC in their care:

1. Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items.

2. Appropriate routine medical and dental care, family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception, and emergency health care services; a complete medical examination (including screenings for infectious diseases) within 48 hours of admission, excluding weekends and holidays, unless the UAC was recently examined at another ORR care provider facility; appropriate immunizations as recommended by the Advisory Committee on Immunization Practices' Child and Adolescent Immunization Schedule and approved by HHS' Centers for Disease Control and Prevention; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

3. An individualized needs assessment, which includes the various initial intake forms, collection of essential data relating to the identification and history of the child and his or her family, identification of the UAC's special needs including any specific problems which appear to require immediate intervention, an educational assessment and plan, and an assessment of family relationships and interaction with adults, peers and authority figures; a statement of religious preference and practice; an assessment of the UAC's personal goals, strengths and weaknesses; identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in connecting the child with family members.

4. Educational services appropriate to the UAC's level of development and communication skills in a structured classroom setting Monday through Friday, which concentrates primarily on the development of basic academic competencies, and secondarily on English Language Training. The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program must provide UAC with appropriate reading materials in languages other than English for use during leisure time.

5. Activities according to a recreation and leisure time plan that include daily outdoor activity – weather permitting – with at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (that should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

6. At least one individual counseling session per week conducted by trained social work staff with the specific objective of reviewing the child's progress, establishing new short- term objectives, and addressing both the developmental and crisis-related needs of each child.

7. Group counseling sessions at least twice a week. Sessions are usually informal and take place with all UAC present. The sessions give new children the opportunity to get acquainted with staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational and other activities. The sessions allow staff and unaccompanied alien children to discuss whatever is on their minds and to resolve problems.

8. Acculturation and adaptation services, which include information regarding the development of social and interpersonal skills which contribute to those abilities necessary to live independently and responsibly.

9. A comprehensive orientation regarding program intent, services, rules (written and verbal), expectations, and the availability of legal assistance.

10. Whenever possible, access to religious services of the child's choice.

11. Visitation and contact with family members (regardless of their immigration status), which is structured to encourage such visitation. The staff must respect the child's privacy while reasonably preventing the unauthorized release of the UAC.

12. A reasonable right to privacy, which includes the right to wear his or her own clothes when available, retain a private space in the residential facility, group or foster home for the storage of personal belongings, talk privately on the phone and visit privately with guests, as permitted by the house rules and regulations, receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

13. Services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the unaccompanied alien child.

14. Legal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation. This information is included in the Legal Resource Guide for Unaccompanied Alien Children.

# EXHIBIT D

## DECLARATION OF LEECIA WELCH

I, Leecia Welch, declare as follows:

1.     I am the Senior Director of Legal Advocacy and Child Welfare at the National Center for Youth Law (NCYL).  I represent Plaintiffs in the above-titled action.  If called to testify in this case, I would testify competently about these facts.

2.     In the past month, I have conducted sites visits in my role as *Flores* counsel at the Donna Central Processing Center, the Carrizo Springs temporary influx facility, and the Kay Bailey Hutchinson Convention Center Emergency Intake Site in Dallas, Texas.

### Donna Central Processing Center

3.     On March 11, 2021, I visited the Customs and Border Protection Donna Central Processing Center ("Donna") with my colleague, Neha Desai, and two Spanish-language interpreters.

4.     Upon entry into the secured perimeter of Donna, we were escorted into a large portable unit that had a long conference room in between two smaller rooms.  From this portable, we could see a series of large tents.  Upon arrival, we asked if we could be shown around briefly and were told we would need to direct the request to Defendants' Department of Justice counsel.  I immediately emailed Defendants' counsel requesting to be shown the living quarters of our clients at Donna.  She denied the request on the basis that we were not entitled to it under the terms of the *Flores* Settlement Agreement.  A follow up request was also denied.

5.     Our point of contact at the facility provided us with the census of unaccompanied children and family units staying at Donna at that time.  The unaccompanied children's census was voluminous, unpaginated, and in no discernible order – so it took a while to determine our priorities in terms of interviewing children.  We later determined that there were more than 2,100 children at Donna on the day of our visit.  We were struck by the number of young children on the census and decided to prioritize speaking to some of the

younger children, teenage girls, and sibling groups.  We have since calculated that there were approximately three hundred children age twelve and under at Donna at that time.

6.　　During the course of the day, I interviewed six children and Ms. Desai interviewed about twelve children – including sibling groups and a fourteen-year-old mother caring for her baby.  The children we interviewed ranged in age from one to seventeen years old.  We also learned about Donna from children we subsequently interviewed at the Convention Center and from some follow-up conversations with children's families.

7.　　The children we interviewed at Donna had been there from five to eight days.  Children at the Dallas Convention Center and families we spoke to subsequently reported longer stays at Donna – up to fifteen days for one child.  Overall, the children's accounts of their time at Donna painted a grim picture of a dramatically overcrowded facility that was not designed to meet the needs of children for an extended period of time – especially young children.

8.　　Children told us that they had infrequent access to showers while held at Donna.  Some children reported having showers every four days, but one reported it was six days before she was permitted to take a shower.  Most reported that there was ample soap, but one child noted she had to use shampoo because there wasn't enough soap.  Children reported taking showers at various times of the day, with one child reporting to me that he was awakened at 3 a.m. to take a shower.

9.　　The overcrowding was particularly concerning in the children's description of their sleeping arrangements.  Children reported that they slept on mats on the floor, but multiple children told us that there were not enough mats and children often had to sleep directly on the floor.  Mats were placed so close together that you could touch the child next to you.  Several children reported pushing the mats together and sleeping sideways so that more children could share the mats rather than having to sleep on the ground.

10.　　Children reported spending all day and night in their "pods" or "cells" in the tents.  The pods were separated by clear plastic walls and organized by age and gender.  Children told us there was nothing to do but sit in the tent and watch TV.  They shared

how hard and sad it was to sit in the tent day after day listening to other children cry. Many said they did not know if it was day or night outside. Some children would lie or sit on the mats all day long. Multiple children said that the only time they saw the sky or the sun was when they went outside to a courtyard with fake grass for about fifteen minutes. Children said that they would go days without going to the courtyard. When they went to the courtyard, they would just sit on the ground because there was nothing for them to do there.

11. The children's views of the food at Donna varied. Most said it was okay but that it was bland or didn't really taste like food. All the children reported being able to get fresh fruit or snacks. Some of the teenagers said the servings weren't enough and one child (who I spoke to at the Convention Center) told me the food at Donna was inedible and he ate nothing but fruit and snacks for nine days.

12. None of the children I spoke to at Donna had been allowed to make a phone call to their family. They were visibly shaken when talking about how hard that was for them. All of the children had family in the U.S., and each of them either had the phone number for their family member written on a piece of paper in a Ziploc bag or had it memorized. More than anything, they wanted to be in touch with their families.

13. All of the children I spoke to wanted to know how long they would have to stay at Donna and when they would be able to see their family. It seemed that none of them had been given information about the sponsorship process or what would happen to them next. They were all desperate for more information.

### Site Visit to Carrizo Springs Temporary Influx Shelter

14. On March 12, Ms. Desai and I visited the Carrizo Springs Temporary Influx Shelter ("Carrizo") with a Spanish-language interpreter. On the day of our visit, there were about 780 children placed there. At that time, all of the children placed at Carrizo were boys between the ages of 13 and 17. We were provided written materials about the layout of the site, but we were already familiar with it because we had previously toured this facility when it was open temporarily in 2019.

15.     In sharp contrast to the children at Donna, the children we interviewed at Carrizo seemed much happier and more at ease.  While upon first observation the physical plant is stark and not particularly child-friendly, it is clear from my own observation and conversations with the care provider that efforts have been undertaken to make the children feel as welcome as possible, including having a banner on the front building that says: "Bienvenidos"; allowing children to decorate their rooms with their own artwork; and giving all children new clothes, shoes, a duffel bag, and a Bible at intake.  I have subsequently learned that the girls who will soon be placed at Carrizo will all have a teddy bear waiting for them on their assigned bed.

16.     Children reported having comfortable living arrangements, including their own bunk beds in a bedroom shared with three other children, a shared bathroom, and a shared living space in between two bedrooms.  Children have access to daily showers.

17.     Children eat in a cafeteria and reported that they were satisfied with the food. One child remarked that the food was better than the other places he had been.

18.     Children reported having school Monday to Friday for 6.5 hours.  They also have daily outdoor recreation, including playing soccer.

19.     Children reported having two 20-minute phone calls a week with their family and getting updates on their case from a counselor prior to these phone calls.  The children I spoke to were generally aware of the status of their sponsor's application and felt hopeful that they would be getting released soon.  One expressed concern about the length of time it was taking his sponsor to get a fingerprinting appointment.

20.     While we were at the facility, legal service providers were meeting with youth to conduct know your rights trainings.  It was refreshing to see children waiting in the common area who were smiling, playing board games with other children and staff, and generally acting like kids.

**Site Visit to Kay Bailey Hutchinson Convention Center Emergency Intake Site**

21.     On March 29, I visited the Kay Bailey Hutchinson Convention Center Emergency Intake Site in Dallas, Texas ("Convention Center") with my colleagues, Neha Desai and Melissa Adamson, and two Spanish-language interpreters.

22.     On the day of our visit, we were told there were about 2,270 children placed at the Convention Center.  All of these children were boys between the ages of 13 and 17 who had been transferred directly from Customs and Border Protection.

23.     Upon arrival at the Convention Center, we were provided with a full tour of the facility. We were repeatedly told that ORR views the standing up of emergency intake sites like the Convention Center as a "life-saving mission."  We were encouraged to consider the Convention Center as akin to a hurricane shelter – with the hurricane in this situation apparently being the increase in children resulting in overcrowded and unsafe conditions at Customs and Border Protection facilities like Donna.

24.     While there is no question that the Convention Center is a significant improvement over a prolonged stay at Donna, I nonetheless have concerns about the lack of case management, lack of phone calls, lack of activities, and lack of identifiable standards at this facility – especially to the extent that children might remain there for many weeks or months.  In my opinion, suggesting that the only options are a prolonged stay at Donna and standardless emergency sites offers a false dichotomy.  ORR should be devoting significantly more resources to enhancing its case management capacity both because children have a right to be quickly and safely reunified with their families and because not doing so will place ever increasing demands on a system that is already stretched far beyond capacity.

25.     During our tour of the facility, we were shown two large conference areas used for eating and sleeping and a number of smaller areas designated for medical services, site support and logistics, and indoor recreation. We were also taken to an area in the loading dock of the Convention Center where portable units had been set up for showers and bathrooms.

26.     All of the approximately 2,300 children living at the Convention Center sleep in an enormous conference room on white cots arranged in vast rows.  There is no privacy in this sleeping area.  Some children stated that it was difficult to sleep with so many people in the same space and so nearby.  One child said it was noisy and unsettling, and it took him hours to fall asleep.  Others noted that being around thousands of people in such close proximity made them concerned about COVID.  One child said being around so many people made him feel "asphyxiated."

27.     There is a separate large area where the children eat their meals.  Groups of children cycle through this area, pick up their meals, and then sit at conference tables and eat together.  We observed some of the lunch and dinner meal times, and I noted how smooth and orderly the process went and how well-behaved the children acted.

28.     Next to the eating area, a section of the Convention Center has been cordoned off for recreation.  The recreation area includes a few basketball hoops, a makeshift space for soccer, and some tables where children can watch movies.

29.     We were also taken to the loading dock of the Convention Center.  This area has rows of portable units with showers and bathrooms.  Intake of new children is also conducted in this area.

30.     Following the tour, we interviewed approximately ten children.  The children I interviewed had been living at the Convention Center for nine to thirteen days.  They reported having been at a CBP facility prior to that for four to eleven days.

31.     Most of the children I spoke with at the Convention Center reported having been given a single 10-minute phone call with their family members the day before our site visit.  They all desperately wanted more contact with family as some had gone weeks or months without talking to them.  One child reported that he was told he would be allowed to have two phone calls a week while at the Convention Center, but that had not been happening.

32.     The children I spoke to reported having no contact with a case manager or anyone who knew about their case.  They all seemed confused about the sponsorship process and

described feeling anxious to have more information about what was happening to them and when they would be released.

33.     We have reached out to several of the interviewed children's family members since our visit.  These family members have told us that they have not been contacted by case managers. They expressed frustration that they have not been provided information about the sponsorship process or the steps they should be taking so that their children can be released to them.

34.     Children at the Convention Center appear to have access to basic hygiene.  They reported that they were able to shower regularly. One child expressed thanks to God that he could shower daily, having come from Donna where he went four days in between showers.  There were hand sanitizer stations throughout the facility and no children raised any concerns about access to soap or toiletries.

35.     Children at the Convention Center have limited access to education and recreation. Children reported having anywhere from fifteen minutes to an hour of English language instruction a day.  One child told me that the time varied based on the availability of the volunteer teachers.  We were told that the site does not have adequate space to set up a classroom for additional instruction.

36.     Children reported inconsistent access to the indoor recreation area of the Convention Center. Some said recreation time was supposed to happen daily, but that it didn't always happen.  In general, children reported having limited activities and spending the majority of their days sitting on their cots.

37.     Children reported that the meals at the Convention Center were generally okay, but that portions were not large enough and they often felt hungry between meals.  The site is aware of this concern, and mentioned they are working with the catering company to increase the portions.

38.     The only fresh air children at the Convention Center get is when they are waiting in line in the loading dock to use the portable shower and bathroom units.  We were told that given the urban environment, there was not a safe space for outdoor recreation and

there were no plans to allow children outside the facility during their stay. This means that some of the children I interviewed have already gone more than a month without outdoor recreation.

39.     As far as I know, the Convention Center is not adhering to any particular standards other than being a "life-saving mission" operating generally under a "best interests of the child" standard. It is not clear to me what that means. Given that this and similar facilities will likely be open for months, it is crucial that ORR develop uniform emergency intake site standards that ensure the safety and well-being of children while they await placement with their relatives. While the rapid deployment of the Convention Center and other similar facilities has been admirable, it is deeply concerning to me that thousands of children have been stuck indoors in close proximity, with minimal activities, limited access to phone calls, and no case managers for many weeks.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 9th day of April, 2021 at Boca Grande, Florida.

Leecia Welch

# EXHIBIT E

# HHS.gov

U.S. Department of Health & Human Services

---

Home > About > News > Pomona Fairplex Emergency Intake Site (EIS)

**FOR IMMEDIATE RELEASE**  **Contact: Administration for Children and Families (ACF)**
May 1, 2021  **media@acf.hhs.gov**

---

# Pomona Fairplex Emergency Intake Site (EIS)

As part of the Biden Administration's work to move unaccompanied children out of U.S. Customs and Border Protection (CBP) facilities as quickly as possible, the **Pomona Fairplex Emergency Intake Site (EIS) in Pomona, California, will receive the first unaccompanied children today, approximately 250 children**. The children will be welcomed by staff, receive a medical check, and be provided needed clothing, toiletries, food and snacks, as well as a safe place to rest. The Pomona Fairplex EIS will provide shelter for boys and girls from 2-17 years of age and has a potential capacity of 2,500 beds.

"Providing unaccompanied children a safe shelter is our legal and moral obligation," said HHS Secretary Becerra. "In the past month, we've made great strides expanding our capacity to meet those obligations while we work to safely and swiftly unify children with a family member or responsible sponsor. I want to express our deep appreciation to the officials who have supported our efforts, and especially want to acknowledge Los Angeles County Supervisor Hilda Solis, Mayor Tim Sandoval and the civic leaders and community of Pomona for the respect and hospitality extended to the children and the team at HHS. While the work has only begun, we're on the right path with reliable partners to get this done right."

While HHS' Office of Refugee Resettlement (ORR) has worked to build up its licensed bed capacity to care for unaccompanied children, additional capacity is urgently needed to manage the increasing numbers of unaccompanied children referrals from CBP. HHS is aggressively working with its interagency partners to ensure that unaccompanied children are safe and unified with family members or other suitable sponsors as quickly and safely as possible. To support this effort, HHS selected the Pomona Fairplex property to establish an EIS to provide ORR with needed capacity to accept children from CBP into its care where they can be safely processed, cared for, and either released to a sponsor or transferred to an appropriate ORR shelter for longer-term care. The EIS is intended for use as a temporary measure.

The Emergency Intake Site will initially provide potentially lifesaving services for unaccompanied children that are consistent with best practices/standards in emergency response in disasters or other humanitarian situations – clean and comfortable sleeping quarters, meals, toiletries, laundry, and access to medical services. A COVID-19 health screening protocol for all children will be implemented to follow

CDC guidelines for preventing and controlling communicable diseases. Services will be provided by a combination of contractors, and federal staff – including teams from the HHS Office of the Assistant Secretary for Preparedness and Response and the U.S. Public Health Service Commissioned Corps.

HHS will utilize all available options to safely care for the children. These options include both short-term and long-term solutions. In the short-term, HHS' Office of Refugee Resettlement (ORR) is working to ensure children don't spend more time in border patrol facilities than necessary by: 1) safely increasing capacity in its permanent/licensed network by implementing enhanced CDC COVID-19 mitigation strategies; 2) safely reducing the time it takes to unify unaccompanied children with sponsors; 3) using Influx Care Facilities with the same standards of care used in its permanent/licensed network; and 4) establishing Emergency Intake Sites to decrease over-crowding in CBP facilities. Simultaneously, ORR is committed to aggressively moving toward the long-term goal of acquiring enough state-licensed beds in our care provider network to reduce the need in the future for Influx Care Facilities or Emergency Intake Sites.

ORR operates a network of over 200 facilities/programs in 22 states and has a proven track record of accountability and transparency for program operations, as well as being a good neighbor in the communities where facilities are located.

HHS has recently taken steps to significantly increase in bed capacity, including:

- On February 22, HHS opened the Carrizo Springs Influx Care Facility (ICF), Carrizo Springs, Texas, adding an additional 1,008 beds to our care-provider network.

- With the assistance of FEMA, on March 14, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children in Midland, Texas, with the potential capacity of 700 beds.

- With the assistance of FEMA, on March 19, HHS opened an Emergency Intake Site (EIS) in Dallas, Texas, with the potential capacity of 2,300 beds.

- With the assistance of the Department of Defense (DOD) on March 25, HHS announced it will open an Emergency Intake Site (EIS) for Unaccompanied Children at Joint Base San Antonio Lackland, near San Antonio, Texas with the potential capacity of up to 350 beds.

- With the assistance of FEMA, on March 27, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at the San Diego Convention Center, with the initial potential capacity of 1,450 beds.

- With the assistance of FEMA, on March 29, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at the Freeman Expo Center in San Antonio, Texas, with an internal potential capacity for 2,100 beds and an external capacity of 300 medical beds.

- With the assistance of the Department of Defense (DOD) on March 30, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at Fort Bliss near El Paso, Texas, with the potential capacity of up to 5,000 beds.

- With the assistance of FEMA, on April 1, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at the National Association of Christian Churches (NACC Houston) site in Houston, Texas, with the potential capacity of 500 beds.

- With the assistance of FEMA, on April 5, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children, Dimmit, in Carrizo Springs, Texas, with the potential capacity of 440 beds.

- With the assistance of FEMA, on April 5, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at the Target Lodge Pecos North property in Pecos, Texas, with the potential capacity of 2,000 beds.

- With the assistance of FEMA, on April 6, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children, Delphi, in Donna, Texas, with the potential capacity of 1,500 beds.

- On April 11, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at the Starr Commonwealth campus in Albion, Michigan, with the potential capacity of 240 beds.

- On April 13, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at the Pennsylvania International Academy (PIA) in Erie, Pennsylvania, with the potential capacity of 418 beds.

- As of April 17, the NACC Houston EIS no longer serves unaccompanied children.

- On April 17, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at Joint Base San Antonio (JBSA)-Lackland near San Antonio, Texas, with the potential capacity of 372 beds.

- On April 22, HHS opened an Emergency Intake Site (EIS) for Unaccompanied Children at the Long Beach Convention Center in Long Beach, California, with the potential capacity of 1,000 beds, including medical isolation.

- As of April 23, the PIA EIS no longer serves unaccompanied children.

HHS will keep Congress, state, and local officials informed of future actions concerning unaccompanied children matters throughout our care-provider network.

### ###

Note: All HHS press releases, fact sheets and other news materials are available at https://www.hhs.gov/news.

Like HHS on Facebook, follow HHS on Twitter @HHSgov , and sign up for HHS Email Updates.

Last revised: May 1, 2021

---

---

### HHS Headquarters

U.S. Department of Health & Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201
Toll Free Call Center: 1-877-696-6775