1

ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

2

3

4

5

*Independent Monitor*

6

7

## UNITED STATES DISTRICT COURT

8

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10

11

JENNY LISETTE FLORES, *et al*.,

12

Plaintiffs,

13

v.

14

15

MERRICK B. GARLAND,
Attorney General of the United
States, *et al*.,

16

17

Defendants.

18

19

20

CASE NO. CV 85-4544-DMG (AGRx)

**NOTICE OF FILING OF JUNE 2021 INTERIM REPORT AND RECOMMENDATIONS REGARDING ORR EMERGENCY INTAKE SITES BY THE INDEPENDENT MONITOR AND DR. PAUL H. WISE**

21

22

23

24

25

26

27

28

On May 12, 2021, Judge Dolly M. Gee ordered Special Expert Dr. Paul H. Wise ("Special Expert") and the Special Master/Independent Monitor Andrea Sheridan Ordin ("Monitor") to "continue to monitor the conditions of any new facilities that care for Class Members, including hotels under the authority discussed in the Court's July 25, 2020 Order [Doc. # 887] and provide such informal recommendations to the parties and to the Court as they deem appropriate." [Doc. # 1122]. The Court also ordered the Special Expert and the Monitor to file their next interim report, if any, with the Court only after delivering a draft interim report and recommendations to the parties.

In accordance with the Court's orders, the Monitor submits the attached Interim Report and Recommendations Regarding ORR Emergency Intake Sites.

DATED:      June 22, 2021              Respectfully submitted,

                                       Andrea Sheridan Ordin
                                       STRUMWASSER & WOOCHER LLP


                                       By   /s/ Andrea Sheridan Ordin
                                          Andrea Sheridan Ordin

                                       *Special Master / Independent Monitor*

**CERTIFICATE OF SERVICE**

Case No. CV 85-4544- DMG (AGRx)

I am a citizen of the United States. My business address is 10940 Wilshire Boulevard, Suite 2000, Los Angeles, California 90024. I am over the age of 18 years, and not a party to the within action.

I hereby certify that on June 22, 2021, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Eastern District of California by using the CM/ECF system:

- **NOTICE OF FILING OF JUNE 2021 INTERIM REPORT AND RECOMMENDATIONS REGARDING ORR EMERGENCY INTAKE SITES BY THE INDEPENDENT MONITOR AND DR. PAUL H. WISE**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on June 22, 2021 at Los Angeles, California.

Jeff Thomson

In the United States District Court

Central District of California – Western Division


JENNY LISETTE FLORES, *et al.*, Plaintiffs,

v.

MERRICK B. GARLAND, *et al.*, Defendants.


Case No. CV 85-4544-DMG (AGRx)ss

Hon. Dolly M. Gee, United States District Judge


## <u>Update on ORR Emergency Intake Sites</u>

**Interim Report and Recommendations by the Independent**

**Monitor and Special Expert Dr. Paul H. Wise**


Andrea Sheridan Ordin
Special Master/Independent Monitor
Strumwasser & Woocher LLP
1094 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
(310) 576-1233

**INTRODUCTION**

Special Master/Independent Monitor ("Monitor") and Special Expert Dr. Paul H. Wise

provide this Interim Report ("Report") pursuant to the Court's Order of May 12, 2021, requiring

that Dr. Wise and the Monitor continue to provide enhanced monitoring of U.S. Customs and

Border Protection ("CBP"), Office of Refugee Resettlement ("ORR"), and U.S. Immigration and

Customs Enforcement ("ICE") facilities. [Doc. #1122]. This Report is focused solely upon

progress made by ORR Emergency Intake Sites ("EIS") since the Monitor's and Dr. Wise's last

Interim Report, dated April 2, 2021. [Doc. #1103].

The June 4, 2021, ORR Juvenile Coordinator Interim Report has greatly assisted the

Monitor and Dr. Wise in their assessments contained in this Report. The charts prepared by the

Juvenile Coordinator, which detail occupancy, average length of care, and length of stay for

minors, have assisted the Monitor and Dr. Wise in evaluating the progress ORR has made during

the present severe influx.

During the past two months, the Monitor and Dr. Wise received regular briefings from

ORR. The Monitor and Dr. Wise met regularly with Plaintiffs, advocates, and personnel from

various non-governmental organizations ("NGOs"). The observations in this Report are also

based on tours and monitoring by Dr. Wise and the Monitor of the following locations:

- Midland EIS

- San Diego Convention Center EIS

- Long Beach Convention Center EIS

- Freeman Expo Center San Antonio EIS

1

- Delphi EIS

- Fort Bliss EIS

## I.    SUMMARY

The dramatic influx of minors in the Rio Grande Valley Sector ("RGV"), which was noted in the Monitor's April 2021 Interim Report [Doc. #1103], continues. As noted in that Report, the number of minors entering CBP continues to require an unprecedented response and the rapid development of emergency holding facilities, which are primarily located in Texas and California. ORR has operated the following EISs on a temporary basis to meet the influx and eliminate severe overcrowding, reduce the length of stay for minors in CBP, as well as provide safe and timely discharge or transfer to licensed ORR facilities. Four of ORR's initial EISs have closed, and others may be closing soon, as their contracts expire and the facilities return to accepting their traditional tenants.

- San Diego Convention Center EIS
- Dimmit EIS
- Kay Bailey Hutchison Dallas Convention Center EIS **(closed)**
- ORR EIS at Fort Bliss
- Delphi EIS
- San Antonio-Lackland EIS **(closed)**
- Houston EIS **(closed)**

- Long Beach Convention Center EIS
- Midland EIS
- Freeman Expo Center San Antonio EIS **(closed)**
- Pomona Fairplex EIS
- Starr Commonwealth EIS
- Pecos Children's Center EIS

There are two noteworthy developments. First, the availability of the EISs has eliminated the severe overcrowding in CBP facilities. For example, as of April 26, 2021, at the CBP facility in Donna, Texas, approximately 600 unaccompanied children ("UAC") were in custody. Although still overcrowded at 600 during a public health crisis, Donna I was home to more than

3,000 UACs a month earlier. As of May 19, 2021, the total number of minors in the RGV Sector, including the Donna I facility, was down to 463, and the June 2021 figures show that capacity remains well below maximum occupancy, with average time in custody at less than 72 hours.

Second, the length of stay in CBP custody has decreased, with average times falling below 72 hours. In the month of April 2021, 3,567 minors were in CBP custody for longer than 72 hours, with 331 minors in CBP facilities for one week or more. Comparatively, in May 2021, 906 minors were in CBP custody for more than 72 hours with only 16 minors at CBP facilities for one week or more. CBP reports that in June 2021, it is rare for minors to remain in CBP custody for more than 72 hours. This achievement deserves recognition as it represents an important element in the broader response to meet the humanitarian challenges associated with the recent influx of UACs at the Southwest Border.

## II.      ORR EMERGENCY INTAKE SITES

The monitored EISs are providing basic custodial services, including food, shelter, sanitary services, and medical care. All sites are designed to include educational, recreational, and mental wellness services, although the level of services varies from site to site. The speed with which the EISs were established and the variation in physical sites, contracting arrangements, and geographical locations results in variances across the system, as noted later in this Report.

### 1.   ORR System Capacity, Census and Available Bed Space, and Length of Stay for Minors at EISs in May and June

The June 2021 ORR Juvenile Coordinator Interim Report describes and explains well the agency's capacity and available bed space as of the date of its filing. *Figure A* below shows the number of occupied and unoccupied beds in the entire ORR shelter system by facility type.

3

ORR's current permanent licensed shelter capacity, which provides a wide range of services to

its minors and is staffed by knowledgeable professionals, is reaching capacity, with the exception

of long-term foster care and traditional foster care shelters. The remaining beds available are

primarily in EIS facilities, which are significantly strained to provide adequate services of case

management and supervision. [Doc. #1126-2].



*Figure A*

As of May 31, 2021, there were a total of 17,418 minors in ORR custody. This represents

a 14% decrease from 20,321 minors in ORR custody on May 14, 2021. *Figure B*, which is also

taken from the June 2021 ORR Juvenile Coordinator Report, provides a breakdown of census

and percent capacity by facility type.[1]

---

[1] On June 16, 2021, 6,452 minors were detained at EISs. This is a decrease from the 8,368
minors reported by the ORR Juvenile Coordinator to have been detained at EISs on May 31,

| ORR CENSUS BY FACILITY TYPE AS OF MAY 31, 2021 | |
| --- | --- |
| **ORR Program Type** | **Census** |
| Shelter | 7,224 (92% Capacity) |
| Staff Secure | 41 (39% Capacity) |
| Secure | 7 (32% Capacity) |
| Residential Treatment Center | 8 (15% Capacity) |
| Transitional Foster Care | 935 (66% Capacity) |
| Long-Term Foster Care | 264 (57% Capacity) |
| Influx Care Facility | 571 (70% Capacity) |
| Emergency Intake Site | 8,386 (46% Capacity) |
| **TOTAL** | **17,418 (60% Capacity)** |

*Figure B*

*Figure C* provides a picture of the 6,452 minors, both tender-age and teenage, detained at EISs on June 16, 2021. As the figure shows, the minors who were present at the EISs on that date, some of whom had just arrived, had spent between several hours and 77 days at such facilities. ORR's June 16, 2021 snapshot census includes some minors who were just transferred to EISs, and therefore, do not have a listed "Date Admitted." The charts in this Report reflect length of stay for such minors as zero days in custody.[2]

---

2021. [Doc. #1126-2]. It is not clear whether this decrease reflects increased speed of release or if significantly fewer minors were transferred to EISs between May 31, 2021 and June 16, 2021.

[2] *Figures C - F* derive from the June 16, 2021 snapshot census of minors in EISs, which ORR shared with the Monitor on June 17, 2021.



*Figure C*

*Figure C* also shows that, as of June 16, 2021, only 1,448 minors were detained at EISs between 21 and 40 days, a significant decrease (-45%) from the 2,622 minors with the same length of stay range on May 31, 2021. The number of minors detained at EISs in excess of 40 days also dropped from 2,177 to 1,304 (-40%) between May 31, 2021 and June 16, 2021. Nevertheless, these decreases fail to highlight that, as of June 16, 2021, almost half of all children in the EISs had been in EIS care for more than 20 days, approximately 1 in 3 children had been in EIS care for more than a month, and approximately 1 in 16 children had been in EIS care for more than two months.

## 2.   Description of Three Sites Monitored

### San Diego Convention Center EIS

On April 15, 2021, Dr. Wise and the Monitor toured the San Diego Convention Center

EIS ("San Diego EIS"), which opened on March 27, 2021. Dr. Wise later returned to the site on

May 25, 2021. The San Diego EIS is an attractive and well-maintained convention center in

downtown San Diego in view of the harbor. The large convention meeting rooms now contain

bunks for girls of all ages and a small number of boys of tender age. Smaller meeting rooms have

been converted to classrooms, meeting rooms for staff, and offices for medical personnel and

legal services volunteers.

The children at this site are dressed in bright and clean clothes, and their care is overseen

by youth workers who are assigned a regular group of minors. The cafeteria is large and modern,

and the same food is served to both the minors and the staff and appears nutritious and

appetizing. This site has a potential capacity of 1,450 minors. On June 16, 2021, a total of 529

minors were detained at this location. Of these minors, six were tender-aged.[3]

While at the site, the Monitor and Dr. Wise interviewed ORR personnel, federal

volunteers who have been providing emergency assistance, contracted staff, and young minors.

They also visited a classroom for the tender-age boys, medical staff offices, and the COVID-19

isolation building and walked through the sleeping areas. This EIS provides a safe and

comfortable environment, including open space, adequate food, clean and appropriate clothing,

single beds for sleeping, recreation areas, and professional medical assistance on-site and

---

[3] The June 16, 2021 snapshot census reflects a decrease in population from the 817 minors
reported by the ORR Juvenile Coordinator to be detained at the San Diego EIS on May 31, 2021.
It is not clear whether this decrease represents increased speed of release or whether the San
Diego EIS has received no additional minors between May 31, 2021 and June 16, 2021.

available from nearby local hospitals. The San Diego EIS is headed by a management team that includes a Senior ORR Federal Field Specialist ("FFS"), senior federal employees who have volunteered from various agencies throughout the country, and contracted employees. The San Diego Unified School District has created a curriculum designed specifically for the minors in custody. The Monitor visited a classroom of 20 young boys enthusiastically working on their numbers in English and Spanish. There is also a Legal Service Provider ("LSP") that contracts with ORR to provide services at this site. The LSP began services soon after our visit.

*Figure D* describes length of stay for minors detained at the San Diego EIS on June 16, 2021.

8



*Figure D*

Figure D reflects that, on June 16, 2021, 105 minors had been detained at San Diego EIS

for between 21 and 40 days, and 124 minors had been detained in excess of 40 days. By

comparison, the June 2021 ORR Juvenile Coordinator Report stated that, as of May 31, 2021,

373 minors detained at the San Diego EIS had a length of stay of 21-40 days, and 195 minors

had a length of stay of 41 days or more. [Doc. #1126-2]. Accordingly, the number of minors at

San Diego EIS with a length of stay in excess of 20 days has decreased by roughly 60%.

However, the June 16, 2021 snapshot census also shows an extraordinary length of stay for some

minors, with 15 minors detained at San Diego EIS for 60 days or more, three of whom were tender-age. At the time of the Monitor's and Dr. Wise's interviews, the case management system was just beginning to ramp up. The contract for case management at that time was in flux, and a new contractor was about to begin work. In interviews, staff, minors, and advocates described a need for more resources to implement an efficient case management system in order to reduce length of stay.

In addition to needing significantly more experienced staff, individuals interviewed also agreed that the present system did not provide adequate communication between the Case Managers and the minors who, too often, had no knowledge regarding the status of their cases. Minors specifically complained that they had not communicated with a case manager for a period of weeks.

An additional problem arose in the San Diego EIS, which now appears to have been unique to this site. San Diego EIS followed a policy which denied phone calls to the minors to their families or sponsors within the United States unless and until case management had been able to fully screen the safety and appropriateness of the potential family or sponsor. Requiring a full screen caused long delays, and as a result, many minors were unable to contact their families or sponsors in the United States for two to three weeks. After the Monitor reported on this policy to the ORR Juvenile Coordinator and relayed the concerns of one of the doctors for the minors regarding the adverse effects of this policy, ORR modified the San Diego EIS policy to conform to analogous policies at EISs across the country. There is now a process for minors to contact their sponsor or family during intake (which takes place between 24 and 48 hours after a minor's arrival to an EIS). Under the new policy, facilitators dial the phone number provided by minors and conduct brief initial screenings before allowing the minors to speak with their sponsors or families.

An additional cause of concern were the many complaints received related to the process for releasing minors to their sponsors or families. Specific examples, which have been forwarded to ORR, include allegations that sponsors received only a couple of hours of notice prior to release. Even with several hours of notice, advocates complained that the information on how and where to pick up children was confusing, unclear, or inaccurate.

Advocates also expressed concern about difficulties experienced by families or sponsors in verifying the location of their children. The families described long wait times and inability to receive any timely response as to minors' current locations over a period of days, as well as receiving inaccurate information.

Undoubtedly, the large number of minors arriving each day plus the necessity of transferring some minors from one location to another presents a significant challenge in communication with the families. Nevertheless, there does not appear to be a uniform system for communicating location information, which U.S. Health and Human Services ("HHS") maintains in its national portal. The EISs respond in various ways to inquiries from families and sponsors. A procedure utilized at the Long Beach Convention Center EIS ("Long Beach EIS") appears to have been effective. A senior HHS case manager was assigned as a troubleshooter to respond to all inquiries regarding the location of minors at Long Beach EIS and communicate with families and sponsors. The person assigned to troubleshoot had also developed a continuing relationship with foreign consulates who were helpful in easing the communications with parents or sponsors.

### ORR EIS at Fort Bliss

ORR EIS at Fort Bliss ("Fort Bliss EIS") began accepting minors on March 30, 2021. This site had an initial capacity of 5,000 minors and is equipped to house boys and girls ages 13-

17. The June 2021 ORR Juvenile Coordinator Report now confirms that Fort Bliss EIS has a

potential bed capacity of 10,000 beds and reports that, as of June 16, 2021, 2,179 minors were

housed there. Fort Bliss EIS does not house tender-age minors.

*Figure E* shows length of stay for minors at this location on June 16, 2021.



*Figure E*

The June 2021 ORR Juvenile Coordinator Report states that, as of May 31, 2021, 1,401

minors detained at Fort Bliss EIS had a length of stay of 21-40 days, and 762 minors had a length

of stay of 41 days or more. [Doc. #1126-2]. Comparing statistics from the June 16, 2021

12

snapshot census represented in *Figure E* with May 31, 2021 statistics from the June ORR

Juvenile Coordinator Report, it appears that the number of minors at Fort Bliss EIS with a length

of stay in excess of 20 days has decreased from 2,163 to 1,318 (-39%). However, it is striking

that, on June 16, 2021, 3 out of 5 minors at Fort Bliss EIS had been there for three weeks or

more.

Dr. Wise visited Fort Bliss EIS a month after it was brought online. On April 29, 2021, at

the time of his visit, around 5,000 children were at the site. Separate tents were provided for the

approximate 500 minors who had tested positive for COVID-19. Although most of the COVID-

19 cases were asymptomatic or not serious, two children were hospitalized and required oxygen.

Children who had tested positive for COVID-19 were monitored and underwent repeated testing

in accordance with prescribed public health guidances.

At the time of Dr. Wise's visit, Fort Bliss EIS also had a large campus with "Boys" and

"Girls" residence tents with approximately 500 minors in each tent. Within these tents, small

bunk beds with the lower bunk almost touching the ground are separated into areas of 50

children each.

All of the minors interviewed had recently arrived from CBP custody. During Dr. Wise's

visit, most of the children were positive when describing the basic conditions at the EIS. They

described the hot food, and they were dressed in clean, acceptable clothing. At that time, there

were no educational facilities, although there was a small area set aside for arts, crafts, or other

indoor activities. There was no opportunity for privacy or small group activities. Outdoor

recreation facilities were near completion at the time of Dr. Wise's visit.

The minors reported significant delays in making their first calls to sponsors or family

members in the United States, despite the facility's goal of giving all children a phone call to

their family or sponsor within 48 hours of arrival. The predominant and consistent complaint

from the minors was the lack of access to case management staff. Minors said they waited weeks

between appointments and sometimes did not have their first interview with a case manager until

they had been at the site for two or three weeks. EIS staff described plans to increase the number

of case workers and explained that many of the workers were still in training at the time of the

visit.

During the month of May, after Dr. Wise's trip to Fort Bliss EIS, the Monitor and Dr.

Wise received letters and phone calls expressing urgent concerns about the inadequate conditions

at Fort Bliss EIS. The Monitor and Dr. Wise interviewed former federal detailees, who had

served as youth care workers, as well as lawyers and mental health professionals who advocated

for the minors. All expressed concerns about the lack of effective communication and delayed

case management. Based on information from these diverse sources, the following concerns

appeared to be most significant:

<u>Case Management</u>

During May 2021, youth workers noted that minors had no systematic way of contacting

their assigned case workers, who resided in a different tent. The minors waited weeks to hear the

status of reunification efforts. Multiple examples were given of inaccurate record keeping,

including misunderstandings of information which had been given by children to the case

workers. Several instances were reported that minors had been processed for reunification, only

to find out at the time of boarding the bus that errors had been made in the paperwork. The

minors were escorted back from the bus to await further information. Other minors were put on

buses with the misunderstanding that they were being released to their families, but then found

out that they had been transferred to another facility.

14

<u>Training and Organization of New Workers</u>

The staffing of Fort Bliss EIS is in a state of transition. Contract firms appear to have replaced the vast majority of federal volunteers who had been detailed to perform services as youth workers, and in some instances, case managers. During some volunteers' time at Fort Bliss EIS, there was no systemic training program, and no written materials or description of tasks were provided. Although the lack of training for the volunteer workforce may now seem irrelevant, it is not. It is critical to ensure that new contractors are adequately trained in the processes of ORR, particularly since many of them come from companies with little experience in supervision of children in facilities.

In late May, there was no schedule or routine of tasks for the volunteer youth workers. Some of the volunteers set up desks to assist the minors in learning English. Another volunteer who was fluent in Spanish took complaints from the boys about case management and forwarded them to the case management tent.

In one of the boys' tents, the ratio of volunteer case workers to boys was 1:15. However, no volunteer was assigned to work with or oversee any specific group of 15 minors. All of the case workers were responsible for all of the minors, and the case workers decided what tasks they wished to accomplish. In one of the girls' tents, in the absence of any written instructions, volunteers organized the girls into pods of approximately 50 minors each, and volunteers took responsibility for the girls assigned to their pod.

<u>Medical and Mental Health Capabilities</u>

Medical and mental health professionals are on-site and available during the day and night. However, advocates, lawyers for the class, and volunteer youth workers complained about lack of access to counseling and medical services. Volunteers were given clear instructions that

15

minors were entitled to medical or mental health appointments or evaluations if requested. However, contracted staff were sometimes reluctant to escort minors to the doctor or mental health counselor despite having been instructed that all medical requests by children must be honored.

Many of the boys and girls expressed anxiety over both their length of stay and the lack of information about their release. Some of the girls would stay in their bunks for most of the day and ask to skip meals. In May 2021, it was reported that girls experienced panic attacks, and several were removed from the residence tents on stretchers for outside medical treatment. Frequent lice outbreaks in late May also caused the girls to be quite anxious.

## Quality of Facility

In late May, the census for one of the girls' tents was approximately 700, and the census for one of the boys' tents was between 800 and 900. Although the two tents have a reported capacity of 1,000, it was reported that the sleeping facilities were crowded and cramped. The girls sleep on double decker bunk beds 12 inches apart, and the bottom bunk is just inches away from the floor. The volunteer youth workers observed that the bedding was dusty, and at the time they were at the facility, the bedding was not laundered on a regular basis.

The children complained that there were not enough socks, underwear, or soap. Although they had adequate access to showers, the girls often did not take advantage of the shower facilities because they did not have clean clothes to change into afterward.

## Access to Recreation and Amenities

Although recreation was minimal at the end of April and beginning of May, as of June, ORR has designated specific personnel to lead recreation activities at Fort Bliss EIS. A second

soccer field has recently been opened. Additionally, in June of 2021, the site opened an indoor recreation tent with daily Zumba classes and a range of different activities.

## Long Beach Convention Center EIS

The Long Beach EIS opened its doors to unaccompanied minors on April 22, 2021 with great fanfare from the City of Long Beach and the charitable community. There were multiple stories in the newspapers and on television welcoming the children to the facility.

Volunteer organizations brought toys, books, and clothes for the girls and boys. Long Beach EIS, like other convention sites, was open and bright with large convention rooms repurposed for individual cots. UCLA Health partnered with ORR to provide both physical and mental health assistance. The walls of the convention center were filled with large, cheerful posters depicting health-related messages. Each bed had a "Pillow Pet" as a gift from the community. The cafeteria was well-designed and provided high level, healthy food for the minors and staff. Volunteer groups came to provide services such as haircuts for both the boys and the girls.

The Long Beach EIS has a potential capacity of 772 minors and is equipped to house girls of all ages and tender-age boys. On June 16, 2021, 162 minors were detained at Long Beach EIS, a decrease from 206 minors housed on May 31, 2021. *Figure F* shows length of stay for minors detained at Long Beach EIS.

17



*Figure F*

Although the June 2021 ORR Juvenile Coordinator Report stated that, as of May 31, 2021, there were no minors at Long Beach EIS with a length of stay in excess of 40 days, by June 16, 2021, the number of minors with a length of stay in excess of 40 days had increased to 28, seven of whom were tender-aged. A multitude of factors affect the rate at which ORR is able to release and reunify minors, and the Monitor expects that future Juvenile Coordinator Reports will discuss in more detail the reasons for any tender-age children remaining at EISs for more than 40 days. It was notable that, during this time, neither the Monitor nor Dr. Wise received any

complaints from advocates or members of NGOs regarding case management delays or lack of communication.

Below is an overview of the Monitor's and Dr. Wise's impressions based upon their tour of Long Beach EIS:

<u>Case Management</u>

Dr. Wise and the Monitor had a lengthy interview with the senior FFS Supervisor and a four-member case management team. The team explained the manner in which they, working together with the youth workers and ORR, confront the challenges they faced. Some of the case managers had had prior experience both in the federal government and in private industry. The contracted case managers explained their unitary contract, which includes a team of case managers and transportation agents. The team believed that working together has helped to eliminate difficulties in coordinating minors and families encountered at the time of minors' release.

<u>Medical and Mental Health Capabilities</u>

UCLA Health provided a full complement of professional health workers including doctors, nurses, and practitioners experienced in mental health issues. The protocols for initial examination at intake, as well as vaccinations and wellness care, were extensive. There is a current vaccination packet, and ORR was looking into including COVID-19 vaccinations.

<u>Access to Recreation and Amenities</u>

Television was available during the day, as well as smaller areas for indoor recreation. The youth workers provided interactive games and projects including a talent show of the tender-age children and a program described as a "student council meeting" in which teams of minors

19

debated over what menu would be available in the cafeteria the following week. There were

tables set aside for crafts and art projects. There were small areas for physical play, including

soccer. The outpouring of charitable gifts included clothes, books, and toys. There were showers

and laundry facilities, and clothes appeared to be fresh and clean.

### 3.   ORR Standard Operating Procedures: Case Management Procedures for Emergency Intake Sites (Version 2.0)

Soon after the development of the first EISs, ORR released guidances for case

management procedures specific to the EISs. The purpose of these guidances, which were

updated by ORR on May 24, 2021, is stated as follows:

> "Document and implement On-site and Virtual Case Management procedures to execute
>
> safe and timely discharge or transfer for Unaccompanied Children from the Department
>
> of Health and Human Services Office of Refugee Resettlement Emergency Intake Sites.
>
> Each section outlines the procedures and responsibilities of partners participating in the
>
> UAC Case Management process at an EIS. This document is a high-level process
>
> standardization and baseline for Case Management at each EIS. Each site can tailor the
>
> Standard Operating Procedures ("SOP") to site-specific roles, responsibilities, and areas,
>
> but should otherwise adhere to the framework established in this SOP. This SOP does not
>
> replace or/override existing policy or act as an exhaustive training guide."

The 43-step protocol for the intake, unification processing, transportation, and discharge

of minors at EISs will be extremely helpful in ensuring that the goals of ORR will be met. In

particular, the timelines and deadlines which are set for specific tasks should assist the case

managers in working toward expeditious and safe reunification. However, in certain places, the

instructions are inconsistent. For example, certain events are measured from a minor's time of

arrival, while others are measured from a minor's time of intake. Additionally, some timeframes use calendar days, while others use business days.

A few examples of the most important mandates are listed below. Undoubtedly, there will be disagreement about whether some of the deadlines are too short or too long. For example, the deadline for reviewing a case and making a final release decision after all case documents have been uploaded to the portal is only one business day (or two business days for cases that require home studies). On the other hand, case managers are not required to update minors on the status of their cases any more frequently than every 10 to 12 days. The development of this document by ORR is laudable. Recognizing how complex and difficult achieving uniform case management performance is, it is essential that training materials be developed quickly and that these mandates be adequately monitored and implemented.

<u>Examples of May 24, 2021, ORR Case Management Guidances (EIS)</u>

- **<u>Within 24 hours of arrival to an EIS</u>**, UACs should receive an Initial Intake Assessment and an Assessment for Risk.

  - Preferably **<u>within 24 hours</u>**, but at most, **<u>within 2 business days</u>**, UACs should receive an Initial Medical Exam.

- **<u>Within 5 days of a UAC's arrival to an EIS</u>**, Case Managers should conduct an interview with the UAC's sponsor.

- If release is approved, Case Managers will notify the sponsor of the decision and inform them that a Transportation Coordinator will contact them with travel details **<u>within 3 days</u>**. Transportation Coordinators should send requests to each site's Transportation Contractor **<u>daily</u>**.

21

- Case Managers retain access to a UAC's case through the portal for **45 days after discharge** (cases automatically close 45 days after discharge).

## III.   FINDINGS AND RECOMMENDATIONS

### A.  Findings

#### ❖  Finding One: Reduction in Overcrowding and Time in CBP Custody

The development of the EISs has accomplished the goal of reducing overcrowding of UACs in CBP custody. The strategy has achieved the additional goal of rapidly reducing the time UACs spend in CBP facilities.

#### ❖  Finding Two: Length of Stay at Emergency Intake Sites

The EIS strategy is also directed at transferring children out of temporary EIS facilities in a safe and timely manner, either via family reunification or transfer to a licensed shelter. Accordingly, the number of children in EIS facilities has fallen, as has the time in EIS custody. The rate at which children are being discharged or transferred to a licensed shelter has also improved recently, with 4 of the 10 operational EISs reporting a discharge rate of over 4 minors per 100 discharged daily. These are useful metrics and reflect intensive ORR efforts to reduce the time children spend in EIS facilities.

Despite these promising indicators, there are too many children who remain in EIS facilities beyond an appropriate length of time. It is difficult to assess the precise number of days at which EIS custody becomes inappropriate. The level of crowding, the nature of services, and age of children in the EISs vary significantly. In addition, children's vulnerabilities and resilience can be equally diverse.

22

❖ **Finding Three: Impact on Minors from Length of Stay**

Direct observations in the largest EISs, interviews with detained children and EIS staff, and consultations with child mental health experts, suggest that the risk of significant psychological and emotional harm becomes considerable after two to three weeks in EIS care.

As previously noted in this Report, almost half of all children in the EISs have been in EIS care for more than 20 days; approximately 1 in 3 children have been in EIS care for more than a month; 1 in 16 children have been in EIS care for more than two months.

It is important to recognize that some categories of children are more difficult to reunify than others. Accordingly, concentrating on elevating the cases of children residing in EISs for longer than two or three weeks and identifying early the more vulnerable and/or difficult to place categories of children could amplify the performance of the EISs in meeting their goal of rapid discharge or transfer.

There are also important approaches to reducing the risk of significant psychological trauma in EIS care, many of which ORR has implemented. Among the most important is minors' early and frequent contact with appropriately vetted family or sponsors while in EIS custody. It is encouraging to see the policy at the San Diego EIS has been revised to facilitate earlier phone contact. Early and regular contact between minors, case managers, and youth workers is also a critical component to reducing risk to the minors' well-being.

**B. Recommendations**

In this Report, we expand upon three of the recommendations drawn from the Monitor's last Interim Report filed in April of 2021. [Doc. #1103.]

23

❖ **Recommendation One: Standards for Emergency Intake Sites**

Continue to prioritize development of custodial, medical, and processing standards specific to EISs to ensure health and safety of the minors awaiting reunification or transfer to licensed shelters. The issuance of ORR case management guidances specific to EISs on May 24, 2021 described in this Report, is an excellent example of actions taken within the last two months. In addition, a protocol for oversight to ensure the implementation of the case management requirements set forth in the May 24, 2021 ORR case management guidances should be considered.

❖ **Recommendation Two: Case Management at Emergency Intake Sites**

As stated in the Monitor's last Interim Report, dedicated case management personnel at EISs are critical to expeditious reunification with family or sponsors and to ensure safe housing for minors. Continue to upgrade the contracted case management services in order to achieve this goal. Engage additional senior, seasoned ORR personnel to provide oversight, training, and accountability.

❖ **Recommendation Three: Medical Capabilities**

ORR has successfully transferred its medical capabilities from a Federal Emergency Management Agency ("FEMA") disaster posture and should now concentrate on expanding access to medical and mental health services designed for the unique population at the EISs.