# EXHIBIT C

# PSYCHOLOGICAL EVALUATION OF CHILDREN AND CONDITIONS
# AT FORT BLISS EMERGENCY INTAKE SITE

## INTRODUCTION

    I am a practicing licensed child clinical psychologist and a Clinical Associate Professor in the Department of Psychiatry and Behavioral Sciences at the Stanford University School of Medicine.  In this position, I serve as the Director of Community Programs for Stanford's Early Life Stress and Resilience Program, and I am a core faculty member in the Stanford Human Rights in Trauma Mental Health Program.  I obtained my Ph.D. in Clinical Psychology from the University of Denver, with a Specialization in Developmental Cognitive Neuroscience.  I completed my predoctoral internship and postdoctoral fellowship at the Multicultural Clinical Training Program at the University of California, San Francisco, which entailed extensive training and experience in trauma-focused clinical intervention for immigrant children and families.  I received a Master of Arts degree in Psychological Research from San Francisco State University, and a Bachelor of Science degree in Cognitive Science from the University of California, San Diego.  My clinical and research efforts and experiences focus on understanding and addressing the impact of stress, trauma, and adversity in children, families, and communities.

    I have published research manuscripts in peer-reviewed journals and I have authored chapters on trauma in published volumes on mental health.  I have given numerous presentations at national and international professional conferences and have delivered workshops and trainings on child traumatic stress, trauma-focused intervention, and trauma-informed practice for mental health professionals, trainees, and multidisciplinary audiences.  I have served as a peer reviewer for the Annual Meeting of the International Society of Traumatic Stress Studies (ISTSS), the Journal of Traumatic Stress, the Journal of Psychiatric Research, the Journal of Interpersonal Violence, and Psychological Trauma: Theory, Research, and Practice.

    I have worked extensively with immigrant children and families from Mexico, Central America, and South America.  I am fluent in Spanish and I provide bilingual psychological evaluation and treatment services.  I have developed and implemented clinical interventions specifically tailored to address immigration-related stress including common traumas experienced before, during, and after migration.  Furthermore, I have participated in the monitoring and psychological evaluation of migrant children in federal immigration custody.  In 2018 and 2019, I visited ORR-contracted shelters and influx facilities including Southwest Key Casa Padre (Brownsville, Texas), BCFS Tornillo Influx Facility (El Paso, Texas), and Homestead Influx Facility (Homestead, Florida).  During these visits, I conducted site inspections and child interviews for the purposes of evaluating the mental health and physical wellness of the children detained at these facilities, as part of ongoing monitoring under the *Flores* Settlement Agreement.  In 2019 and 2020, I conducted similar monitoring and evaluation of the psychological impact of the Migrant Protection Protocol through observation and interviewing at various shelter and child care facilities in Tijuana (Baja California, Mexico) and Ciudad Juarez (Chihuahua, Mexico).  Based on these experiences, I have prepared and submitted expert reports and declarations, including for the cases of *Flores v. Barr* and *Lucas R. v. Azar,* and in briefings for the U.S. Senate and House of Representatives.  I have also conducted review, evaluation, and expert reporting related to child trauma exposure in individual cases, including

habeas filings, federal tort claims, and in the case of *DJCV v. United States*. For further information regarding my experiences and affiliations, see attached curriculum vitae.

I visited the Fort Bliss Emergency Intake Site (EIS) on June 3, 2021, and June 4, 2021, at the request of attorneys who represent detained children as part of the settlement agreement in *Flores v. Garland*. My clinical impressions of the detained children and the detention conditions are based on: (1) a tour of the facility provided by Commander Gregory Davis on June 3, 2021; and (2) face-to-face individual interviews with 4 boys and 4 girls aged from 13 to 17 at the Fort Bliss Emergency Intake Site (Fort Bliss) on June 3 and 4, 2021. The children I interviewed were from Guatemala, Honduras, Nicaragua, and El Salvador. The children I interviewed had lengths of stay at Fort Bliss ranging from approximately 51 days through 62 days, and many had been previously placed at other EIS facilities, following stays in Customs and Border Protection (CBP), before being placed at Fort Bliss. All were seeking to reunite with family members or known family friends in the United States (however, one child believed his proposed sponsor was being denied, resulting in his apparent placement in Category 4).

I have detailed my findings and recommendations below. In sum, Fort Bliss is a restrictive environment where children have limited freedom of movement, limited access to resources, and limited opportunities for recreation and agency, among other restrictions. The general conditions, experiences, and daily routines of children at Fort Bliss pose risks to their physical and psychological well-being, especially considering their particular vulnerability as immigrant children who have frequently faced significant prior exposure to adversity and trauma. In particular, children experience intense psychological distress regarding their case status and their limited access to information about the release process. Additionally, increased duration of detention corresponds with declining psychological functioning and well-being and, as children spend more time at Fort Bliss, they are likely to become increasingly hopeless, helpless, and despondent. Children are not able to access adequate supports and services from the staff and facility at Fort Bliss, and the available mental health supports are inadequate for meeting the needs of the population. Children also suffer distress due to insufficient quantity and quality of contact with their families. The general experiences and treatment of children at Fort Bliss are not consistent with principles and practices of trauma-informed care.

It is my professional opinion that large-scale congregate care facilities such as Fort Bliss are inappropriate for housing unaccompanied immigrant children for extended periods of time (i.e., beyond a few days or 1-2 weeks), due to the risk of causing clinically significant psychological harm. Furthermore, such facilities are entirely inappropriate – and potentially harmful – for any duration of stay for children with moderate to severe mental health difficulties, children with disabilities, children with significant family stress, tender age children, children who primarily speak indigenous languages, and children who are pregnant or parenting.

This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

## POPULATION AT FORT BLISS EMERGENCY INTAKE SITE

Children are generally vulnerable based on their dependence on adult caregivers and their sensitivity to environmental experiences in shaping their long-term development. From infancy through early adulthood, children are continually developing their psychological skills and sense of self and the world, and these outcomes – along with children's neurobiological structure and function – are deeply influenced by their life experiences. Immigrant children are particularly

2

vulnerable because they are known to have experienced significant childhood adversities and traumas, often across or within multiple stages of development (Betancourt et al., 2017). Immigrant children have heightened rates and risk for trauma exposure before, during, and after migration. Children currently and recently arriving at the U.S. Southern Border (from countries such as El Salvador, Guatemala, and Honduras) have commonly experienced extreme poverty, severe health risk, domestic abuse and violence (including witnessing and/or experiencing physical and sexual abuse), community violence (including witnessing and/or experiencing assault, murder, or gang persecution), discrimination based on identity (e.g., ethnicity, sexual orientation, indigenous heritage), extortion, kidnapping or attempted kidnapping, and loss of family members or loved ones (Keller et al., 2017; Physicians for Human Rights, 2019). Unaccompanied immigrant children have yet another level of vulnerability because, by nature, they are experiencing the temporary but ambiguous loss of the primary protective factor that supports healthy child development: the consistent presence of a stable and supportive caregiver.

Childhood exposure to adversity and trauma is known to increase risk for future mental health difficulty, physical health problems, and functional impairment, and, through these mechanisms, has been associated with shortened life expectancy (Bucci et al., 2016; Felitti et al., 1998; Felitti & Anda, 2010). Exposure to discrete incidents of trauma is associated with the presence of a range of psychological symptoms and psychiatric disorders including, but not limited to, depression and other mood disorders, anxiety disorders, posttraumatic stress disorder, adjustment disorders, and substance use disorders. Additionally, the presence of multiple traumas in childhood across multiple stages of development is known to result in more pervasive and pernicious difficulties in cognitive, emotional, behavioral, and relational functioning, with response styles that emphasize survival, impulsivity, and hypervigilance as adaptive reactions to dangerous environments (Shonkoff, 2016; Blaustein & Kinniburgh, 2018; National Scientific Council on the Developing Child, 2005/2014; van der Kolk, 2014). These developmental impacts of trauma influence children's independent functioning, self-care, health functioning, cognitive and academic functioning, occupational functioning, and social or interpersonal functioning.

The experience of being detained in government custody has clear, demonstrated negative consequences for the psychological health and general functioning of immigrant children (Linton, Griffin, & Shapiro, 2017; von Werthern et al., 2018). For many children, experiences of involuntary placement in restrictive custody settings constitute a form of traumatic stress exposure that puts them at increased risk for suffering the various health and psychological harms described above.[1] As an indicator of prevalence in the current population, a 2019 study of Central American immigrant children detained in an ICE facility with a caregiver showed that these children demonstrated two times the rates of abnormal emotional and behavioral difficulties, and three to four times the rates of PTSD prevalence compared with children in the general U.S. population (MacLean et al., 2019). For immigrant children in

---

[1] While involuntary placements for purposes of maintaining safety are standard practice in the field of medicine and mental health, such decisions are only made when there are clear and acute safety risks identified via in-depth evaluation to ensure that the acute safety risks of non-secure care outweigh the harms of restrictive care. In standard medical and mental health practice, involuntary placements are never pre-emptively applied to entire populations of individuals. In the current context, the experience of restrictive custody is often the driving factor contributing to the severe mental health decline and associated safety risks.

detention, particular concerns have been raised regarding the development of thoughts of suicide and acts of self-harm, behavioral difficulties (e.g., disruptive conduct, mutism, and social and behavioral withdrawal), somatic symptoms and health complaints, and difficulties with sleeping and eating (Robjant et al., 2009; von Werthern, et al., 2018).  Additional concerns are present for children who are held in custody in institutionalized, congregate care settings (such as Fort Bliss), due to the impacts of regimented routines, lack of individualized care, and barriers to personal investment in children.  Experts conclude that providing for children's basic needs (e.g., food, sleep, health) is insufficient for promoting typical development in the absence of individualized and reliable caregiver-child relationships (Center on the Developing Child, 2013).  Furthermore, the harms to children in these settings only increase when detention is prolonged.  Research has demonstrated that increased time in immigration detention is associated with greater psychological distress and increased impairment in mental health functioning for children (Mares, 2016; Newman & Steel, 2008; Robjant et al., 2009; von Werthern et al., 2018).  Separation from family members due to detention adds further risk and is associated with poorer mental health outcomes relative to children who stay with caregivers or family members (von Werthern et al., 2018).  The negative mental health outcomes associated with restrictive custody, congregate care, and separation from family can be long-lasting, as the symptoms of psychological distress described above have been shown to endure for years beyond release from detention (von Werthern et al., 2018).  The developmental impact of adversity experienced due to restrictive care can alter a child's future trajectory and functioning, and may increase the risk for future traumatic stress, as children's resilience and resources are undermined.

## OBSERVATIONS OF CHILDREN AND CONDITIONS AT FORT BLISS EIS

**The general conditions, experiences, and daily routines of children at Fort Bliss pose risks to their physical and psychological well-being.** Through the Fort Bliss tour and interviews, I learned that children spend approximately 21-22 hours per day inside their tents, in which they are closely quartered with hundreds of other similar-age children.  They leave their tents only for brief periods of recreation (usually – though not always – offered on a daily basis, but often during hot mid-day hours), to move to dining halls, and to attend occasional case management, medical, or counseling appointments.  They have limited opportunities for recreation and activity within their tents (sometimes playing cards or making beaded jewelry) and are generally offered 1-2 hours of optional English lessons most days of the week.  In general, children appear to spend the majority of their time talking with peers, sleeping, or reading.

In these circumstances, many children experience extreme boredom, lethargy, low motivation, hopelessness, and helplessness, all of which are symptoms and contributors to depression and psychological stress.  The majority of children I spoke with endorsed or demonstrated at least one of these symptoms, and generally indicated that these difficulties were present most of the time – if not all of the time – in recent weeks.  Many children also reported regular (i.e., daily or near everyday) sleep difficulties, which can be attributed to experiences of depression and psychological stress, disruption in sleep patterns (e.g., due to extended daytime sleep), and/or exposure to light throughout the night (in some areas of the tents, bright lights remain illuminated 24 hours/day).

One child described her struggle with the crowded living conditions, noting that she feels uncomfortable around large groups of people (a common symptom of social anxiety), with the

4

result that she experiences chronic stress in her living environment and is not able to fully engage with the available recreational and educational activities in her tent.  Some children struggled with the lack of privacy in their living environment, noting that time alone, as well as the ability to talk to family members in confidence, typically helps to reduce their stress, but they don't have such opportunities at Fort Bliss.  Many children complained about the food (including multiple specific reports that they were served raw and bloody chicken with feathers) and reported experiencing a reduced appetite, which is both a symptom and contributor to depression and psychological stress.  Without developmentally-appropriate, goal-directed, and values-oriented activities to guide children's activities and daily functioning, they began to languish in a state of increasing sadness, inactivity, agitation, anxiety, and adjustment difficulty.

**Children experience intense psychological distress about their case status.**  Nearly all children I spoke with endorsed clinically significant[2] and severe stress and anxiety about the status of their case, particularly related to the lack of knowledge about their case and the lack of accurate information on their timeline for release.  All children stated that their primary need and desire was to be released from Fort Bliss and to be united with their potential sponsor(s). Communication with case managers varied widely, with some children reporting regular recent contact with case managers, and others reporting a complete absence of contact during the entirety of their stay.  Nearly all children reported having no contact with a case manager in the first 3-4 weeks of their stay, and most stated that they primarily receive updates on their case status through second-hand reporting via conversations with their sponsors and family.

Most children directly stated that having more contact and information from their case managers would lessen their stress and anxiety, and that news about their case served as a primary motivator for staying active and engaged in their daily activities.  However, children were generally told that they cannot meet with their case managers by request and were instead instructed to wait for case managers to call for them (at the case managers' discretion).  This inability to request information and assistance when needed contributes to children's sense of helplessness and lack of agency.  In the absence of clear and consistent information, many children were experiencing unmitigated worry and anxiety, as they had begun to envision worst-case scenarios, such as that they will never see their family, that they will be transferred to a new (and potentially worse) facility, and that they will have to re-start their cases.

Similarly, many children did not understand why their cases were delayed (especially when comparing themselves to peers who had come and gone from Fort Bliss), which led them to worry that there was something wrong with their cases that would result in an undesired outcome.  Many children attributed sleep difficulties to their anxieties about their cases, noting that they stay awake at night worrying about what will happen to them.  Some children demonstrated significant frustration regarding their case status (and/or lack of information and communication) that linked with experiences of irritability and anger with a resulting impact on their social functioning and their interactions with facility staff.  Other children described and demonstrated sadness and helplessness about their situation (including their inability to get information or do anything about their case) that manifest as symptoms of depression.  Many children had been told that they would be at Fort Bliss for a specific duration (typically, either 40 or 60 days); those children that were approaching these marks therefore experienced increasing anxiety as they feared they were about to experience another setback in their release to family

---

[2] The term "clinically significant" is used when stressors or psychiatric symptoms are present the majority of the time, cause significant distress, and result in impairment in functioning.

5

and community and no one had communicated to them what would happen when they reached the 40- or 60-day mark.

**Increased duration of detention corresponds with declining psychological functioning and well-being.** Within these circumstances and experiences, children's psychological functioning appears to deteriorate and decompensate over time as their stay at Fort Bliss is extended. Multiple children noted that their symptoms of anxiety and/or depression began after approximately 4-5 weeks at Fort Bliss. They reported that the frequency and intensity of their sadness, tearfulness, worry, and anxiety gradually increased over time. Many noted that they had never experienced symptoms of pervasive anxiety and/or depression prior to their placement at Fort Bliss.

Children reported particular difficulty in seeing other peers arrive and get discharged from Fort Bliss, while they remained in an uncertain limbo. In addition to the concerns about their own case status that get triggered by seeing other peers leave, many children endorsed sadness directly resulting from the loss of social support stemming from friends' departures. Indeed, many children rely on the mutual support that comes from their companions in custody, but children with extended stays experience multiple losses of this important peer resource, thereby contributing to their grief and despair.

As children spend more time in the restrictive environment at Fort Bliss (in which they have limited freedom of movement, limited access to resources, and limited opportunities for recreation and agency, among other restrictions), they are likely to become increasingly hopeless, helpless, and despondent. Patterns of behavioral inactivity become routine, habitual, and engrained as children's motivation and energy for positive and productive activity deteriorates. In contrast to normative adolescent development which entails increased independence over time, children experience prolonged periods of limited agency, leading them to either succumb to a state of helpless despair, or to resort to acts of desperation. Such acts can include self-harm or attempts to escape, both of which children I interviewed at Fort Bliss had witnessed. As children's concerns, worries, and anxieties about their case disposition are unaddressed and unmitigated, their fears and preoccupations intensify. One child endorsed significant distress caused by persistent and intrusive negative thoughts that "I won't ever get out; I'm going to die here" ("nunca voy a salir; voy a morir aquí"). Multiple children reported that, with extended time at Fort Bliss, they increasingly lost hope that they would reach their destination, be reunified with their family, or achieve the positive outcomes they had hoped for at the start of the journey to the United States.

**Children are not able to access adequate supports and services from the staff and facility.** On the whole, interactions and supports from facility staff and counselors appear to be inadequate – and in some cases harmful – for children's psychological health. While some children stated that facility staff are helpful and supportive, others reported and demonstrated distress stemming from their interactions with staff. One child stated that, in her tent, children are not permitted to speak or converse with staff, leaving them devoid of support from adults during the vast majority of their time in custody. Other children reported being told by staff that they would be deported if they tried to leave their tent or the facility, and that receiving an incident report would prolong their stay or negatively impact their immigration case.

Instances of staff using threats and misinformation as a means of behavior management can have negative psychological consequences for children. These comments, from staff, not only exacerbate children's worries and anxieties about their case status, but also engender distrust and lack of confidence in the adults around them. The use of threats (including

6

presentation of false information) as a form of behavior management is an indication of staff overwhelm, potentially due to insufficient qualifications to work with this population, insufficient staffing, inadequate training, general burnout, and/or vicarious traumatization. Furthermore, the apparent constant rotation of staff in and out of children's living environments and daily activities prevents children from developing supportive relationships that provide a consistent source of trust, stability, and security. For normative and healthy development, children need access to consistent, trustworthy, and supportive adults to support their emotional and behavioral regulation and to instill confidence in their abilities and functioning. Such opportunities appear to be lacking in the Fort Bliss milieu, which is of particular concern for children who spend extended periods of time in this placement.

**Available mental health supports are inadequate for meeting the needs of the population.** Mental health counseling supports appear to be generally available to children based on their request. When a child makes a request (by adding their name to a sign-up sheet), they generally receive a single session of counseling within the day, though these requests are not always fulfilled. Counseling sessions are with different support providers each time, meaning there is no continuity of care, and there are minimal opportunities to build rapport and trust with a stable provider. Counseling sessions are not always held in private locations and therefore do not provide the safety and confidentiality that are fundamental for mental health service, and are important conditions for effectively addressing emotional or psychological distress. While children generally appear to appreciate the opportunity to receive support from counselors, this is an inadequate level of care for children with moderate to severe mental health concerns who are placed at Fort Bliss for more than 1-2 weeks. Children with severe mental health concerns (e.g., demonstration of self-harm behavior, extreme anxiety and panic) can be placed under 1:1 supervision but do not receive therapeutic supports or intervention (beyond the counseling sessions described above), which is below general standards of care. The qualifications for mental health counseling and clinical service providers are unclear. There do not appear to be standards for preventive screening and identification of children in need of socioemotional support, meaning that children either have to proactively refer themselves, or else decompensate to the point of severe stress and risk in order to receive supports.

**Children suffer distress due to insufficient quantity and quality of contact with family.** Concerns about family members' well-being was another primary source of distress for many children. Children typically reported having access to phone calls for 10 minutes twice per week; however, these phone calls occur in the context of the loud and crowded tent environment, without the privacy or comfort to allow them to express their distress. Some children reported that they avoid talking to their family members (usually in their communities of origin) because it was too sad and too emotional for them (and, in some cases, they didn't want to experience overwhelming emotions in the public tent setting), and also because they didn't want to cause additional distress for their family members by disclosing the adverse circumstances that they are living in. Some children struggled with having to decide between using their limited phone time to communicate with potential sponsors (to receive case updates) or to communicate with family in their home community. Children consistently stated that having more time to talk to family members in privacy (without the loud and disruptive noise from the crowded tent environment) would help to mitigate their distress. The lack of ability to both receive and provide updates on well-being with family members, and to seek reassurance and encouragement from family, contributes to children's experiences of worry, anxiety, sadness, and depression. One child also had a younger sibling housed at Fort Bliss, and stated that he had benefited from weekly 90-

7

minute visits with her, particularly given that he felt responsible for her safety and well-being. However, he learned from his sponsor that his sister had been unexpectedly transferred to a facility in New York without his knowledge; upon receiving this notice, he entered immediate despair and stated that he had never experienced such sadness before in his life.

**The general experiences and treatment of children at Fort Bliss are not consistent with principles and practices of trauma-informed care.** In general, children are able to tolerate experiences of stress and adversity when such experiences are *temporary and brief*, and when children are *supported by stable and protective caregivers*. Neither of these conditions are met for many children at Fort Bliss, as they endure prolonged and seemingly indefinite stays and do not have adequate contact or support from stable, familiar caregivers. Such conditions therefore increase the likelihood for traumatization due to children's experience in custody. Trauma is defined as "an event, series of events, or set of circumstances that is experienced by an individual as physically or emotionally harmful or life threatening and that has lasting adverse effects on the individual's functioning and mental, physical, social, emotional, or spiritual well-being" (Substance Abuse and Mental Health Services Administration [SAMHSA], 2014, p. 7). Trauma is known to be subjective in nature, meaning that an individual's *perception* of experiences of potential threat or adversity determines whether such experiences are 'traumatic' and entail risk for subsequent posttraumatic stress.

Two primary factors influencing individuals' perceptions of potential threat or adversity are whether they have *knowledge and information* about their experience, and whether they feel a *sense of agency and control* over their experience. These two elements are clearly lacking in children's experiences and perceptions of their placements at Fort Bliss. In particular, failures to provide clear and accurate information, and to answer children's questions, about their case status results in confusion, disorientation, and disempowerment. Without reliable knowledge, information, and communication about their cases, children remain in a state of ambiguous uncertainty, and are rendered helpless to adequately prepare themselves for their stay or to take action to advocate for themselves in their cases. The difficulties children encounter in simply getting answers to their questions about their cases indicates an inability on the part of the system to respond appropriately to children's needs and concerns (which includes concerns about their well-being). As described above, lack of information about cases is a primary source of children's distress, worry, and sadness. Most children arrive at Fort Bliss under circumstances of stress, adversity, and significant transition and uncertainty, and the failure to provide clear and accurate information about their stay and case disposition further exacerbates their distress, thereby increasing risk for traumatic stress.

Many children reported feeling like they had no control over their situation and that they had limited agency over both their case status and their activities of daily life. Giving children options and agency to inform both significant life decisions and quotidian activities can influence their perceptions and subjective experiences within the context of ongoing stress and adversity. Children in EISs like Fort Bliss are not given the opportunity to advocate for themselves in placement determinations (both across and within EIS facilities), and they have limited options and agency to determine the services and supports they need during their time in custody. Restrictions on options for self-determination and self-care in activities of daily living are neither trauma-informed, developmentally appropriate, nor culturally-sensitive. Specific examples of these restrictions that were described as stressful for interviewees included: inability to practice a preferred religion; restrictions on freedom of movement and access to privacy and outdoor space; inability to clean one's own clothes (or to receive clean clothes in a timely manner); not being

8

able to get a haircut; inability to follow a preferred diet (with the added insult of receiving raw meat); inability to contribute to their families and communities; and, notably, not being able to access sufficient family supports. These large and small limitations to child agency, self-determination, and empowerment while at Fort Bliss once again exacerbate existing distress and increase the risk that children will perceive their experience in custody as harmful and/or traumatic.

Furthermore, trauma-informed care requires attention and response to a specific individual's (or set of individuals') historical context, experiences, and needs. The care of children on a mass scale in a congregate setting creates significant barriers and challenges to providing care based on individualized needs and contexts. In such circumstances, children can feel isolated and insignificant. Congregate care can also impact children's sense of safety; multiple children reported incidents of peer conflict and bullying in which they either felt unsupported by staff, or felt that they could not report the concern to staff out of fear of repercussions. Children with special vulnerabilities are frequently not adequately served, supported, and protected in congregate care settings, due to the inability of the system to attend to their individual needs. This was exemplified at Fort Bliss by the experiences of interviewees experiencing moderate to severe psychological stress.

Placement at congregate care EIS settings such as Fort Bliss is likely to entail increased risk for physical or psychological harm to children who: are tender-age,[3] primarily speak indigenous languages, have a disability, and/or are pregnant or parenting. During the tour, it was clearly acknowledged by facility leadership that Fort Bliss is not an appropriate placement for all children. However, it also appears that children are placed at Fort Bliss without discretion or screening. Based on what I was told, children are screened at intake for sponsor status and for severe medical conditions (e.g., communicable disease, COVID status). However, there was no clear indication of preventive screening for mental health, psychological distress, or other vulnerabilities. Thus, identification of children who are not appropriate for Fort Bliss based on psychological risk appears to occur only in response to outward, observable displays of risk behavior (e.g., aggression, self-harm, panic attack). Mental health services appear to be limited to the universal program of single-session counseling that relies on proactive requests by children (described above). However, within the population of children at Fort Bliss, there is a range of mental health needs: while some children may benefit from the universal single-session counseling approach, many are likely to require access to regular therapeutic support with a stable and consistent mental health professional, with whom they can develop trust and rapport, utilizing evidence-based treatment approaches for depression, anxiety, posttraumatic stress disorder, and other psychiatric conditions. Such an approach would be consistent with standard

---

[3] While I did not meet with any children age 12 or younger (as they are not currently placed at Fort Bliss), I understand that such tender-age children are held at some EIS facilities. I would be particularly concerned about their vulnerability in being housed in congregate care facilities, as younger children require increased structure and caregiver oversight to ensure healthy development. Furthermore, younger children are likely to be more profoundly impacted by the lack of developmentally appropriate activities and living environments, and are more susceptible to perceived threats (e.g., from older youth) in the absence of other protective supports. In general, younger children are more vulnerable to trauma and threat exposure due to the earlier and more pervasive impact on developmental capacities.

9

practices in mental health service delivery that allow for adaptation and tailoring of support based on children's individual needs, histories, and changes in functioning over time.

Finally, a trauma-informed service system attends not only to the needs and circumstances of its clients, but also to those of its staff and service providers. Children's experiences at Fort Bliss are clearly impacted by the nature of their relationships and interactions with staff, and I received multiple reports of incidents in which children felt unsupported and mistreated by staff, resulting in children's psychological distress. Staff must receive adequate training, professional development experience, and vicarious trauma support in order to maintain a care setting that resists re-traumatization (of both children and staff) and provides developmentally-appropriate care.

## CONCLUSIONS AND RECOMMENDATIONS

Despite the efforts to quickly build EIS care facilities and programs that provide physical safety and stability for unaccompanied children (UC), the size, scale, and context of the operation does not offer the capacity and flexibility to appropriately care for the full population, resulting in a system that exacerbates the individual and historical traumas impacting these children. While there are some children that appear able to navigate and tolerate the detention experience without significant lasting consequence, it is clear that there are numerous children (likely the majority) who are under-equipped to manage the challenges and adversities of extended placement at Fort Bliss or similar sites and do not receive adequate supports to this end.

The chronic stress, adversity, and trauma that stem from the conditions and children's experiences and perceptions of their stays at Fort Bliss are compounded with the prior traumas and adversities that are prevalent in this population. As children spend more time in detention at Fort Bliss, their resource capacity and resilience are gradually eroded as they adapt to the conditions of detention (which are generally not conducive for healthy development). For example, many of the youth I interviewed were accustomed to being active and industrious in their daily lives, having had previous roles in contributing to their families and communities through labor and employment, caring for younger family members, and leading youth groups. In custody, they have little to no opportunity to continue or advance such efforts, resulting in a developmental arrest and an insult to their capacities for resilience. They describe experiencing increasing hopelessness and helplessness about their situation, and ongoing psychological distress that is not adequately addressed or treated. Together, the cumulative impact of lifetime adversity and trauma (which includes time in detention at Fort Bliss) increases risk for future and potentially long-lasting psychological distress, poor physical health, and general impairment in functioning.

Specific aspects of children's experiences at Fort Bliss that contribute to risks associated with time in custody include:
- Lack of clear and accurate information about case status, including restrictions on access to case managers;
- Failures to identify and address children's individual physical and mental health needs, including paucity of preventive supports (such as screening and assessment; consistent, private, and evidence-based mental health services; strategic group and peer supports);
- Inability to access consistent and responsive supports from adults, including continuous clinical care, when needed;

10

- Restrictions on children's autonomy and agency in determining significant life outcomes, placement settings and conditions, and general activities of daily living;
- Insufficient access to family and community supports (via phone, videoconference, or live visitation);
- Failure to understand and attend to the individual histories, needs, and contexts of children.

It is my professional opinion that large-scale congregate care facilities such as Fort Bliss are inappropriate for housing unaccompanied immigrant children for extended periods of time (i.e., beyond a few days or 1-2 weeks), due to the risk of causing clinically significant psychological harm. Furthermore, such facilities are entirely inappropriate – and potentially harmful – for any duration of stay for certain subgroups of the UC population. These subgroups include children with moderate to severe mental health difficulties, children with disabilities, children with significant family stress, tender age children, children who primarily speak indigenous languages, and children who are pregnant or parenting. In general, children's psychological health will be maximized if they are placed in minimally-restrictive family and community settings, and/or in placements that provide opportunities for individualized support and care.

However, bearing in mind current constraints, I provide the following advisory recommendations as potential measures that could mitigate the psychological harm – and reduce risk for further traumatization of immigrant children – due to the conditions in which children are detained in EIS settings such as Fort Bliss:

- As quickly as possible, release children into family and community settings where they may have increased access and options for ongoing and continuous case management, monitoring, medical, mental health, and social services;
- Take all measures possible to limit stays at EIS facilities to 1-2 weeks, and to increase the intensity and frequency of case management, mental health, and general staff support services for any children that exceed this time limit;
- To the maximum extent possible, provide children and families with choices and input over their placement location and living conditions;
- Increase options and opportunities for developmentally-appropriate education, activities of independent living, and recreation (for example, education in applied science, arts, service, or career development; increased independence and access to materials for self-care and personal hygiene; increased freedom of movement and access to privacy; and increased dietary options);
- Reduce "tent" size, or the number of children who cohabit in a defined living space (i.e., no more than 10-15 children cohabiting a shared space, and ideally fewer);
- Ensure that children can meet regularly (e.g., weekly) with their case managers to receive accurate information about their cases and are provided the opportunity to ask questions about their cases;
- Increase frequency and quality of opportunities for contact and communication with family members (e.g., via private phone conversation, videoconference, or live visitation), particularly for children with vulnerabilities (e.g., due to extended stays, pre-existing conditions or disabilities, and/or mental health difficulties);
- Implement standardized universal mental health screening to proactively identify children who (1) are in need of more intensive services, and/or (2) are inappropriate for this care

11

setting and should be transferred to a foster care or least restrictive licensed shelter placement;
- Develop a stepped-care model of support services (e.g., a multi-tiered system of support) to be able to respond to the range of needs of unaccompanied children, with increasingly intensive case management and mental health supports for children with moderate to severe mental health concerns and/or extended lengths of stay in custody, for example:
    - Provide universally-available support groups for children to understand and process the psychological impacts of the detention experience, and to facilitate development of peer supports;
    - For children with moderate to severe mental health concerns, provide regular, continuous mental health care with a consistent mental health professional trained in culturally-sensitive evidence-based treatment approaches for depression, anxiety, and posttraumatic stress disorder;
- Provide opportunities for community-building and structured peer supports, including affinity groups and specific cultural groups;
- Enlist children's participation in advisory and advocacy committees, providing opportunities for them to voice their concerns and needs;
- Provide staff with support, consultation, and training on relevant topics, including: best practices in crisis response intervention for children (e.g., Psychological First Aid, Skills for Psychological Recovery), supportive responses to child behavior challenges, supporting children who have experienced trauma, and management of secondary traumatic stress.


I, Ryan Matlow, declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of July, 2021, at Palo Alto, California.

*[signature: Ryan Matlow]*

# REFERENCES

Betancourt TS, Newnham EA, Birman D, Lee R, Ellis BH, & Layne CM (2017). Comparing trauma exposure, mental health needs, and service utilization across clinical samples of refugees, immigrant, and U.S.-origin children. *J Trauma Stress 30(3)*: 209-218. doi:10.1002/jts.22186.

Blaustein ME & Kinniburgh KM (2018). *Treating traumatic stress in children and adolescents: How to foster resilience through attachment, self-regulation, and competency* (2nd ed.). New York, NY: Guilford Press.

Bucci M, Marques SS, Oh D, & Harris NB (2016). Toxic stress in children and adolescents. *Advances in Pediatrics, 63*(1), 403–428. https://doi.org/10.1016/j.yapd.2016.04.002

Center on the Developing Child, Harvard University. (2013). InBrief: The science of neglect. https://developingchild.harvard.edu/resources/inbrief-the-science-of-neglect/

Felitti VJ, Anda RF, Nordenberg D, Williamson DF, Spitz AM, Edwards V, Koss MP, & Marks JS (1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. The adverse childhood experiences (ACE) study. *American Journal of Preventive Medicine, 14*(4), 245–258. https://doi.org/10.1016/S0749-3797(98)00017-8

Felitti VJ & Anda RF (2010). The relationships of adverse childhood experiences to adult medical disease, psychiatric disorders, and physical behavior: Implications for healthcare. In R. A. Lanius, E. Vermetten, & C. Pain (Eds.). *The hidden epidemic: The impact of early life trauma on health and disease* (pp. 77–87). Cambridge, UK: Cambridge University Press.

Keller A, Joscelyne A, Ganski M, & Rosenfeld B (2017). Pre-migration trauma exposure and mental health functioning among Central American migrants arriving at the US border. *PLoS ONE 12(1):* e0168692. Doi: 10.1371/journal.pone.0168692.

Linton, JM, Griffin M, Shapiro AJ, & Council on Community Pediatrics. (2017). Detention of immigrant children. *Pediatrics, 139*(5). https://doi.org/10.1542/peds.2017-0483

MacLean SA, Agyeman PO, Walther J, Singer EK, Baranowski KA, & Katz CL (2019). Mental health of children held at a United States immigration detention center. *Social Science & Medicine, 230*, 303–308. https://doi.org/10.1016/j.socscimed.2019.04.013

Mares S. (2016). Fifteen years of detaining children who seek asylum in Australia—Evidence and consequences. *Australasian Psychiatry, 24*(1), 11–14. https://doi.org/10.1177/1039856215620029

National Scientific Council on the Developing Child. (2005/2014). Excessive stress disrupts the architecture of the developing brain: Working Paper 3. *Center on the Developing Child, Harvard University*. https://developingchild.harvard.edu/resources/wp3/

Newman LK & Steel Z (2008). The child asylum seeker: Psychological and developmental impact of immigration detention. *Child and Adolescent Psychiatric Clinics of North America, 17*(3), 665–683. https://doi.org/10.1016/j.chc.2008.02.009

Physicians for Human Rights (2019). "There is No One Here to Protect You": Trauma Among Children Fleeing Violence in Central America. Retrieved from: https://phr.org/our-work/resources/there-is-no-one-here-to-protect-you/

Robjant K, Hassan R, & Katona C (2009). Mental health implications of detaining asylum seekers: Systematic review. *British Journal of Psychiatry, 194*(4), 306–312. https://doi.org/10.1192/bjp.bp.108.053223

Shonkoff JP (2016). Capitalizing on advances in science to reduce the health consequences of early childhood adversity. *JAMA Pediatrics, 170*(10), 1003–1007. https://doi.org/10.1001/jamapediatrics.2016.1559

van der Kolk B (2014). *The body keeps the score: Brain, mind, and body in the healing of trauma.* New York, NY: Penguin Books.

von Werthern M, Robjant K, Chui Z, Schon R, Ottisova L, Mason C, & Katona,C. (2018). The impact of immigration detention on mental health: A systematic review. *BMC Psychiatry, 18*(32). https://doi.org/10.1186/s12888-018-1945-y