# EXHIBIT D

**DECLARATION OF JONATHAN D. RYAN**

I, Jonathan D. Ryan, declare as follows:

1. My name is Jonathan D. Ryan and I am a resident of Texas. I am an attorney and I am licensed to practice law in Texas.

2. This declaration is based on my own personal knowledge, observations and legal work with children who are or who previously were detained at the Emergency Intake Site ("EIS") located in Pecos, TX ("Pecos"), except as to those matters based on information and belief which I believe to be true. If called to testify in this case, I would testify competently about the following facts.

Experience Serving Youth in ORR Custody

3. Since 2008, I have been an attorney with and currently serve as the CEO & President for the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), a legal service provider that defends the rights of immigrants and refugees, empowers individuals, and advocates for liberty and justice. We envision a compassionate society where all people have the right to migrate and human rights are guaranteed.

4. I have personally represented individuals in my capacity as an attorney and managed legal service programs in both U.S. Immigration and Customs Enforcement ("ICE") detention centers and U.S. Office of Refugee Resettlement ("ORR") facilities since 2005. In my tenure as an attorney representing individuals in their immigration cases, I have visited almost every ICE detention center and HHS facility in the jurisdiction of the U.S. Immigration Courts in San Antonio, TX and have also visited numerous other such facilities throughout the state.

5. Starting in 2009, RAICES began serving unaccompanied noncitizen children in ORR custody by providing Know your Rights Presentations (KYR), individual intake interviews, referrals and matching

with *pro bono* legal representation. Since then, our legal teams have served tens of thousands of children in ORR care, as well as after their reunification with a sponsor in the United States. RAICES also provides direct *pro bono* representation and legal services to children during and after their time in ORR care though our network of offices across Texas.

6. RAICES has also provided services at ERCs in San Antonio, TX in 2012 and 2014; at Fort Bliss near El Paso, TX in 2016-2017; the ERC in Carrizo Springs, TX in 2019, and at the ERC in Tornillo, TX in 2019.

7. At present, our nonprofit provides legal services to children at fifteen ORR facilities in San Antonio, TX and in Corpus Christi, TX. In addition, RAICES has been providing legal services in 2021 at an Emergency Reception Center ("ERC") in Carrizo Springs, TX, the EIS in Dimmit County, TX; and an EIS in San Antonio, TX. RAICES also currently provides services at Pecos.

8. The ORR facilities where RAICES provides services to unaccompanied noncitizen children are normally located close to populated metropolitan centers with large hiring pools and access to professional service providers, government oversight agencies, and that facilitate the reunification process. None of these qualities describes Pecos.

Pecos Emergency Intake Site

9. As the legal service provider for Pecos, our legal team maintains regular contact with the youth being held there. We provide ongoing consultations and presentations concerning the legal rights of detained minors, as well as direct legal representation and legal services. RAICES also maintains contact with children after their release from Pecos and provides continuing legal services, case management, referrals, and direct legal representation in their immigration cases before the U.S. Immigration Court and the U.S. Immigration Service.

10. To date, RAICES has provided Know Your Rights presentations to over 2800 unaccompanied youth detained at Pecos, and conducted individual intake interviews with more than 1500 children.

11. Pecos holds unaccompanied noncitizen children between the ages of thirteen and seventeen. Upon information and belief, the facility will soon receive children as young as six years old. It is my understanding that Pecos is unlicensed and provides only emergency services to youth detained there. The current population of unaccompanied children detained at Pecos is under one thousand youth. We have seen the population grow to more than fifteen hundred children, and I anticipate the population will rise when Pecos begins to receive very young children.

12. Having toured Pecos and subsequently walked through it several times, I would compare it to a vast outdoor maze. Rows of long, prefabricated buildings are used to house the children, and larger prefabricated buildings serve as a cafeteria and administrative offices. Several large tent structures are used for all other activities. Housing units are long prefabricated buildings containing small rooms with two bunks each on both sides of a narrow central hallway. The ground outside is covered in gravel and there is almost no shade anywhere. The hot sun reflects from every surface, and temperatures in Pecos this summer have already topped one hundred and ten degrees Fahrenheit.

13. During the time RAICES has spent working at Pecos, we have developed significant concerns regarding case management, including inconsistent case management provision, inefficiencies in the case management process, lack of communication with youth and sponsors. These inefficiencies and inconsistencies have a negative impact on children being detained by Endeavors.

14. Generally, children with whom we speak have little to no information about the status of their reunification process. The predominant condition of almost all children with whom RAICES representatives have spoken is confusion: they don't know what to expect from day-to-day and have no information or means to get information about the status of their reunification cases. Children have reported meeting with multiple Endeavors contractors about their reunification case, and that the process appears to start over from the beginning with each change in personnel. The children's reported experiences are consistent with the lack of information received by intending sponsors with whom I have

spoken who express high levels of anxiety and distress related to the lack of updated information about their reunification case.

15. RAICES has met with siblings and close relatives who have been separated inside of Pecos. Children have described receiving only one hour per week of visitation time with their siblings and, in some cases, no visitation time with non-sibling relatives. The separation of these family units within the detention center appears to cause a particular anxiety and stress with children who ask questions about the health and welfare of their sibling or relative, whether they can spend time together, and whether they will be released together. RAICES is aware of at least one case of separated siblings at Pecos who received different reunification case managers, resulting in one child reunifying with their mother while their sibling remained behind at Pecos.

16. Children I have met with and represent whose length of stay at Pecos extends beyond a few days describe feeling confined, distressed, and like they are being punished. By my direct observation, children who have remained at the facility for more than a few days, including those whom I represent, demonstrate increasing frustration, confusion and a worsening appearance of wellness that deteriorates over time. Despite this visibly negative impact on children's mental health after relatively short periods of time at Pecos, approximately four in ten children we interviewed stayed longer than thirty days with numerous children staying over ninety days.

17. Children our office represents have commented that they and others experienced long waiting times for medical services. Numerous children report food-related abdominal pain and illness, however many express that they do not seek medical services because of long waiting times at the medical area. Multiple children have described medical staff instructing them to return during late overnight hours to avoid long waiting times. RAICES team members on the ground at Pecos have reported to me their observations that disinfectant and other cleaning supplies were generally in short supply.

18. Children I have met describe the food at Pecos as often being undercooked, including numerous descriptions from children of uncooked meat and chicken, and report that eating this food makes them and

their peers feel sick to their stomachs. Additionally, children describe that many times their food is served cold.

19. Children, particularly girls, report that they receive too few undergarments, such that they are compelled to wear the same ones for multiple days. Children also report they must wash their clothes in their dormitory bathroom sinks with hand soap in order to have enough clean underwear to last between their assigned laundry times.

20. Children report that they access laundry services at most once per week. Children I represent have explained to me that their clothes were washed together in large batches, and they frequently received the wrong clothing back from the laundry. Due to a notable increase in the transfer of children from one dormitory to another, numerous children report missing out on laundry services for extended periods of time as a direct result of the conflicting dormitory schedules.

21. A significant number of the children at Pecos, particularly those from Guatemala, primarily or exclusively speak an indigenous language. There is no evidence of any training for Pecos employees in cultural competence when working with these communities. RAICES pays for telephonic interpretation services to assist with any languages not spoken by our on-site legal teams. However, with respect to Endeavors, these interpretation services do not appear available to the contractors who care for the children directly.

22. By my own observation, and as described to me by other RAICES team members, indigenous language-speaking children appear to be treated as if they speak Spanish even when they speak little to no Spanish. In describing this divide, children we represent have expressed that Pecos workers communicate more with and pay more attention to the needs of Spanish-speaking children compared to those who speak indigenous languages. The observable result is that any indigenous language-speaking children who are not Spanish proficient are marginalized, excluded and often confused about what is happening around them.

23. Our team reports that they have met with children living with mental health conditions, including apparent Autism Spectrum Disorder ("ASD"), residing together with the general population of children and receiving no identifiable additional support. In one case, the child was accompanied by their cousin, also a child, upon whom the Endeavors workers appeared to rely as their relative's primary advocate and caregiver.

24. In a second instance, our team reports meeting another child possibly living with ASD who appeared not to understand what was happening around them. In this case, the children who were detained along with the child expressed a high level of concern, confusion and empathy about what they could or should do to help their peer.

25. In both of these cases we observed that the Pecos staff lacked sufficient training, facilities, protocols or resources to effectively manage these types of individual circumstances. The only reason one of the children appeared to fare better was directly related to interventions by their cousin, and not the result of any action taken by Endeavors.

26. Children I represent describe a schedule of activities that regulates their daily lives at Pecos. Each dormitory follows its own schedule, which causes significant disruption for the increasing number of children being transferred from one dormitory to another. By our observation, school at Pecos consists of one so-called English class every two to three days. I have heard no other descriptions from any child of any other structured school or education access. Children report that the English class takes place in a soft-sided tent structure, which by the declarant's observation is an unfit location for educational purposes. Other than a provided workbook, there does not appear to be any additional education curriculum. Based on my own observation and understanding, Pecos does not have a dedicated school building.

27. Children whom I represent and with whom I have spoken do not describe having access to routine religious observation services, and some children have asked our legal team if they are permitted to leave the detention center to attend religious services. Children access bibles in Spanish that they read in their dormitories. Inability to attend religious services has been described by numerous children to our

representatives as a source of distress. There appear to be individuals identified as chaplains on site, but it is unclear how many are available, what religions are represented, or what services they provide.

28. I have observed some of the available recreational spaces, which are little more than gravel expanses with no shade from the hot Texas sun. There is a small soccer field with artificial grass on the property that also, at last view, did not have any shade. Children have expressed to me directly their distress over the general lack of recreation and almost total restriction from unstructured, outdoor play.

29. Due to the frequency of transferring children from one dormitory to another, numerous children report not going outside for recreation in some cases for multiple days because the change in dormitory activity schedules caused them to miss out on outdoor recreation.

30. In some cases, the lack of access to outdoor recreation might relate directly to the harsh weather conditions, with triple-digit temperatures and occasional torrential rain. The children with whom we have spoken report that any outdoor recreation time only takes place in the hours before 4 pm, which are among the hottest, after which time their activities are finished and they remain inside their dormitory rooms for the rest of the day.

31. Pecos is located two hours from the nearest airport in Midland, TX; three hours from El Paso, TX; five hours from San Antonio, TX; and over six hours from Dallas, TX. The highways connecting Pecos to these major cities include long stretches of undivided desert highway dominated by large trucks transporting consumer goods, industrial materials and large oil field equipment.

32. As I observed in my capacity as an attorney advocating for my client's release, the great distance between Pecos and any major Texas city also contributes to delays of a week or longer in the release of children after their approval for reunification with family.

33. It has been the general experience of the RAICES team that the Office for Refugee Resettlement Federal Field Specialist ("FFS") position has been covered by remote federal workers, resulting in delayed communications and an apparent lack of local federal oversight.

34. These long distances and difficult travel conditions to Pecos have presented significant barriers to the provision by RAICES of pro *bono* legal services, representation in legal proceedings, and our efforts to protect children from potential mistreatment, exploitation and trafficking. This is true for any other legal, medical or other professionals seeking to provide *pro bono* services to these children. Pecos offers so few local resources to sustain the detention center's operations and is so difficult to reach that its remote location appears to be its most distinguishing characteristic.

35. Based upon my direct observations and experience working since 2005 as an attorney who primarily represents immigrants detained in Texas, I find the conditions at Pecos among the harshest and most restrictive of any ORR or ICE facility that I have visited in my career.

Executed on this 30th day of July, 2021 at San Antonio, TX.

_____

Jonathan D. Ryan, J.D.