CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
       crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General of the United States, *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br>**EXHIBIT A TO PLAINTIFFS' RESPONSE TO NOTICE OF REQUEST FOR EXTENSION OF SPECIAL MASTER/INDEPENDENT MONITOR TERM (ECF NO. 1237)**<br><br>[HON. DOLLY M. GEE] |



April 6, 2022

U.S. Department of Homeland Security
Office of Civil Rights and Civil Liberties
Compliance Branch, Mail Stop #0190
2707 Martin Luther King Jr. Ave., SE
Washington, DC 20528-0190
Sent via Email: CRCLCompliance@hq.dhs.gov

> RE: Abuse of Unaccompanied Minors in Customs and Border Protection Custody, January to December 2021

## I. INTRODUCTION

Immigrant Defenders Law Center ("ImmDef"), on behalf of its clients, submits this complaint to the Department of Homeland Security ("DHS") Office of Civil Rights and Civil Liberties ("CRCL"), documenting the systemic abuses unaccompanied children face while in Customs and Board Protection ("CBP") custody. This complaint is filed jointly with other complaints filed by Kids in Need of Defense ("KIND"), Florence Immigrant and Refugee Rights Project ("FIRRP"), and Americans for Immigrant Justice ("AIJ") regarding similar abuses reported by the unaccompanied children they serve. The case examples contained in these other complaints substantiate the complaints made herein and vice versa. Together, we urge CRCL to take steps toward investigating CBP's systemic abuse of unaccompanied children and adopting measures to prevent the continued violations of unaccompanied children's human rights.

ImmDef is a Southern California-based 501(c)(3) nonprofit organization whose mission is to achieve universal representation for immigrants in removal proceedings. Founded in 2015, ImmDef pursues this mission by providing pro bono services to and advocacy for Southern California's most marginalized immigrant and refugee communities.

The Children's Representation Program ("CRP") is the largest of ImmDef's direct representation programs. As a subcontractor of the Office of Refugee Resettlement ("ORR"), through funding received from the Vera Institute for Justice and other sources, ImmDef provides no-cost representation to Los Angeles-area unaccompanied children in removal proceedings.[1] Every year, ImmDef provides hundreds of locally detained and released unaccompanied children with various social and legal services including Know Your Rights presentations, legal screenings and consultations, case management support, legal and community referrals, and full-scope legal representation. ImmDef's CRP leadership has been working with unaccompanied children since 2010 and has extensive knowledge and experience representing children in immigration matters.

---

[1] As referred to here, the Los Angeles area includes seven counties: Los Angeles County, Orange County, Riverside County, San Bernardino County, Ventura County, Santa Barbara County, and Kern County.



As a universal representation program, ImmDef's CRP attorneys and staff zealously advocate to ensure their unaccompanied child clients receive the full benefit of protections under the TVPRA, the *Flores* Settlement Agreement, and other applicable law. Through our CRP intake process, children are also asked about their treatment in CBP custody. ImmDef is alarmed and disappointed by our clients' consistent reports of mistreatment by CBP officers.

**II.     VIOLATIONS**

The treatment of unaccompanied children in CBP custody is largely governed by two sources: (1) the *Flores* settlement agreement; and (2) the TVPRA. The *Flores* settlement agreement was born out of the *Reno v. Flores* class action litigation and set minimum standards for the detention, treatment, and release of unaccompanied children. Several years later, Congress passed the Trafficking Victims Protection Reauthorization Act ("TVPRA"), which both codified the protections established in *Flores* and set forth new rights for unaccompanied children, who Congress described as a "particularly vulnerable population" to whom the country "owes a special obligation" to treat "humanely and fairly."[2]  Together, these authorities govern how DHS and its subcomponents, including CBP, treat and process unaccompanied children.

For over a decade, legal services providers nationwide have documented CBP's violations of these protections and the discrete rights of unaccompanied children. CBP has violated the following rights and protections guaranteed to unaccompanied children in their custody:

(1) Treatment "with dignity, respect, and special concern for their particular vulnerability as minors," i.e. an environment free from verbal, physical, and sexual abuse;[3]
(2) "Access to… drinking water and food as appropriate;"[4]
(3) "Access to… medical assistance if the minor is in need of emergency services;"[5]
(4) Right to "[a]dequate temperature control and ventilation;"[6]
(5) "Access to toilets and sinks;"[7]
(6) "Transfer… to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child;"[8] and
(7) Right to remain "segregate[d] from unrelated adults."[9]

---

[2] 154 Cong. Rec. S10866 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein).
[3] *Flores v. Reno* ("*Flores*"), No. CV 85-4544-RJK (Px), Stipulated Settlement Agreement at ¶ 11 (C.D. Cal. Jan. 17, 1997), http://www.aila.org/File/Related/14111359b.pdf.
[4] *Id.* at ¶ 12.
[5] *Ibid.*
[6] *Ibid.*
[7] *Ibid.*
[8] 8 U.S.C. 1252(b)(3)
[9] *Flores* at ¶12

Case 2:85-cv-04544-DMG-AGR Document 1243-1 Filed 04/11/22 Page 4 of 18 Page ID #:46668



### A. ImmDef's Findings

In 2021 alone, ImmDef's Detained Youth Empowerment Program ("DYEP") provided Know Your Rights presentations and conducted legal screenings for at least 2,356 unaccompanied children, many of whom were detained in CBP custody for more than the statutorily mandated 72-hour limit; denied food, water, and medical care; and even subject to verbal, physical, and sexual abuse. During these legal screenings, DYEP staff asked children to describe their experience being processed through the U.S. immigration system, with a focus on the conditions in CBP custody. After intake, staff and attorneys entered information into ImmDef's data tracking platform, Cerenade, and any incident reports were saved to the client's profile. The following anecdotes are based on attorney and staff input in Cerenade. While these numbers and stories are already egregious, we estimate the true number of violations to be much higher due to reporting inconsistencies from tender-aged and traumatized children as well as human error involved in data input.

*The right to be free from verbal, physical, and sexual abuse*: Of the children that ImmDef encountered, eighty-five reported verbal harassment or abuse, twenty-four reported physical abuse, and two reported sexual abuse.

> **L.A.C.** is a sixteen-year-old child from Honduras who was detained in a *hielera*[10] and kicked by CBP officers while she slept if she did not get up fast enough. During her time in CBP custody, she reported that she was hungry and did not receive enough food.

> **P.A.M.** is a sixteen-year-old child from Mexico who was seven-months pregnant while in CBP custody. CBP officers pulled P.A.M.'s hair while conducting a body search and grabbed her ankle without warning, causing her to lose her balance. In the *hielera*, CBP officers insulted P.A.M. and other children, called them animals, and shut doors in their faces. P.A.M. was ultimately hospitalized for two days because she began experiencing contractions and had a high-risk pregnancy. CBP refused to give her the discharge documents that had important information for her follow up appointments.

Unfortunately, these experiences are not novel. CRCL complaints and investigative reports by advocacy organizations track CBP's longstanding physical and verbal abuse of children in its custody. In 2014, legal services providers nationwide filed a CRCL complaint (hereinafter "2014 Complaint") on behalf of 116 children, more than fifty percent of whom experienced verbal abuse such as name-calling, death threats, swearing, and yelling.[11] Other

---

[10] Throughout this complaint, the word *hielera* is used to refer to CBP custody. *Hielera*, which roughly translates to "ice box," is the word used by most children to describe CBP custody due to the extremely cold temperatures maintained in those facilities.

[11] *See* Complaint from Ashley Huebner, National Immigrant Justice Center; Joe Anderson, Americans for Immigrant Justice; James Lyall, ACLU Border Litigation Project; Erika Pinheiro, Esperanza Immigrant Rights Project; Lauren Dasse, Florence Immigrant Rights & Refugee Project to Megan H. Mack, Officer for Civil Rights and Civli Liberties, Department of Homeland Security and John Roth, Inspector General, Department of Homeland Security



organizations have likewise documented frequent insults, including calling children animals or criminals, the use of homophobic slurs, and threatening withholding of food and sexual abuse.[12] Children who cried or asked for help were mocked and taunted by officers.[13]

Physical abuse is also rampant. At the time of apprehension, children reported being restrained in three-point shackles, enduring prolonged periods of forced sitting or standing in uncomfortable positions, being hit by patrol cars, being thrown to the ground and restrained, and being tased by CBP officers.[14] Once detained, officers kicked children to wake them up in the morning, used shackles—even on pregnant women—and hit or used excessive force to bully and intimidate children during questioning.[15] In one report, AI Justice also documented an instance of a child being bitten by a CBP dog and then being refused medical attention to treat the wound.[16]

Finally, unaccompanied children have long reported sexual abuse by CBP officers. The 2014 Complaint describes incidents of officers patting down and strip-searching children—sometimes of the opposite sex and without witnesses present—while also verbally harassing them.[17] In addition, girls have reported invasive searches upon apprehension involving inappropriate touching, sexual comments, and sexual threats.[18] These children are without any immediate recourse, as shown by CBP ignoring at least one child's repeated complaints following sexual abuse by two adult detainees.[19]

*The right to drinking water, food, and medical attention:* ImmDef has encountered 172 children who were not given adequate food and water, and twenty-three children who suffered medical neglect.

**R.M.M.** is a seventeen-year-old child from Guatemala who was detained in CBP custody for eight days, during two of which he received *no* food, causing him to experience head pains and stomach problems. He received medication for three days, but his later requests

---

11, 18, https://www.acluaz.org/sites/default/files/documents/DHS%20Complaint%20re%20CBP%20Abuse%20of%20UICs.pdf (Jun. 11, 2014).

[12] *See* ACLU Border Litigation Project, ACLU Border Rights, University of Chicago Law School, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection 18, 25, https://www.dropbox.com/s/lplnnufjbwci0xn/CBP%20Report%20ACLU_IHRC%205.23%20FINAL.pdf?dl=0 (May 2018).

[13] *See* Americans for Immigrant Justice, Do My Rights Matter? The Mistreatment of Unaccompanied Children in CBP Custody 28, 40–42, https://aijustice.org/wp-content/uploads/2020/10/Do-My-Rights-Matter-The-Mistreatment-of-Unaccompanied-Children-in-CBP-Custody.pdf (Oct. 2020).

[14] *See* Florence Immigrant and Refugee Rights Project, Seeking Protection, Enduring Prosecution: The Treatment and Abuse of Unaccompanied Undocumented Children in Short-Term Immigration Detention 10, 11, 24, 27, https://www.firrp.org/media/BPAbuseReport.pdf (Aug. 2009); Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 10; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 13.

[15] *See* Americans for Immigrant Justice, Do My Rights Matter? at p. 40.

[16] *See id.* at 46.

[17] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 9.

[18] *See ibid*; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 26.

[19] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 10.



for medical attention were outright denied. Instead, CBP officers yelled at him and called him names.

*A.R.B.* was seventeen years old when she was detained CBP custody for eight hours. During that time, she was never provided with a meal and was pressured to sign documents that she did not understand.

*L.G.O.* is a thirteen-year-old child from El Salvador who only received a single meal consisting of cold, rotten food each day she was held in CBP custody. Upon apprehension, her birth certificate was confiscated and never returned to her, and she was not allowed to make any phone calls. Because of the lack of quality food, L.G.O. developed stomach pain, but she never received treatment. She was instead forced to lie on the floor without a mattress. She was unable to sleep because light and noise were constant. L.G.O. was never given the opportunity to shower.

Stories of inedible food, inadequate drinking water, and medical neglect have also been reported in the past. Organizations nationwide have reported that the food in CBP custody is often spoiled or frozen, and the water tastes heavily of chlorine.[20] These conditions are especially dangerous for the infants, small children, and pregnant or nursing mothers, whom CBP regularly detains.[21] This inedible food frequently makes children feel ill and need medical care, which CBP denies.[22]

Indeed, advocacy organizations have long documented CBP's rampant failure to provide any medical services, much less adequate medical treatment. Over the past decade, between 50-80% of children in CBP custody have reported medical neglect or inadequate medical care.[23] CBP officers confiscate children's medications, including inhalers; withhold milk, clean diapers, or prenatal medications from pregnant girls and young mothers with infants; refuse to treat injuries or pre-existing medical conditions; and deny requests for doctor and other medical

---

[20] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 11; Florence Immigrant and Refugee Rights Project, Seeking Protection at p. 13; Americans for Immigrant Justice, Do My Rights Matter? at pp. 13, 28; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 20.

[21] *See* No More Deaths, A Culture of Cruelty: Abuse and Impunity in Short-Term U.S. Border Patrol Custody 19, https://nomoredeaths.org/wp-content/uploads/2014/10/CultureOfCruelty-full.compressed.pdf (2011); Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at pp. 11–15; Americans for Immigrant Justice, Do My Rights Matter? at pp. 30–31; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 13.

[22] *See* ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 20.

[23] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 12; Florence Immigrant and Refugee Rights Project, Seeking Protection at pp. 8–9; Complaint from American Immigration Council, American Immigration Lawyers Association, and Catholic Legal Immigration Network, Inc. to Officer Cameron Quinn, Office for Civil Rights and Civil Liberties; Inspector General Joseph V. Cuffari, Office of the Inspector General; and Christopher A. Wray, Director, Federal Bureau of Investigation 6, https://www.aila.org/infonet/deprivation-medical-care-to-children-cbp-custody (Sept. 4, 2019); ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 21.



visits.[24] CBP officers openly retaliate against those who request medical assistance, chilling others from ever requesting medical assistance in the first place. [25]

*Right to humane living conditions:* ImmDef encountered forty-two children who were held in unsanitary conditions, 126 children who were forced to sleep on the ground or outside, and 452 children who were detained for longer than 72 hours. Many children also reported extremely cold temperatures and privacy violations.

**H.G.C.** is a sixteen-year-old child from Guatemala who was held in a *hielera* for three days. H.G.C. was also held in a cell that housed other detainees and contained only one, entirely exposed toilet. H.G.C.'s only hope for privacy was to ask his cellmates to move to the opposite side of the room each time he used the bathroom. During his three days in the *hielera*, the lights were always on, causing H.G.C. to lose sense of whether it was day or night.

**G.G.G.** is a seventeen-year-old child from Guatemala who was detained for four days in a *hielera* that had bathrooms without doors, leaving him and the other children without any privacy while using the toilet. The facility was kept at very cold temperatures, yet G.G.G. never received a blanket thick enough to keep him warm. G.G.G. witnessed CBP officers yell at other kids who did not get up right away at five o'clock in the morning for roll call or who did not immediately obey the commands of CBP officers. During his four days in CBP custody, G.G.G. was only allowed to make one phone call.

**O.L.L.**, an eleven-year-old child from Guatemala, was detained in a *hielera* for seven and a half days under frigid conditions that caused his lips to turn purple. O.L.L. only speaks Spanish, yet officers spoke to him in English. He was only allowed to make one phone call every three days.

**E.C.C.** is a thirteen-year-old child who, for nine days, was detained in a CBP facility in a small room with thirty-five to forty other people, most of whom were adults and none of whom ever received a toothbrush or soap. The only bathrooms available were not private and were accessible only if E.C.C. asked a CBP officer. CBP officers yelled at E.C.C. in both English and Spanish, including waking him and other children by yelling, "*Levantense cabrones*."[26]

---

[24] *See* ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at pp. 21–23; Americans for Immigrant Justice, Do My Rights Matter? at p. 33; Complaint from American Immigration Council, et al. to Officer Cameron Quinn, et al. at pp. 5–6; Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at pp. 12–14.

[25] *See* Florence Immigrant and Refugee Rights Project, Seeking Protection at pp. 8–9; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at pp. 21–22;

[26] This phrase translates to "Get up assholes."



Organizations have long documented these types of violations experienced by ImmDef clients in the past year. Indeed, CBP's facilities are historically unsanitary and inhumane. Children often refer to them as *hieleras*, or "ice boxes," because they are kept at notoriously cold temperatures.[27] The lights are on around the clock, causing children to lose sense of time and making sleep difficult.[28] Children are regularly given only mylar blankets and are forced to sleep on cold floors or dirty mattresses in overcrowded facilities.[29] The conditions are also unsanitary, with CBP denying personal hygiene products and privacy when children use the toilets or showers.[30] Some children were not allowed to shower or brush their teeth at all while detained, even when detained longer than 72 hours.[31]

*The right to due process:* Most of the children that ImmDef encountered reported being forced to sign documents without interpretation as well as the indefinite confiscation of important personal documents.

**D.S.** is a seventeen-year-old child from Romania who was held in CBP custody for five days. When he was taken into custody, CBP confiscated his passport. He was given a mylar blanket but was never provided a toothbrush or toothpaste. D.S. did not have access to sufficient interpretation services and was forced to sign some documents that were never explained to him in Romanian. D.S.'s passport was never returned to him.

D.S.'s experiences are unsurprising considering CBP's well-known history of violating the fundamental rights of children in its custody. Officers regularly confiscate and refuse to return children's' personal belongings like birth certificates, which are later necessary when pursuing immigration relief within the United States.[32]

Children are also coerced into unknowingly waiving their rights. Before children may access counsel or a legal service provider, officers have children sign legal documents that are written in English and not described in a child-appropriate manner.[33] Children who ask for

---

[27] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at pp. 11, 13, 15; Americans for Immigrant Justice, Do My Rights Matter? at p. 13; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at pp. 23–24.

[28] *See* National Immigrant Justice Center, Unaccompanied Immigrant Children 3, https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2016-11/NIJC%20Policy%20Brief%20-%20Unaccompanied%20Immigrant%20Children%20FINAL%20Winter%202014.pdf (Jan. 2014); Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 11; Americans for Immigrant Justice, Do My Rights Matter? at p. 14.

[29] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at pp. 11–16.

[30] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at pp. 11, 15; Americans for Immigrant Justice, Do My Rights Matter? at pp. 15, 29; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at pp. 19, 32.

[31] *See* Americans for Immigrant Justice, Do My Rights Matter? at pp. 15, 29

[32] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at pp. 16–17; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 29.

[33] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 16; Florence Immigrant and Refugee Rights Project, Seeking Protection at p. 15; Americans for Immigrant Justice, Do My Rights Matter? at p. 47; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at p. 30.



clarification are met with intimidation tactics that leave them feeling like they have no choice but to sign the document.[34] Indeed, children are largely separated from the outside world by way of CBP's regular failure to provide access to telephones.[35] Advocacy organizations in 2009, 2014, and 2018, found that many of the children they interviewed were denied an opportunity to call their family, their consulate, or an attorney.[36]

    **B.**    **Illustrative Cases**

ImmDef encountered several children whose treatment by CBP officers and in CBP facilities was especially egregious and clearly in violation of *Flores* and the TVPRA, as detailed below.

**D.C.E.** was sixteen years old when he fled to the United States and was processed into the country as an unaccompanied child. D.C.E. was held in a *hielera* for eight days, during which he was harassed, neglected, and denied basic human dignity. CBP officers called him a "gangster," and threatened his aunt. They gave him an mylar blanket, which was not enough to keep him warm. He was not given supplies to brush his teeth or take a full shower, and he did not have privacy when using the bathroom.

While D.C.E. was detained, the lights were always on in the facility, making it difficult for him to distinguish between day and night. His waking hours were marked by meals consisting of old or spoiled food, which made him sick. CBP officers forced to D.C.E. to sign paperwork that was not explained to him in his primary language, and he was never explained his rights as an unaccompanied child in U.S. immigration detention.

**M.J.C.** arrived in the United States when she was fourteen years old and, from the moment she encountered U.S. immigration officers, she was met with hostility. When M.J.C. was first apprehended by CBP, she was handcuffed for approximately twenty-four hours without any food or water. Alone, exhausted from her journey, and afraid for her life, she was forced to sit on the side of the road as CBP officers yelled at her in English, which she did not understand. M.J.C. was cold and wet when she finally arrived at the *hielera*, but rather than give her warm clothes, CBP officers berated M.J.C., saying that "she should've thought about that before coming to the U.S."

M.J.C. spent eighteen days in the *hielera*, where she received almost inedible food and insufficient water. When she requested more water, she received tap water that tasted highly chlorinated and quickly caused her to experience stomach pains. M.J.C. requested medical attention, which CBP officers denied for three days, instructing her instead to lie down or sleep.

---

[34] *See* Florence Immigrant and Refugee Rights Project, Seeking Protection at p. 15, ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection at pp. 29 – 30.
[35] *See* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al. at p. 17; Florence Immigrant and Refugee Rights Project, Seeking Protection at p. 14.
[36] *See generally* Complaint from Ashley Huebner, et al. to Megan H. Mack, et al.; Florence Immigrant and Refugee Rights Project, Seeking Protection; ACLU, Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection.



CBP officers eventually had to take M.J.C. to a hospital after her symptoms worsened. Doctors later confirmed that her stomach problems were caused by the food provided in the *hielera* and that she was living with an untreated broken arm that she sustained during her journey.

M.J.C. was eventually returned to the CBP facility, where officers withheld her medications and only provided her the same food that made her sick and landed her in the hospital. She became so hungry that she had no option but to eat the dangerous food, which unsurprisingly caused her to experience the same stomach pain. This time, however, she was too afraid to tell the officers that she was in pain and instead suffered in silence.

M.J.C.'s abuse was not limited to withheld medical care and inedible food and water. CBP officers yelled loudly near her ears to wake her up and only gave her a mylar blanket to keep warm despite M.J.C.'s request for a different blanket. She was forced to sleep on a bench or on the ground close to others, in blatant disregard for the risks of such proximity due to the COVID-19 pandemic. M.J.C. was also repeatedly denied requests to use the toilet and was never given a change of clothes—for eighteen days, she wore the same dirty clothes she had arrived in.

Like D.E.C., M.J.C. was forced to sign documents she did not understand. Her requests to make phone calls were either denied or conditioned on her signing paperwork that was written in English. M.J.C. was subject to additional scrutiny and questioning because CBP officers believed she appeared older than indicated on her birth certificate. M.J.C. lived in constant fear during her nearly three weeks in CBP custody.

*M.T.P., B.T.P., and A.T.P.* are three sisters from Guatemala who were detained in CBP custody for seven days, during which they experienced mistreatment and medical neglect. The T.P. sisters were placed in a dirty, crowded detention facility where they were held with other children who were sick to the point of vomiting. They were not allowed to shower for the first four days they were detained and reported that CBP failed to undertake any efforts to maintain hygiene or social distancing in light of the COVID-19 pandemic. The sisters felt uncomfortable using the toilets in the facility due to the lack of privacy, and they were not provided with sufficient sanitary supplies.

All three sisters experienced issues with the quality of food. M.T.P. became so sick she was forced to stop eating the burritos. Instead, she ate only a cookie and water each day and was afraid to ask CBP officers for alternatives or medicine because she had seen others being yelled at. When B.T.P. asked for medical assistance due to constant headaches, she was first ignored and later told that she would see a doctor. The doctor never arrived.

While detained, the T.P. sisters reported that the CBP officers did not speak Spanish well and did not explain the documents that they asked each girl to sign. They felt forced to sign these documents and were denied the right to place a phone call on multiple occasions.

*M.G.G.* is a seventeen-year-old child who arrived in the United States from El Salvador and experienced egregious abuse at the hands of CBP officers. When M.G.G. was apprehended, she was verbally harassed. She reported hearing CBP officers refer to her and other children and

9



families as "motherfuckers" in English, *pendejos*, and *hijos de puta*.[37] Upon apprehension, M.G.G. was denied water and witnessed other individuals being physically beaten by immigration officers. M.G.G. arrived with her younger brother, and officers made him pick up trash along the side of the river while they were waiting to be transported to the *hielera*.

When they arrived at the *hielera*, M.G.G. was separated from her brother and did not hear any information about his whereabouts, health, or safety for over three weeks, until she was finally able to make contact with him from the ORR shelter. During her thirteen days in the *hielera*, M.G.G. was never given a blanket or a change of clothes and was only allowed to shower once. By way of explanation, CBP officers swore at her and told her that it "wasn't a hotel." Every day, she was woken up early and could not sleep.

M.G.G. also reported that she was given old and rotten food. For thirteen days, she was only fed burritos with rice and apples. When she told CBP officers that she felt sick, they told her to drink more water and exercise. However, she was only given a single small bottle of water each day at 6am.

M.G.G. also reported a lack of COVID-19 precautions and general medical neglect. When she first arrived, M.G.G. was not given a COVID-19 test and later discovered that there were people with active cases of COVID-19 held in the *hielera* with her. She was not provided with a mask. M.G.G. also reported that she felt she was touched inappropriately during the officers' search of her belongings because she had her identification hidden under her clothes. When she asked to call her mom or for any information about her brother, CBP officers denied her requests.

**L.L.C.** is a sixteen-year-old child from Guatemala who was detained in a *hielera* for twelve days. When she first arrived at the *hielera*, she was yelled at by the guards and given a single mylar blanket. L.L.C. and the other children slept in a shelter with only a roof but no walls. L.L.C. recalls being very cold but afraid to ask for more blankets after seeing other children get yelled at.

The following day, L.L.C. was transferred to a *hielera* in Texas, where she stayed for the next twelve days. L.L.C. described the walls of the *hielera* as equivalent to a thick nylon, and she was held in a room approximately the size of a conference room with eighty-one other girls. The cell was so crowded that she was forced to sleep pressed up against the person next to her or sitting up. L.L.C. described being extremely cold day and night. She described feeling like she and the other children were being treated like animals.

The food in the *hielera* consisted of burritos that tasted spoiled, and L.L.C. soon became sick. When she reported feeling ill to medical staff, they did not address her concerns. As a result, L.L.C. was forced to skip meals. L.L.C. witnessed similar treatment of other children when they felt sick—CBP officers refused to provide medicine and only told the children to drink more water. L.L.C. reported that the water tasted heavily of chlorine.

L.L.C. also suffered verbal abuse while in CBP custody. She was spoken to in both English and Spanish, and officers would become angry and yell at the children when they did

---

[37] These phrases translate to "assholes" and "sons of bitches."



not fall asleep immediately. L.L.C. described that it was difficult to sleep because the CBP officers woke them every hour in order to clean the cells and the lights were always kept on.

L.L.C. was only able to brush her teeth three times per week, and she was only able to bathe once during the twelve days she was held in the *hielera*. L.L.C. felt that there was no privacy in the bathrooms, and there were several times when she did not have toilet paper.

Before L.L.C. left the *hielera*, she was forced to sign documents she did not understand. She was only allowed to make one, two-minute telephone call, and during the call a CBP officer stood within earshot.

**M.V.P.** is a seventeen-year-old child from Guatemala who was detained in a *hielera* for five days, where she experienced abusive and neglectful conditions. While crossing the border, M.V.P. hurt the back of her right knee while jumping over a wall. When she asked to see a doctor in the CBP facility, she was given unidentified pills but did not receive any other treatment or follow up.

M.V.P. reported that she did not eat during her time at the detention center because the burritos given to the children smelled spoiled. She was given only small amounts of water. After four days in CBP custody, M.V.P. began experiencing severe stomach pains and complained to CBP officers. Four hours later, she was taken to a nurse, who did not treat her. After another nine to ten hours of suffering severe pain, M.V.P. was taken to the emergency room, where she was diagnosed with dehydration and put on an IV. When she was discharged from the emergency room, the doctor gave the immigration official paperwork about her condition. M.V.P believes there was more to her condition than dehydration, but she never received a copy of that paperwork.

In the *hielera*, M.V.P. was confined to a cell with around eighty other people, including women with small children. M.V.P. reported that there was nowhere to sit or sleep the first night, and she slept sitting on a metal bench the following nights. The cell also contained a toilet, which was not closed off from the rest of the space. As a result, M.V.P. and her cell mates were forced to use the mylar blankets that they slept with as makeshift curtains to create privacy for the toilet. M.V.P. was not given any opportunity to shower during her time in CBP custody.

Before M.V.P. was released from CBP custody, she felt forced to sign paperwork that was not explained to her in Spanish.

**K.M.A.** is a seventeen-year-old child who was detained in a *hielera* for three days, during which time she experienced and witnessed verbal abuse, in part due to her pregnancy. K.M.A. arrived in the United States with a minor friend and witnessed CBP officers take him into a small room and yell at him. Other CBP officers berated K.M.A. because she was pregnant and accused her of providing a false birth certificate. The CBP officers yelled at K.M.A. so much that she cried, and when she asked to call her mother, they refused to allow her to use the phone.

K.M.A. was examined by a nurse while detained in CBP custody, and K.M.A. asked the nurse if it was common for the CBP officers to yell at children in the way she had experienced. The nurse responded that she could not answer the question and instead told CBP officers what K.M.A. had asked her. K.M.A. was then yelled at by two CBP officers, who told her that child immigrants should not come to the United States because it was a waste of taxes. The CBP

11



officers accused K.M.A. of only coming to the United States so her baby could be a U.S. citizen and so that she could receive welfare. The officers expressed to her that it was not fair that the U.S. government would pay to support her baby.

K.M.A. was also threatened by CBP officers. She was told that she would be put in jail because she was pregnant and because she had brought a fake birth certificate, even though K.M.A. repeatedly assured the officers that it was not fake.

*J.N.P.* is a sixteen-year-old child who was held in CBP custody for two days, during which she experienced violations of her basic human rights. When J.N.P. was apprehended, CBP officers confiscated her belongings, including a cell phone and identification documents. They threw away her clothing and gave her other clothes that did not fit her. She did not get her documents and cell phone back until she was reunited with her father after being held in an ORR shelter.

Once J.N.P. arrived at the *hielera*, she was forced to bathe with many other girls in one bathroom. There was no privacy except for transparent curtains, and J.N.P. reported feeling very uncomfortable. The girls had to bathe without clothes on, yet officers were present with them in the bathrooms and were rude and disrespectful. When J.N.P. and some of the other girls complained, the CBP officers yelled at them and rushed them out as soon as their five minutes were up. Even after she bathed, J.N.P. developed head lice and dandruff due to the unsanitary conditions.

Throughout her time in the *hielera*, J.N.P. was given egg burritos for every meal, which left her feeling hungry and ultimately gave her stomach pains. When she needed to use the bathroom, there was no privacy—the toilets were separated by walls on the sides but not in the front, and J.N.P. felt uncomfortable using the bathroom because others could see everything. The temperatures inside the *hielera* were kept extremely cold, and J.N.P. was denied blankets or more clothes when she asked. The cold made sleeping difficult, and J.N.P. was forced to sleep on a thin mat pressed up against strangers due to overcrowding. The lights were also left on the entire time, yet when J.N.P. and other children could not sleep, CBP officers only yelled at them. Throughout her time in the *hielera*, J.N.P. was not allowed to make any phone calls.

Due to the poor conditions, J.N.P. also developed a migraine in addition to head lice and stomach pains. When she asked for help, she was given a pill that did not help her symptoms. She was afraid to ask for another because the CBP officers made her feel nervous, and she felt that she would be in trouble for asking.

On her way out of the *hielera*, J.N.P. witnessed CBP officers shoving other kids to get them to move faster. She was pressured to sign documents that were not explained to her, but she refused.

### III.   DEMANDS

The examples included in the concurrently filed complaints demonstrate that CBP's abuse of children is common and widespread. It is not limited to one child or one instance. It is not limited to the conduct of a "bad apple" employee within the agency. It is not limited to even a rogue or remote CBP outpost that lacks training and resources. The sheer number of children



who have reported abuse, many of whom told us that they fear retaliation and were afraid to speak up, suggests that these examples are but a fraction of the actual total. For each story included herein and in the concurrently filed complaints, there are likely an equal number of children who experienced the same but were too afraid to report. Existing complaints show that CBP engages in a pattern and practice of treatment that relies on overcrowded facilities; a lack of adequate food, water, medical care, and privacy; and verbal and physical abuse of the most vulnerable immigrants.[38] This is unacceptable.

CBP is an agency that has shown itself to be incapable of providing adequate care to immigrant children in its custody, as evidenced by the stories in this complaint. Worse still, the agency's treatment of unaccompanied children is marked by horrific conditions, outdated facilities, and abuse. This agency cannot and should not hold children without significant reforms. We demand that the government create a child-friendly, trauma-informed reception system that relies on trained child welfare professionals working in the best interest of the children in their custody.

Below, we offer recommendations that will move CBP toward this goal in the short term. However, we also call on the federal government to reimagine and reinvent the system for caring for unaccompanied immigrant children. In so doing, we urge DHS and CBP to involve stakeholders to inform their decision-making and ensure the best interests of children are at the center of future policymaking.

1. ***Strict Adherence to the TVPRA and the* Flores *Settlement Agreement*:** CBP should adhere to the requirements laid out in the *Flores* settlement agreement and the TVPRA. Specifically:

    o   Children should not be held in CBP custody for more than 72 hours, as these facilities have never been designed to house children for any extended period of time, and their prolonged detention leads to their continued exposure to abhorrent conditions;
    o   Children in CBP custody must be provided with an environment that is "safe and sanitary." This should include adequate access to clean bathroom facilities, toothbrushes, showers, clean clothes, medical care, as well as adequate, unspoiled, and healthful food and water. Age-appropriate food should be provided for infants and toddlers;
    o   Children in CBP custody should not be made to sleep on concrete floors in frigid rooms, with bright lights on at all hours of the day and night; and
    o   CBP must end the practice of gathering in one room or cell all children who report being ill with no regard or forethought to their health and wellbeing and no access to medical treatment.

---

[38] In fiscal year 2021, DHS referred 122,731 unaccompanied children to ORR. *See* U.S. Department of Health and Human Services, Fact Sheet: Unaccompanied Children (UC) Program 2, https://www.hhs.gov/sites/default/files/uac-program-fact-sheet.pdf (Feb. 17, 2022)



2. ***Protect children's right to privacy:*** CBP officials must respect children's right to privacy and implement policies and standards that protect children's right to privacy. Specifically, CBP should ensure that children are afforded individual privacy in shower and bathroom facilities. Also, CBP should immediately remove cameras from sensitive locations, such as bathrooms and enact more child-friendly best practices to ensure the safety of children in those locations.

3. ***Adherence to and enforcement of the CBP National Standards on Transport, Escort, Detention and Search (TEDS)****:* All CBP officials should consider the best interests of the child in all decisions, as required by 2015 TEDS Standard 1.6. Moreover, CBP should promptly promulgate guidelines, like those proposed in the 2016 *Interagency Framework on Considering the Best Interests of Unaccompanied Children*, to ensure that all CBP officials consider children's best interests in every decision from the first encounter through processing, detention, and release or transfer. CBP should also make the TEDS standards enforceable to help ensure that all children are receiving appropriate care in CBP facilities. CBP should regularly conduct reviews and inspections at all facilities holding children to ensure compliance with the TEDS standards and order corrective action and additional training when violations are found. CBP should also regularly review the TEDS standards for additional improvements to further promote the safety and wellbeing of children in CBP custody.

4. ***Provide the same standards of care centered on the best interests of children as required in ORR facilities***: CBP's standards of care should be centered on advancing the best interests of children. Accordingly, CBP should meet or exceed standards of care recommended by pediatric health and child wellbeing experts, including access to clean bathroom and shower facilities that allow for individual privacy; clean, age-appropriate clothing; adequate bedding, food, water, and personal hygiene time and products; adequate medical care; telephone access to contact family; and the ability to remain with trusted family caregivers but separated from unknown adults. Facilities should be temperature-controlled, have adequate lighting, and bright lighting should not be kept on 24 hours a day.

5. ***Mandatory training of CBP officers and staff***: CBP officers and staff should be trained regularly on topics such as cultural competency, basic human rights, trauma-informed approaches, child development, de-escalation techniques, harm reduction, and the basics of trafficking and asylum.

6. ***Access to a phone with a complaint hotline and telephonic access to legal services providers:*** CBP must make available to all minors in its custody a confidential telephone through which children can make outgoing calls, connect with an attorney, and access a private hotline to report abuse. Any child that asks to make a phone call must be allowed to do so at any time.



7. ***Access to interpreters***: CBP should ensure access to interpreters for children in its custody. This includes hiring bilingual officers, training officers in language assessment, and providing full-time access to an interpretation service that includes indigenous language interpreters.

8. ***Implement proper surveillance practices in line with privacy laws:*** Insofar as a CBP facility subjects its detainees to video surveillance, it must develop and make publicly available policies that require reasonable record retention consistent with federal and state privacy protections and allow access to said recordings when requested by CRCL, OIG, CBP, or other investigatory agencies and stakeholders, as part of an investigation into abuse.

9. ***Hire child welfare professionals:*** Consistent with Congress's directive as part of the Consolidated Appropriations Act, 2022, DHS should hire state-licensed child welfare professionals at all southern land border facilities.[39] Child welfare professionals possess the expertise necessary to ensure the safety and well-being of unaccompanied children in CBP custody. These professionals should conduct protection screenings of arriving children, ensure appropriate care, and maintain children's family unity. They should also be permitted to facilitate reasonable telephonic contact with confirmed family members.

10. ***Access to legal counsel:*** CBP should prioritize access for legal services providers in CBP detention centers. LSPs should have the ability to meet with children in confidential spaces, have access to rosters of children in CBP custody, and access to areas in the CBP facility where children are held in order to monitor conditions.

//

//

//

//

//

//

//

---

[39] *See* Consolidated Appropriations Act, 2022, Explanatory Statement, Division F—Department of Homeland Security; https://docs.house.gov/billsthisweek/20220307/BILLS-117RCP35-JES-DIVISION-F.pdf (2022).



## IV.  CONCLUSION

ImmDef urges the Office of Civil Rights and Civil Liberties to investigate and address the longstanding violations alleged herein and to take all steps necessary to bring CBP personnel and facilities in compliance with the *Flores* Settlement Agreement and the TVPRA. We also urge CBP and DHS to initiate stakeholder discussions to usher in the changes outlined above.

Please do not hesitate to contact me via e-mail at Hcomstock@immdef.org or by telephone at (213) 340-7676 with questions or inquiries for additional information concerning the complaints raised above. We look forward to continued communication with you concerning these alarming reports.

Sincerely,

Hannah Comstock | Managing Attorney
Immigrant Defenders Law Center
634 South Spring Street, 10th Floor
Los Angeles, CA 90014
hcomstock@immdef.org

Carson Scott | Staff Attorney
Immigrant Defenders Law Center
634 South Spring Street, 10th Floor
Los Angeles, CA 90014
cscott@immdef.org

Madeline Sachs | Paralegal
Immigrant Defenders Law Center
634 South Spring Street, 10th Floor
Los Angeles, CA 90014
msachs@immdef.org

cc: U.S. Department of Homeland Security
Office of Inspector General, Mail Stop #0305
245 Murray Lane SW
Washington DC 20528-0305
Sent via Email: JointIntake@dhs.gov; jointintake@cbp.dhs.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2022, I served the foregoing EXHIBIT A on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/Peter Schey
*Counsel for Plaintiffs*
CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey