CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES., *et al.*, | Case No. CV 85-4544-DMG-AGRx |
| Plaintiffs, | **<u>EXHIBIT B</u> TO PLAINTIFFS' RESPONSE TO NOTICE OF REQUEST FOR EXTENSION OF SPECIAL MASTER/INDEPENDENT MONITOR TERM (ECF NO. 1237)** |
| v. | |
| MERRICK B. GARLAND, Attorney General of the United States, *et al.*, | |
| Defendants. | [HON. DOLLY M. GEE] |



April 6, 2022

Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch, Mail Stop #0190
2707 Martin Luther King Jr Ave
SE Washington, DC 20528-0190
Sent via Email: CRCLCompliance@hq.dhs.gov

DHS Office of Inspector General/MAIL STOP 0305
Attention: Office of Investigations - Hotline
245 Murray Lane SW
Washington, DC 20528-0305
E-submitted at https://hotline.oig.dhs.gov

**RE: Widespread infringement of the civil rights and civil liberties of Unaccompanied Noncitizen Children held in the custody of CBP: January – December 2021**

To All Interested Individuals:

Kids in Need of Defense (KIND) files this complaint on behalf of Unaccompanied Noncitizen Children (UNCs) who experienced civil rights abuses while being detained by U.S. Customs and Border Patrol (CPB) between January and December 2021.[1] This complaint is filed simultaneously with other complaints from Immigrant Defenders Law Center (ImmDef), Florence Immigrant and Refugee Rights Project (FIRRP), and Americans for Immigrant Justice (AI Justice) regarding similar abuses reported by the UNCs they serve. The case examples contained herein substantiate these other complaints and vice versa.

This complaint first provides an overview of the legal standards that define the civil rights and civil liberties of UNCs. Then, it discusses the abuses UNCs experienced in terms of general trends, quantitative and qualitative data, and the scope of our complaint. Next, we highlight five specific cases that are representative of the abuses at large. Finally, we recommend a course of action to both investigate these abuses and prevent further incidents. The names and A-numbers of the specific complainants are set forth in Appendix A.

I.    Legal Standards

Three main sources define the civil rights and civil liberties of UNCs in CBP custody: 1) The *Flores* Settlement Agreement; 2) the Trafficking Victims Protection Reauthorization Act (TVPRA), and 3) the

---

[1] Some of these incidents took place during a high level of apprehensions, and it is critical that CBP operations be prepared to respond to such situations while still respecting detainees' rights. A surge in apprehensions cannot be an excuse to violate a UNC's rights.



CBP National Standards on Transport, Escort, Detentions and Search (TEDS).  In 1997, parties to the class action litigation *Reno v. Flores* stipulated to standards for the detention, release, and treatment of UNCs, commonly known as the *Flores* Settlement Agreement. Important protections delineated in the *Flores* Settlement Agreement and applicable to this complaint include:

1. The right to be treated with dignity, respect, and special concern for the particular vulnerability of minors;
2. The right to be held in facilities that are safe and sanitary, with adequate ventilation and temperature control;
3. Access to toilets and sinks;
4. Access to drinking water and food; and
5. Access to medical assistance.

The TVPRA delineates many important protections for UNCs, the most applicable of which is the requirement that CBP transfer UNCs to the custody of ORR within 72 hours of detention, barring exceptional circumstances. 8 U.S.C. § 1232(b)(3). Finally, the TEDS also contain many important guidelines concerning the treatment of UNCs, the most pertinent of which are the following:

1. CBP employees must act with utmost integrity and professionalism. (Standard 1.2)
2. CBP employees must treat all individuals with dignity and respect, perform their duties in a non-discriminatory manner, and respect individual rights and due process. (Standard 1.4)
3. Officers/Agents will consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation. Officers/Agents should recognize that juveniles experience situations differently than adults. (Standard 1.6)
4. Clean bedding must be provided to juveniles. (Standard 4.2)
5. Food and water should never be used as a reward, or withheld as punishment. Food provided must be in edible condition (not frozen, expired or spoiled). (Standard 4.13)
6. CBP staff will treat all at-risk populations (including UNCs) with dignity, respect, and special concern for their particular vulnerability. (Standard 5.1)
7. Every effort must be made to transfer UNCs from CBP to ORR custody as soon as possible, but no later than 72 hours after determining that a child is a UNC. (Standard 5.6)
8. Juveniles will be given access to basic hygiene articles, and clean bedding. When available, juveniles will be provided clean and dry clothing. (Standard 5.6)
9. Juvenile detainees will be offered a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled mealtimes. At least two of those meals will be hot. Juveniles must have regular access to snacks, milk, and juice. (Standard 5.6)
10. Reasonable efforts will be made to provide showers, soap, and a clean towel to juveniles who are approaching 48 hours in detention. (Standard 5.6)
11. Hold rooms for UNCs must provide adequate temperature control and ventilation. (Standard 5.6)



12. Any physical or mental injury or illness observed by or reported to an officer/agent should be reported to a supervisor and appropriate medical care should be provided or sought. (Standard 5.6)

13. At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain. Barring exigent circumstances, officers/agents must not use restraints on pregnant detainees or juveniles. (Standard 5.7)

KIND received widespread reports that CBP officers routinely violated the *Flores* Settlement Agreement, the TVPRA, and the TEDS, resulting in this complaint.

## II. General Trends

KIND is the contracted legal service provider at twelve Office of Refugee Resettlement (ORR) shelters located in New York City, Houston, Atlanta, and Seattle. From January through December 2021, KIND staff met with approximately 4,515 minors while they were in ORR custody in these locations, to conduct legal screenings. The primary purpose of these screenings was to determine if the minors qualify for legal relief from removal, and a small portion of the screening generally included discussing their time in CBP detention. During these screenings, minors reported civil rights violations about their apprehension and detention by CBP that fall into three broad categories: 1) Approximately 1,745 minors, or 38.6% of minors screened, reported a prolonged detention of greater than 3 days in CBP custody. 2) Approximately 455 minors, or 10.6% of the minors screened, indicated that they lacked access to sufficient food, water, medical attention, or other basic necessities while in detention.  3) A significant number of minors reported that they had been mentally or physically harmed while in CBP custody. As these numbers do not reflect any violations that children declined to disclose as part of legal screenings, as they draw from meetings with 4,515 minors, whereas CBP recorded more than 146,000 encounters of unaccompanied children in Fiscal Year 2022,[2] and as ImmDef, FIRRP, and AI Justice have filed similar complaints, KIND believes that the numbers cited herein represent only a small portion of the abuses that CBP agents and officers have perpetrated against UNCs in CBP custody.

### a. Prolonged Detention

Because the TVPRA requires CBP to transfer UNCs to ORR custody within 72 hours of apprehension barring "exceptional circumstances," this complaint defines a prolonged detention as anything greater than 3 days. 8 U.S.C. § 1232(b)(3). The average length of detention was 7.5 days for minors reporting a prolonged detention. Over 1,700 minors reported being detained by CBP for more than 72 hours, and more than 130 reported being detained longer than two weeks. These prolonged periods enhance children's vulnerability to harms such as those addressed below.

### b. Physical, Mental, and Gender-based Harm

UNCs experienced a variety of physical and mental harm while in CBP custody, in direct violation of the *Flores* Settlement Agreement and several TEDS standards. At least two minors reported having

---

[2] CBP, "CBP Releases Operational Fiscal Year 2021 Statistics" (Jan. 3, 2022); https://www.cbp.gov/newsroom/national-media-release/cbp-releases-operational-fiscal-year-2021-statistics.



guns pointed at them when they were being detained by officers, and another reported hearing shots fired when officers attempted to detain her and members of her group. Other children report having handcuffs that were placed on them so tightly that they left painful red marks on their wrists that did not immediately go away after the handcuffs were removed. We received widespread reports of officers who woke up sleeping children, often in the early morning or middle of the night, by screaming at them, kicking them, hitting them, kicking the mats they were sleeping on, or pulling the mats out from under them. We also received reports of officers shoving children, grabbing and pulling them by the ear, arm, or clothing, and using intimidating body language. Children described officers who yelled aggressively, used foul language, called them names, told them they were undeserving of help or respect, accused them of being criminals or lying, and threatened to deport them. Children report being called "cabron" (asshole), "puta" (bitch or slut), "pendejo" (stupid), "mierda" (shit), "burro" (donkey, ass, or idiot), "cerdo" (pig), "waste of time," "criminal," and "liar."

Many older children described being threatened and intimidated by officers who did not believe they were minors. For example, one girl who wishes to remain anonymous was 17 years old when officers detained her in August 2021. She was held in CBP detention for approximately five days. While in detention, she felt singled out and harassed by a particular officer who did not believe that she was a minor. The first time she met the officer, he grabbed her by the arm and pressured her to sign a document affirming that she was a minor. She encountered this officer again multiple times and felt threatened, scared, and intimidated every time. The officer called her a liar and threatened to throw her in jail and deport her. The officer claimed to have worked closely with the Guatemalan government for 10 years, which he felt qualified him to know whether she was a minor or an adult. The minor reports that she was not the only person targeted in this way. The officer seemed to think that anyone who was taller or heavier-set was an adult, and he called them liars and threatened to throw them in jail or deport them.

Children also described officers who threw away their personal belongings. Others describe officers throwing their food or belongings on the floor, rather than directly handing these items to the children. One child stated he felt like he and the other children with him were treated "like animals." Finally, children report having been so terrified by the violent and aggressive behavior of officers that they cried or were unable to sleep or eat. They describe feelings of extreme anxiety and sadness. Some have nightmares about their time in CBP detention and experience other psycho-somatic symptoms, such as shaking or crying, when recalling the harm they suffered.

KIND staff also received reports of gender-based harm while minors were detained. For example, a female minor, who wishes to remain anonymous, was 17 years old at the time she was detained for approximately 14 days. She states that she was treated very poorly by officials and that they woke her up every morning by kicking her. She also describes an incident when she experienced gender-based shame because officers yelled at her to leave a bathroom, but she did not have time to finish taking care of her needs before several male officers came into the restroom. This experience left her feeling humiliated and exposed.



### c.   Lack of Access to Sufficient Food, Medical Attention, or Other Basic Necessities

Reports regarding a lack of access to sufficient food were also widespread, explicitly violating terms of the *Flores* Settlement Agreement and TEDS standards. Children described being given food that was frozen, undercooked, or spoiled and therefore inedible. Other children report becoming nauseated or vomiting after eating the food. Many children describe going hungry because they received meager portions of food, often described as "snacks," only once or twice a day. Some describe missing meal distribution because they were in the bathroom; others, being denied water for several hours after asking for it.

Children also regularly complained of inadequate medical attention while in custody, again in direct violation of the *Flores* Settlement Agreement and TEDS standards. Many children reported having symptoms such as fever, ear infection, nausea, stomach pain, sore throat, cough, chills, headaches, and/or body aches while detained, but they were denied access to adequate medical attention when they reported these symptoms to officers. Instead, officers regularly told minors to drink more water or gave the children cough drops or allergy medicine, rather than allowing them to speak with a trained medical professional. One minor, who felt feverish and had a very sore, swollen throat, remembers asking to see a doctor. Officers told her that she could only see a doctor "if she was dying." Another minor, who was a teenager mother, reports begging officers to take her baby to the doctor after her baby became very ill. The officers first told her that she shouldn't have left her country if she didn't want her baby to get sick, and that there would be no "preferential treatment" for her. When the baby's condition worsened, officers finally agreed to take him to the hospital, where doctors told the mother that the baby had a bacterial infection, likely caused by food he had eaten in detention.

The *Flores* Settlement Agreement requires that UNCs be held in facilities that are "safe and sanitary," and the TEDS make clear that UNCs should have access to basic hygiene items and regular showers. However, children reported a widespread lack of basic sanitation and personal hygiene in CBP detention. Sick and well children were kept together in the same overcrowded facilities. Children report that they were never or rarely able to shower and change clothes, even when detained for several days or weeks. Some report wearing the same clothing during their entire detention – clothing that was often very dirty and sometimes wet from having crossed a river. They report having no or limited access to toothbrushes and toothpaste. For example, one minor, who was detained for several weeks, remembers that there were never enough toothbrushes for each child, so they had to take turns deciding who would be able to brush their teeth. Some children report that officers denied them access to the bathroom when they needed it. Others report that officers got angry or humiliated the children when they asked to use the bathroom at a time the officer felt was inconvenient.

Both the *Flores* Settlement and the TEDS specify that UNC should be held in facilities with adequate ventilation and temperature control. However, minors widely reported being held in freezing cold cells (commonly referred to as "la hieleira" or "the icebox") with no windows and concrete floors. As protection against the cold, children described being provided with aluminum emergency blankets that were uncomfortable and did not keep them sufficiently warm. Many children report being crowded into small spaces with large numbers of people, resulting in insufficient space to sit or lie down. Children



generally described the sleeping arrangements as mats on the concrete floor. However, due to overcrowding, there were often not enough mats for all the children, and many were compelled to try to share mats or to sleep on the concrete floor or concrete benches. Many children report being unable to sleep in detention because the lights were always on, even at night. Others report being woken up in the middle of the night (often in an aggressive manner) so their cell could be cleaned, or so children could speak with officers.

III.     **Representative Cases[3]**

The following accounts are shared with the consent of the minors involved and are demonstrative of the thousands of complaints KIND received regarding treatment of UNCs in CBP custody from January – December 2021.

Debra* was 15 years old when two male immigration officers detained her in Arizona on or about October 9, 2021. The officers never gave their names, but she remembers they wore green uniforms. She was very frightened when she encountered the officials. One of them violently grabbed her by the sweater, forced her face-down to the ground, and put his knee in her back while handcuffing her. She was in a great deal of pain, and it was extremely difficult to breathe. She lay face-down on the ground for approximately 2 minutes, with the officer's body pressure on her back. The officer was violent and aggressive, and Debra was terrified. The officer did not speak to her in a language she could understand except when he told her in Spanish to "get up" off the ground. During this violent encounter, she sustained abrasions and bruises to her face and legs, and she was sore, especially on her back and shoulders, for several days after the encounter. The photos included in Appendix B were taken on October 14, 2021, approximately 5 days after the incident. Abrasions and bruises are still visible on her face, and bruises are visible on her leg. She also reports having bruises on her thighs but did not feel comfortable having this part of her body photographed. After her apprehension, Debra was taken to a detention facility and spoke with a medical provider for 2 minutes or less, but they told her there was nothing they could do for her injuries. They did not clean her injuries or provide her with any bandages. She was also interviewed by a female immigration officer who explained that she was the "police of the police." The woman introduced herself, but Debra does not recall the woman's name. She does, however, remember that the woman was wearing a blue uniform. The woman in the blue uniform interviewed Debra for about 20 minutes, asked about her injuries, and took photos. However, nobody explained what would be done with the information obtained during the interview. She was not advised of her rights while in detention. Debra begins to cry whenever she thinks about the immigration officer's violence toward her, and she does not like discussing the trauma that she experienced.

Nathaniel* was 17 years old when CBP officers detained him in Texas on or about March 3, 2021. What he remembers most about his time in CBP detention is that it was extremely cold, that he barely slept, and that he did not receive sufficient food, so he was almost always hungry. He thought he would only be there for 3 days, but he was there for approximately 12. He was only permitted to shower

---

[3] The minors are identified in the body of this complaint by pseudonyms. However, the attached Appendix A includes their actual names and A numbers.



2 or 3 times while he was detained. Officers would only let him sleep for short durations of time before they would wake him up to conduct roll call, speak with children, or clean the cell. There was not enough space in the cell for everyone to sleep at the same time. It was a horrible experience for him. He says that the other children cried a lot, because the officers were not nice to them, but he did not want to elaborate on what he meant because he was afraid to share further details.

Abel, Cameron, and Mikayla* are siblings. They were respectively 5, 6 and 15 years old when they were detained by CBP officers on or about March 18, 2021 in Texas. They spent approximately 16 days in detention. Officers believed that Mikayla was Abel and Cameron's mother, rather than their sister, and they called her a liar when she said she was a minor. They tried to get her to say that she was an adult and that she was the mother of the boys, and eventually made her sign a document stating that she was a minor. Abel was not able to discuss his experience in detention, possibly as a result of his young age and the trauma that he experienced there. Cameron stated that he had a stomachache while in detention and that he did not like the food. He said it was a horrible experience but was unable to elaborate further. Mikayla shared that on approximately the 5th day of their detention Cameron, Abel, Mikayla, and other detained children became very sick after eating rice and tortillas that they believed were spoiled because they tasted sour. Other food they ate tasted under-cooked. Mikayla reports that they had stomach cramps, fever, and other flu-like symptoms. She vomited 2 or 3 times. Her brothers were sicker than she was and vomited multiple times a day, multiple days in a row. Mikayla alerted CBP officers at least 5 times that they were sick, but the officers did nothing to help them. Officers told her they did not have medication or medical personnel available to help the children. Mikayla remembers that they said, "This is not a hospital, and we are not doctors. We cannot help you." Mikayla asked if they could eat anything else instead of the food which had made them ill. Officers replied that they would either eat what was given to them or not eat at all, and that it was not their concern whether the children ate or not. Mikayla was very worried about her little brothers, who continued getting sick. At one point the boys stopped eating altogether because they vomited anything they ate. Later, the boys only ate apples or drank juice.

Mikayla further reports that during their 16-day detention, she and her brothers were only permitted to shower and change their clothes approximately 3 times, and that they were only permitted to brush their teeth twice. They were held with approximately 100 children, in a cell that Mikayla estimates could only fit 25 children comfortably. The cell did not have any windows. Mikayla reports that she hardly ever slept while in detention and that she was completely exhausted by the time that she left. It was difficult to sleep because the rooms were so crowded, the lights were almost always on, and the officers woke the children regularly to clean the cell. Furthermore, there was not sufficient space for all the children to lie down at the same time, and children quarreled over a very limited number of sleeping mats available. Mikayla stated that the children were "practically sleeping on top of each other." Mikayla also reports that the cell was kept extremely cold and the aluminum blankets that they were given did not keep them warm.

Mikayla also reports that one particular officer was very aggressive and threatening. She does not know his name but described him as a bald man in a green uniform. This particular officer terrified the children because he threatened to beat 6-year-old Cameron with a nightstick because he was



lethargic as a result of his illness and did not want to leave a room when ordered to do so. He eventually lifted Cameron up by his T-shirt. The officer threatened to beat the children with a nightstick many times during their detention. He almost always yelled when he spoke to them, and he told the children that if they didn't want to be treated the way they were being treated then they never should have come to the United States.

Mikayla reports that she cried every day, multiple times a day, while she was in detention because the conditions were so horrible and because of the deep fear and anxiety she felt as a result of the officer's threats and their ongoing illness. She shows signs of being very nervous and uncomfortable when discussing the trauma she experienced.

**IV.    Recommended Course of Action**

KIND calls on the DHS Office for Civil Rights and Civil Liberties and the Office of the Inspector General to investigate these widespread reports of abuses of UNCs detained by CBP, and we request a copy of any written report stemming from that investigation. Furthermore, CBP should immediately and fully adhere to all TVPRA, *Flores* Settlement Agreement, and TEDS requirements, including those governing the timely transfer to ORR custody of unaccompanied children arriving at the U.S.-Mexico border, whether at or between ports of entry. Finally, consistent with Congress's directive as part of the Consolidated Appropriations Act, 2022, DHS should hire state-licensed child welfare professionals at southern land border CBP facilities.[4]  These professionals should conduct protection screenings of arriving children, ensure appropriate care, and maintain children's family unity. Unlike unlicensed CBP agents, officers, and other personnel, child welfare professionals possess the expertise necessary to ensure the safety and well-being of unaccompanied children in CBP custody.

We look forward to continued communication with you regarding these troubling trends. Please do not hesitate to reach out at csessions@supportkind.org or 623-444-5745. Thank you for your attention to this this urgent matter.

Sincerely,

Carly Sessions

National Senior Attorney

---

[4] *See* Consolidated Appropriations Act, 2022, Explanatory Statement, Division F—Department of Homeland Security; https://docs.house.gov/billsthisweek/20220307/BILLS-117RCP35-JES-DIVISION-F.pdf.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2022, I served the foregoing EXHIBIT B on

all counsel of record by means of the District Clerk's CM/ECF electronic filing

system.

<div align="center" style="margin-left:40%">

*/s/Peter Schey*

*Counsel for Plaintiffs*
CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey

</div>