CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email:pschey@centerforhumanrights.org
        crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General of the United States, *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br>**<u>EXHIBIT D</u> TO PLAINTIFFS' RESPONSE TO NOTICE OF REQUEST FOR EXTENSION OF SPECIAL MASTER/INDEPENDENT MONITOR TERM (ECF NO. 1237)**<br><br><br>[HON. DOLLY M. GEE] |



April 6, 2022

U.S. Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch, Mail Stop # 0190
2707 Martin Luther King, Jr. Ave., SE
Washington, DC 20528-0190
CRCLCompliance@hq.dhs.gov
*Via email*

Re:   **U.S. Customs and Border Protection's Consistent Failure to Comply with the Terms of the Flores Settlement Agreement and Their Own Standards on the Transport, Escort, Detention and Search of Unaccompanied Children**

Americans for Immigrant Justice (AI Justice), on behalf of their clients, submit this administrative complaint to the Department of Homeland Security (DHS), Customs and Border Protection (CBP), based on their consistent failure to adhere to their own standards on the Transport, Escort, Detention and Search (TEDS)[1] of Unaccompanied Children (UC) as well as their failure to comply with the terms of the *Flores* settlement agreement[2]. This complaint is filed concurrently with other complaints from other organizations, Immigration Defenders, Kids in Need of Defense and the Florence Immigrant Refugee Rights Project, regarding similar abuses reported by the UCs they serve. We urge CRCL and Office of Inspector General to conduct a full inquiry into mistreatment of UCs and adopt preventative measures to avoid inflicting future harm to children in their custody.

**Introduction**

AI Justice is a non-profit law firm that provides free legal assistance to immigrants. AI Justice's Children's Legal Program was established in 1999 and has served thousands of unaccompanied children since that time. AI Justice is also the only legal service provider in South Florida that provides pro bono assistance to unaccompanied children detained in Office of Refugee Resettlement (ORR) shelters.

From 2019-2021, AI Justice interviewed approximately 12,731 unaccompanied children who passed through ORR facilities that we serve. This complaint encompasses incidents that took place during that timeframe.

---

[1] US Customs and Border Protection. *National Standards on Transport, Escort, Detention, and Search*. US Department of Homeland Security, Oct. 2015, www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

[2] Flores v. Reno, Case No. CV 85-4544-RJK(Px).



The *Flores* settlement agreement[3] and CBP's own National Standards on TEDS[4] collectively govern the treatment of children in DHS custody. Collectively, the Flores settlement agreement, TEDS and the later codified  Trafficking Victim Protection Reauthorization Act (TVPRA)[5] set the standards for the treatment and care of UCs while in CBP holding cells, commonly referred to as "*hieleras*" and "*perreras,*" such as access to "toilets and sinks; professional cleaning and sanitizing at least once per day; drinking fountains or clean drinking water along with clean drinking cups; adequate temperature control and ventilation; and clean bedding."[6]

Importantly, the TEDS standards state that CBP employees should perform "their duties in a non-discriminatory manner, with respect to all forms of protected status under federal law, regulation, Executive Order, or policy, with full respect for individual rights including equal protection under the law, due process, freedom of speech, and religion, freedom from excessive force, and freedom from unreasonable searches and seizures."[7]

**Our Findings**

Despite the requirements of the *Flores* agreement and CBP's own policies, the vast majority of the 12,732 minors who we met with between 2019-2021 reported violations of the *Flores* settlement agreement and CBP's TEDS guidelines.

**2019**

The data and statements outlined below were originally obtained and published in a report by our office in October of 2020.[8] Collectively they demonstrate that most of the children interviewed by our office in 2019 were held in deplorable and inhumane conditions in violation of the standards set out by the *Flores* settlement and CBP's own policies and procedures:

---

[3] *Flores v. Reno*. See also United States Code. Title 6, section 279.
[4] US Customs and Border Protection. *National Standards on Transport, Escort, Detention, and Search*. US Department of Homeland Security, Oct. 2015, www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf, p. 22.
[5] National Immigration Forum. "Trafficking Victims Protection Reauthorization Act Safeguards Children." p. 1, immigrationforum.org/wp-content/uploads/2018/05/TVPRA-Advocacy-2018-Final-Final.pdf.
[6] US Customs and Border Protection. *National Standards on Transport, Escort, Detention, and Search*. US Department of Homeland Security, Oct. 2015, www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf, p. 22.
[7] Id. at 4.
[8]  Americans for Immigrant Justice, *Do My Rights Matter: The Mistreatment of Unaccompanied Children in CBP Custody*, October 2020 found at https://aijustice.org/do-my-rights-matter-the-mistreatment-of-unaccompanied-children-in-cbp-custody/.



- **Poor Sleeping Conditions and Freezing Temperatures**: More than 64% of minors AI Justice interviewed complained about the cold temperatures in these facilities. Many children also reported poor sleeping conditions and being given a piece of mylar as a blanket and a thin mattress to sleep on. These aluminum blankets did not provide enough warmth for the very low temperatures of the *hielera* or the holding facility.

- **Lack of Water and Food:** About 40% of unaccompanied minors who were interviewed by AI Justice complained about the lack of food and water in border detention facilities. The 2008 CBP Memo regarding Hold Rooms and Short-Term Custody requires officials to provide juveniles who are detained for longer than eight hours with regularly scheduled hot meals, and to provide snacks and milk upon request for the youngest detained children and pregnant women.[9] Detained youth said CBP often failed to adhere to this policy.

- **Lack of Access to Personal Hygiene**: Lack of access to shower and ability to practice dental hygiene was frequently reported by the children we interviewed. Likewise, many children reported a lack of privacy and, at times, not being allowed access to a bathroom for hours.

- **Inadequate Medical Care:** Our clients have also reported lack of access to adequate medical care while in CBP custody. The following complaint is one particularly disturbing example of how the lack of medical care and training in CBP custody came dangerously close to resulting in loss of life:

  o I.D.G.M., who at the time of her apprehension was only 15, states that when she was detained for approximately 12 days, she began experiencing excruciating pain. She spent her time crying and vomiting from the pain in her abdomen. Despite her attempts to seek medical attention, she was dismissed by the officers and told she would be fine. One officer went as far as to accuse her of feigning illness to force them to "waste money" on her and told her she should tell them she feels fine so they would not have to take her to hospital. I.D.G.M. was eventually transported and treated for kidney stones. The treating physician told her that if they had waited any longer, the situation would have been far graver.

- **Verbal and Physical Abuse:** CBP officers may be the first individuals a migrant child encounters upon arriving in the United States. This initial encounter comes after children have made a long, arduous journey, often after fleeing dangerous situations in their home countries. Children come to

---

[9] Aguilar, David V. *Hold Rooms and Short Term Custody*. US Customs and Border Protection, US Department of Homeland Security,  2 Jun. 2008, foiarr.cbp.gov/docs/Policies_and_Procedures/2011/200842354_378/1104271006_Hold_Room_Custody_Directive_Reading_Room.pdf.



the United States expecting to be safe. Instead, they face abuse by the first people they encounter. Too often our clients have reported being subject to verbal and physical abuse/excessive force. In 2019, 147 children reported physical abuse and 895 reported verbal abuse. These numbers only account for the brave children and youth who felt comfortable enough to report their experiences. It is our experience that these numbers are likely higher. The example below is unfortunately familiar to us as it echoes what several of our clients reported during our initial interviews:

o E.M.C.S., a young girl who was very ill and had a high fever while in CBP custody, requested medical attention and never received any. While E.M.C.S. slept, an officer called her name, but she was too weak to respond or stand. When the officer approached E.M.C.S. and she still could not get up, the officer kicked E.M.C.S. in the ribs while she was lying on a mattress on the floor.

**2021 to Present Day**

Looking forward to 2021, violations of the *Flores* settlement agreement and CBP's TEDS appear to continue at the same high rate as years prior. In 2021, 70% of children we interviewed reported conditions and/or abuse while in CBP custody in violation of the *Flores* settlement agreement. From 2019-2020, the percentage of children who reported mistreatment was 85%. This comparison demonstrates little has improved at our border facilities for unaccompanied children. Youth we have screened in the last twelve months continue to report conditions that demonstrate disregard for the standards of care laid out in the *Flores* settlement agreement as well as CBP's own guidelines. Below is a sampling of complaints heard by our office in 2021-2022 of children whose mistreatment has unfortunately become emblematic of the stories we hear from children who have passed through CBP custody:

**-50% of children reported cold temperatures where the children describe their lips becoming chapped, bodies trembling, and/or becoming sick with a fever or cold.**

- N.T.M., 13, asked to be moved because she was so cold in her cell that her skin went purple, and her lips were so dry they cracked and bled.
- K.P.R., 9, reported feeling so cold his "bones hurt."
- D.C.L., 16, reports being so cold he trembled. He said he did not have a sweater and all they were given were mylar blankets that often broke. When they tried to grab another blanket, the officers would yell at them. He stated he felt desperate to get out of the cold.
- A.B.B., 17, echoed the stories of many when she reported that she was very cold during her time in CBP custody and that the mylar blanket provided was not enough to keep warm.
- 

**-32% of children report being detained for longer than 72 hours.**
- M.L.G., 13, was held for 19 days. During that time, she reports she was unable to shower,



change or brush her teeth. Simply recounting her days in CBP custody causes M.L.G. to cry.

- C.Y.S.A., 14, was held for five days. When she first arrived, she reports being left outside to wait for CBP to transport her for five hours in the middle of the night with other youth.
- D.C.L., 16, was held for 10 days.
- C.L.R., 16, was held for 7 days.
- N.T.M., 13, reported being held for 9 days.
- K.G.C., 15, states she was held for 10 days.

**-13% of children reported lack of food and/or water. Children reported that the food provided was insufficient, malnourishing, and at times, inedible due to it being spoiled or raw.**

- K.G.C., 15, reported only receiving bread despite being detained 10 days.
- J.H.M., 9, reported receiving raw ham and burgers containing raw meat.
- J.E.A., 15, reported being thirsty and the only access to water being right a by a bathroom with dirty water so he worried about drinking water from there. He also reported being hungry and having only been fed a sandwich.

**-6% reported verbal abuse and/or harassment by adult immigration officials.**

- J.E.A., 15, reported one officer swearing at him and using the word "fuck" and having officers laugh but not understanding exactly what was being said to him or about him.
- D.C.L., 16, stated that there were two officers that would yell at the detained children for any perceived misstep and feeling very intimidated. He stated: "It felt so horrible, you were trapped." He reported feeling that there was a lot of racism and not understanding why he was being treated so poorly when he came to the U.S. seeking safety.
- H.M.C., 15, stated an officer said "shut your fucking mouth" after he attempted to help other migrants understand his order. He also reported several officers would threaten to send youth back to their countries and boasted that they could easily do so.
- C.R.F., 17, stated an officer told him he would be returned to Honduras to frighten him. He cried after that. He remembers officers saying things like "this is not your country, and you are here illegally" to put them down.
- K.X.S., 16, stated that officers harassed her about her age and were making jokes at her expense. She reported that they said she looked older and threatened to send her to jail.
- A.B.B., 17, reported being yelled at for greeting someone she recognized during her registration and accusing her of providing a fake birth certificate.
- K.V.A., 16, witnessed others being verbally berated and kicked awake if they were not responsive.

**-5% of children reported being detained with adults.**

- J.H.M. stated that he was in the holding cell with four adult men, two of which harassed the 9-year-old telling him that he was his father and another, his uncle because one of them had



impregnated his mom. J.H.M was distraught and tried to tell CBP officers what was happening to him but still he remained in the cell with adults. He reports lying on the floor and crying.

**-1% of children reported physical abuse or excessive force.**

- One child, D.G.M.H., 15, reported having her foot handcuffed to a chair despite being cooperative and answering CBP officers' questions.
- H.M.C., 15, reported that if their name was called and they did not respond because they were sleeping, officers would kick them awake. He reports that they wear heavy work boots, and this was very painful.
- F.C.R., 15, reported being kicked awake when he was sleeping.

**-17% reported other and/or egregious mistreatment.**

When we looked more closely at cases of mistreatment classified as "other," we found comparable stories as those described herein. Many children reported the food they were given was undercooked, frozen, tasted rotten, or gave them digestive issues. Many children reported deplorable sleeping conditions where they had to share a mattress with multiple people and sometimes, even had the thin mattress they were given taken away as punishment. Children were often woken up multiple times at night, sometimes violently. Children often shared witnessing the mistreatment of other children, such as seeing other youth being yelled at or harassed. Other common concerns were the lack of access to regular and private showers and not being allowed to change their clothing or brush their teeth regularly:

- K.G.C., 15, reported sleeping on the same mattress with three other girls due to overcrowding. She stated that she ended up getting lice while in custody. She reports that when she was allowed to shower, she was only allowed to change her clothes once and was only able to brush her teeth twice despite being detained for over a week.
- C.C.L., 10, who was held for over five days, reported feeling hungry and not being able to shower regularly during his time in CBP custody. He states that at one point during his time there he had his mattress taken away. He stated that CBP would take their mattress if they felt someone was misbehaving. He also reported that officers sometimes would use vulgar words directed at them.
- C.L.R., 16, was detained seven days. She reports being so cold she never took off her sweater, which she felt grateful for since she saw most people had their sweaters taken away. She reports sleeping four to a mattress on the floor and feeling hungry because there was not enough food provided. She cried recounting her time in CBP custody. She said she felt horrible and isolated because she was not allowed to speak to her family.
- D.G.M.H., 15, reported a lack of privacy and described that the bathrooms have no doors.
- N.A.E., 12, reported that when he presented himself to immigration, he was told he would be reunited with his mother in the United States and would see her soon. CBP held him for four days before moving him to a hotel where he spent another three days before being illegally



returned to Guatemala without his knowledge or consent.

## Conclusion

Our client accounts make clear that the mistreatment and poor conditions that our organization has documented for years continue to be commonplace in CBP holding facilities. The conditions and treatment these children endure are, at best, inhumane and unsanitary, and at worst, punitive and cruel. Each of the instances reported on their own are violations of the *Flores* settlement agreement and CBP standards. In aggregate, they are an indictment on the CBP's treatment of vulnerable unaccompanied children in their custody.

The Trafficking Victim Protection Reauthorization Act (TVPRA)[10] and the *Flores* settlement agreement[11] unequivocally state that these facilities must not house children for longer than 72 hours and yet, all too often, that is exactly what occurs. Not only have these facilities have proven to be unsafe and unsanitary for children, but they have also become increasingly repressive and punitive. These are meant to be safe and clean spaces where children are housed for brief periods prior to their transfer to the Office of Refugee Resettlement, not correctional facilities.

The abuse and neglect reported by detained children and youth violate CBP's standards of care, the *Flores* settlement agreement and the TVPRA. The *Flores* settlement agreement, which was meant to ensure that children are kept in safe and sanitary conditions, is more than 20 years old and yet conditions in CBP facilities are continually unfit to house children of any age.

## Recommendations

The examples included in the concurrently filed complaints demonstrate that CBP's abuse of children is widespread. It is not limited to one child at one instance. It is not limited to the conduct of a "bad apple" employee within the agency. It is not limited to even a rogue remote CBP outpost that lacks training and resources. The abuse of children in CBP custody is common. The sheer number of children who have reported abuse, many of whom told us that they fear retaliation and were afraid to speak up, thus suggesting that these numbers are a fraction of the actual problem, shows that CBP engages in a pattern and practice of treatment that relies on overcrowded facilities, a lack of adequate food, water, medical care, and privacy, and the verbal and physical abuse of the most vulnerable immigrants.

This is unacceptable. Our organizations offer suggestions to improve the treatment of unaccompanied children in the paragraphs below. We believe that these will offer immediate solutions to ameliorate some of the problem.

---

[10] National Immigration Forum. "Trafficking Victims Protection Reauthorization Act Safeguards Children." p. 1, immigrationforum.org/wp-content/uploads/2018/05/TVPRA-Advocacy-2018-Final-Final.pdf.
[11] Flores v. Reno, Case No. CV 85-4544-RJK(Px).



While these recommendations will help in the short term, we call on the federal government to reimagine and reinvent the system for caring for unaccompanied immigrant children. CBP is an agency that, through these complaints, has shown itself to be incapable of providing adequate care. Worse still, the agency's treatment of unaccompanied children is marked by horrific conditions, outdated facilities, and abuse. This agency cannot and should not hold children. We demand that the government create a child-friendly, trauma-informed reception system that relies on trained child welfare professionals working in the best interest of the children in their custody.

1. ***Strict Adherence to the TVPRA and the* Flores *settlement agreement*:** CBP must adhere to the requirements laid out in the *Flores* settlement agreement and the TVPRA. Specifically:
   o Children must not be held in CBP custody for more than 72 hours, as these facilities have never been designed to house children for any extended period of time and their prolonged detention leads to their continued exposure to abhorrent conditions.
   o Children in CBP custody must be provided with an environment that is "safe and sanitary." This must include adequate access to bathroom facilities, toothbrushes, showers, clean clothes, medical care, as well as adequate and edible food and water. Age-appropriate food must be provided for infants and toddlers. Children must not be made to sleep on concrete floors in frigid rooms, with bright lights on all hours of the day and night. CBP must end the practice of gathering in one room or cell all children who report being ill with no regard or forethought to their health and wellbeing and no access to medical treatment.

2. ***Protect children's right to privacy*:** CBP officials must respect children's right to privacy and implement policies and standards that protect children's right to privacy. Specifically, CBP must ensure that children are afforded individual privacy in shower and bathroom facilities. Also, CBP must immediately remove cameras from sensitive locations, such as bathrooms.

3. ***Adherence to and enforcement of the CBP National Standards on Transport, Escort, Detention and Search (TEDS)*:** All CBP officials must consider the best interests of the child in all decisions, as required by 2015 TEDS Standard 1.6. Moreover, CBP must promptly promulgate guidelines, like those proposed in the 2016 *Interagency Framework on Considering the Best Interests of Unaccompanied Children*, to ensure that all CBP officials consider children's best interests in every decision from the first encounter through processing, detention, and release or transfer. CBP must also make the TEDS standards enforceable to help ensure that all children are receiving appropriate care in CBP facilities. CBP must regularly conduct reviews and inspections at all facilities holding children to ensure compliance with the TEDS standards and order corrective action and additional training when violations are found. CBP must also regularly review the TEDS standards for additional improvements to further promote the safety and wellbeing of children in CBP custody.



4. ***Provide the same standards of care centered on the best interests of children as required in ORR facilities***: CBP's standards of care must be centered on advancing the best interests of children. Accordingly, CBP must meet or exceed standards of care recommended by pediatric health and child wellbeing experts, including access to clean bathroom and shower facilities that allow for individual privacy; clean, age-appropriate clothing; adequate bedding, food, water, and personal hygiene time and products; adequate medical care; telephone access to contact family; and the ability to remain with trusted family caregivers but separated from unknown adults. Facilities must be temperature-controlled, have adequate lighting, and lighting must not be kept on 24 hours a day.

5. ***Mandatory training of CBP officers and staff***: CBP officers and staff must be trained regularly on topics such as cultural competency, basic human rights, trauma-informed approaches, child development, de-escalation techniques, harm reduction, and the basics of trafficking and asylum.

6. ***Access to a phone with a complaint hotline and telephonic access to legal services providers:*** CBP must provide all minors in its custody with regular access to a confidential telephone that is equipped to make calls and to access a private hotline available for children to report abuse. Any child that asks to make a phone call must be allowed to do so at any time.

7. ***Access to interpreters***: CBP must ensure access to interpreters for children in CBP custody. This includes hiring bilingual officers, training officers in language assessment and providing full-time access to an interpretation service that includes Indigenous language interpreters.

8. ***Implement proper surveillance practices in line with privacy laws:*** In so far as a CBP facility subjects children in detention to video surveillance, it must develop and make publicly available policies that require reasonable record retention consistent with federal and state privacy protections and allow access to said recordings when requested by CRCL, OIG, CBP, or other investigatory agencies and stakeholders, as part of an investigation into abuse.

9. ***Hire Child Welfare Professionals:*** Consistent with Congress's directive as part of the Consolidated Appropriations Act, 2022, DHS should hire state-licensed child welfare professionals at all southern land border facilities. These professionals should conduct protection screenings of arriving children, ensure appropriate care, and maintain children's family unity. Unlike unlicensed CBP agents, officers, and other personnel, child welfare professionals possess the expertise necessary to ensure the safety and well-being of unaccompanied children in CBP custody. These professionals should also be permitted to facilitate reasonable telephonic contact with confirmed family members.

10. ***Access to Legal Counsel:*** CBP must prioritize access for legal services providers in CBP detention centers. LSPs must have the ability to meet with children in confidential spaces, have



access to rosters of children in CBP custody, and access to areas in the CBP facility where children are held in order to monitor conditions.

Thank you for your attention to this important matter. Do not hesitate to contact us with questions or concerns.

Sincerely,

Jennifer Anzardo, Esq.
Director, Children's Legal Program
Americans for Immigrant Justice

Maite Garcia, Esq.
Supervising Attorney, The Children's Legal Program
Americans for Immigrant Justice

cc: Joseph V. Cuffari
U.S. Department of Homeland Security
Office of Inspector General / MAIL STOP 0305
245 Murray Lane SW
Washington, DC 20528-0305
JointIntake@dhs.gov; jointintake@cbp.dhs.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2022, I served the foregoing EXHIBIT D on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

*/s/Peter Schey*
*Counsel for Plaintiffs*
CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Peter A. Schey
