# JULY 1, 2022 ORR JUVENILE COORDINATOR ANNUAL REPORT

# Table of Contents

Introduction ................................................................................................................................2

ORR Programs & Capacity ..........................................................................................................3
    Number of Minors in ORR Custody..........................................................................................3
    ORR Programs and Bed Capacity ............................................................................................3
    De-licensing of Beds by State Action ......................................................................................5
    Census of Minors in Each of the Agency's Facilities ................................................................6
    Average Length of Stay ...........................................................................................................8
    Census of Minors and Length of Stay in EIS............................................................................9
    Updates to Expand Capacity in Licensed Shelter Beds and ICF ...............................................9

COVID-19 in ORR Facilities..........................................................................................................9
    Minors Currently Testing Positive for COVID-19. ..................................................................10
    Updates to Expand Capacity in Licensed Shelter Beds .........................................................12
    COVID-19 Plans on Vaccine Distribution ..............................................................................13

DHUC Health Services: Year in Review .....................................................................................13
    Health Care Services .............................................................................................................13
    Initial Medical Examination ..................................................................................................14
    Public Health Surveillance.....................................................................................................14
    Staffing ................................................................................................................................14
    EIS Medical Operations and Communicable Disease Support.................................................15
    COVID-19 Guidance Updates and Trainings ..........................................................................15
    Mental and Behavioral Health ..............................................................................................16
    Minors with Special Health Care Needs.................................................................................17
    Tuberculosis .........................................................................................................................17
    Support of Operation Allies Welcome ...................................................................................18

ORR's Support of Special Populations ......................................................................................18
    Unaccompanied Afghan Minors ...........................................................................................18
    Ukrainian Efforts .................................................................................................................19
    Haitian Efforts .....................................................................................................................20

Placement in Restrictive Settings.............................................................................................20
    Staff Secure .........................................................................................................................20
    Residential Treatment Center (RTC) .....................................................................................21
    Secure .................................................................................................................................22
    Out of Network Placements...................................................................................................23
    Notice of Placement .............................................................................................................24
    Minor Appeals of More Restrictive Placement Decision ........................................................25
    Flores Bond Redetermination Hearing ..................................................................................25
    Placement Review Panel.......................................................................................................26

**Services at ORR Licensed Facilities and EIS** ..................................................................................**26**

    Case Management Services ...................................................................................................... 26

    Recreational Services ............................................................................................................... 27

    Educational Services ................................................................................................................ 28

    Calls or Visits with Sponsors and Family ................................................................................ 28

    Legal Services .......................................................................................................................... 29

**Policies & Field Guidance for Program Improvements** .........................................................**29**

    Family Reunification Process and Case Management ............................................................. 29

    Background Checks ................................................................................................................... 30

    Home Studies ........................................................................................................................... 30

    Unaccompanied Afghan Minors (UAM) .................................................................................. 30

    Services in ORR Custody .......................................................................................................... 31

    Initial Medical Examination ..................................................................................................... 31

    Medical Services ...................................................................................................................... 31

    Mental Health Services ............................................................................................................ 31

    Reporting ................................................................................................................................. 32

    Staffing .................................................................................................................................... 32

    COVID-19 .................................................................................................................................. 32

    Measles .................................................................................................................................... 33

**Juvenile Coordinator Site Visits** ...........................................................................................**33**

    ICF/EIS Site Visit Tour .............................................................................................................. 33

    Site Visits at ORR Licensed Care Providers ............................................................................. 37

**Summary** ...............................................................................................................................**41**

**ORR JUVENILE COORDINATOR ANNUAL REPORT**

**July 1, 2022**

**Aurora Miranda-Maese, ORR Juvenile Coordinator**

## Introduction

This is the second annual report for the Office of Refugee Resettlement (ORR) submitted by the Juvenile Coordinator to The Honorable Dolly M. Gee. The first annual report for ORR was submitted by the Juvenile Coordinator on July 1, 2020. This report is submitted in accordance with Paragraph 30 of the Flores Settlement Agreement (FSA). The Juvenile Coordinator was excused from filing an annual report in 2021 given the several interim reports that were filed throughout the year. Pursuant to the April 29, 2022 Court Order, the Juvenile Coordinators for Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and ORR were directed to file an annual report by July 1, 2022.

In accordance with the Judge's Orders, issued during the April 29, 2022 status conference, the ORR Juvenile Coordinator Annual Report includes the following topics:

1) The overall census of minors in the agency's facilities;

2) The average length of stay for minors currently in the agency's facilities and for minors who have been released;

3) The number of minors currently testing positive for COVID-19;

4) A census of minors in an EIS for more than 20 days and those minors' lengths of stay;

5) Updates on ORR's plans, if any, to expand capacity, particularly of licensed shelter beds and influx care facilities; and

6) Any updates on ORR policies or plans regarding the use of EIS', including policies and procedures to address COVID-19.

In addition, the Court directed that the ORR Annual Report consist of ORR's accomplishments, operational changes and the challenges that ORR services, processes, and policies experienced throughout the various departments. This report also summarizes the Juvenile Coordinator's site visits during the reporting period from June 1, 2021 through May 31, 2022.

This report covers a one-year period, from June 1, 2021 to May 31, 2022. Any reference to activity outside of the reporting period is included to provide context and place the activities within the broader framework of ORR's overall operations.

## ORR Programs & Capacity

### Number of Minors in ORR Custody

During the annual reporting period, ORR received referrals for approximately 144,628 minors and discharged approximately 151,360 minors.

Figure 1 below illustrates the trend in ORR referrals and discharges over the course of the annual reporting period.

*Figure 1: ORR Referrals and Discharges from June 1, 2021 to May 31, 2022*



### ORR Programs and Bed Capacity

Building and maintaining sufficient capacity during the reporting period has been a challenge for ORR due the impacts of the international COVID-19 pandemic and the historically high volume of unaccompanied minors arriving at the U.S. border, in addition to the actions of some states to de-license ORR programs. In response to these first two challenges, ORR swiftly established a new type of accommodation designed to reduce unaccompanied minors' length of stay at CBP and ICE facilities. This new type of accommodation is known as Emergency Intake Sites (EIS). The first EIS began operations in March 2021, and this quickly increased to a total of 14 EIS within three months. However, by June 2021, ORR began closing EIS and transferring minors to other ORR programs. By combining EIS with ORR's pre-existing traditional facility types, ORR quickly increased bed capacity to match the high volume of minors referred from federal agencies.

Figure 2 below illustrates results of ORR's rapid expansion of bed capacity to meet the historically high number of children referred to the agency during the reporting period.

*Figure 2: Average Funded Bed Capacity and Average Number of Minors in ORR Custody*



| | June | July | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg Bed Capacity | 34,476 | 26,666 | 25,270 | 25,716 | 25,320 | 21,197 | 22,110 | 21,463 | 20,811 | 20,376 | 20,416 | 20,598 |
| Avg UC in Care | 16,015 | 15,104 | 16,171 | 13,730 | 11,502 | 12,203 | 12,511 | 8,903 | 9,990 | 10,275 | 9,809 | 9,423 |

Figure 3 below is a chart of the EIS, with their opening and closing dates. Note, the EIS at Ft. Bliss and
Pecos EIS remained operational for the longest period of time and eventually converted to Influx Care
Facilities (ICF). The EIS at Ft. Bliss converted to an ICF on May 30, 2022 and the Pecos EIS converted to an
ICF on June 4, 2022.

*Figure 3: Operational Dates for ORR Emergency Intake Sites*

| EIS Name | Location | Opening Date | Closing Date |
|---|---|---|---|
| San Diego Convention Center | San Diego, CA | March 2021 | June 2021 |
| Midland EIS | Midland, TX | March 2021 | June 2021 |
| Kay Bailey Hutchinson Convention Center | Dallas, TX | March 2021 | May 2021 |
| Freeman Expo Center | San Antonio, TX | March 2021 | May 2021 |
| The EIS at Fort Bliss | El Paso, TX | March 2021 | Converted to ICF on May 2022 |
| NACC Houston | Houston, TX | April 2021 | April 2021 |
| Pecos Children's Center | Pecos, TX | April 2021 | Converted to ICF on June 2022 |
| Dimmit | Dimmit, TX | April 2021 | July 2021 |
| Delphi | Donna, TX | April 2021 | July 2021 |
| Starr | Albion, MI | April 2021 | February 2021 |
| Pennsylvania International Academy | Erie, PA | April 2021 | April 2021 |
| JBSA Lackland | San Antonio, TX | April 2021 | May 2021 |
| Long Beach | Long Beach, CA | April 2021 | July 2021 |
| Pomona | Pomona, CA | May 2021 | November 2021 |

4

In addition to establishing EIS', ORR operated the Carrizo Springs ICF during the annual reporting period. Carrizo Springs operated from February 22, 2021 to March 23, 2022. ORR actively pursued opportunities to open other ICF's by surveying potential sites and seeking contractors to operate them. Although many of the possible ICF sites were not established, ORR is currently preparing to open two ICF's in the upcoming months to accommodate a projected surge. The sites are located in Greensboro, NC and at the site that previously operated as Carrizo Springs. The two new ICF's will join the currently operating ICF at Ft. Bliss and Pecos ICF to increase ORR's bed capacity beyond the licensed care provider network.

### De-licensing of Beds by State Action

On May 31, 2021, the State of Texas issued an emergency proclamation directing the Texas Health and Human Service Commission (HHSC) to amend its regulations to "discontinue state licensing of any child-care facility in this state that shelters or detains [UC] under a contract with the Federal government."[1] The proclamation directed HHSC to "deny a license application for any new child-care facility that shelters or detains UC under a contract with the Federal government, to renew any existing such licenses for no longer than a 90-day period following the date of this order, and to provide notice and initiate a 90-day period beginning on the date of this order to wind down any existing such licenses." On July 13, 2021, HHSC issued an emergency rule implementing the directives of the Governor's proclamation; the emergency rule exempted Federal grantees from state-licensing requirements and provided for the rescission of grantees' existing licenses.[2] The proclamation was originally set to expire on November 9, 2021, but was extended to January 8, 2022.[3] Subsequently, HHSC published a second emergency rule effective January 9, 2022, reinstating the terms the earlier emergency rule, and setting additional requirements for those programs that serve both unaccompanied minors and domestic children.[4] The latest emergency rule is anticipated to remain in effect until July 8, 2022. HHSC has indicated that it plans to issue a Notice of Proposed Rulemaking to make the terms of the emergency rule permanent.

On September 28, 2021, the State of Florida issued an Executive Order[5] directing the Florida Department of Children and Families (DCF) to determine whether childcare and child placing agencies which serve minors should continue to be licensed by DCF. If not, this Order directed DCF to amend state licensing standards to require a cooperative agreement between the State of Florida and the Federal government in order for DCF to issue or renew licenses for ORR's programs. On December 10, 2021, DCF issued an emergency rule amending the Florida Administrative Code Rule 65C-46.022 to implement the directives of the Executive Order, such that no license will be issued or renewed unless and until there is a cooperative agreement in place between the State of Florida and the Federal government that provides Florida with notice of and an opportunity for consultation regarding the resettlement of minors in Florida.[6]

---

[1] May 31, 2021, Emergency Proclamation, *available* at: https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-2021.pdf.

[2] *See* 26 TAC § 745.115.

[3] *See* HHSC, Press Release: New Emergency Rules Adopted Related to Governor's Proclamation Declaring Disaster (Jan. 10, 2022), https://www.hhs.texas.gov/provider-news/2022/01/10/new-emergency-rules-adopted-related-governors-proclamation-declaring-disaster.

[4] *See also* 26 TAC § 745.115 (amended Jan. 9, 2022), 26 TAC § 745.10301.

[5] Fl. Executive Order No. 21-223 (September 28, 2021), available at https://www.flgov.com/wp-content/uploads/orders/2021/EO_21-223.pdf.

[6] *See* Emergency Rule 65CER21-3, https://www.flrules.org/gateway/ruleNo.asp?id=65CER21-3

Florida has confirmed to HHS that it has no intention of entering into the cooperative agreement contemplated by the emergency rule.  As of May 31, 2022, the actions of the State of Texas and the State of Florida impacts approximately 31% of ORR's 205 programs (excluding ICF and EIS).

Immediately upon learning of the State of Texas' actions, ORR began exploring options to mitigate the serious impact of State de-licensing actions on ORR's licensed care provider network. After efforts to resolve the matter with Texas and Florida were unsuccessful, ORR published a Request for Information (RFI) in the *Federal Register* on September 3, 2021. The RFI solicited feedback from the public on the prospect of establishing a Federal Licensing Office within HHS, which would license programs only in instances where the State was unwilling to license or engaged in de-licensing activities similar to the actions taken by Texas and Florida. ORR has announced its intent to publish proposed regulations establishing a regulatory framework for new Federal Licensing of ORR facilities, which will be used when State governments do not provide State licensing of such facilities. The notice indicates that the new office created to manage the Federal licensing will be located within the Administration for Children and Families (ACF), but not within ORR.

Texas' and Florida's implementation of their de-licensing initiative remains an emergent issue.  ORR is in close contact with care providers in those states regarding developments at the State level and potential operational impacts.

The census of minors in each of the agency's facilities

Figure 4 below summarizes ORR's bed capacity as of May 31, 2022. This information is dynamic as ORR continues to aggressively pursue efforts to increase bed capacity. Therefore, it is likely that the information depicted in the figure below changed very soon after it was produced.

*Figure 4: ORR Bed Capacity and Occupancy as of May 31, 2022[7]*

| Program Type | Available Capacity | | | Unavailable | Total Funded Bed Capacity |
|---|---|---|---|---|---|
| | Occupied | Unoccupied | Total | | |
| Shelter | 6,294 | 3,826 | 10,120 | 2,639 | 12,838 |
| Transitional Foster Care | 717 | 285 | 1,002 | 1,931 | 2,966 |
| Long Term Foster Care | 448 | 91 | 539 | 96 | 635 |
| Influx Care Facilities | 197 | 605 | 802 | 0 | 945 |
| Emergency Intake Sites | 2,501 | 439 | 2,940 | 19 | 3,055 |
| Staff Secure & Therapeutic Staff Secure | 26 | 56 | 82 | 30 | 112 |
| Residential Treatment Centers | 18 | 31 | 49 | 21 | 70 |
| Secure | 9 | 15 | 24 | 0 | 24 |
| *Total* | *10,210[8]* | *5,348* | *15,558* | *4,736* | *20,645* |

There are several reasons that ORR capacity includes unavailable beds. Consistently throughout the reporting period, three reasons have accounted for most of the unavailable beds: 1) staffing issues; 2) foster family limitations; and 3) medical isolation or quarantine needs. Recently, ORR's decision to stop placement for child safety concerns while addressing program non-compliance has also contributed a significant number of unavailable beds and in particular, the reduction of available Transitional Foster Care (TFC) beds. Figure 5 provides insight on the reasons that 4,736 beds were unavailable on May 31, 2022.

---

[7] Figure 4 depicts ORR's total funded bed capacity as of a specific moment in time. The information depicted in this chart fluctuates very frequently due to the constant operations necessary to serve minors. Furthermore, this chart expands the information periodically reported in the ORR Juvenile Coordinator's interim reports to include the actual number of unavailable beds and ORR's total funded bed capacity. In the interim reports, the ORR Juvenile Coordinator focuses only on ORR's available capacity, which is the data highlighted in Figure 4 by the thicker border lines.

[8] This total does not include the following: 10 minors enroute from one ORR program to another; 338 minors enroute to ORR from a DHS facility; and 18 beds that are designated for minors approved for transfer from one ORR program to another.

*Figure 5: Reasons for Unavailable Beds as of May 31, 2022*



The average length of stay for minors currently in the agency's facilities and for minors who have been released.

Figure 6 below is a measure of time that a minor remains in ORR care, which is known as the length of care (LOC). The first measure, labeled *UC In-care LOC* (in orange), tracks the average LOC for minors still in ORR custody as of May 31, 2022. For these minors, the LOC is calculated from the day they are admitted to ORR custody to May 31, 2022. The second measure, *UC Discharged LOC* (in blue), tracks the average LOC for minors from the day they are admitted into ORR custody to the day they are discharged from ORR custody.

*Figure 6: Average Length of Care for Minors from June 1, 2021 to May 31, 2022*



### A census of minors in an EIS for more than 20 days and those minors' lengths of stay;

As of June 5, 2022, ORR had no minors residing at EIS facilities. As of June 4, 2022, the two EIS facilities (Ft. Bliss and Pecos) have transitioned from EIS to ICF.

### Updates on ORR's plans, if any, to expand capacity, particularly of licensed shelter beds and influx care facilities; and

Throughout the reporting period, ORR has continuously sought to expand bed capacity. Initially, most of ORR's focus involved establishing beds that were rapidly available through EIS due to the historically high volume of minors arriving at the border. Concurrently, ORR engaged in efforts to establish Influx Care Facilities, a process that takes much longer to accomplish than setting up EIS. The ICF expansion efforts continue to the present. Recently, ORR converted two EIS (Ft. Bliss and Pecos) to ICF and are finalizing efforts to open two additional ICF's, which will be located at the site that previously operated as Carrizo Springs and in Greensboro, NC.

ORR also focused on expanding the use of state licensed programs. In particular, ORR worked closely with existing care providers to increase their bed capacity and re-assess the COVID-19 related social distancing protocols. On December 6, 2021, ORR issued a Notice of Funding Opportunity (NOFO), which sought additional licensed shelter and TFC beds, which will award July 1, 2022. ORR issued a second NOFO on April 7, 2022, seeking more licensed shelter and TFC beds. And on May 5, 2022, ORR issued a third NOFO seeking more shelter and TFC beds. ORR expects to issue four more NOFO's in the upcoming months that will also seek an expansion of ORR's bed capacity.

The timeline from issuance of the NOFO to availability of additional beds is approximately one year. During that year-long timeline, ORR reviews responses to the NOFO's, with awarding of grants typically occurring several months after the NOFO was published. The balance of the year-long process involves setting up the program, undergoing state licensing and related requirements, and recruiting, hiring, and training staff.

## COVID-19 in ORR Facilities

On April 8, 2022, ORR released updated guidance for standard programs and ICF (Field Guidance #6: COVID-19 Intake Procedures for Unaccompanied Children Newly Admitted into ORR Care). The updated guidance discontinues the previous requirement for a 7-day, routine COVID-19 intake quarantine for asymptomatic children who test negative upon arrival. The 7-day quarantine following a known exposure to an individual who has been diagnosed with COVID-19 remains in effect. This guidance is dependent on the epidemiology of COVID-19 among children in ORR care. ORR's Division of Health for Unaccompanied Children (DHUC), in collaboration with the Center for Disease Control (CDC), will continue to review COVID-19 trends among children in ORR care and the surrounding communities to determine if routine intake quarantine should be reinstated in the future.

All minors who are newly referred to ORR will continue to be tested for COVID-19. Contact tracing should begin immediately if anyone tests positive for COVID-19. Minors who test positive for COVID-19 will be isolated until they meet the criteria to discontinue isolation. Minors exposed to COVID-19 should be

quarantined for seven days and tested by the fifth, sixth, or seventh day of their quarantine. Minors who test negative will be released from quarantine on the eighth day.

Since the beginning of the pandemic, more than 700,896 COVID-19 viral tests have been completed for the unaccompanied minors in ORR's program. As of June 10, 2022, this number includes tests conducted at standard shelters, ICF, and EIS facilities.

ORR does not require that staff at standard shelters disclose their private medical information as it relates to COVID-19; however, some staff voluntarily reported this information. Since collecting this information, ORR has been notified of 2,245 (cumulative) personnel with positive COVID-19 test results as of June 10, 2022.

On December 31, 2021, ORR issued new 'Return to Work' guidance for program staff who are isolating with a COVID-19 infection or quarantining due to exposure to COVID-19. This guidance was developed in collaboration with the CDC and allows ORR to maintain critical staffing levels and services while minimizing COVID-19 risks to minors. Staff with positive COVID-19 test results are required to medically isolate for at least five days and may return to work on the sixth day if they test negative with a COVID-19 antigen test and their symptoms are absent or improving.

Staff with suspected exposure to COVID-19 have different quarantine requirements depending on their vaccination status and whether they develop COVID-like symptoms. Quarantine ranges from zero days for a staff member who is up to date on COVID-19 vaccines and who remains symptom-free to five days for a staff member who develops COVID-like symptoms. In accordance with ORR guidance, staff returning from isolation or quarantine must wear appropriate masks or respirators while working.

At this time, care provider program staff who are eligible for the COVID-19 vaccine based on the CDC's Advisory Committee on Immunization Practices (ACIP) recommendations and the recommendations of their state and local jurisdictions may opt to receive the vaccine, which remains readily available to adults.

## The number of minors currently testing positive for COVID-19

The Juvenile Coordinator consulted with the DHUC to determine the likely source of infection for minors who were diagnosed with COVID-19 and are currently in medical isolation at standard shelters, excluding Transitional Foster Care and Long Term Foster Care programs.  Figure 7 below provides the census data for these minors as of June 10, 2022.

*Figure 7: Positive COVID-19 Minors in Medical Isolation as of June 10, 2022*[9]

| Program Name (Location) | Bed Capacity | Beds Occupied | Positive Minors During Initial Intake Period | Positive Minors Likely Acquired in ORR care |
|---|---|---|---|---|
| ███████████ (AZ) | 19 | 16 | 1 | 0 |
| ███████ (TX) | 61 | 59 | 0 | 1 |
| ██████ (TX) | 48 | 33 | 1 | 0 |
| █████ (TX) | 87 | 47 | 1 | 0 |
| ████████ (TX) | 80 | 12 | 2 | 0 |
| █████████ (NY) | 131 | 116 | 0 | 1 |
| ██████████ (CO) | 14 | 14 | 0 | 1 |
| ██████ (TX) | 18 | 18 | 1 | 0 |
| ████████ (AZ) | 46 | 33 | 0 | 1 |
| ████ (IL) | 98 | 41 | 1 | 0 |
| █████ (PA) | 41 | 38 | 1 | 0 |
| ███████ (TX) | 55 | 50 | 1 | 1 |
| ████ (NY) | 34 | 34 | 0 | 1 |
| ███████ (AZ) | 119 | 102 | 1 | 1 |
| ███████ (AZ) | 311 | 235 | 1 | 0 |
| ████████ (TX) | 800 | 215 | 9 | 0 |
| █████ (TX) | 187 | 112 | 8 | 0 |
| ███████ (AZ) | 200 | 161 | 3 | 0 |
| ███████ (AZ) | 63 | 52 | 2 | 0 |
| █████ (TX) | 60 | 49 | 1 | 0 |
| █████ (TX) | 1065 | 689 | 6 | 1 |
| █████ (TX) | 210 | 185 | 0 | 1 |
| █████ (TX) | 358 | 282 | 4 | 0 |
| ████ (TX) | 48 | 37 | 1 | 0 |
| ████████ (TX) | 345 | 186 | 1 | 0 |
| ██████ (TX) | 69 | 47 | 1 | 0 |
| *Total* | - | - | *47* | *9* |

A COVID-19 health screening protocol for all minors was implemented to follow CDC guidelines for preventing and controlling communicable diseases. As of June 4, 2022, both Pecos and Ft. Bliss facilities have transitioned from EIS to ICF standards. For minors diagnosed with COVID-19, ICF facilities have

---

[9] Figure 7 is the result of data gathered by the ORR Juvenile Coordinator in consultation with DHUC as it pertains to minors diagnosed with and currently isolated for COVID-19 throughout the licensed shelter network. This information reflects the status as of June 10, 2022. Additionally, the bed capacity and census for each shelter is a snapshot in time as this information is constantly changing as developments arise.

established medical isolation areas. Figure 8 below provides details on minors placed in ICF with a positive COVID-19 diagnosis.

*Figure 8: Positive COVID-19 Minors at ICF in Medical Isolation as of June 10, 2022*[10]

| ICF Facility (Location) | Bed Capacity | Beds Occupied | Positive Minors |
|---|---|---|---|
| Ft. Bliss ICF (TX) | 1500 | 1009 | 25 |
| Pecos ICF (TX) | 1034 | 709 | 70 |
| *Total* | - | - | *95* |

## Updates on ORR policies regarding the use of ICF, including policies and procedures to address COVID-19.

As of June 4, 2022, both Pecos and Ft. Bliss facilities have transitioned from EIS to ICF facilities. The CDC continues to provide technical support and guidance to ICF on COVID-19 and communicable disease prevention and control. DHUC meets with CDC several times a week to discuss ongoing guidance, developments and to troubleshoot site-specific issues that arise.

CDC currently recommends the following COVID-19 testing protocol for minors at ICF facilities. Specific protocols are adapted to each ICF as necessary to work within any resource constraints. Minors are tested for COVID-19 prior being transported to an ICF and are tested every three days thereafter. Also, a minor is immediately tested if symptoms of COVID-19 develop.

The routine seven-day COVID-19 intake quarantine for asymptomatic minors who test negative upon arrival has also been discontinued at ICF's. Minors that test positive for COVID-19 are required to be isolated for 10 days from the date the positive test was collected, or 10 days from the date of symptom onset, if symptomatic. Minors exposed to COVID-19 should still be quarantined for seven days and continue to be routinely tested.

ICF facilities are required to report positive COVID-19 rapid antigen test results to the local health department and to ORR. ICF facilities are also required to complete the "Discharge and Transfer Record of Public Health and Medical Information" form for all minors discharged from an ICF. This form accompanies the minor to their final destination to ensure medical services are complete and not duplicated. Medical contractors provide public health and medical care at each ICF facility. The specific contractor at each facility varies. Medical contractors are required to adhere to all of the above requirements.

---

[10] Figure 8 is the result of data gathered by the ORR Juvenile Coordinator in consultation with DHUC as it pertains to minors diagnosed with and currently isolated for COVID-19 in ORR ICF'. This information reflects the status as of June 10, 2022. Additionally, the bed capacity and census for each ICF is a snapshot in time as this information is constantly changing as developments arise.

## COVID-19 Plans on Vaccine Distribution

On March 2, 2021, the President directed all states to prioritize school staff and childcare workers for COVID-19 vaccination, and ORR continues to encourage teachers, school staff, and workers in childcare programs to obtain the vaccination and boosters. HHS determined that staff in organizations caring for minors through the Unaccompanied Refugee Minors (URM) Program and Unaccompanied Children (UC) Care Provider Organizations are eligible for vaccination through this directive as childcare workers.

On June 18, 2022, the CDC endorsed the recommendation that minors ages 6 months through 4 years receive either the Pfizer-BioNTech or Moderna COVID-19 vaccine for prevention of COVID-19. The Food and Drug Administration (FDA) authorized the use of both COVID-19 vaccines for minors ages 6 months through 4 years on June 17, 2022. Distribution of pediatric vaccinations across the country started the week of June 20, 2022.

ORR is currently updating Field Guidance #17 to reflect the expanded age eligibility for COVID-19 vaccination, in addition to other updates, and expects to issue the revised guidance soon. Beginning immediately, care providers should identify a source of the newest pediatric COVID-19 vaccine formulation, and prepare for expanding the COVID-19 vaccination to minors ages 6 months through 4 years in ORR care:

As of June 7, 2022, a cumulative total of 77,339 minors have received the first dose of the COVID-19 vaccine in ORR care (e.g., some minors were vaccinated in home country), and a cumulative total of 28,576 minors have received a second dose in ORR care.

## DHUC Health Services: Year in Review

Within ORR's Unaccompanied Children Programs, DHUC oversees public health screening and the provision of health services to minors in ORR care. DHUC monitors for serious medical conditions and communicable diseases of public health importance through an automated notification system. DHUC responds to care provider programs seven days a week and provides management guidance on communicable diseases, serious mental health conditions, and complex medical cases. DHUC also ensures reporting of public health information to the appropriate public health authorities and coordinates public health responses with the local health jurisdiction.

### Health Care Services

ORR facilitates and funds health care for all minors in-care. ORR has developed its healthcare policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel, and communities. Through ORR's care providers and other healthcare professionals, children receive the following services:

- An Initial Medical Exam (IME)

- Routine medical and dental care

- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception

- Emergency health services

- Immunizations

- Administration of prescribed medications and special diets

- Appropriate mental health interventions

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each minor.

### Initial Medical Examination

Each minor must receive an Initial Medical Examination (IME) within two business days of admission. The purposes of the IME are to assess general health, administer vaccinations in keeping with U.S. standards, identify health conditions that require further attention, and detect communicable diseases, such as influenza and active tuberculosis. The IME is performed by a licensed health care provider (MD, DO, NP, or PA). The IME is based on a well-child examination, adapted for the unaccompanied minors population with consideration of screening recommendations from the American Academy of Pediatrics, the CDC, and the U.S. Preventive Services Task Force. If a vaccination record is not located or a minor vaccination status is not up-to-date, the minor receives all vaccinations in accordance with the ACIP recommended catch-up schedule, approved by the CDC. Minors also receive seasonal influenza vaccine. Data from the IME is entered into a web-based data repository accessible by DHUC staff who routinely monitor reports to ensure care provider programs are adhering to ORR guidelines and timelines. Any minor who is identified through intakes screening or the IME as having a unique medical, urgent dental or mental health need is referred to a specialist (e.g., psychiatrist, cardiologist) for further evaluation.

### Public Health Surveillance

DHUC routinely tracks communicable diseases occurring among minors in care and advises care provider staff on infection prevention, infection control, and public health reporting in line with local, state, and federal public health guidelines. This includes COVID-19, influenza, and other common communicable diseases that might occur in the ORR program setting.

### Staffing

DHUC is currently comprised of 23 medical and public health professionals including five medical officers (two pediatricians, one preventive medicine, two child & adolescent psychiatrists; all board certified in their specialty), three epidemiologists (two at the PhD level), one nurse epidemiologist, two nurse practitioners, one advanced practice psychiatric nurse, two licensed clinical social workers, one data manager, one medical case manager, six medical services coordinators, and one special advisor. Two team members received additional training through the CDC Epidemic Intelligence Service program, a two-year applied epidemiology fellowship. In addition, the three epidemiologists previously worked in infectious diseases at the CDC. Eight members are Commissioned Officers in the United States Public Health Service (USPHS) Commissioned Corps.

As of June 10, 2022, DHUC was working to fill three open positions — the DHUC Director position, a medical epidemiologist position, and a masters-level epidemiologist position. A candidate has been offered and accepted the medical epidemiologist position, with a start date of August 1, 2022. Interviews are underway for the masters-level epidemiologist and will be scheduled for the DHUC Director position in the near future.

Notably, the Mental and Behavioral Health Services Team (MBHST) has grown in number and scope in the last 12 months. In June 2021, a child psychiatrist assumed the team lead position. An additional child psychiatrist and a licensed clinical social worker were added, bringing the team to a total of five full time mental health professionals.

During the influx in referrals in the Spring and Summer of 2021, staffing and coverage were augmented by external deployments of pediatricians, child psychologists, and epidemiologists to support DHUC activities.

### EIS Medical Operations and Communicable Disease Support

Beginning in Spring 2021, DHUC supported medical operations and communicable disease response at the 14 EIS' that were opened to decompress crowded CBP stations during the record influx. DHUC provided medical, mental health, and public health oversight to contractors at EIS' to ensure the health and safety of minors. Oversight included weekly standing phone calls with contractual medical staff and site leadership; the deployment of federal medical and safety officers to bolster infection prevention and control efforts and ensure quality of healthcare; real-time review of clinical cases and communicable disease concerns; training for and auditing of UC Portal documentation via on-site deployments; and regular communication with CDC's Southwest Border Migrant Health Task Force (SBMHTF).

Other DHUC support included monitoring of daily EIS Situation Reports, the sites' completion of health assessments, and administration of ACIP-recommended vaccinations to minors in EIS care. DHUC provided individual consultation and technical assistance regarding minors with special healthcare needs, facilitating immediate transfers from EIS to standard care programs and ensuring continuity of clinical services. DHUC technical assistance culminated in helping support the recent transition of the two remaining EIS to ICF standards.

### COVID-19 Guidance Updates and Trainings

ORR develops and revises COVID-19 mitigation guidance in real-time to keep pace with changes in federal guidance and the scientific understanding of COVID-19. In coordination with CDC, ORR provides and regularly updates written guidance on a variety of COVID-19 mitigation practices, including but not limited to the following: physical distancing; child and staff vaccinations (including boosters); indoor and outdoor use of masks; staff use of personal protective equipment (PPE); cleaning and disinfection within the facility; symptom checks for staff and visitors; routine surveillance testing of well-children and staff; diagnostic testing of minors with COVID-like symptoms; medical isolation of minors and staff confirmed to have COVID-19; and quarantine of minors and staff suspected or known to be exposed to COVID-19. Additionally, DHUC provides tailored guidance to programs regarding unique situations (e.g., foster care environments where medical isolation may be challenging, quarantine and isolation guidance for sibling-pairs where one minor is COVID-infected, etc.).

During the annual reporting period, ORR issued several critical updates to guidance for standard care programs and ICF, including re-issuing Field Guidance #17 to expand recommendations for administering the COVID-19 vaccine to children aged 5-11 years; issuing new 'Return to Work' guidance to help standard care programs cope with critical staffing shortages during the COVID-19 Omicron surge of December 2021; and updating Field Guidance #6 to remove requirements for a routine, intake quarantine of all minors (while strengthening requirements for day-of-arrival testing for COVID-19). Revisions to written guidance were distributed throughout the network and accompanied by webinar-style virtual trainings to facilitate the timely adoption of new guidance and to allow programs to pose questions directly to ORR.

In addition to guidance for standard care programs and ICF's, ORR worked collaboratively with CDC to update COVID-19 mitigation guidance specific to EIS'; the first revision to this EIS-specific guidance document was completed in August 2021, and a second revision has been drafted for expected release in July 2022. ORR and CDC meet regularly with onsite medical staff at the EIS facilities (which have recently converted to ICF) to respond to COVID-19 and other communicable disease inquiries and provide tailored solutions.

### Mental and Behavioral Health

The daily work of the DHUC/MBHST involves tracking acute psychiatric hospitalizations, reviewing behavioral health significant incident reports and treatment authorization requests for behavioral care and psychological evaluations, and answering questions from the care provider network. The team also reviews every case in residential treatment (including out-of-network facilities) every thirty days to ensure the minor meets the criterion for remaining in a residential level of care. DHUC/MBHST provides technical assistance and clinical consultations to care providers and has partnered with external professional organizations to help with these consultations.

ORR appointed a Special Advisor to assist with evaluating behavioral health services. Over 45 hours of interviews were conducted to gather concerns from various stakeholders in ORR, in the care provider network, and in partner organizations. From those concerns, DHUC/MBHST is utilizing the feedback as consideration for future improvements.

ORR health forms completed by healthcare and mental health providers were updated to reflect an emphasis on recognizing symptoms that are transient and not necessarily indicative of serious mental illness. At the same time, the new forms allow for a clinical diagnosis when indicated.

Multiple mental and behavioral health trainings for care providers were conducted over the annual reporting period, to include: webinars to increase cultural competence – Afghan culture, holidays and food; caring for children with loss and trauma; and appropriate use of psychological testing.

Finally, DHUC/MBHST established partnerships with external partners to collaborate on several ongoing projects. These projects include: developing a training for shelters on trauma-informed approaches to care; creating a behavioral care framework that clearly defines a continuum of services (i.e., preventative services for all minors; highly intensive care for minors in need); and education of care provider staff about child-focused care and engaging minors in the therapeutic environment.

## Minors with Special Health Care Needs

To ensure proper and appropriate medical service delivery to those in need, DHUC continues to identify and monitor minors with special health care needs while in ORR care. During the annual reporting period, DHUC provided technical guidance and oversight to care provider staff for nearly 3,000 minors with special health care needs. These minors had a variety of medical conditions including, but not limited to, cardiac, oncologic, genetic, obstetric, ophthalmologic, gastrointestinal, autoimmune, and developmental conditions. DHUC worked with care provider staff to secure access to appropriate medical providers nationally.

Through ongoing collaboration with external pediatric advocacy stakeholders and academic medical centers, DHUC expanded the pool of pediatric specialists available to evaluate and provide clinical services to unaccompanied children with special health care needs while in ORR care. These medical specialists are urged to continue providing services after unification, if possible.

Additionally, approximately 150 serious medical procedure requests were reviewed and approved during the annual reporting period, to include cardiac, orthopedic, ENT, urologic, and dental surgeries. DHUC facilitated successful ORR placements and coordination of care for minors who sustained traumatic falls from the border wall, which caused complex orthopedic injuries. Additionally, ORR and DHUC worked closely with an out-of-network hospital, care provider, child advocate, and legal service provider to secure ongoing rehabilitation services for a minor who sustained a traumatic brain injury enroute to the U.S. and subsequently aged-out of ORR care. In another case, DHUC supported the transfer of care for a two-year-old minor with a severe underlying neurologic disability, hospitalized for over a year at an acute rehabilitation hospital in Texas, to the care of an ORR care provider foster family in Michigan.

## Tuberculosis

As part of the IME, minors receive a tuberculosis (TB) screening that can result in a diagnosis of latent tuberculosis infection (LTBI). LTBI requires 3-9 months of treatment to prevent potential progression to active TB disease, a threat to both the individual's and the public's health. Minors are not routinely treated for LTBI while in ORR care because the average length of stay is typically shorter than the time required to compete treatment, and because there could be negative effects from discontinuing LTBI treatment before completion, such as developing drug-resistant TB. In 2018, DHUC developed a post-unification LTBI reporting system to help states identify unified minors with LTBI living in their state. This process uses the CDC's Epi-X system, a web-based network that allows for the secure transfer of LTBI data between ORR and State TB control programs. Due to the shift in focus to pandemic response and the recent influx, this notification system was paused but brought back online at the end of 2021, with 42 jurisdictions receiving reports.

Minors with LTBI who remain in ORR care for 3 months or more are recommended to be seen by the local public health department TB clinic to start treatment. To ensure these minors are receiving treatment, DHUC began a new quality assurance process to identify minors with LTBI who have been in care greater than 3 months and those likely to be in care greater 3 months.

<u>Support of Operation Allies Welcome</u>

In conjunction with the U.S. Department of Homeland Security (DHS), DHUC provided technical assistance in support of medical operations and screening protocols at Dulles Airport, the primary port of entry for Unaccompanied Afghan Minors (UAM) during the initial phase of Operation Allies Welcome (OAW). DHUC also supported 157 UAM designated as medically complex, either through direct care services provided while physically placed at ORR care facilities or virtually as referrals from Ports of Entry, Safe Havens (DOD Installations) or OCONUS (outside the contiguous U.S.)- Lily Pads. To support the language and cultural needs of UAM, ORR and DHUC partnered with Afghan professional organizations to provide Afghan child health workers, interpreters, mentors, and culturally-specific training for care provider staff.

# ORR's Support of Special Populations

## Unaccompanied Afghan Minors

### BACKGROUND:

In the final days of the War in Afghanistan in mid-to-late 2021, Operation Allies Welcome (OAW) saw a record number of at-risk Afghans evacuated from Afghanistan. These at-risk Afghans included minors who were unable to be accompanied by a parent or legal guardian. Once these minors reached safety in the U.S., many were referred to ORR's care as Unaccompanied Afghan Minors (UAM).

### EFFORTS:

Efforts to aid OAW can be broken down into two phases: Phase 1) the initial arrival of families and minors to the overseas military bases and safe havens (US state side military bases); and Phase 2) involved subsequent efforts to place minors in standard and appropriate care settings. Phase 1 has been completed and Phase 2 remains ongoing.

### PHASE 1:

Phase 1 began with the evacuation after the fall of the Afghan government and the implementation of OAW. Due to the emergent nature of the Afghan evacuation, many agencies were not prepared in advance for the implementation of OAW. However, close interagency collaboration with ORR federal partners (i.e., Department of State (DOS) and DHS) allowed minors arriving at safe havens to be identified and transferred into ORR custody as quickly as efforts could mobilize. Phase 1 focused on making sure minors were safe and moved into appropriate care. During this time, efforts to quickly reunify identified UAM's directly with their sponsors were made from either safe havens, or from ORR programs.

### PHASE 2:

Phase 2 involves the transfer of Afghan minors identified as UAM from safe havens to ORR programs. This phase is ongoing and will continue until all UAM are placed in ORR custody. Recognizing that UAM are not a population typically in ORR's Unaccompanied Children's Program, ORR initially placed most UAM at Starr Commonwealth EIS, which enabled ORR to provide focused culturally appropriate services for the UAM

population. However, Starr Commonwealth EIS was a temporary placement designed to address the rapid and unexpected need to accommodate UAM. Therefore, ORR promptly transferred UAM to ORR's licensed programs as soon as feasible. Due to the sudden arrival of UAM, ORR programs experienced some challenges immediately adjusting their operations to balance serving the unique cultural needs for UAM while continuing their traditional care for their typical population of minors (i.e., minors from Central America). However, with support from ORR and engagement of Afghan community stakeholders, the programs are making the necessary adjustments and addressing the challenges.

### SUPPORTING UAM IN-CARE:

The ORR policy team collaborated with grantees and other partners to address the challenges described in Phase 1 and the ongoing challenges in Phase 2 through policy implementation as well as various trainings and weekly care provider calls (starting November 2021). The following list includes information regarding other efforts and successes to combat some of the challenges:

- Issuance of Field Guidance #19: Unaccompanied Afghan Minor Processing

- Issuance of (2) FAQ documents: 1) ORR Unaccompanied Afghan Minor FAQ#1 and FAQ #2

- Updated portions of the safety and wellbeing call checklist to better reflect the cultural needs of discharged UAM

- Released translation of key documents into Dari and Pashto languages

- Issuance of Field Guidance #22: Interpreters Working with the Unaccompanied Children (UC) Programs for UAM care providers to access translation services

- Implementation of trainings on cultural competencies such as Ramadan (one of the holiest months of the year for Muslims), nutrition, and family reunification

- Creation of a UAM resource mailbox for use by care providers with questions pertaining to the care of UAM

- Ongoing contract with a third-party contractor to allow for additional case management support at UAM care provider facilities

- Mentorship and support from local Afghan communities

- Collaboration with the Unaccompanied Refugee Minors (URM) program to expeditiously place UAM who are accepted into URM placements

The above list is not exhaustive as efforts to support the UAM in care remain ongoing. As of May 26, 2022, ORR received referrals for approximately 1,489 UAM and discharged approximately 1,344 UAM, with a total of 152 UAM still in ORR care.

### Ukrainian Efforts

Unlike the planned evacuation of UAM, the Ukrainian minors in ORR care are not part of any evacuation plan. Most of these minors arrive at the U.S. border and are referred to ORR in the traditional manner.

ORR is working to place Ukrainian minors with programs located near communities with culturally appropriate resources. ORR is also translating key documents into the Russian and Ukrainian languages. From March 1, 2022 to June 2, 2022, there were 74 Ukrainian minors who were referred to ORR; with three minors physically in ORR care and a total of 71 minors who were discharged.

### Haitian Efforts

During fiscal year 2022, ORR has seen a significant increase in the number of Haitian children arriving at the southwestern border of the United States. Many of the Haitian immigrants initially fled their country due to social unrest and scarcity of resources. As with Ukrainian minors, ORR attempts to place Haitian minors at programs situated near communities with culturally appropriate resources. Therefore, ORR has designated four ORR programs in Florida for the placement of Haitian minors. However, Haitian minors are periodically placed at other ORR programs when the Florida based programs reach maximum capacity.  ORR attempts to place Haitian minors together and assists programs in locating Haitian Creole interpreters.

From September 1, 2021 to May 26, 2022, there were 349 Haitian minors who were referred to ORR; with 79 minors physically in ORR care, one minor who was enroute, and 269 minors who were discharged.

## Placement in Restrictive Settings

ORR maintains a variety of placement settings based on the individual needs of unaccompanied minors. Though the majority of minors are placed in least restrictive settings such as shelter and transitional foster care, ORR has capacity for those minors who require a heightened level of care and supervision.  As mandated by law, ORR places a minor in the least restrictive setting that is in the best interests of the child. Currently, ORR has three specialized levels of care to accommodate those minors who require a heightened level of care and supervision. The program types include Staff Secure, Therapeutic Staff Secure, Secure, and RTC. Anytime a minor is placed in a Staff Secure, Secure, or RTC there is an extensive process to determine if the minor qualifies for these levels of care.

### Staff Secure

The ORR Policy Guide in Section 1 describes all of the considerations regarding placement and transfer. Readers should refer to the Policy Guide for such standards.

Per the ORR Policy Guide Section 1.2.4: Secure and Staff Secure Care Provider Facilities and Children Entering the United States Unaccompanied:

A staff secure care provider is a facility that maintains stricter security measures, such as higher staff to minor ratio for supervision, than a shelter in order to control disruptive behavior and to prevent escape. A staff secure facility is for minors who may require close supervision but do not need placement in a secure facility. Service provision is tailored to address a minor's individual needs and to manage the behaviors that necessitated the minor's placement into this more restrictive setting. The staff secure atmosphere reflects a more shelter, home-like setting rather than secure detention. Unlike many secure care providers, a staff secure care provider is not equipped internally with multiple locked pods or cell

units. In almost all states, staff-secure providers maintain identical type of license as a non-secure care provider, and for such purposes are not viewed as different from a non-secure care provider.

Those minors who have been identified for a staff secure setting have either arrived by transfer, or as a direct referral from ORR Intakes. In placing minors in Staff Secure via transfer or direct intake, ORR considers if the minor:

- Has engaged in unacceptable behavior that has proven to be unacceptably disruptive to the normal functioning of a shelter care facility such that a transfer is necessary to ensure the welfare of others;

- Is an escape risk;

- Has reported gang involvement (including prior to placement in ORR custody) or displayed gang affiliation while in care;

- Has non-violent criminal or delinquent history not warranting placement in a secure care provider facility, such as isolated or petty offenses; or,

- Is ready for step down from a secure facility.

Additionally, the referring ORR Care Provider must conduct ongoing assessments and staff the minor's case with a Case Coordinator and FFS prior to referral. Once it has been determined that the minor can be referred to Staff Secure, the referring ORR/GDIT Case Coordinator refers the minor's case to a Staff Secure provider who reviews the case and determines if the minor is appropriate for their facility. If the minor meets the receiving Staff Secure criteria and does not violate their state licensing requirements, the minor will be accepted.

### Residential Treatment Center (RTC)

Section 1.4.6 of the ORR Guide provides information on placement in an RTC. When a minor has been recommended into an RTC, a licensed psychologist or psychiatrist must have determined that the youth is a danger to self or others. In addition, ORR will consider transfer to an RTC only if a licensed psychologist or psychiatrist has determined the following:

- The minor has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis).

- The minor's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting.

- The minor requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities.

- The minor presents a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as, medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24-hour supervision,

supportive services or therapeutic services). Currently, ORR operates a total of six Staff Secure facilities, two of which are Therapeutic Staff Secure facilities.

An RTC is a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services and interventions. RTC's provide highly customized care and services to individuals following either a community-based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. ORR uses an RTC at the recommendation of a psychiatrist or psychologist or with ORR Treatment Authorization Request (TAR) approval for a minor who poses a danger to self or others and does not require inpatient hospitalization. Unlike acute care psychiatric hospitals that offer emergency and/or life-threatening mental health services, RTC provide longer term therapeutic services to treat mental health needs. Those minors who enter RTC facilities are referred from various ORR facilities throughout the United States. Prior to a minor being considered for RTC, the referring ORR care providers must conduct ongoing assessments and staff the minor's case with Case Coordinator and FFS prior to referral. Once the psychological or psychiatric evaluation has been completed, and the minor has been recommended for RTC placement, the referring Case Coordinator refers the minor to an RTC placement who reviews the case and makes the determination whether the minor is appropriate for their facility. The transfer process to an RTC is the same as Staff Secure programs with the exception that minor must have a recommendation from a licensed clinical psychologist or psychiatrist prior to referral. Currently, ORR operates three RTC's in the United States.

## Secure

A secure setting is a facility with a physically secure structure with staff who are able to control violent behavior. ORR uses a secure facility as the most restrictive placement option for a minor who poses a danger to self or others or has been charged with having committed a criminal offense. A secure facility may be a licensed juvenile detention center or a highly structured therapeutic facility. An ORR secure facility receives minors as direct referrals from the ORR Intake Team, or transfers from various ORR Care Providers. One or more of the following is required for a minor to be placed in a secure facility:

a) Has been charged with a crime, is chargeable with a crime, or has been convicted of a crime; or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; and assesses whether the crimes or delinquent acts were:

- Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon (e.g., breaking and entering, vandalism, DUI, status offenses, etc.); or

- Petty offenses which are not considered grounds for a stricter means of detention in any case (e.g., shoplifting, joy riding, disturbing the peace).

b) Has committed, or has made credible threats, to commit a violent or malicious act while in ORR custody;

c) Has committed, threatened to commit, or engaged in serious, self-harming behavior that poses a danger to self while in ORR custody;

d) Has engaged in conduct that has proven to be unacceptably disruptive of the normal functioning of a staff secure facility in which the youth is placed such that transfer may be necessary to ensure the welfare of the minor or others;

e) Has self-disclosed violent criminal history in ORR custody that requires further assessment; or

f) Has a history of or displays sexual predatory behavior, or has engaged in inappropriate sexual behavior

Prior to a minor being considered for Secure care, referring ORR care providers must conduct ongoing assessments and staff the minor's case with a Case Coordinator and FFS prior to referral. Once it has been determined the minor can be referred to Secure, the referring Case Coordinator refers the minor to a Secure provider who reviews the case and makes a determination if the minor is appropriate for their facility. Currently, there is one ORR secure facility in the United States.

<u>Out of Network Placements</u>

Since 2015, ORR's Policy Guide (at section 1.2) has provided that "ORR makes every effort to place children and youth within the ORR funded care provider network. However, there may be instances when ORR determines there is no care provider available within the network to provide specialized services needed for special needs cases. In those cases, ORR will consider an alternative placement. An ORR Supervisor and ORR Project Officer must approve these placements."

ORR ensures the safety of minor in Out of Network (OON) Placements by continuing to monitor their progress throughout the life of the case and ensuring that minor's case plan goals continue to be pursued, whether it be family reunification or an alternative case plan goal.

OON placements are state-licensed childcare facilities that provide care to those minors who exhibit significant mental health or special needs that cannot be met within the ORR care provider network. In order for a minor to enter an OON placement, the minor must receive a psychological or psychiatric evaluation recommending a level of care that ORR cannot secure in its existing network. Prior to a minor being referred to OON provider, the minor must be referred and denied by all recommended ORR placements. Additionally, the minor's case must be reviewed by the FFS Supervisor of Special Populations prior to referring a minor to an OON placement. Once it has been determined that OON placements can be explored for the minor, the minor's attorney of record must be notified.

When the minor is accepted to the OON placement and is transferred to the program, the ORR referring program must continue to actively work on the minor's family reunification case and or concurrent case plan goal. The managing ORR care provider must maintain regular contact with the OON provider to ensure the OON is providing the minor with regular contact with minor's attorney of record, child advocate, and if necessary, the consulate or embassy. The managing ORR care provider participates in weekly staffing's with the OON placement and receives regular reports and incident reports. Any concerns identified by the assigned ORR care provider must be elevated to ORR. In addition, the assigned ORR care

provider ensures the minor maintains their regular approved contacts with family. The FFS and or Contract Field Staff (CFS) conducts monthly visits with the minor and meets with OON placement to discuss any concerns as they arise. The assigned FFS works in collaboration with the OON care provider and the assigned ORR care provider to ensure all the guidance is followed and the minor's case continues to move towards the case plan goal.

Notice of Placement

Once a minor enters a specialized level of care such as a Staff Secure, RTC, Secure, or OON placement setting, the ORR care provider must review the Notice of Placement (NOP) with the minor within 48 hours of placement. At this time, the assigned Case Manager at the ORR facility will review the NOP in the minor's language of their understanding. The Case Manager at the ORR Care Provider facility must select the reason(s) on the NOP that led to the minor's placement and provide additional narrative as to why the minor was placed the Staff Secure, RTC, Secure, or OON placement setting. The NOP is reviewed every 30 days or earlier to determine if the minor should remain in placement or be transferred to a less restrictive setting. At any time, the minor may request a formal review of their NOP and request an attorney or child advocate to support them in contesting their existing placement.

In addition, on a weekly and monthly basis, the ORR Flores Compliance Team reviews every minor's NOP to ensure the Staff Secures, RTC and Secures are in full compliance with the NOP procedures and placement criteria. Each month, the Flores Compliance team reviews each minor's NOP to ensure each minor is placed properly and that the reasons for placement are documented appropriately on the NOP. In addition, the Flores Compliance Team checks whether each NOP was completed within the mandated timeframes and that the NOP was reviewed with the minor in their preferred language.  If these milestones are not captured accurately on the NOP, ORR holds the program accountable by citing them with a Corrective Action Plan that informs them of the specific violation. The program is then required to submit a plan to ORR explaining how the Corrective Action will be resolved. The Flores Compliance Team has provided multiple trainings to all the ORR facilities and continues to provide training as needed.

Figure 7 below displays the total number of NOP reviews conducted by each type of restrictive setting during the annual reporting period. This figure also provides the total number of corrective action plans issued to ORR care providers as a result of the NOP's that were found to be noncompliant with ORR policies and procedures.

*Figure 9: ORR NOP Reviews by Restrictive Setting*

| Restrictive Facility Type | NOP Reviews | Corrective Action Plans |
|---|---|---|
| Secure | 396 | 2 |
| RTC | 751 | 7 |
| OON | 183 | 9 |
| Staff Secure | 377 | 20 |
| *Total* | *1707* | *38* |

Those minors who have been identified for transfer to Staff Secure, RTC, or Secure go through a vigorous process to determine if they qualify for such a placement based on the NOP criteria. In addition to the NOP criteria, the ORR care provider, Case Coordinator and FFS must consider the totality of the case when

conducting a transfer. All evidence such as the minor's family reunification case status, legal status, medical, behavioral and mental health issues, and current functioning in the facility must be considered. Once it has been determined that the minor meets criteria for transfer, the Case Coordinator distributes the transfer request to the recommended program. The receiving program reviews the transfer request to determine if the minor meets their criteria and does not violate their respective State childcare licensing requirements. Once the minor is accepted and transferred to the receiving care provider, the minor and the new Case Manager review the NOP and the reasons why the minor was transferred. The minor, and minor's family/potential sponsor, local DHS office, Executive Office of Immigration Review (EOIR), and Child Advocate (if applicable) are all notified of the minor's transfer. The receiving program continues to work on the minor's primary case plan.

## Appeals of More Restrictive Placement Decision

Minors placed in more restrictive settings are able to appeal either their placement decision or the fact that they may not be released due to danger through various methods. The first method is by requesting a Flores Bond Redetermination Hearing (FBRH), which is available to all minors in ORR custody irrespective of the level of placement. The second method is by requesting an administrative review by ORR's Placement Review Panel (PRP). Each method is discussed below.

## Flores Bond Redetermination Hearing

Soon after admission to an ORR facility, all minors receive the Legal Resource Guide, which includes a copy of the Flores Bond Redetermination Hearing (FBRH) forms in English and Spanish. In addition, minors placed in Staff Secure, Secure, RTC, and OON facilities are reminded of their option to request an FBRH and are provided an opportunity to do so during their review of the NOP. The explanation and opportunity are provided to those minors in a more restrictive placement every 30 days and at the time their NOP is reviewed. In addition, minors are able to request an FBRH at any time while in ORR custody. In an FBRH, the immigration judge decides whether the minor poses a danger to the community. For the majority of minors in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. For these minors, a bond hearing is not beneficial. An immigration judge does not rule on any of the following: a) release to a sponsor; b) the minor's placement or conditions of placement while in ORR custody; or c) release a minor on their own recognizance, although ORR will take into consideration the immigration judge's decision about the minor's level of danger when assessing the minor's placement and conditions of placement.

For a minor without an attorney of record, ORR facilitates their FBRH request by filing it on their behalf with the Immigration Court in the area where they are placed. ORR also files responsive documents, which either contest the minor's position or indicates that ORR does not consider the minor a danger to self or the community.

During the annual reporting period, there were two (2) minors who requested a FBRH for reconsideration of placement in a Staff Secure and RTC facility (October 2021 and November 2021 respectively); both of the minors' requests were withdrawn via their attorney.

<u>Placement Review Panel</u>

In addition, minors can appeal their continued placement in a restrictive facility by requesting an administrative review before a panel of ORR staff. This administrative review is called the Placement Review Panel (PRP). The ORR staff are senior personnel who have several years of experience as professionals in the fields of child welfare, mental health and related policy. They are also veteran HHS staff, with experience in ORR's UC Program.

The PRP ensures that the minors (or their attorney of record) review any evidence supporting their continued placement at the secure or RTC placement prior to holding the panel. In addition, the minor (or their attorney) can opt to provide the PRP a written statement and/or request a hearing. It is the minor's decision whether to have both a written statement and a hearing or elect to engage in only one of the options. In cases where the minor does not have an attorney of record, ORR encourages the care provider to seek assistance for the minor from a contracted legal service provider or a Child Advocate. ORR also arranges for the Juvenile Coordinator to act as an advocate for the minor if needed. After reviewing the evidence, statements, and holding the hearing (if elected), the PRP provides the minor a written decision regarding their placement. During the current annual reporting period, five (5) minors requested a PRP. Two of the minors subsequently withdrew their request, the PRP determined that two of the minors should be stepped down (and they were subsequently stepped down) based on the panel's decision, and the PRP maintained the restrictive placement for one minor.

## Services at ORR Licensed Facilities and EIS

<u>Case Management Services</u>

Case managers initiate and direct the reunification process between the minors and their designated sponsors. During the reunification process, it is important that case managers attend to the minors needs by frequently meeting with them, referring appropriate childcare services, and following up on the services and needs of the minor. Also, case managers work closely with the FFS and case coordinators to advance cases and recommend release, reunification, or transfer of the minor to another facility.

When initiating a minor's case, case managers must first meet with the minor to orient them on the reunification process, check on immediate needs, and conduct assessments. Generally, case managers will try contacting parents/legal guardians in home country before contacting other potential sponsors. To do this, case managers must first confirm contact information for parents/legal guardians of the minor and verify their identity and relationship to the minor. Once the relationship is verified, the Case Manager obtains the information pertaining to a potentially viable sponsor and contacts the sponsor in order to verify identity and knowledge of the minor. Subsequently, the Case Manager assists the sponsor with the Family Reunification Application (FRA). The Case Manager will maintain continuous communication with the sponsor through the reunification process; assessing suitability for minors' safety, informing the minors of their case status and needs while in ORR care, and assisting with completion of the reunification process.

Case managers frequently meet with minors to follow-up on updates on case status. Additionally, case managers work closely with mental health clinicians to foster and maintain the health and well-being of

the minors in care. Case managers also facilitate contact with child advocates and legal representatives and alert other staff about the minor's needs.

The primary role of a Case Manager is to facilitate the reunification of minors and sponsors; however, cases where there is no sponsor (Category 4), the Case Manager may recommend the minors be transferred to a LTFC and/or other childcare programs. The Case Manager communicates with other appropriate program personnel throughout the reunification process, which allows for informed recommendations for the safe and timely release of the minors in care; this can involve recommendations for home studies before discharge or after care planning such as referrals for post-release services.[11]

### HIGHLIGHTS, CHALLENGES, AND SOLUTIONS:

By June 2021, ORR operations began stabilizing from the unprecedented rate of referrals which had led to delays in case management services in some of the EIS. It was during this time that ORR began to ramp up the hiring and training of case managers. ORR provided solutions to alleviate the pressure and demand for case management services by contracting with non-governmental organizations to provide additional case management staff where needed. In addition, ORR issued field guidance in support of the timely process and release of minors. In March 2021, ORR issued Field Guidance #10: Expedited Release for Eligible Category 1 Cases for the expedited release of eligible Category 1 cases. ORR has prepared this field guidance to best serve minors in ORR custody who have parents/legal guardians or other potential Category 1 sponsors in the U.S. In May 2021, ORR issued Field Guidance #15: Release for Eligible Non-Sibling, Closely Related Children to a Category 1 or Category 2A Sponsor, which allows for certain minors to be released to their parents or legal guardians (or Category 2A sponsors) using specialized procedures that modify standard release requirements under the ORR Policy Guide. Additionally, under ORR Policy Guide Section 2.2.3, case managers are permitted to complete the FRA for some sponsors.

ORR also implemented initiatives that addressed delays in the fingerprinting process. In addition to offering fingerprinting services at ORR Digital Fingerprinting sites or via mailed fingerprinting cards, ORR contracted with FieldPrint to establish additional locations. Through this expansion of fingerprinting services, case managers are able to arrange fingerprinting of sponsors within three days and rapidly process fingerprint results.

Lastly, ORR recruited federal agency employees to serve on temporary details as case managers at ORR programs. This additional case management support allowed for compliance with ORR policy as it pertains to the ratio of case managers to minors. Furthermore, ORR programs extended the provision of case management services to evenings, weekends, and holidays in adherence with ORR Policy Guide Section 2.3.2.

### Recreational Services

ORR programs must provide minors with at least one hour of outdoor, large muscle activity daily. Programs also provide minors with at least one hour of structured leisure activities daily; such as reading, board games, table tennis, TV/movies, arts and crafts, etc. Programs may also arrange for off-site outings such as playing soccer at a local soccer field, watching movies at a local movie theatre, etc. On days where

---

[11] Post release services coordinate referrals to supportive services in the community where the minor resides and provide other child welfare services, as needed.

minors do not have to attend school, their time for outdoor activities increase to a total of three hours (weather permitting).

**HIGHLIGHTS, CHALLENGES, AND SOLUTIONS:**

By June 2021, ORR addressed challenges that were encountered due to COVID-19 protocols by reestablishing recreational areas for socially distanced activities (e.g., table tennis or yoga). Also, there were initial challenges experienced at EIS with providing minors access to outdoor play due to concerns regarding child safety. However, by June of 2021, EIS overcame these challenges by designating outdoor play areas while still adhering to social distancing guidelines.

## Educational Services

ORR assesses each minor individually to determine academic level and needs within 72-hours of a minor's arrival. With this assessment, program staff plan educational services that are appropriate to each minor's level of development and ability to communicate by grouping them into classes according to their respective academic development rather than by age.

ORR programs must provide at least six hours of school (Monday – Friday), concentrating primarily on coursework pertaining to Science, Social Studies, Math, and English, and must provide content that is sensitive to the cultural differences of the minors in care.

**HIGHLIGHTS, CHALLENGES, AND SOLUTIONS:**

During the annual reporting period, the social distancing protocols for COVID-19 caused challenges across the ORR network. ORR Programs utilized technology for providing educational services to minors by continuing to teach students via the use computers and digital tablets. Prioritizing COVID-19 safety protocols still allowed minors to resume learning in classroom settings in most cases. Furthermore, EIS facilities dedicated areas for administering classroom time.

## Calls or Visits with Sponsors and Family

ORR programs provide minors with at least two, ten-minute phone calls per week to pre-screened family members and sponsors. ORR Programs keep a list of authorized callers or call recipients, and phone calls occur in a private setting. Program personnel administer these phone calls at designated times. Case managers and clinicians can also conduct additional supervised calls.

With regard to visitation between minors and their family members, care providers must provide an alternative public place to conduct these visits. ORR program staff supervise the visits accordingly.

**HIGHLIGHTS, CHALLENGES, AND SOLUTIONS:**

During the annual reporting period, there were challenges to these services above due to the continued development of EIS. The challenges and staff shortages and training of case managers at EIS contributed to delays in timely access to phone calls and difficulty tracking phone call logs. However, these issues improved with the continuing development of infrastructure and related staffing levels. ORR Programs, including EIS, established schedules and phonebank teams to prioritize the minors' access to phone calls.

<u>Legal Services</u>

During the reporting period, ORR's sub-contracted legal service providers (LSP) offered minors Know Your Rights (KYR) presentations and conducted legal screenings within 10 business days of the minor's admission to an ORR facility. In addition, the LSP expanded their services to providing KYR presentations and legal screenings for minors discharged from ORR custody before receiving the services. The expansion to offering post-release KYR presentations and legal screenings was implemented to accommodate ORR's initiatives to expedite release of minors to sponsors. At the discretion of the attorney and the minor, LSP offered minors ORR funded direct representation on the minor's immigration related cases. The LSP also offered court assistance and court preparation services to minors.

## Policies & Field Guidance for Program Improvements

<u>Family Reunification Process and Case Management</u>

ORR consistently reevaluates its policies and procedures to ensure they are unifying minors in ORR custody with approved sponsors in the safest and most efficient manner possible.

Since May of 2021, ORR has made numerous improvements to the case management and family reunification process to allow ORR to best serve the minors in its care and respond to the influx of minors referred to ORR custody. These improvements have included changes to <u>ORR Policy Guide Section 2.3.2</u>, allowing ORR to require that care providers extend case management service hours to include evenings, weekends, and holidays.

ORR has worked to expedite the sponsor assessment and reunification process by incorporating Field Guidance #14 into <u>ORR Policy Guide Section 2.2.3</u>, allowing case managers to assist sponsors in filling out the family reunification application (FRA) during the sponsor interview. Field Guidance #14 also allows the sponsor to send a picture of the signed signature page once he or she has verified the information contained in the application, speeding up the process.

Efforts to streamline the sponsor assessment process also included updates to the sponsor assessment forms aimed at removing duplicative questions and easing the burden on the FFS and case managers. ORR's Manual of Procedures (MAP) was modified to reflect those updates. This change eliminated the requirement for the potential sponsor to provide proof of immigration status or U.S. citizenship, which previously posed a challenge to potential sponsors, and in some cases, led to delays in the sponsor evaluation process.

To best address the challenges of releasing minors to approved sponsors during an influx period, ORR issued a revised "Fly Out Guidance" in May 2021, which informed care providers that ORR would cover the entirety of travel and escort costs associated with the release of minors to approved sponsors. ORR's MAP was modified to incorporate broader language relating to the case manager's role in assisting in the arrangement of transportation.

In June 2021, ORR issued <u>Field Guidance #18: Expansion of Long-Term Foster Care Eligibility</u> to best serve minors where no viable sponsorship option is available. The field guidance expands eligibility to Category

4 cases in which a minor: (1 remains without viable sponsorship options; 2) is currently placed in a state-licensed ORR care provider shelter; and (3 and is not otherwise ineligible under Policy Guide Section 1.2.6.

## Background Checks

To meet increasing background check needs and mitigate any delays to the release process, ORR expanded the availability of fingerprinting services through new contracts with Lutheran Immigration and Refugee Service (LIRS) and FieldPrint. The new contract with LIRS expanded the number of ORR digital sites – which there are currently fifty-seven (57) sites. ORR's contract with FieldPrint introduced over 1,400 new locations where potential sponsors, adult caregivers, and adult household members may attend a digital fingerprinting appointment, with results typically received within 24 to 72 hours upon completion. As part of this expansion, ORR updated Section 2 of the MAP to incorporate guidance on scheduling fingerprinting appointments at the new ORR LIRS Digital Sites and FieldPrint locations. These updates include screening procedures for determining if a potential sponsor, adult caregiver, or household member is a good candidate for an appointment at a FieldPrint site.

## Home Studies

ORR modified ORR Policy Guide Section 2.4.2 to clarify mandatory home study requirements for children under the age of 12, recognizing that home study requirements may introduce delays in the sponsor assessment process prior to release to a non-relative sponsor. The revision also clarified that home studies are required where a non-relative sponsor has previously sponsored (or attempted to sponsor) additional minors, even when those previously-sponsored minors were related to the sponsor and there were no safety concerns.

In September 2021, ORR issued Field Guidance #20: Home Study Processing to streamline the sponsor assessment and review process and eliminate undue delays. This guidance grants care providers permission to conduct background checks and home studies concurrently and exempted sponsors and household members in Category 1 cases from the enhanced background checks that are typically required when a case is referred for a home study (the exemption applies only where there are no specific safety concerns with the sponsor or household members).

In May 2021, ORR also introduced a revised version of Field Guidance #5: Home Study/Post Release Services COVID-19 Practice Guidance to address the unique challenges COVID-19 presented to ORR's commitment to the safe and timely release of minors to approved sponsors. The revised version allows virtual home studies to be conducted in states that allow for them, without the provider having to first request a waiver from ORR.

## Unaccompanied Afghan Minors (UAM)

In November 2021, ORR issued Field Guidance #19: Unaccompanied Afghan Minor Processing in support of Afghan minors coming to the U.S. as part of evacuation efforts in Afghanistan. This guidance directs field staff to make best interest decisions on a case-by-case basis and sets forth standards for such determinations when evaluating whether Afghan minors should be referred to ORR or if they should remain with a trusted accompanying adult caregiver.

ORR also recognizes the challenges faced by Unaccompanied Afghan Minors (UAM) and their potential sponsors. To address questions identified in the field, ORR has released a FAQ document to address, among other topics: SIR reporting; minimum required services; medical and dental services; mental health services; and religious services. A second FAQ document regarding available legal services was released that covers: UAM lawful immigration status; admission into the UC program for UAM; change of address procedures; interpreting; age redetermination and age outs; family reunifications; Long Term Foster Care (LTFC); and the Unaccompanied Refugee Minor (URM) program. ORR continues to collect and address questions relating to UAM for consideration in future policy updates.

In addition to the referral protocols and case processing standards, ORR has developed instructions for care providers to ensure that UAM are being connected to appropriate resources, such as Afghanistan Placement Assistance, after discharge.

## Services in ORR Custody

In May of 2021, ORR issued Field Guidance #16: Clarification That the Individual Service Plan (ISP) and the UC Case Review Are Generally Not Required for Unaccompanied Children (UC) Placed at Emergency Intake Sites (EIS). This guidance determines that individual service plans and minors' case reviews are not generally required at the EIS. ORR released Case Management Standard Operating Procedures and FAQ for emergency influx sites to provide guidance for safe and timely discharge of minors. Each site can tailor the Standard Operating Procedures to site-specific roles, responsibilities, and areas.

## Initial Medical Examination

ORR has changed its procedures for age determinations when appropriate documentation is missing or conflicting. Reference to outdated skeletal maturity assessments have been removed, and the guidance now emphasizes that age determinations are made using multiple forms of evidence and are based on a totality of this evidence.

## Medical Services

In October 2021, Field Guidance #21: ORR issued Compliance with Garza Requirements for Pregnant Unaccompanied Children in Texas. This guidance includes updated procedures for caring for pregnant minors, in compliance with the *Garza* ruling, regarding appropriate reproductive health care, transport, confidentiality, notification, and release decisions. To ensure that minors are being appropriately informed of their health care rights, the Field Guidance clarified that all facilities, including EIS, are required to post the *Garza* notice in Spanish and English, and to review the notice individually with all female youth during their orientation. Staff are directed to consult with the clinical or medical team to determine if the *Garza* notice should be reviewed with a tender-age minor or a youth who identifies as male, on a case-by-case basis. Field Guidance #21 addresses care providers in Texas. ORR is currently reviewing the guidance in light of the Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Org.*

## Mental Health Services

To ensure both the physical and mental health needs of minors in care are being met and prioritized, Division of Health for Unaccompanied Children (DHUC) issued guidance for clinicians and FFS' on the types

of psychological evaluations available to minors in ORR care, and the procedures and considerations for requesting these evaluations. These evaluations aim to identify or clarify diagnoses relating to a minor's mental health or intellectual functioning to allow programs to provide them the best support available.

## Reporting

ORR revised its Serious Incident Report (SIR) reporting process as part of ORR's ongoing efforts to timely respond to emergency incidents and ensure the safety and wellbeing of minors in ORR custody; this includes additional SIR categories for more accurate record keeping and revised procedures for report of Emergency SIR's. Under the revised guidance, Emergency SIR's are now elevated to the FFS Supervisor, who are often in a better position to address the immediate needs of the minors, rather than the ORR Intakes Hotline. The ORR Policy Guide Section 4.10 and 5.8 (and accompanying sections in the MAP), included major revisions that imposed more stringent reporting timelines. The policies provide additional clarification for supervisors and staff in the form of visual charts with reporting requirements based on particular types of events that may occur involving minors in ORR custody.

## Staffing

The influx of minors being referred to ORR and the changing demographics of those minors referred have created additional challenges for care providers that ORR has addressed through the institution of new field guidance's. In March 2022, ORR issued revisions to Field Guidance #22: Interpreters Working with the Unaccompanied Children (UC) Program as new preferred languages of minors in ORR custody are identified. To aid these efforts. This guidance outlines the minimum requirements for interpreters working with unaccompanied minors and UAM, inclusive of Operations Allies Welcome, EIS, and standard ORR care provider programs. Field Guidance #22 allows for the Interpreter Agreement to be signed by an interpreting company on behalf of its staff and clarifies that an Agreement is not required for Interpreters hired by third-party service providers. It allows for Interpreters with pending background checks to work with minors under direct line-of sight supervision by ORR or care provider staff. ORR has also offered interpretative guidance to clarify the circumstances under which ORR may permit staff or volunteers who have not yet completed background checks to have access to ORR care providers and supervised limited access to minors. In addition, in March 2022, ORR issued Field Guidance #23: Volunteers Working with Unaccompanied Children (PDF) ORR Agreement with Volunteers which creates a Volunteer Agreement Form and offers guidance on minimum requirements for volunteers working with minors.

## COVID-19

In January 2022, ORR issued revisions to Field Guidance #17: COVID-19 Vaccination of Unaccompanied Children (UC) in ORR Care. Recognizing that developments have occurred since January 2022, Field Guidance #17 is currently undergoing revisions. This guidance includes updates on internal procedures and external communications to acknowledge the newly available pediatric Pfizer vaccine for COVID-19. This revised guidance includes recommendations regarding vaccine boosters for all minors who have completed the primary vaccination series, an additional dose for immunocompromised minors, and updated language on isolation, quarantine, masking, and testing for vaccinated minors. A new handout was also released offering instructions for sponsors on obtaining the new vaccine for a minor in their care, with translations provided in Dari, Pashto, and Spanish.

Measles

UAM entering the U.S. after October 8, 2021 no longer require precautionary quarantine for measles, as all minors six months or older should have received the Measles, Mumps, and Rubella (MMR) vaccine.

# Juvenile Coordinator Site Visits

During the annual reporting period, the Juvenile Coordinator conducted site visits at thirteen ORR facilities; including EIS, ICF, RTC, Secure, and licensed shelter facilities. The purpose of these site visits was to:

a) Review, assess and report to ORR on ORR's compliance with the Court's 2017 and 2018 Orders, and explain any reasons for substantial noncompliance, to include:

- Visiting ORR-funded facilities, interviewing minors at such facilities, interviewing ORR staff, and reviewing data; and

- Making recommendations to ensure compliance within ORR

b) Perform any functions as ordered by the Court

c) Respond to concerns raised by Plaintiffs' counsel related to the FSA

## ICF/EIS Site Visit Tour

The following summaries are from the site visits conducted by the Juvenile Coordinator, at the one (1) ICF and seven (7) of the EIS facilities that were operational in the state of Texas and California during the annual reporting period:

1. **MIDLAND EIS** (Midland, TX):
   **June 2, 2021**

   This EIS had friendly staff and a very child-friendly environment. Also, this facility housed tender-aged minors. During a tour of this facility, it appeared the minors had ample room and a large bed in each bedroom. The Juvenile Coordinator interviewed six minors at this facility with their main concerns pertaining to the food. There were some concerns expressed by the minors regarding improvements in communication with their case managers and variety of food that the Juvenile Coordinator discussed with program management.

   Midland EIS staff reported having challenges in transporting the minors. However, better communication with the transportation contractor and this EIS rectified this issue.

   At the time of the site visit, no individual counseling was provided for minors at this facility; however, they indicated there were a sufficient number of case managers assigned at the facility. All of the minors interviewed reported they were provided excellent medical services.

33

The Juvenile Coordinator met with the onsite Lead Case Manager and Clinician, the Chief Medical Officer and Nursing Officers, and the Supervisory Youth Care Worker. The concerns raised by the minors interviewed were addressed with this staff for process improvement.

2. PECOS EIS (Pecos, TX):
   **June 3, 2021**

This EIS appeared well-organized with adequate protocols in place for masking and adherence to entry regulations pertaining to COVID-19.

The Juvenile Coordinator interviewed six minors and met with the onsite FFS. All of the minors interviewed advised they liked the food and the recreational activities. All of the minors reported they received excellent medical care and good overall treatment by staff as well. A main concern expressed by the majority of minors interviewed was the lack of robust case management services.

One of the minors interviewed had a significant speech impediment and would have been better served if he were placed in a licensed shelter provided this did not delay his reunification, which was conveyed by the Juvenile Coordinator to program management and ORR field staff; in addition to recommending the minor be allowed to extend his weekly allotted 10-minute phone calls.

The program responded favorably to the feedback provided as the program immediately discussed proposed operational improvements during the meeting. The program also confirmed that several suggested changes were implemented over the next few days.

3. CARRIZO SPRINGS ICF (Carrizo Springs, TX)
   **June 5, 2021**

Carrizo Springs ICF was the only Influx Care Facility (ICF) operating within the ORR licensed care network during the annual reporting period. The facility appeared to be child-friendly and had robust recreational and educational activities implemented. The Juvenile Coordinator interviewed six minors at this facility.

The minors interviewed advised they were treated very well by staff, and they enjoyed the food as well. However, all of the minors expressed a desire for a more relaxed schedule. In particular, the minors preferred a reduction in the number of days they were expected to participate in educational services, which was scheduled for every day of the week.

The fire department in this facility offered minors training for those who were interested in learning more about fire safety. At the time of the site visit, the Juvenile Coordinator was able to observe a graduation ceremony for the minors who had completed this training. The Juvenile Coordinator also observed that interactions between staff and minors were positive.

4. DIMMIT EIS (Carrizo Springs, TX)
   **June 6, 2021**

The Juvenile Coordinator interviewed six minors at this facility. The minors advised they received excellent medical treatment and appreciated the communication with their case managers even when there was nothing new to report. The minors highlighted that case managers adhered to a meeting

schedule with them which was very helpful and assuring. The minors advised they felt valued as the Case Manager served as a "lifeline" to the sponsor vetting process and ultimately the goal of reunification.

A tour of the facility revealed a pleasant community-type setting, with the sleeping areas resembling the housing style frequently found in some Hispanic cultures (front doors opening to a covered patio where socializing occurs). However, some of the common spaces in the facility (cafeteria and educational area) lacked minors' artwork and thus these spaces appeared less child-friendly.

The Juvenile Coordinator and the onsite staff discussed their ongoing efforts to address concerns pertaining to the safety protocols at building entryways (i.e., ensuring proper hand sanitizing prior to entering the cafeteria) in addition to providing proper food allergy labels/alerts for those minors with potential food allergies. Additionally, there was no television in any of the areas which was difficult for some of the minors due to them feeling disconnected from the world.

The Juvenile Coordinator discussed these concerns with program management as noted above who responded favorably to making the necessary improvements.

5. **FT. BLISS EIS** (El Paso, TX)
   **June 8, 2021**

   Ft. Bliss was the largest of all EIS facilities. The Juvenile Coordinator interviewed six minors at this facility. All minors reported the conditions at Ft. Bliss were much better than at CBP. However, some of the minors interviewed appeared to be despondent and anguished due to the lack of sufficient communication with their Case Manager. As a result, some of the female minors interviewed advised they suffered from severe anxiety attacks.

   The Juvenile Coordinator addressed the concern of cramped sleeping quarters with no pod-like structuring that would otherwise provide the minors with a sense of community. Some of the cot-like bunk beds were not sufficiently stable and the living and sleeping quarters did not appear conducive to providing a healthy environment for the minors. Furthermore, some of the minors were observed to be asleep or idle during the mid-morning tour.

   At the time of the site visit, the educational services at Ft. Bliss were minimal, as well as the recreational activities that were still being enhanced. Clinical services were available to the minors, however only for crisis management.

   The Juvenile Coordinator discussed the concerns cited above with program management. Staff were responsive to the feedback and assured the Juvenile Coordinator that improvements were actively underway. In the following months, the Juvenile Coordinator tracked these improvements, noting that the bunk beds were replaced with more stable beds and educational services were established. The program improved sufficiently to achieve conversion from an EIS to an ICF on May 30, 2022.

6. **DELPHI EIS** (Donna, TX)
   **June 9-10, 2021**

   The Juvenile Coordinator interviewed six minors at this facility and conducted a tour that revealed a tent-like facility that incorporated a pod-style environment. Pods were filled with valuable

information on day-to-day activities that were posted on the walls. Also, there were sofas and chairs in a living room setting where minors could congregate to watch television or participate in other activities. The bunk beds were stable and clean. The facility appeared to promote a healthy environment for the minors and there was artwork displayed by the minors on many of the common walls as well as in the cafeteria setting.

There were designated telephone rooms for minors to meet with their case managers and clinicians in private, as well as to call their family and/or sponsors.  Medical areas were located throughout the facility and minors spoke of the excellent medical care they were provided while at Delphi. Recreation and educational services were robust at Delphi EIS and were some of the best seen at the EIS toured by the Juvenile Coordinator. Case management services were in place, and case managers were holding regular visits and appointments with the minors, which they appreciated.

The Juvenile Coordinator met with the assigned FFS and program management team who were amenable to the feedback provided.

7. **LACKLAND EIS** (Lackland, TX)
   **June 11, 2021**

The Juvenile Coordinator interviewed six minors at this facility. At the time of this site visit, the process to de-mobilize Lackland EIS was already underway; thus, there were very few minors in care. Subsequent to this site visit, the remaining minors were transferred to licensed shelters or were re-unified with their sponsor.

All of the minors reported they received good medical care and overall treatment by staff. Although the minors understood the facility was closing, some of them still expressed a feeling of being left behind as many of their friends had already been transferred and/or reunified.

Lackland EIS maintained a two-team FFS approach to the operations/management of this site, which undoubtedly contributed to the success and the valued treatment the minors reported receiving from all staff.

8. **POMONA EIS** (Pomona, CA)
   **August 10-11, 2021**

The Juvenile Coordinator interviewed eight minors at this EIS facility with the Special Master observing some of the interviews with the minors. All minors reported making a good adjustment and felt welcomed by staff.

Educational services were provided to minors three times per week with English as the primary subject.  Recreational activities were also provided to the minors with access to a large outdoor soccer field that could be divided to accommodate several groups of minors at any given time. The indoor activities included reading, playing board games/cards, and arts and crafts.  Most minors advised they preferred to play outdoors, however, some felt that outdoor recreational activities were not provided as often as they would like.

All of the minors reported they received good medical care. The minors all reported the food was good and plenty and enjoyed the variety of meals served. All minors reported that they received

sufficient clothing, and all were given sufficient hygiene products to maintain good hygiene. All minors reported that their cots, bedding and sleeping quarters were more than adequate. Phone calls to either the minor's family in home country or to their sponsor in the U.S. were made within the first 24 hours of arrival.

Case management services were a main focus at Pomona EIS. Some minors advised they met with their case manager within two days of their arrival, while others advised it took several days before meeting with a Case Manager. All minors reported that they met with a Clinician shortly upon their arrival and could see a Clinician as needed. All minors reported that it was helpful to talk to a Clinician and was beneficial in helping them remain patient during the reunification process.

There were minors arriving at the end of the day and the transition of minors from the buses to the various stations were well coordinated. During a tour of the facility areas/grounds, the Juvenile Coordinator observed barbers providing haircuts to the minors in two mobile vans, which was a popular service and a good way for minors to socialize with others while waiting for a haircut and listening to music of their choice. The mobile barber vans frequented the facility on a weekly basis.

The Juvenile Coordinator met with ORR field staff and program management to discuss feedback from the minors interviewed as well as other site visit observations. The concerns with case management were discussed with staff who advised they were working hard to improve these services. The care and treatment of minors was evident in the conversations had with them as many expressed their appreciation for the staff's kindness and support. Overall, the care and treatment of minors was conducted exceptionally well at this facility.

### Site Visits at ORR Licensed Care Providers

The following summaries are from the site visits conducted by the Juvenile Coordinator, at four (4) ORR licensed care provider facilities that were operational during the annual reporting period:

1. **SHENANDOAH VALLEY JUVENILE CENTER** (Staunton, VA)
   **October 19, 2021**

   The Juvenile Coordinator conducted a one-day site visit at Shenandoah Valley Juvenile Center (SVJC). Due to the health and safety concerns surrounding the COVID-19 pandemic, the Juvenile Coordinator received a modified tour of the facility, and the minors were interviewed in a private setting. The Juvenile Coordinator met with program management at the facility to discuss issues/concerns related to the COVID-19 pandemic as well as any challenges with step-down to lower levels of care.

   The Program Director at SVJC advised that the facility had been impacted greatly with staffing shortages due to COVID-19.  At the time of the site visit, the facility's UC Program was understaffed by 16 positions. The staffing shortages resulted in a temporary stop-placement which began on September 8, 2021. At the time of the site visit, staff retention and recruitment efforts were paramount, with the program offering competitive salaries, and SVJC was doing all they could to attract qualified applicants. Although much of the hiring problems were attributed to COVID-19, some staff resigned after being a subject of problematic behavior by minors at the facility (domestic and unaccompanied minors). The Director advised that the ORR field staff assigned to the program were extremely supportive during the stop placement; however, the Program Director welcomed

additional support in handling their staffing shortages. One of the concerns raised was the desire for a more streamlined process to accomplish efficient step-down to a less restrictive facility. Some suggestions that the Program Director included establishing a warm transfer to a step-down facility to better help prepare minors for their new placement and encouraging communication across ORR programs.

At the time of the site visit, there were no recent outbreaks of COVID-19 with minors in-care nor with staff and staff were diligent in adhering to masking and social distancing requirements as well as with other preventative measures.

2. **YOUTH FOR TOMORROW SHELTER AND RTC** (Bristow, VA)
**October 20-21, 2021**

A site visit was conducted by the Juvenile Coordinator at the Youth for Tomorrow Shelter and RTC. The purpose of these site visits was to conduct interviews with minors in-care, including those from Afghanistan.  The site visit included a tour of the facility and meetings with ORR federal field staff and program management team.

Program management noted that following the various field guidance's recently issued by ORR was challenging. Therefore, the program developed charts to compile and break down the material which was helpful to case managers. The program management team reported that releases occurred in an expedited fashion and that they were working as expeditiously as possible, while taking all precautionary measures to ensure a safe and timely release.

The Juvenile Coordinator interviewed nine minors, two of whom were UAM at Youth for Tomorrow Shelter. A language line was used as the primary method of communication when interviewing the Afghan minors. The program management team advised the Afghan minors had trouble adjusting to the new environment and the case management team was working hard to address this concern.

Many of the beds were reserved for tender-aged minors who required immediate placement; however, there were no tender-aged minors at this facility at the time of the site visit. The facility also maintained a reserve of available beds for quarantine and isolation of Afghan minors due to a measles outbreak.

All minors interviewed advised they received a warm welcome with emphasis on the good care they received. The minors interviewed appeared to have clean clothing and good hygiene, and they all launder their own clothing.  All the minors advised receiving good medical care and treatment.

The minors commented that the food was good and had no complaints. However, some minors advised the serving sizes were too small and expressed a preference for more ethnic foods from their countries of origin. In addition, all minors advised they enjoyed the educational program at the shelter and were learning new material daily.

The Juvenile Coordinator conducted a tour of the facility which provided an opportunity to see the improvements being made through remodeling the common living spaces into a more home-like environment. The bedrooms were clean, and it was obvious the staff and minors took pride in cleanliness and in caring for the outdoor areas, which had green grass, flowers, and plenty of open

space available.  The kitchen was clean and orderly, and staff were teaching some of the minors how to work in the kitchen with food preparation for those who expressed an interest in learning.

The two Afghan minors were interviewed with the assistance of a Pashtu interpreter via telephone. The two minors interviewed were cousins who arrived at the facility together. They indicated they had no family nor close friends in the U.S. that they could trust to sponsor them. The minors did not know their birthdays nor their ages.  Both minors advised they were well-cared for and felt welcomed at the shelter. The minors advised they received all the food and water needed; although, they would have preferred to eat only their own halal food that was served to them.  Due to the food not being hallah, they usually ate breakfast and dinner but skipped lunch and ate only food items such as fruit or rice which are halal permissible.  The minors advised of their main complaint which was to have a razor provided to them as this was required of them to remove their unwanted hair every 40 days due to their Muslim religious beliefs. The Juvenile Coordinator discussed these concerns further with the program management team and the ORR federal staff subsequent to this site visit.

The minors advised that school time is one of their most interesting and productive times of the day. The minors enjoyed learning and were still able to learn despite the language barriers (as lessons were taught in English), as they did not have access to an interpreter during school hours. They advised that the school was better here than in Afghanistan where they were speaking and learning in Pashtu with only some English being introduced.

The minors advised their health remained in good condition and they immediately received vaccinations upon their arrival to the U.S. The minors interviewed were given medication for a vitamin deficiency, but thought they were doing well now, and advised of no other problems with regard to medications that were administered.

The minors advised they met with their Case Manager frequently who kept in touch with their family in Afghanistan. The Case Manager was trying to obtain certifications pertaining to their birthdate and other required documents. The minors advised they did not want return to Afghanistan under any circumstances, and that their desire was to be released to a foster family. The minors enjoyed being outdoors and wanted the opportunity to continue their studies in a real school setting.  They knew their Case Manager was working on getting them both discharged to a foster family and expressed that it was very important for them to not be separated.

The minors advised they were provided religious services which was very much a part of their lifestyle/religion and liked being taken to the local Mosque every Friday. The minors were very grateful to the Afghan community members who would come to visit. They advised they wanted to continue to meet with Afghan members of the community to help them learn more about American culture.

The Juvenile Coordinator discussed all of the concerns presented by the UAM in-care with the assigned ORR field staff subsequent to the interview for process improvements.

Youth for Tomorrow RTC demobilized in October 2021.

3. **SWK Estrella** (Tucson, AZ)
**March 14-15, 2022**

The Juvenile Coordinator interviewed ten minors at this facility. All of the minors advised receiving good medical care and overall treatment by staff and felt safe and secure from the onset of their arrival. The minors all advised they received plenty of food and water to drink.

The minors advised they enjoyed the recreational activities as well as the educational services that were provided at this shelter. The minors reported they had sufficient time to shower, and all received the necessary hygiene products.

Overall, the minors appeared happy to be at this shelter and had few complaints. The minors felt that staff were truly happy to care for them as evident by their demeanor and daily interactions with them.

Case management services were robust with two case management teams working various hours to expedite the reunification process.

According to the minors interviewed, the staff put forth a lot of effort in making them feel comfortable in their transition while still honoring their cultural customs and traditions. For example, the shelter offered Ethnic food options and other cultural activities to lessen their feelings of being homesick.

The Juvenile Coordinator met with the assigned ORR field staff and program management to discuss some of the concerns related to staffing. For instance, the clinical team was significantly understaffed and had been operating without a Lead Clinician for quite some time. The need to hire additional clinicians to keep pace with the increased number of minors who arrived daily was necessary. Additionally, the Juvenile Coordinator discussed the concerns presented by minors and staff for process improvement. Subsequently, a de-briefing was held with the assigned ORR field staff who advised the hiring and training of clinicians had greatly improved since the time of the site visit.

4. **Gwen Mikeal Village** (Tucson, AZ)
**March 21-22, 2022**

This shelter housed females only between the ages of 5 to 17 years old. The Juvenile Coordinator interviewed eight minors and met with program management. The facility was comprised of two components, situated a few miles apart.

Much of the challenges faced at this facility were the staffing shortages due to the COVID-19 pandemic. However, at the time of this site visit, the shelter was fully staffed. Minors were transported several times a day from one housing component to the other for school and recreational purposes.

During the tour, the Juvenile Coordinator observed limited space for recreational activities at both facilities. However, program management confirmed the minors were still able to play soccer and other sports.

Some minors advised they volunteered to do chores and tasks such as light housekeeping in common areas as well some meal prepping, all of which served as life skills that minors were interested in learning. The minors advised they were treated well by staff and felt well-cared for at this shelter. The minors also advised they liked their rooms as well as the educational services offered. All minors

40

advised they received good medical care and treatment by staff and were explained the reasons for taking any medications that were prescribed. Additionally, the one pregnant minor interviewed advised she was doing well and had been receiving excellent medical care. At the time of this site visit, she was awaiting an ultrasound which was scheduled soon after her arrival at the facility.

Both of the facilities were exceptionally clean. The minors reported they had sufficient time to shower, and all received the necessary hygiene products. The minors advised they would like to have more recreational equipment, toys and items, and more outings to nearby parks and other outdoor activities.

The Juvenile Coordinator met with program management and ORR field staff to discuss the concerns presented by the minors and staff interviewed for process improvement.

## Summary

The undersigned respectfully submits this report to the Court pursuant to the Court Orders as previously stated above. The Juvenile Coordinator will continue to work independently and with the Special Master, Ms. Andrea Sheridan Ordin, to assure adherence to the FSA.

## Field Guidance Appendix

Field Guidance #6: COVID-19 Intake Procedures for Unaccompanied Children Newly Admitted into ORR Custody........................ pg.7

Field Guidance #19: Unaccompanied Afghan Minor Processing............................. pg.16

Field Guidance #22: Interpreters Working with the UC Program........ pg.16,25

ORR Policy Guide Section 2.2.3...................................................................... pg.21

Field Guidance #18: Expansion of Long-Term Foster Care Eligibility....... pg.21

Field Guidance #20: Home Study Processing.... pg.23

Field Guidance #5: Home Study/Post Release Services COVID-19 Practice Guidance....... pg.23

Field Guidance #16: Clarification That the Individual Service Plan (ISP) and the UC Case Review Are Generally Not Required for UC Placed at Emergency Intake Sites (EIS)................. pg.23

Field Guidance #21: Compliance with Garza Requirements for Pregnant UC in Texas.......... pg.24

Field Guidance #23: Volunteers Working with UC....... pg.25

Field Guidance #17: COVID-19 Vaccination of UC in ORR Care.......... pg.25