BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
FIZZA BATOOL
Trial Attorney
District Court Section
Office of Immigration Litigation
    P.O. Box 868, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 532-4824
    Fax: (202) 305-7000
    Email: Sarah.B.Fabian@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544 |
| Plaintiffs, | **DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO ORR JUVENILE COORDINATOR'S ANNUAL REPORT [ECF No. 1269]** |
| v. | |
| MERRICK GARLAND, Attorney General of the United States; *et al.*, | |
| Defendants. | |

On July 1, 2022, the ORR Juvenile Coordinator filed her annual report (ECF No. 1259-3) ("ORR JC Report"), as required by Paragraph 30 of the *Flores* Settlement Agreement ("Agreement") and recent orders of this Court. FSA ¶ 30; ECF No. 1253. On July 15, 2022, Plaintiffs filed a response to the ORR Report. ECF No. 1269 ("JC Response").

As Plaintiffs' note in their JC Response, following the filing of the ORR JC Report Plaintiffs emailed Defendants raising the question of "why, according to the report, children are being placed in unlicensed Emergency Intake Sites (EIS) and Influx Care Facilities (ICF) when ORR appears to have more than enough available shelter beds to accommodate all these children." JC Response at 3. On July 15, 2022, the parties met and conferred to address Plaintiffs' question. *Id.*

On that meet and confer Defendants explained to Plaintiffs the extensive and complicated decision-making process that goes into ORR's allocation of bed space and initial assignment of children to various facilities following their apprehension at the U.S. border. However, despite claiming on the call to find ORR's explanation persuasive, Plaintiffs nonetheless proceeded to file the JC Response in which they state that they "remain concerned" about ORR's decision-making and reiterate the same claims—evidencing a fundamental misunderstanding of ORR's operational processes—that were discussed on the meet and confer. To remedy their own failure to understand or address the evidence presented by ORR, Plaintiffs then ask the Court to add still more reporting onto the increasingly burdensome interim reporting that ORR is already providing on a schedule that is over and above the reporting requirements contained in the Agreement. Defendants respectfully ask the Court to deny Plaintiffs' request to add additional burdensome reporting requirements to the Juvenile Coordinator's interim reporting—reporting that is, in any event, supposed to be based solely on issues related to COVID-19—simply because Plaintiffs seek to oversee and second-guess ORR's operational planning and obtain reporting to which they are not entitled under the Agreement.

To assist the Court to understand the complex nature of ORR's operational decision-making which Plaintiffs' JC Response fails to acknowledge or address, ORR provides the following further response to the unfounded "concerns" raised by Plaintiffs. At base, Plaintiffs' misunderstanding arises because they focus entirely on the numbers provided in various ORR reports, and fail to consider or address the context in which those numbers arise and the corresponding significant on-the-ground changes in operational considerations with which ORR has had to contend.

First, as ORR has repeatedly explained, reporting at any given moment is a snapshot of the numbers as they appear at that moment in time. The numbers Plaintiffs are looking at are pulled at different times of the year on the reporting schedule directed by the Court (Oct 2021, Jan 2022, April 2022, and May 2022). These numbers are not always directly comparable without taking into account factors—discussed in more detail below—that might affect migration as well as other operational circumstances that might affect the reporting at any given time.

Plaintiffs propose that because the numbers Defendants are providing may not give the full picture, Defendants should be ordered to provide monthly average occupancy numbers. But Defendants have already sought to explain the effect of various factors on the numbers that Plaintiffs do have, and Plaintiffs have made no effort to account for the explanation they have received. The problem is not the numbers, but rather Plaintiffs' failure to consider them in the context of these factors that provide a more complete picture. Plaintiffs should, at a minimum, be required to account for the information they have already received from ORR in asserting their continuing "concerns" over ORR's decision-making process before they ask the Court to turn the burden onto ORR to provide additional reporting with no clear explanation as to its purpose.

Second, as ORR explained extensively at the meet and confer, significant factors have influenced ORR's decision-making regarding the placement of children who are transferred into ORR custody into various facilities over the time period at

issue. Plaintiffs entirely fail to address the potential impact of these factors on ORR's decision-making, or to explain why ORR's explanation regarding its need to consider these factors does not resolve their "concerns." We discuss a number of these factors below.

     Notably, one significant factor that has influenced ORR's decision-making in more recent months is ORR's response to a widely-shared concern—raised by this Court several times at recent status conferences—that ORR might see a significant increase in children transferred to its custody and therefore needs to plan accordingly. Factors giving rise to this concern include the possible termination of Title 42 in May 2022 (until it was enjoined); cyclical increases in UC arrivals through the Spring and Summer; fluctuations in COVID-19 infections due to more contagious variants (i.e., BA.5); and widely-reported projections from DHS which warned of a possible historically high number of arrivals. ORR has to plan for a potential increase in UC referrals by evaluating not only the number of beds currently available in each type of facility (licensed or EIS/ICF), but also the numbers and types of beds that will be needed over the coming days and weeks as the (currently unknown) numbers and categories of UC who arrive at the border continuously fluctuate. Thus, the numbers about which Plaintiffs raise vague and undefined "concerns" based only on their observation that the numbers have changed over time are more accurately evaluated by seeing them as studied and educated estimates by ORR as to its changing future needs for available licensed beds over a particular time period given a wide variety of factors.

     A second factor that has affected ORR's decision-making over time is the EIS settlement reached between ORR and Plaintiffs this Spring, which requires ORR to prioritize the placement of particularly vulnerable children into licensed facilities upon their transfer to ORR. *See* Proposed EIS Settlement, ECF No. 1256-1, at 2 ("WHEREAS the Parties agree that particularly vulnerable children, including children 12 years old and younger and children with special needs, should receive

3

priority for licensed placement and should not be placed in an EIS unless no licensed beds are available, and the only alternative is for the child to remain in CBP custody for an indeterminate period of time[.]"); *see also id.* at 7, § III.A.i,v (defining "particularly vulnerable children" to include "children 12 years of age or younger", "children who are not proficient in English or Spanish", "children who have a known disability or other mental health or medical issue requiring additional evaluation, treatment, or monitoring by a healthcare provider", "pregnant or parenting teens", and "children who are at a documented enhanced risk due to their identification as lesbian, gay, bisexual, transgender, questioning, or intersex (LGBTQI)"). ORR cannot foresee the volume of children who will arrive in the future or anticipate the percentage of those arrivals will be designated particularly vulnerable children. Therefore, ORR has had to make educated estimates as to the number of licensed beds that must be kept open and available to ensure compliance with this term of the EIS settlement agreement.[1] It is also worth noting that pregnant children are considered particularly vulnerable children under the EIS settlement agreement, and thus settlement considerations, along with recent actions by state governments and the U.S. Supreme Court, have further influenced ORR's decision-making so that it can keep appropriate licensed placements open and available for a pregnant child who may need access to medical care.

Finally, and relatedly, a third factor ORR has had to consider is the closing of EIS facilities over time. ORR has increasingly relied more on licensed shelter beds

---

[1] To the extent Plaintiffs now seek to allege that ORR's actions to implement the EIS settlement are themselves a violation of the Agreement, it would seem that final approval of the EIS settlement should not proceed until such concerns about its implementation—concerns that were not raised by Plaintiffs during settlement negotiations—are resolved. *See* JC Response, at 2 (raising Plaintiffs' "serious concerns that children are not being placed in licensed placements 'as expeditiously as possible'" in violation of ¶ 12.A.).

as it has moved to close EIS facilities. The below chart compares the number of filled shelter beds to the number of filled EIS/ICF beds:



As the chart shows, since May 31, 2021, ORR has consistently held far more children in licensed beds than EIS/ICF beds at a given time and has continued to reduce the numbers of EIS/ICF beds in use. Moreover, according to the data in the May 2022 Monthly Report that Plaintiffs' counsel received from ORR in June, there were approximately 12,497 UC referred to ORR in May 2022. Of the 12,497 referrals: 6065 (49%) were placed in shelters and 5,362 (43%) were placed in EIS/ICF. While the difference may appear slight, it shows that ORR is favoring placement in shelters over placement in EIS/ICF, even when the total number of placements in a month is considered. The fact that significantly more children remained in licensed facilities than in EIS/ICF facilities at the end of May 2022 also further confirms that ORR is moving the children placed into EIS/ICF facilities out of those facilities either through transfer or release at a faster rate than for children in licensed facilities.

Additionally, ORR is in "influx" status due to the high overall numbers of children in its care, which is what permits it to operate EIS and ICF facilities at all. While more EIS facilities were in operation, and before the parties agreed to greater

restrictions on which children could be placed at an EIS, ORR had more "wiggle room" to manage capacity by placing children in EIS facilities. ORR uses the EIS facilities to manage capacity by placing at EIS facilities children who are not particularly vulnerable and who appear likely to be eligible for a relatively quick release to a parent or other relative sponsor, preserving licensed space for more vulnerable populations based on its best estimates of the future needs for such placements. Because ORR has closed several EIS and ICF facilities, ORR's operational "wiggle room" and ability to use EIS facilities for all populations began shrinking in the Fall 2021. This has required ORR to preserve additional available licensed capacity to ensure availability for those who need it. The table below attempts to detail this change:

| Date Bed Data Retrieved | % Available Shelter Beds Occupied | % Available Shelter Beds Unoccupied | EIS/ICF in Operation |
|---|---|---|---|
| May 2021 | 92% | 8% | San Diego, Starr, Midland, Dimmit Delphi, Lackland, Fort Bliss, Pecos, Long Beach, Carrizo Springs |
| July 2021 | 89% | 11% | Starr, Pomona, Fort Bliss, Pecos, Carrizo Springs |
| August 2021 | 87% | 13% | Starr, Pomona, Fort Bliss, Pecos, Carrizo Springs |
| October 2021 | 90% | 10% | Starr, Pomona, Fort Bliss, Pecos, Carrizo Springs |
| January 2022 | 83% | 17% | Starr, Fort Bliss, Pecos, Carrizo Springs |
| April 2022 | 79% | 21% | Fort Bliss, Pecos |
| May 2022 | 62% | 38% | Fort Bliss, Pecos |

Thus, considering all of the above factors, and as part of the very preparations for a potential surge in migration which this Court urged ORR to take, ORR determined over more recent months that it needed to create a buffer of available beds that will allow ORR to strategically prioritize the placement of particularly vulnerable children and those who are likely to need longer term ORR custody into licensed beds. ORR therefore places a percentage of eligible UC in EIS/ICF (now only ICFs) so that it can accommodate the unknowable volume of more vulnerable children that can suddenly arrive and fill those shelter beds in mere days. As an

example if, in May 2022, ORR placed all of the 5,362 UC who were referred to EIS/ICF facilities into licensed shelter beds instead, by May 31, 2022, ORR would still have 3,336 UC occupying those beds leaving ORR with only 490 shelter beds unoccupied. And, when the 1,328 UC that arrived from June 1 to 4, 2022 were transferred into ORR custody, ORR would have no choice but to place approximately 838 of them (not accounting for any beds opened by discharges in the same time period) in EIS/ICF irrespective of whether they were particularly vulnerable children or otherwise required a licensed placement.

All of the above shows why it is impossible, and even dangerous, to assess ORR's operational decisions regarding the reservation of available licensed beds based on numbers alone. ORR is constantly having to make educated estimates as to its future needs based on all of the factors discussed above as well as any other unanticipated issues that may arise in the future. Plaintiffs have either ignored or failed to understand ORR's attempts to explain the many factors that go into its decision-making that led to the numbers that, on their face, raise "concerns" for Plaintiffs. But Plaintiffs' failure to consider and address these many factors means that Plaintiffs' "concerns" are nothing more than vague assertions unsupported by any facts or actual evidence of noncompliance by ORR, and thus Plaintiffs have provided no reason why this Court should impose additional burdensome reporting requirements on ORR.

///

///

///

DATED: July 27, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
FIZZA BATOOL
Trial Attorney
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2022, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ *Sarah B. Fabian*
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

Attorney for Defendants